1  DANIEL E. LUNGREN, Attorney General
   of the State of California
2  GEORGE WILLIAMSON, Chief
   Assistant Attorney General
3  JOAN W. CAVANAGH (#56708)
   KARL S. MAYER (#38896)
4  ISMAEL CASTRO (#85452)
   Deputy Attorneys General
5  455 Golden Gate Avenue, Room 6200
   San Francisco, CA 94102
6  Telephone No. (415) 703-2841

7  Attorneys for Defendants Wilson,
   Sandoval, Gomez, Khoury and Zil

8

9              UNITED STATES DISTRICT COURT

10             EASTERN DISTRICT OF CALIFORNIA

11

12  RALPH COLEMAN, et al.,            )   No. CIV S-90-0520 LKK (JFM)
                                      )
13           Plaintiffs,             )   DEFENDANTS' TRIAL BRIEF
                                      )
14      v.                            )
                                      )
15  PETE WILSON, et al.,             )
                                      )
16           Defendants.            )
    _____)

17

18

19

20

21

22

23

24

25

26

27

28

358

## TABLE OF CONTENTS

Page

INTRODUCTION                                                          1

    A.   Nature Of This Action.                            1

    B.   Plaintiffs' Class.                                1

    C.   No Definition Of SMD.                             2

    D.   The Defendants.                                   2

    E.   The Constitutional And Statutory Positions Of The
        Plaintiffs.                                       2

    F.   The Positions Of The Defendants.                  2

I.   EIGHTH AMENDMENT CULPABILITY REQUIRES PROOF OF
    OBJECTIVE DEFICIENCIES AND SUBJECTIVE "DELIBERATE
    INDIFFERENCE."                                        8

II.  UNDER ESTABLISHED PRINCIPLES OF EIGHTH AMENDMENT
    JURISPRUDENCE, THE COURT IS LIMITED IN ITS REVIEW OF
    ALLEGATIONS OF CRUEL AND UNUSUAL PUNISHMENT.         10

    A.   The Eighth Amendment May Not Be Used To "Do Good" By
        Imposing Intrusive Reforms.                      10

    B.   Remedial Orders Are Subject To "Close Scrutiny" On
        Review.                                          12

    C.   Eighth Amendment Standards For Medical Care In
        General, And Mental Health Services In Particular,
        Are Below General Medical Standards, Including
        Malpractice Standards.                           13

    D.   Expert Opinion And Organizations' Standards Are
        Not Constitutional Minima.                       16

    E.   The Eighth Amendment Does Not Guarantee
        Rehabilitation.                                  17

    F.   It Is Legitimate For the Defendants And The Court
        To Recognize Fiscal Restraints.                  18

    G.   Current Conditions Necessarily Carry More Weight
        Than Past Anecdotes.                             19

III. DEFENDANTS HAVE IN PLACE A SYSTEM FOR THE DELIVERY OF
    MENTAL HEALTH CARE TO PRISONERS THAT MEETS OR EXCEEDS
    RECOGNIZED SYSTEMIC CONSTITUTIONAL MINIMA.           22

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.   PLAINTIFFS' ALLEGATIONS UNDER 29 USC § 794 ARE
      INSUFFICIENT AS A MATTER OF LAW.                          24

CONCLUSION                                                      25

1

# TABLE OF AUTHORITIES

2

<u>Cases</u>                                                                    <u>Page</u>

3

4  *Alabama v. Pugh*
   438 U.S. 781, 57 L.Ed.2d 1114 (1978)                                    18

5

   *Balla v. Idaho State Board of Corrections*
6  869 F.2d 461, 469-470 (9th Cir. 1989)                                18, 23

7  *Bell v. Wolfish*
   441 U.S. 520, 562, 60 L.Ed.2d 447 (1979)                                10

8

   *Bowring v. Godwin*
9  551 F.2d 44, ____ (4th Cir. 1977)                                    13, 18

10 Bowring v. Godwin
   551 F.2d 44, 47 (4th Cir. 1977)                                         18

11

   *Brill v. Brown*
12 867 F.2d 956 (6th Cir. 1989)                                            18

13 *Capps v. Atiyeh*
   559 F.Supp. 892, 916-921
14 (D. Ore. 1982) (Supp. Opin. 1983)                                   13, 17

15 *Carter v. District of Columbia*
   795 Fed.2d 116, 123 (D.C. Cir. 1988)                                    20

16

   *County of Los Angeles v. Davis*
17 440 U.S. 625, 643, 59 L.Ed.2d 642 (1979)                                20

18 *Estelle v. Gamble*
   429 U.S. 97 (1976)                                                 8, 9, 13

19

   *Gilday v. Boone*
20 657 Fed.2d 1 (1st Cir. 1981)                                            20

21 *Golden v. Zwickler*
   394 U.S. 103, 108, 22 L.Ed.2d 113 (1969)                                19

22

   *Green v. Mausour*
23 474 U.S. 64, 71-73, 88 L.Ed.2d 371 (1985)                              20

24 *Gregg v. Georgia*
   428 U.S. 153, 173 (1976)                                                 8

25

   *Hoptowit v. Ray*
26 682 F.2d 1237, 1246 (9th Cir. 1982)                                11, 15, 17

27 *Lovell v. Brennan*
   728 Fed.2d 560, 564 (9th Cir. 1984)                                     20

28

*Lyons v. Los Angeles*
615 Fed.2d 1243, 1245-1246 (9th Cir. 1980)                    20

*Monell v. New York City Department*
*of Social Services*
436 U.S. 658, 65 L. Ed.2d 611 (1978)                          21

*Newman v. State of Alabama*
559 F.2d 283, 291 (5th Cir. 1977)                             18

*O'Shea v. Littleton*
414 U.S. 488, 495, 596, 38 L.Ed.2d 694 (1979)                20

*Oklahoma City v. Tuttle*
471 U.S. 808, 85 L.Ed.2d 791 (1985)                          20

*Partee v. Lane,*
528 F.Supp. 1254, 1261 (N.D. Ill. 1981)                      24

*Preiser v. Newkirk*
422 U.S. 395, 402-403, 45 L.Ed.2d 272 (1975)                 20

*Rhodes v. Chapman*
452 U.S. 337, 345-348, 60 L.Ed.2d 59 (1981)          9, 11, 17

*Roberts v. Spalding*
783 F.2d 867, 870 (9th Cir. 1986)                            17

*Ruiz v. Estelle*
503 F.Supp. 1265, 1339 (S.D. Tex. 1980)
aff'd _____ F.2d _____ (5th Cir._____)                    23

*Sanchez v. Vild*
891 F.2d 240, 242 (9th Cir. 1989)                            17

*Shields v. Kunkel*
442 F.2d 409, 410 (9th Cir. 1971)                            17

*Sosebee v. Murphy*
797 F.2d 179 (4th Cir. 1986)                                 17

*Toussaint v. McCarthy*
801 F.2d 1080, 1087 (9th Cir. 1986)
cert. denied 481 U.S. 1069 (1987)          10, 11, 13, 15, 17, 24

*Whitley v. Albers*
475 U.S. 312, 319 (1986)
(quoting *Rhodes v. Chapman*
425 U.S. 337, 347 (1981)                                    8-10

*Wilson v. Seiter*
501 U.S. ___, 115 L.Ed.2d 271 (1991)                        8, 9

*Wright v. Rushen*
642 F.2d 1129, 1132 (9th Cir. 1981)                          10

iv

*Youngberg* v. *Romeo*
457 U.S. 307, 321, 73 L.Ed.2d 28 (1982)                                    14


<u>Statutes</u>

California Code of Regulations,
    Tit. 22, Div. 5, Ch. 22                                                  5

California Penal Code
    § 1168                                                                   8
    § 1170(a)(1)                                                            18

Title 28, United States Code
    § 2201                                                                  19

Title 29, United States Code
    § 794                                                                2, 24

Title 42 United States Code
    § 1983                                                       10, 17, 20, 21

1 | DANIEL E. LUNGREN, Attorney General
  | of the State of California
2 | GEORGE WILLIAMSON, Chief
  | Assistant Attorney General
3 | JOAN W. CAVANAGH (#56708)
  | KARL S. MAYER (#38896)
4 | ISMAEL CASTRO (#85452)
  | Deputy Attorneys General
5 | 455 Golden Gate Avenue, Room 6200
  | San Francisco, CA 94102
6 | Telephone No. (415) 703-2841

7 | Attorneys for Defendants Wilson,
  | Sandoval, Gomez, Khoury and Zil

8 |

9 |              UNITED STATES DISTRICT COURT

10 |            EASTERN DISTRICT OF CALIFORNIA

11 |

12 | RALPH COLEMAN, et al.,          )   No. CIV S-90-0520 LKK (JFM)
                                     )
13 |           Plaintiffs,           )   **DEFENDANTS' TRIAL BRIEF**
                                     )
14 |      v.                         )
                                     )
15 | PETE WILSON, et al.,            )
                                     )
16 |           Defendants.           )
    |_____)

17 |

18 |                    **INTRODUCTION**

19 | **A.    Nature Of This Action.**

20 |          This is a class action by state prisoners for

21 | declaratory and injunctive orders against state officials to

22 | vindicate alleged deprivations of the prisoners' rights under the

23 | constitution and laws of the United States.

24 | **B.    Plaintiffs' Class.**

25 |          The Court's order of October 23, 1991 defines the class

26 | of plaintiffs as all state prisoners suffering from a serious

27 | mental disorder (SMD).

28 | ///

C.   No Definition Of SMD.

What is meant by "SMD" has not been defined by the Court or by the prisoners.

D.   The Defendants.

The defendants are Pete Wilson, the Governor of California; Joe Sandoval, Secretary of the Youth and Adult Corrections Agency; James Gomez, Director of Corrections; Nadim Khoury, M.D., Assistant Deputy Director for Health Services, and John Zil, M.D., J.D., Chief Psychiatrist.  The defendants are each sued only in their official capacities.

E.   The Constitutional And Statutory Positions Of The Plaintiffs.

Under the prohibition of cruel and unusual punishment by the Eighth and Fourteenth Amendments, the prisoners allege that, because of "deliberate indifference" of the defendants, not every prisoner receives all desireable mental health care. Plaintiffs believe that the present mental health services system is too small, too inefficient, and too insensitive.

The prisoners also allege that defendants violate the federal statutory rights of mentally disordered inmates as "handicapped" persons under 29 U.S.C. § 794.

F.   The Positions Of The Defendants.

Defendants do not contend that every prisoner receives all desirable mental health care.  Defendants, however, categorically deny that they are indifferent, deliberately or otherwise, to providing mental health care to state prisoners.

Over $80,000,000 is spent annually to provide to thousands of prisoners a wide array of individualized mental

1  health services beginning with referral and clinical

2  diagnosis,and including pharmacotherapy in general population,

3  sheltered residential care with pharmacotherapy and an array of

4  complimentary programs, as well as inpatient care in licensed

5  psychiatric hospitals.

6        As the California prison system has experienced an

7  unprecedented fourfold growth during the last ten years to its

8  present population of over 109,000 inmates in 22 prisons spread

9  over nearly 900 miles from the Oregon border to the Mexico

10  border, substantial increases in medical staffing, facilities,

11  and programs have been requested and implemented.  Particular

12  emphasis has been applied to care at the highest levels.  In

13  accordance with negotiated memoranda of understanding, inpatient

14  care was removed from Corrections and transferred to licensed

15  psychiatric hospitals of the Department of Mental Health, and the

16  number of available inpatient beds expanded.  A new extended

17  outpatient program was designed and implemented (EOP), and space

18  in this program progressively expanded to well over 3000 beds.

19  Facilities and medical staffing for general population mental

20  health services have also increased, as have the degree and

21  sophistication of recruiting efforts to fill vacant positions for

22  mental health providers.

23        More remains to be done.  Studies by expert outside

24  consultants have been commissioned to recommend systemic needs,

25  as well as whether and how to redesign or reorganize the system

26  for an improved and more efficient delivery of health services,

27  including mental health services.

28  ///

DEFENDANTS' TRIAL BRIEF          3.

1          What was large but thought subject to local field
2     management with only skeletal central office oversight rapidly
3     became vast and more difficult to manage.   This has been the case
4     with custodial operations as well as with health services
5     operations of the Department.   Until the mid-1980's, the prisons
6     operated as semi-autonomous institutions all operational aspects
7     of which were controlled by wardens or superintendents who
8     reported to the Director.   Rapid unprecedented growth, however,
9     necessitated a reorganization of custody operations to create a
10    state-wide Deputy Director for Institutions (David Tristan), and
11    three regional Assistant Deputy Directors (Carl Larson, North
12    Region; Steve Cambra, Central Region; JoAnn Gordon, South Region)
13    The wardens remained in charge of all local operations, but
14    subordinate to their assistant deputy directors, etc.

15         Prison health services personnel followed the same
16    chain of command through their chief medical officer to the
17    warden, and then to an assistant deputy director for health
18    services   (defendant Khoury) who nevertheless also was
19    subordinate to the deputy director for institutions.   In June
20    1992, the Director (defendant Gomez) further reorganized by
21    separating health services from custodial operations and then
22    elevating health services operations to its own division with a
23    new position of deputy director (Kyle McKinsey) equal to the
24    position of deputy director for institutions.   The new health
25    services division carries with it a detailed new management and
26    management information system, including extensive features for
27    quality assurance, organized on a state-wide basis with its own
28    chains of command for health personnel, and approximately 110

DEFENDANTS' TRIAL BRIEF          4.

1  redirected positions to staff and implement the system

2  (redirection of 60 positions has recently been approved for this

3  year, and 50 more have been approved for fiscal 1993-94).

4          The Director has recently computerized department-wide

5  the dispensing of medications under the extensive CDC formulary.

6  Plans and requests to computerize all medical records, in

7  addition to custodial records, on state-wide data base are

8  underway.

9          Over the last 18 months outside consultants' (Scarlett

10  Carp & Associates) have studied and made recommendations for a

11  redesigned mental health services system that is, consistent with

12  new state regulations (Cal. Code Regs., Tit. 22, Div. 5, Ch. 22

13  [268 pages in draft form]) for licensure of newly conceived

14  Correctional Treatment Centers (CTCs).  This study is about to

15  culminate in a final report which will recommend shifting the

16  emphasis in mental health services from centralized most

17  expensive inpatient and residential care levels to decentralized

18  licensed CTC care at numerous "clusters", less expensive lower

19  levels of care, and early intervention.  Evaluation and then

20  implementation of these recommendations, or a version of them,

21  will entail all the complex planning that comes with multi-

22  million dollar capital allocations; construction and physical

23  plant changes; medical staff allocations and recruiting;

24  custodial staff allocations and training (for increased frequency

25  and duration of field contacts with SMD inmates in a

26  decentralized system), and compliance with licensure requirements

27  for the CTCs which will be an integral part of the system.

28  ///

1            During the recent several years of severe fiscal crisis
2    in California, the Director has worked hard with success to
3    "protect" mental health services for inmates from  budgetary
4    pressures which have necessitated extreme overall restraint in
5    all departments of state government.  California's state budget
6    shortfall for fiscal '92-'93 was over 10 billion dollars - more
7    than the entire budget of all but a very few of the largest
8    states.  The mental health services budget not only has not been
9    cut, but it has been increased while other operations of the
10   department have suffered substantial cuts of millions of dollars
11   and thousands of personnel.

12           Budget constraints are not contended to excuse
13   violations of the Constitution or laws of the United States.  But
14   they are nevertheless compelling considerations which cannot
15   lawfully be disregarded by state and local government officials.
16   The Director must be mindful not only of the calculus of the
17   parochial medical mental health interests asserted by these
18   prisoners, but must also be concerned with the equally compelling
19   other medical and non-medical interests of these same prisoners;
20   all of the interests of the far greater number of prisoners who
21   are not seriously mentally ill; the safety of all inmates; the
22   safety of all staff and the public; the secure operation of all
23   of the prisons; and the overall operation of this multi-billion
24   dollar Department.  The other defendants who are superior to the
25   Director (the Secretary, and the Governor) have even broader
26   compelling concerns - the Department of Corrections is but a part
27   of the Agency, and the Governor's unavoidable concerns span all
28   operations of state government.

1          The plaintiffs as well as their counsel and designated

2     experts in this case, are neither obligated nor competent to

3     consider, let alone to balance and determine these concerns.

4     Indeed, it is their office categorically to demand satisfaction

5     of their interests proposed in this litigation to the exclusion

6     of consideration of all other priorities.   That defendants cannot

7     reasonably or lawfully do this, and therefore must disagree with

8     plaintiffs demands, is not some indicia of indifference to

9     plaintiffs' interests.

10          In addition to discussing a number of other matters, we

11    point out below that eighth amendment jurisprudence recognizes

12    and accommodates defendants' extra-litigation obligations and

13    broader policy interests by limiting the court's authority to

14    embrace a parochial approach by plaintiffs'; by limiting eighth

15    amendment conditions standards to basic minima far below notions

16    of reform or "doing good", below standards published by

17    associations, and below standards of medical malpractice; by

18    requiring proof and findings not only of deficiencies but also of

19    "deliberate indifference", and by requiring proof and findings of

20    both objective and subjective elements of such deliberate

21    indifference.

22          The evidence will show that defendants are objectively

23    and subjectively attentive, and are not "deliberately

24    indifferent", to mental health services for SMD prisoners.

25    ///

26    ///

27    ///

28    ///

DEFENDANTS' TRIAL BRIEF          7.

1                                I.

2       **EIGHTH AMENDMENT CULPABILITY REQUIRES PROOF**
        **OF OBJECTIVE DEFICIENCIES AND SUBJECTIVE**
3       **"DELIBERATE INDIFFERENCE."**

4              Although the purpose of imprisonment for crime in

5    California is punishment, Cal. Penal Code § 1168, the Eighth

6    Amendment proscribes "cruel and unusual" punishments. Cruel and

7    unusual punishments are those resulting in the "unnecessary and

8    wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173

9    (1976). "An express intent to inflict unnecessary pain is not

10   required, [citation omitted] and harsh 'conditions of

11   confinement' may constitute cruel and unusual punishment unless

12   such conditions "are part of the penalty the criminal offenders

13   pay for their offenses against society.'" *Whitley v. Albers*, 475

14   U.S. 312, 319 (1986) (quoting *Rhodes v. Chapman*, 425 U.S. 337,

15   347 (1981)).

16             Recently, the Supreme Court has articulated the showing

17   necessary to establish liability under the Eighth Amendment in a

18   case challenging general conditions of confinement. *Wilson v.*

19   *Seiter*, 501 U.S. ____, 115 L.Ed.2d 271 (1991). *Wilson* adopts for

20   all Eighth Amendment conditions cases the "deliberate

21   indifference" test developed in *Estelle v. Gamble*, 429 U.S. 97

22   (1976), for medical conditions litigation. *Wilson*, 115 L.Ed.2d

23   at 281-282. In doing so, *Wilson* makes it clear that there are

24   distinct subjective and objective elements of proof of Eighth

25   Amendment claims: whether the deprivation is sufficiently serious

26   is an objective inquiry; assuming such seriousness, there remains

27   the subjective inquiry of whether the deprivation was accompanied

28   by "deliberate indifference." *Id.*, 115 L.Ed.2d at 279, 281-282.

1    Respecting the objective element, The *Wilson* court

2    referred to *Rhodes* to explain the "The Constitution, . . . `does

3    not mandate comfortable prisons,' [citation omitted] and only

4    those deprivations denying `the minimal civilized measure of

5    life's necessities,' [citation omitted] are sufficiently grave to

6    form the basis of an Eighth Amendment violation." *Wilson*, 115

7    L.Ed.2d at 278-279.

8    Even if plaintiffs were to meet the objective

9    requirement, they would still have the additional burden of

10   proving that the defendants have the requisite culpable state of

11   mind to establish culpability.  The state of mind applicable to

12   Eighth Amendment claims in prison conditions cases is

13   "wantonness"[1] which is the equivalent of "deliberate

14   indifference" within the meaning of *Estelle*.  *Wilson*, 115 L.Ed.2d

15   at 277-278, 281-282.

16   Deliberate indifference in *Estelle* is largely defined

17   in the negative, i.e., it is not "mere indifference" or

18   "negligence."  In *Whitley v. Albers*, 475 U.S. 312 (1986), the

19   Supreme Court discussed Eighth Amendment culpability for

20   responses to prison emergencies in terms of "obduracy" and acts

21   taken "sadistically and for the very purpose of causing harm,"

22   Id. at 319, 320-321.  *Wilson* observed that this *Whitley* standard

23

24       1.  In *Smith v. Wade*, 461 U.S. 30 (1983), the Supreme Court
defined "wantonness" as "the licentious act of one man toward the
25   person of another without regard to his rights; . . . the
conscious failure by one charged with a duty to exercise due care
26   and diligence to prevent an injury after the discovery of the
peril, or under circumstances where he is charged with a
27   knowledge of such peril, and being conscious of the inevitable or
probable results of such failure." *Id.* at 39-40 n. 8 (quoted in
28   *Redman v. County of San Diego*, 942 F.2d 1435, 1443 n. 10 (9th
Cir. 1991)).

DEFENDANTS' TRIAL BRIEF         9.

1  does not apply to prison conditions cases, 115 L.Ed.2d at 281-
2  282, and that the "wantonness" required to establish "deliberate
3  indifference" was something less than the *Whitley* standard of
4  malicious purposefulness but more than negligence.

5                              II.

6        **UNDER ESTABLISHED PRINCIPLES OF EIGHTH**
         **AMENDMENT JURISPRUDENCE, THE COURT IS LIMITED**
7        **IN ITS REVIEW OF ALLEGATIONS OF CRUEL AND**
         **UNUSUAL PUNISHMENT.**

8

9  A.    **The Eighth Amendment May Not Be Used To "Do Good" By**
         **Imposing Intrusive Reforms.**

10

11        The Supreme Court of the United States has explicitly
12  admonished the lower federal courts to avoid enmeshing themselves
13  in the minutiae of prison operations in the name of the
14  Constitution.  *Bell* v. *Wolfish*, 441 U.S. 520, 562, 60 L.Ed.2d 447
15  (1979).  "The commission of a federal judge is not a 'general
16  assignment to go about doing good' [citation omitted]."
17  *Toussaint* v. *McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986), cert.
18  denied 481 U.S. 1069 (1987).  An action under 42 United States
19  Code, section 1983, may not be used by a federal court " as a key
20  by which the door barring access to the operation of [a] state
21  prison by federal courts is opened widely to the plenary
22  supervisorial power of these courts."  *Wright* v. *Rushen*, 642 F.2d
23  1129, 1132 (9th Cir. 1981).

24        Plaintiffs' allegations about prison mental health care
25  fall under Eighth Amendment jurisprudence according to which this
26  Court's inquiry is quite narrow.  In *Bell* v. *Wolfish*, the High
27  court agreed that "[a]n institution's obligation under the Eighth
28  Amendment is at an end if it furnishes sentenced prisoners with

DEFENDANTS' TRIAL BRIEF          10.

1   adequate food, clothing, shelter, sanitation, medical care, and

2   personal safety.  [Citation omitted.]"  441 U.S. at 529 n. 11.

3           That Eighth Amendment standards are most basic, and are

4   not to be used as a basis merely for desirable prison reform, is

5   also made clear by the opinion of the Supreme Court in *Rhodes v.*

6   *Chapman*, 452 U.S. 337, 345-348, 60 L.Ed.2d 59 (1981):

7       (1)  The Eighth Amendment prohibits punishments which
             involve the unnecessary and wanton infliction of
8            pain or punishments which are grossly
             disproportionate to the severity of the crime.

9

10      (2)  Among unnecessary and wanton infliction of pain are
             those that are totally without penological
11           justification.

12      (3)  Although there is no static test for whether prisoner
             conditions are cruel and unusual, because the Eighth
13           Amendment "must draw its meaning from the evolving
             standards of decency that mark the progress of a
14           maturing society," Eighth Amendment judgments must
             neither be nor appear to be the subjective views of
             judges.

15

16      (4)  The above principles apply to evaluation of conditions
             of confinement.

17      (5)  Under contemporary standards of decency conditions of
             confinement may be restrictive and even harsh without
18           also violating the Eighth Amendment because such
             conditions are part of the penalty that criminal
19           offenders pay for their offenses against society.

20          If, under the evidence appropriately analyzed as above,

21   the court finds an Eighth Amendment violation, then the following

22   admonition of the Ninth Circuit is pertinent:

23       "The function of the court is limited to determining
          whether a constitutional violation has occurred,
24        [citation], and to fashioning a remedy that does no
          more and no less than correct that particular
25        constitutional violation.  [Citation.]"

26   *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

27          Indeed, the opinion in *Toussaint* is more expansive on

28   this point where the following aphorisms are collected from cited

DEFENDANTS' TRIAL BRIEF        11.

cases:

    (1)   Injunctive relief against the state agency or official must be no broader than necessary to remedy the constitutional violation.

    (2)   The remedy must be related to the condition alleged to offend the Constitution.

    (3)   The task is to correct, by a balancing of the interests, the condition that offends the Constitution; judicial authority may be exercised only on the basis of a constitutional violation.

    (4)   A judge must order correction of specific violations and may require only that these corrections bring the conditions above constitutional minima.

    (5)   The relief must be no broader than necessary to remedy the constitutional violation.

    (6)   The function of the court is limited to determining whether a constitutional violation has occurred and to fashioning a remedy that does no more and no less than correct that particular constitutional violation.

    (7)   The court must fashion the least intrusive remedy that will still be effective.

    (8)   The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the states.  *Id*. at 1086-1087.

B.    **Remedial Orders Are Subject To "Close Scrutiny" On Review.**

        The import of these general restraints on litigation under the eighth amendment has been underscored by the Ninth Circuit's special standard of review applicable remedial orders in systemic prison litigation.  The Court of Appeals for the Ninth Circuit has characterized such litigation as "structural litigation" in which an exercise of district court discretion to establish norms defining the future standard of conduct of state government raises serious questions regarding the legitimacy of the authority of the federal court.  Recognizing that there are few effective external controls, other than appellate review, to check a district court's power under these circumstances, the

DEFENDANTS' TRIAL BRIEF     12.

1    Ninth Circuit stated that such injunctions will be subject to

2    "close scrutiny" to make sure that no more is required of state

3    officials than is necessary to assure compliance with the

4    constitution.  *Toussaint v. McCarthy*, 801 F.2d at 1089.

5    **C.   Eighth Amendment Standards For Medical Care In General, And
     Mental Health Services In Particular, Are Below General**

6    **Medical Standards, Including Malpractice Standards.**

7                The court's power to review the mental health care

8    provided to prisoners, and to order a remedy in the event that

9    its finds that the care provided fails to meet constitutional

10   minima, is even more limited than in general conditions Eighth

11   Amendment cases.

12               The constitutional duty to provide mental health care

13   is a subset of the duty to provide medical care to prisoners that

14   was recognized by the Supreme Court in *Estelle v. Gamble*, 429

15   U.S. 97 (1976).  See *Bowring v. Godwin*, 551 F.2d 44, _____ (4th

16   Cir. 1977).  In *Estelle*, the Supreme Court held that the Eighth

17   Amendment is violated only if prison officials are "deliberately

18   indifferent" to the serious medical needs of prisoners.  429 U.S.

19   at 104.  In the context of mental health care, a court's

20   evaluation is even more problematic than in the area of physical

21   medicine.  See *Capps v. Atiyeh*, 559 F.Supp. 892, 916-921 (D. Ore.

22   1982) (Supp. Opin. 1983).

23               In *Capps* Judge Burns appropriately points out that

24   there are three reasons why evaluation of mental health care is

25   more difficult than evaluation of medical care:  (1) There is

26   considerable room for disagreement and debate among psychiatrists

27   and mental health professionals as to what is a serious mental

28   illness for which the denial of adequate treatment causes

DEFENDANTS' TRIAL BRIEF          13.

1  constitutionally-cognizable pain;  (2) Psychiatrists themselves

2  differ on the underlying theories and on the methods of treatment

3  of mental illness; (3) Unlike regular physicians, mental health

4  care professionals face an additional burden in treating their

5  patients because the patient must acknowledge his illness and

6  cooperate in treatment, although a large number of mentally ill

7  patients, including inmates, refuse to cooperate with their

8  doctors.  *Id.* at 917.

9      In making the first of the above three points, Judge

10  Burns reasoned as follows:  (1) There are many forms of mental

11  illness which are not understood, including some which are

12  untreatable in the sense that no effective therapy has yet been

13  discovered and their rates of cure are low.  (2) Diagnosis of

14  mental illness is "an extremely subjective art."  (3) The

15  diagnosis of mental illness is made the more difficult because it

16  is easy for inmates tired of their boring restrictive and even

17  harsh routines to feign the symptoms of mental illness to effect

18  a change in their environment.  *Id.*

19      With respect to the second reason why evaluating mental

20  health care is difficult, Judge Burns reasoned that although he

21  can intervene where there is inadequate treatment with respect to

22  which professionals <u>agree</u>, the court is not free to intervene

23  with respect to treatment about which health professionals could

24  reasonably differ because:  "'The Constitution only requires that

25  the courts make certain that professional judgment in fact was

26  exercised.  It is not appropriate for the courts to specify which

27  of several professionally acceptable choices should have been

28  made.'  *Youngberg* v. *Romeo* [457 U.S. 307, 321, 73 L.Ed.2d 28

1  (1982)]." 559 F.Supp. at 917. Indeed, eighth amendment review

2  is limited even when an exercise of professional medical judgment

3  results in a professionally unacceptable choice. Thus, an eighth

4  amendment violation is not established by showings that medical

5  care conditions fall below medical standards, or even that a

6  given condition might constitute medical malpractice. *Toussaint*

7  *v. McCarthy*, 801 F.2d. at 1113.

8        Judge Burns agreed there were many problems with the

9  health care system at the Oregon prison he reviewed, but

10 nevertheless concluded that the deficiencies did not reach an

11 Eighth Amendment level. Recalling the language in *Hoptowit* with

12 respect to the scope of judicial review, Judge Burns' concluding

13 remarks express an appropriate level of judicial self-restraint.

14 In *Hoptowit*, the Ninth Circuit opened its description of the

15 scope of judicial review by stating: "In entertaining a cause of

16 action alleging Eighth Amendment violations in a state prison,

17 federal courts must be cognizant of the limitations of federalism

18 and the narrowness of the Eighth Amendment. Federal courts lack

19 the power to interfere with decisions made by state prison

20 officials, absent constitutional violations. Courts must

21 recognize that the authority to make policy choices concerning

22 prisons is not a proper judicial function. [Citation]" *Id.* at

23 1246. In concluding in his supplemental opinion and order that

24 the Oregon prisoners had failed to establish denial of mental

25 health care under the Eighth Amendment, Judge Burns summarized

26 the problems he nevertheless realized existed:

27        "Inmates, even those at PSU [the psychiatric security
         unit with seclusion cells (559 F.Supp. at 918, n. 3)],
28        have infrequent contact with the treatment staff.
         There appear to be no articulated treatment plans. PSU

1    records are so badly kept it is as if they did not
     exist.  This is not to stay the staff turns a deaf ear
2    to inmates' pleas for help.  Given the meager resources
     the legislature devotes to mental health care, the
3    staff must make choices they would rather not as to who
     gets mental health care and how much of it.

4

5    "One further point requires elaboration.  Though the
     state says PSU functions as a crises intervention
6    center, the majority of PSU's patients are chronically
     ill.  [fn.]  Dr. Powitzky reported 30 inmates in PSU
7    were there because of active or partially remissive
     psychosis.  He also identified three other inmates
8    suffering from severe depression.  The only treatment
     afforded these patients is psychotropic medicine.  As
9    such, PSU serves as a large holding pen formentally ill
     inmates."  *Id.* at 921.

10

11       Also of particular note in the context of appropriate

12   judicial restraint is Judge Burns' statement:

13   "If my task were that of a philosopher, or even,
     perhaps that only of an interested observer, the
14   language of this opinion would be somewhat different.
     OSCI is an institution which nearly doubled its
15   population in about 18 months, and, at the same time,
     wiped out its mental health staff.  One need not be a
16   Plato to be able -- indeed, compelled -- to wonder
     whether it is the kept or the keeper who is mad.  But
17   my task here is that of a judge, and thus I eschew any
     such observations."  *Id.* at 921, n. 9.

18

19   D.   Expert Opinion And Organizations' Standards Are Not
          Constitutional Minima.

20

21       Plaintiffs will offer the opinions of "experts" about

22   whether particular conditions, or combinations of conditions,

23   have some potential for psychological impact on members of the

24   class.  Plaintiffs also will offer the views or proposed

25   standards of organizations as evidence of evolving standards of

26   decency for eighth amendment purposes.  However, such opinion and

27   such standards are entitled to little weight in determining

     whether a particular condition constitutes cruel and unusual

DEFENDANTS' TRIAL BRIEF          16.

1  punishment.  Such views should be taken only as goals recommended

2  by the expert or organization in question, and not as

3  constitutional minima.  *Rhodes v. Chapman*, 452 U.S. at 348 n. 13;

4  *Toussaint v. McCarthy*, 801 F.2d at 1107 n. 28.

5         The Constitution does not require that prisoners be

6  given the kind of medical attention which they would ideally like

7  to have.  *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986).

8  Neither inadvertent failure to provide adequate care, nor

9  carelessness, nor even deliberate failure to conform to the

10 standards suggested by experts is cruel and unusual punishment.

11 Absent "deliberate indifference" to serious and obvious medical

12 needs which results in unnecessary and wanton infliction of pain,

13 there can be no valid constitutional claim concerning denial of

14 medical care.  *Roberts v. Spalding, supra; Shields v. Kunkel*, 442

15 F.2d 409, 410 (9th Cir. 1971); *Sosebee v. Murphy*, 797 F.2d 179

16 (4th Cir. 1986).

17        A difference of opinion between patient and physician

18 does not state a claim under section 1983.  *Shields v. Kunkel*,

19 442 F.2d 409, 410 (9th Cir. 1971); See also, *Sanchez v. Vild*, 891

20 F.2d 240, 242 (9th Cir. 1989) [difference of medical opinion as

21 to treatment of prisoner did not amount to deliberate

22 indifference of a prisoner's serious medical needs and did not

23 support section 1983 claim.]

24 E.    The Eighth Amendment Does Not Guarantee Rehabilitation.

25        As Judge Burns observed in *Capps*, inmates making mental

26 health claims under the Eighth Amendment must, at a minimum,

27 establish that they are suffering from actual mental illness.

28 *Id*. at 917.  There is no constitutional right to rehabilitation.

DEFENDANTS' TRIAL BRIEF          17.

1 | *Hoptowit* v. *Ray*, 682 F.2d at 1255.

2 |     Even though rehabilitation may be desirable, it is not

3 | the primary function of a system of punitive incarceration, and

4 | is not a right protected by the Constitution in such a system.

5 | *Id*. at n. 8; *Balla* v. *Idaho State Board of Corrections*, 869 F.2d

6 | 461, 469-470 (9th Cir. 1989).  Since 1976 it has been the finding

7 | and declaration of the California Legislature that "the

8 | purpose of imprisonment for crime is punishment."  Cal. Penal

9 | Code, § 1170(a)(1).

10 |     Apropos are the observations by the court in *Newman* v.

11 | *State of Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), reversed on

12 | other grounds *sub nom*.  *Alabama* v. *Pugh*, 438 U.S. 781, 57 L.Ed.2d

13 | 1114 (1978):

14 |     "The mental, physical, and emotional status of
individuals, whether in or out of custody, do

15 | deteriorate and there is no power on earth to prevent
it . . . .  The Constitution does not require that

16 | prisoners as individuals or as a group, be provided
with any and every amenity which some person may think

17 | is needed to avoid mental, physical, and emotional
deterioration."

18 |

F. | **It Is Legitimate For the Defendants And The Court To**

19 | **Recognize Fiscal Restraints.**

20 |     In the area of mental health, the right to treatment

21 | under the Eighth Amendment is limited to what may be provided

22 | upon a reasonable cost and time basis -- the essential test is

23 | one of medical necessity and not simply that which may be

24 | considered merely desirable.  *Bowring* v. *Godwin*, 551 F.2d at 47.

25 | Requests for funding, even though not successful, are evidence of

26 | a lack of deliberate indifference.  *Brill* v. *Brown*, 867 F.2d 956

27 | (6th Cir. 1989).

28 | ///

DEFENDANTS' TRIAL BRIEF          18.

**G.    Current Conditions Necessarily Carry More Weight Than Past Anecdotes.**

Finally, assuming arguendo that the court were to find that some individuals were at some time deliberately indifferent to the serious mental health needs of the plaintiffs, that would not be enough for the court to issue an injunction.  To justify the issuance of an injunction, plaintiffs must prove and the court must find that the present defendants are currently "deliberately indifferent" in violation of plaintiffs' constitutional rights.

Plaintiffs have continued to rely on a 1987 study which purports to identify deficiencies in the correctional mental health care delivery system.  In doing so they overlook the changes in both the Governor's office and in the office of the director of corrections.  They also overlook the changes implemented both by the current administration and by the administration in place in 1987 which remedied many of the deficiencies existing in 1987.

Under Title 28, United States Code, section 2201, an "actual controversy" is a jurisdictional requisite to the granting of declaratory relief.  This requires the plaintiff to establish that "a `controversy'. . . existed at the time of the hearing . . . ," rather than at some earlier times such as when the complaint was filed.  *Golden v. Zwickler*, 394 U.S. 103, 108, 22 L.Ed.2d 113 (1969).  Similarly, prospective injunctive relief must depend not on the past, but on present and future circumstances as "[past] exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive

DEFENDANTS' TRIAL BRIEF         19.

1  relief, . . . if unaccompanied by any continuing, present adverse
2  effects." *O'Shea v. Littleton*, 414 U.S. 488, 495, 596, 38
3  L.Ed.2d 674 (1979).

4         Proof by plaintiffs, if there be such, that a defendant
5  in the past followed some illegal policy which has since been
6  discontinued does not justify equitable relief in the absence of
7  proof of a reasonable likelihood of recurrence of the unlawful
8  conduct.  *See, Green v. Mausour*, 474 U.S. 64, 71-73, 88 L.Ed.2d
9  371 (1985); *County of Los Angeles v. Davis*, 440 U.S. 625, 643, 59
10  L.Ed.2d 642 (1979); *Gilday v. Boone*, 657 F.2d 1 (1st Cir. 1981).
11  Public officials are thus presumed to take seriously their duty
12  to comply with the law, with the result that -- unlike cases
13  involving private litigants -- the courts will accept a voluntary
14  change in policy by government defendants as demonstrating their
15  intent to continue to follow the policy as corrected, eliminating
16  the need for a court to order them to do so.  *Preiser v. Newkirk*,
17  422 U.S. 395, 402-403, 45 L.Ed.2d 272 (1975); *Lovell v. Brennan*,
18  728 F.2d 560, 564 (9th Cir. 1984); *Lyons v. Los Angeles*, 615 F.2d
19  1243, 1245-1246 (9th Cir. 1980), reversed on other grounds, 461
20  U.S. 95, 75 L.Ed.2d 675 (1983).

21         Singular anecdotes of particular past conduct of
22  employees of a defendant, or a predecessor of a defendant, are,
23  alone, insufficient to establish governmental policy or
24  governmental liability.  *Oklahoma City v. Tuttle*, 471 U.S. 808,
25  85 L.Ed.2d 791 (1985).  Nor are collections of such anecdotes
26  necessarily sufficient to establish a policy, or a pervasive
27  pattern of conduct tantamount to a policy, warranting government
28  liability under section 1983.  See *Carter v. District of*

1  *Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1988).  Indeed, it is

2  entirely appropriate to be wary of anecdotes plaintiffs may seek

3  to prove and garnish with rhetoric which, to paraphrase the

4  court's opinion in *Carter*, do not etch sharply a pattern or a

5  policy, but, instead, show "scattered fire smoldering in smoke

6  from which no policy or custom emerges."  *Id.* at 125.[2/]

7       Apropos are the admonitions of the plurality in *Tuttle* with

8  respect to claims by plaintiffs in section 1983 actions that

9  government defendants follow a policy which is essentially

10  negative, and further admonitions about proof of unconstitutional

11  conduct under a policy which is itself not unconstitutional:

> "In the first place, the word 'policy' generally
> implies a course of action consciously chosen from
> among various alternatives; [footnote] it is therefore
> difficult in one sense even to accept the submission
> that someone pursues a 'policy' of 'inadequate
> training,' unless evidence be adduced which proves that
> the inadequacies resulted from conscious choice -- that
> is, proof that the policy makers deliberately chose a
> training program which would prove inadequate.  And in
> the second place, some limitation must be placed on
> establishing [governmental] liability through policies
> that are not themselves unconstitutional, or the test
> set out in *Monell* [*Monell v. New York City Department
> of Social Services*, 436 U.S. 658, 65 L.Ed.2d 611
> (1978)] will become a dead letter.

* * *

> "Proof of a single incident of unconstitutional
> activity is not sufficient to impose liability under
> *Monell*, unless proof of the incident includes proof
> that it was caused by an existing, unconstitutional
> municipal policy, which policy can be attributed to a
> municipal policy maker.  Otherwise, the existence of
> the unconstitutional policy, and its origin, must be

---

2.  There is an extensive discussion by the *Carter* court of
reversible error by the district court in that case in receiving
at length plaintiff's evidence of incidents of misconduct
contained in administrative complaints, pleadings and lawsuits,
and newspaper articles about members of the police department who
were not defendants, as well as members who were defendants.  *Id.*
at 126-133.

DEFENDANTS' TRIAL BRIEF          21.

1    separately proved.  But where the policy relied upon is
     not itself unconstitutional, considerably more proof
2    than the single incident will be necessary in every
     case to establish both the requisite fault on the part
3    of the municipality, [footnote] and the causal
     connection between the `policy' and the constitutional
4    deprivation.  [Footnote.]"  *Tuttle*, 471 U.S. at 823-
     824, 85 L.Ed.2d at 804.

5

6        Finally, defendants point out that the plurality in

7    *Tuttle* also questioned whether even gross negligence in

8    establishing particular practices could also establish a "policy"

9    that constitutes a "moving force" behind subsequent

10   unconstitutional conduct, *id*. at 824, n. 7, and noted as well

11   that the fact that a policy "might lead to" misconduct is not

12   sufficient to show that a particular policy is a "moving force"

13   behind a <u>constitutional</u> violation.  *Id*. at 824, n. 8 (emphasis by

14   the court).

15                            III.

16       **DEFENDANTS HAVE IN PLACE A SYSTEM FOR THE**
         **DELIVERY OF MENTAL HEALTH CARE TO PRISONERS**
17       **THAT MEETS OR EXCEEDS RECOGNIZED SYSTEMIC**
         **CONSTITUTIONAL MINIMA.**

18

19       Six elements have been said to be necessary to a

20   Constitutional mental health services system: (1) Initial

21   systematic screening and evaluation for mental health needs; (2)

22   Care must entail more than just segregation and close

23   supervision; (3) Sufficient numbers of trained mental health

24   professionals so that inmates requiring treatment for serious

25   mental disorders may be identified and treated in an

26   individualized manner[3]; (4) Accurate, complete and confidential

27   ────────────────────────────────────────────────

28       3.  Funding sufficient mental health positions and actively
     recruiting to fill vacancies, though this may be difficult and
     not always successful, refutes the subjective mental culpability

DEFENDANTS' TRIAL BRIEF          22.

1   records of the mental health treatment process must be

2   maintained; (5) Psychotropic medications must be prescribed and

3   administered in a safe manner and with appropriate supervision

4   and periodic evaluation; (6) There must be a basic program for

5   identifying, treating, and supervising inmates with suicidal

6   tendencies. *Balla v. Idaho State Bd. of Corrections*, 595 F.Supp.

7   1558, 1576-1577 (D. Idaho 1984), aff'd in part and reversed in

8   part on other grounds, 869 F.2d 461 (9 Cir. 1989); *Ruiz v.*

9   *Estelle*, 503 F.Supp. 1265, 1339 (S.D. Tex. 1980), aff'd ____ F.2d

10   ____ (5th Cir._____).

11          The evidence will show that the Department of

12   Corrections mental health services system includes each of these

13   elements, as well as a great deal more.

14          Defendants include the above list only as available

15   guidelines for the court. Defendants do not agree that these

16   opinions necessarily establish Constitutional minima; that a

17   perceived deficiency in part or all of one of these elements at a

18   particular California prison is sufficient to satisfy the

19   objective requirement of Eighth Amendment culpability, or that

20   defendants are otherwise bound in law, or in this case, by these

21   opinions from other federal trial courts, or intermediate federal

22   appellate courts.

23          We do not make this disclaimer out of obduracy. For

24   example, the Ninth Circuit has rejected arguments by California

25   prisoner-plaintiffs that Constitutionally adequate medical care

26   cannot be provided without complete medical records, and that a

27   lack of confidentiality of medical records also tends to prove

28

element of "deliberate indifference" on this particular issue.

DEFENDANTS' TRIAL BRIEF          23.

1    denial of medical care. *Toussaint v. McCarthy*, *supra*, 801

2    F.2d at 1112. Further, it has been observed that medical records

3    commonly suffer from occasional disorder and indecipherability

4    without violating the Constitution. *Partee v. Lane*, 528 F.Supp.

5    1254, 1261 (N.D. Ill. 1981).

6                                    IV.

7              **PLAINTIFFS' ALLEGATIONS UNDER 29 USC § 794**
               **ARE INSUFFICIENT AS A MATTER OF LAW.**
8

9         Title 29, United States Code, section 794 provides:

10        "No <u>otherwise qualified</u> individual <u>with handicaps</u> in
          the United States, . . . , shall, <u>solely by reason of</u>
11        <u>his or her handicap,</u> be excluded from the participation
          in, be denied the benefits of, or be subjected to
12        discrimination under any program or activity receiving
          Federal financial assistance . . . ."
13

14        Plaintiffs' amended complaint upon which we now embark

15   in trial does not allege exclusion, denial, or discrimination

16   against any person "solely by reason of his or her handicap." The

17   complaint, crafted by lawyers and not by pro se inmate(s),

18   accordingly, is insufficient as a matter of law to raise any

19   substantial federal question under the only statute upon which

20   the court is asked to rely for jurisdiction to hear this part of

21   the case.

22        Defendants deny that they exclude, deny, or

23   discriminate against "otherwise qualified" handicapped inmates

24   "solely by reason of" their handicap.

25        Defendants respectfully request leave further to brief

26   questions under this statute after trial concludes so that there

27   is a better factual context of plaintiffs' contentions than now

28   is available to defendants.

DEFENDANTS' TRIAL BRIEF          24.

1

**CONCLUSION**

2          Defendants reserve the right to further brief these and

3   other points, and to respond to matters which plaintiffs agree in

4   briefs to the court.

5   DATED:   February 22, 1993

6                              DANIEL E. LUNGREN, Attorney General
                               for the State of California
7
                               GEORGE WILLIAMSON, Chief
8                              Assistant Attorney General

9                              JOAN W. CAVANAGH
                               Deputy Attorney General
10
                               KARL S. MAYER
11                             Deputy Attorney General

12

13

14

15                             ISMAEL A. CASTRO
                               Deputy Attorney General
16
                               Attorneys for Defendants
17                             Wilson, Sandoval, Gomez, Khoury and Zil

18   KSM:jy
     c:\coleman\trial.brf
19

20

21

22

23

24

25

26

27

28

DEFENDANTS' TRIAL BRIEF          25.