

1   PRISON LAW OFFICE
    DONALD SPECTER (State Bar # 83925)
2   ALISON HARDY (State Bar # 139566)
    JANE KAHN (State Bar # 112239)
3   General Delivery
    San Quentin, California 94964
4   Telephone: (415) 457-9144

5   McCUTCHEN, DOYLE, BROWN & ENERSEN
    WARREN E. GEORGE (State Bar # 53588)
6   JORDAN C. BUDD (State Bar # 144288)
    CAROLYN REID (State Bar # 154750)
7   MARGARET BIELAK (State Bar # 155845)
    Three Embarcadero Center
8   San Francisco, California 94111
    Telephone: (415) 393-2000

9   ROSEN, BIEN & ASARO
    MICHAEL W. BIEN (State Bar # 96891)
10  ALLISON M. ZIEVE (State Bar # 142628)
    KATHERINE SHER (State Bar # 148588)
11  155 Montgomery Street, 8th Floor
    San Francisco, California 94104
12  Telephone: (415) 433-6830

13  HELLER, EHRMAN, WHITE & McAULIFFE
    RICHARD L. GOFF (State Bar # 36377)
14  AMELIA A. CRAIG (State Bar # 14178)
    INGRID S. LEVERETT (State Bar # 148813)
15  STEPHANIE HINDS (State Bar # 154284)
    333 Bush Street
16  San Francisco, California 94104
    Telephone: (415) 772-6000

17  DISABILITY RIGHTS EDUCATION AND DEFENSE FUND
    ELAINE B. FEINGOLD (State Bar # 99226)
18  2212 6th Street
    Berkeley, California 94710
19  Telephone: (415) 644-2627

20  Attorneys for Plaintiffs

                IN THE UNITED STATES DISTRICT COURT
21
                EASTERN DISTRICT OF CALIFORNIA
22
    RALPH COLEMAN, et al.,              )   No. CivS-90-0520 LKK-JFM
23
                Plaintiffs,             )   PLAINTIFFS' TRIAL BRIEF AND
24                                      )   PROPOSED FINDINGS OF FACT
    vs.                                 )
25                                      )
    PETE WILSON, Governor of the State of )
26  California, et al.,                 )
                                        )
27              Defendants.             )
    _____ )
28

                                               Plaintiffs' Trial Brief
                                               and Proposed Findings of Fact

                        359

# TABLE OF CONTENTS

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Proposed Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.  Screening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.  Access to Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          3.  Staffing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          4.  Medication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          5.  Forced Medication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          6.  Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          7.  Quality Assurance/Peer Review and
              Utilization Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          8.  Segregation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          9.  Presence of Category J. Inmates
              and Residential Outpatient Care . . . . . . . . . . . . . . . . . . . . . . 22

          10. Inpatient Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          11. Presence of Category K Inmates
              In the General Population . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          12. Suicide Prevention and Treatment . . . . . . . . . . . . . . . . . . . . . 27

          13. Protective Planning for Heat
              Sensitive Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

          14. Taser and 37 Millimeter Guns . . . . . . . . . . . . . . . . . . . . . . . 29

          15. Discrimination Against Handicapped
              Prisoners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

          16. Defendants' Response to the Present
              Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

### TABLE OF CONTENTS
#### (continued)

17. Defendants' Response to Previous
Court Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.   Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.   The Constitutional Standard Applicable to the
Treatment of Severely Mentally Ill Prison
Inmates is Deliberate Indifference . . . . . . . . . . . . . . . . . . . . . . . 33

B.   Proper and Routine Screening Is Constitutionally
Required to Identify Inmates with Mental Disorders . . . . . . . . . . . . . 36

C.   The Obstacles to Inmates' Access to Mental Health
Care and Treatment in California Prisons are
Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.   Due to Severe, Unconstitutional Shortages
of Mental Health Staff, Mentally Ill Inmates
Have Little Access to the Professionals Qualified
to Treat Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.   Mentally Ill Inmates Must Endure
Unconstitutionally Lengthy Delays Before Receiving
Needed Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3.   Inpatient Care, Residential Care and Outpatient
Care Are Essential Components of a Properly
Functioning Mental Health System, and the Failure
to Provide them is Unconstitutional . . . . . . . . . . . . . . . . . . . 45

4.   The Method by which Defendants Permit their
Employees to Distribute Psychotropic Medications
is Constitutionally Unacceptable . . . . . . . . . . . . . . . . . . . . . 48

5.   California Prisons Do Not Provide Mental
Health Treatment which Meets Even Minimally
Acceptable Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

6.   Defendants' Deficient Treatment Practices
Put Inmates at Risk of Committing Suicide . . . . . . . . . . . . . . . . 50

# TABLE OF CONTENTS
### (continued)

D.    Mentally Ill Inmates Often Are Forced to Live
in Punitive Housing Units, where Conditions Are
the Harshest in the California Prison System, and
Are Constitutionally Inadequate and Improper . . . . . . . . . . . . . . . . . . 51

E.    Because C.D.C.'s Medical Records are Inaccurate,
Incomplete, Disorganized and Illegible, Mentally
Ill Inmates' Care is Seriously Compromised  . . . . . . . . . . . . . . . . . . 53

F.    Unconstitutional Deficiencies in Mental Health Care
in California Prisons is Partially Attributable to
the Lack of Mental Health Care Quality Assurance and
Lack of a Comprehensive Peer/Utilization Review System . . . . . . . . . . 56

FF.   A Constitutionally Adequate Mental Health Care
System Must Take into Account the Special Needs of
Mentally Retarded Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

G.    Defendants' Employees Improperly Use Taser Guns,
37 mm Guns and Restraints Against Mentally Ill
Inmates in Violation of the Inmates' Constitutional
Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

H.    Defendants Do Not Have Proper Procedures to
Protect the Health and Liberty Interests of
Inmates Placed in Restraints for Psychiatric
Reasons  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

I.    Defendants Have Failed to Meet Constitutional
Standards by Failing to Establish Protocols for
the Administration of Involuntary Medication such
that Inmates' Liberty Interests, their Health and
the Well-Being of Others all are Accommodated . . . . . . . . . . . . . . . . 60

J.    Defendants Have Failed to Effectively Ensure
that Inmates Taking Medications which Induce
Heat-Sensitivity Are Not Exposed to High
Temperatures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

K.    Defendants Have Deprived Mentally Ill Inmates
of their Right to Participate in Work,
Educational, Rehabilitation and Other Programs
Generally Available in the California Prison
System  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Plaintiffs' Trial Brief
and Proposed Findings of Fact

1

**TABLE OF CONTENTS**
(continued)

2

3       L.      Defendants May Not Evade this Courts' Injunctive
                Powers by Instituting Hasty Changes -- Many of them
4               Merely on Paper but not in Practice -- to Mental
                Health Care in Response to the Present Litigation . . . . . . . . . . . . . . . . 66
5

6       M.      Evidence of Defendants' Actions in Response to
                Prior Court Orders and the Effect of These
7               Actions Upon Plaintiffs is Relevant to Claims
                for Additional Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
8

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alexander v. Choate*
469 U.S. 287, *remanded*, 762 F.2d 1008 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Bee v. Graves*
744 F.2d 1387 (10th Cir. 1984),
*cert. denied*, 469 U.S. 1214 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Bonner v. Lewis*
857 F.2d 559 (9th Cir. 1988),
*remanded*, 714 F. Supp. 420 (D. Ariz. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Bowring v. Godwin*
551 F.2d 44 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Cody v. Hillard*
599 F. Supp. 1025 (D.S.D. 1984),
*aff'd*, 799 F.2d 447 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Dallas Gays Alliance v. Dallas County Hosp. Dist.*
719 F. Supp. 1380 (N.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*E.E.O.C. v. Mobile Oil Corp.*
362 F. Supp. 786 (W.D. Mo. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Eng v. Smith*
849 F.2d 80 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Estelle v. Gamble*
429 U.S. 97 (1976), *reh'g denied*,
429 U.S. 1066, *remanded*, 554 F.2d 653 (1977) . . . . . . . . . . . . . . . . . . . . . 33

*Feliciano v. Barcelo*
497 F. Supp. 14 (D.P.R. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 46

*Finney v. Arkansas Bd. of Correction*
505 F.2d 194 (8th Cir. 1974), *remanded*,
410 F. Supp. 251 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Fisher v. Koehler*
692 F. Supp. 1519 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

*French v. Owens*
  777 F.2d 1250 (7th Cir. 1985),
  *cert. denied*, 479 U.S. 817 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40, 60

*Greason v. Kemp*
  891 F.2d 829 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Holt v. Sarver*
  309 F. Supp. 362 (E.D. Ark. 1970), *aff'd and*
  *remanded*, 442 F.2d 304 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Hoptowit v. Ray*
  682 F.2d 1237 (9th Cir. 1982), *appeal after remand*,
  753 F.2d 779 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Credit Indus. Corp.*
  366 F.2d 402 (2d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Jones v. Diamond*
  636 F.2d 1364 (5th Cir.), *cert. dismissed*,
  453 U.S. 950 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Johnson v. Duffy*
  588 F.2d 740 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Laaman v. Helgemoe*
  437 F. Supp. 269 (D.N.H. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lightfoot v. Walker*
  486 F. Supp. 504 (S.D. Ill. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 44, 56

*Martino v. Carey*
  563 F. Supp 984 (D. Ore. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*McKenzie v. Blidberg Rothchild Co.*
  12 F.R.D. 392 (S.D.N.Y. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Michenfelder v. Summer*
  860 F.2d 328 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

*National Org. For Woman v. Operation Rescue*
  726 F. Supp. 1483 (E.D. Va. 1989), *aff'd*,
  914 F.2d 582 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## TABLE OF AUTHORITIES
### (continued)

Page

*Newman v. State of Alabama*
503 F.2d 1320 (5th Cir. 1974),
*reh'g denied*, 506 F.2d 1056 (5th Cir.),
*cert. denied*, 421 U.S. 948 (1975) ................................ 35, 55

*Palmigiano v. Garrahy*
443 F. Supp. 956 (D.R.I. 1977), *remanded*,
599 F.2d 17 (1st Cir. 1979) ........................................ 57

*Parker v. Asher*
701 F. Supp. 192 (D. Nev. 1988) ................................... 58

*Peterkin v. Jeffes*
661 F. Supp. 895 (E.D. Pa. 1987), *aff'd in
relevant part*, 855 F.2d 1021 (3rd Cir. 1988) .......................... 63

*Ramos v. Lamm*
639 F.2d 559 (10th Cir. 1980),
*cert. denied*, 450 U.S. 1041 (1981) ............................... *passim*

*Ruiz v. Estelle*
503 F. Supp. 1265 (S.D. Tex. 1980) ............................... *passim*

*Todaro v. Ward*
565 F.2d 48 (2d Cir. 1977) ....................................... *passim*

*Toussaint v. McCarthy*
597 F. Supp. 1388 (N.D. Cal. 1984), *aff'd in
relevant part*, 801 F.2d 1080 (9th Cir. 1986) ........................ 63, 69

*United States v. Concentrated Phosphate Export Ass'n*
393 U.S. 199 (1968) .............................................. 66

*United States v. W.T. Grant Co.*
345 U.S. 629 (1953) .............................................. 67

*Vitek v. Jones*
445 U.S. 480 (1980) .............................................. 62

*Washington v. Harper*
494 U.S. 210 (1990) .............................................. 61

*Wellman v. Faulkner*
715 F.2d 269 (7th Cir. 1983),
*cert. denied*, 468 U.S. 1217 (1984) .............................. *passim*

Plaintiffs' Trial Brief
and Proposed Findings of Fact

## TABLE OF AUTHORITIES
### (continued)

Page

*Whitaker v. Rushen*
No. C-81-3284 SAW (U.S.D.C., N.D. Cal., March 25, 1985) . . . . . . . . . . . . . 62

*Wilson v. Seiter*
111 S. Ct. 2321, *remanded*,
940 F.2d 664 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Youngberg v. Romeo*
457 U.S. 307, *remanded*,
687 F.2d 33 (3rd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## CALIFORNIA CASES,

*Keyhea v. Rushen,*
178 Cal. App. 3d 526, 223 Cal. Rptr. 746 (1986) . . . . . . . . . . . . . . . . . . . . . . 61

## STATUTES

28 C.F.R. § 42.501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. § 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 30

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33, 35

U.S. Constitution
Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 57
Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## OTHER AUTHORITIES

1 H. Newberg, *Newberg on Class Actions* § 2.15 (2d ed. 1985) . . . . . . . . . . . . . . . . . 67

## I.    Introduction

The right to imprison does not include the right to torment by withholding necessary medical treatment. Defendants, California officials charged with the care of prisoners in their custody, have overwhelmingly ignored the serious and sometimes dire medical needs of plaintiffs, those inmates with severe mental illnesses.[1] Defendants' indifference extends even to inmates experiencing acute psychiatric crises, as plaintiffs' experts have attested. Grassian Dec. at 18-22; Meenakshi Dec. at 5-6; Petrella Dec. at 96-97; Kaufman Dec. at 45-46; Kupers Dec. at 46-50.

As plaintiffs shall prove, defendants' insensibility to the critical needs of their mentally disordered prisoners has had numerous appalling consequences which, taken together or separately, violate the Eighth Amendment to the United States Constitution. Among these is defendants' systematic failure to identify or treat inmates who are seriously mentally ill, in spite of having known for years -- as evidenced by defendants' own costly statistical surveys -- the prevalence of mentally ill inmates in their prisons. The consequence of defendants' inaction has been that these inmates identify themselves by acting out in ways that cause them needless suffering and endanger themselves, prison employees and other inmates. Sometimes, defendants and their employees learn that an inmate needs psychiatric help only after it is too late to help him or her -- suicide is an all-too-common result of unidentified, untreated mental illness in California prisons. Even the small percentage of inmates who somehow become identified as having serious mental illnesses rarely receive adequate psychiatric treatment.

---

[1]    The plaintiff class includes inmates at all California prisons except San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville, which already are subject to court orders in *Gates v. Deukmejian*, No. CIVS 87-1636 LKK-JFM (E.D. Cal. 1987) and *Marin v. Rushen*, No. C-80-0012 MHP (N.D. Cal. (currently pending)).

In this brief, plaintiffs set forth the facts which they shall prove at trial:

•Defendants systematically fail to identify -- and consequently to treat -- the seriously mentally ill among California prison inmates;

•Defendants fail to treat, monitor or evaluate those inmates whom they know to be suffering, often acutely, from mental illness;

•Inmates who are fortunate enough to be identified as being mentally ill are frequently left to languish for months in ordinary prison cells or, worse, in isolated, high-security segregated housing before receiving the hospitalization which their conditions mandate;

•Defendants tolerate incomplete, disorganized or non-existent medical files and the disastrous consequences of such shoddy recordkeeping;

•Seriously mentally disordered inmates must wait, often indefinitely, simply to consult with a mental health professional;

•Inmates lucky enough to receive any treatment at all must put up with haphazard, inconsistent and discontinuous care from prison to prison and sometimes even from different professionals within a single prison;

•Defendants have allowed these inhumane conditions to persist in spite of having known from at least the late 1980s that mental illness is widespread among the inmates in their custody.

Plaintiffs demonstrate below how these conditions violate the requirements of the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983 and 29 U.S.C. § 794.[2]

---

2/    Defendants waited until the eve of trial to attack the sufficiency of plaintiffs' pleading of a cause of action under 29 U.S.C. § 794 in the Complaint filed more than 1½ years ago.  Defendants' argument in their Pretrial Statement in support of this challenge is without merit.  In arguing that plaintiffs have "fail[ed] to raise any substantial federal question," defendants misunderstand federal subject matter jurisdiction.  The claimed deficiency in the complaint does not deprive this Court of jurisdiction, since federal subject matter jurisdiction is conferred by suit under the
(continued...)

## II.    Proposed Findings of Fact

The following proposed factual findings summarize the conditions of which plaintiffs seek to introduce evidence at trial.  Reference is made to examples at various prisons which were addressed in the direct testimony of plaintiffs' experts, submitted per the Court's order in the form of declarations, and in depositions.  The examples cited are not intended to be exhaustive of the evidence that will be presented at trial.  Plaintiffs reserve the right to supplement these findings based on the evidence presented at trial.

### A.    Introduction

1.      Plaintiffs are all inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections (hereafter "CDC") (except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville).  The class includes inmates who are mentally retarded and any prisoners who are suicidal.

2.      There is a high incidence of serious mental disorders among inmates in the CDC prison system.  As the CDC's own study found, more than 24.5 percent of California prisoners have a currently symptomatic serious mental disorder.  Greenfield

---

2/(...continued)
  federal statute.  The question whether or not one has included all the niceties in pleading a cause of action under a federal statute does not raise questions about federal subject matter jurisdiction, which exists as long as a civil action arises under the laws of the United States.  *See* 28 U.S.C. § 1331; *Equal Employment Opportunity Commission v. Mobil Oil Corporation*, 362 F. Supp. 786, 788-790 (W.D.Mo. 1973).  In any event, the Complaint gave defendants all the notice of their claim under 29 U.S.C. § 794 which federal procedural law requires.  *See* Amended Complaint at ¶ 31, filed on or about June 25, 1991.  "The purpose of Rule 8 of the Federal Rules of Civil Procedure is merely to notify the defendant of the facts on which plaintiff relies for recovery."  *McKenzie v. Blidberg Rothchild Co., Inc.*, 12 F.R.D. 392 (S.D.N.Y. 1952).  Defendants may not triumph on plaintiffs' claim of widespread discrimination based on a pleading technicality.  *See In re Credit Industrial Corporation*, 366 F.2d 402, 411 (2d Cir. 1966).

Dec. at 13, citing "Current Description, Evaluation, and Recommendations for Treatment of Mentally Disordered Offenders" (hereafter "the Stirling Report").

### B.    Issues

### 1.    Screening

a.       Defendants have completely failed to ensure that class members are screened for mental disorders on a systematic, ongoing basis.  Greenfield Dec. at 14, 19.  A prison mental health care system cannot provide for the needs of inmates without proper procedures and practice of screening inmates for mental illness at the time of reception or re-reception into the prison system, or at the time of transfer from one prison to another, and without a means of identifying individuals who become mentally ill at some point following the screening.

b.       The procedures and practices defendants have established for identifying inmates with serious mental disorders when they are received into the prison system, are re-received after parole violations, or are transferred from prison to prison, are completely inadequate to identify many such prisoners.  As  a result, plaintiff class members are subjected to unnecessary pain.  Many of these inmates are not identified as being in need of psychiatric care unless and until they present bizarre behavior, they report a problem to an MTA, or their records show a history of mental illness.  As a result, class members whose psychiatric problems are not immediately obvious to untrained prison employees fail to receive such care.  Meenakshi Dec. at 33.  Inmates are questioned by CDC employees who are not adequately trained to screen prisoners for psychiatric care needs, and the questions asked at screening do not adequately cover the subject of mental illness or suicidality.  Petrella Dec. at 14-15, 25-26, 90;

1   Kaufman Dec. at 39 (Tehachapi); Kupers Dec. at 65 (Pelican Bay State Prison (PBSP));

2   Haney Dec. at 55 (PBSP).  Routine screening forms do not cover all relevant information;

3   at some institutions, routine screening is limited to questions regarding whether an inmate

4

5   is taking psychotropic medications.  Kaufman Dec. at 39 (Tehachapi), 72 (Corcoran);

6   Meenakshi Dec. at 92 (Mule Creek).  At other institutions, some or all inmates are not

7   screened at all for psychiatric needs.  Meenakshi Dec. at 67 (Northern California

8   Women's Facility (NCWF), 103 (California Correctional Center (CCC), 109 (Sierra

9   Conservation Center (SCC).  Screening often takes place in surroundings that are entirely

10   inappropriate for that purpose, and that lack the privacy necessary for effective screening.

11   Petrella Dec. 73-78; Kaufman Dec. at 18, 74 (Corcoran); Kupers Dec. at 136.  Because

12   of the deficiencies in screening, many class members, even those with self-reported

13

14   histories of suicide attempts or psychiatric illness, fail to come to the attention of prison

15   mental health staffs and as a result do not receive the care they need.  Petrella Dec. at

16   114-15 (CVSP).

17           c.     A particularly shocking example occurs at the California

18   Institution for Men (CIM), where inmates are questioned, while naked, in a crowded

19   room that provides virtually no privacy of any kind.  The psychiatric screening there

20   consists of one question about whether the inmate has been hospitalized for mental illness.

21   This screening is completely inappropriate for identifying inmates in need of mental health

22   care.  Petrella Dec. at 73-74.

23           d.     Class members who have been identified at reception as

24

25   being in need of psychiatric attention routinely have to wait for as long as a month ore

26   more at some institutions before receiving such attention, to the detriment of their mental

27

28

**Plaintiffs' Trial Brief**
**and Proposed Findings of Fact**

health.  While they are waiting to see a psychiatrist, their medications in many instances are prescribed by ordinary physicians who are not trained in the proper use and the risks of psychiatric medications.  This does not meet community standards of medical practice.  Kaufman Dec. at 89 (Donovan); Meenakshi Dec. at 44 (Central California Women's Facility (CCWF).  *See also* the declaration of defendant Zil, offered as an expert declaration, at p.9, ¶ 36.  In other cases, class members are forced to go without their psychotropic medications for some time after they arrive at prisons, often because no doctor is available to prescribe the medications.  Kupers Dec. at 88 (Solano), 119 (Folsom); Meenakshi Dec. at 42 (CCWF).  Some of these class members become actively psychotic during the time they are deprived of their medications.  Meenakshi Dec. at 42-43 (CCWF).

       e.     When class members are transferred from one prison to another, they often arrive without their medical records, making it impossible for the reception staff at the new institution to screen them effectively for mental illness or for mental health care requirements.  Kaufman Dec. at 37-38 (Tehachapi); Meenakshi Dec. at 33 ((California Institution for Women (CIW), 42 (CCWF), 68 (NCWF)).  This prevents inmates from receiving the psychiatric care they need to prevent decompensation or psychosis.

       f.     Defendants have not adequately trained prison staffs to identify inmates who become mentally ill or whose psychiatric disorders worsen after reception into an institution.  As a result, the staffs fail to detect the psychiatric needs of class members who do not present management problems, exhibit bizarre behavior, or report psychiatric illness to the screening MTA.  Petrella Dec. at 115 (Chuckawalla

Valley State Prison (CVSP); Meenakshi Dec. at 35 (CIW), 92 (Mule Creek). Class members often do not receive or have not received mental health care unless and until they decompensate or become grossly psychotic. Grassian Dec. at 47 (PBSP); Kupers Dec. at 155 (California Rehabilitation Center (CRC)).

g.    Defendants are and have been aware of the deficiencies in psychiatric screening in California prisons. Their failure to provide adequate screening amounts to deliberate indifference to the serious mental health care needs of the prisoners in their custody and control.

### 2.    Access to Care

a.    Throughout the CDC, there is a consistent pattern of class members being denied access to the psychiatric care they need for their mental health. Plaintiffs are frequently forced to wait an unacceptable length of time for psychiatric care, or only receive any care at all if they decompensate or experience a psychiatric emergency. Petrella Dec. at 39-40, 105 (Calipatria); Kupers Dec. at 78 (Solano), 113 (Folsom); Meenakshi Dec. at 47 (CCWF), 110 (SCC). Many class members who are psychotic but who do not create management problems or exhibit bizarre behavior are ignored. Petrella Dec. at 123 (Wasco); Grassian Dec. at 47 (PBSP); Kupers Dec. at 41 (PBSP). At some institutions, class members have to wait several months for non-emergency psychiatric care or routine psychological evaluations. Many never receive a psychological evaluation. Kaufman Dec. at 36-37 (Tehachapi); Kupers Dec. at 90 (Solano); Meenakshi Dec. at 70 (NCWF); Kaufman Dec. at 73-74 (Corcoran).

b.    Even when class members succeed in seeing a psychiatrist or psychologist their visits often are extremely short, due in part to severe staffing shortages

at many prisons.  Kaufman Dec. at 90-91 (Donovan); Kupers Dec. at 90 (Solano);

Meenakishi Dec. at 93 (Mule Creek).

        c.      Many prisons where class members are housed do not offer

any psychiatric care other than the administration of medication.  This means that many

class members are denied access to group therapy, psychotherapy, or other forms of

therapy that normally are available to psychiatric patients in the community, and that are

necessary to their mental health.  Petrella Dec. at 80 (California Institution for Men

(CIM), 105 (Calipatria), 124 (Wasco); Grassian Dec. at 48-49 (PBSP); Kaufman Dec. at

70 (Corcoran); Kupers Dec. at 106 (New Folsom); Meenakshi Dec. at 61 (CCWF), 84

(NCWF), 99 (Mule Creek).  Because of this lack of therapy, class members decompensate

or suffer other unnecessary mental pain.  Petrella Dec. at 124 (Wasco); Meenakshi Dec.

at 62 (CCWF).

        d.      Alcohol or drug treatment programs at many institutions, if

they exist, are insufficient to meet the needs of inmates who need them, although

defendants know that many class members are in need of this treatment.  Kupers Dec. at

107 (Folsom); Grassian Dec. at 48 (PBSP); Kaufman Dec. at 30, 73 (Corcoran).  This

causes class members unnecessary suffering.

        e.      The conditions of confinement, particularly the overcrowding

in many prisons, exacerbate mental illness and cause unnecessary suffering to class

members.  At overcrowded prisons, class members are more likely to be stigmatized or

victimized by other inmates or to be sent to administrative segregation as a result of an

altercation.  In addition, it is more difficult for staff at overcrowded prisons to supervise

properly the administration of medications.  Kupers Dec. at 75, 98-99 (Solano).

f.      Defendants are and have been aware of their failure to provide plaintiffs with adequate access to psychiatric and mental health care. Defendants' failure to provide such care amounts to deliberate indifference to plaintiffs' serious mental health care needs.

**3.      Staffing**

a.      Defendants have completely failed to provide mental health care staffing that can meet the needs of prisoners with serious mental disorders. Petrella Dec. at 78-79 (CIM), 88, 107 (Calipatria); Kaufman Dec. at 70-71 (Corcoran), 106 (CMC); Haney Dec. at 58 (PBSP), Kupers Dec. at 66 (PBSP); Kupers Dec. at 89 (Solano), 105 (Folsom), 134 (Deuel Vocational Institution (DVI)); Meenakshi Dec. at 30 (CIW). Some prisons have had or now have no full-time psychiatrists on their staffs. Petrella Dec. at 114 (CVSP); Kaufman Dec. at 16 (Tehachapi), 154 (Soledad); Kupers Dec. at 66 (PBSP); Haney Dec. at 54 (PBSP); Meenakshi Dec. at 46 (CCWF), 70 (NCWF). At least one institution has no mental health care staff at all, but relies instead on temporary psychiatrists. Kupers Dec. at 89 (Solano). These staffing shortages seriously endanger class members' mental health.

b.      Because of these chronic shortages in mental health staffing, class members receive only sporadic care, or receive care only if they become acutely suicidal or psychotic. Petrella Dec. at 105 (Calipatria), 123 (Wasco); Grassian Dec. at 45-46; Kaufman Dec. at 106 (California Men's Colony (CMC), 146 (Avenal). Other inmates experience significant delays in seeing a psychiatrist, and their mental health suffers as a result. Kaufman Dec. at 106 (CMC).

c.      The salaries that defendants offer to psychiatrists, psychologists, and other mental health care professionals are not competitive with those offered for similar work outside the CDC, and are not high enough to compensate them for the difficulties involved in working at a prison.  As a result, defendants often know they will fail -- and do fail -- in their efforts to recruit psychiatric staff.  Petrella Dec. at 80 (CIM); Kaufman Dec. at 10, 17, 71 (Corcoran), 155 (Soledad); Meenakshi Dec. at 31 (CIW).  In addition, the CDC has instructed the officials of at least one prison not to fill budgeted psychiatric positions in order to save money, making it even more difficult for class members to receive the mental health care they need.  Meenakshi Dec. at 30 (CIW).

d.      Defendants have built many prisons in remote parts of the state.  They know and have known that it is difficult to attract psychiatric staff to such areas.  Kaufman Dec. at 145 (Avenal) (*see also*, *e.g.* PBSP, CVSP, Calipatria).  Despite the difficulty of filling mental health positions in these areas, defendants have assigned inmates with serious mental disorders to such institutions.  As a consequence, class members do not receive the mental health care they desperately need.  Petrella Dec. at 27-28 (CVSP, Calipatria).

e.      Because of the absence of psychiatrists at some prisons, non-psychiatrist physicians often prescribe psychiatric medications.  This is not acceptable medical practice, because many or most of these physicians are not trained to prescribe and monitor such medications.  Some non-psychiatrist physicians are reluctant to prescribe psychiatric medications.  As a result, class members do not receive the medications they need for their mental health.  Kaufman Dec. at 22-23; 42-43 (Tehachapi); 147 (Avenal); Kupers Dec. at 138 (DVI); Meenakshi Dec. at 49 (CCWF).

**Plaintiffs' Trial Brief
and Proposed Findings of Fact**

6.  An even more egregious practice occurs at some institutions where, because of the lack of full-time psychiatrists, physicians have prescribed or now prescribe psychiatric medications based on the recommendation of psychologists, rather than based on their independent observation and judgment.  Grassian Dec. at 46 (PBSP); Kaufman Dec. at 42 (Tehachapi).

f.      The few psychiatrists and psychologists available at CDC prisons spend a substantial portion of their time on meetings and reports unrelated to psychiatric treatment, such as Board of Prison Term reports, rather than on providing care for class members.  Kaufman Dec. at 70 (Corcoran), 87 (Donovan); Kupers Dec. at 89 (Solano), 135 (DVI), 131 (CRC).  At California Correctional Center (CCC), the one psychiatric staff member was hired solely to complete Board of Prison Term reports.  As a result, class members at CCC have virtually no access to psychiatric care.  Meenakshi Dec. at 103-04.

g.      Defendants often employ psychiatrists who are not Board-certified and psychologists who are not licensed.  Petrella Dec. at 89 (Calipatria), 121 (Wasco); Kaufman Dec. at 10; Ruggles Depo. 10:5-12:23.

h.      Custodial staff and MTAs do not receive adequate training on issues relating to mental health care.  Kaufman Dec. at 28, 154 (Soledad); Kupers Dec. at 95 (Solano), 103 (Folsom).  As a result, they cannot recognize the signs of mental illness or suicidality and cannot respond adequately to class members' mental health needs.  A particularly horrifying example of this occurred in April 1992, when an inmate at Pelican Bay State Prison, who had been recommended for a psychiatric evaluation, was acting in a bizarre manner and smearing feces on himself.  He was restrained by security officers,

escorted to the infirmary and forced into a bathtub filled with a substance that may have been detergent and with water that was so scaldingly hot that he suffered third degree burns on the back of his legs and buttocks.  Kupers Dec. at 56-59.

       i.     Defendants employ very few psychiatric nurses or psychiatric social workers who could provide support, monitor medications, and perform other functions that would improve the quality of mental health care in CDC prisons.  See Meenakshi Dec. at 32 (CIW).  There are also insufficient medical stenographers and office assistants, which causes delays in having records transcribed.  As a result, the quality and continuity of the class members' mental health care suffers.  Petrella Dec. at 32 (CIW).

       j.     Due to staffing shortages, crucial mental health care functions are not performed if the individual responsible for performing them is absent due to sickness or vacation.  Grassian Dec. at 47 (PBSP); Petrella Dec. at 107-8 (Calipatria).

       k.     Defendants' failure to provide mental health care staff that is adequate to meet the needs of prisoners with serious mental disorders amounts to deliberate indifference to plaintiffs' serious mental health care needs.

### 4.    Medication

       a.     Defendants have neglected their obligations to ensure that medications are properly prescribed, dispensed, and distributed.  They also fail to monitor class members who take psychotropic medications to ensure that they are taking their medications, that they are not hoarding them and that the medications are having the desired effect, and to observe side effects of the medication.

b.    Prison schedules are arranged in ways that make it difficult or impossible for class members to receive the psychiatric medications they need for their mental health.  Some institutions hold pill call during visiting hours, during counselors' rounds, and when the inmates have to be at work.  Inmates consequently are forced to choose between receiving their medications and attending required activities.  Meenakshi Dec. at 56 (CCWF).  At other prisons, inmates who sleep through the time for pill call do not receive their medications that day.  Kaufman Dec. at 147-48 (Avenal).  During "lockdowns," many prisoners do not receive their medications, including psychotropic medications.  Kaufman Dec. at 148 (Avenal).  Being deprived of their medications causes class members unnecessary mental suffering.

c.    Class members' mental health suffers because medications are not properly monitored.  Kaufman Dec. at 23-24.  Because they lack the resources to monitor medications properly, doctors at some institutions do not prescribe psychotropic medications that would benefit mentally disordered prisoners, or they prescribe them in doses too low to have any therapeutic effect.  Kupers Dec. at 90 (Solano); Meenakshi Dec. at 36 (CIW), 72 (NCWF).  Some potentially beneficial psychiatric medications are not available anywhere in the CDC because of concerns about monitoring or expense.  Kaufman Dec. at 24.  As a result of these problems, inmates do not receive the medications they need and their mental health suffers unnecessarily.

d.    Defendants have not established policies and procedures to prevent the hoarding of psychiatric medications, despite the fact that hoarding is a continuing problem.  Meenakshi Dec. at 96 (Mule Creek); Kaufman Dec. at 23-24, 54-55 (Tehachapi).  Medications are given in pill rather than liquid form.  This makes it more

likely that inmates will "cheek" or hoard drugs. Kaufman Dec. at 23, 74 (Corcoran). At some institutions, class members are or have in the past been given two weeks' or one month's supply of drugs, which allows them to hoard or sell the medications, or use them to make suicide attempts. Kaufman Dec. at 23-24, 88 (Donovan); Grassian Dec. at 50 (PBSP); Kupers Dec. at 68-69 (PBSP).

e.    Many class members who take Lithium do not receive tests to monitor their Lithium blood levels. This can endanger their health. Meenakshi Dec. at 95 (Mule Creek), 111 (SCC).

f.    Doctors do not always use informed consent forms for prescription of psychotropic medications. As a result, some class members are unaware of all the potential side effects of their medications and cannot make an informed decision on whether to accept them. Thus, their use of the medications is not voluntary. Kaufman Dec. at 42 (Tehachapi); Kupers Dec. at 118 (Folsom).

g.    Because of the lack of continuity in treatment resulting from high staff turnover and inadequate medical records, some class members' medications are changed too frequently. This lack of continuity in treatment endangers their mental health. Meenakshi Dec. at 36 (CIW).

h.    Defendants have not established appropriate procedures for renewing expired prescriptions for psychiatric medications. When prescriptions for psychotropic medications expire at some institutions, class members have to notify the doctors themselves because there is no procedure for staff members to do so. This can result in class members who need medications not having their prescriptions renewed. Petrella Dec. at 132 (Wasco); Meenakshi Dec. at 95 (Mule Creek). At some prisons,

**Plaintiffs' Trial Brief**
**and Proposed Findings of Fact**

class members do not see a doctor before their psychiatric medications are renewed. Petrella Dec. at 94 (Calipatria).

i.     In some instances, psychotropic medications are discontinued as a disciplinary measure, to the detriment of prisoners' mental health. Non-psychiatrically trained MTAs can even terminate anti-psychotic medications. Kupers Dec. at 117-18 (Folsom). It is outrageous and completely inappropriate to impose this kind of mental suffering as a form of punishment.

j.     Defendants have been and are aware of the deficiencies in prescribing, dispensing, distributing, and monitoring psychiatric medications. Their failure to provide for adequate policies and practices regarding such medications amounts to deliberate indifference to plaintiffs' serious mental health care needs.

### 5.     Forced Medication, Involuntary Treatment and Restraints

a.     The use of physical restraints is sometimes necessary to provide mental health care consistent with community standards. Petrella Dec. at 95; Meenakshi Dec. at 83; Kupers Dec. at 148. Despite this fact, defendants have failed to ensure that restraints are used when necessary or appropriate. For instance, there are no four-point or five-point restraints used at the Folsom infirmary. Hollingsworth Depo. 63:3-64:9. NCWF does not even have a set of restraints on the premises. Meenakshi Dec. at 83.

b.     Custody staff participate inappropriately in decisions about whether to place a class member in restraints. This decision is purely a medical one, and custody staff should not be involved in making it. Meenakshi Dec. at 28 (CIW).

1          c.          Doctors often order the use of restraints over the telephone,

2    without having first examined the class member to be restrained.  This is not appropriate

3    medical practice.  Petrella Dec. at 83 (CIM).

4          d.          Prison medical staffs leave class members in restraints longer

5    than is medically necessary, thus depriving them of liberty without due process of law.

6    They also fail to follow community medical practices in monitoring class members who

7    have been placed in restraints.  Petrella Dec. at 104 (Calipatria).

8          e.          The use of involuntary medication is sometimes necessary to

9    provide mental health care that is consistent with community standards.  Defendants have

10   failed to establish consistent and appropriate practices for involuntarily medicating class

11   members.  The staff at some institutions do not administer medications involuntarily at all.

12   Astorga Depo. 57:7-9 (Pelican Bay); Hollingsworth Depo. 62:20-63:2 (Folsom).  Even at

13   CMC, involuntary medication is under-utilized.  It is often not ordered until a class

14   member has decompensated so severely that emergency involuntary medication is

15   necessary.  Kaufman Dec. at 142.

16          f.          Medications are involuntarily administered in a manner that

17   violates both good community practice and the institutions' own protocols.  Meenakshi

18   Dec. at 13, 28, 60, 99.  Medications should only be administered involuntarily in an

19   infirmary, hospital, clinic or emergency room because emergency medical care sometimes

20   becomes necessary.  Meenakshi Dec. at 28-29, Kaufman Dec. at 142.  However,

21   medications are administered involuntarily in other settings, which are not appropriate for

22   their use.  Kaufman Dec. at 142 (LOU at CMC); Meenakshi Dec. at 28 (Support Care

23   Unit at CIW).  This practice endangers plaintiffs' health.

**Plaintiffs' Trial Brief
and Proposed Findings of Fact**

-16-

1       g.  Prison doctors often order the involuntary administration of

2 medication over the telephone, without having first examined the inmate to be medicated.

3 Because of the seriousness of involuntary medication, it should only be ordered by a

4

5 physician who has first examined the inmate.  Kaufman Dec. at 142 (CMC); Petrella Dec.

6 at 83 (CIM).

7       h.  Custody staff are inappropriately involved in decisions

8 regarding whether to medicate a class member involuntarily.  This practice violates state

9 law, the CDC's own regulations, and community medical standards.  Meenakshi Dec. at

10 29 (CIW).

11

12       i.  Defendants know and have known that their prison staffs are

13 inadequately prepared to perform forced medication or efficacious restraint of inmates in

14 certain situation.  Defendants' failure to ensure that all staff are prepared to perform these

15 functions when necessary constitutes deliberate indifference to the mental health needs of

16 class members.

17

18       j.  Defendants deprive class members of due process of law by

19 failing to provide proper procedures for involuntary psychiatric treatment and involuntary

20 medication.

21    **6.**  **Medical Records**

22       a.  Accurate, complete and organized records are essential in the

23 provision of psychiatric care.  Medical records in the CDC are poorly maintained, both in

24 terms of form and of substance.  Petrella Dec. at 110 (describing "virtually every

25 [Calipatria] file" as "substantially flawed"); Meenakshi Dec. at 24 (describing CIW

26 records as "abysmal"), 87 (NCWF) Kupers Dec. at 94 (Solano); Kaufman Dec at 46

27

28

(Tehachapi). As a result, it is impossible to maintain continuity of care, Grassian Dec. at 52, or gain a complete picture of an inmate's medical/psychiatric history. Baker Depo. 58:4-17.

        b.     Critical psychiatric records are not integrated into medical records. Neither suicide watch records, Sheff Depo. 162:7-163:3, nor records of prior psychiatric hospitalization or infirmary care are incorporated into the medical files. Sheff Depo. 54:26; 55:2-26, Petrella Dec. at 86 (CIM). Because of this, psychiatrists and other doctors do not have all the information they need when evaluating or treating class members, which adversely affects the quality and continuity of care available to plaintiffs.

        c.     Treatment plans, which are a standard part of community practice, are inadequate or missing altogether. As a result, the continuity of class members' psychiatric care may be disrupted. Meenakshi Dec. at 26; Petrella Dec. at 47; Kupers Dec. at 120.

        d.     Defendants know and have known that their medical records are of substandard quality and that their poor quality endangers the quality and continuity of class members' psychiatric treatment. Defendants' failure to improve medical record keeping constitutes deliberate indifference to plaintiffs' serious mental health care needs.

        **7.**     **Quality Assurance/Peer Review and Utilization Review**

        a.     Any properly functioning mental health care system must have quality assurance and peer review systems in place. These systems ensure that mental health care staff are fulfilling their tasks in an effective manner. Petrella Dec. at 21-22, Meenakshi Dec. at 32. The CDC should also institute a system of utilization

review, to ensure that treatment modalities, such as inpatient beds, are being utilized appropriately.  Kaufman Dec. at 30.

        b.     There is a consistent lack of comprehensive systematic mental health quality assurance, peer review or utilization review programs, both at individual prisons and Department-wide.  Petrella Dec. at 28, 113 (Calipatria); Grassian Dec. at 53 (PBSP); Kaufman Dec. at 46 (Tehachapi); Kupers Dec. at 127 (Folsom), 146 (DVI); Meenakshi Dec. at 66 (CCWF), 90 (NCWF), 102 (Mule Creek).  As a result, there is no way to assess the quality of care provided or to judge whether the resources available are being used effectively.  Problems therefore can persist without any corrective action being taken.  Petrella Dec. at 28-29.  Such review has not been or is not possible at certain institutions where there is no more than one psychiatrist on staff, since a psychiatrist cannot perform peer review or quality assurance on his or her own work.  Meenakshi Dec. at 32-33 (CIW).  Even where there is more than one psychiatrist available, the clinical staff members are often too overworked to have the time to meet, assess charts, and interview the clinicians whose work is being assessed, while still carrying out their other duties.  Kupers Dec. at 70 (PBSP).

        c.     The quality assurance and peer review plans that exist at individual institutions are often rudimentary or still developing.  Kaufman Dec. at 31, Petrella Dec. at 137-38 (Wasco); Meenakshi Dec. at 90 (NCWF).  These plans often lack essential elements, such as recommended action, laboratory test results, and frequency of needed follow-up care.

        d.     As a result of the lack of quality assurance, peer review, and utilization review, defendants cannot ensure that class members receive the care they need

for their mental health. Defendants' failure to provide such review amounts to deliberate indifference to plaintiffs' serious mental health care needs.

### 8.    Segregation

a.    CDC prisons contain administrative segregation (hereafter "ad. seg.") units; some also contain security housing units (hereafter "SHU") or other types of punitive segregation. Seriously mentally ill prisoners are often placed in ad. seg. or SHU because of strange, difficult, or unusual behavior that results from their mental illness, because they cannot cope on the mainline (general population) (*i.e.*, for the deterioration of their clinical condition rather than for disciplinary infractions), or while awaiting transfer to CMF-Main. Petrella Dec. at 60 (CMC), 142 (Wasco); Kaufman Dec. at 44 (Tehachapi); Kaufman Dec. at 97 (Donovan); Kupers Dec. at 82, 85 (Solano), 128 (Folsom); Meenakshi Dec. at 94 (Mule Creek), 104 (CCC). Many of these inmates require inpatient treatment. Meenakshi Dec. at 95 (Mule Creek). Inmates are placed in ad. seg. because of behavior caused by mental illness even in CMC-East, one of the few facilities in the state intended to provide intensive mental health treatment services. Kaufman Dec. at 109.

b.    Housing a mentally ill prisoner in ad. seg., SHU or other segregation units tends to exacerbate the severity of the mental illness, induce psychosis, and increase the risk of suicide. Kaufman Dec. at 25; Grassian Dec. at 5-15 (PBSP). The isolation and/or lack of environmental stimulation (*e.g.*, little yard or exercise time, no work or program assignments, placement in "quiet rooms" with no furnishings, not even a mattress) in many of these units unnecessarily triggers or exacerbates psychosis and can lead to permanent harm. Grassian Dec. at 33-43; Kaufman Dec. at 77 (Corcoran),

108 (CMC); Kupers Dec. at 50-51 (PBSP); Meenakshi Dec. at 19 (CIW). These factors are particularly acute in the SHU and in the Violence Control Unit at Pelican Bay State Prison, where many class members prisoners are housed, often because of behavior that results from their mental illnesses. Haney Dec. at 29-31, 34, 43, 44.

        c.     Mental health care staff are excluded from decisions regarding the housing of mentally disordered inmates, even though behavioral problems often are the result of mental illness and segregated housing can exacerbate mental illness or trigger psychosis. As a result, class members suffer unnecessary mental pain. Grassian Dec. at 55-56 (PBSP); Kaufman Dec. at 77 (Corcoran).

        d.     Many class members in ad. seg. or SHU require intensive psychiatric treatment. Kaufman Dec. at 96 (Donovan); Kupers Dec. at 49 (PBSP), 84 (Solano); Meenakshi Dec. at 19 (CIW), 50 (CCWF). While in such housing, they do not receive appropriate psychiatric care: they sometimes do not receive any medications; they rarely see a psychiatrist; and their previous treatment is disrupted, sometimes for months or years at a time. Petrella Dec. at 61-63, 68 (CMC), 82 (CIM); Kaufman Dec. at 25-26, 110 (CMC); Kupers Dec. at 85 (Solano), 128-29 (Folsom); Meenakshi Dec. at 19 (CIW). Because of this lack of care, plaintiffs' psychiatric problems are exacerbated, and they decompensate during their time in segregation. Petrella Dec. at 69 (CMC), 93 (Calipatria), 142 (Wasco); Kupers Dec. at 86 (Solano). Because of these problems, mentally ill inmates should not be housed in ad. seg. or SHU. Meenakshi Dec. at 49.

        e.     Mental health professionals spend little time in ad. seg., making it more difficult for plaintiffs to receive the mental health care they need while they are housed there. Kaufman Dec. at 26. Inmates often go for months at a time

without seeing a psychiatrist. Meenakshi Dec. at 50 (CCWF). Meetings with

psychiatrists in ad. seg. or SHU units are conducted in a non-therapeutic setting; often, all

persons in the unit must wear flack jackets, and evaluations are conducted through a

closed door cell. Petrella Dec. at 81 (CIM, 92 (Calipatria). This procedure is not

conducive either to an effective therapeutic relationship or to confidentiality. Kaufman

Dec. at 25-26, 68-69 (Corcoran), 107 (CMC).

        f.     Defendants have been and are aware that class members are

housed inappropriately in ad. seg., SHU or other segregation units and that such housing

unnecessarily exacerbates plaintiffs' illnesses and triggers psychosis. Defendants'

continuing policies and practices regarding segregated housing amount to deliberate

indifference to plaintiffs' serious mental health care needs as well as discrimination against

plaintiffs on the basis of their mental disability.

    **9.**    **Category J Inmates and Residential Outpatient Care**

        a.     Residential care for prisoners in the CDC system is provided

at three institutions, California Men's Colony, California Medical Facility, and the

California Institution for Women. Inmates who are unable to function within the general

population should be transferred promptly to one of these institutions. Despite this fact,

inmates who suffer from major mental illness and as a result have difficulty functioning in

the general population are routinely found in the general populations of prisons unable to

care for them; some of these inmates have been classified as Category J, but defendants

inappropriately house them in the general population. Meenakshi Dec. at 57; Kupers Dec.

at 39-40 (PBSP); 86-87 (discussing Solano); 100, 107 (Folsom).

b.       When prison psychiatrists or psychologists decide that an inmate should be classified as Category J and housed in a residential outpatient program, the inmate often has to wait for months before being transferred for evaluation, due in large part to the lack of bed space defendants have provided at these institutions. Meenakshi Dec. at 57 (CIW), 77 (NCWF), 96 (Mule Creek), 106 (CCC), 110 (SCC); Kupers Dec. at 96 (Solano), 116 (Folsom), 139 (DVI); Kaufman Dec. at 40 (Tehachapi); Petrella Dec. at 64-65. In fact, access to residential outpatient programs is so limited that staff at other prisons have given up trying to transfer inmates with serious mental health problems to the institutions that offer such programs. Rose Depo. 57:25-26 (PBSP). Because of the lack of residential outpatient care, class members decompensate to the point that they require hospitalization; this procedure is far more expensive and less therapeutic than outpatient care. 3. Many class members suffering serious mental illness do not receive the treatment they require during the delay between being identified for transfer as a potential Cat J and being transferred. They are often kept in administrative segregation or in reception centers, and are deprived of the opportunity for work or other programs while they are awaiting Cat J evaluations. Kaufman Dec. at 20.

c.       Defendants' criteria for access to residential treatment are inappropriate and confusing. Petrella Dec. at 179-80.       Many inmates are rejected for Cat J evaluation without a thorough evaluation and record review. Kaufman Dec. at 20; Petrella Dec. at 151-80. On some occasions, rather than recommending transfers on the basis of the severity of an inmates' mental illness, mental health staff recommend transfers based on whether an inmate has severe behavioral problems. Baker Depo. 149:22-150:26; Ruggles Depo. 27:15-28:12 (Pelican Bay). As a result, class members with serious

mental illnesses who do not exhibit bizarre behavior are left to languish indefinitely in their cells without receiving the treatment they need.

        d.     Even when an inmate is fortunate enough to be transferred, the residential treatment programs provided by defendants are entirely inadequate to meet the mental health care needs of the class members who need them, and do not meet the standards for such programs in the community. Petrella Dec. at 44-45; Meenakshi Dec. at 15 At CMC, for instance, there are waiting lists for group therapy groups, individual therapy has been all but eliminated, and occupational therapy is available only to a limited number of inmates. Petrella Dec-. at 43. As a result, class members' mental health suffers.

        e.     Class members are discharged prematurely from residential outpatient programs. Some inmates returning to their previous institutions arrive in "more or less the same condition" as when they left. Rose Depo. 54:21-26 (PBSP). Many inmates destabilize again and have to be returned to the residential program. Sheff Depo. 70:15-21 (PBSP).

        f.     Defendants know and have known that class members who are or should be classified as Category J are found in the general populations of prisons that cannot meet their needs. Defendants' policies with respect to Cat J inmates, their transfer to appropriate institutions, and their housing and psychiatric requirements while at their current institutions constitute deliberate indifference to plaintiffs' mental health needs as well as discrimination against plaintiffs on the basis of their handicaps.

10.    **Inpatient Services**

a.    Prisoners who need inpatient psychiatric care should be transferred to CMF-Main, to CIM's small inpatient section, or to one of the state hospitals with which the CDC has contracted to provide inpatient care.

b.    Class members who are in need of inpatient care are often denied such care.  There are not enough inpatient beds available to serve the inmates who need them.  Kaufman Dec. at 22; Meenakshi Dec. at 10.  In addition, the beds that are available are often underutilized because the CDC has not been able to reach agreement with the Department of Mental Health, with which it has contracted to provide the beds, on the criteria for inpatient admissions.  Kaufman Dec. at 114-15; Petrella Dec. at 45-46.  Some institutions are unwilling to accept prisoners who refuse to take medication voluntarily, those who are suicidal or violent, or those who are perceived as management problems.  Meenakshi Dec. at 7; Petrella Dec. at 67.  As a result, class members are denied vital psychiatric care, sometimes for years at a time.  Kaufman Dec. at 9, 115 (CMC); Meenakshi Dec. at 7 (CIW).

c.    Even when an inmate is recommended for transfer as a "Category I" for inpatient care, the transfer can take up to a month.  Petrella Dec. at 82 (CIM).  This is far too long. Inmates in need of psychiatric care should be transferred immediately; they are likely to decompensate further and to become more difficult to treat if their transfer is delayed. Petrella Dec. at 18.  The dangers of these delays are apparent from the deaths of two prisoners who committed suicide while awaiting transfer for inpatient care.  Petrella Dec. at 68 (CMC).

d.     The quality of the inpatient care provided to plaintiffs at CIM is highly inadequate.  There is minimal contact between professional staff and patients. The treatment plans for patients are inadequate, and there is limited programming or therapy for patients.  Petrella Dec. at 46-47. 5. Class members are discharged prematurely from inpatient programs, sometimes because they have caused management problems.  Kaufman Dec. at 115.  As a result, class members' mental health suffers

e.     Defendants know and have known that the inpatient care they have provided is inadequate to meet system needs and that processing delays have caused significant suffering to class members.  Defendants' policies with respect to securing access to inpatient facilities, eliminating delays in transfer, and budgeting for sufficient inpatient care constitute deliberate indifference to class members' mental health.

**11.     Presence of Category K Inmates in the General Population**

a.     Defendants know and have known that the state prison population contains mentally disabled inmates who require special programming and protective housing.  Petrella Dec. at 51, 71.  Despite this knowledge, defendants have failed to provide screening for mentally retarded inmates who should be classified as Category K.  Petrella Dec. at 186.

b.     Mentally retarded class members have special programming needs.  These needs include protective housing, because these inmates are especially vulnerable to being preyed on by others.  Petrella Dec. at 47-48.  However, defendants do not provide any special care, special programming, or protective housing for them. Beerman Depo. Vol. II., p. 406.

c.    CDC has no structured program to identify and care for mentally disabled inmates. Petrella Dec. at 47. It is not even possible to estimate how many such class members are currently in state prisons. Grassian Dec. at 16.

d.    Defendant's failure to identify and provide for mentally disabled class members constitutes deliberate indifference to plaintiffs' serious mental health care needs, as well as discrimination solely on the basis of their mental disabilities.

### 12.    Suicide Prevention and Treatment

a.    Defendants know and have known that mentally disordered prisoners are at particular risk of committing suicide. Despite this knowledge, prison staffs systemwide are inadequately trained in how to identify and monitor prisoners at risk of committing suicide. Mandel Depo. 22, 116 (Pelican Bay); Petrella Dec. at 69 (CMC); Petrella Dec. at 100 (Calipatria); Hollingsworth Depo. 79:9-14; 80:6-12 (Folsom); Meenakshi Dec. at 36 (CIW), 59 (CCWF), 98 (Mule Creek), 107 (CCC). The CDC's commitment to suicide prevention training is inconsistent at best, Meenakshi Dec. at 39 (CIW), and nonexistent for most custody staff. Baker Depo. 159:25-160:2 (Pelican Bay).

b.    Suicide and its prevention are not treated as serious issues of concern within the CDC. Unsuccessful attempts are routinely characterized as "gestures" that do not warrant serious attention. Meenakshi Dec. at 111, Kupers Dec. at 123, 125. Prison staff dismiss even the most drastic acts of self-mutilation by inmates as manipulation. Astorga Depo. 44:15-45:2; 45:3-11; Petrella Dec. at 37. The fact that an inmate could be tasered (see Section 14 below) while in the process of attempting suicide, Meenakshi Dec. at 107, demonstrates the misperceptions that prison staff hold about suicidal inmates and their needs.

c.    Ad. seg. units are used to house suicidal inmates despite the fact that adequate monitoring or evaluation under such circumstances is impossible. Petrella Dec. at 36.

d.    Defendants' failure to establish policies and procedures to reduce the risk of seriously mentally disordered inmates committing suicide constitutes deliberate indifference to plaintiffs' serious mental health care needs.

### 13.    Protective Planning for Heat Sensitive Inmates

a.    Because psychotropic medications affect the body's ability to regulate its own temperature, people who take these medications are at an increased risk of heat stroke or hyperthermia. Special precautions must be taken to prevent medicated inmates from suffering heat stroke. Kupers Dec. at 161. Although CDC prisoners have died as a result of exposure to heat while taking psychiatric medications, prior to the order entered as a result of this litigation there were no system-wide guidelines establishing the basic components of a plan to protect medicated prisoners from the effects of extreme weather. Development of heat plans has been uneven across the system. Mule Creek developed a plan in 1991. Meenakshi Dec. at 101. Other institutions, including CIW and Folsom, did not have heat plans in place until 1992. Meenakshi Dec. at 39; Kupers Dec. at 121. As late as March of 1992, DVI still did not have a heat protection plan. Kupers Dec. at 145.

b.    Even where heat plans are in place, implementation is haphazard and key staff have no knowledge or only passing knowledge of the plan established for their institution. Meenakshi Dec. at 66, 90, 102, 108; Hollingsworth Depo. 55:15-56:15; Kupers Dec. at 122. Despite CDC orders not to send

1    psychotropically medicated inmates to Calipatria where temperatures are especially

2    extreme, approximately twenty to thirty such inmates arrive there every month.  Millan

3    Depo. 19:1-20:26.  At CIW, even after the heat plan was in effect, a medicated inmate

4

5    passed out as a result of heat exposure.  Meenakshi Dec. at 40.

6                    c.       There are not enough staff to monitor inmates for signs of

7    heat-related illness when temperatures become extremely high.  Kaufman Dec. at 143

8    (CMC).

9                    d.       Defendants have not ensured that the class members at risk

10   from heat understand what precautions to take during periods of extreme temperatures.

11   Meenakshi Dec. at 108.

12

13                   e.       Defendants know and have known that psychiatrically

14   medicated inmates are at risk of serious injury in extreme weather conditions.

15   Defendants' failure to ensure proper planning at all institutions and implementation of all

16   heat-related directives constitutes deliberate indifference to class members' mental health.

17            **14.    Taser and 37 Millimeter Guns**

18

19                   a.       Defendants' employees use taser guns, 37 mm guns, and

20   other similar devices to subdue inmates.  Taser guns are designed to give an electric

21   shock.  37 mm guns are designed to shoot prisoners with rubber bullets or wooden blocks.

22   These devices, especially taser guns, are inappropriate for use on prisoners with serious

23   mental disorders.  When used on inmates who are taking psychotropic medications, these

24   devices can be extremely dangerous.  At least one inmate has died from the use of a taser

25   while he was taking psychotropic medications.  Kupers Dec. at 148 (DVI).

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.      Defendants continue to use taser and 37 mm guns in "cell extractions," often on mentally ill prisoners.  They are also used against class members simply for refusing custody staff orders, without any professional mental health intervention.  Petrella Dec. at 123 (Wasco).  They have even been used on a prisoner who was in the process of attempting suicide.  Meenakshi Dec. at 107 (CCC); CDC 005419.

c.      Defendants use tasers and 37 mm guns to subdue inmates who are exhibiting bizarre behavior, such as smearing feces or masturbating in public.  The use of these devices for such behavior is inappropriate and unnecessary, and causes class members needless pain.  Kaufman Dec. at 28-29, 84 (Corcoran).

d.      Defendants' policies and practices regarding the use of tasers, 37 mm guns, and other similar devices against prisoners with serious mental disorders amount to deliberate indifference to plaintiffs' mental health care needs.

**15.    Discrimination Against Handicapped Prisoners**

a.      For the same reasons that defendants have violated the Eighth Amendment and the Fourteenth Amendment as described above, they have also violated 29 U.S.C. § 794 ("Rehabilitation Act of 1973") by discriminating against class members solely by reason of their mental handicaps.  For example, mentally ill, mentally retarded, and mentally disabled class members have been placed in administrative segregation solely because of their mental disability of illness; while there, they are denied access to normal work or program assignments and to ordinary psychiatric care.  See section H above; Kaufman Dec. at 20; Petrella Dec. at 115 (CVSP).  In addition, plaintiffs spend extended periods in reception centers before they are transferred to institutions where they can receive mental health care.  While in the reception centers, they do not have access to

programs that other inmates participate in, such as work and educational programs. Kaufman Dec. at 38 (Tehachapi); Kupers Dec. 136 (DVI).  Defendants deny access to the substance abuse program at CRC to mentally ill prisoners.  Defendants also exclude prisoners with certain types of mental illness, such as organic grain syndrome, from mental health treatment.  These and other examples amount to denial of access to these programs solely on the basis of plaintiffs' handicaps.

### 16.    Defendants' Response to the Present Litigation

a.    Defendants have responded to the present litigation by making hasty changes in staffing, by attempting to improve mental health care at certain institutions, and by instituting "Coleman Reviews" of mentally ill inmates.  Grassian Dec. at 46 (PBSP); PEL 503558-825.  Plaintiffs expect that defendants will present at trial a written plan for restructuring their mental health care delivery system.  However, these changes do not demonstrate a good faith commitment to long-term improvements in the mental health care delivery system.  They indicate instead that defendants are only likely to improve mental health care in California prisons under threat or compulsion of a court order.  Moreover, they indicate a greater willingness to create paper plans than to implement actual plans and to undertake appropriate care of prisoners with serious mental disorders.

### 17.    Defendants' Response to Previous Court Orders

a.    Defendants are subject to the Consent Decree issued in *Gates v. Deukmejian*, No. CIVS 87-1636 LKK-JFM (E.D. Cal. 1987).  A major aspect of that Decree concerned significant reforms in the provision of psychiatric care to the prisoners at the California Medical Facility at Vacaville.  More than three years later, defendants

remain far from compliance with the Consent Decree and the numerous Court orders that have followed.

      b.      An example of defendants' lack of compliance is their response to the Consent Decree's requirement that defendants revamp their Outpatient Psychiatric Program ("OPP") to meet specified goals by certain dates. One part of the OPP was to be "fully staffed and operational" by June 1990, and the remainder of the program was to meet the same standard by October 1990. Consent Decree, Part V.F. Defendants remain far out of compliance with this Order even today. Full staffing was achieved only as a result of a contempt motion filed by plaintiffs in the spring of 1991. Full operation of the program has yet to be achieved. In his Eighth Quarterly Report, at 52, the Mediator concluded, "More than two years have elapsed since defendants agreed to provide appropriate psychiatric care for all prisoners at CMF. There is no justification for the delay in complying with this Court's Order."

      c.      Defendants have failed not only to live up to the agreements with plaintiffs reflected in the *Gates* Consent Decree but also have failed to comply with numerous orders of this Court issued subsequently as part of the compliance and remedial process. Thus, the ongoing *Gates v. Deukmejian* experience demonstrates that these same defendants have been unable or unwilling to implement a successful psychiatric program in <u>one</u> prison despite numerous Court Orders and vigorous monitoring by a Court-appointed mediator and a team of experts.[3/] This history indicates that defendants

---

[3/]    The Court will also recall that defendants failed to comply with several discovery orders in this case and that it became necessary to impose sanctions to induce compliance.

1    are unlikely to implement voluntarily the changes that would be necessary to provide

2    constitutionally adequate mental health care.

3    **III.    Legal Standards**

4

5            **A.    The Constitutional Standard Applicable to the Treatment of
        Severely Mentally Ill Prison Inmates Is Deliberate Indifference.**

6          The Eighth Amendment prohibits cruel and unusual punishment.  "The

7    Eighth Amendment is violated by "deliberate indifference to serious medical needs of

8    prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[4/]  A cause of action lies under

9

10    42 U.S.C. § 1983 if a complainant alleges deliberate indifference to his or her serious

11    medical or psychiatric need.  *Estelle*, 429 U.S. at 105; *see also Bowring v. Godwin*, 551

12    F.2d 44, 48 (4th Cir. 1977).  "Treatment of the mental disorders of mentally disturbed

13    inmates is a 'serious medical need.'"  *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir.

14    1983), *cert. denied*, 468 U.S. 1217 (1984) (affirming lower court's finding of

15

16    unconstitutional overcrowding and unconstitutionally inadequate medical care at state

17    prison in Indiana) (citing *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980), *cert.*

18    *denied*, 450 U.S. 1041 (1981) (affirming trial court's findings of Eighth Amendment

19    violations with respect to shelter, sanitation, food, personal safety, and health care)).

20

21

22    [4/]    This standard is not altered by the United States Supreme Court's holding in *Wilson*

23    *v. Seiter*, __ U.S. __, 111 S.Ct. 2321 (1991).  In that case, the Court held that in
cases challenging the conditions of confinement in prison, the claimant must show a

24    culpable state of mind on the part of prison officials.  That state of mind is deliberate
indifference.  Thus the Court in *Wilson* did little more than to establish a uniform

25    standard under the Eighth Amendment for claims of constitutionally deficient medical
care and claims that other, non-medical prison conditions violate the constitution.

26    Nothing in the Court's decision in *Wilson* changed the definition of "deliberate
indifference" given in decisions in earlier-decided cases.  Indeed, the *Wilson* Court

27    indicated, in agreement with those cases, that the existence of a long-standing, cruel
prison condition could help to establish deliberate indifference.  *Id.* at S.Ct. 2325.

28

           **Plaintiffs' Trial Brief
           and Proposed Findings of Fact**

The rationale for this standard is that, as plaintiffs' custodians, the

defendants owe plaintiffs mental health treatment which meets minimal standards of

adequacy. *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985) (conditions at state

prison, including medical neglect and continuous threats to inmates' safety, constituted

cruel and unusual punishment) (citing *Wellman*, 715 F.2d at 271).

> When a state imposes imprisonment as a punishment for
> crime, it accepts the obligation to provide persons in its
> custody with a medical care system that meets minimal
> standards of adequacy. This obligation is enforceable in
> federal court, since inadequate medical care for prisoners
> violates the eighth amendment.

*Wellman*, 715 F.2d at 271 (citing *Estelle*, 429 U.S. at 104).

There are two ways to demonstrate deliberate indifference in a prison

system: "(1) by a showing of a pattern of individual incidents involving inadequate

medical care; or (2) by pointing to systemic deficiencies in the delivery of medical care

which make unnecessary suffering inevitable." *Ruiz v. Estelle*, 503 F. Supp. 1265, 1330

(S.D. Tex. 1980) (finding various constitutional violations in the Texas Department of

Corrections, including inadequate mental health and medical care). Moreover,

> Deliberate indifference to serious medical needs is shown
> when prison officials have prevented an inmate from
> receiving recommended treatment or when an inmate is
> denied access to medical personnel capable of evaluating the
> need for treatment.

*Ramos*, 639 F.2d at 575 (citations omitted). "'When systematic deficiencies in staffing,

facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to

use its injunctive powers.'" *Wellman*, 715 F.2d at 272 (quoting *Todaro v. Ward*, 565

F.2d 48, 52 (2d Cir. 1977)).

1    Nor is it necessary for plaintiffs to show defendants' direct, personal

2    participation in the constitutional violations before injunctive relief may be imposed under

3    42 U.S.C. § 1983. *Johnson v. Duffy*, 588 F.2d 740, 744 (9th Cir. 1978). Defendants

4    may be liable under § 1983 both for affirmative acts which

5

6    set[ ] in motion a series of acts by others which the actor
     knows or reasonably should know would cause others to inflict
7    the constitutional injury. [Citations omitted.]

8    *Id.* at 743-744. Defendants also violate plaintiffs' constitutional rights if they fail to act

9    when there is a duty to act with the result that plaintiffs' constitutional rights are violated.

10   *Id.* at 743.

11

12   Defendants may not avoid responsibility for their constitutional violations

13   by arguing that those transgressions are excused by an inability to cure constitutional

14   defects due to a lack of funding. "Inadequate resources no longer can excuse the denial of

15   constitutional rights." *Todaro*, 565 F.2d at 54. "[C]ompliance with constitutional

16   standards may not be frustrated by legislative inaction or failure to provide the necessary

17   funds." *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), *reh'g denied*, 506 F.2d

18   1056 (5th Cir. 1974), *cert. denied*, 421 U.S. 948 (1975) (court affirmed orders by the

19   district court which were issued to ensure, among other things, necessary medical

20   attention for Alabama state prisoners). "Prisons may not deny, on account of cost,

21   inmates from obtaining constitutionally adequate health care." *Cody v. Hillard*, 599 F.

22   Supp. 1025, 1058 (D.S.D. 1984), *aff'd*, 799 F.2d 447 (8th Cir. 1986) (a state prison was

23

24   ordered to file a plan to bring conditions within constitutional standards because the

25   totality of conditions there, including medical, dental, psychiatric and psychological care,

26

27   subjected inmates to cruel and unusual punishment). Lack of financing is not

28

a defense to a failure to provide minimum constitutional standards. If the state wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutional manner.

*Cody*, 599 F. Supp. at 1062.[5/]

Plaintiffs intend at trial to show this court evidence of specific instances of negligent treatment of members of the class as well as evidence of severe systemic deficiencies in staffing, facilities and procedures.

**B.    Proper and Routine Screening Is Constitutionally Required to Identify Inmates with Mental Disorders.**

Screening inmates for mental illness, both upon reception into the prison system and upon transfer to another prison, is a vital component of adequate psychiatric care. *See Ruiz*, 503 F. Supp. at 1339; *Lightfoot v. Walker*, 486 F. Supp. 504, 517 (S.D. Ill. 1980) (Illinois state correctional center ordered to bring health care within constitutional standards) ("[P]roper screening is a vital element of adequate medical

_____

5/    Plaintiffs anticipate that defendants may argue that they have made every effort to obtain funding, but that the lack of funds available in the California budget has prevented them from doing so. In fact, however, defendants' efforts to obtain funding for mental health care have been woefully inadequate. Defendants have made no requests for additional funds to address the systemwide understaffing of which they have been aware since their August 1986 "Psychiatrist/Psychologist Workload Study." Nor did the Stirling Report's recommendations for additional psychiatric staffing -- made in 1989 -- prompt defendants to request the funding necessary for the recommended psychiatric staffing. Defendants' Budget Change Proposals which have requested additional staffing have not cited the Stirling Report or any other prevalence numbers in support of the necessity for additional funding. When defendants have requested additional funding, the support which they cited for their requests was admittedly arbitrary. Tilton Depo. ___. (The transcript of the Tilton Depo. is not yet available.) Defendants' irrational budget process shows deliberate indifference to plaintiffs' serious psychiatric needs. *Lightfoot v. Walker*, 486 F. Supp. 504, 525 (S.D. Ill. 1980) (Defendants' budgetary process was found to be "chaotic, irrational and the product of gross mismanagement;" defendants' reckless failure to obtain adequate funding for their health system constituted deliberate indifference to plaintiffs' serious medical needs).

1   services"); *Laaman v. Helgemoe*, 437 F. Supp. 269, 312 (D.N.H. 1977) (ordering New

2   Hampshire State Prison officials to improve conditions at the prison, including mental

3   health and medical care).  Among the reasons the court in *Laaman* granted a permanent

4   injunction for the improvement of medical and mental health care (among other

5   constitutionally deficient conditions) at the New Hampshire State Prison is that the prison

6   had failed to assess the conditions of newly admitted prisoners.  The court explained that

7

8               The failure to discover and/or diagnose serious medical
                problems can lead to the same evils as does the lack of
9               therapeutic attention once an illness or injury is known.

10  *Laaman*, 437 F. Supp. at 312.

11          In ordering that various conditions in the Puerto Rican prison system be

12  brought up to constitutional standards, the court in *Feliciano v. Barcelo*, 497 F. Supp. 14,

13  18 (D.P.R. 1979) observed that there was no screening of inmates; "[t]he only psychiatric

14  screening that the overwhelming number of inmates receive is the untrained subjective

15  evaluation of the prison guard."  *Id*.  The court pointed out that there was "no excuse" for

16  the failure to perform psychiatric evaluations of inmates.  In response to similar problems,

17  the court in *Ruiz* ordered "a systematic program for screening and evaluating inmates in

18  order to identify those who require mental health treatment."  *Ruiz*, 503 F. Supp. at 1339.

19          California prisons have in place no routine procedure designed to bring to a

20  clinician's attention inmates who suffer from mental disorders.  Consequently, the means

21  by which a mentally ill inmate is identified are left largely to chance.  A mentally ill

22  inmate in a California prison, as was true for inmates in Puerto Rican prisons as explained

23  in *Feliciano*, must hope to attract the attention of a sympathetic or interested guard, whose

24  random observations represent the only semblance of a "mechanism" affirmatively to

25

26

27

28

1    identify inmates suffering from serious mental disorders.  Needless to say, this "method"

2    does nothing for inmates whose suffering is not apparent to the untrained eye.  Failing

3    that, the prisoner must undertake a sustained, persistent and frequently unavailing

4    campaign to see the mental health professional in a prison.

5           The Stirling Report's prevalence findings suggest that an estimated 60% of

6    the California prison population has not been screened, identified and/or treated.  Stirling

7    Report, Vol. I, p.107.  A number of procedural deficiencies undoubtedly  contribute to

8    this large number.  In the first place, inmates who are transferred from one prison to

9    another often arrive at the new prison without their medical records.  Receiving prisons

10   consequently are unable continue a course of treatment or medication and may be unaware

11   that the inmate is seriously mentally disordered.  Secondly, a mentally ill inmate whose

12   medical records <u>have</u> accompanied him or her to a prison but whose records do not

13   suggest a mental disorder frequently pass through reception undetected both because

14   inmates' medical records are incomplete and of poor quality (see discussion at section III,

15   subsection E, below) and because no evaluation for mental illness is conducted at that time

16   or at any other.  Inmates on psychotropic medications may have their medications

17   renewed upon transfer from one prison to another, but these inmates are not referred to a

18   psychologist or psychiatrist for a psychiatric evaluation.  In any event, inmates wishing to

19   volunteer information about mental health problems during the institutional screening that

20   <u>does</u> take place when an inmate arrives at a prison must contend with the complete lack of

21   privacy attending this process.

C.     The Obstacles to Inmates' Access to Mental Health Care and Treatment in California Prisons are Unconstitutional.

The Eighth Amendment prohibits restrictions to mentally ill inmates' access to psychiatric care.  "[A]s a matter of constitutional law, a certain minimum level of medical service must be maintained to avoid the imposition of cruel and unusual punishment."  *Wellman*, 715 F.2d at 274.

This minimum level of service must include, among other things, a means by which inmates may bring their mental problems to the attention of clinicians.  "Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff . . . These requirements apply to . . . mental health."  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (district court injunctive relief partially affirmed and partially reversed in action for "overcrowding, inadequate medical care, increasing violence, the continuation of a lockdown, insufficient and poorly trained guards, improper classification of inmates, torturous conditions in the isolation, segregation and protective custody units, inadequate physical plant, and inadequate vocational, educational, and recreational opportunities."). California prison inmates who wish to see mental health professionals often have no effective way in which to inform a psychologist or psychiatrist of their mental problems. In many instances, their informal requests to see a psychiatrist or a psychologist, communicated to a guard or to an MTA, simply go unheeded.  Meanwhile the inmate waits, expecting a response from the clinician that all too often never arrives.

Seriously mentally ill inmates have extremely limited access to mental health care in California prisons.  Inmates who seek the care they need are, more often than not, frustrated by long -- even indefinite -- delays before they may see a mental

1   health professional or be transferred to a facility which is capable of providing the

2   inpatient or residential outpatient care they need. When treatment is at hand, it is

3   overwhelmingly cursory and inadequate. Moreover, inmates often are denied their

4

5   prescribed medications for a variety of reasons, often having to do with defendants' faulty

6   system for the distribution of medications. Finally, inmates may not count on having their

7   medications -- or their mental conditions generally -- monitored by qualified mental health

8   professionals.

9                    **1.    Due to Severe, Unconstitutional Shortages of Mental**
                            **Health Staff, Mentally Ill Inmates Have Little Access to**
10                          **the Professionals Qualified to Treat Them.**

11              Dangerously low levels of mental health staff, such as in California prisons,

12

13   violate the Eighth Amendment. Deliberate indifference may be evinced by . . . showing

14   'systematic or gross deficiencies in staffing, facilities, equipment or procedures.'"

15   *French*, 777 F.2d at 1254 (quoting *Ramos*, 639 F.2d at 575) (emphasis added). "Staff

16   shortages render medical services below constitutional muster if the shortage is such that it

17   endangers the health of the inmate population by either a lack of medical coverage or by

18
     use of unqualified personnel to staff the facility." *Laaman*, 437 F. Supp. at 312. "When
19

20   systematic deficiencies in staffing, facilities or procedures make unnecessary suffering

21   inevitable, a court will not hesitate to use its injunctive powers." *Wellman*, 715 F.2d at

22   272 (quoting *Todaro*, 565 F.2d at 52) (emphasis added).

23              Virtually every prison in the California prison system labors under

24
     shortages of mental health staff, and most prisons are grossly understaffed. (See
25

26   declarations of Grassian, Haney, Kaufman, Kupers, Meenakshi and Petrella.) This

27

28

understaffing largely explains the long delays which mentally ill inmates must endure before they are evaluated and treated.

This shortage of mental health staff in California prisons pervades the entire prison system and has plagued it for years. At Pelican Bay, for example, a prison of between 3,600 and 4,000 inmates -- a large number of whom, according to defendants' own documents, "have a long history of psychosis and/or other severe mental illness" -- there was no psychiatrist for over two years, with the exception of a psychiatrist who resigned after one month on the job. Haney Dec. at 52; Grassian Dec. at 15; 16; 45-46. The warden there borrowed psychiatrists from other institutions when he could, a practice which he characterized as a "hit and miss method." Haney Dec. at 52. General practitioners wrote prescriptions for inmates in consultation with the staff psychologist. Grassian Dec. at 46. The situation at Pelican Bay thus resembled that in *Ramos*, in which the Tenth Circuit affirmed a trial court's findings of Eighth Amendment violations regarding health care, among other things. Specifically:

> [T]here is no on-site psychiatrist or licensed Ph.D. psychologist at Old Max . . . A psychiatrist from the state reformatory [has visited] once every two months. One expert found that this level of psychiatric coverage is 'ridiculously pathetic.'

*Ramos*, 639 F.2d at 578.

Other California prisons also have perilously low levels of psychiatric staffing. A few representative examples of this pervasive problem are described below by way of illustration:

• Tehachapi had no psychiatrist <u>or</u> psychologist from 1987 to 1989. Kaufman Dec. at 35. Currently, Tehachapi has had no full-time psychiatrist for over two

years.  *Id*.  Its population of 5,500 inmates is treated by one and a half psychologists and

a psychiatrist who works two weekends a month.  Kaufman Dec. at 34-35.  Consequently,

four or five months pass before an inmate may have a routine appointment with the full-

time psychologist, Dr. Haskett.  Kaufman Dec. at 36-37.  Dr. Haskett wrote a letter to

defendant Khoury informing him that Tehachapi needed more mental health staff, but Dr.

Khoury never answered him.  Kaufman Dec. at 35.

•According to the one full-time psychiatrist at Corcoran, a prison of

approximately 5,500 inmates, he and the half-time psychiatrist then at Corcoran were

"spread real thin" and had "been pretty fortunate that [they] haven't had anybody kill

themselves."  Kaufman Dec. at 70-71.  Dr. Willis spends a significant amount of his time

doing paperwork, such as Board of Prison Terms evaluations.  Kaufman Dec. at 70.  The

part-time psychiatrist, Dr. Christopherson, said that he and Dr. Willis constituted "the

bare minimum" in psychiatric care at Corcoran.  *Id*.

•Deuel Vocational Institution is "grossly understaffed."  Kupers Dec. at

134.  One psychiatrist working two days per week cared for 3,000 inmates as late as

December 1992, when a full-time psychiatrist was hired.  *Id*.  The remaining psychiatric

staff simply handled emergencies and prescribed or renewed medications.  *Id*.

•One physician who has scant background in psychiatry cares for the 3,500

inmates at Calipatria.  Petrella Dec. at 88-89.  This physician is, in the opinion of one of

plaintiffs' experts and by the physician's own admission, "completely overwhelmed with

his workload."  Petrella Dec. at 88.

> As a consequence, class members at Calipatria are unable to
> access vital psychiatric services.  Grossly psychotic inmates
> are housed in the infirmary and in Ad. Seg.  The lack of care

leads to decompensation, suicide attempts and in one tragic
case, death by suicide.

*Id.*

•At the time plaintiffs' expert toured the Central California Women's
Facility, there was no psychiatrist on staff. Meenakshi Dec. at 63-64. The chief medical
officer explained to plaintiffs' expert that he had to sign contracts with four or five part-
time psychiatrists to provide a total of sixteen hours a month of psychiatric coverage to
this institution of 2,783 women. *Id.*, and Meenakshi Dec. at 40. The inmates whom
plaintiffs' expert interviewed unanimously complained that "their requests for psychiatric
attention had gone ignored for months." Meenakshi Dec. at 63-64.

Lest there be any doubt that defendants are aware of the inadequacy of the
mental health staffing in their prisons, it is clear that defendants have known since at least
August 1988 that mental health staffing had to be increased. Haney Dec. at 21-22. A
"Psychiatrist/Psychologist Workload Study" conducted by the CDC in 1986 revealed that
the psychiatric workload in California prisons could <u>not</u> be met with the staff then
employed. *Id.* One year later, the Stirling Report, Vol. I, in whose authorship defendant
Zil and other CDC employees participated, confirmed this finding.

This Court is empowered to mandate specific staffing levels for
psychiatrists, psychologists, nurses, counselors, psychiatric social workers and physician
assistants. *Cody*, 599 F. Supp. at 1044.

2.    **Mentally Ill Inmates Must Endure Unconstitutionally
Lengthy Delays Before Receiving Needed Treatment**

Delayed access to mental health care is unconstitutional.

"[T]o prove an individual claim of unconstitutional denial of medical care
it is necessary to show either denied or unreasonably delayed access to a

physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment."

*Lightfoot*, 486 F. Supp. at 509 (quoting *Todaro*, 431 F. Supp. at 1133).

Among constitutionally unacceptable obstacles to mental health care in prison is making an inmate suffer lengthy delays to obtain psychiatric evaluation and treatment. *Lightfoot*, 486 F. Supp. at 522. Yet such delays are commonplace within the California prison system, as plaintiffs' experts discovered.

Indeed, delay is a theme that pervades mental health care in California prisons. One of the most deplorable aspects of the system over which defendants preside is the long delays which routinely precede the transfer of any inmate from a general population prison to an institution (*i.e.*, CMF, CMC) capable of providing inpatient or residential outpatient care. Inmates typically wait for two or three months or more after a psychiatrist has recommended them for such a transfer before the transfer actually occurs. Meanwhile they ordinarily receive no treatment for their mental disorders beyond, perhaps, medication.

While seriously mentally disordered inmates await transfer to psychiatric prison facilities they must live in general population housing designed for inmates without significant mental problems. Some inmates awaiting transfer to inpatient or to residential outpatient facilities are left to languish in ad. seg. or the SHU -- isolated, punitive housing designed for non-disordered inmates who have committed infractions of the prison system's rules. The housing of the mentally ill in such a modern-day Bedlam is in itself unconstitutional (see discussion at section III, subsection D, below). These delays, like the delays in making needed adjustments to an inmate's psychotropic medications, are unconstitutional. "Deliberate indifference to serious medical needs is shown when prison

officials have prevented an inmate from receiving recommended treatment or when an

inmate is denied access to medical personnel capable of evaluating the need for

treatment." *Ramos*, 639 F.2d at 575.  Nor may housing an inmate in closely-watched

segregated housing units masquerade as mental health treatment.   "Treatment must entail

more than segregation and close supervision of the inmate patients." *Ruiz*, 503 F. Supp.

at 1339.

      3.      **Inpatient Care, Residential Care and Outpatient Care Are Essential Components of a Properly Functioning Mental Health System, and Failure to Provide them is Unconstitutional.**

In order to be able to function both in prison and in the outside world, the

mentally ill must have access to inpatient care, residential care and outpatient care.  A

minimally adequate prison system must provide these three levels of care.  To plaintiffs'

disadvantage, defendants have failed to provide anything but the most skeletal structure of

a mental health system.

The court in *Cody* found the availability of these levels of care to be of

crucial importance.

> There are three levels of care which are essential in providing
> an adequate system of psychiatric and psychological care[:
> (1)I]n-patient hospitalization care to treat acutely psychotic
> individuals, individuals experiencing suicidal tendencies, and
> those other individuals most significantly impaired by
> psychiatric illness[; (2)] intermediate care and treatment for
> those individuals who have been stabilized by medication and
> supportive psychotherapy but who cannot return immediately
> to the general inmate population[; and (3)] out-patient care.

*Cody*, 599 F. Supp. at 1043-44.  See also *Ramos*, 639 F.2d at 574 (the State must "make

available to inmates a level of medical care which is reasonably designed to meet the

routine and emergency health care needs of inmates.  This includes medical treatment for

inmates' . . . psychological or psychiatric care.").

The failure to provide these levels of care constitutes cruel and unusual

punishment.  *Feliciano*, 497 F. Supp. at 35 ("[t]he failure to hospitalize known mentally

ill under conditions where the penal institution personnel know that they cannot provide

medical or psychiatric services constitutes cruel and unusual punishment").  See also

*Cody*, 599 F. Supp. at 1043 ("[a]n inmate's mental condition need not present a risk of

harm to himself or to others before psychiatric intervention by qualified personnel is

required.").

While some inpatient care is available at CMF and other institutions

administered by the California Department of Mental Health (hereafter "DMH"), there are

not nearly enough beds available to accommodate all the inmates referred for inpatient

care.  Kaufman Dec. at 21-22.  As a result, inmates needing immediate transfer to

inpatient care suffer long delays.  Many inmates are never even recommended for transfer

to inpatient care units, but instead are placed in punitive segregation.  Petrella Dec. at 42.

Because the CDC and DMH disagree as to the criteria for admission to inpatient care, an

inordinate number of inmates eligible for such care is rejected.  Petrella Dec. at 45-46.

Many clinicians know how difficult it is to have an inmate admitted to inpatient care and

consequently do not even refer inmates to this level of care.  *Id.*  Inmates who are

accepted to inpatient care are returned prematurely to the general population.  Petrella

Dec. at 32.

Such inpatient care as exists is of exceedingly poor quality.  Petrella Dec.

at 42-43.  The inpatient hospital unit at CIM, for example, "more closely resembles a

lockdown unit than a psychiatric hospital." Petrella Dec. at 46-47. "Contact between professional staff and patients was minimal[, and] treatment plans for the patients were extremely sketchy and inadequate." *Id.*

Residential care is unavailable in all prisons except CMF, CMC and CIW, which, as with inpatient care, cannot accommodate all inmates eligible for transfer. Kaufman Dec. at 20-21. Indeed, defendants' own document indicates that, as of November 1, 1991, there was a backlog of 376 inmates awaiting transfer to CMF or CMC. Kaufman Dec. at 20. Moreover, custodial employees of the CDC have the power to veto a clinician's judgment that an inmate needs a referral to the CDC's residential care program. *Id.* Inmates consequently either are completely denied access to appropriate residential care or must wait an unacceptably long time to be transferred to these institutions. *Id.* Furthermore, the paucity of resources devoted to residential care imposes pressure to discharge inmates from this level of care prematurely. Kaufman Dec. at 144.

The residential care which is available to those who succeed in gaining access to it is substandard. Petrella Dec. at 44. Inmates must endure yet further delays before they may consult with clinicians. *Id.* The inmates whom plaintiffs' expert interviewed at CMC "often had severe treatment needs completely ignored." *Id.* Individual therapy is virtually non-existent, and there are waiting lists for group therapy. Petrella Dec. at 45. Occupational therapy is available to a very few. *Id.* Overworked clinicians do not have the time to do their jobs properly, and clinical judgment suffers as a consequence. *Id.* Ironically even at CMC, inmates who act out are placed in punitive

housing units where their serious psychiatric needs are ignored. *Id.* "Such housing will exacerbate mental illness and increase the risk of suicide." Kaufman Dec. at 109-110.

Finally, a system of outpatient care designed to monitor and treat inmates who do not need residential care is non-existent in California prisons. Petrella Dec. at 41-42.

In order for defendants to comply with constitutional minima, these three basic levels of mental health care must be available to all inmates who need it.

### 4. The Method by which Defendants Permit their Employees to Distribute Psychotropic Medications is Constitutionally Unacceptable.

Also unacceptable under the Eighth Amendment is the unsupervised distribution of psychotropic medications. "The control, prescription, dispensation, and administration of medications are important aspects of any medical care delivery system." *Ruiz*, 503 F. Supp. at 1324. "[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment." *Id*. at 1339.

In numerous respects, the "system" by which the defendants have allowed their employees to distribute medications is dangerous. All too frequently, non-psychiatric physicians are the only professionals available in California prisons to prescribe potentially dangerous psychotropic medications, with which they typically are unfamiliar. Indeed, Tehachapi's five non-psychiatric physicians, who were forced into this uncomfortable position, made their unhappiness with this unethical practice known to defendant Khoury in a memorandum dated May 27, 1992. Kaufman Dec. at 43.

1          Another constitutional deficiency of the system by which medication is

2   administered is that plaintiffs with prescriptions for "behavior-altering medications" often

3   do not receive their prescriptions if their work schedules, visiting hours or other

4   institutional programming conflicts with "pill call." Meenakshi Dec. at 56. If the inmates

5   miss attending required activities, such as jobs, they receive disciplinary infractions. *Id*.

6   Rarely, if ever, does the prison accommodate inmates with these predictable variations

7   from the "normal" schedule. The inmate instead is forced to accommodate the system,

8   often to the great disadvantage of his or her mental health.

9          In a similar vein, several prisons are constructed such that the line for "pill

10  call" forms outdoors. Inmates with prescriptions for psychotropic medications

11  consequently must brave rain and extreme temperatures in order to receive the

12  medications to which they are entitled. Inmates on medications which make them

13  sensitive to heat are especially vulnerable to the ill -- and potentially fatal -- effects of this

14  regime.

15         Even if inmates make it to and through "pill call," there is no system by

16  which their medications are monitored to assure that the type of medication and the dosage

17  are appropriate. Nor, in many prisons, is there anything to prevent inmates from

18  hoarding their medications or surreptitiously failing to ingest them.

### 5. California Prisons Do Not Provide Mental Health Treatment which Meets Even Minimally Acceptable Standards.

The mental health "treatment" in the California prison system amounts to

little more than the warehousing of seriously mentally ill inmates. Mentally ill inmates

who are fortunate receive appropriate psychotropic medications. Fewer still receive

minimal and abbreviated inpatient or residential outpatient treatment at CMF or CMC,

usually after their mental health has decompensated to such a degree that they have begun

to act out in critically bizarre or dangerous ways or have attempted suicide.

This "treatment" strongly resembles that of the Texas Department of

Corrections (hereafter "TDC"), addressed by the court in *Ruiz*. The court explained that

> TDC's program for the care and treatment of inmates with
> mental disorders can be characterized as rudimentary at best.
> Although a very large number of inmates have some
> character or mental disorder, few resources have been
> devoted by TDC to the provision of mental health services.
> Professional treatment personnel are virtually non-existent on
> the units. "Treatment" there consists almost exclusively of
> the administration of medications, usually psychotropic drugs,
> to establish control over disturbed inmates. Other options,
> such as counseling, group therapy, individual psychotherapy,
> or assignment to constructive, therapeutic activities are
> rarely, if ever, available on the units. Essentially, an inmate
> with a mental disorder is ignored by unit officers until his
> condition becomes serious. When this occurs, he is
> medicated excessively. If his condition becomes acute, he is
> deposited at TDC's Treatment Center, a facility exclusively
> for inmates with mental disorders . . . [T]he Treatment
> Center has only limited professional staffing, and inmates
> who are sent there are the recipients of little more than
> medication and what amounts to warehousing.

*Ruiz*, 503 F. Supp. at 1332.

### 6. Defendants' Deficient Treatment Practices Put Inmates at Risk of Committing Suicide.

The failure to intervene before an inmate commits suicide, where the

inmate's suicidality is known, constitutes deliberate indifference. *Greason v. Kemp*, 891

F.2d 829, 835-36 (11th Cir. 1990).

The scarcity in mental health staffing and poor training of custody staff

regarding mental health issues has resulted in suicide by mentally ill inmates who were not

caught by mental health screening, never evaluated by a mental health professional and never monitored as suicide risks.  Many of the mentally ill inmates who have killed themselves while incarcerated in California prisons would have been prevented from doing so if adequate procedures were in place to detect and to monitor those at risk.  The court in *Ruiz* found such a system necessary.

> [A] basic program for the identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program.

*Ruiz*, 503 F. Supp. at 1339.  Naturally, any mental health care system must be able to intervene when suicidal inmates are detected.

> Psychiatric intervention is clearly necessary in those instances where an inmate is contemplating suicide or where he exhibits psychiatric symptoms in such a degree that the inmate presents a risk of harm to himself or to others.

*Cody*, 599 F. Supp. at 1043.

The California prison system's efforts to prevent suicide by inmates is half-hearted at best.  Many inmates whose suicidality had been known to prison employees have made suicide attempts -- and some have succeeded.  Suicide attempts are frequently dismissed as the manipulative acts of malingerers.  Defendants must rigorously train all prison personnel to recognize symptoms of suicidality and to act swiftly when these are detected.

**D.    Mentally Ill Inmates Often Are Forced to Live in Punitive Housing Units, where Conditions Are the Harshest in the California Prison System, and Are Constitutionally Inadequate and Improper.**

The housing of mentally ill inmates in harshly punitive housing units, where contact with other inmates and staff is limited, security extremely tight and privileges,

such as exercising on the yard, constrained, is in itself a violation of such inmates' right

to be free from cruel and unusual punishment.

> Courts have universally condemned conditions of segregation
> inimicable to the inmate-occupants' physical health, and, in
> some instances, have also considered conditions that
> jeopardize the mental health or stability of the inmates so
> confined. The touchstone, in either case, is the health of the
> inmate; while the prison administration may punish, it may
> not do so in such a manner as threatens the physical and
> mental health of prisoners.

*Laaman*, 437 F. Supp. at 310.

A large proportion of the mentally ill inmates in the California prison

system are housed semi-permanently in ad. seg. or in the SHU, primarily because they

have displayed abnormal or antisocial behavior which guards failed to recognize as

symptomatic of a mental illness. Haney Dec. at 47; Grassian Dec. at 55, 56. Many of

these inmates have not been, nor will they be, recommended to CMF or CMC for

psychiatric evaluation and treatment, often because they have disciplinary proceedings

pending against them. Such disciplinary actions must be resolved before mentally ill

inmates are eligible to be transferred to a facility where they will be treated. Petrella

Dec. at 41. This rule holds even if the inmate's behavior which resulted in the

disciplinary action was a symptom of his or her mental disorder. *Id*. Thus here, as in

*Ruiz*, "[p]roper medical treatment and practice is often sacrificed to exaggerated concerns

about security . . . " *Ruiz*, 503 F. Supp. at 1307.

Plaintiffs' experts have submitted extensive testimony describing the bleak

conditions in ad. seg. and in the SHU and explaining why those conditions transgress all

standards of treatment for the mentally ill. Haney Dec. at 28-47; Grassian Dec. at 33-43.

Keeping mentally ill inmates under such conditions

1

2         worsens the prospects for recovery and increases the
          likelihood of decompensation into psychosis, suicidality and
3         the need for restrictive and intrusive treatment such as
          inpatient hospitalization, seclusion, restraints and involuntary
4         medication.  The more seriously mentally ill a person
          becomes, the more difficult he or she is to treat and the less
5         likely to fully return to the initial level of functioning.  The
          potential for suicide also increases.

6

Petrella Dec. at 41.

7

8         Beyond a doubt, segregation and SHU "threaten the physical and mental

9    health of prisoners."  Here, as in *Laaman*, "the experts concurred that the use of isolation

10   for disturbed inmates violates all modern treatment practice and is potentially

11   psychologically destructive and physically dangerous."  *Laaman*, 437 F. Supp. at 280.

12                **E.    Because the CDC's Medical Records are Inaccurate, Incomplete,**
                  **Disorganized and Illegible, Mentally Ill Inmates' Care is**
13                **Seriously Compromised.**

14         A prison system must maintain inmates' medical records in a coherent,

15   organized fashion in order to meet the requirements of the Eighth Amendment.

16

17         Properly kept medical records serve many purposes:  legal
           documentation of treatment is afforded; audits of the quality
18         of treatment provided by particular doctors or by the
           institution as a whole may be accomplished; determination of
19         the various needs of the institution are disclosed; and the
           major illnesses occurring there may be identified.  Also, a
20         physician who has had no previous involvement with the
           patient may examine a properly kept chart and, from the
21         information contained on it, carry on with the care and
           treatment of the patient.  However, the poor quality of TDC
22         medical records renders it impossible to fulfill these
           objectives.
23

24   *Ruiz*, 503 F. Supp. at 1323.  The court in *Ruiz* went on to order the TDC to maintain

25   "accurate, complete and confidential records of the mental health treatment process."  *Id*.

26   at 1339.  The medical records which the court discussed in *Ruiz* contained only an entry

27

28

1   reflecting the inmate's complaint and any medication which may have been prescribed.

2   *Id*. at 1323.  Missing from the medical files in *Ruiz* were:  physicians' diagnoses, nurses'

3   entries reflecting care provided, admission and discharge summaries and entries indicating

4   whether tests or procedures had been ordered or completed.  *Id*.

> Poorly maintained medical records violate the Eighth Amendment.
> The eighth amendment is implicated when "'inadequate,
> inaccurate and unprofessionally maintained medical records'
> give rise to the 'possibility for disaster stemming from a
> failure to properly chart'" the medical care received by
> inmates.  [Citations omitted.]

10  *Cody*, 599 F. Supp. at 1057.  The court in *Laaman* found that the inadequate medical

11  records there were "a hazard to the health of the patient inmates."  *Laaman*, 437 F. Supp.

12  at 313, 324.  Deficiencies in the medical records at issue in *Laaman* included:  non-

13  existent medical histories, the absence of any indication as to the basis for any medical

14  care administered, the lack of treatment plans, disorganization of the medical files and

15  insufficient detail.  *Id*. at 287.

17         The medical records of mentally ill inmates of California prisons are

18  fraught with glaring defects which impair the mental health care which inmates receive

19  and which therefore do not pass constitutional muster.  As in *Ruiz*, inmates' contacts with

20  mental health staff in California prisons often simply are not charted.  When a clinician

21  <u>has</u> made notes in an inmate's file, they are cursory and usually cryptic and/or illegible.

22  Moreover, frequently the records in inmates' medical files are not in chronological order,

23  thus effectively burying the misfiled information for all time; in this respect, the medical

24  files in the present case resemble those found constitutionally deficient in *Laaman*.  Also

25  as with the constitutionally deficient medical records in *Laaman*, the medical files of

26  California prisoners lack any detail, psychiatric histories and treatment plans.  The

1    consequences of these defects is that mentally disordered inmates receive inconsistent

2    treatment from the different clinicians in a prison (assuming they receive any treatment at

3    all) and inconsistent treatment (or no treatment) when they are transferred from one prison

4    to another.

5

6            To compound these problems, medical files often do not accompany an

7    inmate upon transfer from one prison to another.   The court in *Newman*, 503 F.2d at

8    1323, n.4, articulated well the implications of flawed medical records.

9                    The consequences of inadequate medical records are manifest
10                   in two ways.  First, because inmates transferred to and
                     released from [one prison] are accompanied by paltry
11                   records, personnel at the receiving institutions are unaware of
                     the diagnosis, treatment previously rendered, and the
12                   treatment prescribed for the future.  Second, there can be
                     little or no monitoring of whether receiving facilities are
13                   complying with a physician's orders.  Indeed, the evidence
                     indicates that such noncompliance is rampant.
14

15   *Id*.  The poor quality of medical records was one of the constitutionally inadequate

16   conditions which, according to the court in *Newman*, had justified the district court's

17   imposition of a permanent injunction to bring medical care to constitutional standards.  *Id*.

18   at 1323, 1325.

19

20           The medical records in California prisons suffer from the same flaws as did

21   those in *Ruiz* and *Laaman*.  Plaintiffs' experts have described the medical records which

22   they reviewed as "substantially flawed" and "abysmal."  Petrella Dec. at 110; Meenakshi

23   Dec. at 24.  Indeed, in some cases the informational vacuum inherent in the manner in

24   which inmates' medical records are maintained is "life-threatening."  Meenakshi Dec. at

25   24-25.  Psychiatric records often are not filed with inmates' medical records such that, for

26

27

28

example, it is difficult to track suicidal inmates.  Treatment plans -- standard in the

community -- are inadequate or altogether missing.

Plaintiffs urge this Court to order defendants to bring medical records

within the California prison system up to the community standard.

**F.      Unconstitutional Deficiencies in Mental Health Care in California Prisons is Partially Attributable to the Lack of Mental Health Care Quality Assurance and Lack of a Comprehensive Peer/Utilization Review System.**

Neither individual prisons which are designed to house general population

inmates nor the CDC as a whole has a system of mental health quality assurance, a peer

review system or a utilization review system.[6/]  It is thus impossible for the system to

assess comprehensively the quality of the mental health care it provides.

> A system of peer review and/or medical audit is the established method by which medical care may be evaluated and deficiencies corrected.

*Lightfoot*, 486 F. Supp. at 518.

Indeed, one of the reasons the court in *Ruiz* ruled constitutionally

inadequate the medical care provided in the Texas Department of Corrections' was that

> the entire medical care "system" is marked by an absence of any organizational structure, plan, or written procedures for the delivery of medical care or for the instruction, supervision, and review of the personnel putatively providing it.

*Ruiz*, 503 F. Supp. at 1307.

---

6/      Inadequate peer review exists at CIM and at CMC.

1

2

**FF.    A Constitutionally Adequate Mental Health Care System Must Take into Account the Special Needs of Mentally Retarded Inmates.**

3

4

5

6

7

8

9

Prison life is especially hard on mentally retarded inmates.  What was true in *Ruiz* is true here:  "Mentally retarded persons meet with unremitting hardships in prison . . ." *Ruiz*, 503 F. Supp. at 1275.  Few would argue that prison life, difficult for those of normal intelligence, can be brutal for retarded inmates who can be expected to find the prison routine confusing and terrifying and who are more vulnerable to the predations of guards and of other inmates.

10

11

12

13

14

15

16

17

18

19

20

21

The lack of mental health and rehabilitative services for mentally retarded inmates rises to a violation of the Eighth Amendment's proscription against cruel and unusual punishment when, as here, the conditions of confinement, from the perspective of mentally retarded inmates, "militates against reform and rehabilitation." *Holt v. Sarver*, 309 F. Supp. 362 (E.D. Ark. 1970).  Because mentally retarded inmates face more abuse from guards and from other inmates than do inmates of normal intelligence, and because prison life generally is more frightening and psychologically damaging to mentally retarded inmates than to others,[7] the absence of programs to treat their special needs violates the Eighth Amendment.  See *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 209 (8th Cir. 1974); *Palmigiano v. Garrahy*, 443 F. Supp. 956, 981 (D.R.I. 1977).

22

23

**G.    Defendants' Employees Improperly Use Taser Guns, 37 mm Guns and Restraints Against Mentally Ill Inmates in Violation of the Inmates' Constitutional Rights.**

24

25

26

Taser guns and 37 mm guns may be used only "in proportion to the need in each situation." *Hoptowit*, 682 F.2d at 1250.  *See also Michenfelder v. Summer*, 860

27

28

[7]    See testimony of Dr. Louis Beerman ("retarded people are often victimized . . . victimized in a number of ways.").  Beerman Depo. at 402-406.

F.2d 328 (9th Cir. 1988); *Parker v. Asher*, 701 F. Supp. 192, 194 (D. Nev. 1988).

Where there is a risk of serious psychological or physical harm or even death associated

with the use of a taser gun, the need for its use obviously decreases.

In an effort to subdue mentally ill inmates who have acted out as a result of

their disorders, guards in California prisons immobilize the inmates by means of electric

shock from taser guns and by using 37 mm guns which fire wooden or rubber pellets.

The use of these weapons on inmates with serious mental disorders constitutes cruel and

unusual punishment. Plaintiff's expert has testified that

> The mentally ill prisoners who tend to be subject to such
> violent methods of ill prisoners who tend to be subject to such
> violent methods of restraint frequently are in an acutely
> psychotic state, as their bizarre behavior evidenced. Aside
> from the dangers inherent in using a taser on an inmate
> receiving psychotropic medication, the use of any weapons
> like these is contraindicated with such patients. Shooting
> mentally disturbed people and approaching them wearing flack
> jackets, helmets, and masks is not therapeutic, to put it
> mildly. Such activity only serves to create fear and anger, to
> escalate the existing trauma or conflict, and to damage
> attitudes to authority figures, including prison personnel.
> [Citation omitted.] Such activity transforms the situation into
> one about survival for the inmate and survival for the
> correctional officer in which anxiety and violence feed off
> each other and escalate.

Kaufman Dec. at 29. Plaintiffs' expert suggests as an alternative to the use of tasers and

37 mm guns that defendants implement training for their employees in the techniques of

"Management of Assaultive Behavior." Kaufman Dec. at 29.

Aside from being cruel, the use of taser guns on inmates taking

psychotropic medications is extremely risky and potentially fatal. While the effects of the

electric shock from the taser gun in combination with the effects of psychotropic

medications are unknown, it is reasonable to suppose that inmates who have ingested

psychotropic medications -- particularly those medications which induce heat sensitivity -- face more risk from receiving an electric shock than do unmedicated inmates.  Indeed, at least one inmate died after he was shocked with a taser gun and then given a high dosage of a psychotropic drug.  Kupers Dec. at 148:23-149:15.

It is the serious psychological harm and the unknown but potentially catastrophic risks of taser use on psychotropically medicated inmates which distinguish the present case from those in which the use of tasers for legitimate penological purposes was deemed constitutional.  *See, e.g., Michenfelder*, 860 F.2d at 336.

This Court should enjoin defendants from permitting the use of taser guns on mentally ill inmates.  Furthermore, the use of 37 mm guns on mentally ill inmates should be limited to situations in which the need for force is great.  *Hoptowit*, 682 F.2d at 1251.  Specifically, defendants' employees should refrain from using 37 mm guns unless the use of the guns will prevent either more serious harm to the inmate or injury to others.

**H.    Defendants Do Not Have Proper Procedures to Protect the Health and Liberty Interests of Inmates Placed in Restraints for Psychiatric Reasons.**

The Supreme Court has held that a person involuntarily committed to an institution retains a liberty interest in remaining free from bodily restraint.  *Youngberg v. Romeo*, 457 U.S. 307 (1982).  The Court held in that case that although courts must defer to professional judgment regarding the need for restraints, ". . . liability may be imposed . . . when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  457 U.S. at 323.

1    The holding in *Youngberg* was applied in the prison context in *French v. Owens, supra*.

2    In *French*, the Seventh Circuit, in light of extreme abuses of the use of restraints in an

3    Indiana prison, upheld the District Court's injunction limiting use of restraints to an

4    infirmary setting, requiring that they be approved by a psychiatrist, and requiring transfer

5    to a psychiatric hospital if the inmate remained in restraints for over 24 hours. *French*,

6    777 F.2d at 1253-55.

7

8            At present defendants do not have system-wide protocols governing the use

9    of four- or five-point restraints on mentally ill inmates. This has allowed improper

10   procedures, outside of the realm of appropriate clinical judgment, to be used at various

11   institutions. For example, at CIM, restraints are imposed following a telephone order by

12   a physician. Petrella Dec. at 26. At Calipatria, at least one inmate remained in restraints

13   for over twenty-four hours without appropriate medical monitoring. Petrella Dec. at 33.

14   Moreover, this inmate was left in restraints after he had stabilized. *Id*. In addition, at

15   times custody considerations are allowed to impinge upon clinical decisions regarding

16   restraints. For example, at CIW, orders for restraints are cleared with custody staff.

17   Meenakshi Dec. at 10. These examples demonstrate the need for a system-wide protocol

18   for the use of restraints to ensure that patients are not inappropriately denied their right to

19   remain free of bodily restraint.

20

21

22       I.    **Defendants Have Failed to Meet Constitutional Standards by**
             **Failing to Establish Protocols for the Administration of**
23           **Involuntary Medication such that Inmates' Liberty Interests,**
             **their Health and the Well-Being of Others all are**
24           **Accommodated.**

25

26           To ensure the health and safety of mentally ill inmates who become acutely

27   psychotic and act out in bizarre ways, as well as for the well-being of other inmates, it is

28

1    necessary at times to medicate inmates involuntarily. So that involuntary medication is

2    performed safely and in a manner that does not invite abuse, it must be done in

3    accordance with procedures which safeguard inmates' liberty interests while protecting

4    their health and the well-being of others. *Washington v. Harper*, 494 U.S. 210, 221-22,

5    233-34, 236 (1990). In its decision in *Washington*, the United States Supreme Court

6    indicated that, before an inmate could be medicated involuntarily, the institution was

7    required to institute <u>some</u> procedural protections to protect the inmate's liberty interest.

8    *Id*. at 236. The Court concluded that the Washington State Department of Corrections'

9    policy for involuntary medication of psychotic inmates was constitutional in that it

10    safeguarded the interests of inmates who must be medicated involuntarily and ensured the

11
12    safety of other prisoners. *Id*. at 225-226, 233. *See also Keyhea v. Rushen*, 178 Cal.

13    App. 3d 526 (1986) (state prisoners are entitled to a judicial hearing to determine their

14    competency to refuse long-term psychotropic medication); *Bee v. Graves*, 744 F.2d 1387

15
16    (10th Cir. 1984), *cert. denied*, 469 U.S. 1214 (1985) (involuntary administration of

17    psychotropic medication to an inmate would be acceptable in an emergency, but inmate's

18    liberty interest must be balanced with institutional security concerns).

19
20    Defendants have not consistently instituted procedures designed to protect

21    the competing interests involved in instances of involuntary medication. In order to

22    protect the health and safety of mentally ill inmates and others, as well as to safeguard the

23    liberty interests of mentally ill inmates, defendants should be required to institute a formal

24    protocol for the administration of involuntary medication to mentally ill inmates.

25
26    In addition to procedures for properly administering involuntary medication,

27    defendants must follow an appropriate protocol before transferring inmates to another

28

facility for involuntary psychiatric treatment.  Prisoners maintain a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment, in avoiding involuntary transfer from prison to a mental hospital.  *Vitek v. Jones*, 445 U.S. 480 (1980).  The Supreme Court's ruling in *Vitek* relied in large part upon its finding that there was a significant stigmatizing effect in such a transfer.  The same is true of transfers into mental health treatment programs located within the prison system.

Indeed, defendants have recognized this and have agreed to provide for a hearing in accordance with *Vitek* following any involuntary transfer to the California Medical Facility for mental health treatment.  Consent Decree, *Whitaker v. Rushen*, No. C-81-3284 SAW (U.S.D.C., N.D. Cal., March 25, 1985).  Although a transfer to CMC for residential mental health care or to CIM for inpatient care carries such a stigma, the procedures set forth in *Vitek* are not applied.  Defendants should be required to implement procedures similar to those now in place for transfers to CMF to be used whenever a prisoner is involuntarily transferred to a mental health treatment program.

J.    **Defendants Have Failed to Effectively Ensure that Inmates Taking Medications which Induce Heat-Sensitivity Are Not Exposed to High Temperatures.**

Neuroleptic and anticholinergic drugs, commonly prescribed to treat various types of mental illness, are known to affect the body's ability to regulate its own temperature.  Thus people who take these medications are at increased risk of heat stroke or hyperthermia.  Kupers Dec. at 161.

Defendants have a constitutional obligation to provide plaintiffs with adequate shelter and medical care.  *Hoptowit*, 682 F.2d at 1253, 1256.  Temperature and ventilation are essential components of adequate shelter.  *Id.* at 1256.  Indeed, cells that

are so hot and airless as to endanger health fall below "minimum requirements for human habitation" and violate the Eighth Amendment. *Martino v. Carey*, 563 F.Supp. 984, 999 (D.Ore. 1983); *Toussaint v. McCarthy*, 597 F.Supp. at 1409; *Peterkin v. Jeffes*, 661 F.Supp. 895, 904 (E.D. Pa. 1987), *aff'd in relevant part*, 885 F.2d 1021 (3d Cir. 1988) (distinguishing between extreme temperatures that are merely uncomfortable and those that are "necessary to support life or prevent disease").  Defendants have been deliberately indifferent to plaintiffs' need for shelter and medical care which adequately protect them from heat and from the enhanced heat dangers for inmates on psychotropic medication.

Defendants are well aware of the life-threatening danger posed when inmates taking psychotropic medications are exposed to excessive heat.  These dangers are well known in the medical community. Kupers Dec. at 161.  Moreover, defendants have had direct experience with these dangers.  In 1988, an inmate at CMF who was taking Prolixin suffered severe brain damage following a heat stroke.  Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, at 3.  In 1991, tragically, three inmates on psychotropic medications at CMF died in one night during a summer heat wave. *Id*. at 1; Report of the California State Assembly Committee On Public Safety of the Hearing on Circumstances Surrounding Inmate Deaths Occurring on July 3, 1991 at CMF.

Plaintiffs more fully described these incidents, and defendants' failure to respond to them on a system-wide basis, in their Motion for Preliminary Injunction filed with this Court on July 31, 1991, and in their Renewed Motion for Preliminary Injunction, filed April 2, 1992.  Indeed, defendants are aware of their specific legal obligations in this regard as a result of this Court's Findings and Recommendations of

1    October 21, 1991.  In those Findings and Recommendations, the Court specifically

2    recognized the heat-related risks faced by inmates on neuroleptic and anticholinergic

3    medications, and the defendants' constitutional obligation to provide cooling, ventilation,

4    and adequate medical attention for prisoners susceptible to heat-related conditions.

5

6    Findings and Recommendations, p. 4.

7           The Court denied plaintiffs' original motion for preliminary injunction due

8    to the evidence presented by defendants at that time which showed that they were taking

9    steps to address the problem.  Unfortunately, defendants' action virtually ceased following

10   the issuance of the Findings and Recommendations.  Memorandum of Points and

11   Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, at 9-10.  The

12   deliberateness of defendants' indifference is highlighted by the fact that at that point,

13   although they had developed an extensive written plan for CMF, they refused to modify it

14   for state-wide use or to use the lessons learned at CMF on a state-wide basis.  The spring

15   of 1992 came without any state-wide standards having been put into effect regarding the

16   protection of inmates from excessive heat.  Id. at 12-13.

17           State-wide standards were established only in response to plaintiffs' renewed

18   motion, which, after intense negotiation, resulted in the issuance of a Stipulated Order.

19   Order of May 6, 1992.  Defendants followed the dictates of this Order in that they created

20   a heat plan for each institution which met the state-wide requirements.  However,

21   defendants have not fully met their obligations with regard to the implementation of these

22   plans.  Many staff members remain uninformed about the provisions of their institutions'

23   heat plans.  Meenakshi Dec. at 66, 90, 102, 108; Hollingsworth Depo. 55-56; Norum

24   Depo. at 152.

25

26

27

28

Moreover, key aspects of the CDC's overall plans for dealing with heat risks have not been followed. Despite CDC orders not to send psychotropically medicated inmates to Calipatria or CVSP, where temperatures are especially extreme, dozens of inmates on psychotropic medications arrive at these two institutions every month. Millan Depo., 19-20; Sept. 17, 1992 Memo from D. Tristan and K. McKinsey to Chief Medical Officers & Chief Psychiatrists. The evidence submitted thus clearly supports a finding of defendants' deliberate indifference to plaintiffs' needs with regard to protection from heat. In the face of clear evidence of a life-threatening danger to plaintiffs, and under court order to provide protection from this danger, defendants have nonetheless failed to provide adequate protection.

**K.      Defendants Have Deprived Mentally Ill Inmates of their Right to Participate in Work, Educational, Rehabilitation and Other Programs Generally Available in the California Prison System.**

Mentally ill inmates may not be deprived of the programs offered to inmates generally in California prisons. 28 C.F.R. § 42.501; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("an otherwise qualified handicapped individual must be provided with meaningful access to" benefits offered generally); *Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir. 1988) ("[b]y ensuring that inmates have meaningful access to prison activities, such as disciplinary proceedings and counseling, the goals of both the institution and the Rehabilitation Act are served").

For a variety of reasons, many mentally ill inmates are deprived of the ordinary programming generally available within California prisons. As explained above at section III, subsection D, some mentally ill inmates are confined to ad. seg. or the SHU as a direct result of the symptoms of their mental illnesses. Other mentally ill inmates

Plaintiffs' Trial Brief
and Proposed Findings of Fact

must live in housing units specifically designated for inmates taking psychotropic medications.  Because inmates must remain in those units during periods of high temperatures, or because jobs and programs simply are not offered on those units as they are in other units, mentally ill inmates frequently are not allowed to hold jobs or to participate in the ordinary prison programming.  In any event, the inflexibility of many prisons forces some inmates to choose between holding a job that conflicts with "pill call" or remaining unemployed so that they can take the medications they need.

**L.    Defendants May Not Evade this Court's Injunctive Powers by Instituting Hasty Changes -- Many of them Merely on Paper but not in Practice -- in Response to the Present Litigation.**

In an action which seeks injunctive relief, a defendant cannot dodge the court's injunctive powers by "reforming" the offending practices at the last minute.  The United States Supreme Court has stated that unless "subsequent events made it <u>absolutely clear</u> that the allegedly wrongful behavior could not reasonably be expected to recur," an injunction may issue to enjoin prior illegal conduct.  *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (emphasis added).  Accord *Fisher v. Koehler*, 692 F. Supp. 1519, 1565 (S.D.N.Y. 1988) (despite recent reforms, injunction issued against correctional institution based on evidence of earlier wrongdoing) and *National Organization for Women v. Operation Rescue*, 726 F. Supp. 1483, 1489, 1491, 1495, *aff'd*, 914 F.2d 582 (4th Cir. 1990) (despite recent cessation of trespassory activity, injunction issued based in part on evidence of organization's five-year history of such lawbreaking).

Furthermore, the burden of proving that the wrongs of the past could not reasonably be expected to recur rests with the defendants.  *See Phosphate Export Ass'n*,

393 U.S. at 203; *Jones v. Diamond*, 636 F.2d 1364, 1375 (5th Cir. 1981). That burden is "a heavy one." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). This heavy burden is difficult to carry when defendants make reforms during the pendency of litigation, since

> courts are suspicious that the defendant's dominant motivation
> is to deliberately moot the controversy and evade judicial
> review of its conduct.

*Dallas Gays Alliance v. Dallas County Hospital District*, 719 F. Supp. 1380, 1385 (N.D. Tex. 1989) (citing 1 H. Newberg, *Newberg on Class Actions* section 2.15 (2d ed. 1985) and relying on *W.T. Grant Co.*, 345 U.S. at 633). Thus, the Second Circuit Court of Appeals affirmed the granting of a preliminary injunction in a case challenging the mental health services at Attica Correctional Facility despite defendants' claim of substantial post-trial improvement. The court stated that although defendants had made improvements,

> without a preliminary injunction there is nothing to prevent
> defendants from abandoning procedures which the court
> determined to be necessary to protect plaintiffs' constitutional
> rights.

*Eng v. Smith*, 849 F.2d 80, 83 (2d Cir. 1988).

Defendants in the present case had a number of opportunities long before the filing of this lawsuit to improve the delivery of mental health care. They could have increased the mental health staffing in the California prison system in August 1986, after the completion of the "Psychiatrist/Psychologist Workload Study," which informed them that mental health in the California prison system was grossly understaffed. Haney Dec. at 25. Failing that, they could have hired more staff and improved mental health care in 1987, after the completion of the prevalence study which was conducted as part of the Stirling Report. The prevalence study revealed that more than 25% of the population of

1    inmates in California prisons were suffering from currently symptomatic mental disorders.

2    Greenfield Dec. at 13. The defendants had another chance to correct their constitutionally

3    substandard mental health care in 1989, after the Stirling Report itself was completed.

4    The Stirling Report made numerous recommendations for dramatic changes in the level of

5    mental health care staffing throughout the California prison system, as well as for

6    improved procedures for psychiatric screening, evaluating, monitoring and treating

7    mentally ill inmates. Haney Dec. at 19-20.

8    

9              As emphatic as were the warnings that defendants needed to improve mental

10   health care in California prisons, defendants ignored the signals that something was

11   desperately wrong. To the extent that they claim to have shown a desire recently to

12   provide constitutionally adequate psychiatric care, defendants' sudden interest in reform

13   has arisen solely under the pressure of litigation. *See*, *e.g.* Plaintiffs' Exhibit 0512,

14   Exhibit 8 to Domingo Depo., "Notes from Mental Health Task Force Meeting, CMC,"

15   November 19 and 20, 1991 ("The *Coleman* case drives the current focus of mental health

16   services."). Since defendants' motivation, if any exists, to improve mental health care

17   appears to be a desire to avoid the consequences of litigation rather than a sense of

18   responsibility for those in their custody, the impetus to make changes for the better is

19   likely to dissipate in the absence of an injunction to bring mental health care up to the

20   standards of the Eighth Amendment. Consequently, an injunction is appropriate in this

21   case even if the Court finds that defendants appear to have laid plans eventually to

22   improve psychiatric care in California prisons.

23

24

25

26

27

28

Plaintiffs' Trial Brief
and Proposed Findings of Fact

-68-

**M.    Evidence of Defendants' Actions in Response to Prior Court Orders and the Effect of These Actions Upon Plaintiffs is Relevant to Claims for Additional Relief.**

It is appropriate for the Court to consider the history of a defendants' noncompliance with previous court orders in fashioning relief in the present case. *Toussaint*, 597 F. Supp. at 1418 ("the history of noncompliance compiled by defendants over the ten-year course of this litigation must guide the Court in shaping a remedial decree"); *Finney*, 505 F.2d at 200, 214-214 (court concluded that Arkansas prison officials' continuing violations of previous court orders made it appropriate to retain federal jurisdiction over the prison system and to grant further relief).

Similarly here, defendants' failure to comply with previous court orders in a case substantially identical to the present one makes it evident that injunctive relief, at a minimum, is appropriate here. After seven weeks of trial in *Gates v. Deukmejian* in the fall of 1989 -- a class action against virtually the same defendants as in the present case challenging unconstitutional conditions at CMF -- the parties negotiated a consent decree which was approved by the Court in March 1990. A major aspect of the decree concerned significant reforms in the provision of psychiatric care to the prisoners at CMF. More than three years later defendants remain far from compliance with the consent decree to which they agreed and with the numerous court orders that have followed.

For example, the consent decree required defendants to revamp their Outpatient Psychiatric Program (hereafter "OPP") to meet specified goals by dates certain. One part of the OPP was to be "fully staffed and operational" by June 1990 and the remainder of the program was to meet the same standard by October 1990. Consent Decree, Part V.F. Defendants remain far out of compliance with this order even today.

1    Full staffing was achieved only as a result of a contempt motion filed by plaintiffs in the

2    spring of 1991. Full operation of the program has yet to be achieved. In his Eighth

3    Quarterly Report at page 52, the mediator appointed in *Gates* concluded:

4

5              More than two years have elapsed since defendants agreed to
             provide appropriate psychiatric care for all prisoners at CMF.
6              There is no justification for the delay in complying with this
             Court's Order.

7

8            Defendants have failed not only to live up to the agreements with plaintiffs

9    reflected in the consent decree in *Gates* but also have failed to comply with numerous

10   orders of this Court issued subsequently as part of the compliance and remedial process.

11   Thus, the ongoing experience in *Gates v. Deukmejian* demonstrates that these same

12   defendants have been unable or unwilling to implement successfully a psychiatric program

13   in <u>one</u> prison despite numerous court orders and vigorous monitoring by a Court-

14   appointed mediator and a team of experts.

15

16           In light of defendants' prior conduct, it appears clear that they will not act

17   voluntarily to make constitutionally-mandated changes to the mental health care in

18   California prisons. Injunctive relief therefore is necessary.

19   **IV.    Conclusion**

20           The evidence presented in plaintiffs' experts' declarations and the evidence

21   which plaintiffs will present at trial will clearly show that defendants have been

22   deliberately indifferent to plaintiffs' serious medical needs. Plaintiffs respectfully request

23

24

25

26

27

28

1   that this Court therefore order defendants immediately to bring the mental health care

2   which they provide into compliance with constitutional standards.

3   Dated: February 22, 1993                    HELLER, EHRMAN, WHITE & McAULIFFE

4

5

6   By: _____

7        Ingrid S. Leverett

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Trial Brief
and Proposed Findings of Fact**

1 **PROOF OF SERVICE BY MAIL**

2     I, Tina M. Estrella, declare as follows:

3     I am employed with the law firm of HELLER, EHRMAN, WHITE &

4 McAULIFFE, whose address is 333 Bush Street, San Francisco,

5 California 94104-2878.  I am readily familiar with the business

6 practices of this office for collection and processing of

7 correspondence for mailing with the United States Postal Service;

8 I am over the age of eighteen years and not a party to this

9 action.

10     On February 22, I served the following:

11     PLAINTIFF'S TRIAL BRIEF AND PROPOSED FINDINGS OF FACT

12 on the below parties in this action by placing true copies

13 thereof in sealed envelopes, addressed as shown, for collection

14 and mailing pursuant to the ordinary business practice of this

15 office which is that correspondence for mailing is collected and

16 deposited with the United States Postal Service on the same day

17 in the ordinary course of business:

18 Ismael A. Castro, Esq.    Karl Mayer
   Deputy Attorney General   Deputy Attorney General

19 State of California      State of California Department
   Department of Justice     of Justice

20 1515 K Street, Suite 511  455 Golden Gate Avenue, 6th Floor
   P.O. Box 944255       San Francisco, California  94102

21 Sacramento, CA  94244-2550

22     I declare under penalty of perjury under the laws of the

23 State of California that the foregoing is true and correct.

24     Executed at San Francisco, California on February 22, 1993.

25

26                            _Tina M. Estrella_
                               Tina M. Estrella

27

28