ORIGINAL

FILED

JUL 2 2 1993

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

1   EASTERN DISTRICT OF CALIFORNIA

2   In Re:                        )   Case No. CIV S-90-520 LKK JFM
                                  )
3   RALPH COLEMAN, WINIFRED       )   Sacramento, California
    WILLIAMS, DAVID HEROUX,       )   Monday, June 21, 1993
4   DAVID McKAY, ROY JOSEPH,      )   9:00 A.M.
    and all others similarly      )
5   situated,                     )   COURT TRIAL
                                  )
6       Plaintiffs,               )
                                  )
7   v.                            )
                                  )
8   PETE WILSON, GOVERNOR OF      )
    THE STATE OF CALIFORNIA,      )
9   JOSEPH SANDOVAL, SECRETARY    )
    OF YOUTH AND CORRECTIONS      )
10  AGENCY, JAMES GOMEZ,          )
    DIRECTOR OF THE CALIFORNIA    )
11  DEPARTMENT OF CORRECTIONS,    )
    NADIM KHOURY, M.D.,           )
12  ASSISTANT DEPUTY DIRECTOR     )
    FOR MEDICAL SERVICES, JOHN    )
13  S. ZIL, M.D., CHIEF,          )
    PSYCHIATRIC SERVICES,         )
14                                )
        Defendants.               )
15  _____)

16              VOLUME XXXIX
            TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOHN F. MOULDS
17       UNITED STATES MAGISTRATE JUDGE

18  APPEARANCES:

19  For Plaintiffs:          DONALD SPECTOR
                             Prison Law Office
20                           General Delivery
                             San Quentin, CA  94964
21                           (415) 772-6000

22  For Plaintiffs:          MICHAEL W. BIEN
                             Rosen, Bien and Asaro
23                           155 Montgomery Street
                             Eighth Floor
24                           San Francisco, CA  94104
                             (415) 433-6830

25  ////

FORM 2094 PENGAD/INDY 1-800-631-6989

536

39-ii

APPEARANCES:   (Cont.)

For Plaintiffs:          WARREN GEORGE
                         McCutchen, Doyle, Brown
                         and Enersen
                         Three Embarcadero Center
                         San Francisco, CA  94111
                         (415) 393-2000

For Defendants:          KARL MAYER
                         State of California
                         Department of Justice
                         Office of the Attorney General
                         455 Golden Gate Avenue
                         Suite 6000
                         San Francisco, CA  94102
                         (415) 703-2174

For Defendants:          ISMAEL A. CASTRO
                         State of California
                         Department of Justice
                         Office of the Attorney General
                         1515 K Street
                         P.O. Box 944255
                         Sacramento, CA  94244
                         (916) 323-1977

Court Recorder:          LAURA CERDA
                         U.S. District Court
                         650 Capitol Mall
                         Sacramento, CA  95814
                         (916) 551-2165

Transcription Service:   V/ARS, INC.
                         2001 H Street
                         Sacramento, CA  95814
                         (916) 448-2457

Proceedings recorded by electronic sound recording; tran-
script produced by transcription service.

39-iii

WITNESS INDEX

| FOR DEFENDANT | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| James Gomez | | S-2 | M-81 |

| FOR PLAINTIFF | | | |
|---|---|---|---|
| Nadim Khoury | B-85 | M-91 | |

Legend:  S = Spector
         M = Mayer
         B = Bien

EXHIBIT INDEX

| FOR DEFENDANT | ID | ADMITTED |
|---|---|---|
| 1654 2/25/'93 letter, Gomez to legislature | 6 | 7 |
| 1655 '93-'98 master plan | 7 | 8 |
| 1619 3/8/88 memo | | 42 |

| FOR PLAINTIFF | | |
|---|---|---|
| 1649 Memo, Khoury to CIW warden | | 87 |
| 1656 Consent decree | | 90 |
| 1633 | | 103 |
| 1640 | | 103 |
| 1614 | | 104 |
| 1615 Incident report, Vacaville | | 104 |
| 1616 Suicide policy | | 104 |
| 1319 | | 104 |
| 1320 | | 104 |
| 1321 | | 104 |
| 1659 Taser package | | 106 |
| 1660 | | 106 |

--o0o--

FORM 2094 PENGAD/INDY 1-800-631-6989

39-1

THE COURT:  Good day, all.  Good morning.

MR. MAYER:  Good morning, Your Honor.

THE COURT:  Counsel are all present.  Is there anything to take up before Mr. Gomez is recalled?

MR. MAYER:  No.

MR. SPECTOR:  No, but there's lots to do afterwards.

THE COURT:  All right.  Mr. Gomez, if you'd come forward, please.  Believe it or not, you are still under oath, sir.

THE WITNESS:  I believe it.

J. GOMEZ, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

MR. MAYER:  Your Honor, before Mr. Gomez starts, I just wondered, I don't know if this has to be on the record. I was just wondering about the schedule today and whether or not it will include closing arguments and so on, or should we wait until after the testimony on that?

THE COURT:  Let's go off the record.

(Off the record.)

THE COURT:  Mr. Gomez is on the stand.

Mr. Spector.

MR. SPECTOR:  Good morning, Mr. Gomez.

THE WITNESS:  Good morning.

Gomez - Cross                                    39-2

1                           CROSS EXAMINATION

2    BY MR. SPECTOR:

3    Q.   When you last testified here at the, in the end of May,

4    the assembly had a cut of about 800 million and the senate

5    had something like 400 million the Department of Corrections

6    budget.  My question to you is, what is the status of those

7    cuts at the present time?

8    A.   To the best of my knowledge, there are two tracks.  The

9    first track is the conference committee report which came

10   out with a reduction of $392 million for the Department of

11   Corrections.  It was both specified and unspecified.  Over

12   the weekend there were negotiations between the governor,

13   Assemblyman Brown, Senator Maddy, Assemblyman Brulte and

14   Senator Roberti.  A bill passed out late last night or early

15   this morning with a budget that is now in the senate and

16   will be voted on today.  To the best of my knowledge, that

17   has approximately a $9 million cut in the Department of

18   Corrections.

19   Q.   Okay.  You took a cut in the operating budget of the

20   Department of Corrections last year.  Isn't that correct?

21   A.   That's correct.

22   Q.   And that was about five percent or about $135 million.

23   Do I have --

24   A.   That --

25   Q.   -- that right?

1  A.    That's correct.

2  Q.    And you testified on direct examination that you pro-

3  tected the medical and psychiatric services during last

4  year's cuts.  Is that correct?

5  A.    I believe I did protect it, yes.

6  Q.    And that was because you think that medical and mental

7  health care are high priority?

8  A.    That's correct.

9  Q.    And it's also true, is it not, that the Coleman case

10  had at least an indirect affect on your decision making

11  process?

12  A.    I think it --

13          MR. MAYER:  Objection, Your Honor.  The question

14  is ambiguous.

15          MR. SPECTOR:  Ambiguity is not an objection, Your

16  Honor.  Vagueness might be, but not ambiguity.

17          THE COURT:  Well, --

18          MR. MAYER:  My --

19          THE COURT:  In any event --

20          MR. MAYER:  My objection is that it's also vague

21  and as stated, irrelevant.

22          THE COURT:  The objection as restated is sus-

23  tained, Mr. Spector.

24          MR. SPECTOR:  On what grounds?  Which one of the

25  grounds?

Gomez - Cross                           39-4

1          THE COURT:  I said as restated.

2          MR. SPECTOR:  As vague?

3          THE COURT:  Yes.

4          MR. SPECTOR:  Okay.

5    BY MR. SPECTOR:

6    Q.   It is also true, is it not, that the Coleman case had

7    at least an indirect affect on your decision making process

8    in terms of which services to cut?

9          MR. MAYER:  Again, I object.  It's vague.

10         THE COURT:  Overruled.

11         THE WITNESS:  Relative to the cuts, no, I don't

12   think It had a significant affect on the decisions that we

13   made.  Maybe an indirect affect in that I knew it was there

14   but it was not what I would call a deciding factor in why we

15   made those cuts.  It was a factor that was present.

16         THE COURT:  Mr. Spector.

17         MR. SPECTOR:  Yes.

18         THE COURT:  What does this have to do with this

19   trial?

20         MR. SPECTOR:  Well, Your Honor, it seems to me

21   that if the Coleman litigation is responsible in part for

22   some of the actions of the defendants taken in this matter

23   then that is itself a reason why the Court should issue

24   injunctive relief.

25         THE COURT:  All right, proceed.

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                    39-5

1   BY MR. SPECTOR:

2   Q.   Now, it's also true that in your opinion last year's

3   cut brought the Department of Corrections actually, in your

4   terms, to the bone.  You made cuts which cut to the bone.

5   Is that --

6              MR. MAYER:   I Object again on the same --

7              MR. SPECTOR:   -- accurate statement, restatement

8   of your thinking?

9              MR. MAYER:   I object.  The question is ambiguous,

10  Your Honor.

11             THE COURT:   Overruled.

12             MR. MAYER:   And vague if there's a difference.

13             THE WITNESS:   I believe that it has cut us to a

14  very difficult point in terms of operations.  I don't know

15  if I used the term, the bone, but it certainly has taken all

16  the fat away from the Department of Corrections and our

17  ability to continue to operate effectively was severely

18  hampered last year with the significant cut that we took.

19  BY MR. SPECTOR:

20  Q.   And it's also true that if you suffer any unallocated

21  cuts in this next fiscal year that you will not be able to

22  protect mental health services from cuts.  Isn't that true?

23  A.   Well, it depends upon the size of the cut.  Now, if we

24  got $100 million cut, I don't believe I could protect any-

25  thing.  I think if we get a nine or $10 million cut, my

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                         39-6

1   ability to move things around is much better.  So, I think

2   it depends upon the magnitude of what the legislature and

3   the governor agree to and I would clearly say, as we rise in

4   the multi-million dollars that our ability to protect is

5   very difficult, but at the smaller level, my budget is about

6   $2.6 billion.  One percent is 25 million.  If we can get

7   into the fractions of percents, obviously I think I have a

8   better ability to manage but it depends upon the magnitude

9   of the cut.

10  Q.   The Department of Corrections puts out on at least an

11  annual basis and maybe semi-annual, a five year facilities

12  master plan.  Is that correct?

13  A.   And we put it out twice a year.

14  Q.   Okay, and you're familiar with those, are you not?

15  A.   On a general perspective, not, I don't know all the

16  technical numbers today.

17  Q.   All right.  Well, you write a letter that accompanies

18  this master plan to the legislature, do you not?

19  A.   That's correct.

20        MR. SPECTOR:  Okay.  Going go mark this as Plain-

21  tiff's next in order, please.

22  BY MR. SPECTOR:

23  Q.   Mr. Gomez, I'm going to, I showed you a letter dated

24  February 25th, 1993 and that accompanies the five year

25  facilities master plan of 1993 to 1998.  Is that, in fact,

FORM 2094 PENGAD/INDY 1-800-631-6989

1   the letter you wrote to the legislature?

2   A.   Yes it is.

3   Q.   And that's an accurate copy of the facilities master

4   plan that accompanies it?

5   A.   It sure appears to be.

6   Q.   Okay.

7           THE COURT:   Could I have the exhibit number on

8   that, please?

9           MR. SPECTOR:   Sixteen fifty-four.   We move that --

10          THE COURT:   Mr. Spector, --

11          MR. SPECTOR:   Yes.

12          THE COURT:   There are two documents that I

13   received.   One is the letter of February 25, '93 and the

14   other is a multi-page California Department of Corrections

15   five years facilities master plan, 1993 to '98.   Are you

16   offering those under the same number?

17          MR. SPECTOR:   That was my intent, Your Honor,

18   because the letter just refers to the document.

19          THE COURT:   For ease in our own record keeping,

20   I'm going to direct that the letter bear the number which it

21   now has of 1654.   You are offering that?

22          MR. SPECTOR:   Yes.

23          THE COURT:   Without objection, that will be admit-

24   ted.   The '93-'98 master plan will be marked as 1655.

25          MR. SPECTOR:   We're offering that as well, Your

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                               39-8

1   Honor.

2           THE COURT:  And without objection, that is admit-

3   ted also.

4   BY MR. SPECTOR:

5   Q.   You can put that aside, Mr. Gomez.  I'm not going to

6   even ask you any questions about it, believe it or not.  Is

7   the California prison system the largest one in the country

8   at the present time, do you know?

9   A.   Yes it is.

10  Q.   And it's true, is it not, that it's grown very rapidly

11  in the last ten years?

12  A.   Yes, it has.

13  Q.   And from what I understand it went from about 25,000 in

14  1980 to about 113,000 prisoners today?

15  A.   I think, I know it's 114,500 today and I know it was

16  33,000 in 1983.  I'm not sure of the 1980 --

17  Q.   Okay.

18  A.   -- number.

19  Q.   But that accurately describes the magnitude of the

20  rise.

21  A.   That certainly does.

22  Q.   Okay.

23          THE COURT:  The --

24          MR. SPECTOR:  And your --

25          THE COURT:  I have seen numbers closer to 20,000,

Gomez - Cross                                    39-9

1   like 21,000 in about '81 or so.  Do you know whether those
2   are inaccurate?

3           THE WITNESS:  They sound low to me.  That sounds
4   more like '78, '79 but it could be that --

5           THE COURT:  I'm sure they're around here some-
6   place.

7           MR. SPECTOR:  They're in my office.  If you'd
8   like, I can --

9           THE COURT:  Well, I would like to get the numbers
10  from the early eighties if they are available and if they
11  are admitted.  If they're not, then I would imagine there
12  are documents of which this Court can take judicial notice
13  since I assume that's a matter of an annual, at least an
14  annual report.

15          THE WITNESS:  Oh, it's certainly available.
16  BY MR. SPECTOR:
17  Q.  Your office has a public information department which
18  keeps that?
19  A.  Yeah.  We have a statistical section and Dick Welch
20  would be able to provide that information on a phone call,
21  and the report that goes with it.
22  Q.  Okay.  So, during that rapid rise in the prison popula-
23  tion, there was a tremendous pressure on the Department to
24  build prisons and to build them quickly.  That's true,
25  correct?

1   A.    That's true.

2   Q.    And there was obviously overcrowding during that time

3   but you realize that those prisons had to be built quickly

4   before the overcrowding got to unmanageable proportions.

5   Isn't that correct?

6           MR. MAYER:   I object to the question as vague in

7   use of its term overcrowding.

8           THE COURT:   Sustained.

9   BY MR. SPECTOR:

10  Q.    You're familiar with the fact that prisons are built to

11  a designed capacity, are you not?

12  A.    Yes.

13  Q.    And you're also familiar with the fact that more pris-

14  oners are housed in institutions than are, than there are

15  beds that they were designed for?

16  A.    Yes.

17  Q.    And I will refer to that as overcrowding.  Is that okay

18  with you?

19          MR. MAYER:   I object.

20          THE COURT:   Sustained.

21  BY MR. SPECTOR:

22  Q.    My question, Mr. Gomez, was that there was pressure on

23  the Department to build the prisons before the overcrowding

24  became unmanageable.  Isn't that true?

25  A.    There was pressure to build additional prison cells

1  because there was knowledge that the increase was averaging
2  anywhere between seven and 9,000 inmates per year and we had
3  to build additional cells to accommodate that kind of intake
4  which took place from '85 through '93, so clearly there was
5  pressure to build additional prison cells to handle the
6  influx of inmates being sent to us by the courts and we
7  reacted to that as well as the California legislature
8  reacted to that and the public by passing bond initiatives,
9  at least revenue initiatives and then building those
10  prisons.
11  Q.   And the first prison they built was opened in 1985.
12  Isn't that correct?
13  A.   I believe that the first prison opened in '84 in
14  Vacaville but --
15  Q.   CMF South?   What --
16  A.   CMF South.
17  Q.   Okay, and so did, the Department didn't do any large
18  studies on how to build prisons or make general plans for
19  doing that, it just went ahead and started building and
20  learned on the way.   Isn't that --
21  A.   No.   I don't think that's fair.   I think that it's fair
22  to say that people planned from 1978 to 1983.   They didn't
23  do anything but they planned a lot.   There are more plans
24  back in the offices of what should be done and what should-
25  n't be done, of what kind of housing units should be built.

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                          39-12

1   What happened was, no action took place during that period

2   of time, of any significance.  So, when the new administra-

3   tion came in, in '83, the conditions were escalating in

4   terms of the number of inmates coming and there were studies

5   commissioned, five year plan was prepared, housing designs

6   were looked at, housing designs were agreed upon.

7               So, there was clearly planning that took place.

8   You have to remember that no prisons were built in Califor-

9   nia for 20, 25 years and yet there was a recognition in 1978

10  when the determinate sentencing law was passed that that was

11  going to have an impact.  I think what you found was a

12  significant lack of firm action in that period of '78

13  through '82 on how to actually do it and in fact that's why

14  in 1982, '83 the legislature took the function of prison

15  construction and placed it in the Department of Corrections

16  because general services and the legislative analyst and

17  everybody else was planning but no one was accomplishing

18  anything.  So, what they did is they took that responsi-

19  bility that in all other government resides in general

20  services, and they placed it in the hands of the Director of

21  Corrections and said, you're the one that has the most to

22  lose if prisons are not built on a timely basis, it's your

23  function, go build, and that's what started to happen in

24  '83.

25  Q.   And when did you get to the Department of Corrections?

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                               39-13

1   A.    I came in 1983 at the end of '83.

2   Q.    And one of your mandates was to start building those

3   prisons.

4   A.    Certainly was.

5   Q.    And so you took the data that had been collected and --

6          THE COURT:  Excuse me.  In what capacity did you

7   come to the Department of Corrections?

8          THE WITNESS:  As chief deputy director, the number

9   two person.

10  BY MR. SPECTOR:

11  Q.    And so you looked at those plans and you looked at the

12  data that had been collected.  As an effective manager you

13  made decisions on how it should proceed and you made, and

14  you took action.  Is that correct?

15  A.    I like to believe so.

16  Q.    Okay.  Now, during that time, the Department built

17  38,000 beds in 14 new prisons at a cost of $4.5 billion.  Is

18  that correct?

19         MR. MAYER:  Object to the question as vague as to

20  use of the terms that time.  If that could be specified,

21  please.

22         MR. SPECTOR:  Okay.

23  BY MR. SPECTOR:

24  Q.    From 1983 to the present you built 38,000 beds in 14

25  new prisons at a cost of $4.5 billion?

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                           39-14

1    A.    I can't say exactly but I can tell you that I know it's

2    over 36,000 and I know it's over four billion but I don't

3    know if your numbers are exactly accurate.

4    Q.    Right.   I'm not trying to hold you to exact figures

5    here.

6    A.    Okay.

7    Q.    But that's approximately correct.   In the process of

8    building all these new prisons and beds, cells, health care

9    was not given all the attention it deserved.   Isn't that

10   true?

11   A.    I think that's a judgment and I think that if you, this

12   morning at 9:30 the Department of Health was looking at our

13   hospital in Corcoran.   It is to open on, next week, the

14   28th.   It's a 75 bed hospital that has been constructed and

15   that is a significant increase in medical capacity.   We also

16   built infirmaries, 22 bed infirmaries in each and every one

17   of those institutions that you talked about over that nine

18   year period.   So, there has been some medical planning that

19   has gone on to provide medical care during that construction

20   period.

21   Q.    But the Department grew so fast that health care did

22   not have the attention it should have, isn't that correct,

23   in your opinion, Mr. Gomez?

24   A.    It's my opinion that it did not have as high a priority

25   as I felt it should as a new director.

1   Q.   Now, you're familiar with what was done in, a study

2   that was done in 1986.  It was called the workload study.

3   It was a month long study of all institutions with mental

4   health professionals in order to determine the appropriate

5   ratio for psychologist and psychiatrists?

6   A.   Boy, I'm not real familiar.

7   Q.   Okay.

8   A.   I'd have to see it.

9   Q.   You're aware, at your deposition -- let me show you a

10   copy of it.  This is, I'm referring to Exhibit 456, Your

11   Honor.

12   A.   I'm sure you showed it to me at my deposition.

13      (Pause.)

14         THE COURT:  Are you familiar with the document?

15         THE WITNESS:  I'm somewhat familiar with the

16   document, yes.

17         MR. SPECTOR:  Okay.

18   BY MR. SPECTOR:

19   Q.   Now, if you look at page Roman numeral VI.

20   A.   Yes.

21   Q.   It concluded that the current workload is clearly

22   excessive with the existing resources.  You see that?

23   A.   I see that statement, yes.

24   Q.   And you understood that the general thrust of the study

25   was that the mental health staffing has not kept staff with

FORM 2094 PENGAD/INDY 1-800-631-6989

1    the rapid rise in the prison population and that existing

2    resources needed to be augmented.  Isn't that correct?

3    A.    No.  I believe that the purpose of the study was to

4    study that issue, not that a conclusion had been made but to

5    take a look at that issue.

6    Q.    Well --

7    A.    I mean, if the conclusion was there, why do the study?

8    Q.    No.  I'm sorry.  Well, that's what the study found

9    after it had studied the issue.

10   A.    I think that's what the study, on its basis said, that

11   there were insufficient resources, yes.

12   Q.    Okay, and you agree that you were aware of this study

13   when it came out, were you not, in 1986?

14   A.    Somewhat, yes.

15   Q.    And you agree that the study was a red flag that there

16   was a problem with mental health resources, were you not?

17   A.    I believe that the study indicated that based on what

18   it found in the study that it felt that there was additional

19   resources required in the mental health area.

20        MR. SPECTOR:  I would like to read from Mr.

21   Gomez's deposition at page 47, lines 15, starting at line

22   15.

23   "Q.  When you read something like this even though it's not

24   methodologically adequate, in your opinion, would it or did

25   it send up a warning flag to you that maybe there's a

FORM 2094 PENGAD/INDY 1-800-631-6989

1  problem here?

2  "A.  As I remember this issue six years ago yes, the answer

3  would be yes."

4  Q.   Now Mr. Gomez, I know this is a long time ago but do

5  you recall that this 1986 study was turned into a budget

6  change proposal in which the Department of Corrections

7  sought to establish ratios for psychiatrists and

8  psychologists?

9  A.   I believe it was.

10  Q.   And that budget change proposal was denied by the

11  Department of Finance, was it not?

12  A.   I believe it was.

13  Q.   And the reason they denied it was because the Depart-

14  ment of Finance determined that the workload study was not

15  sufficient to justify the ratios.  Is that true?

16  A.   That's correct.

17  Q.   Now, you're also aware, in 1989, of the Stirling

18  Report, are you not?

19  A.   Yes, I am.

20  Q.   And you understand that like the workload study of 1986

21  the Stirling Report concluded that the Department had insuf-

22  ficient resources to identify and treat serious mentally ill

23  prisoners?

24  A.   The Stirling Report indicated they felt more resources

25  should be provided to adequately provide services to

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                          39-18

1    severely mentally ill.

2    Q.    And did you or your staff ever determine what the

3    fiscal implications of the Stirling Report were in terms of

4    the amount of staff that they recommended?

5    A.    Not to my knowledge.

6    Q.    Did you have an idea that the fiscal implications of

7    the staffing recommended by the Stirling Report were very

8    significant?

9    A.    I think they were but as I remember going through the

10   Stirling Report at that time and as you know it's probably a

11   two or three volume report, fairly, probably 12 inches

12   thick, that there were so many problems with the report that

13   I had at that point in time that I didn't spend time on, a

14   lot of time looking at what they viewed the staffing pat-

15   terns.   I don't remember a document, Don, within that that

16   said, we think it's this number of staff per institution and

17   that's what you're insufficient.   I have no recollection of

18   that.

19   Q.    Okay.  Are you aware that besides talking about exist-

20   ing resources, the Stirling Report also had criticisms of

21   various policies and procedures in the mental health care

22   system such as quality assurance, management information

23   systems, case management tracking and the like?

24   A.    Yes.  There were some criticisms in that report.

25   Q.    Now, you testified on direct that the Department didn't

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                                39-19

1  embrace the report.  Those were your words.  Do you recall

2  that --

3  A.    Yes.

4  Q.    -- testimony?

5  A.    Yes.

6  Q.    Isn't it true that, in fact, the Department really did

7  nothing in response to that report?

8  A.    No.

9  Q.    What did it do?

10  A.    I think that, as I said, that sent up another indicator

11  of a warning sign that we had problems.  Part of the BCP's

12  that were prepared in '89 and '90 came from a recognition

13  that the Stirling Report said we had problems.  I think that

14  you would find in both of those BCP's prepared by staff that

15  they would have probably referenced the Stirling Report,

16  they referenced everything else typically, and I think that

17  when we looked at the some $6 million expansion that took

18  place in the, in '90-'91 period of time, I believe that that

19  Stirling Report was just another report indicating that we

20  had some issues in the mental health system that we should

21  attend to and whether it was used as a technical back up, it

22  certainly was a document that continued to tell us that we

23  had problems in the mental health area.

24  Q.    Okay.  Now, you testified on direct also about the

25  Scarlett Carp Report.  You're familiar with that, correct?

FORM 2094 PENGAD/INDY 1-800-631-6989

1  A.   I'm familiar with the report.

2  Q.   Okay, and the report came out of a study that went on

3  for, I think, over a year or more.  Is that correct?

4  A.   That is correct.

5  Q.   And you were briefed periodically on the status of the

6  Carp, Scarlett Carp study?

7  A.   At least three times.

8  Q.   Okay.  You understand that Carp, like the workload

9  study, like the Stirling Report, recommended that the

10  Department significantly augment the mental health

11  resources, particularly in terms of staffing?

12  A.   I believe that the Scarlett Carp Report indicated that

13  we should, in fact, redo the system of how we provide mental

14  health care and significantly increase resources.

15  Q.   Now, as I understand your testimony, you rejected the

16  staffing analysis that was done by the Carp Report because

17  you believe that it didn't have sufficient justification for

18  you to ask for what you term the $40 million it would take

19  to implement it?  Is that an accurate statement of your

20  position?

21  A.   It's an accurate statement to say that I did not feel

22  that the justification in that report would be sufficient

23  enough to get it through the Department of Finance.  I

24  believe that three experts got in a room and threw around

25  their best expertise of what they thought it would take to

Gomez - Cross                    39-21

1   meet these kinds of illnesses and these kinds of problems

2   but they did not do the technical backup detail behind it

3   that Finance typically approves a budget change proposal of

4   the 30 or $40 million variety and so I think it's fair to

5   say that I think it would be very difficult to sell that

6   report without technical backup behind it that says three

7   experts in a room believe you need $40 million for the

8   following staffing.  That doesn't mean that it can't be done

9   but it means that it would be very difficult.

10  Q.   The type of data that is missing, if I understand your

11  testimony correctly is you want to see how many clients a

12  clinician can see in an hour, how long they have to spend on

13  administrative functions, how many clients they can see in a

14  week, that type of thing?

15  A.   That's correct.

16  Q.   And that would be similar to the type of data but forth

17  in the workload study that was done in 1986, wouldn't it?

18  A.   Well, it would be, the workload study in '86 was not

19  very well done in that basis.  It was the best that was

20  available at that point in time.  To do it on the basis that

21  one really would like, you would like to be able to know

22  that on 160 hours a month, what is the psychologist or psy-

23  chiatrist going to be doing, approximately?  How many

24  patients are they going to see, what kind of treatment are

25  they going to do, if this is psychiatrists, are, do we have

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                                      39-22

1    them prescribing medication?  If it's a psychologist, do we

2    have them doing counseling, do we have them doing group?

3    What is it that they would do and what is their objective?

4    I think that the 1986 report did not have the kind of backup

5    that, Finance tore it to shreds as I remember.

6          I think the Scarlett Carp Report has a much better

7    programmatic sense of what people should be doing and de-

8    fines what they think a psychologist should be doing in the

9    system and what a psychiatrist should be doing in the system

10   and what a psychiatric social worker should do in the system

11   but I don't believe that it has the kind of detail behind it

12   that we would like in the best of all worlds.

13   Q.    That work --

14          THE COURT:  I'm sorry.  I didn't hear --

15          THE WITNESS:  In the best of all worlds.

16          THE COURT:  Best of all worlds, you'd be out of

17   work and I'd be out of work so -- excuse me.  Just an obser-

18   vation, sir.

19   BY MR. SPECTOR:

20   Q.   Mr. Gomez, would you take a look at that workload study

21   which I just gave you and just for example turn to page 44.

22   That's table number six.

23        (Pause.)

24   Q.   Do you have that?

25   A.    Yes I do.

1    Q.   Do you see that as a table in which they've -- it's a
2    worksheet really, in which they are describing the different
3    duties that a psychiatrist, psychologist have, how long it
4    takes them to do that, what the time is per single activity
5    and then there's some sort of formula and then they get to
6    the actual time that's required per year.  Is that accurate?
7    Am I reading that chart correctly?

8    A.   Well, I think you're summarizing it somewhat correctly.
9    Q.   Okay, and then if you turn the page, please, to page 45
10   you see that they actually do those computations.  Isn't
11   that true?  You see that, Mr. Gomez?

12   A.   Yes I do.  I'm, it appears they did.

13   Q.   Okay.  Is that the type of analysis that you were
14   referring to when you wanted to see how many clients a
15   clinician would see in an hour and how many hours it would
16   take per activity and the like?

17   A.   I would expect it to be much more detailed than this.
18   Q.   Um-huh.  Have you consulted the Stirling Report which
19   has some methodology in terms of staffing requirements and
20   they go into how many hours it takes for particular
21   subjects?

22   A.   No.  I have not personally done that.

23   Q.   Okay.  Now, you're, going back to the Carp Report for a
24   minute, you're aware that Carp, like Stirling, also identi-
25   fied many, what I'll call system problems with the mental

Gomez - Cross                    39-24

1   health care provided by the Department, things like adequacy
2   of screening medical records, quality assurance, and the
3   like.
4   A.    Yes, I am aware of that.
5   Q.    Then you understand that many of the problems that are
6   identified by Carp in 1993 are the same type of problems
7   that are identified by Stirling in 1989?
8   A.    Some of them are.
9   Q.    And you recognize that many, if not all, these problems
10  had the direct and significant impact on the Department's
11  ability to provide adequate mental health care to prisoners?
12  A.    I think they can but I think that you need to put in
13  perspective that many of those issues have been resolved,
14  some have not, but I don't think it's fair to say that
15  during '89 to '93 nothing has happened.
16  Q.    Well, for example, in '89 the Stirling Report concluded
17  that there was inadequate screening and that there was a
18  large number of prisoners who were undetected by the system.
19  Carp, in the same, in 1993, also criticized the Department's
20  screening process and I, myself, am unaware of anything
21  different that's happened.  Is that not accurate?
22  A.    Well, no, I think lots of resources have been put
23  forward towards screening.  I think whether it has met where
24  we would like it to be, it's fair to say that no, I'm not
25  where we'd like to be on the issue of screening for

FORM 2094 PENGAD/INDY 1-800-631-6989

1  psychiatric illness but I think that it's better in '93 than

2  it was in '89.

3  Q.    Because there are more psychologists there?

4  A.    More psychologists, more resources, more emphasis on

5  it, more discussion taking place, a clearer understanding of

6  expectations.  I think we're getting very close to having

7  standardized screening documents that will be used in all

8  institutions, a recognition that we have to go in a standard

9  way in our screening for all the institutions.  I think a

10 lot of work has been done.  It has not all yet come to

11 fruition but I think we're in a different place in '93 than

12 we were in '89.

13 Q.    Now, on direct examination in response to a question

14 from the judge, you indicated that the problems that are

15 existing in the screening process at the institutions were

16 directly attributable to a lack of leadership from a central

17 office.  Do you recall that testimony?

18 A.    Yeah.  I'm not sure I used those terms but I think it's

19 fair to say that leadership in central office should be, in

20 my mind, developing standardized tools for the field and

21 then the field should be expected to implement those tools.

22 I think central office has not, over the past years, taken

23 as aggressive a role as I expect them to in the last two

24 years and in the future in determining and developing those

25 standards and then holding the field accountable to meeting

1  those standards.  I think that you're looking at a system,

2  and I'm talking an entire prison system of which mental

3  health is one component where we are embarked upon a journey

4  in which standardization is the word, not centralization.  I

5  don't want to take all the authority and bring it up to

6  central office but I want all the standard setting done at

7  central office where then we can have expectations and

8  accountability at the local level and I think it's fair to

9  say that in the eighties we did not take as aggressive a

10 posture in terms of standardization of that kind of issues

11 as we are in the nineties.

12 Q.   And that goes farther than standardization, does it

13 not?  Doesn't it go to accountability, to making sure that

14 policies and procedures that were in place were actually

15 being followed?

16 A.   I believe that standardization will give you a better

17 ability for accountability and a better ability to hold

18 people accountable and a better ability to set expectations

19 of what that accountability is.  I think most people in

20 government will provide you what you set out for them.

21 They're committed.  They care and they want to do the job

22 but if it's not as clear as it should be what you expect

23 that job to be, they are going to not be as accountable

24 'cause they're not sure as much what you're actually expect-

25 ing them to do.

1  Q.    And isn't it true that another component of getting

2  people in the field to do the job is giving them the

3  resources necessary to do that job?  Isn't that correct?

4  A.    I believe it is.

5  Q.    Okay.  Now, you testified on direct examination that

6  you shared the Carp Report with the Department of Finance.

7  Is that true?

8  A.    Yes.

9  Q.    Okay.  What was their reaction to the report?

10 A.    I don't know if it's fair to give a reaction.  I think

11 that they have had the report and they've looked at it

12 briefly.  They've not spent the kind of hours that I expect

13 eventually them to spend on the detail but their reaction to

14 the report was not warm and fuzzy.

15 Q.    Wasn't it true that it was pretty negative?

16 A.    I don't think it was pretty -- I mean, you have to, I

17 send 100 reports a year over to Finance.  I don't think

18 pretty negative is necessarily a fair term.  I think it was

19 very analytical.  Their response was very analytical and

20 their first look, not from a policy level at the top but

21 from the lower level staff is to tear it to shreds.  That's

22 how they view their role in government.  So, they have

23 become very analytical and if they find that it doesn't have

24 the analytical base that they want they can be very diffi-

25 cult to deal with.

FORM 2094 PENGAD/INDY 1-800-631-6989

1   Q.   Were, did you also get any comments from finance about

2   the fiscal implications of the Carp Report?

3   A.   Only relative to our settlement discussions.

4   Q.   Okay.  You mentioned on direct examination that you

5   talked to the director of finance about the options you have

6   with respect to Coleman.  What options was the director of

7   finance aware of?

8   A.   I think --

9            MR. MAYER:  Your Honor --

10           THE WITNESS:  -- all the discussions I've had with

11   the director of finance have been in settlement, not in any

12   other regard, on Coleman.

13   BY MR. SPECTOR:

14   Q.   Okay.  Now, if I understand your testimony correctly,

15   these, part of the job of the Department of Finance is to

16   tear your proposals to shreds, so to speak.

17   A.   I believe that's a part of their role in government.

18   Q.   Okay, and --

19   A.   Or they perceive it to be part of their role in

20   government.

21   Q.   And in order to meet, in order to keep your proposals

22   intact you try and justify your requests for money and funds

23   with supporting data, correct?

24   A.   That's correct.

25   Q.   And as a general proposition would you agree that the

Gomez - Cross                          39-29

1   better the supporting data the more likely that your propos-

2   als will be approved?

3   A.   Yes, in a, in times of fiscal stability, yes.  In times

4   of fiscal instability, there are occasions where you can

5   have all the supporting data you want but it doesn't make

6   any difference.  I think you would find that in Department

7   of Corrections, in the court system, in the welfare system,

8   you name it, that you may have all the right justifications

9   and right arguments but there are, there is no money and so

10  I think you have to temper that with the times in which

11  you're dealing and I think that makes a difference.

12  Q.   Do you also have to temper it with the fact that policy

13  decisions come into play, regardless of the necessities that

14  are demonstrated?

15  A.   I'm not sure I understand --

16  Q.   Okay.

17  A.   -- your question.

18  Q.   Well, the supporting data, you've testified, isn't the

19  sole consideration.  Sometimes it depends on how much money

20  the State has, correct?

21  A.   That's correct.

22  Q.   And it also depends on the priorities that the state

23  agencies put on a specific proposal?

24  A.   Definitely.

25  Q.   Okay.  Now, you understand that Stirling Report,

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                          39-30

1  besides the talking about systems problems was also a study

2  designed in large part to measure the prevalence in mental

3  illness within the Department of Corrections.

4  A.    I believe it was.

5  Q.    Okay, and you're aware, are you not, that your chief

6  psychiatrist, Dr. Zil, was, had a role in overseeing the

7  consultants during that study?

8  A.    Yes, he did.

9  Q.    And you're aware that, in general terms, he agrees with

10  the prevalence figures that Stirling Report came up with?

11  A.    No, I'm not.

12          MR. MAYER:    I object as, again, ambiguous or

13  vague.    There's --

14          MR. SPECTOR:    Well, he answered it.

15          MR. MAYER:    Reference to the term prevalence

16  figures.

17          THE COURT:    Objection is overruled.

18  BY MR. SPECTOR:

19  Q.    Now, you under --

20          THE COURT:    I think the question --

21          MR. SPECTOR:    Sorry.

22          THE COURT:    There was a question and I didn't hear

23  the answer was, were you familiar with his position in that

24  regard.

25          THE WITNESS:    I met with Dr. Zil after the first

FORM 2094 PENGAD/INDY 1-800-631-6989

1    report and discussed it with him.  We did not spend as much
2    time on the prevalency numbers as me questioning Dr. Zil
3    where these people are and for him to explain to me that if
4    I remember the numbers they went from as low as seven per-
5    cent to as high as 15 percent and questioning, if that's the
6    case, where are these people, where are they within the
7    system, how come they're not demonstrating that they have a
8    psychiatric problem whatsoever.  We had a long discussion
9    and I think we're talking '88, I think '88, at this point in
10   time, and I continued to be unconvinced from Dr. Zil and his
11   responses and we went back and forth, I think, for half an
12   hour or an hour at a time that I think Dr. Zil had some
13   concerns about the report but whether he said the report was
14   100 percent accurate from his perspective, I don't know.
15   I've never sat down and talked to him on that.

16   BY MR. SPECTOR:

17   Q.   So, your position was, show me where they are.  Is that
18   accurate?

19   A.   That is one of the positions of the questions that I
20   was asking and show me the kinds of behaviors that they were
21   demonstrating and why, if those numbers were correct, we
22   weren't seeing those individuals within our system with the
23   kind of regularity that one would anticipate.

24   Q.   And Dr. Zil, was his position that, was he trying to
25   persuade you that, in fact, they were there?

1  A.   I think that what he was trying to persuade me was that

2  there was a need out there and whether this was the number,

3  the appropriate number that he believed that there was an

4  unmet need.

5  Q.   Um-huh, and your disagreement with him was based on the

6  fact that it didn't meet your personal observations when you

7  went out into the institutions and looked at, looked how the

8  institutions were functioning and observed the inmates.

9  A.   No.

10  Q.   Is that correct?

11  A.   That's just part of it.  My disagreement was, they

12  could not demonstrate effectively to me at that point in

13  time, to my satisfaction, that those numbers were good

14  numbers and part of that had to do with what I would call

15  walking in the institutions and not seeing people zonked out

16  but on the other hand there was a clear recognition that we

17  had mental health problems within the Department of Correc-

18  tions and that every single need was not being met.  I

19  understood that but I wouldn't say it's fair to say it was

20  based only on that.  Don, I must have met four, eight, ten

21  hours, long time on the Stirling Report back in '88, '89 and

22  I had a host of questions which I can't even remember today

23  of which I was continually unimpressed with my staff's

24  ability to answer and unimpressed with their ability to

25  explain effectively to me that prevalence.

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                                          39-33

1   Q.   Well, you're not a statistician, are you?

2   A.   I'm not technically a statistician, no.

3   Q.   Okay, and you didn't study the statistical methodology

4   by which they arrived at these numbers, did you?

5   A.   I may have.  I studied two or three different statisti-

6   cal methodologies.  I can't remember what --

7   Q.   But --

8   A.   -- statistical methodology they used.

9   Q.   You have no reason to doubt, do you, the statistical

10  methodology that's contained in the report, do you?

11  A.   I have no particular, at this point in time, no partic-

12  ular disagreement or agreement with the statistical method-

13  ology used.

14  Q.   Well, I guess my question is maybe, I just want to make

15  sure we're on the same wavelength.  You don't have any

16  reason to believe that the method in which they conducted

17  the study was erroneous?

18  A.   I --

19  Q.   That it wouldn't lead to statistically valid

20  conclusions?

21  A.   I was not convinced, at that point in time, that the

22  statistical validity that they used -- I cannot remember the

23  exact regression formula they used but I was not convinced

24  that it accurately portrayed the entire range of needs in

25  the Department of Corrections for mental health services.

Gomez - Cross                    39-34

1   Q.   But, so if I understand your position correctly, you
2   were, you took exception to the results but you had no real
3   reason to doubt the method.  Is that accurate?
4   A.   It's accurate to say that I did not go and attack the
5   method for regression analysis or the statistical method-
6   ology they used as a basis to challenge their results.
7   Q.   Okay, so really the only basis you have to disagree
8   with the results is your own personal opinions when you were
9   walking through the institution and the fact that your staff
10  could not adequately explain the results to you.
11  A.   My staff or the consultants.  When I asked the consul-
12  tants, I think it was, I think Cotton & Associates was part
13  of this particular one, I can't remember for sure, there
14  have been so many different reports but when we met they
15  were not significantly effective in convincing myself and
16  others at that point in time that the need was as great as
17  they saw it.
18  Q.   Okay.  Do you recall that I deposed you in February of
19  this year?
20  A.   Yes I do.
21  Q.   And at that time -- let me back up a step.  You're
22  aware, generally, of a number -- let me strike that.  You're
23  aware that the Stirling Report found that for four major
24  mental disorders there was 7.9 percent of the prison popula-
25  tion suffering from those mental disorders within 30 days.

1   A.   That's correct.

2            MR. MAYER:   I --

3            MR. SPECTOR:   Okay.

4            MR. MAYER:   -- object to the question as misrepre-

5   senting the Stirling Report.   It's plus or minus approxi-

6   mately three percent from that number, according to the

7   Stirling Report and the witnesses have testified --

8            THE COURT:   The objection is overruled.   The

9   motion to strike, if that's what it is, is denied.

10  BY MR. SPECTOR:

11  Q.   Now, when I deposed you in February of '93, we dis-

12  cussed that eight percent number.   It's also referred to in

13  the report as 7.9 percent but we'll talk about eight per-

14  cent, round it off a little bit, and you agreed that eight

15  percent is a reasonable benchmark for the use of prevalence

16  of those four major mental disorders.   Do you recall that

17  testimony?

18  A.   I do.

19  Q.   And is that, in fact, your opinion?

20  A.   I think that benchmark is a fair term, yes.

21  Q.   Okay, and isn't it true that in terms of scientific

22  studies that 7.9 percent figure is really the best figure

23  you have?

24  A.   In terms of what is actually available to us, it is

25  five years old and probably the best figure we have.

1  Q.   Now, you also agree, do you not, that it's important to
2  consider studies of prevalence when determining the amount
3  of resources that you need?

4  A.   I think it is a consideration, yes.

5  Q.   And in fact you don't have complete confidence in your
6  staff's ability to determine the appropriate number of
7  mental resources you currently need.  Isn't that true?

8  A.   I don't believe that they have the data systems that
9  would allow them to do it the way I believe it needs to be
10  done and I think that you need those data systems on an
11  ongoing basis, not a study five years ago but on an ongoing
12  basis to determine need.

13        I think one of the biggest problems in the Depart-
14  ment's data systems is, if you don't have an ongoing system
15  of providing you that information you're taking best guess
16  based on four, five, six, seven year old data and that's not
17  usually well received by other agencies that are to provide
18  funding for it and I think that what we need to do as a
19  department is develop those data systems and we're doing
20  that right now.  We're in the process of doing that so that
21  on an ongoing basis, and the data systems, we'll start with
22  the screening device which would start telling you right off
23  the bat who has what problems and then you go through the
24  assessment process and the treatment process.

25        I think until you have that standardized and a

Gomez - Cross                                    39-37

1   data system feeding you that information back on an ongoing

2   loop, you're making best estimates and best guesses of the

3   situation and so yeah, I think the Stirling Report, at 7.9,

4   we're willing to use as a benchmark.  I think we have said

5   that before and I think that benchmark can be plus or minus

6   two or three percent in either direction, depending upon the

7   clientele that we receive.

8           I think it's also clear from my understanding,

9   from my psychiatrists, that there are many people who may

10  have a severe mental illness who will not accept or partici-

11  pate in treatment so that it's not uncommon that one out of

12  five people would not receive any service because they're

13  not going to participate in treatment.

14  Q.   Well, the Stirling Report came out in 1989, correct?

15  A.   I believe it did.

16  Q.   And at that time those figures were relatively current

17  by your standards, correct?

18  A.   That's correct.

19  Q.   Yet you never, in any budget request, used the Stirling

20  Report prevalency figures to either, A, justify the request

21  that you did make, A, or B, determine how much resources you

22  need.  Isn't that true, Mr. Gomez?

23  A.   I left the Department of Corrections in 1989, Don.  I

24  left for 19 months and no, in my absence I don't know what

25  particularly was used.  When I came back in 1991 one of the

FORM 2094 PENGAD/INDY 1-800-631-6989

1   first things I did was push an outpatient psychiatric BCP
2   for five and a half million, I believe five and a half
3   million dollars through Finance and through the legislature
4   so I can't remember in that five and a half million dollar
5   BCP whether we used the Stirling prevalency rates.  I doubt
6   it.  I -- because they had not yet necessarily been accepted
7   by Finance.  I believe that it's likely that we use popula-
8   tion growth as the basis for that BCP but I was gone during
9   a two year period so I cannot tell you, after the Stirling
10  Report, what did or did not go.

11  Q.   That's fair but would it be fair to say that to your
12  knowledge the prevalency figures for the Stirling Report
13  have never been used either to justify or plan for the
14  resources?

15  A.   I did not go back and review the --

16  Q.   Okay.

17  A.   -- hundreds of BCP's that were prepared during my stint
18  in Santa Clara.

19  Q.   Okay.  Now, the $5 million budget request you're refer-
20  ring to, is that the one that's being implemented this
21  current year?

22  A.   I believe that was implemented in '92 to three, yes.

23  Q.   Okay, and that's for the 60 some odd positions and 800
24  and some odd beds.  Is that correct?

25  A.   That's correct.

Gomez - Cross                                    39-39

1  Q.   Okay.  We'll talk a little bit about that later.  I'm

2  going to show you a document which has been previously

3  marked as Plaintiff's Exhibit 1619.

4       (Pause.)

5  Q.   Mr. Gomez, this is a memorandum dated March 8th, 1988

6  to you and Mr. Harper that's signed on page three by your

7  then boss, Mr. Rowland and Mr. O'Connor.  Do you recall that

8  document?

9  A.   Yes I do.

10 Q.   Okay, and this was the document which confirmed the

11 agreement to have DMH operate inpatient beds at CMF.  Is

12 that correct?

13 A.   That's correct.

14 Q.   And there's also, in preparation for this document, a

15 joint CDC DMH task force, was there not?

16 A.   I believe there was.

17 Q.   Could you turn to the fourth page.  If you would look

18 at the bottom right-hand corner there in hand printed

19 numbers.

20 A.   Yes.

21 Q.   Okay, and that attachment to the document is a summary

22 of the agreements that were reached between CDC and DMH,

23 correct, in terms of the task force, not in terms of the

24 inpatient beds.

25 A.   Yes.  It is correct.

Gomez - Cross                                           39-40

1   Q.   Okay, and would you look at item number four, please.

2   It says that the parties will assume a five percent preva-

3   lence of severe mental disorder within the CDC for planning

4   purposes pending receipt of data from the current prevalence

5   study.  Are you aware of that?

6   A.   That's what it says.

7   Q.   Okay.  Now, Mr. Gomez, that five percent figure done

8   before the Stirling Report came out was never used either as

9   a basis to either plan for mental health resources or to

10  justify it.  Isn't that correct?

11  A.   I'm not sure.

12  Q.   Now, isn't it also true that, well, I'm sorry.  If you

13  could please turn the page to number, page number five and

14  look at point number nine.

15  A.   Yes.

16  Q.   It says that the "temporary fix" at CMF is not intended

17  to provide the long range solution to CDC's problem of

18  inpatient psychiatric care.  The need exists for freestand-

19  ing psychiatric facilities in the future.  My question is,

20  is there anything on the planning table for freestanding

21  psychiatric facilities?

22  A.   No, there isn't and I certainly don't agree with this

23  need exists for freestanding psychiatric facilities in the

24  future.

25  Q.   Okay.

Gomez - Cross                                  39-41

1  A.   I think you need to go back to the original statement

2  on this CDC DMH task force report which says, based on CDC's

3  concern for improving the condition of psychiatric care the

4  Department assembled this ad hoc task force in July of '87

5  to develop alternatives for psychiatric care.  Mental

6  health, at that point in time, was pushing as an agency, for

7  freestanding psychiatric facility.  What they wanted was

8  more for them.  What this put in was a recognition that this

9  was a temporary fix at that point in time and we needed to

10 look on a long range basis.  It became clear to us that the

11 need, as we went through a time, was not just inpatient but

12 was outpatient and in fact as we have found over the past

13 couple of years they tend to hold our patients for a, proba-

14 bly a longer term than needed and we've not found that

15 inpatient psychiatric beds necessarily are as in need as

16 outpatient, depending on how you aggressively manage those

17 cases.

18 Q.   Well, those cases haven't been aggressively managed.

19 A.   That's, they have not, from my perspective at this

20 point in time, been aggressively managed.  They're starting

21 to be managed better but from an aggressive management

22 standpoint I would want to have a treatment plan.  I would

23 want to know the expected time period that they were going

24 to be in and then I would want to monitor to that and find

25 out why or why not the time frame is too little or too long

Gomez - Cross                              39-42

1   and I think that's something that we're clearly planning for

2   in the future 'cause it's nothing more than utilization

3   review of the time someone goes to a medical facility,

4   whether it be acute care or mental health care, you ought to

5   have a utilization review component.  You ought to have an

6   expected time period and then you ought to monitor to that.

7          I think that you'll find that in the private

8   sector that they have to aggressively push on that and I

9   think we have to aggressively push on that and the Depart-

10  ment, we have not pushed because of a resource limit at

11  central office, like we should.  We will in the future based

12  upon the some 100 positions that have redirected as part of

13  that function.

14         MR. SPECTOR:  Okay.

15         Your Honor, I'd like to offer Plaintiff's 1619

16  into evidence.

17         THE COURT:  Without objection, 1619 is admitted.

18  BY MR. SPECTOR:

19  Q.   Mr. Gomez, that five percent figure that is referred to

20  in this document, you believed it was a reasonable number

21  for planning purposes, did you not?

22  A.   The task force did.

23  Q.   No, you believed it was a reasonable number for plan-

24  ning purposes.

25  A.   I don't remember in particular.  I may have but I don't

1    remember in particular.

2           MR. SPECTOR:   Okay.  I'd like to read from Mr.

3    Gomez's deposition, page 111, lines nine through 13.

4    "Q.  My question is that in this you believe that the five

5    percent was a reasonable number.

6    "A.  We believe for planning purposes it was a reasonable

7    number."

8    BY MR. SPECTOR:

9    Q.   Now, I'd like to, if you would, have you take a look at

10   Exhibit 1422 which is the budget change proposal for the 60

11   odd positions for fiscal year '92-'93 which we just were

12   talking about.

13          MR. MAYER:   What's the exhibit number again, Don?

14          MR. SPECTOR:   Fourteen twenty-two.

15   BY MR. SPECTOR:

16   Q.   Mr. Gomez, this Plaintiff's Exhibit 1422 is, in fact,

17   the budget change proposal we were discussing?

18   A.   I believe it is.

19   Q.   Okay, and if you'd just turn the first page and go to

20   the page which begins with the text, you notice in the third

21   paragraph that the methodology that was used in order to

22   determine how many beds were needed was a telephone survey

23   of five of CDC's largest male institutions.

24   A.   Yes.

25   Q.   Do you see that?

Gomez - Cross                          39-44

A.    I see that.

Q.    Okay.  Now, when we discussed this at your deposition,
this methodology of calling five institutions, finding out
how many people were on psychotropic medication, then ex-
trapolating that to the whole system, and they came up with
the number of about 1,000 and in fact it's your position
that you agree that this methodology that used to determine
the number of beds needed was rather primitive.  Isn't that
correct?

A.    I believe it is.

Q.    Okay, and the Stirling Report, on the other hand, was,
you agree, was a much more sophisticated attempt to deter-
mine a need throughout the system.  Isn't that true?

A.    The Stirling Report probably was technically better
prepared from a statistical standpoint but --

Q.    And isn't it true -- I'm sorry.

A.    But had not been accepted by the Department of Finance
for anything or for any purpose.  In preparing a proposal to
the Department of Finance, this BCP, to an existing program
which they had approved in the past and tried to project
that forward because it was a known quantity in which they
approved.

Q.    And because it was statistically more sophisticated,
wouldn't you agree that it was a more reliable method of
determining need than making a few phone calls?

1   A.    Yes, it probably would be.

2   Q.    Now, also, wouldn't you agree that the 1986 workload

3   study which we looked at before was a more rigorous analysis

4   of a need for staffing within the Department of Corrections

5   than this BCP?

6   A.    What I know is that the 1986 study was completely and

7   totally rejected by the Department of Finance and to use it

8   again would have ensured the defeat of any BCP.

9   Q.    I understand that but that wasn't my question.

10  A.    Well --

11  Q.    My question was --

12  A.    You --

13  Q.    -- wasn't it a more rigorous study?

14  A.    I do not prepare BCP's so that they can be used in

15  court.   I prepare BCP's so that they can be approved by the

16  Department of Finance and the legislature.   I will use, in

17  that preparation of the BCP --

18  Q.    Um-huh.

19  A.    -- what I think has the best opportunity to provide us

20  those resources.   So, whether you technically agree or don't

21  agree with the preparation of that BCP is irrelevant in the

22  preparation of the BCP.   My number one objective in going to

23  the Department of Finance with a BCP is to get additional

24  resources to meet a problem that I believe exists.   If they

25  are accepting the method and I can get resources through

Gomez - Cross                                    39-46

1   that, whether there's 13 methods that are statistically
2   better that they have rejected, I am going to go with the
3   method that I think I can get additional resources in the
4   Department. That makes it difficult on occasion because you
5   are going for increases based upon what they approved last
6   year but it becomes folly to prepare BCP's that have no
7   chance of success and if they reject something year in and
8   year out and you continue to present it on that same basis,
9   then you're not achieving your objective which is, again, is
10  the whole purpose of a budget change proposal is to get
11  additional resources to meet a need that you believe exists
12  out there so you sell it however you can sell it and I think
13  the --
14  Q.   Well, you --
15  A.   -- methodology is not as critical in terms of --
16  Q.   Um-huh.
17  A.   -- the preparation as is what is going to be accepted
18  by those who are going to look at it.
19  Q.   Well, it's your position, is it not, that you sold this
20  BCP because you believed it was a high priority?
21  A.   That, I believe, is how it was sold.
22  Q.   But the, was the workload study not a high priority?
23           MR. MAYER:   Your Honor, I object it's
24  argumentative.
25           THE COURT:   Sustained.

Gomez - Cross                          39-47

1    MR. SPECTOR:  I'm just asking a factual question,

2  Your Honor.  Okay.

3         (Pause.)

4  BY MR. SPECTOR:

5  Q.   Now, going back to the workload study for a second, the

6  Department of Finance found that it was insufficient.

7  You've testified to that a couple of times.

8  A.   The 1986 workload study?

9  Q.   Yes.

10 A.   Yes.  I believe they did.

11 Q.   And you never, the Department, to your knowledge, never

12 attempted to fix the problems that the Department of Finance

13 identified with that workload study, did they?

14 A.   Not that I remember but I, as I remember the BCP analy-

15 sis, it was a, they just rejected it almost in its entirety.

16 Q.   Okay.  Now switching to another subject for a minute --

17       THE COURT:  Before you leave that subject --

18       MR. SPECTOR:  Okay.

19       THE COURT:  Mr. Gomez, you talked about the need

20 for standardized and regular accumulation of data in the

21 mental health field and at least from your answer to the

22 question it appeared that this was a need you felt more for

23 purpose, if you will, of selling your program to the people

24 who pass on your budget than for maintaining a developing

25 knowledge of the scope of the problems for your own

1   administrative purposes and I guess my question out of this
2   is whether, in fact, you believe that given your tenure with
3   the Department of Corrections and the data that's available
4   to you, and to some extent the institutional memory of the
5   Department, whether you would have sufficient information
6   available to you without this data collection to understand
7   the size and scope of the problem and then it's simply a
8   sales job, if you will, to the Department of Finance or to
9   the legislature or whether you believe at the present time
10  the Department has sufficient understanding of the size and
11  scope of the problems in the mental health area.  That is a
12  relatively broad ranging question and if you want it refor-
13  mulated, I'll be happy to do it.

14       THE WITNESS:  No.  I think I'll respond in two
15  ways.  One, I think when you standardize you have an ability
16  to get a need and the number one issue that I look at on an
17  issue like this is what is needed for the clientele and as
18  you standardize and gather data that will provide you the
19  need for the clientele which will form the basis for your
20  request for additional funds.  It has to be done in a sys-
21  tematic manner so that those people that are going to come
22  in and look over your shoulder can understand how you
23  acquired that basis of need and I think that as you develop
24  those data systems you'll have that capacity.

25       I think that we have an ability to have an

Gomez - Cross                    39-49

1   understanding of the range of problems in mental health.  We
2   don't have the exactness that we would like in terms of the
3   information available to us.  We don't have the systems that
4   I believe that, in the long term, the State of California
5   should have to manage the mental health population in the
6   prison system but I think that we do have a significant
7   amount of data to let us know that there are problems out
8   there and what direction we should go in trying to fix those
9   problems.

10         I think that clearly what we do not have that we
11  want to get in the future is some agreement upon staffing
12  levels out of finance that for a unit of need you have a
13  unit of staffing and that is where we need to get to in the
14  next two or three years so that as population goes up or
15  down you'll have an agreement that resources will go with
16  that and I think that's clearly where our objective is in
17  the next year or two, is to get ourselves to that point.
18  We're not there yet, to date, clearly, but I think that the
19  overriding concern is not to sell to Finance, although that
20  is a concern, but it is to identify the need that we agreed
21  that that need exists and then to go push diligently to get
22  that need filled and I think that that's the direction we're
23  heading.  I don't think that we've had all the data and all
24  the information that is sufficient to get us there.

25         As I ask questions of my staff, well, if all these

Gomez - Cross                        39-50

1   people are in need out there why are they, that need's not
2   being met and nothing bad is happening and as Don was ques-
3   tioning me over the questions I asked, they're the same
4   questions that Finance asks of us when we go forward and so
5   if your unmet need is so tremendous and people can't under-
6   stand that if it was that bad there'd really be something
7   bad going on, that does bear a problem in going to Finance.

8            I'm not sure I answered all your questions but
9   clearly to me the most important item is to develop the need
10  that you can then go forward but the need has to be under-
11  standable in terms that finance analysts can make a recom-
12  mendation to their bosses.

13           THE COURT:  The, you talked about the population
14  going up or down in the future.  That's the first time I've
15  heard you mention a downward population in your testimony
16  here.  Can I assume that that's largely theoretical, at
17  least based on the fact that you have 1500 more inmates in
18  your system now than you did when you were last here four
19  weeks ago?

20           THE WITNESS:  It certainly is theoretical.  It may
21  just reflect an analytical approach that says there's a day
22  that's going to come but I'm not sure when that day is going
23  to be.  But I think that if you develop a formula based upon
24  population that as that happens it comes up or goes down,
25  that then you should get additional resources or lose

Gomez - Cross                                39-51

1   additional resources, and that is where our desire has been.

2             THE COURT:  Well, as I understand it, when you

3   determine that you're going to put a new prison on line from

4   the time you sit down to build that prison you now have an

5   agreement with the executive agencies involved that you will

6   need X number of staff to man the custodial posts for that

7   institution and you do not have to reinvent that particular

8   part of the staffing wheel.  Is that fair?

9             THE WITNESS:  That's fair.

10            THE COURT:  Can, given the fact that there's been

11   a major change in prison design, I assume that that's

12   impacted the number of custodial staffing positions that you

13   need for the, for your newer institutions.

14            THE WITNESS:  That's correct.

15            THE COURT:  All right.  But you've been able to

16   work that out over time with the Department of Finance and

17   that there is no similar understanding that X number of

18   medical personnel or X number of medical/psychiatric person-

19   nel are needed for a new institution and you essentially

20   have to approach that from a zero base position.  Is that

21   fair?

22            THE WITNESS:  It's not totally fair.  There is a

23   recognition that you need a chief psychiatrist.  There is a

24   recognition you need a psychologist but there's not a stan-

25   dard staffing component that says that if this institution

Gomez - Cross                      39-52

1 | has 4,000 you should get eight and if this institution has
2 | 2,000 you should get four but what we are provided is a,
3 | what I would call a baseline of staffing for the institution
4 | but it's not met on, based on particular needs of that
5 | inmate population.  It's a generic inmate.

6 | THE COURT:  Well, when you talk about baseline
7 | staffing you're really talking about the administrative or
8 | medical/administrative staffing.  Is that correct?

9 | THE WITNESS:  Well, I believe the chief psychia-
10 | trist and there are psychologists in each standard staffing
11 | package.  I would have to go back and check that but I think
12 | there are some staffing in a standard staffing package in
13 | psychiatric and I'm sure that's available.  If not, we cer-
14 | tainly can get it.  We put a standard staffing package
15 | together for each and every institution and I believe
16 | there's some psychologists in there.

17 | THE COURT:  Thank you.  Oh, the other question,
18 | and Mr. Spector may be getting to this, but from time to
19 | time I've heard in your testimony a bit of restiveness about
20 | your relationship with the Department of Mental Hygiene.  Do
21 | you see in the long run the Department trying to take back
22 | the inpatient portion of services that are provided to the
23 | Department by the Department of Mental Hygiene at the pres-
24 | ent time?

25 | THE WITNESS:  Not as long as I'm director, not one

Gomez - Cross                    39-53

1   chance in 1,000.

2          THE COURT:  So even though you think they take the
3   easy, the relatively easy cases and keep them too long, you
4   prefer it that way to any of the other options available?

5          THE WITNESS:  Undoubtedly.  They had, I'm the one
6   that pushed for them to come in and run the inpatient psy-
7   chiatric unit at Vacaville.  We were getting approximately
8   $28,000 per patient for that facility, prior to them coming
9   in.  They got 68,000 when they came in, per patient, on an
10  inpatient basis.  I walked through that facility and was
11  quite concerned about how we were managing in 1985 and
12  Department of Health, Department of Mental Health today gets
13  about $85,000 per inpatient for mental health services on an
14  annual inpatient basis.  They have formulas and staffing
15  standards and acuity levels, 100 percent agreed to by the
16  Department of Finance.  If their census goes up, they get
17  85,000 or something in that neighborhood.  If their census
18  goes down, they lose that amount and that is providing a
19  quality program at Mental Health.

20         Now, to the extent that we have people in that
21  program too long, that's a management issue but they have
22  been able to convince, from a professional standpoint, both
23  the Department of Finance and the California State Legisla-
24  ture that those staffing standards and acuity levels are
25  appropriate for inpatient mental health treatment.  I think

1  that it would be, I just have no desire whatsoever to get
2  into the business of running inpatient mental health systems
3  for California prison inmates.  I would much prefer to have
4  Mental Health do it.  If I think they're charging us too
5  much then I should go look at how long they're keeping them
6  and whether they're doing it appropriately but I think it
7  would be a mistake, and it's going to be a raging issue in
8  the near future because Mental Health has lost 2,000 beds
9  over the past 20 months with the, sending the function down
10  to the local level and so I would be very concerned about
11  having that function given to the Department of Corrections
12  for us to administer it because of those staffing standards
13  and formulas that have been agreed upon for ten, 15 years.

14              THE COURT:  Thank you.  At this point let's take
15  our morning break.

16              (Recess.)

17              (Call to Order of the Court.)

18              THE COURT:  Back in session in Coleman versus
19  Wilson.  Counsel are all present.  Mr. Gomez is still on the
20  stand.

21              Mr. Spector.

22  BY MR. SPECTOR:

23  Q.   In response to the judge's last question, you suggested
24  that the Department of Finance believes that things aren't
25  all that bad as far as mental health care is concerned or

1  else other unspecified things.

2  A.    I don't believe I said that.

3  Q.    Okay.  Would you rephrase it then and tell me what

4  you --

5          MR. MAYER:  I object to counsel's -- rephrasing

6  what?  The answer is on the record.

7          THE COURT:  Sustained.

8  BY MR. SPECTOR:

9  Q.    Okay, isn't it not true, Mr. Gomez, that the Department

10  of Finance is somewhat skeptical about your need for, you

11  know, tens of millions of dollars of augmented mental health

12  services?

13          MR. MAYER:  I object to the question as vague,

14  Your Honor.

15          THE COURT:  Well, there's one more negative in the

16  question than I believe you intended, Mr. Spector, so I'm

17  going to ask you to at least rephrase it.

18          MR. SPECTOR:  Okay.

19  BY MR. SPECTOR:

20  Q.    Isn't it true, Mr. Gomez, that the Department of

21  Finance is skeptical of the need for tens of millions of

22  dollars for additional mental health resources?

23  A.    The Department of Finance is skeptical for everything,

24  everything I've ever presented to them.  Mental health would

25  be included in that all encompassing everything.

Gomez - Cross                           39-56

1   Q.   Okay.  So, they are skeptical of mental health?  Is
2   that accurate?

3          MR. MAYER:  I object.  The question has been asked
4   and answered, Your Honor.

5          THE COURT:  Sustained.

6          MR. SPECTOR:  Okay.

7   BY MR. SPECTOR:

8   Q.   Why are they skeptical about the need for tens of
9   millions of dollars of additional resources?

10  A.   The Department of Finance reviews proposals as submit-
11  ted to them and based upon their review of those proposals
12  they make recommendations to the director of finance.  They,
13  unless they feel that they have a sufficient work load that
14  meets their standards of what's justifiable work load, they
15  typically recommend against a particular field, mental
16  health being one of them.  So, I think that the Department
17  of Finance's role in state government is to question every
18  need and every request to ensure that expenditures of public
19  funds are kept to the minimum necessary to meet needs so I
20  think it's fair to say that they would be skeptical of any
21  mental health budget change proposal we were to submit to
22  them as to whether that need existed.

23  Q.   Okay.  Have they had any -- have you had any conversa-
24  tions with them in which they have expressed the notion that
25  things are not so bad in the Department of Corrections to

Gomez - Cross                          $39-57$

1  justify the $40 million it would take to implement the
2  Scarlett Carp Report?

3         MR. MAYER:  Your Honor, I object to this question
4  and again it's, as Your Honor and the court knows and as the
5  record knows there have been extensive settlement discus-
6  sions in this case and counsel's question is directly
7  broaching on those discussions.

8         THE COURT:  Mr. Mayer, I'm not aware of what those
9  discussions are.

10         MR. MAYER:  No, but you're --

11         THE COURT:  And I've not --

12         MR. MAYER:  -- aware they have occurred.

13         THE COURT:  Mr. Mayer.  And the, this witness has
14  so far seemed entirely capable of defending himself from
15  encroachments upon the settlement area and if he needs
16  further assistance I'm sure it can be provided but I do not
17  know, at the outset, that this question impinges on those
18  areas.  The objection is overruled.

19  BY MR. SPECTOR:

20  Q.  Can you answer the question?

21  A.  The only discussions we've had with the Department of
22  Finance relative to the Scarlett Carp Report has revolved
23  around the settlement negotiations on the Coleman case.

24  Q.  Okay.  On direct examination the Court asked you
25  whether you could, whether you believed you have the

Gomez - Cross                          39-58

1   authority to refuse to accept inmates for whom you could not
2   meet your constitutional obligations.  Do you recall that
3   question?

4   A.    Yes I do.

5   Q.    And you replied that you did not believe you had that
6   authority and that is your position, correct?

7   A.    That's the best of my belief.

8   Q.    Okay.  I'm going to hand you a copy of Penal Code
9   section, California Penal Code section 2900.  I know you're
10  not used to reading or you may not be used to reading stat-
11  utes so let me just direct your attention, if you would, to
12  section B-1.  It's the third paragraph and I'd like you to
13  read that to yourself.  It begins with the words, as an
14  emergency measure.

15  A.    Okay.

16        (Pause.)

17  A.    I've read it.

18  Q.    Okay.  I understand this provision to mean, and I'll
19  ask you if you share this understanding, that in an emer-
20  gency you can direct that persons committed to the Depart-
21  ment be housed at the county jail.

22  A.    I believe that's the same reading I have.

23  Q.    Okay.  Were you aware of the statute prior to today?

24  A.    I'm generally aware that we have the authority to take
25  committed felons and place them in county jails.

Gomez - Cross                    39-59

1  Q.   Okay.  Have you ever used this section?

2  A.   To place felons in county jails as an emergency?  I

3  don't believe we have.

4  Q.   And would you believe the failure to meet your consti-

5  tutional obligations would constitute an emergency?

6        MR. MAYER:  Your Honor, I object to the question

7  as vague and also as misleading.  According to the statute,

8  and again it's a question of law, I suppose, and at that

9  state level but wherever the director, emergency or non

10  emergency, specifies the place of reception, there's no

11  indication in the statute that that thereby relieves the

12  director of any constitutional obligation to the inmate

13  wherever he is received.

14        MR. SPECTOR:  That's an argument, Your Honor, not

15  an objection.

16        THE COURT:  The objection is overruled.  The

17  question, as I understand it, Mr. Mayer, does not call for a

18  conclusion of law.  It asks about this witness' state of

19  mind.

20        THE WITNESS:  Could you ask me the question again.

21        MR. SPECTOR:  Sure.

22  BY MR. SPECTOR:

23  Q.   Would you understand that the inability of the Depart-

24  ment of Corrections to meet its constitutional obligations

25  to constitute an emergency?

1   A.   It could.

2   Q.   Okay.   Now, you testified on direct about the new

3   health care services division that you have created with the

4   help of Mr. McKinsey and from, it's true, is it not, that

5   this is going to have about 110 staff?

6   A.   I think it's going to have many more than that.   I

7   think about 110 are going to be redirected in a 12 month

8   period.   It also had an existing complement of staff.

9   Q.   I see, and what would the total number of positions be?

10  A.   I think it was 195 over a three year period which is

11  what was contemplated.

12  Q.   And of those 195 how many of them were preexisting?

13  A.   I would, my best estimate is 30 to 40, probably 40.

14  Q.   Okay.   So, that means there are about 155 new posi-

15  tions, either redirected or funded through legislative

16  appropriations?

17  A.   Yeah.   I'm sitting here recollecting, and it may be as

18  high as 50, 55 were existing because we took the infectious

19  disease proposal of about 20 positions a year ago so my best

20  guess would be probably a 50 to 55 existing and another 140

21  to 145 new positions to be directed or funded through

22  increased BCP's in the future.

23  Q.   Okay.   Now, this may sound like a silly question but I

24  don't mean to insult you by asking this but for the record,

25  do you realize that, you know, without psychiatrists,

Gomez - Cross                          39-61

1   psychologists, social workers in the field you can't provide
2   adequate psychiatric care, correct?

3             MR. MAYER:   Object as vague, Your Honor.

4             THE COURT:   Overruled.

5             THE WITNESS:   I believe without adequate staff in
6   the field you don't provide adequate service.  I don't
7   necessarily agree we don't have adequate staff in the field.
8   I understand the direction you're heading, that I should
9   consider putting those positions in a different place.  I
10  clearly made the decision that I had available to me that
11  the most important thing for the Department of Corrections
12  in mental health and medical services was to set a structure
13  which it could work within and I was convinced and continue
14  to be convinced that that structure was important in terms
15  of the long-term benefit to the Department of Corrections
16  and I'm approaching this on a long-term benefit basis,
17  develop the systems and the data necessary to ensure that
18  when I'm gone that health care services will stand on its
19  own and will be able to survive as a separate entity.  I
20  think that's critically important in looking at the long-
21  term of the future of the Department of Corrections health
22  care services as well as mental health services.
23  BY MR. SPECTOR:
24  Q.   You also recognize, do you not, your obligations to
25  provide adequate services at this moment and during your

Gomez - Cross                                    39-62

1  tenure as the director of Department of Corrections?

2  A.    Yes I do.

3  Q.    And you are aware, are you not, that you are short of

4  mental health staff in the field?

5              MR. MAYER:   I would object as vague, Your Honor.

6              THE COURT:   Overruled.

7              THE WITNESS:   I believe we're providing an ade-

8  quate level of mental health care.   I'm not, believe that

9  we're providing the level of mental health care that I would

10 strive to as the director of corrections.

11 BY MR. SPECTOR:

12 Q.    Okay.   You testified that you go, on direct in May,

13 that you go to the institutions, that you look around, that

14 you talk to people.   Is that accurate?

15 A.    Yes, I believe it is.

16 Q.    And from what I also understand you believe that health

17 care is a high priority, correct?

18 A.    Yes.

19 Q.    So, when you're in these institutions you ask questions

20 about health care?

21 A.    Yes.

22 Q.    And that includes mental health care?

23 A.    Yes.

24 Q.    So, you're aware, are you not, that there are a lot

25 of --

1    (Tape broke.  Brief interruption in record.)

2    Q.   -- for even allocated positions for mental health

3    clinicians in the Department.  Isn't that true?

4    A.   I'm more in the area of psychiatrists than in psycholo-

5    gists.  We've been doing quite well in --

6         (Very brief tape malfunction.)

7    A.   -- since.

8    Q.   And you're aware, are you not, that some of the insti-

9    tutions in the Department of Corrections do not have a

10   psychiatrist on staff?

11   A.   On occasion that does happen and there are two or three

12   institutions, I couldn't tell you which one they are today

13   that do not have a full-time psychiatrist on staff and they

14   have a recruitment problem.

15   Q.   And you're aware that Pelican Bay has historically been

16   one of those institutions?

17        MR. MAYER:  Objection.  The question is vague in

18   terms of what historically means.

19        THE COURT:  Overruled.

20        THE WITNESS:  I believe that Pelican Bay currently

21   has a psychiatric component of staff available at the insti-

22   tution probably as well staffed as it has been.

23   BY MR. SPECTOR:

24   Q.   My question went to historically, not the present.

25   A.   Historically, I was not here during the first 18 months

Gomez - Cross                    39-64

1   of Pelican Bay's operation.  Since I have been back in the
2   two year period they were in, they were without a chief
3   psychiatrist for a while.  We made a specific effort when we
4   learned about that to ensure that adequate resources were
5   provided up there and I believe they have been provided.
6   Q.   And you're aware of, that Tehachapi has about 5,500
7   inmates, are you not?
8   A.   That's correct.
9   Q.   And have you been aware that they have lacked a psychi-
10  atrist for, a full-time staff psychiatrist for years?
11  A.   I am aware that they have filled in through contract
12  and other means and that they have been missing a full-time
13  psychiatrist on board during that period of time but other
14  levels of services were provided through either contract or
15  part-time staff.
16  Q.   And it's your opinion that the level of staff at
17  Tehachapi during the last few years, I'd say two or three
18  years, has been adequate?
19        THE COURT:   Object as vague, Your Honor, use of
20  the word adequate?
21        MR. SPECTOR:   Well, he's --
22        THE COURT:   I wasn't certain whether he said
23  adequate or inadequate and that was my problem with the
24  question.
25        MR. SPECTOR:   I said adequate, Your Honor.

Gomez - Cross                               39-65

1       THE COURT:  Well, I'd ask you to reformulate the
2   question.  The objection is overruled.

3   BY MR. SPECTOR:

4   Q.   It's your testimony, Mr. Gomez, that the number of
5   mental health staff they've had at Tehachapi during the last
6   two or three years has been at an acceptable level?

7   A.   No.  I was testifying that on a whole for the depart-
8   ment I believe we've provided an adequate level.  I cannot
9   go down to an institution by institution level and tell you
10  that for a particular period in time that there's a suffi-
11  cient staffing at that individual institution.  I don't have
12  that kind of recollection nor is it something that I have
13  kept a data system on.

14  Q.   Okay, you're aware, though, are you not, that in terms
15  of the general picture there's about 20 percent vacancy rate
16  for mental health staff within the Department of Correc-
17  tions?  That's vacancy from allocated positions.

18  A.   I believe that that's true and relative to psychia-
19  trists.  I'm not convinced that's true in psychologists and
20  psychiatric social workers and the like.

21  Q.   And the, and were you aware, and talking about the big
22  picture again, that in July of '92, that's last summer, ten
23  out of the 21 prisons in California did not have a psychia-
24  trist on staff?

25  A.   On that particular month, no, I was not aware of that.

Gomez - Cross                           39-66

1  Q.   Okay.  Were you aware of that generally, that there was
2  a lack of, a significant lack of staff psychiatrists at
3  institutions?

4  A.   I was aware that there was a lack of psychiatrists of,
5  there was a significant number of psychiatric vacancies at
6  institutions who had authorized positions and we were con-
7  tinuing to have recruitment problems in filling those
8  positions.

9  Q.   Now, when you went to the director of, -- well, let me
10 back up a second.  To get these new people in the health
11 care division you did that partly by talking to the director
12 of finance.  Is that correct?

13 A.   Director and chief deputy director, both.

14 Q.   Okay, and in one instance you had a 30 second conversa-
15 tion with the director and said, if I could find 50 posi-
16 tions from somewhere else, can I redirect them to staff the
17 new division?

18 A.   Yeah.  It may have been a little more than 30 seconds
19 but it was certainly less than five minutes.

20 Q.   Okay, and in that less than five minutes but more than
21 30 seconds, did you ask him if you could redirect any posi-
22 tions so that you could increase the pay for psychiatrists
23 at the institutions where you've had trouble recruiting?

24 A.   No.  He had a BCP in front of him at that point in time
25 for increasing that pay.

1  Q.  And you realize, do you not, that compensation for
2  psychiatrists and psychologists to a lesser extent is one of
3  the major factors that makes it difficult to recruit these
4  mental health clinicians?

5  A.  It is one of the factors.

6  Q.  And you testified that you had read the Carp Report.
7  You were also familiar that, you also understand that as
8  part of their recommendations that they recommended that
9  additional resources be placed at certain institutions as
10  soon as possible?

11  A.  Yes they did.

12  Q.  And that was in February of '93?

13  A.  That's correct.

14  Q.  Okay, and the conversation, excuse me, and you were
15  also aware that this recommendation was contained in their
16  draft report in December, 1992?

17  A.  I believe it was.

18  Q.  But no action has been taken on this recommendation,
19  has it, Mr. Gomez?

20  A.  That's not correct.  We've met on at least two or three
21  times with Finance relative to settlement discussions in
22  terms of where we believe resources are needed and it has
23  been in the context of those settlement discussions, whether
24  it be recruitment and retention or additional psychiatric
25  resources or the enhancement outpatient BCP for next year

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                    39-68

1   that they felt that the best method to do that was to wrap
2   it in one package and not go piecemeal by piecemeal.
3   Q.   But you didn't redirect any of the positions that you
4   had at, to fill these bureaucratic positions in the new
5   health care services division to go down in the field to
6   staff, to implement the staffing recommendations made by the
7   Carp Report, did you?
8   A.   That's correct.
9   Q.   Okay.  Now, the Department of Finance earlier in this
10  fiscal year denied the Department's recruitment and reten-
11  tion bonus for psychiatrists and psychiatrists, correct?
12  A.   That's correct.
13  Q.   And --
14           THE COURT:  Psychiatrists and psychologists is
15  that?
16           MR. SPECTOR:  What did I say?  Psychiatrists and
17  psychologists.
18           THE WITNESS:  BCP was for all medical staff.
19           MR. SPECTOR:  Okay.
20           THE WITNESS:  Included psychiatrists and
21  psychologists.
22  BY MR. SPECTOR:
23  Q.   And after the Department of Finance makes a decision
24  there's an appeal procedure that the governor, you can take
25  that, you can appeal that decision to the governor.  Isn't

Gomez - Cross                           39-69

1  that true?

2  A.   That's correct.

3  Q.   And you along with Mr. Sandoval who is the secretary of

4  your agency made that decision about whether to appeal?

5  A.   That's correct.

6  Q.   And you're also aware the Department of Finance denied

7  the BCP for an additional 21.5 outpatient positions.  Isn't

8  that true?

9  A.   That's correct.

10  Q.   And you did not appeal either the BCP for the recruit-

11  ment and retention bonus or the 21.5 positions, did you?

12  A.   That's correct.  We decided that the better way to

13  handle that was through settlement negotiations and put it

14  in an overall package.

15  Q.   So the net effect of all this is that the legislature

16  never had a chance really ever to vote on whether they

17  wanted to enact these two budget change proposals.

18  A.   That's correct.

19  Q.   Okay.  You testified on direct examination that you had

20  an interview for, I guess I'll call it a job interview with

21  Governor Wilson.

22  A.   I did.

23  Q.   Is that true?

24  A.   Yes.

25  Q.   And when did that take place approximately?

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                           39-70

1   A.    February, 1991.

2   Q.    Okay, and you have mentioned to us before, and we've

3   talked about this a lot, that you've had, health care was

4   one of your priorities and that breaks down into medical and

5   mental health care and I, is it true that mental health care

6   is as important to you a, is as important a priority as

7   medical care?

8   A.    On a relative scale, yes.

9   Q.    Okay.

10  A.    I think you need to put in perspective that 115,000

11  inmates need medical care and certainly a much lesser per-

12  centage need mental health care and both of them are priori-

13  ties and they both have to be addressed but certainly one

14  has a, there's a lot more inmates that are in need of medi-

15  cal care than there are in need of mental health care.

16  Q.    And you had a five hour interview with Governor Wilson

17  before you were appointed this position.  Is that true?

18  A.    Four or five.  I don't know exactly.

19  Q.    Right, and you told the governor during the interview

20  that health care was one of the major issues of the nine-

21  ties, correct, for corrections?

22  A.    Yes I did.

23  Q.    And you told him also that correctional systems in this

24  country were in trouble in the health care area, correct?

25  A.    I told him that health care would be an issue

Gomez - Cross                    39-71

1  nationwide in the correctional systems and that whether it

2  be infectious disease or other that I thought it was going

3  to be the issue of the nineties as overcrowding was the

4  issue of the eighties.

5  Q.   Okay.  Let me just read to you your statement and let's

6  see where there's a difference.  I don't want, I'm not

7  trying to pin you down on this.  I'm just trying to get to

8  the actual thing you told him.  You talk about the fact that

9  they were not going to be relating, the trouble spots were

10  not going to be relating to overcrowding or conditions of

11  confinement.  "The issues that the correctional systems

12  nationally were in most trouble on were going to be in the

13  health area."

14  A.   Yeah.  I --

15  Q.   Is that a fair --

16  A.   I think it's fair to say that.  I think it's fair to

17  say that, you know, how I recollect a conversation two and a

18  half years --

19  Q.   Um-huh.

20  A.   -- ago is difficult but I clearly gave the governor the

21  notion that in the nineties that issues of health care ser-

22  vices were going to be more difficult to deal with than the

23  issues of overcrowding which I felt was the eighties issue

24  and that that's something he had to be aware of.

25  Q.   Okay, and that fact that you thought that correctional

1  systems in the country were in trouble in that area, did
2  that include California?
3  A.   I felt that California had a ways to go in that area,
4  definitely.
5  Q.   Okay, and that was based on your experience as the
6  deputy director of the CDC?
7  A.   That's correct.
8  Q.   And your reading of, your study of national issues and
9  your meetings with other directors and corrections
10 professionals?
11 A.   That's correct.
12 Q.   Okay.  You talked to him about AIDS and tuberculosis
13 and other infectious disease?
14 A.   I'm sure I talked about AIDS.  I'm not positive I
15 talked about other infectious disease but I did talk about
16 the generic area of infectious disease control.
17 Q.   Since you believe mental health is, on a relative
18 scale, as important as medical care, did, I'm sure you
19 talked to him about the need for mental health care as well.
20 Isn't that true?
21 A.   I believe I did but I can't --
22 Q.   Okay.
23 A.   -- remember specifically.
24 Q.   Did you inform him that the Department of Corrections
25 was having trouble recruiting mental health care

1   professionals?

2   A.    Not in that meeting, no.

3   Q.    Okay.  You have informed him in other meetings?

4   A.    Not that I know of, no.

5   Q.    Okay.  Did you discuss the Stirling Report, for

6   example?

7   A.    No, not with the governor.

8   Q.    Did you --

9   A.    It's not --

10  Q.    Did you -- why don't you --

11  A.    Wasn't on his list.

12  Q.    Why don't you tell me what you did tell him about

13  mental health care.

14  A.    You know, I can't remember in particular what -- it was

15  a four hour rambling conversation between two individuals,

16  one under much more pressure than the other, and I can't

17  tell you everything that was said in that conversation.  I

18  cannot tell you whether, you know, in particular -- I know

19  that the Stirling Report was not discussed 'cause I didn't

20  bring it up and he didn't bring it up but I think I, we had

21  a general interaction relative to the issues of what was

22  going on in society and that the prison system was becoming

23  a receptacle in many instances for problems that were going

24  on within our entire societal structure and that what we

25  were starting to get in the 1990's versus the 1980's and the

FORM 2094 PENGAD/INDY 1-800-631-6989

Gomez - Cross                      39-74

1   seventies was a very different population than that that we
2   had had before.

3          I know I talked about drug use and what that does
4   to individuals' bodies and the transmission of diseases
5   through the sharing of needles.  I think we discussed that
6   whole area of drugs but I know I mentioned mental health.  I
7   know I mentioned that it was a concern in the Department of
8   Corrections but I know I also didn't mention prevalency
9   study.

10  Q.    Okay.  Fair enough.  Now, I'm going to go back to your
11  favorite subject which is the Stirling Report again and
12  focus on the screening for a minute.  I think we discussed
13  earlier in your testimony and you are, I'd like to confirm
14  that you are aware that the Stirling Report had problems
15  with or had recommendations that the screening system be
16  enhanced, correct?  You're aware of that?

17  A.    I believe it did.

18  Q.    Okay, and that it found that there were, in its words,
19  a very large number of prisoners who were undetected by the
20  system.  You're aware of that generally, correct?

21  A.    Yes.

22  Q.    Okay, and the report also found that prisoners who are
23  quiet, they call them quietly desperate, other terms for
24  them are quiet, the quiet psychotics.  You're aware of those
25  type of mentally ill individuals?

1   A.   Generally.

2   Q.   In general.  The report found that many of those type

3   of prisoners go untreated when their psychotic symptoms

4   don't bring them to the attention of staff.  You're aware of

5   that?

6   A.   I've been aware that there's a population of those

7   individuals.

8   Q.   Okay, and were you aware that your own mental health

9   task force made a similar finding in its report in December

10  of '91, I believe?

11  A.   I'm not sure the finding was similar but I know that

12  they described, I think, a group called psychiatrically

13  unidentified.  I'm not sure what the term was.

14  Q.   Okay, and I know you're not a mental health expert but

15  you do understand enough about the process that enhancements

16  to the screening process are that you'd have to, the Depart-

17  ment is, to enhance the process, would have to develop a

18  short standard series of questions that are asked to every

19  inmate?

20  A.   Yes, I'm aware of that.

21  Q.   And that there would have to be some type of referral

22  procedure after that?

23  A.   An assessment for those people that answer in a partic-

24  ular way to particular questions, yes.

25  Q.   Right, and some training for the individuals, minimal

Gomez - Cross                                    39-76

1  training, I think, is --

2  A.    Yes.

3  Q.    Okay, and I assume that, and correct me if I'm wrong,

4  that you have confidence that your staff is able to develop

5  such a form.

6  A.    Yes I do.

7  Q.    And it's true, isn't it, that actually CDC has hundreds

8  of standard forms that it uses from everything from person-

9  nel to disciplinary matters throughout the system?

10  A.    We have some standard forms, nowhere near enough.  We,

11  I would venture to say that we have many more forms that are

12  not standard than they are standard and that's one of the

13  issues, as director, I've made a particular interest in is

14  that we ought to be using the same form for the, different

15  inmates everywhere we see them.

16  Q.    Okay.  Well, it's, you have confidence in your ability

17  of your staff to develop the form.  It can't be very diffi-

18  cult or expensive to devise a form.

19  A.    Yes.  I've reviewed two of them in the past three

20  months.

21  Q.    Okay.  But it's taken, you've been here since '91 as --

22  A.    That's --

23  Q.    -- the director?

24  A.    That's correct.

25  Q.    But yet the Department hasn't improved its screening

1   process.

2           MR. MAYER:  Objection, Your Honor.

3           MR. SPECTOR:  Or standardized --

4           MR. MAYER:  It's argumentative.

5           MR. SPECTOR:  -- the -- I'm sorry.

6   BY MR. SPECTOR:

7   Q.   My question was, yet the Department has not standard-

8   ized its screening process.

9   A.   I think it has for the new institutions that have been

10  opened but has not for the others and I think that is part

11  of the problem.  I agree with you that we've not standard-

12  ized it system wise and that has clearly been an issue that

13  we have been discussing for the past seven or eight months

14  relative to all our settlement negotiations, was the need

15  for a standardized screening tool for all inmates in the

16  Department of Corrections.

17  Q.   Okay.  Well, this issue has been on the burner since

18  1989 at the earliest, as far as at least your staff and your

19  awareness.  How come it's taken so long to develop a simple

20  form?

21  A.   I don't have a good answer for that.  I think that the,

22  what we're looking at since I've been back as director was

23  to have a standardized form.  I know we've been looking at

24  that for up to a year but I can only focus on the past seven

25  or eight months where it has been on a everyday event, a

Gomez - Cross                                    39-78

1   discussion and part of what we were going to settle on in
2   any potential settlement agreements that we had to have
3   standardized form for that process.

4           You, in order to have a standardized form that's
5   going to produce a result you then have to be able to handle
6   that result that comes from it and part of those discussions
7   have been that if you do a, that as you do that standardized
8   intake then you have to do assessment of what comes from
9   that and then you have to do treatment of what comes from
10  that and we've been looking at it in the last seven or eight
11  months in terms of a total package and you had to deal with
12  that in a total package and that's one of the reasons we
13  commissioned the Scarlett Carp Report in 1991.  I would
14  remind you that one of the issues that we asked for when we
15  first came back was the commission of the Scarlett Carp
16  report which has produced all this information that we're
17  now aggressively looking at and pursuing.

18          So, in order to first deal with the issue we went
19  out and hired some of the best experts in the nation in the
20  Scarlett Carp Report.  I think that they have given us some
21  alternatives and some different ways of dealing with that.
22  We have been a centralized system of delivery of mental
23  health and the Scarlett Carp Report envisions a decentral-
24  ized system of delivery of mental health and I think that as
25  we've been discussing in those settlement negotiations it's

Gomez - Cross                    39-79

1   critically important that we make the decision as to whether
2   we're going to be a decentralized or a centralized and based
3   upon that decision that can drive resources.

4            I think that when you look at screening as only
5   one component, and we have been trying to address this as a
6   four or five component stage and yeah, it means that that
7   one component hasn't been implemented early but we think in
8   order to effectively gather resources from Finance and the
9   legislature that we've been able to show them that we can
10  deliver the total package.  There's a lot of people that are
11  concerned, especially at Finance and the legislature, that
12  when you come to them for resources that you're clear on
13  what you need and that you're going to be able to address
14  the problem.  We think the Scarlett Carp Report, for the
15  first time, gives us a magnitude of what we potentially need
16  in one system, maybe less in another system, and that we can
17  effectively go make that argument.

18  Q.   Okay, going back for a minute to the implications of
19  the screening.  If what I understand you to be saying is
20  correct, you understand that if you develop a screening form
21  which tightens the net, so to speak, you will find more
22  people who then need to be assessed and you have to have a
23  staff there available to treat those people.  Is that
24  accurate?

25  A.   That's accurate but it's more than that.  If you ask

Gomez - Cross                    39-80

1  six questions it may get this population.

2  Q.    Um-huh.

3  A.    If you ask ten questions it may get you this --

4  Q.    Um-huh.

5  A.    -- population.  If you ask 50 questions it may get you

6  this population and as that grows you have to make sure that

7  you're trying to get what I think we're defining, I think

8  you're defining, as severely mentally ill, seriously men-

9  tally ill and that the questions that you develop should be,

10  should go towards that population and that's the discussions

11  we've had in order to generate that population that we have

12  been looking at.  You, the broader you ask the questions,

13  the more questions you ask, I'm led to believe that you can

14  generate different populations.

15         MR. SPECTOR:  Okay.  No further questions, Your

16  Honor.

17         THE COURT:  Mr. Mayer.

18         MR. MAYER:  If the Court could bear with me just a

19  minute here.

20         THE COURT:  Certainly.

21         MR. MAYER:  I might have a very short --

22         THE COURT:  Why don't you take a couple minutes.

23  Give Mr. Gomez a chance to stretch and you a chance to

24  review your notes, Mr. Mayer.  You can let us know when

25  you're ready.

Gomez - Redirect                    39-81

1        (Off the record.)

2                    REDIRECT EXAMINATION

3    BY MR. MAYER:

4    Q.   Mr. Gomez, you started with Corrections in approxi-

5    mately 1983?

6    A.   That's correct.

7    Q.   As chief deputy.

8    A.   That's correct.

9    Q.   And were there through or into 1989.

10   A.   That's correct.

11   Q.   And then returned in 1991 to the present.

12   A.   That's correct.

13   Q.   Were, was Dr. Khoury there when you first arrived in

14   1983 as chief deputy?

15   A.   No, he was not.  He was not the chief medical officer.

16   Q.   Okay, and then he became chief medical officer after,

17   whatever, some period of time after you started as chief

18   deputy.

19   A.   Yeah.  I terminated the existing chief medical officer

20   within the first 18 months of being there and Dr. Khoury

21   interviewed and was successful in the filling of that

22   vacancy.

23   Q.   Okay, and then Dr. Zil came on as chief psychiatrist at

24   some point after that, after Dr. Khoury?

25   A.   I believe so.

1   Q.   Okay.  During the period from Dr. Khoury's taking the

2   position as chief medical officer through the point where

3   you left the Department in 1989, my question is did Dr.

4   Khoury, during that period, have authority independently to

5   hire additional medical or mental health personnel?

6   A.   No, he did not.

7   Q.   Okay, or to redistribute throughout the, from one place

8   or to another in the Department particular numbers of mental

9   health personnel?

10   A.   No, he did not.

11   Q.   Did Dr. Khoury have authority during that period him-

12   self to implement the Stirling Report?

13   A.   No, he did not.

14   Q.   And the same series of questions with respect to Dr.

15   Zil when he took the position as chief psychiatrist, did he

16   in that role, have authority to himself hire additional

17   mental health personnel, transfer them from place to place

18   throughout the system or to implement the Stirling Report

19   recommendations?

20           MR. SPECTOR:  Objection.  This goes beyond the

21   scope of cross.

22           THE COURT:  Overruled.

23           THE WITNESS:  No, he did not.

24   BY MR. MAYER:

25   Q.   Okay.  Now, after you came back to Corrections in

Gomez - Redirect                              39-83

1   approximately, as I recall, April 15th, 1991, was Mr.

2   Sandoval the secretary at that point?

3   A.    Yes, he was.

4   Q.    Okay.  Do you recall when he started as secretary for

5   the agency, approximately?

6   A.    I believe he started in 1988 or '89 and stayed through-

7   out the change of administration.

8   Q.    Okay.  Now, for the period when you came back as the

9   director of Corrections, I would ask the same series of

10  questions with respect to the authority of Drs. Khoury and

11  Zil from when you returned to the present.  Did either of

12  them have the authority to hire additional personnel, to

13  redistribute personnel, this is a separate authority, or to

14  implement either the Stirling Report or the Carp Report?

15  A.    I believe they did not have the ability to do any of

16  that with the exception of redistribute existing personnel.

17  I believe at that point in time Dr. Khoury, on occasion,

18  could take a psychiatric position from here and move it over

19  here but he could create no new ones or create no new

20  program.

21  Q.    Okay.

22        (Pause.)

23        MR. MAYER:  That's all I have, Your Honor.

24  Thanks.

25        THE COURT:  Any redirect -- recross, Mr. Spector?

39-84

1          MR. SPECTOR:  No, Your Honor.

2          THE COURT:  May this witness be released?

3          MR. SPECTOR:  Yes.

4          THE COURT:  Mr. Mayer.

5          MR. MAYER:  Yes, Your Honor.

6          THE COURT:  Thank you for your attendance here,

7    Mr. Gomez.

8          THE WITNESS:  It's been a pleasure.

9          THE COURT:  Mr. Mayer, your next witness.

10         MR. MAYER:  The defendants rest, Your Honor.

11         THE COURT:  Mr. Spector.

12         MR. MAYER:  That's with a, I think we had already

13   covered our exhibits.  I was just referring to I guess what

14   would be called housekeeping matters and making, checking

15   sure that all our exhibits that we wanted in are in but I

16   think we've done that already, so we rest.

17         MR. SPECTOR:  I will recall Dr. Khoury, rebuttal.

18         THE COURT:  Good morning, Dr. Khoury.  You're

19   still under oath.

20         MR. SPECTOR:  Your Honor, I think Dr. Khoury might

21   have been excused.  Does that make a difference about

22   whether he's still under oath or not?  Okay, thanks.

23         MR. MAYER:  If I might interject, Your Honor, my

24   recollection also is that Dr. Khoury had been excused during

25   the course of the testimony of, it was either Dr. Choo or

FORM 2004 PENGAD/INDY 1-800-631-6989

1  Frank, Mr. Powell, there was a Plaintiff's Exhibit 1649 that
2  I objected to on the grounds it wasn't authenticated, it
3  wasn't signed and plaintiffs, at that point, stated that
4  they would seek to bring back Mr. Khoury as their only
5  rebuttal witness for the purpose of inquiring about the
6  authenticity of that exhibit and my understanding and my
7  argument would be that this examination this morning be
8  limited to that representation of plaintiff's counsel and
9  that purpose.

10  THE COURT:  Mr. Mayer, I'm sure you'll be able to
11  formulate the objection if you hear a question that's out-
12  side the intended scope but you do not object to his being
13  recalled for this specific purpose.

14  MR. MAYER:  That's correct, Your Honor.

15  THE COURT:  All right.

16  Mr. Bien.

17  Dr. Khoury, you ready or --

18  THE WITNESS:  Yes I'm ready.  Thank you.

19  NADIM KHOURY, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

20  DIRECT EXAMINATION

21  BY MR. BIEN:

22  Q.  Dr. Khoury, I'd like to show you Plaintiff's Exhibit
23  1649.

24  (Pause.)

25  A.  Okay.

Khoury - Direct                                    39-86

1  Q.   Dr. Khoury, Plaintiff's Exhibit 1649 is a memorandum

2  from you to the warden at CIW concerning staffing.  Do you

3  recognize Plaintiff's Exhibit 1649 as such?

4  A.   I recognize the memo.  I have seen it before.

5           MR. BIEN:  Plaintiff's offer 1649.

6           MR. MAYER:  I'd object, Your Honor.  The found-

7  ation's not established yet.

8           THE COURT:  Objection is sustained.

9  BY MR. BIEN:

10 Q.   Where did you see 1649?

11 A.   There was a debate in the mental health staff at one

12 time when we were trying to initiate in the female outpa-

13 tient program whether should we have all the program in one

14 place or two places.  This memo is one of the staff, a

15 proponent of dividing the staff in the mental health to

16 have, part of it is in Madera State Prison and the other

17 part is CIW.  This memo, if I remember correctly, was not

18 signed by me.  It was sent to the institution warden and to

19 the other members for a meeting, a planning meeting we were

20 set to have at CIW to have a discussion on that issue,

21 whether it is appropriate to have at one location or

22 another.  You need to know at that time there were other

23 proponents within the staff who were believing that we

24 should keep all the enhanced outpatient program at CIW so

25 that memo is in that framework whereby it was prepared for a

FORM 2094 PENGAD/INDY 1-800-631-6989

Khoury - Direct                    39-87

1  planning session to allow the individual people who were
2  attending the meeting to, if we decided this course of
3  action, what does it mean as far as splitting of the staff
4  at that time?

5          MR. BIEN:  Your Honor, plaintiffs offer it again.
6  We've now established its authenticity, that it was prepared
7  by the Department of Corrections, that it's a business
8  record.  I don't know what else we need.

9          MR. MAYER:  We haven't established that it's a
10 business record, Your Honor.

11         THE COURT:  The exhibit is admitted.

12         MR. BIEN:  Your Honor, I'd like to mark as the
13 Plaintiff's next in order a copy of the consent decree in
14 the case, United States of America versus State of Califor-
15 nia in the case pending in this court, CIV S 89-1233.

16         MR. MAYER:  May I ask, Your Honor --

17         THE COURT:  Just a moment.

18         MR. MAYER:  Are we through with Dr. Khoury?

19         THE COURT:  Mr. Bien.

20         MR. BIEN:  Yes.

21         THE COURT:  Is this related to Dr. Khoury's
22 testimony?

23         MR. BIEN:  Yes it is.  About two minutes, I'm just
24 going to ask him one question about it.

25         (Pause.)

Khoury - Direct                    39-88

1    MR. MAYER:  Your Honor, there's not a copy of this

2   for defendant's counsel.  It's a new exhibit in the case.

3    MR. BIEN:  Could you stand up -- you want to look

4   at it for a second first?

5    MR. MAYER:  For what purpose are you using it?

6   It's a 50 page document to look at.

7    THE COURT:  Well, it is, it appears to have all

8   the usual indicia of a document from the files of this

9   court.  If you have an objection to the question, I'll hear

10  that.

11   MR. MAYER:  I don't know what the question is yet.

12   THE COURT:  Well, that's why I'm telling you to

13  please wait.  We'll hear what the question is.

14  BY MR. BIEN:

15  Q.   Dr. Khoury, can you turn to page 11 in that document.

16  A.   Yes.

17  Q.   Is that your signature on page 11?

18  A.   Yes.

19  Q.   And were you a signatory to the consent decree between

20  the United States of America and the State of California in

21  the litigation that that consent degree refers to?

22  A.   Yes.

23  Q.   And this litigation concerned the medical psychiatric

24  care at California Medical Facility at Vacaville?

25  A.   I believe so, yes.

Khoury - Direct                    39-89

1   Q.   Okay.  Will you turn to page five, please.  Do you see

2   a definition of psychiatrist there in the middle of page

3   five?

4   A.   Yes.

5   Q.   Okay, and you agree to that definition of psychiatrist

6   in settling that case with the United States of America?

7   A.   In relation to that case, yes.

8            MR. MAYER:  Wait a minute.  A, the document speaks

9   for itself.  B, it's filed in court.

10           THE COURT:  The first objection is sustained, --

11           MR. MAYER:  And -- yes.

12           THE COURT:  -- Mr. Mayer.

13           MR. MAYER:  Okay, and C, it's, this is all abso-

14  lutely irrelevant to this case.

15           MR. BIEN:  I'm finished with that document.

16           MR. MAYER:  I should think so.

17           THE COURT:  The objection to that question can

18  only be sustained once, Mr. Mayer.

19           MR. MAYER:  Thank you, Your Honor.

20  BY MR. BIEN:

21  Q.   Dr. Khoury, I'd like to show you what's been previously

22  marked as Defendant's Exhibit 963.

23       (Pause.)

24  Q.   Dr. Khoury, it's correct that Defendant's Exhibit 963

25  is a copy of a budget change proposal for Enhanced Pharmacy

FORM 2094 PENGAD/INDY 1-800-631-6989

Khoury - Direct                    39-90

1  Resources singed by you in June of 1991?

2  A.   That's correct.

3  Q.   And was this budget change proposal funded?

4  A.   No, I don't believe so.

5         MR. BIEN:  I have no further questions, Your

6  Honor.

7         (Pause.)

8         MR. BIEN:  Your Honor, as to 1656, the kripa

9  (phonetic) decree, we'd like to move that into evidence.

10        MR. MAYER:  Defendants object, Your Honor.

11        THE COURT:  The objection being?

12        MR. MAYER:  The objection being that it's irrele-

13  vant, it's immaterial, and it's a consent decree in another

14  case.

15        THE COURT:  The --

16        MR. MAYER:  With another, with the United States,

17  not even with the plaintiffs.

18        THE COURT:  The objection, the document will be

19  admitted.

20        MR. MAYER:  May I ask for what purpose?  The whole

21  decree, the kripa decree is a piece of evidence in the

22  Coleman case?

23        THE COURT:  It is a matter that this Court may

24  judicially notice.  The Court will.  As to what, for what

25  purpose, I'm not at all sure.  I'll hear from you all during

FORM 2094 PENGAD/INDY 1-800-631-6989

Khoury - Cross                39-91

1  final argument, Mr. Mayer.  The possibility that it may be
2  some argument that goes to the defendant's state of mind
3  with regard to the definition of psychiatrist leads me to
4  allow it and we'll hear from the defendant's --

5       MR. MAYER:  The defendant's state of mind as to
6  the definition of psychiatrist is also not relevant to this
7  action.

8       THE COURT:  Well, that may well be true, Mr.
9  Mayer.  I'll hear from you a while about that, I'm sure.

10       Mr. Bien, do you have anything further?

11       MR. BIEN:  Not for Dr. Khoury, Your Honor.

12       THE COURT:  All right, anything further for this
13  witness, Mr. Mayer?

14       MR. MAYER:  Yes.  I have to ask him about this.
15  It's coming into evidence.

16                    CROSS EXAMINATION

17  BY MR. MAYER:

18  Q.  Dr. Khoury, do you still have that kripa, Plaintiff's
19  Exhibit whatever it is, 1656?

20  A.  Yes I do.

21  Q.  Okay, and I'll refer you to page five, please, the
22  definition of psychiatrist.

23  A.  Yes.

24  Q.  Did you draft that definition?

25  A.  No.

FORM 2094 PENGAD/INDY 1-800-631-6989

1   Q.   Do you know who did, if you know?

2   A.   I'm not sure.

3   Q.   Okay.

4        (Pause.)

5   Q.   Looking at that definition, is there any limitation, to

6   your knowledge, in California Law so defining a

7   psychiatrist?

8   A.   I think as I stated before a physician who is licensed

9   in California to practice medicine, how he practice medi-

10  cine, what he practice medicine, it depends on his comfort

11  level and the training and comfort that he has as far as his

12  license being protected and as far as his patient not being

13  harmed and the issue in number four basically is much more

14  restrictive than the State of California is stating as a

15  psychiatrist and as a physician who can practice medicine.

16  So, there is a conflict involved here.

17       (Pause.)

18            MR. MAYER:   That's all I have, Your Honor.

19            Thank you, Dr. Khoury.

20            THE COURT:   Mr. Bien, anything further?

21            MR. BIEN:   Nothing further, Your Honor.

22            THE COURT:   Thank you for your further attendance

23  here, Dr. Khoury.

24            THE WITNESS:   Thank you.

25       (Pause, off the record conversation.)

FORM 2094 PENGAD/INDY 1-800-631-6989

1    MR. BIEN:  Your Honor, we would also like to offer
2  some additional exhibits before resting our rebuttal case.

3    THE COURT:  What exhibits?

4    MR. BIEN:  First two are the two most recent
5  reports by the special master in the Gates case about the
6  status of defendant's compliance with that decree.  The
7  other, the prior reports are already in evidence and this
8  brings it up to the most recent report.

9    THE COURT:  Well, if you're going to offer them,
10 Mr. Bien, get them marked first so we know what we're talk-
11 ing about.

12    MR. BIEN:  Okay.

13    THE COURT:  Or at least so other people will know
14 what we have been talking about.

15    (Pause.  Off the record conversation.)

16    MR. BIEN:  Sixteen fifty-seven is the mediator's
17 11th progress report in the Gates versus Deukmejian litiga-
18 tion and 1658 is the mediator's 12th progress report.

19    (Pause.)

20    THE COURT:  You are offering 1657?

21    MR. BIEN:  Yes, Your Honor.

22    THE COURT:  Mr. Mayer.

23    MR. MAYER:  Okay, just for the record 1657 is the
24 11th progress report?

25    THE COURT:  That's correct.

39-94

1    MR. BIEN:  Right.

2    MR. MAYER:  Okay.  Defendant's object, Your Honor.
3  No foundation.

4    THE COURT:  Any objections other than that?

5    MR. MAYER:  It's irrelevant, immaterial, mislead-
6  ing, waste of time, undue consumption of time of the Court
7  and counsel and particularly this counsel.  My understanding
8  of the Gates case, I don't know which reports these are.  I
9  think there are several that have been, Your Honor's been
10  requested to review and others that are on review to Judge
11  Karlton if not also the Ninth Circuit.  I don't know where
12  these fit in that bailiwick.  I can imagine no use they have
13  in this case and I'm somewhat discouraged that counsel's
14  resorting for whatever reason to throw this stuff in this
15  record at this late stage.  I don't understand it.  I don't
16  know why it would be tolerated by the Court and this is,
17  anyway, I'm making a speech instead of an objection.  I've
18  objected to a lack of foundation of authenticity of these
19  reports.

20    THE COURT:  Mr. Bien, are you offering 1658?

21    MR. MAYER:  Same objections, Your Honor.

22    MR. BIEN:  Yes, Your Honor.

23    THE COURT:  I assume your objections are no
24  different.

25    MR. MAYER:  Correct, Your Honor.

39-95

1          THE COURT:  All right.

2          MR. MAYER:  I haven't looked at either report.  I

3   have no idea what's in them or why they're being offered.

4   I'm not counsel in the Gates case.  I have here 200 pages of

5   exhibits I'm being asked to react to in a minute and a half.

6          THE COURT:  At this point is there anything fur-

7   ther from the plaintiffs?

8          MR. BIEN:  We want to go over some documents that

9   we have determined have not been admitted yet we'd like to

10  offer.  I have copies to provide to Mr. Mayer.  They're

11  documents that have been previously marked and discussed in

12  the case.

13         THE COURT:  I'm holding in abeyance ruling on

14  1657, 1658 at the moment.  How long do you anticipate final

15  argument for plaintiffs in this case, Mr. Bien?

16         MR. BIEN:  It could be two or three hours, maybe

17  shorter.

18         THE COURT:  Mr. Mayer, what are you looking at?

19         MR. MAYER:  I, depending on what I, it's necessary

20  to react to with plaintiff's argument, my argument is going

21  to be very brief and I do not intend to use the occasion as

22  to admit an oral proposed findings of fact and conclusions

23  of law but I, give you a straight answer to your question, I

24  think a half hour on the open end would be enough for me.

25         THE COURT:  Okay.  When you were estimating your

39-96

1  time, Mr. Bien, were you including your opening and your

2  close?

3          MR. BIEN:  Yes.

4      (Pause.)

5          THE COURT:  What are the list of other documents

6  that you believe there's a problem about?

7          MR. BIEN:  It's relatively short, 1632, 33, 39,

8  and 40 are documents that have been marked and apparently,

9  at least according to the court's records are not in evi-

10  dence and we would like to offer them.

11      (Pause.)

12          THE COURT:  Mr. Mayer, do defendants intend to

13  state objections to those four documents?

14          MR. MAYER:  Yes, Your Honor.  I'm just looking at

15  them right now.  I, some of them I recognize by having,

16  there having been reference to them during the trial, in

17  particular, number 1640 and whatever objections I had then I

18  would rely on now and I don't remember what they were at the

19  moment.

20          THE COURT:  Well --

21          MR. MAYER:  Others here, I just don't recognize at

22  all, particularly number 1632.  I have no idea what it is.

23          THE COURT:  The, upon the ruling on the six exhib-

24  its outstanding, do plaintiffs intend to rest their rebuttal

25  case?

1    MR. BIEN:  Your Honor, there's one more motion
2 outstanding which you continued to the present day which is
3 our motion on striking part of Dr. Dvosken's declaration so
4 I don't know.  I'm sure that would have to be taken care of
5 before we rest our rebuttal but it seems like it needs to be
6 taken care of.

7    THE COURT:  Mr. Mayer, do you wish to be heard on
8 that?

9    MR. MAYER:  In all candor, I had forgotten about
10 that, Your Honor.

11    THE COURT:  Well, then we'll do this.

12    MR. MAYER:  There's one other thing.  There was a
13 subpoena duces tecum served by plaintiffs on Mr. Tristan for
14 copies of taser reports and .37 millimeter reports.  We
15 served on plaintiffs a written response, partial response
16 and partial objection to the subpoena and delivered to, I
17 delivered to Mr. George this morning the taser reports but
18 whether that's incompleted housekeeping duties or not, I
19 don't know.  I assume that we have fulfilled our obligations
20 under that subpoena.

21    MR. GEORGE:  We agree that they have, Your Honor.
22 Warren George speaking for the plaintiffs, and we'd like to
23 introduce these taser reports as a group exhibit.  This has
24 been done in response to a question you asked us, whether or
25 not there was compliance in taser reports following the

1  institution of a policy by CDC to seek medical clearance
2  before tasers were utilized and in the course of discovery
3  in this case production by defendants of taser reports
4  ceased as of the end of August, '92 and the policy had not
5  been implemented until September of '92 so we had no way to
6  answer the question, so we subpoenaed the records as Mr.
7  Mayer has indicated and we also subpoenaed .37 millimeter
8  gun reports.  Those have not been produced.  We do have the
9  taser reports and I've made a quick review of them and I can
10  answer the Court's questions, I believe, based on that
11  review but in any event, we would like to introduce these as
12  Plaintiff's next in number as a group exhibit.

13           THE COURT:  Well, a minute ago I asked if we were
14  through with exhibits.

15           MR. BIEN:  I didn't quite, I didn't answer.  We
16  have three or four more.  That's about it but there are a
17  couple of more housekeeping things.  You asked us to look at
18  the whole scope of what's out there and we have a couple of
19  things just to clear up beyond the ones I've said so far.  I
20  think I can tell you all of them right now.

21           THE COURT:  All right.  Let me tell you, I have
22  some sympathy for Mr. Mayer's position with regard to being
23  asked to respond to two very lengthy exhibits with which
24  this Court is quite familiar because they've come before
25  this Court in the exercise of its duties and I was inclined

FORM 2094 PENGAD/INDY 1-800-631-6989

1  to give Mr. Mayer some time and perhaps a slightly extended
2  lunch hour to give him an opportunity to review these and
3  state any further objections he might have before the Court
4  rules but we could end up dribbling on all afternoon on
5  these housekeeping matters and tomorrow morning at 9:00
6  o'clock I start another trial.  So, final argument in this
7  case happens this afternoon and I'm concerned about getting
8  an agenda so we can get the substantive part of this case
9  completed, one way or another.

10          Now that I've said that, tell me what's on your
11  agenda for housekeeping matters, Mr. Bien.

12          MR. BIEN:  Okay.  The exhibits that we would like
13  to offer are 1632, 1633, 1639, 1640, 1614, 15, and 16.  We
14  understand that defendant's exhibits one to 1312 are in
15  evidence.  If they are not, we would like to offer them in
16  evidence and --

17          THE COURT:  Well --

18          MR. BIEN:  -- there is an ambiguity.  I'm raising
19  that because there is an ambiguity.  We worked on this in
20  the last two weeks and I think it needs to be cleared up and
21  the last three defendant's exhibits that plaintiffs would
22  like to offer that we understand are not in evidence are
23  1319, 1320, and 1321 and then we'd like to offer the taser
24  exhibit package.

25          THE COURT:  And you are also offering 1657 and

1   1658?

2          MR. BIEN:   That's correct, Your Honor.

3          THE COURT:   And?

4          MR. SPECTOR:   The only other housekeeping matter
5   is the motion (indiscernible).

6          (Pause.)

7          THE COURT:   Does that complete the housekeeping
8   matters outstanding?

9          MR. SPECTOR:   Yes, Your Honor.

10         THE COURT:   Mr. Mayer, are there any housekeeping
11  matters outstanding from the defense perspective, other than
12  the matters already raised?

13         MR. MAYER:   No, Your Honor, though I'd ask again
14  if counsel could indicate a purpose for 1657 and 1568 (sic),
15  am I glancing at those or whether they're just general
16  reading documents, in case somebody has five minutes free
17  time?

18         MR. BIEN:   We're offering them to show the state
19  of compliance of the defendants with court orders concerning
20  the psychiatric program at CMF.

21         MR. SPECTOR:   We'd be happy to confer with Mr.
22  Mayer over the lunch hour, Your Honor, and see if we can
23  resolve any of these objections.

24         THE COURT:   Well, I will leave that to Mr. Mayer.
25  He has a fair amount to complete over the noon hour and

FORM 2094 PENGAD/INDY 1-800-631-6989

1   whether he wishes your assistance in these matters or not is
2   a matter I'm sure he can decide in his own discretion but I
3   would ask you to remain for a minute if he wishes to.

4         At this point then we'll stand adjourned until
5   2:00 o'clock.  When we get back at 2:00 o'clock we will
6   first take up the seven matters and get those resolved.  At
7   the conclusion of that, we'll go directly into plaintiff's
8   opening final argument and we'll hear from defendants and by
9   plaintiffs and we will not be staying late this evening, so
10  take that into careful consideration when crafting your
11  final arguments.  All right?  With that, thank you very
12  much.  We'll see you back here at 2:00 o'clock.

13        (Whereupon the proceedings were adjourned for the lun-
14  cheon recess to reconvene at 2:00 p.m. this same date.)

15                     --o0o--

16

17

18

19

20

21

22

23

24

25

1   <u>SACRAMENTO, CALIFORNIA, MONDAY, JUNE 21, 1993, 2:00 P.M.</u>

2

3       (Call to Order of the Court.)

4           THE COURT:  Back on the record in Coleman versus

5   Wilson.  Counsel are present.  The first thing on the agenda

6   for this afternoon was the plaintiff's motion to admit

7   Exhibits 1632, 33, 39, and 40.

8           MR. BIEN:  We have submitted them.

9           THE COURT:  So moved, yes.

10          Mr. Mayer.

11          MR. MAYER:  Just before the lunch break, Your

12  Honor, Mr. Bien told me to forget number 1632.  I assume

13  that means it's withdrawn.  Sixteen thirty-three we don't

14  object.  Sixteen forty we, defendant's don't object.  Six-

15  teen forty, defendant's don't object.

16          THE COURT:  What about 1639?

17          MR. MAYER:  That's next.

18          THE COURT:  Oh.

19          MR. MAYER:  I thought I'd get the easy ones out of

20  the way.  Sixteen thirty-nine defendant's object.  It seems

21  to be just a, some kind of a statement by plaintiff's coun-

22  sel or by someone and to the extent it refers to taser

23  exhibits, they're in evidence, I assume.  They refer to it

24  as Plaintiff's 107 and 174.  That is the actual incident

25  reports and so we'd object to this as a self serving

39-103

1  statement of plaintiffs and if it's argument, it's argument
2  but it shouldn't be evidence.

3          There were a couple of others that were -- or
4  should I stop there?

5          THE COURT:  Let's stop there.

6          MR. MAYER:  Okay.

7      (Pause.)

8          THE COURT:  Anything further on that batch, Mr.
9  Bien?

10          MR. BIEN:  No, Your Honor.

11          THE COURT:  Exhibits 1633 and 40 are admitted
12  without objection.  Sixteen thirty-nine will not be admit-
13  ted.  Now, the next is 1614, 15, and 16.

14          MR. MAYER:  Sixteen, I'm sorry, Your Honor, 1614,
15  no objection, 1615 is, appears to be, there's missing pages.
16  It begins with page two of four, at least our copy does,
17  with an exhibit stamp on it.  Appears to be an incident in
18  February '93 at CMF Vacaville, an institution expressly
19  excluded from this action.  I don't know the purpose for
20  which it's offered into evidence in this action but we would
21  object to it as relating to, at least as far as I can tell,
22  to circumstances at Vacaville which, again, are expressly
23  not a part of this action.

24          THE COURT:  Mr. Bien.  Oh, excuse me.  Before we
25  go -- what about 16, Mr. Mayer?

1    MR. MAYER:  Okay, 1616 also, this appears to be a
2    suicide policy of the Department of Mental Health at
3    Vacaville.  Again, it's not a document of a defendant in
4    this action.  Its foundation has not been laid and it
5    appears to be a, again, a DMH document and a document relat-
6    ing to Vacaville, an institution that's expressly excluded
7    from the action so we'd object to it on those grounds.

8         THE COURT:  Mr. Bien.

9         MR. BIEN:  We have previously argued the rele-
10   vance of CMF as having defendants in their case.  That's all
11   I'd argue again here, that what happens at CMF is relevant
12   to this case too.

13        THE COURT:  Sixteen fourteen, 15, and 16 are each
14   admitted.

15        Now, Mr. Mayer, what about one through 1312?

16        MR. MAYER:  Your Honor, we have no objection to,
17   my understanding is that those are in evidence, but to the
18   defendants' exhibits, we don't object to their coming in.

19        THE COURT:  All right.  If those were admitted
20   they are and if they're, they weren't, they still are.

21        MR. MAYER:  I believe there were also defendant's
22   1319, 20, and 21 counsel referred, and I have the same
23   response for those.

24        THE COURT:  All right, then those will be
25   admitted.

1              Next is the taser material.

2              MR. BIEN:  Sixteen fifty-nine, Your Honor.

3              MR. MAYER:  That's the package from this morning?

4              THE COURT:  Yes.

5              MR. MAYER:  Sixteen fifty-nine, okay.  The defen-

6   dants don't object to this coming in, Your Honor, although

7   again with the proviso that our understanding of why these

8   are now coming to the surface is that the Court had an

9   inquiry about whether the statewide policy effective, I

10  believe it was, September, late September of '92 was being

11  followed and the policy related to a prohibition of the use

12  of tasers on inmates on certain medications.  These taser

13  reports may include inmates who, since they're all taser

14  reports from September into May, '93 may include inmates who

15  were not class members and so on and we would ask that their

16  identities be covered by the protective order in the case.

17             THE COURT:  All right.

18             MR. MAYER:  And then there is, on, as part of

19  these taser reports I neglected to give counsel a copy of

20  this but --

21             (Pause.)

22             MR. MAYER:  Your Honor, in the taser package it

23  should be on the top, unless the order's been changed, that

24  a report, this is a, it refers to an incident at California

25  State Prison Sacramento which is Folsom, B facility, an

FORM 2094 PENGAD/INDY 1-800-631-6989

1  incident on January 16, 1993 at 12:50 hours.  The report

2  itself does not, on its face, reflect an inquiry of the

3  inmate's medical records.  We have a copy of the inmate's

4  medical records for January 16, '93 and it reflects that a

5  check had, in fact, been made by custody of, for medical

6  clearance, the use of taser and we would ask that that be

7  added to that report in that package if they are to come

8  into evidence.  Otherwise, we don't have an objection.

9        MR. SPECTOR:  No objection, Your Honor.

10        THE COURT:  Mr. George, any objection to the

11  inclusion of that document?

12        MR. GEORGE:  No, Your Honor.

13        THE COURT:  All right, I will --

14        MR. MAYER:  Can I -- does the Court have the

15  stack?

16        THE COURT:  I'm going to give you 1659 so that you

17  can take care of the addition.

18        MR. MAYER:  Can I just give this to the clerk and

19  -- should we separately mark this or just clip it on?

20        THE COURT:  That will be marked as 1660.  Is

21  that -- 1659 and 1660 are admitted.  Now, we're on 1657 and

22  58.  You have nothing more to say about --

23        MR. BIEN:  We have nothing more to say.

24        THE COURT:  Mr. Mayer.

25        MR. MAYER:  Oh, yes sir, Your Honor, I do have

39-107

1    a --

2         THE COURT:  I was asking Mr. Bien if he had any-

3    thing more to say.  I'm presuming you do.

4         MR. MAYER:  Okay, these are the --

5         THE COURT:  I know what they are.

6         MR. MAYER:  -- special masters, what, --

7         THE COURT:  Eleventh and 12th.

8         MR. MAYER:  Progress reports, 11th and 12th prog-

9    ress reports in the Gates case.  My glance at the 11th

10   report is dated February, 1993 and the 12th, April, May,

11   1993.  Now, Your Honor, we object to these coming into

12   evidence in this case.  We believe there's no foundation,

13   that the statements in here are all hearsay.  They're opin-

14   ion evidence of the special master or whatever Mr. Breed's

15   (phonetic) title is in the Gates case, mediator, I guess it

16   is and the comments says, insofar as the Coleman case is

17   concerned are neither material nor relevant and on all of

18   those grounds we would object to coming into evidence in

19   this case.  In particular, the February report, plaintiffs

20   have been sitting on and raise it at the last moment, long

21   after their case in chief has closed.  I don't know what

22   possible explanation for that there is but in any event we

23   object to both.

24        THE COURT:  Mr. Bien, anything further?

25        MR. BIEN:  No, Your Honor.

FORM 2094 PENGAD/INDY 1-800-631-6989

1      THE COURT:  All right.  Clearly the foundation
2  would be adequate.  These are copies of documents that are
3  on file in another proceeding in this court and this Court
4  can judicially notice the files and records of the court.
5  However, I'm not going to admit 1657 and 1658.  They do not
6  strike the Court as rebuttal in the sense that they were not
7  reasonably anticipatable as part of the plaintiff's case in
8  chief.

9      Now, we left with the motion to strike Dr.
10  Dvosken, a portion of Dr. Dvosken's testimony.  My
11  recollection is that that was the portion that relates to
12  the suicide programs?

13      MR. SPECTOR:  That's correct, Your Honor.

14      THE COURT:  Did you wish to be --

15      MR. MAYER:  Yes, Your Honor.  We'll just submit
16  that, Your Honor.

17      THE COURT:  All right.  Did you have anything
18  further on that, Mr. Spector?

19      MR. SPECTOR:  No, Your Honor.

20      THE COURT:  All right.

21      MR. SPECTOR:  Unless you needed me to refresh --

22      THE COURT:  No.

23      MR. SPECTOR:  Okay.

24      THE COURT:  That motion is denied.

25      Are we ready on final argument?

1    MR. BIEN:  Your Honor, I'm going to address the
2    following issues.  First, I'm going to address the overall
3    weight of the expert testimony presented to the Court in
4    this litigation, then the issues of staffing, mental retar-
5    dation, the EOP programs and defendant's record of complying
6    with orders of this court.

7    Mr. Spector is going to address the issue of
8    deliberate indifference by defendants, the studies of the
9    CDC mental health system that have been done over the past
10   years, screening, access to inpatient and outpatient care,
11   suicide, segregation and SHU units and the issue of reme-
12   dies.  We have also filed with the Court last week a docu-
13   ment that summarized some of the key exhibits in the case
14   and we intend, with leave of the Court, to file a document
15   by the end of this week, and we apologize for the delay,
16   that is an index to the deposition excerpts that plaintiffs
17   have submitted.  Neither of these documents would be in
18   evidence but they would merely be an aid to the Court in
19   reviewing the thousands of pages of materials that are
20   before it.

21   Your Honor, this trial is a complex class action
22   concerning the delivery of mental health care to thousands
23   of prisoners scattered over more than 20 institutions.
24   Virtually all of the factual matters at issue concern areas
25   of specialized knowledge, experience, and skills, the

1   diagnosis and treatment of illness, standards of care,
2   prescription monitoring and tracking of medications, the
3   effects of segregation and isolation, admission and dis-
4   charge criteria of the mental health programs, the preva-
5   lence of mental illness, staffing patterns, medical records
6   and management information systems, quality assurance,
7   tracking, suicide prevention, and many others.

8         Plaintiffs proved their case on each and every
9   issue through various forms of evidence including testimony
10  of class members, their medical records, admissions by
11  defendants and their employees and agents in documents and
12  testimony and deposition excerpts.  But the crucial evidence
13  in support of plaintiff's case were their expert witnesses
14  and in this kind of case it's the expert testimony that is
15  the crucial evidence the Court must weigh in evaluating
16  these issues which are beyond the scope of normal, regular
17  knowledge.

18        The expert testimony covered all of these issues
19  and it was based on the solid foundation of prison tours,
20  interviews with prisoners and staff, review of documents,
21  including medical records, depositions, studies, and key
22  memoranda, as well as the extensive experience, training,
23  and background in all of the relevant fields.

24        Drs. Petrella, Kaufman, Kupers, Meenakshi each
25  toured and testified about several prisons and offered

1 opinions about the care provided to particular prisoners in
2 particular units in particular institutions.  Each also
3 addressed system wide issues and offered their opinions.
4 Drs. Grassian and Haney along with Dr. Kupers testified
5 about the unique factors and problems in the Pelican Bay
6 prison and the factors of segregation and SHU units in
7 general throughout the system.  Dr. Haney along with Dr.
8 Greenfield offered opinions concerning the Stirling Report,
9 its methodology, its findings, and its recommendations.

10          In stark contrast to plaintiff's expert testimony,
11 defendants have failed to offer expert testimony in defense
12 on virtually every issue.  The Court need not, in this case,
13 determine the winner of a classic battle of the experts
14 because defendant's experts failed to join the battle.
15 Defendants have offered extremely limited and confined
16 expert testimony on issues that are largely not in dispute.
17 Defendants chose to withdraw two of their experts, Dr. Zil,
18 the chief psychiatrist who was to have defended various
19 aspects of the system including medication and pharmacy
20 issues, inpatient and enhanced outpatient programs, and they
21 also withdrew Dr. Captane Thompson, an outside expert, who
22 was to have testified about community standards in
23 psychiatry.

24          Plaintiffs, on the other hand, chose not to cross-
25 examine defendant's lead outside experts, Drs. Koson and

1  Dvosken because their declarations, especially when read in
2  context of their deposition experts which are now in evi-
3  dence, failed to call into question any aspect of plaint-
4  iff's case.  Defendant's only other experts are two current
5  employees of the defendants, Assistant Deputy Director
6  Kambra (phonetic) and chief psychologist, Dr. Beermann.  In
7  fact, Koson and Dvosken, each nationally prominent experts
8  in correctional mental health offer strong testimony in
9  support of plaintiff's case.  Koson's and Dvosken's opinions
10  about the CDC's mental health delivery system and its defi-
11  ciencies are set forth not only in their declarations which
12  were submitted by defendants but in the Scarlett Carp
13  Reports where they were the lead outside experts and in the
14  excerpts of their deposition testimony which are in evidence
15  now.

16          What is most significant about the expert testi-
17  mony of Koson and Dvosken that was submitted by defendants
18  is not what they said or what they didn't say.  Neither of
19  them offer the expert opinion that the mental health care
20  provided to any member of the plaintiff class by defendants
21  meets constitutional standards.  Neither of them offer the
22  expert opinion that any aspect of mental health care pro-
23  vided at any one institution meets constitutional standards
24  and neither Koson nor Dvosken offer the expert opinion that
25  the existing mental health care delivery system provides

1  adequate or appropriate mental health care to class members.
2  In fact, defendants have failed to come forward with any
3  such evidence.  Basically there's no defense on issues of
4  liability.

5      When Koson and Dvosken were retained and desig-
6  nated to offer expert testimony in this case, it was to
7  offer testimony both on liability and on the design of the
8  system but then each was instructed not to offer any opinion
9  about the actual operation of the mental health delivery
10  system as they observed them in action.

11      As is demonstrated in their excerpts, not only
12  were Koson and Dvosken each retained to form these opinions
13  on liability issues, each actually formed such opinions
14  after extensive tours and record reviews and then they
15  communicated those opinions to the attorney general.  Only
16  after hearing the opinions the attorney general decided not
17  to allow these experts to communicate these opinions to the
18  court.  There is only one possible inference that the Court
19  can draw about what these opinions would have been.

20      What is left in the expert declarations filed by
21  Koson and Dvosken are some half hearted positive statements
22  about limited or relevant issues and some very powerful
23  descriptions and testimony about the elements that need to
24  be incorporated into a mental health delivery system that
25  would be adequate.  For example, both Koson and Dvosken

FORM 2094 PENGAD/INDY 1-800-631-6989

1   testified the current system is "adequate in design" meaning
2   apparently that it would be theoretically possible to
3   deliver appropriate mental health care using their current
4   design but neither testifies that the current system's
5   design, in fact, works in any way, shape, or form and then
6   both recommend massive changes in the current design in
7   order to efficiently deliver mental health services.

8          These improvements include appropriate screening,
9   decentralization of services through clusters scattered
10  throughout the state, improved outpatient care and access to
11  care in outlying prisons, crisis beds, enhanced infirmary
12  beds, enhanced staffing throughout the system and especially
13  in segregation and SHU units.  These are, of course, the
14  same elements set forth in the Scarlett Carp reports which
15  were prepared by these same two experts.

16         On liability issues, plaintiffs offered expert
17  testimony regarding defendant's liability under the Eighth
18  Amendment, the Fourteenth Amendment, and section 504.

19         Dr. Kaufman testified about several institutions
20  and offered his overall conclusions and proposed remedies
21  regarding staffing, screening, psychiatric medical records,
22  CAT J programs, outpatient programming outside of the CAT J
23  programs, access to inpatient care, prescription administra-
24  tion of psychotropic meds., use of newer psychotropic meds.,
25  housing mentally ill people in segregation, suicide

39-115

1  prevention, mental health care training for custody, use of
2  tasers and .37 millimeter guns, treatment of substance abuse
3  in mentally ill inmates, quality assurance, peer review,
4  utilization review, and the role of the psychiatrist.

5      Dr. Petrella testified about several institutions
6  and addressed the CAT J backlog, the care of mentally
7  retarded inmates, the elements that should be in a mental
8  health care delivery system and the inadequacies in the
9  present system, including the failure to respond to clear
10 evidence of serious problems, the failure to provide screen-
11 ing, the lack of tracking and management information sys-
12 tems, the failure to keep medical records, quality assur-
13 ance, classification.  In short, we have covered each of the
14 issues in the case with this expert testimony yet there's
15 nothing on the other side.

16     Look at the Pelican Bay evidence.  Dr. Grassian
17 testified about reducing environmental stimulation.  Who
18 testified in opposition?  No one.

19     Director Gomez testified today that he had hired
20 the best experts in the nation for the Scarlett Carp Report
21 yet he ignores what these very experts have told him needs
22 to be done.

23     Defendant's expert, Dr. Dvosken, in his testimony
24 that's offered by the defendants, endorsed again the Scar-
25 lett Carp Report.  He offered his opinion about the

1  appropriate use of administrative segregation and the need
2  for management information system.  He did not at all refer
3  to the present operations of the CDC except to state that
4  the suicide prevention pamphlet distributed to CDC staff is
5  adequate because it's the same one he uses in New York.  He
6  gave no testimony about any particular institution or
7  inmate.

8          Dr. Koson's testimony is to the same effect.  He
9  endorses nothing about the present system and he describes
10 what needs to be in the system.

11         In contrast, among the key admissions Dr. Koson
12 offered in his deposition testimony were the following.  He
13 said the lack of crisis beds and his observation of prison-
14 ers housed in ad. seg. and inadequate infirmaries was
15 extremely serious problem, that the use of .37 millimeter
16 guns and tasers on mentally ill prisoners was improper and
17 inappropriate.

18         It's important, Your Honor, in looking at this
19 particular issue, the .37 millimeter guns and tasers, to
20 focus on the fact that neither Dr. Koson nor plaintiffs
21 object to the use of tasers solely on the basis that it can
22 cause a heart attack on someone taking psychotropic medica-
23 tions.  Rather, the use of weapons on mentally ill persons
24 to restrain them is simply inappropriate and inexcusable
25 behavior, given the mental condition of the victims of these

1  weapons and there are appropriate, safe methods, alternative
2  methods that are not contratherapeutic, that are available,
3  and that are used in psychiatric institutions that could
4  replace the use of these weapons by custody.  It is this
5  very point that Dr. Koson made.  It's this very point that
6  Dr. Kaufman made and Dr. Petrella and that Dr. Gritter made
7  on the stand in this case.

8        The taser policy that defendants have come up with
9  in response to this litigation is not enough.  First of all,
10 the evidence that we received here today, Plaintiff's
11 Exhibit 1659 shows that in approximately half of the 14
12 incidents since the taser policy went into effect it was
13 followed.  In the other half it was not followed.  What I
14 mean by that is the incident reports do not reflect that
15 anyone checked with a medical doctor to see whether or not
16 the prisoner was on psychotropic medications.  So, even this
17 limited policy has been beyond the ability of these defen-
18 dants to implement.

19       Of the cases of no compliance, four, three or
20 four, I think the one they just, maybe it's three now, were
21 psychiatric cases and we can only glean this from reading
22 the incident report but the incident report referred to the
23 fact that the prisoner, in one of them, was to receive
24 haldol, another one was to go on suicide watch, another one
25 was to go into psych. observation.  Now, these are three

FORM 2094 PENGAD/INDY 1-800-631-6989

39-118

1  cases where the inmate was tasered.  It was clearly mental

2  health driven in one way or another yet there was no check

3  of the medical records reflected in the incident report.

4  Again, we don't, we haven't looked at the files.

5        The taser was banned at CMF in the Gates litiga-

6  tion but was replaced not by the appropriate methods of

7  restraint but by the .37 millimeter gun and again, this

8  Court must not simply restrict the use of the taser so that

9  some other weapon can be invented, even if you restricted

10  both the taser and the .37 millimeter gun.  What we need to

11  do is require these defendants to implement an appropriate

12  system of restraining mentally ill prisoners.

13        Dr. Koson testified that the Department's manage-

14  ment information system was inadequate and that the Depart-

15  ment lacked any quality assurance activities.  He testified

16  that without this kind of information it was impossible for

17  the Department to run an appropriate system.  He testified

18  about the lack of access to inpatient hospitalization.  He

19  testified that the current system fails to provide timely

20  access to psychiatric care and thereby causes increased pain

21  and suffering.  Let me just quote for a minute.  He was

22  talking about the Scarlett Carp proposal and he says, this

23  is on page 215.  "We were driven throughout the entire model

24  to create an entire or a complete continuum of care without

25  any gaps so that we could intervene and give care in such a

1  way that problems would not be compounded.  New problems
2  would be better dealt with and the individual would not go
3  on to become, you know, seriously --

4  "Q.  That's exactly what I was going to ask you.

5  "A.  Yes.

6  "Q.  Isn't it correct that the, that not only would such a
7  system reduce costs but it would also reduce decompensation
8  and suffering and prisoner suffering in the units?

9  "A.  Yes.  It necessarily does both.  Hospital care is, as
10  you've indicated, obviously the most costly form of care and
11  it also removes the individual from his setting which is
12  itself not always the best thing to do.  So from any stand-
13  points, including cost, our model is driven by the need to
14  allow inmates to access care they need relatively rapidly,
15  rapidly so that they, not just so that they won't decompen-
16  sate but so that the problems that are affecting them can be
17  ameliorated as quickly as possible without, -- I mean
18  period.  Delays in that care aggravate and complicate the
19  treatment picture.

20  "Q.  In your examination of the existing system, do you
21  believe that it effectively provides for early access to
22  psychiatric care?

23  "A.  In my opinion, it does not."

24          Dr. Koson testified that the classification sys-
25  tem, the system of I's and J's and K's improperly interfered

1   with the delivery of mental health services.  He testified
2   that the monitoring of medications was inadequate along with
3   the practice of non psychiatrists prescribing meds.  He
4   testified to insufficient staffing and the lack of prompt
5   and appropriate access to care.  Let me quote again.  This
6   is from 224.

7   "Q.  In terms of crisis intervention in your tours of pris-
8   ons and your interviews with prisoners and your review of
9   files, did you see examples of cases where prisoners had
10  requested psychiatric evaluation and have not received it
11  promptly?

12  "A.  Yes, we did.  When I use the word we, I'm referring to
13  any particular plaintiff's expert with whom I was touring.
14  We were reading the same materials, interviewing the same
15  patients.  We did see examples of requests that were not
16  responsively answered and we interviewed inmates who had
17  sent requests and asked for services and for one reason or
18  another didn't receive them.

19  "Q.  In conversations with the medical professionals respon-
20  sible for attempting to deliver these services at various
21  institutions did you come to the opinion that there was
22  insufficient staffing to provide these kind of services at
23  general population institutions?

24  "A.  Yes.  What I generally concluded from a number of these
25  deficiencies was that my previous beliefs were confirmed.

1   That staffing is just not sufficient in terms of mental
2   health staff of all kinds and that really seemed to be the
3   problem.  The personnel on site with whom we spoke, whether
4   they were general practitioners, psychiatrists, psycholo-
5   gists, appear to be overwhelmed, highly motivated and very
6   caring figures yet they were overwhelmed and it was just a
7   matter of sheer numbers.  In those institutions that did not
8   have mental health staff the problems I've described above
9   were at their height."

10      He testified that medical record keeping was
11  inadequate and that no QA system for medical records was in
12  place.  He further testified that the deficiencies in medi-
13  cal records and quality assurance were dangerous problems
14  that interfered with the ability of the system to provide
15  appropriate psychiatric care.  He testified about seeing
16  people who had not been picked up who were on meds. from one
17  institution to the other, the people who hadn't received
18  lithium tests.

19      Dr. Koson fully endorsed the Carp Report and its
20  recommendations.  He testified that the resources devoted to
21  the mental health delivery system in California must be
22  enhanced to meet minimal constitutional standards.  I quote,
23  "It's reflected here as a question that the Scarlett Carp
24  team has 'determined that resources must be enhanced if
25  mental health care were to be considered reasonably

1 accessible, adequate, and constitutional'.   Is that your
2 view, Dr. Koson?

3 "A.   Yes it is."

4        He testified that even if the CDC were to fully
5 implement the Carp proposal as written, inpatient beds and
6 EOP beds should not be reduced unless and until there was a
7 demonstrated lack of demand for those beds and I think I
8 read earlier in the case, Your Honor, during Mr. McKinsey's
9 testimony the fact that he was not aware of the cut back in
10 inpatient beds and he did not recommend it.   This quote on
11 page 274.   The question is,

12 "Q.   In doing your work either for Coleman or for Scarlett
13 Carp did you believe that there's any basis clinically for a
14 reduction in the number of inpatient beds provided to male
15 prisoners in California at this time?

16 "A.   No."

17        This was in January of 1993.

18        He also testified to an urgent need for immediate
19 enhancement of resources in under staffed institutions.
20 This is on 274 again.   "The next recommendation is to aug-
21 ment outpatient mental health positions as soon as possible
22 in clusters that are currently under staffed pending imple-
23 mentation of the cluster concept.

24 "Q.   In your view, Dr. Koson, are there certain institutions
25 and clusters under your plan that are severely under staffed

1 | at this time, mental health staff?

2 | "A.  I can only say the majority of them.  I mean, I begin

3 | this deposition with a premise that resources allocated to

4 | outpatient staff were very insufficient and I noted also in

5 | my deposition that institutions, there were a few institu-

6 | tions that had adequate mental health staffing and in those

7 | institutions the care looked pretty good.  I would not begin

8 | with those but you can't, no mental health staff is as low

9 | as staffing can get.  I mean, there were many that just had

10 | no staff so you can't pick one out as the worst staffed

11 | under those circumstances.  You should start where, I

12 | believe, where the business or the traffic, so to speak, in

13 | patients who need treatment is the greatest."

14 | Dr. Koson testified about the inadequacy of the

15 | CDC formulary of psychotropic drugs and the needs to use

16 | liquid medications and newer drugs such as clozaril, also

17 | known as clozapine.  He felt that clozapine should clearly

18 | be available and was needed.  It was not experimental.

19 | He testified to the need for policies concerning

20 | the prescribing and renewal of medications and the monitor-

21 | ing of medications and the lack of any existing policy.

22 | Here he's reading from his notes on Mule Creek.  This is on

23 | page 409.

24 | "Q.  And then continue if you could.

25 | "A.  But Dr. Gard or his M.D. usually starts the medication

1   before Dr. Martin sees them.  Dr. Martin sees every 90 days
2   if controlled, then in brackets there is no policy and he
3   doesn't want one.

4   "Q.  What were you referring to there in terms of a policy?
5   What kind of policy?

6   "A.  For follow up review of patients on medication.

7   "Q.  In your opinion is the lack of a policy for follow up
8   review a deficiency in a system in mental health care
9   delivery?

10   "A.  Yes.  I think policies are necessary on this issue.

11   "Q.  Do you believe that a 90 day review of a patient by a
12   psychiatrist is appropriate for a prisoner receiving psycho-
13   tropic medications?

14   "A.  There are circumstances where it may be but usually it
15   is not.

16   "Q.  Would you agree that's the outside limit for periodic
17   review by a psychiatrist of patients receiving psychotropic
18   medications?

19   "A.  Yes.

20   "Q.  Would you agree that it's more appropriate to have
21   reviews at 30 days and 60 days than 90 days?

22   "A.  Yes.

23   "Q.  Is there a danger in that a patient that is not
24   reviewed by a psychiatrist until 90 days past may develop
25   side effects or other problems with his medication?

FORM 2094 PENGAD/INDY 1-800-631-6989

1  "A.   There is such a danger."

2         Finally Dr. Koson testified to his overall opinion
3  as to the inadequacies of the current system.   This begins
4  on page 433.   The question is,

5  "Q.   What are the major inadequacies of the current system?"
6             He states,

7  "A.   Services were heavily centralized, both hospital and
8  EOP programs and while conceptually workable, as I have
9  indicated it's the structure and place, the structure and
10 place has experienced ongoing problems because of the imbal-
11 ance of resources I've referred to.   There just aren't
12 enough mental health staff in the institutions to treat
13 patients, screen patients, refer patients promptly.   The
14 inability to categorize and move patients on a timely basis
15 has hampered an otherwise conceptually sound structure and
16 predictably so.   It's difficult predictably to centralize
17 services to the extent that they are in California as part
18 of the lack of mental health staff resources and facilities
19 at the institutional level.   This problem is at its most
20 alarming in the reception setting.   There's a heavy reliance
21 on physical medical personnel, health care practitioners and
22 nursing and the general practice of medicine to provide
23 screening as well as medication treatment services and that
24 has proven to be problematic as I've indicated in my testi-
25 mony regarding some of the reception centers.   Last, I would

1  reiterate that the lack of management information and direct

2  line authority between the health services branch and per-

3  sonnel working mental health field hampers and is a problem

4  to the entire system."

5          He also testified to the dangers of housing men-

6  tally ill prisoners in segregation and his observation of

7  that practice in the EOP program at CMC as well as the

8  inadequacy of the locked observation unit at CMC.  This is

9  on 448.

10 "Q.  Isn't it correct that certain patients with mental

11 illness will have their mental illnesses exacerbated by

12 housing in administrative segregation unit?

13 "A.  Yes.

14 "Q.  Do you recall seeing people in ad. seg. at CMC who were

15 psychotic in need of care?

16 "A.  Yes.

17 "Q.  Would you agree that the LOU does not meet the standard

18 that you have recommended for crisis bed units?

19 "A.  Yes.

20 "Q.  It lacks both therapeutic programming and facilities

21 that you recommend for a crisis bed unit?

22 "A.  Yes.

23 "Q.  Do you believe that mental health care at CMC, given

24 their population, would be benefitted by the addition of a

25 crisis bed unit?

"A.   I think I recommended one for that facility.

"Q.   Do you have any doubts that you would have recommended one for that facility?

"A.   If I didn't, I should have."

Similarly admissions were made by defendant's other lead outside expert, Dr. Joel Dvosken.  He testified that it was inappropriate to operate a general population prison without a staff psychiatrist and that California's practice of operating such prisons without budgeted or filled positions was unacceptable.  He does not tolerate that in New York where he is responsible for the system.

He testified that segregation could exacerbate mental illness in a prisoner.  He testified that there were severe shortages of mental health staff at the institutions he visited.  He testified that the existing system fails to provide adequate early intervention, stabilization, and symptom management.  He testified that mental health staff-ing at the outlying general population institutions was severely lacking.  He testified that he observed prisoners in psychiatric crisis housed in infirmaries throughout the system who were not getting appropriate treatment.  He found a lack of crisis beds in the California system which he said were a crucial part of an appropriate mental health delivery system.  He observed that it was common for non psychia-trists to prescribe psychotropic meds. in California and

1  testified that this occurred far more often than in his
2  system which is New York and this is a practice that is not
3  desirable and should be minimized.

4        He testified that he found about one prisoner in
5  each of the prisons he toured in California that needed to
6  be transferred to a psychiatric treatment facility immedi-
7  ately during his one day tours when he probably encountered
8  20 or 30 prisoners.

9        He testified that there is no tracking system of
10  prisoners receiving mental health care or who need monitor-
11  ing in California and that makes it highly unlikely that
12  such prisoners will be picked up upon arrival at their new
13  prison.

14        He testified to observing inadequate care in the
15  infirmaries and he testified that the absence of regular
16  rounds in SHU units and segregation units made the system
17  inadequate.

18        He testified that the medical records he observed
19  were inadequate, illegible, and that basic standards for
20  documentation were not being met.  He testified that prison-
21  ers were waiting far too long for CAT J evaluations and
22  transfers.

23        The evidence shows that many California prisons
24  have no staff psychiatrist.  Plaintiff's Exhibit 1659 is a
25  chart showing that.  Each of plaintiff's experts has

1   testified to understaffing of mental health care profes-
2   sionals at the prisons.  The '86 work load study found
3   understaffing.  The Stirling Report in '89 found under-
4   staffing.  The Scarlett Carp Report first issued in 1991,
5   again, found severe understaffing and recommended specific
6   increased staffing levels.

7        The recruitment and retention budget change pro-
8   posals complained of understaffing and as you just heard Dr.
9   Koson and Dvosken testified to pervasive understaffing.

10       Defendants have been aware of this problem for
11   years.  Their failure to correct it has caused and continues
12   to cause the suffering of many, many mentally ill men and
13   women for whose care defendants, whether they like it or
14   not, are responsible.

15       Although defendants have a population driven
16   budget which allows for more custody staff and non psychiat-
17   ric medical staff to be hired as the population increases,
18   no such ratio system is in place for mental health staff as
19   Mr. Gomez testified again today.  This failure to include
20   mental health staff in the population driven budget has
21   delivered indifference and has caused severe problems with
22   the massive growth we've had in the last ten years.

23       The mental health program as it currently exists
24   will only worsen for the prison population is expected to
25   increase dramatically.  In the meantime defendants continue

1   to commission more studies, to evaluate, and to ruminate.  A
2   study is simply not a basis for discussion, it's a tool for
3   planning.  Defendant's studies are only useful if defendants
4   react to them.  It's time to act.

5          We heard testimony from Dr. Domingo that the
6   Scarlett Carp Report was delayed due to this litigation.  It
7   wasn't released when it was ready.  The final report was
8   issued in February, 1993 yet Mr. McKinsey testified that
9   defendants were not prepared to implement any part of the
10  Carp recommendations, even the ones that the Carp experts
11  who are also, of course, defendant's testifying experts,
12  Koson and Dvosken, until further studies were undertaken,
13  although one of the contract requirements of the Carp study
14  was to make specific staffing recommendations and the Carp
15  team was especially qualified to make such recommendations,
16  defendants have refused to accept the recommendations.
17  Again, Mr. Gomez said today it was just a bunch of guys
18  sitting in a room.

19         Dr. Khoury, after hours of obfuscation and avoid-
20  ance clearly admitted that even under the most conservative
21  measure of mental health staffing requirements the CDC is
22  presently at least ten percent understaffed.  Defendants
23  have failed to offer any expert testimony defending their
24  existing staffing levels in the system or at any one insti-
25  tution nor have they offered any expert testimony attacking

1    or undermining the Stirling Report and its methodology or
2    findings.  Defendants have offered expert testimony by Koson
3    and Dvosken that endorses and supports the Scarlett Carp
4    Report and its findings and recommendations.

5           Plaintiffs' experts, Your Honor, have also
6    endorsed the Carp report as an excellent starting point but
7    we pointed out some of its limitations, for example, its
8    failure to take into account the needs of the mentally
9    retarded which were excluded from the study and the fact
10   that it's based on population figures that are already out
11   of date.

12          In the face of all of this evidence of severe
13   understaffing and despite the recommendations of their own
14   clinicians, experts, and officials, these defendants told
15   this court that they were unwilling and unable to do any-
16   thing at this time.

17          We've heard that 36,000 new beds were built, $4
18   billion was spent, 15 new prisons were built yet no one has
19   addressed the issues beyond the food, walls, guards, guns,
20   and bars that are needed for these prisoners.  The Constitu-
21   tion requires more than those things.  It requires adequate
22   medical and mental health care.  These have been ignored.

23          Plaintiffs expected a surprise announcement at
24   trial, that there would be, the Scarlett Carp Report was
25   going to be implemented, that something was going to be

1  happening.  The task force report that Dr. Domingo testified
2  about was going to be implemented.  You may recall Mr.
3  McKinsey didn't even remember what it was about when he
4  testified days later.  They're simply not listening to their
5  own clinicians, their own consultants, and there's no basis
6  for their ignoring this evidence.

7      During my examination of Mr. McKinsey he testified
8  concerning the CDC's five year plan, that's Defendant's
9  Exhibit 985.  That was presented to the legislature in
10  January of 1992.  This plan requested no additional mental
11  health funding due to the pendency of the Carp Report.  At
12  the time I cross-examined Mr. McKinsey I did not have the
13  copy of the 1993 five year plan which was presented to the
14  legislature on February 25th, 1993.  We have today intro-
15  duced this plan as Plaintiff's 1654.

16      What's perhaps most remarkable about this new plan
17  is what it says about the defendant's alleged commitment to
18  make mental health care a priority and to address the gross
19  deficiencies in their own system.  The plan says nothing.
20  In fact, the charts describing population needs and charac-
21  teristics that existed in last year's five year plan and all
22  previous five year plans had a category called psychiatric
23  beds.  This category has been deleted from this new plan.
24  Just like the problem of unmet needs has been "solved", it
25  has been dropped out of the public eye.

1    A brief mention of the Carp Report appears in the
2  new plan but there's no discussion of its findings or recom-
3  mendations despite the fact the draft final report was
4  issued in December, 1992 and the final report which was
5  largely unchanged had been issued several weeks before this
6  five year plan was presented to the legislature.  In fact,
7  defendants misrepresent the status of the Carp Report in the
8  new five year plan by stating that, "Completion is antici-
9  pated in the future.", when, in fact, the final report was
10  in their hands.

11    A year earlier defendants trumpeted the Carp
12  Report as the answer to all their planning needs and used
13  the pendency of the report as a justification for not
14  requesting additional funding in their 1992 program.
15  Defendant's Exhibit 985, page 225.  This year defendants are
16  beginning the process of burying the Carp Report in the same
17  way they buried the Stirling Report.

18    Mr. McKinsey testified about his new division for
19  several hours.  What was apparent from his testimony is that
20  the new system depends on the same people who were responsi-
21  ble clinically for the old system, Drs. Khoury and Zil, Mr.
22  O'Shaughnessy are the only people in the new system, we went
23  through all, a whole chart and all the colored boxes that
24  have any experience in the past with mental health delivery
25  systems.  Not one of those numerous colored boxes represents

1  a person with clinical and management experience in the
2  delivery of mental health to, in a correctional setting.
3  None of them are mental health professionals.

4      These people are the same people that Director
5  Gomez testified today cannot convince him what the Stirling
6  Report meant.  These are the same people who Director Gomez
7  testified to, about today who could not implement the
8  screening process or any of the other recommendations.
9  These are the same people that we're to rely on in the
10 future.

11     The Scarlett Carp Report, as I mentioned, fails to
12 make any recommendations for staffing or services for the
13 mentally retarded.  As Dr. Koson testified, the contract
14 excluded the study.  Dr. Koson agreed, however, that the
15 mentally retarded exist in the CDC system, that he saw them.
16 They need to be identified.  They need to be screened for
17 and there needs to be appropriate habilitation services and
18 housing for them.  This is page 28 to 30 of his deposition.

19     Dr. Petrella testified about the kind of program-
20 ming and housing that we need for mentally retarded inmates
21 in the system.  They've been ignored.  There is very little
22 being done and there's no plans to do anything about them.
23 The experiences of inmate Charlie Griffin in this trial are
24 dramatic evidence of the kinds of pain and suffering that
25 result from the current ignoring of these problems and these

FORM 2094 PENGAD/INDY 1-800-631-6989

1   people.  You may recall he was tasered several times.  He
2   got in trouble.  He was never identified.  He spent time in
3   Corcoran and in Pelican Bay SHU and no one seemed to be able
4   to identify his problems which were apparent or get him to
5   an appropriate service.

6           There is no expert testimony on this issue offered
7   by defendants.  The only testimony in the record is plaint-
8   iff's testimony concerning the extent of the problem and
9   what needs to be done about it.

10          A key aspect of the provision of mental health
11  services is the provision of psychiatric medications.
12  Indeed, within the CDC that's largely all that happens in
13  most institutions but the myriad problems for the provision
14  of medication in the CDC has been the subject of a great
15  deal of testimony in this trial.  We've heard testimony
16  about inmates who cannot get to see a psychiatrist to get a
17  prescription, inmates who are prescribed incorrect medica-
18  tions by physicians who lack training and experience in
19  psychiatry, inmates who can't get to a pill line due to a
20  lock down, inmates who receive medication but no monitoring
21  of side effects, inmates whose prescriptions are altered
22  each time they're transferred from one prison to another,
23  inmate who horde, trade, and sell medications.  The list of
24  problems goes on and on.

25          The deficiencies in the CDC pharmacies are

1   themselves numerous.  They were well summarized by defen-
2   dants themselves in the BCP for 1992-'93 signed by Defendant
3   Khoury.  This is Defendant's Exhibit 963 which was discussed
4   today.  You may recall Dr. Khoury testified today that the
5   funding for this BCP was not approved so all the problems
6   identified in that BCP exist.  The BCP states that, "The
7   Department's institutions are continuing to operate both
8   licensed and unlicensed pharmacies that are inadequately
9   staffed, improperly controlled, and legally deficient."  The
10  BCP further states that non pharmacist staff perform func-
11  tions beyond their legal authority.  Inmates do not consis-
12  tently received ordered medications in a timely or accurate
13  fashion.  Mandatory record keeping, drug monitoring, inspec-
14  tion, inventory control and consultation by pharmacy staff
15  is not being performed.  "Since 1988 the inmate population
16  has increased by 40 percent and the number of new pharmacy
17  staff has not increased at all except for those that were
18  included in the new institution."

19          At least as recently as mid '91 CIM and CMC were,
20  quote, operating pharmacy satellites utilizing non pharma-
21  cist supervised staff which jeopardizes both these institu-
22  tions' acute hospital licenses.

23          Problems relating to CDC's medication policy,
24  we've heard again and again put CDC physicians in untenable
25  positions and ethical dilemmas.  We heard from Dr. Maloof

39-137

1    about his ethical dilemma that required him to resign from

2    his position at Solano.  He did not believe that Solano was

3    an appropriate place to provide psychotropic medications

4    even if prisoners needed them due to the lack of monitoring

5    and distribution system.  The way they dealt with that

6    problem was to encourage him to transfer and they went ahead

7    and provided the medications.

8            This same problem has occurred at many, many other

9    institutions.  At Tehachapi, as you know, the non psychia-

10   trists who were required to provide medications actually

11   wrote a memo to Dr. Khoury about their misgivings and their

12   discomfort with prescribing these medications.  Nothing

13   happened in response.

14           Inmate John Worms (phonetic) testified that it

15   took him five or six months to see a psychiatrist after

16   arrival at Avenal to get his medications and there are

17   numerous other examples by plaintiffs about these problems.

18           Defendant's Exhibit 226 states, "To meet legal

19   requirement as well as providing proper medical care, only a

20   psychiatrist is qualified and trained to prescribe treatment

21   and monitor psychotropic mood altering drugs.  We introduced

22   the kripa decree today to show another example of defend-

23   ants' admission as to who a psychiatrist is and what role

24   the psychiatrist is.  A psychiatrist is not someone who

25   feels inclined to practice psychiatry no more than any

doctor who wants to practice brain surgery can go out and perform brain surgery. Psychiatrist is a field, an important field, and an essential field in delivery of mental health service.

Inmate Askew testified at trial that when he arrived at Solano he was told that no medications were available for his paranoid schizophrenia, previously diagnosed and treated in San Quentin with medications. He responded, if I don't get my medications I can get upset, I can be violent so the prison responded by putting him in ad. seg. without medication. Dr. Thor first testified on direct here, Your Honor, that he did prescribe psychotropic medications for Mr. Askew when he saw him two weeks after his arrival but during his cross-examination he was asked to review Dr. Askew's complete medical file and admitted --

THE COURT:  You mean Inmate Askew?

MR. BIEN:  Yes.  I'm sorry, Inmate Askew's file and admitted that he did not prescribe the medications until six weeks after Mr. Askew arrived at Solano.  During that period Mr. Askew was held in administrative segregation and you may recall his very powerful testimony about what it was like to be in ad. seg. at Solano.

For both Mr. Griffin and Mr. Askew as for many other inmates when they needed treatment the system gave them punishment.  When medication is prescribed, monitoring

1  procedures are often inadequate.  Lack of monitoring is
2  dangerous for many reasons.  As Inmate Worms testified, some
3  inmates horde pill form drugs and then sell them to other
4  inmates.  He stated that lithium, for example, sold for $1
5  per pill.  Dr. Thor testified that hording was a problem he
6  had to deal with every day.

7         Procedures in place in the CDC such as distribut-
8  ing a two week supply of medications at one time which is
9  the testimony concerning Donovan encourage and allow hord-
10  ing.  One way, largely, to eliminate the problem of hording
11  is to administer liquid medications.  Defendants are well
12  aware of this option which costs more than pill form medica-
13  tion.  Again, this BCP discusses this problem and the CDC
14  drug formulary has also been restricted, we believe, improp-
15  erly, to save money.  Clozapine, clozaril is not available.
16  It's a dramatic treatment for schizophrenic patients who
17  have not previously responded to other medications.

18         THE COURT:  Was that the testimony?

19         MR. MAYER:  No, Your Honor.  It was the testimony
20  it was available in DMH.

21         THE COURT:  You'll have an opportunity in a
22  moment, Mr. Mayer but my recollection, maybe Mr. Mayer's
23  answered it.  My recollection was that the drugs which were
24  not part of the formulary nonetheless were available on some
25  special application and nature and procedure for which

1  candidly was not entirely clear to me and I certainly didn't

2  hear of any situation in which it had been prescribed within

3  the CDC.

4          MR. BIEN:  Your Honor, Plaintiff's Exhibit 762 is

5  a July, 1992 memo from, I don't know who signed it, whether

6  it's Dr. Khoury who signed it or someone else, we can check

7  that, but it said that this has been available on the formu-

8  lary but not allowed to be used and as of July, 1992 it was

9  completely taken off the formulary.  There's also some memos

10  sent to DMH stating, don't give people clozapine or cloz-

11  aril, our prisoners, unless you're willing to keep them

12  forever 'cause we're not going to take any of them back.

13          THE COURT:  Seven sixty-two?

14          MR. BIEN:  Seven sixty-two, yes.

15      (Pause.)

16          MR. BIEN:  Your Honor, Dr. Dansereau also testi-

17  fied that he was unable to provide clozaril to prisoners he

18  saw in Wasco at reception who he had previously treated with

19  clozaril when he was at Atascadero.  I think the testimony

20  was that in general there is a procedure whereby a doctor

21  can ask for an additional drug for a particular prisoner to

22  be added to the formulary but as to this particular medica-

23  tion the CDC's made a decision so far not to allow its use

24  and just for the record the DMH budget change proposal

25  defendants put in evidence, that's 687, called clozapine,

FORM 2094 PENGAD/INDY 1-800-631-6989

1    "the major medical accomplishment of the decade".

2    There are other medications that are unavailable
3    under the formulary.  Dr. Kaufman testified about them.
4    Once again, there is no expert testimony offered by defen-
5    dants on the issue of medication, on the formulary, on
6    pharmacy procedures.  The only testimony in the record is by
7    plaintiff's experts.

8    Four CDC prisons currently operate enhanced outpa-
9    tient programs or EOP's, CMC, CIW, Donovan, and CMF.  The
10   evidence shows that the EOP's experience many of the same
11   problems that exist throughout the system in general, for
12   example, understaffing which is a serious problem, for
13   example, at CMC where the Plaintiff's Exhibit 1630 and 1631
14   show how few of the budgeted psychiatric positions and
15   mental health positions are filled and another problem at
16   these EOP programs is the inappropriate use of administra-
17   tive segregation for the mentally ill, inappropriate
18   involvement of custody staff in medical decision making, and
19   in general the unavailability of the kind of treatments that
20   are necessary for prisoners who need what's called residen-
21   tial psychiatric care.

22   As stated in the Stirling Report, outpatient
23   services should include individual psychotherapy and group
24   psychosocial skills development.  The EOP's, however, are
25   not providing these services.  "Outpatient care is informal,

1   limited to medication only, for the most part." This is
2   Plaintiff's Exhibit 421 from the Carp materials presented to
3   defendants on October 11th, 1991.

4        In regard to the program at CMC psychiatrists'
5   case loads are so large that most patient psychiatrist
6   contacts are crisis only. CMC has been severely under-
7   staffed. Individual therapy is virtually nonexistent.
8   Group therapy has tremendously long waiting lists. In
9   addition, the internship program has been either terminated
10  or limited and group therapy which was provided mainly by
11  these interns therefore has been greatly reduced.

12        As Dr. Kaufman and Petrella both testified, lack
13  of continuity of care is a major problem, both within the
14  programs at CMC, transfers from the LOU to other units and
15  then going to Atascadero from CMC and back from Atascadero.
16  Deaths have occurred in each of these transitions in the
17  last two years.

18        Without psychiatric approval, custody staff has
19  the authority to place suicide risk inmates on CTQ status
20  and CMC has no policy barring placement of mentally ill
21  prisoners in ad. seg. but they use ad. seg. to house prison-
22  ers awaiting transfer to CMF and while in ad. seg. they're
23  cut off from their normal treatment processes. The result
24  is discontinuity of care and lack of much needed follow up.
25        Suicides at CMC and CMF are at epidemic levels.

FORM 2094 PENGAD/INDY 1-800-631-6989

1   Dr. Goldberg testified to three more in the first few months
2   of 1993 at CMC.  Suicides at CMF are now occurring at a rate
3   higher than the rate in the 12 months before the Gates trial
4   in '89.  The EOP programs are simply understaffed.  Seri-
5   ously ill prisoners who should be inpatients are being
6   improperly housed in EOP's.  All of the EOP's are based in
7   the same program design as Plaintiff's Exhibit 1404 created
8   in June, 1989 but the program design is inadequate and
9   flawed.  At CMF defendants have abandoned their efforts to
10  implement the EOP as described in that program guide.

11          The expansion of the male beds in 1992, '93 that
12  Mr. McKinsey testified about and Mr. Gomez today mentioned
13  has failed to deliver anywhere near the 850 additional EOP
14  beds described in the BCP.  CMC's program rather than being
15  enhanced has been harmed by the addition of hundreds of more
16  seriously ill prisoners without sufficient staff.  The
17  additional prisoners arrive there even before the staff was
18  hired.  Access to inpatient care at ASH has remained a
19  serious problem as Dr. Goldberg testified.  He testified the
20  waiting list had increased as a result of this year's reduc-
21  tion in CDC's contract for inpatient beds at ASH from 412 to
22  374.  The new Donovan program serves only the most stable of
23  inmates.  It's far smaller than planned and lacks the neces-
24  sary facilities and staff to provide appropriate residential
25  care.

1        There is no testimony that any aspect of the San

2   Quentin and Corcoran programs are operational as of the time

3   the evidence was submitted, Your Honor.

4        At CMW, the only program for women, the support

5   care unit houses EOP patients other than those placed in

6   segregation.  As Dr. Meenakshi testified, many inmates in

7   the EOP actually need inpatient care.  The therapy is mostly

8   confined to medication and even that is strained to its

9   limits.  Treatment plans seem generic, formulated and con-

10  tinued without real thought.  Individual or group therapy

11  appear to be randomly provided.  Many patients are ignored

12  until they're psychotic.

13       The improvements at CIW which we acknowledge and

14  think are long overdue occurred only after this litigation

15  not only was filed but pointed out the problems through

16  depositions.  Understaffing at CIW has resulted in the use

17  of unlicensed inmates to provide mental health care to other

18  inmates.  Segregation units are really being used for treat-

19  ment units at CIW.  Once again, the only expert testimony

20  concerning the adequacy of the operation of the EOP programs

21  in providing appropriate residential care is the plaintiff's

22  expert testimony.  The only thing that defendant's experts

23  stated on the topic was that the EOP programs were "adequate

24  in design".  Neither defended their operation as imple-

25  mented.  Neither said they provided appropriate care.

FORM 2094 PENGAD/INDY 1-800-631-6989

39-145

1    Director Gomez, Mr. McKinsey and Dr. Khoury asked
2   the Court to trust in their good will, good intentions,
3   skills, and abilities to address the myriad of problems in
4   the delivery of mental health services that even they some-
5   times admit to.  The evidence before this court, however, is
6   to the contrary.  These defendants should be evaluated not
7   based on what they say, what they have done but what they
8   have done or failed to do in the past few years concerning
9   the very same issue, mental health care delivery in a
10  prison.

11          The Gates litigation was settled by a consent
12  decree which, after approval by the court, became an order
13  of this court.  In the area of mental health care the par-
14  ties agreed and the court ordered that important programs
15  and policies would be in place by a date certain.  The
16  record shows that defendants have acted in callous disregard
17  for these agreed to and then court ordered deadlines.  Nor
18  have defendants shown appropriate respect for or deference
19  to the orders of the court or its procedures, most of which
20  flow directly from the consent decree itself.  I refer only
21  to two examples.

22          Defendants specifically agreed in the decree that
23  the intensive unit of the EOP at CMF would be fully staffed
24  and operational by June 30th, 1990 and that the remainder of
25  the EOP would be fully staffed and operational by October

1   31, 1990.   These dates were not imposed by the court.
2   They're not part of a later negotiated plan.   They're part
3   of the decree itself.

4   The decree also stated the program would then be
5   evaluated to see if it provided appropriate care and if not
6   the program would then be modified.   As noted by the Gates
7   mediator in numerous of his reports defendants failed to
8   meet all of these deadlines for development, implementation,
9   staffing and evaluation of their OPP as set forth in the
10  consent decree.   Rather than move for contempt plaintiffs
11  agreed to a new schedule which was reflected in a new court
12  order entered in early 1991.   The EOP now would have to be
13  fully staffed and 50 percent operational by May 1, 1991 and
14  100 percent operational by July 1, 1991.   Once again, defen-
15  dants failed to meet these deadlines.

16  On July 3rd, 1991 three residents of the under-
17  staffed EOP program at CMF died on haldol as a result of
18  heat stroke.   No heat emergency plans or other measures were
19  in effect at the prison.   Plaintiffs moved for contempt and
20  the court ordered defendants to fully staff the OPP by
21  October 1, 1991.   Reports by the mediator's expert psychia-
22  trist and by the inspector general's department of the CDC
23  issued in '91 and '92 showed the EOP at CMF to be seriously
24  out of compliance with its own program standards and the
25  requirements of the decree.   The program was understaffed.

1   It was not operating to provide appropriate psychiatric
2   evaluation and treatment.

3           In August of '92 defendants were ordered to draft
4   new plans for two parts of the OPP program by October 1st,
5   1992.  Defendants ignored the deadline.

6           In short, these same defendants who wish to be
7   given time, discretion, and latitude to design, staff, and
8   implement on their own mental health delivery system for
9   more than 20 institutions all across the state have been
10  unable or unwilling to abide by the terms of the consent
11  decree and this court's orders to get one psychiatric pro-
12  gram located in a prison a few minutes away from Sacramento
13  to meet minimal standards three years after the deadline
14  they agreed to.

15          The other example which we, which I would like to
16  discuss briefly has been discussed in the trial and that's
17  the decision to pull $2.7 million out of the inpatient con-
18  tract for men at Atascadero.  This was done despite the
19  existence of an order of this court which was the result of
20  a mediation process now an adversary proceeding that specif-
21  ically required defendants to maintain their contract for
22  412 beds at ASH.  This prior order had resulted from an
23  attempt in the year before by two defendants in Gates, DMH
24  and CDC to reduce the ASH beds for the 1991-'92 year which
25  was stopped again by an action of the court.

1        Despite knowledge of this court order by Mr.

2   McKinsey, Mr. O'Shaughnessy and others, defendants proceeded

3   to cut the contract once again without seeking leave of the

4   court, without utilizing the provisions of the decree avail-

5   able to modify a plan.  This decision was made against the

6   advice of defendant's expert consultants as Dr. Koson testi-

7   fied and we believe in flagrant indifference to the needs of

8   prisoners for prompt and effective access to inpatient care.

9   This court must establish a strong and effective remedial

10  process given the severity and urgency of the systemic

11  problems and defendant's unwillingness to voluntarily

12  address them.  There's simply no justification for trust.

13  Lives are at stake.  Great and avoidable suffering will

14  continue unless halted by these court's orders.  Thank you.

15        THE COURT:  Counsel, it strikes me as the inescap-

16  able conclusion of what you're saying at the moment is that

17  Mr. Gomez has been testifying in this court in bad faith.

18  Is that the conclusion you're urging upon the court?

19        MR. BIEN:  I don't think there's bad faith.  I

20  think he's, what he's testified to is that he's getting

21  around to it now.  I didn't hear an explanation for why it

22  didn't happen in '87 and '88, all the way through.  He's

23  saying now he's going to do it and my question is how do we

24  know he's going to do it when he hasn't done it, other than

25  through the litigation, when he hasn't done it voluntarily

FORM 2094 PENGAD/INDY 1-800-631-6989

1   in this period, when he has all this information before him

2   and we also don't know whether he'll be permitted to do it.

3   He keeps on talking about these other forces which are

4   represented by the governor, I guess, in terms of our defen-

5   dants.  Can he do it without a, even if he wanted to?

6          It's not a, I think Mr. Gomez, bad faith is, as to

7   what?  I think some of his testimony is a little hard for me

8   to understand but in general the idea that he should be

9   trusted and that everything's going to be fine based on

10   these charts is just not enough to protect the plaintiff

11   class.

12          THE COURT:  All right.  Thank you, counsel.

13          Mr. Spector.

14          MR. SPECTOR:  Your Honor, if it's okay with the

15   Court I would just cover my part and do the final closing or

16   whatever it's called after Mr. Mayer speaks.

17          THE COURT:  Well, I have this problem, counsel.

18   At some point other than Mr. Bien's exhortation to be tough

19   the, and I do not mean by that to demean his final argument

20   to the court because I understood his to be more fact spe-

21   cific, I want to hear what the plaintiffs think should

22   happen by way of remedies.  I have heard a number of times

23   in this court from parties on both sides critiques of the

24   settlement in Gates and the procedures followed therein and

25   I have to confess the fact that I have engaged in similar

FORM 2094 PENGAD/INDY 1-800-631-6989

1   statements of my own.  The, it's sort of easy for me to do

2   that because I was not at the table when Gates was settled

3   but I think I need to hear from plaintiffs what remedies are

4   being proposed under this general rubric established by Mr.

5   Bien and rather than hear that, since you're going to be

6   covering remedies, Mr. Bien told me, and rather than hear

7   that in summation, I would like to hear that at some point

8   where I also have the opportunity to hear from Mr. Mayer

9   about what he thinks about what you have to say which is why

10  I want to hear from you now, Mr. Spector.

11          MR. SPECTOR:  Yes, Your Honor.

12      (Pause.)

13          THE COURT:  We can go off the record for just a

14  moment.  I --

15          MR. SPECTOR:  Could we go off the record?  I --

16          THE COURT:  Yeah.

17          MR. SPECTOR:  -- have a request to make.

18      (Off the record.)

19          MR. SPECTOR:  Your Honor, I guess I have a number

20  of things to say which reflect about remedy.  They're sub-

21  ject specific and they're also general in nature.  I think

22  I'd like, before I talk about remedy I'd like to somewhat

23  address your prior question to Mr. Bien about state of mind

24  of the defendants.

25          You know, as you mentioned in the, I think it was

1    the pretrial conference or shortly before or shortly after

2    the trial started, this is not a criminal action and we

3    don't have to prove they have a mens rea and a culpable

4    state of mind.  However, there is some blame that goes along

5    with deliberate indifference and it's difficult to charac-

6    terize it as bad faith because that's a, those are very

7    tough words and Mr. Bien was correct, I think, in his

8    answer.

9         The problem, however, I think, goes right to the

10   heart of the constitutional test which is not whether Mr.

11   Gomez is misleading the court or intends to mislead the

12   court or whether he does not, he wants to hurt these prison-

13   ers or act affirmatively, does not want to treat them.

14   Really it, we have here a classic case of turning your back

15   on a problem and not doing anything about it even though you

16   know what the problem is, you know people's lives are at

17   stake, their mental well-being is at stake and you know if

18   you don't act there are going to be serious consequences and

19   the problem in this case is that we, what we have here is a

20   case where the turning of the back has been done not only

21   by, you know, in our opinion by the current defendants but

22   by their predecessors, by Governor Wilson, by the Department

23   of Finance.

24        There has been a lot of testimony in this case

25   about the fact that and the, part of the defendant's defense

1   actually is that there are other priorities that Governor
2   Wilson, Mr. Gomez, the Department of Finance have to be
3   responsible to.  They have other concerns which they have to
4   deal with and not as opposed to the plaintiff class which is
5   looking only for the enforcement of their constitutional
6   rights and I think that's an accurate statement of the
7   political process but it's not a defense to the constitu-
8   tional action whereby, as you so rightly pointed out during
9   Mr. Gomez's testimony, defendant's first obligation or one
10  of their first obligations is to enforce the Constitution
11  and that obligation really is no less important when the
12  persons at issue are behind prison gates.  After all, as
13  Justice White remarked about 15 years ago, it's a prison
14  wall, it's not an iron curtain and because of the lack of
15  political power that some of these, our clients have they
16  can't compete with these other priorities that Mr. Mayer
17  mentioned in his opening statement and that Mr. Gomez
18  alluded to during his testimony.

19          Now, we know that, from Mr. Gomez's testimony
20  today, that Governor Wilson knew as early as 1991 that there
21  were serious problems from, about the mental health care
22  system in the State of California.  We don't know precisely
23  what he knew.  We know, in fact, that his right arm, so to
24  speak, in terms of the Department of Finance, has known
25  about the problems in mental health care because they are

1   the ones that review from 1986 on the budget change propos-
2   als to have a staffing ratio, to have recruitment and reten-
3   tion, to have the 21.5 positions that Dr. Khoury said he
4   needed to properly staff the system, and we know that a lot
5   of the times that those proposals have been turned down and
6   they may well have been turned down because there are other
7   priorities that are more pressing or more politically expe-
8   dient to a political system but we, what we have here from
9   Mr. Gomez is, he says health care is a big priority and as a
10  high priority and that's very nice rhetoric but the real
11  question is, what is, what happens when the rubber meets the
12  road.  What is he going to do about it.

13       Well, what, let's look at what he's going to do
14  about it.  Does he take action to eliminate the 20 percent
15  vacancy rate that's existing in the prisons at this time?
16  Does he take action?  Does he redirect positions to get a
17  staff psychiatrist at Tehachapi?  I brought that up with him
18  in his deposition.  We have heard no evidence, since, that
19  there is one person.  Does he take action to get more mental
20  health staff in the segregation units?  Does he take action
21  to get a viable program for the mentally retarded?  Does he
22  take action to get clozapine on the formulary?  No.  He
23  says, we'll do that three to four years from now when we
24  gather our data to do our, when we have our own bureaucracy,
25  when I have my 100, almost 200 positions in place to do our

1  own study to gather our own data about what exactly is
2  happening in the system.

3         Now, in terms of deliberate indifference, you
4  compare his actions with mental health care to his actions
5  in terms of the prison construction program and you heard
6  him testify today that in 1983 when he was brought over, he
7  was given a job to do and that was to build prisons quickly
8  and what did he do?  He said there had been studies from
9  1979 to 1983 on how to build prisons but nobody was doing
10  anything about it so he and Mr. McKinsey went out and they
11  started building prisons and I think in '84 or '85 the first
12  prison was built.  They took the available data and they
13  acted on it.  They didn't create first a huge bureaucracy on
14  how to build prisons, do another study three or four years
15  later and then decide what's the paradigm of the best prison
16  to build and then build a prison.  He couldn't afford to do
17  that because his governor was telling him, you got to build
18  more prisons.  The legislature was telling him, you got to
19  build more prisons and it's not time to wait.

20         Well, the only thing that's telling him that he's
21  got to do more health care now really is this case and what,
22  and even in the face of this case he doesn't take the best
23  data that he has available, the data that he testified that
24  he recognized, that 7.9 percent was a benchmark for four
25  major disorders.  He didn't use that figure when he went,

1    when he or his staff went to the Department of Finance to

2    ask for more beds.  They haven't, that study is four years

3    old now and it's still sitting in a room gathering dust

4    despite any evidence that was admitted at this trial that

5    it's inaccurate.

6         Now, he didn't ask the Department of Finance to

7    redirect positions for Tehachapi or Pelican Bay or what not.

8    He just created a big bureaucracy in Sacramento which, it

9    may be true and I believe what he says, that he wants to run

10   a very good mental health care system and the defendants do

11   and Mr. McKinsey does.  That's three or four years down the

12   road and if in three or four years down the road the defen-

13   dants are operating a viable health care system and in our

14   view --

15        THE COURT:  You're not suggesting, --

16        MR. SPECTOR:  What?

17        THE COURT:  -- Mr. Spector, are you, that what the

18   district court should do in this case is to tell Mr. Gomez

19   that he ought to take 130 or 40 positions that he has allo-

20   cated for his central staff in health care services and move

21   those out into the field and just let everybody out in the

22   field go do whatever they think needs to be done, are you?

23        MR. SPECTOR:  No, not at all.  I'm, I don't think

24   this court should get into that type of priority setting, as

25   you will.  I think it's perfectly appropriate, it's

1  certainly consistent with his authority, lawful authority to
2  establish these health care divisions. I think what it
3  shows, though, is what his priorities are and that he's
4  really turning his back on the field. I think, you know,
5  everybody admits that the health care division is a good
6  idea but our clients can't wait three or four years until
7  it's up and running. They need relief now and what we want
8  the --

9  THE COURT: Not to be rushing you along but if
10  this Court were inclined to recommend everything that you
11  think needs to be done, which I assure you is not the case
12  but let's just harbor that for the moment, --

13  MR. SPECTOR: Okay.

14  THE COURT: -- and if the district court were
15  prepared to sign off on that without further request, what
16  would you suggest?

17  MR. SPECTOR: That --

18  THE COURT: What ought to happen next?

19  MR. SPECTOR: What ought to happen next? Well,
20  I'll rush along here.

21  THE COURT: Should this Court recommend the
22  removal of the bureaucracy currently in residence in the
23  State Department of Corrections and replace it with your-
24  self, Mr. Bien and Mr. George?

25  MR. SPECTOR: Well, I don't think anybody would

1  wish that on anybody and I certainly wouldn't be interested
2  in it.  I don't know about my colleagues but no, I mean, I
3  don't think you have to touch their health care services
4  division.  That's a matter for them to decide to do.  I
5  think what you have to do, in terms of recommending orders
6  to the district court is order that the most urgent thing is
7  that they get sufficient staff in there now and --

8          THE COURT:  And how do you determine that?

9          MR. SPECTOR:  Well, the first thing that I would
10  suggest or we would request doing is that within the next 30
11  or 60 days, just like you did in the contempt motion in the
12  Gates case, you order them to fill all their existing allo-
13  cated positions through whatever means necessary, whether
14  they have to hire people on a contract basis, whether they
15  have to raise the pay or what, whatever they have to do is
16  get the allocated positions that are existing.

17          The second thing I think that ought to happen is
18  to take the extra 21.5 positions that were denied by the
19  Department of Finance in this year's budget negotiations
20  between the departments and tell them that they have to fill
21  those 60 days later.

22          I think you ought to order them to come up with
23  the, and the next priority, it seems to me, is that you
24  order, you ought to order them to find the prisoners who
25  need mental health care.  They don't have the capacity to do

1  that now.  Mr. Gomez testified that they had a standardized
2  screening form on the shelf for about eight or, last eight
3  or nine months and they haven't implemented yet and he's
4  looked at two or three of them.  I think you ought to have
5  them come back within a 30 day period and submit a proposed
6  standardized screening form and a plan under which that form
7  would be adopted statewide and implemented with people who
8  are trained to use it.

9       Then the next thing is, what happens if they, once
10  they find these people, what do they do with them.  Well,
11  the answer, in our, from our perspective, is that there be a
12  court order that they get to see a clinician within a rea-
13  sonably prompt time after they are identified through this
14  screening process and once they are --

15       THE COURT:  What's that period of time?

16       MR. SPECTOR:  I would think the emergency should
17  be done within two or three hours or 24 hours at the most
18  and most of the assessments should be done within 72 hours
19  after the referral.  Then after the referral happens and
20  what happens now is the doctor would recommend that a pris-
21  oner be a CAT J or a CAT I, we think that the Court should
22  make an order saying that all prisoners recommended for
23  category J evaluation or category I placement shall be
24  promptly transferred to an appropriate medical setting and
25  if the defendants do not have the beds available in their

1   existing EOP programs that they take, or excuse me, their

2   existing inpatient contract facilities with the Department

3   of Mental Health, that they take whatever steps are neces-

4   sary to obtain beds from the community.  Basically, that

5   means contracting out with other organizations.  They can

6   take, they can, there are --

7            THE COURT:  What's that backlog at the moment?

8            MR. SPECTOR:  Pardon me?

9            THE COURT:  What's that backlog at the moment, so

10  far as you're --

11           MR. SPECTOR:  For CAT J?

12           THE COURT:  Yes.  So far as you're concerned, from

13  the evidence.

14           MR. SPECTOR:  It was, I don't know, to tell you

15  the truth or I don't have any current figures.  Maybe Mr.

16  Bien does.  Mr. Bien says about --

17           THE COURT:  All right.  In any event I'm --

18           MR. SPECTOR:  Okay.  For inpatient care there

19  should not be two week, two month, two, you know, three

20  month waiting list to get to Atascadero.  There's no excuse

21  for it.  They should be transferred within 24 hours.  If the

22  doctor thinks they're so sick that they need inpatient care

23  that should be done immediately and as soon as possible and

24  by that I don't mean as soon as all the bureaucratic

25  processes can get fixed but they should be transferred as

1    soon as transportation can be arranged to the appropriate

2    facility.

3            We think that there should be a psychiatrist at

4    every institution so, and that by and large the presumption,

5    if not the rule should be that psychiatrists should be the

6    ones to prescribe psychiatric medications.  We think that

7    in --

8            THE COURT:  What do -- what does a psychiatrist

9    mean to you, Mr. Spector?

10           MR. SPECTOR:  Psychiatrist means to me somebody

11   who has completed a residency in psychiatry and is board

12   eligible in that field.

13           Just skipping around here a little bit, we think

14   that in the long term this doesn't have to be done now in 30

15   or 60 days but the defendants would be given maybe 120 days

16   to come up with a rational plan to determine what their

17   overall staffing needs are for now or in the future.  What

18   we have seen from the defendants, and I talked about this a

19   lot with Mr. Gomez this morning, is very, very --

20           THE COURT:  You're speaking now about cross-exami-

21   nation here in court.

22           MR. SPECTOR:  Yes.

23           THE COURT:  All right.

24           MR. SPECTOR:  I was referring to the BCP for the

25   64.5 positions where the basis of that number came from Dr.

FORM 2094 PENGAD/INDY 1-800-631-6989

39-161

1   Khoury's staff calling around to five institutions to find

2   out how many people are on psychotropic medications and then

3   extrapolating that number to, for the rest of the prison

4   system.  I think they should come up with a basis and I

5   think really the presumption should be that they come up

6   with some figure of prevalency preferably from the Stirling

7   Report but if they are some other basis to determine preva-

8   lency that we don't know about, we'd be glad to look at it

9   but there's got to be some rational basis to plan for the

10  existing needs of the system and the needs of the future so

11  that in the next budget year they have adequate, they can

12  start planning for adequate staffing.

13          If Mr. Gomez thinks that Mr. Dvosken, I mean Dr.

14  Dvosken and Dr. Koson's expert advice is not justifiable and

15  the Stirling Reports advice is not justifiable and the work

16  load study's advice is not justifiable, he has to come up

17  with something that is.  He can't just say I'm going to wait

18  three years till we do it ourselves.  That's, to me, that's

19  just another excuse to put off the ultimate question and I

20  think, Your Honor, going back to the issue of bad faith just

21  to get a little bit away from the remedy here, I don't think

22  it's so much bad faith in the sense of ill will as it is the

23  fact that psychiatric care isn't cheap and they know it and

24  things have gone on so long, have been bad so long, for so

25  long a time that it's a big, it's a bullet that they have to

39-162

1    bite and it seems to me that they have been unwilling to

2    bite that bullet and I think one of the remedies is that

3    they come up with something which addresses the whole

4    system.

5            THE COURT:  How do you propose, assuming for the

6    moment that this, that you were to succeed with this line of

7    argument, don't we find ourselves six months down the line

8    having another trial just like the one we just finished on

9    the question of whether this is an adequate and rational

10   plan for staffing?

11           MR. SPECTOR:  I think in a sense you're right.

12   There may be, have to be a hearing on that particular issue.

13   Hopefully if they get a court order --

14           THE COURT:  Do you think this time we could do it

15   in 40 days instead of 41?

16           MR. SPECTOR:  I hope we could do it in less than

17   one day but or one or two days but not an extensive hearing,

18   but I don't really see how else to do it if the defendants

19   are going to be given the first bite at the apple.

20           Another alternative, I think, which would be

21   acceptable to the plaintiffs is that the defendants imple-

22   ment the Scarlett, be, you know, directed to implement the

23   Scarlett Carp proposal which is something that they commis-

24   sion, they work with.  That's certainly an alternative that

25   we think would be acceptable as a first shot, at least to

1    get things going and then be fine tuned later.

2            THE COURT:  Doesn't that move in exactly the
3    opposite direction from the director's desire to increase
4    standardization and centralization?

5            MR. SPECTOR:  No.  I think the Scarlett Carp
6    proposal is a standardized system but he made the distinc-
7    tion this morning during his testimony between standardiza-
8    tion and centralization and I think the Scarlett Carp model
9    makes the same distinction where they say that, we're going
10   to do things in a certain way but we're going to not do it
11   all at CMF and CMC and CIW, we're going to do some of that
12   at ten or 15 different prisons throughout the system and I
13   think really when you give some thought to it, Your Honor, I
14   mean, one of the severe problems with the system is that
15   there is a lack of crisis care intervention for prisoners
16   who really get sick, they need immediate help and if there
17   is going to be an influx of resources to stabilize these
18   people in a treatment setting, not just put them in an
19   infirmary and have a doctor look at them once every few
20   days, there's going to have to be some resources, crisis
21   care resources within many of the prisons, if not all of
22   them, under even Mr. Gomez's model of enhancing the capacity
23   of CMF.

24           So that actually gets down to spreading out the
25   resources within the system because it takes time to get

1    everybody to CMF.  It costs a lot of money and I don't know
2    if anybody in this trial has testified that that's the
3    appropriate way to handle the issue.

4           The other alternative is to order the defendants
5    to, if you find through what we believe is undisputed evi-
6    dence, that the Stirling Report is accurate and a reliable
7    figure of the present state of things is to order them to
8    come up with staffing packages based on the figures in that
9    Stirling Report and there's a very important table which I'd
10   like to just get from the Scarlett Carp Report which would
11   help and that is --

12          (Pause.)

13          MR. SPECTOR:  This is table number nine in the
14   Scarlett Carp Report.  It's the final, final report.  It's
15   on page 30 and what it does is it breaks, it took the Stirl-
16   ing Report numbers at the behest of the Department of Cor-
17   rections, the Stirling Report prevalency figures and they
18   put it through an analysis and they, by Dr. Steadman in New
19   York, to determine, well, what does prevalency mean in terms
20   of the needs of the system and they came up with what they
21   think are the general ball park figures for the needs of the
22   system.  So, another alternative, I think, is for the court
23   to order them to come up with a plan to provide the staffing
24   and the resources necessary for the figures listed on table
25   nine and if they have some reason to believe that a

FORM 2094 PENGAD/INDY 1-800-631-6989

39-165

1 particular figure is way off or whatever they should be free

2 to do that, let us know about that.

3      The other thing that we want from the court is a

4 special master and I would think the court would want that

5 too.  We think that the special master either should be a

6 psychiatrist or should be allowed to hire or consult with a

7 psychiatrist because some of the issues in the case are very

8 technical and I think it would be important that the person

9 have the medical knowledge or be able to consult with the

10 person who has the sufficient medical knowledge.  This is a

11 case, you know, special masters have been used in many cases

12 for just individual prisons and obviously in a case of this

13 complexity, in a case of this geographical scope I think

14 it's really an essential part of the process.

15      THE COURT:  Do you have a list of nominees or a

16 suggested procedure for arriving at the, an appropriate

17 special master?

18      MR. SPECTOR:  Yes.  I think the appropriate course

19 of action would be for the court, when it issues its injunc-

20 tion, to give the parties a limited amount of time to submit

21 names of a special master.  It might be appropriate to see

22 if the parties could agree on a person who they believe

23 would be acceptable first and then submit that for the

24 court's approval or in any event in the Marin case we used a

25 procedure where we submitted three names and one name

1   happened to show up on both lists so that was the obvious

2   choice but that would be the procedure we would use and we

3   believe that the special master should have complete access

4   to the institutions, should have access to documents, the

5   personnel, both inmates and staff.  He should be able to

6   observe the institutions at any time of the day or night

7   with reasonable notice and, to the defendants, and we

8   believe that special master should be directed by the court

9   to issue reports periodically and we can talk more about how

10  periodically but those should be periodic and I think there

11  should also be a mechanism, it doesn't have to be spelled

12  out in the order but if the defendants are not complying

13  with the orders of this court in a prompt and appropriate

14  manner I think one thing we did learn from the Gates consent

15  decree is that there should be speedier access to the dis-

16  trict court or this court to the district court for compli-

17  ance matters.

18          THE COURT:  What do you mean by that?

19          MR. SPECTOR:  Well, I mean by that is that in the

20  Gates consent decree process there is a lot of, there's a

21  perceived violation that has to happen and then we, first we

22  negotiate --

23          THE COURT:  I understand that.

24      (Pause.)

25          MR. SPECTOR:  Another thing that we are asking the

39-167

1   Court to do is we'd like you to, think it's an urgent prob-

2   lem, is to have the Court enhance the suicide prevention

3   program.  The suicide prevention, for many reasons, is not

4   working now as Mr. Bien alluded to in his argument.  There

5   are many, many suicides at the places which should have the

6   least suicides and the reporting mechanism that's operating

7   by the defendants isn't working.  The follow up mechanism

8   that's operating by the defendants isn't working.  The

9   training mechanism that's operating by the defendants isn't

10  working.  There are no consequences for failure to follow

11  the suicide prevention program so that when there are mis-

12  takes being made the one person who is responsible for

13  evaluating the suicide prevention program in the CDC is not,

14  does not even have the authority to take any kind of disci-

15  plinary or corrective action to make sure that something

16  untoward doesn't happen again.

17          We also believe that the court should order the

18  defendants to provide a treatment or a program, it's not a

19  treatment program but a habilitation program for the men-

20  tally retarded prisoners.

21          We think that another very important item of any

22  court order should be procedures and staffing with respect

23  to segregation.  We believe that the staffing in the segre-

24  gation units now in the system as a whole is very poor, that

25  there is no screening to catch people who are mentally ill

1 before they get into segregation.  There should be some sort
2 of screening that when a person is mentally ill and needs
3 treatment, rather than punishment that those prisoners
4 receive what they need.

5      We think that there should be periodic mental
6 health evaluations of prisoners in segregation to make sure
7 it's not exacerbating a problem and this is especially true
8 at Pelican Bay where the what's called the reduced environ-
9 mental syndrome operates to have the people who are actually
10 kind of healthy become mentally ill.  We think at Pelican
11 Bay, besides the normal screening processes and periodic
12 evaluations and staffing for people in segregation there
13 should be some sort of programmatic change so as in Dr.
14 Haney's words there is something meaningful to do with their
15 time, whether this be increased educational material,
16 increased access to courses by video, whether it be more
17 visits with their loved ones, group exercise where possible,
18 or the like.  I think defendants should be ordered to come
19 up with a plan to give these people something to do so they
20 don't go crazy.

21      THE COURT:  The, other than talking about the
22 problem of clozarine (sic), clozaril or klonopine,
23 clozapine --

24      MR. SPECTOR:  Yes.

25      THE COURT:  -- what is your view of how to deal

39-169

1    with that other than find this court in the extraordinarily

2    unfortunate position of prescribing medication?  It seems to

3    me well outside my area of expertise.

4          MR. SPECTOR:  Well, I don't think, you know, you

5    should prescribe or recommend that the district court pre-

6    scribe medication for any particular prisoner but I do think

7    you should order that medications which are generally avail-

8    able in the community should be available within the prison

9    system and that would include clozapine.

10          THE COURT:  Well, would that include medications

11    which are generally available in the community which have

12    historically not been used in correctional formulary?

13          MR. SPECTOR:  You're talking about things which

14    have addictive properties?

15          THE COURT:  What I think of as the fun drugs.

16    That's probably an unfair and inaccurate categorization but

17    those drugs which have a major risk for developing a second-

18    ary market inside prison, even greater than the ones that

19    are now prescribed.

20          MR. SPECTOR:  Well, I think the problem with

21    secondary markets is somewhat unavoidable as Dr. Nearhood

22    testified.  You remember he said cogentin which is the drug

23    about, controls the side effects for haldol which is widely

24    prescribed has some substance abuse properties if taken

25    alone but and that, I think, it's up to defendants to

39-170

1    provide mechanisms to control the secondary market.  I don't

2    think --

3            THE COURT:  So you think valium ought to be

4    available?

5            MR. SPECTOR:  Not, I think, if there's another

6    reasonable alternative and they do have, prescribe mild

7    tranquilizers now.  I can't remember off the top of my head

8    what the names for them are but they're there, atarax or

9    something.  I --

10            THE COURT:  Well, but if you get into making that

11    kind of distinction --

12            MR. SPECTOR:  Right.

13            THE COURT:  -- you're back to where I started

14    which is having this court and the system where it must

15    begin to find a way other than simply saying drugs that are

16    generally available in the outside community and has to --

17            MR. SPECTOR:  I see what you --

18            THE COURT:  -- develop a list of or find a way to

19    develop a list of correctional medications as opposed to

20    medications that are generally available and that involves a

21    process of weighing and measuring the, I must tell you,

22    stops me cold, conceptually.

23            MR. SPECTOR:  Well, I think that goes to part of

24    the reason why I suggested that the special master be a

25    psychiatrist so if a dispute such as the one you're

1 contemplating does develop the special master does help, A,
2 negotiate with the parties and try and resolve the issue and
3 B, provide advice to the court on this issue.

4       THE COURT:  But the short answer is you are not
5 contending for complete community standard then.

6       MR. SPECTOR:  No but I think general treatment,
7 general types of treatment which are available in the commu-
8 nity should be available in the prison setting.  Clozaril is
9 a case which doesn't fall into that category of fun drugs
10 where there's been no claim that it would be abused by the
11 prisoners.  For things like that there's really no reason
12 why it shouldn't be used since, and used properly in the
13 Department of Corrections given the proper controls.
14 There's no reason to exclude that very important treatment
15 because, you know, there's a problem with semantics in terms
16 of valium and what not.

17       THE COURT:  We need to get to Mr. Mayer quickly.
18       MR. SPECTOR:  Okay.

19       THE COURT:  And we also, I believe Mr. Mayer is
20 entitled to a break before we hear from him so, or at least
21 he's entitled to the option of a break so --

22       MR. MAYER:  I have no comment while we're still on
23 the record, Your Honor.

24       MR. SPECTOR:  Well, that's fine, Your Honor.  I
25 want to just make clear that the remedies that we've, I've

FORM 2094 PENGAD/INDY 1-800-631-6989

39-172

1   thought of off, all the remedies that I've mentioned off the

2   top of my head aren't meant to be exclusive.  I think

3   we've --

4           THE COURT:  I do not feel bound by your closing

5   statement, counsel.

6           MR. SPECTOR:  Okay, and I just want to leave the

7   Court with one quote from Dr. Beermann that I want to empha-

8   size in terms of the, what I think is indicative of the

9   evidence that you've heard from the defendants during the

10  trial and that is on page 22-156 of his testimony where I

11  asked him, in your opinion should the transfer to Atascadero

12  occur within two weeks and he said, paraphrasing, that's a

13  difficult thing to do, to get it done in two weeks.  I would

14  like it to be much shorter than that.  Then I read from his

15  deposition which was, which quotes,

16  "Q.  I am not asking you really for your opinion about how

17  the bureaucracy works.  I'm talking to you as a clinician.

18  How much time do you think is appropriate once the decision

19  is made that this person needs to go to a hospital?

20  "A.  I would like to see it happen within a couple of

21  weeks."

22          Then Dr. Beermann, before I had a chance to ask

23  him another question said, quote, that's my clinical answer.

24  This, today, is my bureaucratic answer and I asked him, does

25  your bureaucratic answer sometimes overshadow your clinical

1  judgment and he says, it overwhelms it sometimes and I think

2  that in many respects that's the same answer for many, many

3  of the problems that are present in the system today that

4  the concerned, other concerns overwhelm the clinical judg-

5  ment and I think it's the duty of this court to return

6  clinical judgment to where it belongs, with the clinicians

7  rather than the bureaucrats.  Thank you.

8          THE COURT:  Thank you, counsel.  Let's go off the

9  record.

10      (Off the record.)

11          THE CLERK:  Court is in session.  You may remain

12  seated.

13      (Pause.)

14          THE COURT:  Good afternoon again.  We're back on

15  the record in Coleman versus Wilson.  Counsel are present.

16          Mr. Mayer.

17          MR. MAYER:  Yes, Your Honor.  May it please the

18  Court and so on.  I've said openly several times and I'll

19  repeat it here, I do not intend to make any kind of a pro-

20  posed oral findings of fact or to go through the evidence in

21  great detail.  There's too lengthy a proceeding that we've

22  all experienced here to do that, I think, in the time allot-

23  ted and even with that it would be preferable, were that the

24  case, to do it in writing, and with careful draftsmanship.

25          THE COURT:  Counsel, if you desire to submit

1  anything in writing, I am going to give both counsel at the

2  end of this the option of doing that but I would like it

3  done in what I'm sure you would all regard as a very short

4  time frame.  I'm not requiring it.  I'm not certain that it

5  will be helpful to me although certainly I will read what-

6  ever submitted and, but I intend, if I do that, to give you

7  both the same date so that I do not get into a responsive

8  briefing situation and I'll give you that opportunity but I

9  am not candidly soliciting that.

10         MR. MAYER:  I'm not volunteering to do it either.

11         THE COURT:  Okay, fine.

12         MR. MAYER:  As I say, it's --

13         THE COURT:  I'm just telling you that that is an

14  option I'm ready to give to the parties if it's your desire

15  but I assure you I have been here since the first of March

16  as the rest of you have and I'll look at something if you

17  wish to submit it but if that, if I don't have volunteers

18  I'm perfectly prepared to proceed at the end of this argu-

19  ment today.

20         MR. MAYER:  Yes, Your Honor.

21         THE COURT:  Or as, I'm prepared as I think I can

22  be.

23         MR. MAYER:  A difficulty with such an approach in

24  this case or a case of this type is trying to discern where

25  to stop, something short of rehashing not only the

39-175

1    transcripts but the libraries and just as a formality, I

2    state for the record a reminder that the statements of

3    counsel, including myself, are not evidence, of course.

4    This has been a complicated case, a long case, but at the

5    same time I think and defendants think it's somewhat of a

6    simple case.

7            The question here is whether defendants, and

8    they're a very small group of people, are deliberately

9    indifferent to the needs of a class of state prisoners who

10   suffer serious mental disorders to health care under the

11   Eighth Amendment.

12           We do not dispute that the Eighth Amendment,

13   Federal Constitution in the Eighth Amendment requires medi-

14   cal care be afforded seriously ill inmates, including seri-

15   ously mentally ill inmates.  The Department of Corrections

16   has had a system for detecting mental illness and for deliv-

17   ering mental health care and has had one for years.  There

18   is no evidence from any defendant, about any defendant, or

19   from any employee or representative of a defendant that

20   would dispute that.

21           The, as we indicated in the evidence and in

22   defendant's opening statement there is in place a system

23   which consumes something approaching $80 million a year just

24   for mental health for state prisoners.  The system includes

25   screening of incoming inmates for mental problems, diagnosis

39-176

1  or evaluation of what the nature and acuity of the problem
2  is or severity of the problem and multi levels of care, care
3  in the field institution, care in residential programs,
4  acute inpatient care, and chronic inpatient care and indeed,
5  semi-chronic residential care.

6       Psychiatrists are employed, psychologists are
7  employed, social workers are employed.  There is an exten-
8  sive medication formulary.  There are procedures for using
9  the formulary and for going outside the formulary where
10  particular physicians think it's appropriate and necessary.

11       Who are the defendants?  Governor Wilson took
12  office in January, 1991.  Director Gomez took office in
13  April of 1991, appointed by Governor Wilson after he became
14  governor.  Drs. Zil and Khoury are mid level executives,
15  well below the level of operation of the other defendants.
16  Secretary Sandoval has been in charge of the agency which
17  includes corrections and other custodial agencies and state
18  government.  There has been almost no evidence about Secre-
19  tary Sandoval about what he did or didn't do or should have
20  done or knew or what he didn't know.

21       We ask the Court, in assessing this case, to look
22  at, defendant by defendant, you know, is there or is there
23  not deliberate indifference to the inmates' problems by a
24  particular defendant.  I think it's perfectly clear there is
25  no evidence of Sandoval being, Secretary Sandoval being

1    indifferent.   There is no evidence that Dr. Khoury is indif-
2    ferent.   There is no evidence that Dr. Zil is indifferent or
3    has been.   There is certainly no evidence that secretary or
4    that Director Gomez is or ever was indifferent to these
5    problems and there's no evidence that the governor is or has
6    been indifferent to these problems.

7         A feature, we think, of the trial and the most
8    impressive testimony has been from Director Gomez and Kyle
9    McKinsey.   Other very important testimony has, from our
10   perspective, has come from Dr. Beermann, the chief psycholo-
11   gist in the Department.   Each of these men has testified not
12   just where they're coming from but in answering questions on
13   cross-examination by the, or by plaintiff's counsel and
14   questions by the Court.   The attitude, I think, that came
15   through is one of direct concern, of creative and indepth
16   thinking about this process.   There was nothing glib about
17   their answers.   They're very comprehensive, thoughtful
18   answers that reflect having wrestled with these issues
19   indepth personally and with their colleagues.

20        The director, we think, has put on an impressive
21   display of information about his direct concern with these
22   problems about how in nearly disastrous budget years medical
23   health in general and mental health in specific has been a
24   high priority and he has protected those budgets and those
25   activities from serious budget cuts where there have been

39-178

1   extraordinary pressures to cut.  He's cut in other areas and

2   has cut severely.  Thousands of positions have been

3   eliminated in other areas of the activities of this vast

4   department and indeed, under the directorship of Mr. Gomez

5   the mental health activities have improved in quantity and

6   in quality.

7          The EOP program, the essential residential care

8   program has expanded.  The inpatient program has expanded.

9   The outpatient pharmaceutical drug program for mental ill-

10  ness has expanded and has improved in quality with the

11  installation of computerization and computer tracking at

12  field institutions of who was on the meds., when prescrip-

13  tions expire.  The lists are, of course, also used, as the

14  Court knows, for finding inmates in cases of heat alerts

15  around the state.

16         There are plans and very substantial plans to

17  increase, to spend a great deal of money to design and

18  implement a statewide data or statewide database or medical

19  information with a vast computer bank, both for custody and

20  for medical information.

21         The director has caused to be created the new

22  division for health services, a very important step from a

23  managerial point of view, from the management information

24  systems point of view and from the inmates' point of view of

25  his not getting lost in the system and field medical care,

39-179

mental health care not suffering from local aberrations and local policies varying from place to place, throughout California. Our system is huge and has grown rapidly. It has suffered growing pains. I said this on the opening statement. The point was made with Mr. Bien's examination this morning of Mr. Gomez.

THE COURT: Mr. Spector.

MR. MAYER: Mr. Spector. The inmate population increased from whatever it was, the high 20's or the low 30,000's up to over 110,000. The number of institutions up to over 26 and more coming, spread from the Oregon border to the Mexico border. It's a vast system. It's a very compli-cated system and there have been growing pains. Nobody's denying it. There has been thoughtful deliberation specific to mental health care and medical care as the two run together to systematize, to make uniform everything.

There's an awareness of a need for a uniform screening of incoming inmates. So a screening document hasn't been dreamed up overnight. That doesn't show indif-ference to the need. There was testimony of experts, plain-tiff's and defendant's experts that went to Wasco, one of our large reception centers, and there was compliments, generally, of that screening instrument that was used there, that it worked, that it found an appropriate number of inmates for, to be diagnosed or evaluated by a clinician.

1    There's testimony of screening at CIM.  There was, even our

2    expert was critical of it, at least what he learned of it on

3    a visit, Dr. Koson, and there was testimony in court about

4    how that system has been improved considerably and at CIM,

5    the screening system.  It's slightly different from the

6    system at Wasco.

7         The director indicated that what screening instru-

8    ment you pick will make a difference on the work load that's

9    produced as a result of the screening instrument.  It's

10   important from a state government perspective to not just

11   pick something and go with it.  It's necessary to understand

12   what it will produce and if the screening instrument pro-

13   duces an over recommendation that requires hiring clinicians

14   to do the evaluations that come through the referrals and

15   there's no evaluation, half of them are going to be spinning

16   their wheels and perhaps instead of evaluating people that

17   don't need to be evaluated because of an over referral, they

18   should be off someplace treating people that need to be

19   treated and those things, there's a need managerially to be

20   sensitive to those things and it takes time to work it out

21   but there's nobody that has said and no plaintiff's witness

22   or expert has accused a defendant or any of these gentleman

23   that testified here of being indifferent, of denying the

24   problem, or of refusing to try and work it out.

25        Just, you know, where is the indifference?  There

1  is none.  There is absolutely none and there's no evidence

2  of it in this case.  There's evidence of deficiencies.

3  There's evidence of clumsiness.  There's evidence of mis-

4  takes.  Name a large system where you couldn't find such

5  evidence.  The plaintiffs have had several years.  They've

6  had full access to all of the prisons, all of the prison

7  personnel, and all of the inmates and all of the records.

8  Sure they've come up with what they think is an impressive

9  array of problems.  They've had the benefit of the so-called

10  Stirling Report, of the Carp Report, commissioned by this

11  director before this case was filed to look specifically

12  into the mental health delivery system and to recommend a

13  better way to do it.

14       This director didn't say to the Stirling Report or

15  to task force reports or other reports, I deny there's a

16  problem.  This director did something about it.  We're

17  talking about a vast system and very substantial consider-

18  ations and they warrant more than just embracing recommenda-

19  tions of task forces or committees.

20       A great deal has been made in this case of the

21  thousands of documents that have been found in correctional

22  coffers by plaintiff's attorneys.  There's memoranda from

23  all over the place, task forces, physicians in the field,

24  headquarters people that make critical statements of what's

25  going on.  They make recommendations as to better ways to do

1  it.  There are requests in the famous BCP's that there's so

2  much evidence about budget change proposals, where people in

3  the field essentially say that unless I get everything I'm

4  asking for here the sky will fall.

5       There's some testimony explaining the context

6  within which that language is used in state government but

7  also of importance, I think, is Director Gomez's testimony

8  that as director of corrections, unlike other department

9  heads in other political appointments, he encourages the

10  BCP's to be proposed, encourages his field people to request

11  things, and to send these up on a formal basis as opposed to

12  other department heads that will say, here is this year's

13  political agenda and if you want more, this is this year's

14  political priority, if you want something more it must fall

15  within this priority and I don't want you putting in

16  requests in other areas.

17       This manager, this executive testified, as I

18  recall, that there were hundreds of BCP's that come up to

19  him and are evaluated.  Some are passed on to Finance but in

20  this case plaintiffs have made much of not only BCP's but of

21  drafts of BCP's and of concept statements and of task force

22  memos, anything that's written or drafted by a correctional

23  employee has been presented as some kind of an admission in

24  this case that binds the defendants, the director, the

25  governor, the secretary, and we urge that the Court has

FORM 2054 PENGAD/INDY 1-800-631-6989

1   authority to stay its hand in this area, to not blindly say

2   that what I as an employee might write to my boss as a

3   recommendation of what to do differently, the boss is free

4   to reject or even laugh at it but if a lawsuit is filed that

5   my casual statement, there maybe even self interested state-

6   ment, becomes a binding admission on everybody above me.

7         It's not a responsible, we think, way to urge that

8   government be operated and certainly it does not justify a

9   conclusion that a director of corrections failure in 1993 or

10  1991 when this case was filed to consider himself bound by a

11  draft of a memo from a prison in 1988 saying that something

12  should be done.  Consider it, put it in the hopper, sure,

13  but are you going to say as plaintiff's would urge that it's

14  deliberate indifference to not adopt that casual draft as

15  the director's own best idea.

16        The same goes with the Stirling Report, this thick

17  report.  There are many problems with the Stirling Report.

18  We examined, the gentleman's name is escaping me at this

19  point, plaintiff's expert who was the statistician.

20        THE COURT:  Haney, I believe.

21        MR. MAYER:  Pardon?

22        THE COURT:  Dr. Haney?

23        MR. MAYER:  No.

24        MR. SPECTOR:  Dr. Greenfield?

25        MR. MAYER:  Greenfield, that participated in the

39-184

1   design and the doing of the Stirling Report or at least

2   volume one of the Stirling Report. Dr. Greenfield

3   acknowledged that the information that was collected after

4   the interview of the 400 or so inmates that were interviewed

5   from the whole system, randomly picked, that that instrument

6   did not produce a diagnosis where he or any other clinician

7   would say, that inmate has, in fact, that mental illness.

8   It's a planning document. It's a way to gather statistics

9   for planning purposes. It's inappropriate for the Court to

10  say from that document, whatever is projected, 7.9 percent

11  or ten percent or 15 percent or whatever number is picked

12  out of that of being a prevalence of mental illness, that,

13  in fact, there are 7,900 or 10,000 or 15,000 seriously

14  mentally ill inmates out there and we're only, we've only

15  found 8,000 and therefore there's, the difference is a mass

16  of undetected men, seriously mental ill inmates. It's a

17  planning document. It's not a diagnostic document.

18          The director's question on the Stirling Report is,

19  he's walked around the prisons, he's talked to his clinical

20  people, he's talked to his custody people. Everybody knows

21  that a seriously mentally ill person sticks out like a sharp

22  spike in the inmate population if they're acting out, if

23  they're starting things, if they're getting into trouble or

24  getting others into trouble. There's nothing subtle about

25  it at all. There's a great deal of testimony here that the

1   custody staff, the medical staff, the lay staff and execu-
2   tive staff and everyone are sensitive to those problems.
3   When those inmates act that way they're touched base with.
4   Somebody talks to them.  There's a clinical evaluation of
5   some kind, a note is made, something is done.

6          If, regardless of whether they're denied medical
7   care, whether they get everything they're, theoretically
8   they might, might be desirable for them to get, at least
9   they're known about but this interpretation of the Stirling
10  Report is saying there are huge numbers of thousands of
11  these types of inmates floating around the system that
12  nobody even knows about and the director simply said in his
13  experience, in the experience of his consultations with all
14  other people available for him to talk to that he has talked
15  to, they're not there.  They're not missing that many.

16         A separate question is whether the inmates who
17  have been detected with mental illness are getting every-
18  thing that A, they should get or must get or B, that's
19  desirable for them to get, that might help them and again
20  the defendants' witnesses have all said they want to do more
21  and they're all trying to find out the best way to do it
22  better.  Nobody is indifferent, deliberate or otherwise, to,
23  A, there's a problem, B, it should be solved and promptly,
24  and C, in a good faith, professional commitment to try and
25  reach and solve the problem that will work.

39-186

1    In many ways the efforts of the defendants are

2    hampered by the plaintiffs themselves.  Many, even

3    plaintiff's experts testified the Stirling Report states

4    that something approaching 20 percent of the mentally ill

5    inmates will competently refuse treatment and if the

6    estimate is 8,000 or 10,000 there's going to be 2,000

7    approximately that will be found, will be detected, and will

8    competently refuse treatment and there are problems.

9    There's other inmates who the treatment is afforded them and

10    they screw it up.  They'll horde the pills.  They'll delib-

11    erately manipulate the system in an effort to try and get

12    housing in a different place.  Pelican Bay inmates want to

13    go to Vacaville.  There was an ASH inmate that, or ASH

14    patient that manipulated his way into ASH and then got tired

15    of ASH and manipulated his way out by being assaulted.  He

16    was a witness here and recall his testimony and recall Dr.

17    Gritter's testimony describing such inmates.

18    In a sense for plaintiffs to come to this court

19    and say, we're entitled to something and then a lot of good

20    people expend a lot of efforts and mental energies and pro-

21    fessional good faith to arrange for it to be delivered to

22    them and they say, well, I don't want it today, there was an

23    inmate here where he had mental problems along with diabetes

24    and an MTA is delivering medications to his cell and he

25    takes a needle and tries to assault the MTA with it.  It's

1   not just refusals.  There's a basis, at least, in the con-

2   text of this forum, to question the plaintiff's good faith

3   and if we're going to give them all of these things perhaps

4   there should be a consequence when they, the inmate, stands

5   in the way, a competent, mentally ill inmate stands in the

6   way of my client's attempt to deliver this kind of medical

7   care and they disrupt it for themselves and for others.

8        They overload by, there's a great deal of testi-

9   mony about malingering, about false claims to see or base-

10  less claims to be on the sick line.  They crowd up the sick

11  lines when there's few available doctors and some inmates

12  who it's important to see, they're thrown in with the malin-

13  gerers and the manipulators.  The class members are getting

14  in their own way and they're disrupting the delivery of the

15  limited mental health care system to themselves and --

16       THE COURT:  Counsel, I was interested and if you

17  have some testimony to the contrary, I'd like you to point

18  it out to me because I was interested in the testimony that

19  I received in this matter at the acknowledgment by both

20  plaintiff's witness, particularly plaintiff's expert witness

21  and defendant's witnesses of two things, one is that malin-

22  gering was a substantial problem in a prison population and

23  two, that it wasn't all that difficult to deal with as a

24  problem, that it, by and large, was something that clogged

25  up the system, made the job difficult, but for the persons

1   on the front line was something you had to learn how to deal

2   with because it was part of the job and it was something

3   that was, while not always discernable, relatively easy to

4   deal with and I have to tell you, that was a surprise to me

5   because I had expected it to be a much more complex problem,

6   having once been in private practice and being confronted

7   with the problems of trying to figure out when your client

8   was telling you the truth, something that may not be just a

9   private practitioner's problem but the, I was interested

10  that the clinicians seemed to feel more comfortable with

11  that than I had expected them to, frankly.

12          MR. MAYER:  Well, they're professionals.  At least

13  our, I'm going to say our defendants are committed profes-

14  sionals.  That and everything else they do in prison is a

15  difficult job and part of the recruitment problem is they're

16  not practicing boutique mental health in Beverly Hills.

17  You've got to be rather committed to do this at all and part

18  of what they're saying is they understand, I suppose, it's a

19  sign of their mental health, to put it in that context but

20  nevertheless they are indicating, as I recall, that it does

21  burden the system, a limited system.  It will always be a

22  limited system.  We're never going to have more than enough,

23  you know, a surplus of mental health clinicians any more

24  than there are a surplus of deputy AG's.

25          I don't know that anything can be done about,

1  realistically and certainly perhaps not from the forum of

2  this court about the visiting a consequence on a plaintiff

3  that comes before the court demanding something but at the

4  same time reserving the right to A, throw it off for them-

5  selves after efforts are made to provide it or B, to inter-

6  rupt the flow of that service to someone else but it's a

7  thing that defendants and their representatives and employ-

8  ees have to deal with and as the Court indicates its recall

9  of the testimony is that there is an understanding and that

10  is dealt with as best they can but it's an artificial prob-

11  lem that plaintiffs themselves are creating which makes the

12  work even tougher than it otherwise is.

13       What I'm saying with all of this, Your Honor, is

14  that at the top of the system there is in place a committed

15  professional.  I don't think anybody can look Mr. Gomez in

16  the eye and say, you're indifferent to this problem.  Were

17  he, in any way, indifferent to it, he couldn't have answered

18  your questions and counsel's questions the way he answered

19  them.  His answers all reflect not just concern or worry but

20  a great deal of thought about this problem and we think that

21  the record is abundantly clear that this man is in the best

22  position to carry this forward and there's no reluctance on

23  his part to do it.  He's fought for and accomplished a great

24  deal in this area, more than has been accomplished in a

25  large number of prior years and he's in the position to do

39-190

1   something about it.

2        THE COURT:  The, there is substantial evidence
3   that he has sought resources which he has not been granted.

4        MR. MAYER:  Yes, and --

5        THE COURT:  And --

6        MR. MAYER:  And that he has sought some which have
7   been granted.

8        THE COURT:  I understand.

9        MR. MAYER:  Right.

10       THE COURT:  You don't get 33,000 employees without
11  getting a few of your requests granted but the, it is a
12  matter of concern that I do not see Mr. Gomez as someone who
13  is going to make requests that could be fairly characterized
14  as a wish list.  His requests are ones that this Court has
15  to take, I think, extraordinarily seriously as his efforts
16  to meet his constitutional mandates in --

17       MR. MAYER:  Yes.

18       THE COURT:  -- this field.

19       MR. MAYER:  Yes.  I would agree.  The, counsel
20  have characterized as creating a, some kind of a headquar-
21  ters bureaucracy, this division that the director has
22  created with Kyle McKinsey in charge but again he's done
23  this to establish now and for the future, as he indicated
24  this morning, --

25       THE COURT:  Mr. Mayer --

FORM 2094 PENGAD/INDY 1-800-631-6989

39-191

MR. MAYER:  -- a self running operation.

THE COURT:  Mr. Mayer, I think --

MR. MAYER:  It's --

THE COURT:  -- one thing you can be comfortable with, if nothing else, and it's perhaps nothing else but the, this Court does not see it as its obligation to make any recommendation that impinges on the manner in which Mr. Gomez endeavors to manage what may well be the largest bureaucracy in the State of California.  I don't know if there's any entity in the State of California that employs more than 33,000 people but I bet if there is they're few and far between.

MR. MAYER:  Let's hope it's not the Franchise Tax Board.  Okay.

(Pause.)

MR. MAYER:  Your Honor, as I've indicated, I made a brief reference to Drs. Khoury and Zil.  These are men which we believe are inappropriately defendants in the case, witnesses perhaps.  They have not been, in the past and still are not in any position to a governmental power themselves to do, I mean, they're idea people.  Until recently they've essentially been without staffs and operating in a role of a consultant almost and it would be, I think, inappropriate and the evidence, as far as I'm familiar with it, doesn't indicate a basis for the Court to find them

39-192

1  deliberately indifferent either, in fact, or in a sense of

2  being in a position to do something about it but failing to

3  act, but failing, inappropriately failing to act on some-

4  thing and the director's testimony fleshed out this morning,

5  I believe, that they simply, these two defendants did not

6  have the power to change or to recommend or to argue but not

7  to actually, themselves, to do something as the director has

8  had authority to do and has done and with those observations

9  I assume that essentially ends up my argument on the merits

10  of the case and on the defense.

11        From all of this we suggest it would be appropri-

12  ate for the Court to not find any defendant deliberately

13  indifferent and without that finding it, to say the least,

14  would limit the court's, the scope of the court's authority

15  to grant relief.

16        Mr., should I, Mr. Spector's list, I assume the

17  Court would invite comments orally on that or --

18        THE COURT:  However you want to handle it.

19        MR. MAYER:  Well, -- I think the first way to

20  address these is to make a statement of principle.  Obvi-

21  ously we're arguing that the Court should not issue perma-

22  nent injunctive relief against these defendants in this

23  case.  If relief is ordered, I think it's clear, particu-

24  larly from experience in other cases, that efforts should be

25  made to not micromanage or to authorize the micromanagement

1    of the Department of Corrections and in particular should

2    this be avoided in a case of both the nature and scope of

3    this case.  Mental illness is, and mental health care is not

4    a bright line area.  What is mental illness?  What's a

5    serious mental illness?  It's still not really defined in

6    the case yet.  The class members are inmates with serious

7    mental disorders but serious mental disorder is not really

8    defined.  There may be some dispute about what it is or

9    isn't.  There's disputes among the professionals about what

10   does or doesn't fall within that bailiwick but then having,

11   where there are agreements there, there's disagreements in

12   particular cases as to what care is or isn't necessary, what

13   care would or wouldn't work.

14          In particular cases the care that's prescribed is

15   adjusted from time to time to try other things, to try other

16   medications, to try other word therapy or other activity

17   therapy.  There are different schools of thought in mental

18   health and in psychiatry.  So it's a difficult, very diffi-

19   cult area to deal with conceptually and managerially and

20   given all of that we would suggest that if any order issues

21   that, A, lawyers be kept out of it as much as possible,

22   including those in the courtroom and including myself, and

23   that as much latitude be given to the defendants, particu-

24   larly Director Gomez and Mr. McKinsey to run their depart-

25   ment, to implement and improve their mental health care

FORM 2094 PENGAD/INDY 1-800-631-6989

39-194

1    system.  Perhaps it would be appropriate to specify
2    standards, to order commitment of resources but how the
3    resources are used, to what they're directed, without spe-
4    cific schedules and so on we believe would be the most
5    appropriate way to deal with it.

6           There was some argument, for example, about if a
7    physician, a psychiatrist sees an inmate and concludes the
8    inmate should have inpatient care that Mr. Spector suggested
9    this should occur, the transfer to inpatient care should
10   occur within a couple of hours or no more than 24 hours if
11   it's an emergency and no more than 72 hours in other cases.
12   The testimony in the case is generally that for emergencies
13   it is, there is an immediate transfer.  For other category I
14   recommendations it's not that simple.

15          Dr. Goldberg from CMC, as I recall, essentially
16   testified that for many category I placements it's elective,
17   it's not a person needs hospitalization.  It's not like an
18   appendicitis attack or a heart attack where you've got to
19   get to a hospital.  It's a determination that this condition
20   will benefit from what is delivered in inpatient care in a
21   hospital.  Dr. Gritter has testified that a little bit about
22   the kind of care that is available at Atascadero State
23   Hospital, billed as one of the leading mental health or
24   certainly government mental health hospitals in the country.
25   There is activities not unlike regular prison activities but

39-195

1   with hand holders that kind of follow the patients around.

2   There's, whatever, there's volleyball.  I think he testified

3   that walking was one of the activity therapy programs.

4           I guess what I'm saying is there's a great deal of

5   hospital care that is really ambulatory.  It's not an

6   urgent, life threatening heart attack kind of hospitaliza-

7   tion.  It's just another place they call a hospital where a

8   certain array of mental health care is offered and a respon-

9   sible physician, Dr. Goldberg, has indicated in some way is

10  somewhat elective.  A person would benefit from it, should

11  get it.  It's not available here at CMC or other places but

12  it's not an urgent thing and whether it happens, and it's

13  not clear to us, to me, from the evidence that whether it's

14  72 hours or 144 hours or whatever is going to make a long-

15  term difference to that inmate when it's not an emergency

16  and these things, I guess what I'm getting at, I'm saying

17  all of this is that as soon as there's an inclination to set

18  up a bright line in this area there's going to be diffi-

19  culties in the sense of a lack of flexibility and bright

20  lines are in one way easy, you set up a menu and if you do

21  all of these things you're okay and if you don't you're not

22  okay but at the same time in this area the defendants and

23  the Department need flexibility to adjust and do things

24  reasonably as opposed to just having a menu to make it easy

25  to see if something is or is not being done.

1      So, we'd ask that that spirit pervade the Court's
2   consideration, if there be any, of the need for an order in
3   the case against the defendants.

4      There was a question during Mr. Spector's list of,
5   as I recall, of what is the current CAT J or EOP backlog and
6   Dr. Beermann has indicated to me that at the present time
7   statewide it's approximately 20 inmates.  That's way down
8   from --

9      The election, I think the director in his direct
10   testimony alluded to this.  There is the reference in Mr.
11   Spector's list to implement the Stirling staffing recommen-
12   dations or implement the Carp staffing numbers or the Carp
13   approach to delivering mental health care and as I recall
14   with the Carp recommendations the director indicated that
15   it's, it would be a new reorganization of, in essence, the
16   culture of corrections, excuse me, in that where now the
17   mentally ill inmates, or at least the more ill ones, tend to
18   be located in a few spots.  By disbursing, under the Carp
19   system, the inmates to many locations, the correctional line
20   staff and others would be brought into more long-term daily
21   contact with them and the negotiations and adjustments would
22   have to be made to account for that in the culture.

23      Also, the numbers, at least in the Carp Report the
24   recommendations take into account that in the clusters there
25   will be crisis care, local crisis care centers and by virtue

FORM 2094 PENGAD/INDY 1-800-631-6989

39-197

1   of the nature of the care that's delivered under those

2   circumstances it's anticipated that would require licensure

3   under the new CTC regulations from California which specify

4   for given medical activities need these numbers of medical

5   personnel for these kinds of activities.

6          THE COURT:  Those regulations not having yet been

7   adopted.

8          MR. MAYER:  They're not yet adopted.  They're

9   proposed but they're not yet adopted but the Carp numbers,

10  as I understand it, anticipate that they will be adopted and

11  to recommend numbers to meet those standards when they come

12  into effect so you don't have to do it again, in effect, as

13  for the positions and so in a sense they might be somewhat

14  artificially high or higher than is necessary to meet con-

15  stitutional minima or to meet just the mental health

16  requirements of the inmates in those areas.

17         The director's testimony, as I recall, and others

18  have testified that a problem with the Carp staffing numbers

19  is that they're not backed up with exactly what the staff

20  will do at particular locations and they need that informa-

21  tion to go to Finance.  I might be getting into far too much

22  detail here on these things but --

23         THE COURT:  No.  Counsel, that's an area of detail

24  that is of interest to me, frankly, because I heard the

25  director's testimony on that and I'm torn between the need

FORM 2094 PENGAD/INDY 1-800-631-6989

1   for large institutions for good information to make proper
2   decisions because heaven knows when a large institution
3   makes a mistake it is a whopper.

4          On the other hand, the best way I ever found in my
5   life of opposing something was telling somebody to give me
6   more detail because that's absolutely a bottomless pit and
7   you can keep it going on forever and I don't think there's
8   any doubt about that.  Well, if you have any thoughts in
9   that regard I'd appreciate it but they, it did sound, from
10  the --

11         MR. MAYER:  I think that's referred to in that
12  context by the director only in indicating the reason why
13  the Carp final final which came out basically December or
14  February was not, it talks about some pretty big numbers and
15  wasn't simply thrown into the pot, here it is, and give us
16  the money for all these positions.  He sensed, as he indi-
17  cated here, that to do that, in addition to the cultural
18  change, he's concerned about to take that to Finance he's
19  going to need something more to beef it up and he wants to
20  do it in the right way to --

21         THE COURT:  Hearing the director's testimony it
22  was hard for me not to conclude that he is aware of the
23  substantial unmet need which he has not yet been able to
24  persuade the governor and the governor's entity, the depart-
25  ment of Finance, should be funded.

1      MR. MAYER:  A couple comments on that.  The
2  director's perspective of an unmet need may or may not
3  coincide with a legal perspective on constitutional minima.
4  Classically, Corrections has delivered services to inmates
5  that far exceed constitutional minima and they've asked for
6  more on top of that.  Medical care, --

7      THE COURT:  I didn't --

8      MR. MAYER:  -- they far exceed --

9      THE COURT:  I didn't see Mr. Gomez as a frivolous
10  administrator seeking --

11      MR. MAYER:  Well, that's not being frivolous but
12  what I, all I'm saying is he's speaking as an administrator
13  when he's saying there's unmet needs.  He's not necessarily
14  speaking as a constitutional lawyer.

15      THE COURT:  Well --

16      MR. MAYER:  Okay.

17      THE COURT:  But counsel, isn't it the case that
18  the standard that involves intent is the indifference stan-
19  dard but what must be met is serious medical needs and I did
20  not see anything in any of the proposals that was talking
21  about, candidly, at the start of this trial I wondered if we
22  were going to hear testimony about different style and
23  modalities of treatment and whether we were talking about
24  group therapy or talking therapy or the rest and it didn't,
25  I didn't hear that debate in this trial.  It appeared that

1   we were talking about rock bottom, ordinary treatment of
2   people with acknowledged serious ailments.

3           MR. MAYER:  Well, the treatment that Corrections,
4   I mean, the word therapy, if I can use that bailiwick, is
5   afforded in the residential programs.  It's afforded in the
6   inpatient programs.  They're very elaborate programs and
7   some of it's afforded in the field or the local institu-
8   tional programs, the group therapy, individual therapy.
9   It's the so-called rock bottom, if there is such, if it's
10  anyplace it's in the field.  It's the inmate on meds. other-
11  wise functioning pretty well in wherever he is, San Quentin
12  or in some general population setting and he's got a job or
13  his education, whatever else he's doing, sweeping floors,
14  and he shows up and gets his meds.  He doesn't have a lot of
15  group therapy and maybe not very much individual therapy
16  other than some formal individual therapy as contacts with,
17  on sick call and so on, with doctors.  Whether that's a rock
18  bottom or not, I would dispute or I think that's far above a
19  rock bottom given, in the mental health context, the support
20  that the structure of the system gives and in the outside
21  world, yeah, they're being deprived of their freedom but
22  that's only because they earned that deprivation in prison
23  but they're getting food and clothing and shelter and a host
24  of other things which have been listed here which the same
25  person in the outside world would not have.

1          THE COURT:   There's no doubt, counsel, --

2          MR. MAYER:   And that support.

3          THE COURT:   No doubt that we undertake a tremen-

4    dous responsibility to one of our residents of this state

5    whom we incarcerate.   It's --

6          MR. MAYER:   But that counts.   It's being done.

7    Those things are being provided and it counts and it's

8    supportive and it's constructive for mental health.   It's

9    not, it's, you can't say, I don't think it's appropriate to

10   say just 'cause you have to provide it under some other

11   constitutional provision that it doesn't count.   It does

12   count.   It does help.   It does support them, the inmates.

13         THE COURT:   Well, you're talking about other

14   support services such as --

15         MR. MAYER:   Yes.

16         THE COURT:   -- food and clothing.

17         MR. MAYER:   Yes.

18         THE COURT:   All right.

19         (Pause.)

20         MR. MAYER:   Oh, just addressing, there, I was just

21   trying to remember where I was in addressing the references

22   in Mr. Spector's discussion to Stirling and Carp.   The

23   special mastership, again, we would ask that that goes back

24   to a retaining of flexibility, if there is a special master

25   or some outside overseer, special master, monitor, mediator,

39-202

1  whatever the person is called.  To have, yes it may be
2  appropriate for that person to have some standards and check
3  up on whether they're being met but the person should not be
4  in a position to substitute judgment for, and again, this
5  gets back to a maximum of flexibility in the operation of
6  this substantial part of state government.

7          THE COURT:  I have to tell you, Mr. Mayer, the, I
8  recognize, by the way, your first argument which is that no
9  relief should be ordered in this case and by asking you
10  these questions I am --

11          MR. MAYER:  Yes, Your Honor.

12          THE COURT:  -- no more implying where this case
13  goes than you are by talking about it.

14          MR. MAYER:  Yes.

15          THE COURT:  But the one thing I think I have
16  learned if I can be taught anything here out of the Gates
17  experience is that if we're going to minimize the involve-
18  ment of lawyers, as you seem to want to do --

19          MR. MAYER:  Um-huh.  Yes, Your Honor.

20          THE COURT:  -- and I think I agree with you, then
21  it strikes me that a special master must be given clear
22  guidelines and less options for discussion, hearing, exami-
23  nation, and the like and much more in the way of summary
24  procedures and I think that would comport with your earlier
25  suggestions regarding, well, with Mr. Spector's suggestions

39-203

1  regarding time frames and your earlier suggestions about
2  getting lawyers out of the process, to the extent that it's
3  possible.

4          It is hard for me to know how to give you the
5  operational flexibility you're talking about at the same
6  time minimizing relitigation, if you will, --

7          MR. MAYER:  I think it --

8          THE COURT:  -- because it strikes me, two things
9  strike me.  A lot of the complaints that I have heard so far
10 about the Gates decree are probably from people who may not
11 have gotten around to reading the Gates decree yet, but
12 leaving that aside for the moment, Gates appears at least in
13 retrospect and I think it was predictable at the time it
14 happened as a way of conducting litigation in a different
15 forum and in a slower way.  Now, there may be some really,
16 very good reasons for doing it that way but I have noticed
17 that each tough question seems to find its way to the media-
18 tor and from the mediator to me and from me to Judge Karlton
19 and in some situations from Judge Karlton to the court of
20 appeals and it does strike me that this is the time to
21 decide this case and to try to minimize the number of mat-
22 ters we leave for future litigation.

23         MR. MAYER:  Yes.  If I might, in that context,
24 Your Honor, indicate that, I'm sure this is obvious but
25 there are, there is a fairly long list of areas of

1   activities in the mental health system that have been ques-
2   tioned by plaintiff's case and counsel's argument.  It's,
3   may not be necessary for the court to rule all or nothing.
4   It may, indeed, be the case that six or eight or ten areas
5   are okay and two or three areas need work and it may be more
6   constructive to focus on what the court may perceive are the
7   more narrow areas rather than everything.

8           Mr. Spector also referred to the habilitation for
9   mentally retarded inmates.  We don't believe that they're
10  mentally ill or mentally disordered.  I think many mental
11  health professionals do not agree they're mentally disor-
12  dered or mentally ill.  Whether the definition of this type
13  of inmate, the class is, are inmates with serious mental
14  disorders and whether that does or doesn't include develop-
15  mental disabled or mentally retarded persons, again, we
16  would say it does not.  Habilitation is quite different from
17  mental health care and essentially I think what plaintiffs
18  are getting at is a sheltered place or a place for such
19  inmates to be kept where they're not preyed on and so on but
20  I think those are questions which are quite discrete from
21  what this trial was about and need not be addressed by the
22  court's order.  They could be left for another day.

23          THE COURT:  Well, the, I will note in passing, Mr.
24  Mayer, that except for some expert testimony and one witness
25  who this court found quite moving the amount of testimony in

1  that area is, has certainly been limited.  The other

2  observation is one that you might keep in mind, since I

3  understand you and the plaintiffs are still talking, is that

4  if the Court were to define the class narrowly, as you

5  contend for, we may all be back here in about a year looking

6  at another case and --

7          MR. MAYER:  Presumably that would be under the

8  Federal ADA statute or --

9          THE COURT:  I, fortunately I'm no longer a member

10 of this California State Bar --

11         MR. MAYER:  Well --

12         THE COURT:  -- except an inactive member --

13         MR. MAYER:  Well --

14         THE COURT:  So I don't practice law and I couldn't

15 tell you how it would be pled, counsel.  The, what the

16 possibility that any litigation you can imagine seems to end

17 up here pretty quickly after you've imagined it because

18 plaintiff's counsel are at least as active as your

19 imagination.

20         MR. MAYER:  More so, I think.  I'm always sur-

21 prised, Your Honor.  In any event, that would conclude, I

22 haven't addressed all of the approximately 15 things that

23 Mr. Spector referred to but I don't think, at this point,

24 it's necessary to do that and barring further questions,

25 we'd submit it.

39-206

1          THE COURT:   Thank you very much, counsel.

2          MR. MAYER:   Thank you.

3          THE COURT:   Counsel.

4          MR. SPECTOR:   We don't have any rebuttal with the

5    exception of the statement that I also didn't address a lot

6    of areas like medical records and the like which you've

7    heard testimony of and I assume you understand that.

8          THE COURT:   I --

9          MR. SPECTOR:   It's not a waiver of request --

10         THE COURT:   The --

11         MR. SPECTOR:   -- for remedy.

12         THE COURT:   To the extent that it's possible for

13   each of you to overcome that horrible need that affects

14   everybody on leaving the courtroom to cover those matters

15   which you wished you'd covered, I find it hard to imagine

16   that there are any left but I know that there will be, I am

17   going to allow filing of further written argument by anybody

18   who absolutely must do so by the close of business next

19   Monday.   Those are not to be responsive to each other and

20   I'm not going to let anybody respond to anything anyone

21   files absent a further motion on incredibly strong showing

22   and I'm not soliciting this, frankly.   I'm simply giving you

23   the opportunity and I will not entertain a request for

24   continuance or extension of that time and you all take the

25   risk, not a substantial one, I will concede, but nonetheless

39-207

1  the risk that I may have it written by Monday so it will all
2  be irrelevant anyway.  I don't think that's likely to happen
3  but I'm not doing anything other than telling you the record
4  will remain open for filing of further written argument
5  until next Monday, well, I'll give you your choice.  Would
6  you prefer Monday or Friday?
7          MR. MAYER:  Could it be understood that if a side
8  does not file such a thing it would not be in any way viewed
9  as a acknowledgement --
10          THE COURT:  Mr. Mayer, I have --
11          MR. MAYER:  -- of weakness or --
12          THE COURT:  -- practically, to the extent that I
13  have been able to do so, I have been encouraging you both
14  not to file anything.
15          MR. MAYER:  Thank you, Your Honor.
16          THE COURT:  So believe me, if there was any unin-
17  tended effect of not filing it would only be the Court's
18  gratitude.  If that takes care of your concern in that
19  matter.
20          MR. MAYER:  Yes, Your Honor.
21          THE COURT:  Now, having said that, since sometimes
22  deadlines on Friday afternoon are much better than Monday
23  because it does wonderful things for weekends.
24          MR. MAYER:  Could we make it tomorrow morning, the
25  deadline, 9:00 o'clock?  Even that won't stop them, I don't

39-208

1    think.

2            THE COURT:  I'll give both sides their choice of

3    either Friday the 25th or Monday the 28th, close of

4    business.

5            MR. SPECTOR:  Twenty-eighth.

6            MR. MAYER:  Consulting with Mr. Castro as to his

7    preference, Your Honor.

8            THE COURT:  Huh?

9            MR. CASTRO:  The 28th is fine.

10           THE COURT:  All right.  I trust that none of you

11   will feel homesick if we terminate this litigation at this

12   time but --

13           MR. MAYER:  Your Honor, if I might, you were

14   complimentary of counsel.  I would --

15           THE COURT:  Well, I haven't done it on the

16   record, --

17           MR. MAYER:  -- like to compliment the Court.

18           THE COURT:  -- counsel, and I told you I'd do it.

19           MR. MAYER:  I've been through a number of trials

20   and I would like to just thank the Court and its personnel

21   for making  a difficult situation very liveable and --

22           THE COURT:  Well, thank you.  I think we can all

23   thank the reporter and the courtroom clerk who have been --

24           MR. MAYER:  Yes, Your Honor.

25           THE COURT:  -- a great assistance to all of us.  I

FORM 2094 PENGAD/INDY 1-800-631-6989

39-209

1    want to thank you.  This has been contentious litigation,

2    been hard fought but I do not think I have heard any blows

3    in this that have been foul and I appreciate that.  These

4    are hard questions including the proper role of a court in a

5    democratic society, by the way, and the, I appreciate every-

6    body's attention to the merits of this case as we've gone

7    along, Mr. Mayer, Mr. Castro, Mr. Spector, Mr. Bien, and Mr.

8    George, you're back there behind Mr. Bien.  I thank you very

9    much for your service to this court.  Thank you.

10            (Whereupon the proceedings in the above-entitled matter

11    were adjourned.)

12                          --o0o--

13

14                        CERTIFICATE

15        I certify that the foregoing is a true and correct

16    transcript from the record of proceedings in the above-

17    entitled matter.

18    _____    Dated July 15, 1993.

19    Jean Tworek, Transcriber

20

21

22

23

24

25