

JUN - 6 1994

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, WINIFRED WILLIAMS
DAVID HEROUX, DAVID McKAY, ROY
JOSEPH, and all others similarly
situated,

        Plaintiffs,           No. CIV S-90-0520 LKK JFM P

    vs.

PETE WILSON, Governor of the State
of California, JOSEPH SANDOVAL,
Secretary of Youth and Corrections
Agency, JAMES GOMEZ, Director of
the California Department of
Corrections, NADIM KHOURY, M.D.,
Assistant Deputy Director for
Medical Services, JOHN S. ZIL, M.D.,
Chief, Psychiatric Services,

        Defendants.         <u>FINDINGS AND RECOMMENDATIONS</u>
_____/

        Plaintiffs are state prisoners proceeding with this class

action challenge to the delivery of mental health care at most

institutions within the California Department of Corrections.

Plaintiffs raise claims under 42 U.S.C. § 1983 based on alleged

violations of the Eighth and Fourteenth Amendments to the United

States Constitution and under the Rehabilitation Act, 29 U.S.C.

§ 794.

AO 72
(Rev 8/82)

547

PROCEDURAL HISTORY

This action was commenced as an individual action by plaintiff Ralph Coleman proceeding in propria persona. On June 25, 1991, plaintiff filed a request for substitution of counsel. On the same day, plaintiff and four other individuals, through counsel, filed a motion to amend the complaint and a motion for class certification. By order filed July 10, 1991, this court granted plaintiff's request for substitution of counsel and plaintiffs' present counsel were substituted in as counsel of record. By order filed August 12, 1991, plaintiffs' motion to amend the complaint was granted and plaintiffs' motion for class certification was set for hearing on August 29, 1991. Following the hearing, this court recommended and the district court ordered certification of the following class:

> [A]ll inmates with serious mental disorders who
> are now or who will in the future be confined
> within the California Department of Corrections
> (except the San Quentin State Prison, the
> Northern Reception Center at Vacaville and the
> California Medical Facility-Main at Vacaville).

(Class Certification Order, filed November 14, 1991, at 4-5.)

On August 1, 1991, following the heat and medication related deaths of three inmates receiving psychotropic medication at California Medical Facility (CMF) at Vacaville, plaintiffs filed a motion for preliminary injunctive relief. Plaintiffs sought a court order requiring defendants to "take all feasible measures necessary to implement within one week" temporary hot weather emergency plans at all state prisons covered by this action and to adopt a final comprehensive hot weather emergency plan. Plaintiffs

2

also sought appointment of a special master to monitor defendants'
compliance with the temporary and final plans.  The motion for
preliminary injunction was also set for hearing on August 29, 1991.

At the time set for hearing, defendants filed a
memorandum, dated August 27, 1991, from the Deputy Director of the
Institutions Division of the California Department of Corrections
(CDC) and the Assistant Deputy Director of Health Care Services for
CDC addressed to wardens, chief medical officers and chief
psychiatrists at institutions within CDC.  The title of the
memorandum was "Prevention of Heat-Related Pathologies Plan."  The
memorandum directed all addressees to "initiate the subject plan at
your institution" and to incorporate enumerated policies into the
plan.

On the basis of that memorandum and the evidence of
defendants' apparent efforts to implement at least a temporary
emergency hot weather plan, the court continued the hearing on the
preliminary injunction for two weeks.  At the hearing, plaintiffs
presented evidence that the temporary plan had not been implemented
at least at Folsom Prison in the time since the first hearing.  The
court gave defendants five days to respond to plaintiffs' evidence.

In findings and recommendations filed October 22, 1991,
this court found that plaintiffs had "presented significant
evidence that there are many inmates throughout the California
prison system who are both on psychotropic medications and in
prisons which are subject to extreme heat conditions."  (Findings
and Recommendations, filed October 22, 1991, at 4.)  This court

AO 72
(Rev. 8/82)

found "evidence that defendants have not, in the past, been adequately attentive to either the need for adequate cooling in the face of extreme heat, or to the special needs of inmates on psychotropic medications."  (Id.)  However, this court also found that defendants were then taking steps to remedy the problem by promulgating a temporary plan and "gathering information for the preparation and promulgation of a systemwide permanent plan."  (Id. at 5.)  The action was then set for trial on June 1, 1992, and this court directed the parties to conduct discovery so that a hearing on heat-related issues could be held on or before April 16, 1992, if necessary.  This court specifically found that "absent good faith implementation of the August 27, 1991 memorandum and efforts toward a permanent plan, the balance of hardships would tip decidedly in favor of plaintiffs."  (Id. at 7.)  However, defendants' efforts at the time led this court to find that injunctive relief was not then warranted.  (Id.)  No objections to the findings and recommendations were filed, and they were adopted by the district court by order filed November 14, 1991.

On April 2, 1992, plaintiffs renewed their motion for preliminary injunctive relief.  The evidence tendered by plaintiff at that time demonstrated that defendants had done almost nothing about a permanent plan over the winter months.  (See Declaration of Katherine Sher, filed April 2, 1992, at paragraph 17.)  On the eve of the hearing, after settlement negotiations supervised by U.S.

/////

/////

4

Magistrate Judge Gregory G. Hollows, the parties agreed on the terms of a stipulated preliminary injunction.  The stipulated injunction was entered on the record on May 11, 1992.

At the request of the parties, trial of this matter was continued to March 1, 1993, so that they could pursue settlement discussions concerning all of the issues raised in the action. Those discussions were supervised and facilitated by Judge Hollows.[1]  The parties were unable to resolve the issues presented by this litigation and trial commenced on March 1, 1993. This court heard evidence for thirty-nine days.  Trial concluded on June 21, 1993, and the matter was thereafter submitted for decision.

EXPERT WITNESSES

The court heard testimony from seven expert witnesses for plaintiffs and four expert witnesses for defendants.[2]  Following is a brief summary of the expert testimony tendered to the court.[3]  The qualifications and background of each of these experts is set forth in the Appendix to this opinion.

/////

---

[1]  This court is enormously indebted to Judge Hollows for his work as settlement judge in this case.

[2]  Pursuant to court order, the direct testimony of expert witnesses was received through signed declarations.  The opposing party was allowed to conduct extensive cross-examination of each expert witness, and the party tendering the witness was given an opportunity to conduct a redirect examination.

[3]  Plaintiffs also offered expert testimony from Terry Kupers, M.D. The court has not considered Dr. Kupers' testimony in making these findings and recommendations.

AO 72
(Rev 8/82)

A.   <u>Plaintiffs' Experts</u>

Dr. Stuart Grassian testified concerning the psychiatric consequences of solitary or small group confinement.  Dr. Grassian also testified concerning mental health care issues at Pelican Bay State Prison, including the prevalence of mental illness at the prison and in the Pelican Bay Security Housing Unit (SHU) in particular, staffing levels, screening for mental illness, access to care, including access to inpatient and intensive outpatient care, administration of medications, involuntary medication, medical records, quality assurance/peer review, suicide prevention, and the relationship between security issues and the mental health needs of the inmate population.

To prepare for his testimony, Dr. Grassian toured Pelican Bay State Prison, particularly the SHU.  He conducted interviews with twenty-nine inmates housed at the prison, twenty-four of whom were housed in the SHU; each interview was approximately thirty or forty minutes and Dr. Grassian reviewed whatever medical information was made available for each of these inmates.  He spoke briefly with a staff psychiatrist, a staff psychologist, and Pelican Bay's litigation coordinator during his tour.  Dr. Grassian also reviewed medical and central files of most of the inmates interviewed, documents produced by defendants relating to the provision of mental health care at Pelican Bay, and the deposition testimony of six health professionals employed at Pelican Bay and of Dr. John Zil, the Chief Psychiatrist for the CDC.

/////

AO 72
(Rev 8/82)

Dr. Thomas Greenfield testified concerning the prevalence of mentally ill inmates in the CDC based on his work as a consultant in the preparation of the Stirling Report.[4]/ Dr. Greenfield also testified concerning a reanalysis of the Stirling Report prevalence data that he performed in 1991 for Scarlett Carp & Associates, consultants hired by the CDC to evaluate mental health care delivery in the prison system.[5]/ Dr. Greenfield also testified concerning the adequacy of screening for mental illness at institutions within the CDC and about inmates' self-reported willingness to received mental health treatment in those institutions. Finally, Dr. Greenfield offered testimony concerning flaws in the method used by the CDC to seek resources for mental health care.

Dr. Craig Haney offered testimony concerning the Stirling Report, including the validity and quality of the methodology used by the researchers who conducted the study and the reliability of the prevalence data contained in the Report. Dr. Haney also offered testimony regarding living conditions in the Pelican Bay SHU and the Violence Control Unit (VCU) that is part of the SHU, the psychological impact on mentally ill inmates subjected to those

---

4/   The Stirling Report is discussed more fully in a later section of this opinion. The report was a legislatively mandated study entitled "Current Description, Evaluation, and Recommendations for Treatment of Mentally Disordered Criminal Offender." The prevalence data are contained Volume I of the report.

5/   The Scarlett Carp Report is a published report of a study conducted by independent consultants hired by the CDC in 1991. The report is discussed more fully in a subsequent section of this opinion.

AO 72
(Rev.8/82)

conditions, and the adequacy of the psychiatric services available to such inmates.  In preparation for his testimony Dr. Haney observed the SHU and the VCU, interviewed inmates and staff, and reviewed documents.  Dr. Haney also offered testimony concerning the psychological impact of other SHU units throughout the CDC. This testimony was based on review of documents as well as interviews with and observation of inmates in the Pelican Bay SHU who had previously been housed in other SHU units.

Dr. Edward Kaufman testified concerning the delivery of mental health care in the California Department of Corrections and at six specific prisons in the class.[6/]  He also testified about staffing, screening for mental illness, medical records, evaluations for placement in a residential psychiatric program (so-called "Category J" evaluations[7/]), other outpatient psychiatric programs, access to inpatient care, prescription, administration and availability of psychotropic medications, housing of mentally ill inmates in administrative segregation, suicide prevention, mental health care training for custody staff, use of tasers and other gun-fired projectiles on mentally ill inmates, treatment of substance abuse in mentally ill inmates, and quality assurance/peer review.

---

6/  California Correctional Institution at Tehachapi, California State Prison/Corcoran, R. J. Donovan Correctional Facility, California Men's Colony, California State Prison/Avenal, and the Correctional Training Facility at Soledad.

7/  The principal acute mental health category is Category J.  Other mental health categories include Category I, Category K and Category U.  (Petrella Declaration at 30.)

        Dr. Kaufman's testimony was based on tours of four institutions, where he interviewed staff and prisoners, reviewed central and medical files and observed the facilities.[8/]  He also reviewed other medical records for inmates in the CDC, including reports of nine suicides at California Men's Colony and incident reports regarding inmates restrained by tasers and 37mm guns.  He also reviewed deposition transcripts, exhibits, and documents from the four institutions that he toured and from Avenal and Soledad. He also reviewed documents produced by defendants regarding systemwide policies and problems, including the Stirling Report, the Scarlett Carp reports[9/], and major Budget Change Proposals. Finally, Dr. Kaufman relied on literature in the fields of psychiatry, mental health delivery systems, forensic mental health and related fields.

        Dr. V. Meenakshi offered testimony on numerous issues relating to the provision of mental health care at six institutions in the class.[10/]  Dr. Meenakshi's testimony addressed the following issues:  screening and referral, access to care, adequacy of inpatient care, administrative and segregated housing units, medical records, involuntary medication, tasers and restraints,

_____

8/   California Men's Colony, R. J. Donovan Correctional Facility, California Correctional Institution at Tehachapi, and California State Prison/Corcoran.

9/   The Scarlett Carp consultants published a series of reports before their final report was published in February 1993.

10/   California Institution for Women, Central California Women's Facility, Northern California Women's Facility, Mule Creek State Prison, California Correctional Center, and Sierra Conservation Center.

AO 72
(Rev.8/82)

staffing shortages and problems with recruitment, quality assurance, informed consent, medication distribution and monitoring, suicide prevention, and the effects of exposure to heat on inmates taking psychotropic medications.  Dr. Meenakshi's testimony was based on tours of several prisons, interviews with staff and prisoners, review of documents produced by defendants, and review of numerous inmates' psychiatric and central files.

Dr. Russell Petrella testified regarding the necessary elements of an adequate mental health care delivery system, the adequacy of the management of mental health care and the adequacy of mental health resources in the CDC.  He also testified about numerous mental health care issues at five institutions in the class,[11]/ and the delays and backlog created in referring inmates for Category J evaluation.  Finally, he testified regarding care for mentally retarded inmates.

Dr. Petrella toured four prisons in the class.[12]/  At each institution he interviewed staff and prisoners, reviewed medical files and observed the facilities.  He also reviewed additional medical records, deposition transcripts, exhibits and other documents, including documents and reports describing systemwide policies and problems.

In connection with his opinion on the backlog of inmates waiting for referral for Category J evaluation, Dr. Petrella

---

11/    California Men's Colony, California Institution for Men, Calipatria, Chuckawalla Valley State Prison, and Wasco State Prison.

12/    California Men's Colony, Wasco State Prison, California Institution for Men, and Calipatria.

AO 72
(Rev. 8/82)

reviewed deposition testimony, documents, and medical, psychiatric
and central files of a sample of inmates originally referred for
Category J evaluation who were subsequently reevaluated and
reclassified as general population inmates.  He also reviewed
questionnaire responses and correspondence to plaintiff's counsel
from some of these inmates.

B.   Defendants' Experts

Dr. Louis L. Beermann, the Chief Psychologist for the
CDC, testified concerning the development and implementation of the
suicide prevention program used by the CDC, as well as the
historical and current suicide rates in the Department.

Steven Cambra offered testimony concerning the training
required for new correctional employees in the CDC, the in-service
training provided at each institution in the CDC, and the on-the-
job training at institutions throughout the Department.  He also
testified about the role of custody staff in the provision of care
to mentally ill inmates, placement of inmates in administrative
segregation and security housing units, and conditions of
confinement in such units.  Mr. Cambra' testimony was based on his
personal experience and observation, as well as review of
Department policy and documents.

Dr. Joel A. Dvoskin testified concerning the mental
health care delivery system in the CDC.  Dr. Dvoskin was one of the
consultants hired by Scarlett Carp and Associates to conduct the
1991 study of mental health care delivery in the CDC.  He testified
about the services necessary for a mental health care delivery

11

system to function adequately, problems within the CDC system, the Scarlett Carp consultants' recommendations for remedying those problems, and the prevalence of inmates in the CDC needing treatment for serious mental disorders on any given day.  Finally, he testified about placement of mentally ill inmates in administrative segregation or security housing units, suicide prevention, and the need for a management information system and some form of quality assurance.

Dr. Dennis Koson testified concerning the definition of serious mental disorder, the need for screening and the screening procedures that are used at the reception centers at Wasco State Prison and R. J. Donovan Correctional Facility.  Dr. Koson also offered testimony concerning organization of the CDC mental health care delivery system and some of the problems that obtain in the present structure.  Finally, he testified about the placement of mentally ill inmates in administrative segregation.

Dr. Koson's opinion was based on tours of nine prisons in the class,[13]/ prior experience in other prison litigation, and on his work as one of the consultants for the Scarlett Carp Study.

/////

/////

/////

/////

_____

13/   California Institution for Women, Central California Women's Facility, Northern California Women's Facility, California Men's Colony, Mule Creek State Prison, Wasco State Prison, California Institution for Men, Calipatria State Prison, and Richard J. Donovan Correctional Facility.

AO 72
(Rev.8/82)

STANDARDS[14]/

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of [state law]
> . . . subjects, or causes to be subjected, any
> citizen of the United States . . . to the
> deprivation of any rights, privileges, or
> immunities secured by the Constitution . . .
> shall be liable to the party injured in an
> action at law, suit in equity, or other proper
> proceeding for redress.  42 U.S.C. § 1983.

In the instant case, plaintiffs contend that defendants have violated and are continuing to violate their rights under the Eighth Amendment to the United States Constitution.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on convicted prisoners and applies to "the treatment a prisoner receives in prison and the conditions under which he is confined."  <u>Helling v. McKinney</u>, ___ U.S. ___, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993).

> When the State takes a person into its custody
> and holds him there against his will, the
> Constitution imposes upon it a corresponding
> duty to assume some responsibility for his
> safety and general well being. . . .  The
> rationale for this principle is simple enough:
> when the State by the affirmative exercise of
> its power so restrains an individual's liberty
> that it renders him unable to care for himself,
> and at the same time fails to provide for his

---

[14]/   As noted <u>infra</u>, this court is reserving findings and recommendations on plaintiffs' claims regarding treatment of mentally retarded inmates pending further briefing.  For the reasons discussed below, this court finds the evidence of defendants' constitutional violation with respect to the treatment of mentally ill inmates so clear that the court need not reach plaintiffs' claim under the Rehabilitation Act at this time.  Therefore, the only standards set forth in this section are those that apply to plaintiffs' Eighth Amendment claim.

13

> basic human needs - e.g., food, clothing,
> shelter, medical care, and reasonable safety -
> it transgresses the substantive limits on state
> action set by the Eighth Amendment. . . .

Id., quoting DeShaney v. Winnebago County Dept. of Social Services,
489 U.S. 189, 199-200 (1989); see also Hoptowit v. Ray, 682 F.2d
1237, 1253 (9th Cir. 1982) ("The Eighth Amendment requires that
prison officials provide a system of ready access to adequate
medical care").  Access to adequate mental health care is a
necessary part of an adequate medical care system in prison.  Id.
at 1253; Balla v. Idaho State Bd. of Corrections, 595 F.Supp. 1558,
1576-77 (D. Idaho 1984), quoting Bowring v. Godwin, 551 F.2d 44
(4th Cir. 1977).

In Balla, the district court described six components
essential to a minimally adequate mental health care system.  These
components are:  (1) a systematic program for screening and
evaluating inmates to identify those in need of mental health care;
(2) a treatment program that involves more than segregation and
close supervision of mentally ill inmates; (3) employment of a
sufficient number of trained mental health professionals; (4)
maintenance of accurate, complete and confidential mental health
treatment records; (5) administration of psychotropic medication
only with appropriate supervision and periodic evaluation; and (6)
a basic program to identify, treat, and supervise inmates at risk
for suicide.  Balla at 1577.

Inadequate medical care in prison constitutes cruel and
unusual punishment in violation of the Eighth Amendment when the
inadequacies rise to the level of "deliberate indifference to

14

serious medical needs."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106

(1976).  An Eighth Amendment claim based on deliberate indifference

to medical needs is comprised of an objective component and a

subjective component.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 111 S.Ct.

2321, 2324, 115 L.Ed.2d 271 (1991).  The objective component

focuses on whether the deprivation of medical care is "sufficiently

serious," while the subjective component focuses on whether the

defendant officials "act[ed] with a sufficiently culpable state of

mind."  <u>Id</u>.  As a general rule, the state of mind required for an

Eighth Amendment violation is one of "'obduracy and wantonness.'"

<u>Id</u>. at 2324, quoting <u>Whitley v. Albers</u>, 475 U.S. 312 (1986).  In

cases raising claims based on inadequate medical care, "wantonness"

is shown by proof of deliberate indifference on the part of

defendant officials.  <u>Wilson</u> at 2326-27.

Deliberate indifference is shown where inmates are unable

to make their medical problems known to medical staff that is

competent to examine inmates and diagnose illnesses, as well as to

treat medical problems or provide referrals and access to those who

can provide treatment.  <u>Hoptowit</u> at 1253.  The Seventh Circuit has

held that deliberate indifference to the serious medical needs of

prisoners may be demonstrated by proof of "such systemic and gross

deficiencies in staffing, facilities, equipment or procedures that

the inmate population is effectively denied access to adequate

medical care."  <u>Wellman v. Faulkner</u>, 715 F.2d 269, 272 (7th Cir.

1983), <u>cert. denied</u>, 468 U.S. 1217 (1984).

/////

AO 72
(Rev.8/82)

ANALYSIS

At the outset, this court finds that there is virtually no dispute over the objective component of plaintiffs' claims.  As discussed in detail below, plaintiffs have clearly shown, and defendants have effectively acknowledged, that the delivery of mental health care within the California Department of Corrections is, and for many years has been, grossly inadequate.

The remaining question is whether defendants have acted with deliberate indifference to the serious medical needs of inmates with serious mental disorders.  This court finds the evidence of defendants' deliberate indifference manifest; defendants have for years ignored the considered advice of their own experts about the woeful deficiencies in their system.  In the interim, untold thousands of mentally ill inmates have gone undiscovered, undiagnosed, and untreated while, at the same time, being subjected to conditions that aggravate their illnesses. Additionally, mentally ill inmates who do receive some forms of treatment suffer needless, extended, and medically harmful delays in access to necessary psychiatric care.[15]/

/////

_____

15/  Plaintiffs presented compelling and tragic evidence at trial of the suffering of mentally ill inmates in California's prisons, both through the declarations of their expert witnesses, see, e.g., Declaration of V. Meenakshi, M.D., filed February 5, 1993, passim; Declaration of Stuart Grassian, M.D., filed February 5, 1993, passim; Declaration of Dr. Russell C. Petrella, filed February 5, 1993, at 160-183; Declaration of Edward Kaufman, M.D., filed February 5, 1993, passim, and through the testimony of inmate witnesses at trial, see, e.g., testimony of James Moore, March 5, 1993; James O'Donnal, March 5, 1993; Rahsson Bowers, March 5, 1993; Winifred Williams, March 19, 1993.

16

A.  History

    1.  Workload Study

In 1984, management in the California Department of Corrections recognized that the CDC and the California Department of Finance had not established a staffing ratio of psychiatrists and psychologists to inmates in the CDC.  (Plaintiffs' Exhibit 456 at vi, 1.)  Defendant Khoury, then Chief of the Health Services Unit for the California Department of Corrections, was directed to develop such staffing ratios.  Id.[16/]  A CDC Health Services Unit task force was created and assigned the task of conducting a workload study to develop these ratios.  (Id.)

In the workload study, completed in May 1986 and published in August 1986, the task force found, inter alia, that the absence of a standardized staffing formula had led to staffing patterns which had "almost doubled the average caseload for psychiatrists and psychologists" over the preceding seven years. (Id. at 1.)  In addition, "the dramatic escalation in the number of inmates,[17/] [as well as] legislative changes, court orders, and

/////

---

16/  Plaintiffs' Exhibit 456 shows that the Chief of the Health Services Unit was directed to undertake this task "[d]uring the 1984-85 Departmental budget hearing."  (Id. at 1.)  Defendant Khoury testified that he became Chief of the Health Services Unit in January 1985 and that he initiated the study.  Testimony of Dr. Nadim Khoury, M.D., Reporter's Transcript (RT), March 29, 1993, at 14-56, 14-63, 14-64.

17/  The task force found that the inmate population had increased 138% in the seven years preceding its study, while the number of budgeted positions for psychiatrists and psychologists increased by only 29%.  It is not clear whether all the budgeted positions were in fact filled.  (See Exhibit 456 at 11.)

17

settlement agreements with the Department[18]/ . . . increased the number of required evaluations and treatments done by the psychiatric staff."  (Id. at 2.)

The task force drew the following conclusions:

1.   The practice of allocating Psychiatrist and Psychologist positions without consideration of population or workload is inappropriate.

2.   Court orders and mandates are increasing the workload demands of the psychiatric staff.

3.   The current workload is clearly excessive with the existing resources.

(Id. at vi.)   The task force recommended adoption of the following ratios of staff to inmates:

| | | |
|---|---|---|
| Reception Centers: | Psychologist | 1:121 |
| | Psychiatrist | 1:278 |
| Referral Centers: | Psychologist | 1:666 |
| | Psychiatrist | 1:498 |
| CIW[19]/ | Psychologist | 1:350 |
| | Psychiatrist | 1:559 |
| Outpatient Facilities | Psychologist | 1:2636 |
| | Psychiatrist | 1:2125 |

(Id. at vi.)

The workload study, though approved by defendant Khoury, was not adopted by the CDC.  (Testimony of Dr. Nadim Khoury, Reporter's Transcript (RT), March 30, 1993, at 15-131, 132.)  To this day, ten years after formal recognition of the problem,

---

18/   The task force noted an increase in litigation against CDC involving psychiatric care issues.  In so noting, the report states that "[t]he contention of the courts is that inmates must be provided with a comparable scope and quality of psychiatric care services as found in the community at large."  (Id. at 5.)  (Emphasis added.)

19/   California Institution for Women.

1  defendants have not adopted a staffing ratio for either

2  psychiatrists or psychologists to the inmate population.

3  (Testimony of James Gomez, RT, May 17, 1993, at 74.)   Instead, the

4  CDC still relies on the budget change proposal process criticized

5  in the 1986 workload study.   (Id.; Plaintiff's Exhibit 456 at 1.)

6  Further, as will be discussed in greater detail infra, the CDC is

7  intolerably understaffed in the area of mental health care.

8          2.   Stirling Report

9          In 1986, responding to a legislative mandate,[20] the

10 CDC undertook a "study of the prevalence of mental illness among

11 inmates and parolees" and a "systematic evaluation of mental health

12 service delivery in the correctional system."   (Plaintiffs' Exhibit

13 1 at ii-1.)   The researchers were directed to focus on

14          the prevalence of Severe Mental Disorder (SMD)
15          among prisoners and parolees;[21] evaluate
           available mental health services and facilities
16          for these populations and forecast program

17 ___

20/   1984/1986 Assembly Bill 2390 (Stirling).   (Plaintiff's Exhibit
18 1 at i-1.)

19 21/   Severe mental disorder is defined in the legislation as "an
   illness or disease or condition which substantially impairs the
20 person's thought, perception of reality, emotional process, or
   judgement; or which grossly impairs behavior, or which demonstrates
21 evidence of an acute brain syndrome. . . .   The term 'severe mental
   disorder'. . . does not include a personality or adjustment disorder,
22 epilepsy, mental retardation or other developmental disabilities, or
   addiction to or abuse of intoxicating substances."   Cal. Penal Code
23 § 2962; (Plaintiffs' Exhibit 1, at i-1).   The Stirling Report stated
   that the disorders assessed in the prevalence survey included organic
24 brain syndrome, schizophrenia, affective (mood) disorders, obsessive
   compulsive disorder, anxiety disorders (including phobias, generalized
25 anxiety  disorder,  panic  disorders,  and  post  traumatic  stress
   disorder), and somatization disorder.   (Id. at ii-1.)   The study also
26 went beyond the statutory definition of SMD and gathered data for
   diagnosis of alcohol and substance abuse and/or disorders "because of
   the importance of these disorders for service planning."   (Id.)

19

AO 72
(Rev.8/82)

> needs; review and make recommendations
> regarding screening proceedings; and design 'a
> study of the effectiveness of treatment
> programs in reducing the level of re-offending
> among parolees with mental disorders.

(Plaintiffs' Exhibit 1 at i-1.)   The purpose of the Stirling study

was to remedy the "lack of systematic psychiatric epidemiological

data on the California prison population for use in projecting

mental health service needs."   (Id. at ii-3.)   The study noted that

> [t]he intent of the Stirling legislation is to
> strengthen the capabilities of CDC, through its
> Office of Health Care Services, working in
> concert with the State Department of Mental
> Health (DMH), to provide effective mental
> health treatment for the severely mentally
> disordered (SMD) offender, during incarceration
> and parole. . . .[22]/

The prevalence study was conducted in July 1987 and

published in July 1989 as Volume I of the Stirling Report.

(Plaintiffs' Exhibit 1.)   The prevalence study divided inmates into

two groups.   The first group was called the "unidentified" general

population group, i.e., inmates "who had not been assigned

psychiatric categories in the CDC inmate classification system."

(Id. at ii-3.)   The second group was drawn from "psychiatrically

identified" inmates, i.e., those who in June 1987 had "specific

---

[22]/   The primary goal of the legislation was "foremost, to find cost-effective ways to reduce the damages to society incurred by releasing SMD offenders to the community who, by dint of inadequate or inappropriate treatment, or no treatment at all, would remain at risk (perhaps increased risk) of re-offending, possibly violently." (Plaintiffs' Exhibit 1, at i-1.)   Ultimately, the Technical Advisory Committee concluded, however, that "a study to determine whether (and to what degree) mental health intervention might reduce criminal recidivism was premature, given the budget and feasible timeline." (Id. at ii-1.)   Therefore, that portion of the study was only designed and was not conducted.   (Id. at ii-2.)

AO 72
(Rev.8/82)

psychiatric classifications and/or were located in specific psychiatric facilities used by CDC." (Id. at ii-3.) These two groups were assessed for lifetime diagnosed SMD and for SMD with disorder-associated symptoms in the preceding month. (Id. at ii-7.) The lifetime disorders included organic brain syndrome - severe, schizophrenia, major depression, and the bipolar disorders. (Id.)

The study found that approximately 13 percent of inmates in the unidentified group and 35 percent of the psychiatrically identified inmates, or 14 percent of the total population, suffered from one of the major illnesses during their lifetime. (Id. at ii-8, ii-9.) The study further found that 6.9 percent of inmates in the unidentified group and 27.5 percent of inmates in the psychiatrically identified group, or 7.9 percent of the total population, had suffered disorder-associated symptoms in the preceding month. (Id.)

In July 1987, at the time the study was conducted, the inmate population was approximately 59,000 inmates. (Id. at ii-3, ii-9.) Given that population size, the study found that "even the small base-rate of 7% for the four serious disorders amounts to over 4,000 undetected SMD individuals." (Id.)

The report found that "[t]he survey results imply that there are somewhat over 5,000 . . . SMD inmates with some current symptoms in 1988. This number is projected to more than double by

/////

21

the year 2,000."  (Id. at ii-10.)23/  The study also found that,

given the scarcity of psychiatric resources in the CDC, "it is

likely that few of the psychiatrically unidentified group would

have access to desirable levels and durations of service."  (Id.)

Volume II of the Stirling Report, called "Array and

Administration of Services," was published in November 1988.

(Plaintiffs' Exhibit 2.)  That portion of the study found

significant deficiencies in mental health services within the CDC,

particularly in the areas of screening and staffing.  The

consultants made several recommendations relevant to this

litigation, including recommendations that CDC set adequate

staffing standards for all mental health professionals, determine

why there is a problem with recruitment and retention of mental

health professionals, adequately document mental health contacts

and develop a quality assurance program, conduct initial screenings

in an atmosphere more conducive to obtaining relevant information,

standardize mental health testing, evaluate time and criteria

involved in transfers for psychiatric care, and evaluate extending

inmates' length of stay at Reception Centers to provide additional

opportunities for psychiatric evaluation.  (Plaintiffs' Exhibit 2

at iii-iv.)

---

23/ In fact, with a total prison population of just over 118,000 today
(see Department of Corrections Weekly Report of Population as of
Midnight May 15, 1994, filed May 25, 1994), that number has likely at
least doubled already.  Defendants' expert, Dr. Dvoskin, opined that
"the level of need in the California Department of Corrections for
treatment of serious mental disorder on any given day would be
approximately 11 to 15 percent of the total population."  (Dvoskin
Declaration at 6.)

AO 72
(Rev 8/82)

Defendants did not accept the prevalence data from the Stirling Report, nor did they adopt the recommendations of the report. (See Testimony of James Gomez, RT, May 17, 1993, at 52-55.) The deficiencies described therein remain to this day, over five years after issuance of Volume II of the Stirling Report.

### 3.   The Scarlett Carp Report

In 1991, the CDC commissioned yet a third study of mental health services in the Department.[24]/ (RT, May 17, 1993, at 90-91.) The Department contracted with Scarlett Carp and Associates, Inc. to conduct the study. Hereinafter, the study is referred to as the Scarlett Carp study or the Scarlett Carp Report. The purpose of the Scarlett Carp study was to "design three alternative mental health service delivery systems" for the CDC. (Plaintiff's Exhibit 96 at 1.) All three alternatives were to include screening, follow-up evaluation, crisis care, inpatient psychiatric hospital care, intermediate care, outpatient care, pre-release services, and parolee outpatient services as component parts. (Id. at 1-2.) The difference between each system was based on resources underpinning a particular design; one was to be designed based on existing resources, a second based on a potential 10 percent budget cut, and a third based on "increased resources to the level necessary to support an enhanced system." (Id.)

June 15, 1991 was designated as the official start date for the Scarlett Carp study. (Id. at 1.) At the outset of the

---

[24]/   The workload study was done internally. Both the Stirling Report and the Scarlett Carp Report were prepared by independent consultants.

AO 72
(Rev.8/82)

study, the consultants interviewed twelve individuals identified as "key stakeholders."  (Id. at 3.)   Six management officials within the California Department of Corrections, including defendants Khoury and Zil, were in the group.[25]/  (Id.)   During June and July 1991, the consultants interviewed these persons and others. Several significant deficiencies in mental health care delivery within CDC were noted by the interviewees and described in an initial progress report dated June/July 1991.  (Id. at 5.)

In September/October 1991, the consultants issued a second progress report. (Plaintiff's Exhibit 1398.)  In that progress report, the consultants indicated that a delivery system designed around a 10% reduction in resources would not meet "a constitutionally acceptable level of care;" therefore, discussion of this alternative was omitted.  (Id. at i, 38.)

The September/October 1991 progress report contained several observations of problems with the current delivery system, including the following:

> Screening and follow-up evaluations not formalized and staffing is inconsistent.
>
> Inpatient Hospital Care is ill defined with regard to CDC expectations and bed utilization.
>
> Enhanced Outpatient Care is ill defined with regard to treatment objectives and population to be served.

---

25/   Other CDC employees interviewed were David Tristan, the Deputy Director for Institutions and John O'Shaughnessy, CDC Chief, Mental Health Services Branch.   Robert H. Denninger, CDC Chief Deputy Director and Kyle McKinsey, Deputy Director, CDC Planning and Construction Division, were to be interviewed during the month of July, 1991.  (Id.)

AO 72
(Rev.8/82)

Crisis Care and Outpatient general population services need formalization, and resources are inconsistent.

The centralized/regional method of service delivery does not provide equal access to care for all inmates.

Services for women are not equal to those for men.

There is an inadequate exchange of inmate mental health clinical records, which reduces the effectiveness and continuity of service delivery systems.  This is particularly applicable regarding the transfer of prisoners between institutions and of inmates to the parolee outpatient clinics.

. . . .

. . . .

. . . .

While professional services are generally being provided by psychiatrists, psychologists, and social workers, supplementary, lower level clinicians are needed throughout the system to assist in (1) mental health screening, (2) crisis care, (3) housing management and care, and (4) to provide supportive clinical work.

Recruitment and retention problems for mental health professionals at institutions located in rural areas is problematic.

There is a lack of routine mental health data collection that (1) tracks and monitors inmate/parolee patients, (2) analyzes inmate/parolee mental health needs, and (3) evaluates mental health services/programs/interventions.

(Id. at 32-33.)[26]/

/////

_____

[26]/  Many of these findings were similar to findings in the June/July 1991 progress report drawn from the stakeholder interviews.  (See Plaintiff's Exhibit 96 at 5.)

AO 72
(Rev 8/82)

The consultants found that only a delivery system based on enhanced resources would satisfy constitutional requirements after the inmate population expanded beyond the size of the 1991/92 population.  (<u>See</u> <u>id</u>. at 36-37.)[27]/

In February 1992, the consultants published a third progress report.  (Plaintiff's Exhibit 691.)  Appended to that report are several tables which compare staffing levels existing within the CDC in 1991/92 with projected staffing needs for 1996/97 based on projected prison population for those years.  In 1991/92, the CDC had a total of 277.4 positions authorized for mental health care.  (<u>Id</u>. at Table B, Table E.)  Two hundred eight and three tenths of those positions were filled.  (<u>Id</u>.)  The consultants projected a need for 732 staff positions by 1996/97.  (<u>Id</u>.)

The final report from Scarlett Carp and Associates is dated February 16, 1993.  (Defendants' Exhibit D1338.)  The final report describes several deficiencies in the existing CDC mental health delivery system.  The consultants found, inter alia, that

> [s]ervice delivery tends to be inconsistent, informal, crisis-oriented, and largely unmonitored. . . .  Mentally ill inmates are as likely as not to receive minimal treatment until they decompensated [sic] to the point where inpatient hospitalization or transfer to an Enhanced Outpatient Program bed is the only option. . . .  There is also the perception and belief among some institution staff that, unlike medical conditions, treatment of mentally ill inmates is not their responsibility.  Others express concern about

---

27/   The consultants were of the opinion that the then current resources "[might] minimally meet constitutional standards for the 1991/92 inmate population, but [would] be inadequate to meet future needs."  (<u>Id</u>. at 37.)

AO 72
(Rev.8/82)

> their inability to provide needed services due
> to the lack of mental health resources.
> Furthermore, the current system is
> understaffed.
>
> The level of service availability varies widely
> from institution to institution, as does the
> amount and type of staff providing services.
> The current system of classifying mentally ill
> inmates further hinders timely transfer of
> inmates considered stable, or assessed as not
> mentally ill, out of mental health beds.
> Inmates so classified must wait to be
> reclassified through the CDC classification
> system (which is responsible for classification
> of all inmates) before they can transfer, which
> further renders an already strained system
> inefficient.

(Id. at 34.)   The final report again highlighted the deficiencies noted in the 1991 progress reports.   (Id.)

The final Scarlett Carp report includes data regarding the prevalence of inmates within the CDC who suffer from mental impairments; the consultants found that 11.07% of males committed to the CDC suffer from serious mental impairments, and 9.47% suffer from moderate mental impairments. while 15.21% of female inmates suffer from serious mental impairments and 9.03% suffer from moderate mental impairments.   (Id. at ix, Table ES-1.)   The report recommends a delivery system based on a decentralized cluster model described in the previous progress reports, and includes a finding that 340.8 additional mental health positions and 183.5 new medical positions will be required to implement the system.[28]/

---

28/   The recommendations of the Scarlett Carp Report are not summarized in depth; this court makes no finding with regard to whether defendants can satisfy the requirements of the injunctive relief recommended herein by implementing the recommendations of that report. The court does note, however, that the Scarlett Carp Report's recommendations were based on a projected inmate population for

27

It is apparent from the three extensive studies undertaken by the CDC in the last ten years that certain specific problems which profoundly affect the availability of mental health care for inmates in the CDC have been repeatedly described to defendants.  In particular, defendants have known for nine years that their program for screening and identifying mentally ill inmates is ineffectual, that their mental health care delivery system is understaffed, that their recruitment program is underresourced, that the mental health staff they do have is significantly overworked, and that they lack necessary quality assurance programs and sufficient inpatient and outpatient resources to aid practitioners in the provision of appropriate care.  Despite this knowledge, defendants have failed to take any significant steps to address the deficiencies and the problems identified in the Stirling Report and the Scarlett Carp reports.

B.   The Magnitude of the Problem

1.   Introduction

At trial, experts for both plaintiffs and defendants testified concerning the necessary elements of an adequate system for delivery of mental health care in prison.  These elements

---

1996/97 of "over 119,000." (Defendants' Exhibit 1338 at xi.)  This figure was based on a population sized at "150 percent of design bed capacity."  (Id. at xi, 16)   This projection was significantly underestimated; at the time of trial of this action in early 1993 the inmate population was 113,000 and the CDC was operating at 186 percent of capacity.  (See Testimony of James Gomez, May 17, 1993, at 7, 14, 47.)  On May 15, 1994, the inmate population was just over 118,000 and the CDC was operating at 175% of capacity.  Department of Corrections Weekly Report of Population as of Midnight May 15, 1994, filed May 25, 1994.

AO 72
(Rev 8/82)

1   include screening and identification of mentally ill inmates;

2   prompt access to mental health professionals for diagnosis and

3   treatment; patient access to necessary and appropriate levels of

4   care as determined by clinicians, including outpatient care,

5   residential care, crisis care, and inpatient care; medical records

6   and an information management system; and a quality assurance

7   system.   (Declaration of Dr. Russell C. Petrella, filed February 5,

8   1993, at 13-22; Declaration of Joel A. Dvoskin, Ph.D., filed

9   February 17, 1993, at 2-3, 9.)   This expert testimony closely

10  tracks the essential components described by the district court in

11  Balla; the court in Balla also noted that an adequate suicide

12  prevention program is constitutionally required and the parties

13  here have litigated the adequacy of the CDC's suicide prevention

14  program.

15          This court finds that the above components are essential

16  to a minimally adequate mental health treatment system.   Each of

17  these components is necessary to insure that mental health care

18  needs of inmates will be known timely by medical staff competent to

19  provide necessary care.   Hoptowit at 1253.

20          The mental health care delivery system in the California

21  Department of Corrections lacks each of these elements, either in

22  whole or in part.   The result is a system charitably described by

23  defendants' expert, Dr. Dvoskin, as "inefficient in function."

24  (Dvoskin Declaration at 3.)   In fact, it is a constitutionally

25  /////

26  /////

AO 72
(Rev. 8/82)

inadequate system which cannot and does not meet the serious medical needs of mentally ill inmates incarcerated in California's prisons.

The defendants have no system in place for screening and identifying mentally ill inmates. As a result, thousands of inmates suffering from mental illness remain unidentified as needing care. These inmates either go undetected and without care, or they come to the attention of staff only when they behave in bizarre or inappropriate ways. Inmates in the latter category are often dealt with solely in punitive fashion, without regard to the impact of such punitive measures on their psychiatric condition.

The CDC is significantly and chronically understaffed in the area of mental health care; even those inmates who are identified as needing mental health care suffer lengthy waits for necessary evaluation and treatment. The CDC has a profoundly inefficient medical recordkeeping system. In some instances records are not kept at all or are kept only haphazardly. Those records that are kept are often inaccurate and incomplete. Those medical records that are maintained do not travel with inmates when they move from one facility to another.

The result of these and other inadequacies is a system which causes terrible suffering for thousands of inmates afflicted with severe mental illness. Defendants have known about the woeful inadequacies in the delivery of mental health care within the California Department of Corrections for over eight years. Defendants have done little to rectify the egregious defects that

AO 72
(Rev.8/82)

have repeatedly been brought to their attention by their own consultants and employees.  This court finds that defendants for several years have been and still are in violation of the requirements of the Eighth Amendment to the United States Constitution by deliberately failing to provide a minimally adequate mental health care delivery system within the California Department of Corrections.

2.   Screening and Identification of Mentally Ill Inmates

In order to provide necessary mental health care to prisoners with serious mental disorders, there must be a system in place to identify those individuals, both at the time they are admitted to the Department of Corrections and during their incarceration.  (Petrella Declaration at 14; Declaration of Dr. Edward Kaufman, filed February 5, 1994, at 17.)  The CDC lacks an adequate mechanism for screening for mental illness, either at the time of reception or during incarceration, and has lacked adequate screening since at least 1987.  (Petrella Declaration at 25-26; Kaufman Declaration at 18; Declaration of Thomas Greenfield, Ph.D., filed February 5, 1994, at 19.)

At trial, Director Gomez testified that the CDC still did not have a standardized mental health screening form.  (RT, May 17, 1993, at 49; RT, June 21, 1993, at 39-25.)  Director Gomez also testified that there were no standardized procedures for screening at reception centers.  (RT, May 17, 1993, at 49.)

Defendants' expert Dr. Koson testified that the screening process at the reception center at Wasco State Prison differed from

the screening process at the reception center at R.J. Donovan
Correctional Facility. (Declaration of Dr. Dennis Koson, filed
February 16, 1993, at 5-6.) Dr. Koson also opined that the
screening process at both these institutions "appears to function
appropriately." (Koson Declaration at 5.) This court finds that
the overwhelming weight of the evidence before the court
demonstrates that screening and identification of mentally ill
inmates throughout the CDC is inadequate. The court's conclusion
rests, in part, on the conclusions of the Scarlett Carp study, an
exhibit tendered by defendants. Dr. Koson was one of the
consultants on the Scarlett Carp study. (Koson Declaration,
Exhibit A at page 8.) The absence of formalized screening and
follow-up evaluations was a deficiency noted by the Scarlett Carp
consultants in several of their reports, including the final report
dated February 16, 1993 which was tendered as an exhibit by
defendants. (Defendants' Exhibit 1338 at 34.)

Plaintiff's experts observed a variety of inadequate,
haphazard screening efforts at various prisons across the state,
both on initial intake into the CDC and on transfer between
prisons. At California Institution for Women, inmates often
arrived without a psychiatric file from either the state prison or
the county jail from which they were transferred. (Declaration of
Dr. V. Meenakshi, filed February 5, 1994, at 33.) They were
screened by a Medical Technical Assistant (MTA) "who does not
necessarily have any formal training in recognizing mental
illness." (Id.) Dr. Meenakshi made similar findings at Central

32

California Women's Facility.  (Id. at 41-42.)  At Northern

California Women's Facility, some inmates were not screened at all.

(Id. at 67.)  At Mule Creek State Prison, MTAs conducted general

intake interviews while inmates were in the holding tank within

earshot of other inmates and staff; screening questionnaires were

not designed to elicit all relevant information.  (Id. at 92.)  The

intake process at California Correctional Center did not include

psychiatric screening; inmates were identified only if they

reported that they were taking psychotropic medication.  (Id. at

103.)  Similarly, no psychiatric screening was performed at Sierra

Conservation Center.  (Id. at 109.)

At California Institution for Men the only question asked

to screen for mental illness was whether the inmate had ever been

admitted to a psychiatric hospital.  (Petrella Declaration at 25-

26.)  The screening took place in a room that was crowded with

naked inmates, completely chaotic, and devoid of privacy.  This

compounded the inadequacy of the minimal screening procedure and

destroyed any confidence in the self-reporting upon which this

screening procedure relied.  (Id. at 26, 77-78.)

At Calipatria, inmates were interviewed by an MTA; often

the MTA lacked access to the medical file at the time of the

interview and the psychiatric screening that did take place was

inadequate.  (Id. at 89-91.)  At Chuckawalla Valley State Prison

inmates were screened via a record review conducted by a nurse or

an MTA.  This record review did not always bring a mentally ill

inmate to the attention of medical staff.  (Id. at 114-115.)

At Wasco State Prison, there was a two-level screening process. (Id. at 139.) The first level was for individuals on initial arrival at Wasco. (Id.) This level was reported to be "largely appropriate," though comprised of only a limited series of questions regarding psychiatric history, current medications and past suicide attempts. (Id.) The second level of review was for individuals identified at the first level as needing evaluation. (Id.) The second level was described as very weak, with a very weak referral system and little follow up for the evaluations. (Id.)

At the receiving and releasing unit in California Correctional Institution at Tehachapi, screening was based on a single question about whether an inmate took medication. (Kaufman Declaration at 37-38). The interviews were conducted by a sergeant or an MTA in an environment that was not conducive to accurate self-reporting. (Id.) Fifty to seventy-five percent of inmates arrived with a list of medications they took. (Id.) Inmates arriving from Los Angeles County Jail might arrive with a report stating "psychiatric treatment" but containing no specific information. (Id. at 37-38.) The receiving and releasing unit did not get any medical records from the jail. (Id. at 38.)

Similarly, at California State Prison/Corcoran, screening for mental illness was limited to screening which asked whether an inmate was on psychotropic medication. (Id. at 72.) At R.J. Donovan Correctional Facility, an MTA made an initial assessment of an inmate's medical needs as soon as the inmate arrived. (Id. at

AO 72
(Rev.8/82)

87.)  Psychiatric screening was not a routine part of this initial assessment, although referrals for evaluation were made "if the inmate's history shows a need for psychiatric evaluation."  (<u>Id.</u>) At Pelican Bay State Prison, there was no organized system to screen inmates for mental illness through late 1992.  (Declaration of Dr. Stuart Grassian, filed February 5, 1994, at 47.)

As a result of the absence of an adequate, systemized screening program, a significant number of mentally ill inmates go undetected.  (Meenakshi Declaration at 33-35.)  Only those inmates who self-report or present with medical records demonstrating a prior psychiatric history, those who exhibit bizarre behavior, or those who ask to be seen by a psychiatrist will be identified as needing psychiatric care.[29]  (<u>Id.</u>)  Other inmates with serious mental illness in remission, with suicidal tendencies, or with a serious mental illness the symptoms of which are not apparent to an untrained observer are left unidentified and without access to necessary care.  (<u>Id.</u>)

As discussed above, mentally ill inmates who are not identified at the time they are received into the CDC or when they are transferred between institutions often only come to the attention of staff when they exhibit bizarre behavior.  At the present time, new custody staff only receives three hours of training in "Unusual Inmate Behavior."  (Declaration of Steve

---

[29]  As is discussed in section 4(d), <u>infra</u>, inmates who act out as a result of mental illness are often treated only as custody problems and subjected solely to punitive measures rather than provided with necessary care in conjunction with appropriate discipline.

AO 72
(Rev 8/82)

Cambra, filed February 11, 1993, at 3.)   The three hour mandatory course covers "situations when an inmate should be referred for a psychiatric evaluation, skills to use in dealing with a disturbed inmate, actions to be taken with a suicidal inmate and the importance of familiarizing the correctional officer with the inmates in his or her assigned areas of supervision."  (Id. at 3-4.)

In-service training is offered at institutions in the class.  (Id. at 5.)  One of the in-service training courses offered at California Men's Colony is a two hour course called "The Skillful Observer."  (Id.)  This course includes refresher training on when mental health referral is required.  (Id.)

Dr. Kaufman testified that a minimum of twelve hours of training for new custody staff should be required.  (Kaufman Declaration at 28.)  Dr. Kaufman also opined that a more in-depth course should be required for correctional officers who work with mentally ill inmates.  (Id.)  As will be discussed in further detail, infra, inmates who exhibit bizarre behavior or other psychiatric symptoms are often dealt with solely in punitive fashion by custody staff.  This court finds that the training for custody staff to recognize the signs and symptoms of mental illness is inadequate.

### 3.   Access to Competent Staff

#### a.   Staffing

There is no dispute that the CDC is seriously and chronically understaffed in the area of mental health care.  The

36

workload study, undertaken almost a decade ago, found that the need for psychiatric services was far in excess of the staffing resources available. (Plaintiffs' Exhibit 456 at vi.)  The two subsequent studies confirmed this. (Plaintiff's Exhibit 2 (Volume II of the Stirling Report); Defendants' Exhibit 1338 at, e.g., 34 (Scarlett Carp Final Report).)

The Scarlett Carp consultants found that 732 staff positions would be necessary to adequately staff mental health care for an inmate population of 119,000 inmates. (Defendants' Exhibit 1338 at xi; Plaintiffs' Exhibit 691 at Table B.)  The fiscal year 1992/93 budget for CDC contained 376.6 authorized mental health care positions to serve an inmate population of 113,000. (Defendants' Exhibit 1338 at 36; RT, May 17, 1993, at 7.)[30/]

Mentally ill inmates are housed at all institutions throughout the CDC, and the significant and chronic understaffing problem obtains systemwide. (See Meenakshi Declaration at 30-32 (California Institution for Women); 40, 63-65 (Central California Women's Facility); 67, 85-87 (Northern California Women's Facility); 91, 100-101 (Mule Creek State Prison); 102-103 (California Correctional Center); 108-109 (Sierra Conservation Center); Kaufman Declaration at 33-36, 38, 40-41 (California Correctional Institution at Tehachapi); 69-72 (California State Prison/Corcoran); 86 (R. J. Donovan Correctional Facility); 104-107

---

30/   The CDC had a twenty-five percent vacancy rate in mental health care positions for fiscal year 1991/92. (Plaintiff's Exhibit 691 at Table E.)  There was no evidence that this vacancy rate had changed significantly at the time of trial.

AO 72
(Rev 8/82)

(California Men's Colony); 144-146 (Avenal State Prison); 154-155 (Soledad); Petrella Declaration at 73, 78-80 (California Institution for Men); 88-89, 107-110 (Calipatria); 114, 117 (Chuckawalla Valley State Prison); 119-122 (Wasco State Prison); Grassian Declaration at 17, 45 (Pelican Bay State Prison).)

Defendants offered no evidence to rebut plaintiffs' testimony in this regard.  To the contrary, defendant Gomez testified that psychiatric staffing has "lagged behind" the staffing for other key positions within the Department for the past twelve years.  (RT, May 17, 1993, at 73-74.)  Defendant Khoury's testimony confirmed that departmental requests for mental health care staffing are based on percentages of outdated or underestimated inmate populations.  For example, he testified that the request for mental health care staffing for the 1992/93 fiscal year was derived by adding to the total number of outpatient beds authorized for the 1989/90 budget a percentage increase equal to the percentage increase of all male inmates in the system between the fall of 1988 and July of 1991.  (RT, March 30, 1993, at 15-170.)  The 1993/94 budget request was based on the same formula, except that the formula relied on a projected male inmate population by June 1994 of 103,971.  (Id. at 15-171, 15-172.)[31]/ In fact, it appears that the male inmate population was at or above that figure at the time of trial of this action in May 1993. (See RT, May 17, 1993, at 7 (Director Gomez' testimony that total

---

[31]/  This request was not approved for inclusion in the budget in any event.  (RT, March 30, 1993, at 15-172.)

AO 72
(Rev 8/82)

inmate population at time of trial was 113,000); RT, March 30, 1993 at 15-173 (Defendant Khoury's estimate that total population at time of trial was 109,000, with the female population comprising approximately 8,000 or 9,000 of the total number of inmates).)

While these concessions by defendants are significant, even they must be viewed as efforts to portray years of indifference in a favorable light.  It is clear from the evidence that defendants have deliberately ignored years worth of substantial, competent evidence about what is required to adequately staff their mental health care delivery system.

There are several reasons for the understaffing.  First, despite the studies done by and for the CDC since 1984, defendants have not adopted a method for determining necessary mental health staffing ratios.  (RT, May 17, 1993, at 14.)  As a result, defendants have perpetuated a vicious circle for over a decade: they fail adequately to screen and identify the number of mentally ill inmates in the CDC, so they claim they have no method for adequately assessing staffing needs.[32/]  At the same time, the failure to adequately screen and identify mentally ill inmates is attributable to the chronic understaffing that has plagued the Department.  The dilemma is, of course, illusory.  The Department

_____

32/  At trial, Director Gomez, while acknowledging that he was not a psychiatrist or a clinician, explained that he rejected the prevalence data contained in the Stirling Report because "[i]t didn't reconcile with what [he] felt was going on in the institutions" and because "[s]taff were not capable of explaining to me, whether it be Dr. Zil or Dr. Khoury or John O'Shaughnessy [the top mental health care officials in the department], they were not capable of providing me the kind of answers I felt I needed."  (RT, May 17, 1993, at 52, 54, 55.)

AO 72
(Rev.8/82)

has already conducted three studies to address prevalence of mental illness and staffing needs, and the information needed to appropriately determine staffing needs is well developed and readily available.

Problems with recruiting and retaining staff contribute to the chronic understaffing.  In 1991/92 approximately 25% of the positions authorized for mental health care were unfilled. (Plaintiff's Exhibit 691, Tables B and E.)  Defendants do not offer competitive salaries to psychiatrists and psychologists.  (RT, March 29, 1993, at 14-142, 14-170, 14-171.)  Defendants have institutions in remote areas of the state where it is difficult to recruit psychiatric professionals and they continue to house mentally ill inmates at those institutions.  (See, e.g., RT, March 29, 1993, at 14-135.)  Defendant Khoury testified that it is more difficult to recruit physicians to work with inmate populations, and that other incentives such as "safety retirement" and improved working conditions are a necessary part of an adequate recruitment program.  (RT, March 29, 1993, at 14-143.)

This court finds that defendants are violating the Eighth Amendment by their present level of staffing.  Defendants do not employ a number of trained mental health professionals sufficient to meet the constitutionally mandated minimum needs of mentally ill inmates incarcerated in the State of California, and they know that they do not.

/////

/////

AO 72
(Rev.8/82)

### b.   Competence of Staff

It was undisputed that the most efficacious method for assessing the competence of medical staff is through a quality assurance/peer review program.   (Petrella Declaration at 21; Kaufman Declaration at 30; Dvoskin Declaration at 9.)   The CDC has no effective quality assurance or peer review program either department-wide or at individual institutions within the class. (See Petrella Declaration at 28 (department-wide); 113 (no program at Calipatria), 137 (at time of trial, Wasco "in the very early stages of developing a quality assurance program"); Grassian Declaration at 53 (no program at Pelican Bay State Prison); Kaufman Declaration at 46 (no program at Tehachapi), 142 (program exists at California Men's Colony but it is ineffective); 151 (quality assurance/utilization review committee began at Avenal in July 1991 but apparently no longer exists); Meenakshi Declaration at 32-33 (no program at California Institution for Women), 66 (no program at Central California Women's Facility), 90 (no quality assurance at Northern California Women's Facility, and only limited, flawed peer review program at said facility), 102 (Mule Creek State Prison has quality assurance committee, but psychiatric services are never discussed).)   The few efforts at quality assurance and peer review in the system are "rudimentary."   (Kaufman Declaration at 30.)

Defendants' own expert, Dr. Dvoskin, opined that "a large system such as the California Department of Corrections could probably not provide adequate mental health care without some sort of management information system and some form of quality

41

assurance."  (Dvoskin Declaration at 9.)  At this point, defendants have no effective method for insuring the competence of their mental health staff, and, hence, for insuring that mentally ill inmates in the department have access to competent care.  In this regard, they are violating the class members' Eighth Amendment right of access to adequate mental health care.

### 4.   Care of Mentally Ill Inmates

#### a.   Introduction

Mentally ill inmates within the CDC do not have constitutionally adequate access to necessary care.  There are significant delays in, and sometimes complete denial of, access to necessary medical attention, multiple problems with use and management of medication, and inappropriate use of involuntary medications.  In addition, the mental health status of class members is adversely impacted by inappropriate use of punitive measures without regard to the impact of such measures on their medical condition.

In large measure, these deficiencies are attributable to the problems in screening, evaluation, and staffing already described.  However, the existing system for delivering care uses a referral and classification system that facilitates unconscionable delays and sometimes results in a complete denial of care even for those persons this inadequate system has identified as needing treatment.33/  Finally, this system does not give sufficient

---

33/   Dr. Khoury described the referral and classification system described infra as resulting in "bus therapy" -- inmates traveling on buses back and forth between institutions without adequate determina-

weight to medical opinion in decisions regarding access to medical
care and does not allow sufficient consultation with and
consideration of medical opinion in decisions regarding discipline
and/or behavior control.

b.   <u>Delays in Access to Care</u>

The September/October 1991 Scarlett Carp progress report
described the existing structure of the mental health care delivery
system in the CDC as comprised of the following:

**Screening at intake/diagnostic.**

**Follow-up evaluations.**

**Inpatient Hospital Care** - provided
predominantly at CMF and ASH[34]/ by DMH[35]/
(708 beds).  18 inpatient beds, staffed by CDC
personnel, are located at CIM.[36]/

**Enhanced Outpatient Care** - provided at CMF,
CMC[37]/, and CWI [sic][38]/ (2,421 beds).
Services provided in this program range from
acute care to sheltered outpatient care, but
exact bed designations for each are not
official.  A 60-bed day treatment program is
also provided at CMF by DMH.

**Crisis Care** - informal, provided within each
institution with existing resources, which are
variable.  The use of infirmary beds for crisis
care is estimated at 30 to 40 percent of the
total available infirmary beds in the institutions.

_____

tions regarding the need for care.  (RT, March 30, 1993, at 15-15.)

<u>34</u>/   Atascadero State Hospital.

<u>35</u>/   California Department of Mental Health.

<u>36</u>/   California Institution for Men.

<u>37</u>/   California Men's Colony.

<u>38</u>/   California Institution for Women.

43

> **Outpatient Care** – informal, limited to
> medication only for the most part.  Some
> psychological services available depending on
> the institution's staffing.

(Plaintiff's Exhibit 1398 at 32.)

There are significant and unacceptable delays at each level of care.  (Petrella Declaration at 39.)  These delays at each stage cause significant pain and suffering to inmates in need of mental health care.  (Id. at 40.)  Frequently, such inmates receive no care at all or only medication; they are often housed in administrative segregation or security housing units while awaiting care.  (Id.)

Dr. Petrella stated that he was informed by a physician at Calipatria that inmates on antipsychotics were seen within a week of arrival and inmates on tranquilizers were seen within a month of arrival; Dr. Petrella's review of the medical records showed delays of several weeks.  (Petrella Declaration at 91-92.) The physician at Calipatria reported to Dr. Petrella that he was not able to provide follow-up care to any inmate on a regular basis; inmates at Calipatria reported that their requests to see a psychiatrist were ignored for days and weeks.  (Id. at 92.)

At Chuckawalla Valley State Prison, inmates referred for psychiatric evaluation often had to wait several weeks to see a psychiatrist.  (Id. at 114.)  In some cases, such inmates were placed in administrative segregation during this wait, even where the symptoms requiring the evaluation included self-harming behavior.  (Id. at 115.)

/////

AO 72
(Rev.8/82)

At Wasco State Prison, the demands on psychiatric staff were so acute that the majority of their attention was focused on crisis patients.  (<u>Id</u>. at 122.)  Inmates referred by physicians for further diagnostic interviews had to wait several weeks for such evaluation.  (<u>Id</u>. at 123.)

At Tehachapi, delays of over five months for routine psychological evaluations were "not unusual."  (Kaufman Declaration at 36.)  At R.J. Donovan Correctional Facility, inmates experienced significant delays in access to a clinician.  (<u>Id</u>. at 90.)  New evaluations were performed in approximately 20 to 25 minutes, which was an insufficient amount of time to perform an adequate evaluation.  (<u>Id</u>.)  Follow-up visits were even shorter and less frequent.  (<u>Id</u>. at 91.)

At Central California Women's Facility, inmates on psychotropic medications often waited months to see a psychiatrist; some mentally ill inmates there reported never having seen a psychiatrist.  (Meenakshi Declaration at 47-49.)  Dr. Meenakshi testified that inmates at Northern California Women's Facility who were taking psychotropic medications "have had virtually no access to a psychiatrist."  (<u>Id</u>. at 70.)  Seven inmates that she interviewed there reported that their repeated requests for access to a psychologist or psychiatrist had been ignored.  (<u>Id</u>.)

At Mule Creek State Prison, inmates with serious mental illness were seen by a psychiatrist only once or twice a year. (<u>Id</u>. at 93.)  The visits lasted only 5-15 minutes.  (<u>Id</u>.)
/////

In addition to the delays in access to care within each institution, delays in access to enhanced outpatient or inpatient care, which generally require transfer to another facility, were substantial. When an inmate at a general population institution was found to be in need of enhanced outpatient care or inpatient care, the clinician making that determination could not simply refer the inmate to one of the enhanced outpatient facilities or to an inpatient hospital for necessary care. Instead, the clinician had to refer the inmate to the receiving institution for evaluation to see whether the inmate fit into one of approximately four ill-defined classification categories. (Petrella Declaration at 30; RT, March 30, 1993, at 15-11, 15-13.)

This referral system has historically resulted in a backlog of inmates waiting for acceptance of the referral to the appropriate institutions for further determination as to whether or not they are eligible for care. (RT, March 30, 1993, at 15-16; see discussion infra.) In addition to the fact that there is insufficient staff to complete the evaluations, the CDC system is also structured so that an inmate must go through the custody classification process before he or she can be transferred. (Defendants' Exhibit 1338 at 34.) This builds in additional delays. (Id.)

In November 1991, the Department had a backlog of approximately 400 inmates waiting for transfers to California Medical Facility or California Men's Colony for psychiatric evaluations. (Petrella Declaration at 151; Testimony of Louis L.

46

Beermann, Ph.D., RT, April 14, 1993, at 22-6.)  A special clinical
assessment team was formed to travel to reception centers to
reevaluate inmates who were waiting for such transfers.  (Petrella
Declaration at 151; Testimony of Louis L. Beermann, Ph.D., RT,
April 14, 1993, at 22-3.)  The team was comprised mostly of
psychologists, and included a  psychiatrist and a classification
service representative.  (RT, April 14, 1993, at 22-3 - 22-6.)[39]
This first team rejected 60% of the inmates who had been referred
for psychiatric evaluation.  (Petrella Declaration at 153.)  This
rejection rate was double the historical rejection rate of inmates
who were evaluated for a week or two in the intake unit at either
CMC or CMF.  (Id.)

By July or August of 1992, the backlog of inmates
awaiting psychiatric evaluation was again up to 300 inmates.
(Petrella Declaration at 156.)  A special assessment team headed by
Dr. Beermann went out again in December 1992 in an effort to reduce
the backlog, and again rejected a large percentage of inmates.
(Id.)  At trial in April 1993, Dr. Beermann testified that the
backlog of inmates awaiting transfer for evaluation was "under 200,
perhaps 180 something."  (RT, April 14, 1993, at 22-9.)

The delays in transfer for evaluation were unacceptably
lengthy.  Inmates waited for transfer for several weeks or months,
during which time they often received no psychiatric care other

---

[39]  The classification service representative was included "so that
he or she could make the -- put their stamp of approval on" the
clinical recommendation that the inmate be transferred to CMC or CMF,
or returned to general population.  (RT, April 14, 1993, at 22-6.)

AO 72
(Rev 8/82)

than medication.  (See, e.g., Kaufman Declaration at 20; Petrella Declaration at 40, 146.)  These were inmates who manifested severe psychiatric symptoms to a clinician.  The delays are constitutionally unacceptable.

Similarly, when a clinician in the CDC determines that an inmate is in need of inpatient hospitalization, the inmate must generally be referred to a facility operated by the California Department of Mental Health (DMH), either Atascadero State Hospital or the DMH facility at California Medical Facility.  DMH clinicians evaluate the referred inmates to determine whether they will be accepted for care.  (Kaufman Declaration at 9; Petrella Declaration at 31.)  The rejection rate from Atascadero State Hospital is approximately 50%.  (Kaufman Declaration at 9.)  Delays in transfer to Atascadero can be several months.  (Id.)  Since these persons are inmates exhibiting symptoms deemed by a staff physician to require inpatient hospitalization for psychiatric illness, the delays are egregious.

c.  Medication Management

As noted in the Scarlett Carp report, outpatient care is limited primarily to medication.  (Plaintiff's Exhibit 1398 at 32.) Use of psychotropic medications is not properly monitored. (Kaufman Declaration at 11.)  Inmates experience delays in receiving their medication when they are transferred to another institution, when placed on lockdown status, and when their prescriptions expire.  Numerous other problems in medication management were observed by plaintiffs' experts.  (See, e.g.,

48

Meenakshi Declaration at 36 (some medications unavailable in CDC; prescriptions changed too frequently), 55 (no system in place at Central California Women's Facility to alert staff when prescription expires), 72 (at Northern California Women's Facility, medications were prescribed and discontinued in an "erratic manner," medications were prescribed and/or renewed without evaluation and/or mental status examination, and medications were prescribed in dosages too low to have therapeutic effect), 95-96 (no system in place at Mule Creek State Prison to alert physician when prescription expires, no monitoring for inmates on Lithium and Tegretol, lack of proper informed consent for use of such medications, inadequate monitoring of inmates on other medications, no system to prevent hoarding of medication); Petrella Declaration at 132 (significant problems with monitoring medication and providing follow-up care at Wasco State Prison, no formal mechanism for notifying staff when a prescription expired); Kaufman Declaration at 24 (new, very efficacious drugs for treatment of schizophrenia and depression, which drugs would require close monitoring of patients, not available to inmates in CDC); 147-148 (backlog of patients at Tehachapi such that physician could only see patients every eight weeks, even though inmates might need prescriptions refilled after only a month).)

/////
/////
/////
/////

49

Many of the problems with medication management are attributable, once again, to the severe staffing problem in the CDC.[40]  In addition, problems are attributable to the shockingly inadequate development and use of medical records at most institutions in the class.  (See Section 5, infra.)

The court further finds, however, that the present practices with regard to medication management are constitutionally unacceptable.  As noted above, the Eighth Amendment requires that psychotropic medication be administered only with appropriate supervision and periodic evaluation.  Defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring.

Finally, the issues with regard to regulating heat exposure for inmates on psychotropic medication are presently the subject of a preliminary injunction issued by the district court. This court will recommend that the preliminary injunction be made a

---

40/  Plaintiffs presented a great deal of testimony suggesting that psychotropic medications should only be prescribed by a psychiatrist. Under California law, any licensed physician may prescribe medication. California Business & Professions Code § 2051.   Defendants' mental health care system must provide for the administration of such medication in a manner consistent with the requirements of the federal constitution; that is, psychotropic medication must be administered only with appropriate supervision and periodic evaluation.  Balla, 595 F.Supp. at 1577.

permanent injunction to remain in effect for a period of three years.  The principal obstacle in this regard was motivating defendants to develop the heat management plans that are the subject of that injunction; now that the plans are developed and in use, defendants have little reason to abandon them and good reasons to keep them in place.

> d.    Use of Disciplinary/Behavior Control
>        Measures Against Mentally Ill Inmates

As noted above, many inmates do not come to the attention of either medical or custody staff until they exhibit bizarre or inappropriate behavior.  Defendants make no effort to determine when this behavior is the result of decompensation as a result of mental illness.

Custody staff within CDC lack sufficient training to differentiate between an inmate who is acting out as a result of mental illness and an inmate who is acting out for other reasons. (Kaufman Declaration at 28.)  As a result, mentally ill inmates who act out are typically treated with punitive measures, without regard to their mental status.  (Petrella Declaration at 33; Kaufman Declaration at 28-29.)

At some institutions administrative segregation is used as a substitute for hospitalization, as an overflow for the outpatient program, as housing following treatment in the infirmary for an acute psychiatric episode, and to house inmates awaiting transfer for psychiatric evaluation.  (See, e.g., Meenakshi Declaration at 19 (California Institution for Women), 94 (Mule Creek State Prison); Kaufman Declaration at 44 (Tehachapi), 95-96

51

(R.J. Donovan).)   In all institutions, placement in segregated
housing occurs as a result of disciplinary proceedings.   In either
event, placing mentally ill inmates in administrative segregation
or segregated housing exacerbates the underlying mental illness,
induces psychosis, and increases the risk of suicide.   (Kaufman
Declaration at 25; Grassian Declaration at 5-15).

Plaintiffs' experts reported on the denial of access to
necessary care and the suffering caused by placement and retention
of mentally ill inmates in administrative segregation or segregated
housing throughout the CDC.   (See, e.g., Meenakshi Declaration at
19-24, 50-54, 94-95; Grassian Declaration at 18-42; Petrella
Declaration at 60-61, 62-63, 81-82, 92-94, 142-144; Kaufman
Declaration at 44-45, 78-79, 95-99, 107-110.)

Dr. Grassian described the particular types of
psychological symptoms and injury caused by housing in the security
housing unit (SHU) at Pelican Bay State Prison.   Dr. Grassian
described a group of psychiatric symptoms which have come to be
identified with isolation, both in prison settings and in prisoner
of war camps.   (Grassian Declaration at 6-12.)   These symptoms
include overt paranoia, hyperresponsivity to external stimuli,
perceptual distortions and hallucinations, panic attacks,
difficulties with thinking, concentration, and memory, emergence of
primitive, aggressive fantasies, and problems with impulse control.
(Id. at 6-8.)

Dr. Grassian interviewed twenty-four inmates in the
Pelican Bay SHU.   (Grassian Declaration at 17.)   He testified that

AO 72
(Rev.8/82)

> [o]f these, at least seven were actively
> psychotic and urgently in need of acute
> hospital treatment.  Nine others suffered
> serious psychopathological reactions to SHU
> confinement, including in several cases a
> history of periods of psychotic
> disorganization.  Of the remaining eight, five
> gave a history of psychiatric problems not
> clearly exacerbated by SHU, two others appeared
> to be free of psychiatric difficulties, and in
> one a language barrier prevented adequate
> evaluation.  I also interviewed two inmates in
> general population who had a history of prior
> SHU incarceration.  Both had a history of
> psychotic disorders which were significantly
> worsened during their past incarceration in
> SHU.

(Id. at 17-18.)  Dr. Grassian testified that seven inmates he interviewed were too ill to discuss whether housing in SHU had exacerbated their illness, though it appeared that it had.  (Id. at 33.)  Nine others, however, had developed psychiatric problems while in SHU that were "strikingly consistent" with the group of symptoms described earlier.  (Id.)  Dr. Grassian also testified that while the acute symptoms experienced by these individuals would likely subside upon release from SHU, "many of these inmates will likely suffer permanent harm as a result of their confinement in SHU."  (Id. at 43.)

Defendants and their employees recognize the danger to mentally ill inmates from housing in segregated housing units, particularly Pelican Bay SHU.  (See RT, March 29, 1993, at 14-77; Grassian Declaration at 44 (discussing deposition testimony of Dr. Zil).)  Nonetheless, defendants continue to house mentally ill inmates in these units.  Defendants' use of administrative segregation and segregated housing at Pelican Bay SHU and statewide

AO 72
(Rev.8/82)

to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing.

Inmates who act out are also subjected to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition.

The Department of Corrections calls tasers and 37mm guns "non-lethal weapons." (Kaufman Declaration at 159.)  Both are projectile-type weapons.  A taser is a weapon that fires a needle-like dart attached to a wire through which the victim receives an electric shock.  (Id.)  The 37mm gas gun is used to fire rubber bullets or wooden blocks.  (Id.)

Dr. Kaufman cited fourteen examples of mentally ill patients who were tasered and/or shot with the 37mm gun.  Each confrontation commenced with a conflict between inmates or between and inmate and staff.  In each situation, Dr. Kaufman testified, custody staff escalated the conflict by demanding compliance to orders.  When the inmate refused to comply, the staff (custody and medical) suited up in gloves, masks, goggles and raincoat-like suits.  (Kaufman Declaration at 162.)  If it was deemed necessary (and typically it was) to physically remove the inmate from his

54

cell, the "cell extraction team" suited up in protective vests (flack jackets), helmets, face guards, heavy gloves and large plastic shields. (Kaufman Declaration at 162.) These staff members then approached the inmate with the weapon and spoke through masks and shields. (<u>Id</u>.)

Tasering a person using psychotropic medications may "result in heart beat irregularity or death." (<u>Id</u>. at 159.) In many of the incidents described by Dr. Kaufman, inmates sustained physical injuries from the use of these weapons. (<u>Id</u>. at 163.) In addition, use of these weapons could, and often did, cause further damage to and deterioration of the inmate's mental condition. (<u>Id</u>.; Petrella Declaration at 34.) It also reduced the possibility that future mental health treatment would be successful. (Kaufman Declaration at 163.)

Dr. Petrella stated that in all his experience he has yet to see a situation where the use of tasers or 37mm guns on a mentally ill patient was warranted. (Petrella Declaration at 34.) Dr. Kaufman agreed that the use of either tasers or 37mm guns on any mentally ill inmate was inappropriate. (Kaufman Declaration at 12, 29.)

At Wasco, Dr. Petrella found that inmates are "tasered simply after refusing custody staff orders, without any professional mental health intervention." (Petrella Declaration at 128.) This can have grave consequences for the medicated inmate. One inmate at Wasco was tasered after refusing to take medication; he was then involuntarily medicated. (<u>Id</u>. at 129.) In another

AO 72
(Rev 8/82)

example, an inmate was "tasered, forcibly medicated, and placed in restraints" as a result of the inmate's attempt to self-mutilate. (Id. at 126.)

Strict guidelines for the use of tasers on inmates taking psychotropic medication were issued to all Wardens by directive dated September 29, 1992. (Meenakshi Declaration at 98.) It is clear from the evidence that this directive was not adequately communicated to staff. Some of the doctors were unaware of the directive at the time of their depositions, (Id. at 97, 106, 110), and some were unaware that the use of tasers on persons using psychotropic medications could have adverse effects. (Kaufman Declaration at 47.)

Other measures which may be required for proper management of mentally ill inmates are used inappropriately throughout the CDC. There was uncontradicted evidence that mechanical restraints are necessary in some instances for proper management of a mentally ill inmate, but that such restraints should only be used when physical assault, by the mentally ill inmate against others or against him or herself, is imminent or has just occurred, and that such restraints should only be used in accordance with strict guidelines. (Petrella Declaration at 35; Meenakshi Declaration at 82.) Since the use of mechanical restraints is only appropriate when a psychological emergency has occurred, it is necessary to provide follow-up psychiatric care to the mentally ill inmate after restraints have been used. (Petrella Declaration at 128.) Procedures for use of these restraints vary

56

from institution to institution within the class, and there is no systemwide review in place to ensure appropriate use of such restraints.  (<u>Id</u>. at 36.)

Similarly, involuntary medication is in certain instances a necessary treatment modality for a mentally ill inmate.  (<u>See</u>, <u>e.g.</u>, Kaufman Declaration at 142.)  In <u>Washington v. Harper</u>, 494 U.S. 210, 227 (1990), the United States Supreme Court held that prison officials may administer psychotropic medications to an inmate against his or her will.  However, the Court held that an inmate has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment in refusing such medication unless the inmate has a serious mental illness, the inmate is dangerous to self or others, and the treatment is in the inmate's medical interest.  (<u>Id</u>.)

An inmate is entitled to certain procedural protections before he or she is involuntarily medicated. (<u>Id</u>. at 228, 233.) First, the decision to medicate must be made by medical professionals.  (<u>Id</u>. at 231.)  Second, the inmate is entitled to review of that medical decision at an administrative hearing.  (<u>Id</u>. at 235.)  The inmate is entitled to notice of the hearing, the right to present at the hearing, and the right to present and cross-examine witnesses.  (<u>Id</u>.)

The purpose of the hearing is principally to review a medical treatment decision made by a medical professional.  (<u>Id</u>. at 232.)  The issues for review are (1) whether the inmate suffers from a mental disorder; (2) whether as a result of that disorder

57

the inmate is dangerous to self or others; and (3) the type and
dosage of medication.  (Id. at 232.)  Under the policy at issue in
Washington v. Harper, the type and dosage of medication was
reviewed on a "regular basis.  (Id.)

In Washington v. Harper, the Supreme Court approved a
policy which mandated that the hearing committee be composed of a
psychiatrist, a psychologist, and a prison administrator.  (Id. at
229.)  The policy also provided that "[n]one of the committee
members may be involved, at the time of the hearing, in the
inmate's treatment or diagnosis; members are not disqualified from
sitting on the committee, however, if they have treated or
diagnosed the inmate in the past."  (Id.)  The committee's decision
was also subject to review by the Superintendent of the facility.
(Id.)

There are several deficiencies in the use of involuntary
medications throughout the California Department of Corrections and
at particular institutions in the class.

At California Men's Colony, in an emergency the
psychiatric officer of the day can make a telephone order for
involuntary medication of an inmate without examining the inmate;
the medication is then administered by a nurse or medical technical
assistant.  (Kaufman Declaration at 141-142.)  In addition, Dr.
Kaufman testified that involuntary medication is underutilized at
CMC; when inmates refuse medication, involuntary medication is not
considered as an option until the inmate has decompensated so
severely that emergency involuntary medication is required.  (Id.

AO 72
(Rev.8/82)

at 142.)   This underutilization has two vices.   First, it causes harm to the inmate who is decompensating instead of being treated. Second, it results in the de facto denial of the procedural safeguards to which mentally ill inmates are entitled.

It appears that custody staff can and does play a significant role in recommending the use of involuntary medication. Dr. Petrella cited an example in which a decision was made to involuntarily medicate an inmate based solely on the report of custody staff; medical staff were consulted but apparently did not evaluate the inmate.   (Petrella Declaration at 129.)   Dr. Meenakshi described an incident at Mule Creek State Prison where an inmate was involuntarily medicated after he assaulted custody staff and then refused medication.   (Meenakshi Declaration at 99.)   In that case, the involuntary medication was ordered by a medical doctor, but was not authorized by either the Chief Medical Officer or the institutions' contract psychiatrist as is theoretically required by the institution.   (Id.)

Custody staff are also allowed to veto clinical decisions concerning the use of involuntary medication.   (Meenakshi Declaration at 3.)   At California Institution for Women, the warden must approve all orders for involuntary medication, and custody administrators outnumber psychiatric staff two to one on the hearing panel that decides whether to involuntarily medicate an inmate.[41/]   (Meenakshi Declaration at 29.)   While the

_____

[41/]   Dr. Meenakshi also testified that this violates a state court injunction filed in Keyhea v. Rushen (Solano Co. Sup. Ct. No. 67432, filed October 13, 1986) prohibiting an employee of the CDC from

requirement that the warden approve all orders for involuntary medication does not run afoul of the federal constitution, a predominance of custody staff in the decisionmaking process regarding use of involuntary medication, or a system which allows custody staff to unilaterally veto a medical decision that the use of such medication is required, does.  See Washington v. Harper, supra.

There is no protocol in place at Pelican Bay State Prison for involuntary administration of medication.  (Grassian Declaration at 51.)  Sierra Conservation Center does not have a written policy governing use of involuntary medications, although inmates have been involuntarily medicated at that institution. (Meenakshi Declaration at 111.)

In addition, inmates are often involuntarily medicated in inappropriate settings.  At CIW inmates are involuntarily medicated in the East Wing of the Support Care Unit.  (Id. at 28.) This unit has no provision for emergency medical care.  This care is necessary because the inmate may have physical reactions to the involuntary medication that require immediate medical attention. (Id.)  Dr. Kaufman opined that administration of involuntary medication at CMC is also done in an inappropriate setting. (Kaufman Declaration at 142.)

Once again, the above-described deficiencies flow in large part from the failure of defendants to have an adequate

serving as a hearing officer in the certification hearing, and that it violates CDC regulations as well.  Compliance with state court injunctions is not, of course, before this court.

60

1  program in place for screening and identifying mentally ill

2  inmates.   The deficiencies are also attributable to a lack of

3  adequate training of custody staff to recognize signs and symptoms

4  of mental illness.   Finally, the deficiencies are attributable to

5  policies which permit custody staff to use these measures in the

6  absence of consultation with, or against the considered advice of,

7  medical and/or mental health professionals.

8        This court finds that use of tasers and 37mm guns upon

9  mentally ill inmates without regard to the impact of such measures

10 on an underlying mental illness violates the Eighth Amendment.   The

11 court further finds that defendants present practices concerning

12 the use of mechanical restraints and involuntary medication violate

13 the requirements of the federal constitution.[42]/

14              5.   Medical Records

15        The medical records system within the California

16 Department of Corrections is extremely deficient.   (Testimony of

17 James Gomez, RT, March 29, 1993, at 47-48.)   A medical record

18 should describe the patient, assess the problem, and track the

19

20 _____

[42]/   Section 3364 of Title 15 of the California Code of Regulations
21 sets   forth   guidelines   for   the   administration   of   involuntary
medication.   The regulation contains several requirements, including
22 a requirement that the decision to involuntarily medicate an inmate
must be made by a physician based on personal examination of the
23 inmate with a follow-up medical opinion three days later, guidelines
for the location of administering such medication as well as notice
24 by   medical   staff   to   custody   staff   of   such   administration,   a
requirement of formal consultation where such treatment is continued
25 beyond ten days, notification to next of kin, and standards for
charting and recording each incident of involuntary medication.   Id.
26 The regulation does not cover the procedural protections for inmates.
The evidence before the court demonstrated that defendants have not
complied with their own regulation.

AO 72
(Rev.8/82)

course of treatment. (Petrella Declaration at 134.) An adequate

record is necessary to provide continuity of care, particularly

with respect to mental illness. Since mental illness is often

recurrent, the prior treatment records help determine future

treatment decisions. (Petrella Declaration at 20.) At most of the

prisons in the class there are serious deficiencies in medical

recordkeeping, including disorganized, untimely and incomplete

filing of medical records, insufficient charting, and incomplete or

nonexistent treatment plans. To complicate the situation beyond

all reason, inmates are typically transferred between prisons

without even such medical records as might exist.

Dr. Meenakshi observed that medical records at the

California Institution for Women (CIW) were "abysmal." (Meenakshi

Declaration at 24.) The records were incomplete, lacked lab

reports and complete evaluations of the inmate's mental illness,

and were often illegible. (Id.) When inmates were transferred to

CIW, their charts did not usually accompany them. Sometimes there

would be more than one chart for one patient; sometimes the

patient's chart could not be located for the psychiatrist to review

prior to evaluation and treatment. Often documents at CIW were

misfiled, either within the patient's chart or in another patient's

chart. Frequently documents were not filed in chronological order.

(Id. at 25.) Prior records were often missing from the patient's

file. In addition, patient notes did not reflect that medication

had been adjusted to treat the patient's current needs or "to

respond to the escalation of psychotic symptoms." (Id.) This

62

precluded the clinician from having benefit of a treatment and diagnostic history, and forced the clinician to rely solely on the information provided by the patient, which was often incomplete or inaccurate.  (<u>See</u> <u>id</u>. at 26-27.)

The medical records that did exist at CIW were underutilized by clinicians.  Dr. Meenakshi did not find a single reference in any of the records that she reviewed at CIW that the patient's medical chart had been reviewed prior to "making a diagnosis or prescribing treatment."  (<u>Id</u>.)  The clinicians did not attempt to obtain medical records from a patient's prior hospital stay.  In addition, the medical records at CIW did not contain adequate treatment plans.  In fact, until last year, CIW did not have treatment plans at all.  (<u>Id</u>.)

Similar deficiencies existed at Central California Women's Facility (CCWF).  Inmates transferred to CCWF frequently arrived without their medical records.  The records were usually incomplete; Dr. Meenakshi found "significant information . . . missing in almost every file" at CCWF.  (Meenakshi Declaration at 65.)  The medical records at CCWF did not show that physicians and doctors reviewed the patient's chart before treating the patient.  Medication sheets were absent from some files at CCWF.  The medical charts at CCWF were disorganized and were not promptly updated; signatures on consent forms were obtained late.  (<u>Id</u>.)

Record-keeping at Northern California Women's Facility (NCWF) was also deficient.  Medical records were often misfiled, either within the patient's own chart or in another patient's

chart.  Frequently, filing at NCWF was not in chronological order.
Important lab reports, medication sheets, consent forms and
discharge summaries were often missing.  (Meenakshi Declaration at
86-87.)  When a patient was admitted to the infirmary at NCWF, a
separate medical file was established.  Often there was no
correlation between the inpatient file and the outpatient file --
no mention in the outpatient file that the patient was going to be
hospitalized or that the patient had been discharged and might need
follow-up outpatient care. (Id. at 88.)

        Charting at NCWF was also insufficient.  (Id. at 87.)  No
reference to a review of the patient's prior medical record was
found.  Often no diagnosis was recorded.  In one set of records,
rather than delineate specific information, the physician simply
wrote the acronym SOAP[43]/ followed by the prescription issued.
(Id.)  This offered no insight for the next clinician who reviewed
the file.  Dr. Meenakshi cited other examples of deviances in
treatment that were not explained within the medical record at
NCWF.  (Id.)

        In addition, NCWF did not have adequate treatment plans.
An adequate plan "should be based upon a competent psychiatric
evaluation . . . [and] should include prescription of appropriate
medications and other forms of therapy, as well as a statement of
goals for treatment."  (Id. at 86.)  A doctor at NCWF testified

---

43/  "The acronym SOAP is a tool to help the clinician remember to
record the following information:   the patient's subjective
description of the problem, the clinician's objective evaluation, his
or her assessment of the patient's condition, and a plan for
treatment."  (Id. at 87.)

AO 72
(Rev.8/82)

that his treatment plan consisted solely of orders for medications and follow up care.  (<u>Id</u>.)

Dr. Meenakshi described the documentation of psychiatric care at Mule Creek as "grossly inadequate."  (Meenakshi Declaration at 100.)  The medical records were disorganized and misfiled, and many were missing lab reports.  Medical files were mixed in with psychiatric files.  (<u>Id</u>.)

There was also evidence of insufficient charting at Mule Creek.  Some files contained no reference to a review of the patient's prior medical record.  "In some, it [was] impossible even to determine the source of recommendations for Category J evaluations, psychotropic medication or psychiatric assessments" at Mule Creek.  (<u>Id</u>.)

Inmates sent to Mule Creek frequently arrived without their medical records.  It usually took two weeks for the records to arrive.  (<u>Id</u>.)

Medical records received at Pelican Bay were often incomplete and sometimes even failed to contain information on prior psychiatric hospitalizations.  (Grassian Declaration at 52.) Sometimes pertinent psychiatric records were misfiled in the patient's central file.

At Pelican Bay, infirmary records were kept separately from medical records.  Suicide watch records were made in the infirmary record, and Psychiatric Services did not receive infirmary records.  (<u>Id</u>.)  Dr. Grassian also found that clinicians at Pelican Bay were not reviewing patient records prior to

AO 72
(Rev.8/82)

evaluation and treatment.  He observed: "Records are of use only if they are read."  (Id.)

Medical records at California Institution for Men (CIM) were disorganized and Dr. Petrella reported that "there [was] no audit or quality assurance program to determine whether records were properly kept." (Petrella Declaration at 86.)  Consent forms were sometimes missing from the medical records at CIM.

Inmates often arrived at CIM without their medical records, or with only a description of their medication.  This made it difficult to adequately treat suicidal patients.   (Id. at 85.)

A review of medical records at CIM revealed insufficient charting.  Dr. Petrella testified that "[i]t was not possible to review a record and discern the nature of the inmate's problem, the assessment of the problem, the plan for treating it and the implementation of the plan."  (Id. at 86.)  Although some entries recommended the inmate be seen in "psych line," there was little evidence that this recommendation was followed.

Medical records at Calipatria were disorganized and incomplete.  Progress notes and discharge summaries were missing. (Petrella Declaration at 109-10.)  Medical files were not updated in a timely manner.  A shortage of medical transcribers contributed to the delay in properly updating files.  (Id. at 111.)  Infirmary files were kept separately from psychiatric files at Calipatria. This made it difficult to provide continuity of care because the clinician had no easy access to the separate file or did not know it existed.  (Id. at 110.)

AO 72
(Rev.8/82)

Charting at Calipatria was insufficient as well.  Dr. Petrella cited one example where medication was prescribed, but the clinician's notes did not explain why, and another example where the clinician's notes recommended no medications, yet the medications chart showed the patient continued to receive medications.  (<u>Id</u>.)

Inmates at Calipatria were sometimes examined without their medical records.  Dr. Millan admitted this had a negative impact on the quality of care he was able to provide.  (<u>Id</u>.)

Medical files at Wasco were disorganized and incomplete. "Dr. Lewengood stated that he had recently found a stack of unfiled medical records that [were] taller than him."  (Petrella Declaration at 135.)  Wasco had difficulty with timely transcription of medical records as well.  (<u>Id</u>. at 136.)  Infirmary files were kept separately from psychiatric files, and updates were not made simultaneously.  (<u>Id</u>. at 135.)

There was insufficient charting at Wasco.  The mental health staff did not document their patient assessment or treatment.  Dr. Petrella called their record-keeping "vague." (<u>Id</u>.)  He observed the record of an inmate placed on suicide watch at Wasco in which the record did not show who placed the inmate on suicide watch or why the watch was instituted.  (<u>Id</u>.)

He also testified that record-keeping problems were compounded because ninety-five percent of all inmates received at Wasco had no medical or mental health documentation with them when they arrived.  (<u>Id</u>. at 136.)

AO 72
(Rev.8/82)

Dr. Petrella found the medical records at California Men's Colony (CMC) generally acceptable.  (Petrella Declaration at 71.)  Often the files were disorganized and some of the files lacked treatment plans, but most of the files contained the necessary information.  (Id.)

Dr. Kaufman found the medical records inadequate at Tehachapi.  The files were illegible and incomplete.  The charting was insufficient, with no evidence of full psychiatric evaluations, treatment plans, or quality assurance reviews.  (Kaufman Declaration at 46.)

Psychiatric records at Avenal were separated behind a divider in the inmate's medical file.  Dr. Kaufman found evidence of insufficient charting, including inadequate detail in evaluating inmates and failure to use consent forms.  (Kaufman Declaration at 152-53.)  Sometimes inmates arrived at Avenal without their medical records.  (Id. at 151.)

As a result of the serious deficiencies in the overall medical records system, it is difficult, if not impossible, to provide effective mental health care.  (Petrella Declaration at 20.)  It is crucial to have a complete and legible record for the next clinician to review before evaluating and treating the inmate. Inmates have often been misdiagnosed based on an absent or incomplete record, which can result in life-threatening situations. (Meenakshi Declaration at 24.)

/////

/////

68

At trial, defendant Gomez acknowledged the deficiencies in medical recordkeeping. (RT, May 17, 1993, at 47-48.) Defendant Gomez also acknowledged that there is a problem with inmates being transported between prisons and returning to custody without their medical files. (RT, May 17, 1993, at 87.) An essential element of a constitutionally adequate mental health care delivery system in prison is the maintenance of accurate, complete and confidential mental health treatment records. The mental health records in the CDC, such as they are, have none of these qualities. Defendants are in violation of the Eighth Amendment in this regard. Further, those records must be readily available to a clinician at the time an inmate presents for necessary care. Defendants do not have an adequate system for transporting and retrieving inmate mental health records and they are well aware of this deficiency; this, too, constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment.

### 6. Suicide Prevention

Plaintiffs' experts testified concerning at least twelve suicides at institutions in the class, plus an additional suicide at the San Quentin Reception Center, between 1988 and 1992. (Petrella Declaration at 69-70, 158; Kaufman Declaration at 47, 132-141.) Plaintiffs also provided evidence that suicide attempts were frequent at some institutions in the class. For example, Dr. Petrella testified that there were approximately ten suicide attempts at Calipatria each month; two to three of these occurred in administrative segregation. (Petrella Declaration at 100.) Dr.

69

Petrella also testified that there were two suicide attempts "or other psychiatric emergencies" each week at Wasco State Prison. (Id. at 145.)

Dr. Meenakshi described four suicide attempts that took place at California Institution for Women between March and October 1992. (Meenakshi Declaration at 36-38.) She described five cases of inmates admitted to the infirmary on suicide watch at Central California Women's Facility during 1992. (Id. at 58-59.) She also described three suicide attempts by women at Northern California Women's Facility during the same year. (Id. at 79-81.) Dr. Meenakshi testified that the staff psychiatrist at California Conservation Center "estimates that she is called to the prison to see an attempted suicide approximately 2-3 times per year." (Id. at 106.)

There was also evidence that suicide attempts are not as frequent at other institutions. (See, e.g., Kaufman Declaration at 151 (Suicide attempts are "infrequent" at Avenal).)

Dr. Louis L. Beermann testified that the suicide rate in the CDC had declined from a high of 77 per 100,000 inmates in 1982 to 14 per 100,000 inmates in 1992.[44]/ (Declaration of Dr. Louis L. Beermann, Ph.D., filed February 11, 1993, at 6; see also Beermann Declaration at Attachment 1.) The suicide rate for male inmates in the CDC appears to be lower than that the rate in the general population; in 1992, the suicide rate for male inmates in

_____

[44]/ There were 24 suicides in the CDC in 1982; that year the average daily population was 31,142 inmates. (Beermann Declaration at Attachment 1.)

AO 72
(Rev. 8/82)

the CDC was 14 per 100,000 inmates, while the rate for non-imprisoned males was 20 per 100,000.  (<u>Id</u>. at 6.)[45]/

The CDC has a Suicide Prevention Program in place. (Beermann Declaration at 4.)  The program was standardized and enhanced in 1990.  (<u>Id</u>.)  The program consists of three major components:  staff education, prevention, and assessment.  (<u>Id</u>.) Each prison has a suicide prevention coordinator to implement the suicide prevention program, heighten staff awareness of suicide prevention measures, and report any suicide to the central Mental Health Services Branch within twenty-four hours.  (<u>Id</u>. at 3-4.)

As part of staff education, the Department has published a "Suicide Prevention Handbook" prepared by Dr. Beermann for use in in-service training for correctional officers.  (<u>Id</u>. at 4.) Approximately 25,000 copies of the Handbook have been distributed to correctional officers and other CDC personnel.  (<u>Id</u>.)  A suicide prevention videotape is also available and has been shown at in-service training.  (<u>Id</u>.)  Dr. Beermann testified that 80 to 100 percent of all correctional officers at all institutions have now received suicide prevention training.  (<u>Id</u>. at 4-5.)  Dr. Beermann also testified that suicide prevention training is now included as part of the curriculum at the Department of Corrections Training Academy and that all new correctional officers are required to participate in the training.  (<u>Id</u>.)

/////

---

45/  The suicide rate for female inmates appears to be relatively low; of the 181 suicides reported in the CDC from 1980 to 1990, 179 were male and 2 were female.  (Beermann Declaration at Attachment 1.)

The second component of the program is the prevention component.  As described by Dr. Beermann, this part of the program consists of identification of inmates who are potential suicide risks and "suicide watch."  (Id. at 5.)  Suicide watch is ordered by a clinician and may involve the confinement of an inmate considered seriously suicidal in an observation cell, removal of items from the cell with which the inmate could harm himself or herself, and recording observations every fifteen minutes.  (Id.)

The suicide assessment component of the program consists of preparation of a psychological autopsy on each inmate who does commit suicide.  (Id.)  These autopsies are conducted in order to improve the Suicide Prevention Program.  (Id.)  Each autopsy includes a description of how the suicide was accomplished, as well as specific recommendations on how to prevent a similar occurrence and time-lines for implementation of the specific recommendations. (Id.)  All autopsies are sent to the CDC-Mental Health Services Branch for review and follow-up; the warden of the institution where the suicide occurred is required to submit a signed follow-up memorandum describing the actions taken to implement the recommendations.  (Id.)

The presence of a suicide prevention coordinator and in-service training at least some institutions was acknowledged by plaintiffs' experts.  (See Meenakshi Declaration at 39 (suicide prevention coordinator and in-service training program at CIW), 82 (suicide prevention protocol claimed to exist at CCWF but doctor at

the prison unable to describe what it entails); Kaufman Declaration

at 48 (training implemented at California Correctional Institution

at Tehachapi by December 1992).)   The presence of either a

coordinator or staff training at other institutions was disputed.

(See Meenakshi Declaration at 79 (staff at Northern California

Women's Facility not properly trained to respond to suicide

attempts), 97 (staff at Mule Creek is not trained in suicide

prevention), 105-106 (as of April 1992, no training information had

been distributed to staff at California Correctional Center and

staff doctor did not know of suicide prevention program); Kaufman

Declaration at 151 (doctor at Avenal had not received any suicide

prevention training, had only received the department manual on the

morning of his deposition, and had not trained any staff).)   Dr.

Meenakshi also questioned the long-term commitment of California

Institution for Women to the Suicide Prevention Program, and she

testified that the program was halted for a period of time in

August 1990 to save money.   (Meenakshi Declaration at 39.)

Dr. Grassian testified that there has been in-service training and

distribution of the pamphlet at Pelican Bay, but that the

psychiatric staff at the prison has not provided the custody or the

medical staff with formal training in suicide prevention.

(Grassian Declaration at 53.)   Dr. Grassian also testified to a

suggestion that the in-service training has not made a difference

in the way staff handles potentially suicidal inmates.   (Id.)

        Plaintiffs' experts challenged the adequacy of the

suicide watch program at several prisons.   Dr. Meenakshi testified

AO 72
(Rev.8/82)

that, at CIW, women known to be high suicide risks were placed in segregation or confined to quarters rather than being properly monitored or observed after suicide attempts, and that charting of the suicide attempts was wholly inadequate.  (Meenakshi Declaration at 36-39.)   Dr. Meenakshi reported similar inadequacies in the suicide watch program at Central California Women's Facility (id. at 58-59), Northern California Women's Facility (id. at 80-81), Mule Creek State Prison (id. at 96), California Correctional Center (id. at 106), and Sierra Conservation Center (id. at 110).

Dr. Petrella testified that the monitoring for suicide risk was inadequate at California Men's Colony.  (Petrella Declaration at 69.)   Dr. Petrella also testified that some good suicide prevention procedures existed at CMC; he testified that the Locked Observation Unit provided good supervision for inmates on suicide watch.  (Id. at 70.)   In other instances, the suicide watch program at CMC was, in his opinion, inadequate; use of certain cells in another part of the institution for suicide watch happened and was, he stated, "grossly inappropriate."  (Id.)   Dr. Petrella found the suicide watch program, including ready access to a psychiatrist, observation, monitoring and charting, at Calipatria to be inadequate.  (Id. at 100-103.)   Dr. Petrella also testified that at Wasco delays in access to psychological help have resulted in suicide attempts.  (Id. at 144.)   Finally, he found that charting of inmates on suicide watch was inadequate, as was follow-up monitoring and care after suicide attempts.  (Id. at 144-146.)
/////

AO 72
(Rev.8/82)

This court finds that defendants have designed an adequate suicide prevention program and have taken many of the steps necessary to implement that program.  This court also finds that the program has not yet been fully implemented, and that some of the failure to fully implement the program is due to the severe understaffing in mental health care.  Accordingly, the court will recommend that the special master recommended below be ordered to report to the court on the adequacy of suicide prevention in the CDC twelve months after the order of the district court.

C.  Deliberate Indifference

The evidence of defendants' deliberate indifference to the deficiencies in mental health care was not seriously contested. Defendants have known of the serious problem with understaffing at least since they undertook the interdepartmental workload study in 1985.  That study concluded, inter alia, that the then current workload was "clearly excessive."  (Plaintiffs' Exhibit 456 at vi.) Defendants have known that there were thousands of mentally ill inmates incarcerated in the state of California who were not even identified as needing care, let alone being provided necessary care, at least since the publication of the Stirling Report in July, 1989.  The inadequacies in the mental health care delivery system were confirmed in 1991 when the Scarlett Carp consultants commenced their study, and they remain today.

Defendants repeatedly acknowledged that they were grossly understaffed in the area of mental health care, that their medical recordkeeping system was woefully outdated and inadequate, and that

AO 72
(Rev 8/82)

they did not have a mechanism in place for screening and identifying mentally ill inmates.

Even without the historical facts found above, the grossly inadequate mental health care provided in the California Department of Corrections, by itself, would be sufficient evidence of deliberate indifference to warrant injunctive relief.  Wellman v. Faulkner, 715 F.2d at 272.  The fact that defendants have known about these deficiencies for over eight years without taking any significant steps to correct them is additional evidence of deliberate indifference.  Injunctive relief is required.

D.  Remedies

The district court has "broad discretion to fashion remedies once constitutional violations are found."  Hoptowit v. Ray, 639 F.2d at 1245 (citing Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971)).  Indeed, when constitutional violations are found "a federal court must order effective relief."  Toussaint v. McCarthy, 801 F.2d 1080, 1087 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1989).

The relief "must be no broader than necessary to remedy the constitutional violation."  Id. at 1086.  "A defendant's history of noncompliance with prior court orders is a relevant factor in determining the necessary scope of an effective remedy."  Id. at 1087 (citing Hutto v. Finney, 437 U.S. 678, 687 (1978) (additional citations omitted)).

/////

/////

76

As described above, this court finds that defendants are in violation of the Eighth Amendment with respect to screening and identification of mentally ill inmates, staffing for mental health care, access to care, use and monitoring of psychotropic medication, placement and retention of mentally ill inmates in administrative segregation and segregated housing units, use of tasers, 37mm guns, mechanical restraints, and involuntary medication, and maintenance of mental health records.  This court will recommend that defendants be required to develop and implement forms, protocols, and plans necessary to remedy these violations as set forth below.

E.   Appointment of Special Master

The court may appoint a special master in a non-jury case on a showing that "exceptional conditions" require such appointment.  Fed. R. Civ. P. 53(b).  In the instant case, appointment of a special master will be necessary.  This court will recommend to the district court that defendants be ordered to remedy the constitutional violations found in their mental health care delivery.  Monitoring compliance with this order will be a significant task.  This court will recommend that the district court appoint a special master to monitor defendants' compliance with court ordered injunctive relief with defendants to pay the cost of the master.

F.   Mental Retardation

This court has determined that further briefing is required concerning the claims raised on behalf of mentally

77

retarded inmates and has separately issued a further briefing order. Accordingly, findings and recommendations on said claims are deferred at this time.

RECOMMENDATIONS

In accordance with the above, IT IS HEREBY RECOMMENDED that the district court order as follows:

1.   The district court appoint a special master for a term of three years to perform the following duties:

a.   Consult with the court concerning the appointment of experts to develop the protocols and plans required by the district court's order;

b.   Monitor compliance with court-ordered injunctive relief;

c.   Report to the court in twelve months on the adequacy of suicide prevention at all institutions in the class; and

d.   Perform such additional tasks as the court may deem necessary.

Defendants shall pay the cost of the special master.

2.   Within thirty (30) days of the order of the district court, defendants shall develop and use standardized mental health screening forms and protocols to be used at all institutions in the class upon the admission, readmission or transfer of any inmate. Said forms and protocols shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

/////

AO 72
(Rev.8/82)

3.   Within ninety (90) days of the order of the district court, defendants shall implement a training program to train all medical technical assistants, nurses, correctional officers, and other personnel who work with inmates on a regular basis in the recognition and identification of the signs and symptoms of mental illness.   Said training program shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

4.   Within thirty (30) days of the order of the district court, defendants shall develop and implement medication protocols to establish an adequate formulary, to ensure timely refilling of prescriptions, to maintain continuity of medication delivery, to require adequate monitoring of the medical condition, including blood levels where appropriate, of inmates receiving psychotropic medications, and to avoid hoarding of medications.   Said protocols shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

5.   Within ninety (90) days of the order of the district court, defendants shall develop and implement a plan to use transfer notes and to transfer medical records with inmates when they are transferred from one institution to another within the California Department of Corrections.   At the same time, defendants shall develop a plan for obtaining medical records from county jails for inmates on their initial admission to the California

79

Department of Corrections.  Said plan shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

6.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a formula for mental health care staffing ratios at all institutions within the class. Said formula shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

7.  Within (90) days of the order of the district court, defendants shall develop and implement a recruitment program, including but not limited to provision of adequate compensation, for the recruitment of mental health staff at every institution in the class.  Said program shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

8.  Within ninety (90) days of the order of the district court, defendants shall fill those positions presently authorized for the provision of mental health care services.  Within one hundred eighty (180) days of the order of the district court, defendants shall fill those positions determined to be necessary under the formula developed in paragraph 7, supra.

9.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a system for quality assurance and peer review of mental health care services.  Said

80

system shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

10.  Within sixty (60) days of the order of the district court, defendants shall develop and implement a protocol, as well as any contractual arrangement that may be necessary, to guarantee prompt access to inpatient psychiatric hospitalization for every class member in need of such hospitalization.  Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

11.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a protocol to govern placement and retention of mentally ill inmates in any administrative segregation or segregated housing unit, and to govern care of any mentally ill inmate who is so housed.  Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

12.  Within ninety (90) days of the order of the district court, defendants shall develop and implement protocols to govern use or non-use of tasers, 37mm guns, mechanical restraints, involuntary medication and other measures on class members.  Said protocols shall specifically address coordination and consultation between mental health staff and custody staff and, in the case of involuntary medications, use of federal due process protections.

81

Said protocols shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

13.   Within ninety (90) days of the order of the district court, defendants shall develop and implement a standardized protocol for completion and maintenance of adequate mental health records at every institution in the class.   Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.   Defendants shall also take any and all additional steps necessary to insure that adequate mental health records are kept for all inmates in the class.

14.   The preliminary injunction regarding heat plans presently in existence in this action be made permanent to remain in effect for three years.

15.   Defendants' motion for judgment pursuant to Federal Rule of Civil Procedure 52(c), made at the close of plaintiffs' case in chief, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).   Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.   Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Any reply to the objections shall be served and filed within ten days after service

AO 72
(Rev.8/82)

1  of the objections.   The parties are advised that failure to file

2  objections within the specified time may waive the right to appeal

3  the District Court's order.   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

4  Cir. 1991).

5  DATED:   June 6, 1994.

6

7  _____

   UNITED STATES MAGISTRATE JUDGE

8  JFM:hg:cw
   coleman.fin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

83

APPENDIX

EXPERTS' BACKGROUNDS[46]/

**Plaintiff's Experts**

Stuart Grassian, M.D.

        Dr. Stuart Grassian is a board certified psychiatrist. He received his medical degree from New York University Medical School in 1973 and completed his psychiatric residency training at Beth Israel Hospital/Harvard Medical School in Boston, Massachusetts in 1977.  He received his Board certification in 1979.

        He has been a clinical instructor of psychiatry at the Harvard Medical School since completing his residency, was on the active teaching staff of the Tufts University School of Medicine as an Assistant Clinical Professor of Psychiatry from 1978 to 1981, and has been on the teaching staff at Beth Israel Hospital in Boston continuously since 1977.

        Dr. Grassian has published two articles on the subject of the psychological effects of solitary confinement.  He has been retained as an expert concerning the psychological effects of imprisonment generally and solitary confinement specifically in class action lawsuits in Massachusetts, New York, Kentucky, and California.

Thomas Greenfield, Ph.D.

        Dr. Thomas Greenfield is a psychologist licensed in the State of Washington.  Dr. Greenfield was one of the consultants who conducted the prevalence study ultimately published as the Stirling Report.  In 1991, he was asked to, and did, reanalyze the prevalence data published in the Stirling Report for use by Scarlett Carp & Associates; these results were used in subsequent reports published by Scarlett Carp & Associates.

        Dr. Greenfield obtained his doctoral degree in clinical psychology from the University of Michigan in Ann Arbor in 1977. From 1968 to 1970, he was a predoctoral intern in the department of psychology at Ypsilanti State Hospital in Ypsilanti, Michigan, where he conducted psychological testing and provided psychotherapy to severely disabled patients.  He did a second predoctoral internship at the Counseling Center, Bureau of Psychological Services at the University of Michigan from 1970 to 1971.

---

46/   The following information is drawn from the declarations and curriculum vitae of the expert witnesses filed by the parties.

1

He has been a psychological counselor from 1971 to 1986, first at University of Michigan and then at Washington State University.  From 1986 to 1988, he was a National Institute of Mental Health postdoctoral fellow at the Department of Psychiatry, University of California, San Francisco, in the Clinical Services Research Program.  He worked as a research psychologist in the same department from 1988 to 1989.  From 1989 to 1991, he was an Associate Director for Research at the Marin Institute for Prevention of Alcohol and Other Drug Problems.

He is currently Senior Scientist at the Alcohol Research Group, Institute for Epidemiology and Behavioral Medicine, Medical Research Institute of San Francisco, and served as the director of that institute during 1992.  He has also provided psychiatric research consultation services to several organizations and has held a number of university appointments.  Dr. Greenfield has been involved in several psychometric studies, i.e., studies which measure psychological variables such as depression or client satisfaction, in a given population as well as other prevalence and investigative studies.  Many of the studies have been published in journals, presented at professional meetings, or presented to agencies such as the California Department of Corrections.

<u>Craig Haney, J.D., Ph.D.</u>

Craig Haney, J.D., Ph.D., is a Professor of Psychology and Director of the Program in Legal Studies at the University of California at Santa Cruz, where he has taught graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis for fifteen years.

Dr. Haney received his Ph.D. in Social Psychology and his Juris Doctor degree from Stanford University in 1978.  He has published over thirty articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration.  He has also served as a consultant to several organizations, including the National Judicial College, the California Legislature, and the United States Justice Department.

For over twenty years, Dr. Haney has studied the effects of living and working in maximum security prisons.  During that time he has done numerous interviews with correctional officers, guards and prisoners to assess the impact of prison adjustment, and has analyzed data to examine the effects of overcrowding and other conditions on the quality of prison life and prisoner adjustment. He has toured maximum security state prisons in Alabama, Arkansas, California, Georgia, New Jersey, New Mexico, Ohio, Tennessee, Texas, Washington; maximum security federal prisons at McNeil

AO 72
(Rev.8/82)

Island and Marion, Illinois; and prisons in Canada, England, and Mexico.  For the last fifteen years, he has also studied the backgrounds and social histories of persons accused and convicted of violent crime and assessed the effects of prior periods of incarceration on such persons.

Dr. Haney has testified as an expert in state and federal courts in California, including the Superior Courts of Lake, Los Angeles, Marin, Orange, Placer, Sacramento, San Diego, San Francisco and Ventura Counties, and the federal courts in the Northern, Southern, and Eastern Districts of California.  He has also testified in federal district courts in the Eastern District of Washington and the Southern District of Illinois.  His testimony in California has concerned conditions of confinement at several institutions in the California Department of Corrections.  He has also evaluated conditions of confinement and the quality of care provided at Atascadero State Hospital for the United States Department of Justice.

<u>Edward Kaufman, M.D.</u>

Dr. Edward Kaufman is a clinical professor in the psychiatry department at the University of California, Irvine.  He is Board certified by the American Board of Psychiatry and Neurology and is a Fellow of the American Psychiatric Association. Dr. Kaufman graduated from Jefferson Medical College in 1960, completed his residency in psychiatry in 1964 at the New York State Psychiatric Institute at the Columbia Presbyterian Medical Center, and received his Psychoanalytic Certificate in 1970.  He received Board certification in psychiatry in 1971.  In 1980, he was made a fellow of the American Psychiatric Association.  In 1987 he was certified in Alcohol and Other Drug Dependencies by the American Society of Addiction Medicine.

Dr. Kaufman was Chief of Psychiatric Services at Lewisburg Federal Penitentiary in Pennsylvania from 1964 to 1966. From 1966 to 1967 he was the Senior Research Psychiatrist and Director of An Inpatient Unit at New York State Psychiatric Institute's Washington Heights Community Mental Health Services. From 1967 to 1971 he was Chief of Emergency Psychiatric Services at St. Luke's Hospital Center in New York City.  From 1971 to 1973, Dr. Kaufman was the first Director of Psychiatry for Prison Mental Health Services of the City of New York, where he developed regionalized treatment programs at each jail in the city as well as an inpatient unit at Riker's Island Prison.  From 1973 to 1977, Dr. Kaufman was the Chief Psychiatrist and Medical Director of the Lower East Side Service Center in New York City, where he directed services for over 1000 narcotics addicts.  In 1977, he also served on the Standards and Advisory Panel for Juvenile Justice of the New York State Division of Criminal Justice Services.

AO 72
(Rev 8/82)

In 1977, Dr. Kaufman moved to California.  From 1977 to 1978, Dr. Kaufman was a psychiatric consultant to the Orange County Department of Mental Health and to the Metropolitan State Hospital in Norwalk, California.  From 1977 to 1979, he was the Medical Director for the Venice Drug Abuse Coalition.  From 1978 to 1983, he served as Chief of Clinical Psychiatric Services at the University of California, Irvine (UCI) Department of Psychiatry. From 1979 to the present he has served as Director of Family Therapy Training at UCI Medical Center.  From 1986 to 1990, he served as Executive Director of the Family Center in San Bernardino, and from 1988 to 1991, he served as Director of UCI's Chemical Dependency Program at Capistrano-By-The-Sea Hospital. From 1983 to 1991, he was also the Director of Psychiatric Education at UCI Medical Center.

Dr. Kaufman has held several professorships and has worked extensively with individuals with problems with drug abuse and alcoholism.  He has written several articles on the subject of mental health care in prisons, including an article entitled "Violation of Psychiatric Standards of Care In Prison," which was reproduced in part by the California Department of Corrections in the 1986 workload study.

### V. Meenakshi, M.D.

Dr. V. Meenakshi is a psychiatrist licensed to practice medicine in the State of California.  She received her medical degree from the All India Institute of Medical Sciences in February 1963.  She completed her residency at the Yale Psychiatric Institute at Yale University in New Haven, Connecticut in 1971. From 1971 to 1974, she was a Senior Fellow and then Assistant Medical Director at the Yale Psychiatric Institute.  In 1975, she was an Advanced Fellow in Forensic Psychiatry at the University of Southern California.  She has held teaching positions at the University of California campuses at Los Angeles and Davis.  She is a Diplomate in Psychiatry of the American Board of Psychiatry and Neurology.

Dr. Meenakshi has been a staff psychiatrist at the Napa State Hospital, the Los Angeles County Crisis and Evaluation Unit stationed at Metropolitan State Hospital in Norwalk, California, the Drug Abuse Program and the Alcohol Program at the Veterans Administration Hospital at Sepulveda, California.  From 1979 to 1985, she was in private practice with the Northridge Psychiatric Medical Group in Northridge, California; from 1982 to 1985 she was Co-Chairperson of Adolescent Psychiatry at Northridge Hospital. She has also served as a consultant to the Superior Court of Los Angeles, Atascadero State Hospital, Penny Lane Placement Home for Children, the United States Public Health Service, the Los Angeles Residential Community Clinic, the Criminal Justice Committee for

the State Bar of California, the Burbank Municipal Court, and the Hillsides Children's Home in Pasadena, California.  She is currently employed part-time as a psychiatrist at the Sutter-Yuba Mental Health Center and as a private practitioner.

Dr. Meenakshi worked as a psychiatrist at California Medical Facility from 1986 to 1990.  During her tenure at CMF, she served as Chief Psychiatrist, Chairperson of the Department of Psychiatry, Chief of Inpatient and Outpatient Psychiatry, and Chief Psychiatrist of the Outpatient Program.  From 1990 to 1992, Dr. Meenakshi was Medical Director of Inpatient Psychiatry at the Sacramento County Jail.  She also was a member of the Task Force on Mentally Ill Sex Offenders and Mentally Ill Offenders sponsored by the Conference of Mental Health Directors and the California Psychiatric Association.

Russell C. Petrella, Ph.D.

Dr. Russell Petrella is the Director of Mental Health Services for the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services, a position he has held since 1990.  In his present position, he is responsible for planning, developing, directing and monitoring the delivery of mental health services throughout the state of Virginia.  He is also responsible for overseeing the provision of inpatient services to female prisoners transferred from the Department of Corrections as well as all male inmates transferred from local jails for inpatient psychiatric hospitalization.

Dr. Petrella received a Ph.D. in Clinical Psychology from Washington University in 1978.  In 1975 and 1976, he trained at the Medical Services Division of the Supreme Bench of Baltimore City in Baltimore, Maryland, performing pre-trial and pre-sentencing evaluations of offenders, providing consultation to judges and probation officers, and providing individual psychotherapy to offenders.  In 1976, he worked for the Special Offenders Clinic in Baltimore, providing group therapy for violent offenders and sexual offenders.  In 1977, he served as a consultant to the Missouri Department of Probation and Parole.  From 1977 to 1978, he worked as a Clinical Assistant in the Behavior Therapy Clinic of Washington University Psychological Service Center.

In 1978, Dr. Petrella started his own consultation and clinical practice, which continues to the present.  The practice includes, inter alia, evaluation and testing in criminal cases, consultation to mental health and corrections systems, review of service delivery systems and consultations in litigation.  In the same year, he also became a staff psychologist in the Department of Psychology for the Center for Forensic Psychiatry in Ann Arbor,

AO 72
(Rev. 8/82)

Michigan.  He became Associate Director of the Center's Evaluation Unit in 1979, and Director/Chairman of the Department of Psychology in 1991.  He also provided direct services to inmates transferred from the Michigan Department of Corrections to an inpatient unit. From 1979 to 1981, he also served as a consultant to the Federal Correctional Institute in Milan, Michigan, where his work included conducting treatment groups for inmates.

From 1985 to 1989, Dr. Petrella was Director of Forensic Services for the Virginia Department of Mental Health.  While in that position, he participated in the planning, development and implementation of a mental health system for the Virginia Department of Corrections.  Prior to the reorganization, inmates in need of inpatient services had been referred to Department of Mental Health facilities; the reorganization included development of a licensed correctional psychiatric hospital run by the Virginia Department of Corrections.  Dr. Petrella also worked on the development of legislation concerning mental health transfers from jails to hospitals; a hospital staffing study; and study of the clinical and security aspects of forensic inpatient programs.

In 1989, Dr. Petrella was appointed the Chairman of the Governor's Special Advisory Panel on Forensic Mental Health in Boston, Massachusetts.  The Panel was established by the Massachusetts legislature to evaluate and make recommendations regarding mental health and substance abuse services for men and women in the criminal justice system, including development of policy and evaluation of budgetary, resource, or statutory changes necessary to implement the recommendations.  The Panel ultimately sent a comprehensive report to the Governor.  In 1991, he served as Associate Commissioner of Community/Facility Services in the Virginia Department of Mental Health in addition to his present position.

Dr. Petrella has held several University appointments, and has made numerous presentations and written several articles on the subjects of forensic mental health and mental retardation.  He has also had extensive prior experience as an expert witness on mental health legal matters.  He has served as an expert witness in three cases involving systemic issues regarding mental health care in jails and/or prisons.

In 1987, he was retained jointly by plaintiffs and defendants to evaluate the quality of care at Bridgewater State Hospital, a corrections operated psychiatric facility in Massachusetts.  He made numerous recommendations regarding program type and design, staffing numbers and organization, seclusion/restraint, medical records and other aspects of treatment programming.  The case resolved by settlement.

6

In 1988, he was retained by the Pennsylvania Attorney General's office in a case brought by an individual inmate.   Dr. Petrella concluded that the inmate did not need to be hospitalized in a mental health hospital and that the correctional programs and services were adequate for the inmate.   The federal judge in that case agreed with Dr. Petrella's recommendations and ruled in favor of the Commonwealth of Pennsylvania.

In 1989, Dr. Petrella was retained as an expert for plaintiffs in a lawsuit against New York City regarding the mental health care services in the corrections psychiatric wards at Bellevue Hospital and Elmhurst Hospital.   Again, he made several findings regarding problems with the quality of services including poor continuity of care, insufficient staff and delays in treatment.   The case resolved by settlement.

AO 72
(Rev 8/82)

**Defendants' Experts**

Louis L. Beermann, Ph.D.

        Louis L. Beermann, Ph.D., is the chief psychologist for
the California Department of Corrections.  He has worked for the
CDC since 1990.

        Dr. Beermann received his doctoral degree in psychology
from the University of Oregon in 1974, and he completed a
postdoctoral internship in clinical psychology.  He became licensed
to practice psychology in California in 1982.  From 1974 to 1977,
he was the chief of psychological services for the Nevada Division
of Mental Hygiene and Mental Retardation.  He was the director of
the Sierra Developmental Center for the Mentally Retarded from 1977
to 1979.

        From 1979 to 1980, Dr. Beermann was a service area
director for the California Department of Mental Health (DMH), and
from 1980 to 1981 he was the chief of forensic services for the
same agency.  From 1981 to 1983, he served as a special assistant
to the Deputy Director for Clinical Services for DMH.  From 1984 to
1989 he served as chief of research for DMH.  In that capacity, he
designed and implemented a research program to study mental illness
in California.  The program was replicated by the National
Institute of Mental Health and is currently known as the "Public
Academic Liaison" research program.  During this same period, he
also worked as a clinical consultant to the DMH Inpatient Program
at California Medical Facility and subsequently as the chief of the
Northern California Conditional Release Program.

Steve Cambra

        Steve Cambra is the Regional Administrator of the Central
Region of the Institutions Division of the California Department of
Corrections.  He has been in that position since 1992.  He is
responsible for nine prisons in the region; he supervises the
wardens of those nine prisons, as well as the Classification
Services Unit, the Correctional Case Records Unit, the
Transportation Unit and the Program Support Unit in the
Institutions Division.  He has worked for the CDC since 1970 and
has extensive experience in line and staff positions.  He has
worked at several prisons as well as in headquarters.

Joel Dvoskin, Ph.D.

        Dr. Joel Dvoskin is a clinical psychologist employed as
the Associate Commissioner for Forensic Services, New York State
Office of Mental Health.  In this position, he is responsible for
inpatient services at three large forensic hospitals and two

8

regional forensic units, including services to civil, forensic, and correctional patients. He is also responsible for all mental health services in New York State Prisons, and he has other community and local jail responsibilities.

In 1991, Dr. Dvoskin was hired as a consultant by Scarlett Carp & Associates. He worked with Henry Steadman, Ph.D. and Dennis Koson, M.D., to develop the mental health delivery system proposed in the Scarlett Carp report. He has acted as a consultant to approximately eighteen jurisdictions regarding the provision of mental health care to incarcerated persons.[47]/

Dennis F. Koson, M.D.

Dennis F. Koson, M.D. is a medical doctor licensed in Florida. He also has inactive medical licenses in Michigan, Pennsylvania and Massachusetts. Dr. Koson received his medical degree from the University of Michigan Medical School in 1972. He completed his residency in psychiatry at the University of Pennsylvania in 1975. In 1974-75, he was a Fellow in Law and Psychiatry at the Center for Studies in Social-Legal Psychiatry at the University of Pennsylvania as well as a registered auditor at the law school there. He is certified by the American Board of Psychiatry and Neurology and by the American Board of Forensic Psychiatry.

Dr. Koson has held several teaching positions, including a consultant position for the National Institute of Corrections, National Academy of Corrections for a course in suicide prevention in jails at the Nova Law Center in Fort Lauderdale, Florida. He has also held positions as a research assistant and as the Director of Research at the State of Michigan Center for Forensic Psychiatry.

From 1973 to 1975, Dr. Koson was a part-time psychiatrist at Haveford State Hospital in Haveford, Pennsylvania. From 1974 to 1975, he was the Co-Director and Director of Training at the Forensic Psychiatry Clinic at the University of Pennsylvania. From 1979 to 1980, he was the Assistant Medical Director at Bridgewater State Hospital in Bridgewater, Massachusetts. From 1979 to 1981, he was also an assistant psychiatrist at the Institute of Psychiatry and Law at McLean Hospital in Belmont, Massachusetts. From 1981 to 1982 he was a senior forensic psychiatrist at South Florida State Hospital in Hollywood, Florida.

---

[47]/ Dr. Dvoskin indicated that his curriculum vitae was appended to his declaration; it was not, so the court is unable to address his qualifications further.

AO 72
(Rev.8/82)

Dr. Koson has served as an expert for special masters and on behalf of parties in four class action lawsuits involving mental health services in corrections departments.   In connection with a class action law suit in Puerto Rico he assessed the correctional mental health system, created a remedial system, and has since been monitoring compliance with the plan and serving as a consultant to the federal monitor.   He is serving the same role in litigation in Florida.   He also served as an expert during similar litigation in Texas.   Finally, he served as a federal monitor overseeing compliance with a consent decree and providing consultation and technical assistance in a federal class action in New York State involving mental health services to female prisoners in administrative segregation.   He has also had extensive experience treating inmate patients in prisons and jails.

AO 72
(Rev 8/82)

Amelia A Craig
Heller Ehrman White and McAuliffe
333 Bush Street
Suite 3100
San Francisco, CA  94104-2878

Ismael A Castro
Attorney General's Office of the State of California
P O Box 944255
1515 K Street
Suite 511
Sacramento, CA  94244-2550

Karl S Mayer
California State Attorney General
455 Golden Gate Avenue
Suite 6000
San Francisco, CA  94102-2550

Catherine I. Hanson
California Medical Association
221 Main Street
San Francisco, CA  94105



                                    Jack L. Wagner, Clerk

                              BY: _____
                                    Deputy Clerk

United States District Court
for the
Eastern District of California
June 6, 1994


\* \* CERTIFICATE OF SERVICE \* \*


2:90-cv-00520


Coleman

·v.

Reagan

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  June 6, 1994, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

Donald Specter                          CF/JFM
Prison Law Office
General Delivery                        SJ/LKK
San Quentin, CA  94964

Warren E George Jr
McCutchen Doyle Brown and Enersen
Three Embarcadero Center
Suite 1800
San Francisco, CA  94111

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Sidney Wolinsky
Disability Rights Advocates
1999 Harrison Street
Suite 2020
Oakland, CA  94612-8644

Richard L Goff
Heller Ehrman White and McAuliffe
333 Bush Street
Suite 3100
San Francisco, Ca 94104-2878