FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA   MAR 1 2 1996

RALPH COLEMAN, et al.

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

**Plaintiffs,**

**vs.**                          **No. CIV S-90-0520 LKK JFM P**

**PETE WILSON, et al.,**

**Defendants.**

## FIRST REPORT OF THE SPECIAL MASTER ON
## THE REMEDIAL PLAN

The purpose of this report is to chronicle for the
court progress to date in the development of the defendants'
plan for remedying the deficiencies in mental health
services identified in the June 6, 1994 Findings and
Recommendations in this case. The court's order on
timelines, dated February 7, 1996, directed the master to
review plans, protocols, forms and other applicable
documentation on mental health screening procedures for new
admissions and readmissions to the California Department of
Corrections (CDC); on training programs for staff on how to
recognize and respond to mentally ill inmates; on
arrangements for providing prompt inpatient hospitalization,
when needed; and on the use of 37mm guns on mentally ill
inmates. The expectation was that, at the conclusion of the

671

first thirty days of review, the master would have worked
out with the parties mutually acceptable plans in each of
the four areas for submission for final judicial approval.

The master has reviewed the materials submitted by
the defendants, as has his mental health expert.  The master
has also discussed these materials with counsel for
plaintiffs and with the defendants.  Before launching into
an analysis of the defendants' progress to date in crafting
a remedial plan in each of the four areas designated for
review in this first report, it may be useful to briefly
outline the CDC's overall strategy for the improvement of
its mental health services.

Beginning in mid-1994, the department undertook
implementation of its plan, based, with modifications, on
the recommendations that emerged from the <u>Mental Health
Service Delivery System Study:  Final Report</u>, dated February
16, 1993, the so-called Scarlett Carp Report, compiled for
the department by the Western Consortium for Public Health
and Scarlett Carp and Associates.  The defendants' plan
calls for the delivery of a continuum of mental health
services, including long-term inpatient care (provided
through the department's contract with the California

2

Department of Mental Health), short-term inpatient care (the department's Mental Health Crisis Bed program), intensive oupatient care (the Enhanced Outpatient program) and routine outpatient care (the Correctional Clinical Case Management program). Delivery of this combination of programs has been decentralized through the establishment of service areas consisting of clusters of institutions that will provide, within each cluster, a continuum of the four tiers of service, including access to long-term inpatient care through DMH. Initial entry to the service continuum will be provided primarily through a uniform screening process established at the department's reception centers beginning in July, 1994.

The system thus briefly described is still in the process of implementation. Many of the components of the overall plan are in place but, for some services, only in some institutions. The present estimated target date for the implementation of all of the system's components in all of the department's institutions is mid-1997.

The evolving nature of the defendants' system has some important implications for the master's work in this case. As with the implementation of new methods for

providing traditional services in any large bureaucratic
entity (and correctional bureaucratic entities do not get
any larger than the CDC), the process here is subject to
fits and starts.  Scheduled events do not all occur
precisely on time, nor do all of the plans work in exactly
the way contemplated; schedules slip and slide, and plans
are re-worked.  The master's intervention occurs in the
midst of all of this, and it is in the interest of neither
the court nor the parties for that intervention to introduce
premature rigidity into the implementation process.  The
defendants' ability to shape the best possible system for
the delivery of care needs to be safeguarded, while, at the
same time, judicial pressure for immediate improvement must
be maintained.

There are, moreover, some key issues in this case
that need to be analyzed on the basis not just of plans, but
also of experience.  An example of such an issue, and one
that will be discussed in more detail below, is the
definition of the population in CDC institutions eligible
for mental health treatment and services.  This means that
some aspects of the defendants' plans for the delivery of
mental health services are not yet ready for judicial

endorsement.   Indeed, the finalization of plans for some
such issues ought not to occur until there has been an
opportunity to assess the practical impact of the proposed
theoretical remedy.

With this understanding in mind, what follows is
an analysis of each of the four areas designated for review
in this report:

1.   **Reception screening**

Criticism of the defendants' screening of
inmates for potential mental health service needs in the
June 6, 1994 Findings and Recommendations focused primarily
on the absence of a standardized screening process or
instrument in the department.   Institutions differed widely
in the nature and extent of the screening they conducted,
and some institutions performed the screening function so
poorly that many inmates were never screened at all, while
others with serious mental disorders were never effectively
identified.

The defendants recognized early that an effective
department-wide screening process was the essential
cornerstone for a successfully revamped mental health
delivery system, and made the development of such screening

a priority.  The immediate focus was on the initial
reception of new and readmitted inmates in CDC.  The
defendants have not yet addressed the issue of screening
inmates transferred inter-departmentally among CDC
institutions.  At this point, consequently, the master's
review focuses solely on the reception screening process.

        To provide the master and plaintiffs with
information on the reception screening process, the
defendants submitted for review its <u>Mental Health Services
Delivery System Program Guides</u> (particularly, the chapters
on program overview, levels of care and reception center
assessment); the <u>Mental Health Reception Center Tracking and
Data Collection System</u>; the <u>Program Plan for Reception
Center Assessment for Mental Health Needs</u>; a June 21, 1994
memorandum on Mental Health Reception Center Training; and
the <u>Mental Health Screening Interview</u> instrument.

        It needs to be noted immediately that the
reception screening process described in these documents
represents a vast improvement over the screening procedures
described in the findings and recommendations.  The
documents call for a uniform multi-tiered screening process,
utilizing a common screening instrument administered by

mental health professionals.  In the view of the master's expert, as well as the plaintiffs', the Offender Profile Report, the screening instrument, appears to be an effective one.

It is not yet time, however, to urge the court's overall approval of the present screening process.  The defendants are currently assembling requested information responsive to questions from the plaintiffs and master about some aspects of the process, including the following:

a.  The documentation provided by the defendants, as well as their statistical reports, suggests that some incoming inmates are not screened.  The percentage of inmates missed is small, less than three percent, but the absolute number is not insubstantial, some 3500 inmates over the period from mid-July, 1994 to mid-February, 1996.  It is important to know who is missed and why, and what happens to them.  The master has requested the defendants to provide departmental or institutional protocols indicating how the department deals with this segment of the population.

b.  The documentation also suggests that some inmates are transferred before they receive or complete a scheduled psychological evaluation.  Again, there is a need

to determine what happens to these inmates.  The defendants
are gathering the appropriate protocols on this category for
the master.

c.  The documentation identifies a category
of individuals who are unwilling to participate in the
screening process, without indicating what happens to them.
While there is apparently an effort to get these individuals
together with a mental health professional, the master has
requested institutional or departmental protocols
appropriate to the handling of this population.

d.  The master has also requested
departmental and institutional protocols for protecting the
confidentiality of mental health information collected
during the screening process.  Confidentiality is involved
in two ways during the screening process.  First, there is a
concern over the extent to which a seriously mentally
disordered inmate may be required to affirm publicly his or
her condition, particularly during the bus screening, in
order to obtain access to the defendants' mental health
services delivery system upon initial entry into the CDC.
While the documentation reports a requirement for privacy in
the psychological screening and the full evaluation, it is

unclear whether any degree of privacy is accorded during the
bus screening.

A second concern about confidentiality springs
from the defendants' development of a management information
system for mental health assessments. While the development
is to be applauded, it also raises the risk of breaches of
confidentiality in direct proportion to the accomplishment
of its goal, i.e., getting information about an individual's
mental health into as many hands that have a need to know as
possible. Always a danger in the correctional context is
the granting of access to fellow inmates and others, with no
need to know, to information about the mental health
problems of their peers.

Before the master is in a position to endorse
fully the defendants' screening process, he must review the
requested protocols and procedures relative to all of these
aspects of the process. These documents were not requested
until the end of the review process, and the defendants are
not to be faulted for providing them in an untimely manner.

There is another critical issue which must be
addressed before the screening process can be fully
approved. The objective mental health condition the

screening seeks to identify is just as important as the
screening process itself.   The defendants have articulated
in their screening process plans the serious mental health
problems they seek to identify and treat.   The breadth of
the criteria adopted for that definition is the engine that
drives much of the mental health system, for the whole issue
of resources depends directly on what the defendants
recognize as their obligation to treat.

On the basis of its reception center screening
experience over the past nineteen months, the department has
calculated the incidence of serious mental disorders in its
screened population to be 4.91%.   That figure is lower than
anything in the record of this case would have led one to
expect and surprises both the plaintiffs' and the master's
experts.   This is not meant to signal a rejection of the
defendants' number and the criteria on which it is based,
but simply indicates that there needs to be a careful
analysis and evaluation of the impact of both the number and
the criteria on the constitutional adequacy of the mental
health services provided by the defendants to the CDC
population.

In summary, the master is encouraged by the improvements in screening introduced by the defendants. He will begin review of the additional and recently requested materials on screening as soon as they are provided and continue to work with his experts and the parties to analyze and assess the appropriateness of the defendants' eligibility criteria for the treatment of serious mental disorders.

2. **Staff training**

One consequence of a derelict screening process is the burden it places on custodial staff to manage a population riddled with unidentified seriously mentally disordered inmates. One of the central deficiencies in the defendants' mental health care system identified by the court in the 1994 findings and recommendations was the inability of untrained custodial staff to deal with the results of a failed screening system. Unable to differentiate between the behavior of mentally ill inmates and the calculated rebellion of personally responsible prisoners, custodial staff not untypically responded to both with the same punitive measures, often with disastrous results for the mentally ill. There was no effort on the

part of many staff, untutored in the basic concepts of mental illness, even to consider whether an inmate's behavior was related to decompensation associated with a serious mental disorder.

There is an inescapable tension in corrections between the administration of institutional discipline and sensitivity to the mental health needs of some elements of the incarcerated population.  The trial record in this case testifies eloquently and starkly to the results of neglecting the mental health side of this balance or tension.  The defendants' introductory overview of their new mental health structure states concisely the other side of the balance in what is described as a key concept in the design and administration of their mental health services delivery system:

> To deliver services not only to promote mental health, but also to develop and reinforce individual responsibility, with the basic premises that mental illness does not necessarily excuse individual responsibility and accountability, that achieving clinical goals is enhanced by a therapeutic emphasis on responsibility for one's own behavior. (MHSDS Program Guide Overview, p. 3)

The tension expressed here is hardly unique to corrections.  There is just as much controversy over issues

of personal responsibility and accountability in the general
community as there is in corrections.  But the social
consequences of the deinstitutionalization of mental health
care have had profound impact on corrections and the nature
of the incarcerated population.  However large the
proportion of the prison population with serious mental
disorders may be, and there is disagreement over the size of
that proportion, it is generally recognized that there are
today more mentally ill inmates housed in prisons than there
used to be.  The need for a trained staff, capable of making
difficult and instant decisions about discipline for both
mentally ill and fully responsible inmates, is more
imperative than ever.

If the emphasis here seems unduly focused on
discipline and control, it is because behavioral control is
at the very core of the relationship between custodial staff
and inmates.  The choice of methods by staff in applying
force to counter and control disruptive behavior, whether
those choices involve the use of force in the form of
weapons, physical restraints or the employment of isolated
confinement, is largely responsible for the court's
involvement in this case.  It is the careless application of

brute force by custodial staff, either indifferent to or
ignorant of inmates' mental illness, that shocks the
conscience of judicial observers.  Perhaps the greatest
challenge to the defendants' implementation of a truly
effective mental health delivery system will be instilling
in line staff an habitual readiness to recognize mental
illness and respond accordingly in the disciplinary context.

          That is perhaps a more elaborate background than
necessary for consideration of the training materials on
mental illness developed by the defendants for custodial
staff.  Those materials are quite good.  They include
training modules on the recognition of mental illness in
inmates and on the defendants' system for providing care for
those identified as mentally ill.  There is also a training
program for custodial staff on their role in suicide
prevention.  Each training course provides lesson plans,
visual aids, study materials for trainees, tests and a
course evaluation.  The materials are thoughtfully
constructed both substantively and pedagogically.

          Plaintiffs and the master's expert suggest some
additions to the materials, which the defendants have agreed
to review and consider.  Those suggestions do not fault the

present materials, but rather reflect a concern that some
topics and situations may not be addressed with sufficient
clarity or at sufficient length.  Some such topics include
malingering, decompensation and the effects of psychotropic
medications.

        The plaintiffs, in addition, express deep and
continuing concern over the adequacy of the defendants'
training of custodial staff in the application of force
against the mentally ill in the disciplinary context.  It is
the master's understanding that use-of-force issues will be
addressed in the defendants' response to the requirements of
paragraphs 11 and 12 of the remedy, relating directly to
segregated housing and the use of restraints.

        The master will work with the defendants to seek
to incorporate the suggested additions into the training
materials and begin to assess the defendants' success in
delivering this approved training in all of their
institutions.

### 3.  Prompt inpatient hospitalization

        At the time of the 1994 findings and
recommendations, the defendants relied on the Department of
Mental Health (DMH) to provide inpatient mental health care,

primarily in beds located at the California Medical
Facility, Vacaville (CMF) or Atascadero State Hospital
(ASH).  When a mental health clinician in a general
population institution determined that an inmate needed
long-term inpatient care, the inmate would be transferred
either to CMF or to California Men's Colony (CMC) where an
evaluation would be conducted to confirm the referring
clinician's recommendation.  Once evaluated as requiring
hospitalization, the individual would then be put on a
waiting list for transfer to a DMH facility.  Once
transferred, DMH clinicians would conduct their own
evaluation to determine whether long-term inpatient care at
a DMH facility was necessary and appropriate.  This multi-
tiered evaluative process was further complicated by the
needs of the department's classification system, whose
approval and cooperation in securing transportation was
necessary for each movement.  In addition, staffing
shortages at CMF and CMC sometimes short-circuited the
evaluation process and backlogs would develop. In the
meantime, the inmate-patient would be consigned to a crisis
bed in an infirmary, where interim care depended on the
extent and availability of local mental health resources,

which were chronically over-taxed.  The process was fraught
with delays, and backlogs of inmates awaiting evaluation and
transfer to the next step in the long progression to DMH
cyclically waxed and waned.

     To address this problem, the defendants have
created their own Mental Health Crisis Bed (MHCB) program
for short-term inpatient care to supplement their
traditional relationship with DMH for long-term inpatient
care.  The plan envisions that each service area or regional
cluster of institutions will have at least one crisis bed
unit, licensed as a correctional treatment center, to
provide up to a ten-day stay for the purpose of stabilizing
seriously mentally disordered inmates undergoing a crisis.
It is envisioned that eventually each MHCB program will have
the capacity to evaluate the treatment needs of inmates and
make arrangements for transfer directly to DMH for long-term
inpatient care, should such care be indicated.

     Because the development of local MHCB programs in
the regional service areas is still underway, the defendants
currently continue to funnel all male inmates for whom long-
term inpatient care has been clinically prescribed through
CMF or CMC.  Female inmates slated for DMH inpatient

hospitalization, usually provided at Patton State Hospital,
continue to be processed through the California Institution
for Women (CIM)  The system, then, is still in transition
from the operative routine of 1994 to the process envisioned
when the service area delivery structure is fully in place.
The defendants assert that, while the procedures remain
largely unchanged from 1994, the mental health resources
available within the department have increased substantially
and now suffice to keep evaluation backlogs well within
acceptable limits, at least at CMF, CMC and CIW.

        The defendants provided the master with a copy of
the FY 1995/96 Interagency Agreement between the CDC and
DMH, which together with its attached memoranda, describe
the terms of agreement under which DMH commits to provide
inpatient mental health care for CDC inmates.  While this
document has not yet been executed by the respective
departments, due to a continuing difference over the funding
of raises for DMH personnel, the terms contained in the
agreement apparently govern the conduct of their
relationship.  Close review of the agreement and its
accompanying memoranda suggest that some of the procedures
for the movement of CDC inmates in need of long-term DMH

inpatient care have been expedited since 1994.  For example,
some of the documentary requirements for the referral
summary have been deleted; DMH has only five working days
within which to review and decide on a referral; a swifter
appellate process for rejections by DMH has been created.
The inter-agency agreement has also been adjusted to respond
to projected changes in the defendants' mental health
services delivery system, and there are references to
transfers from hub facilities in the new service areas.

The contract between DMH and CDC, however,
provides little information about resolution of the court's
principal criticism of inpatient care in 1994, namely, the
lack of timeliness with which long-term inpatient care was
provided to seriously mentally disordered inmates.  The
master has requested the defendants to submit departmental
protocols currently governing referrals and transfers of
inmate/patients clinically identified as needing long-term
inpatient care both within the department and between CDC
and DMH.  Such protocols will spell out the rules,
timelines, appellate processes and the role of
classification applicable to transfers from general
population facilities to hub facilities with a MHCB program,

from hub facilities to CMF, CMC or CIW, and from CMF, CMC
and CIW to DMH.  The particulars of these protocols are more
likely to describe the current timeliness of access to DMH
inpatient care than the terms of the inter-agency agreement.
Again, as in the case of the screening materials, the
master's request for these additional documents did not come
until the end of the review period, and the defendants are
even now in the process of responding to the request.

Because the issue of delayed access was so central
to the court's condemnation of procedures for providing
inpatient care, approval of the defendants' current and
interim policies for moving inmates through the internal
departmental mental health structure and then on to DMH will
not settle this issue.  Final approval here means
affirmation of plans and protocols that will govern the
completed system once the defendants have implemented fully
their reorganization for the movement of affected inmates
from general population facilities to service area hubs to
DMH.

The master will begin review of these recently
requested protocols as soon as the defendants make them
available, and begin institutional monitoring of existing

procedures for the transfer of CDC inmates to DMH for long-term inpatient care.

### 4.  Use of 37mm guns

The last of the four items for review in this first cycle of issues involves the defendants' use, or non-use, of 37mm guns to control the behavior of inmates with serious mental disorders.

The defendants provided the master with two memoranda to wardens to describe the department's current policy on the use of 37mm guns.  The first memorandum, dated June 17, 1994, describes three different types of projectiles available for the 37mm gun, which are made respectively of wood, hard rubber and dense foam.  The June 17 memorandum reports that, after operational analysis, use of the wooden and hard rubber projectiles is to be confined to "large, open spaces, i.e., exercise yards, day rooms, dining halls."  Henceforward, directs the memorandum, wooden and hard rubber ammunition:

> "will no longer be authorized for use in
> confined spaces or narrow spaces, such
> as hallways, cells, holding cages and
> cell block tiers, with the exception
> that the 264R (hard rubber) round is
> authorized for barricade removal, e.g.,
> a mattress.  Round must be fired at the
> barricade and not at a person."

The memorandum goes on to identify a third and new ammunition, the dense foam round, as the projectile now approved by the department for use in cell extractions and other close range applications.  This early memorandum nowhere addresses the issue of the appropriateness of the use of 37mm guns or any of the different available projectiles on mentally ill inmates.

The  second memorandum, dated February 28, 1996, begins by specifically banning the use of the dense foam projectile against seriously mentally disordered inmates. It then reaffirms the policy articulated in the June 17, 1994 memorandum, directing that the wooden and hard rubber rounds:

> "will continue to be an option for use against inmates to gain control of a disturbance in large open spaces, which includes but not limited to dayrooms, dining rooms, exercise yards, and open work areas, for incidents involving multiple inmates who may or may not be known to be identified as seriously mentally disordered."

A somewhat cryptic explanation follows, applying "this ban" only to seriously mentally disordered inmates and to all of the different rounds available for the 37mm gun, "except in emergencies."  It is the master's understanding

22

that the defendants have intended in these two memoranda to
ban entirely the use of the 37mm gun against seriously
mentally disordered inmates except in efforts to quell a
general disturbance in an open area, where it is neither
possible nor practical to separate out seriously mentally
disordered inmates from those who are not seriously mentally
disordered.

If the master's understanding of the defendants'
policy is correct, that policy seems to address adequately
the court's concerns in regard to the use of 37mm guns.  The
master's task now is to determine whether that policy is so
understood and applied throughout the department.

### Summary

The master, then, is encouraged by the defendants'
progress in the development of a uniform reception screening
process.  While some of the procedural aspects of that
process still need to be assessed, the master is ready to
begin evaluation of the extent to which the defendants have
actually implemented the process at each of their reception
centers.  In the course of this evaluation, and also during
review of the next cycle of defendants' remedial plans, the

issue of the definition of the CDC population eligible for treatment will be examined further.

With regard to staff training, the master will work with the defendants to improve the adequate training materials developed so far, and begin to assess the extent to which the training has been institutionalized within the department.

Because the inter-agency agreement between DMH and CDC prescribes rules for only the last step in providing long-term inpatient care, and because, additionally, the department's own procedures for handling inmates with a need for long-term inpatient care are in transition, talk of judicial approval is now premature. The master will review the defendants' documentation describing present procedures and assess through observation the extent to which these ensure adequate access to needed inpatient care as the defendants work to implement fully their new mental health services delivery system.

Lastly, the master endorses the defendants' policy on the use of 37mm guns, and will begin to review its implementation in the defendants' institutions.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

March 11, 1996

mastering/1planrpt.doc

25