FILED

APR 17 1996

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

      Plaintiffs,

   vs.                No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

      Defendants.

## SECOND REPORT OF THE SPECIAL MASTER ON REMEDIAL PLANS

      This second report on the defendants' plans for remedying the deficiencies in mental health services articulated in the June 6, 1994 Findings and Recommendations focuses on staffing issues and the recruitment of mental health staff.

**Background**

      The master's initial report wrestled inconclusively with some of the problems inherent in evaluating a system in flux. The California Department of Corrections (CDC) adopted in 1993 a modified version of the overall plan for the delivery of mental health services proposed by their consultants in the so-called Scarlett Carp Report. According to that plan, the department's mental health services, largely centralized historically in the

678

California Medical Facility (CMF), the California Men's Colony (CMC) and the California Institution for Women (CIW), were now to be regionalized in clusters or service areas that would offer within a much smaller geographical compass a full continuum of services ranging from outpatient care in the general population to beds for short-term crisis situations. Long-term inpatient care for acute cases would continue to be provided through a contract with the State Department of Mental Health (DMH), and an array of extended outpatient programs, including residential programs, would be offered in the service areas. There was a commitment to keeping inmates with serious mental disorders out of geographically remote facilities, but the regionalization of services meant that a full spectrum of mental health services would be available, where necessary, everywhere in the system within a matter of hours. The fundamental purpose of the reorganization was to make mental health services significantly more accessible. One of the principal indictments that permeated the June 6, 1994 Findings and Recommendations was that mental health services in the CDC were often inaccessible to inmates in need.

While the Scarlett Carp Report recommended the creation of 17 regional clusters, the department elected eventually to establish 12 service areas, but the basic concept of a regionalized delivery mode was preserved. Similarly embraced was a commitment to the provision of a full range of services within the geographically dispersed service areas. As indicated in the master's first report, the defendants began implementation of the reorganization plan with the introduction of a uniform screening process for newly admitted inmates at its reception centers in mid-1994. Over the course of the next three years all of the other elements of the plan, with the exception of program elements in two institutions, were, and are, to be gradually integrated into the department's institutions, with completion of the implementation scheduled during the 1996-97 Fiscal Year (FY), which ends on June 30, 1997. (See Attachment 1 for a matrix showing the implementation schedule for the different programs in all of the department's institutions.)

**Staffing and Staffing Ratios**

Because this second report focuses on staffing issues and the defendants' ability to provide sufficient

resources to make mental health services broadly accessible
to inmates with serious mental disorders, the master
requested from the defendants information on current
formulas for staffing, data on actual current staffing and
vacancies and materials related to the department's
recruiting efforts in the mental health field.  The
materials provided by the defendants in response revealed,
again, a system in transition and confirmed the difficulty
that emerged initially during review of the first round of
issues.  It turns out to be extremely difficult to assess
the efficacy of a plan for providing services that is only
partially complete and subject to intervening vicissitudes
of population, budgeting, recruitment and overall
leadership.  Indeed, the very materials provided to
demonstrate the current status of the system describe
anticipated goals as often as present realities.

Further complicating the effort to ascertain
staffing resources currently available in the department's
mental health care delivery system is the description of
those resources in budgetary terms, or as authorized
positions.  Budgetary authorization, say, for a
psychiatrist's position in program X in institution Y, as we

all know, does not necessarily mean that a living, breathing
psychiatrist is actually at work in program X in institution
Y.  Even more confusing are those positions authorized
contingently, based on an anticipated expansion in the
population.  Occupants for these positions apparently are
not hired until the close of the fiscal year in which their
potential need has been realized.  Such considerations make
it difficult to analyze accurately the immediate dimensions
and composition of the defendants' institutional mental
health staff based on budgeting documents.

The defendants' 1995/96 staffing allocation plan,
in any event, calls for a mental health delivery system with
a total of 591.8 positions at the end of the current fiscal
year in June, 1996.  (Attachment 2 provides excerpts (pp. 17
and 18) from the department's current Staff Allocation Plan
1, which give staffing allocation figures for institutions
in Service Area L, as well as summary figures for the whole
system.) That projected total is exclusive of the
department's already approved request for any increase based
on an anticipated growth of population of up to 151,000
inmates by the end of this fiscal year.  The population of
the CDC as of April 7, 1996, was 138,622.

At the time of trial, the then applicable 1992-93 FY budget authorized 376.6 mental health care positions to serve an inmate population of 113,000. The latest budget figures reflect an increase of 215.2 positions (57 percent) during the intervening three years. That is a substantial increase, but as the court pointed out in the June 6, 1994 Findings and Recommendation, the Scarlett Carp Report estimated that the proposed decentralized reorganization would require 340.8 new mental health positions, over and above the 1992-93 budget allocations, and even that estimate was based on an anticipated population of only 119,000 inmates. Since then, the defendants have modified the Scarlett Carp Report recommendations by, for example, reducing the number of clusters or service areas from 17 to 12, which surely will result in some staff savings. Moreover, the defendants' evolving budget request for FY 96-97 seeks 22 more mental health care positions to complete the introduction of the reorganization. That would give the department a total of 613.8 positions (591.8 plus 22.0), 104.4 positions less than the figure recommended in the Scarlett Carp Report for implementation of the reorganization it proposed (376.6 plus 340.8, or 717.4).

Further confusing the calculations are those
requests for additional mental health staff based on
projected population increases.  The FY '95-96 budget
approved a further 45.44 positions, contingent on a
projected rise of the population to 151,000 by the end of
the fiscal year (see Attachment 3), while the currently
proposed FY '96-97 budget approves a further 80.5 positions,
contingent on an increase in population to 160,000 by the
end of June, 1997 (see Attachment 4).  It now appears
unlikely that the population will hit 151,000 by the end of
the current fiscal year, and it is not clear from available
budgetary documents whether any increment of the population
based-allocation will kick in if the population remains in
the 140,000 range.

Another body of materials provided by the
defendants gives a slightly different perspective on the
staffing situation.  In order to manage more closely the
department's recruitment of mental health care personnel,
CDC generates a monthly, summary report on the status of
unfilled vacancies in authorized positions (see Attachment
5).  This document suggests that, as of March, 1996, 609.9
positions were authorized in the defendants' mental health

7

delivery system.  Disregarding the puzzling discrepancy in the number of authorized positions, which remains for the moment unexplained, the same document reports that 76 of these authorized positions were vacant.  Overall that represents just over a 12-percent vacancy rate, a respectable figure.  Nearly 65 percent of the vacancies (48.6 of the 76), however, are confined to psychiatrists and psychologists, the bellwether clinical positions in the system.  While the vacancy rate among psychiatrists and psychologists together in the CDC is 17.5 percent (48.6 vacancies of 277 positions), the vacancy rate among psychiatrists alone is just a shade under 25 percent (27 of 108.6).

       It should be clear from all of this that the numbers alone present some uncertainties about exactly where the defendants presently stand in their struggle to provide accessible care to seriously mentally disordered inmates.  It is also difficult, at least on the basis of materials provided thus far, to fully understand the rationale that underlies the department's numbers.  It is clear that the defendants have accepted as a point of departure the prevalence figures that emerged from the Stirling Report,

compiled in the late 1980's in response to a legislative
mandate to "collect information necessary to better
understand the dimensions of the [mental health] problem [in
CDC]."   That Stirling Report concluded:

> Prevalence rates of mental disorders in California
> prison and parole populations are substantial.
> Using conservative operationalizations of the
> statutory definition of SMD embodied in Penal Code
> Section 2960 (i.e., including only major disorders
> involving thought disorder, serious emotional or
> perceptual disturbances, and/or cognitive
> disabilities) leads to the conclusion that about
> 15 percent of the resident prison population is
> diagnosable on a lifetime basis.  <u>Based on reports
> of recent symptoms by this group, eight percent of
> the population</u>, in the order of 5,000 inmates in
> 1988, <u>may be at any given time in need of
> psychiatric treatment, evaluation, or monitoring
> for serious mental illness.</u>
>
> <u>Current Description, Evaluation, and
> Recommendations for Treatment of Mentally
> Disordered Criminal Offenders:  Volume I:
> Introduction and Prevalence</u>, N&C/AY/SCC
> Consortium, June, 1989, at p. ii-15.   (Emphasis
> added).

When the next generation of consultants, those
associated with the Scarlett Carp Report, assessed the
future likely mental health needs of the CDC, they did not
simply endorse the Stirling Report's eight percent figure.
(See Attachment 6, which provides Table 5.1 from the
Stirling Report, which gives the 7.9 percent figure used
currently by the defendants, rounded off to eight percent in

the narrative paragraph quoted above.)  Accepting, with some
reservations, the earlier study's use of diagnostic groups
to determine basic prevalence rates, the Scarlett Carp group
added a functional impairment analysis to each diagnostic
category, based on the GAF (Global Assessment of
Functioning) scale, in order to determine, more reliably,
likely treatment needs.  The result was a matrix setting out
anticipated percentages of the population at the different
levels of functional impairment within each diagnostic
category.  For example, among male CDC prisoners, the
Scarlett Carp Report concluded that 11.07 percent of the
male population both falls within a diagnostic category
earmarked for treatment and suffers from serious functional
impairment (see Attachment 7).

        The Scarlett Carp team then used these figures to
calculate the kind and quantity of mental health care
services that would be needed for each clinically relevant
group, based on a continuum of care that included screening,
assessment, diagnosis, crisis intervention and
stabilization, inpatient hospital care, residential care,
outpatient services, pre-release services and parolee
clinical services.  In a final step, Scarlett Carp applied

10

its analysis of mental health service needs to the
department's projected future admissions, population and
releases, resulting in an estimate of the percentage of CDC
inmates needing the different types of services on any given
day (see Attachment 8).

The resulting calculations seem to dwarf that 7.9
or eight percent figure generated by the Stirling Report,
but Scarlett Carp concluded its analysis with the following
significant caveat:

> Also it should be noted that the estimates
> represent 100 percent of the need.  Few, if any,
> systems of mental health care ever attempt to meet
> the total need in any community or any
> correctional system.  A 1990 study entitled
> "Community Mental Health Needs Met by Local and
> State Hospital Services in California" (Meinhardt,
> Spitznagel, and Jerrell, 1990), which also uses
> the DIS to estimate prevalence of mental illness
> among California citizens, indicates that the
> percentages of adults predicted to suffer from
> schizophrenia, bipolar psychosis, and major
> depression, for example, who actually received
> treatment, are 34.5, 14.6, and 3.16, respectively.
> Therefore, the estimates of need for the
> California prison population provide the starting
> point for this planning effort.  They are the
> upper limits and should not be considered
> realistic goals, unless the California Department
> of Corrections is held to a standard higher than
> that required for the greater community of
> California and probably achieved nowhere else in
> the United States.
> Mental Health Service Delivery System Study:
> Final Report, Western Consortium for Public Health
> in association with Scarlett Carp and Associates,
> February 16, 1993, at p. xi.

11

That caveat, by inserting a highly subjective and non-specific pea under the mattress of the preceding prevalence analysis, raises an important question.  When the Scarlett Carp group developed its proposal for the defendants' mental health service delivery system, how did it determine what levels of service and care were appropriate?  The answer to that question is not entirely clear.  After citing the need for devising a system that passes constitutional muster, the study urged the adoption of a level of care comparable to, but not in excess of, that available to the general population in the community. Beyond that, the report identified as a guiding principle the concept of reasonable access to care, defined as "timely, responsible, and adequate care provided by qualified (and appropriately licensed) staff."

The Scarlett Carp Report, thus, falls short of providing the clear, quantifiable and objective goals that would make judgments in this case so much easier.  The defendants, in order to cope more effectively with that supremely objective administrative tool, the budget, return, not surprisingly, to the Stirling Report's eight-percent figure.  For all of Scarlett Carp's concern about and

refinement of that number, its principal attraction, at least for the defendants' administrative planning purposes, is its objective and quantifiable character.

It is instructive that the Scarlett Carp Report identifies reasonable access to care as the key criterion for the creation of an effective mental health care delivery system, the same factor that was central to the court's condemnation of the department's system in 1994. It may well turn out that the only reasonably objective way to evaluate the defendants' plans for complying with a constitutional standard for mental health care is to evaluate how well those plans actually provide such access.

One other complication needs to be mentioned before leaving the subject of staffing. The department's current staffing plan allocates 126.1 positions for the provision of mental health services at CMF. That reflects the fact that CMF has traditionally been the northern hub of the defendants' highly centralized system for providing mental health care. A significant portion of all of the inpatient and acute-care beds provided under contract by DMH to CDC are also located there. In addition, the Gates case has obligated the department to maintain levels of staffing

commensurate with the quality of care the defendants agreed to provide in the consent decree in that case.

Under the Scarlett Carp reorganizational proposal, CMF, together with CSP, Solano, was to form one of 17 regional clusters.  This Cluster 5 was to have 16 crisis beds, 100 residential outpatient beds and other outpatient services, with a total mental health staff of 41.0 slots. The department's modification of the Scarlett Carp plan combined proposed Clusters 5 and 6 into one Service Area D, now embracing CMF, Solano, San Quentin and Deuel Vocational Institution.  (See Attachment 9 for a reconciliation of the proposed Scarlett Carp clusters and current CDC service areas.)  Under the modification, CMF is scheduled to provide only residential and non-residential outpatient services; Solano and San Quentin will be providing crisis beds for the service area.  The department projects a total of 14.5 mental health positions for CMF, when the reorganization is complete.  (See Attachment 10 for the defendants' staffing allocation plan for Service Area D.)  Here is how the Scarlett Carp proposal saw the transition occurring from the presently centralized version of service delivery in the three major hub facilities to the decentralized version:

> Maintain the existing Enhanced Outpatient Programs
> at CMF, CMC, and CIW at their current levels until
> implementation of the service delivery system at
> the cluster level reduces the number of transfers
> to these institutions and reduces the demand for
> the current number of beds.  The cluster concept
> would be phased in at the above clusters (Ed:
> I.e., CMF, CMC and CIW) as the demand for beds is
> reduced to the projected levels.
> <u>Scarlett Carp Report</u>, at p. 115.

The problem is that a substantial proportion of
the department's current mental health staffing resources
(21.3 percent, 126.1 of 591.8, or 20.6 percent, if you use
the 609.9 figure) is frozen into place at CMF.  The
department had expected gradually to shift all but 14.5 of
those positions to other facilities, where, it was
anticipated, in accordance with the Scarlett Carp scenario,
their employment would begin to reduce the number of inmates
being transferred to CMF.  It is difficult to see how the
transition pictured in the Scarlett Carp report could have
occurred without some serious, albeit temporary,
dislocations, but the commitment of staff to CMF, due
primarily to intervening judicial events, has grown
enormously since the Scarlett Carp study was compiled and
now constitutes an unforeseen and substantial proportion of
overall resources.

The defendants' current budget request for FY '96-97 addresses this problem by seeking from the legislature authorization to create 103.5 mental health positions of "limited duration" to take the place temporarily of positions that would have been relocated from CMF to other service areas.  (See Attachment 11, which is Attachment F to CDC's FY '96-97 Budget Change Proposal.)  In the absence of some sort of resolution of this issue, implementation of the reorganization plan will inevitably stall.

If access to mental health care is the fundamental criterion for evaluation of the defendants' plans for the provision of constitutional mental health care, the sufficiency of the defendants' formula for staffing, and the staffing itself, will stand or fall on whether inmates with serious mental disorders have access to competent mental health care when they need it.  There is simply not enough information currently available to the master and his experts either on the plans and a rationale for delivering such accessibility or on the resources currently available throughout the system to pass meaningful judgment on the issue of accessibility.  I have requested from the defendants a detailed breakdown of each category of mental

health staff by program, institution and service area, matched with a current and projected population and individual program census by each institution in the CDC system. While much of this information is available in disparate sources, there is no existing single document that brings it all together. The defendants are working to generate such a product(s). Meanwhile, they have provided detailed job descriptions for mental health staff positions, which the master's experts are now reviewing, as well as other material on their rationale for staffing allocations.

In their responses to the master's requests for additional information, it has become clear that the defendants' staffing numbers for the various program elements in their overall delivery system do not simply reflect mechanical applications across the board of an eight percent formula. Staffing for different programs responds to a variety of criteria. Allocations for positions in the department's Mental Health Crisis Bed Program, for example, are driven by Correctional Treatment Center (CTC) standards, derived from California statutes and regulations. Other allocations for outpatient caseloads and residential outpatient programs are based more subjectively on

administrators' analyses of historical population trends and mental health patient profiles.  As indicated, the defendants have recently provided the master with materials relevant to the development of such formulas, such as, e.g., the regulations governing CTCs.

As implementation of their overall reorganization proceeds, the defendants are beginning to recognize that actual demand for some programs does not match expectations and see, already, the need for adjustments.  One of the operative assumptions of the Scarlett Carp analysis, incidentally, was the recognition that objective data based on actual experience documented in each cluster would lead to program modifications and resource reallocations as implementation unfolded.  <u>Scarlett Carp Report</u>, at p. xv.

In the predecessor to this report, the master acknowledged, not without some frustration, that it was too early to determine whether the defendants' operational definition of serious mental disorders comported fully with constitutional requirements.  There was serious concern on the part of the master's experts with unexpectedly low levels in the incidence of mental disorders among the screened CDC population, and questions arose about the

18

criteria being applied in the screening process and the
department's operative definition of "serious mental
disorder."  In the past month, direct observation of
screening operations has helped to clarify application of
the operative definitions and familiarize the master with
the department's own uncertainties about definitional theory
and practice.  That same kind of field experience is also
essential for a fair and full evaluation of whether mental
health services are sufficiently accessible to inmates in
CDC to meet a constitutional standard and, consequently,
whether the defendants' staffing ratios are acceptable.

**Recruitment**

The June 6, 1996 Findings and Recommendations
adopted by the court directed the defendants to develop a
recruitment program for mental health professionals that
includes, among other features, a provision for adequate
compensation.  While the court did not specifically list
other elements the recruitment program ought to include, it
gave an index of its expectations for the quality of the
mandated program by requiring the defendants to fill
"positions presently authorized for the provision of mental

health care services."   Presumably, that means all
authorized positions.

The materials on recruitment provided by the
defendants demonstrate that the department takes seriously
its obligation to recruit mental health professionals.  It
has assigned sufficient central office personnel, and
provided them with an adequate budget, to organize and
conduct an impressive recruitment effort, targeting a wide
and varied mix of general and professional publications,
professional conferences, university placement organs and
public and private institutions offering apparent
recruitment opportunities.  One might argue that more or
different target publications or opportunities ought to be
added to the list, but the nature and scope of the general
recruitment effort appears to be adequate.

The problem with the defendants' recruitment
program is not its overall effectiveness, but rather its
continuing inability, already alluded to earlier in this
report, to lure psychiatrists and psychologists to work for
CDC.  Recall the numbers:  The overall vacancy rate for the
department's mental health delivery system is 12.4 percent
(76 vacancies among 609.9 slots).  Among all categories of

personnel, apart from psychiatrists and psychologists, the vacancy rate is 8.2 percent (27.4 out of 332.4).  For psychologists, the rate rises to 12.7 percent (21.6 of 168.9), and for psychiatrists, it soars to 24.8 percent (27 of 108.6).  It was precisely this difficulty of hiring psychiatrists and psychologists the court sought to address with its specific directive in the June 6, 1994 Findings and Recommendations relative to the issue of compensation.

The defendants' materials on recruitment indicate that they have considered and approved programs for enhanced compensation for job-related classifications and assignments that are hard to fill (the so-called Hiring Above Minimum program) and to provide hiring and re-enlistment bonuses (the so-called Recruitment and Retention Bonuses program). It also appears, however, that the award of any enhanced compensation must be reviewed on a case-by-case basis, and no description of applicable criteria for such reviews were provided.

The materials provided by the defendants also indicate that the department uses some limited contracting with private sector mental health providers, as well as some limited contracting with universities (UC Davis,

specifically), to supplement mental health staff resources.
(See Attachment 12 for a list of CDC use of contracting.)
The contract list suggests that just under 12 percent of the
department's psychiatric resources (roughly 11.87 of 108.6
positions) are procured through contracts.  But nowhere in
the materials is there a policy, procedure or rationale for
such contracting, nor is there any discussion of whether, or
to what extent, contracting might be more widely employed to
fill the department's vacancies.  If constraints exist, we
do not know if they are related to finances, professional
scarcity, community antipathy, geographical remoteness, etc.

        The master has requested from the defendants more
information on their recruitment efforts to hire
psychiatrists and psychologists that is responsive to these
criticisms, and the department is assembling such
information.  There is a need to avoid rushing to judgment
here.  It is, moreover, clear that the defendants are
handling the recruitment business better than they were in
1991 and 1992, when, as reported in the findings and
recommendations, approximately 25% of the far fewer
positions then authorized for mental health care were
vacant.  The recruitment of psychiatrists and psychologists,

however, remains a serious problem, and there is no evidence
before the master at this point of an aggressive campaign
focusing on enhanced compensation, whether through bonuses,
improved retirement, higher pay, etc., to address the nub of
the recruitment difficulty.  There is, moreover, not much
room for error in this regard.  The June 6, 1996 Findings
and Recommendation originally directed the defendants to
fill then currently authorized positions within 90 days of
the of the district court order, and to fill any new
positions within 180 days.

The essential difficulty here is cumulative.  The
department's definition of serious mental disorder embraces
a relatively narrow, but exceptionally needy, population.
The defendants have elected to reduce the staffing
recommendations of the Scarlett Carp Report, leading one of
the master's mental health experts to describe, at least
tentatively, currently projected staffing ratios as "thin."
And finally, there is that 24.8 percent vacancy rate among
psychiatrists and the 17.5 percent vacancy rate among
psychologists.  What is the impact of this combination of
factors on accessibility to care for inmates in the CDC with
serious mental disorders?  The answer to that question is

not yet clear.  There are more documents, plans, policies and protocols to be reviewed and studied, and there is a need to see and evaluate through direct observation the institutional status of the actual care being delivered in the defendants' institutions.  That process is now underway.


Respectfully submitted,


J. Michael Keating, Jr.
Special Master

April 16, 1996

# ATTACHMENT 1

**Status of Programs in**

**CDC Mental Health Services**

**Delivery System in**

**Service Areas and Institutions**

**STATUS OF MENTAL HEALTH PROGRAMS
IN CDC INSTITUTIONS**

| Service Area | Institution | MHCB[1] | EOP[2] | CCCMS[3] |
|---|---|---|---|---|
| A | CSP, Sacramento | 1995 | 1995 | 1995 |
|   | Folsom | N/A | N/A | 1996 |
|   |   |   |   |   |
| B | Pelican Bay | 1996 | 1995 | 1995 |
|   | California Correctional Center (CCC) (Susanville) | N/A | N/A | 1997 |
| ** | High Desert SP (HDSP) (Susanville)  (RC '96) | 1996 | 1997 | 1997 |
|   |   |   |   |   |
| C | Mule Creek SP (MCSP) (Ione) | 1996 | 1997 | 1996 |
|   | Sierra Conservation Center (SCC) (Jamestown) | N/A | N/A | 1996 |
|   |   |   |   |   |
| D | CMF, Vacaville | N/A | 1997 | 1997 |
|   | CSP, Solano (SOL) (Vacaville) | 1997 | N/A | 1997 |
| ** | San Quentin    (RC '95) | 1998 | 1997 | 1997 |
| ** | DVI (Tracy)    (RC '95) | N/A | N/A | 1997 |
|   |   |   |   |   |
| E | Pleasant Valley SP (PVSP) (Coalinga) | N/A | N/A | 1996 |
|   | California SP, Corcoran (COR) (Corcoran) | 1996 | 1995 | 1995 |
|   | Avenal SP (ASP) (Avenal) | N/A | N/A | 1996 |
|   |   |   |   |   |
| F | California Training Facility (CTF) (Soledad) | N/A | N/A | 1997 |
|   | Salinas Valley SP (SVSP) (Soledad II) | 1997 | 1997 | 1997 |
|   |   |   |   |   |
| G | California Men's Colony (CMC) (San Luis Obispo) | 1995 | 1997 | 1995 |
| ** | Wasco SP (WSP) (Wasco) (RC '95) | 1995 | N/A | 1997 |
| ** | North Kern SP (NKSP) (Delano)    (RC '95) | 1995 | N/A | 1997 |
|   |   |   |   |   |
| H | CSP, Los Angeles County (LAC) (Lancaster) | 1995 | 1997 | 1995 |
| ** | California Correctional Institution (CCI) (Tehachapi)    (RC '95) | N/A | N/A | 1995 |
|   |   |   |   |   |
| I  ** | California Institution for Men (CIM) (Chino) (RC '95) | 1995 | N/A | 1996 |
| ** | California Rehabilitation Center (CRC) (Norco) (RC | N/A | N/A | 1996 |

| | | | | |
|---|---|---|---|---|
| | '95) | | | |
| | | | | |
| J  ** | R.J. Donovan Correctional Facility at Rock Mountain (RJD) (San Diego) (RC '95) | 1995 | 1997 | 1996 |
| | Ironwood SP (IRON) (Blythe) | 1997 | N/A | 1997 |
| | Calipatria SP (CAL) (Calipatria) | N/A | N/A | 1997 |
| | Chuckawalla Valley SP (CVSP) (Blythe) | N/A | N/A | 1997 |
| | Centinela SP (CEN) (Imperial) | 1997 | N/A | 1997 |
| | | | | |
| K  ** | California Institution for Women (CIW) (Frontera) (RC '95) | 1998 | 1997 | 1996 |
| | CRC-Women (Norco) | N/A | N/A | 1996 |
| | | | | |
| L  ** | Central California Women's Facility (CCWF) (Chowchilla) (RC '95) | 1995 | 1996 | 1995 |
| ** | Northern California Women's Facility (NCWF) (Stockton) (RC '95) | N/A | N/A | 1995 |
| ** | Valley State Prison for Women (VSPW) (Chowchilla) (RC '95) | N/A | N/A | 1996 |

**   Reception Center

mastering/staffgr2.doc

---

[1]    MHCB:  Mental Health Crisis Beds:  Provide inpatient care to inmates in crisis who need 24-hour care for a strictly limited term.

[2]    EOP:  Enhanced Outpatient Program:  Provides structured residential therapeutic environment, less restrictive than inpatient care.

[3]    CCCMS:  Correctional Clinical Case Management System:  Provides outpatient care, monitoring and follow-up services to relatively stable inmates in the general population.

2

## **ATTACHMENT 2**

**Excerpts (Pp. 17 & 18) from 1995/96**

**Staffing Allocation Plan 1,**

*Revised January 19, 1996*

**1995/96 STAFFING ALLOCATION PLAN 1/**

**BASED ON INMATE POPULATION OF 119,000**

**DOES NOT INCLUDE FY 1995/96 POPULATION INCREASE POSITIONS**

| SERVICE AREA | | 1994/95 & 1995/96 MHSDS REQUIRED STAFFING | | | | | 1995/96 NEEDS/ EXCESSES | 95/96 BCP ALLOCATION | | | | | | 1995/96 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAGE 1 | EXISTING | RC | CRISIS BEDS | CCCMS | EOP | TOTAL | (PRE-BCP) | RC | CRISIS BEDS | CCCMS | EOP | TOTAL | TOTAL | NEEDS/ | COMMENTS |
| CLASSIFICATION | STAFF | 94/5 | 94/5 | 94/5 | 95/6 | | | | | | | | STAFF | EXCESSES | ALL PROGRAMS IMPLEMENTED |
| CCWF  CHIEF PSYCHIATRIST | 1 | | 1 | | | 1 | | | | | | 0 | 1 | 0 | |
| SR PSYCHIATRIST | 0 | | | | | | | | | | | 0 | 0 | 0 | |
| STAFF PSYCHIATRIST | 3 | | 1 | 1 | 0.5 | 2.5 | | | | | | 0 | 3 | 0.5 | FUTURE ALLOCATION |
| SR PSYCHOLOGIST-SUP | 0 | | | 1 | 1 | 2 | | | | | 1 | 1 | 1 | -1 | 1 POS LOST IN 190% DEACTIVATION; NEED 1 POS |
| PSYCHOLOGIST, CL | 7 | 3 | 2 | 2 | | 7 | | | | | | 0 | 7 | 0 | |
| PSYCH. SOCIAL WRKR | 3.5 | | 1 | 2.5 | 0.5 | 4 | | | 0.5 | | | 0.5 | 4 | 0 | |
| REC/OCC THERAPIST | 1 | | 1 | | | 2 | | | | | 1 | 1 | 2 | 0 | |
| PSYCHIATRIC TECH | 0 | | | | 1 | 1 | | | | | 1 | 1 | 1 | 0 | |
| SR MTA | 0 | | | | | 0 | | | | | | 0 | 0 | 0 | |
| MTA | 0 | | | | | 0 | | | | | | 0 | 0 | 0 | |
| SUPERVISING NURSE | 1 | | 1 | | | 1 | | | | | | 0 | 1 | 0 | |
| REGISTERED NURSE | 6 | | 6 | | 1 | 7 | | | | | 1 | 1 | 7 | 0 | |
| MED TRANSCRIBER | 2 | 1 | 1 | | | 2 | | | | | | 0 | 2 | 0 | |
| OFFICE TECH | 3.5 | | 1 | 1.5 | 1 | 3.5 | | | | | 1 | 1 | 4.5 | 1 | FUTURE ALLOCATION 3/ |
| TOTAL | 28 | 4 | 15 | 8 | 6 | 33 | | 0 | 0 | 0 | 5.5 | 5.5 | 33.5 | 0.5 | |
| | | 94/5 | | 94/5 | | | | | | | | | | | |
| NCWF  CHIEF PSYCHIATRIST | | | | | | 0 | | | | | | | 0 | 0 | |
| STAFF PSYCHIATRIST | 0.5 | | | 0.5 | | 0.5 | | | | | | | 0.5 | 0 | |
| SR PSYCHOLOGIST-SUP | | | | 1 | | 1 | | | | | | | 0 | -1 | RECLASS FROM PHD |
| PSYCHOLOGIST, CL | 1.5 | 0.5 | | | | 0.5 | | | | | | | 1.5 | 1 | RECLASS TO SR. PHD |
| PSYCH. SOCIAL WRKR | 0.5 | | | 0.5 | | 0.5 | | | | | | | 0.5 | 0 | |
| REC THERAPIST | | | | | | 0 | | | | | | | 0 | 0 | |
| SR MTA | | | | | | 0 | | | | | | | 0 | 0 | |
| MTA | | | | | | 0 | | | | | | | 0 | 0 | |
| SUPERVISING NURSE | | | | | | 0 | | | | | | | 0 | 0 | |
| REGISTERED NURSE | | | | | | 0 | | | | | | | 0 | 0 | |
| MED TRANSCRIBER | | | | | | 0 | | | | | | | 0 | 0 | |
| OFFICE TECH | 0.5 | | | 0.5 | | 0.5 | | | | | | | 0.5 | 0 | |
| TOTAL | 3 | 0.5 | | 2.5 | | 3 | | | | | | | 3 | 0 | |

1/ BASED ON INMATE POPULATION OF 119,000

C:956STF3.XLS
CREATED 03/22/95
REVISED 01/19/96

1995/96 STAFFING ALLOCATION PLAN 1/

BASED ON INMATE POPULATION OF 119,000

DOES NOT INCLUDE FY 1995/96 POPULATION INCREASE POSITIONS

| SERVICE AREA | | | MHSDS | | | | 1995/96 | | 95/96 BCP | | | | | 1995/96 | |
| | | | REQUIRED STAFFING | | | | NEEDS/ | | ALLOCATION | | | | | NEEDS/ | |
| PAGE 2 | | EXISTING | | CRISIS | | | | EXCESSES | | CRISIS | | | | TOTAL | EXCESSES | COMMENTS |
| | CLASSIFICATION | STFG 2/ | RC | BEDS | CCCMS | EOP | TOTAL | (PRE-BCP) | RC | BEDS | CCCMS | EOP | TOTAL | STAFF | | |
| VSPW | | | | | 95/6 | | | | | | | | | | | |
| | CHIEF PSYCHIATRIST | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | STAFF PSYCHIATRIST | 3 | 1 | | 1 | | 2 | 0 | | | | | 0 | 3 | 1 | 1 POS EST 2/1/96 FOR RC (MAY REVISE) |
| | SR. PSYCHOLOGIST-SUP | | | | 1 | | 1 | -1 | | | 1 | | 1 | 1 | 0 | |
| | PSYCHOLOGIST, CL | 3 | 2 | | 2 | | 4 | -1 | | | 1 | | 1 | 4 | 0 | 2 POS EST 2/1/96 FOR RC (MAY REVISE) |
| | PSYCH. SOCIAL WRKR | | | | 2.5 | | 2.5 | -2.5 | | | 2.5 | | 2.5 | 2.5 | 0 | |
| | REC THERAPIST | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | PSYCH TECH | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | SR. MTA | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | MTA | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | SUPERVISING NURSE | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | REGISTERED NURSE | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | MED TRANSCRIBER | | | | | | 0 | 0 | | | | | 0 | 0 | 0 | |
| | OFFICE TECH | 1 | 1 | | 1.5 | | 2.5 | -1.5 | | | 1.5 | | 1.5 | 2.5 | 0 | 1 POS EST 2/1/96 FOR RC (MAY REVISE) |
| | TOTAL | 7 | 4 | | 8 | | 12 | -5 | 0 | 0 | 6 | 0 | 6 | 13 | 1 | |
| SERVICE AREA TOTAL | | 38 | 8.5 | 15 | 18.5 | 6 | 48 | -10 | 0 | 0 | 6 | 5.5 | 11.5 | 49.5 | 1.5 | |
| GRAND | | | | | | | | | | | | | | | | |
| TOTAL | (ALL SRVCE AREAS) | 521.84 | 61 | 136.5 | 100.5 | 31.5 | 329.5 | 190.34 | 0 | 33 | 31.5 | 5.5 | 70 | 591.8 | 262.34 | |
| 1/ BASED ON INMATE POPULATION OF 119,000 | | | | | | | | | | | | | | | | |

C:956STF3.XLS
CREATED 03/22/95
REVISED 01/18/96

# ATTACHMENT 3

**Attachment K to CDC**

**Budget Change Proposal for**

**FY 95-96 on**

## Impacts of Population Growth to 151,000,

MENTAL HEALTH PROGRAM
IMPACTS OF POPULATION GROWTH TO 151,000

**ATTACHMENT K**

| SERVICE AND ADDITIONAL STAFF | PYS |
|---|---|
| **RECEPTION CENTER EVALUATION** | |
| STAFF PSYCHOLOGIST | 9.00 |
| MEDICAL TRANSCRIBER | 1.00 |
| RECEPTION SUB TOTAL | 10.00 |
| **ENHANCED OUTPATIENT PROGRAM** | |
| STAFF PSYCHIATRIST | 1.00 |
| PSYCHIATRIC SOCIAL WORKER | 3.00 |
| REGISTERED NURSE | 0.00 |
| PSYCHIATRIC TECHNICIAN | 0.50 |
| RECREATIONAL THERAPIST | 0.00 |
| OFFICE TECHNICIAN | 0.00 |
| EOP SUB TOTAL | 4.50 |
| **CLINICAL CASE MANAGEMENT SYSTEM** | |
| STAFF PSYCHIATRIST | 4.00 |
| CLINICAL PSYCHOLOGIST | 4.00 |
| PSYCHIATRIC SOCIAL WORKER | 9.50 |
| MEDICAL TRANSCRIBER | 2.00 |
| CCMS SUB TOTAL | 19.50 |
| **CORRECTIONAL TREATMENT CENTER** | |
| **MEDICAL** | |
| CORRECTIONAL HEALTH SVCS ADMIN. | 2.00 |
| STDS AND COMPLIANCE COORDINATOR | 2.00 |
| DIETICIAN | 2.00 |
| PHARMACIST I | 1.00 |
| PHARM. ASSISTANT | 1.00 |
| MEDICAL RECORDS DIRECTOR | 2.00 |
| HEALTH RECORDS TECH II | 2.00 |
| MEDICAL TRANSCRIBER | 4.00 |
| OFFICE TECH | 7.00 |
| AGPA COST ANALYSIS | 2.00 |
| JANITOR SUPERVISOR II | 1.00 |
| REGISTERED NURSE | 3.50 |
| PUBLIC HEALTH NURSE | 2.00 |
| SUPERVISING REGISTERED NURSE | 1.00 |
| DIRECTOR OF NURSING | 1.00 |
| EMERGENCY SERVICES REGISTERED NURSE | 6.44 |
| CLINICAL PSYCHOLOGIST | 1.00 |
| CTC MEDICAL SUB TOTAL | 40.94 |
| **MENTAL HEALTH CRISIS BEDS** | |
| CHIEF PSYCHIATRIST | 1.00 |
| PSYCHIATRIC SOCIAL WORKER | 1.00 |
| SUPERVISING REGISTERED NURSE | 1.00 |
| REGISTERED NURSE | 6.44 |
| RECREATIONAL THERAPIST | 1.00 |
| MEDICAL TRANSCRIBER | 1.00 |
| CTC CRISIS BED SUB TOTAL | 11.44 |
| | |
| TOTAL ADDITIONAL STAFF/POP. GROWTH | 86.38 |
| * THIS IMPACTS THE PROPOSED PROGRAM AT THE ALL SITES INCLUDED | |
| IN 1994/95 AND 1995/96 AND INCLUDES CTCS AT MADERA II AND COALINGA. | |
| (NO MENTAL HEALTH CRISIS BEDS AT COALINGA.) | |
| NOTE:  THESE ADDITIONS ARE BASED ON 151,000 INMATE POPULATION. | |

# ATTACHMENT 4

**Attachment K to CDC**

**Budget Change Proposal for**

**FY 96-97 on**

## Program Staffing Adjusted for 160,000 Inmates,

*June, 1997*

ATTACHMENT K

# HEALTH CARE SERVICES DELIVERY SYSTEM
## PROGRAM STAFFING
### ADJUSTED FOR 160,000 INMATES BY JUNE 1997

| POPULATION GROWTH STAFF | |
|---|---|
| FOR GROWTH TO 160,000 INMATES | |
| CLASSIFICATION | PYS |
| STAFF PSYCHIATRIST | 9.50 |
| STAFF PSYCHOLOGIST | 15.50 |
| REGISTERED NURSE (21 FOR CTC MEDICAL POP GROWTH) | 23.00 |
| PSYCHIATRIC SOCIAL WORKER | 16.00 |
| PSYCHIATRIC TECHNICIAN | 9.00 |
| OFFICE TECHNICIAN | 7.50 |
| TOTAL | 80.50 |
| * THIS IMPACTS THE PROPOSED PROGRAM AT THE ALL SITES INCLUDED | |
| IN FYS 94/95, 95/96, 96/97 | |

## ATTACHMENT 5

**1995/96 MHSD Monthly Staffing Allocation**

**and**

**Vacancies For All Institutions,**

*March 12, 1996*

## 1995/96 MHSD MONTHLY STAFFING ALLOCATION AND VACANCIES
### FOR ALL INSTITUTIONS

| POSN TITLE: | JAN All | JAN Vc | FEB All | FEB Vc | MAR All | MAR Vc | APR All | APR Vc | MAY All | MAY Vc | JUN All | JUN Vc | COMMENTS: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUPT. PSYCHIATRIST | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| ASS'T SUPT PSYCH | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| CHIEF PSYCHIATRIST | 17 | 6 | 17 | 5 | 17 | 4 | | | | | | | |
| SR. PSYCHIATRIST | 11 | 2 | 11 | 3 | 11 | 3 | | | | | | | |
| STAFF PSYCHIATRIST | 78.6 | 22 | 78.6 | 19 | 78.6 | 20 | | | | | | | |
| CH PSYCHOLOGIST | 3 | 0 | 3 | 0 | 3 | 0 | | | | | | | |
| SR. PSYCHOLOGIST | 28 | 4 | 29 | 2 | 29 | 2 | | | | | | | |
| PSYCHOLOGIST, CL, CF | 137.9 | 23.3 | 136.9 | 18.1 | 136.9 | 19.6 | | | | | | | |
| PSYCH INTERN DIR. | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| PSYCH ASSOC | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| SUP. PSYCH SOC WRKR | 4 | 0 | 4 | 0 | 4 | 0 | | | | | | | |
| PSYCH. SOC WRKR | 84.1 | 15 | 84.1 | 9.9 | 84.1 | 8.9 | | | | | | | |
| SR. OCC. THRPST | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| OCC. THRPST | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| REC. THRPST | 23 | 3 | 23 | 1 | 23 | 1 | | | | | | | |
| PSYCHOMETRIST | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| PSYCH. TECH. | 21.7 | 1.7 | 21.7 | 1.2 | 21.7 | 1.2 | | | | | | | |
| CORR. COUNSELOR II | 3 | 0 | 3 | 0 | 3 | 0 | | | | | | | |
| CORR. COUNSELOR I | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| AGPA | 2 | 0 | 2 | 0 | 2 | 0 | | | | | | | |
| CHSA | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| SR MTA | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| MTA | 19 | .6 | 19 | .6 | 19 | .6 | | | | | | | |
| SUPERVISING NURSE | 12 | 0 | 12 | 0 | 12 | 0 | | | | | | | |
| REG NURSE | 72.1 | 7.5 | 72.1 | 5.7 | 72.1 | 3.7 | | | | | | | |
| NURSE PRAC | 1 | 0.5 | 1 | 1 | 1 | 1 | | | | | | | |
| PHARMACIST | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| PHARMACY ASST | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| OFF SRVCS SUPV | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| MGMNT SRVCS TECH | 1 | 1 | 1 | 1 | 1 | 0 | | | | | | | |
| INFO SYSTEMS TECH | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| HEALTH REC. TECH | 3 | 0 | 3 | 0 | 3 | 0 | | | | | | | |
| STDS. & COMP. COORD | 2 | 0 | 2 | 0 | 2 | 0 | | | | | | | |
| HEALTH PROG COORD | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| HEALTH ANALYST | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| MED SCTY. | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | | |
| SR. MED STENO | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| STENOGRAPHER | 1 | 0 | 1 | 0 | 1 | 1 | | | | | | | |
| SR. MED TRANS | 1 | 0 | 1 | 0 | 1 | 0 | | | | | | | |
| MED. TRANS | 33 | 2.5 | 33 | 3.5 | 33 | 3.5 | | | | | | | |
| OFFICE TECH | 21.5 | 6.5 | 21.5 | 4.5 | 21.5 | 4.5 | | | | | | | |
| OFFICE ASST | 17 | 1 | 17 | 1 | 17 | 1 | | | | | | | |
| OFFICE TECH/ASST | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | |
| | | | | | | | | | | | | | |
| SUBTOTAL ALL INST: | 609.9 | 97.6 | 609.9 | 77.5 | 609.9 | 76 | | | | | | | |

# ATTACHMENT 6

### Table 5.1 from

### Current Description, Evaluation, and

### Recommendations for Treatment of

### Mentally Disordered Criminal Offenders,

### Volume 1:  Introduction and Prevalence
### (Stirling Report)

*June, 1989*

TABLE 5.1  ESTIMATED MENTALLY DISORDERED PRISONER POPULATIONS TILL 1992
Symptomatic in Prior Month where DSM-III Diagnosis Ever Made

| DIAGNOSIS | TOTAL % | 7/5/87 | 6/30/88 | 6/30/89 | 6/30/92 |
|---|---|---|---|---|---|
| TOTALS: | 100.0 | 61.689 | 68.222 | 74,315 | 91,653 |
| Organic Brain Synd.-Severe | 0.5 | 324 | 358 | 390 | 481 |
| Schizophrenia | 3.1 | 1,933 | 2,137 | 2,328 | 2,872 |
| Depression-Single Episode | 1.4 | 870 | 962 | 1,048 | 1,292 |
| Depression-Recurrent | 2.1 | 1,312 | 1,451 | 1,581 | 1,949 |
| (Major Depression Summary) | 3.5 | 2,182 | 2,413 | 2,629 | 3,241 |
| Bipolar Disorder | 0.1 | 59 | 65 | 71 | 88 |
| Atypical Bipolar | 0.6 | 383 | 423 | 461 | 569 |
| (Bipolar Summary) | 0.7 | 442 | 488 | 532 | 657 |
| Summary of Above Disorders | 7.9 | 4,880 | 5,396 | 5,879 | 7,251 |

Note: Population totals exclude Civil Addicts & Community-Based Facilities.

24

# ATTACHMENT 7

**Table 4.1 from**

**California Diagnosis by Severity of Functional**

**Impairment Estimates:  Males and Females,**

**Mental Health Service Delivery**

**System Study:  Final Report**
**(Scarlett Carp Report)**

*February 16, 1993*

| Table 4 California Diagnosis by Severity of Functional Impairment Estimates: Males and Females | | | | |
|---|---|---|---|---|

| Dx Grp | Severity of Functional Impairment (Percentage) | | | Total |
|---|---|---|---|---|
| | Serious | Moderate | Mild/None | |
| **Males** | | | | |
| Psychotic | 3.11 | 1.43 | 0.00 | 4.54 |
| Mood | 1.74 | .47 | 0.21 | 4.42 |
| Anxiety | 4.85 | 2.17 | 7.17 | 14.19 |
| Other Axis I | 0.07 | 0.16 | .04 | 0.26 |
| Organic | 0.93 | 1.24 | 0.31 | 2.49 |
| Personality | 0.37 | 2.01 | 0.44 | 2.82 |
| None | 0.00 | 0.00 | 71.28 | 71.28 |
| **Total Males** | 11.07 | 9.47 | 79.46 | 100.00 |
| **Females** | | | | |
| Psychotic | 4.28 | 1.36 | 0.00 | 5.64 |
| Mood | 2.39 | 2.35 | 0.20 | 4.95 |
| Anxiety | 6.66 | 2.07 | 6.84 | 15.57 |
| Other Axis I | 0.09 | 0.15 | 0.04 | 0.28 |
| Organic | 1.28 | 1.18 | 0.30 | 2.76 |
| Personality | 0.50 | 1.91 | 0.42 | 2.84 |
| None | 0.00 | 0.00 | 67.96 | 67.96 |
| **Total Females** | 15.21 | 9.03 | 75.76 | 100.00 |

Sources:  See text.

*Policy Research Associates*

# **ATTACHMENT 8**

**Table 9.  Percentage of CDC Inmate Census**

**Needing Each Type of Mental Health Service on**

**Any Given Day, from**

**Mental Health Service Delivery**

**System Study:  Final Report**
**(Scarlett Carp Report)**

*February 16, 1993*

| Table 9<br><br>Percentage of CDC Inmate Census Needing Each Type of<br>Mental Health Service On Any Given Day | | |
|---|---|---|
| **Service Component** | **Males<br>(percent)** | **Females<br>(percent)** |
| Screening | 0.3 | 0.3 |
| Follow-up Evaluations | 0.01 | 0.01 |
| Crisis Intervention Visits | 0.1 | 0.1 |
| Crisis Beds | 0.5 | 0.7 |
| Inpatient Beds | 1.0 | 1.4 |
| Residential Care Beds | 3.2 | 4.4 |
| Outpatient Caseload | 12.1 | 14.4 |
| Pre-release Transition Caseload | 1.8 | 2.5 |
| Parole Outpatient Clinic Caseload | 1.8 | 2.5 |
| **Percent Needing Mental Health<br>Services On Any Given Day** | **15.8\*** | **19.6\*** |

*Policy Research Associates*

\* Totals are less than the sum of the individual service component percentages because some inmates would be using multiple services on the same day.

Note:   Caseload is defined as the total number of inmates who will be carried on a caseload; it should not be interpreted to indicate the number who will require services each day.

Inmates with a mental illness diagnosis on a pre-release transition caseload are those requiring pre-release services because they are two months short of release. Inmates will be receiving this service while residing in a crisis bed, residential care, or inpatient bed, or while being carried on an outpatient caseload.

# ATTACHMENT 9

## Conversion Table for CDC Service

## Areas to Scarlett Carp Clusters

## Service Area* to Cluster** Conversion

Service Area A (SAC, Folsom):  Cluster 3

Service Area B (PB, CCC, HDSP):  Clusters 1 & 2

Service Area C (MCSP, SCC):  Cluster 4

Service Area D (CMF, SOL, SQ, DVI):  Clusters 5 & 6 (plus DVI)

Service Area E (PVSP, COR, ASP):  Cluster 8

Service Area F (CTF, SVSP):  Cluster 7

Service Area G (CMC, WSP, NKSP):  Clusters 9 & 10

Service Area H (LAC, CCI):  Cluster 11

Service Area I (CIM, CRC):  Cluster 12

Service Area J (RJD, IRON, CAL, CVSP, CEN):  Clusters 13, 14 & 15

Service Area K (CIW and CRC(Women)):  Cluster 17

Service Area L (CCWF, NCWF, VSPW):  Cluster 16


*  Service Area:  Regional groupings of institutions under current CDC
                 Mental Health Services Delivery System

**  Cluster:  Regional configurations in the Scarlett Carp
              recommendations


mastering/convsacl.doc

# ATTACHMENT 10

## CDC 1995/96 Staffing Allocation

### Plan 1 for Service Area D

1995/96 STAFFING ALLOCATION PLAN 1/

BASED ON INMATE POPULATION OF 119,000

DOES NOT INCLUDE FY 1995/96 POPULATION INCREASE POSITIONS

| SERVICE AREA D PAGE 1 | CLASSIFICATION | EXISTING STAFF | 1994/95 & 1995/96 MHSDS REQUIRED STAFFING RC | CRISIS BEDS | CCCMS 96/7 | EOP 96/7 | TOTAL | 1995/96 NEEDS/ EXCESSES (PRE-BCP) | 95/96 BCP ALLOCATION RC | CRISIS BEDS | CCCMS | EOP | TOTAL | TOTAL STAFF | 1995/96 NEEDS/ EXCESSES | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | UNABLE TO REDIRECT POSITIONS-GATES |
| CMF | CHIEF PSYCHIATRIST | 2 | | | | | 0 | 2 | | | | | | 2 | 2 | |
| MEDICAL | SR. PSYCHIATRIST | 3 | | | | | 0 | 3 | | | | | | 3 | 3 | |
| MEDICAL | STAFF PSYCHIATRIST | 10 | | | 1 | 1 | 0 | 10 | | | | | | 10 | 10 | |
| | CHIEF PSYCHOLOGIST | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | SR. PSYCHOLOGIST SUP.S | 2 | | | 1 | 1 | 0 | 2 | | | | | | 2 | 2 | |
| MEDICAL | PSYCHOLOGIST, CL | 18.5 | | | | | 0 | 18.5 | | | | | | 18.5 | 18.5 | |
| | SUP. PSYCH SOC. WKR | 3 | | | | | 0 | 3 | | | | | | 3 | 3 | SEE BELOW |
| MEDICAL | PSYCH. SOCIAL WKR | 24 | | | 2 | 2 | 0 | 24 | | | | | | 24 | 24 | 1 POS RECLASSIFIED TO SUP. PSW IN 8/95 |
| | SR OCC THERAPIST | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | REC THERAPIST | 3 | | | | 1 | 0 | 3 | | | | | | 3 | 3 | |
| | PSYCH TECH | 15 | | | | 2 | 0 | 15 | | | | | | 15 | 15 | |
| | SR. MTA | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | MTA | 17.6 | | | | | 0 | 17.6 | | | | | | 17.6 | 17.6 | |
| SRN & SPN | SUPERVISING NURSE | 2 | | | | | 0 | 2 | | | | | | 2 | 2 | |
| | REGISTERED NURSE | 5 | | | | 2 | 0 | 5 | | | | | | 5 | 5 | |
| | ASSOC INFO SYS ANA | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | HEALTH REC. TECH | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | STDS & COMP. COOR | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | HLTH PROG COORD | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | AGPA | 1 | | | | | 0 | 1 | | | | | | 1 | 1 | |
| | MED TRANSCRIBER | 5 | | | | | 0 | 5 | | | | | | 5 | 5 | |
| | OFFICE TECH | 1 | | | 0.5 | 1 | 0 | 1 | | | | | | 1 | 1 | |
| | OFFICE ASSISTANT | 7 | | | | | 0 | 7 | | | | | | 7 | 7 | |
| MEDICAL | TOTAL | 126.1 | 0 | 0 | 4.5 | 10 | 0 | 126.1 | | | | | 0 | 126.1 | 126.1 | |
| | | | 96/7 | 96/7 | | | | | | | | | | | | |
| SOLANO | CHIEF PSYCHIATRIST | | 1 | | | | 0 | 0 | | | | | | 0 | 0 | |
| | STAFF PSYCHIATRIST | 1 | 1 | 1 | | | 0 | 0 | | | | | | 0 | 1 | NEEDED FOR 96/7 PROGRAMS |
| | SR. PSYCHOLOGIST SUP | | | | | | 0 | 0 | | | | | | 0 | 0 | |
| | PSYCHOLOGIST, CL | 1 | 2 | 1 | | | 0 | 0 | | | | | | 0 | 1 | NEEDED FOR 96/7 PROGRAMS |
| | PSYCH. SOCIAL WKR | | 1 | 2 | | | 0 | 0 | | | | | | 0 | 0 | |
| | REC THERAPIST | | 1 | | | | 0 | 0 | | | | | | 0 | 0 | |
| | SR. MTA | | | | | | 0 | 0 | | | | | | 0 | 0 | |
| | MTA | | | | | | 0 | 0 | | | | | | 0 | 0 | |
| | SUPERVISING NURSE | | 1 | | | | 0 | 0 | | | | | | 0 | 0 | |
| | REGISTERED NURSE | | 8 | | | | 0 | 0 | | | | | | 0 | 0 | |
| | MED TRANSCRIBER | | 1 | | | | 0 | 0 | | | | | | 0 | 0 | |
| | OFFICE TECH | | 1 | 1 | | | 0 | 0 | | | | | | 0 | 0 | |
| | TOTAL | 2 | 0 | 17 | 6 | 0 | 0 | 0 | | | | | 0 | 0 | 2 | |

1/ BASED ON INMATE POPULATION OF 119,000

C:956STF3.XLS
CREATED 03/22/95
REVISED 01/19/96

# ATTACHMENT 12

## Contract List for Statewide Supplemental

## Mental Health Staff,

### *October 5, 1995*

## STATEWIDE SUPPLEMENTAL MENTAL HEALTH STAFF* **
5 October, 1995

California Medical Facility

Contract with UC Davis Medical Center for Forensic Psychiatry Residents

Mule Creek State Prison

1 1/2-time contract psychiatrist ; 1 contract psychologist 2 days/month

Northern California Women's Facility

1 1/2-time contract psychiatrist

Deuel Vocational Institute

1 part-time contract psychiatrist

Sierra Conservation Center

1 1/2-time contract psychiatrist

Central California Woman's Facility

2 full-time contract psychiatrists

Valley State Prison for Women

1 contract psychiatrist 2 days/week

California State Prison, Corcoran

1 full-time and 1 1/2-time contract psychiatrists

North Kern State Prison

2 contract psychiatrists 10 hours/week each

Wasco State Prison

2 full-time contract psychiatrists; 1 full-time retired annuitant psychiatrist; 2 PIE psychiatrists 10 hrs/week each

* Includes Contracted, PIE's and Retired Annuitants
** Institutions not listed have no supplemental mental health staff

Pleasant Valley State Prison

1 contract psychiatrist
2 days/week

California State Prison, Lancaster

1 contract psychiatrist
2 days/month

California Institute for Men

3 PIE psychiatrists:
   1 - 6 hrs/wk
   1 - 10 hrs/wk
   1 - 16 hrs/wk
1 contract psychiatrist
5-8 days/month

Centinala State Prison

1 contract psychologist
2 days/week

Chuckawalla Valley State Prison

1 contract psychiatrist once
every two weeks

Ironwood State Prison

1 contract psychiatrist
1 day/week; 2 contract
psychologists 1 day every
2 weeks