**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.

     Plaintiffs,

vs.                                        No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

     Defendants.

## SPECIAL MASTER'S REPORT ON PLANS

On January 30, 1997, the court entered an order directing the special master to submit for approval plans, procedures, policies, forms and other applicable documents on the defendants' mental health care delivery system by mid-April. On April 17, 1997, the court extended the deadline for submission of the plans to May 30, 1997.

This report accompanies six volumes of materials, including program guides, policies, plans, policy and procedure manuals, forms, training materials and memoranda, as follows:

    1.     Volume I: <u>California Department of Corrections (CDC) Mental Health Services Delivery System Program Guides</u>, dated May, 1997.

    2.     Volume II: <u>Mental Health Services Delivery System Training Materials</u>.

    3.     Volume III: <u>Coleman Documents</u>, the so-called <u>Blue Book</u>, which contains a miscellany of materials, including memoranda, reports, bulletins, procedures, etc. ,keyed to the <u>Coleman</u> court order.

    4.     Volume IV: <u>CDC Health Care Services Division Drug Formulary</u>, dated March, 1996.

850

5.      Volume V: <u>Mental Health Services Delivery System Mental Health Forms Orientation Handbook</u>, dated April 1996.

6.      Volume VI: <u>Correctional Treatment Center Policy and Procedure Manual: Health Records Service; Pharmacy; and Mental Health Volumes</u>, revised on April 3, 1997.

These materials have been the subject of intense scrutiny over the past four months as parties, counsel, master and master's staff and experts have engaged in an exhaustive review and critique of the documents contained in this submission. In February and March, counsel and parties met separately with the master and his staff and experts during nine full days of meetings to discuss, issue by issue, the defendants' proposed plans, policies and supporting documents. During April and May, parties and counsel met together with the master and his staff and experts for five days of meetings to reconcile differences, where possible, and define clearly their respective positions on unresolved differences. The results of that process are impressive. With few exceptions, the parties agree that the blueprint for the defendants' mental health care delivery system contained in these documents describes a system that comports with the requirements of the court in this case.

While the extent of agreement between the parties is exceptional, some disagreements persist. The court has consistently identified 12 broad areas of concern in the defendants' delivery of mental health care. In five of those areas, including training, the use of non-lethal weapons, the screening of intra-departmental transfers, health records and the acquisition of county records, the parties have reached agreement on governing plans and policies. Relative to the use of non-lethal weapons, the parties agree that there is a need to integrate the policies adopted during this process for the use of force against seriously mentally disordered inmates into the department's general policies governing the use of force. The defendants have

-2-

committed themselves to the task of integration through the elaborate administrative procedural process required for the amendment of the departmental operations manual.

In addition, the parties have agreed to the criteria for mental health treatment developed by the defendants. The parties believe that the criteria currently articulated in the defendants' policy, if fully and faithfully implemented in the field, will serve adequately to identify seriously mentally disordered inmates who need treatment. The monitoring phase of the mastership will examine closely and carefully the department's success in implementing the criteria agreed to in this process.

In five other broad areas, there is agreement on the bulk of the relevant plans and policies, but some disagreement on one or more specific issues. These include:

**Medications**: One remaining issue in the area of medications involves the defendants' restricted use of Clozaril/Clozapine. Clozapine is an antipsychotic medication for the management of schizophrenic patients who fail to respond to standard antipsychotic drug treatment. The drug has serious potential side effects, including agranulocytosis (a reduction of the white cell blood count) and seizures, that impose extraordinary monitoring requirements and, from the defendants' perspective, great potential legal liability. Until now, the department has restricted the use of Clozapine solely to CDC inmates transferred to and housed in Atascadero State Hospital (ASH) or Patton State Hospital (PSH). Once placed and stabilized on Clozapine at ASH or PSH, a CDC inmate remained there, and could not return to CDC. Largely because of the high placement costs associated with ASH and PSH, the department has recently decided to authorize the use of Clozapine in three designated CDC institutions, but only for those inmates for whom the use of Clozaril was initiated at ASH or PSH and whose use of the drug has become fully stabilized. This means that Clozapine is not included in the department's drug formulary,

-3-

nor is it regularly available for prescription by a psychiatrist in the department who wishes to initiate its use to treat a schizophrenic inmate.

The plaintiffs object to the defendants' restrictions on the use of Clozapine, and argue that it is an accepted and commonly used medication and ought to be available for use by CDC psychiatrists in appropriate cases. They also point to the anomaly that would refuse Clozapine to a newly arrived schizophrenic inmate from the community, already stabilized on Clozapine, because the use of the drug had not been initiated at ASH or PSH.

The defendants reply that, given the serious side effects of Clozapine, their caution in its use is fully justified. They point to successor drugs to Clozapine, like Olanzapine, which treat the same symptoms with less serious side effects and which are available to psychiatrists in the department. They add that, in any rare case in which an inmate, already stabilized on Clozaril in some community or other non-DMH program, enters CDC, his or her future treatment would be decided on the basis of a clinical judgment in the individual case, although that is not explicitly permitted in the submitted policy.

Recommendation: The master recommends approval of the defendants' policy for the use of Clozapine, amended to specifically include a provision granting to CDC psychiatrists the discretion to maintain on the drug a newly arrived inmate, already stabilized on Clozapine through a program other than those at ASH or PSH, subject to the housing and monitoring conditions recited in the policy.

**Screening/Reception**: There are three unresolved issues in the screening and reception area:

1.    Unscreened inmates: There are inmates in the population who have not received a mental health screening (i.e., they have not undergone the 31-question mental health screening

-4-

test administered by a psychologist or a master's level mental health clinician) since introduction of the reception center screening process in mid-1994. The defendants believe that, between the turn-over in population, regular screenings of inmates placed in administrative segregation and the system now in place for the referral of inmates with mental health problems, the population of unscreened inmates is probably small. They also argue that the last two measures ensure that inmates in the population who have not yet been screened, but who have needed, or who need, mental health care, will be identified and attended to.

The plaintiffs argue that the terms of the findings and recommendations and the final order in this case quite clearly require the mental health screening of all inmates, citing the court's observation that identification of the need for mental health treatment cannot be left to untrained staff or inmates who, by virtue of their condition, may be incapable of gaining access to mental health care. While the plaintiffs agree that the number of unscreened inmates may be small, they suggest that the actual number is uncertain and seek some formal plan to identify and screen all those in the population who have yet to be screened.

Recommendation: No one knows the size of the unscreened population, although there are indications that it is small. The master should be directed to conduct a survey through a random sampling of medical records in some representative facilities during early implementation monitoring to assess the extent of the problem. Based on the findings from this survey, the master should submit an appropriate recommendation on this issue with his first quarterly monitoring report to the court.

2.    Identifying inmates with a past serious mental disorder: Another unresolved issue involves the identification and tracking of inmates with a past history of mental illness, but no present symptoms, who are not included in the active mental health caseload at the time of their

-5-

entry into CDC. In terms of the plans submitted to the court for approval, the issue arises in the context of the computerized two-digit identifier code used by the defendants to identify recipients of the department's mental health care services.

Plaintiffs want to see inmates with a past history of serious mental disorder, who are presently able to function adequately in the institutional environment, identified so that, in the event of some future deterioration of their condition, the fact of their past serious mental illness will trigger automatically and immediately active consideration of that past on the inmate's present behavior. The defendants respond that anyone with a past history involving the ten enumerated categories of serious mental disorders designated for treatment in the department, which are characterized by chronic remissions and decompensation, are earmarked routinely for treatment and, thus, included in the code. They also point to the requirement to screen inmates placed in administrative segregation for mental health problems as another safety net for identifying possibly decompensating inmates.

Recommendation: The focus here is not on a requirement to identify and record newly arrived inmates' past mental health problems. Such a requirement already exists. Responses to the 31-question mental health screening instrument, as well as positive responses to questions in any follow-up psychological evaluation, relative to past mental health problems are supposed to be included in an inmate's mental health record. Under policies included in this filing, if a deteriorating inmate self-refers, or is referred, for mental health care, any attending clinician will have access to the inmate's unit health record with its information on past problems; if a deteriorating inmate is charged with a disciplinary infraction that requires housing in administrative segregation, he or she will receive a mental health screening, which also requires referral to the inmate's unit health record with any relevant information on prior mental health

-6-

treatment. The question here is whether the defendants must include in their computerized coding system a category for, and a list of, inmates with a history of serious mental disorder, who are presently coping.

Because there is uncertainty about the extent to which information on inmates' past mental health history may, or may not, be available to clinicians or disciplinary hearing officers, it is premature to consider imposing on the defendants a requirement to expand their identifier code system. This is another area where the monitoring process can develop data on the nature and size of the problem, if there is one, and subsequently make whatever policy recommendation seems appropriate. The master should be directed to do so and submit a recommendation on this issue in his second quarterly implementation report.

3.    Validation of the screening instrument: The plaintiffs urge the necessity for conducting a formal validation of the 31-question screening instrument the defendants use for their basic mental health assessment of all inmates. The plaintiffs' principal concern is determining whether the screening instrument misses individuals who actually need mental health services and who, in the absence of such services, subsequently experience some sort of negative outcome.

The defendants respond that their quality assurance system will look at negative outcomes among inmates not initially identified for treatment, and insist that the overall mental health delivery system was designed to provide inmates with prompt access to mental health care through self-referrals or staff referrals, whenever mental health needs arise. Moreover, because the screening instrument is identifying 20 to 25 percent of the screened population for further psychological evaluation, it is meeting the targeted numbers predicted by the various expert projections and consultant studies that estimated CDC's mental health needs. Finally, the

-7-

defendants argue, a formal validation is a complex and expensive undertaking, the results of which are rarely definitive, and, to date, there is no mental health screening instrument used in a prison that has been formally validated. On the other hand, the defendants concede that, at some point in the evolution of their mental health care delivery system, they intend to conduct some sort of evaluation of the screening instrument. Indeed, in 1995, they engaged a nationally respected consultant to assess the screening instrument and process, though not to conduct a formal validation. That assessment, they report, was favorable. For all of these reasons, the defendants decline to commit to a formal validation process for the questionnaire, and deny that such a process is required by the findings and orders in this case.

Recommendation: The master's experts concede the cost and difficulties of conducting a formal validation cited by the defendants. They also feel the need to assess through some evaluative process the ability of the mental health screening instrument and process to identify successfully those inmates in the population who need to receive mental health care, while limiting the number of false-positives identified in the screening.

The defendants ought not be compelled to undertake a formal validation process. Initial monitoring efforts aimed at assessing the adequacy of care provided by the defendants through the review of records ought to focus sharply on observed failures of the screening process to identify inmates who should have, and could have, been identified at entry for mental health treatment.

**Inpatient Transfers**: The remaining source of disagreement in this policy area is related to the timelines for transfer of seriously mentally disordered inmates to Mental Health Crisis Bed (MHCB) programs and from MHCB programs to Department of Mental Health (DMH) programs. The defendants' policy sets a time limit of 24 hours for the transfer of emergency

cases to MHCB beds. Presumably that 24 hours is measured from the clinician's determination
of the need to remove the inmate, although the policy does not explicitly so state.

Another specific policy provision requires transfers, presumably not involving an
emergency, to California Medical Facility (CMF)/DMH programs or to the California Men's
Colony (CMC) and the California Institution for Women (CIW) for eventual referral to ASH or
PSH, to occur within 72 hours of endorsement. The uncertainty here lodges in that period
between clinical determination of the need for a move and endorsement, a passage of time not
necessarily within the full control of the clinician, which erodes the value of the 72-hour deadline
for movement. There are no other clear timelines for movement in the policy, although state
regulations relative to Correctional Treatment Centers (CTCs), within which the defendants'
MHCB programs are housed, impose a ten-day limit on the retention of mental health patients
with acute psychiatric problems in a CTC.

There is, moreover, some uncertainty about actual practices in the department relative to
the timing of transfers and the length of time inmates actually spend in MHCB units. The
defendants have recently introduced a system and structure for the management of these mental
health population movements that reportedly expedites needed transfers with efficiency. The
monitoring that occurred in mid and late-1996 indicated that the movement to inpatient programs
was significantly improved over the pace of inpatient transfers that existed at the time of the
hearing of this case.

Recommendation: This appears to be another policy area that requires the master
to collect data over the next six months and, based on his findings of fact, make appropriate
recommendations for specific timelines for the defendants' inpatient transfer plan.

**Quality Assurance**: Here, again, there was broad agreement over the substance of policy, but disagreement over timelines for implementation of some of the elements of the quality assurance system. In particular, the plaintiffs objected to the defendants' projected mid-1998 initiation of the peer review system within service areas (regional administrative clusters of institutions with inter-dependent mental health programming), and to the mid-1999 institutional introduction of the Quality Assessment and Improvement (QA&I) component of the quality assurance structure. These dates suggest the extent of departure of the defendants' schedule for the implementation of their quality assurance system from the schedule envisioned in the June 6, 1994 Findings and Recommendations, which contained a deadline of 90 days after entry of a final order for the development and implementation of a quality assurance program. Among all of the defendants' efforts to create the framework for a mental health system, plans for a formal quality assurance system are of the most recent vintage and, consequently, were the most raw of the materials presented to the master and plaintiffs for review. There has not been enough time in this process of scrutiny to complete an implementation schedule that meets the approval of the parties, but doing so does not seem impossible, given some additional time within which to work.

Recommendation: The master should be directed to work with the parties to reach agreement on an implementation schedule for the quality assurance plan or, in the absence of agreement, to submit a recommended schedule along with the first quarterly monitoring report.

**Administrative Segregation**: The parties agreed on most of the policies and plans relevant to the delivery of mental health services in administrative segregation. There were, however, two issues on which the parties could not fully agree:

-10-

        1.     The placement and treatment of EOP and 3CMS inmates in administrative

segregation: There are two different aspects of this issue, one relating to the placement of some

EOP and 3CMS inmates[1] in administrative segregation, the other focusing on the treatment

provided to EOP and 3CMS inmates once they are housed in administrative segregation. As to

the placement issue, while the plaintiffs argue generally that inmates in an EOP program

probably ought never be placed in administrative segregation, they are particularly concerned

about placing EOP or 3CMS inmates who might decompensate, or who a clinician determines

are especially likely to decompensate, in administrative segregation. Plaintiffs urge that policy

empower mental health clinicians to prevent the placement in administrative segregation of

inmates who can be clinically identified as likely to decompensate in the administrative

segregation environment, or who have a history of such decompensation in past exposures to

administrative segregation.

      The defendants respond that it is impossible to identify clinically who is likely to

decompensate and that it is equally impossible to determine clinically that the administrative

segregation environment itself actually caused decompensation in those with a past record of

such decompensation. The defendants remain committed to working with EOP inmates in

administrative segregation, while attempting to expedite their placement elsewhere, where

---

[1] EOP stands for enhanced outpatient program and represents the defendants' most intensive level of outpatient care for inmates who experience adjustment difficulties in the general population, but who are not so impaired they require 24-hour inpatient care. EOP services typically include management of daily living activities, group and individual psychotherapy, medication management, recreational therapy and clinical pre-release planning, all provided in housing separate from the general population. 3CMS stands for correctional clinical case management system, which provides outpatient mental health services to inmates in the general population. Such services range from simple medication monitoring to linkages to psychotherapy and other supportive services and the direct provision of counseling and therapy.

appropriate or necessary, and to provide one-on-one mental health services to 3CMS-level inmates in administrative segregation.

A different concern of the plaintiffs is about the defendants' ability to provide needed therapeutic services to EOP inmates in administrative segregation. The defendants say they are committed to meeting the needs of these inmates, as best they can, within the administrative segregation context by providing medication, careful monitoring of any deterioration that might necessitate acute care and individual therapeutic contacts as required. They also express a commitment to expedite the dispositions of infractions of those prisoners whose psychiatric needs might be better served outside of administrative segregation, especially those at an EOP level of care. There is no disagreement among the parties that inmates experiencing decompensation or some other mental health crisis, who need acute inpatient care, shall be removed from administrative segregation at the direction of an appropriate mental health clinician.

Plaintiffs argue that EOP treatment goals and needs, which, according to the defendants' own program guides, involve a minimum of ten hours a week of structured therapeutic activities, cannot be met in administrative segregation. The defendants reiterate their belief that only crisis or acute care treatment needs ought to override those safety and custody interests addressed by placing inmates in administrative segregation. For all other administrative segregation inmates with mental health treatment needs, the defendants are committed, as indicated already, to providing individualized treatment (i.e., individual therapeutic contacts), in addition to medication, close observation and working to expedite prompt transfer out of administrative segregation.

-12-

Relative to 3CMS treatment in administrative segregation, the defendants note that, with a full-time psych tech assigned exclusively to administrative segregation five days a week in each institution, as well as visits from an inmate's regular clinician/case worker, 3CMS inmates in administrative segregation get more attention and quicker follow-up than 3CMS patients in the general population. In addition, the defendants point out, an MTA delivers medications on weekends, and emergency on-call coverage is provided. While the plaintiffs continue to dispute whether those 3CMS inmates a clinician thinks might decompensate ought to be housed and treated in administrative segregation, the parties seem to agree that other 3CMS inmates might be treated in administrative segregation for a limited period, provided they did not spend inordinately long periods in administrative segregation for relatively minor infractions.

Recommendation: The master's experts' first concern is for those individuals in administrative segregation for whom acute inpatient care is indicated. They find the defendants' provisions for dealing with those cases adequate. More difficult are those cases in which an inmate is beginning to deteriorate, or whose decompensation is gathering steam, when a clinician wants to transfer an inmate out of administrative segregation in anticipation of a worsening situation. Here, the experts believe, there ought to be a process in which clinicians have strong input to bring about a transfer, and in those instances where custody or safety issues override the clinical imperative, custodial administrators ought to be required to put their reasons for the override in writing, and such decisions should be subjected to review. The master believes the defendants have agreed to implement such a process, and will amend the relevant policy provisions to reflect that agreement. Once past that issue, the experts are willing to let the defendants try to provide some outpatient mental health services in administrative segregation, provided there are meaningful efforts to limit the duration of the stay of seriously mentally

-13-

disordered inmates in administrative segregation. They urge close scrutiny of the application of the defendants' policies for the delivery of care in administrative segregation during the monitoring phase to determine whether the reality of delivered care matches the abstract policy directives.

Ultimately, the success of the defendants' efforts to meet the needs of inmates in administrative segregation with serious mental disorders depends on the creation of a collaborative relationship between custodial and mental health professionals. A shared respect for and understanding of the legitimacy of their respective interests and the constraints under which they must both operate are the keys to a fruitful collaboration. There are some encouraging indications that, in some institutions, a pattern of collaboration is beginning to emerge. The goal of this process ought to be to encourage and nuture that development.

The master recommends the provisional adoption of the defendants' plans for the delivery of mental health treatment services to EOP and 3CMS inmates in administrative segregation, as well as the adoption of the master's experts' suggestion for handling cases involving actively decompensating inmates. The master ought also be directed to submit any additional recommended changes, consonant with his findings during the next 180 days, with his second quarterly report.

        2.     <u>The role of mental health clinicians in the disciplinary process</u>: Current departmental policy deliberately limits the input of mental health clinicians in determinations of guilt for disciplinary infractions by inmates with serious mental disorders. The policy reflects the defendants' belief that it is inappropriate for clinicians to influence decisions on institutional, staff and inmate safety, unless, of course, the accused inmate is undergoing some sort of mental health crisis and in need of acute inpatient care. The dialogue among parties and counsel on this

-14-

issue made clear, however, that parties agree that clinical input into the subsequent disposition of disciplinary adjudications is both critical and appropriate. Penalties resulting from the disciplinary process typically include confinement for periods in administrative segregation, loss of good-time credit, and the imposition of points (leading to a higher level of custodial classification), all of which can have an important effect on the access to mental health care of seriously mentally disordered inmates.

The defendants have indicated that input from mental health clinicians will be most useful and appropriate when determining the disposition of the disciplinary infraction. The defendants are committed to creating avenues for such input, but have not been able to do so in time to include them formally in this submission to the court.

Recommendation: The defendants should be given additional time to develop this policy, which should be submitted for approval with the master's first compliance report.

Finally, there are two broad areas in which the parties have not reached agreement relative to policies, but have nonetheless agreed on how to proceed to address their differences:

**Staffing and Recruitment**: The principal obstacle to agreement on this issue is the absence of an objective or validated rationale for the defendants' staffing patterns for different disciplines within the variety of evaluative and treatment components of their mental health care delivery system. Given the diversity within CDC of the nature, custody level and location of institutions within an overall context of explosive growth, in addition to the complexities of the mental health services delivery system itself, the articulation of a precise rationale for staffing patterns defies easy solution. The defendants have adopted and modified somewhat the recommendations of the so-called Scarlett Carp report, but are unable at this point to assess their adequacy. Neither the plaintiffs nor the master's experts are entirely satisfied with

-15-

the rationale for the defendants' current staffing patterns, but they are not in a position currently to articulate a more acceptable rationale of their own. Both feel the need to obtain a better understanding of the practical impact of existing staffing patterns.

On the other hand, both plaintiffs and the master's experts are concerned about vacancies in the defendants' authorized clinical mental health positions. Table I shows the number of authorized positions and vacancies as of April 1, 1997 in key classifications in the defendants' mental health delivery system. The defendants point to the exceptional growth in the number of authorized clinical positions over the past three years as the principal source of the problem. The department's clinical staff has nearly tripled during that period. Nonetheless, the defendants have identified the authorized staff they feel is necessary for the implementation of the mental health care delivery system, and there are vacancy rates of better than 20 percent in some key positions. The department uses contracted services to cover the gap to some extent, but that measure satisfies neither the plaintiffs nor the defendants, and presents problems of both quantity and quality.

## Table 1

## CDC Mental Health Staffing Allocations and Vacancies

## As of April, 1997

| Classification | Authorized Staff | Vacancies (#s/%) |
|---|---|---|
| Asst. Supt. Psychiatrist | 1 | 0  (o%) |
| Chief Psychiatrist | 21.5 | 4  (18.6%) |
| Senior Psychiatrist | 11 | 2  (18.1%) |

| | | |
|---|---|---|
| Staff Psychiatrist | 96.2 | 22  (22.8%) |
| Chief Psychologist | 4 | 0  (0%) |
| Senior Psychologist | 42.5 | 5.5  (12.9%) |
| Clinical/Classification Psychologist | 162.8 | 18.85 (11.5%) |
| Supt. Psych Social Worker | 4 | 1  (25 %) |
| Psych Social Worker | 125.1 | 29.6  (23.6%) |
| Recreational Therapist | 34 | 8.5  (25%) |
| Psych Technician | 72.77 | 11.53  (15.8%) |
| MTA | 21 | 1.2  (5.7%) |
| Supervising Nurse | 17 | 2  (11.7 %) |
| Registered Nurse | 95.71 | 10.61  (11%) |
| Med Transcriber | 41 | 5  (12.1%) |
| Office Technician | 50.6 | 10.1  (19.9%) |
| Office Assistant | 18 | 1  (5%) |
| **TOTAL** | **845.18[2]** | **132.89(15.72%)** |

There is an undisputed need to accelerate the recruitment of professional staff.  Faced with uncertainty over appropriate staffing patterns and an unsatisfactory rate of vacancies in authorized mental health positions, the plaintiffs agreed to forego their demand for the immediate articulation of the defendants' rationale for staffing decisions with the understanding that the defendants would develop and commit themselves to a fast-track, intensive recruitment plan with

---

[2] This number includes an additional 27 authorized positions in 23 different classifications not shown in this table.

measurable goals and timelines. The defendants have developed such a plan, but not one that meets either the plaintiffs' or the master's expectations relative to measurable goals and timelines.

The defendants' proposed attack on their recruitment problem, which focuses exclusively on psychiatrists and psychiatric social workers, the two categories with the highest rates of vacancies, is two-pronged. The first approach is designed to enhance and regularize the financial inducements the department can offer prospective mental health care professionals; the second looks to centralize and expedite the administrative procedures for hiring, thereby enhancing the efficient management of the process. Unfortunately, the plan provides no measurable goals or objectives against which to evaluate the success of the recruitment effort, and no amount of discussion sufficed to persuade the department to commit to a specific vacancy reduction figure or percentage. Part of the reluctance is born of a disinclination to get caught in a process that puts quantity ahead of quality by requiring some specific number of warm bodies, whatever their competency. The defendants also argue that their program for contracting with private practitioners, and the measures undertaken recently to improve the quality of that program, go a long way toward meeting all staffing needs.

After long and intense discussion, the plaintiffs agreed to suspend their disbelief in the efficacy of the defendants' recruitment plan as presently constituted, provided the master makes sure during the first 90 days of his compliance review that the bureaucratic developments necessary to support the defendants' enhanced recruitment efforts are in place. At the end of 180 days, the master should analyze and report on the defendants' success in filling vacancies, along with any appropriate recommendations for changes in the plan, after consultation with the parties.

-18-

Recommendation: The court should provisionally adopt the defendants'
recruitment plan and direct the master to monitor closely its implementation in conformance with
the agreement between the parties. The master should also be directed to work with the parties to
develop an acceptable rationale for the staffing patterns of the department's mental health
program components and submit recommendations for such patterns with his third quarterly
compliance report.

**Involuntary medications**: This issue involves some possible tension between state and
federal law that creates both a legal and practical dilemma for the defendants. The strict
procedural protections demanded in the Keyhea case were mandated to prevent institutional
abuse of the use of involuntary medication. There is, however, a real concern that those same
protections may make the use of involuntary medication so onerous, clinicians will elect not to
prescribe medications involuntarily even when they are clinically necessary.

Both plaintiffs and defendants concede that there is currently too little understanding of
the impact of the Keyhea procedures on institutional practices in regard to the use of involuntary
medication to be able at this point to articulate with confidence definitive policy in this area.
They also agree that there is a need to reconcile the underlying legal and practical tensions and
provide clinicians with some clear guidance on how to proceed. Plaintiffs and defendants agree
to postpone the submission to the court of a definitive plan on involuntary medications at this
time, pending a review of practices in the field by the master, which might serve to provide a
better understanding of the nature and dimensions of the problem.

Recommendation: The master should survey the practical implications of the
defendants' current policies on the use of involuntary medications, based on Keyhea, work with

the parties to develop mutually acceptable policy guidelines and report to the court any recommendations for change in those policies in his third quarterly compliance report.

**Additional Issues:** There are two additional issues that raise primarily legal questions. The first involves the use of mechanical restraints. The defendants believe that the court's September 13, 1995 Order rescinded the order on the use of mechanical restraints recommended in the June 6, 1994 Findings and Recommendations. While the master, after conferring with the court, accepted that understanding, the issue has not been formally addressed. The plaintiffs object to the exclusion of the use of mechanical restraints from the remedy. Substantively, the parties and the master have reviewed and discussed the defendants' policy on the use of mechanical restraints and agreed to a mutually acceptable version of that policy.

A second issue involves the extent to which the defendants' suicide prevention plan, policies and practices are subject to the remedial order and the master's review. That, again, involves an interpretation of the court's order and is beyond the scope of this report. It should be added that there is no dispute over the substance of the defendants' suicide prevention policy, plan or training materials, all of which are acceptable to plaintiffs and the master's experts.

Finally, the plaintiffs seek to address what they perceive to be deficiencies in the defendants' so-called heat plan or policies governing the supervision of psychotropic drugs during periods of extreme hot weather. The master's January, 1997 Interim Progress Report suggested a number of changes to improve the defendants' heat plan. The most critical of these was the transfer of responsibility for departmental coordination of the heat plan from the institutional division to the health care services division. That transfer has occurred. The defendants have also agreed to pull together and promulgate the house-keeping suggestions for

standardizing institutional components of the heat plan recommended by the master. These changes address, or will address, the deficiencies in the heat plan reported by the master.

**Procedure for Modification of Plans:** The parties have agreed to a process for future modification of the plans now being submitted to the court, modeled on mutually acceptable arrangements in other cases. That model calls for the following procedures to govern modifications:

1.    Defendants shall submit, with a copy to plaintiffs, a copy of the revised policy, document, etc. to the special master fourteen days prior to its effective date. If there is a *bona fide* emergency, this time period may be reduced by an appropriate amount, but in no event shall the revised policy, document, etc. be submitted to the master later than its effective date.

2.    If the master determines that the modification(s) conflict with any of the court's orders, he shall work with the defendants to reconcile the conflict.

3.    If reconciliation is impossible, the master shall file a report with the court which sets forth his findings as to why the defendants' modification(s) to policy violate the court's order(s). He shall also make recommendations as to what actions should be taken concerning the modification(s).

**A final note**: This catalogue of unresolved issues should not overshadow the enormous amount of agreement that has emerged from this nearly six-month long process of review and collaboration. The parties have worked long and hard to make sure that the six volumes of

materials submitted with this report establish a systemic framework for the delivery of adequate

mental health care services to prisoners in the California Department of Corrections.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

May 30, 1997

#50091273 v1 - LOPESMA - tm_901!.DOC - 9999/1

## DECLARATION OF SERVICE BY MAIL

Case Name: Ralph Coleman, et al. v. Pete Wilson, et al.
U.S.D.C. Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island. I am over the age of 18 years and not a party to the within entitled cause: my business address is Brown, Rudnick, Freed & Gesmer, One Providence Washington Plaza, Providence, Rhode Island 02903.

On June 5, 1997, I served the attached

### SPECIAL MASTER'S REPORT ON PLANS

in said cause, placing, or causing to be placed, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepared in the United States mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
Eastern District of California
650 Capitol Mall
Sacramento, CA 95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
650 Capitol Mall, Suite 5054
Sacramento, CA 95814

Haven Gracey, Esq.
Senior Staff Attorney to
Chief Magistrate John F. Moulds
United States District Court
Eastern District of California
650 Capitol Mall
Sacramento, CA 95814

Robin J. Dezember, J.D.
Deputy Director
Health Care Services Division
Dept. of Corrections
770 L St., Suite 1200
P.O. Box 942883
Sacramento, CA 94283-0001

Donald Specter, Esquire
Alison Hardy, Esquire
Prison Law Office
General Delivery
San Quentin, CA 94964

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery Street, 8th Fl.
San Francisco, CA 94104

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont Street, Suite 3000
San Francisco, CA 94105-2239

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont Street, Suite 3000
San Francisco, CA 94105-2239

Jerold A. Prod, Esquire
Deputy Director, Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Warren E. George, Jr., Esq.
Carolyn L. Reid, Esq.
McCutchen, Doyle, Brown & Enersen, LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Richard L. Goff, Esq.
Heller Ehrman White & McAuliffe
701 5th Avenue
Seattle, WA 98104

I declare under penalty of perjury under the laws of the State of Rhode Island that the
foregoing is true and correct, and that this declaration was executed at Providence, Rhode
Island on June 5, 1997.

Christine M. Blanchard

#50091275 v1 - LOPESMA - tm_b01!.DOC - 9999/1

3