**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

APR 2 1 1998



CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.               No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

---

### FIRST MONITORING REPORT OF THE SPECIAL MASTER
### ON THE DEFENDANTS' COMPLIANCE WITH
### PROVISIONALLY APPROVED
### PLANS, POLICIES AND PROTOCOLS

J. Michael Keating, Jr., Esq.
Special Master
Little Bulman & Reardon, P.C.
50 South Main Street
Providence, RI 02903
(401) 272-8080
Fax: (401) 521-3555
April 20, 1998

936

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II | INSTITUTIONAL REVIEW | 10 |
| | Service Area A | 10 |
| | CSP/Sac | 10 |
| | Folsom | 24 |
| | Service Area B | 29 |
| | PBSP | 29 |
| | HDSP | 35 |
| | CCC | 43 |
| | Service Area C | 49 |
| | MCSP | 50 |
| | SCC | 58 |
| | Service Area D | 69 |
| | CSP/Solano | 70 |
| | DVI | 83 |
| | Service Area E | 90 |
| | CSP/Corcoran | 90 |
| | PVSP | 103 |
| | ASP | 109 |
| | Service Area F | 113 |
| | SVSP | 114 |
| | CTF | 121 |
| | Service Area G | 126 |

CMC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **126**

WSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **135**

NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **148**

**Service Area H** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **158**

CSP/LAC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **159**

CCI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **167**

**Service Area I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **173**

CIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **173**

CRC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **179**

**Service Area J** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **189**

RJD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **189**

ISP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **196**

CEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **199**

CAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **203**

CVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **206**

**Service Area K** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **210**

CIW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **210**

**Service Area L** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **219**

CCWF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **219**

NCWF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **229**

VSPW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **233**

**Institutional Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **239**

**III ISSUES REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **240**

**Health Care Staffing and Programs** . . . . . . . . . . . . . . . . . . . . . . . **240**

i

**Administrative Segregation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **244**

**Inpatient Transfers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **246**

**Heat Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. **249**

**Use of Force** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. **251**

**Re-scheduling** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. **252**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.**

   **Plaintiffs,**

   **vs.**                                    **No. CIV S-90-0520 LKK JFM P**

**PETE WILSON, et al.,**

   **Defendants.**

## FIRST MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

### I. INTRODUCTION

In late June, 1997 the court provisionally approved the defendants' plans for the delivery of mental health services and directed the special master to begin monitoring the defendants' compliance with the approved plans. This report represents the first evaluation pursuant to that direction.

The plans, policies and protocols submitted by the defendants consisted of six volumes of documents. The Coleman case requires the monitoring of implementation of all of these plans, policies and protocols in 30 CDC institutions (excluding only San Quentin and CMF/Vacaville), stretching from Crescent City to Blyth. The June 27, 1997 Order contemplated quarterly reports on the progress of the defendants' implementation of the plans, policies and protocols. The master and his staff of two attorneys and three psychiatric experts realized early they could not possibly monitor fully the implementation of

all of the plans in all of the institutions in a three-month period.     During the

course of this suit, the court has identified 12 general areas of mental health

services requiring improvement.  This first report chronicles the defendants'

progress in implementing approved plans, policies and protocols in five of those

areas, including staffing and services, administrative segregation, inpatient

transfers, the use of force and the heat plan.  The report will also address some of

the policy questions left unresolved as of the time of submission of the plans in

June 1997.

There is need for candor at the beginning of this report.  The special

master underestimated badly the size and complexity of the monitoring effort

required in this case.  A staff that seemed sufficient in July turned out to be far

too small for the task.  The special master himself got deeply involved in

negotiations for settlement of the Shumate case and for the possible

combination of the Gates and Coleman cases that together stretched over six

months; another deputy master became mired in Texas prison litigation in the

Ruiz case; and one of the master's psychiatric experts was unable to continue his

participation.  In the meantime, the monitoring team gradually began to

comprehend the physical enormity of the State of California and the sheer bulk

of the body of plans, policies and protocols needing to be assessed.  As

hundreds of pages of interim reports from the field flowed in and huge quantities

of ancillary materials accumulated, it quickly became obvious that adjustments

were required.

The first adjustment sought and obtained was a change in

reporting requirements from a quarterly basis to a semi-annual one.  The logistics

of visiting 30 institutions, preparing a draft report for dissemination to parties, and incorporating revisions in a final document simply precluded the time-honored quarterly approach appropriate for monitoring a single institution, and the court agreed.

The change in reporting requirements also served to skew once again the elaborate schedule for implementation established most recently in mid-1997, which was keyed to quarterly reviews and assessments of progress. A revised schedule for the implementation and review of items needing to be addressed in the monitoring process comes at the end of this report.

A second adjustment involves a significant expansion in the resources available to conduct future monitoring. As of this date, the court has approved the engagement of five additional lay monitors, while two psychiatric experts have also been added. Efforts are continuing to recruit at least three more psychiatric experts. The numbers are somewhat deceptive, because everyone involved in the monitoring task is employed on a part-time, hourly basis. Nonetheless, the additions will substantially enhance the monitoring effort over the next 12 months.

There is also a need at the beginning of this report to wrestle briefly with the nature of this assessment of the defendants' success in implementing the provisionally approved plans, policies and protocols. The implementation of complex change in a large bureaucratic structure like the CDC is a dynamic, not a static, undertaking. Over the past months the monitoring team visited each institution for no more than a few days. Those visits began in July, 1997, a relatively long time ago. The purpose of the visits is not to freeze-frame for

eternity a particular institution's momentary state of compliance, but rather to confirm and solidify successful implementation, note partial success and push facilities to achieve full success, and document outright failures while creating the necessary impetus for successful implementation. This report can do no more than reflect the state of affairs at each institution at the time of the monitoring team's visit, which is noted at the beginning of the discussion of each facility. Because central office personnel accompanied the monitor(s) regularly, it is anticipated that the defendants will have undertaken efforts to redress the shortcomings identified by the monitors during the past six months, and there is already evidence of such efforts. The monitors will revisit the deficiencies found in this first comprehensive round of monitoring in future reviews. This cycle of critique, response and re-review is the natural cycle of a mastership.

The methodology of the compliance review was not complex. Monitors, sometimes alone and sometimes with a psychiatric expert, visited each institution to be reviewed for a period ranging from two to five days, depending on the range of mental health services provided in the facility. The exceptions to this pattern were Corcoran and CSP/Sacramento, where multiple legal monitors and their psychiatric expert(s), together with legal representatives of both the plaintiffs and the defendants, conducted broader inspections.

Each visit included interviews with administrators, mental health and custodial staff and inmates, as well as reviews of individual unit health records and central inmate files, local policies and procedures, local logs and reports, videotapes of cell extractions and training records and lesson plans. Personnel from the Health Care Services Division in Sacramento accompanied

4

the monitors regularly. At the conclusion of institutional visits, monitors routinely met with facility administrators to discuss compliance findings. Administrators and personnel in the institutions visited were consistently cooperative and responsive. The monitors had full and immediate access to whatever information they requested.

The plaintiffs in their objections to the tentative report complained of methodological inconsistencies, arguing that the report failed to provide a systematic analysis in each of the five areas covered. There is some validity to the complaint. The special master, his assistants and his psychiatric experts were all feeling their way through this first round of issues in all 30 institutions. The institutional variables in CDC are, after all, considerable, including the nature and size of the general and mental health populations, levels of custody, climate, diversity of mental health programs, geographical remoteness, the level of available documentation and the extent of collaboration between mental health clinicians and custody staff. Subjective variables include the professional training and prison experience of individual monitors, the personal styles of members of the monitoring staff and the need to permit some level of discretion to savvy professionals used to operating in the correctional context. The practical usefulness of structured interviews in such monitoring is limited. For the moment at least, there is no uniform information management system operable in all of the institutional mental health programs. The obstacles to a seamlessly uniform analysis are prodigious, but this revised final report attempts to address some of the plaintiffs' concerns in this regard. In addition, this final version also

summarizes those recommendations appropriate to each institution, as requested by the plaintiffs.

The observations contained in this report typically are attributed generically to a "monitor", rather than to any particular member of the mastering team. An exception to this general rule of attribution will occur in the case of clinical reviews of psychiatric records conducted by the master's psychiatric experts. The report will indicate when the analysis and discussion of such records is the product of psychiatric experts.

Among their other objections to the tentative version of this report, the plaintiffs voiced concerns about judgments by monitoring lawyers, untrained in psychology or psychiatry, on the clinical adequacy of mental health care provided by the defendants. It is accurate to note that monitors who are not trained in psychology or psychiatry cannot clinically evaluate care, and the draft report may not always have distinguished clearly between clinical and non-clinical assessments. Having said that, it ought to be noted that lay monitors can observe facts that correlate predictably with adequate, or inadequate, care, including sufficiency of resources, frequency of contact and completeness and quality of progress notes and other record entries, as well as the apparent intelligence and sensitivity of staff. All of these are reasonably useful measures of a system of care, although no substitute for psychiatric expertise in rendering clinical evaluations.

The psychiatric experts of the special master, it should be remembered, will never be able to review more than a relative handful of the some 15,000 recipients of mental health services in the CDC. The master's

psychiatric experts typically focused on problematic cases of high profile in the institutions they visited, with specific interviews and record reviews triggered by unusually long stays in a mental health crisis bed, enhanced outpatient program or administrative segregation, observations of especially troubled inmates in classification or interdisciplinary treatment team hearings or, on occasion, the plaintiffs' recommendations. This suggests that, in large measure, any evaluation of the adequacy of the defendants' overall mental health system, as distinguished from clinical assessments of individual cases, will depend importantly on the observations of the monitor's staff who are not psychiatric experts.

The organization of this report has proven difficult. A first effort to organize the data on the basis of the five subject areas covered in each institution was eventually scrapped because its scattered information on different facilities limited the usefulness of the report as a vehicle for the improvement of institutional services. The goal of the report is to provide the defendants with a targeted analysis that lets them know where improvements are required to attain compliance, as well as to keep both the plaintiffs and the court informed about implementation progress and problems. This organization of the report also mirrors more accurately the monitoring activities of the master and his staff, which were conducted on an institution-by-institution basis.

After the institutional review, there will be some broader, albeit brief, discussion of the defendants' overall progress in implementing plans, policies and protocols in each of the five subject areas. The report will also

address other pending issues related both to the agreement among the parties about the plans, policies and protocols and to the June 27, 1997 Order.

The institutional review is organized to comport with the regional service area scheme currently used by the defendants to structure the delivery of their mental health services. This typically includes a hub institution with an inpatient or mental health crisis bed (MHCB) program and facility for short-term acute care needs and an enhanced outpatient (EOP) residential program. Each service area includes from one to four ancillary facilities that typically have a correctional clinical case management system (3CMS) or program that provides outpatient services for seriously mentally disordered inmates in the general population. The service area concept, which is still evolving in some of its particulars and configurations, reflects the department's commitment to the decentralized and regionalized delivery of mental health care services. The final number of service areas and their eventual composition remain subject to further study and review.

Finally, in response to the request of the plaintiffs, attached as Exhibit A to this final report are copies of reports of the defendants' Health Care Population Management Unit that provide statistics on the number of inmate patients in each mental health program in each institution in CDC on a mid-month date in July, August, September, October, November and December, 1997 and January and February, 1998. The reports also provide statistics on the number of inmates on the mental health caseload housed in administrative segregation, security housing units (SHU) and the sole psychiatric services unit (PSU) on the given dates.

Attached as Exhibit B is an MHSDS Monthly Staffing Allocation and Vacancies for all Institutions Report, dated November 26, 1997, and the MHSDS Hiring and Recruitment Activity Report, also dated November 26, 1997, which together provide departmental statistics on mental health staffing allotments and vacancies for the first five months of FY 97-98 and a breakdown by institution and mental health program of allocated and vacant positions as of the date of the report. The origin of this report was an early request by the master for a matrix that provided all of this information in one document. The information contained in the matrix sometimes lags behind the current staffing situation in individual institutions as local personnel administrators move in occasionally convoluted ways to combine and recombine vacant positions to make them more palatable to potential employees. It may take weeks for such changes to wend their way through institutional and departmental personnel channels before being incorporated in this report.

One last reminder that the information reported here reflects the situation in each institution at the time of the monitor's visit. The dates of those visits are provided for each institution. Typically, each facility was visited only once during the monitoring round, although there were some exceptions, which will be noted.

## II. **INSTITUTIONAL REVIEW**

### **Service Area A**

This service area includes California State Prison at Sacramento (CSP/SAC), with an MHCB program (8 beds), an EOP program for up to 96 Level IV inmates and a 3CMS program for up to 499 inmates; and Folsom State Prison, with a 3CMS program for up to 299 inmates. Inmates in this service area in need of acute short-term inpatient care are regularly sent to CSP/SAC.

**CSP/SAC**

Because CSP/SAC is the hub institution in the service area, it has the widest array of mental health programs. The monitor visited CSP/SAC on August 7, 8 and 27, and again on November 17 and 18. The latter visit included a psychiatric expert.

Mental Health Staffing and Program:

Documentation provided by institutional administrators indicated that, in August, mental health staffing at CSP/SAC included a chief and 4.5 staff psychiatrists, three or 3.5 of which were filled, with commitments to fill the other two full-time positions in the late fall (one of which was filled at the time of the November visit); five psychological positions, with four filled and recruiting efforts underway to fill the fifth; 5.5 psych social worker positions, with four filled and a fifth committed psych social worker scheduled to start (and who actually started) in early September; 2.5 recreational therapist positions with two filled; and 7.5 psych tech positions, with seven filled.

10

Mental Health Crisis Beds: The infirmary was scheduled to be certified as a CTC. Once certified, it will have eight MHCB and eight other floater beds for use as MHCBs, if needed. In early August, the MHCB census was eight. None of the five of eight whose date of entry was noted during the monitor's tour had been there longer than six days.

The monitor accompanied the interdisciplinary treatment team (IDTTT) on one of its regular rounds of mental health care patients in the MHCB program. The rounding immediately followed an IDTT meeting, during which the assigned case manager led a discussion of each case. Clinical staff, usually the treating psychiatrist, dominated the discussion. The group included three psychiatrists, as well as other clinicians and custody staff. The purpose of the rounding was to communicate to the prisoner what the IDTT had decided. The contacts with inmate/patients were conducted decently and humanely, and the treating psychiatrist had full control over both medical decisions and their communication to the inmate. Custody staff was totally cooperative with psychiatric service providers in the MHCB unit.

EOP: At the end of August, CSP/SAC had a 96-bed EOP program. It was being staffed for 96 additional beds, but the expansion was on hold pending greater demand for Level IV EOP slots department-wide. By November, the EOP was staffed for the expansion, which was still on hold.

The EOP program and administrative segregation were both housed in the A-Facility at CSP/SAC. Like MCSP and CCI, CSP/SAC had a "soft line" for some prisoners, like child molesters, former police officers and some older

11

inmates, who could not function on the mainline. This was included in the A-Facility.

CSP/SAC's EOP program was fully operational during the monitor's visit. It did not feature stages or phases like the EOP program at CSP/Corcoran to separate higher functioning from lower functioning patients or to encourage behavior modification. The program had higher and lower functioning patients, as well as patients who were both experienced in the program and new arrivals, but they were all mixed together. At least one inmate and one staff member spoke of the therapeutic value to higher functioning patients of assisting lower functioning ones.

The basic ten hours of weekly programming included five hours of outside yard activity; two hours of group therapy; and three hours of indoor recreation time, consisting largely of groups in poetry/writing, painting or health therapy, run by nurses or recreational therapists. There was typically a weekly contact with a case manager and weekly individual contact with a nurse. Most of the group activities described as hour-long programs typically included about 40 to 45 minutes of actual activity and 15 to 20 minutes of assembling and dispersing.

In addition to programmed time, inmates had five hours weekly of free time, which could be spent on the yard or at the library or law library. Inmates also were allowed 1.5 to 2.0 hours of dayroom time one evening every third day.

On weekends, inmates got two morning hours of yard time, but a recreational therapist did not supervise it. The library and the law library were

open when the yard was open. Inmates could also go out in the small yard two hours each day of the weekend, and there was relatively easy access to this yard at other times during the day on weekends. There was an AA group at times and one or more optional religious groups that met on the weekend. There was also a nursing group on weekends.

A random review of EOP medical charts revealed good documentation of inmate participation in supervised program activities. Institution staff had modified one of the psychiatric service forms to create a new form to log inmate participation in programs. Review of these forms indicated that group sessions were frequently subject to cancellation. The forms reflected well-organized and professionally administered psychiatric services. A number of the reviewed forms recorded as many as 15 hours of program activities, well above the ten hours required in the departmental program guides. Interviewed inmates confirmed the quality of the CSP/SAC EOP program. The level of satisfaction with the services provided was high, and inmates recounted significant improvement in their own mental health.

3CMS: The program was understaffed. The existing staffing pattern was designed for 220 inmates, but the count in August was just under 500. Since then, authorized staffing was increased to manage a caseload of 499, but the count of 3CMS patients on November 17 was 585. One case manager interviewed in depth in August reported his personal caseload to be 137 inmates, and indicated that the number had reached 190 in the past. He had briefly conducted a group session, but found that it prevented him from his essential monitoring tasks and discontinued it. In an initial interview with an inmate,

according to the case manager, he reviewed the medical record, identified specific problems and assessed the seriousness of the individual's illness. He saw general population inmate/patients approximately once every 90 days. A printout provided a monthly list of inmates that needed to be seen during the current month to meet that deadline. His monthly list included the names of 50 inmates. He had seen eight patients on the day of the interview, seven from the list and one self-referral.

The case manager reported visiting with the relatively small number of administrative segregation inmates on his caseload within 48 hours of their commitment to that facility. He also interviewed them in advance of their regular 30-day ICC hearing. If an administrative segregation inmate/patient refused a call-out for an interview, the case manager would go to his cell to talk to him.

The monitor also interviewed a psychiatrist in August who covered the B-Facility, where approximately 100 inmates on psychotropic medications were housed. The psychiatrist monitored those inmates even if they subsequently went to the infirmary. He had no clerical assistance, but did not feel its absence. On the day interviewed, he had seen ten inmate/patients, plus one in the infirmary. He reported seeing some patients within 30 days, some within 60 and some within 90. Medical records were readily available. The psychiatrist seemed to be fully in control of his work; he seemed also to enjoy it.

Interviews with inmates confirmed the staff descriptions. The inmates received their medication, were seen periodically by a case manager

14

and could see a psychiatrist when they needed to. They were not receiving group therapy, but had no specific complaints about their mental health care.

The monitor's psychiatric expert reviewed the quality of the mental health care provided at CSP/SAC during the monitor's mid-November tour of the facility. He attended an EOP IDTT meeting, visited the MHCB program and conducted a review of medical records. A report on his observations follows:

1.    IDTT Meeting in EOP (for Building C)

Impressions: The monitor's expert sat in on an IDTT meeting chaired by a staff psychiatrist and a case manager. The EOP offered inmates between 14 and 16 hours of structured activity weekly, in addition to regular medication follow-up every two to four weeks. Although the program, as described in the departmental program guide, was mandatory, inmates who consistently refused to participate or were otherwise unwilling to cooperate were eventually transferred back to 3CMS or to a higher level of care, depending on the severity of their psychopathology and acuity. In that sense, the EOP program operated as a voluntary program, as is common in many outpatient psychiatric treatment settings. The average length of stay was between six and nine months. A staff psychiatrist was assigned to spend 20 hours per week examining and interacting with approximately 96 outpatients.

The IDTT meeting was efficient and useful. Its decision-making process was focused upon the appropriate issues, and discussions were relevant to immediate treatment options. It appeared as if much of the preliminary assessment work had been accomplished prior to the meeting, as one would expect in a program in which inmates stayed for months. Formulations had

been thoughtfully considered, and there seemed to be a consensus among staff. Medications were prescribed which were consistent with diagnostic formulations. A tool that would have enhanced the process, i.e., a roster of EOP inmates containing the primary diagnosis, target symptoms and current medications, unfortunately, was missing. The monitor's expert strongly recommended that all psychiatric units in CDC develop and use a "Psychiatric Treatment Roster", like the one in use at CCWF, which can be updated weekly.

Case examples: Review of nine inmate cases occurred during the IDTT meeting observed by the expert (J85499, J37562, H39266, J25655, K48632, H92839, C79483, D49793 and J48787). The expert also interviewed seven additional inmates (D75951, H39266, D49793, D84696, H07383, H43599 and E50406).

Treatment plans for inmates seen during the IDTT meeting, again, were consistent with diagnosis and appeared to be shaped by histories of previous treatment responses to medications. In addition, there appeared to be an appropriate willingness to use the Keyhea process and long-acting intramuscular medications (Haloperidol Decanoate and Fluphenazine Decanoate) where these interventions were indicated. For example, inmate J25655, who was diagnosed with schizophrenia, paranoid type, was refusing medications. He had stopped taking his medications and was not cooperating initially. He was then offered intramuscular long-acting medication (Haloperidol Decanoate, 150 mg), to be given every three weeks.

Similarly, Inmate J48787, a 35 year old male, was diagnosed with schizophrenia, paranoid type and target symptoms of paranoia and intimidating

behavior.  He had attempted murder and was sentenced to life without parole.

He was admitted to EOP on 5/2/96 and refused all medications.  The team

recommended the documentation of all behavior for the Keyhea process even

though an administrative law judge had disallowed a previous Keyhea

determination.  During the interview with the team, the inmate presented himself

as paranoid and disorganized but admitted that medication helped.

 2. MHCB Program/Infirmary

 Impressions:  Inmates appeared generally well treated.  It is

difficult to generalize about quality of mental health care based on only two

patients.  However, one of the patients, who was clearly appropriate for a short-

term inpatient psychiatric unit (J28159) because of the severity of his illness and

its acuity, had initially been refused acceptance at DMH.  This same patient was

not receiving antipsychotic medications even though they were indicated.

 Case Examples:  H22825 had been admitted to the infirmary

on 11/6/97, saying he wanted staff to "shoot him."  He remained on suicide

watch with psychiatric nurses performing rounds every 15 minutes.  He was a

muscular man, who was delusional about a metal object, which he thought was

causing electricity to seep through the ground into his penis.  He had had this

delusion since 1995.  He said,  "Nothing can help," and he was worried about

"spirits." There was a history of treatment at UCLA.  On 11/6/97 he was started on

Haloperidol (10 mg PO) twice a day, and his current treatment was "directly

observed therapy of Haloperidol, 20 mg PO BID."

 J28159 had a diagnosis of major depression with psychotic features

and psoriasis.  Although his symptoms included auditory hallucinations, no

antipsychotic medications were ordered.  His continuing psychosis had not responded to antidepressants and mood stabilizers (Lithium Citrate, 300mg and 600 mg; Elavil, 200 mg PO QHS; and Tegretol, 200mg Tm).  The patient had been initially refused for transfer to DMH, but four days later was accepted.  This inmate should have been accepted on the first try.

        3.     <u>Medical Files Review</u>

Impressions:  Half, or seven of 14, of the files reviewed had a significant lack of consistency between the current diagnosis and information about symptoms documented in past or recent clinical observations.  Five out of the 14 files had current medications prescribed that were inconsistent with the current diagnosis.

Case examples: Inmate D52074 had a history of auditory hallucinations and schizophrenia, and psychotropic medication use was documented in his medical record since 1992.  In spite of this, he was discharged from EOP in May 1997 and his psychotropic medications were discontinued in October 1997.  A diagnosis of "psychosis not otherwise specified, rule-out malingering" was offered.  Malingering is a diagnosis given only when other potential diagnostic explanations for symptomatology have been excluded.

Inmate J37562, a 23-year-old male diagnosed with schizophrenia and poor impulse control, had had a Keyhea hearing and received involuntary medication.  He had a history of treatment at Atascadero State Hospital (two admissions) and has been treated with Risperidone and Prolixin in the past.  A chrono on 8/22/97 indicated the patient was not taking his medications and was decompensating.  The Keyhea order had expired on 8/1/97.  The patient denied

18

categorically having a psychiatric illness or needing psychiatric treatment, but asked for an "easy yard." He stated that the psychiatric medication shots did not help, but he was willing to take liquid Benadryl and Mellaril.

There appeared to be a commitment by clinicians at CSP/SAC to use whatever tools were necessary for the consistent and effective treatment of decompensating inmates, specifically Keyhea hearings, long-acting intramuscular medications and atypical antispychotic medications, such as Olanzapine. Effective medication treatment by clinical staff had contributed substantially to this development.

On the other hand, clinicians at CSP/SAC often did not appear to take into account previous medication responses and other elements of past history crucial to current diagnosis and treatment plans. In half the medical records reviewed, past clinical observations were not taken into account in the current diagnostic assessments. In addition, many records showed that current medications were not consistent with current diagnoses. One infirmary patient (J28159) had a psychotic illness, but was not being treated with antipsychotic medications, contributing to a delay in the inmate's improvement. These findings suggested that clinicians at CSP/SAC often did not refer to readily available past chart notes that are crucial to current psychiatric diagnosis. The expert made similar findings at RJD, CCWF, CSP/LAC and DVI. This tendency toward under-treatment and inconsistent treatment was a system-wide problem.

Administrative Segregation:

In August, 1997 there were 59 inmates in administrative segregation on the mental health caseload. Two of those were designated as EOP patients,

19

and five had been designated for evaluation for the EOP program.  Once transferred to administrative segregation, inmates received a hearing before an institutional classification committee (ICC) within ten days and every 30 days thereafter.  An inmate recipient of mental health services met with an interdisciplinary treatment team (IDTT), which included his case manager, a psychologist, a psych technician and appropriate custody personnel, every 90 days.  ICC and IDTT meetings were typically held jointly.  Unlike IDTT meetings in the EOP unit, IDTT meetings in administrative segregation were not dominated by clinicians.  The emphasis here was on custody, although there was some input from mental health participants.

Observed custody and mental health staff appeared to work well together in the administrative segregation units.  When the psych tech came into the unit, his presence was announced over the PA, so inmates who wanted to talk to him could identify themselves.   The psych tech could bring a prisoner to an interview office or talk to the inmate at his cell.  The psych techs assigned to the three different administrative segregation units in CSP/SAC were responsible for the distribution of medications during the week, a task assumed by an MTA on weekends.

One complicating factor in the administrative segregation unit at CSP/SAC is its use to house inmates sentenced to administrative segregation from neighboring Folsom, which has no segregated housing unit itself.  When an inmate from the CSP/SAC population was moved into administrative segregation, his case manager was informed of the transfer and was responsible for following up and ensuring continuity of mental health care.  There was

sometimes a glitch in coordinating prompt mental health care to a transferee from Folsom, however, because Folsom remained responsible for handling the disciplinary and classification processes for its own prisoners, even those in the CSP/SAC administrative segregation unit.

Discussions with the associate warden who dealt regularly with classification issues indicated that she was unaware of any policy initiative requiring the participation of mental health clinicians in the disciplinary dispositions of seriously mentally disordered inmates. She was not opposed to such participation, just unaware of it. The monitor was told that efforts were made to expedite the disciplinary process for CSP/SAC EOP inmates in administrative segregation, but not for Folsom EOP inmates.

Inpatient Transfers:

Institutional records indicated that from February through the end of July, 1997, 13 inmate/patients were transferred from CSP/SAC to the Department of Mental Health (DMH). Among those 13, the longest stay in a crisis bed was 21 days. Six of the 13 were in crisis beds longer than ten days. Staff reported some rejections, one involving an older inmate with poor daily living skills, another an adult with pervasive developmental disabilities resulting from brain damage after the age of 18.

According to a computer printout purporting to show all admissions to the infirmary, 245 had admitting diagnoses that seemed indicative of psychiatric problems. Of those, approximately 18 had stays of longer than ten days; four stayed longer than 20 days, specifically 21, 23, 31 and 40 days.

Heat Plan:

21

A random check of both internal and external temperature logs indicated that heat was not a problem at CSP/SAC. While outdoor temperatures often exceeded the 90-degree trigger, the buildings were new and relatively cool. Even when the outside temperature was in the high 90's, the highest recorded indoor temperature was 84 degrees.

The facility had installed a secure outdoor misting system in the small EOP yard to make it more comfortable in hot weather. There was some talk of installing a similar system in the administrative segregation yard to expand the time heat-risk inmates might stay outdoors.

The monitor noted that there might have been some delay in moving heat-risk inmates initially housed in non-heat-risk housing units to appropriate heat-risk units, but the issue needed further review.

Use of Force:

The monitor reviewed incident reports involving the use of 37mm and OC gas in instances involving prisoners on the mental health caseload. In two of the incidents reviewed, a 264-R round from the 37mm launcher was used to quell a fight in a cell in violation of regulations on the use of that weapon against seriously mentally disordered inmates. None of the seven cell extractions executed in the first half of 1997 involved inmates on the mental health caseload.

CSP/SAC recommendations:

1.    The caseload of the 3CMS program at CSP/SAC is too high; it needs to be brought down to its capacity level, or have its staffing expanded to meet higher caseload levels.

primary diagnosis, target symptoms and current

medications, like the one currently use at CCWF, which can

be updated weekly. The department needs to assess and

address that recommendation.

**Folsom**

The monitor was at Folsom on August 26 and 28. Folsom, perhaps

the best known and certainly the oldest prison in California, is within sight of

CSP/SAC.

Mental Health Staffing and Program:

At the time of the monitor's visit, authorized mental health staff

positions included a staff psychiatrist, a senior psychologist, two psych social

workers and a half-time office tech. There were no vacancies technically, but

one of the psych social workers was out on disability, and the psychiatrist was

often not in attendance. He was absent both days the monitor was at Folsom,

one a scheduled day off, the other a called-in no-show. He had been absent

when the monitor visited the facility in 1996.

The institution's 3CMS program, its only mental health component,

had approximately 300 inmates at the time of the monitor's visit. In addition,

there were six EOP inmates awaiting transfer. The senior psychologist directed

mental health services in the institution and was responsible for preparing board

of prison term (BPT) and other court and parole-related reports. This left roughly

1.5 case managers for the caseload of 300 inmates.

While Folsom was not the only institution in the system with a serious

shortage of mental health staff, the situation there was bad. Staffing was simply

insufficient to deliver the 3CMS program described in the department's program guide, despite the evident competence and dedication of the psychologist and the psych social worker. The psychiatrist was able to see all of the patients on his caseload by scheduling 40 patients a day, which worked out to less than ten minutes per patient.

An additional drain on the Folsom staff was the requirement that they provide services for Folsom prisoners transferred to CSP/SAC's administrative segregation unit and MHCB program. This meant a Folsom clinical case worker had to make rounds in the CSP/SAC units, attend IDTT and ICC meetings and undergo the hassle of entry and exit in two prisons. The realities of staffing in the two institutions cried out for redress. CSP/SAC mental health personnel should simply assume responsibility for Folsom inmates transferred to CSP/SAC.

Faced with individual caseloads of some 200 inmates, the two case managers were barely able to monitor their inmate/patients. There was no question of running therapy groups for inmates. The clinicians were primarily fire fighters, reacting to crises and occasionally being able to anticipate and head one off. Interviewed inmates and medical records both confirmed that mental health services at Folsom consisted of medication maintenance and a rare interview with a clinician.

Contributing to the difficulties of clinical staff was the inadequacy of clerical staffing. The half-time office tech could not keep up with the paperwork demands of a 300-patient caseload. As a result, the staff did not have the support of an accurate and up-to-date computerized tracking process that, in other institutions, was an important tool for over-burdened clinicians.

25

Administrative Segregation:

As indicated, Folsom did not have an administrative segregation unit, but instead used the unit at CSP/SAC. When the monitor questioned custody staff in the administrative segregation unit at CSP/SAC about seriously mentally disordered inmates in the unit, they pointed out a Folsom prisoner, who had spent his initial hours in CSP/SAC in the MHCB unit. Although he had been designated as an EOP inmate in Folsom, he was not identified for some reason as a mental health patient in the CSP/SAC administrative segregation unit, or Folsom mental health staff was unaware of his transfer. Because he had a pending assault on staff charge, he would not be moving any time soon to the EOP program that he needed.

The monitor attended several ICC hearings in the CSP/SAC administrative segregation unit involving Folsom inmates. The senior psychologist from Folsom represented mental health services in those hearings.

There were no indications that the seriously disordered mental condition of inmates was considered in the disciplinary process at Folsom, whether in the determination of guilt or the imposition of punishment. One incident report described the use of OC gas to compel the transfer of an inmate who was refusing a move to the CSP/SAC MHCB program. He was charged with a disciplinary infraction for failing to respond to orders.

Inpatient Transfers:

There were approximately four to six transfers of Folsom inmates out of the CSP/SAC MHCB program to DMH in the first eight months of 1997. Staff indicated that inmates were usually accepted for transfer within two working

days of the referral and were actually transferred within a week of acceptance. There was little documentation of transfers.

Heat Plan:

The monitor reviewed the institutional heat plan. The Folsom version gives heat-risk inmates an option of returning to their living units in a stage-one heat alert. Departmental policy mandates a return of heat-risk inmates in a stage-one alert.

Interviewed prisoners reported that they often did not hear announcements of a stage-one alert. Otherwise, they all had heat-risk passes or ducats to allow them to return to their units in an alert. They reported that mental health staff had discussed the dangers of heat with them.

The institutional heat plan calls for housing heat-risk inmates on the first two tiers of cellblocks except in extraordinary circumstances. The heat-risk weekly list showed a number of heat-risk inmates who were housed above the first two tiers.

Although Folsom was an old institution, plant operations staff kept both the ventilation and the heating system in good order. They also regularly monitored temperatures and calibrated the thermometers used to record temperatures under the heat plan.

As of early August, there had been no stage-two alert in Folsom in 1997. The facility was prepared for stage-two alerts, having recently acquired huge ice machines.

Use of Force:

The monitor reviewed institutional policies on the use of force. Local policy prohibited the use of the 37mm weapon against seriously mentally disordered inmates in a pre-planned cell extraction. Local policy on the use of OC gas did not require personnel to check the mental health status of a targeted inmate.

Tactical use of force at Folsom was a rare occurrence. There had been no discharges of the 37mm weapon in the facility in 1997 as of the time of the monitor's visit. There were no cell extractions in that period as well. One incident, mentioned above, involved an inmate who did not want to go to the MHCB unit at CSP/SAC for a psychiatric evaluation. There was no indication in the report that mental health staff had attempted to talk him into moving before resorting to the use of OC gas. If no such attempt was made, it should have been, and if an attempt was made, it should have been reported.

Folsom Recommendations:

1.    Folsom was understaffed for the number of 3CMS inmates it housed. The caseload needs to be reduced or the staffing expanded.

2.    The requirement that Folsom mental health staff provide services to inmates transferred to the CSP/SAC administrative segregation and MHCB program represented a unique and unacceptable burden for Folsom staff, with direct adverse impact on the level of services able to be provided in Folsom. CSP/SAC needs to take charge of inmates housed in CSP/SAC, although there needs to be

28

close coordination on transferred inmates to make sure they are identified for appropriate services on their arrival in CSP/SAC.

3.  Folsom needs to develop a local tracking system for its mental health caseload, and the allocation of additional clerical help is probably critical to that effort.

4.  In its use of force, Folsom needs to document efforts to avoid the application of force in cell extractions of seriously mentally disordered inmates.

### Service Area B

Service Area B includes <u>Pelican Bay State Prison (PBSP)</u>, with a PSU (128 beds), an MHCB program (6 beds), an EOP program for up to 64 Level IV inmates and a 3CMS program for up to 299 inmates; the <u>California Correctional Center at Susanville (CCC)</u>, with no formal mental health program currently in place; and <u>High Desert State Prison (HDSP)</u>, with a CTC (which contains 32 beds, some undetermined number of which may eventually be designated as an MHCB program for acute short-term inpatient mental health care) and a 3CMS program for up to 299 inmates. Inmates from CCC in need of acute short-term inpatient care are transferred to HDSP.

### PBSP

The monitor was in PBSP on October 22-24. The extent of the monitor's review in this facility was limited. PBSP has been under the close scrutiny of a court-appointed monitor in the <u>Madrid</u> case for well over two years.

29

One of several key issues in that suit was the adequacy of housing and services provided to seriously mentally disordered inmates in the PBSP Security Housing Unit (SHU). Out of that litigation came the first psychiatric services unit (PSU) introduced in CDC. The court in <u>Madrid</u> also mandated other major changes in the nature and extent of psychiatric services in PBSP.

The monitor in <u>Madrid</u> obtained the services of a psychiatric expert and reviewed and reported regularly on the defendants' progress in implementing in PBSP court-approved changes and improvements in mental health services and in other areas as well. In early 1997, plaintiffs' attorneys in both the <u>Madrid</u> and <u>Coleman</u> cases toured the facility and reportedly found substantial improvement in both the quantity and the quality of mental health services provided in PBSP. The <u>Coleman</u> monitor has been hesitant to impose on the institution still another, and possibly redundant, layer of judicial oversight, especially given the sense of genuine progress communicated by all of the involved parties.

One issue currently pending in <u>Madrid,</u> and one that is of prime importance in <u>Coleman</u> as well, is the adequacy of programming provided to EOP inmate/patients in PBSP. The <u>Madrid</u> monitor has required the department to file with the court a plan for providing broader EOP programming services, which is currently undergoing review. In addition, the department has been engaged in physically re-configuring and expanding EOP programming space in PBSP in the belief that the lack of space contributed importantly to the shortfall in programs actually delivered. The <u>Coleman</u> monitor will continue to follow these developments closely.

the MHCB program, 109 inmate/patients in the PSU, 67 inmates in the EOP program and approximately 370 3CMS inmates. There were other institutions with a greater overall caseload, but the mix and level of services and programs at PBSP was impressive. The PSU unit was a significant and challenging program, containing as it did the most intractable of seriously mentally disordered inmates in CDC. Mental health personnel from other institutions can appreciate the demands of a program that assembled a hundred of the most psychotic and violent inmates from around the State, many of whom have been rejected by or expelled from DMH programs because of their volatility. It is true that the PSU has unique resources and a physical environment suited to its task, but the daily pressure on the staff, both custodial and mental health, was enormous.

One of the requirements generated by Madrid was the development of criteria for identifying those seriously mentally disordered inmates who were not suitable for housing in the PBSP SHU. A by-product of that effort was a screening instrument that was subsequently subjected to a carefully structured and controlled validation process that may eventually have important significance for the 31-question instrument used everywhere else to identify candidates for more thorough mental health evaluation.

In a parallel development, PBSP also put together a local computer program to track medical and mental health services that may be one of the best in CDC. It provided a valuable management tool for monitoring the delivery of services and follow-up and for aggregating data on overall programs. The administrators principally responsible for its creation and implementation

32

transferred to Sacramento at the end of 1997, and it is to be hoped that their expertise will be shared broadly throughout the department.

Inpatient Transfers:

Because the Madrid case imposed a requirement for the swift transfer (i.e., within five days) to DMH of inmates in need of acute or intermediate inpatient care, the administration at PBSP had to develop procedures to expedite and track such transfers. The result was a system that generated weekly for the warden a report containing the name and number of each inmate referred for transfer to DMH, the date of referral, the date accepted or rejected by DMH, the DMH bed number assigned to the inmate, the date transferred and any reason for delay. The process did not guarantee that every referred inmate moved within five days, but most did, and those that did not, did not miss the five-day goal by much.

Of some assistance in this coordination of referrals between CMF/DMH and PBSP has been the experimental, and now routine, use of telecommunications to conduct joint clinician conferences on difficult cases via a telecommunication satellite hook-up that links PBSP and CMF.

Heat Plan:

The monitor reviewed the PBSP institutional heat plan and found that it complied with departmental and court requirements. PBSP's location on the northern California coast and the recent vintage of its construction combine to reduce significantly hot-weather dangers to heat-risk inmates. The facility kept logs of both indoor and outdoor temperatures, which documented that no stage-two alert occurred in any structure housing heat-risk inmates during the first

33

nine months of 1997. The pharmacist prepared weekly lists of heat-risk inmates, which were available in facilities where heat-risk inmates lived. The monitor noted in his review of temperature logs many more omissions of required entries than encountered in most other CDC institution. The warden pledged to redress that issue.

Use of Force:

The use of force at PBSP was remarkably minimal given the nature of the population and the institution. The warden had made a major commitment to limit the use of both lethal and non-lethal weapons in the facility. During the first five months of 1997, the 37mm gun was used only to launch gas canisters, never anti-personnel projectiles, such as the wooden, hard rubber or foam rubber rounds. OC gas was the preferred non-lethal weapon for breaking up fights. There were only 11 cell extractions during the same period that required the use of a cell extraction team. Each use of force in PBSP required the generation immediately of an incident report, hand-written by participants, that was submitted to and reviewed personally by the warden on the morning following the incident. Monitoring and controlling the use of force was a management priority at PBSP, and the importance attached by institutional leadership to that priority was known and appreciated throughout the rank and file of correctional officers.

The monitor reviewed incident reports on the use of the federal gas gun, as the 37mm launcher was referred to in PBSP, and the videotape of a cell extraction. The use of force in PBSP conformed to departmental and court-approved policies.

34

<u>PBSP Recommendations</u>

1.   PBSP needs to complete physical renovations to the EOP program space and work to expand programming to conform to Program Guide requirements.

2.   Compliance with the logging requirements of the heat plan was spotty.  The institution needs to have responsible personnel ensure that temperatures that need to be logged are actually logged.

**HDSP**

The monitor was at HDSP from September 9-11.  HDSP is a largely Level IV general population facility with a limited reception function. Supposedly, because it receives a regular flow of difficult prisoners coming out of PBSP, it has significant security problems.  Lockdowns are common, and the use of force frequent.

<u>Mental Health Staffing and Program</u>:

Mental health staffing was in flux at the time of the monitor's visit. Throughout much of the preceding year, the institution had been preparing to implement an EOP program for up to 60 inmates and a 3CMS program for as many as 349 inmates.  The inability to fill critical clinical staff positions, however, put all of that on hold.  It was decided that the facility would keep its MHCB unit and its small reception center mental health staff, but that, at least for the time being, EOP and 3CMS inmates would be transferred out of the facility.

At the time of the monitor's visit, HDSP had one newly hired psychiatrist and two half-time contract psychiatrists.  The chief psychiatrist

35

position was vacant. Other clinical positions included three psychologists, two of which were vacant; three psych social workers, all of which were vacant; and two psych techs, both filled. Recruitment difficulties in HDSP have effectively short-circuited, at least for the present, the ambitious array of mental health services projected for HDSP.

The institution did keep its MHCB program, which operated in the facility's spacious and commodious infirmary, scheduled to be licensed as a CTC. The unit had a total of 32 beds. At the time of the monitor's visit there were five MHCB patients in the unit. The unit appeared to be adequately staffed, although the monitor noted that one infirmary record reviewed contained no entry from July 3 to July 8, raising the question of what kind of coverage was provided over the long holiday weekend.

Documentation indicated that there were 20 EOP inmates and 81 3CMS inmates in the facility when the monitor visited. Staff was processing all of these inmates for transfer because HDSP had no official mental health program other than the MHCB unit. Staff also indicated that numerous inmates on the heat-risk list had not yet been designated 3CMS for lack of a psychological evaluation and the preparation of a placement chrono. The latest heat-risk list contained the names of 151 prisoners on heat-risk medications. Some of those may have been listed, as staff insisted, because they were taking heat-risk medications for medical, not mental health, conditions, but the proportion of inmates on weekly heat-risk lists for medical, as opposed to mental health, reasons did not come anywhere near a third of the total in any other institution in CDC.

36

Administrative Segregation:

The administrative segregation unit housed 200 inmates in double cells, and it was filled to capacity, with overflow into another unit. A psych tech was primarily responsible for providing mental health services in administrative segregation. A second psych tech, who was assigned to work with EOP inmates, took care of medication deliveries in administrative segregation on the third shift.

The administrative psych tech seemed highly motivated and well trained. She had been given little guidance on the administrative segregation program and had developed her own as best she could. She used a screening instrument she had obtained at a state hospital and was not aware of the 31-question screening instrument used throughout the department, including the reception center in her own facility. She had apparently never been given a copy of the program guide for administrative segregation, which spelled out the nature and purpose of mental health services in administrative segregation.

The psych tech screened all inmates within ten days of their arrival in administrative segregation. She reported referring to a psychiatrist or a psychologist anyone she found with a history of psychiatric illness or anyone who requested such a referral. She said she interviewed inmates in a conference room with custody present, at cell-side or in a cage or holding cell. The last was best for confidentiality. She was aware of EOP inmates in the unit and tried to speak with them frequently. There was no psych tech performing similar functions in the administrative segregation overflow facility. Clinical coverage apparently had been spotty until a new psychologist was hired, and a check of the entry log indicated a regular clinical presence in the unit recently.

37

The monitor interviewed an inmate who had attempted suicide in administrative segregation. He had saved up his and his cellmate's medication allotments and tried to overdose. He claimed that no one observed the taking of medications so it was easy to stockpile dosages. He also said that he had been back and forth between administrative segregation and the CTC for suicidal thoughts before his attempt. He claimed to have told the psych tech weeks before his attempt that he needed to see a psychiatrist, but on the day of his attempt, when a psychiatrist finally and fortuitously came to see him, he refused the visit. He also stated that the psych tech spoke to inmates in administrative segregation only at cell-side, and it was impossible to have a confidential and meaningful cell-side discussion.

The monitor attended ICC hearings in administrative segregation. There were 75 cases scheduled for hearing that day. The psych tech and the psychiatrist sat through all of the hearings, which were thoughtfully conducted. Committee members developed good information before each inmate appeared, and there was a genuine effort to communicate with inmates in the hearings themselves. In addition, a ranking member of the committee went cell-side to talk to prisoners who refused to participate in the hearing, an unusual and, again, thoughtful practice.

Inpatient Transfers:

During the monitor's visit, the nurse who handled DMH and EOP transfers was not at the institution. A review of inmate/patients in the MHCB program indicated that none had been in the CTC longer than 14 consecutive days.

38

Given the limited mental health resources available at the institution, delays in the transfer of EOP patients were a particular problem at HDSP. Strapped resources also slowed the identification and treatment of EOP inmates. The monitor interviewed and reviewed the medical record of an inmate (J90338) who had been formally designated EOP about three weeks earlier. His psychologist case manager thought this inmate was his most fragile EOP patient. He had apparently been in the MHCB program from 7/2 to 7/15. When he was discharged from the CTC, for some reason he was not put on the mental health caseload, although the psychologist saw him as seriously mentally disordered and anticipated his return to the a MHCB. There was no explanation for the hiatus between mid-July and late August when he was officially placed on EOP status.

Another EOP inmate (J97938) awaiting transfer entered HDSP in 10/96, after being cleared at NKSP for placement in the general population. At his screening in HDSP, he was referred for evaluation for possible major depression by a contract psychologist who gave him a GAF score of 40. No further evaluation occurred immediately, but the same psychologist saw him in 4/97 and gave him a GAF score of 65. In 6/97, the inmate was designated 3CMS. In July, he was in administrative segregation and on Elavil. In August, he was admitted to the MCHB program and diagnosed as psychotic and depressed. He was apparently designated as EOP at that time, although there was no chrono to that effect in his record. He was awaiting transfer to another facility with an EOP program. Because his case was not an emergency, he

could spend weeks, or even months, before being transferred from an institution that lacked the resources to provide him needed mental health care.

Heat Plan:

Heat was not a big issue at HDSP. Outdoor temperatures exceeded 90 degrees in the area frequently, but the institution's heating and ventilation system maintained a consistent ten to 20-degree spread between indoor and outdoor temperatures. Because of the altitude, temperatures regularly dipped at night. There were no stage-two heat alerts reported.

The institutional heat plan complied with departmental and court requirements, except that it gave heat-risk inmates an option of returning to their living areas in a stage-one alert, rather than requiring their return. The monitor checked heat logs on a random basis and found them to be in order.

Use of Force:

Written institutional policies on the use of force were less than perfect, but there was an attempt to address the issue of how to limit the use of force on seriously mentally disordered inmates. In addition, the policies reportedly were in the process of being updated.

The April 8, 1997 local addendum on cell extractions required an MTA to be present and to provide first aid as appropriate. It omitted a requirement to check with medical staff to determine whether there might be a medical or psychiatric condition that should be considered. It also lacked reference to the requirement to document when medical input was overridden. The policy on the use of OC gas did require custody staff to check with a doctor or mental health clinician if a targeted inmate was identified as being in a

special medical or mental health category. It also lacked direction on the need to document custody overrides of medical judgment.

The monitor reviewed incident reports on the use of 37mm weapons and OC gas. In the two identified cases involving the cell extraction of seriously disordered inmates, the incident report indicated that custody staff consulted with mental health services before the extraction. In both cases, mental health staff unsuccessfully tried to avert the need for force and eventually endorsed the use of force to move one of the inmates to the MHCB unit and to medicate the other.

In late February, 1997, there had been a major disturbance in HDSP, the quelling of which required 46 cell extractions. The monitor's review of the reports generated by that incident indicated a violation of the policy against the use of the 37mm weapon against inmates, seriously mentally disordered or otherwise, during cell extractions. The incident report indicated that correctional officers discharged the 264-R (hard rubber) rounds into cells without barricades. Reportedly, the rounds were ricocheted at inmates. Departmental policy has banned the use of the hard rubber round in cell extractions except to remove barricades by firing at them. The policy violation was explained as a misunderstanding of the then current policy, which had since been rectified.

The monitor saw evidence that mental health personnel were being contacted and involved in situations involving the use of force against identified seriously mentally disordered inmates. Recent incident reports contained documentation on targeted inmates obtained by custody staff from

41

clinicians, a development suggesting increasing coordination between custody and mental health personnel in instances involving the use of force.

<u>HDSP Recommendations:</u>

1.    The immediate task for the defendants in HDSP is to get EOP inmate/patients out of HDSP as soon as possible and to make sure that no more are transferred into the facility. Resources for handling EOP inmates at HDSP are inadequate for the monitoring and treatment of EOP inmates. During the period it takes to transfer EOP inmates out of HDSP, mental health staff needs to focus on that population and make sure that individuals in need of treatment get what they need.

2.    The planned capacity for 299 3CMS inmates is simply not realistic and needs to be adjusted downward accordingly. One new psychiatrist, one psychologist and two psych techs, even with the contractual psychiatric help, do not constitute sufficient staff to run both a MHCB program and a sizable 3CMS caseload.

3.    If inmates from the mental health caseload are housed in the overflow administration facility, there needs to be a mental health staff presence there. A psych tech needs to visit the overflow unit on a regular basis to monitor seriously mentally disordered inmates that may be housed there.

4.    Local use of force policies need to reflect the requirement that medical and/or mental health staff need to be consulted before the use of force on seriously mentally disordered inmates. The incident involving multiple cell extractions involved a violation of both local and departmental, and effective efforts to prevent its repetition need to be taken by institutional administrators.

## CCC

The monitor visited CCC on September 8 and 9, 1997. CCC is a remote, general population facility closely associated with the conservation and forestry camps operated by CDC. Early plans for mental health services in CCC envisioned a 3CMS program for up to 299 inmates.

Health Care Staffing and Program:

At the time of the monitor's visit, authorized mental health positions at CCC included a half-time psychiatrist, a senior and a clinical psychologist, one full-time and two half-time psych social workers, a psych tech and a medical transcriber. Actual staff consisted of two psychologists, a psych social worker, a psych tech and a medical transcriber.

The most serious staffing deficiency at CCC was the absence of a psychiatrist. The facility was unable to contract privately for psychiatric services to fill the gap. CCC was the only CDC facility totally without psychiatric services. This meant that medical staff had to prescribe, monitor and renew psychotropic medications distributed to inmates. While that situation might be acceptable in an emergency, extended over a period of time, it represented a violation of

43

approved policy and effectively precluded the housing at CCC of seriously mentally disordered inmates on any kind of a medication regimen. The defendants have been forced to keep medicated mental health patients out of CCC, and to transfer elsewhere inmates who might develop a need for psychotropic medication during their stay there.

At the time of the monitor's visit, there were three 3CMS inmates and one EOP inmate in the facility, all of whom were waiting to be transferred. Mental health staff at CCC provided care to the small number of seriously mentally disordered inmates who had been misdirected to CCC, as well as to unmedicated 3CMS inmates that might be housed in the facility from time to time. They also responded to staff referrals and inmate self-referrals for mental health evaluation and care.

The CCC infirmary is an old and primitive unit. There was an EOP patient (K50495) in the infirmary when the monitor visited. He had been initially admitted to the infirmary on 8/15/97, went out for a day on 8/27, was readmitted on 8/28 and was there awaiting transfer on 9/8. He had come to CCC from San Quentin, where he had been screened as suitable for general population. He said he had lied to the mental health screener because he feared the consequences of sharing truthfully his psychiatric history. He ended up in the infirmary on 8/15 due to the referral of a classification counselor at CCC based on reported hallucinations and suicidal ideation.

A physician saw the inmate, put him on Mellaril on 8/15 and steadily increased the dosage. The inmate was still hearing voices and expressed severe discomfort in the infirmary, where he felt "too closed down."

44

He described himself as drugged-up and miserable. He needed to be shipped expeditiously to an institution with the capacity to treat him. He needed a psychiatrist to consider medication issues and an environment where he could receive more treatment and, possibly, be less confined.

He was being seen daily by the medical and mental health staff at CCC. The facility was also trying to move him. Fourteen days after his designation as an EOP patient (and 19 days after his admission to an infirmary with no available psychiatrist), a classification committee recommended his transfer to MCSP or CMC. Two days later the classification services representative (CSR) endorsed him for transfer to CMF/Vacaville. In the absence of a designation of his case as an emergency, a designation the chief medical officer was reluctant to confer, the inmate moved through the classification process at the normal pace. He was transferred on 9/9.

Staffing limitations at CCC were exacerbated by a tendency on the part of the facility's clinicians to discount psychiatric symptoms and to assume that prisoners were malingering or simply bad, personality disordered people. The issue was not one of professional competence, but rather of a demeanor that reduced the willingness of inmates to engage in a frank conversation with some clinicians about personal mental health problems.

Administrative Segregation:

There was a full-time psych tech in administrative segregation, whose principal duties were to monitor the occasional seriously mentally disordered inmates sent to administrative segregation, screen newly arrived inmates in the unit and watch for mental health problems generally. The psych

45

tech conducted regular weekday rounds. The psych tech made clear to the monitor that he did not particularly like prisoners whom he found most often to be full of guile and malingerers. On the day before the monitor's arrival the psychologist and the psych tech jointly interviewed an inmate who claimed a history of past psychiatric problems and current mental health difficulties. The psych tech dismissed the complaints as "not real" and expressed doubts about the veracity of the inmate's claims of a past mental health history, which turned out to have been truthfully represented. The monitor talked with the inmate who sounded both depressed and paranoid. He refused to eat anything except the daily box lunch because he thought the guards in administrative segregation were poisoning his food. The psych tech had so obviously dismissed the inmate's description of his symptoms, the inmate would no longer talk to him.

A review of the administrative segregation logs indicated that in the preceding month the institutional psychologists had visited the unit three times.

Inpatient Transfers:

There were no indications of any recent transfers of patients out of CCC to DMH or to an MHCB program. The senior psychologist reported that there had been no referrals to crisis beds or to DMH during his two-year tenure at CCC. The psychologist explained that the first response to a potential crisis was removal of the inmate to the CCC infirmary for evaluation. If the inmate was not suicidal and calmed down, he would probably be returned to his living unit and monitored. If some one were truly suicidal, he would be transferred elsewhere, presumably to HDSP.

The nature of the limited mental health services at CCC made the business of transfers critical. If an inmate was referred to an EOP or 3CMS program while at CCC, his transfer was subject to all of the normal vicissitudes and delays characteristic of institutional movement from any remote CDC facility. Reportedly, the latest iteration of departmental policy on the movement of EOP inmates sets a 21-day time limit from endorsement to transfer. In the case discussed above it took better than two weeks to get from referral to endorsement, and that particular inmate's movement probably occurred as quickly as it did because of the monitor's interest in and concern about the case. In the ordinary course, however, an EOP or a 3CMS inmate can sit a long time awaiting movement in CCC, an institution with no psychiatric services. If there is an intervening disciplinary infraction to be disposed of, the inmate may sit literally for months, as has happened elsewhere in the system. It is important to keep EOP and 3CMS inmates out of CCC and to move quickly those who turn out during their stay at CCC to need EOP or 3CMS levels of care.

Heat Plan:

Not surprisingly, heat was not much of an issue at CCC. The facility had only a handful of heat-risk inmates at any one time, all of whom were located in one of three buildings where temperatures were logged and the heat plan was known and followed. The institution never had a stage-two or a stage-three heat alert, although outside temperatures in summertime sometimes exceeded the 90-degree trigger. On August 6, 1997, for example, the outside temperature was 103 degrees, but the highest indoor temperature that day was 86 degrees.

47

The heat plan required that heat-risk inmates return to their living unit when a stage-one alert occurred. It also required that heat-risk inmates be issued a pass to enable them to return to their units. The pharmacist prepared a weekly list of heat-risk inmates.

Use of Force:

There had been no use of the 37mm weapon at CCC in memory, nor had there been any use of mechanical restraints or involuntary medication. Local policy on the use of the 37mm weapon in a non-emergency situation did not require a check of the medical or mental health status of the target inmate, an oversight that seemed to reflect the absence of any recent effort to update local rules on the use of force.

The monitor reviewed incident logs, incident reports and a videotape of a cell extraction that involved the use of OC pepper gas. On the basis of that review, procedures at CCC involving the use of force comported with departmental and court requirements.

CCC Recommendations:

1.    In the absence of psychiatric services, the department needs to keep seriously mentally disordered inmates out of CCC, particularly any EOP inmate/patients. This also requires that classification people work cooperatively with CCC mental health personnel to move seriously mentally disordered people more expeditiously than normal. CCC clinicians must move more aggressively to promote expedited transfers.

2.    There appeared to be a preoccupation with malingering among mental health staff in CCC.  In the absence of psychiatric staff to review these malingering diagnoses, staff ought to be especially cautious in such determinations, which tend, among other potentially harmful effects, to slow down or subvert needed transfers.

3.    Given the small number of seriously mentally inmates housed in CCC, it is difficult to judge the routine availability of mental health services in administrative segregation.  This is a service area local mental health staff should review periodically to make sure inmates with mental health problems in administrative segregation have regular access to appropriate care.

4.    CCC needs to clarify local policy on the requirement to determine whether inmates targeted for the planned use of force are seriously mentally disordered.

### Service Area C

This service area consists of Mule Creek State Prison (MCSP), with a MHCB program (5 beds), an EOP program for up to 150 inmates and a 3CMS program for up to 299 inmates; and Sierra Conservation Center (SCC) with a 3CMS program for up to 249 inmates.  Inmates in the service area in need of acute short-term inpatient care are transferred to MCSP.

49

**MCSP**

   The monitor visited MCSP from October 22-25.

   Mental Health Staffing and Program:

   To staff the three levels of mental health programming at MCSP, the facility was allocated a chief psychiatrist, three staff psychiatrists, two senior and one clinical psychologists, five psych social workers, one and a half recreational therapists and five psych techs, plus nursing and clerical staff. The chief psychiatrist and two staff psychiatrist positions were vacant, as was a half-time psych social worker position.

   The 3CMS program initially slated for implementation at MCSP in July of 1995 was to provide services for 224 Level III inmates. The original staffing package for that permutation of the 3CMS program included a half-time psychiatrist, a full-time senior psychologist, two full-time psych social workers and a half-time office tech. A half-time psychiatrist was added in early 1996 when it was decided to introduce a 3CMS program for up to 50 Level IV inmates. Then in mid-1996, the institutional 3CMS caseload was expanded to provide services to up to 299 inmates, including 126 Level IV inmates.

   The number of actual inmate/patients surpassed the anticipated cap of 299 during the summer of 1997. At the time of the monitor's visit, there were 361 3CMS inmates at MCSP. Two hundred and seventeen were Level III inmates, while 120 were at Level IV. Twenty-four others were housed in administrative segregation.

Staff admitted that the existing staffing was inadequate to provide group therapy to the growing caseload. Also, there was difficulty in meeting time restraints for the processing of new admissions to the 3CMS program.

The EOP program at MCSP became fully operational in August of 1996. From August of 1996 through February 1997, the program census climbed to approximately 150. In addition to the clinical staff, two extra correctional officers were assigned to the EOP housing unit on the second and third watch. MCSP also assigned a correctional counselor to the EOP program.

Administrators at MCSP cited staff vacancies, vacations and sick leave as reasons for their inability to meet program guide standards for EOP programming. Finding suitable space for therapy sessions, classes and meetings, always a problem in Level IV facilities, was a challenge to MCSP staff. Other clinical staff insisted that their ability to provide adequate EOP programs was limited by repetitious and cumbersome duties. They felt overburdened by the number of required work-ups, chart documentation, therapy requirements, case reviews and treatment planning.

Whatever the merits of these complaints, it was clear that MCSP, notwithstanding its proximity to Sacramento, was having difficulty hiring and retaining psychiatrists. The chief psychiatrist position had been vacant since December of 1996. According to the chief psychologist, the department has been unable to fill that vacancy or the other two vacant psychiatric positions at the institution. MCSP's mental health program was operating with only one full-time psychiatrist and tried to meet its remaining psychiatric needs through contracted services. The chief psychologist stated that, as long as the

psychiatric positions were vacant, the quality of mental health care at MCSP care would suffer.

<u>Administrative Segregation:</u>

The Monitor interviewed inmates and staff in the administrative segregation unit and attended both ICC and IDTT meetings there.

ICC hearings conducted in MCSP differed from those in other facilities, in that the warden, the chief deputy warden, two associate wardens, a senior correctional counselor and the facility captain all participated in the hearing. In other facilities, the warden rarely attended ICC hearings. A senior psychologist was also assigned to attend ICC meetings, and he had the medical record of each inmate who appeared before the committee. One Spanish-speaking inmate was heard, and a Spanish-speaking correctional officer was provided to interpret for him.

Although the ICC hearing was well run, the lack of participation on the part of the attending senior psychologist was unsettling. In the absence of a chief psychiatrist at MCSP, the chief medical officer had appointed a senior psychologist as his designee. It was clear from the outset that the warden believed that mental health clinicians should play a key role in the placement of seriously mentally disordered inmates, as she stated at least twice explicitly during the hearings. On at least two occasions, the warden directed mental health staff to interview someone further.

In one case, an inmate (J79335) placed in administrative segregation for fighting stated that he had stopped taking his medication because it made him drowsy and did not think it was working. He also stated

52

that he still needed medication because he had panic attacks and was fearful of being attacked by other inmates. The psychologist told the inmate to talk to the psych tech after the hearing and have the psych tech put him on a list to see the psychiatrist. The warden intervened and directed that the inmate be seen by a psychiatrist that day. She also suggested that the inmate stop trying to play doctor when competent staff was available. In this instance, it was the warden, not the psychologist, who made the referral.

Another 3CMS inmate (J09513) was in administrative segregation for touching staff inappropriately. He was visibly decompensating. He rocked throughout the hearing, complained that his medication was not working and claimed he was not eating. The correctional officer from administrative segregation confirmed that the inmate took his food tray but did not appear to be eating from it. The psychologist indicated that the inmate could be heading toward EOP status and that the treatment team would review his file. He acknowledged that the IDTT team might not meet for another week, but suggested that someone would see this inmate within a few days to conduct another mental health evaluation. The warden again intervened, directing that the inmate's situation be put "on the front burner" immediately so he could get appropriate treatment. She also asked to have the individual appear again before the ICC committee in a week.

The monitor interviewed each of the inmates who appeared before the ICC. They stated that they had regular contact with the psych tech assigned to administrative segregation. The psych tech also attended the ICC hearing and participated more vocally than the psychologist. Inmates also

reported regular contact with the clinician who visited the administrative segregation unit at least weekly.

       The monitor interviewed the administrative segregation psych tech, who made daily rounds (Monday through Friday) of seriously mentally disordered inmates and screened all inmates for mental health referrals. She monitored for signs and symptoms of mental illness, scheduled treatment with psychiatrists and attended ICC and IDTT hearings. A psych social worker also conducted rounds weekly. Relations between custodial and mental health staff in the unit appeared to be cooperative.

       A review of medical records of inmates in administrative segregation confirmed that the psych tech and the psych social worker see inmates regularly. One of the records reviewed seemed to reflect the dearth of psychiatric care available at MCSP. Inmate C38233 came to Mule Creek on 5/9/97, and his bus screening form indicated he had no mental health problems. On 5/15 he saw a psychologist in administrative segregation and received a GAF score of 65. On 5/30 he made a request for Mellaril, which he had taken at another point in his life. The medication was ordered, but the order was not recorded in his progress notes. He was seen by an IDTT on 10/8/97, but was never included in the 3CMS program. A psychologist told the monitor that the inmate was not put in the 3CMS program because the psychiatrist who examined him was not a "team player". Thus, the psychiatrist did not put the inmate on the list, and the inmate subsequently decompensated. The psychologist argued that, if a chief psychiatrist had been available, this breakdown in service would not have occurred.

The monitor observed clinical rounds being conducted in the MHCB unit. One inmate (K41665) was hostile and belligerent and requested a transfer to another facility. He refused to take any tests to help with his treatment and stated that he wanted to go to a mental hospital. He had been suicidal for over 15 days. This bipolar inmate had ceased using his medications (Zoloft, Mellaril, and Lithium) because he said that they were not helping him. Although he had been in the 3CMS program at one point, he was clearly decompensating and stated several times during his interview that he was suicidal. The inmate had a relatively low classification score (he was at custody Level-II), but the committee thought it would have difficulty "selling" him to DMH. He had been in the infirmary well beyond the ten-day goal, and, although he appeared to be a candidate for a Keyhea hearing, the committee felt it lacked sufficient evidence to present a case successfully. Finally, the clinicians determined that they would present his case to DMH even though they believed he was being manipulative. The inmate refused to take a shower, and they continued his suicide watch.

Another inmate ((D00927) was diagnosed with a personality disorder and had an extensive history of alcohol abuse. He had been in the MHCB unit before because he had difficulty programming. He had been the subject of a Keyhea hearing before in another prison, and the mental health staff was in the process of referring him to DMH. A few weeks earlier mental health staff had considered a Keyhea hearing for this inmate, but declined because they felt he was not enough of a threat to others. This individual had been in the MHCB unit for seven days. He had a history of noncompliance with medication. His latest GAF score

55

was 25, and a chrono for transfer to DMH had finally been filed. Involuntary medication seemed indicated. Without a chief psychiatrist, difficult clinical problems tended to be handled indecisively.

Inpatient Transfers:

Eleven patients were transferred from Mule Creek to DMH in 1996 and 1997. The average length of time from admission to the MHCB unit to discharge to DMH was 16.2 days for ten of the cases. One inmate was admitted to the MHCB on January 8, 1997 and was returned to the EOP unit five days later because the wait for his transfer was going to be lengthy.

Transfer records were inadequate for monitoring purposes. There is a need to track the time between clinical referrals for transfer and actual transfers, as well as any rejections, together with reasons for the rejection.

The defendants complied only partially with policies relating to inpatient transfers.

Heat Plan:

The monitor interviewed inmates and staff on the heat plan. A correctional officer told the monitor that, when the outside temperature reached 90 degrees, an announcement was made in the main control area and inmates were required to return to their living units. There was a thermometer in the control booth linked to a sensor in the middle of the day room above the second floor. The officer knew what to do in a stage-two alert and reported that ice and showers were given frequently during stage-two alerts. He stated that during a stage-three heat alert he would remove inmates from their cells, but was uncertain about the need to call for an MTA.

The monitor interviewed several inmate workers housed in the EOP unit. The workers reported that all heat-risk inmates received a heat pass or ducat that helped them return to the housing unit during a stage-one alert. When a stage-one alert was triggered, workers were assigned to fill the cooler with ice. Each of the workers reported that inside temperatures stayed in the low 70's. They also stated that a month earlier, a stage-two alert occurred when the ventilation system temporarily malfunctioned. During the period of the alert inmates were let out of their cells to shower and were given cups of ice and water.

The heat plan at Mule Creek comports with the Court provisionally approved policy and orders. The policy specifies that inmates must return to their units during a stage-one alert and that cooling measures must be implemented during a stage-two alert. The policy requires an MTA to conduct rounds to monitor heat-risk inmates during a stage-three alert. There were approximately 1,110 staff at Mule Creek. One thousand sixty-four or 96 percent had received training on the heat plan.

The monitor interviewed the psych tech and an MTA assigned to the EOP unit. Both stated that there had been no heat-related incidents thus far in 1997. The psych tech and MTA were assigned to the EOP unit on a daily basis.

MCSP complied with heat plan policies and orders.

<u>Use of Force</u>:

The monitored reviewed five cell extractions that involved seriously mentally disordered inmates. Mental health representatives were present at all of the extractions. In three, a psychologist was videotaped discussing the

reasons for the extraction and earlier efforts undertaken to avoid the extraction. The actual extractions were performed quickly and without excessive force.

The monitor also reviewed institutional policy on the use of the 37mm weapon and determined that it complied with applicable departmental requirements regarding its employment against seriously mentally disordered inmates. The 37mm weapon was fired 16 times from January through October of 1997. All of the discharges occurred in the administrative segregation yard or in large open spaces.

### MCSP Recommendations:

1.  The principal deficiency at MCSP is psychiatric staffing. The defendants need to find and hire psychiatrists to provide services as required by the program guides.

2.  There is a need to improve documentation of inpatient transfers through the establishment of a log of transfers, including date of referral, classification approval, CRS endorsement and date of transfer, with any reasons for rejection of the transfer also being recorded.

3.  EOP programming needs to be expanded to meet the requirements of the EOP program guide.

## SCC

The monitor visited SCC on December 17 and 18. SCC, which is located 40 miles from Yosemite National Park, is the conduit for CDC inmates to conservation camps throughout California. It is an older facility, comprised of three sections. The Celaveras yard houses Level I prisoners; the Mariposa yard

houses Level II prisoners, 92 of whom are in the 3CMS program; and the
Tuolomne yard, built in the last decade, houses Level III inmates in five buildings
or units. Tuolomne has swamp coolers that keep inside temperatures at
appropriate levels. It also houses the administrative segregation unit. Housing
units in the older yards are small dormitories, typically housing 24 to 36 inmates.

### Mental Health Staffing and Program:

There were six mental health staff positions at SCC, including a half-
time psychiatrist, a psych social worker, a supervising senior psychologist, a
clinical psychologist, a psych-tech and an office tech. All of these positions were
filled, and most of the staff had been at SCC for over two years. All of the
clinicians were licensed.

The senior psychologist served as the clinical director of mental
health services at the institution. In addition to administering the 3CMS program
for a projected capacity of 349 prisoners, SCC mental health staff conducted
board of prison term evaluations, assessments of suitability for camp assignments
and administrative segregation screenings and MDO reports. At the time of the
monitor's visit, the total 3CMS caseload was 276 (92 in Mariposa, 171 in Tuolumne
and 13 in administrative segregation).

Administrators and staff at SCC made a strong argument for an
additional half-time psychiatrist position to supplement the existing half-time
position, which was felt to be inadequate for service needs. Sacramento did not
agree and apparently felt that SCC had sufficient resources to provide
scheduled services.

SCC had no MHCB program and sent its crisis patients to MCSP.
The institution had a small infirmary, in which five rooms were set aside for
inmates in any sort of mental health crisis or who needed to be kept on a suicide
watch. At the time of the monitor's visit, there were no mental health patients in
the infirmary.

The monitor interviewed and conducted a review of the medical
records of a cross-section of inmates who were the recipients of mental health
services at SCC:

1.    Inmate H39219: This inmate stated that he only saw a
psychiatrist every 90 days and had infrequent contact with a psychologist,
perhaps every 90 days. He stopped taking his medication in June. This inmate
was seen on 11/6/97 by a clinical case manager and apparently his symptoms
were in remission. He was being treated for depression. He arrived in SCC on
3/2/96 and had a treatment plan by 3/22/96. He was seen again by a clinical
case manager on 6/3/96 and by a psychiatrist on 6/4/96. A psychologist saw
him on 7/12/96, and he was placed in the infirmary on 7/19/96 because he was
suicidal. He was released shortly thereafter and seen by a psychiatrist on
8/13/97. He was seen on 11/5/96 by a psychiatrist and was a no-show for an
appointment with his clinical case manager on 11/18/96. He was seen by a
case manager on 11/12/96, 1/22/97 and 4/15/97. The psychiatrist saw him on
1/24/97 and 4/15/97. He was a no-show for an appointment with his clinical
case manager on 4/22/97, but he was seen on 5/1, 7/15 and 8/14 by his clinical
case manager. He was examined by a psychiatrist on 5/13 and 7/1. On IO/ I he
was again a no-show, but was seen by a case manager on 11/6. Despite all of

the contacts, he apparently did not receive an annual update of his treatment plan, due in 3/97.

2.      Inmate J76008: This inmate, who was located in administrative segregation, said he was not sleeping well and was eating only one meal a day. He said he had asked to see a psychiatrist and that he had stopped taking his medication on 6/2/97. The psych-tech noted regularly that the inmate ate daily and saw a clinician weekly. The inmate had arrived at SCC on 8/22/96 and had a mental health evaluation on 8/26/96. The chrono from 8/26 suggested that he was already a 3CMS inmate, but there was no bus screening form in his file to confirm his prior treatment. He entered administrative segregation on 11/15/97 and was seen weekly by a clinical case manager and daily by a psych-tech. A treatment plan was in his file, dated 11/20/97. He was seen by the IDTT team on 11/27/97 and 12/18/97. This individual had regular contact with mental health staff.

3.      Inmate J39132: This inmate was placed in administrative segregation for trafficking in heroin on 11/22/97. His record indicated that he had been seen by a psychologist on 11/25/97, 12/2/97, 12/3/97 and 12/10/97. On 11/26/97 he was seen by the IDTT team. A treatment plan was developed giving him a GAF score of 60 and stating that he was depressed and not compliant with his medication. On 12/17/97 he was seen again by a psychologist in the unit. This inmate refused to see a psychiatrist on 11/25/97.

4.      Inmate J86394: This 3CMS inmate in administrative segregation was endorsed for the SHU at CSP/Corcoran and was awaiting transfer. He said that he had seen the psychologist and was familiar with both

61

refused to be seen by a psychologist. He refused again on 12/I/97, 12/2/97, 12/3/97 and 12/10/97, and was seen again on 12/17/97. He was seen by the IDTT team again on 12/18/97. He was seen by a psychiatrist on 9/5/97 and 12/15/97.

Interviewed inmates had no major complaints about the mental health care they were receiving.

Administrative Segregation:

The monitor observed six ICC hearings for seriously mentally disordered inmates. They were chaired by the chief deputy warden and included the senior psychologist. Reportedly, everyone in the unit was seen within ten days for a mental health screening unless they were already on the mental health caseload.

When the first inmate came into the room the classification counselor immediately let the psychologist know that he was a 3CMS patient. The psychologist led the questioning on the inmate's mental health status and treatment. He also made an appointment for the inmate to see the psychiatrist because he was having problems sleeping. This individual had taken himself off of medication in June.

Another inmate, familiar to the committee members, was clearly decompensating. The psychologist indicated that he would have this inmate examined and possibly removed to the infirmary. This inmate had been placed in administrative segregation for "stretching and arching" in front of a staff member, but he did not hit anyone. His inappropriate actions apparently alarmed the correctional officer who wrote him up. The inmate explained that he was stretching and arching simply to communicate with Jehovah. The

psychologist questioned the inmate closely. He said that he had seen the psych social worker in the unit and had been on medication before in the CDC system. His parole hearing was scheduled shortly. It turned out he had been in the EOP program at RJD. He was seen regularly by a psych tech in administrative segregation.

Another inmate appeared for a 30-day review. The psychologist, who had the inmate's medical records in front of him, recommended that this individual be placed at CSP/Corcoran or CSP/LAC because he was a Level IV inmate, who had walked away from a camp and received both a disciplinary and a formal criminal charge. He received a 32-month sentence with loss of 120 days of credit. He had also been recently designated as a 3CMS patient. He reported seeing a psych-tech daily and a psychologist cell-side weekly, although he felt more comfortable talking to the psych-tech. He saw a psychiatrist once every three months and felt that he was treated well at SCC. He was concerned that he might be at some risk because his medication dosage was so high. The psychologist again interviewed the inmate at length and seemed genuinely concerned about his placement.

The monitor interviewed the administrative  segregation psych tech, who reported that she made rounds in the unit five days a week and also passed out medication and monitored medication for the entire institution. Interviewed inmates seemed to know her and were comfortable with the level of contact she provided. She documented her contacts routinely, as did the psychologist. Reportedly IDTT hearings were conducted regularly. Mental health

services provided in the SCC administrative segregation unit complied with departmental and court-approved policies and standards.

Inpatient Transfers:

In 1997 there were only two transfers out of SCC to the MHCB program at MCSP. The senior psychologist reported that he did not keep data on the two transfers, but he was sure they had both been transferred within 24 hours of their referral. The senior psychologist agreed to begin to keep statistics on transfers.

Heat Plan:

The monitor reviewed the SCC heat plan and found that it comported with court and departmental requirements. Inmates were required to come indoors during a stage-one heat alert, and heat alert passes were distributed. Heat-risk inmates were routinely informed about the effects that excessive heat might have on their physical health. The pharmacist produced a weekly list of heat-risk inmates.

Temperature logs were maintained in all of the buildings at SCC. From May 1 through mid-December, 1997, the outside temperature reached or exceeded 90 degrees on 61 days. The inside temperature reached 90 degrees in one or more of the older buildings five times in May, five times in June and almost daily in July and August. No 3CMS inmates were housed in Calaveras.

Sometime in July of 1997, SCC administrators were contacted by Sacramento to respond to issues raised in a potential class action suit by some 3CMS inmates at SCC. The inmates claimed that inside temperatures in their unit on the Mariposa yard continually exceeded 90 degrees. On August 3, 1997,

3CMS inmates were relocated from the dormitories to the gym in the Mariposa yard. The gym, also called the emergency housing unit (EHU), although not designed for housing inmates, had ceiling fans and large evaporator coolers which kept the inside temperature somewhat cooler. Throughout the summer of 1997, the inside temperature in the gym never reached or exceeded 90 degrees. The dormitories did not have evaporator coolers or ceiling fans. Thus, inmates on the Mariposa yard experienced stage-two heat alerts only in June and July; they never experienced another after their move to the gym.

The relocated 3CMS inmates protested bitterly that their new quarters were inadequate. They insisted that there were insufficient electrical outlets for personal radios and televisions. There were not enough showers, sinks and toilets to meet the needs of the population. Because the EHU also housed newly arrived inmates, they might be exposed to undetected communicable diseases carried by those inmates. Finally, because the gym held well over 200 people, they had less privacy and were more exposed to noise.

Some inmates in the unit contacted the <u>Coleman</u> plaintiffs' counsel about conditions in the EHU. They complained basically that they were deprived of the privileges enjoyed by the rest of the general population. When inmates learned that a <u>Coleman</u> monitor was in the facility, they sought a meeting to discuss their grievances. They told the monitor that in their old unit they could open the dormitory door when inside temperatures hit 90 degrees and sit out on "the porch", where they smoked their cigarettes and congregated in small groups. Such smoke breaks were not allowed in the EHU.

The EHU was separated into three sections, with roughly 90 beds in each section. Noise levels were high, though not excessively so, but there was constant movement in the unit. Inmates complained that they lacked sufficient privacy, and there were not enough toilets or sinks. There were two sink/toilet areas in the unit. The first was on the right side and had three sinks, four toilets and several showerheads. The area on the left side, which was closed during the first shift (10:00 p.m. to 6:00 a.m.) for staffing reasons, had five toilets, six sinks and five showerheads. Inmates complained specifically that at night there were not enough sinks and toilets to serve the population. More generally, inmates complained about deteriorating paint, ceiling leakage and possible asbestos problems.

The monitor spoke at length with a handful of inmates who stated that in a stage-one heat alert inmates were required to return to their housing units, and, although stage-two heat alerts occurred regularly in the dormitories, none had occurred in the EHU. The monitor followed up the claims of the principal spokesman for the disgruntled inmates who alleged that inmates in the Mariposa dormitories were much better off than those in the EHU.

The unit, similar to other dorms on that yard, was a 36-bed dormitory with a locked door and a fence. Correctional officers made hourly rounds in the unit, but were not posted inside the dormitory on a regular basis, meaning that there was considerably less direct supervision than was the norm in the EHU. There were two toilets, three sinks and one shower with two heads. The shower was so small, only one person at a time could take a shower. There was

only one television set in the unit, but there were numerous outlets, and inmates did have individual radios. There was a small dayroom and bunk beds.

The monitor found the dormitory small, dark and humid. It was less noisy than the EHU, but not significantly so. Physically, the EHU was cleaner, brighter and a somewhat nicer place to live. The primary difference between the two locations appeared to be the level of supervision of inmate activity. It was considerably greater in the EHU.

The monitor interviewed the correctional officer in the EHU on the various levels of the heat plan. He referred to a laminated instruction card that listed the appropriate procedures for each of the first two, but not the third, stages of a heat alert. He was at a loss about what to do in a stage-three alert. The monitor had the same experience in administrative segregation where correctional officers also referred to their instructional cards that were similarly silent on their third-stage duties.

Approximately 1,389 of 1,400 total staff (99%) had fulfilled their annual training obligations on the heat plan. Because of its lack of knowledge about its responsibilities in a stage-three alert, however, the SCC staff did not fully comply with court and departmental requirements.

Use of Force:

The monitor reviewed the use of force policy at SCC, which stated that the 37mm weapon could be used to take down a barricade or if "[t]here is evidence of reasonable belief the inmate may be in possession of a weapon." The policy goes on to say that:

"[t]he Def-Tec #20F multiple baton round will be used with the 37 gas gun. The 37 gas gun, with a 264R multiple baton round, will be

68

used to remove the barricade if necessary. In a typical cell extraction, the preferred method of use of the 37mm gas gun is to aim the weapon at the floor in front of the inmate and firing the #20F baton round so that the foam batons ricochet around the cell distracting the inmate. If it is necessary to fire the 37mm gas gun directly at an inmate, the #20F foam rubber baton round will be fired at the inmate's mid-thigh level or below".

This local policy, which does not comport with departmental policy, seemed to grant staff the right to fire the 37mm weapon, in emergency situations, at seriously mentally disordered inmates during a cell extraction.

The monitor reviewed the facility's incident logs and reports and viewed videotapes of cell extractions. The 37mm weapon was used only 11 times in 1997 and only on the administrative segregation yard or in other large and open spaces. Both of the only two cell extractions in 1997 involved the same inmate, who was not on the mental health caseload. While the monitor was at the facility, OC gas was used to quell two 3CMS inmates who were fighting in their cell.

SCC Recommendations:

1.    SCC needs to revise its handout for staff on the heat plan to include directions on the duties of correctional offers in stage-three heat alerts.

2.    The facility also needs to bring its policies on the use of the 37mm gun into conformity with departmental policy.


**Service Area D**

This service area includes California State Prison at Solano (CSP/Solano), with a MHCB program (5 beds) and a 3CMS program for up to 499

inmates; Deuel Vocational Institution at Tracy (DVI), with a 3CMS program for up to 117 inmates; and CMF/Vacaville and San Quentin, neither of which are included in the Coleman case. The existence of separate court orders for CMF and San Quentin differentiates this service area from all others. The department's overall plan for this service area has not yet been implemented.

**CSP/Solano**

The monitor was at CSP/Solano on July 24, August 1and August 6. The institution was severely overcrowded. Two of the gyms used for dorms were triple-bunked and housed up to 282 inmates. There was talk of triple-bunking some dayrooms.

Mental Health Staffing and Program:

CSP/Solano was understaffed for psychiatric services. Its allocated staff (an overall 18.5 positions, including three psychiatrists, three psychologists, four psych social workers, one recreational therapist and one psych tech, plus clerical staff) was based on an MHCB program of five beds and a caseload of up to 499 3CMS inmates. The MCHB program, however, had six to seven patients regularly and sometimes as many as 15, and, at the time of the monitor's visits, there were over 600 3CMS inmate/patients.

Another serious problem was the number of key staff vacancies. One of the two staff psychiatrist positions was vacant, and provisions for contractual replacement produced only about eight additional hours of psychiatric coverage weekly. Efforts to obtain additional contractual coverage were unsuccessful. All four of the allocated psych social worker positions were vacant. These vacancies meant that the 3CMS program, with an allocated

staffing pattern for 499 inmates, was missing four of the scheduled seven case managers and yet had to deal with a caseload of over 600.

Part of the staffing problem could be traced to the anomalous position of this service area in the department's overall mental health services structure. Because of the <u>Gates</u> case, with its staffing requirements and formulas, there is uncertainty about how and when CMF will be integrated into the service area concept with CSP/Solano. Some of the mental health positions at CSP/Solano, and particularly those with high vacancy rates, were, reportedly, "limited term" positions, reflecting the defendants' uncertainty about the role of CMF (and its staff) in a future Service Area D. These limited term positions were funded only through the end of the current fiscal year, although the defendants were seeking to have them converted to permanent positions in the next fiscal year. Another recruiting anomaly compounding the problem was the fact that CMF, the institution immediately next door to CSP/Solano, could hire psych social workers at a full step higher in pay scale than CSP/Solano.

The CSP/Solano MHCB program operates in its infirmary, which is scheduled to be certified as a CTC. Five infirmary beds were officially designated for the MHCB program, and sufficient staffing was allocated for a five-bed program. The remaining ten beds in the infirmary were "floaters", which meant they could be used as either medical or mental health beds, depending on the need. The number of MHCB patients was usually six or seven, but in the week before the monitor's visit all 15 infirmary beds were occupied by MHCB patients. On July 24, 1997, there was a census of 12 mental health patients in the infirmary. On July 25, 1997, the census retreated from eight to five. When the

infirmary was filled with psychiatric patients, medical patients were sent to an outside hospital for inpatient care.

CSP/Solano's 3CMS program opened in late 1996 with 100 patients and maintained that census through 1996. After January, 1997, the patient population grew steadily to approximately 625 patients. With the increase in 3CMS patients, the facilities designated to house them had a concomitant expansion in the number of heat-risk inmates. Staff noted that a year earlier, there were only 35 to 40 heat-risk inmates in Building 2, now there were 147; a year earlier there were 57 in Building 15, now there were 150. This put increasing pressure on ancillary psychiatric service systems, e.g., the measures needed to protect heat-risk inmates and expanded distribution of medications. The monitor also noted that, while a year earlier there had been only one MTA to pass out medications in each building housing seriously mentally disordered inmates, there were two MTA's for each building in 1997. Correctional officers reported that psychiatric crises and episodes of disruptive acting out had become routine, even weekly, occurrences.

Staffing deficiencies at CSP/Solano restricted the delivery of mental health services mandated in the program guides for the 3CMS population. Staff reported the need to triage requests for treatment and focus narrowly on the delivery of services to the "sickest" patients and "crisis" cases. Psychologists described seeing patients frequently without charts, because no one had talked to inmates informally before scheduling a follow-up appointment. Prisoners reported making repeated requests for services over a period of time and

getting no response. Inmates also reported that, compared to other CDC institutions, CSP/Solano had notably inadequate psychiatric services.

The monitor reviewed enough medical files to confirm how thinly stretched the staff was. Some examples included inmate K41212, who entered CSP/Solano on 5/23 with a Lithium prescription. On 5/27, the psychiatrist reviewed his chart and renewed the Lithium prescription for 90 days. No psychiatrist had physically seen the inmate, nor was there an order for lithium levels in his chart. Inmate K29284 reported being on Lithium, Elavil, Navane and Cogentin. He felt that his medications were working well, but his chart contained no order for Lithium levels.

Several inmates complained of delays in the administration of their medications upon their arrival at CSP/Solano. The records confirmed some of these. Inmate K12223 had 150 mg Elavil prescribed at DVI on 6/23/97, and the bus screener noted the prescription when the inmate entered CSP/Solano on 7/11/97. The bus screening process referred the inmate to mental health within 72 hours. A psychiatrist re-prescribed the medication five days later on Wednesday 7/16, and medication administration records showed that the inmate got his first dose on 7/17.

Inmate H88266 said he had been on Thorazine, Haldol, Cogentin and Vistiril at the institution where he was before he came to CSP/Solano, and that he did not get his medication when he first arrived at CSP/Solano. He claimed that his cursing at a correctional officer, which landed him in administrative segregation, was the result of his being off his medication. There

was no bus screening form in his record. He entered CSP/Solano on 6/6/97. A CSP/ Solano psychiatrist put him on three of the four drugs in July, 1997.

There were relatively (i.e., relative to the number of such complaints heard in other institutions) numerous complaints of delays in initially seeing a psychiatrist from inmates already on medication who arrived at CSP/Solano from other CDC institutions. Staff reported that the system for continuing psychotropic medications for inmates entering with CDC prescriptions was for the MTA to refer the patient chart to a psychologist, who notified the pharmacy to continue the medication based on the valid prescription in the medical chart. The psychologist also referred the patient to a psychiatrist, but inmates reported that it commonly took six weeks to see a psychiatrist, and some prisoners reported being in the institution longer, with medications renewed, but without seeing a psychiatrist.

There were numerous complaints about delays in getting to see a psychiatrist or psychologist in response to self-referrals or getting to see a psychiatrist after a psychologist told an inmate that he would be seen by a psychiatrist. The complaints were credible due to their consistency and the staffing shortage.

<u>Administrative Segregation</u>:

The monitor observed ten-day and 30-day ICC hearings, but no IDTT hearings. The monitor believed, but was unable to confirm, that due to staff shortages IDTT's were not conducted on a regular basis.

The monitor found that the ICC hearings observed at CSP/Solano handled mental health issues in a cursory and perfunctory manner, and were

among the worst observed in CDC institutions. The deficiencies were attributed to the sheer volume of work, rather than intent. The result was that little was communicated in either direction during the hearings, and that mental health issues were not effectively addressed.

The ICC committee almost made it through one review without noticing that the inmate (E34178) was a 3CMS patient. The classification counselor presented his case hurriedly. The prisoner understood almost nothing of what passed. The monitor had interviewed the inmate before his hearing. He reported he had gone off Haldol because he disliked its side effects. He seemed intellectually impaired, and the monitor had to speak unusually slowly and simply to get him to understand and converse. The ICC hearing did not address these issues.

The ICC also reviewed the status of an inmate returned to CSP/Solano from CSP/SAC for the disposition of a pending infraction. This prisoner had been transferred from CSP/Solano to the EOP program at CSP/SAC in early 7/97. It was noted immediately that the inmate was an EOP program patient. When asked how he was doing, the inmate described himself as "stressed out." No one on the ICC followed that question up. There was only the slightest of medical information available on the individual. The file had no mental health placement chronos.

The monitor had also interviewed this inmate before the hearing. He reported being confined in administrative segregation in CSP/Solano for three months before he was transferred to CSP/SAC. He claimed he could not stand being locked up in administrative segregation again. He was, he said, "stressing

bad" after just a week there. On the other hand, his psychiatric status had apparently been taken into account in the disposition of his infraction, as he got a 150-day suspended SHU term and was sent to the EOP program at CSP/SAC instead of to a SHU or PSU.

The monitor reviewed the administrative segregation log for entries into the unit of mental health staff. During the period from July 21 to August 6, a psychologist and a psych tech signed in on August 6, the day of the observed ICC hearings; a psychiatrist had signed in for an hour on August 1; a psychologist signed in for four hours on July 30; and a psychologist signed in on July 23. This level of mental health coverage does not comply with program guide requirements for the monitoring of seriously mentally disordered inmates in administrative segregation.

At the time of the monitor's visit, CSP/Solano seemed to lack a psych tech to provide continuous mental health monitoring and services in administrative segregation. While there were only 24 identified psychiatric patients in administrative segregation out of a unit population of 180 on July 23, the services required in the program guide are geared to the stressful nature of the administrative segregation environment, not any particular population figure.

Inpatient Transfers:

Like some other institutions, CSP/Solano had recently assigned a competent person to expedite the proper completion and processing of paperwork so the case gets to the classification services representative (CSR) in a timely fashion, and to track prisoners who have been endorsed and who are awaiting transportation.

According to the facility's documentation, CSP/Solano transferred ten inmate/patients to CMF/DMH for acute care in the six months preceding the monitor's visit. The report on transfers provided to the monitor was compiled from a log of admissions to and discharges from the CSP/Solano MHCB program. Four of the ten had length of stays in the MHCB of ten days or less; the other six had lengths of stays in MHCB of 12 (two), 13, 19, 23 and 27 days. The psychiatrist in charge of the MHCB program indicated that delays in transferring MHCB inmates to CMF/DMH were due largely to difficulties in securing a bed assignment at CMF because there were insufficient suitable follow-up mental health programs throughout CDC in which to place inmates coming out of CMF/DMH programs. Efforts were reportedly underway to ease the latter situation. The same psychiatrist reported that he had recently had a suicidal patient transferred within two days.

The institution's log of patients actually transferred did not reflect rejected referrals, but staff could not recall any referrals being rejected. CSP/Solano's documentation of inpatient referrals, dispositions and transfers needed to be upgraded.

Heat Plan:

CSP/Solano had more problems with heat and the heat plan than any other CDC institution. It was the only facility that is the target of an independent civil suit on heat-related issues.

In contrast to the summer of 1996, one of the hottest summers on record at CSP/Solano, weather conditions were more normal in 1997. Still, in May, June and July, stage-two alerts (i.e., when the internal temperature

reaches or exceeds 90 degrees) occurred nine times. Temperatures regularly exceeded 100 degrees in the Solano/Vacaville area, and the usual difference between outdoor and indoor temperatures at the hottest times was about six to eight degrees. What distinguished CSP/Solano was that its buildings retained the heat inordinately, and interior temperature declines at the end of day lagged seriously behind the drop in the exterior temperature. Thus, for example, on the night of May 18, 1997, the outdoor temperature at CSP/Solano was 80 degrees at midnight, but the temperature inside Building 2 was 89.5; inside Building 10, it was 88.9; and inside Building 15, it was 91. Similarly, by way of example, on May 19, when the outside temperature at 9:00 p.m. was 75 degrees, inside Building 2, the temperature was 89.2; inside Building 10, it was 88; and inside Building 15, it was 92. Unlike most other CDC institutions located in areas of high heat, there is no system for cooling air at CSP/Solano.

The monitor has learned a great deal about the nature, history and limits of the heating and ventilation (H/V) system at CSP/Solano. Allegedly, cost overruns early in the construction of the facility led to subsequent money-saving compromises in the H/V system, which resulted in the elimination of originally planned evaporative coolers (so-called swamp coolers), accounting for many of the current problems.

It is beyond the present scope of the <u>Coleman</u> case to correct or attempt to redress the physical plant deficiencies of CSP/Solano. Nonetheless, it needs to be remembered that the origins of the heat plan in this case were three deaths in the facility physically contiguous to CSP/Solano. The mixture of heat,

humidity and psychotropic medications prevalent in the Vacaville/Solano area is known to be potentially lethal.

The physical shortcomings of CSP/Solano impose an obligation on the institutional administrators to be constantly vigilant and creative in finding ways to alleviate the burden on heat-risk inmates flowing from those shortcomings. Whatever measures are adopted, whether greater access for heat-risk inmates to the still hot, but breeze-cooled yard for night recreation, or use of the so-called purge system for pumping hot air out of buildings at the end of a hot day, obviously must comport with the security requirements of the correctional environment. But it is the defendants who have elected, after all, to increase the number of 3CMS inmates in CSP/Solano, the vast bulk of whom are on some sort of psychotropic medication, to well over 600 as of the time of the monitor's visits. The irony here is that the physical facilities of CDC institutions in the southeastern desert quarter of the State, out of which the department works so hard to keep heat-risk inmates, may represent less of a risk to inmates on psychotropic drugs than those at CSP/Solano.

Meanwhile, CSP/Solano's heat plan complies with applicable requirements. It mandates that inmates return from most areas of the facility to their housing areas when outside temperatures hit the stage-one trigger of 90 degrees, unless they are in controlled, cooler, indoor areas. Some inmates complained that they were forced to return to housing units from work or school areas they thought cooler than their housing units, but there was no evidence supporting that belief. Prisoners got credit for the time they miss from their work and other assignments due to heat.

79

The monitor reviewed a sampling of heat records maintained by the institution's litigation coordinator, as well as local records, and record-keeping also seemed compliant. Heat logs were kept in Buildings 2, 10, 15 and 19, all of the housing areas designated for heat-risk prisoners. In Building 2 on August 1, the monitor noticed that two prisoners had been penciled in on the heat-risk list who had arrived the night before, which seemed to reflect some seriousness about keeping current on the heat-risk population.

There were no reported heat incidents. Some inmates in Building 2 reported heat-related illnesses. Staff, on the other hand, defined "heat incident" as requiring a physician's diagnosis in the infirmary that the illness for which the inmate was brought to the infirmary was caused at least in part by heat. Prisoners described two incidents that seemed to meet this definition, but they were not documented in any heat incident report. There were other incidents reported by inmates where MTA's came to a housing unit, and a prisoner was showered or otherwise cooled off, but not taken to the infirmary.

The problem in CSP/Solano in not the heat plan, but the cooling plant, or, more accurately, the absence of a cooling plant. The orders in this case direct the monitor to review and assess the defendants' compliance with the provisions of the heat plan injunction, none of which requires the defendants to maintain a specific temperature in any of their institutions. The whole thrust of the heat plan injunction is on the department's responsibility to take precautionary measures to protect the lives of seriously mentally disordered inmates on psychotropic medications whenever temperatures in any of its institutions exceed triggers identified in the injunction. The monitor found the

defendants to be generally compliant in their implementation of the provisions of the heat plan injunction in CSP/Solano.

The plaintiffs, however, insist that the monitor direct the defendants to correct forthwith those deficiencies in the H/V system in CSP/Solano that cause the high temperatures. While they concede that that the injunction does not presently contain a provision requiring physical modifications, they argue that the court has the power to modify the injunction to require physical renovations or the removal of all heat risk inmates from the facility. The argument suggests that the heat plan order enjoined the defendants from exposing inmates on heat-risk medications to excessive heat, when the order pretty clearly takes such exposure rather for granted and insists on effective countermeasures when it occurs. The plaintiffs are free to pursue the modification of the heat plan order they urge, but the Special Master is not persuaded that he can so expand the meaning of the existing injunction to justify a requirement for renovation of the H/V system at CSP/Solano.

Use of Force:

The monitor reviewed incident logs and copies of 13 incident reports from July, 1996 to July, 1997 involving the use of the 37mm weapon or OC gas. All of the reports described uses of force in the course of incidents involving fighting inmates in open areas who did not respond to orders to stop. There was, therefore, no opportunity in these incidents to check the mental health status of combatants before the weapon use. The incidents reviewed comported with applicable policies.

CSP/Solano Recommendations:

1.    The core problem for CSP/Solano is inadequate mental health staffing, and especially psychiatric staffing. The institution must solve the recruitment problem if it hopes to address its deficiencies. In the absence of immediate recruitment, the facility needs to expand its contracted psychiatric services to meet current responsibilities.

2.    Mental health staff must push aggressively to ensure that inmates who arrive at CSP/Solano on medications continue to receive them without interruption. Key to this is the availability of psychiatrists to review and approve medications at the time of the inmate's arrival.

3.    Access to mental health care is sometimes difficult to obtain in CSP/Solano, again because of the lack of adequate staff.

4.    Mental health staff needs to participate more aggressively in ICC hearings. The presence of a clinician is useless unless the clinician speaks out to identify mental health issues and shape the outcome in ways that are responsive to the mental health needs of individual inmates. Also, if IDTT hearings are not being conducted for inmates in administrative segregation, they need to be provided immediately.

5.    While the documentation of transfers from CSP/Solano to CMF/DMH needs to be improved, present indicators are that transfers occur slowly and are more often rejected than

appears the norm elsewhere.  Considering the propinquity of the two institutions, better coordination ought to be readily attainable.

**DVI**

The monitor was at DVI on September 4 and 5 and October 9.

Mental Health Staffing and Program:

The DVI mental health services staff consisted of a full-time chief psychiatrist, a full-time staff psychiatrist, a 30-hour weekly contract psychiatrist, two two-day weekly contract psychiatrists, and a vacant half-time senior psychiatrist position; a full-time senior psychologist, six full-time staff psychologists, a half-time psychologist and one vacant psychologist position (reportedly kept vacant purposely until upgraded to a chief psychologist position, which was likely to be filled quickly); one full-time psych social worker and one half-time psych social worker; and one recently vacated psych tech position.  This staff services both the reception center and the facility's 3CMS programs.  There were fewer clinical vacancies at DVI than at most other CDC institutions.  One of the part-time psychiatrists worked Friday evenings and Saturdays, which made DVI one of those rare facilities with six days a week of on-site psychiatric coverage.

DVI officially had only a 3CMS program.  There were two 3CMS programs in the facility, one for 132 general population inmates and one for 117 reception inmates.

DVI also had an unofficial crisis bed program in its infirmary. Because the infirmary was deemed inadequate to meet CTC standards, DVI was not scheduled to have a formal MHCB program.  It was supposed to have

access to the crisis beds in CSP/Solano, the hub institution in the service area, but it did not send patients in need of acute, short-term crisis care to CSP/Solano. Instead, DVI mental health staff used infirmary beds at DVI for short-term crisis care and either resolved the crisis or transferred the patient to CMF/DMH or CMC for evaluation for Atascadero. DVI had a psychiatrist and a Ph.D. psychologist assigned to the infirmary for crisis patients in the infirmary. Presumably, these individuals were being diverted from their scheduled responsibilities in DVI's official 3CMS and reception activities.

At the time of the monitor's visit, DVI's 3CMS program had 144 inmate patients in the general population and 93 in reception. It was one of the few CDC institutions with a 3CMS program operating below capacity. DVI is one of the expanding number of institutions that has developed a local computer program to track its mental health population. The program allowed staff to identify, schedule timely appointments for, and monitor the transfer of, inmates on the mental health caseload. It is unfortunate that the defendants have not been able to develop and implement a uniform departmental computer program to perform these functions, but the budgetary and political obstacles apparently are formidable.

DVI's relative paucity of staff vacancies, and the high level of the staff's motivation, allowed some interesting additions to typical 3CMS programs. In the summer of 1997, staff undertook a pilot project of multiple group programs for 3CMS inmates, consisting of five eight-week groups. Significant thought went into the design of the groups to meet different patient needs, with one group targeted at inmates over the age of 45, another at low-functioning and low

intelligence prisoners, one directed at depression, another at anger management. 3CMS programs elsewhere rarely offered group sessions. Staff is typically so over-stretched it is hard to make group sessions happen. It takes time to organize and arrange them, and it is sometimes difficult to get custody's cooperation.

The pilot project proved successful, and six or seven groups were to be offered again, this time in a lengthened format of eight to ten weeks for up to ten inmates each. The monitor spoke to inmates who had participated in the groups, and their response was positive.

An unusual feature of the 3CMS program at DVI was the large number of inmates whose participation in the program was attributable to "medical necessity" rather than a diagnosis under one of the enumerated categories of Axis I serious mental disorders. Almost all of these inmates were on medication. Concern was expressed about the potential impact of this practice elsewhere. Arguably, over-broad use of "medical necessity" widens the service net and may result in the provision of care to marginally needy inmates. That may not be a bad result in an institution, like DVI, with its full complement of staff and, at least temporarily, a relatively low caseload. Elsewhere, limited resources leave little opportunity or incentive to stretch definitions to make mental health care more broadly available.

The monitor interviewed a random sample of 3CMS inmates. They spoke positively of the program and seemed to feel they could gain access to clinicians through the sick call system. They thought well of the clinicians and

indicated that they were doing better at DVI than they had done at other CDC units.

### Inpatient Transfers:

Staff reported that the system for transferring prisoners to CMF/DMH and CMC worked smoothly and quickly. The chief psychiatrist had developed a transfer protocol, so all involved staff knew what steps to follow. Reportedly, the institution took on an actively aggressive posture in following up on referrals. This had been a problem area identified during the monitor's 1996 visit to DVI, and corrective action had been implemented.

On September 3, there were six psychiatric patients in the infirmary. One (D94026) had been discharged that day, apparently back to a housing assignment in the institution. He had been in the infirmary six days. Another inmate (K29122) was transferred to CMC that day. He had been in the infirmary 13 days. A third (K51348) had been in the infirmary four days and was expected to be transferred to CMF/DMH on September 4. He had already received his CMF/DMH bed number, although the referral had occurred only on September 2.

Another inmate (H40183) had been in the infirmary for 39 days. While in the general population he had refused his medications and refused to leave his cell. He was initially referred to CMC on August 7. The medical record showed that DVI followed up on August 18 and learned that CMC did not have the referral. The institution referred him again that day, he was accepted on August 19 and a note in the record, dated September 2, indicated that he was awaiting CRS endorsement. This case illustrated the cracks in the system and the

complained that staff failed to provide cooling measures actually produced evidence that disproved his complaint. He had logged all of the occasions on which extra showers and ice water were provided in the unit. When his log for August was compared with the unit's temperature log, it showed that showers and ice water were delivered during every stage-two alert in his building. He had thought temperatures had exceeded 90 degrees inside more often than they had. Stage-three alerts occurred in one or more housing areas on three days during the summer. Stage-two alerts occurred on 15 days in one or more housing areas.

<u>Administrative Segregation</u>:

The monitor found administrative segregation in DVI to be well managed and its seriously mentally disordered occupants well monitored. Relations between custodial and mental health personnel were cordial and cooperative. There were 12 seriously mentally disordered prisoners in administrative segregation at the time of the monitor's September visits, including two or possibly three EOP inmates. One inmate had been designated for the EOP program the preceding day. The third (and possible) EOP was a 3CMS inmate according to his medical chart, but a clinician reported that the inmate had been upgraded recently to EOP. Staff also reported that a psychiatrist and a psychologist saw each patient in administrative segregation regularly and that IDTT's were updated every thirty days.

There was no psych tech assigned to administrative segregation at the time of the monitor's visit, although there had been one until recently. A psychologist, and often a psychologist and psychiatrist together, conducted

clinical rounds at least five days a week in administrative segregation. A review of the administrative segregation logs confirmed the practice, and also indicated that one of the psychiatrists made rounds of administrative segregation on Saturdays.

Because administrative segregation yard access ended by 12:30 or 1:00 p.m., DVI was able to provide heat-risk inmates there with their mandated ten hours of yard time a week in spite of the hot weather. Documentation of psychiatric contacts with patients, medication administration and heat plan provisions was kept meticulously.

The monitor attended ICC hearings for three 3CMS inmates. The psychiatric services staff knew their caseload. During the hearings of both patients and non-patients, the psychiatrist and psychologist made appropriate observations, and followed up their observations with questions on the mental health status of the prisoner.

Use of Force:

The monitor's review of incident reports indicated that policies relevant to the use of force against seriously mentally disordered inmates were complied with at DVI. There were no cell extractions in DVI during the first nine months of 1997.

The DVI incident report log specifically identified incidents involving psychiatric patients, which seemed to indicate a concern for following the rules on the use of force on seriously mentally disordered inmates.

DVI Recommendations:

1.      This de facto use of the DVI infirmary as an ersatz MHCB

program is a problem the defendants need to address. The

infirmary is inadequate physically and is not staffed for the

function. There needs to be a better integration of DVI with

its hub facility, CSP/Solano, although CSP/Solano is struggling

with its own serious staffing deficiencies. The development

of integrated mental health services in this centrally located

service area is considerably behind schedule. Some of the

delay may be attributable to the defendants' inability at this

point to integrate CMF into the service area, but in the

meantime, there needs to be improvement quickly in the

capacity of CSP/Solano to assume its proper service area

responsibilities and to coordinate crisis care between CSP

Solano and DVI.


## Service Area E

This service area includes <u>California State Prison at Corcoran</u>

<u>(CSP/Corcoran)</u>, with a MHCB program (16 beds), an EOP program for up to 104

Level IV inmates and a 3CMS program for up to 399 inmates; <u>Pleasant Valley</u>

<u>State Prison (PVSP)</u>, with a MHCB program (5 beds) and a 3CMS program for up

to 349 inmates; and <u>Avenal State Prison (ASP)</u>, with a 3CMS program for up to

449 inmates. Inmates in need of acute inpatient care at ASP go to PVSP or

CSP/Corcoran.

## CSP/Corcoran

The monitor visited this institution together with one of the master's psychiatric experts and counsel for the plaintiffs and the defendants from July 16 through July 18. In 1996, CSP/Corcoran was the target of charges of corruption and the use of excessive force. Shortly before the monitor's initial trip to CSP/Corcoran in October of 1996, the warden and his chief deputy had retired, and an acting warden and chief deputy warden were supervising facility activities until permanent replacements were chosen. In December of 1996, a new and permanent warden was named, and, in the monitor's estimation, staff morale and the quality of care at the facility had improved markedly since the monitor's initial October, 1996 visit.

<u>Mental Health Staffing and Program:</u>

CSP/Corcoran was allocated five full-time psychiatrist positions. At the time of the monitor's visit two of those positions were vacant. Administrators reported that, while they could fill most other clinical staffing positions, they had encountered great difficulty in locating and hiring competent psychiatrists. They also admitted that, with the two positions vacant, they could not provide the level of mental health care mandated in the program guides. Eight of fourteen psych tech positions were also vacant. At CSP/Corcoran, the defendants have not complied with the staffing plans and policies provisionally approved by the court in June, 1997.

The EOP program at Corcoran was described as having three stages or phases. Each phase had to be completed successfully before the inmate could move to the next. Program A focused on reducing the symptoms associated with major medical disorders, while stabilizing the inmate on

medication. Staff reported that, in this first stage, inmates were slated to participate in group activities twenty hours a week, focusing on personal hygiene, cognitive restructuring, social skills, communication and stress management.

In Program B, inmates were encouraged to manage their mental illness while improving their coping skills. Inmates assigned to Program B were to spend fourteen hours a week in classes on criminal thinking, substance abuse and self-esteem. They also received individual counseling. Finally, Program C prepared the inmate for a return to the general population. Inmates in Program C were to receive eleven to twelve hours of programming weekly. Here the structured sessions focused on relapse prevention and pre-release planning.

At the time of the monitor's visit, 70 of the approximately 150 EOP beds were occupied. The average length of stay in the EOP program was four to nine months. Contrary to the description of the program content offered by staff, inmates actually received slightly less than ten hours of programming weekly. The monitor attended a group therapy session on the activities of daily living and reviewed inmate health records.

One aspect of the facility's MHCB program was unique among the department's MHCB programs and units. In line with precautions adopted throughout the facility, all staff members in the MHCB at CSP/Corcoran were required to wear security vests or flak jackets at all times.

While staff reported that inmates could be transferred to CMF/DMH within 24 hours of endorsement, a study of movement records for the preceding 90 days indicated that the average length of stay in the MHCB unit was 18 to 20

days, far in excess of the ten-day target set in the program guide for the MHCB program.  Staff reported a willingness to undertake aggressive treatment methods for inmates in the MHCB unit.  Keyhea hearings occurred monthly in the unit.  The psychiatrist in charge of the unit seemed competent and caring, and was familiar with his caseload.

The monitor's psychiatric expert conducted a review of the nature and quality of mental health care provided in CSP/Corcoran and made the following observations:

1.      There was an elaborate introductory presentation on the planned "program" for EOP inmates, including an outline of program for phases A, B, and C.  Each program included a description of active treatment hours, treatment modules, and participation by clinical staff.  Actual review indicated that available staffing seriously constrained the ability of psychiatrists to see patients as actively as anticipated.  Psychiatrists simply could not examine inmates with anywhere near the projected regularity.  While the planning for the program model was commendable, it was still in a largely unrealized state and its further development needed to be monitored carefully.

2.      Staffing:  There were three filled psychiatric positions at CSP/Corcoran.  The plan called for five full-time psychiatrists, and, of the three on board, one was the chief psychiatrist, who had considerable administrative duties.  The warden explained that recruitment efforts to fill the vacant positions were underway and new staff was anticipated shortly.

3.      The expert attended an ICC meeting, at which a record 80 to 90 inmates were expected to be reviewed.  The number alone meant that the

participation of the psychologist member of the committee, responsible for interviewing inmates about their mental health history or issues, would be limited. Moreover, only three inmates seen during the first two and a half hours of hearings appeared to have psychiatric issues. Two were known to the mental health staff, which, because of time constraints, was able to provide only minimal input to custody members of the committee despite the chief deputy warden's willingness to solicit mental health information.

4.    Special Housing Units (SHU): The SHU generated considerable concern. While touring the SHU, the expert noted a number of inmates who had acute or active psychiatric problems or symptoms. A subsequent review of their records revealed that some of these inmates had been recommended for transfer to the PBSP PSU. Administrators indicated that system-wide administrative problems, rather than a lack of space, impeded transfers to the PBSP PSU. The warden stated that he was actively engaged in an effort to improve the transfer process.

5.    Administrative Segregation: Administrative segregation was used not only for individuals charged with disciplinary infractions, but also for protective custody inmates. Inmates who were in protective custody because of injury or threats directed at them were subjected to the same restrictions as inmates waiting for the disposition of their disciplinary charges. The expert pointed out the wisdom and utility of a distinct unit for seriously mentally disordered inmates in protective custody to provide greater access to services and limit restrictions. While touring administrative segregation, the expert noted at least three inmates who were actively psychotic and who would have

benefited from a transfer to the PBSP PSU.  There were also inmates in the SHU who said they had come from other institutions and not been seen by a psychiatrist nor had their mediations renewed.  If true, the screening process for individuals admitted to administrative segregation was flawed.  Possible problems included delays in the evaluation of transferred inmates, as well as in the transfer of records or other information indicating an inmate had participated in a mental health program in another facility and/or received mediation prior to his transfer.

   6. Mental Health Crisis Beds (MHCB): The mental health crisis beds appeared to have been well managed and under-utilized.  The census was lower than expected.  There seemed to be a good relationship between custody and mental health staff under the direction of the staff psychiatrist responsible for the unit.  The expert noted that the staff psychiatrist responsible for the MHCB unit also had other responsibilities elsewhere in the facility due to staffing shortages, a shortage reflected in the continued presence of psychotic individuals in administrative segregation and the SHU, rather than in the MHCB unit.  Again, there were chart notations recommending the transfer to PBSP PSU of some of those psychotic individuals located in the housing units.

   The expert also noted the requirement that all staff wear flak vests in the MHCB unit.  In the SHU and in administrative segregation staff was also required to wear a protective visor to guard the eyes even though inmates were in cells that with a lexan or other plastic protective covering on the door.  The expert noted that, inconsistently, an eye shield was not required in the MHCB unit even though inmates typically were interviewed while sitting on the toilet in their

cell, albeit with hands cuffed behind them. The likelihood of an inmate spitting at a staff member was no less in the MHCB than in any other part of the facility, yet the eye shields were not required in the MHCB.

There was also an issue of confidentiality if an inmate wanted to speak privately to a mental health staff member in the MHCB given the presence of officers at all interviews. Even with these concerns, the MHCB program appeared to be functioning well.

7.     Records: The expert found a number of problems with the medical and psychiatric records he reviewed, including:

A.     In the MHCB, only the current treatment record was available. The general medical file was kept in another part of the facility. When inmates were transferred from the MHCB unit to another part of the facility, their MHCB record might not catch up with the medical record for several weeks or months. This created problems in the communication of important clinical data.

B.     The records were disorganized and it was difficult to find relevant and timely information because similar forms were filed in various sections of the records.

C.     Treatment plans were present in less than 40 percent of the records reviewed, including records from all parts of the facility where mental health care was delivered. An additional concern was that treatment plans appeared to be updated on an annual basis, and many of the plans referred the reader to the previous treatment plan. Progress notes between

treatment plans, however, indicated at times that there had been changes in diagnosis and/or treatment not reflected on the annual master treatment plan.

        D.     There was little evidence of programming or mental health modules in the records consistent with the description of the EOP program model.

        E.     There needed to be included in each record a problem list. When reviewing the records, one found many differing diagnoses for any given individual. There was no problem list to update the diagnosis or inform the reader of the current diagnosis. Clinical staff seemed to agree with this need for such a problem list.

        G.     Patients on mood stabilizing medications (Lithium, Tegretol, Depakote) did not have in their records the required blood level determinations. In some instances, where blood level determinations had been done and were low, there were no progress notes on the physician's review and decision on any treatment modifications.

        8.     Treatment Criteria: The defendants have established a list of psychiatric disorders that warranted an inmate's inclusion in the EOP or C3MS programs. The GAF score was also a relevant factor. The expert found several cases in the course of his review where individuals appeared to have other disorders not included in the listed treatable disorders. Because of the impact of these other disorders on the ability of the affected inmates to function adequately in the prison environment, it was important that, as a matter of medical necessity, they be addressed, as well as the pharmacotherapy appropriate to them.

9.    Quality Assurance: The quality assurance program was in its infancy at CSP/Corcoran and consisted of reviews of medical records and some selected case presentations.  The expert offered some suggestions for improving the scope and relevance of quality assurance efforts, especially with reference to drug utilization reviews, medical necessity case reviews, attempted suicide reviews and possible reorganization of the medical record.  Given the psychiatrist vacancies, such reviews would be difficult to perform.

10.    Review of Successful Suicides:  CSP/Corcoran has had three suicides since 1995, two of which occurred in 1995, the third in 1997.  The 1997 suicide reportedly occurred in the SHU, but the record in that case was not available for review at the time of the expert's visit.  Relative to the 1995 suicides, staff review had determined that one death was caused by an overdose of antidepressant medication and the other by hanging.  In the death by hanging, there had been no previous history of contacts with mental health services and it was viewed as deriving from situational factors.  The death by overdose, however, involved an individual who was receiving mental health treatment and had a history of medication overdose attempts.  The case illustrated the local need for a directly observed therapy (DOT) protocol for psychotropic medications, as well as the need for increased medical staff to provide patient follow-up.

11.    Medication Orders: Medications were initially reported as being renewed every four to six weeks.  During interviews with staff, however, the standard for renewal appeared to be every 60 to 90 days.  Given the staffing shortage, there was also an implication that an inmate was not seen by a

psychiatrist except in the course of medication renewal, an interval far in excess of the suggested frequency of psychiatric contact with inmate/patients.

12.    Keyhea Patients: The expert noted that five inmates were receiving involuntary medication pursuant to Keyhea hearings. Review of the records of two of these patients revealed that they were in active treatment and there were great efforts by medical and custody staff to manage their disorders. They were difficult to manage both diagnostically and therapeutically, but it was clear from the records that staff was providing quality care to these inmates.

13.    Exercise: The exercise area for the EOP program inmates was a concrete yard between housing units. While there is no prohibition against the use of a concrete exercise yard for seriously mentally disordered inmates, the yard was inappropriate for seriously mentally disordered inmates because it was both dehumanizing and disorienting. Fortunately, the facility had plans to rectify that situation.

14.    Interviews with Inmates: The monitoring team, plaintiffs' and defendants' attorneys and the defendants all interviewed inmates during the visit. The interviewed inmates confirmed many of the expert's observations. They reported being unable to see a psychiatrist despite being on medication and/or having requested a psychiatric interview; delays in movement out of orientation considerably beyond the 28-day scheduled maximum; failure to receive medication after transfer from another institution where they had been on medication; and the failure to be moved to PBSP PSU in spite of a clinical recommendation for the move.

Finally, the expert suggested that custody staff work with mental health staff to facilitate group activities, if possible and particularly for EOP inmates, out of the immediate housing area and allow clinicians to interview clients privately and confidentially when indicated.

Heat Plan:

CSP/Corcoran had approximately 1,671 staff. At the time of the monitor's visit, approximately 1,318 staff members (79 percent) had taken their annual heat plan training. Training in other areas of mental health lagged seriously, but the warden, citing other more immediate priorities in the facility, promised to bring overall mental health training up to snuff in the institution by mid-1998.

CSP/Corcoran's institutional heat plan comported with applicable standards. The pharmacist generated the required list of heat-risk inmates weekly. Heat-risk inmates were required to return to their housing units during a stage-one alert. There were no stage-two or stage-three alerts from May 1 through the dates of the monitoring visit, but correctional officers were aware of their obligation to give inmates cool drinks and showers if the inside temperature reached 90 degrees. Correctional officers were less familiar with other requirements of the plan. For example, most officers interviewed did not know of their obligation to contact an MTA during a stage-three alert. That is a common problem, and one that needs to be addressed in CSP/Corcoran and elsewhere.

Use of Force

The monitor reviewed use of force policies and institutional incident logs for 1997. Staff discharged the 37mm weapon 112 times during the first six

months of 1997. All discharges occurred in the recreation yard or in large open spaces. SHU logs indicated that tear gas had not been used at all during 1997, and the Ruger Mini-14/.223, similarly, had not been fired. The monitor reviewed 41 incidents reports on the use of OC gas, which was used primarily in the SHU and in administrative segregation. None of the reports reviewed indicated an excessive use of force. The defendants' use of force at CSP/Corcoran complied with policies applicable to the employment of the 37mm weapon and other non-lethal weapons against seriously mentally disordered inmates.

CSP/Corcoran Recommendations:

1.    The defendants need to move decisively to fill the mental health staffing vacancies at CSP/Corcoran, especially among psychiatrists.

2.    While institutional plans for EOP programming are excellent, staff shortages prevent their implementation. The plans need to be executed.

3.    The movement of seriously mentally disordered inmates, particularly to the PBSP PSU, when clinically directed needs to be expedited.

4.    Mental health staff needs to become more aggressively involved in ICC hearings involving seriously mentally disordered inmates.

5.    Mental health records are a problem at CSP/Corcoran that must be addressed. It is not clear how much of the problem is caused by the physical management of records or how

much is traceable to clinicians' omissions. A review of the problem ought to be conducted and appropriate corrective action taken.

6. The quality assurance efforts of the mental health staff need further encouragement and resources. The absence of psychiatric staff seriously inhibits the still embryonic quality assurance program at the facility, the effects of which can be seen in such areas as blood level testing and follow-up, inadequate and untimely screening and the development of problem lists.

7. There is a real concern at CSP/Corcoran about the adequacy of inmate access to mental health care. This is largely a function of inadequate staff, but steps must be initiated to increase the availability of care to seriously mentally disordered inmates.

8. While not a focus of this round of review, the facility needs to address mental health training requirements for staff working directly with inmates.

9. Finally, CSP/Corcoran needs to provide staff with some readily available reference to its responsibilities in a stage-three heat alert. This can most easily take the form of a posting of directions prominently in affected housing units or the distribution to staff of a laminated card listing those duties.

**PVSP**

The monitor visited PVSP from September 24 to September 26, and found it to be an exceptionally humane and decent institution.

Mental Health Staffing and Program:

Authorized mental health staff positions at PVSP included two staff psychiatrists; a chief, a senior and two clinical psychologists; 2.5 psych social workers; a half-time recreational therapist; a psych tech; and clerical staff. Both of the psychiatrist positions were vacant and had been so for months, one since February, 1997, the other since November, 1996. The senior psychologist position was vacant, but there were three psychologists at work. A half-time psych social worker position was vacant. All of the remaining clinical positions were filled.

The clinical staff seemed well trained and competent. Everybody was either licensed or working toward licensure. The chief medical officer had a strong policy against hiring professionals just for the sake of filling vacancies; he wanted strong staff. Efforts to find psychiatrists had not been successful. Four applicants were not licensed to practice in California, and could only practice for two years without getting a California license. Another applicant had elected to stay with the VA where he was getting $20,000 more in salary than CDC offered.

PVSP was unable to obtain the private psychiatric contract services it needed to cover these long-time psychiatric vacancies. The best it could do was the equivalent of a half-time psychiatrist. It was not clear to the monitor whether the problem was financial or a lack of local professional resources. This absence of psychiatric coverage was a genuine problem for the institution. The

facility's CTC was due for a licensure inspection in October, but one of the licensing requirements was a full-time board-eligible psychiatrist.

Despite the poverty of psychiatric coverage, a review of records indicated that psychiatric visits were scheduled every six to eight weeks, rather than at the 90-day intervals for which prescriptions were normally written.

The MHCB unit was a small one with five beds. At the time of the monitor's visit, there were six inmate/patients in the unit. The level of care in the PVSP MHCB unit appeared to be quite good. Physically, the unit had modern safety cells for the protection of suicidal patients. There were clear and appropriate policies and procedures for suicide watch (constant observation), suicide precaution (15-minute observations), and general psychiatric observations.

There were approximately 480 3CMS inmates at PVSP at the time of the monitor's visit. There were four clinical case managers, with an average caseload of about 120 inmates. Prisoner interviews and record reviews indicated that the 3CMS did not provide the full range of services to 3CMS patients contemplated by the program guide. Staff responded to crises. Clinical staff was able to do only limited monitoring of those inmates on the caseload who were not in crisis. Staff estimated it was able to see about 85 percent of its caseload every 90 days, although the institutional tracking system was inadequate to confirm that guess. Staff described the shortcomings of the services they were able to provide by contrasting what they were actually doing with what they might have been able to do with a caseload of 80 instead of 120. With the lower caseload, they could keep track of all of their patients and make

sure none disappeared until ready to explode in a crisis. They would be able to learn earlier about patients who went off their medications, while now they could not tell until someone decompensated badly. They could have more contacts with inmates who need them. While the clinical staff was good and provided all of the clinical services they possibly could, clinicians knew they were not providing the 3CMS program described in the program guide. The lack of adequate staff resources to handle the caseload was a source of considerable frustration.

The monitor's review of records confirmed the lack of staffing to monitor the caseload properly. Referrals for evaluation did not result in evaluations; scheduled monitoring contacts did not occur until the inmate came independently to the case manager's attention through some manifestation of crisis; and medication reorders for incoming inmates were missed. The symptoms of a clinical staff stretched too thinly were discernible everywhere. This was a program with significant staff vacancies and 140 more inmate/patients than it was scheduled to handle at 100 percent of staffing.

Administrative Segregation:

The administrative segregation psych tech administered the 31-question instrument to all prisoners who entered the unit prior to their initial review. About half of the prisoners refused the screening. The psych tech made her own determination about whether to pursue the issue based on the apparent mental state of the inmate. She did the screenings with the inmate in the "cage," so there was auditory privacy.

Although PVSP had its own developing MHCB program, it still transferred some inmates to CSP/Corcoran. Transfers to CSP/Corcoran could apparently be arranged within a day. PVSP staff also reported no trouble in getting inmate/patients into CMF/DMH. While all referrals might not be accepted, those that were accepted usually moved with 48 hours. Similarly, no problems were reported with transfers to CMC for evaluation for ASH. Documentation on transfers was poor.

Heat Plan:

The monitor reviewed the institutional heat plan and found that it complied with departmental and court requirements. Heat-risk inmates were required to return to their living units during a stage-one heat alert. Temperature logs were kept as required. Staff and heat-risk inmates seemed cognizant of their duties under the heat plan and reported that the provisions for implementation of the various stages of the plan were observed.

The chief of plant operations told the monitor that his staff monitored temperatures in specified cells on a regular basis. He also reported that all thermometers were calibrated at the beginning of each summer. He had procured sophisticated equipment to track temperatures, and certain fans were set to turn on automatically when the temperature hit 89 degrees.

Use of Force:

PVSP policies on use of the 37mm weapon and OC gas complied with departmental and court requirements. They reportedly did not require documentation of the reasons for overruling a medical judgement against the

use of force because they assumed that a medical judgment would not be overruled by custody staff

PVSP's incident reports were among the most readable and informative such reports in the department. They clearly and consistently described the medical/mental health checks executed in every incident involving the use of preplanned tactical force. The reports also documented attempts to avoid the use of force by having staff members make serious efforts to talk inmates into compliance.

A review of the incident reports indicated relatively few instances of the use of force. This seemed to reflect the desire of institutional leadership to promote the humane and respectful treatment of prisoners. Staff understood that everyone was better protected when force could be avoided. As one supervisor put it, they did not conduct cell extractions just because an inmate refused to return a meal tray. The prisoner would turn it in eventually. The reports also showed that the medical staff examined inmates carefully after uses of force to find and treat any injuries.

PVSP Recommendations:

1.    Psychiatric staffing vacancies need to be addressed immediately. The inability of the facility to contract for psychiatric coverage undermines the dedicated and effective efforts of other clinicians on staff to provide adequate mental health care.

2.   PVSP needs to develop internal, computerized systems for tracking contacts with mental health inmate/patients and documenting transfers.

3.   In the absence of psychiatric services, the department needs to increase the number of clinicians in the facility to ensure that 3CMS inmates are seen every 90 days.

**ASP**

The monitor visited ASP on September 22 and 23.

Mental Health Staffing and Program:

At the time of the monitor's visit, ASP's authorized mental health staff consisted of a staff psychiatrist, a senior psychologist, a staff psychologist, 2.5 psych social workers, a half-time medical transcriber and a half-time office tech. The staff psychiatrist position was vacant. Contract services provided a psychiatrist three days weekly, but because the contract was with a service rather than an individual practitioner, the contracted psychiatrist could be, and often was, different from week to week. There was no psychiatrist continuously on-call through the contract service. There were, aside from the contract psychiatrist, two psychologists and two psych social workers to provide mental health services on a daily basis in the facility.

At the time of the monitor's visit, the 3CMS caseload was in excess of 500. In addition, there were typically five to eight mental health patients in crisis in the infirmary, which had neither the staff nor the physical facilities to deal with them. There were eight mental health inmate/patients in the infirmary at the time of the monitor's visit. Routinely there were 15 to 20 EOP

inmates (19 at the time of the monitor's visit), who needed the kinds of monitoring and treatment services the thinly stretched staff at ASP could not begin to provide. With all of this, the typical 3CMS inmate saw a clinician or case manager rarely. Resources were barely adequate to keep up with essential medication monitoring, and the 3CMS program actually delivered in ASP bore little resemblance to that described in the department's program guide.

One exceptional clinician ran four groups on her yard because she could see more inmates/patients that way. Her 3CMS caseload included 287 inmates, but she estimated that less than 100 of them were truly seriously mentally ill.

Inmate self-referrals were subject to delay. The monitor checked referrals and found several that were five-days old. The weekly average of self-referrals ran about 25. Once inmates were seen, they would remain visible, because the institutional computer tracking system at ASP was a good one, generating accurate and useful data. The problem was that there were not enough clinicians to handle the caseload, although the clinicians were hard-working and dedicated.

Administrative Segregation:

A psych tech provided daily (Monday through Friday) coverage in administrative segregation. She screened all new arrivals to the unit because that was easier than checking the files to determine whether they had been screened within the past year. She reported that she had access to the office in the unit for private interviews and used it. She was bilingual and seemed good at her job.

The monitor reviewed entry logs in administrative segregation and noted that a psychologist or psych social worker had entered the unit eight times in the period between September 5 and 23. A psychologist was designated to sit on the ICC.

There were some seriously mentally disordered inmates in administrative segregation, some of whom clearly required an EOP level of care. A staff psychologist shared with the monitor frustration over inability to get one patient moved to an EOP program. The inmate had to be single-celled and refused to come out of his cell for recreation.

Inpatient Transfers:

ASP was supposed to transfer inmates in need of a crisis bed to CSP/Corcoran, and did so often. There were 18 transfers of inmates to the MHCB program at CSP/Corcoran during the first nine months of 1997.

For all of the transfers, however, ASP tended too often to try to treat and stabilize inmates in crisis. There were, again, eight inmates in the infirmary at the time of the monitor's visit. Some had been there more that ten days, and others had been in and out of the infirmary several times. Given the limited psychiatric coverage available in ASP, there was no excuse for diverting resources to a function better executed elsewhere. In addition, the custodial staff in the infirmary were not trained to deal with seriously mentally disordered inmates and did so inappropriately. The monitor observed one encounter between an old, harmless, weak and obviously psychologically impaired inmate and a correctional officer that illustrated the point. The officer lacked the

requisite skill, knowledge and ability to work in an infirmary with seriously mentally disturbed inmates.

There were no records for DMH transfers, but staff thought there had been four in 1997. While that estimate was probably accurate, the need for transfer records was obvious.

Heat Plan:

The monitor reviewed the institutional heat plan and found that it complied with departmental policy and court requirements. Heat-risk inmates who were not in air-cooled environments were required to return to their living units. Temperature logs were maintained, and thermometers had recently been replaced.

Use of Force:

There was little use of the 37mm weapon or OC at ASP. Incidents involving either were confined to breaking up fights in open areas. The use of force in the infirmary, already noted, rarely seemed to involve the mental health staff. Custodial staff would apply force, sometime including OC gas, when inmates acted out in their cells or tried to walk out of open doors. There did not often appear to have been any attempt to persuade inmates to behave before relying on force. There was a disturbing lack of understanding that there should be some psychological intervention with seriously mentally disordered inmates prior to recourse to force.

The monitor reviewed institutional policies on the use of force. They complied with department policies. Use of the 37mm weapon in cell extractions was limited to the removal of barricades.

ASP Recommendations:

1.    Once again, the absence of psychiatric staffing cripples the facility's ability to provide required mental health care. Here some replacement of psychiatric services is available through contracting, but the turnover among participating psychiatrists limits their usefulness.

2.    ASP must be directed immediately to cease its assumption of levels of care that its mental health staff cannot possibly provide. CDC's Population Management Unit and Chief Psychiatrist need to support and direct ASP's efforts to redirect EOP inmates and inmates with acute care needs to other facilities capable of providing needed levels of service.

3.    ASP needs to develop internal, computerized systems for tracking contacts with inmate/patients and for documenting transfers.

4.    In the absence of adequate psychiatric staff, the defendants need to provide other clinical staffing to ensure that referrals are responded to in a timely fashion and that basic program requirements are met.


**Service Area F**

Service Area F includes Salinas Valley State Prison in Soledad (SVSP), with an MHCB program (10 beds), an EOP program for up to 96 Level IV

inmates and a 3CMS program for up to 349 inmates; and the <u>California Training Facility at Soledad (CTF)</u>, with a 3CMS program for up to 499 inmates.

**SVSP**

The monitor visited SVSP from September 30 to October 2. SVSP is one of CDC's latest institutional additions. It opened in May,1996. The population at the time of the monitor's visit, just 16 months after its opening, was at 190 percent of its planned capacity. SVSP, a Level IV institution, was still in the process of shaking down initial operations. Much of the custodial staff was newly hired. Given the nature of the population, the difficulties of bringing a spanking new and huge physical facility on-line and the immediate overcrowding, there was a pervasive sense of tentativeness among both leadership and rank and file.

<u>Mental Health Staffing and Program</u>:

At the time of the monitor's visit, authorized mental health staff positions included a chief psychiatrist, three full-time psychiatrists and two half-time psychiatrists; two senior and a clinical psychologist; five full-time and two half-time psych social workers; five psych techs; and two recreational therapists, plus nursing and clerical positions. One full-time and both half-time psychiatrist positions were vacant, as were the clinical psychologist and one full and both half-time psych social worker positions. This meant that the staff was short the equivalent of two of its allotted five psychiatrists, one of its three psychologists and the equivalent of two of its six psych social workers. It had a full complement of five psych techs and two recreational therapists.

At the time of the monitor's visit, the count of inmate/patients in the MHCB program was 15. There were 50 inmates in the EOP program and 473

inmates in the 3CMS program. The MHCB program was staffed for ten beds and the 3CMS program for 349 inmates, so both of these programs were substantially oversubscribed. The EOP program was well below its target figure of 96.

Physically, the infirmary at SVSP, which will probably be the first licensed CTC in CDC, was spacious and seemed well designed. There were 20 medical and mental health patients in the facility, which could hold up to 24. Newly committed psychiatric inmate/patients were screened by nursing staff and a psychiatrist within 24 hours. The initial IDTT meeting reportedly occurred within 72 hours.

The EOP program consisted of an intake process and four progressive phases, marked by behavioral improvements, through which inmate participants were supposed to advance before their return to the general population. The program consisted of daily recreational therapy and some group activities. Groups were offered from time to time in medication management, interpersonal skills and anger management, and substance abuse. These were supplemented by individual counseling on medication compliance, personal hygiene and recognizing signs of mental illness. The program goal was an average of five hours of organized activity a week versus the program guide's goal of ten hours.

The requirements of security were a constant challenge to the conduct of group activities in the EOP program at SVSP. It was difficult for the monitor to judge whether the level of security-related incidents that occurred during his visit was typical, but the number of firearms discharges, reports of cell extractions (nine in the first evening he was in the facility), and yard and unit

115

shut-downs seemed extraordinary. All of the security activities constrained mightily the movement of inmates to program areas and events. Staff and inmates alike reported that cancellations and postponements of group events were common.

The monitor reviewed the medical file of every third inmate in the EOP program. The records were characterized by unevenness. Most would reference IDTT meetings, but rarely was there more than one IDTT meeting noted. Only about half the files reviewed contained a treatment plan, but those that were present in the files were well done. Group and recreational therapy notes were rare. Only one of the files reviewed contained useful, descriptive notes from group sessions. On the other hand, the records reflected relatively regular contacts with inmates by psychologists and by psychiatrists for medication purposes.

Interviews with EOP inmates tended to confirm the accuracy of the records review. Most felt they were seen by a clinician of some sort at regular intervals and that they had reasonably ready access to mental health staff. Few could recall actual involvement in group sessions, but most had experienced cancellations and postponements of scheduled sessions. More encouragingly, most knew a clinician(s) by name. Sometimes it was a psychologist, sometimes a psych social worker and occasionally a psychiatrist.

The concern raised by the review was that the caseload was at half its anticipated capacity. If it was impossible to provide the treatment prescribed in the program guide with a reduced caseload, one could only wonder what would happen to those goals when the caseload surpassed the

capacity. Interviewed staff seemed convinced that if the authorized but vacant clinical positions could be filled, and if administrators (and staff itself) could exercise some tighter management and work on setting priorities, the mental health delivery system in SVSP might function like it was supposed to.

<u>Administrative Segregation:</u>

A full-time psych tech was assigned to administrative segregation. He was responsible for conducting mental health screenings of new arrivals in the unit and monitoring seriously mentally disordered inmates in the unit population. There were 30 3CMS inmates and no EOP inmates in administrative segregation at the time of the monitor's visit. Reportedly, a clinician, either a psychologist or a psych social worker, made regular weekly rounds of seriously mentally disordered inmates in administrative segregation.

The psych tech had developed what he called a 3CMS daily contact form to organize his recurring monitoring duties. The list gave the name and location of each 3CMS inmate in the unit, with a space for notes and a reminder to enter the notes in both the CDC classification record and the medical record. The psych tech indicated that he typically learned of the commitment of a 3CMS inmate to administrative segregation from the list of inmates on heat-risk medications rather than through the roster of 3CMS inmates, which usually lagged several days behind actual movements. Interestingly, when the monitor asked administrative segregation custody personnel for the current list of heat-risk inmates, they could not produce it. The monitor was in administrative segregation on a Tuesday and checked the entry log for the unit.

The last time the logs reflected a visit from a member of the SVSP mental health staff was the preceding Thursday. It was not a holiday weekend.

The monitor watched four ICC hearings in administrative segregation. A psych social worker represented mental health regularly in the hearings. He was knowledgeable about the administrative segregation caseload and contributed meaningfully to the hearing. The hearings themselves were well conducted, and there was a genuine attempt to communicate with inmates.

### Inpatient Transfers:

Since the facility opened there had been only six transfers from SVSP to DMH, all through CMC to ASH. Staff reported no problems either with the rejection of referrals or the timeliness of transfers. They claimed never to have sought a transfer to CMF/DMH. Documentation of transfers was sparse at best. It provided simply a name, date of transfer and destination.

### Heat Plan:

The monitor reviewed the institutional heat plan, which conformed with applicable policies and court orders. Execution of the heat plan, however, was lax. In administrative segregation, a current list of heat-risk inmates could not be found. According to the heat plan itself, the program unit sergeant was responsible for taking and recording the inside temperature, but the responsibility had been delegated to the control booth officer. When the monitor inspected the administrative log for inside temperatures in the control booth at 1350 hours, the last entry had been made at 0600 hours.

A review of temperature logs elsewhere around the institution revealed a similar laxness. Even the log of outside temperatures, which characteristically was kept fairly meticulously, probably because its completion was normally supervised directly by a watch commander, contained frequent and substantial gaps. Log-keeping on the A-3 and B-4 units was adequate, but on the C-3 unit there were, again, substantial gaps.

To put this in some perspective, heat was not a problem at SVSP. The outside temperature logs, for all of their gaps, indicated clearly that the temperature rarely hit the 90-degree mark; it rarely hit 80 degrees. Inside temperatures were even lower. From May 1 to September 28, the inside temperature in the A-3 unit exceeded 75 degrees only four times. There had never been a stage-two or a stage-three alert at the facility. But there were stage-one alerts, and the policy is the policy. Inadequate training was not the culprit, given that 93 percent of the staff had completed its annual heat plan training requirement. For lots of reasons, some of them natural, the heat plan was not a high priority in the facility.

Use of Force:

As indicated, the use of force at SVSP was common.

The monitor reviewed institutional policies on the use of the 37mm weapon and OC gas and on cell extractions. The policies themselves were carefully and well written and comported with departmental and court requirements. They designated OC gas as the non-lethal weapon of choice in cell extractions and indicated forcefully that even its use was a last resort. The

119

only reference to the use of the 37mm weapon in a cell extraction was an aside suggesting that it could be used to take down a barricade.

The monitor culled the institutional incident log for incidents involving use of the 37mm weapon in enclosed areas or cell extractions and for cell extractions in general, and then reviewed the resulting substantial number of incident reports. Finally, he reviewed the videotapes of three of the cell extractions that seemed most problematic from the descriptions in the incident reports. On the basis of that limited review, procedures involving the use of force seemed to comply with policy. The use of the 37mm launcher in cell extractions seemed to be confined to incidents involving barricades. When fired, rounds were aimed at the barricade, and the use of the weapon was limited to the removal of the barricade. OC was the preferred weapon for cell extractions. The medical and mental health status of the targeted inmate was checked before force was applied. Medical and/or mental health staff was present during the extraction, and that presence was recorded. Efforts to avoid the use of force were made, and those efforts were described and recorded on videotape.

SVSP Recommendations:

1.     Staffing vacancies, particularly psychiatric vacancies need to be addressed at SVSP. The proximity of SVSP to the Monterey Peninsula suggests that contracted psychiatric help ought to be reasonably available.

2.     EOP programming needs to be doubled to reach mandated levels.

3.      Clinicians need to develop treatment plans for
        inmate/patients on their caseload.

4.      There needs to be greater clinician presence in
        administrative segregation.

5.      The facility needs to develop a system for documenting
        transfers to DMH.

6.      Implementation of the heat plan needs to be more closely
        monitored and managed.

**CTF**

The monitor visited CTF on September 29 and 30. Built in 1946, CTF is one of the oldest facilities in CDC, with a rich history and tradition. It houses level I and II inmates exclusively.

Mental Health Staffing and Program:

At the time of the monitor's visit, allocated mental health positions at CTF included two full-time and a half-time psychiatrist, a senior and three clinical psychologists, two psych social workers, a psych tech and 1.5 office techs. One of the current full-time psychiatrists was about to reduce his commitment to half-time, which would leave the facility with a full-time psychiatrist vacancy. Both psych social worker positions were vacant, but they had been combined and converted into the third clinical psychologist position.

There were often differences, usually minor but frequently convoluted in their permutations, between the rosters of authorized positions provided at institutions and those reported in hiring and recruitment documents prepared by the central office. One got the impression that at the local scene,

administrators were ceaselessly engaged in efforts to reconfigure allocated positions to match shifting needs and recruitment opportunities, efforts that were not always fully shared with or necessarily countenanced by Sacramento.

At the time of the monitor's visit, there were 522 3CMS inmate/patients, 23 over the programmed capacity of 499. With four psychologists to serve as clinical case managers, each had a caseload of roughly 130 inmate/patients. Management of that large a caseload, and all of the associated paperwork, left little time or inclination for group activities. The major objective was to monitor medications, touch base with inmates regularly and be available to those on the caseload who were experiencing particular stress or pressure, as well as screening and evaluating staff and self-referrals.

The locally developed computerized tracking process in place at CTF was excellent. Case managers received a regular printout of their caseload with dates when inmates were last seen and upcoming milestones. With the size of the caseloads typically managed by clinical case managers in 3CMS programs, it is hard to understand how they can function effectively in the absence of such tools.

Inmates referred to an EOP level of care were typically transferred either to MCSP or CMC, which, unlike SVSP, had EOP programs at levels of security appropriate for CTF inmates. At the time of the monitor's visit, four EOP inmates were awaiting transfer to MCSP, and two were scheduled to move to CMC that day. Staff reported that the timely transfer of EOP inmates from CTF was not the problem it appeared to be elsewhere in CDC.

The monitor reviewed a sampling of medical records of 3CMS inmates at CTF. These reflected clinical contacts within appropriate frameworks, but some of the files reviewed contained no treatment plans and/or no references to IDTT meetings. Moreover, if group activities were ever conducted for 3CMS inmates, they were not noted in any of the records reviewed.

Administrative Segregation:

A psych tech was assigned full-time to administrative segregation. She was relatively new to the job, but seemed competent and dedicated. She had not seen the program guide for mental health services in administrative segregation and was unaware of its existence. She was also under the impression that she was required to screen every new arrival in administrative segregation, not already on the 3CMS caseload, within 24 hours, an onerous requirement not contained in the program guide or any other applicable departmental policy.

At the time of the monitor's visit there were 38 3CMS inmates and one EOP inmate in the administrative segregation unit. The psych tech reportedly conducted rounds daily (Monday to Friday) and a psychologist conducted clinical rounds weekly. The total administrative segregation population was 154, so the screening and monitoring tasks of the psych tech were considerable.

Inpatient Transfers:

CTF was one of those institutions in which a medical administrator, in this instance the chief medical officer, had established over time a direct and personal relationship with a key medical administrator in another institution, in this

case the chief medical officer at CMC, that greased in wonderful ways the transfer of inmates. Inmates in CTF who needed inpatient care, at least intermediate inpatient care, had an easy transition to CMC and ASH. Those in need of acute care were transferred to the MHCB program next door at SVSP.

Documentation on transfers was inadequate. With the comparatively sophisticated computer capability available, there was no reason not to set up a system to capture data on transfers, including dates of referral, endorsement and transfer and reasons for rejections.

<u>Heat Plan</u>:

The monitor reviewed the institutional heat plan, which had a unique feature. The CTF heat plan policy incorporated a cold plan as well as a heat plan. The policy required the return to a heated cell in their living unit of "cold-risk" inmates, i.e., apparently, those same inmates on psychotropic medications who were issued a heat pass, whenever the temperature hit 40 degrees or below. The inmates so returned were to be given access to hot showers. No one at the facility could identify with any certainty the origin of this local wrinkle, but everyone seemed to accept it as natural. Temperature logs instructed whoever was making entries to notify the watch commander when either inside or outside temperatures hit 40 degrees or below. Despite this idiosyncrasy, the CTF heat plan complied with departmental and court requirements.

There were some lapses in the execution of the heat plan. Procedures for recalling heat-risk inmates from the yard in a stage-one heat alarm were primitive and subject to evasion. There were some gaps in

temperature logs. Interviewed staff and inmates seemed aware of the existence of a heat plan and had some understanding of expectations. Correctional officers knew to provide heat-risk inmates with cold water and ice and access to cold showers in a stage-two alert, although none were aware of the stage-three requirement for MTA rounds. According to training records, just under 80 percent of the staff had met the requirement for an annual heat plan training update. As in SVSP, the salubrious local weather discouraged zealotry in connection with the heat plan. Outside temperatures rarely exceeded 90 degrees and even in the older CTF structures, temperatures did not rise to stage-two or stage-three levels.

Use of Force:

Local policies on the use of force complied with departmental and court requirements. The monitor reviewed incident logs and reports and found no instance during 1997 in which the 37mm weapon was used against a seriously mentally disordered inmate nor any cell extraction of an inmate on the mental health caseload.

CTF Recommendations:

1.    While staffing vacancies were somewhat less of a problem in CTF than in lots of other CDC institutions, evidence of the absence of treatment plans and IDTT meetings suggested that the reduced staff was unable to provide all of the basic elements of the care prescribed in the program guides. In addition, the substitution of crisis intervention for clinical case management in the 3CMS program is the inevitable result of understaffing. The clinical staff vacancies need to be filled.

2.    CTF's efficient computer tracking system needs to be applied to the documentation of DMH transfers.

3.    The facility needs to address the lapses in implementation of the heat plan noted by the monitor.

### Service Area G

This service area includes <u>the California Men's Colony at San Luis Obispo (CMC)</u>, with a MHCB program (5 beds), an EOP program for up to 430 inmates and a 3CMS program for up to 599 inmates; Wasco State Prison (WSP), with a MHCB program (6 beds) and a 3CMS program for up to 125 general population inmates and 324 reception inmates; and <u>North Kern State Prison (NKSP)</u>, with a MCHB program (5 beds) and a 3CMS program for up to 133 general population inmates and 316 reception inmates.

### CMC

The monitor visited CMC on September 19 and October 15 and 16. Since its inception, CMC has been the principal source of mental health care for institutions in the southern part of the State. It also serves as the gatekeeper for CDC inmates entering and leaving Atascadero State Hospital (ASH).

<u>Mental Health Staffing and Program</u>:

CMC was relatively rich in staff. Clinical staff included 16 psychiatrists, 17 full-time and three part-time psychologists, nine full-time psych social workers, and five full-time recreational therapists, plus seven clerical assistants. There were 5.5 vacancies, including a staff psychiatrist, two clinical psychologists, a supervising psych social worker and 1.5 psych social workers.

CMC provided a correspondingly wide range of mental health services to inmates. The institution has long had a multi-level system of care, from inpatient referrals to crisis management to outpatient case management under categories referred to historically as intensive out-patient care, transitional outpatient care and partial out-patient care. Formal implementation of the new mental health care services delivery system at CMC began in May,1995, with the creation of EOP and 3CMS programs. Since then, the total number of inmates in the mental health system has fluctuated between a high of 1,750 on September 2, 1995 (591 EOP and 1,159 3CMS) and a low of 1,124 on August 15, 1997 (438 EOP and 686 3CMS).

As the gatekeeper for transfers out of institutions throughout CDC to ASH, CMC averaged approximately three to four referrals a week (121 in 1997 through August) to ASH from its own population and other institutions.

CMC did not have a formal MHCB program. It lacked a CTC and is not scheduled to have one. It did have what it continued to call an intensive outpatient care program (IOC), which included a transitional living unit (TLU) and a locked observation unit (LOU). The LOU provided a level of care one step removed from ASH. The IOC program consisted of 44 single cells, 14 in the LOU and 30 in the TLU.

The IOC program provided mental health assessment, diagnostic evaluation and treatment on a 24-hour basis for inmates who were in crisis, decompensating or in need of involuntary medication. It was also the program used for special referrals to CMC for short-term stabilization of psychiatric disorders that could not be handled at the referring institutions. IOC services

included evaluations by the IOC team of LOU inmates at least two days a week. After discharge from the IOC, case managers continued weekly clinical contact with inmates until they were fully stabilized.

The formal EOP program was the next lower step in the CMC levels of care. At the time of the monitor's visit, 455 EOP inmates were at the facility under the supervision of 12 case managers. The EOP program was divided between an activity of daily living (ADL) component and a pre-vocational skills component. The ADL piece provided long-term and supportive treatment for inmates found to be stabilized at a regressed level of severe mental illness, the developmentally challenged and those placed on involuntary medications. The pre-vocational skills component provided training and basic vocational skills for inmates unable to maintain a traditional assignment or who were limited or unassigned.

Before an initial IDTT meeting within 14 days of his arrival, an inmate was seen by a case manager who reviewed records, interviewed the inmate and completed an MH2 treatment plan. The IDTT, which met weekly, was composed of a psychiatrist, psychologist, social worker and correctional counselor. During IDTT meetings the inmate was interviewed and a treatment plan discussed, ratified and signed. EOP inmates were then seen weekly by the case manager for evaluation and treatment. The treatment plan was updated quarterly. All inmates were offered group therapy at the facility.

The 3CMS program included 746 inmate/patients at the time of the monitor's visit. Four case managers were assigned to the 3CMS program on the so-called C-Quad clinic. Inmates at this level of care were seen within 24 hours

of arrival at CMC for medication evaluation. The case manager then saw them within five days for an initial evaluation and treatment plan. Reportedly, the 3CMS IDTT reviewed an inmate's record and ratified the treatment plan within seven days of his arrival. The 3CMS IDTT was composed of a case manager, psychiatrist and correctional counselor. 3CMS inmates were seen individually at least once every 90 days, and a treatment summary was completed. Treatment services included program orientation, vocational training, school, medication review and monitoring for crisis intervention, group therapy and counseling support at least quarterly.

A forensic unit was located in the mental health administrative area. Each month three psychologists and one psychiatrist completed 35-45 mentally disordered offender (MDO) reports, 20-25 board of prison term (BPT) reports, and suitability for probation and parole reports. Involuntary medication evaluations and Keyhea hearings were provided for one to three inmates a month. A quality assessment and improvement process was being developed to provide a vehicle for evaluating the clinical efficiency and timeliness of the facility's mental health services.

Another significant aspect of the mental health services delivery system at CMC was the intake evaluation process. Unlike other CDC institutions, CMC processed anywhere from ten to 80 inmates through intake evaluations on a weekly basis.

In December, 1997, the defendants announced that newly enacted legislation required a realignment of the mental health services provided by ASH. Evaluation and the treatment of sexually violent offenders was

129

to become the principal focus of future ASH treatment. This apparently means that, eventually, ASH will no longer provide intermediate inpatient care to CDC inmates, some 250 of whom presently reside and are treated there. It remains to be seen what the impact of this major shift in the provision of inpatient care will be for CMC, although the institution is likely to assume a greater, rather than a diminished, role in the department's development of alternatives to ASH.

Administrative Segregation:

Mental health staff provided services in administrative segregation, where inmates were divided into two categories. The first included inmates already identified as belonging in the mental health services delivery system, who were seen by a social worker or psychiatric technician for initial evaluation within 24 hours of their arrival, except on weekdays and holidays. These inmates were then seen within five working days by an IDTT for an interview, medication renewal and treatment plan.

The second category included all other general population inmates sent to administrative segregation. At an initial institutional classification committee (ICC) hearing the inmate's record was reviewed to see if the inmate had received a mental health screen in the past year. Those not screened within the past year were referred for mental health screening and evaluation. The screening was to be completed within five working days.

The administrative segregation IDTT was composed of a psychiatrist, psychologist, social worker, recreational therapist, psych tech and a correctional counselor. The IDTT reviewed the status of inmate/patients monthly. Medication reviews and treatment plans were completed at the IDTT. The chief

psychiatrist and the administrative segregation team leader funneled information from the IDTT to the ICC.

Treatment and evaluation activities in administrative segregation included daily (five days a week) contacts with all seriously mentally disordered inmates by a social worker or a psych tech. A recreational therapist visited administrative segregation twice a week and provided supportive and recreational activities.

The monitor spent considerable time in the LOU unit, as well as in administrative segregation, and was impressed by the level of mental health services provided to inmates in these units. The psych social worker in administrative segregation saw everyone in the unit at least once a week. His treatment review sheets reflected substantial inmate contacts. A psych tech also saw inmates daily.

The monitor observed IDTT reviews in administrative segregation, which were conducted by the psych-tech, the recreational therapist, a psychiatrist, a psychologist and an RN. The team saw everyone in administrative segregation at least once every 30 days. The psychiatrist who chaired the IDTT hearings presented the inmate's history and record of compliance with medication. Each member of the team was vocal and probed the inmate to determine whether treatment was appropriate.

The monitor interviewed the inmates who had appeared before the IDTT and reviewed their medical records. He found appropriate treatment plans and IDTT meeting summaries in the records. Each of the interviewed inmates was familiar with the administrative segregation clinicians. Each stated

131

that he been to an ICC hearing at least once a month. None of these individuals had any complaints about their treatment. Inmates in administrative segregation at CMC are seen more regularly than their counterparts at other facilities. The level of contact appeared to be high in both quality and substance. The defendants comply with applicable policies governing the delivery of mental health services in administrative segregation.

The monitor also attended a weekly meeting of team leaders at CMC, which occurred every week, led by a senior psychologist and attended by other psychologists and two psychiatrists. The team leaders' meeting was an effective vehicle for quality assurance in the facility, and the participants used the forum to talk about various administrative constraints that needed to be addressed to provide quality care. The meeting was impressive because it was, literally, a team meeting. Each person was encouraged to speak openly and frankly about their treatment concerns.

Heat Plan:

The monitor reviewed the institutional heat plan and determined that it comported with required standards. The monitor was present when a stage-one alert occurred in October at CMC. All heat-risk inmates on the D-yard were required to return to their living units. All inmates subsequently interviewed confirmed that they were always required to return to their units during a heat alert. They also stated that they could get ice and take showers during stage-two alerts. Thermometers in units with heat-risk inmates were placed just above the control desk in the center of the wings.

A review of heat logs for the period from May through October indicated that Building 4 was the only unit at CMC where the inside temperature exceeded 90 degrees, potentially triggering a stage-two alert. The outside temperature logs indicated that from May through September the heat trigger was reached on only three occasions (August 5 and October 15-16) in 1997. Because CMC is so close to the ocean, the climate is generally mild.

Ninety-four percent of the CMC staff (1,393 of 1,478) had received the required heat plan training. The monitor interviewed correctional officers to determine the level of their familiarity with the heat plan. All of those interviewed knew about the need to recall heat-risk inmates during a stage-one alert and to provide ice and cool drinks during a stage-two alert. Stage-three heat alerts are extremely rare at CMC, and none of the interviewed officers knew of the requirement to bring in an MTA to make rounds during a stage-three alert.

Inpatient Transfers:

Transfers from CMC to ASH occurred quickly. Through August, 121 individuals had been endorsed for transfer from CMC to ASH in 1997. Six were rejected by ASH because they posed escape or custody risks. The ICC committee postponed the transfer in three cases so that a disciplinary infraction could be processed, and four individuals were transferred on an emergency basis. The remaining 108 inmates were transported to ASH within an average of 12.52 days of referral. While an inmate awaited transfer, he received appropriate treatment at CMC. The defendants met their obligation to provide prompt inpatient mental health care at CMC.

Use of Force:

There were no discharges of the 37mm weapon in CMC during the first nine months of 1997. Reportedly the 37mm gun has never been used at CMC. Over the past three years there have only been two cell extractions at the facility. Mental health staff believed they could talk an inmate out of almost every potentially violent situation. OC pepper gas was used once in 1997 during a cell extraction in September. The relevant videotape was unavailable at the time of the monitor's visit, but he did observe the videotape from another cell extraction videotape. During that extraction, which occurred on December 21, 1996 at 3:13 a.m., no mental health staff were filmed or appeared to be involved. The inmate was relocated to the LOU because he was spitting and urinating in his cell. The individual was behaving irrationally and was placed on suicide watch. Even though sprayed three times with OC gas, the inmate refused to be cuffed. Ultimately staff dragged him out of his cell by his legs, but no one lifted his torso. When he finally stood up, he appeared to be in good condition. The warden had viewed the videotape of this extraction and, as a result, reportedly worked with staff to improve procedures for cell extractions and make them less rough.

Staff reported no instances of the use of five-point restraints during the first nine months of 1997. Overall the defendants have met requirements regarding the use of force at CMC.

CMC Recommendations:

1.      The facility should undertake to make custodial staff aware of their duties during a stage-three heat alert either by posting directions prominently in units where heat-risk

inmates are housed or distributing laminated cards to staff with appropriate directions.

**WSP**

The monitor visited WSP on August 1, 4 and 5. WSP, like its sister facility NKSP, serves primarily as a reception center, although it also has a substantial permanent Level-III population. The breakdown in numbers is roughly 4,500 reception to 1,500 permanent.

When the monitor visited WSP for the first time in 1996, the chief psychiatrist had recently transferred to the newly opened SVSP, taking with him a not inconsiderable number of WSP clinicians. The facility moved swiftly to replace him and hired a new chief psychiatrist on the eve of the monitor's visit. The defections and the new appointment left mental health services in some disarray at that point, but there was optimism that the new chief psychiatrist would be able to pull things together.

Mental Health Staffing and Program:

Mental health positions allocated to WSP included a chief and two staff psychiatrists, a senior and 11 clinical psychologists, two and a half psych social workers, a recreational therapist and a psych tech, plus nursing and clerical positions. The size of the staff was attributable largely to reception functions, which occupy the efforts of nine of the allocated psychologists and most of the clerical staff.

The facility had an MHCB program with six beds operating in the infirmary, which is scheduled eventually to be a fully licensed CTC. In addition, WSP was staffed to manage up to 125 3CMS inmate/patients in the general

135

population and up to 324 in reception, for a total of 449 3CMS inmates. It had no EOP program, so inmates requiring an EOP level of care had to be transferred elsewhere.

The initial orientation provided for the monitor degenerated before its conclusion into a confrontation between the chief psychiatrist and institutional administrators over staffing inadequacies. The chief psychiatrist cited WSP's inability to recruit psychiatrists and psych social workers. He lamented the fact that six of his psychologists were not licensed and would have to be replaced eventually. He bemoaned the vacancies in ten of the allocated positions, and complained that the actual caseload of 634 3CMS inmates far outran allocated staffing, much less the vacancy-depleted and arguably unqualified staff actually available.

There were also some apparent personal and professional differences between the chief psychiatrist and the chief medical officer, stemming in part apparently from an on-going effort of the chief psychiatrist to adjust his work schedule to allow him time to work mornings elsewhere. An appeal to Sacramento over the head of the chief medical officer had resulted in interim permission for the schedule change, but the chief medical officer had placed the direction of the daily operations of the WSP mental health program in the hands of the senior psychologist. The monitor was informed that in December, 1997, the chief psychiatrist left CDC service. The result of the continuing imbroglio was detrimental to staff morale and institutional mental health services.

The chief psychiatrist's principal complaint was that he lacked adequate staff to provide appropriate mental health care. He stated that, in April of 1997, there were 950 3CMS inmates at WSP. The only care staff could possibly provide was to supervise medications and monitor for indications of suicide. He reported that it was impossible to conduct groups or put together meaningful IDTT meetings.

The monitor toured the MHCB program and observed an IDTT meeting there. It appeared that inmate/patients in the MHCB program received perhaps the best mental health care available in WSP. The chief psychiatrist was in charge of this unit and took pride in his work. IDTT meetings apparently occurred weekly, and rounds were conducted daily (Monday to Friday). The treatment team was comprised of a recreational therapist, an RN, a psychologist and the chief psychiatrist. The group carefully and completely discussed each case and assessed treatment.

The chief psychiatrist stated that an average of three to four inmate/patients a week were placed in the MHCB program. The population of the unit had climbed as high as ten on occasion. Very few individuals reportedly stayed in the MHCB unit beyond ten days, although one individual had remained in the infirmary for almost one year with both medical and mental health problems. CMF/DMH would not accept this inmate, who apparently had all the symptoms of a stroke. The chief psychiatrist was eventually able to find a combination of medications that worked to stabilize the inmate. The chief psychiatrist felt that CMF/DMH engaged in "bad faith bed blocking" when it came to WSP referrals.

The IDTT process in the MHCB unit had been functioning for only the past three months. Prior to that, there was insufficient staff to manage it consistently. The chief psychiatrist reported that ICC hearings carefully considered mental health chronos in inmates' files and that interaction between custody and mental health staff had improved. The treatment of inmate/patients in the MHCB unit seemed to be appropriate. Certainly, inmates there had consistent contact with mental health staff.

As part of the monitor's assessment of mental health staffing and programs in WSP, the monitor interviewed inmates and subsequently reviewed their medical records. The following represents a brief summary of those interviews and record reviews:

1.    Inmate K16291: This inmate had only one laboratory form in his file even though he had been at WSP since 8/96. The file seemed to indicate that he was seen only for medication renewal every 90 days. On 6/19/97 he was seen at an ICC by a psychologist. A mental health screening was conducted on 8/21/96, and the file contained a treatment plan, dated 10/26/96. Apparently the inmate was admitted to administrative segregation on 7/15/97, where he was seen by a psychologist on 7/24/97 and once by a psychiatrist.

2.    Inmate H87405: This inmate arrived at WSP on 9/19/96. He was placed in administrative segregation on 7/15/97 for not reporting to work. He told the monitor that he was an EOP inmate, but staff told him that he would be treated as a 3CMS inmate. He had seen a psychologist on 7/16/97, and a chrono was written for him on 7/24 designating him as an EOP inmate. No IDTT meetings were conducted on his case.

138

3.    Inmate H45979: This inmate was in the infirmary. He had been acting out just prior to a staff assault. He had a bus screening on 9/16/96 and was placed in administrative segregation on 5/19/97 for battery on a peace officer. He was endorsed on 8/4/97 for the PBSP PSU. The only treatment plan in the file was dated 9/19/96. The inmate talked incoherently and apparently fell into fits of assaultive rage. He repeated over and over, "I want my Bo Bo". There was no evidence of an effort to place him in DMH, nor was there any indication that staff had considered involuntary medication.

4.    Inmate J70539: This inmate had been placed in administrative segregation on 6/97 for attempted murder and assault on an inmate. While there, he was seen weekly by a psychologist and by a psychiatrist on 6/25/97 and 7/30/97. There were no psych tech notes in his file.

5.    Inmate H36711: This inmate had a treatment plan, dated 11/19/96, stating that he was 3CMS. On 6/11/97, however, he was cleared for the general population, although he had not been medication-free for a year. The mistake was attributed to the fact that the attending psychologist was new and still learning his job. The then current list of heat-risk inmates indicated that the inmate was receiving Thorazine.

6.    Inmate K43336: This inmate arrived at WSP on 3/11/97. A bus screening form was in his file, as was an informed consent form. This inmate grabbed an officer's tie through a food port in an infirmary cell and refused to return it. He was put on 300 milligrams of Lithium, but he eventually stopped taking his medication. On 4/24/97 this inmate kicked feces and urine and contaminated water off his cell floor in the direction of two staff members. He

was ultimately extracted from his cell and sent to the infirmary. He had been endorsed for the CSP/COR SHU.

    7.    <u>Inmate</u> H34676: He was brought to WSP on 4/10/97 and stated that he had no mental health problems. On 6/10/97 the chief psychiatrist ordered him to be extracted from his cell, but before the team entered the cell he complied with staff instructions. He was then sent to the infirmary. He was ultimately sent to administrative segregation on 6/10/97 for resisting staff when they put restraints on him. He is on medication and the disciplinary charge against him was dismissed, yet he remained in administrative segregation. Although this inmate's mental health problem clearly impacted on his behavior, the psychologist at his ICC hearing did not speak up, so there was no perceived need to move him quickly.

    8.    <u>Inmate</u> K51890: This inmate arrived at WSP on 5/9/97 and had no mental health concerns. There was no treatment plan in his file, and on 5/22/97 a psychiatrist stated that he did not need medication. Another note in the file on 7/22/97 from another psychiatrist stated that he did not have an Axis I disorder. On 7/29 this individual got belligerent with a psychologist. He had a history of drug abuse, and there was only one staff referral.

    9.    <u>Inmate</u> H28070: This inmate received a bus screening on 3/3/97, which noted that he had Huntington's disease. On 3/5/97 his mental health screening stated that he did not have a mental illness. An interview on 4/4/97 indicated that he had a history of polysubstance abuse and a GAF score of 70. He was cleared for general population. He was seen by a psychiatrist on 7/28/97, who determined that a GAF score of 45 was more appropriate and

diagnosed him as eligible for 3CMS treatment on the basis of medical necessity. There was no treatment plan in the file.

### Administrative Segregation:

The monitor interviewed inmates and staff in the administrative segregation unit and observed ICC hearings. A senior psychologist represented the mental health component at the ICC hearings. The hearings were chaired by a custody captain. The psychologist was neither aggressive in presenting and explaining mental health issues nor persistent in asking questions about the status or progress of inmates. In the five cases observed, the clinician inquired about the mental health of only one. The custody captain, on the other hand, sought mental health information from all of the remaining inmates. One of the inmates seen, and not the one questioned by the psychologist, was being considered for assignment to a SHU, when someone in the room noted that he was an EOP inmate. It was finally determined to send him to the PBSP PSU, but the psychologist, the senior clinician in the room, never said a word.

Another inmate was being heard because he had threatened staff. The classification counselor stated that the inmate was an EOP patient, but his chrono identified him as 3CMS. The psychologist asked no questions of the inmate, and he had no file on him. Fortunately, the chair of the ICC again pursued the mental health questions.

Yet another inmate was reviewed in absentia because he had been sent to the infirmary after gassing an officer. This individual had been in ASH in early 1996. The administrative sergeant reported that the inmate had Huntington's disease and his mental capacity was diminishing rapidly. While

Huntington's disease did not fit easily into the criteria for designation as seriously mentally disordered, the inmate had been evaluated with a GAF score of 70 and was an EOP inmate. Further discussion revealed the existence of another chrono in which the inmate's GAF score was listed as 45. The psychologist spokesman for mental health never spoke during this discussion and contributed nothing to the eventual placement of this inmate.

A psych tech made daily ( Monday through Friday) rounds in administrative segregation, and a clinician was scheduled to make weekly rounds. The chief psychiatrist told the monitor that the weekly clinician rounds did not always occur and that IDTT meetings were not conducted regularly in administrative segregation. The administrative segregation psych tech told the monitor she had been assigned permanently to the unit only in the previous week. Prior to that time, it was unclear how often anyone might have been available to conduct daily rounds.

The monitor interviewed 11 inmates in the administrative segregation unit. One inmate (H44298) stated that he has seen a psych tech daily, but that she had only been rounding for one week. He also said that a staff psychologist had seen him a couple of times a week. Other inmates concurred. All of the interviewed inmates had received a heat pass and were required to return to their cells when the outside temperature exceeded 90 degrees.

It was clear that inmates in administrative segregation were, at least recently, being seen by mental health staff irregularly. IDTT meetings, however, occurred inconsistently. The defendants did not comply with

approved policies for the provision of mental health services to inmates in the WSP administrative segregation unit.

### Inpatient Transfers:

The chief psychiatrist observed that inpatient transfers out of WSP were rare occurrences. An institutional list of referrals and transfers showed one inmate who had been on the list for transfer for a year, without any movement. Nine inmates were transferred to DMH in 1996 and the first half of 1997. The average length of time from admission to the CDC to transfer was 26.2 days. Because the bulk of the population at WSP was in reception, local statistics tended to focus on the date of admission, rather than, as elsewhere, on the date of referral. That made it difficult to compare with other facilities. The institution also did not keep track of rejections, but staff estimated that there had been about seven rejections since the beginning of 1996. The chief psychiatrist reported that he had stopped trying to transfer inmates to DMH because they did not accept his transfers. Instead, he reported, he tried to stabilize inmates in the MHCB program with "drug trials" prior to returning them to the general population. Yet there were no Keyhea hearings at WSP in 1997. Inpatient transfers apparently were another casualty of the mental health leadership struggle at WSP, which did not comport with approved policies governing access to inpatient care.

### Heat Plan:

The monitor reviewed the local version of the heat plan, which complied with court and departmental requirements. Heat-risk inmates were required to return to their units during a stage-one heat alert. Interviewed

inmates in the various units where heat-risk inmates were housed confirmed that each inmate had received a heat pass or ducat and a heat alert form describing the effects of heat on individuals on psychotropic drugs. Each inmate also stated that an announcement was made on the yard when the outside temperature reached 90 degrees. Each inmate also understood what a stage-two heat alert was, although they noted that none had occurred lately.

One inmate (K25318) reported that in July he had passed out in his unit. He said he was seen by an MTA, but not given a cool towel, water or ice. He believed that he was having air flow problems in his cell. Although interviewed inmates stated that a stage-two alert had not occurred in their unit, they understood that if inside temperatures hit 90 degrees they were to be given ice water and additional showers. They also stated that they had never had a stage-three alert.

While most correctional officers seemed familiar with the particulars of the heat plan, the monitor interviewed two correctional officers in Building-A who did not know what procedures to implement during a stage-two or a stage-three alert.

A review of temperature logs for the period from May 1 through August, 1997, indicated that outside temperatures exceeded 90 degrees on 71 days. Inside temperatures reached 90 degrees on two occasions in June in different buildings. Because WSP is a new facility with efficient swamp coolers, unit temperatures remained relatively cool even on hot days.

The outside temperature was monitored just outside the watch commander's office. WSP had a sophisticated temperature gauge that

recorded barometric pressure and humidity, as well as the temperature. The temperature gauge is in direct sunlight. The monitor compared readings from the WSP outside temperature log against the National Weather Service's readings to test the accuracy of the WSP measurements. In each case, the WSP temperature readings were within one or two degrees of the temperatures recorded by the National Weather Service.

The pharmacist prepared a weekly list of all inmates who are on heat-risk medications to the watch commander from May 1 through October 31. Each correctional housing officer interviewed was able to produce an updated list of inmates on heat-risk medications.

Just under 90 percent of the WSP staff (1,256 of 1,409) had received their annual training update on the heat plan.

Use of Force:

WSP administrators reported that, in the first eight months of 1997, the 37mm weapon was used only against inmates on the administrative segregation yard and had never been fired during a cell extraction. They also noted that, according to policy, the use of 37mm gun and all of its projectiles was prohibited against seriously mentally disordered inmates, except in efforts to quell general disturbances in open areas, where it was impossible or impractical to sort out seriously mentally disordered prisoners from others.

The monitor reviewed use of force incident logs and full investigative reports from January through early August of 1997. During that time eight reported incidents involved the discharge of the 37mm weapon. All occurred on the administrative segregation yard.

Three cell extractions involving inmates on the mental health caseload occurred in the first seven months of 1997. The monitor reviewed the videotapes of two of the cell extractions and directly observed the third, which occurred during his visit. In the third case, this inmate was resisting medical staff requests to submit to a TB test. Mental health staff was asked to meet with the individual and try to talk him out of his cell. They did so, but were unpersuasive. The cell extraction team entered and pulled the individual out of the cell. Mechanical restraints (leg irons and handcuffs) were used on the individual, who was taken to the medical unit. The chief psychiatrist reported that the inmate was not technically 3CMS, but had been taking TB medication known to cause dementia, which seemed to produce the problems the inmate was experiencing.

Practices related to the use of force at WSP conformed with policy requirements.

<u>WSP Recommendations</u>:

1.     Because of the mental health leadership problem that troubled WSP in late 1997, it is difficult to assess the extent and impact of staff vacancies on mental health services. If only three psychologists were available as clinical case managers at the time of the monitor's visit in early August, each had a caseload of over 200 inmate/patients. That suggests that vacancies were a serious problem, one that needs prompt attention and correction. Other indications of

the impact of insufficient staff were the lack of regular IDTT hearings and missing treatment plans from inmate records.

2.     The institution needs to address immediately the problems surrounding the delivery of mental health services in administrative segregation.  The absence of regular clinician contacts, the failure to hold IDTT hearings regularly and the inadequate provision of mental health input at ICC hearings are all serious failings that must be corrected.

3.     It would appear that relations between WSP and CMF/DMH have undergone much strain, whether due to the former chief psychiatrist or to other causes.  The CDC Population Management Unit and the department's Chief Psychiatrist ought to intervene aggressively to regularize the movement of inmates with acute treatment needs from WSP to CMF/DMH.  Efforts to document such transfers also need to record in each case the date of referral, as well as the inmate's date of admission to WSP.

4.     Relative to the heat plan, it would appear that the institution needs to provide custodial staff with some form of guidance on their duties during the various stages of a heat alert by posting directions prominently in units where heat-risk inmates are housed or by providing correctional officers with laminated cards containing those directions.

**NKSP**

The monitor visited NKSP on August 6 and 7. NKSP is the sister institution to WSP. They are identical in physical shape and mission. The 3CMS populations of both facilities are comparable, as are the numbers of EOP inmates in each. Despite the similarities, the differences in the mental health care delivered in NKSP and WSP are marked. From the perspective of mental health care, NKSP is a well-run institution with a committed warden and a caring staff. Although there are some mental health care problems at NKSP, they are manageable.

<u>Mental Health Staffing and Program</u>:

NKSP had 17.5 allocated clinical mental health positions, including a chief and two staff psychiatrists, a senior and ten clinical psychologists, 2.5 psych social workers, a half-time recreational therapist and a half-time psych tech, plus nursing and clerical positions.

At the time of the monitor's visit, 14.5 of these positions were filled with permanent staff. Just prior to the monitor's first visit to NKSP in 1996, the chief psychiatrist was forced to take a medical leave after he had been attacked by an inmate during a psychological examination. Though he returned to work two weeks after the attack, he could work only part-time and underwent a series of eye surgeries. During his absence, the senior psychologist guided the NKSP mental health program. The chief psychiatrist eventually demoted himself and took a full-time staff psychiatrist position, while the senior psychologist remained in charge of daily mental health operations and led the program successfully through difficult times.

A major staffing concern at NKSP, apart from the psychologist vacancies, was the fact that four of the working psychologists were unlicensed. Unlicensed psychologists could work legitimately at the facility for two years. They could also work an additional third year, if they had not yet achieved licensing but applied for and got a one-year extension. They could not be retained beyond the three-year limit if they were not licensed by then. This meant that the facility needed regularly to replace some of its clinical psychologists. NKSP administrators, like those at WSP, conceded that the recruitment and retention of mental health staff was one of the most difficult aspects of their job. The search for licensed clinical psychologists was particularly onerous for both institutions. NKSP was often forced to hire contract clinicians to manage its mental health caseload. NKSP administrators insisted they had made attractive offers to mental health professionals from outlying areas, but they had not been successful in filling all of their staffing vacancies. In addition, NKSP ands WSP, which are only 20 miles apart, draw from the same pool of applicants. Whatever the reasons, NKSP failed to hire and retain sufficient mental health staff.

NKSP had a MHCB program with five beds in its infirmary, which is scheduled to be licensed as a CTC. At the time of the monitor's visit, there were only three inmates in the infirmary. One was in five-point restraints and had been medicated involuntarily for two days. The senior psychologist explained that this prisoner would be moved to CMF/DMH as soon as a bed there became available. Another inmate (K61166) had just been put into five-point restraints. A referral form had been faxed to DMH requesting transfer for this individual. It was

149

clear from the inmate's record that he had been seen frequently by clinicians and that an order for restraints had been placed in his record. The third inmate had also been seen regularly, and a treatment plan was available in his chart. It appeared that if inmates in the NKSP exhibited psychotic symptoms, they were transferred as swiftly as possible to DMH.

The monitor reviewed the medical record of, and interviewed, a number of inmate recipients of mental health services at NKSP:

1. Inmate D98738: This inmate expressed satisfaction with mental health services at NKSP. Psych-tech rounds were recorded in his file, and there had been regular contact with a psychiatrist and psychologist. There was no treatment plan in the file.

2. Inmate C30557: This inmate stopped taking his medication because he could not write to the courts. He stated that he had been seen by a mental health staff member, who had increased his medication on 8/6/97. This inmate received a bus screening on 4/15/97, a mental health screening on 4/22/97 and a mental health evaluation on 4/25/97. He had been seen every 90 days by a psychiatrist and had last been seen on two occasions within the last week by a psychologist.

3. Inmate E08345: This inmate received a bus screening on 2/13/97. He was seen on 2/13 and again on 2/25 by a psychologist for mental health evaluation. It was determined that he needed EOP level of care. On 4/1 he was seen again by a psychologist and received a GAF score of 40. A psychiatrist saw him on 6/2/97, and he was placed in the hospital on 7/15/97. This inmate's first disciplinary infraction at NKSP occurred on March 4, 1997 and

he had apparently had an additional one monthly since June. Mental health staff felt this inmate should have been transferred earlier to an appropriate EOP program, but, in a classification Catch-22, his string of disciplinary infractions prevented his movement.

       4.     Inmate K36014: This inmate received a bus screening on 1/9/97 and had a mental health evaluation the same day. He received a GAF score of 52. He had received multiple disciplinary charges for beating up another inmate, spitting and other less serious infractions. Psych tech and psychologist rounds in administrative segregation were noted on a frequent basis from 4/29/97 through August. There was no record of an IDTT hearing nor a treatment plan in his file.

       5.     Inmate KI1427: This inmate entered the institution in 10/96. An EOP determination was made on 1/19/97. He received a treatment plan on 2/12/97. He was put into administrative segregation on 5/10/97. His disciplinary case was heard on 6/11, and he was found guilty. This EOP inmate, thus, was in the facility for three and a half months after being diagnosed as requiring EOP programming before committing an offense that prevented his movement to CSP/LAC until late August, where the monitor subsequently encountered him again.

       6.     Inmate E27673: This inmate had no complaints with mental health services. He had been in administrative segregation since he arrived at NKSP on 7/1/97. He had a mental health screening on 7/3/97, a mental health evaluation on 7/9/97 and saw the psychologist in administrative segregation every week.

7.      Inmate K24889: On 10/8/96 this inmate received a bus screening which indicated that he needed a psychiatric referral. A treatment plan was put in his file on 12/15/96 and it was determined that he had a GAF score of 52. Yet there is a chrono from the same day placing him in the infirmary with a GAF score of 40. After a short stay in the infirmary, he was sent back to the general population. He tried to mutilate himself on 12/19/96 and on 2/6/97. He was seen again by a psychologist who gave him a GAF score of 55. He was seen regularly from 2/24 to 5/13 by psychologists at the facility. He received a disciplinary charge on 7/7/97, which had still not been adjudicated one month later. During that month, it was determined that he needed an EOP level of care.

The review and interviews showed that seriously mentally disordered inmates were seen regularly by mental health clinicians at NKSP. The review also indicates problems with the follow-up to diagnoses involving the mix between mental health and discipline and the expeditious movement of inmates requiring an EOP level of care.

Administrative Segregation:

The monitor interviewed inmates in the administrative segregation unit on a day when the outside temperature reached 103 degrees. Inside the unit the temperature never got above 80 degrees.

There were 39 3CMS inmates in administrative segregation. The unit was clean and quiet, although the monitor noticed that a plastic barrier had been placed in front of each cell door to prevent inmates from spitting on or throwing trash at staff.

The monitor interviewed a number of inmates in the administrative segregation unit. Each inmate reported that they saw the staff psychologist assigned to the unit weekly and the psych tech daily (Monday to Friday). Those on medications all knew about the possible effects of heat, and each had received a heat ducat or pass. They also reported that they saw a psychiatrist for medication and medication renewals. Each confirmed that they could see someone from the mental health staff if they put in a request. They stated their early morning access to the recreation yard prevented the loss of yard-time due to heat alerts later in the day.

The monitor attended ICC hearings in administrative segregation. He interviewed both the psychologist and the psych tech assigned to the administrative segregation unit, both of whom attended ICC hearings. The psychologist reported that medical records were kept in the unit and that he could refer to it during ICC hearings. He did not do therapy or any other out-of-cell activity with inmates in administrative segregation. He did evaluations in the ICC and through a cage grill. He said that if he wanted to see someone alone he could, but most of the time an officer was present during interviews. He did approximately six to eight evaluations a day, and he also worked on the reception side of the house. The psych-tech stated that he saw everyone daily and tried to determine what level of care might be needed. Again, it was clear from meetings with inmates that they were familiar with both the psych-tech and the psychologist.

The psych-tech had been at NKSP since October of 1996. He reported that he documented his daily rounds on a MH3 form. He said there

were no interdisciplinary treatment team meetings in administrative segregation; whatever occurred in the way of an IDTT took place during regular ICC hearings. He also reported that there was no recreational therapy in the unit, but they did monitor inmates and provided individual intervention when necessary. No activities of daily living were provided either. He stated that anyone who ran into difficulties and began to decompensate in administrative segregation was sent immediately to the MHCB program. There was also a contract psychiatrist who came in on weekends.

Because the facility was without a chief psychiatrist, a designee attended ICC hearings. ICC hearings were chaired by the chief deputy warden, who had a background in mental health training and was at CMC for many years. He was exceptionally caring and made sure that inmates with mental health problems were seen by a mental health clinician and he deferred to the psychologist's opinion throughout the hearings.

Inmate K24889 was an EOP inmate. He was rocking throughout the hearing and stated that he had been locked up for threatening an officer. He said he saw a clinician regularly, but they did not do anything to help him. The attending administrative segregation psychologist added nothing except to note that the inmate was at the EOP level of care. The chief deputy warden, however, told the sergeant in the unit that EOP inmates should have water available to them whenever they need it.

When inmate KI1427 came into the ICC hearing it was determined that he, too, was an EOP inmate. The monitor had interviewed this inmate the previous day, and it was clear that he was having a problem with his housing.

154

Again the psychologist said nothing. The chief deputy warden asked about the inmate's mental health background.

Inmate K41117 was a 3CMS inmate who had assaulted his cellmate and no longer wished to take his medication. Finally, the psychologist spoke up and said he would have a psychiatrist conduct an examination of this inmate. In sum, the custodial contact with inmates in the ICC hearings was significant, but the psychologist added little to the discussion about the mental health of the inmates. Fortunately, each inmate was seen by a psych-tech and a psychologist on a frequent basis.

### Inpatient Transfers:

NKSP clinicians reported that inpatient transfers to DMH occurred quickly. Of the 28 inmates on whom data was provided, the average time lapse for a transfer was 10.82 days. Most inmates requiring involuntary medication were transferred to CMF.

### Heat Plan:

When the monitor reviewed the heat plan and its operations in 1996 at NKSP, there were a host of problems. An incident involving a heat-risk inmate found unconscious in his cell, who had to be removed to the infirmary and eventually to a local hospital, initiated a closer look at temperatures and the impact of heat on units at NKSP. It turned out that tempeatures inside cells were often three degrees or more higher than in the dayroom areas, where official heat plan thermometers took readings.

In the year since that incident and review, NKSP have taken aggressive action to prevent a recurrence. Each unit has been provided with a

155

hand-held thermometer with which to take cell temperatures. At NKSP, a stage-two alert is triggered when the inside temperature reaches 85 degrees, rather than the 90 degrees required elsewhere. They have also incorporated the measures required elsewhere in the department in a stage-three alert in a stage-two alert at NKSP. This meant that an MTA conducted rounds to check on heat-risk inmates whenever a stage-two alert occurred, or whenever the inside temperature hit 85 degrees.

From May through August 6, 1997, the outside temperature exceeded 90 degrees on 61 days. During the same time period, inside temperatures never exceeded 90 degrees. Only once, on June 17 in C-Building, did an inside temperature exceed 85 degrees, requiring a stage-two heat alert. Because NKSP is one of the newest generation of California prisons, its swamp coolers are still efficient and keep inside temperatures relatively cool. Numerous inmates confirmed that, when the outside temperature reaches 90 degrees, an announcement was made on the yard and in the units that the heat plan was in effect. Prisoners on heat sensitive medications were given cooling drinks periodically and received additional showers when necessary.

A heat-related incident occurred on May 18, 1997. Inmate J11185 became dizzy, apparently from dehydration, in the Facility-A education area. The incident report states that the inmate was transported to the infirmary on a gurney and admitted for observation.

The monitor observed a heat plan training class at NKSP. Unlike most other institutions, which provide staff with an in-service written blurb on the heat plan and a self-administered test distributed through a booklet, NKSP

regularly provided classroom training on the heat plan. Only 154 correctional officers at NKSP of a staff of approximately 1,400, had not received heat plan training.

Use of Force:

NKSP administrators claimed that the 37mm gun was used sparingly at the facility and was never used in cell extractions. They reported that the 37mm was used only in efforts to quell general disturbances in open areas, such as the yard or, possibly, a dayroom. The monitor reviewed institutional policies, including an addendum to the 37mm weapon policy prohibiting the use of the 37mm gun against seriously mentally disturbed inmates in pre-planned tactical extractions and other close-range applications, like cell extractions, except to bring down a barricade.

The monitor reviewed four incident reports involving the use of the 37mm in 1997. Each report indicated that the use of weapon occurred in an open space and under appropriate circumstances. The monitor also reviewed three cell extraction videotapes. In one, which captured a March 17, 1997 cell extraction, the inmate was removed from his unit, placed in five-point restraints, medicated and taken to the infirmary. This individual was subsequently transferred to CMF/DMH. All of the cell extractions reviewed by the monitor were appropriately conducted, and mental health staff participated in each of them. The use of force at NKSP complied with approved policies.

NKSP Recommendations:

1.    Problematic staff vacancies in NKSP involve licensed psychologists, rather than psychiatrists. The institution and

the department need to address this local recruitment permutation.

2.    The absence of treatment plans and the irregular conduct of IDTT meetings are both symptomatic of an understaffed mental health program. NKSP clinicians need to provide regularly these basic elements of programmatic care.

3.    Because of the large number of reception inmates in NKSP (and WSP) awaiting transfer to EOP programs elsewhere and experiencing delays in their relocation, disciplinary infractions incurred during the hiatus by these troubled inmates frequently delay further their movement. In these facilities it is particularly important that custody and mental health personnel work cooperatively to identify infractions that are the result of mental health problems and to minimize their impact on the inmate's access to needed levels of program through transfer.

4.    Mental health staff at NKSP needs to take a more aggressive role in ICC hearings.


### Service Area H

Service Area H includes CSP/Los Angeles County (CSP/LAC), a MHCB program (8 beds), an EOP program for up to 149 Level III and IV inmates and a 3CMS program for up to 349 inmates, and California Correctional Institution/Tehachapi (CCI), with a 3CMS program for up to 339 inmates.

**CSP/LAC**

The monitor, together with a psychiatric expert, visited CSP/LAC from September 25 to 27.

<u>Mental Health Staffing and Program</u>:

CSP/LAC had a chief psychiatrist, four staff psychiatrists, two senior and two staff psychologists, three psych social workers, five psych techs and one recreational therapist, along with five registered nurses. At the time of the monitor's visit there were only three clinical vacancies among all of the 33 allocated positions. The EOP unit was missing a psych social worker, a recreational therapist and a RN. Administrators predicted that these positions would be filled by the end of 1997.

When the monitor first toured the MHCB unit in the institution's CTC, there were only two psychiatric patients. The monitor's psychiatric expert interviewed these inmates and reviewed their medical records. See Exhibit C for the psychiatrist's summaries and notes from interviews and record reviews conducted at CSP/LAC. One of the two inmates had been transferred earlier in the day from the EOP program immediately after an IDTT meeting recommended the move. The second inmate, who had come to the unit from Receiving and Release about 14 hours earlier, was bipolar, taking lithium and was in a continuing psychotic rage.

There were only 57 inmate/patients in the EOP program at the time of the monitor's visit despite the program's capacity of 149, while there were 543 3CMS inmates in a program staffed to handle 349. The under-utilization of the EOP program allowed the facility to shift its clinical resources to serve the excess

3CMS caseload.  The situation at CSP/LAC was also unusual because over 150 of those identified as being on the 3CMS caseload were medication-free and reportedly awaited discharge from the caseload.

The monitor attended an IDTT meeting in the 3CMS program.  The team consisted of four participants, a staff psychiatrist, a classification caseworker, a psych social worker and a senior psychologist.  Treatment team meetings were well organized and run.  Each of the inmates had been seen extensively by a case manager, and the clinicians discussed individual cases with the inmate at length.  One interviewed inmate was being discharged from the program because he had been medication-free for over a year.  Another interviewee, a bipolar inmate, had been functional without medication for three or four months.

The monitor's psychiatric expert also reviewed the quality of the care provided in the mental health program at CSP/LAC.  A brief summary of the expert's review follows, while more detailed case notes are included in Exhibit C.

Strengths in mental health care delivery:

1.      Staff included many skillful and experienced clinicians, exemplified by the psychologist who conducted an excellent initial psychotherapeutic interview with inmate C15685.

2.      Interviewed EOP inmates reported satisfaction with the psychiatric treatment they received at CSP/LAC.

Weaknesses in mental health care delivery:

1.    Psychiatric interventions, such as involuntary antipsychotic medications, Keyhea hearings, crisis hospitalization, or transfer to DMH, were not pursued for some decompensating inmates (e.g., J99328).

2.    Symptoms, such as suicidality, auditory hallucinations, paranoid delusions, often were not followed up in subsequent contacts (e.g., C90160, K01238, E72717, E74672 and E47777).

3.    Mentally disordered inmates were offered treatment plans inconsistent with the diagnosis or symptomatology documented in earlier notes (e.g., K55415, H19015, K01238 and H50093).

4.    Malingering was often diagnosed before other mental disorders were ruled out by observation in psychiatric units, adequate medication trial, or psychological testing. Previous adequate responses to psychiatric medications were not taken into account, and medications were withheld on the assumption of malingering (e.g., J29677).

5.    Mental illness diagnoses were not consistently addressed once a disciplinary charge occurred or once the inmate improved (e.g., J99328).

6.    Psychiatric diagnoses, symptoms, and treatment plans were not regularly included in ICC discussions, even though such information might have improved decision-making.

Some illustrative examples:

1.    K01238: No documentation justified either the discontinuation of Elavil or the decision not to offer an antipsychotic medication. No plan was documented to follow the patient's suicidality or offer an alternative

161

treatment if the antidepressants-free trial were to result in an exacerbation of depression. This was of concern given that a rope had been found in his cell on March 29, 1997.

2.    E72717: There was no indication that the diagnosis or target symptoms were followed-up to see if the treatment was effective. A suicide attempt with auditory hallucinations in August, 1997, was not addressed in his ICC review.

3. J29677: This inmate had violent outbursts, reluctance to leave his cell, an irrational fear that people were putting hairs in his food, weight loss, lack of consistent improvement, and refusal of antipsychotic medications. The medical file contained notes of many psychiatric diagnoses, including bipolar affective disorder, major depression, delusional disorder, schizophrenia, paranoid type, and malingering. His behavior suggested a psychotic process with grave disability but a Keyhea hearing was not considered. Nor was there a recommendation for transfer to an acute psychiatric facility, such as DMH. This might have provided an assessment to clarify the diagnosis and build consensus among clinicians for consistent treatment.

4.    J99328: This inmate was diagnosed with bipolar affective disorder, acute manic episode; he had been decompensating since 9/15/97. He had not been eating properly and was losing weight, suggesting grave disability. Neither a crisis bed nor a Keyhea hearing had been considered. IDTT staff members attempted at length to dialogue with this disorganized, hostile inmate but they did not address immediate safety concerns to prevent assaultive behavior, in spite of his provocative behavior towards other inmates or

custody staff. The inmate's condition was referred to by some staff members as an attitude, suggesting a volitional quality. This formulation suggested a lack of appreciation for the severe mental disorder. The team decided to refer the inmate to DMH, but no plan was developed for his immediate management. The IDTT meeting was not chaired by a psychiatrist, which may have diverted attention from appropriate medication interventions.

     5.    E74672: This inmate's self-destructive impulses were not reassessed, even though he was anxious and distressed over his unresolved bulimia.

### Administrative Segregation

There were 22 3CMS inmate/patients in administrative segregation. A psych tech monitored behavior and delivered medications five days a week, while psychiatric contacts and therapy were scheduled weekly. The staff psychologist in administrative segregation offered "group" therapy sessions, one of which the monitor attended and found to be among the best such sessions he had yet observed in CDC. Seriously mentally disordered inmates in the CSP/LAC administrative segregation unit were well attended.

### Inpatient Transfers

In 1997, 12 inmates were transferred from CSP/LAC to CMF/DMH. There were no mental health referrals to Atascadero. The reported average length of time from referral to transportation was 12.4 days. The average stay in a crisis bed for those inmates transferred was 13.7 days.

### Heat Plan

From early May to the end of September, 1997, there were 77 stage-one heat alerts at CSP/LAC, concentrated mostly in July and August. There had been only two stage-two alerts (inside temperatures at 90 degrees or more) in the first nine months of 1997, with one of them occurring in early February and one in April, when mechanical failures twice activated the heating unit in Building D2. On both occasions, the inside temperature exceeded 90 degrees for a little over an hour. The monitor interviewed inmates who were present during these incidents, and they reported that appropriate measures were taken, including the provision of ice and showers.

Inmates reported that they were issued heat passes or ducats and were required to return to their living units when a stage-one alert occurred. They also reported that inside temperatures in the units were relatively cool all year and rarely rose above 75 degrees. One inmate complained that the living units were too cold.

The institutional heat plan required inmates to return to their cellblocks when the outside temperature reaches 90 degrees, and also directed inmates in vocational programs exposed to 90-degree-temperatures to return to their living units. Inmates with jobs in air-conditioned areas, however, were not required to return to their cellblocks during a stage-one heat alert.

The monitor interviewed correctional officers on heat plan procedures. One was unfamiliar with the various stages of the heat plan and had to pull out a primer from his jacket pocket, which did not include instructions for a stage-three alert. He was unclear about what he was supposed to do during a stage-three alert. The second correctional officer knew where to find

the latest list of heat-risk inmates and knew his duties in stage-one and two alerts, but he had to consult his card for proper stage-three directions. The third knew what to do in a stage-one alert, but had never experienced a stage-two or three alert and was uncertain of his duties. Although it was clear that each understood their obligation to ensure that inmates returned to their housing units in a stage-one alert, they were not well versed on other aspects of the heat plan.

Despite that performance, of approximately 1,300 staff at CSP/LAC, only seven had not received the required heat plan training. Apparently the training materials need to emphasize stage two and three procedures to make sure correctional staff know what to do if necessary. Notwithstanding, it was clear from inmate and staff interviews that when the outside temperature reached 90 degrees, inmates were required to return to their living units and staff actions during stage-two alerts had been appropriate.

There had been only one reported heat incident at CSP/LAC in 1997. Apparently, on July, 8, 1997, a 3CMS inmate fainted from heat exhaustion while exercising on the yard. The inmate had failed to return to his housing unit after a stage-one alert had been activated. He was given first aid and escorted to the clinic. He was treated and later transported to the central infirmary and was later cleared for re-housing in the general population. The defendants complied with heat plan requirements at CSP/LAC.

Use of Force

The monitor reviewed local policy on the use of the 37mm weapon, OC pepper gas and cell extractions. Policy indicated that during a preplanned cell extraction, the participation of mental health clinicians was necessary. The

plan stated that in a pre-planned tactical extraction, a 37mm launcher was prohibited for direct or indirect use against all inmates, but might be used to bring down a barricade. The policy also stated that the 37mm launcher can be utilized to quell non-life threatening incidents (e.g., fist fights, etc.) but only in large open spaces (e.g., dayrooms, exercise yards, dining halls, gymnasiums, etc.).

In 1997 the 37mm weapon was used on 24 separate occasions. The monitor reviewed all the incident logs recording the use of a 37mm launcher and found that it was discharged only in large open spaces. OC gas was used 18 times from January to July. The monitor reviewed three cell extraction videotapes and noted that excessive force was not used in any extraction. The defendants complied with policies relative to the use of force.

<u>CSP/LAC Recommendations</u>:

1.  The review of the monitor's psychiatric expert identified a number of concerns related to the quality of care provided to seriously mentally disordered inmates in CSP/LAC. Frequently those concerns focused on the failure to treat decompensating inmates sufficiently aggressively. The review points to the need for mental health staff at CSP/LAC to develop quickly its own quality assurance process to carry out on a regular basis the kind of review conducted by the monitor's expert.

2.  There were indications that the current heat plan training regimen was not educating custodial staff sufficiently about

166

their duties under the heat plan. The facility ought to review its training materials on the heat plan, and also ensure that correctional officers have quick access to a readily available reminder of their duties during the various heat alert stages.

## CCI

The monitor visited CCI on September 29 and 30. CCI is a reception center that also houses Level IV inmates.

### Mental Health Staffing and Program:

CCI was allocated positions for a senior psychiatrist, a half-time staff psychiatrist, a senior psychologist, 4.5 staff psychologists, two psych social workers, one psych tech, an office technician for medical records and a half-time medical transcriber. One psych tech position was unfilled. Recruitment and retention of staff was not a problem at CCI. For some reason, CCI seems an attractive employment opportunity for mental health clinicians. Staff noted, however, that, apart from reception duties, it was supposed to support a 3CMS program for 399 prisoners (339 in the general population and 60 reception inmates). The 3CMS count at the time of the monitor's visit was 486. Another eleven inmates were endorsed for an EOP level of treatment and were awaiting transfer. Mental health staff at CCI provided individual counseling and therapy and some limited group therapy. Mental health coverage included IDTT planning and program review, attendance at classification hearings, preparation of board of prison term and MDO evaluations and other court and parole revocation evaluations.

167

## Administrative Segregation:

The monitor interviewed inmates in administrative segregation. A psych tech and a psychologist were assigned to administrative segregation on a regular basis. The psych tech visited the unit every other day, Monday through Friday. The psychologist reported weekly contact with the mental health caseload in administrative segregation, but a record review indicated that such regular visits had commenced only earlier in the month of September. The assigned psychologist had just joined the CCI staff in August. Thus, for most of the summer, inmates in administrative segregation were not seen by clinical staff as regularly as the program guide directs.

## Inpatient Transfers:

Twelve transfers were made to the MHCB at CSP/LAC from CCI during the first nine months of 1997. The average length of time for those transfers from the date of their referral was 1.5 days. Clinical staff at CCI complained that the number and swiftness of transfers was misleading, because it did not reflect the numerous rejections of candidates for movement to the CSP/LAC MHCB program recommended by CCI. The clinical staff at CSP/LAC apparently felt that some CCI referrals did not need acute care treatment in a MHCB. The monitor sensed that some heated conversations had occurred among clinicians from the two institutions, but that nothing had been resolved. The senior psychiatrist at CCI insisted he had to make numerous telephone calls to get a meaningful response. Efforts to resolve the situation were underway, and the central office was urging the use of the population management unit in Sacramento to reconcile differences in individual cases.

Although CCI is only an hour from CSP/LAC, it was clear that inpatient transfers from CCI to the CSP/LAC MHCB program did not occur with the regularity or smoothness contemplated in the department's plans and policies.

Heat Plan:

The monitor reviewed heat logs provided for the months of May through August of 1997. During that period, stage-one alerts were triggered approximately 14 times, but there were no stage-two alerts. In 1996, the monitor observed and reported numerous concerns about CCI's compliance with the heat plan, including problems related to announcements of stage-one alerts, the availability of ducats to speed the return of heat-risk inmates to their living units in the event of an heat alert and the nature of the requirement to return. The senior psychologist at CCI told the monitor in advance of his review that new heat passes or ducats had been distributed in April and, since then, inmates were required to return to their housing units during stage-one heat alerts.

The monitor reviewed the institutional heat plan, which did, indeed, require heat-risk inmates to return to their cellblocks during a stage-one alert. Some interviewed inmates, however, insisted that they were not required to return to their cellblocks during a stage-one alert and produced passes indicating that a return to their cells was optional. Other inmates told the monitor that they had recently received new heat passes, and, starting in August, were required to return to their housing units when outside temperatures hit 90 degrees. The confusion suggested that a new plan, not yet fully implemented, had been introduced in mid-summer.

169

The monitor noted that some thermometers in the Level I facility were mounted on shaded or cooler walls, rather than in locations where more prevalent ambient temperatures might be measured.

One interviewed correctional officer told the monitor that heat-risk inmates were required to return to their cells during a stage-one heat alert, but she was unsure about whether to give inmates ice and cooling drinks during stage-two alerts. Another officer reported that an announcement was made during stage-one alerts and that cool drinks and ice were provided during stage-two alerts. He was unclear whether an MTA should be contacted when inside temperatures reached 95 degrees.

The training lieutenant could not readily provide statistics on the status of heat plan training among institutional staff. He stated that virtually all staff had received training on the institutional heat plan. In 1996, 860 of 1083 staff (79%) received training, and he assumed the number had increased in 1997.

There were three heat-related incidents in CCI during 1997. During each incident the heat plan had not been activated because neither indoor nor outdoor temperatures had reached or exceeded 90 degrees. In two of the incidents, the inmates returned immediately to the general population, but in the third, the inmate was referred to the infirmary.

Use of Force:

The monitor reviewed local policy on the use of the 37mm weapon. The policy prohibited the discharge of the weapon at seriously mentally disordered inmates during pre-planned tactical extractions or any other close range applications except in the event of an emergency, i.e., where the

170

potential for self-inflicted injury or injury to others is present. The policy pretty clearly gave staff the right to use the 37mm against a seriously mentally disordered inmate if there is an emergency during a pre-planned extraction. The sergeant who led the cell extraction team in administrative segregation confirmed that he so understood the policy. That local policy did not comport with the departmental policy approved provisionally by the court in June, 1997.

The monitor reviewed eight incident reports involving the use of the 37mm gun, and each discharge, save one, occurred in a large, open area. The exception was used to knock down a barricade in a cell. The monitor also reviewed approximately 24 cell extractions. In at least three of those cell extractions, the 37mm gun was fired to take down a barricade (J80818, H96596 and E37145).

The monitor was of the opinion that the extraction team used excessive force in more than one of these tactical extractions. For example, inmate C77602 was dragged on the floor after he was pulled ultimately out of his cell. Inmate E37145 was extracted from his cell after the 37mm weapon was used to knock down a barricade. The sergeant who conducted the cell extraction informed the monitor that, "if necessary", he would have fired the 37mm directly at the inmate, even if a barrier was not present.

Inmate E14538 was extracted from his cell on April 17, 1997 because he covered his window and would not respond to staff. The cell extraction videotape clearly showed that after the inmate had cuffed up, he was grabbed by the throat by one of members of the extraction team.

171

Inmate H96596 was extracted from his cell on February 28, 1997. The videotape showed footage of the 37mm weapon allegedly being shot against a barricade, yet one officer could be heard shouting, "Shoot him, shoot him." It was difficult to determine whether a barricade was used in the cell, but the language used by the officer seemed to suggest that staff would shoot at an individual in a cell regardless of whether a barricade was present.

While the 37mm gun was not used exceptionally often at CCI, its employment there was troublesome and unique. While the non-lethal weapon of choice for cell extractions elsewhere increasingly is OC gas, CCI continued to use the 37mm weapon in situations that invited potential violation of departmental strictures on the use of the 37mm weapon against seriously mentally disordered inmates. The use of the 37mm weapon at CCI did not comply with approved policy and procedures.

CCI Recommendations:

1.    There need to be regular contacts by mental health staff and clinicians with seriously mentally didordered inmates in administrative segregation.

2.    The process for coordinating transfers from CCI to CSP/LAC for short-term acute care in the latter's MHCB program needs work.

3.    The facility needs to focus more on the implementation of some aspects of its heat plan, including the routinization of the use of ducats, thermometer placements, better direction on the duties of correctional officers in the various

172

stages of heat alerts and the compilation of training statistics.

4.      Both local policy on the use of the 37mm gun and its application in CCI represent violations of departmental policy and the plans, policies and protocols adopted by the court.  The facility needs to correct its policy immediately and make sure that correctional officers understand and implement it fully.

## Service Area I

Service Area I includes the California Institution for Men (CIM), with an MHCB program (10 beds) and a 3CMS program for up to 206 beds; and the male component of the California Rehabilitation Center (CRC), with a 3CMS program for up to 299 inmates.  Male inmates from CRC in need of acute short-term inpatient care are transferred regularly to CIM.

### CIM

The monitor visited CIM from July 25 through July 27, and, again, on September 3, 1997.

Mental Health Staffing and Program:

CIM had thirty-three allocated mental health staff positions.  In July, only three of these positions were vacant.  A part-time staff psychiatrist and a supervisor psych social worker had not been hired and the chief psychiatrist's position was unfilled because the chief psychiatrist had been promoted to chief medical officer and a replacement had not yet been recruited.  Because CIM

173

was operating without a supervisor psych social worker, weekly rounds in administrative segregation unit were not completed regularly. By the time of the monitor's second visit in September, this position had been filled.

Inpatient Transfers:

Clinicians at CIM reported that they had difficulty transferring EOP inmates to both DMH and appropriate EOP programs elsewhere because of the sometimes-lengthy delays associated with classification and transfer policies and procedures. Some delays occurred because inpatient or EOP beds at the appropriate security level were unavailable. Administrators at CIM provided a list highlighting some of the difficulties encountered with such transfers. It required over 70 days for five of the inmates on the list to be moved. Some specific examples included:

1.    Inmate H42356 was referred to CMC on 10/28/96 and was transferred until 1/14/97. His transfer was delayed because of a serious disciplinary infraction for staff assault. Because inmates cannot be transferred to another institution until the disciplinary process is completed, delays can occur for up to six to eight weeks.

2.    Inmate J75815 was referred to DMH on 9/10/96 but was not transported until 3/4/97. This inmate was ready for endorsement on 10/24/96, but the CSR would not endorse him because he had a parole date of 11/23/96. Inmates are not transported if they are within 30 days of their parole date. On 11/6/96, a staff psychiatrist notified the parole authority that this inmate needed psychiatric hospitalization. As a result, the inmate's parole date was suspended for psychiatric reasons, requiring a board of prison terms (BPT) hearing to

complete the revocation. Inmates cannot be transferred to another institution until after the BPT decides their fate. Not only were there multiple delays in getting this inmate to his BPT hearing, but a Chinese interpreter was also necessary for due process reasons. Finally, there were no beds available at DMH when he was ready, at last, for movement. Overall in it took over I00 days to complete his transfer.

3.    Inmate J14246 was referred to CMF/DMH on 7/I/96 and was transferred on 3/4/97. This inmate represents another instance in which the parole date was within 30 days of the referral date. Notification of his psychiatric problems was submitted to parole, and a BPT hearing was ordered. Multiple delays followed in getting the BPT report processed and assigned to appropriate classification personnel, resulting in a lengthy transfer delay.

4.    Inmate H79625 was referred to DMH on 2/10/97 but not transferred until 5/7/97. This inmate had completed his BPT procedures early in the referral process. It appeared that the delays occurred in getting his BPT report processed and a classification counselor assigned.

5.    Inmate J16353 was referred to DMH on 5/6/97 and transferred on 7/21/97. Shortly after the referral, the assigned classification counselor indicated that he needed additional medical and mental health data to prepare the case. The information was hand delivered on 5/9/97. Mental health staff contacted the counselor three additional times to encourage him to expedite the case. After many efforts the inmate was finally transferred.

The cases illustrated the problems created both by disciplinary and parole complications. The absence of available beds at designated receiving

institutions was, as noted, another frequently encountered problem. From January 1 through the end of July, 1997, 17 individuals were referred for transfer to CMC or CMF/DMH. The average time for transfer to these institutions was over 71 days. These delayed transfers did not comply with the defendants' policies relative to inpatient transfers.

<u>Administrative Segregation:</u>

According to administrators, treatment planning and placement determinations were approved by the interdisciplinary treatment team (IDTT) within ninety 90 days of an inmate's admission to the unit. The team consists routinely of the assigned clinical case manager, the acting chief psychiatrist and a custodial administrator (captain). The monitor observed one IDTT hearing and was impressed by the level of interaction on the part of clinicians. The mental health status of all of the administrative segregation inmates interviewed by the monitor had been screened prior to their initial ICC review, which occurred within ten days of placement in administrative segregation. A psych tech conducted rounds five days a week in all administrative segregated housing units. Each inmate interviewed knew who the psych tech was. Each inmate was screened prior to his admission to administrative segregation or within days of his admission. Mental health clinicians or trained support staff conducted the interviews, and the acting chief psychiatrist reviewed referrals from the clinicians.

The monitor also observed several ICC hearings in administrative segregation. The acting chief psychiatrist participated in the ICC hearings, and there appeared to be useful interaction between clinical and custody staff.

The program guide on administrative segregation specifies that a psychologist or masters-level social worker is to conduct weekly rounds. That individual is required to fulfill a variety of functions, also specified in some detail, critical to the maintenance of mental health care in the isolated environment of administrative segregation. At the time of the monitor's visit no appropriate clinician was available to conduct those functions in the administrative segregation unit. The position was filled subsequently in September and, reportedly, the required functions were being performed. That report needs to be confirmed, since the failure to provide the required rounds constituted non-compliance with an important policy provision.

The monitor reviewed medical records for the following seriously mentally disordered inmates housed on the administrative segregation unit during the period of his visit: E84609, J39864, E41652, H48595, E01406, E59764 and, E41662. The files of E41652 and H48595 contained no treatment plans. Psych tech rounds were noted consistently and a psychiatrist saw each individual at least every 90 days.

Heat Plan:

In 1996, CIM's compliance with the requirements of its own heat plan was spotty. There was no requirement for inmates to return to their cells after a heat alert was triggered; some inmates never received the heat ducats necessary to ease their movement back to their unit during a heat alert; and inmates did not always get cooling drinks and showers during a stage-two heat alert. This was not the case in 1997. Over 30 randomly interviewed inmates indicated that they had all received a heat pass and were required to return

indoors when a heat alert was triggered.  Whatever the practice, the institutional heat plan itself indicated that inmates had the option to return to their cells during a heat alert.  Administrators at the facility indicated that they would modify the policy to make it comport with actual practice.

Because CIM is an older facility without swamp coolers, and because the surrounding area can get extremely hot during the summer months, stage-two heat alerts (triggered when inside temperatures reach 90 degrees) occurred repeatedly from May throughout the summer.  Stage-two alerts had already occurred 19 times in five different buildings by the time of the monitor's visit in late July.  Interestingly, stage-one alerts, triggered when the outside temperature hits 90 degrees, had occurred only five times during the same period.  Buildings were so poorly ventilated they retained heat, and inside temperatures regularly exceeded outside temperatures.

Of the approximately 1,456 staff that work at CIM over 1300 (89%) had received training on the institutional heat plan.  CIM complies with heat plan requirements.

### Use of Force:

The monitor reviewed nineteen incident reports involving the use of the 37mm gun from January 1 to the end of July, 1997.  All of the 37mm discharges occurred in the open space of the Palm Hall exercise yard.  During that same period, only one cell extraction, in administrative segregation, was conducted.  The videotape of that cell extraction indicated that mental health staff was consulted prior to the extraction.  OC gas was used only four times during the first half of 1997, and its use complied with applicable regulations.  The

178

monitor received no complaints from interviewed inmates regarding excessive use of force at CIM.

CIM Recommendations:

1.  Transfers, both inpatient and EOP, were a problem at CIM. There needs to be a cooperative effort between the facilities involved, with the help of the Population Management Unit and the department's chief psychiatrist, to expedite the movement of EOP inmates and inmate/patients needing continuing acute care.

2.  While the provision of clinical rounds in administrative segregation appears to be resolved, this issue needs further review and confirmation.

3.  There were indications that some treatment plans were not being prepared or not being filed. There needs to be a review of records to assure that treatment plans, as required by the program guides, are prepared for inmates on the mental health caseload.

**CRC**

The monitor visited CRC on August 14 and 15, and observed CRC administrative segregation hearings, held at CIW and CIM, on September 3 and 4. CRC is a Level II housing facility built in the 1950's. It is the only facility in the CDC system that houses both male and female inmates. CRC is a reception center and administers the "civil addict program", designed to provide training

179

and treatment for those addicted, or in eminent danger of becoming addicted, to narcotics.

CRC was originally a resort hotel with a colorful past and clientele. Because of its physical design, it is not equipped to house inmates who are a danger to themselves or others. Any inmate who decompensates or commits a serious infraction is automatically and rapidly transferred to CIM (males) or CIW (females). Consequently, CRC, like Folsom, does not have an administrative segregation unit.

### Mental Health Staffing and Program:

CRC's allocated mental health staffing includes a senior psychiatrist, two senior psychologists, two clinical psychologists, a psych social worker, a supervising registered nurse, and a medical transcriber. At the time of the monitor's visit, only one clinical psychologist position was vacant. The senior psychiatrist had just been recently hired in July of 1997, some seven months after his predecessor had resigned. Thus, for the first half of 1997, CRC operated without a senior psychiatrist. During that time coverage was provided three days weekly, and sometimes two days weekly, by a staff psychiatrist from either CIM or CIW. Whether due to the past and present vacancies or to some other unidentified cause, appropriate mental health care was not being provided on a regular basis at CRC. At the time of the monitor's visit, staff seemed incapable of performing even rudimentary tasks.

The new senior psychiatrist spoke at length about the problems he had inherited. He insisted that there was a problem with medication renewals and reported that, for a short period of time, the morning distribution of

medications had been suspended. The new senior psychiatrist thought he could rectify these problems. That interview prompted the monitor to conduct a review of records and interview inmates to determine, if possible, the extent of the problem. The following is a synopsis of nine of the cases reviewed:

1.    Inmate C54539: He stated that he saw a psychiatrist every 90 days, but rarely saw a psychologist. He reported a lapse in the delivery of his medication at one point. The individual had entered the facility on 2/21/97 and was seen by a psychiatrist on 3/21 and 5/5/97. There was no treatment plan in the medical record. His medication was renewed on 6/17/97, and the medication progress note stated, "Medication renewed by SRN." When the monitor asked the nurse whether she had the authority to write prescriptions, she told him she did not. She stated that, from time to time, she had received telephone reorders from one of the psychiatrists and recorded a notation similar to the filed in this case. She insisted she had not renewed the medication on her own authority, but had been given verbal orders to do so.

2.    Inmate J46426: He stated that he, too, never saw a psychologist, but saw a psychiatrist every 90 days. He also reported a lapse in his medication during his stay at CRC. This inmate arrived at CRC from CSP/LAC on 4/2/97. He received a bus screening on that date. The inmate had a mental health screening on 5/27/97 and was designated as 3CMS. He apparently received his medication on 4/18/97, and the medication was renewed on 5/15/97 for 30 days, again by a nurse. She subsequently renewed the medication again on 6/13/97 for another 30 days. The Mellaril, which had been renewed, was discontinued on 7/13/97 because the 30 days had expired. It was

not received again by the inmate until 7/18/97. A psychiatrist finally reordered the medication on 7/28/97.

3.    Inmate D32572: This inmate also reported a lapse in medication delivery and stated that he rarely saw anyone from the mental health services except for a psychiatrist. This inmate arrived at CRC on 5/25/97. There was no treatment plan in the medical record. On 6/26/97 a psychiatrist from CIM ordered medication for the individual for four weeks. On 7/4 a renewal note for three days was in the jacket, but the signature was illegible. On 8/5/97 the medication was renewed by a nurse. It appeared that this inmate's medication had lapsed for at least a week.

4.    Inmate J64281: He stated that it took two months before he received medication at the facility. This inmate was screened at CRC on 6/3/97, and there was no treatment plan in the file. He was prescribed Elavil on 7/24/97. He was first seen by a psych social worker on 7/7/97, over a month after he had arrived at the facility. His bus screening form indicated that he had mental health problems in the past. This individual had received psychotropic medication at NKSP prior to his transfer to CRC. His claims were accurate.

5.    Inmate H-95839: He stated that his medication was not renewed for two weeks. This inmate came to CRC from CIM on 5/28/97 and stated in his bus screening that he had mental health problems and was 3CMS at CIM. Even though he came from CIM as a medication-free 3CMS inmate, he was not seen by a clinical case manager until 7/22/97, and there was no treatment plan in the record.

6.    Inmate W58389: This inmate stated that her medication was renewed by the nurse. It appears that she arrived at CRC on 2/1/96 with no mental health problems indicated. There was no treatment plan in the record. The monitor did note, however, that her medication (Sinaquan) was renewed by the nurse on 11/26/96 and 12/23/96.

7.    Inmate W55614: This inmate stated that she had only seen a psychiatrist once in five months and that her medication was renewed by a nurse. She came from CIW. She had been seen regularly at CIW, arrived at CRC on 3/4/97 and received a bus screening and treatment plan. There were no medication order sheets in the file until 3/10/97. Her medication was renewed by the nurse on 4/1/97 and then again on 7/1/97. There was no indication in the record that she had seen anyone other than a psych social worker on 3/5/97.

8.    Inmate N07615: This inmate stated that she only saw a psychiatrist for medication renewals and never saw a psychologist. She arrived at the facility on 3/20/97, and her bus screening form indicated that she had psychiatric complaints. A medical evaluation was given on 3/20/97 and a mental health crisis placement chrono reported a GAF score of 57. Another mental health placement chrono stated on 4/25/97 that she had a GAF score of 55. There did not appear to be a treatment plan in the file. This inmate was seen by clinicians on 4/25/97 and 5/13/97. On 5/25/97 a psychiatrist from CIM ordered medication and she was seen again on 7/30/97 by another psychiatrist who reordered her medication. This inmate did not know what medication she was taking (Cogentin). No further clinical contact was noted.

9.    Inmate N07549: This inmate complained that she only saw a psychiatrist for medication renewals. Apparently this inmate had arrived at CRC on 6/12/97 and received a mental health screening on 6/13/97. A mental health evaluation was conducted on 7/25/97, more than a month after her arrival. There was no treatment plan in the file, and it appeared that medication was ordered on 7/25/97. No other contacts were recorded in the file, and the inmate's complaints were apparently accurate.

IO.    Inmate H99972: This inmate stated that he had not received medication for two days. He arrived at CRC from CIM on 5/8/97. There was no treatment plan in the file, however it was clear from other notes that he had been a 3CMS patient at CIM. Medication was ordered for the individual on 5/16/97, and was stopped on June 26, 1997. On June 27, 1997 his medication was renewed by a nurse, and then was reordered by a psychiatrist on 7/18/97. The inmate was finally seen by a clinical case manager on 7/18/97.

11.    Inmate J97763: This inmate stated that he was a 3CMS patient at WSP, but had stopped taking his medication while at that facility. When he arrived at CRC on 6/19/97, he answered no to all of the mental health questions on the bus screening form. He did not see a psychiatrist until August, when medication was ordered for him. Clinicians stated that because he answered no to all the bus screening questions, they did not suspect that he had a mental health problem. Obviously the bus screener did not look at the medical record when the inmate was admitted.

Although CRC was almost fully staffed by the time of the monitor's visit, they were clearly in need of better clinical supervision and guidance. The

new psychiatrist admitted that the program was in bad shape when he inherited it and that it would take months to bring it up to standard. The chief medical officer stated that he had been trying to get the department to authorize a second psychiatric position exclusively for females. If two psychiatrists were available and psychologists were required to examine inmates regularly, CRC might eventually pass muster. In the meantime, the mental health care delivery system in CRC was inadequate and did not comport with the department's policies, plans and program guides.

<u>Administrative Segregation</u>:

CRC did not have an administrative segregation unit. All inmates who required greater security were shipped immediately to CIM and CIW. Although inmates were sent to administrative segregation units in CIM and CIW from CRC, they remained on CRC's count until they were endorsed for transfer to another institution. Males from CRC who needed administrative segregation were housed in Palm Hall at CIM. Females are put in a special care unit (SCU) at CIW called Graystone.

The monitor visited both of these units and observed joint CRC/CIW and CRC/CIM classification hearings. No clinicians from CIW participated in the "joint" CRC/CIW hearings; only a senior psychologist from CRC was present. The chief psychiatrist from CIW, who was responsible for the inmate's current treatment, was not present. A separate hearing for the same inmate was conducted weekly in the CIW administrative segregation unit, in which the chief psychiatrist participated. On the other hand, the CRC/CIM hearings were truly joint with clinical and custody staff from both facilities participating. There was a

suggestion that CIW clinical staff felt more comfortable conducting their own separate, albeit redundant, review process than participating with CRC clinicians in the administrative segregation hearing. Treatment decisions for CRC inmates in CIM and CIW were made almost exclusively by clinicians at CIM or CIW.

<u>Inpatient Transfers</u>:

Because CRC is close geographically to CIM and CIW, and also because of the limited nature of the mental health services program at CRC, the institution has, fortunately, forged strong ties with clinicians at CIM and CIW. It is not uncommon for inmates with acute mental health care needs to be transferred within the day of referral to the gender appropriate facility. Whatever other failings it may have, the mental health staff at CRC does not try to keep and treat inmate/patients who need a higher level of case than case management in a 3CMS program.

<u>Heat Plan</u>:

The local heat plan at CRC comported with the requirements of the department and the court. Heat-risk inmates were given a pass to expedite their return to their assigned dormitories. A list of heat-risk inmates was generated weekly by the pharmacist, and temperatures were monitored closely in the five dormitories where heat-risk inmates were housed (males were housed in Dorms 201, 301, and 302; females were housed in Dorms 407 and 408). Thermometers were placed at the beginning and end of each of these dorms and were checked every three hours by correctional officers. When the outside temperature reached 90 degrees, 3CMS inmates were returned to their dorms.

Interviewed inmates confirmed that they were recalled to their dormitories when the outside temperature reached 90 degrees, and that they were given ice water and allowed to take showers throughout the day, regardless of the temperature. They also acknowledged that MTAs conducted rounds whenever a stage-three alert occurred.

Interviewed correctional officers reported that, when a stage-one alert was in effect, the Tower-3 officer made an announcement and all heat-risk inmates were required to return to their dorms. Correctional officers were aware that a stage-two alert occurred when the inside temperature reached 90 degrees and that a stage-three alert was triggered when the inside temperature hit 95 degrees. In addition, they were aware of their obligation to notify the infirmary during a stage-three heat alert. The correctional officers reported that they provided inmates with ice water and allowed them to shower as often as they desired during a stage-two alert. The interviewed correctional officers also acknowledged that they had received the required heat training.

Even though water, ice and showers were provided on a regular basis, inmates often declined to accept the ice water or take showers because the brown color of the water much of the time. The monitor was provided with a study conducted by the California Department of Health Services, which indicated that the drinking water has a high content of manganese, but had not been shown to cause chronic health problems. The Department of Health study suggested that the water content should be evaluated regularly. The warden expressed concern about the quality and color of the facility's water and promised to monitor the situation closely over the next year.

A review of heat logs for the period from May 1 through mid-August, 1997, indicated that outside temperature exceeded 90 degrees on 20 separate occasions. A stage-two heat alert occurred in Dormitory 201 four times in May and eight times in July. A stage-two alert occurred 15 times in Dormitory 301 and 17 times in Dormitory 302 during the period. A stage-two alert occurred on two dates in May in both Dormitories 407 and 408. Stage-three heat alerts occurred in Dormitory 201 on four different occasions, in Dormitory 301 on three different occasions and in Dormitory 302 on four occasions.

The monitor reviewed the statistics on heat training compiled by the institutional training personnel. Eighty-seven percent (997 of 1,150) of staff had received their required heat plan training.

Use of Force:

CRC administrators did not condone use of the 37mm weapon. Although they have a policy governing its use, CRC administrators encourage other means to quell disturbances. OC gas was used three times from January to mid-August, 1997. In the absence of cells, there were no cell extractions. The use of force was not a problem at CRC.

CRC Recommendations:

1.    Mental health care in CRC was about the weakest in the entire department and needs much work. The monitor's review of records suggested a host of problems, including inadequate bus screening, late evaluations, repeated interruptions of medications, poor access to mental health, inadequate clinical case management and prescription

renewal practices that may be illegal and are certainly unprofessional. The department needs to address these problems quickly.

## Service Area J

This is the largest of the service areas in terms of the number of institutions included within it. The area embraces RJ Donovan Correctional Facility (RJD), with an MCHB program (10 beds), an EOP program for up to 150 inmates and a 3CMS program for up to 264 general population inmates and 85 reception inmates); Ironwood SP (ISP), which is scheduled to have a CTC (with 15 beds, some undetermined number of which will be designated for inpatient mental health care) and a 3CMS program for up to 50 inmates; Centinela SP (CEN), with an MHCB program (4 beds) and a 3CMS program for up to 50 inmates; and Calipatria SP (CAL) and Chuckawalla Valley SP CVSP), each of which has only a 3CMS program for up to 50 inmates. Because the MCHB programs at Ironwood SP and Centinela SP were still in development, inmates in the Service Area in need of short-term inpatient acute care were regularly sent to RJ Donovan.

### RJD

The monitor visited RJD from August 26 to 28, accompanied by two psychiatric experts.

#### Mental Health Staffing and Program

There were 36 allocated mental health staff positions at RJD, including a chief and 5.5 staff psychiatrists, a senior and 7.5 psychologists, a

189

supervisory and four psych social workers, a recreational therapist and additional nursing and clerical positions. The chief psychiatrist position at RJD had been vacant for months. Interviews had been held in mid-August, and RJD staff was hopeful that the position would soon be filled. In addition, positions for a recreational therapist, a psych social worker, a senior psychologist and a half-time psychiatrist were also vacant.

The health care manager and chief medical officer at RJD was the de facto head of the psychiatric department. In the absence of a chief psychiatrist, most of the responsibility for mental health programs at RJD had been delegated to the senior psychologist, who, at the time of the monitor's visit, was on leave because he was pursuing a civil action against CDC. The visit, nonetheless, proceeded smoothly. Staff was available to answer questions, and they were knowledgeable about the program.

The psychiatric experts of the master conducted a review of health records and interviewed a cross section of inmates. Discussion of some of the cases reviewed and a summary of findings follow. More detailed case notes are attached to this report as Exhibit D.

Sample medical files: Inmate J80016 had not been coming out of his cell, was drinking very little, and thought that others were urinating in his sink. There was no documentation indicating that involuntary medications, a Keyhea process, or transfer to infirmary or DMH had been considered. Staff argued that there was no evidence of grave disability, but the inmate's bizarre behavior was evidence enough of a decompensating severe mental disorder and resultant

grave disability. Past medical records provided extensive evidence of his grave disability.

Inmate H89027 refused to come out of his cell and was refusing medication. He was apparently eating and sleeping well but a recent incident, during which he fabricated a dummy in his cell, raised the possibility of future bizarre behavior. An infirmary admission planned for one week away was not soon enough to deal with his evolving decompensation.

Inmates H91744 and D81816 had improved on medications but still had psychotic or manic symptoms. Higher doses of antipsychotic agents or antimanic drugs were not pursued with guideline plasma levels. Target symptoms were not listed to document improvement or lack thereof.

Inmate D24583 had a history of poor behavioral control, poor anger management, and treatment on Haldol and Cogentin. Although there was a psychiatric referral, no medications other than Hydroxyzine (100 mg) were offered. Given severity of this inmate's psychopathology, suicidality, and acuity, psychiatric referral after bus screening should have been immediate. Instead, there was a two-month delay in the start of psychotropic medications. In spite of symptoms of uncontrollable affect and impulsivity, no mood stabilizing medication was offered between March 1997 and August 1997.

Inmate J99911 was decompensating. Crisis bed admission, involuntary medications and DMH transfer were not considered.

Summary: Psychiatric interventions for decompensating psychotic inmates often were either not in place or delayed (J80016, H89027, J99911).

Medication regimens which had not fully improved targeted symptoms were not re-evaluated and dosages were not increased (H91744, D81816). Mood-stabilizing medications were not used when indicated (D24583).

Interviews with inmates in administrative segregation indicated they were generally satisfied with their psychiatric treatment but wanted more contact with clinicians.

IDTT meetings appeared efficient, focused, and collaborative. The disciplines of psychology, psychiatry, and nursing appeared to operate well together. Psychiatric symptoms and treatment, however, often were not included in discussions between mental health and custody staff of inmates whose psychiatric condition might contribute to discipline problems (D24583 and H91744).

<u>Administrative Segregation</u>

The monitor interviewed the staff psychologist in the administrative segregation unit, who reported that he conducted weekly rounds for each inmate. He routinely interviewed inmates through the cell doors. The psych-tech reportedly was also available on a daily basis (Monday through Friday) to conduct rounds as well.

The monitor observed ICC hearings, which were chaired by the acting chief deputy warden, who has a mental health background. A staff psychiatrist represented the mental health component. The psych-tech was also available for ICC hearings. She was much involved in the hearings. She had

developed a mental health history on each inmate prior to the hearing and was the most vocal of the participating clinicians.

Although policy suggests the chief psychiatrist is the appropriate clinician to attend ICC hearings in administrative segregation, the chief medical officer or his designee may participate, if the facility does not have a chief psychiatrist. The spirit of the policy requires whoever attends the hearing to interact with custody staff. The psychiatrist at the RJD ICC hearings was quite reserved. The psychiatrist also did not have medical records available to him during the hearing.

IDTT reviews of inmates were conducted quarterly in administrative segregation. Medical charts were available during IDTT meetings in administrative segregation.

The interaction between custody and clinical staff at RJD seemed to be improving. The psychiatric experts found the overall level of mental health care offered in administrative segregation to be adequate, although insufficiently aggressive. Inmates in the unit were being seen regularly and appropriate records of contacts were being kept.

<u>Inpatient Transfers:</u>

From January 1, 1997 through August of 1997, 16 inmates were transferred from RJD to DMH. The average length of time from admission in the MHCB to discharge to DMH was 20.25 days. Most of these inmates, however, had spent up to seven days in the MHCB unit before an actual referral was made, which reduced the time from referral to transfer significantly. RJD complied with policies relative to inpatient transfers.

<u>Heat Plan</u>:

The monitor reviewed RJD's institutional heat plan, which conformed with applicable policies. The facility had developed a heat alert checklist which was posted in each unit housing heat-risk inmates. A version of the checklist, which outlines the duties of correctional officers at each stage of the heat plan, was also distributed to custodial staff.

From May 1 through August 27, a stage-one heat alert had occurred seven times. A stage-two heat alert occurred once on August 5 and stage-three alerts occurred three times on April 30, May 31 and August 4. No heat incidents were reported in 1997. Heat-risk inmates were routinely provided with a heat pass and were required to return to their cells during a stage-one heat alert.

The monitor interviewed correctional officers regarding the heat plan. They were able to describe accurately the various stages of alerts and were familiar with their duties at each stage. Again, the checklist in the living units helped to educate custodial staff. All thermometers were on the second tier inside of the buildings and sensors hung from the ceilings inside cellblock areas. Only one interviewed correctional officer misstated that, in a stage-one alert, inmates had the option to return to their cells. The policy required inmates to return to their living units. The defendants have satisfied their obligations regarding the heat plan at RJD.

<u>Use of Force</u>

The monitor reviewed institutional policies relative to the use of force. Local policy on the use of the 37mm weapon did not include the

departmentally operative language prohibiting the use of the weapon against seriously mentally disordered inmates in closed areas, although the policy on cell extractions did include the appropriate language. The latter policy also made clear that in any preplanned tactical extraction, custody staff were required to consult with medical and mental health staff prior to the extraction. The policy also contained language limiting the use of the 37mm gun in a cell extraction to taking down a barricade.

RJD reported ten uses of the 37mm gun in the period from January l through the time of the monitor's visit. All of the discharges reported occurred on a yard or in a large open area. There had been two cell extractions thus far in 1997, neither of which had involved a seriously mentally disordered inmate. Use of force at RJD comported with policy requirements.

RJD Recommendations:

1.    The monitor's experts' comments on quality of care focused on the need for more aggressive responses to decompensating inmates, better medication monitoring within the framework of a planned treatment strategy and a closer match between medications and symptoms. All of these are observations that a properly functioning quality assurance program at the institution ought regularly to record and address.

2.    Mental health staff needs to participate more actively and effectively in ICC hearings in administrative segregation.

3.   The institution needs to document transfers more fully and cut down on the length of stays in its MHCB program by expediting the transfer of those inmate/patients referred for higher or different levels of care elsewhere.

4.   Local use of force policies need to be updated to include the current prohibition on the use of the 37mm gun against seriously mentally disordered inmates except in open areas when proper identification is precluded.

**ISP**

The monitor visited ISP on August 19 and 20 at the peak of the heat season.

Mental Health Staffing and Program:

Given the small size of the mental health caseload, ISP was relatively rich in staffing resources. Allocated positions included a chief and two half-time staff psychiatrists, a contract psychiatrist (eight hours weekly), a full-time and a half-time clinical psychologist, a psych tech, a half-time recreational therapist, a supervising registered nurse and an office tech. Vacancies included the half-time psychologist, the supervising registered nurse and the half-time recreational therapist.

ISP had an MHCB program with five beds, although its CTC had not yet been licensed. The physical renovations required for the present infirmary to meet licensure requirements for a CTC had been approved and were authorized in the then current budget. The renovations were expected to be complete in late 1998. ISP also had a 3CMS program with a ceiling of 50 inmate/patients.

well as with RJD, and no problems in moving the exceptionally few cases

requiring acute or intermediate inpatient care.

Heat Plan:

The institutional heat plan had been amended in early August,

when temperatures in two upper B-3 cells were found to be at 99 degrees,

although the thermometer in the general area registered just 88 degrees. As a

result of that incident, which turned out to be an isolated and unexplained

phenomenon, the plan was changed to require hourly cell temperature readings

whenever inside temperatures reached 80 degrees. It was not yet clear to the

staff on D-3, the overflow residence for heat-risk inmates, how they were

supposed to take such readings in the absence of thermometers of their own.

The policy suggested that correctional officers were to get maintenance people

to take such readings. That word had not been communicated to the D-3 staff.

The number of heat-risk inmates in ISP at the time of the monitor's

visit was ten. The number rarely exceeded 20 in 1997, even in the winter months.

All of the heat-risk inmates were housed in B-3 or administrative segregation,

where one protective custody heat-risk inmate was housed at the time of the

monitor's visit. None were housed in D-3, the overflow facility for heat-risk

inmates.

Eighty percent of the staff (955 of 1200) had taken their annual

update training on the heat plan. The monitor reviewed institutional and unit

temperature logs. There were no post orders on the temperature logging duties

of control tower officers in B-3, where most heat-risk inmates were housed, but

appropriate post orders were available in D-3 and administrative segregation.

No two thermometers were alike. Those in the tower for outside temperatures and the one in administrative segregation were of the dime store variety, while those in B-3 and D-3 had probes out in the living area and were more sophisticated.

Use of Force:

From January 1 to the time of the monitor's visit, the 37mm weapon was used three times, all involving incidents on the yard. Similarly, OC gas was used three times, twice in a cellblock area and once in a classroom. The monitor reviewed all of those incident reports and found nothing remarkable. None of the incidents involved seriously mentally disordered inmates. All reviewed uses of force at ISP comported with policy.

ISP Recommendations:

1.    Clinical case managers need to see their inmate/patients on a more regular basis.

**CEN**

The monitor visited CEN on September 11 and 12.

Mental Health Staffing and Program:

Authorized mental health positions for CEN included a chief psychiatrist, a half-time psychiatrist, one and a half psychologists, a psych tech, a half-time recreational therapist, a medical transcriber and an office technician. The half-time psychiatrist position was vacant. A candidate was offered the job in August, but he refused it for a county job paying, reportedly, $20,000 more than this one. The full-time psychologist position is vacant, but a new hire was scheduled to fill the half-time psychologist position within a week. The

recreational therapist position is also vacant, and there was an effort underway to convert it to a full-time slot that administrators thought might be easier to fill. CEN had an MHCB program in the infirmary (five of 14 beds) which is scheduled to become a licensed CTC. The licensure process is dependent on physical renovations that are not expected to be completed before the end of 1998 or early 1999. The population of the MCHB program is typically only two or three.

While the 3CMS program is staffed for up to 50 inmates, at the time of the monitor's visit there were only 20 in the facility, with only seven of those on psychotropic medications.

The chief psychiatrist, who possessed a J.D. degree in addition to his medical qualifications, seemed unusually competent, dedicated and caring. There seemed also to be somewhat of an excess of mental health resources at CEN, given the small number of seriously mentally disordered inmates in the institution.

There was a remarkable difference in the desert institutions between 1996 and 1997. The number of inmates on psychotropic medications and with a history of mental illness in these facilities was down considerably. It is hard to know whether that was due to greater care on the part of the department in sending people to the desert or to the increased ability of these facilities to move heat-risk inmates more expeditiously out of the institutions. Whatever the reason, the numbers were substantially less, meaning that problems with the delivery of mental health care were manageable.

Administrative Segregation:

There were no heat-risk inmates, nor 3CMS patients, in administrative segregation at the time of the monitor's visit. A review of the administrative segregation log indicated that the psych tech had not spent much time lately in the unit, not surprising given the absence of mental health business there. Apparently, however, the administrative segregation staff does not always require the psych tech to log in and out, an oversight that administrators promised to correct.

Inpatient Transfers:

There had been thus far in 1997 only one instance where there was a need for an emergency transfer, which was accomplished within seven days. Movement of EOP inmates can be a problem, largely due to their getting bogged down in the disciplinary process. One EOP-designated inmate spent over 90 days in the infirmary, rather than in administrative segregation, awaiting transfer due to pending disciplinary charges. He left in June.

Heat Plan:

The 1997 institutional heat plan was readily available. Heat plan operations conformed with policy. Control booth post orders varied in the way the temperature logging duties of the control booth officer were described. One set included specific directions; others referred to the heat plan attached to the post orders. Administrators promised to make the post orders uniform.

Heat plan training in CEN represented somewhat of a contrast with the other desert institutions. There is some question about the precise nature of the heat plan training requirement. Each year in its annual early spring memorandum on the heat plan, the department has directed institutions to

201

conduct heat training annually.  There is, however, no comparable requirement in any of the court orders on the heat plan.

CEN did not comply with the department's requirement that staff be annually updated on the heat plan.  An analysis of the statistics provided by the institutional training personnel indicated that only some 40 percent of the staff received its annual heat plan training during the period from September 1, 1996 to the date of the monitor's review.  On the other hand, it is also clear from the statistics provided that the overwhelming majority of staff at CEN have received training in the heat plan during the past five years.  While CEN, thus, probably meets the court's requirement in this regard, it has not met the requirements of departmental policy.

Use of Force:

The monitor's review of incident logs indicates that the use of the 37mm weapon in CEN conformed with policy.  There was one forcible cell extraction in the first eight months of 1997.  The monitor reviewed the report on, and the videotape of, this extraction, which also conformed with policy.  Through the first week of September, there were 28 incidents in 1997 in which a 37 mm weapon was fired.  A review of the records indicated that reported incidents involved melees and fights on yards or in other open spaces.  There seemed to be a growing reliance on the use of OC gas in lieu of the 37mm weapon to intervene in and end inmate fights.

CEN Recommendations:

1.    The institution ought to develop post orders with uniform directions for correctional officers on their duties in the event of heat alerts.

2.    Departmental policy requires an annual update of heat plan training for staff, a requirement with which CEN does not comply.

**CAL**

The monitor was at CAL on September 12 and 13.

Mental Health Staffing and Program:

Allocated mental health positions at CAL included a full-time psychologist, a full-time psych tech, and a half-time office tech. There were no vacancies, and contracted services provided an additional psychologist two days weekly and another psychologist who spent four or five hours a week primarily preparing board of prison term (BPT) reports. A psychiatrist from RJD spent two days a week at CAL, because the facility's efforts to fill its allocated half-time psychiatrist position were unsuccessful.

At the time of the monitor's visit there were 56 3CMS inmates in the institution, and three EOP inmates had been moved to other facilities within the past few days. The three EOP patients transferred had been waiting for movement since their designation as EOP in early and mid-June, some three months earlier.

The full-time psychologist appeared to be a competent and caring clinician. He saw 3CMS patients regularly, and his record entries were thoughtful

and succinct. His caseload was substantial, but considerably more manageable than those of lots of his colleagues in other CDC institutions.

Administrative Segregation:

Some heat-risk inmates were placed on the second tier of administrative segregation. This was not a particular problem here, since the cellblocks were well cooled, and temperatures rarely exceeded 80 degrees.

During a discussion of mental health screening in administrative segregation, the psychologist described an unwillingness to use the 31-question instrument adopted by the department. He represented that he had never formally received the questionnaire and the scoring template for the test, and went on to suggest that the administration of this unvalidated and simplistic instrument violated his sense of professional ethics. He claimed, nonetheless, to be screening all eligible inmates and noting results, both positive and negative, of the screenings conducted in inmates' health records.

At the time of the monitor's visit, there were five heat-risk inmates in administrative segregation. A review of the entry log in the administrative segregation unit suggested that the psych tech was frequently and regularly in the building.

Inpatient Transfers:

CAL had transferred only one inmate/patient to CMF/DMH thus far in 1997. The inmate was diagnosed as schizophrenic on 3/24/97 and recommended for transfer on that date to CMF. The inmate actually left for CMF on 4/14/97. The case was not designated as an emergency by CAL clinicians.

Use of Force:

204

Incident logs and analysis of reports on the use of force indicated that the 37mm weapon had been used a total of 37 times thus far in 1997, with only eight of those uses occurring within the past 90 days. There seemed to be a growing reliance on the use of OC gas. The monitor's review of incident reports indicated that the use of the 37mm weapon and OC gas conformed with departmental policy. The monitor also reviewed a lengthy videotape on a multiple cell extraction in administrative segregation, which also conformed with policy. This was the only reported use of force for a cell extraction in the first nine months of 1997.

Heat Plan:

The 1997 version of the heat plan was available widely. Of 30 heat-risk inmates then in the facility, only four had been in the institution and actually on heat-risk medications more than 60 days. Of those four, two were scheduled for movement within the next few days. As for the other two, a review of their central records indicated that the mental health staff's recommendations for movement had been reviewed and acted upon by institutional classification, but for some undetermined reason, CSR had not reviewed or endorsed the recommendations. There seemed to be a need for a more efficient tickler system to ensure that recommendations relative to heat risk inmates were acted upon in a timely manner by a CSR representative.

Training at CAL on the heat plan was exceptional, with better than 99% of staff reportedly having received their 1997 heat pathology training update. Training personnel also prepared a blue laminated summary of the heat plan for staff that was distributed to all staff.

Once again, post orders in control booths did not uniformly include specific directions for the collecting and entry of temperature readings by the control booth officer.   Administrators agreed to address this issue.

CAL Recommendations:

1. There was some anomaly in the department's overall population management measures, which placed only 20 3CMS patients and seven heat-risk inmates in CEN, with its greater mental health staff resources, and 56 3CMS inmates in CAL with its more limited resources.  Efforts to match resources with caseloads needs further work.  The slow movement of EOP inmates presents another population management issue the department needs to address.

2. The institution ought to develop post orders with uniform directions for correctional officers on their duties in the event of heat alerts.

**CVSP**

The monitor was at CVSP on August 18 and 19.

Mental Health Staffing and Program:

 Allocated mental health staff positions at CVSP included a half-time psychiatrist, a half-time psychologist, a psych tech and a half-time office tech.  The facility actually had a half-time psychologist, who split his time between CVSP and RJD, and a full-time psych tech.  A contract psychiatrist provided 16 hours monthly in the form of Friday clinics, held twice monthly.  A search was underway for a half-time psychiatrist, but had been unsuccessful as

of the date of the monitor's visit. The facility was also looking to add a half-time office tech position to the existing one and get a full-time medical transcriber.

At the time of the monitor's visit there were 14 3CMS inmates, ten of whom were on heat-risk medications, and an inmate in the infirmary awaiting transport to the MHCB program at RJD. There was one heat-risk prisoner in the administrative segregation unit.

The monitor reviewed the records of all of the inmates on the mental health caseload and interviewed most of them, including the inmate in administrative segregation. The records and interviews alike reflected regular contacts of clinicians with inmates and, among inmates, satisfaction with the level and quality of services.

Administrative Segregation:

As indicated, there was only one heat-risk inmate in administrative segregation at the time of the monitor's visit, and no other 3CMS patients were held there. Recent unit entry logs confirmed that the psych tech was in the unit for an hour or so two days a week and attended ICC hearings on a third day (and, perhaps, conducted rounds, since he was on the unit for up to three hours on hearing days). He did not visit daily, however, nor were his twice-weekly visits long, according to the unit logbook. The interviewed inmate in the unit knew the psych tech and seemed to think he was available. Staff on the unit also knew the psych tech and viewed his presence positively. Reportedly, the psych tech also conducted mental health screenings of non-caseload inmates as they were introduced to administrative segregation. It was difficult to judge whether the time the psych tech spent in administrative segregation was adequate. The

207

program guide requires daily rounding, and that did not seem to occur.
Certainly the one full-time psych tech to look after the tiny number of seriously
mentally disordered inmates housed in the CVSP administrative segregation unit
was adequate for existing service needs. Other psych techs in the system have
a higher caseload in their administrative segregation units than the entire mental
health caseload at CVSP.

Inpatient Transfers:

Through the first seven months of 1997, CVSP transferred five
inmate/patients to MHCB programs in RJD (4) or CIM (1). Another inmate had
been transferred to CMC for processing to ASH, and an inmate was awaiting
transportation to a MHCB in RJD. The chief medical officer reported that he was
able to secure the rapid movement of inmates in emergencies. The facility did
not keep records of the time between referrals and actual transfer. They
reported no rejections of requested transfers.

Heat Plan:

The monitor reviewed the institutional heat plan and found that it
conformed with departmental and court guidelines. The number of heat-risk
inmates was low, rarely exceeding 15 or 20, even in the winter months. During
the summer the institution worked hard to move heat-risk inmates elsewhere.
None of the heat-risk inmates in CVSP at the time of the monitor's visit had been
there longer than 60 days. Lists of heat-risk inmates were readily available in units
where they were housed.

Roughly 83 percent of staff (1000 of 1200) had received their
annual heat plan training, i.e., had returned their completed twelve-question

exam to the institutional in-service training personnel. Interviewed staff was particularly knowledgeable about the heat plan, its stages and their duties during each stage.

Temperature logs were kept on a regular basis. There had been no stage-two or stage-three alerts in the facility despite outside temperatures that consistently exceeded 90 degrees. There were no heat-related medical incidents among heat-risk inmates. Temperatures in the two units with heat-risk inmates were logged by officers on the floor, rather than those in the control center.

Use of Force:

Reportedly, the 37mm weapon has never been used in CVSP. There were no reported instances of its use through July, 1997. There was one reported use of OC gas in the facility in 1997 to quell a fight in an administrative segregation cell. Neither participant was a seriously mentally disordered inmate. The use of force at CVSP comports with approved departmental policy.

CVSP Recommendations:

1.    Staff needs to document in-patient transfers more fully, including dates of referral, classification, endorsement and movement, along with any rejections and the reasons for the rejection.

2.    The psych tech needs to make daily (Monday to Friday) rounds of the administrative segregation unit.

### Service Area K

This service area includes the <u>California Institution for Women at Frontera (CIW),</u> with an EOP program for up to 75 inmates and a 3CMS program for up to 199 inmates; and the female side of the <u>California Rehabilitation Center at Norco (CRC),</u> with a 3CMS program for up to 99 inmates.

### CIW

The monitor was at CIW from August 20 to 22 and on September 3 and 4.  This facility is a reception center and houses a varied population of female prisoners.  It also serves as the gatekeeper for access to Patton State Hospital (PSH), the DMH-run facility that provides both acute and intermediate inpatient care for female CDC inmate/patients.  The monitor found the mental health programs at CIW to be among the best in the CDC system.  The level of coordination between custody and mental health staff was extraordinary and a tribute to the competence and dedication of the leadership on both sides. Clinicians at the facility had a high level of professional satisfaction.   Particularly impressive was the reception given to mental health clinicians by inmates. Interviewed inmates at CIW reported consistently the clinicians working in the facility were capable, caring and, perhaps best of all, accessible.

<u>Mental Heath Staffing and Program</u>:

At the time of the monitor's visit, there were 17.7 authorized clinical positions, including a chief and 4.7 staff psychiatrists, two senior and 5.5 clinical psychologists, 3.5 psych social workers, and one psych techs, plus nursing and clerical positions.  Vacant positions included a 0.7 psychiatrist, 1.5 psychologists

and a psych tech. The recruitment and retention of trained mental health staff at CIW was less difficult than at most other CDC institutions, partly due to its proximity to Los Angeles and partly because of the sense of professional collegiality among mental health staff and between clinical and custodial staffs.

The EOP program at CIW was located in the support care unit (SCU), which was physically separated from the general population. The EOP program operated Monday through Friday and offered a mix of groups, workshops, modules, and individual therapy. Inmates referred to EOP were initially placed in intake during an evaluation process, in which psychiatrists and psychologists determined the level of care appropriate to each case. When the evaluation process was completed, inmates might be referred to Patton State Hospital (PSH), assigned to EOP or 3CMS programs or returned to the general population.

The EOP program at CIW offered individual therapy, group therapy and sessions on addictive processes, substance abuse, anger management, service training, depression, daily living skills, discharge planning and other general topics. Inmate peer helpers facilitated workshops under the supervision of a therapist and presented materials that would later be covered in greater depth in related group therapy sessions. Peer helpers also led aerobics classes, arts and crafts, creative writing and table games. The EOP team was comprised of a psychiatrist who saw inmates on a regular basis, a psychologist, a licensed clinical social worker and inmate peer helpers. The EOP interdisciplinary treatment team (called an IDT here, rather than an IDTT as elsewhere) met frequently.

Interviewed inmates in the EOP unit seemed to like their treatment. Most stated that they saw their psychiatrist more than once a month. They were familiar with the chief psychiatrist.

The IDT team for the EOP unit consisted of a psychiatrist, a classification counselor and two psychologists. The team met with inmates every 30 to 60 days. Each inmate was encouraged to have regular contact with EOP staff, and the psychiatrist followed their medication closely. One interviewed inmate who had just been seen by the IDT was particularly pleased with the level of treatment that she was getting because she no longer heard voices. When asked what the IDT hearing was like, she responded that it was similar to a therapy session.

While there was no formal MHCB unit at CIW, the support care unit (SCU) served as an infirmary, as well as an evaluation unit. Individuals who were experiencing a mental health crisis were transferred to the SCU. Also, inmates from the 3CMS program charged with a disciplinary infraction were brought to the SCU for an evaluation by a psychologist, who attempted to determine whether the inmate's mental condition caused the disciplinary infraction. This latter function represented a departure from procedures elsewhere, where mental health clinicians have been removed from any role in the determination of guilt in the disciplinary process.

The monitor interviewed a number of inmates of the SCU. One inmate (W64978) was taking Depacot, Zoloff, Cogentin and Risperidal. She was manic depressive with a personality disorder and a history of polysubstance abuse. She had been in the unit for a week and before that was at PSH. She

212

stated that she saw a psychiatrist daily, but she did not remember seeing a psychologist. She knew the chief psychiatrist well. Another Inmate (W58598) had been in the unit for a week after returning from CRC. Apparently she had thrown water at a nurse. This inmate stated that the treatment was fine at CIW and that she saw someone from the psychiatric department twice a week. She was getting her medication daily.

Another inmate (W55862) reported that she had been in SCU for two or three days. She was taking Risperidal for paranoid schizophrenia, multiple personalities and attention deficit disorder. She claimed that, although her room was infested with mosquitoes and cockroaches, she was satisfied with her care. One inmate (W35132) had been in the SCU for eight days because she had had a scuffle with another inmate. She said they had forgiven each other and it was all behind them. She had been moved from administrative segregation to the SCU and expected to move to the EOP program from the SCU. She told the monitor, "People here treat you like you are a human being."

Administrative Segregation:

The administrative segregation unit (Graystone) at CIW was located in the special housing unit (SpHU). The total inmate population of SpHU was usually less than 40, and the number of 3CMS inmates housed there was typically less than five. The goal of the 3CMS program in the SpHU was to maintain or improve the functioning of the seriously mentally disordered inmates housed there for disciplinary or security reasons. Inmates in the SpHU were placed there after an evaluation and had to be cleared by the EOP evaluation

and intake staff in the SCU. All patients on heat-risk medications were housed on the first tier of the SpHU.

Inmates identified by custody staff as manifesting signs and symptoms of mental illness were referred to mental health staff for evaluation. According to policy, the inmate was to be seen by a psychiatrist or a psychologist within two working days of the referral. The chief psychiatrist attended the ICC meeting each week in SpHU. Inmates were identified who would be retained in the SCU after their initial classification review, as well as any others with special mental health concerns. The chief psychiatrist then made a referral to the 3CMS staff for follow-up.

A mental health clinician conducted clinical rounds in the SpHU a minimum of five days a week. A psychologist contacted each inmate weekly. Inmates in administrative segregation were interviewed and evaluated Monday through Friday through the cell door for medication issues and any signs of distress by the clinical psychologist. At the time of the monitor's visit the psych-tech position was vacant, and the psychologist assigned to the unit was required to make daily rounds. The psych tech position had been vacant for over four months. Each inmate, however, knew the psychologist and seemed to be comfortable with the level of attention received. To the extent that she could do so, the psychologist scheduled individual therapy sessions with inmates. Whenever she became aware of a particular mental health need, she arranged a one-on-one session.

IDT meetings were held weekly in the SpHU. The IDT team consisted of a psychiatrist, a psychologist and a psychiatric social worker. Each inmate in

214

this unit met with the team monthly or more often as indicated. Overall treatment needs were reviewed, including medication compliance. Patient contacts in SpHU were documented in the mental health record.

The monitor met with two inmates in the SpHU (W41572 and W24028), who had just seen the psychologist. Both stated that she was providing them with a high level of care. The psychologist confirmed that no EOP inmate/patients were housed in the SpHU. She conducted rounds every day for each 3CMS client in the building and documented her contacts regularly. She indicated that she screened self-referrals, custody referrals and anyone referred by the ICC. In addition to her responsibilities in the SpHU, she also saw 3CMS inmates in other buildings.

The monitor interviewed several inmates in the SpHU. One (W51874) reported being in administrative segregation for 59 days. She had originally been at CIW, was transferred to CRC and then returned to CIW for protective custody reasons. This inmate had been diagnosed with depression at CIW, but stopped taking medication at CRC. When she returned to CIW she was depressed again. She said that the psychologist saw her every day. She complained that she needed more time out of her cell because she could not get to the exercise yard because a heat alert was always in effect.

Another inmate (W65094) had been at CIW since late April. She came from CRC because she had received a disciplinary charge for fighting. At first she was housed at SCU, but was later moved to Graystone. She felt stable, and liked her medication and her treatment at CIW. While she was in the SCU unit, she saw a clinician several times a week. She said that she had seen the

215

psychologist every day since she had been in administrative segregation. According to this inmate, her mental health treatment at CIW was excellent.

A third interviewed inmate (W0836) was in the 3CMS program for depression. She took Zoloft and Lithium, but she complained that they did not work for her. She said the psychiatrist would not listen to her. Her psychiatrist did not want to change her medication. The SpHU psychologist, however, did listen to her and was helpful. In the community she had been on Haldol, Elavil and, at times, Melaril.

<u>Inpatient Transfers</u>:

Mental health administrators at CIW described a strong working relationship with administrators at PSH, and reported that inmates were transferred within appropriate timeframes. Mental health administrators also said they attempted to exhaust all clinical possibilities at CIW before transferring inmates to PSH.

From January I through August 20, 1997, 43 inmates were transferred from CIW to PSH. It took approximately 6.44 days for an inmate to be transferred from CIW to PSH once a referral was made. In one case the individual was transferred on the day of the referral. Although rare, Keyhea hearings were sometimes performed at CIW. CIW complied with departmental and court-approved policies relative to inpatient transfers.

<u>Use of Force</u>:

Reportedly, a 37mm weapon had not been fired at CIW during the warden's ten-year tenure at the facility. CIW administrators actually sought an

exemption from the CDC shooting policy that would permit them to ban use of the 37mm at the facility.  The request was denied.

The monitor reviewed local policy on the use of the 37mm weapon and found that it comported with applicable departmental policy.  Use of the weapon was limited to large open spaces except in an effort to take down a barricade.

OC pepper gas was used only twice through the first eight months of 1997.  In addition, OC pepper spray was used only twice in 1997 and never in a cell extraction.  The monitor reviewed the incident reports involving OC gas.  Administrators at CIW reported that they would try every available option before sending in a cell extraction team to remove an inmate.  They were usually successful.  There were no cell extractions conducted in the first eight months of 1997.

Heat Plan:

The monitor reviewed the institutional heat plan, which comported with departmental and court requirements.  The pharmacist provided an updated, weekly list of heat-risk inmates, and all heat-risk inmates received a pass or ducat to help them return to their living unit in the event of a stage-one heat alert. The institutional litigation coordinator meticulously monitored both outside and inside temperatures. The litigation coordinator also prepared a monthly heat plan summary report which specified each unit in the facility within which inside temperatures had reached 90 degrees.

The outside temperature at CIW exceeded 90 degrees routinely throughout the summer.  From May through August of 1997, the outside heat

trigger was met on 31 different dates. With the exception of administrative segregation (Graystone), CIW buildings were old and did not have air conditioners. Inmates in most areas were allowed to have small fans.

Inside temperatures also regularly reached 90 degrees in CIW in the summertime. Each building in the facility, except Graystone with its swamp coolers, experienced a stage-two alert. All interviewed inmates told the monitor that, when the outside heat trigger was reached, they were required to come indoors and routinely were provided with cooling drinks, ice and showers. Inmates in the dormitories known as Miller A and B stated that, although heat fans were difficult to obtain, they were given ice and additional showers and were monitored by an MTA during stage-two and stage-three alerts.

Interviewed inmates had all received a heat card, and they all knew about the need to monitor themselves during a heat wave. Unlike other facilities, inside temperature logs at CIW contained a checklist of duties that must be performed during a heat alert. For example, when the inside temperature reached 90 degrees, a correctional officer was required to check off that cooling measures had been provided to heat-risk inmates. When the inside temperature reached 95 degrees, a correctional officer was additionally required to ensure that an MTA monitored heat-risk inmates.

The outside temperature gauge at CIW was designed according to National Weather Service specifications, and CIW temperatures were almost always identical to those provided by the service. Inmates with permanent jobs were allowed to return to their housing unit if their jobs were not in air-conditioned areas.

Annual heat training had been provided to 227 of 284 (80 percent) custody staff. The warden acknowledged that the figure was too low and pledged to improve it.

CIW Recommendations:

1.    There are no specific recommendations for CIW except to continue to provide the exceptional access to mental health care the monitor observed in August and September.

## Service Area L

This service area includes Central California Women's Facility in Chowchilla (CCWF), with a MHCB program (12 beds), an EOP program for up to 75 inmates and a 3CMS program for up to 299 inmates; Northern California Women's Facility in Stockton (NCWF), with a 3CMS program for up to 99 inmates; and Valley State Prison for Women in Chowchilla (VSPW), with a 3CMS program for up to 299 inmates.

**CCWF**

The monitor and one of the monitor's psychiatric experts visited CCWF from October 14 to 16.

Mental Health Staffing and Program:

Authorized mental health staff positions at CCWF included a chief and 3.5 staff psychiatrists, a senior and 6.5 psychologists, five psych social workers, a psych tech and two recreational therapists, plus nursing and clerical positions. Two of the psychiatrist positions, including the chief psychiatrist, were vacant. Apparently, since the monitor's visit, another psychiatrist position has

been vacated. This meant that the institution had to rely heavily on contracted psychiatric services. The lack of continuity characteristic of contracted services was particularly troublesome in a facility with EOP and MHCB programs. One half-time psychologist position and a full-time psych social worker position were also vacant.

At the time of the monitor's visit, there were three inmate/patients in the MHCB program, 43 EOP inmates and 409 3CMS inmates. The capacity of the MHCB program was 12 beds, the EOP program, 75 inmates and the 3CMS program, 299 inmates.

There were many qualified, hard-working and caring clinical and non-clinical staff members involved in the delivery of mental health services at CCWF. The EOP program consisted of three graduated phases and included a mix of group activities. The program provided a protected environment for a group of seriously mentally disordered inmates who likely would have been victimized in the general population. It provided greater psychiatric monitoring and treatment than a 3CMS inmate received. The monitor observed an educational class that was apparently open to all EOP inmates in which few of the participants seemed actively engaged. The monitor also watched a session led by the recreational therapist for 18 EOP inmates in the first phase of the program. This was a dynamic group with lots of interaction. The monitor talked to one of the clinicians about a program she ran that was positively reviewed by several interviewed inmates. These evidences of programming were encouraging to see, but interviews and record checks suggested that staff was struggling to reach the programming levels mandated by the program guide.

While group sessions and activities were scheduled for EOP inmates, they were often cancelled for a variety of reasons. One programming limitation was the small outdoor yard available to EOP inmates, which supposedly is slated for upgrading. The staff conducted regular and useful IDTT meetings.

Four case managers handled the 3CMS caseload. While that meant that individual caseloads were substantial (approximately a hundred inmates per clinician) and much larger than anticipated in the defendants' staffing ratios, they were more manageable than 3CMS caseloads in some other CDC institutions. Still, the staffing pattern was insufficient to provide the full 3CMS program described in the program guide, although staff managed to run some group sessions, rare among even better staffed facilities in CDC. The system for responding to staff and self-referrals was chaotic, and records indicated that many referrals were not answered in a timely manner. One custodial staff member's referral noting an inmate's lack of understanding of verbal commands, exhibition of hostility and unwillingness to program was filed on October 1. A psychologist was not scheduled to see the inmate until October 15.

The scarcity of staffing showed up in other ways as well. There were some indications that the initial screening of arriving inmates was not always effective. Inmate W62457 entered CCWF from VSPW on 9/19/97. At VSPW she had been on medication and was a 3CMS inmate. The office technician picked her up as a 3CMS on a later DDPS data check, but by that time the inmate had

been off her medications for a month. The good news is that she was found; the bad news is that she seemed to have slipped through the bus screening net.

The monitor's psychiatric expert reviewed the quality of mental health services provided at CCWF. He attended ICC hearings and IDTT meetings in administrative segregation and IDTT meetings in the MHCB unit. The following is a summary of his observations:

1.  Administrative segregation ICC hearings:

Impressions: The ICC hearings in administrative segregation were chaired by the warden. The committee reviewed approximately 17 cases. The meeting was conducted efficiently, and a collegial relationship between the participating mental health and custody professional was apparent.

Disciplinary issues were the main focus of the meeting, and psychiatric symptoms and treatment plans were not routinely discussed. This was proper for the majority of inmates who were clearly not mentally disordered. But for a minority of inmates, there was little discussion of the possibility that their disruptive behavior was related to their psychiatric condition.

2.     Administrative segregation IDTT meeting:

Impressions: The monitor's expert sat in on an IDTT meeting in administrative segregation and later interviewed selected inmates. Although there were inmates with major mental disorders who were decompensating and in need of a higher level of care, staff did not bring up the need for Keyhea hearings for inmates who were refusing medications. There was also no mention made of the need to transfer selected inmates to inpatient programs.

Mental Health administrators at CCWF developed a roster for IDTT meetings that is updated weekly, which provides an inmate's diagnoses and current medications. This clearly helped staff track treatment plans and provide continuity of care. The monitor's expert recommended the system-wide employment of this tool.

Case examples: Inmate W54820 had 13 charges for force and violence in the past 11 months and was in administrative segregation for one week due to mutual combat. She was referred to a psychiatrist but did not show up. The ICC meeting considered her for a SHU term.

When interviewed, the inmate was talkative, with pressured speech and intense, changeable emotions. She laughed vigorously, smiled at us, and giggled for no reason. She was distractible and waved at other inmates in their cells while the interview was taking place. She gave a history of receiving psychitropic medications (the antidepressant Elavil and the an antipsychotic Mellaril) as early as age 20. She also said she was diagnosed with attention deficit disorder as a child. She complained, "I can't sleep at night, having anxiety attacks, trying to tell people about it."

The inmate was seen by a CCWF psychiatrist, who offered a diagnosis of bipolar disorder, which was consistent with the monitor's expert's impressions, but no medications were prescribed. The patient said she would take medications. She was rapidly decompensating and should have been on an inpatient unit with a trial of mood stabilizer medications and antipsychotics. However, the psychiatry staff offered no recommendations for this inmate,

223

whose impulsivity and severe mental disorder was contributing to discipline problems.

Inmate W69112 was in administrative segregation due to battery on an inmate. She was depressed, tearful, and was unable to sit still. She looked away and was on the verge of crying during most of the interview. She said that she was not on medications and had never had any, but said she wanted medications. She was not on the list for treatment. She should have been evaluated for psychiatric treatment. Her case was discussed during ICC without comment on her psychiatric status.

Inmate W61528 had a diagnosis of schizophrenia. She was very disorganized and had been hearing auditory hallucinations as recently as the previous night. She said, 'The voices they be telling me what to do. Bitches. I hear more than one ... since I was 18 ... I was hearing voices real bad and I hit that girl." She had been in prison since February and said, "I was supposed to go home today but I got 60 more days." Although she received Prolixin Decanoate (12.5 mg) intramuscularly on 10/11/97 and her next dose was due 10/23/97, she was still decompensating and in need of supplemental oral medication and inpatient hospitalization. She would have met criteria for hospitalization in many community mental health systems. There was no discussion of need for admission or medication adjustment.

3.    IDTT meeting in the MHCB:

Impressions: Three inmates were interviewed at the meeting. The interviews were led by experienced clinicians. Although information on past treatment and response to medications was readily available from the medical

224

records, this crucial past history was not brought into the discussion to help with the current diagnosis or treatment plan. As a result, crucial aspects of treatment plans were missing, such as the need for a Keyhea hearing in one gravely disabled psychotic woman. Another inmate, who was decompensating due to poor medication compliance, was not considered for a long-acting injected antipsychotic medication.

Case examples: Inmate W56977 was a middle-aged female with a severe mental disorder, who was floridly psychotic and disorganized during the interview. In spite of prominent symptoms of mania and a history of such episodes, no mood stabilizer was discussed or offered. In addition, the inmate had intermittently been gravely disabled and non-compliant on medications, yet no Keyhea process or involuntary medication intervention was considered.

Inmate W58890 was a young woman with a long history of admissions for mood disorders, who had improved after only three days on medications in the hospital. The treatment team recommended that she be discharged to EOP within two days. This was an exceedingly short length of inpatient hospitalization, given her history of rapid decompensation when out of the hospital. It would have been more prudent to retain the patient in the MHCB unit for continued assessment up to the allowed ten days.

Inmate W69099 was a 32-year-old female with a ten-year history of schizophrenia documented in her medical file. In 1992, she began to hear voices of her aborted child. She also had a history of drug abuse with heroin, marijuana and cocaine. She had responded well to antipsychotic medications but often had new psychotic episodes. She was admitted to the infirmary on

10/15/97 from A-yard, refusing to take medications. She had improved on her current regimen of Navane (10 mg) at bedtime and Elavil, an antidepressant.

This review of medical files and current treatment plans revealed a tendency of clinicians at CCWF not to include valuable previous diagnoses, medication response histories, and symptom profiles in current treatment planning. Psychiatric interventions such as involuntary medications, intramuscular medications, and acute inpatient hospitalizations were frequently not used or even considered where they should have been. In addition, interdisciplinary meetings between custody and mental health staff did not appear to incorporate routinely psychiatric information crucial to disposition planning.

Administrative Segregation:

The administrative segregation unit was run efficiently and humanely. There seemed to be excellent rapport between custody and mental health staff. The psych tech conducted mental health screenings as required, as well as regular Monday to Friday rounds. The ICC hearings observed by the monitor reflected a high degree of appropriate communication between custody and clinical personnel, as well as empathetic and effective communication with inmates.

There was also some sensitivity on the part of participants in the ICC hearings to the relationship between mental illness and behavior in the disciplinary context. The ICC, for example, suspended her SHU term and sent an inmate/patient to DMH within a day of her relatively serious assault on the psych tech in EOP.

Inpatient Transfers:

CCWF staff reported no problems in sending inpatient candidates to CIW for transfer to PSH. Of patients in the MHCB program, no inmate, at the time of the monitor's visit, had been in a bed for longer than three days. In addition, because CCWF had open beds in both its EOP and MHCB, mental health staff had program space readily available to which to send troubled patients.

Heat Plan:

CCWF had an effective heat plan. Not only was the institutional plan crafted to the particulars of the facility and respective of the court and departmental guidelines, but it went creatively beyond the standard requirements to include, for example, a light alarm used to indicate activation of a stage-one heat alert. Implementation of the heat plan complied with the requirements of the policy. Temperature logs were kept. Inmates were required to return to their living areas, but could remain in program areas that were cool. There was a mister for cooling purposes in the EOP yard.

Use of Force:

Policies and practices relative to the use of force comply with departmental requirements. Staff was required to check the mental health and medical status of targeted inmates before using CO gas. Local policy also reinforces the notion that mental health staff should be given an opportunity to persuade inmates to cooperate before force is employed.

The monitor reviewed 16 incident reports. The only reported use of the 37mm weapon involved a fight on the administrative segregation yard.

227

<u>CCWF Recommendations</u>:

1.    Psychiatric staffing at CCWF is inadequate with only 1.5 of 4.5 authorized psychiatrist positions occupied as of the end of the year.  The department needs to take steps to fill the vacancies.

2.    One index of insufficient staffing is slowness in responding to referrals, of which there was some evidence in CCWF. Referrals, whether self-referrals or staff referrals, need to be responded to promptly.

3.    The EOP needs to expand programming to meet the requirements of the program guide.

4.    The monitor's psychiatric expert's review of records and interviews indicated that clinicians sometimes did not respond quickly and aggressively enough in the treatment of decompensating inmate/patients.  There apparently was also considerable unwillingness to involuntarily medicate inmate/patients who seemed to be in need of it.  There needs to be a quality assurance process in place at the facility to identify and redress these clinical issues.

5.    Mental health staff need to participate more actively and effectively in the ICC process in administrative segregation.

**NCWF**

The monitor was at NCWF on September 2 and 3. NCWF is a small prison, with about 750 prisoners, that seems to be decently and humanely run. Its decent character derived in part from its leadership and in part from its size.

Mental Health Staffing and Program:

Mental health staff included at the time of the monitor's visit a half-time psychiatrist, two psychologists and a half-time psych social worker. A half-time psych tech position was vacant, as was a full-time office tech position.

NCWF had a small reception operation and a 3CMS program. At the time of the monitor's visit there were 131 3CMS inmate/patients, of whom about 90 were on psychotropic medication. The highest number of 3CMS inmates reached to date had been 150. There were 13 3CMS inmates in the administrative segregation unit. The population there rarely exceeded 15.

The two full-time psychologists expressed some concern that they were not carrying the load clinicians in other facilities carried. The psychiatrist felt comfortable monitoring 90 inmates on medication, but he was busy reviewing records every 30 days and seeing patients every 90 days.

The psychologists stated that they saw most of the inmates on their caseloads monthly and everyone on their caseloads within two months. The monitor's review of medical records confirmed the reported frequency of contact. One of the psychologists ran a group for six inmates on life skills, for which there was a consistent waiting list. The other psychologist and the psych social worker also each ran a group. One problem was finding space in which to conduct the group sessions. Another was assembling participants whose

movements were always subject to the vicissitudes of the ducat system and staff availability and cooperation.

It appeared that inmates referred by staff or those who themselves requested to see mental health staff were seen relatively promptly. Unlike lots of other institutions, the NCWF mental health staff had still not developed a local computerized process for tracking the mental health population and lacked the ability to generate lists of inmates by case manager, with dates of referral, last contact, etc.

The NCWF infirmary was tiny, particularly for a reception center with high turnover and some concomitant potential for medical and psychiatric surprises. There was only one room for a resident patient. The other three rooms in the infirmary were converted into offices. There was talk of reconverting one of the offices back into a respiratory isolation room, a requirement for reception centers. There apparently were plans at one point to renovate the infirmary generally, but nothing had ever come of them.

Administrative Segregation:

NCWF had been allocated a half-time psych tech position to monitor inmates in administrative segregation and provide mental health services. Because of the small size of the mental health caseload that ended up in administrative segregation at any one time and because of the relative richness of staff resources at the facility, administrators did not think they needed to fill the position.

The monitor interviewed one 3CMS inmate (W65846) in administrative segregation, who did not like the unit but reported that she was

seen weekly by her 3CMS case manager. She had not been in the unit for long, and it appeared that inmates served relatively short periods in NCWF's administrative segregation. The monitor checked the entry logs at administrative segregation and found that in the preceding 21 days, at least one psychologist had entered the unit on 11 of those days.

The monitor attended ICC hearings in administrative segregation that were models for the procedure. The quality of the communication among staff about important issues, and between staff and inmates, was exceptional. A substantial amount of time was spent on each prisoner, and each prisoner's participation was carefully solicited.

Inpatient Transfers:

The only documentation at NCWF of transfers out of the institution for emergency mental health services was actual transfer chronos. From March, 1996 through September 2, 1997, there were 19 emergency transfers from NCWF, all but one of them to CCWF. The sole exception went to CIW. One individual accounted for three of the transfers. She kept reentering the system on parole violation charges. NCWF, like some other institutions in CDC, needed to develop a data collection system for capturing information on transfers, including dates of referral, endorsement and transfer and reasons for any rejections.

Heat Plan:

The monitor reviewed the institutional heat plan and found it in compliance with departmental and court requirements. It required heat-risk inmates to return to their units when a stage-one alert was activated, and allowed inmates assigned to cool locations to remain where they were.

231

The monitor also reviewed temperature logs. While there were some missed entries, the logs reflected basic diligence in recording temperatures. One correctional officer observed by the monitor had failed to make an entry due 30 minutes earlier. Weekly lists of inmates on heat-risk medications were prepared. Interviewed inmates confirmed that cooling measures were made available during heat alerts. One interviewed key correctional officer in a unit for heat-risk inmates not only knew all of the steps in the heat alert process, but also knew just who was on heat-risk medications in the unit and who was not functioning well and might need to be watched more carefully.

The institution had installed spray misters on the yard that inmates could control and use in hot weather. An awning had been set up over the pill line. Plant operations crew members made daily rounds to check temperatures in various parts of the facility. All of these actions reflected a genuine seriousness about protecting heat-risk inmates from the perils of hot weather.

The monitor interviewed some staff and inmates about the operations of the heat plan. Building-1 was reported to be the hottest unit in the facility, but the temperature there had never risen above 85 degrees. Ice and cold water seemed readily available, whatever the heat alert status. Any prisoner could bring back ice from the chow hall at dinner, and sometimes ice was distributed along with the daily bag lunches. Interviewed heat-risk inmates felt that the measures provided for dealing with heat were adequate, and expressed equal satisfaction with mental health services in general.

One interviewed inmate (W48163) recited the litany of her drugs and reported that she had been told of the dangers heat posed for her when she was issued her heat card. She said that she sometimes felt the ill effects of heat, headaches, spots before her eyes and nausea. When that occurred, she knew she had to keep cool in her cell, put a cold towel on her head and drink lots of water.

The facility complies with departmental policies and court requirements in regard to the heat plan.

Use of Force:

NCWF did not much rely on the use of force in daily operations. There were no reported uses of the 37mm weapon or OC gas, nor were there any cell extractions.

NCWF Recommendations:

1.    The facility needs to develop an in-house computerized system for tracking contacts with seriously mentally disordered inmates.

2.    There is also a need to document in-patient transfers, including dates of referral, classification, endorsement and movement, as well as any rejections and reasons for the rejection.

**VSPW**

The monitor visited VSPW from January 21 to 23, 1998.

Mental Health Staffing and Program:

Authorized mental health positions at VSPW included 3.5 staff psychiatrists, two senior and 4.5 clinical psychologists, three psych social workers, a psych tech, a registered nurse and 2.5 office techs. Two of the psychiatrist positions were filled, and the psychiatric vacancies were covered through the contracted services of private practitioners. One psychologist position was vacant. Of the three psych social worker positions, one was vacant, another was held by an employee on disability leave whose return was questionable and the third was filled.

VSPW had both a reception component and a 3CMS program for up to 299 inmates. At the time of the monitor's visit, there were 402 3CMS inmates.

Access to clinical care for inmates in the 3CMS program seemed quite adequate. The psychiatrist in charge of the program was serious, dedicated and competent. He spent much time with inmate/patients, and his interactions with them were far from perfunctory.

A particular problem for the 3CMS program at VSPW was the absence of adequate resources for dealing with pregnant, psychotic inmate/patients. Because they could not take medications, this group of patients needed lots of personal one-on-one counseling and therapy. Staffing at VSPW was not adequate to provide the level of care these women needed, and there was a reluctance to intervene aggressively to get them moved expeditiously to facilities capable of caring for them.

Another unusual problem at the facility was the disruption to scheduling posed by winter fog. Classes, meetings with patients and psychiatric

234

appointments were frequently the victims of winter fog in the Chowchilla area that often seemed, for security reasons, to bring movement in the facility to a halt. Fog cancellations commonly disrupted scheduled winter group sessions. Another movement problem in the facility was the use of regular, rather than priority, ducats for mental health appointments and activities. Leaving an assignment on a regular ducat had negative consequences for an inmate, e.g., the loss of job-related good time or pay, and was a strong disincentive to participation in mental health treatment.

The relationship between mental health and custody staff at VSPW was not as cooperative as the monitor had observed elsewhere. Security sometimes seemed to be an obstacle to the delivery of mental health services more often in VSPW than in other CDC institutions.

VSPW mental health services had one of the best office techs in the system. This individual had developed and managed as good a tracking system for inmates and service delivery as existed anywhere in CDC. That kind of support helped immeasurably to alleviate some of the strains of insufficient staffing.

Case management duties for 3CMS inmates were shared among three clinicians, meaning that caseloads were in the 120 to 135 range, roughly two and a half times the anticipated caseload. This allowed little more than monitoring and some crisis intervention, and it appeared that inmates on the caseload were seen at least every 90 days. While there were a few group efforts for 3CMS inmates, there were not the resources to do much in that regard. Once again, the problem was not so much that allocated staff was unequal to

anticipated caseload, but rather that the staff actually available was 33 percent less than it is supposed to be, and the caseload was 33 percent more than anticipated. The combination created frustrating pressures on staff.

Administrative Segregation:

The psych tech assigned to administrative segregation was a 30-year veteran in mental health services. He conducted mental health screenings of new arrivals and made rounds four days a week, making sure he saw everyone on the mental health caseload and carefully recording his observations and conversations. The psych registered nurse made rounds on a fifth day weekly.

Confidentiality was a problem for clinicians in administrative segregation, as private interviews between mental health staff and inmate/patients were required, in practice, to be conducted cell-side (and in the hearing of abutting inmates) or in the presence of a correctional officer. Institutional administrators were unaware of this practice and agreed that private interviews ought to be the norm unless there is some particular security concern.

VSPW had a SHU unit, and mental health staff made a curious distinction between the SHU and administrative segregation. Mental health staff seemed to think that the delivery of services in administrative segregation required extensive, daily notes, but that rounds in the SHU did not require the same amount of note-taking, although everything else about the rounds conducted in the two facilities was the same.

236

The monitor observed eight ICC hearings in administrative segregation, five of them involving 3CMS inmates. Mental health staff knew the prisoners and had reviewed their records. The head of mental health services attended the hearings and closely observed inmates during the proceedings. There was not much consideration given to the mental health condition of inmates in determining the length of SHU sentences. One EOP inmate, however, who was awaiting transfer to an EOP program, was having her SHU term waived so she could be transferred more expeditiously.

Inpatient Transfers:

There was no evidence of any problems in the availability of crisis beds to VSPW or of delays in transfers. There appeared to be some tension in relations between mental health administrators and personnel in VSPW and CCWF, which provided crisis beds for VSPW, but the tension did not seem to affect directly transfers or other aspects of patient care. The monitor did not note any long stays of inmate/patients in the VSPW infirmary awaiting transfer. Again, documentation on transfers, whether to crisis beds or EOP programs, was spotty.

Heat Plan:

The monitor was given a 1996 version of the heat plan to review apparently because a 1997 version of the plan was never generated. It provided for the optional return of heat-risk inmates to their living units in a stage-one heat alert, rather than the mandated return required by departmental policy. Heat passes or ducats were issued when an inmate was put on heat-risk medications. Temperature logs were kept as required. Thermometers were state

of the art, as befitted a brand new institution. Finally, heat was not a problem at the institution. There were no stage-two heat alerts in 1997.

Use of Force:

Policies on the use of force complied with departmental and court requirements. In 1997 there were 81 incidents involving the use of force in VSPW. There were no cell extractions and in only six instances, none involving the preplanned use of force, was OC gas employed. All of the reported uses of the 37mm weapon involved fights or disturbance on the yard or in open areas.

VSPW Recommendations:

1.  VSPW needs to recognize that it is inadequately staffed to handle pregnant psychotic women and must move more rapidly, with the assistance of the department's Population Management Unit and Chief Psychiatrist, to transfer them to facilities better staffed and equipped to meet their needs, whether that be CIW or PSH.

2.  Clinical staff needs to prepare and file notes of clinical contacts in the SHU no less than in administrative segregation.

3.  The facility needs to document more fully in-patient transfers, including dates of referral, classification, endorsement and actual transfer, as well as any rejections and the reason for rejection.

4.    There is a need to address and ensure the confidentiality of clinician interviews with inmate/patients in administrative segregation, consonant with legitimate security concerns.

5.    The facility needs to generate an updated heat plan that includes departmental guidelines and requirements developed over the past 18 months.

## Institutional Summary

The foregoing institutional review covers only some of the issues embraced by the court orders in <u>Coleman</u> and their progeny of plans, policies and protocols. It is not, and does not purport to be, a full analysis of where each facility is vis-à-vis all of the requirements. Nonetheless, it does represent the first truly independent and system-wide review of mental health services in CDC since the case was filed. While the description and critique of progress in the reviewed areas for each institution speak for themselves, some generalizations are in order, if only to provide the defendants with some institutional priorities for corrective actions over the next few months.

As indicated in the beginning of this report, the process of implementation is a dynamic one. Some institutions, like CIW and CMC, seem to be doing well in translating written policies, at least in the five areas examined during this review, into living, breathing programs and services. Others, like CRC, CCC, and HDSP, are struggling so badly their respective places in the department's overall strategy ought to be reconsidered in the absence of some immediate and massive effort at resuscitation. The defendants appear to understand this and are regrouping accordingly.

Another small group of facilities, including CSP/Solano, CPS/Corcoran and WSP, clearly must continue to play a key role in the defendants' decentralized approach to mental health services delivery, but require immediate and focused help to shore up limping progress. The remaining majority of institutions may have problems in one or another of the examined areas, but nonetheless appear to be progressing in the direction of substantial compliance. Finally, in a few facilities there are individual situations or problems that need to be addressed with dispatch, like the DVI infirmary and Folsom's responsibility for its inmate/patients in the CSP/SAC administrative segregation unit and MHCB program.

### III. <u>ISSUES REVIEW</u>

This review of the status of implementation of the court-approved plans, policies and protocols in the five subject areas in all of the CDC institutions also prompts some overall observations about each examined substantive area and some specific recommendations for addressing the system-wide deficiencies noted. These comments and recommendations are designed to provide guidance and some sense of priorities to the defendants in responding to the problems identified by the monitor's team during the review.

<u>Health Care Staffing and Program:</u>

No institution in CDC is without vacancies in its mental health staff. Most have a substantial number of clinical vacancies, whether among psychiatrists, psychologists or psych social workers. In late 1997, 25 percent of psychiatric positions system-wide (including chief psychiatrists, senior psychiatrists and staff psychiatrists) were vacant. There has not been much change in that

figure since the master's initial report on staffing and recruitment in April, 1996, when the percent of psychiatric vacancies was 24.8, and there has been no improvement in those numbers thus far in the first quarter of 1998.

The defendants have tried to cover the vacancies, at least in part, through the use of contracted psychiatric services. At one extreme, e.g., in PBSP where the institution demanded and got some continuity of service through the use of extended placement contracts, the effort has been reasonably successful. At the other extreme, e.g., in CCC where it has proven impossible to obtain any contracted psychiatric services at all, the effort has failed completely. In between the extremes, facilities with contracted services have occasionally gotten some good clinicians for a time, but most have struggled with a constantly rotating succession of mediocre practitioners, unfamiliar with the prison environment, CDC policies and practices and the mental health problems of inmate/patients. Neither the quantity nor the quality of the purchased services, moreover, suffices to replace the service resources represented by the vacancies. Contract services are an inadequate substitute for full-time occupants of authorized positions.

Vacancies among both psychologists and psych social workers run at a rate of about 15 percent. In October, there were 33.35 vacancies among 209.3 psychologist positions, and 19.6 vacancies among 128.1 psych social worker positions. The use of contracts for purchased psychological services is limited, and there are no provisions for hiring private psych social workers.

Any fair reading of the preceding institutional review makes clear that current, actual staffing patterns in CDC institutions impede or prevent the

241

delivery of the mental health services required by the department's own program guides. In addition, given the extent of critical vacancies and their impact on services, it is difficult to determine whether the current ratios of staff to programs and services are adequate.

In the negotiations leading up to the submittal to the court for approval of the defendants' plans and policies in mid-1997, the parties wrestled with appropriate staffing patterns and the high rate of vacancies in authorized mental health positions. At the end of the debate, the plaintiffs agreed to forego their demand for the immediate establishment of staffing ratios with the understanding that the defendants would develop and commit themselves to a fast-track, intensive recruitment plan with measurable goals and timelines. The defendants had already begun the development of such a plan, but it met neither the plaintiffs' nor the master's expectations relative to measurable goals and timelines.

The result of those mid-year discussions was a recommendation, adopted by the court, to accept tentatively the defendants' recruitment plan, while directing the master to make sure that the administrative steps necessary to implement the defendants' recruitment plan were in place within 90 days. At the end of 180 days, the master was to report on the defendants' success in actually filling vacancies.

Six months later, way beyond the time contemplated in those mid-year discussions, the necessary bureaucratic structure appeared to be in place. Exhibit E provides the defendants' latest plan and schedule for its recruitment offensive. A study of the completion dates for the actions required to initiate the

plan suggests that all of the elements of the plan were to be fully activated by the end of January, 1998. Exhibit F provides a copy of a memorandum, dated January 5, 1998, announcing the implementation of a centralized hiring process for psychiatrists. This means basically that the department, rather than individual institutions, will henceforth be driving the recruitment process for psychiatrists. Through the end of March, 1998, the changes have yet to bear fruit.

On the basis of the institutional review of mental health services contained in this report, it is clear that the defendants cannot comply with their own plans and policies with a 25 percent vacancy rate among psychiatrists, and a 15 percent vacancy rate among psychologists and psych social workers. That fundamental issue must be addressed effectively.

The plaintiffs seek a recommendation from the master requiring the defendants to fill every vacancy within 60 days. Their impatience on this issue is understandable. The proposed remedy in the June 6, 1994 Findings and Recommendations in this case called for the defendants to fill all then currently authorized vacancies within 90 days. Four years later, vacancy rates remain unacceptably high.

The defendants respond that the absolute size of the staff has increased exponentially since June, 1994, and that contracted services, whatever their shortcomings, have bridged most of the vacancy gap. See, for example, Exhibit G, a memorandum dated May 29, 1997 that argues that contracted services reduced the vacancy rate among staff psychiatrists from 22 percent to 7.44percent. The defendants argue further that an order to fill every vacancy within 60 days will simply ensure that warm bodies, whatever the

limitations of their training or competence, will be hired perforce to avoid judicial sanctions, and the ultimate cost to the plaintiff class of that approach in terms of the quality of care actually provided will be substantial. Lastly, the defendants assert, such an order would come on the very heels of the defendants' success in finally wringing from the central executive bureaucracy both the permission and power to put together a viable recruitment process, which has simply not been given sufficient time to work.

Whatever the merits of those arguments, there must be a specifically expressed limit to the court's and the plaintiffs' patience on this issue. The special master recommends that the court direct the defendants to demonstrate within 60 days that they have improved both the quality and quantity of contracted services and/or implemented their recruitment program sufficiently to fill vacancies in presently authorized clinical positions. The failure to do so should result in an immediate and unqualified order to fill vacancies within 60 days.

Administrative Segregation:

The addition of the psych tech position has substantially improved access to mental health services for seriously mentally disordered inmates in administrative segregation by providing regular and continuing mental health staff presence in those units. The qualitative value of that presence is somewhat uneven, not surprisingly, and there are indications in various institutions that the administrative psych techs have not always been given clear and certain guidance about their duties and responsibilities. The monitor encountered too many psych techs who had never seen the program guide on mental health

services in administrative segregation.  For all of that, any analysis of the early impact of the position must acknowledge that it has significantly enhanced the access of inmates in administrative segregation to mental health care.

During the negotiations over plans to be submitted to the court for approval in June, an issue was raised relevant to the input of mental health clinicians in disciplinary decisions affecting seriously mentally disordered inmates. The defendants argued persuasively during those discussions that it was inappropriate for mental health personnel to participate in the determination of guilt, but conceded that there ought to be a role for clinical input into the disposition, or penalty phase, of disciplinary adjudications.  Penalties in such cases can include confinement in administrative segregation, loss of good-time credit and an increased level of custodial classification, all of which can have a profound impact on the access to mental health care of seriously mentally disordered inmates.  During discussions among the parties, it was suggested that information on the mental health status of an inmate might be most usefully interjected during review by the chief disciplinary officer in each institution of the determination of guilt and recommended disposition resulting from the disciplinary hearing.

The issue has turned out to be more complex than anticipated. Parties' presumptions about the nature and scope of institutional chief disciplinary officers' review of hearings and their outcome did not necessarily reflect actual practice.  While negotiations were going on between the parties to this case, moreover, the Institutional Division was independently modifying departmental disciplinary procedures.  Some of those revisions may address the

concerns at issue. Exhibit H provides the text of proposed changes to disciplinary and classification procedures that touch on, at least obliquely, clinical input into classification decisions. See particularly paragraph 52080.32 on case review, which suggests acceptance of the need for clinical input, albeit in terms not much different from the currently ineffective policy. Because the Institutional Division is still working on the development and articulation of this policy, there may still be opportunity to influence its final shape. The master recommends that the court direct the defendants to finalize within 60 days a process that formally integrates mental health recommendations in the dispositional or sentencing aspect of disciplinary decisions.

At the working level, there was little evidence in institutions that the department had undertaken any overall effort to enhance communication or increase coordination between custody and mental health staff on the issue of crafting appropriate disciplinary dispositions for seriously mentally disordered inmates. When questioned, mental health staff was largely unaware of the issue. In those few institutions where there was effective cooperation between custody and mental health staff in disciplinary matters involving seriously mentally disordered inmates, it was entirely the result of local initiative.

The Health Services Division and the Institutional Division need to work together immediately to develop and articulate a policy in this regard and see to its implementation at the institutional level.

Inpatient Transfers:

Inpatient transfers in the context of this case involve transfers to beds in the MHCB program of a hub institution, acute care beds at CMF/DMH,

246

intermediate care beds in ASH via CMC and acute or intermediate care beds at PSH via CIW. According to policies approved provisionally by the court and incorporated in program guides, inmate/patients referred to a MHCB within a service area on an emergency basis are to be moved within 24 hours, at least in those cases involving institutional, rather than departmental, transportation. Transfers of inmate/patients referred to CMF/DMH, CMC/ASH or CIW/PSH are supposed to occur within 72 hours of endorsement. As indicated in the institutional review, not all facilities meet those time standards. Indeed, in the absence of better institutional documentation on the transfer process, it is difficult to say with accuracy how long it actually takes some transfers to occur. From the sketchy documentation that exists, however, together with the anecdotal testimony of mental health clinicians, it appears that the timeliness of inpatient transfers has steadily and considerably improved since this case was heard and decided.

The special master recommends the development in every institution immediately of standard documentation of inpatient transfers that includes the date of referral, classification, endorsement and actual transfer and, in the event of a rejection of a referral for transfer, the reason for the rejection. The master also recommends the development of clear and specific timelines for every category of inpatient transfers and intra-departmental program transfers within 60 days.

Transfers to CMC/ASH, meanwhile, may cease to be the normal option for intermediate inpatient care. As indicated in the discussion of CMC, the State has apparently decided to transform the purpose and focus of

Atascadero State Hospital (ASH) and revamp current arrangements between DMH and CDC to provide up to 412 beds for intermediate mental health care to CDC inmate/patients.  On December 31, 1997, a memorandum to all institutions from the then acting director of CDC's Health Care Services Division apparently prohibited any further referrals of inmates to ASH.  See Exhibit I.  The memorandum left unclear what the addressees were to do with inmates in their institutions that might currently be in need of intermediate inpatient care after January 1.  Following some intense discussions among all of the parties to this suit, the acting director of health care sent a follow-up memorandum, dated January 30,1998, to all institutions, clarifying some aspects of the earlier directive. See Exhibit J.

Subsequently, on February 19, the master, together with the mediator in the Gates case, met with parties and counsel on the ASH issue to review the current status of referrals to ASH and clarify the need for an orderly modification process that respected the requirements of orders and agreements in Coleman and Gates.  At that meeting, the defendants reported that the ASH population had been reduced in part because of the return to CDC of some 30 inmates who had been stabilized on Clozaril and that CMF would continue to refer inmate/patients directly to ASH.  Other institutions might still refer patients to ASH, but only after review by the department's chief psychiatrist.  The defendants also suggested that some of the decline in the number of CDC patients in ASH was attributable to the increased availability of inpatient crisis beds in the department, where decompensating inmates could be stabilized without recourse to ASH.

The meeting served to confirm that the population of CDC inmates in ASH has declined over the past year and that the State does indeed plan to restructure the role of ASH in providing intermediate inpatient care to CDC inmates. At the same time, the defendants are now sensitive to the need to plan carefully for any such changes, to share their intended modifications fully with the plaintiffs and the court and to seek appropriate judicial review and approval of any finalized proposals. Continuing discussions on this matter have been scheduled. Throughout the discussions the defendants reiterated their commitment to the provision of appropriate levels of mental health care to inmate/patients irrespective of any proposed changes in the use of ASH.

Heat Plan:

The master's interim progress report, filed with the court in January, 1997, contained an extensive review of the status of implementation of the heat plan in 18 CDC institutions. While noting that the heat plan had been largely institutionalized in the facilities visited, the report described deficiencies in some institutions and offered some general recommendations for the improvement of overall coordination of the heat plan.

The defendants have adopted the master's suggestion to shift overall departmental supervision of institutional heat plans from the Institutional Division to the Health Care Services Division, and each facility is required to file its summary monthly report with the Health Care Services Division in Sacramento. That has led, in turn, to a greater uniformity in both institutional heat plans and the form of the summary reports. Inconsistencies remain in institutional versions relative to the return of heat-risk inmates to their living units in a stage-one alert.

Some facilities, e.g., ASP and CCI, give heat-risk inmates an option to return. Most institutions, and departmental policy, require a return, unless the heat-risk inmate is in another air-cooled program environment. The departmental policy needs to be implemented everywhere.

An issue over heat plan training arose during the monitor's review. Some institutions have difficulty in keeping up with the requirement for annual retraining or re-orientation to the heat plan. The requirement seemed excessive, especially when training for recognition of the signs and symptoms of mental illness and for suicide prevention, both of which are more central to the defendants' delivery of adequate mental health services, are not required annually. Research into the derivation of the requirement for annual retraining indicated that the mandate was imposed by the department itself, rather than by the court. So informed, the department nonetheless reconfirmed its commitment to annual training on the heat plan.

As reported last year, stage-two and stage-three alerts, keyed to inside temperatures of 90 and 95 degrees, occurred in 1997 in a minority of CDC institutions (eight of the 30 facilities reviewed). Those occurrences, with only one or two exceptions tied to mechanical breakdowns, were confined to older institutions like CIW, CIM, CRC, DVI and SCC. CSP/Solano, which is not an old institution, is a special case when it comes to heat problems. Another season of departmental oversight and continued institutionalization of the heat plan may well justify the cessation of judicial monitoring. The plaintiffs object strongly to this surmise which, obviously, is based on the assumption that institutions and the

department will continue to respond to the monitor's recommendation for improvement, as they have over the past two summers.

Use of Force:

Institutional progress in this area continues. There is still a need for the development and articulation of departmental policy that pulls together and integrates all of the directives on the use of force against seriously mentally disordered inmates with general policies on the use of the 37mm weapon, OC gas and cell extractions. In the absence of clear departmental directives in this regard, Individual institutional policies will continue to vary widely. The master recommends that the department be given 60 days to develop and promulgate such a policy.

Two last issues remain to be addressed. The June 27, 1997 Order required the defendants to adopt a process in which custodial administrators who override a clinical recommendation to transfer an actively decompensating inmate out of administrative segregation must put the reasons for the override in writing. In addition, the override must be subject to review. Exhibit K provides a September 4, 1997 memorandum, which purports to meet that requirement. It clearly directs a classification committee that rejects a clinician's recommendation for transfer of an actively decompenstaing mentally ill inmate to a mental health program to document the reasons for its decision. Presumably, the normal appellate provisions of the classification process apply to this decision, which, thus, may be subject to review.

A second requirement of the June 27 Order directed the defendants to modify their policy on the use of Clozapine (Clozaril) to include a

provision granting to CDC psychiatrists the discretion to maintain on the drug a newly arrived inmate, already stabilized on clozapine through a program other than those at Atascadero State Hospital or Patton State Hospital, subject to the department's housing and monitoring policies for inmates on clozapine. Exhibit L provides a memorandum dated December 15, 1997 that implements the court's requirement in this regard. Plaintiffs complain that the formal adoption and promulgation of this policy occurred three months later than scheduled.

**Re-scheduling**

As noted at the outset of this report, the conversion of quarterly monitoring reports into semi-annual ones has wrecked havoc with the schedule contained in the June 27, 1997 Order, adopting provisionally the defendants' plans, policies and protocols and establishing a three-month rhythm of review and report. Respect for the timelines included in that order suggests the need to separate some issues from the reconstituted reporting cycle and address them individually. The master recommends the following schedule revisions:

September 1:    Conduct and report on survey of extent to which the "core" population (i.e., pre-dating mid-1994) has received a mental health screening

November 15:    File recommendations for staffing ratios

December 31:    File recommendations on involuntary medications; any proposed changes in the delivery of mental health care services in administrative segregation; and recommendations on the use of a computerized identifier code for seriously mentally disordered inmates

In addition, the master proposes filing with the court a recommended schedule for implementation of the defendants' quality assurance plan within 30 days.

Lastly, for both parties and the court, the master provides the following schedule of review for the remainder of 1998. Between now and the end of the second semi-annual reporting period, the master's recently expanded monitoring team will be reviewing bus screening and mental health reception procedures in all of the department's reception centers covered by the <u>Coleman</u> orders. Beginning in July and over the course of the next six months, the monitoring team will review progress in the implementation of plans, policies and protocols in all 12 substantive areas in all institutions. That review will form the basis for a comprehensive overview in early 1999 of the department's success through the end of this year in implementing all of the plans, policies and protocols.

This present review cannot close without acknowledging that much has been accomplished by the defendants. CDC's mental health program has come a long way since this suit was initiated and heard. One also emerges from a close reading of this document with an understanding that staffing and population management may well be the two essential keys to full implementation of the plans, policies and protocols. These two issues probably ought to be the department's principal focus over the next six months.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

April 20, 1998

253

## DECLARATION OF SERVICE BY MAIL

Case Name:  Ralph Coleman, et al. v. Pete Wilson
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 year and not a party to the within entitled cause:  my business address is Little Bulman & Reardon, P.C., 50 South Main Street, Providence, Rhode Island 02903.

On April 20, 1998, I served the attached

**FIRST MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS**

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped with postage thereon fully prepared in the United States Mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
650 Capitol Mall
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
650 Capitol Mall, Suite 5054
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
650 Capital Mall
Sacramento, CA   95814

i

Donald Specter, Esquire
Alison Hardy, Esquire
Prison Law Office
General Delivery
San Quentin, CA  94964

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont St., Suite 3000
San Francisco, CA  94105-2239

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Pamela L. Smith-Steward, Esq.
Deputy Director (A),  Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont St., Suite 3000
San Francisco, CA 94105-2239


I declare under penalty of perjury under the laws of the State of Rhode Island
that the foregoing is true and correct, and that this declaration was executed at
Providence, Rhode Island on April 20, 1998.

_____

jmk\mastering\cert.doc

Donald Specter, Esquire
Prison Law Office
General Delivery
San Quentin, CA 94964

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont St., Suite 3000
San Francisco, CA 94105-2239

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

Pamela L. Smith-Steward, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont St., Suite 3000
San Francisco, CA 94105-2239


I declare under penalty of perjury under the laws of the State of Rhode Island
that the foregoing is true and correct, and that this declaration was executed at
Providence, Rhode Island on April 20, 1998.

Mary E. De Fontes

jmk\mastering\cert.doc

Ex. A



# Mental Health Population - Placement Per Institution
Download Date July 17, 1997

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 517 | 115% | | 25 | | | 1 | | 543 |
| CAL | 50 | 54 | 108% | | 9 | | | | | 63 |
| CCC | | 4 | | | 1 | | | | | 5 |
| CCI | 339 | 444 | 131% | | 9 | | | 1 | | 454 |
| CCI-RC | 60 | 48 | 80% | | 7 | | | | | 55 |
| CCWF | 242 | 342 | 141% | 63 | 49 | 78% | 12 | 6 | 50% | 397 |
| CCWF-RC | 57 | 45 | 79% | | 1 | | | 1 | | 47 |
| CEN | 50 | 26 | 52% | | 3 | | 4 | | 0% | 29 |
| CIM | 206 | 219 | 106% | | 10 | | 10 | 1 | 10% | 230 |
| CIM-RC | 293 | 413 | 141% | | 97 | | | 13 | | 523 |
| CIW | 168 | 107 | 64% | 34 | 86 | 253% | | 2 | | 195 |
| CIW-RC | 31 | 9 | 29% | | 1 | | | | | 10 |
| CMC | 599 | 710 | 119% | 430 | 431 | 100% | | 1 | | 1,142 |
| COR | 399 | 556 | 139% | 104 | 90 | 87% | 16 | 6 | 38% | 652 |
| CRC-M | 299 | 369 | 123% | | | | | | | 369 |
| CRC-W | 99 | 89 | 90% | | | | | | | 89 |
| CTF | 499 | 370 | 74% | | 1 | | | | | 371 |
| CVSP | 50 | 20 | 40% | | 4 | | | | | 24 |
| DVI | 132 | 144 | 109% | | 1 | | | 5 | | 150 |
| DVI-RC | 117 | 59 | 50% | | | | | 1 | | 60 |
| FOL | 299 | 287 | 96% | | 8 | | | | | 295 |
| HDSP | | 53 | | | 17 | | | | | 70 |
| HDSP-RC | | 19 | | | 8 | | | | | 27 |
| ISP | 50 | 35 | 70% | | 7 | | | | | 42 |
| LAC | 349 | 480 | 138% | 149 | 69 | 46% | 8 | 4 | 50% | 553 |
| MCSP | 299 | 474 | 159% | 150 | 140 | 93% | 4 | 1 | 25% | 615 |
| NCWF | 86 | 118 | 137% | | | | | | | 118 |
| NCWF-RC | 13 | 27 | 208% | | | | | | | 27 |
| NKSP | 133 | 192 | 144% | | 6 | | 5 | 5 | 100% | 203 |
| NKSP-RC | 316 | 325 | 103% | | 15 | | | 8 | | 348 |
| PBSP | 299 | 335 | 112% | 64 | 52 | 81% | 6 | | 0% | 387 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 465 | 133% | | 2 | | | | | 467 |
| RJD | 264 | 375 | 142% | 150 | 135 | 90% | 6 | 2 | 33% | 512 |
| RJD-RC | 85 | 129 | 152% | | 5 | | | | | 134 |
| SAC | 299 | 449 | 150% | 96 | 107 | 111% | 5 | 17 | 340% | 573 |
| SCC | 249 | 339 | 136% | | 1 | | | | | 340 |
| SOL | 499 | 595 | 119% | | 11 | | | 4 | | 610 |
| SQ | 247 | 283 | 115% | | 7 | | | 7 | | 297 |
| SQ-RC | 252 | 200 | 79% | | 25 | | | 3 | | 228 |
| SVSP | 349 | 577 | 165% | 96 | 76 | 79% | | 3 | | 656 |
| VSPW | 242 | 335 | 138% | | 1 | | | | | 336 |
| VSPW-RC | 57 | 51 | 89% | | 1 | | | | | 52 |
| WSP | 125 | 324 | 259% | | 42 | | 6 | 2 | 33% | 368 |
| WSP-RC | 324 | 220 | 68% | | 47 | | | 2 | | 269 |
| Totals : | 9,324 | 11,232 | 120.5% | 1,336 | 1,607 | 120.3% | 82 | 96 | 117.1% | 12,935 |

| CMF OPP | | | | |
|---|---|---|---|---|
| Wings | | Capacity | Current Pop | % of Capacity |
| LOCKED | CTU | 38 | 36 | 95% |
| | GPU | 76 | 76 | 100% |
| | INTAKE | 88 | 40 | 45% |
| | OBU | 18 | 16 | 89% |
| | PAS | 76 | 53 | 70% |
| | PMU | 38 | 37 | 97% |
| | Total: | 334 | 258 | 77.2% |
| OPEN | Total: | 604 | 551 | 91.2% |
| Total CMF OPP: | | 938 | 809 | 86.2% |

| DMH | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 374 | 301 | 80% |
| CMF-DMH | 150 | 129 | 86% |
| Totals : | 524 | 430 | 82.1% |

| PSU | | |
|---|---|---|
| Capacity | Current Pop | % of Capacity |
| 128 | 119 | 93.0% |

Totals :

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 12,680 | 14,293 | 112.7% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

*R1-2*

7/18/97

# Mental Health Adseg/SHU/PSU

July 17, 1997

| | AD-SEG | | | SHU | | | PSU |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | EOP | CCCMS | Total | |
| ASP | 6 | 23 | 29 | | | | |
| CAL | 1 | 9 | 10 | | | | |
| CCC | | 1 | 1 | | | | |
| CCI | 2 | 31 | 33 | | | | |
| CCWF-RC | | 21 | 21 | | | | |
| CEN | | 3 | 3 | | | | |
| CIM-RC | 8 | 22 | 30 | | | | |
| CIW | | 13 | 13 | | | | |
| CMC | 9 | 8 | 17 | | | | |
| CMF | | 1 | 1 | | | | |
| COR | | | | 15 | 242 | 257 | |
| CTF | | 27 | 27 | | | | |
| CVSP | | 7 | 7 | | | | |
| DVI | | 6 | 6 | | | | |
| HDSP | 4 | 8 | 12 | | | | |
| ISP | 3 | 4 | 7 | | | | |
| LAC | 1 | 22 | 23 | | | | |
| MCSP | 9 | 31 | 40 | | | | |
| NCWF-RC | | 3 | 3 | | | | |
| NKSP-RC | 1 | 25 | 26 | | | | |
| PBSP | 3 | 50 | 53 | | | | 119 |
| PVSP | 2 | 20 | 22 | | | | |
| RJD | 3 | 25 | 28 | | | | |
| SAC | 6 | 41 | 47 | | | | |
| SCC | 1 | | 1 | | | | |
| SOL | | 23 | 23 | | | | |
| SQ | | 13 | 13 | | | | |
| SQ-RC | 2 | 3 | 5 | | | | |
| SVSP | 3 | 25 | 28 | | | | |
| VSPW | | 8 | 8 | 1 | 15 | 16 | |
| WSP-RC | 8 | 35 | 43 | | | | |
| Totals : | 72 | 508 | 580 | 16 | 257 | 273 | 119 |



# Mental Health Population - Placement Per Institution

Download Date August 18, 1997

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| **ASP** | 449 | 509 | 113% | | 25 | | | | | 534 |
| **CAL** | 50 | 58 | 116% | | 4 | | | | | 62 |
| **CCC** | | 6 | | | 2 | | | | | 8 |
| **CCI** | 339 | 432 | 127% | | 8 | | | 1 | | 441 |
| **CCI-RC** | 60 | 57 | 95% | | 6 | | | | | 63 |
| **CCWF** | 242 | 350 | 145% | 63 | 40 | 63% | 12 | 7 | 58% | 397 |
| **CCWF-RC** | 57 | 52 | 91% | | | | | | | 52 |
| **CEN** | 50 | 21 | 42% | | 1 | | 4 | | 0% | 22 |
| **CIM** | 206 | 172 | 83% | | 8 | | 10 | 1 | 10% | 181 |
| **CIM-RC** | 293 | 402 | 137% | | 83 | | | 10 | | 495 |
| **CIW** | 168 | 113 | 67% | 75 | 72 | 96% | | 1 | | 186 |
| **CIW-RC** | 31 | 4 | 13% | | 6 | | | | | 10 |
| **CMC** | 599 | 748 | 125% | 430 | 447 | 104% | | 1 | | 1,196 |
| **COR** | 399 | 583 | 146% | 104 | 78 | 75% | 16 | 18 | 113% | 679 |
| **CRC-M** | 299 | 351 | 117% | | 1 | | | | | 352 |
| **CRC-W** | 99 | 90 | 91% | | 3 | | | | | 93 |
| **CTF** | 499 | 509 | 102% | | 1 | | | 2 | | 512 |
| **CVSP** | 50 | 14 | 28% | | 3 | | | | | 17 |
| **DVI** | 132 | 125 | 95% | | 5 | | | 1 | | 131 |
| **DVI-RC** | 117 | 46 | 39% | | 4 | | | | | 50 |
| **FOL** | 299 | 298 | 100% | | 4 | | | 1 | | 303 |
| **HDSP** | | 59 | | | 17 | | | | | 76 |
| **HDSP-RC** | | 20 | | | 7 | | | | | 27 |
| **ISP** | 50 | 16 | 32% | | 1 | | | | | 17 |
| **LAC** | 349 | 492 | 141% | 149 | 68 | 46% | 8 | 3 | 38% | 563 |
| **MCSP** | 299 | 465 | 156% | 150 | 134 | 89% | 4 | 1 | 25% | 600 |
| **NCWF** | 86 | 117 | 136% | | | | | | | 117 |
| **NCWF-RC** | 13 | 21 | 162% | | 1 | | | | | 22 |
| **NKSP** | 133 | 177 | 133% | | 4 | | 5 | | 0% | 181 |
| **NKSP-RC** | 316 | 359 | 114% | | 17 | | | 8 | | 384 |
| **PBSP** | 299 | 372 | 124% | 64 | 65 | 102% | 6 | 1 | 17% | 438 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-1

8/18/97

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 491 | 141% | | 4 | | | | | 495 |
| RJD | 264 | 392 | 148% | 150 | 117 | 78% | 6 | 2 | 33% | 511 |
| RJD-RC | 85 | 120 | 141% | | 9 | | | 1 | | 130 |
| SAC | 299 | 443 | 148% | 96 | 100 | 104% | 5 | 13 | 260% | 556 |
| SCC | 249 | 267 | 107% | | | | | | | 267 |
| SOL | 499 | 577 | 116% | | 13 | | | 1 | | 591 |
| SQ | 247 | 264 | 107% | | 7 | | | 2 | | 273 |
| SQ-RC | 252 | 182 | 72% | | 21 | | | 6 | | 209 |
| SVSP | 349 | 577 | 165% | 96 | 78 | 81% | | 10 | | 665 |
| VSPW | 242 | 352 | 145% | | 2 | | | | | 354 |
| VSPW-RC | 57 | 70 | 123% | | 2 | | | | | 72 |
| WSP | 125 | 328 | 262% | | 37 | | 6 | 2 | 33% | 367 |
| WSP-RC | 324 | 265 | 82% | | 57 | | | 1 | | 323 |
| Totals : | 9,324 | 11,366 | 121.9% | 1,377 | 1,562 | 113.4% | 82 | 94 | 114.6% | 13,022 |

| CMF OPP | | | | |
| --- | --- | --- | --- | --- |
| Wings | | Capacity | Current Pop | % of Capacity |
| LOCKED | CTU | 38 | 34 | 89% |
| | GPU | 76 | 75 | 99% |
| | INTAKE | 88 | 45 | 51% |
| | OBU | 18 | 15 | 83% |
| | PAS | 76 | 49 | 64% |
| | PMU | 38 | 36 | 95% |
| | Total: | 334 | 254 | 76.0% |
| OPEN | Total: | 604 | 563 | 93.2% |
| Total CMF OPP: | | 938 | 817 | 87.1% |

| DMH | | | |
| --- | --- | --- | --- |
| | Capacity | Current Pop | % of Capacity |
| ASH | 374 | 294 | 79% |
| CMF-DMH | 150 | 130 | 87% |
| Totals : | 524 | 424 | 80.9% |

| PSU | | |
| --- | --- | --- |
| Capacity | Current Pop | % of Capacity |
| Totals : | 128 | 115 |
| | 128 | 115 | 89.8% |

| Grand Totals | | |
| --- | --- | --- |
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 12,721 | 14,378 | 113.0% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-2

8/18/97

# Mental Health Adseg/SHU/PSU

**August 18, 1997**

| | AD-SEG | | | | SHU | | | | PSU | |
|---|---|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | | EOP | CCCMS | Total | | | |
| ASP | 5 | 24 | 29 | | | | | | | |
| CAL | 1 | 7 | 8 | | | | | | | |
| CCI | 3 | 30 | 33 | | | | | | | |
| CCWF-RC | | 25 | 25 | | | | | | | |
| CEN | | 1 | 1 | | | | | | | |
| CIM-RC | 5 | 16 | 21 | | | | | | | |
| CIW | 3 | 18 | 21 | | | | | | | |
| CMC | 7 | 6 | 13 | | | | | | | |
| CMF | | 2 | 2 | | | | | | | |
| COR | | | | | 10 | 245 | 255 | | | |
| CTF | | 56 | 56 | | | | | | | |
| CVSP | | 1 | 1 | | | | | | | |
| DVI | 1 | 7 | 8 | | | | | | | |
| HDSP | 3 | 5 | 8 | | | | | | | |
| LAC | 1 | 26 | 27 | | | | | | | |
| MCSP | 9 | 45 | 54 | | | | | | | |
| NCWF-RC | | 3 | 3 | | | | | | | |
| NKSP-RC | 1 | 36 | 37 | | | | | | | |
| PBSP | 5 | 56 | 61 | | | | | | 115 | |
| PVSP | 1 | 24 | 25 | | | | | | | |
| RJD | 5 | 31 | 36 | | | | | | | |
| SAC | 6 | 56 | 62 | | | | | | | |
| SOL | 1 | 30 | 31 | | | | | | | |
| SQ | | 11 | 11 | | | | | | | |
| SQ-RC | 1 | 4 | 5 | | | | | | | |
| SVSP | | 33 | 33 | | | | | | | |
| VSPW | 1 | 10 | 11 | | | | 18 | 18 | | |
| WSP-RC | 15 | 27 | 42 | | | | | | | |
| **Totals :** | 74 | 590 | 664 | | 10 | 263 | 273 | | 115 | |

Mental Health and HIV numbers are as accurate as the information
provided by the respective DDPS identifier systems.

R2-1

Health Care Population Management

8.18.97



# Mental Health Population – Placement Per Institution

Download Date September 15, 1997

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 480 | 107% | | 19 | | | 3 | | 502 |
| CAL | 50 | 48 | 96% | | 1 | | | | | 49 |
| CCC | | 5 | | | 2 | | | | | 7 |
| CCI | 339 | 420 | 124% | | 12 | | | | | 432 |
| CCI-RC | 60 | 62 | 103% | | 6 | | | | | 68 |
| CCWF | 242 | 340 | 140% | 63 | 38 | 60% | 12 | 8 | 67% | 386 |
| CCWF-RC | 57 | 48 | 84% | | | | | 1 | | 49 |
| CEN | 50 | 23 | 46% | | 1 | | 4 | 1 | 25% | 25 |
| CIM | 206 | 162 | 79% | | 6 | | 10 | 18 | 180% | 186 |
| CIM-RC | 293 | 424 | 145% | | 72 | | | 12 | | 508 |
| CIW | 168 | 131 | 78% | 75 | 61 | 81% | 10 | 4 | 40% | 196 |
| CIW-RC | 31 | 6 | 19% | | 1 | | | | | 7 |
| CMC | 599 | 777 | 130% | 430 | 447 | 104% | 5 | 3 | 60% | 1,227 |
| COR | 399 | 594 | 149% | 104 | 74 | 71% | 16 | 16 | 100% | 684 |
| CRC-M | 299 | 317 | 106% | | | | | | | 317 |
| CRC-W | 99 | 156 | 158% | | 1 | | | | | 157 |
| CTF | 499 | 619 | 124% | | 3 | | | 1 | | 623 |
| CVSP | 50 | 13 | 26% | | 5 | | | | | 18 |
| DVI | 132 | 119 | 90% | | 7 | | | | | 126 |
| DVI-RC | 117 | 66 | 56% | | 9 | | | | | 75 |
| FOL | 299 | 287 | 96% | | 7 | | | | | 294 |
| HDSP | | 63 | | | 12 | | | | | 75 |
| HDSP-RC | | 27 | | | 8 | | | | | 35 |
| ISP | 50 | 9 | 18% | | | | | | | 9 |
| LAC | 349 | 502 | 144% | 149 | 65 | 44% | 8 | 2 | 25% | 569 |
| MCSP | 299 | 450 | 151% | 150 | 120 | 80% | 4 | 2 | 50% | 572 |
| NCWF | 86 | 107 | 124% | | | | | | | 107 |
| NCWF-RC | 13 | 18 | 138% | | | | | | | 18 |
| NKSP | 133 | 161 | 121% | | 4 | | 5 | 1 | 20% | 166 |
| NKSP-RC | 316 | 327 | 103% | | 10 | | | 1 | | 338 |
| PBSP | 299 | 367 | 123% | 64 | 71 | 111% | 6 | 7 | 117% | 445 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-1

9/15/97

| | CCCMS | | | EOP | | | CTC-MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 488 | 140% | | 6 | | 3 | | 0% | 494 |
| RJD | 264 | 376 | 142% | 150 | 122 | 81% | 10 | 2 | 20% | 500 |
| RJD-RC | 85 | 125 | 147% | | 7 | | | 1 | | 133 |
| SAC | 499 | 496 | 99% | 96 | 104 | 108% | 5 | 14 | 280% | 614 |
| SATF | 399 | 3 | 1% | | | #Num! | 16 | | 0% | 3 |
| SCC | 249 | 263 | 106% | | 1 | | | | | 264 |
| SOL | 499 | 565 | 113% | | 22 | | 5 | | 0% | 587 |
| SQ | 247 | 265 | 107% | | 3 | | 10 | 3 | 30% | 271 |
| SQ-RC | 252 | 219 | 87% | | 14 | | | 3 | | 236 |
| SVSP | 349 | 573 | 164% | 96 | 55 | 57% | | 16 | | 644 |
| VSPW | 242 | 336 | 139% | | 1 | | | 1 | | 338 |
| VSPW-RC | 57 | 75 | 132% | | 1 | | | | | 76 |
| WSP | 125 | 336 | 269% | | 28 | | 6 | 1 | 17% | 365 |
| WSP-RC | 324 | 331 | 102% | | 54 | | | 1 | | 386 |
| Totals : | 9,923 | 11,579 | 116.7% | 1,377 | 1,480 | 107.5% | 173 | 122 | 70.5% | 13,181 |

| CMF OPP | | | | |
|---|---|---|---|---|
| Wings | | Capacity | Current Pop | % of Capacity |
| LOCKED | CTU | 38 | 36 | 95% |
| | GPU | 76 | 76 | 100% |
| | INTAKE | 88 | 42 | 48% |
| | OBU | 18 | 18 | 100% |
| | PAS | 76 | 46 | 61% |
| | PMU | 38 | 38 | 100% |
| | Total: | 334 | 256 | 76.6% |
| OPEN | Total: | 604 | 573 | 94.9% |
| Total CMF OPP: | | 938 | 829 | 88.4% |

| DMH | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 374 | 292 | 78% |
| CMF-DMH | 150 | 142 | 95% |
| Totals : | 524 | 434 | 82.8% |

| PSU | | |
|---|---|---|
| Capacity | Current Pop | % of Capacity |
| 128 | 112 | 87.5% |

Totals :

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 13,411 | 14,556 | 108.5% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

*R1-2*

9/15/97

# Mental Health Adseg/SHU/PSU

September 15, 1997

| | AD-SEG | | | | SHU | | | PSU |
|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | | EOP | CCCMS | Total | - |
| ASP | 2 | 15 | 17 | | | | | |
| CAL | | 6 | 6 | | | | | |
| CCI | 3 | 36 | 39 | | | | | |
| CCWF-RC | | 21 | 21 | | | | | |
| CEN | | 1 | 1 | | | | | |
| CIM-RC | 6 | 19 | 25 | | | | | |
| CIW | 2 | 11 | 13 | | | | | |
| CMC | 8 | 5 | 13 | | | | | |
| CMF | | 2 | 2 | | | | | |
| COR | | | | | 11 | 244 | 255 | |
| CTF | | 54 | 54 | | | | | |
| DVI | 3 | 8 | 11 | | | | | |
| HDSP | 1 | 5 | 6 | | | | | |
| ISP | | 1 | 1 | | | | | |
| LAC | | 30 | 30 | | | | | |
| MCSP | 11 | 36 | 47 | | | | | |
| NCWF-RC | | 3 | 3 | | | | | |
| NKSP-RC | 1 | 28 | 29 | | | | | |
| PBSP | 4 | 39 | 43 | | | | | 112 |
| PVSP | 3 | 27 | 30 | | | | | |
| RJD | 8 | 31 | 39 | | | | | |
| SAC | 8 | 69 | 77 | | | | | |
| SCC | | 1 | 1 | | | | | |
| SOL | 1 | 26 | 27 | | | | | |
| SQ | | 10 | 10 | | | | | |
| SQ-RC | | 3 | 3 | | | | | |
| SVSP | | 32 | 32 | | | | | |
| VSPW | | 8 | 8 | | | 16 | 16 | |
| WSP-RC | 14 | 30 | 44 | | | | | |
| Totals : | 75 | 557 | 632 | | 11 | 260 | 271 | 112 |

Mental Health and HIV numbers are as accurate as the information
provided by the respective DDPS identifier systems.          *R2-1*          Health Care Population Management

9 15 97



# Mental Health Population - Placement Per Institution

Download Date October 20, 1997

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 620 | 138% | | 8 | | | 3 | | 631 |
| CAL | 50 | 54 | 108% | | 2 | | | | | 56 |
| CCC | | 7 | | | | | | | | 7 |
| CCI | 339 | 388 | 114% | | 18 | | | | | 406 |
| CCI-RC | 60 | 73 | 122% | | 5 | | | | | 78 |
| CCWF | 242 | 353 | 146% | 63 | 41 | 65% | 12 | 2 | 17% | 396 |
| CCWF-RC | 57 | 53 | 93% | | 1 | | | | | 54 |
| CEN | 50 | 26 | 52% | | 5 | | 5 | | 0% | 31 |
| CIM | 206 | 181 | 88% | | 2 | | 10 | 22 | 220% | 205 |
| CIM-RC | 293 | 438 | 149% | | 75 | | | 4 | | 517 |
| CIW | 168 | 185 | 110% | 75 | 53 | 71% | | | | 238 |
| CIW-RC | 31 | 16 | 52% | | 1 | | | | | 17 |
| CMC | 599 | 773 | 129% | 430 | 428 | 100% | 5 | 1 | 20% | 1,202 |
| COR | 399 | 639 | 160% | 104 | 77 | 74% | 16 | 17 | 106% | 733 |
| CRC-M | 299 | 302 | 101% | | 1 | | | | | 303 |
| CRC-W | 99 | 153 | 155% | | 1 | | | | | 154 |
| CTF | 499 | 570 | 114% | | 2 | | | 1 | | 573 |
| CVSP | 50 | 17 | 34% | | 1 | | | | | 18 |
| DVI | 132 | 143 | 108% | | 8 | | | | | 151 |
| DVI-RC | 117 | 60 | 51% | | 5 | | | | | 65 |
| FOL | 299 | 326 | 109% | | 10 | | | 1 | | 337 |
| HDSP | | 57 | | | 11 | | | 1 | | 69 |
| HDSP-RC | | 16 | | | 5 | | | | | 21 |
| ISP | 50 | 12 | 24% | | 1 | | 5 | | 0% | 13 |
| LAC | 349 | 610 | 175% | 149 | 65 | 44% | 8 | 2 | 25% | 677 |
| MCSP | 299 | 425 | 142% | 150 | 124 | 83% | 5 | 1 | 20% | 550 |
| NCWF | 86 | 95 | 110% | | | | | | | 95 |
| NCWF-RC | 13 | 24 | 185% | | 1 | | | | | 25 |
| NKSP | 133 | 144 | 108% | | 4 | | 5 | | 0% | 148 |
| NKSP-RC | 316 | 299 | 95% | | 10 | | | 2 | | 311 |
| PBSP | 299 | 418 | 140% | 64 | 72 | 113% | 6 | 7 | 117% | 497 |

The mental health population numbers include inmates housed in Ad-Seg and SHU. Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

*R1-1*

Health Care Population Management Unit

10/20/97

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 479 | 137% | | 4 | | 5 | | 0% | 483 |
| RJD | 264 | 364 | 138% | 150 | 124 | 83% | 10 | | 0% | 488 |
| RJD-RC | 85 | 151 | 178% | | 5 | | | | | 156 |
| SAC | 499 | 571 | 114% | 96 | 75 | 78% | 8 | 14 | 175% | 660 |
| SATF | 399 | 10 | 3% | | | | 16 | | 0% | 10 |
| SCC | 249 | 270 | 108% | | 3 | | | | | 273 |
| SOL | 499 | 580 | 116% | | 14 | | 5 | | 0% | 594 |
| SQ | 247 | 268 | 109% | | 6 | | | 2 | | 276 |
| SQ-RC | 252 | 234 | 93% | | 16 | | | | | 250 |
| SVSP | 349 | 573 | 164% | 96 | 48 | 50% | 10 | 16 | 160% | 637 |
| VSPW | 242 | 338 | 140% | | 5 | | | 1 | | 344 |
| VSPW-RC | 57 | 69 | 121% | | 1 | | | 2 | | 72 |
| WSP | 125 | 200 | 160% | | 13 | | 6 | 1 | 17% | 214 |
| WSP-RC | 324 | 342 | 106% | | 51 | | | | | 393 |
| Totals : | 9,923 | 11,926 | 120.2% | 1,377 | 1,402 | 101.8% | 137 | 100 | 57.1% | 13,428 |

| CMF OPP | | | | |
| --- | --- | --- | --- | --- |
| Wings | | Capacity | Current Pop | % of Capacity |
| LOCKED | CTU | 38 | 37 | 97% |
| | GPU | 76 | 76 | 100% |
| | INTAKE | 88 | 42 | 48% |
| | OBU | 18 | 18 | 100% |
| | PAS | 76 | 53 | 70% |
| | PMU | 38 | 38 | 100% |
| | Total: | 334 | 264 | 79.0% |
| OPEN | Total: | 604 | 582 | 96.4% |
| Total CMF OPP: | | 938 | 846 | 90.2% |

| DMH | | | |
| --- | --- | --- | --- |
| | Capacity | Current Pop | % of Capacity |
| ASH | 374 | 308 | 82% |
| CMF-DMH | 150 | 136 | 91% |
| Totals : | 524 | 444 | 84.7% |

| PSU | | | |
| --- | --- | --- | --- |
| | Capacity | Current Pop | % of Capacity |
| Totals : | 128 | 113 | 88.3% |

| Grand Totals | | |
| --- | --- | --- |
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 13,375 | 14,831 | 110.6% |

The mental health population numbers include inmates housed in Ad-Seg and SHU. Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-2

10/20/97

# Mental Health Adseg/SHU/PSU

October 20, 1997

|  | AD-SEG | | | | SHU | | | | PSU | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | EOP | CCCMS | Total | | EOP | CCCMS | Total | | | |
| ASP | 4 | 17 | 21 | | | | | | | |
| CAL | | 7 | 7 | | | | | | | |
| CCC | | 1 | 1 | | | | | | | |
| CCI | 5 | 26 | 31 | | | | | | | |
| CCWF-RC | | 19 | 19 | | | | | | | |
| CEN | | 1 | 1 | | | | | | | |
| CIM-RC | 3 | 26 | 29 | | | | | | | |
| CIW | | 19 | 19 | | | | | | | |
| CMC | 6 | 3 | 9 | | | | | | | |
| CMF | 1 | 1 | 2 | | | | | | | |
| COR | | | | | 8 | 288 | 296 | | | |
| CTF | | 33 | 33 | | | | | | | |
| CVSP | | 1 | 1 | | | | | | | |
| DVI | | 11 | 11 | | | | | | | |
| HDSP | 1 | 3 | 4 | | | | | | | |
| LAC | 1 | 21 | 22 | | | | | | | |
| MCSP | 11 | 28 | 39 | | | | | | | |
| NCWF-RC | | 6 | 6 | | | | | | | |
| NKSP-RC | | 25 | 25 | | | | | | | |
| PBSP | 5 | 56 | 61 | | | | | | 113 | |
| PVSP | 4 | 23 | 27 | | | | | | | |
| RJD | 7 | 30 | 37 | | | | | | | |
| SAC | 4 | 82 | 86 | | | | | | | |
| SCC | 2 | 3 | 5 | | | | | | | |
| SOL | 1 | 29 | 30 | | | | | | | |
| SQ | | 11 | 11 | | | | | | | |
| SQ-RC | | 5 | 5 | | | | | | | |
| SVSP | 1 | 28 | 29 | | | | | | | |
| VSPW | | 8 | 8 | | 1 | 19 | 20 | | | |
| WSP-RC | 12 | 28 | 40 | | | | | | | |
| Totals : | 68 | 551 | 619 | | 9 | 307 | 316 | | 113 | |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

R2-1

Health Care Population Management
10/20/97



# Mental Health Population – Placement Per Institution

Download Date November 17, 1997

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 566 | 126% | | 6 | | | 1 | | 573 |
| CAL | 50 | 62 | 124% | | 3 | | | | | 65 |
| CCC | | 9 | | | 2 | | | | | 11 |
| CCI | 339 | 384 | 113% | | 20 | | | 2 | | 406 |
| CCI-RC | 60 | 75 | 125% | | 7 | | | | | 82 |
| CCWF | 242 | 358 | 148% | 63 | 35 | 56% | 12 | 4 | 33% | 397 |
| CCWF-RC | 57 | 43 | 75% | | | | | 1 | | 44 |
| CEN | 50 | 30 | 60% | | 2 | | 5 | | 0% | 32 |
| CIM | 206 | 241 | 117% | | 3 | | 10 | 16 | 160% | 260 |
| CIM-RC | 293 | 380 | 130% | | 76 | | | 7 | | 463 |
| CIW | 168 | 237 | 141% | 75 | 49 | 65% | | | | 286 |
| CIW-RC | 31 | 10 | 32% | | 1 | | | | | 11 |
| CMC | 599 | 741 | 124% | 430 | 446 | 104% | 5 | | 0% | 1,187 |
| COR | 399 | 635 | 159% | 104 | 82 | 79% | 16 | 18 | 113% | 735 |
| CRC-M | 299 | 287 | 96% | | | | | 4 | | 291 |
| CRC-W | 99 | 148 | 149% | | 1 | | | | | 149 |
| CTF | 499 | 519 | 104% | | 2 | | · | 4 | | 525 |
| CVSP | 50 | 23 | 46% | | 1 | | | | | 24 |
| DVI | 132 | 197 | 149% | | 11 | | | | | 208 |
| DVI-RC | 117 | 86 | 74% | | 3 | | | | | 89 |
| FOL | 299 | 303 | 101% | | 8 | | | | | 311 |
| HDSP | 299 | 126 | 42% | · | 11 | | | | | 137 |
| HDSP-RC | | 12 | | | 2 | | | | | 14 |
| ISP | 50 | 20 | 40% | | 1 | · | 5 | | 0% | 21 |
| LAC | 349 | 594 | 170% | 149 | 56 | 38% | 8 | 4 | 50% | 654 |
| MCSP | 299 | 401 | 134% | 150 | 135 | 90% | 5 | 1 | 20% | 537 |
| NCWF | 86 | 100 | 116% | | | | | | | 100 |
| NCWF-RC | 13 | 32 | 246% | | | | | | | 32 |
| NKSP | 133 | 178 | 134% | | 2 | | 5 | 1 | 20% | 181 |
| NKSP-RC | 316 | 372 | 118% | | 8 | | | 4 | | 384 |
| PBSP | 299 | 412 | 138% | 64 | 72 | 113% | 6 | 7 | 117% | 491 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

*R1-1*

Health Care Population Management Unit

11/17/97

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 463 | 133% | | 3 | | 5 | | 0% | 466 |
| RJD | 264 | 358 | 136% | 150 | 134 | 89% | 10 | | 0% | 492 |
| RJD-RC | 85 | 172 | 202% | | 15 | | | | | 187 |
| SAC | 499 | 585 | 117% | 96 | 95 | 99% | 8 | 5 | 63% | 685 |
| SATF | 399 | 12 | 3% | | | | 16 | | 0% | 12 |
| SCC | 249 | 277 | 111% | | 2 | | | | | 279 |
| SOL | 499 | 603 | 121% | | 9 | | 5 | | 0% | 612 |
| SQ | 247 | 296 | 120% | | 10 | | | 1 | | 307 |
| SQ-RC | 252 | 239 | 95% | | 21 | | | 1 | | 261 |
| SVSP | 349 | 541 | 155% | 96 | 49 | 51% | 10 | 9 | 90% | 599 |
| VSPW | 242 | 339 | 140% | | | | | | | 339 |
| VSPW-RC | 57 | 84 | 147% | | 1 | | | | | 85 |
| WSP | 125 | 198 | 158% | | 8 | | 6 | 1 | 17% | 207 |
| WSP-RC | 324 | 408 | 126% | | 95 | | | | | 503 |
| Totals : | 10,222 | 12,156 | 118.9% | 1,377 | 1,487 | 108.0% | 137 | 91 | 66.4% | 13,734 |

### CMF OPP

| Wings | | Capacity | Current Pop | % of Capacity |
|---|---|---|---|---|
| LOCKED | CTU | 38 | 37 | 97% |
| | GPU | 76 | 75 | 99% |
| | INTAKE | 88 | 38 | 43% |
| | OBU | 18 | 16 | 89% |
| | PAS | 76 | 43 | 57% |
| | PMU | 38 | 38 | 100% |
| | Total: | 334 | 247 | 74.0% |
| OPEN | Total: | 604 | 592 | 98.0% |
| Total CMF OPP: | | 938 | 839 | 89.4% |

### DMH

| | Capacity | Current Pop | % of Capacity |
|---|---|---|---|
| ASH | 374 | 302 | 81% |
| CMF-DMH | 150 | 128 | 85% |
| Totals : | 524 | 430 | 82.1% |

### PSU

| | Capacity | Current Pop | % of Capacity |
|---|---|---|---|
| Totals : | 128 | 117 | 91.4% |

### Grand Totals

| Total MH Capacity | Total MH Population | Percent of Total MH |
|---|---|---|
| 13,325 | 15,120 | 113.5% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-2

11/17/97

# Mental Health Adseg/SHU/PSU

**November 17, 1997**

| | AD-SEG | | | | SHU | | | | PSU | |
|---|---|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | | EOP | CCCMS | Total | | | |
| ASP | 3 | 13 | 16 | | | | | | | |
| CAL | 1 | 5 | 6 | | | | | | | |
| CCC | | 2 | 2 | | | | | | | |
| CCI | 9 | 21 | 30 | | | | | | | |
| CCWF-RC | | 14 | 14 | | | | | | | |
| CEN | | 1 | 1 | | | | | | | |
| CIM-RC | 4 | 19 | 23 | | | | | | | |
| CIW | | 18 | 18 | | | | | | | |
| CMC | 3 | 8 | 11 | | | | | | | |
| CMF | 1 | 1 | 2 | | | | | | | |
| COR | | | | | 8 | 271 | 279 | | | |
| CTF | 1 | 35 | 36 | | | | | | | |
| DVI | 1 | 12 | 13 | | | | | | | |
| HDSP | 1 | 13 | 14 | | | | | | | |
| ISP | | 1 | 1 | | | | | | | |
| LAC | | 24 | 24 | | | | | | | |
| MCSP | 7 | 24 | 31 | | | | | | | |
| NCWF-RC | | 6 | 6 | | | | | | | |
| NKSP-RC | | 24 | 24 | | | | | | | |
| PBSP | 2 | 55 | 57 | | | | | | 117 | |
| PVSP | 2 | 27 | 29 | | | | | | | |
| RJD | 11 | 30 | 41 | | | | | | | |
| SAC | 4 | 72 | 76 | | | | | | | |
| SCC | 1 | | 1 | | | | | | | |
| SOL | 1 | 26 | 27 | | | | | | | |
| SQ | | 13 | 13 | | | | | | | |
| SQ-RC | | 6 | 6 | | | | | | | |
| SVSP | | 29 | 29 | | | | | | | |
| VSPW | | 9 | 9 | | | 22 | 22 | | | |
| WSP-RC | 13 | 29 | 42 | | | | | | | |
| **Totals :** | **65** | **537** | **602** | | **8** | **293** | **301** | | **117** | |



Mental Health and HIV numbers are as accurate as the information
provided by the respective DDPS identifier systems.          *R2-1*          Health Care Population Management
11 17/97



# Mental Health Population – Placement Per Institution

Download Date December 15, 1997

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 527 | 117% | | 11 | | | | | 538 |
| CAL | 50 | 54 | 108% | | 1 | | | | | 55 |
| CCC | | 8 | | | 2 | | | | | 10 |
| CCI | 339 | 426 | 126% | | 19 | | | | | 445 |
| CCI-RC | 60 | 72 | 120% | | 4 | | | | | 76 |
| CCWF | 242 | 341 | 141% | 63 | 35 | 56% | 12 | | 0% | 376 |
| CCWF-RC | 57 | 55 | 96% | | | | | 1 | | 56 |
| CEN | 50 | 25 | 50% | | 1 | | 5 | | 0% | 26 |
| CIM | 206 | 216 | 105% | | 3 | | 10 | 19 | 190% | 238 |
| CIM-RC | 293 | 432 | 147% | | 72 | | | 3 | | 507 |
| CIW | 168 | 249 | 148% | 75 | 54 | 72% | | 1 | | 304 |
| CIW-RC | 31 | 5 | 16% | | 2 | | | | | 7 |
| CMC | 599 | 761 | 127% | 430 | 436 | 101% | 5 | 2 | 40% | 1,199 |
| COR | 399 | 652 | 163% | 104 | 86 | 83% | 16 | 9 | 56% | 747 |
| CRC-M | 299 | 269 | 90% | | | | | 1 | | 270 |
| CRC-W | 99 | 142 | 143% | | | | | | | 142 |
| CTF | 499 | 538 | 108% | | 22 | | | 1 | | 561 |
| CVSP | 50 | 28 | 56% | | 2 | | | | | 30 |
| DVI | 132 | 191 | 145% | | 4 | | | | | 195 |
| DVI-RC | 117 | 77 | 66% | | 8 | | | | | 85 |
| FOL | 299 | 311 | 104% | | 6 | | | | | 317 |
| HDSP | 299 | 150 | 50% | | 13 | | | | | 163 |
| HDSP-RC | | 14 | | | 3 | | | | | 17 |
| ISP | 50 | 24 | 48% | | 2 | | 5 | | 0% | 26 |
| LAC | 349 | 596 | 171% | 149 | 53 | 36% | 8 | 6 | 75% | 655 |
| MCSP | 299 | 388 | 130% | 150 | 142 | 95% | 5 | | 0% | 530 |
| NCWF | 86 | 96 | 112% | | | | | 1 | | 97 |
| NCWF-RC | 13 | 31 | 238% | | | | | | | 31 |
| NKSP | 133 | 205 | 154% | | 3 | | 5 | 1 | 20% | 209 |
| NKSP-RC | 316 | 387 | 122% | | 14 | | | 1 | | 402 |
| PBSP | 299 | 415 | 139% | 64 | 71 | 111% | 6 | 9 | 150% | 495 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

Health Care Population Management

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | 349 | 472 | 135% | | 3 | | 5 | | 0% | 475 |
| RJD | 264 | 360 | 136% | 150 | 137 | 91% | 10 | 8 | 80% | 505 |
| RJD-RC | 85 | 180 | 212% | | 4 | | | | | 184 |
| SAC | 499 | 610 | 122% | 96 | 106 | 110% | 8 | 5 | 63% | 721 |
| SATF | 399 | 18 | 5% | | | | 16 | | 0% | 18 |
| SCC | 249 | 277 | 111% | | 1 | | | | | 278 |
| SOL | 499 | 614 | 123% | | 6 | | 5 | 1 | 20% | 621 |
| SQ | 247 | 315 | 128% | | 4 | | | 2 | | 321 |
| SQ-RC | 252 | 209 | 83% | | 18 | | | 1 | | 228 |
| SVSP | 349 | 520 | 149% | 96 | 50 | 52% | 10 | 5 | 50% | 575 |
| VSPW | 242 | 346 | 143% | | | | | | | 346 |
| VSPW-RC | 57 | 80 | 140% | | 2 | | | | | 82 |
| WSP | 125 | 181 | 145% | | 10 | | 6 | 1 | 17% | 192 |
| WSP-RC | 324 | 362 | 112% | | 96 | | | | | 458 |
| Totals : | 10,222 | 12,229 | 119.6% | 1,377 | 1,506 | 109.4% | 137 | 78 | 56.9% | 13,813 |

### CMF OPP

| Wings | | Capacity | Current Pop | % of Capacity |
|---|---|---|---|---|
| LOCKED | CTU | 38 | 33 | 87% |
| | GPU | 76 | 74 | 97% |
| | INTAKE | 88 | 34 | 39% |
| | OBU | 18 | 17 | 94% |
| | PAS | 76 | 43 | 57% |
| | PMU | 38 | 37 | 97% |
| | Total: | 334 | 238 | 71.3% |
| OPEN | Total: | 604 | 573 | 94.9% |
| Total CMF OPP: | | 938 | 811 | 86.5% |

### DMH

| | Capacity | Current Pop | % of Capacity |
|---|---|---|---|
| ASH | 374 | 280 | 75% |
| CMF-DMH | 150 | 125 | 83% |
| Totals : | 524 | 405 | 77.3% |

### PSU

| | Capacity | Current Pop | % of Capacity |
|---|---|---|---|
| Totals : | 128 | 106 | 82.8% |

### Grand Totals

| Total MH Capacity | Total MH Population | Percent of Total MH |
|---|---|---|
| 13,325 | 15,135 | 113.6% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as the information provided
by the respective DDPS identifier systems.

Health Care Population Management Unit

R1-2

# Mental Health Adseg/SHU/PSU

December 15, 1997

| | AD-SEG | | | | SHU | | | PSU |
|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | | EOP | CCCMS | Total | |
| ASP | 6 | 15 | 21 | | | | | |
| CAL | | 4 | 4 | | | | | |
| CCC | 1 | 1 | 2 | | | | | |
| CCI | 6 | 25 | 31 | | | | | |
| CCWF-RC | | 20 | 20 | | | | | |
| CEN | | 3 | 3 | | | | | |
| CIM-RC | 6 | 29 | 35 | | | | | |
| CIW | 2 | 21 | 23 | | | | | |
| CMC | 2 | 4 | 6 | | | | | |
| CMF | 1 | | 1 | | | | | |
| COR | | | | | 12 | 271 | 283 | |
| CTF | 7 | 50 | 57 | | | | | |
| CVSP | | 3 | 3 | | | | | |
| DVI | 2 | 18 | 20 | | | | | |
| HDSP | | 14 | 14 | | | | | |
| ISP | | 1 | 1 | | | | | |
| LAC | 1 | 26 | 27 | | | | | |
| MCSP | 8 | 18 | 26 | | | | | |
| NCWF-RC | | 6 | 6 | | | | | |
| NKSP-RC | 1 | 34 | 35 | | | | | |
| PBSP | 1 | 56 | 57 | | | | | 106 |
| PVSP | 2 | 18 | 20 | | | | | |
| RJD | 7 | 36 | 43 | | | | | |
| SAC | 7 | 84 | 91 | | | | | |
| SOL | 1 | 33 | 34 | | | | | |
| SQ | | 14 | 14 | | | | | |
| SQ-RC | 1 | 3 | 4 | | | | | |
| SVSP | | 23 | 23 | | | | | |
| VSPW | | 5 | 5 | | | 27 | 27 | |
| WSP-RC | 11 | 21 | 32 | | | | | |
| Totals : | 73 | 585 | 658 | | 12 | 298 | 310 | 106 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

R2-1

Health Care Population Management
2 of 4



# Mental Health Population – Placement Per Institution

Download Date January 12, 1998

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 449 | 591 | 132% | | 7 | | | 1 | | 599 |
| CAL | 50 | 59 | 118% | | 3 | | | | | 62 |
| CCC | | 9 | | | 2 | | | | | 11 |
| CCI | 339 | 506 | 149% | | 17 | | | | | 523 |
| CCI-RC | 60 | 77 | 128% | | 11 | | | 1 | | 89 |
| CCWF | 242 | 355 | 147% | 63 | 33 | 52% | 12 | 2 | 17% | 390 |
| CCWF-RC | 57 | 34 | 60% | | | | | | | 34 |
| CEN | 50 | 29 | 58% | | | | 5 | | 0% | 29 |
| CIM | 206 | 203 | 99% | | 3 | | 10 | 20 | 200% | 226 |
| CIM-RC | 293 | 414 | 141% | | 61 | | | 5 | | 480 |
| CIW | 168 | 290 | 173% | 75 | 50 | 67% | | 1 | | 341 |
| CIW-RC | 31 | 12 | 39% | | | | | | | 12 |
| CMC | 599 | 803 | 134% | 430 | 428 | 100% | 5 | 3 | 60% | 1,234 |
| COR | 399 | 677 | 170% | 104 | 88 | 85% | 16 | 18 | 113% | 783 |
| CRC-M | 299 | 253 | 85% | | | | | 1 | | 254 |
| CRC-W | 99 | 124 | 125% | | | | | | | 124 |
| CTF | 499 | 541 | 108% | | 17 | | | 1 | | 559 |
| CVSP | 50 | 20 | 40% | | 1 | | | | | 21 |
| DVI | 132 | 167 | 127% | | 11 | | | | | 178 |
| DVI-RC | 117 | 67 | 57% | | 3 | | | 1 | | 71 |
| FOL | 299 | 291 | 97% | | 12 | | | | | 303 |
| HDSP | 299 | 160 | 54% | | 11 | | | | | 171 |
| HDSP-RC | | 8 | | | 7 | | | | | 15 |
| ISP | 50 | 17 | 34% | | 1 | | 5 | | 0% | 18 |
| LAC | 349 | 576 | 165% | 149 | 60 | 40% | 8 | 3 | 38% | 639 |
| MCSP | 299 | 396 | 132% | 150 | 157 | 105% | 5 | | 0% | 553 |
| NCWF | 86 | 97 | 113% | | | | | | | 97 |
| NCWF-RC | 13 | 30 | 231% | | | | | | | 30 |
| NKSP | 133 | 198 | 149% | | 4 | | 5 | 3 | 60% | 205 |
| NKSP-RC | 316 | 401 | 127% | | 7 | | | 1 | | 409 |
| PBSP | 299 | 406 | 136% | 64 | 70 | 109% | 6 | 8 | 133% | 484 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.                     R1-1

Health Care Population Management Unit

1/12/98

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| **PVSP** | 349 | 467 | 134% | | 4 | | 5 | 1 | 20% | 472 |
| **RJD** | 264 | 340 | 129% | 150 | 147 | 98% | 10 | 9 | 90% | 496 |
| **RJD-RC** | 85 | 163 | 192% | | 9 | | | | | 172 |
| **SAC** | 499 | 653 | 131% | 96 | 90 | 94% | 8 | 4 | 50% | 747 |
| **SATF** | 399 | 21 | 5% | | | | 16 | | 0% | 21 |
| **SCC** | 249 | 277 | 111% | | 1 | | | | | 278 |
| **SOL** | 499 | 627 | 126% | | 17 | | 5 | | 0% | 644 |
| **SQ** | 247 | 298 | 121% | | 5 | | | 3 | | 306 |
| **SQ-RC** | 252 | 215 | 85% | | 20 | | | 1 | | 236 |
| **SVSP** | 349 | 500 | 143% | 96 | 49 | 51% | 10 | 6 | 60% | 555 |
| **VSPW** | 242 | 349 | 144% | | 1 | | | | | 350 |
| **VSPW-RC** | 57 | 58 | 102% | | | | | | | 58 |
| **WSP** | 125 | 166 | 133% | | 10 | | 6 | 1 | 17% | 177 |
| **WSP-RC** | 324 | 362 | 112% | | 95 | | | 1 | | 458 |
| **Totals :** | 10,222 | 12,307 | 120.4% | 1,377 | 1,512 | 109.8% | 137 | 95 | 69.3% | 13,914 |

| CMF OPP | | | | |
|---|---|---|---|---|
| Wings | | Capacity | Current Pop | % of Capacity |
| **LOCKED** | CTU | 38 | 37 | 97% |
| | GPU | 76 | 75 | 99% |
| | INTAKE | 88 | 37 | 42% |
| | OBU | 18 | 13 | 72% |
| | PAS | 76 | 59 | 78% |
| | PMU | 38 | 38 | 100% |
| | Total: | 334 | 259 | 77.5% |
| **OPEN** | Total: | 604 | 559 | 92.5% |
| **Total CMF OPP:** | | 938 | 818 | 87.2% |

| DMH | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| **ASH** | 374 | 267 | 71% |
| **CMF-DMH** | 150 | 133 | 89% |
| **Totals :** | 524 | 400 | 76.3% |

| PSU | | |
|---|---|---|
| Capacity | Current Pop | % of Capacity |
| **Totals :** 128 | 116 | 90.6% |

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 13,325 | 15,248 | 114.4% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided
by the respective DDPS identifier systems.

R1-2

Health Care Population Management Unit

1/12/98

# Mental Health Adseg/SHU/PSU

**January 12, 1998**

| | AD-SEG | | | SHU | | | PSU | |
|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | EOP | CCCMS | Total | PSU | |
| ASP | 2 | 21 | 23 | | | | | |
| CAL | 1 | 3 | 4 | | | | | |
| CCC | 1 | 1 | 2 | | | | | |
| CCI | 3 | 21 | 24 | | | | | |
| CCWF-RC | | 14 | 14 | | | | | |
| CEN | | 3 | 3 | | | | | |
| CIM-RC | 3 | 23 | 26 | | | | | |
| CIW | | 30 | 30 | | | | | |
| CMC | 4 | 6 | 10 | | | | | |
| CMF | 1 | | 1 | | | | | |
| COR | | | | 14 | 282 | 296 | | |
| CTF | 4 | 41 | 45 | | | | | |
| CVSP | | 3 | 3 | | | | | |
| DVI | 2 | 15 | 17 | | | | | |
| HDSP | | 11 | 11 | | | | | |
| LAC | 1 | 34 | 35 | | | | | |
| MCSP | 10 | 17 | 27 | | | | | |
| NCWF-RC | | 6 | 6 | | | | | |
| NKSP-RC | 2 | 28 | 30 | | | | | |
| PBSP | 1 | 53 | 54 | | | | 116 | |
| PVSP | 2 | 19 | 21 | | | | | |
| RJD | 8 | 34 | 42 | | | | | |
| SAC | 3 | 86 | 89 | | | | | |
| SCC | | 1 | 1 | | | | | |
| SOL | 5 | 30 | 35 | | | | | |
| SQ | | 12 | 12 | | | | | |
| SQ-RC | | 5 | 5 | | | | | |
| SVSP | 1 | 19 | 20 | | | | | |
| VSPW | | 8 | 8 | 1 | 29 | 30 | | |
| WSP-RC | 11 | 25 | 36 | | | | | |
| **Totals :** | 65 | 569 | 634 | 15 | 311 | 326 | 116 | |



# Mental Health Population - Placement Per Institution

### Download Date February 2, 1998

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP  II | 449 | 595 | 133% | | 9 | | | | | 604 |
| CAL  I,II,IV + | 50 | 58 | 116% | | 3 | | | | | 61 |
| CCC  I,II,III | | 11 | | | 1 | | | | | 12 |
| CCI  I,II,III,IV * | 339 | 525 | 155% | | 12 | | | | | 537 |
| CCI-RC | 60 | 86 | 143% | | 13 | | | 1 | | 100 |
| CCWF | 292 | 382 | 131% | 63 | 38 | 60% | 12 | 7 | 58% | 427 |
| CCWF-RC | 57 | 35 | 61% | | 1 | | | | | 36 |
| CEN  I,II | 50 | 33 | 66% | | 1 | | 5 | 2 | 40% | 36 |
| CIM  I | 206 | 223 | 108% | | 1 | | 10 | 25 | 250% | 249 |
| CIM-RC | 293 | 444 | 152% | | 55 | | | 3 | | 502 |
| CIW | 168 | 275 | 164% | 75 | 68 | 91% | | 2 | | 345 |
| CIW-RC | 31 | 11 | 35% | | | | | | | 11 |
| CMC  I,II,III | 599 | 786 | 131% | 530 | 440 | 83% | 5 | 1 | 20% | 1,227 |
| COR  I,III,IV + * | 399 | 705 | 177% | 104 | 86 | 83% | 16 | 8 | 50% | 799 |
| CRC-M  II | 299 | 251 | 84% | | | | | | | 251 |
| CRC-W | 99 | 119 | 120% | | | | | | | 119 |
| CTF  I,II | 499 | 529 | 106% | | 17 | | | | | 546 |
| CVSP  I,II | 50 | 22 | 44% | | 1 | | | | | 23 |
| DVI  I,III | 132 | 171 | 130% | | 5 | | | 1 | | 177 |
| DVI-RC | 117 | 83 | 71% | | 7 | | | | | 90 |
| FOL  I,II | 299 | 284 | 95% | | 11 | | | | | 295 |
| HDSP  I,II,IV * | 285 | 152 | 53% | | 15 | | | | | 167 |
| HDSP-RC | 14 | 10 | 71% | | 8 | | | | | 18 |
| ISP  I,III | 50 | 16 | 32% | | | | 5 | | 0% | 16 |
| LAC  I,III,IV + | 449 | 551 | 123% | 149 | 66 | 44% | 8 | 2 | 25% | 619 |
| MCSP  I,II,III,IV + | 399 | 428 | 107% | 150 | 155 | 103% | 5 | | 0% | 583 |
| NCWF | 136 | 100 | 74% | | | | | | | 100 |
| NCWF-RC | 13 | 30 | 231% | | | | | | | 30 |
| NKSP  I,III | 133 | 185 | 139% | | 2 | | 5 | 2 | 40% | 189 |
| NKSP-RC | 316 | 430 | 136% | | 8 | | | 9 | | 447 |
| PBSP  I,V * | 349 | 391 | 112% | 64 | 69 | 108% | 6 | 8 | 133% | 468 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided by
　the respective DDPS identifier systems.
" + " is a 270 Design Facility.　" * " is a 180 Design Facility.

Health Care Population Management Unit

*R1-1*

2/2/98

| | | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| PVSP | LIII | 349 | 497 | 142% | | 6 | | 5 | | 0% | 503 |
| RJD | LIII | 364 | 345 | 95% | 150 | 151 | 101% | 10 | 4 | 40% | 500 |
| RJD-RC | | 85 | 149 | 175% | | 9 | | | | | 158 |
| SAC | LV * | 499 | 614 | 123% | 96 | 117 | 122% | 8 | 4 | 50% | 735 |
| SATF | II,III,IV * | 399 | 22 | 6% | | | | 16 | | 0% | 22 |
| SCC | LI,III | 249 | 298 | 120% | | 1 | | | | | 299 |
| SOL | II,III | 549 | 643 | 117% | | 15 | | 5 | | 0% | 658 |
| SQ | LI | 247 | 295 | 119% | | 7 | | | | | 302 |
| SQ-RC | | 252 | 219 | 87% | | 24 | | | | | 243 |
| SVSP | LV * | 499 | 492 | 99% | 96 | 51 | 53% | 10 | 4 | 40% | 547 |
| VSPW | | 292 | 345 | 118% | | 1 | | | | | 346 |
| VSPW-RC | | 57 | 52 | 91% | | 1 | | | 1 | | 54 |
| WSP | LII | 125 | 192 | 154% | | 5 | | 6 | | 0% | 197 |
| WSP-RC | | 324 | 365 | 113% | | 92 | | | 1 | | 458 |
| Totals : | | 10,922 | 12,449 | 114.0% | 1,477 | 1,572 | 106.4% | 137 | 85 | 62.0% | 14,106 |

**CMF OPP**

| | Wings | Capacity | Current Pop | % of Capacity |
|---|---|---|---|---|
| LOCKED | CTU | 38 | 37 | 97% |
| | GPU | 76 | 76 | 100% |
| | INTAKE | 88 | 43 | 49% |
| | OBU | 18 | 14 | 78% |
| | PAS | 76 | 58 | 76% |
| | PMU | 38 | 37 | 97% |
| | Total: | 334 | 265 | 79.3% |
| OPEN | Total: | 604 | 563 | 93.2% |
| Total CMF OPP: | | 938 | 828 | 88.3% |

**DMH**

| | Capacity | Current Pop | % of Capacity |
|---|---|---|---|
| ASH | 374 | 263 | 70% |
| CMF-DMH | 150 | 134 | 89% |
| Totals : | 524 | 397 | 75.8% |

**PSU**

| Capacity | Current Pop | % of Capacity |
|---|---|---|
| 128 | 113 | 88.3% |

| Totals : | | |
|---|---|---|

**Grand Totals**

| Total MH Capacity | Total MH Population | Percent of Total MH |
|---|---|---|
| 14,125 | 15,444 | 109.3% |

mental health population numbers include inmates housed in Ad-Seg and SHU.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* is a 270 Design Facility. *** is a 180 Design Facility.

Health Care Population Management Unit

2/2/98

# Mental Health Adseg/SHU/PSU

February 2, 1998

| | AD-SEG | | | | SHU | | | PSU | |
|---|---|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | Total | | EOP | CCCMS | Total | | |
| ASP    II | 3 | 15 | 18 | | | | | | |
| CAL   I,III,IV  + | 1 | 1 | 2 | | | | | | |
| CCC   I,II,III | | 1 | 1 | | | | | | |
| CCI   I,II,III,IV  * | 2 | 23 | 25 | | | | | | |
| CCWF-RC | | 10 | 10 | | | | | | |
| CEN   I,III | | 5 | 5 | | | | | | |
| CIM-RC | 5 | 17 | 22 | | | | | | |
| CIW | 2 | 26 | 28 | | | | | | |
| CMC   I,II,III | 14 | 23 | 37 | | | | | | |
| CMF   I,II,III | 1 | | 1 | | | | | | |
| COR   I,III,IV  + * | | | | | 12 | 298 | 310 | | |
| CTF   I,II | 6 | 27 | 33 | | | | | | |
| CVSP   I,II | | 5 | 5 | | | | | | |
| DVI   I,III | | 17 | 17 | | | | | | . |
| HDSP   I,II,IV  * | | 15 | 15 | | | | | | |
| LAC   I,III,IV  + | 2 | 29 | 31 | | | | | | |
| MCSP   I,II,III,IV  + | 7 | 23 | 30 | | | | | | |
| NCWF-RC | | 5 | 5 | | | | | | |
| NKSP-RC | 2 | 34 | 36 | | | | | | |
| PBSP   I,IV  * | 2 | 51 | 53 | | | | | | 113 |
| PVSP   I,III | 2 | 18 | 20 | | | | | | . |
| RJD   I,III | 14 | 36 | 50 | | | | | | |
| SAC   I,V  * | 13 | 77 | 90 | | | | | | |
| SOL   II,III | 3 | 30 | 33 | | | | | | |
| SQ   I,II | 3 | 33 | 36 | | | | | | |
| SQ-RC | | 8 | 8 | | | | | | |
| SVSP   I,V  * | | 22 | 22 | | | | | | |
| VSPW | | 10 | 10 | | 1 | 28 | 29 | | |
| WSP-RC | 13 | 26 | 39 | | | | | | |
| Totals : | 95 | 587 | 682 | | 13 | 326 | 339 | | 113 |

Mental Health and HIV numbers are as accurate as the information
provided by the respective DDPS identifier systems.          R2-1                    Health Care Population Management
* * * is a 270 Design Facility.  * * * is a 180 Design Facility.                                  2/2/98

Ex. B

EXHIBIT B

November 1977

MHSD Monthly Staffing Allocation and Vacancies for all Institutions
1997-1998

| CLASSIFICATION | July All | July Vac | August All | August Vac | September All | September Vac | October All | October Vac | November All | November Vac | December All | December Vac | January All | January Vac | February All | February Vac | March All | March Vac | April All | April Vac | May All | May Vac | June All | June Vac | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asst Supt Psychiatrist | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Chief Psychiatrist | 22.5 | 5.5 | 22.5 | | 22.5 | | 22.5 | | 22.5 | 6.5 | 22.5 | | 22.5 | | 22.5 | | 22.5 | | 22.5 | | 22.5 | | 22.5 | | SC-1, SD-1 |
| Sr. Psychiatrist | 11 | 24.5 | 11 | | 11 | | 11 | 2 | 11 | | 11 | | 11 | | 11 | | 11 | | 11 | | 11 | | 11 | | CHH+1 |
| Staff Psychiatrist | 96.2 | | 96.2 | 26.5 | 96.2 | 22.7 | 96.2 | 22.7 | 96.2 | 24.2 | 96.2 | | 96.2 | | 96.2 | | 96.2 | | 96.2 | | 96.2 | | 96.2 | | CTF+1, MSP+1 |
| Chief Psychologist | 4 | 1 | 4 | | 4 | | 4 | | 4 | 4 | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | |
| Sr Psychologist | 42.5 | 4.5 | 42.5 | 3.5 | 42.5 | 5.5 | 42.5 | 6 | 42.5 | 5 | 42.5 | | 42.5 | | 42.5 | | 42.5 | | 42.5 | | 42.5 | | 42.5 | | CHH-4 |
| Psychologist, CL, CF | 162.8 | 24.35 | 162.8 | 27.85 | 162.8 | 31.35 | 162.8 | 27.35 | 162.8 | 27.35 | 162.8 | | 162.8 | | 162.8 | | 162.8 | | 162.8 | | 162.8 | | 162.8 | | SC-1, BVSP-1, CRC-1, MSP-1, SC-1, MSP-1, CHH |
| Psych Intern Director | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | |
| Psych Assoc | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Sup Psych Soc Wkr | 4 | | 4 | | 4 | | 4 | 1 | 4 | 1 | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | |
| Psych Soc Wkr | 124.1 | 31.1 | 124.1 | 28.6 | 124.1 | 20.1 | 124.1 | 18.6 | 124.1 | 18.6 | 124.1 | | 124.1 | | 124.1 | | 124.1 | | 124.1 | | 124.1 | | 124.1 | | CHC-1, SD-1 |
| Sr Occ Therapist | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Occ Therapist | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | |
| Rec Therapist | 22.5 | | 31.5 | 7 | 31.5 | 7 | 31.5 | 7 | 31.5 | 6.5 | 31.5 | | 31.5 | | 31.5 | | 31.5 | | 31.5 | | 31.5 | | 31.5 | | PSP-1, MSP+1 |
| Psychometrist | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | |
| Psych Tech | 74.27 | 5.72 | 76.27 | 6.72 | 76.27 | 5.72 | 76.27 | 5.72 | 76.27 | 5.72 | 76.27 | | 76.27 | | 76.27 | | 76.27 | | 76.27 | | 76.27 | | 76.27 | | SAL-1, MSP-1 |
| Corr Counselor II | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | 3 | | |
| Corr Counselor I | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| AGPA | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | |
| CNSA | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | CHC-1 |
| Sr MTA | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| MTA | 21 | 1.2 | 21 | 1.2 | 21 | | 21 | | 21 | | 21 | | 21 | | 21 | | 21 | | 21 | | 21 | | 21 | | |
| SRN II | 1 | | 1 | 2 | 1 | 1 | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Supervising Nurse | 17 | 3 | 17 | 2 | 17 | 3 | 17 | 3 | 17 | 5 | 17 | | 17 | | 17 | | 17 | | 17 | | 17 | | 17 | | |
| Registered Nurse | 94.71 | 11.33 | 94.71 | 11.33 | 94.71 | 7.33 | 94.71 | 8.33 | 94.71 | 7.33 | 94.71 | | 94.71 | | 94.71 | | 94.71 | | 94.71 | | 94.71 | | 94.71 | | DEHT-1, CORC-1 |
| Nurse Practitioner | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | MC-2 |
| Pharmacist | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Pharmacy Assistant | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Off Svcs Supervisor | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | CHC-1 |
| Mgmnt Srvcs Tech | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| AISA | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Health Rec Tech II | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Health Rec Tech | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | 4 | | |
| Std & Comp Coord | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Health Program Coord | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Med Secretary | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Sr Medical Steno | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Stenographer | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | | |
| Sr MTA | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | CCC-1, MSP-1 |
| Med Transcriber | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | 2 | | MOSP-2, CHH-1 |
| Office Tech | 41 | | 41 | | 41 | 8 | 41 | 7 | 41 | | 41 | | 41 | | 41 | | 41 | | 41 | | 41 | | 41 | | |
| Office Assistant | 50.6 | 10.6 | 50.6 | 10.6 | 50.6 | 10.6 | 50.6 | 11.1 | 50.6 | 8.6 | 50.6 | | 50.6 | | 50.6 | | 50.6 | | 50.6 | | 50.6 | | 50.6 | | |
| | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | 18 | | |
| Total All Institutions | 846.18 | 130.8 | 847.18 | 144.8 | 847.18 | 132.8 | 847.18 | 133.3 | 847.18 | 124.8 | 847.18 | 0 | 847.18 | 131.3 | 847.18 | 124.8 | 847.18 | 0 | 847.18 | 0 | 847.18 | 0 | 847.18 | 0 | |

Note: This table now includes all existing positions including PDU at PBSP. Population Growth, & all adjustments made during the last fiscal year. It also includes the 1990/1991 BCP positions. Adjustment of -4.4 in October & BVSP allocation.

Prepared by Linda R. Jensen 11/26/07

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: A**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | ADSEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CSP-SAC** | | | | | | | 8 | 299 | 192 | | |
| CHIEF PSYCHIATRIST | 1 | 0 | | 0 | Dr. Flohr | | | | | | 1 |
| STAFF PSYCHIATRIST | 3 | 0 | 1 | 0 | Amparo left 4/1;Jaffe RD 9/2;Marrow RD 9/15 | | | 1.5 | 2 | | 4.5 |
| SR. PSYCHOLOGIST-SUP | 1 | | 1.5 | 1 | Cyrus Moazem (10-18 RD); 0.5 to be reclassed to St. Psychiatrist;eps to unit 10/3 | | | 1 | 1 | | 2 |
| PSYCHOLOGIST, CL | 2 | 1 | 4.5 | 1 | *4.5 reclassed to PTs;Souris pending HAMM;med;Hebled pending approval; pending license | | | | | | 2 |
| PSYCH. SOCIAL WRKR | 4 | | 2.5 | 1.5 | Holiday RD 2/15/97; Phillipi RD 4/26; Golden RD 9/8; reclassing to psychologist | | | 2 | 4.5 | | 6.5 |
| REC THERAPIST | 1.5 | | 0.5 | 0.5 | reclassing to psychologist | | | | 1 | | 1 |
| PSYCH TECH | 1.5 | 1 | 1.09 | 0.59 | (See Note Below! Garcia, Shelsea 11-18 *see above;Coleman, Rudy, Warren 12-2 | | | | | 1.09 | 2 |
| COR COUNSELOR II | 1 | | | | | | | | 5.5 | 1.09 | 6.59 |
| SUPERVISING NURSE | 0 | | | | | | | | | | 0 |
| REGISTERED NURSE | 4 | | 2 | 0 | Crews & Combes RD 10/27 | | | | 3 | | 7 |
| MED TRANSCRIBER | 1 | | | | | | | | | | 1 |
| OFFICE TECH | 2 | | 1.5 | 0.5 | Schley (1.0; 12-2 RD); will hold 0.5 | | | 0.5 | 2.5 | | 4 |
| **TOTAL** | 22 | 1 | 14.59 | 5.09 | | | 11 | 5 | 20.5 | 1.09 | 37.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA A | | | | | | 1994/95, 1995/96 & 1996/97 | | | | | |
| | | | | | | REQUIRED STAFF & PROGRAM SIZE | | | | | |
| | | | | FY 1996/97 | | | CRISIS | | | | |
| | EXISTING | VACANT | BCP | VACANT | | RC | BEDS | CCCMS | EOP | AD SEG | TOTAL |
| CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | | | 299 | 0 | 0 | |
| FOLSOM | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 1 | | | | | | | 1 | | | 1 |
| SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | | | | | | | | | | | 0 |
| PSYCH. SOCIAL WKR | 2 | 0 | | | Annlynn Chong from CMF (RD 1/6/97) | | | 2 | | | 2 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH. TECH | | | | | | | | | | | 0 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | 0 |
| OFFICE TECH | 0.5 | 0 | | | RD 7/21/97 | | | 0.5 | | | 0.5 |
| TOTAL | 4.5 | 0 | 0 | 0 | | | | 4.5 | 0 | 0 | 4.5 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 2

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: B**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | PSU | CRISIS BEDS | CCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 6 | 299 | 64 | | |
| **PBSP** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | 1 | | | | | | 1 | | | | 1 |
| SR. PSYCHIATRIST | 1 | | 0 | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 6 | 0 | 4 | | Shepherd retired 4/18; Andres moved from Stff. | 3 | 1 | 1 | 1 | | 3 |
| CHIEF PSYCHOLOGIST | 1 | | | | working on 2 cands.; using contract services in the meantime | 1 | | | | | 0 |
| SR. PSYCHOLOGIST-SUP | 2 | 0 | 0 | | | | 1 | 1 | 1 | | 2 |
| PSYCHOLOGIST, CL | 14 | 1 | 1 | | C Cardin RD 5/5; Roy RD 6/2;Pritchard declined--interviews pending; Grimes RD 10/6 | 4 | 1 | 5 | | | 6 |
| PSYCH. SOCIAL WKR | 8.5 | 0 | 0 | | | | 6 | 2.5 | 2 | | 4.5 |
| REC THERAPIST | 2 | 0 | 0 | | Weiner RD 8/4/97; Dye left 8/1; Loney RD 11/3 | 2 | 1 | | 1 | | 2 |
| PSYCH TECH | 8.05 | 1 | 1 | | Martinez RD 6/2; 81 Shephard RD 6/2; Webb left lateral 10/97 | 8.05 | | | 1 | | 1 |
| COR. COUNSELOR II | 1 | | | | | | | | 1 | | 1 |
| AGPA | 1 | | | | | | | | | | 0 |
| MTA | 2 | | | | | | | | | | 0 |
| SUPERVISING NURSE | 2 | 0 | | | | | | | | | 0 |
| **3 IN MED** | | | | | | | | | | | |
| REGISTERED NURSE | 4 | 0 | 0 | | J. Cardin & D. Garozino RD 5/5; K. Hall RD 7/97 | 6.44 | 3 | | 1 | | 4 |
| HEALTH RECORDSTECH 11 | 1 | | | | | | 1 | | | | 0 |
| HEALTH RECORDS TECH | 2 | | | | | | | | | | 0 |
| Sr. MED TRANSCRIBER | 1 | | | | | | | | | | 0 |
| MED TRANSCRIBER | 5 | 2 | 2 | | in salary savings: Clifford promoted 8/1/97; Ellis RD 10/6 | 2 | 1 | | 1 | | 1 |
| OFFICE TECH | 2 | | | | | | 1 | 2 | | | 4 |
| **TOTAL** | 62.55 | 8 | 0 | 0 | | 34.49 | 10 | 11.5 | 9 | | 30.5 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

PAGE 3

ARECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA B**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 299 | 0 | | |
| **CCC** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | | | 0.5 | 0.5 | 607's submitted; recruiting/phone interviews; new exam 3/7/97; no interest; ordered new cert | | | 0.5 | | | 0.5 |
| SR. PSYCHOLOGIST-SUP | 1 | | 1 | 0 | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL. | 1 | | | 0 | R Frederickson (12-9 RD) | | | | | | 0 |
| PSYCH. SOCIAL WKR | | 0 | 2 | 1.5 | Sara Shelley (8-9B RD); contact letter out FFD; 4/30-- did not work out; ordering new cert | | | 0.5 | | | 0.5 |
| REC THERAPIST | | | | | | | | 2 | | | 2 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Jeff Simmons (10-15 RD) | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | 1 | | | | | | | | | | 0 |
| OFFICE TECH | | | | | | | | 0.5 | | | 0.5 |
| **TOTAL** | 2 | 0 | 4.59 | 2.09 | | 0 | 0 | 4.5 | 0 | 1.09 | 5.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

PAGE 4

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

SERVICE AREA B

| | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 12 | 349 | 60 | | |
| HDSP | CHIEF PSYCHIATRIST | 1 | | | | pending R & R; | | | | | | 1 |
| | STAFF PSYCHIATRIST | 2.5 | 1.5 | 1 | 1 | Criswell RD 8/18; waiting for new list 9/12; .5 LT & .5 base to CMC | | | 1.5 | 1 | | 3.5 |
| | SR. PSYCHOLOGIST-SUP | 1 | 1 | 1 | 1 | 1.0 LT to CMC/PFD; 11/19--only 2 responses, may have to go go statewide | | | 1 | 1 | | 2 |
| | PSYCHOLOGIST, CL | 1 | 0 | 1.5 | 1.5 | hire pending Lind--waiting proof of applying for state lincense | 1 | 2 | 0.5 | | | 3.5 |
| | PSYCH. SOCIAL WKR | 1 | 1 | 3 | 3 | no one with license; waiting for new list 9/12;hire pending HAM-Loyal; 2.0 LT to CMC | | 2 | 2 | | | 4 |
| | REC THERAPIST | 1 | 1 | | 1 | interviews 9/30 (4 cands); Selection pending; 1.0 LT to CMC | | 1 | | 1 | | 2 |
| | PSYCH TECHNICIAN | | | 2.09 | 0.09 | (See Note Below) Nettleton & Buhay (1-6-97RD) | | 1 | | | 1.09 | 2.09 |
| | MTA | | | | | | | | | | | 0 |
| 2.5 IN MED | SUPERVISING NURSE | 1 | 1 | | | | | 1 | | | | 1 |
| | REGISTERED NURSE | 6 | 0 | 1 | 1 | Lewis RD 5/12; interviews 11/19 8 cands; 1.0 LT to CMC | | 6 | | 1 | | 7 |
| | MED. TRANSCRIBER | 1 | | | | | | 1 | | | | 1 |
| | OFFICE TECH | 1 | 0 | 2 | 2 | Baker RD 10/31; Davis RD 11/17;1.0 LT to CMC | | 1 | | 1 | | 3 |
| | TOTAL | 16.5 | 5.5 | 12.59 | 9.59 | | 1 | 15 | 6 | 7 | 1.09 | 30.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA C**

| | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **MCSP** | | | | | | | 4 | 299 | 150 | | |
| CHIEF PSYCHIATRIST | 1 | 1 | | | waiting for new names to be put on list in December | | | | | | 1 |
| STAFF PSYCHIATRIST | 1.5 | 1.5 | 1.5 | 0.5 | 0.5 is contracted; Cheema to PT 6/2-left 7/31;FFD 11/14-only 1 cand interested-interview 11/ | | 0.5 | 1 | 1.5 | | 3 |
| SR. PSYCHOLOGIST-SUP | 1 | | 1 | 0 | | | | 1 | 1 | | 2 |
| PSYCHOLOGIST, CL | 1 | 0 | | | Dr. Savage (10-15 RD) | | | | 1 | | 1 |
| PSYCH. SOCIAL WKR | 2 | 0.5 | 3 | 0 | Duskey 12-9-96 RD; Ellington resigned 5/27; .5 went to full time 9/1; interviews 11/21 | | | 2 | 3 | | 5 |
| REC THERAPIST | 0.5 | 0.5 | 1 | 0 | | | 0.5 | | 1 | | 1.5 |
| PSYCH TECHNICIAN | | | 5.09 | 0.09 | B Montalongo; G Lyghts (10-21 RD); S Wiggs (12-9 RD)   See Note Below | | | | 4 | 1.09 | 5.09 |
| MTA | | | | 0 | | | | | | | 0 |
| **1 IN MED** SUPERVISING NURSE | 1 | | | | | | | | | | 1 |
| **3 IN MED** REGISTERED NURSE | 3 | | 2 | 0 | | | | | 2 | | 5 |
| MED TRANSCRIBER | 1 | | | | | | | | | | 1 |
| OFFICE TECH | 1.5 | | 2 | 0 | Deborah Bohall (1/31/97 RD) | | | 0.5 | 2 | | 3.5 |
| **TOTAL** | 13.5 | 3 | 15.59 | 0.59 | | | 9 | 4.5 | 14.5 | 1.09 | 29.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 6

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA C**

| | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 249 | | 0 | | |
| SCC | CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| | STAFF PSYCHIATRIST | 0.5 | | | | | | | 0.5 | | | 0.5 |
| | SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| | PSYCHOLOGIST, CL | | 0.5 | | | advertising and working the cart | | | 0.5 | | | 0.5 |
| | PSYCH. SOCIAL WKR | 1.5 | 0 | | | | | | 1.5 | | | 1.5 |
| | REC THERAPIST | | | | | | | | | | | 0 |
| | PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) R. Mills 10-7-96 RD–left 6/13; Shearm RD 9/2/97 | | | | | 1.09 | 1.09 |
| | SR. MTA | | | | | | | | | | | 0 |
| | MTA | | | | | | | | | | | 0 |
| | SUPERVISING NURSE | | | | | | | | | | | 0 |
| | REGISTERED NURSE | | | | | | | | | | | 0 |
| | MED TRANSCRIBER | | | | | | | | | | | 0 |
| | OFFICE TECH | 0.5 | | | | | | | 0.5 | | | 0.5 |
| | TOTAL | 4.5 | 0.5 | 1.09 | 0.09 | | 0 | | 4 | 0 | 1.09 | 5.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 7

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA D | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT BCP POSITIONS | RECRUITMENT COMMENTS | 1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
| | | | | | | | | | 349 | 350 | | |
| CMF | CHIEF PSYCHIATRIST | 2 | 1 | | | has been transferred to CCWF | | | | | | 0 |
| 1 MEDICAL | SR. PSYCHIATRIST | 3 | | | | | | | | | | 0 |
| 1 MEDICAL | STAFF PSYCHIATRIST | 10 | 0 | | | Dr. Adler retired 12-1-97; Pacifica 3/18/97 | | | 1.5 | 3.5 | | 5 |
| 1 MEDICAL | CHIEF PSYCHOLOGIST | 1 | 0 | | | Herdon RD 9/1 from SR psych. | | | | | | 0 |
| 2 MEDICAL | SR. PSYCHOLOGIST-SUP-SU | 2 | 1 | | | Herdon to chief 9/1; interviews beginning of Dec. | | | 1 | 3 | | 4 |
| | PSYCHOLOGIST, CL | 18.5 | 0 | | | Jomrey RD 1-7-97; Brener 1-20-97 RD | | | 0.5 | 3 | | 3.5 |
| | SUP. PSYCH-SOC. WKER | 3 | | | | | | | | | | 0 |
| 5 MEDICAL | PSYCH. SOCIAL WKER | 24 | 0 | | | Williams left 12/31/96; Ali RD 9/1; Jee to SOL 9/2; Bosler RD 10/6/97 | | | 2 | 6.5 | | 8.5 |
| | SR OCC THERAPIST | 1 | | | | | | | | | | 0 |
| | REC THERAPIST | 3 | | | | | | | | 3 | | 3 |
| | PSYCH TECH | 15 | 0 | | | Springer retired 12-30-96 | | | | 9.5 | | 9.5 |
| | SR. MTA | 1 | | | | | | | | | | 0 |
| | MTA | 17.6 | 0.6 | | | 0.6 in salary savings | | | | | | 0 |
| 1 SRN & 1 SPN | SUPERVISING NURSE | 2 | | | | | | | | | | 0 |
| | REGISTERED NURSE | 5 | | | | | | | | 6.5 | | 6.5 |
| | ASSOC INFO SYS ANAL | 1 | | | | | | | | | | 0 |
| | HEALTH REC. TECH. | 1 | | | | | | | | | | 0 |
| | STDS & COMP. COORD | 1 | | | | | | | | | | 0 |
| | HLTH PROG COORD | 1 | | | | | | | | | | 0 |
| | AGPA | 1 | | | | | | | | | | 0 |
| | MED TRANSCRIBER | 5 | 1 | | | Sato lateral transfer 9/19; interviews beginning of Dec. | | | | | | 0 |
| | OFFICE TECH | 1 | 0 | | | Phillips RD 7/19/97 | | | 1 | 3 | | 4 |
| | OFFICE ASSISTANT | 7 | | | | | | | | | | 0 |
| 9 MEDICAL | TOTAL | 126.1 | 3.6 | 0 | 0 | | | 0 | 6 | 38 | 0 | 44 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 8

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA D — SOLANO**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 5 | 499 | 0 | | |
| CHIEF PSYCHIATRIST | | | 1 | 0 | Dillon | | | 1 | | | 1 |
| STAFF PSYCHIATRIST | 1 | 1 | 1 | 0 | RD pending lateral from CMF-DMH--declined; interviews beginning of Dec. | | 0.5 | 1 | | | 1.5 |
| SR. PSYCHOLOGIST-SUP | | | 1 | 0 | Michael Vasquez (10-1); Horn leaving state service 10/30 | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | 1 | 1 | 2 | 0 | Drs Thiessen, Swimmer (10-28 RD); Horan left state service 11/97; interviews pending | | 1 | 1 | | | 2 |
| PSYCH. SOCIAL WRKR | | | 4 | 0 | Lough & Jee Rd 9/8; MilesRd 10/8/97; Wiseman lateral 1/1/98 | | 0 | 3 | | | 3 |
| REC THERAPIST | | | 1 | 0 | Julie Ramirez RD 2/24/97 | | 0.5 | | | | 0.5 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) JoHelen Williams RD:2-3-97 | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | 1 | 0 | Wade | | | 1 | | | 1 |
| REGISTERED NURSE | | | 2 | 0 | Williams (SVSP-11-4 RD); Angeles trans. from medical 2/24 | | 3 | | | | 3 |
| MED TRANSCRIBER | | | 1 | 0 | D Hyatt (10-15 RD); originally set up as 1.5 w/0.5 to be reclassed to OT | | | 1 | | | 1 |
| OFFICE TECH | | | 2.5 | 0.5 | Wyatts RD 12/1 | | | 1.5 | | | 2.5 |
| TOTAL | 2 | 2 | 17.59 | 1.59 | | | 9 | 7.5 | 0 | 1.09 | 17.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: D**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS (6) | CCCMS (499) | EOP (0) | AD SEG (0) | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **SD** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | 1 | 0 | | | Litweiler to staff 7/31; Ponath RD 11/3 | | 1 | | | | 1 |
| STAFF PSYCHIATRIST | 5 | 0 | | | Hoff 3/3/97; Levine left 3/1/97; Gibbs RD 7/28 from SVSP; Litweiler from Chief 7/31 | 2.5 | 1 | 1.5 | | | 5 |
| SR PSYCHOLOGIST-SUP | 1 | | | | | | 1 | | | | 1 |
| PSYCHOLOGIST-CL | 10 | 2.2 | | | Tyler no license;Ishida retired 9/10; Robinson RD 11/17; 2 pos. frozen-coming from boot camp | 6.5 | 1 | 1 | | | 8.5 |
| PSYCH SOCIAL WKR | 1 | | 2 | 1 | Osteras RD 1-5-97, left 2/6; RD 4/30;Mims RD 5/27 | | 1 | 3 | | | 3 |
| REC THERAPIST | | | | | | | 1 | | | | 1 |
| PSYCH TECHNICIAN | 0 | | 1.09 | 0.09 | (See Note Below) Kulji RD 4/14/97 | | | | | 1.09 | 1.09 |
| CORRECTIONAL COUNS II | 1 | | | | | | | | | | 0 |
| CORRECTIONAL COUNS I | 1 | | | | | | | | | | 0 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | 0 | | | | | | | | | | 0 |
| REGISTERED NURSE | 1 | 0 | | | | | 3 | | | | 3 |
| MED TRANSCRIBER | | | | | interviews pending--combined with medical | | 1 | | | | 1 |
| OFFICE TECH | 1 | | 0.5 | 0 | Joan Long (RD; 10-31-96) | | 1 | 1.5 | | | 2.5 |
| OFFICE ASSISTANT | 1 | 0 | | | Dasalla RD 6/2 | | | | | | 0 |
| **TOTAL** | 22 | 2.2 | 3.59 | 1.09 | | 9 | 10 | 8 | 0 | 1.09 | 18.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 10

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA D**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 249 | 0 | | |
| **DVI** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | 1.5 | 0.5 | | | .5 moved to full time now have .5 vacant--reclassing to Sr. psychologist | | | | | | 0 |
| SR. PSYCHIATRIST-SPEC | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 1 | 0 | | | Tandinco 3/3/97 | | | 1 | | | 1 |
| SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | 5 | 1 | | | Sussman & Hedblad RD 2-10-97; Van Cleve retired 5/27; upgrading to chief--607 to accounting | 3.5 | | | | | 3.5 |
| PSYCH. SOCIAL WKR | | | 1.5 | 0 | Ron Martin (0.5); E Steward (1.0 LT) | | | 1.5 | | | 1.5 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Elaina Cabrera | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| **MEDICAL** | | | | | | | | | | | |
| MED TRANSCRIBER | 1 | 0 | | | Thea D' Angelo tran. from MCSP RD 3/3/97 | 1 | | | | | 0 |
| OFFICE TECH | 0.5 | 0 | | | Adding fractions to make 1.0 (have approval); DeArmond RD 9/8 | | | 0.5 | | | 0.5 |
| **TOTAL** | 10 | 1.5 | 2.59 | 0.09 | | 4.5 | | 4 | 0 | 1.09 | 9.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 11

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA E**

**PVSP**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 5 | 349 | 0 | | |
| CHIEF PSYCHIATRIST | | | | | 0.5 to be redirected from Sr. Psychologist and 0.5 from DVI (pending) | | | 1 | | | 1 |
| STAFF PSYCHIATRIST | 2 | 2 | 1 | 0.5 | tours scheduled | | 0.5 | 1 | | | 1.5 |
| SR. PSYCHOLOGIST-SUP | 1 | | 1 | | | | | 1 | | | 1 |
| SR. PSYCHOLOGIST, CL | 2.5 | 0.5 | | | trying to reclass to a psych social worker--says it has been approved | | 1 | | 0.5 | | 1.5 |
| PSYCH. SOCIAL WKR | 2 | 0 | | | Franco RD 5/1/97 | | | 2 | | | 2 |
| REC THERAPIST | | | 0.5 | 0.5 | using someone from COR in the blanket | | 0.5 | | | | 0.5 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Cynthia Hall RD 11-1-96 | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | 1 | | | 1 |
| REGISTERED NURSE | 1 | | | | | | | 3 | | | 3 |
| MED TRANSCRIBER | | | | | | | | 1 | | | 1 |
| OFFICE TECH | 0.5 | | | | | | | 1 | 0.5 | | 1.5 |
| TOTAL | 9 | 2.5 | 2.59 | 1.59 | | | 5 | 9 | 0.5 | 1.09 | 15.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 12

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: E**

| | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE | | 16 | 399 | 104 | | |
| CORC. | CHIEF PSYCHIATRIST | 1 | 0 | | | Dr. Michael moved up to chief 3/1/97 | | | | 1 | | 1 |
| | STAFF PSYCHIATRIST | 3.5 | 1.5 | | | Thein left 7/21; Dr. Choo 4/28; Burkeson RD 9/8/97; interviews 10/6 cand. declined; starting o... | | 1 | 1.5 | 1 | | 3.5 |
| | SR. PSYCHOLOGIST-SUP | 2 | | | | | | | 1 | 1 | | 2 |
| | PSYCHOLOGIST, CL. | 7 | 0 | | | Cheryl Dirkson | | 2 | | 4 | | 6 |
| 1 IN MED | PSYCH. SOCIAL WKR. | 6 | 1 | | | Seykora 12-10 RD; Pasquira RD 1-21—went to medical 9/26/97; Filak RD 12/2 | | 2 | 2 | 1 | | 5 |
| | REC THERAPIST | 2 | | | | | | 1 | 1 | | | 2 |
| | PSYCH. TECH. | 3.2 | 0.2 | 1.09 | 0.09 | (See Note Below) B. Cox (12-16 RD); not going to fill fraction (.2) | | | 3 | | 1.09 | 4.09 |
| | MTA | | | | | | | | | | | 0 |
| 7 IN MED | SUPERVISING NURSE | 1 | 1 | | | Vermillion left 10/14; interviews 11/21 & 12/1 | | 1 | | | | 1 |
| | REGISTERED NURSE | 10 | 2 | | | Montalvo left 7/21; Reyes left 7/31 to OT; selection pending | | 8 | | 2 | | 10 |
| | MED TRANSCRIBER | 2.5 | 0 | | | Gibson left 7/7 for Porterville Dev. Center; Reyes RD 7/31 | | 1 | 0.5 | 1 | | 2.5 |
| | OFFICE TECH | 2.5 | 0 | | | | | 1 | 1.5 | | | 2.5 |
| | TOTAL | 40.7 | 5.7 | 1.09 | 0.09 | | | 17 | 10.5 | 11 | 1.09 | 39.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 13

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA E**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 449 | | | |
| **ASP** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 1 | | 1 | | Recruiting;Dr. Bernstein retired 2-8-97); advertising in Goldenrod | | | 1 | | | 1 |
| SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | 1 | 0 | | | | | | 1 | | | 1 |
| PSYCH. SOCIAL WKR | 2.5 | 0.5 | | | Beth Crews (11-12 RD), left 2/11/97 | | | 2.5 | | | 2.5 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below);Alvina Oseguera (9-16 RD) | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | 0.5 | 0 | | | | | | 0.5 | | | 0.5 |
| OFFICE TECH | 0.5 | 0 | | | (Tammy Tollen) | | | 0.5 | | | 0.5 |
| **TOTAL** | 6.5 | 1.5 | 1.09 | 0.09 | | 0 | 0 | 6.5 | 0 | 1.09 | 7.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA F**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | BEDS | CCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 499 | | | |
| **CTF** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | |
| STAFF PSYCHIATRIST | 2.5 | 1 | | | Welcher (10-7; went fulltime from 0.5); Reichardt to .5 10/31 | | | | | | 0 |
| SR. PSYCHOLOGIST-SUP | | | | | | | | 1 | | | 1 |
| **2-MED** | | | | | | | | | | | |
| PSYCHOLOGIST, CL | 2 | 0 | | | | | | 1 | | | 1 |
| PSYCH. SOCIAL WKR | | | 3 | 1 | reclassing all 3 to psycholog.; hiring psychol.; Davis RD 8/18; Zmoeting RD 9/15; being reclass- | | | 3 | | | 3 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Chante Journet-Garcia (12-9 RD) | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | 0 |
| OFFICE TECH | | | 1.5 | 0.5 | interviewed; declined | | | | 1.5 | | 1.5 |
| TOTAL | 4.5 | 1 | 5.59 | 1.59 | | | | 7.5 | 0 | 1.09 | 8.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Coc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

PAGE 15

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: F.**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **SVSP** | | | | | **Working on budget to identify salary savings, no hiring until finished.** | | 10 | 349 | 162 | | |
| CHIEF PSYCHIATRIST | | | 1 | 0 | Wilcox (7-1 report date) | | | | 1 | | 1 |
| STAFF PSYCHIATRIST | 1 | 0 | 3 | 1.5 | Preece, Kiana, Gibbs, Farr (0.5); Gibbs to SQ 7/28; recruiting Vicran | | 1 | 1.5 | 1.5 | | 4 |
| SR. PSYCHOLOGIST-SUP | | | 2 | 0 | Sexton (7-31); Oliver (7-1) | | | 1 | 1 | | 2 |
| PSYCHOLOGIST, CL | | | 2.5 | 0.5 | Crowder (7-15); Davis to CTF 8/18; Delahunt RD 10/20/97; Zika RD 11/24 | | | 0.5 | 1 | | 2.5 |
| PSYCH. SOCIAL WKER | | | 5 | 1 | Crooker, Ceyzvk; Hulsey RD 3/3/87/Hasherni RD 12/8 | | 1 | 2 | 3 | | 6 |
| REC THERAPIST | | | 2 | 0 | | | | | 1 | | 2 |
| PSYCH TECHNICIAN | | | 5.09 | 0.09 | (See Note Below)Rhea, Barrett, Williams, & Gutierrez RD 12-2; King RD 4/7 | | 1 | | 4 | 1.09 | 5.09 |
| MTA | | | 0 | 0 | | | | | | | 0 |
| SRN II | | | 1 | 0 | Reclassed from RN--RD 3/10/97 | | | | 1 | | 1 |
| SRN I | | | 1 | 1 | Dorrell RD 12/7/97 | | 1 | | | | 1 |
| REGISTERED NURSE | | | 5.61 | 3.61 | Justice 12/5/4inh RD 9/2; now looking at statewide ranks 4-5 | | 6 | | 3 | | 8 |
| MED TRANSCRIBER | | | 1 | 0 | | | 1 | | | | 1 |
| OFFICE TECH | | | 3.6 | 0.6 | Garcia-Trevino; Samano; Detra Phillips RD 12-16-96;working on combining fractions | | 1 | 1 | 2 | | 4 |
| **TOTAL** | 1 | 0 | 32.8 | 8.3 | | | 13 | 6 | 16.5 | 1.09 | 36.59 |

*1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE*

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 16

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: G**

| Area | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | FY 1996/97 VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS (5) | CCCMS (599) | EOP (430) | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMC | ASS'T SUPT-PSYCHIATRIST | 1 | | | | | | | | | | 0 |
| | CHIEF PSYCHIATRIST | 2 | | | | | | 1 | | | | 1 |
| | SR. PSYCHIATRIST-SUP | 1 | | | | | | | | | | 0 |
| | SR. PSYCHIATRIST-SPEC | 2 | 0 | | | | | | | | | 0 |
| | STAFF PSYCHIATRIST | 13 | | | | Myers from ASH RD 5/5/97;Becker declined; Peake RD 9/15; Interviews pending | | 0.5 | 2 | 4 | | 6.5 |
| | CH. PSYCHOLOGIST | 1 | 0 | | | Dr. Stanwyck | | | | | | 0 |
| | SR. PSYCHOLOGIST-SUP | 1 | 0 | | | | | | 1 | 4 | | 5 |
| | SR. PSYCHOLOGIST-SPEC | 3 | | | | Gannon retiring 12/26 | | | | | | 0 |
| | PSYCHOLOGIST, CL. | 14 | 3 | | | 1 position is funding something else; Rovner-declined; continous interviews | | 1 | 1.5 | 4.5 | | 7 |
| | PSYCHOLOGY ASSOC | 0 | | | | | | | | | | 0 |
| 1 IN MED | PSYCH. SOCIAL WRKR | 10.5 | 0.5 | | | FFD: 10/24; intrvws pndng;1 position reclassed to Sup. Psych Soc. Wrkr--filled with Evans 9/1 | | | 3.5 | 8 | | 11.5 |
| 1 IN MED | REC THERAPIST | 5 | 0 | | | DeJarentte RD 8/5 | | 0.5 | | 4 | | 4.5 |
| | PSYCH TECHNICIAN | 0 | | 1.09 | 0.09 | (See Note Below)  Ortega RD 5/19 | | | | 11.5 | 1.09 | 12.59 |
| | MTA | 0 | | | | | | | | | | 0 |
| MED | SUPERVISING NURSE | 2 | | | | | | 1 | | | | 1 |
| MED | REGISTERED NURSE | 9.88 | | | | | | 3 | | 8 | | 11 |
| | PHARMACY ASST | 1 | | | | | | | | | | 0 |
| | OFC SRVCS SUP | 1 | 1 | | | went to medical; planning to reclass | | | | | | 0 |
| | MNGT SVCS TECH. | 1 | | | | | | | | | | 0 |
| | STENOGRAPHER | 1 | 1 | | | | | | | | | 0 |
| | MED TRANSCRIBER | 2 | 1 | | | HOLDING; ADMINISTRATIVE ISSUE; funding Sr. med transcriber; retiring 11/1; recruiting now | | 1 | 1 | | | 2 |
| | OFFICE TECH | 0 | | | | | | | | | | 0 |
| | OFFICE ASSISTANT | 5 | 0 | | | Reclassed to HRTs; filling as LTs; being handled by Medical; Mickey, S Lock | | 1 | 1 | 4 | | 6 |
| | **TOTAL** | 76.38 | 6.5 | 1.09 | 0.09 | | | 9 | 10 | 48 | 1.09 | 68.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCL, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

MENTAL HEALTH SERVICES DELIVERY SYSTEM

HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA | | | | | | | | 1994/95, 1995/96 & 1996/97 | | | | |
| G | | | | | | | | REQUIRED STAFF & PROGRAM SIZE | | | | |
| | | EXISTING | VACANT | FY 1996/97 BCP | VACANT | | | | CRISIS | | | |
| | CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | RC | BEDS | CCOMS | EOP | AO SEG | TOTAL |
| WASCO | CHIEF PSYCHIATRIST | 1 | 0 | | | Dr. Rodriguez (10-1) | | 6 | 449 | | | 1 |
| | STAFF PSYCHIATRIST | 3 | 2 | | | Wang RD 2/4/97; 10/10 FFD --no response; Andradre left 11/1 | | 1 | 1.5 | | | 2.5 |
| | SR. PSYCHOLOGIST-SUP | 1 | | | | | | 1 | | | | 1 |
| | PSYCHOLOGIST, CL | 8 | 2 | 1 | 1 | 1 147 letters out 10/17; FFD 10/27--no response; Atkins resigned 11/20 | 9 | 1 | 1 | | | 11 |
| | PSYCH ASSOCIATE | 1 | | | | | | | | | | 0 |
| | PSYCH. SOCIAL WKR | 1 | | | 1.5 | 1.5 Larique RD 10/14 .; 5 declined | | | 2.5 | | | 2.5 |
| | REC THERAPIST | 1 | 0 | 1.5 | | Keenan (lat from porterville hos.) RD 3/10 | | 1 | | | | 1 |
| | PSYCH TECH | | 0 | 1.09 | 0.09 | (See Note Below) J Stuart (9-16) | | | | | 1.09 | 1.09 |
| | SR. MTA | 0 | | | | | | | | | | 0 |
| | MTA | 0 | | | | | | | | | | 0 |
| | SUPERVISING NURSE | 1 | | | | | | 1 | | | | 1 |
| | REGISTERED NURSE | 3 | | | | | | 3 | | | | 3 |
| | MED TRANSCRIBER | 1 | | | | | | 1 | | | | 1 |
| | OFFICE TECH | 1 | | | | | | 1 | 1.5 | | | 2.5 |
| | OFFICE ASSISTANT | 3 | | | | | | | | | | 0 |
| | TOTAL | 25 | 4 | 3.59 | 2.59 | | 9 | 10 | 7.5 | | 1.09 | 27.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 18

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: G**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 5 | | 449 | | | |
| **NKSP** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | 1 | 1 | | | Cummings stepped down 3/14 | | 1 | | | | 1 |
| STAFF PSYCHIATRIST | 1.5 | 1 | 0.5 | 0.5 | Contracting w/ASH for two 0.5; R Berkson RD1-2-97--left 9/5/97; Cummings 12/2 RD | | 0.5 | 1.5 | | | 2 |
| SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | 8 | 4 | 1 | 1 | 7 dd ret pri Icon, in one;Zachary RD 9/25;Buckart RD 9/9;Jake ret RD 11/2;Schneider HAM pending | 8 | 1 | 1 | | | 10 |
| PSYCH. SOCIAL WKER | 0 | 0 | 2.5 | 2.5 | Lebron & Richie RD 7/97 | | | 2.5 | | | 2.5 |
| PSYCHOMETRIST | | | | | | | | | | | 0 |
| REC THERAPIST | 0.5 | 0.5 | | | Lopez left 1/14 | | 0.5 | | | | 0.5 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Keith (10-21-96 report date) | | | | | 1.09 | 1.09 |
| SR. MTA | 0 | | | | | | | | | | 0 |
| MTA | 0 | | | | | | | | | | 0 |
| SUPERVISING NURSE | 1 | | | | | | | 1 | | | 1 |
| REGISTERED NURSE | 3 | | | | | | | 3 | | | 3 |
| MED TRANSCRIBER | 1 | | | | | | | 1 | | | 1 |
| OFFICE TECH | 1 | 0 | 0.5 | 0.5 | On Hold; reclassing to medical for CTC | | 1 | 1.5 | | | 2.5 |
| OFFICE ASSISTANT | 1 | 0 | | | C Singleton | | | | | | 0 |
| **TOTAL** | 19 | 6.5 | 5.59 | 2.59 | | 8 | 9 | 7.5 | | 1.09 | 25.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 19

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

### THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
### AND
### PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: H**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 8 | 349 | 149 | | |
| **CSP-LA** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | 1 | | | | | | | | | | 1 |
| STAFF PSYCHIATRIST | 2.5 | 0 | 1.5 | | 0 Lupi RD 1/21LT; Thein list. from Corci RD 4/28 | | | 1.5 | 1.5 | | 4 |
| SR. PSYCHIATRIST-SUP | 1 | | 1 | | 0 Dr Walsh | | | 1 | | | 2 |
| PSYCHOLOGIST, CL | 1.5 | 0 | 1 | | 0 Schroeder to 0.5; Kalivist-2-3/97 RD left 6/97;TaylorRD 7/1/97; reclassed to PT and filled | | | 0.5 | 1 | | 1.5 |
| PSYCH. SOCIAL WKER | 2 | 0 | 3 | | 1 Moore RD 4/7; Bounville RD 8/5;Anderson leaving; 2 hires pending approval & HAM | | | 2 | 3 | | 5 |
| REC.THERAPIST | 1 | | | | Bergman left 7/97; ordered statewide list--no interest | | | | 1 | | 2 |
| PSYCH TECH | | | 4.09 | | 0.09 See Note Below; Cerda (12-23 RD): R. Flemons & C. Leyvor (RD 2/15) | | | | 4 | 1.09 | 5.09 |
| SR. MTA | 0 | | | | | | | | | | 0 |
| MTA | 0 | | | | | | | | | | 0 |
| SUPERVISING NURSE | 1 | | | | 1 | | 1 | | | | 1 |
| REGISTERED NURSE | 4 | | 2 | | 1 Rohstein & Pajo RD 2/18 left;Palais RD 8/18/97; declined because LT; holding for new list | | 4 | | 2 | | 6 |
| MED TRANSCRIBER | 1 | | | | 1 | | 1 | | | | 1 |
| OFFICE TECH | 1.5 | 1 | 2.5 | | 0.5 Hines left 6/1; Wilson to medical;Carranza RD 8/18/97; selection pending approval | | 1 | | 2 | | 4 |
| **TOTAL** | 16.5 | 1 | 16.09 | | 3.59 | | 11 | 6 | 14.5 | 1.09 | 32.59 |

Note: H has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 20

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: H**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | 1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
| **CCI** | | | | | | | 399 | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| SR. PSYCHIATRIST-SPEC | 1 | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 0.5 | 0 | | | Dr Peter King; report date 8-26 | | | 1.5 | | | 1.5 |
| SR. PSYCHOLOGIST | 1 | | | | | | | 1 | | | 1 |
| **1 MED** | | | | | | | | | | | |
| PSYCHOLOGIST, CL | 4.5 | 0 | | | 3/12 Biseda left; Rubonawist to WSP 3/25; Garrison RD 7/1; RD 10/13 Smith | 3.5 | | 1 | | | 4.5 |
| PSYCH. SOCIAL WKR | 2 | | | | | | | 2 | | | 2 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | 0.09 (See Note Below); Gina Gutierrez (9-9 report date); Avila RD 11/3 for new position | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | 1.5 | 0 | | | | | | | | | 0 |
| MED TRANSCRIBER | 1 | | | | Leon RD 11/3 | 1 | | 0.5 | | | 1.5 |
| **1 MED** OFFICE TECH | 1 | | | | | | | 1 | | | 1 |
| OFFICE ASSISTANT | 0 | | | | | | | | | | |
| **TOTAL** | 11.5 | 0 | 1.09 | 0.09 | | 4.5 | 0 | 7 | 0 | 1.09 | 12.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 21

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

### THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
### AND
### PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA | | | FY 1996/97 | | | | 1994/95, 1995/96 & 1996/97 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | EXISTING | VACANT | BCP | VACANT | | | REQUIRED STAFF & PROGRAM SIZE | | | | |
| | | | | | | | | | CRISIS | | | |
| | CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | RC | BEDS | CCOMS | EOP | AD SEG | TOTAL |
| CIM | | | | | | | | 10 | 499 | 0 | | |
| RC | CHIEF PSYCHIATRIST | 1 | 1 | | | 8/1: Dr. Wyman to CMO; interviews 9/25—2 cands—cancelled—reschedule pending | | 1 | | | | 1 |
| RC | SR. PSYCHIATRIST-SPEC | 1 | 0 | | | Dr. Carlin to Patton; Knapke RD 5/19 | | | | | | 0 |
| 1 RC, 1 MED | STAFF PSYCHIATRIST | 4.5 | 0.5 | | | Dr Eskridge to FT; Bosha left 6/25;Brown RD 9/2/97 | | 1 | 1 | | | 2 |
| MED | CHIEF PSYCHOLOGIST | 1 | | | | | | | 1 | | | 0 |
| RC | SR. PSYCHOLOGIST-SUP | 2 | 0 | | | Howell retire 4/11; Jordon RD 5/20/97 | | | 1 | | | 1 |
| 4 RC, 2 MED | PSYCHOLOGIST, CL | 12.5 | 2 | | | Webb RD 7/14;Olsen RD 9/29;Bell RD 10/1;.1 pending upgrade to sprvcr; interviews 11/24-15 cands. | 10.5 | 1 | 1 | | | 12.5 |
| 3 IN MED | PSYCH. SOCIAL WRKR | 5 | 0 | | | Amajoy RD 9/29 | | 1 | 3 | | | 4 |
| 1 IN MED | REC THERAPIST | 2 | 0 | | | Lonnie Robinson (12.2 report date);Wells RD 7/1 | | 1 | | | | 1 |
| | PSYCH TECH | 0 | | 1.09 | 0.09 | (See Note Below) Hardy RD 3/3/97 | | | | | 1.09 | 1.09 |
| | SR. MTA | 0 | | | | | | | | | | 0 |
| | MTA | 0 | | | | | | | | | | 0 |
| MED | SUPERVISING NURSE | 1 | | | | | | 1 | | | | 1 |
| 4 IN MED | REGISTERED NURSE | 5 | 0.5 | | | interviews 5/8; selection pending—declined; interviews again 8/17—no one wanted .5 | | 5 | | | | 5 |
| | MED TRANSCRIBER | 3.5 | 0 | | | J Burnett RD 10/1/96; Bateman RD 10/1/97 | 1 | 1 | 0.5 | | | 2.5 |
| | OFFICE TECH | 1.5 | 0 | | | Lori Romero declined;Gonzales RD 11/3 | | 1 | 1.5 | | | 2.5 |
| | OFFICE ASSISTANT | 0 | | | | | | | | | | 0 |
| | TOTAL | 40 | 4 | 1.09 | 0.09 | | 11.5 | 13 | 8 | 0 | 1.09 | 33.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 22

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA | | | | | | | | 1994/95, 1995/96 & 1996/97 | | | | | |
| 1 | | | | | | | | REQUIRED STAFF & PROGRAM SIZE | | | | | |
| | | EXISTING | VACANT | FY 1996/97 | VACANT | | | | | | | CRISIS | | |
| | CLASSIFICATION | POSITIONS | POSITIONS | BCP POSITIONS | POSITIONS | RECRUITMENT COMMENTS | | RC | BEDS | CCCMS | EOP | AD SEG | TOTAL |
| | | | | | | | | | | 299 | | | |
| CRC | CHIEF PSYCHIATRIST | | | | | | | | | | | | 0 |
| | SR. PSYCHIATRIST-SPEC | 1 | 0 | | | Shannon RD 7/1/97 | | | | | | | 0 |
| | STAFF PSYCHIATRIST | | | | | | | | | 0.5 | | | 0.5 |
| | SR. PSYCHOLOGIST-SUP | 1 | | | | | | | | 0.5 | | | 0.5 |
| | SR. PSYCHOLOGIST-SPEC | 1 | | | | | | | | | | | 0 |
| • | PSYCHOLOGIST, CL | 2 | 1 | | | Levy RD 11/3; second cand declined | | 2.5 | | | | | 2.5 |
| | PSYCH. SOCIAL WKER | 1 | | | | thinks they lost this position | | | | 1 | | | 1 |
| | REC THERAPIST | | | | | | | | | | | | 0 |
| | MTA | | | | | | | | | | | | 0 |
| | SUPERVISING NURSE | | | | | | | | | | | | 0 |
| | REGISTERED NURSE | | | | | | | | | | | | 0 |
| | SR. MED TRANSCRIBER | | 1 | | | | | | | | | | 0 |
| | MED TRANSCRIBER | | 1 | | | | | | | | | | 0 |
| | OFFICE TECH | 1 | | | | | | | 0.5 | | 0.5 | | | 1 |
| | TOTAL | 8 | 1 | 0 | 0 | | | 3 | 0 | 2.5 | 0 | | 5.5 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sec, or Corc

PAGE 23

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: J**

| | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCOMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 10 | 349 | 150 | | |
| RJD | CHIEF PSYCHIATRIST | 1 | 0 | | | Katz RD 11/3/97 | | 1 | | | | 1 |
| 1 RC, 2 MED | STAFF PSYCHIATRIST | 5.5 | 0.5 | | | Nuñoy RD 5/7; interview 8/18;recruiting in community | | 1 | 2 | 1.5 | | 4.5 |
| | SR. PSYCHOLOGIST-SUP | 1 | | 1 | | 607 came back LT rather than PERM-- under investigation; with Roger H.*** | | | 1 | 1 | | 2 |
| 3 RC, 1 MED | PSYCHOLOGIST, CL | 7.5 | 0 | | | Tracy Alderman (10-31 RD) | 5 | 1 | 0.5 | | | 6.5 |
| | SUP PSYCH SOC WKRR | 1 | 1 | | | reclassed to psych social worker but it came back LT instead of PERM--investigating *** | | | | | | 0 |
| | PSYCH. SOCIAL WKRR | 4 | 0 | | | D Mitchell 1-6-97 | | 1 | 2 | 3 | | 6 |
| | PHARMACIST | 1 | | | | | | | | | | 0 |
| | REC THERAPIST | 1 | | | 1 | Johnson-Comier RD 3/1/97; new list--letters out 11/21 | | | | 1 | | 2 |
| | PSYCH TECH | 0 | 0 | 5.09 | 0.09 | (See Note Below)Morton, Donnelly,Flores & Felardi; all looking because not perm. Avila to CO 11/3 | | | | 4 | 1.09 | 5.09 |
| | CHSA | 1 | | | | | | | | | | 0 |
| | HLTH RECORDS TECH | 1 | | | | | | | | | | 0 |
| | SUPERVISING NURSE | 1 | | | | | | | | 1 | | 1 |
| | REGISTERED NURSE | 6 | | 2.22 | 0.22 | Laudnica RD 9/1/97; Marquez 12/96 | | 5 | | 2 | | 7 |
| 1 RC | MED TRANSCRIBER | 3 | | | | | 1 | | | | | 2 |
| | OFFICE TECH | 2 | 1 | 1 | 1 | Englehorne left 9/24 for perm position in community; letters out 10/15; interviews 11/19 | | 1 | 1 | 2 | | 4 |
| | TOTAL | 36 | 2.5 | 10.31 | 2.31 | | 6 | 13 | 6.5 | 14.5 | 1.09 | 41.09 |

*1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE*

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/28/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA J | | EXISTING | VACANT | FY 1996/97 BCP | VACANT | | 1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | CRISIS | | | | | |
| ISP | CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | RC | BEDS | CCCMS | EOP | AD SEG | TOTAL |
| | | | | | | | | 5 | <50 | | | |
| | CHIEF PSYCHIATRIST | | | 1 | 0 | Dr. Richard May (RD 1-8-97) | | 1 | | | | 1 |
| | STAFF PSYCHIATRIST | | | 1 | 0 | Stockdale RD 10/20 | | 0.5 | 0.5 | | | 1 |
| | SR. PSYCHOLOGIST-SUP | | | | | | | | | | | 0 |
| | PSYCHOLOGIST, CL | 1 | 0 | 0.5 | 0.5 | .5 Debux declined, 1.0 Tweety RD 5/16 | | 1 | 0.5 | | | 1.5 |
| | PSYCH. SOCIAL WRKR | | | | | | | | | | | 0 |
| | REC THERAPIST | | | 0.5 | 0.5 | cert ordered 6/2/97 trying to add 0.5 to make fulltime | | 0.5 | | | | 0.5 |
| | PSYCH TECH | | | 1.09 | 0.09 | (See Note Below)  Nathan Johnson (RD 12-18) | | | | | 1.09 | 1.09 |
| | SR. MTA | | | | | | | | | | | 0 |
| | MTA | | | | | | | | | | | 0 |
| | SUPERVISING NURSE | | | 1 | 1 | Letters out:  FFD 10/20; interviews pending | | 1 | | | | 1 |
| | REGISTERED NURSE | | | 1 | 0 | Brunts 3/24/97 | | 3 | | | | 3 |
| | MED TRANSCRIBER | | | 1 | 0 | Platt (RD 1-2-97) lat from PBSP | | 1 | | | | 1 |
| | OFFICE TECH | | | 1.5 | 0.5 | Colby 4/1/97 | | 1 | 0.5 | | | 1.5 |
| | TOTAL | 1 | 0 | 8.59 | 2.59 | | | 9 | 1.5 | | 1.09 | 11.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 25

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

ARECHART.XLS
CREATED: MAY 1, 1996
REVISED:  11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA | | | FY 1996/97 | | | | | | 1994/95, 1995/96 & 1996/97 | | | | |
| J | | | BCP | VACANT | | | | | REQUIRED STAFF & PROGRAM SIZE | | | | |
| | EXISTING | VACANT | | | | | | CRISIS | | | | |
| CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | | RC | BEDS | CCOMS<br><50 | EOP | AD SEG | TOTAL |
| CAL. | | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | | | | | | | | | 0.5 | | | 0.5 |
| SR. PSYCHOLOGIST-SUP | | | | | | | | | | | | 0 |
| PSYCHOLOGIST, CL | 1 | | | | | | | | 0.5 | | | 0.5 |
| PSYCH. SOCIAL WKR | | | | | | | | | | | | 0 |
| REC THERAPIST | | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | | 0.09 (See Note Below) Pool RD 11/24 | | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | | 0 |
| OFFICE TECH | | | 0.5 | | 0.5 working on making it an interchangeble class OT/OA | | | | 0.5 | | | 0.5 |
| TOTAL | 1 | 0 | 1.59 | 0.59 | | | | 0 | 1.5 | 0 | 1.09 | 2.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 26

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA J | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS <50 | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CVSP** | | | | | | | | | | | |
| CHIEF PSYCHIATRIST | | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | | | 0.5 | 0.5 | Still recruiting; no interest to date; has contract services once a week;considering a registry | | | 0.5 | | | 0.5 |
| SR. PSYCHOLOGIST-SUP | | | | | | | | | | | 0 |
| PSYCHOLOGIST, CL | | | 0.5 | 0 | Hansick (11-4 RD) | | | 0.5 | | | 0.5 |
| PSYCH. SOCIAL WRKER | | | | | | | | | | | 0 |
| REC THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) David Warden (RD 1-21-97) | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | 0 |
| OFFICE TECH | | | 0.5 | 0.5 | working on adding another .5 and making a med. transcriber | | | 0.5 | | | 0.5 |
| **TOTAL** | 0 | 0 | 2.59 | 1.09 | | | 0 | 1.5 | 0 | 1.09 | 2.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 27

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA J | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | | 1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | RC | CRISIS BEDS | CCCMS <50 | EOP | AD SEG | TOTAL |
| | | | | | | | | 4 | | | | |
| CENT. | CHIEF PSYCHIATRIST | | | 1 | 0 | Alan Abrams (RD 1-2-97) | | | 1 | | | 1 |
| | STAFF PSYCHIATRIST | 1 | 0.5 | | 0 | Antwerp 8/1/96 RD--left; filled .5 with Davis | | 0.5 | 0.5 | | | 1 |
| | SR. PSYCHOLOGIST, SUP | | | | | | | | | | | 0 |
| | PSYCHOLOGIST, CL | | | 1.5 | 1 | Rivers RD 9/16/97; letters out | | 1 | 0.5 | | | 1.5 |
| | PSYCH. SOCIAL WKR | | | | | | | | | | | 0 |
| | REC THERAPIST | | | 0.5 | 0 | RD 6/1/1997 | | | 0.5 | | | 0.5 |
| | PSYCH TECH | | | 1.09 | 0.09 | (See Note Below)/Ferra RD 5/5/97 | | 0.5 | | | 1.09 | 1.09 |
| | SR. MTA | | | | | | | | | | | 0 |
| | MTA | | | | | | | | | | | 0 |
| | SUPERVISING NURSE | | | 1 | 0 | Wolfe RD 1-22-97-- to CIW; Valenzuela RD 9/16 | | 1 | | | | 1 |
| | REGISTERD NURSE | | | 1 | 0 | Sullivan RD 5/27/97 | | 3 | | | | 3 |
| | MED TRANSCRIBER | | | 1 | 0 | Beato RD 9/16/97 | | 1 | | | | 1 |
| | OFFICE TECH | 1 | | 1.5 | 0.5 | Lopez RD 3/3/97/very happy with Lopez); looking at reclassing to interchangable class | | 1 | 0.5 | | | 1.5 |
| | TOTAL | 1 | 0.5 | 8.59 | 1.59 | | 0 | 9 | 1.5 | | 1.09 | 11.59 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

SERVICE AREA K

| RC | CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 6 | 199 | 34 | | |
| CW | CHIEF PSYCHIATRIST | 6 | | | | | | | | | | 0 |
| | SR. PSYCHIATRIST-SUP | 1 | 1 | | | Ponath leaving 11/1 | | | | | | 0 |
| 1-RC | STAFF PSYCHIATRIST | 4.7 | 0.7 | | | Knapke to CIM; selection pending | | | 1 | 0.5 | | 1.5 |
| | SR. PSYCHOLOGIST-SUP | 2 | 0 | | | D Martin interviews 10/2; McAloon RD 10/31 | | | 1 | 1 | | 2 |
| 2-RC | PSYCHOLOGIST, CL | 6.8 | 1.15 | | | Urbank (7-11)-Lee RD 5/12/97; fractional not being filled: Lamera RD 9/15; Webb not pass prob. | 1.5 | 1 | 1 | 0.5 | | 2.5 |
| | PSYCH. SOCIAL WKER | 2.6 | 0.1 | | | NO RECRUITMENT | | 1.5 | 1.5 | 0.5 | | 2 |
| | REC THERAPIST | 0 | | | | | | 1 | | | | 0 |
| RC | NURSE PRACTITIONER | 1 | 0 | | | X. Lago RD 2/18/97 | | 1 | | 1 | | 1 |
| | PSYCH TECH | 0 | | 1.09 | 0.09 | (See Note Below) Bertran left 5/30/97;Buchowieck RD 9/15 | | | 0.5 | 1.09 | | 1.59 |
| | MTA | 1.4 | 0.4 | | | NO RECRUITMENT | | 1 | | | | 0 |
| | SUPERVISING NURSE | 0 | | | | | | 1 | | | | 0 |
| | REGISTERED NURSE | 6 | | | | | | 3 | | 1 | | 1 |
| | MEDICAL SECRETARY | 1 | | | | | | | | | | 0 |
| MED | SR. MED. STENO. | 1 | | | | | | | | | | 0 |
| | MED TRANSCRIBER | 2 | 0 | | | Flores- Cerrillo RD 5/12/97 | | 3 | 1 | | | 1 |
| | OFFICE TECHNICIAN | 1 | | | | | | | 0.5 | 1 | | 0.5 |
| | TOTAL | 31.5 | 3.35 | 1.09 | 0.09 | | 1.5 | 10 | 5 | 5.5 | 1.09 | 13.09 |

1994/95, 1995/96 & 1996/97 REQUIRED STAFF & PROGRAM SIZE

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 29

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| SERVICE AREA | | | | FY 1996/97 | | | | | 1994/95, 1995/96 & 1996/97 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K | | | | | | | | | REQUIRED STAFF & PROGRAM SIZE | | | | | |
| | | EXISTING | VACANT | BCP | VACANT | | | | | CRISIS | | | | |
| | CLASSIFICATION | POSITIONS | POSITIONS | POSITIONS | POSITIONS | RECRUITMENT COMMENTS | | RC | BEDS | CCCMS | EOP | AD SEG | TOTAL |
| CRC | | | | | | | | | | 99 | | | |
| (WOMEN) | CHIEF PSYCHIATRIST | | | | | | | | | 0 | | | 0 |
| | STAFF PSYCHIATRIST | | | | | | | | | 0 | | | 0.5 |
| | SR. PSYCHOLOGIST-SUP. | | | | | | | | | 0.5 | | | 0.5 |
| | PSYCHOLOGIST, CL | | | | | | | | | 0 | | | 0 |
| | PSYCH. SOCIAL WRKR | | | | | | | | | 0.5 | | | 0.5 |
| | REC THERAPIST | | | | | | | | | 0 | | | 0 |
| | SR. MTA | | | | | | | | | 0 | | | 0 |
| | MTA | | | | | | | | | 0 | | | 0 |
| | SUPERVISING NURSE | | | | | | | | | 0 | | | 0 |
| | REGISTERED NURSE | | | | | | | | | 0 | | | 0 |
| | MED TRANSCRIBER | | | | | | | | | 0 | | | 0 |
| | OFFICE TECH | | | | | | | | | 0 | | | 0 |
| | TOTAL* | 0 | 0 | 0 | 0 | | | 0 | | 1 | | 0 | 1 |

* ALL PSYCH STAFF FOR CRC ARE LISTED IN SERVICE AREA I.

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 30

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

SERVICE AREA: L

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CCWF** | | | | | | | 12 | 299 | 75 | | |
| CHIEF PSYCHIATRIST | 1 | 1 | | | Harrison resigns 7/17; advertising and asking for new cert | | 12 | 1 | | | 1 |
| SR. PSYCHIATRIST | 0 | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | 3.5 | 1 | | | Drs Balas (v=1.0; K=0.5) 10-21-96; cert requested; interviews in Sept. Balasubrahmnian leav | 12/1 | 1 | 1.5 | 1 | | 3.5 |
| SR. PSYCHOLOGIST-SUP | 1 | 0 | | | Dr Lighty demoted 6/16/97; Hernandez 7/97 | | | | | | 0 |
| PSYCHOLOGIST, CL | 7.5 | 0.5 | | | White .5 4/1--went to NCWF; Stephens to VSPW 4/15; Lighty 6/16; Gonzalez RD 7/97 | 3.5 | 2 | 2 | 1 | | 2 |
| PSYCH. SOCIAL WRKR | 5 | 1 | | | Williams & Feline RD 7/97, working to combine two 1/2 positions | | 1 | 3 | 2 | | 7.5 |
| RECROC THERAPIST | 2 | | | | | | | | 1 | | 6 |
| PSYCHIATRIC TECH | 1 | | 1.09 | 1.09 | (See Note Below) 1 SROA; hiring package being submitted; 8 Krypstra (12-16) | | | | 1 | 1.09 | 2.09 |
| SR. MTA | 0 | | | | | | | | | | 0 |
| MTA | 0 | | | | | | | | | | 0 |
| SUPERVISING NURSE | 1 | 0 | | | Garcia RD 8/15/97 | | 1 | | | | 1 |
| REGISTERED NURSE | 7 | | | | | | 6 | | 2 | | 8 |
| MED TRANSCRIBER | 2 | 1 | | | Being reclassed to health records tech in medical | 1 | | | | | 2 |
| OFFICE TECH | 4.5 | 0 | | | White & Campos RD 6/19/97 | | 1 | 1.5 | 1 | | 3.5 |
| TOTAL | 35.5 | 4.5 | 1.09 | 0.09 | * After 7-1 contracting with Interim Physicians Group | 4.5 | 15 | 9 | 9 | 1.09 | 38.59 |

REQUIRED STAFF & PROGRAM SIZE 1994/95, 1995/96 & 1996/97

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996
AND
PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

**SERVICE AREA: L**

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCOMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NCWF** | | | | | | | | 99 | | | |
| CHIEF PSYCHIATRIST | 0.5 | | | | | | | | | | 0 |
| STAFF PSYCHIATRIST | | 0 | | | combined with psychologist to make 1.0 and hired White 8/1/97 | | | 0.5 | | | 0.5 |
| SR. PSYCHOLOGIST-SUP | | 0 | | | | | | | | | 0 |
| PSYCHOLOGIST, CL. | 1.5 | 0 | | | | | | 1 | | | 1.5 |
| PSYCH. SOCIAL WKR | 0.5 | 0 | | | Donna Connelly (10-2 RD) | 0.5 | | | | | 0.5 |
| REC THERAPIST | | | | | | | | 0.5 | | | 0 |
| PSYCH TECH | | | 1.09 | 1.09 | (See Note Below) trying to reclass .5 to OT-- denied; .59 transferred to SAC | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | 0 |
| OFFICE TECH | 0.5 | 0.5 | | | moved to medical secretary 6/1/97; hire pending warden's approval | | | 0.5 | | | 0.5 |
| **TOTAL** | 3 | 0.5 | 1.09 | 1.09 | | 0.5 | 0 | 2.5 | 0 | 1.09 | 4.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 32

ARECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

SERVICE AREA: L

VSPW

| CLASSIFICATION | EXISTING POSITIONS | VACANT POSITIONS | FY 1996/97 BCP POSITIONS | VACANT POSITIONS | RECRUITMENT COMMENTS | RC | CRISIS BEDS | CCCMS | EOP | AD SEG | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CHIEF PSYCHIATRIST | | | | | | | | 299 | | | 0 |
| STAFF PSYCHIATRIST | 3 | 1 | | | new position; selection pending | 1 | | 1.5 | | | 2.5 |
| SR. PSYCHOLOGIST-SUP | 1 | | | | | | | 1 | | | 1 |
| PSYCHOLOGIST, CL | 4 | 0 | | | Hendrixson RD 9/15; Crem RD 10/6 | 2 | | 2 | 2 | | 4 |
| PSYCH. SOCIAL WKR | 3 | 1 | | | Marie RD 2/18/97; resigned 5/2; interviews 11/20; selection pending | | | 3 | 3 | | 3 |
| REC.THERAPIST | | | | | | | | | | | 0 |
| PSYCH TECH | | | 1.09 | 0.09 | (See Note Below) Stanley Norman (10-21 RD) | | | | | 1.09 | 1.09 |
| SR. MTA | | | | | | | | | | | 0 |
| MTA | | | | | | | | | | | 0 |
| SUPERVISING NURSE | | | | | | | | | | | 0 |
| REGISTERED NURSE | | | | | | | | | | | 0 |
| MED TRANSCRIBER | | | | | | | | | | | 0 |
| OFFICE TECH | 2.5 | 0 | | | went to full time position in records 8/11/97--came back 10/16 | 1 | | 1.5 | | | 2.5 |
| TOTAL | 13.5 | 2 | 1.09 | 0.09 | | 4 | | 9 | 0 | 1.09 | 14.09 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

## HIRING AND RECRUITMENT ACTIVITY

THIS CHART REFLECTS EXISTING AND ALLOCATED POSITIONS THROUGH JUNE 30, 1996

AND

PROJECTED FISCAL YEAR 1996/97 BCP POSITIONS

| | TOTAL EXISTING POSITIONS | TOTAL VACANT POSITIONS | TOTAL FY 1996/97 BCP POSITIONS | VACANT 1996/97 POSITIONS |
|---|---|---|---|---|
| TOTAL | 666.23 | 74.35 | 179.95 | 50.45 |
| GRAND TOTALS | Existing = 846.18 | Vacancies = 124.80 | | |

| | | TOTAL REQUIRED STAFF | | | | |
|---|---|---|---|---|---|---|
| | | CMOS | | | | |
| | PC | BEOS | CCCMS | EOP | AD SEG | TOTAL |
| | 67 | 211 | 188.5 | 208 | 30.52 | 685.02 |

Note: If has Ad Seg, 0.09 Psych Tech to be redirected to CCI, Sac, or Corc

PAGE 34

PREPARED BY HEALTH CARE OPERATIONS
Linda R. Jensen

A:RECCHART.XLS
CREATED: MAY 1, 1996
REVISED: 11/26/97

Ex. C

Coleman Monitor Report: Lancaster

September 25, 26, 27, 1997

Howard Fenn, MD,

I. Administrative Segregation/ICC meeting

A.    Introduction

Warden Yarborough chaired the ICC meeting in administrative segregation. Dr. Fenn sat in on the meeting and addressed questions to inmates after staff had finished. Medical files and C-files of problematic cases were reviewed two days later. Selected inmates were interviewed separately by Coleman monitors a day later. Impressions are offered for inmates whose files were reviewed.

B.    Cases reviewed

1.    K01238

2.    H38917

3.    H40740

4.    D14430

5.    C85909

6.    E72717

7.    K32272

8.    E10045

9.    B95120

10.    C470908

11. J29677

C.    Impressions of selected cases

    1. K01238

        a.   No documentation justified either the discontinuation of elavil or the decision not to offer an antipsychotic medication.

        b.   No plan was documented to follow the patient's suicidality.

        c.   No plan was documented for alternative treatment if the trial off antidepressants were to result in an exacerbation of depression. This is of concern given the patient's potential suicidality. (A rope was found in his cell on March 29,1997.)

    2. H38917

Mental health assessment, treatment, and follow-up documented.

    3. D14430

Treatment plan documented and consistent with diagnoses.

    4. B72717

        a.   No documentation that diagnosis or target symptoms were followed to see if treatment was effective.

        b.   Despite a recent suicide attempt in August, 1997 in response to auditory hallucinations, this symptom was not addressed in ICC.

    5. J29677:

        a.   This inmate had violent outbursts, reluctance to leave his cell, an irrational fear that people were putting hairs in his food, weight

2

loss, lack of consistent improvement, and refusal of antipsychotic medications.

b.  These behaviors raised the possibility of a psychotic process and grave disability. There was no documentation that a <u>Keyhea</u> hearing for involuntary medications  was considered.

c.  The medical file contains notes of many psychiatric diagnoses, including bipolar affective disorder, major depression, delusional disorder,  schizophrenia, paranoid type, and malingering.

d.  No recommendation could be found for transfer to a secure, acute psychiatric facility, such as DMH or Psychiatry-SHU. Such a transfer would provide an assessment which would help clarify the diagnosis and build consensus among clinicians for a consistent treatment plan.

D.    <u>Impressions  of  Administrative  Segregation-ICC  Meeting</u>

1.  Efficient, well-run meeting.

2.  Psychiatric diagnoses, symptoms, medications, and treatment plans were not included in the ICC discussions yet this information might help improve decision-making in selected cases.

II.    <u>Administrative Segregation/ C³MS:  Interviews</u>

A.    <u>Introduction</u>

Dr. Fenn interviewed inmates with identified psychiatric problems in Administrative Segregation. C-files and medical files were reviewed later.

B.    <u>Cases Reviewed</u>

3

1.  O73064

2.  J96405

3.  H19015

4.  C90160

5.  C15685

C.    Impressions of selected cases

    1.  O73064

        a.  Inmate was satisfied with his psychiatric care.

        b.  Documentation showed that psychiatric treatment plan was followed.

    2.  J96405

        a.  Inmate was satisfied with psychiatric care.

        b.  Psychiatric treatment plan documented and followed.

    3.  H19015

        a.  When the inmate refused to attend IDTT, there was no documentation of a plan for follow-up. Given the severity of his mental disorder, some further exploration is needed.

        b.  Inmate was pleased with the psychiatric treatment

    4.  C90160

The diagnosis of 7/14/97 was not accompanied by a medication treatment plan consistent with it.

    5.  C15685

A very skillful initial psychotherapeutic interview was demonstrated by Dr. Taylor.

D.    Impressions  of  Administrative  Segregation

1.    Inmates satisfied with accessibility and quality of treatment.

2.    There were two cases in which diagnoses were not consistent with medications prescribed: Scott, H19015,  Salas K01238.

III. EOP/IDTT Meeting

A.    Introduction

This meeting was chaired by Dr. Sipperstein, PhD, with input from selected multidisciplinary team, including Dr. Ludi, MD and Harry Taylor PhD. Dr. Fenn sat in on this meeting on September 25, 1997 and raised questions after staff members had offered their input.

B.    Cases  reviewed

1.   J-99328:  seen for decompensation: C-file and medical file reviewed.

2.   K46008: 90 day review.

3.   K34997: 90 day review.

C.    Impressions  of individual  cases

1.   J-99328

a.  Inmate with a diagnosis of bipolar affective disorder, acute manic episode, had been decompensating at least since 9/15/97 and possibly longer.

b. It was reported that the inmate had not been eating properly, was losing weight, and had symptoms of acute mania and psychosis, all suggesting grave disability.

c. There was no indication from the medical files that a crisis bed admission or a <u>Keyhea</u> hearing had been considered.

d. The IDTT members attempted to engage this disorganized, psychotic inmate.

e. Safety concerns, however, were not discussed, such as prevention of his assaultive potential and his imminent provocative behavior towards other inmates or custody staff.

f. The inmate's condition was referred to by some members of the team as attitude, which implies a volitional quality, minimizing his acute manic condition and severe mental disorder.

g. A consensus was reached to refer the inmate to DMH. No plan was developed for his management during the waiting period.

h. The IDTT meeting reviews treatment plans for inmates with major mental disorders, of which medications are a necessary part. The meeting should be chaired by a psychiatrist, which should not limit the contributions of other mental health professionals.

i. The C-file showed a number of incidents resulting in disciplinary charges which were possibly related to untreated or under-treated manic episodes. No plan was discussed for communicating this formulation to custody.

      j.  Because of a recommendation by Dr. Fenn, the inmate was immediately admitted to a crisis bed in the infirmary.

    2.  <u>K32733</u>

    Psychiatric treatment plan documented and followed-up

IV.    <u>C³MS/IDTT Meeting</u>

A.    <u>Introduction</u>

    Chaired by Dr. Anderson; LCSW PhD, R. Agusto, MD. Dr. Fenn and Mr. Lopes observed.

B.    <u>Cases Reviewed</u>

    C22608

    D61757

    D88502

    E47777

    D66246

    E-39660

C.    <u>Impressions of individual cases</u>

    1.  <u>C22608</u>:

    Appropriate treatment plan and follow up.

    2.  <u>E47777</u>

      a.  Records do not reflect rationale for discontinuation of patient from C³MS.

7

b. There is no documentation of a system to identify relapses in this inmate with a documented chronic, episodic major mental illness. The condition will certainly recur, so that close follow-up is crucial.

V.    C³MS --B Yard/IDTT Meeting

A.    Introduction

Joyce Moore chaired; Dr. Sharone, Dr. Thien. Dr. Fenn observed the meeting.

B.    Cases Reviewed

1.  H50093

2.  E-74672

3.  31-82635

4.  J95318

C.    Impressions

1.  H50093

a. Inmate was not asked about his target symptoms of auditory hallucinations, in spite of the diagnosis of major depression with psychotic features.

b. No documentation that antipsychotic medications were offered.

c. Treatment plan not followed closely.

2.  E-74672

This inmate's self-destructive impulses were not reassessed, even though he was anxious and distressed over his unresolved bulimia.

VI.   EOP Interviews

8

A.    Introduction

Dr. Fenn and Mr. Lopes interviewed random inmates in EOP.

C-files and medical files were not reviewed.

B.    Cases reviewed

1.  K36496

2.   K14593

3.   D94272

C.    Impressions of program

Inmates generally satisfied with the psychiatric treatment.

VII.    CTC/Infirmary/IDTT

A.    Introduction

Drs. Thien and Sharone chaired the IDTT meeting. Dr. Fenn interviewed inmates on September 25 in the infirmary and reviewed their medical charts. Baron J-99328, seen in the Crisis bed was also seen during IDTT/ C$^3$MS and is reported under that section. Dr. Fenn and Mr. Lopes also visited CTC observed on September 26.

B.    Cases reviewed

1.  K55415/EOP

2.  H 18242

3.  J-99328 (reported under IDTT/ C$^3$MS Section V)

C.    Impressions of selected cases

1.  K55415/EOP

9

    a.  No documentation of alternative antimania agents offered, such

       as valproate or carbamazepine.

    b.  No documented plan for follow-up system to track patient.

2.  <u>H 18242</u>

Good documentation of a treatment plan and follow-through.

VIII.   <u>Impressions/recommendations:</u>

1.  Severe target symptoms and major psychiatric diagnoses,
    documented during meetings or evaluations, are often not
    addressed in subsequent clinical notes.  Examples include suicidality,
    auditory hallucinations, paranoid delusions in the e.g., in the case of
    <u>C90160</u>.

2.  Because previous assessments on an inmate are not followed up,
    diagnostic questions are not pursued.  According to DSM-IV, more
    severe and more specific diagnoses should generally be ruled out
    before less severe and less specific ones are considered. Yet medical
    file notes often give a less severe diagnosis when a major mental
    illness had been documented earlier.  Each clinical assessment
    appears to be made independently, without reference to previous
    assessments.

3.  Where previous assessments are not attended to, medication use is
    not consistent With the diagnosis, e.g. <u>K55415</u>.

4.  Malingering is offered as a diagnosis without documentation that
    other severe mental disorders have been ruled out.

5. Severe mental illness diagnoses are often discounted once a discipline charge occurs or once the inmate improves. Yet if criteria existed for a severe mental disorder at one point, it is unlikely that the patient would no longer have the condition.

6. The medical files rarely offer the very rational explanation that the absence of observable positive symptoms may be due in part to:

    a) adequate treatment of an acute episode (as in bipolar affective disorder);

    b) inter-episode improvement (as in bipolar affective disorder);

    c) presence of negative symptoms (as in schizophrenia);

    d) presence of residual symptoms only (as in schizophrenia); and

    e) well-encapsulated symptoms (as in paranoid schizophrenia).

7. Unfortunately, the most severely mentally disordered inmates are often given treatment plans inconsistent with their diagnosis, or diagnoses inconsistent with symptoms documented in earlier notes. Treatment plans may not include crucial antipsychotic medication or, in the case of intermittently compliant inmates, decanoate medications given by decanoate intrumuscular delivery every 2-4 weeks (Haldol or porlixin.)

8. Because of the prevalence of major mental disorders in the prison population, the need for rapid intervention is crucial. But the emergence of decompensation in mentally ill inmates is often not fully appreciated by the very professionals who should be the first to

11

recognize it and intervene. Even when custody staff has called attention to symptoms, mental health professionals may be reluctant to institute decisive measures. For example, the tools available to treat the most disabled patients may not be considered, e.g. involuntary antipsychotic medications, <u>Keyhea</u>, crisis/infirmary hospitalization, or transfer to DMH.

9. There is excessive reliance upon the formulation, if not the diagnosis, of malingering. This is often an unwritten and default explanation for cases that are puzzling. The monitors heard this formulation frequently in discussions. While malingering is a valid part of the psychiatric nosology, it should rather be the last resort, after other diagnoses have been effectively ruled out by periods observation in acute psychiatric units and adequate medication trials, or personality testing. Oftentimes, even previous adequate responses to psychiatric medications are not thoroughly considered before a malingering diagnosis is offered. Often trials of medications are withheld on the assumption of malingering.

## IX. <u>Administrative Segregation/ICC Case Notes</u>

1. <u>K01238</u>

In ICC the inmate was organized and appropriate but he expressed displeasure that his Elavil, an antidepressant, was discontinued by his doctor. He said he had been maintained on this medication and wanted a higher dose rather than a switch to hydroxyzine.

9/26/97 Interview in Ad Seg:

On Elavil for 2 years and doing well according to him. Switched to hydroxyzine 2 days ago. Wanted the Elavil reinstituted and at higher dose. Mental status reflected anxiety.

C file

    1996.       He thought of killing self; from ad seg. was admitted to central infirmary.

    4/30/96:    Dr. Pamplona found inmate meets criteria for mental health treatment

    1/14/97:    Assaulted with a slashing weapon while playing cards with other mates in north yard.

    1/16/97:    Drs. Sharone and Pamplona referred him to admin. segregation and noted that he is in C³MS.

    3/13/97:    Found to be in stable psychological condition --Pamplona and Sharone.

    3/29/97    Officer Vela conducted search and discovered a 6 foot long rope from state issue sheet. Salas stated he was a lifer in for attempted murder and felt he would be eventually killed by inmates, which they tried to do in D yard in Nov. 4/13/97: switched to another cell because he and Cellie weren't getting along. Cellie threatened that if we put Salas back into cell there would be a fight.

4/9-4/15/96:  Infirmary admission.

13

3/29/97:    Admitted to infirmary with Dx. Major depression with

suicidality. Rx:

Haldol Sm g PO q HS, elavil 125 mg PO QHS. Discharged

4/1/97; 4/16/97: CCI IV-B infirmary; Dx Malingering to get

protective custody (V65.2)

Rx: Vistaril 50 mg PO q HS.

8/11/97    IDTT C³MS conference: "Dx major depression with psychotic

features, psychosis in remission. Rx. Elavil 125 mg p Q HS. He

presents no problem with Rx."--Harry Taylor III, PhD.

9/23/97:    "Inmate claims his current medication is not helping go to

sleep. Image claims that he is taking medication elavil to

help him go to sleep. Patient is programming in ad seg, no

vegetative signs of depression reported. No thought disorder

nor SI/HI. No h/o hallucinations. A: Improving Major

depression in remission. P: DIC meds".--Simon Villa MD

9/23/97:    Inmate asked to talk to psychologist. Inmate claims he feels

stress and wants to talk..

2.  <u>H38917</u>

<u>C-File</u>

In Ad seg since 5/31/97 for battery on inmate 115. Re-issue of ad seg.

Plead guilty. Cut another inmate. Had weapon in house.

6/4/93:    Battery on prisoner

5/31/97:    Discipline : mutual combat resulting in great bodily injury.

SHU term.

Medical file

5/12/97:    Mental health assessment/ treatment setting Dx: psychotic

disorder

NOS, Sx: hearing voices and tried to cut wrists.  Has had at

least 5 psychotic breaks. Rx; haldol 5 mg PO bid and

cogentin 2mg bid

8/12/97:    Master mental health treatment plan. dx; psychotic disorder

nos,

Rx. Haldol Smg P0 BID Inmate likes the medicine and

apparently complies

Dx. Anxiety "It helps."

3.  H40740

In Ad seg since 7/23/97 battery, found guilty->SHU 4/23/98. Rx. Haldol

2mg PO BID, which "stopped the negative thoughts". Medical chart not

reviewed.

4.  D14430

Ad seg. since  7/23/97 "drug trafficking->SHU.

Inmate received 12 pouches of tobacco with 124 grams of marijuana

inside. Staff insisted on the truth. Inmate said it was his Cellie's package. "Cellie

came to me and said you take my packages. I don't ever talk to them. I clean

up my house.. .I talks to them. He said: I'm going to beat your behind. This homeboy said I'll knock your teeth out."

Staff interpretation: somebody owes something. 124 grams of marijuana is significant amount and the inmate could be harmed on general population if he showed up with no money for the marijuana.. "I'm a survivor". Staff agreed suspend the SHU term or cancel it. Mr. Glee: I did not know what was in the package." Warden will re issue a 1 14. Rx; Haldol and cogentin in past, now on thorazine. MSE: non contributory, organized and coherent.

Medical File

      3/18/88    Dx : schizophrenia, simple type--AM Charlens, PHD.

      12/29/95   Dx. Malingering v65.02

      1/15/97    Psychiatric evaluation. Dx: Intermittent explosive disorder, +
                    Poly substance abuse, Rx. Mellaril 100 mg PO QHS.

      8/1 I/97:   IDTT Progress note: Dx: Intermittent explosive disorder
                    (provisional)

Rx:    Inmate stated that his medication is "OK. I feel rested.."

      8/13/97:  Received in Ad seg on C³MS . Inmate very verbal.  ADLs wnl.
                  no apparent distress--Blueford

    5.  C85909

Ad Seg for battery . Hit with typewriter handle. He was told to change the typewriter handles because they could be used for weapons. Crips found him doing it and attacked. He hit back.  MSE:  Very large muscular man, under

control and organized.. Re-hearing within the next couple of days 11/15/97. Dx:
PTSD.

Rx. C³MS.

Medical files not reviewed.

6. E72717

In ad seg. for sexual battery; found guilty but stated "I didn't do it". "Took
myself off medications. It calms me." MSE: activated and energized Rx:
Carbamazepine, risperidone.

Warden reversed the 115 conviction. based on new information that
victim (038422) may have been extorting others by threatening sexual assault.
Medical file:

7/2/96-7/5/96:     Admitted to infirmary, Rx. navane S mg BID+ sinequan
                   75 mg PO

3/28/97      to CTC for lacerating wrists. Voices told him to. Rx: Haldol 10
             mg BID

4/16/97-4/18/97:     Dx: substance induced psychosis NOS, admitted to
                     infirmary Rx. Haldol lOmg + 20 mg. , Elavil 150 mg q
                     HS

4/22/97:     Suicide plans. Prior CTC admits after SA. On Haldol 20 mg
             but not working. Rec. ad seg on meds.

4/23/97:     Hearing voices. Dx. PSA with psychotic features, possible
             paranoid schizoprhenia, Rx. Haldol, Rec. F/U

5/14/97-5/15/97    Admitted to infirmary , discharged on risperidone 3 mg

BID + Cogentin 2mg BID, Elavil 150 mg PO qhs.

6/9/97    Referred for suicidality. Dx. schizoprhenia, paranoid type,

8/14/97-8/18/97.  Psychiatric Evaluation D/C summary.

Inmate reportedly cut his wrist, claims to hear voices. Axis I

Substance induced mood/psychotic disorder, PSA, Rx:

Risperidone 3m g PO BID--Villa MD.

9/17/97    "mental health intervention did not appear necessary in that

inmate was not overly psychotic, confused, disoriented." --

Dr. Taylor:

On ad seg. due to the 115 for rape of another inmate, subsequently

overturned.

7.  K32272

In ad seg. for battery on inmate 115. C³MS with great bodily injury. "I was

being attacked.  He was approached by Crips for changing typewriter rolls.

Now has 2 strikes. Convicted for shoplifting, strike 3, received 25 years to

life.

Rx. Prozac 20 mg + tranquilizer. "I can't sleep in a loud noisy place.".

Neither C-file nore Medical file reviewed; inmate not interviewed separately

Impression:  none

8.  E10045

In Ad Seg July 23, 1997 for battery on police officer 115.  Ad seg.

detention until 12.1.97.  Manslaughter and 2nd degree robbery. "I say I was

attacked by staff. I would never put myself in a three strike situation. I felt staff was a threat to me.  No medical attention. Rx. Pain pills. Claims he was attacked and that if they had not initiated contact nothing would have happened. Admitted to voices telling him to "beat people" but otherwise the MSE was coherent and lucid. Neither C-file nor medical file reviewed.

9.   E95120

Ad seg. 9/18/97 for threatening staff; 115 and SHU possible. He threatened staff and was placed on controlled feeding. Mental status exam: 27 year old white man with reddish long beard. "Why would I want to threaten a CO.  "I got a mouth." Warden read from C file to find at least 10 previous incidents involving losing control of temper: disrespect, SHU term battery, threatening and resisting, fighting.  Rx: Elavil.

Neither C-file nor medical file reviewed.

10.   C470908

Ad seg: possession of weapon 115. Referred on 8/28 to Corcoran SHU. Classification Score 470 (very high risk). Rx: Buspar + Depakote 250 mg PO BID. Mental status exam: Pressured and almost out of control.

Neither C-file nor medical file reviewed.

11.   J29677 (C$^3$MS)

Inmate was initially interviewed during ICC without the Coleman monitor present and was relatively calm. He was brought back about 1 hour later and interviewed in the presence of Dr. Fenn.   The inmate's second presentation

was, according to staff who had seen him earlier, much more hostile, threatening, and oppositional.

He would not come out of cell for about 3 weeks. He thought staff was putting hair in his food. Not eating much. Taking 150 mg Elavil regularly. The ICC team and Dr. Fenn went to see his cell while he was being removed. He had previously spit, thrown feces and urine at visitors. But the cell was relatively intact and organized. Apparently he had been totally decompensated about two weeks earlier but had improved since the elavil. Mental status exam: Hooded, thin, tall male who was extremely hostile, saying "suck my dick" and I'll tear your head off" to the monitor and staff. He complained he had taken stelazine in tiny doses and it caused a side effect he did not like.

C-file

10/29/95:   "I observed inmate Jones standing next to day room table. Jones had blood covering his face and forehead."

1/25/96:   "I interviewed inmate Jones regarding a letter he sent to Officer Fowler in C facility.. which contained information that was interpreted as being threatening toward staff. During the interview, Jones admitted sending letter. but denied it was intended as a threat.  Jones claimed to be a very religious person who was only trying to let Officer Fowler knew that he had forgiven her for the death of his pet lizard, during a routine cell search. Jones stated he was only clearing his conscience of bad thoughts he had for officer

20

Fowler before his pending transfer from CSP-SAC. . subsequent to Jones' explanation. I contacted A facility MTA who informed me that Jones is not on psychiatric medication. Note: although there is no officer Fowler working in C facility, it was apparent during my interview that Jones was referring to officer Fallon, currently assigned to C facility 7 -block--T. Biggs Correctional officer.

4/24/96:   Privileges suspended, guilty of charges. 90 day loss of privileges.

2/6/97:    Moved to crisis bed from GP, on psychotropic meds--Simon Villa

2/19/97:   "On February 19, 1997 at approx. 1545 hours I was interviewing inmates in CAL State Prison LA County infirmary. While interviewing inmate Jones he stated, I'll kill one of you mother fucking cops here, if you don't transfer me. I hate you mother fuckers. Inmate Jones is currently in a crisis bed for psychiatric observation. Jones became so belligerent I could not conclude my interview. Due to his statement, Jones should be considered extremely assaultive. Jones expressed in a very sincere manner, his desire to kill a cop."--R. Long CSP-LA3/21/97: meets criteria for inclusion in MH treatment population--Villa.

3/21/97:    Inmate completed a mental health evaluation: BD: Move from crisis bed to C³MS within GP. Inmate refuses to take medication. Patient returned to Ad Seg.--Villa

3/27/97:    Letter from Jones on appeal form: "the psych and psychologist in the infirmary tried to kill me with medications I wasn't suppose to be taking. (Dr. Villa). The medication was stelazine at his and her request my pulse and heart rate almost doubled. He tried again by adding cogentin with it. He still couldn't kill me and I had them take me off the drug. I was also taking elavil at this time at my request. They purposely turned the temperature to almost freezing so it would have the side effect of dizziness to elavil and at that time I asked to be taken off. request: Dr. villa and Olevis investigated and fired. To be put back on the elavil I had been taking for years without any problem. I need 200 mgs of elavil in the evenings."

4/14/97:    Senior Hearing officer issued a violation for "threatening staff, and he was found guilty.  Inmate Jones was assessed a loss of privileges for 90 days and additionally 10 days of loss of Ad Seg."--Cruz.

4/21/97:    Inmate detained in ad seg. "The inmate is in C³MS and found to be in stable psychological condition."--Pamplona, Kalivasp HD.

8/4/97:     In accordance with director's rules, inmate detained in ad

seg for longer than 30 days.  The above inmate

failed/refused committee on July 31, 1997.--Pamplona,

Taylor

Medical file

5/10/96:    Transferred from Folsom to CSP-LAC. He states that he did

better in Folsom but  requested transfer.. In order to be closer

to his family. However, he states, this prison is the worst prison.

He states the officers here made bad racial comments, the

food is trash and he is in the same cell with a "stinking 70 year

old."  After further interview it seems that the patient is

suffering from depressive symtpmatolgoy manifested by

hopelessness, helplessness, hyeprivigilence, a process of

projection, and denial. His main symptom is insomnia. he

denies any suicidal or homicidal ideas. He denies auditory or

fisula hallucinations.  Axis I major depression, recurrent. Rx.

Low dose elavil. . Sofia Pamplona MD

8/10/96:    Medication follow-up progress: 41 year old second termer

now with life continues to have difficulties to incarceration.

He has transferred to LAC.  Computer screen picked up

depression and he has been treated with Elavil with fair

results.  At this time he states he is not so much depressed as

previously but does not increased anxiety.  He has previously

been on vistaril with good results and request it. He is

otherwise stable on MSE   Dx 3/7/97: MH assessment and

treatment setting transfer: Dx. Major depression with

psychotic features, rio bipolar disorder, unspecified, r/o

malingering. Admitted to Crisis Bed. Rx. Elavil 200 mg PO q

HS.

Adjustment disorder with mixed emotional features." Donald R. Walk Md

2/3/97: Dx. R/O Paranoid schizophrenia R/O malingering. Possible delusional

ideation, possible thought disorder. R Anderson PHD.

5/21/97      Inmate in Ad Seg for 2 mo. since 3/14/97, for threatening a

staff member. Now is the best that he feels. Feels hostile

before he fasts, just drinking  water. Then he noticed that he

became confused with poor memory at one time. Sinequan,

vistaril and elavil helps. Other meds haldol, stelazine and

thorazine didn't help. 1979 was the last violent act.

Impression: Major depression Rx. Elavil 100 mg PO q HS.

6/04/97:     Inmate says I'm doing okay. I would like my medications

increased. Currently taking 100 mg of elavil but says he

usually receives 200 mg and would like it increased to 150

mg (sic). Inmate calmer and more patients.  He reads the

bible. Inmate was not coherent and unreachable. (sic).--

Bluefort 6/18/97 Psych notes:  Inmate stated he is much

better on his present medication but I think he needs higher

dose of elavil. He is exercising to lose weight. He thinks he wants to clean his system by dieting. Don't want red meat and caffeine. In ad seg for throwing water on staff. Poor appetite. Impression Major-depression.

7/18/97:    Inmate says he has been doing better. Feels he would not be able to get stable on his psych meds on mainline because it takes time for his mind and body to adjust. I/M says he has Bible study. Inmate is a tall slender man who looks "undernourished. Inmate says he weighs about 140. Inmate says if he weighs more than 150 lbs he starts feeling bad. Inmate's appetite is down he says due to the food that is served here is not good.. .ADLs fair to poor... 8/11/97: interdiscipline progress notes:

Inmate was handcuffed and escorted to the room. From his interaction with the committee and based on his subjective report, the inmate's mental status appeared clear, and uneventful. Axis I: paranoid delusional disorder, Axis II personality disorder. Inmate in past has refused antipsychotic Rx; he is however taking elavil 100 mg q HS. Inmate is oppositional; intermittent supportive therapy is available. Inmate is marginally programming; tends to manipulate staff.

9/12/97:    The inmate is currently housed at CSP-LAC in ad seg. unit. The inmate was briefly interviewed. Assessment: from his interaction and his subjective report, the inmate's mental

status appeared clear, that is to say based on my
observation, his appearance, orientation, speech, short term
memory, mood, affect thinking and impulse control were all
within the normal limits. Inmate appeared resistant to
supportive talk therapy.  Henry Taylor Ph.D. 9/17/97.

7/15/97:    Rx: baclofen 10 mg tid

7/23/97:    Rx:. Elavil 150 mg qhs. No orders for antipsychotics since
            Oct. 30, 1995

X  Administrative Segregation/C³MS Interviews:

Case Notes

    1.  073064

Off C³MS for 2 months. "I was taking the wrong kind of medicine: buspar and
trilafon. They were giving me haldol for my thoughts; it was working. Heard
voices calling my name.  They increased the dose. I see Dr. Taylor."

C-file

    10/4/96:    psych TABE test results total battery average 3.0 GPL3/4/97:
                meets criteria for C³MS. Inmate states that he is experiencing
                a reduction in auditory hallucinations since on his current
                meds. IM states he still needs mental health treatment
                meds--Anderson phd.

    10/7/96:    placed in ad seg because he took aggressive stance
                against correctional staff.  Found guilty. Committee
                considered mitigating factors: no prior disciplinary history

and only a minor act . . he took a fighting stance 12/17/96:

Dx: Meets criteria for inclusion in C³MS.

9/28/97:   meets criteria for MH treatment pop GAF 65--Simon Villa, MD.

Medical file.

8/21/96:   Intake: Arrived 8/13/96 from jail on depakote 1000 mg hs for

Dx impulse control NOS. He states that he is on depakote

"because I hear voices." "I don't have them no more, really."

Now sometimes thinks people are cussing at him. Doesn't

believe medication is helpful. Complains of "hearing voices"

and "a lot of stress on my mind". States low appetite. Sleeps

but I get less sleep doesn't like sleeping in same room as

Cellie. Impression-Axis I rio psychosis, rio anxiety dior NOS.

Dic depakote. Inmate states medication is not helpful.

Buspar. f/u 2 wks. --Gaudet MD 9/4/96: Inmate states he

feels more relaxed on buspar. Thoughts clear, mood stable.

IM improved. Continue buspar f/u in 3 wks.--Gaudet MD.

9/16/96:   "As above IM calm with me; difficulty with thoughts. Is

illogical at times. Seems to have been exacerbated by

move to bid 16 agrees to mellaril. RX Add mellaril to target

thought disorder. f/u 1 week." --JW Gaudet 9/24/96: IM do

mellaril being too strong; states can't function. Has helped

him calm down. Seems slightly major organized. No

collateral reports. Im as above dic mellaril Add trilafon.

Increase buspar f/u 2 weeks--Gaudet

10/10/96:   MH Center Evaluation Dx Substance induced persisting

psychotic d/o w hallucinations rio psychtic disorder NOS" He

hears voices that calling his name. Has stated his sometimes

his son's black type shadow.

2/24/97:    Transferred from Delano on 2/24/97 Gs, AH buspar 15 mg PO

BID and perphenazine. Hx. Psychotic disorder NOS.

Rx: Perphenazine 8mg P0 BID, Buspar S mg BID.

3/24/97:    Dx. reports that medication controls voices and anxiety. IM is

concerned that he will be transferred to Folsom. He would

prefer CMC. Rx continue  medications.

4/7/97:     IM states that he is hearing less voices.. Axis I: psychotic

disorder

NOS"RX: continue medications X 60 days.

5/7/97:     "med control voices and denies depression. C/o frequent

waking up at night. Increase argumentative. MSE: calm. Axis

I: psychotic disorder NOS. RX Increase buspart to 20 mg BID.

Continue perphenazine 8 mg PO BID 5/12/97: Axis I Induced

psychosis with hallucinations RIO psychosis NOS, psychotic

disorder. GAF 65."

5/19/97:    "improved".

7/3/97:        "IM signed refusal of treatment. Both chart and C file not available for review. IM is doing fine and has no problems. Dic perphenazine/buspar today. 7/11/97 IM seen today. He has no more problems. Denies voices and anxiety after a few weeks. Inmate requested to be off meds. Denies voices and anxiety after a few weeks now. IM requested to be off meds. IiM Psychotic disorder NOS in remission No medications. F/U in 90 days for one years. Dx: psychotic disorder NOS."

9/16/97:       IM states has difficulty controlling temper. IM denies hearing voices. im with hightly affect. IM yelling kicking pool; up all night 9/19/97: SIO inmate is 33 year old who is housed at Ad seg for last 2 weeks. He feels that his medications is not working. "Thought disorder evaluated. Dx. Psychotic d/o NOS Rio drug induced psychosis."

Impression:  Inmate satisfied with his psychiatric care. Documentation that psychiatric treatment plan followed.

2.  J96405 Ad seg interview:

"Ad seg MH treatment could be improved   I'm trying to get into EOP. I'm a victim. Ms. Blueford talks to us. Rx. Tegretol and risperidol. History of Auditory hallucinations to "kill myself periodically. I had a razor blade. Voices telling me. But now not as suicidal. Hydroxyzine "kept me up."

C-File

7/10/97:    evaluated for Ad seg and C³MS

3/28/97:    Custody staff observed inmate acting "unusual in his cell. He

was escorted to the facility IV-C satellite medical clinic for a

psychological examination. Upon searching inmate, a razor-

blade was discovered and confiscated from his left pocket.

Said razor appeared to be from an altered stated issued

disposable razor. "Inmate transferred to CSP-Los Angeles

Infirmary for evaluation  and suicide precaution."

## Medical File

4/11/97:    sent to ad seg for threat to his life. Medical file

Dx:    Major depression, recurrent

10/22/96:    Im kind of depressed. ..smiling and talkative".

10/23/96:    Dx. Adjustment of his suffix with other inmates. Physical

altercation.

10/25/96:    worried about threats in yard.  Rx. Amitriptiline 100 mg +

perphenazine 4 mg PO BID.

3/28/97    Admitted to infirmary.

Dx:  Axis I major depression with suicidal ideation and

impulse control disorder. H/o impulse control disorder.

Rx.Tegretol  200 mg PO Bid + risperidol 3 mg BID, benadryl 50

mg PO BID.  RIO suicide attempt.

3.  H19015

## Ad Seg Interview

Ad seg is "better than average. The COs and psych are more involved. Anger management is good. Rx. Tegretol. He said he prefers "something else like thorazine and lithium". "Lithium was affecting my ability to respond." <u>C-File</u>

1/7/94:    dx: "malingering " No evidence of psychiatric disorder. Rio

sadistic personality disorder--Haskett, pHD

12/12/96:    battery on another inmate.

7/29/97:    ad seg. for battery on police officer.

6/8/97:    fighting with another inmate.

7/29/97:    fighting with another inmate <u>Medical file</u>

8/15/95:    psychiatric consultation following suicidal ideation, inmate

threatened to burn bed and clothes. Dx. Adj

disorder/disturbance of conduct. 9/1/96 Hx. Impulsivity and

acting out. Dx. Psychosis NOS + personality disorder

Rx: Lithium carbonate 300 mg + 600 gm and doxepin 50 mg

+ 100 mg + CPZ 50 mg PO PRN--Donald Walk. MD

12/6/96:    Inmate with hx of severe acting out. He reports medication

helps him control his temper and with his sleep. Also, the

medication helps him control his self-inflicting behavior.' "Will

renew lithium carbonate 900 mg PO daily. Doxepin 50 mg in

AMilOOmg+ CPZ 50 mg BID. Dx. psychosis NOS--Agusto, MD.

1/8/97:    Renew meds pending Drs appointment.

2/5/97:    psych eval progress report: psychosis nos, borderline personality, rx. lithium carbonate , doxepine, CPZ; Agusto md.

4/15/97    psychiatric evaluation discharge summary June 10-June 23, 1997 patient admitted to infirmary for psychiatric evaluation and observation, threatened to kill self, depressed, mute. meds adjusted and condition improved. axis i: Bipolar affective disorder NOS, personality disorder. Patient was discharged on medication to remain in C$^3$MS. Discharge meds: Trazodone 100 mg + CPZ 50 mg --Villa MD.

9/8/97:    Inmate scheduled to be seen by IDTT ...he refused to attend. Housed in ad seg. No rationale for his refusal.

4.  <u>C90160</u>

<u>Interview in ad seg</u>

Charged with assault with deadly weapon; incarcerated since 1981, Dx. schizophrenia, , pleaded for Not Guilty by Reason of Insanity. "I was delusional at the time and hallucinating." He reported he saw "things coming out of people. I take meds and it helps." Rx. Haldol IOmg BID. Wanted to be housed near other mentally ill.

<u>Medical file</u>

7/14/97    Admitted to infirmary Dx Psychosis NOS, Rx tegretol 200 mg now and BID , vistaril 100 mg BID, No other meds ordered, discharged 7/16/97--Villa 8/19/97: inmate referred for

emergency psychiatric evaluation: he went to court and became agitated, threatened to hurt self. Sent to Infirmary with Dx. psychosis NOS. Rx: Haldol 10 mg PO BID , Cogentin 2mg BID, Tegretol 200 mg P0 BID. Elavil 50 mg PO QHS.

<u>No C-file available</u>

    5. <u>Valadez C15685</u>

Convicted of 288, victim age 10.

Inmate interviewed by Dr. Taylor. Very masterful psychotherapeutic first contact which Dr. Taylor conducted with tremendous skill and insight, developing rapport, allowing for expression of appropriate emotion, and accomplishing assessment and developing a contract for continuation.

XI.    <u>EOP/IDTT Case Notes</u>

    1.  Baron J-99328

Inmate was losing weight in past three weeks because didn't eat properly and was weak. MSE: A thin hostile inmate with Dx. of Bipolar Affective Disorder in an acute manic state close delirious mania. Flight of ideas, pressured, disorganized, and grandiose/psychotic: "My mother is Jackie Onassis". He wanted to go to General Population. Decision was at first to extend in EOP for 14 days. "We have made progress in 14 days." But inmate had been hostile and out of control since March 13, 1997 and was not getting better. He was in danger of assaulting other or being assaulted. Had been offered Haldol 5 bid but had not taken it and was no better. Dr. Ludi recommended referral to DMH.

The inmate was to be returned to EOP and await DMH placement. Dr. Fenn recommended crisis hospitalization due to imminent assaultive potential.

Medical file

3/21/96: Psychiatric evaluation Treatment plan: MSE: yelling, agitating, sleeping very little, hyperactive. Dx: schizoaffective RIO bipolarRx; Lithium level pending.

Admitted to infirmary 9/21-22/96 Rx; LiCo3 900 mg. q. daily

6/21/96:    admitted to infirmary Rx. Lithium 600 mg BID Mellaril 100 mg PO BID + Ativan lmg TID. MSE: hostile and verbally assautive. Dx. BAD I with psychotic features, or Psychotic disorder NOS due to prior substance use. Discharged 7/15/96.

9/17/97"    Dx. BAD NOS Meds. Lithium and/or depakote.

9/15/97:    Refuses medication. appearance poor, disheveled. Judgment and Insight greatly impaired.

C file

12/3/95:    disrespect.

12/6/95:    tampering.

12/1/2/95:  manipulation.

1/7/96:     destruction of property.

8/3/97:     mutual combat.

Offense: assault with intent to commit a sex offense.

Interview in Crisis Bed/Infirmary.

34

The patient was seen in the infirmary later that day. Orders had been written for Rx: Ativan 2mg IM PRN aggressive behavior q. 4 hrs max 2x.

MSE:    Still hostile and very resistant to medications.

2. <u>K46008</u>: 90 day review.

Very compliant pleasant gentleman with Dx. Schizoaffective + antisocial personality disorder. Rx. Doxepin and Risperidone, and improving. Medical file and C file not reviewed.

3. <u>K34997</u>: 90 day review;

Elderly gentleman whose wife dying of cancer. "I would run into the fence. The program is a blessing to me." Affect hopeful. Facial expression flat. Medical file and C-files not reviewed.

4. <u>K32733</u>: 90 day review

<u>MSE</u>:  Stable and cooperative Dxs: major depression and borderline personality disorder. MSE calm ,appropriate, non-psychotic.   Wanted EOP closer to home (Humboldt County).  Consensus of team: referral to Sacramento or Mule creek.  Was on ADL but dropped from ADLs. Received anger management. <u>Separate interview in C³MS</u>:

Inmate's mental status consistent with previous contact in IDTT. He felt treatment  was "quite well" ... psychologist adequate visits. Dx. Borderline personality.  Rx: Sinequan 150 mg, 2mg Stelazine. Heat plan okay

XII.    <u>C³MS/IDTT Case Notes</u>

1.  Newman C22608

Discipline free since C³MS except for misuse of state resources for business.

Dx: Depressive disorder or major depressive recurrent and

Polysubstance abuse.

Rx: Depakote 250 mg + 500 mg + zoloft 50 mg PO QHS.

MSE: no more fights since start of depakote, "the medication is helping me.

"Taking mood stabilizer and anger management has helped. MSE: Affect even

tempered. "Im an artist. "Recommendation of team: remain in C³MS.

Impression: Appropriate treatment plan and follow up.

2. <u>D61757</u>

Dx depressive symptoms. Combat and violence with another inmate.

115 for possession of alcohol. Dx. discontinued his meds in 9/97. off meds for 3

weeks. Rx Trazodone 100 mg PO Q HS.

3. <u>D88502</u>

Dx. psychotic disorder nos.

Rx Sinequan 25 mg PO q hs + mellaril 25 mg PO QHS.. 6/12/96 arrived

Lancaster.

MSE: "meds work"; "since I'm taking them they calmed me down."

affect calm and pleasant.

4. <u>E47777</u>

2/1/96:    Arrived from CSP Corcoran MSE: bearded, rough-looking

man.

5/31/97:    Stopped all meds. Dx bipolar affective disorder but no sx

since then. "some highs and lows." Physical altercation 3

years ago.

Rx: lithium , depakote, tegretol, thorazaine, mellaril. Off meds

3-4 months. "I still get highs" History of BAD since early

adulthood. Polysubstance abuse on speed and marijuana.

Physical altercation three years ago.

<u>Medical file</u>

2/1/96:      Transferred from CSP Corcoran.

9/19/96:    Dx BAD mixed, Rx. Depakote 250 mg P0 BID + Benadryl 50

mg PO BID.

12/27/96    Dx: BAD, Rx. continue Benadryl.

1/2/97:      MH Assessment  and treatment setting. Dx. BAD, mixed, Rx.

Benadryl 150 mg and Depakote 250 mg. --Ceclia F Baca

psychologist.

2/2/97:      Dx. BAD, "discuss possibility of starting tegretol for mood.

5/1/97:      Start Tegretol 300 mg  PO BID, f/u in 2-4 weeks.

5/31/97:    Depakote gives similar side effect and lithium induces

sweating.

6/6/97:      Patient states his mood is good; denies highs and lows;

stopped his Tegretol.

6/97:        Discharged from C³MS

9/25/97:    Annual EDTT Committee decision is to discharge from C³MS.

No disciplinary findings.

5.  <u>D66246</u>

9/26/96:    115 possession of beverage, Discipline free. Dx. Depression
            and suicide and etoh abuse; Rx Sinequan 150 mg PO QD.
            But not taking meds.

            MSE: He planned to have himself shot. "I could put it aside.
            I've been sentenced for something I didn't do it. The
            sinequan mellows me out. I just want to study my
            electronics."

            Medical file and C-files not reviewed.

6.  E-39660

Arrived 2/14/97    Rx . CPZ 50 mg qhs, lithium 900 mg PO qhs, VPA 250
                   mg +500 mg, doxepin 200 mg.

9/22/97:    Lithium levels pending. Last level was 0.2 meqllithium I month
            ago.

            Axis BAD I on lithium since 1990.

1992-1996:  Cat J program. MSE: he wanted to present his sx of mental
            illness. "You need to get your records straight." Alert,
            pressured and slightly hostile.

XIII.    C³MS --B Yard IDTT Case Notes

1.  H50093

Seen in IDTT- C³MS annual review and medical file reviewed

Dx Schizophrenia, RiO major depression with psychotic features, diabetes type
I, Rx. Prozac 20 mg PO q AM and elavil 25 mg PO Q HS.

Medical file

Admitted October 1995 with hx of auditory hallucinations and impulsivity.

10/20/95:   Psychiatric evaluation; hospitalized because of

decompensation, Dx schizophrenia: tremendous fear .

voices telling him to harm himself."

6/26/96:   MH Assessment Dx. Schizophrenia  undiff.

9/9/96:   Dx. schizophrenia, undiff + DMi, "hallucinating. Rx. Fluoxetine

20 mg.

10/20/95:   Rx:  Haldol 2mg P0 BID for Dx Psychois NOS" EPRD 9/15/99.

Convicted for arson of an inhabited structure.

1/4/97:   cell fight 115. Current symptoms - "I couldn't breath.. my

back side toO hurt." Hx of auditory hallucinations, but not for

6 or 7 months.

9/26/97   Interview in IDTT: Dx. Schizophrenia, r/o major depression.

Patient's hx of auditory hallucinations. Convicted for arson.

Rx Prozac 20 mg + Elavil 25 mg; he said the "medicine helps".

No mention of antipsychcotics.

2.  E-74672

Dx:  Bulimia and alcohol abuse, r/o major depression. Rx. Elavil 75 mg PO

QHS, Prozac 20 mg PO QHS, Buspar 10 mg PO TID.

Convicted of oral copulation with 14 year old.

EPRD 8/31/2000; secondary burglary and lewd and lascivious behavior.

Discopine free since 1'993.

MSE: Very anxious who is troubled about his bulimia, states that there is no

improvement.  No one asked about suicidality.

IDTT C³MS

Dx. Bulimia + etoh Rio major depression, Rx.

Elavil 75 mg PO QHS + Prozac 20 mg + buspar 10 bID.  < MSE very anxious.

Meds were adjusted and reviewed.

>       1/21/97      Inmate is doing well.

>       8/18/97      Amitriptyline leave.

> 3.  J-82635

Axis I substance induced thought disorder and polysubstance abuse,

axis II: antisocial personality. Rx: Tegretol 400 mg  and Mellaril 50 mg PO QHS.

No prior psychiatric treatment. Suicidal gesture 1993. EPRD 8/14/01.

MSE:  Young male, arrested age 16. Clean and goomed. Took psych

meds but "I forgot the name. I've been taking them for hearing voices." Drug

abuse: speed, marijuana and etoh.  "I haven't hit nobody."  "I guess I'm doing

okay. Side effects: dry mouth. Hx. of head injury and was unconcious for one

day. I don't eat the food.  Nightmares every night.  Death in different fashions.

I expect it.  I try to stay up as late as possible."  Do you think of hurting yourself ?

"I tried to slit my wrist sometimes. Tegretol level drawn.  Dr. Thien: Increase

Mellaril dose.

> 4.  J95318

Dx Malingering . Refused doxepin since 1996.  22 year old first termer for

carjacking and use of weapon.  Serving 6 years. EPRD 2/20/98. Discipline:

mutual combat 1996.

Initial sx were insomnia "Bouts of depression." Suicide attempts. age 15 or 16 using drugs at the time MJ, ETOH, PCP.

XIV.     EOP Interviews/Case notes

1.     K36496

Crohns Disease since 1990. Offense: arson. Rx. 600 mg CPZ and risperidone Smg.

Depresssion. Sx. Not eating; delusional about an angel, Age of onset at 25. Now 37. Had been at Atascadero, Now pressured with elevated affect.

2.     K14593

"I like the groups. every group, anger management, social skills, med management. My mom is sick. "Rx. Lithium. Blood drawn q monthly. Psychiatrically impaired since age 13. Now on risperidone.

3.     D94272

Program: " its great. I get the programs I need. I can see a therapist when I want". History of suicide when angry, upset, or off meds. Rx. Depakote 1000 mg, lithium 900 mg, CPZ 200 mg, and naprosyn 100 mg.

Dx. Psychotic with suicidal impulses vs. BAD I

XV.     CTC/Infirmary/IDTT: Case Notes

1.     K55415/EOP

No psychotropics during EOP at Lancaster; has a thought disorder.

Dx: BAD I since age 16 rx lithium Rx: DVPX 250 mg PO BID X 3 days, Haldol 5 mg PO BID, Glyburide 2.5 mg PO  QAM + regular insulin sliding scale. Very

41

compliant with blood work and meds. Discharged today to EOP. After admission to CTC 9/24/97.

Infirmary/CTC

MSE: Very manic and pressured. I can read minds. Came from San Quentin. Rx. Depakote. Admitted 9/24/97 at 20:35 and no PRNS, no psych meds ordered. Very psychotic and agitated. EOP new arrival. Dr. Thien will see in AM when stable.

Medical file

1/97:        Rx: Lithium discontinued due to suspected diabetes insipid.
             Rx. trilafon 8 mg. Refused meds.

6/16/97:     Dx. BAD. Refused meds. MSE: labile, inappropriate.

7/15/97:     Dx. schizoaffective disorder, Plan: continue EOP.

7/24/97:     IDTT progress notes: MSE: mood normal , affect tense.
             Treatment plan: refuses meds ,"lithium gave me diabetes,"
             "depakote gave me a rash. Dx. 296.90 Follow-up plan: "none
             indicated at this time"--JC de Tata, MD.

8/26/97:     Dx Organic personality with dx of Bipolar. arrival 6/16/97; No
             alternate anti manic agent considered.

C-file

No discipline chronos since admitted to LAC.

2.  H 18242

Infirmary interview

Muscular black male seen 8/25/and 8/26/97 in CTC.  Admitted 9/25/97 for a suicide watch.  He asked to see psych because he was upset that his mother had surgery.  He admitted to AH in the past, was started on Mellaril and by the next day looked less upset.

Medical File

12/9/96:   Reception Center Mental Health Evaluation Dx. poly substance dependence No meds ordered.

11/15/96:   brief screening report. These statements are based on behaviors and history of person with similar interview response. "Indications this offender has a possible thought disorder, mood disorder. May be suffering form a mental illness."

9/11/97:   Rx. Mellaril informed consent signed.  IDTT progress report. Dx:  Psychotic disorder NOS, MSE h/o derogatory voices. Started on mellaril 100 mg at HS Agusto, MD.

9/28/97:   Inmate seen in infirmary and released to B-yard F/U by CCM--Dr. Sharone psychologist. Mental status exam: Muscular black man half naked. admitted 9/25/97 for suicidal ideation. Rx. Mellaril 100 mg PO QHS. Paxil 20 mg and vistaril 100 mg plus ativan for agitation. Dx. adjustment disorder vs. psychosis NOS. admits to auditory hallucinations.

#50108902 v1 - LOPESMA - %09y01!.DOC - 9999/1

EX. D

Coleman Monitor Report:  RJ  Donovan

August  26, 27, 28, 1997

Howard Fenn, MD

I.    Reception Center/Bus Screening

A.    Introduction

The Coleman monitoring team arrived August 26 and was given a slide
presentation about the Donovan mental health delivery system. The team
went to the reception area and observed Bus Screening.

B.    Cases Reviewed

1.    14641

2.    H24231

3.    K-01609

4.    K44273

C    Impressions

1.    Screening great numbers of inmates quickly has the potential of
allowing too many false negatives. Inmate # 14641 may be an
example.

2.    Mechanisms should be built into the system to minimize false negative
screens by allowing more time per screen, rotating screeners, and
providing frequent breaks.

3.    Inmates with potential psychiatric problems should be identified for
immediate, more extensive evaluation.

D.    Case notes under Section IX

II.    Administrative Segregation EOP Interviews

A.    Introduction

The monitors spent approximately two half-days in Administrative

Segregation, interviewing inmates and sitting in on clinical meetings.

Selected medical charts and C files were also reviewed at a later time.

Interviews conducted by the monitors in the absence of CDC personnel

except for custody staff.

B.    EOP Cases Reviewed

   1.    H91744

   2.    D81816

   3.    K41533

   4.    I-22995

   5.    I-80016

   6.    H-89027

C.    Non-EOP Cases Reviewed

   1.    D-30617 Dx: BAD, Rx: lithium 900 mg QD, + prozac.  "I could maybe use

         100 mg more lithium. Hx Pelican Bay

   2.    H 46137: "lithium helps" Rx. 750 mg Lithium + 1500 mg VPA

   3.    D-03518: Rx: Doxepin 200 mg only. Hx AH.

D.    Impressions

   1.    Urgent psychiatric interventions to deal with decompensating

         mentally ill inmates were either not in place (J-80016), or delayed,

given the severity of the inmate's condition(H-89027). In other cases, medication had not fully improved target symptoms yet was not re-evaluated or raised (H91744 and D81816.)

2.    In the case of J-80016, the inmate had not been coming out of his cell, was drinking very little, and thought that others were urinating in his sink. Yet there was no documentation that involuntary medications, a Keyhea process, or transfer to infirmary or DMH were considered.

3.    The aforementioned interventions were not offered because, it was argued, there was no evidence of grave disability. But the inmate's bizarre behavior strongly suggested a decompensating severe mental disorder and resultant grave disability. A review of this inmate's medical records (refer to Administrative Segregation/Record Review Case Notes) confirmed this initial impression and provided more evidence of grave disability.

4.    Inmate H-89027 was refusing to come out of his cell and refusing medicines. He was apparently eating and sleeping well but a recent incident, during which he fabricated a dummy in his cell, raised the possibility of future bizarre behavior. An infirmary admission planned for one week away was not soon enough to deal with his decompensation.

5.    H91744 and D81816 were inmates who had improved on medications but still had psychotic or manic symptoms.  Higher doses of antipsychotic agents or antimanic drugs were not pursued with either

3

plasma levels as guidelines.    Target symptoms were not listed to

document improvement or lack thereof.

6.    Interviews with inmates in ad seg. showed they were generally

satisfied with the quality of psychiatric treatment but wished more

contact with professionals.

III.    Administrative Segregation IDTT

A.    Introduction

This meeting on August 29,1997 was chaired by Dr. Saunders and Dr.

Alderman

B.    Cases Reviewed

1.    D-146279:

Admitted to Ad seg 7/24/97 for safety. Dx: Depressive disorder NOS ,

antisocial personality; Rx: doxepin MSE: Hostile toward Dr. Saunders, wants

to change doctors over the medication advice. Decision of team:  Dr.

Saunders should prescribe medications but communicate medication

concerns through other staff.

2.    H-08092

Admitted to Ad Seg for stabbing another inmate. Dx: depression and

substance use, ADHD Rx: Pemoline 37.5 mg qd.  MSE: apparent insight or

searching for it, wants to control anger, likes  the medicine "It slows down my

thinking." Antisocial traits demonstrated by lack of remorse over his assaults.

3.    H89027

4

Inmate refused to come out of cell. Hx. Hearing voices. Patton State Hospital treatment for Schizophrenia and sx, now refusing breakfast, showers, and meds. Rx on Haldol in past with good response, Lt. found him to have limited understanding of impact of his behavior when he made the dummies.

Rx: no meds. Decision of team: admit to infirmary Crisis Bed Tues. Sept. 4th.

C.    Impressions

IDTT meetings appear efficient, focused, and collaborative. The disciplines of psychology, psychiatry, and nursing appeared to operate collaboratively.

IV.    Administrative Segregation/ICC Meeting

A.    Introduction

Monitors observed this meeting, chaired by custody staff.

B.    Cases Reviewed

1.    35987 :115 battery on inmate, "30 day review," PSU term possible.

2.    K-53322: 30 day review; 115-possession of weapon; psych cleared.

3.    D-46279: 30 day Review, safety concerns, C$^3$MS medication compliant.

4.    D-33514: 30 day review; gang activity; C$^3$MS, parole in 3 days.

5.    K58658: 30 day review; safety concerns; no meds.

6.    325328:  one week review; convicted 115 battery on inmate, 15 mo SHU with 5 months for misbehavior. C$^3$MS and med compliant.

5

7.  K47728:  safety concerns; cleared by psych several times with Dx:
    personality disorder due to inappropriate and provocative behavior.
    No psych meds.

8.  H-49686: Court testimony/safety concerns; cleared by psych.

9.  K25378: Escape concerns, convicted aiding and abetting escape. No
    psych concerns.

10. E17970: safety concerns and testimony.  Back from SHU/ Pelican Bay.

11. K 61723: safety concerns.

12. H-98068:  cleared by psych.

13. K-61640:  safety concerns; dated wife of another gang member.
    Cleared by psych.

14. 61712:  safety concerns ("green light on me").

15. D-24583: BPT for 115 charges, C³MS med noncomplaint.
    MSE:  intense affect, labile, joking, stopped meds 4-5 months ago;
    limited psych input.

16. D-47727: Threatened staff, no psych input, awaiting bus.

17. H91744: charges murder, Pelican Bay SHU recommended.
    MSE:  Intense, labile, pressured speech, racing thoughts. Psych Dx not
    mentioned nor Rx mentioned.

18. K06124: cleared by psych.

19. K 44774: battery on inmate, 15 months in SHU pending.

20. H-78688: Battery on staff; C³MS; no mention of meds.

21. E-07612 (Infirmary): victim of battery, acquitted of 115, C³MS followed by psych; out of crisis bed soon.

22. 3-93436: assault and battery on police, active SHU/ Pelican Bay.

23. H-36996: battery on CO, C³MS, no psych Dx or Rx mentioned.

C.  Impressions

Behavioral symptoms and treatment were not often included in the discussion regarding inmates whose psychiatric condition might contribute to discipline problems (*e.g.*, D-24583 and H-191744).

V.  Administrative Segregational EOP: Medical Files

A.  Introduction

1.  Monitors reviewed medical files from administrative segregation.

B.  Cases Reviewed

1. E07612

2. H91744

3. D81816

4. K41533

5. I-22995

6. I-80016

7. D24583

C  Impressions

1.  F07612

a.  Antipsychotic medication not started for 3 days for this psychotic, suicidal inmate.

7

        b.    No documentation of contact prompting admission to infirmary.

    2.   <u>D24583</u>:

       Where criteria for schizophrenia are met this diagnosis should be offered instead of psychosis NOS.

    3.   <u>J-80016</u>

        a.    Paranoid dx may have contributed to altercation with roommate and disruptive behavior during recent ad seg. disciplinary contact. b. Involuntary meds not considered soon enough.

D.    Case Notes from Medical files (see Section XI )

VI.   <u>Enhanced Outpatient Placement (EOP)/IDTT Meeting</u>

A.    Monitors observed this meeting.

B.    Cases reviewed.

    1.   <u>D64778</u>:

       Compensated and compliant inmate.

    2.   <u>J-73295</u>:

       Dx:  BAD I + S/P craniotomy; Rx: Haldol and cogentin; well-compensated.

    3.   <u>H 90339</u>:

       Dx Psychosis NOS, Rx. Navane, compliant, voices "gone".

    4.   <u>J-99911</u>:

       Dx BAD I; received 115; Rx Lithium but not compliant; accepts clonazepam and amitryptiline (elavil). MSE: pressured and racing but articulate: "The Custody are not trained to deal with mentally ill.

During a behavioral state you are not in control. Had the custody

been trained in dealing with inmates' mental disorders they would not

have been as short. " He stopped lithium 3 days ago. Appears

decompensating but a more structured program thought to be

difficult to provide.

5.    K-41319:

Pre-release; auditory hallucinations better; inmate compensated and

compliant.

C.    Impressions

1.    IDTT efficiency might benefit from a smaller group of four professionals

who present cases for all the others.

2.    One mentally ill inmate (J99911) was decompensating. Intervention

was needed to prevent further deterioration, yet neither crisis/infirmary

bed, involuntary medications, nor DMH transfer were even considered.

(I-99911)

VII.    EOP Interviews

A.    Introduction

Monitors selected inmates and interviewed them with only custody present.

B.    Cases reviewed

1.    K-36386:

Dx unknown; MSE:  thought disordered with intense affect and

paranoid delusion; Rx: indocin only; refuses all other meds.

2.    J-46487:

9

Rx haldol; dec every 2 weeks, flat affect.

3. <u>E-65431</u>:

Rx. Navane 2 mg "Psych techs....a waste of taxpayer money."

4. <u>E-70202</u>:

Dx: schizophrenia, 'got naked in Gay Parade"; Rx: lithium 900 mg and

Doxepine 50 mg.

VIII. <u>Mental Health Crisis Beds</u>

A. <u>Introduction</u>

Monitors visited crisis/infirmary, interviewed patients, reviewed records.

B. <u>Cases reviewed</u>

1. <u>K26882</u>

Admitted 8/25/97.

MSE: Hallucinating and withdrawn but taking meds eagerly; anxious.

Rx: Improved on Haldol briefly, switched today to Risperidone.

Hx: 10 + year hx of auditory hallucinations, psych treatment in Mexico.

Child molester; Dx on chart: Psychosis NOS.

2. <u>E42072</u>

Admitted 8/18/97.

MSE: Hallucinating and withdrawn.

Hx: Undetermined.

Rx: Haloperidol Smg BID and serum levels.

Carbamazepine dose unknown and serum levels unknown.

Dx per chart: Psychosis NOS.

3. <u>C52295</u>

Admitted 8/23/97.

Hx: Atascadero State Hospital; reported first psychotic break in 1973 at age 11; now accepting medications.

MSE: 35 year old male with paranoid delusion of angels fighting him and auditory hallucinations telling him to cut and burn himself. Trying to return to his own planet; seeing Klingons. Thought disordered.

Rx: Risperidone 2mg PO BID and Doxepin 200 mg Q HS Dx per chart: Schizoaffective schizophrenia.

C. <u>Impressions</u>

1. Where the history and presentation is consistent with schizophrenia this diagnosis should be offered rather than "psychosis NOS".

2. Medications should be titrated with plasma levels as guides to achieve therapeutic levels (e.g. Haldol and Prolixin) (K26882, C52295).

IX. <u>Reception Center/Bus Screening: Case Notes</u>

1. <u>14641</u>

MSE findings: Motor behavior hyperactive, thoughts racing, affect elevated, excessively engaging, avoiding contact by saying "no" to every question. The screening took about 2 minutes and was very superficial. The monitors brought him back for an interview. On more thorough evaluation during which he gave more history of mental problems: Age 11 evaluated because "Mom wanted me to slow down."

Provisional Dx of Monitors: Attention deficit disorder vs. Bipolar I.

Impression: This inmate gave perfunctory answers and avoided

contact. As a result the screener allowed him to leave as a negative,

when in fact he may have a history of major mental disorder.

2.  H24231

MSE: Calm, cooperative, affect not depressed, organized thinking.

Hx: 3d violation, no apparent psych hx. Dx: unknown.

3.  K-01609

MSE: Unremarkable; not apparently psychotic or depressed.

Hx: No apparent psych hx. Taking meds for asthma. Dx: Unknown.

4.  Olivas CDC # K44273 screened by Tony Vale, Ph.D.

MSE: 40 + year old male from Mexico with limited English. Inmate had

difficulty understanding some questions and he minimized psychiatric

symptoms. No evidence of psychosis or major depression. He

admitted to periods of depressed mood for several months related to

family separation, inability to help them, and related frustration.

Crystal methamphetamine abuse and sleep deprivation. No

apparent psych hx. Monitors thought he had an adjustment disorder

with depressed mood, resolved, psychostimulant abuse and

dependence. Unable to read Amity program form.

X.    Administrative Segregational EOP Interviews: Case Notes

1.  H91744

Hx: Atascadero State; wants to return; several decompensation episodes in past two weeks with disruptive behavior, liability, agitation. Methamphetamine abuse on the outside up to incarceration. Recent sleep deprivation; he self-medicated with Trazodone last night. Discipline charges pending; may move to SHU Pelican Bay MSE: Alert and oriented but pressured speech, racing thoughts, and labile intense affect. Auditory hallucinations. Floridly psychotic but cooperative with meds. Dx per chart: Bipolar affective disorder(BAD), most recent episode manic.

Rx: Haloperidol 4mg QHS and valproic acid 500 mg BID

2.  <u>D81816</u>

Hx: Self diagnosis of BAD and treatment on lithium for years with good result. Discipline charges pending altercation with officer. May have left administrative segregation and not had meds follow closely so a lapse in treatment. Currently in anger management program. MSE: Talkative, articulate, intelligent and very engaging man with pressured speech, elevated intense affect and irritability. Some insight in that he acknowledged he might have contributed to altercation. But tended to minimize psychiatric problems contributing to his problems. Not psychotic at interview. Dx per chart BAD I

3.  <u>K41533</u>

Hx. 30+ male who has had labile affect and demanding, attention getting behavior. Cut wrist and set fire to his cells. Has wanted to go to

infirmary. Hx of ECT in Mexico for mental problems but he "ran away." Rx of impulsivity and refusing morning medications

MSE: Overweight male with prominent facial tattoos believes gang is after him but staff reports this is delusional. Admits to auditory hallucinations telling him to cut himself.

Dx per monitors: psychosis NOS and borderline personality disorder.

Rx: Haldol decanoate 100 mg IM Q 4 weeks, sertraline 50 mg q HS and Doxepin 100 mg q HS and Nifedipine 10 mg TID

4.   J-22995

Hx. Clear cut hx of psychosis and improvement on antipsychotic meds since age 12 and use of methampetamines. Compliant with medications.

MSE: Delusional about the evil eye and ideas of control. Paranoid and hears more than one voice. "I bring on the storms."

Dx Per chart: Schizophrenia, paranoid, acute exacerbation.

Rx: Doxepin 150 mg 2 mg, PO QHS , Perphenazine 32 mg daily.

5.   J-80016

Hx: Paranoid withdrawn inmate who has refused to come out of cell. Had fight with roommate July 16, 1997 and in January 1997 was treated with good result on Prolixin decanoate IM. Now refusing all meds but apparently eating sleeping well, though foul-smelling and thinks someone is urinating in sink. Not clear if he is drinking fluids.

MSE: Staring and sitting sup in bed but tells us to go away. Dx Per chart: schizophrenia, paranoid, acute exacerbation.

Rx: none currently; <u>Keyhea</u> not initiated because of apparent limited evidence of grave disability.

6.   <u>H-89027</u>

Hx: Refuses to come out of cell but talked with monitors. Has been eating and sleeping but refusing all medications. Hx of compliance in past with haloperidol 15 mg BID with good results.

XI.   <u>Administrative Segregational EOP Files: Case Notes</u>

1.   <u>E07612:</u>

Admitted to infirmary 8/17/97, inmate tried to hang self due to voices. Sertraline started 50 mg PO Q HS. Risperidone 1 mg BID 8/20/97

a.   Antipsychotic not started for 3 days; dx of psychotic suicidal inmate.

b.   Mental health placement note 5/14/97: "Inmate continues to need C³MS program.

c.   9/22/95 Rx: imipramine for depression.

d.   June 27, 1997: Notice of reasons for placement in Ad Seg Description of fight between inmate and others, Costello injured.

e.   Inmate's statement of suicidality which prompted crisis bed admission could not be found. No chrono documenting this was found.

15

2. <u>H91744</u>

   Dx: Schizoaffective schizophrenia Rx: Chlorpromazine 200 mg BID,

   trazodone; fluoxetine 20 mg, ASH in 1994

8. <u>R.J. Donovan Monitor Visit</u>

   October 26, 1997

   a. Results of psychiatric contact: 1/25/95: true positive. Rx. Mellaril

      and Benadryl

   b. Aug 15, 1996-31 question Brief Screen: true positive.

      Impressions:  Adequate liaison psych-custody; adequate

      disposition.

3. <u>D81816</u>:

   a. Date of arrival to Donovan 2/20/97.

   b. Outcome of Bus screening: positive.

   c. Results of 31 question screen.

   d. Results of psych eval: 2/25/97 Dx BAD Manic.

   e. Date of placement Ad Seg: 4/30/97: assaults on inmate; 6/8/97

      threats to staff; 7/11/97 threats to staff.

   f. Precipitating event of Ad Seg placement from custody: 6/8/97:

      Inmate charged with resisting staff by picking up shovel and sent

      to ad seg. 7/11/97" Rules violation report: inmate threatened

      correctional officer.

   g. Psychiatric contact after Ad Seg placement 4/30/97 ICC

      reviewed care 8/13/97 retained pending discipline

      h.   Psychiatric notes of treatment in Ad Seg: 4/30/97-8/27/97:

          "escalates if confronted" RX: lithium and prozac. intermittent Med compliance.

      i.   Disposition destination.

      j.   <u>Keyhea</u> hearing 8/4/97, certified involuntary meds in infirmary.

      k.   Impression: Ad Seg placement indicated. psych-custody coordination of care adequate, referral to higher level of care adequate.

4.   <u>K41533</u>

      a.   Received RJ Donovan 3/7/97 6 yr term.

      b.   Bus Screen 3/7/97: true positive: "psych screen within 72 hrs.

      c.   MH screening 3/10/97: true positive.

      d.   First Psych Treatment after reception 3/25/97: Dx Psychosis NOS.

      e.   First Psych med treatment started 5/1/97: Haloperidol 15 mg qAM and 15 mg QHS + Artane Smg qd.

      f.   MH Eval 3/25/97 "Psychosis Idepression C$^3$MS.

      g.   6/19/97: Rx. Haloperidol 20 mg PO BID, Artane 7.5 mg + S mg.

      h.   Ad Seg incident 6/19/97: suicide gesture, inmate lacerated forearm.

      i.   8/1/97: Disciplinary incident : inmate spread feces on cell and became agitated, and set fire to blanket in response to hearing he would be transferred out of infirmary.

5.   <u>I-22995</u>

a. Received RJD 10/5/95 from CMC for EOP.

b. No Bus screen because inmate already screened at CMC.

c. 5/11/95: Psych screen found true positive.

d. 5/11/95: started Rx Navane 30 mg PO BID.

e. 5/11/95-81/97: EOP psychiatry treatment noted.

f. 11/22/95: Treated for psych in FOP.

g. 7/28/95 Dx @ CMC: schizophrenia.

h. 5/26/97 Ad seg placement. for safety.

i. 7/19/97 Ad seg placement for safety "No psychiatric concerns noted at this time".

j. No Keyheas noted.

k. Impressions:  Custody note referring to Ad seg does not reflect psych issue; Good follow-up psychiatric treatment after transfer to RJ Donovan.

9. R.J. Donovan Monitor Visit

October 26, 1997

6. 380016

a. Received RJ Donovan 10/1/95 4th term assault w GBI.

b. 10/16/95: Screened for psych and placed in C³MS.

c. 12/9/96: Staff referral to psych for "nervous, and "hears things/imagines things. "Has been observed pacing the dayroom and his cell.  He also had struggles with imaginary foes."

d.  1/2/97: Dx of paranoid schizophrenia noted.  Non compliant with meds.

e.  1/10/97: Prolixin dec 100 mg ordered but inmate says he "wants an appt. with the MD before he takes psych meds."

f.  3/26/97: Dx of paranoid schizophrenia given in chrono.

g.  3/17/97: "continues bizarre, odd, inappropriate, Very thin.  His clothes are slipping off body."

h.  7/16/97: altercation with roommate.  A broken wooden stake and large rock found in inmate's mattress.  No evidence from record of Keyhea being considered or crisis bed considered.

i.  6/1 1/97: mental health placement: "adjustment problem: psychotic behavior noted, referral to EOP.

j.  Ad Seg 7/28/97: threatened staff: "I'll break your neck."  No mention in rules violation report of his schizophrenia.

k.  10/21/96: Correctional officer noted in chrono inmate "refuses to work and walks around talking to himself.  An appointment was made by a correctional sergeant for inmate to receive psych evaluation 0/10/96

l. Impressions/recommendations:  Good documentation of psych symptom Dx in C-file.

Paranoid dx may have contributed to altercation with roommate and disruptive behavior during recent ad seg discipline contact 7/28.  Involuntary meds not considered soon enough.

7. <u>D24583</u>

    a. 1/08/97 Chlorpromazine started 200 mg PO Q HS.

    b. 12/17/95: Rules violation report convicted of CDC 115.

    c. 01/26/96: fight between inmate and another inmate. d.6/3/97 Received at RJD, paroled from PBSP 12/6/96) e.6/4/97: MH Screening.

    d. 6/10/97: no med needs.

    e. 6/17/97: C³MS Mental health eval GAF 58: "tangential thinking,

    f. hypermotor activity, somewhat anxious"; referred to psych treatment. extensive MH history PBSP Dx. Malingering to major depression.

    g. 8/23/97 threatening staff; rules violation report.

    h. Impressions:

In spite of psych referral, no medications other than hydroxyzine 100 mg offered this patient with a history of poor behavioral control poor anger management and hx of treatment on haldol and cogentin. Given severity of psychopathology, suicidality, and acuity, psych referral after bus screening should have been immediate. There was an apparent delay in evaluation and start of psych meds approx. 2 months after an indication of its need on reception.

    i. Quality of treatment: in spite of labile uncontrollable affect and impulsivity, no mood stabilizing medication was offered between reception in March 1997 and August 1997.

j.   Where criteria for schizophrenia are met this dx should be offered instead of psychosis NOS.

10.  RI. Donovan Monitor Visit

II.   ICC/ C³MS cases

III.  Infirmary cases/crisis bed cases

A.   Reception date.

B.   Bus Screen date and result.

C.   Psych evaluation and result.

D.   First psychiatric med treatment after screen.

E.   Ad segregation dates.

F.   Dates of transfer more intensive psych level of care.

F.   Psych meds coinciding with incident precipitating ad seg. placement.

G.   Keyhea hearings.

II.   Medical Record and C-File Criteria for Coleman Compliance

A.   Documentation of custody-psychiatry treatment interface for behavioral control.

B.   Documentation that inmate in Ad Seg should have been transferred to higher level of care, e.g. crisis beds or DMH.

C.   Documentation that inmate's transfer has been justifiably delayed.

D.   Indication of behavior incidents reflecting a false negative at bus screening.

E.   Documentation of quality of care and care delivery.

21

F.    Indication that <u>Keyhea</u> or involuntary medications have been

unnecessarily delayed.

#50109088 v1 - LOPESMA - %0f401!.DOC - 9999/1

22

Ex. E

**DEPARTMENT OF CORRECTIONS**CR     Document 936     Filed 04/21/98     Page 385 of 427

Health Care Services Division
P.O. Box 942883
Sacramento, CA 94283-0001



**DEC** 1 8 1997

J. Michael Keating, Jr.
Mediator and Specialist
50 South Main Street
Providence, RI  02903

Dear Mr. Keating:

The enclosed project completion dates/timetable reflect activities that have been
completed and progress that has been made in enhancing our Statewide mental health
outreach efforts to date.  The underlined items reflect updates that have been made since
the last report.

Of primary note during this period:

1. Recruitment and Retention Bonuses--Health Care Services Division's (HCSD)
   proposal has been sent to the California Department of Corrections, Personnel
   Operations Section (POS) for review.  If approved, it will be forwarded to the
   Department of Personnel Administration.

2. Centralize the interview hiring process--HCSD has completed a process
   memorandum that, after being signed by HCSD and Institutions Division staff, will
   be sent to the Wardens and Health Care Managers directing them to implement the
   process for Staff Psychiatrists.  The HCSD and POS staff also continue to work to fill
   the 0.5 time position that will process certifications related to this process.

3. Tracking System--The HCSD and POS staff have developed a mechanism to track
   established, filled and vacant positions via the existing PALS system.    This
   information and existing authorized position information will be compiled in a single
   report on a monthly basis to allow HCSD to better measure our progress in filling
   vacant health care positions. The first consolidated report should be available during
   the month of December.

J. Michael Keating, Jr.
Page 2


Should you have any questions, please contact Sandra K. Duveneck, Assistant Deputy
Director, Program Support and Evaluation, HCSD, at 327-2238.

Sincerely,

SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

Enclosures

cc:    C. A. Terhune
       Eddie Myers
       Gregory W. Harding
       Peter Siggins
       Sandra K. Duveneck
       Pamela Smith-Steward
       Bruce Slavin
       David Tristan
       Bill Anderson
       Marjorie TaVoularis, M.D.

**PROJECT COMPLETION DATES/TIMETABLE**

| Project | Lead | Timeframe for Completion or Duration | Start Date | Completion Date | Status/Comments |
|---|---|---|---|---|---|
| 1. Expand specific Recruitment and Retention (R&R) Bonuses where there is a demonstrated need to assist in reducing staff vacancies throughout our Statewide facilities. | P&R | | 4/29/97 | | |
| • Draft mental health proposal to HCSD management for initial review. | | 6/23/97 | | 7/15/97 | |
| • Prioritize 13 field R&R requests (various). | | 11/14/97 | | 12/4/97 | |
| • Complete consolidated/prioritized R&R Bonus package (HCSD Mgmt. approval). | | 11/97 | | 12/4/97 | |
| • HCSD P&R staff send the R&R Bonus proposals to the CDC, POS for review. | | 12/1/97 | | 12/5/97 | |
| • POS send to DPA for review and approval. | POS | 1/1/98 | | | |
| • DPA approval. | DPA | 2/1/98 | | | |
| • Pay Letter issued (increases back to the date of DPA approval) and implementation. | DPA | 3/1/98 | | | |
| 2. Develop mechanism to more quickly process R&R requests. | P&R/POS | | | | |
| • Evaluate all existing R&Rs in all locations to determine the need and appropriate level. | | 2/98 | | | |
| • Develop administrative process to ensure more timely processing of requests. | | 1/15/98 | | | |
| 3. Continue the development of the HCSD Annual Recruitment Action Plan. This plan provides focus and direction to the Statewide outreach necessary for filling vacancies. | P&R | 6/30/97 | 1/7/97 | 6/9/97 | |
| 4. Streamline the examination process. | P&R/PES | Ongoing (New Plan Each Year) | 4/18/97 | | |
| • Evaluate fast track and centralized exam schedule (annually) to assist in meeting critical needs for identified classifications. | | | | 5/19/97 | Centralized plan to PES "Fast Track" to PES |
| • Design new exam processes/applications as necessary for appropriate classifications (i.e., look at a more flexible application filing process). | | | | 3/24/97 | "Fast Track" schedule |
| • Develop annual exam schedule. | | | | 6/19/97 | |
| • Implement annual exam schedule. | | | | 7/1/97 | |
| • Request and administer expedited exams as necessary for individual institutions. | | | | Ongoing | |
| • Evaluate immediate use of field cert lists. | | | | Ongoing | |
| • Evaluate timely scheduling of interviews from field cert lists. | | | | Ongoing | |
| • Provide assistance to applicants being processed via Fast Track process. | | | | Ongoing | |
| • Provide training on examination processes to HCMs. | | | | Ongoing | |

-1-

PROJECT COMPLETION DATES/TIMETABLE

| Project | Lead | Timeframe for Completion or Duration | Start Date | Completion Date | Status/Comments |
|---|---|---|---|---|---|
| 5. Continue to seek more creative outreach methods to reach mental health providers both Statewide and nationwide (i.e., expand use of the Internet/Worldwide Web; develop a mental health video and poster providing better communication on what it is like to work within an institutional setting; and search out additional "local" opportunities to market our employment options via electronic media). | P&R | Various Projects: initiated 12/97 (i.e., Posters or Postcards) | 7/1/96 | | |
| 6. Move to a more flexible approach in hiring mental health providers. This includes:<br>a) Make available more part-time employment opportunities;<br>b) Provide for more flexible work hour opportunities; and<br>c) Expand CDC's utilization of the twenty four month waiver (this relates to the California licensure of psychiatrists for out-of-state licensed clinicians). | P&R | Memo to Field 9/2/97 | 5/27/97 | Memo to HCMs 7/31/97 | |
| 7. Centralize the interview/hiring process for those classifications (i.e., Staff Psychiatrist, Clinical Psychologist, PSW) experiencing the highest vacancy rates:<br>a) Develop process<br>b) Implement process:<br>• First field requests for Staff Psychiatrist<br>• Hiring packages to POS on flow basis<br>• Request certification of eligibles<br>• List of eligibles to HCSD<br>• Schedule interviews, ID interview locations, ID interview panels<br>• First interviews<br>c) Evaluate process | P&R | 6/15/97<br>7/1/97<br>12/97<br>12/1-5/97<br>12/1-5/97<br>12/19/97<br>12/29/97 wk<br>1/12/98 wk<br>Ongoing | 5/27/97 (HCSD HQ Mtg) | 9&10/97<br>11/3/97<br>Ongoing | |
| 8. Standardize hiring process to ensure more professional treatment of clinical staff. Because of the difficulty clinicians often experience in adjusting their individual practices and patient workloads to accommodate CDC hiring interviews, it is necessary to relook at how interview processes are currently managed:<br>a) Prepare memorandum to Administrative Services Division (ASD) Deputy Director requesting assistance in raising consciousness of support staff in dealing with clinicians. | P&R | 12/97 | 12/97 | | |

-2-

**PROJECT COMPLETION DATES/TIMETABLE**

| Project | Lead | Timeframe for Completion or Duration | Start Date | Completion Date | Status/Comments |
|---|---|---|---|---|---|
| b) Memorandum to Wardens by ASD Deputy Director to encourage staff sensitivity in dealing with health care staff (i.e., suggest possible options: more flexibility in scheduling institution visits and interviews). | ASD | 1/98 | | | |
| 9. Continue to **develop opportunities for education and training.** This would include Continued Medical Education offerings and other specialty training for clinicians to become familiar and comfortable with the unique aspects of correctional medicine early in their employment. | HCSD, Tmg. | Ongoing | | Ongoing | |
| 10. Track the **processing of Hire-Above-Minimums (HAM)** during the next few months to ensure timeliness. | P&R/POS | | | | |
| • Develop mechanism to track HAM processing. | | 1/98 | | | |
| • Evaluate processing timeframes. | | 7/98 | | | |
| • As necessary, implement steps to ensure more timely processing of HAMs (i.e., seek delegation for all institutions to authorize HAM requests from the 3rd through 5th steps for psychiatric staff or standardize HAMs offered to co-located institutions). | | 8/98 | | | |
| 11. Implement a **Master Registry Contract** (Northern Region) to provide short-term mental health care staff on those occasions when turnover has created vacancies that must be filled in a timely manner to make sure programming is carried out. | P&R | Ongoing (Renew Contract Each Year) | | | |
| • Determine need (i.e., by classification, location): ID appropriate registry services needed to augment workforce. | | | 1/97 | 1/97 | "Go" on registry for P/S and S/P |
| • Met with CAMB (B. Whitney and D. LaMotta). | | | 1/9/97 | 1/9/97 | |
| • Met Cathi Haas/Anne Perez (assignments). | | | 1/16/97 | 1/16/97 | |
| • Survey:(1) Field staff and (2) Registries. | | 6/30/97 | 5/28/97 | 6/26/97 | |
| • Notify affected employee bargaining unit. | | | | 6/13/97 | Memo to CDC Labor Relations |
| • Assist in development of contract language/contract request form (Karen, Anne, Shari). | | | 1/16/97 | | |
| • Contract for registry (S/P and P/S) transitioned to HCSD Contracts and Material Mgmt. | C&MM | | | 9/24/97 | |
| • Draft Contract language to CAMB for Northern pilot project. | | 7/15/97 | | | |
| • Go out to bid for contract registry services. | | 2/98 | | | |
| • Select contractor(s)/decide on Registry(ies). | | 3/98 | | 10/20/97 | |
| • Advise HCMs in field of awarding of contract and availability of | | 4/98 | | | |

-3-

PROJECT COMPLETION DATES/TIMETABLE

| Project | Lead | Timeframe for Completion or Duration | Start Date | Completion Date | Status/Comments |
|---|---|---|---|---|---|
| services. <br> • Implement Contract. | | 7/1/98 | | | |
| 12. Develop Boiler Plate Registry Contract language for Southern and Central regions. <br> a) Draft contract language to CAMB for other institutions. <br> b) Final contract language to field for implementation as needed. | C&MM | 12/97 | | 10/20/97 | |
| 13. HCSD staff, in conjunction with the ASD set-up a **Tracking System** that will measure CDC progress in filling vacant health care positions on a monthly basis (i.e., authorized, established, filled, vacant and salary savings): | P&R/POS | | | | |
| • Identify problem in tracking systems currently available to HCSD. | | 10/97 | 9/97 | 10/8/97 | P&R memo to Sherrie Giorgi 10/8 <br> P&R memo to Jim Libonati 10/30 |
| • Design of new tracking system to meet HCSD needs completed. | | 12/97 | 10/30/97 | | Staff developed report format to capture authorized, established, filled, and vacant positions (12/2). <br><br> Received PALS report from Sherrie (12/4) |
| 14. Initiate **Conference Call** process on a "trial basis" to monitor institution filling of vacancies/identify institutions with highest vacancies (depending on success after 6 months will determine whether to continue calls). | HCO | 1/98 | | | |

PROJECT COMPLETION DATES/TIMETABLE

| Project | Lead | Timeframe for Completion or Duration | Start Date | Completion Date | Status/Comments |
|---|---|---|---|---|---|
| 15. Implement a **Search Firm Contract** to augment ongoing recruitment efforts to locate clinical staff for hard-to-recruit specialties or geographic locations (if determined to be necessary).<br>• Determine need (i.e., by classification and location).<br>• Coordinate contract process through appropriate staff.<br>• Assist in development of contract language/contract request form.<br>• Go out to bid for contract search firm services.<br>• Select contractor(s).<br>• Advise HCMs in field of awarding of contract and availability of services.<br>• Implement, coordinate, and monitor contract. | P&R | To be determined | | | Unnecessary at this time (10/1/97) |

**Legend:**
California Department of Corrections (CDC)
Personnel Operations Section (POS)
Department of Personnel Administration (DPA)
Personnel and Recruitment (P&R)
Personnel Examining Section (PES)
Administrative Services Division (ASD)
Contracts and Materials Management (C&MM)
Health Care Services Division (HCSD)
Recruitment and Retention (R&R)
Health Care Operations (HCO)

-5-

DHDla44/TIMETAB

Ex. F

State of California                                                      Department of Corrections

# Memorandum

Date    :    JAN 5 - 1998

To      :    Wardens
             Health Care Managers



Subject :    **CENTRALIZED HIRING PROCESS**

The Health Care Services Division (HCSD) is implementing a Centralized Hiring Process (CHP) for medical classifications specific to the California Department of Corrections (CDC). The HCSD has initiated this program in an effort to expedite the hiring of the most difficult to recruit for medical/clinical classifications. This new approach will aide in standardizing the process of hiring staff throughout the State. This program will ensure a more aggressive approach to fill vacancies that continue to be of concern to the litigants in ongoing lawsuits. This memorandum will provide you with new procedures to implement filling vacant Staff Psychiatrist, Correctional Facility (CF) positions. Attached is a copy of the CHP for your review.

The HCSD, Personnel and Recruitment (P&R) Unit has been given the responsibility of developing this new hiring process which will begin immediately for the classification of Staff Psychiatrist, CF. It is our expectation that as the development of this program progresses, additional medical/clinical classifications will be incorporated into the process, (i.e., Psychiatric Social Worker, CF and Psychologist, Clinical, CF).

The P&R Unit will work in cooperation with the Institution Personnel Officer (IPO), Headquarters Personnel Operations and Certification Unit (CU), HCSD Regional Administrators and Mental Health Services. Each participant's role and responsibility is detailed in the CHP (see attached). When an institution is ready to fill a vacant position the IPO will notify the P&R Unit. Upon receipt of the necessary documents, (i.e., duty statement and organization chart), the CHP coordinator will prepare the CDC Form 647, Personnel Action Request. The functions of ordering certification lists, mailing contact letters and identifying interested list eligibles will be carried out by the CU at Headquarters. The P&R Unit will review and verify the eligibility of any applications received from other advertising sources. Once the candidate pool is established, the CHP Coordinator will prepare the interview package, schedule interviews, determine the interview location and schedule an orientation with the interview panel members. After the interviews are completed, the CHP

CDC 1617 (3/89)

Wardens
Health Care Managers
Page 2

Coordinator will forward any additional documents, (i.e., Hiring Above the Minimum and/or Recruitment and Retention) to the appropriate Headquarters' Personnel Operations Analyst.

Prior to forwarding the 647 package to the IPO, the candidate will meet with the Health Care Manager. The CHP Coordinator will initiate a gate clearance and schedule the applicant for a physical including the TB test. A designee from Mental Health Services, Health Care Operations will check the selected candidate's current references. Upon receiving all clearances the CHP Coordinator will contact the IPO with the effective date of hire. The IPO will initiate the new employee gate clearance, background clearance, identification card, and New Employee Orientation.

Please advise your staff of this new hiring process to fill Staff Psychiatrist, CF vacancies at your facility. Additionally, if your institution has a current vacant Staff Psychiatrist, CF position please notify the HCSD, CHP Coordinator. Thank you in advance for your assistance. Any comments regarding this process can be directed to Karen Huston, CHP Coordinator, P&R Unit at (916) 327-2469 or CALNET 467-2469.

SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

DAVID TRISTAN
Deputy Director
Institutions Division

Attachment

cc: Sandra K. Duveneck, Assistant Deputy Director, Program Support and Evaluation, HCSD
    Nadim K. Khoury, M.D., Assistant Deputy Director, Health Care Policy, HCSD
    James E. Libonati, Assistant Deputy Director, Office of Personnel Management
    Roger E. Hagen, Ph.D., Assistant Deputy Director (A), Health Care Operations, HCSD
    Teresa Hawkes, Regional Administrator, Health Care Operations, HCSD
    Tom Voss, Regional Administrator, Health Care Operations, HCSD
    Marjorie TaVoularis, M.D., Chief (A), Mental Health Services, Health Care Operations, HCSD
    Vickie L. Schlone, Regional Administrator (A), Health Care Operations, HCSD
    Institution Personnel Officers
    Karen Huston, CHP Coordinator, Personnel and Recruitment, HCSD

Wardens
Health Care Managers
Page 3


bcc:    Michael Keating, Coleman Special Master
        Michael T. Pickett, Regional Administrator, North, Institutions Division
        Lewis N. Jones, Regional Administrator, Central, Institutions Division
        K. W. Prunty, Regional Administrator, South, Institutions Division
        P&R Staff
        DH97-110601

GADisk1/DOC3CHP

CENTRALIZED HIRING PROCESS

12/3/97

| STEP | ACTIVITY | RESPONSIBILITY |
|---|---|---|
| 1 | IPO will notify P&R of the vacancy, position number and effective date and fax the duty statement and organization chart | IPO |
| 2 | P&R documents the position control log and sets up file | P&R |
| 3 | P&R will prepare the 647A package (Duty Statement, Organization Chart, Job Announcement, Freeze Exemption) | P&R |
| 4 | P&R will route 647A for signature(s) and document position control log initially and upon return | P&R |
| 5 | P&R will fax (and follow up with an email or phone call) the job announcement to the Job Announcement Coordinator in HQ-Personnel and document the position control log | P&R |
| 6 | P&R will fax 647A to the Cert Unit to order the certification list and contact letters  and document the position control log | P&R |
| 7 | Cert Unit will document request | Cert Unit |
| 8 | Cert Unit will order the certification list/contact letters and sets up a file | Cert Unit |
| 9 | Cert Unit will mail out contact letters | Cert Unit |
| 10 | Cert Unit will work the certification list | Cert Unit |
| 11 | Cert Unit will identify candidate group to be interviewed | Cert Unit |
| 12 | Cert Unit will forward eligible names to P&R | Cert Unit |
| 13 | P&R will review and verify the eligibility for the applications received from CDC Job Opportunity Bulletin | P&R |
| 14 | P&R will photo applications and type a listing of the applications being forwarded to the appropriate manager (i.e., Chief of Mental Health Services, Regional Administrator) | P&R |
| 15 | Appropriate manager (i.e., Chief of Mental Health Services, Regional Administrator) reviews  applications and identifies candidates to be interviewed and notifies P&R | MHS/HCO |
| 16 | P&R will coordinate the following: | P&R |
|  | 1)  Identify and reserve location |  |
|  | 2)  Identify, notify, and confirm panel members |  |
|  | 3)  Notify candidates of the time and place for the interview.  If applicable, obtain information for gate clearance, coordinate with Institution to process gate clearance and arrange for an escort |  |
| 17 | P&R will prepare interview package (Attach B, Duty Statement, Organization Chart, Appoint. Just. form, Auth. form to review personnel record) and schedule orientation mtg w/appropriate mgr (i.e. Chief of Mental Health Services, Regional Administrator) | P&R |
| 18 | P&R will meet with the appropriate manager (i.e. Chief of Mental Health, Regional Administrator) to provide panel orientation | P&R |
| 19 | Interviews held at designated location | MHC/HCO/Field |
| 20 | Candidate will meet with the Health Care Manager (HCM) and tour the institution | HCM |
| 21 | The HCO Assistant Deputy Director will arbitrate the decision, should  issues occur regarding the selection of candidate | HCO |
| 22 | Manager will return the interview package to P&R and indicate if a Hire Above Minimum (HAM) and/or Recruitment & Retention (R&R) is needed | MHS/HCO |
| a | P&R will prepare the 647A package.  If applicable, complete the HAM and/or R&R request | P&R |
| b | P&R will forward the HAM and/or R&R request to the appropriate HQ-Personnel Analyst and document the position control log | P&R |
| c | P&R will notify (i.e., email, phone, etc) the manager on the outcome of the HAM and/or R&R request | P&R |
| d | Salary determination to be completed by appropriate Operations' Personnel Analyst |  |
| e | Eligibility for transfer or reinstatement to be completed by  (to be determined) |  |
| 23 | Designee from MHS/HCO will check selected candidate current references | MHS/HCO |
| a | P&R will coordinate use of National Practitioner Data Bank with appropriate institution | P&R |
| 24 | Manager contacts candidate and negotiates a start date | MHS/HCO |
| a | P&R will send Health Questionnaire to selected candidate for completion | P&R |
| b | P&R will coordinate physical examination date and time with Health Manager and candidate | P&R |
| c | P&R will track until physical  is cleared | P&R |

| | | | |
|---|---|---|---|
| 25 | P&R will forward completed 647A package to institution and document position control log | | P&R |
| a | P&R will contact Institution Health Care Manager to ensure new employee is scheduled for Institutional Orientation | | P&R |
| 26 | P&R will close out file and provide the institution with the necessary documents | | P&R |
| a | P&R will provide the Cert. Unit with the proper documentation to clear the cert list | | P&R |
| 27 | P&R will maintain contact with new employee at one month, three month and six month intervals to track progress/status | | P&R |
| | | | |
| | | | |
| Definitions: | | | |
| | | | |
| IPO - Institution Personnel Officer | | | |
| P&R - Personnel and Recruitment | | | |
| MHS - Mental Health Services | | | |
| HCO - Health Care Operations | | | |
| HCM-Health Care Manager | | | |
| | | | |
| disk: process/ file: chp-nacc/ program:  excel | | | |

Ex. G

State of California                                                    Department of Corrections

# Memorandum

Date  :  May 29, 1997

To    :  Robin J. Dezember
         Deputy Director

Via   :  Stephen K. Larsen, Chief
         Planning and Program Coordination

Subject:  **MENTAL HEALTH CONTRACT SERVICES - STAFF PSYCHIATRIST**

Yong Joo Erwin and her staff have been tracking contracted services for staff psychiatrist since December 1996. The information presented below is based on data from December 1996 through March 1997 (data for April 1997 has not yet been completed).

Based on the information supplied by Ms. Erwin, the statewide monthly average for contracted staff psychiatrist services is 2,048.35 hours or 24,580.20 hours per year (see Attachment 1 for an institutional breakdown). Attachment 2 contains the detailed monthly charts supplied by Ms. Erwin which set forth the institution, contract provided, program covered and the respective hours for that month. Ms. Erwin indicated that all contract providers shown, with the exception of Ph.Ds, are psychiatrist.

One full-time position is calculated to be 1,800 hours per year, thus, the contracted staff psychiatrist services would approximate 13.66 PYs. This would take the 1996/97 vacancies for staff psychiatrist from 20.8 to 7.14 positions, a reduction from the 22% to a 7.44% vacancy rate.

| Mental Health Vacancies Summary 1996/97 | | | | |
|---|---|---|---|---|
| | Authorized | Filled | Vacant | Vacancy Rate |
| Staff Psychiatrist | 96.0 | 88.86* | 7.14* | 7.44%* |

*Using the contracted service as filled position(s).

EILEEN BAUMGARDNER
Health Planning Manager
Planning
Health Care Services Division

Attachments

CDC 1617 (3/89)

| MENTAL HEALTH CONTRACT SERVICES | | |
|---|---|---|
| Institution | Hours Per Month | Hours Per Year |
| CCWF | 172 | 2,064 |
| CIM | 59.5 | 714 |
| CMF | 158.75 | 1,905 |
| COR | 156.38 | 1,876.56 |
| CVSP | 12.14 | 145.68 |
| DVI | 164.25 | 1,971 |
| HDSP | 140 | 1,680 |
| ISP | 57 | 684 |
| LAC | 25 | 300 |
| MCSP | 61 | 732 |
| PBSP | 230 | 2,760 |
| PBSP | 67.50 | 810 |
| SAC | 22.38 | 268.56 |
| SQ | 43.25 | 519 |
| SOL | 6 | 72 |
| VSPW | 106.34 | 1,276.08 |
| WSP | 566.86 | 6,802.32 |
| Total | 2,048.35 | 24,580.20 |

MENTAL HEALTH CONTRACT SERVICES
December 1996

Attachment 2

| INSTITUTION | CONTRACT PROVIDER | PROGRAM COVERED | HOURS FOR MONTH |
|---|---|---|---|
| ASP | | | 0 |
| CAL | John Bellinger, Ph.D. | MHCB, EOP, CCCMS | 48 |
| | Louis Blumberg, Ph.D. | BPT Reports | 2 |
| CCC | | | 0 |
| CCI | | | 0 |
| CCWF | Bernard Paladino, M.D. | MHCB, RC, AD. SEG. | 104 |
| | Herman Romm, M.D. | CCCMS | 80 |
| CEN | Louis Blumberg, Ph.D. | BPT Reports | 9 |
| | | Emergency Assments | |
| CIM | N. Hatuk, M.D. | MHCB | 48 |
| CIW | | | 0 |
| CMC | | | 0 |
| CMF | Roy Enright, M.D. | Outpatient Psy. Prog. | 160 |
| | Weingarter, M.D. | Outpatient Psy. Prog. | 12 |
| COR | Charles Davis | | 189.5 |
| CRC | | | 0 |
| CTF | | | 0 |
| CVSP | Payne | | 12.11 |
| DVI | Donald Walk, M.D. | CCCMS | 169 |
| FOL | | | 0 |
| HDSP | Louis Richnac | | 64 |
| | Beth Kline, M.D. | | 64 |
| ISP | Boniface, Dy, M.D. | MHCB, CCCMS | 60 |
| | B. Payne, M.D. | MHCB, CCCMS | 40 |
| LAC | Donald Walk, M.D. | | 60 |
| MCSP | J. A. Smith, M.D. | CCCMS | 71 |
| NCWF | | | 0 |
| NKSP | | CCCMS | 20 |
| PBSP | Benson | | 88 |
| PVSP | | | 0 |
| RJD | | | 0 |
| SAC | | | 0 |
| SCC | | | 0 |
| SOL | Eugene Crayton, Ph.D. | CCCMS | 8 |
| SQ | John Hess, M.D. | RC/MHCB/CCCMS | 173 |
| SVSP | | | 0 |
| VSPW | Bernard Finley, M.D. | CCCMS | 113.34 |
| WSP | Benson | | 30 |
| | Dusy | | 30 |
| | French | | 40 |
| | Goldsmith | | 69 |
| | Griffin | | 100 |
| | Karpman | | 40 |
| | Sinclair | | 18 |
| | Slutzky | | 28 |
| | Surulinath | | 38 |
| | Turner | | 49.5 |
| | Wilson | | 24 |
| **TOTAL MENTAL HEALTH CONTRACT SERVICES FOR D** | | | **2061.45** |

## MENTAL HEALTH CONTRACT SERVICES
### January 1997

| INSTITUTION | CONTRACT PROVIDER | PROGRAM COVERED | HOURS FOR MONTH |
|---|---|---|---|
| ASP | | | 0 |
| CAL | John Bellinger, Ph.D. | | 64.5 |
| CCC | | | 0 |
| CCI | | | 0 |
| CCWF | Bernard Paladino, M.D. | MHCB, RC, AD.SEG. | 188 |
| CEN | Louis Blumberg, Ph.D. | BPT Reports Emergency Assments | 14 |
| CIM | N. Hatuk, M.D. | MHCB | 48 |
| CIW | | | 0 |
| CMC | | | 0 |
| CMF | Roy Enright, M.D. | Outpatient Psy. Prog. | 155 |
| | Weingarter, M.D. | Outpatient Psy. Prog. | 20 |
| COR | Charles Davis | | 190 |
| CRC | | | 0 |
| CTF | | | 0 |
| CVSP | Payne | | 7.54 |
| DVI | Donald Walk, M.D. | CCCMS | 158 |
| FOL | | | 0 |
| HDSP | Louis Richnac, M.D. | | 88 |
| | Beth Kline, M.D. | | 40 |
| ISP | Boniface, Dy, M.D. | MHCB, CCCMS | 40 |
| | B. Payne, M.D. | MHCB, CCCMS | 48 |
| LAC | Donald Walk, M.D. | | 10 |
| MCSP | J. A. Smith, M.D. | CCCMS | 56 |
| NCWF | | | 0 |
| NKSP | | | 0 |
| PBSP | Benson | | 152 |
| PVSP | Eugene Crayton, M.D. | CCCMS | 6 |
| | Justin Birnbaum, M.D. | CCCMS | 24 |
| RJD | | | 0 |
| SAC | | | 0 |
| SCC | | | 0 |
| SOL | Hurley, Ph.D. | CCCMS | 8 |
| SQ | | | 0 |
| SVSP | | | 0 |
| VSPW | | | 0 |
| WSP | Benson | | 32 |
| | Birnbaum | | 44 |
| | Bloch | | 29.5 |
| | French | | 80 |
| | Goldsmith | | 60 |
| | Griffin | | 110 |
| | Karpman | | 40 |
| | Sinclair | | 5 |
| | Slutzky | | 39 |
| | Turner | | 81 |
| | Wilson | | 29 |
| TOTAL MENTAL HEALTH CONTRACT SERVICES FOR J | | | 1866.54 |

## MENTAL HEALTH CONTRACT SERVICES
### February 1997

| INSTITUTION | CONTRACT PROVIDER | PROGRAM COVERED | HOURS FOR MONTH |
|---|---|---|---|
| ASP | | | 0 |
| CAL | John Bellinger, Ph.D. | | 56.5 |
| CCC | | | 0 |
| CCI | | | 0 |
| CCWF | Bernard Paladino, M.D. | MHCB, RC, AD.SEG. | 172 |
| CEN | Louis Blumberg, Ph.D. | BPT Reports Emergency Assments | 9.25 |
| CIM | N. Hatuk, M.D. | MHCB | 48 |
| CIW | | | 0 |
| CMC | | | 0 |
| CMF | Roy Enright, M.D. | Outpatient Psy. Prog. | 168 |
| COR | Charles Davis | | 166 |
| CRC | | | 0 |
| CTF | | | 0 |
| CVSP | Payne | | 12.91 |
| DVI | Donald Walk, M.D. | CCCMS | 160 |
| FOL | | | 0 |
| HDSP | Beth Kline, M.D. | | 40 |
| | Louis Richnac, M.D. | | 96 |
| ISP | B. Payne, M.D. | MHCB, CCCMS | 40 |
| LAC | Donald Walk, M.D. | | 30 |
| MCSP | J. A. Smith, M.D. | CCCMS | 49 |
| NCWF | | | 0 |
| NKSP | | | 0 |
| PBSP | Benson | | 136 |
| | Swigert | | 144 |
| PVSP | Eugene Crayton, M.D. | CCCMS | 32 |
| | Justin Birnbaum, M.D. | CCCMS | 16 |
| | Samuel Benson, M.D. | CCCMS | 16 |
| | Pierce Hurley, M.D. | CCCMS | 16 |
| RJD | | | 0 |
| SAC | Pearce Hurley, M.D. | | 17.5 |
| | John Dusay, M.D. | | 20 |
| | Alfred French, M.D. | | 24 |
| | Justin Birnbaum, M.D. | | 28 |
| SCC | | | 0 |
| SOL | Hurley, Ph.D. | CCCMS | 16 |
| | E. Crayton, Ph.D. | CCCMS | 16 |
| SQ | | | 0 |
| SVSP | | | 0 |
| VSPW | Janet Allison, M.D. | CCCMS | 160 |
| WSP | Benson | | 39.7 |
| | Birnbaum | | 60 |
| | Crayton | | 49 |
| | Dusay | | 20 |
| | French | | 80 |
| | Goldsmith | | 50 |
| | Griffin | | 90 |
| | Karpman | | 40.25 |
| | Michelson | | 20 |
| | Robie | | 29.5 |
| | Sinclair | | 8.5 |
| | Slutzky | | 40.25 |
| | Turner | | 60 |
| | Weintraub | | 20.5 |
| | Wilson | | 20 |
| TOTAL MENTAL HEALTH CONTRACT SERVICES FOR FEB | | | 2316.86 |

## MENTAL HEALTH CONTRACT SERVICES
### March 1997

| INSTITUTION | CONTRACT PROVIDER | PROGRAM COVERED | HOURS FOR MONTH |
|---|---|---|---|
| ASP | | | |
| CAL | John Bellinger, Ph.D. | BPT Reports | 64 |
| | L. Blumberg, Ph.D. | BPT Reports | 8 |
| CCC | | | 0 |
| CCI | | | 0 |
| CCWF | Bernard Paladino, M.D. | MHCB, Weekends, RC, Ad. Seg. | 144 |
| CEN | Louis Blumberg, Ph.D. | BPT Reports Emergency Assments | 8 |
| CIM | M. Hatuc, M.D. | Crisis Beds | 94 |
| CIW | | | 0 |
| CMC | | | 0 |
| CMF | Roy Enright, M.D. | OPP | 120 |
| COR | Charles Davis, M.D. | EOP | 80 |
| CRC | | | 0 |
| CTF | | | 0 |
| CVSP | Dennis Payne, M.D. | Consulting | 16 |
| DVI | George F. Kassebaum, M.D. | | 10 |
| | Donald R. Walk, M.D. | | 160 |
| FOL | | | 0 |
| HDSP | Louis Richnak, Jr., M.D. | EOP | 96 |
| | Beth A. Klein, M.D. | EOP | 72 |
| ISP | | | 0 |
| LAC | | | 0 |
| MCSP | James Smith M.D. | CCCMS, A & C Yards | 68 |
| NCWF | | | 0 |
| NKSP | | | 0 |
| PBSP | Oliver Swiggert, M.D. | PSU | 160 |
| | John Benson, M.D. | PSU, Infirmary | 160 |
| | Don Schultz, M.D. | Infirmary, Crisis Beds | 80 |
| PVSP | Eugene Crayton, M.D. | CCCMS, Inpatient | 96 |
| | Robert Spitzer, M.D. | CCCMS, Inpatient | 64 |
| RJD | | | 0 |
| SAC | | | |
| SCC | | | 0 |
| SOL | Kathleen O'Meara, Ph.D. | BPT Reports | 8 |
| | Robert Wagner, Ph.D. | BPT Reports | 8 |
| | Eugene Crayton, M.D. | CCCMS/Medications | 12 |
| | Pierce Hurley, M.D. | CCCMS/Medications | 12 |
| SQ | | | 0 |
| SVSP | | | 0 |
| VSPW | Bernard Finley, M.D. | RC | 152 |
| WSP | Benson | Infirmary, CCCMS | 24 |
| | Crayton | Infirmary, CCCMS | 45 |
| | French | Infirmary, CCCMS | 50 |
| | Goldsmith | Infirmary, CCCMS | 70.25 |
| | Griffin | Infirmary, CCCMS | 135 |
| | Karpman | Infirmary, CCCMS | 40 |
| | Mihelson | Infirmary, CCCMS | 50.5 |
| | Onkin | Infirmary, CCCMS | 20 |
| | Robie | Infirmary, CCCMS | 65 |
| | Sinclair | Infirmary, CCCMS | 8 |
| | Turner | Infirmary, CCCMS | 86 |
| | Wilson | Infirmary, CCCMS | 30 |
| **TOTAL MENTAL HEALTH CONTRACT SERVICES FOR MARCH 1997** | | | **2315.75** |

EX. H

 **62010.10**
## ▸▸DEPARTMENTAL◂◂
## ▸▸REVIEW◂◂ ▸▸BOARD◂◂

The DRB serves as the final reviewing authority for classification issues when placement decisions are appealed to headquarters or when policy clarification is needed.

### 62010.10.1
### PURPOSE

This section establishes standard procedures for the resolving of all staff classification action appeals at the headquarters level by the DRB.

### 62010.10.2
### COMPOSITION

The DRB shall consist of the:

- Deputy Director or an Assistant Deputy Director, Institutions (chairperson).

- Deputy Director, P&CSD.

- Chief, Classification Services. (Shall abstain on classification actions appealed by wardens/regional administrators.)

- Chief, Medical Services when required.

### 62010.10.3
### QUORUM

The DRB meets at the call of the chairperson. Two voting members constitute a quorum.

### 62010.10.4
### REFERRAL
### CRITERIA

Cases shall be referred for DRB decision when:

- The warden/regional parole administrator appeals an action of the Chief, Classification Services.

- A test case is needed to clarify the application of policy.

- Differences between BPT program placement order and departmental policies or procedures cannot be resolved.

- An out-of-state or federal prison placement is recommended.

- Meritorious credit is recommended to reduce an inmate's period of confinement pursuant to PC 2935.

- Current placement is by prior DRB action and continuing DRB responsibility for the case has not been waived.



 A headquarters level decision for placement is required because of an unusual threat to safety or public interest, i.e., commuted death row cases.

## 62010.10.5
## PROCESS

Cases for DRB review shall be submitted by the warden or regional administrator to the Chief, Classification Services, using the format in Exhibit B.

Because the inmate's C-file is not available to the DRB, referrals shall contain all pertinent information.

When the referral is an appeal of a CSR action, the Chief, Classification Services, shall attempt to resolve the issues before presenting it to the DRB.

The Chief, Classification Services, shall evaluate, add relevant factors to be considered and provide a recommendation for cases presented to the DRB. This shall be provided on a CDC Form 128-G, which shall also provide for documentation of the DRB action.

## 62010.10.6
## IMPLEMENTATION

DRB actions shall be implemented within 30 days.

## 62010.11
## REVISIONS

The Deputy Director, Institutions or designee, shall ensure that the content of this section is current and accurate.

## 62010.12
## REFERENCES

Penal Code Sections 5068, 1170(d), 2935, 5054, and 5058.

California Code of Regulations, Title 15, Division 3.

**Section:     62020     Recall of Commitment**

## 62020.1
## POLICY

Inmates received by the California Department of Corrections (Department) may, under certain circumstances, be recalled by the sentencing court. A recall may also be initiated by the Director of Corrections (Director) or the Board of Prison Terms (BPT).

## 62020.2
## PURPOSE

This section establishes standard procedures for the processing and evaluation of those inmate cases whose sentences and commitments may be reconsidered by the court under the provisions of Penal

Code (PC) Section 1170(d).

### 62020.3
### AUTHORITY

PC 1170(d) permits the sentencing court to recall a previously ordered sentence and commitment within 120 days of the date of sentencing and resentence the inmate. The court may consider a recall of sentence and commitment upon the recommendation of the Director or the BPT at any time during an inmate's incarceration.



- Document inmate misconduct and affirm, modify, or reject any action taken.

- Review disciplinary actions where worktime credits were lost/denied and to act as inmate's first level of appeal review.

- Restore lost credits, where appropriate, for disciplinary violations.

## 62010.9
## CLASSIFICATION
## COMMITTEE
## RESPONSIBILITY
## DUE PROCESS

Each classification committee shall:

- Inform the inmate of the purpose of the hearing and introduce committee members.

- Encourage the inmate to participate in the hearing discussion.

- Make decisions based on evaluation of available information and mutual agreement of the committee members.

- Inform the inmate of the decision.

## 62010.9.1
## CDC FORM 128-G,
## CLASSIFICATION
## COMMITTEE
## DOCUMENTATION
## REQUIREMENTS

Each classification committee shall:

- Prepare a recording of the hearing on a CDC Form 128-G.

- Issue a copy of the CDC Form 128-G to the inmate.

The documentation of each classification shall include:

- The action taken.

- The date of the action.

- The specific reason(s) for the action(s) including the information upon which the decision was based.

- The names of staff who participated in the decision.

- The name of the chairperson of the committee taking the action.

- The name and signature of the person recording the action.



The inmate shall be present at the classification hearing on an administrative segregation order except under the applicable conditions as described in DR 3320(f) relating to disciplinary hearings. If the classification committee hearing is held without the inmate present, the reason shall be documented on the segregation order form. Any staff member assigned to assist the inmate shall be present at the hearing.

**52080.27.1**
**RETENTION FOR**
**DISCIPLINARY**

When the reason for an inmate's placement in administrative segregation is a disciplinary matter and likely to result in a formal report of violation of institution rules on a CDC Form 115 or a referral to the appropriate criminal authorities for possible criminal prosecution, the classification hearing shall assume the alleged misconduct or criminal activities to be factual as reported in the segregation order. The hearing shall not consider evidence or information relating to the guilt or innocence of the inmate. ▶ICC◀ may continue the inmate in administrative segregation pending resolution of the disciplinary issues or consider placement in a specialized security unit based upon other non-disciplinary reasons necessitating such placement.

**52080.27.2**
**RETENTION FOR**
**NON-DISCIPLINARY**

When the reason for an inmate's placement in administrative segregation is for non-disciplinary reasons, the classification committee hearing shall consider all available evidence or information relating to the validity of the reasons given for such placement as well as the need to retain the inmate in administrative segregation pending resolution of the situation or circumstances set forth in the administrative segregation order.

**52080.27.3**
**WITNESSES FOR**
**HEARING**

Based upon the finding of the investigative employee, the ▶ICC◀ shall permit the inmate to present witnesses and documentary evidence at the hearing unless the chairperson of the committee determines in good faith that permitting such evidence shall be unduly hazardous to institution safety. The reason for disallowing witnesses or evidence shall be documented in the "hearing" portion of the CDC Form 114-D and in the CDC Form 128-G, Classification Chrono (Exhibit J).

**52080.27.4**
**DETERMINATIONS**

The determinations of the classification hearing shall be documented in the hearing portion of the CDC Form 114-D, and in the CDC Form 128-G. Such documentation shall include an explanation of the reason and the information and evidence relied upon for the action taken. The completed CDC Form 114-D and any CDC Form 128-G resulting from hearings shall be routed to the inmate's central file. The inmate shall be given a copy of all completed forms and of all other documents relied upon in the hearing except those containing restricted/confidential information.

52080.28
## RELEASE FROM
## ADMINISTRATIVE
## SEGREGATION

Release from segregation status shall occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation. Nothing in this article shall prevent the official ordering an inmate's placement in administrative segregation, or a staff member of higher rank in the same chain of command, from withdrawing an administrative segregation order before it is acted upon or prior to a hearing on the order after consulting with and obtaining the concurrence of the administrator of the general population unit to which the inmate shall be returned or assigned. Release from segregated housing after classification committee confirmation shall be effected only upon the written order of an equal or higher authority.

52080.29
## RETENTION IN
## ADMINISTRATIVE
## SEGREGATION AFTER
## EXPIRATION OF
## TERM/11 MONTHS
## INDETERMINATE

Procedural safeguards apply to inmates retained for administrative reasons after the expiration of a SHU term. SHU terms of confinement shall be set or reduced by classification action.

A CDC Form 114-D shall be initiated, giving written notice of the reasons for retention in sufficient detail to enable the inmate to prepare a response or defense. Except in an emergency, a copy of the order shall be given to the inmate prior to the expiration of the term of confinement. In no case shall notice be given later than 48 hours after the expiration of the term.

During the subsequent classification committee hearing, the inmate shall be given a reasonable opportunity to present witnesses and documentary evidence unless institution officials determine in good faith that presentation of the evidence would be unduly hazardous to institutional safety. The reason for disallowing designated evidence shall be explained in writing by the hearing body on the segregated housing order.

A copy of the completed segregated housing order containing a written decision, including references to the evidence relied upon and the reasons for retention in segregated housing beyond the expired term or one year of indeterminate confinement, if so retained, shall be given the inmate upon completion of the hearing.

52080.30
## SEGREGATION FROM
## GENERAL POPULATION -
## NOT ADMINISTRATIVE
## SEGREGATION

Segregation from general population for the reasons and under the circumstances described below are not administrative segregation and are excluded from the other provisions of this section:

## Medical

When an inmate is involuntarily segregated from the general population for medical or psychiatric reasons by order of medical staff and the inmate's placement is in a hospital infirmary, or in other housing as a medical quarantine, the inmate shall not be deemed to be in administrative segregation.



When personnel other than medical staff order an inmate placed in administrative segregation for reasons related to apparent medical or psychiatric problems, that information shall be immediately brought to the attention of medical staff. The appropriateness of administrative segregation or the need for movement to a hospital setting shall be determined by medical staff.

When medical or psychiatric reasons are not the primary reason for an inmate's segregation, administrative segregation status will be continued even if the inmate is moved to a hospital setting.

**Orientation
and Layover**

Newly received inmates and inmates in transit or layover status may be restricted to quarters (RTQ) for that purpose. Such restrictions shall not be more confining than is required for institution security and the safety of persons, nor for a period longer than the minimum time required to evaluate the safety and security factors and reassignment to more appropriate housing. No inmate shall be placed in RTQ for more than ten days.

**Disciplinary
Detention**

Placement in disciplinary detention is an ordered action of a disciplinary hearing and is not administrative segregation except as provided in DR 3338(a)(2) and (3).

**Confinement
to Quarters**

CTQ is an ordered action of a disciplinary hearing and is not administrative segregation.

**Protective
Housing Unit
(PHU)**

PHU inmates endorsed by CSR action, not requiring segregation other than for protective custody.

**Psychiatric
Management Unit
(PMU)**

PMU inmates posing a serious threat to general population housing, not requiring hospitalization, endorsed by CSR action.

**52080.31
SECURITY HOUSING
UNIT (SHU)**

Refer to DR 3341.5 and DOM Section 62050.13.2.

**52080.32
CASE REVIEW**

The case of every inmate assigned to a segregated housing unit shall be continuously reviewed and evaluated by custodial and casework staff assigned to the unit. Staff will confer on each case no less frequently than once a week during the first two months of the inmate's segregated status. Such case reviews will not be necessary during any week in which the inmate's case is reviewed by a regular or special classification committee or by staff who are authorized to take classification actions. Any significant observations, determinations or recommendations, shall be documented on the inmate's CDC Form 114-A.

A psychological assessment of the inmate's mental health will be included in the case review and classification committee review of inmates assigned to segregated housing units. When any indication of psychiatric or psychological problems exists, the case shall be referred to the institution's psychiatrist or psychologist for further evaluation and recommended classification committee actions.

**52080.33**
**CONDITIONS OF**
**SEGREGATED HOUSING**

In keeping with the special purpose of a segregated housing unit, and with the degree of security, control and supervision required to serve that purpose, the physical facilities of special purpose segregated housing shall approximate those of the general population.

**52080.33.1**
**RESTRICTIONS**





## ▶▶62010.8◀◀
## INSTITUTIONAL CLASSIFICATION COMMITTEES

All decisions affecting transfer, program participation, supervision, security, housing, and safety of persons, shall be made by a classification committee composed of staff knowledgeable in the classification process. A chairperson and any two members of any committee shall comprise a quorum except for reentry classification actions.

Decisions of classification committees shall be documented on a CDC Form 128-G and a copy given to the inmate.

## 62010.8.1
## INSTITUTION CLASSIFICATION COMMITTEE (ICC) FUNCTIONS

ICC's shall:

· Review inter-institutional transfer recommendations in problem cases where departmental or public welfare is at stake.

· Review all cases referred by subcommittee.

· Refer cases to the Chief, Classification Services, or the DRB for resolution/action including recommendations to grant inmate additional reduction of sentence pursuant to PC 2935.

· Review the altered status of each inmate placed in segregated housing at the time of initial placement and at regular intervals thereafter in accordance with the California Code of Regulations (CCR) Title 15, Division 3, Section 3335.

· Approve or deny disciplinary credit losses and inmate requests for credit restoration of Division A-1, A-2, and B offenses in accordance with CCR 3327. This action shall serve as the first level of appeal review.

## 62010.8.2
## ICC AUTHORITY

The ICC is delegated the primary authority for all classification actions within the institution.

## Composition

ICC's shall consist of:

· Warden or deputy warden (chairperson).

· CA (alternate chairperson).

· Psychiatrist or physician.

· PA.

· CC III or CC II (committee recorder).

· Correctional captain.



- Assignment lieutenant.

- Educational or vocational program representative.

- Other staff as required.

## 62010.8.3
## INITIAL
## CLASSIFICATION
## COMMITTEE

Each institution shall establish an initial classification committee to review and initiate a suitable program for each inmate within 14 days after arrival at the institution.

### Composition

Initial classification committees shall consist of:

- PA (chairperson).

- CC III or correctional captain (alternate chairperson).

- CC II or CC I (committee recorder).

- Assignment lieutenant.

- Educational or vocational program representative.

- Other staff as required.

### Functions

Initial classification committees shall:

- Initiate an educational, vocational training, or work program and privilege group designation.

- Evaluate case factors and assist the inmate to understand institution expectations, available programs, and resources.

- Designate the degree of custody necessary to control the inmate.

- Refer complex cases to the ICC.

- Recommend transfer of a new arrival determined to be inappropriately placed.



Ex. I

State of California

Department of Corrections

# Memorandum

Date : **DEC 3 1 1997**

To : Wardens
Health Care Managers
Chief Psychiatrists/Senior Mental Health Staff

JAN 1 3 1998

| Reason For Transmittal | |
|---|---|
| [ ] | State Law Change |
| [ ] | Regulation or DOM Change |
| [ ] | Court Order or Settlement Agreement |
| [ ] | Clarification Request |
| [x] | Other (see below) |
| | *Policy Change* |

HCSD Memo Number   97-0018

Subject: **DEPARTMENT OF MENTAL HEALTH INPATIENT REFERRAL TO ATASCADERO STATE HOSPITAL**

This is to advise each of our institutions that the California Department of Corrections (CDC) is obliged to reduce and eventually eliminate the use of Atascadero State Hospital (ASH) beds for intermediate inpatient care. We will immediately begin evaluating inmates who are currently treated at ASH, under Penal Code 2684, to identify appropriate treatment resources within the Department's Mental Health Services Delivery System (MHSDS).

Upon receipt of this memorandum, we are asking you to stop initiating/processing referrals of inmates to ASH. The California Men's Colony (CMC) has been instructed not to accept any new referrals after this date.

Policy to discontinue referrals to ASH via CMC will remain in effect until further notice. We appreciate your immediate cooperation in this matter.

If you have any questions, please do not hesitate to contact me at (916) 323-0229. Placement difficulties can be discussed on a case-by-case basis with Marjorie TaVoularis, M.D., Chief (A), Mental Health Services, Health Care Services Division (HCSD), at (916) 323-0236.

SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

cc:   J. Michael Keating, Jr., Mediator & Specialist
John Rodriguez, Deputy Director, Long Term Care Services, Department of Mental Health
David Tristan, Deputy Director, Institutions Division
Marjorie TaVoularis, M.D., Chief (A), Mental Health Services, HCSD
Regional Administrators, HCSD
Regional Administrators, Institutions Division

CDC 1617 (3/89)

EX. J

State of California

# Memorandum

Date   :    JAN 3 0 1998

To      :    Wardens
             Health Care Managers
             Chief Psychiatrists

Subject   :    **ATASCADERO STATE HOSPITAL REFERRALS**

I have met with the Health Care Managers and Chief Psychiatrists during the regional meetings conducted in the last few months. We discussed referrals to Atascadero State Hospital (ASH) at that time. I know that you understand the process for the referral of a potential admission to ASH, however, sources outside of the California Department of Corrections (CDC) appear to have some concerns. This information is an addendum to the attached December 31, 1997 memorandum.

1.      There is no change in the referral process of California Medical Facility to ASH.

2.      There is no change in the process that California Men's Colony (CMC) uses in their referrals to ASH except they will fax to Marjorie TaVoularis, M.D., Chief, Mental Health Services, Health Care Services Division (HCSD), their evaluation of all inmates they are recommending for ASH transfer.

3.      The remainder of institutions must contact Dr. TaVoularis, or her clinical designee, to discuss an inmate's potential admission to ASH. A policy to discontinue direct referral to ASH via CMC remains in effect as outlined in the attached memorandum.

With the use of the prescreening process we hope to avoid referrals to ASH of inmates whose mental health needs can be served adequately within the CDC Mental Health Delivery System. I hope that this along with our personal discussions eliminates any potential questions regarding referrals. If further questions remain, please telephone Dr. TaVoularis at (916) 323-0236.

SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

Attachment

Ex. K

tate of California                                                            Department of Corrections

# Memorandum

ate :    September 4, 1997

o   :    Wardens
         Health Care Managers
         Chief Psychiatrists

ubject:  MENTAL HEALTH STAFF PARTICIPATION IN CLASSIFICATION COMMITTEE
         MEETINGS AND DOCUMENTATION REQUIREMENTS

This is to provide guidance on the attendance of mental health clinicians at classification committee meetings and to describe the required documentation process for mentally ill inmates.

### Mental Health Staff Designation:

As required by California Code of Regulations, Title 15, Section 3376(c)(2)(C) and in order to comply with <u>Coleman</u> requirements, the Chief Psychiatrist or designee shall attend all Institutional Classification Committee (ICC) meetings that are held in Administrative Segregation or the Security Housing Unit. Additionally, the Chief Psychiatrist or designee shall attend Unit Classification Committee (UCC) meetings when identified Mental Health Services Delivery System inmates (i.e. Enhanced Out-Patient and Correctional Clinical Case Management System) are reviewed.

In institutions that do not have a Chief Psychiatrist, the Health Care Manager or designee shall attend these meetings. Designees shall be a Psychiatrist, licensed Psychologist, or licensed Psychiatric Social Worker.

### Clinician Input:

The clinician attending the ICC and UCC meetings shall describe the inmate's current mental status and shall present the inmate's treatment needs based on an assessment and the recommendation made by the Interdisciplinary Treatment Team.

Wardens
Health Care Managers
Chief Psychiatrists
Page 2


**Documentation:**

As required by the Department Operations Manual (DOM) Section 62010.9, each classification committee is required to "make decisions based on an evaluation of available information and mutual agreement of the committee members." The DOM Section 62010.9.1 details the documentation requirement for each classification action that includes "the specific reason(s) for the action(s) including the information upon which the decision was based." When an actively decompensating mentally ill inmate is recommended for transfer to a mental health program by the clinician and the decision of the committee is to retain the inmate in segregated housing, the reasons for this decision shall be included in the documentation (CDC Form 128-G). The documentation shall also include a summary of the clinical information provided by the clinician. Clinicians participating in ICC and UCC shall document their input on a CDC Form 128-C (128-C) and MH 3, Interdisciplinary Progress Note. A copy of the 128-C shall be placed in the inmate's Central File and the Unit Health Record.

If you have any questions or concerns, please contact Marjorie TaVoularis, M.D., Chief (A), Mental Health Services (MHS), Health Care Services Division (HCSD), at (916) 323-0036.



ROBIN J. DEZEMBER
Deputy Director
Health Care Services Division

DAVID TRISTAN
Deputy Director
Institutions Division

cc: John R. Covington, D.O., FAAFP, Assistant Deputy Director (ADD) (A),
        Health Care Operations, HCSD
    Nadim K. Khoury, M.D., ADD, Health Care Policy, HCSD
    Sandra K. Duveneck, ADD, Program Support and Evaluation, HCSD
    Stephen K. Larsen, Chief, Planning and Program Coordination, HCSD
    Regional Administrators, Institutions Division
    Regional Administrators, HCSD
    Marjorie TaVoularis, M.D., Chief (A), MHS

Wardens
Health Care Managers
Chief Psychiatrists
Page 3


bcc: Marilyn Kalvelage
     Tim Rougeux
     Yong Joo Erwin
     Betty Sutton
     Shirley Opie
     Phyllis Scott
     Mental Health Chron
     Planning and Program Coordination Chron
     SO 97-161 a:/PCStaff/EOP-ICC/PS/MA

Ex. L

State of California                                                                    Department of Corrections

# **M**emorandum

Date    :    DEC 1 5 1997

To      :    Health Care Managers
             Chief Psychiatrists/
             Supervising Mental Health Clinicians

Subject:    **USE OF CLOZAPINE**

This memorandum informs you of a change in the Department's policy on the clinical use of Clozapine, an atypical antipsychotic medication for the psychiatric management of the severely ill schizophrenic inmate-patient who fails to respond adequately to standard antipsychotic drug treatment.  We will now treat inmate-patients who have been stabilized on Clozapine in a mental health program either at a Department of Mental Health facility or in the community (e.g., county mental health or private psychiatric facilities).

Please replace the first page of the <u>Protocol for the Limited California Department of Corrections (CDC) Use of Clozapine</u> with the attached page.

If you have any questions regarding this policy, please contact Marjorie TaVoularis, M.D., Chief (A), Mental Health Services, Health Care Services Division (HCSD), at (916) 323-0236.

*[signature]* , M.D.
SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

Attachment

cc:  David Tristan, Deputy Director, Institutions Division
      Wardens
      Roger E. Hagen, Ph.D., Assistant Deputy Director (A), Health Care Operations, HCSD
      Nadim K. Khoury, M.D., Assistant Deputy Director, Health Care Policy, HCSD
      Sandra K. Duveneck, Assistant Deputy Director, Program Support and Evaluation, HCSD
      Regional Administrators, HCSD
      Regional Administrators, Institutions Division

CDC 1617 (3/89)

### CALIFORNIA DEPARTMENT OF CORRECTIONS
### PROTOCOL FOR THE LIMITED MHSDS USE OF CLOZAPINE

## 1. INTRODUCTION

A. General: Clozapine, like loxapine, is a dibenzodiazepine derivative but differs from loxapine and all other conventional antipsychotics in several important respects and is classified as an atypical antipsychotic agent. Since the early 1970s, numerous clinical studies have demonstrated clozapine's efficacy in the treatment of psychotic symptoms. It has also been used successfully in treatment-resistant patients who were unresponsive to standard antipsychotics. In treating psychosis, it has done so with a markedly reduced incidence of extrapyramidal reactions and has yet to be implicated in the production of tardive dyskinesia. Potential very severe side effects of clozapine result in this restrictive protocol. In the California Department of Corrections (CDC), clozapine is to always be started and stabilization reached in a Department of Mental Health (DMH) facility or in another mental health program in the community.

B. Restricted: CDC Mental Health Services Delivery System use of clozapine (Clozaril by Novartis, formerly Sandoz) is restricted to:

1) Inmate-patients who have been started and stabilized on Clozapine while at a DMH facility, either Atascadero State Hospital (ASH) or Patton State Hospital (PSH); or at other mental health programs in the community.

2) The stabilized clozapine inmate-patient from ASH or PSH will be tranferred only to the California Men's Colony (CMC) or California Medical Facility (CMF) or California Institution for Women (CIW).

3) Inmates on clozapine who arrive at Reception Centers shall be referred and immediately evaluated by the psychiatrist who will continue the medication, as clinically indicated until inmates can be transferred to CMC, CMF, or CIW.

4) Once continued stabilization is assured, the inmate-patient may be transferred to a Correctional Clinical Case Management System (CCCMS) level of care if clinically warranted. These protocols and laboratory studies are to continue in the CCCMS.

## 2. INDICATIONS FOR USE

A. Inmate-patients must be Schizophrenic or Schizoaffective or have another psychotic disorder and tardive dyskinesia is diagnosed and the inmate-patient requires antipsychotic medications.

B. Inmate-patients less than 75 years old.

C. Treatment failure on conventional neuroleptic drugs, including risperidone.