

FILED

SEP 22 1998

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
          DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.

    **Plaintiffs,**

    **vs.**                  **No. CIV S-90-0520 LKK JFM P**

PETE WILSON, et al.,

    **Defendants.**

## REPORT OF THE SPECIAL MASTER ON
## STAFFING AND THE USE OF FORCE

On August 14, 1998, the defendants submitted documents in
response to the court's mid-June directive to demonstrate improvements
in both the quality and quantity of contracted psychiatric services and/or
their recruitment program to fill vacancies in presently authorized clinical
positions, and to submit their written policy on the use of 37mm weapons,
OC gas and cell extractions when seriously mentally disordered inmates
are involved.  Following the defendants' submission on these issues, the
court directed the special master to review the materials filed and report
to the court on the adequacy of their staffing efforts and their use of force
policy.  The plaintiffs, meanwhile, submitted directly to the special master
their own written critique of the defendants' responses, which was
considered in the preparation of this report.

974



**Staffing/Recruitment:**

The defendants were able to report some positive developments in the recruitment and the filling of staff vacancies. The recruitment of staff psychiatrists for 17 institutions with chronic vacancy problems was centralized in February, 1998, as promised, with some streamlining of the overall hiring process. Success here prompted a decision to extend the centralized approach to the hiring of clinical psychologists.

The department has expanded significantly its use of the Internet to advertise all across the nation employment opportunities in CDC mental health and medical services in conjunction with such prestigious entities as the New England Journal of Medicine, the Mayo Clinic, the Psychiatric Times and the American College of Physicians.

Some other progressive concepts are being developed, including a contract with a search firm to augment CDC's efforts to recruit and hire mental health clinicians in locations and classifications where it is difficult to attract good candidates. In the current fiscal year, the number of regularly scheduled professional examinations conducted to develop a body of eligible candidates for recruitment will be expanded. In addition, it will be possible for institutions to expedite the examination process for specific candidates identified locally to allow them to be put on the eligibility list within as little as seven to ten days. The defendants are also

expanding the number of telemedicine sites, which provide through sophisticated visual telecommunications psychiatric consultation and services to facilities that, due to staffing vacancies or absences, need additional assistance.  The addition of seven new sites in September and October will bring the total of institutions with the telemedicine capability to 12.

The defendants are pursuing the development of transitional contracts, which would allow the employment of a staff psychiatrist on a part-time or restricted basis in anticipation of subsequent full-time engagement.  This would provide a prospective candidate with gainful employment and some time to establish a level of comfort in the correctional environment, while procuring simultaneously at least part-time clinical services for CDC.  The concept would also give CDC time to complete the selection, hiring and appointment process for candidates who have expressed a desire to work for CDC, but who are unable to put their lives on hold while the normal hiring process is completed.

The defendants also point out that their recruitment efforts in the period from June of 1997 through May, 1998 resulted in the hiring of 29 staff psychiatrists, 66 clinical psychologists and 35 psych social workers.  Unfortunately, the submission provides no data on how many clinicians left the department during the same period of time, and the overall statistics suggest that new hires barely sufficed to match the departures.

Finally, the defendants report a dramatic expansion in, and an improved organization of, their efforts to cover vacancies in the ranks of departmental psychiatrists through contracts with outside psychiatrists. According to the defendants' calculations, during May, 1998, they obtained contractual services equivalent to 26 full-time staff psychiatrists, which, when combined with their 89 filled staff psychiatrist positions, gave them a total of 115 staff psychiatrist positions, matching the authorized figure exactly and establishing a zero vacancy rate. The method for calculating equivalency between staff positions and contracted services apparently was to total up the hours of provided contracted hours in a week and divide by 40.

The numbers here are somewhat slippery. In the absence of a department-wide and fully computerized management information system, the defendants' capacity to assemble and aggregate data is, at times, erratic, leading to the generation of reports that sometimes contain differing and unreconciled numbers.

For example, in the materials submitted to the court (Attachment 2. p. 1), the defendants, as indicated, listed the number of filled authorized staff psychiatrist positions in June as 89 and identified 26 vacancies, for a total of 115 allocated positions. The monthly reports on staffing allocations and vacancies provided routinely to the special master, however, indicate that 100.6 staff psychiatrist positions were authorized in June and

33.3 of those were vacant (see Exhibit A). The difference in vacancy rates between the two sets of numbers is not inconsequential, being 22.6 percent in the data filed with the court and 33.1 percent in the monthly figures.

Despite similar differences in the absolute numbers reported in defendants' materials and monthly reports provided to the master on authorized and vacant clinical psychologist and psych social worker positions, the percentages of vacancies in both categories match more closely. In both sets of statistics the defendants' calculations indicate that, as of May, approximately 21 percent of authorized clinical psychologist and some 17 percent of psych social worker positions were vacant.

Whatever the infirmities of their statistics, the defendants argue that the procurement of contracted psychiatric services sufficient to equal current staff psychiatrist vacancies constitutes compliance with the court's requirement to fill all authorized staff psychiatrist positions. On the other hand, the master's monitoring reports to the court have cited significant drawbacks to the use of contracted psychiatric services, including a lack of continuity of care and an inadequate understanding on the part of contracted psychiatrists of the policies and procedures that drive the defendants' mental health care delivery system. These

criticisms, of course, go to the quality of care provided through contracted services, rather than its quantity.

It is too early to judge definitively whether the defendants' heavy reliance on contracted services ensures, or precludes, the delivery of adequate psychiatric services. In terms of quantity, the expansion of contracted psychiatrist services has been significant. In October, 1995, only five CDC facilities used any contracted psychiatrist at all, adding up to some 335 hours monthly (see Attachment 12 to the master's April 16, 1996 report, enclosed here as Exhibit B). By July, 1998, the monthly figure for contracted psychiatrists' services had risen to some 4,500 hours (see Exhibit C, which includes some contracted psychologists' time as well as psychiatrists). Because much of this growth has occurred within the past six months, the master and the master's psychiatric experts, despite their concerns, have not yet had an opportunity to assess its impact fully and fairly.

The defendants also report steps undertaken to improve the quality of the psychiatrist services acquired through contracting. These include greater reliance on registry services, rather than individual practitioners and a recent requirement that each institution obtain three operative registry contracts for mental health services. The move to registry service is apparently part of an effort to impose on vendor entities greater requirements for continuity of coverage and accountability.

Whether or not the defendants' recent expansion of contracts for psychiatrists is an adequate substitute for filling authorized staff psychiatrist positions, the most recent monthly statistics, filed with the special master after the August submission, suggest significant reductions in psychologist vacancies, which historically have also been difficult to fill. As of July, 1998, the rate of vacancies in all of the department's allotted psychologist positions was six percent, down from 18 percent in June (see Exhibit D). The same figures indicate a rise in vacancies among psych techs from 3.5 percent to just under ten percent, while the vacancy rate among psych social workers remains relatively high at 15.6 percent, down somewhat from June. In July of 1997, the vacancy rate among psych social workers was 24.3 percent, although, curiously, the total number of authorized psych social worker positions declined during that same period.

The statistics suggest, then, that staffing changes are occurring. The defendants have put considerable trust in expanded contracting for psychiatrists to address their vacant allocated psychiatrist positions. Again, while the special master and his experts have serious concerns about this remedy to the psychiatrist vacancy problem, we cannot yet, in view of the recent vintage of the expansion in contracted services, judge the adequacy of the remedy. The improvement in other categories of clinicians is not insignificant. As of July, the vacancy rate among all clinicians, apart from staff psychiatrists and including chief and senior

7

psychiatrists, chief, senior and clinical psychologists, supervisory and regular psych social workers and psych techs, was 11.6 percent.

The numbers indicate the need for sustained recruitment efforts and further reductions in vacancy rates. No one expects a hundred percent occupancy rate; there will always be some vacant positions due to attrition and other circumstances beyond the department's control. The problem here is that, with the exception of the in-patient Mental Health Crisis Bed (MHCB) program, the caseload of the defendants' Enhanced Outpatient Program (EOP) is nearly 21 percent over capacity, while that of their Correctional Clinical Case Management System (3CMS) is nearly 14 percent over capacity (see Exhibit E). These numbers put heavy pressure on the defendants to bring their staff as close to authorized numbers as possible.

The master has reported repeatedly throughout his tenure that the key to a successful conclusion of this case is staffing. The defendants cannot comply with the plans and policies provisionally adopted by the court in mid-1997 with substantial staffing vacancies, which tend to coalesce in a few institutions, usually geographically remote, where it is difficult to attract and keep competent clinicians. The master's most recent review found extensive non-compliance with applicable mental health plans and policies in the California Rehabilitation Center, Mule Creek State Prison, Salinas Valley State Prison and Wasco State Prison,

8

primarily because of severe staffing shortages in each of these facilities. There is a need to focus attention on those institutions in CDC where it has proven most difficult to recruit and retain clinical staff.

The plaintiffs' have filed with the special master a sharply critical analysis of the defendants' submission on staffing. They dismiss out-of-hand any argument suggesting that the defendants may be making headway in the effort to reduce vacancies, and cite at length the special master's previous lamentations over inadequate staffing and concerns about the use of contracted psychiatric services as a substitute for filling allocated psychiatrist positions. Their frustration over the slow pace of improvement is entirely justified. They argue persuasively that unless the defendants accord the hiring of mental health staff the same priority attached to its achievement by the court and the special master, CDC will never be able to provide adequate mental health services or comply fully with approved plans and policies.

Perhaps more damning than any of the materials provided formally to the court on this issue of staffing vacancies and the priority attached to it by the defendants' executive hierarchy is a California Department of Finance's (DOF) rejection of a request from the Health Care Services Division of CDC in early 1998. The request sought funding for recruitment and retention (R&R) bonuses for five classifications of mental health clinicians in ten institutions (Exhibit F). The department's request was

cogently reasoned and reflected faithfully the court's directives and the master's recommendations in this case.

By way of contrast, the DOF response (Exhibit G), which speaks eloquently for itself, represents a classically elusive bureaucratic avoidance of responsibility. The recruitment and retention policies cited in the rejection as a substitute for the requested bonuses require the Department of Personnel Administration's (DPA) case-by-case approval for each award of every requested R&R enhancement, a process that typically takes months. In its final evasive maneuver, the DOF rejection loftily asserts that CDC already possesses plenty of resources to fund the request itself and ought to rely on those resources.

It is difficult for the outsider to evaluate the accuracy of the last assertion, but the exchange seems to approach the level of paradigm. Too often it is the complex, hydra-headed nature of defendant bureaucracies in these institutional cases, rather than individual malevolence or incompetence, that impedes or thwarts progress. Agencies far removed from the direct anguish of parties and the court's reach make decisions in the normal, bureaucratically correct fashion without fear of, or much thought about, the consequences.

Suffice it to say that the department's request seems to lay out a proposal for a resolution of the recruitment problem that is targeted,

reasonable and capable of success. It is, moreover, a plan generated exclusively by CDC.

Perhaps the remedy of choice here is to give the defendants until the end of the current calendar year to get the overall rate of clinical vacancies (especially among psych social workers) down to six or seven percent, while the master reviews more closely the adequacy of the defendants' expanded contract services as a substitute for filling authorized staff psychiatrist vacancies. If the defendants cannot fill those vacancies or if their dependency on contracted psychiatrists results in inadequate services, the special master will recommend adoption and implementation of the proposal outlined above within 60 days. If the defendants resist, it would be fitting to require to require the chief executive officers of CDC, DPA and DOF to appear personally before the court to explain their rejection more clearly and produce together a meaningful alternative.

Recommendations:

1.    The special master should monitor the use of contracted psychiatric services during his current round of review and include findings and recommendations on this issue in his report due at the end of the current calendar year. In the meantime, the defendants need to continue to press their efforts to fill authorized staff psychiatrist positions.

11

2.    The master should also monitor the defendants' continuing recruitment efforts to fill other clinical vacancies, especially those among psych social workers, and include a report to the court on those efforts in his next regularly scheduled filing.

3.    The defendants should be required to spell out in detail, in writing with reasons, to the court within 30 days what steps were taken in response to the alternatives proposed in the March 17, 1998 DOF rejection of CDC's bonus proposal, including "hiring above the minimum salary step along with providing or increasing existing bonuses"; funding the bonus proposal with reverted funds already available in CDC's budget; and procuring DPA review and approval of the proposal. The master understands that the proposal has been resuscitated and is part of current CDC budget planning for FY 2000, but the court and the plaintiffs are entitled to know who decided that the proposed staffing solution could be postponed for a year, and the grounds on which that determination was made.

4.    If the defendants fail to reduce vacancies among mental health clinicians to six or seven percent by the end of the calendar and/or if the defendants' reliance on contracted psychiatric services is found to result in the provision of

inadequate mental health services, the court should direct

the defendants to implement the proposal contained in

Exhibit F to this report, or its equivalent.  If the defendants resist

or object, the chief executive officers of CDC, DPA and DOF

should be ordered to appear personally before the court to

explain their objections and produce a meaningful

alternative.

**Use of Force:**

The use of force issue arises from the defendants' failure to date to

incorporate formally provisions in their departmental operations manual

on the use of force, whether in connection with the 37mm weapon, OC

gas or cell extractions, when seriously mentally disordered inmates are, or

may be, involved.

During negotiations in 1997 on policies for the use of force, there was

general agreement on content.  Plaintiffs and the special master,

however, expressed concern that relevant provisions on the use of force

when seriously mentally disordered inmates were involved were

contained in several separate memorandums, which were sometimes

unavailable in institutions or were not integrated into local institutional

policies generated on the use of force.

In the master's first review of institutional implementation of

provisionally approved policies he found a continuing need for a single,

universally disseminated departmental policy on the use of force against

seriously mentally disordered inmates, citing local institutional disparities in

the understanding and application of the approved policy. His

recommendations included a suggestion that the department be given

60 days to develop and promulgate such a policy. The court adopted

the recommendation and ordered the defendants to submit "a written

statement on the relationship between the use of force against seriously

mentally ill inmates and general departmental policies on the use of

37mm weapons, OC gas, and cell extractions."

The defendants' August 14th submission on this issue consisted of an

undated memorandum (since dated August 14 and apparently

disseminated to all CDC institutions), addressed to institutional wardens

and health care managers that pulled together in one document all of

the various rules and procedures governing the use of force when

seriously mentally disordered inmates are involved. The document seems

to capture fairly the policies and procedures agreed to by the parties and

adopted by the court.

The plaintiffs raise some substantive complaints about the policy

statement, including its over-broad definition of "medical staff", which

might be construed to empower MTAs and RNs, who lack the requisite

clinical skills, to pass judgment on the potential harm to a seriously

mentally disordered inmate of an involuntary cell extraction. The actual

language seems to anticipate and respond adequately to the objection:

> If an inmate is designated as seriously mentally
disordered,
>
> > prior to going forward with the pre-planned/calculated
> > tactical extraction, medical staff shall be consulted
> > and present on site for counseling with the inmate.
> > Medical staff
> > will confer <u>as required by licensure</u> about
> > recommendations made. Licensed medical staff may
> > include MTA, R.N., LCSW, Psychologist or Psychiatrist.
> > This will allow custody staff to make an informed
> > decision on whether to proceed with the extraction or
> > seek alternatives. (Emphasis added. P. 2 of
> > Exhibit G).

The plaintiffs' concern over the absence of an articulated standard

for a possible custody override of a medical recommendation, such as

potential risk for serious bodily harm to the inmate, staff or other inmates, is

legitimate and needs to be addressed. The provisions for documenting a

custody override seem adequate, given the level of review accorded to

incident reports in CDC.

The plaintiffs' objection to the possible emergency use of force in

situations involving threats to property seeks to re-negotiate a settled

point. The defendants' original language on this issue permitted the

emergency use of force in situations where there was, simply, "a threat to

property." The language finally agreed to required an "<u>immediate</u> and

<u>serious</u> threat to . . . a <u>substantia</u>l amount of <u>valuable</u> property." (Emphasis

added.) The context put forth by the defendants to justify the provision

15

included, principally, fires and flooding. The limiting adjectives were added at the behest of the plaintiffs and the master, and parties ultimately accepted, however unenthusiastically on the part of some, the language included in this memorandum.

The articulation of the policy, of course, is not enough. It needs to be communicated to and implemented in all CDC institutions. The monitor will review the defendants' success in this regard over the next several months and report his findings to the court at the end of the year.

Recommendations:

1. The defendants need to add to the policy memorandum some standard to guide custody personnel in reaching a decision to override a medical recommendation relative to the use of force against seriously mentally disordered inmates.

2. The defendants need to disseminate and implement the policy.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

September 21, 1998

16



## DECLARATION OF SERVICE BY MAIL

Case Name:  Ralph Coleman, et al. v. Pete Wilson
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 year and not a party to the within entitled cause:  my business address is Little Bulman & Reardon, P.C., 50 South Main Street, Providence, Rhode Island 02903.

On September 21, 1998, I served the attached

**SPECIAL MASTER'S REPORT ON STAFFING AND THE USE OF FORCE**

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped with postage thereon fully prepared in the United States Mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
650 Capitol Mall
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
650 Capitol Mall, Suite 5054
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
650 Capital Mall
Sacramento, CA  95814

i

Susan Steinberg, M.D.
Deputy Director (A)
Health Care Services Division
California Dept. of Corrections
501 J Street, Suite 602
P.O. Box 942883
Sacramento, CA  94283-0001

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont St., Suite 3000
San Francisco, CA  94105-2239

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Pamela L. Smith-Steward, Esq.
Deputy Director (A),  Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont St., Suite 3000
San Francisco, CA 94105-2239

I declare under penalty of perjury under the laws of the State of Rhode Island
that the foregoing is true and correct, and that this declaration was executed at
Providence, Rhode Island on September 21, 1998.

*Mary d De Fontes*

jmk\mastering\cert.doc

ii

Exhibit A

# Mental Health Services Delivery System
## Staffing Allocation and Vacancies for all Institutions
### 1997-1998

| CLASSIFICATION | July Auth | July Vac | August Auth | August Vac | September Auth | September Vac | October Auth | October Vac | November Auth | November Vac | December Auth | December Vac | January Auth | January Vac | February Auth | February Vac | March Auth | March Vac | April Auth | April Vac | May Auth | May Vac | June Auth | June Vac | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chief Deputy Warden | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Asst Supt Psychiatrist | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chief Psychiatrist | 22.5 | 5.5 | 22.5 | 7.5 | 22.5 | 8.5 | 22.5 | 8.5 | 22.5 | 6.2 | 22.5 | | 22.5 | 6.5 | 22.5 | 6.5 | 22.5 | 6.5 | 23.5 | 6.5 | 23.5 | 6.5 | 23.5 | 4.5 | |
| Chief Psychiatrist | 11 | 0 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | | 11 | 10 | 11 | 11 | 11 | 11 | 10 | 10 | 10 | 10 | 10 | 2 | |
| Staff Psychiatrist | 96.2 | 24.5 | 96.2 | 26.5 | 96.2 | 22.7 | 96.2 | 22.7 | 96.2 | 24.2 | 96.2 | | 96.2 | 28.2 | 96.2 | 28.2 | 96.2 | 28.2 | 98.7 | 30.8 | 100.6 | 33.3 | 100.6 | 33.3 | |
| Chief Psychologist | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | |
| Psychologist, CL, CF | 42.5 | 4.5 | 42.5 | 3.5 | 42.5 | 5.5 | 42.5 | 5 | 42.5 | 5 | 42.5 | | 42.5 | 3 | 43 | 3 | 43 | 3 | 43 | 3 | 43 | 4 | 43 | 4 | |
| Psych Intern Director | 163 | 24.4 | 163 | 27.9 | 163 | 31.4 | 163 | 27.4 | 163 | 27.4 | 163 | | 159 | 24.9 | 159 | 22.3 | 159 | 22.9 | 159 | 25.4 | 155 | 30.9 | 157.9 | 34.4 | |
| Psych Assoc. | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 0 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Sup Psych Soc Wkr | 4 | 1 | 4 | 1 | 4 | 1 | 4 | 0 | 4 | 0 | 4 | | 4 | 0 | 4 | 0 | 4 | 0 | 45.5 | 4 | 45.5 | 4 | 45.5 | 3 | |
| Psych Soc Wkr | 124 | 31.1 | 124 | 28.6 | 124 | 20.1 | 124 | 18.6 | 124 | 18.6 | 124 | | 124 | 19.1 | 121 | 17.6 | 121 | 17.6 | 120 | 16.6 | 121 | 14.6 | 116.1 | 20.6 | |
| Sup Occ Therapist | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 2 | 0 | |
| Rec Therapist | 32.5 | 8 | 32.5 | 7 | 31.5 | 7 | 31.5 | 7 | 6.5 | 6.5 | | | 6.5 | 0 | 6 | 0 | 6 | 0 | 6 | 0 | 6 | 0 | 6 | 0 | |
| Occ Therapist | 0 | 0 | 0 | 31.5 | 0 | 31.5 | 0 | 31.5 | 31.5 | 31.5 | 31.5 | | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 33.5 | 33.5 | 34 | 34 | 34 | 4 | |
| Psychometrist | 74.3 | 5.72 | 76.3 | 6.72 | 76.3 | 5.72 | 76.3 | 5.72 | 76.3 | 5.72 | 76.3 | | 76.3 | 3.73 | 81.5 | 2.73 | 81.5 | 2.73 | 86.9 | 4.73 | 78.19 | 2.73 | 78.19 | 2.79 | |
| Psych Tech | 3 | 0 | 3 | 0 | 3 | 0 | 3 | 0 | 3 | 3 | 3 | | 3.73 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | |
| Sr. Counselor II | 1 | 0 | 1 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Sr. Counselor I | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 2 | 2 | | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | |
| MSA | 4 | 1 | 4 | 1 | 4 | 1 | 4 | 0 | 1 | 1 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 2 | 0 | |
| Sr. MTA | 21 | 1.2 | 21 | 1.2 | 21 | 1 | 21 | 1 | 1 | 0 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| MTA | 21 | 3.1 | 21 | 2.1 | 21 | 2.1 | 21 | 21 | 21 | 21 | 21 | | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | |
| Supervising Nurse | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Registered Nurse | 94.7 | 11.3 | 11.3 | 11.3 | 94.7 | 94.7 | 94.7 | 94.7 | 94.7 | 17 | 94.7 | | 94.7 | 8.33 | 94.7 | 17 | 94.7 | 17 | 8.33 | 95.7 | 8.93 | 93.69 | 13.4 | | |
| Nurse Practitioner | 1 | 0 | 1 | 0 | 7.33 | 7.33 | 17 | 9.33 | 17 | 7.33 | 17 | | 17 | 2 | 17 | 7.33 | 17 | 7.33 | 17 | 17 | 2 | 17 | 2 | | |
| Pharmacist | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 6.1 | 1 | 6.1 | 1 | 0 | |
| Pharmacy Assistant | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 4 | | 4 | 0 | 4 | 0 | 4 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Clinical Svcs Supervisor | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Mgmnt Srvcs Tech | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | |
| ASA | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | | | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | |
| Health Rec Tech II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Health Rec Tech | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | 0 | 4 | | 4 | 0 | 4 | 0 | 4 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Std & Comp Coord | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | |
| Health Program Coord | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Med Secretary | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | |
| Medical Steno | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Stenographer | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 2 | |
| Med Transcriber | 2 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 1 | |
| Typist | 41 | 6 | 41 | 8 | 41 | 8 | 41 | 7 | 41 | 5 | 41 | | 41 | 5 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | |
| Office Tech | 50.6 | 10.6 | 50.6 | 10.6 | 50.6 | 10.6 | 50.6 | 11.1 | 8.6 | 8.6 | 50.6 | | 39 | 39 | 39 | 39 | 39 | 39 | 38.5 | 38.5 | 38.5 | 38.5 | 38.5 | 7 | |
| Office Assistant | 18 | 0 | 18 | 0 | 18 | 0 | 18 | 0 | 18 | 0 | 18 | | 6.6 | 6.6 | 6.6 | 6.6 | 6.6 | 6.6 | 5.6 | 5.6 | 9.5 | 9.5 | 50.1 | 9.5 | |
| | | | | | | | | | | | | | 18 | 18 | 18 | 18 | 18 | 18 | 50.1 | 50.1 | 50.1 | 50.1 | 19.5 | 9.5 | |
| **Total All Institutions** | 846 | 140 | 847 | 145 | 847 | 134 | 847 | 131 | 847 | 125 | 847 | 0 | 847 | 122 | 847 | 116 | 847 | 116 | 858 | 119 | 848.68 | 133 | 848.68 | 144 | |

Prepared by: Sharon Riegel
4/19/98
crechart1.xls (Totals)

Exhibit B



## Contract List for Statewide Supplemental

## Mental Health Staff,

### *October 5, 1995*

| | |
|---|---|
| Pleasant Valley State Prison | 1 contract psychiatrist<br>2 days/week |
| California State Prison, Lancaster | 1 contract psychiatrist<br>2 days/month |
| California Institute for Men | 3 PIE psychiatrists:<br>1 - 6 hrs/wk<br>1 - 10 hrs/wk<br>1 - 16 hrs/wk<br>1 contract psychiatrist<br>5-8 days/month |
| Centinala State Prison | 1 contract psychologist<br>2 days/week |
| Chuckawalla Valley State Prison | 1 contract psychiatrist once<br>every two weeks |
| Ironwood State Prison | 1 contract psychiatrist<br>1 day/week; 2 contract<br>psychologists 1 day every<br>2 weeks |

Exhibit C

## MENTAL HEALTH CONTRACT SERVICES
### July 1998

| INSTITUTION | CONTRACT PROVIDER | PROGRAM COVERED | HOURS FOR MONTH |
|---|---|---|---|
| ASP | Registry of Physician Specialists | CCCMS/EOP | 140 |
| CAL | J. Bellinger, Ph.D. | CCCMS/MHCB | 80 |
| | C. Blumberg, Ph.D. | BPT Reports | 17 |
| CCC | National Registry | | 0 |
| CCI | No Contract Services Requested | | 0 |
| CCWF | Joseph Ezra, M.D. | MHCB/EOP/AdSeg | 180 |
| | Beverly Parr, M.D. | RC | 120 |
| | Robert Grove, Ph.D. | EOP | 190 |
| CEN | No Contract Services Requested | | 0 |
| CIM | Parvin Zandpour, M.D. | CCCMS, RC-East | |
| | Napolean Tiquia, M.D. | CCCMS, RC-East | 104 |
| | Rafsi Tashjian, M.D. | CCCMS, RC-East | (total) |
| | Manijah Mikakhtar, M.D. | CCCMS, RC-East | |
| CIW | Shih | EOP | 40 |
| | Yee | EOP | 32 |
| CMC | No Contract Services Requested | | 0 |
| CMF | Roy Enright, M.D. | Outpatient | 168 |
| | Weingarten, M.D. | Outpatient | 20 |
| COR | Bogost | MHCB, CCCMS, AdSeg, SHU | 170 |
| | Zuckerman | CCCMS | 40 |
| | Parekh | MHCB, AdSeg, SHU | 30 |
| | Jeffers | SHU, AdSeg; PHU | 20 |
| | Kumar | MHCB, CCCMS, AdSeg, PHU | 40 |
| | Benson | MHCB, CCCMS | 20 |
| CRC | E. Richard Dorsey, M.D., M.B.A. | | 40 |
| CTF | No Contract Services Requested | | 0 |
| CVSP | Contracted Psychiatrist | EOP | 29.62 |
| DVI | G. Kassebaum, M.D., Inc. | CCCMS, Emerg. Ref. | 116 |
| | National Medical Registry | CCCMS, Emerg. Ref. | 192 |
| FOL | Tri-State | CCCMS | 152 |
| HDSP | Louis Richnak, M.D. | CCCMS | 152 |
| | Rosalee Bradley, Ph.D. | CCCMS | 19 |
| ISP | No Contract Services Requested | | 0 |
| LAC | Robert Fire, Psychologist | BPT Reports | 32 |
| | Eugene Morong, Psychiatrist | EOP, MHCB | 185 |
| | Randolph Noble, Psychiatrist | CCCMS | 40 |
| | Larry Reyes, S.A.Counselor | EOP | 80 |
| | James Rosenberg, Psychiatrist | CCCMS | 32 |
| | Raffi Tashjian, Psychiatrist | CCCMS | 40 |
| MCSP | National Medical Registry | CCCMS, EOP | 390 |
| NCWF | No Contract Services Requested | | 0 |
| NKSP | Jeffers, Psychiatrist | RC | 60 |
| | Magid, Psychiatrist | RC | 20 |
| | Minelson, Psychiatrist | RC | 30 |
| | Goldsmith, Psychiatrist | RC | 20 |
| PBSP | National Medical Registry | CCCMS, PSU, EOP | 632 |
| PVSP | Eugene Crayton, M.D. | CCCMS, MHCB, BPT Reports | 70 |
| | Jack Dusay, M.D. | CCCMS, MHCB | 10 |
| | Pradeep Dumar, M.D. | CCCMS, MHCB | 20 |
| | Joseph Stapen, M.D. | CCCMS, MHCB | 30 |
| | Gregory Jeffers, M.D. | CCCMS, MHCB | 50 |
| | Pearce Hurley | CCCMS, MHCB | 40 |
| RJD | No Contract Services Requested | | 0 |
| SAC | National Medical Registry | EOP | 32 |
| SCC | No Contract Services Requested | | 0 |
| SOL | National Medical Registry | MHCB | 84 |
| SQ | No Contract Services Requested | | 0 |
| SVSP | No Contract Services Requested | | 0 |
| VSPW | Beverly Parr, M.D. | CCCMS | 16 |
| WSP | Various Contract Psychiatrists | RC | 984.5 |
| TOTAL MENTAL HEALTH CONTRACT SERVICES FOR JULY 1998 | | | 5009.12 |

Exhibit D

## Mental Health Services Delivery System
## Staffing Allocation and Vacancies for all Institutions
## 1998-1999

| CLASSIFICATION | July Auth | July Vac | August Auth | August Vac | September Auth | September Vac | October Auth | October Vac | November Auth | November Vac | December Auth | December Vac | January Auth | January Vac | February Auth | February Vac | March Auth | March Vac | April Auth | April Vac | May Auth | May Vac | June Auth | June Vac | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chief Deputy Warden | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Asst Supt Psychiatrist | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Chief Psychiatrist | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr. Psychiatrist | 23.5 | 3.5 | | | | | | | | | | | | | | | | | | | | | | | |
| Chief Psychiatrist | 10. | 4 | | | | | | | | | | | | | | | | | | | | | | | |
| Staff Psychiatrist | 99.6 | 26.3 | | | | | | | | | | | | | | | | | | | | | | | |
| Chief Psychologist | 3 | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr Psychologist | 45.5 | 3 | | | | | | | | | | | | | | | | | | | | | | | |
| Psychologist, CL_CF | 157.9 | 12.9 | | | | | | | | | | | | | | | | | | | | | | | |
| Psych Intern Director | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Psych Assoc. | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Sup Psych Soc Wkr | 6 | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| Psych Soc Wkr | 116.1 | 18.1 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr Occ Therapist | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Occ Therapist | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Rec Therapist | 34 | 4 | | | | | | | | | | | | | | | | | | | | | | | |
| Psychometrist | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Psych Tech | 78.19 | 7.61 | | | | | | | | | | | | | | | | | | | | | | | |
| Corr Counselor II | 3 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Corr Counselor I | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Corr Counselor I | 2 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| AGPA | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| CHSA | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr MTA | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| MTA | 21 | 2 | | | | | | | | | | | | | | | | | | | | | | | |
| SRN II | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Supervising Nurse | 17 | 2 | | | | | | | | | | | | | | | | | | | | | | | |
| Registered Nurse | 93.69 | 8.6 | | | | | | | | | | | | | | | | | | | | | | | |
| Nurse Practitioner | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmacist | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmacy Assistant | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| Off Srvcs Supervisor | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Mgmnt Srvcs Tech | 0 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| AISA | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Health Rec Tech II | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Health Rec Tech | 6.1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Std & Comp Coord | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Health Program Coord | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Med Secretary | 2 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr Medical Steno | 1 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Stenographer | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| Sr Med Transcriber | 2 | 0 | | | | | | | | | | | | | | | | | | | | | | | |
| Med Transcriber | 38.5 | 7 | | | | | | | | | | | | | | | | | | | | | | | |
| Office Tech | 50.1 | 7.1 | | | | | | | | | | | | | | | | | | | | | | | |
| Office Assistant | 19.5 | 0.5 | | | | | | | | | | | | | | | | | | | | | | | |
| Total All Institutions | 847.77 | 112.6 | | | | | | | | | | | | | | | | | | | | | | | |

Prepared by: Sharon Riegel
August 15, 1998

Exhibit E



# Mental Health Population  -  Placement Per Institution

### Download Date August 3, 1998

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP        II | 449 | 546 | 122% | | 11 | | | 1 | | 558 |
| CAL    I,III,IV + | 49 | 43 | 88% | | 3 | | | 1 | | 47 |
| CCC    I,II,III | | 7 | | | 1 | | | | | 8 |
| CCI    I,II,III,IV * | 339 | 478 | 141% | | 11 | | | | | 489 |
| CCI-RC | 60 | 108 | 180% | | 13 | | | 1 | | 122 |
| CCWF | 292 | 452 | 155% | 63 | 47 | 75% | 12 | 4 | 33% | 503 |
| CCWF-RC | 57 | 38 | 67% | | 3 | | | | | 41 |
| CEN    I,III | 49 | 31 | 63% | | 4 | | 5 | | 0% | 35 |
| CIM    I | 206 | 240 | 117% | | 14 | | 10 | 4 | 40% | 258 |
| CIM-RC | 293 | 450 | 154% | | 63 | | | 4 | | 517 |
| CIW | 168 | 239 | 142% | 75 | 56 | 75% | | | | 295 |
| CIW-RC | 31 | 7 | 23% | | | | | | | 7 |
| CMC    I,II,III | 599 | 936 | 156% | 530 | 495 | 93% | 5 | 2 | 40% | 1,433 |
| COR   I,III,IV + * | 399 | 432 | 108% | 104 | 74 | 71% | 16 | 26 | 163% | 532 |
| COR-SHU | 200 | 293 | 147% | | 21 | | | | | 314 |
| CRC-M    II | 299 | 182 | 61% | | 1 | | | | | 183 |
| CRC-W | 99 | 118 | 119% | | | | | | | 118 |
| CTF    I,II | 499 | 645 | 129% | | 15 | | | 2 | | 662 |
| CVSP    I,II | 49 | 22 | 45% | | | | | | | 22 |
| DVI    I,III | 132 | 171 | 130% | | 21 | | | | | 192 |
| DVI-RC | 117 | 123 | 105% | | 10 | | | | | 133 |
| FOL    I,II | 299 | 481 | 161% | | | | | | | 481 |
| HDSP   I,III,IV * | 285 | 251 | 88% | | 7 | | | 2 | | 260 |
| HDSP-RC | 14 | 38 | 271% | | | | | 1 | | 39 |
| ISP    I,III | 49 | 13 | 27% | | | | 5 | | 0% | 13 |
| LAC    I,III,IV + | 449 | 571 | 127% | 149 | 151 | 101% | 8 | 5 | 63% | 727 |
| MCSP   I,II,III,IV + | 399 | 505 | 127% | 180 | 154 | 86% | 5 | 6 | 120% | 665 |
| NCWF | 136 | 80 | 59% | | | | | | | 80 |
| NCWF-RC | 13 | 20 | 154% | | | | | | | 20 |
| NKSP    I,III | 133 | 159 | 120% | | 3 | | 5 | | 0% | 162 |
| NKSP-RC | 316 | 400 | 127% | | 9 | | | 5 | | 414 |
| PBSP    I,IV * | 349 | 316 | 91% | 64 | 55 | 86% | 6 | 14 | 233% | 385 |
| PVSP    I,III | 349 | 412 | 118% | | 4 | | 5 | | 0% | 416 |
| RJD    I,III | 364 | 446 | 123% | 180 | 185 | 103% | 9 | 7 | 78% | 638 |
| RJD-RC | 85 | 149 | 175% | | 25 | | | 1 | | 175 |
| SAC    I,IV * | 499 | 589 | 118% | 96 | 86 | 90% | 8 | 1 | 13% | 676 |
| SATF   II,III,IV * | 399 | 571 | 143% | | 17 | | 16 | 9 | 56% | 597 |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided by
  the respective DDPS identifier systems.
" + " is a 270 Design Facility. " * " is a 180 Design Facility.

| | CCCMS | | | EOP | | | MHCB | | | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| SCC    I,II,III | 249 | 279 | 112% | | 1 | | | 1 | | 281 |
| SOL    II,III | 549 | 625 | 114% | | 27 | | 5 | | 0% | 652 |
| SQ     I,II | 247 | 293 | 119% | | 16 | | | 3 | | 312 |
| SQ-RC | 252 | 203 | 81% | | 25 | | | | | 228 |
| SVSP   I,IV * | 499 | 533 | 107% | 96 | 59 | 61% | 10 | 16 | 160% | 608 |
| VSPW | 292 | 393 | 135% | | 2 | | | 1 | | 396 |
| VSPW-RC | 57 | 84 | 147% | | 1 | | | | | 85 |
| WSP    I,III | 125 | 146 | 117% | | 1 | | 4 | | 0% | 147 |
| WSP-RC | 324 | 285 | 88% | | 57 | | | 2 | | 344 |
| Totals : | 11,118 | 13,403 | 120.6% | 1,537 | 1,748 | 113.7% | 134 | 119 | 88.8% | 15,270 |

| CMF OPP | | | | |
|---|---|---|---|---|
| Wings | | Capacity | Current Pop | % of Capacity |
| LOCKED | CTU | 38 | 37 | 97% |
| | GPU | 76 | 74 | 97% |
| | INTAKE | 88 | 31 | 35% |
| | OBU | 18 | 14 | 78% |
| | PAS | 76 | 36 | 47% |
| | PMU | 38 | 37 | 97% |
| | Total: | 334 | 229 | 68.6% |
| OPEN | Total: | 604 | 557 | 92.2% |
| Total CMF OPP: | | 938 | 786 | 83.8% |

| DMH | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 374 | 180 | 48% |
| CMF-DMH | 150 | 123 | 82% |
| Totals : | 524 | 303 | 57.8% |

| PSU | | |
|---|---|---|
| Capacity | Current Pop | % of Capacity |
| Totals : 128 | 113 | 88.3% |

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 14,379 | 16,472 | 114.6% |

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.
" + " is a 270 Design Facility.  " * " is a 180 Design Facility.

Health Care Population Management Unit

*R1-2*

8/3/98

Exhibit F

State of California                                                    Department of Corrections

# Memorandum

Date    :    February 11, 1998

To      :    Charles T. Kjer, Chief
             Budget Management Branch
             Administrative Services Division

Subject:    **FISCAL YEAR 1998/99 FINANCE LETTER REQUEST**

The Health Care Services Division (HCSD) is transmitting an original and five copies of the
revised Spring Finance Letter requesting Recruitment and Retention (R&R) bonuses for select
mental health classifications at specific institutions. Based on written notification which
HCSD received from the Special Master in the *Coleman* case in December 1997, we recognize
that immediate action is needed to aggressively address the vacancies in mental health
classifications.

If you have any questions regarding the Finance Letter request, please contact
Sandra K. Duveneck, Assistant Deputy Director, Program Support and Evaluation, HCSD, at
327-2238, or Naomi Aoyagi, Chief, Fiscal Systems, HCSD, at 327-1573.

*Sandra Duveneck*

SUSANN J. STEINBERG, M.D.
Deputy Director (A)
Health Care Services Division

Attachment

cc:  Doug Carlile, Deputy Secretary (A), Fiscal and Programs, Youth and Adult Correctional
     Agency
     Steven Cambra, Jr., Chief Deputy Director, Field Operations
     James E. Tilton, Deputy Director, Administrative Services Division
     Richard L. Burrows, Assistant Deputy Director, Financial Management and Support
     Services, Administrative Services Division
     Sandra K. Duveneck, Assistant Deputy Director, Program Support and Evaluation, HCSD
     Naomi Aoyagi, Chief, Fiscal Systems, HCSD

CDC 1617-A (5-94) IAB
FINANCE3.DOC

Steven Cambra, Jr.
Page 2


bcc: Nadim Khoury, M.D., Assistant Deputy Director, Health Care Policy, HCSD
    Roger E. Hagen, Ph.D., Assistant Deputy Director (A), Health Care Operations, HCSD
    Stephen K. Larsen, Chief, Planning and Program Coordination, HCSD
    Marjorie TaVoularis, M.D., Chief, Mental Health Section, HCSD
    Cheryl Stewart, Chief, Fiscal and Business Services, HCSD
    Sandra Saverien, Chief, Fiscal Support, HCSD
    David Hutchinson, Chief, Personnel and Recruitment, HCSD
    Shari Lowen, AGPA, Personnel and Recruitment, HCSD
    Fiscal Support Chron

CALIFORNIA DEPARTMENT OF CORRECTIONS
FINANCE LETTER
FISCAL YEAR 1998/99

**Division: Health Care Services**                    **Number:**
**Title: Mental Health Recruitment and Retention Bonuses**

## A. Nature of Request

This Finance Letter addresses the Department of Corrections' (CDC) inability to recruit and retain sufficient numbers of qualified mental health care professionals. The CDC is currently, under a Federal Court Consent Decree (Coleman v. Wilson) to ensure adequate mental health care is provided to inmates in its 33 institutions throughout the State. The court appointed Special Master for the Coleman case has acknowledged that CDC has taken its obligation to recruit mental health professionals seriously since the order was filed in June of 1994. However, he notified CDC on December 1, 1997 that "... the focused, effective recruitment effort promised during final negotiations ... over the mental health plans had simply not materialized. In the absence of some aggressive CDC administrative action... staff vacancies will continue to impair seriously the department's capacity to comply with the package of policies and plans approved in June." This recent directive highlights the urgency of pursuing funding for Recruitment and Retention (R&R) of mental health professionals.

It is apparent that the primary reason CDC, despite an active recruitment program, has a continuing problem with vacancies in mental health classifications is the inability to be financially competitive for qualified candidates. Annual bonuses which help CDC attract and keep qualified clinicians working in our correctional environment will be essential to meeting the Coleman Court's expectations, as stated in the December 1, 1997 communication. This notification has provided CDC with an indication of the direction the Court will take if CDC does not implement an approach to reduce vacancies. Financial incentives are a critical component in CDC's overall strategy to reduce vacancies. If CDC does not demonstrate the ability to do so on its own, a court imposed (and likely more costly) solution could result.

The purpose of this Finance Letter is to request funding for R&R bonuses at ten institutions for five classifications (see attachment 1) which are experiencing the highest vacancy rates in the state. The CDC does not have the resources available to compensate the mental health care professionals it seeks to recruit. Since CDC cannot pay any more compensation than its existing resources allow, and since the current level of compensation is inadequate, it is impossible to resolve the problem with existing resources. This Finance Letter is critical to successfully address this issue.

## B. Background/History

The CDC has an obligation to provide an acceptable level of mental health care to approximately 152,000 inmates (as of January 11, 1998). Several precedent setting lawsuits have been filed which cite CDC for "deliberate indifference to medical needs" of inmates. "Deliberate indifference" is determined, in part, when inmates do not have timely access to adequate health care, including the appropriate health care professionals. For example, current litigation (Coleman v. Wilson) alleges that CDC is not providing adequate mental health services and asserts that mental health care provided in CDC institutions is inadequate because of the inaccessibility to services, in part due to insufficient health care staffing levels.

The CDC, in staffing its Statewide facilities, is faced with strong competition from the private sector. Most mental health care professionals, when approached by private sector employers, choose to work in locations which are conveniently located within cities and are accessible to schools, entertainment and other amenities. Furthermore, the opportunity to work with nonviolent offenders and an overall more agreeable clientele is offered. The CDC's remote facility locations, general working environment, and lack of adequate resources for space and equipment make it difficult to compete with the private sector.

Despite the foregoing problems, there are mental health care professionals who do have an interest in correctional health care. Unfortunately, CDC's salaries for these professionals are simply not competitive with private mental health care providers. Over the years, as a result of Departmental requests to the State Personnel Board and the Department of Personnel Administration (DPA), various R&R bonuses have been approved on an individual or specific institution basis. Historically these bonuses have been granted as a result of identified needs related to either: 1) Hard-to-fill classifications/specialties within State service. Typically such needs were a result of small candidate pools from which to hire, or salaries that were not competitive with the private sector or other public sector entities; or 2) Geographic locations where the cost-of-living was too high, or in remote locations where only limited numbers of candidates were willing to work. The R&R bonuses have served as a partial and temporary solution to a long-term problem. (Attachment 2 reflects current bonuses for mental health classifications by institution).

Several CDC studies covering vacancy rates, salary levels, working conditions, and the relationships between health care providers and custody staff have spelled out the needs and direction CDC must take in order to ensure the ability to provide appropriate levels of service. The following summarizes the results of the studies:

- Prisons are inherently more dangerous than most private practice settings or other settings outside the correctional environment.

- While health care is the primary mission of private health care facilities and other State agencies who employ health care professionals, such as the Department of Mental Health and the Department of Developmental Services; custody and security are the primary missions of CDC, with health care being a necessary service for fulfilling that mission.

-2-

Clinicians see this as a secondary role in the institution, a role unfamiliar to their training. The resulting conflict affects CDC's ability to recruit mental health care professionals into its institutions.

- CDC's prisons are significantly overcrowded. As such, CDC mental health care staff experience a more complex workload than health care professionals experience in the private sector or other settings outside the correctional environment.

- By their very nature, institutions are high-stress, confined security environments. The design of most institutions requires staff to work in small locked spaces. The living arrangements of inmates and work necessities of staff, combined with inmate overcrowding, make prisons some of the most stressful work environments in our society.

- Prisons are highly litigious environments. Inmates, their lives already heavily immersed in the legal system, will frequently initiate lawsuits. With many clinicians' concerns about malpractice being at historic highs, treating patients in this atmosphere is an unattractive prospect.

Throughout the 1970's and 1980's a variety of recruitment outreach efforts were utilized to attract mental health professionals to work within the CDC prison environment. Typically such efforts were undertaken by individual facilities that were experiencing a unique staffing problem. As a result, recruitment efforts on a Statewide basis were undertaken in a rather "piecemeal" manner.

In February 1990, a dedicated healthcare professional recruiter and a new Recruitment Section was established within the Mental Health Services Branch. The initial success of this specialized recruitment effort led to the establishment of a centralized Personnel, Training, and Recruitment Unit within the newly established Health Care Services Division (HCSD) in 1993.

The Personnel, Training and Recruitment unit conducts an ongoing, aggressive recruitment program which includes:

- Advertisements in in-state and out-of-state print media such as professional journals and newsletters, newspapers, and military publications. Other media sources such as job lines, the internet and cable television are also used.

- Outreach activities including attendance at nationwide conferences and conventions, job fairs, colleges and universities, licensing exams, continuing medical education sessions, military installations, and hospitals that are closing.

- A Centralized Hiring Process intended to expedite the hiring of the most difficult to recruit medical/clinical classifications. The use of this process for the Staff Psychiatrist classification began in January 1998.

- A "streamlined" fast track civil service examination process for 20 health care classifications.

- A national 800 number and "call router" system.

- Creation of new recruitment ads, posters and flyers.

- Safety Retirement for those health care classifications with public protective responsibilities who work directly with inmates or parolees, such as Staff Psychiatrist, Correctional Facility (CF), and Psychiatric Social Worker, CF effective January 1, 1994.

- Obtaining and maintaining equipment, office space and supplies; developing a variety of training courses for mental health care and custody staff; and developing standards, policies and systems to ensure Departmental consistency is established, implemented and maintained. Such efforts should enhance working conditions throughout the Statewide facilities.

- The HCSD is currently working with Personnel Operations Section (POS) staff to update the classification structure (i.e., specification revision for the Psychologist classifications) to assist CDC in meeting critical needs in the development of the Statewide mental health care delivery system. The updating of the classification structure will be an ongoing process until all identified needs have been met.

In summary, CDC has long acknowledged the difficulties and importance of recruiting and retaining mental health care professionals. A variety of activities have been undertaken with the goal of improving the recruitment program. Although each of these methods has had some degree of success, financial incentives are imperative if CDC is to succeed in attracting sufficient numbers of providers and comply with court mandates and legal agreements.

### C. State Level Considerations

This proposal is consistent with Goal 4 of CDC's Strategic Plan which is to "recruit, develop, and retain the highest quality employees." Objective 2 of Goal 4 is to "recruit, hire, and retain the most qualified and motivated employees". One of the strategies listed for achieving this objective is to "evaluate hiring policies and identify methods which will enable CDC to recruit, retain, and promote the most qualified and motivated employees." The availability of bonuses for mental health professionals is essential to address the CDC's critical R&R problems.

### D. Justification

A review of the mental health vacancy data for FY 1994/95 through FY 1997/98 shows a steady high vacancy rate for the Chief Psychiatrist, Staff Psychiatrist, Clinical Psychologist, Senior Psychologist, and Psychiatric Social Worker classifications (Attachment 3). As explained above, one of the primary causes of the high vacancy rate is the fact that the State salary levels are not competitive with the private sector.

The following chart compares the current State salary range with the average salary within California. (The salary survey data was provided by JWT Specialized Communications).

| CLASSIFICATION | CURRENT STATE SALARY (MONTHLY) | SALARY SURVEY DATA * | DIFFERENTIAL SURVEY: STATE | % STATE SALARY BELOW SURVEY |
|---|---|---|---|---|
| Chief Psychiatrist | $8508-9086 | $10,333 ** | $1825-1247 | 12-18% |
| Staff Psych. | $6650-8689 | $10,333 | $3683-1644 | 16-36% |
| Sr. Psych. (Sup.) | $4346-5275 | $6,250 | $1904-975 | 16-30% |
| Sr. Psych. (Spec.) | $4139-5023 | $6,250 | $2111-1227 | 20-34% |
| Clinical Psych. | $3770-4575 | $6,250 | $2480-1675 | 27-40% |
| Psychiatric Social Worker | $2853-3451 | $4,567*** | $1714-1116 | 24-38% |

\*    Average monthly salary in California according to salary survey.

\*\*   Data from American Medical Association-June 1997.

\*\*\* Data from Modern Health Care Magazine and Bay Area Laboratory and Information Systems-June 1997.

As indicated in the "% State Salary Below Survey" column, State civil service salaries for these mental health classifications are 7-40 percent below the average monthly salary within California. This salary survey data validates the fact that CDC is not competitive with other employers as far as compensation for Psychiatrists, Psychologists, and Social Workers.

Further, there has been a recent increase in the number of new Clinical Psychologists working at the institutions who failed to pass their licensure exam. Approximately 30 percent of the Psychologists working in the institutions are preparing to take the licensure exam. If these individuals do not pass the exam, they will have to be dismissed from State service. To avoid such problems in the future, CDC may be required to concentrate more on the hiring of licensed Psychologists. To do so would require that adequate compensation levels be provided.

The ability of CDC to comply with the December 1, 1997 directive from the Court Master is contingent on the availability of funds to provide R&R bonuses to mental health professionals. Sufficient compensation to mental health professionals is a vital link in maintaining a more competitive position in today's job market. The CDC needs that edge in order to fill as many current and future health care professional vacancies as possible. Without that ability, the R&R problems inherent in the current mental health delivery system cannot be resolved.

**E. Analysis of All Feasible Alternatives**

Following is a discussion of the alternatives for addressing this problem:.

1. **Provide a mental health R&R bonus at the following ten institutions which experience the most difficulty in recruiting staff:**

California State Prison, Corcoran                    Correctional Training Facility
California State Prison, Los Angeles County          High Desert State Prison
California State Prison, Sacramento                  North Kern State Prison
California State Prison, Solano                      Valley State Prison for Women
Central California Women's Facility                  Wasco State Prison-Reception Center

**The R&R bonus will apply to the following five classifications which are utilized at these institutions:**

Chief Psychiatrist
Staff Psychiatrist
Senior Psychologist
Clinical Psychologist
Psychiatric Social Worker

Attachment 1 itemizes the total funding in the amount of $1,440,926 required for the R&R bonuses. This amount includes $152,000 for new positions requested in the Mental Health Services Delivery System Outpatient Program BCP submitted by HCSD for FY 1998/99 (BCP # HCSD01).

*Pros*: Makes CDC salaries more competitive with the private sector at those institutions with the most serious recruitment problems. Will assist in bringing CDC into compliance with the Federal Court Consent Decree and other court mandates.

This option enables HCSD to more comprehensively address the recruitment of Mental Health positions in order to comply with the policies and plans approved by the Special Master for the <u>Coleman</u> case. This approach will enable CDC to address recruitment problems at ten institutions with the highest Mental Health vacancy rates. Should conditions arise where other institutions are adversely impacted, CDC may need to seek additional funding in the future.

*Cons*: Institutions that do not currently have a high vacancy rate, and do not receive the additional R&R bonuses requested in this Finance Letter, may begin to have recruitment problems if interested clinicians choose their work location based on availability of the bonus.

**2. Provide a Mental Health R&R bonus at each of CDC's 33 institutions.**

*Pros:* All institutions will have an equal opportunity to recruit from the Statewide applicant pool on the basis of salary.

*Cons:* Institutions that do not have a documented need for a bonus will still receive it. Cost of the proposal would be approximately three times as much since 33, instead of 10 institutions would be included.

**3. Use registry services and other temporary help agencies to hire staff on an as needed basis.**

*Pros*: Would provide a means to rapidly fill positions on a temporary basis.

*Cons:* HCSD currently uses some registry contracts. However, the rate paid to contractors is typically far more than the salary paid to State civil service employees. Employee unions would challenge the circumvention of the State hiring process. Additional staff resources would be needed to develop and monitor registry contracts.

**4. Do nothing--maintain the current process of each institution requesting R&R bonuses on an as needed basis.**

*Cons*: This alternative is not acceptable. The CDC will not be able to meet the requirements of the Federal Court Order. The long existing recruitment problems will not be resolved. Does not provide a comprehensive solution to the problem. A piecemeal approach to funding cannot be sustained without significant redirection from other critical health care programs.

**F. Timetable**

The CDC requests the funding for R&R bonuses be provided July 1, 1998.

**G. Recommendation:**

**1. Provide funds in the amount of $1,440,926 for R&R bonuses for five mental health classifications at the ten institutions identified in #1.**

As detailed above, a review of the vacancy information, a salary survey, and exploration of the issues underlying the R&R problem; all support the need for a salary bonus for certain Mental Health classifications. R&R bonuses at the ten sites with the most severe recruitment problems will assist CDC in attracting and keeping qualified clinicians working in our correctional environment and will help meet the <u>Coleman</u> Court's requirements, as stated in the December 1, 1997 communication.

Prepared by: Shari Luwen    Telephone: 327-2469    DiskR&R/finltr10    Date: 2/11/98

Exhibit G



1998-99 APRIL
GOVERNOR'

XX

(Dollars in ............,)

Agency: Youth and Adult Correctional Agency  PBM: Calvin Smith

Org/Department/Issue

### 5240/Department of Corrections, Health Care Services Division

### Mental Health Classifications Recruitment and Retention Bonuses

1998-99        $1.4 GF

CDC requests $1,440,926 General Fund for recruitment and retention bonuses
at ten institutions and five mental health classifications which are
experiencing unusually high vacancy rates.

The department reports high vacancy rates in the mental health care classifications
and indicates the primary reason is because they are not able to compete financially
in hiring qualified candidates. In addition, they indicate they are currently under a
Federal Court Consent Decree (Coleman v. Wilson) to ensure that adequate mental
health care is provided in 33 institutions throughout the state and, therefore, it is
critical that these positions be filled.

CDC indicates that state employees salaries for these classifications are 7-40
percent below the average monthly salary for non-state employees within
California. At some institutions, CDC already provides hiring above the minimum
salary step as well as recruitment and retention bonuses which are approximately
$200 to $400 per month for institutions not included in this request.

Rather than providing the bonuses noted above, this request is for a 14 percent
bonus for five classifications. CDC states the basis for the 14 percent is to be
consistent with an existing bonus at Pelican Bay State Prison. We note that the
bonus at Pelican Bay is $1,250 per month for two classifications rather than 14
percent.

HAWP\WRD\INDEX\DRILL\APRLTR.DOC/1

Date:  March 17, 1998

1998-99 APRIL 1 LETTERS
GOVERNOR'S BUDGET

**XXXX**

(Dollars in Millions)

Agency: Youth and Adult Correctional Agency  PBM: Calvin Smith

**Mental Health Recruitment and Retention Bonuses (continued)**

Finance staff question the 14 percent increase and believe there may be other less
costly alternatives that could be used to accomplish the recruitment and retention
objective. For example, a 14 percent increase for these classifications would range
from $399 to $1,272 per month depending on the classification. CDC could
consider hiring above the minimum salary step along with providing or increasing
existing bonuses by $200 to $400 per month or equivalent annual bonuses, which is
consistent with practices already in place for other institutions. Costs to implement
these bonuses for the 150 employees could be done for less than half of the $1.4
million requested by this proposal.

Because there are high numbers of vacancies, there is a considerable savings being
generated from the vacant positions. The department indicates that these savings
are used to fund contracts to provide the services not being provided as a result of
the vacancies. However, we note that over $11 million was reverted by the Health
Care Services Division in the 1996-97 fiscal year. Therefore, we believe that the
department may have sufficient resources to fund this proposal from its existing
budget.

The Department of Personnel Administration (DPA) reports that they have not
reviewed this proposal, consequently, we are unable to determine the impact on
collective bargaining. To the extent DPA approves the proposal and the proposal
reduces vacancies, funding will be considered at that time.

We recommend that CDC go forward with recruitment and retention policies to
address the high vacancy issues and work with DPA to develop an appropriate
strategy that addresses collective bargaining issues. However, because of the
savings in the division, we believe CDC has sufficient resources to fund the
proposal.

:H:\WP\WRDINDEX\DRULLVAPRLTR.DOC/2