FILED

NOV 2 0 1998

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                  No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

## SPECIAL MASTER'S RECOMMENDATIONS FOR STAFFING RATIOS

### Introduction

    In a June 15, 1998 Order, the court directed the special master to file recommendations for mental health staffing ratios by November 15, 1998. "Staffing Ratios" in this context mean the proportional rate between staff and inmate/patients in the various component programs of the California Department of Correction's (CDC) Mental Health Services Delivery System. Over the course of this litigation the expression, "staffing ratios," has become a term of art, and some historical background is required for an understanding of its present status.

    In his June 6, 1994 Findings and Recommendations, Magistrate Judge Moulds found that CDC was "seriously and chronically understaffed in the area of mental health care." At. pp. 36-40. After citing the department's own studies and admissions, as well as the testimony of expert witnesses at trial, the court concluded: "Defendants do not employ a number of trained mental health professionals sufficient to meet the constitutionally mandated minimum needs of mentally ill inmates incarcerated in the State of California, and they

994

know they do not." One of the principal reasons for the understaffing identified by the court was CDC's failure to adopt "a method for determining necessary mental health staffing ratios." Among the recommended remedies was a directive that the defendants develop and implement a formula for mental health care staffing ratios at all institutions, a recommendation adopted by the court when it entered its final order in September 1995.

Between 1993, when the hearings in <u>Coleman</u> began, and late 1995, when the final order was entered, the defendants used the studies cited by the court as the bases for developing their own staffing ratios for their newly organized and restructured mental health system. When the court-appointed master and his mental health experts began to assess the defendants' mental health system in early 1996, they found evolving programs in place, or coming into place, based on these staffing ratios. With the concurrence of the plaintiffs and the court, the master opted early to assess the adequacy of the defendants' staffing ratios empirically by evaluating the effectiveness of implemented programs in delivering planned services. That assessment was interrupted first by PLRA-related litigation in 1996 and then by the effort in 1997 to complete and obtain provisional court approval of plans and policies for the defendants' overall mental health services delivery system, but was resumed in mid-1997. Based on nearly a year of further review, the court directed the master in mid-1998 to finalize and submit to the court recommendations for staffing ratios. This report contains those recommendations.

Prefatory to a discussion of staffing ratios, there is a need to address the confusion created by the interconnections and distinctions among the four

2

notions of ratios, prevalence, authorized positions and vacancies. A staffing ratio for any particular mental health program determines the number of mental health staff, including psychiatrists, psychologists, psychological social workers (psych social workers), recreational therapists, psychological technicians (psych techs), nurses and clerks, needed to provide the services required to be delivered by that program to a specific number of inmate/patient participants. The nature of the program, whether it delivers acute in-patient, residential chronic or outpatient care, drives the type and density of required program staffing. Programs that involve the most intervention, not surprisingly, require more staff. Basic concepts of the division of labor, incorporating notions of triage, as well as professional and licensing requirements and restrictions, determine the mix of staff needed to provide various services within a programmatic framework. The ratio for each program is expressed in terms of the number of clinicians and other staff needed to provide, for example, outpatient care to a fixed number of inmates.

Prevalence, typically expressed in terms of a percentage of the overall population, refers here to the incidence of serious mental disorders in the department's population that require treatment on any given day by mental health staff. Projected prevalence anticipates the likely need, while actual prevalence reflects treatment provided. Projected prevalence depends on the projector's view of which serious mental disorders ought to be treated. Even the actual prevalence rate depends, in somewhat circular fashion, on the mental health staff's decisions about what sorts of mental illness to treat. CDC's actual prevalence rate depends ultimately on the criteria applied by the department's

clinicians for including inmates in its mental health system. Some early battles, vitally important to the size and nature of mental health services offered by CDC, were fought out over the criteria for admission to treatment in the department's mental health system. Agreement on those criteria, assuming their even-handed application throughout the system, reduces substantially the relative and subjective character of CDC's actual prevalence figures.

The importance of prevalence for the purposes of this case is that, in the defendants' budget calculations, the projected prevalence number drives the overall total of staff that will be authorized in any fiscal year for mental health. Annual budget estimates assume, based on a projected prevalence rate, that a specific percentage of the general CDC population will require mental health services in the course of the fiscal year, and further assume that specific percentages within that figure will require certain levels of care or programming, for which staffing ratios have been determined. If the annual projected prevalence rate underestimates actual prevalence, there will not be enough authorized resources of staff to meet actual needs, no matter how efficacious the individual programmatic staffing ratios may be. Thus, it is the level of staffing authorized, which represents a combination of staffing ratios and prevalence, that determines the defendants' potential ability to provide programmed services.

Lastly, there is the issue of vacancies in authorized positions and their effects on the delivery of the mental health services and programs. There are currently numerous vacancies in key clinical mental health positions, particularly among psychiatrists and psych social workers, in a great many CDC

4

institutions.  Apart from their adverse impact on the delivery of mandated services, which is presently the subject of other proceedings in this case, substantial vacancies can make it difficult to judge the efficacy of existing staffing ratios.  On the other hand, the master and his monitors and psychiatric experts have been looking at CDC's evolving mental health programs now for well over two and a half years.  They have visited every institution involved in the case at least twice; some they have visited as many as four times.  They have seen each program component in at least one institution with a full complement of authorized staff.  On the basis of their collective observations, they are prepared to evaluate the sufficiency of the defendants' staffing ratios and recommend appropriate ratios where current ones are inadequate.

This report is not about vacancies; it is about the levels of authorized staffing, derived from appropriate staffing ratios and accurate prevalence rates, that are essential if the defendants are ever to provide the kinds of mental health services they and the court agree will suffice to meet constitutional requirements.

### Ratios

Before articulating proposed staffing ratios for each programmatic component of the defendants' mental health services delivery system, more needs to be said about the bases for the recommendations that follow.  Since the mastership was created, monitors and psychiatric experts have made 76 visits to the 30 CDC institutions that are presently the subject of this suit.  Typically, those visits have included at least a monitor and a psychiatric expert, who spend anywhere from one and a half to three days at each facility.  Some earlier visits

involved only a single monitor or expert; occasionally they have involved as many as five monitors and experts. The monitors and experts have spent over 300 person-days on site in CDC institutions observing and evaluating the defendants' mental health programs. In addition, the master, monitors and experts have spent the equivalent of months in meetings with CDC administrators and mental health and health services staff as they developed plans and procedures for every aspect of their mental health delivery system. They have interviewed collectively several hundred institutional administrators, mental health and custody staff members and inmates, and they have reviewed hundreds of individual medical files. The extent of the observation and analysis that has occurred here dwarfs the party or court-sponsored expert review typically associated with litigation that may, at best, involve a handful of experts who spend a handful of days in a handful of institutions. The mastership in this case has conducted the most detailed and searching scrutiny of a correctional mental health system ever.

The credentials of those who have conducted the scrutiny are impressive. Six psychiatrists have served as the master's experts in this case, five of whom have acted as experts on correctional mental health issues for parties, courts and masters all across the country, while the sixth was for eight years a consulting psychiatrist with CDC. Two of these experts were consultants in the creation of the Scarlett Carp Report, one of the key documents in this case. Another serves as the master's expert in the Madrid case, monitoring medical and mental health services in CDC's Pelican Bay State Prison, and is one of the most prolific authors on mental health in the correctional setting in professional

psychological circles.  Another has been the director of forensic services at world-renown St. Elizabeth's Hospital in Washington, D.C., while another is currently the director of mental health services in one of America's larger urban jail complexes.  Exhibit 1 provides a brief description of the experience and resumes of each of the master's psychiatric experts.

Other monitors involved in this mastership include a psychologist who formerly worked for both New York City and State correctional systems and is currently the editor of <u>The American Psychologist</u>, the journal of the American Psychological Association; the medical administrator for a large urban county medical system; a registered and public health nurse who has worked as a consultant in correctional health care for 19 years; a health care attorney; three attorneys who have represented plaintiffs in prison litigation, including the landmark <u>Ruiz</u> case in Texas, for nearly two decades; a former federal court compliance monitor for New York City jails; and a criminal justice systems analyst from UC Berkeley.  The deputy master has served as a court-appointed monitor in correctional cases involving, among other issues, medical and mental health for ten years.  The master in the case has served federal courts in correctional cases for over 20 years.  Together, members of the <u>Coleman</u> monitoring team have served as experts, monitors or masters in correctional cases for 22 federal district courts and numerous state courts.

Finally, before getting to the staffing ratios themselves, a word needs to be said about the standards applicable to staffing in the context of correctional mental health care.  The overarching and governing standard in this case was articulated in the court's September 13, 1995 Order:

> In order to provide inmates with access to
> constitutionally adequate mental health care,
> defendants must employ mental health staff
> in 'sufficient numbers to identify and treat in an
> individualized manner those treatable inmates
> suffering from serious mental disorders.' (Citations
> omitted.) At p. 35.

Fortunately, in this case the parties have collaborated to wring much of the potential ambiguity out of that legal formula. In negotiations that consumed the first half of 1997, the defendants, plaintiffs' counsel and the master and his psychiatric experts refined and agreed to criteria for identifying treatable inmates suffering from serious mental disorders, as well as the structure and nature of programs necessary to treat them in an individualized manner. A major product of those negotiations were program guides that spelled out requirements for treatment at each level of care in the defendants' health care delivery system. Those guides represented the core of the six volumes of policies and procedures subsequently submitted to, and provisionally approved by, the court in mid-1997. For the purposes of this case, the parties, the master and, at least provisionally, the court are all in agreement that the program guides describe the elements necessary for providing inmates with access to constitutionally adequate mental health care.

The program guides also provide a logical framework for analysis of the defendants' staffing ratios. The guides identify reception, the mental health crisis beds (MHCB) program, the enhanced outpatient program (EOP), the correctional clinical case manager system (3CMS) and administrative segregation as the key components in CDC's multi-level mental health care delivery structure. Acute and intermediate inpatient care is provided by the

Department of Mental Health (DMH), which has established its own staffing ratios for this level of care, not addressed in this report.

Reception:

The defendants' staffing ratios for reception are based on an analysis of the screening and evaluation tasks that are central to the reception process. After calculating actual numbers of inmates newly received in CDC in 1993 and the likely number of admissions in 1994, the defendants estimated the average time required to conduct a mental health screening (i.e., administration and scoring of the 31-item questionnaire provided on intake to each inmate who enters CDC) and a full clinical evaluation. Ten minutes were allocated for a screening, while 90 minutes were allotted to evaluate, assess the appropriate level of care and prepare a brief interim treatment plan for each inmate earmarked as requiring further psychological examination in the screening process. The adopted ratio recognized that clinicians would not be able to conduct screenings and evaluations every hour of every day, and 66 hours of each normal monthly workload of 166 hours were allocated to cover leave, training, administrative time and collateral responsibilities.

This is the only staffing ratio developed entirely by the defendants and the only one based on an identified rational analysis, a basic time and motion study, of the tasks to be performed by the involved staff. The small range of the reception tasks, as well as their predictability and repetitiveness, simplified the calculations, but the ratios developed in 1994 have served the defendants well ever since. The final ratio can be reduced to one clinician for every 185 inmates needing to be screened monthly. For the most part these clinicians are

psychologists, the minimum staff level required for the evaluations, although the screening may be conducted by any master's level mental health clinician trained on the screening instrument.

In spite of the steadily increasing CDC population since 1994, the monthly number of inmates admitted newly to the department has remained relatively constant. The master's monitoring team has looked at each reception center in the department three times over the past three years. Because of relatively tight timelines for conducting screenings and evaluations and the need to complete at least the mental health screening before classification will clear a reception inmate for movement to the general population, the defendants have been compelled to provide sufficient staff to carry out these reception functions. Staff vacancies, thus, have not impeded an assessment of the sufficiency of the defendants' staffing ratio in reception. The master finds the defendants' current staffing ratio for reception acceptable and recommends its adoption by the court.

The reception staffing ratio endorsed here refers only to screening and evaluation functions. It has nothing to do with the provision of mental health services to inmates in a reception unit who have been designated for an EOP or 3CMS level of care while they are in the reception facility awaiting transfer to a mainline institution.

Mental Health Crisis Bed Program:

In contrast to the staffing ratio for reception, which the defendants put together on the basis of a straightforward job or task analysis, staffing ratios for the rest of CDC's programs were taken largely from consultants'

10

recommendations.  In the early 1990's, as the <u>Coleman</u> litigation ripened, the defendants engaged Scarlett Carp Associates, a respected California mental and public health consulting firm, to identify and analyze deficiencies in CDC's delivery of mental health services and help design a new and better delivery system.  One element of the resulting Scarlett Carp Report was the strong suggestion, adopted by the defendants, for a reorganization on regional lines of the then highly centralized CDC mental health services delivery system.  Instead of concentrating the department's mental health resources in the California Medical Facility (CMF) and the California Men's Colony (CMC), Scarlett Carp urged the development of a network of service areas, each with a hub facility and nearby satellite institutions.  Each service area would provide three basic levels of service, one for short-term, acute or crisis in-patient care (MHCB), one for residential outpatient care (EOP) and one for traditional outpatient care in the general population (3CMS), while DMH would provide longer-term acute and intermediate chronic inpatient care at CMF and in its own secure hospital facilities.

The defendants adopted the overall regional structure advocated in the Scarlett Carp proposals, but added their own organizational variations. The staffing ratios recommended by the consultants for the different levels of care needed to be jiggled to fit the organizational structure eventually implemented.  Exhibit 2, which includes materials provided by the defendants on the origins of existing staffing ratios, chronicles the adjustments that occurred.  In the broadest terms, the defendants emerged with a commitment to something like one mental health staff member for each MHCB inmate/patient; one mental

11

health staff member for every ten EOP inmate/participants; and one mental health staff member for every 100 3CMS inmates. Obviously, the mix of different kinds of mental health staff within those broad ratios is critical.

Attachment 6 to Exhibit 2 provides the defendants' staffing pattern or ratio for their MHCB programs. Because all of the defendants' MHCB programs will eventually be housed in licensed Correctional Treatment Centers, they must also meet mandated State staffing requirements for acute mental health care (Title XXII, Section 79755). CDC's existing MHCB staffing ratio meets fully the applicable regulatory requirements.

The system-wide census of roughly 100 MHCB patients is consistently less than the department's program capacity of 137 beds. With one exception, institutional MHCB programs rarely and only episodically exceed local capacity. The exception is the California Institution for Men, which recently has been housing two to three times its capacity of MHCB patients. Because the program population in any institution is typically small (six or less) and because staff, particularly psychiatric staff, can be shared among other mental health programs within the institution, the general impact of staff vacancies is attenuated in MHCB programs. Also, the acuity of mental illness among MHCB patients makes it more difficult to divert staff elsewhere without immediately obvious impact. For all of these reasons, the master's team has had sufficient opportunity to observe MHCB programs operate at full, or close to full, staffing ratios. Monitors and experts have seen every MHCB program in the institutions included in Coleman at least twice and several of them as often as four times.

12

According to the defendants' program guide for the MHCB program, this is the department's principal resource for dealing with acute psychiatric crises. The program provides an opportunity for continuous observation and monitoring while a patient's treatment needs can be assessed and the crisis brought under control. The goal is to monitor, assess and stabilize the patient within a relatively short period of time, the goal is ten days, and, if possible, return the inmate to a lower level of care appropriate to his or her psychiatric needs. In addition to 24-hour nursing care, the program requires interdisciplinary treatment planning, weekly case reviews and treatment plan update and a regimen of treatment that includes medication, sometimes involuntary medication, individual therapy and counseling, some limited rehabilitation therapy and aftercare planning. The role of the psychiatrist is critical in the management of medications, assessment of treatment needs and treatment planning, as is around-the-clock nursing observation and attention.

The defendants' staffing pattern for the MHCB program provides for full-time chief psychiatrist and a half-time staff psychiatrist for up to five patients. A program with over six patients requires a full-time staff psychiatrist. In the normal course of events, a chief psychiatrist does not spend 100 percent of his or her time in the MHCB program; the chief psychiatrist has professional supervisory responsibility for the facility's whole mental health program. The staffing ration, however, focuses the chief psychiatrist's available time for clinical duties on the MHCB population. Other clinical, nursing and clerical allocations in the MHCB staffing ratio are adequate to meet program goals.

13

The master finds that the defendants' staffing ratio for their MHCB programs is adequate and acceptable. Again, this does not mean that the monitors have not found serious deficiencies in various MHCB programs operated by the defendants. On the contrary, the master's experts have reported failures in some MHCB programs to evaluate and change medications as needed, order or obtain results of lab work, prepare and update treatment plans, conduct regular interdisciplinary treatment team (IDTT) meetings, initiate needed involuntary medication, etc. Nor does this finding begin to address the issue of the inadequacy of care provided to those CDC inmates found to need an MHCB-level of care who are housed in infirmaries, where there is no MHCB program. This endorsement of the staffing ratio for the defendants' MHCB program does not constitute a finding that the defendants have fully and successfully implemented their MHCB program. It suggests, rather, that the master's experts believe that, if the defendants can meet the MHCB staffing ratio with reasonably competent staff, they will possess, at least, the human resources needed to operate a program that comports with the program guide.

<u>Enhanced Outpatient Program</u>:

Exhibit 3 provides a chart depicting the defendants' sliding scale of staffing ratios for their EOP programs. Ten CDC institutions operate EOP programs with an inmate/patient capacity currently of 1,336. On any one day, another 300 to 400 inmates identified as requiring an EOP level of care are housed in CDC institutions without an EOP unit awaiting transfer to a facility with an available EOP bed. The placement picture is complicated by the need for EOP program slots at each different level of custody classification operated by

the defendants.  Thus, changing mental health needs must be synchronized constantly with changing classification needs, resulting in less and more slowly realized system-wide flexibility.  The vast geography of the CDC system causes further transfer complications.

In a sense, the enhanced outpatient program is a misnomer, for it is in reality a residential program.  The EOP is designed to provide separate housing and structured activities for seriously mentally disordered inmates who cannot function in the general population, but do not require 24-hour inpatient care.  Treatment provided in the EOP is aimed at resolving the inmate/patient's institutional functioning problems by providing clinical intervention that restores the inmate to the less restrictive clinical and custodial environment of the general population.  The anticipated length of stay is four to six months, although there are some chronically, even permanently, dysfunctional inmate/patients who stay much longer.  The program guide mandates the provision of clinical assessment and treatment planning through an interdisciplinary treatment team process, weekly clinical contacts with a mental health clinician, a minimum of ten hours weekly of structured therapeutic activities and recreational and short-term individual therapy.

The breakdown of staff in the defendants' staffing ratio for the EOP provides for every 100 inmate/patients a full-time psychiatrist, a full-time senior psychologist, two full-time psychiatric social workers, two full-time registered nurses, a full-time recreational therapist, three full-time psych techs and a full-time clerk.  In practice, the senior psychologist spends considerable time on administrative and clinical supervisory duties, which leaves only limited clinical

time with EOP patients.   Still, this leaves nine full-time mental health staff workers, all required to meet some form of, for the most part, mental health licensing requirements.

Of the ten EOP programs in CDC facilities, six have been so plagued by staffing vacancies, particularly among psychiatrists, psychologists and psych social workers, they provide no useful measurement of the adequacy of EOP staffing ratios.  Four facilities, including the California Institution for Women (CIW), California State Prison, Sacramento (CSP/Sac), R. J. Donovan Correctional Facility at Rock Mountain (RJD) and CMC have experienced many fewer vacancies at various points during the course of the master's reviews and provide, thereby, a better opportunity to assess the potential of staff at, or reasonably close to, mandated levels to deliver the services required by the program guide.  Of these, CIW has consistently  met the programmatic goals of the EOP program guide.  RJD and CSP/Sac have never fully provided all of the elements of treatment required by the program guide, but they have both met mandated levels of service for many, and at times, most of their EOP patient/participants.  CMC's EOP has a capacity of 599 inmates, regularly exceeded, and is, by virtue of its size, in a class of its own.  The EOP there has never managed to meet fully all of the program guide requirements, but the weekly average of structured therapeutic activities for all EOP inmates in CMC is about seven hours, and many EOP inmates receive more than the minimum weekly requirement of ten hours.

RJD, CSP/Sac and CMC have not fully met EOP program guide requirements in part because of some vacancies in EOP staffing, but mainly

because of staffing deficiencies in other institutional mental health programs. For example, in both RJD and CSP/Sac, staffing vacancies in the ranks of outpatient case managers, coupled with outpatient caseloads at 150 percent of capacity, mean that EOP staff are, in part, diverted to fill the void.

In the judgment of the master's staff and experts, the staffing ratio for the defendants' EOP program is adequate and acceptable. Again, this simply means that, if the defendants can staff their EOP programs at the staffing levels called for in the staffing ratio, the master's experts believe the defendants can provide the services mandated for delivery in the EOP program guide.

Correctional Clinical Case Management Program

The largest component in the array of programs provided by the defendants is the 3CMS program. Some 11,000 to 12,000 inmates are included in CDC's 3CMS outpatient program on any given day. That number means the 3CMS population is larger than the entire prisoner population of 31 states. Except for the California Correctional Center and High Desert State Prison, both of them in Susanville where it is practically impossible to lure mental health clinicians, every CDC institution has a 3CMS program, ranging in capacity from 50 to 599. CMC, which has the 599 capacity, has had an actual count of 3CMS inmates as high as 710.

Because it is the least restrictive level of care and is broadly available in the general population, the 3CMS program is designed to be the bulwark of CDC's mental health care services delivery system. It is assumed that 3CMS inmates will reflect a wide spectrum of functioning abilities. The concept of triage is central to 3CMS staffing, with case managers expected to sort out the

mental health wants of the individual inmate/patients on their caseloads and meet widely differing needs with appropriate levels of care. For those on the high end of the functioning spectrum, clinical case managers are required simply to track and monitor progress, while they must link more seriously impaired inmates to psychotherapy and other available supportive services. The program guide also requires regular assessment and the development and updating of treatment plans, although at intervals appropriate to individual needs. Because the majority of 3CMS inmates are on some sort of medication regimen, there is a need to monitor medications appropriately. Treatment modalities for 3CMS inmates may include, as appropriate, individual counseling and crisis intervention, group therapy and clinical pre-release planning.

The program guide lays a foundation for relatively high 3CMS caseloads by pointing out that in the general community a large part of the work of an outpatient case manager involves securing the basic necessities of life, including food, shelter and clothing, for seriously mentally disordered clients. In addition to providing for these basic needs, a correctional institution offers some educational, vocational and work opportunities. All of this allows the correctional case manager to focus more narrowly on resolving mental health problems.

Attachment 7 to Exhibit 2 provides the defendants' staffing ratio for their 3CMS program. It differs from other ratios in that it provides a basic pattern of staffing and augments it to address specific institutional or population idiosyncrasies. For up to 300 inmates in a basic 3CMS caseload, the ratio requires a half-time psychiatrist, a full-time senior psychologist, two full-time psych social

workers and a half-time clerk. Again, the senior psychologist will have administrative and professional supervisory duties to perform, and will only provide direct clinical services in the time remaining after meeting the demands of competing administrative duties. This leaves the two case managers with somewhere between 100 and 200 inmate/clients, depending on the availability of the senior psychologist, and a half-time psychiatrist to monitor the medications of, and provide crisis intervention and assessment for, as many as 300 inmate/clients.

The master's psychiatric experts have raised questions about the adequacy of this staffing ratio to provide the services mandated in the 3CMS program guide. Unfortunately, there have not been many opportunities over the past three years to observe institutional 3CMS programs with a full, or nearly full, staff. The provision of 3CMS program services in most institutions has been consistently and severely compromised by significant vacancies in clinical positions and by population counts far in excess of program capacity. Caseloads for case managers at facilities have often exceeded 250 inmates. It is difficult, if not impossible, to assess objectively and accurately the validity of staffing ratios in such a context. There have been, however, a few institutions in which caseloads have approached staffing goals, at least for a time. The experiences of these institutions provide the fodder for the misgivings and recommendations of the master's experts.

The Central California Women's Facility (CCWF) is an example of an institution where the 3CMS clinical staff has caseloads comporting with the defendants' staffing ratio. In October, 1997, each of the four case managers in

that facility's 3CMS program had a caseload of approximately 100 inmates.
Although characterized by in the master's report as "qualified, hard working and
caring", the staff of case managers was unable to provide the full 3CMS
program envisioned in the defendants' program guide. One measure of
adequate staffing is the speed with which referrals are handled. The master
found that the system for responding to staff and self-referrals at CCWF was
"chaotic". A review of records revealed that "many referrals were not answered
in a timely fashion." In one instance, an inmate was referred by custody staff,
along with a notation that she was hostile and unable to understand verbal
commands, but was not scheduled to see a psychologist for more than two
weeks. The inadequacy of staff was also reflected in the failure to identify
inmates on the 3CMS caseload that needed treatment. *First Monitoring Report
of the Special Master on the Defendants' Compliance with Provisionally
Approved Plans, Policies and Procedures*, dated April 20, 1998, at pp. 220-221
(hereafter referred to as *First Monitoring Report*).

Observation of the 3CMS program at Folsom State Prison (FSP) also
raised doubts about the adequacy of 3CMS staffing ratios. At the time of the
master's initial review, there were no 3CMS staff vacancies at FSP, and the
program census did not exceed capacity. Here, too, monitors were struck by
the "evident competence and dedication" of the mental health staff. Despite
this, the staff was simply insufficient to deliver the 3CMS program elements
described in the program guide. Case managers at FSP were barely able to
monitor their inmates. Inmate interviews and a review of records confirmed that
mental health services consisted of medication maintenance, crisis intervention,

and "a rare interview" with a clinician. There was no group therapy for inmates. One psychiatrist was barely able to see all of the inmates on his caseload by scheduling 40 inmates a day, which represented an average of less than ten minutes with each inmate/patient. The master's conclusion was that FSP was "understaffed" and that the caseload needed "to be reduced or the staffing expanded." *First Monitoring Report*, at pp. 24-28.

The experience at FSP points to one of the basic problems with the 3CMS staffing levels established by defendants. The senior psychologist, while counted as a clinical staff member for purposes of establishing staffing ratios, was assigned so many administrative tasks, including at FSP the preparation of board of prison terms (BPT) and other court and parole-related reports, he was unable to carry anywhere near the clinical caseload anticipated in the staffing formula. This increased the caseload of the remaining case managers to roughly 150 inmates each.

FSP also demonstrated clerical staffing deficiencies within the 3CMS ratios. FSP's allocated position for a half-time office technician was filled, but the available technician could not keep up with the paperwork demands of 300 inmates. As a result, struggling clinicians did not have access to an accurate and up-to-date tracking process. The master recommended "the allocation of additional clerical help" at FSP. *First Monitoring Report*, at p. 29.

Pleasant Valley State Prison (PVSP) presents another example of 3CMS staffing problems. At the time of the master's first monitoring report, PVSP had vacant positions for psychiatrists and a senior psychologist, but all of its other clinical positions were filled. As a result, four case managers were responsible for

21

approximately 120 inmates each, a caseload relatively close to the staffing ratio. And, once again, clinical staff was found to be "well trained and competent." Still, the 3CMS program was unable to provide the full range of services contemplated by the program guide. The 3CMS staff at PVSP was engaged almost exclusively in crisis intervention, while the monitoring of inmates not in crisis was limited. Staff estimated that they were able to see only about 85 percent of their respective caseloads every 90 days. As a result, case managers were often unable to identify inmates who had stopped taking their prescribed medication until they had decompensated badly. A review of records revealed that referrals often were not scheduled, scheduled mental health contacts frequently did not occur, and medication renewals were sometimes overlooked. Significantly, interviewed staff opined that a caseload of 80 inmates would, in contrast, enable them to keep track of all their patients and allow increased contact with inmates in need of treatment. *First Monitoring Report*, at pp. 103-105.

Several other institutions revealed similar circumstances. At the California Training Facility (CTF), where the caseload of 130 3CMS inmates for each case manager was slightly larger, little treatment other than medication and crisis management was provided. In addition, the files at CTF revealed an absence of treatment plans and a lack of IDTT meetings. *First Monitoring Report*, at pp.121-123. Similarly, 3CMS caseloads of 120 to 130 inmates at Valley State Prison for Women allowed time for little more than medication monitoring and some crisis intervention. *First Monitoring Report*, at p. 235. Administrators and staff at the Sierra Conservation Camp, a facility that was fully staffed,

22

unsuccessfully petitioned defendants for another psychiatrist position to supplement mental health services they thought inadequate for inmates' treatment needs. *First Monitoring Report*, at p. 59. Likewise, at the California Rehabilitation Center, where there was only one vacancy, the master found a host of problems including delayed evaluations, poor access to mental health services, an absence of treatment plans, and inadequate case management. *First Monitoring Report*, at pp. 180-181.

Since those early reviews, the ratio between staff and inmates has worsened at many institutions as the number of inmate/patients has climbed. What is revealing about those early reports is that even when staffing levels approached the ideal, facilities were unable to provide the services mandated by the 3CMS program guide.

To redress the deficiencies the master and his experts found in the level of services provided under current staffing ratios for the defendants' 3CMS program, the master proposes two adjustments in 3CMS staffing ratios, namely, changing the ratio of psychiatrists to 3CMS inmates to 1:175 and the ratio of case workers to inmates to1:75.

Implicit in these limited recommendations is endorsement of the list of augmentations included in the defendants' existing 3CMS staffing ratio, with one exception relating to clerical staff. Because of the critical importance of tracking and scheduling in the management of large outpatient caseloads for clinicians, the master proposes an increase in clerical staffing for the 3CMS program, which would require one clerical staff person for every 4.0 full-time clinicians in the program.

The master has undertaken a preliminary review of correctional outpatient staffing ratios in statewide systems elsewhere around the country with organized, mature mental health systems (typically prompted by some form of court order). Early returns confirm the recommendation for more case managers and psychiatrists for 3CMS inmates, but, frankly, the evidence is mixed and frequently expressed in terms difficult to apply in a much differently organized delivery structure. The recommended changes for the 3CMS staffing ratio depend fundamentally on the findings of the monitors and the expert opinions of the master's psychiatric staff.

The cost of this proposal is substantial. It would mean the doubling of current psychiatric staffing of the defendants' 3CMS program, which now provides for one full-time psychiatrist for every 350 3CMS inmate/patients. The suggested staffing pattern for case managers could be met by increasing the current ratio of a senior psychologist and two case managers for 300 3CMS inmates to a senior psychologist and three case managers, while reserving some of the senior psychologist's time for clinical duties with a small caseload of patients. That possible mix makes calculation of the cost of the proposed increase in 3CMS case managers more problematic. The cost of increased clerical support is perhaps easiest to calculate.

Administrative Segregation:

The defendants do not have a staffing ratio for the delivery of mental health services in administrative segregation. The schedule of augmentations for 3CMS staffing allocates an extra full-time psychologist for each 300 inmates in a security housing unit (SHU), but no other staffing ratio

addresses directly the provision of mental health services in administrative segregation. Since the development of the rest of the staffing ratios reviewed in this report, the defendants sought and obtained through the budgetary process an allocation for enough pysch tech positions to provide a daily weekday presence in every administrative segregation unit in CDC. Beginning in the latter half of 1996, these positions came on line, and today there are 33 psych techs whose task it is to screen the entire administrative segregation population for mental health problems and monitor inmates in the unit already on the mental health caseload. Previous reports of the master have noted the usefulness of these psych techs for improving the access of inmates in administrative segregation to mental health services. This additional staff resource needs to be formally incorporated into the defendants' staffing ratios.

Despite the addition of these psych tech positions, the master's experts continue to be concerned about the level of mental health care provided routinely to inmates in administrative segregation. Both EOP and 3CMS case managers, whose inmate/patients are transferred to administrative segregation, are supposed to visit these inmates weekly. Early reports of the master noted significant problems with the delivery of clinical services to some inmates in administrative segregation, and it is not clear whether clinicians other than psych techs see inmates on the caseload regularly. One of the reasons for the reduction in the size of the caseload of 3CMS case managers is to ensure sufficient resources to cover inmates in administrative segregation.

The master is currently engaged in a broad assessment of the adequacy of mental health services provided by the defendants in

administrative segregation, with a report on the issue due to be submitted to the court by the end of the year. Meanwhile, negotiations are underway to restructure significantly the way the defendants handle discipline and segregated punishment for seriously mentally disordered inmates. The master will postpone any final additional recommendations or endorsements of staffing ratios for the provision of mental health care in the defendants' administrative segregation units, other than to suggest formalization of the requirement for a psych tech in each administrative segregation living unit.

One last aspect of staffing needs to be addressed. The defendants currently maintain only one psychiatric services unit (PSU) in Pelican Bay State Prison (PBSP), although discussions are underway to create more such units elsewhere in the system. Exhibit 4 contains the existing staffing ratio for the PBSP PSU, which the master approves and endorses for any future similar units.

### Prevalence

As indicated earlier, staffing ratios, which spell out the number and types of staff appropriate to each level of care provided by the defendants, are but one component of the formula that fixes the size of the defendants' authorized staff for mental health. The other, and equally important, component is determined by the prevalence rate used in the annual budgeting process to determine what percentage of the overall CDC population will need mental health services in the upcoming year.

There has been considerable discussion of prevalence rates of serious mentally disordered inmates in the CDC population in the course of this case. *The Second Report of the Special Master on Remedial Plans*, dated April

16, 1996, rehearsed at some length the history of the concept within the context of <u>Coleman</u>. It is unnecessary, at this point, to repeat that history. Suffice it to say that the 7.9 percent projected prevalence rate, suggested by the Stirling Report and initially adopted by the defendants, is no longer consistent with the actual prevalence rate of serious mental illness in the CDC population. The most recent figures, set forth in Exhibit 5, indicate a steady increase in the number of inmates needing and receiving mental health services from 9.71 percent in November, 1997 to 10.46 percent in October, 1998.

To the extent they employ a percentage figure lower than the actual prevalence rate of mental illness in the population to determine the overall number of mental health staff authorized for any specific year, the defendants are foredoomed to failure in providing sufficient staff to meet the level of services mandated in the program guides. The master's early monitoring reports established the strain on mental health services when inmate/patients exceeded program capacities. While staff resources have expanded significantly over the past five years, the expansion was premised initially on the faulty assumption that the percentage of the CDC population requiring mental health services was 7.9 percent. The actual number is now 10.46 percent and climbing. The only way to ensure staffing adequate to provide mandated services for those who need those services is to peg the prevalence rate at its actual rate.

CDC administrators have indicated to the master that their budget request for fiscal year 1999, which commences on July 1, 1999, will be based on a 10.6 percent prevalence rate, and the budget request for fiscal year 2000 will

assume an 11.1 percent rate. While these requests are encouraging, they do not go far enough. The presence of mentally disordered inmates in the CDC system is already at 10.46 percent, and there is every indication it will go higher. By the time the 1999 budget request is enacted, even if it is fully met, the actual prevalency rate is likely to be at 11.21 percent, or 0.75 percent higher than it is now, if the experience of the past year is an accurate predictor.

In order to offset the potential harm to plaintiffs from inadequate staffing, it is necessary that the prevalence rate for the next year reflect accurately and fully the anticipated rise. A budget request for FY 99 at today's rate of actual prevalence may reduce the gap between need and resources, but it will not close it. The defendants need to be at 11.21 percent by mid-1999. There are strong indications from correctional systems elsewhere around the country, including those in Michigan, New York and Georgia, that effective system-wide mental health systems have an actual prevalence rate somewhere between 14 and 15 percent, a number close to the prevalence rate predicted in the defendants' own Scarlett Carp Report. It may be premature to require the defendants to go to a 14 percent prevalency figure now, but the master recommends the adoption of an 11.21 percent prevalency figure for FY 1999. At the same time, the defendants ought to be required to review and adjust the projected prevalency figure annually based on the then current actual prevalence rate.

## Conclusions

The master makes the following recommendations relative to the defendants' mental health staffing ratios:

1.    The defendants' current staffing ratios for reception, the MHCB program and EOP are adequate and should be approved by the court.

2.    The defendants' current staffing ratio for the 3CMS program is inadequate. The recommended adjusted ratio for psychiatrists is one for every 175 3CMS inmates; for case managers is one for every 75 3CMS inmates; and for clerical staff, one for every four full-time 3CMS clinicians.

3.    The master suggests postponing the setting of staffing ratios for administrative segregation until December 31, 1998, but recommends formal adoption of the defendants' formula of one full-time psych tech for each administrative segregation unit in CDC. The master also endorses the defendants' PSU staffing ratio.

4.    The master recommends that the defendants be required to adopt an actual prevalence rate of 11.21 percent in determining authorized staffing positions in the mental health budget for FY 1999. Thereafter, the defendants ought to be required to review and adjust the projected prevalency figure annually based on the then current actual prevalence rate.

If history is a guide, there will be objections to the master's recommendations on staffing ratios from the plaintiffs, who will denounce their insufficiency, and from the defendants, who will condemn their overabundance.

The master welcomes thoughtful objections and urges the parties to consider the utility of hearings before the master if the objections are fundamental and irreconcilable.  This report confirms much of what the defendants have done in the establishment of staffing ratios. It also confirms that the defendants must do more to improve 3CMS staffing and ensure the allocation of sufficient authorized staff resources to deliver the services promised in the program guides.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

November 16, 1998

## DECLARATION OF SERVICE BY MAIL

Case Name:  Ralph Coleman, et al. v. Pete Wilson
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 year and not a party to the within entitled cause:  my business address is Little Bulman & Reardon, P.C., 50 South Main Street, Providence, Rhode Island 02903.

On November 17, 1998, I served the attached

**SPECIAL MASTER'S RECOMMENDATIONS FOR STAFFING RATIOS**

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped with postage thereon fully prepared in the United States Mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
650 Capitol Mall
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
650 Capitol Mall, Suite 5054
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
650 Capital Mall
Sacramento, CA   95814

Susan Steinberg, M.D.
Deputy Director (A)
Health Care Services Division
California Dept. of Corrections
501 J Street, Suite 602
P.O. Box 942883
Sacramento, CA  94283-0001

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont St., Suite 3000
San Francisco, CA  94105-2239

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Pamela L. Smith-Steward, Esq.
Deputy Director (A),  Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont St., Suite 3000
San Francisco, CA 94105-2239

Warren E. George, Jr., Esquire
Carolyn L. Reid, Esquire
McCutchen,  Doyle, Brown & Enersen, LLP
Three Embarcadero Center
San Francisco, CA  94111-4067

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on November 17, 1998.

jmk\mastering\cert.doc

iii

Exhibit 1

Psychiatric Experts in <u>Coleman v. Wilson</u>

<u>Lloyd T. Baccus</u>, M.D., a psychiatrist, worked as the director of mental health services for the Fulton County Jail in Atlanta, Georgia for over ten years. As president of Correctional Mental Health Associates, he has acted as a consultant to the Special Master for the Florida and New Mexico correctional systems and as a consultant to plaintiffs and defendants in cases concerning correctional systems throughout the country, including cases in Alabama, the District of Columbia, Indiana, Kentucky, Massachusetts, Michigan, and Texas. Dr. Baccus has maintained a private practice in psychiatry and has worked in an administrative capacity for several public sector agencies. He is an associate professor of psychiatry at the Emory University School of Medicine and an assistant professor of psychiatry at the Morehouse School of Medicine.

<u>Howard H. Fenn</u>, M.D. , a psychiatrist, was the chief of the jail psychiatric unit at San Francisco General Hospital in the mid-1980's. For eight years, he worked as a consultant for the California Department of Corrections at CMF/Vacaville conducting, among other duties, evaluations of mentally disordered inmates. He is currently the associate medical director of the Veteran's Affairs Medical Center in Palo Alto. In addition to a long and diverse psychiatric practice, Dr. Fenn has been a clinical associate professor of psychiatry at Stanford University since 1988. He has written and made presentations on such relevant topics as the jail inpatient psychiatric ward, the

African-American mental patient in the criminal justice system, and the assessment of dangerousness in psychiatric patients.

Kerry C. Hughes, M.D., a psychiatrist, is currently the medical director of the Fulton Country Jail in Atlanta, Georgia.  In the early 1990's, Dr. Hughes was the medical director for an urban outpatient mental health clinic.  He served as a leader of the mental health component of a survey team in Celestineo v. Dugger (D.C. Fla.), reviewing medical and mental health reforms in the Florida prisons. Dr. Hughes is also an assistant professor of clinical psychiatry at the Morehouse University School of Medicine.

Dennis F. Koson, M.D., a psychiatrist, served as the federal monitor in Henry v. Deland (D.C. Utah) from 1994-1996, reviewing mental health services in the Utah prison system.  In addition, he has acted as an expert for both plaintiffs and defendants in numerous lawsuits involving mental health services at prisons throughout the country as well as an expert for the special master in several federal lawsuits involving prison mental health programs.  Dr. Koson has at various time been a psychiatric consultant to the National Institute of Corrections, the Michigan Department of Corrections, and the Pennsylvania Department of Youth Services.  Dr. Koson was for many years engaged in the private practice of psychiatry and had been an associate professor at Nova Law Center. He also held a number of clinical positions at different hospitals, including assistant medical director at Bridgewater State Hospital in Massachusetts.  Dr. Koson has

conducted research and published numerous articles dealing with issue of prison mental health.

Jeffrey L. Metzner, M.D. , a psychiatrist, has been a consultant to the Special Master in Madrid v. Gomez (N.D. Ca.), dealing with mental health services at CDC's Pelican Bay State Prison,  as well as a consultant to the Court Monitor in Dunn v. Voinovich (S.D. Ohio)  and to the Court Monitor in Felliciano v. Gonzales  (D.C. P. R.)  In the early 1990's, Dr. Metzner was the Court Monitor in Reynolds v. Sielaff (S.D.N.Y.) Dr. Metzner has had a long and distinguished career with the Health Service Center of the University of Colorado, where he is currently the associate director.  He has written extensively about the interrelationship between law and psychiatry, including articles on mental health treatment in the penal setting.  He is an active member of many boards and associations, including the American Academy of Psychiatry and the Law.

Raymond F. Patterson, M.D. , a psychiatrist, has had a long association with St. Elizabeth's Hospital in Washington D.C. where he held both staff and administrative positions.   More recently, he has held a number of administrative and clinical positions with Maryland mental health and correctional institutions. Dr. Patterson has also served as a regular member of accreditation teams for the Joint Commission on Accreditation of Health Care Organizations, most recently reviewing the mental health care facilities and programs of the New York State correctional system.  He has been an associate professor of psychiatry at both Georgetown University and the University of Maryland for many years.  He has

spoken and published extensively on the provision of mental health services,

including the provision of treatment in the prison environment.

# CURRICULUM VITAE

# LLOYD T. BACCUS, M.D.

**✶ ✶ ✶ ✶ ✶ ✶**

Correctional Mental Health Associates
1698 Johnson Road
Atlanta, Georgia  30306
404/872-1603

| | |
|---|---|
| Date of Birth: | December 25, 1939 |
| Place of Birth: | Yazoo City, Mississippi |
| Marital Status: | Married |
| Education: | B.A., Fisk University, Nashville, TN, 1961 |
| | M.D., Meharry Medical College, Nashville, TN, 1965 |
| Internship: | U.S. Air Force, Scott A.F.B., Bellville, IL 1966 |
| Residency: | Institute for Living, Hartford, CT, 1969 - 1972. |
| Military: | Captain, U.S. Air Force Medical Corps, France and England, 1966 - 1969 |
| Honors: | Falk Fellow (Psychiatry and Law), American Psychiatric Association, 1972 |
| Professional Experience: | President and Founder Correctional Mental Health Associates, 1987 - Present |
| | Medical Director, NBA Aftercare Network National Basketball Association, 1989 - Present |
| | Mental Health Director Fulton County Jail, Georgia, 1987 to Present. |

Lloyd T. Baccus, M.D.
Page Two

|  | |
|--|--|
|  | Private Practice of Psychiatry, 1973 - Present |
|  | Associate Professor of Psychiatry<br>Emory University School of Medicine, 1983 - Present |
|  | Assistant Professor of Psychiatry<br>Emory University School of Medicine, 1972 - 1983 |
|  | Assistant Professor of Psychiatry<br>Morehouse School of Medicine, 1981 - Present |
|  | Deputy Commissioner<br>Mental Health/Mental Retardation, Fulton County, 1982 - 1984 |
|  | Center Director<br>West Fulton County Community Mental Health Center, 1981 - 1982 |
|  | Director, Psychiatry and Law Service<br>Grady Memorial Hospital, 1973 - 1981 |
|  | Medical Director<br>Georgia Department of Offender Rehabilitation, 1972 - 1973 |
| Consultation<br>Experience: | Alabama Correctional System<br>Consultant to Southern Poverty Law Center, 1982 |
|  | District of Columbia Department of Corrections<br>Consultant to Plaintiff Counsel, 1989 - 1990 |
|  | Federal Penitentiary (Atlanta)<br>Consultant to Georgia Legal Services, 1984 |
|  | Florida Department of Corrections<br>Consultant to Special Master, 1985 - Present |

Lloyd T. Baccus, M.D.
Page Three

Georgia Correctional System
Consultant to District Court, Northern Division, 1979

Idaho Correctional System
Consultant to Plaintiff, 1985

Indiana Correctional System
Consultant to the Attorney General, 1980

Kentucky Department of Corrections
Consultant to Corrections Cabinet, 1986 - 1987

Kentucky Correctional System
Consultant to Justice Department (Civil Rights Division), 1977

Louisiana Correctional System
Consultant to Southern Prisoners Defense Committee, 1984 - 1986

Massachusetts Department of Corrections
Consultant to Attorney General, 1986 - 1987

Michigan Correctional System
Consultant to the Attorney General, 1984 - 1986

New Mexico Correctional System
Consultant to Special Master, 1984 - Present

North Carolina Department of Corrections
Consultant to Plaintiff, 1987

South Carolina Department of Corrections
Consultant to Attorney General, 1985 - 1988

South Dakota Correctional System
Consultant to National Prison Project, 1983 - 1988

Lloyd T. Baccus, M.D.
Page Four

|  | Texas Correctional System<br>Consultant to Plaintiff Counsel, 1983 - 1990 |
|---|---|
| Professional<br>Associations: | American Psychiatric Association |
|  | Georgia Psychiatric Association |
|  | Atlanta Medical Association |
|  | American Academy of Psychiatry and Law |
|  | Georgia Chapter of American Academy of Psychiatry and Law - Secretary, 1989 |
| Other<br>Affiliations: | Member, AIDS Task Force, Georgia Department of Human Resources, 1986 - Present |
|  | Member, Governor's DUI Task Force, 1986 - Present |
|  | Member, Task Force of Forensic Services, Georgia Department of Human Resources, 1990 - Present |

# CURRICULUM VITA

# Howard H. Fenn, M.D.

## Personal Data

| | |
|---|---|
| Home address: | 282 Stanford Avenue, Menlo Park, California 94025 |
| Office address: | Veterans Affairs Medical Center, Palo Alto<br>Psychiatry 116A<br>3801 Miranda Avenue<br>Palo Alto, California, 94304 |
| Telephones: | (415) 493-5000 ext. 65641 or 65471;  (415) 854-2815 |
| Date of birth: | December 21, 1946 |
| Place of birth: | Chicago, Illinois |
| Social security number: | 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 |
| Spouse: | Catharine Birtley Fenn, Ph.D. |

## Education

| | | |
|---|---|---|
| Universities: | 1967-1971 | Loyola University, Stritch School of Medicine |
| | 1964-1967 | University of Illinois, Champaign, Illinois |
| Academic Honors: | 1964 | Phi Eta Sigma Honors Fraternity |
| Fellowships: | 1970 | Association of American Medical Colleges<br>Public Health, Belgrade, Yugoslavia |
| | 1969 | NIMH: Summer Psychiatry Fellowship |
| | 1968 | Student Health Organization: Public Health Fellowship |
| Residency Training: | 1974-1975 | Langley Porter Institute (UCSF) |
| | 1972-1974 | San Francisco General Hospital/UCSF affiliated |
| | 1971-1972 | University of Wisconsin/Madison General Hospital,<br>Rotating-0 Internship |
| Teaching: | 1988-present | Stanford University:<br>Clinical Associate Professor of Psychiatry |

2/27/96/   H. Fenn, MD

| 1978-1986 | University of California at San Francisco: Assistant Clinical Professor of Psychiatry |
| 1981-1987 | UCSF Psychiatric Aspects of Neurology: Course Coordinator |
| 1982-1986 | San Francisco General Hospital, UCSF: Coordinator of Medical Student Education |

**Professional Experience**

| 1986-present | Palo Alto VAMC, Psychiatric Intensive Care Unit, Associate Medical Director |
| 1991-1994 | Stanford Alzheimer's Center, staff psychiatrist |
| 1984-1992 | California Medical Facility, Vacaville, consultant |
| 1986-1987 | San Mateo Mental Health Services Residency, Assistant Director |
| 1985-1986 | San Francisco General Hospital, Jail Psychiatry, Unit Chief |
| 1978-1986 | San Francisco General Hospital, staff psychiatrist |
| 1977-1978 | Mount Zion Crisis Clinic, staff psychiatrist |

**Military Record**

| 1976-1977 | Third Marine Division, Okinawa, Japan: Lt. Commander, USNR; Division Psychiatrist |
| 1975-1976 | Naval Regional Medical Center, Oakland, California. Lt. Commander, USNR; staff psychiatrist |

**Research Experience**

| 1993-present | Pharmacokinetics of Acetyl-L-Carnitine |
| 1991-1993 | Acetyl-L-Carnitine in Alzheimer's disease |
| 1991-1992 | ICI 204,636, A Novel Antipsychotic |
| 1990-1991 | Amperozide: A Novel Antipsychotic |
| 1989-1990 | CI-943, A Novel Antipsychotic |
| 1988-1990 | Clozapine: Compassionate Use |

2/27/96/  H. Fenn, MD

## Post-Degree Honors, Awards, Membership

| | | |
|---|---|---|
| Awards: | 1975 | Alexander Simon Award for Excellence in Teaching Medical Students, UCSF |
| | 1974 | Second Place, Oral Interpretation Competition, University of California, Berkeley |
| | 1973 | First Place Award for Poetry, Intellectual Digest |
| Honors: | 1986 | Faculty Council Representative for Assistant Clinical Professors, UCSF |
| | 1982-1986 | Highest-ranked lecturer in Introduction to Clinical Psychiatry, UCSF |
| | 1981-present | Oral Examiner, American Board of Psychiatry and Neurology, Inc. |
| Memberships: | 1985-present | American Academy of Psychiatry and Law |
| | 1984-present | American Psychiatric Association |
| | 1980-present | California Medical Association |
| Licensure: | 1990-present | State of California Qualified Medical Examiner |
| | 1977-present | Drug Enforcement Administration # AF7786924 |
| | 1975-present | State of California #G-023934 |
| Board Certification: | 1994 | Added Qualifications in Geriatric Psychiatry |
| | 1987 | American Board of Forensic Psychiatry, Inc. |
| | 1978 | American Board of Psychiatry and Neurology, Inc. |

## Publications

| | | |
|---|---|---|
| Verse: | 1974 | Fenn, H. The Black Hole. Intellectual Digest, 1974; 1:14 |
| | 1974 | Fenn, H. Nixon's Comet. National Review,1974; 26:255 |
| | 1972 | Fenn, H. The New Marine Hymn, New England Journal of Medicine , 1972; 287:1153 |

2/27/96/   H. Fenn, MD

Professional:

1996     Fenn H. Robinson D, Luby V, Dangel C, Buxton E,
         Beattie M, Kraemer H, Yesavage J: Trends in
         Pharmacotherapy of schizoaffective and bipolar
         patients: a five-year naturalistic study. American
         Journal of Psychiatry, publication pending.

1995     Fenn H, Yesavage J: Anxiety and Dementia, in
         Treating Alzheimer's and other Dementias: Clinical
         Applications of Recent Research Advances, edited by
         Finkel S and Bergener M.. Springer Publishing
         Company, New York, 1995

1993     Miller TP, Tinklenberg JR, Brooks JO, Fenn HH,
         Yesavage JA: Selected psychiatric symptoms
         associated with rate of cognitive decline in patients
         with Alzheimer's disease. Journal of Geriatric
         Psychiatry and Neurology, 1993; 6:235-238

1993     Fenn H, Luby V, Yesavage J:. Subtypes in
         Alzheimer's disease and the impact of excess
         disability: recent findings. International Journal of
         Geriatric Psychiatry, 1993; 8:67-73

1991     Fenn, H. Editorial: The Moral of Clozapine
         Hospital and Community Psychiatry, 1991; 42:773

1990     Fenn, H.: Editorial: Probability vs. Prediction
         Hospital and Community Psychiatry, 1990; 41: 117.

1988     Fenn, H.  Vignettes in Psychiatric  House Calls,
         Edited by Talbott, J. and  Manevitz, A.
         APA Press, Washington, D.C., 1988

1988     Fenn, H., Ochitill, H: Consultation/liaison defined.
         in: Review of General  Psychiatry. Edited by
         Goldman.H, San Francisco, Lange Press, 1988.

1986     Fenn, H. The jail psychiatric inpatient ward:
         structure, population, and problems. Journal of
         Prison and Jail  Health 1986;6 (Fall/Winter):128-139.

1985     Fenn, H: The black mental patient in the criminal
         justice system,in Proceedings of the Annual Black
         Task Force Mental Health Conference Edited by
         Fullilove, M. San Francisco, UCSF 1985

1982     Weimer, S., Fenn, H: Patient transfers from medical
         and surgical settings to  psychiatric inpatient wards.
         General  Hospital Psychiatry 1982; 4:179-185

2/27/96/   H. Fenn, MD

| 1981 | Fenn, H: Consultation psychiatry: a close-up view, in Introduction to Clinical Psychiatry Course Syllabus, Edited by Hoffman, R; UCSF, 1981 |
|---|---|
| 1981 | Fenn, H., Dinaberg, D: Didactic group psychotherapy with chronic schizophrenics. International Journal of Group Psychotherapy 1981; 31:443-452 |
| 1975 | Fenn, H: Diagnosis by referendum Hospital Practice 1975; 10:11. |
| 1974 | Fenn, H: How happy is the happy worker's doctor?: The Yugoslav health system Resident and Staff Physician 1974; September: 101-103 |
| 1973 | Fenn, H: Antipsychotics and side effects. (letter) New England Journal of Medicine 1973; 188:1202 |

**Selected Presentations**

| 1990 | The Assessment of Dangerousness in Psychiatric Inpatients: Outcome of a Clinical/legal Test, Paper Session, American Psychiatric Association Annual Meeting, New York City, N.Y. |
|---|---|
| 1990 | Assessment of Dangerousness in Schizophrenic/schizoaffective Inpatients: Symposium, American Psychiatric Association Annual Meeting, New York City, N.Y. |
| 1988 | The 180-Day Post Certification: How Accurate a Predictor? Forensic Mental Health Association of California, Annual Meeting, Asilomar, California |
| 1988 | Update on Negligence , Conference on Psychiatry and Law, Menlo Park VAMC, Menlo Park, California |
| 1986 | Inpatient Care to the Jail Population, Forensic Mental Health Association of California, Annual Meeting, Asilomar, California |
| 1985 | Countertransference Problems on a Jail Psychiatry Ward, National Conference on Correctional Health Care, Chicago, Illinois |
| 1982 | Psychiatric Aspects of Medical Practice Course; Poster Session, Association of American Medical Colleges Annual Meeting, Washington, D.C |

2/27/96/  H. Fenn, MD

| | | |
|---|---|---|
| **Committee Work** | 1996-present | Resident evaluation committee, Chairman Department of Psychiatry and Behavioral Sciences Stanford University |
| **Journals Reviewed** | | |
| | 1993-present | Journal of the American Geriatric Society |
| | 1993-present | Alzheimer's Disease and Associated Disorders |

2/27/96/  H. Fenn, MD

## CURRICULUM VITAE

### KERRY COURTNEY HUGHES, M.D.
1705 COLLINES AVE. S.W.
ATLANTA, GA 30331
404-344-8275
FAX: 404-853-2067

**DATE OF BIRTH:**                    SEPTEMBER 9, 1960

**PLACE OF BIRTH:**                   JACKSON, MISSISSIPPI

**CITIZENSHIP:**                      U.S.A.

**SOCIAL SECURITY NUMBER:**           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

**LICENSURE:**                        GEORGIA COMPOSITE STATE
                                      BOARD OF MEDICAL
                                      EXAMINERS

**BOARD CERTIFICATION:**              DIPLOMATE OF THE
                                      AMERICAN BOARD OF
                                      PSYCHIATRY AND
                                      NEUROLOGY
                                      JANUARY, 1994

### EDUCATIONAL BACKGROUND:

Emory University Affiliated Hospitals, Atlanta, Georgia:  Residency in Psychiatry,
July, 1986 - June, 1990

The University of Iowa College of Medicine, Iowa City, Iowa:  Medical Degree,
1982 - 1986

Jackson State University, Jackson, Mississippi:  Bachelor of Science Degree in Biology,
1978 - 1982

Clinton High School, Clinton, Mississippi, 1974 - 1978

1

## OCCUPATIONAL BACKGROUND:

Clinical Director of Mental Health Services, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1993 - present

Staff Psychiatrist, Fulton County Jail, 901 Rice Street, Atlanta, Georgia, 1990 - 1993

Staff Psychiatrist, West Fulton Mental Health Center, 475 Fairburn Road, S.W., Atlanta, Georgia, 1990 - present

Medical Director, Peachtree Alternatives, Incorporated, Outpatient Recovery Program, 5115 New Peachtree Road, Suite 102, Chamblee, Georgia, 1990 - 1994

Psychiatrist, The Behavioral Medicine Institute of Atlanta, Paces Pavilion, Suite 202, 3193 Howell Mill Road, N.W., Atlanta, Georgia, 1990 - 1991

## ACADEMIC POSITIONS:

Assistant Professor of Clinical Psychiatry, Morehouse School of Medicine, 720 Westview Dr., Atlanta, Georgia, 1990 - 1997

## FORENSIC EXPERIENCE:

Mental Health Survey Team Leader, Hendry Correctional Institute, Immokalee, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., July, 1991

Mental Health Survey Team Leader, Martin Correctional Institute, Indiantown, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., August, 1991

Mental Health Resurvey Team Leader, North Florida Reception Center, Lake Butler, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

Mental Health Resurvey Team Participant, Charlotte Correctional Institute, Punta Gorda, Florida; for United States District Court Middle District of Florida; case Celestineo vs. Dugger et. al., December, 1991

**RESEARCH:**

> A Comparison of Pulmonary and Intestinal Lymphoid Cell Recirculation and Tissue Localization in Sheep, Brookhaven National Laboratory, Medical Department, Supervisor - Daniel Joel, D.V.M., Ph.D., 1982

> Minority Access to Research Careers (M.A.R.C.) Project, A Comparison of Infectivity of Three Strains of Codling Moth Granulosis Virus by E.L.I.S.A., University of California at Berkeley, Department of Entomology and Parasitology, Supervisor - Louis Falcon, Ph.D., 1981

**PROFESSIONAL ORGANIZATIONS:**

> American Psychiatric Association
> American Academy of Psychiatry and the Law
> Black Psychiatrists of America
> Georgia Psychiatric Physicians Association
> Southern Medical Association
> American Medical Student Association, 1982 - 1986
> Student National Medical Association, 1982 - 1986

**ACTIVITIES AND ORGANIZATIONS:**

> Commission on AIDS, American Psychiatric Association, 1988 - 1989
> Committee of Black Psychiatrists, American Psychiatric Association, 1989 - 1990
> Medical Student Council, 1984
> Senior Participant, Senior Clinical Conference for Freshman Students, 1982
> President of the Pre-Health Society, Jackson State University, 1981
> Alpha Phi Alpha Fraternity, Incorporated
> Jackson State University Concert Choir and Chorale, 1978 - 1982
> Jackson State University Marching Band and Brass-wind Ensemble, 1978 - 1982
> University of Iowa Alumni Association
> Jackson State University Alumni Association

**AWARDS AND HONORS:**

> APA-NIMH Minority Fellowship, 1988 - 1989
> Trainee-Consultant, APA-NIMH Minority Fellowship, 1989 - 1990
> Magna Cum Laude, Jackson State University, 1982
> President's List Scholar, Jackson State University, 1982

Phi Kappa Phi Honor Society, Jackson State University, 1982
Who's Who Among American Universities and Colleges, 1981 - 1982

## COMMUNITY ACTIVITIES:

Member of South Fulton Running Partners
Member of Atlanta Track Club
Member of Ben Hill United Methodist Church
Member of Advisory Committee of Ben Hill United Methodist Church Pastoral
        Counseling Ministries

# DENNIS F. KOSON, M.D.

Diplomate
American Board of Psychiatry and Neurology
Diplomate
American Board of Forensic Psychiatry

2873 Oak Park Circle
Fort Lauderdale, Florida 33328
Telephone: (954) 474-7449
Fax: (954) 474-4110

## CURRICULUM VITAE
## 1998

### *EDUCATION:*

| | |
|---|---|
| 1968 - 1972 | **University of Michigan Medical School**, Doctor of Medicine |
| 1967 - 1968 | **University of Michigan** - Engineering; Psychology; Pre-Med, Bachelor of Science (Psychology) |
| 1962 - 1966 | **University of Maryland** - Engineering; Business |
| 1960 - 1961 | **Lawrence Institute of Technology** - Engineering |

### *POST GRADUATE TRAINING AND FELLOWSHIPS:*

| | |
|---|---|
| 1974 - 1975 | **University of Pennsylvania Law School** - Registered Auditor |
| 1974 - 1975 | Fellow in Law and Psychiatry, Center for Studies in Social-Legal Psychiatry, **University of Pennsylvania** |
| 1972 - 1975 | Resident in Psychiatry, **University of Pennsylvania** |

### *TEACHING APPOINTMENTS:*

| | |
|---|---|
| 1983 - 1987 | **American Academy of Forensic Sciences**, Faculty Student Academy |
| 1983 - 1986 | Associate Professor of Law, **Nova Law Center**, Fort Lauderdale, Florida |

Courses taught at **Nova Law Center:**

*Law and Psychiatry*
*Psychology for Lawyers*
*Law and Medicine*
*Interviewing, Counseling and Negotiation*
*Public Interest Law Institute, Co-Director*
*(research on law and the elderly; guardianships)*

Special course presentations:

*Supervision, Didactic Instruction in Civil Law Clinic*
*Torts*
*Legal Process*
*Trial Advocacy*

| | |
|---|---|
| 1981 - 1983 | Adjunct Professor of Law, **Nova Law Center**, Fort Lauderdale, Florida |
| 1979 - 1981 | Instructor in Psychiatry, **Harvard Medical School**, Cambridge, Massachusetts |

Dennis F. Koson, M.D. - page two

| | |
|---|---|
| 1974 - 1975 | Lecture Series:  Social-Legal  Aspects of Psychiatry, a graduate level seminar at the **University of Pennsylvania**; with Dr. Robert Sadoff |

## *MILITARY:*

| | |
|---|---|
| 1961 - 1966 | U.S. Air Force |
| | Japan - 2 years - Industrial Engineering Analyst |
| | Germany - 3 years - Management/Systems Analyst |

## *RESEARCH:*

| | |
|---|---|
| 1975 - 1976 | Director of Research, **State of Michigan Center for Forensic Psychiatry**, Ann Arbor, Michigan<br>Duties:<br>-Forensic examinations and testimony<br>-Michigan Department of Mental Health expert in convict transfer proceedings under the Michigan Mental Health Act |
| 1969 - 1972 | Research Assistant, **State of Michigan Center for Forensic Psychiatry**, Ann Arbor, Michigan<br>Duties:<br>-Research - Mentally ill offender<br>-Forensic examinations and testimony<br>-Supervised clinical duties, including night emergency services and psychiatric treatment. |
| 1967 - 1969 | Research Assistant, **Mental Health Research Institute, University of Michigan** |
| | Research topics: |
| | *Psychology-Cybernetics*<br>*Artificial Intelligence*<br>*Information Retrieval* |

## *HOSPITAL, CLINICAL AND ADMINISTRATIVE APPOINTMENTS:*

| | |
|---|---|
| 1981 - 1982 | Senior Forensic Psychiatrist, **South Florida State Hospital**, Hollywood, Florida |
| 1979 - 1981 | Assistant Psychiatrist, **Institute of Psychiatry and Law, McClean Hospital**, Belmont, Massachusetts |
| 1979 - 1980 | Assistant Medical Director, **MCI Bridgewater State Hospital**, Bridgewater, Massachusetts |
| 1974 - 1975 | Clinic Co-Director, Director of Training Forensic Psychiatry Clinic, **University of Pennsylvania** |
| 1973 - 1975 (Part-time) | Physician I, Psychiatry, State of Pennsylvania, Haverford State Hospital State Hospital, Haverford, Pennsylvania |

Dennis F. Koson, M.D. - page three

## *CORRECTIONS APPOINTMENTS*:

| | |
|---|---|
| 1986 | Consultant, **National Institute of Corrections, National Academy of Corrections,** Curriculum Design - Course 6J1501 Suicide Prevention in Jails, **Nova Law Center,** Fort Lauderdale, Florida |

1980 - 1981      Director, Court Clinic, **District Court of Southern Essex,** Lynn, Massachusetts

> Duties:
> -Forensic examinations for the courts
> -Consultation to the Department of Probation
> -Court-ordered treatment
> -Consultation to area Community Mental Health, local Chiefs of Police, Salem County Jail and Danvers State Hospital

1976 - 1979      Psychiatric Consultant to **Michigan Department of Corrections**

**State Prison of Southern Michigan,** Jackson, Michigan
(a maximum-security prison for sentenced male felons)

> Duties:
> -Psychiatric treatment of ambulatory patients
> -Infirmary-based crisis intervention

**Detroit House of Correction,** Northville, Michigan
(a medium-security facility for sentenced female misdemeanants and felons)

> Duties:
> -Ambulatory psychiatric treatment
> -Medical psychiatric emergency intervention

**Huron Valley Women's Prison,** Ypsilanti, Michigan
(a maximum-security prison for sentenced female felons)

> Duties:
> -Psychiatric treatment to general population, segregation, and protective setting for the chronic mentally ill
> -Emergency intervention and hospital transfer

1974 - 1975      Psychiatric Consultant to **Department of Youth Services,** State of Pennsylvania
Special Project--Juveniles and Maximum Security

1972 - 1973      Consultant to **Buck's County Prison,** L.E.A.A. funded project, Downington, Pennsylvania

## *LICENSURE*:

Florida; Michigan (inactive); Pennsylvania (inactive); Massachusetts (inactive)

## *CERTIFICATIONS*:

| | |
|---|---|
| 1981 | **Board Certified** - American Board of Forensic Psychiatry |
| 1980 | **Board Certified** - American Board of Psychiatry and Neurology |

### *AWARDS:*

| | |
|---|---|
| 1985 | American Academy of Psychiatry and the Law <u>"Outstanding Service Award"</u> |
| 1972 | Michigan Association of Neuropsychiatrists and Hospital Physicians, Physicians Award-Best paper by Student/Resident in Psychiatry.  Paper and address entitled <u>"The Insanity of Insanity"</u> |

### *PROFESSIONAL/SCIENTIFIC SOCIETIES:*

| | | |
|---|---|---|
| 1984 - 1988 | Associate Editor - | Bulletin of the American Academy of Psychiatry and the Law |
| 1981 - Present | Member - | Florida Chapter of American Academy of Psychiatry and the Law, Vice-President and Secretary - 1985; President - 1986-1987 |
| 1981 - Present | Member - | Florida Psychiatric Society |
| 1981 - Present | Fellow - | American Academy of Forensic Sciences Secretary - Psychiatry Section 1981-1985 Chairman - Psychiatry Section 1985-1987 |
| 1977 - 1978 | Liaison - | American Bar Association, Subcommittee on Mental Health and Family Law, from the American Academy of Psychiatry and the Law |
| 1973 - Present | Member - | American Psychiatric Association |
| 1973 - Present | Member - | American Academy of Psychiatry and Law Program Chairman - 1975 and 1977 Education Committee Chairman - 1977-1979 Site Selection Committee Chairman - 1979-1987 Counselor and Member of the Executive Committee - 1981-1985 |

### *SCIENTIFIC PRESENTATIONS:*

| | |
|---|---|
| 1989 - Present (Annual) | *Scientific Evidence Workshop*, <u>"Voir Dire and Examination of Psychiatric Experts"</u>, Nova Law Center, Fort Lauderdale, Florida |
| 1987 | *Panel Presentation*, <u>"Need Assessment in Psychiatric Services to Corrections"</u>, American Psychiatric Association, Chicago, Illinois |
| 1986 | *Workshop*, <u>"Jail and Prison Psychiatry"</u>, American Academy of Psychiatry and Law, Philadelphia, Pennsylvania |
| 1986 | *Panel Presentation*, <u>"The Role of Line Staff in Correctional Mental Health"</u>, American Academy of Psychiatry and Law, Philadelphia, Pennsylvania |

Dennis F. Koson, M.D. - page five

| | |
|---|---|
| 1985 | *Presentation*, "The Implementation of Mental Health Care Standards in a Prison Setting", American Academy of Forensic Sciences, Las Vegas, Nevada |
| 1985 | *Presentation*, "The Social Worker as Expert Witness", National Association of Forensic Social Workers, Charlottesville, Virginia |
| 1985 | *Workshop*, "Psychiatry and Corrections - The Agony and the Ecstasy", American Academy of Psychiatry and the Law, Albuquerque, New Mexico |
| 1985 | *Videotaped CLE Presentation*, "Voir Dire and Direct Examination of the Psychiatric Expert", Family Law Section of the Florida Bar Association, Miami and Tampa, Florida |
| 1985 | *Plenary Session*, "Guardianship in Florida", Florida Psychiatric Society/Florida Chapter American Academy of Psychiatry and Law, Boca Raton, Florida |
| 1983 | *Presentation*, "The Changing Face of Guardianship in the United States", World Congress of Psychiatry, Vienna, Austria |
| 1982 | *Plenary Session Address*, "The Psychology of Arson", American Academy of Forensic Sciences, Orlando, Florida |
| 1982 | *Presentation*, "Voir Dire of the Psychiatric Expert: From the Super Expert to the Hired Gun", American Academy of Forensic Sciences, Orlando, Florida |
| 1981 | *Presentation*, "Arson - Modern Trends", Cambridge Hospital Grand Rounds, Cambridge, Massachusetts |
| 1981 | *Presentation*, "Forensic Psychiatry Examinations: Competency", American Academy of Forensic Sciences - Psychiatry Section, Los Angeles, California |
| 1981 | *Presentation*, "Arson - A Diagnostic Study", American Academy of Psychiatry and the Law, San Diego, California |
| 1980 | *Presentation*, "Expert Testimony: Pre-Trial Consultation with the Attorney", American Academy of Forensic Sciences - Jurisprudence Section, New Orleans, Louisiana |
| 1979 | *Presentation*, "Women and Arson", American Academy of Forensic Sciences, New Orleans, Louisiana |
| 1979 | *Presentation*, "Guardianship and Civil Competency", American Academy of Psychiatry and the Law, Tampa, Florida |
| 1979 | *Course Moderator and Presentation*, "Memory Dysfunction and the Law - Special Investigative Techniques", American Academy of Psychiatry and the Law, Baltimore, Maryland |
| 1978 | *Presentation*, "The Psychiatrist and Civil Law", American Academy of Psychiatry and the Law, New Orleans, Louisiana |
| 1978 | *Presentation*, "Cross Examination of the Psychiatric Expert", Ohio Trial Lawyers Association, Youngstown, Ohio |
| 1976 | *Panel Moderator*, "Legal Intervention in Mental Health", American Psychiatric Association, Miami, Florida |

| 1976 | *Panel Moderator*, "The Tarasoff Decision-Psychiatrist's Duty to Warn", American Academy of Psychiatry and the Law, San Francisco, California |
|---|---|
| 1975 | *Panel Moderator*, "Mock Trial of a Custody Case", Anaheim, California; and: as part of a Child Custody Symposium, San Diego, California, American Academy of Psychiatry and the Law |
| 1974 | *Panel Discussion*, "The Teaching of Forensic Psychiatry", American Psychiatric Association, Detroit, Michigan |
| 1972 | *Presentation*, "Amnesia and Competency to Stand Trial", American Psychiatric Association, Dallas, Texas |

## *BIBLIOGRAPHY:*

Koson, D., "Ask the Experts" column, "Jailhouse Screening for Suicide Potential When Professional Help is Sparse", Newsletter of the American Academy of Psychiatry and the Law, Vol. 16, No. 1, April, 1991.

Finnegan, Walter J., M.D., J.D. and Koson, Dennis F., M.D., Jumping from the Frye Plan into the State Farm Fire: An Analysis of Spinal Thermography as Scientific Test Evidence, Law, Medicine and Health Care, Vol. 13, No. 5, October, 1985.

Koson, D., Trials of the Defense Bar - Coping Strategies for Burnout, Trial Advocate Quarterly, Vol. 3, July, 1984.

Koson, D., Review: Eddings v. Oklahoma - Psychiatry in the Capital Sentencing Process, Newsletter of the American Academy of Psychiatry and the Law, Vol. 8, No. 3, July, 1984.

Koson, D., Forensic Psychiatric Examinations: Competency, Journal of the American Academy of Forensic Sciences, January, 1982.

Koson, D., and Dvoskin, J., Arson - A Diagnostic Study, Bulletin of the American Academy of Psychiatry and the Law, Vol. 10, No. 1, 1982.

Koson, D., In Re Vesco: Historical Background, a Contribution to a Symposium - "Child Custody: The Ugliest Litigation", Bulletin of the American Academy of Psychiatry and Law, Vol. 3., No. 2, 1975.

Koson, D., and Robey, A., Amnesia and Competency to Stand Trial, American Journal of Psychiatry, May 1973.

Koson, D., Kitchen, C., and Kochen, M., Psychological Testing by Computer: Response Bias. Journal of Educational and Psychological Measurement, Fall, 1970.

## *OTHER PROFESSIONAL EXPERIENCE:*

| 1994 - 1996 | Federal Monitor ("Impartial Expert") in Henry v. Deland, 89-C1124J, a class action involving the Utah State Prison's Mental Health Services. Monitoring and reporting compliance with the Stipulation in the above case and technical assistance to the mental health staff. |
|---|---|

Dennis F. Koson, M.D. - page seven

| | |
|---|---|
| 1994 | Expert consultant to the attorney general in <u>Hallett v. Payne, C93-5496(T)D</u>, a class action involving mental health services to Washington's women's prison. Includes assessment of mental health services and consultation to attorney general, mental health and corrections staff at prison. |
| 1994 | Expert consultant for the Attorney General, Commonwealth of Pennsylvania in <u>Austin et al. v. Pennsylvania Department of Corrections, Civil 90-7497</u> (E. Distr. PA), a class action involving mental health services to Pennsylvania's prison system. |
| 1994 | Expert consultant for the Plaintiffs in <u>Rentschler v. Schriro et al. (4:94 CV 396 GFG)</u>, a federal class-action involving mental health services to male inmates in administrative segregation in a maximum security Missouri prison. |
| 1993 | Member of independent mental health review team, conducting in-depth evaluation of mental health services in prison system of Ohio within the context of <u>Dunn v. Voinovich</u>, a class action involving mental health services to the entire prison system. Included assessment of mental health services to virtually all prisons in system and extensive report including recommendations. |
| 1992 - 1995 | Expert consultant to plaintiff's counsel in <u>Cason v. Seckinger, 84-313-1-MAC</u>, a class action involving mental health services to Georgia women's prison. Includes assessment of mental health delivery system and expert consultation in the area of special treatment programs for sexually abused and exploited female inmates. Participation in development of Consent Decree. |
| 1992 - 1993 | Expert consultant for the Attorney General, State of California in <u>Coleman v. Pete Wilson et al., U.S.D.C. Cal. CIV S90-0520 LKK-JFM</u>, a class action involving mental health services to California's prison system. |
| 1991 - 1993 | Consultant to Scarlett Carp & Associates, Inc., in designing a Mental Health Services Delivery System and Facilities Plan for the California Department of Corrections. |
| 1991 - 1992 | Expert for the Special Master and the Federal Court in <u>Costello v. Wainwright (sub nom Celestineo v. Dugger), 72-109-Civ-J-S, 72-94-Civ-J-S</u>, a class action involving mental health services to the Department of Corrections of the State of Florida. Final Mental Health Survey to determine quality of mental health services to prison system. |
| 1991 - 1992 | Consultant, State of Michigan, Department of Mental Health, design of new Bureau of Forensic Services, integrating Michigan's forensic system and mental health services to Michigan's prisons. |
| 1989 | Expert for the City of New York in <u>Reynolds et al v. Ward et al</u>, 81-CIV-107 (S. Distr. NY), a federal class-action involving adequacy of mental health services in New York Forensic Hospital system. |
| 1989 | Expert for the Plaintiffs in <u>Johnson et al v. Insley et al</u>, 87-369 CIV-10A, a federal class-action involving the right to release and after-care services for patients at G.P. Wood State Hospital, Florida. |
| 1987 - 1990 | Expert for the Special Master and the Federal Court in <u>Ruiz et al v. Lynaugh et al</u>, Civ. H-78-987-CA. Audited quality of mental health services to all Texas prisons and compliance with Consent Decree and Psychiatric Services Plan. Special study of prevalence of mental illness in segregation. |

Dennis F. Koson, M.D. - page eight

| | |
|---|---|
| 1986 - 1992 | Expert for the Special Master and the Federal Court in <u>Morales-Feliciano v. Colon, Civil No. 79-4 (PG)</u>, a class action involving mental health services to the Department of Corrections in Puerto Rico.  Assessment of entire system, creation of remedial mental health plan.   Monitoring compliance with mental health plan and consultation/technical assistance. |
| 1986 - 1989 | Federal Monitor (by stipulation of the parties) overseeing compliance with consent decree and providing consultation/technical assistance in <u>Langley et al v. Coughlin et al</u>, 84-CIV5431 (LBS). |
| 1986 | Expert for the Attorney General, State of New Mexico, in <u>Duran et al v. Anaya et al</u>, No. Civil 77-721-C, a federal class-action involving psychiatric services to New Mexico's prison system.  Impact of proposed staffing cuts on quality of care. |
| 1986 | Expert for the Federal Court's Mental Health Survey Team in <u>Ruiz</u> above, a class-action involving mental health services to the entire Texas prison system. Establishment of final staffing levels and in-patient beds. |
| 1985 | Expert for the State of New York in <u>Langley</u> above, a federal class-action involving mental health services to female prisoners in segregation.  Participation in development of a consent decree. |
| 1983 - 1991 | Pro-bono consultant to Legal Aid of Broward, Inc. and the Broward County Circuit Courts. |
| 1983 - 1986 | Consulting Board of Directors, Fort Lauderdale Psychiatric Hospital |
| 1981 - 1987 | Expert for Corrections Division, Attorney General's Office, State of Michigan, Corrections Division |

<div style="margin-left:3em">

<u>Federal class-action litigation</u>:

| | |
|---|---|
| 1981 | <u>Swearingum et al v. Johnson et al</u>, USDC-WN Civil No. M-56-73 CA<br>Consent to treatment in Michigan's Intensive Programming Center for the Department of Corrections |
| 1981 | <u>Walker et al v. Johnson et al</u>, CIV-81-40336-FL<br>Psychiatric effects of the "lock-down" following riots at several Michigan prisons |

</div>

| | |
|---|---|
| 1976 - 1988 | Private practice of general psychiatry |

### *GENERAL PRACTICE OF CORRECTIONAL AND FORENSIC PSYCHIATRY, CURRENT*:

Co-Monitor, <u>Cason v. Seckinger, 84-313-1-MAC</u>, a class-action involving mental health services to eight men's and women's prisons in Georgia.  Monitoring and reporting compliance with the Consent Decree and technical assistance to the mental health staff.

Expert consultant to the Plaintiffs in <u>CF et al. v. Fauver et al. (Civil 96-1840[AET])</u>, a federal class-action involving mental health services to inmates in administrative segregation in the New Jersey prison system.

Dennis F. Koson, M.D. - page nine

Member of a team of expert consultants to the U.S. Department of Justice's Civil Rights Division assessing mental health services to detainees in the Los Angeles County Jail as part of a CRIPA investigation.

Expert consultant to the specially appointed defense counsel in <u>Bradley v. Harrelson, 92-A-70-M</u>, a class action involving mental health services in the Alabama prison system. Assessment of mental health services with recommendations and consultation.

Expert consultant to Amicus Curiae in <u>Bridges v. Felton, 74-994-CIV-HOEVELLER</u>, a class action involving mental health services to Dade County Jail. In-depth assessment of mental health service delivery system of jail complex as member of team of mental health professionals. Report recommendations and ongoing technical assistance to jail mental health staff.

Expert consultant to plaintiff's attorneys in <u>Carruthers v. Cochran</u>, a class action involving mental health services to Broward County Jail. Activities included in-depth assessment of mental health services delivery system in the jail complex and report.

Expert testimony and consultation in wide variety of legal psychiatric cases. Special emphasis on testimentary capacity and undue influence, general civil competency and need for guardianship, and general contractual capacity. Additionally, expert testimony and consultation in individual actions against jails, lock-ups, and prisons involving allegations of negligence or deprivation of civil rights in mental health treatment.

**JEFFREY L. METZNER, M.D., P.C.**
3300 EAST FIRST AVENUE
SUITE 590
DENVER, COLORADO 80206

TELEPHONE (303) 355-6842
FACSIMILE (303) 322-2155

## CURRICULUM VITAE

**January 1996**

### BIOGRAPHICAL DATA

**Date & Place of Birth:** Hagerstown, Maryland; March 15, 1950
**Citizenship:** U.S.A.
**Marital Status:** Married

### Education:

University of Maryland (College Park, Maryland), B.S., 1972.
University of Maryland Medical School (Baltimore, Maryland), M.D., 1975.
Internship: University of Colorado Health Sciences Center (UCHSC), January 1975 - July 1975.
Psychiatric Residency: UCHSC, July 1975 - July 1979.

### Licensure:

State of Colorado License, July 1975 to present.

### Academic Appointments:

Chief Resident, Psychiatric Liaison Division, UCHSC (July 1978 to July 1979).
Clinical Instructor, Department of Psychiatry, UCHSC (July 1978 to July 1981).
Assistant Clinical Professor, Department of Psychiatry, UCHSC (July 1981 - July 1989).
Associate Clinical Professor, Department of Psychiatry, UCHSC (July 1989 to October 1995).
Clinical Professor, Department of Psychiatry, UCHSC (October 1995 to present).
Lecturer-in-Law, University of Denver, College of Law (October 1984 to 1986).
Associate Director, Forensic Psychiatry Fellowship Program, UCHSC (1992 to present).

### Other Activities and Honors:

AOA (1975).
Governor's Criminal Insanity Task Force (1978-1979):
    Member, Subcommittee concerning release procedures.
    Member, Subcommittee concerning the issues of treatment of criminally insane in correctional or mental health facilities.
Member, Disability Law Committee, Colorado Bar Association (1981-1995).
Member, Colorado Medical Society's Committee on Medical Care in Correctional Institutions (1983-1990).
Reviewer, Child Abuse and Neglect: The International Journal (1986 to present).

**Other Activities and Honors, con't:**

Reviewer, Bull. Amer. Acad. Psychiatry and the Law (1993 to present).

Reviewer, Hosp. Community Psychiatry, (1993 to present).

Co-chairman, Civil Commitment Task Force (a coalition of major mental health care professional organizations, pertinent consumer and family advocacy organizations, and relevant legal organizations) (April 1987 to September 1990).

American Board of Psychiatry and Neurology, Inc.

   Examiner (October 1988 to present).

   Member, Committee on Certification for Added Qualifications in Forensic Psychiatry (August 1995 to present).

American Board of Forensic Psychiatry, Inc.

   Examiner, American Board of Forensic Psychiatry, Inc. (October 1989 to 1994).

   Member, Written Examination Committee (October 1989 to 1993).

   Member, Board of Directors (July 1, 1992 - March 17, 1995).

   Chairman, Oral Examination Committee (July 1992 to May 1993).

Chairperson, Expert Panel-Psychiatric Disorders and Commercial Drivers, U.S. Department of Transportation (February 1990 to May 1991).

Member, State of Colorado Mental Health Advisory Board for Service Standards and Regulations (April 1990-present).

University of Colorado Health Sciences Center, Department of Psychiatry Clinical Faculty Award, June 1992.

Chairperson, Psychological/Psychiatric Task Force on Impairment, State of Colorado, Department of Labor and Employment (December 1992 to 1995).

Member, Work Group Advisors for the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 1994.

Member, Advisors on Forensic Issues for the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 1993-94.

Member, Board of Directors, Accreditation Council on Fellowships in Forensic Psychiatry (May 1994 to present).

Member, Colorado Supreme Court Grievance Committee (December 1995 - Present)

**Professional Society Memberships:**

Colorado Psychiatric Society:

   Membership Committee (1981-1990; Chairman, 1981-1983).

   Legislative Committee (1979-present; Chairman, 1983-1991, 1992-present.

   Member, Forensic Committee (1981 to present).

   Treasurer (1982-1984).

   Member, Committee on Medical and Psychiatric Care for the Canon City Facility (December 1979-June 1980 and July 1981 to 1983).

**Professional Society Memberships, cont'd:**

Colorado Psychiatric Society:
Trustee (1984-1986).
Fellowship Committee (1987 to present).
President-Elect (May 1990 to May 1991).
President (May 1991-May 1992).
Assembly Representative (May 1994-May 1997).

Member, Board of Directors, Colorado for Physicians Mental Health/Political Action Committee (1988 to present; Chairman, 1988-1990).

American Correctional Health Services Association, Member (1984 to present).

Rocky Mountain Chapter of the American Correctional Health Services Association:
Member at large, Board of Directors (January 1984 to March 1988).

American Psychiatric Association (1978 to present):
Member, Task Force on Psychiatric Services in Correctional Facilities (December 1985-1989).
Fellow, American Psychiatric Association (December 1987 to present).
Member, Council on Psychiatry and the Law (May 1989 - May 1994), Vice Chairman (May 1993 - May 1994).
Assembly Liaison, Council on Psychiatry and the Law (May 1994 to present).
Member, Task Force on Sexually Dangerous Offenders (1993 to present).
Consultant, Commission on Judicial Action (1994-1996).

American Academy of Psychiatry and the Law (1983 to present):
Member, Public Information Committee (November 1984 to present; Chairman, October 1989-January 1993).
Member, Committee on Psychiatric Services for Correctional Facilities (November 1984 to present).
Member, Committee on International Relations (November 1984 to October 1986).
Member, Site Selection Committee (October 1988 to present, Chairman, January 1993 to present).
Member, Institutional Forensic Psychiatry Committee (1991-1994).
Member, Nominating Committee (1991-1993).
Member, Peer Review of Psychiatric Testimony (1992-1995).
Associate Editor, American Academy of Psychiatry and the Law Newsletter (July 1988 - July 1992).
Councilor (October 1991-October 1994).
Chairman, Program Committee for the 1995 Annual Meeting.
Treasurer (October 1995 - October 1997).

American Correctional Association, Member (1986 to present).

American College of Legal Medicine, Associate-In-Medicine (February 1986 to present).

American Academy of Forensic Sciences, Member (February 1991 to present).

Member, Medical Committee, Colorado Guardianship Center for Persons With Developmental Disabilities (1989 - 1993).

Group for the Advancement of Psychiatry: Psychiatry and Law Committee (1991 to present).

**Correctional Psychiatry:**

    Chief of Psychiatry, Colorado State Penitentiary (June 1980 to
        July 1981).
    Consulting Psychiatrist, National Prison Project (1981 to
        present).
    Consulting Psychiatrist, U.S. Department of Justice, Civil
        Rights Division (1990 to present).
    Court Monitor, <u>Reynolds, et al. v. Sielaff, et al.</u> (United
        States District Court, Southern District of New York),
        1991-1994.
    Consultant, Office of the Court Monitor, <u>Morales Feliciano,
        et al. v. Rossello Gonzales, et al.</u> (United States
        District Court for the District of Puerto Rico), 1991 to
        present.
    Certified Correctional Health Professional - Advanced Status
        (February 1, 1994).
    Accreditation Surveyor, National Commission on Correctional
        Health Care (1995 to present).
    Consultant, Office of the Court Monitor, <u>Dunn, et al. v.
        Voinovich, et al.</u> (United States District Court, Southern
        District of Ohio, Western Division), 1995 to present.
    Consultant, Office of the Special Master and to The Honorable
        Thelton E. Henderson, <u>Madrid et al. v. Gomez, et al.</u>
        (United States District Court, Northern Division of
        California), 1995 to present.

**Other Information:**

    Chief of Psychiatry, Division of Forensic Psychiatry, Colorado
        State Hospital (1978).
    Staff Psychiatrist, Denver General Hospital (July 1, 1979 to
        July 1980).
    Private Practice:  Denver, Colorado (July 1979 to present).
    Spalding Rehabilitation Hospital:
        Consulting Psychiatrist - Pain Rehabilitation Program
        (December 1979 to present).
        Medical Staff President (May 1983-May 1984).
        Member, Board of Directors (May 1986 to present).
        Chairman, Board of Directors (January 1992 to October
            31, 1995).
    Consulting Psychiatrist, Institute of Forensic Psychiatry,
        Colorado Mental Health Institute at Pueblo (July
        1981-November 1986; December 1991 to present).
    Consulting Psychiatrist, Denver Veterans Administration
        Hospital, Administrative Medicine disability
        examinations (1981 to present).
    Director, Young Sexual Offenders Program, The C. Henry Kempe
        National Center for the Prevention and Treatment of
        Child Abuse and Neglect (November 1986 to present).
    Diplomate, American Board of Psychiatry and Neurology (April
        1981).
    Diplomate, American Board of Forensic Psychiatry (October
        1985).
    Certified, Added Qualifications in Forensic Psychiatry,
        American Board of Psychiatry and Neurology (1994).

JEFFREY L. METZNER, M.D.

**PUBLICATIONS**

### National Newsletters

1.  Metzner JL: The Role of the Psychiatric Resident in Medical Student Education.   Association of Academic Psychiatry, 5: July 1979.

2.  Metzner JL: <u>Brady et al v. Hopper:</u> The Special Relationship Between Foreseeability and Liability. Amer. Acad. Psychiatry and the Law Newsletter, 8: Dec. 1983.

3.  Metzner JL: <u>Bee v. Greaves:</u> Pretrial Detainees and Involuntary Medication. Amer. Acad. Psychiatry and the Law Newsletter, 10: April 1985.

4.  Metzner JL: The Right to Refuse Treatment in Colorado: <u>People v. Medina.</u> Amer. Acad. Psychiatry and the Law Newsletter, 10:  Dec. 1985.

5.  Metzner JL: <u>Ward v. Kort:</u> Forensic Hospitals and Legal Access to the Courts. Amer. Acad. Psychiatry and the Law Newsletter, 10: Dec. 1985.

6.  Metzner JL: <u>Colorado v. Connelly:</u> Confessions of the Mentally Ill.   Amer. Acad. Psychiatry and the Law Newsletter, 11: Sept. 1986.

7.  Metzner JL: <u>Colorado v. Connelly:</u> Confessions of the Mentally Ill. Amer. Acad. Psychiatry and the Law Newsletter, 12: April 1987.

8.  Metzner JL: <u>Miller v. District Court:</u> Psychiatric Evaluation and the Attorney-Client Privilege.   Amer. Acad. Psychiatry and the Law Newsletter, 12: Sept. 1987.

9.  Metzner JL: <u>Romero v. Colorado:</u>  The Admissibility of Posthypnotic Testimony.  Amer. Acad. Psychiatry and the Law Newsletter, 13: April 1988.

10. Metzner JL: <u>Rotman v. Mirin.</u> Amer. Acad. Psychiatry and the Law Newsletter, 13: Dec. 1988.

11. Metzner JL: <u>Perreira v. Colorado.</u> Amer. Acad. Psychiatry and the Law Newsletter, 14: Sept. 1989.

12. Metzner JL: <u>Washington v. Harper:</u> Treatment Refusal in a Penal Setting Revisited.  Amer. Acad. Psychiatry and the Law Newsletter, 15: Sept. 1990.

13. Metzner JL: <u>Colorado v. Serravo:</u> Insanity Clarified. Amer. Acad. Psychiatry and the Law Newsletter, 17: April 1992.

**PUBLICATIONS, cont'd:**

### National Newsletters, cont'd

14.  Metzner JL: <u>Rufo v. Inmates of Suffolk County Jail</u>. Amer. Acad. Psychiatry and the Law Newsletter, 17: Dec. 1992.

15.  Metzner JL: Amendment to Rule 26: Information Essential for the Forensic Psychiatrist. Amer. Acad. Psychiatry and the Law Newsletter, 19: Sept. 1994.

### Book Chapters

1.  Metzner JL: Insanity Plea, in <u>Psychiatric Decision Making</u>. Edited by Dubovsky SL, Feiger AJ, Eiseman B. Philadelphia, B.C. Decker, Inc., 1984.

2.  Metzner JL: Competency to Stand Trial, in <u>Psychiatric Decision Making</u>.

3.  Metzner JL: Civil Commitment of Adults, in <u>Psychiatric Decision Making.</u>

4.  Metzner JL: Chronic Depression, in <u>Psychiatric Decision Making.</u>

5.  Ryan G, Metzner JL, and Krugman RD: When the Abuser is a Child, in <u>Understanding and Managing Child Sexual Abuse.</u> Edited by Oates, RK. Philadelphia, W.B. Saunders, 1990.

6.  Metzner JL, Struthers DR, and Fogel MA: Psychiatric Disability Determinations and Personal Injury Litigation, in <u>Principles in Practice of Forensic Psychiatry</u>. Edited by Rosner, R. New York, Chapman & Hall, 1994.

7.  Metzner J, Ryan G: Sexual Abuse Perpetration, in <u>Conduct Disorders in Children and Adolescents</u>. Edited by Sholevar, GP. Washington, D.C., American Psychiatric Press, Inc., 1995.

8.  Metzner JL: Confidentiality and Privilege, in <u>Psychiatric Secret</u>. Edited by Jacobson JL & Jacobson AM. Philadelphia, Hanley & Belfus, Inc., 1995.

### Peer Reviewed Journals

1.  Dubovsky SL, Metzner JL, Warner R: Problems with Internationalization of a Transplanted Liver, Amer. J. Psychiatry, 136: 1090-1091, 1979.

2.  Metzner JL, Dubovsky SL: The Role of the Psychiatrist in Evaluating a Prison Mental Health System in Litigation. Bull. Amer. Acad. Psychiatry and the Law, 14:89-93, 1986.

### Book Reviews, cont'd

3.  Metzner JL: <u>The Crimes Women Commit, The Punishments
    They Receive.</u>  Bull. Amer. Acad. Psychiatry and the Law,
    19:323-324, 1991.

4.  Metzner, JL: <u>When a Child Kills: Abused Children Who Kill
    Their Parents</u>.  JAMA, 267:3214, 1992.

5.  Metzner, JL: <u>Children of Chemically Dependent Parents:
    Multiperspectives from the Cutting Edge</u>.  Child Abuse &
    Neglect, 17:566, 1993.

6.  Metzner, JL: <u>Before and After Hinckley: Evaluating
    Insanity Defense Reform</u>.  J. Nervous and Mental Disease,
    182:362-363, 1994.

7.  Metzner, JL: <u>Violence in Health Care; A Practical Guide
    to Coping With Violence and Caring For Victims</u>.  JAMA,
    273; 1796-1797, 1995.

### Other

1.  Metzner JL: The Adolescent Sex Offender: An Overview.
    The Colorado Lawyer, 16: Oct. 1987.

2.  Weinstein HC, Hoover JO, Metzner JL, Shah SA, Steadman
    HJ: Task Force Report 29: Psychiatric Services in Jails
    and Prisons, American Psychiatric Association, March
    1989.

3.  Metzner JL: <u>Perreira v. Colorado</u> - A Psychiatrist's Duty
    to Protect Others.  The Colorado Lawyer, 18: Dec. 1989.

4.  Metzner JL, Tucker GH, Black DW, Felthous A. Linnoila M:
    Conference on Psychiatric Disorders and Commercial
    Drivers.  Federal Highway Administration, Pub. No. FHWA-
    MC-91-006, Washington, DC, May 1991.

January 1996

## *CURRICULUM VITAE*

Raymond F. Patterson
1904 R Street, N.W.
Washington, D.C. 20009
(301) 292-3737

### EDUCATION

| | |
|---|---|
| 1970 - 73 | Undergraduate<br>Northwestern University<br>Evanston, Illinois |
| 1973 - 77 | Doctor of Medicine<br>Howard University College of Medicine<br>Washington, D.C. |

### SCHOLARSHIPS

| | |
|---|---|
| Undergraduate | Illinois State Scholarship Committee Scholarship |
| Medical School | National Medical Fellowships Incorporated Scholarship<br>Clinical Psychiatry Award |

### AWARDS

St. Elizabeth's Overholser Division of Training Alumnus of the Year, 1986

The ADAMHA Administrators Award for Achievements of the Quality Assurance Workgroup, St. Elizabeth's Hospital, March 1987

Blacks in Government Award for Outstanding Service in Forensic Psychiatry and Community Service, 1989

Certificate of Appreciation for Hostage Negotiations Conference, Baltimore County Police Department, Baltimore, MD, February 1992

Certificate of Appreciation for dedicated service to the Psychiatry Section of the Medical Society of DC, May 1992

2

Superior Support for Public Health Service, Washington, D.C., September 1992

Outstanding Assistance and Support to Law Enforcement, US Secret Service, Washington, D.C., October, 1992

Our Hero Award Patient's Rights Council, St. Elizabeth's Hospital, Washington, D.C., October 1992

Award for Public Service, US Department of Justice, Washington, D.C., November 1992

Meritorious Public Service Award, Office of the Mayor, Washington, D.C.,October 1992

Distinguished Service Award, Department of Human Services, District of Columbia, October 1992

Outstanding Public Service Recognition Resolution, Council of the District of Columbia, 1992

Certificate of Appreciation for Risk Management/Quality Assessment Program, Mental Hygiene Administration, Baltimore, MD, October 1992

Certificate of Appreciation for dedication to Clifton T. Perkins and the Mental Health Forensic System of Maryland, February 1994

Certificate of Appreciation, Medical Records Department, Clifton T. Perkins Hospital, Jessup, MD, 1994

## APPOINTMENTS AND POSITIONS

| September, 1995 - Present | Consulting Psychiatrist, Patuxent Institution Department of Public Safety & Correctional Services Jessup, MD |
|---|---|
| August 1994 - September 1995 | Director Division of Demonstration Programs Center for Mental Health Services Substance Abuse, Mental Health Services Administration Rockville, MD |
| October 1992 - July, 1994 | Superintendent and State Forensics Director Clifton T. Perkins Hospital Center Mental Hygiene Administration State of Maryland |

3

| January, 1992 - September, 1992 | Acting Commissioner<br>Commission on Mental Health Services for the District of Columbia<br>Washington, D.C. |
|---|---|
| March, 1987 - January, 1992 | Forensic Services Administrator<br>Commission on Mental Health Services for the District of Columbia<br>Washington, D.C. |
| July, 1985 - April, 1987 | Acting Associate Superintendent<br>General Clinical Programs<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| September, 1983 - February, 1987 | Medical Director<br>Division of Forensic Programs<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| July, 1981 - September, 1983 | Staff Psychiatrist<br>Division of Forensic Programs<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| December, 1981 - July, 1982 | Staff Psychiatrist<br>Alexandria Community Mental Health Center<br>Alexandria, VA |
| April, 1981 - Present | Private Practice in General and Forensic Psychiatry<br>1904 R Street, N.W.<br>Washington, D.C |
| May, 1980 - November, 1982 | Admitting Psychiatrist<br>Psychiatric Institute of Washington<br>Washington, D.C. |
| February, 1979 - March, 1980 | Medical Officer<br>Noyes Division<br>St. Elizabeth's Hospital<br>Washington, D.C. |

4

## FACULTY APPOINTMENTS

| | |
|---|---|
| 1992 - present | Associate Professor of Psychiatry<br>        Institute of Psychiatry and Human Behavior<br>University of Maryland, School of Medicine<br>Baltimore, MD |
| 1988 - Present | Associate Professor of Psychiatry<br>Georgetown University Department of Psychiatry<br>Washington, D.C. |
| 1982 -1992 | Clinical Instructor<br>Howard University College of Medicine<br>Washington, D.C. |
| 1982 - 1992 | Clinical Faculty<br>Department of Psychiatry<br>St. Elizabeth's Hospital<br>Washington, D.C. |

## TRAINING EXPERIENCE

| | |
|---|---|
| August, 1995 | Psychopathy and the PCL-R:  An Advanced Workshop<br>Multi-Health Systems, Inc.<br>      Jessup, MD |
| December, 1994, 1993,<br>1991,1989, 1988, 1986 | JCAHO Annual Surveyors Conference<br>Chicago, IL |
| April, 1987 | Growth in Professional Judgement<br>Harvard University Philosophy of Education Research<br>  Center |
| July, 1980 -<br>January, 1981 | Chief Resident<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| October, 1979 -<br>June, 1981 | Residency - Psychiatry<br>National Institute of Mental Health at St. Elizabeth's Hosp.<br>Washington, D.C. |
| July, 1978 -<br>October, 1979 | Residency - Psychiatry<br>Howard University Hospital<br>Washington, D.C. |

5

| July, 1977-<br>June, 1978 | Internship - General Medicine<br>Howard University Hospital<br>Washington, D.C. |

## CONSULTANTSHIPS

| July 1995 | Consultation<br>Massachusetts Department of Mental Health<br>Boston, MA |
| May,June 1995 | Special Consultant<br>Maryland Adjustment & Classification Center (Supermax)<br>Department of Public Safety & Correctional Services<br>Baltimore, MD |
| May 1995 | Psychiatrist member of Special Task Committee<br>to review mental health needs for Cuban and Haitian<br>migrants<br>Guantanamo Bay, Cuba |
| January 1994 | Consultant-Examiner<br>American Board of Psychiatry and Neurology<br>Chicago, Illinois |
| July, 1993 -<br>Jan 1994 | Center for Mental Health Services Ad Hoc Working<br>Group for Mental Health and Criminal Justice Systems<br>Department of Health and Human Services<br>Rockville, MD |
| Spring 1991 -<br>Spring 1993 | Clinical Consultant<br>Law Center Clinical Program<br>Georgetown University<br>Washington, D.C. |
| 1989 - 1991 | Consultant<br>The National Conference of Christians and Jews, Inc.<br>Washington, D.C |
| 1988 - 1991 | Teacher Consultant<br>Georgia Regional Hospital<br>Atlanta, GA |
| Oct 1989 | Consultant-Examiner<br>American Board of Forensic Psychiatry, Inc. |

6

| | |
|---|---|
| January, 1989 -<br>January 1990 | Psychiatric Consultant<br>US Capitol Police<br>Washington, D.C. |
| May, 1987 | Consultant on Professional Supervision and Clinical<br>　Privileges<br>Indiana Department of Mental Health<br>Indianapolis, ID |
| February, 1985 -<br>Present | Consultant Surveyor, Joint Commission on the<br>　Accreditation of Healthcare Organizations<br>Oak Brook Terrace, Il |
| 1984 - 1991 | Psychiatric Consultant<br>United States Secret Service<br>Department of the Treasury<br>Washington, D.C. |
| 1983 - 1987 | Psychiatric Consultant<br>US Marshal's Service<br>US Government<br>Washington, D.C. |
| 1982 - 1984 | Psychiatric Consultant<br>Metropolitan Police Department<br>Washington, D.C. |

## SPEAKING ENGAGEMENTS

| | |
|---|---|
| November, 1995 | "Public Psychiatry"<br>Discussion Group Leader<br>American Psychiatric Association<br>Washington, DC |
| September, 1995 | "A Comparison of Treatment Models for Women in<br>　Forensic Hospitals"<br>1995 State Mental Health Forensic Directors Conference<br>Madison, WI |
| July, 1995 | "Successes from the Streets:  Strategies Beyond<br>　Shelters and Jails"<br>15th Annual National Alliance for the Mentally Ill<br>　Convention<br>Washington, DC |

7

| | |
|---|---|
| July, 1995 | "Implications of Treatment Breakthroughs for Persons with Mental Illness"<br>Knowledge Development and Application in Mental Health and Criminal Justice Systems for Persons with Mental Illness Living in the Community<br>Albuquerque, NM |
| June, 1995 | "Fostering Hope and Celebrating Strengths, Embracing Families and Communities"<br>Presentation to the Family Advocacy and Support Association, Inc.<br>Washington, DC |
| May, 1995 | "Perspectives in Mental Illness in the Criminal Justice System"<br>Alliance for the Mentally Ill of Michigan<br>Southfield, MI |
| April, 1995 | Keynote Address<br>Approaches to Violent Behavior<br>Second Annual forensic Conference<br>Little Rock, AR |
| April, 1995 | "Clinical Diagnosis and Treatment of Mental Illness: An Overview for the Non-Clinician"<br>Presented to the Superior Court of the District of Columbia<br>Washington, DC |
| November, 1994 | "Community Forensics: Evolving Trends"<br>Grand Rounds Presentation<br>Department of Psychiatry<br>George Washington University Hospital<br>Washington, D.C. |
| October, 1994 | "An Overview of Mental Illness and Managing Violent Persons in the Hearing Room"<br>National Association of Administrative Law Judges<br>Baltimore, MD |
| September, 1994 | Keynote Address<br>"Community Forensics"<br>National Association of Social Workers Working with Forensic Patients and Their Families<br>Bethesda, MD |

8

| | |
|---|---|
| May, 1994 | "The Mentally Ill in Prisons"<br>Panel Presentation<br>National Coalition for the Mentally Ill in Prisons<br>US Capitol<br>Washington, D.C. |
| May, 1994 | "Community Forensics and Aftercare: Placement and<br>  Treatment Issues"<br>Johns Hopkins Department of Psychiatry<br>Baltimore, MD |
| May, 1994 | "Transition Services for Mentally Ill Offenders"<br>The National Coalition for the Mentally Ill in the<br>  Criminal Justice System<br>Breakfast and Briefing for Members of Congress<br>Washington, D.C. |
| May, 1994 | "Managing a Violent Crisis: Media Relations,<br>  Countertransference, and Other Internal & External<br>  Systems Issues"<br>Managing the Risk of Violence<br>Georgia Regional Hospital at Atlanta<br>Atlanta, GA |
| May, 1994 | "Remediation for the Juvenile Offender"<br>Patuxent Institution Staff Retreat<br>Marriottsville, MD |
| April, 1994 | Keynote Address: "Providing a Continuum of Care for<br>  Forensic Patients"<br>Galt Scholar Lecturer<br>Virginia Department of Mental Health, Mental Retardation,<br>  and Substance Abuse<br>Richmond, VA |
| April, 1994 | Guest Speaker: "Forensic Inpatient Services: Trends for<br>  the 90s"<br>Fourth Annual Conference for Forensic Mental Health<br>  Treatment Providers<br>Vernon, TX |

9

| | |
|---|---|
| April, 1994 | "Emergency Psychiatry"<br>Grand Rounds, Department of Emergency Medicine<br>University of Maryland Hospital<br>Baltimore, MD<br>University of Maryland Hospital<br>Baltimore, MD |
| March, 1994 | "Effective Clinical Documentation"<br>Catonsville Community College<br>Catonsville, MD |
| March, 1994 | Forensic Psychiatry Lecture<br>Howard University Medical School<br>Washington, D.C. |
| January, 1994 | "Community Forensics"<br>Grand Rounds, Department of Psychiatry<br>University of Maryland<br>Baltimore, MD |
| January, 1994 | "Overview of the Forensic System in Maryland"<br>Baltimore Mental Health Systems, Inc.<br>Educational Program Series<br>Baltimore, MD |
| December, 1993 | "The Insanity Defense and Serial Sex Offenders"<br>Thurgood Marshall Inn of Court<br>Presented to the Superior Court of DC and<br>  US Court of Appeals<br>Washington, D.C. |
| July 1993 | Keynote Address: "The Forensic Care Providers'  Role<br>  in Educating the Public"<br>Third Annual Conference for Forensic Mental Health<br>  Treatment Providers<br>Vernon, TX |
| June, 1993 | Keynote Address:<br>Forensic Mental Health Care in the United States<br>The Alliance for the Mentally Ill of Maryland<br>The Eleventh Annual Convention, Hood College<br>Frederick, MD |

10

| | |
|---|---|
| May, 1993 | "Developing an Integrated System for Correctional Institutions" American Psychiatric Association 1993 Annual Meeting San Francisco, CA |
| May, 1993 | "Community Violence: How Have We Arrived Here? Can We Go Anywhere Else?" Georgia Regional Hospital Atlanta, GA |
| April, 1993 | "Mock Trial: Serial Rapists" Board on Professional Responsibility District of Columbia Court of Appeals Annual Disciplinary Conference Washington, D.C. |
| April, 1983 | "History of Forensic Psychiatry and the Insanity Defense" University of Maryland Psychiatry Grand Rounds Baltimore, MD |
| April, 1994, 1993, 1992, 1991 | Lecture on Forensic Psychiatry Georgetown University, Department of Psychology Washington, D.C. |
| January, 1993 | Keynote Address: "Violence is a Community Problem: How Did We Get Here?" Workshop: "Violence and the Community" Sponsored by the University of Maryland Linthicum, MD |
| February, 1993 | "The Insanity Defense in the Federal System and the District of Columbia" University of Maryland Forensic Psychiatry Fellowship Program Seminar Baltimore, MD |
| November, 1992 | "The Psychological Dimensions of Preventing Violence" Violence in Our Community Action Agenda 1992 Family Life Conference Henry C. Gregory, III Family Life Center Washington, DC |
| September, 1992 | "Cross Cultural Differences in Evaluation and Treatment" Treatment or Punishment: Mental Illness and the Criminal Justice System National Alliance for the Mentally Ill Washington, DC |

11

| | |
|---|---|
| May, 1992 | "Children and Violence"<br>DC Mental Health Association Annual Luncheon and<br>  Workshop<br>Washington, D.C. |
| February, 1992 | "Hostage Negotiations"<br>Baltimore County Police Department's Annual Hostage<br>  Negotiation Seminar<br>Baltimore, MD |
| August 1990 | "Schizophrenia"<br>PSI Associates, Inc.<br>Washington, D.C. |
| June, 1990 | "Signs and Symptoms of Depression"<br>Women in Business<br>Prince George's Chamber of Commerce<br>Landover, MD |
| May, 1990 | "Not Guilty by Reason of Insanity: Implications for the<br>  Judicial System, the Community and Clinicians"<br>Region 4 Community Mental Health Center Conference<br>Washington, D.C. |
| May, 1990 | "Violent Death and the Family": Multiple Victims"<br>St. Francis Center Conference<br>Washington, D.C. |
| December, 1989 | "Mental Health is Everybody's Business"<br>Speaker and Panelist,<br>Fifth Annual Mental Health Planning Conference<br>DC State Mental Health Planning Council<br>Washington, D.C. |
| October, 1989 | "Mental Health Issues in the Courtroom"<br>Presentation to DC Superior Court Judges and<br>  Commissioners<br>Washington, D.C. |
| April, 1989 | "People Reaching People: Pathways to Black Mental<br>  Health"<br>DC Chapter of the Association of Black Psychologists<br>Howard University<br>Washington, D.C. |

12

| | |
|---|---|
| November, 1987 | "Client and Community Rights and Responsibilities"<br>Fourth Annual State of the District of Columbia Mental<br>  Health Conference<br>Washington, D.C. |
| June, 1987 | "Advocacy - A Shared Responsibility"<br>Information, Protection and Advocacy Center for<br>            Handicapped Individuals, Inc.<br>Washington, D.C. |
| January, 1987 | "Depression: Approaches to Community Management"<br>PSI Associates, Inc.<br>Washington, D.C. |
| October, 1986 | "Re-enactment of Ezra Pound Trial"<br>American Academy of Psychiatry and the Law Annual<br>  Meeting<br>Philadelphia, PA |
| August, 1986 | "Forensic Psychiatry and General Psychiatry Practice"<br>Howard University Hospital<br>Washington, D.C. |
| June, 1986 | "Schizophrenia: Treatment Approaches"<br>PSI Associates, Inc.<br>Washington, D.C. |
| November, 1985 | "Sexual Psychopathology and Anti-Androgen Therapies"<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| October, 1985 | "Re-enactment of Ezra Pound Trial"<br>Medical Society Scientific Day Program<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| March, 1985 | "Tarasoff and its Offsprings: Implications for Clinical<br>  Practice"<br>Eighth Annual John Marr Day Symposium<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| September, 1984 | "Civil Commitment and Post NGI Proceedings"<br>Criminal Practice Institute<br>Washington, D.C. |

13

| | |
|---|---|
| January, 1984 | "Critical Issues in Forensic Psychiatry:  Where Do We Go From Here?"<br>Seventh Annual John Marr Day Symposium<br>St. Elizabeth's Hospital<br>Washington, D.C. |
| June, 1983 | "Psychological Effects of Cancer"<br>Introductory Course in Cancer Education for DC Health and Science Teachers<br>Washington, D.C. |

## PAPERS PRESENTED

| | |
|---|---|
| September, 1992 | "A Community In Crisis"<br>Psychiatric Institute of Washington<br>Washington, DC |
| May, 1992 | "Evaluation and Treatment of Blacks in Jails and Prisons"<br>American Psychiatric Association Annual Meeting<br>Washington, DC |
| October, 1991 | "Criminalization of the Mentally Ill"<br>American Academy of Psychiatry and the Law Annual Meeting<br>Orlando, FL |
| September, 1991 | "Victimization of Staff and Critical Incidents"<br>Twelfth Annual Conference of State Mental Health Forensic Directors<br>Birmingham, AL |
| September, 1990 | "Maintaining the Integrity of the Unit"<br>Eleventh Annual Conference of State Mental Health Forensic Directors<br>Santa Fe, NM |
| December, 1980 | "Use of Psychotropic Medications in Pregnancy:  A Review"<br>St. Elizabeth's Hospital Medical Society<br>Washington, D.C. |

14

| | |
|---|---|
| August, 1979 | "The Psychosocial Aspects of Liaison Psychiatry To Cancer Patients" The National Medical Association Annual Meeting Detroit, MI |

**MEDIA ACTIVITIES**

| | |
|---|---|
| December, 1995 | "Violence in the Community" and "The Holiday Blues" Crosstalk - WDCU Live Public Radio Talk show Washington, D.C. |
| October, 1993 | "Understanding Your Mental Health" Focus on Health WOL Radio 1450 AM Washington, D.C. |
| October, 1993 | "The Criminally Insane" Fox TV Baltimore, MD |
| June 1993 | "Psychodynamics of Violence" and "Total Well Being" WPFW-FM Talk Radio Show Washington, D.C. |
| March, 1992 | "State of the District: Need and Delivery of Mental Health Care Services Through DHS" DC Today, Channel 16 Washington, D.C |
| January, 1992 | "A Perspective on Justice" Discussion with Prince George's County State's Attorney Channel 18 Prince George's County, MD |
| September, 1991 | "Panic Disorders," Urban Health Report WHMM-TV, Channel 32 Washington, D.C. |
| July, 1991 | "Serial Killers" Fox News, Channel 5 Washington, D.C. |
| March, 1991 | "Domestic Violence," Urban Health Report WHMM-TV Channel 32 Washington, D.C |
| May, 1989 | "How Stress Factors Affect the Community" The Morning Show with Cathy Hughes, WOL Radio Talk Show' Washington, D.C. |
| February, 1987 | "A Washington Life" Washington Post Magazine Washington, D.C. |
| January, 1987 | "The San Isidro Murder Slayings: Psychological Aspects" Newscenter 4 Washington, D.C. |

**OTHER ACTIVITIES**

| | |
|---|---|
| 1994 - Present | Vice Chairperson of the Council on Psychiatry and Law American Psychiatric Association |
| 1994 - Present | Member, Executive Council of American Academy of Psychiatry and Law |
| 1994 - Present | Member, Ad Hoc Committee to Develop a Slate of Candidates for Election to the American Board of Psychiatry and Neurology |

16

| | |
|---|---|
| 1993 - 1994 | Member, Institutional Forensic Psychiatry Committee<br>American Academy of Psychiatry and the Law |
| 1993 - 1994 | Vice-Chair to Executive Committee, National Association<br>of State Mental Health Program Directors, Forensic<br>Division |
| 1993 - 1996 | Committee on Added Qualifications in Forensic Psychiatry<br>American Board of Psychiatry and Neurology. |
| 1990 - 1994 | Member, National Association of State Mental Health<br>Program Directors, Forensic Division<br>Alexandria, VA |
| 1992 - 1994 | Treasurer, Washington Psychiatric Society<br>Washington, D.C. |
| 1992 - 1994 | Member, Institutional Review Board<br>Department of Health and Mental Hygiene<br>State of Maryland |
| 1991 - 1992 | President, DC Chapter<br>Washington Psychiatric Society<br>Washington, D.C. |
| 1990 - 1991 | Member, ABT Oversight Committee<br>Patuxent Institute<br>Jessup, MD |
| 1987 - 1993 | Appointed by Chief Judge Fred B. Ugast of the Superior<br>Court of the District of Columbia to serve as a member<br>of the Advisory Merit Selection Panel<br>Washington, D.C. |
| 1990 -1991 | Chairman, Council on Psychiatry<br>DC Medical Society<br>Washington, D.C. |
| 1989 - 1994 | Councilmember<br>DC Medical Society<br>Washington, D.C. |
| 1989 - 1990 | Secretary, Council on Psychiatry<br>DC Medical Society<br>Washington, D.C. |

17

| January, 1986 - 1988 | Co-Editor<br>American College of Mental Health Administration<br>   Newsletter |
|---|---|
| October, 1987 - December, 1987 | President, Professional Staff Organization Commission<br>on Mental Health Services<br>Washington, D.C. |
| July, 1987 - September, 1987 | President<br>Medical Staff Organization of St. Elizabeth's Hospital<br>Washington, D.C. |
| Fall 1985 - Fall 1986 | Editor<br>St. Elizabeth's Hospital Medical Society Newsletter<br>Washington, D.C. |

## MEMBERSHIPS IN PROFESSIONAL ASSOCIATIONS

American Academy of Psychiatry and the Law
American College of Mental Health Administration (Fellow)
American Medical Association
American Psychiatric Association (Fellow)
Arlington County Medical Society
Black Psychiatrists of America
Howard University Medical Alumni Association
Medical Society of the District of Columbia
National Association of State Mental Health Program Directors
Prince George's County Mental Health Association
St. Elizabeth's Hospital Medical Society
Virginia Medical Society
Washington Psychiatric Society

## LICENSES

State of Maryland      1977 - Present
District of Columbia     1978 - Present
State of Virginia      1980 - Present

## BOARD CERTIFICATIONS

1983   Diplomate of the American Board of Psychiatry and Neurology In General Psychiatry
1988   Diplomate of the American Board of Forensic Psychiatry
1994   Diplomate of the American Board of Psychiatry and Neurology in Forensic Psychiatry

**Exhibit 2**

*Meitera*
*Contract #'s*

# MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) STAFFING

## DEVELOPMENT OF THE BASE MHSDS STAFFING:

- The MHSDS staffing estimates were extrapolated from the Scarlett Carp Report recommendations.

- The clinical staffing assumptions developed by Mental Health include approximately 1 staff for every 1 crisis patient; 1 staff for every 10 residential care inmates (See Attachment 1); this equates to our EOP; 1 staff for a CCCMS ("outpatient") caseload of about 100 inmates.

- The 1:100 CCCMS caseload is documented in a Memo dated February 11, 1993, from Scarlett Carp to Kyle McKinsey (Attachment 2), wherein she indicates the total positions required for outpatient services were 170 for an outpatient population of 17,000, resulting in a 1:100 caseload (in Attachment 3, from the Scarlet Carp Report, this includes the outpatient and pre-release transition caseload).

- Reception Center Psychologists were initially determined by using a ratio .0054 for each Reception Center case. The ratio was developed based on a series of computations to include the intake population, and the time included to prepare screening and follow-up evaluations (Attachment 4).

- Clinical Staffing Standards are attached for EOP (Attachment 5), MHCB (Attachment 6) and CCCMS (Attachment 7).

- The Scarlett Carp Report (page 85, Attachment 8) notes that "The staffing plan estimates include and recognize the time required for functions not related to the direct provision of services (training, quality improvement, etc.). Whether this proves adequate will be a function of implementation."

## POPULATION GROWTH RATIOS:

- The Phase II (Fiscal Year 1995/96) and Phase III (Fiscal Year 1996/97) MHSDS Budget Change Proposals included "population growth staffing" to bring the MHSDS from the original design population (119,000 inmates) to the current population. In Phase II we obtained positions to bring the Phase I and Phase II programs up from 119,000 to 143,000. In Phase III we obtained positions to bring the Phase III programs up from 119,000 to 143,000 and all programs from 143,000 to 151,000.

- The Department's Budget Management Branch translated the Phase II population growth request into the current 370:1 population growth ratio (one mental health position for every 370 new inmates).

MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) STAFFING
Page 2


- This 370:1 is the ratio that has been included in the Fiscal Year 1997/98 Departmental Population BCP. The fall population projection estimates the CDC population will increase from approximately 151,000 (June 1997) to 160,000 (June 1998) during the Fiscal Year. Using this ratio, we will receive about 24.5 Mental Health positions.

- At this time, no staffing increases are proposed for the MHSDS for Fiscal Year 1997/98 other than this population related increase. At this time it is anticipated that 6.5 of these positions will be used to implement a CCCMS (399 caseload) at the new Corcoran II prison and 4.0 positions used to bring the EOP at Salinas Valley from 162 beds to 192; the allocation of the remaining 14.5 positions will be based on the assessed need as of the beginning of the Fiscal Year, based on usage trends.


## SUMMARY OF MENTAL HEALTH POSITIONS RECEIVED IN PHASE I-III BUDGET CHANGE PROPOSALS:

(Positions received in the 1994/95, 1995/96 and 1996/97 BCPs)

| FISCAL YEAR | BASE POSITIONS | POP GROWTH POSITIONS | LIMITED TERM POSITIONS | TOTAL POSITIONS DISTRIBUTED |
|---|---|---|---|---|
| PHASE I - 1994/95 | 99 | | | 99 |
| PHASE II - 1995/96 | 66 | (45.44) 36.44 | | 102.44 |
| PHASE III - 1996/97 | 18.6 | (59.5) 37.1 | 103.2 | 158.9 |

NOTE: Pop Growth positions listed in parentheses ( ) are what was approved in the BCP, however, due to reductions in the population projections, we did not receive the entire allocation.

Also, there are approximately 6 Limited Term positions yet to be allocated.

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) STAFFING**
Page 3

## SIZING OF THE OUTPATIENT PROGRAMS

- The original allocation of EOP beds and CCCMS caseload were based on the assumptions that 7.9% of the inmate population are diagnosed as seriously mentally disordered, and of that group 8% would require EOP level of care and 92% would require CCCMS.

- Original allocations of CCCMS caseload were based on assumed Fiscal Year 1996/97 institution population (design capacity at 150% occupancy) and, for the most part, institutions were allocated a CCCMS caseload equal to 7.8 % of their total population (plus or minus 0.5%). The major exceptions are the three institutions which are primarily RC (CIM, WSP, NKSP), which had an original caseload allocation of 9.4-9.7%. Subsequent increases in caseload due to population increases have attempted to equitably spread the increase systemwide.

- Initial allocation of EOP beds followed a less clear pattern. The original plan had five large EOPs (64-104 beds), of which three were at institutions with pre-MHSDS mental health programs (CMF, CMC, RJD) and the other two at Level IV/SHU institutions (CORC, PBSP). The remaining nine programs were smaller (24-48 beds) and spread throughout the state. Soon after this initial allocation it was realized that two of these proposed locations (CIM and SQ) had housing unit physical plants that were not conducive to the EOP and the bed capacity was reallocated (to LAC and MCSP, respectively).

- Although the EOP is based on an assumption that the program's participants would be housed in a unit distinct from the General Population, the original allocations of EOP capacity had not fully taken this into account. The result would have been a housing unit with a mixture of EOP and non-EOP inmates, particularly in institutions with "270 design" housing. Expansion of the EOP in response to population increases have also attempted to correct this problem and in newer institutions the EOPs are sized to match the housing unit capacity at 150% occupancy.

Correctional officer positions for supervision of inmates assigned to crisis and residential care beds are not identified since security supervision is already provided in Central Health Services units (future CTCs) and the housing units proposed for designation as residential care units.

**Core Team Members.** Core Team staff are responsible for providing care for inmates housed in CTC crisis beds (optional mental health treatment program) and all services (assessments, crisis intervention, outpatient services) provided to general population inmates housed in all of the institutions included in the cluster. General population is defined as regular housing assignments (excludes SHU and reception). The senior psychologist is identified as the cluster chief for mental health services; he/she could also be designated as the CTC Clinical Director. Professional staff required to serve the CTC crisis beds are included as part of the core team because time not required for crisis bed inmates should be focused productively on the outpatient population. The only exceptions are the nursing and recreation therapist positions which are calculated exclusively to serve crisis bed patients. Should the crisis bed census be sufficiently low to not require full time recreation therapists, unused person power should be redirected to augment services for residential care and outpatients. Medical records/clerical support positions provide services for all mental health staff assigned to the cluster.

**Residential Care Staff.** Residential Care staff will work together as a multidisciplinary treatment team designated to provide services for residential care inmates: 5.5 positions (Person Years) are calculated for each 50-bed unit. If a residential care unit is 100 beds, 10 positions are assigned as it assumes only one chief will be required. Inmates assigned to these units would access their medication by way of the institution's "pill line;" therefore, only one RN is assigned to the treatment team for each 50 beds. Correctional officers assigned to residential core units will also participate as members of the treatment team.

**Staff Assigned to Reception, Segregation, and Crisis Intervention.** Mental health staffing required to provide services for inmates in SHUs and reception centers have been calculated and shown separately in the cluster tables. Psychologists and psychiatric social worker positions to do follow-up evaluations in receptions centers are calculated based on the assumption that 25 percent of the inmates being screened at reception will be referred to these disciplines for a follow-up evaluation. Follow-up evaluations are assumed to last for an average of one hour (a full evaluation would be provided at the receiving institution's Cluster Center, as appropriate, and include a treatment plan), and that these clinicians could conduct six evaluations per working day. Psychiatrist positions to do follow-up evaluations in reception centers assume that five percent of the inmates being screened at reception centers will be referred directly to a psychiatrist and each would last for an average of half an hour.

A follow-up evaluation is defined as the level of evaluation required to assess whether the individual needs services immediately that are only provided at a cluster center institution (crisis bed, residential care bed), needs outpatient services, merely monitoring, or does not need mental health services. If admission to a CTC crisis bed or residential care bed is indicated, this need must be considered in his/her institution assignment in addition to other classification and custody considerations. A full evaluation is defined as a comprehensive evaluation that a) includes the assessments of several disciplines such that would be conducted when an inmate is admitted for the first time to a CTC crisis bed or directly to residential care, or b) a more in-depth evaluation



RECEIVED
FEB 1 1 1993
HEALTH CARE
SERVICES DIVISION

February 11, 1993

To:        Kyle McKinsey, Deputy Director
           California Department of Corrections
           Health Care Services Division

From:      Scarlett V. Carp, President
           Scarlett Carp & Associates, Inc.

Subject:   Estimated Outpatient Caseload

---

The Study Team experts designed the mental health service delivery
system in such a way that it can be thought of as a wide mouthed funnel.
The broad opening of which is outpatient services which identifies those in
need of care, triages inmates to higher levels of care if required, and
provides services for those who do not. The objective is prevention: only
those who really need to access a higher level of service enter the narrow
neck of the funnel and access residential care, CTC crisis care, and
inpatient hospital care. This system of care is also fiscally responsible in
that, in the sequence presented above, services provided as the funnel
narrows become progressively more expensive. Therefore, there is an
incentive to provide an aggressive system of outpatient services, backed
up by crisis beds and residential care, to prevent to the extent possible
decompensation of the mentally ill inmate to the point where inpatient
hospital care is the only option.

The outpatient staff positions assigned to each cluster were developed by
the Study Team in response to the estimated level of need of the inmates
in the cluster. There are many variations in need among the patient
population that would be carried on a caseload. It could include inmates
who's needs vary from individual one time contacts for staff serving the
SHU population, to a once a month contact for half an hour for an inmate
who is stable on medication and functioning well in general population, to
more frequent contact either individually or in group therapy twice a week.

In the aggregate, there are 154 psychiatrists, psychologists, and psychiatric
social workers estimated who are dedicated to the provision of outpatient
services. Of the psychologist and psychiatrist positions assigned to the
CTC crisis beds it is assumed that the CTC crisis beds will not constitute
a full time caseload and that the overall equivalent of 16 positions will be



available to provide outpatient care. A total of 170 positions to provide outpatient care. This number does not include mental health staff assigned to reception, residential care, and CTC crisis beds (beyond those indicated above). If the total number of inmates projected in Table 8 of the Needs Assessment section of the report estimated for outpatient caseload and pre-release caseload services (approximately 17,000) is divided by the 170 positions, it results in a 1:100 caseload ratio.

While this ratio is higher than is considered desirable, the Study Team experts believe the projected outpatient staff estimates will allow the CDC to triage the mentally ill population if these resources are deployed efficiently. The more inmates being seen, the better the CDC will be at diffusing the problem. If problems arise from not meeting all the need, the crisis beds, residential care, and inpatient hospital beds provide mechanisms for addressing them. The community does the same thing. Access is the best that CDC and the community can be expected to do.

**Attachment 3**

| Table 8 Snapshot of Needed Mental Health Resources, Fiscal Year 1996/97 | | | |
|---|---|---|---|
| Resource | Males | Females | Total |
| Daily Initial Screening Visits | 322 | 34 | 356 |
| Daily Follow-Up Evaluation Visits | 92 | 10 | 102 |
| Daily Crisis Intervention Visits | 131 | 9 | 140 |
| Crisis Stabilization Beds* | 559 | 54 | 613 |
| Inpatient Hospital Beds* | 1,095 | 106 | 1,201 |
| Residential Care Beds* | 3,476 | 336 | 3,812 |
| *Outpatient Caseload* | 13,101 | 1,097 | 14,198 |
| Pre-Release Transition Caseload | 2,047 | 303 | 2,710 |
| Parole Outpatient Clinic Caseload | 2,047 | 303 | 2,710 |

* Census projections used to calculate future bed needs revised based on the number of inmates assigned to currently operating institutions and all institutions projected to come on line through FY 1996/97 according to the CDC Five-Year Master Plan, 1992-1997 at 150 percent of design bed capacity.

Note:    Caseload is defined as the total number of inmates who will be carried on a caseload; it should not be interpreted to indicate the number who will require services each day.

Inmates with a mental illness diagnosis on a pre-release transition caseload are those requiring pre-release services because they are two months short of release. Inmates will be receiving this service while residing in a crisis bed, residential care, or inpatient bed, or while being carried on an outpatient caseload.

Attachment 4

## COMPUTATION OF STAFF REQUIREMENTS

1993     Reception Center Intake

| New Commitments | Parole Violators | Total |
|---|---|---|
| 43,150 (3,596 mo.) | 54,681 (4,557 mo.) | 97,831 (8,153 mo.) |

1994     Projected Intake = + 10% (Planning Purposes)

| New Commitments | Parole Violators | Total |
|---|---|---|
| 48,000 (4,000 mo. +/-) | 60,000 (5,000 mo. +/-) | 108,000 (9,000 mo. +/-) |

Time Estimates

Screening Interview     = 10 min.
    (Based upon trial usage of standardized questionnaire.)

Full Clinical Evaluation     = 1 hr. 30 min.
    (Current average from field surveys is 30 to 45 minutes.
    This was doubled to allow for expanded issues of level
    of care assessment and brief interim treatment plan.)

Available time per month per each Full Time Employee     = 100 hrs.
(FTE) Clinician
    (Normal work month 166 hours; allow 66 hrs. for leave,
    training, administrative time, collateral responsibilities.)

Staff Calculations
    (Assuming all inmates receive a 10 min. screening interview
    and 25% receive a 1 hr. 30 min. full clinical evaluation.)

Screening (System Wide)
    9000 I/M x 10 min. = 1500 hrs. divided by 100 hrs. per FTE     = 15   FTE

Evaluations
    2250 I/M x 1 hr. 30 min. = 3375 hrs. divided by 100 hrs. FTE     = 33.8 FTE
    (25% of 9000 Inmates)

                                     TOTAL     = 48.8 FTE

Current Staff (from chart / adjusted)     - 23.5 FTE

                  Required Additions     = 25.3 FTE

Staff Requirements
Page 2

Staffing Standards
     (Based upon above assumptions)

       48.8 FTE required to screen and evaluate 9000 inmates per month = <u>.0054 FTE</u>
       per Reception Center case per month.

ENHANCED OUTPATIENT PROGRAM STAFFING

Attachment 5

| | 15-24 BEDS | 25-34 BEDS | 35-44 BEDS | 45-54 BEDS | 55-64 BEDS | 65-74 BEDS | 75-84 BEDS | 85-94 BEDS | 95-104 BEDS | 105-114 BEDS | 115-124 BEDS | 125-134 BEDS | 135-144 BEDS | 145-154 BEDS | 155-164 BEDS | 165-174 BEDS | 175-184 BEDS | 185-194 BEDS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychiatrist | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 2 | 2 |
| Sr. Psychologist - Supervisor | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Psychologist, Clinical | | | | | | | | | | | | | | | | 1 | 1 | 1 |
| Psychiatric Social Worker | 0.5 | 0.5 | 0.5 | 1 | 1 | 2 | 2 | 2 | 2 | 2.5 | 2.5 | 2.5 | 2.5 | 3 | 3 | 3.5 | 3.5 | 4 |
| Registered Nurse | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 3 | 3 | 3 | 3 |
| Recreational Therapist | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Psychiatric Technician | 0 | 0.5 | 1 | 1 | 1 | 1 | 1 | 2 | 3 | 3 | 3.5 | 3.5 | 4 | 4 | 4 | 4.5 | 5 | 5 |
| Office Technician | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 | 1.5 | 1.5 | 2 | 2 | 2 | 2.5 | 2.5 |
| TOTAL | 5 | 6.5 | 6 | 6.5 | 7 | 8 | 9 | 10 | 11 | 12 | 12.5 | 13 | 13.5 | 14.5 | 16.5 | 18 | 19 | 20.5 |

DISKETTE: 1996/97 EXCEL DOCUMENTS
FILE: EOPSTAFF.XLS
REVISED: 05/22/96

STANDARD STAFFING PATTERN FOR MENTAL HEALTH CRISIS BEDS

| | 4-5 BEDS | 6 BEDS | 7-8 BEDS | 9-10 BEDS | 11-13 BEDS | 14-16 BEDS |
|---|---|---|---|---|---|---|
| **CLASSIFICATION** | | | | | | |
| | | | | | | |
| CHIEF PSYCHIATRIST | 1 | 1 | 1 | 1 | 1 | 1 |
| STAFF PSYCHIATRIST | 0.5 | 1 | 1 | 1 | 1 | 1 |
| PSYCHOLOGIST, CL | 1 | 1 | 1 | 1 | 2 | 2 |
| PSYCH. SOCIAL WRKR | 0 | 0 | 0 | 1 | 1 | 1 |
| REC THERAPIST | 0.5 | 1 | 1 | 1 | 1 | 1 |
| SUPERVISING NURSE | 1 | 1 | 1 | 1 | 1 | 1 |
| REGISTERED NURSE | 3 | 3 | 4 | 5 | 6 | 8 |
| MED TRANSCRIBER | 1 | 1 | 1 | 1 | 1 | 1 |
| OFFICE TECH | 1 | 1 | 1 | 1 | 1 | 1 |
| TOTAL | 9 | 10 | 11 | 13 | 15 | 17 |

DISKETTE:  1996/97 EXCEL DOCUMENTS
FILE:  MHCBSTF.XLS
CREATED:  05/21/96

MENTAL HEALTH SERVICES DELIVERY SYSTEM

| | <100 CSLD | <150 CSLD | <200 CSLD | <250 CSLD | <300 CSLD | <350 CSLD | <400 CSLD | <450 CSLD | <500 CSLD | <550 CSLD | <600 CSLD | <650 CSLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CCCMS PROGRAM STAFFING (Not cumulative) | | | | | | |
| D | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 |
| R PHD | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| H.D. | 0 | 0 | 0 | 0 | 0 | 0.5 | 1 | 1 | 1 | 1.5 | 1.5 | 1.5 |
| SW | | 0.5 | 1 | 1.5 | 2 | 2 | 2 | 2.5 | 3 | 3 | 3.5 | 4 |
| LERK | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1.5 | 1.5 | 1.5 | 2 |
| OTAL | 2 | 2.5 | 3 | 3.5 | 4 | 5 | 6 | 6.5 | 7.5 | 8 | 9 | 10 |

### AUGMENTATIONS TO STANDARD CCCMS STAFFING RATIOS (Not cumulative)

1   ADD .5 MD FOR LVL IV INSTITUTIONS (100-500 CSLD) AND 1 MD (501-900 CSLD); or

2   FOR RC INSTITUTIONS ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750; or

3   FOR EOP INSTITUTIONS ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750.
    NOTE: FOR MULTIPLE PROGRAMS (1-3) ADD ONLY FOR 1 PROGRAM.

4   THE ONLY STAFF ALLOCATION FOR CCCMS AT NON-HEAT MED INSTITUTIONS IS: .5 MD AND .5 PHD (<500 CSLD) OR
    1 MD AND 1 PHD (501-900 CSLD).

5   FOR SHU INSTITUTIONS ADD 1 PH.D. FOR EACH 300 SHU INMATES
    (CORC SHU CURRENTLY HAS 822 INMATES. 3 ADD'L PH.D..)
    (PBSP SHU CURRENTLY HAS 1572 INMATES. 5 ADD'L PH.D..)

6   FOR WOMEN'S INSTITUTIONS, ADD 1 PH.D. FOR 100-200 CSLD/ 2 FOR 201-300 CSLD/·3 FOR 301-400 CSLD

7   FOR WOMEN'S INSTITUTIONS, ADD .5 PSW FOR < 200 CSLD/ 1 PSW FOR <300/ 1.5 PSW FOR < 400.

8   FOR CRC, BECAUSE OF THE MISSION OF THE INSTITUTION, WE ANTICIPATE A SMALLER CCCMS CSLD.  FOR TOTAL CSLD
    (MEN AND WOMEN) FOR MED NEEDS ALLOW .5 MD / FOR CASE MANAGEMENT ALLOW 1 PHD AND 1 PSW.

9   FOR CAMP HUB INSTITUTIONS, ADD .5 PH.D.. (CCC & SCC)

10  CLERICAL STAFF:
                        UP TO 4.5 CLINICAL STAFF = .5 CLERICAL
                        5 - 5.5 CLINICAL STAFF = 1 CLERICAL
                        6 TO 7.5 CLINICAL STAFF = 1.5 CLERICAL
                        8 OR MORE CLINICAL STAFF = 2 CLERICAL

## Mental Health Staff Estimates

A total of 340.8 mental health positions is estimated to be required to implement all services proposed for the mental health service delivery system at the 17 clusters. New positions are identified as those required in addition to FY 1992/93 budgeted positions in the CDC Health Care Services Division, Mental Health Services Branch at Central Office, those assigned to currently operating institutions, and those required over and above the standard staffing package for institutions that are planned to open through FY 1996/97. These totals include shift relief. A total of 91.8 mental health positions currently located at CMF and CMC would potentially be available for reassignment to other clusters once the impact of implementing the delivery system reduces the need for mental health services at these locations.

The total number of new mental health positions identified include those required to meet CTC Optional Mental Health Treatment Program staffing for crisis beds and support staff positions at the cluster level. Four new positions are identified for Central Office. They are related to the disciplines (psychiatric social work, therapeutic recreation, psychiatric nursing) included in the delivery system for which there is not currently representation at Central Office.

**Methodology.** The total number of mental health positions required to implement the proposed mental health service delivery system at each cluster were first estimated and then, refined by the Study Team independently of existing positions. Existing positions and those included in the standard staffing package for new institutions for each cluster were then deducted from the Study Team's staffing plan to arrive at the number and type of new positions required.

The **base (existing) staffing,** to which the new positions in currently operating institutions are added, is the Fiscal Year 1992/93 authorized and budgeted mental health positions for each institution. For institutions projected to come on line through Fiscal Year 1996/97 according to the <u>CDC Five-Year Master Plan, 1992-1997</u>, new positions are in addition to the current standard staffing plan for new 2,200-bed standard design institutions and reception centers.

In clusters, where the base (existing) complement exceeds the number required according to the Study Team's staffing plan, the excess positions are shown as a negative in Tables V-B through IX-B in the Cluster Summaries section of this report. This only occurs in Cluster Five (CMF/Solano) and Cluster Nine (CMC) where Enhanced Outpatient Programs are currently in place. These positions potentially could be reassigned to other cluster locations when the impact of the delivery system decreases the demand for mental health services at these locations.

The staffing plan for each cluster is structured according to the number of positions required to staff a Core Team, the residential care units, provide follow-up assessments in response to referrals at reception, provide services to inmates housed in segregation, and to enhance crisis intervention capability. The staffing plan estimates include and recognize the time required for functions not related to the direct provision of services (training, quality improvement, etc.). Whether this proves adequate will be a function of implementation. Core Team estimates include positions required to staff mental health crisis beds assuming CTC licensure under proposed CTC regulations as an optional mental health treatment program, which are discussed in detail under "New Positions Required for CTC Implementation," below.

**Exhibit 3**

ENHANCED OUTPATIENT PROGRAM STAFFING - CHART 4

| | 16-24 BEDS | 26-34 BEDS | 35-44 BEDS | 45-54 BEDS | 55-64 BEDS | 65-74 BEDS | 76-84 BEDS | 85-94 BEDS | 95-104 BEDS | 106-114 BEDS | 116-124 BEDS | 125-134 BEDS | 135-144 BEDS | 145-154 BEDS | 155-164 BEDS | 165-174 BEDS | 175-184 BEDS | 185-194 BEDS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychiatrist | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.5 | 1.5 | 1.5 | 1.5 | 2.0 |
| Sr. Psychologist - Supervisor | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Psychologist, Clinical | | | | | | | | | | | | | | | | | | 1.0 |
| Psychiatric Social Worker | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.5 | 1.5 | 1.5 | 1.5 | 2.0 |
| Registered Nurse | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 4.5 |
| Recreational Therapist | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2.0 | 2.0 | 2.5 | 3.0 | 3.0 |
| Psychiatric Technician | 0.0 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2.0 | 3.0 | 3.0 | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 | 4.5 | 5.0 |
| Office Technician | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.5 | 1.5 | 1.5 | 1.5 | 2.0 | 2.0 | 2.5 | 2.5 |
| **Total** | 6.0 | 5.5 | 6.0 | 6.0 | 6.5 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 12.5 | 13.0 | 13.5 | 14.5 | 16.5 | 18.0 | 19.0 |

| | 195-204 BEDS | 205-214 BEDS | 215-224 BEDS | 225-234 BEDS | 235-244 BEDS | 245-254 BEDS | 255-264 BEDS | 265-274 BEDS | 275-284 BEDS | 285-294 BEDS | 295-304 BEDS | 305-314 BEDS | 315-324 BEDS | 326-334 BEDS | 335-344 BEDS | 345-354 BEDS | 355-364 BEDS | 366-374 BEDS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Psychiatrist | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 | 3.5 | 3.5 |
| Sr. Psychologist - Supervisor | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 |
| Psychologist, Clinical | 1.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 |
| Psychiatric Social Worker | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 5.0 | 5.0 | 5.0 | 5.5 | 5.5 | 5.5 | 6.0 | 6.0 | 6.0 | 6.5 | 6.5 | 6.5 | 6.5 |
| Registered Nurse | 3.5 | 4.0 | 4.0 | 4.0 | 4.5 | 4.5 | 4.5 | 4.5 | 5.0 | 5.0 | 5.5 | 5.5 | 6.0 | 6.0 | 6.5 | 6.5 | 6.5 | 6.5 |
| Recreational Therapist | 1.5 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 |
| Psychiatric Technician | 5.5 | 6.0 | 6.0 | 7.0 | 7.0 | 5.0 | 7.5 | 7.5 | 7.5 | 8.0 | 8.0 | 8.5 | 8.5 | 8.0 | 8.5 | 9.5 | 9.5 | 9.5 |
| Office Technician | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.5 |
| **Total** | 22.0 | 24.0 | 24.0 | 25.5 | 27.0 | 28.0 | 29.0 | 30.0 | 31.5 | 32.5 | 33.0 | 34.5 | 35.5 | 36.0 | 36.5 | 38.0 | 39.5 | 40.5 |

| | 375-384 BEDS | 385-394 BEDS | 395-404 BEDS | 405-414 BEDS | 415-424 BEDS | 425-434 BEDS |
|---|---|---|---|---|---|---|
| Psychiatrist | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Sr. Psychologist - Supervisor | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Psychologist, Clinical | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 | 4.5 |
| Psychiatric Social Worker | 7.0 | 7.5 | 7.5 | 7.5 | 8.0 | 8.0 |
| Registered Nurse | 7.0 | 7.0 | 7.5 | 8.0 | 8.0 | 8.0 |
| Recreational Therapist | 3.5 | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Psychiatric Technician | 10.0 | 10.0 | 10.5 | 10.5 | 11.0 | 11.5 |
| Office Technician | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| **Total** | 42.0 | 44.0 | 46.0 | 46.0 | 47.0 | 48.0 |

**Exhibit 4**

## OFFICE OF THE SPECIAL MASTER
## MEMORANDUM

**DATE:**     July 24, 1998

**TO:**     John Hagar, Special Master

**FROM:**     Jeffrey L. Metzner, M.D.

**SUBJECT:**  Psychiatric Services Unit

During July 22, 1998 I attended a PSU IDTT meeting where I observed the staffing process for about 12 inmates. In addition, I met with David Archambault, Ph.D. in order to obtain updated information relevant to the PSU. I also attended an ICC meeting where I observed six inmates being reviewed by the ICC.

The mental health staffing for the PSU was as follows:

124 Inmates

- 1.0    FTE senior psychologist,
- 2.0    FTE staff psychiatrists (filled by contract physicians),
- 6.0    FTE psychologists (1 vacancy),
- 4.0    FTE social workers (1 vacancy),
- 1.0    FTE recreational therapist,
- 1.0    FTE senior RN,
- 3.0    FTE RNs, and
- 20.0    FTE psychiatric technicians (8 vacancies).

One of the contract psychiatrists, Duc Nguyen, M.D., will be ending his contract during the next month and the other psychiatrist, Oliver Swigert, M.D.. will be taking a leave of absence for one month beginning around August 1998.

Information was obtained from Barbara Pearson, Senior Psychiatric Technician, concerning the role of the psychiatric technicians within the PSU. The majority of the psychiatric technicians are assigned to the treatment center which is staffed on the second watch by 5 psychiatric technicians and on the third watch by 2-3 psychiatric