IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**
**MAY 1 9 1999**
CLERK, U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

vs.

No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

## NOTICE OF FILING OF SPECIAL MASTER'S SUPPLEMENTAL RECOMMENDATIONS ON STAFFING RATIOS AND ADMINISTRATIVE SEGREGATION

On November 17, 1998, the master served parties with Recommendations for Staffing Ratios. On January 4, 1999, the master served on the parties his Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding. Because the parties and the master engaged in lengthy negotiations on these recommendations, the court extended the time for parties to file objections and directed that objections be sent to the master for his consideration. Subsequent extensions for filing objections were applied for and granted.

On April 8, 1999, the court ordered the defendants to provide plaintiffs and the master with plans for increased staffing and the provision of mental health care to inmates in administrative segregation on or before April 19,1999. If such plans were not forthcoming, the master was to issue a single report by April 30, addressing both staffing and administrative segregation, and the parties were to have 30 days thereafter to file objections with the court.

1033

After some initial confusion over whatever plans the defendants intended to file in response to the court's directive, the defendants submitted a two-page letter on April 15, with a promise to provide additional statistical data on current staffing levels, eventually sent to the master in late April. Based on this material and negotiations conducted with the parties throughout the first quarter of 1999, the master submitted to the parties on May 12, 1999 his supplementary recommendations on staffing ratios and administrative segregation.

The extensions granted to parties were silent about whether the master should file his supplementary report with the court. Because the parties are to file objections to both the original and the supplementary reports, and because the supplementary recommendations specifically supersede those contained in the original report, the master accordingly files his May 12, 1999 Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation with the court.

Respectfully submitted

J. Michael Keating, Jr.
Special Master

May 18, 1999

## DECLARATION OF SERVICE BY MAIL

Case Name: Ralph Coleman, et al. v. Pete Wilson
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM

I am employed in the County of Providence, Rhode Island. I am over the age of 18 year and not a party to the within entitled cause: my business address is Little Bulman & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

On May 18, 1999, I served the attached

### NOTICE OF FILING OF SPECIAL MASTER'S SUPPLEMENTAL RECOMMENDATIONS ON STAFFING RATIOS AND ADMINISTRATIVE SEGREGATION

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped with postage thereon fully prepared in the United States Mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
Eastern District of California
501 I Street
Sacramento, CA 95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
501 I Street, 8th Floor
Sacramento, CA 95814

Haven Gracey, Esq.
Senior Staff Attorney to
Chief Magistrate John F. Moulds
U.S. District Court
Eastern District of California
501 I Street, 8th Floor
Sacramento, CA 95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

i

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

Pamela L. Smith-Steward, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on May 18, 1999.

*Donna Zografos*

jmk\mastering\cert.doc

ii



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

vs.            No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

## SUPPLEMENTARY RECOMMENDATIONS OF THE SPECIAL MASTER ON STAFFING RATIOS AND ADMINISTRATIVE SEGREGATION

On November 16, 1998, the master filed with court and parties a report and an initial set of recommendations on staffing ratios approving the defendants' current mental health staffing ratios for reception, MHCB (Mental Health Crisis Bed) units, EOP (Enhanced Outpatient Program) and the PSU (Psychiatric Services Unit) at Pelican Bay State Prison. The report also recommended specific increases in the staffing of the defendants' 3CMS (Correctional Clinical Case Management System) program and urged the court to require the defendants to adopt for budgetary and staffing purposes a so-called prevalence rate accurately reflecting the actual percentage of CDC inmates in need of mental health services. Finally, the report suggested a postponement of a judgment on the adequacy of the defendants' staffing ratios for administrative segregation pending a full report on mental health services in administrative segregation then underway.

On December 31, 1998, the special master filed with the court and the parties his report on the delivery of mental health services in administrative segregation, which identified significant deficiencies in the treatment of EOP and 3CMS inmates in administrative segregation. His recommendations included an expansion of mental health clinical staff in administrative segregation, the continued development of a PSU at the California State Prison at Sacramento (CSP/SAC) and the articulation of a plan for training personnel in the effective use of recently introduced procedures for providing information on the mental health status of seriously mentally disordered inmates in the adjudication of disciplinary infractions.

Almost immediately after the first of these two reports was filed, the parties commenced negotiations on efforts to address staffing deficiencies. The defendants, in particular, agreed with the master's finding and recommendation on the need to expand the staffing of mental health services at a rate commensurate with actual demand for such services in CDC. The defendants have requested through the budgetary process for FY 1999-2000 sufficient staffing allocations to meet the mental health needs of all seriously mentally disordered inmates on the mental health caseload, with annual updates to ensure that future staffing matches changing needs. If this initiative, always subject to the possible vagaries of the legislative budgetary process, is ultimately successful, CDC's mental health staffing, as of the date of approval of the State budget, will be based on a 10.6 percent prevalence rate. The rate is scheduled to increase to 11.1 percent as of January, 2000.

2

This encouraging development stands to address directly one of the trio of staffing difficulties affecting the defendants. Its adoption would mean that the chronic 15 to 20 percent shortfall between capacity and the population of the defendants' various mental health programs could be erased. Other staffing difficulties include staffing ratios and vacancies, both of which the defendants are working to address. Vacancies are the subject of a separate report, due to be submitted to the court by the master in the next few days. Staffing ratios are the subject of the supplementary recommendations in this report.

The master's initial recommendations on staffing ratios focused almost exclusively on the defendants' 3CMS program. Staffing ratios for the 3CMS program provided a half-time psychiatrist for up to 300 inmates and a case manager, typically either a psychologist or a psych social worker, for each 100 inmates. In the opinion of the master's psychiatric experts, this staffing ratio was inadequate to provide all of the services mandated in the defendants' 3CMS Program Guide, provisionally approved by the court in mid-1997. The master's November 16,1998 report spelled out the reasons for this conclusion in depth, which do not need to be repeated here. The observations and findings of the master's monitors and experts in the monitoring round completed at the end of 1998, as well as in the current round of review now underway, confirm those earlier findings.

One principal cause for the inadequacy of 3CMS clinical resources identified in both the master's November report on staffing ratios and the December report on administrative segregation was the need for case

3

managers and psychiatrists to provide services not just to their respective voluminous caseloads in the general population, but also to inmates from their caseloads transferred for whatever reason to administrative segregation. The program guide for the delivery of mental health services in administrative segregation, in turn, requires case managers to visit these inmates weekly, provide individual counseling as required, participate in ICC and IDTT proceedings and prepare appropriate treatment and discharge plans. Not surprisingly, the stress of transfer to administrative segregation often reflects and frequently creates complicating difficulties for seriously mentally disordered inmates, involving anxiety and decompensation, non-compliance with medication and the need for intensive medication monitoring and adjustment. Not infrequently, removal to administrative segregation elevates an inmate from the general run of a case manager's and a psychiatrist's caseload to the neediest inmate/patient of all. The current practice of requiring 3CMS case managers and psychiatrists to provide services to inmates from their caseload transferred to administrative segregation simply does not work. Even in those instances where needed services are delivered in administrative segregation, the cost is often the neglect of other 3CMS inmate/patients in the general population.

The defendants responded to the master's proposal for an increase in the ratios of clinical staff for the 3CMS program with an alternative plan to bolster mental health staffing in all administrative segregation units throughout the system. The proposal included the following elements:

> 1. Expansion of the current five-day weekly coverage in each administrative segregation unit by a psych tech to seven days

4

by adding a 0.61 psych tech position to each of the 30 positions now authorized to provide the daily week-day coverage.

2. The allocation of a half-time psychiatrist to each administrative segregation unit.

3. The allocation of a full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed.

4. The addition of another full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities.

5. The allocation of a full-time clerical position to support the work of the administrative segregation clinical team.

The defendants also proposed an enhancement of a full-time case manager (psychologist or psych social worker) for every nine EOP inmates in administrative segregation, with a goal of providing ten hours a week of structured therapeutic activities for EOP inmates in administrative segregation units. The proposal, with enhancements, totals some 100 clinicians, 30 clerical workers and 60 custody staff (two per administrative segregation unit) to provide the physical custody presence and supervision required to deliver services.

The numerical differences between the master's initial recommendations for increasing staffing ratios for the 3CMS program and the defendants' alternative proposal focusing on administrative segregation are not substantial, nor are they easy to summarize. Under the master's proposed changes to staffing ratios for 3CMS, a total of 80.6 psychiatrists would be required to meet the 1:175 ratio for the 14,105 inmates actually on the 3CMS caseload on March 12, 1999 (the latest figures available). Other programs collectively require 36.82 psychiatrists (EOP: 17.82, based on the March 12, 1999 population of 1,782

5

EOP inmates; MHCB: 17.0, based on 17 MHCB units; and PSU: two for Pelican Bay). The PSU being introduced at CSP/SAC will have its own additional staffing; the CMF transition plan presently calls for an allocation of 12 psychiatrists. The total, CSP/SAC's PSU aside, comes to 129.4 psychiatrists.

These figures do not paint the complete picture. The defendants' current 3CMS staffing formula includes a variety of staffing enhancements that dictate additional psychiatric positions in designated situations. See Exhibit A. The application of these institutionally specific enhancements to March 12, 1999 caseloads results in a requirement for 27 additional psychiatrist positions, including eight for reception centers; eight for the Corcoran and Pelican Bay SHUs (Security Housing Units); seven for Level IV facilities; and four for EOP institutions. The master's proposed new staffing formula for 3CMS did not address explicitly these supplemental enhancements. It sought, rather, to replace and simplify the existing formula, but also recognized implicitly the need for at least some of the enhancements. If all of the enhancements are added to the 129.4 total psychiatrist positions identified above as necessary to staff all of the defendants mental health programs, the number of required psychiatrists increases to 156.4.

The defendants currently have 135.5 allocated psychiatrist positions, including 23.5 chief psychiatrists, nine senior psychiatrists and 103 staff psychiatrists. The addition of 15 psychiatrists pursuant to the defendants' proposal would bring the number to 150.5, just six positions shy of the master's suggested total. The defendants' figures do not reflect the as yet unrealized increases that will flow from the change in the prevalence rate from the present

6

nine percent to 10.6 percent, once the FY99-00 budget is approved, nor do they recognize the largely administrative role of chief psychiatrists.

The master's recommendations for a change in the 3CMS staffing formula suggested the need for a total of 189.06 case managers, based on a 3CMS population of 14,105 (one case manager per 75 3CMS inmates), plus 14.5 enhancements for the women's and hub camp facilities, for a total of 203.56 case managers. The defendants currently authorize 345 case manager (psychologists and psych social workers) positions. Other programs require 163 case managers (MHCB: 51; EOP: 62; and reception: 50). Under the defendants' proposal, full case manager staffing for all 3CMS inmates in the caseload pursuant to the present formula requires 155.5 case managers (141 for 14,105 3CMS inmates, plus 14.5 enhancements). The addition of 30 case managers for administrative segregation units would bring the total to 185.5 or within 18 positions of the total recommended by the master.

These numbers may suggest more precision than the reality justifies, but the point is that the numerical difference between what the defendants proposed and the master suggested are not substantial. The real difference lies in the use to which the defendants seek to put the reinforcements. They argue persuasively that by relieving 3CMS clinicians of responsibility for inmates in administrative segregation and meeting actual prevalence rates, psychiatrists and case managers will be much better able to meet program guide requirements for services for 3CMS inmates. They deserve a chance to implement their plan and prove their argument.

7

More importantly, the defendants' plan seems to address more directly the serious deficiencies in mental health services provided in administrative segregation cited by the master. As of March 12, 1999, three administrative segregation units in CDC housed more than 60 seriously mentally disordered inmates. The largest of those, San Quentin with 22 EOP and 82 3CMS inmates, would be entitled under the defendants' proposal to an enhancement of two case managers for its EOP population. A clinical staff of a half-time psychiatrist, a full-time case manager and two full-time psych techs arguably is adequate to meet program guide requirements for the roughly 30 to 35 seriously mentally inmates typically housed in an administrative segregation unit. It certainly represents a quantum leap in improvement over clinical resources currently dedicated to administrative segregation. Again, the defendants deserve an opportunity to implement their plan and prove its worth.

Although the actual number of clinicians added in the two proposals is not radically different, acceptance of the defendants' proposal would leave intact one element of the defendants' staffing formula that is deeply troubling to the master's psychiatric experts. Under the current 3CMS staffing ratio a half-time psychiatrist may be required to assess, monitor and review medication of and treat as many as 300 inmates; a full-time psychiatrist may be responsible for as many as 600 3CMS inmates. For a system that relies so heavily, at least heretofore, on medication for the treatment of seriously mentally disordered inmates, that ratio is simply inadequate.

The inadequacy, moreover, is not just theoretical. In SCC (Sierra Conservation Camp), where the 3CMS population regularly hovers around 300, a

8

half-time psychiatrist, exceedingly competent and dedicated, simply cannot meet program requirements for the caseload. At ASP (Avenal State Prison), where a recently acquired full-time, competent and dedicated contract psychiatrist provides psychiatric services for a 3CMS population that regularly exceeds 600 inmates, program guide requirements cannot be met. The addition of a half-time psychiatrist pursuant to the defendants' proposal might help to lighten somewhat the loads of the psychiatrists in both of these facilities, where the population of seriously mentally disordered inmates in administrative segregation is typical (ASP) or low (SCC).

The defendants respond, in part, with the observation that overall clinical deficiencies, which they feel they are on the threshold of conquering, have tended to skew the department's treatment of seriously mentally disordered inmates in the direction of over-reliance on medication, a trend they hope to correct with a greater emphasis on psychotherapy made possible through acquisition, at last, of adequate clinical staffing.

The master, nonetheless, remains unwilling to ratify permanently a staffing formula for 3CMS that endorses a ratio of one psychiatrist for up to 600 inmates in the program. Instead, he recommends provisional approval of the defendants' current staffing ratio for all positions in the 3CMS program except for psychiatrists, with the reservation of a final recommendation on staffing requirements for psychiatrists program for six months to give the defendants an opportunity to engage and deploy their additional staff resources and the master an opportunity to gauge whether the additional resources suffice to allay continuing concerns about compliance with program guide requirements.

9

As indicated in the master's earlier report on administrative segregation, the provision of services to seriously mentally disordered inmates housed in these units is only part of the solution. The other part consists of keeping seriously mentally disordered inmates out of administrative segregation as often as possible and moving them out of administrative segregation as rapidly as possible once they are housed there. The defendants have taken steps to limit the number of seriously mentally disordered inmates in administrative segregation, but the results to date are, at best, mixed.

Since the master's report on administrative segregation was filed, the defendants completed a survey on the use of new procedures to encourage input into the adjudication process for disciplinary infractions, the 115 process, of information on the mental health status of seriously mentally disordered inmates or inmates who appear to be behaving irrationally at the time of the infraction. The survey indicated that more work needed to be done before the procedures can have their anticipated impact and confirmed the master's recommendation that the defendants develop a plan for training mental health staff, staff assistants and hearing officers involved in the 115 process for adjudicating rule violations.

Both plaintiffs and the master have expressed concern about the appropriateness of delivering mental health services in administrative segregation to seriously mentally disordered inmates, particularly to EOP inmates or to any mentally ill inmates for long periods of time. The defendants' response to this concern has been, in part, a willingness to explore the feasibility of consolidating in a few institutions the bulk of long-term EOP and 3CMS inmates in

10

administrative segregation. Of 399 EOP and 3CMS inmates who, as of March 12, 1999, had spent more than 90 days both in administrative segregation and on the mental health caseload, all but 128 were housed in CSP/Corcoran (mostly 3CMS inmates), Pelican Bay (mostly EOP inmates) or San Quentin (death row). Of the 128, only 13 were EOP inmate/patients. Most of these 128 appeared to be inmates whose intra-institutional offenses were referred to local district attorneys for prosecution. The addition of the 64-bed PSU unit in CSP/SAC should permit some further consolidation of seriously mentally disordered inmates presently housed for long periods in administrative segregation units.

    The method adopted by the defendants to limit the stay of seriously mentally disordered inmates in administrative segregation, namely, the aggressive participation of mental health clinicians in ICC hearings in administrative segregation, has yet to live up to its potential. In a few institutions, characteristically where the relations between custody and mental health staffs are most cooperative, inmates who fail to comply with their medication and decompensating inmates are relatively quickly relocated within the institution or transferred elsewhere. The key here is often also the ability of the local mental health staff to exploit aggressively opportunities and channels for the referral of inmates who need a higher level of care to appropriate programs and institutions. More often than not, the status of the critical relationships between custody and mental health staffs and between local clinicians and mental health administrators elsewhere is a function of institutional leadership, rather than plans and policies or resources. The defendants at the institutional level

need to work on this piece of the solution to the extended tenure of seriously mentally disordered inmates in administrative segregation.

The master's initial report on staffing ratios also addressed clerical staffing for the 3CMS program, suggesting a ratio of one clerical worker for each four clinicians in this program, which embraces roughly 80 percent of the defendants' entire mental health caseload. Adoption of the suggested staffing ratio for administrative segregation, with its inclusion of 30 clerical positions, would bring the ratio of clinicians, including all psychiatrists, psychologists, psych social workers, therapists, psychometrists and psych techs, to one clerical worker for each 4.6 clinician. If the clinician category were expanded to include nurses, MTAs and pharmacists, the ratio would be one clerical worker for each 5.1 clinicians. It is difficult, if nor impossible, to track within each institution the division of clerical duties among different levels of care, but presumably sheer numbers would require a much greater proportion of clerical support to local 3CMS programs. The master is willing at this point to accept the defendants' allocation of clerical positions.

### Recommendations

The special master makes the following recommendations, which incorporate and supercede those made earlier in the November report on staffing ratios and December report on administrative segregation:

1. The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS programs should be provisionally approved by the court, with the exception of the existing ratio of psychiatrists to

12

inmates in the 3CMS program, which the master suggests should be subject to further review.

2. The court should direct the defendants to adopt and implement within 90 days the staffing ratio for administrative segregation described in this report.

3. The court should direct the defendants to adopt an actual prevalence rate of 10.6 in their FY 99-00 budget and a prevalence rate of 11.1 percent as of January 1, 2000. Thereafter, the defendants ought to be required to review and adjust the projected prevalence figure annually based on the then current actual prevalence rate.

4. The defendants should be directed to develop and implement a plan to train mental health staff, staff assistants and hearing officers involved in the new policy on mental health input into the adjudication of disciplinary infractions, the 115 process.

The defendants' adoption of the actual prevalence rate to determine authorized positions and the addition of staffing positions for providing mental health services in administrative segregation are critical elements in advancing the defendants towards full implementation of the program guides and other plans and policies provisionally adopted by the court in mid-1997.

Respectfully submitted,

*J. Michael Keating, Jr.*
J. Michael Keating, Jr.
Special Master

May 12, 1999

13

MENTAL HEALTH SERVICES DELIVERY SYSTEM

| | CCCMS PROGRAM STAFFING (Not cumulative) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | <100 CSLD | <150 CSLD | <200 CSLD | <250 CSLD | <300 CSLD | <350 CSLD | <400 CSLD | <450 CSLD | <500 CSLD | <550 CSLD | <600 CSLD | <650 CSLD |
| MD | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 |
| SR PHD | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| PH.D. | 0 | 0 | 0 | 0 | 0 | 0.5 | 1 | 1 | 1 | 1.5 | 1.5 | 1.5 |
| PSW | | 0.5 | 1 | 1.5 | 2 | 2 | 2 | 2.5 | 3 | 3 | 3.5 | 4 |
| CLERK | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1.5 | 1.5 | 1.5 | 2 |
| TOTAL | 2 | 2.5 | 3 | 3.5 | 4 | 5 | 6 | 6.5 | 7.5 | 8 | 9 | 10 |

### AUGMENTATIONS TO STANDARD CCCMS STAFFING RATIOS (Not cumulative)

1   ADD .5 MD FOR LVL IV INSTITUTIONS (100-500 CSLD) AND 1 MD (501-900 CSLD); or

2   FOR RC INSTITUTIONS ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750; or

3   FOR EOP INSTITUTIONS ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750.
    NOTE: FOR MULTIPLE PROGRAMS (1-3) ADD ONLY FOR 1 PROGRAM.

4   THE ONLY STAFF ALLOCATION FOR CCCMS AT NON-HEAT MED INSTITUTIONS IS: .5 MD AND .5 PHD (<500 CSLD) OR 1 MD AND 1 PHD (501-900 CSLD).

5   FOR SHU INSTITUTIONS ADD 1 PH.D. FOR EACH 300 SHU INMATES
    (CORC SHU CURRENTLY HAS 822 INMATES. 3 ADD'L PH.D..)
    (PBSP SHU CURRENTLY HAS 1572 INMATES. 5 ADD'L PH.D..)

6   FOR WOMEN'S INSTITUTIONS, ADD 1 PH.D. FOR 100-200 CSLD/ 2 FOR 201-300 CSLD/ 3 FOR 301-400 CSLD

7   FOR WOMEN'S INSTITUTIONS, ADD .5 PSW FOR < 200 CSLD/ 1 PSW FOR <300/ 1.5 PSW FOR < 400.

8   FOR CRC, BECAUSE OF THE MISSION OF THE INSTITUTION, WE ANTICIPATE A SMALLER CCCMS CSLD. FOR TOTAL CSLD (MEN AND WOMEN) FOR MED NEEDS ALLOW .5 MD / FOR CASE MANAGEMENT ALLOW 1 PHD AND 1 PSW.

9   FOR CAMP HUB INSTITUTIONS, ADD .5 PH.D.. (CCC & SCC)

10  CLERICAL STAFF:
    UP TO 4.5 CLINICAL STAFF = .5 CLERICAL
    5 - 5.5 CLINICAL STAFF = 1 CLERICAL
    6 TO 7.5 CLINICAL STAFF = 1.5 CLERICAL
    8 OR MORE CLINICAL STAFF = 2 CLERICAL

DISKETTE: 1996/97 EXCEL DOCUMENTS
FILE: CCCMSSTF.XLS
REVISED: 09/25/95