**FILED**

JUL 2 3 1999

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,                    No. CIV S-90-0520 LKK JFM P

   vs.

PETE WILSON, et al.,

      Defendants.                    <u>ORDER</u>
_____/

      Pursuant to court order, on December 24, 1998, the parties submitted a stipulation and proposed order amending the plaintiff class and application of remedy in the above-captioned action. A copy of said stipulation is appended hereto. Good cause appearing, IT IS HEREBY ORDERED that all matters stipulated by the parties are so ordered nunc pro tunc to December 24, 1998.

DATED: July 23, 1999.

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

1

1054

1  PRISON LAW OFFICE
   DONALD SPECTER (State Bar # 83925)
2  General Delivery
   San Quentin, California 94964
3  Telephone (415) 457-9144

4  McCUTCHEN, DOYLE, BROWN & ENERSEN
   WARREN E. GEORGE (State Bar # 53588)
5  Three Embarcadero Center
   San Francisco, California 94111
6  Telephone (415) 393-2000

7  ROSEN, BIEN & ASARO
   MICHAEL W. BIEN  (State Bar # 096891)
8  THOMAS NOLAN (State Bar # 169692)
   155 Montgomery Street, 8th Floor
9  San Francisco, California 94104
   Telephone (415) 433-6830
10
   HELLER, EHRMAN, WHITE & McAULIFFE
11 RICHARD L. GOFF (State Bar # 36377)
   701 Fifth Avenue
12 Seattle, WA 98104
   Telephone (206) 447-0900
13
   DISABILITY RIGHTS AND EDUCATION DEFENSE FUND
14 2212 6th Street
   Berkeley, California 94710
15 Telephone (510) 644-2627

16 Attorneys for Plaintiffs

17          IN THE UNITED STATES DISTRICT COURT

18              EASTERN DISTRICT OF CALIFORNIA

19
   RALPH COLEMAN,                ) No. Civ S 90-0520 LKK-JFM
20                               )
            Plaintiff,           ) **STIPULATION AND ORDER AMENDING**
21                               ) **PLAINTIFF CLASS AND APPLICATION**
   vs.                           ) **OF REMEDY IN COLEMAN**
22                               )
   PETE WILSON, et al.,          )
23                               )
            Defendants.          )
24 _____ )

25

26

27

28

ORIGINAL
FILED

DEC 24 1998

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

STIPULATION AND ORDER AMENDING PLF CLASS AND
APPLICATION OF REMEDY IN COLEMAN

489\3\PLEADING\
STIP-8.602

1    It is hereby stipulated between defendants Pete Wilson,
2    Governor of California, Thomas Maddock, Secretary of the
3    California Youth and Adult Corrections Agency, Cal Terhune,
4    Director of the California Department of Corrections, Susann
5    Steinberg, M.D., Deputy Director of the Health Care Services
6    Division, and Marjorie Tavoularis, M.D. Chief of Mental Health
7    Services for the Department of Corrections, by their counsel
8    Daniel E. Lungren, Attorney General of California, Bruce M.
9    Slavin, Deputy Attorney General and plaintiffs Ralph Coleman, and
10   all other members of the plaintiff class, by their counsel Prison
11   Law Office, Donald Specter, Rosen, Bien & Asaro, Michael Bien,
12   McCutchen, Doyle, Brown and Enersen, Warren George, Heller,
13   Ehrman, White and McAuliffe, Richard L. Goff, that:

14       1.    The parties stipulate and agree that all Findings and
15   Recommendations and Orders issued in this action apply to
16   prisoners and conditions at the California Medical Facility at
17   Vacaville ("CMF") and San Quentin Prison and that this Court has
18   jurisdiction and power to issue relief and orders concerning CMF
19   and San Quentin to the same extent as the Court has jurisdiction
20   and power to do so as to any other California prison.

21       2.    The parties stipulate and agree that the order filed in
22   this case on November 14, 1991, certifying the plaintiff class
23   shall be amended as follows:

24       The plaintiff class consists of all inmates with
25       serious mental disorders who are now, or who will in
26       the future, be confined within the California
27       Department of Corrections.

28

1        3.    Defendants will dismiss, no later than ten days after

2 final approval of the dismissal of <u>Gates</u>, all pending appeals in

3 <u>Coleman</u> with prejudice and will agree not to appeal, at any time,

4 from any now existing orders of this Court. These include: the

5 September 13, 1995 finding of liability (appeal No. 97-16622);

6 the February 21, 1997 interim fee order (appeal No. 97-16622);

7 the July 12, 1996 order concerning special master compensation

8 under the PLRA (appeal No. 97-16622); the September 30, 1997

9 order holding the PLRA inapplicable to plaintiffs' post-April

10 1996 attorneys' fees and expenses (appeal No. 97-17014); the June

11 27, 1997 order approving the remedial plan (appeal No. 97-16622).

12        4.    Defendants hereby waive any rights to assert any

13 limitations on the powers or compensation of the Special Master

14 based on the now existing provisions of the Prison Litigation

15 Reform Act, 18 U.S.C. §3626, <u>et seq.</u>.

16        5.    Defendants agree to comply with the existing Court

17 orders in <u>Gates</u> and <u>Coleman</u> concerning compensation to

18 plaintiffs' counsel for their reasonable legal fees and expenses

19 for all work performed until the case is dismissed by the Court.

20 Plaintiffs waive any right to seek further increases in hourly

21 rates in <u>Gates</u>. Defendants further agree to waive any right to

22 recoupment, refund or set-off for fees and expenses that have

23 been paid or will be paid to plaintiffs' counsel in <u>Gates</u> or

24 <u>Coleman</u> for any reason, including, but not limited to, the PLRA,

25 up to and including the end of the quarter in which the <u>Gates</u>

26 case is dismissed by the Court. Defendants agree to continue to

27 comply with the <u>Coleman</u> Court orders concerning compensation of

28 plaintiffs' counsel from that date forward, but reserve the right

1   to seek recoupment, refund or set-off, based on the PLRA,
2   beginning with fees paid for work performed on the first day of
3   the quarter following dismissal of the <u>Gates</u> case.  In the event
4   plaintiffs' counsel are required to refund any part of the fees
5   paid to them in <u>Coleman</u>, defendants agree that the payment can be
6   made over the course of a year.  The parties agree to be bound by
7   the decision of the Ninth Circuit in <u>Madrid v. Gomez</u>, No. 97-
8   16237, when final, as to the application of the PLRA for
9   monitoring work, assuming the Supreme Court has not held to the
10  contrary in another case.

11      6.   Defendants agree that they will not bring any motion to
12  terminate relief governing CMF under the PLRA, 18 U.S.C. §3626,
13  until two years after this Court issues an order approving
14  defendants' transition plan for CMF required by this stipulation
15  and order.

16      7.   The parties stipulate and agree that this Court and the
17  special master have the power and duty to monitor and report on
18  defendants' suicide prevention program, the incidence of suicide
19  and any related issues concerning suicides in the CDC.

20      8.   The parties stipulate and agree that this Court and the
21  special master will have the power and duty to evaluate and
22  approve, monitor and report on the following issues at CMF only:

23          a.   Defendants' design and implementation of a quality
24  assurance program for medical care at CMF, including the need for
25  problem lists.  Defendants agree to prepare a remedial plan
26  within ninety (90) days of the date of this Order.

27          b.   Defendants' provision of a Medical Officer of the
28  Day (MOD) at all times at CMF.

1          c.    Defendants' provision of a Psychiatric Officer of

2    the Day (POD) at all times at CMF.

3          9.    The parties are concerned about the capacity of the

4    Special Master to take on the significant additional

5    responsibilities for monitoring at CMF.  In addition, the parties

6    wish to assure continuity and consistency in the monitoring of

7    existing policies and procedures at CMF.  Therefore, the parties

8    have requested and the Special Master has agreed to increase his

9    staffing of the case (including an increase in mental health

10   professionals) to assure appropriate and timely monitoring.  The

11   defendants and the Special Master also agree to routinely provide

12   plaintiffs' counsel with copies of any documents provided to the

13   Master by defendants, and to give plaintiffs' counsel notice of

14   any prison tours or visits immediately upon scheduling the same

15   with defendants.  Defendants agree to retain and staff the

16   Compliance Office at CMF in the same manner as it is currently

17   staffed and operated until such time as the private settlement

18   agreement is of no force or effect and the transition plan for

19   CMF has been approved, or the Special Master recommends a change.

20   The parties and the Special Master agree that quarterly

21   monitoring of CMF shall continue until the transition plan is

22   approved and that, during the period of implementation of the

23   transition plan, monitoring will require at least two

24   comprehensive tours and reports per year for the first two years.

25                          CMF TRANSITION PLAN

26        10.    No later than ninety (90) days after this Court's

27   approval, after the fairness hearing, of the merger and dismissal

28   of the <u>Gates</u> consent decree, defendants shall develop a

1  comprehensive transition plan for CMF.  The plan shall address

2  the following issues:

3          A.          Individual assessments will be performed of the

4                following categories of CMF prisoners in order to

5                ensure proper clinical placement of class members at

6                CMF or some other CDC facility in an existing Mental

7                Health Services Delivery System program or some other

8                new program which is determined to be needed to meet

9                the needs of the reassigned class members.  The

10               categories are as follows: prisoners who are currently

11               receiving any form of mental health treatment

12               (including, but not limited to, individual or group

13               therapy, suicide observation and psychotropic

14               medication); prisoners who are currently classified I,

15               J, K, T, U, Psych Eval, CCCMS, or EOP; prisoners who

16               are currently housed in the OPP, including the intake

17               unit.  The plan will require that discharge summaries

18               and recommendations for further evaluation or treatment

19               accompany each class member transferred from the CMF

20               OPP.  The plan will also require that any transfer of a

21               prisoner in need of further mental health treatment

22               take into account the actual staffing, resources and

23               capacity of the receiving prison to address the needs

24               of the mentally ill prisoner.

25         B.          The plan shall also address the clinical and

26               custodial staffing of CMF, and changes to the staffing

27               that will occur as CMF is brought into conformity with

28

1          CDC's statewide Mental Health Care Services Program,

2          including a time line for any changes.

3     C.      The plan shall also address the specific mental

4          health programs that will remain at CMF, including the

5          clinical staffing, clinical administrative staffing,

6          custodial staffing and the prisoner population of each

7          program.  These programs will include, at minimum, the

8          following: the DMH inpatient programs (at CMF and at

9          Atascadero State Hospital) and the DMH Day Treatment

10         Program at CMF; a psychiatric intake unit; a CCCMS

11         program; an EOP program; a mental health program to

12         address the needs of the HIV population at CMF; and

13         short term psychiatric crisis care for CMF prisoners by

14         admission to the DMH acute inpatient psychiatric

15         program at CMF.

16    D.      The plan shall specifically address the treatment,

17         housing and security issues raised by the prisoners

18         housed in the IOC (or "third floor") locked units at

19         CMF as a group.  The plan shall address the treatment

20         and housing required for all of these prisoners.

21    E.      The plan shall also address the use of Willis Unit

22         for housing prisoners with mental illness.

23    F.      The plan shall address the housing and clinical

24         needs of prisoners discharged from the DMH inpatient

25         units at CMF and Atascadero State Hospital, including

26         the maintenance of prisoners on psychotropic

27         medications, such as Clozapine, initiated by DMH.

28

G.      The plan shall be developed in consultation with the <u>Coleman</u> Special Master and his experts, and plaintiffs' counsel. The Special Master shall be assisted by consultants familiar with CDC and CMF mental health issues in the development and evaluation of the transition plan.  The parties shall negotiate in good faith, with the assistance of the Special Master, to resolve any disputes concerning the adequacy of the transition plan.  The transition plan, including any recommendations on unresolved issues, shall be submitted by the Special Master to this Court for approval.  The standard to be applied in evaluating the adequacy of the transition plan is whether it addresses each of the elements set forth in this section and whether the plan satisfies Eighth Amendment remedial standards.

11.   The parties stipulate and agree that no clinical or custodial resources shall be removed from CMF without the approval of this Court which shall address clinical and custodial staffing requirements.  Defendants, including the Department of Mental Health, will continue to comply with all <u>Gates</u> orders and procedures governing mental health care until the transition plan is approved in the <u>Coleman</u> case.  This Court may fully enforce these Orders in the <u>Coleman</u> case unless and until the transition plan for CMF is approved.  Attached hereto as Exhibit <u>1</u> are the applicable <u>Gates</u> orders, plans and procedures that the parties agree will remain in effect and fully enforceable by the Court in <u>Coleman</u>.

1    Dated: June 17, 1998

2

3    Attorneys for Plaintiffs:              Attorneys for Defendants:

4

5    PRISON LAW OFFICE                      DANIEL E. LUNGREN
6    DONALD SPECTER                         Attorney General
     General Delivery                       PETER J. SIGGINS
7    San Quentin, CA 94964                  Senior Asst. Attorney General
                                            BRUCE M. SLAVIN
8                                           Deputy Attorney General

9

10   ROSEN, BIEN & ASARO
     MICHAEL W. BIEN
11   155 Montgomery St., 8Th Floor
     San Francisco  CA  94104

12

13   McCUTCHEN, DOYLE, BROWN &
     ENERSEN
14   WARREN GEORGE
     Three Embarcadero Center
15   San Francisco  CA  94111

16   HELLER, ERHMAN, WHITE &
     McAULIFFE
17   RICHARD L. GOFF
     701 Fifth Avenue
18   SEATTLE, WA 98104

19

20

21

22

23

24

25

26

27

28

489\3\PLEADING\
STIP&.602

9

STIPULATION AND ORDER AMENDING PLF CLASS AND
APPLICATION OF REMEDY IN COLEMAN

1

**ORDER**

2

3          Based upon the foregoing stipulation of the parties,

and good cause appearing, IT IS SO ORDERED.

4

5          Dated:

6

7                                    _____

                                     LAWRENCE K. KARLTON
                                     Chief Judge Emeritus
8                                    United States District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND ORDER AMENDING PLF CLASS AND
APPLICATION OF REMEDY IN COLEMAN

Part V.F. of the Consent Decree, attached hereto, remains in effect except to the extent modified by the attached orders and subject to the construction and interpretation by the Ninth Circuit Court of Appeals in the following published opinions: <u>Gates v. Rowland</u>, 39 F.3d 1439 (9th Cir. 1994); <u>Gates v. Gomez</u>; 60 F.3d 525 99th Cir. 1995); <u>Gates v. Shinn</u>, 98 F.3d 463 (9th Cir. 1996).

Michael W. Bien

Bruce M. Slavin

1  McCUTCHEN, DOYLE, BROWN & ENERSEN
   WARREN E. GEORGE (State Bar # 053588)
2  Three Embarcadero Center
   San Francisco, CA 94111
3  Telephone:  (415) 393-2000

4  PRISON LAW OFFICE
   DONALD SPECTER (# 83925)
5  MILLARD MURPHY (# 124451)
   Freedom Mall, Main Street
6  San Quentin, CA 94964
   Telephone:  (415) 457-9144

7  BROBECK, PHLEGER & HARRISON
8  MICHAEL W. BIEN (# 096891)
   Spear Street Tower
9  One Market Plaza
   San Francisco, CA 94105
10 Telephone:  (415) 442-0900

11 Attorneys for Plaintiff Class

12 JOHN K. VAN DE KAMP, Attorney General
      of the State of California
13 RICHARD B. IGLEHART, Chief Assistant
      Attorney General
14 JAMES E. FLYNN (# 61139)
   Deputy Attorney General
15 JAMES B. CUNEO (# 37423)
   Deputy Attorney General
16 1515 K Street, P. O. Box 944255
   Sacramento, CA 94244-2550
17 Telephone:  (916) 323-1976

18 Attorneys for Defendants

ROSEN & PHILLIPS
SANFORD JAY ROSEN (# 062566)
PAUL A. Di DONATO (# 124962)
SAMUEL R. MILLER (# 138942)
155 Montgomery Street, 8th Floor
San Francisco, CA 94104
Telephone:  (415) 433-6830

ACLU FOUNDATION OF NORTHERN
  CALIFORNIA, INC.
MATTHEW A. COLES (# 076090)
1663 Mission Street
San Francisco, CA 94103
Telephone:  (415) 621-2493

Attorneys for Plaintiff Subclass

19                UNITED STATES DISTRICT COURT

20            EASTERN DISTRICT OF CALIFORNIA

21 JAY LEE GATES, et al.                   )
                                           )
22                    Plaintiffs,          )   No. CIV S-87-1636 LKK-JFM
                                           )
23          v.                             )
                                           )   **CONSENT DECREE**
24 GEORGE DEUKMEJIAN, et al.,              )
                                           )
25                    Defendants.          )
   _____)

26

27 / / /

1   in work, exercise, educational, and vocational programs available
2   at CMF, consistent with the requirements of section 504.   A
3   disabled inmate will not be deemed unqualified to participate
4   because he is physically unable to participate for a full work
5   day or because access to the program area requires that the
6   inmate be searched.

7          17.   Defendants shall review the existing prerelease
8   program for disabled inmates to determine whether it provides
9   them with appropriate information and assistance to meet the
10  special needs of those inmates following release and report on
11  the results.

12  V.   MENTAL HEALTH ISSUES

13       A.   SUICIDE

14          1.   Defendants agree to provide appropriate suicide
15  prevention programs at CMF.

16          2.   Defendants shall develop a plan by March 31, 1990
17  regarding suicide prevention programs at CMF.   The plan will
18  address the following issues:

19               a.   Training of medical, custodial and
20  psychiatric staff;

21               b.   Inclusion in orientation programs of
22  materials concerning suicide prevention;

23               c.   Review of current policies and practices
24  concerning the use of 5-point restraints, isolation and strip
25  cells;

26               d.   Programs for identification, counseling,
27  treatment and hospitalization of prisoners at risk for suicide,

14.

1   including those prisoners believed by a psychiatrist or
2   psychologist to be serious suicide risks who are not admitted to
3   the DMH Unit;

4               e.    Reporting of suicide attempts, suicidal
5   expressions and suicidal gestures to prison officials and
6   psychiatric staff;

7               f.    Appropriate housing for suicide risk
8   prisoners.

9         3.    Defendants shall prepare a report to the Mediator
10  which sets forth defendants' plan to address any identified
11  dericiencies in the suicide prevention program including dates
12  for implementation of any new programs (no later than July 31,
13  1990).

14        4.    Defendants will report to the Mediator
15  periodically the following information:

16              a.    For each prisoner that commits suicide, the
17  following information: name, CDC number, housing unit,
18  classification, and copies of incident reports concerning death,
19  autopsy and coroner's report, death certificate, central,
20  psychiatric and medical file for last three months;

21              b.    Monthly statistics showing the number of
22  suicide attempts; the name, housing unit and classification of
23  each prisoner attempting suicide; incident reports on attempted
24  suicides.

25    B.    PSYCHIATRIC OFFICER OF THE DAY

26        1.    There shall be a psychiatrist present at CMF at
27  all times.

1          2.   Defendants shall evaluate by March 31, 1990

2   whether Psychiatric Officer of the Day (POD) coverage by one

3   psychiatrist provides adequate and appropriate psychiatric care

4   for the existing prisoner population.  The evaluation will

5   address the adequacy of the psychiatric care provided to

6   prisoners at CMF and NRC during POD hours.

7          3.   The results of defendants' evaluation shall be set

8   forth in a written report, to be submitted to the Mediator.  The

9   report will contain defendants' plan to address any identified

10   deficiencies in the POD program, including dates for

11   implementation of any new program (no later than July 31, 1990).

12     C.   HIRING AND RETENTION OF PROFESSIONAL STAFF

13          1.   Defendants shall evaluate and report to the

14   Mediator, by not later than March 31, 1990, regarding all issues

15   affecting the hiring and retention of professional staff

16   necessary to provide psychiatric care.  The report will contain

17   defendants' plans, if any, to address the problems of hiring and

18   retaining the professional staff necessary to provide psychiatric

19   care and dates for implementation of the plans.

20          2.   Defendants will report to the Mediator

21   periodically information sufficient to show their level of mental

22   health staffing on a monthly basis including information

23   concerning contract staff.

24          3.   Beginning March 31, 1990, at least seventy-five

25   percent (75%) of all budgeted mental health positions must be

26   filled, on average, within 6 months after establishment of the

27   positions over any six month period.

1        D.   TASERS, RESTRAINTS AND INVOLUNTARY MEDICATION

2             1.   Tasers will not be used to restrain a prisoner to
3    administer involuntary medication.

4             2.   Defendants shall revise by March 31, 1990 their
5    written policies to limit, to the greatest extent possible, the
6    use of Tasers on prisoners with psychiatric classifications or
7    any other prisoner taking antipsychotic medications.  Defendants
8    shall report their revisions to the Mediator.  Defendants'
9    policies must provide for the following:

10                  a.   Custodial staff must confer with a
11   psychiatrist regarding the use of the Taser and such consultation
12   shall be appropriately documented except in an emergency;

13                  b.   The use of a Taser is a last resort.
14   Alternative means of addressing the situation must be considered
15   and the reasons for their rejection stated in writing;

16             3.   Defendants shall provide to the Mediator
17   periodically incident reports, including the record of the
18   psychiatric consultation, concerning each use of the Taser on
19   prisoners with psychiatric classifications.

20             4.   Defendants shall evaluate and report to the
21   Mediator regarding their procedures and practices for the
22   administration of involuntary psychotropic medication in the
23   outpatient units.

24        E.   INPATIENT CARE

25             1.   Defendants will provide appropriate access to
26   inpatient psychiatric care for all prisoners at CMF.

27   ///

17.

1        2.    Defendants will evaluate by March 31, 1990 the

2   following issues concerning inpatient psychiatric care:

3            a.    The utilization of existing inpatient beds at

4   CMF and Atascadero State Hospital (ASH);

5            b.    The appropriateness and operation of the

6   stated admission criteria and exclusionary criteria for the DMH

7   Unit at CMF and ASH including inpatient care for prisoners who

8   refuse medication, for prisoners who are violent, for prisoners

9   with a history of disciplinary problems, for prisoners with

10  chronic mental illness, for prisoners with suicidal tendencies,

11  for prisoners with HIV seropositivity, ARC or AIDS;

12           c.    The operation of the CAT teams.

13       3.    The results of defendants' evaluation will be set

14  forth in a written report, to be submitted to the Mediator.  The

15  report will also contain defendants' plans to address any

16  identified problems and dates for implementation of any plan (no

17  later than May 31, 1990).

18       4.    Defendants will work through the organized medical

19  staff to develop a program for providing privileges to

20  appropriate CMF medical staff to admit patients to the DMH Unit.

21  The program will be implemented by March 1, 1990.

22       5.    Defendants' periodic reports will contain

23  information concerning the monthly utilization of inpatient beds

24  at CMF and ASH, as well as referrals and rejections by those

25  programs and copies of the CAT team referral/rejection reports.

26  ///

27  ///

F.   THE PROVISION OF APPROPRIATE PSYCHIATRIC CARE
     TO ALL PRISONERS AT CMF.

     1.   Defendants will provide appropriate psychiatric screening for each incoming inmate at CMF and will provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated.

     2.   Defendants will prepare and implement a program, to be operational by June 30, 1990, to provide appropriate psychiatric care for prisoners discharged from the inpatient psychiatric programs at CMF and ASH.  The outpatient program as implemented will address the following elements:

          a.   Reducing regression as much as possible by providing appropriate programming and therapies;

          b.   Providing therapeutic programs designed to facilitate increased functioning, participation in prison programming and return to the general population;

          c.   Appropriate monitoring of medications;

          d.   Communication and consultation between inpatient and outpatient psychiatric staff.

     3.   Defendants will improve outpatient psychiatric services.  The program will be implemented in phases.  An interim program will be in effect by June 30, 1990.  Defendants will provide periodic reports to the Mediator concerning the program and its implementation.  The program will be staffed and fully

///

///

///

19.

1  operational by October 31, 1990.  The outpatient program will

2  address the following issues:

3         a.    Staffing levels for psychiatrists,

4  psychologists, social workers, recreational and occupational

5  therapists, nursing staff and custodial staff will be sufficient

6  to provide appropriate access to psychiatric evaluation and

7  treatment programs for all prisoners at CMF requiring such

8  programs;

9         b.    The need for additional staff will be

10  periodically assessed based on the needs of the population of

11  CMF, and defendants will request such funding for additional

12  staffing pursuant to the budgetary processes;

13         c.    Treatment plans will be developed for all

14  prisoners at CMF receiving psychiatric care.  Such plans shall be

15  reviewed and revised at appropriate intervals commensurate with

16  the level of psychiatric care required by the patient;

17         d.    Each prisoner referred to CMF from another

18  institution (or from another unit within CMF) for psychiatric

19  evaluation or treatment shall be examined and evaluated by a

20  member of the clinical staff within 24 hours of his arrival at

21  CMF and provided with appropriate treatment.  A treatment plan

22  for each such prisoner will be prepared by the treatment team

23  within ten days of assignment to a treatment level;

24         e.    Appropriate space and facilities for

25  treatment programs will be provided;

26         f.    Appropriate access to psychiatrists and other

27  mental health professionals will be provided to all prisoners

1  based on their needs.  The special psychiatric needs of prisoners
2  diagnosed with HIV shall be addressed.  All prisoners receiving
3  psychotropic medications will be seen by a psychiatrist at
4  appropriate intervals;

5          g.    Medications will be appropriately monitored
6  and appropriate medical records and charts will be maintained;

7          h.    Each prisoner request to see a psychiatrist
8  or psychologist will be documented in writing and responded to
9  appropriately.

10          i.    Isolation and seclusion in their cells of
11  prioners in need of psychiatric care will be minimized.

12      4.    In an effort to comply with paragraphs 2 and 3
13  above, defendants will implement their Outpatient Program Guide.

14      5.    Defendants will evaluate their program for
15  providing psychiatric evaluation and treatment in October of 1990
16  and report to the Mediator by December 15, 1990.  The Mediator,
17  if necessary, will independently investigate the program, in the
18  determination of the adequacy of defendants' program for
19  providing appropriate psychiatric services.

20      G.    CLASSIFICATION, HOUSING, MANAGEMENT

21      1.    No prisoner shall be "declassified" from any
22  psychiatric classification without a statement in writing from a
23  psychiatrist, made after a psychiatric evaluation including an
24  interview, recommending the declassification.  If a psychiatrist
25  recommends that an inmate be declassified, the prisoner's case
26  manager or treatment team shall describe the need for further
27  treatment, if any.  The declassification recommendation will then

1  be forwarded to the Classification Committee for its
2  recommendation for appropriate placement of the prisoner.

3           Defendants shall develop written standards and
4  procedures for declassification of prisoners and submit a report
5  by March 31, 1990.  Defendants shall provide to the Mediator
6  periodically a copy of the decisions of the Classification
7  Committee and any supporting documents in 25% of the cases in
8  which a prisoner is declassified from Categories J or K.  The
9  reporting rate may be adjusted by the Mediator.  Defendants shall
10 report periodically the total number of prisoners declassified
11 from Categories J and K.

12           2.  All classification procedures, housing decisions
13 and disciplinary actions concerning prisoners with psychiatric
14 classifications must consider the existing psychiatric treatment
15 plan for the prisoner.  Defendants shall develop and implement
16 appropriate written rules and procedures by March 31, 1990.

17           3.  Defendants will evaluate whether and under what
18 circumstances it is appropriate to house prisoners with
19 psychiatric classifications in Willis Unit.  Defendants will
20 prepare and implement a pilot program by June 30, 1990 regarding
21 the housing of inmates with psychiatric classifications in Willis
22 Unit.  Defendants will evaluate and report on the program and the
23 housing of prisoners in psychiatric classifications in Willis
24 Unit by December 15, 1990.  The Mediator, if necessary, will
25 ///
26 ///
27 ///

1 │ conduct an independent investigation.  The program will, at a
2 │ minimum, address the following issues:

3 │             a.    Prisoners with psychiatric classifications
4 │ may not be placed in Willis Unit without prior approval of a
5 │ clinician absent an emergency.  If the clinician approving the
6 │ referral is not a member of the prisoner's existing treatment
7 │ team, he or she must consult after placement with a member of
8 │ that team.   In an emergency a prisoner with a psychiatric
9 │ classification may be placed in Willis Unit without the prior
10 │ approval of a clinician provided that the prisoner is examined
11 │ and approved for such placement by a clinician within 24 hours
12 │ after the placement.  If the clinician does not approve the
13 │ emergency placement, custody staff may request that the case be
14 │ reviewed jointly by the Chief Psychiatrist and Associate Warden.
15 │ The case must normally be reviewed within 24 hours.  If the case
16 │ is not resolved by the Chief Psychiatrist and Associate Warden,
17 │ it may be referred to the Chief Deputy Warden for Clinical
18 │ Services and the Chief Deputy Warden for Operations.  The case
19 │ must normally be reviewed and a written decision made within 24
20 │ hours.  Any written decision of the chief deputy wardens
21 │ concerning the review of a decision to place a particular
22 │ prisoner in Willis Unit will be produced periodically to the
23 │ Mediator.

24 │         The program shall set forth the factors to be
25 │ considered by the clinician in assessing the appropriateness of
26 │ housing the inmate in Willis Unit and the narrow circumstances
27 │ ///

1  justifying an emergency placement without the prior approval of a
2  clinician.

3            b.    Prisoners in psychiatric treatment categories
4  who are housed in Willis Unit shall receive adequate psychiatric
5  care.  The program shall set forth the types and levels of
6  staffing and the psychiatric programs which will be available to
7  prisoners in psychiatric treatment categories in Willis Unit.

8            c.    To the maximum extent possible prisoners in
9  psychiatric treatment categories who are housed in Willis Unit
10 shall be housed separately from other prisoners in that unit.

11           d.    All prisoners with psychiatric
12 classifications housed in Willis Unit as of the date the Consent
13 Decree is filed will be examined individually by a clinician
14 within thirty (30) days concerning the appropriateness of their
15 continued housing in Willis Unit.  Such evaluation shall consider
16 the availability of psychiatric treatment in Willis Unit at the
17 time of the examination.  Defendants shall report to the Mediator
18 the decision reached as to each such prisoner, including a copy
19 of the results of the psychiatric examination.  If the clinician
20 does not approve the continued placement, custody staff may
21 request that the case be reviewed jointly by the Chief
22 Psychiatrist and Associate Warden.  The case must normally be
23 reviewed within 24 hours.  If the case is not resolved by the
24 Chief Psychiatrist and Associate Warden, it may be referred to
25 the Chief Deputy Warden for Clinical Services and the Chief
26 Deputy Warden for Operations.  The case must normally be reviewed
27 and a written decision made within 24 hours.  Any written

1   decision of the chief deputy wardens concerning the review of a

2   decision to continue the placement a particular prisoner in

3   Willis Unit will be produced periodically to the Mediator.

4   VI.  AIDS

5           1.    Within 120 days of the effective date of this

6   agreement, defendants will in good faith develop and begin

7   implementation of a pilot program to determine the feasibility of

8   placing HIV seropositive inmates in a general population program

9   at CMF.  It is the goal of the pilot program to demonstrate that

10  such placement is possible consistent with medical, behavioral,

11  and security considerations.

12          2.    Screening of HIV seropositive inmates for

13  placement in a general population program at CMF during the pilot

14  program will be done on a case-by-case basis through the pilot

15  program's selection criteria.  These selection criteria shall not

16  be binding on any future program.  The pilot program's selection

17  criteria will include the following:

18              a.    Classification score generally not to exceed

19  that of indicated placement in Level III facilities;

20              b.    No documented recent history of assaultive

21  behavior;

22              c.    No documented recent history of sexual

23  behavior of a kind that poses a risk of transmission of the HIV

24  virus;

25              d.    No documented recent intravenous drug use or

26  possession of intravenous drug paraphernalia;

27  ///

1    adoption of a compensation rate and procedure.

2    CONSENTED TO BY THE UNDERSIGNED:

3    FOR THE DEFENDANTS

4    BY:

6    JAMES ROWLAND           EDDIE YLST
       Director                 Warden
7    Department of Corrections     California Medical Facility

9    DR. NADIM KHOURY        KENNETH SHEPARD, M.D.
       Assistant Deputy Director    Chief Deputy Director
10   Health Services          Clinical Services
       Department of Corrections    California Medical Facility

12   DANIEL E. THOR, M.D.      PAUL MORENTZ, M.D.
13   Chief Physician and Surgeon   Chief Psychiatrist
       California Medical Facility    Outpatient Psychiatric Program
14                          California Medical Facility

16   BRUCE BAKER, M.D.        DOUGLAS G. ARNOLD
       Chief Psychiatrist (Acting)   Director (Acting)
17   Northern Reception Center    Department of Mental Health

19   CLYDE MURRAY Murney      SYLVIA BLOUNT
       Deputy Director          Executive Director
20        for State Hospitals    DMH - Vacaville Psychiatric
       Department of Mental Health      Program
21                          Department of Mental Health

22   JOHN K. VAN DE KAMP
       Attorney General
23        of the State of California

24   By:

26   JAMES B. CUNEO         JAMES E. FLYNN
       Deputy Attorney General    Deputy Attorney General
       Attorney for Defendants    Attorney for Defendants

27

1  FOR THE PLAINTIFFS                    FOR THE HIV SUBCLASS

2  BY:                                   BY:

3

4  _Warren E. George_                    _[signature]_

   WARREN E. GEORGE                      SANFORD JAY ROSEN
5  McCutchen, Doyle, Brown               Rosen & Phillips
      & Enersen
6

7  _Cynthia Greco Herr_                  _[signature]_

   CYNTHIA GRECO HERR                    MATTHEW A. COLES
8  McCutchen, Doyle, Brown               ACLU Foundation
      & Enersen                             of Northern California
9

10 _Michael W. Bien_

11 MICHAEL W. BIEN
   Brobeck, Phleger & Harrison
12

13 _Donald Specter_

14 DONALD SPECTER
   Prison Law Office
15

16         WHEREFORE, the parties to this action having agreed to

17 the provisions of the Consent Decree set forth above, and the

18 Court being advised in the premises, this Consent Decree is

19 hereby entered as the JUDGMENT of this Court.

20         IT IS SO ORDERED, this _____ day of _____, 1989 at

21 Sacramento, California.

22

23

24         _____

25         UNITED STATES DISTRICT COURT

26

27

EXHIBIT   1-A

FILED

MAR 1 8 1992

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

     Plaintiff,          No. CIV S-87-1636 LKK JFM P

  vs.

GEORGE DEUKMEJIAN, et al.,

     Defendants.      ORDER

_____/

     Plaintiffs filed a motion for an order to show cause and order of contempt based upon defendants' failure to comply with the staffing requirements for an outpatient psychiatric program at California Medical Facility - Vacaville.  The matter was heard by the United States Magistrate Judge who issued Findings and Recommendations on February 20, 1992.  Neither party filed objections.

     The court finds the Findings and Recommendations to be supported by the record and by the Magistrate Judge's analysis.  Accordingly, IT IS HEREBY ORDERED that:

/////

625

1

AO 72
(Rev 8/82)

1.  The Findings and Recommendations filed February 20, 1992, are adopted in full;

2.  Plaintiffs' motion for an order to show cause and order of contempt is discharged without a finding of contempt; and

3.  The second paragraph of the Findings and Recommendations filed August 19, 1991 and incorporated in the District Court's order affirming the findings and recommendations, is modified as follows:

> Any Outpatient Psychiatric clinical position that is vacant for more than twenty working days shall be filled through overtime, contractual services or redirection.  If defendants provide the services through the use of overtime or redirection, they shall maintain documentation of the overtime hours actually worked.

DATED:  March 17, 1992

/rl:ml

UNITED STATES DISTRICT JUDGE

2



FILED

FEB 20 1992

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

FEB 2 1 1992

9        IN THE UNITED STATES DISTRICT COURT

10       FOR THE EASTERN DISTRICT OF CALIFORNIA

11   JAY LEE GATES, et al.,

12          Plaintiffs,                    No. CIV S-87-1636 LKK JFM P

13      vs.

14   GEORGE DEUKMEJIAN, et al.,

15          Defendants.                    FINDINGS & RECOMMENDATIONS

16   _____/

17          On August 19, 1991, this court first heard plaintiffs'

18   motion for an order to show cause and order of contempt based upon

19   defendants' failure to comply with the staffing requirements for an

20   outpatient psychiatric program.  At the time of the hearing,

21   defendants were ten months late in complying with the deadline

22   which they agreed to in the consent decree which settled this class

23   action.

24          At the hearing, this court considered defendants' evidence

25   indicating that they had recently made a serious, albeit belated,

26   effort to comply with the staffing requirements at issue.

1    In light of this progress, the hearing regarding contempt
2  was continued to October 7, 1991 with further directions to
3  defendants and with recommendations to the District Court suggested
4  by the mediator and approved by this court.  The recommendations
5  were intended to assist the defendants in their efforts to comply
6  with the consent decree.  Apparently not pleased with the
7  assistance, defendants filed objections to the recommendations; the
8  recommendations were, nonetheless, approved and ordered by the
9  district court.

10    At the October 7, 1991 hearing, defendants' counsel averred
11  that defendants were in compliance with the staffing requirements,
12  but failed to provide evidentiary support for the position.  This
13  court then requested that the mediator inquire further concerning
14  compliance and that the mediator also review the language in the
15  second paragraph of the August 19, 1991 findings and
16  recommendations to determine whether it was appropriate to
17  recommend to the district court that it modify its September 26,
18  1991 order.

19    The mediator, who continues to serve this court with great
20  care and diligence, filed his report on November 1, 1991; although
21  given the opportunity to do so, no party has filed objections
22  thereto.

23    This court has read and considered the report of the
24  mediator and adopts it in its entirety.  In light of the evidence
25  submitted to this court and the report of the mediator, IT IS
26  HEREBY RECOMMENDED that:

2

AO 72
(Rev 8/82)

1      1.  Plaintiffs' motion for an order to show cause and order

2  of contempt be discharged without a finding of contempt; and

3      2.  The second paragraph of the Findings and Recommendations

4  filed August 19, 1991 and incorporated in the District Court's

5  order affirming the findings and recommendations, be modified as

6  follows:

7          Any Outpatient Psychiatric clinical position that is
           vacant for more than twenty working days shall be
8          filled through overtime, contractual services or
           redirection.  If defendants provide the services
9          through the use of overtime or redirection, they
           shall maintain documentation of the overtime hours
10         actually worked.

11     These findings and recommendations are submitted to the

12 United States District Judge assigned to the case, pursuant to the

13 provisions of Title 28 U.S.C. § 636(b)(1).  Within ten days after

14 being served with these findings and recommendations, any party may

15 file written objections with the court and serve a copy on all

16 parties.  Such a document should be captioned "Objections to

17 Magistrate Judge's Findings and Recommendations."  Any reply to the

18 objections shall be served and filed within ten days after service

19 of the objections.  The parties are advised that failure to file

20 objections within the specified time may waive the right to appeal

21 the District Court's order.  <u>Greenhow v. Secretary of Health and</u>

22 <u>Human Services</u>, 863 F.2d 633 (9th Cir. 1988).

23 DATED:  February _/8_, 1992.

24

25                                    _____

26 JFM:jm:cw                          UNITED STATES MAGISTRATE JUDGE

                              3

                                            OR - 00550

AO 72
(Rev 8/82)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FILED

FEB 27 1992

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

JAY LEE GATES, et al.,           )
                                 )
        PLAINTIFFS               )        NO. CIV. S-87-1636 LKK-JFM
                                 )
        VS.                      )        Mediator's Findings And
                                 )        Recommendations
GEORGE DEUKMEJIAN, et al.,       )
                                 )
        DEFENDANTS               )
                                 )
_____)

        Plaintiffs' motion for an order to show cause and order
of contempt was heard on August 19, 1991 before United States
Magistrate Judge J.F. Moulds.  Plaintiffs sought an order
of contempt for defendants' failure to comply with the staff-
ing requirements for an outpatient psychiatric program at
the California Medical Facility under the Consent Decree
entered in this case.

        In their opposition defendants presented evidence of
recent recruitment efforts to staff the program.  In light
of this evidence the hearing on plaintiff's motion was con-
tinued to October 7, 1991.  Defendants were directed to file
a report with the Court by October 1, 1991, detailing further
measures undertaken to ensure compliance which would incor-
porate the following recommendations:

        1.  Defendants were directed to fill, or have written
confirmation of acceptance by a qualified candidate, all
positions in the Outpatient Psychiatric Program by October 1,
1991; and

- 1 -

2.   Any Outpatient Psychiatric Program position that is
vacant for more than twenty (20) working days shall be
filled with an equivalent in overtime; contractual services;
or by an individual holding a different job classification
whose training and experience allows him or her to satisfac-
torily accomplish the vacant position's primary duties; when
an individual holding a different classification is used the
individual will not be a staff member already employed by
the Outpatient Psychiatric Program unless such services are
compensated by overtime.

These findings and recommendations were submitted to
the United States District Judge assigned to the case, who,
on September 26, 1991, ADOPTED them in full.

At a further hearing on this matter before the Magis-
trate Judge held on October 7, 1991 defendants presented
their report filed on October 1, 1991 which asserted that they
were in compliance with the staffing  requirements for the
Outpatient Psychiatric Program.  Unfortunately, the report
did not contain any evidence that the defendants were in fact
in compliance, nor did it comply with the Court's requirement
to have written confirmation of acceptance by a qualified
candidate to qualify as a filled or committed position.

After a careful review of the memorandums presented and
oral arguments made the Court requested that the Mediator
present a report by November 1, 1991 which would address the
following issues:

1.   Verification that the required Outpatient Psychia-
tric Clinical staff positions were filled as of October 1,
1991.

2.  Verification that defendants had written commit-
ments from all candidates listed as occupying a position,

but who had not yet reported for work.

3.   Review the second paragraph of the Findings and
Recommendations of August 19, 1991 as incorporated in the
District Court's Order affirming the Findings and Recommenda-
tions, as to whether it should remain, be modified or be
stricken.

It is the intent of the report that follows to apprise
the Court as to the status of these three issues.

A.  Verification that the required Outpatient Psychiatric
Program staff positions were filled as of October 1, 1991.

There are 115.5 clinical and direct support service
positions which are currently required to staff the Outpatient
Psychiatric Program.  These positions were identified by
budget allocation and through the Personnel Office by posi-
tion number.  A staffing report was then developed (to which
parties agreed) and incorporates the following data:

* Class title/position number.
* Type of position - full time, part time, etc..
* Filled or unfilled.  If positions in unfilled
  there will be an asterisk that gives the name of
  person covering on an overtime basis.  All positions
  covered by overtime are full time.
* Name of employee.  If positions is unfilled the
  date on which it became vacant will be included in
  this column.
* Has position been committed?
* Name of person to whom the position has been com-
  mitted.
* Date person to whom the job is committed will report
  for work.
* Written confirmation of commitment on file.

- 3 -

Using the staffing report form, each of the 115.5 positions was listed and the data required was entered for the date of October 1, 1991.  (See Exhibit A.)  An analysis of the data followed which can be summarized as follows:

1.  All Outpatient Psychiatric positions were filled except the Chief, Professional Education, which is not required by the Decree to be filled until December 1, 1991.

2.  Nine positions were not filled by a regular appointed employee, but were filled by qualified CMF staff working on redirection.  Where employees were redirected their positions were filled by overtime utilizing temporary help categories.

3.  Of the nine positions not filled by a regular appointed employee a written commitment had been made to a new potential employee.

4.  Of the nine positions to which written commitments had been made two potential employees had responded affirmatively orally, but had not sent a written confirmation.  Seven potential employees had sent written acceptance of the job offer.  In all cases, however, the vacant positions were covered through redirection of CMF employees.

B.  Verification that defendants had written commitment from all candidates listed as occupying a position, but who had not yet reported for work.

Personnel records were reviewed, and a written acceptance of a job offer was found in all but two cases.  Both of these cases were Psychiatric Technician positions who had orally committed to report to work on an assigned day, but had not responded to letters or telegrams from CMF requesting a written confirmation.  One individual reported for work on schedule, and the other later declined because of a salary

- 4 -

differentiation.   Both positions were covered at all times
by redirection.

C.   Review the second paragraph of the Findings and Recommen-
dations of August 19, 1991 as to whether it should remain,
be modified or be stricken.

The language in the second paragraph was developed to
assist the defendants in utilizing different coverage tech-
niques to assure that all Outpatient Psychiatric positions
required by the Consent Decree were filled.   Some of this
language might be perceived as interference by the Court
into the personnel management of the California Medical
Facility.   Parties carefully reviewed the wording and agreed
to the following modification:

Any Outpatient Psychiatric clinical position that is
vacant for more than twenty working days shall be filled
through overtime, contractual services, or redirection.
If defendants provide the services through the use of
overtime or redirection they shall maintain document-
tion of the overtime hours actually worked.

Accordingly, IT IS HEREBY RECOMMENDED:

1.   That the Court find that all Outpatient Psychia-
tric clinical positions were filled as of October 1, 1991.

2.   That the Court find that the defendants had written
confirmation of acceptance from all but two candidates to
fill vacant positions, and these, and/or all other positions,
were filled through redirection or overtime.

3.   That the Court  modify the second paragraph of the
Findings and Recommendations of August 19, 1991 as incor-
porated in the District Court's Order affirming the Findings

- 5 -

and Recommendations as follows:

Any Outpatient Psychiatric clinical position that is
vacant for more than twenty working days shall be filled
through overtime, contractual services or redirection.
If defendants provide the services through the use of
overtime or redirection, they shall maintain documen-
tation of the overtime hours actually worked.

4.  That the Court order the defendants to submit to
the Monitor a monthly staffing report on Outpatient Psychia-
tric clinical positions utilizing the format of Appendix A.

5.  That plaintiffs' motion for contempt, which is under
submission, be resolved upon submission of this report.

These findings and recommendations are submitted to
the Magistrate Judge assigned to this case.  Instructions
given to parties by the Court at the October 7, 1991 hearing
were to the effect that if either plaintiffs or defendants
had any response to the Mediator's Report they were to file
such in court within 48 hours of filing of this report.

Allen F. Breed
Mediator

November 1, 1991

- 6 -

APPENDIX "A"

CALIFORNIA MEDICAL FACILITY
OUTPATIENT PSYCHIATRIC SERVICES
STAFFING REPORT

REPORT AS OF OCTOBER 1, 1991

| CLASS TITLE/ POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| **CHIEF PSYCHIATRIST** | | | | | | | |
| 076-220-7612-001 | FT | Y | MORENTZ, P. | | | | |
| **SENIOR PSYCHIATRIST** | | | | | | | |
| 076-220-7616-006 | FT | Y | BRICHTA, E. | | | | |
| 076-220-7616-007 | FT | Y | ADLER, R. | | | | |
| **STAFF PSYCHIATRIST** | | | | | | | |
| 076-220-7618-001 | FT | Y | DENARDO, M. | | | | |
| 076-220-7618-002 | FT | Y | KAMBLY, A. | | | | |
| 076-220-7618-003 | FT | Y | BAKER, B. | | | | |
| 076-220-7628-004 | FT | Y | CUMMINGS, R. | | | | |
| 076-220-7628-005 | FT | Y | FORESTER, H. | | | | |
| 076-220-7628-006 | FT | Y | DIZMANG, L. | | | | |
| 076-220-7628-007 | FT | Y | JAMES, S. | | | | |
| 076-220-7628-008 | FT | Y | MCNICOL, S. | | | | |
| 076-220-7628-009 | FT | Y | LEMP, R. | | | | |
| **SENIOR PSYCHOLOGIST** | | | | | | | |
| 076-220-9839-001 | FT | Y | KAHLE, M. | | | | |
| **STAFF PSYCHOLOGIST** | | | | | | | |
| 076-220-9847-003 | FT | Y | GATOZZI, R. | | | | |

* WRITTEN COMMITTMENT (Y/N)

1

CALIFORNIA MEDICAL FACILITY
OUTPATIENT PSYCHIATRIC SERVICES
STAFFING REPORT

REPORT AS OF OCTOBER 1, 1991

| CLASS TITLE/ POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| **PSYCHOLOGIST, HF** | | | | | | | |
| 076-220-9860-001 | FT | Y | GAVAN, J. | | | | |
| 076-220-9860-002 | FT | Y | FRANK, J. | | | | |
| 076-220-9860-003 | FT | Y | GREENSTONE | | | | |
| 076-220-9860-005 | FT | Y | STEVENS, M. | | | | |
| 076-220-9860-006 | FT | Y | DURBIN, N. | | | | |
| 076-220-9860-007 | FT | Y | HALPERN, S. | | | | |
| 076-220-9860-008 | FT | Y | VIESTI, C. | | | | |
| 076-220-9860-009 | FT | Y | JENESKY, E. | | | | |
| 076-220-9860-010 | FT | Y | FLEMING, J. | | | | |
| 076-220-9860-011 | FT | Y | SWANSON, C. | | | | |
| 076-220-9860-012 | FT | Y | KONSTANTINOU | | | | |
| 076-220-9860-013 | FT | Y | BACKLUND, M. | | | | |
| 076-220-9860-014 | FT | Y | SCHILLER, P. | | | | |
| 076-220-9860-015 | FT | Y | POLLOCK, S. | | | | |
| 076-220-9860-016 | FT | Y | GLOVER, O. | | | | |
| 076-220-9860-017 | FT | Y | FOSS, G. | | | | |
| 076-220-9860-022 | FT | Y | SPRICK, E. | | | | |
| 076-220-9860-024 | .5 | Y | KAUFMAN, P. | | | | |
| | | | | | | | |
| **SUPV PSYCH NURSE** | | | | | | | |
| 076-220-8158-001 | FT | Y | GALBRAITH, W. | | | | |
| | | | | | | | |
| **SUPV REG NURSE** | | | | | | | |
| 076-220-8161-001 | FT | Y | SUMNER, E. | | | | |
| | | | | | | | |
| **REGISTERED NURSE** | | | | | | | |
| 076-220-8165-001 | FT | Y | BARACEROS, L. | | | | |
| 076-220-8165-002 | FT | Y | ROBINSON, R. | | | | |
| 076-220-8165-003 | FT | Y | HUNDLEY, D. | | | | |
| 076-220-8165-004 | FT | Y | GATES, L. | | | | |
| 076-220-8165-005 | FT | Y | HERNANDEZ, A. | | | | |

* WRITTEN COMMITTMENT (Y/N)

2

CALIFORNIA MEDICAL FACILITY
OUTPATIENT PSYCHIATRIC SERVICES
STAFFING REPORT

REPORT AS OF OCTOBER 1, 1991

| CLASS TITLE/ POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| SUPV PSYCH SW | | | | | | | |
| 076-220-9867-001 | FT | Y | GRAY, A. | | | | |
| PSYCH SOCIAL WORKER | | | | | | | |
| 076-220-9868-008 | FT | Y | JOHNSON, G. | | | | |
| 076-220-9868-009 | FT | Y | OLESON, J. | | | | |
| 076-220-9868-010 | FT | Y | CLARK, M. | | | | |
| 076-220-9868-011 | FT | Y | HUGHES-BEASLY | | | | |
| 076-220-9868-012 | FT | Y | DUARTE, E. | | | | |
| 076-220-9868-013 | FT | Y | WILLIAMS, M. | | | | |
| 076-220-9868-014 | FT | Y | HORCH, G. | | | | |
| 076-220-9868-015 | FT | Y | JAMES, M. | | | | |
| 076-220-9868-016 | FT | Y | GRUNWALD, G. | | | | |
| 076-220-9868-017 | FT | Y | AUGUST, J. | | | | |
| 076-220-9868-018 | FT | Y | HENLEY, S. | | | | |
| 076-220-9868-019 | FT | Y | DUNN, M. | | | | |
| 076-220-9868-020 | FT | Y | STEVENS, C. | | | | |
| 076-220-9868-021 | FT | Y | BOSLER, P. | | | | |
| 076-220-9868-022 | FT | Y | JAMES, N. | | | | |
| 076-220-9868-023 | FT | Y | BOYD, L. | | | | |
| 076-220-9868-024 | FT | Y | AWALT, R. | | | | |
| 076-220-9868-025 | FT | Y | BOLAND, S. | | | | |
| 076-220-9868-026 | FT | Y | BEZMAN, P. | | | | |
| 076-220-9868-027 | FT | Y | KNEPLER, J. | | | | |
| SENIOR OT | | | | | | | |
| 076-220-8287-001 | FT | Y | SNIVELY, F. | | | | |
| OCC THERAPIST | | | | | | | |
| 076-220-8288-002 | FT | Y | ANDREWS, E. | | | | |

* WRITTEN COMMITTMENT (Y/N)

3

REPORT AS OF OCTOBER 1, 1991

| CLASS TITLE/POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| **REC THERAPIST** | | | | | | | |
| 076-220-8317-001 | FT | Y | HARRIS, P. | | | | |
| 076-220-8317-002 | FT | Y | ROGERS, P. | | | | |
| **SENIOR MTA** | | | | | | | |
| 076-220-8215-001 | FT | Y | ESPINOSA, M. | | | | |
| **MTA** | | | | | | | |
| 076-220-8217-002 | FT | Y | CORIOSO, M. | | | | |
| 076-220-8217-003 | FT | Y | COX, A. | | | | |
| 076-220-8217-006 | FT | Y | MOORE, E. | | | | |
| 076-220-8217-008 | FT | Y | GONDEK, W. | | | | |
| 076-220-8217-015 | FT | Y | HINDE, J. | | | | |
| 076-220-8217-016 | FT | Y | FISH, M. | | | | |
| 076-220-8217-017 | FT | Y | BRADLEY, S. | | | | |
| 076-220-8217-018 | FT | Y | KIEHN, C. | | | | |
| 076-220-8217-020 | FT | Y | BROOKSHIRE, P | | | | |
| 076-220-8217-021 | FT | Y | ALBANO, D. | | | | |
| 076-220-8217-022 | FT | Y | BUTLER, B. | | | | |
| 076-220-8217-123 | FT | Y | STREET, L. | | | | |
| 076-220-8217-124 | FT | Y | ALDRIDGE, W. | | | | |
| 076-220-8217-125 | FT | Y | BURKETT, C. | | | | |
| 076-220-8217-127 | FT | Y | ROCKWELL, R. | | | | |
| 076-220-8217-130 | FT | Y | NOLES, L. | | | | |
| 076-220-8217-131 | FT | Y | PIGA, C. | | | | |
| **PSYCH TECH** | | | | | | | |
| 076-220-8253-001 | FT | Y | RAMIREZ, J. | | | | |
| 076-220-8253-002 | FT | Y | CRUZVALLES, O | | | | |
| 076-220-8253-003 | | N** | | Y | VOIGHT, S. | 11-04-91 | Y |

* WRITTEN COMMITTMENT (Y/N)
** POSITION IS CURRENTLY BEING FILLED FILLED BY BRADLEY, M. MTA

REPORT AS OF OCTOBER 1, 1991

| CLASS TITLE/ POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| **PSYCH TECH** | | | | | | | |
| 076-220-8253-004 | FT | Y | WRIGHT, C. | | | | |
| 076-220-8253-005 | FT | N** | | Y | SPRINGER, J. | 10-15-91 | Y |
| 076-220-8253-006 | FT | Y | BLUFORD, J. | | | | |
| 076-220-8253-007 | FT | Y | CAIN, V. | | | | |
| 076-220-8253-008 | FT | N** | | Y | BERK, E. | 10-22-91 | Y |
| 076-220-8253-009 | FT | Y | WILLIAMS, J. | | | | |
| 076-220-8253-010 | | N** | | Y | VALLES, F. | 10-28-91 | Y |
| 076-220-8253-011 | | N** | | Y | GALLARDO, J. | 10-28-91 | N |
| 076-220-8253-012 | | N** | | Y | KULISEK, M. | 10-07-91 | Y |
| 076-220-8253-013 | | N** | | Y | WILLIAMS, L. | 10-28-91 | Y |
| 076-220-8253-014 | | N** | | Y | HENDRIX, L. | 10-28-91 | Y |
| 076-220-8253-015 | | N** | | Y | BONIN, S. | 11-01-91 | N |
| **STANDARDS&COMPLIANCE** | | | | | | | |
| 076-220-4672-001 | FT | Y | FRANKLIN, M. | | | | |
| **HEALTH PROG COOR** | | | | | | | |
| 076-220-8202-001 | FT | Y | LITTLE, H. | | | | |
| **MEDICAL TRANS** | | | | | | | |
| 076-220-1177-001 | FT | Y | GUEVARRA, Z. | | | | |
| 076-220-1177-002 | FT | Y | PACE, A. | | | | |
| 076-220-1177-003 | FT | Y | WEEKS, M. | | | | |
| 076-220-1177-009 | FT | Y | BREDING, M. | | | | |
| 076-220-1177-110 | FT | Y | LEWIS, P. | | | | |
| **INFO SYTEMS TECH** | | | | | | | |
| 076-220-1360-001 | FT | Y | GRAVELY, F. | | | | |

\* WRITTEN COMMITMENT (Y/N)

\*\* POSITIONS ARE CURRENTLY BEING FILLED BY:

| 005 | FISH, M. | MTA | 012 | BUTLER, D. | MTA |
|---|---|---|---|---|---|
| 008 | HINDE, J. | MTA | 013 | ALBANO, D. | MTA |
| 010 | CARTER, H. | MTA | 014 | CORIOSO, M. | MTA |
| 011 | COX, M. | MTA | 015 | SHAW, L. | MTA |

CALIFORNIA MEDICAL FACILITY
OUTPATIENT PSYCHIATRIC SERVICES
STAFFING REPORT

REPORT AS OF OCTOBER  1, 1991

| CLASS TITLE/ POSITION # | TYPE POS | FILLED Y/N | NAME OF EMPLOYEE | COMM Y/N | NAME | REPORT DATE | WRTN* COMM |
|---|---|---|---|---|---|---|---|
| **MEDICAL SECRETARY** 076-220-9551-001 | FT | Y | DUNNING, B. | | | | |
| **HEALTH RECORDS TECH** 076-220-1869-001 | FT | Y | ZAUSCH, L. | | | | |
| **OFFICE ASSISTANT** 076-220-1379-001 | FT | Y | TILLEY, D. | | | | |
| 076-220-1379-002 | FT | Y | HARE, D. | | | | |
| 076-220-1379-003 | FT | Y | EPPS, V. | | | | |
| 076-220-1379-004 | FT | Y | RYE, J. | | | | |
| 076-220-1379-005 | FT | Y | YU, M. | | | | |
| 076-220-1379-006 | FT | Y | FISHER, M. | | | | |
| 076-220-1379-007 | FT | Y | LEWIS, F. | | | | |
| **CHIEF PROF EDUC** 076-220-7600-001** | | N | | | | | |

* WRITTEN COMMITTMENT (Y/N)
** 12-1-91 HIRE DATE

9

FILED

SEP 3 1991

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

      Plaintiffs,

    v.

GEORGE DEUKMEJIAN, et al.,

      Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

    This matter is before the court on defendants' motion to amend the court's July 29, 1991 order concerning attorneys' fees, and to stay the portion of that order directing that defendants pay attorneys' fees and costs for compliance and monitoring during the first and seccond quarters of the decree.  Also before the court are defendants' objections to findings and recommendations filed August 19, 1991, by Magistrate Judge John F. Moulds concerning plaintiffs' motion for contempt.

////

////

568   1

I

## MOTION TO AMEND AND STAY

### A.    Fees-for-fees for Compliance Work

On July 29, 1991, this court ordered defendants to pay plaintiffs attorneys' fees and costs in the amount of $144,100.34 for compliance and monitoring during the first and second quarters of the consent decree.  Order at 22.  The court also referred to Judge Moulds for preparation of findings and recommendations the determination of a reasonable rate for supplemental attorneys' fees arising out of the merits portion of this case.  Id. at 21-22.  The court determined that the relevant market for determination of a reasonable rate for supplemental attorneys' fees for the merits was the Sacramento metropolitan area.  Id. at 9-10.  The court failed to determine explicitly the relevant market for determination of reasonable attorneys' fees for work necessary in securing fees for compliance.    The court's order that defendants pay $144,100.34 included $7,924.50 in attorneys' fees expended in preparation of plaintiffs' motion to compel payment of fees associated with compliance and monitoring.    Declaration of Sanford Jay Rosen regarding Plaintiffs' first quarterly statement, Part B, Exhibit E.

The court hereby refers the question of the relevant legal market and the determination of a reasonable attorneys' fee for work associated with preparation of plaintiffs' application for attorneys' fees for the compliance portion of this case to Judge Moulds for preparation of findings and recommendations, pursuant

2

1  to 28 U.S.C. § 636(b)(1)(B).  The court's July 29, 1991 order

2  awarding plaintiffs $144,100.34 is hereby REDUCED by $7,924.50, the

3  disputed amount sought by plaintiffs for preparation of their

4  compliance fee application.

5        **B.**    **Expert Witness Fees**

6        Defendants also ask that the court reduce the $144,100.34

7  award by $7,633.32 in expert fees because under <u>West Virginia</u>

8  <u>University Hospitals, Inc. v. Casey</u>, ___ U.S. ___, 113 L. Ed. 2d

9  68 (1991), plaintiffs may only be reimbursed for expert fees at the

10  rate of thirty dollars ($30) per day. Although plaintiffs withdrew

11  their request for expert witness fees in their supplemental fee

12  application, the $144,100.34 sought for compliance and monitoring

13  included $7,633.32 in expert fees at full hourly rates.

14        Plaintiffs argue that under the terms of the decree,

15  defendants are contractually bound to pay expert witnesses at their

16  full rate.  The language of the decree which plaintiffs argue

17  supports this assertion is as follows:

18              Plaintiffs may seek to recover reasonable
               costs and attorneys' fees and other expenses
19              that may be sought pursuant to 42 U.S.C. §
               1988 and 29 U.S.C. § 794(b) for work performed
20              in this matter prior to entry of this Consent
               Decree and reasonably performed during the
21              pendency of this Consent Decree.  Reasonable
               costs and expenses shall be awarded in amounts
22              agreed to by the parties or, absent agreement,
               as determined by the Court upon plaintiffs'
23              noticed motion.

24  Consent decree at 43.

25        Contrary to plaintiffs' assertion, it appears to the court

26  that the language of the consent decree provides that plaintiffs

3

1  are only entitled to those fees and costs available pursuant to
2  42 U.S.C. § 1988.  Accordingly, the defendants' motion to amend
3  the court's July 29, 1991 order directing defendants to pay
4  $144,100.43 in attorneys' fees and costs is GRANTED.  The
5  $144,100.43 award is hereby REDUCED by $7,633.32.  Plaintiffs may
6  file a motion for compensation for expert witness fees at the rate
7  of $30 per day, supported by appropriate documentation concerning
8  the number of days for which compensation is sought, before Judge
9  Moulds for preparation of findings and recommendations.

10  ### C.  Stay of July 29, 1991 Order

11  Defendants also move to stay the court's July 29, 1991 fee
12  order pending the United States Court of Appeals for the Ninth
13  Circuit's review of the court's award of attorneys' fees and costs
14  for the merits portion of this litigation.  Fed. R. Civ. P. 62(d)
15  provides "[w]hen an appeal is taken, the appellant by giving a
16  supersedeas bond may obtain a stay," subject to exceptions not
17  applicable in this case.  Because defendants have not given a
18  supersedeas bond, their application for a stay pending appeal is
19  DENIED.

20  ### II

21  ### MAGISTRATE'S FINDINGS AND RECOMMENDATIONS

22  On August 19, 1991, Judge Moulds filed findings and
23  recommendations concerning plaintiffs' motion for contempt.  He
24  continued the hearing on contempt to October 2, 1991, in light of
25  the defendants' recent recruitment efforts to staff the outpatient
26  pyschiatric program at California Medical Facility under the

4

consent decree entered in this case.   He also recommended:

> (1) that defendants be directed to fill, or have written confirmation of acceptance by a qualified candidate, all positions in the Outpatient Pyschiatric Program by October 1, 1991; and
>
> (2) any Outpatient Pyschiatric Program position that is vacant for more than twenty (20) working days be filled with an equivalent in overtime, contractual services, or by an individual holding a different job classification whose training and experience allows him or her to satisfactorily accomplish the vacant position's primary duties; <u>when an individual holding a different classification is used, the individual will not be a staff member already employed by the Outpatient Pyschiatric Program unless such services are compensated by overtime</u>.

A district court may refer a motion for contempt to a Magistrate Judge for preparation of proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). <u>Bernardi v. Yeutter</u>, ___ F.2d ___, 1991 WL 159173 at p.2 (9th Cir. 1991). Where as here a party files timely objections to the findings and recommendations, the district court:   "shall make a de novo determination of those portions of the report or proposed findings or recommendations to which objection is made.   A judge of the court may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate,"   28 U.S.C. § 636(b)(1)(B), "receive further evidence or recommit the matter to the magistrate with instructions."   Fed. R. Civ. P. 72(b).

Defendants filed timely objections. First, defendants object to the underlined portion of Judge Moulds' findings and

5

recommendations, above, on the grounds that the requirement that the state officials pay overtime exceeds the powers of a federal court and is contrary to common management practices. Defendants also object to the proposed findings and recommendations on the ground that no time limit is placed on their obligation to comply with the order. And finally, defendants propose that the findings and recommendations be amended to include a "good faith" exception.

The court has conducted a de novo review of the briefs and evidence on file with the court. As to the first objection, defendants cite no authority for the assertion that ordering the defendants to pay overtime compensation is beyond the power of the federal court. Under the Consent Decree filed December 8, 1989, the defendants were required to have the Outpatient Psychiatric Program ("OPP") at the California Medical Facility ("CMF") fully staffed and operational by October 31, 1990. Following mediation, the parties agreed to a new deadline of May 1, 1991. When defendants failed to meet the May 1, 1991 deadline, and after plaintiffs filed this motion for contempt, the parties stipulated to put off the contempt hearing to give the defendants more time to comply. When compliance had not been achieved by the August 19, 1991 hearing date, Judge Moulds issued the proposed findings and recommendations now before the court, giving defendants yet another opportunity to comply. Under the circumstances, Judge Moulds' recommendation appears to be a reasonable means to compel defendants to comply with the terms of

1   the consent decree.

2       Defendants' second objection is that there is no time limit

3   placed on the order. As plaintiffs point out, because

4   recommendations and orders of the court are coextensive with the

5   life of the consent decree, no specific time limit is necessary

6   for this particular order.

7       Finally, defendants object to the proposed findings and

8   recommendations on the ground that there is no provision for the

9   defendants' "good faith" failure to comply with the order.

10   Substantial compliance with a court's order is a defense to civil

11   contempt, and contempt is inappropriate where a party has taken

12   "all reasonable steps" to comply with an order. National

13   Advertising Co. v. City of Orange, 861 F.2d 246, 250 (9th Cir.

14   1988). In addition, contempt is not warranted when the defendant

15   demonstrates that compliance with the court's order is impossible.

16   United States v. Rylander, 460 U.S. 752, 757 (1983). A party's

17   intent in disobeying a court's order is not relevant to a finding

18   cf civil contempt. In re Crystal Palace Gambling Hall, Inc., 817

19   F.2d 1361, 1365 (9th Cir. 1987). Thus defendants may defend

20   against charges of contempt by demonstrating that they have taken

21   all reasonable steps to comply with the court's order or that

22   compliance is impossible. Permitting defendants to raise a "good

23   faith" defense would effectively nullify the court's power to

24   enforce its orders and the consent decree in this case.

25       Accordingly, having reviewed de novo those portions of the

26   proposed findings and recommendations to which defendants have

AO 72
(Rev 8-82)

objected, the court hereby ADOPTS Judge Moulds' proposed findings and recommendations.

In sum, IT IS HEREBY ORDERED as follows:

(1)  The court's July 29, 1991 order awarding plaintiffs $144,100.34 in attorneys' fees for monitoring and compliance during the first and second quarters of the decree is hereby MODIFIED to reduce the award by $7,924.50, the disputed amount sought by plaintiffs for preparation of their compliance and monitoring attorneys' fee application;

(2)  The court hereby refers the question of the relevant legal market and the determination of a reasonable attorneys' fee for work associated with preparation of plaintiffs' application for attorneys' fees for the compliance and monitoring portion of this case to Judge Moulds for preparation of findings and recommendations;

(3)  The court's July 29, 1991 order awarding plaintiffs $144,100.34 in attorneys' fees for monitoring and compliance during the first and second quarters of the decree is hereby MODIFIED to reduce the award by $7,633.32, the amount sought in expert witness fees and costs.  Plaintiffs may file a motion for compensation for expert witness fees at the rate of $30 per day, supported by appropriate documentation concerning the number of days for which compensation is sought for hearing before Judge Moulds for preparation of findings and recommendations;

(4)  Defendants' application for a stay of the court's July 29, 1991 order is DENIED;

8

AO 72
(Rev 8/82)

(5) Defendants are directed to notice their motion for appointment of a special master for fees to work with the Mediator in establishing a yearly litigation budget for compliance and monitoring activities for hearing before Judge Moulds; and

(6) Judge Moulds' proposed findings and recommendations filed August 19, 1991 are hereby ADOPTED in full.

IT IS SO ORDERED.

DATED:   September 26, 1991.

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

     Plaintiff,             No. CIV S-87-1636 LKK JFM

     vs.

GEORGE DEUKMEJIAN, et al.,

     Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

     Plaintiffs' motion for an order to show cause and order of contempt came on for hearing on August 19, 1991.  Michael W. Bien appeared for plaintiffs.  Bruce M. Slavin appeared for defendants.

     Plaintiffs seek an order of contempt for defendants' failure to comply with the staffing requirements for an outpatient psychiatric program at California Medical Facility under the consent decree entered in this case.

     In their opposition defendants present evidence of recent recruitment efforts to staff the program.  In light of this evidence, the hearing on plaintiffs' motion is continued to October

1

2, 1991 at 9:00 a.m. before this court.  Defendants are directed to file a report with this court by October 1, 1991, detailing further measures undertaken to insure compliance, and addressing the recommendations outlined below.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Defendants be directed to fill, or have written confirmation of acceptance by a qualified candidate, all positions in the Outpatient Psychiatric Program by October 1, 1991; and

2.  Any Outpatient Psychiatric Program position that is vacant for more than twenty (20) working days be filled with an equivalent in overtime, contractual services, or by an individual holding a different job classification whose training and experience allows him or her to satisfactorily accomplish the vacant position's primary duties; when an individual holding a different classification is used, the individual will not be a staff member already employed by the Outpatient Psychiatric Program unless such services are compensated by overtime.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within five days after service

\\\\

AO 72

of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Greenhow v. Secretary of Health and Human Services</u>, 863 F.2d 633 (9th Cir. 1988).

DATED:  August 19, 1991.

_____
UNITED STATES MAGISTRATE JUDGE

JFM:rl:cw

3

EXHIBIT    1-B

483-1 + 484-3  ua

ORIGINAL

1   DANIEL E. LUNGREN
    Attorney General
2   GEORGE WILLIAMSON
    Chief Assistant Attorney General
3   PETER J. SIGGINS
    Senior Assistant Attorney General
4   MORRIS LENK
    Supervising Deputy Attorney General
5   BRUCE M. SLAVIN
    Deputy Attorney General
6   State Bar No. 115192
     50 Fremont St., Room 300
7    San Francisco, CA  94105
     Telephone:  (414) 356-6048
8   Attorneys for Defendants

FILED

RECEIVED

MAY 22 1998

ROSEN BIEN & ASARO

LODGED

MAY 14 1998

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

        IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF CALIFORNIA

13  RALPH COLEMAN, et al.,                    CIV-S-90-0520 LKK
                        Plaintiffs,
14          v.
15  PETE WILSON, et al.,
                        Defendants.
16

17  JAY LEE GATES, et al.,                    CIV-S-87-1636 LKK
                        Plaintiffs,
18          v.                                STIPULATION + Order
19  C.A. TERHUNE, et al.,                     re: Bed Space - Inter
                                              Treatment Limit
                        Defendants.
20

21

22          Prior  orders  of  this  Court  in  these  cases  adopting

23  defendants' plans require that inpatient mental health care for

24  male inmates housed in the California Department of Corrections

25  (CDC) be provided by the Department of Mental Health (DMH).  DMH

26  and CDC have, by Interagency Agreement, agreed that DMH would

27  maintain 412 beds at Atascadero State Hospital (ASH) (374

1  . permanent beds and 38 per diem beds) and 150 beds at DMH-

2  Vacaville.  In addition DMH operates 60 unlicensed day treatment

3  beds at the California Medical Facility - Vacaville.

4      DMH and CDC have represented that changes in needs of the

5  CDC mental health population have lessened the need for the

6  intermediate inpatient mental health care beds provided by DMH.

7  In addition, there has been an increased demand for DMH beds at

8  ASH by other populations served by that department.  DMH projects

9  a rapidly growing population of Sexually Violent Predators (SVP)

10  (Cal. Welf. & Inst. Code §§ 6600 et seq.) who are to be housed at

11  ASH.  For these reasons, DMH and CDC have jointly proposed a plan

12  to change the bed siting and allocation for the provision of

13  intermediate inpatient level mental health care previously

14  approved by this Court.  Plaintiffs do not agree that defendants

15  have demonstrated any reduction in demand for intermediate

16  inpatient mental health care beds provided by DMH.

17      On April 23, 1998, the parties, the *Coleman* Special Master

18  and the *Gates* Mediator met to discuss the plan proposed by DMH

19  and CDC.  The plan consists of three primary components: 1)

20  licensure of 84 intermediate care beds at CMF in the existing day

21  treatment beds with care provided by DMH; 2) licensing of 64

22  intermediate care beds at Salinas Valley State Prison (SVSP) with

23  care provided by DMH; and 3) reduction of the CDC prisoner

24  population at ASH to 200 beds.  In addition DMH is considering

25  the construction of 258 additional beds at ASH and a new 1500 bed

26  facility for SVPs.

27

1    To license the additional beds at CMF and the new beds at

2   SVSP, CDC must obtain legislative authorization and funding.  The

3   parties agree that CDC should be able to proceed immediately with

4   the legislative process.   The parties further agree that the

5   plaintiffs,   the   Special   Master   and   the   Mediator   require

6   additional time to review and assess the portion of the plan

7   calling for a reduction in the number of ASH beds available to

8   CDC inmates.  The plaintiffs' do not agree that the day treatment

9   program should be ended.    In entering this stipulation the

10   parties understand, however, that the process for obtaining

11   approval, funding and licensing of the additional beds at CMF and

12   the new beds at SVSP is part of an overall plan designed to

13   reduce the number of beds available to CDC inmates at ASH.   The

14   parties further agree, however, that the new overall plan

15   requires court approval under both cases and that plaintiffs have

16   not agreed to any part of the overall plan except as stated

17   below.

18   \\\

19   \\\

20   \\\

21   \\\

22   \\\

23   \\\

24   \\\

25   \\\

26   \\\

27   \\\

1    Accordingly, **the parties hereby stipulate as follows:**

2    In order to start implementation of the overall plans, CDC

3 may proceed to obtain licensure for 84 additional mental health

4 intermediate inpatient care beds at CMF and 64 new mental health

5 intermediate inpatient care beds at SVSP.   DMH will provide

6 clinical services for these programs.   Those inmates housed in

7 the DMH day treatment program at CMF at the time that the

8 conversion is to take place will remain in the new intermediate

9 inpatient care beds until such time as DMH determines that their

10 mental health needs can be met in a different program.

11    IT IS SO STIPULATED:

12 DATED:   5/12/98

    BRUCE M. SLAVIN

13    Deputy Attorney General

14    Attorneys for Defendants

15 DATED:   5/12/98

16

17    Attorneys for Plaintiffs

18

19    SO ORDERED:

20 DATED: 5/20/98

21    HON. LAWRENCE K. KARLTON

    United States District Judge

22

23

24

25

26

27

DECLARATION OF SERVICE

Case Names:  Coleman, et al. v. Wilson, et al.;
             Gates, et al. v.        Terhune, et al.
Nos.         CIV S-90-0520 LKK; CIV S-87-1636 LKK

I declare:

I am employed in the Office of the Attorney General, which is the
office of a member of the Bar of this Court at which member's
direction this service is made.  I am familiar with the business
practice at the Office of the Attorney General for collection and
processing of correspondence for mailing with the United States
Postal Service.  In accordance with that practice, correspondence
placed in the internal mail collection system at the Office of
the Attorney General is deposited with the United States Postal
Service that same day in the ordinary course of business.

On <u>May 13, 1998</u>, I placed the attached

    LETTER TO HONORABLE JUDGE LAWRENCE K. KARLTON; STIPULATION

in the internal mail collection system at the Office of the
Attorney General, 50 Fremont Street, Room 300, San Francisco,
California 94105, for deposit in the United States Postal Service
that same day in the ordinary course of business, in a sealed
envelope, postage fully postpaid, addressed as follows:

J. MICHAEL KEATING JR.
LITTLE BULMAN & REARDON, P.C.
THE JOSEPH BROWN HOUSE
50 S MAIN STREET
PROVIDENCE, RI  02903

ALLEN BREED
P. O. BOX 698
SAN ANDREAS CA  95249

DONALD SPECTER
PRISON LAW OFFICE
GENERAL DELIVERY
SAN QUENTIN, CA 94964

MICHAEL W. BIEN
ROSEN, BIEN & ASARO
155 MONTGOMERY ST., 8TH FLOOR
SAN FRANCISCO, CA  94104

I declare under penalty of perjury the foregoing is true and
correct and that this declaration was executed on May 13, 1998 at
San Francisco, California.

R. Torres



**DANIEL E. LUNGREN**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

50 FREMONT STREET, SUITE 300
SAN FRANCISCO, CA 94105
(415) 356-6000

FACSIMILE:    (415) 356-6070
(415) 356-6048

May 13, 1998

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
Eastern District of California
650 Capitol Mall
Sacramento, California 95814

> **RECEIVED**
>
> MAY 1 4 1998
>
> ROSEN BIEN & ASARO

RE:  Coleman v. Wilson, No. CIV-S-90-0520 LKK
     <u>Gates v. Terhune, No. CIV-S-87-1636 LKK</u>

Dear Judge Karlton:

Enclosed please find a Stipulation in the above-entitled cases signed by counsel for both parties. The Stipulation concerns changes to the court-approved plans in these cases concerning the provision of inpatient mental health care to prisoners. The Stipulation was reached in the course of discussions with both Mr. Breed and Mr. Keating. Please review the Stipulation and if it meets with your approval, sign it so defendants can proceed with the changes described in the Stipulation.

Thank you for your attention to this matter.

Sincerely,

DANIEL E. LUNGREN
Attorney General

*Bruce M. Slavin*

BRUCE M. SLAVIN
Deputy Attorney General

cc.  J. Michael Keating
     Allen Breed
     Michael Bien
     Donald Specter

SEP 28 1993

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

       Plaintiffs,

   v.

GEORGE DEUKMEJIAN, et al.,

       Defendants.

_____/

NO. CIV. S-87-1636 LKK/JFM P

O R D E R

    Magistrate Judge John F. Moulds heard defendants' objections to the Mediator's Findings and Conclusions regarding Perceived Violation No. A-9.  The perceived violation concerns the alleged reduction in the number of beds allocated at Atascadero State Hospital to inmates in the custody of the California Department of Corrections who are in need of psychiatric inpatient care.

    On June 7, 1993, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within ten days.  On July 1,

1    1993, defendants filed objections to the findings and

2    recommendations. Plaintiffs' response thereto was filed July 8,

3    1993.

4        In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C)

5    and Local Rule 305, this court has conducted a <u>de novo</u> review of

6    this matter. The court finds the findings and recommendations to

7    be supported by the record and by proper analysis. The court

8    adopts the findings with the exception that the date for

9    modification of the interagency agreement is revised.

10       Accordingly, IT IS HEREBY ORDERED that:

11       1.   The Findings and Recommendations filed June 7, 1993, are

12   ADOPTED in full;

13       2.   The Mediator's Findings and Conclusions on Perceived

14   Violation No. A-9, filed April 6, 1993, and regarding the decrease

15   in beds available at Atascadero State Hospital for inmates in the

16   custody of the California Department of Corrections, are ADOPTED

17   in their entirety with the exception that the date by which the

18   California Department of Corrections and the Department of Mental

19   Health shall modify their interagency agreement is October 1, 1993.

20       IT IS SO ORDERED.

21       DATED:   September 24, 1993.

22

23                                      LAWRENCE K. KARLTON
                                        CHIEF JUDGE EMERITUS
24                                      UNITED STATES DISTRICT COURT

25

26

                                   2

FILED

JUN 7 1993

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

          Plaintiffs,          No. CIV S-87-1636 LKK JFM P

     vs.

GEORGE DEUKMEJIAN, et al.,

          Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

        This matter came on for hearing on May 27, 1993 on
defendants' objections to the Mediator's Findings and Conclusions
regarding Perceived Violation No. A-9.  The perceived violation
concerns the alleged reduction in the number of beds allocated at
Atascadero State Hospital to inmates in the custody of the
California Department of Corrections who are in need of psychiatric
inpatient care.  Andrea G. Asaro appeared for plaintiffs; Deputy
Attorney General James E. Flynn appeared for defendants.

        Under an Inpatient Psychiatric Care Plan incorporated
into the Consent Decree governing this action, defendants are

1   required to provide 412 beds at Atascadero State Hospital for use
2   by California Department of Corrections (CDC) inmates who require
3   inpatient psychiatric care.  In 1991, defendants reduced the number
4   of beds available at Atascadero to CDC inmates.  In response
5   thereto, plaintiffs noticed Perceived Violation No. 508.  The
6   Mediator heard the issue and filed Findings and Recommendations in
7   September of 1991.  The court adopted the Findings and
8   Recommendations and directed defendants to have available 412 beds
9   at Atascadero for use by CDC inmates.  The court furthered ordered
10  that any changes to the number of inpatient beds available at
11  Atascadero to CDC inmates must be made pursuant to procedures
12  outlined in the Consent Decree for modification of a plan under the
13  Decree.

14          On July 1, 1992, CDC and the California Department of
15  Mental Health (DMH) entered into an interagency agreement and
16  Memorandum of Understanding regarding the availability of beds to
17  CDC inmates.  The agencies agreed to maintain the number of beds
18  available at Atascadero for CDC inmates at 412 but decreased the
19  actual contracted-for number of beds to 374.  The 38 unallocated
20  beds would be made available to CDC on an as needed basis within
21  seven to 10 days from the date of notice of need.

22          Plaintiffs noticed a perceived violation on the grounds
23  that the reduction in contracted beds violated the Consent Decree
24  and was not made pursuant to the provisions for modifying the
25  Decree.  After informal negotiations between the parties failed,
26  the Mediator issued Findings and Conclusions on Perceived Violation

2

AO 72
(Rev. 8/82)

No. A-9.  Defendants objected to the Mediator's findings; the issue was then argued before this court.

The Mediator found that defendants are obligated to provide 412 beds at Atascadero for CDC inmates and that they have failed to do so.  The Mediator further found that defendants effected a change in the Consent Decree without utilizing the procedures for modifying the Decree.  The Mediator concluded by recommending that CDC and DMH be ordered to modify their Interagency Agreement to reflect that CDC is obligated to provide 412 beds at Atascadero to CDC inmates.  Finally, it was recommended that no future changes to the number of beds available at Atascadero be made without complying with the modification procedures of the Consent Decree.

Defendants object to the Mediator's findings on the grounds that the interagency agreement is not an improper modification of the Decree.  They contend that the agreement with DMH amounts to a change only in the manner in which the beds at Atascadero are funded and that the number of beds available to CDC is still 412, as required.  Finally, they characterize plaintiffs' challenge to the interagency agreement as a demonstration of the "degree to which plaintiffs and the Mediator have inserted themselves into policy and funding decisions regarding the day-to-day administration of the State's prison system."

The court recommends that the Mediator's Findings and Conclusions be adopted.  The court is not persuaded by defendants' argument that the number of available beds at Atascadero is

3

1  unchanged:  the 38 beds that are unallocated are in fact not

2  available for CDC use unless a time-consuming procedure to obtain

3  the use of the beds is initiated.  The difference between

4  "allocated" and "available" is not semantic; defendants' contention

5  that there are still 412 beds available even though only 374 beds

6  have been funded is not convincing.  More importantly, the court

7  finds that defendants' agreement with DMH to reduce the allocated

8  number of beds at Atascadero amounts to an improper modification of

9  both the Consent Decree and the plan governing inpatient

10  psychiatric care for prison inmates.  Defendants are familiar with

11  the provisions of the Decree and the procedures for modification

12  thereof.  The interagency agreement with DMH appears to be an

13  attempt to circumvent those procedures.  Defendants are cautioned

14  that future modifications to the Decree and any plans incorporated

15  therein must conform with the procedures to which defendants agreed

16  when they negotiated, drafted, and signed the Consent Decree.

17       Upon hearing the arguments of counsel and good cause

18  appearing therefor, THE COURT RECOMMENDS that the Mediator's

19  Findings and Conclusions on Perceived Violation No. A-9, filed

20  April 6, 1993 and regarding the decrease in beds available at

21  Atascadero State Hospital for inmates in the custody of the

22  California Department of Corrections, be adopted in their entirety

23  with the exception that the date by which the California Department

24  of Corrections and the Department of Mental Health shall modify

25  their interagency agreement is July 1, 1993.

26  ///

4

1       These findings and recommendations are submitted to the

2   United States District Judge assigned to the case, pursuant to the

3   provisions of Title 28 U.S.C. § 636(b)(1).  Within ten days after

4   being served with these findings and recommendations, any party may

5   file written objections with the court and serve a copy on all

6   parties.  Such a document should be captioned "Objections to

7   Magistrate Judge's Findings and Recommendations."  Any reply to the

8   objections shall be served and filed within ten days after service

9   of the objections.  The parties are advised that failure to file

10  objections within the specified time may waive the right to appeal

11  the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

12  Cir. 1991).

13  DATED:  June  4  , 1993

16  JFM:rl:th

_____
UNITED STATES MAGISTRATE JUDGE

5

AO 72

United States District Court
for the
Eastern District of California
June 7, 1993


* * CERTIFICATE OF SERVICE * *


2:87-cv-01636


Gates

v.

Deukmejian

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  June 7, 1993, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.


Allen F Breed                          SS/LKK
PO Box 698
San Andreas, CA  95249                 CF/JFM

James Edmund Flynn
California State Attorney General
Assistant Deputy Attorney General
1515 K Street
Suite 511
P O Box 944255
Sacramento, CA  94244-2550

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964

Warren E George Jr
McCutchen Doyle Brown and Enersen
Three Embarcadero Center
Suite 1800
San Francisco, CA  94111

Matthew A Coles
American Civil Liberties Union
1663 Mission Street
Suite 460
San Francisco, CA  94103

San Francisco, CA  4103

Sanford Jay Rosen
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

RECEIVED

JUN 0 8 1993

ROSEN, BIEN, & ASARO

Jack L. Wagner, Clerk

BY: _____
D Weeks, Deputy Clerk

4-6-93
482-1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,           )
                                 )
        PLAINTIFFS               )           NO. CIV S-87-1636
                                 )
          VS.                    )           LKK-JFM
                                 )
GEORGE DEUKMEJIAN, et al.,       )           Findings and Conclusions
                                 )              of the Mediator
        DEFENDANTS               )           Perceived Violation No. A-9
                                 )
_____)


## INTRODUCTION

The Consent Decree provides that defendants shall pro-
vide appropriate access to inpatient psychiatric care for
all prisoners at CMF[1].  Defendants' Plan for Inpatient Care,
submitted on October 1, 1990, and incorporated into the
Consent Decree, requires that defendants provide 412 beds
for California Department of Corrections (CDC) inmates at
Atascadero State Hospital (ASH)[2].

Defendants had 412 beds available at ASH that could
be used to provide inpatient psychiatric treatment for
prisoners transferred to the Department of Mental Health
(DMH) pursuant to Penal Code sections 2684 and 2974, until
the late spring of 1991.  On May 31, 1991 defendants informed
parties that there would be a temporary reduction (up to
2 years) in the number of inpatient beds at ASH available
for use of the Department of Corrections necessitated by
fire and life safety renovations at DMH hospitals[3].

On June 4, 1991 plaintiffs noticed Perceived Violation

- 1 -

No. 508 regarding DMH's intention to temporarily decrease
the number of beds available for prisoners transferred
from CDC[4].  After lengthy negotiations and a mediation hear-
ing, the Mediator issued Findings and Recommendations dated
September 10, 1991, which were adopted by the Court and
incorporated into the Decree[5].  The Court's Order requires
that defendants are obligated to have available 412 beds
at ASH that can be used for the inpatient care of prisoners
transferred from CDC, and that no future changes in the
number of inpatient beds available to CDC at ASH may be made
without following the procedures outlined in the Consent
Decree for modification of a Plan under the Decree[6].

Notwithstanding their obligation to maintain 412 beds
at ASH, DMH and CDC executed an Interagency agreement for
fiscal year 1992-93 (effective July 1, 1992 through June 30,
1993) that reduced the contracted for number of inpatient
beds available to CDC from 412 to 374[7].

On December 17, 1992 plaintiffs sent defendants a no-
tice of perceived violation in which they informed defendants
of their belief that the reduction of contracted beds was
a violation of the Consent Decree[8].  Informal negotiations
failed to resolve the dispute, and on January 27, 1993 plain-
tiffs requested that the Mediator issue a Perceived Viola-
tion number and schedule an evidentiary hearing[9].  The Media-
tor issued Perceived Violation No. A-9 (ASH Capacity) and
scheduled an evidentiary hearing [10].  There followed exten-
sive negotiations between parties, and a status conference
on the matter was held on March 5, 1993.  Although a formal
agreement could not be reached at the March 5 conference,
parties agreed to negotiate further in an attempt to mutually
agree on a joint statement of undisputed facts on Perceived
Violation A-9, and if a resolution was not possible an evi-
dentiary hearing would be held on March 22, 1993.

Parties were unable to develop a joint statement, but agreed to submit to the Mediator separate statements of proposed findings of fact and conclusions with brief supporting arguments.

Parties further agreed to waive the need for an evidentiary hearing and allow the Mediator to decide the issues on the written submissions[11].  Parties submitted their proposed findings of fact, conclusions, and briefs in support thereof.  (See Appendix A-Defendants; Appendix B-Plaintiffs).  What follows is the Mediator's review of the briefs, his findings of fact, conclusions and recommendations to the Court.

## FINDINGS OF FACT

1.  The Consent Decree requires defendants to provide appropriate access to inpatient psychiatric care for all prisoners at CMF.  Defendant's existing Plan for inpatient care was incorporated into the Consent Decree, and requires that CDC contract with CMH for 412 beds at ASH.  The availability of 412 beds was reinforced by the Court's Order approving the conclusions in Perceived Violation No. 508.

   Evidentiary support:
   *  Consent Decree, ¶V(E)(1);
   *  Defendants' Action Plan – Utilization and Admission for Inpatient Care, September 26, 1990, p.1;
   *  Findings and Recommendations of the Mediator, Perceived Violation No. 508, September 10, 1991.
   *  Order adopting the Finding and Recommendations of the Mediator – Perceived Violation No. 508, October 5, 1991.

2.  The Consent Decree and subsequent orders of the

Court specifically require that if defendants seek to modify any plans or programs required by the Decree, that specific procedures will be followed. These procedures include notification, meet and confer, and referral to the Mediator for findings and recommendations if agreement cannot be reached by parties. Under these procedures the defendants have the burden of persuasion that the proposed modification should be approved.

Evidentiary support:
* Consent Decree, ¶VIII.
* Order, adopting the Mediator's Findings and Recommen-
  dations - Perceived Violation No. 508, September 10,
  1991.

3. The inpatient beds at ASH are provided as a part of an interagency agreement between CDC and DMH which is negotiated each fiscal year. The agreement is commonly referred to as the Memorandum of Understanding (MOU). The FY 1991-92 interagency agreement required that DMH provide 412 beds at ASH for CDC patients.

Evidentiary support:

* FY 1991-92 Interagency Agreement, p.2, ¶5(A).

4. The FY 1992-93 Interagency Agreement, effective July 1, 1992, required that DMH provide 374 beds at ASH for CDC patients. Although the MOU states that 412 beds would be available for CDC for bed utilization, only 374 beds were actually allocated and budgeted. The FY 1991-92 MOU did not have a bed utilization factor requiring only 374 beds.

Evidentiary support:
* FY 1992-93 Interagency Agreement, p.2, ¶5(A).

5. The CDC's agreement (MOU) to reduce the bed utiliza-
tion and budget capacity of ASH by 38 beds was never justi-
fied on an actual or perceived lack of need for inpatient
treatment of CMF prisoners. Rather, the only evidence pre-
sented indicates that the reduction was based on a low bed
occupancy rate and an effort to save money for other needs.

A. As early as October 1990 the DMH issued a Budget
Change Proposal that recommended that the P.C. 2684 and
2974 beds allocated to CDC at ASH be reduced from 412 to
252. CDC fought this reduction as they believed it would
have a disastrous effect on the Department's ability to
carry out its mission. The reduction in bed allocation
was deferred at that time.

B. On May 6, 1992, John O'Shaughnessy, Chief, Mental
Health Services Branch, CDC, in a letter to Nadim Khoury, M.D.,
Assistant Deputy Director, Office of Health Care Services,
CDC, stated:

> "Our tracking of PC 2684 and 2974 occupancy rates at
> AHS has shown continued decreasing rates. From January 2,
> 1991 to April 28, 1992 the rate decreased from 94.2%
> to 78.4%. To avoid a loss of funds for the unused ASH
> beds, we should reduce the number of contracted PC 2684
> and 2974 beds at ASH from 412 to 350. With the funds
> saved we should increase the number of female inpatient
> beds to 45 and retain any remaining savings for use
> in other mental health programs. Although this reduc-
> tion will have to be worked out relative to the <u>Gates</u>
> case – which is based on 412 ASH beds – the change will
> allow more efficient use of existing funds which great-
> ly reduces the appearance of CDC not using its existing
> health care resources."

(It should be noted that the low occupancy rate was
directly caused by a rejection rate of cases referred to
ASH which averaged over 50%. Also, the proposed reduction
in ASH beds was never "worked out relative to the <u>Gates</u>
case",nor was it ever discussed with plaintiffs.)

- 5 -

C.   For FY 1992-93 the Legislative Analyst's Office
(LAO) advised defendants that it was going to reduce the
number of beds available at ASH for CDC inmates because data
on use of beds in FY 1991-92 did not justify continued fund-
ing for 412 beds.   LAO decided it would use the highest
monthly occupancy rate for FY 1991-92, which was 374, and
provide funding at that level.

The reduction in budget funds for ASH beds that followed
appears to be directly related to the effort to increase
the occupancy rate at Atascadero and save money to be used
for other purposes.

Evidentiary support:
* Memorandum from Nadim Khoury, M.D., to R.H. Denniger,
  October 30, 1990.
* Memorandum from John O'Shaughnessey to Nadim Khoury,
  M.D., May 6, 1992.
* Memorandum from John O'Shaughnessey, to David Tris-
  tan, February 25, 1992.

* Statement of John O'Shaughnessey at March 4, 1993
  informal mediation hearing on Perceived Violation
  No. A-9.
* Mediator's Progress Report re inpatient bed utiliza-
  tion.
* Memorandum from George E. Ingle to Carl Larsen,
  January 8, 1993.

6.   The Interagency Agreement for FY 1992-93 states
that CDC will have 412 beds available at ASH, but funds were
provided for only 374 beds.   CDC agreed to fund additional
beds up to 412 if bed utilization justified such action.
No funds were specifically provided in the CDC budget for
such an augmentation.

- 6 -

Evidentiary support:
* Interagency Agreement CDC-DMH, FY 1992-93.
* Statement of John O'Shaughnessey at March 5, 1993
  informal mediation hearing of Perceived Violation
  No. A-9.
* Memorandum from R.H. Denniger, Chief Deputy Direc-
  tor, CDC to Lynn Whetstone, Chief Deputy Directior,
  Department of Operations, DMH, June 19, 1992.

7.  In late December, 1992, CMF was advised by ASH
that all CDC allocated beds were filled (using the 374 bud-
get figure),and that admissions would have to be on a one-
for-one exchange; that is, for each patient admitted, one
would have to be discharged.  During December 1992 and through
January 1993 the waiting list for CMF patients to ASH averaged
15 patients because a capacity level of 374 was utilized.
If the required capacity of 412 beds had been provided there
would not have been a waiting list.

Evidentiary support:
* Letter from L. Carpenter to Gail Lewis, February 9,
  1993.
* Letter from George E. Ingle to Carl Larson, January 8,
  1993.

8.  In order to have access to any ASH beds in excess
of the 374 beds contracted for under defendants' FY 1992-93
MOU, the CDC must undertake  additional procedures and make
additional payment to DMH, as set forth in a letter dated
February 24, 1993 from Clyde L. Murray, Deputy Director,
Division of State Hospitals,to the Mediator.  Mr. Murray
describes the additional procedures required for CDC to have
access to the 38 ASH beds required by Court Order.

    When the Chief Psychiatrist at the hub facility (CMC
    is the hub facility for ASH) concludes that beds above
    the 374 level will be needed, he is to contact  the

- 7 -

Deputy Director, or designee of the Health Care Services
Division of the Department of Corrections, and report
the facts and his analysis of the situation.   If the
Deputy Director, Health Care Services Division, agrees
that additional beds are needed he will immediately
contact Mr. Murray, or in his absence , the person
acting in that capacity.   They will come to agreement
on the number of beds to be provided, the time frame
for these beds to come on line, and the budget adjust-
ments necessary to support this <u>augmentation</u>*.   Appro-
priate documents can be prepared and processed between
the two departments on an emergency basis if the cir-
cumstances require.   The Deputy Director, DMH, would
notify the Executive Director of ASH of the authorized
change in bed utilization level.

ASH officials estimate this process would take from
seven to sixty days to accomplish, although such timing
appears optimistic when one considers that FY 1992-93 MOU
wasn't completed until February 1993, seven months after
the contract year started.

There was no tangible evidence produced, other than
ASH officials' opinion,as to how long the process would
take to amend the MOU.   It would have been helpful to know
how long each segment of the decision process would take,
particularly as it involved contractual changes and approval
of state control agencies (Department of Finance, Depart-
ment of General Services, etc.).

Evidentiary support:
* Letter from clyde L. Murray to Allen F. Breed, Feb-
  ruary 24, 1993.
* FY 1992-93 Interagency Agreement, February 4, 1993.
* Statement by Jon DeMorales at the March 5, 1993
  informal mediation of Perceived Violation No. A-9.

9.   There is no evidence of any reduction in the CDC's
need for inpatient beds at ASH.

*Underlined for emphasis.

- 8 -

Evidentiary support:

* Memorandum from L. Carpenter to Gail Lewis, February 9, 1993.
* Memorandum from George E. Ingle to Carl Larson, January 8, 1993.
* Coleman vs. Wilson, Deposition of Jon DeMorales, April 27, 1992, pp. 32-35.
* Coleman vs. Wilson, Deposition of John S. Zil, January 8, 1993, p. 328 (corrected by witness February 18, 1993).
* Coleman vs. Wilson, Deposition of Dennis F. Koson, M.D., January 6, 1993, Vol II, pp. 270-274.
* Mediator's Eleventh Progress Report, February 22, 1993, p.39.


## CONCLUSIONS

1. In addition to the 150 inpatient beds available at DMH-V, defendants are currently obligated to provide 412 beds at ASH for the inpatient care of CDC patients.

2. Defendants contractually reduced the number of budgeted inpatient beds available to CDC at ASH from 412 to 374 without utilizing the procedures for modifying their Plan as required by the Consent Decree.

3. Although the current MOU between CDC and DMH provides for the "availability" of 412 beds at ASH, the contract provides funds for just 374 beds with a bed utilization allocation of 374 beds.

4. To increase the bed utilization allocation from 374 beds to a greater number (not to exceed 412) requires a time consuming and bureaucratic process.

5.  This is the second time since the entry of the
Consent Decree that defendants have reduced the number of
ASH beds below the mandated 412 level without utilizing the
modification procedures provided in the Decree.

## RECOMMENDATIONS TO THE COURT

1.  By May 1, 1992, CDC and DMH shall modify their
FY 1992-93 Interagency Agreement to provide for 412 beds
at ASH for CDC patients without any delays for budgetary
augmentation or revision of bed utilization levels.

2.  Occupancy rates at ASH for CDC patients will be
computed on the basis of 412 beds.

3.  No future changes in the number of inpatient beds
available to CDC at ASH for use by prisoners transferred
pursuant to Penal Code Sections 2684 and 2974 may be made
without following the procedures outlined in the Consent
Decree for modification of a Plan under the Decree.

R        fully subm'

Allen F. Breed
Mediator


Dated:  A

NOTES

1.  Gates vs. Deukmejian, Consent Decree, ¶ V(E)(1), March 9, 1990.

2.  Gates vs. Deukmejian, Order, January 8, 1991.

3.  Letter to Allen F. Breed from Bruce M. Slavin, May 31, 1991.  Letter to Michael W. Bien from Bruce M. Slavin, June 21, 1o91.

4.  Letter to Bruce Slavin from Michael W. Bien, June 4, 1991.

5.  Gates vs. Deukmejian, Order, October 10, 1991.

6.  Ibid.

7.  Interagency Agreement, CDC-DMH for referral to DMH hospitals effective July 1, 1992 through June 30, 1993; approved by Department of General Services, February 4, 1993.

8.  Letter to James E. Flynn from Stephen M. Liacouris, December 17, 1993.

9.  Letter to Allen F. Breed from Stephen M. Liacouris, January 27, 1993.

10. Letter from Allen F. Breed to Michael Bien, James Flynn and Warren George, February 22, 1993.

11. Letter to James E. Flynn from Andrea G. Asaro, March 17, 1993.  Telephone conference call between James E. Flynn, Andrea  Asaro, Stephen Liacouris, March 22, 1993.



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

      Plaintiffs,

  v.

GEORGE DEUKMEJIAN, et al.,

      Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

    The court is in receipt of the Findings and Conclusions of the Mediator -- Perceived Violation No. 508.

    IT IS HEREBY ORDERED as follows:

    1.   The report is ordered FILED;

    2.   The court accepts and approves the conclusions agreed to by the parties as reflected in that report; and

    3.   The report is made a part of the Consent Decree in this case.

    IT IS SO ORDERED.

    DATED:  October 5, 1991.

                      LAWRENCE K. KARLTON
                      CHIEF JUDGE EMERITUS
                      UNITED STATES DISTRICT COURT

RECEIVED

OCT 07 1991

ROSEN ... & ASERO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,                )    No. CIV S 87-1636 LKK-JFM
                                      )
            Plaintiffs,               )    FINDINGS AND CONCLUSIONS OF
                                      )    THE MEDIATOR - PERCEIVED
      v.                              )    VIOLATION NO. 508
                                      )
GEORGE DEUKMEJIAN, et al.,            )
                                      )
            Defendants                )
_____ )

On May 31, 1991 defendants notified plaintiffs that the Department of Mental Health (DMH) was planning a temporary decrease in the number of beds allocated for prisoners transferred from the Department of Corrections pursuant to Penal Code sections 2684 and 2972.[1]  DMH allocated 412 beds at Atascadero State Hospital for use by prisoners plus approximately 40 additional beds at other hospitals.  Due to scheduled fire and life safety renovations at its hospitals DMH needed to temporarily decrease its overall number of beds.  Initially DMH

_____

    1.  Penal Code section 2972 refers to parolees who are committed to the Department of Mental Health for treatment.  The number of commitments under this section is generally quite small.  For the sake of simplicity this report will refer to CDC

1  was unsure as to the exact number of 2684 beds it could maintain.
2  The initial projection in 1990 indicated a potential decrease of
3  approximately 160 beds, a figure that was later reduced to 132
4  beds.  DMH hoped, however, that the results of a lawsuit pending
5  in San Diego County Superior Court would permit counties to buy
6  out 71 beds.  These beds could then be made available to the
7  Department of Corrections if needed, and the net result would be
8  a reduction of 61 beds.

9       Plaintiffs objected to the projected bed allocation
10  decrease, and on June 4, 1991 they sent notice of Perceived
11  Violation No. 508.  Informal negotiations between the parties
12  failed to resolve the problem, and on July 17, 1991 a mediation
13  was held at CMF.  At that mediation, the Department of
14  Corrections stated that they had no evidence demonstrating a
15  reduced need for inpatient beds.  DMH stated that the bed buy out
16  was occurring, and only 61 beds would be reduced from the
17  allocation.  CDC agreed generally to maintain historic referral
18  rates, and DMH agreed generally to continue to admit 2684
19  transfer at historic acceptance rates.  The matter was then
20  continued until August 9, 1991 to give DMH time to develop a plan
21  that would allow them to maintain the allocated 412 beds at
22  Atascadero for 2684 transfers.

23       At the mediation on August 9, DMH stated that they
24  would give a high priority to admitting 2684 transfers.  They
25  presented a plan that required them to transfer patients
26  throughout their hospital system in order to achieve the goal of
27  having available at Atascadero the 412 beds for prisoners.  The
28  plan would require time to implement because of the logistics and

1    concerns involved in transferring large numbers of Penal Code
2    commitments and because of the logistics of such a large move.
3    Plaintiffs sought assurances that the moves could be accomplished
4    within a reasonable time and that sufficient beds would remain
5    available in the interim.

6            The parties met again by telephone conference on August
7    16, 1991 to resolve final details.  DMH confirmed that the
8    Memorandum of Understanding with CDC anticipated that there would
9    be a waiting list of prisoners accepted for transfer to
10   Atascadero, but that the waiting list could not exceed 20 inmates
11   a week.  DMH and CDC agreed that a prisoner would be transferred
12   to Atascadero within 25 calendar days after he was accepted for
13   transfer.  DMH also stated that they believed all of the
14   necessary moves could be accomplished within 90 days, and that in
15   the interim they would be able to meet CDC's demand for prisoner
16   beds.

17   FINDINGS OF FACT

18           1.   The Consent Decree provides that defendants shall
19   provide appropriate access to inpatient psychiatric care for all
20   prisoners at CMF.  (V.E.1).  Defendant's existing Plan for
21   Inpatient Care, submitted in October, 1990, and incorporated into
22   the Consent Decree, requires that defendants provide 412 beds for
23   CDC inmates at Atascadero State Hospital.

24           2.   Since the Consent Decree was signed defendants
25   have had available 412 beds at Atascadero State Hospital that may
26   be used to provide inpatient psychiatric treatment to prisoners
27   transferred to DMH pursuant to Penal Code sections 2684 and 2974.
28   Defendants are presently obligated to produce a study of the need

1   for inpatient beds for members of the plaintiff class.  At the
2   present time there is no evidence indicating that need for
3   inpatient beds has declined since the Consent Decree was signed.
4   CONCLUSIONS

5            1.   In addition to the DMH Unit at CMF, defendants are
6   obligated to have available 412 beds at Atascadero State Hospital
7   that can be used for the inpatient care of prisoners transferred
8   from CDC.

9            2.   By November 16, 1991 DMH shall complete any
10  transfers necessary to ensure that 412 beds are available at
11  Atascadero State Hospital for use by prisoners transferred from
12  the Department of Corrections.

13           3.   Defendants may maintain a waiting list of
14  prisoners approved for transfer from CDC at Atascadero State
15  Hospital.  This waiting list may not exceed 20 prisoners per
16  week, and all prisoners placed on the list shall be transferred
17  within 25 calendar days after approval.

18           4.   No future changes in the number of inpatient beds
19  available to CDC at Atascadero State Hospital for use by
20  prisoners transferred pursuant to Penal Code section 2684 may be
21  made without following the procedures outlined in the Consent
22  Decree for modification of a Plan under the Decree.

23  DATED:   September 10, 1991

24                           Submitted,

25

26

27                           ALLEN BREED
                             Mediator

28  pv508.f&c

MAR  8 1991

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

        Plaintiffs,

    v.

GEORGE DEUKMEJIAN, et al.,

        Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

The court is in receipt of the Mediator's Findings and Conclusions relative to defendants' perceived violations Nos. 503 and 504.

IT IS HEREBY ORDERED AS FOLLOWS:

1.    The report is ordered filed;

2.    The court accepts and approves the matters agreed to by the parties in the Findings and Conclusions; and

////

////

////

1          3.    The report is made a part of the Consent Decree in this

2     case.

3          IT IS SO ORDERED.

4          DATED:   March 5, 1991.

5
                                    _____
6                                   LAWRENCE K. KARLTON
                                    CHIEF JUDGE EMERITUS
7                                   UNITED STATES DISTRICT COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                        2

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   JAY LEE GATES, et al.,              )    NO. CIV S-87-1636 LKK
                                         )
12            Plaintiffs,                )
                                         )    FINDINGS AND CONCLUSIONS OF THE
13   v.                                  )    MEDIATOR, PERCEIVED VIOLATIONS
                                         )    NOS. 503 AND 504
14   GEORGE DEUKMEJIAN, et al.,          )
                                         )
15            Defendants.                )

16        On January 10, 1991, counsel for the parties met with the

17   Mediator at the California Medical Facility (CMF) - Vacaville to

18   mediate Perceived Violations Nos. 503 and 504.  The plaintiff

19   class was represented by Michael Bien and Adela Karliner, who

20   were joined by Terry Kupers, M.D., a psychiatrist who served as

21   one of plaintiffs' trial experts.  Defendants were represented by

22   Deputy Attorney General Bruce Slavin.  Also present for

23   defendants were James Tilton, Deputy Director for Administrative

24   Services; Anthony Newland, Chief Deputy Warden of CMF; and Ruth

25   Younger of the CMF Compliance Team.

26        Plaintiffs' Perceived Violation No. 503 alleged that

27   defendants failed fully to implement their outpatient treatment

28

                              - 1 -              FINDINGS AND CONCLUSIONS OF
                                                 THE MEDIATOR, PERCEIVED VIOLATIONS NOS.
                                                 503 AND 504

1    program by October 31, 1990, as required under the Consent

2    Decree.  It further alleged that defendants failed to follow the

3    procedure for modification of programs required under the Consent

4    Decree, in modifying the (1989) Outpatient Program Guide.  It

5    further alleged that the defendants' present schedule for

6    implementation is unsatisfactory in that it calls for full

7    staffing and partial implementation by May 1, 1991 and full

8    implementation by July 1, 1991, with some additional staff

9    positions to be filled by December 1, 1991.

10        Plaintiffs' Perceived Violation No. 504 alleged that

11    defendants were improperly taking steps to terminate the

12    Department of Mental Health (DMH) Day Treatment Program (DTP) in

13    violation of the Consent Decree.  The DTP was a functioning

14    program providing psychiatric treatment at the time that the

15    Consent Decree was entered into and no new program is in place

16    that duplicates its functions.  Plaintiffs further alleged that

17    defendants' unilateral decision to terminate the program without

18    any notice to plaintiffs, violated the terms set forth in the

19    Consent Decree for modification.  Plaintiffs further alleged that

20    defendants improperly informed staff and patients in the DTP of

21    the program's closure, causing harmful fear and anxiety among

22    patients as well as a possible loss of staff.

23        The parties having met and mediated the dispute and

24    substantial agreement having been reached, the Mediator makes the

25    following findings of fact and conclusions.

26    / / /

27    / / /

28    / / /

- 2 -             FINDINGS AND CONCLUSIONS OF
                  THE MEDIATOR, PERCEIVED VIOLATIONS NOS.
                  503 AND 504

Findings of Fact:

1. Defendants were unable to comply with the requirement of the Consent Decree to fully implement a program to provide outpatient psychiatric care for prisoners discharged from the inpatient psychiatric program at CMF and ASH by June 30, 1990 and to have an outpatient program "staffed and fully operational by October 31, 1990".

2. The Consent Decree calls for implementation of an outpatient treatment plan that will provide appropriate psychiatric care for all prisoners at CMF including appropriate care for prisoners discharged from inpatient programs at CMF and ASH as well as all other prisoners requiring outpatient psychiatric care at CMF.  The Consent Decree calls for the implementation of CMF's Outpatient Program Guide drafted in 1989 as an effort to comply with the above requirements.  Although the budget for the 1989 plan had been approved in 1988, the plan was not fully implemented.  One of the reasons for this failure was that CMF had considerable difficulty recruiting psychiatrists.  CMF concluded that the 1989 plan, based on a medical model, was too psychiatrist-intensive and did not adequately address the need for behavior modification and treatment addressed to the activities of daily living.  They informed the Mediator that they would be unable to meet the October 31, 1990 deadline for full implementation.

FINDINGS AND CONCLUSIONS OF THE MEDIATOR, PERCEIVED VIOLATIONS NOS. 503 AND 504

3.  In August 1990, defendants unilaterally decided to modify their outpatient program to one that was less psychiatrist oriented and more behavior management/living skill oriented.  Defendants did not notify plaintiffs about these changes prior to revising their program model, or follow the procedure for modification required by the Consent Decree. Defendants' failure to meet the October 1990 deadline was caused, in part, by the decision to redesign the outpatient program.  Further delays in implementation were caused by the difficulty in hiring staff.

4.  To implement the new program, defendants needed to develop new funding sources.  In September-November 1990, defendants twice sought funding but their attempts to fund Gates-related costs were denied outside of the Department of Corrections by the State control agencies.  Defendants' failure fully to implement the program for lack of funds is not excused under the terms of the Consent Decree.

5.  The Department then decided to try to fund the program by internal redirection including consideration of closing down of the day treatment program DTP. Sufficient funds have been identified from within the Department of Corrections, and the Department is at present packaging the concept for presentation to the Department of Finance.  Approval by the Department of Finance and other governmental authorities requires

- 4 -

1      several steps and is expected by March 31, 1991 at the

2      earliest.

3   6.   While awaiting approval from the Department of Finance

4      and the Legislature for the program changes, CMF can

5      begin processing paper work and recruiting, but they

6      cannot hire until they have final authority.

7   7.   Defendants stated that they intended to fund the

8      outpatient program, in part, by closing down the DMH

9      DTP and transferring its funding to the CDC outpatient

10     program.   They planned to restrict admissions to the

11     program and gradually empty it beginning before a

12     commitment for funding the new program was obtained.

13     DMH staff and prisoners resident in the DTP heard

14     rumors about the closing of the program as early as

15     August 1990, and are still uncertain about the future

16     of the program.   Defendants did not include any

17     reference to the closing of the DTP in their new

18     outpatient plan produced to plaintiffs and the

19     Mediator in October 1990.   Nor did they include any

20     reference to the closing in their monthly reports for

21     November and December 1990.   Plaintiffs objected to

22     the closing of the DTP which is a functioning, fully

23     staffed, operational psychiatric program serving the

24     needs of prisoners, for purposes of funding an also

25     necessary but still incomplete outpatient program.

26     Plaintiffs also objected to linking two separate

27     issues:   1) whether the DTP should be closed, modified

28

- 5 -

1    or transferred to CDC control and (2), the delay in

2    the implementation of the outpatient program.

3    8.    Defendants stated that they will be able to provide

4    funding sufficient to treat all prisoners in

5    psychiatric classifications at CMF as of July 1, 1990

6    without closing the DTP initially.  If, at some later

7    date, defendants intend to increase the number of

8    prisoners in psychiatric classifications at CMF, they

9    may reevaluate the DTP.  If and when defendants

10    consider discontinuing the day treatment program and

11    utilizing those funds for the outpatient program, they

12    will follow the procedure required by the Consent

13    Decree for Modification of programs and plans.

14    9.    Defendants' present schedule, as set forth in the

15    October 1990 report, calls for full staffing and 50%

16    implementation of the outpatient program by May 1,

17    1991 and full implementation of the outpatient program

18    by July 1, 1991.  Two positions for which classes

19    presently do not exist within the Department of

20    Corrections -- Chief Psychiatrist for Professional

21    Education and Supervising Psychiatric Social Worker  -

22    - are not scheduled to be hired until December 1,

23    1991.  Defendants confirmed that they still plan to

24    meet these dates.  Plaintiffs expressed concern that

25    the delay has already caused avoidable deaths and

26    suffering and stated that no further delay will be

27    tolerated.

28

- 6 -

1 | Conclusions

2 | 1. Defendants failed to have an outpatient program

3 | "staffed and fully operational" as required under the

4 | Consent Decree.

5 | 2. Defendants' outpatient program must be fully staffed

6 | by May 1, 1991, 50% operational by May 1, 1991 and

7 | fully operational by July 1, 1991. Failure to obtain

8 | funding shall not relieve defendants from their duty

9 | to comply with these dates.  Any further delay shall

10 | not be tolerated.

11 | 3. Defendants should attempt to obtain the necessary

12 | approvals and funding for the Chief Psychiatrist for

13 | Psychiatric Education and the Supervising Psychiatric

14 | Social Worker positions by May, 1991.  Defendants

15 | should begin recruiting at once and persons to fill

16 | these positions should be hired as soon as the

17 | Department receives the necessary approval from

18 | outside agencies.  In the interim defendants should

19 | attempt to perform these functions utilizing existing

20 | staff.

21 | 4. If at any time defendants deem it necessary to

22 | terminate, transfer to CDC or otherwise modify the

23 | DTP, defendants shall comply with the requirements of

24 | the Consent Decree for modification of programs or

25 | plans.  If defendants determine that funding from the

26 | DTP is necessary to complete final implementation of

27 | their outpatient program by July 1, 1991, then,

28 | Defendants shall not by February 11, 1991, defendants

- 7 -

1    shall present to plaintiffs a written plan regarding

2    the termination of the DTP.  If the program is to be

3    discontinued, the plan shall detail the reasons for

4    the termination of the program, the arrangements for

5    prisoners who will be released from the program due to

6    its termination and the arrangements for prisoners in

7    need of the services provided by the program who will

8    not be admitted to the program upon its termination.

9    The plan should also include an analysis of the types

10   of prisoners presently being served by the day

11   treatment program.  Plaintiffs' response to

12   defendants' plan is due on February 15, 1991.  If

13   defendants do not intend to discontinue the program

14   they should so inform plaintiffs by February 11, 1991.

15   Under no circumstances shall defendants terminate the

16   DTP until such time as an adequate replacement program

17   is fully staffed and operational.  Nor shall

18   defendants restrict admissions to the day treatment

19   program or transfer prisoners resident in the program

20   without medical indication until a replacement program

21   is in place.

22   5.   Defendants shall immediately communicate to DMH staff

23        and prisoners that the DTP will not be terminated on

24        or before April 1, 1991, nor will prisoners resident

25        in the program be transferred out of DTP unless and

26        until an adequate replacement program has been

27        created.  Defendants shall also immediately inform DMH

28        staff and prisoners that the DTP will not be

- 8 -

1    terminated, transferred or modified unless the process

2    for modification required by the Consent Decree has

3    been completed

4

5    DATED:   February 8, 1991        Submitted,

6

7

8    ALLEN BREED,

9    Mediator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -          FINDINGS AND CONCLUSIONS OF
                    THE MEDIATOR, PERCEIVED VIOLATIONS NOS.
                    503 AND 504

EXHIBIT   1-C

FILED

⌣ ⌐ . 1    ⌐⌐⌐

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

FLYNN
DOCKETED
SACRAMENTO

JUN 20 1991

By _____ G. Devisscher
No. _____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

      Plaintiffs,

    v.

GEORGE DEUKMEJIAN, et al.,

      Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

The court is in receipt of the Report of the Mediator erroneously labeled "Perceived Violation No. 506," concerning declassification of prisoners from any psychiatric classification. At the request of the mediator, the violation number is correction to read "507."

IT IS HEREBY ORDERED AS FOLLOWS:

1.    The report is ordered filed;

2.    The court accepts and approves the matters agreed to by the parties as reflected in that report; and

3.    The report is made a part of the Consent Decree in this

AO 72
(Rev.8/82)

OR - 00501

1    case.

2        IT IS SO ORDERED.

3        DATED:    June 17, 1991.

4

5                                    LAWRENCE K. KARLTON
                                     CHIEF JUDGE EMERITUS
6                                    UNITED STATES DISTRICT COURT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2

OR - 00502



FILED

JUN 1  1991

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,           )
                                 )
        PLAINTIFFS               )
                                 )        Perceived Violation
        VS.                      )            No. 506
                                 )              529
GEORGE DEUKMEJIAN, et al.,       )
                                 )
        DEFENDANTS               )
                                 )
_____  )

529

OR - 00503

BACKGROUND

Part F., Section G, Paragraphs 1 and 2 of the Consent Decree requires that no prisoner shall be "declassified" from any psychiatric classification without a statement in writing from a psychiatrist, made after a psychiatric evaluation, including an interview, recommending the declassification. Further, that defendants shall develop written standards and procedures for declassification of prisoners; that in any declassification consideration the prisoner's treatment team will describe the need for further treatment; and all classification procedures, housing decision and disciplinary actions concerning prisoners with psychiatric classifications must consider the existing psychiatric treatment plan for the prisoner.

Defendants developed their policies and procedures including an Action Plan to carry out the requirements of the Consent Decree. The plaintiffs, however, felt that the defendants were not complying with the following:

1. Requirement that a psychiatrist conduct an adequate face to face psychiatric evaluation prior to declassification;

2. Requirement that the Treatment Team describe the need for further treatment if declassification is to be considered;

3. Requirement that housing decisions (institution placements),disciplinary actions, and classification decisions must consider the existing treatment plan; and

4. Implied requirement that an inmate with a psychiatric classification who is on psychotropic medication be placed in an institution with medical/mental health services adequate to meet his medical needs.

- 1 -

OR - 00504

The plaintiffs further felt that the standards and pro-
cedures for declassification of prisoners were over broad and
failed in many respects to provide specific information upon
which sound clinical judgements could be made.

Defendants strongly supported their procedures  and
felt that they had adequately documented that Consent Decree
requirements were being met.

Parties negotiated informally for several months, but
were unable to resolve their differences.  In accordance
with Part IX, Section 5 of the Decree a mediation hearing
on the perceived violation was set for April 19, 1990.

<u>FINDINGS OF FACT</u>

A mediation hearing was held on April 19, 1991 which
was attended by attorneys of record and experts represent-
ing both plaintiffs and defendants.  Oral presentations were
made, memorandums were submitted, and a full discussion of
all of the issues was held.  A recording was made of the
entire hearing and will be preserved.

Since agreement was reached by parties as to a satis-
factory solution to the perceived violations a further find-
ing of fact does not appear to be necessary.  All memorandums,
however, will be made part of the record.

Appropriate wording of the various policies and proce-
dures was laboriously worked out by parties, with final
agreement being reached at a meeting held on May 23, 1991.

- 2 -

OR - 00505

## CONCLUSION

Appendix "A" represents the procedures that parties have agreed to and will be used by the defendants in all future declassification actions.


Allen F. Breed
Mediator


June 6, 1991

OR - 00506

## CALIFORNIA MEDICAL FACILITY

## DECLASSIFICATION PROCEDURE

Declassification is an interdisciplinary process taken to change the psychiatric category of an inmate in order for the inmate to be housed in the least restrictive environment possible, keeping in mind his treatment needs.

Inmates who have been diagnosed with a major mental illness requiring inpatient or outpatient psychiatric care may be considered for declassification to Category U if they have had no serious psychiatric symptoms for a significant period (normally 180 days). Category U shall include inmates no longer in need of psychotropic medication and those who are asymptomatic as a result of compliance with psychotropic medication. These inmates may be expected to function within a non psychiatric setting.

The declassification process has three interrelated steps, 1) clinical evaluation and decision, 2) program review and recommendation from the Unit Classification Committee (UCC) and 3) Classification Service Representative (CSR) for transfer or placement review.

Because clinical evaluation and treatment is of the utmost importance in this process the declassification decision is initiated by and rests solely with the clinical staff. Once clinical staff has reached the decision to declassify an inmate then program staff is responsible for reviewing the case factors and making an appropriate institutional placement recommendation. Once this has been completed the CSR will make a final decision based upon treatment needs, category designation and housing recommendations as outlined in the clinical decision and UCC action.

## I.    Clinical Staff Review

The following procedures will be used when declassifying an inmate from a psychiatric category:

a.    The initial recommendation for a change in psychiatric category may be made by the inmate's treatment team after a psychiatric evaluation including a personal interview with the inmate. A major component of the declassification process is the documentation of the inmate's current mental status, a summary of his history over time and in the 180 day period to declassification, the general course of the illness, other medical problems, past and current treatment, and future recommended treatment, if any. The treatment team

recommending declassification will be responsible for ensuring the appropriate documentation is completed prior to review by a psychiatrist. No inmate will be considered for declassification unless his medical file contains the following completed forms:

*Outpatient Mental Health Services Intake/Initial
 Treatment Plan (CDC 7320 - 4 pages. Includes Mental
 Status Exam).

*Outpatient Mental Health Services Treatment Plan
 (CDC 7319 - 2 pages).

*Outpatient Mental Health Services Treatment Plan
 Addendum (CDC 7319A - 2 pages).

*Outpatient Interdisciplinary Progress Notes
 (CDC 7254).

*Outpatient Mental Health Services Closing Summary
 (CDC 7318).

*Psychiatrists Declassification Recommendation
 Checklist

b.    A psychiatrist must interview and evaluate each inmate who has been referred for declassification. The psychiatrist will also review all appropriate mental health records, and will complete the Declassification Recommendation Checklist. (See Attached).

c.    The Declassification Recommendation Checklist will be filled out on each case being considered for declassification and it will be placed in the medical file upon completion.

d.    When there is a difference of opinion between two clinicians, the Chief Psychiatrist Outpatient Psychiatry Services or designee, will interview the inmate and render a final decision.

e.    Once all documents have been completed and a clinical decision has been made, a CDC 128-C will be completed and forwarded to the Unit Classification Committee for appropriate action. All recommendations to declassify an inmate will be reviewed by the Chief Psychiatrist or designee to assure correct form and consistency with all documentation.

OR - 00508

    f.    CDC Pharmacy Formulary Guidelines for inmates on psychotropic medication for major mental illness will be developed. Transfers to other CDC institutions of Category U inmates on psychotropic medication for major mental illness will only take place if the Department's Office of Health Care Services determines that the receiving institution has the capability of administering psychotropic medication and providing clinical backup in case an emergency situation occurs with the Category U inmate.

    g.    For the purpose of Quality Assurance monitoring, all inmates with psychiatric classifications who are transferred to a different CDC institution will have a copy of the completed forms listed in Section I.a. of this procedure retained in the CMF's Medical Records Office, for a 180 day period.

## II. Program Staff Review

Program staff will be responsible for:

    a.    Reviewing the declassification decision and schedule the inmate for UCC.

    b.    UCC will consider the case factors listed below when making an appropriate institutional placement recommendation consistent with the clinical decision (CDC 128-C) recommendations for further treatment, if any:

        1.    classification score;
        2.    custody level;
        3.    commitment offense;
        4.    location of family or other support systems;
        5.    gang membership or affiliations; and,
        6.    proposed release date.
        7.    institutional behavior
        8.    program needs

    c.    The inmate will be informed of the UCC recommendation. This recommendation will be documented on a CDC 128-G and the inmate will receive a copy. The CDC 128-G will indicate category decision, housing recommendation and any other decisions which may affect the inmate's placement. The CDC 128-G will also remind the inmate of his right to appeal the decision.

OR - 00509

d. The clinical decision (CDC 128-C) and the UCC recommendation (CDC 128-G) will be submitted to the CSR for placement decision.

## III. Classification Service Review

The Classification Service Representative will be responsible for:

a. Reviewing the submitted documents (128-C and 128-G) and central file. This will be done to ensure that the inmate's category designation and Departmental policies are followed when making the final housing decision.

b. Transfer to other CDC institutions of Category U inmates on psychotropic medication for major mental illness will only take place if the Department's Office of Health Care Services determines that the receiving institution has the capability of administering psychotropic medication and providing clinical backup in case an emergency situation occurs with the Category U inmate.

c. Category U inmates who are not taking psychotropic medication may be housed at any institution commensurate with their classification score and case factors.

OR - 00510

## PSYCHIATRIST'S DECLASSIFICATION RECOMMENDATION CHECKLIST

The Declassification Recommendation Checklist will be filled out on each case being considered for a declassification. The following clinical factors will be addressed:

NAME_____ CDC NUMBER_____

### NOTE:  ANY BOX MARKED "NO" MUST HAVE AN EXPLANATION.

                                                            YES    NO

1.  MENTAL HEALTH RECORD REVIEWED AND COMPLETED:            ☐      ☐
    (If no, mental health record brought current)
    COMMENT:_____
    _____
    _____
    _____
    _____
    _____

2.  TREATMENT PLAN CONSULTED AND RECOMMENDATION            ☐      ☐
    REVIEWED:
    COMMENT:_____
    _____
    _____
    _____
    _____
    _____

3.  MENTAL STATUS EXAM PREFORMED BY SIGNATOR:              ☐      ☐

    DIAGNOSIS:  AXIS I _____DSM-III-R_____
                AXIS I _____DSM-III-R_____
                AXIS II_____DSM-III-R_____
    COMMENT (any inconsistencies  with past diagnoses should
    be noted and justified.)_____
    _____
    _____
    _____
    _____

4.  MEDICATIONS REVIEWED/ON THE FOLLOWING MEDICATION:       ☐      ☐

    COMMENT:_____
    _____
    _____
    _____
    _____
    _____

OR - 00511

5.  SUICIDAL HISTORY AND IDEATION REVIEWED:                           ☐   ☐
    COMMENT:_____
    _____
    _____
    _____
    _____
    _____
    _____

6.  CDC 115 DISCIPLINARIES REVIEWED FOR EVIDENCE OF
    INSTABILITY:                                                      ☐   ☐
    COMMENT:_____
    _____
    _____
    _____
    _____
    _____

7.  PROGNOSIS:         ☐   ABLE TO FUNCTION IN GENERAL POPULATION/
                           CATEGORY U/ON NO PSYCHIATRIC MEDICATIONS

                       ☐   ABLE TO FUNCTION IN GENERAL POPULATION/
                           CATEGORY U/ON PSYCHIATRIC MEDICATIONS

                       ☐   REMAIN CATEGORY J CMF/CMC-E ONLY

8.  PSYCHIATRIST'S   RECOMMENDATION   REGARDING   CLASSIFICATION,
    MEDICATION, AMD FURTHER TREATMENT NEEDS TO BE FOLLOWED:
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

PSYCHIATRIST'S
SIGNATURE_____DATE_____

OR - 00512

FILED

JAN 22 1992

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK



Flynn

DOCKETED

JAN 2 4 1992

R. F. Grube

90FE0007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

      Plaintiffs,

    v.

GEORGE DEUKMEJIAN, et al.,

      Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

    The court is in receipt of the Mediator's Report on Perceived Violation No. 404, regarding housing policies and practices, and Mediator's Findings, Conclusions and Recommendations for Perceived Violation No. 510, dealing with declassification of prisoners with psychiatric classification.

    IT IS HEREBY ORDERED as follows:

    1.    The reports are ordered FILED;

    2.    The court accepts and approves the conclusions agreed to by the parties as reflected in those reports; and

////

////

////

604

AO 72
(Rev 8/82)

3.    The reports are made a part of the Consent Decree in this case.

IT IS SO ORDERED.

DATED:    January 17, 1992,

_____
LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

OR - 00565

FILED

JAN 22 1992

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY
DEPUTY CLERK

Flynn

DOCKETED
SACRAMENTO

JAN 2 4 1992

By      R.J. Grubb

No. 90 FE 0002

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,              )    No. CIV S 87-1636 LKK-JFM
                                    )
            Plaintiffs,             )    FINDINGS AND CONCLUSIONS OF
                                    )    THE MEDIATOR - PERCEIVED
      v.                            )    VIOLATION NO. 510
                                    )
GEORGE DEUKMEJIAN, et al.,          )
                                    )
            Defendants              )
_____)

BACKGROUND:

            Part V.G.2 of the Consent Decree provides:

            "All classification procedures, housing
            decisions and disciplinary actions concerning
            prisoners with psychiatric classifications
            must consider the existing psychiatric
            treatment plan for the prisoners."

            Part V.G.1 of the Consent Decree provides:

            "No prisoner shall be "declassified" from any
            psychiatric classification without a
            statement in writing from a psychiatrist,
            made after a psychiatric evaluation including
            an interview, recommending the
            declassification.  If a psychiatrist
            recommends that an inmate be declassified,
            the prisoner's case manager or treatment team
            shall prescribe the need for further
            treatment, if any.  The declassification
            recommendation will then be forwarded to the

OR - 00568

1           classification committee for its
2           recommendation for appropriate placement of
            the prisoner."

3           In March 1991 plaintiffs noticed Perceived Violation
4    507 relating to the declassification of prisoners from Category J
5    to Category U.  The issue was successfully mediated in April and
6    May 1991, and the Mediator's Findings and Conclusions were
7    entered as an order in June 1991.  At that time, defendants
8    represented that all prisoners designated as Category J were
9    placed in Category U upon declassification.  Therefore the
10   procedures approved in the mediation spoke only to the
11   declassification of prisoners from Category J to Category U, not
12   to declassification into the general population.

13          Beginning in July 1991, defendants commenced the
14   transfer of over 170 Category J prisoners to the California Mens'
15   Colony (CMC).  On August 8, 1991, plaintiffs noticed Perceived
16   Violation No. 510 regarding these transfers.  Plaintiffs alleged
17   that the transfer violated Part V.G.2 of the Consent Decree in
18   that the treatment plans of the individual prisoners were not
19   considered in transferring them to CMC.  They also contended that
20   prisoners transferred to CMC were not being afforded many of
21   their rights under the Consent Decree including the right to
22   appropriate declassification procedures.

23          An initial mediation was held at CMF on September 11,
24   1991.  Further mediation occurred at CMF on October 9, 1991.  A
25   partial agreement was reached regarding procedures for transfer
26   of Category J inmates from CMF at that mediation.  Several
27   issues, however, remained unresolved and an evidentiary hearing
28   was scheduled for November 15, 1991.  This mediation was

FINDINGS
MEDIATOR - PER(    OR - 00569

1  continued at plaintiffs' request until November 22, 1991.

2  On November 19, 1991, counsel for plaintiffs and
3  defendants contacted the Mediator informing him that a tentative
4  agreement between the parties had been reached.  This obviated
5  the need for the scheduled evidentiary hearing.  The following
6  findings, conclusions and recommendations reflect the agreement
7  reached between the parties.

8  **FINDINGS**:

9  1.  Between July 1, 1991 and September 19, 1991, at
10  least 172 Category J inmates were transferred from CMF to CMC.

11  2.  In over 40% of the cases there was no
12  documentation that these inmates' treatment plans were consulted
13  or that there was clinical review of the appropriateness of the
14  transfers.

15  3.  In a majority of cases, the transferred inmates'
16  treatment teams and/or treating clinicians were not consulted nor
17  were their treatment plans referred to.

18  4.  In many cases where recommendations of the
19  transferred inmates' treatment teams or treating clinicians were
20  made, they were not followed.

21  5.  The transfers were made because the defendants
22  determined that they could not, at that time, fully accommodate
23  the inmates in their outpatient program nor could they provide
24  all inmates with appropriate psychiatric care as required under
25  the Consent Decree.  The initial 50 transfers were made in
26  response to the heat emergency which occurred on July 3, 1991.

27  6.  The most recent budget change proposal (BCP)
28  provided funding for staff to treat 950 Category J inmates.  At

3.    FINDINGS  OR - 00570
        MEDIATOR - PER

1    the time that the transfers commenced the population of Category

2    J inmates at CMF was over 1200.  There was no previous plan to

3    reduce the Category J population at CMF, and the BCP did not

4    provide a plan for reducing the Category J population to 950.

5    　　　　7.    Prior to the transfers, no plans for the

6    population reduction or transfers were shared with or approved by

7    the plaintiffs.

8    　　　　8.    As of October 2, 1991, CMC mental health staff

9    recommended 29 of the transferred inmates for reclassification

10   from Category J to general population (GP).

11   　　　　9.    As to some of these 29 inmates there was a

12   difference of opinion as to classification between CMF mental

13   health staff and CMC mental health staff.

14   　　　　10.   CDC Departmental Operations Manual section

15   62080.13.1 requires that such differences of opinion be referred

16   to the Chief Psychiatrist, Mental Health Services Branch (MHSB)

17   for resolution.

18   　　　　11.   CMC did not initiate such review as to these

19   inmates, nor was it their practice to require such review.

20   　　　　12.   Only after plaintiffs noticed a perceived

21   violation was such a review undertaken.

22   　　　　13.   Of the 21 inmates recommended for reclassification

23   to GP who remained at CMC at the time of the review, the Chief

24   Psychiatrist MHSB determined that two inmates should remain as

25   Category J's, one should be reclassified to Category K and nine

26   should be reclassified to Category U.

27   　　　　14.   Of these 21 inmates, as of November 27, 1991,

28   6 have been endorsed for transfer and 3 have been transferred to

                                                  FINDING  OR - 00571
                            4.                    MEDIATOR - PF

1    other institutions.  In addition 2 have been referred to the CSR

2    for endorsement.

3        15.  Eight of the transferred inmates were reclassified

4    to GP and transferred to other prisons prior to the audit review

5    of the Chief Psychiatrist MHSB.

6        16.  The Chief Psychiatrist MHSB designee found that 7

7    of the 29 inmates recommended for reclassification to GP should

8    be reclassified to GP because they were clinically stable at the

9    time of his review.

10        17.  The Department Operations Manual (DOM) has no

11   specific provision for reclassifying prisoners from Category J to

12   GP.

13        18.  DOM section 62080.13 Category U provides:

14           Inmates who have recovered from a major
             mental illness requiring inpatient or
15           outpatient psychiatric services shall be
             designated Category "U".  A significant
16           period (normally 180 days) of no serious
             psychiatric symptoms shall be considered
17           evidence of recovery.

18           Category "U" inmates shall include inmates no
             longer in need of psychotropic medication and
19           those who are asymptomatic as a result of
             compliance with psychotropic medication.
20           These inmates may be expected to function
             within a general population setting.
21

22        19.  CDC does not interpret Category U as pertaining to

23   misclassified Category J inmates.  In CDC's view, if an inmate is

24   not mentally ill, then he cannot be considered to have

25   "recovered" as set forth in the definition of Category U.

26        20.  In reviewing the reclassification of the

27   transferred inmates to GP, neither CMC nor the Chief Psychiatrist

28   MHSB made a determination that these inmates had been stable for

5.

1   180 days.

2       21.   The recommendation of CMC's mental health staff to
3   reclassify these 29 inmates was made after review of the inmates'
4   existing mental health records and a psychiatric interview with
5   the inmate.   It is not clear, however, whether CMC mental health
6   staff determined that the mental health records were complete or
7   whether they consulted the prisoner's treatment plan.

8       22.   Since January 1991, CMF has reclassified
9   approximately 13 inmates from Category J to GP.

10      23.   CMF has no approved procedure for reclassifying
11  inmates from Category J to GP.   CMF states that since June 1991
12  it has used the declassification procedure established pursuant
13  to Perceived Violation No. 507 pertaining to declassification to
14  Category U to reclassify Category J inmates to GP.

15      24.   Defendants have represented to plaintiffs' counsel
16  that the transferred inmates who remains Category Js are
17  receiving at least equivalent psychiatric care at CMC to what
18  they were receiving at CMF and that CMC has modified its
19  procedures for reclassifying inmates from Category J to Category
20  U or GP.   The new procedures are attached as Attachment A.

21      25.   Some of the transferred Category J inmates have
22  been placed in administrative segregation or the Locked
23  Observation Unit (LOU).

24      26.   Since September 19, 1991, one Category J inmate
25  has been transferred from CMF to CMC.   This inmate remains in
26  Category J.

27      27.   The Department of Corrections Office of Health
28  Care Services has determined that presently only CMF and CMC may

6.                    FINAL OR - 00573
                      MEDIATOR

1  receive Category U inmates on psychotropic medications because
2  only those institutions have the capability of administering
3  psychotropic medications and providing clinical back-up in case
4  an emergency situation occurs with the Category U inmates.

5      28.   Pursuant to CDC regulations (DOM § 62080.9.2) male
6  Category J inmates are housed only at CMF and CMC-East.

7  CONCLUSIONS:

8      1.   There is no evidence that the procedures used by
9  CMF to transfer Category J prisoners to CMC complied with Part V,
10 section G.2 of the Consent Decree.

11     2.   Neither the Consent Decree nor the
12 declassification procedures set forth in the Mediator's Findings
13 on Perceived Violation No. 507 provide for reclassification of an
14 inmate from Category J to GP.

15     3.   There was no plan approved by plaintiffs to reduce
16 the Category J population at CMF prior to the transfers.

17 RECOMMENDATIONS:

18     1.   No Category J inmate shall be transferred from CMF
19 unless the treatment team is consulted and its recommendation
20 documented.   Should the treatment team's recommendation not be
21 taken, the reasons for overriding that recommendation should also
22 be documented.

23     2.   For each Category J inmate transferred to another
24 institution, a discharge summary shall be prepared which will
25 include the reasons for the transfer, the inmate's condition, the
26 diagnosis, the medications, and the treatment recommendation.
27 CMF shall send the discharge summary to the receiving institution
28 via means designed to ensure that it arrives at the receiving

7.          MEDIATOR - OR - 00574

1   institution at or before the arrival of the transferred inmate.

2        3.   CMF shall cease at once reclassifying Category J

3   inmates to GP until they have developed a procedure for doing so

4   which is acceptable to the plaintiffs and the mediator.

5   DATED:   December 9, 1991

6                              Submitted,

7

8                              ALLEN BREED

9                              Mediator

10  1119gate.510

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        8.        FIND
                                              MEDIATOR -  OR - 00575

R. M. Anderson, M. D.
November 6, 1991

## CMC PROCEDURE FOR RECLASSIFICATION
## FROM CATEGORY J TO U

1.   Continue existing procedure of clinical assessment, including justification for change to Category U. Reasoning shall be specific and sufficient as to why Category J is no longer appropriate. Category U is appropriate basically in stable remission, whether taking psychotropic medication or not. A 128-c chrono, including all data, shall be prepared and signed by the clinician, then countersigned by CMC Chief Psychiatrist, MHOP.

2.   A separate 128-c chrono shall be generated by CMC Chief Psychiatrist, MHOP, documenting personal review of Central file and Health Services Record and concurrence in the recommendation.

3.   A/W Psychiatric Services, or designee, shall review the recommendation and document concurrence with a 128-c chrono.

4.   Record shall be forwarded to classification for appropriate action, including housing assignment. Category U inmates currently receiving or having received psychotropic medication within previous six months shall be housed only at facilities so designated by OHCS, Central Office.

5.   During classification review, Unit Classification Committee shall affirm that Record is in compliance with this procedure.

OR - 00576

APPENDIX "A"

R. M. Anderson, M. D.
November 6, 1991

## CMC PROCEDURE FOR RECLASSIFICATION
## FROM CATEGORY J TO GENERAL POPULATION

1.  Continue existing procedure of clinical assessment,
    including justification for change into GP.  Reasoning
    shall be specific and sufficient as to why Category J
    is inappropriate.  Justification shall include adequate
    data to support an assertion that previous Category J
    designation was not in conformity with CDC-MHOP policy
    and procedure, whether due to malingering or other
    unusual circumstance.  Category J inmates currently
    receiving or having received psychotropic medication
    within previous six months shall not be recommended for
    G.P.  A 128-c chrono, including all data, shall be
    prepared and signed by the clinician, then
    countersigned by CMC Chief Psychiatrist, MHOP.

2.  A separate 128-c chrono shall be generated by CMC Chief
    Psychiatrist, MHOP, documenting personal review of
    Central file and Health Services Record and concurrence
    in the recommendation.

3.  A/W Psychiatric Services, or designee, shall review the
    recommendation and consult by telephone with Chief
    Psychiatrist, Central Office.

4.  Subsequent to receipt of a 128-c chrono documenting
    concurrence by the Central Office, recommendation is
    forwarded to Classification for appropriate action.

5.  During classification review, Unit Classification
    Committee shall affirm that Record is in compliance
    with this procedure

OR - 00577

CALIFORNIA MEDICAL FACILITY
VACAVILLE, CALIFORNIA 95696
OUTPATIENT PSYCHIATRIC SERVICES

EFFECTIVE DATE:  November 1, 1997
REVIEW DATE:  October 1998
REVISION DATE:  November 1998

## Reclassification of Inmate/Patients

PAGE 1                                          PROCEDURE NO.  437

**POLICY**   The Outpatient Psychiatric Program shall provide psychiatric services to inmates who meet the criteria for Category J, K, U, Psychiatric Treatment (PT) and General Population (GP) treatment programs.

**PURPOSE**   Reclassify:

A.   Inmates who are in need of outpatient psychiatric services from GP to J or K.

B.   Inmates in need of limited clinical intervention from Category J to U.

C.   Inmates who no longer meet the criteria of outpatient psychiatric services at California Medical Facility (CMF) from Category U to GP.

D.   Inmates who were inappropriately designated as Category J to GP.

E.   Category U inmates who have decompensated and need a more intensive level of treatment from Category U to Category J.

F.   Inmates who were inappropriately designated or inmates that no longer meet the criteria for Category K to GP.

G.   Inmates discharged from inpatient care in need of outpatient review for appropriate category placement (J, U, K, or GP).

## GENERAL INSTRUCTIONS / RESPONSIBILITIES

The recommendation for a change in clinical treatment category shall be made by the inmate's Correctional Mental Health Treatment Team (CMHTT).  The clinical evaluation will include a review of the medical file, pertinent custody data, and personal interviews with the inmate.  A recommendation for reclassification of the inmate shall be submitted to the appropriate classification committee for institutional placement consistent with the clinical decision. The final authority and responsibility to submit the classification packet to the Classification Services Representative (CSR) rests with the classification committee. Copies will be forwarded to the Utilization Management Clinician.

Case 2:90-cv-00520-RJM-SCR    Document 1054    Filed 07/23/99    Page 127 of 181

PROCEDURES

A.    RECLASSIFICATION FROM GENERAL POPULATION (GP) TO CATEGORY J or K.

    1.    GP inmates who exhibit signs of a major mental illness and/or show significant clinical decompensation or who show signs of mental retardation or developmental disability may be referred to the Intake Team for a Category J evaluation.

    2.    Non-clinical staff shall refer the inmate to clinical staff if they believe that the inmate may be in need of psychiatric services.

    3.    Inmates may be referred by clinical staff directly to the Intake Team via a CDC 128-C chrono.

    4.    Inmates may be directly referred for evaluation by the appropriate classification committee.

    5.    The Intake Team will evaluate the inmate/patients and document on a CDC 128-C whether the inmate meets Category J or K criteria. The CDC 128-C will be forwarded to the appropriate classification committee for institutional placement consistent with the clinical decision.

B.    RECLASSIFICATION FROM CATEGORY J TO CATEGORY U.

    1.    Inmates who have been diagnosed with a major mental illness requiring inpatient or outpatient psychiatric care may be considered for reclassification to Category U if they have had no serious psychiatric symptoms for a significant period (normally 90 to 180 days). These inmates may be expected to function within a GP setting. Category U shall include:

        a.    Inmates no longer in need of psychotropic medication.

        b.    Inmates who are asymptomatic as a result of compliance with psychotropic medication.

    2.    If the Correctional Mental Health Treatment Team deems it clinically appropriate to reclassify an inmate from Category J to Category U, the following steps shall be taken:

        a.    The team psychiatrist will complete a Reclassification Recommendation Checklist.

        b.    A CDC 128-C chrono will be completed outlining the reasons for the decision, current clinical status and further treatment recommendation, if any.

        c.    A Performance Evaluation Form (PEF) reflecting the current clinical status of the inmate will be generated.

        d.    A Mental Health Placement Chrono will be completed to indicate the appropriate interface with the EOP/CCCMS categories.

        e.      Once all documents have been completed, the packet containing the PEF, Reclassification Checklist, the CDC 128-C chrono, and the Mental Health Placement chrono will be forwarded to the Utilization Management Clinician for tracking and distribution.

C.    RECLASSIFICATION FROM CATEGORY U TO GENERAL POPULATION (GP).

    1.    If an inmate has been stable for 90 days as a Category U and no longer is in need of psychotropic medication or is asymptomatic as a result of compliance with psychotropic medication or if a diagnosis is not in conformity with DOM Section 62080, he may be reclassified from Category U to GP.

    2.    If the Correctional Mental Health Treatment Team deems it clinically appropriate to reclassify an inmate from Category U to GP, the following steps will be taken:

        a.      The team psychiatrist will complete a Reclassification Recommendation Checklist.

        b.      A CDC 128-C chrono will be completed outlining the inmate's current clinical status and further treatment recommendation, if any.

        c.      A PEF reflecting the current clinical status of the inmate will be generated.

        d.      A Mental Health Placement Chrono will be completed to indicate the appropriate interface with the EOP/CCCMS categories.

        e.      The packet containing the PEF, Reclassification Checklist, the CDC 128-C chrono, and the Mental Health Placement Removal chrono will be forwarded to the Utilization Management clinician for tracking and distribution.

D.    RECLASSIFICATION FROM CATEGORY J TO GENERAL POPULATION.

    1.    The recommendation for reclassification to general population must be made by the CMHTT. A clinical member of the treatment team will review the medical file and ensure the PEF is current and the psychiatric checklist is complete. The clinician will also review both the medical and central file for any critical information that may affect the team's reclassification decision. The clinician will then prepare a CDC 128-C chrono to include justification for the change to GP. Justification shall be specific and include:

        a.      A clinical summary that delineates why the current Category designation does not conform with DOM Section 62080.

        b.      Clinical substantiation to address any discrepancies between the psychiatric history/documentation and the current diagnosis.

    2.    The Team Psychiatrist will complete a Reclassification Recommendation Checklist.

3.    The CMHTT will complete a Mental Health Placement Removal Chrono indicating the appropriate interface with the EOP/CCCMS categories and include it in the packet.

4.    The completed packet will be forwarded to the Senior Psychiatrist for review and signature.

5.    The Senior Psychiatrist will review the reclassification documents and approve or disapprove the reclassification to GP.

     a.    If the Senior Psychiatrist approved the recommendation, the approved recommendation and the reclassification packet containing the current PEF, reclassification checklist, and CDC 128-C will be forwarded to the CC-II of the respective Unit for placement consistent with the clinical decision. Copies will be forwarded to the UR Management clinician.

     b.    If the reclassification is disapproved by the Senior Psychiatrist, the treating Correctional Mental Health Team may request that a Classification Review Team be established. This team shall be chaired by the Chief Psychiatrist and be composed of the Chief Psychologist, a Senior Psychiatric Social Worker and the Supervising Psychiatric Nurse or their representatives.

        The Classification Review Team will perform an independent evaluation of the inmate including both a review of the medical record, pertinent custody data and a personal interview with the inmate. This team will make the final decision and document the decision on a narrative CDC 128-C chrono.

6.    If the Reclassification Review Team does not concur with reclassification, a CDC 128-C chrono stating the reasons will be filed in the medical record and the process will be terminated.

7.    If the Reclassification Review Team does concur with reclassification, a CDC 128-C stating the reasons for approval, together with the other evaluation and the rest of the packet, will be forwarded to the Utilization Management Clinician for tracking and distribution.

E.    RECLASSIFICATION FROM CATEGORY U TO CATEGORY J.

1.    Category U inmates who show significant signs of clinical decompensation with or without psychotropic medication, may be considered for reclassification to Category J.

2.    If the Correctional Mental Health Team believes that it is clinically necessary to reclassify an inmate from Category U to J, the following steps shall be followed:

     a.    A CDC 128-C chrono will be completed outlining the reasons for the decision, current clinical status, mental status exam, and treatment recommendations.

b.  The team psychiatrist will complete a Reclassification Recommendation Checklist.

c.  An updated PEF will be generated reflecting the change in status of the inmate.

d.  A Mental Health Placement chrono will be completed.

e.  Once the documents have been completed, the reclassification checklist, PEF, CDC 128-C chrono, and Mental Health Placement chrono will be forwarded to the Utilization Management clinician for tracking and distribution.

F.  RECLASSIFICATION FROM CATEGORY K TO GENERAL POPULATION.

The recommendation for reclassification from Category K to GP shall be made by the CMHTT. There are two separate groups of inmates that are to be reclassified from Category K to GP.

1.  Inmates that, through appropriate psychological testing as outlined in the DSM IV, do not meet the criteria for Category K (inmates with pronounced social inadequacies due to mental retardation and/or developmental disabilities which preclude general population placement). In such cases, the CMHTT will prepare a CDC 128-C chrono to include justification for change to GP. Justification shall be specific and include:

    a.  A CDC 128-C chrono delineating which psychological tests (as outlined in the DSM IV) were used, the results of the tests, and the inmate's current status. The CDC 128-C chrono will be submitted to the Category K Coordinator for review of the team's findings and approval or disapproval of the reclassification to GP prior to forwarding the packet.

    b.  A PEF reflecting current clinical status of the inmate will be generated.

    c.  A completed Reclassification Recommendation Checklist will be included.

    d.  A completed Mental Health Placement Removal chrono will be included.

    e.  The packet of the PEF, Reclassification Checklist, the CDC 128-C chrono, and the Mental Health Placement Removal chrono will be forwarded to the Utilization Management clinician for tracking and distribution.

2.  Inmates that meet the criteria for Category K (see F.1. above) in accordance with appropriate testing as outlined in the DSM IV but have maintained a Global Assessment of Functioning (GAF) score consistently above 50 for 180 days. These inmates may be expected to function in a GP setting.

    If the CMHTT deems it clinically appropriate to reclassify an inmate from Category K to GP, the following steps will be taken.

a. The team psychiatrist will complete a Reclassification Checklist.

b. A CDC 128-C chrono will be completed outlining the reasons for the decision and current clinical status.

c. A PEF reflecting current clinical status of the inmate will be generated.

d. A Mental Health Placement Removal chrono will be completed.

e. The CDC 128-C chrono will be reviewed by the Category K Coordinator for approval or disapproval of the reclassification prior to submission of the packet to the Utilization Management clinician.

f. Once all documents have been completed, the packet of the PEF, Reclassification Checklist, the CDC 128-C chrono, and the Mental Health Placement Removal chrono will be forwarded to the Utilization Management clinician for tracking and distribution.

G. RECLASSIFICATION FROM INPATIENT CARE (CATEGORY I) TO THE APPROPRIATE CATEGORY

See Procedure Number 422.

AUTHORITY

DOM SECTION 62080.


ROBERT A. HOREL
Chief Deputy Warden
Outpatient Psychiatric Program

ANA M. RAMIREZ PALMER
Warden

EXHIBIT    1-D

**FILED**

APR - 9 1996

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11   JAY LEE GATES, et al.,
                                    NO. CIV. S-87-1636 LKK
12          Plaintiffs,

13      v.                             O R D E R

14   JAMES GOMEZ, et al.,

15          Defendants.
     _____/

16

17      This matter is before the court on Defendant's Motion in

18   Opposition to the Mediator's Findings and Recommendations Re:

19   Perceived Violation A-13.   Pursuant to Local Rule 230(h), the

20   matter was taken under submission and is now disposed of on the

21   record, briefs and oral argument presented by the parties.

22                              I.

23              **HISTORY OF THE CASE AND PV A-13**

24      Plaintiffs are a class of inmates incarcerated at the

25   California Medical Facility ("CMF") at Vacaville.   Plaintiffs and

26   defendants entered into a Consent Decree ("Decree") which was

                               1

                             1297

1   approved on March 8, 1990.  This decree governs the provision of

2   medical and psychiatric care at CMF.  The Decree provides for the

3   appointment of a mediator to monitor defendants' implementation of

4   the Decree and to report to the court regarding compliance.

5   Subject to judicial review, the mediator also presides over the

6   informal and formal dispute resolution processes established by the

7   Decree.   The process provided by the Decree allows plaintiffs'

8   counsel to bring perceived breaches of the terms of the agreement

9   to the attention of the mediator. <u>See</u> Consent Decree filed March

10  8, 1990 ("Decree") at § IX.4.   If, after an opportunity for

11  defendants to respond to the perceived violations, the Mediator

12  issues Findings and Recommendations to which a party objects, the

13  court then reviews <u>de novo</u> the mediator's determination. <u>Id.</u> at

14  § IX.6.

15       Plaintiffs' counsel initiated Perceived Violation A-13 ("PV

16  A-13") in December 1993.  They were alerted to the potential breach

17  of the decree when on a tour of CMF with their expert.  Plaintiffs'

18  counsel and their expert encountered and observed a number of

19  apparently mentally ill inmates who were taking psychotropic

20  medications while incarcerated in the administrative segregation

21  unit at CMF, Willis Unit.  Dr. V. Meenakshi, plaintiffs' expert and

22  the former Chief Psychiatrist of CMF, found that many of the

23  General Population ("GP") inmates held in Willis should have been

24  categorized in psychiatric classifications, and that, with or

25  without psychiatric classifications, these inmates were

26  decompensating in the administrative segregation unit because of

1  their mental illness.    After presenting both plaintiffs and
2  defendants an opportunity to submit evidence, the Mediator issued
3  Findings and Recommendations ("F & Rs") concerning PV A-13 on March
4  21, 1995.  The Mediator found that the housing and monitoring of
5  inmates taking psychotropic medications in Willis Unit violated the
6  Decree, and the order which was issued in response to Perceived
7  Violation 506 ("PV 506").  Specifically, he found that "[a]dequate
8  controls do not currently exist to monitor and provide necessary
9  services for GP inmates placed in the Willis Unit who are receiving
10 psychotropic medications." See F & Rs at 14.  He recommended that
11 defendants be required to develop policies and procedures for
12 providing psychiatric services to mentally ill inmates incarcerated
13 at Willis, and that prior to implementation of services defendants
14 be prohibited from housing at Willis individuals who are taking
15 psychotropic medications for mental illness.  The Mediator also
16 included a list of psychotropic medications that if used in the
17 short term (defined as 10 days or less) should not trigger a
18 referral to intake for a mental health evaluation.    Nonetheless,
19 he recommended that the court require a psychiatrist to prescribe
20 these medications and that no other psychotropic medications be
21 given to inmates housed on Willis Unit. See F & Rs at 16.
22 ////
23 ////
24 ////
25 ////
26 ////

1                                      **II.**

2                                 **STANDARDS**

3          The Consent Decree provides for de novo district court review

4     with a limited right to introduce additional evidence.[1]

5          Interpretation of consent decrees is governed by the contracts

6     principles of the situs state. Thompson v. Enomoto, 915 F.2d 1383,

7     1388 (9th Cir. 1990), cert. denied, 122 S.Ct. 965 (1992).    In

8     California, contracts must be interpreted to give effect to the

9     mutual intention of the parties as it existed at the time of

10    contracting. Cal. Civ. Code § 1636; see also, United Commercial

11    Ins. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992), cert.

12    denied, 113 S.Ct. 660 (1992).   To determine intent, a court is to

13    apply an objective test, i.e., to examine the language of the

14    contract and the surrounding conduct, rather than the subjective

15    _____

16          [1]The decree provides in pertinent part:

17          The reports and recommendations of the Mediator [regarding a
      perceived violation] shall be filed with the Court and served on
18    the parties and shall be based on the provisions of this Consent
      Decree and/or applicable law.  The Mediator's report shall be final
19    and binding unless, within 15 working days of filing, a party files
      objections with the Court in the form of a noticed motion.    If
20    objections to the Mediator''s report and recommendations are filed,
      the Court shall consider the matter de novo and issue an
21    appropriate order regarding compliance.    Any evidence not
      previously presented to the mediator in the course of the [prior]
22    proceedings . . . will be admitted at a hearing before the court
      only upon a showing that the party offering it lacked a reasonable
23    opportunity to present the evidence to the Mediator.  The burden
      of persuasion is on the party who has objected to the Mediator's
24    findings and recommendations.

25    Consent Decree § IX.6.

26

                                        4

1  beliefs of the parties. Id.; see also, Cal. Civ. Code §§ 1638 and
2  1639.    The true intent of a party is irrelevant if it is
3  unexpressed. United Commercial Ins., 962 F.2d at 856.    Extrinsic
4  evidence, while relevant to help explain what a contract means, may
5  not be used to vary the written terms. Id. at 857 n.5; see also,
6  United States v. Armour & Co., 402 U.S. 673, 681-82 (1971). A
7  contract is to be interpreted to give every part of it effect, each
8  clause helping to interpret the other. Cal. Civ. Code § 1641.
9  Finally, unless words in a contract are used in a technical sense,
10  they are to be understood in their ordinary and popular sense,
11  rather than according to their strict legal meaning. Cal. Civ. Code
12  § 1644.

13                              **III.**

14                        **DE NOVO REVIEW**

15      The defendants contend that the mediator erred in determining
16  that any and all Axis I mentally ill inmates and any inmates
17  receiving psychotropic medication must be excluded from Willis
18  Unit. See Defendants' Memorandum in Opposition to Mediator's
19  Findings and Recommendations filed April 20, 1995 ("Defendants'
20  Oppo") at 18.    They assert that they are not in violation of the
21  Decree because the agreement does not require this broad of a
22  prohibition of inmates on Willis Unit.[2]

23

24      [2] There is no dispute that the parties agreed early on in the
    decree implementation process that defendants would not house
25  inmates with serious mental illness who were classified in
    psychiatric categories in Willis Unit. See Plaintiffs' Ex. 27 at
26  4, Mediator's Second Progress Report at 51.

1       In support of their contention that inmates who are taking
2   prescription medications for psychiatric disorders are not to be
3   housed on the Unit, plaintiffs rely on the agreement between the
4   parties arising out of PV 506[3] and two sections of the consent
5   decree, V.G.3 and V.F.1.  The Mediator found that defendants are
6   in violation of both provisions of the decree.

7       Part V.F.1. of the decree provides that defendants shall
8   provide "appropriate psychiatric evaluation and treatment for all
9   inmates at CMF as medically indicated."  The mediator found that
10  defendants violated that provision because they have failed to
11  create an adequate procedure for monitoring and treating inmates
12  on psychotropic medications in Willis.  The defendants were also
13  found to be in violation of part V.G.3. which requires defendants
14  to implement a program for the housing of inmates with psychiatric
15  classifications in Willis.  I now review each of these contractual
16  provisions and the agreement reached through PV 506.

17      **A. Violation of V.G.3**

18      Section V.G.3 of the consent decree deals directly with the
19  formation of a psychiatric care program for inmates housed in

20
21      [3] Perceived Violation 506 involved the improper housing of
    Category U and non-classified inmates on Willis Unit.  Category U
22  inmates are those who have a history of mental illness, but are
    essentially recovered and can function within the general
23  population.  The parties agreed that, as a general matter, inmates
    with mental illness should not be housed on Willis.  Accordingly,
24  they entered into an agreement by which Category U inmates could
    only be housed on the unit if certain indicia of stability existed,
25  and adequate monitoring was provided.  The agreement also required
    additional safeguards to be instituted to ensure that non-
26  classified inmates with mental illness were not placed on the unit.

6

1    Willis Unit.[4]    The provision was rendered inapplicable when

2    defendants decided that they would abstain from housing mentally

3    ill inmates in the unit, instead of creating a program for treating

4    them.    That agreement between the parties was memorialized in the

5    Mediator's Progress Report at 51. <u>See</u>, Plaintiffs' Ex. 27 at 4.

6    A plain reading of the provisions indicates that if defendants now

7    want to house inmates who have psychiatric classifications in the

8    Unit, they must follow the procedures set forth in the agreement.

9        Defendants contend that they do not seek to house inmates with

10   psychiatric classifications on the unit, rather they seek only to

11   house in the unit non-category inmates who happen to be taking

12   strong psychotropic medications for symptoms that appear to be

13   related to mental illness. Whether the term "psychiatric

14   classifications" means only those who are currently categorized as

15   eligible for inpatient or outpatient services, or whether the term

16   also was intended to include those who are in need of some

17   psychiatric care (e.g., in the form of medication), but who have

18   —————————————————————

     [4] This part provides:

19
         Defendants will evaluate whether and under what
20       circumstances it is appropriate to house
         prisoners with psychiatric classifications in
21       Willis Unit.  Defendants will prepare and
         implement a pilot program by June 30, 1990
22       regarding housing of inmates with psychiatric
         classifications in Willis Unit. Defendants will
23       evaluate and report on the program and the
         housing of prisoners in psychiatric
24       classifications in Willis Unit by December 15,
         1990.  The Mediator, if necessary, will conduct
25       an independent investigation.

26   Consent Decree Part V.G.3.

1  not been classified in a category to date, is the central question.

2      There is no dispute that in order to interpret the term, I

3  must look to the intent of the parties at the time the contract was

4  made. See United Commercial Ins. v. Paymaster Corp., 962 F.2d at

5  856. California law provides that where the provisions of a

6  contract are ambiguous, discovering the intent of the contracting

7  parties requires examination of the written expression of that

8  intent in light of the surrounding and subsequent conduct of the

9  parties. See Cal. Civ. Code §§ 1638 and 1639. The testimony of Dr.

10 Meenakshi indicating that, at the time of negotiations of the

11 decree, all inmates who were receiving psychotropic medication for

12 mental health problems were classified in one of the psychiatric

13 categories, See Findings and Recommendations, Attachment C at

14 ¶ 23[5], is significant evidence in support of the mediator's

15 finding. As I explain below, defendants' response to PV 506 is

16 further evidence that they never intended to house mentally ill

17 inmates, including those taking psychotropic medications, in Willis

18 ////

19 ////

20 _____

21     [5] The Mediator found the testimony of plaintiff's expert, Dr. Meenakshi, to be credible on this, as well as other issues. See Findings and Recommendations at 13. There appears to be no reason

22 to depart from his credibility determination. Dr. Meenakshi concedes that she cannot speak directly to the intent of the

23 parties at the time the contract was signed, since she was no longer employed at the institution at that time. Nonetheless, her

24 discussion of the factual circumstances at the time the parties were negotiating, as well as the fact that the classifications were

25 not altered between the time she negotiated the agreement and the time it was signed, is persuasive evidence of the understanding

26 reached between the parties.

1  Unit.[6]

2      Defendants concede that the agreement that resulted from PV

3  506 provided that defendants could house Category U inmates in

4  Willis only if the inmate had not been prescribed psychotropic

5  medication for 30 days, the act for which placement was made

6  occurred after de-classification to Category U, and the psychiatric

7  evaluation required for de-classification was completed or updated

8  in the past 30 days. See Defendants' Opposition at 18-19.[7]

9  Defendants argue that the agreement dealt only with Category U

10 inmates, and inmates who had not yet been assessed or screened for

11 eligibility for inpatient or outpatient services at CMF.

12 Defendants primary contention is that the term "mentally ill" means

13 only those individuals who are in need of treatment in either the

14 inpatient or outpatient program. See Defendants' Opposition at 19.

15 Thus, defendants urge, the inmates who have not been classified as

16 in need of such treatment, but who are taking psychotropic

17 medications for "mild mental illness" may be housed in Willis.

18      I cannot agree.  The plain language of the agreement involving

19 PV 506 strongly suggests that both sides to this dispute understood

20 at the time of the agreement that those who are taking or are

21 prescribed psychotropic medications are not considered to be

22

23      [6] Defendants do not suggest that the bulk of patients are
   being given psychotropic medication for other than psychological
24 conditions.

25      [7] See also Plaintiff's Ex. 19 at 2 (expressing defendants'
   sentiment that any unclassified mentally ill inmates who "slipped
26 through the cracks" and were housed in Willis should be removed).

9

1    "recovered" from their mental illness.  Accordingly, the use of

2    psychotropic medication to temper or "cure" symptoms of mental

3    disease is an indicator that the patient is mentally ill.[8]

4        In the absence of contrary evidence[9], I find that inmates

5    taking psychotropic medications for psychiatric problems were

6    within the group contemplated by this part of the agreement.

7    Accordingly, the mediator correctly found that defendants are

8    violating this section of the agreement since they are housing

9    mentally ill inmates in Willis in the absence of a sufficient

10   treatment program, as described in the consent decree.

11       B.  Section V.F.1.

12       As discussed above, this section of the Decree provides:

13           Defendants    will    provide    appropriate
             psychiatric  screening  for  each  incoming
14           inmate at CMF and will provide appropriate
             psychiatric evaluation and treatment for all
15           inmates at CMF as medically indicated.

16       The evidence presented to the Mediator indicates that inmates

17   _____

18       [8] Defendants claim that the use of psychotropic medications
     is not indicative of the mental illness of the inmate.  They
19   contend that they may place inmates on these medications in Willis
     Unit  as  long  as  the  inmate  does  not  have  a  psychiatric
20   classification. In sum, defendants assert they can avoid providing
     appropriate medical care by refusing to appropriately classify
21   inmates.  To assert the proposition, is to refute it.

22       [9] Defendants' newly proffered evidence will not be considered.
     Assuming, without deciding that, as defendants claim, the evidence
23   falls within the mandatory judicial notice provisions of Fed. R.
     Evid. 201, the claim is not dispositive. The parties contracted
24   relative to the receipt of new evidence and that agreement is
     binding on any dispute arising from the consent decree.  The decree
25   provides that, for new evidence to be received at the review phase,
     the party offering the evidence must demonstrate that it lacked a
26   reasonable opportunity to bring the evidence before the Mediator.
     Defendants have made no such showing.

                                    10

1 currently housed in Willis are being prescribed psychotropic
2 medication without a doctor first reviewing their file. See F & Rs,
3 Attachment C, Decl. of Meenakshi.    Moreover, monitoring of
4 medication distribution on the unit is so inadequate that inmates
5 are able to hoard medication, a serious concern for potentially
6 suicidal inmates. Id.

7     The record also reflects a serious deficiency with record-
8 keeping and review of medications and dosages on this unit.  Many
9 of the drugs being prescribed have severe side effects that require
10 frequent monitoring and review.  One medication being giving to
11 several Willis Unit inmates is Trazodone (a.k.a. Desyrel).   This
12 drug can cause a priapism in men, a condition which requires
13 immediate surgery in 1/3 of the cases. See Physician's Desk
14 Reference, at 1404 (46th ed. 1992).  There is no indication from
15 the evidence that defendants have set up a monitoring program for
16 individuals taking dosages of this medication, or that defendants
17 have at all contemplated the contingency of immediate surgery for
18 these inmates.

19     Appropriate psychiatric treatment for all inmates means, at
20 the very least, that the provision of medication by the institution
21 will not place the individual inmates in enhanced danger of harming
22 themselves.  The absence of physician prescription, record keeping
23 and monitoring of medication simply fails that test.

24     There is more than sufficient evidence in the record to
25 support the Mediator's finding that this provision of the Decree
26 is being breached by the inadequacy of the monitoring and review

1  of inmates on Willis Unit who are prescribed psychotropic
2  medications. It appears that the recommendations of the Mediator
3  are in substantial part necessary to address the problems discussed
4  herein. However, this court finds that some modifications are
5  necessary.

6  **IV.**

7  ORDER

8  Accordingly, for all the reasons stated above, the court
9  hereby ADOPTS the Mediator's Recommendations insofar as they state:
10  1. No further psychiatric care will be permitted on Willis Unit
11  until defendants develop appropriate Policies and Procedures
12  following the guidelines given below with an accompanying plan for
13  implementation which has been approved by the Mediator.
14  2. The guidelines for development of Policies and Procedures
15  regarding mentally ill inmates in Willis Unit are as follows:

16  a. Every inmate placed in Willis Unit shall be evaluated by
17  health care personnel within twelve hours as to whether there are
18  any medical conditions which would contraindicate such placement.
19  If the medical record indicates any of the following conditions,
20  action will then be taken as set forth:

21        i. If a GP inmate has an Axis I
          diagnosis, he will be evaluated by
22        a psychiatrist or psychologist, and
          if found to need treatment or to be
23        at risk of deterioration, he will
          be immediately transferred to the
24        Outpatient Program Intake Unit for
          an evaluation as to his mental
25        health condition.

26  ////

12

ii. If a GP inmate has a history or diagnosis of mental illness and is currently on psychotropic medication he will be immediately transferred to the Outpatient Program Intake Unit for an evaluation as to his mental health condition.

iii. If a GP inmate has a history or finding of significant intellectual impairment he will be immediately transferred to the Outpatient Psychiatric Intake Unit for an evaluation as to his mental retardation or developmental disability.

b.   The evaluation performed by the Intake Unit should be accomplished within two working days, although, if in the judgment of clinicians a full ten day evaluation is necessary, such procedures will be followed.   Following the evaluation, and based on clinical judgment the GP inmate may be:

i. Placed in the OPP Program.

ii. Placed in the DMH-V Program.

iii. Placed in Willis Unit if:

(a) the incident that required his placement in Willis was the result of a behavioral disruption (including personality disorder), and not an act which was an outgrowth of his mental illness or significant intellectual impairment.

(b) placement in Willis will not likely cause the inmate to decompensate, seriously deteriorate or become suicidal as a result of such confinement, and required care can be provided.

Clinicians making these judgments will fully document their reasons and recommendations for a specific placement.

13

1        c.   Short term use (defined as a period of less than 10 days)
2   of the following psychotropic medications will be permitted for
3   inmates housed in Willis without triggering the referral to the
4   Intake Unit for a mental health evaluation:

5               Elavil - up to 100mg h.s.

6               Benadryl - up to 100mg h.s.

7               Vistaril - up to 100mg h.s.

8               Klonopin - up to 4mg in a 24 hour period

9               Ativan (-loazepam) - up to 4mg in a 24 hour period[10]

10       All such prescriptions will be made by a psychiatrist.

11       If an inmate is prescribed these drugs for insomnia alone and
12   no other symptoms are present, the drug may be used for longer than
13   10 days.

14       No psychotropic medications other than those on this list or
15   members of the classes represented, anti-anxiety or anti-depressant
16   medications in equipotent dosages, may be prescribed in Willis
17   Unit.

18       d. An OPP psychologist who is assigned to work with GP inmates
19   will make rounds on Willis Unit at least two times a week or more
20   often if requested or necessary in his/her clinical judgment.   This
21   psychologist will personally converse with those inmates referred

22

_____

23       [10]   The parties should note that Desyrel (Trazodone) has been
    removed from the Mediator's recommended list due to the concerns
    of the court about the necessity of extensive monitoring of this
24   drug expressed supra at 11:9-17.   This is not, of course, to say
    that the drug may not be prescribed.   However, the safeguards
25   implemented through a review by Intake clinicians are called for
    when a pharmaceutical with such serious side effects is to be
26   administered.

1 by custody or health care personnel and all inmates on any form of
2 psychotropic medication and review their files.  These interviews
3 and file reviews will be fully documented in the medical record.
4 This psychologist should be an individual regularly assigned to
5 Willis to provide continuity.

6       e.  An OPP psychiatrist assigned to work with GP inmates will
7 make rounds on Willis Unit once a week or more often if requested
8 or if necessary in his/her clinical judgment.  The psychiatrist
9 will interview and review the files of inmates referred by the
10 psychologist, custody staff, health care personnel, and will
11 monitor all Willis Unit inmates on psychotropic medication.  These
12 interviews and file reviews will be fully documented in the medical
13 record.    The psychologist and the psychiatrist should be an
14 individual regularly assigned to Willis Unit to provide continuity.

15       f.  A weekly review of all psychotropic medications prescribed
16 on the Willis Unit shall be conducted by the OPP psychiatrist
17 assigned to work with GP inmates, and will be monitored by the
18 Chief Psychiatrist or his designee.  Any psychotropic medication
19 that appears to be excessive will require re-evaluation and
20 justification for continued use.  Continued deviations from close
21 ////
22 ////
23 ////
24 ////
25 ////
26 ////

15

1  standards or perceived need for drugs of another class will require

2  transfer of the patient to Intake, as described above.

3      IT IS SO ORDERED.

4      DATED:  April 4, 1996.

5                                  LAWRENCE K. KARLTON

6                                  CHIEF JUDGE EMERITUS
                                    UNITED STATES DISTRICT COURT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

RECEIVED

JUL 15 1991

ROSEN. BIEN & ASARO

FILED

JUL 10 1991

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   JAY LEE GATES, et al.,

12           Plaintiffs,                    NO. CIV. S-87-1636 LKK

13       v.                                    O R D E R

14   GEORGE DEUKMEJIAN, et al.,

15           Defendants.

16   _____/

17       The court is in receipt of the Report of the Mediator on

18   Perceived Violation No. 506, relative to whether and under what

19   circumstances it is appropriate to house prisoners with psychiatric

20   classifications in Willis Unit.

21       IT IS HEREBY ORDERED AS FOLLOWS:

22       1.   The report is ordered filed;

23       2.   The court accepts and approves the conclusions agreed to

24   by the parties as reflected in that report; and

25   ////

26   ////

AO 72
(Rev.8/82)

1         3.   The report is made a part of the Consent Decree in this

2    case.

3         IT IS SO ORDERED.

4         DATED:  June 17, 1991.

5

6                             LAWRENCE K. KARLTON
                          CHIEF JUDGE EMERITUS

7                              UNITED STATES DISTRICT COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AO 72
(Rev.8/82)

tl

United States District Court
for the
Eastern District of California
July 10, 1991

**RECEIVED**

**JUL 1 5 1991**

ROSEN BIEN & ASARO

\* \* CERTIFICATE OF SERVICE \* \*

2:87-cv-01636

Gates

    v.

Deukmejian

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 10, 1991, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

Sanford Jay Rosen                MB/LKK
Rosen Bien and Asaro
155 Montgomery Street           SS/JFM
Eighth Floor
San Francisco, CA  94104

Matthew A Coles
American Civil Liberties Union
1663 Mission Street
Suite 460
San Francisco, CA  94103

Warren E George Jr
McCutchen Doyle Brown and Enersen
Three Embarcadero Center
Suite 1800
San Francisco, CA  94111

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964

DAG
California State Attorney General
1515 K Street
Suite 511
P O Box 944255
Sacramento, CA  94244-2550

John R Bertram
c/o Leon Shahon
5529 Del Amo Boulevard
Lakewood, CA  90713

Allen F Breed
PO Box 698
San Andreas, CA  95249

Jack L. Wagner, Clerk

BY: _____
      Deputy Clerk

FILED

MAY 1 5 1991

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

FLYNN

DOCKETED
SACRAMENTO

JUN 1 4 1991

By _____G. Devisscher_____

No. 88 CX0002

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

        Plaintiffs,

    v.

GEORGE DEUKMEJIAN, et al.,

        Defendants.

_____/

NO. CIV. S-87-1636 LKK

O R D E R

    In an order filed May 8, 1991, the court ordered filed the
Mediator's Report concerning Perceived Violation No. 506, dated
April 30, 1991.  Pursuant to the request of the Mediator, page 4,
paragraph 2, of the report is hereby AMENDED to read:

> All inmates referred to CMF from another
> institution or parole for psychiatric
> evaluation or treatment shall be examined
> and evaluated by a member of the clinical
> staff within twenty-four (24) hours of
> his arrival at CMF.

    IT IS SO ORDERED.

    DATED:  May 13, 1991

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT

OR - 00542

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


JAY LEE GATES, et al.,   )
                      )
    PLAINTIFFS        )
                      )
       VS.         )
                      )
GEORGE DEUKMEJIAN, et al.,  )
                      )
    DEFENDANTS        )
                      )

Perceived Violation
No. 506

CAT Joel in wims

BACKGROUND

Part V, Section G, Paragraph 3 of the Consent Decree required defendants to evaluate whether and under what circumstances it was appropriate to house prisoners with psychiatric classifications in Willis Unit.  Further, the defendants were to prepare and implement a pilot program by June 30, 1990, regarding the housing of inmates with psychiatric classifications in Willis Unit.  Finally, defendants were to evaluate and report on the program and the housing of prisoners with psychiatric classifications in Willis Unit by December 15, 1990.  After an initial evaluation defendants decided to discontinue the utilization of Willis Unit  for purposes of housing any inmate with a psychiatric classification. This decision was memoralized in defendants' Action Plan dated October 1, 1990, and was accepted by plaintiffs as an acceptable procedure.

On December 24, 1990, defendants notified plaintiffs that they were changing their plan in order to house some Category "U" inmates in Willis Unit.[*] This action was taken because defendants' believed that some Category "U" inmates were a serious security threat and required the custodial provisions that existed in the Willis Unit.  Plaintiffs strongly objected to the placement of inmates with psychiatric classifications in the Willis Unit (an administrative segregation program) and could not accept what they considered to be a violation of an agreement that was made part of the Decree.

[*]According to the Department of Correction's Classification Manual "a Category 'U' inmate is one who has had a major mental illness and is essentially recovered, as evidenced by a significant period free of psychiatric symptoms.  These inmates can be expected to function within the general population."

The plaintiffs also expressed concern that some unclassified mentally ill inmates were being housed in Willis Unit in violation of Part V., Section F., Paragraph 1 of the Decree which provides:

> "Defendants will provide psychiatric screening for each incoming inmate at CMF and will provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated."

Defendants agreed that Willis Unit was inappropriate housing for mentally ill prisoners and if any had been, or were currently, assigned to that Unit they had "slipped through the cracks" and would be removed.

These two issues were negotiated extensively over the next months, but parties were unable to resolve their disputes. In accordance with Part IX, Section 5 of the Decree a mediation hearing on the perceived violations was set for April 19, 1991.

FINDINGS OF FACT

A mediation hearing was held on April 19, 1991 which was attended by attorneys of record and experts representing both plaintiffs and defendants. Oral presentations were made, memorandums were submitted and a full discussion of all of the issues was held. A recording was made of the entire hearing and will be preserved.

Since agreement was reached by parties as to a satisfactory solution to the perceived violations a further finding of fact does not appear to be necessary. All memorandums, however, will be made part of the record.

- 2 -

<u>CONCLUSIONS</u>

No Category "U" inmate will be placed in Willis Unit unless:

1.  The inmate has not been on any psychotropic  medication for at least 30 days.

2.  Placement is a result of an act or behavior that occurred after his declassification to category "U" and has been processed through the institution's disciplinary procedures, or is the result of an act for which court action is pending.

3.  A psychiatric evaluation required for a declassification hearing has been completed within the past 30 days or updated appropriately.

4.  Such action has been approved by a psychiatrist following an evaluation which takes into consideration and includes written comments about medication, the risk of suicide and the likelihood of decompensation.

If a category "U" inmate is placed in Willis Unit the following will occur:

1.  Inmates will be observed daily by an MTA, who will make a written report as to any need for psychiatric services.

2.  Inmate will be observed not less than every 72 hours by a clinician, who will make a written report as to any need for psychiatric services.

3.  Inmate will not be confined for more than 30 days in Willis Unit unless court action is pending.

To assure parties that unclassified mentally ill inmates will

- 3 -

not be assigned to Willis Unit the following procedure will
be followed:

1. All inmates admitted to NRC will be screened for
mental illness (interviewed and medical file review) within
24 hours. If an inmate is identified as in need of psychia-
tric evaluation he will be seen by a clinician within 72
hours. Pending being seen by a clinician the inmate will
not be placed in Willis Unit.

2. All inmates referred to CMF from another institu-
tion or parole for psychiatric evaluation or treatment shall
be examined and evaluated by a member of the clinical staff
within ~~10 days~~ of his arrival at CMF.
        24 Hours

3. All inmates referred to CMF from another institution
or parole for psychiatric evaluation or treatment shall be
placed in the Mental Health Intake Unit, not Willis Unit.

4. For all inmates placed in Willis Unit the follow-
ing procedures will be followed:

   a. MTA will observe each inmate daily and refer
   to the Outpatient Psychiatric Program or DMH, as
   appropriate, those who appear to need services.

   b. Correctional Officers will observe inmates hourly
   and refer to the Outpatient Psychiatric Program or
   DMH, as appropriate, those who appear to need services.

   c. ICC will review each inmate monthly; a mental
   health clinician will interview each inmate prior
   to the meeting and make a written record of the
   interview.

   d. ICC shall refer for CSR review and approval any

- 4 -

case retained in administrative segregation for more
than 30 days.  CSR will refer to Outpatient Psychia-
tric Program those who appear to need services.

5.  The Compliance Team will monitor these procedures
and report their findings quarterly.

6.  Over the next quarter, a Court-appointed psychia-
trist will interview at random five inmates monthly to de-
termine whether mentally ill patients are slipping through
the procedures developed to prevent such an occurrance, or
decompensating within the program without being recognized.

Respectfully submitted,

Allen F. Breed
Mediator

April 30, 1991

- 5 -

# M:morandum

Date : DECEMBER 18, 1990

To : ALL CLINICAL STAFF OF OUTPATIENT PSYCHIATRIC PROGRAM
ALL CUSTODY STAFF

From : California Medical Facility, Vacaville  95696-2000

Subject: HOUSING OF PSYCHIATRIC INMATES IN WILLIS UNIT

After reassessing the placement of Psychiatric Category
inmates in Willis Unit, CMF has now determined that
placement of Category U inmates into Willis Unit will be
allowed if they meet the CMF established criteria.    Per
previous agreement Category J and K inmates will not be
allowed placement in Willis Unit.

The decision to allow Category U inmates in Willis Unit  is
based on the fact that these inmates are not in a treatment
level and are not participating in any type of treatment
program.   Clinical staff have already determined that these
inmates do not belong in the Outpatient Psychiatric Program
at CMF.   They may be maintained on medication if warranted.
However, they have been stabilized and have now been
endorsed for transfer to selected facilities.

The Category U designation is for inmates who have had a
major  mental  illness  and  are  essentially  recovered  as
evidenced  by  a  significant  period  free  of  psychiatric
symptoms.   These inmates can be expected to function within
a general population.   If while in the general population an
inmate's  behavior  or  program  needs  (i.e.,  assaultive
behavior, enemy situation, protective custody needs, etc.)
indicates administrative segregation placement is warranted,
then a Category U inmate may be placed in Willis Unit.

Prior to such a placement, each Category U inmate will be
reviewed by a Psychiatrist.   An evaluation will be completed
to address the psychiatric needs, if any, of the inmate and
will include appropriate housing recommendation and speak to
treatment needs.   This evaluation will be documented on a
CDC 128-C and a copy will be placed with the CDC 114A and in
the inmate's medical file.

If upon review it is determined that the inmate is in need
of psychiatric intervention, an appropriate referral will be
made either to the DMH Inpatient Unit or the Outpatient
Psychiatric Program.

GA-47-8

While in Willis Unit, Category U inmates will nct receive any type of program beyond medication therapy, if warranted. Outpatient Program staff will monitor these inmates on a weekly basis. In addition, the MTA assigned to Willis Unit will make daily rounds. If decompensation is noted, the Chief Psychiatrist, Outpatient Services will be contacted to arrange for an evaluation. Outpatient Program clinical staff will always be available for consultation regarding an inmate's condition.

When an emergency exists, Custody staff will always have the option of housing any inmate in Willis Unit pending the review of clinical staff within 24 hours after the placement.


PAUL E. MORENTZ, MD
Chief Psychiatrist
Outpaitent Psychiatry Service

EXHIBIT    1-E

FILED

MAR 2 3 1994

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY LEE GATES, et al.,

      Plaintiffs,           No. CIV S-87-1636 LKK JFM P

    vs.

GEORGE DEUKMEJIAN, et al.,

      Defendants.          ORDER

_____/

      Magistrate Judge John F. Moulds heard the parties' objections to the Mediator's Report and Recommendation regarding Perceived Violation no. A-7: the use of a 37mm gun for cell extractions of psychiatric inmates.

      On February 23, 1994, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within ten days. On March 11, 1994, defendants filed objections to the findings and recommendations.

1

1  In accordance with the provisions of 28 U.S.C.

2  § 636(b)(1)(C) and Local Rule 305, this court has conducted a <u>de</u>

3  <u>novo</u> review of this matter. The court finds the findings and

4  recommendations to be supported by the record and by proper

5  analysis and adopts the findings in their entirety.

6  Accordingly, IT IS HEREBY ORDERED that:

7  I.  The Magistrate Judge's Findings and Recommendations

8  filed February 23, 1994, are adopted in full;

9  II.  The Mediator's Findings of Fact and Recommendations

10  regarding Perceived Violation No. A-7 (37mm Gun), filed with this

11  court on June 18, 1993, are adopted as follows:

12  III.  Defendants are ordered to incorporate into their

13  existing policy (Department of Corrections Operations Manual

14  § 550.50.30 CMF Supplement revised March 19, 1993) and procedures

15  on the use of a 37mm gun on inmates with psychiatric

16  classifications the following:

17  A.  The 37mm gun will be used on inmates in

18  psychiatric classification in cells or other confined areas only as

19  a last resort after custodial and clinical staff have determined

20  that the situation cannot be controlled by non-physical

21  intervention or lower levels of force.

22  B.  The Warden or the Administrative Officer acting

23  in the warden's place will certify in writing that the 37mm gun may

24  be used on a specific inmate to:

25  1.  prevent or stop serious assaultive

26  behavior;

2

1          2.    prevent an ongoing escape;

2          3.   prevent suicide or imminent serious self-

3    inflicted injury; or

4          4.    accomplish a necessary change in location

5    required for serious medical or health reasons after the inmate has

6    been given a reasonable opportunity to cooperate and has refused.

7          C.    A psychiatrist will review the medical file of

8    the patient on whom use of the 37mm gun is being considered and

9    personally evaluate the inmate to determine whether there are any

10   medical or psychiatric reasons why the gun should not be used.   The

11   psychiatrist will approve or disapprove use of the 37mm gun in

12   writing for the record.

13         D.    If the psychiatrist approves the use of the 37mm

14   gun, he or she will remain and observe the use of the gun on the

15   inmate through completion of the cell extraction.

16         E.    If the psychiatrist does not approve the use of

17   the 37mm gun on the inmate, the Warden or Administrative Officer

18   acting in the warden's place will order alternative methods of

19   restraint approved by CDC policy.

20         F.    In emergency cases constituting actual life

21   threatening situations wherein time does not permit prior approval,

22   the Watch Commander may authorize the use of the 37mm gun.

23   /////

24   /////

25   /////

26   /////

However, immediately following the emergency situation, notification of such use will be made to the Warden and the Psychiatric Officer of the day who will be responsible to review the appropriateness of such action and document their findings for the record.

      IV.  Defendants are ordered to submit to the Mediator and to plaintiffs their revised policies and procedures on the use of the 37mm gun on inmates with psychiatric classifications within 30 days of the date of this order.

DATED:  3/21/94

_____
UNITED STATES DISTRICT JUDGE

/rl:th
gates87m.806

4

GATES v. GOMEZ
Cite as 60 F.3d 525 (9th Cir. 1995)
525

conclusions are supported by substantial evidence. We do not retry the case or alter credibility determinations and factual findings where the evidence is susceptible of more than one rational interpretation. *Orteza*, 50 F.3d at 749.

AFFIRMED.



I

UNITED STATES of America,
ex rel., Plaintiff,

Harold R. FINE, Plaintiff–Appellant,

v.

CHEVRON USA, INC.; Bechtel Petroleum Operations, Inc.; Williams Brothers Engineering Company, Defendants–Appellees.

UNITED STATES of America,
ex rel., Plaintiff,

Harold R. FINE, Plaintiff–Appellant,

v.

UNIVERSITY OF CALIFORNIA, and the Board of Regents of the University of California, Defendants–Appellees.

Nos. 93–15012, 93–15728.

United States Court of Appeals,
Ninth Circuit.

June 8, 1995.

Before: WALLACE, Chief Judge.

Prior Report: 39 F.3d 957.

Upon the vote of a majority of nonrecused regular active judges of this court, it is or-

dered that this case be reheard by the en banc court pursuant to Circuit Rule 35–3.



2

Jay Lee GATES; John Ronald Bertram,
Plaintiffs–Appellees,

v.

James GOMEZ;* Nadim Khoury, M.D., Assistant Deputy Director—CDC Health Services; Kenneth Shepard, Chief Deputy Warden for CMF Clinical; Nicholas Poulos, M.D.; Thor Daniel, Chief Physician and Surgeon, CMF; Paul Morentz, Chief Psychiatrist—CMF Outpatient Program, H MD; Bruce Baker, A R MD, Chief Psychiatrist Northern Reception Center; D. Michael O'Connor; Douglas G. Arnold, Acting Director of the California Department of Mental Health; Clyde Murrey, Acting Deputy Director for State Hospitals; Sylvia RN, Executive Director DMH Vacaville Psychiatric Program; Eddie Yslt, Defendants–Appellants,

and

George Deukmejian, Defendant.

Jay Lee GATES, Plaintiff–Appellee,

v.

James GOMEZ,* et al., Defendants–Appellants,

and

George Deukmejian, Governor,
Defendant.

Nos. 94–15259, 94–15884.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1995.

Decided June 9, 1995.

As Amended Aug. 3, 1995.

Plaintiffs confined in medical facility brought civil rights class action against de-

* James Gomez is substituted for his predecessor, James Rowland, as Director of the California

Department of Corrections. Fed.R.App. P. 43(c)(1).

fendants associated with facility under § 1983 and disability nondiscrimination statute challenging medical care, psychiatric care, and conditions of confinement. The United States District Court for the Eastern District of California, Lawrence K. Karlton, J., approved settlement consent decree, and defendants brought two appeals. Appeals were consolidated. The Court of Appeals, Hug, Circuit Judge, held that: (1) district court had jurisdiction to issue enforcement order incident to consent decree regarding use of 37mm grenade launcher gun on inmates; (2) district court did not abuse its discretion in entering order to enforce consent decree to reform policies of medical facility personnel regarding their use of gun against inmates by shifting decision of whether to use gun from custody officials to physician; (3) order to enforce consent decree was abuse of discretion to extent that it rejected use of gun to prevent imminent substantial property damage; (4) plaintiff provided sufficiently detailed record to support award of attorney fees; but (5) attorney fees awarded pursuant to federal civil rights statute were not warranted for counsel's attendance at mental health conference and contact with media.

Affirmed in part, reversed in part, and remanded.

1. United States Magistrates ⚖=27

Federal district court reviews de novo magistrate judge's conclusions of law in findings and recommendations based on mediator's report on dispute arising from consent decree.

2. Federal Courts ⚖=776

Court of Appeals reviews de novo district court's interpretation of consent decree.

3. Federal Courts ⚖=850.1

Court of Appeals reviews district court's findings of fact for clear error.

4. Federal Courts ⚖=814.1, 862

District court order requiring medical facility personnel to modify their policies regarding use of 37mm grenade launcher on mentally ill inmates was effectively an injunction that Court of Appeals would reverse

only where district court abused its discretion or based its decision on erroneous legal standard or clearly erroneous findings of fact.

5. Contracts ⚖=147(1)

Under California law, contracts are interpreted using objective test to give effect to mutual intention of parties as it existed at time contract was made.

6. Federal Civil Procedure ⚖=2397.6

Consent decree entered in civil rights class action arising from treatment of inmates in medical facility encompassed use of 37mm grenade launcher on inmates under provision that stated that defendants would use appropriate psychiatric treatment on patients, and so district court had jurisdiction to issue enforcement order regarding use of 37mm gun; use of such weapon might have been contraindicated for particular patient's medical or mental health.

7. Federal Civil Procedure ⚖=2397.6

Consent decree entered in civil rights class action arising from treatment of inmates in medical facility provided standard for judging parties' compliance as appropriate psychiatric treatment as medically indicated, rather than using deliberate indifference standard, which was minimum standard required by Eighth Amendment. U.S.C.A. Const.Amend. 8.

8. Injunction ⚖=130

Specific finding of past violation of consent decree is not prerequisite to injunction preventing future violation.

9. Federal Civil Procedure ⚖=2397.6

District court's order to enforce consent decree to reform policies of medical facility personnel regarding their use of 37mm grenade launcher gun against inmates was based on findings that personnel violated decree in policy that allowed custody officials to determine when to utilize gun, rather than professional judgment of physician.

10. Federal Civil Procedure ⚖=2397.6

District court's order to enforce consent decree to reform policies of medical facility personnel regarding their use of 37mm gre-

GATES v. GOMEZ                527
Cite as 60 F.3d 525 (9th Cir. 1995)

nade launcher gun against inmates did not entirely ban gun's use, but shifted decision of whether to use gun to physician, which comported with requirements of consent decree that use of gun be medically appropriate, and so court did not abuse its discretion.

**11. Federal Civil Procedure ⟜2397.6**

District court's order to enforce consent decree to reform policies of medical facility personnel regarding their use of 37mm grenade launcher gun against inmates was abuse of discretion to extent that it rejected use of gun to prevent imminent substantial property damage as allowable use, where decree limited use of gun only to cases where it was medically contraindicated.

**12. Federal Courts ⟜830**

Court of Appeals reviews district court's award of attorney's fees and costs under federal civil rights statute for abuse of discretion. 42 U.S.C.A. § 1988.

**13. Civil Rights ⟜305**

In determining amount of attorney fees and costs under federal civil rights statute, district court must articulate its reasons for fee award. 42 U.S.C.A. § 1988.

**14. Civil Rights ⟜305**

Inmate that prevailed in civil rights action against medical facility provided sufficiently detailed record to support award of attorney fees, even though billings for client communications did not always include names of inmates with whom counsel communicated or issue discussed in communications, where cumulative effect of record allowed conclusion that time spent communicating with clients was reasonable. 42 U.S.C.A. § 1988.

**15. Civil Rights ⟜301**

Filing amicus brief to district court in case that challenged medical and living conditions for AIDS and HIV-infected inmates at medical facility that was subject of civil rights consent decree was reasonably related to compliance and monitoring work under

** Honorable Floyd R. Gibson, Senior United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

decree so as to support award of attorney fees, where both class and some of issues raised in case were identical to subclass and issues raised in civil rights case. 42 U.S.C.A. § 1988.

**16. Civil Rights ⟜301**

Attorney fees awarded pursuant to federal civil rights statute were not warranted for counsel's attendance at mental health conference and contact with media incident to civil rights case, since they were kinds of activities that attorneys generally did at their own expense. 42 U.S.C.A. § 1988.

James E. Flynn, Deputy Atty. Gen., Sacramento, CA, and Allen R. Crown, Deputy Atty. Gen., San Francisco, CA, for defendants-appellants.

Sanford Jay Rosen and Michael W. Bien, Rosen, Bien & Asaro, San Francisco, CA, for plaintiffs-appellees.

Appeals from the United States District Court for the Eastern District of California.

Before: GIBSON,** GOODWIN, and HUG, Circuit Judges.

HUG, Circuit Judge:

This case originated as a civil rights class action under 42 U.S.C. § 1983 and 29 U.S.C. § 794 challenging medical care, psychiatric care, and conditions of confinement at the California Medical Facility and Main Northern Reception Center ("CMF") in Vacaville, California.[1] The suit also challenged the care and confinement of a subclass of HIV-infected inmates. The case went to trial in September, 1989. After plaintiffs rested their case, settlement negotiations culminated in a consent decree which was approved March 8, 1990. The operation of the consent decree has thus far given rise to two published appellate opinions: *Gates v. Rowland*, 39 F.3d 1439 (9th Cir.1994), and *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir.1993). This opinion is the third.

1. CMF is California Department of Correction's primary health care facility for the medical and psychiatric treatment of inmates with serious acute or chronic illness.

528    **60 FEDERAL REPORTER, 3d SERIES**

This opinion consolidates two appeals from enforcement orders under the consent decree. One appeal, No. 94–15884, is from an injunction modifying defendants' policy on the use of 37mm riot-control guns to control mentally ill inmates locked in their cells. The other appeal, No. 94–15259, is from a district court order awarding plaintiffs disputed attorneys' fees for compliance and monitoring work under the consent decree during 1991. We have jurisdiction to hear these two appeals pursuant to 28 U.S.C. § 1291, and as to both, we affirm in part and reverse in part.

## I.

### No. 94–15884: 37mm GUN

In this appeal, defendants challenge a district court order modifying their use of the 37mm gun to control mentally ill inmates locked in their cells. The district court ordered this modification pursuant to § V.F.1 of the Consent Decree. Defendants argue that the consent decree does not cover their use of the 37mm gun. They also argue that even if the decree does cover such use, the district court erred by not applying an Eighth Amendment standard to judge compliance with the decree. Finally, defendants argue that the district court abused its discretion by ordering the modifications because the district court order was not supported by the record and defendants were, in fact, in compliance with the decree.

We affirm the district court order in all respects except one. We hold that the district court abused its discretion by ordering the modification of defendants' 37mm gun policies to preclude the gun's use to protect property. Such a modification was not adequately supported by the record.

### A. Facts

Beginning in March 1992, two years after the decree was approved, defendants began using a 37mm grenade launcher shooting multiple rubber baton rounds (hereinafter "37mm gun") to control mentally ill inmates.

Each discharge of the 37mm gun shoots four hard rubber projectiles against mentally ill patients in closed cells. The gun makes a sound like a firecracker or cherry bomb when fired. The practice at issue in this appeal is defendants' use of the gun to extract violent or agitated mentally ill inmates from their cells. Before the gun is fired, the inmate is warned that the gun will be used. If he remains uncooperative, a warning shot is fired away from the inmate. If the inmate is still uncooperative, a second shot is ricocheted in his direction.

Plaintiffs objected to this practice on the ground that it violates § V.F.1 of the Consent Decree. They contend that use of the 37mm gun on mentally ill inmates poses unreasonable risks of serious psychological harm and physical trauma, that defendants use the gun to extract mentally ill prisoners from their cells when there is no important reason to remove them, that defendants fail to exhaust non-physical alternatives before using the gun, and that they fail to meaningfully consult with clinical staff before using the gun. Instead of the 37mm gun, plaintiffs advocate use of Management of Aggressive Behavior ("MAB") techniques,[2] which are used by all other psychiatric prison facilities in the country to manage aggressive behavior and are approved by the American Psychiatric Association. In contrast, only defendants use the 37mm gun to control mentally ill inmates, and such use has not been approved by the American Psychiatric Association, the American Medical Association, or any correctional standard setting body.

The parties engaged in informal mediation of this issue. After two evidentiary hearings, no agreement was reached and the mediator entered his findings and recommendations on June 18, 1993. Both parties filed objections. The magistrate judge adopted the mediator's findings and a modified version of his recommendations on February 23, 1994. Defendants filed objections to the magistrate judge's findings and recommendations. The district court ruled on March 22, 1994, adopting the magistrate judge's findings and rec-

---

2. Under MAB techniques, a number of staff, usually 4–6, use personal physical restraint to sub-

due the patient.

ommendations, and entered its order on July 20, 1994. The district court denied defendants' request for a stay pending appeal of this order.

### Defendants' Policy

After plaintiffs objected to the gun's use but before the evidentiary hearings, defendants implemented written policies on their use of the 37mm gun, which are set out in the California Department of Corrections Operations Manual at 55050.30 (March 19, 1993). Under these policies, the final decision to utilize the 37mm gun is made by custody personnel, although the inmate's file is reviewed by clinical staff.

Specifically, only the warden or chief deputy warden, or during nonbusiness hours the administrative officer-of-the-day, can authorize the gun's use. In a life-threatening or extensive property-threatening emergency, when time does not permit prior approval, the watch commander may authorize the gun's use. The gun can only be used: (1) in self-defense or defense of others; (2) to prevent escape or serious injury to persons or damage of a substantial amount of property; (3) to contain a violent situation or prevent serious injury threatened by a group of inmates; (4) to prevent suicide or self-inflicted injury by an inmate barricaded within a cell or other enclosed area; or (5) to accomplish a necessary change in location after the inmate has been given reasonable opportunity to cooperate in the relocation process. In this last situation, the inmate must be given notice that the gun will be used if he does not cooperate, and lesser alternatives must be explored. A medical technical assistant must be present during the gun's use. The gun cannot be fired directly at the inmate; it must be ricocheted in the direction of the inmate. And if the inmate has a psychiatric classification, then either a psychiatrist, psychologist, licensed clinical social worker, or psychiatric nurse must review the inmate's file to identify any contraindications to the use of the gun. But the policy does not prevent the warden from ordering the gun's use over a clinician's objection.

### District Court Order

The district court ordered the following revisions to defendants' policy on the use of the 37mm gun:

A. The 37mm gun will be used on inmates in psychiatric classification in cells or other confined areas only as a last resort after custodial and clinical staff have determined that the situation cannot be controlled by non-physical intervention or lower levels of force.

B. The Warden or the Administrative Officer acting in the Warden's place will certify in writing that the 37mm gun may be used on a specific inmate to:

1. prevent or stop serious assaultive behavior;

2. prevent an ongoing escape;

3. prevent suicide or imminent serious self-inflicted injury; or

4. accomplish a necessary change in location required for serious medical or health reasons after the inmate has been given a reasonable opportunity to cooperate and has refused.

C. A psychiatrist will review the medical file of the patient on whom use of the 37mm gun is being considered and personally evaluate the inmate to determine whether there are any medical or psychiatric reasons why the gun should not be used. The psychiatrist will approve or disapprove use of the 37mm gun in writing for the record.

D. If the psychiatrist approves the use of the 37mm gun, he or she will remain and observe the use of the gun on the inmate through completion of the cell extraction.

E. If the psychiatrist does not approve the use of the 37mm gun on the inmate, the Warden or Administrative Officer acting in the Warden's place will order alternative methods of restraint approved by CDC policy.

F. In emergency cases constituting actual life threatening situations wherein time does not permit prior approval, the Watch Commander may authorize the use of the 37mm gun. However, immediately following the emergency situation, notifica-

plaintiffs' hours were duplicative or inefficient. Plaintiffs' billing statements were sufficiently detailed and the hours compensated for work on the Camarillo amicus brief were reasonably related to compliance and monitoring work under the consent decree. In these respects, we affirm the district court's award of attorneys' fees. But we reverse the district court's award of attorneys' fees for attendance at the Forensic Mental Health Association Annual Conference and for media contact.

**AFFIRMED in part, REVERSED in part, and REMANDED for recalculation of the attorneys' fees.**



---

**Editor's Note:** The opinion of the United States Court of Appeals, Ninth Circuit, in *Nat. American Ins. v. Certain Underwriters,* published in the advance sheet at this citation, 60 F.3d 536, was withdrawn from the bound volume and a corrected opinion will be issued.

---

UNITED STATES of America, Plaintiff–Appellee,

v.

John DOE, a juvenile, Defendant–Appellant.

No. 94–10501.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 1995.

Decided June 30, 1995.

Defendant was convicted after bench trial in the United States District Court for the District of Arizona, Samuel Conti, J., of juvenile delinquency for assault with dangerous weapon with intent to do bodily harm and for use of short-barreled shotgun during crime of violence. Defendant appealed. The Court of Appeals held that: (1) evidence supported finding that defendant knowingly, intelligent-

No.:  CIV S-90-0520 LKK JFM P

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>December 23, 1998</u>, I placed the attached

**STIPULATION AND ORDER AMENDING PLAINTIFF CLASS AND APPLICATION OF REMEDY IN COLEMAN**

in the internal mail collection system at the Office of the Attorney General, 50 Fremont Street, Room 300, San Francisco, California 94105, for deposit in the United States Postal Service that same day in the ordinary course of business, in a sealed envelope, postage fully postpaid, addressed as follows:

DONALD SPECTER
PRISON LAW OFFICE
GENERAL DELIVERY
SAN QUENTIN, CA 94964

MICHAEL W. BIEN
ROSEN, BIEN & ASARO
155 MONTGOMERY ST., 8TH FLOOR
SAN FRANCISCO, CA  94104

HELLER, ERHMAN, WHITE & McAULIFFE
RICHARD L. GOFF
701 FIFTH AVENUE
SEATTLE, WA 98104

WARREN E. GEORGE
McCUTHCEN, DOYLE, BROWN & ENERSEN
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA  94111

MATTHEW A. LOPES, JR.
BROWN RUDNICK FREED & GESMER, LTD.
ONE PROVIDENCE WASHINGTON PLAZA
PROVIDENCE, RHODE ISLAND 02903

J. MICHAEL KEATING JR.
LITTLE BULMAN & REARDON, P.C.
THE JOSEPH BROWN HOUSE
50 S MAIN STREET
PROVIDENCE, RI  02903

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed on December 23, 1998, at San Francisco, California.

<u>R. Torres</u>

_____
Signature

the hours charged or the facts asserted by the prevailing party in its submitted affidavits.

*Gates v. Rowland,* 39 F.3d at 1449 (quoting *Gates v. Deukmejian,* 987 F.2d at 1397–98).

[14] Defendants contend that plaintiffs' statement was not sufficiently detailed because it did not identify the subject matter and party to "hundreds of hours of 'client communications.'" As the Supreme Court held, "The applicant should ... maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. Plaintiffs' billings for client communication included the date of the communication, the person who performed it, and in some cases the issue addressed. As plaintiffs explained before the district court and on appeal, they did not reveal the names of inmates with whom they communicated to protect the confidentiality of their communications and because their clients fear retaliation, and they did not always reveal the issue discussed to preserve attorney-client and attorney work product privileges. The magistrate judge found the detail of plaintiffs' billing statements "more than sufficient," and the district court adopted this finding. The magistrate judge found, "It is axiomatic that counsel's monitoring activities will include communication with members of the class," and even though the issue discussed in the communication was not always provided, "the cumulative effect of the records" allowed him to conclude that time spent communicating with clients was reasonable. The district court did not abuse its discretion in adopting this finding. *Cf. Davis v. City and County of San Francisco,* 976 F.2d 1536, 1542 (9th Cir. 1992) (warning against imposing too high a standard of documentation on fee claimants), *vacated in part,* 984 F.2d 345 (9th Cir.1993).

As to the third claim—that plaintiffs' hours were duplicative and inefficient—defendants did not meet their rebuttal burden of submitting evidence challenging the accuracy and reasonableness of the hours charged or the facts asserted. The magistrate judge pointed out,

Defendants filed a separate appendix of annotated billing statements reflecting their disagreements with the joint annotations. Defendants' appendix has provided remarkably little assistance to the court in the resolution of these issues: These annotations do not indicate, in some cases, the amount of time objected to or, in other instances, the ground on which defendants object; the document is approximately 300 pages long and is not paginated; defendants do not provide a key or index to the coded objections to the billings; defendants themselves do not rely on the appendix or reference it in support of their objections to plaintiffs' billings; and the annotations reflect only a portion of defendants' objections to plaintiffs' billings, thereby requiring the court to engage in time-consuming comparison of the parties' appendices.

On appeal, we are restricted to the evidence produced in the district court.

[15] Finally, defendants claim that the district court erred in awarding plaintiffs fees for work not reasonably related to compliance and monitoring of the consent decree. Plaintiffs' counsel were awarded fees for filing an amicus brief to the district court in *Camarillo v. McCarthy,* 998 F.2d 638 (9th Cir.1993), which challenged medical and living conditions for AIDS and HIV-infected inmates at CMF. They filed the brief to protect the interests of the class, since both the class and some of the issues raised in *Camarillo* were identical to the subclass and issues raised in the present action. The district court did not abuse its discretion in finding that plaintiffs' work on the *Camarillo* amicus brief was reasonably related to compliance and monitoring work under the consent decree.

[16] But the district court did abuse its discretion in awarding plaintiffs attorneys' fees for attending the Forensic Mental Health Association Annual Conference and for media contact. These are the kinds of activities that attorneys generally do at their own expense.

## CONCLUSION

Defendants did not meet their rebuttal burden of providing specific evidence that

court a periodic motion to compel payment. The resolution of the parties' first fee dispute is published in *Gates v. Deukmejian*, 987 F.2d at 1396. The resolution of a second fee dispute is published in *Gates v. Rowland*, 39 F.3d at 1448. *Gates v. Deukmejian* involved fees incurred prior to entry of the consent decree, while *Gates v. Rowland*, like the present appeal, involved post-judgment monitoring fees.

This appeal concerns the disputed portion of plaintiffs' 1991 fees requests. Defendants paid parts of the 1991 requests without contest. During negotiations, plaintiffs reduced the disputed portion of their bill by $8,743.75; during the motion to compel disputed fees, plaintiffs reduced their bill by an additional $5,148. The magistrate judge issued his findings and recommendations on the disputed 1991 fees on September 15, 1993, further reducing plaintiffs' fees by $18,533.18. On January 4, 1994, the district court adopted the magistrate judge's findings and recommendations with one clerical correction, awarding plaintiffs $203,908.65 in attorneys' fees and costs.

### B. *Standard of Review*

[12, 13] We review for abuse of discretion a district court's award of attorneys' fees and costs under section 1988. *Gates v. Rowland*, 39 F.3d at 1448. Legal conclusions involved in the determination are reviewed *de novo*. *Holland v. Roeser*, 37 F.3d 501, 503 (9th Cir.1994). "The district court has a great deal of discretion in determining the reasonableness of the fee and, as a general rule, we defer to its determination." *Gates v. Deukmejian*, 987 F.2d at 1398; *see also Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."). But the district court must nonetheless articulate its reasons for the fee award. *Id.*

### C. *Discussion*

Defendants offer four challenges to the district court's award of attorneys' fees. First, they claim that the district court erred because it did not reduce plaintiffs' fees based on the outcome of their work. They urge us to apply a prevailing party standard under 42 U.S.C. § 1988 to post-judgment monitoring and compliance work under the consent decree. But plaintiffs have already met the section 1988 prevailing party standard with the entry of the consent decree. *See Keith v. Volpe*, 833 F.2d 850, 857 (9th Cir.1987) (holding that post-judgment monitoring of the consent decree was a necessary aspect of plaintiffs' prevailing in the case, thus plaintiffs satisfied the § 1988 prevailing party requirement). We already decided, in *Gates v. Rowland*, 39 F.3d at 1450, that the standard to be applied to disputed billing items for compliance and monitoring work under this consent decree is "whether the services were reasonably performed during the pendency of the consent decree." As the magistrate judge noted, under this standard, outcome is relevant to whether the work performed was reasonable, but it is not the touchstone for a fee award. This "reasonable performance" standard was set out in the consent decree and confirmed by the district court in its Order Establishing Procedure for Collecting Attorneys' Fees and Costs During the Pendency of the Consent Decree, which order defendants did not appeal.

Defendants further claim that the district court abused its discretion in awarding plaintiffs fees because plaintiffs' billing statement 1) was not sufficiently detailed, 2) represented duplicative and inefficient work, and 3) represented work not reasonably related to compliance and monitoring of the consent decree. As we stated in *Gates v. Deukmejian*, and again in *Gates v. Rowland*:

The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of

cials. However, since CMF is a prison health care facility, no custody decision should be made that is medically contraindicated. If the use of a 37mm gun in a given case is contraindicated medically, and the weapon is still used, the patient would not be receiving appropriate psychiatric treatment as required by the Consent Decree.

To allow the use of a 37mm gun with mentally ill patients, then, there must first be an approval that such a use of force is not medically contraindicated.

In this way, the district court comported with the requirements of the consent decree—that use of the gun be medically appropriate. Instead of imposing its own judgment, the district court relied on the judgment of defendants' own physicians that the gun's use on a particular prisoner would not be medically contraindicated.

[11] But the district court order veered from this sound position when it limited the purposes for which the 37mm gun can be used by defendants. The mediator's recommendations allowed defendants to use the gun to "prevent imminent substantial property damage." But the magistrate judge and district court rejected this recommendation and did not include the prevention of imminent substantial property damage as one of the allowable uses of the gun.

The touchstone of section V.F.1 as applied to this case is whether the restraint at issue is medically contraindicated. Where it has been found that an individual use of the gun is not medically contraindicated, there is no basis in section V.F.1 for a court order prohibiting the gun's use for that particular purpose. We hold that the district court abused its discretion by prohibiting the gun from being used to prevent "imminent substantial property damages" when there is no medical contraindication for the use of the gun.

CONCLUSION

Defendants' use of the 37mm gun falls under § V.F.1 of the Consent Decree. The standard for measuring compliance with this section is whether the defendants' use of the 37mm gun corresponds with providing appropriate psychiatric treatment. With one exception, the district court did not abuse its discretion by requiring the defendants to modify their policies concerning the use of the 37mm gun. This one exception is the district court's failure to include the prevention of imminent substantial property damage as a permissible use of the gun. We affirm in part and reverse in part the order of the district court.

II.

No. 94–15259: ATTORNEYS' FEES

The district court awarded plaintiffs a portion of their disputed attorneys' fees for 1991 compliance and monitoring work under the consent decree. Defendants appeal this order, contending that the district court abused its discretion in making this award because plaintiffs' billing statements were not sufficiently detailed, and some of the hours paid represent work in which plaintiffs did not prevail, work that was not reasonably related to compliance and monitoring of the consent decree, or inefficient work. We affirm the district court order in part and reverse in part.

A. Facts

Section XI.1 of the Consent Decree sets forth the parties' agreement as to attorneys' fees. It states,

Plaintiffs may seek to recover reasonable costs and attorneys' fees and other expenses that may be sought pursuant to 42 U.S.C. section 1988 and 29 U.S.C. section 794(b) for work performed in this matter prior to entry of this Consent Decree and reasonably performed during the pendency of this Consent Decree. Reasonable costs and expenses shall be awarded in amounts agreed to by the parties or, absent agreement, as determined by the Court upon plaintiffs' noticed motions.

Pursuant to procedures established by the district court and agreed to by the parties, plaintiffs submit to defendants quarterly statements of their attorneys' fees and costs. If defendants dispute the amount of the request, plaintiffs may file with the district

Defendants argue that the district court made no specific finding that defendants had violated the decree; therefore, the court had no authority to modify defendants' policies. Defendants also argue that, irrespective of whether a finding was made, defendants' policies do not actually violate the consent decree; therefore, the district court abused its discretion in modifying defendants' policies. Finally, defendants argue that the district court abused its discretion by modifying the mediator's recommendation and prohibiting use of the gun to prevent property damage because this modification was not supported by the record.

[8, 9] First, a specific finding of a past violation of a consent decree is not prerequisite to an injunction preventing a future violation. *See, e.g., Vertex,* 689 F.2d at 892 ("the district court could properly clarify that ambiguous language [of the consent decree], and this it did, requiring defendants to change their future advertising to comply with the consent judgment, as clarified."). Moreover, in adopting the mediator's report, the district court did find that defendants' policies violate the consent decree. The mediator found, "The final decision to utilize the 37mm gun [at CMF] is made by custody personnel." This was in contrast to its finding that "[t]he type of restraint procedures used with mentally ill patients should normally be a clinical decision. If an emergency arises which requires custody officials to make the decision regarding restraint procedures with mentally ill patients, such a decision should not be medically contraindicated." The mediator similarly found, "since CMF is a prison health care facility, no custody decision should be made that is medically contraindicated." The mediator specified that this decision should be made by the professional judgment of a physician. The mediator found that "CMF policy allows a social worker or psychiatric nurse to make the determination whether the use of a 37mm gun is medically contraindicated." Thus, the district court, in adopting the findings of the mediator, did find that defendants violated the consent decree.

Defendants also argue that the district court's interpretation of the decree to require

a psychiatrist's approval before the gun is used was not supported by the record because the evidence did not conclusively establish that the gun is more dangerous than MAB techniques. The mediator found,

6. Medical experts testified that the use of the 37mm gun on mentally ill patients could be traumatizing and result in psychological injury to the patient, but there were no studies presented to support this opinion.

7. No evidence based on studies was presented which demonstrated that the use of a 37mm gun in cell extractions reduced or increased the risk of injury to staff or to patients.

The mediator further explained,

There was extensive testimony of experts as to whether the use of a 37mm gun produced any long term effect on the course of a patient's mental illness or his relationship with the treating staff. This testimony was totally based on opinion with no studies or tangible evidence to support the diametrically opposed positions.... At best, [ ] one can only declare a draw—with plaintiffs' experts testifying that the use of any weapon may have a traumatic and lasting impact on a patient, and defendants' experts testifying that there was no evidence of such damage in the cases at CMF.

There was also disagreement amongst the experts as to whether more "force" is used with a 37mm gun or when a MAB approach is used.... It should be noted, however, that when the 37mm gun is used at CMF it is still often necessary for staff to enter the cell and physically restrain the inmate.

[10] But the district court did not abuse its discretion in requiring the modification of defendants' policies because its order accommodated the mediator's findings. The court did not entirely ban the gun's use. Instead, the district court took a case-by-case approach, shifting the decision of whether to use the gun to a physician. The district court adopted the mediator's conclusion that,

The decision to control, and the method of control, properly belongs to custody offi-

GATES v. GOMEZ 531
Cite as 60 F.3d 525 (9th Cir. 1995)

mediator pointed out, "If the use of a 37mm gun in a given case is contraindicated medically, and the weapon is still used, the patient would not be receiving appropriate psychiatric treatment as required by the Consent Decree." The mediator found that the use of force to control a mentally ill inmate

is not treatment which is "medically indicated" in the sense that term is commonly used and understood in mental health circles. The decision to use force is not part of the inmate's treatment plan. The question is more properly phrased as to whether the particular force used to restrain or remove a patient is contraindicated. That is, has a physician made a professional judgment that the means to be used poses a substantial risk of harm to the patient's medical or mental health which outweighs the need for control and the possible risk of harm to staff and the patient from the use of other means?

We agree with the mediator, the magistrate judge, and the district court that § V.F.1 of the Consent Decree encompasses defendants' use of the 37mm gun.

The decree has a specific section imposing a restriction on the use of taser guns.[3] The defendants contend that the specific regulation of the use of taser guns in § V.D of the Consent Decree precludes the district court's interpretation of § V.F.1 of the Consent Decree to include a general medical limitation on the use of weapons to restrain mentally ill inmates. The two provisions are not inconsistent. Section V.D, covering tasers, is a specific application of the general standard set forth in section V.F.1; the district court's order is another specific application of section V.F.1 covering 37mm guns, which were not in use when the decree was entered. There is no reason the taser policy need be identical to the 37mm gun policy; they are different weapons with different risks. The

district court's application of these sections is a reasonable interpretation of the decree.

D. Standard for Compliance

[7] Defendants argue that even if the consent decree covers the use of the 37mm gun, the district court applied the wrong standard in judging compliance. Without citing any law, defendants argue that compliance is to be judged under the "deliberate indifference" standard of the Eighth Amendment. We rejected this argument in Gates v. Rowland, and we reject it again here.

Section I.21 of the Consent Decree states, "The parties agree that in entering into this Consent Decree they waive specific findings of fact and conclusions of law and any determination whether the remedies provided are legally required." And section I.25 states, "The parties agree that it is not the intent of this Consent Decree to prescribe the minimum standards required by the United States Constitution." On the basis of these provisions, we concluded in Gates v. Rowland, "Where the parties negotiated use of a constitutional standard, they specified so in the language of the consent decree. Otherwise, the consent decree is not limited to constitutional standards." 39 F.3d at 1444.

Section V.F.1 of the Consent Decree provides the governing standard in this case, that of appropriate psychiatric treatment as medically indicated. This is a sufficiently specific standard with which to judge defendants' compliance.

E. Enforcement Order

Defendants' last argument is that even if the consent decree covers the use of the 37mm gun, and even if the district court applied the correct standard in evaluating defendants' compliance with the consent decree, the district court abused its discretion in ordering reform of defendants' 37mm gun policies.

---

3. Section V.D of the decree covers "Tasers, Restraints and Involuntary Medications." Sections 1–3 cover the use of the taser, and section 4 covers administration of involuntary medication. Under this section, tasers cannot be used to restrain a prisoner to administer involuntary medication, and the use of tasers on prisoners with psychiatric classifications or taking antipsychotic medications must be limited to the great-

est extent possible. Specifically, custodial staff must confer with a psychiatrist before using a taser and such a conference must be documented except in emergencies; alternative means must be considered and the reasons for their rejection stated in writing before a taser can be used; and periodically, incident reports on the use of tasers on prisoners with psychiatric classifications must be provided to the mediator.

tion of such use will be made to the Warden and the Psychiatric Officer of the day who will be responsible to review the appropriateness of such action and document their findings for the record.

## B. Standard of Review

[1] Pursuant to § IX.6 of the Consent Decree, if a party objects, the district court reviews the mediator's report *de novo*. It also reviews *de novo* the magistrate judge's findings of fact to which a party has objected. 28 U.S.C. § 636(b)(1). It reviews the magistrate judge's conclusions of law *de novo*, as well. *Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir.1983).

[2–4] We review *de novo* the district court's interpretation of the consent decree. *Officers for Justice v. Civil Serv. Comm'n*, 934 F.2d 1092, 1094 (9th Cir.1991). "However, we give deference to the district court's interpretation based on the court's extensive oversight of the decree from the commencement of the litigation to the current appeal." *Id.; accord Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 893 (9th Cir.1982). Deference is appropriate in this case, as it has been under the supervision of District Judge Karlton and Magistrate Judge Moulds since its inception. We review for clear error the district court's findings of fact. *United States v. Gila Valley Irrigation Dist.*, 31 F.3d 1428, 1432 (9th Cir.1994). The district court order requiring defendants to modify their policies is effectively an injunction and will be reversed "only where the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Id.* at 1442 (interpreting a consent decree enforcement order as a preliminary injunction and applying the above standard of review).

## C. Scope of the Consent Decree

Defendants claim that the district court had no jurisdiction to issue an enforcement order regarding their use of the 37mm gun because the gun's use was not covered by the consent decree. The district court order is based on § V.F.1 of the Consent Decree, which states, "Defendants will provide appropriate psychiatric screening for each incoming inmate at CMF and will provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated." Defendants maintain that shooting a mentally ill prisoner in his cell with rubber bullets is not "psychiatric treatment," and thus not regulable under the decree. Plaintiffs maintain that shooting a mentally ill prisoner in his cell with rubber bullets can have an adverse effect on "appropriate psychiatric treatment," and thus, falls within the requirements of section F.1. We agree with the district court and conclude that defendants' use of the 37mm gun is covered by the consent decree.

[5] A consent decree is construed with reference to ordinary contract principles of the state in which the decree is signed. *Gates v. Rowland*, 39 F.3d at 1444. In California, contracts are interpreted using an objective test to give effect to the mutual intention of the parties as it existed at the time the contract was made. *Id.* "The language of the contract governs if it is clear and explicit. Words in a contract are generally understood in their ordinary and popular sense, and technical words are interpreted as usually understood by persons in the profession or business to which they relate." *Id.* (citations omitted). Pursuant to § IX.6 of the Consent Decree, "[t]he burden of persuasion is on the party who has objected to the Mediator's findings and recommendations." In this case, the burden of persuasion is on defendants.

[6] The defendants maintain that the type of restraint to be used is purely custodial and thus not covered by the decree. The district court, following the mediator's recommendations, held that while generally the decision to use force on mentally ill prisoners and the type of force to be used is a custodial decision, the type of force *not* to be used is a clinical decision. It framed the issue thus: "The issue is not whether the use of the weapon is a 'treatment' within the meaning of the Decree. The issue is whether prison officials may make and implement custody decisions which are medically contraindicated. Breach of such a duty is clearly encompassed by the Consent Decree." And as the

United States District Court
for the
Eastern District of California
July 23, 1999


* * CERTIFICATE OF SERVICE * *


2:90-cv-00520


Coleman

v.

Reagan


I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 23, 1999, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


Donald Specter                          SJ/LKK
Prison Law Office
General Delivery
San Quentin, CA  94964

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Bruce Michael Slavin
Attorney General's Office of the State of California
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-3664

J Michael Keating Jr
Christopher H Little & Associates
50 S Main St
Providence, RI  02903

Edmund F Brennan
United States Attorney
501 I Street
Suite 10-100

Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: _____

Deputy Clerk