# LITTLE, BULMAN & WHITNEY, P.C.
### Attorneys

72 Pine Street
Providence, Rhode Island 02903
(401) 272-8080
Facsimile (401) 521-3555
Email info@lbwlaw.com

**FILED**

DEC 2 7 1999

CLERK, U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

Christopher H. Little*
John E. Bulman*
Christopher C. Whitney*
Fredrika Quinn Little**
Norma P. D'Apolito
Scott K. Pomeroy
Stephen T. Carney**
Jack J. Vultaggio, Jr.□

Michael W. Reardon*
J. Michael Keating, Jr.
Henry R. Kates
*Of Counsel*

*Also admitted in Massachusetts
**Also admitted in Connecticut
□Admitted in Massachusetts only

December 23, 1999

**FEDERAL EXPRESS**

Clerk's Office
United States District Court
 for the Eastern District of California
501 I Street
Sacramento, CA 95814

> **RE:   Ralph Coleman, et al. v. Gray Davis, et al.
> No. Civ. S-90-0520 LKK JFM P**

Dear Sir/Madam:

Please find enclosed for filing in the above-referenced matter an original and two copies of the <u>The Special Masters' Recommendations on Parties' Requests Regarding Staff Vacancies, a Retention Plan, the Use of Contract Psychiatrists and the Documentation of Transfers.</u>

Thank you for your courtesy.

Sincerely yours,

J. Michael Keating, Jr.
Special Master

Enclosures

michael/mastering/cvltrecrevacretpl.doc

BOSTON OFFICE
The Bulfinch Building   47 Thorndike Street   Cambridge, Massachusetts 02141   (617) 494-8070

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**


**RALPH COLEMAN, et al.**

    **Plaintiffs,**

    **vs.**                      **No. CIV S-90-0520 LKK JFM P**

**GRAY DAVIS, et al.,**

    **Defendants.**


## THE SPECIAL MASTER'S RECOMMENDATIONS ON PARTIES' REQUESTS REGARDING STAFF VACANCIES, A RETENTION PLAN, THE USE OF CONTRACT PSYCHIATRISTS AND THE DOCUMENTATION OF TRANSFERS

On July 26, 1999, the court directed the defendants in this case to undertake actions dealing primarily with mental health staffing and the documentation of a variety of activities deemed essential to the fulfillment of their obligation to provide constitutionally adequate mental health services to prisoners in the California Department of Corrections (CDC). The order identified eight specific directives for implementation within 90 days, or by October 26, 1999:

1.     Reduction of the vacancy rate among psychiatrists to 25 percent or less and among psych social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at present or comparable rates,

2.     Reduction of the employment of multiple, short-term contract psychiatrists from 40 to 25 percent or less of contract services provided, without reducing overall contract services,

3.    Development of a plan for the retention of psychiatrists, addressing such issues as the payment structure that penalizes clinical administrators, opportunities for career and professional development, flexibility and enhancements for remote assignments and incentives, monetary and/or otherwise, for longevity,

4.    Development and implementation of a plan to train mental health staff, staff assistants and hearing officers involved in the new policy on mental health input into the adjudication of disciplinary infractions,

5.    Development and implementation of a system-wide data collection process for information on mental health transfers at the institutional level,

6.    Development of a system in each institution for identifying and recording self-injurious episodes, including forms, logs and other documents necessary to support such a system,

7.    Development of a process for tracking self-injurious inmates discharged from an infirmary or MHCB unit to make sure that indicated clinical follow-up occurs as prescribed, and,

8.    Development and implementation of a system-wide method for tracking, recording and aggregating institutional data on staff members' completion of mental health training courses.

In their report to the court on the status of compliance with each of these mandates in the July 26, 1999 Order, the defendants claimed completion of a retention plan for psychiatrists (No. 3, above); development and initial implementation of a training program for mental health input into the disciplinary process (No. 4, above); introduction of a system to record self-injurious episodes (No. 6, above) and track self-injurious inmates discharged from an infirmary or MHCB unit (No. 7, above); and implementation of a system for tracking and aggregating data on mental health training (No. 8, above).

At the same time, while claiming progress on the remaining issues, the defendants sought an extension of 90 days to accomplish the required

2

reduction in vacancy rates among psychiatrists and psych social workers (No. 1, above) and the use of short-term contract psychiatrists (No. 2, above), as well as a 180-day extension to implement fully a system-wide data collection process for transfers (No. 5, above).

The plaintiffs filed their opposition to the defendants' October 26, 1999 report and request for extensions on November 12, 1999, arguing against the requested reprieve in the deadline for reducing psychiatrist vacancies (No. 1, above) and attacking the defendants' retention plan for psychiatrists (No. 3, above) as hopelessly inadequate. Instead of giving the defendants more time to fill psychiatrist vacancies, the plaintiffs urged the court to order immediately specific and substantial pay raises for CDC psychiatrists. They also requested the court to direct the special master to develop an adequate plan for the retention of CDC psychiatrists.

On December 9, 1999, the court directed the special master to file within 15 days recommendations on the defendants' request for extensions and the plaintiffs' demand for increased salaries for CDC psychiatrists and the master's preparation of a retention plan. This report responds to that directive.

The defendants' requests for a 90-day extension to reduce their reliance on short-term contract psychiatrists and a 180-day extension to implement their system for collecting data on transfers are not unreasonable, are not opposed by the plaintiffs and should be granted.

The plaintiffs' objections and demands focused on two issues:

**Psychiatrist Vacancies**:

3

No issue in this case has received more attention and ink than psychiatric vacancies. Since the early 1990's when the case was first emerging, clinical staffing vacancies generally, and psychiatrist vacancies in particular, have been identified as a principal cause for the continuing inadequacies of the defendants' mental health services. At no time since the remedial order was entered in late 1995 have the defendants been able to get psychiatric vacancies much under 25 percent. Moreover, each time the defendants have come close to reaching a goal of 25 percent, a new allocation of additional psychiatrist positions has typically driven the vacancy rate back up to anywhere between 30 and 40 percent. In December, 1998, there were 48.1 vacancies in 136.1 allocated psychiatrist positions (35 percent). By mid-1999, the rate was down to 31.4 percent, and the master's recommendation that the defendants get it under 25 percent was incorporated into the court's July 23 Order (No. 1, above).

The defendants' late October report on compliance with that order selected September 21,1999 as the date on which to measure vacancies among psychiatrists because it was the one day during the 90-day period on which they had data showing a vacancy rate close to the mark at 25.51 percent (35.1 vacancies among 137.6 positions). The reported proximity to the goal was ephemeral. The latest statistical report on staffing submitted to the master, with data dated November 18, 1999, indicated that the vacancy rate was at 28.77 percent, with 40.6 vacancies among 141.1 positions.

As the plaintiffs report in their pleadings, the vacancy rate is about to become substantially worse, as 13.5 new psychiatrist positions are finally

4

added pursuant to allocations made in the latest budget cycle, based on the

adoption of an increased prevalence rate of seriously mentally disordered

inmates in the overall population.  Moreover, another 16 psychiatrist positions will

be added with the defendants' allocation of staffing enhancements for

administrative segregation mandated by the court in mid-1999.  These additions

will immediately boost the vacancy rate among psychiatrists well over 40

percent.  Any suggestion that the problem of psychiatrist vacancies is under

control is wishful thinking.

The master's most recent report to the court on compliance

describes yet again the impact of these vacancies on the defendants' ability to

provide the mental health services prescribed in the provisionally approved

plans, policies and protocols:

> In too many CDC facilities, staffing resources are
> inadequate to provide the basic elements of the 3CMS program
> guide. . . . Psychiatrists seem to do little else but monitor
> medication.  Forget evaluation, diagnosis, treatment planning;
> forget individual or group psychotherapy; forget treatment team
> meetings; and forget the Keyhea process and quality assurance
> and all those other activities arguably peripheral to the
> fundamental task of medication management for huge caseloads.
> But even the basic elements of medication management,
> including monitoring, follow-up care, laboratory testing and
> adjustments to ineffective medication treatment, are frequently
> not provided.
> Fourth Monitoring Report of the Special Master on the Defendants'
> Compliance with Provisionally Approved Plans, Policies and
> Protocols, December 3, 1999, at p. 336.

This jeremiad was simply a refrain from earlier compliance reports.

The third report on compliance linked the effects of psychiatrist vacancies to

specific institutions:

> The aggregate departmental numbers, bad as they are, do
> not fully describe the impact of vacancies in particular institutions. .

5

.. As of the end of December, five facilities, including Folsom, CCC (California Correctional Center), CSP/Solano, ASP (Avenal State Prison) and CVSP (Chuckawalla Valley State Prison), were without a psychiatrist on staff at all. At CSP/LAC (Los Angeles County), 5.0 of 5.5 allocated psychiatrist positions were vacant; at CCWF (Central California Women's Facility), four out of five psychiatrist positions were vacant; at HDSP (High Desert State Prison), two of four positions were vacant; at both CSP/SAC (Sacramento) and SVSP (Salinas Valley State Prison), 2.5 of 5.5 allocated psychiatrist positions were vacant; at PBSP (Pelican Bay State Prison), 3.0 of 8.5 were vacant; and at CIM (California Institution for Men), 2.5 of 6.5 were vacant. For a system so heavily dependent on medication for the treatment of seriously mentally disordered inmates, the impact of the absence of so many of the only mental health clinicians qualified to prescribe, monitor and adjust prescriptions is devastating.
Third Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, May 24, 1999, at p. 365.

These assessments took full cognizance of the defendants' expanding use of contract psychiatrists to substitute for missing permanent psychiatric staff. Unacknowledged in the plaintiffs' pleadings, the use of contract psychiatrists has prevented utter disaster. Without these substitutes, the defendants' MHSDS would be in a shambles. In September, 1999, the defendants utilized just under 5,000 hours of contract psychiatrists, the equivalent of approximately 31 full-time psychiatrists, not far from the number of psychiatrist vacancies in September.

While the contracted hours roughly approximate the vacancies, the pay-off in delivered services is not nearly equal. The third compliance report just cited summarized the deficiencies arising from the defendants' reliance on contracted psychiatric services to fill vacant psychiatrist positions:

Substitute coverage is provided principally by contract psychiatrists. In a few programs, such as CAL (Calipatria State Prison), CIW (California Institution for Women), DVI (Deuel Vocational Institution) and CCWF, where there is some consistency

6

among contract providers, the defendants appear to have·been reasonably well served. Elsewhere, the results are problematic. In the first place, the coverage provided through contracted services in facilities with many psychiatric vacancies, like CSP/LAC, SVSP and WSP (Wasco State Prison), simply does not begin to match the missing staff resources. A multiplicity of providers, serving short tenures, moreover, creates a nightmare of orientation, training and supervisory requirements for permanent staff, much of which never gets conducted adequately. Contract psychiatrists with little understanding of departmental policies and the correctional milieu are left to fend for themselves in a strange and intimidating environment with a demanding and sometimes volatile clientele. The involvement of contract psychiatrists in administrative segregation, the Keyhea process, cell extractions, and MHCB units sometimes results in a dissonance that is as jarring to the contract physician as it is to inmate/patients.

Inmates complain again and again to the monitor about the turnover in psychiatrists. The monitor's psychiatric experts confirm the problems associated with continuously rotating clinicians. Inmate/patients do not know who their psychiatrist is and have little trust or confidence in the ever changing face; psychiatrists do not know their patients nor can they gage accurately inmates' progress, or deterioration, from visit to visit. Meaningful review and adjustment of medication fall by the wayside. Laboratory tests are not always ordered, nor results pursued. CDC clinicians themselves complain about the baleful effect of such revolving psychiatric attendance.
Ibid, at pp. 365-366

Over the past 18 months, compliance reports have consistently

identified the defendants' staffing problems as the key to successful

implementation of mental health services: "The defendants cannot hope to

implement their mental health policies and procedures with the currently high

rate of clinical staffing vacancies prevalent in some of their institutions." Second

Monitoring Report of the Special Master on the Defendants' Compliance with

Provisionally Approved Plans, Policies and Protocols, October 20, 1998, at p. 116.

The history of this suit and issue suggest there are no easy answers

to the defendants' vacancy problems. The original June 6, 1994 Findings and

7

Recommendations of the magistrate judge urged the court to adopt an order requiring the defendants to fill presently authorized positions within 90 days and all positions subsequently determined to be necessary to provide adequate mental health services within 180 days. The deadlines within those recommendations were never adopted, and much of the succeeding five and a half years have been taken up by a search for effective ways to fill vacant psychiatrist and other clinical positions. Most of 1997 and 1998 were spent in efforts to centralize, streamline and upgrade the department's recruitment machinery and process, but the results were meager. In late 1998, the defendants began finally, at the insistence of the court, to address the issue of compensation by granting a pay increase for mental health staff generally, and psychiatrists particularly. For staff psychiatrists, the increase meant a monthly pay raise of $500.00.

By mid-1999, it was clear the increase had little impact on recruitment efforts, and both medical and departmental administration recognized the need to make the salaries of CDC psychiatrists more competitive with other components of public service and the private sector. Among the materials filed by the defendants in their October report were excerpts from an analysis of salaries in occupations comparable to state civil service prepared by the California State Department of Personnel Administration. According to the agency, the average salary of a staff psychiatrist who worked for the State in January, 1999 was $8,764, compared to a monthly salary of $12,466 for a psychiatrist in the private sector. The report also documented a comparative disadvantage for psychiatrists who worked for the State versus those working

8

within county levels of government.  CDC cannot even compete successfully with local governmental entities in terms of salary for psychiatrists.

The court, the master and the plaintiffs have been extraordinarily patient on this issue of psychiatrist vacancies.  It has been four years since the court entered the initial remedial order in this case, which mandated the filling of vacant positions.  In the following three years a series of structural recruitment improvements have done little to shrink the percentage of vacant psychiatrist positions.  In January, 1999 the defendants took a first and tentative financial measure to address the problem, but that step was, in retrospect, not nearly sufficient.  In the face of the failure of all other options, it is time for the defendants to adopt fiscal measures commensurate with the need.  There have already been indications from the defendants that they understand the need to increase compensation for psychiatrists.  While reluctant to prescribe any specific sum for pay increases, and without insisting on any particular form such increases in compensation (e.g. as salaries, rather than recruitment and retention pay differentials) must assume, the defendants should be directed to implement increases for all classes of psychiatrists by no less than $20,000 annually within thirty days of entry of the court's order.

The plaintiffs' submission opposing the extension of time sought by the defendants for the reduction of psychiatric vacancies to 25 percent did not address the defendants' simultaneous request for an extension to work further on reducing vacancies among psych social workers.  The defendants' progress in eliminating vacancies within this latter category of clinicians is not much more successful than it is with psychiatrists.  There is, however, much less of a sense of

9

urgency here because other categories of clinicians are able, and more readily available, to fill the gap. Psych social workers serve as clinical case managers in the defendants' MHSDS, as do psychologists. As psych social workers have become more difficult to find and hire, the defendants appear to be hiring more psychologists, who seem to be more readily available. As requested, the defendants should be given an additional 90 days to work on reducing further vacancies among psych social workers.

### Retention Plan

The plaintiffs also condemned the retention plan for psychiatrists filed by the defendants with the court, finding it inadequate for its purposes. The "plan" consists of a two-page recital of past and continuing efforts to enhance clinicians' salaries, including the recruitment and retention increases enacted in January and an adjustment in mid-year to salaries of psychiatrists at supervisory levels, who had been left out of the earlier increases, plus an announcement that the Health Care Services Division will consider requests of clinical staff for alternate work schedules (i.e. 4/10/40). Accompanying the "plan" is a collection of memorandums and letters generated over the past 18 months primarily on pay-related issues. These documents, when taken together and applying even the broadest and most generous planning standards, cannot arguably claim to be a *bona fide* retention plan.

The plaintiffs' suggested remedy is for the special master to write a retention plan for the defendants. That proposal is excessively intrusive, and its implementation would probably be counter-productive. The defendants need to develop their own retention plan. The submitted document suggests strongly

10

that the defendants are not persuaded they need a retention plan at all.

Indeed, reports of retention problems are largely anecdotal and do not always

distinguish the movements of psychiatrists from one institution to another from

outright departures from CDC.  Before the master is directed to undertake the

development of a retention plan, more information on the nature and scope of

the problem is warranted.  The defendants should be directed to submit to the

master within 30 days a list of all psychiatrists who have left CDC within the

preceding 24 months, together with their length of service in the department

and the reason, so far as it is known, for each departure.

## Summary of Recommendations

1.  The defendants' request for a 90-day extension to reduce the vacancy rate among psych social workers to ten percent or less should be granted.

2.  The defendants' request for a 90-day extension to reduce their reliance on short-term contract psychiatrists should be granted.

3.  The defendants' request for a 180-day extension to implement their system for collecting data on transfers should be granted.

4.  The defendants should be directed to submit to the master within 30 days a list of psychiatrists employed by CDC, who have left the department's employment within the past 24 months, with information on their length of service and the reasons for departure.

5.  The defendants should be directed to increase the annual compensation of all classes of full-time psychiatrists employed by the department by no less than $20,000 within 30 days.

11

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

December 23, 1999



## DECLARATION OF SERVICE BY MAIL

Case Name:  Ralph Coleman, et al. v. Gray Davis, et al.
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 year and not a party to the within entitled cause:  my business address is Little Bulman & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

On December 23, 1999, I served the attached

**THE SPECIAL MASTER'S RECOMMENDATIONS ON PARTIES' REQUESTS REGARDING STAFF VACANCIES, A RETENTION PLAN, THE USE OF CONTRACT PSYCHIATRISTS AND THE DOCUMENTATION OF TRANSFERS**

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped fully prepared and sent Federal Express from Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
501 I Street
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA   95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

i

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Meg Halloran, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Bruce Slavin, Esquire
Deputy Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

Diane de Kervor, Esq.
Deputy Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA 92186-5266

I declare under penalty of perjury under the laws of the State of Rhode Island
that the foregoing is true and correct, and that this declaration was executed at
Providence, Rhode Island on December 23, 1999.

*Theresa S. French*

jmk\mastering\cert2.doc

ii