FILED

JUL 2 0 2000

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY:
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                  No. CIV S-90-0520 LKK JFM P

GRAY DAVIS, et al.,

    Defendants.

### SPECIAL MASTER'S RECOMMENDATIONS ON DEFENDANTS' REQUEST
### FOR AN EXTENSION TO COMPLY WITH ORDER
### ON PSYCHIATRIST AND PSYCHIATRIC SOCIAL WORKER VACANCIES

On July 26, 1999, the court issued a series of directives to the defendants in this case, including a requirement that they reduce within 90 days the vacancy rate among psychiatrists to 25 percent or less and among psychiatric social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at then current or comparable rates. The defendants were unable to meet the deadline and in October, 1999, sought a 90-day extension within which to comply. While the requested extension was eventually granted in January, 2000, it was linked to a requirement that the annual compensation of psychiatrists in CDC be increased by at least $20,000. The political and bureaucratic complications involved in obtaining the mandated pay increase led the defendants to request a second postponement

of the deadline. During debate over this new request for a second extension, the California Legislature authorized a substantial and responsive pay increase, and the court granted the department an additional 120 days to make use of the enhanced salary structure to recruit psychiatrists. At the same time, the court directed the special master to file a report in mid-June on the status of vacancy rates among psychiatrists and psychiatric social workers, a directive subsequently melded with the need to file these recommendations on the defendants' request for a third extension.

On the eve of expiration of the second extension, the defendants reported their continuing failure to comply with the July 26, 1999 requirement to reduce psychiatric and psych social worker vacancies to mandated levels. This time they seek an extension of 180 days until November 26, 2000, fully 16 months after the July 26, 1999 Order imposed the requirement and five years after entry of the original remedial order in this case, which directed the defendants to fill all vacant authorized mental health positions.

There is no argument over the defendants' continuing non-compliance. In the master's May, 1999 report that led to the imposition of specific goals for vacancy reduction, the vacancy rate for psychiatrists as of April of 1999 was 31.4 percent and for psychiatric social workers, 20.6 percent. See Exhibit A, at p. 3. In July, 1999, the court set a goal of 25 percent for the psychiatric vacancy rate and ten percent for psychiatric social workers. The latest monthly staffing figures submitted to the master report a vacancy rate of 30.57 percent among psychiatrists and a 26.49 percent rate among psychiatric social workers as of June 9, 2000. See Exhibit B.

2

These figures, however, do not tell the whole story. The defendants' statistics for June do not yet include, for example, the 16 psychiatrists authorized earlier this year to augment mental health services in administrative segregation units. Adding these positions to the mix reported in mid-June would raise the vacancy rate among psychiatrists to 37.5 percent. The master's May, 1999 report documented the defendants' acquisition in April of 1999 of 6,082.58 hours of contracted psychiatric services, the equivalent of roughly 38 full-time psychiatrists. See Exhibit A, at p.6. The comparable figure during May, 2000, was 4,735.35 hours of contracted psychiatric services, or roughly 29.5 full-time psychiatrists. This represents a reduction of over 20 percent in contracted services in the face of increasing vacancies. See Exhibit C, at p. 6. Several institutions with substantial psychiatric vacancies identified in the master's May, 1999 report as utilizing no contract services, including the California Mens Colony (CMC), R.J. Donovan (RJD) and Salinas Valley State Prison (SVSP), still do not employ contract psychiatrists despite continuing high rates of vacancy in their psychiatric staffs.

There is more bad news. The vacancy rate among psychologists, at nine percent in April of 1999, has doubled over the past year. The vacancy rate among all categories of mental health staff is rising significantly. In April of 1999 that rate was down to a respectable level of 12.6 percent, but in May, 2000, the rate was back up to 20 percent, meaning the defendants have also been unable to comply with that part of the July 26, 1999 requirement to keep vacancy rates among other categories of mental health staff at current or comparable levels.

3

The defendants' explanation for this failure is incorporated in the declaration of CDC's Chief of the Central Recruitment and Hiring Unit (CRHU) for the Health Care Services Division (HCSD) submitted with their request for a third extension. This includes a recital of everything the department has undertaken over the past two years to enhance the recruitment of psychiatrists and psychiatric social workers, almost all of which have been described at length in prior filings and none of which has succeeded in reducing vacancies. The only real news in the declaration is that the February legislative increments in compensation for CDC psychiatrists would not appear in actual paychecks until June, and that recruitment literature aimed at psychiatrists did not include until May an announcement of the increased compensation rates approved in February. These delays were explained simply with a vague allusion to "the administrative procedures required to enhance compensation (i.e., legislative approval, union approval, and other administrative obstacles) . . ." Declaration of Dave Hutchinson, at p. 1.

The status report provided in the Hutchinson declaration on the conversion of vacant psychiatric social worker positions to psychologist positions, a strategy that has been the subject of discussion for some two years, deserves full quotation. This, again, represents the only specific explanation provided in the defendants' request for an extension for their failure to meet the vacancy reduction goal for psych social worker positions established in the July 26, 1999 Order:

> 16. Although they were informally notified of the option for reclassification in late February, the Department is currently in the process of formally notifying the institutions of the documentation required to support a

reclassification of a psychiatric social worker position to a psychologist position. Based upon this informal notification, some reclassifications are currently in process and the reclassification process is expected to have a positive impact upon filling case manager vacancies.

17. The normal process for reclassifying a position takes approximately six to eight weeks. After the position is reclassed, the normal hiring process (e.g., advertising a position, ordering certification lists, conducting interviews) must be conducted for the new classification. CDC is requesting an extension of time to demonstrate the effectiveness of this approach to reducing case manager vacancies.
Hutchison Declaration, at p. 5.

Putting aside the difficulty of making sense of this gobbledegook, it is the assumption captured by these "explanations" that is most galling to the plaintiffs. For five years now, the orders of the court relative to staffing vacancies in this case have been subjected regularly to the normal course of departmental and state executive personnel and financial procedures. Particularly in regard to vacancies, one detects no discernible awareness that obedience to federal court orders might conceivably require accelerated departures from the normal course of bureaucratic business. The defendants repeatedly have cited "normal" financial and personnel administrative practices as inevitable obstacles to timely compliance with court orders, always in the expectation that the plaintiffs and the court will understand and accept the reality of the unavoidably bureaucratic nature of state government. And, in truth, responsibility in these matters appears to be so defused among state and agency bureaucracies, it is almost impossible to pinpoint accountability and allocate blame.

It is this perceived absence of any sense of urgency or accountability on the defendants' part in regard to the vacancy issue that drives

5

the plaintiffs to suggest some extraordinary procedural measures in their
objections to the plaintiffs' latest request for an extension. They urge the court to
set a hearing in 60 days to consider additional remedial steps recommended in
advance by the master. Meanwhile they seek a requirement directing the
attorney general to file a declaration that "each defendant" has been served
with the most recent orders relevant to vacancies and that each defendant's
employees and agents have been similarly notified of these court orders. In
addition they seek a declaration from defendants Presley, Terhune and
Steinberg, respectively Secretary of the Youth and Adult Correctional Agency,
Director of CDC and Chief Deputy Director for CDC's Health Care Services
Division, detailing the steps each has taken to assure compliance.

As vexing as the delays in filling clinical vacancies may be, it
remains uncertain whether the measures finally in place to make CDC
employment sufficiently attractive to lure clinicians will actually work. Most
observers have opined that increased compensation is the fundamental answer.
Because no announcement of the salary increase for psychiatrists was made
publicly until June, there is as yet no empirical basis for assessing its impact.
Based on the relative ease with which the department seemed able to attract
psychologists in mid-1999, the conversion of psychiatric social worker positions, so
difficult to fill, to psychologist positions seemed an obvious solution then.
Because actual conversion of psychiatric social positions to psychologist
positions began only this May, we have no idea whether the conversions will
result in filled positions. It seems less likely to be a definitive solution with
psychologist vacancies currently soaring. Moreover, according to the schedule

6

provided in the Hutchison declaration, advertisements for the first of the converted positions were unlikely to appear until mid or late June. It is a full year since entry of the July 26, 1999 Order, and only now are we beginning to get into place the measures long ago perceived as possibly effective. It is clearly too early to despair of the adequacy of these measures, however lamentable the pace of their development. We need to see whether these measures work before moving on to different approaches.

It is also important to remember the broader staffing context of which the vacancy issue is only part. The master's May, 1999 report identified inadequate staffing ratios and the so-called prevalence issue as fundamental and co-equal contributors to the defendants' staffing woes. See Exhibit A, at p. 12. The former seems to have been addressed through the allocation of mental health staff to provide services in administrative segregation. The prevalence issue addresses the deficiency of mental health staff arising from the presumption that clinical staff is needed to provide services to a considerably smaller proportion of the CDC population than is actually served. In the last two fiscal-year budgets, the gap between actual staffing resources provided and those needed to service the actual mental health caseload has steadily closed. The FY 00-01 budget for CDC is projected to provide sufficient staff to treat the total number of inmates actually in the MHSDS caseload, and will continue to do so automatically thereafter. Earlier questions over the retention of psychiatrists have been addressed, and the issue set aside as an important cause of psychiatric vacancies.

7

The May, 1999 report also lamented the employment of too many contract psychiatrists providing too few hours of service, who often created more problems than they solved. Fully 40 percent of the department's contracted psychiatric services was provided by such ephemeral contractors. See Exhibit A, at pp. 9-11. The court's July 26, 1999 Order required the defendants to reduce that percentage to 25 percent or less in 90 days. As of May, 2000, the percentage was down to 12 percent, which meant that 88 percent of contracted psychiatrists now work a minimum of ten hours a week in CDC institutions, representing a substantial overall improvement in continuity of contract services. See Exhibit C, at p. 6. When those services, the equivalent of 29.5 full-time positions, are included in the calculation of an overall vacancy rate among CDC psychiatrists, the rate shrinks to ten percent. Even including the 16 psychiatrists added with the administrative segregation staffing augmentation, the overall vacancy rate is less than 20 percent if contracted services are part of the calculation. Last year the master reported that the defendants procured 948 hours of contracted case management services in April, the equivalent of roughly 6.0 full-time clinicians. In May, 2000, total case management contract hours were up to 2,509, the equivalent of 15.7 full-time positions.

None of these positive indicators means the defendants are any closer to filling vital clinical vacancies this year than they were last year. Indeed, advances in resolving the prevalence issue and the addition of mental health staffing to provide services in administrative segregation inevitably will exacerbate the vacancy problem, at least in the short run.

8

The challenge here is to preserve the defendants' progress in dealing with some aspects of the staffing issue, while not disrupting the measures finally put in place to address staff vacancies and maintaining pressure on the defendants for the full and expeditious implementation of those measures. It is time the defendants put aside their reliance on bureaucratic business as usual as an excuse for evading court-imposed deadlines for the implementation of measures they have already acknowledged as necessary for compliance with the plans, policies and protocols provisionally approved by the court in mid-1997.

**Recommendations:**

The master recommends adoption of the following measures:

1.      The defendants should be given sufficient time to implement fully the measures they have developed to deal with psychiatric and psychiatric social worker vacancies. They claim they will need until November 26, 2000 to meet the staffing vacancy limits of the July 26, 1999 Order. The master suggests the defendants be given even longer, until December 31, 2000, to eliminate in advance any possible later claim they may raise about an insufficient opportunity to carry out their plans.

2.      The court should direct the master to submit in mid-December a progress report on the defendants' compliance with the July 26, 1999 requirements on staffing vacancies. If the defendants are in compliance with these requirements, the court might declare an occasion for common rejoicing.

3.      If the special master reports that the defendants are not in compliance, and are unlikely to be in compliance at year's end, he should be

directed now to include in his report then any additional recommendations that
might lead to compliance. It is fair to say that any such recommendations are
likely to focus on a restructuring of the defendants' regional organization in a
way that consolidates the delivery of care in areas where the recruitment of
clinicians is feasible.

4.    If the master reports non-compliance, the court should
schedule automatically a mid-January, 2001, hearing, at which defendants
Presley, Terhune and Steinberg, or their successors, should be required to be
present in order to:

a.    Explain the reasons for non-compliance, and

b.    Respond to the master's recommendations for further
measures to ensure compliance or provide an
alternative plan for reaching compliance.

5.    In the meantime, the defendants should be directed to
restore the differential in recruitment and retention (R & R) bonuses for remote
facilities in CDC that were wiped out when the substantial raise in compensation
for psychiatrists was granted earlier this year.  The $1,700 monthly increase in
psychiatrists' compensation came in the form of a permanent R&R bonus
applied across the board to all psychiatrists in all institutions.  At the time of its
allocation, the defendants did not know, or did not realize, or did not mention
that one of its effects would be to eliminate the existing structure of R&R bonuses,
which provided additional extraordinary payment to those psychiatric recruits
willing to work in remote facilities such as Pelican Bay or the California
Correctional Institution (CCI), whose address at "End of Highway 202" reflects its
geographic isolation.  As a result of the new R&R schedule, these institutions lost

10

the bargaining leverage associated with the old structure and are at a distinct competitive disadvantage. That leverage, in the form or an R&R incremental or differential bonus for remote facilities, needs to be restored.

This suggested R&R bonus restoration measure might well serve as an index or test of the defendants' understanding of the need to jettison the normal bureaucratic course of business and put together a remedy with an urgency reflective of the sense of crisis the court has attributed over the past five years to the issue of staffing vacancies. The defendants in this case have developed an acceptable blueprint for a delivery system for mental health services, approved by the court three years ago. Since then they have slowly but steadily allocated the resources needed to implement that blueprint. The blueprint and the allocation of resources are obviously critical, but they are not enough. Without clinicians to fill authorized positions, the defendants' mental health services delivery system remains a vision, not reality. The plaintiffs are entitled to a real and effective system.

Respectfully submitted,

Michael Keating, Jr.
Special Master

July 19, 2000

11

## DECLARATION OF SERVICE BY FEDERAL EXPRESS

Case Name:  Ralph Coleman, et al. v. Gray Davis, et al.
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 years and not a party to the within entitled cause:  my business address is Little Bulman & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

On July 19, 2000, I served the attached

**SPECIAL MASTER'S RECOMMENDATIONS ON DEFENDANTS' REQUEST FOR AN EXTENSION TO COMPLY WITH ORDER ON PSYCHIATRIST AND PSYCHIATRIC SOCIAL WORKER VACANCIES**

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped fully prepared and sent Federal Express from Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
501 I Street
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA   95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

i

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

John Sugiyama, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Jennifer Weck, Esq.
Deputy Attorney General
1300 I Street, 10th Floor
P.O. Box 944255
Sacramento, CA 94244

Diane de Kervor, Esq.
Deputy Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA 92186-5266

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on July 19, 2000.

*Mary E. De Fontes*

jmk\mastering\cert2 fedex.doc

ii

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**

> **Plaintiffs,**

> **vs.**                    **No. CIV S-90-0520 LKK JFM P**

**PETE WILSON, et al.,**

> **Defendants.**

<u>**SPECIAL MASTER'S REPORT ON STAFFING VACANCIES**</u>

The master submitted a report to the court on September 21, 1998 on the defendants' contracted psychiatric services, as well as the defendants' efforts to fill authorized but vacant clinical mental health positions. At the conclusion of that report, the master recommended continued monitoring of CDC's (California Department of Corrections) recruitment efforts and contract psychiatric services and urged the court to consider direct intervention to prod the defendants to adopt a pending proposal to fund recruitment and retention (R&R) bonuses for five classifications of mental health clinicians in ten CDC institutions.

The plaintiffs opposed the master's recommendations as inadequate, given the defendants' long history of failure to fill vacant mental health positions, and sought the imposition of a requirement on the defendants to fill all vacant mental health staff positions within 90 days and to limit their ability to rely on contract psychiatric services. The court set a hearing on the matter for December 9, 1999. On the eve of the scheduled hearing, the

defendants announced that they had funded the requested R&R bonuses not just for five classifications in ten institutions, but for all classifications of mental health clinicians in all CDC institutions. After a somewhat anti-climactic hearing, the court entered an order on January 19,1999 directing the defendants to report to the master within 90 days on their progress in filling vacant mental health staff positions. The master was also ordered to report to the court 30 days thereafter on the defendants' progress. This report is designed to respond to that direction.

In fact, the defendants did not submit a formal report on their progress to the master, but relied instead on data and statistics provided routinely to the master on staffing, authorized positions, vacancies and contracted clinical services to provide the required update. For the purposes of this report, the master has relied on materials generated and submitted by the defendants in the normal course of monitoring, including the Mental Health Services Delivery System (MHSDS) Monthly Staffing Allocation and Vacancies for All Institutions, dated April 7, 1999 (attached as Exhibit A to this report) and the Mental Health Contract Services and Telemedicine Monthly Report for March, 1999 (attached as Exhibit B to this report).

<u>Status of Mental Health Staffing Vacancies</u>:

The following is a breakdown of key mental health staffing positions and vacancies in December, 1998 and April, 1999:

2

| Position | December, 1998 | | April, 1999 | |
|---|---|---|---|---|
| | Authorized | Vacant (%) | Authorized | Vacant (%) |
| Psychiatrists | 136.1 | 48.1 (35%) | 135.5 | 40.6 (31.4%) |
| Psychologists | 224.6 | 33.35 (14.8%) | 225.0 | 20.35 (9%) |
| Psych S. W. | 119.6 | 31.1 (26%) | 120.0 | 20.6 (17%) |
| Rec Ther | 36.0 | 4.5 (12.5%) | 35.5 | 1.5 (4%) |
| Pysch Tech | 98.3 | 14.81 (15%) | 97.3 | 6.5 (6.6%) |
| Nurses | 103.9 | 7.11 (6.8%) | 103.9 | 6.1 (5.8%) |
| Clerical | 114.1 | 13.1 (11.4%) | 116.1 | 9.6 (8.2%) |
| TOTAL | 832.6 | 152.07 (18.2%) | 833.3 | 105.25 (12.6%) |

The numbers indicate improvement in all categories. Perhaps the most encouraging fact reflected in the statistics is that early in April there were some 47 more staff members attending to the mental health needs of seriously mentally disordered inmates in CDC than there were in December. Progress, however, is painfully slow. While all but two categories of staff show vacancy levels under ten percent, the exceptions, psychiatrists and psych social workers, are crucial to the defendants' mental health services delivery system (MHSDS).

Another measure adopted in the defendants' struggle against vacancies was the initiation last November of weekly telephone conferences among central office and regional administrators and institutional custody, medical and mental health administrators to track and support local recruitment efforts. Out of these teleconferences came a sort of scoreboard recording recruitment progress from the institutional perspective, a sample of which, dated March 24, 1999, is enclosed as Exhibit C. The summary document tracks the

3

declining overall rate of vacancies and categorizes institutions by the number of mental health staff vacancies. As of mid-March, there were 19 CDC facilities with two or less vacancies; five institutions with five or less vacancies; and seven institutions with ten or less. At the far edge of the spectrum, two institutions, CMC and CSP/Corcoran, both important institutions in the defendants' overall MHSDS, had more than ten vacancies. The scoreboard and the process it records have served to focus institutional leadership on the need for increased recruitment efforts and more effective departmental and institutional cooperation in the pursuit of mental health clinicians.

The defendants have sought to cover gaps in the ranks of their psychiatrists and case managers with contracted services. Exhibit B is the latest available monthly report on the defendants' use of contracted mental health services, documenting those services for the month of March, 1999. The report is based on information provided to Sacramento by institutions, and is only as good as the data forwarded. In some instances, there is no breakdown of contractors by name and hours; only the name of the provider service is given. In others, it is not always clear whether the services provided are those of a psychiatrist, psychologist or social worker. Nonetheless, the quality of information provided has improved over time, and it is easier now to piece together an analysis of the defendants' contracted services than it was a year ago.

The focus of the defendants' contracting effort is overwhelmingly on psychiatrists. Coverage of vacant case manager positions is limited, amounting only to 948 hours during March. This is roughly equal to 6.0 full-time positions (160 hours of contracted service monthly is the typical norm for a FTE, or

4

full-time equivalent, position). Almost all of the contracted case managers were Ph.D. psychologists. Case manager vacancies in April amounted to roughly 41 among 345 authorized positions (225 psychologists and 120 psych social workers), or 12 percent. The use of contracted case managers brought the number of vacancies down to 35, or just a shade over ten percent.

These numbers need to be understood in the broader context of the defendants' overall staffing problems. As any regular reader of the master's monitoring reports knows, the caseloads of 3CMS case managers often far surpass projected staffing ratios for the 3CMS program. These overburdened caseloads are typically due, in most cases, to budgetary allocations of case manager positions based on the assumption that nine percent of the overall CDC population requires mental health treatment, when, in fact, 10.6 percent of the population is now on the mental health caseload. That percentage, which expresses the so-called prevalence rate, is expected to climb to 11.1 percent by the end of 1999. Because some 80 percent of all seriously mentally disordered inmates in CDC are on the 3CMS caseload, the impact of the staffing shortfall created by the gap between the budgeted and the actual prevalence rate falls disproportionally on 3CMS case managers. Proper adjustment of the prevalence rate in the FY1999-2000 budget will generate nearly 60 new case manager positions, or roughly two case managers per institution, designed to eliminate currently inadequate ratios of case managers to 3CMS inmates. In the meantime, while the present inadequate prevalence figure imposes huge caseloads on 3CMS case managers, the defendants ought to expand substantially contracting for case managers, whether in the form of psychologists

5

or psych social workers. Indeed, if the defendants fail to adopt the actual prevalence rate to establish the number of authorized case managers actually needed, they ought to be required to use contract services to fill the existing 40 case manager vacancies and the additional 60 case manager positions needed to care for all 3CMS inmates currently on the caseload.

The defendants' use of contract psychiatrists is far more extensive than their use of contract case managers because the vacancy rate among psychiatrists is significantly higher. In March, 1999, the defendants procured a total of 6,082.58 hours of contract psychiatric services. Using the 160 hours monthly as the norm for a full-time position, the defendants employed roughly 38 FTE psychiatrists through contracts. This very nearly matched the total of 40.6 psychiatrist vacancies in the department as of April 7. The total also represents a 33 percent increase in the 4,551.12 hours of psychiatric services the defendants contracted for in July of 1998.

The defendants, of course, hired a great many more than 38 individual psychiatrists. The monthly list actually identifies 78 different individual psychiatrists, while two institutions reported only the names of a company or registry that provided services, without numbering or naming the contract psychiatrists at work in their facilities. Analysis of the list itself suffices to reveal some of the strengths and weaknesses of contracting as a substitute for permanent staff. In some institutions (e.g., CIW, CCI, CVSP, DVI, HDSP, MCSP, CSP/SAC and VSPW), outside psychiatric services were provided by one or two psychiatrists, who met all of the facility's contract needs. In some of these institutions, the monthly total of contracted services was not great, but the

6

services were provided by psychiatrists with a history in the institution. In CIW, for example, the same two psychiatrists each have provided roughly equal hours of service monthly over a long period of time. Earlier monthly contracting reports, as well as reports from monitors in the field, confirm that in these institutions, there is, at least, logistical continuity among the contractors, in the sense that the same clinicians tend to provide all or almost all of the contracted coverage from month to month.

In a second block of institutions, the picture is mixed. Take, for example, WSP, where two contract psychiatrists provided 488.5 hours of coverage in March, while seven others combined to cover the remaining 118.5 hours. Thus, two psychiatrists combined to provide the coverage of 3.0 FTE, while seven others barely covered three-quarters of one FTE. In CCWF, five contractors provided 564 hours of coverage in March, with two working FTE hours, two working 0.5 FTE hours and a fifth working only 24 hours. In CMF, two contracting psychiatrists each filled more than two half-time equivalent positions, while a third provided only 20 hours. In CSP/Solano, one contractor provided more than full-time coverage, another, more than half-time coverage and three others together less than a single full-time equivalent. In CSP/LAC, three contractors provided 334 hours of coverage, 154, 100 and 80 hours respectively, while five others combined to supply the remaining 190 hours. CSP/Corcoran used 890 hours of contracted psychiatrists in March, with 490 of those hours shared among four practitioners (150, 130, 110 and 100 hours, respectively), while 13 contractors provided the remaining 400 hours, an average of just over 30 hours apiece. The

7

result is a combination of some continuous coverage with service that is brief and episodic.

In a third group of institutions, contractors were not individually identified (e.g., ASP and CIM), or the monthly hours reported were shared among multiple providers, none of whom worked even the equivalent of a half-time psychiatrist. At Folsom, for example, six contract psychiatrists worked 199 hours in March, ranging from 72 to seven hours. In PVSP, five contractors combined for 186.7 hours, ranging from 54 to 15,6 hours. Again, earlier monthly reports from these institutions tended to confirm these March, 1999 contract employment patterns.

Not surprisingly, the statistics do not tell the whole story. The most recent exit interview held by a monitoring team at ASP in early May revealed that one contract psychiatrist has been providing virtually full-time coverage in that facility since October, 1998, reversing the dismal picture of contracted services at ASP implied from the data provided to Sacramento. On the other hand, it appears that ASP's contract with the registry providing this individual psychiatrist will expire in July, and it is questionable whether he will be able to continue pursuant to a new contract with another registry.

Overall, at least 3,709.5 hours (60 percent) of the total of 6,082.58 psychiatrist hours contracted for in March, 1999 were provided by psychiatrists who worked sufficient hours to fill the equivalent of a half-time position (14.0) or a full-time position (10.0). The remaining 2,373.08 hours (40 percent) were provided by some 54 named and a handful of unnamed practitioners, who each worked an average of roughly 40 hours a month or ten hours a week.

8

Finally, there are a few institutions that reported no contract psychiatric services at all in March despite significant vacancies, including CMC, RJD, SVSP and CCC. In Exhibit C, CMC is identified in mid-March as a facility with more than ten vacancies, while RJD and SVSP had somewhere between five and ten vacancies. CCC, with its tiny and still shrinking caseload of seriously mentally disordered inmates, had neither a staff nor a contract psychiatrist.

Quantitatively, then, the defendants continue to experience vacancies in some 30 percent of their authorized psychiatrist positions, down from 35 percent in December. They have managed nearly to fill the time missed through staff vacancies with contract services, although some gap exists between authorized positions and efforts to fill them with permanent staff and contract psychiatrists. Some 40 percent of the psychiatric coverage purchased monthly by the defendants is delivered by practitioners who provide an average of approximately 40 hours of service a month.

It is the brief and intermittent nature of the contract services provided by the short-term contract psychiatrists that is the probable source of the qualitative shortcomings in contracted psychiatric services reported by the master over the past 18 months. The master's psychiatric experts have been most critical of psychiatric services in precisely those institutions where either the amount of available contract services inadequately compensates for vacant positions or where multiple and changing contractors are employed to replace missing permanent staff.

The resulting qualitative problems have been described in each of the monitor's periodic reports. A multiplicity of contract providers, each serving

9

only a few hours weekly, seems to preclude proper orientation, training and
supervision by permanent staff, which lacks sufficient time or resources to guide
the efforts of contract psychiatrists. Short-term psychiatrists rarely have even a
basic understanding of departmental policies and the correctional milieu, and
often are left to fend for themselves in a strange and intimidating environment
with a demanding and sometimes volatile clientele. The involvement of
contract psychiatrists in administrative segregation, the Keyhea process, cell
extractions, and MHCB units sometimes results in a dissonance that is as jarring to
the contract physician as it is to inmate/patients.

Inmates complain repeatedly about the turnover in psychiatrists.
The monitor's psychiatric experts have amply confirmed the validity of these
complaints about continuously changing clinicians. Inmate/patients do not
know who their psychiatrists are and have little trust or confidence in the
revolving faces. Short-term contract psychiatrists, for their part, do not know their
patients nor can they gage accurately inmates' progress, or deterioration, from
visit to visit. Meaningful review and adjustment of medication fall by the
wayside. Laboratory tests are not always ordered, nor results pursued. CDC
clinicians themselves complain about the baleful effect of such revolving
psychiatric attendance.

The link between contract services by numerous, short-termed
psychiatrists and inadequate psychiatric care is clear. It is important to
remember, however, that these problems with contracted services do not
explain fully the defendants' overall difficulty with providing adequate
psychiatric care. The defendants' long-time failure to allocate sufficient clinical

10

staff for the actual mental health caseload, combined with an inadequate
psychiatric staff for seriously mentally disordered inmates in administrative
segregation, has left the defendants well short of sufficient number of authorized
psychiatrist positions to meet treatment needs.  Corrective efforts presently
underway should increase by nearly 25 percent the defendants' current
allocation of authorized psychiatrists.  All of these additional psychiatrist positions,
of course, will initially be vacant and equally subject to the difficulties impeding
the filling of positions already allocated.

Some mention of telemedicine is necessary here.  The defendants
have developed the capability of putting together both medical and mental
health patients with physicians and psychiatrists, whether specialists or
generalists, in remote locations.  Initially this creative use of telecommunications,
which allows distant participants to see, as well as hear, one another, allowed
and encouraged consultation among practitioners about complex diagnoses
and treatment.

Within the past year, the defendants have sought to use
telemedicine to supplement thinly spread psychiatric resources, by having a
remote psychiatrist from the central office in Sacramento service a caseload of
inmate/patients in Pelican Bay State Prison.  The master's psychiatric experts
have viewed the defendants' telemedicine system and believe it has potentially
positive uses within the department's overall plans for the delivery of medical
and mental health care.  They also have some question about its use to provide
routine psychiatric services to a remote caseload, need a much more extensive
review of such a use to justify telemedicine as a viable substitute, in part or in

11

whole, for local psychiatric services. At this point, telemedicine represents a miniscule portion of the defendants' efforts to deal with the shortage of psychiatric staff. In March, 69 hours of telemedicine time were included in the department's total count of 6,990.58 hours of mental health contract and telemedicine time. That represents less than one percent of the total. Telemedicine remains, however, a development to watch.

Where does all this leave the defendants in the struggle to address the issue of staffing, repeatedly identified as the most critical issue in this case? Growing familiarity with the defendants' mental health system over time has not only confirmed the importance of staffing, but also deepened appreciation of the complexity of the issue. Vacancies, identified early in the mastership as the paramount obstacle to full staffing, have come to be viewed as only one of several equally vexing problems. Staffing ratios and the prevalence issue have emerged as fundamental and co-equal difficulties.

More recently, recognition of the defendants' inability to retain psychiatrists has emerged as another challenge to full staffing. Discouraged by impossible caseloads in addition to other drawbacks associated with a prison-based psychiatric practice, including barely comparable pay, remote locations and the lack of opportunities for career development, staff psychiatrists have been deserting CDC almost as rapidly as enhanced recruitment efforts have succeeded in wooing new ones.

Finally, an unintended and counterproductive consequence of the R&R bonuses enacted at the end of 1998, which did not apply to supervisory positions, was to make staff positions in some categories of mental health staff,

12

including psychiatrists, more remunerative than supervisory ones. The result was a flurry of resignations among supervisors in favor of staff positions with fewer responsibilities and higher pay.

A restructuring of recruitment efforts, enhanced recruitment and retention bonuses and a leadership more focused on the vacancy problem have resulted in some progress, at least since December. Current percentages in the two categories of psychiatrists and psych social workers, on the other hand, show little change since July of 1998. Moreover, companion recommendations on staffing ratios and administrative segregation currently wending their way through the judicial and administrative labyrinth call for additional allocations of some 25 psychiatrists, the procurement of which will exacerbate the vacancy problem, at least in the short run.

### Recommendations

There are no clear or easy solutions to the defendants' vacancies problem. The failure of a substantially enhanced salary structure to accelerate recruitment quickly, as well as the difficulties encountered in luring at relatively lucrative daily rates contract psychiatrists for work in CDC, suggests limits to a purely financial strategy. Meanwhile, the level of vacancies among clinicians other than psychiatrists and psych social workers seems to be gradually declining and is now under ten percent in all other categories, a possibly acceptable rate in a system with allocated resources sufficient to meet treatment needs. This last caveat, of course, is critical and requires reformation of the defendants' prevalence rate and the provision of sufficient staff to meet the needs of seriously mentally disordered inmates in administrative segregation.

13

In the meantime, vacancy levels among psychiatrists and psych social workers are unacceptable, and the defendants' use of contract psychiatrists to fill psychiatric vacancies, while extensive, undoubtedly costly and commendable, needs improvement. While tempted by the plaintiffs' call for an order requiring the defendants to fill all vacant authorized positions within 90 days, the master recommends instead the imposition on the defendants of the following specific goals calculated to reduce key vacancies, improve contract psychiatric services and generate plans for dealing with retention problems:

1. The defendants should be required to reduce within 90 days the vacancy rate among psychiatrists to 25 percent or less and among psych social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at present or comparable levels.

2. The defendants should be required to reduce within 90 days the employment of multiple, short-term contract psychiatrists to fill vacancies from the current 40 percent to 25 percent or less of contract services provided, without reducing overall contract services unless justified in specific instances by decreasing vacancies. A substitute psychiatrist who works less than 40 hours a month in any one institution, in the absence of some extenuating circumstance, constitutes a short-term contract psychiatrist.

3. The defendants should be required to develop within 90 days a plan for the retention of psychiatrists in CDC, addressing such

14

issues as the payment structure that penalizes clinical administrators, opportunities for career and professional development, flexibility and enhancements for remote assignments, the development of incentives, monetary and/or otherwise, for longevity, etc.

These recommendations are intended to encourage the defendants' continued development of a multi-faceted approach to overall staffing problems that currently impede full implementation of the plans, policies and protocols provisionally approved by the court in mid-1997. Adoption of these recommendations would be largely meaningless in the absence of other proposed changes, including increases in the prevalence rate and mental health staff in administrative segregation. On the other hand, if the defendants can piece together this mosaic of staffing remedies within the next quarter, much of the basic work on the Coleman case will be complete.

Respectfully submitted,

Michael Keating, Jr.
Special Master

May 18, 1999

15

ALL-STATE LEGAL 800.222.0510    FORM RECYCLED

*MENTAL HEALTH SERVICES DELIVERY SYSTEM:  Staffing Allocation and Vacancy History*

| Classification | As of 3/15/2000 | | | As of 4/18/2000 | | | As of 5/19/2000 | | | As of 6/9/2000 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alloc. | Vac | % | Alloc. | Vac | % | Alloc. | Vac | % | Alloc. | Vac | % |
| Chief Psychiatrist | 24.00 | 4.00 | 16.67% | 24.00 | 3.00 | 12.50% | 24.00 | 3.00 | 12.50% | 24.00 | 3.00 | 12.50% |
| Senior Psychiatrist-Supervisor | 4.00 | 0.00 | 0.00% | 4.00 | 1.00 | 25.00% | 4.00 | 0.00 | 0.00% | 4.00 | 0.00 | 0.00% |
| Senior Psychiatrist Specialist | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% |
| Staff Psychiatrist, CF | 111.10 | 36.35 | 32.72% | 111.10 | 34.85 | 31.37% | 112.10 | 39.35 | 35.10% | 112.10 | 39.75 | 35.46% |
| **Psychiatrists** | 142.10 | 41.35 | 29.10% | 142.10 | 39.85 | 28.04% | 143.10 | 43.35 | 30.29% | 143.10 | 43.75 | 30.57% |
| Chief Psychologist | 9.00 | 1.00 | 11.11% | 9.00 | 1.00 | 11.11% | 9.00 | 1.00 | 11.11% | 9.00 | 1.00 | 11.11% |
| Senior Psychologist-Supervisor | 41.00 | 2.50 | 6.10% | 41.00 | 2.50 | 6.10% | 40.00 | 2.50 | 6.25% | 40.00 | 3.50 | 8.75% |
| Senior Psychologist-Specialist | 7.00 | 2.00 | 28.57% | 7.00 | 2.00 | 28.57% | 7.00 | 1.00 | 14.29% | 7.00 | 1.00 | 14.29% |
| Psychologist, Clinical | 172.60 | 30.15 | 17.47% | 174.60 | 37.65 | 21.56% | 182.10 | 43.65 | 23.97% | 187.60 | 51.95 | 27.69% |
| Psychologist Staff | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| **Psychologists** | 230.60 | 35.65 | 15.46% | 232.60 | 43.15 | 18.55% | 239.10 | 48.15 | 20.14% | 244.60 | 57.45 | 23.49% |
| Supervising Psychiatric Social Worker | 4.00 | 0.00 | 0.00% | 4.00 | 0.00 | 0.00% | 4.00 | 0.00 | 0.00% | 4.00 | 0.00 | 0.00% |
| Psychiatric Social Worker | 123.10 | 21.60 | 17.55% | 123.10 | 26.60 | 21.61% | 126.60 | 32.10 | 25.36% | 127.60 | 34.60 | 27.12% |
| **Social Workers** | 127.10 | 21.60 | 16.99% | 127.10 | 26.60 | 20.93% | 130.60 | 32.10 | 24.58% | 131.60 | 34.60 | 26.29% |
| **Clinical Subtotal** | 499.80 | 98.60 | 17.55% | 501.80 | 109.60 | 21.61% | 512.80 | 123.60 | 25.36% | 519.30 | 135.80 | 27.12% |
| Other Direct Services | 41.50 | 4.00 | 9.64% | 41.50 | 3.50 | 8.43% | 40.50 | 5.00 | 12.35% | 40.50 | 5.00 | 12.35% |
| Ancillary Staff | 46.30 | 4.50 | 9.72% | 46.30 | 2.50 | 5.40% | 46.30 | 2.50 | 5.40% | 47.30 | 3.50 | 7.40% |
| Nursing and Psych Tech Staff | 223.20 | 12.80 | 5.73% | 223.20 | 12.80 | 5.73% | 230.20 | 23.80 | 10.34% | 237.30 | 32.00 | 13.49% |
| Administrative Support Staff | 12.00 | 1.00 | 8.33% | 12.00 | 1.00 | 8.33% | 12.00 | 1.00 | 8.33% | 12.00 | 1.00 | 8.33% |
| General Management | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% | 3.00 | 1.00 | 33.33% |
| Office Support | 82.60 | 3.10 | 3.75% | 73.60 | 6.60 | 8.97% | 78.60 | 10.60 | 13.49% | 87.00 | 14.60 | 16.67% |
| **Statewide Totals - All Classifications** | 908.40 | 125.00 | 13.76% | 901.40 | 137.00 | 15.20% | 923.40 | 167.50 | 18.14% | 947.00 | 192.90 | 20.37% |

*This chart does not include Clark positions.  The number of allocated positions is in the process of being validated.

ALL-STATE LEGAL  800-222-0510    ED#11    RECYCLED

# Mental Health Contract Services and Telemedicine Monthly Report

## Psychiatrists only

# May 2000

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report

Printed:  Tuesday, June 20, 2000

May 2000

**For following discipline(s): Psychiatrist**

| Institution / Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of 5/30/00 |
|---|---|---|---|---|---|---|
| **AVENAL STATE PRISON** | | | | | | |
| Hirschberg, John, M.D. | CCCMS | 140.00 | | 140.00 | | Staff Psychiatrist, CF          0.50 |
| Slutzky, G., M.D. | CCCMS | 60.00 | | 60.00 | | |
| Institution Subtotal for  ASP | | 200.00 | | 200.00 | 100% | |
| Thompson, Leonti, M.D. | | | 2.00 | | | |
| **CALIPATRIA STATE PRISON** | | | | | | Staff Psychiatrist, CF          0.50 |
| **CALIFORNIA CORRECTIONAL CENTER** | | | | | | Staff Psychiatrist, CF          0.50 |
| **CALIFORNIA CORRECTIONAL INSTITUTION** | | | | | | |
| Magid, Zalman, M.D. | CCCMS/EOP | 30.00 | | | 30.00 | Staff Psychiatrist, CF          1.00 |
| Wilson, S., MD | CCCMS/EOP | 30.00 | | | 30.00 | |
| Institution Subtotal for  CCI | | 60.00 | | | 60.00   100% | |
| Thompson, Leonti, M.D. | | | 26.00 | | | |
| **CENTRAL CALIFORNIA WOMEN'S FACILITY** | | | | | | Staff Psychiatrist, CF          1.00 |
| Thompson, Leonti, M.D. | | | 10.50 | | | |
| **CENTINELA STATE PRISON** | | | | | | |
| Coles, C, M.D. | All | 160.00 | | 160.00 | | Staff Psychiatrist, CF          0.75 |
| Institution Subtotal for  CEN | | 160.00 | | 160.00   100% | | |
| **CALIFORNIA INSTITUTION FOR MEN** | | | | | | |
| Carlon, M.D. | RC-Screening | 32.00 | | | 32.00 | Staff Psychiatrist, CF          1.50 |
| Feldman-Gonzalez, Ruben , | RC-Screening | 96.00 | | 96.00 | | |
| Musher, J., M.D. | RC-Screening | 40.00 | | 40.00 | | |
| Institution Subtotal for  CIM | | 168.00 | | 136.00   81% | 32.00   19% | |

This report includes confidential data and is governed by privacy laws and requirements.  Unauthorized use is illegal.  Shred to dispose.

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report

### May 2000

For following discipline(s): Psychiatrist

| Institution / Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of 5/30/00 |
|---|---|---|---|---|---|---|
| **CALIFORNIA INSTITUTION FOR WOMEN** | | | | | | |
| Shih, Ching Hsin, M.D. | CCMS | 53.50 | | 53.50 | | Staff Psychiatrist, CF 0.50 |
| Yee, Raymond, M.D. | CCMS | 32.00 | | | 32.00 | |
| Institution Subtotal for CIW | | 85.50 | | 53.50 63% | 32.00 37% | |
| **CALIFORNIA MEN'S COLONY** | | | | | | Senior Psychiatrist Specialist 1.00 |
| | | | | | | Staff Psychiatrist, CF 4.00 |
| **CALIFORNIA MEDICAL FACILITY** | | | | | | |
| Enright, R., M.D. | CCMS/EOP | 104.00 | | 104.00 | | Staff Psychiatrist, CF 1.00 |
| Soufi, M.D. | CCMS/EOP | 40.00 | | 40.00 | | |
| Weingarten, S., M.D. | CCMS/EOP | 20.00 | | | 20.00 | |
| Institution Subtotal for CMF | | 164.00 | | 144.00 88% | 20.00 12% | |
| **CSP - CORCORAN** | | | | | | |
| Benson, Samuel, M.D. | MHCB | 20.00 | | | 20.00 | Staff Psychiatrist, CF 3.00 |
| Lifiyandsky, M.D. | Ad Seg/SHU | 20.00 | | | 20.00 | |
| Magid, Zalman, M.D. | MHCB | 30.00 | | | 30.00 | |
| Manley, Gloria, M.D. | MHCB | 20.00 | | | 20.00 | |
| Mobert, M.D. | Ad Seg/SHU | 60.00 | | 60.00 | | |
| Ruiz, M.D. | Ad Seg/SHU | 20.00 | | | 20.00 | |
| Tuason, M.D. | MHCB/CCMS | 120.50 | | 120.50 | | |
| Wong, M.D. | Ad Seg/SHU/MHCB/CIDS | 120.00 | | 120.00 | | |
| Institution Subtotal for COR | | 410.50 | | 300.50 73% | 110.00 27% | |
| Thompson, Leonti, M.D. | | | 27.25 | | | |
| **CALIFORNIA REHABILITATION CENTER** | | | | | | |
| Compton, Ariel, M.D. | CCMS | 24.00 | | | 24.00 | |
| Dusevich, M.D. | CCMS | 8.00 | | | 8.00 | |
| Institution Subtotal for CRC | | 32.00 | | | 32.00 100% | |
| **CORRECTIONAL TRAINING FACILITY** | | | | | | |

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report

May 2000

5/30/00

For following discipline(s): Psychiatrist

| Institution / Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of |
|---|---|---|---|---|---|---|
| **CHUCKAWALLA VALLEY STATE PRISON** | | | | | | |
| Payne, D., M.D. | EOP | 52.60 | | 52.60 | | Staff Psychiatrist, CF  0.50 |
| | Institution Subtotal for CVSP | 52.60 | | 52.60  100% | | |
| **DEUEL VOCATIONAL INSTITUTION** | | | | | | |
| Church, John, M.D. | All | 149.00 | | 149.00 | | Staff Psychiatrist, CF  1.00 |
| | Institution Subtotal for DVI | 149.00 | | 149.00  100% | | |
| **FOLSOM STATE PRISON** | | | | | | |
| French, A, M.D. | CCCMS | 65.50 | | 65.50 | | |
| Meek, M., M.D. | CCCMS | 27.50 | | | 27.50 | |
| | Institution Subtotal for FSP | 93.00 | | 65.50  70% | 27.50  30% | |
| **HIGH DESERT STATE PRISON** | | | | | | |
| Thompson, Leonti, M.D. | | | 19.00 | | | |
| **IRONWOOD STATE PRISON** | | | | | | |
| Payne, D., M.D. | MHCB | 48.00 | | 48.00 | | |
| | Institution Subtotal for ISP | 48.00 | | 48.00  100% | | |
| **CSP - LOS ANGELES COUNTY** | | | | | | |
| Noble, Randolph, M.D. | CCCMS | 50.00 | | 50.00 | | Staff Psychiatrist, CF  2.00 |
| Rawal, Panna, M.D. | CCCMS/EOP | 19.50 | | | 19.50 | |
| Wilson, S., MD | CCCMS | 9.50 | | | 9.50 | |
| | Institution Subtotal for LAC | 79.00 | | 50.00  63% | 29.00  37% | |

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report
### May 2000

| Institution / Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of 5/30/00 |
|---|---|---|---|---|---|---|
| **For following discipline(s): Psychiatrist** | | | | | | |
| **MULE CREEK STATE PRISON** | | | | | | |
| Adeyemo, M.D. | CCCMS | 165.00 | | 165.00 | | Staff Psychiatrist, CF 4.00 |
| Church, John, M.D. | CCCMS/EOP/MHCB | 80.00 | | 80.00 | | |
| Gross, G., M.D. | CCCMS/EOP | 20.00 | | | 20.00 | |
| Hurley, Pearce, M.D. | CCCMS/EOP | 50.00 | | 50.00 | | |
| Jones, Paula, M.D. | CCCMS | 40.00 | | 40.00 | | |
| Manley, Gloria, M.D. | CCCMS/EOP | 68.00 | | 68.00 | | |
| Rios, Carlos, M.D. | CCCMS/EOP | 112.00 | | 112.00 | | |
| Schultz, George, M.D. | EOP | 80.00 | | 80.00 | | |
| Welcher, Wayne, M.D. | CCCMS/EOP/MHCB | 80.00 | | 80.00 | | |
| Wilson, Frank, MD | CCCMS/EOP | 16.00 | | | 16.00 | |
| Institution Subtotal for MCSP | | 711.00 | | 675.00   95% | 36.00   5% | |
| **NORTHERN CALIFORNIA WOMEN'S FACILITY** | | | | | | |
| **NORTH KERN STATE PRISON** | | | | | | |
| Nguyen, Duc, M.D. | RC | 108.00 | | 108.00 | | Staff Psychiatrist, CF 0.10 |
| Institution Subtotal for NKSP | | 108.00 | | 108.00   100% | | |
| **PELICAN BAY STATE PRISON** | | | | | | |
| Harris, M.D. | CCCMS (A & B Yards) | 80.00 | | 80.00 | | Staff Psychiatrist, CF 3.00 |
| Johnson, David, M.D. | PSU | 183.00 | | 183.00 | | |
| Shipley, Glen, M.D. | CCCMS (A Yard)/Ad Seg | 136.00 | | 136.00 | | |
| Institution Subtotal for PBSP | | 399.00 | | 399.00   100% | | |
| Thompson, Leonti, M.D. | CCCMS (A Yard) | | 6.00 | | | |
| **PLEASANT VALLEY STATE PRISON** | | | | | | |
| Afghan, R., M.D. | CCCMS | 20.00 | | | 20.00 | Staff Psychiatrist, CF 1.00 |
| Kesheva, Shanthi, M.D. | CCCMS | 41.00 | | 41.00 | | |
| McDermott, D., M.D. | CCCMS | 20.00 | | | 20.00 | |
| Rupley, David, M.D. | CCCMS | 39.25 | | | 39.25 | |
| Shaeppers, M.A., M.D. | CCCMS | 20.00 | | | 20.00 | |
| Institution Subtotal for PVSP | | 140.25 | | 41.00   29% | 99.25   71% | |

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.

Page 4 of 6

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report

*May 2000*

| Institution / Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of | 5/30/00 |
|---|---|---|---|---|---|---|---|
| **R.J. DONOVAN CORRECTIONAL FACILITY** | | | | | | | |
| *For following discipline(s): Psychiatrist* | | | | | | | |
| | | | | | | Staff Psychiatrist, CF | 2.00 |
| **CSP - SACRAMENTO** | | | | | | | |
| Kooker, Robert, M.D. | MHCB | 104.00 | | 104.00 | | Staff Psychiatrist, CF | 1.50 |
| Institution Subtotal for SAC | | 104.00 | | 104.00 100% | | | |
| **SUBSTANCE ABUSE TREATMENT FACILITY** | | | | | | | |
| Borchardt, R., M.D. | CCCMS | 16.00 | | | 16.00 | Staff Psychiatrist, CF | 2.00 |
| Fantone, Emmanuel, M.D. | MHCB/CCCMS | 43.00 | | 43.00 73% | 16.00 27% | | |
| Institution Subtotal for SATF | | 59.00 | | 43.00 | 16.00 | | |
| **SIERRA CONSERVATION CENTER** | | | | | | | |
| **CSP - SOLANO** | | | | | | | |
| Dusay, J., M.D. | CCCMS/EOP/MHCB | 70.00 | | 70.00 | | Staff Psychiatrist, CF | 0.50 |
| Jeffers, M.D. | CCCMS/EOP/MHCB | 25.00 | | | 25.00 | | |
| Spitzer, Robert, M.D. | CCCMS/EOP/MHCB | 64.00 | | 64.00 | 25.00 | | |
| Institution Subtotal for SOL | | 159.00 | | 134.00 84% | 25.00 16% | | |
| **CSP - SAN QUENTIN** | | | | | | | |
| **VALLEY STATE PRISON FOR WOMEN** | | | | | | | |
| Allison, Janet, M.D. | CCCMS/RC | 240.00 | | 240.00 | | Staff Psychiatrist, CF | 3.00 |
| Crayton, Eugene, M.D. | CCCMS | 14.00 | | | 14.00 | | |
| Teofilo S. Sy. M.D. | CCCMS | 218.00 | | 218.00 | | | |
| Xuereb, Charles, M.D. | CCCMS | 130.00 | | 130.00 | 14.00 | | |
| Institution Subtotal for VSPW | | 602.00 | | 588.00 98% | 14.00 2% | | |

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.

# Mental Health Care Delivery System

## Contract and Telemedicine Monthly Report

May 2000

**Institution**

| Providers | Programs Covered | Contract Service Hours | TeleMed Hours | Long-Term Contractors | Short-Term Contractors | Direct Clinical Position Vacancies as of 5/30/00 |
|---|---|---|---|---|---|---|
| *For following discipline(s): Psychiatrist* | | | | | | |
| **WASCO STATE PRISON** | | | | | | |
| Abrams, M.D. | RC/Mainline | 40.75 | | 40.75 | | Staff Psychiatrist, CF    4.00 |
| Benson, Samuel, M.D. | RC/Mainline | 17.00 | | | 17.00 | |
| Berge, Fred, M.D. | RC/Mainline | 62.00 | | 62.00 | | |
| Bogost, Bruce, MD | CTC/RC | 163.50 | | 163.50 | | |
| Griffin, Julius, M.D. | RC/Mainline | 170.00 | | 170.00 | | |
| Liflyandsky, M.D. | RC/Mainline | 30.00 | | | 30.00 | |
| Nguyen, Duc, M.D. | CTC/RC | 259.00 | | 259.00 | | |
| Patel, Shailesh, M.D. | RC/Mainline | 9.25 | | | 9.25 | |
| Institution Subtotal for WSP | | 751.50 | | 695.25 | 56.25 | |
| | | | | 93% | 7% | |
| **Statewide Services / Percentage of Services** | | 4,735.35 | 90.75 | 4,146.35 | 589.00 | |
| | | | | 88% | 12% | |
| **Number of Contractors** | | 68 | | 41 | 27 | |

Monthly Contract Hours Were Not Submitted By The Following Institution(s):

*SVSP*

This report includes confidential data and is governed by privacy laws and requirements. Unauthorized use is illegal. Shred to dispose.