**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**FILED**

RALPH COLEMAN, et al.

FEB 2 6 2002

Plaintiffs,

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

vs.                                    No. CIV S-90-0520 LKK JFM P

GRAY DAVIS, et al.,

Defendants.

## SPECIAL MASTER'S SECOND QUARTERLY REPORT
## ON DEFENDANTS' EFFORTS TO REDUCE STAFFING VACANCIES

In mid-1999, the court issued an order that required the defendants to reduce within 90 days the vacancy rate among psychiatrists to 25 percent or less and among psychiatric social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at then current or comparable rates. After prolonged bureaucratic and political delays, which resulted in no immediate improvement in the rate of clinical vacancies in the California Department of Corrections' (CDC) mental health services delivery system (MHSDS), the court in August 2000 gave the defendants until the end of 2000 to meet its earlier vacancy reduction goals. At the same time the master was directed to report in mid-December 2000 on the defendants' progress in bettering its recruitment efforts and make further recommendations, if needed, on how the defendants might meet their staffing obligations.

The result was a report submitted to the court on December 19, 2000, in which the master estimated that the defendants were unlikely to comply with the order to reduce clinical vacancies to the mandated levels and recommended a variety of

*1351*

alternative strategies for recruitment developed with the parties over the previous 60 days. The following April the court entered an order endorsing the recommendations and directed the master to file with the court regular updates on the defendants' progress in pursuing the recommended recruitment and staffing activities, as well as on the impact of these activities on staffing vacancies.

The purpose of all of the strategies generated in late 2000 was to spur CDC's recruitment of mental health clinicians sufficiently to reduce overall clinician vacancies to acceptable levels. None of the strategies identified more than a year ago has served to resolve the defendants' recruitment difficulties. The recruitment "activities" included in the endorsed recommendations committed the defendants to explore and develop feasible alternative approaches to filling vacancies, rather than the adoption of specific actions, such as providing pay raises or recruitment and retention enhancements for different categories of clinicians. To the extent any of the alternative approaches involve the expenditure of additional resources, the State's rapidly deteriorating fiscal situation seems likely to prevent their quick implementation.

The measurement of clinical staffing vacancy rates is not difficult. In December 2000, the reported vacancy rate among psychiatrists was 29.36 percent. In mid-July 2001, the rate was nearly four percentage points lower at 25.49 percent and within striking distance of the 25-percent goal. In the December 2001 monthly statistical report provided by the defendants, the vacancy rate actually dipped beneath the goal to 23.87 percent. On the other hand, among psychiatric social workers, the vacancy rate in December of 2000 was 25.4 percent, but the rate had risen to 27.03 percent in mid-July. By December of 2001, the rate was up to 28.47 percent, nearly three times the ten-percent

goal.  In December 2000, 23.63 percent of allocated psychologist positions were vacant; in mid-July, the rate was somewhat lower at 21.52 percent; and by December 2001 the rate had sunk to 16.35 percent.

These latest December figures may not be entirely reliable.  The department reported to the court at the close of the last budgeting cycle that, thanks to an increase in the so-called prevalence level, which measures the percentage of CDC inmates in need of mental health services, and the expansion of several existing programs, a total of 85.9 clinical positions, excluding those funded for DMH's inpatient program scheduled to commence in June 2002 at Salinas Valley State Prison, had been added to the department's allocation of MHSDS staff.  The defendants' statistical report for December  did not reflect any of these additional allocations, but the January compilation of data, distributed after the submission of the draft version of this report to the parties, began to reflect some of the additional allocations, increasing, as anticipated, the percentage of vacancies reported above in each of the categories.

The overall number of permanent clinicians providing mental health services in CDC continued to expand slowly. Between mid-July and mid-December of 2001, the number of psychiatrists employed by the defendants increased by 4.35; the number of case mangers, including both psychologists and psychiatric social workers, grew by 14.4; the number of psychiatric technicians by 9.6; and the number of registered psychiatric nurses by 4.2.  A total, then, of 32.55 more clinicians were working in CDC in December than in July.

The defendants, meanwhile, continued their aggressive contracting of temporary psychiatrists and case managers to fill vacant positions.  In November 2000,

the department contracted for 5,102.45 hours of psychiatric services, the equivalent of

31.327 full-time psychiatrists.  Contract psychiatrists, who worked more than 40 hours

during the month, provided 93 percent of these services.  When contracted psychiatric

services are added to hired permanent staff, the vacancy rate among psychiatrists drops to

7.7 percent, well within the ten-percent target.

       In November 2000, the defendants contracted for 11,889.59 hours of case

management services, provided largely by psychologists and psychiatric social workers,

the equivalent of 74.04 case managers.  While there are differences in the training of and

licensing requirements for psychologists and psychiatric social workers, both categories

of clinicians perform similar case management functions in CDC's mental health services

delivery system.  Contract case managers, who worked more than 40 hours during the

month, provided 98 percent of these services.  When these contracted case management

services are combined with hired permanent clinicians, including, again, both

psychologists and psychiatric social workers, the vacancy rate among case managers

drops to 4.8 percent.

       The low vacancy rate among case managers, as opposed to the rising

vacancy rate among permanent psychiatric social workers, reflects the defendants'

strategy, adopted early in the face of a troubling inability to recruit psychiatric social

workers, to increase substantially the percentage of psychologists providing case

management services.  Each recent allocation of case managers has relied increasingly on

psychologists, meaning that psychologists have become in the department the principal

providers of case management services.  The defendants, as reflected in the statistics,

have continued to be more successful in recruiting psychologists.  The reduced overall

rate of vacancies among case managers is the result.  Excluding contracted services, vacancies among all permanent case managers, including both psychologists and psychiatric social workers, was 19.7 percent in December.  As indicated, when contracted services are added in, the rate declines to under five percent.

This means that the defendants have largely succeeded in addressing their mental health staffing deficiencies through two strategies, namely, aggressive contracting of temporary clinicians and an increasing emphasis on the use of psychologists to provide case management services.  These two approaches have proven far more effective in reducing vacancies among clinicians than any of the strategies for recruitment or other alternative measures the parties and master suggested in December 2000 or the court ordered in April 2001.  A measure of the defendants' accomplishment in this area of staffing is provided by the standard for clinical staffing adopted for CMF in the <u>Gates</u> consent decree, which required the department to fill just 75 percent of allocated clinical positions through direct staffing <u>or</u> contracted services.  The overall vacancy rate among psychiatrists and case managers throughout CDC, when contracted services are included, was approximately 5.6 percent at the end of 2001.

This does not mean that the defendants have solved all of their staffing vacancy problems.  The department-wide statistics do not reflect the fact that, while some institutions are fully staffed, others remained critically understaffed or so dependent on contracted services that mental health services suffer.  Contract services, moreover, as attested to so often in the course of the monitor's reviews of mental health services, are not truly equivalent to those of permanent staff.  Nor do these statistics address the issue of auxiliary staffing, including nursing, MTA, clerical, pharmacy, medical records and

custody staffing, the absence of which, as documented in recent compliance reports, often frustrates the ability of clinicians, now available in growing numbers, to provide quality services.

Nonetheless, the defendants' use of expanded contracted services and the concentration of case management services in psychologists to counter weaknesses in their ability to attract sufficient numbers of permanent clinical staff have been largely successful. It is absolutely critical that the defendants maintain their current patterns of contracting for clinical services and resist any temptation to reduce such services in response to calls for budget reductions. Indeed, the monitor recommends that the court require the defendants to maintain the vacancy rate among psychiatrists and case managers at no greater than ten percent, including contracted services.

The defendants' most recent report on its efforts to implement the recruitment and other alternative strategies for reducing staffing vacancies is attached to this report as an exhibit. Examination of its contents confirms that none of the suggested strategies has been nearly as effective as contracting in helping the defendants to meet their staffing needs. The report does describe initial implementation of an internship program for psychologists in various CDC institutions in collaboration with the Central California Psychology Internship Consortium Association. A first group of nine interns began working in August in five CDC facilities. The interns are clinically supervised locally, and there is an administrative program supervisor in Health Care Services Division in Sacramento. Recruitment for this year's participating interns begins in February, and a sixth institution will be added. CMF will also be initiating its own program, apart from the departmental program, for two interns this year. The immediate

goal is not an expansion of present case management resources. Rather, the enhanced

prospect of hiring the graduates of these internship programs as full-time clinicians is the

principal anticipated benefit of the initiative. The defendants report that one intern, who

completed her internship last year, accepted a position as a staff psychologist, and there is

some hope that more of her peers, whose internships run through the middle of this year,

will follow suit.

An initiative for the establishment of a senior psychiatric technician within

Health Care Services Division to coordinate statewide efforts to recruit psychiatric

technicians was the victim of a September hiring freeze. The defendants report that the

process for filling the position has been resuscitated, and the department anticipates it

will be able to fill the position in the first quarter of 2002.

The defendants' pursuit of strategies relevant to preventive measures

involving parole has been limited largely to efforts to upgrade CDC's own Parole and

Community Services Division's (PCSD) discharge services to inmates on the MHSDS

caseload about to be released on parole. The defendants' most recent report also

describes in general terms discussions among CDC, PCSD and the Bureau of Prison

Terms (BPT) within the newly created vehicle of the Council on Mentally Ill Offenders.

The council apparently is responsible for coordinating issues such as treatment

populations, treatment plans, progress notes, medications, clinical case management,

assessment of dangerousness and amenability to program placement among local

correctional mental health programs and PCSD programs. See paragraph 6 of the exhibit.

The plaintiffs assert that the defendants' efforts in the pursuit of this

strategy are inadequate and that the master and plaintiffs' counsel should participate in

direct discussions with the defendants and the BPT to develop ways to prevent, reduce or redirect revocations of seriously mentally disordered inmates for technical violations related to their mental illness. From the beginning of the discussion of this issue the plaintiffs have argued that one way to limit the impact of clinical vacancies is to reduce the number of inmates in CDC in need of mental health services. Equally early, the defendants have argued that parolees are not members of the Coleman class and the BPT is not a defendant in this action. The history of this provision merits some review.

The Special Master's Report and Recommendations on Psychiatrist And Psychiatric Social Worker Vacancies, dated December 19, 2000, dealt briefly with so-called preventive measures:

> Within the past year, the defendants have initiated a pilot program to enhance both planning for and delivery of mental health services for inmates leaving CDC on parole. The program goal is to provide a level of aftercare for seriously mentally disordered inmates on parole sufficient to prevent their quick return to CDC. The pilot effort needs to be fully implemented, evaluated and, if successful, replicated broadly.
>
> The plaintiffs have pressed for CDC to open a dialogue with the Bureau of Prison Terms (BPT) to develop policies and procedures to allow the diversion of revoked caseload mental health parolees to treatment programs in the community, as well as a mechanism for assessing the mental health status of caseload inmates to determine the need for, and the length of, their revocations. The defendants recognize that this is an issue that needs to be pursued and agree to explore with BPT mutually acceptable ways to reduce the return to CDC of mental health caseload inmates on parole. At p. 14.

While expressing a willingness to work to improve discharge services to seriously mentally disordered inmates about to leave CDC on parole, the defendants denied emphatically they had ever agreed to explore jointly with BPT for ways to reduce the return to CDC of mental health inmates on parole. They argued that the master had

misunderstood and overstated general expressions of empathy, and protested against any effort to bring BPT within the ambit of Coleman.

The paragraph quoted above was the most, and only, specific recommendation relative to parole or the BPT included in the December recommendations. The final recommendation of the report was broad, reflecting the tentative nature of most of the proposals identified in the report for further examination:

> The master recommends that the defendants be ordered to pursue diligently the development of the alternatives described in this report. Not all of the suggested approaches will succeed, but the defendants should be directed to explore honestly and fully the feasibility of each.
> At p.16.

The defendants protested again when the recommendations were presented in final form to the court, arguing that the section relative to parole exceeded the scope of the Coleman litigation, impermissibly expanded the Coleman class and was vague and ambiguous. The court rejected the defendants' objections, noting: "There is nothing in the special master's recommendation, nor in this court's adoption thereof, which requires defendants to do anything with the Board of Prison Terms that defendants would not do in the ordinary course of their business and addressing their constitutional obligations to class members." Coleman v. Davis, Civil Action No. CIV S-90-0520 LKK JMF P, April 4, 2001, at pp. 2-3.

Based on this somewhat inconclusive and equivocal history, the master has been reluctant to intervene in, or seek to accelerate, direct discussions between CDC and BPT. There are reports, interestingly from the plaintiffs, that the department and BPT are engaged in a dialogue on the possible diversion of revoked parolees on the mental health caseload to community treatment programs and the development of

measures for gauging more accurately the need for, and the length of, revocations of
seriously mentally disordered inmates.  Such discussions, if accurately reported, would
seem to constitute the very dialogue on preventive measures endorsed in the master's
December 19, 2000 report on alternatives.  Meanwhile, any argument that seriously
mentally disordered inmates, returned to CDC for technical violations related to their
mental health care, are not members of the Coleman class is difficult to fathom, and
delays in the provision of revocation hearings that extend the length of stay of MHSDS
inmates in reception facilities well beyond court-mandated transfer timelines seem
obviously to fall well within the scope of Coleman.

      The defendants' progress report also points out three additional initiatives
in the area of recruitment the defendants have undertaken, one of which may have some
genuine potential.  The department is organizing a system of referral for retiring military
psychiatrists, beginning with Army psychiatrists, who might be interested in post-
retirement employment with CDC.  The rate of retirement among military psychiatrists is
reportedly high, and the department's prospects for attracting some of these retirees may
be considerable.

      Finally, the defendants are in the process of negotiating collective
bargaining agreements with various categories of medical and mental health employees,
most of which have been stalled because of the State's difficult fiscal posture.
Reportedly, the working agreement for psychiatric social workers was to have included
compensation enhancements calculated to make the department's salary structure
somewhat more competitive with other public and private sector employers.  While
psychiatric social workers presently represent a shrinking proportion of case managers

among CDC's case managers, any positive moves in increasing compensation for this category of workers would be viewed as a plus. The defendants should be directed to keep the master informed of developments in regard to the finalization of this collective bargaining agreement, as well as other working agreements with an impact on the compensation of mental health staff.

In summary, progress in the development and implementation of the various alternative strategies identified in December 2000 has been negligible. The use of private contracting to operate entire institutional mental health programs went by the board in early 2001; proposals for direct and indirect compensation have gone nowhere; and internships, residency programs for psychiatrists and a connection with the National Health Service Corps have hardly proven an elixir for recruitment. Some improvements in the administration and marketing of recruitment efforts have been implemented, but with little discernible impact on the actual employment of clinicians. Accomplishments in reducing staffing vacancies have come largely from expanding the department's contracting for temporary clinicians and increased reliance on psychologists to deliver case management services, but neither of these approaches was included in the alternatives that are the subject of this report.

Three recommendations emerge from this review, the first of them critical:

1. The defendants should be directed to maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services. The recommendation recognizes that the defendants have been consistently unable to meet the staffing vacancy goals established in mid-1999, but have effectively narrowed the gap between allocated and filled clinical positions through increasingly

aggressive use of contracted clinicians. The recommended directive seeks to secure by means of a court order this somewhat oblique compliance with the spirit of the July 26, 1999 mandate on vacancies.

2. The defendants should be directed to keep the master informed of the results of collective bargaining agreements with the various categories of mental health and medical staff that impact the delivery of mental health services. In their objections to the draft version of this report, the defendants seek specific guidance on the categories of mental health and medical staff included in this recommendation. All categories of mental health staff are included, as well MTAs, nurses and medical records and pharmacy personnel from the medical side of health care services. The interest here is solely with final agreements, with a focus on any changes in existing terms of collective bargaining agreements that may enhance or impede future recruitment in each category.

3. The court needs to decide whether the master should undertake a broader role in discussions between CDC and the BPT on policies and procedures for the revocation of parolees who are seriously mentally disordered. In their objections to the draft report, the defendants reiterated their opposition to any involvement of the master in parole revocation, which, they argue, "is outside the scope of Coleman and beyond the control of the parties . . . ." As indicated earlier, inmates on the mental health caseload who have been returned to CDC and remain overlong in reception facilities awaiting

determination of their revocation status are unquestionably members of the <u>Coleman</u>

class. Expedition of parole revocation procedures related to these inmates would help the

defendants comply with the transfer timelines provisionally adopted by the court in

January, 2001.


Respectfully submitted,


J. Michael Keating, Jr.
Special Master


February 25, 2002

## DECLARATION OF SERVICE BY AIRBORNE EXPRESS

Case Name:  Ralph Coleman, et al. v. Gray Davis, et al. U.S.D.C Eastern District
No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island.  I am over the age of
18 years and not a party to the within entitled cause:  my business address is
Little, Bulman, Medeiros & Whitney, P.C., 72 Pine Street, Providence, Rhode
Island 02903.

On February 25, 2002, I served the attached

## SPECIAL MASTER'S SECOND QUARTERLY REPORT ON DEFENDANTS' EFFORTS TO REDUCE STAFFING VACANCIES

in said cause, placing, or causing to be place, a true copy thereof, enclosed in
a sealed enveloped fully prepared and sent Airborne Express from Providence,
Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
501 I Street
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA   95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

i

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

John Sugiyama, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Jennifer Neill, Esq.
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2500

Rochelle Holzmann, Esq.
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

I declare under penalty of perjury under the laws of the State of Rhode Island
that the foregoing is true and correct, and that this declaration was executed at
Providence, Rhode Island on February 25, 2002.

jmk\mastering\cert2 fedex.doc

ii

Exhibit

Defendants' Report on
Efforts to Fill
Staffing Vacancies


# Memorandum

**Date** :  January 9, 2002

**Subject:**  **Health Care Services Division Efforts to Fill Staffing Vacancies – September 1, 2001 through October 31, 2001**

The following information provides an update, as of October 31, 2001, of California Department of Corrections (CDC) activities in response to various alternatives suggested for filling mental health clinical vacancies in CDC. The alternatives were detailed in a December 20, 2000 report by the *Coleman* Special Master and adopted in an Order issued by the Court on April 4, 2001. This report will include an update on activities described in the May reporting, as well as activities initiated since that report.

## 1. Contracting for Services

- The bid request for a contract for the provision of the Mental Health programs at Avenal State Prison and North Kern State Prison, as well as a new inpatient intermediate level of care program at California State Prison at Corcoran was submitted. While two bids were received neither complied with all bid requirements and were therefore rejected. A new bid request will not be reissued.

## 2. Recruitment

- <u>Institutional websites</u>: The California Department of Corrections continues to maintain a website at www.cdc.state.ca.us, advertising job opportunities throughout the Department. This site includes general information on the Department and individual prison locations as well. Information is provided on the various mental health classifications utilized, including the minimum qualifications, salary range, applicable recruitment and retention bonus offered, benefits, as well as a contact person. In addition to the CDC site, information is also available on the State Personnel Board site. While there are currently no data available as to the number of staff recruited through these websites, anecdotal reports indicate that a number of initial contacts were directly related to the sites.

- <u>Use of Search Firm</u>: The Department contracted with a search firm to assist in the recruitment of psychiatrists. This effort resulted in the hiring of two (2) full time and one (1) half-time psychiatrists. This firm is no longer utilized however as their continued ability to provide additional viable candidates was determined to be not sufficient.

- **Promotional computer disks for geographic areas**: This project continues to be deferred due to funding issues for the Fiscal Year. A cost/benefit assessment will be completed to evaluate the continued viability of this project with the California State University, Sacramento Graphics Department. If the evaluation is considered positive, implementation plans of the project for the current fiscal year it will be initiated. If it is determined that immediate significant positive results will not be realized, it will be deferred to next Fiscal Year (after July 1, 2002).

- **Institutional clinician participation in job fairs**: Institutional clinical staff continue to participate in recruitment efforts, including job fairs, either along with or in place of central office clinicians. The following have occurred are currently scheduled:
  - Greater Bay Area Nurse Week Career Fair, October 10,2001, San Francisco
  - Travis AFB Job Fair, October 23, 2001, Fairfield
  - Latino Social Work Network Conference, October 25-27, 2001
  - California Academy of Family Physicians 54th Annual Scientific Assembly, February 15-17, 2002, San Francisco

- **Centralize aspects of the recruitment and hiring process**: A number of key elements have and continue to be centralized. These include:
  a. Staff Psychiatrist and Psychologist lists are cleared continuously statewide by Central Hiring. For an expedite exam to be processed the certification list must be cleared. Expedite exams are requested as needed, with a 24 to 48 hour turn around time for processing the expedited exam.
  b. Hiring Above Minimum (HAM's) requests are processed at centrally at HCSD and submitted to CDC Headquarters Personnel Operations for review and approval. This cuts up to several weeks off the process and assures that packages, when submitted the first time, include all the necessary information for processing.
  c. Open examinations are conducted for critical medical and mental health classifications frequently.

- **Health Care Services Division Recruiter Roundtable Meeting**: A meeting was held in August to establish a "Recruiter's Roundtable", consisting of select clinical staff from the field and HCSD recruitment staff. The field staff involved were those who have had considerable success in recruiting and filling positions at their respective institutions. At this meeting it was determined that a pilot project would focus on the recruitment in the Central Valley area, and clinicians from these locations would make up the team. This team will assist the institution health care management with recruitment issues in collaboration with the HCSD recruitment staff. A favorable assessment of the initial pilot project will result in other regional areas experiencing high vacancies being invited to participate. Examples of modalities identified at the Roundtable meeting include the development of a special HCSD website and a Medical/Mental Health Newsletter to focus on recruitment activities. Both items would include introduction of new staff, information on "final filing dates" for the "fast-track" exams, memos from HCSD executive staff and provide a mechanism for recognition of staff for special accomplishments. This group will continue meeting to plan further activities and submit a proposal for implementation.

### 3. Outreach to Professional Schools and Programs

- The Clinical Psychology Internship Program was developed to partially assist with the recruitment of psychologists. The California Department of Corrections is a member of the Central California Psychology Internship Consortium Association. The Consortium assists with recruiting interns, training, setting standards for training, and preparation and application for accreditation by the American Psychological Association (APA).

  The first interns were recruited in February 2001. The positions for the interns were created by each institution that has an internship by utilizing a vacant psychologist position (two internship positions were created from each psychologist position). Psychologists at the institution provide clinical supervision. Administrative supervision is provided by Betty Sutton, Ph.D., Chief Psychologist, HCSD.

  The interns began work August 2001. The following institutions have internships with the indicated number of interns.

  | | |
  |---|---|
  | California Correctional Institution (SVSP) | 2 |
  | California Men's Colony (CMC) | 1 |
  | Central California Women's Facility (CCWF) | 2 |
  | Valley State Prison for Women (VSPW) | 2 |
  | Salinas Valley State Prison (SVSP) | 2 |

  The third Tuesday in February is the nationwide notification date for the selection of interns. The CDC internships are advertised nationwide over the Internet through the consortium and the Association of Psychology Postdoctoral and Internship Centers (APPIC). At this time the internships have received applications and are in the process of conducting interviews. If all positions are not filled through computer matching, we will then recruit through the APPIC Clearing House. This class of interns will start work in August 2002 and it is anticipated that all 10 positions will be filled.

  The California Medical Facility will be recruiting for two psychology interns as an individual institution, not through HCSD. San Quentin State Prison planned to start an internship, but they have not vacant positions at this time and may recruit for interns next year. They had one intern last year who recently completed her internship and has accepted a position as a staff psychologist.

  Four of the intern sites will be applying for APA accreditation during the spring and summer of this year, CMC, CCWF, VSPW, and SVSP. Achieving accreditation will approve the desirability of these internship sites and should result in more and better qualified applicants.

- Psychiatric residents program: San Quentin (SQ) has been able to continue the program established and again has two psychiatric fellows working at the institution as contract employees. These are post-graduate students from the "Psychiatry and the Law" Program at University of California, San Francisco. The SQ Chief Psychiatrist continues to serve as the institutional

supervisor for the psychiatric fellows. While neither of the previous participants in this program remained at SQ after the fellowship year (which ended in June 2001), it is hoped that one or both of the current participants will be interested in remaining at the institution. This rotation will conclude in June 2002, with another rotation beginning thereafter.

- **Establishment of headquarters senior psychiatric technician position**: The process of establishing this position by September 2001 was hindered by a hiring freeze. The establishment of this position will again be forwarded through Personnel and it is now anticipated that it will be available to fill within the 1st quarter of this year.

## 4. Enhanced Compensation

- **R&R differentials**: The Department was asked by the Department of Personnel Administration (DPA) to defer any discussion of additional state-wide recruitment and retention (R&R) pay pending completion of negotiation of new master agreements with all of the State's bargaining units. As of October 31, 2001 negotiations were still open with the bargaining units for the majority of mental health classifications. While specific information on the various aspects of the individual contracts were not available, issues such as R&R and other benefits/incentives are being discussed. Once negotiations are completed the various contracts must be ratified by the rank and file employees within each bargaining unit and then approved by the legislature.

- **Sign-on bonuses**: As with the R&R differential, the Department has been asked to defer any discussion of sign-on bonuses pending completion of negotiation of new master agreements with all of the State's Bargaining Units.

- **Work/study programs**: As with the R&R differential, the Department has been asked to defer any discussion of work/study programs pending completion of negotiation of new master agreements with all of the State's Bargaining Units.

- **National Health Service Corps**: The National Health Service Corps (NHSC) "Health Professional Shortage Area" loan forgiveness program was approved for implementation at seven institutions for psychiatrists. (CDC originally requested approval for 20 institutions.) Approved institutions include: California Institution for Men (CIM), CSP – Corcoran, Central California Women's Facility, Deuel Vocational Institution (DVI), High Desert State Prison, Substance Abuse Treatment Facility and State Prison, and Wasco State Prison. Each designated institution, except DVI, has been approved for two participants; DVI has been approved for two for the mainline and two for the Reception Center.

The NHSC shared with CDC two lists of the psychiatrists that were available for appointment, and HCSD recruitment staff contacted all the potential applicants. All were sent recruitment and application materials, however to date we have only been able to hire one (1) psychiatrist at CIM as a result of this program. We continue to participate in this program and will receive a new list of potential applicants in the near future.

## 5. Realignment

- This remains an option and the Department will continue to investigate opportunities for consolidation or realignment of mental health services as appropriate to the delivery of mental health services in the Department. While the ability to recruit and retain staff at certain locations is considered as part of the feasibility of realignment, the provision of timely access to mental health services is the linchpin. CDC is continuing to look at overall changes in the inmate population profile, including the impacts of Proposition 36 and potential system-wide changes in some institutions' missions.

## 6. Preventive Measures

- Coordination with the Board of Prison Terms (BPT): Staff from the CDC, Paroles, and the BPT met to discuss issues relevant to the newly constituted Council on Mentally Ill Offenders. This Council will help coordinate local correctional mental health programs and their interface with state programs, such as those provided in CDC and through Paroles. Treatment populations, treatment plans, progress notes, medications, clinical case management, assessment of dangerousness, amenability to program placement, etc. are some of the important issues that will be approached in a consistent, coordinated manner.

## 7. Miscellaneous Activities

- Recruitment material sent out: Approximately 40 packets of recruitment materials were sent to psychiatrists in a Northern California hospital, based on the possibility that the psychiatric program at that hospital may be terminated. HCSD has contacted the hospital indicating our willingness to meet with the staff and to be involved in a job fair if the program terminates.

- Contact with Military recruiter: HCSD has developed a contact with a military recruiter in the area and is working to organize a system of referral for retiring military psychiatrists who would be interested in potential employment in CDC. This process will begin with Army psychiatrists and extend itself to other military services. The recruiter indicated that there is a high rate of retirement and prospects should be fair for obtaining candidates.

- Oversees hires: HCSD again studied the possibility of obtaining oversees hires and again came to the conclusion that the process is unworkable. This view was shared by an immigration attorney in the community (shared on a *pro bono* basis). Since the September 11, 2001 event, the limited possibilities have diminished even further.

DAVID G. GRANSEE
CHIEF (A), MENTAL HEALTH SERVICES
HEALTH CARE SERVICES DIVISION