IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

RALPH COLEMAN, et al.

JUL 1 0 2002

Plaintiffs,

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

vs.

No. CIV S-90-0520 LKK JFM P

LKK
Haven

GRAY DAVIS, et al.,

Defendants.

## SPECIAL MASTER'S THIRD QUARTERLY REPORT
## ON DEFENDANTS' EFFORTS TO REDUCE STAFFING VACANCIES

In mid-1999, the court required the defendants to reduce within 90 days the vacancy rate among psychiatrists to 25 percent or less and among psychiatric social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at then current or comparable rates. After prolonged delays during which there was little improvement in the rate of clinical vacancies in the California Department of Corrections' (CDC) mental health services delivery system (MHSDS), the court gave the defendants until the end of 2000 to meet mandated vacancy reduction goals and directed the special master to report in mid-December 2000 on the success of the defendants' recruitment efforts and make any needed further recommendations.

The resulting report estimated that the defendants were unlikely to comply with the order to reduce clinical vacancies and recommended a variety of alternative strategies for recruitment. The following April the court entered an order endorsing the recommendations and directed the master to file with the court regular updates on the

1392

defendants' progress in pursuing the recommended recruitment and staffing activities, as well as on the impact of these activities on staffing vacancies.

The purpose of all of the strategies generated in late 2000 was to spur CDC's recruitment of mental health clinicians sufficiently to reduce overall clinician vacancies to acceptable levels. The identified strategies, either individually or in combination, have not resolved the defendants' recruitment difficulties. The recruitment "activities" included in the endorsed recommendations committed the defendants to explore and develop feasible alternative approaches to filling vacancies, rather than adopt specific actions.

Despite the entry of multiple orders and the passage of considerable time, vacancy rates among CDC's mental health clinicians have not changed much. In December 2000, the reported vacancy rate among psychiatrists was 29.36 percent. As of mid-May 2002, the vacancy rate was 26.78 percent. Among psychiatric social workers, the vacancy rate in December of 2000 was 25.4 percent, but the rate had risen to 30.88 percent in mid-May 2002, three times the ten-percent goal. In December 2000, 23.63 percent of allocated psychologist positions were vacant; in mid-May 2002, the rate was roughly the same at 23.89 percent, up from the 16.35 percent reported in the master's last review of the defendants' efforts to reduce vacancies.

The increase in vacancies since the last report reflects, in large part, the belated addition to the defendants' more recent monthly statistics on recruitment those positions actually allocated in the budget for fiscal year 2001-02, but not effectively dispersed to institutions until the end of 2001. The monthly report for December 2001 showed a total of 690.03 allocated psychiatrist and case manager positions; in mid-May

2

2002 the total was up to 741.03. Despite the allocation of 51 psychiatrist and case management positions by the Legislature last July, the number of psychiatrists and case managers actually and permanently employed by CDC some ten months later increased by just 2.1 clinicians.

These allocated, but unfilled, positions are not, however, a total loss because institutions are permitted to hire contractors to fill as many of the vacant positions as they can. The allocations, then, support the ever more aggressive contracting of temporary psychiatrists and case managers. In April 2002, the department contracted for 5,529.54 hours of psychiatric services, the equivalent of 34.5 full-time psychiatrists. Contract psychiatrists, who worked more than 40 hours during the month, provided 94 percent of these services. When contracted psychiatric services are added to hired permanent staff, the vacancy rate among psychiatrists drops to 9.5 percent.

In April 2002, the defendants contracted for 14,012.94 hours of case management services, provided largely by psychologists and psychiatric social workers, the equivalent of 87.58 case managers. While there are differences in the training of and licensing requirements for psychologists and psychiatric social workers, both categories of clinicians perform similar case management functions in CDC's mental health services delivery system. Contract case managers, who worked more than 40 hours during the month, provided 97 percent of these services. When these contracted case management services are combined with hired permanent clinicians, including, again, both psychologists and psychiatric social workers, the vacancy rate among case managers drops to 9.6 percent.

The lower vacancy rate among case managers, as opposed to the rising vacancy rate among permanent psychiatric social workers, reflects the defendants' increased reliance on psychologists to provide case management services. Each succeeding budgetary allocation of case managers over the past several years has included proportionally more psychologists and fewer psychiatric social workers. The latest round of increases, for example, included 37.5 psychologists and just seven psychiatric social workers. Still, the vacancy rate among permanently employed case managers, excluding contract services, was at 25.77 percent in mid-May.

Setting aside contracted services for the moment, the overall number of permanent clinicians providing mental health services in CDC continued to expand. The expansion reflects the fact that the total of allocated mental health positions increases in each succeeding fiscal year budget. Institutional vacancy rates inflate when positions allocated in the latest budget are established locally some three to six months later, but as clinicians are recruited to fill the newly allocated positions, vacancy rates shrink. In the meantime, irrespective of fluctuations in the vacancy rate, the overall number of permanent clinicians continues slowly and steadily to climb.

Consider, for example, the impact of the most recent FY2002-03 budget, described above, which resulted in the distribution among institutions by the end of 2001 of 51 new positions for psychiatrists and case managers. The number of permanent psychiatrists actually employed by the defendants declined by 0.5 (from 147.03 to 146.53) between last December and mid-May, whether due to inadequate recruitment efforts or a surge of retirements or resignations among previously employed psychiatrists. On the other hand, the overall number of permanently employed case managers,

including psychologists and psychiatric social workers, grew by 2.6 (from 545.93 to 548.03). More dramatically, the number of psychiatric technicians increased by 23.7 (from 143.7 to 167.4) in the same period, while 2.0 recreational therapists and 4.7 registered psychiatric nurses were also added. The total of permanently employed mental health clinicians working in CDC this May was 32.5 higher than last December.

By mid-May 2002, then, CDC's total allocated mental health staff reached nearly 1,350, while the number of filled permanent positions climbed over a thousand. In April, the department contracted for the equivalent of 122 additional clinicians, bringing figures for the defendants' overall actual mental health staff to 1,153.5, of whom 957 were licensed clinicians. In the past 24 months, allocated staff has grown nearly 50 percent from 906 to 1,348, while permanently employed staff has grown by some 35 percent from 762 to 1,031.5. In the same timeframe, the utilization of contractors has increased from 7,712 hours in May 2000 to 19,373 hours in April 2002.

The master's last quarterly report on staffing vacancies recognized that, while the defendants had been chronically unable to meet the staffing vacancy goals established in mid-1999, they had effectively narrowed the gap between allocated and filled clinical positions through the growing use of contract clinicians. Citing the standard for clinical staffing adopted in the Gates case for the California Medical Facility (CMF), which required the department to fill 75 percent of allocated clinical positions through direct staffing or contracted services, the master recommended that the defendants should be directed to maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services, instead of the 1999 vacancy goals.

That recommendation represented less a retreat from mandated standards than acknowledgement that there is more than one way to skin a cat. The focus on the hiring of permanent staff overlooked the contribution of contracted staff to vacancy reduction, especially in light of the department's successful efforts to improve substantially its contracting practices by, among other measures, requiring fewer contractors to provide expanded hours of service consistently. As noted in the last report, this does not mean that the defendants have solved all of their staffing vacancy problems. While many institutions have used contracting effectively to meet nearly all of their staffing requirements, some remain critically understaffed. Some facilities, like California State Prison, Los Angeles County (CSP/LAC), California State Prison, Solano (CSP/Solano) and California Substance Abuse Treatment Facility (CSATF), have found it no less difficult to attract contract clinicians than permanent employees. Contract services, moreover, as attested to so often in the course of the monitor's reviews of mental health services, are not truly equivalent qualitatively to those of permanent staff.

The court adopted the master's recommendation on June 12 and directed the defendants to maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contract services. As indicated above, the defendants currently meet the ten-percent standard in both categories, but barely. The State's budgetary difficulties and responsive maneuvers, however, raise serious concerns about the defendants' future ability to meet the standard.

When the master's most recent quarterly report was submitted in February, the State's fiscal problems had already resulted in a partial hiring freeze that required the department to obtain individual exemptions to employ mental health staff not

involved in the direct delivery of clinical services to inmates. In late May 2002, the hiring freeze was extended to include clinicians providing direct services. See Exhibit A, which provides a copy of the Department of Finance's May 24, 2002 Budget Letter announcing the expanded hiring freeze. The precise impact of the extended freeze remains to be determined, but it will inevitably involve hiring delays. Such delays come at a bad time, because institutions are deeply into recruitment efforts to fill the 51 allocated but as yet unfilled positions from last July's budget.

The defendants plan to generate immediately a department-wide package seeking a waiver of the exemption for all clinical positions that were vacant as of May 31 and required under outstanding <u>Coleman</u> orders. This will pre-empt the need for individual institutions to prepare and submit local waiver applications. Justification for the department-wide waiver will focus on the essential nature of the positions and the existing judicial mandates. The department is optimistic that the waiver will be granted. Moreover, the department intends to seek subsequent waivers monthly or bi-monthly for clinical positions that become vacant during the preceding 30 or 60 days. The real question, given the department's strong belief that the requested waivers will be granted, is how long procurement of requested waivers will take.

Following the initial and partial hiring freeze last fall, the department developed its "packaging" strategy and submitted one or more prototype waiver packages, none of which, to date, has been acted upon. Directives on the latest extension of the freeze, moreover, indicate that some waivers will require the scrutiny and approval of executive agency budget administrators, in addition to that of the Department of Finance, a potentially alarming prescription for delay. No agency of government knows

better than budgeting and finance entities that the failure to decide is often ultimately decisive.

The department insists that the freeze does not mean that recruitment efforts must cease. Institutions will be encouraged to continue to identify, interview and investigate clinical candidates, but they will not be permitted to commit to hire a candidate until they have an exemption in hand. In the practical and highly competitive world of clinician recruitment, an inability at the commencement of an interview process to commit to the availability of a job at the conclusion of the process is likely to terminate further discussion. Why would any desirable candidate submit to a long and bureaucratic engagement process in the face of such uncertainty? And what is the likely impact of delays, undetermined at this point, on those candidates already deep into the interview process?

Interestingly, one of the few categories exempted from the hiring freeze are personnel subject to mandatory reinstatements, presumably pursuant to state court or administrative rulings.   See Exhibit A. It is puzzling that state judicial determinations related to individual personnel actions are categorically exempt from the freeze, but a federal court's orders to hire clinicians essential for remedying outstanding violations of the constitutional rights of a substantial class of CDC inmates are not.

Given the uncertainty over the impact of the extended hiring freeze on positions mandated in Coleman, it is more essential than ever that the defendants maintain their current patterns of contracting for clinical services and forego any move to reduce such services in response to calls for budget reductions. The freeze does not relieve the defendants, including here the Governor and his Department of Finance, of

their obligations relative to staffing under applicable court orders, although it doubtless makes compliance more complicated.

There is at this point every indication that the defendants recognize and intend to fulfill their obligations under the existing Coleman orders. Certainly, the current fiscal crisis confronting the State entitles its elected officials and their appointees to reorganize their budgetary priorities to husband more effectively shrinking resources. Presumably, that is the purpose of the freeze and the exemption process. The priority attaching to the allocated positions mandated in Coleman is clear. The defendants need to process swiftly the exemptions submitted by CDC pursuant to that priority.

The defendants' progress report on other pending efforts to implement alternative strategies for reducing staffing vacancies is attached to this report as Exhibit B. The bulk of the six-page report lists job fairs at which institutional and/or departmental personnel, often including clinical staff, made presentations, operated booths and distributed recruitment packages to attendees. In addition, recruitment information on clinical job openings continued to be displayed on public and professional web sites, while both departmental and institutional staff also conducted direct mail initiatives.

The proposed establishment of a senior psychiatric technician within Health Care Services Division to coordinate statewide efforts to recruit psychiatric technicians, delayed in last fall's partial hiring freeze, gave way to a new plan to create a headquarters position for a Nurse Consultant II, who will assist in the statewide recruitment of all nursing disciplines and improve CDC's overall utilization of nurses. Difficulties in finding and recruiting nurses have surpassed those involved in the search

for psychiatric technicians, a category of clinicians that seems more amenable to CDC's recruitment efforts. An exemption from the hiring freeze has been sought for this position and is pending.

Efforts described in the last report to make a direct-mail recruitment pitch to physicians and psychiatrists planning to exit the military this spring ran into a post-September 11 glitch. For security reasons, the military declined to provide the department with promised mailing labels targeted at departing medical and mental health clinicians, but the department is negotiating with the military to have the latter do a direct mailing on behalf of the department.

Internship programs for student psychologists and fellowships for psychiatric residents continue with modest success. California State Prison, Corcoran is about to hire eight graduating psychologists, who interned in the facility during the past academic year pursuant to an active program of the Central California Psychology Internship Consortium. Four of the institutions in which the Consortium currently operates, including California Men's Colony, Central California Women's Facility, Salinas Valley State Prison and Valley State Prison for Women, will be visited in the spring by an accrediting team from the California Psychological Association. It is hoped that eventual academic accreditation will enhance the attractiveness of these internship openings among graduate psychologists. California State Prison, San Quentin, meanwhile, continues to employ two residents in psychiatry from the University of California, San Francisco to supplement local services and possibly attract permanent employees.

The defendants' collective bargaining negotiations with various categories of medical and mental health employees, most of which remain stalled as a result of the State's fiscal difficulties, are still incomplete. Similarly, efforts to enhance recruitment and retention differentials for various health care and mental health clinicians have made no headway, given the increasing commitment to budget austerity.

Overall progress in implementation of the array of alternative strategies identified in December 2000 continues to be negligible. Strategies for recruiting psychiatrists have yielded barely a handful of permanent psychiatrists. Internships for psychologists have produced somewhat better, but still modest, results. Recruitment of clinicians to fill the steadily expanding number of allocated positions continues to lag by some 25 percent, a gap that has been reduced to ten percent exclusively by means of the huge expansion in the department's contracting for temporary clinicians.

This report presents a mixed picture of the defendants' progress in meeting its staffing obligations under the existing Coleman orders. The number of permanently employed clinicians providing mental health services continues to grow steadily, and a considerable portion of the substantial gap between actual and allocated staff is made up through the use of contracted services. To date, on the other hand, almost all of the positions allocated by the Legislature in the current fiscal year budget to meet the requirements of the federal court remain unfilled, and the hiring freeze, in the absence of a prompt exemption, threatens to undo current recruitment efforts and forestall future ones.

## Recommendations

A draft version of this report, together with recommendations that dealt

tentatively with the impact of the hiring freeze on mental health staffing, was

disseminated to parties on June 20th with an expedited timeline for their review and filing

of objections. While the parties pondered and formulated their responses, other

developments occurred with an important impact on the recommendations here.

Hearings in the Madrid case, involving some mental health issues along with a broader

range of conditions in CDC's Pelican Bay State Prison, resulted in the articulation of a

process for dealing with the hiring freeze that balances a respect for the defendants' need

to identify with precision the parameters of case-related exemptions and the need for a

speedy exemption process that preserves the integrity of staffing enhancements identified

as essential for the implementation of court-ordered remedies to constitutional violations.

The objections to the draft recommendations from both parties reflected elements of the

approach adopted in Madrid, with the plaintiffs arguing for swifter and broader

exemptions and the defendants seeking greater precision in the definition of the positions

to be exempted.

As noted in the draft version, these recommendations need to be directed

to the Department of Finance, as well as CDC, because it is the former agency that must

process and respond to the correctional entity's requests for waivers to the recently

broadened hiring freeze:

> 1.  Within ten days of the entry of a court order, the parties, including
>     representatives from the Department of Finance, and the Coleman
>     special master shall meet to identify all existing mental health staff
>     positions required in pending Coleman court orders that need to be
>     incorporated in a blanket exemption to the hiring freeze.

2    Within 40 days of entry of a court order, the defendants shall process, approve and finalize a blanket exemption for all those mental health staff positions identified in the meeting described above. The exemption shall apply both to identified positions that are currently vacant and identified positions that may become vacant in the future during the life of the hiring freeze. These recommendations apply only to currently allocated mental health staff positions and are not intended to circumvent the normal budgetary process of executive and legislative approval for the allocation of new or additional positions.

3.    The defendants shall continue to utilize contracted services to fill all allocated, but vacant, positions identified in the meeting described above.

The State's financial troubles signal the beginning of a potentially difficult hiatus in the implementation of the plans, policies and protocols for mental health negotiated by CDC and provisionally approved by the court in mid-1997. The defendants' mental health system has come a long way since then, but, plainly, some tough issues remain before compliance is complete. While progress over the past five years has been steady, the pace of the progress has been slow. Patience on both sides is wearing thin. The defendants see only the progress; the plaintiffs focus on the pace. The parties must resist the temptation, as resources grow scarce, to abandon the collaborative approach and return to the adversarial trenches. Now, more than ever, the parties must work together and with the court to preserve the progress achieved to date and ensure its continuation.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

July 9, 2002

## DECLARATION OF SERVICE BY AIRBORNE EXPRESS

Case Name: Ralph Coleman, et al. v. Gray Davis, et al. U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island. I am over the age of 18 years and not a party to the within entitled cause: my business address is Little, Bulman, Medeiros & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

On July 9, 2002, I served the attached

## SPECIAL MASTER'S THIRD QUARTERLY REPORT ON DEFENDANTS' EFFORTS TO REDUCE STAFFING VACANCIES

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped fully prepared and sent Airborne Express from Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
 Eastern District of California
501 I Street
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
 Chief Magistrate John F. Moulds
U.S. District Court
 Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

i

John Sugiyama, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Jennifer Neill, Esq.
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2500

Rochelle Holzmann, Esq.
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on July 9, 2002.

jmk\mastering\cert2 fedex.doc

# EXHIBIT A

Department of Finance
May 24, 2002
Budget Letter on Hiring Freeze

# BUDGET LETTER

| | |
|---|---|
| **NUMBER:** | 02-10 |

| **SUBJECT:** HIRING FREEZE | **DATE ISSUED:** May 24, 2002 |
|---|---|

| **REFERENCES:** MANAGEMENT MEMO 01-21 AND 01-24, BUDGET LETTER 01-43, EXECUTIVE ORDER D-48-01, PERSONNEL LETTER 01-022 | **SUPERSEDES:** MANAGEMENT MEMO 01-21 |
|---|---|

TO:     Agency Secretaries
        Department Directors
        Departmental Budget Officers
        Department of Finance Budget Staff

FROM:  DEPARTMENT OF FINANCE

**BUDGET OFFICERS ARE REQUESTED TO FORWARD A COPY OF THIS BUDGET LETTER TO DEPARTMENTAL HUMAN RESOURCES AND LABOR RELATIONS OFFICES.**

In response to the State's fiscal difficulties, the Governor issued Executive Order D-48-01 to implement the statewide Hiring Freeze effective October 23, 2001. Management Memos 01-21 and 01-24 address the implementation of the Hiring Freeze. The purpose of this Budget Letter (BL) is to provide instructions to departments regarding the appointments subject to the Hiring Freeze. Effective immediately, appointments previously exempted from submission and approval of a Request for Hiring Freeze Exemption Form under BL 01-43 must now be submitted to the Agency Secretary and the Department of Finance (Finance) for approval. Only the following appointments may be executed without approval of a Request for Hiring Freeze Exemption Form:

1.  Mandatory Reinstatements
2.  Intradepartmental Transfers
3.  Promotions in Place (see Management Memo 01-24 for a description of promotions in place)
4.  Appointments made from State Restriction of Appointments (SROA) lists or appointments of "Surplus" designated employees

Agency Secretaries and other cabinet-level officers are responsible for administering and ensuring compliance with the Hiring Freeze. For those departments that are not represented by cabinet, Finance is responsible for ensuring compliance. To ensure uniform administration and application of the Hiring Freeze exclusions noted above, all appointments to positions other than the three specific types of transactions noted above must be approved on a Request For Hiring Freeze Exemption Form (DF-160) by the Agency Secretary (for those departments under an Agency Secretary) and Finance. If an appointment satisfies one or more criteria to be exempt from the Hiring Freeze under Executive Order D-48-01, at least one of those criteria should be specified in the "Reason for exemption" box on the Request For Hiring Freeze Exemption Form submitted to the Agency Secretary and Finance for approval.

To maintain the existing ability to generate reports for monitoring compliance, agencies, departments, and other State entities are required to comply with provisions of the State Controller's Personnel Letter 01-022.

Questions regarding this BL should be directed to the appropriate Finance Program Budget Manager.

B. TIMOTHY GAGE
Director

STATE OF CALIFORNIA

# EXHIBIT B

Defendants' May 24, 2002 Report
on Efforts to Fill Staffing Vacancies

# Memorandum

Date  :   May 24, 2002

Subject:  **Health Care Services Division Efforts to Fill Staffing Vacancies – February 1, 2002 through April 30, 2002**

The following information provides an update as of April 30, 2002 to the California Department of Corrections (CDC) activities in response to various alternatives suggested for filling clinical vacancies in CDC mental health services. These alternatives were detailed in a December 20, 2000 report by the *Coleman* Special Master and adopted in an Order issued by the Court on April 4, 2001. This report will include an update on activities described in the most recent report of February 22, 2002 (which covered the time period from December 1, 2001 through January 31, 2002) as well as any activities initiated since that report.

1. **Contracting for Services**

   - CDC continues to contract long-term with mental health clinicians to provide services in the institution's mental health programs.

2. **Recruitment**

   - Websites: Job opportunities continue to be advertised on websites for the California Department of Corrections (www.cdc.state.ca.us), the State Personnel Board, Military Transition Assistance, and The Corrections Connection Network. Recently we are also advertising on the American Psychiatric Association's Job Bank, and Pharmacistplacement.com.

   - Job Fairs: Institutional clinical staff continue to participate along with HCSD staff in recruitment efforts including job fairs. The following have occurred or are currently scheduled:

     - Corporate Gray Job Fair, February 7, 2002, San Diego, CA. Staff attended this activity with assistance from SRN-II Mary Caldera, RJD Correctional Facility. Although this was a general job fair, flyers were sent to the Naval Medical Facilities at Camp Pendleton and San Diego announcing our participation. Turnout was approximately 200, and 30 application packets were distributed.
     - Northern California Psychiatric Society's Job Fair, February 9, 2002, San Francisco, CA. There were three applicants to the San Francisco POC and two for San Quentin Prison from this recruitment effort.
     - California Academy of Family Physicians 54th Annual Scientific Assembly, February 15-17, 2002, San Francisco, CA. HCSD participated as a recruitment exhibitor at this annual convention for California Family Practice physicians.

There were thousands of physicians in attendance at this event.  Materials distributed at our recruitment exhibit were for Chief Medical Officer, CF; Chief Physician and Surgeon, CF; and Physician and Surgeon, CF.  Over 230 recruitment packages were distributed.

- California Nursing Students Association 2002 Annual Conference, February 15&16, 2002, Sacramento, CA.  HCSD staff shared a recruitment table with the Peace Officer Recruitment Branch (PORB).  There were approximately 150 in attendance at this day-and-one-half event.  We distributed 25 application packets.

- Allied Health/Nursing Job Fair, February 22, 2002, Loma Linda, CA.  HCSD shared a table at this event with the Southern Recruitment Team of the PORB.  We were in agreement to offer both MTA and Registered Nurse, CF application packets.  We explained to the candidates that applicants are hired much faster as a RN while they are awaiting certification as a MTA.  If they decide that MTA is not what they prefer, then they have the option of canceling the processing.

- California Job Journal Job Expo, February 27, 2002, Sacramento Convention Center, Sacramento, CA.  HCSD staff shared a recruitment table with the PORB representatives from CSP-Sacramento.  This was a general job fair which drew Correctional Officer applicants and 10 Registered Nurses.

- NurseWeek Career Fair, March 01, 2002, Santa Clara Convention Center, Santa Clara, CA.  HCSD Staff shared a booth with the Peace Officer Recruitment Branch (PORB).  Representatives were from the California Medical Facility, Vacaville.  We were in agreement to offer both Medical Technical Assistant and Registered Nurse, CF to all candidates.  Approximately 79 recruitment informational packages distributed.

- 9th Annual National Association of Social Workers (NASW) Legislative Day Conference of Southern Californian, March 1, 2002, Long Beach, CA.  The event went as scheduled with a large number of students in attendance from the host campus and surrounding schools.  With the outstanding assistance of Robin Thomas, Supervising Psychiatric Social Worker, California Institution for Men, staff was able to interact with many of the participants.  The tally of applications issued was 71.

- UC Davis Summer Job Fair, March 06, 2002, Davis, CA.  HCSD Staff was invited to attend and share a recruitment table.  Representatives were from CSP-Solano.  This event did not produce for either PORB or HCSD.  This particular job fair was presented for students seeking part-time summer jobs.

- Central California Psychiatric Society's Spring Continuing Medical Education Conference, March 8-10, Monterey, CA.  The HCSD recruitment staff participated as a recruitment exhibitor at this annual conference for psychiatrists from the Central Valley of California.  Forty-seven recruitment packets were distributed and there have been several calls responding to the application and recruitment materials that we distributed. Two applications were the result of this effort thus far, and we continue to have contact with two psychiatrists from the Sacramento area.  Dr. Leonti Thompson is coordinating with us on detailing these psychiatric clinician contacts further.

- CSU Long Beach Nursing Career Day, March 13, 2002, Long Beach, CA. HCSD Staff attended this event with assistance from the Director of Nursing at the California Institution for Men.  Well-attended event with approximately 54 recruitment informational packages distributed.
- CSU Fresno Career Day 2002, March 13, 2002, Fresno, CA. HCSD Staff was unable to attend  as it conflicted with the event in Long Beach.  Supervising Registered Nurse II Mike Martens represented us from CSP-Corcoran.
- Hartnell College Nursing and Health Services Career Day 2002, March 15, 2002, Salinas, CA.  HCSD representatives reported a very successful event with approximately 20 application packages distributed.
- California State University, Fresno, Department of Social Work Career Fair, March 15, 2002, Fresno, CA.  This event continued to supply staff with potential candidates to fill vacant positions at the institutions in close proximity to the Fresno area.  Twenty-one applications were issued to individuals that are projected to graduate no later than the completion of the summer semester.
- California State University, Sacramento, Division of Social Work Field Education Program, March 22, 2002, Sacramento, CA. The primary purpose of this event is to familiarize students with the different organizations that have intern programs. The staff encountered only three individuals that were or would soon be eligible to apply for positions within the department.
- Napa Valley College Job Fair, March 27, 2002, Napa, CA. Approximately 40 recruitment informational packages distributed.
- California Psychological Association Annual Convention, April 5 & 6, 2002, Pasadena Convention Center, CA. With the capable assistance of Dr. Margaret McAloon, Chief Psychologist (A), CSP - Los Angeles County, this event appeared to a successful venture for the Department.  A total of thirty-five applications were distributed to individuals displaying a genuine interest in what our positions have to offer. Dr. McAloon's efforts provided two completed applications at the event.
- USC School of Social Work Job Fair 2002, Saint Mary Medical Center, April 5, 2002, Long Beach, CA.  This is a major annual recruitment event sponsored by schools in the greater Los Angeles and surrounding areas.  Fifty applications packets were distributed.
- California State University, Sacramento Annual Job Fair, April 16, 2002, 10:00 AM to 4 PM, Sacramento, CA.  Staff participated at this annual event to promote an awareness of the Department.  The majority of the attendees are Title IV students who are obligated to work initially for a county government. Six applications were distributed to non-Title IV students.
- NASW-CA (National Association of Social Workers - California) Annual Conference, April 19 & 20, 2002, Manhattan Beach Marriot, CA. This year's event resulted in the distribution of 78 applications.
- Southern California Psychiatric Society (SCPS) Annual Meeting April 13-14, 2002. HCSD recruitment staff distributed 34 psychiatrist recruitment packets. There were many psychiatrists from the major HMO's in southern California as well as staff psychiatrists from Kern and Tulare County mental health programs, and the Los

Angeles County correctional system. Many visitors to our recruitment exhibit were comparing salaries and seeking information regarding the 5-year requirement to be vested the State's Safety Retirement.

- Collaborative Nursing Career Fair, Santa Ana College, April 19, 2002, Santa Ana, CA. This was a small event, but approximately 60 registered nurse application packages were distributed and a list of 12 Licensed Vocational Nurses were collected for the Peace Officer Recruitment Branch to send MTA packages.
- Allan Hancock College Career Expo 2002, May 08, 2002, Santa Maria, CA.
- IHIREHEALTHCARE EXPO 2002, May 22, 2002, Santa Clara, CA.
- San Diego Academy of Family Physicians, 46th Annual Postgraduate Symposium – Family, Medicine Update 2002, June 28 - 30, 2002, San Diego – Coronado, CA.
- American Academy of Family Physicians 2002 Scientific Assembly, October 17 - 19, 2002, San Diego Convention Center, CA.

- Direct Mail Recruitment

  - **Pharmacists** - 641 letters were mailed out for the months of February, March and April.
  - **Psychiatrists** – In February 15 recruitment letters were sent to members of the Northern California Psychiatric Society. In April, the California - Orange County Psychiatric Society released their mailing labels to us, and a revolving fund check was submitted to the Society to pay for this service. The 250 mailing labels will be used to send out our recruitment letter.
  - **Physicians/Psychiatrists** – Information has been requested from the Fresno Medical Society regarding member-mailing labels. Direct mail project planned.
  - **Registered Nurses** – Bobbi Floyd, Registered Nurse, SVSP, mailed interest letters in the areas surrounding CMC and SVSP. We have received several calls requesting applications as a direct result of this effort. We are also mailing letters to Registered Nurses currently on the CDC's Certification List requesting they provide updated information, i.e., are they still interested in the CDC, what institutions are they interested in, etc. This information will be forwarded to the Personnel Examination Section for disposition.

- Centralized recruitment and hiring process

  - Staff Psychiatrist and Staff Psychologist lists continue to be cleared statewide. For psychiatrists, only three candidates responded as interested from the Statewide Employment Inquiries in March. Applications were mailed to the institutional Personnel Offices to schedule interviews. For psychologists, Statewide Employment Inquiries were mailed to the entire list of candidates in March. Included with the contact letter was a list of all the vacancies at each institution. Interested candidates were overnight mailed to the Institutional Personnel Officers to schedule interviews. The next examination is scheduled for June 14, 2002.

- Hire Above Minimum (HAM) requests continue to be processed centrally at HCSD and submitted to CDC Headquarters Personnel Operations for review and approval, which streamlines the process.

- Establishment of Headquarters Nursing Recruiter Position: We have requested to have a Senior Psychiatric Technician position for the Mental Health Services unit upgraded to a Nurse Consultant II to assist in statewide recruitment for all nursing disciplines; to provide complex nursing and program consultation and technical assistance to the field in mental health nursing care practices; and to evaluate policies, procedures, and other critical aspects of nursing services provided to MHSDS inmates. Due to the hiring freeze, we have had to submit additional paperwork for a freeze exemption. This has been completed and we are awaiting confirmation.

- Contract with Military Recruiter: Check issuance was processed and mailed out to pay for the 1200 mailing labels for physicians/psychiatrists exiting the military this spring. We received a notice from the directors of Military Gateway that due to the attack on 9-11 the labels will not be released. This is a national security issue. We are presently attempting to arrange for Military Gateway to do the mailing for us if possible. We are waiting to hear if this will be possible.

### 3. Outreach to Professional Schools and Programs

- Clinical Psychology Internship Program: The CDC is a member of the Central California Psychology Internship Consortium (CCPIC). All ten internship positions were filled for the upcoming training year, which begins in August 2002. CSP-Corcoran is in the process (expedited hiring) of hiring 8 new graduates from the California School of Professional Psychology in Fresno, which participates in the CCPIC.

  Four of the Consortium internship sites (CMC, CCWF, VSPW, and SVSP) are scheduled for site visits from the American Psychological Association in the spring and summer of 2002 as part of the process to become APA accredited.

  The California Medical Facility recruited two interns for its independent psychology internship program, and are scheduled to start working in July.

- Psychiatric Fellowship Program: This program continues with two post-graduate psychiatry fellows currently working at San Quentin (SQ) as contract employees, and two new psychiatric fellows from this program will begin training in June 2002. This program is based out of the "Psychiatry and the Law" program at UC San Francisco, and supervised at the institutional level by the SQ Chief Psychiatrist.

Case 2:90-cv-00520-KJM-SCR     Document 1392     Filed 07/10/02     Page 24 of 24

4.  **Enhanced Compensation**

- Recruitment and Retention (R&R) Differentials:  The Department of Personnel Administration (DPA) is continuing to negotiate these issues.  As not all contracts have been  finalized there is no new information available at this time.

- Sign-on bonuses:  Same as with the R&R.

- Work/study programs: Same as with the R&R.

- National Health Service Corps "Health Professional Shortage Area" Loan Forgiveness Program:  All of these positions are currently open.  A new list of candidates is due out in October 2002.

5.  **Realignment**

- The CDC continues to investigate the possibilities for consolidation or realignment of its mental health services, in order to improve the ability to recruit professional staff at attractive locations.  The mental health bed study recently completed by Tucker –Allen will be a valuable source of information for considering realignment needs and possibilities, along with other considerations mentioned in previous reports.  The provision of timely access to mental health services remains the key issue.


DAVID GRANSEB, Chief (A)
Mental Health Services
Health Care Services Division