IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.

     Plaintiffs,

        vs.                          No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

     Defendants.


**<u>FOURTEENTH MONITORING REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS' COMPLIANCE WITH
PROVISIONALLY APPROVED
PLANS, POLICIES AND PROTOCOLS</u>**


J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
February 11, 2005

# TABLE OF CONTENTS

California Correctional Institution (CCI)       5

California Institution for Men (CIM)       15

California State Prison, Corcoran (CSP/Corcoran)       26

California State Prison, Los Angeles County (CSP/LAC)       51

California State Prison, San Quentin (SQ)       60

California State Prison, Solano (CSP/Solano)       78

California Substance Abuse Treatment Facility (CSATF)       92

High Desert State Prison (HDSP)       104

Richard J. Donovan Correctional Facility (RJD)       121

Salinas Valley State Prison (SVSP)       132

Valley State Prison for Women (VSPW)       150

Summary       160

Recommendations       182

Exhibits       190

i.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                      No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## FOURTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

This report documents the latest and substantially abbreviated round of review of institutional compliance with individual corrective action plans (CAPs) compiled by California Department of Corrections (CDC) facilities in 2000 to ensure implementation of the plans, policies and protocols provisionally approved by the court in mid-1997. The abbreviation resulted from a restriction of on-site monitoring tours during the round to permit the special master's experts and monitors to work more closely with the parties to complete the update and revision of the now seven-year old plans, policies and protocols and help conduct and conclude the long-delayed unmet inpatient bed needs assessment, a project undertaken initially in 2000.

Specifically, the abbreviation meant that during the 14th round of review monitoring teams visited just 11 institutions, including those with combined large and complex mental health programs and a history of difficulty in complying fully with the

3

provisionally approved plans, policies and protocols. To communicate to other facilities, excused in this round from an on-site monitoring visit, that the free pass was not intended to signal an acceptable pause in by-passed institutions' continuing efforts to comply fully with their individual CAPs, all institutions were required to complete and submit to Health Care Services Division (HCSD) a written report on their compliance efforts during the monitoring period. In that report, these institutions were to document their progress in resolving deficiencies identified in their CAPs that continued to elude elimination.

In the 11 CDC institutions visited during the 14th round of review, the monitors spent a total of 138 person-days, just 22 less person-days than were expended in the preceding monitoring period. The monitoring teams, however, were larger and spent more time on each site, resulting in a deeper look at the selected 11 facilities. The monitor's psychiatric experts compiled 164 case reviews in eight of the facilities visited during the round. The case reviews are redacted to protect the privacy of inmates.

Institutional administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs and defendants' counsel accompanied monitoring staff during several of the site visits.

In addition to evaluating each visited institution's progress in resolving deficiencies identified in local CAPs, monitoring teams focused on four specific problem areas, including quality assurance, medication management, mental health input in the disciplinary process and access to higher levels of mental health programs, as measured by swiftness of transfer of inmates identified as needing enhanced treatment.

The data collected and findings discussed in this report are the product of many members of different monitoring teams, but subsequent references to various monitors throughout the report shall be singular rather than plural. If the text includes the clinical judgments of one of the monitor's psychiatric experts, an appropriate attribution is given.

Unlike earlier reports, the institutional summaries that follow are presented in alphabetical order. Each summary includes a brief report on staffing allocations and vacancies; a list of resolved CAP problems; discussion of the institution's progress in the four areas of focused review for this round, i.e., quality assurance, medication management, mental health input in discipline and transfers to higher levels of care; a review of the status of the institution's efforts to redress any unresolved CAP issues; and a brief overall evaluation of the institution's progress towards compliance with the plans, policies and protocols adopted provisionally by the court in mid-1997.

### California Correctional Institution (CCI)
April 26, 2004 – April 29, 2004

CCI, which was nearly fully staffed during the eleventh monitoring round some 18 months ago, suffered during the current round from a high level of clinical vacancies. Of the institution's 31 allocated clinical positions, 11.5 were vacant, including positions for 3.5 psychiatrists, a senior psychologist, six psychologists and a psych social worker. Three more psychologists were on sick leave at the time of the monitor's visit, and some case managers had caseloads of over 200 inmates. In addition, there were vacancies for a half-time recreational therapist and an office assistant. One contracted psychiatrist covered one full-time psychiatric vacancy, while four contracted psychologists filled the

equivalent of 2.75 case manager vacancies. The institution had a successful psychology intern program, which provided effective supervision of two interns, and planned to double the number of participants in the program to four.

Over 23 percent of the overall inmate population at CCI was on the mental health caseload. There were 1,257 Mental Health Services Delivery System (MHSDS) caseload inmates in the institution at the time of the monitor's visit. The capacity of the facility's various mental health programs recently rose from 969 to 1199, and the number of allocated mental health positions increased proportionally, but the additional positions were not yet in place locally and were unfilled.

The number of auxiliary staff positions also increased, largely due to new Plata-related allocations, but many remained unfilled. As a result, the number of nursing and MTA vacancies was higher than during the preceding monitoring period. Ten of 37.5 RN positions and ten of 41 MTA positions were vacant.

Quality Management Issues:

The quality assurance process continued to improve. CCI was one of five CDC institutions selected to pilot new departmental quality monitoring tools. The institution prepared an organized mental health management report for this monitoring period, as well as a helpful Quality Improvement Team (QIT) problem list and an updated CAP. Although some meaningful information was compiled in institutional audits, CCI did not use the standard departmental progress report, and its QIT reports did not typically include a statement of methodology, an assessment of the results or recommendations. Moreover, CCI did not always maintain orderly backup files so audit results could be verified. The audit samples were sometimes too small or inappropriate,

and mental health staff did not appear to receive routinely much feedback from completed QIT projects.  Although medication management was a designated priority for all institutions during the monitoring period, CCI completed few audits of its performance in this area, and the ones it conducted were particularly weak.  On the other hand, the institution reported that the institutional health care quality management committee met regularly, the mental health subcommittee began to meet weekly in December and a medication management subcommittee was formed.  Ten charts were audited monthly, and psychiatric peer review occurred weekly, although psychologists and psych techs had not yet initiated a peer review process.

The institution made further progress in implementing its Mental Health Tracking System (MHTS).  Most data was entered into the system in a timely manner, although some was still entered only periodically.  No concordance study had been conducted to determine the accuracy of MHTS data when compared with inmates' Uniform Health Records (UHRs).  As noted below, the MHTS was not used to track Enhanced Outpatient Program (EOP) transfers.

Medication Issues:

Implementation of Direct Observation Therapy (DOT) procedures for administrative segregation inmates improved.  Visual audits, reportedly conducted monthly, found 100-percent compliance with existing requirements for the direct observation of inmates taking medications.  Less formal monitoring by supervisory staff was consistent with this finding.  No central record appeared to be kept of which inmates received DOT under the new policy.

Distribution of HS (*hora somni*, hour of sleep) medications also got somewhat better. It appeared that HS medications were administered on some housing units, but not on others. Some psychiatrists did not prescribe HS medications reportedly based on a belief that MTAs would not administer such medications. At the time of the monitor's visit, it appeared that HS medications were administered at 7:00 p.m. due to staffing constraints.

The length of pill lines reportedly improved, but some inmates still complained that they had to wait 30 to 60 minutes for their medications. Evening waits had been reduced on at least one housing unit by staggering the release of inmates for medication rather than releasing all inmates at one time. The institution had not audited this issue to ascertain how long the lines actually were.

CCI's problems persisted with continuity of medications on inmates' arrival, intra-institutional transfers and prescription renewals. An institutional audit of the continuity issue reported varying compliance rates in different housing units, with rates running as low as 38, 44 and 54 percent in some. The audit, however, was methodologically flawed and failed to distinguish between discontinuities on arrival and changes in housing locations, while prescription renewals were not audited at all. The pharmacy was not always staffed on weekends and holidays. Staff reported numerous medication errors, although medication error reports often were neither completed nor filed.

Follow-up psychiatric care continued to be problematic. According to staff, inmates did not regularly receive timely follow-up appointments after medication changes. The institution had yet to audit this issue, as urged by the monitor's expert, to

determine whether follow-up appointments were scheduled in a timely manner and scheduled appointments occurred as ordered.

Monitoring and documentation of medication non-compliance remained deficient. An institutional audit in February showed that MTAs frequently failed to report non-compliance with medications and psychiatric follow-up to reports of medication non-compliance was untimely. The size of the audited sample was too small because it looked at a random number of inmates receiving psychotropic medication rather than focusing specifically on inmates identified as non-complaint.

Obtaining laboratory blood work for inmates on mood-stabilizing medications continued to be problematic. An institutional audit in January found compliance with orders for laboratory blood work among 70 percent of inmates taking Tegretol and Depakote and 57.5 percent of inmates on Lithium. This audit, too, was flawed in that the number of inmates included in the sample was too small.

Underutilization of the Keyhea process, an issue resolved in an earlier monitoring round, was possibly emerging again as a problem. CCI apparently had some difficulty in obtaining and maintaining an accurate list of inmates on Keyhea orders with the result that one or more orders had expired.

Mental Health Assessments for the Disciplinary Process:

Although the revised mental health assessment process for MHSDS inmates charged with disciplinary infractions was adopted at CCI in June 2003 and training on the process was provided to clinical and custody staff both in June 2003 and January 2004, actual implementation of the new process was still in its infancy. Of 174 MHSDS caseload inmates issued rule violation reports (RVRs) from November through

March, 31were referred for mental health assessments, but an April institutional audit indicated that assessments were not thoroughly completed in all cases. Some assessments failed to indicate inmates' level of care or mental health status as required under the new procedures; in other instances, clinicians failed to explain how an inmate's mental disorder contributed to his behavior; and clinicians failed to indicate whether a confidential interview with the inmate had occurred in 47.7 percent of the audited cases.

The impact of mental health input on the disciplinary process appeared to be, at best, marginal. The institution's April audit found that hearing officers failed to document consideration of mental health input in over 50 percent of their findings; documentation of mental health input, when it occurred, was often cursory; and hearing officers frequently failed to record their reasons for rejecting clinical assessments. Some clinicians complained that their assessments had no impact on dispositions, even when they reported that inmates were psychotic. Institutional data since June 2003 showed that just three cases were dismissed on the basis of a mental health assessment. Although punishment was mitigated in other six cases, the institutional log indicated that the reduction was related to a mental health assessment in only one of the six cases.

The institution maintained a useful disciplinary log that tracked requests for mental health assessments and dispositions of disciplinary infractions, but the log often did not record the nature of clinical assessments or the hearing officers' responses to assessments.

The timeliness of clinical responses to requests for mental health assessments in the disciplinary process varied during the monitoring period. An institutional audit in February 2004 indicated that assessments were completed, on

average, within 6.59 days of a request. An April audit found that assessments were completed, on average, within 10.17 days, exceeding the required timeframe.

Transfers:

The timely transfer of EOP inmates to appropriate programs elsewhere showed improvement. Although EOP transfer data was still not entirely reliable, the institution had enhanced its tracking mechanisms. Most EOP transfers appeared to occur within 60 days, while many were accomplished in less than 30 days. Institutional lists showed 42 transfers during the monitoring period; five transfers took longer than 60 days; 26 took longer than 30 days; and 11 occurred within 30 days. Of the 27 EOP inmates in CCI on the eve of the monitor's visit, three had been in the institution longer than 60 days; another three, longer than 30 days; and the remaining 21, less than 30 days.

CCI again experienced some problems transferring inmates to the Mental Health Crisis Bed (MHCB) unit at California State Prison, Los Angeles County (CSP/LAC). Although this issue was resolved earlier, a number of disagreements occurred during the monitoring period between CCI and CSP/LAC clinicians about inmate level-of-care designations. CCI clinicians complained that CSP/LAC sometimes resisted their MHCB referrals and returned inmates requiring a higher level of care; CSP/LAC, in turn, appeared to believe that some of CCI's referrals to the MHCB level of care were not clinically justified. The disagreements resulted in the return to CCI of several inmates referred to the MHCB unit at CSP/LAC. The monitor identified at least such three inmates, who apparently were transferred back and forth between CCI, CSP/LAC and other institutions. Clinicians at CCI and CSP/LAC expected to meet during the week following the monitor's visit to discuss and work to resolve the issue.

The transfer log at CCI was adequate, except that it failed to reflect all rejections to MHCB units.

Other CAP Issues:

    a.  Progress

Clinical intake assessments occurred more timely during the monitoring period, although staffing resources still impinged on timeliness to some extent. According to an institutional audit of 65 inmates in March, 78 percent of assessments were completed within five working days of arrival, compared to 65 percent during the preceding monitoring period. Increases in staffing allocations were expected to improve further the timeliness of intake assessments.

Clinical contacts occurred more regularly in space conducive to confidential communications in all three administrative segregation units, but many contacts continued to occur at cell-front without auditory privacy on Yard IVB. The lack of sufficient escort officers hampered access to adequate interview space throughout much of the monitoring period. By the end of the monitoring period, individual holding cells had been placed in committee rooms on some housing units, adding limited confidential space for clinical interviews, while reducing somewhat the need for escort officers.

Psych techs made rounds daily in the administrative segregation unit. The monitor's review of the psych tech log book for the period from January through March confirmed daily rounds with few exceptions. This CAP item will be resolved if compliance continues through the next monitoring period.

The monitor did not have an opportunity to assess whether time frames for mental health screenings and evaluations were met for reception center inmates, but CCI did have a system for conducting required screenings. This issue was near compliance during the preceding monitoring round and should be resolved soon.

The institution had made good progress in finalizing and implementing procedures for five-day suicide prevention follow-up. Training in these procedures was provided to nurses in January, and additional training was planned for nurses hired thereafter. According to the institutional follow-up log, most inmates received five-day clinical contacts, but some contacts were missed on weekends and holidays. Data on custody surveillance was not available, but an improved log had been developed to record custody follow-up in the future. This issue, too, was close to resolution.

The provision of pre-release services to paroling inmates continued to improve. Institutional audits showed an increase in the percentage of inmates receiving pre-release medications from 60 percent in January, to 79 percent in February and 82 percent in March. The institution, however, did not identify why some inmates failed to receive medications prior to parole. Institutional audits for the same months showed from 93 to 100 percent of paroling inmates receiving pre-release counseling. It was not clear what percentage of paroling inmates Transitional Case Management Program (TCMP) case workers actually interviewed at CCI and what services were provided. The methodology of the January and February audits, moreover, was not entirely clear, raising some question about the reliability of the results.

b.  Non-Compliance

Timely completion of initial treatment plans declined somewhat during the monitoring period.  An institutional audit in February found that 70 percent of Inter-disciplinary Treatment Team (IDTT) meetings were held within 14 days of arrival of an inmate's referral, compared with 83 percent during the preceding monitoring period.  The quality of treatment plans, found to be deficient in the past, was not assessed.

Psychiatric attendance at IDTT meetings also declined.  An institutional review during February indicated that psychiatrists attended just 22 percent of IDTT meetings.  Correctional counselors present at IDTT meetings were often unfamiliar with the presented inmates.

Group therapy was offered to only a handful of Correctional Clinical Case Management System (3CMS) inmates.  As of March, one group was held on only one of the five housing yards in the facility.

<u>New Problem:</u>

The lack of adequate office space for mental health clinicians was a problem generally, but especially in Facility IVB.

<u>Institutional Summary:</u>

Substantial case manager vacancies at CCI were not adequately covered through contracted services, driving caseloads considerably above mandated levels.  Some of the institution's problems with vacancies were attributable to delays in establishing locally and filling newly allocated clinical positions.

Quality assurance and transfers to higher levels of mental health care showed marginal improvement during the monitoring period, but the revised process for the input of mental health information in disciplinary decision-making was not

progressing well.  A few medication issues showed some improvement, but most continued to lag.  Problems persisted with all phases of continuity of medications, psychiatric follow-up to changes in medications, monitoring and documenting medication non-compliance and laboratory blood work for inmates on mood-stabilizing medications.

No single CAP issue was resolved during the monitoring round, but a few moved closer to resolution.  Daily psych tech rounds in administrative segregation; more timely mental health screenings and evaluations for reception inmates; and clinical follow-up of suicidal inmates discharged from a MHCB unit were all likely candidates for resolution in the upcoming monitoring period.  Some other issues, including the timeliness of initial intake assessments, increased space for confidential interviews in administrative segregation and the provision of pre-release services to paroling inmates, reflected improvement.  Group therapy for 3CMS inmates, however, was shrinking into oblivion, and psychiatric attendance at IDTT meetings slackened appreciably.  While CCI demonstrated some progress on a few CAP items, it needed particularly to address serious inadequacies in its delivery and management of medications and jump-start mental health input into its disciplinary process.

### California Institution for Men (CIM)
April 19, 2004 – April 20, 2004

Psychiatric vacancies increased significantly during the monitoring period. While CIM filled its vacant chief psychiatrist and senior psychiatrist positions, the facility still had six vacant staff psychiatrist positions.  In addition, positions for a senior psychologist, 1.9 staff psychologists, 1.9 psych techs, 3.5 clerical employees and a medical transcriber were vacant.  The institution was recently allocated additional mental

health positions to cover the increased capacity of its reception center, but had not yet started to fill the new positions.

Despite its history of limited reliance on contracted services, CIM gradually increased its use of contract psychiatrists over the course of the monitoring period.  In October, the facility procured as few as 72 hours of contracted psychiatric services.  By January, it engaged as many as 304 hours.  The services contracted, however, covered less than half of the vacancies.

Auxiliary staffing remained largely unchanged during the monitoring period.  Only 0.5 of 87 MTA positions, three of 68 RN positions and one of 16.5 pharmacy positions were vacant.  At the time of the monitor's preceding visit, 11 MTAs and seven RNs were on long-term leave, but the institution did not provide updated information on the leave situation among auxiliary staff.  Similarly, it was difficult to obtain reliable staffing data for each of the institution's mental health programs.

Considerable tension developed during the monitoring period between some psychiatrists and psychologists over MHCB referrals and admissions, which negatively affected relations among key mental health administrators during the monitoring period.

Quality Management Issues:

The quality assurance process progressed slightly.  CIM had a quality assurance coordinator, who maintained organized records of the institution's quality assurance activities and made relevant policies and procedures accessible to staff.  The quality management committee met most months, with the exception of January and February, and kept detailed minutes of its meetings.  The composition of the committee

was interdisciplinary. The institution chartered nine QITs to address high priority issues. Four of the QITs completed their work and disbanded, while five were still active at the time of the monitor's visit.

The MHTS continued to experience problems during the monitoring period. Data entry was often unreliable due to clerical vacancies, and the system failed to generate accurate data on transfer timelines, at-risk EOP inmates, ducating and the scheduling of appointments. It was hoped that the recent hiring of clerical support staff would help improve the system.

Medication Issues:

An institutional audit of 148 charts found some improvement in the continuity of medication on arrival and the renewal of medication orders. According to the institutional data, 90 percent of surveyed inmates received their medications within a day of the medication order, including orders for new arrivals. The institution had not yet met its internal goal of providing inmates with medication within eight hours of arrival. Just 13 percent of surveyed arrivals received their medications within that time frame. CIM recently implemented procedures for notifying physicians when arriving inmates cited, but could not document, an existing medication order, but no audit had yet been conducted to determine the extent of compliance with the new procedures. As for renewals, the audit indicated that 98 percent of inmate medications were renewed or discontinued with an explanatory note at or before expiration. Continuity of medication remained somewhat problematic for inmates transferred to other housing units within CIM. The institutional audit found that 70 percent of internally transferred inmates included in the survey received their medication without interruption.

Follow-up to medication non-compliance was poor. Institutional audits indicated that only 50 percent of inmates who refused medications were appropriately referred. Reportedly, the Keyhea orders of two inmates, at least, expired during the monitoring period. MARs were, however, filed regularly in inmates' charts.

Psychiatric follow-up of inmates with newly prescribed psychotropic medication improved in all housing yards, except for Reception Center/Central (RCC). An institutional audit found that 81 percent of all follow-up appointments were conducted in a timely manner. Based on the monitor's review of institutional data and discussions with staff, compliance with the requirement for following-up inmates for whom medications were recently prescribed in RCC was about 55 percent.

The extent to which the institution provided paroling inmates with pre-release medications was unclear. An institutional audit reported that 88 percent of paroling inmates received their medications in a timely manner, but line staff estimated that CIM failed to identify as many as 30 percent of paroling caseload inmates. Inmate charts rarely contained documentation indicating whether they were offered or received pre-release medications.

Laboratory testing for inmates on mood-stabilizing medications improved during the monitoring period. An institutional audit of 236 inmates on Depakote found that appropriate orders for laboratory tests were written for 99 percent of the audited inmates, and laboratory tests were completed for 94 percent of the written orders. Only 73 percent of completed laboratory studies were filed in inmates' charts, but the institution had implemented a system to ensure that the results of laboratory tests were reviewed by the ordering psychiatrist even when not included in UHRs. The audit did

not show to what extent appropriate adjustments were made in response to abnormal test results, nor did it include other mood-stabilizing medications, such as Lithium or Tegretol; it looked just at inmates taking Depakote.

Documentation of informed medication consent was erratic. Signed informed consent forms for medication were present in 72 percent of charts reviewed in an institutional audit. The medication consent form used at CIM, moreover, was outdated.

CIM did not appear to track psychiatric responses to inmate and staff referrals, so it was difficult to assess the effectiveness or timeliness of responses related to medication problems. Deliveries of medication suffered from some additional problems. No record was kept of which inmates were observed while taking their medications, and implementation of DOT procedures had not yet been audited. HS medications were not prescribed for a variety of reasons.

Mental Health Assessments for the Disciplinary Process:

The new 115 disciplinary process was implemented at CIM in September 2003. Mental health clinical staff and hearing officers were trained in the new mental health assessment process. Documentation of the disciplinary process for mental health inmates, however, was poor. The institution's disciplinary logs were incomplete and failed to include key information, such as the date of a request for a mental health assessment, the name of the clinician making the assessment, the date of the assessment and the clinician's findings. Similarly, completed appointment history forms maintained via the MHTS failed to record the date of requests for mental health assessments, clinicians' findings or hearing officers' responses to assessments. The institution recently

revised its disciplinary log, but the revised form still did not capture all of the data needed to evaluate the process.

The monitor reviewed each RVR for the period from November through March. Of 62 disciplinary infractions for 3CMS inmates, three inmates were referred for mental health assessments due to "bizarre behavior." The number of referrals seemed low and suggested, perhaps, the need for some additional correctional officer training. During the same period, EOP inmates incurred 15 disciplinary infractions, all of which were referred for a mental health assessment. No RVRs apparently were written for self-injurious behavior. According to the institution's status report, clinical assessments were generally completed in a timely manner.

After reviewing the RVRs, the monitor found that hearing officers took mental health input into consideration during the adjudication process. Indeed, many disposition narratives stated that sanctions were reduced due to mental health factors cited in the assessments. Mental health staff, however, apparently received no feedback from hearing officers on the usefulness of the submitted assessments.

Transfers:

CIM maintained complete referrals logs of inmates transferred to higher levels of care, as well as a list of inmates awaiting such transfers. The list was generated by the MHTS and appeared sometimes to be inaccurate.

The institution reported the establishment of a position for a Department of Mental Health (DMH) transfer coordinator to facilitate the timely evaluation and transfer of inmates in need of a higher level of care. The institution further reported that the percentage of clinician referrals resulting in actual transfers to DMH increased to

nearly 80 percent during the monitoring period.  Of 33 referrals to DMH made during the

monitoring period, 26 were accepted and actually transferred to DMH facilities.  The

average time from DMH referral to acceptance was three days, while the average time

from acceptance to transfer was eight days.

Despite these encouraging figures, indications suggested that CIM did not

refer some psychotic and suicidal inmates, who appeared to need acute inpatient care, to

the DMH acute inpatient program (DMH/APP) at the California Medical Facility (CMF).

The census in CIM's MHCB unit often exceeded the number of allocated psychiatric

beds, and psychotic inmates reportedly were sometimes discharged from the General

Acute Care Hospital, where CIM's MHCB unit was housed, to make room for other

inmates in greater need of care.  The number of referrals to DMH/APP, moreover, was

surprisingly low, with only three inmates being referred there during the entire

monitoring period.  Meanwhile multiple admissions to the MHCB remained high.  An

institutional audit indicated that 29 percent of all admissions involved inmates with prior

admissions.  Some of these multiple admissions were due to delays in transfers to DMH

or CDC programs elsewhere.

A new glitch arose in the transfer of some inmates to the DMH

intermediate inpatient program at Atascadero State Hospital (ASH).  ASH regularly

accepted, but deferred, the transfer of inmates with a pending parole revocation hearing

scheduled within the next three weeks.  As a result, some inmates, whose hearing dates

were subsequently postponed, a not infrequent occurrence, could end up at CIM for

weeks awaiting the indicated transfer for intermediate inpatient care.

The institution continued to use its MHTS to track reception center transfers, but the system was not entirely reliable. While not much changed during the monitoring period with regard to the timeliness of EOP transfers out of the reception center, some improvement occurred regarding the transfer of 3CMS inmates. According to the MHTS, the percentage of EOP inmates transferred out of reception to appropriate programs elsewhere within 60 days from November through March remained at 60 percent, the same as during the preceding monitoring period. The percentage of 3CMS inmates transferred from the reception center within 90 days improved from 76 percent to 84 percent. Among inmates with stays in reception exceeding the mandated timelines, the average length of stay for 3CMS inmates was 122 days and for EOP inmates, 112 days. Some progress was made in expediting the transfer of EOP inmates in administrative segregation. The percentage of EOP inmates transferred out of the administrative segregation unit to an EOP administrative segregation hub within 30 days rose from 53 to 63 percent, and the average length of stay of EOP inmates in administrative segregation dropped from 42 to 26 days. The major obstacle to EOP transfers was the availability of bed space elsewhere. It appeared, also, that expedited transfers were rarely requested for general population EOP inmates.

Other CAP Issues:

a. Partial Compliance

The frequency of IDTT meetings in the MHCB unit improved significantly. An institutional review of 268 IDTT meetings indicated that 71 percent of initial IDTT meetings were held within 24 hours of admission, while another 27 percent were held within 72 hours of admission. The composition of the meetings was also

adequate.  The same institutional review showed that a psychiatrist, a psych social

worker, a nursing representative or MTA and a correctional counselor were present for 96

percent of the reviewed meetings; a psychologist was also present in 86 percent of IDTT

meetings.

Clinical contacts in the MHCB unit occurred largely at cell-front, except

for IDTT meetings and group therapy.  Group therapy was available in the unit, but

treatment activities were negatively impacted by the high mental health census and the

resulting emphasis on admission and discharge processing.

According to the institution's status report, the average length of stay in

the MHCB unit was 5.6 days, increasing slightly from 4.3 days during the preceding

monitoring period.  The percentage of MHCB stays over ten days also rose slightly from

six percent to eight percent.

The frequency of case management contacts with caseload inmates in

administrative segregation improved.  CIM began assigning inmates to specific case

managers.  An institutional survey of 26 administrative segregation caseload inmates in

April found that 78 percent of surveyed inmates knew who their case manager was.

According to the institution, all caseload inmates were offered weekly case management

contacts, but not necessarily weekly contact with their assigned case manager.  Case

managers reportedly saw their assigned inmates about 80 percent of the time.  Limited

physical plant impacted on the frequency with which inmates were seen by their own

case managers.

Inmate access to confidential meeting space in the reception center

improved.  Windows had been added to offices, and the door to the interview room was

no longer left open. Custody staff and other persons were no longer present during clinical meetings. The problem reported earlier with the redirection of the escort officer in the new wing to other duties was resolved. Ducating also improved, although it was sometimes still difficult to find inmates for their appointments.

Some improvement was noted in after-hours bus screenings. An institutional audit for the period from February 19 to March 11 indicated that 90 percent of inmates arriving after-hours were brought to the emergency area and screened by nursing staff. The monitor's limited chart review found two files without bus screening forms, suggesting either that bus screenings were not always conducted or the forms were not consistently filed in inmates' charts. Jail transfer forms, earlier reportedly not forwarded to mental health after the bus screening procedures were completed, were now made available to psychiatrists as part of their screening and evaluation process.

The provision of pre-release planning remained unchanged during the monitoring period. An institutional review of all paroling caseload inmates in the first quarter of 2004 found that 60 percent of EOP and 87 percent of 3CMS inmates received parole planning from CIM mental health staff. According to a QIT, about half of all paroling caseload inmates were discharged on short notice, from several days to a week, making it difficult for the institution to arrange counseling services for them before discharge. TCMP contactors continued to provide pre-release services directly to paroling inmates, but the institution did not assess during the monitoring period the percentage of inmates receiving TCMP services.

It was unclear to what extent the maintenance of medical records improved during the monitoring period. According to the institution, the backlog of

unfiled materials had been reduced, and the pile of unfiled documents was consistently less than 12 inches, roughly the equivalent of one day's worth of materials.  This improvement was reportedly related to a decrease in the number of medical records staff vacancies.  Clinicians and other staff, however, continued to complain about missing notes and about frequently disorganized files.

Institutional Summary:

Mental health services were impacted negatively by staffing vacancies, particularly among psychiatrists.  Only a portion of CIM's vacant psychiatrist positions was covered by contract clinicians.  Clerical vacancies clearly contributed to deficiencies in the institution's MHTS.

Quality assurance improved, but problems with the accuracy of data provided by the MHTS were a cause for concern.  Some medication management issues were addressed more effectively.  Continuity of medication on arrival and prescription renewal, psychiatric follow-up of inmates on newly prescribed medications and most aspects of laboratory testing improved.  On the other hand, continuity of medication for inmates changing locations within the institution remained somewhat problematic, as did follow-up to medication non-compliance, the acquisition of signed medication consent forms by psychiatrists, the provision of HS medications and implementation of DOT procedures.  The status of the provision of pre-release medications for paroling inmates needed clarification.

Mental health input into the disciplinary process showed genuine progress, although the number of rule violations involving 3CMS inmates that were referred to the assessment process probably needed to be examined.  Transfers of inmates in need of a

higher level of care improved slightly, but some inmates in need of acute DMH care may

not have been referred, including some individuals staying over-long in, or being

admitted repeatedly to, the MHCB unit.   Transfers for EOP administrative segregation

inmates occurred more expeditiously, as did transfers of 3CMS inmates out of reception.

The timeliness of transfers for EOP inmates in the general population lagged.

Most remaining CAP items showed some level of progress.  The

frequency and composition of IDTT meetings in the MHCB unit, weekly case

management contacts in administrative segregation, access to confidential interview

space in the reception center and after-hours bus screening all improved.

CIM needed to work further on its quality assurance efforts, various

aspects of its management of medications and transfers to higher levels of care.  The

monitoring period, meanwhile, was marked by progress in remaining unresolved CAP

issues.

**California State Prison, Corcoran (CSP/Corcoran)**
April 12, 2004 – April 15, 2004
June 2, 2004 – June 3, 2004
July 8, 2004

Clinical vacancies continued to impede the efficient delivery of mental

health services at CSP/Corcoran.  The institution had vacancies among 12.6 of 68.6

mental health positions, and the institution's protracted inability to provide adequate and

consistent psychiatric coverage remained unchanged.  In April, positions for three

psychiatrists, seven psychologists, 1.1 psych techs and 1.5 office techs were vacant.  A

chief psychologist was hired, but the chief psychiatrist was chronically absent due to

illness.  By the time of the monitor's second visit in June, none of the psychiatric

vacancies were filled. Limited access to psychiatrists was felt most keenly in the administrative segregation unit and the SHU. Contracted services sufficed to cover just one of the psychiatrist vacancies, but psychologist vacancies were generally covered by contract clinicians.

Auxiliary staffing improved in some areas and worsened in others. Nursing vacancies decreased significantly during the monitoring period, falling from 18.52 unfilled positions to ten. MTA vacancies also decreased slightly, declining from 19.23 openings to 17. On the other hand, vacancies among medical records staff increased from six unfilled positions to ten. In addition, two medical records employees were on leave.

Mental health administrators at CSP/Corcoran felt strongly that the current allocation of psychiatric positions was inadequate to meet the needs of its large mental health population, which represented 25 percent of the institution's entire census. The monitor compared existing allocated staffing in the various mental health programs at CSP/Corcoran with court-approved staffing ratios and found that the facility's allocations of clinical staff met or exceeded approved ratios in some programs, but not in others. Psychiatrist caseloads, for example, were extremely high in the general population 3CMS program, where one psychiatrist was available to provide services for roughly 500 inmates. Caseloads among 3CMS case managers reportedly ranged from 120 to 197 inmates, well above the approved caseload of 100. In the EOP administrative segregation unit, a psychiatrist visited the unit only once a week, and inmates in the unit generally received just one cell-front contact a month with a case manager, rather than the required weekly contact.

The regular provision of escort officers, so vital for the delivery of mental health services in secure institutional settings, was a critical problem in April. The availability of escort officers improved between the monitor's April and July visits, but during much of the monitoring period the lack of escort officers compounded problems resulting from clinical vacancies. Following the April visit, additional escort teams were assigned to the SHU and the principal administrative segregation unit to improve access to mental health care, but additional escort officers were not readily available in the overflow administrative segregation unit. The institution also undertook efforts, again after the April visit, to foster better and more cooperative communication between correctional officers and mental health staff. By the time of the monitor's July visit, clinicians reported improvement in their working relations with custody staff.

The catalyst for the three monitoring visits to CSP/Corcoran conducted during the monitoring period was the deteriorating condition of mental health services found in the initial April visit, particularly in administrative segregation and the SHU. The staffing deficiencies just outlined, exacerbated by some unresolved tensions between clinical and custody staffs and fueled by serious allegations of some custody staff abuses of seriously mentally disordered inmates in administrative segregation and the SHU, were all highlighted in the monitoring team's exit teleconference in April and led to a series of continuing formal exchanges between the monitor and the defendants. The exchanges, in turn, resulted in some quick intervention by the department to attempt to redress some of the most glaring problems and the scheduling of follow-up monitoring visits to assess the department's success in helping the facility to correct its deficiencies. As reported in the

institutional summary that follows, CSP/Corcoran managed to redress some, but not all, of the problems identified in the initial April visit.

Issues Resolved:

> EOP general population inmates were offered ten hours of structured therapeutic activities weekly.
>
> The institution adequately documented the availability of structured therapeutic activities for EOP inmates.
>
> Inmates no longer remained for extended periods of time in the MHCB unit, and clinically discharged inmates did not remain in the unit for days following their discharge.
>
> Administrative segregation inmates were seen daily by psych techs.

Quality Management Issues:

The quality assurance process at CSP/Corcoran continued to develop and grow. The quality management committee met weekly, maintaining minutes that reflected relevant discussion and studies, and mental health representatives participated regularly in these committee meetings. All case managers completed monthly chart reviews and collected considerable useful data on problems with the mental health system. Quality improvement teams were chartered appropriately, but few reports or studies were completed, and the format used for documenting and disseminating study results was inadequate. The quality management committee frequently found fault with reviewed mental health services and practices, but the institution's ability to identify its failings accurately and clearly through its own quality assurance process, at least, was encouraging.

Implementation of the MHTS continued to improve. The system was used to track multiple items and to generate a wide variety of reports, including compliance

with program guide requirements for new arrivals, case management contacts, IDTT meetings and other clinical contacts. The MHTS, however, was unable to produce placement chronos, making it difficult to track changes in levels of care. With three office techs on extended leave, data entry was delayed on average about eight days. In addition, there were problems with some clinicians failing to provide required data for entry into the system.

Medication Issues:

       Continuity of medication on arrival improved somewhat. Staff was trained in the new medication management procedures instituted during the preceding monitoring period. An institutional audit of 57 new arrivals found that two-thirds received their medications within a day of their arrival. While the data indicated that up to a third did not receive their medications in a timely fashion, the percentage of those who got their medications within two days of their arrival increased from 55 to 88 percent during the monitoring period. The institution did not assess the continuity of medication on the renewal of medication orders, but staff reported that gaps in medication on the renewal of prescriptions occurred frequently.

       Continuity of medication for inmates changing housing locations within the facility also improved. According to an institutional audit, 75 percent of MHCB inmates received their medications within one day of their discharge from the unit. The percentage of MHCB inmates receiving their medications within two days increased from 74 to 94 percent during the monitoring period. Continuity of medication for inmates moved to the SHU also showed some progress, albeit slight. Only 43 percent of newly assigned SHU inmates received their medications within a day of their arrival, but the

percentage of such inmates who got their medication within two days rose from 81 to 88 percent during the monitoring period.  The institution did not conduct an audit of medication continuity for inmates transferring to other, or from other, areas within the facility, but staff reported that inmates frequently did not receive their medications in a timely manner.

Follow-up to medication non-compliance was erratic.  The institution conducted a limited audit of just ten charts and found that medication refusals were documented in three of the ten.  The audit found no documentation of a referral of an inmate who was non-compliant with his medications for three consecutive days.  According to the non-compliance referral log, inmates referred for non-compliance were seen, on average, within 16 days, with response times ranging from zero to 77 days.  This aspect of medication management was critically impacted by the absence of an adequate psychiatric staff.

Problems remained with laboratory testing for inmates on mood-stabilizing medications.  A quality improvement team was chartered in mid-2003 to study the criteria for laboratory testing, and a second quality improvement team was chartered in October 2003 to study the tracking of laboratory work.  The final report of this second study was still pending in April.

Implementation of DOT procedures for inmates in administrative segregation was poor.  An institutional audit in the administrative segregation unit found that correctional officers did not regularly accompany nurses administering medication, as required by the new medication management procedures.  Medications were passed to inmates in the unit through the gaps at the edges of cell doors.  Without a correctional

officer present and under these circumstances, it was virtually impossible to ensure the proper observation of inmates taking their medications. Staff had been trained in the new DOT procedures, and, in an effort to improve compliance, an administrative memorandum required a correctional officer to be present on the housing tier during the distribution of medications. The institutional audit did not look at DOT practices in the SHU.

The provision of discharge medications for paroling inmates was audited for the first time during the monitoring round. The audit showed that approximately 95 percent of discharged caseload inmates received their prescribed medications on release.

MARs was not always filed in the inmates' charts in a timely manner. The institution conducted a small audit of 15 charts and found nine charts with MARs from the previous month. While all of the MARs were complete, entries were not always legible. The monitor's chart reviews were consistent with the audit's findings.

There had been no change in the use of HS medications at CSP/Corcoran. The institution provided the monitor with a list of 15 inmates who were receiving HS medications, most of them on non-psychotropic medications. In the opinion of the monitor's expert, the list clearly underrepresented the number of inmates for whom HS medications would be clinically indicated, given the MHSDS caseload in the institution. According to another process audit conducted in March, the institution did not comply with the provisions for the distribution of HS medications in its local operating procedure on medication management.

<u>Mental Health Assessments for the Disciplinary Process:</u>

It appeared that CSP/Corcoran was largely compliant with the revised process for mental health input into disciplinary decisions. All 96 MHCB and EOP inmates who received RVRs from October 1 through March 31 were referred to mental health for an assessment, while 34, or 13 percent, of 3CMS inmates who received RVRs and seven non-caseload inmates were also referred for assessments. Clinicians determined that inmates' mental health problems may have affected their alleged misconduct in 58 percent of assessments prepared. Although nearly half of all these cases were still pending, 13 of the 57 cases that had been adjudicated resulted in a reduced sanction or dismissal. The monitor's review of adjudicated inmates' C-files found that most hearing officers seriously considered mental health input and, on occasion, used the information to justify lesser charges or penalties.

Preparation of mental health assessments also improved. An institutional audit of 17 completed RVRs and assessments, however, found several deficiencies, including some incomplete mental health assessments, failures by hearing officers to document consideration of mental health input in their findings and dispositions and a few failures to use the revised mental health assessment form.

<u>Transfers:</u>

CSP/Corcoran appeared to have good access to DMH inpatient acute care. The log for referrals to DMH/APP at CMF, however, was poorly maintained, incomplete and difficult to understand. Apparently 27 inmates were referred to DMH/APP between September 15 and March 15. Only one inmate was rejected before being accepted, but he was rejected twice. Based on the 20 inmates for whom transfer data was available, 13, or

65 percent, experienced a lapse of four or more days between receipt of a bed number
and transfer.  The average time between referral and transfer was 10.2 days, with a range
of six to 20 days.

      Institutional data suggested that CSP/Corcoran did not have good access to
DMH inpatient intermediate care.  According to the institution's referral log, four inmates
were referred to the intermediate DMH inpatient program (SVPP) at Salinas Valley State
Prison from February 1 to May 31, three of whom were rejected on the grounds that they
did not meet admission criteria.  The monitor's review of SVPP's referral log raised
doubt about the accuracy of CSP/Corcoran's records.  According to the SVPP referral
log, CSP/Corcoran referred six inmates to the SVPP from February 1 to May 17, four of
whom were rejected.    No inmates were referred to ASH during the monitoring period.

      The institution's problem with over-long stays in the MHCB was resolved
during the monitoring period.  An institutional audit for the period from mid-September
through mid-March found that just 15 of 358 admitted inmates remained in the MHCB
unit longer than ten days, only half of them for clinical reasons.   The average length of
stay in the MHCB unit was 7.2 days for CSP/Corcoran inmates and eight days for
inmates from other institutions.  The average length of stay after clinical discharge
declined to 1.2 days.

      Progress occurred in transferring inmates from CSP/Corcoran to
Psychiatric Services Units (PSUs).  A newly established policy was implemented in April
that required inmates appropriately referred to and accepted by a PSU be endorsed and
transferred despite pending infractions or DA referrals.  According to transfer logs, this
change in policy had not yet reduced endorsement delays associated with pending

disciplinary infractions or DA charges at the time of the monitor's first visit in April.

Once endorsed, however, transfers generally occurred within a few months. Transfer

logs for a small number of transferred inmates indicated that inmates referred to a PSU

were transferred, on average, within 22.5 days of their endorsement, with delays ranging

from two to 43 days. The three inmates endorsed to a PSU at the time of the monitor's

April visit had been waiting between three and 45 days for transfer. Most of the delays in

transfers to PSUs reviewed by the monitor during the June visit continued to be related to

pending rule RVRs or DA referrals, but CSP/Corcoran maintained four separate PSU

transfer logs, making it difficult to ascertain accurately the timeliness of transfers.

Psych and return protocols were not reliably followed. The institution

reportedly did not routinely receive either a faxed discharge summary or an advance

telephone call for inmates returning from DMH/APP.

Despite improving access to facilities with higher levels of mental health

care, several EOP inmates interviewed by the monitor's expert demonstrated or reported

overtly psychotic symptoms, suggesting that some needed referrals to higher levels of

care were not being pursued adequately. In the month preceding the monitor's June visit,

the institution reportedly implemented a process for reviewing weekly the possible need

of EOP administrative segregation inmates for transfer to higher levels of care. It was too

early to evaluate the impact of this process.

Other CAP Issues:

a. Partial Compliance

The frequency of case management contacts with EOP general population

inmates improved. According to institutional audits, 86 percent of general population

inmates were seen weekly by their case managers, compared with 76 percent during the preceding monitoring round.

An institutional audit from October through February 29 found a decrease in the application of restraints. During the five months covered by the audit restraints were applied to 16 inmates, down from the 41 inmates restrained during a four-month stretch in the preceding monitoring period. Documentation of the use of restraints also continued to improve. All 16 restrained inmates had verbal orders from a physician documented in their charts within an hour of application of the restraints. Fifteen charts had documentation of the need for restraints, while 11 contained clear guidelines for release. Four charts contained a psychiatric evaluation within four hours of the initial application of restraints, and two had physicians' orders authorizing restraints for another 24 hours. Additional training on restraint policies and documentation requirements was needed.

An institutional audit of pre-release planning for paroling inmates found that 89 percent of surveyed inmates received discharge services prior to their release, an increase from 59 percent during the preceding monitoring round. A general lack of coordination between TCMP clinicians and the mental health staff at CSP/Corcoran persisted.

Some aspects of health care records continued to improve, while others deteriorated. An institutional audit of 120 charts found that 82.5 percent of reviewed charts contained documentation only for the indicated inmate (i.e., charts did not contain materials related to other inmates), while just about two-thirds had materials filed appropriately. The incidence of documents filed out of chronological order, however,

increased slightly from 12 to 20 percent, and the percentage of files that were not current increased from 27 to 30 percent. An unacceptable amount of mental health documents were not filed in inmates' UHRs in a timely manner. At the time of the monitor's April visit, the filing backlog was approximately six to eight weeks. The institution reportedly reduced loose filings from 12 to five feet after the April visit but, at the time of the monitor's June visit staff reported filing backlogs of up to a month. This problem was largely due to staffing shortages in the medical records section and the limited physical space allocated for the storage of medical records. The institution was developing a plan to relocate the medical records section elsewhere to provide more space, but did not appear to have a plan for addressing filing problems in the short-term. Timely access to UHRs for clinicians was again a major problem.

### b. Non-Compliance

The timeliness of initial mental health assessments appeared to decline further during the monitoring period. Audits on this issue were sometimes based on a sample that was too small, ranging from 10 to 40 charts depending upon the area of the institution, but the audit data was discouraging. Assessments were completed within program timelines for only 20 percent of 3CMS inmates in the SHU, 27 percent of 3CMS inmates in general population, 29 percent of 3CMS inmates in administrative segregation, 35 percent of EOP inmates in administrative segregation and 84 percent of general population EOP inmates. A quality improvement team was chartered to address this persistent problem.

The availability of charts during UCC and ICC hearings, which had improved somewhat during the preceding monitoring period, was once again problematic for the reasons discussed above.

The institution reported improved timeliness of IDTT meetings based on data from the MHTS, especially for EOP inmates. Institutional chart reviews, however, found rates of compliance lower than those reported during the preceding monitoring round. According to chart reviews, initial IDTT meetings were held in a timely manner for 84 percent of EOP general population inmates, 35 percent of EOP administrative segregation inmates, 27 percent of 3CMS general population inmates, 20 percent of 3CMS SHU inmates and ten percent of 3CMS administrative segregation inmates. IDTT meetings to update treatment plans were held quarterly for 78 percent of EOP general population inmates and 59 percent of EOP administrative segregation inmates and annually for 83 percent of 3CMS general population inmates, 60 percent of 3CMS SHU inmates and 23 percent of 3CMS administrative segregation inmates. The composition of IDTT meetings continued to be a significant problem. Psychiatrists, in particular, did not regularly attend IDTT meetings, except those held in the MHCB unit and for general population EOP inmates. Psychiatrists reportedly attended 75 percent of scheduled IDTT meetings for EOP inmates in administrative segregation and 32 percent of IDTT meetings for 3CMS inmates in the SHU. A new rotational system was designed during the preceding monitoring period to increase participation by correctional counselors in IDTT meetings, but attendance by counselors continued to lag.

CSP/Corcoran continued to have difficulty providing inmates with timely initial treatment plans. Institutional chart reviews showed variable compliance rates,

depending on the program, ranging from 28 percent for 3CMS inmates in administrative segregation and 52 percent for 3CMS inmates in the SHU to 86 percent for 3CMS inmates in the general population program.  Compliance rates for EOP programs were in the eightieth percentile.

The timeliness of psychiatric responses to inmates' self-referrals declined dramatically.  Although the institution was unable to use its MHTS to track and analyze this issue, log data indicated that the average response time for routine referrals was 36 days, while the average response time for urgent referrals was a totally unacceptable 21 days.  According to the administrative segregation referral log, 22 of 28 administrative segregation inmates referred to mental health from February 20 to June 1 were responded to within five working days.  The lapse between referral and clinical contact for inmates elsewhere ranged from seven to 43 calendar days.

Compliance with requirements for quarterly case management contacts with 3CMS general population inmates also declined somewhat, due largely to staffing issues and case managers' high caseloads.  According to data from the MHTS, 82 percent of 3CMS general population inmates received case management contacts every 90 days, compared to 89 percent during the preceding monitoring period.  The institution's chart reviews reflected slightly lower compliance rates.

The amount of group therapy offered to 3CMS inmates also declined.  At the time of the monitor's April visit, only one group was offered.  According to the institution, the decline was related to a correctional officer vacancy that was remedied just prior to the April visit.

The amount of structured therapeutic activities offered to EOP inmates in administrative segregation appeared to decrease. Data from the MHTS for the period from April 1 through May 31 indicated that inmates were offered 9.15 hours of therapy a week, but received only 5.28 hours. The programming cells used for group therapy were inadequate. The structure of the programming cells, with solid sides and dim lighting, made it difficult for members of the group to see and communicate with each other. The programming cells, moreover, were placed in a noisy area, further inhibiting meaningful group dynamics. Only rarely was offered group therapy coordinated with individualized treatment plans of participating inmates. Rather, the group activities scheduled in administrative segregation consisted of several basic therapeutic groups offered to any EOP inmate in the unit. Inmates were assigned to specific therapy groups typically by cell location, and had to switch groups when moved to another cell.

The frequency of case management contacts with inmates in the administrative segregation unit also declined for the second consecutive monitoring period. An institution audit for September through March indicated that approximately 65 percent of 3CMS and EOP inmates received weekly case management contacts in administrative segregation. According to a two-week quality improvement team study in April, 80 percent of case management contacts in administrative segregation occurred at cell-front, while 73 percent of contacts occurred without the inmates' UHRs. Case managers' high caseloads and staff turnover were largely responsible for this limited provision of meaningful weekly clinical contacts to inmates in administrative segregation. Staff felt there were simply too few case managers to provide an appropriate standard of care for all of the mental health inmates in the unit. A QIT was chartered to

40

examine problems in the unit with clinicians' caseloads, programming space and escort requirements, which was due to be completed in July. That study was completed, and the department was reviewing the results in the context of a system-wide review of staffing ratios throughout CDC.

The provision of mental health care in the SHU was grossly inadequate and unacceptable. Institutional data indicated that nearly 30 percent of 3CMS inmates in the SHU did not receive even quarterly case management contacts. Psych tech rounds in the SHU, meanwhile, were also inadequate. An institutional audit for October through February found compliance with the requirement for daily psych tech rounds declined from 95 to 84 percent. While these numbers were not bad, they obscured the fact that inmates who were asleep were not awakened by the psych techs, and inmates who were not in their cells during rounds were not seen later. Given the limited provision of care, it was hardly surprising that the monitor's expert identified a number of 3CMS inmates in need of higher levels of care. See, for example, case reviews 5, 6, 7, 9, 10, 11, 13, 16 and 17 in the attached Exhibit B for concrete examples of the level of care provided to some 3CMS inmates in the SHU. Here, as elsewhere, high clinicians' caseloads impacted adversely on the levels of provided treatment and the effective management of medications. In the CSP/Corcoran SHU, nearly a third of 3CMS inmates did not receive the most basic component of a general population 3CMS program, namely quarterly case management and psychiatric contacts. As indicated above, assessments, IDTT meetings and treatment plans were often untimely; psychiatric responses to referrals were slow, and psychiatric services in general were inadequate.

Mental health administrators in the facility attempted to meet the demands on their inadequate resources by concentrating services on the more seriously mentally ill segments of the MHSDS population, but that left 3CMS inmates in the SHU with too few of the most basic components of mental health treatment in one of the harshest physical and psychological environments in CDC.  Perhaps even more critical, when the original staffing ratios were developed for the 1997 program guides, no differentiation was made between staffing needs for 3CMS inmates in the general population and those in a SHU. That was a serious misjudgment because obtaining access to 3CMS inmates in the SHU setting is an intensely time-consuming task.  Clinicians in the SHU are at the complete mercy of escorting correctional officers for whom the provision of mental health services is not a priority.  Some other Level IV CDC institutions with complex MHSDS caseloads of seriously mentally ill inmates, like Pelican Bay State Prison (PBSP) and California State Prison, Sacramento, have learned that prioritizing the delivery of mental health care pays substantial security and safety dividends.  CSP/Corcoran, like CSP/LAC, High Desert State Prison, Richard J. Donovan Correctional Facility, California State Prison, San Quentin and Salinas Valley State Prison, has not yet absorbed that lesson.

Follow-up to suicidal inmates discharged from the MHCB unit declined during the monitoring period.  An institutional audit for the period from mid-September to mid-March indicated that five-day clinical follow-up occurred for 82 percent of suicidal inmates discharged from the MHCB unit, compared with 95 percent during the preceding monitoring period.  Notification to case managers of the imminent discharge of inmates from the unit remained a problem.

Significant problems with the use of force against seriously disordered inmates at CSP/Corcoran were reported during the monitor's initial visit in April. Data suggested that mental health inmates were involved in a disproportionate number of use-of-force incidents. Although the mental health caseload comprised only 25 percent of the inmate population, they were involved in over half of all incidents involving the use of force. In particular, incidents resulting from non-contact offenses resulted in the use of force against MHSDS caseload almost three times more often than against non-caseload inmates. There was a serious backlog of internal investigations of use-of-force incidents. Of 99 incidents involving the use of force against MHSDS inmates that occurred from October through February and required review for compliance with applicable policies and procedures, nearly half (48) had not been reviewed by mid-April, including one incident from October. The institution's inability to complete required internal reviews in a timely manner suggested strongly that the facility's formal mechanism for policing the use of force in the institution was an inadequate management tool. Of the 51 use-of-force incidents reviewed by the committee, just three were found not to be non-compliant with applicable institutional policies and procedures. Information provided subsequently indicated that the overwhelming majority of incidents involving the use of force in CSP/Corcoran were deemed to be emergencies by the custody personnel initiating the application of force, thereby superseding the rules for the calculated use of force, which embrace the bulk of procedures designed to protect MHSDS inmates from abuse when force is utilized. In April, the monitor reviewed four calculated use-of-force videos involving caseload inmates and concluded that they conformed to appropriate policies and procedures, although the clinical interventions preceding the application of force

lasted just 30 seconds in one instance and two minutes and ten seconds in another.  No training was provided to clinical staff on their role in interventions preceding the use of force, nor did policy guidelines speak to this issue.  A quality improvement team was chartered to study this issue.  The team's report, which was presented at a quality assurance meeting on June 1, was inconclusive and did not suggest any need to modify the institution's use-of-force policies and practices.

In addition, inmates in the EOP administrative segregation unit repeatedly complained to the monitor about physical abuse and harassment by custody staff, especially by some correctional officers on the third watch.  The institution's investigation of such alleged misconduct resulted in the transfer of two correctional officers and the disciplining of a third.  Similarly, inmates in the SHU complained of harassment and abuse, including the withholding of food and showers.  Group interviews with clinical staff confirmed inmates' allegations of abuse in both administrative segregation and the SHU.  Some clinicians in the group interviews, moreover, expressed their own concerns about custody staff retaliation and intimidation.  After the April visit, the institution appointed a senior custody supervisor with an investigative background to examine the situation.  He reportedly conducted interviews with some inmates and clinical staff and sought to elicit information from inmates willing to come forward to substantiate allegations of ill-treatment.  He also reviewed the inmates' complaint process to develop leads for further interviews.  Apparently, not much specific information emerged from this review, and the unwillingness of inmates and clinical staff to come forward and provide information was seen as a failure to confirm the allegations.  Meanwhile, between the monitor's April and July visits, the institution provided

substantially improved custody escort personnel and services to enhance clinical access to inmates in both administrative segregation and the SHU. The institution and the department also committed itself to undertaking a process for assessing and improving the "culture" of the institution in so far as that culture represents a complex mix of relationships among inmates and clinical and custody staffs. In the monitor's second and third visits, clinical staff described some improvement in its relations with custody staff, although inmates continued to report harassment on the part of some custody staff.

Physical conditions and the level of mental health care provided in the MHCB unit were both found to be inadequate during the monitor's April visit. Inmates in the MHCB unit continued to be confined naked in the unit without mattresses and blankets. Mattresses and blankets were provided regularly by the time of the monitor's June visit, but inmates continued sometimes to be deprived inappropriately of clothing. The monitor observed IDTT meetings for seven inmates in the MHCB unit, three of whom had been admitted for suicidal ideation. All three were denied even underpants, although the risk of suicide was determined to be minimal for at least two of them. There was little discussion among the IDTT participants of the inmates' clinical status, and no treatment plans were developed. Other than daily IDTT meetings, few clinical interventions appeared to occur in the MHCB unit.

Institutional Summary:

The mental health services delivery system at CSP/Corcoran remained exceedingly troubled. Significant problems with the adequacy of mental health staffing allocations were exacerbated by high vacancy rates and absences, particularly among psychiatrists, and the use of multiple contractors. The institution's mental health

programs also suffered from the inability of custody staff to provide sufficient escort services to ensure meaningful clinician access to caseload inmates, as well as inadequate treatment and office space, especially in administrative segregation and the SHU.

Despite CSP/Corcoran's many problems with the delivery of mental health services, the quality assurance process at CSP/Corcoran continued to improve during the monitoring period. The institution's ability to quantify and better understand the reasons for its inadequate mental health services was maturing rapidly. The drawback, of course, was that the evolving capacity to define and analyze deficiencies, in the presence of so many obstacles, did little to reduce or eliminate them. Implementation of the MHTS also progressed, and the system was beginning to provide important support to the facility's quality assurance efforts. Similarly, implementation of the revised mental health assessment process for RVRs involving caseload inmates seemed to be progressing relatively smoothly.

Medication management, on the other hand, was a mixed bag. The provision of discharge medications to paroling inmates appeared to becoming quite reliable. Continuity of medication on arrival and changes in housing locations within the facility improved marginally, while continuity on the renewal of medication orders remained largely unchanged and marked by interruptions. Follow-up to medication non-compliance was erratic and frequently untimely, and problems with laboratory work for inmates on mood-stabilizing medications persisted. Implementation of DOT procedures in accordance with the new local policy on the management of medications was proceeding slowly, and its impact in administrative segregation was as yet imperceptible.

MARs regularly were not filed timely, and HS medications were still largely unavailable in the facility.

As for transfers to higher levels of care, the institution seemed to have timely access to acute DMH inpatient care. Its access to intermediate DMH inpatient care, however, was poor, with few successful referrals to SVPP and no referrals at all to ASH during the monitoring period. There was some improvement in the timeliness of transfers to PSUs, but delays attributable to pending disciplinary charges and DA referrals continued to slow down some transfers, despite policy moves to reduce these barriers.

For all of the progress just cited in these four areas of special attention and despite the institution's resolution of four of its CAP deficiencies, the monitoring period was not a prosperous one for mental health services in CSP/Corcoran. The facility's problems have been mounting over the past several monitoring rounds, and the confluence of inadequate staff and administrative resources with a large and complex caseload mix reached crisis proportions in early and mid-2004.

Some realistic measure of the inadequacy of CSP/Corcoran's staffing resources can be obtained by comparing its mental health staff and caseload with those in PBSP, a once troubled facility that has turned around its previously inadequate mental health services. In mid-April at the time of the monitor's initial visit to CSP/Corcoran, PBSP had a MHSDS caseload of 598 inmates, including 405 3CMS inmates, 106 of them in administrative segregation, 62 general population EOP inmates and 124 inmates in its PSU. PBSP also had a MHCB unit with six beds. CSP/Corcoran had a total MHSDS caseload of 1,356 inmates, more than twice that of PBSP, including 1,159 3CMS inmates,

147 of whom were in administrative segregation and 581 in the SHU, in addition to 174

EOP inmates, including 119 in general population, 53 in administrative segregation and

two inappropriately in the SHU.  CSP/Corcoran's MHCB unit had a capacity of 23 beds.

As of mid-May, mental health staffing allocations for the two facilities were nearly equal,

a total of 84.4 positions for CSP/Corcoran and slightly more, 86.4, for PBSP.

CSP/Corcoran, however, had a vacancy rate among all mental staff of 23.8 percent;

PBSP's vacancy rate was four percent.  CSP/Corcoran in April managed to cover less

than half of its vacancies with contracted personnel; PBSP was able to hire contractors to

fill slightly more positions than were vacant.  CSP/Corcoran, after contracting, had

roughly 4.25 staff psychiatrists and an often ill and absent chief psychiatrist to tend to

1,356 patients; PBSP, without contracting, had seven staff psychiatrists, a senior

psychiatrist and a chief psychiatrist on hand to tend 598 inmates.  Both institutions had

roughly comparable allocations of case managers, but CSP/Corcoran had to contract to

fill a third of its vacant case manager positions, while PBSP had no vacancies among its

allocated case manager positions.  CSP/Corcoran was allocated 11.0 clerical positions,

PBSP 15.0.

> The comparison indicates that, as of mid-April, CSP/Corcoran had

relatively many fewer resources to meet the needs of a much larger MHSDS population

than did PBSP.  CSP/Corcoran's failure to meet those needs was less a reflection of

insufficient effort on the part of the mental health staff at CSP/Corcoran than of the

defendants' failure to provide local administrators with sufficient resources to comply

with the facility's CAP and the plans, policies and protocols provisionally approved by

the court in mid-1997.

Despite these handicaps, the institution managed somehow to resolve four of its CAP deficiencies during the monitoring period.  Meanwhile, also, pre-release services, the utilization and documentation of the use of restraints, case management contacts with EOP general population inmates and some aspects of the maintenance of mental health records improved.

Nonetheless, CSP/Corcoran's problems with the delivery of mental health care were legion.  Mental health treatment in the SHU was simply unacceptable.  The institution was unable to provide large segments of the 3CMS population in the SHU with minimum requirements of quarterly case management and psychiatric contacts; caseload inmates in the SHU often lacked timely IDTT meetings and treatment plans; psych tech rounds, the one clinical accommodation to the harsh conditions of life in a SHU, were not reliably provided; group therapy was never available.   Meanwhile, elsewhere in the institution, initial mental health assessments and treatment plans were untimely; charts for ICC and UCC hearings were unavailable; filing backlogs were lengthy and records were rarely available during clinical contacts; psychiatric responses to inmate referrals were untimely; the frequency of quarterly case management contacts with 3CMS inmates in general population and administrative segregation declined; and group therapy provided 3CMS inmates and structured therapeutic activities offered to EOP administrative segregation inmates also shrank.  The IDTT process was replete with deficiencies, including untimely meetings and the failure of psychiatrists and correctional counselors to participate as required.

In addition to all of these deficiencies in the delivery of mental health care, some renegade elements of custody staff in administrative segregation and the SHU

apparently took it upon themselves to apply their own benighted version of how best to handle seriously mentally disordered inmates. Without regard to departmental policies and training efforts, some few correctional officers reportedly humiliated and harassed mentally ill inmates, even withholding food and medications to control misbehavior. As always in a prison context, it is difficult to substantiate such reports, but in CSP/Corcoran inmates' perceptions of abuse were confirmed by mental health staff in group interviews with the monitor, during which individual clinicians were confessedly reluctant to expose even themselves to retaliation from some of their custody counterparts. Equally damning, patterns of the use of force in the facility suggested a regular practice of employing force disproportionately against seriously mentally disordered inmates; the overwhelming majority of incidents involving confrontation with MHSDS inmates, moreover, were treated as emergencies, short-circuiting policy restrictions on the use of calculated force against them.

In the months since the monitoring team's April exit interview, which raised all of these issues forcefully, the defendants have responded with a variety of efforts to correct the deficiencies reported here. Some of the adopted measures have been referred to in the course of this report. More recently, the department has made some key administrative appointments and is in the process of reducing the size of the general population 3CMS program in the facility. In July, mental health staff reported some improvement in coordination with custody escorts and relations between mental health and custody staffs. Much, however, remains to be done, particularly in regard to the provision of adequate mental health staffing resources, at CSP/Corcoran.

**California State Prison, Los Angeles County (CSP/LAC)**
April 21, 2004 – April 23, 2004

  The vacancy rate among mental health staff at CSP/LAC at the time of the monitor's visit was 11 percent.  Positions for two psychiatrists, five case managers, two psych techs and one clerical employee were vacant.   The vacancy rate among other health care staff was just eight percent, including vacant positions for two nurses and two MTAs.

  Contract employees covered almost all clinical vacancies during the monitoring period with the exception of 26 psychiatrist hours in November and 130 case-manager hours in March.  Institutional lists indicated that one of the two vacant psych tech positions was covered with contracted services, but no confirming documentation was provided.  Contract coverage was not provided for clerical or nursing vacancies.

Issues Resolved:

  Case managers consistently met with 3CMS inmates quarterly.

  IDTT meetings were regularly held in a timely manner.

  MH-4s were completed within five working days of inmates' arrival or referral.

  Case managers met with EOP inmates weekly.

  EOP inmates in administrative segregation were consistently offered ten hours of structured therapeutic activities weekly.

  Suicidal inmates discharged from the MHCB received appropriate clinical follow-up.

Quality Management Issues:

  The mental health quality assurance process made some progress with the adoption of a local operating procedure in October, but implementation of the procedure

was incomplete at the time of the monitor's visit. The mental health quality management committee met monthly during the six months preceding the monitoring visit, but few custody representatives participated in committee meetings. In addition, a significant percentage of committee members, between 20 and 50 percent, were absent from each meeting, and discussion of important issues was often deferred because key members were not in attendance. For example, representatives of the suicide prevention committee were absent regularly, so no reports pertaining to suicide prevention were presented to the quality management committee during the monitoring period. The committee minutes were not always accurate.

The QIT process functioned in a manner that was inconsistent with the institution's protocol. QITs were not always shaped to address a particular problem; they most often addressed multiple problems by level of care. Membership on QITs was restricted and not appropriately interdisciplinary; typically they included few line mental health clinicians. No written reports were completed for a number of completed QITs. In addition, the institution's audits needed to be conducted with a standardized format, including a statement of the problem, methodology, results, analysis of the results and plans for improvement.

The peer review process improved slightly. Psychiatrists met monthly since January and reviewed regularly an appropriate number of charts during their meetings. The peer review process was less developed for psychologists and psych social workers who met only quarterly.

Medication Issues:

Continuity of medication remained deficient, both on arrival and changes in housing locations. No institutional audit of the issue had been conducted, but the monitor reviewed 11 charts of newly arrived inmates and found gaps in medication for six inmates, ranging from two to seven days. There were also problems related to the timely renewal of medications.

Psychiatric follow-up to medication non-compliance improved. An institutional audit showed that the average response time to referrals for non-compliance during the monitoring period fell from 9.1 days in October to three days in March. The monitor's review of just 11 charts, however, showed some continuing problems with non-compliance follow-up for two of the reviewed inmates. The institutional audit, moreover, did not assess the percentage of non-compliant inmates actually identified and referred.

HS medications at CSP/LAC were making a come-back. They were prescribed for approximately 20 inmates and delivered after 7:00 p.m.

Laboratory blood-work appeared to be ordered more consistently for inmates on mood-stabilizing medications. According to institutional audits, the percentage of inmates on mood-stabilizing medications for whom laboratory tests were ordered increased from 70 percent in October to 100 percent in February and March. The audit, however, looked at different medications each month and did not determine whether tests were ordered and conducted in a timely manner or whether results were returned in a timely fashion and placed in inmates' UHRs.

Procedures for DOT and nurse-administered medications were neither observed nor supervised, and there appeared to be no clinical review of practices for distinguishing between DOT and nurse-administered medications.

Mental Health Assessments for the Disciplinary Process:

Procedures for ensuring mental health input into the disciplinary process improved, particularly toward the end of the monitoring period. The institution maintained two log books of rules violation reports and began to use a departmental audit tool. Following an initial institutional audit, staff concluded that mental health assessments were not thoroughly completed and had little impact on the outcome of disciplinary cases. Subsequently, in February, a second training session was provided to all clinicians involved in preparing assessments for the disciplinary process. The monitor's expert reviewed the rules violation reports for all EOP inmates filed during the monitoring period and found that mental health assessments had an increasing impact on dispositions after the training.

There were 72 rules violation reports for EOP inmates from November through March. According to institutional logs, staff assistants to help inmates were assigned as needed. Mental health assessments in seven cases concluded either that mental illness influenced the inmate's behavior or mental health factors existed which should be considered in reaching a determination. The narrative sections of all the disciplinary reports indicated that mental health assessments were reviewed and considered by the hearing officers. Punishments were mitigated for twenty EOP inmates, as compared to none in the preceding monitoring round; in ten cases, the narrative findings clearly demonstrated that punishment was mitigated for mental health reasons.

Although mental health assessments were requested for 15 3CMS inmates during this period, punishment was mitigated in only one case. No information was gathered regarding disciplinary proceedings for MHCB inmates. Further data was needed to assess the degree to which the assessment process complied fully with the revised policy.

Transfers:

Access to some higher levels of care remained problematic at CSP/LAC. The institution maintained a transfer log documenting MHCB referrals as well as referrals to DMH/APP at CMF and ASH. The log appeared to have improved in the recent months, but the monitor noted some missing APP entries and some small discrepancies between the log and the MHTS; in addition, the date of return for MHCB inmates was not included. No log was maintained of referrals to SVPP, and SVPP transfer lists generated by the MHTS did not contain the date of an inmate's acceptance.

Access to MHCB care appeared to be timely. Similarly, transfers to the DMH/APP at CMF were generally accomplished without difficulty. A total of 14 inmates were referred to the DMH/APP from October through March. Thirteen of the referred inmates were accepted, and the one rejection was attributed to an imminent parole date. Seven of the eight inmates for whom complete data was available were transferred within 72 hours of acceptance; one inmate's transfer was delayed a week due to a lack of transportation.

In contrast, access to DMH/SVPP appeared impeded. Institutional records showed 14 referrals to SVPP from October through March, only three of which were accepted, while two others were wait-listed respectively for ten days and one month.

Staff found the SVPP referral process onerous and indicated that they were discouraged by earlier rejections from making further referrals.

CSP/LAC rarely sought access for inmates in need of intermediate inpatient care at ASH.  Only one inmate was referred to ASH during the entire monitoring period; he was rejected because of an existing medical condition.  Most clinicians seemed unfamiliar with procedures for referrals to ASH.

Some EOP inmates did not appear to be referred to more intensive levels of care in a timely manner.  The monitor's review of a small number of EOP charts indicated that some inmates exhibited psychotic symptoms for several months before being referred for more intensive treatment.  See, for example, case reviews 2, 6, 8, 9, and 10 in Exhibit C.

Other CAP Issues:

a.  Progress

Timely psychiatric follow-up was provided more regularly.  According to an institutional audit for the period from October through March, 91 to 100 percent of inmates were seen within seven days of their scheduled appointments.  Institutional audits further showed that the percentage of inmates seen within 30 days following significant medication changes ranged from 80 to 100 percent a month from December to March.

The provision of structured therapeutic activities for general population EOP inmates improved.  CSP/LAC was able to provide ten hours of structured therapeutic activities for at least 90 percent of EOP inmates in the D-1 unit during 14 of the 25 weeks from October 5 through March 28, and for EOP inmates in the D-2 unit

during 11 of the same 25 weeks. During the remaining weeks, the percentage of EOP inmates actually offered ten hours of therapy fluctuated widely from zero to 83 percent. Disruptions, such as lockdowns, holidays and staff absences, continued to interrupt the regular availability of structured therapeutic activities.

The percentage of inmates returned to their housing units at CSP/LAC within 24 hours of their clinical discharge from the MHCB unit continued to improve from October through March. According to the institution's status report, monthly compliance rates, which ranged from 75 to 100 percent during the preceding monitoring period, varied from 86 to 100 percent during this monitoring period. The monitor's review of inmates' histories in the MHTS printout was not entirely consistent with the status report.

Timely IDTT meetings were held more reliably in administrative segregation. According to the institution's status report, between 96 and 100 percent of IDTT meetings from October through March were held timely. Appropriate clinical staff consistently attended; participation by correctional counselors continued to be a problem for much of the monitoring period, although correctional counselors' attendance recently was better. Union grievances, which long prevented correctional counselors from bringing C-files to IDTT meetings, had been resolved, which should result in easier access to these records in the future. Training to improve the quality of IDTT meetings and treatment plans was conducted for administrative segregation staff during the monitoring period.

Caseload inmates in administrative segregation received weekly case management contacts but, according to an institutional review of the MHTS, between 43

and 74 percent of all contacts from October through March occurred at cell-front. The monitor reviewed inmate histories for ten administrative segregation inmates and found that 25 percent of contacts took place at cell-front. The monitor's review also revealed a number of incongruities between the information contained in inmate histories and corresponding UHR notes relative to the location and date of reported case management contacts. A QIT may be needed to resolve this issue.

Custody follow-up for suicidal inmates discharged from the MHCB unit improved significantly during the monitoring period.

Clinical contacts with EOP inmates were more consistently documented. The congruency rate between the MHTS and inmates' UHRs with regard to case management contacts with inmates in the D-1 unit was 94 percent from late January through March. Accuracy of the MHTS for the EOP inmates in the D-2 unit was also better, but still inadequate. According to an institutional audit, the percentage of MHTS case management contacts with matching UHR notes in the D-2 unit increased from 60 percent during the preceding monitoring period to over 80 percent between January and March. During the same period, the percentage of IDTT contacts with a matching UHR note in D-2 was 77 percent, compared with over 90 percent in D-1.

Inmate charts were more complete. According to the institution's status report, charts regularly contained MH-2s and MH-4s. In contrast, the percentage of charts containing informed medication consent forms varied widely from October through March, with compliance as low as 50 percent in November and as high as 90 percent in February. Problems with loose filings fluctuated during the monitoring period, but seemed to wane somewhat recently. The amount of unfiled material on any given

day ranged from five to 37 inches. UHRs were not always returned to the records section in a timely manner, hampering clinicians' access to charts. As a result, MARs, as well as medication orders, were not always filed in a timely manner.

      b. Non-Compliance

Psychiatric responses to inmate self-referrals, in contrast to psychiatric responses to medication issues, were often untimely, although their timeliness improved somewhat over the course of the monitoring period. According to an institutional audit, the average response time to urgent referrals and to non-urgent staff referrals fell consistently within program guide timelines. Psychiatric responses to non-urgent inmate referrals and to referrals from inmates in administrative segregation, however, were not always timely. The average response time for inmate referrals was as 12.2 days in October but declined to 4.4 days in March and was consistently less than ten days after December. The average response time for routine administrative segregation referrals exceeded the required five-day timeline during four of the six months from October to March, ranging from 10.4 days in October to 4.2 days in February and March.

<u>Institutional Summary:</u>

Nearly all mental health positions at CSP/LAC were routinely filled by permanent staff or contracted clinicians. A sound quality assurance infrastructure was evolving slowly, although committee meetings, QITs and peer review needed further work. Among medication-related issues, psychiatric follow-up to medication non-compliance, the provision of HS medications and the ordering of laboratory blood-work showed some limited improvement, while continuity of medications on arrival, changes in housing locations and renewal of prescriptions and DOT were inadequate.

Progress in implementing the assessment process for mental health input into disciplinary decisions was notable during the monitoring period. Access to MHCB and acute DMH care was adequate, but most referrals to the SVPP intermediate inpatient program were rejected, and the facility rarely referred inmates to ASH.

The institution resolved six issues during the monitoring period and made some measure of progress on almost all remaining CAP items. Progress occurred in the provision of structured therapeutic activities for general population EOP inmates; the curtailment of administrative delays in the discharge of inmates from the MHCB unit; the timeliness of IDTT meetings in administrative segregation; the documentation of clinical contacts with EOP inmates; and the provision of custody follow-up for suicidal inmates discharged from a MHCB level of care. Inmates' UHRs were more complete, although problems with filing backlogs and the completion of informed medication consent forms persisted. Psychiatric responses to inmate self-referrals and attendance of correctional counselors at IDTT meetings in administrative segregation needed further improvement. On balance, CSP/LAC's overall progress towards compliance with its CAP and the requirements of <u>Coleman</u> remained strong during the monitoring period.

### California State Prison, San Quentin (SQ)
June 22, 2004 – June 24, 2004

The number of vacant psychiatrist positions at SQ increased from one to 3.5 during the monitoring round. In addition, positions for a chief psychologist, 5.5 staff psychologists, a psych social worker, two psych techs, and a half-time office tech were open. Psychiatric coverage was particularly problematic from December through April, when two psychiatrists were on extended medical leave and little contract psychiatric

coverage was available. As a result, psychiatric care was not provided in administrative segregation and the condemned inmates' unit.

Contract services did not adequately cover all mental health vacancies. Although documentation was inconsistent, it appeared that contractors covered about half of vacant clinical positions through most of the monitoring period.

Vacancies among auxiliary staff were also problematic in some categories. Almost half of all MTA positions, 22 of 45.29, and more than half of RN positions, 17 of 28.4, were vacant. Contracted replacements covered about three-quarters of the MTA openings. Roughly 30 percent of unfilled nursing positions were covered through the use of overtime.

In response to recurring management failures in the mental health program at SQ that, among other problems, led to totally unacceptable psychiatric care for inmates in administrative segregation and the condemned inmates' unit for some four months, the institution underwent, just prior to the monitor's visit, a substantial change in administrative and clinical leadership. The lack of psychiatric coverage was being addressed aggressively, but it was too early to sort out fully the results or assess the impact of the changes on services or the mental health staff's morale.

Issue Resolved

HS medications were administered in the institution.

Quality Management Issues:

The quality assurance process was largely stagnant during the monitoring period, due in part to administrative uncertainty and changes. The quality management committee met weekly or bi-weekly and received reports from the mental health quality

management subcommittee.  Participation by representatives of all the disciplines in the mental health subcommittee appeared to be adequate.  Quality improvement teams were chartered to review many important mental health issues, but with little apparent oversight or follow-up.  Only a few studies were generated, and those did not typically describe the methodology employed in sufficient detail to assess their accuracy and value.  The monitor observed one subcommittee meeting, where the discussion of problems and resolutions was limited; most of the meeting was taken up by the discussion of delinquent materials.

The institution began to address these deficiencies in quality assurance more aggressively in May, developing an action plan to ensure more effective management of the quality of mental health services.  Chart reviews began in May; peer review activities reportedly occurred among psychiatrists and psychologists, although these reportedly were pretty rudimentary in nature.

Operation of the MHTS improved somewhat during the monitoring period.  SQ assigned and trained four clerical staff members to manage the MHTS, contrasted with the sole clerical employee previously assigned to the task.  The institution also was developing and nearing completion of an extensive MHTS operating procedure, including detailed instructions for the use of the MHTS to track transfers to higher levels of care.  The MHTS was used to produce reports and schedule appointments with general population inmates.  The system continued to have a problem with missing or inaccurate data.

Medication Issues:

Continuity of medications on arrival seemed to improve marginally during the monitoring period, but diverse studies conducted during the period left the extent of any improvement uncertain.  The institution conducted two studies, a month apart, each with a different methodology and each reaching widely different conclusions and casting some doubt on the reliability of both.  Staff reported delays in medication ranging from a few days to as many as 18 days.  The monitor reviewed the charts of seven arriving inmates and found two inmates with medication gaps respectively of two and three days.  New medication management procedures were implemented during the preceding monitoring period, but some enduring existing practices apparently contributed to persistent interruptions in medications.  Specifically, at SQ arriving inmates were not referred to a psychiatrist immediately and simultaneously with the writing of a 14-day medication continuity order, as was done elsewhere in CDC.  Initial psychiatric referrals were not made at SQ until an inmate's mental health evaluation was completed, an event not scheduled to occur pursuant to the program guide until 18 days after the inmate's arrival.  Thus, the referral to a psychiatrist regularly did not occur until after expiration of the 14-day arrival medication order, and interruptions persisted.  Staff reported inmates waiting up to a week for their medications.

The institution reported some improved continuity of medications for inmates on changes in housing units.  According to an institutional study of data from January, March and May, between 11 and 26 percent of inmates experienced some gap in medications on relocation, but none missed more than one dose of medication.  The institutional study was somewhat over-inclusive, and the number of inmates in the study,

whose housing location was actually changed, may have been statistically small. The monitor's limited review of charts found two inmates who did not receive prescribed medications following a housing change and some gaps in medication longer than those reported in the institutional study.

Follow-up to medication non-compliance was erratic. Although a substantial number of referrals for non-compliance occurred during the monitoring period, MTAs failed to make some other referrals, and some of those made never got to mental health at all. An institutional audit showed that just 37 percent of inmates referred for medication non-compliance received follow-up psychiatric appointments in a timely manner. Some referred inmates were not seen at all for follow-up by a psychiatrist. To help offset the low rate of follow-up, psychiatrists initiated a medication non-compliance group, which was available for only a few inmates.

The monitor found in administrative segregation three inmates, who reportedly experienced difficulty in receiving their medication deliveries and subsequently incurred RVRs for violent or aggressive behavior they attributed to missed medications. They also reported three medication errors during the preceding six months. SQ did not maintain a log of medication errors, and nursing and pharmacy staff believed that such errors were under-reported. Staff indicated that a medications error log would be started in July.

DOT procedures were reportedly followed throughout the institution. According to an institutional audit, observations of staff who administered DOT medications occurred 33 times from January 15 to February 18. DOT procedures were reportedly followed 97 percent of the time. Distributions were also monitored 18 times

in March, when 100-percent compliance was noted.  The monitor accompanied a MTA dispensing medications and witnessed the effective administration of DOT medications to one inmate.  The institution did not maintain a list of inmates requiring DOT medication administration.

Laboratory testing of inmates on mood-stabilizing medications continued to be troubled.  Institutional audits of this issue were discontinued early in the monitoring period because the log used to track blood levels was incompatible with the institution's MHTS.  Revisions to the log were made, and audits resumed in March.  Audits of March and April data confirmed that laboratory testing was ordered erratically everywhere, but particularly in administrative segregation.

Staff audits noted a continuous decline in the number of inmates receiving pre-release medications upon discharge, but no attempt was undertaken to investigate the reasons for this decline or remedy the problem.  According to staff, the pharmacy routinely received a list of all paroling inmates and prepared a 30-day supply of their current medications for distribution.  The institution maintained a log of paroled inmates who received their medications at discharge, but the information in the log did not concur with the findings of the quality improvement team.  Institutional data apparently did not distinguish between inmates who refused their medications and those for whom no medications were ordered.

Medication informed consent forms were not consistently found in inmates' charts.  The monitor reviewed the charts of ten caseload inmates and found informed medication consent forms in six.

65

<u>Mental Health Assessments for the Disciplinary Process:</u>

SQ progressed in providing mental health input into the disciplinary process. All, or nearly all, clinical staff had been trained with respect to the new mental health assessment form and procedures. The monitor reviewed all RVRs written for caseload inmates and found none that seemed inappropriate. Some RVRs even noted earlier threatening behavior by the same EOP inmate, which had not been reported. Among the RVRs reviewed by the monitor, no disciplinary infractions were issued for suicide attempts.

Mental health assessments were handled relatively well. SQ had a special process for determining whether 3CMS inmates warranted a mental health assessment. Logs reflected a relatively high number of 125 requests for mental health assessments for 3CMS inmates during the monitoring period, three-quarters of which were determined to qualify for an assessment under the stated criteria. The institution also developed procedures to ensure that inmates were not assessed by their own case managers and assessments included inmate interviews and reviews of the inmates' UHRs and C-files. Although staff reported general compliance with these procedures, a custody audit of 44 cases indicated that the frequency of inmate interviews declined during the monitoring period. The monitor reviewed the cases in the custody audit, as well as the C-files for ten other disciplinary infractions, and found some assessments forms that were internally inconsistent and/or incomplete.

The impact of mental health input on the disciplinary process increased during the monitoring period. The monitor reviewed 54 dispositions and found that mental health input was discussed and included in the summaries of most, but not all,

disciplinary hearings. Although most hearing officers did not describe specifically the impact of mental health input on their decisions, charges were dismissed or reduced expressly for mental health reasons in a number of cases.

Disciplinary logs still did not track and collect all relevant procedural milestones in one document. The most comprehensive log, for example, did not record whether a written assessment was completed or whether reported mental illness was thought to be a factor.

Transfers:

Some serious problems remained with inmates' access to higher levels of care. Staff did not appear to fully understand the criteria for admission to DMH. As a result, only six inmates were referred from SQ to the DMH/APP at CMF between October and June. Five of the referred inmates were from the condemned men's unit and the sixth was in the reception center. Most of the referrals, however, were handled timely, and the delay between referral and transfer ranged from two days to 11 days. No referrals to ASH or SVPP were made during the monitoring period.

Between nine and 15 inmates were endorsed for transfer to a PSU during the monitoring period, but only five inmates were actually transferred. There were also some problems with the timeliness of the PSU transfers that occurred. The time to endorsement ranged from three to eight months; the delay between endorsement and transfer was one to two weeks for four of the inmates and two and a half months for the fifth transferee. The remaining inmates with pending referrals had been waiting from one to six months or were paroled.

One particularly egregious case involved an inmate originally confined in the California Youth Authority (CYA), whose mental health situation was sufficiently severe to warrant an earlier special transfer to PBSP, where his needs were well-assessed and documented. From there, he was subsequently sent to be treated at DMH/APP for 16 months. When discharged to SQ, staff immediately noted his need for an EOP level of care and his assessed SHU term, but it took almost a year for classification personnel at SQ to discover, procure necessary information from CMF about and remedy the inmate's long-expired CYA status, which prevented his return to the PSU at PBSP. During that long period, the inmate did not receive an EOP level of treatment, had numerous OHU and MHCB admissions, and incurred escalating RVRs for threats, flooding, indecent exposure, arson, and battery. After 13 months of unnecessary delay, with little indication that custody or classification staff aggressively addressed his stalled status or mental health staff actively sought an accelerated transfer, he was endorsed for PSU, but his most recent indecent exposure charge, meanwhile, was referred to and picked up by the local district attorney and could now serve as his third strike.

Transfers to MHCB units reportedly occurred expeditiously, but some delays persisted. There were 139 OHU mental health admissions in March and April, 89 percent of which were discharged within 72 hours. Of the identical number of 139 MHCB transfers that occurred between October 1 and May 19, 14 percent remained in the OHU for more than 72 hours. Most of the delays, however, exceeded the deadline by only a day or two. The longest wait for a MHCB transfer appeared to have been 12 days.

Treatment for mental health inmates awaiting transfer in the OHU deteriorated beginning in March with the loss of the OHU psychiatrist. Although the unit

was covered by a changing cadre of psychiatrists, treatment plans for inmates with multiple MHCB admissions were neither revised nor tracked. Discharge planning declined significantly beginning in March, with only 12 percent of discharged inmates receiving direct case management follow-up contacts in April. The use of the body cavity search room as confidential interview space for clinical contacts fell off after the departure of the unit psychiatrist. Indeed, a review of the unit logs by the monitor's expert found no documentation that any inmates in the OHU were seen in this interview space. Preparation for a separate room for confidential interviews was nearly complete. The physical plant of the OHU was a matter of some concern. Specifically, some tiles in most of the cells on the security side of the OHU were broken and could be used to inflict self-injury; the shower heads in these rooms were not the break-away kind that were safe for suicidal inmates; and the grills covering the windows in these cells could sustain substantial weight and constituted a suicide risk.

Twenty-one percent of inmates admitted to the OHU had three or more admissions. Some of these inmates with multiple admissions were referred to MHCB units, while others were not. None of the charts reviewed by the monitor's expert documented consideration of referring inmates with multiple OHU admissions to a higher level of care.

Some inmates remained in the reception center for long periods of time awaiting transfer to appropriate 3CMS and EOP programs. Data on transfers during the monitoring period was confusing, conflicting and essentially unreliable, making it impossible to determine accurately the precise percentage of inmates remaining in reception beyond applicable transfer timelines. At the time of the monitor's visit, 41

percent of EOP inmates in reception had been awaiting transfer longer than 60 days, while 17 percent of 3CMS inmates had been in reception longer than 90 days. Twenty-five EOP inmates had been in the administrative segregation unit longer than 60 days. One EOP inmate had been in the reception center just over a year, while the most senior 3CMS inmate had been in reception for about a year and a half. Reported shortages among classification staff contributed to the problem. SQ maintained a priority transfer list, but it was so poorly designed and so riddled with unexplained entries that it was unusable.

      The facility gathered some data on the delivery of mental health services in the reception center to 3CMS inmates, who were not on medications, and to EOP inmates, but not on services provided for those 3CMS inmates on medication. According to an institutional audit for March, 86 percent of EOP inmates in reception received weekly case management contacts, while 73 percent also received some weekly group therapy. An institutional audit of 3CMS inmates in reception not on medication found that 85 percent received case management contacts within the preceding 30 days, but a similar audit scheduled for 3CMS inmates on medications was left incomplete because of staff reassignments. The monitor reviewed MHTS inmate histories which, while not entirely reliable, reflected a lower percentage of case management contacts than did the institutional audits. Of 12 EOP inmates, whose histories were reviewed, seven had regular weekly case management contacts, while half of 30 reviewed 3CMS inmates had not had any case management contacts in their more than 90 days in reception.

Other CAP Issues:

    a.  Partial Compliance

    The mental health screening of inmates newly admitted to the administrative segregation unit showed significant improvement.  An institutional audit reflected monthly compliance rates ranging from 69 to 100 percent from October through April.  The monitor's review of charts confirmed the progress.  Of 21 charts reviewed, 19 charts documented timely mental health screenings; one other chart documented some delay in conducting the screening, while the last did not contain a screening form.

    Compliance with the requirement for weekly case management contacts with caseload inmates in administrative segregation also improved considerably.  An institutional audit for March found 95.8-percent compliance for weekly case management contacts with EOP inmates and 87.5-percent compliance for contacts with 3CMS inmates.  The percentage of inmates receiving out-of-cell contact was considerably lower.  Sixty-three percent of 3CMS inmates and 35 percent of EOP inmates were seen at cell-front.  Lack of adequate interview space, a shortage of escort officers, large caseloads and inmate refusals to be seen out-of-cell all contributed to the preponderance of cell-front interviews.

    The timeliness of IDTT meetings for caseload inmates in administrative segregation was good.  An institutional audit for March 2004 found that 96 percent of EOP inmates in segregation received timely initial IDTT meetings, as well as timely IDTT meetings to update treatment plans.  Initial IDTT meetings were held in a timely manner for 87.5 percent of 3CMS inmates, but only 58 percent of 3CMS inmates had timely up-dated treatment plans and IDTT meetings.  The monitor's expert attended

IDTT meetings for eight inmates in the East Block.  Attendance by the required

participants was excellent, but the room used for the meeting was inadequate for the

purpose, as noted in the monitor's preceding report.

   The suicide prevention committee, which had been meeting monthly until

March, began to meet every two weeks.  The minutes of the meetings, however, reflected

a need for generating specific recommendations and better follow-up to identified

problems.  Despite the increased committee meetings, serious deficiencies persisted.

According to an institutional audit for March, just 42 percent of suicidal inmates

discharged from the OHU received five-day clinical follow-up, while custody checks

apparently were not conducted at all in March.  Additional suicide prevention training for

both clinical and custody staff was conducted in response to the poor audit results, and

compliance rates began to improve.  An institutional audit for May found 100-percent

compliance with requirements for five-day clinical follow-up and 50-percent compliance

with requirements for custody checks.  The monitor's expert conducted a review of

follow-up records and concluded that compliance with requirements for clinical follow-

up was closer to 85 percent.  In addition, institutional audits indicated that suicide risk

assessments were conducted in the OHU for 37.5 percent of admissions in April and 67

percent in May 2004.  The monitor's expert reviewed many of the suicide risk assessment

forms and found the quality of the assessments uneven; conclusions reached in

assessments on the degree of risk were often inconsistent with the data on the forms and

the assessed inmates' mental health histories.

   Some progress was made in providing pre-release services to paroling

inmates, but a few problems remained.  SQ reportedly formulated a plan for providing

discharge services to inmates in administrative segregation and reception and began

forwarding parole dates to case managers in these units. Lists of paroling inmates,

however, were incomplete, due to data entry backlogs resulting from a shortage of

classification and medical records personnel. TCMP contractors reportedly failed to see

all paroling inmates, and the fit between discharge services provided by TCMP workers

and SQ mental health clinicians had never been evaluated.

        The monitor's chart reviews indicated that SQ's persistent problem with

filing backlogs improved somewhat during the monitoring period, although MARs were

often missing from reviewed charts.

        b. Non-Compliance

        The timeliness of treatment plans for 3CMS inmates, an issue resolved

during an earlier monitoring period, resurfaced. Documentation showed deterioration in

some of the basic elements of SQ's previously well-functioning general population

3CMS program. According to one institutional audit of 39 new arrivals in the general

population 3CMS program, fewer than half received a timely MH-4 and only half had

timely IDTT meetings and corresponding treatment plans. The monitor reviewed the

charts of ten 3CMS inmates and found quarterly case management contacts in only six.

Staff cited problems with the ducating system.

        Inmates and staff reported significant delays in responding to psychiatric

referrals. No hard data was available on compliance because the institutional audits

conducted in this area were methodologically flawed. Staff, again, attributed problems in

this area to ducating problems, indicating that delays in scheduling follow-up visits to

referrals for psychiatric services occurred routinely.

The provision of structured therapeutic activities for EOP inmates in administrative segregation deteriorated. Between 20 and 40 percent of EOP inmates in administrative segregation were identified as clinically unable to tolerate ten hours of structured therapeutic activities weekly, a determination deemed excessive and often inappropriate by the monitor's expert. As a result, fewer than ten hours of structured therapeutic activities were offered to a significant percentage of EOP inmates in administrative segregation, with most treatment plans calling for only two hours of such activities weekly. Institutional data from the MHTS during the monitoring period confirmed the deterioration. Some 15 percent of EOP inmates in administrative segregation were offered no structured therapeutic activities; another third received an hour or less of therapy per week; only 22 percent of inmates were offered ten hours or more weekly of structured therapeutic activities consistently, and none actually received as many as ten hours weekly. In addition, many inmates in the EOP administrative segregation unit and in the adjustment center were not seen by a psychiatrist for long periods of time due to the lack of psychiatric coverage from December through April.

The physical facilities available to run programs for EOP inmates in administrative segregation were inadequate, and only limited out-of-cell activities could be offered in the unit. The situation was complicated further by the need to share the limited available programming space with the condemned inmates' EOP. The institution's request for building modifications to provide more space had been rejected. The census of EOP inmates in the administrative segregation at the time of the monitor's visit was 55, seven of whom were housed in the adjustment center. Staff asserted that available resources were insufficient to service this population. SQ reportedly had space

to provide 315 hours of structured therapeutic activities a week in administrative segregation; at ten hours a week, the unit could accommodate no more than 30 to 35 inmates.  The institution needed to reduce the size of the administrative segregation EOP to fit the number it could treat in conformance with program guide requirements.  Office space for IDTT meetings was also inadequate.  Despite the problems with programming space, mental health staff devoted a significant amount of time during the monitoring period to review and plan treatment for each EOP inmate, and additional training was provided to correctional officers interacting with EOP inmates.

Problems also persisted with the provision of care to EOP inmates in the condemned men's unit.  Psych tech rounds were not performed as required, and the lack of psychiatric staffing from December to April left condemned EOP inmates bereft of basic medication management and other psychiatric services.  Most condemned EOP inmates were offered between eight and nine hours of therapy a week, but about half actually participated in three to six hours, while the other half participated in structured therapeutic activities less than an hour weekly.

Institutional Summary:

The number of psychiatric vacancies increased alarmingly during the monitoring period, seriously impacting on mental health care in administrative segregation and among condemned inmates.  The failure to provide psychiatric coverage in these units from December through April resulted in significant departmental intervention in the local management of mental health services and some quick changes in clinical leadership at the facility.  While it was too early to gauge the effectiveness of

the new leadership, the defendants anticipated that the changes would lead to considerable improvement in the mental health services provided at the institution.

Progress in the development of an effective quality assurance process at SQ stalled during the monitoring period, due largely to the crisis in clinical leadership. Some signs of resuscitation began to appear in May and early June, but the new management team in mental health needed to address some critical operational problems before focusing on quality assurance. The efficiency of the local MHTS increased due primarily to a substantial infusion of clerical staff.

Medication management, on the whole, was inadequate. Continuity of medication on arrival, changes in location and renewal seemed marginally improved, but local data on the issues was contradictory and unreliable. Follow-up to medication non-compliance was erratic, and medication errors were inadequately tracked and corrected. Laboratory testing for inmates on mood-stabilizing medications was conducted inconsistently, and the provision of discharge medications to paroling inmates apparently declined. On the positive side, DOT procedures were being effectively implemented and monitored, while HS medication appeared to be distributed routinely, perhaps uniquely in CDC.

Timely transfers to higher levels of mental health care were similarly stalled. From October to June, just six inmates were transferred to the DMH acute care program at CMF, and SQ made no referrals to any DMH intermediate care program during the monitoring period. Clinicians seemed unaware of the availability of the DMH resource and were largely uninformed about procedures for referrals to DMH. Access to MHCB units was reasonably smooth and timely for the facility, but referrals to PSUs

were often delayed extensively. Although inadequate local data made accurate estimates difficult, a significant portion of EOP inmates remained in the reception center for more than 60 days before transferring to an appropriate general population EOP, while a much smaller percentage of 3CMS inmates remained overlong in reception.

Mental health assessment procedures for the disciplinary process were being gradually incorporated in local practice. The facility needed to improve its documentation of assessments and their impact on outcomes, but utilization of the process seemed to be progressing.

As for outstanding CAP items, the provision of mental health services in administrative segregation improved, including more regular and timely mental health screenings, more frequent case management contacts and more timely IDTT meetings and treatment plans. Pre-release services to paroling inmates, though they needed to be evaluated, appeared to improve, as did treatment services in reception and some aspects of suicide prevention. Filing backlogs diminished somewhat.

Meanwhile, treatment services in the OHU and for administrative segregation and condemned EOP inmates deteriorated sharply. The general population 3CMS program faltered and ceased to function as well as it had in the past.

SQ had a troubled monitoring period, with some long simmering problems bubbling to the surface. The department and the institution were hopeful that some of the resulting changes will help SQ make swifter, greater strides in developing and institutionalizing more effective mental health services. Only the future will tell.

### California State Prison, Solano (CSP/Solano)
June 22, 2004 – June 24, 2004

The vacancy rate among permanent mental health staff at CSP/Solano, which was high during the preceding monitoring round, rose to 38 percent during this monitoring period. Positions for 1.5 psychiatrists, a senior psychologist, six staff psychologists, a psych social worker and three office techs were vacant. At the same time, the capacity of the institution's 3CMS program rose for the third time since September 2002, increasing to 1,199 inmates; the program's capacity grew 62 percent since May 2002. As a result of the expanded capacity, CSP/Solano was allocated an additional half-time psychiatrist, a senior psychologist, two staff psychologists and an office tech. These positions were not funded at the time of the monitor's visit and could not yet be filled, although the institution's caseload consistently exceeded the expanded program capacity throughout the monitoring period. At the time of the monitor's visit, the caseload population consisted of approximately 1,280 3CMS and five EOP inmates.

Contract services were utilized to cover roughly a third of clinical vacancies, including just over half of the vacant psychiatrist positions. The actual vacancy rate among case managers, after accounting for contract coverage, resulted in an average caseload of approximately 150 inmates.

Ancillary staffing also continued to be problematic. CSP/Solano suffered particularly from chronic pharmacy vacancies. Specifically, four of seven pharmacy positions were vacant, and almost all members of the pharmacy staff, including the acting pharmacy director, were contractors. The loss of medical records personnel during the monitoring round left the institution with three of 11 clerical records positions vacant, threatening the orderly maintenance of inmate charts. Staffing allocations for support

positions reportedly were not increased, or were increased only slightly, during the last eight years, despite the dramatic growth of the mental health population.

The large number of inmates serving life sentences at CSP/Solano and an increase in MHCB admissions to the institution during the last nine months added to the drain on mental health resources during the monitoring period. In addition, the facility had a tuberculosis-related incident from late April to mid-May that resulted in closing the facility temporarily to admissions and discharges and significantly increased workloads in some departments, such as medical records and the pharmacy.

The MHCB unit at CSP/Solano had been temporarily housed in the administrative segregation unit since the fall of 2003, while the Correctional Treatment Center (CTC), which housed the MHCB unit, underwent renovations. Although it was initially reported that the unit would be closed to outside admissions, the institution continued to receive referrals from other CDC institutions throughout the monitoring period. The use of the temporary unit as an infirmary for crisis treatment presented some serious problems. Due to the physical limitations of the unit, the use of mechanical restraints and involuntary medications was deemed inappropriate. Audio confidentiality was also severely limited in the administrative segregation setting. Unable to adequately address continuing problems with the unit, the defendants decided to close it as of June 30, 2004, until the physical renovations at the CTC were completed. Until then, inmates in need of MHCB care were to be sent elsewhere. The new CTC was scheduled to open in July, following the resolution of several punch list items and approval by the fire marshal.

<u>Issues Resolved:</u>

Psych techs made daily rounds in the administrative segregation unit.

Issues related to the heat plan were resolved; in particular, all heat-risk inmates had heat cards and temperatures were measured in all buildings, not just buildings housing heat-risk inmates.

<u>Quality Management Issues:</u>

The quality assurance process at CSP/Solano continued to improve, although further development was needed. With the help of headquarters personnel, CSP/Solano established a quality assurance governing body, consisting of representatives from a variety of disciplines. The governing body was primarily concerned with renovation of the CTC during the monitoring period, but considered some other issues, such as medication compliance and medical transportation.

The mental health quality management committee met monthly, with the exception of November and February, but the composition of the group was inadequate. No representatives from disciplines other than mental health attended the meetings. Minutes suggested that meetings functioned more as staff meetings than quality assurance sessions. The peer review process, although somewhat informal, was well underway for psychiatrists, psychologists and psych social workers. Clinicians had reviewed close to 100 UHRs since January.

A substantial number of QITs were mentioned in committee minutes, but, according to staff, many of them were not formally chartered and their activities were largely undocumented. QIT reports to the mental health quality assurance committee were rarely referred to in the minutes of meetings. Additional QITs were needed to study important and troubling problems, such as medication administration.

The accuracy of the MHTS appeared to improve. The MHTS was used to track case manager contacts, IDTT meetings, initial mental health assessments, transfers and mental health referrals. Chart reviews and reviews of inmate histories suggested a high degree of concordance between the MHTS and UHR documentation. The monitor's expert reviewed 20 charts and found a better than 90 percent rate of concordance between mental health entries in UHRs and inmate histories generated by the MHTS, with most discrepancies involving medication orders. The institution, however, needed to conduct its own audit of this issue to determine the extent of compliance.

Medication Issues:

Significant and troubling deficiencies were noted regarding many aspects of medication management at CSP/Solano. Continuity of medication on arrival was a persistent problem. Institutional data showed that psychiatrists often failed to write timely continuity orders for inmates arriving on medication. In addition, the pharmacy often failed to fill expeditiously the continuity orders that were written. A nursing audit of 40 charts for January through May found that just 30 percent of inmates arriving with current medication orders received their medications within one day. An audit of 96 charts of newly arriving inmates from October through March reported that 59 percent of audited inmates received medications within one day of their arrival, while 74 percent were offered medication within 48 hours. Twenty of the audited inmates waited from three to seven days for their medications, while five others waited longer than a week.

The institution conducted an inconclusive audit of medication continuity for inmates whose housing location within the institution changed, but staff and inmates continued to report gaps in medication of varying lengths for these inmates. The

institution lacked an effective tracking system to follow relocated inmates in a timely manner, resulting apparently in frequent medication interruptions for inmates relocated within the facility. To rectify the problem, CSP/Solano was in the midst of changing its method of medication distribution, currently conducted in individual housing units, to centralized pill lines on yards. The new pill lines had been introduced on some yards, along with new operating procedures for medication distribution, but some inmates were still receiving their medications temporarily in their housing units.

The institution failed to audit medication non-compliance, but chart reviews by the monitor's expert showed that non-compliance was neither adequately tracked nor monitored. Non-compliant inmates were not consistently referred to a psychiatrist. Moreover, psychiatric responses to referrals for medication non-compliance were erratic, and not all inmates referred to a psychiatrist for non-compliance were actually seen. The expert's chart reviews and reviews of MHTS inmate histories suggested that it took from seven to 21 days after referral for psychiatrists to see non-compliant inmates.

Medication distribution problems continued. Staff and inmates complained of medication errors and gaps in distribution. HS medications still were not administered at CSP/Solano.

The institution had not yet implemented new departmental DOT procedures. Staff apparently had not yet identified inmates needing to be placed on DOT, as distinguished from those eligible for nurse-administered medications. The pharmacy, due to computer limitations, listed all inmates who were taking psychotropic medications as requiring DOT, but most medications were administered at routine pill lines or at cell-

front in administrative segregation and during lockdowns. Staff claimed that medications were administered DOT for a few inmates, but it was not clear what procedures were employed to ensure appropriate observation. Moreover, the institution did not provide the monitor with a list of these few DOT inmates. CSP/Solano needed to document and audit the implementation of its DOT procedures.

Many inmates complained about the length of pill lines. Historically, inmates on psychiatric medications were housed in heat-risk buildings, and medications were dispensed indoors. The aforementioned change to centralized pill lines meant that caseload inmates, even those in heat-risk buildings, were required to use the outdoor pill line. The pill lines were extremely long and slow, and inmates reportedly sometimes waited one to two hours to receive their medications.

No audit was conducted of the frequency of laboratory testing for inmates on mood-stabilizing medications during the monitoring period nor did the institution undertake an assessment of clinical interventions following the receipt of abnormal laboratory test results. The monitor's expert's review of 20 charts found that psychiatrists typically ordered laboratory testing when required, but their orders were not reliably executed. Laboratory test results were missing in some UHRs reviewed by the monitor's expert, and some orders for laboratory tests had been rewritten several times. The expert also found one instance in which a treating psychiatrist failed to respond to a reported sub-therapeutic blood level.

The extent to which paroling inmates were provided with pre-release medications was unclear. The institution reported that the pharmacy generally received a list of paroling inmates and provided these inmates with a 30-day supply of medication

prior to their release, but no audit was conducted during the monitoring period to determine the degree of compliance with these procedures.

The Keyhea log indicated that the institution had not initiated a Keyhea order or received any inmates on Keyhea orders during the monitoring period. The monitor's expert, however, identified one inmate, who was psychotic for several months, for whom the initiation of a Keyhea order seemed appropriate.

Mental Health Assessments for Disciplinary Proceedings:

The monitor's review of completed RVRs and mental health assessments indicated that the new procedures had been implemented and were followed regularly. It appeared that mental health referrals were appropriately made for caseload inmates involved in disciplinary hearings; mental health assessments were properly completed; and punishments were mitigated in response to mental health input. The institution, however, did not maintain an adequate tracking log for the mental health assessment process and needed to conduct its own audit of this issue.

Transfers:

The timeliness of EOP transfers continued to improve. According to MHTS data for the period from October through June 10, 15 EOP inmates in administrative segregation were transferred to hub units. The average time between referral and transfer for these inmates was 33 days; none of the inmates waited longer than 60 days for transfer. During the same period, 26 EOP inmates in the general population were transferred. A third of these transfers took longer than 60 days; the average time to transfer was 46 days. All of the delayed transfers, however, occurred in October and November, reportedly due to local problems that were resolved by the end of

November.  Since then, all transfers of general population EOP inmates have been completed in a timely manner.  At the time of the monitor's visit, two EOP inmates in general population and three in administrative segregation were awaiting transfer, none of whom had been waiting longer than 60 days.  The institution, however, did not seek expedited transfers when clinically appropriate.  The monitor's expert identified one EOP inmate whose clinical condition warranted a 30-day expedited transfer.

The percentage of MHCB inmates remaining in the infirmary longer than ten days decreased during the monitoring period from 35 to 21 percent.  The lengths of stay for these inmates ranged from 11 to 49 days.  Clinical lengths of stay, however, exceeded ten days for only ten percent of admissions, with extended clinical stays ranging from 11 to 18 days.  As in the past, most of the administrative delays for inmates discharged from the MHCB unit involved inmates waiting to return to other CDC institutions, although some delay was also attributable to the tuberculosis-related incident that occurred in the facility during the monitoring period.  Delays that involved extended stays in the temporary MHCB unit in CSP/Solano's administrative segregation unit were particularly onerous.

Access to DMH/APP was adequate, but underutilized.  Five inmates were referred and transferred to DMH/APP from February 4 to May 25.  The time from referral to transfer ranged from eight to 27 days, with the longest delays occurring during the tuberculosis scare.  The institution's referral log still did not include the date a bed assignment was issued, so it was impossible to determine whether inmates were transferred within 72 hours of the receipt of their bed assignments.  During the monitoring period, no transfers occurred to intermediate DMH facilities at ASH or CMF.

One inmate was referred to DMH/SVPP, but he was rejected.  That same inmate was admitted later to DMH/APP, but the referral and transfer were not recorded in the DMH log.  The monitor's expert identified two EOP inmates who were not referred to an inpatient level of care, although they seemed to need it.

Other CAP Issues:

    a.  Partial Compliance

    There appeared to be some improvement in the composition of IDTT meetings.  Erratic attendance by correctional counselors at IDTT meetings, an issue noted in previous monitoring reports, was determined by the institution to be a problem with documentation.  IDTT documentation practices were changed two weeks prior to the monitor's visit, and correctional counselors were trained in the new procedures.  The monitor's review of eight charts found only one IDTT meeting where no correctional counselor participated.  A review of 20 charts by the monitor's expert found that most IDTT meetings were conducted with a full team in attendance.  An institutional audit found adequate interdisciplinary composition in 57 percent of IDTT meetings, but the study covered a time period that extended back several years.  A more current audit was needed to determine the actual degree of present compliance in this area.

    CSP/Solano continued to struggle to conduct initial IDTT meetings and complete initial treatment plans within 14 working days of arrival.  An institutional audit reported a 74-percent compliance rate in this area.  The monitor reviewed 14 charts and found timely treatment plans and IDTT meetings for 11 of the reviewed inmates.  An institutional audit indicated that more than 90 percent of inmates received annual IDTT meetings and timely updated treatment plans.  Inmate histories provided further evidence

that annual IDTT meetings, resulting in updated treatment plans, were held for almost all inmates. A review of 20 charts by the monitor's expert found current treatment plans in all of the reviewed UHRs.

The frequency of case management contacts with 3CMS inmates was inconsistent. Staff reported that 83 percent of inmates had quarterly case management contacts, but the institution did not provide the monitor with an audit confirming this rate of compliance. The monitor's expert reviewed 20 UHRs and 25 MHTS inmate histories and found nine inmates with case management contacts that were delayed two to three weeks. Although some inmates were seen more often than every 90 days, the expert identified three seriously mentally ill inmates, who needed more frequent case management contacts but did not receive them. Although few case management contacts were missed entirely, treatment continuity was sometimes poor when inmates were seen by several different case managers.

Documentation of case management contacts appeared to have improved. Chart reviews found entries documenting at least quarterly case management contacts, which were often accompanied by thorough and careful notes.

Despite the growing mental health census, the provision of group therapy for 3CMS inmates improved, with the number of groups increasing from six to 13. Approximately 110 3CMS inmates, or nine percent of the caseload, were enrolled in groups. Attendance, however, was low ranging from a high of six inmates to a low of two inmates per group session, and charts reviews indicated that scheduled groups were frequently cancelled. Only a handful of treatment plans reviewed by the monitor and the monitor's expert documented consideration of group therapy.

It was unclear whether EOP inmates were seen weekly by case managers. The institution conducted an audit of this issue, but the data from the audit had not been adequately analyzed. The monitor's expert reviewed the charts of three EOP inmates, two of whom were in administrative segregation, and found that the inmates were generally seen weekly by case managers, but with some lapses. The frequency of contacts appeared to be improved, but it was impossible to determine compliance without a more careful study.

The frequency of case management contacts in administrative segregation was unchanged. Chart reviews indicated that case management visits were generally documented on a weekly basis, but some lapses still occurred. Clinical contacts continued to occur primarily at cell-front and were documented on pre-printed forms stating that the inmate had refused an out-of-cell interview.

Suicide prevention follow-up improved. Tracking records, which were available for 15 of the 21 suicidal inmates discharged from the infirmary from October 28 through June 8, indicated a high, but not perfect, rate of compliance. Despite some occasional gaps, there was significant improvement in the provision of weekend follow-up. According to the data, 13 of the 15 inmates received five consecutive days of clinical contact following their discharge; the remaining two inmates received four consecutive days and three consecutive days respectively, interrupted by weekend gaps. The suicide prevention committee, however, was not functioning appropriately. The composition of the committee was inadequate; meetings were short; few substantive issues were discussed; and often no action was taken to remedy identified problems.

The availability of program space improved during the preceding monitoring period with the completion of a new mental health building, but some groups sessions were still cancelled due to the lack of program space. Between ten to 15 percent of clinical contacts occurred in non-confidential settings due partly to a shortage of office space and partly to security concerns.

The institution reported improved procedures for procuring the records of caseload inmates with prior mental health histories. According to the institutional status report, the medical records department processed requests for outside records and maintained a log of requests sent and records received.

The provision of pre-release services to paroling inmates reportedly continued to improve. TCMP workers combined the list of paroling inmates from CSP/Solano with a departmental list to determine which inmates needed to be seen. An audit of the pre-release services provided by TCMP contractors and CSP/Solano staff was needed.

b. Non-Compliance

The percentage of clinical intake assessments completed within five days of arrival declined during the monitoring period from 92 percent to 83 percent. Staff attributed the slippage to continued expansion of the caseload population.

The timeliness of clinical responses to referrals also slipped during the monitoring period, due partly to increased caseloads. Forty-eight percent of 859 referrals listed in the MHTS referral tracking report for the period from January 1 to June 10 were not seen within seven days, the institution's internal goal. According to the MHTS, the

average delay between referral and appointment was 10.6 days, but there were many cases in which referred inmates were not seen for several weeks.

The problem of unfiled UHR materials, an issue resolved during the previous monitoring period, reappeared. Large filing backlogs emerged again due, in part, to the tuberculosis-related incident, which required all inmates to be retested, and, in part, to the loss of three office techs during the monitoring period. Physicians did not have timely access to laboratory results, and many charts did not contain MARs dated later than March. Staff indicated that the filing of mental heath records was considered a priority, and the monitor's chart review seemed to suggest that, except for MARs and laboratory test results, most UHRs were relatively current and well organized, despite the recurring problems with filing.

New Problem:

Many caseload inmates in the general population interviewed by the monitor complained that some custody staff treated them in a demeaning and punitive manner. The monitor was unable to confirm the complaint, but the unanimity of inmates in expressing the complaint suggested that institutional administrators on the custody side needed, at least, to investigate the claim.

Institutional Summary:

Chronic staffing vacancies and insufficient auxiliary staffing, coupled with repeated increases in the capacity of the 3CMS program, combined to limit the full provision of mental health services. Despite the staffing problems and serious logistical difficulties related to the tuberculosis-related incident, some significant improvements in mental health occurred in CSP/Solano during the monitoring period.

Organization of the institution's quality assurance program was finally underway, and the MHTS continued to expand and improve. Procedures for the

provision of mental health assessments in the disciplinary process seemed to be fully implemented and were producing positive results.  Transfers to higher levels of care occurred more routinely.  EOP transfers were more timely, while lengths of stay in the MHCB unit declined.  Access to DMH/APP, a problem in the past, seemed to improve, although access to intermediate DMH programs was spotty, at best.

Alone among the four major issues focused on during the monitoring period, CSP/Solano seemed to struggle without success with medication management. Continuity of medication on arrival and changes in housing was often interrupted; clinical follow-up to medication non-compliance was erratic; pill lines were long; documentation in MARs was inadequate; medication distribution was deficient; HS medications were not prescribed; and DOT had not yet been meaningfully implemented.  No audits were conducted to assess psychiatric responses to abnormal laboratory results or the provision of pre-release medications to paroling inmates.

A number of pending CAP items showed significant improvement. Deficiencies in psych tech rounding in administrative segregation and the execution of the institution's heat plan were resolved fully.  Caseload inmates in the general population participated more fully in recreational activities, and more therapy groups became available.  In addition, documentation of mental health contacts contained more useful clinical information than in the past; the composition of IDTT meetings was much improved; clinical follow-up of suicidal inmates discharged from the MHCB unit was nearly routine; requests for prior mental health histories were processed and tracked.

Some CAP problems persisted.  Initial IDTT meetings and treatment plans were often untimely; the frequency of case management contacts with 3CMS inmates

was inconsistent; the timeliness of clinical intake assessments and psychiatric responses to referrals was poor; and problems with unfiled UHR materials resurfaced. The institution's use of the administrative segregation unit to house its MHCB unit during renovation of the CTC created some serious problems that were about to end with the closure of that temporary site and the completion of construction in the CTC.

Overall, CSP/Solano had a relatively positive monitoring period and edged closer to full implementation of its CAP, with the exception of medication management, which still needed much work.

### California Substance Abuse Treatment Center (CSATF)
July 6, 2004 – July 9, 2004

The vacancy rate among permanent mental health staff at CSATF remained at approximately 30 percent. Positions for four psychiatrists, a senior psychologist, four staff psychologists, a psych social worker and a recreational therapist were vacant. The turn-over among clinical staff since December was roughly 19 percent. A psychiatrist position, converted to create a chief psychologist position, was not replaced, despite the institution's complaint that its current allotment of psychiatric positions was inadequate. Although all office tech positions were filled, staff maintained that clerical allocations were inadequate to meet the facility's needs. A new chief medical officer, the eighth since September 2002, was hired.

Auxiliary staff vacancies increased for the second consecutive monitoring period. MTA vacancies rose from 4.6 to 15.75, while nursing vacancies increased from 12.48 to 19.19, largely due to the allocation of new nursing positions. Of 8.5 nursing

positions assigned to mental health, 3.5 were unfilled. Openings also remained for a supervisory nurse and three pharmacists.

Contract clinicians provided coverage equivalent to 3.3 of the four vacant psychiatrist positions and 3.3 of the five vacant case manager positions. The institution reported that registry nurses, combined with the use of overtime, covered all of the nursing and pharmacy openings.

Meanwhile, the defendants reduced the population of mental health inmates at CSATF during the monitoring period to help the institution meet compliance standards. The overall caseload population declined from 953 inmates in December to 883 in April, although the census began to climb again at the end of the monitoring period.

Issues Resolved:

Mental health assessments were present in 3CMS inmates' UHRs.

Caseload inmates in administrative segregation were seen weekly by their case managers.

Clinical follow-up was provided to suicidal inmates discharged from the MHCB unit.

Adequate treatment services were provided to EOP inmates awaiting transfers; EOP inmates were transferred to appropriate programs in a timely manner.

Quality Management Issues:

The quality management committee met weekly during the monitoring period. Minutes of meetings reflected a meaningful effort to address deficiencies in the delivery of mental health services. The institution chartered a number of quality improvement teams to study problem areas; the teams analyzed data and suggested

remedies, many of which were implemented.  Clinicians were not, however, regularly informed of results of studies.

Weekly chart reviews were conducted by mental health clinicians, averaging from 30 to 40 charts per month.  Peer review, however, had not yet commenced.  CSATF, along with several other CDC institutions, was part of a pilot project testing the use of an approved quality management report and specific quality management audits.

The MHTS was, according to institutional audits, more reliable.  The monitor's review found a good, albeit imperfect, concordance rate between UHR documentation and MHTS data.

Medication Issues:

Continuity of medication continued to show improvement.  The institution reported that medication continuity orders were generally issued to inmates within eight hours of their arrival.  The monitor reviewed the charts of ten inmates arriving at CSATF on medications and found that all ten were seen by a clinician and received medication orders within eight hours of entry.  Continuity at the time of prescription renewal also appeared to be consistently good.  The monitor's review of ten charts of inmates receiving Risperdal confirmed that all ten inmates had their medications renewed in a timely manner.

There were some problems with continuity of medication for inmates transferring from one housing unit to another within the institution.  Although new procedures regarding the transfer of medications for relocated inmates had been implemented and staff had been trained regarding these standards, an institutional audit in

May indicated that the policies were not routinely followed. Institutional data on this issue, moreover, was thought to be unreliable.

Documentation of psychiatric follow-up to referrals for medication non-compliance was inadequate. Staff received training in the importance of, and procedures for, documentation, but collected data was insufficient to assess the status of this CAP item at the time of the monitor's visit. A QIT had been chartered to study the issue. MARs, however, were legible and filed in inmates' UHRs. No-shows were marked on MARs reviewed by the monitor, with details presented on the reverse side of the form; the monitor did not review any MARs that showed medication refusals.

DOT procedures appeared to be improving. MARs and medication labels reflected DOT orders. Supervisory staff observed the delivery of both DOT and nurse administered medications. An institutional audit of 44 percent of the DOT population indicated that DOT procedures were followed consistently.

Laboratory testing of inmates on mood-stabilizing medications also improved. Charts reviews for six inmates showed that appropriate laboratory tests were ordered and results obtained, although the results were not always returned in a timely manner.

Paroling inmates were generally provided with appropriate pre-release medications. The monitor examined the institution's parole lists, housing change lists and release documents and concluded that mental health and the pharmacy were notified when inmates were about to be paroled at least 14 days prior to their release. CSATF maintained a medication log for paroling inmates, which together with other reviewed

documentation, showed that paroling inmates usually received a 30-day supply of medications on discharge.

The number of inmates receiving HS medications, while still small, had increased. An institutional audit conducted on May 19 found HS prescriptions for 17 inmates. Only nine of these inmates actually received their medications after 8:00 p.m., even though the institution's medication operating procedure required HS medications to be delivered at or after that time. All of the eight inmates who received their HS medications inappropriately before 8:00 p.m. were from the same housing facility in the institution. A subsequent audit on June 16 found that all HS medications were administered after 8:00 p.m.

Informed medication consent forms were found in all ten charts reviewed for that purpose by the monitor. Most interviewed inmates, however, claimed that no one had explained the side effects of their medication, including the heat risks associated with their medications.

Mental Health Assessments for the Disciplinary Process:

Revised procedures for mental health input into the disciplinary process were not fully implemented. Although the number of inmates referred for mental health evaluations had appropriately declined since the new procedures were instituted, the monitor's chart review found several inmates for whom mental health assessments were prepared for no clear reason, suggesting some lack of understanding of the new rules among some custody staff. Moreover, RVRs continued to be issued for self-injurious behavior without adhering to the protocols included in the revised departmental policy.

From December through June, 308 RVRs were written for caseload inmates, 20 percent of which were referred for a mental health assessment.  Seven non-caseload inmates were also referred for evaluations.  Clinicians concluded that mental health factors might have influenced behavior in 26 percent of cases referred for an assessment.  It was, however, difficult to reach any conclusion about the impact of mental health input because completed RVRs were not consistently filed in inmates' C-files and mental health assessments were not always attached to completed reports.  Moreover, the completed RVRs did not consistently refer to the mental health assessments, summarize clinicians' conclusions or record hearing officers' reactions to assessments.  Further training on mental health referrals and the appropriate documentation of assessments and outcomes was needed.

Transfers:

The timeliness of EOP transfers improved during the monitoring period.  Of 16 EOP inmates transferred to programs elsewhere from October through June, only two remained at CSATF longer than 60 days, and these two transfers exceeded the 60-day limit by just three and four days respectively.  At the time of the monitor's visit, eight EOP inmates were housed in CSATF, none of whom had been in the institution for more than 60 days.

Fewer inmates remained in the MHCB unit for extended periods during the monitoring round.  Eighty-six percent of MHCB admissions were clinically discharged within ten days, but administrative delays continued to cause a significant number of extended stays.  Of 212 MHCB admissions from December 10 through June, 35 percent remained in the unit longer than ten days, compared with 46 percent of 178

admissions during the preceding monitoring period.  Clinical concerns caused about 15 percent of stays of longer than ten days, while the bulk of discharge delays were due to complications associated with transfers to EOPs, DMH programs or other sending CDC institutions.  The average length of these overlong stays prior to clinical discharge was 14 days, with a range of 11 to 24 days.

      The timeliness of transfers to DMH's APP at CMF was good during most of the monitoring period.  Of 59 referrals to DMH/APP between December 10 and June 14, 48 inmates were transferred, eight referrals were rescinded by CSATF and three were pending; none of the referrals was rejected.  The average time between referral and acceptance was 4.6 days, while the average lapse between referral and transfer was 9.4 days, with delays ranging from one to 21 days.  The delay between bed assignment and transfer exceeded 72 hours in only one case as the result of a Keyhea hearing.  Transfer delays increased in number and extent in the few months preceding the monitor's visit and were attributed to a waiting list at DMH/APP, which had been eliminated earlier in the monitoring period.

      The monitor's review of psych and return procedures was inconclusive. Six inmates sent to DMH/APP returned to CSATF, but only two of these were still at the facility at the time of the monitor's visit.  Documentation indicated that psych and return procedures were followed for one of the two inmates, but the other's UHR lacked a mental health discharge summary, a fax cover sheet with contact information and a placement chrono.  The inmate's subsequent discharge summary from CSATF's MHCB unit indicated that the inmate returning from DMH/APP remained suicidal.

      CSATF did not seek access to intermediate DMH care.  The mental health

staff was unfamiliar with admission criteria to SVPP, ASH or ICF/CMF and did not appear to refer inmates to these programs. No referrals to any of these programs occurred during the monitoring period.

Other CAP Issues:

a. Partial Compliance

The timeliness of initial intake assessments improved in the months preceding the monitor's visit. An institutional audit for the period from June through January found only 33 percent of audited inmates with an initial intake assessment completed within five working days of arrival. A second audit for April, however, reflected a timeliness compliance rate of 92 percent. The improvement was attributed to closer supervision and smaller caseloads, which allowed clinicians to function in a more timely manner. Staff began to track new arrivals more effectively in an effort to maintain the improved timeliness.

Similarly, the composition of IDTTs apparently improved in the period preceding the monitor's visit. Data collected by the institution in May and June found that IDTT meetings were attended by both psychiatrists and correctional counselors. According to the same data, C-files were reported as unavailable for many meetings. In contrast, the monitor's review of just seven charts found attendance by correctional counselors and psychiatrists to be erratic. Both the institutional data and the monitor's chart reviews indicated that psychiatrists participating in IDTT meetings seldom were the presented inmates' treating psychiatrists.

The quality of treatment plans appeared to improve after case managers were provided with mandatory treatment plan training in February through April. Chart

reviews confirmed that treatment plans were complete and updated annually.  The monitor's chart review turned up one case without a treatment plan after arrival at CSATF and one without a fresh treatment plan after discharge from the MHCB unit.

The timeliness of psychiatric responses to referrals showed some improvement, but many responses remained untimely.  An institutional audit of 797 fully documented referrals found that 73 percent were contacted within 14 calendar days as required under local time frames.

The frequency of case management contacts with 3CMS inmates also progressed.  An institutional audit for a four-month period showed an increase in compliance from 65 percent in January to 87 percent in April.  MHTS data for the quarter preceding the monitor's visit indicated a compliance rate of over 90 percent.  This progress was confirmed by the monitor's chart reviews, which revealed gaps in case management contacts in only one of 15 reviewed charts.  This issue will be resolved provided this level of compliance continues for another monitoring period.

The provision of group therapy for 3CMS inmates increased.  Group therapy was available on all housing yards, except in the substance abuse program and the administrative segregation unit.  The number of offered groups grew from two to eight during the monitoring period, with a total of 49 3CMS inmates, or five percent of the 3CMS population, enrolled in the group activities.  Another 106 inmates were on the waiting list for group therapy.  Inmates, however, commonly complained about poor access to group therapy and reported waiting several months to be assigned to a group. The chapel was no longer being used for group therapy, and problems with the use of the hobby room limited available program space and restricted the provision of group

therapy. In addition, treatment plans did not consistently document consideration of group therapy at IDTT meetings.

Clinicians' access to inmates in the MHCB unit improved in some ways, although problems remained with custody coverage. Clinicians' contacts also appeared to occur in private, but visits with inmates were often delayed because custody escort officers continued to be assigned to perform other functions.

Inmates were routinely screened in a timely manner on placement in the new administrative segregation unit (ASU). According to institutional records, five 3CMS inmates were mistakenly placed in the unit during the first six months of 2004, and seven inmates, while in the unit, were referred to the 3CMS program. All 12 of these inmates were removed from the ASU as required within one day. During the same time period, 118 mental health referrals were filed by inmates or staff in the ASU. Chart reviews indicated that not all ASU inmates referred to mental health were seen within five working days as required. Psych tech referral tracking records, however, were sometimes incomplete.

The suicide prevention committee met monthly. Minutes from the meetings showed that the composition of the committee had improved; in particular, attendance by custody representatives was better, though still sporadic. The institution provided the monitor with information on interventions initiated by the committee in response to three suicides that occurred in administrative segregation during the preceding monitoring period. The committee reviewed each of these suicides from a systems perspective, identified common risk factors and cited the need for additional training for custody and mental health staffs. An audit required by HCSD in the

corrective action plan for one of the suicides to determine whether IDTT clinicians were reviewing inmates' C-files was not completed at the time of the monitor's visit, although it was well past the completion date set in the department's corrective plan.

Some improvement was noted in the provision of pre-release planning for paroling inmates. Training in pre-release discharge planning was provided to all case managers in January, with follow-up training in May. In February, the institution began providing case managers with a list of all inmates paroling in the next six months. According to the TCMP social worker, nearly all caseload inmates were contacted prior to their release. Documentation of TCMP contact with an inmate close to parole was found in one chart reviewed by the monitor for other purposes. Despite these positive developments, CSATF had not yet developed an audit tool to measure compliance in this area.

b. Non-Compliance

It was unclear whether inmates were seen in a timely manner for their initial assessments by a psychiatrist. The institution had not audited this issue and had not yet developed an audit tool to measure its compliance.

Treatment of inmates in the MHCB unit deteriorated somewhat. Inmates, regardless of their custody classifications, were inappropriately handcuffed with their hands behind their backs in the MHCB programming cells, even during recreational activities.

New Problem:

Records were frequently filed in a disorganized manner in inmate charts.

Institutional Summary:

Although vacancy rates among permanent staff were not insubstantial, contracting and departmental efforts to reduce the number of caseload inmates at CSATF enabled the institution to improve significantly the delivery of mental health services during the monitoring period.   Quality assurance efforts progressed, and once peer review was established, the facility would have a complete quality management package. In the management of medications, CSATF was further along than most CDC institutions.  Continuity of medications was improving rapidly in all areas; DOT and laboratory testing were fully implemented and close to compliance; medication consent forms were regularly filed in UHRs; parolees apparently received discharge medications; and a growing number of HS medications were appropriately administered. Documentation of psychiatric follow-up to medication non-compliance needed work. Mental health assessments in the disciplinary process, on the other hand, needed further work and more thorough documentation.  Timely transfers to EOP programs elsewhere and the DMH/APP at CMF occurred more regularly, though not without some recent delays in the latter.  The facility made no use of intermediate DMH programs. Meanwhile, the length of stays in the MHCB unit was somewhat reduced.

Four of the facility's CAP deficiencies were resolved during the monitoring period and there was considerable progress on a number of other CAP issues. The timeliness of initial intake assessments, the composition of IDTTs, the quality of treatment plans, the timeliness of psychiatric responses to referrals and activities of the suicide prevention committee all showed improvement.  Case management contacts with 3CMS inmates occurred more frequently, and increased amounts of group therapy were

provided to more 3CMS inmates. Access to MHCB inmates showed some improvement, pre-release discharge planning had gotten better and EOP inmates were seen weekly by a case manager. The institution needed to conduct audits in some areas not yet evaluated, including follow-up to medication non-compliance and the timeliness of initial assessments by psychiatrists.

The institution failed to demonstrate progress in only a few areas. The number and consistent availability of escort officers impacted adversely on programming in the MHCB unit, and, at times, all MHCB inmates, regardless of their custody level, were handcuffed with hands behind their backs while engaged in activities in the CTC programming room. Lastly, CSATF needed to make sure that routine mental health referrals out of the new ASU were responded to within five days.

Overall, CSATF made considerable progress toward implementation of its CAP during the monitoring period and clearly graduated from the ranks of CDC's most troubled institutions in respect to its mental health services.

### High Desert State Prison (HDSP)
April 6, 2004 – April 8, 2004

A few weeks prior to the monitor's visit, the capacity of the 3CMS program at HDSP reportedly was expanded from 649 inmates to 699 inmates. The facility's population of 3CMS inmates was 690 at the time of the monitor's visit. Although administrators indicated that HDSP had not yet received the additional staffing allocated to handle the increased caseload, the institution did acquire during the monitoring period new positions for a psychologist and two psych techs. The overall vacancy rate among mental health staff fell from 58 to 41 percent during the monitoring period.

Psychiatric vacancies continued to disrupt mental health services at HDSP. All of the institution's psychiatric positions, specifically for a chief psychiatrist and five staff psychiatrists, were unfilled, and numerous and largely short-term contract clinicians covered only about half of the six vacancies. The monitor also noted some slippage during the monitoring period in psychiatric coverage on weekends, holidays and after working hours. Vacant positions for three psychologists and two psych social workers were all filled by contractors. Two of three psych tech vacancies were expected to be filled during or shortly after the monitor's visit. In addition, the institution hired a chief psychologist without, apparently, a current allocation for the position, and two clerical workers during the monitoring period.

Auxiliary staffing improved somewhat. Vacancies among MTA, pharmacy and medical records staff were reduced, leaving openings for ten of 30 MTA positions, 2.9 of 29.9 nursing positions and one of six pharmacy positions.

Construction of the new ASU was completed during the monitoring period, and the unit was activated on June 14. As of July 12, 2004, the unit housed 128 inmates; no caseload inmates had been assigned to the unit, but six inmates had been referred to mental health since the unit opened. The institution appeared to have put adequate procedures in place for conducting daily rounds, completing mental health screenings and responding to mental health referrals, but it was impossible to confirm compliance with these procedures due to filing backlogs and data entry delays in the MHTS. Inmates confirmed the provision of daily psych tech rounds. Further monitoring of this unit was needed.

<u>Issue Resolved:</u>

Medications were delivered consistently to all buildings during all shifts.

<u>Quality Management Issues:</u>

HDSP appointed a psychologist to coordinate quality assurance activities and introduced some important and substantial changes in its quality assurance practices. The mental health quality assurance committee continued to meet monthly, and committee minutes reflected regular attendance by multidisciplinary representatives. The number of audits conducted by the institution increased during the monitoring period and, while some were poorly designed and unreliable, several well-structured studies employing an appropriate methodology were conducted. Some confusion about the QIT process and format remained, but the institution reported the creation of QITs on medication renewals, treatment planning, reception center processing, psychiatric responses to referrals and screening in administrative segregation. The institution continued to conduct peer review for psychologists and also began implementation during the monitoring period of a peer review process for a shrunken staff of contract psychiatrists. HDSP, however, made only limited use of its MHTS for quality assurance purposes, partly because some of the data captured in the system was inaccurate.

<u>Medication Issues:</u>

Continuity of medications appeared to improve for inmates arriving with verified medication orders, but continuity problems persisted for other inmates. The institution conducted three audits of medication continuity for newly arriving inmates, none of which was dispositive. Audits were either too small, failed to include any MHCB or administrative segregation inmates or made no distinction between inmates

arriving with verified medication orders and those with undocumented medication claims. Despite these limitations, all three audits concluded that arriving inmates generally received timely medication continuity orders, but that the administration of medication was sometimes delayed beyond 24 hours. The monitor conducted a review of 50 charts, representing approximately six percent of new arrivals during the monitoring period, and found that HDSP provided timely medication continuity orders for 75 percent of inmates arriving from other CDC prisons with valid medication orders. Inmates arriving with undocumented medication claims did not fare as well, and the institution seemed to lack procedures for handling such inmates. The monitor's chart review showed that while all but two of the reviewed inmates were referred to mental health, 43 percent of the referred inmates were not seen by a psychiatrist for more than two weeks and some were not seen for as long as two months. The monitor was unable to assess the timeliness of medication delivery because a substantial number of MARs were missing. At least six inmates, however, experienced medication gaps of more than 24 hours, suggesting some continuing deficiencies in this area.

       Continuity of medication on changes in housing location seemed to occur more regularly, but further improvement was needed. Medication administration procedures developed last year for inmates relocated within the facility were not always followed by custody officers. The institution conducted two flawed audits which, taken together, showed delays of one day in receiving medications in about 20 percent of housing moves, although performance was stronger for inmates transferred from the MHCB unit. The institution recently redesigned its audit tool and conducted further staff training in an effort to improve performance in this area.

The renewal of medication orders also occurred more routinely, but some problems with continuity of medication on renewal lingered. HDSP installed a computerized system that automatically filled current medication orders on a monthly basis, and appointments were generally scheduled with prescribing clinicians before medication renewal dates expired. The monitor's review of charts found few expired medications, and institutional audits indicated that 85 percent of medication orders were renewed prior to the medication expiration date whenever 14-day medication orders were involved. On the other hand, the monitor's chart review found poor continuity of medication where 30-day medication orders were involved. Institutional audits also indicated that 35 percent of reviewed charts contained no progress notes accompanying the renewal of medication orders.

Clinical follow-up to medication non-compliance appeared somewhat erratic. Some of the standards employed to define medication non-compliance seemed ambiguous and confusing but even when standards were clear, the monitor's review of MARs revealed many instances of non-compliance that were not referred to mental health. The monitor's chart reviews uncovered instances of delayed referrals, made well after three consecutive days of non-compliance. A review of the institution's referral log demonstrated that referrals were often, but not always, written for medication non-compliance and referrals were not always seen by clinicians in a timely manner. The referral log, which was poorly maintained and contained numerous blank spaces, reflected just 46 referrals for non-compliance during the first quarter of 2004. The monitor reviewed the data for 17 of these referrals and found that about half were seen within a week, while it took between one-and-a-half to two-and-a-half weeks to see most

of the others and more than three weeks to see a few of them. The monitor's broader

chart reviews identified 16 inmates who were referred for non-compliance. Up to a third

of these inmates were not seen for more than two weeks, with nine weeks being the

longest response time. As for MARS, a significant percentage was not filed in the

inmates' medical records, making it difficult to assess accurately the degree of this

problem.

Implementation of the new DOT procedures had just begun. It was not

clear how many inmates were identified as requiring DOT therapy. The institution's

status report indicated that DOT had been prescribed for five caseload inmates, but there

were several other lists of DOT candidates and another list which reflected nine caseload

inmates with DOT orders. According to the monitor's expert, the number of DOT

candidates appeared to be extremely low for the size of the mental health population at

HDSP. Institutional methods for identifying DOT candidates appeared weak, and no

mechanism existed for soliciting MTA and psych tech input into the DOT decision.

Moreover, the institution lacked a reliable means for ensuring that clinicians responsible

for ordering DOT medications received inmate histories of hoarding or overdosing.

One inmate at HDSP reportedly was on HS medications at the time of the

monitor's visit. The monitor's expert attributed the low number to the "chilling" need to

obtain the CMO's permission to prescribe HS medications, although the CMO at HDSP

reported being unaware of the need to review and approve all such prescriptions. This

issue, like DOT procedures, was one of several aspects of medication management not

covered fully or clearly in the facility's local operating policy enacting the recent

revisions to departmental policy on medications.

The distribution of parole medications remained troubled.  HDSP conducted several audits of this issue, all of which were methodologically inadequate. The results of the studies varied widely.  In one flawed audit, only three of 13 paroling inmates received their medications, while in a second, 62 percent of surveyed inmates received their medications.  Another list of inmates paroling during the first quarter of 2004 seemed to indicate that 82 percent of inmates received their appropriate medications on discharge.  Finally, a small study of 11 inmates transferred to other CDC institutions found that all of the inmates had been given their medications.  HDSP reportedly developed a new written policy and process for delivering parole medication, but no information on these described developments was provided to the monitor.

The institution did not routinely obtain informed medication consent forms.  Most of the charts reviewed by the monitor did not contain medication consent forms for all prescribed medications.  Moreover, the consent forms used by the institution were highly generic.

Appropriate laboratory blood-work was not always ordered or drawn for inmates on mood-stabilizing medications.  Review by psychiatrists of the results of laboratory tests was rarely documented, and chart reviews uncovered some abnormal test results that were not addressed at all.

Many of these failures in the effective management of medications stem directly from the inadequacy of psychiatric resources available at HDSP.  See the case reviews in Exhibit E, which confirm in specific instances many of the problems described here.

<u>Mental Health Assessments for the Disciplinary Process:</u>

HDSP seemed to be largely compliant with the new procedures for disciplinary proceedings involving seriously mentally disordered inmates, although some problems needed to be addressed. Custody officers and sergeants, for example, still had not received any training regarding the new disciplinary procedures. The administration inefficiently continued, contrary to the revised procedures, to direct mental health staff to review all infractions involving caseload inmates. As a result, 285 mental health assessment requests were completed from October through March 30, including assessments for minor infractions and rule violations unlikely to have been influenced by mental illness or the result of bizarre behavior.

The clinician responsible for completing disciplinary assessment requests still did not consistently review the accused inmates' charts and rarely, if ever, reviewed their C-files, but the same clinician did contact the inmates at cell-front and offered to meet in a more private setting if greater confidentiality was desired. An institutional audit found that twenty-five percent of reviewed mental health assessments were improperly completed. The monitor's chart reviews found the supportive narratives in some assessments inadequate and unlikely to have been useful to hearing officers. Further training in this area appeared necessary.

The percentage of infractions determined to have been affected potentially by mental illness increased from less than ten percent to 21 percent during the monitoring period. It appeared that hearing officers took mental health input into account more consistently in reaching their determinations. The log showed hearing officers dismissing or mitigating punishments in a significant number of cases in response to assessments.

The monitor's chart reviews also found two cases in which hearing officers reduced assessed penalties based on mental health information provided by the clinician.

Transfers:

Transfer data was still not entirely reliable or complete, and the institution provided several sources of information, some of which were inconsistent. Nevertheless, it appeared that the timeliness of EOP transfers improved slightly. Of 14 inmates transferred to appropriate EOP programs during the period from October 1 to March 31, the transfer of just three exceeded the 60-day deadline, with the longest taking 95 days. All four transfers from the administrative segregation unit were accomplished in a timely manner. Of nine EOP inmates awaiting transfer at the time of the monitor's visit, two had been waiting longer than 60 days. The institution, however, did not identify inmates in need of expedited transfers, and some supervisory staff thought that the expedited transfer process had been discontinued. The institution's priority transfer list contained a substantial number of errors and was highly unreliable. The timeliness of transfers out of the reception center also appeared to have improved. Only ten percent of 3CMS inmates remained in the reception center beyond 90 days, and transfers for these were delayed typically just a month or less.

Progress had also been made in transferring inmates in need of acute care to DMH's APP at CMF. The monitor sensed that clinicians were making referrals to DMH in a timelier manner. According to the institutional referral log, 32 inmates were referred to DMH/APP from October 7 to February 23. Of those referrals, seven were withdrawn, one was rejected and 24 resulted in transfers. The average length of time from referral to bed assignment was 7.4 days; the average length of time from referral to

transfer was 10.1 days, similar to the 9.8 days indicated in the monitor's preceding report, with a range of transfer delays from three to 21 days. Transfers typically occurred within 72 hours of a bed assignment. Indeed, the percentage of transfers delayed beyond 72 hours after receipt of a bed number declined during the monitoring period from 28 to nine percent. On the other hand, HDSP clinicians rarely sought access for caseload inmates to DMH intermediate care. Local clinicians made no referrals to ASH and only one referral to SVPP, which was subsequently rescinded. Psych and return procedures appeared to be working, and treatment continuity on return seemed adequate.

Lengths of stay in the MHCB unit decreased slightly during the monitoring period. Only about five percent of the 188 MHCB admissions from October 1 to March 30 remained in the unit longer than ten days for clinical reasons. The overall percentage of admissions remaining in the MHCB unit beyond ten days for both clinical and administrative reasons declined from 33 percent to 23 percent. The percentage of extended stays involving delayed transfers to DMH, EOP programs or other CDC institutions remained about the same as during the preceding monitoring period, 80 percent. The longest stay in the MHCB unit during the monitoring period was 30 days. According to a staff summary, there were only six inmates with multiple admissions to the MHCB unit, a relatively small number. Taken together, the reduced lengths of stay and decreased number of repeat admissions to the MHCB unit suggested that inmates were being identified and transferred appropriately to higher levels of care.

Other CAP Issues:

    a. Partial Compliance

    The timeliness of initial IDTT meetings and initial treatment plans improved during the monitoring period. An institutional audit of 55 charts indicated that 90 percent of arriving 3CMS inmates received an initial IDTT and MH-2 within 14 working days.

    Clinicians' access to inmates for clinical services improved, with only a small portion of missed appointments attributable to custody-related reasons. During the months of December and January, inmates missed 18 percent of all mental health appointments, but only four percent of the 656 missed appointments resulted from lockdowns, lack of escorts or other custody issues. Most missed appointments were the result of transfers, inmate refusals and rescheduled appointments.

    The amount of participation of 3CMS inmates in group therapy did not change much during the monitoring period. Only 50 3CMS inmates received any group therapy, some six percent of the caseload population. Just six groups were offered at HDSP, but groups were conducted on every yard. Importantly, the need for group therapy was considered regularly at IDTT meetings. According to the institution, 54 inmates were on a waiting list for group therapy. Information on the percentage of cancelled groups was not provided.

    Treatment services for MHCB inmates improved. An institutional audit indicated that admission notes were completed within 24 hours of arrival; treatment plans and IDTT meetings were completed within 72 hours of admission; discharge planning was generally conducted; and treatment plans were updated every seven days. Inmates

were not discharged on Fridays or weekends, and case managers were notified when inmates were released from the MHCB unit. On the other hand, suicide risk assessments were still not regularly completed on admission or discharge, and daily psychiatric contacts were not documented adequately.

The frequency of case management and psych tech contacts in administrative segregation appeared to have increased. Psych tech rounds were consistently documented, and weekly psych tech summaries were found in eight of ten charts audited by the institution. Most missing summaries were from inmates' first week in the administrative segregation unit, suggesting problems with identifying caseload inmates on arrival. According to the institutional audit, weekly case managers' progress notes were found in seven of ten audited charts. An institutional audit of ten percent of all administrative segregation inmates found that 83 percent received an appropriate screening. In contrast to these positive studies, the monitor's review of a handful of inmate histories showed that case management and psych tech contacts occurred less frequently than the institutional audits indicated and many case management contacts continue to occur at cell-front.

Suicide prevention follow-up continued to be strong. The MHCB log showed 93-percent compliance with five-day clinical follow-up for suicidal inmates discharged from the unit. An institutional audit reported 70-percent compliance with custody follow-up but, in a ten-chart review, the institution found 95.7 percent compliance with requirements for custody follow-up. The emergency response review committee, which reviews suicide attempts among other emergencies, had not met in

almost four months.  One completed suicide occurred at HDSP during the monitoring period.

Some improvement was noted in the provision of pre-release services for paroling inmates.  The institution was in the process of obtaining lists of paroling inmates and developing a system for tracking the frequency and timeliness of TCMP contacts. According to the institution's status report, many TCMP contacts occurred, but were not properly documented.  Moreover, it appeared that the list of paroling inmates maintained by the department was not entirely reliable.  The institution indicated that inmates who did not receive a TCMP contact would be seen by HDSP staff, but no documentation was provided to confirm this.

Access to inmate records during clinical contacts continued to improve. An institutional audit for January and February found that inmate charts were available for 93 percent of all mainline IDTT meetings.  A second audit for a one-week period in March indicated that UHRs were available for 96 percent of all scheduled mental health appointments.

The MHTS improved slightly, and management compliance reports were completed weekly to assess the degree of compliance in multiple areas.  There were, however, problems with a number of the reports generated by the MHTS, particularly with the tracking of referrals.  A concordance study was needed to determine the reliability of MHTS data for audits.

b.  Non-compliance

The timeliness of initial mental health assessments was poor.  An institutional audit of 55 3CMS charts in January found that only 42 percent of arriving

inmates received an initial mental health assessment within five working days, as compared with 65 percent during the preceding monitoring period.

The timeliness of psychiatric responses to referrals declined during the monitoring period. According to the institutional referral log, only one-third of 215 referrals in February received a timely response within five days, while 51 percent of February referrals, compared with 62 percent during the preceding monitoring period, were seen within ten days. A second study looked at 749 referrals and found that it took more than two weeks to see 37 percent of referred inmates, while some inmates were seen as much as three months later or not at all. The average referral response time was 11.2 days. Approximately 28 percent of referrals took more than two days to reach mental health, with typical referral delays ranging from three days to two weeks. Some requests took more than a month to arrive, and delays were particularly problematic for inmate self-referrals. The institution only recently began to track responses to emergency and urgent referrals.

There were some indications that treatment services for EOP inmates awaiting transfer, an issue resolved earlier, might be re-emerging. The UHRs of the two EOP inmates at HDSP in February indicated that one received no case management contacts, while the other received only nine out of 15 possible weekly contacts. The number of EOP inmates at HDSP recently increased to nine. The monitor reviewed the charts of current EOP inmates and found case management contacts erratic. About half of the inmates received timely case management contacts, while the rest experienced delays as long as a month or were not seen at all.

The composition of IDTT meetings continued to be problematic, due largely to chronic psychiatric vacancies and insufficient contract coverage.  Institutional audits showed that psychiatric attendance at IDTT meetings declined even further during the monitoring period from 54 to only 13 percent.  Attendance by members of other disciplines, including correctional counselors, was over 90 percent in the audits.  Similarly, psychiatrists were present for less than ten percent of IDTT meetings in administrative segregation.

Initial IDTT meetings and treatment plans were often untimely for administrative segregation inmates, due largely to problems with identifying new caseload inmates in the unit.  According to an institutional audit, none of the initial IDTT meetings in administrative segregation was held prior to initial ICC hearings as required by CDC policy.  On the other hand, the same audit found 100 percent compliance with quarterly updates.

Institutional Summary:

Overall mental health staffing improved marginally, but chronic shortages of both permanent and contracted psychiatrists continued, with considerable negative impact on the provision of some vital mental health services.  Heavy use of contract clinicians covered most case manager vacancies, but also caused some continuity problems.

HDSP's quality management efforts showed progress with the appointment of a coordinator, regular meetings of the Quality Management Committee, a healthy number of QITs and the development of peer review.  The imperfect methodology of some QIT audits produced unreliable results, and the MHTS was still not

accurate enough to contribute greatly to the institution's quality assurance process. The process for providing mental health input into disciplinary decisions affecting seriously mentally disordered inmates was largely compliant, although the institution applied the process mistakenly to all RVRs involving MHSDS inmates, resulting in a significant number of incomplete or skimpy assessments. Hearing officers considered the assessments, sometimes accepted the clinical input and mitigated charges and sanctions accordingly. While the data provided on transfers was sometimes unreliable, the timeliness of transfers of EOP inmates elsewhere and 3CMS inmates out of reception seemed to improve. During the monitoring period, HDSP had good access to DMH/APP, made no referrals to ASH and rescinded its only SVPP referral.

The delivery and management of medications remained an as yet unmet challenge for HDSP throughout the monitoring period. There was some improvement in the continuity of medications on arrival and changes in location within the facility, but even here the data provided was, at best, uncertain, and the maintenance of MARs was so poor, it was nearly impossible to confirm audit findings. Meanwhile, newly implemented DOT procedures were lagging; follow-up to medication non-compliance was erratic; problems with the provision of parole medications persisted; medication informed consent forms were often missing from UHRs; HS medications were largely unavailable in the institution; and laboratory work for inmates on mood-stabilizing medications was often not ordered or conducted, while results often were neither recorded nor responded to by psychiatrists when abnormalities were identified. The management of medications is preeminently the responsibility of psychiatrists, and HDSP's inability to hire and keep

permanent or contracted psychiatrists left its management of medications in dysfunctional disarray.

As for its CAP, HDSP resolved its problem with missed medication deliveries, the first CAP item to be resolved in three monitoring periods. The institution also made progress in some other areas, including lengths of stay in, and multiple admissions to, the MHCB unit, the timeliness of initial IDTT meetings and treatment plans, clinical access to inmates, frequency of case management and psych tech contacts with caseload inmates in administrative segregation, suicide prevention follow-up, pre-release services and clinical access to inmates' UHRs. The new ASU opened during the monitoring period, and appropriate protocols for the exclusion of MHSDS inmates appeared to have been implemented there. While group therapy was provided for some 3CMS inmates, its availability was limited. Finally, the MHTS showed continuing improvement, but problems with the reliability of underlying data made it difficult to determine compliance accurately in some areas.

Despite these positive developments, chronic psychiatric vacancies contributed importantly to several persistent problems, including infrequent psychiatric participation in IDTT meetings, the timeliness of psychiatric response to referrals and the overall management of medications, as enumerated above. The timely responsiveness of the mental health referral process at HDSP, in particular, needed much work. The timeliness of initial mental health assessments remained poor, as well as of initial IDTT meetings and treatment plans for administrative segregation inmates. Some indices of problems with the provision of treatment services for EOP inmates awaiting transfers re-emerged.

Institutional and departmental administrators need to analyze HDSP's incapacity to attract and retain psychiatrists. The experience of PBSP suggests that physical isolation is not an insuperable barrier to the successful recruitment and retention of mental health clinicians. Moreover, the problem at HDSP seemed largely confined to psychiatrists; the facility seemed able, at least, to procure adequate contract case managers to cover permanent vacancies. There is unlikely to be much further improvement in mental health care at HDSP in the continued absence of adequate psychiatric services.

### Richard J. Donovan Correctional Facility (RJD)
July 12, 2004 – July 14, 2004

As of June 28, 2004, 16 new mental health positions were approved and funded at RJD though most of these new slots were as yet unfilled. Between newly allocated and unfilled positions and existing vacancies, RJD had vacant positions for five psychiatrists, 4.4 senior psychologists, 5.5 staff psychologists, 8.56 psych techs, four recreational therapists and 7.3 office techs. The institution was converting 1.5 of its vacant psychiatrist openings into a single position for a supervising psychiatrist, but the conversion had not yet been finalized. The overall mental health staff vacancy rate was 20 percent. The morale of clinical staff was low and, at times, appeared to affect the provision of care negatively.

Contracted clinicians covered all psychiatrist vacancies, but it was difficult to determine the adequacy of the contracted case manager services, because it was unclear how long individual case manager positions were vacant. The institution utilized a substantial amount of contracted case manager time, ranging from 445 to 971 hours a

month from January through May.  Contracted coverage for psych tech vacancies was

inadequate, and vacant recreational therapist positions were not covered at all with

contracted services.

Auxiliary staffing remained generally adequate, although RJD had

difficulty retaining nurses; as in the preceding monitoring round, 5.5 of 12.5 R.N.

positions were vacant.

Quality Management Issues:

The quality assurance process at RJD continued to mature.  The quality

management committee and the mental health quality management subcommittee met

regularly.  Minutes of meetings were maintained and reflected some problems with the

participation of required members.  A variety of QITs were formed to address deficient

CAP items.  The institution conducted chart reviews related to a number of CAP issues,

but the quality of the audits conducted varied.  Peer review for both psychiatrists and

psychologists continued to occur.

Implementation of the MHTS progressed, but the system remained

significantly less developed than at other CDC facilities.  The department provided staff

at RJD with additional training in tracking procedures during the monitoring period.  A

fourth office tech was hired, improving data entry for the system; data entry was

reportedly only four days behind, compared with 20 to 30 days at the time of the

preceding monitoring visit.  Despite these efforts, the system was still not used to

schedule psychiatric visits or to track mental health referrals.  Moreover, RJD had yet to

perform an audit or concordance study of its MHTS.  Nor was its software able to track

MHCB admissions and discharges.  A QIT recommended hiring a fifth office tech to help remedy some of these problems.

Medication Issues:

The medication management process at RJD was marked by inadequate prescription practices, ineffective medication administration and poor follow-up.  The institution had not yet fully implemented its new local operating procedure for medication management, and the documentation of medication practices was generally insufficient.  The institution had chartered just one QIT to address almost all of its different medication management issues.

Continuity of medication remained relatively unchanged, and some inmates experienced gaps in medication.  An institutional audit found that 20 percent of inmates arriving at RJD did not receive their medications within 24 hours.  Similarly, 20 percent of MHCB inmates did not receive their medications in a timely manner on discharge from the MHCB unit.  Interruptions in continuity of medication on other intra-facility transfers occurred in 25 percent of surveyed cases.

Medication continuity on the renewal of orders also remained sometimes problematic.  An institutional audit found that medications were renewed in a timely manner 83 to 100 percent of the time, depending upon the housing area.  The size of the audit sample was too small to represent a reliable assessment of compliance on the issue.

The institution did not audit follow-up practices for medication non-compliance.  The monitor's chart review, however, found inconsistent tracking of and erratic responses to medication non-compliance.

Laboratory testing for inmates on mood-stabilizing medications also remained largely unchanged since the last monitoring period. An institutional audit found laboratory results for 85 to 88 percent of inmates on lithium, while the sample of audited inmates on carbamazepine was too small to permit a valid assessment.

The institution reported inadequate implementation of DOT practices. Supervisory staff observed the distribution of nurse-administered and DOT medications on the yard in Facility I on June 28, and found that two-thirds of inmates scheduled for DOT medications did not receive the requisite DOT. The audit, while small, also revealed a problem with the identification of Keyhea inmates by means of MARs during the distribution of medications.

Problems with pill lines continued. The same supervisory audit of Facility I pill line on June 28 found that waits ranged acceptably from 13 to 36 minutes. Upon further review, however, these results appeared uncharacteristic when compared with other yards where pill lines apparently continued to be excessively long. Inmates and staff reported that pill lines took up to an hour in some housing units, and some lines were discontinued prematurely because MTAs had to leave for other assigned duties. EOP inmates in Facility I received their medication in the housing unit, thereby reducing pill line waiting times in that yard.

The provision of HS medications improved significantly. Staff reported that approximately 600 inmates were prescribed HS medication, a dramatic increase since the last monitoring report when HS medications had been ordered for less than ten. Charts indicated that HS medications were not consistently administered at 8:00 p.m.

According to an institutional audit, 32 percent of inmates on HS medications received their medications beginning at 7:00 p.m.

Informed medication consent forms were not consistently filed in inmates' charts, although some improvement was noted.  An institutional audit indicated that medication consent forms less than a year old were present in 64 percent of reviewed charts, compared with 55 percent during the preceding monitoring round.   A second audit found treatment refusal forms in 50 percent of audited charts.

Mental Health Assessment for the Disciplinary Process:

The new mental health assessment process for the disciplinary procedure went into effect at RJD in May 2003, and both mental health and custody staff were trained in the new procedures.  During the first six months of 2004, 146 RVRs for caseload inmates, including 130 EOP and 16 3CMS inmates, were identified as requiring a mental health assessment under the revised procedure.

RJD maintained a comprehensive disciplinary log that contained all relevant information, except that it sometimes failed to record the effect of mental health assessments on dispositions.  All EOP inmates charged with disciplinary infractions and 13 3CMS inmates actually received mental health assessments.  These assessments were fully and adequately completed, and some hearing officers utilized the mental health information provided in assessments in making their decisions.  Based on the disciplinary log and on the monitor's review of RVRs, nine cases were found in which hearing officers' decisions were influenced by mental health assessments.  In a few additional cases, the chief disciplinary officer, after a review of the case and the provided mental health assessment, mitigated punishments imposed by hearing officers.

Transfers:

RJD did not have a local operating procedure governing transfers to a higher level of care; instead, the institution reportedly followed applicable memorandums of understanding between CDC and DMH. The institution provided clinicians with an information sheet listing the names and purpose of all DMH programs, the admission criteria for each, a contact person and other relevant data. The institution also maintained a transfer log, but the log did not always contain all required information, missing in some cases the date of endorsement, reasons for rejection or the date of actual transfer.

Referrals to ASH reportedly slowed slightly in months preceding the monitor's visit, in part because few clinicians remained at RJD who had been trained to prepare application packets for ASH. Clinicians in the MHCB unit reported making no referrals to acute inpatient DMH care during the preceding six months. Delays in processing inmates for ASH transfers were also attributed to staffing shortages. A significant number of inmates reportedly were returned to RJD from DMH programs without discharge summaries, while some of the discharge summaries provided were too dated to be useful by the time the returned inmates actually got to RJD.

The percentage of inmates with multiple admissions to the MHCB unit remained low, just three percent of the admissions between December and the end of May. The institution apparently did not yet identify inmates with three or more admissions to the MHCB for possible referral to inpatient DMH care.

The percentage of inmates remaining in the MHCB unit longer than ten days declined, but a significant number of discharges continued to be delayed for administrative reasons. An institutional audit indicated that 19 percent of admissions to

the MHCB unit from December through May had lengths of stay greater than ten days, with the average length of stay being seven days. The number of inmates with extended stays in the MHCB unit at the time of the monitor's visit was high; five of the ten MHCB inmates in the unit had been in the unit longer than ten days, with stays ranging from 12 to 67 days.

The percentage of 3CMS inmates remaining in the reception center for longer than 90 days was erratic and increased during part of the monitoring period. Institutional data in February indicated that the percentage of stays in reception of more than 90 days for 3CMS inmates increased to 31 percent, up from the 15 percent reported in the preceding monitoring period, although June data reflected the rate of delayed transfers declining back to 17 percent. The percentage of EOP inmates remaining in reception longer than 60 days increased slightly, from 31 percent to 35 percent in February and back to 32 percent in June.

Other CAP Issues:

a. Partial Compliance

The frequency of case management contacts with 3CMS inmates seemed to improve slightly in the three months preceding the monitor's visit, but compliance varied depending on the housing location. An institutional chart audit indicated that 40 to 90 percent of audited 3CMS inmates were seen quarterly by their case managers. The lowest compliance rate was attributed to staffing changes and space limitations on Yard III.

A QIT was chartered to address problems with the identification and management of decompensating EOP inmates. Case managers reportedly received

quarterly training in Keyhea orders and referrals to DMH.  Chart reviews, however, found that decompensating EOP inmates were rarely referred for a Keyhea order or transfer to DMH.  See, for example, case reviews 9, 10, 11, 13, 17 and 18 in Exhibit F. Referrals to the MHCB unit, on the other hand, seemed to occur as appropriate.

RJD utilized extensive overtime to bring UHRs up to date in the weeks preceding the monitor's visit.  Filing backlogs were characteristic at RJD, but efforts to reduce or eliminate backlogs were regularly mounted in anticipation of monitoring visits. The monitor's review of charts made clear that UHRs were extremely disorganized.  In addition, the proper filing of MHCB notes in inmates' UHRs continued to lag.  A small institutional audit of seven charts of inmates discharged from the MHCB unit found MHCB notes in just three UHRs.  The institution needed to develop and maintain a consistent process for filing clinical materials in inmates' UHRs, rather than continue their episodic spurts of compliance on the eve of each monitoring visit.

b.  Non-Compliance

Mental health evaluations and IDTT meetings for 3CMS inmates were not conducted in a timely manner on arrival at the institution.  A small institutional audit of 25 charts on three RDJ housing yards found that MH-4s were not completed within five days for any of the audited inmates.  Similarly, IDTT meetings and MH-2s were completed within 14 days of entry for zero to 31 percent of audited inmates, depending on the yard.

The amount of structured therapeutic activities offered to EOP general population inmates remained inadequate.  An institutional audit of charts of 21 EOP inmates during randomly selected weeks from December through April found that the

surveyed inmates were offered an average of 2.8 hours of structured therapeutic activities weekly, with a range of 0.6 to 6.1 hours of therapy per inmate.  All group therapy ceased operating from November through February due to staffing vacancies and high caseloads.

The provision of structured therapeutic activities for EOP inmates in administrative segregation regressed significantly during the monitoring period.  An institutional audit found that EOP inmates in administrative segregation were either offered or received a weekly average of 1.5 hours of structured therapeutic activities weekly, compared with 9.9 hours offered and 4.5 hours received weekly during the preceding monitoring period.  No structured therapeutic activities were offered to EOP inmates housed in the overflow administrative segregation unit due to a lack of holding cells in the unit.

EOP treatment plans were not always completed in a timely manner.  Institutional audits based on the MHTS indicated that 28 percent of treatment plans for EOP inmates were not completed within 14 days.  This was virtually identical with the non-compliance rate reported in the preceding monitoring period.  As in the past, the monitor's chart review found a number of untimely treatment plans, including charts without a current treatment plan being prepared in the last six months.  The timeliness of IDTT meetings for EOP inmates was also erratic.  According to an institutional MHTS audit for randomly selected days in January through May, 67 to 96 percent of IDTT meetings were held within fourteen calendar days.  Chart reviews for a similar period of time found a slightly lower level of compliance, ranging from 56 to 89 percent.  Treatment plans for EOP inmates were frequently generic, listing, for example, all groups in the EOP program schedule, rather than specifying which groups were appropriate for

the particular individual.  Treatment plans did not consistently reflect consideration by

clinicians of referrals to higher levels of care.  Based on chart reviews and interviews, it

appeared unlikely to the monitor that audits based on MHTS data were reliable prior to

April 2004.

        The provision of weekly case management contacts with caseload inmates

in administrative segregation was inadequate.  EOP inmates reportedly were transferred

from overflow units in the reception center to the main administrative segregation

building within a few days, but some inmates in the main segregation unit was not seen

weekly by a case manager.  Institutional audits indicated that 77 percent of EOP inmates

and 74 percent of 3CMS inmates in administrative segregation received weekly case

management contacts.  Staff reported that approximately two-thirds of contacts with

3CMS inmates occurred at cell-front.

        The availability of health records during clinical contacts, an issue

resolved in an earlier monitoring period, seemed to deteriorate.  An institutional audit

indicated that health records were available for 84 percent of clinical visits, but the audit

surveyed the issue during only one week in the monitoring period.  The monitor's chart

reviews and staff reports indicated that the availability of charts during clinical contacts

was considerably worse than the sole weekly audit suggested.

        Problems with heat cards, another matter previously resolved, also

resurfaced.  RJD acknowledged that inmates on heat-sensitive medications had not been

provided with heat cards recently.  In addition, the monitor found some other heat plan

deficiencies when touring housing units.  The availability of heat lists varied depending

on the housing unit; ventilation was reportedly inadequate in one housing area; and the

placement of fans and thermometers was inadequate in another housing unit. It was apparent to the monitor that staff needed some additional re-training on the heat plan.

New Problem:

> Suicide risk assessments were not generally completed for inmates admitted to the MHCB unit nor were the new suicide risk assessment forms completed properly for inmates discharged from the MHCB unit.

Institutional Summary:

The number of mental health positions allocated to RJD increased significantly during the monitoring period, few of which the institution had yet filled. Meanwhile, staffing turn-over and vacancies resulted in high individual caseloads for some clinicians with adverse impact on the quality of care provided to mental health inmates.

The quality assurance process improved, but implementation of the institution's MHTS remained incomplete and an impediment to further progress in some areas. Implementation of the mental health assessment process in discipline, on the other hand, was nearly complete, and the process seemed to be functioning reasonably well. Access to ASH was adequate, but staff familiarity with the referral process appeared to be fading due to staff turn-over, and access to other DMH programs seemed somewhat disorganized. Movement of caseload inmates out of reception fluctuated during the monitoring period but was not much different overall than during the preceding monitoring period.

The institution's administration and management of medications advanced only marginally during the monitoring period. Continuity of care on arrival, internal relocation and medication renewal showed little or no improvement, as did follow-up to

medication non-compliance, DOT, pill lines and laboratory testing.  Medication consent forms were often absent from UHRs.  The one bright spot was the reported sharply increasing use of HS medications.

No new CAP deficiencies were resolved during the monitoring period, and progress in other areas was limited.    Some improvement was noted in the frequency of case management contacts with 3CMS inmates, efforts to identify and manage decompensating EOP inmates and, at least just prior to the monitor's visit, reduction of backlogs in the filing of materials in inmates' UHRs.  Inmate charts were more current, but still disorganized, and no longer likely to be as available for clinical contacts as they used to be.  The program aspects of the institution's EOP suffered significant set-backs in both general population and administrative segregation, as the provision of structured therapeutic activities came to a standstill during a significant portion of the monitoring period.  See, for example, case reviews 4, 13, 16 to 24 and 26 to 29 in Exhibit F for concrete examples of the general decline of RJD's EOP.  Case management contacts with caseload inmates, both EOP and 3CMS, were often missed in administrative segregation, while the timeliness and quality of treatment plans also seemed to decline.  These are all basic elements of mental health care for important elements of the caseload population and their contraction represented a challenge to the very integrity of mental health services in the facility.

### Salinas Valley State Prison (SVSP)

May 18, 2004 – May 21, 2004

SVSP continued to experience chronic psychiatric vacancies and high turnover among other mental health disciplines.  The vacancy rate among permanent

mental health staff increased during the monitoring period from 37 to 40 percent. Positions for a chief psychiatrist, 5.5 staff psychiatrists, three psychologists, two psych social workers, a senior psych tech, five psych techs, 2.5 recreational therapists and 1.1 office techs were vacant. The staffing statistics provided monthly by HCSD reflected considerably fewer mid-May vacancies than reported by the institution.

Contract coverage during the monitoring period was inadequate. Contracted psychiatrists provided services equivalent to roughly 1.5 to two full-time clinicians monthly. Contracted clinicians covered 3.2 psychologist and 3.7 psych tech vacancies. SVSP lost all three of its contracted recreational therapists in March after an inmate attacked one of the therapists, causing a sharp decline immediately in offerings of recreational therapy. Overall, contract clinicians covered less than half of vacant positions among mental health staff. Case managers' caseloads in the general population 3CMS program averaged about 140 inmates. Staff complained about high turnover among clinicians and the discontinuity of care associated with the employment of contractors unfamiliar with the institution.

Auxiliary staffing changed little during the monitoring period. Seven of 24.6 registered nursing positions and eight of 28 MTA positions were vacant, but almost all of the vacancies were covered by registry contractors.

Staffing shortages were compounded by increases in the rated capacity of SVSP's mental health programs. Capacity in the overall EOP rose to 192 inmates, with an expansion of the EOP administrative segregation hub unit to 45 inmates, while the capacity of the 3CMS general population program rose from 799 to 949 inmates. SVSP received additional allocations of staff as a result of the population increases, including a

psychiatrist and three psychologists, but supervisors at SVSP maintained that the additional allocations were unequal to the increases, particularly in regard to case managers.

The composition of the caseload population at SVSP also shifted somewhat during the monitoring period, placing greater demands on mental health staff. The sensitive-needs population in A-Yard increased, resulting in heightened tensions among gangs and mounting pressure to find other housing for vulnerable inmates. Some 3CMS inmates in the sensitive-needs yard were moved to the EOP program pending transfer to sensitive-needs housing in MCSP. Inmates in need of tighter security replaced inmates with lower custody needs in the EOP program. These changes in the make-up of the population caused increasing custody-related interruptions in mental health programming, resulting, in turn, in more missed appointments and cancellations of therapeutic activities and fewer case management contacts.

Issues Resolved:

An inmate's need for group therapy was regularly considered during IDTT meetings for 3CMS inmates.

Medication change orders were generally accompanied by a documented rationale.

SVSP complied with suicide prevention mandates, including suicide follow-up procedures for inmates discharged from the MHCB unit.

The institution had an adequate system for documenting requested transfers to higher levels of care.

Quality Management Issues:

The quality assurance process progressed slowly. The mental health quality assurance committee met regularly during the monitoring period, but there was

little follow-up from one month to another regarding problems raised at committee meetings.

The QIT process was floundering. QIT charters were often vague or confusing. The institution listed 22 QITs chartered between January 15 and April 13, but many of these were eventually merged, even though the issues scheduled for examination seemed at times quite disparate; some others were not truly QITs at all. Of all the quality improvement teams formed, only five were regarded as still active at the time of the monitor's visit, , and some of these, like the QIT on programming space, had actually disbanded, leaving behind a sole administrator to handle the matter without input from the original team members. QITs were frequently disorganized, and some were abandoned quickly without generating any findings. The minutes of meetings of the quality assurance committee did not regularly record discussions of QIT reports. The senior psychologist, however, did conduct an excellent and accurate study of the QIT process, but the rest of the institution's mental health leadership seemed to understand the QIT process only poorly.

There was no evidence of peer review, and the facility did not conduct required monthly reviews of charts.

Implementation of the MHTS remained problematic. An institutional audit for October through March found a discordance rate of 29 percent, nearly a third, between entries in inmates' charts and their mental health histories in the MHTS. A recent computer malfunction reflected some further deficiencies in the MHTS and resulted in the loss of some important data.

Medication Issues:

The management of medications was replete with problems.  Continuity of medication on arrival worsened during the monitoring period.  An institutional audit revealed a sharp increase in the percentage of newly arriving inmates who experienced interruptions of medication in excess of 24 hours.  During the preceding monitoring period, SVSP reported that 84 percent of inmates received their first dose of medication within 24 hours of arrival, but an institutional audit for the period from October to March found that, on average, just 61.67 percent of inmates received their medication within a day of arrival.  The percentage of inmates whose medications were not delivered during their first 48 hours in the facility also rose from eight to 22.5 percent during the monitoring period.  Large caseloads, frequent changes in psychiatrists, the failure of custody staff to follow relevant operating procedures and the pharmacy's unwillingness to honor medication orders from other CDC institutions all contributed to the problem.

Continuity of medication for inmates changing housing locations within SVSP also declined.  Institutional audits for January through March indicated that only 72 percent of inmates received their medication within 24 hours of their relocation.  Continuity was a particular problem for inmates discharged from the MHCB unit, with only 67.5 percent receiving their first dose of medication within 24 hours of discharge and 20 percent experiencing medication gaps of more than 48 hours.  There was also considerable evidence of medications expiring at the time of their scheduled renewal.

The extent to which the institution had implemented follow-up procedures for medication non-compliance was unclear.  Staff reported that MTAs followed established operating procedures, and psychiatrists acknowledged that some inmates,

who failed to comply with their medications, were referred, but the institution had not yet conducted an audit to assess the extent of compliance relative to this issue. An institutional audit, however, revealed frequently missing MARs, raising some doubts about the potential reliability of future audits.

Psychiatrists continued to renew prescriptions for some inmates without seeing them. An institutional audit of 219 inmates on psychotropic medications from October through December indicated that 54 percent of renewals were accompanied by a progress note dated within 48 hours of the renewal, compared with 78 percent of renewals during the preceding monitoring period. This figure fell to approximately 48 percent among 161 inmates audited from January through March. The audits showed a number of other problems with the process for renewing medication orders, attributed largely to inconsistent psychiatric coverage. Staff reported that some entire housing yards lacked psychiatric coverage during significant portions of the monitoring period. In March, the institution launched a pilot project that was expected to improve performance in this and other related areas by assigning psych techs to help coordinate psychiatrist lines in three locations. The monitor's expert found that some psychiatrists apparently entered discontinuation orders for inmates who refused medication without seeing them, even though no MARs with signed refusals were in the inmates' charts. The expert also found a large pile of such orders awaiting a psychiatrist's signature.

There appeared to be problems with the provision of pre-release medication to paroling inmates. Institutional data from April indicated that among 32 paroling inmates, who should have received medication, just 15 received their medications at the time of their discharge. No log was maintained by the institution to

track whether inmates received their medications, and no documentation on the distribution of pre-release medication was filed in inmates' UHRs.

Compliance with requirements for laboratory blood-work declined marginally during the monitoring period. An institutional audit for October through March found that laboratory tests were ordered for 80 percent of inmates on mood-stabilizing medications, as compared with 88 percent during the preceding monitoring period. The results of laboratory tests were found in the UHRs of 81 percent of inmates for whom tests were ordered, but the absence of test results probably reflected in large part inmates' refusal to have their blood drawn. The percentage of abnormal test results dramatically increased from 17 percent to 49 percent. Follow-up psychiatric progress notes related to laboratory testing were found in only 40 percent of the audited UHRs.

The provision of HS medications improved. HS medications formerly were prescribed only for EOP inmates, but psychiatrists began prescribing them for 3CMS inmates in May, when operating procedures for the delivery of HS medications were approved. Approximately 140 inmates received HS psychotropic medications as of May 19.

The institution's CAP reported that psychiatrists prescribed DOT for almost all medications, but procedures for the administration of DOT in the department's recently revised medication policy had not yet been implemented in SVSP.

The percentage of inmate charts with medication consent forms declined again during the monitoring period. An institutional audit for October through December found medication consent forms in 47 percent of audited charts, compared with 69 percent during the preceding monitoring period and 80 percent two periods ago. A

second institutional audit from January thorough March reflected a further decline to 40 percent.

Mental Health Assessments for the Disciplinary Process:

Documentation of the new rule violation process was inadequate. The institution maintained two separate tracking logs, neither of which captured all relevant information. Institutional data on the process was unwieldy, often contradictory and difficult to verify. According to the logs, rule violation reports were issued to 533 MHSDS caseload inmates during the monitoring period, representing approximately 32 percent of all RVRs written in the institution. All 106 EOP inmates receiving RVRs reportedly were referred for mental health assessments, but this information could not be confirmed from a review of the logs. Several EOP inmates, identified in the institutional data as receiving RVRs, were not listed in the tracking data, and it was difficult to determine whether the absence reflected incomplete tracking or a missed assessment. In addition, the monitor's chart review for other purposes turned up one EOP inmate with a RVR, who did not receive a mental health assessment.

Less than five percent of 3CMS inmates receiving RVRs were referred for mental health assessments. The monitor found several inmates, not listed as receiving a mental health assessment, who actually did receive one, raising some question about the reliability of institutional data on the issue. The monitor's review of records also found that some inmates, who received RVRs involving self-injurious behavior, were not referred to mental health in violation of the department's policy on the issue.

The timeliness of mental health assessments was unclear, since the institution's tracking data did not reflect inmates' levels of care, which impacted on the

139

timelines for preparation of assessments. Among 124 assessments completed from October through March, 11 took more than the ten-day limit for 3CMS inmates to complete, and three took more than the 20-day limit for EOP inmates. The tracking log also indicated that four mental health assessments were never submitted, four were classified as "lost" and six were designated, "no comp." (sic).

The monitor's review of all available mental health assessments completed during the monitoring period found many that were confusing or incomplete. Many did not provide information that appeared potentially helpful to hearing officers. Some assessments, for example, concluded that mental disorders affected inmates' behavior without explaining how or why. Others were clearly not connected at all to the behavior or conduct in question. Some clinicians involved in preparing the assessments lacked a clear and accurate understanding of the role of the mental health assessments in the disciplinary process.

Hearing officers appeared to take mental health assessments into consideration in many, but not all, cases. An institutional audit for the period from October through December found that hearing officers documented their consideration of mental health assessments in 80 percent of all their findings and 80 percent of dispositions for EOP inmates. A second audit of assessments for January through March found a decline in documentation to 60 percent of findings and 70 percent of dispositions. The monitor examined ten completed rule violation packets, in which the assessment concluded that mental health was a factor in the inmates' behavior, and found that hearing officers documented consideration of the mental health input in six of their findings and five of the dispositions. On the other hand, the monitor found several cases

where hearing officers dismissed charges or mitigated punishments for inmates after taking mental health assessments into consideration.

Transfers:

Many of the deficiencies associated with the institution's transfers to higher levels of mental health care were resolved in earlier monitoring rounds, including the faulty documentation of transfers, untimeliness of DMH transfers and extended lengths of stay in, and multiple admissions to, the MHCB unit.  Although chart reviews conducted by the monitor's expert revealed a few apparently decompensating inmates, who were not considered for transfer to higher levels of care, the institution's performance in each of these areas remained compliant.

SVSP maintained transfer logs that captured all pertinent dates and required information.  The logs indicated that inmates in need of inpatient care were generally transferred to DMH in a timely manner.  Data on repeat admissions to the MHCB unit seemed to confirm that inmates in need of inpatient DMH care were transferred appropriately and timely.  Data on admissions to the MHCB unit reflected that 172 inmates had between 217 and 224 MHCB admissions to the unit from October through March.  Just 13 inmates, or 7.6 percent of admitted inmates, had three or more admissions, four of whom were referred to DMH.  Lengths of stay in the MHCB unit were also generally appropriate; the average length of stay in the MHCB unit during the same period was 8.7 days.  Available data did not permit a calculation of how many admissions exceeded ten days.

Access to DMH facilities improved, but was somewhat erratic.  SVSP appeared to have no trouble in transferring inmates to the DMH/APP in CMF.  There

were 58 referrals to DMH/APP from September 26 to April 14; eight of the referrals were rescinded, but none was rejected.  The average time between referral and transfer was 8.4 days, with a range of one to 20 days.  Transfers generally did not exceed 72 hours after the receipt of a bed assignment.

SVSP also enjoyed good access to SVPP from October through January.  According to an institutional log, eight inmates were referred to SVPP during this period and accepted; a second log indicated that 12 inmates were referred and accepted.  In February, however, the former ease of access to SVPP seemed to change abruptly.  Both logs showed six referrals during the month, four of which were rejected and none of which resulted in a transfer.  The spate of rejections appeared to have a chilling effect, and no subsequent referrals to SVPP were made in March or April.  Staff acknowledged a reluctance to refer many of their most difficult inmates to SVPP based on a perception that their candidates would not meet the program's criteria for admission.  See, for example, the case review for Inmate S in Exhibit G.

Referrals to ASH continued to be rare.  The one inmate referred to ASH during the monitoring period was rejected for custody reasons.  According to the department, ASH referrals had to meet strict custody criteria and had to be pre-approved by the institution's classification and parole representative.

Other CAP Issues:

a. Partial Compliance

Case management contacts with 3CMS inmates appeared to occur more frequently, but institutional data on the issue was inconsistent with the monitor's chart reviews.  According to the institution's audit from November through March, over 90

percent of inmates were seen quarterly. The monitor's review of 25 UHRs found gaps in case management contacts greater than 90 days in all but four of the surveyed charts. There was no clear explanation for so large a discrepancy.

Follow-up to missed appointments weakened somewhat during the monitoring period for 3MCS inmates in the general population. An institutional audit of 196 ducats issued from October through March indicated that inmates failed to attend 43.9 percent of scheduled appointments, a considerably higher rate of no-shows when compared with 27 percent of failed appearances during the preceding monitoring period. Clinical follow-up occurred within a week in 70 percent of surveyed cases, a decrease from the 87.4 percent reported in the preceding monitoring period, but hardly surprising given the much higher percentage of no-shows. Clinical follow-up for 3CMS administrative segregation and EOP inmates, meanwhile, remained strong. According to the institution, case managers followed-up 100 percent of missed appointments for 3CMS administrative segregation inmates at cell-front within five days. A MHTS audit revealed few missed EOP appointments.

There was some improvement in the scheduling of group therapy for 3CMS inmates. According to the institution's report, between one and five groups were scheduled on each of the housing yards during the monitoring period. Groups consisted of seven to 25 inmates each. Staff acknowledged, however, that about 75 percent of scheduled groups were cancelled. There were also long waiting lists for group therapy.

The frequency of IDTT meetings in administrative segregation continued to improve. An institutional audit of 84 inmates found that all but 12 had initial IDTT meetings prior to their ICC hearings. Moreover, institutional data for March indicated

that 81 percent of administrative segregation inmates also had quarterly IDTT meetings after their ICC hearings.  Chart reviews, however, revealed some problems with the composition of IDTT meetings; psychiatrists or correctional counselors did not participate in four of the 25 IDTT meetings reviewed.

b.  Non-Compliance

Custody-related interruptions continued to impede clinical access to inmates.  Institutional data indicated that cancellations of mental health appointments increased from to 43 to 58 percent from October through March, as compared with 36 to 48 percent during the preceding monitoring period.  SVSP audits showed that custody concerns were responsible for 24 to 39 percent of all cancelled appointments.  Inmate refusals and clinician unavailability accounted for most of the remaining cancellations.

Psychiatric responses to referrals were not always timely.  An institutional audit for October through March indicated that 70 percent of referrals were seen within 15 days of a request, while 50 percent were seen within five days.  The data did not, however, differentiate between urgent and routine referrals.  A QIT study concluded that additional delays often occurred between the time referral requests were received in a housing unit and the time they were transmitted to the mental health department.  It was hoped that a pilot program employing psych techs as part of the clinical team on three housing yards, which started in March, would expedite the processing of referrals.

The quality of treatment plans was not visibly improved.  An institutional audit of 196 charts for October through March found 72 percent with individualized, as opposed to generic, treatment plans, compared with 90 percent during the preceding monitoring period.  Similarly, an institutional audit of 404 MHSDS caseload inmates in

administrative segregation from October through May found 78 percent with individualized treatment plans. Institutional audits of the quality of treatment plans suffered from methodological flaws, including the absence of clear criteria for what constituted an individualized treatment plan, but a helpful model for treatment plans was developed recently, which clinicians were beginning to use more regularly. The monitor's expert reviewed a small number of charts and found all of them inadequate; one plan contained just six words of entries, while three others were written by a sole clinician and a correctional counselor, but without input from a psychiatrist.

The frequency of case management contacts with EOP inmates, an issue resolved during the preceding monitoring period, re-emerged as a problem. An institutional audit for October through March found some decline in the number of inmates receiving weekly contacts. According to the audit, the monthly average of EOP inmates receiving four contacts a month ranged from 46 to 82 percent. An average of 78 to 100 percent received three or more case management contacts monthly during the same period.

The provision of structured therapeutic activities for EOP inmates declined during the monitoring period. Institutional data showed that EOP inmates received, on average, 8.9 hours of structured therapeutic activities from October through March, compared to 9.7 hours in the preceding monitoring report. Meanwhile, the average weekly amount of structured therapeutic activities offered to each EOP inmate fell steadily throughout the monitoring period from 10.28 hours in October to 6.92 hours in March. The data, however, did not include work assignments or educational activities.

A substantial number of group activities was cancelled during the monitoring period. See, for example, case reviews 20 and 22 in Exhibit G. In January only 30 groups were actually held, while 71 were cancelled, primarily by mental health due to the absence of a group leader. The provision of recreational therapy was, in addition, dramatically effected by the resignation of all of SVSP's recreational therapists in March. During the preceding monitoring period, some 40 percent of out-of-cell activities for general population EOP inmates consisted of outdoor recreational therapy, which became largely unavailable due to the resignations. Attendance at other scheduled groups also declined during the monitoring period.

It appeared that EOP inmates were not offered ten hours of structured therapeutic activities weekly in the administrative segregation unit. The capacity of the EOP administrative segregation unit in January was 31 inmates, but the actual population was 50 inmates, or 161 percent of capacity. Although the population dropped to 30 inmates by May, the monitor's expert concluded, based on interviews and treatment schedules, that the unit could provide ten hours of therapy for only about 20 inmates. The expert also concluded that the planned addition of ten new holding cells would enable the unit to treat up to 40 inmates adequately, and the department's subsequent increase in the unit's capacity required allocation of additional clinicians.

Institutional data on the premature discharge of inmates from the EOP program was flawed. A more accurate study was needed to assess how the criteria for discharge from the unit were applied and the treatment provided discharged inmates once they returned to the general population. In a review of charts for other purposes, the monitor's expert found one discharged EOP inmate, whose treatment did not meet even

adequate 3CMS requirements and was experiencing significant mental health problems, including a MHCB admission.

The percentage of 3CMS inmates in administrative segregation receiving weekly out-of-cell case management contacts varied depending upon the housing unit. Compliance was as low as zero to 22 percent in the D-8 unit, although it was significantly higher in the D-1 and D-2. On average, the overall compliance rate from October through March ranged from 33 to 46 percent. According to staff, all 3CMS inmates were consistently offered out-of-cell contacts, but many declined to come out of their cells; some inmates reportedly were concerned that their cells would be searched while they were out, and others were discouraged by the use of handcuffs in holding cells. EOP inmates, in contrast, appeared to receive frequent out-of-cell contacts with their case managers. Seven EOP inmates interviewed during a group session by the monitor reported no obstacles to out-of-cell contacts.

Problems with the frequency of psych tech contacts in administrative segregation were resolved during an earlier monitoring round, but questions arose during the monitoring period about the quality of some psych tech rounding activities. The monitor's expert reviewed treatment provided for seven of the 27 EOP inmates in the administrative segregation unit at the time of the monitor's visit. Three of the reviewed inmates were so symptomatic, the monitor's expert referred them to mental health for urgent intervention. It appeared that the status of more severely mentally ill inmates in administrative segregation sometimes went unrecognized until there was a crisis.

<u>New Problems:</u>

       Confidential interview space generally was inadequate.

       Inmates considered at risk for self-injury were sometimes placed in a holding cell and restrained there for indefinite periods of time until seen by a mental health clinician.

<u>Institutional Summary:</u>

       Staffing vacancies, particularly psychiatric vacancies, coupled with an increase in the caseload population, substantially impacted on the institution's efforts at compliance. SVSP did not do well among any of the four special areas reviewed during the monitoring period. The quality assurance process was largely stalled, and the MHTS sometimes struggled mechanically and had difficulty capturing consistently accurate and reliable data. Problems with medication management were widespread, as confirmed in the case reviews in Exhibit G. Continuity of medication on entry, changes in housing location and renewal of medication orders was poor; follow-up to medication non-compliance was uncertain; prescriptions were often renewed without psychiatrists seeing inmates; laboratory testing was erratic; pre-release medications were not always provided to paroling inmates; DOT procedures were not implemented; and medication consent forms were often missing. The only glimmers of progress here were resolution of past failures to provide a documented rationale for changes in medications and the expanding prescription of HS medications.

       SVSP had not yet adequately implemented procedures for mental health input into its disciplinary process. The institution needed to do more to ensure that mental health assessments were provided whenever required; maintain better records and logs; provide some additional training to clinicians, hearing officers and general custody

staff, particularly those heavily involved with MHSDS inmates in areas of increased security; and encourage hearing officers to document their consideration of mental health assessments in their findings and dispositions. Relative to the transfer of inmates to higher levels of mental health care, the facility was able to maintain past success with the transfer of inmates to higher levels of care, including the documentation of transfers, better access generally to DMH facilities, reductions in multiple admissions to, and lengths of stay in, the MHCB unit. Difficulties with referrals to ASH persisted, while recently encountered obstacles to transfers to SVPP emerged.

        As for other CAP issues, the institution provided regular follow-up care for suicidal inmates discharged from the MHCB unit; considered inmates' needs for group therapy regularly; and held timely and routinely IDTT meetings for 3CMS inmates, thereby resolving all three of these issues. Other improvements were noted in a limited number of areas. The frequency of case management contacts increased; group therapy was somewhat more available for 3CMS inmates; and IDTT meetings occurred somewhat more timely in administrative segregation. While follow-up to missed appointments was good for 3CMS inmates in administrative segregation and EOP inmates, it did not improve for 3CMS inmates in general population.

        SVSP continued to struggle significantly with timely psychiatric responses to referrals, the quality of treatment plans and custody-based interruptions of clinical access to inmates. The frequency of case management contacts with EOP inmates and out-of-cell contacts with 3CMS inmates in administrative segregation, premature clinical discharges from the EOP program, and adequate offerings of structure therapeutic

activities in the EOP general population administrative segregation all needed more work or better documentation.

Overall, SVSP's forward progress during the monitoring period in complying fully with its CAP and the requirements of <u>Coleman</u> in regard to quality assurance, the management of medications, mental health assessments in the disciplinary process and transfers was, at best, meager.

**<u>Valley State Prison for Women (VSPW)</u>**
April 19, 2005 – April 21, 2004

Staffing continued to be a significant problem at VSPW. The chief psychologist was reassigned to CCWF during the monitoring period, while the chief psychologist from CCWF was reassigned to VSPW. The new chief psychologist at VSPW, however, resigned almost immediately after arriving at VSPW and was scheduled to leave the institution within a week of the monitor's visit. In addition, VSPW had vacancies for 3.5 psychiatrists, a senior psychologist, 3.5 staff psychologists, 3.3 psych social workers, a psych tech and 2.5 office techs. Another psych social worker was expected to resign immediately after the monitor's visit, leaving all allocated psych social worker positions vacant. Several office techs allocated to mental health were also reassigned to the medical department during much of the monitoring period.

The caseload population at VSPW increased 2.5 percent during the monitoring period, but the institution received an additional allocation of mental health positions, including a half-time psychiatrist, a psychologist, a psych social worker, a psych tech and an office tech. With these new but as yet unfilled positions, the vacancy rate among mental health staff increased from 29 to 41 percent.

VSPW no longer used telemedicine to help cover psychiatric vacancies. The institution utilized as many as 12 contract psychiatrists a month to provide coverage equivalent to 4.4 psychiatrists, creating problems with continuity of treatment. The institution's reliance on so many contract clinicians was exacerbated in the absence of a chief or senior psychiatrist to orient and supervise contractors. Psychology interns and contract clinicians more than covered all case manager vacancies.

Quality Management Issues:

The quality assurance process at VSPW was developing slowly. The quality care management committee, a medical body, met regularly and chartered health care QITs. While mental health was included within this committee, the chief psychologist and his designee attended fewer than half of the committee's meetings during the monitoring period. The separate mental health quality management committee met monthly and maintained minutes. Clinicians met periodically to review and audit charts, sometimes as many as 30 charts a month. No QITs were chartered in mental health during the monitoring period, and no real peer review was underway.

Medication Issues:

Effective medication management was still evolving. A new medication management operating procedure had been developed and was scheduled to be implemented in May. The new procedure did not conform with all CDC policy requirements, and not all staff members were trained in the new requirements. While some sections of the operating procedure were well crafted, others, such as provisions on DOT and medication refusals, were confusing and ambiguous. Moreover, institutional audits of medication management issues were, in the opinion of the monitor's expert,

methodologically flawed because they relied heavily on the summary sheets of pharmacy techs making rounds, rather than MARs.

An institutional audit of 16 newly arrived inmates concluded that all but one of the inmates received their medications within 24 hours of arriving at the institution.  The monitor's expert, however, noted that the institutional audit took the start-up date for ordered medications from the MHTS and failed to confirm from MARs whether inmates actually received their ordered medications on the date recorded in the MHTS.  In contrast, some chart reviews conducted by the monitor and the monitor's expert indicated that continuity of medication for inmates arriving from county jails was still a problem.  Several inmates arriving with verified medication orders did not receive their medications for days, even though continuity orders were written on their arrival at the institution.  Inmates who arrived without verified medication orders failed to receive their medication in a timely fashion, and some of them decompensated in the reception center as a result.  Delays in processing medication orders for new arrivals sometimes lasted three to six days because the pharmacy was closed on weekends.

Continuity of medication for inmates changing housing locations within the institution declined during the monitoring period.  An institutional audit of intra-facility housing moves from November through January found that 79 percent of audited inmates received their medications within 24 hours of a move.  A second audit for March was based solely on psych tech data sheets rather than MARs, which reflected the actual date medications were delivered.  One EOP administrative segregation inmate interviewed by the monitor's expert missed her medications for a week after being discharged from the OHU.

Follow-up to medication non-compliance, an issue resolved in an earlier monitoring round, deteriorated. VSPW used pharmacy techs to review MARs and refer non-compliant inmates to mental health. While the use of pharmacy techs for this purpose made sense in some ways, the institution made no attempt to audit the adequacy of the system for identifying medication non-compliance. The monitor's expert noted some flaws in the system. It was clear, for example, that when a new monthly MAR was initiated, the old MAR was sent directly to medical records, and pharmacy techs were sometimes unable to identify patterns of non-compliance or medication refusal. There was also no back-up coverage when pharmacy techs were absent. Psychiatric response to non-compliance referrals, meanwhile, was often slow, although improved. According to data from the MHTS, 50 percent of 268 referrals for medication non-compliance were not seen by a psychiatrist within seven days of the referral, compared with 74 percent during the preceding monitoring period. The average wait for an appointment was 13 days. Discontinuity of psychiatric coverage and inadequate clerical support contributed to the resurfacing of this problem.

The status of medication continuity on the renewal of medication orders was uncertain. An institutional study showed an increase in compliance during the monitoring period, but apparently the institution did not adopt corrective measures to improve compliance, such as scheduling inmates for earlier return visits with a psychiatrist or instituting 14-day continuity orders. Inmates continued to complain about expiration gaps in medication, and the monitor's chart reviews uncovered one case in which a 30-day medication order was not renewed promptly, resulting in a seven-day medication gap.

Procedures for ordering laboratory tests for inmates on mood-stabilizing medications were still somewhat erratic. An institutional audit found serum-level testing was ordered and drawn for 11 of 15 surveyed inmates on mood-stabilizing medications. Psychiatrists reviewed the test results for ten of these inmates, but documentation of any psychiatric follow-up was present in the chart of just one inmate. The institution prepared guidelines for laboratory testing and a protocol for conducting blood-level studies. An appropriate new audit tool was also developed, but it had not yet been utilized.

DOT procedures, an issue resolved in an earlier monitoring round, appeared to be a problem once again. It was unclear how many mental health inmates at VSPW were on DOT or to what extent DOT procedures had been implemented at the institution. At different times during the monitor's visit, the monitor was told that one, three or five inmates were on DOT in the facility. DOT procedures were not followed for the one inmate at VSPW on a Keyhea order. This inmate, housed in administrative segregation, had a week-long gap in her medications and was not referred to a psychiatrist, even though DOT procedures require a referral for Keyhea inmates after one missed dose. This case suggested that the DOT procedures that existed did not always work as planned.

VSPW seemed to have good procedures in effect for obtaining signed informed medication consent forms. Charts reviewed by the monitor consistently contained appropriate informed consent forms for all prescribed medications.

There were no HS medications prescribed at VSPW, and no procedures existed for the administration of HS medications.

154

Medication management was compromised repeatedly by the large number of contract psychiatrist employed at VSPW.  Inmates reported frequent medication changes without contact with a psychiatrist, and changes in medication often occurred without a documented rationale.  Medication errors also appeared to occur frequently, and VSPW lacked a system for tracking medication errors.

Mental Health Assessment for the Disciplinary Process:

Documentation of mental health assessments in the disciplinary process was poor.  The institution maintained two tracking logs, which were inconsistent with each other and failed to capture all relevant information.  The first log listed inmates for whom mental health assessments had been completed, but did not record the outcome of disciplinary hearings.  The second log listed all caseload inmates who received an RVR, but did not record the findings of inmates' mental health assessments.  Six of the first 12 inmates listed in one log did not appear in the second log.

According to this confusing data, 241 RVRs were written for caseload inmates during the monitoring period.  Mental health assessment requests were completed for 21 3CMS inmates, five EOP inmates and one non-caseload inmate.  The monitor's limited chart review suggested that mental health considerations were not always factors in hearing officers' dispositions of cases.   For example, in two reviewed cases, the clinical information provided on the inmate was communicated ambiguously, and in a third case the clinical information was inappropriately discounted.

Transfers:

EOP transfers continued to be timely.  Between November 1 and April 16, the institution transferred 18 EOP inmates, all but one of whom left the institution in less

than 60 days.  The average time between referral to EOP and transfer was 23 days.  At

the time of the monitor's visit, none of the nine EOP inmates in VSPW had been awaiting

transfer longer than 60 days.  Only six 3CMS reception center inmates, just four percent

of the 3CMS reception population, remained in reception longer than 90 days.

Access to the MHCB unit at CCWF was adequate.  There were 25 MHCB

referrals from November to April period with no rejections.  Four inmates were admitted

to the unit twice, but none was admitted more than twice.

Access to DMH was also adequate.  According to institutional data, 13

inmates were referred to PSH during the period from November 1 to April 16, and all

were transferred.  Eight inmates were transferred within 24 hours of their referrals, and

two more were transferred within 48 hours.  The longest delay between referral and

transfer was seven days.

Other CAP Issues:

a.  Partial Compliance

The timeliness of initial IDTT meetings improved.  An institutional audit

indicated that 75 percent of new arrivals received an initial IDTT meeting within 14

calendar days;  the rate of compliance would undoubtedly have been higher had the

institutional audit measured compliance against the current program guide standard of 14

working days.  The timeliness of annual IDTT meetings, which the institution had not

audited during the preceding monitoring period, stood at 91 percent.  Moreover, the

composition of IDTT meetings improved significantly.  Institutional audits found that

psychiatric attendance at these meetings increased from 45 percent during the preceding

monitoring period to 85 percent in the latest period.  Chart reviews by the monitor,

however, found several cases where correctional counselors were not in attendance at IDTT meetings.

The amount of structured therapeutic activities offered to EOP inmates in administrative segregation reportedly was consistent with program guide requirements, but the monitor's expert found problems with the documentation of structured therapeutic activities.  Although the MHTS report for November 1 through March 28 showed that inmates consistently were offered at least ten hours of therapeutic activities weekly, the reliability and accuracy of the MHTS data was suspect, primarily because inmates' charts did not always confirm the amount of structured therapeutic activities reported in the MHTS as offered to EOP inmates.  In addition, the monitor's chart reviews and staff interviews indicated that the refusal rate of programming among most EOP inmates was greater than 40 percent.

The quality of treatment plans improved somewhat during the monitoring period, but many were still incomplete or generic.  According to an institutional audit, the percentage of inmates with complete treatment plans rose from 42 during the preceding monitoring period to 56 percent.  Sixty-nine percent of audited treatment plans were found to be individualized.

VSPW continued to request the treatment records of inmates with prior hospitalizations.  The rate of response to such requests was 63 percent during the monitoring period.  An institutional audit of 18 charts found 12 with documented deliberations by clinicians of whether to request prior treatment records.

b.  Non-Compliance

The timeliness of responses to inmate and staff referrals slipped.  The institution's declining performance was due in large part to the diversion of mental health office techs to the medical department during much of the monitoring period.  The diverted office techs were returned to mental health in the early spring, and MHTS referral data thereafter began to reflect improved response times.

Clinical follow-up of suicidal inmates discharged from an MHCB unit or the local OHU, another issue previously resolved, apparently worsened.  An institutional audit for the last quarter of 2003 found that 68 percent of suicidal inmates discharged from an MHCB unit or the OHU received five consecutive days of clinical follow-up, while a second study of inmates discharged since November found that only 57 percent received the full five days of required clinical follow-up.  Documentation of custody checks was not readily available, but the institution reported a high level of compliance, except for a few cases on the first watch.  An audit of custody checks was needed.  Staff attributed declining compliance in this area to staffing turnover among psych techs.

Institutional Summary:

Staffing vacancies, particularly among psychiatrists, continued to trouble VSPW and impinge on the delivery of mental health services.  The reassignment of the chief psychologist and the subsequent resignation of the new chief psychologist created anxiety within the mental health staff and helped stall progress in some CAP areas.  Clinical staffing problems, especially at the administrative and supervisory level, resulted in planned audits that were not completed, postponed QITs and delays in the development and implementation of needed policies and procedures.

Quality management showed some progress, and transfers to higher levels of care seemed to occur routinely. The process for providing meaningful mental health input into the disciplinary process for caseload inmates needed work, especially in regard to collecting complete and accurate data on assessments and their impact. Medication management, meanwhile, persisted as a major problem area. Continuity of medication on arrival, housing changes and the renewal of medication orders improved only marginally. Psychiatric follow-up to medication non-compliance deteriorated, and implementation of DOT lagged. Medication errors and unexplained medication changes increased, due largely to the facility's reliance on a large number of poorly supervised contract psychiatrists. HS medications were not available in the institution. While laboratory testing for inmates on mood-stabilizing medication was somewhat erratic, documentation of informed medication consent was consistent.

In regard to other CAP items, progress was noted in the timeliness of initial and annual follow-up IDTT meetings. The provision of structured therapeutic activities to EOP inmates reportedly improved, although some of the supporting data for the reported improvements needed to be scrutinized more closely. The quality of treatment plans continued to improve, and clinicians regularly ordered records for inmates with prior mental health hospitalizations. The timeliness of responses to referrals and clinical follow-up of suicidal inmates discharged from a MHCB unit or the OHU deteriorated. Overall, VSPW continued to progress, but compliance in a few areas had slipped, and the institution needed to do much more work to develop effective medication management.

## SUMMARY

The following analysis looks at developments during the monitoring period in the 11 CDC institutions visited by the monitor during the 14th round of review. Because the visited institutions included only those with large and complex MHSDS caseloads, as well as a history of trouble in complying with the plans, policies and protocols provisionally approved by the court in mid-1997, the report provides a somewhat distorted view of the defendants' overall compliance with the requirements of Coleman.    The 11 institutions covered in this report housed roughly 12,620 MHSDS inmates, some 45 percent of CDC's overall mental health caseload.  That 12,620 total, incidentally, which represents less than half of the CDC caseload, is within a few hundred of the combined mental health caseloads of adult correctional systems in New York and Ohio.  The other 21 CDC institutions, meanwhile, share an additional MHSDS caseload of roughly 15,000 inmates.

This overall summary focuses on staffing, quality assurance, the distribution and management of medications, implementation of revised mental health assessment procedures for the disciplinary process and transfers to higher levels of mental health care in the 11 covered facilities, as well as efforts to implement further individual institutional CAPs.  This summary portion of the report also provides the basis for the specific recommendations that follow.

Staffing:

Not surprisingly, the 11 visited institutions, by and large, shared similar staffing and recruitment difficulties.  While two institutions among them (CSP/LAC and CSATF) were able to cover their clinical vacancies with contracted services, the rest

typically had substantial vacancies among permanent mental health staff and also experienced some difficulty in covering their vacancies fully with contracted services. In three institutions (CCI, RJD and SVSP), vacancy rates among permanent staff were temporarily elevated by recent additional allocations of staff positions, which had not yet been established locally or filled. Among the 11 institutions visited during the monitoring period, six institutions (CSP/Corcoran, CSP/Solano, HDSP, SQ, SVSP and VSPW) historically had considerable difficulty in obtaining adequate permanent or contracted psychiatric coverage. In at least four of those facilities (CSP/Corcoran, HDSP, SVSP and VSPW), location probably played a significant role in the continuing difficulty.

All of HDSP's psychiatric positions were vacant, and numerous and largely short-term contract clinicians covered roughly half of its six allocated but vacant psychiatrist positions. In SVSP, 6.5 psychiatric positions were vacant, and contracted psychiatrists provided services roughly equivalent to 1.5 to two full-time clinicians monthly. Some other facilities, like CSP/Corcoran and VSPW, covered part of their psychiatric vacancies with a large number of frequently changing contractors, but lacked sufficient administrative resources to provide effective clinical orientation and supervision of their temporary psychiatrists. In these institutions, the monitoring teams typically found inadequate or marginally adequate management of medication practices, untimely psychiatric services and poor psychiatric participation in IDTT meetings and the generation of treatment plans.

Generally, institutions were better able to cover permanent vacancies among case managers through the acquisition of contracted services. CCI, which was

able to find contractors to cover its psychiatrist, but not its case manager vacancies, was exceptional in that regard. Contracted psychologists and psych social workers typically worked longer hours and enjoyed longer tenure than contracted psychiatrists, mitigating thereby some of the adverse aspects of clinical contracting. On the other hand, the defendants' inability to process additional acquisitions of newly allocated case managers in a more timely fashion, when combined with hikes in program populations that typically preceded the later filling either permanently or through contracting of newly allocated positions, often resulted in rapid escalations in caseloads for case managers. Many case managers in CCI, CSP/Solano, HDSP, RJD and SVSP reported extraordinarily high caseloads often attributable to immediate increases in program capacity and the delayed acquisition of staffing positions allocated for expanded program capacity.

Vacancies among other categories of mental health clinicians and auxiliary staff were more episodic and unpredictable. SVSP, for example, lost all three of its recreational therapists after an inmate's physical attack on one of them in March. Reports of more and longer absences of incumbents filling occupied psych tech and MTA positions due to the demands of the war in Iraq increased. Nursing shortages in CDC echoed the State of California's widespread dearth of RNs, and the department, like most of its counterparts in both public and private sectors, used nursing registries and overtime to meet its needs as fully as possible.

Problems with the availability of custody staff to ensure clinical access to caseload inmates continued to persist in some institutions with high levels of security and a large MHSDS census in a variety of tightly secure environments. Nowhere was this a

greater problem than in CSP/Corcoran, where the scarcity of escort staff meant that the almost all clinical contacts with caseload inmates in administrative segregation and the SHU occurred at cell-front, where confidential communication about mental health issues, much less the establishment of meaningful therapeutic relationships between inmates and clinicians, was virtually impossible.  In other institutions, especially HDSP and SVSP, frequent lockdowns of different units and/or population segments sporadically impeded the access of clinicians to their inmate caseloads, and, in some facilities, clinical access during lockdowns was assigned a low priority.

In the preceding monitoring round, four institutions, namely, CSP/Corcoran, HDSP, RJD and SVSP, were identified as lagging badly in the implementation of their institutional CAPs.  The court in late July required the defendants to develop within 60 days new plans to bring these facilities into compliance with their CAPs.  Those plans were duly submitted by the defendants in late September.  While those events were transpiring, the 14th round of monitoring was underway.  Little changed during the 14th round relative to staffing in these four facilities.  CSP/Corcoran's SHU problems continued unabated, and HDSP and SVSP remained desperately short of psychiatrists.  RJD's problems also persisted, but they were attributable to a lack of effective management rather than a want of staffing resources.  RJD had numerous clinical vacancies because of additional allocations, but the facility was able to cover most of their permanent vacancies with contracted services.

The defendants' specific plans for dealing with staffing shortages at HDSP and SVSP consisted largely of increasing coordination between HCSD and the two institutions with regard to recruiting efforts.  That strategy seemed to rely on the

assumption that headquarters would be able to enhance and support local recruitment

efforts, an assumption that has not proven to be at all accurate during the defendants'

struggles over the past five years to improve the recruitment and retention of staff.  As for

CSP/Corcoran, the department planned and undertook a lengthy review of the staffing

ratios needed to provide a meaningful level of mental health services corresponding to

the proposed revised program guide.  Under the plan, a final staffing proposal was due to

be submitted through CDC's Financial Services Division by November 1.   If such a

proposal was submitted, it has not been shared with the monitor to date.  More worrisome

were the final lines of the defendants' proposal, which rendered it impossible to calculate

with any certainty when CSP/Corcoran's clinical staffing shortage might be addressed:

> Provided that all approvals of revised staff ratios are obtained,
> new staffing would be available for COR upon the enactment of the
> 2005/2006 budget and not prior to July 1, 2005.  Even then,
> the Department is still facing the difficulty of recruiting clinical staff to the
> Central Region, particularly COR and the Substance Abuse Treatment
> Facility.  When new staffing ratios are finally determined, it is expected
> that there will be difficulty filling the positions.
> Letter to the Special Master on Plan to Implement Revised Program
> Guides in CSP-Corcoran Security Housing Unit (SHU), dated September
> 27, 2004, at p. 4.

The monitor's early visits for the 15th round to CSP/Corcoran, HDSP and

SVSP in September and October 2004, for which the completion and filing of this report

have been delayed, indicated that no significant changes in the staffing situations at

CSP/Corcoran, HDSP and SVSP have occurred in the past year.  The defendants' plans

have effected no staffing improvement in these facilities to date, and given the long

history of this case have little likelihood of doing so in the future.

Quality Assurance:

      The monitoring period brought improvement in the development of some of the basic elements of a quality assurance system in many of these troubled institutions. Those basic elements included an operating institutional quality management committee with a mental health subcommittee that met regularly and kept competent minutes of its proceedings; monthly chart reviews; regular chartering of Quality Improvement Teams (QITs), capable of conducting effective audits with useful analyses and specific suggestions to remedy identified problems; and meaningful peer review for the various categories of clinicians. Seven of the reviewed institutions showed progress in developing these elements during the course of the monitoring period. Two of the seven, CSATF and CSP/Solano, had all of the required elements in place, although some of the elements needed further work. Five of the seven with improving quality assurance infrastructure were able to produce some evidence of evolution in most elements. Two institutions, CIM and HDSP, had appointed coordinators specifically to oversee the development of local quality assurance efforts.

      Lagging quality assurance problems in SVSP and VSPW could be traced directly to insufficient staffing resources, particularly among psychiatrists. Neither facility, for example, had initiated peer review. When an institution lacked staff to provide basic services, quality assurance predictably sank to the bottom of the list of local priorities. In SQ, where a year ago a fairly robust quality assurance capability seemed to be emerging, progress stalled in the midst of distracting management difficulties that required some fundamental structural and personnel changes. CIM's appointment of a

coordinator represented an effort to address generally lagging quality assurance efforts in that facility.

A key to redressing effectively the deficiencies identified in institutional CAPs was the creation of QITs, which were supposed to pinpoint the extent and cause of a deficiency though carefully targeted audit(s) and analysis of their results, leading, in turn, to the articulation of a remedial strategy subsequently communicated broadly to the entire mental health staff. In troubled institutions, problems with QITs persisted. Some facilities, like CSP/LAC, CSP/Solano, inconsistently documented QIT efforts; some, including CSP/Corcoran and HDSP, chartered lots of QIT audits that were methodologically flawed and generated unusable or barely usable results; and others conducted too few audits, addressing too few problems. Audits, whether conducted by a QIT or independently, were conducted erratically in CCI and SQ, while SVSP struggled to generate any meaningful audits at all. Given CSP/Corcoran's considerable problems, it worked with diligence and some success in making its QIT process work.

The Mental Health Tracking System (MHTS), CDC's management information system, was central to the compilation of accurate and useful audits, the principal working tool of QITs. For the most part, efforts to implement the MHTS, even in these troubled facilities, continued to advance. Some, like CSP/Solano, were beginning to conduct concordance evaluations of their MHTS by comparing data entries in their local MHTS against UHR documentation to assess the accuracy of the former. The monitor's review of charts in some other institutions, including HDSP, RJD and SVSP particularly, suggested an erratic or poor concordance between the documentation contained in UHRs and the data generated by the local MHTS.

166

One system-wide development with a potentially profound impact on CDC's future quality assurance efforts occurred during the monitoring period. The defendants completed the design for and began the experimental deployment of a new medical and mental health management information system that is slated to replace the MHTS. Based on software developed and reportedly utilized with great success by the federal Veterans Administration, the new MIS will initially replace local information systems for tracking and documenting the administration of medications, both medical and psychotropic. The system is projected eventually to create an electronic system for the comprehensive documentation of medical and mental health information that is compiled largely by practicing clinicians and accessible when needed to other clinicians wherever they are located, whether in juvenile or adult correctional institutions, camps or community programs, i.e. parole. The ultimate goal is an UHR universally available electronically to clinicians. While the potential of a successfully implemented such system is truly vast, given the history of the MHTS, its full deployment and implementation may take many years. Meanwhile, institutions must continue to rely on the existing MHTS.

As suggested above, troubled institutions had a difficult time diverting over-extended clinical resources to quality management and assurance. This was one area where HCSD can provide assistance to local institutions. Better acquainted with quality assurance norms and processes, central office staff can help troubled facilities fashion and implement more quickly local procedures and instruments for managing quality. The plans developed by the defendants in response to the court's July 27, 2004

Order focused largely on providing such assistance. It remains to be seen what local facilities can do with such help.

Medications:

The administration and management of medications involved a whole bundle of issues, including medication errors; continuity of medication on arrival, changes in location and renewal; monitoring and redressing medication non-compliance; providing pre-release medications; laboratory testing; direct observation therapy (DOT); pill lines; obtaining informed medication consent forms; the Keyhea process; and HS medications. The extent of compliance with departmental policies and procedures on medication among the 11 monitored institutions varied widely. Two institutions, RJD and SVSP, performed poorly in almost all of these listed medication issues, although paradoxically these same two institutions did more to provide HS medications to more caseload inmates than any of the other facilities reviewed. The remaining nine institutions managed to improve their compliance in some of the enumerated areas, with CIM and CSP/LAC performing better in more areas than the rest.

Local performance in providing continuity of medications varied among institution and within institutions, depending on whether the continuity measured focused on inmates newly arrived, inmates whose locations within the institution were changed or inmates in need of a renewal of their medications orders. Generally, continuity of medications on arrival showed improvement among the monitored institutions, although comparative progress was difficult to measure. Institutional data differed widely, with some facilities counting just inmates arriving with written medication orders, some counting only those arriving without orders and some counting

both. Some institutional audits focused on the lapse between arrival and the issuance of a

medication order, while others looked at the gap between arrival and delivery of the

actual medication. The one common, and encouraging, similarity was that just about all

institutions viewed a gap of more than 24 hours between arrival and either an order or a

delivery as excessive. Institutions have developed only slowly accurate auditing tools

and practices for this issue, resulting in often flawed, uncertain or inconclusive data.

Audits often fail to distinguish inmates arriving with orders from those arriving without

orders, or those arriving from other CDC institutions from those arriving from elsewhere.

The measurement problem, moreover, was much larger and more complex for institutions

with reception centers than for those without an intake function.

       Because the continuity of medications associated with changes of location

within a facility involves inmates totally within the control of CDC and the institution at

both ends of the movement, one expected substantially fewer interruptions than on

inmates' arrival from outside the institution or CDC. The incidence of such interruptions,

contrary to expectation, was considerable and typically varied within institutions

depending on the housing areas involved in the location changes. Movements in and out

of secure units, including administrative segregation units, administration segregation

overflow units and SHUs, typically involved the longest delays in medication delivery.

Transfers out of some MHCB units were accompanied, shockingly, by significant

medication interruptions. In SVSP, for example, an audit conducted during the

monitoring period indicated that just 20 percent of inmates transferred elsewhere in the

same institution out of its own MHCB unit received their medications within 48 hours of

their discharge. Typically, these inmates with a severe mental health crisis were placed

in the MHCB so clinicians could stabilize them primarily on a careful regimen of psychotropic medications before returning them to their normal mental health unit or outpatient program. Delays in the receipt of medications for these inmates undermined the very purpose of the MHCB level of care and were both inexcusable and unacceptable.

During the monitoring period, interruptions in medications on the renewal of orders ranged from a low of two percent in CIM to a high of 35 percent in HDSP. In four institutions, CCI, HDSP, SVSP and VSPW, the monitor's experts also found evidence that some prescriptions were being renewed without a psychiatric contact. This unacceptable practice was attributable, at least in the last three of theses institutions, to the lack of sufficient psychiatrists to provide such contacts.

Medication errors were found to be a problem in three institutions. In CCI, errors were reported verbally, but not regularly documented; in CSP/Corcoran, they were not documented; and in VSPW, they were apparently frequent and not tracked.

The acquisition and placement in UHRs of informed medication consent forms were inconsistent in HDSP, RJD, SQ and SVSP. Such forms were found much more consistently in UHRs in CIM and VSPW.

Some pill lines in CSP/Solano and RJD reportedly were excessive long. Procedures for DOT in the revised medication management policy were confusing to many institutions and being adopted only slowly. Local operating policies typically copied the provisions in the departmental policy on DOT, but in CIM, CSP/LAC, CSP/Solano, RJD, and SVSP, the procedures were not applied or their application was not documented. Some facilities reported that the new DOT procedures were in place, but failed either to designate which caseload inmates were to receive DOT, as opposed to

urse administered, medications or document the designation. In HDSP, where the policy was in place and DOT designations made, the number of inmates actually on DOT seemed much too small in the opinion of the monitor's expert. In CSP/Corcoran, where inmates were also designated for DOT, the actual procedures were not effectively or regularly followed in administrative segregation

The delivery of pre-release medications to paroling inmates continued to improve generally. A CSP/Corcoran audit indicated 95 percent of paroling inmates received their discharge medications, while a CIM audit found 88 percent of identified parolees got their medications, although some 30 percent of paroled inmates were not identified as about to parole sufficiently in advance of their parole to receive discharge medications. At the other end of the spectrum, SVSP reported in one audit that 50 percent of paroled inmates left with medications, but no documentation or log existed to verify even those inadequate results.

In regard to laboratory testing, orders were entered, blood drawn and tested, results returned and filed, reports reviewed and appropriate adjustments in medication orders made with some overall increasing regularity. Improvement in all aspects of testing was reported in CIM and CSP/LAC. One or another aspect of the testing cycle was problematic in CCI, CSP/Solano, HDSP and SVSP. In VSPW, testing was erratic and in SQ, testing in administrative segregation was ordered rarely.

Responding to medication non-compliance included three elements, namely, accurate recording of the receipt or non-receipt of medications in inmates' Medication Administration Reports (MARs); timely monitoring and reporting of medication non-compliance; and timely clinical follow-up of reported non-compliance.

The monitor's experts found that MARs were a mess in HDSP, often unfiled in SVSP and often filed untimely in CSP/Corcoran. Monitoring of non-compliance was performed poorly in CCI and CSP/Corcoran; it was not performed at all in CSP/Solano. Clinical follow-up to reported non-compliance was found to be poor, erratic, untimely or undocumented in ten of the 11 institutions monitored. Only in CSP/LAC was follow-up to medication noncompliance found to be improved on all scores.

The problem of orders for and the delivery of HS medications refused to go away. In three monitored facilities, CIM, CSP/Solano and VSPW, no HS medications at all were prescribed. In HDSP, where the Chief Medical Officer's permission was required to prescribe them, apparently without his knowledge of the requirement, just one inmate was on HS medication. The prescription of HS medications reportedly was beginning to make something of a comeback in CCI, CSP/Corcoran, CSP/LAC and CSATF, where the number of inmates with prescriptions for HS medications ranged from an indeterminate number in CIM up to 20 in CSP/LAC. As indicated earlier, the number of inmates on HS medications in the monitored institutions matched or exceeded anticipated percentages only in RJD and SVSP.

These findings reflected accurately that the institutions monitored during this round continued to experience some serious problems in delivering and managing medications effectively. Continuity of medications and responsiveness to medication non-compliance represented the stiffest challenges to clinicians and administrators in these troubled facilities, challenges that so far have surpassed efforts mustered to confront them.

Mental Health Assessments in the Disciplinary Process:

Review of the mental health assessment process in the disciplinary system focused on the performance and quality of the assessments actually conducted and the impact of assessments on the outcome of disciplinary proceedings for the MHSDS inmates involved. In general, MHSDS inmates at the EOP and MHCB levels of care, who were charged with disciplinary infractions for which Rule Violation Reports (RVRs) were written, regularly received a mental health assessment. Whether mental health assessments were prepared for all 3CMS or general population inmates whose behavior was "bizarre, unusual or uncharacteristic" was uncertain and exceedingly difficult to determine. Given both the subjective nature of the descriptive adjectives operative here and the virtual impossibility of effectively monitoring and reviewing their application sufficiently broadly to generalize, compliance with this component of the process was likely to remain uncertain. Meanwhile, the monitor was able to determine that mental health assessments were prepared and submitted to hearing officers in only an insubstantial number of such cases involving 3CMS inmates.

In some institutions, including CCI, CSP/Corcoran, CSATF, HDSP and SVSP, the assessment component of the process experienced difficulties. In CSATF, for example, assessments were generated for 3CMS and general population inmates for no discernible or documented reason, meaning that the preparation of assessments was becoming a heavy burden on clinicians, just what the revisions were designed to avoid. Completeness and/or the quality of assessments were a problem in CCI, CSP/Corcoran and HDSP. The quality issue involved the usefulness of completed assessment in providing hearing officers with an understandable description of the inmate's mental

health at the time of the offense and its possible influence on his/her behavior. A February audit in CSP/LAC indicated that assessments were inadequate and further training was provided to affected personnel. The monitor found that the assessments prepared after provision of the additional training in CSP/LAC were noticeably better than those prepared elsewhere in CDC.

Documentation of the mental health assessment process was also uneven. In some institutions, individual cases were poorly tracked and documented; in others, logs were inadequately maintained. RJD, on the other hand, kept good logs, as did CSP/Solano. Record-keeping relative to the mental health assessment process was weak in CCI, CIM, SQ and SVSP.

The impact of the assessments prepared and submitted was measured both by the extent to which hearing officers considered the assessments in their deliberations and the use of assessments to fashion appropriately responsive outcomes. Documentation of hearing officers' consideration of assessments, whether favorable or unfavorable, was often undocumented. That made it difficult to determine whether the assessments were just being ignored or hearing officers' consideration of assessments, to whatever extent, was just not being recorded. The documentation also varied among hearing officers within the same institution. In at least one institution, RJD, the Chief Disciplinary Officer, exercised a strong role in reviewing and sometimes amending dispositions on the basis of mental health assessments. That role would seem to be a model for other institutions.

Almost everywhere, there were reports and some evidence of mitigated outcomes in response to some metal health assessments. The positive reviews, however,

were based too often on anecdotal descriptions of particular cases rather than solidly documented evidence. Institutions needed to develop better recording practices and instruments to validate hearing officers' consideration of assessments and any changes in dispositions crafted in response to the contents of the assessments. It remained too early to tell whether the revised process for the meaningful inclusion of mental health issues in the disciplinary process will serve to mitigate the rise through custody levels of seriously mentally disordered inmates, whose misbehavior is related to their mental illness.

During the course of gathering data on mental health assessments, the monitor found that two institutions, CSATF and SVSP, continued to file RVRs for MHSDS caseload inmates involved in self-injurious behavior without following mandated procedures for prior mental health review and input.

Transfers:

The most troublesome aspect of transfers continued to involve access to intermediate inpatient DMH care. During the monitoring period, the institution enjoying the fullest access to intermediate inpatient DMH care among the 11 reviewed facilities was CIM, which made 33 referrals to Atascadero State Hospital (ASH), of which 26 were accepted. CIM's easy access to ASH, however, was atypical among the 11. Five of the eleven monitored facilities (CCI, CSP/Solano, CSATF, HDSP and SQ) reported making no referrals at all to ASH during the monitoring period; CSP/LAC and SVSP reported making one referral each, both of which were rejected; and CSP/Corcoran and RJD reported declining referrals to ASH. Only VSPW reported access to DMH care for both acute and intermediate care via Patton State Hospital as acceptable.

While ASH was the principle focus of complaints about access to intermediate inpatient care, that facility represented just one of three intermediate programs operated by DMH for CDC inmates. The recently opened Salinas Valley Psychiatric Program (SVPP), a DMH-run intermediate inpatient program for CDC inmates with a history of violent behavior, filled all of its available beds in mid-2004, and the defendants sought to expand the program in space apparently about to be vacated by the relocating Day Treatment Program at CMF. It was anticipated that the expansion would add some 35 to 40 beds to the 64 beds available now at SVPP. The reported demise of the DTP, however, was premature, and initial plans for the expansion had to be considerably re-worked, a process currently underway. It is now anticipated that the additional capacity intended for inmates CDC inmates with a violent history will become available at CMF in January 2005.

The highest priority for access to the SVPP was given to inmates in the department's Psychiatric Service Units (PSUs) at Pelican Bay State Prison (PBSP) and California State Prison, Sacramento (CSP/Sac), neither of which was visited by the monitor during the 14th round of review. These two facilities have enjoyed the lion's share of access to the SVPP, leaving little space for candidates from other Level IV institutions in CDC. Hence, for the 11 institutions included in this report, SVPP was not much of a resource. CSP/Corcoran, CSP/LAC, HDSP and SVSP collectively managed to place roughly a dozen inmates in the SVPP during the monitoring period. Those placements represented about a third of the inmates actually referred to the program by clinicians in the four institutions.

The third intermediate inpatient program operated by DMH for CDC inmates was located at CMF in the Intermediate Care Facility/Day Treatment Program (ICF/DTP), which provided treatment to a combined population of from 50 to 80 inmates during the monitoring period. The ICF/DTP was used historically and principally as a step-down program for inmates discharged from DMH's Acute Psychiatric Program (APP), also located at CMF, and was largely unknown to clinicians elsewhere in CDC. That is about to change, as plans evolve for a significant expansion of the DTP component and its physical separation from the ICF, which, in turn, is also to be expanded and converted into a Level IV DMH intermediate inpatient facility. CDC and DMH are planning now for the future promotion and use of this intermediate inpatient additional capacity.

Reviewed institutions reported a marked difference in their access to the inpatient acute DMH program in CMF, as compared with intermediate inpatient programs. While waiting lists sometimes slowed transfers to DMH's Acute Psychiatric Program (APP), clinicians in the monitored institutions perceived the admission process to DMH/APP as well and fairly managed, even though delayed transfers occurred intermittently. Moreover, the referral procedures for admission to DMH/APP were viewed as considerably less onerous than those for DMH's intermediate inpatient programs; less paperwork was required and it could be provided realistically by facsimile. Unfortunately, recent focus on the reportedly easier procedures for referrals to APP has apparently persuaded DMH that the requirements imposed by the DMH/APP at CMF have been relatively lax and need to be made equally as onerous as those for referrals to intermediate inpatient DMH care.

Early returns from CDC's assessment of its unmet need for inpatient DMH beds already indicate that the steadily shrinking number of CDC inmates in DMH intermediate inpatient programs and facilities reflects inaccurately the actual need for inpatient DMH care among inmates included in the MHSDS caseload. Clinical teams conducting the assessment have already identified numerous CDC inmates who need a level of inpatient care not presently offered anywhere in CDC's array of mental health programs. Even as the assessment unfolds, the defendants recognize and are planning their response to the expanded and more clearly defined need for inpatient DMH beds. The significant challenge of generating sufficient beds in DMH to handle all CDC inmates who need them will be matched by the no less daunting task of persuading and educating CDC clinicians to utilize the referral system competently and aggressively to place inmates in need of inpatient care in the newly available beds.

Meanwhile, CDC institutions still need to develop a system for documenting transfers that captures accurately and completely sufficient data to inform administrators of both CDC and DMH of the extent of the need for inpatient beds. Such a system requires the recording of all milestones in the referral process, from the clinical referral through clinical acceptance, the assignment of a DMH bed, endorsement and transfer, as well as complete, accurate and current information on the reasons for rejection by DMH of CDC clinicians' referrals. The need for such data has been urged since 1999, yet it is often inaccurately or erratically collected by institutions and the department. During the monitoring period, some facilities (e.g., CIM and SVSP) improved the documentation of their DMH transfers, while in others (e.g., CSP/LAC, HDSP and RJD), logs continued to be incomplete and data on referrals inadequate.

Access to the various levels of mental health care within CDC varied during the monitoring period. Transfers to the PSUs at PBSP and CSP/Sac slowed, with a significant backlog of inmates in EOP administrative segregation hub units increasing at CSP/Corcoran and SQ. Transfers of EOP inmates in administrative segregation to hub administrative segregation units, on the other hand, occurred in a more timely fashion. CIM estimated that the length of stay for EOP inmates in its administrative segregation unit prior to movement to an administrative segregation hub unit sank to 26 days during the monitoring period. Institutions with reception functions generally reported more timely transfers during the monitoring period of both EOP and 3CMS inmates to mainline programs elsewhere. No facility reported difficulty in placing inmates in crisis in MHCB units within required timeframes, although some individual transfers might take two to three days to effect, usually over week-ends, and some movements seemed to cover extraordinary distances. The latter problem was expected to decline with completion of the renovation and licensing of Correctional Treatment Centers throughout the department.

Overall Progress:

During the monitoring period, the 11 reviewed institutions managed to resolve collectively 22 deficiencies identified in their respective corrective action plans (CAPs.). Four institutions resolved no CAP items, but three of these facilities (CCI, CIM and VSPW) demonstrated considerable overall progress toward compliance with their respective CAPs and the plans, policies and protocols provisionally approved by the court in mid-1997. The failure to resolve any of the deficiencies in its CAP reflected accurately RJD's lack of progress in meeting its CAP and complying with the

requirements of Coleman.  Conversely, while SVSP was able to resolve four of its CAP items, the facility's overall performance during the period was poor.  SVSP was unable to provide some basic elements of mental health care; EOP inmates did not all receive weekly contacts or required amounts of structured therapeutic activities; almost all weekly clinical contacts with 3CMS inmates in administrative segregation were conducted at cell-front; the quality of treatment plans was generally mediocre; clinical access during lockdowns was a serious problem; psychiatric responses to referrals were untimely; and staffing vacancies and caseload population were both increasing.

         In three other institutions, CSP/Corcoran, HDSP and SQ, staffing problems played a key role in lagging performance.  SQ suffered a management lapse that resulted in the total suspension of psychiatric services in the condemned and administrative segregation units, while the dearth of psychiatrists, permanent or contracted, in HDSP led to a steady dwindling of mental health care services.  In CSP/Corcoran, mental health staffing deficiencies were felt most keenly in the SHU, where nearly a third of some 500 3CMS inmates did not even receive quarterly case management contacts and 80 percent of clinical contacts occurred at cell-front.

         Finally, some custody staff in some institutions reportedly harassed and abused seriously mentally disordered inmates.  While interviewed caseload inmates in numerous institutions have often complained to monitoring teams of harassment by custody staff over the course of the mastership in this case, it has been nearly impossible for the monitor to confirm such reports.  During the monitor's April visit to CSP/Corcoran, however, clinical staff not only confirmed reports of harassment of caseload inmates in both administrative segregation and the SHU, but also reported that

some custody staff withheld food and medications from caseload inmates and confessed

their own intimidation by the behavior of some custody staff.  Assembling the proof to

establish definitive responsibility for such conduct on the part of custody staff is always

difficult, particularly in an institution with a history of violence, given the reluctance of

inmates and clinical staff to expose themselves to potential retaliation for their

cooperation in the investigative process.  The administration at CSP/Corcoran undertook

its own investigation

        Confronted with accusations of custody staff misbehavior at the end of the

monitor's April visit, CSP/Corcoran completed an investigation of several specific

allegations that resulted in the disciplining and relocation of three correctional officers in

the administrative segregation unit.  The institution also initiated a broader internal

review of the general allegations of inmate and mental health staff of abuse and

harassment of seriously mentally disordered inmates in administrative segregation.  A

facility captain with an investigative background was appointed to conduct the

assessment.  That investigation consisted largely of videotaped interviews with a limited

number of volunteering inmates and a sampling of mental health and custody staff

members.  In mid-November, seven months after the monitor's April visit, he issued a

draft report of his finding that the general allegations of abuse and harassment described

by the monitor in April could not be corroborated.  Meanwhile, the regional

administration conducted a review of the use of force in CSP/Corcoran against MHSDS

caseload inmates.  The most striking finding in that report was the revelation that 86

percent of all incidents in the institution during the study period involving the use of

force against seriously mentally disordered inmates involved "emergency" applications

of force, which effectively preempted procedures for the pre-planned or calculated use of force with its measures to slow down and mitigate the application of force to MHSDS caseload inmates. Both reports seemed to exonerate custody staff from any wrong-doing; neither report provided meaningful recommendations for improving relations between custody staff and MHSDS inmates.

At the conclusion of the monitor's visit in April to CSP/Corcoran, the defendants committed to one clearly ameliorative undertaking to address the reported tensions among custody staff and MHSDS inmates and mental health staff, namely the procurement of an independent "cultural assessment" designed to evaluate and appropriately enhance relations among the facility's various constituencies. Seven months later that assessment still remained on the drawing board.

When the monitor returned to the institution in July and August, clinical staff acknowledged substantially improved access to caseload inmates in the SHU and administrative segregation through the provision of additional custody escorts and also cited better relations between custody and clinical staff. Inmates in administrative segregation continued to complain about harassment.

## RECOMMENDATIONS

Three recommendations follow from the findings and summary provided in this report. Two deal with the broader issues of staffing and transfers; one addresses the particular situation in CSP/Corcoran.

    1. <u>Staffing</u>: While mental health staffing generally in CDC institutions has improved since the court adopted the defendants' provisional plans, policies and protocols in mid-1997, some pockets of staffing in

some institutions have resisted improvement.  This report reaffirms that psychiatric staffing in HDSP, SVSP and VSPW continues to be unacceptably inadequate, while overall mental health staffing in CSP/Corcoran is insufficient to meet program guide requirements for that facility's large and complex MHSDS caseload.  The defendants should be directed to submit a plan to the court within 30 days for the provision of a meaningful schedule of differential pay, known in the department as R&R, for psychiatrists in HDSP, SVSP and VSPW and for psychiatrists, case managers, recreational therapists and psych techs in CSP/Corcoran.   The plan needs to include a differential pay scale for clinical supervisors, as well as staff clinicians.  The plan must also anticipate and address the potentially adverse impact of an enhanced R&R schedule in the enumerated facilities on adjacent institutions, including here CTF, CCWF and CSATF, as well as competition for mental health personnel inevitably associated with DMH's opening of its Coalinga facility in 2005 and CDC's opening of its Delano II institution.  The plan should include a timeline that permits the inclusion of the enhanced pay scales in the Governor's rewritten FY2005-2006 budget proposal in May, 2005.

In addition, the defendants should be required to submit to the special master within 30 days a breakdown of headquarters staffing for mental health within the Health Care Services Division in Sacramento, identifying all staff, whether full or part-time, including institutional

clinicians detailed temporarily to headquarters and retired annuitants, and their principal areas of responsibility.

2.  Transfers:  CDC should be required to develop and implement within 60 days a department-wide monthly summary of referrals and transfers to all DMH programs for each institution.  The institutional summaries should record and track the fact and dates of referral to each specific DMH program; acceptance or rejection (with reasons) by DMH; the status and outcome of any appeal; the issuance of a bed number by the DMH program; teletype authorizations or endorsements for transfer by CDC classification staff representatives; and the actual transfer.  The institutional monthly summaries should include all pending transfers, as well as all transfers actually referred, rejected or completed during the preceding month. Each institution should be required to submit to HCSD its monthly summary within 15 days of the end of the month, and CDC should be required to submit to the monitor a copy of each institutional summary within 30 days of the end of the month.

3.  CSP/Corcoran:  The defendants need to contract for the provision of the promised "cultural assessment" within 60 days.  The study should be completed within 90 days of its initiation.  CSP/Corcoran also needs to complete and file with the monitor its final fact-finding report on allegations of staff misconduct, as well as a final version of its Use of Force Handbook.  The institution should also be required to provide to the monitor within 30 days of the close of each month a copy of

incident reports involving the use of force against MHSDS caseload inmates, as well as a copy of the Institution Head Use of Force Review Form with a notation on the disposition for each incident reviewed during the preceding month. Lastly in regard to CSP/Corcoran, the defendants should be required to include in the FY2005-2006 budget a request for sufficient clinical staff to provide the mental health services required in the revised program guides for MHSDS caseload inmates in the administrative segregation unit and the SHU.

In their objections to the draft version of this report, the plaintiffs sought two additional recommendations, one requiring a system-wide training effort on mental health assessments in the disciplinary process and the other seeking increased accountability in providing mental health services in EOP hub administrative segregation units in CSP/Corcoran, San Quentin and R.J. Donovan. The first additional recommendation is not supported by the findings in this report, which covered only 11 facilities and found the new assessment process being, for the most part, appropriately implemented.

There is merit, however, to the second requested recommendation. The provision of mental health care to EOP inmates in the administrative segregation units at CSP/Corcoran, San Quentin and R.J. Donovan was found in the 14th round of monitoring to be inadequate, due primarily to a lack of sufficient staff and programming space. The court has already addressed both the staffing and programming space issues raised in these hub EOP administrative segregation units, but the remedies promised by the

defendants, while delivered elsewhere, have not been provided in the enumerated facilities.

   The defendants should, therefore, be required to take steps within 30 days to ensure that adequate staffing and programming space is provided in the three hub units for the EOP population housed in each facility. The defendants should be directed to report in writing on their progress in meeting this requirement to the special master every two weeks until such time as the services required by outstanding orders of this court are provided in each unit on a regular basis. These reports should include the daily population of the units, as well as data on clinical and custody staffing, the scheduled structured therapeutic activities offered each inmate in the unit during the preceding two weeks, with reasons for the cancellation of any scheduled activities, and any deficiencies in the availability of programming space.

   The filing of this report coincides with two other landmark events in the history of this long remedial undertaking. A definitive assessment of the defendants' need for inpatient DMH beds is nearing completion, and the monitor is about to submit recommendations for a final version of the program guides. A proper understanding of the system's need for inpatient care and an effective effort to meet it will fill a vital vacuum, while the court's approval of revised, updated and formerly provisional plans, policies and protocols should signal the beginning of the end of the court's involvement in this case. But this report indicates that mental health services in some CDC

institutions still fall considerably short of an acceptable level of adequacy. This case will not end until the mental health services provided in all CDC facilities, including those identified in this report with lagging services, comply substantially with court-approved plans, policies and protocols.

Respectfully submitted

/s/ J. Michael Keating, Jr.

_____

J. Michael Keating, Jr.
Special Master

February 11, 2005

## DECLARATION OF SERVICE BY EMAIL AND U.S. MAIL

Case Name:  Ralph Coleman, et al. v. Arnold Schwarzenegger, et al., U.S.D.C. Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Nassau, Florida.  I am over the age of 18 years and not a party to the within entitled cause:  my business address is 2351 Sussex Drive, Fernandina Beach, FL 32034.

On February 11, 2005, I served the attached

**FOURTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS**

in said cause by transmitting a true copy by EMAIL.  No error was reported by the machine used to email the document.  In addition, I placed a true copy thereof enclosed in a sealed envelope with postage thereof fully prepaid in the U.S. Mail at Fernandina Beach, FL, addressed as follows:

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Kathleen Keeshen, Esq.
Deputy Director, Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA  94283-0001

Lisa A. Tillman, Esq.
Deputy Attorney General
1300 I Street, Room 125
P.O. Box 944255
Sacramento, CA 94244-2500

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct, and that this declaration was executed at Fernandina Beach, Florida on February 11, 2005.

/s/ J. Michael Keating, Jr.

_____

**FOURTEENTH MONITORING REPORT OF THE SPECIAL MASTER
ON THE DEFENDANTS' COMPLIANCE WITH
PROVISIONALLY APPROVED
PLANS, POLICIES AND PROTOCOLS**

**EXHIBITS**

EXHIBIT A

<u>Correctional Institution for Men (CIM)</u>

April 19, 2004 –April 20, 2004

1.    Inmate A

This inmate arrived at CIM around March 24, 2004.  He was housed in Reception Center East immediately and remained there as of April 20, 2004, when he was interviewed by the monitor's expert.  When interviewed, it was evident that Inmate A's fund of information was small; he did not know the date, his identification number or other basic information.  He reported that this was his first incarceration.  He said that he missed his mother.  His command of spoken language was adequate, but rudimentary.  He said that he could not read or write.  He reported that he had trouble sleeping, paced in his cell nightly, angered his cellmate and owed another inmate cigarettes because he borrowed soup.

Inmate A had a bus screening that resulted in a referral for further evaluation.  The screening was not scored, as CIM's scanner had been broken for a lengthy period of time.  He was seen for further evaluation four days later and placed on the mental health roster.  He reportedly had a history of psychiatric treatment in the community.  Once on the caseload, Inmate A was seen immediately by a psychiatrist and medicated with Zoloft and Risperdal for treatment of Schizoaffective Disorder.  This inmate's medication continuity appeared to be sustained from his arrival through receiving to the reception center.  The inmate's Clark screening indicated normal cognitive functioning, which was inconsistent with observations made by two independent observers.

Assessment:

This inmate's mental health intake processing and treatment were adequate.

2.    Inmate B

This inmate had been at CIM for nearly one year.  He was assigned an EOP level of care on July 14, 2003, nine months prior to the date of this review.  According to a MHTS transfer list, the inmate remained at the EOP level of care in April 2004.  Other sources of information, however, indicated that his level of care was changed to 3CMS in December 2003 and March 2004.  It was not implausible that his level of functioning and level of care changed more than once between July 2003 and April 2004.

Inmate B was housed in Birch for custodial reasons for nearly the entire term of his incarceration.  When interviewed on April 20, 2004, he reported that he had been moved twice very recently because his new cell mate in Birch had harassed a female officer.  He felt upset and unsafe in his new location.  He reported that his stay was long because he had a nine-month violation and two 115 disciplinary infractions.  He said that he thought a SHU term might have been imposed.

When interviewed by the monitor's expert, he appeared to be well oriented, alert and euthymic.  His conversation was logical and relevant.  He appeared to have formed a therapeutic alliance with his case manager.  When questioned about his treatment, he

reported that he had done well when taking Depakote, Paxil and Zyprexa. When he was told by staff that he could no longer have Zyprexa because it was not available, he tried Geodon, but it gave him gastric distress. In November 2003, he decided to stop taking medication. He was not on psychotropic medication from November 2003 through April 2004.

Review of this inmate's UHR showed that he was ordered Geodon, Depakote and Risperdal from July through November 2003. The most recent orders for Zyprexa were dated 2001. His compliance with medication between July and November was very poor. It appeared that he had not been in the MHCB unit since he was released after a two-day stay in August 2003. In July and August 2003, he was in and out of a crisis bed on five occasions, although some admissions were less than one day in duration.

Early in his incarceration on July 24, 2003, inmate B incurred a 115 disciplinary infraction for aggravated battery on a peace officer with an unknown liquid, while he was in the hospital. He was angry about being on suicide precautions. He was also described as psychotic. A SHU term of ten months was assessed and commuted. A district attorney referral was made, but not picked up. Inmate B cleared all hurdles to transfer and was endorsed on April 14, 2004 for SATF-IV at the 3CMS level of care. He was due to be discharged to the community on July 6, 2004.

Psychiatrists who saw him in December were unaware that he was non-compliant with his medications. He was seen every five to ten days by his case manager for the past several months. He was described as stable, alert, oriented and irritable on most occasions.

Assessment:

Intake and transfer processing were unacceptably slow for this mentally ill inmate, resulting in a reception center stay of nine to 12 months under highly restrictive conditions. Part of the reason for the slow pace of processing was the handling of a 115 disciplinary infraction that the inmate incurred while psychotic and in the hospital. During his lengthy reception center stay, psychiatric monitoring was poor, but case management treatment was responsive to his clinical needs.

3.      Inmate C

This inmate had been at CIM at the EOP level of care for over six months. When interviewed on April 20, 2004, he was disoriented, paranoid and delusional with loose associations, pressured speech and volatile mood. Although housed in the general population, he was clearly in need of acute care. He had a current order for Eskalith, but there was no indication that he had taken it since March 16, 2004. The last half of the inmate's March MAR was blank.

Strangely, the most recent entry in Inmate C's UHR was dated one month ago. On March 23, 2004, a psychology progress note indicated that this inmate "was referred for

hospital last week and remains in MHCB today." The inmate apparently had not been seen by mental health staff since he was discharged from the hospital to the general population, which had occurred an unknown number of days or weeks before he was interviewed by the monitor's expert.

Inmate C's name appeared on a DMH transfer log showing that a psychiatrist intended for him to be referred to DMH on March 30, 2004. The referral was never made. The record contained no documentation for the month of April. Staff reported that this inmate had been housed in the hospital for an extended period of time, but the UHR contained no inpatient records. Inmate C was in administrative segregation for most of the month of January. His administrative segregation stay may have been associated with an altercation with his cell mate. His case manager reported orally that Inmate C had been in the hospital from around March 23, 2003 until an unknown date in April, and hence unavailable for outpatient follow-up.

<u>Assessment:</u>

This inmate had been psychotic at CIM for at least six months. He had not been referred to DMH, despite attempts at referral by the clinicians who were treating him. While in the general population, Inmate C was not followed as clinically indicated or as frequently as his EOP level of care required. The inmate's lack of medication compliance went unnoticed by staff. Inmate C's MARs were incomplete. Among the many failings in this inmate's record, two procedural problems were especially prominent:

- Clinicians were unable to refer directly to higher levels of care; their referrals apparently were subject to an administrative veto.

- The mental health service had no standard operating procedure for notifying case managers when inmates on their caseload were discharged from the hospital back to general population.

4.     Inmate D

This inmate was listed on a transfer report, which indicated that he had been an EOP inmate at CIM since October 16, 2003 and was, thus, four months past the 60-day limit for transfer to an institution that could provide EOP treatment; his UHR confirmed that Inmate D had been designated as an EOP inmate continuously for six months. He was seen by a case manager almost every week for the past six months, with the exception of an unexplained three-week hiatus in December 2003.

When interviewed on April 20, 2004, Inmate D appeared to be well oriented, alert and well organized. His mood was elevated. He said he hoped to leave CIM on December 30, 2004. He attributed his lengthy stay at CIM to two 115 disciplinary infractions. He said both stemmed from an argument with the same inmate. He reported that he lost 30 days and was sentenced to an additional 90 days as a result of the infractions. He said he did not take medication, but was seen weekly by his case manager.

There was no bus screening in the inmate's UHR from CIM. Based upon other records, a deduction was made that he arrived sometime between April 2003 and October 2003, but apparently did not go through a bus screening upon entry.

The inmate was treated for Delusional Disorder, paranoid type, r/o Schizophrenia, paranoid type. In October 2003, he was described as having extensive paranoid delusions, acting out violently and refusing to take medication. His presentation was largely unchanged six months later.

Assessment:

Bus screening was not conducted for this inmate. A stay of six months in the reception center for this EOP inmate was unacceptably lengthy. His length of stay may have been affected by two disciplinary infractions that he incurred in the reception center. He was seen weekly by a case manager, with the exception of a three-week hiatus.

5.      Inmate E

The UHR of this inmate was obtained in error from medical records. His was not intended to be part of the sample of UHRs reviewed. He had a mental health screening at CIM in March 2004, but there was no corresponding nursing bus screen, which suggested that he eluded the bus screening when he arrived.

Assessment:

No bus screening was performed for this inmate when he arrived at CIM in March 2004.

6.      Inmate F

This inmate was listed as an EOP inmate on a transfer pending log, but his current level of care was in fact 3CMS. He was housed in the reception center. He had been treated in CIM's MHCB unit from December 29, 2003 to January 1, 2004 at the EOP level of care, after punching a window in anger. In the MHCB unit, he was diagnosed with Borderline Personality Disorder and medicated with Geodon 160, Depakote 2000, and Effexor 225 m.g. He was seen by a clinician for four of five days of planned follow-up after being discharged from the MHCB unit. Inmate F's medication continuity was sustained when he left the MHCB unit to go to general population.

About three weeks later, during a psychiatric follow-up, the inmate's dose of Effexor was changed, but the inmate did not receive the new dose of medication until 5 days after the orders were written. In addition, the inmate's Geodon was discontinued, but restarted a few days later. Again, the new medication orders did not result in a change in medication administration for four days. Inmate F's blood levels were checked and a psychiatrist signed the results on January 21, 2004. A second blood level was ordered and the results were obtained eight days later.

During the month of January 2003 following discharge from the MHCB unit, Inmate F was placed in the "At Risk" program. The inmate attended group treatment while in the program, but incurred an infraction on January 30, 2004. He signed a refusal of all medication on February 1, 2004. Ten days later, a psychiatrist wrote a discharge order for all medication. At that time, a progress note written by a case manager indicated that the inmate's thought processes were logical and relevant, but that he expressed delusional material and exhibited religiosity. He continued to be seen weekly either in a group or individually.

One month after the inmate's medication was discontinued, a trial of Trileptal was initiated at his request on March 10, 2004. Inmate F was seen again one week later and the dose for this medication was increased. His level of care was changed to 3CMS on March 15, 2004. One month later, his mood was noted as improved. Weekly follow-up continued through March and April. When interviewed on April 20, 2004, he appeared to be neatly dressed, well groomed, well oriented and alert; his conversation was logical and relevant.

Assessment:

This inmate's length of stay in the reception center exceeded specified time limits. His mental health treatment met program guide requirements, with the exception of one missed day of five-day follow-up and excessively long processing times for medication orders.

7.      Inmate G

Inmate G was treated at the 3CMS level of care in April 2004. In January 2004, he was treated in the MHCB unit for Depressive Disorder NOS because he expressed suicidal thoughts. He was medicated with Depakote 1500 and discharged after a two-day stay with orders for Depakote and five-day follow-up.

Medication continuity was sustained for this inmate when he moved from the MHCB unit to the reception center. His medication regimen was changed about one week after he was discharged from the MHCB unit because he said he no longer wanted to take Depakote; Trileptal was ordered instead. Informed consent for Trileptal was obtained from the inmate. There was a four-day gap between the writing of the new medication order and the inmate's receipt of the medication.

Inmate G was seen for all five days of required follow-up. He was followed appropriately by a psychiatrist after a change in his medication regimen. The inmate was often uncooperative and told the doctors that he wanted Seroquel. Psychiatry was responsive to his reports, but observed that, since he was tolerating Trileptal well, a medication change was not warranted.

Assessment:

This inmate's mental health treatment was adequate. Psychiatric monitoring following a change in this inmate's medication regimen was good, as was medication continuity when he changed locations. The inmate was seen for all five days of follow-up, after being discharged from the MHCB unit.

8.       Inmate H

Inmate H was discharged from the MHCB unit on January 20, 2004, after a stay of ten days. He was discharged with orders for Buspar, Geodon, Depakote, five-day follow-up and a recommendation for the 3CMS level of care. Medication continuity was sustained for this inmate when he moved from the MHCB unit to the reception center. He was seen for four of five days of follow-up.

Inmate H had been treated at the EOP level of care since January 30, 2004, ten days after he left the MHCB unit. He had been seen nearly weekly by his case manager for the past two and a half months. He frequently complained of gastric distress associated with his medication regimen and occasionally refused medication. His medication orders were changed by psychiatry to include Seroquel, as he requested.

The inmate was scheduled to be paroled in April 2004. His UHR contained a TCMP chrono dated April 7, 2004 and several recent progress notes contained information about discharge plans.

Assessment:

This inmate's mental health treatment was adequate, but the length of his stay in the reception center exceeded acceptable limits. During Inmate H's time in the reception center, he was hospitalized in the MHCB unit, after which he received appropriate suicide prevention follow-up for four of five days. The inmate's medication continuity was sustained, psychiatry was responsive to his reports and he was seen weekly by a case manager. He received discharge planning from a TCMP worker and his mental health treatment provider at CIM was also attentive to his discharge plans.

9.       Inmate I

Inmate I was treated at the 3CMS level of care. When interviewed in a group on April 20, 2004, he reported that some psychiatrists would order Seroquel, but others would not. Review of his UHR indicated that he had a two-week trial of Seroquel in March, which was discontinued after it was determined that he did not need an anti-psychotic medication.

Assessment:

This inmate's mental health treatment was adequate.

EXHIBIT B

California State Prison at Corcoran (CSP/Corcoran)

April 12, 2004 – April 15, 2004
June 2, 2004 – June 3, 2004

1.      Inmate A

This inmate was briefly observed by the monitor's expert during rounds in the administrative segregation unit. He complained about the lack of timely access to a psychiatrist.

The inmate was seen at the cell-front, due to the lack of available correctional escort officers, on November 4. On November 19, 2003, Inmate A was described as being very anxious and angry related to the untimely renewal of his prescription for Zoloft. This reported gap in medication was confirmed by mental health staff. The inmate was seen again by a psychiatrist at cell-front due to the lack of sufficient escort officers on December 2, 2003. Inmate B next met with a psychiatrist on December 30, 2003, when he was prescribed Effexor XR.

The health care record of this inmate was also reviewed. His last appointment with a psychiatrist was on March 5, 2004. Against Inmate A's wishes, the psychiatrist did not find sufficient clinical indicators to warrant a prescription for Artane. Geodon was prescribed, instead, in an attempt to help the inmate with his anger.

Assessment:

This inmate experienced problems with access to a psychiatrist, especially in the context of out-of-cell contacts.

2.      Inmate B

This inmate requested to see a psychiatrist in order to have his medications changed.

Inmate B was admitted to the MHCB on March 22, 2004. His medications included Risperdal and Depakote. It appeared that the inmate has been receiving medications on a Keyhea order since at least December 2003.

This inmate was seen at the cell-front on April 1, 2004, due to the lack of available mental health escorts. A MH-4 assessment was completed on April 9, 2004. His diagnoses included Schizoaffective Disorder and brain trauma.

The health care record of this inmate contained a suicide risk assessment dated April 9, 2004. Inmate B was described as previously receiving an EOP level care. His presentation was consistent with the diagnosis of Schizophrenia. He remained mildly disorganized and significantly depressed.

Assessment:

The monitor's expert was unable to determine the events leading to this inmate's current placement in administrative segregation housing. In was clear that Inmate B had a serious mental disorder, which continued to be associated with psychotic features. It was

difficult to assess and treat this inmate at cell-front, which often occurred due to lack of available correctional escort officers.

3.      Inmate C

This 33-year-old inmate was described as a relatively recent admission to the administrative segregation unit.  He was reportedly not very talkative during mental health rounds.

A December 29, 2003 note reported that Inmate C was very anxious and had a history of auditory hallucinations for about seven years.  The impression was probable Schizophrenia.

The inmate's most recent treatment plan update was dated January 29, 2004.  The problems described in that plan included grief and depressive symptoms.  The monitor's expert did not find any reference to psychotic symptoms in the treatment plan.

A February 4, 2004 progress note indicated that this inmate's health care record was not available.  The inmate was noted to be depressed and tearful during what appeared to be his IDTT meeting.  The inmate's previous case manager visit was at cell-front on March 9, 2003.  This inmate was minimally responsive to his case manager.  He was seen again at cell-front by the same case manager on March 18, 2004 and was found to be unresponsive.

The health care record of this inmate was reviewed.  This inmate declined a cell-front visit with his case manager during the morning of the April 13, 2004.  Although sullen in appearance, he was courteous and responsive to his case manager.

Assessment:

This inmate appeared to be experiencing a significant depressed affect and probable psychotic symptoms.  It was very difficult to assess and treat the inmate adequately due to both his clinical state and the inability of clinicians to meet with him routinely in a setting that facilitated the development of a therapeutic alliance; most of the inmate's clinical contacts occurred at cell-front.

4.      Inmate D

Inmate D complained that he was not receiving adequate treatment in the administrative segregation unit, but he reported that he was seen by a case manager on a weekly basis. The inmate was wearing a helmet related to a reported seizure disorder.  He indicated that he did not know why he was in administrative segregation.  Custody staff reported, however, that he had knocked out a MTA, after hitting him twice during a reported seizure. He apparently was assessed a SHU term.  This inmate also indicated that he was just recently notified by the chaplain that his brother had died.

The health care record of this inmate was reviewed. Weekly case management contacts were documented since at least February 2004, although the inmate apparently had been in the administrative segregation unit since February 2002. Based on a review of volume six of the inmate's UHR, it did not appear that Inmate D had been previously receiving weekly case management contacts.

The inmate was currently taking anti-convulsant and anti-inflammatory medications. Inmate D was also prescribed Zoloft on February 4, 2004.

The inmate's treatment plan was last updated on June 2, 2003. His diagnoses were Psychotic Disorder and Antisocial Personality Disorder. The treatment plan was very vague in content. The inmate's most recent note by a psychiatrist was dated October 14, 2003.

Assessment:

Based on review of the health care record, Inmate D was not receiving timely assessments by a psychiatrist. It was unclear whether the frequency of his contacts with the case manager has been weekly since his admission to the administrative segregation unit.

5.      Inmate E

This 27 year-old man has been incarcerated in CDC since 1995 and had a SHU custody classification since 1998. Inmate E had been in the PBSP PSU from 1998 until his transfer to the CSP/Corcoran SHU during 2002.

Inmate E stated that he had been diagnosed as having a severe Personality Disorder and a Bipolar Disorder. His current medications included Haldol 5 mg po b.i.d., Wellbutrin 150 mg po b.i.d. and Artane 6 mg po q.d. The inmate reported that he had only been restarted on medications during the past several months, after attempting to see the psychiatrist for many months due to the return of symptoms including auditory hallucinations and thought-withdrawal.

This inmate indicated that his visits with the psychiatrist, which varied from every 90 days to six months, were almost always at cell-front. He complained that his visits with his case manager, which he thought were not helpful, generally occurred in the programming cell by the correctional officers' station, and did not provide for auditory privacy.

Inmate E stated that he had been transferred from the PBSP PSU to CSP/Corcoran after being free of any major disciplinary infractions for one year, which was supposed to have resulted in a suspended SHU term. However, he stated that his SHU term was not suspended due to the associate warden's transfer to CSP/Corcoran, which created an administrative obstacle for processing the reported planned suspension.

The current symptoms described by the inmate included auditory hallucinations, paranoid thinking and thought withdrawal. Mood swings were also described by this inmate, which were predominantly depressive in nature.

This inmate complained that he had experienced excessive use of force two to three months earlier, but indicated that an incident report was not written.

The health care record of this inmate was reviewed. The last documented case manager note was dated March 4, 2004. This inmate was noted to have a Depressive Disorder nos, Polysubstance Dependence and an Antisocial Personality Disorder. ADHD was also considered in the inmate's differential diagnosis.

The inmate's diagnoses in August 2002, while he was still at the PBSP PSU, included Dysthymia, Post-Traumatic Stress Disorder and Antisocial Personality Disorder with borderline features. A September 17, 2003 treatment plan indicated a diagnosis of Bipolar II and Antisocial Personality Disorder. The plan included medication by the psychiatrist. A March 4, 2004 treatment plan indicated the inmate's diagnoses to be Depressive Disorder nos, Polysubstance Dependence, Antisocial Personality Disorder and r/o ADHD.

A December 9, 2003 case management note indicated that Inmate E was seen at cell-front due to the lack of escort officers. During October 2003, this inmate was evaluated related to self-mutilating behaviors.

The most recent documented psychiatrist/physician order was dated December 9, 2001 starting Haldol, Artane and Benadryl. The most recent psychiatrist note was dated September 19, 2003, at which time the inmate's Prozac was discontinued.

Assessment:

This inmate's presentation was consistent with the differential diagnoses of a psychotic disorder nos and a personality disorder. The lack of psychiatric follow-up gave cause for concern. It appeared that the inmate was functioning much better in the highly structured PSU environment, as compared to the SHU. A PSU level of care should be considered.

6.     Inmate F

This 27-year-old inmate had been incarcerated in CDC since 2000. He was admitted to the PSU at CSP/Sac during early 2003, prior to his transfer to the CSP/Corcoran SHU in December 2003. Inmate F described difficulties in obtaining his prescribed Seroquel during the first two to three weeks of his incarceration in the SHU. He subsequently refused his medications for a variety of reasons, which were, in part, somewhat disorganized.

This inmate described several verbal outbursts in the SHU related to his interactions with correctional officers. He stated that he urinated on the tier during the past week because of the problematic behaviors of other inmates.

Inmate F was unaware of his diagnosis, although he did acknowledge having some emotional difficulties. He stated that the diagnosis of Paranoid Schizophrenia was not correct. He described the 3CMS program as being a sham. Significant problems with access to a psychiatrist were reported by Inmate F.

This inmate indicated a desire to return to the PSU at CSP/Sac. He described the group therapy as having been helpful. He stated that he did not participate in yard activities due to concerns regarding other inmates.

The health care record of this inmate was not available for review.

Assessment:

This inmate's presentation was consistent with the differential diagnosis of Paranoid Schizophrenia and a Schizoaffective Disorder. A PSU level of care should be considered.

7.    Inmate G

This 58-year-old inmate had been incarcerated through CDC since 1996 and in the SHU at CSP/Corcoran since 1999. He reported that he was receiving psychotropic medications, although he was unclear about the reasons for such medications. He indicated that he had been receiving medications under a Keyhea order, which had expired about six months ago. He stated that he was placed on a Keyhea order related to smearing feces because "I wanted to make the officers mad..."

This inmate used a wheelchair related to mobility issues due to chronic back problems. He had coronary bypass surgery during 1999 and was currently being worked up for cardiac symptoms. He was also followed in neurology clinic for an apparent dementia.

Inmate G did not know the name of his psychiatrist, whom he has seen one to two times during the past six months. He reported meeting with a case manager he knew by name about once every several months.

A mental status examination demonstrated no symptoms of a psychotic disorder. The inmate's affect was euthymic. His verbal behavior demonstrated vague content of speech, although there was no evidence of an overt thought disorder. Mild confabulation appeared to be present. The inmate was oriented in all three spheres.

The health care record of this inmate was reviewed. The inmate's most recent treatment plan was dated October 9, 2002. His diagnoses included Delusional Disorder, Substance Induced Psychotic Disorder and Antisocial Personality Disorder. Inmate G had been under a Keyhea order for one year beginning May 1, 2002. His medications since, at

least, October 2003 included Valproic Acid, Haldol, Remeron and Cogentin. Appropriate laboratory studies had been ordered,

The most recent note by a psychiatrist in the inmate's UHR was dated June 18, 2003. An October 22, 2003 IDTT meeting indicated that the inmate was last evaluated by a psychiatrist on July 22, 2003. Inmate G's annual ICC was conducted on October 23, 2003. The monitor's expert was unable to locate documentation of further psychiatric face-to-face follow-up.

Weekly cell checks by the psych techs were documented. The inmate's most recent case management contact was documented on December 11, 2003. The inmate was seen at cell-front due to the lack of available correctional escort staff.

Assessment:

The lack of documented psychiatric follow-up was disturbing, especially in the context of this inmate's multiple medical problems, which apparently included dementia. This inmate was not receiving appropriate mental health treatment.

8.      Inmate H

This 31-year-old inmate indicated that he had been incarcerated in CDC since 1998 and in CSP/Corcoran since 2001. Inmate H indicated that he had received an EOP level of care in the past at CMC East and at CSP/Sac. Records relevant to treatment in an EOP were not reviewed because the monitor's expert only had access to volume IV of this inmate's four-volume UHR. The inmate also reported a psychiatric hospitalization in Mississippi, which was characterized by psychotic symptoms.

Inmate H indicated that he took Wellbutrin and one other psychotropic medication. He described poor access to his case manager. Numerous psychiatric symptoms, which were characterized by over inclusiveness, were described by this inmate.

The health care record of this inmate was reviewed. The most recent note by a psychiatrist was dated March 27, 2004, indicating that the inmate's presentation was consistent with a psychosis and a history of affective symptoms. The interview was at cell-front due to Inmate H's refusal to leave his cell. His Seroquel was subsequently increased and a decrease in Wellbutrin was to be considered at the next appointment that was to occur in three weeks. The inmate's most recent case management contact occurred in September 2003.

The most recent treatment plan was dated August 12, 2003. The inmate's diagnoses included Bipolar Disorder nos, Polysubstance Dependence and Antisocial Personality Disorder. This inmate had a Clark assessment on October 31, 2003. This assessment was apparently negative although the inmate refused testing. Weekly cell checks by a psych tech during the past several months were documented.

<u>Assessment:</u>

This inmate's presentation was consistent with the differential diagnosis of a Bipolar Disorder, Psychotic Disorder nos, and a Personality Disorder. The absence of regular case management contacts was of concern in the context of this inmate's presentation and reported diagnosis. The inmate was not receiving mental health treatment consistent with program guide requirements.

9.       Inmate I

This 39-year-old inmate had been in CDC since 1991 and had a SHU classification throughout that period. He reported that he received psychotropic medications because he had auditory hallucinations, depression and a sleep disturbance. These medications were described as being somewhat helpful. The inmate had a long history of substance abuse, especially cocaine use.

Inmate I had been incarcerated in the SHU at the PBSP, CCI and CSP/Corcoran. He reported that the correctional officers at CSP/Corcoran were more prone to harass inmates, compared to correctional officers in other SHUs.

Inmate I indicated that he saw a psychiatrist every four months at cell-front. He reported that he was not seen by a case manager.

The health care record of this inmate was reviewed. The most recent psychiatrist note was dated March 15, 2004. According to a progress note, the inmate's medications were renewed at that time, although the psychiatrist's orders ordering the renewal were not found in the chart. The inmate's previous medications were Remeron 30 mg po q.d. and Olanzapine 20 mg po q. p.m. The previous psychiatrist's note was dated December 11, 2003. The most recent MAR in the chart was dated February 2004.

The most recent case management note was dated October 29, 2003. This inmate's diagnosis was described as being a Major Depressive Disorder with Psychosis. The last treatment plan update was dated May 14, 2001. The inmate's diagnoses included Psychotic Disorder nos and Antisocial Personality Disorder.

<u>Assessment:</u>

It was difficult to clarify this inmate's differential diagnosis based on documentation in this inmate's UHR, due to the lack of an adequate database and because of inadequate mental health follow-up. A 3CMS level of care would be appropriate for this inmate, if program guides were followed.

10.    Inmate J

This 30-year-old inmate had been in CDC for about ten years and had a SHU classification since 1996. His current medications included Zoloft and Zyprexa for apparent affective symptoms. Inmate J reported not seeing a clinical case manager. He reported seeing the psychiatrist around two to four times, but the visits occurred only intermittently in a setting with adequate auditory privacy.

The health care record of this inmate was reviewed. Inmate J was last seen by a psychiatrist on February 23, 2004. Prior visits with the psychiatrist occurred on November 6, 2003 and October 16, 2003. The last psychiatric order was dated October 29, 2003, which increased this inmate's Olanzapine and continued his Benadryl. His diagnosis was listed as Bipolar Disorder with Psychotic Features.

The inmate's most recent treatment plan was dated September 10, 2003. His diagnoses included Depressive Disorder nos and Antisocial Personality Disorder. The inmate's last case management note was dated August 11, 2003. The inmate's March 2004 MAR confirmed this inmate's report that he was receiving Zoloft, Olanzapine and Benadryl.

Assessment:

This inmate was appropriate for receiving a 3CMS level of care, although his current treatment was not consistent with program guide requirements.

11.    Inmate K

This 46-year-old inmate had been in the CSP/Corcoran SHU since December 1999. He previously had been treated in the PBSP PSU until being paroled. He stated that he stopped taking his medications after being paroled and was violated about four months later.

Inmate K reported that at DVI his level of care was changed from EOP to 3CMS for reasons that were not clear to him. He reported receiving the wrong dosage of medication and untimely renewals in the past. This inmate also reported that he had not been seen by a case manager and had only occasionally been seen by a psychiatrist at cell-front.

Inmate K reported that he continued to experience auditory hallucinations. His medications he said included Olanzapine, Haldol, Cogentin and Prozac.

The health care record of this inmate was reviewed. The most recent note by a psychiatrist was dated March 28, 2004. The prior psychiatrist note was dated November 3, 2003. The last psychiatric orders present in the UHR were dated January 3, 2004 for Haldol, Benadryl, Prozac and Cogentin.

An IDTT note, dated February 7, 2004, was present in the chart. Another IDTT progress note was dated December 17, 2004. A 1999 mental health update indicated diagnoses of Schizoaffective Disorder, Opioid Dependence, Alcohol Dependence, Antisocial Personality Disorder and Hepatitis C. These diagnoses were consistent with the CSP/Corcoran treatment plan dated October 18, 2000. Documentation relevant to other more recent treatment plans was not located in the chart.

Progress notes from 1998 during the inmate's stay in the PBSP PSU indicated diagnoses of Bipolar I Disorder, in partial remission, most recently depressed, Polysubstance Dependence, Antisocial Personality Disorder and an advanced liver disease, Hepatitis C.

Assessment:

The rationale for changing this inmate's level of care from EOP to 3CMS was unclear from the UHR. The frequency and nature of the inmate's clinical contacts were disturbing, especially given the inmate's documented history in the PBSP PSU. This inmate was not receiving mental health treatment consistent with program guide requirements.

12.    Inmate L

This 33-year-old inmate had been in CDC for about 11 years and in the CSP/Corcoran SHU for about the past year. He reported receiving mental health treatment for a Bipolar Disorder characterized by mood swings. His medications included Remeron and Wellbutrin, which were described as being helpful.

Problems with access to psychiatrists were described by Inmate L. The inmate reported that he was not seen a case manager on a regular basis.

The health care record of this inmate was reviewed. The last psychiatrist note in Inmate L's chart was dated March 20, 2004. The inmate's prescriptions for Risperdal, Vistaril and Wellbutrin were renewed at that time and his Remeron was increased. The most recent case manager note was written by a psychologist. Mental health notes were also present in the chart as part of an ICC hearing. The inmate was, in addition, seen by a case manager on November 13, 2003 and assessed by a clinician on December 5, 2003.

The inmate's most recent treatment plan was dated May 27, 2003.

Assessment:

This inmate was appropriately assigned to a 3CMS level of care, although it appeared that he was not receiving care consistent with program guide requirements. Clinical contacts either did not occur in a setting that allowed for auditory privacy or were not relevant to his current difficulties. Both of these problems appeared to be related to current resource allocations and physical plant limitations.

13.     Inmate M

This 3CMS inmate was housed in the SHU.  He was diagnosed with Major Depressive Disorder and Delusional Disorder, nos.  An additional diagnosis of Schizophrenia, paranoid type, was also present in the inmate's UHR.  The inmate was not prescribed psychotropic medications at the time of the monitoring visit.

This inmate was transferred from CMC to CSP/Corcoran on March 19, 2004 for placement in the SHU.  The inmate was not on psychotropic medications at the time of transfer; but he had been treated with Prozac as recently as September of 2003.  The inmate's mental health record also indicated that he had a history of EOP placement up to November 19, 2003 and he had been treated with Seroquel as recently as May 2003.

The only mental health information present since the inmate's transfer to CSP/Corcoran was a progress note dated March 5, 2004 by a case manager, indicating that the inmate was seen for an initial ICC hearing.

Assessment:

There were significant deficiencies noted regarding the care provided to this inmate.  There was no documentation of an MH-2 or an MH-4 being completed upon the inmate's arrival at CSP/Corcoran.  There was no documentation of monthly psych tech rounds in the medical record, and no documentation that the inmate had been adequately assessed by a case manager since his arrival at CSP/Corcoran.  The only documentation of case manager contact was the above-mentioned ICC note.  There was also no documentation of a psychiatric evaluation since the inmate's arrival at the institution.

These deficiencies were of significant concern because the inmate, when seen at the time of the monitoring visit, presented with probable psychotic symptomatology, including probable response to auditory hallucinations, unkempt appearance and disorganized behavior.  An assessment by a psychiatrist for probable treatment with psychotropic medications was clearly indicated.  Transfer to a higher level of care should also be considered after an evaluation.

14.     Inmate N

This 3CMS inmate was diagnosed with Bipolar II Disorder, as well as Sexual Sadism.  He was treated with Artane 4 mg/day, Wellbutrin 400 mg/day, Benadryl 50 mg/day and Risperdal LA 25 mg intramuscular every two weeks.

A review of this inmate's medical record indicated that he had previously been on a Keyhea order that expired on October 27, 2003.  Progress notes by the psych tech indicated that the inmate was compliant with his medications.  It appeared that the inmate was scheduled for case manager contacts on December 23, 2003, February 11, 2004 and March 3, 2004.  The case manager indicated that all attempts at clinical contact were refused.  The inmate was last seen by a psychiatrist on March 20, 2004.  The psychiatric

progress note was difficult to decipher, but it appeared that the inmate was seen because he refused his Risperdal injection.

Assessment:

The care provided to this inmate was of concern for the following reasons:

- It appeared that the inmate had not been seen for clinical evaluation by a case manager since August 22, 2003.

- There was no documentation of any attempts to conduct a mental health evaluation, even though the inmate was consistently refusing interview attempts.

- There were some lapses in the documentation of weekly psych tech rounds.

- This inmate's Keyhea order was allowed to lapse, despite the inmate's history of treatment non-compliance and the recurrent course of his illness.

At the time of the monitoring visit, this inmate appeared to be psychiatrically unstable, reporting increasing auditory hallucinations. He presented with hyperverbal speech and hyperactivity, as well as emotional lability. His appearance was bizarre, with tissue inserted into his nostrils. At the time, the inmate was requesting an evaluation by a psychiatrist. In view of this inmate's history, immediate psychiatric intervention was indicated to prevent probable psychiatric decompensation. This information was conveyed to the facility staff.

15.    Inmate O

This 3CMS inmate was housed in the MHCB unit. He was diagnosed with Mood Disorder due to back and knee injury, as well as pain disorder associated with psychological factors and a general medical condition. He was not prescribed psychotropic medications at the time of the monitoring visit. There was a standing order for Geodon as needed, to be used for extreme agitation.

The inmate was housed in the MHCB unit at the time of the monitoring visit due to a serious suicide attempt by laceration of his neck. A review of the inmate's medical record and incident reports indicated that he initially presented to the emergency room on April 13, 2004 at 4:00 p.m. stating that he was going to kill himself. The incident report indicated that the on-call psychiatrist was contacted at that time. An interview with the nurse who made the call indicated that she was informed by the psychiatrist that he was not scheduled to be called until 5:00 p.m. She reported that she then called another psychiatrist who informed her that he was on vacation. This psychiatrist did direct the nurse to call the chief psychiatrist. The emergency room nurse indicated that at the time that the inmate presented to the emergency room, there were no vacant beds in the MHCB unit. She reported that she provided the chief psychiatrist with the phone number to population management, so that the chief psychiatrist could contact them regarding the need for a MHCB bed. At 6:17 p.m., the medical doctor provided an order for pain

medication and for the inmate to return to the yard. The nurse documented that she called the on-call psychiatrist immediately thereafter at 6:18 p.m., advising him of the medical doctor's orders and indicated that he agreed with those orders. The inmate was then returned to the housing unit.

The incident report indicated that the inmate was found the following morning on April 14, 2004 at approximately 6:09 a.m., after cutting his neck in a suicide attempt. The inmate was treated in the emergency room and subsequently transferred to the MHCB unit, where he remained at the time of the monitoring visit.

The inmate's outpatient medical record indicated that he had a significant history of medical difficulties, primarily a herniated disk at L4 to S1 with radiculopathy. There were also orders in the medical record regarding his mobility; there were actual orders, indicating that the inmate was only to use a wheelchair when traveling to the acute care hospital and that he should otherwise use a walker.

The mental health progress notes indicated that Inmate O was followed by his case manager, who indicated that the inmate's medical health had been deteriorating. The inmate was not prescribed psychotropic medications.

The inmate's case manager was interviewed. She indicated that the inmate's suicide attempt was a surprise to her, but she did report that the inmate had significant depression related to his progressively deteriorating medical condition and his perception that there was a lack of adequate response to his condition. She expressed his concerns that he had been scheduled for surgeries that were postponed repeatedly. She did report that the inmate was actively involved in treatment and had completed an anger management group therapy course last year.

Assessment:

The care provided to this inmate was of significant concern for the following reasons:

- This inmate initially presented in the emergency room at 4:00 p.m. The emergency room nurse was unable to locate an on-site psychiatrist and attempted to contact the on-call psychiatrist, who told her that he was not on call at that time. The inmate was eventually released from the emergency room and allowed to return to his housing unit after consultation with the on-call psychiatrist; the consultation occurred after 5:00 p.m. when the psychiatrist went on-call. This inmate was returned to the housing unit without documentation of a suicide risk assessment or face-to-face contact with a mental health provider. The inmate also expressed significant fear of returning to his unit due to conflicts with a specific custody officer.

- It also appeared that this inmate, with chronic and progressive deterioration in his medical condition and reported chronic pain, did not have his medical concerns

adequately addressed. This scenario has been identified as a factor in past
completed suicides.

- Finally, there did not appear to be a psychiatrist on site at 4:00 p.m., when the
  inmate initially presented with suicidal ideation to the emergency room.

16.    Inmate P

This 3CMS inmate was housed in the SHU unit and diagnosed with Schizoaffective
Disorder, Bipolar Type. He was treated with Depakote 1000 mg/day and Zydis 20
mg/day. This inmate was on a Keyhea order, which was scheduled to expire on August
30, 2004. The inmate was on a Keyhea order due to his dangerousness to others.

This inmate was transferred from HDSP to the SHU unit at CSP/Corcoran on January 15,
2003. On November 5, 2003, the chief psychiatrist indicated that he had discussions with
the inmate's clinician who indicated that the inmate was psychotic and on a Keyhea
order; at that time, STAT orders for Haldol were given with an increase in the inmate's
Zyprexa. It should be noted that the inmate was not seen at this time for face-to-face
clinical contact. The chief psychiatrist also indicated that the inmate would be brought to
the emergency room, if necessary. It did appear that the inmate was subsequently
admitted to the MHCB unit, where he remained from November 5 to November 25,
2003. Thereafter, the inmate was transferred to CMF/DMH for further stabilization. He
remained at DMH until December 5, 2003. It was unclear from the medical record
whether the inmate was discharged from DMH with medication recommendations. There
was, however, an order for Benadryl and Vistaril written on the day of the inmate's
arrival at CSP/Corcoran.

Inmate P was seen on December 8, 2003 by his case manager, who noted that the inmate
was psychotic with manic symptoms. The case manager also indicated that the inmate
had been non-compliant with his medications for four days. On that day, the inmate was
admitted to the MHCB unit, where he remained until December 16, 2003. The inmate
was discharged back to the 3CMS SHU after his release from the MHCB unit. He was
seen by a case manager on December 22, 2003, who reported that the inmate remained
with psychotic symptoms, including disorganized speech. The only recommendation
made at that time was to retain the inmate in the 3CMS program.

Inmate P was last seen by a psychiatrist on January 29, 2004, when he was reportedly
hypomanic with hyperreligiosity. His Depakote was increased at that time. The last
clinical progress note in the inmate's chart was dated February 25, 2004, by a psych tech
who indicated that the inmate was uncooperative with an interview and made derogatory
comments to the psych tech during rounds. Two days later, the psych tech noted that the
inmate had been refusing oral medications and he was transferred to the emergency room
for an injection.

Assessment:

The care provided to this inmate was of significant concern. This inmate, with a documented history of dangerousness to others, was last seen by his case manager on December 22, 2003, when he was reportedly psychotic. No clinically indicated plans were made regarding care for this inmate at that time and no subsequent case manager contacts were documented. Furthermore, when the inmate was last seen by the psychiatrist on January 29, 2004, he again presented with psychotic symptoms. The only clinical intervention performed at that time was medication adjustment. This inmate remained psychotic with continued medication non-compliance, despite his Keyhea orders.

Additional concerns regarding the care provided to this inmate include the following:

- Despite treatment with Depakote and medication adjustments, there was no documentation of appropriate laboratory testing for this medication.

- It was of concern that this inmate was released from the acute psychiatric program at DMH in December with no documentation of a discharge summary or treatment recommendations.

- There appeared to be some lapses in psych tech rounds for this inmate. The psych tech also frequently documented that the inmate was asleep, with no subsequent documentation of follow-up.

This inmate was interviewed by the monitor's expert during the monitoring visit. He presented with significant psychopathology, including hyperreligiosity, paranoid delusional thinking, pressured speech and poor insight regarding his mental illness. The inmate indicated that "psychiatry is a tool of the devil". He also indicated that psychiatrists were wizards and should be put to death. This inmate was clearly in need of more aggressive therapy, including recommendations for EOP treatment, at a minimum, or DMH hospitalization. Continued housing in the SHU unit was contraindicated for this inmate, due to his psychiatrically unstable condition.

17.    Inmate Q

This 3CMS inmate was housed in the SHU. He was diagnosed with Psychotic Disorder, NOS and Anti-Social Personality Disorder. The inmate was treated with Seroquel 800 mg/day.

This inmate was transferred to the CSP/Corcoran SHU on May 20, 2003. The progress notes indicated that he remained in the SHU throughout the review period. The progress notes further indicated that the inmate was frequently uncooperative in an interview with no response to questions and that, at times, the inmate presented with suicidal behavior and paranoid delusional thinking concerning the poisoning of his food and water.

There appeared to be at least two MHCB hospitalizations noted in the inmate's chart. The first occurred for approximately one day, from February 4 through February 5, with a discharge diagnosis of Psychotic Disorder, NOS. The second hospitalization occurred from February 5 through February 17, with a discharge diagnosis of Anti-Social Personality. The last progress note in the medical record was dated March 3, 2004 by the psych tech and indicated that the inmate was asleep, no problems were reported by the staff and the inmate was eating well.

Assessment:

The care provided for this inmate was of significant concern for the following reasons:

- This inmate presented with chronic, paranoid delusional thinking and a history of poor medication compliance. Despite this, he appeared to receive poor clinical follow-up. He was last evaluated by a psychiatrist, while in the MHCB unit on or about February 17, 2004. The last documented case management contact with the primary clinician occurred on February 2, when the inmate reported hallucinations urging him to harm himself; this resulted in a MHCB hospitalization. Despite the fact that this inmate refused interviews and medication, there was no documentation of additional interventions.

- There appeared to be lapses in the documentation of the psych tech rounds with respect to this inmate. When the psych tech documented that the inmate was asleep, there was no subsequent follow-up.

This inmate was interviewed by the monitor's expert. At the time, Inmate Q was exhibiting paranoid delusional thinking with significant anxiety because he believed that the custody staff was poisoning his water. He indicated that he only drank water from the showers, as he believed that this was the only water that was not contaminated. He also expressed the belief that the staff was attempting to "push me over the edge."

This inmate clearly required a higher level of care then was provided. In a progress note documenting an ICC meeting on January 21, 2004, the case manager indicated that the inmate was refusing medications. The note further indicated that a higher level of care would be considered and an evaluation was needed for possible EOP placement. There was no documentation of any follow-up regarding these issues.

18.     Inmate R

This 3CMS patient was housed in the SHU. There was no current diagnosis in the inmate's medical record; there were, however, past diagnoses of Dysthymic Disorder and Major Depressive Disorder. The inmate was not prescribed psychotropic medications at the time of the monitoring visit.

The information presented in the inmate's medical record was confusing regarding the clinical course of this inmate's treatment. It appeared that this inmate was on the 3CMS

caseload until May 28, 2003, when he was removed. The IDTT meeting indicated that the inmate had refused medications and that he had not been treated with psychotropic medications for over one year. It should be noted that the inmate did request to be continued in the 3CMS program at that time. There was no mental health documentation in the inmate's UHR after May 29, 2003; a MHTS printout of clinical contacts, however, showed that Inmate R was seen by a psych social worker on March 26, 2004. The printout also indicated that a case management contact occurred in response to the inmate's self-referral on March 22, 2004; according to the printout, the inmate refused the interview.

Assessment:

The lack of clinical documentation, regarding the care provided to this inmate, was of concern as it made an evaluation of the care provided to Inmate R very difficult. This inmate was apparently on the mental health roster again, after having been discharged; there was, however, no documentation regarding his return to the mental health caseload, nor was there appropriate documentation of clinical contacts.

EXHIBIT C

California State Prison, Los Angeles County (CSP/LAC)

April 21, 2004 – April 23, 2004

1    Inmate A

Review of this case by the monitor's expert was abridged and not all pertinent clinical and custodial materials were reviewed. According to a MH-2, this inmate was placed in CSP/LAC's EOP on February 17, 2004 for treatment of high anxiety and auditory hallucinations. He may have been admitted to the MHCB unit because he made small cuts on his wrist in February or March 2004, but no inpatient records were filed in the inmate's UHR.

Inmate A was also cognitively limited and his ability to adjust to incarceration was negatively affected. A Clark psychologist found that in 2002 he was vulnerable to victimization. A CASE protocol that was completed for a Clark assessment dated July 30, 2002 found that he was D1A and described him as having a history of violent behavior and sexual assault. He was found to need help with all forms, to require prompts for hygiene and to need assistance in meeting the demands of his schedule. He spoke slowly, used simple language and had difficulty comprehending complex instructions. He was described as easily influenced and as vulnerable to exploitation by others.

Inmate A was prescribed Zyprexa and Risperdal throughout February and March. According to a March MAR, he was medication compliant. In April 2004, his regimen included Zyprexa, Remeron and Risperdal.

This inmate's dependence upon his family an well as his poor mental health, concrete cognitive functioning, poor coping skills and disciplinary issues were all prominent features in his recent mental health treatment. A progress note dated March 2, 2004 reported that he felt down and heard hallucinations about hopelessness because an extended SHU term had recently been imposed and he would be moved far from his family. The note described his mood as swinging rapidly from happy to depressed in one week. The following day he was observed smearing feces and talking to himself. Around this time, he was removed to the clinic for a stat injection of Ativan, and then returned to his housing unit. He was agitated the following day, received a stat dose of Risperdal and was allowed to call his parents.

Inmate A seemed to feel better after his parents visited him that weekend. He participated in EOP groups. He went on a hunger strike at the end of March, as he had decided that no one cared, including himself, and expressed the intention to starve to death, but he changed his mind by April 9. His mood brightened after a second visit by his family and he continued to participate in EOP treatment groups. Mental health staff met with him more frequently than weekly.

Inmate A had incurred charges for making terrorist threats around December 28, 2001. The mental health assessment filed at the time said that his behavior may have been influenced by mental illness, specifically his paranoid state. The assessment further indicated that the inmate needed a staff assistant, but stated that he was capable of

understanding the charges and the nature of the disciplinary process. The evaluator recommended that mental health factors be considered, if sanctions were imposed. Due to his cognitive limitations and low level of functioning, the inmate was assigned a staff assistant during adjudication as required by <u>Clark</u>. He pled guilty to the charges.

According to the central file, an 18-month SHU term was imposed for this incident. It was aggravated and lengthened by six months because the inmate had previously incurred infractions for similar behavior, which involved charges of harassment of another person or making terrorist threats. Although the recent infraction was referred to a district attorney, prosecution was not pursued.

Chronos indicated that Inmate A was treated at the 3CMS level of care when the offenses occurred, but he was found to require a higher level of care and designated EOP during his stay in administrative segregation.

The following paragraph was excerpted from the monitor's review of a sample of EOP disciplinary records.

> Inmate A: Terrorist threats; harassment of another person. Over a 4 month period, Inmate A was calling and sending mail to 2 people, 1 of them a minor. He was threatening to kill them, telling them they were being followed, etc. The 115X stated that his behavior was impacted by his mental illness as he hears voices telling him to kill others before they hurt him and he thinks his food is poisoned. He is psychotic, paranoid and has hallucinations. The hearing officer noted this information; however, he was found guilty and assessed 60 days loss of behavior/work credit. He was referred to ICC for a SHU assessment and/or medical facility for continued medical needs, and he was referred to the DA for possible felony prosecution.

None of the referrals to the district attorney in the expert's sample resulted in prosecution.

<u>Assessment:</u>

This inmate's recent mental health treatment was responsive to his needs. Inmate A's condition apparently deteriorated while he was housed in administrative segregation pending adjudication. Although the influence of his mental illness was described, the impact made by his developmental disability went unmentioned in the mental health evaluation.

Given his personal characteristics, whether Inmate A understood the implications of his behavior and his guilty plea was an open question. His cognitive limitations, dependent personality style and mental illness cast doubt on his ability to comprehend legal information and to advocate for himself.

According to hearsay, he was a client at a regional center. The harassing telephone calls were made to two young women with whom he had worked in a sheltered workshop.

2.      Inmate B

As of April 2004, Inmate D was treated at the 3CMS level of care. He was discharged from the EOP level of care in December 2003.

When interviewed individually by the monitor's expert in a program office on April 22, 2004, Inmate B's hands were cuffed. His hygiene and grooming were unremarkable and his mood was euthymic, with flat affect. He exhibited leg tremors, which he said were always present. He also displayed very pronounced lip smacking. His cognitive processing was not well organized, his memory for important detail was poor and the fluidity and content of his speech was diminished in contrast to what had been noted in January.

An abbreviated review of his UHR showed that, at the time of his discharge from the EOP program, he was actively participating in recreational activities. The mental health staff, at that time, was concerned that the inmate might injure himself in order to remain in the EOP program.

When seen by psychiatry at the end of January 2004, he exhibited signs of tension and stress, reported disturbed sleep with nocturnal auditory hallucinations and said he had problems with multiple cellmates. His dose of Thorazine was increased to 200 mg. Along with Thorazine, the inmate's regimen was comprised of Geodon 80 bid, Trazodone 200 and Zoloft 200. The progress note associated with the January psychiatric visit did not note side effects, but a case manager who saw the inmate one week later noted EPS.

The case manager planned to see Inmate B weekly and referred him to a psychiatrist. The inmate was seen by a psychiatrist and followed by his case manager the next week. The psychiatrist noted signs of akathisia and lowered the dose of Thorazine to 50 mg, but it was back up to 300 mg within eight weeks.

Progress notes written during the first quarter of 2004 described the inmate as angry, demanding and uncooperative. In contrast to observations made one month later, a psychiatrist note dated March 19, 2004 reported that the inmate was experiencing no side effects from Thorazine.

In the most recent progress note, written days before the monitoring visit after a cell-front contact, Inmate B was described as stressed, exhibiting "slightly disorganized and/or limited cognitive ability" and having both sleep problems and difficulty distinguishing between actual and hallucinated voices. The inmate was assessed as being unstable and possibly negatively affected by the lockdown. He was referred to a psychiatrist.

Assessment:

This inmate's mental health treatment was not adequately responsive to the evident side effects of medication or to the deterioration in his level of functioning. He needed to be assessed for tardive dyskinesia. He was decompensating and should have been considered for a regimen change and a higher level of care.

3.    Inmate C

Inmate C had a diagnosis of Schizophrenia, paranoid type and was designated DD1, which meant that he had cognitive and functional impairments that complicated his adjustment to incarceration. He had arrived at CSP/LAC from NKSP one year before. He was classified as needing a special needs yard and may have had a transgender identity. He was housed in a special needs yard at the time of the monitoring visit, although on March 25, 2004 he was determined to need an EOP level of care. He had been awaiting an EOP transfer for almost one month.

Inmate C was medicated with 1 mg of Risperdal. He appeared to be functioning well enough during his wait for an EOP bed.

Assessment:

This inmate's mental health treatment was adequate under the circumstances, but he needed to be housed in an EOP unit.

4.    Inmate D

Inmate D had been at CSP/LAC since May 2001. About one month prior to the monitoring visit, he had moved from one building to another due to stressors. He said that he needed a break from the people there.

The inmate's UHR contained a chrono dated April 2, 2004 that designated the inmate for treatment at the EOP level of care. At the time of the monitoring visit, three weeks later, he continued to be housed in a special needs yard awaiting placement in an EOP unit.

Although he was reportedly stable without medication from November through December 2003, Inmate D's functioning subsequently deteriorated and he was placed back on a regimen of Zoloft and Depakote in April 2004. He was noted as having sleep disturbance, racing thoughts, irritability, tangential thought processes and pressured speech.

When interviewed by the monitor's expert in a group on April 22, 2004, his presentation was consistent with a hypomanic episode, as described above. His affect was intense and his mood was angry. He was adamant about retaining his sensitive needs placement and simultaneously receiving EOP treatment. He said that he was willing to wait for an EOP bed on a sensitive needs yard to open up.

Inmate D had a diagnosis of Bipolar Disorder with elevated levels of depression and some Post-Traumatic Stress Disorder issues, which were not formally diagnosed. His medication had been discontinued because he complained of side effects, including problems with vision and gastric distress. Progress notes indicated that he had wanted to remain in the EOP program, but did not want to take medication.

Assessment:

This inmate's mental health treatment was adequate under the circumstances, but he needed to be housed in an EOP unit.

5.      Inmate E

Inmate E was interviewed by the monitor's expert in the EOP. He was reportedly assigned to a cell at the far end of the building, which he alleged had deleterious effects upon his mental functioning and made him feel more depressed. He had been moved to this location to decrease the visibility between the inmate and correctional officers, because he engaged in exhibitionism. He had a history of inappropriate sexual behavior.

Inmate E participated in EOP treatment, but was not enrolled in groups led by female staff. When interviewed on April 22, 2004, he was neatly dressed, well groomed and able to converse logically and relevantly.

According to his UHR, Inmate E had diagnoses of Major Depression, severe, recurrent, with psychotic features, Polysubstance Dependence in institutional remission, Exhibitionism and Narcissistic PD. Most recently, his medication regimen comprised Prozac and Geodon. The inmate's MARs indicated that he was compliant with his medication in February and March 2004.

Assessment:

This inmate's recent mental health treatment met program guide requirements and his treatment needs.

6.      Inmate F

Inmate F's UHR indicated that he had a diagnosis of Schizophrenia, paranoid type, but his MHTS inmate history showed a diagnosis of Schizoaffective Disorder. Progress notes indicated that he had not been stable recently. Factors which may have contributed to this instability included his refusal to take some of his medications and several changes that were made to his medication regimen, one of which was due to the implementation of new local practices regarding the use of pharmaceutical products. An additional stressor was a negative incident that occurred in mid-March involving his cellmate. A clinical note said that Inmate F incurred a 115 disciplinary infraction in connection with

the incident. He continued to discuss concerns stemming from the incident with his case manager for several weeks.

In January 2004, Inmate F began refusing Depakote and the medication was discontinued. His most recent IDTT meeting was held in February 2004. The inmate's Wellbutrin was stopped on March 9, 2004, shortly after the inmate expressed fear that it would be. Geodon and Prozac were included in his regimen of April 2004. In March, Inmate F refused some doses of Geodon and told his case manager that he was no longer taking it. He participated in EOP activities, but his level of participation was not ascertained during this monitoring visit. When interviewed by the monitor's expert in a group on April 22, 2004, the inmate held up his hands in a non-threatening, but demonstrative, manner and declared that he was a Jedi Knight, ready to fight.

According to a MHTS summary, Inmate F was offered 6.5 hrs, 5.5 hrs, 9.5 hrs and 9.5 hours of treatment during each of the weeks in March 2004.

Assessment:

This inmate's mental health treatment was not responsive to his presentation. The discontinuation of Inmate F's Wellbutrin, due to new local psychiatry practices regarding the use of medication, was only one of several problems. In addition, the amount of treatment offered to Inmate F was insufficient. The inmate needed to be considered for a different medication regimen, more intensive treatment or referral to a higher level of care.

7.    Inmate G

An abbreviated review of this inmate's UHR showed that Inmate G was discharged to an EOP level of care from the MHCB unit and seen for five days of follow-up early in March 2004.

An IDTT meeting was held in the EOP within two weeks of the inmate's re-entry and he was given a diagnosis of Bipolar Disorder, with auditory hallucinations. At the time of the monitoring visit, Inmate G was treated with Risperidone, Trazodone and Paxil. He had extreme religious beliefs concerning sexuality and had recently inflicted a serious self-injury in the hope that it would help him become a better person. It was that injury that precipitated the inmate's admission for treatment at a higher level of care. Progress notes indicated that he was adjusting well to the EOP since his return.

When interviewed briefly by the monitor's expert in a public area on April 22, 2004, Inmate G presented as neat, well groomed, well oriented, logical and relevant.

Assessment:

This inmate's mental health treatment met program guide requirements.

8.      Inmate H

This inmate had been treated at the EOP level of care for over six months.  He had also been treated in the EOP program at CMF in July 2003.

Inmate H had a Keyhea order that expired on March 9, 2004, but there was no mention of the expiration in the inmate's most recent IDTT plan.  At the time of the expiration, the inmate had orders for Thorazine 200 and Depakote 1000, with a back up of Thorazine and Haldol IM, if he refused his medications.  When interviewed by the monitor's expert in a group on April 22, 2004, Inmate H reported that he was not taking medication, although he had told his case manager on April 19, 2004 that he planned to take it.

Inmate H had a diagnosis of Schizophrenia, paranoid type.  Progress notes written throughout the past six months described the inmate as delusional, paranoid and using language idiosyncratically.

<u>Assessment:</u>

This inmate's mental health treatment in the EOP was inadequate.  Failure of clinicians at the inmate's IDTT meeting to consider whether to seek a renewal of his <u>Keyhea</u> order was a glaring omission in light of his psychotic presentation and lack of compliance with medication.  Inmate H should have been considered for a change in medication regimen, more intensive treatment or referral to a higher level of care.

9.      Inmate I

This EOP inmate was quite ill in September 2003 and was placed in a crisis bed after being found unresponsive in his cell.  He was treated for depression at the acute level of care at DMH's APP for about two months.  Because he remained depressed in December, after over four weeks of inpatient treatment, his doses of Paxil and Zyprexa were increased.  He was discharged early in January to the EOP at CSP/LAC with orders for Paxil 30 a.m., Zyprexa 10 hs, Wellbutrin 150 bid and Depakene 1250 p.m.  Inmate I had been treated with Zyprexa at DMH's APP, but this medication was discontinued when he returned to CSP/LAC in accordance with recently implemented local psychiatry practices.

The handling of Inmate I's medication orders upon his return to CSP/LAC was unusual.  One psychiatrist rewrote only the order for Paxil, but did not write orders for the other three medications.  A second physician, in accordance with standard operating procedures, continued the inmate's orders for Olanzapine, Wellbutrin and Valporic Acid for a two-week period.  At the end of the two-week period, only the Paxil was continued.  Risperdal prn for agitation was ordered for a time in February, but it proved ineffective and was discontinued.  Trazodone was added to the regimen in mid-April.

The inmate continued to complain of sleep disturbance, bruxism and depression in April, but no psychotic process was evident. Progress notes indicated that the lockdown and modified programming in April were a source of stress for Inmate I. The inmate met with his case manager weekly, often at cell front, and participated in 43 hours of group and individual activities in March. Staff reported that he was responding well to treatment.

In an IDTT meeting held on April 4, 2004, Inmate I was retained at the EOP level of care, with goals of reducing his isolation and increasing his participation in activities. By April, the inmate was doing much better and had reached a higher level of functioning, after his return to the EOP unit. Inmate I had been in the EOP for over three months at the time of the monitoring review.

Assessment:

Medication continuity was perhaps partially sustained for this inmate upon arrival at CSP/LAC, in that orders were written when he arrived, albeit different orders were written by different psychiatrists. According to the inmate's MARs, however, the first dose of medication was administered on January 15, 2004, but other documentation said that the inmate arrived at the facility on January 9, 2004, indicating that his medication was interrupted for several days after he left the APP.

The abrupt changes in medication orders that this inmate experienced immediately upon discharge from acute care were inadvisable. When his case was discussed with medical administrators, they said that recent changes in how medication was prescribed resulted in the discontinuation of Wellbutrin and Zyprexa for this inmate. In January 2004, administrative staff decided that inmates returning from the hospital will continue on the same medication regimen for three to six months.

This inmate should be considered for more intensive treatment, a different medication regimen or a higher level of care, if he does not do well enough at the EOP level of care.

10.     Inmate J

This inmate had been treated at the EOP level of care for over six months. He had diagnoses of Delusional Disorder and Personality Disorder NOS. Trazodone, Wellbutrin and Geodon were prescribed during the last quarter of 2003. The inmate began refusing Trazodone and Geodon, but continued to take Wellbutrin because he found it useful in the past. Wellbutrin, however, was no longer readily available at CSP/LAC due to the implementation of local algorithms guiding the use of pharmaceutical products. The inmate was offered alternative psychotropics, but he refused to take medication, despite repeated recommendations by his psychiatrists.

IDTT meetings were held quarterly for Inmate J. He was described as stable at his unmedicated baseline, which meant he was irritable, grandiose and delusional. Weekly

case management contacts were made, but some were at cell-front due to lockdowns and modified programming.

On December 17, 2003 a bag containing a total of 19 pills of all three medications that Inmate J had been taking was found on the inmate's person. A staff assistant was assigned to help Inmate J with the resulting 115 disciplinary infraction. A mental health assessment was performed; it erroneously said that mental illness was not a factor in the inmate's behavior, but the hearing officer later determined that it was.

The disciplinary hearing was not held for six weeks. Inmate J pled guilty, but no sanctions were imposed because time constraints were violated. A February clinical note indicated that the inmate received an additional six months on his sentence for hoarding medication, but that statement was not supported by the disciplinary records.

When interviewed by the monitor's expert on April 22, 2004, Inmate J reported that he was on C status for 90 days as a result of the hoarding incident. His presentation during the interview was typical of a person whose level of functioning was at an EOP level of care. In March, progress notes indicated that Inmate J's hygiene was poor, that he hoarded food and that he was grandiose. He became angry and threatened staff when told to clean up.

Assessment:

Inmate J was delusional and hoarded food and medication. The mental health assessment done for disciplinary purposes erroneously concluded that mental health was not influential in the inmate's behavior, which led to the infraction for hoarding medication. He reportedly lost privileges for 90 days subsequent to the offense.

This inmate's mental health treatment in the EOP unit was not adequate. The local pharmaceutical guidelines were, in his case, an obstacle to treatment. Given his poor level of functioning in the EOP, Inmate J warranted more intensive treatment or consideration for referral to a higher level of care.

11.    Inmate K

This inmate had been treated at PBSP's EOP in 2001. He was not doing well in the EOP at CMF at the end of 2003. He felt persecuted and was withdrawn. He was transferred to CSP/LAC's EOP around the first of February 2004.

When interviewed by the monitor's expert in a group on April 22, 2004, Inmate K reported that his medication had been interrupted when he came from CMF to CSP/LAC at the end of January. A review of the inmate's MARs found that his medication was interrupted for two days upon arrival. Subsequent orders changed the regimen he had been on at CMF. Zyprexa, which he had been taking, was discontinued in February 2004, presumably due to CSP/LAC's algorithim governing the use of psychotropics. In April 2004, Inmate K was medicated with Buspar, Depakote and Paxil.

Clinical notes described the inmate as having continuous auditory hallucinations stemming from a self-inflicted gunshot injury to the head. Inmate K was classified as D1A, meaning that he was functionally disabled to the extent that daily activities might be negatively affected, his level of adaptive functioning was below average and he might be vulnerable to victimization.

Inmate K's level of participation in EOP activities was consistently low. Mental health staff recently contacted his family with his consent. He was seen weekly by a case manager, but at times meetings were held at cell-front due to lockdowns or other security constraints. The inmate's mood was recently described as depressed, hopeless and anxious. The April 2004 lockdown had a deleterious effect upon his mental status. He had contracted for safety several times during the past few weeks.

It was not possible to discern this inmate's medication compliance because the MARs present in his UHRs were intelligible.

Assessment:

This inmate's medication continuity was interrupted when he moved from CMF to CSP/LAC. In addition, Inmate K was taken off Zyprexa, in accordance with the local protocol. The inmate's MARs were unintelligible.

This inmate had not been doing well in CMF's EOP and he continued to function poorly, perhaps even worse, during his ten-week stay at CSP/LAC. He needed a risk assessment, more intensive treatment and/or referral to a higher level of care.

12.    Inmate L

When interviewed by the monitor's expert in a group on April 22, 2004, Inmate L reported that he had a current Keyhea order, but was non-compliant with his medication. According to the inmate's UHR, a 12-month Keyhea order was issued on November 10, 2003 on the grounds of grave disability.

In January and March, Inmate L had orders for Depakote and Risperdal, with a back up of Haldol IM if refused. Contrary to the treatment plan written in an IDTT meeting, a psychiatrist discontinued all of the inmate's medication for the month of February in an attempt to ascertain whether he was actually mentally ill. Inmate L was floridly psychotic by the third week of February, and medication was initiated on an involuntary basis. The inmate regained his orientation and organization over the next few weeks, but remained resistant to taking medication. A MAR showed that he took medication daily in March.

Inmate L was seen weekly by his case manager, sometimes at cell-front. He was seen more often than monthly by a psychiatrist.

<u>Assessment</u>

This inmate was hurt by a radical departure from his treatment plan and by the flouting of a recent <u>Keyhea</u> order.

EXHIBIT D

California State Prison, Solano (CSP/Solano)

June 22, 2004 – June 24, 2004

1.    Inmate A

Inmate A arrived at CSP/Solano from NKSP in May 2004 with current orders for Seroquel and Prozac. He was being treated for Schizoaffective Disorder and Post-Traumatic Stress Disorder. An MH-2 was written, which seemed to indicate that an IDTT meeting was held for the inmate within 14 days of his arrival and that a psychiatrist attended the meeting. There were problems with the inmate's MH-2, however, because it was undated, lacked the signatures or initials of treatment team members present at the meeting and did not indicate that a correctional counselor was present. A case manager attended the inmate's UCC meeting.

Although Inmate A's current medication orders were documented by the bus screener, there was no box checked to indicate that the inmate was referred to mental health. There was no order for medication in the inmate's UHR, but a MHTS report showed that the chief medical officer had continued his medication. A progress note stated that the inmate reported not receiving medication when he first arrived at CSP/Solano. The note was not signed. Inmate A had not been seen by a psychiatrist at the time of the monitoring visit, although he had been at CSP/Solano for over three weeks.

Assessment:

Current consent forms were filed in this inmate's UHR, but other essential documentation in the chart was incomplete. The inmate's bus screening did not indicate that he was referred to mental health. Insufficient information was available to ascertain the composition of the inmate's IDTT meeting. It was also not possible to determine whether medication continuity was maintained for this inmate upon his arrival at the institution. Inmate A's initial mental health contact and IDTT meeting were timely and a case manager attended his UCC meeting.

2.    Inmate B

Inmate B arrived at CSP/Solano from WSP in May 2004 with current orders for Celexa, Risperdal and Depakote. His UHR contained a variety of diagnoses, including Major Depression, Mood Disorder NOS, r/o Schizoaffective Disorder and Polysubstance Dependence. The inmate's current medication orders were recorded by the bus screener, but the box indicating that a referral to mental health had been made was not checked.

Inmate B was seen within two days of his arrival at the institution by a mental health worker and had an IDTT meeting within 14 days. The IDTT meeting was attended by a full team. Little clinical information was contained in the documents in the mental health portion of the inmate's UHR, leaving a question as to the nature and severity of Inmate B's mental health needs.

A progress note written in June said that Inmate B reported not having received his medication. The inmate was seen by a psychiatrist approximately three weeks after he arrived at CSP/Solano.

Assessment:

Current consent forms were filed in inmate B's UHR, but the inmate's bus screening was incomplete in that the box indicating that a referral to mental health had been made was not checked. The inmate's intake assessment and treatment plan were completed in a timely manner, although the mental health annotations in both documents contained little clinical information. Medication administration may have been interrupted as the inmate's reported, but there were no MARs available to assess compliance.

3.      Inmate C

Only the third of three volumes from Inmate C's UHR was reviewed. Inmate C was treated at the EOP level of care. He arrived at CSP/Solano from WSP on March 27, 2004, with current orders for Zyprexa, Depakote and Prozac. He had also been prescribed Thorazine at WSP, but he signed a refusal form for this medication in March. The inmate's medical record raised questions about whether he was at an EOP or 3CMS level of care at WSP. The record suggested that he had done fairly well at WSP for a period of time and that he found the regimen of Zyprexa, Depakote and Prozac helpful.

Inmate C was seen weekly at WSP through March 2004, when he was transferred to CSP/Solano. The inmate's bus screening noted that he was referred to mental health. During his initial mental health contact at CSP/Solano, it was noted that Inmate C had received EOP treatment at WSP.

An IDTT meeting was held for the inmate within two weeks of his arrival at CSP/Solano, but he was not designated an EOP inmate. The treatment plan was to follow the inmate at 90-day intervals.

Inmate C was referred to mental health by other inmates in May 2004 because he stayed awake all night talking and laughing to himself. Inmate C had a fight with another inmate in mid-May. At that time, he was seen by a social worker who wrote a note saying that the inmate was stable without medication. The plan was to refer the inmate to a psychiatrist to discontinue his medication. Inmate C was referred a second time in June by custody staff because he behaved unusually and a third time early in June by his teacher, who had concerns about his ability to participate in class.

According to the inmate's MARs, he took little or no medication in April and May, typically failing to pick it up. The MARs also contained a large number of blank boxes during those months. Inmate C was referred to mental health for medication non-compliance early in May 2004. A Valporic Acid level was obtained in mid-May, showing a level of 49.

Inmate C was cleared by clinicians for placement in administrative segregation on June 11, 2004. He may have been moved to administrative segregation because he was not sleeping and was not allowing others to sleep. The inmate appeared to the nurse to be sleep deprived. He was admitted to the MHCB unit on that date.

A second IDTT meeting was held for Inmate C. Ironically, given that his problems included staying awake all night talking to spirits, the inmate's "belief in god" was listed as a strength, while the prominence of religiosity during his decompensation went unmentioned. The inmate continued to refuse medication through June.

Inmate C was in the MHCB unit from June 11 through June 17, 2004. He consistently refused to take medication and remained psychotic. He was moved to an EOP level of care.

Assessment:

This inmate's mental health treatment was not adequate. Inmate C should not have remained in the general population for over two months, while he was psychotic. Scheduling clinical follow-up for this inmate at 90-day intervals was inappropriate, given his recent history of psychiatric treatment. Events in this inmate's history should have elicited mental health scrutiny weeks earlier and the inmate should have been sent to a higher level of care. Once in the MHCB unit, Inmate C should have been referred to DMH for acute care. Once designated an EOP inmate, he should have been slated for a 30-day expedited transfer. Inmate C should have been considered for a <u>Keyhea</u> hearing.

4.      Inmate D

Inmate D arrived at CSP/Solano on April 13, 2003 from WSP with current orders for Paxil and was referred to mental health. He was seen by mental health within two days of his arrival. His UCC was attended by a case manager. An IDTT meeting, attended by a psychiatrist and a correctional counselor, was held within two weeks of the inmate's arrival at CSP/Solano. Inmate D had diagnoses of Major Depressive Disorder, Alcohol Dependence and r/o Schizoid Personality Disorder.

Assessment:

This inmate's mental health treatment met program guide requirements, except that no finding regarding medication continuity upon arrival was made.

5.      Inmate E

Inmate E arrived at CSP/Solano in December 2002. He was on the 3CMS caseload. He was one of the lower functioning 3CMS inmates whose charts were reviewed by the monitor's expert. Inmate E's GAF was assessed as 52 in January 2004.

Although his inmate history form showed a diagnosis of Psychotic Disorder NOS, Inmate E's diagnosis from his most recent treatment plan was Major Depressive Disorder with psychotic features. Inmate E was treated with Zyprexa, Trazodone and Depakote and was seen by a case manager every two weeks during the past three months. Prior to that, he was seen monthly by either a psychiatrist or a case manager. Psychiatric appointments were held at regular intervals for this inmate and his medication was adjusted in response to his reports.

Blood levels and a LFT were ordered for the inmate in March 2004, but no results were in the UHR when it was reviewed on June 23, 2004. The most recent laboratory tests for Inmate E were obtained in July 2003. The inmate's Valporic Acid level was within the therapeutic range at that time.

An IDTT meeting attended by a full team was held for Inmate E in January 2004. The resulting treatment plan was individualized.

Assessment:

Mental health treatment was provided to this inmate as clinically warranted. His treatment was well-documented in 2004, except for documentation of blood level monitoring. Laboratory testing was not carried out as ordered.

The inmate's IDTT meeting and treatment plan met program guide requirements. There were no MARs in his chart more recent than March 2004. Informed consents were present in the UHR.

The concordance rate between the MHTS and Inmate E's UHR entries for 2004 was 100%, with the exception of his diagnosis.

6.     Inmate F

Inmate F arrived at CSP/Solano in January 2002. He was treated with Risperdal, Seroquel and Benadryl at the 3CMS level of care for r/o Depressive Disorder NOS and Psychosis NOS. The diagnosis shown on the inmate history differed from the one on the inmate's most recent treatment plan.

An IDTT meeting attended by a full team was held for Inmate F in March 2004. The resulting treatment plan was individualized. Inmate F's GAF was 65 at that time. An AIMs test was completed in November 2002.

Assessment:

There were no MARs in the inmate's chart later than March 2004. Informed consents were present. This inmate's mental health treatment was adequate, well-documented and in compliance with program guide requirements.

The concordance rate between the inmate history and 2004 entries in the inmate's UHR was 100%, with the exception of the diagnosis.

7.    Inmate G

Only the second of two volumes of this inmate's UHR was reviewed.  Inmate G arrived at CAP/Solano from PBSP in September 2003.   When interviewed in a group by the monitor's expert on June 23, 2004, he reported that his medication had expired that day, but that he had not been seen recently by a psychiatrist.

Inmate G was treated at the 3CMS level of care with Lithium, Trazodone and Remeron for Bipolar Disorder.  He had a current treatment plan and was seen at least monthly by a case manager and regularly by a psychiatrist.

There were problems with this inmate's medication continuity.  Documentation suggested that there may have been several factors which contributed to those problems, including one instance in which a psychiatrist renewed the inmate's medication orders during an appointment without access to his UHR as well as multiple misunderstandings about the status of the inmate's current orders.  Although Inmate G had a current medication order through July 2004, the corresponding MAR for May was not in his UHR; the inmate was told by an MTA that his medication was due to expire on June 21, 2004, which was the date on the most current MAR in his UHR.  Apparently, orders written in April, when the inmate was seen by a psychiatrist without benefit of his UHR, did not result in a MAR, although they were recorded by MHTS.  The psychiatrist was under the impression that the inmate's medication orders had expired the week before, but, according to the UHR, they had not.  Inmate G also had had trouble getting medication in October 2003, despite the fact that he had a current order.

A Lithium level was ordered in January 2004.  Results from the test were returned on March 6, two months later, but not filed in the UHR before the inmate was seen again on March 23.  The psychiatrist noted that the results were missing.  The inmate's Lithium level was in the therapeutic range.

Assessment:

This inmate's mental health treatment was adequate and well-documented.  There were problems with his medication orders, MARs and medication administration.  Results from laboratory tests were missing, which may have been associated with the voluminous backlog of filing at CSP/Solano.  Consent forms were present in the inmate's UHR.

The concordance rate between the MHTS and entries in the inmate's UHR entries was 8/9.  A psychiatric progress note, written without access to the inmate's UHR, was not found in the record.  The medication order written at that time evidently did not result in a MAR.

8.    Inmate H

Inmate H arrived at CSP/Solano in December 2002.  When interviewed by the monitor's expert in a group on June 23, 2004, he reported that his medication was due to expire that day and that it had taken three months to obtain laboratory test results.

According to the MHTS, Inmate H was treated at the 3CMS level of care for Psychotic Disorder NOS.  More recently, a psychiatrist reassessed his condition and decided that he did not have a psychotic disorder and was not amenable to treatment with anti-psychotic medications.  A new treatment plan was not due until August 2004, so the inmate's old diagnosis prevailed on the MHTS history form.  Inmate H was seen regularly by a psychiatrist and his case manager during the monitoring period.

Inmate H repeatedly complained of having bad reactions, including blurred vision, weakness, increased water consumption and nocturnal tremors, to Seroquel in October, November and December 2003.  He was referred to mental health by the MTAs and nurses several times.  The referrals did not elicit timely responses, but the inmate was eventually seen and his medication regimen was changed.  At the time of the monitoring visit, Inmate H was taking Remeron, Benadryl and Buspar.  He was described as having panic attacks.

<u>Assessment:</u>

This inmate's mental health treatment was adequate, but staff referrals for medication side effects did not elicit timely responses at the end of 2003.  Informed consents were present in the UHR.  The concordance rate between the MHTS and entries in the inmate's UHR was 8/9.

9.    Inmate I

Inmate I arrived at CSP/Solano over one year ago.  He was interviewed by the monitor's expert in a group on June 23, 2004.  He reported that he was taking Lithium and that laboratory test results were obtained infrequently.  He believed that his medication orders had occasionally been renewed in the absence of contact with a psychiatrist.

Inmate I was treated for Bipolar Disorder with Lithium 600 bid.  Blood level tests were ordered by a psychiatrist in January 2004 and pursued until they were obtained three months later.  The inmate's Lithium level was within the therapeutic range.  Inmate I's Seroquel was discontinued in March 2004, after he refused it.  Nurses and MTAs initiated several referrals for medication non-compliance and refusals within a short period of time in February 2004, but Inmate I was not seen by mental health until four weeks after the first referral was made.

The inmate was seen regularly by a case manager and by a psychiatrist.  His MARs were present in the UHR through May 2004, as were informed consent forms.  The inmate's treatment plan was current.

Assessment:

Laboratory tests were not routinely ordered for this inmate, but his blood levels were eventually obtained due to the persistence of the psychiatrist.  Response to staff referrals was slow.  Except for these two problems, this inmate's mental health treatment met program guide requirements.

The concordance rate between the MHTS and entries in the inmate's UHR appeared to be 100%, provided that three psychiatric contacts to check laboratory test results were not intended to have corresponding progress notes.

10.    Inmate J

Inmate J arrived at CSP/Solano in December 2002.  He was treated at the 3CMS level of care for Major Depressive Disorder, NOS, with Effexor.  A new treatment plan was written in January 2004 at an IDTT meeting that was attended by a full team.  The inmate's GAF was assessed at 65 to 72 at that time.

When interviewed by the monitor's expert in a group on June 23, 2004, Inmate J reported difficulties with medication continuity.  According to his MAR, Inmate J's medication expired on June 1, 2004.  The most recent psychiatry contact documented in his UHR took place on March 3, 2004, during which the inmate's medication orders were extended to June 1, 2004.

Information shown on the MHTS differed, indicating that the inmate had current medication orders from May 21 through August 19, 2004.  The inmate history listed two psychiatric contacts subsequent to March 3, including one on May 21.  Presumably, the intention was for the inmate's medication orders to be renewed, regardless of whether he was seen by a clinician.  Since the MHTS history and the UHR differed as to whether medication orders were written for Inmate J, perhaps the order to renew was not received by the pharmacy.

Assessment:

This inmate's mental health treatment fell short of program guide requirements in that medication orders expired in the absence of a quarterly psychiatric contact.  Inmate J received regular and well-documented case management contacts.  His IDTT meeting was timely and was attended by a full team.

The concordance rate between the MHTS and entries in the inmate's UHR was 100%, except for the two psychiatric appointments that were supposed to result in medication renewal and discrepancies regarding medication continuity.

11.    Inmate K

Inmate K arrived at CSP/Solano in 2002.  He was treated at the 3CMS level of care and carried a diagnosis of Psychotic Disorder NOS.  He was medicated with Depakote and Risperdal.

A full IDTT meeting was held in March 2004 and an individualized treatment plan was written.  The inmate's GAF was assessed as 62 at that time.  An IDTT meeting in December 2003 suggested that Inmate K met the criteria for a diagnosis of Bipolar Disorder, which was more consistent with his medication regimen in June.  The latest MAR in the inmate's UHR was dated March 2004.

The inmate's Valporic Acid levels were measured in March 2004 and were found to be low; test results from October 2003 found his level to be within the therapeutic range.  The inmate's medication dose was not adjusted after the low level was found.  Medical notes indicated that Inmate K complained of chest pain associated with exertion and that a stress test was scheduled in June 2004.

Inmate K was seen every two months by a case manager and every three months by a psychiatrist.  Progress notes contained relevant clinical information.

Assessment:

This inmate's mental health treatment met program guide requirements.  The inmate's MARs for April and May were missing from his UHR.

The concordance rate between the MHTS inmate history and entries in the inmate's UHR was 100% from September 2003 through May 2004, with the exception of an IDTT meeting held in December that did not appear on the MHTS summary.

12.    Inmate L

Inmate L arrived at CSP/Solano from SQ in February 2004 at the 3CMS level of care.  He was seen within two days by mental health and within one week by a psychiatrist.  He reported hearing auditory hallucinations and Seroquel was added to his regimen of Rispderal.

An IDTT meeting attended by a full team was held within two weeks of the inmate's arrival at the institution.  It resulted in an individualized treatment plan.

The inmate's MARs were current, with the exception of a missing MAR in March.  Inmate L was intermittently non-compliant with his medication regimen.  According to his MARs, referrals for medication non-compliance were made, but no referral chronos were found in the UHR.  The MARs contained many blank dates as well as notations indicating no shows.

<u>Assessment:</u>

This inmate's mental health treatment conformed to program guide requirements, with the exception of the poor response to medication non-compliance. The inmate's MARs were also poor.

The concordance rate between the MHTS and entries from the UHR for the period since the inmate's arrival at CSP/Solano through May 2004 was 100%, with the exception of a psychiatric entry that occurred within one week of arrival. The entry may have reflected a medication order without any clinical contact.

13.     Inmate M

Inmate M had been at CSP/Solano since 2002. He was treated at the 3CMS level of care for Bipolar Disorder. He had a current treatment plan written in July 2003. His treatment regimen included Lithium and quarterly case management contacts. From January through May 2004, Inmate M's speech was consistently described as pressured.

Laboratory tests were ordered for Inmate M and followed-up appropriately. His Lithium level in January was .8. The inmate failed to have his blood drawn in February and was referred to mental health by a nurse at his request. The referral resulted in a contact within eight calendar days. Medication non-compliance referrals were made in May 2004 and resulted in a mental health contact within nine to 12 days. Documentation of clinical contacts and medication management by the case manager and the psychiatrist was excellent.

The inmate's UHR contained no MARs beyond March 2004.

<u>Assessment:</u>

This inmate's mental health treatment conformed to program guide requirements, but MARs were missing from the UHR.

The concordance rate between the MHTS record and entries in the inmate's UHR from January through May 2004 was 100%.

14.     Inmate N

Inmate N arrived at CSP/Solano in August 2003. When interviewed by the monitor's expert in a group on June 23, 2004, he reported difficulties obtaining medication. Discrepancies regarding medication orders were found among the inmate's UHR, the MHTS, physician order forms and MARs. Specifically, orders shown on the order forms did not appear on the MHTS summary or on the MARs; medication orders were written, but did not result in MARs. Furthermore, MARs were missing for the months of March, April and the later portion of May 2004.

Inmate N was treated at the 3CMS level of care for Psychosis NOS. He had a current treatment plan dating from August 2003. He consistently reported auditory hallucinations and a severe sleep disturbance. The inmate's medication was adjusted in response to his reports.

Inmate N was seen quarterly by his case manager and a psychiatrist. Progress notes contained relevant clinical information.

Assessment:

This inmate's mental health treatment conformed to program guide requirements, with the important exception of medication discontinuity. The inmate's medication orders did not result in MARs. The MAR for March 2004 showed blank dates and the MAR for May was missing from the UHR.

15.     Inmate O

Inmate O had been at CSP/Solano since 2001. He was treated at the 3CMS level of care for Schizophrenia, disorganized type. His medication regimen included Prolixin, Seroquel, Cogentin and Benadryl. He was stable on medication in 2004, reporting no problems. He was seen quarterly by a case manager and a psychiatrist. When interviewed by the monitor's expert in a group on June 23, 2004, he was neatly dressed and well groomed. His demeanor was retiring and he was somewhat withdrawn, but he responded relevantly to questions.

An IDTT meeting attended by a full team wrote an individualized treatment plan in January 2004 for Inmate O.

The inmate's MARs were fairly complete, with the exception of several blank dates in March 2004. MARs were filed in the inmate's UHR through April 2004.

Assessment:

This inmate's mental health treatment conformed to program guide requirements. The concordance rate between the MHTS summary and entries in the inmate's UHR was 8/10 since October 2003.

16.     Inmate P

Inmate P arrived from the ASU at CSP/Corcoran in November 2003 with current orders for Remeron, Paxil and Benadryl. He was seen by mental health in a timely fashion, but could not be seen by a psychiatrist on at least two occasions due to lockdowns. The inmate's medication orders were, nonetheless, continued.

An IDTT meeting attended by a full team was held for Inmate P, but it was approximately ten days late. The inmate's GAF was assessed at 70 to 72. This was the inmate's first incarceration and he was noted to be feeling stress due to psychosocial factors and adjustment problems. Inmate P had been moved to the administrative segregation unit at CSP/Corcoran in July 2003 due to a battery on an inmate.

The inmate's diagnoses over the past nine months included Adjustment Disorder, Depressive Disorder NOS and panic attacks. Most recently, Inmate P was treated with Paxil only. The inmate's dose of Paxil was increased when he reported experiencing panic attacks. He was seen more frequently than quarterly by a psychiatrist, but there was a 120-day interval between case management contacts in December 2003 and April 2004.

MARs were in the inmate's UHR through April 2004. The MAR for April was blank through the 21st, indicating a problem with medication administration. No referrals regarding medication non-compliance were made and no refusals were noted.

Assessment:

This inmate's mental health treatment conformed to program guide requirements, with the exception of a late case management contact and a blank MAR. The blank MAR suggested that medication may not have been administered for three weeks in April 2004.

The concordance rate between the MHTS summary and entries in the inmate's UHR was 100%, with the exception of two initial psychiatric contacts that were listed as "appointment completed" by the MHTS when no contacts were made.

17.    Inmate Q

Only the inmate history generated by MHTS on June 22, 2004 was reviewed by the monitor's expert for this inmate. Inmate Q arrived at CSP/Solano on May 19, 2004 and was seen five days later for an initial mental health evaluation. He was treated at the 3CMS level of care. An IDTT meeting was held one week after he arrived. Medication orders for Seroquel and Benadryl were renewed on the date he arrived. Inmate Q was seen by a psychiatrist and medication orders were renewed within three weeks of his arrival at CSP/Solano.

When interviewed in a group by the monitor's expert on June 23, 2004, Inmate Q reported having received the wrong pills the day before.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as target items were recorded by the MHTS. No findings were made regarding the composition of his IDTT meeting or medication continuity. Subjective reports indicated that a medication error was made.

18.    Inmate R

Only the MHTS summary was reviewed by the monitor's expert for this inmate as well. Inmate R had been at CSP/Solano for over two years. He was treated at the 3CMS level of care. He had an IDTT meeting in June 2004. He was treated for Major Depressive Disorder, recurrent, severe, with psychotic symptoms and medicated with Effexor and Risperidone. Inmate R's medication orders were renewed on the date they expired.

This inmate was seen quarterly by a case manager and more frequently than quarterly by a psychiatrist. He did not attend a group interview held by the expert on June 23, 2004.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as target items were recorded by the MHTS. No findings were made regarding the composition of his IDTT meeting or medication continuity.

19.    Inmate S

Inmate S had been at CSP/Solano since 2002. He was treated at the 3CMS level of care. There was a discrepancy between the diagnosis shown for the inmate on the MHTS summary and the diagnosis in his most recent treatment plan. An IDTT meeting was held in February 2004. It was attended by a full team and resulted in an individualized treatment plan. Inmate S was treated for Depressive Disorder NOS with quarterly case management contacts, psychiatric follow-up more frequently than quarterly and Vistaril. Referrals for medication problems resulted in psychiatric contacts and several adjustments to his regimen, among them the discontinuation of Desyrel and Seroquel. A referral to the psychiatrist made by a case manager resulted in contact 11 calendar days later.

Although the IDTT team had considered discharging this inmate from the MHSDS, his level of distress was elevated during a lockdown early in 2004 and he was subsequently retained on the caseload. Progress notes in his chart were clinically informative.

When interviewed by the monitor's expert in a group on June 23, 2004, Inmate S reported that his medication had been discontinued without cause. MARs were in the inmate's charts only through March 2004. The MAR for March was blank from March 1 through March 21, which was consistent with the inmate's statement that he had not received his medication. Current consent forms for medication were in the UHR.

Assessment:

This inmate's mental health treatment largely conformed to program guide requirements, but medication continuity seemed to have been interrupted for three weeks in March. Inmate S's condition worsened during a lockdown.

The concordance rate between MHTS data and entries in the inmate's UHR was 100% for the period of time from September 2003 to June 18, 2004.

20.    Inmate T

Inmate T arrived at CSP/Solano in February 2004. He was treated at the 3CMS level of care. MARs indicated that there was a three-day gap between his arrival at the institution and the administration of medication.

There was a discrepancy between the diagnosis shown for this inmate on the MHTS summary and the diagnosis shown in his most recent treatment plan. An IDTT meeting was held about three weeks after the inmate arrived at the institution. It was attended by a full team and resulted in an individualized treatment plan. Inmate T was treated for Mood Disorder NOS or Bipolar Disorder with Depakote.

Inmate T was referred to mental health twice in March 2004 because he complained of problems with his medication. One complaint concerned the failure to administer his medication in March. Mental health contacts in response to the two referrals took place within two weeks and three days respectively. There was no MAR for March 2004 in the inmate's UHR. There were MARs in the inmate's UHR through May 2004. Laboratory tests ordered on March 26, 2004 were returned on April 12, 2004, but the inmate's Valporic Acid level was not included; the inmate's most current Valporic Acid level was obtained one year earlier.

Assessment:

This inmate's mental health treatment largely conformed to program guide requirements, but medication continuity was interrupted for three days upon his arrival at the institution. The timeliness of psychiatric responses to referrals ranged from three days to two weeks. The inmate's initial IDTT meeting was slightly late. A laboratory test that was ordered was not obtained; the blood levels of this inmate on a mood stabilizing were not monitored frequently enough.

The concordance rate between the MHTS data and entries in the inmate's UHR was 100%.

21.    Inmate U

Inmate U, age 59, arrived at CSP/Solano in December 2003 from SQ. He was seen in a timely fashion by mental health staff. He was medicated with Navane. In subsequent discussions with a psychiatrist, he declined to try an atypical anti-psychotic medication.

An IDTT meeting was held for the inmate three weeks after he arrived at the institution. He was given a diagnosis of Schizophrenia, paranoid type, and his GAF was assessed as 55. The IDTT meeting was attended by a full team. Although the resulting treatment plan was individualized, it only called for case management follow-up at 90-day intervals

despite the inmate's low level of functioning.  The inmate's medication non-compliance had not resulted in a referral at the time of the IDTT meeting.

Inmate U was, however, referred for medication non-compliance several times in January, February and March 2004.  He also failed to attend two mental health appointments, one in March and another in June.  When seen by a psychiatrist early in March, Inmate U complained of medication side effects.

The inmate's order for medication expired in May 2004.  An order that would have been current was then written, but the pharmacy had no record of it and apparently it was never processed.  Laboratory tests were ordered on May 17, 2004, but no results were obtained.  Laboratory tests were ordered again by the psychiatrist on June 7, 2004, but no results were in the inmate's UHR when it was reviewed over two weeks later on June 23.

When interviewed by the monitor's expert in a group on June 23, 2004, Inmate U reported that he had run out of medication three weeks before.  He was withdrawn, slightly disheveled and seemed less confident than the other 12 members of the group.

Assessment:

This inmate's mental health treatment fell significantly short of program guide requirements.  Intake processing was timely for this inmate, but the inmate's IDTT meeting was slightly late even though it was attended by a full team and resulted in an individualized treatment plan.  The inmate's clinical contacts were well-documented, but case management contacts were not scheduled as frequently as clinically warranted.  Non-compliance referrals were made and resulted in mental health contacts.  Although it proved to be an ongoing issue, Inmate U's medication non-compliance was not systematically addressed.  Laboratory test orders were not carried out and a medication order was not received or processed by the pharmacy, resulting in lapses in the administration of medication to this inmate.  The MAR for March 2004 was not filed in the inmate's UHR.

22.     Inmate V

Inmate V arrived at CSP/Solano in February 2004 from CTF.  Medical documents suggested that he had been treated in the OHU at SQ in February 2004, when he threatened to jump off a tier.  By February 26, he was at CSP/Solano, where he was treated at the 3CMS level of care, diagnosed as having Schizophrenia, undifferentiated type, and medicated with Olanzapine.

Inmate V's initial mental health contact and IDTT meeting were timely.  His GAF was recently assessed as 55.  He appeared to have been housed in the administrative segregation unit upon his arrival at the institution or within days of it.  His stay in administrative segregation was brief, lasting a week or less.  Annotations in the inmate's UHR indicated that Inmate V's medication was interrupted during his first week at CSP/Solano.  The administrative segregation case manager brought Inmate V's

medication gap to the attention of a psychiatrist and a new medication order was written. The inmate refused to attend at least two mental health appointments and was, in general, not very forthcoming with clinicians.

After living in the general population for two months, Inmate V was referred to mental health by an officer. The clinician who saw the inmate described him as expressing suicidal ideation and experiencing auditory hallucinations. He was sent back to his housing unit and was scheduled to see a psychiatrist, which occurred two days later. The psychiatrist described him as delusional, exhibiting bizarre flat affect and likely to be experiencing auditory hallucinations. He had not been seen again as of June 23, a period of five weeks. According to the inmate's UHR, Olanzapine was discontinued without inmate contact on June 18 by the same psychiatrist who had seen him earlier because he refused it.

When interviewed by the monitor's expert in a group on June 23, 2004, Inmate V stood out from the other members of the group.

Assessment:

This inmate received a timely intake assessment and the psychiatric response to his custody referral was prompt. The inmate's mental health treatment, however, was inadequate. The inmate's psychosis elicited no clinical response, and Inmate V was allowed to remain in the general population for over five weeks after his psychotic state was discovered following an officer's referral. Discontinuation of the inmate's medication and the lack of follow-up for medication non-compliance were clinically contraindicated. Inmate V should have been considered for a higher level of care.

23.    Inmate W

Only the MHTS history for this inmate was reviewed by the monitor's expert. Inmate W was interviewed in a group by the expert on June 23, 2004. He was neatly dressed, well groomed and his conversation was logical and relevant.

Inmate W was treated at the 3CMS level of care for Major Depressive Disorder, recurrent, unspecified. His regimen included Trazodone and Prozac. He attended two mental health treatment groups. He was seen quarterly by a psychiatrist and individually every two months by a case manager. Inmate W had a current treatment plan.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as targets items were recorded by the MHTS.

24.    Inmate X

Only the MHTS history for this inmate was reviewed by the monitor's expert. Inmate X was also interviewed by the expert in a group. His presentation was unremarkable.

Inmate X had been at CSP/Solano for 13 months. He was treated at the 3CMS level of care for Schizophrenia, paranoid type. His regimen included Olanzapine and Benadryl. He was not seen frequently enough by psychiatry. There was a seven-month interval between two psychiatric contacts made in October 2003 and May 2004. Inmate W apparently failed to appear for a psychiatric appointment in December 2003 and was never rescheduled. Case management contacts were also infrequent, with a four and a half-month interval between contacts in December 2003 and May 2004. According to the MHTS medication order summary, which may not have been accurate, the inmate had no medication orders for the first five months of 2004.

Inmate X had a current treatment plan dating from July 2003.

Assessment:

The mental health treatment for this inmate fell seriously short of program guide requirements.

25.    Inmate Y

Again, the monitor's expert reviewed only the MHTS history for this inmate. On June 23, 2004, Inmate Y was also interviewed by the expert in a group. He was neatly dressed, well groomed and his conversation was logical and relevant.

Inmate Y had been at CSP/Solano for over one year. He was treated at the 3CMS level of care for Depressive Disorder NOS. His regimen included Risperidone and Olanzapine. He was seen more frequently than quarterly by a psychiatrist and by his case manager.

Inmate Y had a current treatment plan. He was referred for medication non-compliance in December 2003 and was seen by a psychiatrist one day later.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as targets items were recorded by the MHTS. Psychiatric response to this inmate's referral for medication non-compliance was rapid.

26.    Inmate Z

The monitor's expert reviewed only the MHTS history for this inmate. Inmate Z was, on June 23, 2004, interviewed by the expert in a group. His presentation was unremarkable.

Inmate Z had been at CSP/Solano since December 2002. Information from the MHTS history suggested that he had been in administrative segregation from July 2003 until he was released to the general population sometime prior to March 23, 2004.

Inmate Z was treated at the 3CMS level of care for Psychotic Disorder NOS. He was on Seroquel from the start of his incarceration at CSP/Solano until the medication order expired in January 2004. Inmate Z was not seen by a psychiatrist after November 14, 2003, when he was seen due to mediation non-compliance. At the time of the monitoring visit in June 2004, the inmate had not been seen a psychiatrist in seven months.

Case management contacts were made weekly, while Inmate Z was in administrative segregation, with the exception of a five-week hiatus in September and October 2003. It was not clear if the inmate was in administrative segregation during this period as his whereabouts during that time were not part of the record reviewed by the expert. IDTT meetings were held four months apart in July and December 2003.

Assessment:

If Inmate Z had a psychotic disorder and needed to continue taking an anti-psychotic medication, his mental health treatment would have fallen short of program guides requirements. His mental health treatment would have been adequate, if he was not psychotic and not in need of medication, and if he was not in administrative segregation during the five-week gap in weekly case management contact.

27.    Inmate AA

The monitor's expert reviewed only the MHTS history for this inmate. Inmate AA was interviewed on June 23, 2004 in a group. His presentation was unremarkable, but he sat with his back against the wall and asked that his name be withheld. He reported that he had on occasion been given the wrong pills, specifically Sinequan rather than his usual medication. He said that the nurse identified the pills as Sinequan and corrected the error.

Inmate AA arrived at CSP/Solano from SCC in December 2003. The inmate's intake assessment and his IDTT meeting were timely. He had a diagnosis of Schizophrenia, paranoid type. His medication orders for Risperidone and Sertraline were renewed consistently throughout his stay at CSP/Solano. Inmate AA was seen at least quarterly by a case manager and more frequently than quarterly by a psychiatrist.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as targets were recorded by the MHTS. The inmate reported that a medication administration error was made.

28.    Inmate BB

The monitor's expert again reviewed only the MHTS history for this inmate. Inmate BB was interviewed on June 23, 2004 by the monitor's expert in a group. He was neatly dressed, well groomed and his conversation was logical and relevant.

Inmate BB had been at CSP/Solano for nearly three years. He was treated at the 3CMS level of care for Psychotic Disorder NOS. He was not prescribed any psychotropic medication in 2004. He was seen by his case manager regularly, with the exception of a five-month interval between visits that occurred in October 2003 and March 2004. He had a current treatment plan in his UHR.

Assessment:

With the exception of a missed case management contact in January 2004, this inmate's mental health treatment conformed to program guide requirements in so far as targets were recorded by the MHTS.

29.    Inmate CC

The monitor's expert reviewed only the MHTS history for this inmate. Inmate CC was also interviewed in a group. He was neatly dressed, well groomed and his conversation was logical and relevant.

Inmate CC had been at CSP/Solano since February 2004. He was treated at the 3CMS level of care for Major Depressive Disorder, recurrent, severe, with psychotic features. He was treated with Prozac, Zyprexa and Benadryl. His initial mental health contact and IDTT meeting were held in a timely manner. He was seen by his case manager quarterly and by a psychiatrist more frequently. A referral for medication non-compliance resulted in a mental health contact within six days.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as targets were recorded by the MHTS. Psychiatric response to a staff referral was prompt.

30.    Inmate DD

The MHTS history for this inmate was reviewed and the inmate was interviewed in a group. He was neatly dressed, well groomed and his conversation was logical and relevant.

Inmate DD had been at CSP/Solano for nearly one year. He was treated at the 3CMS level of care for Major Psychotic Disorder, NOS. He was treated with Trazodone and

Zyprexa.  He had a current treatment plan and had been seen by psychiatry every 60 days.
A 90-day case management follow-up was missed on June 15, 2004.

Assessment:

This inmate's mental health treatment conformed to program guide requirements with the
exception of a missed case management contact.

31.     Inmate EE

Inmate EE's MHTS history was reviewed and the inmate was ducated for a group
interview held on June 23, 2004.

Inmate EE had been at CSP/Solano for nearly two years.  He had a diagnosis of Major
Depressive Disorder, recurrent, unspecified.  His medication orders for Remeron,
Sertraline and Buspar were continuous through late 2003 and 2004.  He was seen
quarterly by a case manager, with the March 2004 appointment occurring two weeks late,
and more frequently than quarterly by a psychiatrist.  His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements.   A case
management follow-up was two weeks late.

32.     Inmate FF

The monitor's expert reviewed only the MHTS history for this inmate.  Inmate FF was
ducated for a group interview held June 23, 2004.

Inmate FF had been at CSP/Solano for 18 months.  He had a diagnosis of Schizoaffective
Disorder.  His medication orders for Sertraline, Olanzapine, Dilantin and Benadryl were
continuous through late 2003 and 2004.  Case management follow-up occurred at long
intervals; consecutive contacts made in September 2003 and February 2004 were five
months apart and the following contact was made three weeks beyond the 90-day
maximum permitted interval.  Inmate FF was seen quarterly by a psychiatrist with one
additional contact.  His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements, with the
exception of case management contacts which did not take place quarterly.

33.     Inmate GG

This inmate's MHTS history was reviewed.  Inmate GG did not appear for a group
interview held by the monitor's expert on June 23, 2004.

Inmate GG arrived at CSP/Solano from SCC in January 2003. His intake assessment and his IDTT were timely. No diagnosis was shown on his MHTS inmate history. Inmate GG's medication orders for Remeron and Sertraline were renewed consistently throughout his stay at CSP/Solano. He was seen at least quarterly by a case manager and by a psychiatrist.

Assessment:

This inmate's mental health treatment conformed to program guide requirements in so far as targets were recorded by the MHTS.

34.     Inmate HH

Inmate HH's MHTS history was reviewed and the inmate was ducated for a group interview held June 23, 2004.

Inmate HH had been at CSP/Solano for nine months. He had a diagnosis of Schizoaffective Disorder with medication orders for Remeron, Prozac, Gabapentin and Benadryl that were continuous through late 2003 and 2004. Inmate HH received quarterly case management follow-up, although one of the contacts was about three weeks late. Inmate HH was seen quarterly by a psychiatrist. His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements, with the exception of one late case management contact.

35.     Inmate II

The monitor's expert reviewed only the MHTS history for this inmate. Inmate II was ducated for a group interview held by the expert on June 23, 2004.

According to a history of contacts on the MHTS summary, Inmate II had been at CSP/Solano for over two years. The arrival date, however, was shown as February 27, 2004.

Inmate II had a diagnosis of Panic Disorder with Agoraphobia. His medication orders for Gabapentin, Buspar and Doxepin Concentrate were current in June 2004. The order for Doxepin appeared to have lapsed for a week between April 27 and May 5, 2004. Psychiatric contacts during that period occurred 97 days apart and the inmate's medication orders on the MARs were not continuous. Inmate II's regimen had changed over the past several months, with Prozac being discontinued in April and Buspar initiated in May 2004.

The inmate received quarterly case management follow-up, although one of the contacts was about three weeks late. Inmate II was seen almost quarterly by a psychiatrist and his treatment plan was current.

<u>Assessment:</u>

This inmate's mental health treatment met program guide requirements, except that a medication order expired and one case management contact was three weeks late.

36.    Inmate JJ

The monitor's expert reviewed only the MHTS history for this inmate. Inmate JJ was also ducated for a group interview held by the expert on June 23, 2004.

Inmate JJ had been at CSP/Solano for four years. He had a diagnosis of Depressive Disorder NOS and had recently begun taking Trazodone and Buspar. He was not on psychotropic medication and was not seen by a psychiatrist for a period of ten months spanning 2003 and 2004. The inmate received quarterly case management follow-up, although one of the contacts was two weeks late. His treatment plan was current.

<u>Assessment:</u>

This inmate's mental health treatment met program guide requirements, with the exception of one late case management contact.

37.    Inmate KK

Inmate KK's MHTS history was reviewed and the inmate was ducated for a group interview held June 23, 2004.

Inmate KK had been at CSP/Solano for over four years. He had a diagnosis of Schizophrenia, undifferentiated type. He was medicated with Risperidone, Cogentin and Benadryl with continuous orders for the past eight months. His case management follow-up occurred quarterly and his treatment plan was current.

<u>Assessment:</u>

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.

38.    Inmate LL

The MHTS history for this inmate was reviewed by the monitor's expert. Inmate LL was ducated for a group interview held by the expert on June 23, 2004.

Inmate LL had been at CSP/Solano for nine months. His intake assessment and IDTT meeting were timely. He had a diagnosis of Schizophrenia, paranoid type. He was medicated with Trazodone, Ziprasidone, Quetiapine and Artane with continuous medication orders since he arrived at the institution. Case management follow-up occurred more frequently than quarterly for this inmate and his treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.

39.    Inmate MM

The MHTS history of this inmate was reviewed. Inmate MM was ducated for a group interview held on June 23, 2004, but he did not attend.

Inmate MM had been at CSP/Solano for nine months. He was treated at the 3CMS level of care for Bipolar Disorder NOS. He was treated with Ziprasidone, Prozac and Benadryl. His medication orders were continuous since he arrived at the institution. Psychiatric and case management contacts occurred at least quarterly. Inmate MM's treatment plan was current. A referral for medication non-compliance resulted in a clinical contact within 17 days.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS, except for the slow response to a staff referral for medication non-compliance.

40.    Inmate NN

Inmate NN had been at CSP/Solano for 14 months. He had a diagnosis of Bipolar Disorder, NOS and was medicated with Benadryl, Buspar and Gabapentin at the time of the monitoring visit. Inmate NN was seen by a psychiatrist more frequently than every quarter and his treatment plan was current.

Inmate NN had been referred several times for medication non-compliance. The interval between the first referral and contact with mental health was 19 days. Two additional referrals were generated during that interval for the same reason.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS, although the response to the referral for medication non-compliance was late.

41.    Inmate OO

Inmate OO had been at CSP/Solano for 18 months.  He had a diagnosis of Depressive, Disorder, NOS and was medicated with Paxil, Remeron and Zyprexa at the time of the monitoring visit.  He received case management and psychiatric follow-up quarterly, but one case management contact was two weeks late.  The inmate's treatment plan was current.

The MHTS record of the inmate's medication orders was unclear.  The dates of the medication orders were continuous, suggesting continuity of treatment, but one set of orders seemed to have been discontinued without renewals being written, which would indicate a three-month interruption in medication.

Assessment:

This inmate's mental health treatment generally met program guide requirements in so far as targets were recorded by the MHTS, except that one case management appointment was held two weeks late and there may have been a lengthy gap in the inmate's medication.

42.    Inmate PP

Inmate PP had been at CSP/Solano for 20 months.  He had a diagnosis of Psychotic Disorder, NOS and was maintained on 100 mg of Thorazine.  He also took Dilantin, which was prescribed by a member of the non-psychiatric medical staff.  Inmate PP's medication orders as recorded in MHTS were unusual.  An order for Thioradizine was discontinued in June, but there was no order initiating it, suggesting that Inmate PP was not actually on the medication.   Inmate PP was seen by a psychiatrist at least quarterly.  His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.  There were some unexplained medication oddities in the inmate's MHTS history.

43.    Inmate QQ

Inmate QQ had been at Solano for ten months.  He had a diagnosis of Major Depressive Disorder, recurrent, severe, with psychotic features.  At the time of the monitoring visit, he was medicated with Benadryl, Navane and Prozac.  Psychiatric follow-up for Inmate QQ was conducted at appropriately short intervals with a recent change in the inmate's regimen.  Case management contacts occurred quarterly.  The inmate's treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.

44.    Inmate RR

Inmate RR had been at Solano for three years.  He had a diagnosis of Bipolar II Disorder. At the time of the monitoring visit, he was medicated with Depakote, Zyprexa and Cogentin.  He was also prescribed two anti-convulsant medications by a member of the non-psychiatric medical staff.  Psychiatric follow-up for Inmate RR was conducted at appropriately short intervals with a recent change in the inmate's regimen.  The inmate was seen by both a psychiatrist and case manager more frequently than every 90 days. His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.

45.    Inmate SS

Inmate SS had been at Solano for 20 months.  He had a diagnosis of Psychotic Disorder NOS.  At the time of the monitoring visit, he was medicated with Remeron and Perphenazine.  Psychiatric follow-up was conducted at appropriately short intervals through a recent change in the inmate's regimen.  Inmate SS was seen more frequently than quarterly by his case manager.  His treatment plan was current.

Assessment:

This inmate's mental health treatment met program guide requirements in so far as targets were recorded by the MHTS.

46.    Inmate TT

This 3CMS inmate was housed in the general population.  He was diagnosed with Bipolar I Disorder and treated with Paxil 20 mg/day and Depakote 1500 mg/day.

Inmate TT had been housed in CSP/Solano since May 1, 2003 and had been in the 3CMS program since his arrival at the facility.  Progress notes indicated that the inmate presented with intermittent complaints of mood instability, including depressive symptoms, as well as periods of irritability and complaints of mood swings.  The progress notes also indicated that the inmate had not been consistently taking his prescribed psychotropic medications.  The most recent psychiatric progress note from May 13, 2004 indicated that the inmate continued to report depression and frustration; his medications were then renewed.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- There was documentation of quarterly case manager contacts for this 3CMS inmate.

- There appeared to be a lapse in psychiatric contacts that occurred between December 16, 2003 and June 13, 2004. The inmate seemed to have missed two appointments and there did not appear to be any psychiatric follow-up during this time period.

- A review of the MARs indicated that the inmate was frequently non-compliant with his medications. Although the case manager indicated in his progress note that Inmate TT was not taking medications and that he was scheduled to see the psychiatrist, the psychiatric progress note dated one month later did not address the inmate's chronic medication non-compliance.

- Appropriate laboratory testing for treatment with Depakote was completed on November 15, 2003. In light of this inmate's history of non-compliance, however, repeat laboratory testing was indicated. The last psychiatric progress note was dated May 13, 2004 and indicated that laboratory testing for treatment with Depakote would be completed, but there was no documentation that these orders were actually written.

- The inmate's annual IDTT meeting was conducted in a timely manner. This IDTT meeting included all the necessary participants. While this inmate had significant medication non-compliance problems, there was no documentation that the issue was addressed in his IDTT meeting.

- The documentation of medication administration on the inmate's MARs was poor, with multiple blank spaces.

47.    Inmate UU

This EOP inmate was housed in general population. He was diagnosed with Schizophrenia, undifferentiated type and treated with Risperdal consta 25 mg intramuscular every two weeks, Propranolol 20 mg/day and Artane 4 mg/day.

Inmate UU was transferred to CSP/Solano from WSP on May 18, 2004. The inmate was seen for an initial evaluation by a clinician on the day following his transfer. At that time, the clinician noted the Inmate UU had a history of EOP care. An IDTT meeting was conducted on May 26, 2004 and the inmate was recommended for an EOP level of care. Subsequent progress notes described the inmate as being medication non-compliant

and presenting with psychotic symptoms, including paranoia, delusional thinking and treatment refusal.  The inmate also reportedly had significant medication side effects and occasionally cited this as a reason for his medication non-compliance.

On June 9, 2004, Inmate UU was seen by his treating psychiatrist, after he was found to have refused all medications.  He was reportedly paranoid and suspicious.  The psychiatrist indicated that the inmate's medications would be discontinued, but no other treatment recommendations were outlined at that time. There was a subsequent psychiatric progress note dated the same date, indicating that the inmate had significant psychotic decompensation, with overt psychotic symptoms, delusional thinking and hallucinations.  The psychiatrist noted that the inmate was refusing his Prolixin and that Risperdal consta would be ordered, but the inmate refused that medication also.  The only treatment recommendation was to schedule the inmate for another psychiatric appointment.

The inmate was seen by a psychologist on June 16, 2004.  At that time, he stated, "I feel like I died inside…I died in my body.  I am not alive today."  The psychologist also noted that the inmate presented with significant psychotic symptoms and unkempt appearance, as well as abnormalities consistent with a medical condition.  The inmate was referred for a medical consultation.  Inmate UU was last seen by the psychologist on June 19, 2004, at which time he continued to exhibit the above-mentioned symptoms.  The medications noted above were prescribed with a recommendation for an EOP level of care.

Assessment:

The care provided to this inmate was of significant concern.  This inmate was transferred to CSP/Solano and, soon after his transfer, was recommended for an EOP level of care.  Despite presenting with significant psychotic symptoms and poor functioning within his housing location, there was no recommendation for an expedited transfer to an EOP program.  Furthermore, this inmate refused his medications and appeared to be having significant medication side effects.  In addition, Inmate UU was not recommended for treatment in the MHCB unit, even after the he made comments regarding feeling as if he had "died inside".  There was no documentation of a suicide risk assessment at that time.

Additional comments regarding the care provided to this inmate included:

- The inmate's chart contained documentation that medications were ordered on the day of his arrival to CSP/Solano.  It appeared from the MARs that there was a lapse in medication continuity and that the inmate did not receive his medications until four days after his arrival at the facility.

- There was a lapse in the documentation of weekly case manager contacts with this EOP inmate.

- The inmate was seen for an initial clinical assessment within five days of his arrival at the facility.

253

- An initial IDTT was completed for Inmate UU within 14 days of his arrival in the institution. The inmate's IDTT meeting documented attendance by all of the necessary participants.

- Although this inmate chronically refused medications and complained of medication side effects, it did not appear that these issues were appropriately addressed by the psychiatrist.

48.    Inmate VV

This 3CMS inmate was housed in the general population. He was diagnosed with Psychotic Disorder, NOS. He was not treated with psychotropic medications at the time of the monitoring visit.

Inmate VV had been housed at CSP/Solano since March 2003 and had been on the mental health caseload for much of that time. Progress notes indicated that the inmate had previously been treated with Seroquel, but this medication was discontinued in November 2003. Case manager notes indicated that the inmate was stable off medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The chart contained documentation of quarterly case manager contacts.

- This inmate was involved in group therapy during February 2004.

- An annual IDTT meeting was conducted for this inmate, but it was somewhat delayed. It was unclear whether there was any psychiatric participation at the IDTT meeting.

49.    Inmate WW

This 3CMS inmate was housed in the general population. He was diagnosed with Depressive Disorder, NOS and treated with Celexa 60 mg/day.

Inmate WW had been housed at CSP/Solano since November 2001 and had been in the 3CMS program since May 2002. Progress notes indicated that the inmate was followed consistently by the case manager and psychiatrist. Although there were some initial modifications of the inmate's medication to address his complaints of anxiety and depressive symptoms, the most recent progress note indicated that the inmate was stable on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The chart contained documentation of quarterly case manager contacts.

- The chart also contained documentation of consistent psychiatric contacts with appropriate medication management.

- Documentation showed that this inmate was involved in group therapy.

- An annual IDTT meeting was completed for Inmate WW, but it was difficult to determine the timeliness of this meeting since only the most recent volume of the inmate's UHR was reviewed and it did not include documentation from the previous IDTT meeting. The appropriate composition of the meeting was documented.

- There appeared to be some medical records filing lapses, as the most recent MAR present in the medical record was from February 2004.

50.    Inmate XX

This 3CMS inmate was housed in the general population. He was diagnosed with Mood Disorder, NOS and was treated with Zoloft 50mg/day.

This inmate was transferred to CSP/Solano on March 2, 2004 from NKSP. The inmate had been treated with Seroquel and Wellbutrin and was recommended for a 3CMS level of care while at NKSP. It appeared that the inmate was initially seen by mental health on March 10, 2004 and was seen on the following day by a psychiatrist who ordered Seroquel. Inmate XX was next seen by a psychiatrist on March 31, 2004, at which time he reported being depressed. Zoloft was started and Seroquel was discontinued at that time. Subsequent progress notes indicated that the inmate was medication non-compliant. Inmate XX was referred by a MTA after he was found "palming" his medications at the pill line. His case manager indicated on June 7, 2004 that the inmate wished to discontinue medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There appeared to be a lapse in medication continuity for this inmate upon arrival at CSP/Solano. A review of the MARs revealed the inmate did not have an updated order for medications and that his medications were not administered until nine days after his arrival at the facility.

- The chart contained documentation of case manager contacts.

- The chart also contained documentation of consistent psychiatric contact.

- An IDTT meeting was held within 14 days of the inmate's arrival at the facility and included the necessary participants.

- The most recent MAR in the inmate's medical record was from April 2004, indicating medical records filing lapses.

- A mental health referral was submitted upon the inmate's arrival to CSP/Solano.

51.    Inmate YY

This 3CMS inmate was housed in the general population.  He was diagnosed with Bipolar Disorder, NOS and treated with Lithobid 900 mg/day, Zyprexa 20 mg/day and Wellbutrin SR 300 mg/day.

Inmate YY had been housed at CSP/Solano since January 13, 2004 when he was transferred from CIM.  The inmate was initially seen by mental health on January 27, 2004, at which time he presented with depressed mood, feelings of hopelessness and "feeling trapped."  The psychiatrist indicated that the inmate denied suicidal ideations and that he contracted not to harm himself.  He recommended continuing the inmate's medications.  Inmate YY was also seen by a case manager on that same date pursuant to a referral from the psychiatrist.  The case manager indicated that the inmate was not suicidal at that time.  Subsequent progress notes described a previous suicide attempt by hanging, six months earlier.  The most recent progress notes indicated that the inmate was stable on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Although this inmate's medications were ordered on the day of arrival, a review of the MARs indicated that he did not receive his medications until eight days later.

- An initial MH-4 was completed within five working days of the inmate's arrival to the facility.

- An IDTT meeting, with all the necessary participants, was conducted within 14 days of the inmate's arrival at the facility.

- Although this inmate presented with significant depressive symptoms and questionable suicidality, neither the treating psychiatrist nor the case manager completed a suicide risk assessment.  This was a significant concern, since the inmate had a history of a recent serious suicide attempt.

- A review of the MARs revealed multiple blank spaces; probable no shows/refusals were documented. Despite this pattern of inconsistent medication compliance, there was no documentation of a referral for medication non-compliance.

- Appropriate laboratory testing for treatment with Lithium was conducted.

- The chart contained documentation of quarterly case manager contacts.

- Documentation of consistent psychiatric contacts with appropriate medication management was also in the chart.

52.    Inmate ZZ

This 3CMS inmate was housed in the general population. He was diagnosed with Bipolar Disorder, NOS and treated with Seroquel 750 mg/day, Vistaril 200 mg/day and Remeron 30 mg/day.

Inmate ZZ had been housed at CSP/Solano since February 2002. Progress notes indicated that the inmate was followed consistently by the case manager and psychiatrist in general population. The most recent progress notes indicated that he was essentially stable on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation in the inmate's chart of quarterly case manager contacts.

- The chart also contained documentation of consistent psychiatric contacts.

- The inmate's annual IDTT meeting included the necessary participants.

53.    Inmate AAA

This 3MCS inmate was housed in the general population. He was diagnosed with Mood Disorder, NOS and treated with Zoloft 200 mg/day, Tegretol 400 mg/day, Buspar 30 mg/day and Wellbutrin SR 300 mg/day.

Inmate AAA had been housed at CSP/Solano since May 2, 2002 and had been in the 3CMS program since that time. Progress notes indicated that the inmate was followed consistently by the case manger and psychiatrist. Although Inmate AAA occasionally complained of some mild mood instability, it appeared that he was essentially stable on medications.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- There was documentation of quarterly case manager contacts in the inmate's chart.

- Documentation of consistent psychiatric contacts was also in the UHR.

- The last record of laboratory testing regarding the inmate's treatment with Tegretol was during November 2003.  The psychiatrist ordered repeat laboratory studies on May 26, 2004, but the results were not present in the medical record.  It appeared that this might have been a medical records filing issue.

- There was documentation of a timely annual IDTT meeting.  It appeared that there was no custody representative present at the meeting.

54.    Inmate BBB

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Psychotic Disorder, NOS and treated with Risperdal consta 25mg intramuscular every two weeks and oral Risperdal 4 mg/day.

Inmate BBB was transferred from DVI to CSP/Solano on April 27, 2004 and was referred to mental health upon arrival.  The inmate was initially seen by a clinician in the administrative segregation unit on May 14, 2004 when he presented with paranoia and medication refusal.  A diagnosis of Psychotic Disorder, NOS was provided and the psychiatrist completed a 3CMS chrono.  Four days later, an IDTT note documented that the inmate was disheveled and unkempt, exhibited inappropriate affect with possible hallucinations and had a messy cell.  A recommendation for transfer to an EOP level of care was made at that time.  Six days later, the case manager in administrative segregation noted that the inmate's cell was filthy and referred him to the MHCB unit for stabilization.

The inmate was hospitalized in the temporary MHCB unit from May 24 until June 4, 2004.  During that time, he was placed on oral and long acting Risperdal and reportedly showed significant improvement in his psychotic symptoms. Subsequent progress notes after his return to administrative segregation indicated that the inmate was functioning adequately and was compliant with medications.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately referred to mental health from intake after presenting with unusual and bizarre behavior. He was not seen by mental health in administrative segregation until eight days after his arrival in the unit. It appeared that an attempt was made by a psych social worker in general population to respond to the inmate's referral, but the social worker merely mentioned that the inmate did not show up for evaluation because he was in administrative segregation.

- This inmate was appropriately referred for a higher level of care after presenting with psychotic decompensation in administrative segregation.

- An IDTT meeting conducted in the administrative segregation unit documented attendance by all the necessary participants. Although there was documentation that the inmate was followed by the case manager in administrative segregation on a weekly basis, all progress notes contained a pre-printed statement at the beginning of the note with a pre-printed date and a statement indicating that the inmate was seen at the cell door, since he declined an out-of-cell contact. This brought into question the efforts of clinicians to evaluate inmates appropriately in this setting.

55. Inmate CCC

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Depressive Disorder, NOS and Paranoid Personality Disorder. He was treated with Zoloft 200 mg/day, Remeron 45 mg/day and Vistaril 100 mg/day.

Inmate CCC had been housed at CSP/Solano since January 1997. He had been in the 3CMS program at least since January 2003; the previous medical record volume for this inmate was not available for review. During the beginning of the monitoring period, the inmate was housed in the general population where he was followed at least monthly by the case manager. Progress notes indicated that the inmate presented with chronic dysphoria and irritability. It appeared that on December 15, 2003, Inmate CCC became angry during a psychiatric visit and requested discontinuation of his psychotropic medications. These medications were subsequently resumed during February 2004 at the inmate's request.

During early March 2004, the inmate was transferred to the administrative segregation unit for unknown reasons. Progress notes documented that he continued to complain of chronic symptoms. A chrono was submitted on June 8, 2004, indicating a change to an EOP level of care. The corresponding progress note, however, made no mention of a change in level of care.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The chart contained documentation of quarterly case manager contact in the general population.

- The chart also contained documentation of consistent psychiatric contacts in general population.

- There appeared to be a lapse in weekly case manager contacts in the administrative segregation unit between April 8 and May 11, 2004. Furthermore, one administrative segregation case manager documented all clinical contacts with a pre-printed heading, indicating that the inmate refused out-of-cell contact. It appeared that this inmate was usually followed by another case manager, but it was unclear whether these case management contacts occurred at cell front.

- An IDTT meeting was conducted in the administrative segregation unit. It appeared to include all the necessary participants.

- It was unclear why this inmate was referred to the EOP level of care. His progress notes did not document the reasons for the EOP recommendations and there was no evidence that an IDTT meeting had been conducted regarding this increase in level of care.

56.    Inmate DDD

This inmate was housed in the MHCB unit. He was diagnosed with Schizophrenia, undifferentiated type and treated with Risperdal 8 mg/day.

Inmate DDD was transferred from the OHU at DVI to the MHCB unit at CSP/Solano on June 10, 2004. The inmate had been housed in the OHU from June 8 through June 9, 2004, and reportedly presented with psychotic symptoms, including delusional thinking, disorganization and auditory hallucinations. Prior to his transfer to CSP/Solano, the clinicians at DVI had recommended an EOP level of care. Upon transfer to CSP/Solano, the inmate's medication was switched from Zyprexa to Risperdal. Subsequent progress notes indicated that the inmate remained agitated and uncooperative and continued to exhibit psychotic symptoms.

Assessment:

The care provided to this inmate was of concern for the following reasons:

- This inmate clearly needed an increased level of care, as he continued to present with psychotic symptoms, treatment resistance and poor insight regarding his illness. There was no documentation that a referral to DMH acute care had been made.

- There appeared to be lapses in documentation regarding the frequency of clinical contact in the MHCB unit.

EXHIBIT E

<u>High Desert State Prison (HDSP)</u>

April 6, 2004 – April 8, 2004

1.  Inmate A

This inmate's chart was reviewed as part of a wider study of laboratory reports. Inmate A arrived at HDSP on February 24, 2004 from the county jail. The county jail medical information indicated that he was on no medications. His bus screening form stated, "patient says Lithium 600 mg b.i.d. and Prozac 40 mg per day". The inmate's mental health referral form indicated that the inmate's psychiatric medications had been renewed for 30 days, but the number 30 was crossed out and the number 14 was substituted. The referral form also indicated that the inmate had a history of mental health care within the last six months and that "documentation shows that the inmate is prescribed psychiatric medication… from another CDC institution". The basis for this statement was unclear, as the inmate arrived on no medication, indicating only that he had taken medication in the past.

A telephone order by the chief psychiatrist for Lithium 600 mg b.i.d. and Prozac 40 mg. was picked up on February 26, 2004, two days after the inmate's arrival. Parole prescriptions for the same medications were written on March 4, 2004. Neither order was signed; only a copy of the order was in the inmate's UHR.

A review of the inmate's progress notes revealed that, as of April 5, 2004, Inmate A had not been seen by a psychiatrist during his stay at HDSP. A review of the laboratory section of his chart revealed that he had never had a Lithium work-up or any Lithium level tests.

Inmate A was paroled on March 7, 2004 and arrived again at the institution on March 16, 2004 as a parole violator. His bus screening this time indicated "in jail only two hours, no medication". Once again, a telephone order for medication was written without the benefit of an evaluation or any verification that the inmate was on medication. The inmate's original February 26 telephone order was signed, along with the parole medication orders.

MARs for February and March revealed that Inmate A began receiving medications on February 27, 2004 and received them daily until his March 7 parole. Psychiatric orders dated March 24, 2004 were in the inmate's new chart for the same Lithium and Prozac prescriptions. Another telephone order, unsigned, was transcribed by nursing staff for Lithium 600 mg b.i.d., Prozac 40 mg per day and a Lithium work-up along with a blood level test. As of April 5, 2004, there were no results back from any of these studies.

Assessment:

1.  This inmate's case showed dangerous medication management practices, including prescribing medications without an evaluation and without any verification of medications.

2.  This inmate never received the parole medications that were ordered for him.  He went for eight days without medication, until his return as a parole violator.

3.  There were no Lithium level tests completed or any clinical work-up done for this inmate during either of his two stays at HDSP.

4.  Telephone medication orders for this inmate were not signed.

5.  The inmate's statements that he had a history of taking medication was inappropriately construed by nursing staff as verification that he was taking prescribed medications.

2.  Inmate B

Inmate B arrived at HDSP on February 3, 2004.  His bus screening indicated that he was taking Risperdal 3 mg h.s., which was verified by a medication summary from the county jail.  A telephone order for this medication was given on the same date.  The inmate received his medication within one day.

3.  Inmate C

Inmate C arrived at HDSP on January 7, 2004.   Documentation from the county jail verified that he was taking Zyprexa 10 mg h.s.  A telephone order of the same date, however, prescribed Zyprexa 20 mg p.m. for the inmate, changing both the time of day that the inmate's medication was administered and doubling his dosage.  A review of the MARs indicated that the medication was, in fact, never given to the inmate.

4.  Inmate D

Inmate D arrived at HDSP on February 3, 2004.  Documentation from the country jail verified that the inmate was taking Wellbutrin SR 150 mg.  A telephone order for the same medication was written on February 4, 2004, one day following the inmate's arrival.  The telephone order was unsigned.  The inmate's MAR was missing and, consequently, there was no documentation that the inmate ever received his medication.

5.  Inmate E

Inmate E arrived at HDSP on January 21, 2004 with documentation from the county jail verifying that he was on Paxil 60 mg p.m. and Seroquel 250 mg q.p.m. A telephone order of the same day prescribed the same medications.  A new medication order was written on February 25, 2004, but the MAR for that date was missing and there was no evidence that the medication was ever administered.

6.  Inmate F

Inmate F arrived at HDSP on January14, 2004 with documentation from the country jail verifying that he took Seroquel 25 mg q.p.m.  Since Inmate F was on a taper of that medication, his Seroquel 25 mg q.p.m. was scheduled to be discontinued on January 16, 2004.  A telephone order was given the same day for the same medications.  According to the inmate's MAR, which was present in his chart for this time period, the medication was never administered.

7.  Inmate G

Inmate G had been taking Lithium since 2001 and was still on that mediation at the time of this study.  The inmate received an appropriate Lithium work-up on October 15, 2003 at HDSP.  His blood levels were as follows:  On October 24, 2003 – "none detected"; on October 25, 2003 – less than 0.2.; on October 31, 2003 – 0.7; and on November 5, 2003 – 0.3.  Progress notes revealed that the inmate had been seen by a psychiatrist on November 8, 2003 and a new blood level test was ordered following a review of the October 31 level.  A referral dated December 15, 2003 was sent to psychiatry after nine consecutive evening doses were missed.  The inmate was not seen until December 24, 2003.  His Lithium at that time was re-started and a blood level drawn.  Progress notes of January 9, 2004 did not mention any of these issues or problems.

A review of the inmate's MARs from October of 2003 revealed a total of four blanks spaces during p.m. administration, indicating that the inmate missed four days of Lithium.  In November, there were nine blank spaces during p.m. administration, representing nine days of missed medication.  There were blanks in the MARs from December 7 through December 17, including spaces variously marked "NS", "R" and "A", during p.m. medication administration.  After being seen on December 24 and having his medications restarted, the inmate failed to show up for medication administration that evening through December 28.

Assessment:

1.  This inmate's psychiatric referral for non-compliance was ten days late.

2.  A psychiatrist saw the inmate on January 9, 2004 without having any compliance information and without any mention of the December 28 non-compliance.  There was no reference to the inmate's Lithium levels.  A Lithium level test was not re-ordered after the inmate's Lithium was restarted on December 23, 2004.

3.  The inmate was treated by a telemedicine psychiatrist, which was inappropriate for someone with complex needs and treatment resistance.  Telemedicine coverage of this inmate's treatment was discontinued in

October 2003 for reasons that were not clear, and Inmate G's subsequent continuity of medication was poor.

8.   Inmate H

This inmate's chart was reviewed as part of a study of laboratory tests for mood stabilizers.  Inmate H was on long-term Lithium therapy.  He arrived at HDSP for the first time on June 9, 2003, was subsequently paroled and readmitted to the institution on September 8, 2003 as a parole violator.

He entered the institution in June on Lithium prescribed for him at the county jail, but he had not received any Lithium level tests or a Lithium work-up there.  On the day of his arrival, telephone orders were written for 30 days of Lithium 300 mg a.m. and 600 mg p.m.  Those medications were renewed on July 9 and July 15, 2003, and a Lithium level test was ordered.  That test was never drawn.

Inmate H came back to HDSP on September 8, 2003 as a new arrival on Lithium.  On October 15, 2003, he received an appropriate Lithium work-up and level testing.  On January 10, 2004, his Lithium was increased to 900 mg p.m.  A level test was ordered at that time. A review of the laboratory section revealed that the inmate received a Lithium level test two weeks after his October 15 order.  The result was low normal, or 0.5.  Inmate H's thyroid studies and the remainder of his Lithium work-up were normal.  The level testing ordered on January 10 was never drawn, and there were no subsequent Lithium levels in the inmate's chart.  There was a level drawn on November 22, 2003, seven days after the test was ordered.  The inmate's Lithium level at that time was 0.73.

A review of the inmate's progress notes revealed a poor transition from a telemedicine clinician to an institutional psychiatrist.  There was no evidence from the progress notes that the psychiatrist had reviewed the chart for prior Lithium levels or work-ups.  There was no mention of the low or low-normal level of Lithium in October and no substantiation for the increase in the inmate's Lithium dosage on January 10.

A review of the inmate's MARs revealed that he had taken his Lithium every day.

Assessment:

1.   This inmate's care was inadequate, even though he was stable.

2.   Inmate H's case evidenced a poor transition from telemedicine to institutional psychiatric treatment.

3.   There was no substantiation in the inmate's chart for the change in his medication dosage.

      4.      The psychiatrist did not document any review of the inmate's abnormal or low levels of Lithium test results.

9.  Inmate I

Inmate I was on long-term Lithium therapy. There were orders dated March 17, 2004 in his chart for Lithium and Lithium 1200 mg q.p.m... At that time, a Lithium work-up and blood-level testing was ordered. A Lithium level dated March 29, 2004, 12 days after testing was ordered, was 0.77. The inmate's progress notes substantiated the Lithium work-up and level testing. Prior Lithium levels from 2003 were initialed by the psychiatrist, reflecting psychiatric review.

Assessment:

      1.      This inmate's chart reflected good medication management for someone who was stable on Lithium.

10.  Inmate J

Inmate J was on long-term Lithium therapy. Orders for Lithium were in his chart for July 17, August 18 and October 3, 2003. There was also an order dated December 15, 2003, when the inmate arrived from county jail as a parole violator. There was a telephone order for the same date for Lithium 600 mg q.a.m. and 900 mg q.p.m. Inmate J's most recent medication order was dated March 9, 2004 for 90 days of the same doses of Lithium.

The MTA administering medications sent a non-compliance referral regarding Inmate J on February 26, 2004. The psychiatrist, without seeing the inmate, discontinued his Lithium and Keppra, an anti-convulsant medication. A review of the inmate's January MAR revealed that he missed his Lithium during 11 out of 31 mornings. During February, he missed nine of 25 a.m. doses.

The inmate's treatment plan dated December 30, 2003 revealed diagnoses of "rule out bipolar disorder" and "rule out adjustment disorder". There was also a referral chrono written on February 10, 2004 by the MTA because the inmate had "refused medications" for seven days. The inmate was not seen by psychiatry in response to that referral until February 26, 2004. The progress note indicated that "the inmate had refused psych line" and was referred by the MTA secondary to refusing his Lithium and Keppra. The psychiatrist, who was seeing the inmate for the first time, focused on the rule out diagnosis of adjustment disorder following a two-day stay in the CTC. The note of the same day made no reference to the fact that the psychiatrist had actually discontinued the inmate's Lithium and Keppra. The psychiatrist's chart review consisted of just reviewing the orders of December 20, 2004, which discharged the inmate from the CTC. The psychiatrist's note ordered a return visit for routine follow-up as though the clinician were taking over the inmate's care. Inmate J was subsequently seen by the same psychiatrist on March 9, 2004. There

was no indication that the inmate's MARs were ever reviewed by the psychiatrist. Inmate J was seen by four psychiatrists in three months.

Assessment:

1.    The psychiatrist in this case inappropriately discontinued all of the inmate's psychotropic medications, ignoring the inmate's diagnosis and the evidence contained in his MARs.

2.    This inmate's treatment reflected frequent changes of psychiatrists with poor continuity of care.

3.    The inmate had no Lithium level testing since a test indicated "none detected" in July 2003 at another institution.

4.    This inmate was inappropriately referred for non-compliance referrals when it appeared that he never refused medications.

11. Inmate K

Inmate K was on long-term Depakote. His chart revealed a Valporic Acid level test from January 16, 2003, indicating "0 detected". On September 2, 2003, Inmate K's Valporic Acid level was normal.

There was only one psychiatric note in the inmate's chart during the year 2004. On March 10, 2004, the psychiatrist documented that the inmate was "stable bipolar" and renewed his Depakote for 250 mg b.i.d. The MARs demonstrated that Inmate K had taken his medications twice a day since January 2004.

Assessment:

1.    There was no review or follow-up of this inmate's abnormal Valporic Acid test results.

EXHIBIT F

Richard J. Donovan Correctional Facility (RJD)

July 12, 2004 – July 14, 2004

1.      Inmate A

This 3CMS inmate was housed in general population and diagnosed with Bipolar I Disorder.  He was treated with Seroquel 300 mg/day and Paxil 10 mg/day.

Inmate A was transferred from CIM to RJD on November 14, 2003.  Although the inmate had previously been on the 3MCS caseload as recently as September 2003, he was not on the mental health caseload at the time of his transfer to RJD.  A staff referral was submitted on March 25, 2003, indicating that the inmate had anxiety regarding an upcoming parole board hearing and was experiencing auditory hallucinations and anxiety symptoms.  A case manager indicated that the inmate would be referred to a psychiatrist.  The psychiatrist subsequently saw the inmate on May 10, 2004.  At that time, Inmate A reported depressive symptoms with poor appetite, depressive mood, poor concentration and tearfulness.  The psychiatrist prescribed Paxil and indicated that the inmate would be seen for follow-up in one week.  That was the last documentation of clinical contact in the inmate's medical record.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately returned to the 3CMS program after presenting with a recurrence of mental health symptoms.

- There was documentation of quarterly case manager contacts in the inmate's chart.

- There was no documentation in the inmate's chart indicating completion of either a MH-2 or MH-4.

- Inmate A presented with reported depressive symptoms on May 10, 2004 and was seen by a psychiatrist who indicated that the inmate would be seen again for follow-up one week later.  There was no documentation in the inmate's chart indicating that he had been seen for clinical reassessment since that time, a period of approximately two months.

- Although there was a progress note indicating that an IDTT meeting was completed when the inmate was placed in the 3CMS program, it was not possible to determine the participants at that meeting.

- A review of the inmate's MARs dated April and May contained several blank spaces, as well as evidence that the inmate did not attend some clinical appointments.

- There was no documentation of follow-up for this inmate's medical non-compliance.

270

- Informed medication consent forms for prescribed psychotropic medication were present in the medical record

2.    Inmate B

This 3CMS inmate was housed in general population on Facility 3.  He was diagnosed with Major Depressive Disorder, recurrent with psychotic features and treated with Geodon 20 mg/day, Benadryl 150 mg/day, Desyrel 150 mg/day and Paxil 30 mg/day.

Inmate B was transferred from CIM to RJD on July 2, 2004.  The inmate had been in the 3CMS program at CIM and was prescribed the above medications; these medications were ordered on the day of his arrival to RJD.  The inmate's medical record did not include any information documenting clinical contact at RJD.

Assessment:

As mentioned above, there was no documentation that this inmate had received any clinical contact since his arrival at RJD.  There was also no documentation showing completion of a MH-2 or MH-4 and no documentation of a psychiatric evaluation.  The inmate's IDTT meeting was not due until two days after the monitoring visit.  There did appear to be medication continuity upon the inmate's arrival to the facility.

3.    Inmate C

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed with Psychotic Disorder, NOS; an additional diagnosis of Major Depressive Disorder, recurrent was present in the medical record.  The inmate was treated with Remeron 60 mg/day and Benadryl 200 mg/day.  He was previously treated with Lithium between February 2004 and June 2004 for affective symptoms.  This medication was discontinued reportedly at the inmate's request.

This inmate was transferred from CIM to RJD on September 19, 2003.  He was receiving a 3CMS level of care at the time of transfer and was housed in the administrative segregation unit during the review period.  Progress notes indicated that the inmate was followed by the case manager and psychiatrist in the administrative segregation unit.

On June 21, 2004, Inmate C presented with auditory hallucinations of homicidal content.  On the following day, a chrono was present indicating a change in the inmate's level of care from 3CMS to EOP.  Subsequent progress notes indicated that the inmate continued to express complaints of depression and anxiety.  Inmate C reportedly had been assaulted by his cellmate.  The inmate was seen in an IDTT meeting, at which time he reported experiencing hematuria and concerns that his medical issues had not been appropriately addressed.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- Although this inmate was treated with Lithium for approximately four months, there was no documentation of appropriate laboratory testing for treatment with this medication. This was of particular concern since the inmate also complained of hematuria, which could possibly be a result of Lithium induced renal pathology.

- There were significant lapses in the documentation of weekly case manager contact for this inmate while he was in the administrative segregation 3CMS program.

- There was a lapse in the documentation of weekly case manager contact after the inmate was transferred to an EOP level of care between July 1 and July 12, 2004.

- There was no documentation located in the inmate's medical record indicating that an IDTT meeting was conducted at the time that the inmate was transferred from a 3CMS level of care to an EOP level of care.

- The inmate's medical record was extremely disorganized and progress notes were not in chronological order.

4.      Inmate D

This EOP inmate was housed in administrative segregation. He was diagnosed with Schizophrenia, paranoid type and treated with Prozac 40 mg/day, Seroquel 300 mg/day, Benadryl 150 mg/day, Artane 4 mg/day and Buspar 60 mg/day.

This inmate was transferred from NKSP to RJD on January 6, 2004. The inmate was receiving an EOP level of care and was prescribed medications prior to his transfer to RJD. There was documentation of a mental health referral at the time of the inmate's arrival at the institution. Inmate D was seen for initial clinical contact by a psychiatrist one week after his arrival at the facility and his medications were ordered on that date. Subsequent progress notes indicated that the inmate presented with periods of increased psychotic symptoms, including reports of passive suicidal ideation, paranoid delusional thinking, auditory hallucinations and periods of agitation. It appeared that there was some consideration of transferring the inmate to a 3CMS level of care during March and April, however, due to the inmate's worsening symptoms, these considerations were discontinued.

Inmate D was transferred to the administrative segregation unit on June 16, 2004, after he was charged with a battery on another inmate. The last progress note in his chart was dated June 28, 2004 and indicated that the inmate remained psychotic and anxious. His medications were further adjusted at that time.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- It appeared that this inmate's medications were not ordered at the time of his arrival to the facility.  There was a lapse in his psychotropic medication of at least one week after his arrival.

-  Informed medication consent forms for treatment with psychotropic medication were present in the inmate's medical record.

- There were some lapses in the documentation of weekly case manager contact for this inmate when he was in the outpatient EOP program.

- At the time of the monitoring visit, Inmate D had been housed in the administrative segregation unit for approximately one month.  The inmate's medical record only documented one case manager contact and one psychiatric contact during that period of time, despite the fact that this inmate had a history of significant psychiatric symptoms and was in the EOP program.

- A review of the inmate's MARs revealed the presence of blank spaces as well as evidence of medication refusal and no-shows.  There was no documentation present in the UHR indicating that a referral was made to mental health regarding this inmate's non-compliance.

- The inmate's EOP IDTT meetings did contain the necessary participants.

- There was no documentation of an IDTT meeting since the inmate had been transferred to the administrative segregation unit.

5.    Inmate E

This EOP inmate was housed in the administrative segregation unit.  He was diagnosed Schizoaffective Disorder, Bipolar Type and treated with Zoloft 200 mg/day, Risperdal 4 mg/day, Zyprexa 20 mg/day, Vistaril 150 mg/day and Depakote 1500 mg/day.

This inmate was transferred from a county jail to RJD on May 13, 2004.  He had previously been treated with psychotropic medications at the county facility.  It appeared that his medications were ordered on the day of his arrival at RJD, but these orders were not present in the inmate's medical record.  A mental health referral was submitted upon the inmate's arrival and he was seen for an initial clinical contact on May 24, 2004, at which time he was placed into the EOP program.  Progress notes described the inmate as presenting with psychotic symptoms, including auditory hallucinations and paranoid delusional thinking.  He also reportedly had periods of anxiety and disorganized thinking.

This inmate was transferred to the administrative segregation unit on June 17, 2004, reportedly due to threats to another inmate. On June 20, an MTA referred him to mental health because he was reportedly experiencing command auditory hallucinations urging him to harm others. The following day, he was seen by a case manager who noted that the inmate had some increase in paranoia and referred him to the psychiatrist. The inmate was seen for a psychiatric evaluation on June 28, 2004, at which time he presented with auditory hallucinations of paranoid content; his Risperdal was increased in response. Subsequent progress notes indicated that the inmate was angry regarding his placement in administrative segregation, but reportedly stable without current threats to harm himself or others.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately referred to mental health upon his arrival to the facility.

- There appeared to be medication continuity upon the inmate's arrival to the facility.

- Informed medication consent forms for treatment with all psychotropic medications were not present in the inmate's medical record.

- There were some lapses in the documentation of weekly case manager contact for this inmate after his transfer to the administrative segregation unit.

6.    Inmate F

This 3CMS inmate was housed in the general population. He was diagnosed with Bipolar Disorder, NOS and ADHD, but not treated with psychotropic medications at the time of the monitoring visit.

This inmate arrived from the country jail at RJD on June 18, 2004. His bus screening indicated that he had reported a history of a psychiatric disorder and depressive symptoms. There was no documentation from the county jail indicating that the inmate had been treated with psychotropic medication. Inmate F was seen for an initial mental assessment on June 28, 2004, at which time a MH-7 was completed. The MH-7 form indicated that the inmate had a history of being treated at a 3CMS level of care as well as a history of treatment with multiple psychotropic medications in the past. That was the last documentation of psychiatric contact in the inmate's UHR.

<u>Assessment:</u>

Although this inmate reported that he did not receive his psychotropic medications at the time of arrival at RJD, there was no documentation in his chart indicating that he had been treated with psychotropic medication at the county jail prior to his transfer to RJD. A MH-7 was completed and was timely. The MH-7 recommended a 3CMS level of care.

7.    Inmate G

This 3CMS inmate was housed in the general population and diagnosed with Depressive Disorder, NOS as well as Bipolar Disorder, NOS. He was not treated with psychotropic medications at the time of the monitoring visit.

Inmate G was not taking any prescribed psychotropic medications at the time of his transfer to RJD from a county jail. He was seen for an initial psychiatric evaluation on May 12, 2004 and was diagnosed with Depressive Disorder, NOS; the psychiatrist indicated that the inmate did not wish to take psychotropic medications. An MH-7, completed on the following day, recommended a 3CMS level of care.

<u>Assessment:</u>

This inmate's chart contained a MH-7 that was completed in a timely manner as well as a psychiatric evaluation with appropriate medication management.

8.    Inmate H

This inmate completed suicide on April 25, 2004. The inmate had been admitted to RJD's MHCB unit on April 13, 2004 as a transfer from CIM. The inmate was noted as Spanish-speaking only and was admitted because he cut his wrist in a suicide attempt. The inmate, who was in the CDC system for the first time, was a 25 year-old man with an R-suffix who reported fearing for his safety because other inmates might find out he was a "child molester." The inmate was transferred on April 20, 2004 to RJD's administrative segregation unit "for safety."

A suicide risk assessment dated April 19, 2004 included the following findings: "sex offender, s/p wrist cut, OD, first term, recent S.I., anxious, agitated, fearful, hopelessness, helplessness, fearful of safety, recent attempt." There was, however, no estimate of risk on the assessment. The plan was to refer the inmate to his primary clinician and to conduct five-day follow-up. The inmate was still on five-day follow-up at the time he completed suicide. A psychiatric note prior to his discharge from the MHCB unit indicated that a Spanish interpreter was used during the interview and that the inmate was "informed he'd get 115 for further acts as he is attempting to stay in MHCB 'until I leave CDC'". In this note, the inmate's mood was described as "scared", although he was reported to have denied suicidal or homicidal ideation. His diagnosis was given as Adjustment Disorder.

Assessment:

The suicide report for this inmate had not been completed at the time of the monitoring visit, necessitating a more comprehensive review by the monitor's expert after the internal CDC review. This inmate's history and risk factors, however, did not appear to have been appropriately assessed. It was unclear why the inmate would have been transferred to a single cell in administrative segregation given the indicators on his suicide risk assessment from April 19, 2004. Furthermore, the psychiatric note recording that the inmate was told he would get 115 disciplinary infractions for attempting to stay in a MHCB unit were clearly inappropriate and without adequate evaluation of his risk for suicide.

9.      Inmate I

This inmate was interviewed in the MHCB unit where he had been housed for approximately six days. The inmate was a 47 year-old man with garbled speech and thought disorder on interview. The inmate reported a very unclear history of homelessness, being "framed" and being a "spy." The inmate reported that he had been incarcerated for four and a half years, but did not know why he had been incarcerated or when he would be released. The inmate had great trouble tracking his thoughts and appeared disheveled and unkempt.

Assessment:

This inmate's placement in the MHCB unit appeared to be appropriate. A referral to an intermediate level of care at DMH would be appropriate for this inmate should his condition not stabilize within ten days.


10.     Inmate J

This inmate was also interviewed in the MHCB unit, where he had been residing for approximately 18 days. The inmate had been admitted to the MHCB unit because of "depression" and because he had been walking on the yard nude. He was seen by the psychiatrist and case manager in the MHCB unit, who indicated their intention to refer the inmate to the EOP program; the inmate would, however, be discharged back to the reception center since he had not yet been endorsed. Prior to his current return to CDC, Inmate J reported that he had been housed at ASH, where he had received medication and group therapies that were helpful. The inmate was scheduled to be discharged and to receive five-day follow-up for potential suicidal ideation. He was currently taking Depakote and Abilify.

Assessment:

This inmate's care and treatment since his admission to the MHCB unit were helpful to him, but he should have been referred to DMH prior to his extended MHCB stay.

11.    Inmate K

This inmate was interviewed by the monitor's expert in the MHCB unit with staff present. The inmate had been in the MHCB unit for approximately 33 days. He was initially admitted because of a history of "bizarre behavior", in which he reportedly lost significant weight, was missing appointments in the EOP yard and had poor medication compliance. The inmate admitted he had been prescribed Navane 5mg on the yard, but had sporadic compliance. His Navane was increased to 10mg in the MHCB unit, but the inmate had been refusing the 10mg for several days. Inmate K reported that he had taken his medication on the morning of the interview, but indicated that he only received 5mg rather than the prescribed 10mg of Navane.

Inmate K presented with handwritten notes that he shared with the staff and the expert, reflecting a complex delusional system that included his belief that his father was the chief of NASA and that his incarceration had to do with his father's political involvements. While the staff reported that they considered a DMH referral for this inmate, there was no written evidence that such a referral had been made. With regard to referrals generally, the staff reported that they only made three referrals to DMH during the last six months and those referrals had been to the SVSP/DMH program.

Assessment:

This inmate's care and treatment in the MHCB unit were inappropriate because the inmate needed a higher level of care. The staff had considered, but not made, a referral to DMH. It would have been appropriate to refer Inmate K to the DMH APP program during his first ten days in the MHCB unit, but the inmate currently appeared to be more appropriate for transfer to a DMH intermediate care treatment program.

12.    Inmate L

This inmate approached the monitor's expert as he was going from one building to the next. The inmate reported that he had medical problems and that he had suffered a seizure as a result of having been prescribed "the wrong meds", which he identified as Wellbutrin. Inmate L stated that Seroquel was the appropriate medication for him, but indicated that his psychiatrist had changed his medication to Wellbutrin, even though his medical record documented that he had seizures on Wellbutrin in the past. The inmate reported that with his last seizure he injured his knee and had been going through the proper channels to have his medical case reviewed. He also stated that he had signed up on a list to "see Coleman" during this monitoring visit; no such list, however, was presented to the monitor or the expert.

Review of this inmate's record revealed that he had experienced medication changes and a questionable seizure with a knee injury while on Wellbutrin. There was no further discussion in the inmate's UHR regarding his medical complaint or his complaints about his medication change.

<u>Assessment:</u>

This inmate's care and treatment appeared to be inappropriate and should be reviewed by the treatment team and the administration with regard to his psychiatric and medical complaints.

13.    Inmate M

This inmate was seen during an IDTT meeting that was attended by the appropriate personnel. The IDTT meeting discussed the seven criteria for DMH referrals and concluded that this inmate was not appropriate for such a referral. The inmate had participated sporadically in treatment and acknowledged that he refused group therapy because he had "tics and outbursts." The inmate reported that he did not have a mental health problem, but did have a neurological problem. The staff confirmed that the inmate's primary diagnosis was Tourettes Syndrome and Bipolar Disorder. They reported that the inmate got embarrassed and anxious, resulting in more tics and outbursts such that he was not participating actively in the mental health program.

Inmate M had requested a transfer to CMC, where he has been treated in the past. The staff agreed that this would be an appropriate transfer, but the correctional counselor indicated that the transfer required a discussion between health care managers at both institutions. The correctional counselor also reported that this matter had been under consideration for three years, without resolution.

<u>Assessment:</u>

It was unacceptable that an appropriate clinical transfer for this inmate had been delayed for three years, as reported by staff, because of the lack of communication between health care managers at the two institutions. Staff acknowledged that the inmate did not participate in EOP programming for reasons directly related to his mental illness and neurological disorder, but clinicians did not appear to have aggressively pursued a transfer to CMC or alternatively considered referring the inmate to a DMH intermediate care program. The staff reported that they would pursue the transfer more actively.

14.    Inmate N

This inmate was seen in an IDTT meeting and his care and treatment were discussed. The inmate was diagnosed in the past with Psychotic Disorder NOS, but currently had a diagnosis of Schizophrenia. The case manager recommended a change in the inmate's level of care from EOP to 3CMS, even though during the discussion it was acknowledged that the inmate, while not appearing ill, "talks to his dead wife" everyday, refuses all groups and has trouble interacting with more than one person at a time. The inmate reported that this was an "energy" issue, in that he was able to read the energy of people with whom he spoke, but could only read the energy of one person at a time.

Inmate N also acknowledged that he was in need of medications because of his beliefs and that he had great difficulty with a particular female correctional officer. The inmate had been in administrative segregation in February 2004 because of conflicts with staff, but he refused to go into more detail about his conflicts or to identify any problems in himself. Instead, he indicated that the correctional officer had a problem and "everybody knows what it is." The inmate became increasingly more agitated during the course of the IDTT meeting, but appeared accepting of a change to the 3CMS level of care.

Findings:

The IDTT meeting considered transferring Inmate N to a 3CMS level of care, despite his documented severe and persistent mental illness, which included fixed delusions and conflicts with particular staff, and his refusal to participate in programming because of his illness. This inmate appeared to be more appropriate for an EOP level of care, with modifications of medication interventions and psychosocial supports in his treatment plan to address his conflicts with others.

15.     Inmate O

This inmate stopped the monitor's expert on the yard and asked if he could talk about his "problems". The inmate reported that he had received a 115 disciplinary infraction and indicated that he needed someone to help him with it because he could not read or write and did not understand what it meant. The inmate reported he had signed up several weeks ago for a review of the 115 infraction, but the review had not occurred. In the brief interview, the inmate reported he was in the 3CMS program. He appeared to have intellectual deficits and probable mental retardation. Review of the inmate's record, revealed that he did indeed have a DDP designation. The monitor's review of his 115 information and his C-file suggested that the inmate had a correctional officer assistant, but no input from mental health staff regarding the inmate's 115 infraction was documented.

Assessment:

This inmate's care and treatment could not be adequately assessed, but there appeared to be no mental health input regarding his recent 115 disciplinary infraction or any consideration of his intellectual deficits to competently participate in the rule violation process. Inmate O's 115 infraction and rule violation issues should be reviewed by mental health staff in coordination with the developmental disability treatment staff to facilitate the most appropriate resolution of his disciplinary actions.

16.     Inmate P

This EOP inmate requested a meeting with "Coleman". He reported he had been transferred to RJD from the MCSP EOP program approximately ten months ago. He described the two programs as the difference between "night and day." Inmate P reported that he lost approximately 35 pounds since his transfer to RJD and attempted to

burn himself on three occasions.  He indicated that the primary reason for this behavior
was the lack of sufficient programming.  According to the inmate, "if you have a group
scheduled and refuse to go to the group they CAP your cell."  In the inmate's word, this
meant that the officers locked the cell "so that you can't come out of the cell for the rest
of the day" to use the dayroom or for any other activities.

Inmate P felt that generally the custody staff needed more training because correctional
officers seemed to resent EOP inmates, call them names and treat them badly.  Inmate P
made reference to a particular correctional officer in Facility 1 who provoked and
antagonized EOP inmates.  He also claimed that the officer had taken inmates' radios and
other property when they went to group therapy, so that they were afraid to leave their
cells.  Inmate P also reported that, since the program changed from general population to
segregated EOP inmates, he got three to four hours of out-of-cell activities, which
included the dayroom and the yard, except when he did not come out of his cell on the
second watch because of this particular correctional officer.

Assessment:

This inmate's care and treatment were inadequate in that he was not receiving the range
or amount of EOP programming necessary for his treatment.  In addition, his concerns
about a specific correctional officer were communicated to the RJD administration; the
administration was not aware that this particular correctional officer was assigned to the
EOP program and indicated that the assignment would be remedied promptly and the
correctional officer would not have any further participation in the EOP program.  While
this inmate's complaint was not verified by the RJD administration, the assurance that the
officer would be moved was given to the monitor's expert at the time of this monitoring
visit.

17.    Inmate Q

Inmate Q was admitted to the reception center at RJD on April 9, 2004, having been
returned as a parole violator.  Prior to his parole, he had a history of having been in the
MHSDS and being treated for a psychotic disorder with Haldol and other medications.  A
bus screening on April 9 was positive and indicated a referral within 72 hours to mental
health for assessment.  The inmate was diagnosed on May 21, 2004 with Schizophrenia
Paranoid Type, with a GAF of 40; he was reported as "not Keyheable."  In addition, the
inmate's record described him as paranoid with grandiose and persecutory delusions,
poor grooming, bizarre behavior and a history of behavior from his prior incarceration
resulting in his cellmate refusing to live with him.  Inmate Q was currently an EOP
inmate.  Despite his lack of participation in treatment and his record of poor functioning,
there was no notation of any referral to a higher level of care.

Assessment:

This inmate clearly met the criteria for referral to DMH, but there was no indication in
the record that such a referral had been made.

18.    Inmate R

This inmate was admitted to RJD on January 10, 2004. His bus screening was positive for a psychiatric referral, since he had been admitted from the DMH/APP program at CMF, where he resided from December 12, 2003 to January 10, 2004. The inmate had diagnoses of Schizophrenia, Borderline Personality Disorder and Antisocial Personality Disorder. He was prescribed Zyprexa, Depakene, Benadryl, Abilify and Wellbutrin, but no medication consent forms for these medications were located in the inmate's UHR. Inmate R was at an EOP level of care prior to his transfer to DMH but, according to an IDTT note, his level of care was changed to 3CMS on April 1, 2004; there was no corresponding MH-2 on that date. The inmate was again recorded as an EOP inmate on June 15, 2004. There were no progress notes in the chart from June 18, 2004 until the time of the monitoring visit on July 13, 2004.

Inmate R was referred to the MHCB unit on May 8, 2004 and evaluated by a case manager because of his statement "I'm suicidal." There was a suicide risk assessment performed, but the date of the assessment was unclear and there was no estimate of risk. The MHCB plan for this inmate was to return him "to Ad Seg in single cell, remove clothing and bedding as S/P precaution – to have increased observation by CO and followed by CM on Monday 5/10/04." Inmate R cut his arm on May 28, 2004 and was seen by a psychiatrist who wrote a note, but no suicide risk assessment was documented in the record at that time.

The inmate was also in the MHCB from April 8 through April 12, 2004 for suicidal ideation. The suicide risk assessment dated April 12 had no estimate of suicide risk. It was noted that the inmate had five other suicide attempts from March 2003 through December 2003. In addition, Inmate R claimed that he did not get his medications for four days after a move from Facility 1 to Facility 2.

Assessment:

This inmate's care and treatment were inadequate. Inmate R had a history of suicide attempts and self-harming behaviors, with inconsistent and incomplete suicide risk assessments. The lack of progress notes in the inmate's chart for over three weeks was also unacceptable. This inmate's current mental health needs were not clear from the record. Inmate R needed to be seen at an IDTT meeting and reassessed by his case manager for the most appropriate placement and treatment interventions.

19.    Inmate S

This EOP inmate was admitted to RJD on September 26, 2003. He had a diagnosis of Schizophrenia, Disorganized Type and was currently on a Keyhea order. Review of his record revealed that, despite his Keyhea order, there were missing medication notations on the inmate's MARs in March, April and May. Inmate S was described as "spacey" in group notes. His most recent IDTT meeting was on April 1, 2004; there was no

documentation in the record of an update as required by July 1, 2004. This inmate appeared to have very limited English language skills, but none of the notes in Inmate S's chart made any reference to his level of communication in English or his need for an interpreter.

Assessment:

This inmate's care and treatment were very difficult to assess because of inadequate information in the record. Furthermore, his treatment in terms of medication interventions appeared to be inadequate in that the MARs indicated he had not received medications in accordance with his Keyhea order.

20.    Inmate T

This EOP inmate was admitted to RJD on March 12, 2004. There were incomplete psychiatric medication orders in the inmate's chart, such as "continue without change Zoloft", etc. These medication orders failed to indicate the intended time of administration or the prescribed number of days. Similarly, medication consent forms were often incomplete; the consent form dated March 12, 2004, for example, contained no inmate signature and failed to identify the prescribed medication. The most recent treatment plan for this inmate was dated March 23, 2004; there was no updated treatment plan in the record as required by June 23, 2004. The March treatment plan was incomplete, as it did not document participation by a psychiatrist and did not include target symptoms or behavioral objectives.

Assessment:

This inmate's care and treatment were inadequate to meet his mental health needs as an EOP inmate.

21.    Inmate U

This EOP inmate had a diagnosis of Bipolar Disorder and was prescribed Lithium. His medication consent form, however, was out-dated. On June 6, 2004, Inmate U had a sub-therapeutic blood level of 0.4 meq/l. A psychiatric note of June 16 did not mention this test result or indicate the need for retesting. The note did, however, eliminate Bipolar Disorder as part of the inmate's diagnosis. It was anticipated that the next treatment plan would reflect these changes.

Assessment:

This inmate's care and treatment appeared to be appropriate with regard to medication management, but he was not offered the ten hours of structured therapeutic activities weekly as required by the EOP program guides.

22.    Inmate V

This EOP inmate was prescribed Depakote as part of his treatment for Bipolar Disorder. His Valproic Acid level of May 10, 2004 was 61.2, which was within the therapeutic range.  The inmate's record revealed that he had been participating in two to three groups per week since May 2004.

Assessment:

This inmate's Valproic Acid blood level was within the therapeutic range, but his treatment was inadequate in that he was not offered ten hours of structured therapeutic activities as mandated for EOP inmates.

23.    Inmate W

This EOP inmate was admitted to RJD in October 2003.  His diagnoses were Psychotic Disorder NOS, Hepatitis C and GERD.  He was receiving Seroquel, Risperdal, Remeron, Trazodone and Lithium, but no medication consent forms for these medications were located in the inmate's record.  Inmate W's Lithium level for January 2003 was 0.67, but laboratory tests had not been repeated since that time.  According to his chart, this inmate was receiving two therapy groups per week, including depression management and substance abuse, as well as weekly case management contacts.  Inmate W's diagnoses did not indicate that he had either depression or a substance abuse disorder.

Assessment:

This inmate's care and treatment were inadequate in that he was not receiving the required amount of EOP structured therapeutic activities.

24.    Inmate X

This EOP inmate was diagnosed with Schizophrenia Paranoid Type, Polysubstance Abuse and ASPD.  The inmate was seen on March 23, 2004 by a psychiatrist. Medication orders for this inmate reflected a progressive decrease in his Zyprexa on a weekly basis.  Zyprexa was reordered for Inmate X on April 24, 2004, but it was unclear whether the inmate was seen on that date.  Progress notes for June 1 and June 18, 2004, indicated that the inmate failed to attend a scheduled clinical appointment; the plan was to return the inmate to the clinic in three to four weeks.

There were multiple blanks on the inmate's MARs for March, April and May; the June MAR was totally blank.  Inmate X was documented as refusing group therapy in June. The inmate reported that he did not get a ducat to attend his sessions.  Inmate X received weekly case management contacts, but almost all contacts were at cell front.  A MH-2 dated May 12, 2004 did not address the inmate's medication non-compliance or the change in his medication that began in March 2004.  The treatment plan was generic in that it listed all the groups that might have been offered in the EOP program, but did not

indicate that Inmate X was only participating in two of the groups and that he had been sporadically refusing to attend those groups. No correctional counselor was in attendance at the IDTT meeting connected with this plan.

Assessment:

This inmate's care and treatment were inadequate for an EOP level of care. Inmate X's medication changes and issues of medication non-compliance were not addressed in his treatment plan.

25.    Inmate Y

This inmate had diagnoses of Schizoaffective Disorder, Hepatitis C, Polysubstance Abuse and ASPD. The inmate had been at ASH from September 24, 2003 through April 22, 2004. He reported that he did not receive his medications for a few days upon his arrival at RJD. The inmate was admitted to the MHCB unit from May 4 through May 5, 2004 with acute suicidal ideation. A suicide risk assessment performed on May 4 gave no estimate of risk. A suicide risk assessment on May 11 indicated that the inmate was "not suicidal". The required five-day follow-up was completed upon the inmate's discharge from the MHCB unit.

Assessment:

This inmate's care and treatment appeared to be inappropriate for his level of need. The inmate had a history of six to seven hospitalizations in the past five years, with two suicide attempts, but this history was not addressed in his treatment plan.

26.    Inmate Z

This inmate was admitted to RJD on October 2, 2003. He had diagnoses of Schizoaffective Disorder, Seizure Disorder and ASPD and was being treated with Zoloft, Seroquel, Trazodone, Vistaril and Depakote. A medication consent form for Zoloft, dated May 11, 2004 was incomplete. Review of the inmate's MARs revealed multiple blanks for medications not administered. The inmate had sub-therapeutic Dilantin levels of 2.85 on May 11, 2004 and a sub-therapeutic Valproic Acid level of 26 on November 3, 2003, without any explanation or review in the progress notes. An MH-2 dated July 16, 2004 provided a list of therapy groups available to caseload inmates, but did not individualize the plan by assigning this inmate to particular groups.

Assessment:

This inmate's care and treatment were inadequate for his EOP level of need.

27.    Inmate AA

This EOP inmate was seen by the monitor's expert in a group meeting.  A review of his record revealed an IDTT meeting on June 25, 2004, which recommended continuing Inmate AA at an EOP level of care for 30 days.  The inmate was described as "mute, poor cooperation", but his mental health was noted as "improving".  In contrast, the inmate's MH-2 treatment plan indicated that the inmate had a "demanding voice, loud, complaining and pushy."  A psychiatric progress note of June 29, 2004 referred to the IDTT meeting on June 25 as recommending a change in the inmate's level of care to 3CMS.  The inmate's UHR further revealed that the inmate had six MHCB admissions from May to December 2003.  This history was not addressed at the inmate's most recent IDTT meeting, nor was the conflicting information in his record clarified.

Assessment:

This inmate's care and treatment appeared to be inadequate for his EOP level of care needs.

28.    Inmate BB

This EOP inmate was also seen by the monitor's expert in a group meeting and his record was subsequently reviewed.  Inmate BB had a diagnosis of Schizophrenia Paranoid Type and was prescribed Seroquel.  His MH-2 was completed in June 2003, but failed to indicate the specific date.  It was signed only by a psychologist.  Although the MH-2 assigned Inmate BB to three groups, he refused to attend most of the groups; documentation in his chart indicated that he was "not around."  The MH-2 did not address the issue of medication non-compliance for this inmate.

Assessment:

This inmate's care and treatment appeared to be inadequate for his EOP level of need.

29.    Inmate CC

This inmate refused to attend an EOP group meeting with the monitor expert, but his record was subsequently reviewed.  According to his UHR, Inmate CC had been admitted to RJD on April 5, 2002.  A note dated June 22, 2004 identified the inmate's "parole meds" as Abilify, Haldol and others.  As of July 14, 2004, however, the inmate remained at RJD.  The UHR made reference to this inmate waiting an MDO transfer "next month", but it was not clear which month was intended.

Assessment:

This inmate's care and treatment appeared to be inadequate.  His discharge planning, including parole medications, was unexplained in the record.

EXHIBIIT G

<u>Salinas Valley State Prison (SVSP)</u>

May 18, 2004 – May 21, 2004

1.    Inmate A

Inmate A had been treated at the 3CMS level of care in the general population for the past several months.  He appeared to be fairly high functioning.  He was seen by a psychiatrist in December 2003 and treated with Remeron and Prozac.  The inmate received no further psychiatric contact, but his medication orders were renewed before they expired.  Inmate A's MARs for March and April of 2004 were in his UHR, indicating compliance with medication management.

Inmate A received regular case manager contacts, with the most recent contact occurring at 114 days rather than at 90 days.  The inmate's treatment plan, written in the context of an IDTT meeting held in August 2003, was current.  A detailed MH-4 was completed in December 2003.

Assessment:

On the whole, this inmate's mental health treatment met program guide requirements, with the exception that his medication was renewed without psychiatric contact and that one case manager contact was two weeks late.  Inmate A's treatment plan was individualized.

2.    Inmate B

Inmate B was removed from the general population side of the EOP program in September 2003 and placed in administrative segregation for six weeks during an investigation of EOP staff misconduct.  He was returned to the general population side of the EOP program at the conclusion of the investigation and had been housed there for the past several months.  The ICC indicated that the inmate should not be housed in a certain portion of the EOP unit.

Inmate B was treated for Schizoaffective Disorder.  The EOP unit was locked down during the monitoring visit and the inmate was seen at cell front on May 18, 2004 for his weekly case manager contact.  Cell front contacts were not unusual for this inmate.  One-third of Inmate B's weekly case manager contacts, or seven out of 21 visits, made between January 1 and May 18, 2004 were conducted at cell front.

The inmate was seen regularly by a psychiatrist.  His most recently medication regimen consisted of Prozac and Zyprexa.  His MARs for March and April 2004 indicated occasional medication refusals.  Inmate B refused his evening dose of Zyprexa nearly every day in February, but was compliant with Risperidone and Prozac.  Case manager notes for the month of February did not mention compliance problems, but reported that the inmate felt stressed and had a fight with another inmate.  Inmate B was not referred to a psychiatrist regarding his non-compliance throughout February.  He was not seen until March 8, 2004 when his non-compliance was noted by a psychiatrist, who discontinued the inmate's Risperdal, increased his dose of Zyprexa and continued his prescription for Prozac.

Quarterly IDTT meetings were documented for Inmate B, but the February 2004 meeting did not appear to have been attended by a psychiatrist.  Inmate B's treatment plans were insufficiently

individualized. They did not mention the inmate's job assignment in the kitchen, his non-reader status, his recent drug seeking behavior observed by staff or the visual hallucinations he consistently reported. The treatment plan was limited to target behaviors and objectives to "reduce depression and voices". It contained a list of fill-in-the-blank interventions, which in total called for an evaluation by staff psychiatrist q 90 days, IDTT review q 90 days, psychological follow-up 1x wk/individual/2xmonth indiv (frequency left unspecified) and group assignments of ten unspecified groups per week.

Inmate B's attendance at two groups was documented in his UHR. Four sessions each of self-esteem and anger management groups were recorded. He attended two sessions of each group; the other two sessions were cancelled for custody reasons. There was no indication in the inmate's UHR that he was enrolled in or attended any additional therapeutic activities.

Assessment:

This inmate's mental health treatment complied with program guide frequency requirements, but was clinically inadequate. Although housed in the cloistered setting of the EOP program, Inmate B did not receive individualized treatment. One-third of all his case manager contacts during the past five months were at cell front. Case manager notes were nearly devoid of clinical content for many consecutive weeks, with the exception of circled words on a preprinted MH-3 and a sentence of narrative reporting subjective data. Psychiatric notes were uniformly brief and there was no documentation that a psychiatrist was present at the inmate's IDTT meeting. The inmate's treatment plans were kept current, but were not individualized. Although Inmate B was non-compliant with his medication for a sustained period of time, neither the MTA assigned to the EOP program or his case manager made any response.

3.    Inmate C

Like Inmate B, Inmate C was removed from the general population side of the EOP unit and placed in administrative segregation for six weeks during an investigation of staff misconduct. He, too, had been returned to the general population side of the EOP program at the conclusion of the investigation and housed there for the past several months. The ICC indicated that he should not be housed in a certain portion of the EOP unit.

Inmate C was treated for Psychosis NOS. He was noted as increasingly depressed recently. His medication was adjusted in response to his reports. His most recent regimen consisted of Zyprexa and Effexor. The inmate's MARs for all the months in 2004 were in his UHR.

IDTT meetings for Inmate C were held quarterly. They were attended by a full team and resulted in individualized treatment plans. He was scheduled for four hours of work weekly and five treatment groups, plus two recreational therapy groups when available. There was some documentation in the inmate's chart of his attendance at therapeutic activities. Inmate C missed two of his weekly case manager meetings; of the remaining weeks in 2004, he received 11 out-of-cell case manager contacts and six cell front visits. Case manager and psychiatrist notes contained pertinent clinical information.

Assessment:

This inmate's mental health treatment met program guide requirements.

4.       Inmate D

This inmate's chart was reviewed in a cursory manner during the October 2003 monitoring visit. It raised questions about the appropriate use of mental health information in the imposition of a SHU term. Apparently, this inmate argued with an EOP officer and called her profane names, incurring a 115 disciplinary infraction for threatening staff. A four-month SHU term was imposed, after the inmate had been in administrative segregation for three months. Inmate D was endorsed for transfer to a PSU. Subsequent to the October 2003 monitoring visit, his case was reheard. The inmate was not moved to a SHU, but was in the EOP unit at SVSP at the time of the May 2004 monitoring visit.

According to the inmate's medical records, Inmate D came to a medical appointment on May 14, 2004 complaining of pain in the shoulder and neck and with a 602 saying that he was waiting for an MRI and that all of his medications were to be renewed. According to a progress note, Inmate D suffered from a spinal problem with associated pain and weakness. The inmate had gone for a radiology consult on April 16, 2004. The results showed that he might have some very early narrowing of C6-7 with persistent mild spurring and redemonstration of old post op/surgical changing involving his mandible. He was treated with anti-inflammatory agents. A mental health note attributed the injury to an attempted hanging with a closed head injury.

He had been treated in the general population EOP program for the past several months for Depressive Disorder NOS and suicidal ideation. His previous diagnoses included Schizoaffective Disorder. He was designated DD2, meaning that he is cognitively limited, has functional impairments that hamper his adjustment to incarceration and upon release to the community is a likely candidate for regional center services due to his developmental disability.

Inmate D was medicated with Zyprexa and Paxil most recently. His MARs for each month of 2004 were present in the inmate's UHR, indicating good compliance. Inmate D's case manager contacts were sporadic in 2004, with five weekly contacts missed, three made at cell front and the remainder occurring weekly out-of-cell. The inmate attended four to six treatment groups. Progress notes by the psychiatrist and psychologist were largely devoid of clinical content. Group notes were more complete, but the notes from the grief group described only the content of the sessions, omitting pertinent individual information, such as whether the inmate attended.

IDTT meetings for Inmate D were attended by a full team and resulted in individualized treatment plans. The IDTT meeting held in March was three weeks overdue.

Assessment:

The decision against transferring this inmate to a PSU was appropriate in light of the particulars of his case. Inmate D, however, spent a lengthy period of time in administrative segregation for

misbehavior that was not particularly severe or unusual. His mental health treatment met program guide requirements, with the exception of impoverished clinical documentation and a late IDTT meeting.

5.    Inmate E

This inmate's chart was reviewed in a cursory manner in October 2003. At that time, Inmate E voiced concerns about his personal safety and was housed in the EOP administrative segregation unit. On September 22, 2003, he was seen by medical staff, who noted multiple contusions. He reported that he had been beaten by five officers. Inmate E had a documented enemy in the EOP unit at SVSP and had requested sensitive needs yard status. He was very fearful at SVSP, attributing his level of fear to loss of his single-cell status. In an IDTT meeting that was observed by the monitor's expert in October, staff confirmed that he had been victimized on multiple occasions. In an ICC meeting also held in October, the inmate was given a Level III over-ride and slated for transfer to the sensitive needs EOP yard at MCSP.

Inmate E was referred to ASH in December 2003, but the inmate refused to be referred to SVPP on the grounds that he would be uncomfortable there.

According to the medical record reviewed in May 2004, Inmate E had been treated at MCSP's EOP before coming to SVSP, where he had spent over eight months in the EOP administrative segregation unit.

Inmate E had a <u>Keyhea</u> order, renewed for six months in February, that was current until August 31, 2004. He carried diagnoses of Bipolar Disorder and Narcissistic Disorder.

There were orders in the inmate's chart from April 2004 for Zyprexa, Lithium and Prozac, with an alternative of Geodon if refused. The inmate had a history of cheeking medication. His MARs for 2004 indicated good compliance in January and February, but there were blank dates on the March and April MARs, indicating that the inmate's medication was not administered every day. Inmate E had orders for DOT because of his EOP status. There was one medication refusal in his chart from March. Inmate E's blood levels were monitored in August 2003, while he was at MCSP, and in March 2004 at SVSP. His Lithium was within the therapeutic range both times.

Inmate E recently complained of a blood disorder and sores in his mouth. He also wrote a letter threatening self-injury. His participation in EOP treatment had been reluctant and he had consistently insisted that he needed a single cell. Mental health staff was responsive to his presentation. Behavioral treatment that employed incentives was provided. A current treatment plan that resulted from an IDTT meeting was dated February 25, 2004. A full team was present at the meeting. Progress notes contained pertinent clinical information. The inmate was often seen at cell front because he refused office visits. The plan was to enroll him in nine groups.

Assessment:

This inmate's mental health treatment met program guide requirements. His reports that his personal safety was in jeopardy were legitimate. He could probably be treated more successfully in an EOP environment that did not require him to seek administrative segregation housing.

6.    Inmate F

This inmate's chart was reviewed during the October 2003 monitoring visit. Notably, the institution failed to administer medication as ordered for four consecutive months. The chart also reflected very poor mental health responses to multiple staff referrals for psychotic symptoms as well as a lack of follow-up after Inmate F was discharged from the EOP to general population 3CMS. The inmate's mental health treatment did not improve during the following seven months.

There was no indication that Inmate F was seen by a psychiatrist after he was moved to a different general population yard. An order was written on September 22, 2003 to continue Risperdal, but there was no indication of any psychiatric contact. The order expired 90 days later and was not rewritten, although the inmate was by then in administrative segregation where he was seen weekly by a case manager.

This inmate's mental health treatment following discharge from the MHCB unit was wholly inadequate. He was seen for four of the five days of follow-up after he was discharged around September 25, 2003 from the infirmary, where he had been admitted due to suicidal ideation. There was an empty IDTT summary in the chart dated September 30, 2003 signed by a single case manager.

Inmate F was treated at the 3CMS level of care in general population during October 2003, when he was referred to mental health by custody due to bizarre behavior. He appeared to be responding to internal stimuli and was referred by a case manager to psychiatry. When seen by a mental health clinician two weeks later, in November, in the context of an ICC meeting in administrative segregation, his condition was reported as unremarkable. He was seen at cell-front on a weekly basis for the next several weeks. He was uncooperative with mental health staff. An IDTT meeting attended by a full team was held after he had been in administrative segregation for over a month. He was retained at the 3CMS level of care and diagnosed with Schizophrenia, undifferentiated type.

Inmate F was seen by a psychiatrist on January 15, 2004 and an order for Geodon was written. The note contained little pertinent information, but stated that the inmate's present medication would be continued. There were, however, no current orders from that date. The inmate's MARs indicated, however, that Risperidone and Zyprexa were administered from January through April 2004. This marked the first period of medication continuity since Inmate F was discharged from the EOP program in June 2003.

Assessment:

This inmate's mental health treatment fell far short of program guide requirements on multiple occasions and was inadequate given his need. Moreover, an instance of missed follow-up subsequent to discharge from the infirmary was not captured accurately by an institutional audit of five-day follow-ups.

7.      Inmate G

Chart reviews revealed that this 3CMS inmate had a two-part treatment plan dated January 13, 2004. Part 2 of that plan indicated that it was prepared by a psych social worker and a correctional counselor. The mental status evaluation was blank. Under section IV, the diagnosis contained a single Axis I diagnosis of Adjustment Disorder with Depression. Axis II, Axis III and Axis IV were blank. Axis V indicated a GAF of 70. That number, plus the four-word diagnosis, constituted the inmate's entire treatment plan. Under the problem section, Section V, "depression" was indicated. Sections on strengths and goals and discharge planning were blank.

A formatted MH-3 of the same date indicated that the inmate's IDTT meeting consisted of five psychologists, three psych social workers and two psychiatrists, which was obviously incorrect. There was a chrono dated January 13, 2004, indicating that the inmate was already at a 3CMS level of care. The formatted MH-3 indicated that Inmate G was at a 3CMS level of care for medical necessity. A referral for a medication evaluation was made. There was no other substantive information in the MH-3, except a check mark next to the action taken.

There was no MH-4 in the inmate's chart. A nurse referred Inmate G for treatment on January 7, 2004. The psych social worker in answering that referral stated that the inmate "had no mental health history", even though his UHR was rife with notes and records indicating that he had previously been a 3CMS inmate in both 1995 and more recently in 2002. The psych social worker indicated an intent to refer the inmate to a psychiatrist. Prior to the IDTT meeting of January 13, 2004, the psych social worker met with the inmate and took an additional history, still planning a psychiatric referral for medication. The plan was also for the treatment team to determine the inmate's eligibility for 3CMS status.

Assessment:

1.      The IDTT process for this inmate was highly irregular and the inmate had a grossly inadequate treatment plan.
2.      The inmate's chart did not contain a clinical MH-4 assessment.
3.      The psychiatric referral from January 2004 was never received and there was no response by the psychiatrist.
4.      There were no mental health contacts or notes in the chart since January 13, 2004.

8.    Inmate H

The monitor's expert reviewed Inmate H's treatment plan of July 16, 2003. There was nothing in the first very general section and no signatures in second section to indicate who participated in the IDTT meeting. Section 3 contained a complete mental status evaluation. The diagnosis in section 4 indicated schizophrenia. The only other diagnostic Axis present was Axis V, which indicated a GAF of 61. There were no problems mentioned and no other general concerns. One strength was indicated, the inmate's willingness to take medications, and there was no discharge planning. The treatment plan was signed on the bottom by the case manager and the correctional counselor.

The IDTT note referring to the July 16 treatment plan was written on July 22, 2003. The note indicated that the inmate had arrived at SVSP only the week before the treatment plan was written. The formatted MH-3 employed for this note contained only a single check mark near "continue as a 3CMS patient". That note was also signed by the case manager and a correctional counselor.

The monitor's expert reviewed the contact notes for the year 2004 in the inmate's chart. The case manager note dated January 27, 2004 reflected the inmate's refusal to attend. There was no return visit scheduled. There was an IDTT meeting on March 18, 2004, at which a psychiatrist and case manager were present. The formatted MH-3 indicated with a single check mark only that the inmate would be retained at a 3CMS level of care. The team noted a history of two custody referrals for poor ADLs and emotional distress. There had been no response to those referrals. Improved self-care was added as an objective and the only other objective mentioned was the presence of hallucinations. New interventions included an unspecified group. The inmate's GAF, despite his poor clinical condition, remained at 60. A contemporaneous note of March 18, 2004 by the same two mental health clinicians also noticed poor ADLs and non-compliance with medication, which was not mentioned in the treatment plan. The psychiatric note of that date indicated in only six words "inmate disoriented. No medications since 1/04!" The plan was Zyprexa 20 mg q.p.m. for 90 days.

A review of the other progress notes for the year 2003 indicated that the inmate was on medication, doing reasonably well. There were case manager contacts in August, two in September and in October. On January 27, 2004, there was a note by what appeared to be a case manager, indicating that the inmate had not been on medications for some time and had not seen a psychiatrist. An MH-4 was completed at that time for the first time. That was the last contact note until an emergency visit on March 18.

The expert also reviewed referrals made for Inmate H. There were two from custody between January 27 and March 18, 2004 related to poor ADLs. A referral dated January 29, 2004 from nursing indicated that the inmate's Zyprexa had expired on December 26, 2003; there was no response to that referral. A review of the inmate's orders revealed a prescription for Zyprexa 20 mg dated October 2, 2003 for 84 days, which was consistent with the expiration date of December 26. There appeared to be no validity to the

psychiatric progress note of March 18, 2004, indicating that the inmate had not been on medications since January 4, 2004. There were no further psychiatric orders, despite the psychiatric plan of March 18 mentioned in the progress note of the same date and calling for a renewal of the inmate's medications.

Assessment:

1.    This inmate received very poor medication management. The expiration of this inmate's medications led to the clinical deterioration of his stable condition. It is unclear if the inmate ever received medications in the year 2004.

2.    There was no response to multiple referrals and no referral by the case manager on January 27, 2004.

3.    This inmate's decompensation appeared to have been preventable, but there were no psychiatric contacts between September 2003 and May 2004.

4.    The treatment planning for this inmate was grossly inadequate.

9.    Inmate I

The monitor's expert reviewed a treatment plan dated January 9, 2004 in this inmate's chart. This was the Inmate I's initial treatment plan. Section 2 indicated that it was prepared by a case manager, a psychiatrist and a correctional counselor. There was a mental status evaluation and a five-Axis diagnosis. The inmate's GAF was listed as 60. The only problem, other than a diagnosis of depression, indicated that the inmate was "coping with lock-downs". No strengths or limitations and no discharge planning were mentioned. The inmate had not signed the plan. The interventions that were planned for Inmate I indicated generally that the team should follow program guide requirements, including psychiatry if needed and annual IDTTs. Documentation indicated that the inmate was not interested in group therapy. A formatted MH-3 dated January 28, 2004, 19 days later than the putative treatment plan, indicated with a check mark only that Inmate I was to be kept at a 3CMS level. The note was signed by the case manager and the psychiatrist.

Progress notes after the January 9 treatment plan were reviewed by the expert as well. The last psychiatric note was dated in December 2003 when the inmate's medications were expiring. The next note was date April 7, 2004, indicating that the inmate had not attended a scheduled appointment because "the case manager was out of time". The inmate was re-ducated for April 19, 2004 and missed the appointment because there was no UHR. He was re-ducatted for April 26, 2004 with the same result, because of a lockdown for TB testing.

This inmate's medication orders included a prescription on December 3, 2004 for Paxil 20 mg for twelve weeks or 84 days. As indicated above, there was a psychiatric note for that prescription. The next order was a continuity order on March 15, 2004 for the same medication and same dosage for 30 days. There was a final psychiatric order dated March 24, 2004 for the same medications and the same dosage for 30 days. There were no further orders. The medications presumably expired after April 22, 2004. The inmate did not receive any face-to-face psychiatric evaluations during 2004.

Assessment:

1.   This inmate's treatment plan was inadequate. The IDTT note was completed three weeks after the treatment plan.

2.   Inmate I's medications appeared to have expired on April 22, 2004 without referral or psychiatric re-visit.

**3.**   Inmate I received no case management or psychiatric contacts after January 9, 2004.

10.   Inmate J

This inmate was interviewed privately and individually by the monitor's expert. Following the interview, his UHR, current MAR, inmate history and 114 were reviewed.

Inmate J reported that he had been hearing voices for some time and had just been assigned to an EOP level of care. He arrived at the institution on April 22, 2004 and was placed in D-1 until his transfer to the D-2 administrative segregation EOP unit four days prior to this interview. A review of the 114 revealed that he had group therapy in the EOP program on both May 17 and May 19, 2004. On May 18, his group was cancelled.

Inmate J complained that he had been without medication for one week. He said that he asked nursing staff every day for his medication, but was informed that there was a "refill problem". He had been taking Depakote, Thorazine and Artane. According to Inmate J, the problem with his medication started in the D-1 unit, so it was unlikely that it was a discontinuity occasioned by his move. He was rocking and hearing voices during the interview, but had no obvious thought disorder. He also indicated that in April, while in D-1, he missed his medications for three or four days. He did not have a heat card and was not sufficiently familiar with the correctional officers in the mental health program to describe his interactions with them.

A review of inmate J's MARs revealed that he had no current MAR in the clinic. A review of his inmate history revealed that his prescriptions for Thorazine, Depakote and Artane had expired on May 13, 2004. A review of his UHR confirmed that his Depakote and Thorazine expired on May 13 and May 15. 2004 respectively. There was no new order. Inmate J had an IDTT meeting on May 12, 2004 and a treatment plan that was signed by two psychologists. There was no psychiatrist present at the IDTT meeting, so

presumably Inmate J's medications were not reviewed; there was no referral made.  A review of Inmate J's April MAR confirmed a three-day medication gap.

Assessment:

1.  This inmate experienced medication discontinuity when his prescriptions were not renewed.
2.  He also experienced medication discontinuity when the institution failed to refill his medication.
3.  Inmate J had no heat card.
4.  Inmate J was referred by the monitor's expert to the chief psychologist for an immediate review.

11.   Inmate K

This inmate was interviewed privately and individually by the monitor's expert. Following the interview, the inmate's current MAR, UHR, 114 and inmate history were reviewed.

Inmate K reported being "worse" in the EOP program.  When he arrived at the institution last year, he was assigned a 3CMS level of care.  Inmate K reported that he was "having a lot of stress, sees flashes and demons".  He had been seeing things and hearing voices for the last year.  The inmate complained of stress because his mother could not visit him. He reported that his Risperdal in the past made him tired and gave him headaches and diarrhea.  He complained that correctional officers laughed at him whenever he said he was hearing voices, so he stabbed someone and went to administrative segregation.  He also indicated that he "went off" in D-1 when he was hallucinating and was placed in the MHCB unit on suicide watch.  He was then sent to the APP and came back from there as a psych and return on February 2, 2004.  He came back as an EOP inmate on a Keyhea order and was placed in D-2.  Inmate K reported that it took two weeks to get his medications in D-2.  At that time, he said that "went off" on correctional officers.  He indicated that he had a cellmate, even though he was on walk-alone status, because he was threatened with a 115 disciplinary infraction if he did not accept a cellmate.  He had "gone off" on the cellmate and received a warning earlier.

Inmate K saw his case manager weekly and wanted more frequent counseling.  He said that his case manager did not generally offer to take him out, but indicated that he saw his case manager out-of-cell at least once per month.

With respect to correctional officers, Inmate K said that they are for the most part "terrible", but that the mental health escort officers were better.  He found only one officer on the second shift who was understanding and sympathetic.  He complained again that, when he talked about hearing voices and when he refused a tray, the officers laughed at him.  He said he had a heat card, but only for Paxil.  It was not clear whether he understood this question.

A review of the 114 for the month of May revealed that all of his groups were either cancelled or refused.  Far more groups were cancelled than refused.

A review of the inmate's current MAR revealed only a blank on May 11, 2004.  He was on Paxil only, as he had indicated.  Inmate K had been sent to the APP on December 12, 2003 and discharged back to this institution as a psych and return on February 2, 2004.  His diagnosis was Major Depressive Disorder with Psychotic Features.  He was on a Keyhea order until July 17, 2004.  He also had a history of cheeking medications.  His discharge summary, in addition to the above history, indicated that he was on Paxil.  On his return from CMF, his bus screen indicated that he was on medication, but there was no continuity order written and the inmate consequently received no medication.  The next order for psychotropic medications was dated April 16, 2004.  At that time, Paxil 10 mg q.a.m. was re-ordered.  A review of the inmate history from the MHTS revealed that Inmate K had been prescribed Olanzapine and IM Haldol p.r.n. for refusal during March and April.  Those medications were discontinued and no such orders were reflected in the UHR.

Assessment:

1.    This inmate's treatment and medication management were inadequate.  Inmate K should have been on an anti-psychotic medication.

2.    Inmate K did not receive sufficient psychiatric contacts.

3.    The inmate experienced medication discontinuity in reception.

4.    Medication orders were missing from the inmate's UHR.

5.    The inmate indicated that he had a heat card.

6.    Inmate K described correctional officers, except for mental health escort officers, as "terrible" and as laughing at him.

7.    It was not possible to confirm the inmate's report of missed medication delivery as there was no MAR in the chart for February 2004.

8.    Inmate K saw his case manager weekly, but case management contacts were out-of-cell only once per month.

9.    The monitor's expert referred this inmate to the chief psychologist for immediate review.

12.    Inmate L

This inmate was interviewed individually and privately by the monitor's expert. Following the interview, his UHR, current MAR, inmate history from the MHTS, and 114 were reviewed.

Inmate L indicated that he arrived at SVSP on April 16, 2004 as an EOP and "sensitive need" inmate, which accounted for his presence in administrative segregation. He indicated that he was doing "all right" and was simply waiting for the a bed in the "soft" yard at MCSP and their Level III EOP program.

Inmate L indicated that his medications had just stopped and that he had previously missed his medications for two or three days or a week. He also indicated that when he arrived back from CMF there was a one-week medication gap, during which he did not get his Risperdal. Inmate L reported that he had been very tired on his medication. Now, however, he said he felt more alert, to the point that he had not slept in nine days and had the shakes.

The inmate did not have a heat card. He saw his case manager weekly in private in a holding cell.

Inmate L reported that he had difficulty with the correctional officers. He complained that they always threatened him with a 115 disciplinary infraction if he refused a cellmate, even though he was having command hallucinations (homicidal) and had problems with cellmates. He claimed that the officers kept him for several days in a holding cell. He now, however, had a good cellmate.

A review of his current MAR revealed only a blank on May 11, 2004. The MAR also showed refusals of eight doses of medication over four days. A review of the inmate's April MAR indicated that he arrived on April 26, 2004 from CMF on Zoloft. He came back from the APP diagnosed as having a Major Depressive Disorder with Psychotic Features and on Risperdal, 5 mg hs, Zoloft 100 mg q.a.m. and Vistaril 75 mg t.i.d. A review of his chart indicated that while Inmate L arrived on April 26, 2004, a continuity order for his medications for 30 days was not written until April 28, 2004 and was not started until the next day on April 29, 2004, leaving a three-day gap in medication. The continuity order, moreover, was written for only 4 mg h.s. A closer review of the inmate's MAR, however, revealed that the Risperdal was never, in fact, administered. Consequently, Inmate L went three weeks without receiving his Risperdal. A review of the MARs prior to his transfer to APP revealed gaps in the inmate's Zyprexa and Risperdal sometimes for weeks. Refusals during that time period were also confirmed.

Assessment:

    1.    This inmate experienced numerous medication discontinuities on arrival as well as unexplained gaps in medication some of which appeared to be the

298

result of delivery problems; clinicians also failed to write an order for an anti-psychotic medication.

2.      Inmate L's medication management was inadequate.  A continuity order written for too small a dose was never, in fact, administered.

3.      The inmate had no heat card.

4.      Inmate L saw his case manager weekly and privately in a holding cell.

5.      The inmate complained of strained relations with correctional officers, especially as his psychosis increased.

6.      Inmate L was referred by the monitor's expert to the chief psychologist for immediate review.

13.    Inmate M

This inmate was interviewed by the monitor's expert privately and individually while in a wheelchair.  Following the interview, his UHR, current MAR, 114 and inmate history from the MHTS were reviewed.

Inmate M reported that he arrived at SVSP on April 27, 2004 from CMF.  He indicated that he hated SVSP, stating that it was the worst prison he had ever been in.  He had medication problems at DVI when he first came into the CDC system and spent one year in the DVI reception center.  He had Crohn's disease, MS and a seizure disorder.

Inmate M was assigned an EOP level of care while he was in the DVI reception center, but was sent to SVSP as a 3CMS inmate.  He became suicidal after being transferred to SVSP, began hearing voices and was sent to APP for three weeks.  He returned to SVSP on psych and return from APP as an EOP inmate.  When he arrived at SVSP, his level of care was reduced to 3CMS.  Inmate M wanted more therapy than that level of care allowed him.  While in administrative segregation, an IDTT meeting reinstated him at an EOP level of care.  Inmate M was an ex-sheriff's deputy and indicated that he had an enemy in the mainline and in a number of other places; he was waiting for a bed in the MCSP sensitive needs EOP program.

Inmate M indicated that some of the correctional officers at SVSP were fine and treated him with respect, while others were provocative towards him.

This inmate was receiving chemotherapy and seizure medications.  He complained that these medications, Depakote and Phenobarbital, had expired three weeks ago; he had begun receiving his Depakote recently, after this three-week gap.  Inmate M indicated that he took Phenobarbital as part of his treatment for seizures.  When asked about his last seizures, he reported that it was difficult to say, as he gets "absences" or petit mal seizures preceded by ringing in the ears.  The inmate complained that he was not being

given his Lomotil, a medication for diarrhea, which he got b.i.d. as a KOP. Inmate M had just had intestinal surgery and he felt that he needed to have the medication q.i.d.; he wanted to administer it himself.

Inmate M described his case manager as "rude", adding that the case manager did not believe he had a psychiatric illness. He was generally seen by the case manager at cell front; according to the inmate, he and his case manager have had to yell to hear each other because the inmate talked from his bed. Inmate M did not have a heat card.

A review of the inmate's current MAR confirmed that he did not get Phenobarbital and missed his Depakote for four days. His Zyprexa stopped on May 19, 2004 for unclear reasons, even though the order was good until May 28, 2004. The inmate's Remeron similarly stopped on May 19, although that order was also good until May 28.

Assessment:

1.      This inmate experienced generalized medication mismanagement and medication discontinuities that were difficult to explain.

2.      Inmate M had a negative relationship with his mental health professionals.

3.      The inmate did not have a heat card.

4.      Some officers, but not all, were reportedly provocative and insensitive to this inmate's widespread psychiatric and medical problems.

5.      This inmate was referred by the monitor's expert to the chief psychologist for immediate review.

14.    Inmate N

This inmate was interviewed by the monitor's expert privately and individually. Following the interview his UHR, current MAR, 114 and inmate history from the MHTS were reviewed.

Inmate N reported that he was in the EOP administrative segregation program, while waiting for an outside court hearing on assault charges. He had recently returned from the APP in Vacaville on March 1, 2004.

Inmate N complained of a two-week medication gap in March, when he was taking Zyprexa. He claimed to have reported the missed medication to the staff every day. The inmate was now getting his medications daily, which kept him sedated. He did not have a heat card and complained, like other inmates interviewed, that he was allowed to go to the yard only once every two weeks. He reported that he saw his case manager weekly out-of-cell in a holding cell.

Inmate N stated that some of the correctional officers were good, while others played games with him and were demeaning. He complained that they were often insensitive and withheld help from him when he asked.

A review of the inmate's MARs revealed a medication gap only on May 11, 2004.

Assessment:

>    1.    This inmate reported an unconfirmed medication gap of two weeks in March. His UHR did not have a March MAR.
>
>    2.    The inmate did not have a heat card.
>
>    3.    Inmate N had a negative relationship with some of the correctional officers who he said were demeaning and provocative towards him.

15.    Inmate O

This inmate was interviewed by the monitor's expert privately and individually. Following the interview, his current MAR, 114 and UHR were reviewed, along with his inmate history report from the MHTS.

Inmate O reported that he was "not good". He did not, however, have any disturbance in thought processes. The inmate reported that he disliked his case manager and did not trust him. He saw the case manager weekly in a private holding cell, except when his case manager was on vacation for two weeks. During the case manager's vacation, Inmate O was not seen by any other case manager and had no group therapy.

The inmate was a Vietnam War veteran and was diagnosed as having Post-Traumatic Stress Disorder. His reported a mixed experience with group therapy, indicating that some groups were fine and that some did not benefit his particular problems.

Inmate O reported taking medication for his Post-Traumatic Stress Disorder and because he heard voices. He reported a three-day gap in medications, after returning from the MHCB. He also reported that in late April his medications expired and there was a two-week gap, which he said happened a lot. He did not have a heat card. The inmate complained that at least 95 percent of the correctional officers were "terrible", sadistic and oppressive. He maintained that they taunted and provoked him.

A review of the inmate's UHR revealed an April 12, 2004 order for Depakote 1500 mg extended release and Zyprexa 200 mg h.s., but no time frame was given for either of those medications. A continuity order for these medications was written, although not present in the chart, on May 5 and expired on May 10, 2004. Similarly, a continuity order for Risperdal was written on May 7 and expired on May 10, 2004. The cause for such brief orders was apparent from the MHTS inmate history, as Inmate O was in the MHCB from May 5 through May 10, 2004. His current MAR did not list either of these

medications, nor was there an order for them. Consequently, the inmate had not received any medications since his discharge from the MHCB.

Assessment:

1.    This inmate experienced medication mismanagement and medication discontinuity. No medication orders had been written and no medication had been delivered to this inmate following his discharge from the MHCB, with the result that he had been without medications for two weeks.

2.    Inmate O had a negative relationship with his treating mental health professionals.

3.    The inmate was critical of correctional officers, indicating that they taunted and provoked him.

4.    Inmate O had an unconfirmed two-week gap in his medications in April.

5.    The inmate received private weekly case manager contact.

16.    Inmate P

Inmate P was interviewed by the monitor's expert individually and privately. Following the interview, his current UHR, MAR, 114 and inmate history from the MHTS were reviewed.

Inmate P reported that he had only been at SVSP for three weeks and that previously he had been on sensitive needs yards for four years. He indicated that he was on A-Yard at SVSP, described a number of stresses he experienced there and stated that he could not function on that yard.

The inmate reported taking Dilantin for a seizure disorder and noted a previous two-day gap in the delivery of his medication. More recently, the inmate indicated that he had been getting his medication every day. Since being assigned an EOP level of care, the inmate had been receiving Prozac and some other medications as well. Inmate P indicated that he became homicidal and, although allowed to double cell, had no cellmate. He saw his case manager privately in a holding cell every week and had been in groups for two weeks, which he found satisfactory.

A review of the inmate's UHR failed to confirm any medication gaps during April or May of 2004. The inmate's current MAR indicated that he was taking Geodon, Prozac and Dilantin, which he received every day, with the exception of the May 19, when he refused his morning psychotropic medications.

<u>Assessment:</u>

1.    This inmate's complaints of medication discontinuities were not confirmed by a review of his records.

2.    Inmate P had a heat card.

3.    This inmate appeared to have received appropriate medication management.

17.    Inmate Q

This inmate indicated that he was serving a 300-year life sentence and was concerned that he had been told he would be discharged from the EOP program after a six-month stay had been completed.  It was difficult to obtain a more coherent history from him relevant to this issue.

The healthcare record of this inmate was reviewed.  He underwent a bus screening at SVSP following his transfer from CSATF on January 12, 2000.  The bus screening was negative from a mental health perspective.

The inmate's chart contained a January 2, 2004 EOP 90-day MH-2 review.  The inmate was in the administrative segregation unit at that time.  He was noted to be without psychotic symptoms, but with significant anger problems.  He was diagnosed as having an Obsessive-Compulsive Disorder, Sexual Masochism and a Borderline Personality Disorder.

Review of a January 6, 2004 MH-3 indicated that this inmate was serving a 300-years to life sentence for sexual acts with a 14-year-old.  He was subsequently evaluated by a psychiatrist on January 13, 2004, who described him as a 53-year-old Puerto Rican man whose diagnosis was deferred.  He was started on Depakote and Effexor for mood stabilization with the recommendation to consider antipsychotic medications in the future. A February 11, 2004 MH-2 assessment was essentially unchanged.

A January 15, 2004 note indicated the inmate had not yet received his medications.  On January 20, 2004, his case manager recommended that he receive an EOP level of care.

Inmate Q was transferred to the general population EOP on February 5, 2004.  Review of subsequent progress notes revealed frequent canceled groups related to lockdowns, clinician unavailability and holidays.  It appeared that the inmate's first visit with a psychiatrist in the general population EOP occurred on April 20, 2004.  The inmate was subsequently diagnosed as having a Paraphilia.  His Effexor was discontinued and Prozac was started.  He was scheduled to return to see the psychiatrist in one week.  According to documentation in the inmate's UHR, he was not seen by the psychiatrist again until his May 13, 2004 IDTT meeting.  Inmate Q was expected to remain in the general population

EOP program about another four months. He was noted to be making good progress in treatment.

Assessment:

This inmate appeared to be making progress in his treatment, which was hampered somewhat by frequently canceled therapeutic activities and untimely follow-up visits with a psychiatrist. His concern about being discharged from the EOP program was well founded based on a review of the IDTT note. His expected discharge in about four months was a matter of clinical concern in light of the inmate's reported progress in treatment and the chronic nature and severity of his symptoms.

18.    Inmate R

This EOP inmate claimed in a vague manner that he was being discriminated against due to his involvement with the Coleman case. The healthcare record of the inmate was reviewed by the monitor's expert.

Inmate R's bus screening on July 16, 2002 following his transfer from CMC was positive from a mental health perspective. A March 26, 2001 IDTT update indicated that his diagnoses were Psychotic Disorder due to substance abuse, Alcohol Dependence in remission and Hallucinogen Dependence in remission. It was noted that the inmate was compliant with his medications and treatment and was working in the kitchen. He was hopeful that his points would eventually be decreased so he could return to a Level III yard in the future. He continued to be in need of an EOP level care at the time of the monitoring period.

Inmate R's most recent treatment plan was dated August 19, 2002. However, there was an EOP IDTT note from April 1, 2004. This note provided little information other than noting the decision to retain this inmate in the EOP program for another 90 days.

This inmate was noted to be unstable on May 5, 2004. A May 11, 2004 note by the psychiatrist indicated that the inmate did not want further psychotropic medications. He was described as currently being stable. The plan was to observe the inmate for decompensation.

A May 12, 2004 progress note indicated that Inmate R was non-compliant with his medications, resulting in signs of decompensation. He was referred to the psychiatrist for further assessment. The psychiatrist reported on May 18, 2004 that the inmate continued to deny any psychological problems and was refusing medications. He continued to be assessed as stable.

Assessment:

The lack of an updated treatment plan for this inmate was a matter of concern. It was also disturbing that there were significant discrepancies among his treating clinicians

regarding this inmate's clinical condition.  This inmate was not receiving treatment consistent with program guide requirements.

19.    Inmate S

This inmate was briefly interviewed in the yard.  He described an elaborate delusional system which involved his belief that he was working undercover for the United States Department of Justice.  During this brief interview, he indicated a willingness to participate in a higher level of mental health care, although information subsequently obtained from the staff indicated that he was very reluctant to participate in any type of mental health treatment.

The mental health staff was familiar with this inmate and in agreement that he would be appropriate for referral to the SVPP.  However, they stated that such a referral had not been made because, based on the clinician's prior experiences with referrals to SVPP, it was anticipated that the inmate would not be accepted.

The healthcare record of this inmate was briefly reviewed.  His bus screening on November 20, 2003 was positive from a mental health perspective.

Notes belonging in another UHR were found in this inmate's UHR. The inmate's most recent treatment plan was dated November 5, 2001.  An April 8, 2004 IDTT update for the EOP program, made in lieu of a MH-2, indicated that Inmate S's diagnoses were Schizoaffective Disorder, Polysubstance Dependence and Antisocial Personality Disorder.  He was also noted to be blind in his right eye.  The inmate's GAF was 40.  He was described as chronically refusing to participate in the EOP program.

Inmate S's medications included Seroquel 300 mg po q am and 400 mg po hs. His progress notes since at least the end of April 2004 indicated increasing psychotic symptoms.

Assessment:

This inmate was in need of a higher level of care, such as offered at a SVPP.  He was not currently receiving treatment consistent with program guide requirements.

20.    Inmate T

This inmate informed the monitor's expert that he was not receiving adequate treatment related to the deaths of his parents. Volume VI of this inmate's UHR was reviewed. Another inmate's treatment plan was present in this volume.

Inmate T's most recent treatment plan was dated April 7, 2004.  His diagnosis was reported to be Adjustment Disorder with Depressed Mood.  His problems included the deaths of both parents during the past 18 months.

The inmate's treatment plan indicated that he had problems with mild depression and anger and was not likely to benefit from more than 90 days in the EOP program. The plan was to reduce his depression and work on his bereavement. This inmate apparently had been requesting a transfer to SVPP, but it was determined by staff not to be indicated.

Review of the inmate's progress notes indicated that on April 5, 2004 Inmate T was not ducated to his anger management group and the group was canceled on April 19 and April 26 due to custody issues. In addition, the inmate reportedly refused to attend two of the five grief therapy groups held during April 2004, with participation in two of the sessions being described as "not listed."

Inmate T's medications included Zoloft and Benadryl. This inmate was also being treated for a dermatological condition.

This inmate had been on a Keyhea order from June 2002 until January 2004. His diagnoses while in the PSU at PBSP included Delusional Disorder and Personality Disorder NOS with antisocial and paranoid traits. A treatment plan dated October 9, 2003 at PBSP indicated diagnoses of a Bipolar I Disorder, Antisocial Personality Disorder and Paranoid Personality Disorder.

Assessment:

The discrepancies in this inmate's diagnoses were a matter of great concern, especially given the lack of documentation related to the changes in his diagnoses. It appeared that Inmate T did not arrive at SVSP until late March 2004. Although the monitor's expert agreed that the inmate's treatment should have focused on grief issues, clarification of his diagnosis which would impact on his treatment plan was also important. The expert was also concerned about the number of missed appointments for grief group therapy, which needed to be further verified and remedied.

21.    Inmate U

This inmate reported alleged abuse by the correctional officers in the EOP program. The monitor's expert reviewed the healthcare record of this inmate.

Inmate U's bus screening from October 2002 was positive from a mental health perspective. His most recent treatment plan was an IDTT update for the EOP that was dated March 18, 2004. He was noted to have moderate mental retardation and apparently a Psychotic Disorder NOS.

A May 10, 2004 note indicated that Inmate U was seen in the emergency room, due to increasing auditory hallucinations. His medications included Thorazine, Haldol, Haldol Decanoate, Depakote and Artane.

Progress notes during February 2004 indicated that Inmate U generally did not attend structured therapeutic activities.

<u>Assessment:</u>

This inmate appeared to be minimally participating in the EOP program, although he remained very symptomatic. It would be appropriate to consider Inmate U for treatment in the SVPP. The inmate's healthcare record did not document any complaints of abuse from correctional officers.

22.    Inmate V

The monitor's expert knew this inmate for many years and had seen him at both PSPB's PSU and CSP/Sac's EOP. This inmate had many complaints regarding his incarceration at SVSP, which was reminiscent of his incarceration in the PSU at PSPB. He reported that his level of care was changed during the past several months to 3CMS.

The healthcare record of this inmate was reviewed by the monitor's expert. This inmate had a bus screening that was positive from a mental health perspective on January 21, 2004 following his transfer from CSP/Sac.

The inmate's most recent treatment plan was dated October 22, 2003, which indicated diagnoses of Schizophrenia, paranoid type in remission, and an Antisocial Personality Disorder.

During the month of March 2004, the inmate's paranoia group was canceled on March 8 and March 15. His relationship group was canceled on March 3, March 10 and March 17. His regulating emotions group was canceled on March 2 and March 9.

A note from an EOP IDTT meeting on March 25, 2004 indicated that this inmate had reached maximum benefit from the EOP program and could function with just 3CMS support. His diagnoses was listed as Schizoaffective Disorder, Post-Traumatic Stress Disorder, Polysubstance Dependence in remission, and Antisocial Personality Disorder. The inmate's treatment plan had been negatively impacted by extensive lockdowns on the EOP unit for security concerns. The inmate was noted to be medication compliant with Zyprexa and Lithium. He had been at SVSP for 63 days at that time of the monitoring visit.

It was noted that this inmate had been in the PSU for five years, which had been followed by three years in the general population EOP program at CSP/Sac. This inmate indicated that he would discontinue his medications in a general population yard because he had to be on guard to protect himself.

<u>Assessment:</u>

Although this inmate appeared to be doing reasonably well at the present time, the monitor's expert was concerned that he will not do well in a general population yard for a variety of reasons, including his decision to discontinue his medications. It would seem

to make more sense to keep him longer in an EOP level of care and specifically deal with his discharge issues.

EXHIBIT H

<u>Valley State Prison for Women (VSPW)</u>

April 19, 2004 – April 21, 2004

1.     Inmate A

Inmate A was interviewed in an IDTT meeting.  She was a 20-year-old woman who had just arrived from the California Youth Authority.  She has been at VSPW for several months and had an extensive and quite disturbing history of continuous foster care placements, abuse and neglect and abandonment.  She had a very assaultive history, including staff assaults in this facility.  She appeared at the IDTT meeting in leg irons due to a history of kicking and a spit-mask, with modified property control.  She had been in the MHCB unit one time since she arrived at the institution for cutting herself; she had several OHU admissions for the same reason.  Laudably, the inmate's treatment team joined the MHCB staff for treatment planning when the inmate was sent to that unit.  The IDTT review observed by the monitor's expert was held to consider a recommendation by a case manager to switch the inmate to an EOP level of care.  Inmate A currently had a diagnosis of Post-Traumatic Stress Disorder and was consequently classified as a medical necessity.

Inmate A had a history, as indicated above, of multiple batteries in jail, including batteries at the California Youth Authority, the reception center at CCWF and VSPW.  She was facing not only multiple 115 disciplinary infractions, but also district attorney's charges amounting to a possibility of 25 extra years in prison.  The inmate was not particularly verbal or forthcoming during her mental health evaluation.

Inmate A also had a history of refusing medications and taking many different classes of medications, including anti-depressants, anti-psychotics and stimulants.  The IDTT psychiatrist indicated that Inmate A was, given her extensive history and resistance to medications, very difficult to treat with medications.  The psychiatrist decided to employ monotherapy, or using only one psychotropic medication at a time, in an effort to establish whether or not the medication could help her.

Inmate A was interviewed by the monitor's expert in a private carrel.  She indicated that when she first met the treatment team on January 4 it consisted only of two people; she seemed to be upset about that fact.  She reported that the IDTT meeting indicated that she did not meet the criteria for mental health treatment in that she was classified only as medical necessity.  In contrast, she said, the treatment team was currently talking about putting her in an EOP program.  Inmate A indicated that she had taken many different medications since the age of seven and implied that she has taken every medication possible.  The inmate described her psychiatrist's recent efforts to get her to take Depakote, which she refused to take because she said it agitated her.  Inmate A indicated that medication generally affected her adversely and did not help her.  She displayed many cuts on both of her arms and across her legs; the scars appeared to be old.  The inmate indicated that she last cut herself in February of 2004, as a result of which she was sent to the MHCB unit.  The MHCB log confirmed that

the inmate was admitted to the unit for six days starting on December 3, 2003 and for 15 days beginning on February 26, 2004. Inmate A was placed in a safety cell in the OHU two months ago. At that time, she indicated that she was suicidal and had drunk Ajax and other substances in an effort to kill herself.

The inmate indicated that she was not currently on any medications. This was confirmed by a psych tech and by a review of the inmate's MAR. The administrative segregation psychiatrist only offered her one medication, explaining to her that it was difficult to evaluate her medication history and to determine what medication might actually help her because she was so adverse to medications. She had been to Metropolitan State Hospital once for an entire year, having been sent there from the California Youth Authority's Girls' Facility in Ventura. She was assaultive at that time and frequently suicidal. While at the hospital, she continued on a Keyhea order, which had been initiated at the Ventura county jail. Inmate A was sent to the state hospital for a competency to stand trial evaluation.

The inmate's UHR was not reviewed by the monitor's expert due to a lack of time.

<u>Assessment:</u>

1.    There was a very good IDTT discussion and good interaction between the treatment team and the inmate.

2.    The inmate was appropriately being considered for an increase in level of care.
      Appropriate non-pharmacological care was given to this extremely difficult
      inmate.

3.    The inmate had appropriate access to needed levels of care for, and appropriate
      management of, her parasuicidal behavior.

4.    The monitor's expert agreed with a treatment team's cautious approach to pharmacotherapy for this inmate.

2.    Inmate B

This inmate was seen by the monitor's expert in an IDTT meeting. She had a history of 3CMS treatment but, as the treatment team indicated, was clinically deteriorating. The IDTT meeting observed by the expert was held to consider increasing the inmate's level of care to EOP. Her behavior had been extremely bizarre; she had agreed to go to an occasional group, but did not participate in it; she had refused contact with the case manager and had refused to see the

psychiatrist. Inmate B had refused her medications as well. When brought to the IDTT meeting, Inmate B appeared quite distracted and tangential in her thinking.

The inmate was interviewed by the monitor's expert in a carrel. She indicated that she was "fine," but appeared to be grossly delusional. She repeatedly gave a startled response, as though she were responding to internal voices. Her demeanor and behavior were quite bizarre. She was rambling and tangential; her associations were extremely loose, to the extent that it was difficult to obtain a responsive answer to a question. She did appear reasonably well groomed and clean and she indicated that she was eating every day.

An interview with nursing staff revealed that the inmate did not take medications of any kind and had no MARs. Inmate B confirmed that she was not taking any medication.

Inmate B's chart was reviewed. It confirmed a diagnosis of psychotic disorder NOS, along with a history of cocaine dependency. Inmate B arrived at VSPW from CCWF in December of 2003 with a SHU term. In the recent IDTT meeting, the psychiatrist documented that her condition had worsened since her arrival from CCWF, but that she was still functioning moderately well, although she generally refused to see the psychiatrist or to take any medication. The psychiatrist's opinion was that she was not a candidate for a Keyhea order. The recommendation by the treatment team was to switch the inmate to an EOP level of care and to have the case manager see her on a weekly basis.

<u>Assessment:</u>

1.   In the opinion of the monitor's expert, this inmate unquestionably could not be expected to function in an EOP setting, either in restricted administrative segregation or SHU housing or in the general population EOP. The expert strongly recommended to the treatment team supervisor that the inmate be referred to Patton State Hospital.

3.   Inmate C

Inmate C was in the EOP program. She reported to the monitor's expert that she had been in Napa State Hospital for seven years as incompetent to stand trial. When she returned to the prison after 18 months on parole, she was told that she still had to serve the remainder of a SHU term. She came to the interview with a great deal of paper, charges, etc. Her presentation was very clear and there was no evidence of any disturbance of thought or mood. She indicated that she arrived back in prison on Zyprexa, Serzone, Depakote and Neurontin, and had been very stable on those medications. She said that the administrative segregation psychiatrist had stopped all of her medications, indicating that she was "sleeping too much". She reported that she was subsequently placed in a safety cell in the OHU, following a use of force. She had a 115 disciplinary

infraction, which was dismissed after reviewing mental health input. The inmate was not on medication at the time of the battery underlying the infraction. The psychologist who interviewed her recommended a referral to PSH. According to Inmate C, the psychiatrist stopped her transfer to PSH.

Since that time, Inmate C had received many 115 disciplinary infractions. The psychiatrist prescribed Lithium for her, which the inmate had been taking. Inmate C said that she took the Lithium off and on and that it occasionally made her sick or hurt her liver. She currently felt that she was doing reasonably well on the Lithium and hoped to get out of administrative segregation to a housing yard. She also hoped that her infractions would all be dropped because she strongly believed that there was no good reason for her confinement in administrative segregation.

The nursing staff was interviewed by the monitor's expert and Inmate C's MAR was reviewed. The inmate was on Lithium Citrate, which had just been increased through a physician's order. She appeared to be on 300 mg per day and her MAR demonstrated that the inmate was taking her medication.

A review of the inmate's chart revealed an order dated April 13, 2004 for Lithium, which was being titrated up over five days to a maximum of 600 mg per day. At the time of the expert's review, the inmate's medication order and MAR confirmed that she was taking 300 mg q.p.m. A Lithium level test was ordered for the week of May 3, 2004. An EKG order from January 26, 2004 was not done, despite multiple repeat requests. The inmate was at an EOP level of care and had a medical necessity diagnosis. The psychiatrist documented her diagnosis in an April 19, 2004 note. On Axis I, the inmate was diagnosed as polysubstance abuse; on Axis II, she was diagnosed as borderline personality disorder and antisocial personality disorder; on Axis V, her GAF was 48. On April 13, 2004, Inmate C refused all medications and her level of care was increased to EOP. There was a signed refusal form in the chart. The inmate subsequently started taking Lithium, as indicated above.

Assessment:

1.    This medical necessity inmate received appropriate pharmacotherapy and medication management for someone whose diagnosis was questionable.

2.    Despite initially refusing all medications, Inmate C was currently taking medications. Her medication compliance was good.

4.    Inmate D

Inmate D was an EOP inmate in administrative segregation. She was interviewed by the monitor's expert and reported to the expert that she took medications on a

daily basis. She further indicated that she was going to group therapy to help her cope in administrative segregation. Inmate D was in segregation for an assault on a law enforcement officer for which she received a 115 disciplinary infraction as well as district attorney charges. The event underlying the infraction occurred in January 2004. Inmate D waived her 115 hearing and, consequently, had not had a 115 mental health evaluation and had not been to court for the district attorney charges. The inmate was very uncertain about these matters and about her decision to waive the 115 hearing.

Inmate D's affect seemed to be extremely flat and her thinking appeared slow and uncertain. She was, however, responsive to questions and her answers were relevant. She described administrative segregation as "gory" and said that she could not move because of the limited space. She appeared to be trying to describe feelings of claustrophobia. She was doing well in a single cell setting, but wanted a cellmate. She knew that she would be going to an ICC hearing the upcoming week.

Inmate D indicated that she was transferred to PSH for "drinking her urine and eating her feces." The institution's DMH transfer log indicated that Inmate D was sent to PSH on February 4, 2004, only ten days after an 18-day stay in the MHCB unit. She was not on medications at that time. She reported that she was quite disturbed both at home and at county jail following her arrest because she was not on any medications. She refused to take Seroquel 200 mg t.i.d. and Paxil at the county jail and she refused to take any medications at the time of her bus screening in VSPW on January 5, 2004.

While in the reception center at VSPW, Inmate D got into a fight with another inmate, which led to a housing change. She was hearing voices at that time telling her to hit the other inmate. When a sergeant came to read her 115 disciplinary infraction to her following the fight, Inmate D hit the officer in the eye. Her symptoms continued through her stay in administrative segregation, until she was placed in MHCB unit. Inmate D also indicated that she was returned from the MHCB unit to administrative segregation after being referred to PSH to await her transfer.

The inmate had been back from the hospital for two weeks. She described the treatment at PSH as very good. She was in the intermediate care unit, had an in-house job and went to many different groups. She returned on medications that included Loxitane, Trazodone and Dilantin. She reported that she cannot get Seroquel at VSPW. She reported going to group therapy for three hours a day at VSPW; she was not clear as to whether she was being seen by a case manager.

The monitor's expert did not review this inmate's chart due to lack of time.

314

Assessment:

1.  Appropriate care was provided for this well functioning and stable EOP inmate.

2.  The inmate received appropriate medication continuity and management.

3.  This inmate seemed to be doing very well with the group and individual programming she received.

4.  It was questionable whether this inmate had the competency to waive her hearing. Her history indicated she was quite psychotic at the time of her 115
    disciplinary infraction and afterwards.

5.  This inmate was apparently not well stabilized by an 18-day stay in the MHCB
    unit. She should have been transferred to PSH from the MHCB unit.

5.  Inmate E

Inmate E was interviewed by the monitor's expert because she was in the EOP program in administrative segregation. She appeared unresponsive to questions and barely answered any questions. After a while, she indicated that she had a "seizure disorder or epilepsy." She squeezed her eyes, answered very briefly with some strained difficulty and complained of a daily headache, which she said, was currently very bad. The inmate's behavior seemed somewhat bizarre and inappropriate.

The expert interviewed the nursing staff and reviewed the inmate's MAR. The inmate was currently taking Tegretol and Effexor, but she refused her Tegretol the day of the monitor's visit. Inmate E had a medication order dated April 16, 2004 for Effexor XR 225 mg q.p.m. for 30 days. The Effexor had an April 17, 2004 start date, but all the days since then were blank on the MAR. Although the MAR prior to April 17 was missing, the nurse recalled that the inmate's compliance with Tegretol had been sporadic. The nurse confirmed that the inmate had returned from PSH at the end of March, three weeks prior to the monitor's visit. The institution's DMH transfer log indicated Inmate E was transferred on February 3. Copies of orders in the nursing station indicated that the administrative segregation psychiatrist had recently discontinued Inmate E's Tegretol and placed her on Dilantin. The nursing staff was still waiting for the inmate's new MAR, but had not called the nursing supervisor or pharmacy about it.

Inmate E's chart was reviewed. It confirmed that she was at the EOP level of care. There was an order dated April 16, 2004 for Effexor XR 225 mg q.p.m., a

copy of which was reviewed in the nursing station. There was also an order dated April 20, 2004, discontinuing the inmate's Tegretol and prescribing Dilantin 300 mg q.p.m., ostensibly for a seizure disorder. A copy of that order was also in the nursing station. A progress note of April 16, 2004 by the psychiatrist indicated that the inmate was slightly more talkative but non-compliant with medications. The psychiatrist discussed a possible transfer to the EOP at CCWF with classification. The April 16 psychiatric note indicated that the inmate would not come to her IDTT meeting and told the case manager that she wanted to go back to the hospital. That note also indicated that there was a problem with a custody transfer to the EOP across the street. Inmate E was not on a Keyhea order and there were no indications for involuntary treatment. The inmate's MARs were reviewed by the treatment team and showed that the inmate refused her a.m medication of Effexor three times that week.

Assessment:

1.     Appropriate care was provided for this difficult and treatment-resistant inmate, who was functioning well but continued to be symptomatic.

2.     This inmate experienced a medication delay and the nursing staff failed to call the nursing supervisors or the pharmacy about the problem.

6.     Inmate F

Inmate F was interviewed because she was in the administrative segregation EOP program. She indicated that she understood she was in the EOP program. She said that the EOP was very "nice" and not too tiring. She indicated that she received out-of-cell time. The inmate reported that she chose to watch the therapy groups in which videos were shown and puzzles were available. She said that she never chose to go to "talking group," as she valued her privacy and was very picky. Inmate F had been in prison for twelve years and in the EOP program for some time and felt that she could afford to be choosy.

Inmate F was transferred to PSH on November 11, 2003. She reported that she had been back in administrative segregation for one week since her discharge and had missed her medications. She said that the psychiatrist had been seeing her regularly, up until the time she left segregation to go to PSH the preceding week. Inmate F indicated that she was on Haldol, Zyprexa, Depakote, vitamins and an oral hypoglycemic. She reported that the ICC had released her from segregation last week because her 115 disciplinary infraction had been dismissed. She was placed in a yard, but within a few hours she kicked a correctional officer and was immediately returned to administrative segregation. She explained that she did not want to be in the yard and wanted to get back to administrative segregation, so she kicked at and missed a correctional officer.

Inmate F's chart was reviewed. It revealed medication orders for Depakote 500 mg b.i.d., Haldol 10 mg b.i.d., Artane 2 mg q.a.m. and Zyprexa 10 mg b.i.d. The order was dated March 25, 2004 and was good until April 15, 2004. Inmate F had been discharged form PSH on March 25, 2004 on these same medications. Orders for the medications were rewritten by a psychiatrist at CIW.

On March 29, 2004, while the inmate was at CIW, she was seen on a five-day "step-down" follow-up as a PSH returnee. Consequently, she had only been back at VSPW from PSH for a little more than two weeks at the time she was seen by the monitor's expert on April 20, 2004. Clinicians at VSPW who interviewed her on her return disagreed with the CIW decision to discharge her to an administrative segregation EOP. They viewed the inmate's discharge from PSH as premature, since she was fairly symptomatic and dysfunctional. A review of the inmate's chart revealed a grossly inadequate treatment plan accomplished at CIW on March 30, 2004, after the inmate's discharge from PSH. The inmate's records confirmed a staff assault and a resulting Keyhea order.

A psychiatrist wrote new orders for the inmate dated April 14, 2004, copies of which were in the nursing clinic but not in the inmate's UHR. The psychiatric note indicated that no one had known that the inmate was on a Keyhea order, which was not due to expire until July 10, 2004. There was a very good transfer note, anticipating that the ICC would discharge the inmate to a yard the following week. That was the last mental health note for this inmate. The prior week, the inmate's case manager noticed that the inmate was having medication problems and that she was still experiencing auditory hallucinations. The psych tech's notes revealed that the inmate suffered from occasional thought disorder and that she was delusional.

Discussions with psych techs in the clinic and subsequently with a senior nurse revealed that the inmate's MAR prior to April 21, 2004 was missing from the clinic; it had been sent to medical records for filing in the inmate's chart, pursuant to routine procedures requiring that old MAR be sent for filing whenever there is a medication order change. There was a MAR in the chart from CIW, which was noted in the inmate's bus screening. Inmate F's case was discussed every morning at VSPW because she was on the high-risk list, a list of "pre-DOT patients at high-risk for non-compliance". These discussions obviously did not help ensure that the inmate received her medications; no one checked the fact that the inmate was on a Keyhea order and she missed her medications for one week. Clinical supervisors agreed that she was too psychiatrically fragile and symptomatic to be released to the yard, rather than sent directly to the EOP program across the street.

The monitor's expert visited the nursing clinic again the following morning in the company of the pharmacy tech who made daily rounds and reviewed all MARs. The expert and the tech were unable to determine why there was no MAR for this inmate prior to April 21, 2004. It was also unclear why the inmate's immediate

return to administrative segregation after a few hours in yard was not picked up on a daily movement sheet. Senior nursing staff agreed to follow the recommendation of the monitor's expert to retain old MARs in the clinic medication book until all the MARs for a given inmate could be filed in the UHR. It was agreed that this was an unusual case that strained an otherwise well-functioning process, because the inmate was only in yard for a few hours and presumably her medications and MARs were on the way to that clinic. The staff indicated that they would be sensitive to such scenarios in the future. The fact that the inmate began to receive her medications on April 21, 2004 was ultimately confirmed.

Assessment:

1.    This inmate experienced medication discontinuity for six days on her return to administrative segregation.

2.    Staff failed to notice that Inmate F was on a Keyhea order and, therefore, required to receive DOT.

3.    No effort was made to call the senior nursing staff or the pharmacy to check on the inmate's medication, despite daily complaints.

7.    Inmate G

This inmate was interviewed by the monitor's expert in her housing unit pursuant to a request by plaintiffs' counsel. She had complained that a local psychiatrist refused to prescribe psychotropic medications for her, a complaint that apparently went back to the fall of 2003.

Upon interview, Inmate G indicated that it was the administrative segregation psychiatrist who refused to give her medications. The inmate left administrative segregation on March 17, 2004 and had been doing well since without medications. Inmate G indicated that she made two suicide attempts in September 2003 because of frustration and stress. She had reportedly overdosed on one of her medications, which included Seroquel, Motrin and Neurontin. The inmate was serving a nine-year sentence. According to the inmate, she violated parole by missing a mental health appointment with the POC.

Inmate G filed numerous, unsuccessful grievances about this medication matter. She also wrote to mental health asking for help and was seen by a psychologist, who she said intended to place her back on the 3CMS caseload within a month. Inmate G had difficulty with impulse control and in general had difficulty managing her anger. She had been in several fights, she said, but was not taking any medication currently. The inmate's speech patterns appeared to be at times rapid or hypomanic, but she was otherwise very rational and coherent and described no psychological difficulties other than stress and impulse control.

318

<u>Assessment:</u>

1.      It appeared that the historical problems, about which Inmate G
        complained, were moot.  It was appropriate to place her back on the
        3CMS roster for therapy.