Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, DC  20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
IN CALENDAR YEAR 2003

**I.  Overview and Introduction**

This is the fifth report on completed suicides in the California Department of Corrections (CDC) submitted as part of the Special Master's review of the defendant's overall compliance with court mandated remedies and requirements in <u>Coleman v. Schwarzenegger</u>.  The third report on completed suicides included recently updated calculations of the annual incidence of suicide in the general US population, finding 10.7 suicides for every 100,000 persons (Minino, et. al., 2002, NIMH Suicide Facts and Statistics, 2001).   The third suicide report also noted that the National Center on Institutions and Alternatives, together with other sources, analyzed data collected over a ten-year period from 1984 thru 1993 and concluded that the average annual incidence of deaths from suicide in correctional institutions was 20.6 per 100,000 inmates.  More recently, the National Center on Institutions and Alternatives concluded that the average annual incidence of death from suicide in correctional institutions, including both jails and prisons, is 17 per 100,000 inmates, and in prisons specifically, the incidence rate is approximately 12 deaths per 100,000 inmates.

The data analysis and recommendations provided in this report will follow the same adopted in earlier versions.  This format includes two tables: Table 1 summarizes collected demographic data, while Table 2 provides a review of mental health information on CDC inmates who completed suicide while incarcerated in 2003.  In the past these tables and the summary data on CDC suicides have served sometimes to stimulate review and comment among the parties and counsel in the <u>Coleman</u> case, as well as CDC clinicians.  CDC, moreover, generated in mid-August 2004 its own report on suicides completed in 2003, which was helpful in the preparation of this report.  The report here will focus on data associated with suicides completed during calendar year 2003.  A five-year longitudinal summary study of completed suicides in the CDC from 1999 through 2003 is scheduled for completion in early 2005.

This report reflects the policies and procedures for reviewing suicides that were finalized in January 2002, establishing assigned timeframes for the completion of specific reviews by clinical and executive components of CDC and mandating the development and

1

implementation of Corrective Action Plans (CAPs) as an integral part of the department's suicide prevention strategy. The third and fourth suicide reports reflected considerable improvement in the timeliness of the defendants' provision of data on completed suicides. The timeliness of the review process continued to improve in 2003. The great majority of documents relative to the 36 completed suicides reported during calendar year 2003 were provided before May 31, 2004, the cut-off date for filing relevant materials for 2003 suicides, but some Suicide Reports and follow-up implementation plans for corrective actions, as will be seen below, were not submitted within applicable timeframes.

As the department's competence in compiling and submitting information via the suicide review process has matured, the collection of meaningful data on specific institutional plans for implementing the recommendations contained in individual Suicide Reports has become the most problematic aspect of the process. Also, departmental reviews of submitted institutional remedial plans for their relevance and consistency with CDC-wide policy and procedure, their responsiveness to the specifics of individual suicides completed in given institutions and the utilization of findings and corrective actions in specific Suicide Reports to enhance departmental policy and procedural guidelines need considerable work if the reports are ever to contribute genuinely to the department's overall suicide prevention efforts. As demonstrated in the reviews of specific inmate suicides, some issues arise repeatedly and need to be addressed systemically. For example, seven suicides in 2003 involved hangings that made use of ventilation screens with mesh large enough to hold a home-made noose in administrative segregation cells, plus two additional similar suicides in the California State Prison, Corcoran Security Housing Unit. Ten suicides in 2003 involved apparent or real delays in the timely initiation of Cardio-Pulmonary Resuscitation (CPR), delays that may have contributed to some of the reported deaths. The department is slowly responding to the first of these two difficulties, but has done little to address the second.

<u>Coleman</u> experts and monitors, as in prior years, reviewed information on completed suicides during their regularly scheduled site visits, thereby providing some additional useful information. Plaintiffs' observations and comments on some specific suicides were also incorporated into the reviews provided in this report.

Despite the defendants' renewed objection to the use of the terms, this report continues to embrace the concept of "foreseeable" and "preventable" suicides, concepts that have been discussed in considerable detail, reviewed and critiqued by the parties and confirmed by the court as appropriate for purposes of analyzing the adequacy of the defendants' suicide prevention efforts.

"Foreseeable" refers to those cases where information already available about an inmate indicates the presence of a substantial or high risk for suicide, which requires reasonable clinical, custody and/or administrative intervention(s). Assessment of the degree of risk, whether high, moderate or low to none, is an important component in determining foreseeability. In contrast to a high and immediately visible risk, a "moderate" risk of suicide involves an ambiguous set of circumstances that requires significant clinical

judgment based on adequate training and a timely assessment to determine the level of risk and the most appropriate and relevant interventions to prevent suicide.  As previously defined, those individuals evaluated as "low risk," "no risk" or "negligible risk" may require some degree of monitoring and subsequent evaluation, with appropriate notification of clinical and custody staff of the potential for self injury and/or suicidal ideation or activity.

"Preventable" applies to those situations in which, if some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy, the likelihood of a completed suicide might have been reduced substantially.  These concepts of "foreseeable" and "preventable," in turn, reflect the adequacy of the defendants' suicide prevention policies and procedures, training and the implementation and supervision of policies and procedures, as well as clinical judgment.

Over the past few years CDC has established policies and procedures for the provision of follow-up monitoring by clinical and custody staff of suicidal inmates discharged from Mental Health Crisis Bed (MHCB) units or returned from the Department of Mental Health (DMH).  In addition, the department now requires that Suicide Risk Assessments (SRAs) be conducted whenever inmates with suicidal ideation or activity are admitted to, or considered for admission to, MHCB units or Outpatient Housing Units (OHUs).  At the institutional level, some ambiguity persists about the need for clinical and custody follow-up monitoring of inmates who have been admitted to an MHCB unit or an OHU, and whose risk of suicide during the course of admission has been assessed as low to none.  Specific completed suicides in 2003, where issues involving suicide risk assessments and follow-up clinical and/or custody monitoring were identified, are reflected in Table 2 and the case reviews in Appendix B.  Table 2 and Appendix B also reflect whether CPR measures were initiated whenever a suicidal inmate was found physically unresponsive and in need of such measures.

The number of suicides completed in CDC during calendar year 2003 and included in this report was 36, an increase of 14 over the 22 reported in 2002 and six over the 30 reported in calendar year 2001.  This total more than doubled the annual suicide rate for prisons reported by the National Center on Institutions and Alternatives.  The total also includes one questionable suicide, where death was caused by a drug overdose that CDC attributed to poly-pharmacy rather than suicidal intent.  The department, after numerous requests, provided a copy of the inmate's UHR and the Medical Examiner's evaluation, but not enough additional information to allow the compiler of this report to determine whether the death was a suicide or the result of synergistic drug effects on an inmate for whom multiple medications were prescribed.  On the eve of the generation of this report, another 2003 death, determined to be a suicide in the official autopsy report but not included in the regular suicide review process, surfaced.  The defendants attributed this oversight to a change in headquarters personnel responsible for tracking suicides and reportedly were undertaking a formal review of the death.  The Special Master is awaiting more information on this case.

3

Of the 36 suicides discussed in this report, none occurred in a DMH facility and all involved male inmates.  In 2002, by contrast, three suicides occurred in DMH facilities.

The first completed suicide in calendar year 2003 occurred on January 3; the last occurred on December 17.  Documents provided on each suicide included, as in previous years, the deceased inmate's UHR, the official Incident Report, the Autopsy Report (if an autopsy was conducted), the Suicide Report, the CDC Executive Suicide Report and, where relevant, the facility's implementation report, usually in the form of a responsive memorandum to recommended corrective actions contained in the Suicide Report.  In addition, most suicide reviews undergo a Mortality and Morbidity Review at the departmental executive level, a copy of which is provided to the institution for response and review.

The average daily census in the CDC during calendar year 2003 was reportedly 160,772 inmates.  If the number of suicides during the year in CDC was 36, the suicide rate per 100,000 inmates was 22.39; if the number of suicides was 35, the suicide rate per 100,000 inmates was 21.8.

Appendix A provides CDC policy-driven timelines for completion of the existing suicide review cycle.  The timelines were not met consistently for 2003 suicides, as illustrated in Table 2, and reflected delays in the completion of some CDC Suicide Reports and institutional responses to recommended corrective actions.  There is no timeline for Health Care Services Division's (HCSD) review and approval of institutional responses to recommended corrective actions, nor does the review cycle currently close the reporting loop with some HCSD mechanism to ensure that reported institutional remedies are actually implemented.

Earlier difficulties in assessing the adequacy of the system for reviewing institutional responses to the recommendations contained in a Suicide Report were attributed largely to the recent vintage of this follow-up phase of the review process.  Given the development of the requirement for the planning and implementation of responses to recommended corrective actions by early 2002, all of the suicides completed in 2003 should have met applicable guidelines and timelines for the institutional reports.  As will be seen in the following analysis, a number did not.  As suggested in preceding reports, training in the suicide reporting and prevention process continues to be needed.

The overall quality of Suicide Reports has improved considerably over the past three years, and the data provided in most permit a reasonably objective review of appropriate and inappropriate applications of policies and procedures. The department's review and oversight of implementation of institutional responsiveness to individual reports, however, continues to require upgrading.  The process for generating and reviewing institutional corrective action plans and incorporating system-wide the valuable information garnered from the analysis of specific suicides has not yet been fully realized.  Repetitive, almost formulaic or generic, recommendations for corrective actions have been reproduced repetitively over the past two years.  The inconsistency in some

4

cases of centralized review and the lack of a coordinated effort to identify deficiencies that occur in disparate institutions (and sometimes repeatedly in the same institution) and redress them systemically are documented in this report, as in its predecessors.

This report seeks to examine failed applications of existing policies and procedures, identify the need for developing additional or modified policies and procedures that might be beneficial in reducing the incidence of completed suicides and redress factors that contribute to foreseeable or preventable suicides in specific instances. As of yet, the joint institutional and departmental analysis of individual suicides contemplated in CDC's suicide review process has not produced the anticipated enhanced level of adherence to suicide prevention policies and procedures. On the other hand, the process typically works to highlight areas in need of more consistent training and more aggressive supervisory practices for clinical and custodial staff to reduce risk factors for inmates experiencing suicidal ideation or overt suicidal intent.

Again, the timeliness of the provision of materials documenting completed suicides in 2003 continued to improve. Compliance with timeframes for completion of CDC Suicide Reports, in particular, has improved, while the timeliness of responses by facilities to the recommendations in the reports has varied widely. As noted, the characterization as a suicide of two deaths reported in 2003 was contested by the CDC, and documents appropriate for the second of the two have not been received as of this writing.

Appendix B provides narrative case summaries of the 35 CDC inmates who committed suicide in 2003, as well as a summary of information known about a 36th disputed suicide.

## II. Discussion

Either 35 or 36 suicides were completed in the CDC in calendar year 2003, an approximately 60 percent increase from 2002 and the highest number of completed suicides for any calendar year since 1998. One suicide (Inmate # 16 in the tables above), as indicated, was disputed by CDC. The inclusion of this disputed suicide is based on the Medical Examiner's determination and the absence of persuasive contravening documentation. The percentages reflected below exclude this inmate because of the controversy surrounding his death. During calendar year 2003, no completed suicides occurred in a DMH facility, although one each occurred in an MHCB unit and an OHU. The following data summarizes the information on the 35 suicides contained in the preceding tables:

- o Frequency of suicides by facility

    CSP/COR        4
    SATF           4
    CMC            3

| | |
|---|---|
| CTF | 2 |
| CSP/SAC | 2 |
| CIM | 2 |
| MCSP | 2 |
| SVSP | 2 |
| DVI | 2 |
| RJD | 2 |
| CAL | 1 |
| CSPO/SOL | 1 |
| ISP | 1 |
| CMF | 1 |
| SCC | 1 |
| HDSP | 1 |
| PVSP | 1 |
| FOL | 1 |
| CSP/LAC | 1 |
| CCI | 1 |

- Single-Cell Housing    22 of 35 (62.9%)

- Inmates incarcerated for sex offenses (R Suffix)    9 of 35 (25.7%)

- Method

  | | |
  |---|---|
  | Hanging | 30 of 35 (85.7%) |
  | Exsanguination | 2 of 35 (5.7%) |
  | Trauma | 2 of 35 (5.7%) |
  | Other (Hanging & Exsanguination) | 1 of 35 (2.9%) |

- History of suicidal behavior    17 of 35 (48.6%)

- History of past mental health treatment    26 of 35 (74.3%)

- Housed in infirmary, MHCB, OHU, PSU, or DMH    3 of 35 (8.6%)

- Housing in administrative segregation or SHU    20 of 35 (57.1%)

- Inmate on Keyhea order for involuntary medication    1 of 35 (2.9%)

- Concomitant severe or life threatening medical illness    13 of 35 (37.1%)

- On MHSDS caseload at time of death    22 of 35 (62.9%)

- Age range

  Under 18    1 of 35 (2.9%)

6

      18-30              6 of 35 (17.1%)
      31-40              15 of 35 (42.8%)
      41-50              8 of 35 (22.9%)
      over 50            5 of 35 (14.3%)

- Race

      Caucasian          14 of 35 (40%)
      Hispanic            12 of 35 (34.3%)
      African American    4 of 35 (11.4%)
      Native American    3 of 35 (8.5%)
      Asian/Afghanistan  1 of 35 (2.9%)
      Pacific Islander     1 of 35 (2.9%)

- Gender

      Male    35 of 35 (100%)
      Female  0 of 35 (0%)

- Indications of inadequate treatment (including, e.g., canceled appointments not rescheduled, referrals not responded to, past medical records not reviewed, unsupported diagnoses, non-compliance with treatment without reassessment, assignment to an inappropriate level of care, failure to provide five-day clinical follow-up, failure to provide immediate CPR)   26 of 35 (74.2.8%)

The last category, indicating that 74.2 percent of suicides completed in 2003 involved some measure of inadequate treatment or intervention, represented a substantial increase over the 45 percent of suicides so identified in 2002. Reported factors indicating treatment inadequacies included lapses in communication and inattention to documented concerns about the need for an assessment or placement in a higher level of care of individuals demonstrating significant mental illness or past suicidal behavior. Some of the suicides in 2003, who were not considered for referrals to a higher level of care or not placed on the mental health caseload, were treated by contract providers. While a number of resulting remedial recommendations in such cases required local training of staff in applicable policies, there was little focus on the orientation and supervision of contracted clinicians to ensure their familiarity and compliance with policies and procedural guidelines. In only a few of the 35 completed suicides, was disciplinary action, peer review or training for an individual staff member(s) recommended. No documented results of any of these recommendations were provided by the defendants.

The annual rate of completed suicides in CDC since 1998 has been as follows:

1998 – 22 suicides in a population of approximately 158,159
       Completed suicide rate of 13.9/100,000

1999 – 25 suicides in a population of approximately 160,970

7

       Completed suicide rate of 15.5/100,000

2000 – 15 suicides in a population of approximately 160,855
       Completed suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
       Completed suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
       Completed suicide rate of 13.9/100,000

2003 – 35 suicides in a population of approximately 155,722
       Completed suicide rate of 22.5 /100,000 (or 23.1 for
       36 suicides)

### III. Summary of Observations and Recommendations

The suicide rate for inmates in the CDC has ranged from a low of 9.3/100,000 in 2000 to a high of 22.5 or 23.1/100,000 in 2003, compared with a national average in correctional institutions estimated at between 17 and 20/100,000 for most of the same time period. The difference between the national and CDC rates is important to consider in attempting to assess the adequacy of the department's suicide prevention efforts, as is an analysis of the broader trends, which include a low rate of completed suicides in 2000 (9.3/100,000) offset by 2001and 2003, when the rate has exceeded 19/100,000.

This report indicates that some 74.2% of suicides completed in 2003 were probably foreseeable or preventable, based on the definitions used in this report and the documentation of information that was or should have been available to clinical staff. That finding confirms that the department's process for developing both local and system-wide corrective responses to deficiencies identified in individual completed suicides is not yet working nearly well enough. It has failed to produce any overall downward trend in the occurrence of completed suicides in CDC.

Analysis of the case reviews provided in Appendix B allow some generalizations, most of them consistent with observations in earlier versions of these annual reports on suicide. Some such generalizations include:

- o Two suicides in 2003 occurred in a MHCB unit or OHU; in addition six EOP inmates, one of them on a Keyhea order for involuntary medication, committed suicide. These numbers reflect a failure of observation and monitoring in some of CDC's most intensive levels of mental health care that need to be addressed.

- A recurrent theme in the case reviews that involve foreseeable and preventable suicides was the failure of clinicians to use available information to ensure that inmates were referred to a level of mental health care commensurate with their needs. Too many of the inmates whose death are documented in this report might have survived if clinicians had intervened more aggressively to provide a more intensive level of treatment to inmates whose symptoms and behaviors were not responding positively in their existing placements.

- A lack of communication between clinical and custody staffs played an important role in several of the suicides analyzed in the case reviews. Surprisingly, the crimp in the flow of communication seemed to occur more often at the clinical end of the spectrum, rather than the reverse. Too often, clinicians responded tardily or poorly to custody referrals and/or reports of significant behavior or simply neglected to include custody personnel in the development of treatment plans and approaches. Comprehensive treatment planning demands not only a multidisciplinary clinical approach, but also the active participation of custody staff and administrators, especially when issues of inmate safety, single-cell status or other special circumstances exist and are critical components of a potentially effective treatment package.

- The case reviews serve to pinpoint some issues that the department needs to address systemically and quickly. An example is the air vent issue. During 2003, seven inmates hanged themselves from the mesh screen ventilation covers in their administrative segregation cells in seven different CDC institutions; two more did so too in the CSP/Corcoran SHU. This represents a clearly defined system-wide physical plant issue. It is one the defendants are beginning to address, but at an extremely deliberate pace. It should also be remembered that ten other inmates were able to hang themselves in administrative segregation cells in CDC in 2003 without relying on the mesh ventilation screens by utilizing instead a light fixture (3), a cell window or window latch (3), or some part of an upper bunk (4), so fixing the ventilation screens cannot be expected to prevent all suicides in administrative segregation cells. Similarly, the operative rules for the initiation of CPR by custody staff are an issue that must be addressed by CDC; the issue clearly transcends institutional resolution.

- The suicide review process, which continues to improve, still has some problems. The department's assessment of suicides sometimes lapses into an over-sensitive defensiveness that undermines the purpose of the process. One of the principal values of the review process is its ability to isolate and define weaknesses and failures of clinical evaluation and treatment that lead to tragic outcomes but may help other clinicians to handle more effectively similarly complex and challenging cases. Some of the attached case reviews should be summarized, sanitized and disseminated to clinicians for just that purpose. See, for example, case reviews Nos. 7, 11, 13, 14, 15, 28, 29, 32 and 36. The

focus of the review process is prevention, the same focus that is the crux of the peer review and quality improvement processes. There are other systems for affixing blame and sanctions for incompetence, malfeasance and negligence. This process seeks to prevent future suicides through better clinical understanding and practices.

- On the other hand, when the review process reveals incompetence, malfeasance or negligence, the defendants must pursue it in the proper investigatory and disciplinary channels. An outstanding court order requires the defendants to provide the <u>Coleman</u> monitor with a summary description of the methods and outcome of such investigations. No description of an investigatory outcome or method was provided for a single suicide that occurred in 2003, despite the mention within a few Suicide Reports of one sort of investigation or another.

- As indicated, the department sometimes sounds defensive in the suicide review process, but some institutions are even more prickly about the identification of local mental health and custody failings in the Suicide Reports. They often do not respond at all, or if they do respond, their replies are not shared with the monitor. The corrective actions described in institutional responses typically cite training efforts and the production of memorandums that often seem perfunctory and tangential to the quality of clinical practices and judgments questioned in the Suicide Report. Never do facilities report the use of the analysis and findings of a Suicide Report to generate focused thought and discussion among local clinicians about how to improve the quality of their own clinical practices and judgments.

- Lastly, the final phase of the review process is evolving only slowly. The department is learning to include more pointed recommendations for improvement, while institutions are beginning to respond more often with some basic description of remedial actions contemplated and undertaken. But there are few indications that the department is using the process to analyze and change system-wide practices, although the unfurling effort to address the issue of mesh ventilation screens in administrative segregation cells may represent just such a development. And nowhere is there an indication yet that the department means to hold institutions accountable for their inadequate responses to the recommendations in the Suicide Reports or intrude to ensure the actual implementation of reforms described or promised in the institutional replies. Both of these elements are critical if the process is ever to contribute substantially to the prevention of suicides in CDC.

The following recommendations flow from this annual report on suicides that occurred in CDC in 2003:

1. The defendants should be required to submit to the monitor within 30 days of the court's order a plan for dealing with the hazard of

      large-mesh ventilation screens in administrative segregation cells in which mental health caseload inmates are housed.

2. The defendants should be required to develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement.

3. Whenever the Suicide Report or suicide review process refers any member of the mental health, medical or custody staff, initially judged to have been responsible for some act of incompetence, malfeasance or negligence, to another investigatory and/or disciplinary channel, the defendants should be required, once again, to provide the monitor with a summary description of the methods and outcomes of such investigations.

4. Health Care Services Division of CDC should be required within 90 days to develop as part of the suicide review process a procedure to ensure the implementation of remedies described or promised in institutional responses to the recommendations for corrective action in individual Suicide Reports.

In their objections to the draft version of this report, the plaintiffs urged the adoption of three additional measures and the acceleration of one of the proposed recommendations. Two of the additional measures sought improved tracking of inmates with a past, but presently inactive, history of involvement in CDC's mental health caseload and of inmates with a history of attempting suicide or making suicidal gestures.

In support of the suggestion for a mental health identifier code for inmates formerly included in CDC's Mental Health Services Delivery System (MHSDS) caseload, the plaintiffs cite two suicides that occurred in 2003. (See case reviews nos. 19 and 33 in Appendix B). In neither of these two cases was it remotely likely that the existence of a code identifying the inmates as former members of the caseload would have prevented their subsequently completed suicides. Inmate 19 was administered a mental health evaluation on his admission to administrative segregation and denied any mental health problems, needs or suicidal ideation. He committed suicide two days later. Inmate 33 was seen by a psych tech on the day after he was returned as a parole violator to CDC and denied any need for mental health services or suicidal ideation. He committed suicide the next day, his second day back in CDC. Even if these two inmates had an identifier code alerting the clinicians interviewing them that they were once on the MHSDS caseload, nothing in either interview would have triggered an emergency or urgent referral, which meant that neither would have received further clinical intervention prior to the time of their imminently subsequent suicides.

11

The plaintiffs cited four additional cases of suicide over the preceding three years from 2000 to 2002 to support their argument for an identifier code.  None of the cited cases makes a compelling argument for the necessity of the identifier code sought by the plaintiffs.  In one case, the deceased inmate had been briefly on a suicide watch 20 years earlier, but was never formally included in the MHSDS.  The second case involved an inmate who was discharged from the mental health caseload some three years before his suicide.  When he was admitted in early 2002 to administrative segregation a month prior to his suicide, he did not receive a mental health evaluation; present CDC policy and the revised program guides require the administration of a mental health evaluation of all inmates entering administrative segregation who are not presently on the MHSDS caseload.  The special master's psychiatric expert thought this inmate's suicide to be unforeseeable, but found it potentially preventable only because of a delay in the administration of CPR.  The third cited case involved an inmate who received considerable, but essentially ineffectual, clinical attention prior to his suicide.  He did not need the identifier code to catch the attention of the defendants' mental health services, which, unfortunately, did not assess his mental health needs accurately.  The fourth case cited by the plaintiffs involved an inmate in CDC for 25 years, who in the early '90s was in the MHSDS caseload for an Axis II personality disorder.  He received a mental health screening in administrative segregation five months before his suicide and a subsequent bus screening a month before his suicide.  It was unclear from the record whether on not the screeners were aware of his past mental health history, but both reported no mental health problems and cleared him for general population.  The special master's psychiatric expert found the suicide to be neither foreseeable nor preventable.

The plaintiffs have long argued for the necessity of an identifier code for inmates discharged from the MHSDS caseload, usually within the context of discussions on revisions to the program guides.   The special master's psychiatric experts have consistently rejected that argument.  The evidence provided in this annual suicide report does not suffice to override the experts' opinions in this matter.

The plaintiffs also sought the initiation of a process for tracking the suicidal history of inmates in CDC's mental health caseload.  There is much stronger evidence in both this suicide report and its predecessors to support such a recommendation.  Indeed, the plaintiffs appropriately cite the defendants' own report on suicides in 2003 to buttress the need for a suicide-related tracking system.  The defendants' compilation found that 22 CDC inmates who committed suicide in 2003 had a history of prior attempted suicides in either the community or CDC.  In addition, from time to time, the department's own Suicide Reports have recommended the use of the department's Mental Health Tracking System to track caseload inmates at risk for suicide.  See, for example, p. 53 in Appendix B.  There is no evidence that this recommendation has been adopted to date.  Now, as the incidence of suicide continues at so high a level in CDC, is the appropriate time to do so.

The third additional recommendation sought by plaintiffs rightly focused on the sometimes ineffectual intervention of mental health clinicians in the deliberations of Institutional Classification Committee hearings involving long-serving inmates in administrative segregation and security housing units (SHUs) with extremely serious

mental health problems, who are also experiencing decompensation. Thoughtful and emphatic intervention is particularly needed when inmates return to an administrative segregation unit or SHU from a DMH inpatient program or a MHCB unit. But even in the normal course of providing mental health monitoring and treatment to seriously mentally ill inmates confined for long periods of time in administrative segregation or a SHU, clinicians need to be more attentive than they have been historically to detect signals of decompensation and push aggressively for appropriate alternative placements or increased mental health care. The plaintiffs listed seven completed suicides in the period from 2000 to 2003 that seemed to illustrate this problem and concluded with a rather vague recommendation that defendants develop a policy and procedure for a written mental health assessment of such inmates.

The problem here, however, involves practice more than policy. As the plaintiffs point out, current policy requires clinical participation in ICC hearings in segregated units to determine whether inmates can be retained in segregation without serious adverse mental health consequences. Until the defendants opened in 2004 the DMH program for inpatient Level IV inmates with a history of violence or volatility at Salinas Valley State Prison, there genuinely was nowhere to send seriously mentally ill, violent inmates in need of intermediate inpatient care. It has taken, moreover, the recently completed Unmet Needs Assessment to make clinicians in CDC more broadly aware of the availability of this resource. Finally, the recent attention focused on the inadequate delivery of mental health treatment to inmates in the CSP/Corcoran SHU has led to demands for increased clinical resources to provide meaningful mental health care in that facility, which houses 80 percent of all male MHSDS caseload inmates in a SHU in CDC. All of these practical developments postdate all of the suicides listed by the plaintiffs in their call for a new policy and were designed, in part, to give clinicians in ICC hearings in segregated units an expanded array of alternative treatment placements and resources with which to meet their role in ICC hearings as defined in the policy. There does not appear to be a need to redo the policy at this point.

Finally, the plaintiffs sought to accelerate the timing of the recommendation for the defendants' implementation of a policy for a clear requirement that custody staff, when confronted with the need to respond to an emergency involving suicide, provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement. By failing to object to this recommendation, the defendants have known at least since March they will need to address this issue. Because of the length of the process for review of and comments on the draft version of this report and revisions to the draft version in response to those comments, the recommended timeframe for the implementation of this recommendation is reduced to 60 days from the entry of a court order.

In addition to the change in the timing of implementation of the 2nd recommendation, a fifth recommendation, as indicated in the preceding text, is proposed, as follows:

13

5. The defendants should be required to develop a plan within 60 days of the court's order for the initiation of a process for tracking the suicidal history of inmates in CDC's mental health caseload in the Mental Health Tracking System and/or any successor management information system utilized by the department.

| NUMBER | CDC# | FACILITY | DATE OF DEATH | AGE | RACE | METHOD | HOUSING (Single/ Double Celled) | LEVEL OF CARE | R-SUFFIX | MEDICAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | D-22427 | CTF | 3-Jan-03 | 52 | Caucasian | exsanguinations | Double | GP | no | yes |
| 2 | P-31384 | CAL | 9-Jan-03 | 36 | African-American | Hanging | Single Ad Seg | GP | no | no |
| 3 | C-14562 | SAC | 11-Jan-03 | 43 | Hispanic | exsanguinations | Double | CCCMS | no | no |
| 4 | C-97384 | SOL | 19-Jan-03 | 39 | Am. Indian | Hanging | Double Ad Seg | CP | no | no |
| 5 | T-59297 | CIM | 21-Jan-03 | 25 | Afghanistanian | Trauma | Dorm | RC-GP | no | no |
| 6 | H-81591 | CIM | 28-Jan-03 | 32 | Hispanic | Hanging | Single | EOP | no | no |
| 7 | H-51350 | ISP | 12-Feb-03 | 37 | Hispanic | Hanging and exsanguination | Double | GP | yes | no |
| 8 | P-13767 | MCSP | 12-Mar-03 | 40 | Caucasian | Hanging | Double | CCCMS | no | yes |
| 9 | J-46013 | CMC | 15-Mar-03 | 52 | Caucasian | Hanging | Single Ad Seg | EOP | yes | yes |
| 10 | T-59297 | CMF | 18-Mar-03 | 42 | Hispanic | Hanging | Double | EOP | no | yes |
| 11 | T-60299 | SVSP | 22-Mar-03 | 42 | Caucasian | Hanging | Double | CCCMS | no | no |
| 12 | J-82013 | SATF | 23-Mar-03 | 52 | Caucasian | Hanging | Double | CCCMS | Yes | yes |
| 13 | T-57107 | SCC | 26-Mar-03 | 39 | Caucasian | Hanging | Single | GP in OHU | No | no |
| 14 | E-87491 | CMC | 3-Apr-03 | 48 | Caucasian | Hanging | Single Ad Seg | EOP | No | yes |
| 15 | P-13813 | HDSP | 20-Apr-03 | 27 | African-American | Hanging | Single | MHCB | No | yes |
| 16 | T-86811 | RJD | 4-May-03 | 40 | African-American | Overdose | Double | CCCMS | No | yes |
| 17 | H-05294 | PBSP | 10-May-03 | 33 | Caucasian | Hanging | Single SHU | EOP | No | yes |
| 18 | P-62291 | SATF | 21-May-04 | 26 | Hispanic | Hanging | Single Ad Seg | GP | Yes | no |
| 19 | K-39659 | COR | 22-May-03 | 41 | Hispanic | Hanging | Single Ad Seg | GP | No | no |
| 20 | T-44931 | SATF | 27-May-03 | 22 | Hispanic | Hanging | Single Ad Seg | CCCMS | No | no |
| 21 | E-06655 | COR | 2-Jun-03 | 37 | Hispanic | Hanging | Single Ad Seg | EOP | No | no |
| 22 | P-49609 | DVI | 14-Jun-03 | 31 | Caucasian | Hanging | Double | CCCMS | Yes | no |
| 23 | E-56871 | COR | 19-Jun-03 | 38 | Hispanic | Hanging | Double SHU | CCCMS | No | yes |
| 24 | T-83368 | FOL | 28-Jun-03 | 56 | Hispanic | Trauma | Double | GP | Yes | no |
| 25 | T-67329 | CCI-YOR | 1-Jul-03 | 17 | African-American | Hanging | Single Ad Seg | CCCMS | No | no |
| 26 | D-56667 | MCSP | 9-Jul-03 | 48 | Caucasian | Hanging | Single Ad Seg | GP | Yes | no |
| 27 | E-82587 | RJD | 10-Aug-03 | 48 | Caucasian | Hanging | Single Ad Seg | CCCMS | No | no |
| 28 | T-96571 | CTF | 5-Sep-03 | 25 | Pacific Islander | Hanging | Single Ad Seg | GP | No | no |
| 29 | T-18116 | LAC | 11-Sep-03 | 32 | Hispanic | Hanging | Double | CCCMS | Yes | no |
| 30 | H-54017 | COR | 2-Oct-03 | 31 | Caucasian | Hanging | SHU | CCCMS | No | no |
| 31 | P-82238 | RJD | 6-Oct-03 | 36 | Hispanic | Hanging | Single Ad Seg | CCCMS | Yes | yes |
| 32 | T-45033 | SATF | 24-Oct-03 | 58 | Caucasian | Hanging | Single Ad Seg | CCCMS | No | yes |
| 33 | J-12377 | DVI | 27-Oct-03 | 36 | Caucasian | Hanging | Single Ad Seg | GP | No | no |
| 34 | P-16472 | SVSP | 7-Nov-03 | 38 | Native American | Hanging | Single | CCCMS | No | yes |
| 35 | H-86940 | SAC | 9-Nov-03 | 30 | Native American | Hanging | Single Ad Seg | CCCMS | No | no |
| 36 | P-19965 | CMC | 12/17/03S | 43 | African-American | Hanging | Single Ad Seg | CCCMS | No | yes |

| | CDC# | PAST MENTAL HEALTH | PAST SUICIDAL BEHAVIOR | KEYHEA | MHCB | 5 DAY F/U | CPR | SUICIDE REPORT | 60-DAY CAP | 90-DAY FACILITY RESPONSE | FORESEEABILITY/ PREVENTABILITY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | D-22427 | no | Yes | no | no | n/a | no | 8-Apr-03 | n/r | n/r | Preventable |
| 2 | P-31384 | no | No | no | no | n/a | yes | 8-Apr-03 | n/r | n/r | Preventable |
| 3 | C-14562 | yes | Yes | no | no | n/a | yes | 13-Mar-03 | n/r | n/r | Preventable |
| 4 | C-97384 | no | No | no | no | n/a | no | 8-Apr-03 | n/r | n/r | Preventable |
| 5 | T-59297 | yes | Unknown | no | no | n/a | n/a | 8-Apr-03 | No | No | Preventable |
| 6 | H-81591 | yes | No | no | no | n/a | yes | 8-Apr-03 | No | No | Preventable |
| 7 | H-51350 | no | No | no | no | n/a | n/a | 27-May-03 | No | No | Foreseeable/Preventable |
| 8 | P-13767 | yes | Yes | no | no | n/a | yes | 12-May-03 | n/r | n/r | Neither |
| 9 | J-46013 | yes | Yes | no | yes | n/a | yes | 7-Aug-03 | Yes | Yes | Preventable |
| 10 | T-59297 | yes | Yes | yes | no | n/a | yes | 7-Aug-03 | n/r | n/r | Neither |
| 11 | T-60299 | yes | No | no | no | n/a | yes | 7-Aug-03 | Yes | Yes | Preventable |
| 12 | J-82013 | no | No | no | no | n/a | yes | 7-Aug-03 | No | No | Neither |
| 13 | T-57107 | no | Yes | no | ohu | n/a | yes | 29-Aug-03 | Yes | Yes | Preventable |
| 14 | E-87491 | yes | No | no | no | n/a | yes | 15-Aug-03 | Yes | Yes | Preventable |
| 15 | P-13813 | yes | Yes | no | yes | n/a | yes | 7-Aug-03 | Yes | Yes | Foreseeable/Preventable |
| 16 | T-86811 | yes | Yes | no | no | n/a | yes | unknown | Yes | unknown | Foreseeable |
| 17 | H-05294 | no | No | no | no | n/a | yes | 10-Jul-03 | n/a | n/a | Neither |
| 18 | P-62291 | no | No | no | no | n/a | yes | 10-Sep-03 | n/r | n/r | Preventable |
| 19 | K-39659 | yes | No | no | no | n/a | yes | 2-Mar-04 | No | No | Preventable |
| 20 | T-44931 | yes | Yes | no | no | n/a | no | 10-Sep-03 | Yes | Yes | Foreseeable/Preventable |
| 21 | E-06655 | yes | No | no | no | n/a | yes | 10-Sep-03 | No | No | Foreseeable/Preventable |
| 22 | P-49609 | yes | Yes | no | no | n/a | yes | 29-Oct-03 | No | No | Neither |
| 23 | E-56871 | yes | No | no | no | n/a | yes | 12-Sep-03 | | | Preventable |
| 24 | T-83368 | no | No | no | no | n/a | no | 19-Feb-03 | No | No | Preventable |
| 25 | T-67329 | yes | Yes | no | no | n/a | yes | 22-Mar-03 | No | No | Preventable |
| 26 | D-56667 | yes | No | no | no | n/a | yes | 15-Oct-03 | No | No | Neither |
| 27 | E-82587 | yes | Yes | no | no | n/a | yes | 10-Sep-03 | No | No | Foreseeable/Preventable |
| 28 | T-96571 | yes | Yes | no | no | n/a | yes | 10-Mar-04 | Yes | No | Preventable |
| 29 | T-18116 | yes | No | no | no | n/a | yes | 8-Apr-04 | Yes | No | Foreseeable/Preventable |
| 30 | H-54017 | yes | Yes | no | no | n/a | yes | 16-Dec-03 | Yes | Yes | Preventable |
| 31 | P-82238 | yes | No | no | no | n/a | yes | 10-Mar-04 | No | No | Preventable |
| 32 | T-45033 | yes | Yes | no | no | n/a | yes | 6-Apr-04 | Yes | Yes | Foreseeable/Preventable |
| 33 | J-12377 | yes | No | no | no | | yes | 6-Apr-04 | No | No | Neither |
| 34 | P-16472 | yes | Yes | no | no | n/r | no | 6-Apr-04 | No | No | Foreseeable/Preventable |
| 35 | H-86940 | yes | Yes | no | no | n/r | yes | 8-Apr-04 | No | No | Preventable |
| 36 | P-19965 | yes | Yes | no | no | n/r | yes | 6-Apr-04 | No | No | Foreseeable/Preventable |

**Appendix A**
**Tracking Timelines for Preparation of Documents on Completed Suicides**

|   | **Event/Document** | **Timeline** |
|---|---|---|
| 1 | Date of Death | 0 hour |
| 2 | Chief Medical Officer to Death Review Coordinator (DRC) | 8 hours |
| 3 | Initial Inmate Suicide Report (Form 7229B) by Suicide Prevention Coordinator to DRC | 2 business days |
| 4 | DRC to Mental Health Suicide Prevention Coordinator (MHSPC) | 3 business days |
| 5 | MHSPC appoints Mental Health Suicide Reviewer (MHSR) | 5 business days |
| 6 | MHSR writes Preliminary Report; Notifications of suspected misconduct to Suicide Review Committee (SRC) | 15 days |
| 7 | SRC completes Review and Adds Corrective Action Plan (CAP); Review to MHSR to Complete Executive Report | 30 days |
| 8 | MHSR submits Executive Report and all documents to SRC to complete Final Suicide Report | 60 days |
| 9 | Facility, Warden, and CMO or HCM implement CAP | 120 days |
| 10 | Report on implementation of CAP by facility Warden and CMO or HCP to SRC | 150 days |