**Appendix B**

## REPORT ON SUICIDES COMPLETED
## IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
## IN CALENDAR YEAR 2003

## Case Reviews

**1.  Inmate #D22427**
Brief History:  This inmate was a 52-year-old Caucasian male who committed suicide at the California Training Facility (CTF) on 1/3/03.  He was double-celled in the general population when he completed suicide by exsanguination.  The inmate had been incarcerated in CDC since 1/28/86 and was serving a term of 15 years to life.  The inmate had been housed at CTF since October 1994.

The inmate was discovered by a correctional officer at approximately 11:15am, and, by 11:20am, an MTA had arrived.  There was no indication CPR was attempted upon discovery of either the inmate or his cellmate, both of whom had self-inflicted lacerations.  The cellmate was noted to be "alive" with vital signs and was transported by Stokes litter.  The deceased inmate did not receive CPR, but there is no explanation why he did not.

The inmate was not a patient in the Mental Health Services Delivery System (MHSDS); did not have a history of treatment for mental illness; and had no documented history of any suicide attempts before his incarceration.  His mother and cellmate, however, reported subsequently to his death that he had attempted to commit suicide in approximately April or May 2002.  The inmate had contracted Hepatitis C, and his suicide may have been related to the deterioration of his physical health.  The inmate and his cellmate both attempted suicide at the same time by cutting their wrists.  The inmate's cellmate survived his suicide attempt, but the deceased inmate died from exsanguination.  Although the deceased inmate had been incarcerated for 17 years, two years beyond his EPRD, his heroin addiction in and out of prison, possible debts owed in the facility and physical health status were all reported as possible contributory factors in the Suicide Report.

There was no corrective action plan (CAP) in the Suicide Report, but the razors used by the inmate were not state-issued.  The Autopsy Report revealed 0.03 mg/L of opiates in the inmate's blood at the time of his death.  Although the inmate had not been involved in the MHSDS as a patient, he had been recommended for individual therapy and narcotics anonymous in previous psychological evaluations for Board of Prison Term (BPT) hearings.  The inmate was also considered to have a chronic low-grade depression by a psychologist in a March 1993 report.  The inmate was initially diagnosed with Hepatitis

in 1972, but had an acute episode of Hepatitis for which he was hospitalized in January 2001.  It appears he did not receive other treatment for his Hepatitis.

Findings:  This inmate's completed suicide did not appear to have been foreseeable but might arguably have been preventable if CPR had been initiated and continued.  He and his cellmate apparently entered a suicide pack based on the factors noted above and their continuing relationship with each other.  The cellmate had vital signs when discovered, while this inmate did not, but there is no documentation to indicate an attempt was made to reestablish his vitals.


## 2.  Inmate #P31384

Brief History:  This inmate was a 36-year-old African American male who completed suicide on 1/9/03 at Calipatria State Prison (CAL).  The inmate was last admitted to CDC on 3/10/99, having been convicted under the three-strikes law on a charge of possession of counterfeit money, and was serving a life sentence.

The inmate was discovered hanging from a cell light fixture by a sheet in his administrative segregation (AdSeg) cell on 1/9/03 at approximately 10:25pm.  The correctional officer who discovered the inmate cut him down after retrieving the cut-down tool from the control booth officer with the assistance of a Sergeant and an additional correctional officer.  The Incident Report indicated the institutional fire captain and inmate firefighters placed the inmate on a Stokes litter and carried him down to the institutional emergency transport vehicle where CPR was initiated.  The inmate was transported to the OHU, where CPR was continued until 11:23pm.  The inmate was pronounced dead at 11:25pm by a physician.  The Incident Report noted the time of discovery as approximately 10:25pm.  It was unclear, however, from the report of the incident how long it took to get the inmate to the emergency transport vehicle where CPR was begun.  It appeared from the Incident Report that CPR was not initiated when the inmate was discovered.  The Autopsy Report of 1/11/03 indicated the cause of death as asphyxia by hanging and the manner of death as suicide.

The inmate had an extensive criminal justice history and had been convicted of robbery, assault, possession of controlled substances and burglary.  The inmate was committed to the California Youth Authority (CYA) for grand theft at age 17, paroled in 1985 and returned on a parole violation in 1986.  He was discharged from CYA in 1987 at the age of 21.  The inmate's institutional record indicated he was a chronic alcoholic and received nine rule violation reports (RVRs) for possession of manufactured alcohol while at Pleasant Valley State Prison (PVSP).  He was transferred to CAL on 12/19/02 and placed in AdSeg at his own request because of fear of other inmates.  His adult record, prior to his final conviction for the possession of counterfeit money, included convictions for possession of marijuana for sale, possession of cocaine for sale, transportation of a controlled substance, possession of a firearm and armed robbery.

The inmate had bus screenings on 5/12/96, 3/10/99, 4/13/99, 1/4/02, 9/18/02 and 12/19/02, all of which were negative for any mental health history or mental health

concerns. He had, however, two other mental health screenings on 3/6/96 and 1/8/03, which indicated the presence of a mental illness, but resulted in no referral. It was also reported he had denied any concerns regarding his mental health.

Of the inmate's nine RVRs for possession of inmate-manufactured alcohol, three were dismissed, but the rest raised his classification score from 38 to 70 points, and he was endorsed to CAL on 12/19/02 from PVSP, where he had been from 4/13/99 through 12/19/02. The Suicide Report made reference to his losing a child custody case, a recent denial by the BPT, his accumulation of six RVR convictions for possession of inmate-manufactured alcohol and transfer to a higher level of security as possible precipitating events, in addition to his placement in AdSeg. Although the notes in his UHR all confirmed the absence of any mental illness or pathology, the Suicide Report referred to his having been diagnosed with "Depression and Schizoaffective Disorder" while he was out to court in December 2001 with a prescription of Risperdal and Zoloft from 12/25/01 through 1/15/02. There was no mention of this diagnosis or medication in any of the screenings or progress notes in the UHR after the inmate's arrival at CAL. The mental health screening of 1/8/03 at CAL indicated the inmate did not meet criteria for inclusion in the MHSDS. The inmate was seen by the psych tech for a mental health screening in AdSeg at cell-front on 1/8/03, and it was noted that he did not have any obvious signs or symptoms of mental illness nor did the UHR indicate any major mental illness. He was subsequently cleared for AdSeg placement. This was his last mental health contact as he committed suicide the following day.

The Suicide Report included no recommendations for corrective action.

Findings: This inmate had a questionable history of treatment for mental illness while out to court in December 2001 and January 2002. There was no indication this reported treatment was ever followed up by anyone within CDC. He did not have a history of treatment in the MHSDS, and no history of suicidal behavior reported by the inmate or anyone else was included in the documents reviewed. The inmate did, however, have a history of severe alcohol dependence and received multiple RVRs related to inmate-manufactured alcohol. There appeared to have been no referrals for any consideration of treatment for his alcohol dependence. Based on his alcohol-related infractions, the inmate generated enough points to be moved to a Level IV institution and, upon arrival, requested placement in AdSeg because of reported fears about being on the yard. Despite this, no referral was generated to address his alcohol dependence.

It is also unclear whether CPR was initiated when the inmate was discovered, but it was noted that he was found to have rigormortis in his jaw and some lividity at the time of attempted resuscitation in the OHU.

Based on the provided documentation, this suicide was probably neither foreseeable nor preventable. Nonetheless, the failure to refer an inmate with an obvious alcohol dependence, as well as some past indication of mental illness, for an assessment appeared to be a flaw in the overall management of this inmate's condition.

3

### 3. Inmate #C14562

Brief history:  This inmate was a 43-year-old Hispanic male who completed suicide on 1/11/03 at California State Prison, Sacramento (CSP/Sac).  The inmate was returned to CDC for his third term of incarceration on 6/19/91 with convictions on several counts of armed robbery and assault.  Shortly after his return, he was convicted of murdering his cellmate and received an additional consecutive sentence resulting in a 53-year term on 9/26/91.

The inmate reportedly was discovered by a correctional officer during a count at approximately 9:45pm.  The inmate was doubled-celled at the time, and his cellmate was standing over the inmate pointing down at him at the time of discovery.   The deceased inmate was found to have a deep laceration across his left arm and an abrasion on his upper chest with a large amount of blood in his cell.  The inmate was transported to U.C. Davis Medical Center and pronounced dead at 10:45pm.  The Suicide Report noted that the two inmates had been drinking and fighting, and, despite an initial suspicion of homicide, the Autopsy Report indicated the cause of death was suicide.  A review of the toxicology report revealed that the inmate's blood ethanol level was 0.27% (legal limit is 0.08%), but no other illegal substances or prescribed psychotropic medications were found in his toxicology analysis.  The Autopsy Report indicated the inmate lacerated his left brachial artery.  After removing the cellmate from the cell, officers entered the cell and found a small razor blade between the inmate's legs and applied first aid.  Medical personnel arrived, initiated CPR, and transported the inmate to the U.C. Davis Medical Center.  The Autopsy Report, dated 1/14/03, indicated the cause of death as an incised wound of left arm.  In a supplemental statement, the pathologist indicated that a detective from the District Attorney's office stated to him that, based on the subsequent investigation, the inmate had expressed thoughts of depression, auditory hallucinations and suicidal ideation on the evening of his death, and the cellmate had attempted to console the decedent and talk him down as well as providing pruno but did not alert correctional officers.  It was further reported that the cellmate went to sleep and when he awoke, the decedent was standing near the toilet and turned to reveal a deep laceration to his left arm with a copious flow of blood.

Review of the inmate's institutional functioning indicated that he had a long history of RVRs with consequent AdSeg and SHU terms.  The RVRs began in November 1982 and involved battery and assaults on other inmates, as well as assaults on staff.  He received SHU terms in July 1983 through September l983, October 1985 through July 1986, and July 1992 with a term at Pelican Bay State Prison (PBSP).  He continued to receive RVRs for cell-fights, refusals to lock-up, resisting custody officers, other fighting, refusing direct orders, possession of a weapon, failure to report to work, possession of inmate-manufactured alcohol and battery on an inmate.  The inmate reportedly was a member of the Mexican mafia.  Nonetheless, after July 2001 he was housed in general population at CSP/SAC, where he worked as a tier porter.  He was described as participating well in programming, and inmates and staff reportedly "liked him."  He was also described as always being in a good mood and joking around a lot.  He maintained

consistent contact with his mother by telephone, and his mother was expecting him to call her on 1/13/03, approximately two days after his death.

This inmate was discovered at approximately 9:26pm. He was placed on a Stokes litter, and pressure was placed on his bleeding arm at approximately 9:30pm. Because of the large amount of blood in the cell, staff was instructed to put on biohazard suits and the cellmate was removed. Consequently, CPR was not initiated until 9:42pm, approximately 16 minutes after the inmate was discovered.

The inmate's involvement with mental health treatment appears to have begun when he was approximately 16, although there are references to a history of behavioral misconduct prior to age 15 and he served time in CYA's Juvenile Hall. The inmate had his first psychiatric hospitalization at Camarillo State Hospital in March 1979 at the age of 19.

There was a large gap in institutional history from 1993 through 1999. According to the Suicide Report, some documentation was missing that was not located in the C-file for this inmate, so his institutional functioning during that period was uncertain, although his classification score was 350 and he was placed in Level IV institutions for most of his incarceration. Despite his high classification score, the inmate had been in general population and received no RVRs for approximately 18 months prior to his death.

The inmate reported a history of multiple drug use since approximately age 14, including crank, alcohol, marijuana, and other substances. His first psychiatric treatment subsequent to the Camarillo State Hospital admission referenced above was in February 1995 when he was admitted to the PBSP infirmary with a diagnosis of Brief Psychotic Disorder, which was subsequently changed to Schizoaffective Disorder, and included Antisocial Personality Disorder and Poly-substance Dependence. His first suicide attempt occurred in March 1995 when he was admitted three times to the PBSP infirmary. His admissions were because of self-inflicted lacerations, suicidal ideation and depression. The inmate's second suicide attempt was in April 1995, when he jumped from a second tier and suffered a head injury that included a fractured skull. He was subsequently admitted to the Department of Mental Health Acute Psychiatric Program at California Medical Facility (DMH/APP at CMF) on 4/27/95 with a diagnosis of Major Depressive Disorder with Psychotic features. He was also diagnosed with Pedophilia (uncorroborated) by self-report. He remained at DMH until 7/19/95.

The inmate was subsequently admitted to Atascadero State Hospital (ASH) from 7/19/95 through 5/7/96 and reported making six suicide attempts while hospitalized at ASH. The inmate was placed on a Keyhea order from March 1995 through April 1996, although the Keyhea order apparently was not renewed at expiration. The inmate was placed on a subsequent Keyhea on 9/4/01, following a self-inflicted laceration to the left anticubital fossa on 9/1/01. He was admitted to an MHCB unit from 9/1/01 to 9/21/01 and upon discharge was returned to a 3CMS level of care. The Keyhea of 9/4/01 was not renewed at its expiration. The inmate was maintained at a 3CMS level of care at CMF from 5/7/96 through April 2000. He was transferred to CSP/Sac on 5/1/00 and remained at the

3CMS level of care.  A review of treatment plans and records indicated he was diagnosed with Major Depressive Disorder with Psychotic Features, Antisocial Personality Disorder and Poly-substance Dependence.  On 6/17/02, the inmate began refusing medications, which at the time included Risperdal.  He had been treated in the past with Risperdal, Neurontin, Haldol, and Zoloft.

The last mental health contact noted in the inmate's record on 12/11/02 was written by a psych social worker who indicated she saw the inmate with a psychologist or a psychiatrist.  In that note, the clinician indicated the inmate appeared to be functioning fairly well and denied any suicidal or homicidal ideation.  She also reported that the inmate felt better without the Risperdal and said he was comfortable even though he experienced some mild auditory hallucinations.  The clinician's plan was to see the inmate for a 30-day follow-up rather than 90 days to determine and monitor his stability.  The inmate committed suicide on 1/11/03, approximately 30 days after the last clinical contact.

The Suicide Report indicated the inmate was "closely followed in the mental health programs" because staff were aware of his psychosis and his pattern to "attempt suicide when his psychosis suddenly became unmanageable and the voices 'unfriendly'."  The Suicide Report concluded that there were no precipitating events other than the inmate's drinking bout and fight with his cellmate.  The suicide appeared to be highly impulsive and followed a well established pattern.  The report further concluded, "There was not much that staff could have done to prevent this suicide because this inmate denied his mental illness, refused medications, and in spite of his active psychotic symptoms he was able to function adequately at the time of his death without obvious problems that would have made him eligible for a Keyhea".  The Suicide Report contained no recommendations and no corrective action plan.

Findings:  This inmate had a long history of psychiatric evaluation and treatment dating back to approximately 1979.  He also had multiple serious suicide attempts including repeated cuttings/stabbings of his left arm, and jumping from a tier while at PBSP.  The inmate's history also included stays at Camarillo State Hospital and in DMH programs and MHCB units.  Further, the inmate was on Keyhea orders at least twice, which were not renewed because he was "cooperative."  There was no documentation of any referral to an EOP program for a more intensive level of care and supervision, despite the inmate's psychiatric history.  The last progress note by mental health staff indicated the inmate continued to have auditory hallucinations and referenced the inmate's pattern of suicidal behavior when the symptoms of his psychosis became unmanageable or overwhelming.  It is unclear from the record why he was not referred to an EOP program irrespective of the ability to place him on a Keyhea order.

While there were no indications that the inmate was planning suicide in the foreseeable future based on the records reviewed, his long history of psychotic illness and suicide attempts seemed to indicate a need for a level of care higher than 3CMS.  The plan by mental health staff to see the inmate in 30 days appeared to have been insufficient.  While

not foreseeable, his suicide might have been preventable if he had been at an appropriate level of mental health care (EOP or DMH) with more treatment and monitoring.

### 4. Inmate #C97384

Brief history: This inmate was a 39-year-old Native American, who completed suicide on 1/19/03 at California State Prison, Solano (CSP/Solano). The inmate was in AdSeg and had a cellmate. The inmate was first admitted to CDC on 12/20/84 to serve a sentence of 15 years to life plus one year of enhancement for the offense of murder in the second degree with use of a deadly weapon.

The Autopsy Report and the Suicide Report indicated the inmate was discovered hanging from the upper bunk of a two-man cell with a sheet tied around his neck by a correctional officer conducting security checks at approximately 12:10am. The officer called for a correctional sergeant who then called for an emergency extraction team, which entered the cell, cut the inmate down, removed him from the cell and placed him on the tier. The inmate's cellmate was removed from the cell, placed in restraints, and escorted to a shower area. The timeline from the discovery of the inmate until the emergency extraction team entered the cell and cut down the inmate was unclear in the Suicide Report. The inmate was transported to the medical treatment room and pronounced dead by a physician at 1:05am. Neither the UHR nor the Inmate Death Report contained any other timelines, and both stated that CPR was not performed because the inmate was "absent of any vital signs and lividity was setting in."

Review of the inmate's UHR and other documents revealed the inmate had a history of juvenile arrests beginning at the age of approximately 11. He had been under the supervision of a probation officer from that time until his commitment to CYA in February 1979. He was paroled from CYA in September 1980. The inmate also had a history of alcohol abuse prior to his incarceration, and a history of heroin abuse subsequent to his incarceration.

The Suicide Report indicated the inmate had never been included in the MHSDS. The inmate received six psychological evaluations for the Board of Prison Terms (BPT), with the most recent in the record dated 11/9/99. With the exception of his placement in AdSeg because of heroin possession, the Suicide Report indicated the inmate had only a few minor disciplinary charges in his 19 years of incarceration and zero classification points. The psychological evaluation conducted as part of the Suicide Report indicated a diagnosis of alcohol abuse in institutional remission and a GAF of 75, and no other diagnosis. The Suicide Report made reference to the inmate's marriage in June 1997, while housed at CTF. The inmate's wife apparently had recently developed cancer, which was troubling to the inmate. The report further elaborated that the inmate and his cellmate discussed his wife's illness on 1/18/03 after the inmate had spoken with his mother-in-law. The cellmate reported he went to bed thinking the inmate's wife was "doing okay," and had no idea the inmate planned to take his life that night. The most recent mental health contact was a bus screening conducted when the inmate entered CSP/Solano from CTF on 4/18/02. That bus screening was negative, with all mental

health questions answered negatively, and the inmate was released to custody. That same bus screening form, however, also noted a referral to a 3CMS case manager, but the record did not indicate whether any such referral occurred. A medical report of injury or unusual occurrence, dated 9/12/02, indicated the inmate stated "I got caught with heroin." The inmate had IV track marks on both of his arms with a diagnostic impression of an IV drug user. The disposition was a return to yard, but the inmate was placed in AdSeg on 1/12/03 for drug possession. The inmate had also recently been out to court on charges of heroin possession. The Suicide Report contained no recommendations for remedial measures and no CAP was generated.

Findings: This inmate's suicide did not appear to have been foreseeable, but may have been preventable. There was a question about the time that elapsed between the inmate's discovery at approximately 12:10am and the time it took for an emergency cell extraction team to be assembled to enter the cell to cut him down and begin CPR. The documentation, which lacked specific information on timelines, indicated simply that no attempt at CPR was initiated for this inmate because the MTA noted the absence of vital signs and the onset of lividity.

## 5. Inmate #T59297

Brief history: This inmate was a 25-year-old Afghan male who committed suicide by jumping from a tier on 1/21/03 at California Institute for Men (CIM). This inmate entered CDC on 6/28/02 through reception at North Kern State Prison (NKSP). After pleading guilty to first degree burglary, criminal threats and manufacturing/importing/ selling a concealed knife blade and screwdriver, he was sentenced to three years in prison. The inmate left NKSP for court proceedings on a car-jacking charge in Orange County on 7/15/02. The inmate pled guilty, received a five-year sentence and on 1/13/03 returned to CDC initially through the reception center at CIM.

On 1/21/03 at approximately 3:05 am, the inmate was being released from the unit day room for transport by two correctional officers, who observed him walking up the west side steps to the third tier despite being ordered to return to the first floor. The inmate sat on a railing on the third tier facing the cells. A correctional officer, who had pursued the inmate up to the third tier, sought to snatch him off the railing and managed to grab his right forearm when the inmate lunged backward and fell approximately 25 feet to the cellblock floor beneath, striking it with the right side of his body and head. The inmate was transported promptly to the emergency room and transferred to the CIM hospital for additional treatment. Ultimately, he was sent to the Arrow Head Regional Medical Center for trauma care. Life-saving efforts were begun at the CIM hospital and were continued at Arrow Head RMC, but the inmate was pronounced dead at 9:20 am that same day. The Autopsy Report, dated 1/22/03, indicated the cause of death as multiple blunt force injuries and the manner of death was listed as suicide. The Inmate Death Report gave a graphic description of the inmate's condition after jumping from the tier and arriving at the CIM emergency room: "non-responsive, massive bleeding from the mouth, fixed dilated pupils 5-8 mm, poor 0-2 saturation and cyanotic." The death report described inter-trachea intubation, placement of a cervical collar, starting of IV fluids,

and the suctioning of blood until the patient was transferred to Arrow Head Medical Center.

Because of the inmate's short length of stay, his record was sparse.  It included a bus screening on 6/28/02 at NKSP, which was negative and recommended a release to custody.  There was in the record, however, a transfer/discharge health summary from Detention Health Services, dated 6/27/02, which indicated as a significant health problem a "history of psych disorder treatment at RPDC."  The summary contained a brief note, dated 4/25/02, indicating that the inmate was involved in an altercation and received a laceration requiring sutures with subsequent staple removal on 5/1/02.  A comment in the summary referred to "medical records" and gave a telephone number.  This transfer/discharge health summary was not reflected in the NKSP bus screening conducted on the following day.  The inmate received a physical examination on 7/2/02, indicating a positive PPD of 20mm.  On that same day, as a result of the positive TB test, he was ordered INH, vitamin B6, a liver panel and a chest x-ray and given a consent-to-treatment form in Spanish, which he signed.  The chest x-ray indicated no evidence of active tuberculosis.  Also on the same day, the inmate received a mental health screening (the 31-item questionnaire) that indicated he had taken "Paxil 5 months ago," and he was referred for further evaluation.  There was no evidence in the reviewed record that the inmate ever received a psychological evaluation by mental health professionals while at NKSP prior to his transfer out to court in Orange County.  His transfer from NKSP occurred on 7/15/02, just 17 calendar days after his admission to that facility.  The inmate remained out-to-court until 1/13/03, when he returned to the CDC via the CIM reception center.  His location at CIM was temporary, and he was expected to return to the NKSP to complete his reception processing.  On arrival at CIM, there was no evidence the inmate received an obligatory bus screening or any other mental health or medical contact.

A confidential medical health information transfer form, dated 7/15/02, indicated the inmate was "TB-Code 33" and receiving INH and B6.  There was no indication of any other screening test results or any pending medical or mental health appointments.  The inmate remained in CIM's reception from 1/13/03 until 1/21/03 when he jumped to his death.

The Suicide Report was essentially consistent with these findings.  It included references to information provided by inmates and gathered from reviewing letters from his former girlfriend (not the mother of his child), suggesting he was having difficulty coping with his imprisonment and was possibly suffering from an adjustment disorder with severe depression and shame or perhaps a psychotic disorder.  The report also opined that the inmate possibly was suffering from a pre-existing mental illness, an opinion based on his crimes, the mental health screening he received at NKSP and the information provided by the county detention facility in the transfer/discharge summary.

The Suicide Report contained three recommendations:

Recommendation 1: CDC should consider establishing a departmental policy requiring that the C-file and UHR chart accompany an inmate whenever he or she is temporarily transferred to another facility, or, alternatively, provide an information sheet with critical health care data to accompany the transferred inmate.

Recommendation 2: Establish a procedure for reception at NKSP that required the completion of psychological evaluations of inmates who test positive on a mental health screening prior to their transfer elsewhere.

Recommendation 3: Provide training to CIM nursing staff in reception on the critical need to complete all standardized bus screenings.

The cover letter to the institution on the Suicide Report contained the standard notation indicating that the institution was expected to implement the recommendations within 60 days or less and report on that implementation to Health Care Services Division (HCSD) within 90 days of receiving the report, which was dated 4/8/03. No information was provided on CIM's implementation of the recommendations in the materials submitted by the defendants for this report.

Implementation of the recommendation s associated with this inmate's suicide was reviewed by Coleman monitors during an October 2003 site visit to CIM. The monitoring review indicated that some training reportedly was provided to nursing staff on completing the standardized bus screening form for all inmates who arrive at CIM, including those arriving during off-hours. Although the training was described as having been completed, no documentation of actual delivery of the training was provided. In addition, the institution cited an audit of 100 inmates arriving at CIM since the training was completed that examined the presence or absence of completed bus screening forms, but the audit sample included no inmates arriving during off-hours. Finally, mental health administrators at CIM had no knowledge of the status of any new departmental policy requiring that the C-file and health record accompany transferred inmates or, alternatively, of the need to provide an information sheet with critical health care data.

Findings: The failure to provide a full mental health evaluation at NKSP as recommended at the time of the mental health screening on 7/2/02 may have contributed to the completion of this suicide. The somewhat ambiguous information provided by Detention Health Services at the time of transfer to NKSP in the discharge/summary might also have provided some earlier indication of a need for a further psychological evaluation at the time of the inmate's arrival at NKSP, but apparently it was unavailable to whoever conducted the bus screening at NKSP on 6/28/03. Although the inmate left NKSP before the time limit for conducting the full mental health evaluation pursuant to the program guide lapsed, there apparently was no communication between custody and clinical staff about the inmate's upcoming transfer on 7/15/02. That oversight was not considered in the Suicide Report. Probably much more central to the outcome here was the failure of CIM to complete a bus screening of this transiting inmate, who arrived at CIM on 1/13/03 in the off-hours. Such a bus screening might have resulted in a referral

10

to mental health during the period from 1/13/03 to 1/21/03, while the deceased inmate sat in reception in CIM without any clinical contact whatsoever.

The recommendation to CIM to provide training to staff on the need to conduct all bus screenings reportedly was implemented to some extent, based on the monitor's review in October 2003. As indicated, no documentation of the recommended training was provided, nor was any evidence produced to indicate whether NKSP or the department had implemented the recommendations directed at them.

While this inmate's death was not foreseeable on the basis of the information available to clinicians at either NKSP or CIM, it may have been preventable if a bus screening at CIM had been conducted and the inmate had been referred to a mental health clinician. In the absence of any knowledge of what state the inmate was in on 1/13/03, when he arrived at CIM, it is difficult to assume that his bus screening, if conducted, would have been positive, but it might have led to a referral to mental health and a possibly different outcome.

## 6. Inmate #H81591

Brief History: This inmate was a 32-year-old Hispanic male who completed suicide by hanging on 1/28/03 at California Institution for Men (CIM). The inmate had been readmitted to CDC on his fourth parole violation on 12/27/02 with new charges of misdemeanor battery and vehicle tampering. He was awaiting a parole revocation hearing and possible criminal prosecution on these charges. The inmate was placed on a parole hold on 12/26/02, when police officers arrested him after what appeared to be unprovoked attacks on two males and a female in a city park, as well as entering the vehicle of one of the two males. The police reported the inmate did not answer any of their questions and had a "blank look on his face" at the time of his arrest.

The inmate was discovered hanging by a sheet from the air vent in his general population single cell on 1/28/03 at approximately 7:30pm. He was discovered by a MTA who was distributing medications. A correctional officer activated her alarm, and the MTA radioed for medical assistance. A sergeant responded to the alarm, and the sergeant and correctional officer used a cut-down tool to cut the sheet and placed the inmate on the floor immediately adjacent to his assigned cell. CPR was started at approximately 7:33 pm, although the Incident Report stated that "only minimal signs of life were evident." Another officer and the MTA continued CPR until an emergency medical response team arrived at approximately 7:40pm; the response team continued life-saving efforts with an ambubag and defibulator. The inmate did not respond, but CPR was continued as the inmate was transported to the CIM emergency room. The Inmate Death Report indicated that during transport via ambulance, the defibulator was used twice and the inmate arrived in the emergency room at 7:50pm. At that time, his "limbs were cold, body was still warm, pupils were dilated and not reacting to light, no pulse, respiration, or heartbeat." He received multiple shocks with the defibulator; intubation was completed; and an IV was started. The inmate, however, did not respond and was pronounced dead at 8:20pm. The Autopsy Report recorded the cause of death as "hanging, minutes."

Toxicology revealed no evidence of illicit drugs or alcohol in the inmate's system at the time of his death.

The inmate entered CDC for the first time on 7/6/93 after plea bargaining to a charge of second-degree robbery and receiving a sentence of seven years. He entered the system at Richard J. Donovan (RJD) and was housed at California Men's Colony (CMC), CSP/Sac, Ironwood State Prison (ISP), California State Prison, Corcoran (CSP/ Corcoran), Salinas Valley State Prison (SVSP), and finally at CSP/Sac again, where he paroled on 2/18/99. He was placed on a parole hold pending a parole revocation hearing on 8/27/99 for failing to attend his parole outpatient clinic appointment.

In the bus screening conducted when the inmate returned to CDC on 12/27/02, the inmate denied being previously diagnosed or treated for mental illness or having recurrent or past thoughts about suicide or any current mental health problems, and no mental health referral was made. On 12/30/02 the inmate received a mental health screening. A Clark evaluation was also conducted on 12/31/02, which classified him as DD2. In the latter evaluation, the inmate was described as "very simple – child like – needs direction for most things – also mentally ill – can't read or write".

On 12/31/02, the inmate was evaluated by a psychologist who completed an MH-7 noting that the inmate had a flat affect and reported that he had been on a Keyhea order in the past. The psychologist recorded the inmate's report of a history of taking psychotropic medication, as well as his denial that he had ever had inpatient or outpatient treatment for suicidal or violent behavior. The psychologist diagnosed Psychosis NOS, and referred the inmate to psychiatry for review. He was placed at the EOP level of care for medication review and assigned to CIM reception's at-risk program. The psychiatrist, who also saw the inmate on 12/31/02, indicated the inmate was confused, had blunted affect, and was on medication in the community but did not want to take them anymore. The psychiatrist's assessment was a "very mild" Psychosis NOS, and rule out malingering, with a plan for the inmate to return to clinic in four weeks for further evaluation of the medications prescribed. On that same day, a correctional officer requested a mental health evaluation because the inmate appeared to be "lost" during yard time. The psychiatrist saw the inmate again on 1/2/03, and reported the inmate as having "vague symptoms" and described his behavior as "avoidance, suspicious and uncooperative." The psychiatrist described the inmate's mood as "okay" and his affect as odd and blunt. He reported the inmate denied hallucinations and suicidal or homicidal thoughts and concluded the inmate did not have an Axis I disorder and was not in need of treatment. A psychologist evaluated the inmate on 1/3/03, described his speech as "short, impoverished and concrete," noted the inmate had "poor eye contact" and seemed fascinated with a light switch.

On 1/9/03, the IDTT team met and a treatment plan was developed. The treatment plan was signed by a psychologist only, and there was no evidence that a psychiatrist attended this meeting. The treatment plan noted that the inmate had poor eye contact, flat affect, poor memory and impaired judgment and his behavior appeared dominated by his mental health symptoms, with a GAF of 40. The inmate denied hallucinations, although the staff

suspected he might have been responding to auditory hallucinations. The treatment team noted he was refusing medication and had been on a Keyhea. The treatment team also noted that the inmate's UHR was unavailable during this initial and important IDTT meeting. The team decided that the inmate was to receive weekly monitoring and follow-up by psychiatry. The next case manger contact noted in the record occurred 15 days later on 1/24/03 and indicated the inmate refused to come out of his cell, pointed to his throat indicating difficulty talking, and denied suicidal ideation and auditory hallucinations. The inmate's GAF was estimated at 55. The case manager's note indicated that the plan was for weekly "follow-up" and reported advising the inmate to put in a request if he wanted to be seen before his next weekly contact.

The Suicide Report was essentially consistent with the foregoing statement of the inmate's mental health care preceding his suicide. Additional data was obtained from correctional officers and inmates at CIM. The correctional officers, as well as an MTA, reported that the inmate generally functioned well. The MTA reported that the inmate would sometimes say hello and at other times simply stare and say nothing when she passed his cell. An interviewed inmate stated that the inmate would sometimes make eye contact and then look away, but at other times would throw water on the tier and make odd gestures such as holding one hand in his waistband while using the other to make a cleaning motion on the cell wall. The interviewed inmate also reported his impression that the deceased inmate was moved to a cell toward the end of the tier because he kept throwing water on the tier floor. An interview with the inmate's mother included in the Suicide Report indicated the inmate began telling his parents in approximately November 2002 that he did not want to live anymore because he was suffering too much from "constant voices and would hit his head on the wall and the voices would stop." The UHR contained no references to self-injurious or suicidal behaviors by the inmate.

The Suicide Report contained identified seven problems and made the following recommendations:

    <u>Recommendation 1</u>: The institution needed to work on improving communication between correctional officers and clinical staff about how inmates are functioning on the living unit.

    <u>Recommendation 2</u>: Correctional staff and psychiatrists needed to be included in IDT meetings, especially those involving inmates in the at-risk program.

    <u>Recommendation 3</u>: Training of clinical and correctional staff on the housing unit was needed regarding their responsibilities for inmates with developmental disabilities.

    <u>Recommendation 4</u>: Custody staff should be required to investigate information provided by inmates about other inmates' impaired functioning, especially when the information suggests an inmate may be mentally ill and not functioning well.

    <u>Recommendation 5</u>: Training should be provided to clinical staff on the importance of documenting the rationale for their diagnoses and clinical decisions,

especially when issues of malingering, denial of treatment or involuntary medication may arise.

Recommendation 6:  Clinical staff needed to be trained on the importance of investigating inmates' physical complaints and making appropriate referrals to the medical department.

Recommendation 7:  The institution needed to establish a Quality Improvement Team (QIT) to study the unavailability of UHRs.

As was customary, the Suicide Report reminded the institution that it was required to respond to the recommendations within 60 days and submit a report to HCSD within 30 days of the implementation of the recommendations.  If CIM ever responded as required, the response was not included in the materials provided to the monitor on this suicide.

A Coleman monitoring team visited CIM in October 2003 and provided some information on the facility's implementation of the CAP recommendations, as follows:

Recommendation 1:  Staff reported the recommendation was implemented through training provided to correctional officers on suicide prevention within the context of 7-K (annual in-service) training.

Recommendation 2:  Information on the implementation of this recommendation was conflicting.  In general, ensuring the presence of custody representation and psychiatrists assigned to at-risk inmates during their IDTT meetings presented significant logistical problems CIM had not yet resolved.

Recommendation 3:  Training reportedly was provided to mental health staff, but not to custody staff because the mandatory Clark training already provided was considered sufficient.

Recommendation 4:  No information on this issue was available at the time of the monitoring team's visit.

Recommendation 5:  Training provided to clinical staff on developmental disabilities, as noted in Recommendation 3, which reportedly lasted approximately 20 minutes, was deemed sufficient to cover this recommendation as well.

Recommendation 6: Reference was made again to the training provided in response to Recommendations 3 and 5, although disability development trainin had nothing to do with medical complaints.

Recommendation 7:  CIM staff claimed that this recommendation needed to be considered and conducted by HCSD, and local staff did not know whether HCSD had initiated such a QIT study.

Findings:  This inmate had a long history of severe and persistent mental illness which appeared to have begun in approximately 1994.  While he had a wide variety of diagnoses, the ones most consistently identified included psychotic disorders, depressive disorders and personality disorders.  He also received an array of medications and was placed on a Keyhea from 1997 through 1998.  This inmate also had a diagnosis of developmental disability.  The recommendations in the Suicide Report directed at the lack of communication between clinical and custody staff, as well as among clinical staff and psychiatrists in particular, seemed appropriate, although at least one reference by custody resulted promptly in a psychiatric interview.  The lack of the UHR with its wealth of information on this particular inmate at the inmate's final IDTT meeting was important because it contained information about the inmate's considerable mental health problems prior to 1998, which might have triggered closer observation.  Despite the absence of the UHR, notations in the record compiled at CIM indicated that the inmate reported he had been treated for mental illness and placed on a Keyhea order in the past.  Similarly, the inmate's intellectual limitations due to his developmental disability were noted.  Inadequate interdisciplinary collaboration regarding the results of the various screenings and assessments conducted on the inmate after his return to CIM on 12/27/02 prevented the immediate adoption of a comprehensive and responsive approach to the inmate's care.

While the inmate apparently gave no indication of current suicidal ideation, his clinical condition prior to admission as described at the time of his arrest and his extensive history of psychotic and depressive illness were known at least in part by clinical staff who saw the inmate.  Had the UHR been obtained in a timely manner and some of the required interdisciplinary collaboration occurred among clinicians who saw this inmate, the seriousness of the inmate's condition and continuing deterioration might have resulted in and more vigorous medication intervention and more careful monitoring.  The failure to obtain and make UHRs available at reception centers, such as CIM, has long been identified as a flaw in the department's overall reception process.  While there is a need for the department to continue pursuing a systemic answer to this problem, institutions need to understand and embrace greater local responsibility with for this issue.  It is the local institutions with reception functions that have direct relations with the detention and parole entities regularly sending inmates to CDC.  Any ultimate solution to the problem must come through joint institutional and departmental efforts.

While this inmate's death may not have been foreseeable because no information was available to CIM clinicians indicating the inmate's intent to kill himself, it was possibly preventable.  Appropriate collaboration among clinical and custody staff or an UHR available to clinicians during their assessments of the inmate during the 30 days he was in CIM might have prevented this death.

**7.  Inmate #H51350**
Brief History:  This inmate was a 37-year-old Hispanic male in general population, who committed suicide by hanging and lacerations on 2/12/03 at Ironwood State Prison (ISP).  This inmate had been returned to CDC on 6/2/00 via NKSP after conviction for the

15

possession of a firearm, his third strike, for which he received a sentence of 25 years to life.  The inmate initially entered CDC in October 1992 because of sexual abuse of his wife's daughter.  He was sentenced to five years in prison, paroled on 2/28/95 and deported to Mexico on 5/1/95.  He was transferred from NKSP to ISP on 5/29/02.

On 2/12/03 at approximately 3:55pm a correctional officer was informed by the inmate's cellmate that the inmate had cut himself.  The correctional officer responded and, on opening the inmate's cell, observed blood on the cell floor, which resulted in a directive for all inmates in the unit to "get down."  Based on activation of the officer's personal alarm, other staff responded to the unit and observed the inmate hanging.  Considerable blood was on the floor of the cell, and an MTA found no vital signs and indicated the inmate was cold to the touch.  CPR was not initiated due to the MTA's statement about the inmate's vital signs and skin temperature.  The inmate was cut down, and the cell door was locked to await the arrival of the on-duty physician, who arrived at approximately 4:40pm.  The inmate was pronounced dead at 5:16pm at the scene.  Although the Incident Report indicated the inmate hanged himself, it did not state what he used to hang himself.  He also had lacerations on both wrists and both calves.  His cellmate reportedly had been out of the cell since approximately 11:30am, and the decedent apparently placed towels on the floor against the base of the cell door.  He also covered the window of his cell to obstruct the view into it.

The inmate left two notes addressed to his wife and recently deceased son.  Those notes were provided as part of the information for review.  They were written in Spanish, inmate's only language, and no translations were provided.  The Autopsy Report indicated the cause of death as hanging.  No toxicology studies were obtained.

A Death Summary Review prepared by a physician on 2/12/03 indicated the inmate had a history of "ongoing anxiety" and mentioned family visits with the inmate and a recent visit from a Catholic Chaplain.  The Suicide Report indicated the inmate had a family visit on 2/2/03, and it was believed that during a subsequent visit on 2/8/03 he was informed by a friend of the murder of his son.

The Suicide Report included a case review by the ISP chief psychiatrist following the inmate's death in which he stated, "I see little in addition to the treatment provided that could have been realistically done to predict or prevent this inmate's suicide.  He was seen frequently by the staff psychiatrist for his complaints of anxiety and treated with a mild anxiolytic agent, hydroxyzine.  At no time did he express serious depression, suicidal or homicidal ideas."  The inmate apparently was seen by a psych tech and the Chaplain after learning of his son's death and denied any suicidal thoughts or intent.  The inmate received mental health screenings on 6/6/00, 10/3/01, 3/21/02, and 1/24/03, all of them negative relative to a need for mental health services.  He received another negative bus screening at NKSP on 6/2/00, and was released to custody.  A bus screening conducted on 5/29/02 at ISP was similarly negative, and the inmate was again released to custody.

Despite all the clearances, the inmate apparently began to suffer from an anxiety disorder that was treated with Visteril (or hydroxyzine) by an ISP staff psychiatrist.  The UHR contained a psychiatric note, dated  5/30/02, which included a plan for an evaluation.  That evaluation occurred on 6/7/02, resulting in a diagnosis of "Anxiety" on Axis 1 and a GAF of 65 on Axis 5, as well as a prescription for hydroxyzine daily.  The plan did not include admission to the MHSDS as a 3CMS inmate.  The psychiatrist increased the dosage of hydroxyzine on 7/9/02, and noted that the inmate was "better but still depressed" and still reported problems with sleep and stress.  The psychiatrist continued to see the inmate approximately monthly through 9/27/02 and then again on 11/7/02 for the last time, which was documented in a note confirming the diagnosis of Anxiety on Axis 1, a GAF of 65 and a continuing prescription for daily hydroxyzine.  Another later mental health contact occurred on 2/5/03, when a psych tech recorded that the inmate was "seriously grieving over the loss of his son," who was killed in a gang shooting.  This entry also noted the inmate was transferred to ISP after his third-strike conviction.  The psych tech reported the "patient's behavior is very tearful with wailing outbursts of grief."  The note went on to report the inmate was not on any medication (sic) and did not want medication because "he wants to feel this pain for his son."  The note concluded, "Patient claims he has no intent of hurting self or others.  Referral for follow-up with mental health services physician submitted by writer."  This interview with the psych tech occurred one week prior to the inmate's suicide, but the inmate was not subsequently seen by a clinician or psychiatrist prior to his suicide on the day of his son's funeral.  .

The Suicide Report contained only one recommendation, suggesting that the inmate should have been referred for placement in the 3CMS caseload on the basis of medical necessity to document his placement on medication for anxiety.  The corrective action recommended was for the chief psychiatrist to provide training to institutional mental health staff and contractors on procedures and practices for placing inmates in 3CMS cases possibly involving medical necessity.  No information was provided on ISP's implementation of this recommendation.

Findings:  This inmate appeared to suffer from a traumatic stressor associated with the loss of his son, which culminated in a severe grief reaction.  Although never formally designated as a 3CMS,inmate, he had been treated for an anxiety disorder since 6/7/02, when he was prescribed Visteril (hydroxyzine)   He was seen by a psychiatrist approximately once per month from June through September and again in November 2002.  While he had no further contact with psychiatrist thereafter, a psych tech saw him one week prior to his suicide, reported his intense grief and noted his submission of a referral for a follow-up mental health evaluation.  Although scheduled to be seen by a case manager on the date of his suicide, there was no indication in the record that the inmate was actually seen by a case manager or psychiatrist following the psych tech's report of the inmate's acute distress over the loss of his son.

Although the record indicated the inmate's denial of any intent to harm himself, the Suicide Report questioned whether he should have been referred to a 3CMS level of care in June, when he began treatment for the anxiety disorder.  If he had been added to the mental health caseload at that time, he would have been eligible for regular case manager

and psychiatric appointments, as well as organized treatment planning.  It should be noted that he was actually seen more often by the psychiatrist than required under applicable 3CMS program guidelines, but apparently received neither case management contacts nor IDTT planning.  Moreover, had he been added to the 3CMS caseload in June, he would probably have been referred for transfer out of ISP, a desert institution obligated to transfer inmates on psychotropic medications elsewhere.  More critically, the psych tech's referral for a clinical evaluation one week prior to the inmate's death documenting his acute distress and intense grief did not result in the suggested evaluation.  It is uncertain whether that failure was due to a delay in the psych tech's actual referral or an untimely response by some clinician.  While the inmate denied suicidal intent, given the level of his distress and pain as reported in the record, his death might have been preventable if a mental health evaluation had been provided promptly as a result of the psych tech's plan for referral.  For both of these reasons, the inmate's suicide was preventable.

This suicide was may also have been foreseeable, given the inmate's clear indication of excessive grief over the death of his son, an obviously traumatic stressor calling for prompt clinical response.

**8.  Inmate #P13767**
Brief History:  This inmate was a 40-year-old Caucasian male who completed suicide by hanging on 3/12/03 at Mule Creek State Prison (MCSP).  The inmate was admitted to CDC on 10/7/98, serving a 15-year to life sentence for second degree murder.  The inmate apparently killed his ex-girlfriend after what had been a possessive, controlling and violent relationship.  He reportedly tried to commit suicide by overdosing on antidepressant medication two days after the murder and was hospitalized in a psychiatric facility for a 72-hour observation period.  He was arrested on discharge, remained in the county jail for a year, where he continued to be treated for depression, and ultimately entered CDC on 10/7/98.  He was placed at the 3CMS level of care at the time of his admission and remained at that level throughout his incarceration.

The inmate was discovered hanging in his cell by a correctional officer who was conducting laundry returns on 3/12/03 at approximately 11:51am.  The inmate had tied a bed sheet to the ventilation grate within his general population cell and fashioned a noose from which he hanged himself.  Two officers and a correctional counselor cut the inmate down and lowered him to the floor, where an MTA responding to the medical emergency call began CPR.  The MTA was assisted by other responding staff.  At approximately 12:00pm, an ambulance was called; it arrived at 12:06pm.  The inmate was transported to Sutter-Amador Hospital for emergency treatment.  He was subsequently pronounced dead at approximately 1:20pm.  The Autopsy Report indicated the cause of death as asphyxia due to hanging (minutes).  A toxicology screen revealed no evidence of alcohol, illegal drugs or medications.

The inmate entered CDC through reception at Deuel Vocational Institution (DVI) on 10/7/98, was evaluated and placed immediately at the 3CMS level of care.  The inmate

was out to court for two months in 1999, when his father was tried as an accessory for concealing evidence of the son's murder.

The inmate, as indicated, attempted to overdose on antidepressants and methamphetamine two days after the murder. He was admitted to a local hospital, treated for the overdose and sent home the same day. The following day he was treated for anxiety and committed to a psychiatric hospital for a 72-hour evaluation. He was subsequently arrested. The 1997 suicide attempt was recorded on the bus screening and reflected in his treatment. The inmate was transferred to MCSP on 11/16/98 and refused antidepressant medication for a short time, but quickly became depressed and re-started his medications. He was briefly made 3CMS under medical necessity in March 1999, but was converted to regular 3CMS in June 1999 with a primary diagnosis of Major Depressive Disorder, Recurrent, and Post Traumatic Stress Disorder. The trauma for the PTSD was associated with his offense. In April 2002 the inmate requested his Prozac be discontinued because of migraine headaches. Subsequently in late July he reported feeling depressed and suffering insomnia, and Wellbutrin was started in August 2002. The inmate apparently made no other suicide attempts prior to or following his crime.

His most recent treatment plan of 9/12/02 maintained the diagnoses listed above, and his UHR indicated he was seen by his clinical case manager and psychiatrist in compliance with the requirements of the 3CMS Program Guide. The inmate remained on Wellbutrin, until 12/2/02, when he indicated he wanted to resume Prozac because he was beginning to feel side effects from the Wellbutrin. The inmate was also being treated by health care for migraine headaches, with his last medical clinic appointment occurring on 2/13/03, when his medications were refilled. His last psychiatric progress note was dated 2/10/03, when a psychiatrist indicated the inmate was doing fine since he had been switched from Wellbutrin to Prozac. The psychiatrist's note reported, "depression not a problem." The psychiatrist also noted the inmate's denial of suicidal and homicidal ideation, and planned to continue Prozac and Benadryl with follow-up in 12 weeks. The last clinical case manager note in the UHR was dated 3/6/03. In it, the case manager indicated the inmate felt "pretty good" and denied any suicidal or homicidal ideation. The inmate committed suicide on 3/12/03, and, as noted above, CPR and other life saving measures were instituted without success.

In a hand-written note, dated subsequently to the suicide on 3/13/03, the senior psychologist supervisor reported that two inmates, who were long-term friends of decedent, stated that the deceased inmate had talked about committing suicide in the past if he thought he could no longer bear spending life in prison. A hand-written suicide note was found, which read simply, "beyond blue eyes – game over." It was signed by the inmate, "A.K.A. Blue Eyes."

The Suicide Report was consistent with this recital and included information from other inmates, including the description of a suicide pact the decedent entered with another lifer. The other inmate apparently had attempted to kill himself a year prior to this inmate's death, but was unsuccessful. The inmate's cellmate reported the deceased inmate had problems with migraine headaches and was stealing pain medications from

the cellmate to try to relieve his headaches. A second suicide note addressed to his family was discovered in his address book after the inmate's death. The inmate apparently stuck his shoes in the tracks of the cell door to delay any responsive efforts to save his life. The Suicide Report included no recommendations.

Findings: Based on the documents provided, this inmate's death did not appear to have been foreseeable or preventable.


### 9. Inmate #T62140

Brief History: This inmate was a 52-year-old Caucasian male who committed suicide by hanging at California Men's Colony (CMC) on 3/15/03. This was the third CDC term for the inmate, who reentered CDC on 6/24/02 through Wasco State Prison (WSP) on a 14-year sentence for dissuading a witness from testifying. The inmate had an extensive history of multiple jail and prison incarcerations, as well as state mental hospital stays for chronic mental illness. The offense underlying his third CDC term occurred while he was an involuntary inpatient at Atascadero State Hospital (ASH) in 2002.

The inmate was discovered by a correctional officer on 3/15/03 at approximately 12:05pm in the AdSeg annex as the officer was positioning food carts to begin serving the noon meal. The officer activated his alarm, and he and another officer observed the inmate "until the sergeant arrived within a matter of seconds." They entered the cell and removed the portion of sheet that was looped around the window from which the inmate was hanging. The inmate was unresponsive and not breathing, and an MTA, who arrived on the scene, and the sergeant began to administer CPR. The inmate was transferred to the medical clinic at CMC, where further attempts to resuscitate him were unsuccessful and he was pronounced dead by a physician.

The records revealed this inmate had an extensive history of involvement with the criminal justice system beginning as a juvenile at age 14. The Suicide Report gave a detailed account of the inmate's history, including his enlistment in the army on his 18th birthday to avoid incarceration in the CYA. He had an extensive substance abuse history, which began in early adolescence and included alcohol, opiates, benzodiazepines, barbiturates, and hallucinogens including LSD. He was discharged from the army after one or two years for unspecified reasons.

The inmate had several admissions to psychiatric hospitals, including VA hospitals, related to substance-induced psychosis and various other psychotic disorders. The inmate also had forensic confinements in hospitals as a mentally disordered sex offender and a sexually violent predator. The Suicide Report noted, and the UHR confirmed, that while hospitalized at ASH in the late 1990's he exhibited increasingly difficult behavioral and medical problems. During the course of his hospitalization, the inmate assaulted a female nurse, which ultimately resulted in his pleading guilty to a felony charge of dissuading a witness that resulted in his final CDC incarceration.

The inmate was discharged from ASH to WSP in July 2002, and was initially treated in an MHCB, only to be transferred to CMC on 8/2/02 for consideration for transfer to an inpatient DMH unit. The inmate was placed in the locked observation unit (LOU) at CMC with suicide precautions, but the anticipated referral to ASH did not occur. A psychiatrist at CMC indicated that the inmate suffered from severe Axis II pathology including Antisocial and Borderline Personality Disorders with the possibility of a Bipolar Disorder. There was also a consideration of rule out Dissociative Disorder. As of September 2002, his diagnoses included: (1) Malingering Mental Illness, (2) Antisocial Personality Disorder, (3) Paraphilia and (4) Polysubstance Abuse and Dependence. There continued to be a rule out Bipolar Disorder at that time. The inmate spent nearly one month in the MHCB unit at CSP/Corcoran, and was returned to the CMC LOU on 11/19/02. He remained in the LOU until 3/7/03 when he was transferred to the NKSP MHCB unit and returned to CMC on 3/12/03. He returned with discharge medications of Depakote, Effexor and Zydis but, on return to CMC, his mix of medications was changed to include Depakote, Haldol and Artane. The Effexor and Zydis were discontinued.

The inmate was on suicide precautions in the LOU on 3/12/03 and transferred to AdSeg on 3/13/03. No Suicide Risk Assessment (SRA) occurred prior to his discharge from the LOU, and no five-day post-MHCB follow-up was conducted. There was also a late entry on 3/25/03 by the psych tech indicating that, based on a visit on the day of the inmate's death, the inmate was found to be "in no distress…alert and relaxed." Some ambiguity in the entry made it unclear whether the date of the visit was 3/14 or 3/15. The Suicide Report further described communication gaps between CMC and the MHCB staff, as well as multiple diagnoses ranging from various forms of Schizophrenia, Schizoaffective Disorder, Major Depression, Psychosis NOS, PTSD, Paraphilia, Dissociative Disorder, Malingering, Rule Out Bipolar Disorder, Rule Out Dissociative Disorder, as well as Antisocial Personality Disorder, Borderline Personality Disorder, and no mental disorder. In addition to this, the inmate also had a variety of medical problems including Hepatitis B and C, Emphysema, Rule Out Diabetes, Rule Out Seizure Disorder, possible Tardive Dyskinesia, difficulties with urination, digestive track disturbances, cortical atrophy with dementia and possible frontal lobe syndrome and various skin lesions.

The inmate also had multiple RVRs and at one time was described by the chief psychiatrist at CMC as "currently the most chronically hard to manage inmate in CMC's EOP program." These behaviors were also associated with suicidal ideation and assault threats. His last AdSeg placement involved an attempted assault on the chief psychiatrist at CMC. Based on these disciplinary infractions, the inmate's classification score was 65, surprisingly low given his history, and he was awaiting transfer to a Level IV facility, either CSP/Sac or PVSP. The Suicide Report concluded that the inmate suffered from multiple medical problems, dementia, and polysubstance dependence, as well as a long history of serious mental disorders. The report also concluded that his motive for suicide was unclear. The inmate left no suicide note to help clarify his motive.

The Suicide Report listed eight problems and recommendations as follows:

<u>Problem 1</u>:  Medication orders from MHCB were dramatically changed upon the inmate's return to CMC without documented justification or rationale.

<u>Recommendation</u>:  Develop a training module to ensure that such medication changes only occur with substantial clinical rationale well documented in the UHR.

<u>Problem 2</u>:  CMC's LOU was utilized as an inpatient alternative for extended periods of time (months) with little attempt to provide treatment other than various medications.  Inmates in the LOU experienced little out-of-cell time.

<u>Recommendation</u>:  Cease using the LOU to house inmates in need of transfer to an MHCB unit.

<u>Problem 3</u>:  Differing opinions over appropriate diagnoses and medication regimen for this inmate were never resolved.

<u>Recommendation</u>:  Provide training to mental health staff for responding to cases that are difficult to manage and pose high risks.  A detailed IDTT meeting needed to develop in these cases a specific provisional working diagnosis and treatment (behavioral change) plan with clear and measurable objectives to unify treatment efforts. Any unsuccessful provisional plan should be carefully reconsidered.

<u>Problem 4</u>:  Five-day post- MHCB clinical follow-up was not provided, nor was a SRA conducted

<u>Recommendation</u>:  The institution needed to comply with departmental requirements for providing both clinical and custodial follow-up of suicidal inmates discharged from MHCB units.

<u>Problem 5</u>:  The disciplinary process reached determinations of guilt without considering mental health input or mitigation of sanctions.

<u>Recommendation</u>:  The institution needed to comply with new departmental procedures for mental health input into the disciplinary process.

<u>Problem 6</u>:  Although the inmate remained highly unstable and appeared to be deteriorating, his inconsistent medication compliance was never addressed.

<u>Recommendation</u>:  Inmates' failure to respond to treatment should have been examined carefully for poor medication compliance with a view to correction.  Develop protocols for considering and using when appropriate such measures as laboratory testing for blood levels, DOT, medication counseling and Keyhea proceedings.

<u>Problem 7</u>:  This inmate was placed at the EOP level of care.  Though never able to participate in EOP programming, he continued to carry that designation.  Inmates unable to program at the EOP level should be considered for referral to an inpatient DMH program.

<u>Recommendation</u>:  Ensure that such inmates are considered for a referral to DMH.

<u>Problem 8</u>:  The inmate's medical respiratory difficulty was never addressed.

Recommendation:  Ensure that medical complaints in difficult mental health cases are properly evaluated and treated.

CMC combined its response to these recommendations with its response to the suicide of described in case review 14 below, which occurred some two weeks later.  CMC responded to the CAPs in both cases on 10/14/03 and described the following actions taken to address the problems identified in the suicide of this inmate:

Problem 1:  A memorandum from the Quality Assurance Improvement and Inspection Committee chairman at CMC, dated 9/25/03, stated that the department of psychiatry in the institution had an existing policy on standards for the discontinuation of psychotropic medications, but had newly established a format for recording clinical information in progress notes and distributed the policy and guidelines to all psychiatrists.  The Quality Assurance Improvement and Inspection Committee also met on 9/23/03 to discuss the issues of physicians' compliance with existing policies on the discontinuation of psychotropic medications and decided to perform an audit looking at that issue as it applied specifically to the current patient pool.

Problem 2:  CMC referred to a 2/26/03 memorandum of the then Chief Deputy Director, Field Operations, CDC, indicating that pursuant to a court order in Budd v. Cambra CMC's use of its LOU as an MHCB unit was banned.  The three-page memorandum elaborated on potential consequences for failure to obey state law and concluded, "CMC staff is to *immediately* cease any and all operation of LOU as a MHCB in violation of the Budd Court Order, state law, and department policy."

Problem 3:  Training on practices for managing difficult cases was provided for mental health clinicians on 9/10/03, with a follow-up repeat of the training scheduled for 10/23/03 for clinicians unable to make the September training.  CMC's response included an outline of the training provided and sign-in sheets.

Problem 4:  CMC provided three memorandums, the first of which, dated 4/2/03, required all inmates returning from a MHCB unit to receive five-day clinical follow-up in the intake unit or the TLU, except for returned inmates housed directly in AdSeg, where the usual follow-up would be provided.  The second memorandum, dated 8/11/03, describes custody procedures and use of the Suicide Prevention Observation Record for inmates on suicide precaution or suicide watch status.  The third memorandum, dated 10/2/03, reaffirmed the "current practice of completing an SRA checklist on every inmate who was admitted to LOU on suicide precautions," and explained that inmates placed in the LOU for observation purposes only need not be administered a SRA unless the clinician was concerned about an inmate's risk of self harm.

Problem 5:  CMC reported that Guidelines on the Rules Violation Report (RVR) Mental Health Assessment, dated 6/03, had been provided to staff, and custody staff was trained in and compliant with the guidelines.  No documentation confirming this report was provided.

Problem 6:  CMC reported its adoption of the revised departmental Medication Management policy and pointed out that the inmate in this case refused medication only occasionally and never for more than two days.  The response also made reference to a memorandum to psychiatrists on guidelines for initiating a Keyhea order.

Problem 7:  CMC reported the issuance of guidelines for transfers to DMH inpatient programs and stated that ASH staff had indicated that the inmate here would not have been accepted to ASH because of his earlier assault on ASH staff.

Problem 8:  CMC provided a memorandum from the institution's Chief Physician and Surgeon, dated 9/26/03, stating that the inmate here was seen on 15 separate occasions by seven different CMC physicians.  Finding that "no deficiencies in medical care were identified" relative to the inmate's breathing problem, the memorandum concluded that the CMC medical department "does provide proper evaluation and treatment" and, consequently, there was no need either for staff training or other response to the "unfounded finding" in the Suicide Report.

Findings:  The deceased inmate's clinical course and institutional adjustment were extremely complex and problematic.  The mental health diagnoses and care provided during the inmate's final term of some nine months in CDC were no less complex and problematic, resulting in a multitude of diagnoses and sparse actual treatment.  He was an EOP inmate, who essentially never participated in EOP programming.  On his return to CMC, just three days before his suicide, from the NKSP MHCB unit, his third stay in a MHCB in nine months, he was housed in the LOU, where he was placed on suicide precautions but received neither a SRA nor any documented clinical or custody follow-up.  The next day, he was placed in the AdSeg annex, again without a SRA or clinical or custody follow-up.  He was seen on the eve of, or the day of, his suicide by a psych tech, who recorded ten days later that he was alert and relaxed and in no distress.  Meanwhile, the mix of his discharge medications from the NKSP MHCB unit was substantially altered, apparently without explanation or rationale.  Whatever the complexities of his condition, this inmate was not well served by the defendants' MHSDS during his last CDC tenure.

Given that conclusion, the institution's overall response to the recommendations contained in the Suicide Report seemed excessively defensive.  The purpose of the corrective action plans in the Suicide Review process is to improve suicide prevention measures in the facility that has just experienced a suicide.  The pivotal failure in this case was the absence of clinical and custody follow-up after the inmate's return from the NKSP MHCB unit.  A requirement for five-day clinical follow-up of suicidal inmates discharged from a MHCB unit has been part of CDC and CMC policy since 2000.  Issuing another memorandum that appears to misrepresent CDC policy on who requires such monitoring and where it should be delivered, seems aimed at advertising the requirement rather than improving compliance with it, which, of course, was the objective of the recommendation.  The memorandum, moreover, prescribed the usual follow-up in Ad Seg, where this suicide occurred without any clinical or custodial follow-up at all.

24

While this inmate's death did not appear to be foreseeable, it was probably preventable had appropriate policies and procedures been followed, including, particularly, the provision of five days of clinical monitoring after discharge from a suicide-related MHCB stay and the timely administration of an SRA.

### 10.  Inmate #J46013

Brief History:  This inmate was a 42-year-old Hispanic male who committed suicide by hanging at California Medical Facility (CMF) on 3/16/03.  The inmate was discovered hanging by a state-issued belt from the vent above the toilet in his cell at approximately 12:27pm on 3/16/03, by a correctional officer responding to an inmate yelling. "Man down, 208."  The correctional officer activated his personal alarm and a correctional sergeant, lieutenant and medical staff arrived shortly.  The lieutenant and correctional officer succeeded in cutting the inmate down and lowering him to the floor.  The officer began chest compressions, while the sergeant and another correctional officer assisted with the ambubag for ventilation.  At 12:31pm, an RN and MTA arrived and transported the inmate to the emergency room.  The inmate arrived at the emergency room in CMF at approximately 12:35pm and was pronounced dead at 12:45pm.

The inmate's C-file indicated the inmate had numerous arrests from 1981 through 1985 followed by a conviction for first degree burglary in July 1985, resulting in a two-year sentence and a court recommendation for placement in either Patton State Hospital (PSH), ASH, or CMF.  The inmate was admitted three times to Metropolitan Hospital in 1985, prior to an August 1986 parole.  He was re-arrested in 1988 for burglary and receiving stolen property and returned to CDC in February 1988 to finish his term.  He was subsequently paroled in August 1990, arrested again in 1991, 1992, and 1994 for burglary, the last resulting in a commitment to PSH, and ultimately transferred to CDC with a seven-year sentence.  He paroled in January 2000, was re-arrested and revoked for attempted burglary and possession of a dangerous weapon in October 2000.

This inmate's mental health history predated his incarcerations; he had at least 16 documented admissions to Metropolitan Hospital, ASH and PSH.  The inmate frequently refused medications and was placed on Keyhea orders at various times because of his assaultiveness.  The record suggests he was assaultive whether or not he was on medication.  He was placed in the EOP program at CMF during the last months of his incarceration and reportedly experienced psychotic symptoms, including hallucinations, disorganized thinking and paranoia.  A note in the record from a psychiatrist indicated he was unhappy about the most recent renewal of his Keyhea order on 3/12/03 and expected to be forced to take Clozapine.  He repeatedly refused HIV medications, although he agreed to start them in 2003, and had never been treated for his Hepatitis C.

The inmate had at least one previous suicidal behavior, when he attempted to hang himself at the age of 21.  At the time of his death, the inmate was diagnosed with Schizophrenia, Paranoid Type, Polysubstance Abuse, and Personality Disorder NOS in addition to having Hepatitis C and being HIV positive.  He was being treated with

Risperdal and Haldol.  The Risperdal was renewed pursuant to the 3/12/03 Keyhea order.
The inmate's condition was seen as deteriorating, and his case manager's note on 3/10/03
reported the inmate's request for transfer to ASH and the case manager's intent to refer
the inmate to ASH.   The case manager's 3/12/03 progress note, while indicating the
patient remained aloof and paranoid, but not acutely so, also reported, "He states he
sometimes thinks of suicide but won't try it because he is a coward."  This note also
indicated that, while the inmate's delusions remained about the same, his disorganized
thinking seemed to be improving.  He assessed the inmate's risk for suicide as "low."
The inmate committed suicide four days later, just one day prior to his 42nd birthday.

The Suicide Report contained no recommendations for corrective action relative to this
inmate's completed suicide.

Findings:  This inmate had a long history of mental illness with some intermittent periods
of stabilization during multiple and extended hospitalizations.  He was on a Keyhea at the
time of his death because of his refusal to comply with medication interventions and was
in the EOP program.  His condition was noted as essentially stable, improving in some
areas but deteriorating in others.  Despite a recent request for transfer to ASH, he had
made and withdrawn such requests in the past.  This inmate's completed suicide appeared
to be neither foreseeable not preventable.


## 11.  Inmate #T60299

Brief History:  This inmate was a 42-year-old Caucasian male who committed suicide by
hanging on 3/22/03 at Salinas Valley State Prison (SVSP).  The inmate was a general
population 3CMS inmate.  The inmate entered CDC on 7/16/02 via DVI after being
convicted of attempted murder, endangering an elder adult, assault and battery with
serious bodily injury, with enhancement for use of a deadly or dangerous weapon, for
which he received a 15-year prison term.

The inmate was discovered by two correctional officers responding to an inmate yelling
"man down" at approximately 10:08am on 3/22/03, a Sunday.  The inmate was hanging
by a shoelace tied around his neck from an upper locker in his cell.  The inmate was in a
sitting position with his back against the locker facing the cell door with his buttocks
approximately one inch off the ground.  The inmate was initially discovered by his
cellmate, who was returning from his job and shouted the "man down" alert.  A
correctional sergeant arrived and requested the cut-down tool, but two correctional
officers brought a pair of scissors instead.  The sergeant was able to cut the noose from
around the inmate's neck and he was lowered to the floor.  Two RNs arrived at the scene
and began CPR, while other staff arrived with a gurney and wheeled the inmate to the
emergency response vehicle waiting outside the building.  The inmate was transferred to
the CTC as the nurses continued CPR and at approximately 10:30am, paramedics arrived,
intubated the inmate, and administered Epinephrine and Atropine.   A physician at
Salinas Valley Memorial Hospital was contacted by phone and pronounced the inmate
dead at 10:48am (by phone).

The Suicide Report referred to the inmate's crime, which involved his cutting his 73-year-old mother's throat one day prior to his 41st birthday in 2002. This apparently was a continuing stressor for him because of the impact of the crime on his family and his intense feeling of guilt. He apparently murdered his mother while under the influence of alcohol and methamphetamines.

The inmate had arrests and prior convictions for fighting in public, misdemeanor assault, resisting arrest, driving under the influence, corporal injury to spouse-cohabitant, battery on a spouse and other charges, but this was his first CDC term. He entered CDC at DVI and was transferred to SVSP on 8/13/02. A bus screening on 7/16/02 was positive because the inmate indicated he had been treated for mental illness and was taking medication (Trazodone). He denied any previous attempt at or thought of committing suicide or any current desire to harm himself. He had a mental health evaluation on that same date by a psychologist, who diagnosed Major Depressive Disorder as well as Poly-substance Dependence (methamphetamine and alcohol abuse). A mental health screening conducted the following day by another psychologist indicated a need for further evaluation which was provided on August 2, 2002 by a psychiatrist, who described the inmate as depressed and anxious and prescribed Remeron and Zyprexa.

A bus screening on 8/13/02 at SVSP was also positive and noted that the inmate denied any current mental health problems or thoughts of committing suicide. The inmate was seen by a psychiatrist who added Vistaril to his Remeron and Zyprexa. An IDTT on 9/19/02 gave a diagnosis of Major Depression, Severe and Recurrent with Psychotic Features, continued his medication and placed him at a 3CMS level of care with additional plans for Alcohol and Narcotics Anonymous. Although the IDTT progress note was signed by a psychiatrist, psychologist and CC1, the actual treatment plan meeting apparently was attended only by the psychiatrist and CC1. A psychologist's progress note of 10/23/02 indicated the inmate was continuing to ruminate about his conviction and described his mood as "very depressed." He reportedly was not contemplating suicide. The plan was to re-visit the inmate during the following week, but the next case manager note was not entered in the UHR until 1/21/03. A psychiatric note, dated 11/5/02, included a diagnosis of Major Depressive Disorder in remission - no psychotic features, continued the inmate's medications, Zyprexa, Remeron and Vistaril. The 1/21/03 case manager's note described the inmate as feeling depressed about having screwed up his life and thrown a lot away. Despite these statements, the inmate was noted as "doing good self-reflection and trying to look beyond mistakes." His appearance was noted as better, and the plan was to follow-up with one-to-one counseling the next week. A week later on 1/28/03, the inmate was seen by a psychiatrist, who reordered the Zyprexa but not the Vistaril and did not mention the Remeron.

He was next seen by his case manager on 3/5/03, who noted the inmate continued to be obsessed about what he had done "under the influence." The case manager further indicated that the inmate was anxious, depressed, frustrated, apathetic, agitated, and denied suicidal ideation, but had suicidal impulses; the case manager rated the inmate's risk of suicide as minimal. The inmate also reported that he wanted less "heavy" meds that didn't "knock him out." The inmate's condition was described as deteriorating

because his medications were not helping him, and the case manager noted a "medical referral" for unknown reasons. On 3/20/03, two days before his suicide, the inmate was seen by a psychiatrist, who discontinued his Remeron and Zyprexa and began him on Prozac with a diagnostic impression of "OCD with Depression" and Poly-substance Abuse. The psychiatrist also noted that the inmate had been taking his medications sporadically because they made him sleep all day and unable to participate in prison programs. The MARs indicated the inmate took his medications sporadically in February and received the newly prescribed Prozac only once on the day before he died.

The Suicide Report indicated that other inmates described the decedent as "weird" and "quiet." Correctional officers and his cellmate described the inmate as quiet and seldom talking. The cellmate also reported that the inmate had not been taking his medication for approximately 30 days and kept the unused medication in his cell. The cellmate added that the inmate had started talking to himself approximately seven to ten days prior to his suicide. Cellmate and correctional officers indicated that the inmate was walking around the dayroom talking to himself the night before his suicide, and pruno was found in his cell. The cellmate alleged that correctional officers observed the inmate's medications on the floor of the cell. The Suicide Report noted that the MTA, case manager and psychiatrist involved with this inmate's care were all contractors and no longer worked at SVSP. Hence, they were not available for interviews about the inmate's medication non-compliance during February and March. The report also recorded the statement of the cellmate and a neighboring inmate that the decedent requested medication from an MTA on the day of his suicide but was told they had run out. The Suicide Report also described letters received by the inmate from his wife, daughters, and mother indicating their concerns about his continuing obsessive focus on his crime. These letters encouraged him to forgive himself and suggested he take medication for his depression.

The Suicide Report identified two problem areas and associated recommendations:

       Problem 1: Faulty medication administration, with a recommendation to establish a QIT to study medication administration issues.

       Problem 2: Inadequate treatment and interventions, with a recommendation to provide training to mental health staff on developing and implementing treatment interventions/plans consistent with clinical findings.

SVSP's follow-up report, dated 10/3/03, indicated a QIT was chartered on 6/24/03 on medication management issues and attached a study of medication administration issues and a flow chart for addressing the identified issues. The SVSP response also provided an in-service training (IST) report on training sessions held on treatment plans on 6/12/03 and 6/26/03, together with a list of staff who attended these sessions. In a memorandum dated 2/13/04, HCSD reviewed SVSP's implementation of the recommended corrective actions and found it appropriate.

Findings: Prior to his incarceration, this inmate presented with a history of chronic substance abuse involving methamphetamines and alcohol. These substances were also

apparently involved in the murder of his mother. Mental health contacts and notes indicated the inmate was continuously and obsessively concerned about the chronic substance abuse that led to his crime, and this obsession contributed to his depression from the very onset of his incarceration. Nevertheless, he was prescribed an extremely low dose of antidepressant and an anti-psychotic at DVI, which were continued at SVSP without adequate clinical review and analysis. The inmate reported he wanted a medication that was less sedating and apparently stopped taking his medication to reduce the sedating effect. During the entire course of his treatment, the anti-psychotic medication was continued. There was no indication in the treatment plan of psychotic symptoms, nor was there anything in the earlier records from DVI to justify the diagnosis of Major Depression with Psychotic Features or the prescription for Zyprexa. No appreciable change in his antidepressant regimen occurred until the initiation of Prozac one day prior to his suicide, and even then the Prozac was prescribed at a starting dosage unrelated to the inmate's extended non-compliance or the inappropriateness of the anti-psychotic medication previously prescribed.

Although the inmate was placed in a 3CMS level of care, his case manager(s) noted as part of the plan for his treatment the need to see him within a week to assess his status. In neither instance did the follow-up contact occur. The IDTT note indicated the participation of a psychiatrist, but no psychiatrist signed the treatment plan, which contained no change in treatment to address his obsessive thinking, ruminations, depressed mood, and self-isolating behaviors while incarcerated.

The recommended remedies in the Suicide Report were generic and vague. They did not address the deficiencies in care provided to this particular decedent. They did not press the need for consideration of referral to a higher level of care for inmates who remain deeply depressed or show signs of further deterioration nor address the apparent lack of communication between custody and mental health staffs about the inmate's bizarre behavior and discovery of pruno in his cell on the day of his death. Although the inmate did not have a history of suicidal behavior or ideation, his clinical condition failed to improve and apparently deteriorated seriously. Plans to increase therapeutic interventions as reflected in the progress notes were never carried out, and his medication management was ineffective and poorly justified.

This inmate's suicide was not foreseeable, but it might very well have been prevented with appropriately aggressive clinical responses to his deteriorating condition. Clinical staff apparently recognized his deterioration and made some plans to meet it, but failed to execute those plans. There was no indication that any clinician raised the possibility of transferring this inmate to a higher level of care. The plans to intensify the level of his 3CMS care never materialized. There was no effort to pursue a more vigorous medication regimen until two days prior to his death. The departure of the contracting clinicians involved in the care of this inmate did not excuse the failure to use this inmate's death to articulate more clearly and forcefully the standards of care expected from all CDC and SVSP clinicians, contracted or permanent.

**12. Inmate #J82013**

Brief History:  This inmate was a 52-year-old Caucasian male who committed suicide by hanging on 3/23/03 at the California Substance Abuse Treatment Facility (CSATF).  The inmate was admitted to CDC on 10/25/95 through reception at RJD, having pled guilty to crimes of forcible rape, sexual penetration/force, vehicle-taking, first degree burglary and evading an officer.  He was sentenced to 60 years to life.  After arriving at RJD on 10/25/95, he was transferred to CSP/Sac, SVSP, CAL and ultimately to CSATF on 5/21/02.

The inmate was discovered hanging in his two-man cell in the absence of his cellmate by a correctional officer at approximately 7:04pm.  The officer was conducting the 7:00pm night yard unlock, and discovered the inmate hanging from his shelf in the cell.  The officer activated his alarm, and a second officer obtained the cut-down tool.  As the first officer held the inmate up, the second officer cut him down.  The correctional officers then began chest compressions, and, after a correctional sergeant arrived and requested an ambubag, CPR was begun.  An MTA subsequently arrived and took over CPR, and the inmate was transported to the CTC via the Emergency Response Van.  Paramedics subsequently arrived and continued with life-saving efforts; but at 7:40pm medical personnel "stopped their efforts per telephone order of the physician on call who pronounced the inmate dead."  This telephone call apparently was to the Fresno/King/Madero Emergency Service.

This was the inmate's third term in the CDC.  The inmate served his first term in 1990 for burglary and possession of stolen property.  His second CDC term began in 1991 for robbery and grand theft.  The inmate reportedly witnessed at age 19 the murder of his father's girlfriend by his father.  The inmate's sister reported that he was traumatized by the event and had to be hospitalized.  While at large in the community on parole in August 1994, the inmate reportedly threatened to commit suicide because someone attempted to serve him with a subpoena that he feared would result in his return to prison.  Upon incarceration for his third CDC term, he received a negative mental health screening at RJD in October 1995.  The inmate also denied being treated for mental illness, having attempted suicide or having current suicidal thoughts or mental health problems in bus screenings completed on 7/10/96 at SVSP and 7/29/98 at CAL.  A third bus screening, completed on 5/21/02 at CSATF, was also negative.  The inmate was not a part of the MHSDS caseload and received no treatment for mental illness while incarcerated.

Available information relative to his medical treatment for other conditions was confusing.  His UHR contained a 2001 biopsy report that revealed basal cell carcinoma for which the inmate refused treatment.  There were references in the record to other minor medical problems, including an old fracture and nerve injury to the right ankle, reports of shoulder pain, submandibular swelling, and Verucca Vulgaris, as well as hypertension.  His MARs were not provided for calendar year 2003, and the Suicide Report reported local staff was unable to locate them.  The inmate also had received a laceration on the back of his neck from a cut caused by another inmate in June 1998 for which he received emergency room treatment.

The inmate requested protection one day after he entered CDC in October 1995 because of the notoriety of his crimes and ultimately was placed on a special needs yard for inmates who were sex offenders.

The Suicide Report contained reports by correctional officers and inmates that this inmate was not a management problem and did not cause trouble. His cellmate reported that he suspected the deceased inmate occasionally used heroin that he was able to purchase with money his mother deposited in his inmate account. Another inmate friend, who was housed with him at CAL, indicated that the inmate told him that if anything happened to his mother, he would commit suicide. This friend also reported that the decedent used heroin on occasion and stated that the decedent's mother acknowledged that her son told her he would kill himself when she died. The Suicide Report indicated that the inmate's 72- year-old mother was hospitalized for two weeks during the Christmas before the inmate's suicide but had recovered by the time of his death.

In an interview subsequent to the suicide, the inmate's mother expressed her belief that her son had not committed suicide and was suspicious that someone had killed him. Review of taped telephone conversations with the inmate's mother indicated that the inmate indicated he was having chest pain and difficulty breathing one to two months prior to his suicide and was unhappy with the medical care he was receiving. The inmate's cellmate did not notice any changes in the inmate's behavior, mood, attitude or mental health functioning prior to the suicide. The decedent left a suicide note on his bed that expressed multiple complaints about the prison, particularly with regard to medical care. In this note, the inmate also complained about staff being disrespectful and the constant use of program time for staff training. The note also referred to his futile request to be transferred elsewhere and complained that his reward for being "seven years clean" was to be moved to a Level III yard, which was run like a Level IV/ 180 yard. The note concluded with a request that his cellmate get his electronic equipment.

The Suicide Report identified one problem area for corrective action, namely, the missing MARs. As indicated, the MARs for this inmate for 2003 were not in his UHR, and records personnel were unable to find them. The last MAR in his UHR was for October 2002. HCSD recommended the establishment of an interdisciplinary QIT to review this inmate's medical care with particular focus on the delivery of his prescribed medications and the completion and filing of his latest MARs. The facility provided no information on the implementation of the recommendation.

Findings: This inmate had a complex history, but was never a part of the MHSDS. He appeared to have suffered from Personality Disorder, as well as possible sexual disorders. The inmate's completed suicide did not appear to have been foreseeable or preventable. CSATF also failed to report on its implementation of the recommendation in the Suicide Report.

**13. Inmate T-57107**

31

Brief History:  This inmate was a 39-year-old Caucasian male who completed suicide on 3/26/03 by hanging at Sierra Conservation Center (SCC).  The inmate had been admitted to CDC on 6/11/02 at WSP and was transferred to SCC on 8/14/02.

The inmate was discovered hanging by a sheet that was wrapped around his neck and tied to a corner of the upper bunk in his Outpatient Housing Unit (OHU) cell at approximately 2:15am on 3/26/03.  The MTA, who was conducting hourly checks in the OHU, activated his alarm and entered the cell with an accompanying correctional officer.  They attempted to remove the sheet from the upper bunk area as other staff arrived.  The correctional officer lifted the inmate while the MTA cut the sheet from the upper bunk, and CPR was initiated at approximately 2:17am by the MTA, a correctional officer, and a registered nurse who had also arrived.  CPR continued until 2:40am, when an outside ambulance arrived and a paramedic instructed that CPR be discontinued.  The paramedic then contacted a doctor at Tuolumne General Hospital, who pronounced the inmate dead via the telephone at 2:58am.  The Suicide Report indicated the inmate was pronounced dead at 3:10am, but the Incident Report indicated the inmate was pronounced dead at 2:58am.

This inmate had been admitted twice within several days to the OHU where he committed suicide.  The inmate was admitted first on 3/23/03, discharged on 3/24/03 and re-admitted on 3/25/03.  The Suicide Report described a suicide note discovered by other inmates prior to the inmate's suicide, which was not given to custody until after the inmate's death.  The Suicide Report indicated the fellow-inmates, who were cleaning up the dorm, found a two-page note under the bunk of the decedent.  The note stated, "I love my mom.  I'm sorry if I hurt you. Tell the kids I'm sorry  And tell them I Loved Them And tell Rosale to Pray I go to Heaven  I want to be put with Timothy where I belong And…," followed by several scratched out words.  The next page included addresses and phone numbers and dates, and another date, "Oct 25," circled at the bottom of the page.  The inmate was scheduled to parole in October 2003.  The listed names were those of the inmate's family.  The inmates who found the note reportedly gave it to a correctional officer on the morning of 3/26/03, after the suicide, and explained they had planned to give the note back to the inmate when he returned from medical and talk to him about it.  The autopsy reported the cause of death to be asphyxia (minutes) due to hanging (minutes).

The inmate had no known history of mental health treatment and was not in the MHSDS at the time of his death.  The inmate had a long history of substance abuse, primarily involving methamphetamine.  A bus screening on 6/11/02 at WSP was negative, and he was released to custody.  His mental health screening on 6/13/02 at WSP was also negative.  Similarly, his bus screening at SCC, dated 8/14/02, was negative for any indicators of mental health problems, and the inmate was released to custody at that time.  The inmate apparently was diagnosed with asthma after his arrival at SCC and prescribed an Albuterol inhaler.  The inmate also had surgery for a lipoma of the upper mid-back on 2/3/03.  His only other recorded medical complaint was of chronic, recurrent lower back pain secondary to what appeared to have been an old compression in the lumbar spine.

The Suicide Report indicated the inmate's criminal history began in February 1985 at the age of 21, when he was arrested for being under the influence of a controlled substance. He had subsequent arrests for vandalism, obstructing and/or resisting a public officer, disobeying a court order, possession of a controlled substance, stalking and failure to appear, battery and disorderly conduct/ under the influence of drugs. The last resulted in his arrest and conviction in May 2002 for the manufacture of a controlled substance for which he received a three-year sentence in CDC. The inmate apparently admitted to a ten-year use of methamphetamine, and a nursing note in June 2002 indicated he had been an IV methamphetamine user for 20 years.

The inmate had no involvement with the MHSDS until 3/20/03, when he was referred to mental health by medical. He was seen on that day by a medical nurse and complained of shortness of breath, being unable to sleep and a skin rash, and reported that he had been feeling stressed out for several weeks. The inmate stated he had no suicidal thoughts or thoughts of hurting others. He was diagnosed with anxiety and prescribed Benadryl for two weeks. The mental health consult was to take place in 14 days. The inmate subsequently submitted a sick call request indicating he had been "unable to sleep for five or more days." It is noted by a nurse on 3/23/03 that he was having a panic attack; he was referred for a medical evaluation and subsequently admitted to the OHU that morning with a diagnosis of "acute anxiety neurosis." He was prescribed Atenolol for three days and Ativan every eight hours for three days for acute anxiety, and a psychiatric consult was ordered. In the course of the physical examination, the nurse noted in the history, "The inmate was admitted with progressive agitation and anxiety where he began to visualize himself as being physically non-receptive to his peer group in the form of generalized changes which made him repulsive." Another statement indicated he was anxious "about his future in relationship to being able to communicate with his bosses, concerned about being a good father." It was also noted that the inmate had consumed his two-week supply of 28 Benadryl 50mg tablets in a three-day period. The inmate was admitted to the OHU for the first time at 11:45am on 3/23/04 and discharged at 2:45pm on 3/24/03 with "acute anxiety neurosis." The quotations above were taken as part of the history of present illness at the time of the first admission, which also described him as pacing the yard and having difficulty coping with all situations. This note also read, "He was delusional in any form" which appeared to be a typographical error, i.e., omitting the "not," but there is no further explanation of the statement in the record.

On 3/24/03 the inmate stated he had always had anxiety and on occasion got anxiety attacks, and that he was reluctant to enter the mental health program and take psych medications. The psychologist diagnosed chronic anxiety disorder and "no indication of any serious mental disorder." The plan was to discharge the inmate from the OHU to regular housing. The inmate was to consider entering the mental health program and send a request if he decided to seek treatment. He was discharged from the OHU to regular housing. On that same day nursing notes documented that at 10:45am, prior to his discharge, the inmate stated, "I'm having a nervous breakdown" and "I don't like myself." It also noted that the inmate denied suicidal and homicidal ideation, but admitted to being depressed. Later in the day, the inmate stated he wanted to talk with the "doctor for psych" before being released to the yard. He later stated that he wanted

out of the OHU and did not want to see anyone. He was subsequently discharged without further mental health contact on 3/24/03.

The following morning at 9:30am, the inmate was re-admitted to the OHU for psychiatric observation after being referred by custody staff. He complained again of being unable to sleep, dry mouth and feeling shaky with his stomach in knots. His respiration was 16, pulse 96, and he was referred to mental health. He was then re-admitted and prescribed Seroquel q4hr prn and q 1 hour checks, but no SRA was conducted and suicide precautions were not initiated. The q 1 hour checks were documented on 3/25/03 from 10:00am until 2:15am on 3/26/03, when the inmate was found hanging by the sheet, as noted above. During the preceding hourly checks, the inmate was either resting, laying on his bunk, or up and about in the cell. The notes for the checks indicated his diet was "fair" and meds were taken at 6:00pm and 7:00pm. Nursing notes during this time indicated that, on his re-admission (3/25/03 at 9:30am) the inmate stated, "He will not go back to yard because the other inmates will make fun of him because he's crazy." The nursing notes from that point were consistent with the hourly checks until, at 2:15am, they indicated the inmate was found hanging and the paramedic ordered discontinuation of CPR at 2:40am. The last entry was written at 3:10am and noted the arrival of the physician, who confirmed the death of the inmate.

The Suicide Report referred to the events on 3/24/03 and 3/25/03 and indicated that prior to the order for Seroquel prn the inmate stated that he would "go crazy" unless he got to sleep. The Suicide Report also referred to the inmate's agreement to go on medication and become involved in the 3CMS mental health program, but this was not clearly noted in the record. The admitting order in the UHR and the order for Seroquel also indicated a case manager would follow-up to obtain a MH-4 and directed hourly checks without suicide precautions.

The Suicide Report indicated that interviewed inmates expressed surprise at the inmate's suicide, although one described the inmate as "really shaky or spaced out" two days before the suicide and saying he could not "take the stress anymore." Another inmate indicated the decedent was having trouble dealing with the death of his son, which occurred several years previously, including problems with sleeping and eating; he was described as seeming "geeked out or buggy" and worried about a rash on his body. The deceased inmate was housed in a dorm and apparently slept in an area where the television was located, with inmates entering and exiting the room throughout the day and night. There was also a suggestion of some racial tension among the inmates. The correctional officers, who referred the inmate to the OHU for the second time, indicated the inmate did not mention racial tension or other problems to them. The Suicide Report also indicated the inmate anticipated parole in approximately seven months, and that his job would be available to him upon his return to the community.

The Suicide Report identified two problems and recommended the following corrective actions:

Problem 1:  The inmate was not immediately referred for a mental health evaluation nor considered for a transfer to a MHCB despite his apparently acute symptoms and placement on psychotropic medication.

Recommendation:  The institution needed to review local procedures for mental health evaluation of inmates admitted to the OHU with psychiatric symptoms and local criteria for referrals to a MHCB level of care.

Problem 2:  The inappropriate use of bunks in the OHU was noted.

Recommendation:  The institution needed to develop a QIT that included institutional health and safety and maintenance personnel to review the safety of furnishings and other equipment in the OHU.

SCC provided a follow-up response to the recommendations on 11/3/03.  A cover letter to the response reported that an assessment for removal of the six upper bunks currently in the OHU had been conducted, but, according to local medical staff, no state-wide medical standard prohibits the use of double bunks in the OHU.  The removal of the six upper bunks in the OHU, moreover, would reduce SCC's population count by six, but "would not necessarily curtail or stop inmates' suicides regardless of the double bunk fixtures."  The letter concluded, "Based on this factor, the removal of the six identified upper bunks in the OHU will be completed upon your final approval," and was signed by the warden.  The attached report of a Quality Improvement Team, headed by a senior psychologist, indicated that the institution's corrective actions should include additional training of custody, medical and mental health staff on signs and symptoms of potentially suicidal inmates and the  removal of all upper bunks in OHU.  Minutes of the QIT were provided, as well as a CDC memorandum, dated originally 7/14/03, to all administrators, wardens, health care managers, etc. on suicide prevention and training in recognizing the signs and symptoms of potentially suicidal inmates, a specific recommendation to remove all upper bunks in the OHU and a survey of seven other CDC prisons, all of which reported they had no upper bunks in their OHU for medical or suicidal patients.  Lastly, the package included a work order, dated 10/10/03, to remove all top bunks in the OHU.

Findings:  This inmate did not have a significant mental health history prior to the few days before his suicide.  He was admitted to the OHU with an "acute anxiety neurosis" and released the next day without a thorough assessment of his mental distress or the administration of a SRA.  The inmate was re-admitted to the OHU the day after his initial discharge, although the record indicated he was re-admitted for "medical" not "psychiatric" reasons.  Staff also documented that the decision for inclusion in the MHSDS was left to the inmate's discretion.  The record, in addition, documented the inmate's ingestion of a two-week supply of Benadryl in just three days and his marked behavioral changes prior to and during his stays in the OHU.  The care and treatment for this inmate did not meet accepted standards.

This inmate's completed suicide was not foreseeable as he consistently denied suicidal ideation.  It may well have been preventable, however, if local mental health clinicians had intervened more aggressively by conducting a full mental health assessment, together

with a SRA, and moved for referral to a higher level of care, particularly after the second admission to the OHU.

## 14. Inmate #E87491

Brief History:  This inmate was a 48-year-old Caucasian male who completed suicide on 4/3/03 by hanging at California Men's Colony (CMC).   This was the inmate's fifth prison term, and he last entered CDC at High Desert State prison (HDSP) on 10/29/97, serving a third-strike, 25-year to life sentence for felony possession of a fire arm.

Staff discovered this inmate in his single cell in AdSeg hanging from a noose made from his clothing.  The discovery came as the result of water flooding the low side of the tier at 12:45am, which caused staff to begin a search for the source of the water. During clean-up of the water, a correctional officer "heard banging coming from the high side of the tier" and responding to the banging, found the inmate hanging from clothing that had been affixed to the cell window latch.  There apparently was some difficulty in contacting the fire house for an emergency transport vehicle, but by 1:17am contact had been made, and the vehicle was dispatched.  Meanwhile, other correctional officers responded to the tier, obtained a cut-down tool and cut down the inmate.  The emergency transport vehicle arrived at approximately 1:21am, and staff from the vehicle began CPR approximately six minutes after the Firehouse was called.  The inmate was transported to the medical clinic and pronounced dead at 1:34am.  The Incident Report indicated the inmate was last seen alive at approximately 12:20am by a correctional officer.  An autopsy noted the cause of death as asphyxia by hanging, and a toxicology screening was negative.

The inmate's bus screening on entry to HDSP in October 1997 was positive and he was included in the MHSDS caseload as a 3CMS inmate on 12/4/97.  In February 1998 he was admitted to the MHCB unit at CSP/Solano because of his belief that inmates were conspiring against him.  He was treated and released.  He was readmitted to the MHCB unit in May 1999, placed on suicide watch following a RVR for mutual combat and referred to an EOP level of care approximately two weeks later.  He was admitted to the MHCB again in March 2000, after stopping his medications in February.  He was again referred to the EOP, and prescribed antidepressant, anti-anxiety and anti-psychotic medications.  In October 2000, his level of care was reduced to 3CMS even though he had stopped all of his medications the previous week.  Within a week of the change in his level of care, he reported to custody staff that he felt like hanging himself and gave a homemade rope to a correctional officer.  He was admitted to the MHCB unit at MCSP on 11/11/00 at MCSP, but remained at the 3CMS level of care upon discharge.  It was not until approximately a full month later in November 2001 that his level of care was changed to EOP.  By that time he had also started treatment with interferon for Hepatitis C.  The inmate remained at the EOP level of care through his transfer to CMC on 3/20/02, but his level of care was reduced again to 3CMS at CMC on 4/2/02.  Approximately three weeks later, he received another RVR and was admitted to the LOU on 4/27/02.  He was described as paranoid with suicidal ideation, and started on an antidepressant, Celexa.  He received another RVR in May 2002, and his level of care was

raised again to EOP on 7/10/02. Two days later he engaged in a fight with another inmate, received a RVR and remained in AdSeg until his death on 4/3/03.

In September 2002, the inmate again refused medications and subsequently received another RVR, this time for battery. His level of care, nonetheless, once again was reduced from EOP to 3CMS on 11/6/02. By December 2002, his SHU term, which had been assessed earlier and typically required transfer to a more secure facility with a SHU unit, expired. The inmate apparently became increasingly dissatisfied with custody staff, depressed about his transfer and paranoid. He refused on 3/3/03 to attend an IDTT meeting, which was held in absentia. He further refused an out-of-cell contact with his case manager on 3/17/03, who saw him on that date at cell-front although he refused to get out of bed and respond. His last clinical contact was on 4/1/03, when a case manager noted growing concern about the inmate's functioning and described an "increase in the rise of paranoia he experiences." The note went on to report, "Today he appears in clear distress that either custody or other inmates are going to physically hurt him," and stated the inmate was scheduled for an IDTT meeting the following day. The 4/2/03 IDTT indicated the inmate "appears to be getting more paranoid, not on psych meds." The IDTT indicated the inmate had been worried about rumors he was hearing, but noted "No SI." The inmate wanted to be in general population, did not want to be medicated and concluded, "I feel that these events are real." The team's assessment was that the inmate was somewhat delusional and its plan was to "continue to observe without psych meds in view of his intent to refuse psych meds." The inmate completed suicide the following morning.

The Suicide Report and UHR indicated this was the inmate's fifth incarceration. He was first incarcerated in the CDC in 1978 at approximately age 23. He had an extensive juvenile history, as well as a history of arrests and jail incarcerations prior to his sentence to CDC. The inmate also had an extensive history of substance abuse including inhalants, marijuana, barbiturates, and heroin, with limited intake of alcohol and reports of some use of methamphetamine. The UHR had diagnoses of probable substance abuse, alcohol dependence, psychosis NOS, and major depression, severe with psychotic features. He had also been diagnosed with Hepatitis A, B, and C and began receiving interferon in August 2001 for one year. The inmate, as noted above, had several RVRs resulting in AdSeg and SHU terms. The inmate also had a history of several MHCB stays related to statements that he would harm himself and paranoid ideations and delusions. The inmate had a history of noncompliance with medications and, when noncompliant, he tended to decompensate and become increasingly paranoid, leading to frequent conflicts with other inmates and staff. The inmate was also diagnosed with personality disorders at various times during his incarceration.

The Suicide Report identified the following seven problems and recommendations:

> Problem 1: The retention of high-risk mentally ill inmates in AdSeg after completion of their terms.
> Recommendation: Establish procedures to track such inmates and give priority to their transfer back to general population.

Problem 2:  There was a failure to provide of close observation and monitoring of this decompensating inmate.

Recommendation:  CMC needed to cease the use of its LOC as an inpatient or crisis facility and transfer inmates in need of MHCB care to appropriate facilities.

Problem 3:  Closer custody observation was needed of inmates noncompliant with their medications and decompensating.

Recommendation:  Ensure that all shifts of custody staff are aware of the need for closer observation of noncompliant and decompensating inmates.

Problem 4:  Follow-up to inmate refusal of medications.

Recommendation:  Establish a process for evaluating inmates who repeatedly or persistently refuse their medications and subsequently decompensate for application of a Keyhea order and documenting the evaluation.

Problem 5:  Recognize that a serious medical condition like Hepatitis C may contribute to an inmate's depression, especially for one who is noncompliant with medications and decompensating.

Recommendation:  Remind medical and mental health staff to communicate and coordinate treatment in developing such an inmate's mental health treatment plan.

Problem 6:  The emergency phone number 222 was not working the night of the inmate's death.

Recommendation:  Establish a regular testing procedure for this emergency system.

Problem 7:  The progress note describing inmate's death was unclear due to corrections in the record that were difficult to decipher.

Recommendation:  Provide training to staff about the legally acceptable procedures to make corrections in official documentation.

CMC's 10/14/03 reply to these recommendations was combined with its response to the review of the inmate's suicide provided above in case review 9.  Specific actions adopted included the following:

Problem 1:  CMC provided a memorandum, dated 10/8/03, generated by the Assistant Warden that established a procedure for immediate implementation that tracked "high risk" inmates identified by the AdSeg IDTT.  An internal procedure was developed to expedite notice to the Health Care Placement Unit (HCPU) in Sacramento of inmates in need of transfer.

Problem 2:  CMC repeated the recent ban on the use of the LOU to house inmates in crisis or in need of a MHCB level of care.

Problem 3:   The response cited memoranda on custody's responsibility for inmates discharged from the LOU or East Facility Hospital, described above in case review 9, as well as a one-page descriptive symptom list entitled "Detecting Inmates at High Risk for Suicide – Examples of Behavioral Changes."

Problem 4:   The institution described local operating procedures adopted to implement the department recently revised policy on medication management.

Problem 5:   The response cited a 9/23/03 memorandum of the Health Care Manager on interferon therapy and mental illness, which reportedly reinforced the need for communication and collaboration between medical and mental health staff.

Problem 6:  The institution attached an 8/25/03 memorandum of facility captains outlining the process for testing emergency phones by watch commanders at the beginning of their shifts.

Problem 7:  CMC provided a 9/29/03 memorandum on medical record modifications re-stating the process for correcting entries in a UHR.

Findings:   This inmate had a long history of mental illness and severe personality disorder.  He also had complicating factors resulting from his medical illnesses of Hepatitis A, B and C.  A review of this record revealed multiple diagnoses, medication prescriptions and changes in levels of care, as well as what appeared to be associated and unassociated RVRs resulting in disciplinary sanctions.

This inmate's suicide did not appear to have been foreseeable, because he did not report to staff any imminent intention of harming himself or overtly display suicidal behavior prior to his death.  His completed suicide might have been preventable if he had been transferred to a higher level of care due to his progressive deterioration, particularly during the several days preceding his suicide.  This inmate was difficult to treat and manage, but, given his history of periodic decompensation resulting in violence (although usually to others), the plan to conduct an evaluation at a later date after observing the inmate in AdSeg without medications was inadequately responsive.  He should have been placed in a higher level of care with more intensive observation and continuing assessments.

**15. Inmate #P13813**

Brief History:   This inmate was a 27-year-old African American male who completed suicide by hanging on 4/20/03 at High Desert State Prison (HDSP).  The inmate was in an MHCB unit at the time of his death, but his level of care prior to that admission was 3CMS.  This inmate returned to CDC on 2/11/00 as a parole violator with new charges. He went back and forth to court for several months, was recommitted as a parole violator with a new term on 6/13/00 and transferred to HDSP on 9/10/02.  His original committing offense was drug-related and resulted in his initial incarceration on 10/13/98. He paroled from CSP/Sac on 11/28/99, and was returned to CDC custody on 2/11/00.

The inmate was placed at the 3CMS level of care upon admission and throughout his incarceration.

The inmate was discovered on 4/20/03 at approximately 5:30am by a correctional officer making rounds in the MHCB unit. The inmate was hanging by a sheet suspended from the sprinkler head in his cell. CPR was initiated by medical staff when the inmate was cut down, but it was unsuccessful, and the inmate was pronounced dead at 6:12am. Following the inmate's death, all cells in the Correctional Treatment Center (CTC) were inspected, and it was discovered that several had small gaps between the sprinkler head fixture and the ceiling similar to the gap this inmate used to attach the sheet and hang himself. The autopsy conducted on 4/22/03 indicated the cause of death was hanging, and toxicology results were negative.

The inmate was housed in the MHCB unit because he inflicted on himself "five 6-7 inch scratches on both forearms." The staff evaluated this as a suicidal gesture and noted the inmate was extremely upset, asserting "I can't tolerate it anymore." He was admitted to the MHCB unit for an assessment. The inmate was placed in a safety cell on 4/16/03 and received an assessment on the following day.

This was the inmate's third admission to the MHCB unit. His first admission on 2/8/03 occurred because the inmate was noted to be "yelling and screaming, kicking his cell door" and was described as enraged, agitated, explosive and paranoid. The inmate was placed on suicide watch for 24 hours and then moved to a regular cell. His medications were changed to Seroquel and Depakote. The Depakote was prescribed despite the fact that the inmate had been diagnosed with Hepatitis C, and Depakote might possibly compromise his liver functioning. A SRA was completed on 2/18/03, and the inmate was discharged to his original housing with a five-day follow-up order through 2/23/03. At the time of his discharge, he was prescribed Seroquel and Neurontin.

A psychiatric progress note, dated 3/20/03, indicated that the inmate's Seroquel and Neurontin were both discontinued because the inmate requested Ativan from the psychiatrist. The psychiatrist denied the request, and the inmate asked that all of his medications be discontinued. The psychiatrist complied. Three days later, the inmate received a RVR for resisting a peace officer. On the following day, he visited the emergency room with complaints about his transfer from B-yard to D-yard, asserting that he did not want to be housed with "dopers," lifers or "baby rapers." During this 3/24/03 visit to the emergency room, the inmate stated, "I'm just having suicidal thoughts-you know." He refused to be specific about his intentions but stated he was hearing voices. It was noted in this visit that the inmate quickly escalated his anger and hostility but then returned to a calm and cooperative demeanor after dialogue and discussion.

The Suicide Report referred to a psychiatric progress note of 4/3/03 indicating the inmate discontinued medications because it interfered with his liver functioning due to Hepatitis C, but the note was not included in the accompanying materials. A psychiatric progress note of 4/10/03 did, however, describe the inmate's statements about a conspiracy involving President Bush and HDSP and the need to keep his family away from him.

The inmate was reported as having stated, "If I look at you, you will slap me." The psychiatrist felt the inmate was delusional and should be transferred to the MHCB unit. During this psychiatric encounter, the inmate was placed on a different antipsychotic, Geodon, and also on Ativan, previously denied to him on 3/20/03.

The inmate again appeared at the CTC on 4/12/03, when he reported he had attempted to overdose on medications, stating: "I took them to kill myself. You guys won't let me die." He was readmitted for a second time to the MHCB unit for medication stabilization. A SRA was conducted during this stay, which indicated that he was at minimal risk for suicide, and he was discharged on 4/16/03 with a five-day follow-up order. The inmate initially was single-celled but received a cellmate later the same day. He again presented himself to the CTC at approximately 5:30pm on 4/16/03 with the "scratches" on his wrist described above. The inmate apparently was stabilized in the MHCB unit in a safety cell on 4/16/03. The Suicide Report indicated he was readmitted to the MHCB unit on 4/17/03. The record is confused about the medications ordered during his third MHCB admission. Haldol and Ativan, which he had been taking when he first came to HDSP, apparently were re-ordered. A mental health assessment (MH-4) completed by a psychologist on 4/17/03 noted, "Once he was stabilized and once he made it known to this evaluator that he had really wanted to hurt himself, he was placed in a safety cell for his own protection." Despite this statement, an SRA conducted on 4/17/03, the same day, described the inmate as a "mild risk" for suicide.

The Suicide Report referred to the clinician's consideration of a referral to DMH, but noted, "they had not documented this." The admission order in the record for this last entry to the MHCB unit CTC was dated 4/16/03 at 6:00pm. A treatment plan, also dated 4/16/03, indicated the diagnosis for this inmate as Polysubstance Dependence by history, rule out Psychotic Disorder NOS or Substance Induced Psychotic Disorder, and Anti-Social Personality Disorder. The discharge plan in the treatment plan indicated the inmate was to be returned to his 3CMS status and the general population on the following Monday. The plan stated that the single-cell issue should be addressed at the housing level and required five-day follow-up upon discharge.

A progress note by the recreation therapist on 4/18/03 referred to the diagnosis of Psychotic Disorder NOS and observed that the "inmate's appearance, etc., are basically within normal limits with the exception of his judgment," but he was described as lacking realistic goals and impulse control. Another progress note on 4/18/03 indicated that the inmate "needs limit setting" and that he was essentially being given a time-out over the weekend. The last progress note on 4/19/03 at ll:30am indicated that the inmate stated, "I don't see what good it does to talk. I don't get the treatment that works so why take any." The inmate was described as angry and becoming somewhat more uncooperative and negative, with a sullen presentation. Staff planned to continue to offer one-to-one counseling to increase his coping skills and behavioral redirection. The inmate was subsequently discovered hanging from the shower head at 5:30am on 4/20/03.

The inmate's history included a substantial history of polysubstance dependence and extensive criminal justice involvement beginning in approximately 1993 at the age of 18,

and a mental health history beginning in approximately 1997.  He was subsequently diagnosed as having paranoia and auditory hallucinations strongly suggestive of a diagnosis of schizophrenia.  His substance abuse began at age 14 and included methamphetamine, cocaine, marijuana and alcohol.

The Suicide Report identified three problems, with the following recommended actions:

Problem 1:  Physicians' (including but not limited to psychiatrists) documentation was sparse and incomplete, making it difficult to follow the treatment provided and the rationale used at times.  This was true for both changes in psychiatric medication and the use of anti-viral therapy for the HCV disease.  Oddly, the defendants objected to this description of the problem, which is a slightly condensed version of the problem described by the defendants in their own Suicide Report.  The basis for the objection is a lengthy list of clinical contacts with the deceased inmate in the days prior to his suicide.  The problem statement, however, focused not on the number of contacts but on the inadequacy of the documentation that resulted from those contacts.

Recommended Action:  The HCM needed to provide direct in-service training for all physicians regarding documentation.

Problem 2:  There was no documented evidence that departmental policy was followed for the treatment of this inmate's HCV.  Interactions between anti-viral medications and psychiatric conditions were described, with a conclusion that the "treatment protocol should ideally be developed in consultation with the appropriate specialists and reviewed in the Medical Authorization Review (MAR) committee."

Recommended Action:  HDSP was to develop or review and update and train all medical staff (including psychiatrists} on a local operating procedure for the treatment of Chronic Viral Hepatitis with information on whom should be contacted and a review process using the MAR.

Problem 3:  Orders for psychiatric medications by HDSP psychiatrists reflected frequent changes in prescriptions while the inmate continued to destabilize.  Psychiatrists were evidently too reactive to this inmate's complaints about his medications and possibly to his strong antisocial personality:

Recommended Action:  In-service training was needed for psychiatrists about medication changes and dosage adjustments.  Training needed to emphasize how to deal with inmates who are demanding and hostile, while maintaining professionalism and following medical protocols.  Clinical reviews, moreover, should be conducted for difficult cases.  The recommendation also suggested the provision of regular training to look beyond an antisocial presentation to evaluate objectively co-morbid Axis I disorders.

On 2/3/04, HDSP generated a follow-up report to the recommendations contained in the Suicide Report.  The response reported via memorandums from the chief psychologist and chief psychiatrist that training was conducted with institutional physicians and psychiatrists on the areas recommended in the CAP.  These memorandums indicated that training covered operating procedures for treatment of chronic viral hepatitis; the need to proceed slowly and carefully with medication changes and dosage adjustments; and the

need for "complete and accurate documentation of treatment and treatment decisions including a progress note explaining the reasons for the order and the plans for follow-up." All of the indicated training was noted as completed in November 2003.

Findings: This inmate presented with extremely complex Axis I and Axis II pathology. The record indicated that more successful interventions, including medication prescriptions, were provided to the inmate at various times during his CDC incarceration, particularly prior to his transfer to HDSP. After the transfer, several medication changes, including for a time the discontinuation of all psychotropic medications, occurred because the inmate was demanding and difficult to interact with. Despite the difficulties of the interpersonal interaction, there was little question that the inmate had a psychotic disorder, which needed management with anti-psychotic medication as well as an anxiolytic, a combination that his record suggested had been successfully employed with him in the past. The inmate's multiple admissions to the MHCB without any documented consideration of possible transfer to a higher level of care were a concern. The treatment consisted of providing him with a "time out" over-the-weekend before returning him to the same conditions he identified as precipitating his recent repeated admissions to the MHCB, without any specific effort to address these issues while he was in the MHCB. Finally, given the inmate's clearly decompensating mental status and his history, the characterization of his behaviors as "suicidal gestures" while estimating the risk of suicide as "mild" in the SRA was inadequately explained in the record.

While identifying problems with the clinical management of this inmate during his HDSP tenure, the Suicide Report did not mention the exposed sprinkler heads in the CTC. This may have been because the institution had already addressed that issue, but the integrity and safety of cells used to house self-injurious and potentially suicidal inmates was a system-wide issue, and this suicide should have initiated a review of similar sprinkler heads in all MHCB units and OHUs where potentially suicidal inmates may be housed. HCSD did not identify this problem nor did it consider a system-wide review of this possible physical deficiency. The defendants' objection to this observation simply asserted, "Such a system-wide review was not warranted by this event." Implicit in the otherwise unexplicated assertion is the suggestion that additional hangings from exposed sprinkler heads in CTCs would be needed to justify such a review. That is not a sustainable objection.

This inmate's completed suicide appeared to have been both foreseeable and preventable. He made clear statements of his intent to harm himself. Within the context of the inmate's decompensating mental status and history of psychotic thinking and associated violent behaviors, his statements reflecting his feeling that he was "boxed in" should have been addressed in a comprehensive manner.

## 16. Inmate #T86811

Brief History: This inmate was a 40-year-old African American male who completed suicide by means of an overdose of medication on 5/4/03 at the reception center at Richard J. Donovan Correctional Facility (RJD). The inmate was admitted to CDC and

the RJD reception center on 4/8/03 with commitment offenses of second degree burglary and petty theft with priors after receiving a six-year sentence. The inmate pled guilty to these charges on 1/17/03 and could have received a 25-year to life prison term under the three strikes law based on two prior felony convictions in New Mexico. The Suicide Report indicated the court sentenced the inmate to the milder six-year term because of the nature and seriousness of his offenses, the slight value of the stolen property involved ($131.12) and the defendant's apparently life-threatening illness. This was the inmate's first CDC incarceration.

The inmate was discovered by his cellmate on 5/4/03 at approximately 7:50pm lying on the floor and curled in a fetal position. The inmate did not respond to his cellmate, who alerted a correctional officer that the inmate needed medical attention. The correctional officer responded to the cell and alerted central control of the need for an emergency transport vehicle because the inmate did not seem to be breathing. The correctional sergeant arrived on the unit, obtained the ambubag and together with another correctional officer, began CPR. The Incident Report indicated the emergency transport vehicle arrived approximately five minutes later, and two MTAs relieved the sergeant and officer and continued CPR. The inmate was taken to the CTC, where a paramedic unit arrived at approximately 8:20pm in response to a request from CTC staff, and continued CPR. One of the paramedics contacted a physician, although the location of the physician was not specified, who pronounced the inmate dead via telephone at 8:38pm. The Inmate Death Report listed the provisional cause of death as Cardiopulmonary Arrest, and the inmate was noted to have a history of Hepatitis C and Lymphoma which had been treated with chemotherapy in 1999.

The Autopsy Report from the Office of the Medical Examiner, County of San Diego found the cause of death to be "Acute Intoxication" and the manner of death, "suicide." The medical examiner indicated the inmate had (1) acute Doxepin intoxication, (2) mild chronic hepatitis consistent with hepatitis C, (3) mild mitral valve prolapse, (4) history of lymphoma with no evidence of residual or recurrent disease, (5) gynecomastia consistent with use of Premarin and Provera associated with a history of transsexuality, and (6) evidence of medical therapy. The report stated, " . . . . specifically, there was no evidence of recurrent or residual lymphoma or fatal infection." The autopsy reported that toxicology studies revealed a lethal level of Doxepin and its metabolite in the blood and liver. The report also stated that the level of Doxepin and its metabolite in peripheral blood was more than ten times the maximum expected level with therapeutic use and only a small amount was detected in the stomach; and the therapeutic level of Wellbutrin and its metabolite was detected in the peripheral blood. The conclusion of the Chief Deputy Medical Examiner was that "in consideration of the history of depression and the extremely high level of a drug, which is not a drug of abuse, the overdose of Doxepin appears to have been intentional; therefore the manner of death is classified as suicide."

A letter dated 2/27/04 from the Chief Psychologist, HCSD, to the Coleman Special Master, indicated that, based on the medical review of this case by Anita Mitchell, M.D., Chief Medical Officer, Clinical Standards and Services, HCSD, this death was not a suicide. CDC determined the final cause of death was "iatrogenic drug overdose," with a

"lethal level of Doxepin in the blood and liver." As a result of this determination, a full Suicide Report was neither completed nor initially provided to the Special Master. Only much later and at the request of the Special Master, on the advice of his expert, was a Suicide Report prepared and provided.

The Suicide Report referred to a probation officer's report, dated 2/21/03, that provided a description of the inmate's attempted theft of liquor, strawberries and fried chicken in a San Diego grocery store in November 2002, which was the basis for his commitment offense. There were also references to the inmate's alcohol and drug addictions, including cocaine. The inmate had apparently been incarcerated approximately four weeks at the time of his death. The probation officer's report also described the inmate's 22-year relationship with a male partner, who died in September 2002. At the age of 15 years, the inmate apparently lost his father due to a heart attack, and the impact of his father's death lead to the inmate's drug use. The probation report indicated the inmate obtained AA degrees in Computer Science, Business Administration and Public Administration, as well as a certification for training in Microsoft software. On the other hand, the probation officer's report included the inmate's statement that he had spent "25 years in prison." His criminal history apparently began in 1981, with a history of at least four primarily property-related crimes in New Mexico, Iowa and California. The inmate reported to his probation officer that he had a life-threatening brain tumor and was taking pain medications, including a morphine patch and Seroquel and Doxepin for depression.

A review of the UHR indicated the inmate was admitted to CDC on 4/8/03. A San Diego County Sheriff's Department Confidential Medical Information Transfer Sheet indicated the inmate was a transgender male with a history of Hepatitis C and abnormal liver function tests. The inmate was also noted to have had complaints of weight loss, diarrhea and a history of Depressive Disorder NOS. Medications on the transfer sheet included Premarin, Provera, Ecotrin, Spironolactone, Prilosec, Wellbutrin, Sinequan, and Nasacort. The inmate's HIV tests were reported to be non-reactive as of 1/9/03. The bus screening completed on 4/8/03 at RJD indicated the inmate had been diagnosed and treated for mental illness in the past. The bus screening also showed negative responses to questions about suicide attempts or suicidal ideation, although responses to questions about current mental health problems and psychiatric treatment were positive. The bus screening form did not indicate whether the inmate was referred to mental health and he was released to custody, but a chrono, also dated 4/8/03, indicated the inmate had a history of psychiatric care, needed assessment and a "psychotropic medication review" and referred him for further evaluation.

A mental health placement chrono, with dates and signatures that were illegible in the provided copy, indicated the inmate "meets the inclusion criteria" for mental health treatment population as a "medical necessity," with a GAF of 55. Doctor's orders on 4/8/03 indicated the inmate was prescribed Premarin, Provera, Spironolactone, and Wellbutrin, with notes on 4/9/03 indicating the addition of Sinequan with a request for Sinequan levels and other lab work, as well as a request for medical records and lab work from the San Diego County Jail. A Clark DDP screening on 4/9/03 indicated NCF, but also indicated the inmate might be suffering from a thought and mood disorder and

experiencing a Major Depression. The psychologist who conducted the DDP screening referred the inmate for further evaluation.

The inmate's MAR for May indicated the inmate received his medications from May 1 through May 4. No MAR was available for April 2003, and the UHR provided for this deceased inmate contained no documentation for any mental health contacts with the inmate after his positive bus screening, other than the DDP screening. After the inmate's entry physical examination, the next documented entry in the UHR was the Medical Report of Injury or Unusual Occurrence Report and Emergency Care Flow Sheet, dated 5/4/03, the date of the inmate's death.

Notwithstanding the absence of supportive documentation in the provided UHR, the Suicide Report indicated the inmate was evaluated by a psychiatrist on 4/9/03. The Suicide Report indicated the psychiatrist found the inmate "very depressed, tearful and some sleep disturbance," and noted that he "denied hallucinations," but reported "suicidal ideation, no active plans." In his 4/9/03 examination, the psychiatrist described the inmate as "alert, oriented x 4, articulate, soft-spoken, depressed, tearful, some sleep disturbances, passive suicidality – contracts for safety. Memory, concentration, and judgment are well preserved." The Suicide Report also indicated the psychiatrist diagnosed the patient with "Major Depression (mild to severe)," prescribed Sinequan, ordered Doxepin levels, an EKG, and medical records and lab work from the San Diego County Jail, and prescribed Provigil with follow-up in one week. The staff psychiatrist reportedly signed and stamped the order, which was dated 4/9/03. A consent form was obtained for Sinequan, Wellbutrin, and Provigil on that date and signed by the same psychiatrist and the inmate, who signed his name as "Mrs."

The Suicide Report also referred to an MH-7, dated 4/17/03, resulting from a psychologist's evaluation of the inmate, which noted the inmate's statement that his "husband just died last September after 22 years." The evaluation also indicated the inmate worked as a legal assistant, had been in prison for embezzlement, had a mild sleep disorder and obsessive thoughts, received outpatient mental health treatment when his mother died and had been taking Sinequan and Wellbutrin within the last two years. The evaluation indicated that the inmate did not report a history of suicide attempts, but did state that he "almost jumped off the pier" after throwing his male companion's ashes into the water. The inmate further claimed to have been in a gun battle in Mexico, during which he killed three people, complained of a chronic, severe sleep disorder due to which he had not slept for two days and reported that he had a Ph.D. in law. The evaluation reported the inmate as suffering "anxiety and depression," and "narcoleptic sleep attacks," as well as the fact that he had not received his medications for three days after a housing change. The psychologist diagnosed Bereavement, Complicated, Gender Identity Disorder, and Narcolepsy, with a GAF of 55 and recommended placement in the MHSDS at the 3CMS level of care. The Suicide Report also indicated the inmate was called for psychiatric appointments on 4/16/03 and 4/17/03 but "did not present himself." No documentation of the scheduled appointments was provided.

The Suicide Report indicated that the UHR documentation it reviewed but did not provide suggested the inmate was "grandiose, dishonest, and antisocial." It further reported the inmate "evidently did not have a significant mental health history prior to entering the CDC." These statements seemed to contradict the inmate's positive bus screening. The Suicide Report also noted that due to the length of time between the inmate's death and the preparation of the Suicide Report, it was not possible to interview inmates or staff who might have had knowledge of the inmate. Nonetheless, the Suicide Report indicated the deceased inmate had had four different cellmates at RJD, the last of whom was his cellmate for approximately two weeks. This last cellmate, according to the Suicide Report, described the deceased inmate as "well-read and intelligent"; "a normal nice guy but homosexual"; and as taking liquid medications.

The Suicide Report noted that the inmate was an unreliable historian and appeared to have an Antisocial Personality Disorder. The Suicide Report found that, in order to commit suicide by overdosing on Doxepin, the inmate would have had to "circumvent the DOT procedures by avoiding detection from staff that he was not swallowing his liquid medication." The Suicide Report noted that he would have had to transport the medication back to his cell from the facility clinic and store a sufficient quantity of medication to kill himself, a possibility discounted as unlikely. A more likely alternative explanation, according to the Suicide Report, was that the inmate was a victim of a catastrophic medical event related to the deadly interaction of his multiple prescribed medications. The possibility that the inmate might have obtained Doxepin from other sources within the institution in pill form was not considered in the Suicide Report. .

The Suicide Report identified three problems and contained the following recommendations:

Problem 1: Documentation and record-keeping with respect to prescribing medications were inadequate. Informed medication consent forms were missing and the rationale supporting prescription practices were not noted in the UHR.

Recommendation: Training needed to be provided to physicians and psychiatrists on documentation and record-keeping related to medications, emphasizing the need for a corresponding progress note to explain the reasons for prescribing a particular medication. The training should also stress the importance of writing legible documentation. .

Problem 2: Follow-up mental health contact with this inmate who entered a safety contract was not provided in a timely manner.

Recommendation: Training of mental health staff on the importance of close follow-up of inmates with safety contracts was required. Safety contracts without establishing a therapeutic relationship were meaningless. When contracting inmates missed follow-up appointments, significant efforts needed to be undertaken to locate and contact them to determine their mental status.

Problem 3: The inmate's MAR for April was missing, and staff were unable to locate it.

Recommendation: The institution was directed to establish a QIT to review the tracking and filing of MARs and develop an effective tracking and filing process.

There was no follow-up report from RJD on the implementation of the recommendations contained in the Suicide Report.

Findings: This inmate's death appeared to have been foreseeable because he reported suicidal ideation without a plan, as well as the recent significant loss of his partner of 22 years. Although he contracted for safety with a psychiatrist, with whom he had just one meeting, follow-up was scheduled but never delivered. There was no SRA included in the documents provided on this suicide, nor was documentation provided to support the Suicide Report's descriptions of the psychiatrist and psychologist's evaluations. This inmate's death might have been prevented if he had received the appropriate and scheduled follow-up described in the Suicide Report, or if appropriate DOT and documentation practices been in effect and monitored. Without the April MAR, it was impossible to verify the actual delivery of medication via liquid or pill form or the inmate's compliance with his medications. The absence of a SRA for an inmate, who reported suicidal ideation without a plan, came into the facility on antidepressant medication, indicated the loss of his significant other in the recent past, made references to an unexplained limited time to live and was diagnosed with Major Depression and Bereavement, complicated, was significant.

Despite its analysis of the death here, the Suicide Report made no recommendation for the charter of a QIT or other process to identify inmates who might be prescribed a mixture of medical and mental health medications that might possibly have iatrogenic, deleterious, synergistic or even lethal results. CDC initially rejected the medical examiner's conclusion that the manner of this death was a suicide. Only after extensive delay did the department conduct its review and submit a Suicide Report in December 2004. In that report, recommendations for remedial actions included the possible need for a QIT to examine DOT policies and procedures, but only if CDC's Chief Pharmacist, who earlier rejected the coroner's characterization of the death as a suicide, was now persuaded that the deceased inmate's death was indeed a suicide. That recommendation appeared to equate erroneously and inappropriately the pharmacist's opinion on the cause and manner of death with that of the Office of the Medical Examiner. It also suggested the wrong remedy. Even if the Chief Pharmacist were correct about this death, the more appropriate remedy would appear to have been a system-wide review of departmental polypharmacy policies and procedures.

The recommendation for training on the documentation and closer monitoring and follow-up of with inmates with safety contracts also failed to address some broader failures. Assessments by a psychiatrist and a psychologist that the inmate had a Major Depressive Disorder and Bereavement, Complicated, as well as Gender Identify Disorder and Narcolepsy were not pursued in any meaningful way, nor was there evidence of any IDTT treatment planning and a MH-4 in the documents provided. The mental health treatment apparently provided to this inmate was inadequate and ineffective.

**17. Inmate #H05294**

Brief history: This inmate was a 33-year-old Caucasian male who completed suicide by hanging on 5/10/03 at Pelican Bay State Prison (PBSP). The inmate was reported to have had no prior mental health history and was never a participant in the MHSDS. Review of the record indicated that the inmate was admitted to the CDC on 11/20/91 via the reception center at SQ. He was transferred to PBSP on 11/26/91 where he remained until his death. The inmate's commitment offense was first degree murder with numerous enhancements, including kidnapping, burglary, robbery, grand theft auto (armed), and the involvement of minors which resulted in a sentence of life without possibility of parole plus 21 years. The inmate was serving a SHU term for a disciplinary infraction involving the possession of a weapon with an MERD of 9/18/03.

The inmate was discovered by a correctional officer on 5/30/03 at 10:55pm in a sitting position between the lower bunk and the cell toilet hanging by a cloth material tied around his neck and attached to an upper bunk. The correctional officer was making his 11:00pm institutional count and notified the control booth officer to activate the unit alarm. A sergeant, several other officers and a MTA responded to the call. When sufficient staff was present, the officers entered the cell and removed the noose from the inmate's neck, whereupon a correctional officer and a MTA immediately began CPR. The inmate was transferred by a Stokes litter to an ambulance and transported to Sutter Coast Hospital where a physician pronounced him dead at 11:50pm. Because the incident report provided was incomplete (i.e., every other page was not copied), the synopsis of the actual incident was derived from the Suicide Report.

This was the inmate's first CDC incarceration. For seven months prior to his commitment in 1991 to CDC, the inmate was housed in a county jail, where he incurred numerous disciplinary infractions requiring his isolation from other inmates, was being treated for Major Depression and drug abuse and had prescriptions for Sinequan and Benadryl. Although the inmate was referred for further evaluation, no information was provided on the results of any such evaluation.

The inmate, again, was not a participant in the MHSDS at the time of his death and received no mental health services during the course of his tenure at CDC. He did receive at least two mental health screenings related to his AdSeg and SHU placements within the last six years, both with negative results.

The Suicide Report opined that the inmate appeared to have a "psychopathic personality" and had adjusted well to life in prison. The inmate reportedly was heavily involved in "prison politics," was known as a "maniac" on the yard and was suspected of manufacturing and carrying weapons. Although he was not validated as a gang member, his confidential file reflected involvement in racial fights, numerous enemies, participation in Satanism and the possession of white supremacy literature. His classification score was 123, and, while he had only ten RVRs in his record, he was suspected of being involved in more inmate stabbings than he was charged with. The RVRs were for possession of weapons, attempted murder, mutual combat, fighting and disobeying orders. He also had a conviction for attempted murder and assault with great

bodily injury in the 1998 stabbing of another inmate, for which he received an additional seven-year consecutive sentence. The C-file also indicated that the inmate had an horrific childhood, including extensive physical and sexual abuse by his parents and grandfather.

The Suicide Report cited interviews with correctional officers and other inmates that suggested the inmate killed himself the night before Mothers Day to get back at his mother for her alleged abuses. Correctional officers reported that the inmate was bright and well adjusted to institutional life. The inmate's suicide apparently "came as a complete surprise to everyone who knew him," although it was believed that the suicide was probably planned and not a response to impulse. The inmate left a suicide note requesting that his coffee and other belongings be given to another inmate in a different cell who had no funds. He described the note as his "dieing will." The autopsy report identified the cause of death as asphyxia due to hanging, and toxicology revealed that there was no alcohol or illicit drugs in the inmate's system at the time of his death.

The Suicide Report did not provide any recommendations regarding this inmate's death.

Findings: This inmate was not a participant in the MHSDS and was not known to be in any psychological distress; no recent changes in behavior or functioning had been noticed; and he had requested no mental health services. This inmate's death did not appear to have been foreseeable or preventable.

## 18. Inmate #P62291

Brief history: This inmate was a 26-year-old Hispanic male who completed suicide on 5/21/03 by hanging in his Ad Seg single cell at the California Substance Abuse Treatment Facility (CSATF). The inmate was admitted to CDC for his first incarceration on 12/20/99 subsequent to his conviction on 18 counts of robbery, 14 of them with firearm enhancements, one count of receiving stolen property, and two counts of sexual battery by restraint. He was sentenced to 58 years. While incarcerated, he received RVRs for the possession of a weapon and contraband for which he received additional time resulting in a total sentence of 66 years. The inmate entered CDC through the reception center at California State Prison, San Quentin (SQ) and was transferred to CAL, RJD, California Correctional Institution (CCI), CAL again and ultimately to CSATF on 9/25/02. His various bus screenings and mental health screenings contained no positive indications of a need for mental health services throughout his incarceration. Apparently, the inmate's last evaluation in AdSeg was conducted at cell-front in CAL on 12/29/01.

The inmate was discovered hanging from the cell vent in his assigned AdSeg cell at approximately 9:30pm on 5/21/03 by a correctional officer who was conducting count and picking up mail. The officer activated his alarm and retrieved a cut down tool. On the arrival of a sergeant, the cell was entered, and the inmate was cut down. The inmate was handcuffed, and medical staff arrived at the scene ten minutes after the inmate was discovered. An MTA and RN who responded discovered that the inmate still had a pulse and CPR was begun. The inmate was transported by an emergency response vehicle to the CTC, where CPR was continued. The CPR, however, proved unsuccessful, and the

inmate was pronounced dead at 10:25pm.  The Autopsy Report dated 5/22/03 indicated the cause of death as asphyxia due to ligature strangulation (hanging).

The record and the Suicide Report indicated the inmate had no involvement with the MHSDS and no history of mental health treatment prior to his incarceration.  While there was no record of juvenile offenses, his first arrest occurred when he was approximately 19 for being under the influence of a controlled substance, followed by arrests for hit and run, kidnapping to commit robbery, assault with a deadly weapon, receiving stolen property and other offenses.  His current incarceration with a 58-year sentence was the result of his arrest at 22 years-of-age, as described above.  He requested placement in AdSeg on 5/18/03 because of reported enemies on the yard.  The inmate had also requested placement on a Special Needs Yard at his 5/21/03 ICC, and this process was pending at the time of his death.  There was a note discovered in his cell, dated 5/20/03, in which he reportedly described his feelings for his family, acknowledged making bad choices and emphasized he was not a bad person.  His note also described frequent dreams of the ocean and his realization that he would never see the ocean again.  The note also reportedly described the deceased inmate as being all alone and unable to tolerate prison anymore.

The Suicide Report made no corrective recommendations following this inmate's death.

Findings:  This inmate was not a participant in the MHSDS.  He appeared to have had fears for his safety in the days and weeks preceding his death and requested a placement in AdSeg and a Special Needs Yard, although the reasons for these requests were unclear. He had a long sentence of 58 years and received an additional eight years due to disciplinary infractions committed in CDC.  There was no explanation in the Suicide Report for the failure of custody staff to provide ventilation (as part of CPR) for this inmate until medical personnel arrived, nor did the Suicide Report address this issue in its recommendations for corrective actions.  The Suicide Report also failed to consider the mesh size of the ventilation grates, identified in other Suicide Reports as contributing to suicides by hanging in AdSeg units.

There was no information in the record of this case suggesting this inmate's completed suicide was foreseeable.  On the other hand, the chance of preventing his death might have been greater had his last mental health evaluation in AdSeg been conducted in privacy, rather than at cell-front and had CPR, utilizing appropriate ventilation and compressions, been initiated immediately by discovering correctional officers.  The Suicide Report's failure to identify problems and recommend actions related to these two factors was troubling.

## 19.  Inmate #K39659

Brief History:  This inmate was a 41-year-old Hispanic male who completed suicide by hanging in his AdSeg cell at California State Prison, Corcoran (CSP/Corcoran) on 5/22/03.  This inmate was admitted to CDC via RJD's reception center on 2/18/97, having been convicted on charges related to the disappearance and death of his wife and

receiving a 54-years-to-life sentence. When he arrived at RJD, the inmate was already taking Sinequan and Prozac, which had been prescribed for him in the county jail. On admission to CDC, he was referred for mental health evaluation because of his prescriptions and a history of suicide attempts reported in his bus screening and admitted to the MHSDS at the 3CMS level of care.

This inmate was discovered at 7:26am on 5/22/03 by a correctional officer delivering morning meal trays. The inmate was hanging from a sheet twisted into a rope tied around his neck from the upper bunk railing, and was suspended facing the toilet and sink area. The inmate's hands and feet were tied in front of his body and bound together. The correctional officer, who discovered the inmate, yelled to the control booth officer to activate the unit alarm and retrieved the cut-down kit. He, another correctional officer and a sergeant responded and assembled an "Emergency Cell Entry Team." The team entered the cell, cut the inmate down, removed him from the cell. Medical staff began CPR at 7:30. At approximately 7:42am, the inmate arrived at the Acute Care Hospital on the grounds via an Emergency Response Vehicle that had arrived approximately five minutes after the call was placed. CPR was continued, but was unsuccessful. The inmate was pronounced dead at 8:06am by a physician.

The inmate had earlier attempted suicide after his wife's death, but, subsequently, while in the county jail, married his new girlfriend. The inmate was out to court from March 1999 until March 2000 for the retrial of his committing offense. This long legal proceeding resulted in his conviction for the murder of his wife; he was sentenced again to the same sentence received at the end of his original trial. He continued to appeal his conviction, but his appeals were unsuccessful. On his arrival in CDC in February 1997, he had been placed at the 3CMS level of care and remained at that level of care until June 1997, when he was endorsed for transfer to the CSP/Corcoran EOP after he had been hospitalized for suicidal ideation related to a child custody case concerning his daughter in April 1997. The inmate was considered for transfer to DMH at that time, but he was not transferred. He remained at the EOP level of care for approximately seven months and was discharged to the 3CMS level of care in April 1998, although he was noted to be a high suicide risk at that time.

This inmate stopped taking all medications in July 1998 and was subsequently removed from the 3CMS level of care and the MHSDS caseload in June 2000. In May 2001, the inmate was placed in AdSeg because of reported enemy concerns and submitted sick call requests because of insomnia and agitation. He was placed back at the 3CMS level of care for medical necessity, according to the Suicide Report, but there was no chrono in his UHR for this placement. His treatment with Prozac was also resumed at that time and he was to be seen by a psychiatrist in November 2001, but, again, there was no documentation that this ever occurred. It was unclear from the record what actually occurred relative to the inmate's mental health treatment after his resumption of Prozac, the prescription for which apparently expired in November 2001 without renewal. A note by a psychiatrist dated 9/26/01 indicated that the inmate had missed a scheduled appointment, his medications would expire in November and he would be rescheduled for an appointment on 11/28/01.

The next mental health entry was a 5/20/03 AdSeg mental health screening, which was negative based on the inmate's denial of any past treatment, past history of suicidal behaviors or ideation or any current need for treatment. Several of the questions on the bus screening form were unmarked, but all that were marked indicated no past history of treatment for mental illness or substance abuse, and the screener concluded that a referral was not necessary at the time. The screener apparently was unaware of the inmate's past treatment in the MHSDS system at the 3CMS, EOP or MHCB levels of care, his consideration for transfer to DMH or his three episodes of suicidal ideation and/or attempted suicide. There are no other mental health entries in the record.

Two days later on 5/22/03, the inmate completed suicide prior to his AdSeg review by the ICC.

The inmate's diagnoses during the time that he was actively treated in the MHSDS were for various depressive disorders. He was also noted to have some psychotic features, including auditory hallucinations, and had been estimated as a high risk for suicide at times during his treatment. With regard to medical history, the inmate was noted to have suffered a head injury in a motorcycle accident prior to incarceration and also to have gastroesophageal reflux disease.

The Suicide Report noted the inmate's comments to staff about his resolve to kill himself given his long sentence and hopelessness. The report referred to correspondence from his family, but also his sense of not having any local support. The Suicide Report indicated that mental health staff did not have time to review his records prior to the weekly ICC classification meeting and suggested that the inmate's denial of any past mental health history to the psych tech on 5/20/03 may have indicated his resolve to end his life.

The Suicide Report identified three problems and recommended the following corrective actions:

> Problem 1: The inmate's long-term suicide risk was not tracked.
> Recommendation: The MHTS should be used to track suicide risk
>
> Problem 2: There was a failure to track medical necessity cases.
> Recommendation: Training on procedures to track and eventually remove medical necessity cases was needed.
>
> Problem 3: CSP/Corcoran had two recent suicides in its SHU in which inmates hanged themselves using wide-mesh vent screens or covers. (Sic: in this case, the inmate hanged himself from the upper bunk.)
> Recommendation: Plant Operations should evaluate the possibility of installing vent covers with smaller mesh.

CSP/Corcoran submitted a follow-up report to HCSD on 5/25/04. The report included a memorandum to all clinical staff on the use of mental health tracking forms to track

medical necessity cases and the need for clinicians to complete the form's "Behavioral Alerts," "Suicide Information," and "Alerts" sections; IST training sheets for clinical staff on these subjects; and a memorandum, dated 4/2/04, from the Correctional Plant Manager II A on the projected cost of replacing current ventilation screens with screens with a smaller mesh..

Findings:  This inmate had a history of past mental health treatment and suicidal behaviors and ideation that preceded his incarceration and continued during the early part of his incarceration, when he was in the 3CMS, EOP and MHCB levels of care.  He was considered for a referral to DMH at one point, and was then assessed as a high risk for suicide.  The inmate stopped taking medications, and was removed from the MHSDS approximately two years later, as noted in the records.  Apparently, he subsequently sought mental health services, but the record was confused about whether his antidepressant medication was resumed and he was ever actually placed again in the MHSDS as a 3CMS medical necessity inmate.  There is no documentation to support this last event, but the Suicide Report makes reference to it.  He was supposed to have been seen in September 2002 by a psychiatrist, and medication was apparently prescribed at that time.  He was not seen as planned for a follow-up appointment in November 2002, nor apparently was he seen thereafter.  When the inmate next came to the attention of mental health staff due to his requested placement in AdSeg after a fight with his cellmate, the psych tech did not complete the mental health screening and was clearly unaware of the inmate's past history.  The inmate, therefore, was not seen for a more complete mental health evaluation, and committed suicide two days later.

This inmate's death may not have been foreseeable because, according to the records, he never made his self-injurious intentions known to anyone.  The suicide, however, was clearly preventable. The inmate should have been replaced in the MHSDS caseload in the fall of 2002, when his antidepressant medication was renewed, but he apparently fell through the cracks with regard to any follow-up comprehensive mental health services or treatment planning.  His more recent failure to report his significant past history of mental health treatment and suicidal behaviors, all recorded in the UHR, should have been reviewed by mental health staff and a more vigorous evaluation undertaken.  Had policy requirements been followed in either of these two instances, it was considerably less likely that this suicide would have occurred.


**20.  Inmate #T44931**
Brief History:  This inmate was a 22-year-old Hispanic male who committed suicide by hanging on 5/27/03 at the California Substance Abuse Treatment Facility (CSATF).  The inmate was housed in a double cell in AdSeg, but he was the only inmate assigned to his cell, where he was housed after being assaulted by two inmates on 4/20/03.  The inmate was a participant in the MHSDS at the 3CMS level of care; had been diagnosed with Psychotic Disorder NOS; and was prescribed Geodon.  The inmate was admitted to CDC on 2/27/02 via the SQ reception center.  He was transferred to SVSP on 7/10/02, and to CSATF on 3/21/03.

The inmate was discovered hanging by a sheet and towel from the light fixture in his cell at approximately 12:40am by the floor officer. The correctional officer reported that the inmate was last seen alive on 5/26/03 at 11:55pm during an institutional count. When the inmate was discovered hanging, the officer retrieved the cut-down tool and access keys. Approximately three minutes after the discovery, the sergeant and another correctional officer responded to the cell, and the inmate was cut down. The inmate was lowered to the floor, and an MTA and RN who responded attempted to take vital signs. Finding no vital signs and the inmate's skin cool to the touch, they decided not to attempt CPR. Photographs were taken; the inmate was cuffed, removed from the cell, and transported to the CTC by the ER van. The on-call physician arrived at approximately 1:40am, and pronounced the inmate dead at 1:45am.

The coroner's Autopsy Report reported the cause of death as asphyxia (hanging), and classified the death as a suicide. The Toxicology Report revealed the blood was negative for all tested drugs as well as for alcohol.

This inmate was serving his first prison term with a 13-year sentence for Second Degree Robbery and Assault with a Deadly Weapon likely to produce great bodily harm. The inmate's offense involved a man who observed the inmate and two co-defendants taking a scooter from a young boy and gave chase. The man was subsequently assaulted, and the defendants took a gold chain from him. They also assaulted the woman who was with the man while she was attempting to telephone the police.

The inmate's criminal history dates to approximately age 16, when he was arrested as a juvenile for vehicle theft. In addition to his committing offense, the inmate's adult record included arrests for assault, disturbing the peace, driving while under the influence, resisting arrest, threatening crime, graffiti, being under the influence and driving while under the influence, as well as gang criminal activity. He was reportedly a member of the "VGL" ("Varrio Gramercy Locos"). The inmate also had a history of abusing alcohol since approximately 8 to 9 years of age, followed by marijuana, methamphetamine, and cocaine. He also was reported to have used LSD on one occasion. The inmate had been treated in a substance abuse program prior to his arrest.

The inmate received three bus screenings during the course of his incarceration. The first bus screening occurred on 2/27/02 at SQ, and, because all responses were negative, no referral was made to mental health. On 3/21/02, a brief screening report also concluded there was no indication of mental illness, and no referral to a mental health professional resulted. When the inmate was transferred from SQ to SVSP, a bus screening was conducted on 7/10/02, during which the inmate indicated that he had been receiving psychiatric treatment for depression, but had refused medications for approximately one month and now wanted to re-start his medications. During this bus screening, the inmate reported a suicide attempt in May 2002. A 24-hour referral to mental health was generated. The inmate's third bus screening was conducted on 3/21/03 at CSATF following his transfer from SVSP, in which the inmate indicated he was taking Prozac for depression and had attempted suicide in February 2002. This bus screening generated a 72-hour referral to mental health.

The inmate actually came first to the attention of mental health staff when a psych tech at SQ referred the inmate because of complaints of poor sleep and labile mood. A psychologist saw the inmate on 5/24/02 and indicated the inmate was not in the MHSDS but reported "suicidal thoughts one month ago and doesn't talk to anyone since coming to SQ." The note also recorded positive "A/V hallucinations," "negative S/H ideations," flat affect, poor appetite, and bizarre presentation with referral for medical evaluation. On 6/13/02, he was seen by an IDTT, which included a psychiatrist, psychologist and psych tech. The team noted that the inmate reported auditory and visual hallucinations, paranoid ideation, and concluded that, while there was no current suicidality, the risk of violence was elevated. The diagnosis was Psychotic Disorder NOS, and a GAF of 52 was assigned. On that same date, the inmate was added to the MHSDS as a 3CMS inmate. He was prescribed Risperdal for 90 days on 6/13/02, but that order was discontinued on 6/25/02. The next order for psychotropic medications was on 8/23/02, after his transfer to SVSP, for Prozac for 90 days.

The Suicide Report referred to an IDTT held on 7/22/02 at SVSP, but no documentation of this IDTT meeting was included in the materials provided. The Suicide Report indicated the IDTT added Antisocial Personality Disorder to his original diagnoses, and noted the ambivalence in his desire to be placed within the MHSDS. On 8/6/02, the inmate was placed in AdSeg for safety and security reasons after a gang member informed a correctional officer the inmate was in danger of being stabbed within two days. Other than the prescription for Prozac, dated 8/23/03, no mental health contact with the inmate was documented until 9/2/02, when the inmate stated in a medical report of injury or unusual occurrence, "I'm lonely- loneliness" and "I'm suicidal." Reportedly, he placed strips of sheet around his neck and pulled both ends of the sheet tightly to support his claim that he was suicidal. Although there were no injuries, the inmate was sent to the CTC ER for a psychiatric evaluation. A psychiatrist completed a SRA on 9/2/02 to determine the need for referral to the MHCB unit. In the SRA, only the box for correctional officer or other staff interviews was checked, while boxes indicating interviews with inmates and review of the UHR and C-file were not checked. The SRA referred to a previous suicide attempt on 5/02 by hanging and quoted the inmate as stating, "I backed down." The SRA noted that this was the inmate's first prison term, as well as the inmate's poor compliance with treatment/medication. The diagnosis was Adjustment Disorder with Depressed Mood, and the inmate was referred to his primary clinician or case manager. An IDTT on 9/9/02 noted the inmate's auditory hallucinations, paranoid ideation, impaired insight and judgment, poor sensorium, poor interview attitude and possible risk for violence, but reported no current suicidality. The IDTT diagnoses were Psychotic Disorder NOS and Antisocial Personality Disorder, while identified problems included extreme noncompliance with treatment (especially medications), auditory hallucinations, some paranoid ideation and poor insight. The inmate was retained at the 3CMS level of care in AdSeg. The MH-2 also noted that the inmate "vacilates" between medication compliance and non-compliance, as well as inclusion in the MHSDS.

On 9/29/02, the inmate presented to the emergency room and a medical report of injury or unusual occurrence indicated the inmate's complaint as "I'm suicidal still." In addition, a reddened pressure area to the right temple was noted. The MTA assessment also recorded "reports petit mort and autoasphaxiation in history (sic)" with a plan to refer the inmate to the MHCB unit. No documentation was provided to confirm that the inmate received a mental health evaluation in the emergency room or that a SRA was administered.

The next mental health note was filed by a case manager, who saw the inmate on 10/7/02 during a routine case management interview at cell-front. The inmate was described as hostile, denying suicidal ideation, impulsive and continuing "to be oppositional and responding sarcastically to questions." The assessment was that the inmate appeared stable, and the plan was to refer him to the psychiatrist to discuss medications. The inmate was seen by a psychiatrist on 10/12/02, who noted the inmate was refusing medications and unwilling to be interviewed and concluded, "will reevaluate 2 weeks." The next note from a psychiatrist, dated 12/6/02, indicated the inmate was not taking his medications, but denied suicidality and auditory or visual hallucinations. The psychiatrist directed that the inmate should be followed as needed. A psychiatrist next saw the inmate on 1/10/03 and indicated the inmate did not want to continue his meds, but reported no suicidal or homicidal ideation or auditory or visual hallucinations. The psychiatrist noted the inmate's poor insight and ordered continued follow-up. It was unclear whether the psychiatrist intended to order medication at that time.

Case manager contacts occurred approximately weekly from 10/7/02 through 12/19/02, although all were conducted at cell-front because the inmate refused to leave his cell and declined an out-of-cell interview offer. The inmate had been ordered Geodon, as well as Prozac, but his medication compliance was variable. On 5/12/03, Geodon and Prozac were ordered to be continued for the next 90 days.

The Suicide Report described an IDTT on 2/10/03 in AdSeg, but, again, documentation for this meeting could not be found in the materials provided. The Suicide Report indicated the team's diagnoses as Psychotic Disorder NOS and Antisocial Personality Disorder. The team also reportedly noted some improvement in his medication compliance, which at that time included just Prozac.

The inmate was transferred to CSATF on 3/21/03, where he was scheduled to be seen by a psychologist on 3/26/03, following his positive bus screening. The psychologist noted the inmate was a new arrival who "refused to attend. Signed refusal. Reducate. LOC=med nec." The note also indicated no chart was available. On 4/16/03 the inmate was seen by a case manager, who described the inmate as vague, argumentative and providing "no clear answers to standard questions." This note indicated the inmate spoke of seeing the grim reaper and admitting to inhalant use (glue) for a year. The inmate apparently became uncooperative and profane and was dismissed from the interview, with an order for follow-up in 30 days to reassess and make an appropriate level of care determination. The next clinical note, dated 4/24/03, was generated at an AdSeg ICC hearing, where the inmate denied suicidal or homicidal ideation and showed no evidence

of deterioration. In the final mental health note prior to the inmate's death on 5/5/03, his case manager reported that he continued to be on the 3CMS caseload and had a variable history of compliance with his Prozac medication. This note described the inmate as speaking of "voices in head," laughing and stating, "I feel own little world." The note recorded the inmate's discussion of his substance abuse, receiving counseling in school and problems controlling his anger, as well as his report that he had been hearing voices since June 2002. The note indicated that the inmate's family had visited, but he refused to see them. The inmate reported he "has suicidal thoughts – but not able to follow through." No assessment or plan for follow-up was included in this final clinical note.

The Suicide Report described interviews with inmates and staff that suggested the inmate was becoming "increasingly disorganized in his thinking and functioning." Neighboring inmates described him as stressed, telling them he heard voices that at times "didn't make sense." In a letter found in his property addressed to "Jesus de Nazereth 1313 gate, planet heven, 95122," the inmate asked God to take him away and referred to the voices he heard. The Suicide Report indicated that the inmate's mother reported her son had deteriorated and refused to see her and her daughter on 5/5/03 for a visit. She reported he did not have any history of mental illness prior to his incarceration.

Although the provided documents indicated the last case manager visit occurred on 5/5/03, the Suicide Report described multiple later clinical contacts with the inmate prior to his suicide. In the first of these later but undocumented contacts, a psychiatrist reportedly saw the inmate at cell-front on 5/12/03. Based on his conversation with the inmate, the psychiatrist reportedly prescribed Geodon in addition to Prozac and ordered both to be administered in the evening. The Suicide Report also described a case manager note of 5/15/03, in which the inmate was reported to have asked, "What's the point?" because his medications had no effect on him. He apparently claimed he continued to hear voices and had a transformer in his head and stated he was the antichrist and believed in magic. The Suicide Report stated the case manager referred the inmate to his psychiatrist. According to the Suicide Report, on 5/22/03 a psych social worker noted the inmate did not want to see his case manager. The Suicide Report described another IDTT held on 5/20/03, undocumented in an MH-2, at which the inmate provided "graphic descriptions of hearing voices" and asked for sun glasses so he could look at his reflection. The IDTT apparently did not offer any new or additional diagnoses and checked a box on the form that states, "Continue with current treatment as outlined on MH2 dated: _____." The date was not filled in. The Suicide Report also referred to a note found in the inmate's property that the inmate wrote on 5/25/03 to a neighboring inmate asking him to be his cellmate, together with a response from the neighboring inmate indicating he was scheduled for an ICC hearing on 5/29 and would request to become the deceased inmate's cellmate. According to the Suicide Report, the deceased inmate's last clinical contact occurred on 5/26/03, when a psych tech observed the inmate and noted that his behavior was alert and appropriate, he seemed oriented and responded negatively when asked if he had any suicidal/homicidal ideation.

The Suicide Report identified two problems and recommended the following actions:

Problem 1:  This inmate's mental condition deteriorated, but his level of care and treatment plan remained unchanged.

Recommendation:  Clinical staff needed training on developing timely and complete individualized treatment plans that incorporate prior clinical information and recent changes in mental status and functioning.

Problem 2:  Several progress notes omitted the time of their creation.  One again, the defendants objected to their own characterization of the problem and insisted that contacts were documented in progress notes, although the described problem focused on the failure of clinicians to date accurately their progress notes.

Recommendations:  Clinical needed training on the proper way to write progress notes.

In response to the Suicide Report the chief of mental health at CSATF provided an account of local actions to implement the recommended remedies, which indicated that all clinical staff had been trained in accordance with the recommendations in the Suicide Report as of 10/22/03.  The response contained a letter of instruction, dated 10/23/03, for those absent from the training; an agenda for the training; and an IST sign-in sheet.  The copy of the IST sign-in sheet for the course entitled, "Suicide Corrective Action Plan Training," that was provided to the author of this report bore no dates, times or clinicians' signatures.

Findings:  This inmate's suicide appeared to have been both foreseeable and preventable.  The inmate presented to CSATF staff with a history of poor compliance with mental health treatment and medications and a history of suicidal statements and self-injurious behaviors.  Available documentation, even including the materials described in the Suicide Report but not physically provided, indicated the staff at CSATF, as well as staff at CSP/Corcoran, did not consider referring this inmate to a higher level of care or pursuing a Keyhea order at any time.  The inmate's history of noncompliance with treatment, as well as his own reports of suicidality and active auditory hallucinations that appeared to influence his behavior, was not appropriately addressed by clinical staff in either facility.  Flaws in adequate assessment and documentation, including undated progress notes and gaps between follow-up visits, also contributed to the inadequacy of the care this inmate received.  References to his decompensation in AdSeg, including his increasing isolation from other inmates and his unusual and bizarre behavior with inmates and staff, were amply noted in the record.  The Suicide Report indicated the inmate was taking his medications during the two weeks preceding his death, but the record also suggested strongly that his medications were without effect on the inmate and reflected his frustration with his unabated symptoms of mental illness.

The failure to provide documents cited in the Suicide Report, particularly in the absence of any proffered explanation for their absence, served to damage the integrity of the review process in this case.

The Suicide Report indicated the need for staff training on well established CDC policy and procedural guidelines for mental health.  The recommendations proposed nothing

more than the training of staff in areas, where they should have already been trained and regularly supervised.  CSATF's response asserted compliance with the recommendation and supplied an unsigned IST attendance roster in proof of its compliance.  Both the review of, and the response to the review of, this inmate's suicide were perfunctory, bureaucratic and ineffectual.

### 21.  Inmate #E06655

Brief History:  This inmate was a 37-year-old Hispanic male who completed suicide at California State Prison, Corcoran (CSP/Corcoran) on 6/2/03 at approximately 4:45am.  The inmate was housed in a single cell in Ad Seg, and was discovered by a correctional officer conducting a count.  This inmate had been admitted most recently to CDC on 1/16/02 via the NKSP reception center as a parole violator with new charges for assaulting a police officer during his re-arrest while on parole.  The inmate was initially admitted to CDC in 1989, and had had a history of arrests for assaults, carrying concealed weapons, grand theft, receiving stolen property, shooting at an inhabited dwelling, attempted murder, false identification to a police officer and lewd and lascivious acts with a child under 14.  The inmate arrived at CSP/Corcoran to begin a SHU term on 6/18/02, and was endorsed for transfer to the MCSP EOP on 4/14/03.  He remained awaiting transfer in the CSP/Corcoran AdSeg until 6/2/03, when he committed suicide.

The inmate was discovered in his single AdSeg cell by a correctional officer conducting a count at approximately 4:45am.  The inmate was observed in a standing position as he had attached a sheet around his neck and tied it to the cell vent.  The officer activated his alarm, staff arrived with protective equipment including shields and vests and entered the cell, at which time the inmate was cut down.  Correctional officers began CPR and the inmate was transported to the emergency room.  CPR and advanced life support continued until he was pronounced dead at 5:12am.

The inmate had a long history of mental health treatment, beginning in approximately 1986, according to the inmate.  The inmate reported that he was admitted to Metropolitan State Hospital after he held a loaded gun to his head, but CDC staff was unsuccessful in obtaining the records from that reported hospitalization.  The inmate also reported up to ten suicide attempts, including an attempted hanging in 1994 in the county jail after his arrest on child molestation charges.  The inmate had various diagnoses, including Mood Disorders, Malingering, Poly-substance Abuse, Antisocial Personality Disorder, Adjustment Disorder and Bipolar Disorder, by history.  This inmate also had a history of amphetamine dependence with amphetamine-related organic hallucinosis, as well as alcohol abuse prior to incarceration.

A treatment plan of 1/17/03 identified diagnoses of Malingering (current), Bipolar Disorder by history and Antisocial Personality Disorder.  The inmate was also diagnosed as HIV positive and with Hepatitis C.  A 5/16/03 treatment plan, written while the inmate was in the MHCB unit, indicated diagnoses of Malingering Mental Illness and Polysubstance Abuse, as well as Antisocial Personality Disorder.  A history and physical done on 5/10/03 indicated a negative HIV test in August 2002, despite the inmate's report

that he was HIV positive.  Other documents in the UHR, the last dated 5/14/03, indicated the inmate was HIV positive.  The inmate was admitted to the MHCB unit from 5/10 - 5/14/03 and again from 5/15 – 5/16/03 because of depression and suicidal ideation.  A SRA was conducted on 5/10/03 prior to his first discharge, indicating the inmate was at "low risk" for suicide, but this assessment was based solely on an interview because the UHR was "unavailable."  This SRA was incomplete because it did not list any of the inmate's previous suicide attempts, his history of lewd and lascivious acts with a child, history of mental illness and Axis I diagnosis or prior recent suicidal ideation. Based on the inmate's denial of imminent suicidal ideation, the inmate was to return to housing.  Although the treatment plan of 5/16/03 listed diagnoses of Malingering Mental Illness and Polysubstance Abuse, the doctor's orders of 5/14/03 prescribed Neurontin, Buspar, Prozac and Wellbutrin.  There were also references in the record to the inmate's history of seizure disorder.

The inmate's UHR reflected that he had been placed in a MHCB unit for suicidal ideation or suicide attempts five times from 12/2/02 through 5/16/03.  Psych Tech notes taken in AdSeg during the two weeks prior to his death indicated the inmate was cooperative, denied suicidal/homicidal ideation, continued to experience depression, but was feeling better.  The record also noted he attended and apparently participated in groups, although there were also notes indicating the inmate wanted to get out of the EOP program and go to ASH, if he could not be downgraded to 3CMS.  Group notes during that same time period indicated the inmate refused groups on 5/15/03 and 5/16/03 and participated minimally in groups on 5/22 and 5/23.  The last Psych Tech rounds indicated the inmate was compliant with medications and looked forward to a move to MCSP on 6/1/03.  Documentation of the five day follow-up after his last admission to the MHCB unit was confusing; it indicated that the first day of his five-day follow-up was 5/15/03, which appeared to be the date he was both discharged and readmitted to the MHCB unit.  The note from the second day, 5/16/03, indicated he was returned to the MHCB unit during the first watch of that day, but was still counted as day two.  Days three, four and five were dated 5/17, 5/18, and 5/19 respectively, and all indicated there were no suicidal issues.  An IDTT progress note, dated 5/27/03, indicated the team included two psychologists, a CCI and a teacher, but no psychiatrist.  The inmate was present and described as medication compliant and showing no change.  The team found him not at risk for self injury or assaultive behavior.  The note reported the inmate denied any present risk of self-injury or assaultive behavior, but observed that he has been seen frequently in the ER in the CTC for suicidal ideation.  The inmate apparently asked again to get out of EOP, and was told he would be considered for 3CMS when he demonstrated stability for three months.  The last notation from any mental health professional was dated 5/31/03.  The psychiatrist who saw him indicated the inmate was behaving bizarrely, sleeping poorly, was depressed, but his mental status was described as "clear."  His insight and judgment were noted as being within normal limits, and the inmate denied thoughts or plans to harm himself or others.  The psychiatrist's assessment was that the inmate was still in a labile mood and "manic/depressed" and his medications were only partially effective, although the psychiatrist planned to continue him on the same medications.

The Suicide Report was consistent with the foregoing analysis of the UHR. It confirmed that the inmate had been endorsed for transfer to the EOP at MCSP on 4/14/03. There was no evidence in the record that an expedited transfer was sought. The Suicide Report also confirmed that the inmate was not considered for referral to an inpatient DMH program despite his multiple MHCB admissions and his episodic non-compliance with medications and EOP programming after his release from the SHU term. The Suicide Report noted the inmate's negative HIV test, but pointed out his verbal assurances to staff that he was HIV positive and his advanced liver disease, from which he reported he was "suffering greatly." His overall health status appeared to have been of great concern to him.

The Suicide Report identified three problems and recommended the following corrective actions:

Problem 1: The inmate was not considered for a transfer to DMH despite his five admissions in six months to a MHCB unit with suicidal ideation and behaviors.
Recommendation: Clinical staff needed to be trained to identify for possible referral to DMH inmates with multiple admissions to DMH.

Problem 2: A recently hired and unlicensed case manager was the primary clinician for this complex and difficult patient.
Recommendation: The institution needed to consider assigning more experienced and licensed clinical staff to the SHU and AdSeg.

Problem 3: Neither a psychiatrist nor a case manager was present at IDTT meetings with this AdSeg EOP inmate. The IDTT progress note was perfunctory.
Recommendation: The assigned psychiatrist and case manager should attend IDTT meetings, and staff needed training in documenting IDTTs properly.

No institutional response from CSP/Corcoran to this Suicide Report was provided. The institutional response should have been filed within 90 days of receipt of the Suicide Report, which was dated 10/29/03.

Findings: This inmate's death appears to have been both foreseeable and preventable. While the Suicide Report recognized the lack of staff attendance/participation in treatment planning, the inexperience of unlicensed case manager who was responsible for managing this patient and the need to train staff on established guidelines for referrals to DMH, it did not identify as a problem the inadequacies of the SRA (including the failure to review the UHR), the inadequate five-day follow-up after discharge from the MHCB in May and inconsistencies in the record with regard to the inmate's compliance with medications and participation in treatment programming.

## 22. Inmate #P49609

Brief History: This inmate was a 31-year-old Caucasian male who completed suicide by hanging on 6/14/03 at Deuel Vocational Institution (DVI). The inmate was double-celled

in the reception center, and his cellmate was asleep at the time of his discovery. The inmate had returned to the CDC on 5/29/03 as a parole violator related to his chronic abuse of methamphetamine. The inmate had an extensive criminal history with multiple admissions to and paroles from CDC. The inmate was never included in MHSDS caseload during his incarcerations at CDC. The inmate completed suicide on 6/14/03, approximately two weeks after his return to prison on 5/29/03.

The inmate was discovered hanging in his double cell in the DVI reception center at approximately 2:35am by a correctional officer who was conducting a count. The Incident Report indicated the correctional officer observed the inmate in a semi-standing position with a sheet tied around his neck with the other end attached to a ladder to the upper bunk. After attempting unsuccessfully to get a response from the inmate, the correctional officer activated her personal alarm to which other custody and medical staff responded. Custody staff entered the cell and used a cut-down tool to sever the sheet from which the inmate was hanging. An MTA and RN began CPR, and the inmate was transferred to the DVI infirmary where CPR was continued. An ambulance arrived, and the paramedics continued their assessment with a paramedic contacting a physician at San Joaquin General Hospital, who ordered CPR to terminate at 3:05am. The inmate was pronounced dead via telephone by the same physician.

The Coroner's Report, dated 6/15/03, indicated the cause of death was "suicidal, hanging." The Suicide Report described a suicide note that read in part, "any usable organs I would like to have donated for transplant surgery, thank you," and was signed by the inmate.

This inmate had an extensive criminal justice history beginning as a juvenile; he was arrested at approximately age 15 for breaking and entering and vandalism. He was then arrested at age 19, convicted of molesting a seven-year-old female cousin and given three years on probation because of his lack of criminal history. The inmate reported he had been sexually abused by his mother's boyfriend from ages 8 through 11. The record indicated the inmate attempted to have sex with his older sister. While still 19, he was convicted of burglary related to his poly-substance dependence, including methamphetamine and cocaine. Because of this arrest, his probation was revoked and he was sentenced to three years in the CDC on the lewd and lascivious conduct offense involving his seven-year-old cousin.

He first entered CDC at age 20 on 3/6/92. The inmate paroled on 3/30/94 and was subsequently arrested for battery and assault and inflicting corporal injury on his spouse. This conviction resulted in his return to CDC on 2/1/95, where he remained through 5/8/98. During this incarceration, the inmate was seen on 10/24/97 for a psych evaluation after being referred by a CCI "due to anger or possible unresolved grief." The inmate was described as alert and cooperative with no evidence of mood or thought disorder. He denied current suicidal ideation and reported one past suicide attempt at the age of 14. While the inmate acknowledged anger and other issues, the conclusion was that there was no need for mental health services. The inmate apparently had three follow-up appointments scheduled for 11/21/97, 12/4/97 and 12/11/97. The inmate was a no-show

for the first two appointments, and during the third appointment, parole plans, including abstinence from drugs, and "no major complaints" were discussed.

After his parole in May 1998, the inmate was rearrested on 6/29/99 for possession of methamphetamine and drug paraphernalia, as well as failure to register as a sex offender. The inmate was sentenced to 32 months and reentered CDC on 8/9/99 via DVI. He was subsequently transferred to CTF on 9/22/99, where he remained until paroled on 2/10/02. He returned to CDC on 7/18/02, once again for failure to register as a sex offender. The inmate was paroled yet again on 10/24/02 and returned to DVI on 3/4/03 on another parole violation, this time related to drug abuse. His latest and last return to CDC through the reception center at DVI occurred on 5/29/03.

This inmate had multiple bus screenings, all of which were negative and resulted in no referrals for a mental health evaluation. The staff referral in August 1995 resulted in a clinical interview, described above, but no referral to the MHSDS caseload. At that time, the inmate was diagnosed with Cocaine Dependence and Antisocial Personality Disorder, but there was no indication of a serious mental illness or recommendation for mental health treatment.

On his last CDC admission, the bus screening at DVI on 5/29/03 was positive because the inmate indicated he was taking Paxil for depression, had been treated for mental illness in 2003 and did have a mental health problem. The bus screening resulted in an immediate referral to mental health. Despite the bus screening's reference for an immediate referral, the inmate apparently was not seen until 6/6/03, as documented in the record. An order dated 5/29/03 continued the inmate's Paxil, while a "psych referral" was mentioned in the same order. Administration of the inmate's Paxil was changed from evening to morning at the same dosage on 6/6/03. The inmate received a mental health evaluation (MH-7) on 6/6/03, during which the inmate reported his history of sexual and physical abuse and his treatment with Paxil 30mg h.s. for depression since 5/2/03. The evaluation recorded no current suicidal behavior, but described a history of suicidal behavior, which was recorded as follows: "summer of 02 – 2x – OD on sleeping pills – hung self – on the streets," which was related to "relationship problems." The inmate apparently also reported a history of torturing animals, setting fire, "lots of fights in prison," domestic violence and methamphetamine dependence. The evaluation indicated the inmate's mood was stable, but noted his history of depressed feelings, helplessness and hopelessness. Otherwise, the inmate's mental status was reported as being essentially within normal limits. The diagnoses identified in the evaluation included "Major Depression, single episode, mild (with meds), Antisocial Personality Disorder." The plan was to admit the inmate to the MHSDS at a 3CMS level of care and follow-up the evaluation in 30 days. A subsequent note, apparently written by a psychiatrist, indicated the inmate was seen on 6/13/03, at which time he had no complaints, was receiving his medications, denied auditory hallucinations and suicidality and appeared courteous, pleasant and stable. The progress note made no change in existing treatment or medication orders.

The Suicide Report indicated the inmate was seen by a psychiatrist on 6/6/03 after an evaluation in the reception center from which the psychologist walked the inmate to a psychiatrist. An order for Paxil was renewed at the same dosage. The UHR, however, contained no progress note indicating the inmate was seen by a psychiatrist on 6/6/03. The provided MARs and records indicated the inmate began receiving Paxil on 5/30/03, which continued through 6/13, with an interim change in administration from h.s. to a.m. The final progress note resulting from contact with a psychiatrist was dated 6/13/03. The inmate completed suicide the following day.

The Suicide Report indicated the inmate's cellmate was unaware the inmate was contemplating suicide and was surprised by his cellmate's death. Interviews with a cousin revealed that the inmate had gotten himself into trouble on the street and was afraid of being harmed in some way. The inmate was placed on antidepressant medication for approximately six weeks prior to his death, beginning at the county jail and continuing in CDC. His reported history of two attempted suicides in 2002 and his long history of methamphetamine dependence were noted in the Suicide Report as historical risk factors.

The Suicide Report identified one problem and recommended the following actions:

Problem 1:  Documentation of progress notes by the psychiatrist did not correspond with orders.
Recommendations:  In-service training was needed for psychiatrists on the importance of documenting all inmate contacts, and supervisors needed to review actions of psychiatrists, who fail to document care.

A follow-up report by DVI, dated 7/9/04, included a memorandum of 5/4/04 that indicated the institution had provided training for psychiatrists in documentation and conducted audits in January and March 2004, which demonstrated 100-percent compliance, together with a plan to continue to conduct monthly audits for the next six months. Submitted documents also included minutes from meetings of psychiatrists and a list of progress note audits for specific inmates with 20 cases reviewed in April 2004. .

Findings:  This inmate's suicide did not appear to have been foreseeable or preventable. He was receiving mental health care prior to his last arrest and incarceration, and his care began in the county jail and was continued at DVI. The Suicide Report referred to the failure to document a contact on 6/6/04 by the psychiatrist, but did not mention the bus screening of 5/29/04, which called for an immediate referral. The inmate was not seen by mental health staff for more than a week after this "immediate" referral. This failure did not appear to contribute to the inmate's completed suicide because he was seen and evaluated on 6/6/04 and placed in the MHSDS, and he was seen subsequently on 6/13/04 by a psychiatrist. While documentation was neither complete nor extensive, the information reflected in these two contacts by the psychologist and psychiatrist indicated an awareness of the inmate's change in mental status since his last incarceration and recommended appropriate interventions to address his depression and potential for harm to self.

### 23. Inmate E-56871

Brief History:  This inmate was a 38-year-old Hispanic male who completed suicide by hanging on 6/19/03 at California State Prison, Corcoran (CSP/Corcoran).  The inmate was in the SHU for an indeterminate term as a gang-member since 1998 and on single-cell status from 1998 until May 2003, when he received a cellmate who paroled on 6/5/03.  He received a new cellmate on 6/6/03, who discovered him hanging on 6/19/03.  The deceased inmate was admitted to CDC on 5/29/90 through the reception center at CIM for his first CDC incarceration.  He was transferred to PBSP in 1990 and CSP/Sac in April 1993.  He returned to PBSP in July 1993, where he remained until 1/21/98, with the exception of a short interlude at an unidentified institution.  He was transferred to the CSP/Corcoran SHU on 1/21/98.  The inmate was originally committed to CDC after a guilty plea to second degree murder with a sentence of 15 years to life and a minimum eligible parole date of 7/19/03.

The inmate was discovered on 6/19/03 at approximately 2:50pm by a correctional officer responding to yelling from the deceased inmate's new cellmate.  When the correctional officer arrived at the cell, the cellmate appeared to be pulling on a sheet from which the deceased inmate was hanging.  According to the Incident Report, correctional officers removed the cellmate and placed him in handcuffs.  They then cut the sheet and removed the deceased inmate from the cell and began CPR.  An emergency response vehicle arrived approximately five minutes later, and the inmate was transported to the emergency room where CPR was continued unsuccessfully.  The inmate was pronounced dead at approximately 3:15pm.  The copy of the Incident Report included in the provided was incomplete; it contained only the first page of the report.

Information received from plaintiff's counsel raised questions about the amount of time between the inmate's discovery and use of the cut-down tool, including the handcuffing and removal of the cellmate and, allegedly, handcuffing the inmate while he was still hanging from the sheet. Among the materials provided on this suicide was a staff member's progress note, written on the date of the suicide, indicating he/she felt for a carotid pulse, felt none and initiated CPR.  Plaintiffs' counsel suggested that the inmate might possibly have survived had he been cut down more promptly after his discovery and CPR immediately initiated.

The inmate's second degree murder charge that led to his CDC commitment apparently was gang-related.  The inmate served several stints in AdSeg units and acquired three SHU terms during his incarceration. The inmate's medical condition included two outside hospital stays related to complaints of pain in one leg, shoulder pain and carpal tunnel syndrome in both wrists.  The inmate reported he had been in a car accident and suffered back pain ever since; the pain in his leg came from a gunshot wound received in 1993 at PBSP.  The inmate had filed appeals to obtain better pain medication and eye glasses with wider frames, but those issues were unresolved at the time of his death.

The inmate was placed in the MHSDS in April 2000 at the 3CMS level of care. He remained at that level of care from that date until his death. The inmate's records indicated he had no known previous mental health history, although he did have a history of cocaine and marijuana abuse prior to his incarceration. The inmate was identified as an associate of the Mexican Mafia resulting in an indeterminate SHU term from approximately 1996. The inmate had a psychological evaluation in September 1993 that diagnosed *cannibis* dependence and antisocial personality disorder, but was not placed in the MHSDS caseload. He did not have another contact with mental health until January 2000. An IDTT apparently was scheduled for him in January, but he refused to attend. The resulting treatment plan called for 90-day case manager contacts, but the mental health chrono that actually placed the inmate at the 3CMS level of care was dated 4/21/00. Although the inmate seemed to have been placed in the 3CMS in early 2000, he was not seen by a case manager until September 2000. His case manager's progress note on 9/29/00 indicated the inmate complained of increasing symptoms of depression and anxiety related to his confinement and isolation in the SHU. There were also references to the inmate belief that he was suffering from Post Traumatic Stress Disorder from the incident involving the gunshot to his leg in 1993 at PBSP. The case manager also noted the inmate's report of having exaggerated startle responses, flashbacks, and "notions of persecution." The case manager concluded that the inmate suffered from Post Traumatic Stress Disorder and Major Depressive Disorder, recurrent. This inmate's difficulty with his SHU placement apparently was known to mental health staff; one psychologist's progress note stated that the "inmate was suffering from mood disturbance that is accentuated by his incarceration in SHU setting and the symptoms can be expected to decline if or when he is placed in a less restrictive/isolated environment." As early as January 2002, the inmate's clinical course was noted to have been adversely effected by his medical problems; he complained that his numerous requests for medical care had not been responded to. The inmate was described by a psych tech in January 2002 as being "very depressed" and refusing his antidepressant medications, which led a psychiatrist to discontinue his medication. The psych tech referred the inmate to the Acute Care Hospital at CSP/Corcoran for an evaluation due to a concern that the inmate might possibly be suicidal, and the sergeant who escorted him to the hospital was quoted as saying the "inmate appears to be having some kind of emotional breakdown." The inmate was seen by a mental health clinician, who concluded that he was not suicidal and released him back to custody, but the progress note apparently related to that evaluation was illegible in part, undated and unclear. The inmate continued to complain about his medical problems and pain and was referred to neurology in January 2002. The inmate also refused to attend an IDTT on 1/30/02, for which there was a progress note in the UHR but no MH-2. The progress note was minimally informative, made no mention of the inmate's decompensation earlier in the month, the discontinuation of his psychotropic medications or his complaints about his medical problems.

A progress note dated 4/1/03 by the case manager reported the inmate had mild agitation and was reporting an increase in anxiety and depression. The note also indicated the inmate stated his mother had written him to tell him about his brother's death and, as a result, the inmate was "stressing." The case manager indicated he would contact the CCI

about allowing the inmate to make a telephone call, but there was nothing further about the phone call in the record.

The inmate was seen on 1/14/03 by a psych tech who reported the inmate stated his psych medications "were ok," but he continued to be stressed about his medical and custody issues. The psych tech also noted that the inmate denied having thoughts of hurting himself or others. A case manager's note on 1/23/03 indicated the inmate denied a history of suicide or current suicidality, and described the inmate's mood, affect and behavior as being within normal limits; the case manager summarized that the inmate was "intact." A diagnostic impression was deferred on Axis I, and his GAF was reported as 65. On 1/24/04 the inmate was seen by a psychiatrist who indicated that the inmate continued to report that medical doctors were not giving him appropriate pain medication, which made the inmate angry and anxious. He also noted that the inmate agreed to a trial of Benadryl. A psych tech note on 2/6/03 indicated the inmate talked about a medication change because he continued to feel hyper and agitated. The psych tech also noted the inmate denied having thoughts of hurting himself or others. On 2/13/03, the psych tech reported the inmate's belief that his current psych medications were increasing his anxiety and agitation, but again denied having thoughts of hurting himself or others. On 2/21/03, the psych tech reported the inmate's requests to be seen by a psychiatrist about his medications. On 2/27/03, the same psych tech reported the inmate admitted receiving his psych medications and feeling alright.

Some two weeks later on 3/14/03, the psych tech reported the inmate requested a one-to-one with a psychiatrist and wanted to know on 3/20/03 when his requested psychiatric interview would occur. On 4/1/03, the clinical case manager reported the inmate was experiencing a recent increase in anxiety and depression, and the case manager talked with the psychiatrist about changing medications. This was the same contact during which the inmate described the phone call from his mother telling him about his brother's death, which was causing stress. A note by the psychiatrist on 4/1/03 indicated the inmate had a history of PTSD and depression as well as "post chronic infection pain syndrome secondary to a gunshot wound." The inmate's medications at that time were Tegretol and Benadryl. The psychiatrist noted the inmate denied any ideas of harming himself or others, and the plan was to decrease his Tegretol because of low hemoglobin and discuss treatment options with the inmate "this week." A 4/9/03 progress note described an IDTT, apparently attended by the case manager, CCI, sergeant, and correctional officer but no psychiatrist, which the inmate declined to attend. This note referred to the need for an updated treatment plan because the inmate's last MH-2 was dated 9/29/00. The inmate next saw the psychiatrist on 4/10/03, which resulted in a note that described a history of mood swings and neuropathies with a diagnosis of "mood D-O NOS, R-O BAD" and stated a plan to begin Neurontin. The inmate was seen by a psych tech seven times between 4/17/03 – 6/5/03, with varying complaints about anxiety and medications, which resulted in a referral to be seen by the psychiatrist on 6/6/03. He was seen on 6/6/03 by the psychiatrist, who noted the inmate's bizarre behavior, fair sleep and clear goal-directed speech. The psychiatrist concluded that the inmate's medications were therapeutic and would continue to be Neurontin and Benadryl as ordered. The psychiatrist indicated the inmate denied any thoughts of harming himself. The inmate

was not seen on psych tech rounds the following week because the psych tech was diverted to cover another unit. The psych tech's last note on the day of the inmate's death contained the inmate's report that he was receiving his psych meds and they were effective; he was seen on psych line that same day and asked whether his medication were to be increased by the psychiatrist. The psych tech note stated the inmate denied any other mental health concerns or issues.

The record tracked the inmate's numerous requests to the psych tech and his case manager to see a psychiatrist about his anxiety levels, pain and medication management. While he was seen eventually, the psychiatric contacts were delayed. There were also several occasions when the inmate was not seen regularly by his psych tech either because the inmate was out of his cell or the psych tech was diverted to another location. Review of the MARs indicated that, even though an increase in the inmate's medications was ordered, specifically for Neurontin in June 2003, he did not receive the increased dosage until approximately two weeks after the order was written and just one day prior to his suicide.

The Suicide Report of 2/19/04 identified six problems and the following recommended corrective actions:

Problem 1: The inmate's last mental health treatment plan (MH-2) was more than two years overdue. In its description of this problem, the Suicide Report alluded to the fact that the inmate apparently had an admission to a MHCB unit in January 2002, an admission not mentioned in any of his subsequent treatment plans or progress notes. This problem also noted the inmate's numerous medical problems, which should have been assessed for their impact on his mental health functioning and incorporated into an updated mental health treatment plan, and noted that the case manager did not contact weekly this inmate, who was housed in the SHU.

Recommendation: Clinical training needed to be provided to clinical staff on the requirements for the care of caseload inmates in the SHU in CDC's program guides and the Coleman order.

Problem 2: Some progress notes did not include the results of an assessment or explain the rationale for a particular treatment course (e.g., a change in medication). Some notes by physicians lacked corresponding progress notes for physicians' orders. Some notes were illegible, without a date or time indicated.

Recommendation: Clinical staff needed training on the legal and clinical standards for documentation and record-keeping.

Problem 3: There were problems with ordering/prescribing medications and their documentation in the UHR, as well as the administration of medications as ordered by the physician and documentation of their delivery in MARs.

Recommendation: The institution needed to establish a QIT to review the procedures and protocols for ordering and documenting medication orders and their delivery.

Problem 4:  Physicians made changes in psychiatric medications without consulting with the treating psychiatrist.

Recommendation:  All health care professionals needed training on the importance of consultations.

Problem 5:  The institution mailed the inmate's property to his next of kin before the psychological review was completed.

Recommendation:  A memorandum to appropriate staff prohibiting the mailing from the institution of the property of an inmate who commits suicide until completion of the psychological review.

Problem 6:  This institution had experienced two recent suicides in the SHU by inmates who have tied a sheet to the air vent screen.

Recommendation:  Plant operations needs to evaluate the feasibility of installing vent covers with smaller mesh in the SHU.

CSP/Corcoran submitted a follow-up report on the recommended remedies, dated 7/9/04 and authored by the warden and the health care manager, together with a more detailed report on the issues from CSP/Corcoran staff.  The response noted: (1) the institution already provided and would continue to provide on-going training for clinicians regarding program guidelines and standards of care; (2) the medication management issues raised in the Suicide Report had been addressed and resolved through the Medication Management Operational Procedure implemented in 2003 and the subsequent, mandatory training associated with the new policy; and (3) significant delays in scheduling inmates for psychiatry appointments occurred primarily because of a shortage of psychiatrists, which the institution would continue to address through its on-going recruitment efforts.  The average waiting period for routine psychiatric appointments was two to three weeks at the time of the institution's response.

The institution also provided documentation on the issue of the screen mesh for ventilation covers.  The projected cost for modifying the ventilation screens in all institutional cells was $203,607, and the smaller mesh might restrict air flow in the cells. This information was coupled with a request to HCSD in Sacramento to provide advice on how best to proceed on this issue.  .

Lastly, the institutional Emergency Review Committee reviewed the emergency procedures followed by custody staff in cutting down the hanging inmate and found that the responding correctional officers followed appropriate custody policies and practice and identified no training issues that needed to be addressed further.

Findings:  The Suicide Report identified a half dozen problems associated with this suicide, most of them targeted at the overall mental health treatment and care provided to the deceased inmate, while plaintiffs' counsel raised the issue of the timeliness of the provision of CPR after the hanging inmate was discovered.  Neither the problems associated with the inmate's overall mental health treatment, which represented deviations from general program guide requirements, nor plaintiffs counsel's concern

70

about the timeliness and appropriateness of custody staff situational response meant this suicide was foreseeable. They do, however, suggest that it might have been preventable.

For example, while it was true that clinical staff often noted the inmate's consistent denial since after January 2002 of suicidal ideation or of an intent to harm himself, his continuing medical complaints of chronic pain, his increasing frustration with his detention in the SHU, the multiple progress notes that indicated his condition was unstable and at times deteriorating and the lack of a comprehensive treatment approach or plan that addressed the inmate's medication compliance issues and the loss of his brother and its concomitant stress, all probably contributed cumulatively to his ultimate decision to take his life. Had the appropriate program guides, together with the local policies and procedures adopted to implement them, been followed, the inmate might have received comprehensive treatment that addressed his situational and acute factors and prevented his death.

### 24. Inmate #T83368

Brief History: This inmate was a 56-year-old Hispanic male who completed suicide by jumping from a fourth-level tier and sustaining massive head trauma resulting in his death on 6/28/03 at Folsom State Prison (Folsom). He was admitted to CDC through the NKSP reception center on 3/25/03.

On 6/28/03 at approximately 5:03pm, correctional officers responded to the sound of a "thud," which was observed to have been caused by the inmate's leap from the fourth-level tier of his general population housing on Unit 3, Tier 4, Section A. During his descent, the inmate struck his head on the edge of the roof of a first-floor office before he hit the floor. The inmate suffered severe trauma to his head, such that his brains were described as "spilling out." The Incident Report made no reference to the initiation of CPR at any time during the response to the inmate's leap while he was lying on the floor or during his transport to the institutional medical clinic and subsequently to UC Davis Medical Center. The inmate was noted to be unresponsive, but according to the MTA, who notified the on-call physician (MOD), the inmate had Cheynes-Stokes breathing with fixed pupils. The inmate was subsequently pronounced dead at UC Davis Medical Center at approximately 6:50pm.

This inmate had a juvenile history of gang involvement and drug use beginning at approximately the age of 13. He first entered CDC on 3/14/74 at the California Rehabilitation Center for a seven-year term, but was discharged on 5/3/74. His second term with CDC began on 6/21/90 with a five-year sentence for shooting a gun into a building and car. At that time, the inmate was receiving methadone treatment for heroin addiction, and he was described as being paranoid that his wife would be killed and his children stolen. The inmate paroled on 6/26/93 and was discharged from that parole on 2/25/94.

The inmate returned to CDC for the third time in February 2003 after he killed his mother by repeatedly stabbing her. The inmate reportedly believed his mother was possessed by

"demons and ghosts," and, when he killed her, he observed the release of these ghosts from her body. He was found guilty and sentenced to CDC. He entered NKSP on 2/25/03, where the bus screening was negative for mental health history or symptoms. He received a mental health evaluation (MH-7) on 2/27/03, which indicated that, based on the initial screening, there was no indication the inmate was suffering from a mental illness, and no referral to a mental health professional was made. There was an undated referral by a CCI at NKSP, prior to the inmate's transfer to Folsom, that indicated the inmate was referred for a psychiatric medication review because he "exhibited bizarre behavior," referring to the killing of his mother, and appeared to be hallucinating and hearing voices. This referral for mental health evaluation was undated, but a response to the referral apparently occurred on 4/29/03, during which the inmate was found not to be in need of mental health services. Neither did he request any mental health services during the interview. The inmate was transferred from NKSP to Folsom on 5/16/03, and the bus screening on his arrival was also negative for any mental health history or illness and no referral was generated.

On 6/26/03, the inmate appeared for medical treatment based on undefined injuries, apparently involving bruises on his back and both arms, along with a note from a correctional officer about a possible altercation with his cellmate. The inmate reported, "Nothing happened," when questioned about the correctional officer's note. There were references in the Suicide Report that the inmate might have believed his son had killed himself, but there was no record of a received letter(s) or telephone call to confirm this possibility.

This inmate was diagnosed with probable substance dependence at reception in NKSP some 13 years earlier, but he was not then identified as needing mental health care or treatment. He resided in general population for the entire length of his last incarceration.

The Suicide Report, dated 12/23/03, identified three problems, all focused on the reception center at NKSP, as follows:

Problem 1: The reception center at NKSP used an old form of the 31-item questionnaire during this inmate's mental health screening.
Recommendation: NKSP needed to be using Form-7277, the Initial Health Screening, for all initial mental health screenings.

Problem 2: The staff referral of the inmate to mental health was undated, nor was there a data field on the local form for a date.
Recommendation: The institution needed to use the correct form for staff referrals, CDC-128AB Chrono.

Problem 3: There was no indication on the evaluation (MH-7) conducted in the reception center of the reason for the referral nor any indication that the inmate's C-file was reviewed.
Recommendation: Training should be provided to clinicians on completing the MH-7 properly and the necessity for reviewing the C-file.

NKSP indicated in a response to the Suicide Report that the recommended training in the three problem areas had been provided to staff. The response from NKSP was dated 7/13/04, nearly eight months after the Suicide Report was completed in December 2003.

Findings: This inmate's suicide did not appear to have been foreseeable. There were, however, some critical flaws in the mental health assessment process at NKSP, and the response to the staff referral that occurred at that facility. Particularly important was the failure of clinicians to look at the inmate's C-file, which gave perhaps the best indication that there was something seriously wrong with this inmate. A review of the C-file might have triggered a referral to the MHSDS. The documents indicated that the inmate never sought mental health services, although he clearly was in need of a full mental health evaluation and services. Although there was a failure to provide CPR immediately, his circumstances at the time with obvious head trauma and massive bleeding, were exceptional. The record did indicate that he had respiration at the time of his discovery and at least for some period during his transport.

### 25. Inmate #T67329
Brief History: This inmate was a 17-year-old African American male who completed suicide by hanging on 7/1/03 at the California Correctional Institution (CCI). The inmate was single-celled in AdSeg. This was the first term for this 17-year-old inmate, who was tried as an adult and admitted to CDC on 11/26/02 via the reception center at CCI. The inmate had an extensive juvenile criminal record, as well as a mental health history. He was at the 3CMS level of care on admission and at the time of his death.

The inmate was discovered hanging from a sheet tied to the air vent in his cell at approximately 12:35am on 7/1/03 by a correctional officer conducting the 1:00am institutional count. The Incident Report was remarkable for the lack of information provided on the actual sequence of events, but it appeared that the discovering correctional officer called for another correctional officer to assist. An emergency notification reportedly was made via the institutional radio, and efforts to communicate with the inmate received a negative response. According to the Incident Report, a "cutting device" was obtained from the control officer, the cell door was opened and two correctional officers entered the cell to cut the noose from around the inmate's neck. Additional staff arrived, the inmate was placed on a Stokes litter and immediately transferred to the infirmary. The Incident Report indicated that the emergency code was sounded at 12:35am, the inmate was removed from the cell at 12:40am and CPR was initiated at 12:45am, when the inmate arrived in the infirmary. The Suicide Report indicated that CPR was performed for 20 minutes with a negative result, and, when a physician arrived in the infirmary at 1:02am, additional attempts at resuscitation were undertaken unsuccessfully and inmate was pronounced dead at 1:10am.

The Suicide Report indicated that the inmate was observed to be alert and standing in his cell at approximately 11:00pm. There were references to a suicide note, which, after correction of multiple spelling errors, read: "sorry, maybe I will be in a better place than

this.  Pray for me please that I will be in a better place than this. Thanks, (inmate's name), Bye – Bye."

This was the inmate's first adult conviction.  He was convicted on two counts of robbery second degree with a three-year sentence and admitted to CDC on 11/26/02.  The inmate had a troubled and tumultuous life, possibly beginning prior to birth.  He was born to a 13-year old mother, who used illegal drugs during her pregnancy.  The inmate and his mother were wards of the juvenile court, and legal guardianship of the inmate was assumed by a great aunt.  The inmate subsequently had a number of caretakers with multiple placements within the Department of Health Services, Juvenile Detention, and the Department of Mental Health.

A competency evaluation, dated 6/17/02, indicated the inmate was in several group homes prior to his arrest.  During this evaluation, the inmate essentially told the examiner that he and a co-defendant had stolen a car and run away from a group home, and his legal problems were largely due to his co-defendant.  The inmate reported he had been sexually abused at approximately the age of 14 by a former therapist.  There were also references to hospitalization in at least three psychiatric facilities in the San Francisco area and two serious suicide attempts at approximately ages 10 (hanging) and 14 (stabbing).  The inmate had been treated with a number of medications, with the last medication prior to his competency evaluation report having been Zyprexa, although he was not taking any medications at the time of the report.  The inmate apparently had a substantial learning disability and a history of use of illegal drugs that were taken as pills or smoked.

The inmate had a wide variety of diagnoses, including ADHD with Hyperactive-Impulse Type Conduct Disorder, Dysthymia, Learning Disorders, Substance Abuse Disorder, and Oppositional Defiant Disorder.  There were reports, but no data, suggesting he was psychotic, while there was some data to suggest he was manipulative.

The inmate was admitted to the Youthful Offender Program (YOP) upon arrival at CCI due to his status as a minor.  Although the inmate was placed in this program, he was also allowed to sign informed consent forms for medications, and was prescribed Seroquel, Depakote, and Visteril during this CDC admission.

A SRA was completed by a psychologist on 11/26/02 for the purpose of determining any level of suicidality.  The SRA referred to the inmate's lack of a parent, being raised in group homes and now serving his first term.  The SRA noted the inmate "stated he was not suicidal, but appears fearful and anxious," and suggested follow-up "for a few days."  This SRA concluded the inmate was at "mild risk," but no other relevant indicators were checked on the SRA form, including previous suicide attempts, emotional instability, history of mental illness, history of poor impulse control, lack of family support or fear for safety.  None of the boxes in Part 5 of the SRA on actions taken by the evaluating clinician was checked.  There was no documentation that indicated the follow-up suggested by the evaluator was conducted; the inmate apparently was not seen again by a mental health clinician until he placed in the YOP AdSeg after assaulting his cellmate on 2/22/03.

Another SRA was conducted on 4/24/03 to help with discharge planning. The case manager apparently relied heavily on an interview with the inmate for information. This SRA was more complete than the 11/26/02 assessment. It had checked boxes indicating first prison term, long or life sentence, history of poor impulse control, current AdSeg placement, recent suicidal ideation, significant current impulsivity, fearful for safety and recently assaultive or violent. The box for past suicidal ideations/threats was checked, but did not specify dates. Additional comments included, "Patient disavowed any suicidal ideation and did sign non-suicide contract." The level of imminent risk was rated as "negligible," and the plan was to refer the inmate to his primary clinician/case manager. Once again, the inmate's history of previous suicide attempts and multiple diagnoses apparently were not reviewed, and the long list of risk factors indicated as relevant did not seem to support the conclusion that the risk of imminent suicide was "negligible."

A third SRA was conducted on 6/11/03 to help formulate treatment planning. Sources for information for this assessment were interviews with the inmate, correctional officers and clinical staff. Boxes indicating first prison term, no new court proceedings or disciplinary actions, and current AdSeg term were checked, but no other risk factors were identified, and no historical information on past suicide attempts was noted other than a reference to "numerous threats" of suicidal ideation without dates. Additional comments in this SRA indicated that the inmate "has history of making threats of suicide followed by admissions that he has been able to work the system for his own secondary gains," with an evaluation of imminent risk as "negligible" with no recommended plan of action.

During the some seven-month course of this inmate's incarceration, he variably reported auditory and visual hallucinations, depression, poor sleep, poor appetite, anxiety and agitation. He got into conflicts with other inmates, including seriously assaulting his cellmate. He reported suicidal ideation on multiple occasions and subsequently made contradictory statements. For example, on 5/1/03, the inmate stated as his chief complaint on admission to OHU, "I really didn't want to be there and promise I won't really do anything." On 5/8/03, he stated flatly, "I'm going to kill myself." The inmate was admitted to the OHU at CCI on numerous occasions and he was transferred to MHCB units elsewhere and DMH's APP at CMF. Subsequent to most of these admissions, he received orders for five-day follow-up in accordance with policy, but the ordered follow-up often was not provided.

The inmate's diagnoses during his incarceration included Adjustment Disorder, Psychotic Disorder NOS, Bipolar Disorder, diagnosis deferred, R/O Malingering, Antisocial Personality Disorder, and no Axis II diagnosis.

An MH-4, dated 4/15/03, indicated this mental health assessment was conducted after the inmate's third OHU admission in the previous two months, with his complaint being of suicidal ideation and auditory and visual hallucinations. The inmate referred to his long history of mental health problems since approximately the age of nine, as well as his history of taking medications on the streets. The MH-4 recorded his crime of carjacking, history of ADHD and substance abuse, prior outpatient treatment and concluded with diagnoses of Psychotic Disorder NOS (origin of perceptual disturbance ukn), Antisocial

75

traits, and a GAF of 40. Risperdal was identified as the medication the inmate was then taking. There were no indications of plans for any treatment change or referral to a higher level of care.

A two-page hand-written letter, dated 4/21/03, from the inmate to an IDTT at CSP/LAC summarized his complaints. Part of this hand-written letter reads (after spelling corrections): "PLEASE TAKE NOTICE: That this is deliberate indifference. The Coleman law addresses these issues of inmates who have mental disorders. It's clear that when the law was written, ages of inmates was not a factor. Being that I'm 17, the law applies to me. It's imperative that I receive effective mental health care. Due to the facts that (CCI) California Correctional Institution does not have adequate mental health staffing nor is there observations for the care I need. It's very unethical, against the laws of the state of California to ignore signs of illnesses. The California code of regulations title 15 makes provisions for inmates who desire and needs treatment." The letter also referred to PSU services, other levels of care and the inmate's belief about what he needed in the way of mental health care. The letter concluded, "For all of the above stated your cooperation in giving me psych treatment will be greatly appreciated. Respectfully submitted."

The inmate's last treatment plan of 5/5/03, prepared at the CSP/LAC MHCB unit, reported the inmate's behavior as agitated, his insight and judgment impaired and his interview attitude guarded, but concluded that, otherwise, his mental status was within normal limits and he represented no current risk of suicide or violence. A comment noted the inmate was at CSP/LAC for a second MHCB admission, both related to his attempted murder and solicitation of murder at CCI. The diagnoses at the time of this treatment plan were identified as Adjustment Disorder NOS on Axis I and no diagnosis on Axis II, with a GAF of 50, and the plan was to discharge him back to the YOP at CCI at the 3CMS level of care.

In a progress note dated 6/19/03 the inmate was quoted as claiming to be part of the "Black Gorilla Family" (BGF) and that he was faking suicidal ideation to take care of gang business. Remarkably, in this 6/19/03 progress note, all objective mental status indicators were recorded to be within normal limits. Suicidality and harm to others were denied and the plan was to continue individual therapy.

The Suicide Report indicated the inmate was admitted to CCI's OHU for psychiatric observation because of suicidal ideation or threats on 3/31/03, 4/9/03 and 4/14/03. The Suicide Report also indicated that medical records for the first two admissions were missing. Documentation of the 4/14/03 admission indicated the inmate was transferred to CSP/LAC MHCB unit on 4/16/03. In this instance, the OHU admission indicated a diagnosis of Psychotic Disorder NOS and treatment with Risperdal. The staff at CSP/LAC concluded the inmate's diagnosis was Adjustment Disorder, and that he was "apparently exaggerating his mental health symptoms." It was during this stay at the CSP/LAC that the inmate wrote the letter described above. That letter also stated the inmate's concern that his return to CCI would endanger his life due to the lack of mental health treatment, and stated, "Failure to appropriately assign mental health housing will result in ending my life."

The Suicide Report also described the inmate's three CCI OHU admissions within seven days of his return from CSP/LAC for suicidal ideation and intent and his subsequent denial of any mental health problems. The inmate was returned to the MHCB unit at CSP/LAC on 5/1/03, where staff again determined he was "exaggerating his mental health symptoms for secondary gain" and his problems were custodial in nature, involving safety concerns at CCI. Despite this, he was diagnosed as Psychotic Disorder NOS and returned to the CCI YOP in AdSeg with five-day follow-up. After his return to CCI, the inmate was placed in OHU again on 5/8/03 with a diagnosis of Bipolar Disorder, and he was referred to the MHCB unit at CSATF, where he was admitted on 5/9/03 for suicidal ideation and auditory and visual hallucinations.

This admission to the CSATF MHCB resulted in his first referral for a DMH level of care in the APP at CMF on 5/19/03, where he was clinically accepted and placed on a waiting list on 5/28/03. The inmate was transferred to the APP program at CMF on 5/30/03 where, reportedly, he told clinicians "he had been lying about hallucinations and suicidal behavior" to get rid of the charges against him of attempted murder at CCI. The records from CMF were not provided for review, but the Suicide Report suggested that the record described the inmate as demanding and easily angered with a mental status that was unremarkable and stable. During this admission, the diagnoses stated in the Suicide Report were "Malingering, Adjustment Disorder, ADHD, Conduct Disorder, and Learning Disorder" with a GAF of 50. The inmate was discharged from DMH/APP on 6/6/03 and returned to CCI on 6/9/03 with no medications.

Upon his return to CCI, the inmate was placed in the OHU on suicide precautions because of suicidal ideation. The Suicide Report indicated a special IDTT was convened with a request from the psychiatrist that high-level custody staff be present at the IDTT, but the actual IDTT meeting was attended only by a custody sergeant and a CCI. The IDTT met and described the inmate as "calm, responsive, and courteous" and determined his risk for suicide was "negligible" with a discharge to AdSeg and no need for five-day follow-up. The Suicide Report referred to a psychologist's note at 11:45 am on the day of discharge (6/19/03), which stated, "Inmate threatened to kill self, was sent back to his housing unit. Psychiatrist instructed he be sent back regardless of threat." The existing orders and the directive to provide no five-day follow-up were left standing. The inmate was last seen by mental health staff, specifically his case manager, on 6/19/03, as noted above. He was not seen the following week by the case manager even though he was housed in AdSeg. He was scheduled to be seen by a psychology intern on 6/30/03, but the intern did not see the inmate on that date or during the preceding week because she was transitioning from her former to her new assignment to treat the YOP population. The inmate was not ducated for his scheduled appointment. The Suicide Report indicated that "due to shear (sic) human error or oversight, he was not included on the ducat list for patient escorts by custody staff. The psychology intern had no direct knowledge of the inmate's grave, complex and extensive mental health history, his disciplinary history or custody issues." The Suicide Report stated there was no conscious decision to exclude him from services. The Suicide Report noted that on 6/30/03 the inmate was verbally abusive to a clinician and his co-defendant, who was his former cellmate and the victim of his assault, resulting in a verbal reprimand. The Suicide

Report indicated that a Level 1 investigation was initiated by the ISU as a result of that incident.

The Suicide Report summarized the mental health interventions provided this inmate during the four months from the inmate's assault on his cellmate to his death, citing 12 separate admissions to the CCI OHU, outside MHCB units and the DMH/APP at CMF, all initiated by self-reported suicidal ideation, as well as seven SRAs that found the inmate's risk for self-harm as low (one), mild (two) or "negligible" (four). Documentation was provided for most of the admissions and SRAs cited but not all of them in the materials that accompanied the Suicide Report.

The Suicide Report described the inmate's problems with institutional adjustment, citing his RVRs for attempted murder, destruction of state property, solicitation of murder (dismissed) and other conduct. The attempted murder involved his co-defendant and former cellmate, resulting in severe injury to the victim and the inmate's placement in the YOP AdSeg. A DA referral was initiated on the attempted murder charge, but the DA dropped the charges in April 2003. The RVR for attempted murder resulted in a 26-month SHU term on 6/18/03. The inmate's first admission to the CCI OHU occurred approximately five weeks after his initial placement in AdSeg.

The Suicide Report provided information garnered from interviews with other inmates housed in the same cellblock where this inmate completed suicide. One of the interviewed inmates reported that he and the deceased inmate had been planning to "stage hanging themselves" on the 7/4/03 and had carefully timed how to do this and survive. This interviewed inmate had no explanation for the deceased inmate's failure to follow the plan, but stated that the deceased inmate had been threatened with death if he returned to the general population because he was wearing an unauthorized BGF tattoo. A Level 1 investigation reportedly had been initiated at the time of the Suicide Report because the interviewed inmate claimed that he and other inmates had been yelling "man down" for 15 minutes before custody staff responded to deceased inmate's cell. That version contradicted the description provided by staff in the Incident Report.

The Suicide Report stated that the motive for this inmate's suicide was unknown for certain, but referenced his placement in the "safest possible environment in a correctional setting," namely his single AdSeg cell and walk-alone status. It noted further that "whatever his difficulties at CCI, had he been able to persevere for just another six months until he reached adulthood in December, he could have been transferred to any other institution commensurate with his custody level."

The Suicide Report indicated CDC mental health staff generally followed established departmental policies and procedures in the case, but did not follow mental health program guides during the entire course of this inmate's incarceration. There were references to custodial and legal issues involved with his RVRs, DA referral, pending SHU term and gang-related politics.

The Suicide Report identified six problems and recommended the following corrective actions:

Problem 1:  No follow-up occurred after 11/26/02, when the SRA found low risk for suicide.  Despite verbal threats to harm himself, the inmate was discharged from the CCI OHU without any five-day clinical or custody follow-up.

Recommendation:  All clinical and nursing staff needed to be trained on CDC suicide prevention policies, treatment and discharge follow-up of suicidal inmates.

Problem 2:  The inmate was not seen during his second full week in AdSeg after his discharge from the OHU on 6/11/03.

Recommendation:  The institution should implement supervisory procedures to ensure that case managers see each YOP AdSeg patient on a weekly basis.

Problem 3:  There was no documentation of the IDTT's decision to discharge the inmate following his first admission to the CSP/LAC MHCB unit.

Recommendation:  Clinicians at CSP/LAC's MHCB unit needed to review procedures to ensure that patient discharge decisions are reached and documented by an IDTT.

Problem 4:  There was a lack of continuity in mental health care provided in the YOP AdSeg unit due to frequent changes in case managers

Recommendation:   CCI needed to consider the permanent assignment of an experienced clinician as the case manager for this difficult population.

Problem 5:  There appeared to be confusion about administering medication to a minor without parental or a guardian's consent.

Recommendation:  The department needed to obtain an opinion from Legal Affairs about who is responsible for giving consent for the medication of minors and develop appropriate policy.

Problem 6:  The records for this inmate's first two admissions to the CCI OHU on 3/31/03 and 4/9/03 were missing.

Recommendation:  A search at CCI was needed to locate the files.

CCI submitted a follow-up response to the Suicide Report's recommendations on 7/9/04, some eight months after the Suicide Report was concluded.  CCI explained that the Suicide Report was initially sent to CSP/LAC alone, and CCI did not receive it until considerably later.  The institution reported the following responses to the problems identified in the Suicide Report:

Problem 1:  Clinical staff was provided with Suicide Prevention training in August 2003.

Problem 2:  A full-time experienced psychologist was assigned to the YOP, whose contacts were regularly monitored through the MHTS.  The Senior Psychologist will soon begin chart audits.

Problem 3: This problem involved services at CSP/LAC; reportedly, that facility was working on it.

Problem 4: As indicated, a full-time experienced psychologist was assigned to the YOP, including AdSeg. A Senior Psychologist saw all YOP inmates in the EOP weekly.

Problem 5: An opinion was obtained from Legal Affairs, and CCI wrote a local operating procedure based on the opinion.

Problem 6: Medical records personnel searched for the missing records and could not find them. A new procedure was implemented by Medical Records to ensure that OHU records were promptly filed in UHRs.

Additional documents were provided as attachments to CCI's follow-up to the Suicide report, including a memorandum, dated 3/3/04, from the chief psychiatrist at CSP/LAC stating, "At our institution, all discharges are determined by the CTC Interdisciplinary Treatment Team," and adding: "Our current written procedures imply but do not specifically state that only the IDTT makes discharge decisions, although this is our current practice." A memorandum dated 1/26/04 and entitled "Addendum No. 1 to Operational Procedure No. 442, Custody Follow-Up of Post-Discharge from Mental Health Crisis Bed" was also attached, which outlined custody responsibilities at CCI for the follow-up of suicidal inmates discharged from a MHCB or OHU. Another attachment, dated September 2003, and entitled "Medication Consent Administration for YOP" provided the new YOP Medication Consent Form.

Findings: This inmate's death appeared to have been both foreseeable and preventable. The inmate had a well-known history of mental health evaluations, assessments and treatment since childhood or early adolescence, depending on the records reviewed. There was a history of self-reported suicide attempts prior to his incarceration. Equally well-documented was the difficulty of managing this inmate once he was incarcerated and the decline in his mental health functioning after he was placed in AdSeg following the attack on his co-defendant and former cellmate. The inmate made repeated statements that he would kill himself and retracted his statements once his housing circumstances had been changed. Contributing factors included his reported gang affiliation and implied threats against him for apparently unauthorized self-reported gang affiliation. The inmate received a variety of diagnoses, several of them indicative of severe and persistent mental illness, while others reflected situational and/or adjustment problems. He also clearly appeared to exaggerate or fake symptoms for secondary gain. The inmate received numerous SRAs. Several were not provided and cannot be evaluated; others were incomplete and failed to list sources of information or were limited to the inmate's own assertions alone, often ignoring known historical, static and dynamic risk factors. The inmate had multiple stays in the OHU at CCI, at least two admissions to MHCB units and a short stint at DMH's APP at CMF, all of which generated an array of diagnoses and discharge plans.

Whatever the difficulties associated with evaluation and treatment of this inmate, his youth and concomitant immaturity, his first term adult incarceration, his difficult adjustment, the DA referral, and the SHU term assessment, no comprehensive and coordinated approach was ever adopted to manage this inmate's fairly unique and complex mental health needs and circumstances. Mental health staff in different facilities and within treatment teams often disagreed about diagnoses and treatment plans. Even when custody factors, such as housing and possible enemy concerns were acknowledged, no effective collaboration occurred between custody and health care staff, particularly at supervisory levels, to determine the most appropriate management strategy for this inmate. Clinicians, moreover, seemed unaware of any legal requirements surrounding the provision of medications to minors. The referral to the DMH/APP came late in the inmate's clinical course, and while the referral was appropriate, it, too, failed to generate the needed comprehensive review of his overall mental health, behavioral and custodial issues. Instead, he was returned again to the same environment that triggered his repeated suicidal threats. While inmates cannot dictate their placement within correctional systems, this inmate's persistently reported decompensation, in combination with his mental health history and difficulties with institutional adjustment, should have resulted in a meaningful and interdisciplinary determination about the appropriate level of his mental health care and the location for its delivery. Finally, the assignment of a psychology intern to take charge of this inmate's clinical management was a particularly poor decision, one which, fortunately, did not actually contribute to the outcome here.

The Suicide Report referred to a number of departures from policy and procedural guidelines, as well as flaws in the delivery of mental health services at CCI and CSP/LAC. The body of the report referred to two Level 1, ISU investigations arising from the handling of this inmate's suicide, but no documentation was, or has been, provided to the Coleman special master on the outcome of these investigations, as required by the court. Furthermore, no documentation on any follow-up by HCSD to the largely defensive and marginally responsive corrective actions described by the institutions has yet been provided. Indeed, the Suicide Report itself seemed to focus more on the difficult challenge of evaluation and treatment presented by the deceased inmate than on the failure of CDC mental health clinicians, in cooperation with their custody counterparts, to meet the challenge. Recitation of the quantity of SRAs conducted and the number of admissions to various treatment programs, while clearly indicative of the complexity of the deceased inmate's mental condition, was no substitute for the need to address candidly the inadequacy of the quality of the provided assessments and treatment programs that failed so fatally to meet the needs of this young inmate. One worries about the future of peer review in handling tough cases in a system that seems, at least on this occasion, unduly defensive and sensitive to criticism. In any event, results of the defendants' ISU investigations in this case need to be shared with the special master.

## 26. Inmate #D56667

Brief History: This inmate was a 48-year-old Caucasian male who completed suicide by hanging in his AdSeg cell on 7/9/03 at approximately 6:53 am at Mule Creek State Prison (MCSP).

The inmate was discovered hanging by a noose tied to a cell air vent above the sink by a correctional officer making rounds in Building 12. The correctional officer called for assistance and used a cut down tool to cut the inmate down. An MTA arrived on the scene, determined the inmate had no vital signs and fixed pupils and initiated CPR. The inmate was subsequently transferred to the emergency room where CPR was continued by medical staff until paramedics arrived at approximately 7:29am and continued CPR. CPR was discontinued at approximately 7:30am based on a doctor's order by telephone (Sutter Amador Hospital). Although this inmate was in a double cell, his cellmate had been transferred out of the cell prior to this event so the inmate was, in effect, single-celled.

The inmate's first adult incarceration occurred on 5/18/87 when he entered CDC at CIM on convictions for second degree burglary and receiving stolen property with a sentence of two years. The inmate paroled on 3/8/88 and was arrested again on charges of burglary, stolen credit cards, auto theft and illegal substance abuse. He returned to CDC on 10/13/88. The inmate was subsequently transferred to SCC, where he escaped on 9/3/89. He was re-captured the same day. No charges were pressed, and the inmate subsequently paroled on 2/2/90. The inmate was arrested in Santa Cruz County in 1990, escaped in 1991, and was subsequently apprehended in June 1991. The inmate was sentenced to 25 years for five counts of lewd and lascivious acts with a child under the age of fourteen, including his 9-year-old stepson, which occurred in September and October of 1990. This constituted his second strike.

While incarcerated, the inmate received additional charges of lewd conduct with a minor based on random monitoring of phone calls on 2/24/03 involving a grandchild of the mother of another inmate with whom he was conducting a romantic relationship. Two conversations were taped involving this 11-year-old boy, and the inmate was placed in AdSeg, his visits were suspended and subsequent investigation indicated the inmate had been fondling the youngster's genitalia during visits to MCSP. The inmate requested protective custody status on 4/16/03 because of the notoriety associated with these charges, which was granted on 5/8/03. The inmate had a preliminary hearing on 6/2/03 that indicated he would likely be convicted on a third strike. On 6/24/03, the inmate received an RVR for refusing a compatible cellmate and remained single-celled until his death on 7/9/03.

The Suicide Report indicated the inmate was willing to accept a compatible cellmate, although none had been assigned as of 7/7/03, and staff reported there was no indication he was planning a suicide. Further information in the Suicide Report indicated the inmate was a "model inmate," received visits from his girlfriend, as noted above, and wife. Within approximately a year of his possible release date, allegations of the inmate's lewd conduct with a minor while incarcerated were reported widely in the media and he was likely facing a third strike.

Reports indicated the inmate had been arrested as a runaway at age 13. The inmate's criminal history began at approximately age 19 and involved property crimes and illegal drugs with a two-year term in the California Youth Authority beginning at age 20.

During his initial CDC incarceration, the inmate was in general population and had never been admitted to the MHSDS. Records indicated he received counseling and medication for depression in 1991 after his conviction for child molestation while in the Santa Cruz County Jail. While incarcerated in the Santa Cruz Jail, the inmate reportedly made a rope of sheet strips that was found in his jail cell, but the inmate apparently denied suicidality at the time. When the inmate was admitted to MCSP on 7/15/ 96, his mental health screening was negative for both psychiatric history and mental health need. He apparently did not receive another mental health screening when he was transferred to AdSeg at MCSP on 2/24/03, although he should have because he had not been screened during the past year and was not participating in the MHSDS. Psych tech rounds were made in AdSeg, and the inmate was monitored during those rounds, the last of which was documented to have occurred on 7/8/03. None of these contacts indicated the inmate was in need of mental health services.

The inmate received similar charges of lewd conduct with a minor involving the son of a woman he married while incarcerated in 1989, which resulted in a 25-year sentence in 1991. These charges were similar to the charges he received in 2003, and the inmate denied the charges both times.

The Suicide Report identified just one problem, involving the violation of CDC policy on the provision of mental health screenings to inmates newly admitted to AdSeg. MCSP needed to develop a local written procedure to specify how new AdSeg cases were to be reviewed and referred for mental health screening when appropriate, along with direction on the documentation of such determinations. MCSP's responsive report included the institutional Suicide Prevention Coordinator's description of the new local mental health screening process policy for AdSeg and copies of staff training records on this policy. The Chief Psychologist and the Suicide Prevention Coordinator certified that this problem had been resolved with completion of the policy revision and training.

Findings: This inmate's suicide did not appear to have been foreseeable because there were no indications from the psych tech rounds or correctional officers' observations of the inmate of any suicidal intent, nor did the inmate request any mental health services. The suicide might arguably have been preventable if an appropriate mental health screening had occurred in February 2003. Also, his hearing on lewd and lascivious acts with a child under the age of 14 on 6/2/2003 and the likelihood of a third strike conviction with a life sentence were the kinds of personal stressors that might have triggered a mental health screening or evaluation by mental health staff. Although such an evaluation was not required by CDC policies and procedures, these were stress factors that have long been associated with enhanced suicide risk and probably ought to have generated some sort of screening or evaluation. This is an area for further review and resolution within policy and procedural guidelines.

**27. Inmate #E82587**

Brief History:  This inmate was a 48-year-old Caucasian male who committed suicide by hanging on 8/10/03 at Robert J. Donovan Correctional Facility (RJD).  The inmate was single-celled in AdSeg and was at the EOP level of care in the MHSDS.   The inmate initially entered CDC on 1/21/91 at RJD, having pled guilty to attempted murder with a sentence of 11 years.  During his incarceration, he was transferred from RJD to CSP/Corcoran, CSP/Sac, Folsom and CMF.  In February 1996 while he was at CSP/Sac, he assaulted another inmate with a deadly weapon.  He pled guilty and received an additional two-year sentence.  In April 2002, the inmate paroled from CSP/Corcoran. The inmate was re-arrested on 7/16/03 for nine parole violations, including assault with a deadly weapon, battery, violations of special conditions of parole and the use of alcohol. On 7/24/03 the inmate was returned to RJD because of these parole violations and completed suicide approximately three weeks later on 8/10/03.

The inmate was discovered hanging by a noose made from his jumpsuit on 8/10/03 at approximately 10:32pm by a correctional officer conducting a security check in AdSeg. Although this was a two-man cell, the inmate was the only occupant of the cell.  The correctional officer contacted control officer, who requested an emergency transport vehicle and assistance.  A second correctional officer arrived from another housing unit and these two officers cut the inmate down and placed handcuffs on him.  At approximately 10:37pm, an MTA arrived with a sergeant and another correctional officer, and the MTA and sergeant began CPR.  The inmate was transported to the CTC, where CPR continued but was unsuccessful, and the inmate was pronounced dead at approximately 10:50pm.  Documentation indicated that the inmate was housed in AdSeg because of enemy concerns after his return to custody on 7/24/03.  The Autopsy Report conducted on 8/12/03 indicated the cause of death was hanging and the manner of death, suicide. The autopsy also found healed scarring on the inmate's left forearm possibly indicative of self-inflicted cuts in the past.

This inmate was first involved in the MHSDS in September 1996 while at CSP/Sac.  The evaluation at that time indicated he had a history of multiple substance abuse, including; heroin, methamphetamine, alcohol, cocaine and inhalants (paint and glue).  Prior to his CDC incarceration, he had been hospitalized in Michigan, when he severely cut his left wrist.  He reportedly was also hospitalized in Tennessee for pain in his arm and, again, because he was depressed and intoxicated.  During the evaluation at CSP/Sac, a psych social worker indicated he had pressured speech, was angry and had a depressed mood, but did not present evidence of a psychotic disorder.  At that time, the inmate reported he had no suicidal ideation, but stated that if he received a third strike, he would hang himself.  The inmate told the psych social worker he had required a blood transfusion from one previous suicide attempt, and the evaluation concluded that the inmate was at risk for suicide when feeling angry and had "no impulse control."  The diagnoses at that time were rule out Substance-Induced Mood Disorder and Borderline Personality Disorder (primary) with a GAF of 68.  He was admitted to the MHSDS at the 3CMS level of care. The inmate also reported he was extremely anxious about a pending hearing scheduled for July 1997, at which he feared he might receive a third strike.  He was

subsequently diagnosed with Panic Disorder with suicidal ideation after he reported he had braided his sheet the preceding night and tied himself to the vent, but eventually flushed the sheet down the toilet.

In November 1999, while at CSP/Corcoran, the inmate received a diagnosis of Psychosis, Not Otherwise Specified, and staff reported poor impulse control and suicidal ideation. He was prescribed Risperdal and Depakote. Prior to his return to custody at RJD, he had been treated in the San Diego County Jail for Depressive Disorder NOS, rule out PTSD and received Sinequan and Wellbutrin.

The inmate's UHR from his previous CDC incarceration indicated he also had diagnoses of Schizophrenia and Schizoaffective Disorder, and was treated with a number of medications. The UHR also indicated he was uncooperative with psych tech rounds and became angry, disrespectful and even vulgar when approached by a psych tech.

According to the Suicide Report, the inmate was seen for a bus screening on 7/23/03 and responded positively to questions about his past treatment for mental illness and any past suicide attempts, although he indicated that his suicide attempts occurred in the 1970s and 1980s. He admitted present mental health problems, but denied any present desire to hurt himself. The inmate reported to the RN, who conducted the bus screening, that he was currently receiving both medical and psychiatric treatment, had been diagnosed with Depressive Disorder and was taking Sinequan and Wellbutrin. He was referred to mental health. A transport form from the medical services division of the San Diego County Jail, dated 7/20/03, indicated the inmate had a diagnosis of Depressive Disorder NOS, rule out PTSD, chronic lower back pain, history of hypertension, history of Hepatitis C, and he was taking Sinequan, Wellbutrin and Oxycotin. The transport form also recommended referring the inmate to an MD for follow-up of his medical problems and a psychiatrist for follow-up of his psychiatric problems. On the same day, a physician at RJD noted that the inmate was a new arrival and was not seen, but the physician ordered Remeron for him and referred him to a psychiatrist. While the medication did not appear related to the inmate's profile, his MAR indicated the inmate received Remeron 7/24/03 to 7/28/03. The actual bus screening form filled out by the RN was not provided, but progress notes reflected visits on 7/28/03 and 8/6/03. Weekly group therapy notes indicated that all groups the inmate was scheduled to attend were either cancelled or refused by the inmate. A treatment plan dated 8/5/03 recorded diagnoses of Bi-Polar Disorder NOS, Poly-Substance Dependence, no medical problems on Axis III, and Axis II deferred. The inmate was noted to be medication compliant and was placed at the EOP level of care although he was in the AdSeg unit. Progress notes by the psychologist indicated the inmate reported his parole was violated because he got drunk and now was depressed and sleeping poorly. The notes indicated he was receiving his medication and was scheduled for an IDTT in the first week of August. On 8/4/03, a note indicated the UHR and C-file were unavailable, the patient was stable and he should be retained at the EOP level of care. The note also recorded that he denied suicidal ideation and, though he was cooperative, refused to participate in groups. A note on 8/6/03 indicated his mood was "ok," but his sleep was poor; he continued to deny suicidal ideation or psychotic symptoms.

The Suicide Report identified eight problems and recommended the following corrective actions:

Problem 1:  Correctional officers failed to recognize the inmate's behavior as related to his mental health or make an emergency referral to mental health when he complained and acted out when he was not getting his medications.

Recommendation:  Correctional officers needed training in recognizing the signs and symptoms of mental illness.

Problem 2:  Correctional staff responding to his destructive behavior did not take into account the information on the inmate's suicidal and mental health history that was available to them on the CDC 114-A-1.

Recommendation:  Training on this issue needed to be provided to correctional officers.

Problem 3:   Reasons for changes in medication were not documented in physicians' progress notes that were supposed to correspond with change orders.

Recommendation:   A memorandum for health care staff and especially psychiatrists on documentation and record-keeping needed to be drafted and circulated.

Problem 4:  Health care staff was unable to locate the deceased inmate's last MAR.

Recommendation:  The institution needed to establish a QIT to review the process for documenting more accurately MTAs' delivery of medication ordered by psychiatrists.

Problem 5:  Psych techs and other licensed mental health staff in AdSeg did not adequately document mental health rounds.

Recommendation:   Clinicians needed to maintain daily logs and weekly documentation, and their supervisors needed to conduct audits and provide in-service training to ensure these requirements are met.

Problem 6:  Correctional officers' failure to recognize and appropriately respond to a severely mentally ill inmate at the EOP level of care in distress and, instead, impose punitive measures may have contributed to the stress that led the inmate to commit suicide.

Recommendation:   The institution should conduct an investigation to determine whether the correctional officers involved followed policies and procedures for the management of mentally ill inmates in acute distress and, specifically, whether their actions, in effect, denied him access to mental health care as a form of punishment.

Problem 7:  Ventilation grates in the AdSeg unit, from which the inmate hanged himself, had a mesh large enough to put a rope through.

Recommendation:   Plant operations should review the feasibility of replacing vent grates in AdSeg with smaller mesh.

Problem 8:  The inmate was prescribed a non-formulary medication without documentation indicating that the proper protocol had been followed.

Recommendation:   The institution needed to provide the appropriate documentation for this inmate, if available, and, if proper procedures were not followed, conduct appropriate training on the issue.

RJD staff provided its response to the recommended actions contained in the Suicide Report on 5/24/04, as follows:

Problem 1:  Training was provided to AdSeg correctional officers on recognizing the signs and symptoms of mental illness.

Problem 2:  Training was provided to AdSeg correctional officers on the contents and uses of CDC 114-A-1.

Problem 3:  Documentation of medication changes was addressed and training on new procedures provided.

Problem 4:  The Chief Medical Officer prepared a memorandum on the filing of MARs that was distributed to relevant affected staff.  A search for the deceased inmate's final MAR was conducted unsuccessfully.

Problem 5:  In-service training on rounding for AdSeg psych techs was provided in December and a sign-in sheet for the training documented its completion.

Problem 6:  The institution's reported that four Level 2 internal affairs investigations had been initiated into this inmate's suicide, which would be assessing the issues raised in the Suicide Report about the conduct of AdSeg correctional officers' in response to the deceased inmate's acting out behavior.  Results of these investigations were not included.

Problem 7:  An estimate of the costs of replacing the large-mesh grates in AdSeg had been prepared.

Problem 8:  Training on the use and documentation of non-formulary medications was provided to clinical staff.

Findings:  Although this inmate did not evidence obvious signs or symptoms of imminent self-harm or share his intent to harm himself with clinical or custody staff immediately prior to his death, his suicide may have been, nonetheless, foreseeable because his UHR contained information predictive of a high risk for suicide.  His death may have been somewhat more clearly preventable for a variety of causes.  The inmate had a well-documented history of suicidal behavior and a serious Axis I mental illness, of which mental health staff at RJD appeared to have been largely unaware.  The UHR contained significant documentation relative to a heightened risk of suicide if the inmate were to receive a third strike.  Clinical staff consistently either lacked or failed to make use of

appropriate documents in the UHR to validate his past history. The signs and symptoms of mental illness that the deceased inmate displayed to custody staff were not recognized by correctional officers, who failed to refer him appropriately to mental health. Delays in providing prompt CPR by handcuffing the inmate and waiting for other staff to arrive to initiate CPR may have contributed to his death. Finally, the inability to locate MARs and other documents in past and current records relevant to the administration of this inmate's medications and the use of a non-formulary prescription without following appropriate procedures, may also have contributed to some small extent to the outcome here.

## 28. Inmate #T96571

Brief History: This inmate was a 25-year-old Pacific Islander serving his first term in CDC. He committed suicide by hanging at California Treatment Facility (CTF) on 9/5/03 at approximately 4:55pm. The inmate was single-celled in AdSeg, where he had been placed on 8/21/03. The inmate was admitted to CDC through the reception center at SQ on 6/23/03 and was subsequently transferred to CTF on 8/14/03. He was committed to CDC after entering a guilty plea to Second Degree Robbery for which he received a two-year sentence.

The inmate was discovered at approximately 4:55pm on 9/5/03 by a correctional officer making rounds on the tier in AdSeg. The inmate had used a state issued sheet to make a makeshift rope, and was hanging by his neck from the sheet attached to the air vent above the upper bunk in his cell. The officer shouted "man down" and other correctional officers responded, subsequently entered the cell, and used a cut-down tool to cut the sheet from the vent. The correctional officers were joined by a nurse and a MTA, who began performing CPR, and the inmate was transported to the CTF Central Facility Health Services. CPR was continued but was unsuccessful, and the inmate was pronounced dead at 5:27pm by a physician at the facility.

The inmate had a history of juvenile arrests from 1991 to 1996 for Grand Theft, Battery/Use of Force/Violence upon a Person, Assault with a Deadly Weapon, and Burglary. The inmate was placed on supervision for these offenses and required to pay fines and restitution. The inmate had two prior adult arrests for driving under the influence and fleeing from a police officer that resulted in probation, brief jail sentences, fines and restitution. The inmate's arrest for Second Degree Robbery, which brought about his CDC incarceration, occurred when he was 25 years old.

At the time of his June 2003 admission to CDC at SQ, the inmate's bus screening indicated he was prescribed medications for hypertension and had a positive PPD, but had no mental health complaints or history. On 6/25/03, the inmate received a brief mental health screening, which generated the following statement: "There are indications that this offender is experiencing a major depression." The evaluator elaborated that the inmate appeared to be suffering from a mental illness and referred him to a mental health professional. A mental health screening chrono dated 6/25/03 cleared the inmate for general population, and no referral was made for a full mental health evaluation, as required by program guides. The Suicide Report referred to a probation officer's report,

which described the inmate as reporting he had been diagnosed with depression, was unhappy with his life, and felt suicidal and his mother had once walked in on him when he had a gun pointed at his head.  This probation report indicated that the inmate was treated with Prozac and Zoloft while in custody prior to his incarceration in the CDC.  There was also a notation from the probation officer that the inmate's sister had confirmed the inmate was taking psychotropic medication because he would "see things and talk to things" that were not there.  The Suicide Report indicated the inmate received a DDP screening for developmental disabilities, and, despite a history of attendance in special education classes, he received a passing score and was scored "NCF" on the DDP screening.

The inmate was transferred to CTF on 8/14/03, and an initial health screening administered on that date indicated the inmate denied any symptoms or history of mental illness or treatment for mental health problems.  On 8/14/03 a medical report of injury or unusual occurrence indicated the inmate had minor scratches on both forearms, but the inmate reportedly stated, "Nothing happened.  I don't have injuries."  On 8/21/03, an initial AdSeg ICC note was written indicating the inmate "assaulted I/M in R&R on arrival (no medical file)."  This note reported the inmate denied mental health problems, denied suicide or homicide intentions and audio or visual hallucinations.  The note indicated the inmate should be held 60 days for investigation.  A second note, dated the same day, referenced the probation officer's report referring to auditory hallucinations.  When questioned, the inmate admitted to auditory hallucinations, and the plan was to refer him to IDTT.  On 8/26/03 the inmate was seen in IDTT where it was noted he had a history of auditory hallucinations, but "none at present."  It was further noted the inmate denied any current mental health problems, and there was no need for mental health services.   The note indicated the inmate was told to contact staff if he needed help in the future and described him as "Solemn - good attitude."  These three notations were the only notations from mental health staff after this inmate's admission to AdSeg.

The Suicide Report referred to these notations, as well as those recorded at the SQ reception center, noting that none of them met the program guide requirement for a full mental health evaluation, and they were not documented on the MH-4 as required.  Nor was the inmate properly evaluated for placement in the MHSDS, even though he had a history of auditory hallucinations and symptoms of a serious mental health disorder.  The Suicide Report also cited the RVR written for the inmate's battery on another inmate with serious injury resulting.  The incident occurred on 4/14/03, but was not included in the documents reviewed locally.  The Suicide Report suggested the possibility the RVR involved a gang-related incident and, if so, the inmate would have been aware of the possibility of the assessment of a SHU term, although actual disposition of the RVR had not occurred before his death.  The Suicide Report included comments from correctional officers that the inmate was quiet, slept much of his time in AdSeg and liked to read, but also described some unusual behavior at the beginning of his AdSeg placement, characterized by writing in large letters on the wall "I like it."  The inmate cleaned the writing off the wall when instructed to do so by a correctional officer.  The inmate left no suicide note.

The Suicide Report identified four problems and made the following remedial recommendations:

Problem 1:  Once again, the large mesh in the inmate's AdSeg cell provided a place from which to hang himself.
Recommendation:  A plant operations engineer should examine the cells in AdSeg and evaluate the possibility of covering the air vents with screens with a smaller mesh.

Problem 2:  At the SQ reception center, the inmate was cleared for general population despite a positive standard mental health screening.
Recommendation:  SQ needed to conduct an audit of ten percent of all inmates screened in the reception center during the next six months and, specifically, an audit of ten percent of all inmates screened by the clinician who screened this inmate.

Problem 3:  At CTF, the required mental health evaluation was not conducted in AdSeg.
Recommendation:  CTF needed to train all clinicians on the importance of providing mental health evaluations for new admissions to AdSeg as required in the program guides and conduct an audit of ten percent of inmates who receive mental health screening in AdSeg.

Problem 4:  Policies on mental health evaluations were violated at both the SQ reception center and the CTF AdSeg.
Recommendation:  Investigation of the apparent violations of policies and procedures at both facilities should be initiated.

Findings:  This inmate's death did not appear to have been foreseeable because he did not express to any institutional staff his suicidal ideation or plan.  There was here, on the other hand, a documented history of previous suicidal ideation, treatment for depression, possible auditory and visual hallucinations and reports of current mental health symptoms suggestive of major depression and/or other serious mental illness.  The deceased inmate did not receive a complete mental health evaluation as required by the program guides at either the SQ reception center or the CTF AdSeg despite clear indications that an evaluation should have been performed.  Had the indicated mental health evaluations been undertaken properly, the inmate's death might have been prevented.

## 29.  Inmate #T18116

Brief History:  This inmate was a 32-year-old Hispanic male who was discovered hanging in his double cell at California State Prison, Los Angeles County (CSP/LAC) on 9/11/03.  The inmate was housed on a sensitive needs yard in the DDP program and was at the 3CMS level of care at the time of his death.  This was the inmate's first term, and he was admitted to CDC on 5/18/01 via the reception center at SQ.  He was transferred to CSP/LAC on 10/26/01, to CAL on 12/19/01 and then back to CSP/LAC on 7/31/02, where he resided until his death.  The inmate had also been found to be DD1 and D1A under the Developmental Disabilities Placement Program based on evaluations dated

6/14/02 and 12/30/02. The inmate was noted to have limited English; Spanish was his primary language.

The inmate was discovered by the control booth officer at approximately 8:15am on 9/11/03 in response to inmates yelling "man down" in the area of his cell. The control booth officer activated his personal alarm, and responding staff found the inmate hanging by a torn bed sheet from the inside of his cell door. The inmate was cut down causing him to fall to the floor; he was carried out of the cell and placed on a Stokes litter and a wheeled gurney. Medical staff also responded to the area and began CPR, which continued as the inmate was transferred to the CTC. The inmate was pronounced dead at approximately 8:35am at the CTC.

The inmate's cellmate initiated the man down alert when he discovered the inmate hanging in the cell. The cellmate reported he and the inmate had gone to breakfast and, on their return, the deceased inmate indicated he wanted to take a cell bath and hung up the sheet for privacy. The cellmate subsequently realized it was extremely quiet and there was no sound of splashing water. When he looked behind the sheet, he discovered this inmate hanging and yelled man down. The cellmate was taken to AdSeg pending investigation. The inmate death report indicated the inmate was discovered hanging at about 8:15am and brought to the ER at 8:26am. Reportedly, the inmate had been hanging "for about 2 hours." The death report indicated CPR was initiated by custody staff when the inmate was cut down, but there was no further explanation for the estimated two-hour time frame within which the inmate was reported to have been hanging. The Autopsy Report, dated 9/14/03, found the cause of death to be asphyxia due to hanging.

The inmate's initial bus screening on 5/18/01 at the reception center at SQ was positive for a history of asthma but negative for any mental health history or treatment for mental illness. Similarly, bus screenings at CSP/LAC on 10/26/01, CAL on 12/19/01 and CSP/LAC on 7/31/02 were all negative screens for mental health history or needs. The inmate's initial DDP screening at SQ on 6/14/01 was a DDO, indicating no need for adaptive support services. Subsequent evaluations on 6/14/02 and 12/30/02, however, found the inmate to be a D1A with need for assistance. This was believed to be because of the inmate's limited English and his need for support during complex or more stressful circumstances.

On 5/28/02, while at CAL, the inmate was seen by medical for headaches and trouble breathing and referred to mental health. A SRA was performed at that time. Based on an interview with the inmate and a review of his UHR, the inmate was estimated to be at low risk for imminent harm to self. However, he was retained in the OHU for a psychiatric consultation. In the SRA, the inmate denied past suicide attempts and ideation, but acknowledged being anxious, depressed, and fearful for his safety as he was on sensitive needs yard and had a long sentence. A psychiatric consultation was conducted on 5/29/02 with the use of an interpreter. The resulting MH-4, dated 5/28/02, indicated the inmate was seen in response to a crisis referral because he reported headaches, trouble breathing, choking sensations in his chest, hot flashes, racing thoughts and feeling the "presence" of a devil or spirit that seemed to be touching him. The inmate also reported

he felt CAL was too hot and far away from his family, and he concluded, "I feel I want to die." The inmate had religious messages in Spanish on his left palm stating Jesus lives and Jesus loves. The inmate's UHR indicated the provisional diagnoses were Depressive Disorder NOS and Anxiety Disorder NOS, with a GAF of 51 to 60. The inmate was admitted to the OHU. The following day, 5/29/02, a psychiatric evaluation concluded the inmate was depressed and moderately anxious when discussing suicidal ideation and psychiatric medications, but was not psychotic. The diagnoses were the same, and alcohol abuse/dependence in sustained remission was added. The inmate was advised to take medications, but he refused. He was admitted to the 3CMS level of care and released to custody on 5/29/02 with five-day follow-up and a plan to return to psychiatry for follow-up in 3CMS as a medical necessity.

Approximately two weeks later on 6/12/02, the inmate agreed to take Paxil. He was transferred to CSP/LAC on 7/31/02. A SRA was completed on 8/2/02 to help formulate treatment planning. His recent passive suicidal ideation was noted, as well as his history of alcohol abuse. His risk for imminent self-injury was evaluated as negligible. Comments on that evaluation indicated the inmate had anxiety and adjustment issues, with "mild to moderate somatization of fears with vague spiritual references." The comments also noted the inmate "calms easily when reassured."

The inmate was on a sensitive needs yard because his committing offense involved the sexual assault of a child, beginning when she was five and continuing until she was eight. The assault included force, penetration and threats to cut the girl's tongue out if she told anyone. The victim's grandmother discovered the inmate in bed with the victim, and he subsequently received an 18-year term.

After the inmate's arrival at CSP/LAC, a progress note of 8/2/02 indicated he was placed in the EOP level of care based on an IDTT of 8/2/02. The inmate continued to complain of visual and auditory hallucinations related to the devil or a spirit touching him, but he remained compliant with his medication of Paxil. On 8/16/02, the inmate was brought to the ER after he was found lying on the floor and refused to get up. In a psychiatric note, he was described as incoherent with complaints of auditory hallucinations and hearing the voices of the devil he felt was trying to kill him and Jesus who was trying to save him. His mental status was described as alert, oriented times three, but moderately agitated with loud speech and mildly loosened associations. The impression was Depression with Psychotic Features; he was given an injection of Haldol and Cogentin and started on Zyprexa and Paxil with a plan to re-evaluate him in a week. The inmate was next seen on 10/3/02, when he was referred for evaluation with complaints of difficulty sleeping, bouts of anger and feeling frustrated and sad, with questionable medication compliance. Zyprexa and Paxil had been found in his cell, although the inmate was supposed to be on DOT. No SRA was completed at this time. While the inmate was found to be stable at the time of the interview, his Zyprexa was increased with a plan to follow-up in 60 days.

The inmate was subsequently seen on 11/4/02 and 11/19/02 by a psychiatrist who described him as having adjustment issues with depression and various complaints of hearing voices of devils trying to attack him. The psychiatrist opined that the inmate

"appears to be struggling to come up with symptoms," and the plan was to follow-up in 90 days as a 3CMS inmate. Notations on 2/14/03 and 2/19/03 indicated the inmate had a diagnosis of Major Depressive Disorder and appeared to be responding to an internal stimulus, even though he denied any problems. By 4/4/03, the inmate reported that he was "bothered by voices but no longer hears them." He had refused his psych meds for several months and was requested to sign an official refusal. The psychiatrist noted he earlier appeared to respond favorably to Paxil and Zyprexa, but was "in denial at present." The assessment was Psychotic Disorder NOS in partial remission, and the plan was to discontinue all psych meds, with the refusal signed. On 4/29/03, his case manager noted the inmate appeared to be responding to internal stimuli, although he denied auditory hallucinations and a need for medications. The inmate also requested to get out of DDP, and he was referred to the DDP clinician, as well as a psychiatrist. The inmate was not seen by a psychiatrist until 7/1/03, more than two months after the referral. The psychiatrist noted the inmate reported having headaches and not sleeping well, and stopping his psych meds for three months because "the Zyprexa made him too sedated." The note indicated the inmate continued to hear voices but denied suicidal and homicidal thoughts. The psychiatrist's plan was to order Remeron for sleep, but the inmate did not want sleep medication. A psychiatrist's note on 7/14/03 indicated the inmate reported he was doing "fine on meds," and had no suicidal ideation, although his insight and judgment were questionable. His Remeron was continued.

On 7/20/03, the inmate was seen again in the ER where he reported he wanted to kill himself and had tried to hang himself. Correctional officers had referred him to the ER after his cellmate stated that he had a red mark on his neck and had tried to hang himself. The psychiatrist consulted with the ER nurse and concluded the inmate was not suicidal and returned him to the yard where he would be seen the next day. When seen the next day by the psychiatrist, the inmate was noted to have no complaints and verbally contracted for safety. Once again no SRA was completed either in the ER the day before or by the psychiatrist when he saw him. The inmate's last IDTT was on 7/24/03. This IDTT did not document in the MH-2 or in progress notes any reference to the inmate's 7/20/03 ER encounter or his statements there that he had been contemplating suicide. Suicidality on the mental status portion of the MH-2 was checked as "none." Nor was there any modification in the treatment approach, despite the inmate's statements that he wanted to die, the correctional officer's referral to mental health because of the red mark on the inmate's neck and the expressed concerns of the inmate's cellmate. The treatment plan was to continue with regular 3CMS contacts at 90-day intervals. There was no reference to the inmate's borderline intellectual functioning and/or developmental disabilities/mental retardation on Axis 1 or II in the diagnosis offered on the MH-2 of 7/24/03.

The Suicide Report indicated the inmate had a new case manager assigned to him following this IDTT. The inmate twice refused out-of-cell visits, but his case manager saw him at cell-front. The MHTS indicated he was seen on 8/5/03 and 8/12/03, but there was a progress note in the UHR for only the latter visit, during which the inmate apparently was counseled about keeping his appointments with the case manager. The Suicide Report indicated the inmate told the case manager to "put the chrono up her ass."

According to the Suicide Report, the case manager had not thoroughly reviewed the UHR and had no idea of the inmate's suicidal ideation or DDP needs.

The Suicide Report noted the inmate's isolation and limited socialization skills, his DD1 status, his limited cognitive abilities and language and cultural barriers. The Suicide Report also noted the DD1 status of the inmate's cellmate. The Suicide Report and the UHR cited the inmate's limited insight and judgment, poor compliance with medications despite periods of increased anxiety and suicidal ideation, including his description in July 2003 of suicidal ideation with a plan to put a self-made rope around his neck. According to the Suicide Report, the concerns of correctional officers, who referred him to mental health, were not adequately assessed or appreciated by the IDTT or the newly assigned case manager. The Suicide Report also indicated that, in an interview subsequent to the inmate's death, his cellmate reported that the deceased inmate had arguments with God and the only way to relieve the resulting headaches was to apply pressure to his neck or kill himself. The cellmate also indicated that he had notified staff about the red or purple mark the deceased inmate had on his neck in July 2003.

A handwritten letter in Spanish, described in the Suicide Report as a prayer, was found lying on a shelf in the inmate's cell after his death, in which he asked God to give him strength, to show mercy by taking hold of the demons and help him give back praise to God the Father and Jesus.

The Suicide Report identified five problems and recommended the following corrective actions:

Problem 1: In October 2002, the inmate was found to be hoarding medication. In April 2003, he admitted not taking his medications for several months. DOT procedures, prescribed for this inmate, were apparently not followed consistently.
Recommendation: The institution needed to review its operating procedures for medication administration, as well as train and audit staff to ensure compliance with DOT procedures and documentation.

Problem 2: MARs for the past seven to eight months were missing from the inmate's UHR; other MARs in the UHR were undated. The admission MH-4 was also missing.
Recommendation: A review of procedures for getting MARs from the yard to the UHR was needed, and the institution should conduct a QIT, if necessary, to identify and resolve the issue. Charts needed to be audited for missing and undated MARs.

Problem 3: There was no indication that a Spanish language interpreter was utilized or even considered during mental health contacts with the deceased inmate at CSP/LAC. The fact that an interpreter was used at CAL suggested this might have been desirable, even if the inmate had limited English.
Recommendation: Provide training for staff on the importance of utilizing an interpreter when the primary language and culture is not English/American. Availability

of interpreter services both within and outside the institution must be made known to all clinical staff.  If an interpreter is not used, the rationale should be documented.

      Problem 4:    SRAs were not completed at CSP/LAC following the two ER referrals for suicidality on 10/3/02 and 7/20/03.
      Recommendation:  Issue a local memorandum to mental health staff informing them that a SRA is required to be completed whenever an inmate is seen for possible suicidal ideation, as per CDC memo of 7/14/03, and provide training on the issue as needed.

      Problem 5:  Continuity of care for this inmate was impaired by poor documentation linking ER referrals for suicidality to MH-3s and MH-2s and the lack of alerts about the deceased inmate's DDP status.
      Recommendation:  Provide mental health staff with some training on completion of the MSE section of the MH-2 and the need for references in MH-3s to on-going issues relevant to mental health.  The institution also needed to look at a possible system for flagging charts of caseload inmates with DDP status.

Findings:  This inmate's suicide appeared to have been both foreseeable and preventable.  The inmate clearly had a history of serious and persistent mental illness, but mental health staff failed repeatedly to provide adequate assessment and treatment, given his documented psychosis, suicidal ideation and self-harming behaviors.  The inmate was not properly evaluated, and information readily available in the UHR appeared not to have been reviewed or known by his mental health care providers.  In addition, as referenced in the Suicide Report, policies and procedures on medication administration and documentation, the conduct of SRAs and the use of interpreters were not followed, and clinicians involved in the delivery of mental health care to the deceased inmate at the time of his suicide appeared to be totally ignorant of his mental health history or status.  Had applicable policies and procedures been followed or had the inmate's primary clinicians been better informed about their inmate/patient's history and status, this inmate might have been assessed as needing a higher level of care and suicide precautions.  He certainly would have received more vigorous and consistent treatment for his severe and persistent illness, rather than the discontinuation of his medications and the provision of the inadequate medication therapies reflected in the record.


## 30.  Inmate #854107

Brief History:  This inmate was a 31-year-old Caucasian male who committed suicide by hanging at California State Prison, Corcoran (CSP/Corcoran) on 10/2/03, at approximately 12:25pm.  The inmate was housed in the SHU in a single cell, and was at the 3CMS level of care in the MHSDS at the time of his death.  The inmate was admitted to CDC via the reception center at SQ on 10/30/92.  He was transferred to PBSP in 1993, HDSP in 1997, CSP/Corcoran in February 1999, returned to PBSP in June 1999 and placed ultimately in CSP/Corcoran on 10/18/00.

A correctional officer, who was assisting in yard-recall in the SHU, approached the inmate's cell at approximately 12:25pm and saw the inmate hanging from the air vent with a noose made from bed linen tied around his neck. The inmate was the only inmate assigned to the cell. Upon his discovery, the correctional officer notified two other correctional officers to come to the location and requested the control booth officer to open the door of the cell. The cell was opened, and the correctional officer, who discovered the inmate, held him up by his upper torso while two other correctional officers pulled and tore the linen rope to release the inmate. The inmate was carried outside the cell, and two correctional officers requested the "Exacto knife and the ambu bag." from the control booth officer. One correctional officer cut the noose from the inmate's neck and another began CPR with assistance from other officers using the ambu bag. The correctional officers continued CPR until an MTA arrived, who relieved the correctional officers and continued CPR until the emergency vehicle arrived and the inmate was transported to the Acute Care Hospital at CSP/Corcoran. Resuscitation efforts continued until 12:41pm, when the inmate was pronounced dead. The Autopsy Report indicated the cause of death to be asphyxia due to soft ligature strangulation. The Suicide Report indicated the inmate's feet were tied together, his hands were tied together behind his back in a loose knot and he was partially suspended in a sitting position, when he was discovered by the correctional officers. ISU conducted a search of his cell and found an envelope with two letters and a will addressed to his wife, a short note for his family and information on his prison trust account and telephone numbers and addresses of family members.

The inmate was admitted to the CDC on 10/30/92 with a sentence of 25 years to life for first degree murder. The inmate killed a man with a sledge hammer in the man's home; the inmate was 20 years old at the time of the offense, his first felony conviction. The probation officer's report, prepared for the inmate's sentencing on the murder charge, provided an extensive history of the inmate's criminal justice, mental heath and personal history prior to his incarceration.

The inmate was sexually abused by a stranger at approximately age five and was declared a neglected child after being physically abused by his mother's boyfriend at approximately seven years of age. The inmate's mother also apparently physically abused him, burning him with cigarettes and beating him with a belt. The inmate was placed in foster care in 1980 at the age of eight, but was returned to his mother's home when he was 11. The inmate attempted suicide at approximately age 10 and, at the age of 16 and 17, he had a total of five suicide attempts, including overdosing with 25 headache pills (January 1988); cutting his wrists with a knife (October 1988); choking himself with a belt (March 1989); trying "to rip open or break his esophagus by hand" (March 26, 1989); and being discovered in a tree with a cable television cord wrapped around his neck in which he either "slipped or jumped" (June 11, 1989). The inmate was identified as being at a borderline to low-average range intellectually and had a diagnosis of Dysthymic Disorder with low grade depressive symptoms. This disorder, his history of suicidality and his repeated absconding from group homes were all believed to be related to his serious, chronic history of physical, emotional and sexual abuse and neglect. The probation officer concluded that the inmate likely suffered from chronic suicidal ideation.

After the inmate entered CDC, he was evaluated by a psychiatrist on 11/25/92 in the AdSeg unit at SQ. The psychiatrist recorded a history of alcohol abuse and self–injurious behaviors, including attempted hanging, cutting himself and overdosing, as well as two prior hospitalizations for self-harm/suicidal behavior. The evaluation, nonetheless, concluded that the inmate did not suffer from any mental disorder. The 11/25/92 evaluation was conducted in response to a referral from a CCI, which had an extract attached to it from the probation officer's pre-sentence report, cited above.

The inmate was not seen by CDC mental health staff again until July 1994 during his first stay at PBSP, when a psychologist noted the inmate was having difficulties adjusting to prison and diagnosed a "secondary adjustment reaction to prison." The psychologist recommended four sessions of treatment and concluded, after the sessions were provided, that there was no evidence of a severe mental disorder.

On 8/19/96, a brief mental health screening report was completed, which indicated that the inmate was not suffering from a mental illness and did not need to be referred to a mental health professional. This conclusion was reached in spite of the fact that the inmate had a history of impulsivity, severe and multiple previous self-injurious incidents, several hospitalizations as a teenager prior to entering CDC and had been seen in several CDC facilities for stress-related concerns. In November 1997, a psych tech administered a mental health screening and noted that mental health staff would monitor the inmate on a continuing basis, as was recommended by an IDTT when the inmate was at PBSP earlier.

The inmate was admitted to the Correctional Treatment Center (ER) at HDSP from 4/13/98 through 4/14/98, secondary to "scratches" and dizziness reported by the inmate after a cell extraction. He was not seen by mental health staff during that admission. A notation in the UHR indicated the inmate was referred to mental health on 5/17/99 after he reported to a mental health staff member that he was depressed and having difficulty sleeping, but he was not seen by mental health staff prior to his transfer to PBSP on 6/29/99. His arrival screening at PBSP, which included reportedly a mental health screening and a review of his records, found that the inmate "does not currently exhibit any categories of at risk behavior described in the Madrid SHU exclusion order."

From the time of his October 1992 arrival in CDC, the inmate began to collect RVRs. In November 1992, he was charged with assault on another inmate and he went on to accumulate 22 additional RVRs prior to his 1999 transfer to PBSP. Charges against him included assaults, physical altercations, battery on a peace officer, obstructing a peace officer in the performance of his duty, possession of a weapon, possession of dangerous contraband, battery on an inmate and a number of mutual combats. The inmate's initial SHU term was extended repeatedly because of these charges; in February 1999, while in the SHU at CSP/Corcoran, he assaulted an inmate with a weapon causing serious bodily harm, resulting in the extension of his SHU term for an additional two years. He received another two-year extension in December 2000 for assault on another inmate capable of causing mortal/serious injury and a subsequent extension, when he was found in

possession of a weapon in February 2001. Many of these disciplinary charges were related to the inmate's involvement with the Aryan Brotherhood prison gang.

In July 1999, an ICC reviewed the inmate's history and institutional adjustment and noted the probation officer's pre-sentence report indicating a history of attempted suicides. This resulted in the inmate being seen by a psych social worker for monitoring on a consistent basis, but he was not placed in the MHSDS until 1/16/01, when he appeared before an IDTT in the PBSP SHU. The inmate presented with problems related to impulsivity and elevated mood and was seeking 3CMS services because, "I have to do something with myself." The inmate had recently been involved in a fight with his cellmate causing serious injury to his cellmate. It was also noted that the inmate had been hospitalized at the ages of 16 and 19, reported multiple suicide attempts, poly-substance abuse and Hepatitis C. In response to questions about suicidality, the inmate responded, "Suicide is not in my vocabulary." The inmate's diagnoses were Mood Disorder NOS, Poly-substance Abuse, and Hepatitis C, with SHU incarceration pending disciplinary on Axis IV, and a GAF of 65 on Axis V. No specific interventions were listed in response to these identified diagnoses. The IDTT determined the inmate's level of care should be changed to 3CMS. The SRA, also completed on that date, indicated the inmate reported multiple superficial suicide attempts, a history of mental illness, disturbances in mood, chronic or terminal illness (Hepatitis C), first term with a long/life sentence, classification at Level IV, history of poor impulse control and a history of substance abuse and concluded the analysis of risk for suicide as "no risk."

An IDTT note dated 1/18/01 indicated the treatment plan called for quarterly case management contacts with cell-front visits as required, psych tech visits weekly, medication evaluation by the psychiatrist as needed and the inmate's medication compliance. A psychiatric note of 2/6/01 indicated that Risperdal and Paxil were prescribed for 90 days. A psychologist's note of 2/14/01 indicated the inmate was seen by a psychiatrist, but the inmate was unhappy with the medications prescribed and refused to take them. The psychologist noted the inmate "denies intent to harm self or others," and referred him back to the psychiatrist. The psychiatrist saw the inmate on 2/20/01, reported the inmate was prescribed Risperdal and Benadryl and was being seen for an evaluation for Paxil. Treatment review, as noted by the psychiatrist, indicated the IDTT goals were to decrease impulsivity and mood swings. She concluded the inmate was suffering from Major Depression with anxious features, discontinued the Risperdal and started Paxil, with a plan for follow-up in one month.

A different psychiatrist saw the inmate on 3/26/01 and indicated no evidence of severe depression or thought disorder and suggested as medications, "D.C. Risperdal, Benadryl HS." Approximately weekly psych tech notes indicated the inmate's adjustment was fair to good, and he wanted to speak with his case manager. On 5/10/01, the inmate was seen by a psychiatrist who diagnosed Adjustment Disorder with depressed mood resolved, history of Poly-substance Dependence in institutional remission, and Mixed Personality with antisocial traits. The plan by this psychiatrist was to discontinue all psychotropic medication; he concluded the inmate was not depressed or in need of further treatment. On 7/18/01, the inmate stated to a psych social worker that he wanted to be removed

from the 3CMS caseload and claimed he was doing well. An undated note by a psychiatrist indicated the inmate refused a psychiatric interview, which appeared to have been written at or around the time of the 7/18/01 note by the psych social worker.

The inmate continued to be seen during weekly psych tech rounds. Psych techs noted generally that the inmate was alert, appropriate in mood and speech, and reported no mental health concerns, although his personal hygiene and self-cleanliness were poor. He was seen by a psychiatrist on 4/11/02 for a follow-up evaluation, which found no mental disorder and planned to discharge him from the 3CMS. On 7/11/02, a psychiatrist evaluated him and assessed Axis I with no evidence of major mental disorder, a history of adjustment disorder with depressed mood and Axis V with GAF of 75+. This psychiatrist indicated "problem areas/meds-none (psych)."

An IDTT on 7/15/02 indicated the inmate was divorced from his wife, whom he married after being in prison, and was engaged to a former girlfriend. The inmate described his first nine years in prison as a long fight to adjust to the prison culture, resulting in his long terms in the SHU. The MH-4 and progress notes indicated the inmate had a "tight program for the next ten years" and noted his decision to turn his life around a year earlier and completing his GED.

The diagnoses at this IDTT were Mood Disorder and Poly-substance abuse with a GAF of 80. A SRA completed on 7/15/02 indicated his risk for suicide was low, with a number of positive factors being checked, including family support, caring for children, religious support, spousal support, support of friends, insight into crime, realistic life plan and exercise. The source of information for this SRA was solely a clinical interview with the inmate. Approximately weekly psych tech notes indicated the inmate continued to do well. A psychiatric note of 9/30/02 described the inmate as cooperative, with bright affect, good eye contact and no formal thought disorder. The inmate denied having any suicidal or homicidal thoughts and reported no psychotic symptoms, but he also reported "mood swings" for three to four days lasting for half a day. The psychiatrist concluded that while there was a history of Major Depression, it had been in remission for at least a year. The psychiatrist found no need for psychotropic medication and ordered follow-up in twelve weeks.

The inmate apparently continued to do well until 11/5/02, when a psych tech referred him to psych line because he stated he was having problems sleeping. MH-2s were completed on 11/11/02 and 11/12/02. Both described the inmate as at the 3CMS level of care, but the MH-2 of 11/11/02 gave diagnoses of Mood Disorder and Poly-substance Dependence (remission), Hepatitis C and a GAF of 68, while the MH-2 of 11/12/02 gave diagnoses of Rule Out Adult ADHD (long childhood history), Rule Out Bipolar with Axis III Hepatitis C and a GAF of 65. They both described mood swings, and the MH-2 of 11/12/02 reported the inmate wanted to be back on medications, admitted he had issues and was open to therapy, if consistent. The treatment plan was to continue at the 3CMS level of care with case manager contacts every ninety days or as needed, weekly cell checks and medications PRN. The inmate was seen by a psychiatrist on 11/14/02 who prescribed Wellbutrin and Neurontin. The inmate was described as having

"difficulty concentrating, not psychotic, not depressed, good insight." A follow-up note by a psychiatrist on 11/16/02 indicated that medications had not yet been started and the inmate was anxious about their effects. Psych tech notes in November and December 2002 indicated the inmate wanted his medication to be increased or adjusted. He was seen on 1/3/03 by a psychiatrist, who diagnosed a history of ADHD and rule out Bipolar Type 2, discontinued Wellbutrin and Neurontin and started the inmate on Benadryl and Paxil. Weekly psych tech notes indicated the inmate reported generally that he was doing well, but he was not available for interview because he was out of his cell.

The inmate was seen by a psychiatrist again on 3/18/03 after he reported to a psych tech he wanted his Benadryl to be increased. The psychiatrist increased his Benadryl to 100mg at pm, up from 50mg. The inmate appeared to have missed medications in April 2003 for reasons that were unclear. The inmate apparently was seen by a psychiatrist on 6/14/03 (note is unsigned), who indicated diagnoses of ADHD and Bipolar Disorder, found the inmate to be stable and planned to renew medications and follow-up in one month. On 8/3/03, the psychiatrist noted the inmate had mild depressive symptoms and insomnia and did not want psychotropic medications. The plan was to see him in several months and continue current medications. On 8/19/03, a psych social worker met with the inmate, who requested to be seen on a more regular basis because of domestic concerns and reported his wife had been raped after going out drinking with friends. A week later, on 8/26/03, a psych tech reported the inmate stated his wife had been raped recently and he wanted an antidepressant although he appeared to have no signs or symptoms of anxiety or depression. On 8/29/03, the inmate was seen by a psychiatrist who indicated no chart was available, but the inmate reported no behavioral issues aside from some mild insomnia. The plan was to continue Benadryl. On 9/12/03, the inmate met with the psych social worker and reported he no longer believed his wife had been raped and wanted to "find out what she was doing."

At an ICC meeting held on 9/24/03, the inmate denied any suicide history and current suicidality, but his history of violence with other inmates was noted. A summary found no mental health concerns, and diagnostic impressions were deferred. On 9/30/03, the inmate met again with the psych social worker, who reported she met with the inmate at the request of staff, who indicated the inmate appeared anxious and somewhat angry because his wife had cancelled visits and was not writing frequently enough. He elaborated that his wife might leave him, and the psych social worker reported she allowed him to vent and agreed to follow-up within a week. She also reported he denied suicidal ideation at that time. On 10/2/03, the psych social worker met with the inmate again and they discussed further the inmate's conflicts with his wife. It was unclear whether the marriage would continue. On 10/2/03, the inmate met with the psychiatrist, who noted the inmate was seen on referral from the psych tech because of "depression and request for psych meds." At that time, the inmate was receiving Benadryl only. The psychiatrist conducted a cell-front interview and noted the inmate reported feeling depressed for a long time and especially during the past couple of months because of his wife's rape. The inmate stated, "I need meds to chill out," and denied having entertained suicidal thoughts because of the grief his suicide would cause his family. The psychiatrist assessed the inmate as having a "depressive disorder (probably mainly

reactive)," and prescribed medication (Remeron) with a plan to follow-up in three to four weeks.

During an earlier ICC on 5/21/03, the inmate was described as a non-validated, self-admitted associate of the Aryan Brotherhood, who requested to disassociate himself from the gang. According to the Suicide Report, he had successfully completed phase one of the debriefing process. By September, the inmate was considered for possible transfer to a Level IV sensitive needs yard, and his case was referred to the CSR with a recommendation that his indeterminate SHU status be ended and he be placed in AdSeg pending transfer to a sensitive needs yard at MCSP or CSATF.

According to the Suicide Report, the inmate's wife visited him on 9/25/03 and cancelled all of her visits after that date. The Suicide Report noted the difficulties the inmate was having in his relationship with his wife, the likelihood of his wife pursuing an annulment or divorce and her plan to mail a letter to the inmate informing him that she was leaving him. The inmate's correctional counselor believed it was unlikely the inmate received the letter prior to his suicide because the notes he left in his cell did not refer to such a letter.

The Suicide Report noted the psychiatrist's visit of 10/2/03, which occurred approximately just two to three hours prior to the inmate's suicide, the absence in the UHR of an order for Remeron and the missing MAR for October 2003, which was not in the inmate's UHR. It appeared from the Suicide Report that the psych social worker and psychiatrist were unaware of each other's involvement in this inmate's case. The psych social worker apparently was the last person to see the inmate alive.

The Suicide Report identified five problems and recommended the following corrective actions:

Problem 1: None of the recent documentation indicated that clinical staff had reviewed the inmate's C-file, which would have alerted clinicians to the inmate's unique suicide history and potential stress factors.
Recommendation: Clinical staff needed training on the legal and program guide requirements for reviewing inmate's records and how to integrate C-file entries with IDTT documentation. The institution should conduct monthly audits for six months of IDTT updates to determine if clinicians are reviewing the C-Files and integrating data from these files in their documentation of treatment plans.

Problem 2: This inmate/patient did not receive weekly case manager contacts as required in MHSDS guidelines.
Recommendation: The institution needed to conduct monthly audits of case manager contacts in SHU for six months and supervisors need to take appropriate remedial actions if required contacts are not provided.

Problem 3: Clinicians did not always follow legal and ethical standards with respect to documentation, such as noting the date and time of contacts and their documentation.

Recommendation:   Clinical staff needed training on proper documentation and record-keeping in accordance with applicable professional and ethical standards.  Peer review on this issue needed to be conducted over the next six months.

Problem 4:  The clinical staff working with this inmate did not communicate effectively with each other about his emerging mental health problems prior to his suicide.

Recommendation:   The institution needed to conduct training on team building.

Problem 5:  A psychiatrist evaluated the deceased inmate on the morning of his suicide and indicated that he was going to prescribe an anti-depressant, but no physician's order in the inmate's UHR corresponded with this note.

Recommendation:   The supervisor should review and take appropriate action, including peer review, as indicated and ensure procedure for prescribing and documenting medication orders.  Monthly audits of psychiatrist orders and program notes needed to be conducted for six months.

Findings: This inmate's suicide was not foreseeable because the inmate never apparently expressed suicidal ideation prior to his suicide.  It may have been preventable if appropriate policies and procedures had been followed.  Clinical staff did not provide weekly case manger contacts or communicate effectively with each other.  The case manager, psych tech and psychiatrist remained largely ignorant of each others encounters and efforts with the inmate.  More importantly, the failure to review and digest the prior suicidal and mental health history revealed in the inmate's C-file deprived clinicians of understanding and insight that might have triggered closer monitoring and greater intervention during the inmate's run-up to his suicide.

## 31.  Inmate #T-82238

Brief History:

This inmate was a 36-year-old Hispanic male who completed suicide by hanging in his single cell in AdSeg at Richard J. Donovan Correctional Facility (RJD) on 10/6/03.  The inmate was a participant in the MHSDS at the 3CMS level of care.  This inmate was returned to CDC on 7/8/03 as a parole violator because he failed to register as a sex offender.  He was placed initially in the reception center at RJD and subsequently in Ad Seg, where he remained until his death.  The inmate originally entered CDC on 6/15/00 after a conviction for child molestation.  He was paroled on 8/22/02, released to INS and deported.

On 10/6/03 at approximately 7:35am, the inmate was discovered hanging in his single cell in the Ad Seg overflow unit at RJD by a correctional officer serving the morning meal.  The correctional officer observed the inmate hanging in his cell from a state-issued sheet that was tied around the light fixture in the cell.  The correctional officer called for assistance and requested a cut-down tool.  The cut-down tool was obtained by the floor officer from the control booth and a correctional sergeant, MTA, and an additional correctional officer responded.  The sergeant and MTA lifted the inmate by the legs, an

officer cut the inmate down, and the MTA began CPR. At approximately 7:44am, the emergency transport vehicle arrived at the housing unit and transported the inmate to the CTC where unsuccessful CPR was continued. The inmate was pronounced dead at 7:51am by a physician at the CTC. Contrary to the description of the suicide in the Incident Report, the physician filling out the Inmate Death Report, dated 10/6/03, indicated that the inmate was discovered at "about 7:15am," and no CPR was employed. The inmate had been placed on single-cell status in the AdSeg overflow unit on 10/1/03 because his cellmate accused the deceased inmate of raping him, and an investigation was pending.

The committing offense for this inmate's first CDC admission occurred on 9/22/99, and resulted from his arrest for licking the thigh of a nine year old girl inside her home, where he was a member of a construction crew. A court-related psychological evaluation in the following January recommended a penal code 1203.03 evaluation, which, according to the Suicide Report, was not conducted. The inmate subsequently received a three-year sentence and was admitted to the RJD Reception Center on 7/15/00. The inmate was released on 8/22/02, placed on an INS hold, and deported following his release from RJD. The inmate received an "R" suffix for his commitment offense and was required to register as a sex offender. The inmate was deported by INS on 9/24/02, but he was arrested on 12/11/02 as a parole violator after re-entering the United States and failing to register as a sex offender. He received a 32-month sentence for his parole violation. He returned to the RJD reception center on 12/30/02, was released out to court to the San Diego Jail on 2/11/03 and returned to RJD on 7/8/03. He remained in the reception center until 7/17/03, when he was transferred to AdSeg where he remained until his death.

A psychological evaluation was not provided, but the Suicide Report indicated one was conducted on 1/22/00. A Mentally Disordered Offender evaluation indicated the inmate had impulse control and character problems that included obsessive compulsive and narcissistic features, but no Axis I diagnosis was made.

After his arrival at RJD in June 2000, the inmate received a reception mental health evaluation on 6/29/00, which indicated that the inmate had problems with sleep, appetite and mood disturbances; he was placed in the 3CMS level of care under medical necessity. His diagnoses were Amphetamine Withdrawal, R/O Heroin Withdrawal, and Poly-substance Dependence with a GAF of 52. The inmate had a history of illegal drug use including methamphetamine, heroin and marijuana, as well as valium and alcohol abuse. The inmate had also been diagnosed with Benzodiazepine dependence and he was prescribed Trazodone in July 2000; Vistaril was added in August 2000. There is a notation in the record that the inmate stole a bottle of Seroquel in September 2000, but this was reportedly not for the purpose of harming himself. In December 2000, the inmate was diagnosed with Generalized Anxiety Disorder and Borderline Personality Disorder and his Trazadone was increased, but it was then discontinued in February 2001 for unclear reasons. In August 2001 the inmate received RVRs for stealing glue, mutual combat and delaying a peace officer. MH-2s completed in October 2000 and October 2001 indicated diagnoses of Mood Disorder NOS, Adjustment Disorder,

Methamphetamine Dependence, Poly-substance Abuse, and Anti-social Personality Disorder.

The inmate was paroled in August 2002 and received two MDO evaluations prior to his parole, both of which noted that he had symptoms of Poly-substance Dependence and Withdrawal, Adjustment Disorder, Generalized Anxiety Disorder and Personality Disorders (including Borderline and Anti-social Personality Disorder). Each of these evaluations indicated that he did not demonstrate symptoms of any psychotic disorder, such as hallucinations, delusions or perceptual disturbances, and he denied suicidal ideation or intent. Much of his anxiety was related to fears that other inmates could become aware of his commitment offense.

Upon his return to custody via RJD on 12/30/02, a bus screening indicated the inmate reported current suicidal ideation, depression and the fact that he was currently taking psychotropic medications. The transfer form from the San Diego Jail did not indicate he was receiving psychiatric treatment, and no effort was documented to validate his statement about taking psychotropic medications. An MH-7, dated 12/30/02, indicated he was receiving Trazadone, and a brief mental health screening indicated possible thought disorder and major depression. He was re-assigned to the 3CMS level of care, and both Seroquel and Trazadone were prescribed. The inmate's compliance with medication was inconsistent, with medication refusals noted in his MARs. Despite these refusals, the dosages of his medications were increased. The inmate was housed in AdSeg from 12/30/02 until 1/8/03 and, according to the Suicide Report, he was transferred to a transitional building at that time. He was subsequently returned to the San Diego Jail on 2/11/03 and remained there until 7/8/03. On 7/9/03, a bus screening recorded no indication of a mental illness.

Progress notes in July, August and September reported alternately that he was doing well, with no issues to discuss, and that he was stressed, depressed and "anxious mild to moderate." The inmate was placed at the EOP level of care on 9/4/03. The inmate reported his belief he was going into a depression, and on 9/10/03 his diagnoses included, "Major Depressive Disorder, Depressed, Anxious, Irritable." On 9/15/03, the inmate was seen by a psychiatrist, who indicated that the inmate had deteriorated markedly and was describing auditory and visual hallucinations, as well as a suicide attempt two years earlier by cutting his wrist. The inmate reported his mood, on a scale of 1-10 with ten being his best mood, a score of one. The inmate also reportedly denied current suicidal ideation. The psychiatrist diagnosed Psychosis NOS, rule out Major Depressive Disorder with Psychotic Features, Poly-substance Dependence, and estimated his GAF as 52. The psychiatrist also started the inmate on Zyprexa and Prozac, with a plan for his return to the clinic in three weeks. The inmate's condition apparently continued to deteriorate, but he was not reevaluated by a psychiatrist.

The Suicide Report indicated the inmate reportedly had sexual relations with his cellmate, who was described as "a 48-year-old with a history of mental illness, mental retardation, epilepsy and pedophilia" and in the 3CMS caseload on the same medications as the inmate. The sexual relations allegedly occurred on 9/30 or 10/1/03, resulting in the

cellmate's transfer to the University of California Medical Center for examination. The deceased inmate was single-celled because the cellmate reported initially that he had been raped, although he subsequently recanted and stated that the relations were consensual. The deceased inmate apparently reported to his case manager that he had been moved and shared his belief that his cellmate had AIDS, presenting with associated agitation, pressured speech, paranoid thought content, auditory hallucinations and some manic delusions.

Remarkably, the Suicide Report suggested that mental health staff were unaware of the deceased inmate's sexual encounter with his cellmate. The Suicide Report also referred to a UHR notation by the psych tech that the deceased inmate was seen on 10/5/03. The record indicated, however, that the psych tech's half-hour visit required rounding of some 200 AdSeg inmates, including 66 3CMS and 20 EOP inmates, and there were no psych tech notes in the UHR for that date. A later entry note, dated 10/7/03, by the senior clinical psychologist supervisor indicated that a psych social worker and psychiatrist interviewed the inmate together on 10/1/03, five days before his death.

The inmate received several RVRs, as noted earlier, and had an R-suffix based on his offense. On 1/3/03 the inmate requested placement on a sensitive needs yard because he feared other inmates had become aware of his offense by overhearing a Board of Prison Terms hearing in which he had participated. He was placed in AdSeg on 1/2/03 because of his safety concerns, but was released from AdSeg on 1/8/03, and a 1/22/03 chrono indicated he no longer had safety concerns. The Suicide Report referred to a CDC 114 note of 6/30/03 indicating the inmate was placed in AdSeg due to enemy concerns, but the inmate was not at RJD at the time and did not return until 7/8/03. The Suicide Report noted that the inmate did not raise enemy concerns on his return. The Suicide Report also referred to a 9/9/03 suggestion in the C-file that the inmate had been approved for transfer to a Level III sensitive needs yard in MCSP.

The Suicide Report mentioned documents from the San Diego County Detention Facility prior to the inmate's return to RJD as a parole violator, which were not requested and might have been helpful to the treatment staff at RJD. The Suicide Reports also noted the inmate's rapid deterioration in August 2003 as contrasted with his MDO evaluations prior to his release on parole in August 2002. The suicide note discovered in the inmate's cell after his death described the inmate as troubled by the sexual encounter with his cellmate and contained an expression of guilt for his homosexual behavior. The pending investigation regarding the sexual encounter might have resulted in a third strike for this inmate. The actual suicide note was not provided, but the Suicide Report reported an attempt to decipher the text of the five-page suicide note, in which the inmate described his sexual relations with his cellmate as being wrong for both men. The note also complained about living conditions and the lack of yard. But the deceased inmate reported being "mad' and "shocked" when his cellmate told him he had AIDS. The note apparently concluded: "I'm going on my third attempt. The sheet ripped twice."

The Suicide Report concluded that the deceased inmate's death demonstrated many of the systemic problems associated with incarceration of sexual offenders and noted that "these

risks can never be eliminated but the dangers are greatly increased when information is not sought, shared or documented." The Suicide Report referred to the likelihood that if a SRA had been performed on 9/15/03 for this inmate, it would have identified him has as being at high risk for self-injurious behavior. The inmate's UHR indicated that no SRA of this inmate was ever conducted. The Suicide Report also noted the inmate's decompensation in September, suggesting that the inmate should be considered for EOP, but that, too, was never acted upon. The Suicide Report found also a lack of collaboration between the inmate's psychiatrist and case manager. Indeed, it was unclear whether the inmate even had an assigned case manager. The Suicide Report speculated that at various points between August and September 2003, "coordinated mental health contact, observation, and assessment could have changed the outcome." Apparently no new case manager was appointed to monitor the deceased inmate once his regular case manager left the institution. The Suicide Report concluded that no individual clinician "acted below the standard of care."

The Suicide Report identified eight problems with the following recommended corrective actions:

Problem 1: MHSDS inmates in the Ad Seg overflow unit received insufficient time out of their cells.
Recommendation: MHSDS inmates in both the AdSeg and the AdSeg overflow unit needed to receive out-of-cell time comparable with general population AdSeg inmates, pursuant to the DOM and Title 15.

Problem 2: Staff needed to address the increased rate of suicide during the past year particularly among single-celled inmates in AdSeg.
Recommendation: All inmates not already in the MHSDS caseload who are placed in Ad Seg should receive a mental health screening and, if indicated, a SRA upon their initial placement and at every subsequent IDTT meeting in AdSeg. Pursuant to the April 25, 2003 memorandum on double-celling, custody needed to obtain a recommendation from mental health staff on single-celling versus double-celling for all MHSDS inmates.

Problem 3: The mental health staffing of the AdSeg overflow unit was inadequate.
Recommendation: The facility needed to develop a plan for properly staffing the AdSeg overflow unit and, in that plan, consider the assignment of experienced psychiatrists and psychologists, rather than contractors, to both AdSeg and the AdSeg overflow.

Problem 4: PT rounds were inadequate.
Recommendation: The institution needs a system to monitor PT rounds and documentation to ensure that they are conducted in accordance with applicable program guides.

Problem 5:  Medication compliance for caseload inmates in AdSeg with a documented history of non-compliance within the past 12 months needed to be monitored.

Recommendation:  Training needed to be provided to nursing staff who distribute medications in AdSeg on the new medication administration requirements, particularly those involving the use of DOT for inmates who are non-compliant with their medications.

Problem 6:  Staff needed to address the mental health needs of caseload inmates undergoing their first psychotic episode in AdSeg.

Recommendation:  Clinicians need to consider transferring inmates from AdSeg to a MHCB unit to ensure they receive an indicated level of required treatment.

Problem 7:  Staff failed to evaluate this MHSDS inmate after the allegation of sexual assault.

Recommendation:  Even before an RVR is issued, case managers should evaluate MHSDS inmates involved, either as perpetrator or victim, in an alleged physical or sexual assaults.

Problem 8:  The deceased inmate's cellmate may not have had accurate Clark testing.

Recommendation:  The inmate ought to be retested.

The follow-up report on corrective action plan for this inmate was submitted by RJD on 6/7/04 and contained the following responses:

Problem 1:  A local operational plan was developed and a copy attached, which described a mechanism for providing caseload inmates in AdSeg overflow with yard time.  An AdSeg yard schedule was also attached.  Both provided, reportedly as required by the DOM, AdSeg inmates with one hour per day, five days per week, out-of-cell time.

Problem 2:  A copy of the referenced memorandum was distributed to all division heads reminding them of the policy and their responsibilities under it.

Problem 3:  A copy was provided of a memorandum, dated 5/17/04, on the AdSeg overflow unit from the chapter president of CCPOA notifying the employee relations officer of a grievance regarding changes in staffing.

The institution's response also transmitted a miscellany of additional materials, some of them related to the recommendations in the Suicide Report, including a RJD operational plan on suicide prevention; a 5/18/04 memorandum from the warden of RJD on the department's double-celling policy; a memorandum, dated 5/11/04, from the AdSeg senior psychologist supervisor to the chief psychiatrist with recommendations for AdSeg staffing, as well as a memorandum from the AdSeg senior psychologist supervisor to the warden advising that mental health personnel working in AdSeg should be experienced in a correctional setting rather than contract staff as a matter of policy, unless, inexplicably,

custody consents to an exception to this policy; a memorandum from the RNC-SRN1 on psych tech rounds in AdSeg, indicating that Sundays, Saturdays, and Wednesdays were the days when rounds were most often missed because of the high number of relief workers and the lack of psychologists to do checks on weekends, accompanied by another memorandum on the logging of rounds made in AdSeg; a memorandum, dated 5/3/04, from the chief psychiatrist to all staff that an in-service training form needed to be filled out to address issues involved in suicide reports and reviews; various in-service training forms signed by staff members; an April 25, 2004 memorandum to all clinical case managers from the chief psychologist and chief psychiatrist on the subject of assessments following sexual assault; and a DDP evaluation, dated 1/30/04, of the deceased inmate's cellmate.

These documents were provided in a packet with references to specific problems identified in the Suicide Report. No HCSD evaluation of the appropriateness and responsiveness of the institution's submitted materials was included with the documents provided for this report.

Findings: This inmate's suicide did not appear to have been foreseeable, but might have been preventable if appropriate policies and procedures had been followed. These policies and procedures required mental health screenings on admission to AdSeg, the administration of SRAs when appropriate and comprehensive and coordinated treatment planning. The Suicide Report clearly identified a number of deviations from approved and applicable policies and procedures, including staffing, inadequate psych tech rounding in AdSeg, insufficient monitoring and follow-up of medication non-compliance, and the failure to evaluate a caseload inmate involved in allegations of sexual assault. An additional concern here was the failure to recognize and take appropriate actions for the deceased inmate's deterioration in functioning while in AdSeg. Lastly, RJD's responses were poorly and inadequately related to the problems and recommendations identified in the Suicide Report. Finally, if the department was unwilling to hold institutions to a greater degree of accountability for their defensive, evasive and seemingly largely indifferent responses to the recommendations in the Suicide Report, the whole suicide review process has little likelihood of effecting positively CDC's suicide rates.

## 32. Inmate #T45033
### Brief History
This inmate was a 58-year-old Caucasian male who completed suicide by hanging on 10/24/03 at the California Substance Abuse Treatment Facility (CSATF). The inmate was housed in a single cell in Ad Seg and was at the 3CMS level of care at the time of his death. The inmate was admitted to CDC via the reception center at RJD on 2/28/02. An Autopsy Report attributed the cause of death to asphyxia due to ligature strangulation.

The inmate was discovered by the AdSeg floor officer while conducting security checks on 10/24/03 at approximately 4:44am, prior to the 5:00am institutional count. The inmate was hanging in his cell by a bed sheet that was attached to the upper bed rack. The officer notified the control booth, and the control booth officer activated his personal

alarm.  The sergeant and two correctional officers arrived on the unit, and the sergeant radioed the emergency room in the CTC.  The sergeant and an officer entered the cell, and cut the inmate down using a cut down tool.  The sergeant attempted to find a pulse, did not find one, and began CPR.  The watch commander arrived while CPR was in progress, and subsequently the emergency response van arrived with an RN. The inmate was placed on a Stokes litter and transported to the CTC, where he arrived at approximately 4:55am.  Upon arrival at the CTC with an MTA, RN and correctional officer, the inmate was evaluated by the same RN and pronounced dead by a physician via telephone.  On the day following his death, a note was discovered in the inmate's cell that stated, "Now the wheelchair is yours Lieutenant."  This appeared to be a reference to conflicts over getting a wheelchair assigned to him because of his complaints of chronic pain syndrome.

The inmate entered CDC on 2/28/02 after having been found guilty of attempted voluntary manslaughter with use of a firearm, and pleading guilty to attempted voluntary manslaughter with a firearm and personally inflicting great bodily injury.  This conviction arose from his having shot his wife and attempting to shoot her boyfriend in a parking lot several months after he and his wife had separated.  The Suicide Report referred to a probation officer's report that the inmate told arresting officers he intended to commit suicide after killing both his wife and her boyfriend.  The inmate apparently reported three or four previous suicide attempts, involving an overdose of medication, driving his car over a cliff and poison.  When the inmate was arrested in April 2001, he was discovered in his apartment unconscious with several bottles of prescription medication in the room.  At that time, CPR was begun and he was transported to a medical center where he was treated for an overdose of prescription drugs. The probation officer reported that the inmate had been seen in the jail prior to his conviction, where he was confined to a wheelchair secondary to significant pain while complaining he had not received pain medication since his arrival in the jail.  The inmate had no criminal history prior to this commitment offense.

The inmate had a rich history of mental health and medical problems and complaints.  A medical record, dated 3/1/02, included his physical examination and history when he entered the CDC.  The inmate reported a history of back surgery, skin cancer and gastrointestinal problems.  The inmate indicated he had been using a wheelchair for approximately a year due to back problems; he stated he could not stand without assistance.  His back problems appeared to have begun in 1982, when the inmate was employed as a Deputy Sheriff for San Diego County.  This condition involved his having a blood clot on his spine, which was surgically removed, allowing him to return to work in San Diego County.  Approximately a year later in May 1983, the inmate fell down cement stairs at work, injured the same area of his spine, received medical disability and retired in 1984.  In various documents, these back problems were described as deteriorating, and he was reported to need muscle relaxants, pain medication, physical therapy, the use of a walker and, after his incarceration, a wheelchair.  The inmate also had numerous gastrointestinal problems including Acid Reflux Disease, Diverticulosis, Hiatal Hernia, Esophagitis, and Gastric Ulcers.  His problems also included bone degeneration, which resulted in evidence of Degenerative Disk Disease, Spondylosis,

Herniated Disks, and Spinal Stenosis in a MRI in 2001. After his admission to CDC, his initial physical examination concluded that his mobility was impaired, he could not walk more than 100 yards or up stairs without a walker or crutches and, because of pain and weakness, would need to be confined to a bed or wheelchair. A subsequent disability evaluation concluded he was a permanent wheelchair user because of his mobility impairments. On 10/27/02, the inmate submitted an accommodation request and subsequent appeals on 10/30/02 and 11/21/02 requesting further assistance with chronic back pain, including pain medication, moist heat, an egg crate mattress, muscle relaxants and extra mattresses. The appeals were granted in part, and the inmate received an egg crate mattress, an extra pillow and was scheduled for orthopedic and neurology clinics. He was also authorized by a chrono to use an egg crate to cushion the seat of his wheelchair in December 2002. During that month, a neurosurgeon reported the inmate was status-post lamenectomy with a long history of iatrogenic narcotic addiction, "modest detoxification symptoms" and psychosocial overlay with extreme somatization syndrome. The neurosurgeon prescribed Elavil, Robaxin, Motrin and an MRI with a follow up in two weeks. A neurologist saw the inmate later that month, and determined he had neuralgia, paresthesias, and low back pain possibly from arthritis associated with spasms and tenderness of paraspinal muscles with prescriptions for Neurontin, Baclofen and non-steroidal antiflamatories.

The inmate filed three grievances in January 2003 based on complaints he was not receiving adequate or timely medications for his pain, with specific complaints against MTAs. On 4/29/03, a physician at CSATF completed an evaluation, discontinued the inmate's wheelchair and ordered a temporary walker for 90 days. The physician also noted that the inmate had a past and current addiction to narcotics "secondary to Benzodiazapine." This physician rescinded the inmate's chrono for the wheelchair, indicated he had a temporary medical condition and imposed work restrictions for six months to lift no more than 15 lbs and an order to avoid bending, stooping, or digging. He also ordered low bunk/low tier housing for 90 days, indicating also that the inmate did not meet DPP placement criteria. He found the inmate had a temporary medical condition requiring no prolonged standing or walking (70 percent of the time on a job). The inmate subsequently filed an appeal of this physician's determinations. On 6/4/03 the physician, who wrote the 4/29/03 chrono, was scheduled to see the inmate for a required ADA evaluation in which the inmate refused to participate. The Suicide Report and UHR both noted the physician's statement, "Cooperation of inmate required. Inmate refused to be examined at CTC/transport to CTC as of 1600 hrs. Inmate is <u>disabled not certified</u> (inmate already had W/C rescinded and apparently still <u>has it</u>." (sic) The physician further indicated the wheelchair was not medically prescribed and should be removed immediately, and ordered all other supports discontinued until the inmate's disability status was verified, including medical appliances, pillows, mattress, egg crate and an order for steroid injection directed by a consultant on 5/28/03. On 6/12/03 the physician completed additional chronos reaffirming the removal of all supports.

The inmate filed grievances in May and July regarding his need for a wheelchair and was interviewed by a different physician on 7/29 and 8/13, who granted his appeal in part by referring him to the pain management clinic, a neurosurgeon and directing the issue of a

wheelchair for use outside of his cell until the new evaluations were completed.  The inmate apparently had numerous outside appointments for MRIs and other radiographic evaluations, which concluded that he had degenerative arthritis and degenerative disk disease.  The Suicide Report, however, reported that the inmate "jumped out of his wheelchair" while being escorted and stated he needed to go to the CTC for an x-ray.  His last medical appointment was on 10/14/03, during which he was seen for left shoulder pain and another request for a wheelchair.  The doctor referred him for physical therapy and indicated he needed to progress from a wheelchair to a walker or crutches, as well as an appointment with general surgery to remove a cyst on his neck.

The inmate apparently had no known psychiatric history prior to his admission to Palomar Memorial Hospital in 1987 secondary to stab wounds in his abdomen and hands as well as abrasions on his neck and scalp.  The inmate reported these were caused by an unknown person, but the Suicide Report indicated the inmate's wife told a probation officer that the inmate had stabbed himself.  At that time the inmate was uncooperative with an examination because of reported back pain, and he was treated for four days and released on pain medications with instructions to see his doctor.  He was subsequently admitted to the same hospital on 10/27/87, when he suffered carbon monoxide poisoning from a suicide attempt that involved his connecting the hose from his exhaust pipe to the inside of his car.  There were also prescription medications found in the car including Demerol, Valium, and Flurazepam.  He was taken to a hospital in a comatose state, was revived and evaluated by a psychiatrist who arranged for the inmate to receive treatment for depression.  In June 2001 a psychiatric evaluation indicated the inmate had a history of depression while in the Air Force (dates not specified).  In this evaluation, the psychiatrist referred to the inmate's personal losses, including his relationship with his wife, his physical integrity and self-esteem.  The psychiatrist opined the inmate could be a risk for suicide while in custody based on these losses and noted the inmate's statement that he feared he would die in prison because of physical deterioration or at the hands of another prisoner.

When the inmate arrived in the CDC, he received a bus screening on 3/28/02, in which he reported his history of attempted suicide and current mental health problems.  He was not, however, referred for mental health evaluation as the RN concluded he was not currently suicidal.  On 4/9/02 he received a DDP screening that indicated he was NCF.  He was seen on 4/24/02 by a psychologist for a mental health screening, and it was determined the inmate did not suffer from mental illness and did not need to be referred to a mental health professional.  The inmate, therefore, had no mental health care or treatment while at RJD.  On 10/8/02, the inmate received a bus screening at CSATF.  He reported the same information as he had provided during his initial bus screening at RJD and mentioned no other current mental health problems.  Again, he was not referred for mental health services.  On 10/12/02, the inmate was admitted to the MHCB as a "possible danger to himself" due to reported suicidal ideation.  On 10/15/02, he was admitted to the medical side of the CTC for gastric distress.  The inmate reported he had not received his pain medications, was treated for low back pain and discharged on 10/22/02 with referral to the pain clinic.  There was no MH-2, SRA or any other mental health documentation relative to this admission.  The inmate was evaluated by a

psychologist on 12/9/02, based on a 12/4/02 referral, in which the inmate discussed his frustrating problems with receiving medical care, his history of prior suicide attempts and thoughts of killing himself. The evaluation quotes the inmate as saying, "It's easier to kill myself than fighting with doctors for medication." The inmate added that he was more depressed than he had ever been in his life. The psychologist completed an MH-4, diagnosed Major Depression, severe without psychotic features, secondary to pain and sedative, hypnotic or anxiolytic dependence, and admitted the inmate to the 3CMS level of care.

On 12/19/02, a psychiatrist saw the inmate, diagnosed "Somatic pathology – severe" and prescribed Fluoxetine, Buspirone, and Vistaril with indications the inmate was depressed, severely agitated and irritable. The inmate reported experiencing suicidal and homicidal ideation, as well as physical pain. The inmate was seen for follow up by a psychiatrist in January, February and March, and the impression was that he was stable and doing well. On 1/8/03, an IDTT was held and continued the diagnosis of Major Depression, severe, as noted by the psychologist on 12/9/02, and reported the inmate with suicidal ideation, but no current intent to harm himself. He remained in the 3CMS program and was to see the psychiatrist and case manager as per program guides. Additional notes in April and May indicated the inmate was seen by mental health staff, who indicated he had some suicidal ideation without a plan that was related to the degree of pain he was experiencing, his difficulty in sleeping, chronic low back pain and migraine headaches. He also reported five past suicide attempts while in the community. On 4/29/03, the inmate signed a "No Suicide Contract" with a psychologist and was referred to a psychiatrist. A SRA was completed by a psychologist on 5/27/03 during an IDTT review, which noted the inmate's report of five previous suicide attempts in the community and his currently depressed mood.

On 6/5/03, the inmate was placed in the MHCB on suicide precautions after he reported feeling depressed and having chronic pain. This was subsequent to an evaluation by a psychologist, who noted he was agitated with pressured speech, and directly followed his receipt of a RVR for kicking an MTA. This incident occurred after the physician (see above) ordered the inmate's wheelchair be removed. The MTA attempted to take the wheelchair from the inmate, but the inmate lunged from his bunk, put his arms around the wheelchair and fell to the floor. The MTA gave the inmate an order to surrender the wheelchair, informed him that he would receive a RVR for failing to follow a direct order and warned him he could be charged with stealing state property. The inmate reportedly began yelling and kicked the MTA in the left shin. The inmate was subdued by correctional officers, who placed him in handcuffs and leg restraints and placed him on a Stokes litter, where he began banging his head against the support bar on the litter. The inmate was then taken to the CTC to be treated for cuts and bruises, where he received the evaluation noted above. Medical staff reported he denied suicidal or homicidal ideation, and cleared him for discharge from the CTC for housing in AdSeg. However, he was admitted by mental health staff to the MHCB unit, as noted above.

The inmate was subsequently charged with battery on a peace officer and a DA referral was instituted, but the DA refused to pursue the case. He was found guilty of battery on a peace officer by a hearing officer on 8/11/03, and a nine-month SHU term was assessed,

pending review by the CSR. On 10/16/03, the CSR upheld the SHU term and indicated a MERD of 12/28/03, but retained the inmate in AdSeg.

The inmate remained in the MHCB unit until 6/19/03 when he was discharged with a diagnosis of Major Depression, and returned to AdSeg. There was no SRA completed at that time, but one was completed on 6/26/03 by a case manager, who listed a number of risk factors including his being anxious, agitated or fearful, having significant current impulsivity, as well as a history of poor impulse control or poor coping skills. Despite the inmate's report of feeling agitated and depressed but not suicidal or homicidal, the inmate's suicide risk was estimated as low. Three days later a psychologist completed an SRA and listed the inmate's previous suicide attempts, gestures, and behaviors (not noted on the 6/26/03 SRA), first prison term, current depressed or labile mood, recent suicidal ideation, hopelessness, Level-4 custody score, recent noncompliance with treatment, being anxious and agitated and his somatic complaints, and noted the inmate signed a "no suicide contract." This psychologist also estimated the inmate's risk of suicide as low.

While in AdSeg in 2003, controlled medications were discovered in the inmate's cell; he was observed to be disheveled, agitated, anxious and labile by his case manager; and he refused to come out of his cell for morning medications despite being on "DOT Plus." During this time period, the inmate did not have his wheelchair, and it was unclear how he could have complied with DOT Plus requirements that he come out of his cell.

On 7/2/03 the inmate received a RVR for hording medications in his cell and was subsequently found guilty of possession of controlled medication. During August 2003, the inmate stated he needed more pain medication, was referred by the psychiatrist to see his physician and reported experiencing more depression, pain and impaired sleep, with continuing thoughts of suicide with no plan. During July and August the inmate had his wheelchair at times, but not at other times. In September 2003, the inmate continued to complain of physical pain, poor medical attention and being more depressed, but he was taking his medications and being monitored by his case manager and psych techs. By mid-September 2003, the inmate reported he was "losing faith" in the ability of mental health staff to help him resolve his problems with custody and medical staffs. The inmate complained that psych techs were treating him differently than other inmates, and reported he did not receive his medications in September. Review of his MAR for September 2003 indicated the inmate was receiving his psychotropic medications, but not his pain and other medications, and the word "cold" was written across the MAR without explanation. In their objections to the draft version of this report, the defendants explained that institutional policies on medication directed staff to write the term, cold, on a MAR, when the medication(s) did not require nurse administration or direct observation. The MAR, however, did not document the distribution of the inmate's pain and other medications.

The inmate made numerous complaints to the psychiatrist, case manager, and psych techs from July through October 2003, and in several of those notes he was referred to speak with someone, whether a physician, a psychiatrist, a case manager or psych techs, other than whomever he was targeting with his complaints at the time. Confusion over his medical treatment was persistent. An ICC meeting on 10/2/03 indicated the inmate did

not need a wheelchair although on 8/22/03 the inmate had been approved for the use of a wheelchair out of his cell. Beginning in early October the inmate refused to come out of cell to meet with his case manager; refused to talk with his case manager at the cell door; and complained he could not get out of bed to receive his medications. The case manager, however, reported on 10/17/03 that, although the inmate refused to speak to the case manager at cell-front, the inmate was doing fine reportedly based on discussion with correctional staff. The inmate was seen by a psychiatrist on 10/22/03, who reported the inmate had no auditory or visual hallucinations, needed no medication changes and was still using a wheelchair. The last mental health contact was by the psych tech on 10/23/03, who indicated the inmate denied suicidal or homicidal ideation.

The Suicide Report referred to the inmate's "preoccupation" with his medical condition, particularly his back problem and his belief that he needed a wheelchair. The Suicide Report also noted the inmate's perceptions that both correctional and health care staff were insensitive to his back pain and his need for a wheelchair, and reported the existence of a diary kept by the inmate of his interactions with staff, who, he believed, mistreated him. The inmate's case manager reported a good rapport initially, but the relationship gradually eroded based on the inmate's cellmate's influence over him. The inmate engaged in "constant power struggles with staff," according to the case manager. The Suicide Report referred to the inmate's deterioration and his well-documented and increasing depression, anxiety, sleep difficulties and suicidal ideation prior to his death, all related to his medical problems and his housing in AdSeg.

The Suicide Report identified five problems and recommended the following remedial actions:

Problem 1: The Medical Department's approach in dealing with this inmate's back problems changed once he was transferred to CSATF. It became adversarial and in some instances, appeared to be punitive.
Recommendation: The medical care provided to this inmate should be independently reviewed.

Problem 2: The difficulties and challenges presented by this inmate apparently elicited strong, negative reactions from staff.
Recommendation: Training should be provided to healthcare and correctional staff on counter transference issues; training should also address the impact of chronic pain and prolonged disability on mental functioning (i.e., depression).

Problem 3: Interface between the medical and mental health departments was lacking.
Recommendation: The facility needed to establish a QIT to identify a mechanism to ensure open communication between these two departments.

Problem 4: The inmate's C-file contained a probation officer's report, which discussed his suicide attempts while in the community. There was no indication that mental health staff used this information as a basis for inquiry about the inmate's prior suicide history in their mental health evaluations or any of their SRAs.

Recommendation:  Training was needed for clinical staff on the legal requirements for reviewing inmates' records and how to integrate information from the C-file into IDTT documentation.  Following the training n audit needed to be conducted to determine if clinicians review C-files and incorporate information from these files in their treatment planning and documentation.

Problem 5:  Mental health staff did not address custody issues with an impact on their treatment planning and interventions.  This inmate, e.g., had a history of overdosing on medication and custody staff found in AdSeg found him with unauthorized medication in his cell 7/2/03, but no one from mental health followed-up to determine how he was able to hoard his medications.

Recommendation:  Mental health staff needed to be instructed to review inmates' 114-As and AdSeg logs on a routine basis.

Findings:  This inmate's suicide appeared to have been both foreseeable and preventable.  There was information in the C-file and the probation officer's report, as well as in several notes in the UHR, about the inmate's prior suicidal behaviors.  The available information disclosed not only his frequent suicidal ideation, but also described his prior methods, including past attempts at overdosing on medications.  Clinicians, for the most part, did not utilize this information, and the SRAs that were conducted consistently failed to reflect any knowledge of these risk factors.  The SRAs, while noting other risk factors, persistently rated the inmate's risk for suicide as low.  The failures of communication between medical, mental health and custody staff about this inmate were striking.  While medical assessments and evaluations of his chronic pain syndrome varied considerably, the cancellation by one physician of his previously approved supporting medications and mechanical devices based on the inmate's failure to appear for an ADA evaluation appeared more punitive than therapeutic. The ensuing conflict among physicians over the inmate's retention of his wheelchair that went on through the summer of 2003 fed the inmate's increasing anger and hostility over what he perceived as inadequate treatment of his medical condition and became a precipitating stressor that contributed to his suicide.  His repeated filing of grievances and pursuit of appeals, even when partially successful, obviously was not enough to assuage his growing sense of hopelessness and helplessness to advocate effectively for his medical needs.  The Suicide Report described an event that occurred on the morning before the inmate's suicide in which custody staff in his housing unit needed a wheelchair to transport an inmate to the CTC.  Staff asked to "borrow" the deceased inmate's wheelchair, and the inmate became hostile and refused.  A lieutenant apparently indicated he would check whether there was medical documentation for the assignment of a wheelchair to the inmate and, if not, the wheelchair would be removed.  The inmate's suicide note stating, "Now the wheelchair is yours Lieutenant" suggested his final frustration in seeking effective response to his medical problems and pain.

The Suicide Report referred to the lack of communication among mental health, medical and custody, who frequently told the inmate to see someone else to deal with his problems, rather than develop an interdisciplinary treatment response to the inmate's complaints.  Finally, his deterioration after his placement in AdSeg and the consequent

stress related to the DA referral and the potential SHU term, were never addressed in the inmate's treatment planning to any degree.

### 33. Inmate #J12377

Brief History:  This inmate was a 36-year-old Caucasian male who completed suicide by hanging in his single cell in AdSeg at Deuel Vocational Institution (DVI) on 10/25/03. The inmate returned to DVI on 10/23/03, just two days before his completed suicide. This was approximately the 12th time the inmate had been admitted to CDC on convictions or parole violations.

On 10/25/03 at approximately 12:10am the inmate was discovered by a correctional officer who was conducting a count of inmates in Ad Seg at DVI.  The inmate was the sole occupant of the cell, and was discovered hanging by a sheet attached to the cell vent. The correctional officer contacted staff by radio and activated her personal alarm. Custody and medical staff responded, the cell was opened, and an officer entered the cell with a cut down tool and cut the inmate down.  An MTA and RN responded and the inmate's body was removed from the cell and carried on a Stokes litter to the infirmary. The Incident Report indicated the MTA and RN hooked up the automated external defibulator (AED) in the infirmary and made attempts to revive the inmate.  An ambulance responded to the institution, and after a paramedic assessed the inmate's condition, a doctor at Doctor's Hospital at Manteca was contacted and ordered that efforts at resuscitation be terminated at 12:40am.  The inmate was pronounced dead by the same doctor.

The Inmate Death Report indicated that resuscitation was not attempted due to "rigormortis."  In contrast, the initial inmate Suicide Death Report answered positively the question on the form asking whether emergency procedures following the suicide act were prompt.  A review of the Autopsy Report, dated 10/26/03, determined the cause of death to be asphyxia due to hanging.  A suicide note addressed to "Mom" was discovered in the inmate's cell, and indicated he felt he had done nothing but wrong and was "not worth a shit."  He wrote that he loved his mom and thought she would not understand why he was doing this, but said, "I'm tired, mom."  He added, "I can't do this anymore. Please forgive me," and urged her to give his love to the rest of his family.  The note ended with a "goodbye" and was signed with the deceased inmate's first name.  The inmate was not receiving mental health services in the MHSDS at the time of his death and had been housed in AdSeg since his return to DVI two days earlier.

The Suicide Report described the inmate's "extensive criminal history" beginning at age 12, with numerous offenses in Yuba County from 1980 thru 1985 resulting in probation, community services and juvenile hall that terminated when he was age 18.  The inmate's adult record included charges of drinking in public, disorderly conduct, fighting, vandalism, burglary, grand theft, entering a noncommercial dwelling, resisting a public officer and being under the influence of a controlled substance.  The inmate's first admission to the CDC was on 3/23/90, when he was incarcerated at CCC until paroled in

September 1991.  The inmate's next arrest was in September 1993 on charges of attempting to steal merchandise from a store and resisting a security guard, apparently to support his heroin habit.  Multiple arrests in different counties for possession of different substances and paraphernalia and related property crimes led to a second CDC term that began on 3/11/94 at the SQ reception center.  He was transferred to SCC and CSP/Solano until he was paroled again in December 1995.  He returned to the CDC via DVI in September 1996 on parole violations and subsequently paroled from MCSP in March 1997.  He had multiple convictions, parole releases and returns on violations from 1997 through 10/23/03, when he returned to CDC for his twelfth and last time.  All of his convictions and violations of parole appeared to have been drug-related.

During his periods in CDC, the inmate incurred several RVRs, mostly non-violent, which cost him loss of credit; one offense was for battery on an inmate, which resulted in a 90-day SHU term.  He was also placed in AdSeg at HDSP from June thru October 2000 for safety reasons because he reported he was a dropout from a gang associated with the Aryan Brotherhood.  The Suicide Report noted that the inmate requested placement in AdSeg for protective custody when he arrived at the reception center in DVI on 10/23/03 because he was a gang dropout with enemy concerns.  He was placed in a single cell pending review of his suitability for double-celling.

Although the inmate was not a participant in the MHSDS at the time of his death, he had an extensive mental health history.  He was first admitted to the MHSDS in approximately September 1996 when he was returned to DVI from parole.  He was placed in the EOP level of care at that time, with a GAF of 45, and was prescribed Elavil for depression and to assist with sleep.  It was not clear from the inmate's UHR when he was downgraded to 3CMS, but he apparently was at a 3CMS level of care at MCSP in 1996.  He was removed from the MHSDS in December 1996.  His removal appeared to have been based on staff determination that the inmate's reported symptoms, which included hallucinations, depression, sleep disturbance, mood swings and past suicide attempts were related to his heroin and methamphetamine use.  The Suicide Report indicated the inmate was not taking his antidepressant medication, did not have a qualifying diagnosis, had a GAF of at least 60 and was not interested in programming.  In addition, the inmate reported he expected to return to his drug use when he returned to the street.  The inmate was subsequently placed in the 3CMS level of care for medical necessity based on an evaluation in April 1998 after he had returned to CDC on 3/3/98.  The inmate paroled and next returned to the CDC on 8/12/98, reportedly having cut himself prior to his return to DVI.  He was again placed at the 3CMS level of care with a GAF of 60 and prescribed antipsychotic and antidepressant medication.  He subsequently paroled, and when he returned to the CDC on 6/9/99, was continued in the 3CMS program for medical necessity at SQ and prescribed Zyprexa.  He was, once again, removed from the 3CMS in February 2001 because he reported he wanted to be drug-free before he paroled, and his Zyprexa was discontinued. His diagnoses included Cyclothymia, Poly-substance Dependent as a primary diagnoses, and Antisocial Personality Disorder with a GAF of 72.  He received an MDO evaluation in January 2001, which concluded that he did not have a severe mental disorder and did not meet criteria to be considered a mentally disordered offender.  The inmate's last formal

evaluation by mental health staff occurred on February 2001. He was seen by a psych tech on 10/24/03, the day prior to his suicide, when he reportedly denied any mental health needs or current suicidal thoughts, as he "interacted briefly" before returning to his bed. There is no indication that his C-file or UHR was reviewed during his initial bus screening on his return to CDC on 10/23/03.

The inmate reported he was sexually abused by a stepfather from the age of approximate five until an unknown age. He reportedly was "kicked out" of his mother's home at the age of 13 because he often ran away and began on methamphetamine. He was treated with Ritalin as a child at an uncertain age. His alcohol and drug abuse reportedly began at the age of approximately nine, initially with alcohol and then subsequently with marijuana, methamphetamine and heroin. He was treated in a substance abuse program in 1999, but clearly unsuccessfully. As indicated, he was treated in CDC with a number of antidepressant and antipsychotic medications, which were prescribed for transient symptoms, including depression, anger, impulsivity and suicidal ideation. The records indicated the inmate reported auditory hallucinations related to his drug use. There were references in the record to multiple suicide attempts beginning approximately at the age of 19 after the death of his grandfather, and again in 1990 by hanging, twice in1992 by cutting his wrists and hanging himself, the latter resulting in his hospitalization, and in August 1998 by cutting his wrists. The Suicide Report noted that none of these suicide attempts were made while incarcerated in the CDC. The Suicide Report also noted the inmate had been medically withdrawn from heroin while he was in the county jail prior to his return to the CDC on 10/23/03. The Suicide Report referred to the inmate's belief he would be paroled the day after he was returned to custody and his anxiety arising from a CCI's statement that the belief was unfounded. The Suicide Report suggested that this may have been the "last straw" for the inmate, whose suicide may have resulted from his impulsivity. Finally, the Suicide Report indicated that resuscitation attempts were started as soon as the inmate was removed from his cell, but that assertion appeared to be inconsistent with the Incident Report and Suicide Death Report, both of which indicated that AED was started when the inmate was transported to the CTC by Stokes litter but made no reference to the initiation of CPR when he was cut down.

The Suicide Report identified three problems in its review of this suicide and recommended the following remedies:

Problem 1: The large-mesh grate over the vent in his AdSeg cell was used by the inmate to hang himself.
Recommendation: Local plant operations needed to review the feasibility of replacing vent covers with screens with a smaller mesh to prevent future hangings.

Problem 2: The inmate was placed in a single cell immediately on his arrival in AdSeg. While this is a common practice, departmental policy calls for inmates to be double-celled unless an ICC hearing determines they must be single-celled.
Recommendation: The warden needed to provide copy of Institutions Division Memorandum DD8/03, dated 4/25/03, on "Double Cell Housing Policy" to ICC and AdSeg staff with instructions to follow the policy.

Problem 3:  DVI had a number of suicides over the past three years involving inmates recently returned as parole violators with drug addictions.  These inmates may possibly have been suffering withdrawal or experiencing difficulty in adjusting to incarceration.

Recommendation:    Although not specific to this case because the deceased inmate detoxed in jail prior to his return to CDC, DVI needed to develop a plan for providing closer observation of newly returned parole violators, especially those returned directly to the prison without enough time in county jail to complete detoxification.

DVI responded to the identified problems and remedial recommendations in the Suicide Report on 7/29/04, as follows:

Problem 1:  A memorandum, dated 5/24/04, from the institutional plant manager on ventilation screens indicated that the cost for DVI to replace the vent covers in 1700 cells at $55 per cell would be approximately $93,000.00 and require 255 hours of labor to install.  The memorandum indicated the expenditure and labor for installation would not be a responsible use of resources, given other cell features that would remain available for an inmate intent on hanging himself.  In addition, DVI lacked the funds and manpower to accomplish this project.

Problem 2:  A memorandum, dated 7/27/04, from the warden expressed his disagreement with the recommendation, apparently because the ICC was aware of the double-cell housing policy and adhered to it.  The memorandum indicated the inmate had not yet been seen by the ICC and was, therefore, not qualified for placement in a double cell.  The memorandum went on to note that, when C-files were not available for newly arriving inmates, a common event for reception center inmates, they were placed initially in single cells pending a review of case factors by the ICC to ensure the safety of the inmate, other inmates, staff and the security of the institution.

Problem 3:  A QIT was instituted and minutes from the team's meeting on 4/28/04 were provided.  To develop a process to identify inmates undergoing detoxification, who may have psychiatric needs, a decision was made to focus on inmates whose symptoms have risen to a level where they were receiving medical services and being medicated for detoxification.  Mental health should then record contacts and outcomes with such inmates and make a presentation on the resulting data and lead discussions on the issue with the suicide prevention and quality management committees.  The QIT agreed to put a pilot project in place for 30 days to track mental health involvement in such cases, gather data and make presentations to, and consult with, the two committees.  No further information on the pilot project was provided.  A memorandum from the DVI Senior Psychologist Supervisor indicated that a procedure for identifying newly arriving inmates who are detoxing was already in place.  Under the procedure, whenever "a detox packet" was ordered, mental health was notified and a clinician was sent to make a clinical determination of any needed follow-up and monitoring.

Findings:  This inmate's death was not foreseeable because he gave no indication of current mental health problems or suicidal ideation.  His death was probably not preventable, as well.  It is uncertain from the Suicide Report whether the inmate's UHR or C-file were present in the institution or might have been available to the bus screener or other mental health personnel.  UHRs and C-files for returning parole violators are often not available at the institution for some days.  In addition, the statement of policy regarding Ad Seg double-celling in the Suicide Report is incorrect, as pointed out by the warden.  While ultimate determination of single or double-cell status is made by the ICC, that decision typically does not occur until ten days after the inmate's arrival in AdSeg, by which time the ICC will have sufficient records and data to make an appropriate determination.  To double-cell newcomers in AdSeg without knowing anything about their potential for violence or possible enemies would violate basic custody practices.  On the other hand, the issue of air vents in AdSeg and SHU housing has been raised as a safety issue in conjunction with suicides for some two years.  Like plant operations managers in other CDC institutions faced with this recommendation, the DVI administrator calculated the cost for converting the vent screens in all cells, not just AdSeg cells, which results in an astronomical figure precluding further reasonable dialogue, and then begs poverty of resources to accomplish the immensely larger project.  Moreover, HCSD, which is cooperating in a system-wide review of this issue, ought to inform those responsible for assembling Suicide Reports and plant operations personnel as well, of that effort.


## 34.  Inmate #P16472

Brief History:  This inmate was a 38-year-old Native American male who completed suicide by hanging on 11/7/03 at Salinas Valley State Prison (SVSP).  The inmate was discovered hanging from a makeshift noose attached to the top bunk in his single cell.  The inmate was admitted to CDC on 10/29/98 through the reception center at WSP on his third strike offense for petty theft, the shoplifting of merchandise at Target and K-Mart stores, for which he received a sentence of 31 years to life.   He was transferred to SVSP on 1/11/01.

On 11/7/03 at approximately 6:57pm the inmate was discovered hanging in his single cell by a correctional officer performing security checks.  The cell door window was covered and obstructed the view into the cell.  After a failed attempt to communicate with the inmate through the cell door, the correctional officer instructed the control booth to apprise the facility sergeant.  The officer unlocked the cell food port, observed the inmate hanging with a noose tied around his neck from the top bunk, and activated his personal alarm.  The correctional officer then retrieved the cut down tool from the control booth officer and, with the assistance of another floor officer, entered the cell and cut the inmate down.  The inmate reportedly was unresponsive with no movement as he was lowered to the floor, and responding medical staff arrived on the scene.  The LVN who arrived found no signs of life, and CPR was not attempted.  The inmate was transported to the CTC emergency room, and a physician pronounced the inmate dead at 7:20pm.  The Incident Report provided the following timeline:  The inmate was discovered at 6:57pm; officers entered the cell at 7:03pm; medical staff arrived at 7:05pm; the inmate arrived at the CTC at 7:14pm; and he was pronounced dead at 7:20pm.   The Suicide

Report referred to the LVN's description of the inmate's face as cold and his skin mottled, and correctional officers described the inmate as appearing to be dead and exhibiting an "extremely grotesque appearance, including apparent lividity." The Inmate Death Report indicated that a determination of whether emergency procedures following the suicide act were prompt was "unknown at this time." The Inmate Death Report also cited as a "psychosocial factor" a "possible pact between the deceased inmate and his cellmate," although the deceased inmate was single-celled. The Autopsy Report indicated the cause of death was asphyxia due to hanging and noted that toxicology test results indicated the presence of blood methamphetamine below toxic levels.

The inmate had a history of alcohol abuse since the age of approximately ten, along with several arrests and convictions related to alcohol, including being drunk in public, resisting arrest, and drunk driving. He also had arrests for battery, robbery, assault with a deadly weapon and indecent exposure. His first adult incarceration was in 1988 when he was convicted of assault with a deadly weapon, which involved the stabbing of his mother's boyfriend. The boyfriend survived and the inmate received a four-year term. Details of his second incarceration were unclear, but it apparently occurred between 1992 and 1996. The Suicide Report referred to the inmate's multiple RVRs and AdSeg placements, particularly for fighting with or assaulting other inmates. His custody level was Level IV, with 179 points. The inmate received a RVR for possession of a hypodermic needle in June 2003 and was found guilty of that offense.

Despite the inmate's long history of alcohol, methamphetamine and heroin addictions, as well as abuse of LSD and PCP, he was never part of the MHSDS during his first two terms in CDC. The inmate had a number of bus screenings, mental health screenings and AdSeg admission screenings, none of which indicated a need for mental health treatment. On 5/27/03 the inmate was seen in the emergency room at SVSP because of self-inflicted severe lacerations to both wrists. These lacerations were medically treated, and he was admitted to the MHCB unit. Curiously, a SRA on that date described him as a "moderate" risk.

A psychiatric progress note, also dated 5/27/03, indicated the inmate had had suicidal ideation present for approximately one year secondary to auditory hallucinations that had existed for approximately two years. The psychiatrist noted the inmate's auditory hallucinations, which reportedly said "horrible things." The inmate admitted using drugs, "all of them," with the last one used being heroin approximately a week prior to his last incarceration. The psychiatrist further reported the inmate was experiencing insomnia and racing thoughts for the last year. The inmate reportedly could not explain what had prevented him from attempting suicide in the past, but he was able to do so now because "it felt right." The psychiatrist quoted the inmate as saying he "will cut wrists again if returned to his house."

The psychiatrist described the inmate's history of foster care since he was approximately six years old, with 23 different foster homes until he was 16. He also noted the inmate's description of his brother having killed himself with a gunshot to the head at age 21 because he was gay. This occurred when the deceased inmate was 18 years old. The psychiatrist reported the inmate had not mentioned his symptoms to correctional officers

because he was concerned they would treat him differently. The inmate added, "I'm going to do it to myself before someone does it to me," and indicated "my paperwork is dirty." The inmate further elaborated that, if someone was bad, he would "get hit" and he had it coming. The psychiatrist also reported the inmate's stating, "It feels good now" about the reasoning behind his suicide plan and self-inflicted lacerations. The diagnostic impression was Depression NOS, and the plan was to admit him to the CTC with consideration for transfer to DMH. The same psychiatrist saw the inmate the next day, 5/28/03, and reported the inmate's complaint as "the same as yesterday." The inmate reported that his auditory hallucinations told him to, "Fuck it." The psychiatrist described him as continuing to have racing thoughts and problems with his paperwork, but the inmate indicated he was agreeable with finding a safe place. The psychiatrist further described the inmate as malodorous; his brief responses were coherent; his affect was blunted and constricted, with mood depressed. The diagnostic impression was changed to Mood Disorder, and he was prescribed Geodon and Depakote.

A different psychiatrist saw the inmate on 5/29 and 5/30/03 and reported on 5/29 that the inmate stated, "I tried to take my life before someone else did" because of his R-status, with an impression of Adjustment Disorder with depressed mood; the plan was to continue current treatment and resolve his custody issues. The inmate was seen by a third psychiatrist on 5/31 and 6/1/03, who described the inmate on 5/31 as having dysphoric mood, goal directive thoughts and poor insight with impressions of mood disorder versus adjustment disorder with depressed mood. On 6/1/03, the inmate was described as saying, "I can return to my cell. I am sleeping well." The inmate reported the voices as "less now." The inmate's insight was fair. The plan was to consider discharge the following morning. The inmate was discharged on 6/2/03, and the psychiatrist's note on that date indicated bright affect and denial of any suicidal ideation or intention, with a diagnosis of Adjustment Disorder, Depressed Mood and a GAF of 60. He was discharged to the yard with medication orders for Geodon and Depakote. An MH-2 completed in the MHCB unit on 5/29/03 was consistent with the notes described above. His GAF at the time was 25. The inmate, however, continued to express fear of other inmates due to his "dirty paperwork, and there was no indication that these issues were addressed by clinical or custody staff during his stay in the MHCB. He was also diagnosed with Antisocial Personality Disorder, which continued throughout his MHCB admission. A SRA completed on 6/2/03 indicated the inmate was a "low" risk, and the discharge summary indicated the psychiatrist's impression that the inmate had made a "suicidal gesture" to be removed from the yard because of his custody-related issues.

The inmate's MARs indicated he took the Geodon and Depakote prescribed on his discharge from the MHCB unit until 8/7/03, when he refused them and, on the following day, signed a refusal form. A note by the case manager, however, dated 7/16/03, indicated the inmate said he had stopped taking his medications at that time. The inmate was seen by a psychiatrist on 8/26/03, and his medications were discontinued because he was noted as doing well. The inmate did receive his ordered five-day follow-up from 6/3 thru 6/7/03 after his discharge from the MHCB unit, and he was placed at the 3CMS level of care. On 6/3/03, during his five day follow-up, the inmate received an RVR for possession of a syringe, but any issue of his possibly continuing heroin or other IV drug

use was not addressed in any of the available case manager notes, including those written in July and October.

On 11/5/03, the inmate and his cellmate received RVRs for mutual combat, during which they were pepper-sprayed while reportedly fighting inside their cell. The inmate was transferred to the MHCB unit and received a SRA on that date, which indicated he had been "talking to his mother this morning who was in the spirit world," and he told her, "he would be there soon." The SRA estimated the inmate's risk for suicide as "moderate." The Suicide Report referred to the Native American institutional spiritual leader's doubt about the inmate's explanation that he and his cellmate had "only shared blood, as Indian blood brothers, and they had no intent to die." A suicide note written by the inmate was found by custody staff on 11/5/03, but it was not shared with mental health staff. Despite these factors and the estimated "moderate" risk of suicide on 11/5/03, the inmate was returned to population on 11/6/03, with five-day suicide follow-up. There was no indication of a treatment team meeting in the MHCB unit where these incidents were discussed or addressed prior to his discharge on 11/6/03. On the first day of the five-day follow-up, 11/7/03, the case manager monitoring the inmate indicated the inmate did not report distress and stated he was "coming down" from being "high." The Suicide Report noted the cellmate's report that they had been injecting methamphetamine for several days prior to the cell fight on 11/5/03. The Suicide Report also indicated the deceased inmate's cellmate was possibly flushing drugs down his toilet on 11/5/03, as well as the cellmate's statement that the deceased inmate wrote an additional suicide letter that was never recovered. According to the Suicide Report, the inmate possibly owed "many thousands of dollars" related to his drug use, despite his having some reported income from Indian gaming.

This inmate's medical status included diagnoses of Hepatitis C and Hepatitis A. He had refused treatment with Interferon in 2002 for Hepatitis C and, despite elevated liver enzymes at that time, did not appear to be receiving any treatment for medical complaints up to the time of his death.

The Suicide Report noted the inmate's references to his "dirty paperwork" and his R-suffix. This may have been related to his past indecent exposure charge, but that was the only charge in his record that he might have been referring to. His reports of having an R-suffix were not linked by mental health or custody staff with the inmate's fear of other inmates for drug related debts or a need for housing changes or other protections from other inmates.

The Suicide Report referred to a suicide note written by the inmate prior to the 11/5/03 incident with his cellmate and indicated that, because there was a housing change, "neither custody staff on his current housing unit, nor clinical staff knew of the note." The suicide note was not provided, but the Suicide Report indicated that the inmate requested in the note to be taken home to be buried with his people and asked for forgiveness. He dated and signed the note. The note apparently referred to the inmate's identification with his tribe, thankfulness toward it and ended, "no more ha!" reportedly

an indication the inmate had decided that suicide "feels right." The Suicide Report described the note as reading like a will.

The Suicide Report also suggested the possibility that the inmate and his cellmate may have had a suicide pact, but this was not confirmed by the cellmate. The Suicide Report further opined that the cellmate might have participated in a "pseudo-suicide pact in order to murder" the deceased inmate. The Suicide Report indicated the inmate had suffered from psychotic symptoms for at least two years, and was able to manage those symptoms until his first suicide attempt in May 2003. The inmate was placed in the MHSDS on 5/27/03 at the MHCB level of care and placed at the 3CMS level of care on his return to population. Despite his refusal of medications in later months, his recent suicide attempt, and a SRA that estimated his risk for suicide as moderate on 11/5/03, he was returned to population on the following day without any change in his level of care.

The Suicide Report identified eight problems, two of which involved straightening out inconsistencies among reports. Six other more substantive issues were noted, along with the following recommendations for remedial action:

Problem 1: The Incident Report here indicated that no resuscitation attempt was made, but the Inmate Death Report incorrectly indicated that resuscitation was attempted.
Recommendation: A corrected Death Report should be submitted or the reports need to be otherwise reconciled.

Problem 2: No resuscitation attempt was made after the LVN found no signs of life on assessment, a violation of CDC policy, and no staff rode in the ambulance with the inmate to the ER.
Recommendation: An in-depth review of this incident by the Emergency Response Review Committee is needed at both the institutional and departmental levels.

Problem 3: The incident on 11/5/03 involving the deceased inmate and his cellmate was written up as a cell fight, when there was evidence it was a joint suicide attempt.
Recommendation: Custody staff needs some training on suicide and suicide pacts.

Problem 4: Investigation staff removed and logged the inmate's suicide note without referring the inmate to mental health staff.
Recommendation: All staff received training on potential indicators of suicide, but a memorandum from the warden was needed, stressing the need for custody to bring such issues to the immediate attention of mental health should be issued.

Problem 5: The inmate reported on 7/16/03 that he had not been taking his medications, yet the MAR indicated he was receiving them.
Recommendation: MTAs needed to be trained on DOT and nurse administered procedures, and supervisors needed to audit medication passes until compliance with DOT policy and procedures was satisfactory.

      <u>Problem 6</u>:  After the inmate reported not taking his medications, he was not seen by a psychiatrist for three weeks.

      <u>Recommendation</u>:  Follow-up to medication non-compliance must be timely, and efforts to educate the patient about his need for medications must be documented.  The institution needed to conduct peer review for all psychiatrists specifically addressed to this issue.

Documents provided by the defendants did not include a response by SVSP to the Suicide Report.

Findings:  This inmate's death was probably foreseeable and certainly preventable.  In its identification of problems and recommended corrective actions, the Suicide Report confined itself to the need for documentation corrections and the training of staff on well established policies and procedures and largely ignored clinicians' failures to respond appropriately to the inmate's functional deterioration once it became identified in the form of serious suicidal behavior in May 2003 and thereafter until his death.  The inmate's placement in the MHCB unit in May 2003 was obviously warranted, but his subsequent placement in the 3CMS program raised clinical questions.  His later noncompliance with medications and treatment, given that his complaints were of psychotic symptoms, depressed mood, and suicidal behaviors, complicated by suspected ongoing drug use, was inadequately addressed by the clinical staff.  His clearly expressed concerns about his "dirty paperwork," and its impact on his safety were never addressed adequately by clinical or custody staff.  The inmate's behaviors on 11/5/03, two days prior to his death, described variously as a cell fight and a suicide pact, certainly called for a more thorough evaluation of his current functioning, especially when the SRA found his risk for suicide to be moderate.  The discovery of a suicide note by custody staff, though apparently never communicated to medical or mental health staff evaluating his self-inflicted lacerations, the inadequate explanation provided by the inmate for his wounds, which sounded incredible to the spiritual/cultural leader of the Native American population, suggested strongly that the inmate needed to be retained in a safe environment such as an MHCB unit while these issues were being evaluated.  The lack of meaningful coordination of efforts between custody and mental health staffs in this instance created significant barriers to the prevention of this suicide.  Nonetheless, the inmate gave multiple indications to clinicians that he was a potential candidate for suicide to which staff responded inadequately.  The Suicide Report did not identify as problematic any of the clinical failures that contributed to this successful suicide and made no recommendations relative to the faulty clinical practices and decisions that contributed importantly to this death.

### 35.  Inmate #H86940

Brief History:  This was a 30-year-old Native American/Hispanic male who completed suicide by hanging at California State Prison, Sacramento (CSP/Sac) on 11/9/03.  He was housed in a single cell in administrative segregation and was a member of the MHSDS at the 3CMS level of care at the time of his death.  The inmate was serving his fourth term

in CDC, having reentered the system as a parole violator via the RJD reception center on 11/4/99.

On 11/9/03 at approximately 9:15pm a correctional officer discovered the inmate hanging from a noose that was attached to the air vent in his single cell in administrative segregation. The correctional officer activated an alarm, and the control officer notified medical and requested a gurney. Two correctional officers entered the cell and, using the cut down tool, cut the noose away from the vent and placed the inmate on the floor. An outside ambulance was requested at approximately 9:17pm, and the inmate was transported to the emergency room at 9:18pm where CPR was started. CPR was continued until paramedics arrived, but CPR was unsuccessful and the inmate was pronounced dead at 9:35pm. Notably, CPR was not initiated by the correctional officers who discovered the inmate and was started only after the inmate arrived in the emergency room. The Inmate Death Report, dated 11/9/03, indicated that emergency procedures were followed promptly after the suicidal act, and that CPR or ACLS was begun by a correctional officer and a RN, an assertion that was contradicted in the Incident Report.

The inmate had been in the MHSDS since 7/9/03, based on a referral by custody staff at CAL indicating the inmate was behaving strangely on the yard. The Suicide Report described the strange behavior as sitting at chow among Black inmates, one of whom he tried to stab, reportedly to provoke correctional officers to kill him. Other examples of the inmate's strange or bizarre behavior included his throwing away his wedding ring, tearing up pictures of his wife and becoming increasingly despondent and depressed, while reporting disturbed sleep and auditory hallucinations. These symptoms were noted as being related to problems with his wife, and possibly the transfer of his cellmate. There were also references to the inmate's reporting of suicidal ideation without a plan on a daily basis and the use of methamphetamine and heroin while in prison. On 7/9/03, the inmate was admitted to the OHU at CAL on suicide precautions because of these complaints. He received a diagnosis of Major Depression. A SRA was completed on the same date, but did not indicate his level of risk. He was transferred to the MHCB at ISP on 7/10/03, and his GAF score was estimated at between 10 and 20. He was transferred because he was considered a danger to himself and had been placed on suicide watch in the CAL OHU. In an MH-4 on 7/11/03, the inmate was noted to be guarded about the problems he had on the yard at CAL and his unwillingness to take psychotropic medications because they made him drowsy. He did, however, take medications, was evaluated as stable, denied suicidal ideation and his GAF was raised to 35. He was subsequently discharged on 7/15/03 to the 3CMS level of care and returned to the CAL OHU, where he remained until 7/16/03.

After his return to CAL, the inmate was described as hostile and responded to questions about suicidal ideation with, "You figure it out." He was placed back on suicide precautions and returned again to the MHCB unit at ISP on 7/17/03. In the MHCB unit, he complied variably with medication, and, although his insight and judgment were impaired, he was not estimated to be at risk for suicide. He was described as cooperative but refused to discuss the issues at CAL that required his return to ISP. By 7/24/03, the inmate was approved for transfer to a 3CMS program at a Level IV institution. The diagnostic impression at ISP was Psychosis NOS. There were also issues raised about

enemy concerns at CAL and the possibility of a third strike related to a stabbing of another inmate, together with a possible need for protective custody. The inmate was subsequently transferred to CSP/Sac on 7/31/03 with a chrono noting that "prior to transfer, the ISP chief psychiatrist/designee shall ensure that SAC mental health staff is contacted to ensure continuity of care." There apparently was nothing in the inmate's UHR indicating that the mandated contact occurred. Additionally, there was no discharge summary from ISP in the inmate's UHR from either of his two stays in the ISP MHCB unit.

The inmate arrived at CSP/Sac on 7/31/03 where the bus screening indicated he was taking medications and he was referred to mental health. On 8/1/03, a psychiatrist noted that the inmate had been in the MHCB unit at ISP but did not state the reasons, and the inmate was not placed on five-day follow-up. The inmate's mental status was reported as free of depression or psychotic symptoms; he was described as cooperative and having a full range of affect; and his Risperdal and Cogentin were continued at that time. The inmate received an IDTT and an MH-2, dated 8/5/03, at CSP/Sac, which indicated the inmate was not currently suicidal and had no symptoms of mental illness. His mental status was described as clear, no problems were identified. The inmate was housed in AdSeg because of the RVR related to the stabbing of the inmate at CAL on 7/9/03. Mental health staff and psych tech notes at CSP/Sac indicated the inmate appeared to have no complaints or symptoms. There are no references by the case managers to his MHCB admissions or his history of suicidal ideation or suicide precautions and suicide watch. The inmate's last mental health contact was on 11/7/03 at cell-front with a case manager, who was not his assigned case manager. This contact occurred two days prior to his completed suicide and consisted of a "complete mental status examination," which noted that the inmate's prescribed medications at the time were Risperdal and Cogentin. The inmate apparently had 42 tablets of Risperdal and 36 tablets of Cogentin in his single cell at the time of his death.

The inmate's criminal justice history reportedly began at approximately age 15, when he was placed in a program called 'Vision Quest' as a condition of parole after he had assaulted an individual in the community. He was subsequently dismissed from that program because of altercations with participants, as well as an assault on a staff member. The inmate's first adult arrest occurred at age 18 for grand theft and robbery of a liquor store, during which he apparently threatened to assault employees of the store if they reported the crime. The inmate received probation for this offense. He reportedly had an unacknowledged alcohol problem and subsequently failed to attend required AA sessions. A probation officer's report indicated the inmate had juvenile and adult arrests involving violence and limited insight into his responsibilities. The inmate performed poorly on probation, which was revoked in June 1993, with a remand to state prison to serve both of his terms.

The inmate had four admissions to the CDC on 8/4/93, 9/26/95, 5/29/97 and 11/4/99. All of the admissions occurred at RJD. After his last admission, he was transferred, as noted above, successively to CAL, ISP and CSP/Sac. During his incarcerations, the inmate had a total of 19 RVRs, with five for violent offenses and sanctions that included three SHU terms. At the time of his death, the inmate was housed in a single cell in AdSeg and was

on walk alone status. The Suicide Report referred to reports in the C-file indicating he may have been involved in drug distribution and keeping inmate weapons for other inmates. Whether these reported involvements related to his enemy concerns at CAL was unclear. The inmate's dysfunctional relationship with his wife, who was the victim of his last criminal offense of inflicting corporal injury on a spouse/cohabitant, resulted in an 11-year sentence. Contrary to the diagnosis of record in the UHR, the Suicide Report suggested the inmate may possibly have met criteria for a Borderline Personality Disorder but did not appear to suffer from a major mental illness. The Suicide Report provided information on the inmate's relationship with his wife, indicating she had not visited him since his transfer to CSP/Sac, and described a letter from her received after his death that contained $1,000 with an explanation for her not writing due to depression and other problems she was experiencing.

The Suicide Report indicated the inmate informed a correctional officer on 11/9/03 that he "was through," which in prison jargon meant that he wanted out of gang-related activities and wanted to go to a sensitive needs yard (SNY). The Suicide Report described this as the appropriate process for gang disaffiliation, and the correctional officer gave him a form to fill out and notified ISU, but the process ended there because of the inmate's suicide. There was apparently no reasonable basis to believe that the inmate meant that he "was through" with life or was suicidal in any way. The Suicide Report referred to the fact that the inmate had been in AdSeg for over three months and had not yet had a hearing on the disciplinary charge related to his stabbing offense in CAL, one possible result of which was a third strike and a sentence of from 25 years to life.

The Suicide Report identified eight problems and recommended the following corrective actions:

Problem 1: The MHCB unit at ISP did not, as required by policy, contact a clinician at CSP/Sac to notify CSP/Sac of this inmate's discharge from the ISP MHCB unit and his imminent arrival there.
Recommendation: ISP needed to audit MHCB transfers for six months to ensure that clinician-to-clinician contacts were made in these kinds of discharge, with the results to be presented to the ISP Suicide Prevention Committee and sent to HCSD monthly.

Problem 2: The inmate was received at CSP/Sac directly from a MHCB unit and was not given five-day clinical follow-up.
Recommendation: CSP/Sac needed to develop an operational plan to identify all suicidal inmates released from an MHCB unit elsewhere to provide the required five days of clinical follow-up.

Problem 3: The deceased inmate's case manager and other staff were unaware of his recent MHCB and suicide history and other issues troubling the inmate. When case mangers assumed the case after internal transfers, they were equally unaware of pertinent mental health history.

Recommendation:  Clinicians needed to review the records of new inmates on their caseloads, make case presentations at IDTT meetings and document relevant information on MH-2s to communicate issues to subsequent mental health staff.  Case managers were to write an intake summary on a MH-3 if they did not write a MH-2 or MH-4.  Supervisors needed to audit mental health records for the next six months to ensure this occurs.

Problem 4:  Frequent moves within AdSeg disrupt continuity of care for inmates in the MHSDS.
Recommendation:  The institution needed to charter a QIT to work with custody to minimize transfers of caseload inmates when the transfer necessitates a change of case manager.

Problem 5:  This was a high-risk inmate who was single-celled.
Recommendation:  The warden should provide copy of Institutions Division Memorandum DD58/03, dated 4/25/03, on "Double Cell Housing Policy" to ICC staff with a local memorandum requiring staff to follow this policy.

Problem 6:  There was no indication in the deceased inmate's recent MH-2s of his recent suicidality and MHCB placement, nor did his MH-2s contain a description of the symptoms or problems that underlay the diagnosis and treatment plan.
Recommendation:   Training was needed on proper treatment planning and documentation.  The MH-2 should include indications of recent important events such as MHCB admissions for suicidality, as well as justification for diagnosis and treatment.

Problem 7:  The inmate's hoarded medications indicated faulty medication administration procedures and staff unawareness of medication noncompliance, while inadequate cell searches by custody staff failed to discover a month's worth of horded medication.
Recommendation:  The health care manager and the supervising registered nurse for AdSeg needed to review medication administration procedures in AdSeg to ensure that policies are being followed and conduct onsite audits of medication rounds to ensure that nurse administered procedures are correctly followed.  A review of custody cell search procedures was also needed.

Problem 8:  No MAR for October was found in the deceased inmate's record.
Recommendation:  Written procedures were needed for transferring MARs from the unit to the UHR in a timely manner.

ISP responded to the Suicide Report's recommended remedies on 4/13/04.  The response provided institutional memorandums and described training that addressed each of the problems identified in the Suicide Report, although it was clear that the recommendations in regard to some of the identified problems were directed primarily at CSP/Sac.

In their objections to the draft version of this report, the defendants reported that CSP/Sac submitted a responsive report in June, a copy of which was subsequently provided to the special master, but not to the author of this report.  .

Findings:  This inmate's suicide did not appear to have been foreseeable because he did not express or request help in dealing with imminent suicidal ideation or intent.  The suicide may have been preventable if appropriate policies and procedures had been followed.  The Suicide Report identified the primary lapses in the communication of critical clinical information and history that contributed to the outcome here, but did not similarly target the conflicting information provided in the Incident Report and Inmate Death Report over the prompt provision of CPR.  Nor did it address the inmate's use of the large-mesh ventilation screen in his AdSeg cell as his vehicle for the suicide.  While ISP provided a response to the recommendations in the Suicide Report, indicating its intent to review and revise policy and conduct training in the identified problem areas, CSP/Sac apparently did not respond.


### 36.  Inmate #P19965

Brief History:  This inmate was a 43-year-old African American male who completed suicide by hanging in his single cell in administrative segregation on 12/17/03 at the California Men's Colony (CMC).  The inmate had been admitted to CDC on 12/2/98 after having been convicted of corporal injury to a spouse, preventing/dissuading a victim/witness from testifying and false imprisonment, for which he received a 16-year sentence.

On 12/17/03 at approximately 1:16pm, a correctional officer making normal security checks in the AdSeg overflow unit on Facility B at CMC observed the inmate slumped against the wall of his cell with a sheet secured to the cell window.  The vision panel of the cell had been papered over, but the correctional officer was able to see around the paper and observed the inmate leaning forward in this position.  The correctional officer activated his personal alarm, and a sergeant, another correctional officer and a MTA arrived and entered the cell.  The sergeant used a cut down tool to cut the sheet from the inmate's neck as the correctional officer held the inmate up to relieve the weight on the sheet.  The inmate was noted to be unconscious, and the sergeant and MTA began to administer CPR immediately.  The emergency transport vehicle was summoned and arrived, and the crew of the vehicle continued CPR on the inmate until they arrived at the East Facility Clinic.  Upon arrival, the inmate was pronounced dead by the attending physician.

The inmate entered CDC for his first term on 12/2/98 at the SQ reception center.  He was subsequently transferred to the California Conservation Center (CCC) on 1/29/99, where he was placed in AdSeg because of "bizarre behavior" in his cell, namely banging his head against the cell door after being told his request for a single cell would not be handled until the following day.  On 2/4/99, the inmate was placed on single-cell and walk-alone status, with a referral to the CSR for possible transfer to CMF or CMC.  The ICC at CCC noted the inmate was a transsexual who had completed half of the transgender operation to become a female and had "noticeable breasts."  Although the bus screenings the inmate received determined he was not in need of mental health care or treatment, the inmate had a history of three suicide attempts in the community prior to his incarceration, including two attempts to jump from a bridge and one attempt to set himself on fire.  The inmate also had a history of psychiatric hospitalizations in New

York. After incarceration in New York for killing his child, he was paroled to a state hospital in a process similar to the MDO statute in California. His transgender issues became the basis for his mental health treatment and were ultimately related to his completed suicide.

Following the CSR review at CCC in February 1999, the inmate was transferred to CMF for a psychiatric evaluation on 3/19/99. Because he came from AdSeg in CCC, he was placed in AdSeg on his arrival at CMF. On 3/5/99, prior to his transfer to CMF, the inmate was classified with the administrative designation of SOR, which apparently meant he had a bisexual or homosexual orientation that might require special placement and should be considered for single-cell housing. The psychiatric evaluation at CMF resulted in the inmate being placed in the MHSDS at the 3CMS level of care on 7/1/99, with diagnoses of Major Depressive Disorder, rule out Delusional Disorder, rule out Schizophrenia Paranoid Type, and he was prescribed Risperdal. The inmate was supposed to receive an evaluation for possible placement in an EOP, but the evaluation determined he did not require an EOP level of care. His history of recurrent suicidal thoughts, however, was noted during the evaluation process. After his arrival at CMF, he was determined to not be in need of single-cell housing and he was placed in general population.

On 6/23/99, he was determined to have met Close A custody criteria and placed in AdSeg, although he did not apparently meet the criteria for single-cell status at that time. The inmate was subsequently endorsed for transfer to CSP/Solano, and was transferred on 8/20/99 with no special restrictions. Despite his request for single-cell status in May 2001 based on his transgender issues, he was determined not to meet the criteria for single-cell housing.

A progress note of 12/19/01 indicated the inmate was taking Doxepin, which was working well without side effects, and the inmate's main concern was receiving a medical or psychiatric chrono that he not be placed in a dorm setting because he had undergone pre-op hormonal therapy for a transsexual. He reported that he wanted his breasts removed, but he could not have that done until he was out of prison because it was not a "necessary" medical procedure. The psychiatrist authoring this note indicated he would speak with a supervisor and that "efforts will be made to transfer inmate to transgender program at DMH." The inmate was assessed as having normal mental status without suicidal or homicidal ideation, and his depression was stable.

The Suicide Report noted the inmate was placed in AdSeg at CSP/Solano on 11/19/02 because of safety concerns related to the inmate's report that he had been a victim of sexual assault by his cellmate. He was placed on single-cell and walk-alone status, and on 1/29/03 the CSP/Solano ICC approved single-cell status for him while in the CSP/Solano AdSeg unit, even though the allegations of sexual abuse by his cellmate were reported as unsubstantiated. There was also a recommendation for a transfer to a Level III institution because of the accusations to prevent retaliation by the accused. The inmate was referred to the CSR for transfer to CMC East or MCSP and remained in AdSeg pending transfer. At some point during his stay in CSP/Solano, the inmate apparently received S-status, which meant that he was to be single-celled. There was

nothing to confirm that dating from his tenure at CSP/Solano, but documentation provided subsequently at CMC confirmed the designation.

Correspondence from Coleman plaintiffs' counsel, dated 3/5/03, 8/19/03 and 6/23/04, was among the documents reviewed pertaining to this case. The 3/5/03 letter from plaintiffs counsel reported the inmate's claim that he had been repeatedly raped by a cell mate at CSP/Solano and requested CDC medical, mental health and custodial staffs follow "existing practices and procedures governing sexual assault victims in CDC." The correspondence pointed out that the inmate had a single-cell chrono that neither mental health nor custody would enforce. The 8/19/03 correspondence referred to a beating of the inmate by a cellmate at CMF in 2000 and a sexual assault by another cellmate in CSP/Solano in 2001. Each of the letters from plaintiffs' counsel referred to the inmate's multiple requests for single-cell status for protection against further assaults. The correspondence included an 11/6/02 note from a physician stating the inmate "has been assaulted several times in the past because he has large breasts." A subsequent note, dated 11/13/02 and signed illegibly by an unidentified clinician, denied the request for a single cell and stated the request could only be approved by an M.D. An 11/15/02 note by an M.D. stated, "Single cell is strictly custody issue."

As noted above, on 11/19/02 the inmate was placed in AdSeg while his allegations of an assault were being investigated and was started on an antidepressant medication in December 2002. The medication was changed to a different antidepressant medication in April 2003, which he continued to receive until his death. The Suicide Report indicated that the inmate was considered medication compliant, but noted his pills were "crushed."

The 11/19/02 note included a plan to refer the inmate to the North Bay Medical Center for a SART (assumed to be a sexual assault evaluation), which apparently was conducted and was negative for trace evidence of rape. Despite this, there was a note dated 1/13/03, apparently by the same clinician with an illegible signature who wrote the 11/19/02 note, indicating that the inmate was "sexually assaulted 11/19/02 – wants to find out if he contracted HIV-Hep C."

The inmate was transferred to MCSP on 6/26/03. A 6/27/03 progress note from a clinician at MCSP indicated the inmate had been transferred to MCSP from PVSP (sic), where he had been placed in protective housing in a single cell. The note went on to state that this was because the inmate stated he had been "physically and sexually assaulted at CCC (Susanville), SVSP (Salinas), and PVSP (Pleasant), and that he will not double cell because of fear of repetition." The inmate was described as "slight of build, downcast, anxious, has enlarged breasts, claims his genitalia are different than other men only because he has undescended testicles." The note continued that "although the inmate reports he is heterosexual, he is perceived as 'a girl'." The note further reported, "He said he is not considering suicide unless he is placed in a cell with another inmate. If he is forced to double he will kill himself." The treatment team meeting note of 7/10/03 included diagnoses of Generalized Anxiety Disorder, and rule out PTSD. A psychiatrist's progress note on 7/29/03 indicated the inmate complained of not receiving his Elavil regularly and was fearful of being assaulted if he was not single-celled, which he has been "since November 2002 due to being assaulted."

132

The inmate was subsequently approved for double-cell housing on 7/8/03 at MCSP, with the UCC noting, "there was no evidence that you were sexually assaulted at SOL," but also noting the inmate's statements that he was allegedly "sexually assaulted at San Quentin, Susanville, and CMC."

The inmate was seen by the MCSP ICC on 8/4/03, which determined there was no basis for continuing his single-cell status but continued his single-cell status for 60 days because he had been on lockdown status since 6/26/03 when he arrived at MCSP. The CMC documents indicated the inmate was to work with mental health staff toward double-cell status. On 8/12/03, the inmate hanged himself in his single cell in a serious suicide attempt and had to be cut down. The inmate began breathing after he was cut down and was admitted to the MHCB for a suicide attempt. The resulting SRA attributed the attempt to the inmate's desire for a single cell. The Suicide Report indicated that two days later the inmate "reported that other inmates had sexually assaulted him." He remained in the MHCB until 8/18/03 with discharge diagnoses of Depressive Disorder NOS and Borderline Personality Disorder, which was subsequently changed to Depressive Disorder and "probably" Post Traumatic Stress Disorder (due to alleged rape by inmate), and Gender Identity Disorder. After the inmate's discharge from the MHCB unit on 8/18/03, there was no evidence that the inmate received the required five-day clinical follow-up.

The inmate was subsequently placed in the EOP level of care and continued to be housed in AdSeg based on his complaint, which apparently was substantiated by a confidential source, that his breasts were fondled while he was in the library at MCSP. An ICC on 8/21/03 determined he would be compatible with inmates on the special needs yard and could program in the B-Facility, but would be transferred to another institution. The inmate was also approved for single-cell status for safety reasons and subsequently was approved to remain on single-cell status until he was transferred to CMC East. From the records reviewed, it appeared his level of care was changed to 3CMS at MCSP. The inmate was endorsed for CMC East on 10/6/03 by the CSR. CMC documentation noted both his violent history and his S-suffix, designated to alert staff of the inmate's need for single-cell housing.

The inmate was transferred to CMC on 10/16/03 and placed on suicide precautions in the locked observation unit (LOU) the following day. The inmate reported he planned to kill himself if he were housed with anyone else, and in his appeal of his housing assignment, stated he was told "he was coming to CMC for single-cell only." The inmate was seen by the UCC on 10/29/03, which noted the inmate had a single cell at MCSP, but recommended removal of the single-cell status. The recommendation "was based on the fact that there is no information in your file to substantiate your claim that your cellmate sexually assaulted you." The UCC also based its recommendation for double-celling on the inmate's history of documented suicide attempts, apparently without considering that the cited attempts were directly related, as indicated in the inmate's report and clinical notes, to his fears of being double celled.

The inmate was seen again on 11/13/03 by the ICC for his S-suffix review. The determination was made to remove his S-suffix because the inmate stated he was a

transsexual, not a homosexual, and did not participate in homosexual activity and there were no RVRs to support his allegations of sexual assault by any cell mate. The ICC also cited two RVRs the inmate had received for possession of inmate-manufactured alcohol, which the inmate reported belonged to his cellmate, not him, and for attempting to commit suicide on 8/12/03.

The inmate was readmitted to the LOU on 11/13/03 reporting suicidal ideation, related to his fear of double-celling. A rule out PTSD diagnosis was also considered at this time. During this admission to the LOU, the inmate continued to express his fears of double-celling and concerns for his safety. He also reported he had not received medications for approximately three to four days while in the LOU. The Suicide Report indicated the CMC staff considered sending the inmate to an MHCB, but determined it was not necessary. The Suicide Report speculated that the option was rejected because the inmate's suicidal threats "were seen as being so volitional." The inmate also reportedly did not want to go to a MHCB at another institution. The Suicide Report indicated that, when the inmate was told he was being transferred to a double cell, he threatened staff, resulting in his placement in AdSeg. He was found hanging in the cell one hour later. The inmate had filed an appeal regarding the denial of his request for single-cell status and received a response on 12/10/03 rejecting that appeal. The appellate process provided some of the information cited in the Suicide Report and here. In his appeal of the ICC decision to remove his S-suffix, the inmate requested the restoration of his S-suffix, assignment to a SNY and a return to B-Yard at MCSP as soon as possible.

The last note by a mental health clinician was dated 11/25/03 and reported that all of the inmate's mental health problems "relate to not wanting to double cell," with an assessment of "situational problem," and a plan of "depression in remission with Elavil 100mg, RTC (return to clinic) three months." A final record entry on 12/16/03 indicated the inmate was seen by a UCC in absentia, and the plan was to transfer the inmate to the SNY at ASP. It was unclear whether the inmate was informed of this determination. The diagnoses of record at the time of the inmate's death were Axis I – Major Depression; Post Traumatic Stress Disorder; Gender Identity Disorder; and Axis II – Personality Disorder, NOS with a GAF of 65. With regard to the inmate's personality dynamics, the Suicide Report indicated that several examiners concluded that the inmate's "personality structure decompensated under stress. His insight and judgment would rapidly degrade when he was provoked. This was likely a factor in killing his son, choking his wife, and killing himself." The Suicide Report concluded that the inmate was followed closely by mental health and, while his allegations of sexual assault could not be substantiated, "they were not absurd or even unlikely." The Suicide Report concluded, however, with the statement, "On the other hand when he finally was placed in a single cell at CMC, he committed suicide."

The Suicide Report neither identified problems nor recommended any remedies.

A 6/23/04 letter from plaintiffs' counsel objected to the findings and conclusions of the Suicide Report and asked that it be redone in a manner that addressed the failures of clinical and custody staff to appropriately respond to the inmate's single-cell and safety concerns, which, they believed, clearly contributed to the suicide. The plaintiffs also

took exception to statements and views about clinical issues and actions included in the Suicide Report. Finally, plaintiffs' counsel expressed the view that the overall review and the department's handling of the issues involved in this suicide violated the court's 1/12/04 order, which in response to the monitor's report on 2001 suicides, directed defendants to make clinical and custody staff aware of and address inmate safety concerns, serious medical conditions, or adverse court rulings, as well as to improve communication and joint decision making.

Findings: This inmate's death was both foreseeable and preventable. The inmate had a long history of suicidal behaviors prior to incarceration and after his incarceration in CDC. His transgender issues and allegations of sexual abuse and assault while in CDC were assessed by some clinical staff as indicative of PTSD, which needed to be treated, and serious custodial consideration of single-cell housing to address the inmate's safety concerns. Indeed, his recurrent suicidal ideation and particularly his August 2003 attempt, for which he received a RVR that failed to comply with applicable procedures for processing such charges, were all related to issues of safety and single-cell housing based on his undeniable gender identity disorder and his fears of sexual assault by other inmates. The Suicide Report's conclusion that there were no problems in this inmate's care and treatment or custodial management is inexplicable. The inability of the custody, health and mental health disciplines to work together to make competent placement decisions in difficult cases like this one resulted in this inmate's unnecessary death. Mental health staff seemed regularly to take the position that single celling was purely a custody decision; the custody side repeatedly refused to approve single-cell status in the absence of substantiated evidence of assault. There were exceptions along the way; clinicians and custody staff seemed better able to coordinate their efforts at MCSP, but not elsewhere. A professionally fair and competent review of this inmate's clinical record indicates that, irrespective of the number and extent of actual physical or sexual attacks the inmate endured in CDC, his fear of assault was palpably real and destructive to his mental health; indeed the fear, whether real or perceived, pretty clearly was the cause of his death. The episode of fondling at MCSP, apparently confirmed by an informant, suggested, moreover, that at least some of his fear was grounded in reality. Even though the dreaded "M-word" was not used, most clinicians who evaluated and treated the inmate seemed to suspect he was malingering to obtain or retain single-cell status. Even the Suicide Report, which contained some direct statements about the risk of suicide for this inmate based on his safety concerns and identified mental health issues, including depression, anxiety, PTSD and gender identity disorders and opined that, if subjected to pressure, his risk for suicide would be even greater, concluded that the removal of his S-suffix and his placement in double-cell housing was somehow appropriate. The UHR indicated that the inmate's allegations of sexual abuse were never addressed clinically. The failure to place this inmate at CMF, where other gender dysphoric individuals are housed separately and single-celled, as apparently recommended by MCSP clinicians and custody staff, together with the reduction of his level of care from EOP to 3CMS, given the inmate's history and serious August 2003 suicide attempt, reflected poor clinical judgment. The evaluation and treatment of this inmate were deficient and inadequate.