PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.: Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER, PARAGRAPHS 2 AND 5, RE: SUICIDE PREVENTION POLICIES** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| | Honorable Lawrence K. Karlton |

# INTRODUCTION AND STATEMENT OF FACTS

The rate of suicide in the California Department of Corrections ("CDCR") is significantly higher than the national prison suicide rate of 14 per 100,000 inmates as reported by the Bureau of Justice Statistics Special Report, August 2005. Declaration of Jane Kahn in Support of Plaintiffs' Objections ("Kahn Dec.") ¶ 2 and Exhibit 1. In 2003 CDCR had a suicide rate of 22.39 suicides per 100,000. Special Master's Report on Suicides Completed in the CDC in the Calendar Year 2003, filed 4/28/05, ("Suicide Report for 2003") at 4. In 2004 CDCR had a suicide rate of 17.5 suicides per 100,000 (a total of 28 suicides). Kahn Dec. ¶ 3. Since January 1, 2005, there have already been 29 suicides within CDCR, an annual rate of 27.2 suicides per 100,000, which is nearly twice the national average. Kahn Dec. ¶ 4. To address these high suicide rates, the Special Master made specific recommendations for necessary changes to CDCR's policies and procedures in his Suicide Report for 2003. The Court adopted these recommendations in its June 9, 2005 Order. Defendants are in violation of the June 9, 2005 Order and, as a result, class members lives remain at risk.

The recommendations adopted by the Court flowed from the Special Master's extensive study of actual suicides that occurred within CDCR over several years. The review of these suicides found that emergency medical care, such as CPR, was not provided by defendants in a timely manner and this was a contributing factor in numerous suicides within the CDCR. It was also determined that some custody officers, who were first responders to the scene of a suicide, were not providing CPR. Defendants' existing policy does not require a custody officer trained in CPR to provide CPR to an inmate. Defendants' failure to require custody officers to provide CPR has been a contributing factor in numerous suicides within the CDC. Kahn Dec. ¶ 5; See, e.g., Coleman Suicide Report, July 14, 2000, Sixth Monitoring Report of the Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed 10/11/00: Inmate 5, at 9 (delays in response after inmate found hanging, including CPR not immediately initiated), Inmate 18 at 16 (CPR not performed when inmate cut down), Inmate 22 at 18 (CPR not performed until five minutes after discovered hanging), Inmate 23 at 18 (CPR not performed for eight minutes after found hanging and not until

1 transferred to ER), Inmate 24 at 19 (after cut down, noose never loosened and CPR never
2 done), Inmate 29 at 23 (No CPR done); <u>Report on Suicides Completed in the CDC in
3 Calendar Year 2001, attached as Exhibit V to the Eleventh Monitoring Report of the Special
4 Master on the Defendants' Compliance</u> with Provisionally Approved Plans, Policies and
5 Protocols, filed 6/11/03: Inmate 6 at 20 (inmate cut down but no CPR initiated without any
6 explanation), Inmate 19 at 37 (inmate cut down but no CPR initiated until he was transported
7 to the urgent care clinic five minutes after his discovery), Inmate 21 at 42 (inmate cut down
8 with pulse but no CPR initiated until arrived at infirmary 15 minutes later), Inmate 24 at 46
9 (inmate handcuffed, then cut down, and transported to emergency room before CPR initiated);
10 <u>Report on Suicides Completed in the CDC in Calendar Year 2002, attached as Exhibit U to the
11 Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with
12 Provisionally Approved Plans, Policies and Protocols</u>, filed 12/10/03: Inmate 1 at 14 (no CPR
13 done), Inmate 3 at 20 (alive when found by officers, MTA began CPR five minutes later),
14 Inmate 5 at 25 (no CPR when cut down, provided in the ER), Inmate 9 at 32 (no CPR by
15 responders), Inmate 13 at 42 (inmate cut down and cuffed, MTA arrived five minutes later and
16 decided not to start CPR), Inmate 17 at 52 (inmate cut down by officer and placed on floor, six
17 minutes later MTA arrived and initiated CPR), Inmate 19 at 57 (inmate cut down with a faint
18 pulse, no CPR initiated until MTA arrives); <u>Suicide Report for 2003</u>: Inmate 1 at 1 (no CPR
19 provided with no explanation), Inmate 3 at 5 (CPR not initiated for 16 minutes after inmate
20 found), Inmate 18 at 50 (inmate cut down and cuffed, no CPR until MTA arrived ten minutes
21 later and discovered pulse), Inmate 25 at 73 (no CPR initiated until inmate arrived in the
22 infirmary ten minutes after discovered hanging in his cell by officer), Inmate 27 at 84 (inmate
23 cut down and placed in handcuffs until MTA arrived five minutes later to initiate CPR), Inmate
24 35 at 126 (no CPR initiated until inmate transported from housing unit to emergency room).
25     Inmate suicides where CPR was delayed or not provided by custody staff have
26 continued in 2004 and 2005. Kahn Dec. ¶ 6.
27     On February 28, 2005, the Special Master issued his draft recommendation that the
28 Court require defendants to prepare a policy requiring custody staff to provide CPR, if trained

to do so, to inmates until medical staff arrives to initiate or continue life support measures. Defendants did not object to this recommendation and the Special Master's final report, which was filed with the Court on April 28, 2005, recommended that defendants develop and implement the policy within 60 days. The Special Master shortened the implementation period to 60 days because of the ample notice that defendants had received. Suicide Report for 2003 at 13. This Court's June 9, 2005 Order directed defendants to develop and implement their new CPR policy by August 8, 2005, a deadline that is almost six months from the time defendants received the Special Master's initial recommendation. As of August 8, 2005, however, there was no evidence that defendants complied with the June 9, 2005 Order. Only after repeated requests by plaintiffs' counsel did defendants provide any response whatsoever. Kahn Dec. ¶ 7 and Exhibits 2 & 3. On August 15, 2005, defendants finally provided a copy of their new CPR policy. The policy is inadequate and is far from implementation. Defendants remain in clear violation of paragraph 2 of the Court's June 9, 2005 Order.

The June 9, 2005 Order also addressed defendants' failure to track the suicide attempt history of inmates in the CDC's mental health caseload and directed defendants to develop a plan for tracking this history by August 8, 2005. June 9, 2005 Order ¶ 5. More than half of the inmates who committed suicide in 2003 had previously attempted suicide either in the community or within CDC. Suicide Report for 2003 at 6, 12. Defendants have determined in their own suicide reviews that tracking this suicide history would provide valuable information to clinicians and custody staff who would treat such identified prisoners as high risk. Suicide Report for 2003 at 12. In April 2005, defendants provided suicide training to their clinical staff by an expert who has lectured and written about the importance of tracking prior suicide attempt history. Kahn Dec. ¶ 8; White, Thomas W., How to Identify Suicidal People, A Systematic Approach to Risk Assessment, at 27-30, Philadelphia: Charles Press Publishers, Inc., 1999. Defendants did not object to the Special Master's recommendation to develop a plan for tracking suicide attempt history of mentally ill inmates housed within CDCR.

Despite plaintiffs' repeated requests, defendants have failed to provide a plan for tracking suicide history of caseload inmates as required by the June 9, 2005 Court Order.

Defendants informed plaintiffs' counsel on or about August 22, 2005, that they have yet to prepare a plan. Declaration of Tom Nolan in Support of Plaintiffs' Opposition ("Nolan Dec") ¶ 3.

On August 25, 2005, at approximately 10 a.m., Michael Bien and I spoke with Bruce Slavin, General Counsel of CDCR. Mr. Slavin indicated that he had only recently become aware of defendants' lack of compliance with paragraphs 2 and 5 of the Court's June 9, 2005 Order and was attempting to address the problem. Later that day, at approximately 4:30 p.m., plaintiffs' counsel received an email containing a document provided to Special Master Keating regarding defendants' efforts to begin tracking suicide information within their Mental Health Tracking System. Kahn Dec. ¶ 14. Attached hereto as Exhibit 6 is a true and correct copy of Defendants' Memo to Special Master Keating re Tracking Suicide Information in the Mental Health Tracking System. Plaintiffs have not had an opportunity to review this document.

Defendants failed to request relief from the June 9, 2005 Order from this Court, from the Special Master, or plaintiffs' counsel. The conduct should not be tolerated.

## ARGUMENT

### I. DEFENDANTS HAVE FAILED TO DEVELOP AND IMPLEMENT A POLICY REQUIRING CUSTODY OFFICERS TO PROVIDE CPR

#### A. Defendants have not implemented their CPR Policy

The June 9, 2005 Order clearly requires that defendants **develop** and **implement** a CPR policy by August 8, 2005. Defendants were on notice of this obligation for almost six months before the Court Order was entered. During meetings with defendants in May 2005, plaintiffs and the Special Master were provided with defendants' CPR Action Plan, which outlined a process and timeline for developing and implementing their CPR Policy. Kahn Dec. ¶¶ 9 & 10 and Exhibit 4. As part of the Plan, defendants identified the need to negotiate the terms of the CPR policy with the impacted Unions, as well as to provide training to correctional officers on the new policy before implementation could occur. The CPR Action Plan included a timeline with most elements of the Action Plan to be completed by the end of May 2005.

The document defendants provided to Special Master Keating on August 8, 2005, shows that the CPR Action Plan was ignored and that defendants have no present schedule for compliance with the June 9, 2005 Order. Kahn Dec. ¶ 11 and Exhibit 3. Labor negotiations and training have not yet been completed. Nolan Dec. ¶¶ 2 & 3. In fact, it is unclear whether defendants have even started the critical Labor Relations piece of their Action Plan and defendants have informed plaintiffs' counsel that they have not yet hired a trainer to begin their necessary training piece of the implementation of the new policy. Nolan Dec. ¶ 2.

Defendants were well aware of the time frames of this Court Order and the requirements of their CPR Action Plan for implementation of the Order. The failure to ensure compliance with this Order is inexcusable. This is particularly true given the nature of the Order –lives are at stake.

### B. Defendants' Policy is Inadequate

The Court's Order requires that defendants develop a policy that establishes **clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so.** Defendants' proposed Policy, however, requires peace officers that are first responders and are trained in CPR to utilize these life saving efforts **whenever the inmate might benefit from such efforts** and when it is reasonably safe to the employee to do so. Kahn Dec. ¶ 12.

Plaintiffs object to the language in this section because it asks the custody staff to determine whether an inmate might medically benefit from CPR. This is clearly inappropriate. Custody staff should initiate CPR when it is safe to do so and continue CPR until medical staff arrive and make a determination about whether to continue or discontinue life support measures. Plaintiffs have previously objected to a prior version of the same policy with similar language. Kahn Dec. ¶ 13 and Exhibit 6.

### II. DEFENDANTS HAVE FAILED TO PROVIDE A PLAN FOR TRACKING SUICIDE HISTORY OF MENTALLY ILL INMATES

As of August 24, 2005, defendants had not provided any written materials in response to paragraph 5 of the June 9, 2005 Order which requires that defendants develop a plan by August

8, 2005 for tracking the suicide history of inmates in the CDCR mental health caseload. In response to phone inquires by plaintiffs' counsel, defendants have reported that no plan is available. Kahn Dec. ¶ 7; Nolan Dec. ¶ 3. On August 25, 2005, at approximately 10 a.m., Michael Bien and I spoke with Bruce Slavin, General Counsel of CDCR. Mr. Slavin indicated that he had only recently become aware of defendants' lack of compliance with paragraphs 2 and 5 of the Court's June 9, 2005 Order and was attempting to address the problem. Later that day, at approximately 4:30 p.m., plaintiffs' counsel received an email containing a document provided to Special Master Keating regarding defendants' efforts to begin tracking suicide information within their Mental Health Tracking System. Plaintiffs have not had an opportunity to review this document. Kahn Dec. ¶ 14. Attached hereto as Exhibit 6 is a true and correct copy of Defendants' August 25, 2005 Memo to Special Master Keating re Tracking Suicide Information in the Mental Health Delivery System.

Defendants are well aware of the value of tracking prior suicide attempts of inmates in the CDCR as evidenced by their own recommendations in their Suicide Reviews and their own Suicide Reports. Suicide Report for 2003 at 12. This knowledge, which is one of the most important indicators that a person may be at greater risk of eventually attempting or completing suicide, permits CDCR to treat these identified inmates as higher risk and provide additional screening and mental health services during transitional periods. As the Special Master noted, defendants' own report on suicides in 2003 found that 22 of the 35 CDCR inmates who committed suicide in 2003 had a history of prior suicide attempts. Suicide Report for 2003 at 12. The Special Master cited the high rate of suicides in 2003 as a factor in support of the need to track this suicide history. Id. As the suicide rate in 2005 approaches twice the national prison suicide rate, defendants must respond to this June 9, 2005 Order with the seriousness that it demands.

## CONCLUSION

The CDCR's suicide rate in 2005 is alarmingly high to date (29 suicides in the first eight months of 2005, with a rate of 27.2 suicides per 100,000) yet the defendants' response to the June 9, 2005 Order indicates no sense of urgency. The failure to provide timely CPR to

inmates during a suicide attempt can make the difference between life and death. Tracking suicide history of inmates has been recommended by defendants in their own reviews of suicides as a means to identify high-risk inmates, as well as by their own suicide expert. The June 9, 2005 Order flows from the review of the suicidal deaths in CDCR in 2003, the majority of which were deemed preventable/foreseeable, and demands the defendants' careful attention and compliance with the Court's Order.

Dated: August 26, 2005.

Respectfully submitted,

*Jane Kahn*
Jane Kahn
Rosen, Bien & Asaro, LLP
Attorneys for Plaintiffs

**PROOF OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the City and County of San Francisco, California, and not a party to the within action. My business address is 155 Montgomery Street, 8th Floor, San Francisco, California. On the date and in the manner indicated below, I served a true copy of the following documents:

**PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER, PARAGRAPHS 2 AND 5, RE: SUICIDE PREVENTION POLICIES**

**DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER PARAGRAPHE 2 AND 5, RE: SUICIDE PREVENTION POLICIES**

**DECLARATION OF THOMAS NOLAN IN SUPPORT OF PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER PARAGRAPHE 2 AND 5, RE: SUICIDE PREVENTION POLICIES**

on the parties in said action by placing a true copy thereof enclosed in a sealed envelope to be delivered in the manner indicated below and addressed as follows

**BY ELECTRONIC FILING**

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814

Matthew A. Lopes, Jr.
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI  02903

J. Michael Keating, Jr.
Office of the Special Master
*Coleman v. Schwarzenegger*
285 Terrace Ave.
Riverside, RI 02915

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of August, 2005 at San Francisco, California.

_____
Kim Le