PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>            Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>            Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER PARAGRAPH 2 AND 5, RE: SUICIDE PREVENTION POLICIES**<br><br>Honorable Lawrence K. Karlton |

I, Jane Kahn, do hereby declare under penalty of perjury as follows:

1.      I am an associate in the law firm Rosen, Bien & Asaro, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.

2.      According to the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails, which was issued by the U.S. Department of Justice in August 2005, state prison suicide rates have dropped to 14 per 100,000 inmates (at 2). Attached hereto as Exhibit 1 is a true and correct copy of the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails.

3.      I determined the annual 2004 CDCR suicide rate of 17.5 per hundred thousand based upon a CDCR total population figure of 160,000 inmates and the total of 28 suicides that took place in the CDCR during 2004.

4.      I calculated the annual 2005 CDCR suicide rate of 27.2 per hundred thousand based upon a total CDCR population figure of 160,000 inmates and based upon the fact that there have been 29 suicides in the first eight months of 2005. I then annualized the suicide rate (assuming that the current suicide rate will continue for the last 1/3 of the year) and adjusted the figure by the appropriate ratio to arrive at an annual rate per 100,000 inmates (rather than per 160,000 inmates).

5.      The Special Master's experts have reviewed each CDCR suicide since 1998 and written a report on each of these suicides. I have carefully reviewed each of those reports. Among the issues that emerged out of this careful study and review over the past five years was the defendants' failure to provide prompt and effective emergency services to inmates who had attempted suicide. In addition, it was also apparent that custody officers who were frequently the first responders to a suicide were failing to initiate CPR. During discussions of the Revised Program Guides on Suicide Prevention in 2004, defendants informed plaintiffs' counsel and the Special Master that CDCR policy did not require custody officers to provide CPR unless they were required to do so by their custody position. Plaintiffs have consistently objected to defendants' position on requiring custody officers to provide CPR to inmates.

1      6.      Defendants provide plaintiffs' counsel and the Special Master with a Suicide

2  Report for every inmate suicide within the CDCR.  I review every Suicide Report provided to

3  plaintiffs' counsel, as well as many of the medical records of the inmates who have committed

4  suicide.  CPR was delayed or not provided by custody officers to many of the inmates who

5  committed suicide in 2004 and 2005.  See, e.g., On July 1, 2004, an inmate was found

6  unconscious in her cell at CCWF from a drug overdose and custody officers waited 22 minutes

7  until an MTA arrived to provide CPR;  on  November 17, 2004, an inmate was found hanging

8  at CCC, Eel River Conservation Camp by an officer who first called his commanding officers

9  by phone, then cut down the inmate, but did not provide any life-support measures while he

10  waited for his commanding officers to arrive; and on March 5, 2005, an inmate was found

11  hanging in the new ASU at CSP-SAC by officers who cut him down but did not provide him

12  with CPR.

13      7.      On August 11, 2005, I called Deputy Attorney Lisa Tillman and left her a voice

14  message requesting information regarding defendants' implementation of the June 9, 2005

15  Court Order, ¶¶ 2 and 5.  I did not receive any response to my phone message on August 11,

16  2005.  On August 12, 2005, I sent an email to Lisa Tillman and Michael Stone, CDCR

17  attorney, requesting that defendants comply with the June 9, 2005 Order and provide plaintiffs

18  with their plans.  Attached hereto as Exhibit 2 is a true and correct copy of the August 12, 2005

19  email.  Defendants finally provided plaintiffs with a copy of their new CPR policy on August

20  15, 2005.  Attached hereto as Exhibit 3 is a true and correct copy of defendants' new CPR

21  Policy.

22      8.      During the May 16, 2005 Coleman Policy meeting, defendants informed

23  plaintiffs' counsel and the Special Master that they had hired Thomas W. White, a psychologist

24  with a specialty in suicide risk assessment, to conduct training for their clinical staff.  This

25  training had been conducted by video-conference on April 20, 2005.  Plaintiffs requested a

26  copy of the video-conference and were provided with a copy of the training.  I viewed the

27  video-conference training.  During the training of CDCR clinicians, Dr. White discussed the

28  importance of identifying inmates with a history of suicide attempts, noting that a history of

1  prior attempts serves as a red flag of greater future suicide risk and should be probed by

2  clinicians.

3      9.    During the May 16, 2005 Policy Meeting with defendants and the Special

4  Master, defendants provided plaintiffs' counsel with their CPR Action Plan, which outlined a

5  process and timeline for developing and implementing their CPR Policy. Attached hereto as

6  Exhibit 4 is a true and correct copy of Defendants' CPR Action Plan.

7      10.   The CPR Action Plan provided for May 2005 target dates for assessment of

8  equipment needs and development of standardized method of training. No target dates were

9  set for the labor negotiations, however, a process clearly identifying the need to first finalize a

10 policy before negotiations could be initiated was set forth in the CPR Action Plan. The CPR

11 Action Plan anticipated some time beyond the development of the policy for labor negotiations

12 before the policy could be implemented.

13     11.   According to the Memorandum to Special Master Keating attaching the

14 defendants' CPR Policy, dated August 9, 2005, the negotiations with the impacted bargaining

15 unit had not yet been scheduled and it was anticipated that the negotiations would begin within

16 the next 30 days. See Exhibit 3. Although the Policy states that standardization of the

17 CPR/First Aid curriculum and equipment is scheduled to begin July of 2005, CDCR Attorney

18 Lisa Tillman has informed plaintiffs' counsel that defendants have not yet secured a contractor

19 to conduct the new CPR Policy training. See Nolan Dec. ¶ 2.

20     12.   The June 9, 2005 Order, paragraph 2, stated that defendants should establish a

21 policy that clearly and unequivocally sets forth a requirement that custody staff trained in CPR

22 provide it to inmates. Defendants' policy sets forth two qualifiers before custody officers must

23 provide CPR to inmates: First, that it must be reasonably safe for them to provide CPR; and

24 second, that the custody officer must feel that the inmate might benefit from the CPR.

25 Training is obviously a critical component in implementation of this type of policy; however,

26 non-medical personnel should not be making the determination as first responders whether to

27 initiate CPR. Defendants' CPR Policy must direct custody officers to provide CPR until

28 medical personnel arrive and make a determination whether to continue or discontinue life

DECL OF JANE KAHN ISO PLFS' OBJECTIONS TO DEFS' FAILURE
   TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER

1   support measures.

2       13.   In Plaintiffs' Objections to the Revised Program Guides, Section 10: Suicide

3   Prevention and Response, plaintiffs objected to a similar provision that permitted custody staff,

4   as first responders, to determine whether to provide CPR rather than the medical personnel

5   upon their arrival.  Attached hereto as Exhibit 5 is a true and correct copy of Plaintiffs'

6   Additional Objections to the Revised Program Guides, dated May 23, 2005,  Plaintiffs' expert,

7   Lindsay Hayes, a nationally recognized expert on suicide prevention, reviewed defendants'

8   Section 10: Suicide Prevention and Response and advised against defendants' proposed CPR

9   policy which permits custody staff to determine whether to initiate CPR.  If necessary, Mr.

10  Hayes is prepared to testify to these matters.

11      14.   On August 25, 2005, at approximately 10 a.m. Michael Bien and I spoke with

12  Bruce Slavin, General Counsel of CDCR.  Mr. Slavin indicated that he had only recently

13  become aware of defendants' lack of compliance with paragraphs 2 and 5 of the Court's June

14  9, 2005 Order and was attempting to address the problem.  Later that day, at approximately

15  4:30 p.m., plaintiffs' counsel received an email containing a document provided to Special

16  Master Keating regarding defendants' efforts to begin tracking suicide information within their

17  Mental Health Tracking System.  Plaintiffs have not had an opportunity to review this

18  document at this time.

        I do so declare under penalty of perjury this 26th day of August, 2005, at San

20  Francisco, California that the foregoing is true and correct.

22                                                      Jane Kahn

4                    DECL OF JANE KAHN ISO PLFS' OBJECTIONS TO DEFS' FAILURE
                     TO COMPLY WITH THE JUNE 9, 2005 COURT ORDER

Exhibit 1

U.S. Department of Justice
Office of Justice Programs



# Bureau of Justice Statistics
# Special Report

August 2005, NCJ 210036

# Suicide and Homicide in State Prisons and Local Jails

By Christopher J. Mumola
*BJS Policy Analyst*

Data from new Bureau of Justice Statistics (BJS) data collections offer the first opportunity to analyze the personal characteristics, current offenses, and environmental factors surrounding inmate deaths in local jails and State prisons nationwide.

To implement the Death in Custody Reporting Act of 2000 (PL 106-297), BJS began collecting inmate death records from all local jails in 2000 and expanded reporting to include State prisons in 2001. In this first report from the Deaths in Custody Reporting Program, data from 2000 to 2002 highlight inmate and facility characteristics related to high risks of suicide and homicide.

Jail suicide rates declined steadily from 129 per 100,000 inmates in 1983 to 47 per 100,000 in 2002. In 1983 suicide accounted for the majority of jail deaths (56%), but by 2002, the most common cause of jail deaths was natural causes (including AIDS) (52%), well ahead of suicides (32%). Suicide rates in State prison fell from 34 per 100,000 in 1980 to 16 per 100,000 in 1990, and have since stabilized.

State prison homicide rates dipped sharply from 1980 (54 per 100,000) to 1990 (8 per 100,000). By 2002 prison homicide rates had declined further, down to 4 per 100,000. Homicide rates in local jails were more stable, declining slightly from 5 per 100,000 in 1983 to 3 per 100,000 in 2002.

## Highlights

| Cause | Local jail inmate deaths | | | | State prison inmate deaths | | |
|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2000-02 percent | 2001 | 2002 | 2001-02 percent |
| All causes | 912 | 953 | 978 | 100 % | 2,878 | 2,946 | 100% |
| Illness | 462 | 432 | 459 | 47.6 % | 2,304 | 2,379 | 80.4 % |
| AIDS | 60 | 59 | 50 | 5.9 | 270 | 245 | 8.8 |
| Suicide | 289 | 315 | 314 | 32.3 | 169 | 168 | 5.8 |
| Homicide | 17 | 22 | 20 | 2.1 | 39 | 48 | 1.5 |
| Accident | 25 | 35 | 35 | 3.3 | 23 | 31 | 0.9 |
| Intoxication | 37 | 58 | 54 | 5.2 | 35 | 37 | 1.2 |
| Other/unknown | 22 | 32 | 46 | 3.6 | 38 | 38 | 1.3 |

**State prison, local jail suicide rates have fallen sharply since the 1980's**



Suicides per 100,000 inmates

- In 2002 the suicide rate in local jails (47 per 100,000 inmates) was over 3 times the rate in State prisons (14 per 100,000 inmates).

- The suicide rate in the Nation's 50 largest jail systems (29 per 100,000 inmates) was half that of other jails (57 per 100,000).

- Violent offenders in both local jails (92 per 100,000) and State prisons (19 per 100,000) had suicide rates over twice as high as those of nonviolent offenders (31 and 9 per 100,000 respectively).

**Homicide rates in State prisons dropped 93% from 1980 to 2002**



Homicides per 100,000 inmates

- Homicide rates were similar in local jails (3 per 100,000) and State prisons (4 per 100,000).

- 67% of homicide victims in State prisons had served at least 2 years; 37% had served 5 years.

- Violent offenders were the victims of most State prison homicides (61%), and their jail homicide rate (5 per 100,000) was over twice that of nonviolent offenders (2 per 100,000).

### The Death in Custody Reporting Act of 2000

The passage of the Death in Custody Reporting Act of 2000 (DICRA, PL 106-297) dramatically altered programs collecting data on inmate deaths. Prior to the act, BJS conducted annual counts of State prisoner deaths. Counts of jail inmate deaths were collected in the Census of Jails, which is conducted every 5 or 6 years. For both populations, death counts were obtained by gender and by general cause categories, such as illness/natural causes, AIDS, suicide, and homicide. These aggregate counts of deaths did not allow for analysis of individual death cases.

DICRA was attached as a grant requirement of the Violent Offender Incarceration and Truth-in-Sentencing (VOI/TIS) incentive grant program. Beginning in 1996, these grants provided over $2.5 billion to all 50 States and U.S. Territories for expanding prison capacity to house violent offenders for longer periods. Each State receiving VOI/TIS funds was required under DICRA to report:

*"on a quarterly basis, information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility (including any juvenile facility) that, at a minimum, includes —*

*(A) the name, gender, race, ethnicity, and age of the deceased;*
*(B) the date, time, and location of death; and*
*(C) a brief description of the circumstances surrounding the death."*

BJS developed a new series of collections to meet the mandates of the act. Aggregate counts of deaths were replaced by detailed, individual inmate death records, collected every 3 months from over 3,000 jail jurisdictions, 50 State prison systems, juvenile correctional authorities in all 50 States, and roughly 18,000 State and local law enforcement agencies nationwide. These new data collections were phased in over 4 years, with local jails reporting in 2000, followed by State prisons in 2001 and State juvenile authorities in 2002. A network of statewide law enforcement reporters began submitting arrest-related death records to BJS in 2003.

With these new collections, BJS has enhanced both the frequency and scope of its data on inmate mortality. Among other improvements, BJS now collects information on specific medical causes of death, as determined by a coroner or medical examiner. BJS replaced a general category of "illness/natural causes," with specific categories of medical conditions related to mortality, such as cancer, heart disease, and hepatitis C. A detailed analysis of these fatal medical conditions will be the focus of the next report from this data collection series.

### Long term trends show steep declines in rates of State prisoner homicide and local jail inmate suicide

Over the past two decades, State prison and local jail inmate mortality rates have displayed some dynamic changes. Suicide was the leading cause of death among jail inmates in 1983 (129 per 100,000 inmates); by 1993 that rate had been cut by more than half (54 per 100,000 inmates), and illness/natural cause (67 per 100,000) had become the most common cause of jail deaths. By 2002 the jail suicide rate (47 per 100,000) had fallen to nearly a third of the 1983 rate. Rates of death from AIDS-related causes in jails also declined; the 2002 rate (8 per 100,000) was less than half of the 1988 rate (20 per 100,000). As a result of these reductions, the overall mortality rate in local jails dropped 37% between 1983 and 2002.

State prison suicide rates have historically been much lower than those of jails, but these also dropped sharply from 34 per 100,000 in 1980 to 14 per 100,000 inmates in 2002. Even more dramatic was the decline in homicide deaths, from 54 per 100,000 inmates in 1980 to 8 per 100,000 inmates in 1990, and to 4 per 100,000 inmates in 2002. With the introduction of new therapies during the 1990's, AIDS-related mortality rates in State prison fell rapidly from 100 per 100,000 inmates in 1995 to 15 per 100,000 inmates 5 years later. Overall State prisoner mortality rates have grown slightly (6%) since 1980, mostly due to illness/natural causes (up 40% since 1980).

| | Local jail inmate mortality rate, per 100,000 inmates | | | | |
|------|-----------|-------------------------|------|---------|----------|
| Year | All causes | Illness/ natural cause | AIDS | Suicide | Homicide |
| 2002 | 147 | 69 | 8 | 47 | 3 |
| 2001 | 151 | 68 | 9 | 50 | 3 |
| 2000 | 147 | 74 | 10 | 47 | 3 |
| 1999 | 154 | 64 | 13 | 54 | 5 |
| 1993 | 149 | 67 | 15 | 54 | 4 |
| 1988 | 199 | 82 | 20 | 85 | 3 |
| 1983 | 232 | 88 | -- | 129 | 5 |

Note: Mortality rates are based on average daily population for each year. Data on deaths for 1983-99 are from the Census of Jails; data from 2000-02 are from the Deaths in Custody data series.
-- Not available.

| | State prison inmate mortality rate, per 100,000 inmates | | | | |
|------|----------|-------------------------|------|---------|----------|
| Year | All causes* | Illness/ natural cause | AIDS | Suicide | Homicide |
| 2002 | 246 | 198 | 20 | 14 | 4 |
| 2001 | 242 | 194 | 23 | 14 | 3 |
| 2000 | 238 | 190 | 15 | 16 | 5 |
| 1995 | 308 | 165 | 100 | 16 | 9 |
| 1990 | 228 | 187 | -- | 16 | 8 |
| 1985 | 239 | 163 | -- | 26 | 24 |
| 1980 | 233 | 141 | -- | 34 | 54 |

Note: Mortality rates for 1980-2000 are based on death counts of sentenced prisoners and the December 31 jurisdiction population as collected in the National Prisoner Statistics (NPS) program. Rates for 2001-02 are based on counts from the Deaths in Custody Reporting Program and the NPS June 30 custody population count.
*Excludes executions.    -- Not available.

**Table 1. State prison jurisdictions: Number of prisoner deaths, suicides, and homicides, and mortality rates, per 100,000 prisoners in custody, 2001-02**

| Region and jurisdiction | Number of prisoner deaths, 2001-02 | | | Average annual mortality rate (2001-02) per 100,000 prisoners held at midyear | | |
|---|---|---|---|---|---|---|
|  | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **U.S. total*** | 5,815 | 337 | 87 | 244 | 14 | 4 |
| **Northeast** | 887 | 46 | 5 | 257 | 13 | 1 |
| Connecticut | 60 | 9 | 0 | 162 | 24 | 0 |
| Maine | 13 | 1 | 0 | 370 | 28 | 0 |
| Massachusetts | 49 | 3 | 0 | 239 | 15 | 0 |
| New Hampshire | 11 | 0 | 0 | 224 | 0 | 0 |
| New Jersey | 129 | 3 | 0 | 225 | 5 | 0 |
| New York | 360 | 21 | 3 | 264 | 15 | 2 |
| Pennsylvania | 248 | 6 | 2 | 327 | 8 | 3 |
| Rhode Island | 11 | 2 | 0 | 155 | 28 | 0 |
| Vermont | 6 | 1 | 0 | 217 | 36 | 0 |
| **Midwest** | 1,057 | 77 | 11 | 221 | 16 | 2 |
| Illinois | 158 | 20 | 2 | 178 | 22 | 2 |
| Indiana | 97 | 6 | 3 | 246 | 15 | 8 |
| Iowa | 20 | 3 | 0 | 123 | 18 | 0 |
| Kansas | 43 | 4 | 0 | 248 | 23 | 0 |
| Michigan | 227 | 11 | 1 | 231 | 11 | 1 |
| Minnesota | 28 | 2 | 0 | 215 | 15 | 0 |
| Missouri | 122 | 6 | 1 | 210 | 11 | 2 |
| Nebraska | 15 | 0 | 0 | 190 | 0 | 0 |
| North Dakota | 4 | 0 | 0 | 192 | 0 | 0 |
| Ohio | 229 | 8 | 2 | 254 | 9 | 2 |
| South Dakota | 15 | 4 | 2 | 262 | 71 | 34 |
| Wisconsin | 99 | 13 | 0 | 245 | 32 | 0 |
| **South** | 2,717 | 121 | 40 | 267 | 12 | 4 |
| Alabama | 172 | 2 | 1 | 342 | 4 | 2 |
| Arkansas | 73 | 8 | 2 | 322 | 36 | 9 |
| Delaware | 31 | 4 | 0 | 222 | 28 | 0 |
| Florida | 365 | 11 | 3 | 251 | 8 | 2 |
| Georgia | 199 | 10 | 4 | 217 | 11 | 4 |
| Kentucky | 77 | 1 | 1 | 325 | 4 | 4 |
| Louisiana | 150 | 2 | 0 | 381 | 5 | 0 |
| Maryland | 141 | 13 | 6 | 293 | 27 | 12 |
| Mississippi | 69 | 2 | 0 | 228 | 7 | 0 |
| North Carolina | 128 | 8 | 2 | 197 | 12 | 3 |
| Oklahoma | 115 | 2 | 4 | 260 | 5 | 9 |
| South Carolina | 116 | 2 | 3 | 267 | 5 | 7 |
| Tennessee | 112 | 2 | 3 | 317 | 6 | 8 |
| Texas | 804 | 49 | 10 | 273 | 17 | 3 |
| Virginia | 140 | 4 | 1 | 227 | 6 | 2 |
| West Virginia | 25 | 1 | 0 | 357 | 14 | 0 |
| **West** | 1,154 | 93 | 31 | 213 | 17 | 6 |
| Alaska | 22 | 3 | 0 | 263 | 36 | 0 |
| Arizona | 139 | 6 | 1 | 247 | 11 | 2 |
| California | 625 | 52 | 21 | 196 | 16 | 7 |
| Colorado | 94 | 5 | 2 | 268 | 14 | 6 |
| Hawaii | 20 | 2 | 0 | 195 | 19 | 0 |
| Idaho | 26 | 3 | 0 | 243 | 28 | 0 |
| Montana | 11 | 1 | 0 | 199 | 19 | 0 |
| Nevada | 52 | 3 | 2 | 260 | 15 | 10 |
| New Mexico | 26 | 4 | 2 | 221 | 34 | 17 |
| Oregon | 57 | 5 | 0 | 259 | 23 | 0 |
| Utah | 14 | 4 | 1 | 170 | 49 | 12 |
| Washington | 60 | 4 | 2 | 192 | 13 | 6 |
| Wyoming | 8 | 1 | 0 | 260 | 33 | 0 |

Note: All mortality rates are calculated based on custody populations for June 30.
*Excludes 9 total prisoner deaths reported by the District of Columbia in 2001. None of the 9 deaths was a suicide or homicide. The District of Columbia transferred all prisoner custody operations to the Federal Bureau of Prisons during 2001.

**Nationwide, 337 State prisoners committed suicide during 2001-02**

Suicide and homicide accounted for a combined 7% of all State prisoner deaths during 2001-02 (table 1). The average annual suicide rate of State prisoners (14 suicides per 100,000 prisoners) was a third of that of local jail inmates (48).

Prison suicide rates showed wide variation at the State level. New Hampshire, Nebraska, and North Dakota all reported no suicide deaths during the 2-year period. Another six States had suicide rates of 5 per 100,000 prisoners or lower. Thirteen States had suicide rates of at least 25 per 100,000 prisoners, led by South Dakota (71), Utah (49), Vermont, Alaska, and Arkansas (each with 36).

In most State prison systems, suicides were rare events. Only 9 States reported as many as 10 prisoner suicides during this period, with 42% of all suicides taking place in four States. California (52), Texas (49), New York (21), and Illinois (20) reported 142 of the Nation's 337 State prisoner suicides. About half of all States (24) recorded 3 or fewer suicides.

**87 State prisoners became victims of homicide over 2 years**

Most States did not have any prisoner homicides in the course of a year. During 2001, 31 States reported no prison homicides; 29 States did not report a homicide during 2002. Three States reported 43% of all homicides — California (21), Texas (10), and Maryland (6). No other State reported more than 5 homicides during 2001-02.

Homicide rates were low in most States, and 5 had a rate of at least 10 homicides per 100,000 prisoners, led by South Dakota (34) and New Mexico (17). However, even in these 5 States, a combined total of 13 homicides were reported over 2 years.

**Table 2. The 50 largest jail jurisdictions: Number of inmate deaths and suicides and mortality rates per 100,000 inmates, 2000-02**

| Jurisdiction | Number of inmate deaths, 2000-02 | | Average annual mortality rate, 2000-02 | | | |
| | | | Per 100,000 inmates — average daily population | | Per 100,000 inmates — at risk[a] | |
| | All causes | Suicide | All causes | Suicide | All causes | Suicide |
|---|---|---|---|---|---|---|
| Total | 1,037 | 180 | 167 | 29 | 11 | 2 |
| Los Angeles, CA | 105 | 12 | 180 | 21 | 19 | 2 |
| New York City, NY | 99 | 9 | 224 | 20 | 27 | 3 |
| Cook County, IL | 48 | 3 | 157 | 10 | 15 | 1 |
| Maricopa County, AZ | 31 | 10 | 141 | 45 | 8 | 3 |
| Philadelphia City, PA | 41 | 6 | 198 | 29 | 33 | 5 |
| Dade County, FL | 46 | 3 | 231 | 16 | 14 | 1 |
| Harris County, TX | 52 | 7 | 243 | 32 | 15 | 2 |
| Dallas County, TX | 29 | 7 | 145 | 34 | 9 | 2 |
| Orleans Parish, LA | 14 | 2 | 77 | 10 | 6 | 1 |
| Broward County, FL | 29 | 3 | 200 | 21 | 13 | 1 |
| San Bernardino County, CA | 14 | 5 | 92 | 33 | 5 | 2 |
| San Diego County, CA | 23 | 6 | 153 | 39 | 8 | 2 |
| Shelby County, TN | 22 | 0 | 140 | 0 | 11 | 0 |
| Orange County, CA | 6 | 1 | 42 | 7 | 3 | 1 |
| Santa Clara County, CA | 14 | 5 | 115 | 40 | 8 | 3 |
| Alameda County, CA | 29 | 4 | 242 | 34 | 17 | 2 |
| Orange County, FL | 15 | 1 | 124 | 8 | 8 | 1 |
| Bexar County, TX | 26 | 2 | 245 | 20 | 12 | 1 |
| Baltimore City, MD | 39 | 9 | 381 | 88 | 27 | 6 |
| Hillsborough County, FL | 16 | 4 | 156 | 39 | 8 | 2 |
| Sacramento County, CA | 20 | 8 | 206 | 81 | 11 | 4 |
| Riverside County, CA | 8 | 4 | 92 | 46 | 5 | 3 |
| Tarrant County, TX | 10 | 2 | 92 | 18 | 6 | 1 |
| Milwaukee County, WI | 7 | 0 | 70 | 0 | 3 | 0 |
| Jacksonville City, FL | 30 | 3 | 341 | 35 | 20 | 2 |
| Pinellas County, FL | 14 | 2 | 174 | 26 | 10 | 1 |
| Davidson County, TN | 24 | 2 | 291 | 25 | 21 | 2 |
| Clark County, NV | 21 | 8 | 279 | 107 | 8 | 3 |
| Fulton County, GA | 9 | 3 | 105 | 35 | 9 | 3 |
| King County, WA[b] | 3 | 0 | 55 | 0 | 3 | 0 |
| Wayne County, MI | 17 | 8 | 208 | 97 | 13 | 6 |
| DeKalb County, GA | 7 | 0 | 78 | 0 | 6 | 0 |
| Palm Beach County, FL | 13 | 0 | 176 | 0 | 7 | 0 |
| Kern County, CA | 8 | 4 | 103 | 51 | 7 | 3 |
| Travis County, TX[c] | 11 | 2 | 141 | 26 | 7 | 1 |
| Franklin County, OH | 10 | 4 | 142 | 55 | 7 | 3 |
| Allegheny County, PA | 16 | 6 | 208 | 80 | 17 | 6 |
| Marion County, IN | 16 | 2 | 218 | 27 | 14 | 2 |
| Essex County, NJ | 12 | 1 | 180 | 14 | 16 | 1 |
| Suffolk County, MA[d] | 2 | 0 | 29 | 0 | 4 | 0 |
| El Paso County, TX | 10 | 2 | 154 | 33 | 9 | 2 |
| Fresno County, CA | 14 | 3 | 205 | 44 | 11 | 2 |
| Oklahoma County, OK | 7 | 3 | 119 | 51 | 5 | 2 |
| Cobb County, GA | 5 | 3 | 77 | 47 | 4 | 3 |
| Cuyahoga County, OH | 7 | 1 | 116 | 17 | 7 | 1 |
| Hamilton County, OH | 11 | 5 | 182 | 83 | 8 | 4 |
| Hudson County, NJ | 11 | 1 | 200 | 17 | 23 | 2 |
| San Francisco City/Co., CA | 9 | 4 | 154 | 73 | 6 | 3 |
| York County, PA | 4 | 0 | 73 | 0 | 10 | 0 |
| Mecklenburg County, NC | 3 | 0 | 52 | 0 | 2 | 0 |

Note: A specified cause of death was not provided for 6 deaths reported in 2000 (5 from New York City and 1 from Marion County), 11 deaths in 2001 (2 each from Bexar County and Jacksonville City, 1 each from Orleans Parish, Broward, San Diego, Hillsborough, Tarrant, Clark, and Suffolk counties), and 10 deaths in 2002 (2 from Alameda County, and 1 each from Dade, Broward, Bexar, Hillsborough, Milwaukee, King, Franklin, and Hamilton counties).
[a]The at-risk jail population combines the January 1 count with the number of annual admissions.
[b]King County data include only the years 2001-02.
[c]Travis County data for 2002 exclude the Travis County Substance Abuse Treatment Facility.
[d]Suffolk County data for 2000 exclude the Suffolk County House of Corrections.

## Suicide rate in the Nation's 50 largest jail jurisdictions half that of all other jails

There are over 3,300 local jails operated by county and municipal jurisdictions nationwide. Jails typically hold unsentenced offenders, those sentenced to less than a year, and offenders sentenced to longer terms who are awaiting transfer to State prison. As a result, almost every State prisoner has been through a period of jail confinement.

Over a 3-year period (2000-02), the Nation's 50 largest jail jurisdictions reported a total of 1,037 deaths from all causes (table 2). This death count represented a higher overall mortality rate (167 per 100,000 inmates in the average daily population) than other jails (140 per 100,000).

Mortality rates varied widely among the top 50 jurisdictions. Twelve of these 50 jurisdictions had overall mortality rates of fewer than 100 deaths per 100,000 inmates, led by Suffolk County, Massachusetts (29), Orange County, California (42), and Mecklenburg County, North Carolina (52). Another 16 of the top 50 jurisdictions had rates of 200 or more deaths per 100,000 inmates, led by Baltimore City, Maryland (381), Jacksonville City, Florida (341), and Davidson County, Tennessee (291).

The 50 largest jail jurisdictions collectively had a comparatively low prevalence of suicide. Inmate suicides accounted for 17% of all deaths in these 50 largest jurisdictions but were the cause of 41% of the deaths in all other jails. The suicide rate of the 50 largest jurisdictions (29 per 100,000) was half that of all other jails (57).

Eight of the top 50 jurisdictions reported no suicides during 2000-02, and another 4 jurisdictions had a suicide rate of 10 per 100,000 or less. Ten of these jurisdictions also had suicide rates of at least 50 per 100,000 inmates, led by Clark County, Nevada (107), Wayne County, Michigan (97), and Baltimore City, Maryland (88).

## During 2002 the Nation's smallest jails had a suicide rate 5 times that of the largest jails

On an average day in 2002, over 40% of the nation's jails housed fewer than 50 inmates, while 2% of all jails held at least 1,500 inmates. Rates of inmate suicide were closely related to jail size, with the smallest facilities recording the highest suicide rates.

| Number of inmates in jail | Local jail mortality rate, per 100,000 inmates, 2002 | |
|---|---|---|
| | All causes | Suicide |
| Total | 147 | 47 |
| Fewer than 50 | 313 | 177 |
| 50-99 | 159 | 77 |
| 100-149 | 120 | 50 |
| 150-249 | 107 | 48 |
| 250-499 | 124 | 53 |
| 500-999 | 102 | 33 |
| 1,000-1,499 | 133 | 43 |
| 1,500-1,999 | 150 | 32 |
| 2,000 or more | 173 | 32 |

Note: Mortality rates are based on average daily population (ADP) during the calendar year; table excludes 47 jail facilities, which did not report valid ADP data.

The Nation's largest jail facilities recorded the lowest suicide rates (32 per 100,000 inmates). The suicide rate rose steadily as jail size decreased and was over 5 times higher (177 per 100,000) in jails holding fewer than 50 inmates. However, given their small populations, these jails accounted for 14% of all jail suicides.

## Jail suicide rates drop by over 90% when based on "at-risk" population

BJS has usually based jail mortality rates on the average daily population of inmates (an ADP of under 700,000). A more sensitive measure of jail mortality would reflect the far larger number of persons admitted into these facilities over the entire year (nearly 13 million). All of these persons admitted are at risk of dying while held in jail.

Past attempts to collect admission data for a whole year were unsuccessful, because many jail information systems do not keep cumulative counts of admissions. As part of the new Deaths in Custody records, BJS collected annual admission data, which can be used to calculate an at-risk measure of mortality for the Nation's largest jails.

While the 50 jurisdictions had an average daily population of 207,471 over the 3-year period, these same jails had an average of 2,827,133 admissions each year. As a result, the at-risk mortality rates of these jurisdictions are far lower. The ADP rate of overall mortality in the top 50 jurisdictions (167 per 100,000) was 15 times the at-risk rate (11). The ADP-based suicide rate for these 50 jurisdictions (29 per 100,000) was 14 times the at-risk suicide rate for these facilities (2 per 100,000).

## Males and white inmates had the highest rates of suicide in jails

Among local jail inmates, mortality rates varied across demographic subgroups (table 3). In terms of deaths from all causes, male inmates had a higher death rate (150 per 100,000 inmates) than females (130). Gender was a stronger factor in suicide rates: males (50 per 100,000) were 56% more likely to commit suicide than female jail inmates (32). The homicide rate of male jail inmates was low (3 per 100,000) and female inmates did not experience a single homicide during 2000-02.

The most common cause of death among jail inmates was illness (48% of all jail deaths during 2000-02). As a result, the overall mortality rates of jail inmates steadily rose with age. Among jail inmates age 18-24, the mortality rate was 60 per 100,000; this rate was 3 times higher for inmates age 35-44 (179), and over 11 times higher for inmates age 55 or older (694). The only exception to this pattern was the death rate of jail inmates under age 18 (138 per 100,000), who made up less than 2% of all jail deaths.

Jail suicide rates also increased with inmate age. Inmates age 18-24 were the least likely to commit suicide (38 suicides per 100,000 inmates); this rate increased 24% for inmates age 25-34 (47), and 39% for inmates age 35-44 (53). The oldest inmates, age 55 or older, had the highest rate of suicide (58 per 100,000) among adult inmates.

The youngest jail inmates were the exception to this pattern; jail inmates under 18 had the highest suicide rate in local jails (101 per 100,000). Given their relatively small numbers, inmates under the age of 18 committed 35 of the 918 jail suicides recorded nationwide over 3 years.

**Table 3. Local jail and State prison inmate mortality rates, per 100,000 inmates, by selected characteristics**

| Characteristic | Average annual mortality rate, per 100,000 inmates | | | | | |
|---|---|---|---|---|---|---|
| | Local jail inmates, 2000-02 | | | State prison inmates, 2001-02 | | |
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All inmates** | 148 | 48 | 3 | 244 | 14 | 4 |
| **Gender** | | | | | | |
| Male | 150 | 50 | 3 | 251 | 14 | 4 |
| Female | 130 | 32 | 0 | 140 | 10 | 0 |
| **Age** | | | | | | |
| Under 18 | 138 | 101 | 0 | 52 | 52 | 0 |
| 18-24 | 60 | 38 | 3 | 34 | 14 | 3 |
| 25-34 | 99 | 47 | 2 | 63 | 14 | 3 |
| 35-44 | 179 | 53 | 4 | 182 | 14 | 4 |
| 45-54 | 349 | 52 | 7 | 571 | 13 | 3 |
| 55 or older | 694 | 58 | 0 | 2,019 | 13 | 4 |
| **Race/Hispanic origin** | | | | | | |
| White, non-Hispanic | 219 | 96 | 3 | 327 | 22 | 5 |
| Black, non-Hispanic | 118 | 16 | 3 | 207 | 8 | 2 |
| Hispanic | 98 | 30 | 3 | 243 | 18 | 7 |

Note: Jail inmate mortality rates are per 100,000 inmates held, based on average daily population (ADP). Inmate populations of various demographic subgroups are estimates based on the Annual Survey of Jails and the 2002 Survey of Inmates in Local Jails. State prison rates are per 100,000 inmates held in custody on June 30. Prisoner demographic subgroups are estimates based on the June 30 National Prisoner Statistics custody counts and demographic data from the National Corrections Reporting Program.

Inmate age did not have any clear relationship to jail homicide rates, which were no higher than 7 per 100,000 inmates for all age groups. Both the youngest (under 18) and oldest (55 or older) inmates had no homicide deaths during 2000-02.

**White jail inmates 6 times more likely to commit suicide than black inmates and 3 times more likely than Hispanic inmates**

Mortality rates displayed substantial differences by race and ethnicity. Death rates from all causes for both black (118 per 100,000 inmates) and Hispanic (98) jail inmates were at least 20% below the overall jail inmate mortality rate (148). But the death rate of white jail inmates (219 per 100,000) was 86% higher than that of black inmates and over twice as high as the rate for Hispanic inmates.

Differences across racial/ethnic categories were more pronounced in jail inmate suicide rates. The suicide rate of white jail inmates (96 per 100,000 inmates) was more than triple that of Hispanic inmates (30) and was 6 times the suicide rate for black inmates (16). White inmates accounted for nearly three-quarters of all jail inmate suicides during 2000-02.

Unlike the overall mortality and suicide rates, homicide rates were not related to race/ethnicity. White, black and Hispanic jail inmates were all equally likely to be victims of a homicide (3 deaths per 100,000 inmates).

**State prisoners age 45 or older made up 17% of inmates but 66% of deaths**

Just as in local jails, male State prisoners had higher overall mortality rates than female prisoners. While this difference was modest in local jails (the male death rate was 15% higher), males (251 deaths per 100,000 prisoners) were 79% more likely than females (140) to die in State prison during 2001-02.

In contrast, male and female suicide rates in State prisons were similar (14 suicides per 100,000 males, compared to 10 per 100,000 females). In local jails men were over 50% more likely than women to commit suicide.

The increase in mortality rates seen in older jail inmates was also evident among older State prisoners. The overall death rate was lowest for State prisoners age 18-24 (34 per 100,000). The death rate was over 5 times higher for State prisoners age 35-44 (182) and nearly 17 times higher for prisoners age 45-54 (571). The death rate of the oldest prisoners, age 55 or older, was highest (2,019 – or 59 times higher than the rate for prisoners age 18-24).

Deaths attributed to "illness/natural cause" made up 80% of all State prison deaths reported during 2001-02. Two-thirds of all State prison deaths involved inmates age 45 or older, though such inmates represented 17% of all State prisoners held during 2001-02.

| Inmate age | Number of inmate deaths | |
| --- | --- | --- |
| | Local jails, 2000-02 | State prisons, 2001-02 |
| All inmates* | 2,834 | 5,818 |
| Under 18 | 48 | 3 |
| 18-24 | 323 | 149 |
| 25-34 | 609 | 507 |
| 35-44 | 896 | 1,323 |
| 45-54 | 667 | 1,809 |
| 55 or older | 291 | 2,027 |

*Excludes 9 jail inmates and 6 State prisoners whose ages were not reported.

Despite the close relationship between age and the overall mortality rates in State prison, inmate age was not related to suicide rates. State prisoner suicide rates ranged from 13 to 14 suicides per 100,000 prisoners for every age group over 18. The suicide rate of State prisoners under 18 was 4 times higher (52 per 100,000), but this age group accounted for less than 0.3% of State prisoners and had 3 suicides nationwide over 2 years. By comparison, 116 prisoners age 25-34 committed suicide during 2001-02.

Age also showed no relationship to State prison homicide rates, with all age groups over age 18 recording a homicide rate of either 3 or 4 per 100,000 inmates. No reported homicides involved State prisoners under age 18 during 2001-02.

**Black inmates had the lowest suicide and homicide rates in State prisons**

As in local jails, white inmates had the highest overall mortality rate (327 deaths per 100,000 prisoners). While the mortality rate of white jail inmates was 86% higher than that of blacks and 123% higher than that of Hispanics, the differences in State prison were smaller. White State prisoners were 35% more likely than Hispanic inmates (243 per 100,000) and 58% more likely than black prisoners (207) to die during 2001-02.

White inmates had the highest suicide rate of all State prisoners (22 suicides per 100,000 inmates). This rate was 22% higher than the Hispanic suicide rate (18 per 100,000). As in local jails, white inmates in local jails were 3 times more likely than Hispanics to commit suicide. Black inmates had the lowest suicide rate of all State prisoners (8 per 100,000). Blacks were about a third as likely as whites to commit suicide in State prison and less than half as likely as Hispanics.

Homicide rates were less than 10 per 100,000 State prisoners for all racial/ethnic groups during 2001-02. Hispanic inmates were the most likely to be killed in State prisons (7 homicides per 100,000 inmates), which was over 3 times the homicide rate of black inmates (2 per 100,000). The homicide rate for white inmates (5) almost matched the rate for all State prisoners (4).

## Violent offenders committed suicide at nearly triple the rate of nonviolent offenders in jails

The death rate of violent offenders in local jails (212 per 100,000) was 75% higher than that of nonviolent offenders (121), but this difference was larger in cases of suicide (table 4).

The suicide rate of violent jail inmates (92 per 100,000) was nearly triple that of nonviolent offenders (31). Kidnaping offenders had the highest suicide rate (275), followed by those inmates held for rape (252) or homicide (182).

| Current offense | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
|---|---|---|---|
| | All causes | Suicide | Homicide |
| Violent | 212 | 92 | 5 |
| Nonviolent* | 121 | 31 | 2 |

*Excludes offenders with "other/unspecified" current offenses.

Among all nonviolent offenders, only probation/parole violators had a suicide rate of at least 100 per 100,000 (118). Drug offenders were found to have the lowest rates of mortality, particularly suicide. Drug offenders were the only group that had fewer than 100 deaths

from all causes per 100,000 jail inmates (92). The suicide rate of drug offenders (18 per 100,000) was the lowest among offender groups. Violent offenders (92) were 5 times more likely to commit suicide than drug offenders, and public-order offenders were more than twice as likely to commit suicide (42).

## Local jails had an average of fewer than 20 inmate homicides each year

Over 3 years (2000-02), there were 59 jail inmate homicides reported nationwide, resulting in a rate of 3 jail inmate homicide deaths per 100,000 inmates. Violent offenders were the most likely to be killed in local jail (5 homicides per 100,000 inmates), followed by property and public-order offenders (3 for both). Drug offenders (1 per 100,000) had the lowest homicide victimization rate of all offenders.

Kidnaping offenders had the highest rate of jail inmate homicide (15 per 100,000 inmates — 5 times the rate for all inmates), followed by inmates held for rape (9) and violation of parole/probation (7). But even among these offenders with the highest homicide rates, a combined total of eight homicides took place nationwide over this 3-year period.

**Table 4. Average annual jail inmate mortality rates, by most serious current offense, 2000-02**

| Current offense | Number of local jail inmate deaths, 2000-02 | | | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
|---|---|---|---|---|---|---|
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All offenses** | 2,843 | 918 | 59 | 148 | 48 | 3 |
| **Violent offenses** | 1,026 | 447 | 24 | 212 | 92 | 5 |
| Homicide[a] | 162 | 87 | 3 | 338 | 182 | 6 |
| Kidnaping | 54 | 37 | 2 | 401 | 275 | 15 |
| Rape | 56 | 29 | 1 | 489 | 252 | 9 |
| Other sexual assault | 122 | 51 | 0 | 227 | 95 | 0 |
| Robbery | 130 | 48 | 3 | 121 | 44 | 3 |
| Assault | 377 | 144 | 14 | 168 | 64 | 6 |
| **Property offenses** | 530 | 164 | 16 | 113 | 35 | 3 |
| Burglary | 139 | 58 | 4 | 108 | 45 | 3 |
| Larceny/theft | 148 | 36 | 4 | 110 | 27 | 3 |
| Arson | 12 | 4 | 0 | 208 | 70 | 0 |
| Fraud | 91 | 28 | 3 | 97 | 30 | 3 |
| **Drug offenses** | 434 | 85 | 7 | 92 | 18 | 1 |
| Possession | 197 | 43 | 3 | 95 | 21 | 1 |
| Trafficking | 184 | 34 | 4 | 79 | 15 | 2 |
| **Public-order offenses** | 765 | 200 | 12 | 160 | 42 | 3 |
| Weapons | 35 | 13 | 1 | 91 | 34 | 3 |
| Obstruction of justice | 144 | 40 | 4 | 192 | 54 | 5 |
| Traffic | 86 | 23 | 1 | 121 | 32 | 1 |
| Driving while intoxicated[b] | 113 | 22 | 1 | 92 | 18 | 1 |
| Drunkenness/morals[c] | 92 | 23 | 1 | 282 | 71 | 3 |
| Violation of parole/ probation[d] | 249 | 66 | 4 | 448 | 118 | 7 |

Note: All mortality rates were calculated using average daily population counts from the Annual Survey of Jails and offense distribution estimates from the Survey of Inmates in Local Jails, 2002.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes drunkenness, vagrancy, disorderly conduct, unlawful assembly, morals, and commercialized vice.
[d]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

**Drug offenders had the lowest suicide and homicide rates of all State prisoners**

State prison mortality rates showed similar patterns by offense type (table 5). Violent offenders not only had the highest overall mortality rate (312 deaths per 100,000 prisoners), they were the only State prisoners with a death rate of at least 200 per 100,000 prisoners held. Property and public-order offenders each had a rate of 184 deaths per 100,000, followed by drug offenders (166).

Compared to violent offenders in local jails (92 suicides per 100,000 inmates), the suicide rate of violent offenders in State prison (19 per 100,000) was much lower. But among State prisoners, violent offenders were more than twice as likely to commit suicide as nonviolent offenders (9 per 100,000).

Kidnapers had the highest suicide rate (36 per 100,000 prisoners), followed by offenders held for homicide (29), sexual assault (23), and assault (20). Among nonviolent offenders, probation/parole violators had the highest suicide rates (18 per 100,000), followed by offenders held for arson (16), burglary (14), and obstruction of justice (14). Drug offenders recorded the lowest suicide rates of all State prisoners (6 per 100,000 inmates).

The rate of homicide in State prison was 4 per 100,000 prisoners, and varied little across offense types. Three types of offenders had as many as 10 homicides per 100,000 prisoners — arsonists (16), kidnapers (15), and probation/parole violators (12). Among these three categories with the highest homicide rates, the number of homicides was small, with a total of nine prisoners killed over 2 years.

State prisoners convicted of fraud and driving while intoxicated had the lowest rate of homicide, with zero homicides reported for 2001-02.

**Nearly half of jail suicides occurred in the first week of custody**

Jail inmate suicides were heavily concentrated in the first week spent in custody. Forty-eight percent of all jail suicides during 2000-02 took place during the inmate's first week following admission. In particular, almost a quarter of all jail suicides took place either on the date of admission to jail (14%) or the following day (9%).

| Time served after admission | Percent of jail inmate suicides, 2000-02 |
|---|---|
| Same day | 13.7% |
| Next day | 9.0 |
| 2-7 days | 24.9 |
| 8-14 days | 9.6 |
| 15-30 days | 7.7 |
| 31-60 days | 10.6 |
| 61-180 days | 14.0 |
| 181 days or more | 10.4 |

The frequency of jail suicides slowed after the initial week, with the second week of custody accounting for 10% of jail suicides. The next 2 weeks in custody (days 15 to 30) accounted for even fewer suicides (8%). Despite this early concentration of suicides, more suicides took place after the 60th day in jail (24%) than during the first 2 days (23%).

The median time served in jail prior to committing suicide was just over 1 week (9 days), but this period of time varied across demographic and criminal offense categories (table 6). Females spent less than half as much time as males in jail prior to committing suicide (median time served: 4 days for females and 10 days for males). The median length of time served by Hispanic inmates prior to suicide (23 days) was over twice as long as the time for white inmates (9 days) and nearly 4 times longer than that for black inmates (6 days).

**Table 5. Average annual State prison inmate mortality rates, by most serious current offense, 2001-02**

| Current offense | Number of State prison inmate deaths, 2001-02 | | | Average annual mortality rate, per 100,000 State prison inmates, 2001-02 | | |
|---|---|---|---|---|---|---|
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All offenses** | 5,824 | 337 | 87 | 244 | 14 | 4 |
| **Violent offenses** | 3,691 | 229 | 53 | 312 | 19 | 4 |
| Homicide[a] | 1,295 | 89 | 16 | 417 | 29 | 5 |
| Kidnaping | 151 | 5 | 5 | 454 | 36 | 15 |
| Rape | 344 | 14 | 1 | 299 | 12 | 1 |
| Other sexual assault | 803 | 36 | 8 | 523 | 23 | 5 |
| Robbery | 552 | 28 | 11 | 171 | 9 | 3 |
| Assault | 485 | 44 | 11 | 217 | 20 | 5 |
| **Property offenses** | 904 | 58 | 18 | 184 | 12 | 4 |
| Burglary | 447 | 36 | 9 | 177 | 14 | 4 |
| Larceny/theft | 199 | 10 | 4 | 209 | 10 | 4 |
| Arson | 35 | 2 | 2 | 277 | 16 | 16 |
| Fraud | 128 | 6 | 0 | 209 | 10 | 0 |
| **Drug offenses** | 853 | 33 | 11 | 166 | 6 | 2 |
| Possession | 278 | 10 | 5 | 224 | 8 | 4 |
| Trafficking | 485 | 21 | 6 | 188 | 8 | 2 |
| **Public-order offenses** | 319 | 13 | 4 | 184 | 7 | 2 |
| Weapons | 36 | 2 | 1 | 67 | 4 | 2 |
| Obstruction of justice | 53 | 2 | 1 | 381 | 14 | 7 |
| Driving while intoxicated[b] | 123 | 2 | 0 | 263 | 4 | 0 |
| Violation of parole/ probation[c] | 32 | 3 | 2 | 194 | 18 | 12 |

Note: All mortality rates were calculated using June 30 custody prisoner counts from the National Prisoner Statistics program and 2002 offense distribution estimates from the National Corrections Reporting Program.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

Of all offender groups, public-order offenders spent the shortest time in custody prior to committing suicide; half of their suicides took place in the first 3 days of custody. Property and drug offenders each had a median time served of about a week (7 and 8 days, respectively) prior to suicide. Violent offenders spent the longest time in custody prior to suicide; half of their suicides took place after spending 3 weeks in jail (20 days).

## 7% of State prison suicides took place during the first month

In State prison, suicides were less concentrated around admission. Sixty-five percent of jail suicides occurred in the first 30 days, but 7% of prison suicides took place during the first month. Most State prison suicides (65%) took place after the inmate's first year of confinement, and 33% took place after the inmate had served at least 5 years in prison.

| Time served since admission | Percent of State prisoner suicides, 2001-02 |
|---|---|
| Less than 1 month | 7.4% |
| 1-5 months | 14.9 |
| 6-11 months | 12.5 |
| 12-23 months | 11.0 |
| 24-59 months | 21.4 |
| 60-119 months | 18.5 |
| 120 months or more | 14.3 |

The median time served in State prison prior to a suicide (30 months) was over 100 times longer than in local jails (9 days). Male (30 months) and female (29 months) State prisoners spent almost identical amounts of time in prison before committing suicide. However, race was related to the length of time served prior to suicide. Half of all suicides by white inmates occurred in the first 21 months of custody, while the corresponding figures for black (40 months) and Hispanic inmates (49 months) were twice as long.

Violent State prisoners spent more time in custody prior to suicide than other offenders (median time served was 45 months). Drug offenders were the only other offender group who served a median of at least a year in State prison prior to their suicides (18 months), followed by property (10 months) and public-order offenders (9 months).

## At least 80% of suicides in prison and jail occurred in the inmate's cell; time of day not a factor

The vast majority of both local jail (80%) and State prison (87%) inmate suicides took place within the inmate's cell or room (table 7). Temporary

holding areas (lockups) were the next most common location of suicide events (10% in jails, 4% in prisons). Common areas such as cafeterias, libraries, and recreational areas were the scene of very few suicides (6% in jails, 3% in State prisons), as were areas outside of the correctional facility (2% of jail suicides, 3% percent of prison suicides).

Suicide events in both local jails and State prisons showed little relationship to the time of day. Aside from morning hours (20% of jail suicides), the frequency of suicides in other parts of the day varied from 24% (during after-noon hours) to 28% (evening and overnight hours). Similar data were reported for suicides in State prisons. Twenty percent of State prisoner suicides took place in the morning, with all other times of day varying from 25% (evening and overnight hours) to 30% (afternoon hours).

In both local jails (94%) and State prisons (89%), the majority of suicide events were followed up by the performance of an autopsy or post-mortem examination by a medical examiner or county coroner.

---

**Table 6. Time served since admission by jail inmates and State prisoners committing suicide, by selected characteristics**

| Characteristic | Median time served since admission* | |
|---|---|---|
| | Local jail inmate suicides, 2000-02 | State prisoner suicides, 2001-02 |
| All inmates | 9 days | 30 months |
| **Gender** | | |
| Male | 10 days | 30 months |
| Female | 4 | 29 |
| **Race/Hispanic origin** | | |
| White, non-Hispanic | 9 days | 21 months |
| Black, non-Hispanic | 6 | 40 |
| Hispanic | 23 | 49 |
| **Current offense** | | |
| Violent | 20 days | 45 months |
| Property | 7 | 10 |
| Drug | 8 | 18 |
| Public-order | 3 | 9 |

*The median time served is that length of time at which half of the inmates spent less time in custody, and the other half spent more.

---

**Table 7. Time of day and location of suicide events in local jails and State prisons**

| | Percent of inmate suicides | |
|---|---|---|
| | Local jail inmates, 2000-02 | State prisoners, 2001-02 |
| **Time of day** | | |
| Overnight (midnight-6 a.m.) | 28.0% | 24.7% |
| Morning (6 a.m.-noon) | 19.5 | 19.9 |
| Afternoon (noon-6 p.m.) | 24.1 | 30.4 |
| Evening (6 p.m.-midnight) | 28.4 | 25.0 |
| **Location of suicide event** | | |
| Inmate's cell/room | 80.8% | 86.6% |
| Temporary holding area | 9.6 | 4.0 |
| Common area[a] | 6.1 | 3.0 |
| Outside of the facility[b] | 2.3 | 3.0 |
| Elsewhere | 1.1 | 3.4 |
| Number of suicides[c] | 918 | 337 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or work release, under community supervision by the jail/prison, or in transit to/from the facility.
[c]Time of day was not reported for 12 jail and 41 prison suicides; location was not reported for 6 jail and 39 prison suicides.

## Most jail homicides occurred at least 2 weeks after admission

During 2000-02 the number of homicides in the more than 3,000 jail jurisdictions nationwide had an average of fewer than 20 each year. In State prisons, which held nearly 1.2 million inmates nationwide, there were fewer than 50 homicides each year during 2001-02.

These homicide counts resulted in a rate of less than 5 homicides per 100,000 inmates in both State prison (4 per 100,000) and local jail (3 per 100,000 inmates, based on ADP). In the 50 largest jails nationwide, the at-risk rate of homicide averaged 0.4 per 100,000 inmates held during the year.

| Time served after admission | Percent of jail inmate homicides, 2000-02 |
| --- | --- |
| Same day | 5.3% |
| Next day | 7.0 |
| 2-7 days | 17.5 |
| 8-14 days | 15.8 |
| 15-30 days | 10.5 |
| 31-60 days | 14.0 |
| 61-180 days | 14.0 |
| 181 days or more | 15.8 |

Unlike suicides, homicides in local jails were not concentrated in the first few days following admission. Twelve percent occurred in the first 2 days in custody, but 54% took place after the inmate had served at least 2 weeks in jail. The median length of time served prior to a homicide death (29 days) was triple that of suicide deaths in local jails (9 days).

## Two-thirds of homicide victims in State prison had served at least 2 years in prison; nearly 40% had served 5 years or more

The initial months following admission to prison accounted for a small percentage of State prisoner homicides (table 8). One percent of prison homicides took place during the victim's first month in prison, and less than a tenth of homicide victims had served fewer than 6 months (8%). A fifth of homicides involved State prisoners who had served less than a year.

Among the 5,824 total prisoner deaths reported nationwide during 2001-02, fewer than 20 were homicides of a first-year inmate. Sixty-seven percent of State prison homicide victims had spent at least 2 years in prison, while 37% had served at least 5 years.

The median time served in State prison by homicide victims was 44 months. Hispanic homicide victims (with a median time served of 22 months) were killed after serving less than half

| Table 8. Time served, time of day, and location of homicide events in State prisons, 2001-02 | Percent of State prison homicides, 2001-02 |
| --- | --- |
| **Time served after admission** | |
| Less than 1 month | 1.1% |
| 1-5 months | 6.9 |
| 6-11 months | 11.5 |
| 12-23 months | 13.8 |
| 24-59 months | 29.9 |
| 60-119 months | 24.1 |
| 120 months or more | 12.6 |
| **Time of day** | |
| Overnight (midnight-6 a.m.) | 11.4% |
| Morning (6 a.m.-noon) | 38.6 |
| Afternoon (noon-6 p.m.) | 28.6 |
| Evening (6 p.m.-midnight) | 21.4 |
| **Location of homicide event** | |
| Inmate's cell/room | 60.5% |
| Temporary holding area | 2.6 |
| Common area[a] | 28.9 |
| Outside of the facility[b] | 2.6 |
| Elsewhere | 5.3 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or at work release sites, under community supervision by the prison, or in transit.

as much time as white (46 months) or black (55 months) prisoners.

Public-order offenders were the most likely to be killed early in their prison terms, with a median time served of just under 2 years (23 months). The median term served by both drug (40 months) and property (45 months) offenders were about twice as high. Violent offenders had the longest amount of time served in prison prior to being killed, with a median term of almost 5 years (55 months).

| Characteristic | Median time served after admission: State prisoner homicides, 2001-02 |
| --- | --- |
| All inmates | 44 months |
| **Race/Hispanic origin** | |
| White, non-Hispanic | 46 months |
| Black, non-Hispanic | 55 |
| Hispanic | 22 |
| **Current offense** | |
| Violent | 55 months |
| Property | 45 |
| Drug | 40 |
| Public-order | 23 |

Prison suicides took place almost exclusively inside the deceased's cell or room (87%); no other location accounted for even 5% of suicide events. However, over a quarter of all prison homicides (29%) took place in common areas within prisons, such as cafeterias, libraries, workshops, and recreational yards. A small percentage of homicide events took place in either a temporary holding area or a location outside of the prison facility (3% for each). Prisoners' cells or rooms (61%) were the most likely scene of a homicide in State prison.

State prison homicides were over 3 times more likely to occur during the morning (39% of homicides) than between midnight and 6 a.m. (11%).

Nearly all State prison homicides (92%) resulted in an autopsy or post-mortem exam of the deceased. All but 8 of 87 prisoner homicides during the 2-year period were committed by other inmates (91%). Of those "other homicide" events, most involved escape attempts or cases in which assailant identity was not established.

## Homicide rate of U.S. residents, when standardized, 10 times the rate of jail inmates in 2002

According to rates compiled by the Centers for Disease Control and Prevention (CDC), the U.S. resident population experienced 6 homicides and 11 suicides per 100,000 residents (table 9). The homicide rates for both State prisoners (4) and jail inmates (3) were lower than that for the U.S. population. Suicide rates for both State prisoners (14) and jail inmates (47) were higher than the rate for the resident population. However, reliable comparisons of such rates require closer analysis.

The demographic compositions of inmate populations do not reflect those of the U.S. resident population. In 2002 the U.S. population was 51% female, 81% white, and 22% age 55 or older; by comparison, the State prison population was 6% female, 50% white, and 4% age 55 or older.

The suicide and homicide rates of these demographic subgroups vary substantially. For example, the homicide rate of black males age 18-24 in the resident population (108 per 100,000) was over 8 times that for white males of the same age (13). As a result, the differing rates of death seen in the general population and correctional facilities reflect differences in demographic makeup as much as differences in the relative safety of these environments.

To improve the comparison of mortality risks, the resident population rates can be standardized by age, race, and gender to match the proportions seen in prisons and jails. The resulting rates estimate what the resident population mortality rates would be if the U.S. resident population had the same demographic composition as prisons and jails.

Standardized to match the State prison population, the resident population had a homicide rate (35 per 100,000) nearly 9 times the rate of homicide in

State prisons (4). Standardizing to match local jail demographics yields a greater difference the resident rate (32 per 100,000) being nearly 11 times higher than the rate in jails (3).

State prisoners had a higher rate of suicide (14 per 100,000) than the overall resident population (11). Once standardized to match the State prisoner population, the U.S. resident rate of suicide (18) exceeded that of State prisoners in 2002.

The standardized resident suicide rate (17 per 100,000) was less than half of the jail suicide rate based on ADP (47). However, an at-risk rate of jail suicide would be a more appropriate comparison, but not all jails reported the needed admission data. Based on the at-risk measure of suicide for the top 50 jail jurisdictions, an at-risk jail suicide rate for all jails would likely be less than a tenth of the ADP measure. (See page 5.)

### Methodology

BJS phased in data collection activity under the Death in Custody Reporting Act of 2000 (PL 106-297), with the first collection of death records covering only local jail facilities. The 2000 jail collection covered the entire calendar year (the act became law in October of 2000), while subsequent collections were done on the quarterly basis required by the act.

BJS requires a quarterly report from all jails which had an inmate death during the period. All jails were instructed to

complete an annual summary of death reports and population counts (to allow for calculation of death rates).

Jail response rates for all 3 years were over 99%. In 2000, 3,063 jurisdictions responded, and 9 refused, for a response rate of 99.7%. Data for 2001 was submitted by 3,049 jurisdictions, with 2 refusals, for a response rate of 99.9%. In 2002, data were submitted by 3,030 jurisdictions and refused by 6, for a response rate of 99.8%.

Quarterly collection of State prison inmate death records began in 2001. These records were collected from State departments of corrections, rather than from each prison facility. For all years, BJS has had 100% participation from all 50 State prison systems. Data were also collected from the District of Columbia for 2001 in which it still operated a prison system, prior to transferring sentenced felons to the custody of the Federal Bureau of Prisons.

Copies of all questionnaires collected under the Deaths in Custody series can be found on the BJS website at <http://www.ojp.usdoj.gov/bjs/quest.htm>.

### Standardized U.S. resident death rates

Homicide and suicide rates for specific age, race, and gender groups within the U.S. population can be queried from the Centers for Disease Control and Prevention's online injury mortality reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>.

**Table 9. Mortality rates of U.S. resident population and State prison and local jail inmate populations, per 100,000 residents, 2002**

| Cause of death | Deaths per 100,000 residents, 2002 | | | | |
|---|---|---|---|---|---|
| | U.S. resident population rate | State prisons | | Local jails | |
| | | Standardized U.S. resident rate | State prisoner rate[a] | Standardized U.S. resident rate | Local jail inmate rate[b] |
| Suicide | 11 | 18 | 14 | 17 | 47 |
| Homicide | 6 | 35 | 4 | 32 | 3 |

Note: U.S. resident population mortality rates are taken from the Centers for Disease Control and Prevention's injury mortality reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>. BJS standardized those rates by age, race, and gender to match the characteristics of the State prison and local jail inmate populations.
[a]State prisoner rates of suicide and homicide are based on June 30 custody population.
[b]Local jail inmate rates of suicide and homicide are based on average daily population (ADP).

For example, the 2002 suicide rate for white females, age 35-44, was 7.8 per 100,000. These rates were then standardized to match the characteristics of State prison and local jail populations by weighting the rates by the proportion of all inmates represented by that subgroup. The sum of all of the weighted subgroup rates provides the standardized rate for the resident population.

Population proportions for these gender, race and age subgroups of inmates were derived from the National Corrections Reporting Program (for State prisoners) and the 2002 Survey of Inmates in Local Jails (for jail inmates).

*Population bases for mortality rates*

Annual mortality rates were based on different population counts:

1. For prisons the custody population on June 30 of each year

2. For local jails the average daily population in each calendar year.

Estimates of the population at risk for the largest jail jurisdictions combined the population on January 1 and admissions during the year.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Lawrence A. Greenfeld is director.

Christopher J. Mumola wrote this report, under the supervision of Allen J. Beck. Doris J. James, Lauren E. Glaze, and Rebecca L. Medway verified the report, and Tom Hester edited it.

Christopher J. Mumola, under the supervision of Allen J. Beck, designed the survey, developed the questionnaires, and monitored data collection and data processing.

Data collection and processing of State prison death records were carried out by Lara Reynolds. Data collection and processing of local jail death records were carried out by Pamela Butler, Margaret Ferguson, Patricia Torreyson, and Pearl Chase, under the supervision of Charlene Sebold, Governments Division, Census Bureau, U.S. Department of Commerce.

August 2005   NCJ 210036

**Office of Justice Programs**
Partnerships for Safer Communities

http://www.ojp.usdoj.gov

**Obtain the most recent counts of inmate deaths from *Key Facts at a Glance* on the BJS Internet site:**

http://www.ojp.usdoj.gov/bjs/glance/shipj.htm

Exhibit 2

## Jane E. Kahn

| | |
|---|---|
| **From:** | Jane E. Kahn |
| **Sent:** | Friday, August 12, 2005 10:52 AM |
| **To:** | 'Lisa Tillman'; 'michael.stone2@corr.ca.gov' |
| **Cc:** | 'jmichaelkeatingjr@yahoo.com'; 'matthew.lopes@hklaw.com'; 'Michael Bien'; Thomas Nolan; 'dspecter@prisonlaw.com'; 'kwattley@prisonlaw.com'; 'sfama@prisonlaw.com'; 'Jane Kahn'; Nathan Kleiner |
| **Subject:** | Re June 9, 2005 Court Order |

Dear Lisa,

I just wanted to confirm that I left you a voice message yesterday about Items 2 and 5 of the June 9th Court Order, which require that within 60 days defendants develop and implement a policy regarding CPR and develop a plan for initiation a process for tracking the suicide history of inmates in the MHSDS in the MHTS.

We have not yet received any materials from defendants regarding either of these items and hope to receive them per Court Order.

Thank you very much for your assistance.

Sincerely,

Jane Kahn
Rosen, Bien & Asaro, LLP
155 Montgomery Street, 8th Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104

mailto:jkahn@rbalaw.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at the above address.

Exhibit 3

## Jane E. Kahn

| | |
|---|---|
| **From:** | Lisa Tillman [lisa.tillman@doj.ca.gov] |
| **Sent:** | Monday, August 15, 2005 3:25 PM |
| **To:** | jmichaelkeatingjr@yahoo.com |
| **Cc:** | DocKC99@aol.com; DoctorKoson@aol.com; harconwil@aol.com; melissawarren@appliedforensics.org; hammujones@comcast.net; rpattersonmd@earthlink.net; gmorrison@healthcaremediations.com; matthew.lopes@hklaw.com; paul_nicoll@msn.com; Donald Specter; Keith Wattley; Steve Fama; Jane E. Kahn; Michael W. Bien; Thomas Nolan; Jeffrey.metzner@uchsc.edu |
| **Subject:** | CPR Policy |

**Attachments:**      cpr.pdf



cpr.pdf (137 KB)

August 8, 2005

Dear Mr. Keating:

In response to the court order of June 9, 2005, please find enclosed a copy of the defendants' cardiopulmonary resuscitation policy. The original was provided to you at the Program Guide meeting last week.

Thank you for your consideration of this matter.

Sincerely,

Lisa Tillman
Deputy Attorney General
Telephone: 916-327-7872
Facsimile: 916-324-5205


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date  :  August 9, 2005

To  :  J. Michael Keating, Jr.
Office of the Special Master
285 Terrace Avenue
Riverside, RI  02915

via:  Lisa Tillman
Deputy Attorney General
Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244

Subject :  **CARDIO PULMONARY RESUSCITATION POLICY**

Please find attached the California Department of Corrections and Rehabilitation Cardio Pulmonary Resuscitation Policy. This policy has been forwarded to our Labor Relations Unit for review and impact assessment. The policy is in the process of being scheduled for negotiations with the impacted bargaining unit and it is anticipated negotiations will begin within the next 30 days.

MIKE KNOWLES
Deputy Director (A)
Division of Adult Institutions

Attachment

cc:  Joe McGrath
John Dovey
Kathleen Keeshen

State of California                                        Department of Corrections and Rehabilitation

# Memorandum

Date    :    July 20, 2005

To    :    Associate Directors, Division of Adult Institutions
         Associate Directors, Division of Correctional Health Care Services
         Wardens
         Health Care Managers

Subject :    **POLICY REGARDING PEACE OFFICERS RESPONSIBILITY FOR USE OF
         CARDIO PULMONARY RESUSCITATION AND FIRST AID**

A review of several incidents related to our staff's use of Cardio Pulmonary
Resuscitation (CPR) has prompted the review of departmental policy on this topic.
Case law supports the expectation for all employees trained in CPR to perform it
whenever the inmate might benefit from such efforts and when reasonably safe to do
so. This would include having the appropriate protective equipment commensurate
with the situation. The California Department of Corrections and
Rehabilitation (CDCR) has moved forward in the adoption and application of this
departmental policy. This policy memorandum supersedes all other previous
directions specifically related to peace officers responsibilities in the performance of
CPR.

**Application of Policy**

The application of this policy change requires peace officers who are first
responders (including, but not limited to, Correctional Officer, Correctional Sergeant,
Correctional Counselor I) and are trained in CPR/First Aid,. to utilize these life saving
efforts whenever the inmate might benefit from such efforts and when it is
reasonably safe to the employee to do so. In cases where CPR and/or First Aid are
not initiated due to obvious signs of prolonged death e.g., rigormortis, decapitation,
and/or the situations which pose a threat to self or others; the staff member will be
required to articulate the decision made and actions taken or not taken.

An example of this would include the following:

> *A peace officer responding to an emergency, observes an unconscious inmate
> with multiple stab wounds. The officer initiates emergency response procedures
> e.g., sounding alarm, assessing and reacting to present danger and takes steps
> to ensure the area is both safe and clear of immediate threat. The use of
> CPR/First Aid shall be conducted when reasonably safe to do so. Officers will
> follow all blood borne pathogen guidelines and precautions. The Officer's report
> should describe the actions and steps taken to provide a safe and secure
> environment while ensuring the provision of life saving efforts.*

There are other examples where the immediate safety of the staff member or others
would supersede the initiation of CPR/First Aid. The underlying issue is whether
staff are trained to maximize and expedite response efforts to ensure CPR/First Aid
are provided whenever possible and when reasonably safe to do so. Correctional
peace officers initiation of CPR/First Aid does not relieve responding medical

Associate Directors, Division of Adult Institutions
Associate Directors, Division of Correctional Health Care Services
Wardens
Health Care Managers
Page 2

personnel of their responsibility to assume life saving efforts upon arrival. Responding medical personnel shall assume primary responsibility in the provision of medical attention and life saving efforts upon their arrival. The combined efforts of both custody and medical personnel are expected. Both custody and medical personnel are responsible to continue life saving efforts in unison as long as necessary.

### Training

The CDCR has already implemented a new training requirement to include mandatory annual CPR/First Aid training and recertification for Correctional Officers and Supervisors. The Office of Training and Professional Development implemented mandatory off post training for CPR/First Aid effective January 2005. The CDCR has enhanced existing CPR/First Aid training by standardizing CPR/First Aid curriculum and equipment. This standardization is scheduled to begin in July of 2005. Additional training will be provided to include an administrative overview. This overview will ensure an understanding of the legal obligations and liabilities as well as the technical application of this obligation.

If you have any questions or require clarification regarding the information provided, please contact Gary C. Swarthout, Project Coordinator, at (916) 322-9502.


JOHN DOVEY
Director
Division of Adult Institutions

cc:  Mike Knowles          Sandra Duveneck          Renee Kanan, M.D.
     David Lewis           Kathy Keeshen            Tim Virga
     Paul Bestolarides     Joe Armor                Dennis Beaty
     Gail Tanaka           Mike Beaber              David Hellerstein
     Caroline Short        Margaret Howerton        Carole Springer
     Ralyn Conner          Cassandra Mraz           Gary Swarthout

Exhibit 4

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                                ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF CORRECTIONS**
**P. O. Box 942883**
**Sacramento, CA  94283-0001**



May 11, 2005

J. Michael Keating, Jr.                    via:    Lisa Tillman
Office of the Special Master                       Deputy Attorney General
2351 Sussex Lane                                   Department of Justice
Fernandina Beach, FL  32034                        1300 I Street, Suite 125
                                                   P. O. Box 944255
                                                   Sacramento, CA  94244-2550

**RE:** RALPH COLEMAN, et al. v. ARNOLD SCHWARZENEGGER, et al. <u>USDC, Eastern
District of California, Case No. CIV S-90-520 LKK JFM P</u>

Dear Mr. Keating:

Please find the following enclosed documentation resulting from the all parties conference call
on April 22, 2005:

- *Case Summaries for Unidentified Needs Assessment Identified Inmate-Patients*
  Institution Specific Memorandum (Attachment A)

- *Inmate-Patients    Pending    Department    of    Mental    Health    Transfer*
  Memorandum (Attachment B)

- As of May 2, 2005, updated bed forecasting projections of Intermediate Care and
  California Medical Facility Acute Care, including and without the Unidentified Needs
  Assessment (UNA) inmate-patients (Attachment C)

- *Classification Data for Unidentified Needs Assessment* (Attachment D)

In addition, the following documents are being provided in advance of the all parties meeting
scheduled for May 16, 2005:

- *Staffing for HDSP (Psychiatry) and RJD (Psych Techs)* (Attachment E)

- *Cell Window Covering Survey*, May 9, 2005 (Attachment F)

- *Cardio Pulmonary Resuscitation Action Plan* Memorandum (Attachment G)

- *Summary of Referrals and Transfers to the Department of Mental Health (DMH)* with
  cover letter of May 6, 2005, from Lisa Tillman, Deputy Attorney General (Attachment
  H)

- *Defendants' Notice of Motion and Motion on Shortened Time for Order Appointing
  Special Master* regarding Jerry Valdivia, et al. (Attachment I)

J. Michael Keating, Jr.
Page 2

- *Mule Creek State Prison Level IV Enhanced Outpatient Program and Outpatient Housing Conversion* cover letter dated May 5, 2005, from John Dovey Chief Deputy Director (Attachment J)
- *Statewide Department of Corrections Mental Health Programs* update on construction, including Correctional Treatment Centers (Attachment K)
- *Suicide Prevention* Memorandum (Attachment L)

If you have any questions, please contact me at (916) 323-0229.

Sincerely,

RENEE KANAN, M.D., MPH
Deputy Director (A)
Health Care Services Division

Enclosures

cc: G. Kevin Carruth, Undersecretary, Youth and Adult Correctional Agency
    J. S. Woodford, Director, California Department of Corrections
    Ernest C. Van Zant, Chief Deputy Director, Support Services
    John Dovey, Chief Deputy Director, Field Operations
    David Lewis, Deputy Director (A), Financial Services Division
    Kathleen Keeshen, Deputy Director, Legal Affairs Division
    Suzan Hubbard, Deputy Director (A), Institutions Division
    George A. Sifuentes, Deputy Director, Facilities Management Division
    John Rodriguez, Deputy Director, Department of Mental Health
    Cindy Radavsky, Assistant Deputy Director, Department of Mental Health
    Nadim Khoury, M.D., Assistant Deputy Director (A), Clinical Policy and Programs
       Branch, Health Care Services Division (HCSD)
    Yulanda Mynhier, Assistant Deputy Director (A), Field Management Branch, HCSD

J. Michael Keating, Jr.
Page 3

bcc:  Tim Fishback, M.D., Chief Psychiatrist, Mental Health Programs, HCSD
      Calvin Smith, Regional Administrator – North (A)
      Chris Chrones, Regional Administrator – Central (A)
      Richard Alvarado, Regional Administrator – South (A)
      John Van de Erve, Staff Counsel, Legal Affairs Division
      Doug McKeever, Mental Health Project Director, HCSD
      Vicki O'Shaughnessy, Staff Services Manager I, Correspondence & Appeals Unit, HCSD
      Sharon Riegel, Health Program Specialist I, Mental Health Programs, HCSD
      Terri Hall, Staff Services Manager I, Clinical Program Support Unit, HCSD
      Robert Storms, Associate Governmental Program Analyst, Clinical Program Support
          Unit, HCSD
      Michael Barks, Associate Governmental Program Analyst, Clinical Program Support
          Unit, HCSD

State of California                                                                                    Attachment G
                                                                                          Department of Corrections

# Memorandum

Date    :    April 29, 2005

To      :    John Dovey
             Chief Deputy Director
             Field Operations

Subject :    **CARDIO PULMONARY RESUSCITATION ACTION PLAN**

I received your memorandum and attached a legal decision regarding the Department's legal obligations to provide Cardio Pulmonary Resuscitation (CPR). As directed, I have taken the lead in ensuring that this project is brought to fruition. On April 29, 2005, I held our first CPR committee to discuss the legal decision given and the noted CPR related issues identified in your memorandum dated April 26, 2005. All of the noted stakeholders were present which included representatives from Legal Affairs Division, Labor Relations, Office of Departmental Training, Academy, Health Care Services Division, Institutions Division, Business Services and Financial Services Division.

During the meeting we discussed the issues as outlined in your memorandum. The level of discussion in the meeting provided the necessary information to create a comprehensive action plan necessary to strategize a method of implementation. During the meeting, specific goals and timelines were discussed and have been incorporated into the attached CPR Action Plan.

I will keep you apprised of our progress and ensure that this assignment is given priority. If you have any questions regarding the status of this project, you may contact me or Gary Swarthout, Associate Warden, Institution's Divisions, at 322-9502.


SUZAN L. HUBBARD
Deputy Director (A)
Institutions Division


Attachments

cc: Gary Swarthout

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|---|---|---|---|---|---|
| **POLICY CLARIFICATION:** The Department of Corrections CPR policy requires clarification and supporting administrative direction. | Request Legal to review policy and issue pertaining to the legal requirements of CDC to provide CPR to incarcerated felons. | Legal has reviewed this information and supporting case law and has determined that employees trained in CPR are constitutionally required to perform CPR when responding to situations where an inmate might benefit from such aid and when the employee would not be placed in danger by doing so. Refer to memorandum dated March 30, 2005, entitled, *LIABILITY OF CALIFORNIA DEPARTMENT OF CORRECTIONS EMPLOYEES AND ADMINISTRATORS WHEN CORRECTIONAL EMPLOYEES FAIL TO ADMINISTER CPR WHEN AN INMATE REQUIRES IT.* | Kathleen Keeshen | 1-Feb-05 | 30-Mar-05 |
| **INITIAL RESEARCH & IMPACT ASSESSMENT:** The related issues and author an issue memorandum that will identify the potential impact and related stakeholders required to address them. | Assign personnel resource to research pertaining to the rendered legal Decision need to be researched and documented. | Initial research and memorandum completed. | Gary Swarthout | 20-Apr-05 | 26-Apr-05 |
| **PROJECT LEAD:** There is currently no assigned person to take lead in Ensuring this policy change comes to fruition. | Assign responsibility for the formulation of a CPR committee. | A CPR memorandum signed by John Dovey was distributed on April 26, 2005. The memorandum identified the noted stakeholders and potential issues that will need to be addressed. S. Hubbard was given lead in the formulation of a CPR committee and tasked with bringing the administrative direction to fruition. | J Dovey | 1-May-05 | 26-Apr-05 |

1

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|---|---|---|---|---|---|
| **CPR COMMITTEE:** The issues identified in the research document/memorandum will require subject matter experts and stakeholders input in order to determine the best course of action for implementation. The legal decisions may require interpretation and a collaborative effort to implement. | Establish CPR committee and schedule strategic planning meeting to committee that consist of develop action plan for implementation representatives from stakeholders of new CPR policy. | S. Hubbard has formed the CPR committee that consist of representatives from stakeholders identified in the research document. These include, Office Of Departmental Training, Human Resources, Legal, Labor, Policy and Regulations, Academy, Budgets and Fiscal. The First meeting is scheduled for April 29, 2005. | S. Hubbard | 2-May-05 | 29-Apr-05 |
| **ACTION PLAN:** During the April 29, 2005 CPR meeting there were a variety of issues that were discussed. The resolution of these issues will Have a direct impact on our ability to Implement the new CPR policy. | Develop an action plan that will identify the specific topics of concern, the intended action to correct them, any pertinent comments related to their progress and or barriers, person responsible, target date for completion and actual completion date. | The formulation of an CPR action plan has already been initiated. The document will be used to routinely track and provide updates on the projects progress. The action plan will require ongoing updates. | Gary Swarthout | 6-May-05 | |

2

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|-------|-------------|----------|--------------------|-----------|-----------------|
| **IMPACTED CLASSIFICATIONS:** The committee met on 4-29-05 and discussed the legal decision for CPR and garnered clarification regarding the impacted classifications. This clarification will require Directorate approval. | Determine impacted classifications for CPR legal decision. | The committee met on 4-29-05 to discuss the legal decision for CPR and the determine the impacted classifications. During the meeting the initial determination made was Correctional Officers, Sergeant, Lieutenants, Captains, Correctional Counselors I, II, and III, Fire Fighters Parole Agents who work within an institution would be recommended to the Directorate for inclusion in CPR requirement. There was also a second recommendation to include other staff with a Safety designation, to include, Cooks, Educators and Plant Operations Personnel. These recommendations will be forwarded to the Director with the associated impacts and benefits of such decision. | Committee | 6-May-05 | |
| **MEDICAL REQUIREMENTS:** CPR requirements for medical personnel may be different than those for other personnel. | Determine difference in level of training and whether medical personnel would benefit from proposed standardized training. Assess current status of CPR certified medical personnel. | A review of Duty Statements, Labor Contracts, Continuing education requirements etc will provide this information. | Kathy Keeshen, Dr. Dave Hellerstein Raylin Conner | 13-May-05 | |

3

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|---|---|---|---|---|---|
| **FISCAL IMPACT:** Legal recommends CPR Training for all employees. If the department elects to requiring the provision of CPR for all employees a fiscal analysis will be required regarding the adopt this recommendation a fiscal associated cost both in training, recertification and equipment. This research will need to be done regardless of the decision of whom will receive training. | Conduct an analysis of training cost associated with new policy change trained employee or employees designated to be trained in CPR. | This analysis will require the ODT, Academy and Budgets to work collaboratively. | P. Bestolarides, Caroline Short, Nancy Baldwin, Gary Laws | 13-May-05 | |
| **EQUIPMENT:** Equipment Needs have not been assessed and reconciled with new policy requirements, training curriculum and fiscal impact. | The type of equipment needed for delivery of CPR will need to be researched. This research will need to include the existing equipment provided, as well as potential new equipment that would allow staff to render immediate aid. | Some research has already been done in this area. Samples of available equipment have been procured. Contact G. Swarthout . The expectation is that the a documented assessment will done that will provide recommendations and alternative for CPR related equipment. The assessment should include an analysis of the associated fiscal impact, product viability for use and application in a correctional setting, safety, product specifications, shelf life etc. | Caroline Short, P. Bestolarides, Nancy Baldwin, Gary Laws | 13-May-05 | |

4

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|---|---|---|---|---|---|
| **PROCUREMENT:** The recommended and approved equipment will need to purchased in bulk in order to ensure a fiscally prudent process and standardization occurs. | Utilize research and set up contract for purchase of agreed upon equipment. | Procurement of equipment should be done after policy, curriculum, and labor related issues are resolved. | Caroline Short, Nancy Baldwin, Gary Laws, Steve Stone | TBD | |
| **POLICY:** Existing policy memorandums do not clearly define administrative expectations. The new policy will require an updated policy memorandum and training for all personnel on the administrative expectations. | Author, distribute and train staff on new policy. | This distribution of said policy should be coordinated with the supporting equipment and training. | Gary Swarthout | 6-May-05 | |
| **LEGAL REVIEW OF POLICY:** The departmental policy will require a final review by Legal to ensure the language complies with intent the decision rendered. | Upon completion of Policy route to Legal for review and approval. | | Chuck Sickels, Gary Swarthout | 13-May-05 | |
| **LABOR RELATIONS:** The new policy will have an impact on bargaining Units and will require Union Negotiations. | Notice affected bargaining units and set up negotiations. | Negotiations cannot be set up until policy is completed and relative decisions regarding supporting infrastructures, fiscal, equipment, curriculum etc., are made. | Tim Virga Labor Relations Carole Springer | TBD | |

4/29/2005

# Cardio Pulmonary Resuscitation Action Plan

| Issue | Action Item | Comments | Person Responsible | Target Date | Completion Date |
|-------|-------------|----------|-------------------|-------------|-----------------|
| **CURRICULUM:** The existing curriculum for CPR is both contracted and trained by CPR T4T instructors. The differences in curriculum, training, equipment and equipment may vary. | Review Curriculums and training methods, determine course of action for achieving standardized training and from a standardization and application impact, ensuring that the assessment reconciles with accepted standards for CPR, approved equipment and Academy Training. | The decision to utilize a standardized method of training will be most viable with associated cost and projected vantage. | Caroline Short, P. Bestolarides, Nancy Baldwin, Gary Laws | 27-May-05 | |

6

## CPR COMMITTEE MEMBERS
### 4/29/05

| | | |
|---|---|---|
| Suzan Hubbard | Institutions Division | 445-5691 |
| Gail Tanaka | Business Management | 324-0008 |
| Joe Armor | Business Management | 324-4575 |
| Sandra Duvenek | YACA | 324-8875 |
| Mike Beaber | CTC | (209) 744-5018 |
| Paul Bestolarides | CTC | (209) 744-5020 |
| Kathy Keeshen | LAD | 327-6328 |
| Dennis Beaty | LAD | 445-6896 |
| David Hellerstein | HCSD | 323-4614 |
| Caroline Short | ODT | 445-9061 |
| Margaret Howerton | ODT | 445-8031 |
| Carole Springer | OLR | 327-4143 |
| Gary Swarthout | Institutions Division | 322-9502 |

Exhibit 5

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP

ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

May 23, 2005

**BY FACSIMILE AND REGULAR MAIL**

J. Michael Keating, Jr.
Office of the Special Master
285 Terrace Avenue
Riverside, RI 02195

     Re:    Coleman v. Schwarzenegger
           Plaintiffs' Additional Objections to the Revised Program Guides
           <u>Our File No. 489-3</u>

Dear Mr. Keating:

     This letter sets forth Plaintiffs' additional objections to Section 10 of the Revised Program Guides.

**<u>Chapter 10:  Suicide Prevention and Response</u>**

**<u>Page 12-10-15 & 16</u>**

     Inmates on suicide precaution are placed in an MHCB because of high risk of attempting self-injurious behavior.  The behavioral checks provided for these inmates are inadequate because they do not include custody checks.  (Chart on page 12-10-15)  Hourly nursing checks alone do not provide adequate observation for these inmates who have high risk suicidal behavior.

     National Correctional standards require that inmates placed on suicide precaution be closely observed with staggered custody watch at least every fifteen minutes.

**<u>Page 12-10-21 & 22</u>**

     Plaintiffs object to the following section, starting with the last paragraph of page 12-10-21 which begins "**Once the inmate is cut down**" and concluding with the sentence : "**Non-clinical staff shall be trained…**" on 12-10-22.  Non-clinical staff should not be making decisions about whether to initiate CPR (cardio-pulmonary resuscitation) based upon a list of signs of death which they are not trained to assess.  The assumption should be that non-clinical staff will initiate CPR and continue to administer CPR until medical staff arrive at the housing unit.

J. Michael Keating, Jr.
May 23, 2005
Page 2

Plaintiffs object to the inclusion of the sentence:  "**If possible, the inmate shall also be transported to a triage and treatment area.**"  Inmates who have attempted suicide by hanging may have neck and spinal cord injuries.  Moving these inmates before they can be assessed by a medical person can often result in more serious medical injuries.  This section should be revised and include a medical evaluation before the inmate is moved.

Please feel free to contact us if you have any questions about these comments.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:pj

cc:      Matthew A. Lopes, Jr.
         Lisa A. Tillman
         John van de Erve
         Coleman Co-counsel

## MULTI-FAX TRANSMISSION

# ROSEN, BIEN
# & ASARO, LLP



FAXED
(KD 5|23)

---

**Attorneys at Law**
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax:   (415) 433-7104

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

---

_____3_____ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 5/23/05

TO: J. Michael Keating, Jr.

Recipient's Fax No: 401/383-9314   Phone No: _____

TO: Matthew A. Lopes, Jr.

Recipient's Fax No: 401/553-6850   Phone No: _____

TO: Lisa A. Tillman

Recipient's Fax No: 916/324-5205   Phone No: _____

TO: Don Specter

Recipient's Fax No: 457-9151   Phone No: _____

FROM: Jane Kahn   Our File No: 489-3

Message: _____

_____

# ROSEN, BIEN
# & ASARO, LLP



### FAX TRANSMISSION

Attorneys at Law

155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax: (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us. It is hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

_____4_____ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

TO: _John Van de Erve_

FROM: _Jane Kahn_          Our File No.: _489-3_

Recipient's Fax No. _916 327-5306_    Phone No: _____

DATE: _5/23/05_                        (to confirm)

## IF YOU EXPERIENCE ANY PROBLEMS WITH THE QUALITY
## OF OUR TRANSMITTAL, PLEASE CALL (415) 433-6830

Message:

_____

_____

_____

_____

_____

```
***************************
***     TX REPORT     ***
***************************

TRANSMISSION OK

TX/RX NO                4715
CONNECTION TEL                4579151p4893
SUBADDRESS
CONNECTION ID
ST. TIME                05/23 16:26
USAGE T                 01'17
PGS. SENT               4
RESULT                  OK
```

## *MULTI-FAX TRANSMISSION*

# ROSEN, BIEN

# & ASARO, LLP

**Attorneys at Law**
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone:  (415) 433-6830
Fax:    (415) 433-7104

CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

___3___  PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 5/23/05

TO: J. Michael Keating, Jr.

Recipient's Fax No: 401/383-9314   Phone No: _____

TO: Matthew A. Lopes, Jr.

Recipient's Fax No: 401/553-6850   Phone No: _____

TO: Lisa A. Tillman

Exhibit 6

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION          ARNOLD SCHWARZENEGGER, GOVERNOR

*DIVISION OF CORRECTIONAL HEALTH CARE SERVICES*
P. O. Box 942883
Sacramento, CA  94283-0001



August 25, 2005

J. Michael Keating, Jr.                       via:    Lisa Tillman
Office of the Special Master                  Deputy Attorney General
285 Terrace Avenue                            Department of Justice
Riverside, RI  02915                          1300 I Street, Suite 125
                                              P.O. Box 944255
                                              Sacramento, CA  94244-2550

## RE:  TRACKING  SUICIDE  INFORMATION  IN  THE  MENTAL  HEALTH TRACKING SYSTEM

Dear Mr. Keating:

Pursuant to court order, please find enclosed our initial efforts to begin tracking suicide information within our Mental Health Tracking System (MHTS).  This first phase has already begun.  It was initiated via the enclosed memorandum to the field.

Specifically, per the memorandum, the institutions have begun to enter the suicide alert information noted by the clinician at each psychiatric or case management visit.  It will take approximately 90 days before all mainline patients have been seen.  Once the data has been entered, the "back end" of the MHTS is forwarded to Division of Correctional Health Care Services (DCHCS) on the 10th of the following month (expected date November10, 2005).  At that time phase two will begin.

Phase two will take place as follows:

1   Validation of the data entered, and any final system modifications to improve data entry and management will be recommended.
2.  The institutions and DCHCS will begin to run reports by November 15, 2005, and any systems errors will be reviewed and problems rectified.
3.  A plan is in development to determine the most effective way of transferring and highlighting this data when the patient moves to a new institution.
4.  Assurance that tracking systems in development will include this data at minimum will be addressed through the work group that was established over a year ago to work on the Correctional Clinical Case Management System.

J. Michael Keating, Jr.
Page 2


If you have any questions, please contact me at (916) 323-6811.

Sincerely,

RENEE KANAN, M.D., MPH
Director (A)
Division of Correctional Health Care Services


Enclosure

cc    J. S. Woodford
      John Dovey
      Kathleen Keeshen

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date     August 8, 2005

To       Health Care Managers
         Chief Psychiatrists
         Chief Psychologists
         Chiefs, Mental Health Program

Subject:  **TRACKING SUICIDE INFORMATION IN THE MENTAL HEALTH TRACKING
          SYSTEM**

In order to ensure quality and continuity of care for high-risk mental health inmate-patients, all
institutions are required by the California Department of Corrections and Rehabilitation to track
the suicidal history of inmate-patients.

Therefore to accomplish this mandate, institutions must utilize the Mental Health Tracking
System (MHTS) by entering data from each individual clinical contact relating to suicide
ideation, behaviors and/or attempts.

Please see the attached data entry screens from the MHTS (Attachment I-III). Ensure that your
institution is in full compliance with entering all the requisite data on these screens no later than
September 1, 2005. Those items requiring historical review must be completed by
September 30, 2005, for all Enhanced Outpatient Program patients and by November 30, 2005,
for all Correctional Clinical Case Management System inmate-patients.

If you have any questions regarding the direction of this memorandum, you may contact
Margaret McAloon, Ph.D., Chief Psychologist, Mental Health Program, Division of Correctional
Health Care Services, at (916) 324-6102.

RENEE KANAN, M.D., M.P.H.
Director (A)
Division of Correctional Health Care Services

Attachments

cc:     Nadim Khoury, M.D.        Chris Chrones          Shama Chaiken, Ph.D.
        Yulanda Mynhier           Calvin Smith
        Robert Meyers, M.D.       Timothy Fishback, M.D.  Michael Stone
        Dwight Winslow, M.D.      Margaret McAloon, Ph.D. Lisa Tillman
        Steven Ritter, D.O.

CDCR  1617 (3/89)

Attachment I

Listings of ALERTS that could be printed from MHTS



Attachment II

Alerts Date Entry Screen

Attachment III

Suicide Information    Data Entry Screen

