PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br>**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' NOTICE OF DEFENDANTS' FAILURE TO COMPLY WITH THE JUNE 9, 2005 ORDER AND REQUEST FOR RELIEF**<br><br>**HEARING**<br>DATE:　October 27, 2005<br>TIME:　10:00 a.m.<br>COURT:　Hon. Lawrence K. Karlton |

H:\489\3\PLEADING\Pltf's Reply to Defs' Resp to Notice of Failure, 9-29-05, 489-3.DOC

Plaintiffs' Reply In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM

# INTRODUCTION

On June 9, 2005, the Court ordered that "within sixty days from the date of this order defendants shall develop and implement a policy that establishes *clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrive* to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement." June 9, 2005 Order ¶2, [*emphasis added*].

Defendants have failed to comply with the June 9, 2005 Order. <u>First</u>, defendants have developed a CPR policy that is neither a clear nor *unequivocal* directive required by the June 9, 2005 Order. <u>See</u> Exhibit 3 to Defendants' Response to Plaintiffs' Notice of Defendants' Failure to Comply with the June 9, 2005 Order ("Defendants' Response"). <u>Second</u>, as acknowledged in Defendants' Response, defendants failed to distribute their CPR Policy to the Wardens of the CDCR institutions for implementation within the Court-ordered timeframe. Defendants' Response at 4. <u>Third</u>, although defendants were aware that additional emergency equipment and training was necessary for implementation of their CPR Policy, defendants did not expedite the purchase or delivery of the equipment or the training until after August 26, 2005, when plaintiffs filed their Notice of Defendants' Failure to Comply with the June 9, 2005 Order ("Plaintiffs' Notice"). Defendants' Response at 5.

The June 9, 2005 Order directed defendants to develop a policy that "clearly and unequivocally" established custody officers' responsibility to provide immediate life support to inmates, if trained to do so. June 9, 2005 Order ¶2. Defendants' September 12, 2005 CPR Policy, in contrast, provides that custody staff should provide CPR "whenever the inmate might benefit from such efforts and when it is reasonably safe to the employee to do so." <u>See</u> Exhibit 3, to Defendants' Response. This vague and open-ended language provides non-medical personnel with excuses for not providing CPR: (1) that the inmate might not benefit from the CPR, and (2) the assertion that it was unsafe to provide CPR. In short, the policy gives officers virtually unlimited discretion to <u>not</u> initiate CPR. This will likely result in a continuation of the current practice of correctional officers delaying and/or refusing to initiate

CPR prior to the arrival of medical personnel. The June 9, 2005 Order was designed to correct this dangerous practice. Defendants' CPR policy will allow the practice to continue.

The Special Master and his experts have identified the failure to provide immediate life support, such as CPR, by custody staff first responders as a contributing factor to inmate deaths in several annual suicide reports. See Report on Suicides Completed in the CDC in Calendar Year 2001, attached as Exhibit V to the Eleventh Monitoring Report of the Special Master on Compliance with Provisionally Approved Plans, Policies and Protocols, filed June 11, 2003 at 7; Report on Suicides Completed in the CDC in Calendar Year 2002, attached as Exhibit U to the Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed December 10, 2003 at 7. In the Special Master's Report on Suicides Completed in the CDC in the Calendar Year 2003, filed April 28, 2005, ("Suicide Report for 2003"), which contains the CPR recommendation which is the foundation for the June 9, 2005 Order, at least one-third of the suicides reviews clearly indicated that the responding custody officer did not initiate CPR. Reply Declaration of Jane Kahn in Support of Plaintiffs' Notice of Defendants' Failure to Comply with the June 9, 2005 Order ("Kahn Reply Dec.") ¶2. There have been 21 suicides within CDCR since June 9, 2005. Kahn Reply Dec. ¶4. In at least six (29%) of these suicides, custody officers who were first responders to the scene of the suicide did not provide CPR. Kahn Reply Dec. ¶5

The Court should require that defendants immediately revise and implement their CPR policy with the clear and unequivocal directive that custody staff, who are trained to do so, must provide immediate life support until medical personnel arrive.

## ARGUMENT

### I. DEFENDANTS HAVE FAILED TO ESTABLISH COMPLIANCE WITH PARAGRAPH 2 OF THE JUNE 9, 2005 COURT ORDER,

#### A. Defendants CPR Policy Does Not Comply With The Requirements Of The Order.

The June 9, 2005 Order clearly directs CDCR to develop and implement a policy that will address the documented, on-going emergency response failures by custody staff in many

2

Plaintiffs' Reply In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM No.: Civ S 90-0520 LKK-JFM

of the suicides reviewed by the Special Master in the past five years. The Court requires that defendants' Policy must be "clear and unequivocal" in requiring custody staff to provide immediate life support until medical staff arrive. The Court dismissed the excuse of limited duty statement obligations of the custody officers and imposed this emergency response obligation on each custody officer trained in immediate life support measures.

Defendants' September 12, 2005 CPR Memorandum to the field, which was distributed 35 days *after* the court-ordered implementation deadline, provides little, if any new direction or guidance to custody officers responding to an emergency. It permits custody staff to make a *medical* determination whether an inmate might "benefit" from CPR and only requires officers to provide CPR "whenever possible and when reasonably safe to do so." See Exhibit 3, to Defendants' Response. Such vague and open-ended language provides non-medical personnel with virtually unlimited discretion to <u>not</u> initiate CPR. Furthermore, it fails to provide clear guidance on emergency response procedures for custody staff: there are no timelines for entering cells in an emergency from initial discovery of an inmate during a suicide attempt, no direction to the first responder to alert other staff to call medical personnel, no direction to retrieve the "cut down" kit, and, most importantly, no direction that custody staff should never presume that a victim is dead but should rather initiate and continue appropriate life-saving measures until relieved by medical personnel.

Lindsay M. Hayes is a nationally recognized expert on suicide prevention in correctional settings. He has reviewed defendants' CPR Policy and finds it severely lacking and dangerous:

> In my opinion, the CDCR CPR Policy is a dangerous policy because it does <u>not</u> require custody officers to initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. The decision not to provide life-saving measures without medical training should <u>never</u> occur because of the potential dire results, as evidenced by the Special Master's reviews of the CDCR suicides. CPR/First Aid training is designed for non-medical persons and specifically directs individuals responding to an individual in distress to first survey the scene, call for back-up personnel (including medical staff and emergency medical personnel), and then initiate and continue first aid and/or CPR until relieved by arriving medical personnel. CPR/First Aid increases the odds of survival by providing immediate emergency care until trained medical personnel can arrive on the scene of an emergency. Following a suicide, the degree and promptness of

the staff's intervention often makes the difference whether the victim will survive.

Lindsay Hayes Declaration in Support of Plaintiffs' Reply in Support of Plaintiffs' Notice of Defendants' Failure to Comply with the June 9, 2005 Order ("Hayes Dec.") ¶9.

Mr. Hayes noted that defendants' flawed September 12, 2005 CPR Policy Memorandum emphasized that a custody officer need not institute CPR if the inmate "would not benefit". Defendants used as an example, that CPR need not be initiated if the custody officer observed "obvious signs of death e.g., rigormortis". This example according to Mr. Hayes is dangerous and unworkable:

> "Rigormortis is defined as a stiffening of the body from one to seven hours after death from hardening of the muscular tissues in consequence of the coagulation of the myosinogen and parmyosinogen. <u>PDR Medical Dictionary</u>, Medical Economics Co., Montvale, NJ, 1995. The determination of whether an inmate is clinically dead and has rigormortis is a medical determination and should never be made by a non-medical person."

Hayes Dec. ¶9.

Mr. Hayes recommends that defendants' flawed CPR policy be rescinded. Hayes Dec. ¶10. Mr. Hayes recommends that defendants revise their CPR policy to include the following language: "*All trained custody officers must immediately initiate and continue providing CPR/First Aid to inmates until relieved by medical personnel.*" Hayes Dec. ¶10. Defendants should develop procedures for implementing their policy on emergency intervention (including CPR initiation) following a suicide attempt so that it is straightforward and, at a minimum, include the following requirements:

    1.    All staff who have regular contact with inmates shall be trained in standard first aid procedures and CPR.

    2.    Any correctional officer who discovers an inmate engaging in self-harm shall immediately survey the scene to assess the severity of the emergency, alert other staff to call for medical personnel, retrieve the housing unit's emergency response bag (a first aid kit, pocket mask, face shield or Ambu-bag, and rescue tool), and begin standard first aid and/or CPR as dictated by the nature of the emergency.

4

3. If the first responding officer does not enter the cell alone because the incident has occurred in an administrative segregation or security housing unit, cell entry with back-up correctional personnel shall occur within four minutes from initial discovery of the emergency.

4. Correctional personnel shall never wait for medical staff to arrive before entering a cell and initiating appropriate life-saving measures. Further, custody staff shall never presume that the victim is dead, but should initiate and continue appropriate life-saving measures until relieved by arriving medical personnel who can assess the need for continued life support measures. Hayes Dec. ¶7.

Defendants must be directed to revise their CPR Policy to comply with the clear and unequivocal directive of the June 9, 2005 Order. The Policy should include the following language: *All trained custody officers must immediately initiate and continue providing CPR/First Aid to inmates until relieved by medical personnel.*

### B. Defendants Have Failed To Establish Substantial Compliance With The Order.

#### 1. Defendants Did Not Comply With The Order Timeline Or Expedite Implementation.

Defendants have known since February 24, 2005 that the Special Master would recommend a Court Order requiring defendants to develop and implement a policy mandating custody staff to provide immediate life support (including CPR). Kahn Reply Dec. ¶7. Furthermore, defendants did not object to the Draft Suicide Report, circulated by Special Master Keating on February 28, 2005, which contained this recommendation. Suicide Report for 2003 at 13. Despite ample notice of the recommendation, and 60 days to comply with the June 9, 2005 Order, defendants failed to comply with the Order. In fact, defendants acknowledge that their CPR Policy was not even distributed to the field until September 13, 2005, more than a month after the Court-ordered timeframe. Declaration of Gary Swarthout, attached to Defendants' Response ("Swarthout Dec.") ¶20.

Defendants were well aware of the many elements necessary for implementing the CPR Policy as evidenced by their CPR Action Plan (Ex. 4 to 8/26/05 Kahn Dec.), yet defendants failed to expedite implementation of these necessary elements until Plaintiffs' Notice was filed

5

on August 26, 2005. Swarthout Dec. ¶18 . Plaintiffs had repeatedly urged defendants to comply prior to filing their Notice. Kahn Declaration in Support of Plaintiffs Notice of Defendants' Failure to Comply with the June 9, 2005 Order ¶¶7,14 and Nolan Declaration in Support of Plaintiffs' Notice of Defendants' Failure to Comply with the June 9, 2005 Order ¶¶2,4.

Defendants have failed to offer any defense or excuse for their violation of the June 9, 2005 Order. The failure to comply with the Court-ordered deadline and the delay in expediting the necessary elements for implementing the Policy does not evidence good faith efforts by defendants. In light of the spiraling suicide rate within CDCR-- 21 suicides since the June 9, 2005 Order, and at least four since August 8, 2005-- the defendants' delay in implementing this life-saving Order is inexcusable. Kahn Reply Dec. ¶¶4,6.

The evidence of defendants' inability or unwillingness to comply with the June 9, 2005 Order is the basis for plaintiffs' request for additional and measured enforcement orders in this critical area.

### 2. Defendants Have Failed To Provide Competent Evidence Of Actual Compliance.

It remains far from certain that defendants have actually implemented the CPR Action Plan filed with the Court. Defendants' Response, for example, fails to address the impact that the delayed labor negotiations will have on the implementation of the CPR policy by custody staff at the CDCR institutions. Ex. 7 to Swarthout Dec. ¶¶16,17. The Court should require defendants to prove by sworn declaration or live testimony that labor negotiations have not delayed implementation of the new CPR Policy.

Furthermore, defendants have not provided competent evidence that CDCR institutions have implemented the CPR policy at the local institutional level through instruction on the CPR Policy to their staff, by providing adequate training in CPR, and by confirming that custody officers have ready access to necessary CPR equipment both in the housing units and on their persons.

In contrast, the defendants' declarations provide vague assurances of future implementation. See, e.g., "As of the date of this declaration of September 13, 2005, I understand the mouth shields will be shipped to each institution directly by September 16, 2005." Swarthout Dec. ¶18. In fact, Mr. Swarthout's declaration was filed before CDCR institutions were required to submit documentation to Mr. Swarthout that their Housing Unit Control Booths and/or designated areas are equipped with the CPR safety equipment, that this CPR equipment is stored with the emergency cut down device and is readily available in the event of an emergency, and that officers have been provided with On-the Job Training in the new CPR policy. Swarthout Dec. ¶19 and Exhibit 4 attached to Defendants' Reply. Defendants have provided no additional evidence that CDCR institutions have provided their custody officers with the additional emergency equipment and training necessary for implementation of their CPR policy.

## CONCLUSION

The June 9, 2005 Court Order requires that defendants "develop and implement a policy that establishes clearly and unequivocally a requirement for custody staff to provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement". It arose out of multiple years of suicide reviews by the Special Master where inmates attempting suicide were not provided with immediate emergency care by the first responding custody officers, who waited until medical personnel arrived to the housing units to provide the critical emergency care. Defendants adopted a policy that is neither clear nor unequivocal. Defendants have also failed to establish that CDCR institutions have implemented their CPR policy through training on the policy to their staff, by providing adequate training in CPR, and by confirming that custody officers have ready access to necessary emergency equipment in the housing units and on their persons.

Defendants' failure to comply with the clear dictates of the June 9, 2005 Order necessitates additional orders from the Court. Plaintiffs respectfully request the following orders:

7

Plaintiffs' Reply In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM No.: Civ S 90-0520 LKK-JFM

1. Defendants must revise their CPR Policy that was distributed to their CDCR institutions on September 12, 2005 to contain the following language which establishes a clear and unequivocal duty of custody officers to provide immediate life support: *All trained custody officers must immediately initiate and continue providing CPR/First Aid to inmates until relieved by medical personnel*;

2. Defendants should be required to consider the following standards in developing the procedures and training for implementing their new CPR Policy:

    a. All staff who come into contact with inmates must be trained in standard first aid and CPR;

    b. All housing units will contain an emergency response bag that includes a first aid kid, pocket mask, micro shield or face shield, latex gloves and emergency rescue tool. All staff who come into regular contact with inmates will know the location of this emergency response bag and be trained in its use. The emergency response bag will be inspected by correctional staff each shift to ensure that all equipment is accounted for and in proper working order;

    c. Any staff member who discovers an inmate attempting suicide will immediately respond, survey the scene to ensure the emergency is genuine, alert other staff to call for the facility's medical personnel, and bring the emergency response bag to the cell. If the suicide attempt is life-threatening, Central Control personnel will be instructed to immediately notify outside ("911") Emergency Medical Services (EMS). The exact nature (e.g. "hanging attempt") and location of the emergency will be communicated to both facility medical staff and EMS personnel;

    d. The first responding officer will use their professional discretion in regard to entering the cell without waiting for backup staff to arrive. With no exceptions, if cell entry is not immediate, it will occur no later than four minutes from initial notification of the emergency. (Should the emergency take place with the Security Housing Unit, Administrative Segregation or Psychiatric Housing Unit and require use of the Cell Entry Team, the Team will be assembled, equipped and enter the cell as soon as possible, and no later than four minutes

from initial notification of the emergency.) Correctional staff will *never* wait for medical personnel to arrive before entering a cell or before initiating appropriate life-saving measures (*e.g.* first aid and CPR);

   e. Upon entering the cell, correctional staff will *never* presume that the victim is dead, rather life-saving measures will be initiated immediately. In hanging attempts, the victim will first be released from the ligature (using the emergency rescue tool if necessary). Staff will assume a neck/spinal cord injury and carefully place the victim on the floor. Should the victim lack vital signs, CPR will be initiated immediately. All life-saving measures will be continued by correctional staff until relieved by medical personnel;

   f. The shift supervisor will ensure that both arriving facility medical staff and EMS personnel have unimpeded access to the scene in order to provide prompt medical services to, and evacuation of, the victim;

   g. Although the scene of the emergency will be preserved as much as possible, the first priority will always be to provide immediate life-saving measures to the victim. Scene preservation will receive secondary priority.

   3. Defendants must establish through competent testimony the status of the following necessary elements of the CPR Action Plan for implementation of the CPR Policy: that each CDCR institution has received the necessary mouth shields and distributed them to their correctional officers; that "On the Job Training" in the new CPR Policy has occurred for all correctional officers, including a copy of the training materials; that each CDCR institution has confirmed that CPR equipment is stored in each housing unit with the emergency cut-down device; and that the policy is fully in effect without regard to the status of labor negotiations with CCPOA over the new policy;

///
///
///
///
///

9

Plaintiffs' Reply In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM No.: Civ S 90-0520 LKK-JFM

4. The Special Master shall monitor defendants' compliance with the Court-ordered CPR Policy and issue a report to the Court within 60 days.

Dated: September 30, 2005.

Respectfully submitted,

_____
Jane Kahn
Rosen, Bien & Asaro, LLP
Attorneys for Plaintiffs