1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California 94964
4  Telephone (415) 457-9144

5  BINGHAM, McCUTCHEN, LLP
   WARREN E. GEORGE Bar No.: 53588
6  Three Embarcadero Center
   San Francisco, California 94111
7  Telephone (415) 393-2000

8  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
9  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
10 155 Montgomery Street, 8th Floor
   San Francisco, California 94104
11 Telephone (415) 433-6830

12 HELLER, EHRMAN, WHITE & McAULIFFE
   RICHARD L. GOFF Bar No.: 36377
13 701 Fifth Avenue
   Seattle, Washington 98104
14 Telephone (206) 447-0900

15 THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
   CLAUDIA CENTER Bar No.: 158255
16 LEWIS BOSSING Bar No.: 227402
   600 Harrison Street, Suite 120
17 San Francisco, CA 94107
   Telephone: (415) 864-8848

18
19 Attorneys for Plaintiffs

                UNITED STATES DISTRICT COURT
20
                EASTERN DISTRICT OF CALIFORNIA
21

22 RALPH COLEMAN,                         ) No.: Civ S 90-0520 LKK-JFM
                                          )
23        Plaintiffs,                     ) DECLARATION OF LINDSAY M.
                                          ) HAYES IN SUPPORT OF PLAINTIFFS'
24 vs.                                    ) NOTICE OF DEFENDANTS' FAILURE
                                          ) TO COMPLY WITH THE JUNE 9, 2005
25 ARNOLD SCHWARZENEGGER, et al.,         ) ORDER AND REQUEST FOR RELIEF
                                          )
26        Defendants                      )        HEARING
                                          )
27                                        ) DATE:    October 27, 2005
                                          ) TIME:    10:00 A.M.
28                                        ) COURT:   Hon. Lawrence K. Karlton
   _____   )

H:\489\3\PLEADING\Dec of Lindsay Hayes, 9-28-05 489-3.DOC

1    I, Lindsay M. Hayes, do hereby declare:

2    1.    I make this declaration in support of Plaintiffs' Notice of Defendants' Failure to

3    Comply with the June 9, 2005 Court Order requiring defendants to develop and implement a

4    policy "that establishes clearly and unequivocally a requirement for custody staff to provide

5    immediate life support, if trained to do so, until medical staff arrive to initiate or continue life

6    support measures, irrespective of whether the obligation to do so is part of the particular

7    custody staff member's duty statement." I have personal knowledge of the matters stated

8    herein and if called upon as a witness I could and would be able to competently so testify.

9    **BACKGROUND AND EXPERIENCE**

10    2.    I have a Masters of Science in the Administration of Justice from The American

11    University in Washington, D.C. My primary area of expertise is suicide prevention in

12    correctional settings. I currently serve as the project director of the National Center on

13    Institutions and Alternatives. I am also a technical assistance consultant with the National

14    Institute of Corrections (NIC), a part of the U.S. Department of Justice, in the area of jail and

15    prison suicide prevention. In addition, I am the Project Director and Editor of the *Jail*

16    *Suicide/Mental Health Update,* a quarterly newsletter published by the U.S. Justice Department

17    (National Institute of Corrections). The newsletter focuses on two areas: (1) current research,

18    litigation, training and model programs in the field of jail suicide prevention; and (2)

19    promoting information and technology transfer between local jurisdictions that desire to

20    implement or enhance jail-based mental health services.

21    3.    I have also served, and continue to serve, as a technical assistance consultant to

22    the Special Litigation Section of the U.S. Justice Department's Civil Rights Division in

23    numerous investigations of suicides and general conditions on confinement within jails,

24    prisons, and juvenile facilities throughout the country.

25    4.    I have written extensively in the area of suicide prevention in correctional

26    facilities. A complete list of my publications are set forth in my curriculum vitae, a true and

27    correct copy of which is attached hereto as Exhibit A.

28

1    5.    I have served as an expert witness in other prison and jail suicide cases. I have

2    served and am presently serving as a suicide prevention expert for the State of New York in the

3    case *Disability Advocates, Inc. v. New York State Office of Mental Health*, USDC, Southern

4    District of New York Case No. 02-CIV-4002. I have also served as the Juvenile Suicide

5    Prevention Expert to the Special Master in *Jerry M. v. District of Columbia, et al*, between

6    1989 and the Present. I served as the Jail Suicide Prevention Expert to the Special Master in

7    *Campbell v. McGruder, et al* (District of Columbia) between 1994 to 1997. I was the

8    Principal Investigator for the Evaluation of Suicide Prevention Policies and Practices at

9    Bridgewater State Hospital, Massachusetts, 2000. I have also provided Suicide Prevention

10   Services (staff training, program assessment/development and litigation consultation) to a

11   variety of organizations and jurisdictions in the following states: Alabama, Alaska, Arizona,

12   California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho,

13   Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts,

14   Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire,

15   New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma,

16   Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Texas,

17   Vermont, Virginia, Washington (State) West Virginia, Wisconsin and Wyoming. A complete

18   list of my professional experience and education is set forth in my curriculum vitae, a true and

19   accurate copy of which is attached hereto as Exhibit A.

20                              **GENERAL OPINIONS**

21    6.    I have been asked by counsel for plaintiffs in this matter to act as a consultant

22   and expert witness on the adequacy of the defendants' suicide prevention policies and

23   procedures. In that capacity I have reviewed documents produced by defendants concerning

24   their CPR/First Aid Policy developed in response to the June 9, 2005 Court Order. These

25   documents include the Exhibits attached to Defendants' Response. I am informed and believe

26   that these documents were filed with the Court on September 14, 2005. Attached hereto as

27   Exhibit B are true and correct copies of the relevant CDC policies.

28

H:\489\3\PLEADING\Dec of Lindsay Hayes, 9-28-05 489-3.DOC          2

Declaration Of Lindsay M. Hayes In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM

1    7.    I authored the "Suicide Prevention Protocols", which is Appendix B to the

2    *Standards and Guidelines for Delivering Services, Correctional Mental Health*, of the National

3    Commission on Correctional Health Care, 2003.  Attached hereto as Exhibit C is a true and

4    accurate copy of these protocols.   These protocols address the type of intervention policy that

5    a correctional facility should have in regard to suicide attempts:  "First, all staff who come into

6    contact with the inmate should be trained in standard first aid procedures and cardiopulmonary

7    resuscitation (CPR).  Second, any staff member who discovers an inmate engaging in self-

8    harm should immediately survey the scene to assess the severity of the emergency, alert other

9    staff to call for medical personnel if necessary, and begin standard first aid and/or CPR as

10   necessary.  Third, staff should never presume that the victim is dead, but rather should initiate

11   and continue appropriate life-saving measures until relieved by arriving medical personnel.  In

12   addition, medical personnel should ensure that all equipment utilized in responding to an

13   emergency within the facility is in working order on a daily basis." (at 228).  (See, also, "A

14   Framework for Preventing Suicides in Adult Correctional Facilities, Lindsay Hayes and Judith

15   F. Cox, in B. Schwartz (Ed.) *Correctional Psychology: Practice, Programming and*

16   *Administration*, Kingston, NJ: Civic Research Institute, 2003. at 4-16.)

17   8.    Non-medical personnel, including correctional officers, should not presume that

18   an inmate is dead because they lack both the medical training and credentials to determine

19   death.  Further, non-medical personnel, including correctional officers, should not presume that

20   an inmate is dead simply because the exact (or even approximate) time of the injury and

21   subsequent loss of breathing and pulse resulting from the injury are unknown by these

22   personnel.  Therefore, it is imperative for non-medical personnel, including correctional

23   officers, to immediately initiate CPR and/or first aid until relieved by arriving medical

24   personnel.

25   9.    I have reviewed the CDCR's CPR/First Aid Policy as contained in the September

26   12, 2005 Memorandum, Exhibit 3, attached to Defendants' Reply.  The CDCR CPR/First Aid

27   Policy resembles a mission statement rather than a policy and/or procedure for CPR/First Aid.

28   The policy provides little, if any, guidance for responding to an emergency involving a suicide

attempt. What guidance that is provided is limited to the resounding theme that CPR/First Aid be utilized "whenever the inmate might benefit from such efforts and when it is reasonably safe to the employees to do so." As an example of when officers would not have to initiate CPR, the policy includes "obvious signs of prolonged death e.g. rigormortis". Rigormortis is defined as a stiffening of the body from one to seven hours after death from hardening of the muscular tissues in consequence of the coagulation of the myosinogen and parmyosinogen. PDR Medical Dictionary, Medical Economics Co., Montvale, NJ, 1995. The determination of whether an inmate is clinically dead and has rigormortis is a medical determination and should never be made by a non-medical person. In my opinion, the CDCR CPR/First Aid Policy is a dangerous policy because it does not require custody officers to initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. The decision not to provide life-saving measures without medical training should never occur because of the potential dire results, as evidenced by the Special Master's reviews of the CDCR suicides. CPR/First Aid training is designed for non-medical persons and specifically directs individuals responding to an individual in distress to first survey the scene, call for back-up personnel (including medical staff and emergency medical personnel), and then initiate and continue first aid and/or CPR until relieved by arriving medical personnel. CPR/First Aid increases the odds of survival by providing immediate emergency care until trained medical personnel can arrive on the scene of an emergency. Following a suicide, the degree and promptness of the staff's intervention often makes the difference whether the victim will survive. Unfortunately, CDCR's CPR/First Aid Policy, provides non-medical personnel with virtually unlimited discretion not to initiate CPR/First Aid, resulting in a continuation of the current troubling practices within the CDCR in which correctional officers are delaying and/or refusing to initiate CPR/First Aid prior to the arrival of medical personnel.

10.     In my opinion, CDCR's flawed CPR/First Aid policy should be rescinded. Defendants should revise their CPR/Aid to include the following clear directive: *All trained custody officers must immediately initiate and continue providing CPR/First Aid to inmates until relieved by medical personnel.*

H:\489\3\PLEADING\Dec of Lindsay Hayes, 9-28-05 489-3.DOC          4

Declaration Of Lindsay M. Hayes In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM

1        11.     Through my research and work as an expert and consultant, I am familiar with

2   suicide prevention and emergency response policies in prison systems and jails throughout the

3   United States.  As part of my work as an expert and consultant I have been asked to develop

4   Intervention Procedures for Suicide Attempts for prison systems, which is contained in a

5   Model Intervention Procedure for Suicide Attempts, attached hereto as Exhibit D.  In

6   developing an appropriate Intervention Procedure or Immediate Life Support Policy, a prison

7   system must address the following critical issues:

8         a.     All staff who come into contact with inmates must be trained in standard first aid

9              and CPR.  The staff should participate in annual "mock drill" training to ensure a

10            prompt emergency response to all suicide attempts;

11        b.     All housing units should contain an emergency response bag that includes a first

12            aid kid, pocket mask, micro shield or face shield, latex gloves, and emergency

13            rescue tool.  All staff who come into regular contact with inmates should know

14            the location of this emergency response bag and be trained in its use.  This

15            emergency response bag should be inspected by correctional staff each shift to

16            ensure all of the equipment is accounted for and in good working order;

17        c.     Any staff who discovers an inmate attempting suicide should immediately

18            respond, survey the scene to ensure the emergency is genuine, alert other staff to

19            call for the facility's medical personnel, and bring the emergency response bag to

20            the cell.  If the suicide is life-threatening, Central Control personnel should be

21            instructed to immediately notify outside ("911") Emergency Medical Services

22            (EMS).  The exact nature (e.g. hanging attempt) and the location of the

23            emergency will be communicated to both facility medical staff and EMS

24            personnel;

25        d.     The first responding officer will use their personal discretion in regard to

26            entering the cell without waiting for backup staff to arrive.  With no exceptions,

27            if cell entry is not immediate, it will occur no later than four minutes from initial

28            notification of the emergency.  (Should the emergency take place within the

H:\489\3\PLEADING\Dec of Lindsay Hayes, 9-28-05 489-3.DOC     5

Declaration Of Lindsay M. Hayes In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM

1    Security Housing Unit, Administrative Segregation or the Psychiatric Security

2    Unit and requires the use of the Cell Entry Team, the Team shall be assembled,

3    equipped and enter the cell as soon as possible, and no later than four minutes

4    from notification of the emergency.)  Correctional staff will never wait for

5    medical personnel to arrive before entering a cell or before initiating appropriate

6    life-saving measures (e.g. first aid or CPR);

7    e.    Upon entering the cell, correctional staff will never <u>presume that the victim is</u>

8    <u>dead</u>, rather life-saving measures will be initiated immediately.  Only medical

9    personnel has the training to determine whether death as occurred.  Delaying the

10   initiation of CPR until medical personnel arrives greatly reduces the chances of

11   survival in a suicide attempt.  In hanging attempts, the victim will first be

12   released from the ligature (using the emergency rescue tool if necessary).  Staff

13   will assume a neck/spinal cord injury and carefully place the victim on the floor.

14   Should the victim lack vital signs, CPR will be initiated immediately.  All life-

15   saving measures will be continued by correctional staff until relieved by medical

16   personnel;.

17   f.    The shift supervisor will ensure that both arriving facility medical staff and EMS

18   personnel have unimpeded access to the scene in order to provide prompt

19   medical services to, and evacuation of, the victim;

20   g.    Although the scene of the emergency will be preserved as much as possible, the

21   first priority will always be to provide immediate life-saving measures to the

22   victim.  Scene preservation will receive secondary priority.

23   12.    CDCR's CPR/First Aid Policy fails to incorporate these essential elements in its

24   policy that was distributed to the field on September 12, 2005, and as such, cannot adequately

25   address the on-going failure of correctional officers to initiate immediate life support efforts

26   until medical personnel arrive.

27       The foregoing is based upon my own personal knowledge, except where stated to be

28   based upon information and belief.  If called upon to do so, I could and would so testify.

9-29-2005 10:16AM   FROM NCIA/LINDSAY-M-HAYES 5083373083          P. 2

1    I declare under penalty of perjury and was executed this 29th day of September, 2005 at

2    MANSFIELD, MASSACHUSETTS _____ that the foregoing is true and correct.

3

4

5                          Lindsay M. Hayes

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration Of Lindsay M. Hayes In Support Of Plaintiffs' Notice Of Defendants' Failure To Comply With
The June 9, 2005 Order And Request For Relief, Case No. Civ S 90-5020 LKK-JFM

**Exhibit A**

# VITAE

# LINDSAY M. HAYES

## PERSONAL INFORMATION

**Office Address:**          National Center on Institutions and Alternatives
                            40 Lantern Lane
                            Mansfield, Massachusetts  02048

**Contact Information:**     (508) 337-8806
                            (508) 337-3083 - facsimile
                            E-Mail: Lhayesta@msn.com

**Date of Birth:**          June 5, 1955

**Marital Status:**         Married, four children

## ACADEMIC BACKGROUND

Master of Science -- Administration of Justice (1978); The American University,
     Washington, D.C.

Bachelor of Arts -- Sociology (1977); Ithaca College, New York

## SUMMARY

Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts. He is nationally recognized as an expert in the field of suicide prevention within jails, prisons and juvenile facilities. Mr. Hayes serves as a technical assistance consultant/expert by conducting training seminars and assessing inmate and juvenile suicide prevention practices in various state and local jurisdictions throughout the country.

Mr. Hayes has conducted the only four national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, and *Juvenile Suicide in Confinement: A National Survey* in 2004). The jail and prison suicide studies were conducted through contracts with the National Institute of Corrections (NIC), U.S. Justice Department; whereas the first national study of juvenile suicide in confinement was conducted through a contract with the Office of Juvenile Justice and Delinquency Prevention, U.S. Justice Department.

Mr. Hayes has acted as an expert witness/consultant in over 240 suicide litigation cases, as well as appointed to assist special masters in the development and implementation of suicide prevention policies in several adult and juvenile correctional systems under court jurisdiction. He is also a suicide prevention consultant to the U.S. Justice Department's Civil Right Division (Special Litigation Section) in its investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country.

Mr. Hayes serves as editor/project director of the *Jail Suicide/Mental Health Update*, a quarterly newsletter devoted to research, training, prevention, and litigation that is funded by NIC; and is a consulting editor and editorial board member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, as well as editorial board member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*,

the official scientific journal of the International Association of Suicide Prevention. Mr. Hayes has authored over 50 publications in the area of suicide prevention within jail, prison and juvenile facilities, including model training curricula on both adult inmate and juvenile suicide prevention.

As a result of research, technical assistance, and expert witness consultant work in the area of suicide prevention in correctional facilities, Mr. Hayes has reviewed and/or examined over 1,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 24 years. In 2001, Mr. Hayes was presented with the National Commission on Correctional Health Care's Award of Excellence for outstanding contribution in the field of suicide prevention in correctional facilities. His work has been cited in the suicide prevention sections of various state and national correctional health care standards.

## POSITIONS HELD

## National Center on Institutions and Alternatives (NCIA), Alexandria, Virginia, (January 1978 to Present).

o **Technical Assistance Consultant/Expert Witness** (January 1983 to Present) providing specialized staff training and facility needs-assessment to jails, prisons, and juvenile facilities in suicide prevention. **Expert Witness** consultation and testimony provided in litigation concerning jail, prison, and juvenile suicide. Qualified as an expert in both state and federal court.

o **Technical Assistance Consultant** (June 1984 to Present) to the National Institute of Corrections (NIC), U.S. Department of Justice for jail and prison suicide prevention. Also member of NIC's National Jail Suicide Prevention Task Force (1984-1985), an advisory board created to design strategies for reducing jail suicides nationwide.

o **Project Director/Editor** (May 1989 to Present) of the *Jail Suicide/Mental Health Update*. This U.S. Justice Department (National Institute of Corrections) contract publishes a quarterly newsletter focused on two areas: 1) current research, litigation, training, and model programs in the field of jail suicide prevention; and 2) promoting information and technology transfer between local jurisdictions that desire to implement or enhance jail-based mental health services. This project is a continuation of prior U.S. Justice Department grants (1986-1988).

o **Technical Assistance Consultant** (June 1993 to Present) to the Special Litigation Section of the U.S. Justice Department's Civil Rights Division in its investigation of suicides and general conditions of confinement within jails, prisons, and juvenile facilities throughout the country. Served as the sole jail suicide consultant to 1993 investigation of Mississippi jail suicides.

o **Project Director/Principal Investigator** (August 1999 to December 2003) of a U.S. Justice Department, Office of Juvenile Justice and Delinquency Prevention contract to conduct the first national survey of juvenile suicide in confinement. During the contract period, the project determined the extent and distribution of juvenile suicides throughout the country, as well as developed a report (*Juvenile Suicide in Confinement: A National Survey*) for use by juvenile justice practitioners in expanding their knowledge base and in creating/revising policies and training curricula on suicide prevention.

o **Technical Assistance Manager** (September 1987 to September 1997) of NCIA's services to state and local government officials in identifying policies and programs to alleviate overcrowded prisons and jails. Systemic assessments provided counties in the following states: Alabama, Delaware, Georgia, Idaho, Maine, Maryland, Pennsylvania and Rhode Island. In addition, served as a consultant to U.S. Justice Department (National Institute of Corrections) in providing needs-assessment to jurisdictions which experience jail overcrowding. Qualified as an expert in federal court.

o **Project Director/Principal Investigator** (April 1993 to August 1994) of a U.S. Justice Department (National Institute of Corrections) contract to develop a monograph on prison suicide. The monograph (*Prison Suicide: An Overview and Guide to Prevention*) included an extensive literature review, examination of state and national standards for prison suicide prevention, analysis of prison suicide rates, case studies of effective prevention programs, and review of liability issues.

o **Project Director** (September 1990 to February 1991) of an NCIA research project to evaluate the effectiveness of the Intensive Parole Supervision Project, a joint venture of the U.S. Parole Commission and the U.S. Probation Office for the District of Maryland. The purpose of this five-month evaluation project was to assess the performance and goal achievement of the program during a two-year period, while providing Parole Commission officials with information useful to decision-making regarding program continuation, expansion and/or refinement, and allocation of resources.

o **Project Director/Principal Investigator** (September 1986 to February 1988) for the National Coordination of the Jail Suicide Prevention Information Task Force. This U.S. Justice Department (National Institute of Corrections) contract: 1) Conducted regional seminars on jail suicide prevention throughout the country; 2) Gathered information from each state on the incidence of jail suicide and related issues, including replication of NCIA's 1981 National Study of Jail Suicides; 3) Provided technical assistance to individual jails and others regarding jail suicide prevention while disseminating a quarterly newsletter (*Jail Suicide Update*) concerning timely developments in jail suicide prevention, litigation, training and special issues; and 4) Developed a model training manual on jail suicide prevention.

o **Project Director/Principal Investigator** (July 1980 to November 1981) for the National Study of Jail Suicides, the first effort to determine nationally the extent and distribution of suicides within jails and lockups. Responsible for collection and analysis of suicide data, as well as development of recommendations to impact current practices and policies regarding programmatic intervention for identification of potential suicide victims.

## Research Assistant/Juvenile Decarceration Project -- Joint Effort of NCIA and The American University, Washington, D.C. (January 1978 to December 1978).

o A one-year project for the study of policy implementation regarding deinstitutionalization services for delinquent youth (a four state study). Responsible for compiling research for the monograph -- *The Politics of Decarceration.*

## Administrative Assistant/Bergen County Courthouse, Hackensack, New Jersey (June 1977 to August 1977).

o Worked as an administrative assistant to the county court administrator and was responsible for conducting municipal court inspections. The purpose of these inspections was to correct any inadequacies in each of the (72) municipal courts, and to coordinate each court into a consistently run municipal court system.

## Youth Counselor/South Lansing Center, Lansing, New York   (January 1977 to May  1977).

o The South Lansing Center was a New York State Division for Youth Title II Residential Treatment Facility. Worked as a full-time intern in conjunction with Ithaca College. Involved gaining knowledge of the treatment program as a whole and working with youth on a one-on-one basis.

## Administrative Assistant/Bergen County Jail Annex, Hackensack, New Jersey (June 1976 to August 1976).

o Worked as an administrative assistant to the jail psychologist and assisted in interviewing, counseling and screening individuals for the county's work-release program.

## SELECTED (STATE and NATIONAL) CONFERENCE PRESENTATIONS

Texas Juvenile Probation Commission, Behind Closed Doors: Liabilities, Issues and Trends in Juvenile Justice Facilities, Austin, TX, September 2005.

National Center for Mental Health and Juvenile Justice, National Policy Academy on Improving Services for Youth with Mental Health and Co-Occurring Substance Abuse Disorders within the Juvenile Justice System, Bethesda, MD, September 2005.

National Commission on Correctional Health Care, Mental Health in Corrections, Chicago, IL, July 2005.

Connecticut Youth Suicide Advisory Board and Connecticut Clearinghouse, Suicide Prevention Promises and Practices: Focus on Youth, Rocky Hill, CT, May 2005.

Corrections Corporation of America, 2005 Health Services Conference, Scottsdale, AZ, April 2005.

Wisconsin Department of Justice and Wisconsin Department of Corrections, Suicide Prevention in Jails, Wisconsin Dells, WI, April 2005.

National Commission on Correctional Health Care, 28th National Conference on Correctional Health Care, New Orleans, LA, November 2004.

National Commission on Correctional Health Care, Mental Health in Corrections, Las Vegas, NV, July 2004.

Massachusetts Department of Public Health, Suicide Prevention Across the Lifespan, 3rd Annual Suicide Prevention Conference, Worcester, MA, May 2004.

Suicide Prevention Resource Center, Preventing Suicide in Regions VII and VIII: Communities Working Together to Implement the National Strategy for Suicide Prevention in the Prairies and Mountain West, Westminster, CO, October 2003.

North Dakota Office of Management and Budget, Risk Management Division, Suicide Prevention in Correctional Facilities Workshop, Bismarck, ND, May 2003.

Maine Department of Behavioral and Developmental Services, 2003 Crisis Clinician Conference, Keynote Address. Augusta, ME, March, 2003.

Texas Juvenile Probation Commission, Symposium on Juvenile Suicide Prevention and Intervention: Putting Children First, Austin, TX, March 2003.

American Correctional Association, Winter Conference, Charlotte, NC, January 2003.

Council of Juvenile Correctional Administrators, Mid-Winter Meeting, Charlotte, NC, January 2003.

New York State Commission of Correction and Office of Mental Health, 2002 Correctional Medical and Mental Health Care Symposium, Sarasota Springs, NY, October 2002.

University of Connecticut Health Center/Correctional Mental Health Conference, Suicide Prevention: Assessment and Management in a Correctional Environment, Farmington, CT, September 2002.

American Correctional Health Services Association, Multidisciplinary Training Conference, Portland, OR, March 2002.

Wisconsin Department of Corrections, Executive Planning Meeting, Kohler, WI, January 2002.

MCP Hahnemann University, Behavioral Healthcare Education, 9th Annual Forensic Rights and Treatment Conference, Grantville, PA, November 2001.

National Commission on Correctional Health Care, 25th National Conference on Correctional Health Care, Albuquerque, NM, November 2001.

Maryland Governor's Interagency Workgroup on Youth Suicide Prevention, 13th Annual Suicide Prevention Conference, Baltimore, MD, October 2001.

Florida Department of Corrections, 4th Annual Female Offender Focused Symposium, Orlando, FL, September 2001.

National Institute of Corrections, U.S. Department of Justice, Prison Health Care: Suicide Prevention Workshop, Longmont, CO, June 2001.

New York State Office of Mental Health, Best Practices Conference, Brooklyn, NY, June 2001.

Office of Juvenile Justice and Delinquency Prevention (OJJDP) National Conference, Justice for Children: A Vision for the 21st Century, Washington, DC, December 2000.

National Commission on Correctional Health Care, 24th National Conference on Correctional Health Care, St. Louis, MO, September 2000.

OJJDP/ACA's 15th Annual National Juvenile Corrections and Detention Forum, Albuquerque, NM, May 2000.

Governor's Summit - Correctional Health to Community Health: A Continuum of Prevention and Care for the Criminal Offender, Las Vegas, NV, April 2000.

Ohio Community Forensic Association, Suicide and the Criminal Justice Population, Columbus, OH, March 2000.

Hawaii Criminal Justice Association, 3rd Annual Conference, Keynote Address, Honolulu, HI, March 2000.

National Commission on Correctional Health Care, 23rd National Conference on Correctional Health Care, Fort Lauderdale, FL, November 1999.

Council of Juvenile Correctional Administrators, Western Regional Meeting, Tucson, AZ, November 1999.

Florida Senate and House of Representatives, Committees on Corrections, Presentation on Suicide in Florida Prisons, Tallahassee, FL, January 1999.

Open Society Institute, First National Conference on Death and Dying in Prisons and Jails, New York, NY, November 1998.

Ohio Department of Mental Health, Office of Forensic Services, Unlocking the Barriers: Mental Health Services in Jails and Working with Law Enforcement Agencies, Cuyahoga Falls, OH, August 1998.

Oregon Senate and House of Representatives, Senate Judiciary Crime and Civil Subcommittee and House Interim Committee on Judiciary, Presentation on Suicides in Hillcrest Youth Correctional Facility, Salem, OR, March 1998.

Combined California Correctional Associations, Keys to Inmate Management Conference, Concord, CA, March 1998.

Wood County Juvenile Detention Center, 1998 Ohio Regional Juvenile Suicide Awareness Seminar, Bowling Green, OH, March 1998.

Netherlands Institute for the Study of Criminology and Law Enforcement, Leiden University, Leiden, The Netherlands, July 1997.

Institute for the Study and Treatment of Delinquency, Third International Conference on Deaths in Custody, Uxbridge, England, July 1997.

National Juvenile Detention Association, 9th Annual National Juvenile Services Training Institute, Indianapolis, IN, June 1997.

National Commission on Correctional Health Care, 20th National Conference on Correctional Health Care, Certified Correctional Health Care Program, Nashville, TN, October 1996.

Sam Houston State University, Criminal Justice Center, 27th Annual Jail Management Conference, Huntsville, TX, October 1996.

Oregon Jail Managers' Association, Bend, OR, August 1996.

Ohio Department of Rehabilitation and Correction, Correctional Health Care Conference, Columbus, OH, May 1996.

U.S. Department of the Army, U.S. Army Military Police Support Agency, Army Corrections Conference, Fort Belvoir, VA, December 1995.

National Commission on Correctional Health Care, 19th National Conference on Correctional Health Care, Washington, DC, November 1995.

Centers for Disease Control and Prevention, National Violence Prevention Conference, Des Moines, IA, October 1995.

National Commission on Correctional Health Care, National Conference on Legal Issues in Correctional Health Care, Chicago, IL, June 1995.

Louisiana State University, School of Social Work, Office of Correctional Studies, Prison Suicide Prevention Workshop, Baton Rouge, LA, September 1994.

Wisconsin Department of Corrections, Suicide Prevention in Detention Facilities Seminar, Wisconsin Dells, WI, September 1994.

University of Virginia, Institute of Law, Psychiatry and Public Policy, 26th Semi-Annual Forensic Symposium: Jails and Mental Health Services, Charlottesville, VA, May 1994.

American Association of Suicidology, 27th Annual Conference, New York, NY, April 1994.

Institute for the Study and Treatment of Delinquency, Second International Conference on Deaths in Custody, Cambridge, England, April 1994.

National Association of State Mental Health Program Directors' Conference, St. Louis, MO, September 1993.

Pennsylvania Prison Warden's Association, Jail Suicide Prevention Seminar, Bethlehem, PA, November 1992.

Montana Sheriff's and Peace Officers' Association, 64th Annual Training Seminar, Billings, MT, June 1992.

Iowa State Sheriffs' and Deputies' Association, First Annual 20-Hour Jail School, Ames, IA, February 1992.

Institute for the Study and Treatment of Delinquency, Diamond Jubilee Conference -- Deaths in Custody, Canterbury, England, March 1991.

Law Enforcement Television Network, Carrollton, TX, March 1990.

American Jail Association, 8th Annual Training Conference, Hollywood, FL, April 1989.

American Jail Association, 7th Annual Training Conference, Los Angeles, CA, April 1988.

National Conference on Alcohol Countermeasures and Occupant Protection, Boston, MA, March 1988.

American Correctional Association, Winter Conference, Phoenix, AZ, January 1988.

American Association of Correctional Training Personnel and the Juvenile Justice Trainers Association, Third Annual National Correctional Trainers Conference, Pittsburgh, PA, October 1987.

Police Foundation, Police Litigation Prevention Seminar, Chicago, IL, May 1987.

University of Maine, Conference on Preventing Youth Suicides, Kennebunkport, ME, May 1987.

Centers for Disease Control, 1987 Conference on Injury in America, Atlanta, GA, February 1987.

Southeastern Psychological Association, 29th Annual Meeting, Atlanta, GA, March 1983.

American Association of Suicidology, 16th Annual Conference, Dallas, TX, April 1983.

## PUBLICATIONS

"Demographic, Criminal, and Psychiatric Factors Related to Inmate Suicide," (with Eric Blaauw and Ad J.F.M. Kerkhof), *Suicide and Life-Threatening Behavior*, 35 (1), 2005.

*Juvenile Suicide in Confinement: A National Survey*, Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2004.

"A Framework for Preventing Suicides in Adult Correctional Facilities," (with Judith F. Cox) in B. Schwartz (Ed.), *Correctional Psychology: Practice, Programming and Administration*, Kingston, NJ: Civic Research Institute, 2003.

"Prevention, Management, and Treatment of Offenders at Risk for Suicide," (with Andre Ivanoff) in J. Ashford et al (Eds.), *Treating Adult and Juvenile Offenders With Special Needs*, Washington, DC: American Psychological Association, 2001.

"Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 22 (1), 2001.

"Suicide Prevention in Juvenile Facilities," *Juvenile Justice*, 7 (1), 2000.

"Suicide in Adult Correctional Facilities: Key Ingredients to Prevention and Overcoming the Obstacles," *Journal of Law, Medicine & Ethics*, 27 (3), 1999.

"Guide to Developing and Revising Suicide Prevention Protocols," in *Correctional Mental Health Care: Standards and Guidelines for Delivering Services*, Chicago, IL: National Commission on Correctional Health Care, 1999.

"Was it Preventable?: The Comprehensive Review of Inmate Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (4), 1999.

*Suicide Prevention in Juvenile Correction and Detention Facilities: A Resource Guide*, South Easton, Massachusetts: Council of Juvenile Correctional Administrators, March 1999.

"Inmate Suicide: A Look at Yesterday, Today and Tomorrow," *Correctional Mental Health Report*, 1 (1), 1999.

"Another Preventable Jail Suicide: Part Two," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (1), 1999.

"Juvenile Suicide Prompts Closing of Facility," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 19 (2), 1998.

"Suicide Prevention in Correctional Facilities: An Overview," in M. Puisis (Ed.), *Clinical Practice in Correctional Medicine*, St. Louis, MO: Mosby, Inc., 1998.

"Jail Suicide: Preventing Future Casualties," in A. Liebling (Ed.), *Deaths of Offenders: The Hidden Side of Justice*, Winchester, England: Waterside Press, 1998.

"From Chaos to Calm: One Jail System's Struggle with Suicide Prevention, *Behavioral Sciences and the Law*, 15, 399-413, 1997.

"Jail Suicide and the Need for Debriefing," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

"Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

"Another Preventable Jail Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (2), 1997.

"State Standards and Suicide Prevention: A Lone Star," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (1), 1996.

"Custodial Suicide: Overcoming the Obstacles to Prevention," in A. Liebling (Ed.), *Deaths in Custody: Caring for People at Risk*, London, England: Whiting and Birch, 1996.

"National and State Standards for Prison Suicide Prevention: A Report Card," *Journal of Correctional Health Care*, 3 (1), 1996.

"An Unusual Case of State-Assisted Prison Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 17 (2), 1996.

"Prison Suicide: A Look at Rates and Prevention Policies," *Corrections Today*, 58 (2), February 1996.

"Controversial Issues in Jail Suicide Prevention, Part 2: Use of Inmates to Conduct Suicide Watch," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (4), 1995.

"Prison Suicide: An Overview and a Guide to Prevention," *The Prison Journal*, 75 (4), 1995.

*Prison Suicide: An Overview and Guide to Prevention*, Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 1995.

"Controversial Issues in Jail Suicide Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (3), 1995.

*Training Curriculum on Suicide Detection and Prevention in Jails and Lockups* (Second Edition), with Joseph R. Rowan, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 1995.

"Prison Suicide: An Overview and Guide to Prevention (Parts 1, 2 and 3)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (2), 1995, 16 (1), 1995, and 15 (4), 1994.

"Jail Suicide in Mississippi," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

"Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

"Jail Suicide Prevention in the United States: An Overview of Yesterday, Today and Tomorrow," in A. Liebling and T. Ward (Eds.), *Deaths in Custody: International Perspectives*, London, England: Whiting and Birch, 1994.

"Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach," *Juvenile and Family Court Journal*, 45 (2), 1994.

"Developing a Written Program for Jail Suicide Prevention," *Corrections Today*, 56 (2), April 1994.

"Jail Suicide: Overcoming Obstacles to Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (2), 1994.

"Youth Suicide in Custody: An Overview," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (1), 1994.

"Suicidal or Manipulative? -- Does it Really Matter," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (4), 1993.

"Jail Suicide -- Prevention Through Written Protocol (Parts 1 and 2)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (2), 1993, and 14 (1), 1993.

"Can Jail Suicide Be Prevented?" *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (2), 1992.

"Jail Suicide -- An Overview of Yesterday," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (1), 1992; *Befrienders Worldwide*, Issue 40, July 1993.

"Jail Suicide," *Montana Sheriff Magazine*, Summer 1992.

"Ask the Experts," *American Academy of Psychiatry and the Law Newsletter*, 16 (1), April 1991.

"National Study of Jail Suicides: Seven Years Later," *Psychiatric Quarterly*, 60 (1), Spring 1989.

"National Study of Jail Suicides: Seven Years Later," *National Sheriff*, December-January 1989.

"Jail Suicide Prevention: Research, Litigation and Training," *Issues in Correctional Training and Casework*, 4, October 1988; *Ohio Law Enforcement Training Bulletin*, March through June 1989.

"Research and Training in Jail Suicide Prevention," *American Jails*, Fall 1988.

*National Study of Jail Suicides: Seven Years Later*, with Joseph R. Rowan. Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

*Training Curriculum on Suicide Detection and Prevention in Jails and Lockups*, with Joseph R. Rowan, Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

*Jail Suicide/Mental Health Update* (1986 to Present)

    "Model Suicide Prevention Programs: Part II," 14 (2), Fall 2005.
    "Model Suicide Prevention Programs: Part I," 14 (1), Summer 2005.
    "A Practitioner's Guide to Developing and Maintaining a Sound Suicide Prevention Policy," 13 (4), Spring 2005.
    "Jail Standards and Suicide Prevention: Another Look," 13 (3), Winter, 2004.
    "Special Issue: Juvenile Suicide in Confinement – Findings From the First National Study," 13 (2), Fall, 2004.
    "Special Issue: Inmate Suicide Litigation Redux," (Editor), 13 (1), Summer, 2004.
    "Innovations to Reduce Jail Suicide – A Kentucky Initiative," (Editor), 12 (4), Spring, 2004.
    "Suicide Prevention and 'Protrusion-Free' Design of Correctional Facilities," 12 (3), Fall, 2003.
    "Use of 'No-Harm Contracts and Other Controversial issues in Suicide Prevention," 12 (2), Summer 2003.
    "Criminalization of People with Mental Illnesses: The Role of Mental Health Courts in System Reform," (Editor), 12 (1), Spring 2003.
    "A Jail Cell, Two Deaths, and a Telephone Cord," 11 (4), Winter 2003.
    "Characteristics of Suicide Attempts in a Large Urban Jail System With an Established Suicide Prevention Program," (Editor), 11 (3), Fall, 2002.
    "Preventing, Managing, and Treating Suicidal Actions in High-Risk Offenders," 11 (2), Summer, 2002
    "Special Issue: The Evolving World of Jail Suicide Litigation," (Editor), 11 (1), Spring 2002
    "Factors in Prison Suicide: One Year Study in Texas," (Editor) ,10 (4), Fall, 2001.

"Special Issue: Preventing Suicides Through Prompt Intervention," 10 (3), Summer, 2001.
" Suicide Prevention and Manipulative Behavior," 10 (2), Spring, 2001.
"Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," 10 (1), Fall 2000.
"Suicide Prevention Initiatives in a Large Statewide Department of Corrections: A Full-Court Press to
       Save Lives," (Editor), 9 (4), Summer 2000.
"Correctional Suicide Prevention in the Year 2000 and Beyond," (Editor), 9 (3), Spring 2000.
"Playing Catch-Up With the Jail Logs: Another Look," 9 (2), Fall 1999.
"Special Issue: Suicide Prevention in Juvenile Facilities," 9 (1), Summer 1999.
"Special Issue: The Uncertain World of Jail Suicide Litigation," (Editor), 8 (4), Spring 1999.
"Were They Preventable?: The Comprehensive Review of Inmate Suicides, 8 (3), Winter 1999.
"Model  Suicide Prevention Programs: Part IV," 8 (2), Fall 1998.
"Model  Suicide Prevention Programs: Part III," 8 (1), Summer 1998.
"Model Suicide Prevention Programs: Part II - Juvenile Facilities," 7 (4), Spring 1998.
"Model Suicide Prevention Programs: Part I," 7 (3), Winter 1998.
"Suicide Prevention Though Repeated Tragedy: One Jail System and the Lessons that were Learned,"
       7 (2), Fall 1997.
"Special Issue: Critical Incident Stress Debriefing," (Editor), 7 (1), Summer 1997.
"Jail Standards and Suicide Prevention: Another Look," 6 (4), Summer 1996.
"Special Issue: Jail Suicide Litigation Redux," (Editor), 6 (3), Spring 1996.
"Suicide Prevention in Juvenile Facilities: New Jersey's Experience," (Editor), 6 (2), Winter 1995.
"Use of Inmates to Conduct Suicide Watch and Other Controversial Issues In Jail Suicide
       Prevention," 6 (1), Fall 1995.
"U.S. Justice Department's Investigation of Jail Suicides in Mississippi: A Status Report," 5 (4), Spring
       1994.
"Special Focus on Mental Health Issues and Suicide Prevention," (Editor), 5 (3), Winter 1993.
"Special Issue: Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach,"
    5 (2), Fall 1993; *Correct Care*, 8 (1), February 1994.
"Preventing Suicides Through Critical Administrative Review," 5 (1), Summer 1993.
"Managing the Manipulative Inmate," 4 (4), Winter 1992.
"Preventing Suicide Through Prompt Intervention," 4 (3), Fall 1992.
"Liability for Custodial Suicide," (Editor), 4 (2), Summer 1992.
"Trouble in Paradise: Jail Suicide on the Hawaiian Islands and a Police Department's Pro-Active
       Response," 4 (1), Spring 1992.
"Model Suicide Prevention Programs - Part 4," 3 (4), Spring 1991.
"Model Suicide Prevention Programs - Part 3," 3 (3), Winter 1990.
"Model Suicide Prevention Programs - Part 2," 3 (2), Fall 1990.
"Model Suicide Prevention Programs - Part 1," 3 (1), Summer 1990.
"Notes from the Eleventh Circuit," 2 (4), Winter 1989.
"Litigation Revisited," 2 (3), Fall 1989.
"National Standards of  Jail Suicide Prevention," 2 (2), Summer 1989.
"Suicide Prevention in New York State," 2 (1), Spring 1989.
"National Study of Jail Suicides: Seven Years Later," 1 (4), April 1988.
"Training," 1 (3), Summer 1987.
"Litigation," 1 (2), Spring 1987.
"Jail Suicide Prevention Information Task Force," 1 (1), Winter 1986.

"And Darkness Closes In...A National Study of Jail Suicides," *Criminal Justice and Behavior*, 10 (4), 1983.

"Confining Wayward Youths: Notes on the Correctional Management of Juvenile Delinquents, with Robert
      Johnson, *Juvenile and Family Court Journal*, 32 (4), 1981.

*And Darkness Closes In...A National Study of Jail Suicides*. Final Report to the National Institute of Corrections.
      Washington, D.C.: National Center on Institutions and Alternatives, October 1981.

## OTHER SELECTED TECHNICAL ASSISTANCE/RESEARCH PROJECT REPORTS

*An Assessment of Suicide Prevention Practices at the MacLaren Youth Correctional Facility*, September 2004.

*An Evaluation of Bridgewater State Hospital's Suicide Prevention Policies and Practices*, June 2000.

*An Assessment of Suicide Prevention Practices at the Hillcrest Youth Correctional Facility*, April 1998.

*Suicide Prevention in the Central Detention Facility: An Assessment and Corrective Action Plan*, July 1994.

*Suicide Prevention in YSA Facilities: A Status Report and Corrective Action Plan*, September 1992.

## OTHER SIGNIFICANT DATA

Juvenile Suicide Prevention Expert for the *Memorandum of Agreement Between the U.S. Department of Justice and the State of Arizona Concerning Adobe Mountain School, Black Canyon School, and Catalina Mountain School*, 2004 to Present.

Consulting Editor and Editorial Board Member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, 2004 to Present.

Editorial Board Member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention, 2004 to Present.

Recipient of the National Commission on Correctional Health Care's B. Jaye Anno Award of Excellence in Communication for an outstanding contribution to the field of suicide prevention in correctional facilities, November 2001.

Recipient of a Governor's Citation by the Governor of the State of Maryland for assistance in the implementation of revised suicide prevention policies in the state's juvenile institutions, October, 2001.

Principal Investigator, Evaluation of Suicide Prevention Policies and Practices at Bridgewater State Hospital, Massachusetts, 2000.

Suicide Prevention Consultant to the Council of Juvenile Correctional Administrators, 1998 to Present.

Jail Suicide Prevention Expert to Special Master in *Campbell v. McGruder, et al* (District of Columbia), 1994 to 1997.

Juvenile Suicide Prevention Expert to Special Master in *Jerry M. v. District of Columbia, et al*, 1989 to Present.

Special Editor for series devoted to international perspective of jail suicides in *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

Columnist/Reviewer to *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, Spring 1992 to Present.

Outstanding Alumnus, School of Justice, The American University, Washington, D.C., Spring 1985.

Invited Lecturer, School of Justice, The American University, Washington, D.C., January 1985 to April 1990.

14

**SUICIDE PREVENTION SERVICES (staff training, program assessment/development and litigation consultation) PROVIDED TO JURISDICTIONS IN THE FOLLOWING STATES:** Alabama, Alaska, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Virginia, Washington (State), West Virginia, Wisconsin, and Wyoming.

**Listings of training, technical assistance, and litigation consultation in suicide prevention furnished upon request.**

September 2005

**Exhibit B**

**Coleman v. Schwarzenegger**
**United States District Court, Case No. CIV S-90-0520 LKK JFM P**
**Defendants' Reply to Notice of Noncompliance**
**Exhibit 3**

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date     :    September 12, 2005

To       :    Associate Directors, Division of Adult Institutions
              Regional Administrators, Health Care Services Division
              Wardens, Health Care Managers

Subject :    **POLICY REGARDING PEACE OFFICERS RESPONSIBILITY FOR USE OF
             CARDIO PULMONARY RESUSCITATION AND FIRST AID**

A review of several incidents related to our staff's use of Cardio Pulmonary
Resuscitation (CPR) has prompted the review of departmental policy on this topic.
Case law supports the expectation for all employees trained in CPR to perform it
whenever the inmate might benefit from such efforts and when reasonably safe to do
so. This would include having the appropriate protective equipment commensurate
with the situation.   The California Department of Corrections and Rehabilitation
(CDCR) has moved forward in the adoption and application of this Departmental
Policy. This policy memorandum supersedes all other previous directions specifically
related to peace officers responsibilities in the performance of CPR.

**Application of Policy**

The application of this policy change requires the following peace officers who are
first responders (which includes, but is not limited to Correctional Officer, Sergeant,
Correctional Counselor I) and are trained in CPR/First Aid to utilize these life saving
efforts whenever the inmate might benefit from such efforts and when it is
reasonably safe to the employee to do so. In cases where CPR and/or First Aid are
not initiated due to obvious signs of prolonged death e.g., rigormortis, decapitation,
and/or the situations which pose a threat to self or others; the staff member will be
required to articulate the decision made and actions taken or not taken.

An example of this would include the following:

> *A peace officer responding to an emergency, observes an unconscious inmate
> with multiple stab wounds.  The officer initiates emergency response procedures
> e.g., sounding alarm, assessing and reacting to present danger and takes steps
> to ensure the area is both safe and clear of immediate threat. The use of
> CPR/First Aid shall be conducted when reasonably safe to do so. The Officer's
> report should describe the actions and steps taken to provide a safe and secure
> environment while ensuring the provision of life saving efforts.*

There are other examples where the immediate safety of the staff member or others
would supersede the initiation of CPR/First Aid.  The underlying issue is whether
staff are trained to maximize and expedite response efforts to ensure CPR/First Aid
are provided whenever possible and when reasonably safe to do so.  Correctional
peace officers initiation of CPR/First Aid does not relieve responding medical
personnel of their responsibility to assume life saving efforts upon arrival.
Responding medical personnel shall assume primary responsibility in the provision
of medical attention and life saving efforts upon their arrival.  The combined efforts of

See Distribution List
Page 2

both custody and medical personnel are expected.   Both custody and medical personnel are responsible to continue life saving efforts in unison as long as necessary.

**Training**

The CDCR has already implemented a new training requirement to include mandatory annual CPR/First Aid training and recertification for Correctional Officers and Supervisors. The Office of Training and Personnel Development implemented mandatory off post training for CPR/First Aid effective January 2005. The CDCR has enhanced existing CPR/First Aid training by standardizing CPR/First Aid curriculum and equipment.    This standardization is scheduled to begin in July of 2005. Additional training will be provided to include an administrative overview.   This overview will ensure an understanding of the legal obligations and liabilities as well as the technical application of this obligation.

If you have any questions or require clarification regarding the information provided, please contact Gary C. Swarthout, Project Coordinator, at (916) 322-9502.

JOHN DOVEY
Director
Division of Adult Institutions

DISTRIBUTION LIST:

Mike Knowles          Sandra Duveneck          Renee Kanan
David Lewis           Kathy Keeshen            Tim Virga
Paul Bestolarides     Joe Armor                Dennis Beaty
Gail Tanaka           Mike Beaber              David Hellerstein
Caroline Short        Margaret Howerton        Carole Springer
Ralyn Conner          Cassandra Mraz

**Coleman v. Schwarzenegger**
**United States District Court, Case No. CIV S-90-0520 LKK JFM P**
**Defendants' Reply to Notice of Noncompliance**
**Exhibit 4**

State of California                          Department of Corrections and Rehabilitation

# Memorandum

Date  :    September 12, 2005

To    :    Associate Directors
           Wardens

Subject:   **CARDIO PULMONARY RESUSCITATION**

The California Department of Corrections and Rehabilitation (CDCR) has developed the
attached Cardio Pulmonary Resuscitation (CPR) Policy for immediate implementation.
Please ensure that your institution/facility provide immediate documented On-The-Job
Training to all Peace Officer classifications.  The training will include the review and
discussion of the attached policy.  The training on the new policy must be conducted by
September 29, 2005.  Please confirm your compliance via email to Associate Warden, Gary
Swarthout, Division of Adult Institutions, by September 30, 2005.

CDCR has purchased new standardized safety equipment "CPR mouth shield" that will be
shipped to your institution/facility.  Upon arrival, documented On-The-Job Training provided
must be provided by a certified CPR instructor to all Peace Officers who are responsible for
the use of CPR and First Aid.   This training must include a review of the instructions
enclosed with product.  In the interim you are to instruct those Peace Officers to use existing
safety equipment that has been provided under the negotiated Bloodbourne Pathogen
Agreement. Once trained, each officer will be provided a personal CPR mouth shield which
must be carried at all times.

**\*Note,** *Both of these training elements are also to be incorporated into your formal CPR
training immediately.*

Each institution/facility is to ensure and confirm Housing Unit Control Booths and/or
designated areas are equipped with the CPR safety equipment that was negotiated in the
Bloodborne Pathogen Agreement.  Institutions are also to ensure that this CPR equipment is
stored with the emergency cut down device and is readily available in the event of an
emergency.  Please confirm your compliance via email to Gary Swarthout by September 15,
2005.

If you have any questions regarding the information provided or require clarification, please
contact Associate Warden, Gary Swarthout, at (916) 445-5691.

Mike Knowles
Deputy Director (A)
Division of Adult Institutions

Attachment
cc:  John Dovey.             Renee Kanan, M.D        Kathleen Keeshen
     Brigid Hanson           Tim Virga               Michael Stone
     Doug Mckeever,          Gary Swarthout

CDC 1617 (3/89)

**Exhibit C**

# Correctional Mental Health Care

## STANDARDS AND GUIDELINES FOR DELIVERING SERVICES



**NCCHC**

National
Commission
on Correctional
Health Care

**2003**

# APPENDIX B

## Guide to Developing and Revising Suicide Prevention Protocols

Lindsay M. Hayes
Project Director
National Center on Institutions and Alternatives

*All correctional facilities, regardless of size, should have a comprehensive suicide prevention program that addresses several key components.*

### Training

The essential component to any suicide prevention program is properly trained staff, who form the backbone of any correctional facility. Very few suicides are actually prevented by mental health, medical or other professional staff because suicides are usually attempted in housing units, and often during late evening hours or on weekends when they are generally outside the purview of program staff. These incidents, therefore, must be thwarted by correctional staff who have been trained in suicide prevention and have developed an intuitive sense about suicidal inmates. Correctional staff are often the only personnel available 24 hours a day; thus, they form the front line of defense in preventing suicides.

All direct care, medical, and mental health personnel, as well as any staff who have regular contact with inmates, should receive 8 hours of initial suicide prevention training, followed by 2 hours of refresher training each year. The initial training should include why the environments of correctional facilities are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, components of the facility's suicide prevention policy, and liability issues associated with inmate suicide. The two-hour refresher training should include a review of predisposing risk factors, warning signs and symptoms, and review of any changes to the facility's suicide prevention plan. The annual training should also include general discussion of any recent suicides and/or suicide attempts in the facility.

In addition, all staff who have routine contact with inmates should receive standard first aid and cardiopulmonary resuscitation (CPR) training. All staff should also be trained in the use of various emergency equipment located in each housing unit. In an effort to ensure an efficient emergency

Correctional Mental Health Care: Standards and Guidelines

response to suicide attempts, "mock drills" should be incorporated into both initial and refresher training for all staff.

Identification/Referral/Evaluation

Intake screening and on-going assessment of all inmates is critical to a correctional facility's suicide prevention efforts. It should not be viewed as a single event, but as an on-going process because inmates can become suicidal at any point during their confinement, including the initial admission into the facility, after adjudication when the inmate is returned to the facility from court; following receipt of bad news or after suffering any type of humiliation or rejection; confinement in isolation or segregation; and following prolonged a stay in the facility.

In addition, although there is no single set of risk factors that mental health and medical communities agree can be used to predict suicide, there is little disagreement about the value of screening and assessment in preventing suicide. Research consistently reports that approximately two-thirds of all suicide victims communicate their intent some time before death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than those who have never made an attempt.

Intake screening for suicide risk may be contained within the medical screening form or as a separate form. The screening process should include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health treatment/hospitalization; recent significant loss (job, relationship, death of family member/close friend, etc.); history of suicidal behavior by family member/close friend; suicide risk during prior confinement; and arresting/transporting officer(s) belief that the inmate is currently at risk. Specifically, inquiry should determine the following:

- Was the inmate a medical, mental health or suicide risk during any prior contact and/or confinement within this facility?

- Does the arresting and/or transporting officer have any information (e.g., from observed behavior, documentation from sending agency or facility, conversation with family member) that indicates inmate is a medical, mental health or suicide risk now?

- Have you ever attempted suicide?

- Have you ever considered suicide?

224

- Are you now or have you ever been treated for mental health or emotional problems?

- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?

- Has a family member/close friend ever attempted or committed suicide?

- Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?

- Are you thinking of hurting and/or killing yourself?

Although an inmate's verbal responses during the intake screening process are critically important to assessing the risk of suicide, staff should not exclusively rely on an inmate's denial that they are suicidal and/or have a history of mental illness and suicidal behavior, particularly when their behavior and/or actions or even previous confinement in the facility suggest otherwise.

The process should also include referral procedures to mental health and/or medical personnel for a more thorough and complete assessment.

The intake screening process should be viewed as similar to taking your temperature, it can identify a current fever, but not a future cold. Therefore, following the intake screening process, should any staff hear an inmate verbalize a desire or intent to commit suicide, observe an inmate engaging in any self-harm, or otherwise believe an inmate is at risk for suicide, a procedure should be in place that requires staff to take immediate action to ensure that the individual is constantly observed until appropriate medical, mental health, and/or supervisory assistance is obtained.

The screening and assessment process is only one of several tools that increases the opportunity to identify suicide risk in inmates. This process, coupled with staff training, will only be successful if an effective method of communication is in place at the facility.

Communication

Certain behavioral signs exhibited by the inmate may be indicative of suicidal behavior and, if detected and communicated to others, can reduce the likelihood of suicide. In addition, most suicides can be prevented by correctional staff who establish trust and rapport with inmates, gather

Correctional Mental Health Care: Standards and Guidelines

pertinent information, and take action. There are essentially three levels of communication in preventing inmate suicides: between the arresting/transporting officer and correctional staff; between and among facility staff (including correctional, medical and mental health personnel); and between facility staff and the suicidal inmate.

In many ways, suicide prevention begins at the point of arrest. During *Level 1*, what an arrestee says and how they behave during arrest, transport to the facility, and at intake are crucial in detecting suicidal behavior. The scene of arrest is often the most volatile and emotional time for the individual. Arresting officers should pay close attention to the arrestee during this time; suicidal behavior may be manifested by the anxiety or hopelessness of the situation, and previous behavior can be confirmed by onlookers such as family members and friends. Any pertinent information regarding the arrestee's well-being must be communicated by the arresting or transporting officer to correctional staff. It is also critically important for correctional staff to maintain open lines of communication with family members who often have pertinent information regarding the mental health status of inmates.

During *Level 2*, effective management of suicidal inmates is based on communication among correctional personnel and other professional staff in the facility. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff. At a minimum, the facility's shift supervisor should ensure that appropriate correctional staff are properly informed of the status of each inmate placed on suicide precautions. The shift supervisor should also be responsible for briefing the incoming shift supervisor regarding the status of all inmates on suicide precautions. Multidisciplinary team meetings (to include correctional, medical and mental health personnel) should occur on a regular basis to discuss the status of inmates on suicide precautions. Finally, the authorization for suicide precautions, any changes in suicide precautions, and observation of inmates placed on precautions should be documented on designated forms and distributed to appropriate staff.

During *Level 3*, facility staff must use various communication skills with the suicidal inmate, including active listening, staying with the inmate if they suspect immediate danger, and maintaining contact through conversation, eye contact, and body language. Correctional staff should trust their own judgment and observation of risk behavior, and avoid being misled by others (including mental health staff) into ignoring signs of suicidal behavior.

Correctional Mental Health Care: Standards and Guidelines

pertinent information, and take action. There are essentially three levels of communication in preventing inmate suicides: between the arresting/transporting officer and correctional staff; between and among facility staff (including correctional, medical and mental health personnel); and between facility staff and the suicidal inmate.

In many ways, suicide prevention begins at the point of arrest. During *Level 1*, what an arrestee says and how they behave during arrest, transport to the facility, and at intake are crucial in detecting suicidal behavior. The scene of arrest is often the most volatile and emotional time for the individual. Arresting officers should pay close attention to the arrestee during this time; suicidal behavior may be manifested by the anxiety or hopelessness of the situation, and previous behavior can be confirmed by onlookers such as family members and friends. Any pertinent information regarding the arrestee's well-being must be communicated by the arresting or transporting officer to correctional staff. It is also critically important for correctional staff to maintain open lines of communication with family members who often have pertinent information regarding the mental health status of inmates.

During *Level 2*, effective management of suicidal inmates is based on communication among correctional personnel and other professional staff in the facility. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff. At a minimum, the facility's shift supervisor should ensure that appropriate correctional staff are properly informed of the status of each inmate placed on suicide precautions. The shift supervisor should also be responsible for briefing the incoming shift supervisor regarding the status of all inmates on suicide precautions. Multidisciplinary team meetings (to include correctional, medical and mental health personnel) should occur on a regular basis to discuss the status of inmates on suicide precautions. Finally, the authorization for suicide precautions, any changes in suicide precautions, and observation of inmates placed on precautions should be documented on designated forms and distributed to appropriate staff.

During *Level 3*, facility staff must use various communication skills with the suicidal inmate, including active listening, staying with the inmate if they suspect immediate danger, and maintaining contact through conversation, eye contact, and body language. Correctional staff should trust their own judgment and observation of risk behavior, and avoid being misled by others (including mental health staff) into ignoring signs of suicidal behavior.

Poor communication between and among correctional, medical, and mental health personnel, as well as outside entities (e.g., arresting or referral agencies, family members) is a common factor found in the reviews of many custodial suicides. Communication problems are often caused by lack of respect, personality conflicts and boundary issues. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.

Housing

In determining the most appropriate housing location for a suicidal inmates, correctional facility officials (with concurrence from medical and/or mental health staff) often tend to physically isolate (or segregate) and sometimes restrain the individual. These responses might be more convenient for all staff, but they are detrimental to the inmate since the use of isolation escalates the their sense of alienation and further removes the individual from proper staff supervision. To every extent possible, suicidal inmates should be housed in the general population, mental health unit, or medical infirmary, located close to staff. Further, removal of an inmate's clothing (excluding belts and shoelaces) and the use of physical restraints (e.g., restraint chairs or boards, leather straps, handcuffs, straitjackets) should be avoided whenever possible, and used only as a last resort when the inmate is physically engaging in self-destructive behavior. Housing assignments should be based on the ability to maximize staff interaction with the inmate, not on decisions that heighten depersonalizing aspects of confinement.

All cells designated to house suicidal inmates should be suicide-resistant, free of all obvious protrusions, and provide full visibility. These cells should contain tamper-proof light fixtures, smoke detectors and ceiling/wall air vents that are protrusion-free. In addition, the cells should not contain any live electrical switches or outlets, bunks with open bottoms, towel racks on desks and sinks, radiator vents, or any other object that provides an easy anchoring device for hanging. Each cell door should contain a heavy gauge Lexan (or equivalent grade) clear panel that is large enough to allow staff a full and unobstructed view of the cell interior. Finally, each housing unit in the facility should contain various emergency equipment, including a first aid kit, pocket mask or face shield, Ambu-bag, and rescue tool (to quickly cut through fibrous material). Correctional staff should ensure that such equipment is in working order on a daily basis.

Correctional Mental Health Care: Standards and Guidelines

Levels of Observation

In regard to suicide attempts in correctional facilities, the promptness of the response is often driven by the level of supervision afforded the inmate. Medical evidence suggests that brain damage from strangulation caused by a suicide attempt can occur within 4 minutes, and death often within 5 to 6 minutes. Two levels of supervision are generally recommended for suicidal inmates: close observation and constant observation. *Close Observation* is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior. Staff should observe such an inmate at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). *Constant Observation* is reserved for the inmate who is actively suicidal, either threatening or engaging in suicidal behavior. Staff should observe such an inmate on a continuous, uninterrupted basis. In some jurisdictions, an intermediate level of supervision is utilized with observation at staggered intervals that do not exceed every 5 minutes. Other aids (e.g., closed-circuit television, cell mates) can be used as a supplement to, but never as a substitute for, these observation levels. Finally, mental health staff should assess and interact with (not just observe) suicidal inmate on a daily basis.

Intervention

Following a suicide attempt, the degree and promptness of the staff's intervention often foretells whether the victim will survive. National correctional standards and practices generally acknowledge that a facility's policy regarding intervention should be threefold. *First,* all staff who come into contact with the inmate should be trained in standard first aid procedures and cardiopulmonary resuscitation (CPR). *Second,* any staff member who discovers an inmate engaging in self-harm should immediately survey the scene to assess the severity of the emergency, alert other staff to call for medical personnel if necessary, and begin standard first aid and/or CPR as necessary. *Third,* staff should never presume that the victim is dead, but rather should initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. In addition, medical personnel should ensure that all equipment utilized in responding to an emergency within the facility is in working order on a daily basis.

Finally, although not all suicide attempts require emergency medical intervention, *all* suicide attempts should result in immediate intervention and assessment by mental health staff.

Reporting/Notification

In the event of a suicide attempt or suicide, all appropriate officials should be notified through the chain of command. Following the incident, the victim's family should be immediately notified, as well as appropriate outside authorities. All staff who came into contact with the victim before the incident should be required to submit a statement including their full knowledge of the inmate and incident.

Critical Incident Staff Debriefing/Mortality Review

An inmate suicide is extremely stressful for both staff and other inmates. Staff may also feel ostracized by fellow personnel and administration officials. Following a suicide, misplaced guilt is sometimes displayed by a correctional officers who wonders: "What if I had made my cell check earlier?" Residents are often traumatized by critical events occurring within a facility. Such trauma may lead to suicide contagion. When crises occur in which staff and inmates are affected by the traumatic event, they should be offered immediate assistance. One form of assistance is Critical Incident Stress Debriefing (CISD). A CISD team, comprised of professionals trained in crisis intervention and traumatic stress awareness (e.g., police officers, paramedics, fire fighters, clergy, mental health personnel), provides affected staff and inmates an opportunity to process their feelings about the incident, develop an understanding of critical stress symptoms, and develop ways of dealing with those symptoms. For maximum effectiveness, the CISD process or other appropriate support services should occur within 24 to 72 hours of the critical incident.

Every completed suicide, as well as serious suicide attempt (i.e., requiring medical treatment and/or hospitalization), should be examined through a mortality review process. If resources permit, clinical review through a psychological autopsy is also recommended. Ideally, the mortality review should be coordinated by an outside agency to ensure impartiality. The review, separate and apart from other formal investigations that may be required to determine the cause of death, should include a critical inquiry of: 1) the circumstances surrounding the incident; 2) facility procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; 5) possible precipitating factors leading to the suicide; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

# APPENDIX C

Guide for the Pychological Reconstruction
of an Inmate Suicide

Prepared by: _____
Date: _____

Name: _____
Reg. No.: _____
Date of Birth: _____ Date of Death: _____

I    Background Information
     Education
     Marital/Family Status
     Religious Preference/Involvement
     Race/Ethnicity
     Offense
     Sentence/Time Served
     Occupational/Military History
     Release Plans

II   Health Care and Personality Description
     Physical Status/Functioning
          Previous/Current
     Social Status/Functioning
          Previous/Current
     Psychological Status/Functioning
          Previous/Current
     Suicide History
     Medication History
     Mental Health History
          Diagnosis/Treatment
     Abuse History
          Alcohol/Drugs
     Assaultive History
     Institutional Infractions

Correctional Mental Health Care: Standards and Guidelines

III   Antecedent Circumstances
      Identifiable Stressors
      Staff Opinions
      Inmate Opinions
      Last Person to Have Contact
      Last Staff Contact

IV    Full Description of Suicide Act and Scene
      (to include diagrams, where appropriate)
      Date/Time of Incident
      Location
      Method
      Predictors of Suicidal Actions
      Suicide Note?
      Other Relevant Information

V     Conclusions/Recommendations

VI    List of Documents Examined

VII   List of Staff and Inmates Interviewed

232                          National Commission on Correctional Health Care

---

### Mental Heal

Jeffrey L. Metz
Clinical Profess
University of C

The scien
inmate in an is
human interact
is designed to
clinicians work
to observe ma
disorders, to de
housed in these

Zinger an
relevant to the
the literature i
based upon far
shortcomings a
anecdotal evide
present in diffe
experiments pe

Zubek, Ba
have three mai
confinement. E
inmates' respo
decreased/altere
appear to be mo
to sensory depri
sensory over-sti
for other reason
housing units,
severe disruptio
2002).

The difficu
health care an
environment, re
office space an

National Commiss

**Exhibit D**

## Intervention Procedures for Suicide Attempts

1) All staff who come into contact with inmates will be trained in standard first aid and cardiopulmonary resuscitation (CPR). All staff who come into contact with inmates will participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts.

2) All housing units will contain an emergency response bag that includes a first aid kit, pocket mask, microshield or face shield, latex gloves, and emergency rescue tool. All staff who come into regular contact with inmates will know the location of this emergency response bag and be trained in its use. The emergency response bag will be inspected by correctional staff each shift to ensure all equipment is accounted for and in proper working order.

3) Any staff member who discovers an inmate attempting suicide will immediately respond, survey the scene to ensure the emergency is genuine, alert other staff to call for the facility's medical personnel, and bring the emergency response bag to the cell. If the suicide attempt is life-threatening, Central Control personnel will be instructed to immediately notify outside ("911") Emergency Medical Services (EMS). The exact nature (e.g., "hanging attempt") and location of the emergency will be communicated to both facility medical staff and EMS personnel.

4) The first responding officer will use their professional discretion in regard to entering the cell without waiting for backup staff to arrive. With no exceptions, if cell entry is not immediate, it will occur no later than four minutes from initial notification of the emergency. (Should the emergency take place within the Special Housing Unit and require use of the Cell Entry Team, the Team will be assembled, equipped and enter the cell as soon as possible, and no later than four minutes from initial notification of the emergency.) Correctional staff will *never* wait for medical personnel to arrive before entering a cell or before initiating appropriate life-saving measures (e.g., first aid and CPR).

5) Upon entering the cell, correctional staff will *never* presume that the victim is dead, rather life-saving measures will be initiated immediately. In hanging attempts, the victim will first be released from the ligature (using the emergency rescue tool if necessary). Staff will assume a neck/spinal cord injury and carefully place the victim on the floor. Should the victim lack vital signs, CPR will be initiated immediately. All life-saving measures will be continued by correctional staff until relieved by medical personnel.

6) The shift supervisor will ensure that both arriving facility medical staff and EMS personnel have unimpeded access to the scene in order to provide prompt medical services to, and evacuation of, the victim.

7) Although the scene of the emergency will be preserved as much as possible, the first priority will always be to provide immediate life-saving measures to the victim. Scene preservation will receive secondary priority.

8) An Automated External Defibrillator (AED) is located in the Special Housing Unit. All medical staff, as well as designated correctional personnel, will be trained (both initial and annual instruction) in its use. The facility medical director will provide direct oversight of AED use and maintenance. (See also policy on "Automated External Defibrillator Use.")

9) The facility medical director will ensure that all equipment utilized in the response to medical emergencies (e.g., crash cart, oxygen tank, AED, etc.) is inspected and in proper working order on a daily basis.

10) All staff and inmates involved in the incident will be offered critical incident stress debriefing. (See policy on "Critical Incident Stress Debriefing.")