1   ROSEN, BIEN & ASARO, LLP
    MICHAEL W. BIEN Bar No.: 096891
2   JANE E. KAHN Bar No.: 112239
    THOMAS NOLAN Bar No.: 169692
3   155 Montgomery Street, 8th Floor
    San Francisco, California 94104
4   Telephone (415) 433-6830

5   THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
    CLAUDIA CENTER Bar No.: 158255
6   LEWIS BOSSING Bar No.: 227402
    600 Harrison Street, Suite 120
7   San Francisco, CA 94107
    Telephone: (415) 864-8848

8
    Attorneys for Coleman Plaintiffs and for Robert Hecker
9

10              UNITED STATES DISTRICT COURT

11              EASTERN DISTRICT OF CALIFORNIA

12
    RALPH COLEMAN,                    )   No.: Civ S 90-0520 LKK-JFM
13                                    )
          Plaintiffs,                 )   **DECLARATION OF MICHAEL W.**
14                                    )   **BIEN IN SUPPORT OF NOTICE OF**
    vs.                               )   **RELATED CASES**
15                                    )
    ARNOLD SCHWARZENEGGER, et al.,    )   **L.R. 83-123**
16                                    )
          Defendants                  )
17  _____  )

18

19

20

21

22

23

24

25

26

27

28

MICHAEL W. BIEN DECLARES:

1.      I am a member of the Bar of this Court and of the firm, Rosen, Bien & Asaro, one of the attorneys for the plaintiff class in this litigation. I have personal knowledge of the matters stated herein and if called as a witness I could and would so competently so testify. I make this declaration in support of Plaintiff's Notice of Related Cases.

2.      Attached hereto as Exhibit A is a true and correct copy of plaintiffs' April 3, 2005 Letter to *Coleman* Special Master J. Michael Keating, and counsel for the defendants in *Coleman*, Lisa A. Tillman and John van de Erve. This letter discusses the issue of EOP inmates' exclusion from the work, education, vocational and other programs and services enjoyed by non-mentally disabled inmates on pages 5 and 8.

3.      Attached hereto as Exhibit B is a true and correct copy of plaintiffs' May 20, 2005 Letter to *Coleman* Special Master J. Michael Keating, with copies provided to counsel for defendants in *Coleman*, Lisa Tillman and John van de Erve. The letter requests that defendants change their draft Program Guide for the EOP program to provide that EOP inmates will not be excluded "from access to the same broad range of programs, services, and opportunities available to general population inmates, including work, educational, vocational, and recreational programs" on page 5 and requests a similar change with respect to CCCMS programs on page 4 and 5.

4.      Attached hereto as Exhibit C is a true and correct copy of excerpts from a package of materials sent by defendants' counsel in *Coleman* to plaintiffs and the Special Master on October 20, 2005. The materials respond to plaintiffs' requests to change the policy of excluding EOP inmates from work, education and vocational opportunities. In addition to the cover letter, two enclosures from the October 20, 2005 package relevant to EOP access to programs and services are provided. First, attached is Enclosure XIII, which is an October 18, 2005 Memo to Michael Keating. In the October 18, 2005 Memo, John Dovey states that EOP inmates may be assigned to program assignments "if therapeutically beneficial." This is a non-responsive attempt to

address plaintiffs' concern. EOP inmates are rarely if ever permitted to program outside of their housing units. Second, attached is Enclosure XIV, which addresses access to educational programs for EOP inmates. The Enclosure includes an admission by CDCR Director of Adult Divisions John Dovey that only limited educational services are provided to EOP inmates and notes that "there are several constraints that impact the delivery of these education services, including facility space, staffing, housing, and programming limitations." The letter does not include any promises to resolve the problem of exclusion of EOP inmates from educational programs offered to non-mentally disabled inmates.

5.      At several recent *Coleman* meetings, including a September 16, 2005 meeting in Sacramento, defendants have indicated that they do not believe that the issue of EOP exclusion from general population activities and services is a *Coleman* issue.

6.      Early on in the *Coleman* case, defendants allowed inmates at CMF and elsewhere who were EOP inmates in sheltered housing units to participate in mainline general population programs and activities alongside general population inmates. These activities included work, education, vocational and recreational programs. Beginning in approximately 2002, EOP inmates at CMF and elsewhere began to be excluded from these programs. One of the explanations for these exclusions given by defendants at the time was that the inmates needed to remain in their housing units to facilitate the provision of the 10 hours per week of structured therapeutic activities mandated by *Coleman*. In my opinion, the real reason for this policy is administrative convenience and budget cutbacks.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration is executed in San Francisco, California on December 2, 2005.

Michael W. Bien

# EXHIBIT  A

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

April 3, 2005

<u>VIA FACSIMILE AND U.S. MAIL</u>

J. Michael Keating, Jr.
Special Master
2351 Sussex Lane
Fernandina Beach, FL 32034

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2500

John van de Erve
Legal Affairs Division
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

     Re:    *Coleman v. Schwarzenegger*
             Classification Issues
             <u>Our File No. 489-9</u>

Dear Michael, Lisa, and John:

    Plaintiffs challenge CDC classification policies and practices that interfere with the delivery of mental health treatment, unlawfully discriminate against inmates with mental illnesses, discourage participation in mental health treatment programs and generally obstruct the process necessary to remedy the ongoing Constitutional violations suffered by the plaintiff class. Together with other related custodial practices, these classification policies have contributed to the striking recent rise[1] in the general

---

[1] This movement of mentally disabled inmates to higher security levels is clearly documented in the November 2004 HOK study commissioned by the CDC. That study indicates that in 1999 only 24.5% of EOP inmates in the CDC were housed in Level IV units. Five years later, in 2004, the percentage of EOP inmates housed in Level IV units

*   MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**  MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

classification levels of inmates with mental illness.  If these unlawful classification policies and practices are allowed to continue, the plaintiff class will suffer further harmful security increases in the future.

The policies and practices at issue are as follows:

1.    The CDC's New Classification System Improperly Adds Four-Points At Initial Classification for Mental Illness.  On March 6, 2003, the CDC officially adopted a new inmate classification system which included, for the first time, the addition of four points during initial classification for "diagnosis of mental illness at CDC reception center."  C.C.R. Tit. 15, § 3375.3(a)(5); CDC 839 (Rev. 12/02).[2]  This significant change in defendants' policies and practices directed to the plaintiff class was implemented without leave of this Court and without notice to the Special Master.

This addition of four-points to the initial classification scores of inmates with psychiatric disabilities has a profound impact on the custody level placement of these inmates, often making the difference between placement in a lower security and a higher security institution.[3]   The negative consequences of a higher security level are numerous: reduced access to jobs, vocational and educational programs and the numerous other benefits that flow from such participation; reduced freedom, privileges, and opportunities; increased risk of victimization at the hands of other inmates and custodial staff;  reduced access to mental health care and treatment due to the consequences of high security procedures (lock downs, escorts, etc.); and increased sentence lengths due to reduced opportunities to "earn" credits.

---

had nearly doubled, rising to 43.8% of the total EOP population.  See November 2004 HOK Study at Executive Summary, p. 12 of 32, Table ES-C (percentage based on number of beds planned at each security level).

[2] By contrast, the system assigns four points for having a "well documented incident of an inmate's manufacture or possession of a deadly weapon where apparent use was intended" during a prior incarceration.  C.C.R. Tit. 15, § 3375.3(b)(4)(F)(1).  Being associated with a street gang leads to an additional 6 points.  C.C.R. Tit. 15, § 3375.3(a)(4).

[3]  The number of points assigned to a prisoner determines his security level, and thus, the environment in which he lives while in the system.  A higher score is supposed to reflect a greater risk of misconduct or escape, and therefore the need for higher security.  The point-based assignments are as follows:

| 0 to 18 points | Level I |
| 19 to 27 points | Level II |
| 28 to 51 points | Level III |
| 52 or more points | Level IV |

Over time with good behavior, an inmate can lower the score he received at the reception center, and be transferred to a lower security unit.  (The reclassification forms are called "840s.").  However, as discussed below, one of the primary method by which inmates lower their scores, annual four-point reductions for average or above average participation in work, education, or vocational programming, is not available to EOP inmates.

There is no legitimate justification for adding points to the initial classification scores of inmates due solely to their mental health status. The four-point factor is purportedly based upon studies conducted in 1996 and 1997, well before the current MHSDS system was established to identify inmates with psychiatric conditions and to deliver psychiatric care.[4] At the time of the study, only a small percentage of inmates were identified during initial screening as having a mental illness, and those so identified were undoubtedly those already exhibiting disruptive behavior.[5] It is not surprising that this small subset of inmates with mental illness would exhibit statistically higher rates of disciplinary problems, as they were initially labeled based on this very behavior. There is no evidence that the far larger group of inmates now being identified as having psychiatric illnesses is similarly associated with disciplinary problems. Further, at the time of the study, the MHSDS was at a primitive stage such that even inmates with known psychiatric disabilities were not likely to receive appropriate mental health care. Thus a major causative factor of behavior problems for persons with mental illnesses—lack of appropriate treatment—was not accounted for in the study. Sadly, the four points are now pushing inmates with these disabilities into higher security levels, exacerbating the very disciplinary problems it was allegedly intended to address.

2. <u>EOP Inmates Do Not Receive Annual Point Reductions for Participating In Their Programs</u>. EOP inmates are assigned to a full-time EOP program in the place of a

---

[4] See March 17, 2003 Memo from Edward Alameida to Wardens regarding "Research Report on the Inmate Classification Score System" at Executive Summary at p.3. Moreover, during the 1998 Simulation Study the UCLA researchers cautioned that the 1996-97 data had severe limitations: "*the computer data sets used by the UCLA staff for the current study were created during the 1996-97 Classification Score Form Evaluation. These data sets were never intended to support computer simulations and were found to be inadequate. The inadequacies included the small size of the sample, and the length of time since the study group was incarcerated. Furthermore, very few of the inmates in the sample remained incarcerated through several periods of reclassification. This factor prevented predictions of future distribution.*" May 1998 Report to the Legislature, Classification Score System Simulation Study at Executive Summary at p. i.

[5] During the study period, the reception centers were not adequately screening incoming inmates for mental health conditions. See 13th Monitoring Report of the Special Master at 228 (by mid 2004, "the incidence of inmates with serious mental disorders rose to roughly 17 percent, a far cry from the 7.9 percent projected some eight years ago as the likely percentage of inmates needing mental health services"). The data used in the Berk study reported far lower levels of psychiatric conditions than would be plausible: In the experimental group, the study reported only 1.3 percent of Level I inmates, and only 13 percent of Level III inmates, as having mental illness. See Richard Berk et al, A Randomized Experiment Testing Inmate Classification Systems, February 10, 2003 at 18. We hypothesize that at the time of the study, and previously, the staff was simply labeling persons who were disruptive or who "read" mentally ill (i.e. shouting, throwing, assaulting) as being mentally ill. Not surprisingly, the study found a small but statistically significant correlation between presently disruptive persons and future misconduct. Id. at 26-28. The percentage of incoming inmates with "serious mental disorders" is now estimated at 17 percent. 13th Monitoring Report at 228. This much larger group of persons is now being inappropriately assigned the additional four points.

work, school, or vocational program where they would have an opportunity to reduce their classification scores over time. The CDC does not consider EOP programs to be a qualifying assignment for the purpose of the annual point reductions generally provided to inmates who are programming at average or above average standards.[6] See C.C.R. Tit. 15, § 3375.4(a)(3) ("For each six-month period with an average or above performance in work, school, or vocational program, two points shall be entered."). Plaintiffs object to this discriminatory policy.

Inmates who are programming in the manner required of them by the CDC should not be punished for their disabilities in this manner. The EOP program is not voluntary. It is an immersive, full-time program, which precludes other qualifying full-time assignments and should qualify as the same type of "program" as work, education, or vocational participation for the purposed of annual credit reductions. Opportunities to participate in work, educational or vocational programs are infrequently made available to EOP inmates at all.

Defendants' discriminatory refusal to provide annual four-point reductions for EOP inmates is unfair and irrational. It also interferes with the delivery of adequate mental health care and discourages participation in the mental health delivery system. Inmates often seek to avoid EOP placements, even when needed, to escape the punitive consequences of this policy. Recently, one inmate facing a transfer from a Level III EOP program to a more dangerous Level IV institution because of the absence of these annual point reductions became extremely suicidal.[7]

3.    Inmates with Mental Illnesses Serve Longer Sentences Because they Are Delayed in the Reception Centers Where They Cannot Earn Sentence-Reducing Credits. Coleman class members often spend more time in reception center than other inmates, because they frequently are required to wait for placement in treatment programs that are full.[8] Because inmates in reception centers are not eligible to earn sentence-reducing

---

[6] Defendants and the Special Master's experts are well aware that for many EOP inmates, the EOP program is essentially a permanent assignment.

[7] See December 30, 2004 letter from Jane Kahn to Lisa Tillman regarding inmate Timothy O'Keefe (T-18559) who was denied annual point reductions for successfully participating in work, education, or vocational assignments, even though participation in the EOP program precludes such an assignment. Mr. O'Keefe was considered for an override that would have allowed him to remain at CMC even though he has a classification score of 54, however, he was eventually denied the over-ride and transferred to SVSP.

[8] See Thirteenth Monitoring Report of the Special Master (reporting on delays in transfers of caseload inmates out of reception centers including all of the major reception centers) at 68-69 (San Quentin), 76 (DVI data unclear), 149 (one-third of 60 EOP inmates in Wasco RC had stays longer than 60 days, average length of stay 93 days for delay cases), 157 (at NKSP "no progress had been made in providing more timely transfers for reception center EOP inmates to programs elsewhere" and 28 of 46 EOPs in RC had lengths of stay greater than 60 days), 170 (CCI data not reliable, conflicting, but still shows a number of EOP in RC for longer than 60 days), 180 (40 percent of EOPs

day-for-day credits available to inmates at mainline prisons, inmates with mentally illnesses serve longer sentences as a result of these delays (in addition to being denied access to needed mental health care).

Under the remedial plan in the Armstrong v. Schwarzenegger lawsuit, inmates with physical disabilities that require special placement are presumed to have an "extended stay" in a reception center if they remain there for longer than 60 days. See January 3, 2001 Armstrong Remedial Plan at 10-12. Under this policy, unless the CDC can show that these inmates' extended stays are caused by factors other than their physical disability, the inmates are given privileges equivalent to those available to general population inmates and are also given sentence reducing credits for the period of their "extended stay." This policy does not apply to mentally ill inmates who have extended stays due to their mental illness, as they are not Armstrong class members. There is no justification for not providing mentally ill inmates with the same extended stay credits and privileges that are provided to inmates with physical disabilities. Once again, the result of this policy is to discourage inmates from accessing mental health care—they are forced to serve longer sentences due to the delay in obtaining mental health placements.

4.    The Unnecessary Segregation of EOP Inmates and Their Exclusion from Mainline Work, Education, and Recreation Programs. Although EOP inmates are only given ten-hours a week of therapeutic activity, they are required to remain on their unit during their remaining free hours each week.[9] This irrational and discriminatory segregation policy increases the isolation of EOP inmates and denies them access to therapeutic mainline education, vocational, and recreational activities.

This exclusion is also based upon an irrational stereotype as to the ability of individuals with mental disabilities to fully participate in work and education programs. Such stereotypical ideas are disproved, however, by the CDC's own extensive past experience at both CMF and CMC with EOP-level inmates successfully participating in general population programming and work.

---

not transferred within 60 days, 24 percent of CCCMS inmate not transferred within 90 days), 193 (delays in RC and EOP transfers out of reception center), 209 (CIW RC lengths of stay not reviewed by monitors).

[9] Although historically EOP-level inmates at some institutions were allowed to program and to work in general population settings, the CDC has recently barred most EOP inmates from off-wing employment and other off-wing programming. In 2001, over plaintiffs' objections, CMF stopped permitting EOPs to work and program outside their treatment units. In some institutions, education programs were provided on treatment wings to EOP programs. However, many of these on-wing education programs were eliminated in 2003-2004. See March 8, 2004 Letter from Jennifer Neill to Michael Keating (listing status of education programs in various EOP wings) (attached). Plaintiffs have been told, but have not independently confirmed that one CDC institution, California Men's Colony (CMC), still allows EOP inmates to work in mainline positions. See id.

J. Michael Keating, Jr.
April 3, 2005
Page 6

     5.    <u>The Exclusion of EOP inmates and CCCMS inmates from Lower Custody Placements</u>.  The CDC does not allow any inmates on psychotropic medication to be housed in the low security Level I camps that are located outside the perimeter fence at most CDC institutions, or in many low security Level II facilities, or in the fire camps scattered throughout the state.  (To the best of our knowledge, CCCMS inmates are not allowed in <u>any</u> Level I environments, while EOP inmates are not allowed in <u>any</u> Level I or Level II environments.)

     Low custody environments are safer, less stressful, more open, and more therapeutic.  In addition, the Level I environments from which CCCMS and EOP inmates are excluded allow for valuable work and job training opportunities not available to inmates within the security perimeter of most institutions.[10]  These training experiences also play an important role in reducing recidivism among inmates.

     Many inmates who would otherwise be assigned to CCCMS or EOP programs actively seek to avoid mental health programs, or seek to be removed from mental health programs, so that they can better cope with incarceration and so that they can participate in meaningful work.  These inmates attempt to get along without the medications they require to function and, as a result, increase the risk to themselves of unnecessary decompensation and exacerbation of their mental illness.

     The trend towards placement of inmates with mental illnesses into high security contexts is self-fulfilling; because fewer jobs, more isolation, more conflict, and less adequate treatment are available to inmates at higher custody levels, inmates in these units are more likely to act out and to incur further disciplinary violations, which in turn prolongs their stay in high custody environments or moves them into even more restrictive environments.  For this reason, action is needed to intervene and suspend high custody placements for these inmates, and break this cycle. See 2/16/93 Report of Scarlett Carp and Associates Report at 8 ("Treatment should focus on housing the individual in the least restrictive environment possible and reintegrating him/her in general population activities to the maximum extent.").

---

[10] Plaintiffs can provide numerous individual examples of specific programs and specific inmates excluded, but in general, these programs include numerous early release halfway house programs, transitional substance abuse programs, fire camp programs, and transitional work-release programs.

Information Necessary Concerning Classification Policies:

In order to fully evaluate these discriminatory classification policies, certain information should be obtained from defendants. It is hoped that informal meetings with defendants on these issues may help persuade defendants to abandon these discriminatory policies that interfere with the delivery of mental health care.

A.    The new classification system. More information is necessary to understand the manner in which the new classification system has been implemented, including the timing of the implementation. Was the policy piloted with a group before the 2003 implementation date? It is unclear whether the addition of four points has only been applied at the initial classification of newly arriving inmates or has also been (or will be) applied across the board to inmates already in the CDC who had a history of mental illness prior to and at the time the new classification policy was implemented. Additional information is also necessary to understand how the policy is implemented in practice. For example, what evidence do the custodial officers calculating the classification score use to determine whether the inmate has a history of mental illness? What materials and instructions were provided in the training of CDC staff in the new classification procedures?

B.    The UCLA Study. It is critical that defendants provide additional information concerning the UCLA Study, which provides the justification for the new policy. An informal meeting with Dr. Berk should be arranged to permit a greater understanding of his work. Dr. Berk would also be able to explain the current status and location of his data sets and other information upon which his work is based.[11]

C.    Population data. In order to understand the manner in which the classification levels of mentally ill inmates have changed over the last six years, defendants should gather more detailed information concerning the classification levels of MHSDS inmates in various programs and categories. This information should also be reported as part of the monthly statistical packages, so that changes in the classification levels of MHSDS inmates can be monitored over time.

---

[11] These studies include, *inter alia*: The 1996/97 Validation Study by the CDC Evaluation, Compliance and Information Systems Division, Three Strikes Planning and the UCLA Department of Statistics, the findings of which were submitted to the legislature as *Report on the Inmate Classification System – Validation Study* (May 1, 1997); the 1997/98 Simulation Study performed again with the assistance of the UCLA Department of Statistics, the results of which were reported to the legislature as *Report to the Legislature – Classification Score Systems' Simulation Study* (May 1, 1998); the 1998/99 Pilot Project Study testing the proposed case factors, which resulted in *Report to the Legislature, Violent Felon Identification Program – Classification Pilot Project* (Dec. 1, 1999); Richard A. Berk et al., *A Randomized Experiment Testing Inmate Classification Systems*, 2 Criminology & Public Policy 215 (2003); Report to the Legislature - Classifications Score System Simulation Study (May 1, 1998); R.A. Berk & J. de Leeuw, *An Evaluation of California's Inmate Classification System: Using a Generalized Regression Discontinuity Design*, 94 J. American Statistical Assoc. 1045 (1998); and Richard Berk, et al., *A Randomized Experiment Testing Inmate Classification Systems* (Feb. 10, 2003).

D.    Policy of denying EOP inmates annual four point reductions for participation in their program. Defendants should share information concerning the policy of refusing to give inmates enrolled in EOP programs the annual four point reductions for work and education. What are the reasons for this policy? When was it implemented? What are the consequences?

E.    Policy of precluding EOP inmates from working outside the EOP units. Defendants should share information concerning the policy of exclusion and segregation of EOP inmates from mainline institution activities. Are EOP inmates excluded from working in mainline general population positions at all CDC institutions? If not, at which institutions are EOP inmates allowed to work in off-wing, mainline positions? When did the exclusion of EOP inmates from mainline activities begin at which institutions? What is the purpose of the exclusion of EOP inmates from mainline work and recreation activities? Is there any statewide CDC policy on this issue? Is it a written policy? What percentage of EOP inmates are long-term participants in the EOP program, unlikely to ever be able to function in the GP?

F.    Programs available at different custody Levels and access of MHSDS inmates to Level I and Level II housing: Defendants should provide additional information concerning their range of programming available at all institutions and camps. In addition, information is necessary concerning programming currently available to MHSDS inmates, both CCCMS and EOP, at the different custody levels. What are the policies or practices that regulate the ability of EOP and CCCMS inmates to access Level I and II housing? Are MHDS inmates ineligible for certain programs (such as fire camps)? Why?

G.    Reception Center Delays for MHSDS. Defendants are already required to provide data as part of their monthly statistical package about delays in RC processing of caseload inmates. Unfortunately, this data continues to be unreliable and inadequate for assessing the overall problem.[12] Defendants should provide information concerning the total length of stays for EOP inmates in RC (not just the time frames once they are identified as EOP). Can the monthly data on RC stays be improved to be more reliable and useful? Are defendants willing to expand the category of inmates for whom extended stay credits and privileges are provided in RC to include mentally ill inmates when they are retained in RC solely due to their mental illness?

Additionally, if resolution of the issues described above requires a hearing, plaintiffs may need more formal discovery.

---

[12] In the current monthly statistical package, dated on the CDC cover memo at January 4, 2005, but not received by plaintiffs until February 11, 2005, Enclosure 13 is a set of documents entitled "RC processing for MHSDS inmate patients. December 2004." Defendants have admitted in the past that the data in this report is not accurate.

J. Michael Keating, Jr.
April 3, 2005
Page 9

   The resolution of these issues is extremely important to the plaintiff class.  These classification policies are a significant obstacle to the completion of the remedial process and, in fact, contribute significantly to the ongoing Constitutional violations.  As the HOK study demonstrates, defendants are in the midst of planning for a major re-organization of its mental health delivery program that would concentrate its care delivery in three new mega mental health institutions.  This billion dollar project is designed based on the assumption that defendants' flawed and illegal classification system is appropriate and that the trends of ever-higher security levels for the plaintiff class will continue.  It is critical that these classification policies and practices be addressed as soon as possible.

   We look forward to further conversations with you concerning how best to address this critical issue.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

*Thomas Nolan*

By: Thomas Nolan

cc:    Mr. Lopes
       Dr. Metzner
       Dr. Warren
       Dr. Patterson
       Dr. Hughes
       Co-counsel

*MULTI-FAX TRANSMISSION*

# ROSEN, BIEN

# & ASARO, LLP



---

**Attorneys at Law**
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax:   (415) 433-7104

CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

---

__12__ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 4/4/05

TO: J. Michael Keating Jr.

Recipient's Fax No: 904 491-7158    Phone No: _____

TO: Lisa Tillman

Recipient's Fax No: 916 324-5205    Phone No: _____

TO: John van de Erve

Recipient's Fax No: 916 827-5306    Phone No: _____

TO: Mr. Lopes

Recipient's Fax No: 401 553-1850    Phone No: _____

FROM: Thomas Nolan    Our File No: 489-9

Message: _____

## MULTI-FAX TRANSMISSION

# ROSEN, BIEN
# & ASARO, LLP



**Attorneys at Law**
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax:    (415) 433-7104

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

_____ 12 PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 4/4/05

TO: Dr. Metzner

Recipient's Fax No: 303/322-2155  Phone No: _____

TO: Dr. Warren

Recipient's Fax No: 202/543-3025  Phone No: _____

TO: Dr. Patterson

Recipient's Fax No: 301/292-6272  Phone No: _____

TO: Dr. Hughes

Recipient's Fax No: 404/364-9708  Phone No: _____

FROM: Thomas Nolan   Our File No: 489-9

Message: _____

# ROSEN, BIEN
# & ASARO, LLP



### *FAX TRANSMISSION*

---

**Attorneys at Law**

155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax: (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us. It is hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

---

_____12_____ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

TO: Don Specter

FROM: Thomas Nolan    Our File No.: 489-9

Recipient's Fax No. 457-9151    Phone No: _____
_____ (to confirm)

DATE: 4/4/05

### IF YOU EXPERIENCE ANY PROBLEMS WITH THE QUALITY
### OF OUR TRANSMITTAL, PLEASE CALL (415) 433-6830

Message:

_____

_____

_____

_____

_____

```
                        ***  MULTI TX/RX REPORT  ***
                        *********************************

TX/RX NO              4409
PGS.                  12
TX/RX INCOMPLETE      -----
TRANSACTION OK        (1)   19044917158p4899
                      (2)   19163245205p4899
                      (3)   19163275306p4899
                      (4)   14015536850p4899
                      (5)   13033222155p4899
                      (6)   12025433025p4899
                      (7)   13012926272p4899
                      (8)   14043649708p4899
                      (9)   4579151p4899
ERROR INFORMATION     -----
```

# *MULTI-FAX TRANSMISSION*

# ROSEN, BIEN

# & ASARO, LLP

**Attorneys at Law**
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone:  (415) 433-6830
Fax:    (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

___12___  PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 4/4/05

TO: J. Michael Keating Jr.

Recipient's Fax No: 904/491-7158    Phone No: _____

TO: Lisa Tillman

Recipient's Fax No: 916/324-5205    Phone No: _____

# EXHIBIT  B

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**

ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

May 20, 2005

J. Michael Keating, Jr.
Office of the Special Mater
285 Terrace Avenue
Riverside, RI 02195

Re:    Coleman v. Schwarzenegger
         Plaintiffs' Objections to the Revised Program Guides
         Our File No. 489-3

Dear Mr. Keating:

This letter sets forth Plaintiffs' objections to the Revised Program Guides dated July 2004. As noted in the Special Master's Draft Report on Revised Program Guides, ("Draft Report"), plaintiffs concur with the Master's recommended revisions made in the Draft Report and do not, therefore, repeat our objections to those provisions in our own comments here.

## Chapter 1: Program Guide Overview

## Page 12-1-2

### A.    Reasonable Accommodation for Inmates

This section should include additional language which states that: **reasonable accommodation shall be provided to inmate-patients who participate in the MHSDS to ensure that they are housed at security levels commensurate with their classification scores and are provided access to the same broad range of programs, services and opportunities available to general population inmates, including the work, educational, vocational and recreational programs available at lower security housing levels.**

Failure to provide access to programs, services and opportunities available to general population inmates increases the isolation of inmate-patients who participate in the MHSDS and denies them access to therapeutic mainline education, vocational and recreational activities. It also interferes with the delivery of adequate mental health care by discouraging participation in the mental health delivery system.

*   MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**  MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

### Page 12-1-9

Paragraph H. This paragraph refers to the Inmate Mental Health Identifier System (IMHIS) which is designed to track the movement of all inmate-patients receiving care in the MHSDS. Although defendants previously used the IMHIS to track former caseload inmate-patients, they no longer do so but have provided no explanation for why they now consider the practice burdensome. Plaintiffs request that this code for former caseload be reinstated.

The Revised Program Guides permit defendants to remove CCCMS patients from the MHSDS after six months in remission. This "experiment", which does not have the safeguard of tracking patients who have been removed from the MHSDS, may be quite dangerous. Implementing a tracking system of former MHSDS patients will enable defendants to identify and screen these inmates at critical times when they are most at risk – such as when they are moved into administrative segregation units for safety or disciplinary reasons and are dealing with the underlying stressors or mental health decompensation that led to the ASU placement.

### Page 12-1-11 (Table of Timelines)

Plaintiffs object to the failure to include a transfer timeline for EOP patients housed in administrative segregation Hub units in the Table of Timelines. EOP patients are housed in these units for a variety of reasons, including PSU transfer delays, RVR processing, SNY concerns and DA referrals, and the lengths of stay for many of these patients remain long. As noted by the Special Master in discussing the need for a timeline tied to referral in the case of DMH beds:

> **"The referral-based timelines, however do require CDC to manage the utilization of these programs more carefully, develop and maintain carefully an accurate measurement of the demand for them and budget the needed expansion of those programs lacking adequate bed space to meet growing demand."** (Special Master's Draft Report on Revised Program Guides at 8.)

The department requires a transfer timeline for PSU transfers in order to develop the needed beds and classification processes necessary to move EOP patients out of administrative segregation Hub facilities. In discussing the richer staffing of the PSU program, the Special Master noted that "[t]hese differences are not enough, however, to preclude the use of the hub EOP administrative segregation unit for the limited period of 60 days required to transfer inmates to a PSU." (Keating Letter to Roseanne Campbell, dated May 16, 2003, at p.2) Unfortunately, it is taking much longer than 60 days to transfer these patients and it is time for a PSU transfer timeline to require defendants to seriously manage the bed need and classification processes.

A transfer timeline for EOP patients housed in administrative segregation who are waiting for resolution of safety and disciplinary issues is necessary because of the

defendants' on-going failure to address the Court's concern about moving seriously disordered inmates out of administrative segregation as rapidly as possible. (Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, dated May 12, 1999, at p. 10.)

This is not a new problem and despite recent attempts to focus defendants' attention on the long stays of EOP patients in the Hub facilities, the department has failed to effectively address these delays. (See January 12, 2004 Court Order, Item 5, ordering defendants to identify reasons for length of stay in administrative segregation for each of the 34 EOP inmates held for six months or more; See January 7, 2005 Health Care Placement Unit data listing 41 EOP inmates held for six months or more in EOP administrative segregation units.)

Many of the EOP patients housed in the Hub ASUs decompensate during their stays in these units. (See UNA Study Appendix F; See Multiple MHCB Admissions, Corcoran, 9/30/04-3/31/05 reporting 38% of multiple admissions from the EOP adseg Hub, 12% from mainline EOP, 21% from 3CMS SHU.) Absent a transfer timeline, the department will not develop timeframes for processing RVRs, DA referrals, safety investigations or for the development of sufficient Level IV SNY beds, for moving these patients rapidly through the disciplinary, classification and investigative processes to mainline EOP programs or PSU programs that are designed for long term programming.

In addition, while EOP patients wait in administrative segregation units to transfer to PSU programs or to mainline EOPs, they are likely to require more intensive treatment and programming than provided in a mainline EOP program. Therefore, clinical and custodial staffing and program space for these administrative segregation Hub units must be enhanced to provide for more than the minimum ten hours a week of structured therapeutic activities.

## Chapter 2: Reception Center Mental Health Assessment

Plaintiffs object to the use of the new inmate classification system which adds four points during initial classification for "diagnosis of mental illness at CDC reception center." 15 CCR § 3375.3(a)(5); CDC 839 (Rev. 12/02). Defendants have offered no legitimate justification for adding classification points based solely on mental health diagnosis.

The addition of four extra points to the initial classification scores of inmates with psychiatric disabilities has a significant impact on the custody level placement of these inmates, often making the difference between placement in a lower security and higher security institution. The negative consequence of a higher security level are numerous: reduced access to jobs, vocational and educational programs and the numerous benefits that flow from such participation; reduced freedom, privileges, and opportunities; increased risk of victimization at the hands of other inmates and custodial staff; reduced access to mental health care and treatment due to the consequences of high security

Michael Keating, Jr.
May 20, 2005
Page 4

procedures (lock downs, escorts); increased lengths of sentences due to reduced opportunities to "earn" credits.

## Page 12-2-8  (Transfer Timelines)

The transfer timelines for MHSDS inmates housed in reception centers require that EOP patients be transferred within 60 days, and that CCCMS patients be transferred within 90 days. MHSDS inmate-patients frequently spend more time in reception centers than other inmates because they are required to wait for placement in treatment programs that are full. Inmates in reception centers are not eligible to earn sentence-reducing day-for-day credits available to inmates at mainline prisons, which has caused inmates with mental illnesses to serve longer sentences as a result of these transfer delays (in addition to being denied access to needed mental health care).

Plaintiffs propose the following procedures for inmate-patients who remain at reception centers for extended stays solely due to their participation in the MHSDS:[1] **These inmate-patients shall be granted, during their extended stays, privileges that are available at mainline institutions, as outlined in 15 CCR § 3044(d) Privilege Group A. In addition, these inmate-patients shall also receive sentencing credits, during their extended stays, that they could have earned if they had been transferred to a mainline institution, as outlined in 15 CCR§ 3044(b), Work Group A1. Inmate-patients participating in the MHSDS who are, by law, ineligible to earn work time credits are exempt from this requirement.**

**When it comes to the reception center's attention that an inmate-patient participating in the MHSDS has a reception center stay that has extended beyond 60 days for EOP participants or 90 days for CCCMS participants, the inmate-patient's case will be presented to the classification committee on the 61st or 91st day respectively for determination whether the extended stay is solely due to participation in the MHSDS. The determination by the classification committee shall be documented on the CDC Form 128G. If the classification committee determines that the extended stay is solely due to participation in the MHSDS, the corresponding CDC Form 128G Privilege Group A and Work Group A1 shall be forwarded to the appropriate custody staff to ensure privileges are provided as required and to the Case Records manager to apply applicable work credits.**

## Chapter 3: Correctional Clinical Case Management System

## Page 12-3-2

1.     Plaintiffs propose additional language to this section: **CCCMS inmate-patients shall be housed in security levels commensurate with their classification points. Their participation in the MHSDS will not exclude them from access to the**

---

[1] This is the same procedure defendants now utilize for inmates with mobility, vision and hearing disabilities that impact placement.

same broad range of programs, services and opportunities available to general population inmates, including the work, educational, vocational and recreational programs available at lower security housing levels.

### Chapter 4:  Enhanced Outpatient Program

### Page 12-4-4

### Enhanced Outpatient Care (Designated Housing Unit)

Plaintiffs propose additional language to this section:  **EOP inmate-patients will be housed in EOP programs in security levels commensurate to their classification points.  Their participation in the EOP program will not exclude them from access to the same broad range of programs, services and opportunities available to general population inmates, including work, educational, vocational and recreational programs.**

### Annual Point Reduction (New Section)

EOP inmates are assigned to a full-time EOP program in the place of a work, school or vocational program where they would have an opportunity to reduce their classification scores over time.  Inmate-patients participating in the EOP program should receive the same annual four point classification score reductions as inmates participating in other types of programs, such as work, education and vocation.  (15 CCR §3375.4(a)(3)("For each six-month period with an average or above performance in work, school or vocational two points shall be entered.")

Defendants' refusal to provide annual four-point reductions for EOP patients is unfair and irrational.  It also interferes with the delivery of adequate mental health care and discourages participation in the mental health delivery system.  Finally, it has resulted in EOP patients remaining at higher custody levels because they cannot reduce their classification scores over time.

### Chapter 5: Mental Health Crisis Bed

### Page 12-5-14

Defendants must incorporate the requirements of Health and Safety Code Sections 1180-1180.6, Use of Seclusion and Behavioral Restraints in Facilities in their Program Guide Section on Clinical Restraint and Seclusion.

Section 1180.3 applies to psychiatric units in general acute care hospitals, acute psychiatric hospitals, psychiatric health facilities, and crisis stabilization units.

Section 1180.4 and 1180.5 sets forth clinical requirements for use of restraints and clinical and quality review after each use of seclusion or behavioral restraints.

J. Michael Keating, Jr.
May 20, 2005
Page 6

### Page12-5-26-27

Plaintiffs object to the increasing use of the Outpatient Housing Units for housing mental health inmates in crisis. These housing units are essentially lock-up units that are poorly staffed with only an RN, MTA, LVN or a CAN (Certified Nurse Assistant). This section must clearly state that inmate-patients admitted to the unit for suicide observation must be transferred immediately and no later than 24 hours to an MHCB after there is a determination that the inmate has **active suicidal ideation, threats or an attempt.** The section makes reference to providing care in compliance with the Suicide Prevention and Response Project but does not specify when an inmate who has been admitted to an OHU for observation for suicidality must be transferred to an MHCB bed for suicide precaution or watch. Standards and timeframes must be set forth clearly in this section.

Plaintiffs object to the official establishment of the OHU as a placement option for EOP patients who are waiting for transfer to an EOP program. These units are lock-up units that do not have access to recreational therapy or other programming. Furthermore, they are not appropriately staffed mental health units. If the EOP patient is too ill or vulnerable to be discharged to the General Population while he or she waits for a transfer to an appropriate level of care, then the patient should be transferred to an MHCB bed where appropriate staff and services can be provided until an expedited EOP transfer can be arranged.

### Chapter 7: Administrative Segregation

### Page 12-7-2

Item 4 of Program Goals and Objectives describes the role of mental health in the classification decision-making process during ICC, including assessing whether the inmate-patient is likely to decompensate if retained in ASU and should be recommended for an alternative placement. This important role addresses the concerns expressed early in the case by the Special Master when evaluating the delivery of mental health care in administrative segregation. Unfortunately its implementation has been weak.

In discussing the challenges in delivering mental health care services in administrative segregation, the Special Master noted:

"[t]hat clinicians must have strong input in any decision to transfer decompensating inmates out of administrative segregation. Given such input, the experts were willing to give the defendants the opportunity to attempt to deliver mental health services in administrative segregation, with the understanding that serious efforts to limit the duration of stay of seriously mentally disordered inmates in administrative segregation would be undertaken." (Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding, January 4, 1999 at p.2.)

The description of the role played by the mental health clinician in the ICC by the Special Master in 1999 has changed little: the case manager was oftentimes not the inmate's treating clinician; the UHR was often missing; there was limited or meaningless participation by the clinician who was either intimidated, chose not to speak or was ignored (Special Master's Recommendations on Administrative Segregation at 5). Six years later, the numbers and lengths of stay of caseload inmates remain high and the role of the mental health clinician in the ICC remains limited.

Plaintiffs propose the development of a form/protocol to be used in conjunction with this Program Guide Section that requires review of the inmate-patient's UHR by the IDTT/clinical case manager to address whether the inmate-patient is likely to decompensate if housed or retained in administrative segregation. This form would be completed prior to the ICC and utilized during the ICC to recommend alternative placements. These clinical recommendations must be implemented by ICC.

This form/protocol would include a review of the UHR to look for a prior history that indicates that the inmate has done poorly in administrative segregation or SHU (i.e. prior DMH admissions or repeated MHCB admissions) or is currently doing poorly (i.e. repeated MHCB admissions, refusing medications or yard or showers). Once a clinical determination has been made that an inmate-patient is likely to deteriorate if placed or retained in segregation, the inmate must be removed immediately **before** he or she decompensates. **It is unacceptable to repeatedly return inmate-patients to segregation who cannot be stabilized in segregated housing.**

### Page 12-7-4

5.    Clinical Rounds: This section provides that a mental health staff member will conduct rounds seven days per week of all MHSDS inmates but **only once a week of all general population inmates.** Plaintiffs object to this reduction in the clinical rounds for general population inmates housed in the administrative segregation units. In addition, plaintiffs object to the description of the requirements for clinical rounds in this environment because they do not require verbal interaction with the inmates.

Administrative segregation units are characterized by harsh conditions, limited out of cell time, the absence of programming, high security and other major stressors arising from the underlying reasons that inmates are housed there. The department does not track inmates who have been recently discharged from the mental health caseload in order to provide them with additional screening or rounding during their initial placement in administrative segregation. The department does not effectively track inmates with suicide attempt history in order to identify former caseload or general population inmates at high risk when placed in administrative segregation. For all of the above reasons, plaintiffs strongly object to the proposed change from daily psych tech rounding of non-caseload inmates to once a week rounding, and to the provision of psych tech rounding that does not require that the psych tech speak with each inmate during the rounds.

### Page 12-7-6

2.      Inmate-patients who receive treatment at the CCCMS level of care will be provided with individual case manager contact **every other week**. Plaintiffs object to the reduction in individual case manager contacts from weekly to every other week in the harsh environment of administrative segregation. Lengths of stay for CCCMS patients have increased in administrative segregation, as have the numbers of CCCMS suicides in lock-up units. Both factors do not support a reduction of care in these harsh living units.

### Chapter 8: Security Housing Unit

### Page 12-8-2

The top of this page sets forth an incomplete list of the <u>Madrid</u> exclusionary criteria. Attached are the current Madrid exclusionary criteria. The Revised Program Guide must include the complete exclusionary criteria to ensure that inmates are not incorrectly transferred to the Pelican Bay SHU.

In addition, plaintiffs contend that appropriate exclusionary criteria should be developed for the other SHU programs that are characterized by similar harsh conditions, limited programming, high security, long stays and other major stressors. There is no rationale or clinical justification for the existing policy and practice that excludes a class member from the Pelican Bay SHU and places him without evaluation or review of appropriate exclusionary criteria in the Corcoran or CCI SHU.

### Page 12-8-3

5.      This section provides for mental health input into ICC proceedings regarding whether an inmate-patient is likely to decompensate if retained in SHU. Plaintiffs refer to Chapter 7, Page 12-7-2 (at page 6 of Plaintiffs' Objections) for discussion of the form/protocol to implement for review for ICC.

As stated above in Chapter 7, this review would include an evaluation of the inmate-patient's UHR for history of decompensation in locked units, suicide attempt history in SHU and administrative segregation units, **plus** recent PSU discharge during a specified transition period. Once a clinical determination is made that an inmate-patient is likely to decompensate if placed or retained in the SHU, the inmate must be removed immediately from the SHU **before** he or she decompensates. It is unacceptable to repeatedly return inmate-patients to the SHU who cannot stabilize in segregated housing.

### Page 12-8-5

Clinical Rounds: This section provides that a mental health staff member shall conduct a weekly round of all MHSDS inmates and a round every other week on non-MHSDS inmates. Plaintiffs object to limited clinical rounding in the SHU. As stated in our previous comments on the Revised Program Guides, the standard of care in all lock-up units within CDC, including the SHU should include daily clinical rounding of **all**

J. Michael Keating, Jr.
May 20, 2005
Page 9

inmates. The SHUs are all characterized by harsh conditions, long stays, limited programming, isolation, and other major stressors, including threats, victimization and custody misconduct.

### Page 12-8-8

Required Treatment: Plaintiffs object to the provision of case manager contacts every 30 days to CCCMS inmate-patients housed in the SHUs. CCCMS patients housed in the SHU should be offered weekly individual out-of-cell meetings with their clinical case managers.

### Screen of all Non-Caseload Housed in CCI, VSPW and Corcoran SHUs

Plaintiffs object to the failure to include a requirement for a one-time screen of all non-caseload inmates currently housed in the Corcoran, VSPW and CCI SHUs using the 31-question mental health questionnaire used in the Reception centers. (See Plaintiffs' Comments on Section 8 filed on May 17, 2004; Issue also discussed at the Program Guide meeting on April 29, 2004.) There are over 800 general population inmates housed in the SHUs who are not provided with clinical rounds, some of whom have been housed in the units for many years. These men and women should be provided with an initial mental health screen as part of the Revised Program Guides.

### Enhanced Programming and Treatment

Defendants must provide enhanced programming and improved conditions, including additional out of cell time, for those inmate-patients housed in the SHUs for extended periods of time. In addition, the Program Guides must incorporate procedures to ensure clinical mental health input as to any custody policies or procedures that change conditions or programming in the SHUs. Examples from the past few years include: painting windows; removing beds and mattresses, shoes, medications; excessive violence.

### Chapter 9: Psychiatric Services Unit

### Page 12-9-3

Section F sets forth an incomplete list of the Madrid exclusionary criteria for the Pelican Bay SHU. A complete listing of the current Madrid SHU exclusionary criteria is attached hereto and must be incorporated into the PSU Program Guide.

### Page 12-9-4

Sections 3e. and 3f. are part of the comprehensive mental health assessment done by the primary clinician and other IDTT members prior to the initial IDTT for each PSU patient. This assessment includes a review of the disciplinary history and custodial placements by the assigned Correctional Counselor or Lieutenant and a review of specific risk factors for violence toward self and others. After the Initial IDTT, these factors are evaluated and updated at 60 and 120 days after admission, and at least every 90 days thereafter. Despite the individualized assessment of each PSU patient's specific risk

factor for violence towards others, all group therapy and individual case manager contacts occurs in the PSU program in treatment cages through all Stages, including before transitioning to mainline EOP/3CMS programs or parole.

Plaintiffs object to a treatment program that does not include a Step Level where the patients are programmed in groups without cages. Some of these PSU patients have successfully programmed in groups at SVPP before returning to the cages at SAC and Pelican Bay PSUs. A treatment program, intended to transition patients to parole and/or mainline EOP/3CMS programs, that does not include a Step Level without caged groups does not properly prepare the patient for successful reintegration.

### Page 12-9-5

The IDTT makes a decision regarding appropriate placement for the inmate-patient in the PSU, which can include referral to DMH, placement in an MHCB bed, retention in the PSU, referral to ICC for SHU placement as 3CMS or placement in a general population EOP if the SHU has been served. There should be an additional section added which states that if the IDTT finds that the inmate-patient cannot be retained in segregated housing because of likelihood of decompensation, then the treatment team should recommend removal and referral to ICC for an alternative placement including placement waiver of SHU if appropriate, or placement in DMH until the SHU is served.

Once there has been a clinical determination that an inmate-patient is likely to decompensate if retained in segregation, that patient should be removed immediately from segregated housing.

### Chapter 10: Suicide Prevention and Response

### Page 12-10-16 and 12-10-17

Plaintiffs object to the use of closed-circuit televisions to replace direct staff observation of inmates on suicide watch for several reasons including the therapeutic importance of direct contact between the inmate and staff and the technical limitations of using video monitoring. Closed-circuit televisions can be used as a supplement to, but never as a substitute for constant observation by staff. This is a dangerous practice.

### Identifier Code for Suicide Attempt History for All Inmates

Plaintiffs object to defendants' failure to track suicide history for all inmates in their IMHIS or any other management information system developed by defendants. In Plaintiffs' Comments on the Draft Special Masters' Report on Suicides in the CDC in 2003, we requested a recommendation that defendants track suicide attempt history for all inmates within CDC through the use of their IMHIS. The Special Master recommended that defendants develop a plan for initiating a process to track the suicide history of inmates in CDC's mental health caseload either using the MHTS and/or any other management information system developed by defendants. (Special Master's

J. Michael Keating, Jr.
May 20, 2005
Page 11

Report on Suicides Completed in the California Department of Corrections in Calendar Year 2003, Recommendation 5 at p.14.)  While this recommendation addresses an important need within CDC, it does not go far enough.

The Revised Program Guides provide for removal of patients from CCCMS – the largest portion of the mental health caseload- after only six months of remission. Defendants no longer track former caseload inmates in their IMHIS and these inmates with suicide history will not be tracked under the current requirements of the Special Master's Recommendation 5.

Furthermore, non-caseload inmates with suicide histories will not be tracked under Recommendation 5 of the Special Master's Suicide Report.  According to the Special Master's Suicide Reports covering the years 1998-2003, 31% of the non-caseload suicides (18 of the 58 where the suicide history was known) involved inmates with suicide attempt history.  Plaintiffs believe that the cost of tracking the suicide attempt history for general population inmates (which would include former caseload inmates) is minimal compared to the benefits to defendants' Suicide Prevention Program.

### Request For Plaintiffs' Experts to Conduct Tours of Programs

In preparation for hearings concerning these disputed issues, plaintiffs' experts need to tour several EOP administrative segregation units and Outpatient Housing units, the SAC PSU and the SHUs at CCI, Corcoran and Valley State for Women.  We anticipate that these inspections could be completed in no more than two days per institution provided that we are provided with appropriate access to programs and opportunities to conduct interviews and review files.

Please feel free to contact us if you have any questions about these comments.

Sincerely,

*Jane Kahn*

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:ts

cc:    Matthew A. Lopes, Jr.
       Lisa A. Tillman
       John van de Erve
       Coleman Co-counsel

# 11

# MENTAL HEALTH INTAKE
# SCREENING / REFERRAL / EVALUATION PROCESS

## I.    POLICY

A.    Mental Health Services shall maintain procedures to identify inmates in need of mental health services:

1.    Inmates entering the institution (new arrival screening).

2.    Inmates moved to the Administrative Segregation Unit (ASU) from any other part of the institution (31-item screening).

3.    Inmates moved to the Security Housing Unit (SHU) from any other part of the institution (SHU screen).

4.    Inmates already in the institution who were not previously identified and are experiencing mental illness or psychiatric / emotional crisis.

5.    Inmates who experience an exacerbation of a previously identified mental illness.

## II.    PROCEDURE

A.    **Primary Screening (Bus Screen) of all Incoming Inmates**

All inmates arriving at Pelican Bay State Prison (PBSP) shall be screened upon arrival at the facility R& R and upon unloading off the bus at SHU by a Medical Technical Assistant using a standardized form CDC Form 7278-PB (Bus Screen).

B.    **General Population Inmates New Arrival Screening**

1.    Within 24 hours of their arrival, the health care records of all general population inmates arriving at PBSP, excluding those identified in the primary screen, shall be reviewed by health care staff.

2.    If the screening results suggest the likelihood of a need for mental health treatment, the inmate shall be referred for a mental health evaluation to occur within ten working days of referral.

C.    **Security Housing Unit (SHU) Inmates New Arrival Screening**

1.    Health Record Review

a.    Within 24 hours of the time of placement into SHU, the inmate's Health Care Record shall be reviewed.  The results of this review shall be documented on the Health Record Review Form. This process will involve a thorough search of the Health Care Record for evidence of any of the following:

© 7-17-00 PBSP

## VA - 11 - 1

1. Documented diagnosis or evidence of any of the following DSM IV – Axis 1 conditions currently in existence or within the preceding 3 months:

   a. Schizophrenia (all sub-types);
   b. Delusional Disorder;
   c. Schizophreniform Disorder;
   d. Schizoaffective Disorder;
   e. Brief Psychotic Disorder;
   f. Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal);
   g. Psychotic Disorder Not Otherwise Specified;
   h. Major Depressive Disorders
   i. Bipolar Disorder I and II

2. A diagnosed mental disorder that includes being actively suicidal.

3. A diagnosis of a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads to significant functional impairment.

4. A diagnosis of "organic brain syndrome" that results in a significant functional impairment if not treated.

5. A diagnosis of a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment.

6. A diagnosis of mental retardation.

7. A prior history which suggests that the inmate will do poorly in the SHU. This includes inmates who have experienced psychotic symptoms which appear to be attributable to incarcerations in a SHU environment. These inmates are those for whom evidence exists of a deterioration in mental health which correlates with placement in SHU or SHU-like environments. Such diagnoses as "Brief Psychotic Episode", "Psychosis NOS", and "Major Depression" which have been assigned during periods of placement into SHU may, for example, be indicative of deterioration of mental health which accompanies SHU placement. Inmates whose history suggests such a causal relationship should be excluded from SHU.

8. A history which includes any of the following within the preceding three months:

   a. Medication prescribed to address any of the "at risk" mental health categories listed in "1" through "9" above.

        b.    Therapy and/or supportive services to address any of the "at risk" mental health categories listed in "1" through "9" above.

© 7-17-00 PBSP

**VA - 11 - 2**

        c.    Frequent (e.g. at least weekly) monitoring for deterioration in mental health condition. This does not include situations in which repeated visits by mental health staff are attributable to repeated referral from the inmate or from custody staff but where no metal health condition is noted.

        d.    A history which includes a recurrent or "cyclic" mental health condition (e.g. Bipolar Disorder) where the inmate has not currently been symptom free from a period of time that is at least **twice as long** as the longest known period of active symptoms or known to demonstrate recurrent symptoms at intervals of approximately 6 months, would be considered as "positive" on this indicator until they had been symptom free for a continuous period of at least 12 months.

    b.    Where the results of the Health Care Record review reveal that any of the above conditions exist, the inmate must be removed from SHU within 96 hours of his arrival on that unit.

    c.    Where the results of the Health Care Record review **do not** reveal the existence of any of the above conditions **and** there is evidence that the inmate has been evaluated with the existing 31 item screen or other evaluation (documented on an MH1 or MH7 form) within the preceding 12 month period, the inmate may be housed in SHU.

    d.    Where the results of the Health Care Record are equivocal (as where no clear diagnosis is established but where mental health contact and observations has suggested that symptoms consistent with one or more of the above conditions have been observed) or when no mental health evaluation (a 31 item screen completion of an evaluation documented on an MH1 or MH7 form) has occurred the preceding 12 month period, a mental health evaluation (as detailed below) should occur.

2.    Mental Health Evaluation

    a.    The Mental Health Evaluations prior to SHU placement consists of completing the MH7 form per the existing standard instructions for that form **and** completing the Similarities Subtest from the WAIS-R as per the standardized instructions for that instrument.

    b.    If the mental health evaluation results in the finding that none of the conditions elaborated in Section 1 above are present **and** the Subtest Score from the Similarities Subtest is 8 or above, the inmate may be housed in SHU.

c.    If the results of the mental health evaluation reveal that any of the conditions elaborated in Section 1 are present, the inmate must be removed from SHU within 96 hours of arrival.

© 7-17-00 PBSP

**VA - 11 - 3**

d.    If the Similarities Subtest score is less than 8 **or** if the mental health evaluation reveals any other evidence of significantly subaverage cognitive functioning (suggestive of mental retardation) the Adaptive Skills Overview should be completed:

1.    If there is no evidence of significantly subaverage adaptive functioning, the individual may be housed in SHU (as he does not meet the diagnostic criteria for mental retardation).

2.    If there is evidence of significant impairment in adaptive functioning, a standardized test of cognitive ability (the Quick Test, TONI, GAMA, or the WAIS III) must be completed.

    a.    If the I.Q. score obtained from the selected standardized cognitive measures listed above is 76 or higher, the individual may be housed in SHU.

    b.    If the I.Q. score obtained from the selected standardized cognitive measure is 75 or below, a review of records (including the Central File) for evidence of functioning prior to age 18 should occur.

        1.    If the Central File clearly documents "average" adaptive functioning prior to age 18, the inmate may be housed in SHU (as they do not meet the diagnostic criteria for mental retardation).

        2.    If the Central File documents significant deficits in adaptive functioning prior to ate 18, the inmate should be removed from SHU within 96 hours.

3.    Evaluation of Inmates who Refuse Participation in the Screen

a.    For those inmates who are found (through the Health Record Review) to require an evaluation but who refuse participation in the evaluation, the following process should occur:

1.    The MH7 should be completed to the extent possible with information obtained from the Health Care Record and the Central File.

Case 2:90-cv-00520-KJM-SCR    Document 1721    Filed 12/02/05    Page 34 of 49

2.    The Adaptive Skills Review should be completed.

3.    Those inmates who, through the above process, are found to exhibit conditions or to have histories described in Section 1 (above) should be removed from SHU within 96 hours.

4.    Those inmates who are not found to exhibit any of the conditions or to have histories consistent with those described in Section 1 may be housed in SHU.

© 7-17-00 PBSP

### VA - 11 - 4

**D.    Certification of SHU Mental Health Screening Providers**

1.    Mental Health Staff who complete new arrival screening or other evaluations within the SHU shall be certified in the SHU Mental Health Screening and exclusion procedures and criteria. Specific criteria are as follows:

    a.    Staff will include Licensed Clinical Social Workers, Psychologists and Psychiatrists;

    b.    All providers shall receive training in the SHU Exclusion Criteria;

    c.    All providers shall receive training in the use of the SHU screening tool including training in diagnostic criteria for mental retardation;

    d.    All certified providers shall be initially proctored by the Chief Psychologist or designee until they demonstrate proficiency to the satisfaction of the Chief Psychologist.

2.    The Certification shall not expire.

3.    The Chief Psychologist shall maintain a list of the providers that are certified in SHU Mental Health Screening.

**E.    Administrative Segregation Unit Inmates New Arrival Screening**

1.    All inmates placed into ASU shall be reviewed for initial identification of current mental health treatment status on the first work day following an inmate's placement. This initial review shall include a review of the inmate's Health Care Record. Current mental health treatment inmates are identified by checking the ASU placements reported on the institutional Daily Movement Sheet with the institutional tracking system for inmate mental health treatment cases. During the initial review, mental health staff will ensure the continuity of mental health care, including prescribed medications. Upon an inmate's placement in ASU, the MTA shall transfer the inmate's Medication Administration Record to ASU.

2. A mental health staff member, usually a Psychiatric Technician, shall conduct rounds seven days per week in all ASU housing units to attend to the mental health needs of all inmates. Those not previously identified as having mental treatment needs who exhibit possible signs and symptoms of serious mental disorders shall receive a follow-up clinical evaluation. Inmates held on Administrative Segregation Status with the PSU shall be provided with EOP level of care and shall be monitored through daily rounds a minimum of 7 days per week.

3. All inmates who are retained in ASU after Institutional Classification Committee (ICC) review who have received no mental health referral to that time shall receive a mental health screening interview, utilizing the mental health screening questionnaire that is currently used in the Reception Centers (31-item screen). The interview shall be conducted by mental health clinician or trained support staff. The results of the questionnaire shall be evaluated either by hand-scoring or on an approved automated scoring system to determine the need for further evaluation. Inmates who have been cleared by a previous screening questionnaire at a Reception Center within the previous year shall not require a subsequent clearance.

© 7-17-00 PBSP                          **VA - 11 - 5**

4. In those instances in which an inmate refuses to participate in the screening (and refuse the 31-item screen), completion of the 128-C required to clear the inmate for transfer to SHU shall be based on a review of the inmate's Health Care Record. The inmate's refusal shall be noted on the 128-C. The inmate will be screened through the SHU Screening process (as per existing guidelines) upon placement into the Security Housing Unit.

5. All clinical referrals and results of evaluations shall be recorded in individual inmate health records on approved forms, and entered into the institution management information system.

## III.    PROCEDURES FOR EVALUATION AFTER INTAKE

A. Referrals for mental health evaluation may come from a variety of sources, including referrals from any staff member, the inmate requesting services, family or friends, or other inmates. Every referral, whatever its source, will be taken seriously.

Whenever possible, referrals should be in writing. Verbal or telephone referrals shall be documented on a standard referral form by the person receiving the communication. Any inmate may submit a request for mental health services by completing a standard Health Care Services Request or a "Request for Interview"form. In addition, SHU inmates may request mental health services during routine SHU rounds (see Chapter 14, MONITORING OF SECURITY HOUSING UNIT INMATES). Referrals from custody staff shall be written on a Request for Mental Health Services form or an Inmate Sick Call Slip, and delivered to the appropriate clinic RN for triage.

B. All referrals/requests for mental health services shall be reviewed by the facility clinic Registered Nurse to establish priority. Triage shall occur within 24 hours of referral/receipt of request for services. Priority shall be based on routine, or emergency nature. Referrals indicating current suicidality or other immediate Mental Health crisis shall be handled as in #1 below. For other referrals, the RN shall determine whether face-to-face triage is needed

based on the information contained in the referral. Referrals containing the phrases "self-injurious", "withdrawn", "depressed" in conjunction with other symptoms, "want to hurt myself/others", "danger to others"," physically assaultive", and "smearing feces" or other indications of grave disability, shall require face-to-face triage by the RN the same day. If the RN is absent, the Supervising Registered Nurse I (SRN I) will ensure that the above triage is completed in a timely manner. In the event both are absent, the infirmary RN must prioritize the requests and make the appropriate recommendations for follow-up care. Following triage, the referral forms shall be transmitted by fax or rover to arrive at MH Services the same day for scheduling.

1.  **Emergency referrals/requests** an immediate assessment of the patient by the MH clinician. In these instances, during business hours, telephone notification shall be provided to the Mental Health Services office. At other times, the infirmary RN shall be contacted, who will notify the Psychiatrist on Call via telephone. Mental Health Services staff or the Psychiatrist on Call shall provide instruction regarding assessment, and any necessary relocation of the inmate for evaluation and follow-up.

© 7-17-00 PBSP

**VA - 11 - 6**

2.  **Routine referrals/requests** will be reviewed by the Chief Psychiatrist, Chief Psychologist, or designee (licensed clinician), who will assign a clinician and priority level for each evaluation. This evaluation will be scheduled by the office of Mental Health Services. Referrals which inadvertently are sent directly to MH Services without going to the clinic RN first will be evaluated by the Chief Psychiatrist, Chief Psychologist, or designee regarding the need for immediate triage. If any of the phrases listed in "B" above occur in the referral, the evaluation will either have a MH clinician see the patient the same day or fax the referral the appropriate clinic for RN face-to-face triage the same day.

3.  The clinic RN will document his/her triage by initialing and dating the referral form in the upper right-hand corner. For face-to-face triages, the RN will write a note for the health record, in SOAP format, and attach a copy to the referral form to be faxed with it to MH Services.

C.  After the health care services form is filled out, it is placed in a designated box, which is located in the unit rotunda. This box is clearly marked "Sick Call Slips and MH Referrals". In General Population units, this box is locked. The clinic MTA picks up the slips daily and reviews them, addressing any potential emergencies immediately and delivering the slips to the Clinic RN. The MTA shall also have verbal contact with the floor or control officers in each unit to determine if there are immediate needs that have not been identified on the request form. This shall further ensure that any inmate who is unable to fill out a request shall have his medical/dental/mental health problems appropriately addressed.

D.  Procedures for evaluation by the Mental Health Clinician include:

1. Mental health evaluation will be provided within 10 working days for established MHSD patients, and 5 working days for new referrals.

2. The purpose of the evaluation is to determine whether an inmate is in need of mental health services, and to recommend the level and type of services needed. Recommendations may include any of the entire range of mental health programs provided at PBSP, including the Enhanced Outpatient Program, Correctional Clinical Case Management Services, Psychiatric Services Unit, or Mental Health Crisis Beds. In each case, referral to the appropriate program will follow the process outlined in the respective operational or program guidelines.

3. SHU inmates found to meet the PBSP SHU exclusion court order criteria as a result of the mental health evaluation will be transferred from the SHU to the Psychiatric Services Unit within 96 hours.

4. The evaluation must include a face-to-face interview and be conducted in a private setting (at least sound privacy) except where security needs contraindicate such privacy. Exceptions shall be documented and include the specific reasons they were required.

5. The written documentation of the Mental Health Evaluation shall be on standard Mental Health Forms (e.g. MH7) or in standard "SOAP" format.

6. Crisis cases shall be immediately referred to the infirmary.

© 7-17-00 PBSP                    VA - 11 - 7

7. Concerns about suicide shall be evaluated, documented, and if warranted, the inmate will be referred to the Infirmary for suicide watch or other actions as indicated.

8. If a language barrier exists, a translator shall be obtained.

E. The following information is maintained by the MH scheduler:

1. The date of referral.

2. The date of triage.

3. Priority (e.g., emergent, routine).

4. Date of evaluation

5. Disposition of referral (e.g., evaluation completed).

F. Referral forms are returned to the Mental Health Services office following the evaluation of the inmate. The referral forms are archived in chronological order within Health Care Services.

G.  When an inmate's appointment is missed, refused, "no show", or canceled, the clinician will go to see the inmate at the cell front to assess the patient and determine the reason for the missed appointment. The clinician will then determine whether and when the patient needs to be rescheduled, document the visit in a Progress Note, and inform the MH scheduler by making a note on the Appointment Book Report.

H.  If a lockdown occurs and inmates cannot respond to their ducats, inmates shall be escorted by custody personnel to the MH office for evaluation and treatment. The clinic MTA staff shall coordinate with custody to ensure continuity of care during a lockdown. In the even of a total lockdown, cell front visits shall be done.

I.  If a clinician is absent on a day an appointment line is scheduled, the Chief Psychologist shall confer with the MH scheduler and determine which referral appointments need to be covered by another clinician, and which can be rescheduled, to meet the above timelines.

© 7-17-00 PBSP

# EXHIBIT  C



**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

October 20, 2005

**RECEIVED**

OCT 2 5 2005

**Rosen Bien & Asaro**
*Via Overnight Mail*

J. MICHAEL KEATING, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02915

RE:    Coleman v. Schwarzenegger
       USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

Please find enclosed the original letter of October 18, 2005 enclosing the information you requested in the meeting of September 16, 2005.

Sincerely,

LISA A. TILLMAN
Deputy Attorney General

For    BILL LOCKYER
       Attorney General

*Enclosure

See attached courtesy copy list

Special Master Keating
October 20, 2005
Page 2


cc. w/ enclosure:

Steve Fama
Michael Bien
Matthew Lopes
Jeffrey Metzner
Melissa Warren
Dennis Koson
Raymond Patterson
Kerry Hughes
Paul Nicoll
Tricia Williams
Virginia Morrison
Mohamedu Jones

30052341.wpd

Case 2:90-cv-00520-KJM-SCR   Document 1721   Filed 12/02/05   Page 42 of 49

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA 94283-0001

October 18, 2005

| | | |
|---|---|---|
| J. Michael Keating, Jr.<br>Office of the Special Master<br>285 Terrace Avenue<br>Riverside, RI 02915 | via: | Lisa Tillman<br>Deputy Attorney General<br>Department of Justice<br>1300 I Street, Suite 125<br>P. O. Box 944255<br>Sacramento, CA 94244-2550 |

Dear Mr. Keating:

Please find enclosed the information you requested pursuant to the meeting held on September 16, 2005. The California Department of Corrections and Rehabilitation (CDCR) prepared the accompanying documents for your review.

The following is a summary of the enclosed documents:

1. **Revisions to Program Guide Chapter 5:**
   *Chapter 5 – Mental Health Crisis Bed, Pages 12-5-1 to 12-5-31 (Enclosure I).*

   The CDCR has modified Chapter 5 with the following changes:

   - Page 12-5-14, first paragraph after bullets: Deleted "discipline."
   - Page 12-5-16, third paragraph and page 12-5-18, fourth paragraph: Added "trained."
   - Page 12-5-27, sixth paragraph: Added "This timeline for transfer shall include any days that the inmate-patient is in a Mental Health Crisis Bed following endorsement, and shall not be restarted if the inmate-patient returns to the OHU."

2. **Revisions to Program Guide Chapter 6:**
   *Chapter 6 – Department of Mental Health Inpatient Program, Pages 12-6-1 to 12-6-24 (Enclosure II).*

   The CDCR has modified Chapter 6 with the following changes:

   - Page 12-6-2, III, first paragraph: Deleted "a maximum of."
   - Page 12-6-3, b. 1: Added "Referrals must be completed within two (2) working days of identification."
   - Page 12-6-5, C. 1, second paragraph: Deleted "acceptance" and added "bed assignment."

J. Michael Keating, Jr.
Page 2

- Page 12-6-9, C, first paragraph:  Added "Referrals must be completed within 5 working days of identification by IDTT if inmate-patient consent is obtained, and within 10 working days of identification if due process hearing is required."
- Page 12-6-10, first paragraph following bullets:  Clarified paragraph by deleting Headquarter staff and adding "Chief of Mental Health, or designee" and deleting "or clinical staff"
- Page 12-6-10, D. 1:  Added "Transfer must take place within 30 days of referral, if accepted at DMH."
- Page 12-6-11, 3.  Deleted "acceptance" and added "bed assignment."

3. **Bridging Model:**
   The CDCR is providing additional information on the Bridging Model (Enclosures III and IV).

4. **Survey of Psychiatrists and Definition of Board Eligibility/Admissibility for Psychiatrists:**
   The CDCR is providing a completed survey of Staff Psychiatrist Employee Information as of August 31, 2005.

   The CDCR, regarding eligibility and admissibility, are stating, "meet training requirements" as the American Board of Psychiatry and Neurology, Inc. (ABPN) reserves the right to indicate admissibility.  The training requirements are listed at the bottom of the summary sheet (Enclosure V).  Additionally, *Enclosure VI* has the residency/certification information for our existing Staff Psychiatrist employees and *Enclosure VII* lists all positions at all institutions, including those that are vacant.  Excerpts discussing eligibility/admissibility and residency requirements from the ABPN Information Bulletin for Applicants are included (Enclosure VIII).

5. **Security Housing Unit – Mental Health Rounds Survey:**
   The CDCR is providing a *Mental Health Rounds Survey* conducted in the Security Housing Unit for inmate-patients included in the Mental Health Services Delivery System (MHSDS) and those not included in MHSDS (Enclosure IX).

6. **Specifications of Strategic Offender Management System (SOMS):**
   The CDCR is providing the Mental Health Functional Requirements for SOMS (Enclosure X).  This document is the current draft and is subject to revision.

7. **Staffing Allocation – Corcoran Mental Health Services Delivery System**
   The CDCR is providing the May Revise Finance Letter and Duty Statements for California State Prison, Corcoran (Enclosure XI and XII).

J. Michael Keating, Jr.
Page 3

8. **Policy Changes Giving Four Classification Points to Inmates Diagnosed at Reception as Mentally Ill:**
The CDCR is providing additional information on policy changes giving four classification points to inmates diagnosed at reception as mentally ill (Enclosure XIII).

9. **Educational and Work Opportunities to EOP Inmates:**
The CDCR is providing additional information on educational and work opportunities to EOP inmates (Enclosure XIV).

10. **Standardized On-the-Job Training – Observation in Restraints:**
The CDCR is currently in the process of finalizing the procedure and is expected to enter into labor negotiations with all effected bargaining units in the near future. This process is expected to take approximately 120 days and upon completion the CDCR will release the procedures in its entirety.

11. **Status of Ad-Seg Air Vent Plan:**
The first step in the preparation of the statewide feasibility study for the conversion of Administrative Segregation Units (ASU) supply and exhaust grille openings is completed. The statewide inventory of ASU's (33 institutions) was completed on schedule by the Office of Facilities Management. The information gleaned from the survey will be reviewed in a collaborative effort with Health Care Services, Adult Institutions, and Facilities Management in order to develop the required feasibility study and meet subsequent court-ordered milestones.

12. **Suicide Proof of Practice Binder:**
*The CDCR is providing the minutes, memorandums and action item logs from the Suicide Prevention Focus Improvement Team (Binder - Enclosure XV).*

Please contact Dr. Kanan if you have any questions or concerns at (916) 323-6811.

Sincerely,

RENEE KANAN, M.D., MPH
Director (A)
Division of Correctional Health Care Services

JOHN DOVEY
Director
Division of Adult Institutions

Enclosures

cc:  Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs
     Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations Branch,
          Division of Correctional Health Care Services
     Mike Knowles, Deputy Director (A), Division of Adult Institutions
     George Sifuentes, Deputy Director, Office of Facilities Management

Enclosure XIII

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
P.O. Box 942883
S    nento, CA  94283-0001

October 18, 2005

J. Michael Keating, Jr.                                    Via:  Lisa Tillman
Office of the Special Master                         Deputy Attorney General
285 Terrace Avenue                                   Department of Justice
Riverside, RI  02915                                   1300 I Street, Suite 125
                                                               P.O. Box 944255
                                                               Sacramento, CA   94244-2550

Dear Mr. Keating:

In an April 3, 2005, correspondence to the Legal Affairs Division, plaintiffs in the *Coleman v. Schwarzenegger* litigation challenged the California Department of Corrections and Rehabilitation's (CDCR) classification policies and practices. The following is a response to several issues that were raised:

**Plaintiffs contend that the classification placement score system improperly adds four points on all felon inmates who are newly received into the CDCR and are diagnosed with a mental illness. Plaintiffs argue that the additional four points often make a difference between placement in a higher versus lower security institution and there is no legitimate justification for adding the points solely due to an inmate's mental health status.**

In 1996/1997 the California Department of Corrections (CDC), under the assistance of the University of California at Los Angeles (UCLA), Department of Statistics, conducted a validation study to determine if the Inmate Classification Score System worked as intended. The study concluded that the system works well, works well over time, and works as well for women as for men in sorting inmates appropriately according to their potential to become involved in future misconduct while in prison. The study also found that minor changes in the system might result in modest improvement in its effectiveness.

In July 1998 the California Legislature directed the CDC to test a potentially viable set of case factor variables. As a result, CDC, in conjunction with UCLA, initiated a two-year evidence based research project known as the Violent Felon Identification Program. The purpose of the project was to determine if proposed configuration of new variables would result in a better system. Pilot program score sheets, using the factors determined by UCLA staff to be the most "powerful" as predictors of the likelihood of in prison misconduct, were developed and tested.

On February 10, 2003, a report regarding that pilot project, was prepared by Richard A. Berk, Ph.D., UCLA Department of Statistics. In that report, Dr. Berk concluded "the six items that seem to be most strongly associated with any misconduct were age of first arrest, age at reception, **mental illness**, prior jail sentences, a prior sentence with the California Youth Authority, and a prior CDC sentence."

The current CDCR inmate classification placement score system was designed to consider all background factors together in order to achieve an accurate representation of the security placement an inmate requires. Removal of the four points applied for mental illness for inmates who have been enrolled in the Mental Health Services Delivery System (MHSDS) would make the current system invalid.

J. Michael Keating, Jr.
Page 2

The CDCR has contracted with an outside consultant from the National Institute of Corrections to conduct an overview of the entire classification system. Included in this overview will be a review of the placement score system.

**Plaintiffs have pointed out that Enhanced Outpatient Program (EOP) inmates do not receive annual point reduction for participating in the program.**

In accordance with Section 61020.20.3 of the Department Operations Manual, an inmate shall be awarded favorable credit for every six-month period of average or above performance in work, school, or vocational programs. However, in order to receive the favorable point deduction, the inmate has to be assigned to a work incentive assignment and reported on the first day or prior to the first day of the six-month review period or partial review period being considered. As per April 23, 2003 Deputy Director (DD) Memorandum 26/02, entitled Work Assignment Opportunities for Enhanced Outpatient Program Inmates, EOP inmates may be assigned to credit qualifying assignments if therapeutically beneficial. In these assignments the inmate would be eligible for consideration of annual point reduction. However, consistent with Section 2933 of the California Penal Code, therapeutic programs (such as anger management and narcotics anonymous) are not recognized as work incentive assignments, and therefore, the point deduction is not awarded.

**Plaintiffs indicate inmates with mental illnesses serve longer sentences because they are delayed in the Reception Centers (RCs) where they cannot earn sentence reduction credits.**

On February 15, 2004, the Bridging Education Program was initiated at all CDCR RCs. The program allows all inmates who are eligible to earn Penal Code Section 2933 day-for-day credits to start earning those credits while undergoing RC processing. Inmates enrolled in the MHSDS at the level of EOP care are not excluded from participating in this program if they are day-for-day eligible. EOP inmates who are not day-for-day eligible will automatically receive the maximum amount of credit off their sentence that the law allows (up to one third).

**Plaintiffs contend that EOP inmates are unnecessarily segregated and excluded from mainline work, education, and recreation programs.**

On April 23, 2002, DD Memorandum 26/02, was distributed to the field. That document instructed staff to award Work Group/Privilege Group A1/A to all EOP inmates who are actively participating in structured therapeutic activities as determined by the Interdisciplinary Treatment Team. That document also directed that EOP inmates may be assigned to credit qualifying assignments if participation will be therapeutically beneficial.

If you should have any questions or concerns, please contact Linda Rianda, Chief, Classification Services Unit, at (916) 322-2544.

Sincerely,

JOHN DOVEY
Director
Division of Adult Institutions

cc:  Renee Kanan, M. D.          Linda Rianda          Michael Stone

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

## DIVISION OF ADULT INSTITUTIONS
P.O. Box 942883
Sacramento, CA 94283-0001



OCT **1 8 2005**

J. Michael Keating, Jr.                      Via:  Lisa Tillman
Office of the Special Master                       Deputy Attorney General
285 Terrace Avenue                                 Department of Justice
Riverside, RI 02915                                1300 I Street, Suite 125
                                                   P.O. Box 944255
                                                   Sacramento, CA 94244-2550

Dear Mr. Keating:

The California Department of Corrections and Rehabilitation (CDCR) currently provides limited education services to Enhanced Outpatient Program (EOP) inmates. There are several constraints that impact the delivery of these educational services, including facility space, staffing, housing, and programming limitations. The Office of Correctional Education (OCE) is in the process of implementing new education delivery models and standardizing operations that include providing further services to EOP inmates (see enclosure). The OCE is evaluating all resources in order to identify additional teachers and educational materials in order to effectively deliver education services.

We are committed to expanding services to the EOP population as well as all other inmates within the CDCR. The OCE will continue to monitor current resources and evaluate their use. In addition, OCE will review existing programs and develop a more effective standardized delivery system based on individual EOP inmate needs within the context of the Mental Health Treatment Team.

If you have any questions, please contact Raul Romero, Assistant Superintendent, OCE, at (916) 323-0606.

Sincerely,

JOHN DOVEY
Director
Division of Adult Institutions

Enclosure

cc:   Renee Kanan, M. D., MPH
      Raul Romero

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date      :        OCT 0 7 2005

To        :    Associate Directors-Division of Adult Institutions
               Wardens
               Supervisors of Correctional Education Programs

Subject  :    **OFFICE OF CORRECTIONAL EDUCATION'S IMPLEMENTATION OF ALTERNATIVE
               EDUCATION DELIVERY MODELS**

This memorandum authorizes all institutions to begin the implementation process of the attached Alternative Education Delivery Models (AEDM). This AEDM plan is approved by your institution and the Office of Correctional Education (OCE). It is now ready for implementation and includes the signatures from the Warden, Superintendent of Correctional Education (SCE), and Supervisor of Correctional Education Programs (SCEP). It is recommended to implement the four models according to the projected timelines, but only after training is provided for all affected staff.

There are four alternative models that are being implemented: **Academic Education and Independent Study Model, Independent Study Model, Distance Education Model, and Education and Work.** Also, there is a lockdown/modified program component included. The four models will enable most educational departments to deliver educational services to additional inmates, historically underserved inmates, and to provide a continuum of educational services during modified programs and lockdowns.

Prior to implementation, the institution is to write an Operational Procedure (OP) or addendum to an existing OP that details the parameters of the AEDM. A copy of a generic OP used during the meet-and-confer process with the impacted union is attached. However, the OP will also be required to include institutional specifics of the AEDM. Once the OP or addendum is written and signed by the Warden, a copy is to be sent to the OCE, 1515 S Street, Room 221-North, Sacramento, California, 95814, Attention: Janet Blaylock, Assistant Superintendent of Correctional Education (ASCE), Central Region.

The Warden, SCEP, and designated staff should provide AEDM informational training for all institutional stakeholders prior to implementation. The training should include the following:

- A copy of the approved AEDM plan implementation strategy with timelines.
- A copy of the institutional OP or addendum.
- Lockdown/modified program procedures.
- A discussion of planned inmate movements and accountability logistics.
- A discussion of shared AEDM risk prevention strategies.
- The need to schedule and confer on-going joint AEDM improvement application meetings.

* CDCR 1617 (3/89)

Associate Directors-Division of Adult Institutions
Wardens
Supervisors of Correctional Education Programs
Page 2

Additionally, prior to implementation, the SCEP is required to:

- Provide initial training for all education staff regarding the AEDM models, lockdown/modified component, and logistics.
- Explain the AEDM Teacher/Instructor Duty Statement.
- Define teacher work hours.
- Define student work hours.
- Clarify specific classroom or meeting area assignments.
- Provide inmate movement procedures for the distribution of material.
- Provide detail and stratagem for designated course curriculum.
- Provide requirements of student assessment.
- Provide open line location and hours must be part of the training.
- Clarify lockdown and modified programming. Emphasis should be placed on explicit lockdown and modified program procedures.
- Give explanation on special population and other underserved population educational needs.
- Address the effective use of Correctional Learning Network and other relevant educational curriculum.

Once the above training has occurred, a copy of the In-Service Training sign-in sheet is to be mailed to the OCE, 1515 S Street, Room 221-North, Sacramento, California, 95814, Attention: Janet Blaylock, ASCE, Central Region.

Should you have any questions pertaining to the implementation requirements, please contact Jean E. Bracy, SCE (A), OCE, at (916) 327-4245. For technical assistance, please contact Janet Blaylock, ASCE, Central Region, OCE, at (916) 323-5827.

ORIGINAL SIGNED BY

JOHN DOVEY
Director
Division of Adult Institutions

Attachments

cc: J. S. Woodford      Mike Knowles          Renee Kanan, M. D.
    David Lewis          Sandra Duveneck       Karen Wong
    Patrick Boyd         Kathleen Keeshen      Richard A. Rimmer
    Tim Virga            Ombudsman             Kathleen L. Dickinson
    Jean E. Bracy        Janet Blaylock        Raul Romero
    Rob Churchill        Gary Sutherland