1  KENNETH R. MORROW
2  4B-1L-32/P.O.Box 3481
3  CORCORAN, CA. 93212
4  PRISON NO. C-53683
5
6  DECEMBER 5, 2005
7



FILED

DEC - 8 2005

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

8      IN THE UNITED STATES DISTRICT COURT
9      FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11  ASSERTED CLASS MEMBER OF PLAINTIFF CLASS
12  RALPH COLEMAN V. ARNOLD SCHWARZENEGGER
13  NO. CIV S-90-0520 LKK JFM P (KENNETH MORROW)
14
15  RE:(1.) CONSPIRACY TO COMMITT, ATTEMPTED MURDER
16      BY CALIFORNIA DEPARTMENT OF CORRECTIONS, AND
17      REHABILITATION, PRISON OFFICIALS, IN LEAGUE
18      WITH MENTAL HEALTH STAFF EMPLOYED AND RE-
19      TAINED BY CDOCÉR, AT CORCORAN STATE PRISON.
20  (2.) OPPRESSING A PRISONER, Cal. P.C. § 147.-
21  (3.) TORTURE OF PRISONER, Cal. P.C. § 206-
22  (4.) SUICIDE, MALFEASANCE, MISPRISON, DELIBERATE
23      INDIFFERENCE, UNWANTON INFLICTION OF PAIN, FAILURE
24      TO HOUSE MENTAL HEALTH PATIENTS OUT OF SOLITARY
25      CONFINEMENT.
26  IN THE UNITED STATES DISTRICT COURT FOR THE
27  EASTERN DISTRICT OF CALIFORNIA
28  CHIEF JUSTICE EMERITUS LAWRENCE KARLTON

                            1.

1    501 "I" STREET SUITE NO. 8-200

2    SACRAMENTO CALIFORNIA 95814

3

4    <u>DEAR HONORABLE JUDGE KARLTON</u>

5

6    I WROTE THIS COURT ON SEPTEMBER 12, 2005 TO WHICH

7    THIS HONORABLE COURT, ORDERED THE COURT CLERK TO

8    TO SEND A COPY OF SAID LETTER TO PLAINTIFFS COUNSEL

9    AND SPECIAL MASTER ON 11-17-05-SEE (DOCUMENT #1710)

10    <u>ATTACHED EX; "A"</u>

11    MY REQUEST CAN BE FOUND IN THE FACTS HERE IN.

12    I AM A CLASS MEMBER OF THE ABOVE NOTED

13    CIVIL CASE. I AM ILLEGALLY BEING HOUSED AND HELD

14    IN CALIFORNIA STATE PRISON AT COR CORANS, NOTORIOUS

15    (INFAMOUS) DISCIPLINARY SECURITY HOUSING UNIT,

16    DISGUISED BY HIGH LEVEL CORRECTIONS OFFICIALS

17    PRESUMEDLY FOR PROTECTION REASONS.

18    SOLITARY CONFINEMENT CAUSES ME TO SUFFER

19    SUICIDE, AND IVE HAD SEVERAL SERIOUS ATTEMPTS

20    IN MY PAST. I SPENT SEVERAL DAYS IN A OUT

21    SIDE HOSPITAL HOOKED UP TO A VENTILATOR MACHINE

22    TO BREATH, AFTER HANGING FOR 12 MINUTES

23    BEFORE I WAS DISCOVERED. IVE BEEN IN PRISON

24    24 YEARS.

25    IM IN THE SECURITY HOUSING UNIT (HERE

26    AFTER FOR BREVITY CALLED SHU) FOR ASSISTING

27    PRISON OFFICIALS ON A SECURITY MATTER. AND

28    THE PRISON POPULATION HAS SPREAD WORD THROUGH

2.

1   OUT THE PRISON SYSTEM, THAT I ASSISTED THE ENEMY
2   AND EVERY PRISON I GO TO, IM THREATENED BY IN-
3   MATES.

4      I WAS PUT UP FOR OUT OF STATE TRANSFER BUT
5   THE STATES DENIED MY REQUEST. THE CALIFORNIA
6   DEPARTMENT OF CORRECTIONS AND REHABILITATION.
7   (FOR BREVITY HERE AFTER CALLED CDC&R) HOUSED
8   ME IN SHU INSTEAD OF PROTECTIVE HOUSING UNIT
9   (HERE AFTER CALLED) "PHU) CDC&R, DEPARTMENTAL
10  REVIEW BOARD (HERE AFTER CALLED DRB) ORDERED
11  ME HOUSED IN SHU, KNOWING MY HISTORY
12  OF SUICIDAL ATTEMPTS. SEE EX. A. DOCUMENTS-25-04.
13     RECENTLY A CLOSE FRIEND OF MINE KILLED
14  HIMSELF IN CALAPATRIA, PRISON SEE AUTOPSY
15  ATTACHED DATED APRIL 7, 2003, STABBING
16  HIMSELF 5 TIMES IN HIS HEART. SEE EX: B"
17  ATTACHED.

18     I CANNOT FILE A ADMINISTRATIVE APPEAL ON
19  MY SUICIDAL HOUSING, AS A DRB DECISION IS
20  UN-APPEALABLE, SEE EX: C ATTACHED.

21     ITS NOT A MATTER OF WILL I COMMITT
22  SUICIDE, BUT WHEN. ITS ILLEGAL AND A CRIME
23  TO SUBJECT ME TO PAIN AND SUFFERING. RULED
24  ON IN THIS VERY COURT SEE EX: D" ATTACHED.
25     I AM BEING DELIBERATELY SUBJECTED TO
26  UNWANTON INFLICTION OF PAIN BY CDC&R.
27  AND BY MENTAL HEALTH STAFF, SUPERVISOR
28  OF THE CORCORAN HUB MS. SEYKORA, AND

3.

1  DR. JUAREZ, AND CDC&R. CORCORAN PRISON ASSO-
2  CIATE WARDEN YAMAMOTO.
3       I AM DELIBERATELY, INDIFFERENTLY, FORCED
4  TO LONG TERM INVOLUNTARY, SOLITARY CONFINEMENT -
5  THAT CONSTITUTES, A SIGNIFICANT, PAINFUL, AND
6  DAMAGING PSYCHOLOGICAL TORTURE" IN
7  VIOLATION OF MY CONSTITUTIONAL RIGHTS
8  UNDER THE EIGHTH AMENDMENT" AND I COME
9  TO THIS HONORABLE COURT SEEKING PROTECTION
10 OF MY RIGHTS THAT THIS COURT ORDERED, CDC&R
11 TO NOT ABRIDGE.
12      THE U.S. DISTRICT JUDGE THELTON HENDERSON
13 ANNOUNCED ON JUNE 30, 2005, THAT HE WOULD
14 APPOINT AN INDEPENDENT AUTHORITY, TO SEE
15 OVER THE HEALTH CARE IN CALIFORNIA PRISONS.
16      THE JUDGE RECOGNISES THE ONGOING RISR OF
17 DEATH AND HARM TO PATIENTS IS UNCONSTITUTIONAL
18  SEE EX: "E" ATTACHED FOR PSYCHIATRIC REPORTS.
19      THE SPECIAL MASTER M. KEATING IS VERY
20 AWARE OF MY VOLATILE, HOUSING CONDITIONS
21 AND HAS DONE NOTHING TO APPLY THE COURTS
22 ORDERS TO PROTECT MY 8TH AMENDMENT RIGHTS
23 DESPITE THE ATTORNEY'S, M. BIEN, T. NOLAN,
24 AND ESPECIALLY J. KHAN'S, ADMIRABLE DEDI-
25 CATED, DILIGENT STRUGGLE TO DEFEND MY
26 RIGHTS, AND JUSTICE, AGAINST HEAVY ODDS,
27 TO WHOM LITERALLY MORE THEN ONCE KEPT
28 ME FROM COMMITTING SUICIDE, AND A SENSE

4.

1  OF HOPE TO ME. BUT THEY HAVE NO POWER
2  NOR, AUTHORITY FROM THIS COURT TO HAVE
3  MY SOLITARY CONFINEMENT HOUSING REMEDIATED.
4  THEY HAVE PLEADED WITH CDC&R, OFFICIALS,
5  TIME AND AGAIN. AND CDC&R, REFUSES TO
6  ABIDE BY THIS COURTS ORDERS AND THESE
7  ATTORNEY'S REQUESTS. TO STOP DAMAGING
8  AND TORTURING ME MENTALLY SEE THEIR
9  LETTERS TO CDC&R, EX: F "ATTACHED.

10  THE CDC&R HAS NO REGARD FOR THE CONSE-
11  QUENCES! THE SERIES OF CONSTITUTIONAL RIGHTS
12  ARE A VITAL ESSENCE, AND THE PRIMARY PRINCIP-
13  LE TO A AFFIRMED GUARANTEE OF PROTECTION
14  OF HUMAN RIGHTS IN A EVER EVOLVING SOCIETY.
15  IN WALSH V. MELLAS 837 F. 2d. 789 (7TH CIR.
16  1988) PAGE 788, THE COURT SAID, "WE FIRMLY
17  BELIEVE THAT THE FAILURE OF PRISON OFFICIALS
18  TO EVEN REVIEW AN INMATES FILE TO DE-
19  TERMINE HIS PROCLIVITY FOR VIOLENCE AND
20  WHETHER THEY ARE A GANG TARGET IN THE
21  FACE OF GANG RELATED THREATS AND VIOLENCE
22  MANIFEST UTTER DISREGARD FOR THE VALUE OF
23  HUMAN LIFE. THIS WE WILL NOT CONDONE. FOR
24  IN AMERICA" WE RESPECT THE SANCTITY OF HUMAN
25  LIFE, INCLUDING THOSE CONFINED IN PENAL IN-
26  STITUTIONS.
27  THE FUNDAMENTAL RIGHTS WHICH ARE GUAR-
28  ANTEED AND APPLY EQUAL PROTECTION OF THE LAW

5.

1  EXTEND TO PRISONERS AS WELL.

2  THE EIGHTH AMENDMENT OF THE UNITED STATES

3  CONSTITUTION IMPOSES ON STATES AN OBLIGA-

4  TION TO PROVIDE FOR THE BASIC HUMAN NEEDS OF

5  PRISON INMATES. SEE FARMER V. BRENNAN

6  114 S.CT. 1970, 1976 (1994).

7  MY PSYCHOLOGICAL PSYCHOSIS EXACER-

8  BATES WHEN IM FORCED TO BE HOUSED

9  IN SHU. IT IS NOT EXCEPTIBLE

10  FOR MENTAL HEALTH, AND CORRECTIONAL,

11  STAFF, TO TREIAT A PATIENTS ILLNESS

12  AFTER HE SUSTAINS PSYCHOLOGICAL HARM

13  BY SHU HOUSING. THIS COURT HAS RE-

14  PEATEDLY STATED QUOTE, UNDER

15  EIGHTH AMENDMENT PRISON OFFICIALS WERE

16  REQUIRED TO MAINTAIN SYSTEM IN WHICH

17  INMATES WERE ABLE TO MAKE THEIR NEEDS

18  FOR MENTAL HEALTH CARE KNOWN TO STAFF

19  COMPETENT TO PROVIDE SUCH CARE "BEFORE"

20  INMATES SUFFERED UNNECESSARY AND

21  WANTON INFLICTION OF PAIN.

22  I DO NOT REQUIRE GROUP THERAPY, AND

23  MANY OF THE MENTAL HEALTH SERVICES,

24  BUT MEDICATION AND ONE ON ONE SESSIONS

25  WEEKLY WITH A DOCTOR. AND HOUSED OUT

26  OF SHU, PSU, DMH. I NEED SNY EOP AT

27  MULE CREEK.

28  FINALLY I REQUEST THIS COURT PROVIDE

6.

1 | PLAINTIFF'S COUNSEL, MR. BIEN AND MS. KHAN
2 | THE AUTHORITY TO HAVE C.D.C&R. MOVE ME
3 | NOW TO MULECREEK PRISON EOP SNY.
4 | SEE EX: "F" FOR VERIFICATION.
5 |      I ASK THIS COURT TAKE STEPS, TO SER-
6 | IOUSLY BRING THE MENTIONED STAFF
7 | MEMBERS IN THIS MISSIVE TO JUSTICE,
8 | FOR THEIR CORRUPT, DELIBERATE INDIFFERENCE
9 | AND WRECKLESS DISREGARD, AND ABUSE
10 | OF POWER, TO JUSTICE. TO CONTACT THE
11 | HANFORD SENIOR DISTRICT ATTORNEYS OFF-
12 | ICE IN KINGS COUNTY CALIFORNIA·OR
13 | THE CALIFORNIA ATTORNEY GENERALS OFF-
14 | ICE PURSUANT TO THE CALIFORNIA CONSTI-
15 | TUTION ARTICLE V. § 13¢
16 |      THANK YOU FOR YOUR VALUABLE TIME.
17 | I AM,
18 | SINCERELY,
19 |
20 | DATED: DECEMBER 5, 2005
21 |
22 |                    Kenny Morrow
23 |                    RESPECTFULLY SUBMITTED
24 |
25 |
26 |
27 |
28 |
                    7.

EX: "A"

1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RALPH COLEMAN, et al.,

11              Plaintiffs,              No. CIV S-90-0520 LKK JFM P

12        vs.

13    ARNOLD SCHWARZENEGGER,
      et al.,
14
                Defendants.              ORDER
15    _____/

16              The court is in receipt of a letter from inmate Kenny Morrow, an asserted member

17    of the plaintiff class. The plaintiff class is represented by counsel in this matter.

18              Good cause appearing, IT IS HEREBY ORDERED that the Clerk of the Court is

19    directed to send a copy of inmate Morrow's letter (document # 1710) to counsel for plaintiffs and

20    to the Special Master.

21    DATED: November 17, 2005.

22

23                                        _____
                                          UNITED STATES MAGISTRATE JUDGE
24

25    12
      morrow.let
26

                                    1

KENNY MORROW C-53683
4B-1L-32 / PO BOX 3481
CORCORAN, CA. 93212

SEPTEMBER 12.2005

RE: CONSPIRACY TO <u>ATTEMPT OF MURDER</u>,
MISPRISON OF <u>MENTAL HEALTH STAFF</u>
MEMBERS, <u>HUB SUPERVISOR MS.SEYKORA</u>,
CHIEF <u>PSYCHIATRIST DR. JUAREZ</u>, ANN
PRISON OFFICIALS, "<u>ASSOCIATE WARDEN</u> "
<u>YAMAMOTO, CAPTAIN LOPEZ</u>.
"SUICIDE", INSUFFICIENT TRAINING,
ABUSE OF PUBLIC TRUST, THREIATS TO
MENTAL HEALTH PATIENTS, SHU,
HOUSING OF MENTIALLY ILL PRISONERS,
TORTURE OF MENTIALLY ILL PATIENTS,
DELIBERATE INDIFFERENCE, WANTONESS
INFLICTION OF PAIN. PUNISHMENT OF
THE MENTALLY ILL PATIENTS, AND
ABUSE OF POWER BY MENTIAL HEIALTH
STAFF AT CORCORAN PRISON.

<u>CASE NO: COLEMAN V. SWARZENEGGER</u>
<u>CIV S-90-0520 LKK JF mP</u>
CHIEF JUDGE EMERITUS LAWRENCE KARLTON
UNITED STATES DISTRICT COURT - EASTERN DISTRICT
501 "I" STREET STE. 8-200, SACRAMENTO, CA. 95814.

DEAR HONORABLE JUSTICE KARLTON!

I AM A CLASS MEMBER OF THE ABOVE CITED
CASE, AND IM, INCARCERATED AT CORCORAN STATE
PRISON, IN EOP UNIT 4B-1L- MANAGED BY
HUB, SUPERVISOR MS. SEYKORA.
    MY REQUEST CAN BE FOUND AROUND THE
FACTS HERE IN.

    I WOULD LIKE TO ILLUSTRATE THE INE-
FFECTUAL NATURE OF CORCORANS MENTAL HEALTH
STAFF, 'DR. JUAREZ', AND SUPERVISOR MS.-
SEYKORA" IN ATTENDANCE WITH ASSOCIATE
WARDEN MS. YAMA MOTO.

    JUDGE KARLTON, IT IS MY INTENTION
TO EXPLAIN TO YOU, THE MEMBERS OF ABOVE
MENTIONED STAFF (BEFORE I COMMITT SUI-
CIDE AT THE HANDS OF THE ABOVE STAFFS
DELIBERATE, ATTACK UPON MY MENTAL
HEALTH SITUATION) IN THE HOPES THAT
AFTER MY DEMISE (OR POSSIBLE DEMISE)
YOU MAY DISCERN THE REASONING OF HOW
SEGMENTS OF THE DILIGENT COLEMAN
CASE YOU RULED OVER. HAS COLLAPSED
AROUND CORCORAN PRISON STAFF, AND HOW
SUCH A TRIAGEDY CAN UNFOLD, IN THE
HOPES THAT YOU MAY LEARN, AND RULE
AROUND SAID ISSUE, SO THAT IT WILL
NEVER HAPPEN A GAIN.

    ON 9-7-05, AT INT ON CSP-CORCORAN
4B-1L- EOP-ASU- SUPERVISOR SEYKORA OF
THE HUB, AND ASSOCIATE WARDEN YAMA-
MOTO, et al., DECIDED TO LOWER MY EOP
LOC. TO CCCMS, SO IT WOULD LOOK (good)
TO THE STATE OF NEW HAMPSHIRE AUTHOR-
ITES, TO ACCEPT MY REQUEST TO BE INTER
STATE TRANSFERED OUT THERE, AND BE -

                    2

CAUSE I ONLY PARTICIPATE IN 60% OF THE
GROUPS HERE. I TOLD THE ENTIRE INT
STAFF (I BELIEVE IT WAS TAPED) THAT
I COULD NOT FUNCTION IN SHU, SOLITARY
CONFINEMENT, THAT I WOULD CLEARLY
DECOMPENSATE AS I DID EARLIER (THAT I
WOULD WITHIN 30 DAYS TIME COMMIT SUICIDE
WHICH IS WELL DOCUMENTED IN MY MEDICAL
FILE, AND OR COME BACK TO EOP LEVEL OF
CARE) TO WHICH ASSOCIATE WARDEN YAMAMOTO
STATED ITS OK IF I FEEL SUICIDAL BUT
THEIR NOT ALLOWING ME TO EOP AGAIN.

JUDGE KARLTON I SPENT "27" YEARS IN
THE MOST BRUTAL REPRESSIVE SOLITARY
CONFINEMENT IN UNITED STATES, ON NO
HUMAN CONTACT STATUS, BEAT AND TOR-
TURED, ELECTROCUTED BY TASERS, CHAINED
TO METAL STOOLS FOR DAYS AT TIMES
NAKED, AND BEATEN TO A BLOODY PULP,
AND THEN TASED ON MY PRIVATE PARTS.

SUPERVISOR MS. SEYCORA TOLD ME THEY
WOULD SEND ME TO PSU AT SAC-IV, WHERE
I JUST CAME FROM WHERE I SUFFERED
FROM SENSORY DEPRIVATION FAR WORSE THEN
PLAIN SOLITARY CONFINEMENT, OR SHE
WOULD REDUCE MY LOC TO CCCMS AND
PUT ME BACK IN SHU. SO WITH THAT
HIDEOUS THREAT HANGING OVER MY HEAD
I SUCCUMBED TO CCCMS, WHICH WILL SEND

3.

ME TO SHU SOLITARY CONFINEMENT WHICH IS
A HORROR SHOW IN MY MIND), IN RATHER
COMMIT SUICIDE, BECAUSE AFTER 24 YEARS
OF INCARCERATION AND AT AGE 43, MY
LIFE TO MORROW REALLY AINT WORTH LIVING
IFore ESPECIALLY IN SOLITARY CONFINEMENT
WHICH DRAINS ME OF MY WILL TO LIVE. BE-
CAUSE THE MISERY FAR OUTWEIGHS THE
HOPE OF A BETTER EXISTENCE. I ALSO SUFF-
ER FROM AUDITORY COMMANDS TO SLICE OPEN
BOTH ARTERIES IN WRISTS. AND OPEN JUG-
LER VEIN, AND SIMULTANEOUSLY HANG MY
SELF FINALIZING SELF MURDER. WHEN I
AM SUBJECTED TO SHU HOUSING.

OVER HERE IN EOP, IM NOT SO ADAMANT
→ TO CAUSE SELF DEMISE, BECAUSE I GET YARD
TIME FOUR DAYS A WEEK FOR 5 HOURS
AT A TIME, AND I CAN GO TO TEACHER
MR. ZEGERS GROUP AND GET SCHOOL BOOKS
AND DO THE TESTS AND HE WILL GRADE
THEM FOR ME, EVEN THOUGH I DO HAVE A
GED. THIS STIMULATION OCCUPYS MY TIME.
    I WRITE YOU SO YOU CAN STOP THIS SADISTIC
PRACTICE AT SHU FROM BEING INFLICTED
UPON ANY OTHER MEN.

    THE INT HERE, TAILORS THEIR ACTIONS
TO FIT THEIR AGENDA, PLEASING CDC'S
STAFFS AGENDA NOT WHATS GOOD FOR
THE PATIENT, AND DR. JUAREZ AND HUB,
SUPERVISOR, SAY THEIR HANDS ARE TIED
BY MENTAL HEALTH RULES, TO HELP

4.

ME. THE MENTAL HEALTH STAFF ARE NOT
FREE TO DISREGARD THE CONSTITUTIONAL
RIGHTS OF ANY MENTALLY ILL PRISONERS
SUCH AS I." YOU RULED SO IN COLEMAN CASE."

SUPERVISOR MS. SEYCORA'S OBJECTIONS AT
INT MAY BE REGARDED AS OBLIQUELY
RELYING ON OPINIONS AND CONSTRAINTS
OF MY LEVEL OF COMPLIANCE TO GROUP AC-
TIVITIES, TO REFUTE OR DISGUISE HER
DELIBERATE INDIFFERENCE, AND RECKLESS
DISREGARD TO MY MENTAL HEALTH NEEDS
ARE AT BEST FRAGILE!!

WHEN I TOLD INT ON 9-7-05, THAT
THEIR REDUCING MY LEVEL OF CARE TO CCCMS
AND SUBSEQUENT SHU HOUSING WOULD LEAD
ME TO DECOMPENSATE IN 30 DAYS LEADING
TO "SUICIDE", IT WAS INT'S OBLIGATION
TO REEVALUATE MY MENTAL HEALTH CON-
DITION, NOT TO ORDER ME INTO A HOUSING
SITUATION WHICH WOULD CLEARY TRY MY
PSYCHOSIS AND INFLICT UNWANTON PAIN.
IT IS NOT ENOUGH TO SAY THAT CSPC
MENTAL HEALTH AUTHORITIES CONSIDER THE
ISSUE CAREFULLY ... AUTHORITIES ARE
ALSO REQUIRED TO AFFORD SUFFICIENT
WEIGHT TO THE CONSTITUTIONAL RIGHTS
OF INDIVIDUAL PATIENTS, WHICH IS
WELL DOCUMENTED WITH IN THE COLEMAN
CASE, LITIGATED IN THIS VERY COURT,
WHERE CORCORAN MENTAL HEALTH STAFF
OWE THEIR EMPLOYMENT TO. THE

5.

FAILURE TO TREAT MY CONSTITUTIONAL PROVISIONS
WITH APPROPRIATE RESPECT CONSTITUTES DELIBER-
ATE INDIFFERENCE TO THE RIGHTS [AT STAKE] SEE
JORDAN 986 F. 2d. at 1529.

SUPERVISOR MS. SEY CORA AND A.W. YAMAMOTO
et al., ARE SIMPLY SEEKING TO DELAY THEIR CONSTI-
TUTIONAL OBLIGATION TO MY MENTAL HEALTH ISSUE
AT HAND; WHO IS THEIR CHARGE. I HAVE CONSID-
ERED IDT'S ARGUMENTS AND THEIR REASONING
TENDERED BY THEM. I CONTEND THAT CSPC INT
STAFF ON 9-7-05. ARGUMENTS ARE SO SERIOUSLY
FLAWED THAT THEY RAISE QUESTIONS OF GOOD
FAITH. THEIR REASONING BEHIND THEIR PSEUDO
ARGUMENT DOES NOT SUPPORT THEIR PROPOSITION
FOR WHICH IT IS TENDERED). IN MANY INSTANCES
THEIR OPINIONS AND ARGUMENTS, NOT ONLY DOES
NOT SUPPORT THEIR CONTENTION, IT SUPPORTS THE
VERY FINDING OF "MINE", TO WHICH THE OBJEC-
TIONS IS BEING MADE,

SUPERVISOR OF THE CORCORAN HUB, MS. SEY CORA
AND CDC ASSOCIATE WARDEN YAMAMOTO' INDICATED
THAT IF I STAYED IN EOP, IT WOULD HINDER
MY TRANSFER TO THE STATE OF NEW HAMPSHIRE
THAT NH. AUTHORITES DONT WANT A MENTAL
HEALTH CASE, EVEN THOUGH ADMITTING THEY
WERE IN THE PROCESS OF SENDING NH. MY
REQUESTED MENTAL, AND MEDICAL HEALTH FILE
AND DESPITE LAST YEAR ON 8-24-04, AT THE
SAME EOP HOUSING AND SAME IDT STAFF, SEY-
CORA AND YAMAMOTO, SAID BEING EOP LEVEL
OF CARE WOULD NOT STAND IN THE WAY OF
MY NH. INTERSTATE TRANSFER) CLEARLY SHOWS
THEIR DECISIONS ARE TAILORED TO THEIR
ARBITRARY OPPRESSION OF MY LIFE AND
MENTAL HEALTH CARE. THESE DEADLY DECISIONS
CONCERNING MY M.H. STATUS, IS ACTING FOR
THE SOLE PURPOSE OF DELAY, PERPETUATS MY

6.

HUMAN SUFFERING, AND VIOLATES THE FEDERAL CONSTITUTION, WHICH THE EVIDENCE IN MY CASE DEMONSTRATES DELIBERATE INDIFFERENCE IS NOTHING IF, IT IS NOT THAT.

THE GROSS INADEQUANCIES IN THEIR DECISIONS IS OVER WHELMING. THE RISK OF HARM TO ME FROM THESE DEFICIENCES IS OBVIOUS. THE ACTUAL SUFFERING EXPERIENCED BY ME IN BEING INDEFINATELY CONFINED IN SOLITARY CONFINEMENT FOR YEARS, ON NO HUMAN CONTACT STATUS IS APPARENT IN MY ACUTE, MENTAL ILLNESS, AND ONLY SERVES TO EXASBERIATE MY PSYCHOLOGICAL CONDITION.

JUDGE KARLTON, I AM ENCLOSING A LETTER FROM THE COLEMAN ATTORNEYS, ROSEN, BIEN AND ASARO. JANE KHAN TO CDC, REGARDING THE PERIL ATTRIBUTED TO ME IF LEFT IN SHU. (AND A PLEA TO PROPERLY HOUSE ME IN PHU PROTECTIVE HOUSING UNIT) SO IT AINT LIKE CDC CAN CLAIM IGNORANCE TO MY VOLATILE SITUATION. DATED MAY 3, 2005.

IN THE COLEMAN V. WILSON CASE, THAT ITS ILLEGAL TO HOUSE INMATES IN SHU WHERE THEY SUFFER SERIOUS PSYCHO PATHO-LOGICAL REACTIONS TO SHU CONFINEMENT AND PSYCHOTIC DISORGANIZATION SEE 912 F. Supp. 1282 (E.D. Cal. 1995) PAGE 1321.

IN THE SAME CASE PAGE 1288, IT STATES UNDER 8TH AMEND., PRISON OFFICIALS ARE RE-QUIRED TO MAINTAIN A SYSTEM IN WHICH INMATES WERE ABLE TO MAKE THEIR NEEDS FOR MENTAL HEALTH CARE KNOWN TO STAFF

7

"
COMPETENT TO PROVIDE SUCH CARE BEFORE
INMATES SUFFERERER UNNECESSARY AND
UNWANTON PAIN. SEYCORA AND YAMAMOTO INCOMPETENT.

.. FINALY PAGE 1285, SAME CASE, 27. STATES,
PRISON OFFICIALS CANNOT BE FOUND LIABLE UN-
DER 8TH AMEND., FOR DENYING INMATE HUMANE
CONDITIONS OF CONFINEMENT, UNLESS OFFICIAL
KNOWS OF AND DISREGARDS EXCESSIVE RISK
TO INMATE'S HEALTH OR SAFETY, OFFICIAL
MUST BE AWARE OF THE FACTS FROM WHICH
INFERENCE COULD BE DRAWN THAT SUBSTANTIAL
RISK OF SERIOUS HARM EXISTS."

      THUS IN THE CASE OF MY DEATH IN
SHU, WHERE MY DECOMPENSATION WILL OCCUR,
I REQUEST YOU TAKE ACTION IN BRINGING
THESE MENTIONED STAFFS ABUSE OF POWER AND
INCOMPETENT DECISIONS TO JUSTICE. I THANK
YOU FOR YOUR VALUABLE TIME.   I AM,
SINCERELY,

DATED: SEPTEMBER 12, 2005

                        Kenny Morrow
                  RESPECTFULLY SUBMITTED

8.

| NO.: C-53683 | NAME: MORROW | CDC-128-G (Rev. 2/96) |
|---|---|---|
| Custody: MAX | Assignment: ASU | |
| Comments: DEPARTMENTAL REVIEW BOARD | | |

**INSTITUTION STAFF RECOMMENDATION:** The MCSP ICC recommended that Inmate Morrow be transferred to Pelican Bay State Prison (PBSP) or COR for placement in SHU on Indeterminate status pending out-of-state transfer.

**CLASSIFICATION SERVICES RECOMMENDATION:** The Classification Services Unit (CSU) recommends out-of-state placement to Montana, Wyoming, or Nevada for Inmate Morrow for safety concerns via the Western Interstate Corrections Compact. The CSU recommends that DRB approve placement of Inmate Morrow at COR on Indeterminate SHU status pending out-of-state transfer. The SHU placement recommendation is based on the unresolvable safety issues and his stated refusal to program on any General Population yard. The Law Enforcement Investigations Unit concurs with the CSU recommendation.

**DRB ACTION OF 5-25-04:** The DRB concurs with the MCSP ICC and acts to approve transfer to COR-SHU on Indeterminate status due to safety concerns, pending the Interstate transfer of Inmate Morrow to the state of Montana, Wyoming, or Nevada. The DRB notes that the states being approved have the authority to accept or deny Inmate Morrow's placement. The DRB also takes the following actions:

### MCSP

1. The MCSP Classification and Parole Representative (C&PR) is instructed to submit required documents, not already provided, pursuant to the Department Operations Manual, Sections 62040.4 and 62040.5, to the Interstate Compact Unit within 30 days after receiving this action.   *dmu, 6/21/04*
2. Inmate Morrow to be advised that if, in fact, his transfer request is accepted by another state, actual transfer/placement may not be timely based on bed availability within that state.   *Dmu 6/21/04 Sec 128*
3. The MCSP C&PR is instructed to facilitate this placement/transfer in conjunction with the CDC Transportation Unit.
4. Inmate Morrow to be advised that any future BPT Hearings will be held telephonically if he is housed out of state.   *dmu 6/18/04 Sec 128*
5. The DRB elects to establish DRB transfer control of this case effective this date.

### COR

1. COR ICC is instructed to return this case to DRB in 12 months if Inmate Morrow has not transferred out of state.

RETAIN DRB TRANSFER CONTROL:   YES ☒   NO ☐

| Date: 5-25-04 | Classification: DRB ACTION | Institution: MCSP |
|---|---|---|

NO.: C-53683 | NAME: MORROW | CDC-128-G (Rev 2/96)
Custody: MAX | Assignment: ASU |
Comments: DEPARTMENTAL REVIEW BOARD

MEMBERS:  S. HUBBARD, Deputy Director (A)
Institutions Division

B. DEGROOT, Assistant Deputy Director (A)
Parole and Community Services Division

L. RIANDA, Chief
Classification Services Unit

RECORDER: D. ROTHCHILD, Correctional Counselor III
Classification Services Unit

L. RIANDA, Chief
Classification Services Unit

S. HUBBARD, Deputy Director (A)
Institutions Division

| Date: 5-25-04 | Classification: DRB ACTION | Institution: MCSP |

EX: "B"

FORENSIC PATHOLOGY SERVICES

## FOR IMPERIAL COUNTY, CA.



P.O. BOX 1040

### AUTOPSY REPORT

**Name of deceased:** WENDALL NORRIS        57-W-M        C#: 03-062

**Date and time of death:**        APRIL 7, 2003        7:50 AM

**Date and time of autopsy:**        APRIL 8, 2003        9:40 AM - 11:26 AM

CAUSE OF DEATH:        MULTIPLE STAB WOUNDS TO THE CHEST

MANNER OF DEATH: SUICIDE

AUTOPSY FINDINGS:

   I. Five stab wounds to the left anterior chest.

  II. Acute heroin intoxication.

 III. Small abrasions on right cheek and bridge of nose.

 IV. Mild left ventricular hypertrophy.

 V. Cirrhosis of the liver.

 IV. Absent right testicle.

VII. Fracture of mid sternum and anterior right rib fractures.

   A. Status post cardiopulmonary resuscitation.

VIII. No other significant natural disease.

 IX. No other trauma.

The Foregoing Instrument Is A Correct
Copy Of The Original On File In This Office.
Attest:_____
          Sheriff-Coroner
County Of Imperial. State of California

By _____ Deputy

**OPINION:** According to the Investigator's Report, the decedent is a 57 year old prison inmate who was found collapsed in the exercise room with stab wounds to the chest. He failed to respond to resuscitative efforts.

Autopsy shows five grouped stab wounds to the left anterior chest each having a horizontal orientation, some with squared-off medial ends and primarily front to back directions. There were three stab wounds to the heart, one stab to the left lung hilum and one through the left lobe of the liver, causing death. Autopsy also shows small abrasions to the right cheek and bridge of nose, cirrhosis of the liver and absent right testicle. There is no other significant natural disease and no other significant trauma on the body. Toxicology shows a very high blood morphine level. The cause of death is multiple stab wounds to the chest.

From the scene investigation, autopsy examination and circumstances around the death as currently known, the manner of death is classified as suicide.

ROBERT E. WHITMORE, MD
FORENSIC PATHOLOGIST

Date signed:    6/12/03

## AUTOPSY

The autopsy was performed in the Imperial County Coroner's Facility in Brawley, California on Tuesday, April 8, 2003 between 9:40 AM and 11:26 AM.

**WITNESSES:** Coroner's Investigator Henry Proo, Officers Maria Dominguez, Stanley Crittendon, Kimberli Roe and Israel Brizuela all from the Calipatria State Prison and Autopsy Assistant Carlos Ortega were present at the autopsy.

**IDENTIFICATION:** The body is received in a yellow plastic pouch identified by a tag on the zipper stating the decedent's name "WENDALL NORRIS", and case number "03-062".

**CLOTHING:** The body is clad in the following articles of clothing:
1. Blue shorts.
2. White boxer shorts.

**EVIDENCE OF MEDICAL THERAPY:** Consists of the following.
1. There is an endotracheal tube in the mouth.
2. There are EKG pads on the bilateral upper anterior chest and left lateral abdomen.
3. There is an I.V. in place in the dorsal distal right lower leg with attached line and bag.

### EXTERNAL EXAMINATION

**GENERAL:** The body is that of a normally developed, well nourished Caucasian male appearing younger than the listed age of 57 years. The length is an estimated 5 foot 8 inches, the weight 175 pounds. The body is well preserved, refrigerated and unembalmed. Rigor mortis is present and full. Postmortem lividity is posterior and fixed. For scars see individual body areas below. There are numerous tattoos on the body, particularly the upper extremities and torso.

**HEAD:** The head hair is shaved. There is a gray mustache. The rest of the face is clean shaven. The ears are normally formed and located. The irides are blue, corneas clear and the conjunctivae free of petechiae. The sclera are white and free of hemorrhage. There is a crescent-shaped superficial red abrasion on the right cheekbone measuring 3/16 X 3/8 inch. There is a irregular light purple contusion on the bridge of the nose measuring 5/16 X 3/16 inch containing a 1/8 inch superficial red abrasion. The nose is otherwise intact. The lips are normally formed and atraumatic. The frenula are atraumatic. The teeth are natural and in good repair. No other foreign material is in the mouth.

**NECK:** The neck is symmetrical and atraumatic.

**CHEST:** The chest is normally formed. The breasts are symmetrical without palpable masses. See External Evidence of Injury.

**ABDOMEN:** The abdomen is flat and firm without palpable masses. There is a 3 inch midline scar above the umbilicus.

EXTERNAL GENITALIA: The external genitalia are those of a normal adult male with circumcised penis, numerous heart tattoos on the penis and a swastika tattoo on the glans. The right testicle is absent. The left testicle is in the scrotum and palpably normal.

ARMS: The arms are normally formed. No recent needle puncture marks or old tracks marks are readily apparent due to a marked number of dark tattoos on the forearms. No wrist scars are present. The palms are unremarkable. The dorsum of the hands and knuckles are atraumatic. The fingernails are short and clean. The nailbeds are cyanotic.

LEGS: The legs are normally formed without evidence of edema or deformity. There is a 1 inch depressed linear scar on the medial mid left thigh. There are four left and three right pale parallel superficial linear scars on the anterior left and right ankles.

BACK: The back is straight, symmetrical and atraumatic. The anus is atraumatic.

## EXTERNAL EVIDENCE OF INJURY

There are five stab wounds on the body. The stab wounds are a group on the left anterior chest over an area measuring 2-3/4 inch in vertical by 2 inches in horizontal dimension. The stab wounds are each horizontally oriented. At least two of the five wounds show medially oriented squared off ends.

### STAB WOUND #I:

A. ENTRANCE WOUND: There is a stab wound located on the left anterior chest with a central defect centered 1 inch to the left of the anterior midline and measuring 3/8 inch in horizontal by 1/8 inch in vertical dimension. Both ends are pointed.

B. EXIT WOUND: None.

C. DIRECTION AND DEPTH: The direction of the stab is primarily front to back and slightly right to left for a depth of at least 2 inches, see Internal Examination below.

D. PATH: See Internal Examination below.

### STAB WOUND II:

A. ENTRANCE WOUND: Stab wound II has a central defect centered 2 inches to the left of the anterior midline directly left of stab wound I. The central defect is horizontally oriented and measures 5/8 inch in horizontal dimension and gapes to 3/16 inch in vertical dimension. The lateral end is pointed, while the medial end is squared-off.

B. EXIT WOUND: None.

C. DIRECTION AND DEPTH: The direction of the stab is front to back for a depth of at least 6 inches.

AUTOPSY REPORT                          (5)                    WENDALL NORRIS 03-062

D. PATH: See Internal Examination below.

## STAB WOUND III:

A. ENTRANCE WOUND: Stab wound III is located on the left anterior chest below stab
wounds I and II with a central defect centered 1-1/2 inches to the left of the anterior midline.
The central defect is horizontally oriented and measures 5/8 inch in horizontal dimension and
gapes to 3/16 inch in vertical dimension. The lateral end is pointed while the medial end is
squared-off

B. EXIT WOUND: None.

C. DIRECTION AND DEPTH: The direction of the stab is primarily front to back for a
maximum depth of at least 3-1/4 inches.

D. PATH: See Internal Examination below.

## STAB WOUND IV:

A. ENTRANCE WOUND: Stab wound IV is centered 1-1/4 inches to the left of the anterior
midline and 1/2 inch below stab wound III, and 1 inch below stab wounds I and II.
The central defect is horizontally oriented and measures 3/8 inch in horizontal and gapes to
3/16 inch in vertical dimension. The lateral end is pointed while the medial end is somewhat
squared.

B. EXIT WOUND: None.

C. DIRECTION AND DEPTH: The direction of the stab is primarily front to back and has a
path confluent with stab wound III. The maximum depth is at least 4-1/2 inches.

D. PATH: See Internal Examination below.

## STAB WOUND V:

A. ENTRANCE WOUND: Stab wound V is the most inferior of the group and centered 1 inch
below stab wound IV and 3/4 inch to the left of the anterior midline. The central defect is
horizontally oriented and measures 3/4 inch in horizontal dimension and gapes to 1/4 inch in
vertical dimension. The medial end is squared off while the lateral end is pointed. The margin
is sharp.

B. EXIT WOUND: None.

C. DIRECTION AND DEPTH: The direction of the stab is front to back, right to left and
downward for a depth of at least 5-1/2 inches.

D. PATH: See Internal Examination below.

## INTERNAL EXAMINATION

BODY CAVITIES: The abdominal fat measures 4.5 cm in thickness. There is 1800 cc of liquid and clotted blood within the left pleural cavity, a film of blood within the pericardial cavity, and 100-200 cc in the left upper quadrant. There is no other abnormal fluid in the cavities. The serosal surfaces are smooth and glistening. The organs are normally located. There is a stab wound through the medial left hemidiaphragm underlying the pericardium, see Liver below. There are moderate fibrous peritoneal adhesions.

CARDIOVASCULAR SYSTEM: The heart weighs 360 grams and bears three stab wounds as follows: There is a stab wound of the anterior proximal pulmonary artery which perforates the anterior wall and opens the artery; there are two perforating stab wounds of the left ventricle. One is located over the mid left ventricle which exits through the lateral wall and the second is near the apex which perforates through the posterior wall. The heart is not is enlarged. It has a thickened left ventricle with a smooth, glistening epicardium. The coronary arteries have a normal origin and distribution with right dominance. They show significant atherosclerosis as follows: LAD, circumflex and RCA, all three show moderate focal atherosclerotic changes. There are no intraluminal thrombi. The endocardium is intact, smooth and glistening. The cardiac valves are of normal number, intact and free of vegetations. The myocardium is otherwise red-brown, firm and uniform. There is left ventricular hypertrophy. The right ventricular wall measures 0.3 cm in thickness and the left 1.5 cm. The septum is unremarkable.

The aorta follows its usual course and has no significant atherosclerotic changes. There are no other vascular anomalies, aneurysms or thromboses.

RESPIRATORY SYSTEM: The right and left lungs weigh 650 and 390 grams, respectively. There is a stab wound of the left hilum with a surrounding 2 X 3 inch purple-black hematoma. The stab penetrates the lung parenchyma 1-1/2 inches. They have the usual lobation. The pleura is otherwise smooth and glistening. There is mild anthracotic pigmentation. The lungs are well expanded and aerated on the right and severely atelectatic on the left, pink- purple and subcrepitant on the right, noncrepitant on the left. Cut surfaces are dark red and exude a mild amount of blood and pulmonary edema fluid. There are no areas of consolidation or enlargement of the airspaces. The bronchi and pulmonary arteries are patent.

HEPATOBILIARY SYSTEM: The liver weighs 2180 grams. There is a stab wound which perforates the lateral left lobe, a thickness of 1-1/2 inches. This is associated with an estimated 100-200 cc of liquid blood within the left upper quadrant. The capsule is otherwise smooth, glistening and intact. Cut surfaces are tan-brown, very fibrotic, micronodular and show no change in consistency.

The gallbladder contains an estimated 20 ml of bile and a single 1/2 inch diameter round green gallstone. The mucosa is intact and the bile duct is patent.

The pancreas has a normal size and shape. Cut surfaces are pink-tan, firm and show the usual lobulated architecture.

**HEMOLYMPHATIC SYSTEM:** The spleen weighs 240 grams. The capsule is smooth, glistening and intact. Cut surfaces are maroon, firm and uniform.

There is no enlargement of the lymph nodes in the neck, chest or abdomen. Where sectioned, their parenchyma is unremarkable.

**ENDOCRINE SYSTEM:** The thyroid gland is not enlarged and the lobes are symmetrical. Cut surfaces show a uniform, firm, red-brown parenchyma.

The adrenals have their usual size and shape. Sections show a normal structure with thin, uniform, yellow cortices. The pituitary is not enlarged.

**GASTROINTESTINAL SYSTEM:** The esophagus is patent. The stomach is empty. The gastric mucosa is intact. The pylorus is patent. The duodenum is intact. The small and large intestines are unremarkable to inspection and palpation. The appendix is not identified. The rectal mucosa is unremarkable.

**GENITOURINARY SYSTEM:** The right and left kidneys weigh 170 and 180 grams, respectively. They have their normal shape and position. The capsules strip with ease revealing smooth cortical surfaces. Cut surfaces show the usual corticomedullary structure. The pelves and ureters are not dilated or thickened. The bladder contains approximately 125 cc of concentrated clear amber urine. The mucosa is intact and the bladder wall is not hypertrophied.

The prostate is of average size and grossly unremarkable. The right testicle is absent. The left testicle is of normal to palpation.

**NECK:** The neck organs are removed en bloc with the tongue. There are no hemorrhages in the tongue, strap muscles, thyroid or pharyngeal constrictors. The cartilaginous and bony structures of the larynx and hyoid are intact. The airway is unobstructed and lined by smooth, pink-tan mucosa. There is no displacement or crepitus of the cervical vertebrae.

**MUSCULOSKELETAL SYSTEM:** The musculoskeletal system is normally developed. There are no natural deformities. The ribs are not brittle. The skeletal muscle is dark red and firm.

The following fractures are identified:
1. Fracture of mid sternum with minimal hemorrhage.
2. Anterior right rib fractures 3rd and 5th with minimal hemorrhages.

There are no other fractures.

**HEAD:** Reflection of the scalp reveals no hemorrhage. The calvarium is intact. There is no epidural or subdural hemorrhage. Removal of the dura from the base of the skull reveals no fractures. The proximal spinal cord is intact.

**CENTRAL NERVOUS SYSTEM:** The brain weighs 1530 grams. The leptomeninges are glistening and transparent. There is no subarachnoid hemorrhage or exudate. The hemispheres

are symmetrical with a normal gyral pattern. There is no evidence of herniation. The arteries at
the base of the brain are intact and show no significant atherosclerotic changes or aneurysms.

Cross sections through the cerebral hemispheres show a uniform, intact cortical ribbon. The basal
ganglia, thalamus and other internal structures are symmetrical and without focal changes. The
white matter is uniform. The ventricles are not enlarged, and their linings are smooth and
glistening. Cross sections through the brainstem and cerebellum show an intact structure without
focal lesions.

## SPECIMENS RETAINED

TOXICOLOGY: Samples of left chest blood, peripheral blood, urine and liver are retained.

HISTOLOGY: Sections of heart and liver are submitted for histology.

PHOTOGRAPHY: Multiple police photographs are taken.

X-RAYS: No x-rays are taken.

## MICROSCOPIC EXAMINATION

HEART (1 section): No significant pathology.

LIVER (1 section): Micronodular cirrhosis.

# EX: "C"

(A.G.) 1300 "I" ST. STE. 125 Po box 944255 Sac. CA. 94244-2550

(DRB) 1515 "S" ST. Po box 942883 Sac.

11. Certificate of Compliance as to 3-20-96 order transmitted to OAL 7-25-96 and filed 9-5-96 (Register 96, No. 36).

12. Amendment of section and Note filed 5-1-97; operative 5-31-97 (Register 97, No. 18).

13. Amendment of subsection (d)(2)(A) filed 7-28-97 as an emergency; operative 7-28-97 (Register 97, No. 31). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 1-5-98 or emergency language will be repealed by operation of law on the following day.

14. Certificate of Compliance as to 7-28-97 order transmitted to OAL 10-27-97 and filed 12-8-97 (Register 97, No. 50).

15. Amendment of subsection (d)(2)(A), new subsection (d)(2)(B), subsection relettering and amendment of subsection (d)(3)(E) filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.

### 3376.1.  Departmental Review Board.

The Departmental Review Board (DRB) provides the director's final review of classification issues, which are referred by an institution head for a resolution or decision at the headquarters level. The DRB decision serves as the director's level decision, which is not appealable and concludes the inmate/parolee's departmental administrative remedy of such issues.

(a) Composition of the DRB:

(1) The deputy director or an assistant deputy director of the institutions division (chairperson).

(2) The deputy director or assistant deputy director of the parole and community services division.

(3) The chief of classification services (shall abstain on DRB issues resulting from a difference of opinion between an institution head and the chief of classification services).

(4) The chief of health services.

(b) Two members shall constitute a quorum.

(c) The DRB shall meet at the call of the chairperson.

(d) Referrals shall be made to the DRB when:

(1) An institution head is unable to resolve a difference of opinion with the chief of classification services.

(2) An institution head believes a clarification of departmental policy of statewide importance is required.

(3) An institution head believes a DRB level decision for placement of an inmate is required because of an unusual threat to the safety of persons or public interest in the case, e.g., commuted or modified death sentence or classification of an inactive gang member or associate. Subsequent DRB reviews of the continued placement of inactive gang members or associates in a security-housing unit (SHU) shall occur no earlier than two years after the previous DRB decision. Upon denial of an alternative placement for an inactive gang member or associate, the DRB is authorized to schedule an earlier review of the placement if the DRB determines that it is reasonable to expect that release from SHU will be granted in less than two years.

(4) A difference between a Board of Prison Terms' program placement order and the department's policies cannot be resolved.

(5) An out-of-state or federal prison placement is recommended by the institution classification committee.

(6) Meritorious credit is recommended by an institution classification committee to reduce an inmate's period of confinement pursuant to Penal Code Section 2935.

(7) The inmate's current placement was ordered by the DRB and there is no documentation in the inmate's central file to indicate that the DRB has relinquished responsibility for the inmate's placement.

(e) Decisions of the DRB shall be in writing and implemented within 30 calendar days after the decision is made.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code; and *Sandin* v. *Connor* (1995) 515 U.S. 472; *Madrid* v. *Gomez* (N.D.Cal. 1995) 889 F.Supp. 1146.

HISTORY:

1. New section filed 1-16-92; operative 2-17-92 (Register 92, No. 13).

2. Amendment of subsection (d)(3) and Note filed 8-30-99 as an emergency; operative 8-30-99 (Register 99, No. 36). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 2-8-2000 or emergency language will be repealed by operation of law on the following day.

3. Certificate of Compliance as to 8-30-99 order transmitted to OAL 2-7-2000 and filed 3-21-2000 (Register 2000, No. 12).

### 3377.  Facility Security Levels.

Each camp, facility, or area of a facility complex shall be designated at a security level based on its physical security and housing capability. Reception centers are not facilities of assignment and are exempt from the security level designations except for the assignment of permanent work crew inmates. The security levels are:

(a) Level I facilities and camps consist primarily of open dormitories with a low security perimeter.

(b) Level II facilities consist primarily of open dormitories with a secure perimeter, which may include armed coverage.

(c) Level III facilities primarily have a secure perimeter with armed coverage and housing units with cells adjacent to exterior walls.

(d) Level IV facilities have a secure perimeter with internal and external armed coverage and housing units described in section 3377(c), or cell block housing with cells non-adjacent to exterior walls.

NOTE: Authority cited: section 5058, 5058.3, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

HISTORY:

1. New section filed 8-7-87 as an emergency; operative 8-7-87 (Register 87, No. 34). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 12-7-87.

2. Certificate of Compliance as to 8-7-87 order transmitted to OAL 12-1-87; disapproved by OAL (Register 88, No. 16).

3. New section filed 1-4-88 as an emergency; operative 1-4-88 (Register 88, No. 16). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 5-3-88.

4. Certificate of Compliance as to 1-4-88 order transmitted to OAL 5-3-88; disapproved by OAL (Register 88, No. 24).

5. New section filed 6-2-88 as an emergency; operative 6-2-88 (Register 88, No. 24). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 9-30-88.

6. Certificate of Compliance including amendment transmitted to OAL 9-26-88 and filed 10-26-88 (Register 88, No. 50).

7. Change without regulatory effect amending section filed 10-22-(  pursuant to section 100, Title 1, California Code of Regulati-  (Register 91, No. 4).

8. Editorial correction of printing errors (Register 91, No. 11).

9. Editorial correction of printing error in subsection (b) (Register No. 5).

10. Amendment of section heading, first paragraph and Note 8-27-2002 as an emergency, operative 8-27-2002 (Register No. 35). Pursuant to Penal Code section 5058.3 a Certific-  Compliance must be transmitted to OAL by 2-4-2003 or gency language will be repealed by operation of law <  following day.

11. Certificate of Compliance as to 8-27-2002 order transmi  OAL 1-21-2003 and filed 3-6-2003 (Register 2003, No. 1

### 3377.1.  Inmate Custody Designations.

(a) Designation of a degree of an inmate's custody :  reasonably related to legitimate penological interests. Th

EX. D

adequate mental health care. U.S.C.A. Const.Amend. 8.

> See publication Words and Phrases for other judicial constructions and definitions.

**20. Criminal Law ⟸1213.10(3)**

Where allegations are that there has been failure to provide adequate medical care, inmates, to prove violation of Eighth Amendment, must demonstrate that defendants acted with deliberate indifference to their serious medical needs. U.S.C.A. Const. Amend. 8.

**21. Criminal Law ⟸1213.10(3)**

Eighth Amendment violation based on inadequate medical care to inmates is comprised of both objective component and subjective component: objective component turns on whether deprivation of particular medical need is sufficiently serious, while subjective component requires that defendants have acted with deliberate indifference to inmate's need for care. U.S.C.A. Const. Amend. 8.

**22. Criminal Law ⟸1213.10(3)**

Objective component of Eighth Amendment claim premised on denial of adequate medical care to inmates turns on whether deprivation of particular medical need is "sufficiently serious"; routine discomfort that results from incarceration and which is part of penalty that criminal offenders pay for their offenses against society does not constitute "serious medical need," but rather, medical need is said to be "serious" for Eighth Amendment purposes if failure to treat inmate's condition could result in further significant injury or unnecessary and wanton infliction of pain. U.S.C.A. Const. Amend. 8.

> See publication Words and Phrases for other judicial constructions and definitions.

**23. Criminal Law ⟸1213.10(3)**

Examples of indication that inmate has "serious medical need" for Eighth Amendment purposes include: existence of injury that reasonable doctor or patient would find important and worthy of comment or treatment; presence of medical condition that sig-nificantly affects individual's daily activities; or existence of chronic and substantial pain. U.S.C.A. Const.Amend. 8.

**24. Criminal Law ⟸1213.10(3)**

Objective component of "deliberate indifference" to medical needs of inmate, for Eighth Amendment purposes, is treated as mixed question of law and fact; etiology, symptoms and diagnosis of medical conditions present questions of fact, and whether medical condition is "serious medical need" for purposes of Eighth Amendment is legal conclusion to be drawn from established facts. U.S.C.A. Const.Amend. 8.

**25. Criminal Law ⟸1213.10(3)**

There are six components of minimally adequate prison mental health care delivery system under Eighth Amendment: systematic program for screening and evaluating inmates to identify those in need of mental health care; treatment program that involves more than segregation and close supervision of mentally ill inmates; employment of sufficient number of trained mental health professionals; maintenance of accurate, complete and confidential mental health treatment records; administration of psychotropic medication only with appropriate supervision and periodic evaluation; and basic program to identify, treat, and supervise inmates at risk for suicide. U.S.C.A. Const.Amend. 8.

**26. Criminal Law ⟸1213.10(3)**

Even when inmates with serious medical illnesses are deprived of access to adequate mental health care, Eighth Amendment violation is not shown unless defendants have acted with deliberate indifference to their need for such care. U.S.C.A. Const.Amend. 8.

**27. Criminal Law ⟸1213.10(1)**

Prison official cannot be found liable under Eighth Amendment for denying inmate humane conditions of confinement unless official knows of and disregards excessive risk to inmate's health or safety; official must both be aware of facts from which inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

BEFORE I/m's suffered unnecessary & wanton inFlicti of Pain

suffering from mental illness were either undetected, untreated, or both. U.S.C.A. Const.Amend. 8.

**43. Criminal Law ⚖=1213.10(3)**

Under Eighth Amendment, prison officials were required to maintain system in which inmates were able to make their needs for mental health care known to staff competent to provide such care before inmates suffered unnecessary and wanton infliction of pain. U.S.C.A. Const.Amend. 8.

**44. Criminal Law ⚖=1213.10(3)**

Evidence established that California Department of Corrections was significantly and chronically understaffed in area of mental health care services, for purposes of Eighth Amendment analysis, even though Department did have some staff providing mental health services, and despite claim that consultants who performed study in evidence designed their plan to be well above constitutional minima; goals of study and design criteria incorporated to achieve those goals closely tracked mandates of Federal Constitution, such that study's assessment of staffing needs was significant evidence that level of mental health care staffing was constitutionally inadequate and, moreover, several major studies had been done, each of which had concluded that mental health care system was seriously understaffed. U.S.C.A. Const.Amend. 8.

**45. Civil Rights ⚖=265**

Requiring development of quality assurance program was appropriate remedy for constitutional deficiencies in delivery of mental health care at institutions within California Department of Corrections; defense expert had testified that defendant officials could not provide adequate mental health care without some form of quality assurance. U.S.C.A. Const.Amend. 8.

**46. Prisons ⚖=17(2)**

State prisoners had federal constitutional right of access to adequate mental health care and, in order to meet that requirement, defendant officials were required to provide inmates with access to competent medical staff. U.S.C.A. Const.Amend. 8.

**47. Criminal Law ⚖=1213.10(3)**
**Prisons ⚖=17(2)**

Evidence established that there were delays everywhere within mental health care system for inmates at institutions within California Department of Corrections and that those delays resulted in exacerbations and patient suffering, in violation of objective facet of test for violation of Eighth Amendment; in addition to study highlighting delays in access to necessary care as deficiency in present mental health care system, there was extensive testimony concerning delays in access to necessary care at every level. U.S.C.A. Const.Amend. 8.

**48. Criminal Law ⚖=1213.10(3)**
**Prisons ⚖=17(2)**

Medication management for mentally ill inmates at institutions within California Department of Corrections were constitutionally deficient under objective facet of test for violation of Eighth Amendment; computer tracking system available at individual institutions was not networked to any other institution and, thus, did not solve significant problems occurring when inmates on psychotropic medication were transferred to another institution, fact that some inmates at some places within Department were getting timely medication and/or appropriate monitoring did not address systematic failure resulting in gross deficiencies at institutions throughout Department, and record showed that some medications that were very effective in treatment of serious mental disorders were not available. U.S.C.A. Const.Amend. 8.

**49. Prisons ⚖=17(2)**

In order to satisfy Constitution, medical staff must have available to them modalities to provide inmates with necessary care. U.S.C.A. Const.Amend. 8.

**50. Civil Rights ⚖=265**

Although findings made by magistrate judge did not support issuance of permanent injunction concerning heat plans for inmate on psychotropic medication, record did support such injunction; there was ample proof that medication management practice within California Department of Corrections violated Eighth Amendment, history of defendant

SHU.    (Grassian Declaration at 17.)[56]/  He found that

> [o]f these, at least seven were actively psychotic and urgently in need of acute hospital treatment. Nine others suffered serious psychopathological reactions to SHU confinement, including in several cases a history of periods of psychotic disorganization. Of the remaining eight, five gave a history of psychiatric problems not clearly exacerbated by SHU, two others appeared free of psychiatric difficulties, and in one a language barrier prevented adequate evaluation.

(Id.)    Dr. Grassian's findings concerning the seven actively psychotic inmates and the nine others suffering serious psychopathological reactions to SHU confinement, and the response of CDC staff to those conditions, (see id. at 18-43), fully support the magistrate judge's findings.  The descriptions tendered by another of plaintiffs' experts, Dr. Craig Haney, are equally disturbing.  (Haney Declaration at 45-47.)  Given this testimony, defendants' assertion that the concerns about possible psychological harm from confinement in the Pelican Bay SHU "never materialized" can only be viewed as evidence of defendants' deliberate indifference to the serious harm visited on class members.

For the reasons set forth by the magistrate judge, defendants' present policies and practices with respect to housing of class members in administrative segregation and in segregated housing

_____

56/    As noted above, defendants raise several evidentiary objections to the use of Dr. Grassian's declaration.  Those are overruled.  In any event, Dr. Grassian's testimony concerning the condition of inmates confined in the SHU that he interviewed is plainly competent evidence.  See Fed. R. Evid. 703.

73

The following is a current listing and location of Morrow's enemies

|  | CDC# | Name | Location |
|---|---|---|---|
| 1 ▪ | C-54349 | Ethridge | Discharged |
| 2 ▪ | C-56257 | Dilts | Discharged |
| 3 ▪ | D-09186 | Maness | Discharged |
| 4 ▪ | C-41618 | Zimmerman | MCSP-III SNY |
| 5 ▪ | E-04448 | Hymes | SQ-ASU |
| 6 ▪ | C-09884 | Patton | Discharged |
| 7 ▪ | E-70318 | Johnson | Discharged |
| 8 ▪ | E-87737 | Gordon | Discharged |
| 9 ▪ | B-73151 | Mart | Discharged |
| 10 ▪ | H-77005 | Aselio | Discharged |
| 11 ▪ | C-84849 | Scott | COR-IV |
| 12 ▪ | T-92254 | Hughes | CIM-RCC |
| 13 ▪ | C-53655 | Miles | PBSP-IV |

The following is a listing of the location of Morrow's Confidential enemies

14 ▪ LAC-IV SNY
15 ▪ CEN-IV
16 ▪ LAC-IV SNY
17 ▪ SAC-IV C-yard
18 ▪ SVSP-IV SNY
19 ▪ CAL-IV SNY
20 ▪ CAL-IV ASU
21 ▪ PBSP-IV
22 ▪ SACCO-WICC
23 ▪ PBSP-ASU
24 ▪ CMF
25 ▪ CIM
26 ▪ SAC-C-yard
27 ▪ SATF-IV SNY
28 ▪ MCSP-III SNY
29 ▪ SOL
30 ▪ CEN-IV
31 ▪ SACCO-WICC
32 ▪ SVSP SNY
33 ▪ LAC-IV SNY
34 ▪ LAC
35 ▪ MCSP-III SNT
36 ▪ MCSP-IV SNY
37 ▪ MCSP-IV SNY

6 ▪

EX. E

*IN THE U.S. CT. OF APPEALS*
*REGINALD S. WILKINSON V. CHARLES E. AUSTIN*
*ON WRIT OF CERTIORARI TO THE U.S. CT. OF*
*APPEALS FOR THE SIXTH CIR.*
*BRIEF OF PROFFESSORS 4 ANI) PRACTITIONERS OF*
*PSYCHOLOGY ANI) PSYCHIATRY AC AMICUS CURIAE IN SUPPORT*
*OF RESPONDENT.*

served as a consultant to a number of correctional systems in the United States and elsewhere, and has received many awards for distinguished contributions to criminology and penology.

## SUMMARY OF ARGUMENT

Because of the extraordinary nature of extremely isolating "supermax" confinement—including the type that has been described as being practiced at Ohio State Penitentiary (OSP)—and the significant risk of psychological harm it creates for some prisoners, we conclude that these conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Indeed, long-term solitary confinement, in widespread use over a century ago, was abandoned largely because of its harmful psychological effects. Especially in its more modern supermax form, there is nothing "typical" about it. In addition, the literature that we review clearly documents that supermax confinement imposes a significant "hardship" in the form of grave psychiatric and psychological risks to prisoners. No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects. Moreover, research raises significant doubts about the ability of supermax prisons to achieve their goal of reducing violence in prison systems. Prisoners have a clear liberty interest, as this Court has defined it, in insuring that they are not exposed to such risks on the basis of mere conjecture, or absent a meaningful opportunity to contest the basis for their supermax confinement.

6

> extraordinary and extreme form of imprisonment unique in the modern history of corrections.[3]

In all but a few respects—some that appear to improve conditions and some that appear to make them worse— the OSP environment conforms to this general description.[4]

## ARGUMENT

### I.   PROTRACTED SUPERMAX CONFINEMENT REPRESENTS A SERIOUS PSYCHOLOGICAL STRESSOR AND IMPOSES SIGNIFICANT PSYCHOLOGICAL PAIN.

Prolonged or long-term involuntary solitary confinement constitutes a significant, painful, and potentially damaging psychological stressor. Strong empirical support for this proposition comes from a variety of sources.

Some direct evidence on the effects of this kind of punishment is part of the historical record of long-term solitary confinement used a century or more ago. Its effects were drastic enough to lead nineteenth-century officials to abandon the practice.[5] Thus, the first block of

---

[3] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 *Crime & Delinquency* 124, 127 (2003).

[4] *Amici* rely on the District Court's description of these conditions. Austin v. Wilkinson, 189 F. Supp. 2d 719, 724 (N.D. Ohio 2002).

[5] This historical record is summarized in Craig Haney and Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis

7

solitary confinement cells in the Walnut Street jail was authorized by the Pennsylvania legislature in 1790, to house "the more hardened and atrocious offenders."[6] Some jurists soon recognized that solitary confinement was "a greater evil than certain death" and it was reported that prisoners in solitary "beg, with the greatest earnestness, that they may be hanged out of their misery."[7]

When a similar form of solitary confinement was tried in New York,[8] Gustav Beaumont and Alexis de Tocqueville recorded the outcome: "This experiment, of which such favourable results had been anticipated, proved fatal for the majority of prisoners. It devours the victim incessantly and unmercifully; it does not reform, it kills. The unfortunate creatures submitted to this experiment wasted away..."[9] Another historian also

---

of Supermax and Solitary Confinement, 23 *New York Review of Law & Social Change* 477, 481-496 (1997).

[6] Harry Elmer Barnes, *The Evolution of Penology in Pennsylvania* Indianapolis: Bobbs-Merrill (1927), at 118-120.

[7] Enoch Edwards, president of the Philadelphia Court of Quarter-Sessions, charging a grand jury in 1791. Quoted in Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture, 1776-1865.* New York: Oxford University Press (1989), at 83.

[8] See Adam J. Hirsch, From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts, 80 *Michigan Law Review* 1178-1269 (1982), for a discussion of the forms of imprisonment in use during this period.

[9] Quoted in Torsten Eriksson, *The Reformers, An Historical Survey of Pioneer Experiments in the Treatment of Criminals.* New York: Elsevier (1976), at 49. See, also, W. Davis Lewis, *From Newgate to*

5

Since *Sandin* shifted the focus of the due process inquiry
to the nature and severity of the conditions to which
prisoners are subjected, we address those conditions
and their effects in psychiatric and psychological terms.
As one analysis of the nature of the supermax
environment noted:

> To summarize: prisoners in these units
> live almost entirely within the confines of
> a 60 to 80 square foot cell, can exist for
> many years separated from the natural
> world around them and removed from
> the natural rhythms of social life, are
> denied access to vocational or educational
> training programs or other meaningful
> activities in which to engage, get out of
> their cells no more than a few hours a
> week, are under virtually constant
> surveillance and monitoring, are rarely if
> ever in the presence of another person
> without being heavily chained and
> restrained, have no opportunities for
> normal conversation or social interaction,
> and are denied the opportunity to ever
> touch another human being with affection
> or caring or to receive such affection or
> caring themselves. Because supermax
> units typically meld sophisticated modern
> technology with the age-old practice of
> solitary confinement, prisoners experience
> levels of isolation and behavioral control
> that are more total and complete and
> literally "dehumanized" than has been
> possible in the past. The combination of
> these factors is what makes this

1  IN RE: WALSH V. MELLAS, 837 F. 2d. 789-793
2  (7TH Cir. 1988) COURT OF APPEALS: THE COURT
   SAID:
3

4     RECENTLY THE COURTS NOTICED THAT CONFINEMENT
5  IN STATESVILLE SEGREGATEA UNIT INVOLVES CONSID-
6  ERABLE ISOLATION SOMETIMES FOR PROTRACTEN
7  PERIODS; AND THE RECORD SHOWS, WHAT SEEMS
8  PRETTY OBVIOUSLY THAT ISOLATING A HUMAN
9  BEING FROM OTHER HUMAN BEINGS, YEAR AFTER
10  YEAR OR EVEN MONTH HFTER MONTH CAN
11  CAUSE SUBSTANTIAL PSYCHOLOGICAL DAMAGE
   EVEN IF THE ISOLATION IS NOT TOTAL...
12
13

EX. F

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

**FILE COPY**

November 14, 2005

Kenny Morrow, C-53683
CSP-Corcoran
4B-1L-32
Corcoran, CA 93212

  Re: Coleman v. Schwarzenegger
     Our File No. 489-3

Dear Mr. Morrow:

  I am writing in response to your last letter that our office received while I was on a monitoring tour at CCI. I have made the copies that you requested and am enclosing them with this letter. I cannot forward the letters for you but will enclosed stamped envelopes for you to use.

  I have also enclosed a response that I received from Linda Rianda, Chief of Classification Services Unit, regarding my letter to the DRB. In her letter she has written that she has contacted Warden Scribner at Corcoran and requested that your case be reviewed and referred to the DRB for appropriate placement. She indicates that as part of the review staff at Corcoran will speak with you about whether you will be comfortable with placement at the Level IV SNY EOP at Mule Creek State Prison. Let me know if and when that occurs.

  Our office is copying your correspondence file. It is quite large and I apologize that this is taking a while to complete. It should be completed this week.

          Sincerely,

          ROSEN, BIEN & ASARO, LLP

          By: Jane E. Kahn

JEK:ts
Enclosures- Copies of 9/1/05 Morrow Letter, Rianda Letter, and SASE

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

July 25, 2005

CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED
LEGAL MAIL
Kenny Morrow, C-53683
CSP - Corcoran
PO Box 3476
Corcoran, CA 93212

Re:    Coleman v. Schwarzenegger
       Our File No. 489-3

Dear Kenny:

We received your letters dated July 20 and 21, 2005 today. I am sorry to hear that you are feeling frustrated and that you are once again feeling suicidal. I agree with you that what has been happening to you is unconscionable. It makes no sense to keep someone in severe isolation for their own protection when they have done nothing wrong – especially when, like you, the reason they need to be protected is that they did something right. Also, it sounds like the EOP staff is giving you a hard time for no real reason.

My only advice to you is to hang on and ignore them and see what happens. I know you have been hearing that for a while now, but your out-of-state transfers are still pending, and if they do not come through, the CDCR will need to send you back to the DRB for PHU consideration. I don't blame you for losing patience with this drawn-out process, but the CDCR will need to bring you back to the DRB soon. I'm not sure why the DRB staff there are threatening to send you to the PSU again – I'm hoping that they are just bluffing. In the meantime, you should be able to go to yard. Are there any decent groups there that you would be willing to try, if only to get out of your cell more often? Also, you should ask for one-on-one therapy. Maybe you will get lucky and find a decent case manager. Mike and Jane are out of the office this week, so I will be responding to your letters.

Take care of yourself and keep in touch.

Sincerely,

ROSEN, BIEN & ASARO, LLP

Tom Nolan

By: Tom Nolan

SASE

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

June 2, 2005

Kenneth Morrow, C-53683
SVPP-A-3
SVSP/P.O. Box 1080
Soledad, CA 93960

# FILE COPY

Re:    Coleman v. Schwarzenegger
       Our File No. 489-3

Dear Mr. Morrow:

I am writing in response to both of your letters that arrived from SVPP. I am enclosing a letter that I sent to you at Corcoran, which I think you are unlikely to have received because you would have transferred before it arrived. I will also send you a copy of the letter that we sent to the DRB, which includes some of your classification documents. Let me know if you want other documents as well. I have also copied the consent forms from SVPP that you sent with your most recent letter.

We are looking for the Change of Address Forms that you requested in your letter. If we are unable to locate them, I believe that you can simply write to the court and inform them of your change of address.

I am sorry to read that your feelings about the program have changed so dramatically within days. First, I believe that you may be cuffed just during an orientation period, because when I have visited the program I saw many guys that I knew from PSU programs who were not cuffed or locked up in their cells all day. They were walking around the program and sitting in groups without cuffs. There is initial orientation when they are assessing you and trying to determine the risk factors. Because you had been housed in the ACH, they are probably concerned about giving you a razor or clippers right now.

I wanted you to know that I spoke with Dan Rothchild, the CCII at Classification Services who sits on the DRB and is familiar with your case. He informed me that there are still two states, Idaho and Maine, who have not yet responded to your request for transfer out-of-state. Until all of the states have responded to the out-of-state transfer requests, the DRB does not review your case again. He indicated that the institution would then decide whether to put you up for PHU referral. We recommend that you relax about the out-of-state transfer right now and try to get as much as you can from the

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

**FILE COPY**

October 18, 2005

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2500

Michael Stone
CDC Legal Affairs Division
P.O. Box 942883
Sacramento, CA 94283-0001

Departmental Review Board
Room 300 N
1515 S Street
Sacramento, CA 95817

Re:    Coleman v. Schwarzenegger
       Kenneth Morrow, C-53683
       Our File No. 489-3

Dear Ms. Tillman, Mr. Stone, and Departmental Review Board:

Plaintiffs write on behalf of Coleman class member, Kenneth Morrow, C-53683, who is currently housed at CSP-Corcoran. Mr. Morrow's case was referred to the DRB on January 24, 2004, for approval of an Indeterminate SHU pending an out-of-state transfer request based upon overriding safety concerns. (See Memo to Chief, Classification Services, dated January 24, 2004, attached hereto.) Mr. Morrow was approved for transfer to the Corcoran SHU, pending his Interstate Transfer, but has repeatedly decompensated while housed in the Corcoran SHU--and has been transferred many times to the ACH, to the EOP HUB, to SAC PSU and to SVPP--while waiting for a final decision on his out-of-state transfer requests.

Mr. Morrow recently withdrew his request for transfer to New Hampshire, the last pending request. During the 16th Round monitoring tour of Corcoran, Dr. Metzner, who reviewed Mr. Morrow's file, stated that based upon his familiarity with New Hampshire's

Lisa A. Tillman
October 18, 2005
Page 2

Department of Corrections, he felt it was very unlikely that Mr. Morrow would be accepted for transfer by New Hampshire.

Plaintiffs' counsel wrote to the Departmental Review Board in May 2005 to request that Mr. Morrow be placed in the Protective Housing Unit (PHU) at Corcoran while he awaited responses on his out-of-state transfer requests. (See Letter to DRB, dated May 3, 2005, attached hereto.) In addition, plaintiffs requested that the DRB house Mr. Morrow in the PHU in the event that his out-of-state transfer requests were denied due to mental health concerns based on Mr. Morrow's documented history of mental decompensation when housed in long-term locked down conditions. (See Memo to Chief, January 28, 2004: 2 suicide attempts in 1990 in Corcoran SHU, one suicide attempt in 1992 in SAC ASU, multiple ACH admissions from Corcoran SHU recently.) These requests were denied. Unfortunately, and as predicted, Mr. Morrow again experienced decompensation while housed in the Corcoran SHU and was transferred to DMH during the subsequent months. He was returned to the Corcoran SHU.

Mr. Morrow was most recently housed in the Corcoran SHU where his mental health has again deteriorated. Following placement in the ACH on October 13, 2005, for suicide precautions, Mr. Morrow has written that his case manager is recommending that his treatment level be increased to EOP. We request that Mr. Morrow, whose Indeterminate SHU was imposed for safety concerns, be referred for transfer to the Level IV SNY EOP program at Mule Creek State Prison where he can program on a mainline. Mr. Morrow deserves the opportunity created by such a program.

In addition, Mr. Morrow's demonstrated inability to program in the SHU environment must not be ignored. "Cycling" a prisoner such as Mr. Morrow, between the SHU, crisis beds, the PSU and DMH causes permanent harm to a patient. This continued harm could be prevented by the placement that we have requested for Mr. Morrow.

Thank you in advance for your consideration and response to this request.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:ts

cc:    J. Michael Keating, Jr.
       Matthew A. Lopes, Jr.
       Coleman Co-counsel
       Kenneth Morrow, C-53683 (CSP-Corcoran)

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

FILE COPY

September 19, 2005

Kenny Morrow, C-53683
4B-11-32
CSP-Corcoran
P.O. Box 3481
Corcoran, CA 93212

Re: Coleman v. Schwarzenegger
Our File No. 489-3

Dear Mr. Morrow:

I am writing in response to your letters that we received last week and today. In the letters last week you wrote about the special IDTT held with Associate Warden Yamamoto, Captain Lopez, Dr. Juarez, and other staff members. The most recent letter was sent from the EOP Hub so it appears that you are not being moved quickly out of the unit. You did not indicate whether you were seen by Dr. Metzner who was at the facility on September 12, 2005, but even if you were not seen, he may have reviewed your records and spoken to clinical staff. I also spoke to him myself and discussed your difficulty with long-term SHU housing while you wait for your out-of-state transfer requests to be resolved.

I have copied the letters that you wrote to Judge Karlton. Good luck with it. It is well written. I am also enclosing the address to the CCPOA, which is as follows:

CCPOA, 755 Riverpoint Drive, West Sacramento, CA 95605-1634.

I want to raise another issue with you at this point. There is another possible placement for you that we believe may work very well for you. Mule Creek State Prison has recently opened a Level IV SNY EOP yard. I understand that you have experienced difficulties programming on SNY yards, however, EOP SNY yards are different because of the treatment needs of most of the men. These are general population yards --- not locked units like EOP ASUs or PSUs. I understand that this may have an impact on your out-of-state transfers, but you have already moved in and out of EOP units. We could write on your behalf and ask that you be transferred to this SNY EOP unit if you are willing to try to program there. Let me know what you think?

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Kenny Morrow, C-5368
September 19, 2005
Page 2

As I mentioned in my earlier letter, the declarations of Haney and Grassian were filed under seal with the Court because they discuss individual cases. I am unable to provide them.

You asked about who makes the rules that govern Corcoran's mental health program. There are Program Guides that were provisionally adopted by the Court in 1997 that govern what is supposed to be provided at each level of care, and then each institution has adopted their own Operational Procedures for implementing the care. The Court monitors come in and review aspects of the Program Guides -- for example, whether the prison provides psych tech rounding as required, or weekly case manager contacts, etc., but there are so many aspects of the daily program that ends up not being monitored. And the Federal Courts are loathe to get involved in the running of prisons, even with a finding of unconstitutionality since this is a State Prison system. The monitoring that does happen in Coleman – which is considered pretty intrusive considering how long it has been happening and how often the prisons are visited each year- still cannot uncover everything that goes on. I don't know if that answers your question.

I will enclose an envelope for you to use to write back.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:pj

Enclosure: SASE, 2 copies of Letter to Judge Karlton

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FILE COPY   FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

October 18, 2005

CONFIDENTIAL – LEGAL MAIL
Kenneth Morrow
C-53683
PO Box 3481
4B-1L-32
Corcoran, CA 93217

Re:   Coleman v. Schwarzenegger
      Our File No. 489-3

Dear Mr. Morrow:

I am writing in response to your letter of October 2 which my office did not receive until today, October 18! In the mean time, we have received other letters from you authorizing us to proceed with efforts to transfer you to the Mule Creek EOP SNY. Jane Kahn completed a letter to Lisa Tillman, the Deputy AG in Coleman, and to the DRB, advocating on your behalf (you are copied on the letter). You will also note that she referred in the letter to your history of decompensation when housed in the SHU and other ad seg units. So...many of the issues you raise in your letter to me are out of date and I am not going to attempt to respond to each and every point or question in your letter.

I have been unable to obtain a copy of Dr. Grassian's old published study. I have located, however, and enclose for you, two other documents that should be of interest: One is a copy of a recently published article by Dr. Craig Haney (Dr. Haney testified for plaintiffs in the Madrid and Coleman cases) about the effects of segregation. The second is a brief filed in the United States Supreme Court in the Wilkinson case challenging the procedures for placing inmates in Ohio's supermax unit. Both of these documents contain far more up to date research than Dr. Grassian's article and both make reference to Dr. Grassian's work.

You have asked that we continue to advocate on your behalf to be transferred to a mainline EOP program. Now that you have abandoned your efforts at interstate transfer,

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Ken Morrow
October 18, 2005
Page 2

and given us permission to push for your transfer to MCSP, we have already begun to do
so as evidenced by Ms. Kahn's letter of today.

You also asked if we keep a file of your letters. It is our practice to keep all letters
we receive from Coleman class members. You have asked for a copy of all your letters
to us. We are willing to provide them to you. Before we send them, however, I want you
to consider whether it is safe for you to have those letters in your possession. I note, for
example, that in the October 2, 2005 letter that I am responding to right now, you discuss
things that might put you in danger if reviewed by custody staff.

Very truly yours,

ROSEN, BIEN & ASARO, LLP

By: Michael W. Bien

MWB:ts

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

**FILE COPY**

December 22, 2004

Kenny Morrow, C-53683
CSP-Corcoran/4B-1L-63
P.O. Box 3476
Corcoran, CA 93212

> Re: Coleman v. Schwarzenegger
> Our File No. 489-3

Dear Mr. Morrow:

I am writing in response to the letter that you sent to our office to forward to the Special Master. The Special Master's name is Michael Keating. He is a lawyer. We are unable to forward his letter, but I can provide you with the address of the Court and you can send your letter to Judge Karlton, United States District Court, Eastern District of California, 501 "I" Street, Sacramento, CA, 95814. You should put the name of the case, Coleman v. Schwarzengger, No. CIV S-90-0520 LKK JFM P. Judge Karlton can decide whether to forward the letter to Mr. Keating.

It is our understanding after having spoken to Penny Godbold at the Prison Law Office, that they have requested that you be transferred to the PHU at Corcoran based upon your safety concerns. This issue is not a part of the Coleman case. With regard to your mental health care, we have contacted CDC Headquarters and been assured that you are meeting regularly with your case manager, and it appears from your own letters that you feel that he is your best advocate. In terms of the alternative plans that Corcoran is offering to you, I have visited the program at SVPP, and I suggest that you consider this program. It is an open program where you will be provided with extensive mental health programming in a less restrictive environment. It is really a gem within CDC. Also, as you know, mental health programming is limited in the PHU so the more extensive your suicidal ideation, the less likely you are to be transferred to that program where less clinical resources are available.

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Kenny Morrow, C-53683
December 22, 2004
Page 2

  I am returning your letter with mine so that you can forward it to the Court if you wish. I will enclose an envelope for you to use.

         Sincerely,

         ROSEN, BIEN & ASARO, LLP

         By: Jane E. Kahn

JEK:ts
enclosure