IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                         **No. CIV S-90-0520 LKK JFM P**

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.


### FIFTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
January 13, 2006

# TABLE OF CONTENTS

**INSTITUTIONAL SUMMARIES**                                                     4

**Service Area A**                                                              4

    California State Prison, Sacramento  (CSP/Sac)              4

    Folsom State Prison (Folsom)                               14

**Service Area B**                                                             22

    Pelican Bay State Prison (PBSP)                            22

    High Desert State Prison (HDSP)                            30

    California Correctional Center (CCC)                       52

**Service Area C**                                                             59

    Mule Creek State Prison (MCSP)                             59

    Sierra Conservation Center (SCC)                           68

**Service Area D**                                                             82

    California Medical Facility (CMF)                          82

    California State Prison at Solano (CSP/Solano)             92

    California State Prison at San Quentin (SQ)               108

    Deuel Vocational Institution (DVI)                        128

**Service Area E**                                                            142

    California State Prison at Corcoran (CSP/Corcoran)        142

    California Substance Abuse Treatment Facility (CSATF)      161

    Pleasant Valley State Prison (PVSP)                       172

    Avenal State Prison (ASP)                                 178

**Service Area F**                                                     186

    Salinas Valley State Prison (SVSP)                           186

    California Training Facility (CTF)                           204

**Service Area G**                                                     215

    California Men's Colony (CMC)                                215

    Wasco State Prison (WSP)                                     225

    North Kern State Prison (NKSP)                               237

**Service Area H**                                                     244

    California State Prison, Los Angeles County (CSP/LAC)        244

    California Correctional Institution (CCI)                    259

**Service Area I**                                                     269

    California Institution for Men (CIM)                         269

    California Rehabilitation Center (CRC)                       281

**Service Area J**                                                     290

    Richard J. Donovan Correctional Facility (RJD)               290

    Ironwood State Prison (ISP)                                  302

    Calipatria State Prison (CAL)                                306

    Centinela State Prison (CEN)                                 312

    Chuckawalla Valley State Prison (CVSP)                       317

**Service Area K**                                                     320

    California Institution for Women (CIW)                       321

**Service Area L**                                                    327

    Central California Women's Facility (CCWF)              327

    Valley State Prison for Women (VSPW)                   335

**SUMMARY**                                                            345

**RECOMMENDATIONS**                                                    411

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

      vs.                  No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## FIFTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

This report documents the latest and substantially extended round of review of institutional compliance with individual corrective action plans (CAPs) compiled by California Department of Corrections and Rehabilitation (CDCR) facilities in 2000 to ensure implementation of the plans, policies and protocols provisionally approved by the court in mid-1997. The expanded round was a response to the more narrow scope of the preceding 14th round of monitoring, which was limited to just 11 institutions to enable parties, counsel and the special master's monitors and experts to work on program guide revisions and complete the design and undertake an assessment of CDCR's unmet need for inpatient Department of Mental Health (DMH) beds for the most seriously mentally ill inmates in its population. While focusing on 11 CDCR institutions with large and complex mental health programs and a history of difficulty in complying with the provisionally approved plans, policies and protocols, the 14th round of monitoring included no monitoring visits to the remaining 21 CDCR institutions.

These 21 institutions were simply required to file a paper review with the Division for Correctional Health Care Services (DCHCS) in Sacramento to document their continuing compliance efforts.

The limitations of the 14th round of monitoring largely dictated that during the current round, all 32 CDCR institutions would be visited and their mental health programs evaluated. In addition, monitoring in the round focused on four broader topics, including quality management, medication management, mental health input into the hearing and disposition of rule violation reports (RVRs) generated in response to disciplinary infractions committed by seriously mentally disordered inmates and the timeliness of transfers to more intensive levels of mental health treatment. Because 21 of the institutions reviewed in this round, moreover, had not been visited by a monitoring team since late 2003, the period actually covered in the following institutional summaries ranges from a few months to 16 months.

Monitoring during this round was further complicated by the need to review the defendants' use of ten newly built and activated administrative segregation units, specifically restricted by an October 2002 court order, and the referral of RVRs involving seriously mentally disordered inmates to local district attorneys for criminal prosecution. Finally, once the methodology for the conduct of the assessment of the defendants' unmet need for DMH inpatient beds was approved in October 2004, actual conduct of the assessment required the participation of the monitor's experts in each institutional assessment through early March and the preparation of the final report by March 31, 2005. The result of all of these complicating factors was a somewhat extended monitoring period that began in early August 2004 and did not conclude until late May

2005, as well as the most voluminous monitoring report generated to date in this mastership already rich in voluminous reports.

During the 15th round of review, the monitor's psychiatric experts and monitors spent 308 person-days in all 32 CDCR institutions, with 24 of those person-days devoted largely to the new administrative segregation units. The monitor's psychiatric experts compiled numerous case reviews based on interviews with inmates and clinicians, chart reviews, or a combination of these elements, which are included as exhibits in this report. A total of 424 case reviews from 26 institutions are attached to this report. The case reviews are redacted to protect the privacy of inmates.

Institutional administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs and defendants' counsel accompanied monitoring staff during several of the site visits.

The data collected and findings discussed in this report are the product of many members of different monitoring teams, but subsequent references to various monitors throughout the report shall be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

This report contains an institutional summary of compliance for each CDCR institution, which includes a brief report on staffing and staffing vacancies; a list of resolved CAP problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care, as well as problems identified in the institution's

3

CAP and targeted for elimination. A concluding summary of overall compliance is generally followed by an assessment of each institution's likely candidacy for reduced future monitoring or a list of major local obstacles to future reduced review. The institutional summaries are followed by a more general and department-wide analysis of compliance and any recommendations that spring from the analysis.

The arrangement of the institutional summaries in this report corresponds with the defendants' regional service areas, which typically include a hub institution with a Mental Health Crisis Bed (MHCB) unit for short-term inpatient crisis care and an intensive residential Enhanced Outpatient Program (EOP). The service areas also include anywhere from one to four other facilities, each of which generally has a Correctional Clinical Case Management System (3CMS) program in the general population.

### Institutional Summaries

### Service Area A

This service area includes <u>California State Prison, Sacramento (CSP/Sac)</u> and <u>Folsom State Prison (Folsom)</u>.

### California State Prison, Sacramento (CSP/Sac)
October 6, 2004 – October 7, 2004

Mental health vacancies at CSP/Sac remained low. Of 118.1 mental health positions, 9.1 (7.7 percent) were vacant. Specifically, the institution had positions open for a psychiatrist, a psychologist, a psych social worker, 3.1 nurses, two office assistants and a medical transcriber. A significant portion of the unfilled clinical hours were covered by contractors, who provided between 300 and 380 hours of service per month from June through August 2004.

4

There were few vacancies among auxiliary staff as well. Only one of 27 MTA positions was unfilled, while one of four pharmacy positions was vacant during the monitoring period.

Issue Resolved:

The new mental health assessment process for RVRs involving caseload inmates was implemented adequately.

Quality Management:

The quality assurance process, a CAP item previously resolved, continued to function well at CSP/Sac. The quality management committee met weekly, maintaining ample minutes. Quality improvement teams were chartered in a number of areas, including medication continuity, documentation of group therapy and access to care for EOP administrative segregation inmates. Peer review meetings were conducted for psychiatrists, although not for other clinicians. The monitor's expert reviewed the minutes of these peer review meetings for the period from April through July 2004, but was unable to determine the methodology employed by the review committee or to ascertain the committee's conclusions. Clinicians were not regularly provided with the results of institutional audits.

Medication Management:

Most CAP items pertaining to medication management were resolved during earlier monitoring rounds, but a number of audits were still needed to assess continuing compliance with medication management policies and procedures. Continuity of mediation on entry to the facility and transfer to other housing areas within the institution improved further. Implementation of a newly developed inmate movement form during the monitoring period helped eliminate remaining interruptions. Institutional

audits from October 2004 showed compliance rates between 81 and 100 percent for new arrivals and inmates moving to other intra-institutional locations.  The institution had not conducted any audits to determine whether inmates in need of medication renewals were seen by a physician before their renewal date or before the expiration of relevant continuity orders.

The timeliness of psychiatric responses to staff and inmate referrals for psychiatric care was uncertain.  The institution had yet to track response times to requests for psychiatric services.

Medication refusals were documented on inmates' Medication Administration Records (MARs), and inmates who refused their medications or did not appear for medication distribution were reportedly referred to mental health.  The filing of MARs, however, was backlogged, and no audit had been conducted to assess the extent of follow-up to medication non-compliance.

Laboratory testing of inmates on psychotropic medication remained timely, although a problem had developed with the filing of test results in inmates' charts. The institution had not conducted an audit to determine whether clinicians adjusted inmate medications in response to abnormal test results.  A quality improvement team was chartered to study the implementation of requirements for laboratory testing of inmates on mood-stabilizing medications.

There were 86 inmates on Keyhea orders in CSP/Sac at the time of the monitor's visit.  Keyhea orders were routinely sought for inmates who needed involuntary medications, and renewals of such orders were sought in a timely manner.

Procedures were reportedly in place to ensure that all paroling inmates in need of psychotropic medications were identified and provided with adequate discharge medications, but no audits had been conducted to determine the actual rate of compliance.

The administration of HS (*hora somni*, hour of sleep) medications improved during June 2004, when approximately 80 inmates were receiving such medications. The number of inmates with HS medications declined, however, during July and August to around nine.

Problems with obtaining informed medication consent from inmates on psychotropic medications continued. Not all inmates were appropriately counseled regarding their prescribed medications. A process remained in place, however, to ensure that heat cards were distributed to inmates receiving heat-sensitive medications, and inmates were told of the risks associated with their heat-sensitive medications.

Procedures were in place for observing inmates while taking Direct Observation Therapy (DOT) medications.

Mental Health Assessments for the Disciplinary Process:

The revised mental health assessment process for MHSDS inmates charged with disciplinary infractions was fully implemented at CSP/Sac. A social worker assigned to complete mental health assessments reportedly interviewed all inmates for whom an assessment was requested and reviewed their charts in preparing the assessments.

Mental health input appeared to have an impact on the disposition of a significant number of infractions. From June 1 through April 3, 2004, mental health

7

assessments were completed for 178 of the 451 RVRs issued to mental health inmates, 40

percent of which concluded that mental illness had influenced the inmates' behavior. An

institutional audit, confirmed by chart reviews, indicated that mental health input was

consistently considered by hearing officers and occasionally used to justify a reduced

penalty. In some cases, the chief disciplinary officer assigned to review hearing

dispositions reduced the penalty imposed by the hearing officer. Some gaps in

documentation continued to occur.    The monitor reviewed RVRs for eight inmates and

found two instances in which clinical input was not summarized in the RVR; one instance

in which a completed mental health assessment was not filed in the inmate's C-file; and

one instance in which the hearing officer failed to indicate whether the mental health

information provided was used in reaching a disposition.

Transfers:

          Access to MHCB care at CSP/Sac was erratic. When the MHCB unit at

CSP/Sac was full, Psychiatric Services Unit (PSU) staff sometimes chose to retain fragile

inmates in need of MHCB care in the PSU under intensified monitoring rather than

transfer them to a MHCB unit in another CDCR prison. Other inmates were placed in

holding cells with continuous monitoring or in the OHU (Outpatient Housing Unit)

pending transfer. The OHU referral log showed that inmates sometimes spent four to

seven days in the OHU waiting for a MHCB bed to become available. Access to the

OHU was reportedly adequate. There were 250 OHU admissions from June 1 through

October 4, 2004, 17 of which lasted longer than 72 hours; 15 of the inmates who

remained in the OHU beyond 72 hours were waiting for MHCB beds.

After the monitor's October 2004 visit to CSP/Sac, access to a MHCB level of care slowed even further due to a system-wide shortage of beds in MHCB units caused by mechanical, licensing and inter-agency problems. The department-wide squeeze for space required the MHCB unit at CSP/Sac to take priority inmates from elsewhere in CDCR and led to the use for some local inmates referred to the institution's MHCB unit with less priority of so-called ZZ cells, which were holding cells with toilets and, sometimes, mattresses, located outside of the Correctional Treatment Center (CTC). On several occasions, the institution had to rely on placing inmates with a need for a MHCB level of care even in contraband cells, without toilets, located down the hall from the CTC. This meant that unstable and seriously mentally ill inmates were placed in unacceptable physical conditions entirely outside of the institution's structure for providing mental health monitoring and treatment. This obviously was not a problem of CSP/Sac's making and was related directly to the serious department-wide shortage of MHCB beds.

CSP/Sac appeared to have adequate access to the DMH Acute Psychiatric Program (APP) at CMF. From June 1 through September 3, 2004, 19 referrals were made to the APP, 15 of which resulted in transfers. The average time between referral and transfer was 12 days, although delays exceeded three weeks in three cases. The institution failed to record the bed assignment date in the DMH referral log so it was impossible to assess compliance with the 72-hour transfer guideline, but the staff agreed to include this information in the future.

In contrast, the DMH Salinas Valley Psychiatric Program (SVPP) appeared to be underutilized by CSP/Sac. Staff indicated that the referral process was

burdensome. Moreover, institutional referral data suggested that the timeliness of some transfers to SVPP were problematic. For the period from June 1 through October 6, 2004, CSP/Sac made seven referrals, six of which were accepted for transfer while the last referral was rescinded. The average time between referral and acceptance was 27 days, ranging from four to 56 days. At the time of the monitor's visit, only three of the referred inmates had actually been transferred; the periods between referral and transfer for each of these inmates were 72, 33 and five days respectively. Of the three referrals still pending, two had been waiting for more than 75 days and one had been waiting 41 days.

Treatment continuity for inmates returning to CSP/Sac from DMH was satisfactory, although documentation of the care provided was erratic. The monitor reviewed eight charts and found that discharge summaries were often misfiled in progress notes or missing. In addition, none of the charts reviewed contained inpatient records from DMH.

Other CAP Issues:

a. Partial Compliance

In October, the institution reported that EOP inmates in administrative segregation were scheduled for an average of 12.1 hours of group treatment a week, but due to staff absences and institutional needs, hours actually offered averaged 8.3 a week. The monitor found that EOP inmates in administrative segregation participated in an average of roughly 5.3 hours a week. The principal limitation on the delivery of scheduled structured therapeutic activities appeared to be inadequate staffing allocations, which did not include relief coverage.

The availability of sufficient general population EOP program space, a problem temporarily resolved with the completion of phase one of CSP/Sac's mental health construction project, became an issue once again with the beginning of phase two of the project in September 2004. Group treatment was moved back to the dayrooms, and individual counseling was conducted in the noisy dining room, which lacked confidentiality. Phase two construction was scheduled to last until well into 2006.

b. Non-Compliance

Some suicidal inmates did not receive adequate clinical follow-up monitoring after their discharge from a MHCB unit or the OHU. According to an institutional audit, five-day clinical follow-up was provided for 82 percent of discharged suicidal inmates, while custody checks were completed for 86 percent. A quality improvement team was re-instituted to study this issue further.

New Problem:

Daily psych tech rounds were not conducted in the newly activated ASU, and mental health screenings in the new unit were inadequate.

In their objections to the draft version of this report, the defendants protested the accuracy of the identified new problem and the failure to raise it during the monitoring visit or its associated exit interview. The problem, however, was not identified during the regular monitoring visit in October 2004, but in a September 7, 2004 visit by two monitors to review specifically mental health services in the so-called "stand alone" or new administrative segregation unit opened at CSP/Sac in late January 2004. During that visit, the monitor reviewed the actual isolation log, the large volume kept at the entrance of the unit to record all activities, including the psych techs' entry and exit and check marks of rounded inmates. The monitor reported that the unit log reflected

11

consistent, but not perfect, compliance with daily psych tech rounding and listed seven

days during the slightly more than seven preceding months when rounds were not

recorded in the unit's log (3/27 and 30; 4/3 and 18; 8/4 and 14; and 9/6). The monitor

also found the quality of the rounds conducted to be inadequate, identified deficiencies

with the psych tech involved and made specific recommendations for improved rounding.

The monthly log summaries provided with the defendants' objection

reflected only one of the seven days listed by the monitor when psych tech rounding was

not conducted in the unit. The monitor(s) typically briefly share their findings at the

conclusion of these short visits with whomever among custody and/or mental health

administrators are available, but there are no formal exit interviews.

Institutional Summary:

Mental health staffing was almost complete at CSP/Sac, and a significant

portion of the few staffing vacancies were covered with contracted services. Many

aspects of quality management and medication management were resolved during earlier

monitoring periods and remained satisfactory, although additional audits were needed to

assess compliance in some medication-related areas, including the use of HS medications

and the timeliness of psychiatric responses to referrals, such as those for medication non-

compliance. In addition, the facility needed to implement peer review for psychologists

and psych social workers and tighten up its practices for procuring informed medication

consent forms. Revised procedures for ensuring mental health input into the disciplinary

process when MHSDS inmates were involved appeared to be functioning effectively.

Timely transfers to a MHCB level of care and to the DMH/SVPP program grew

increasingly untimely and difficult, while temporary housing arrangements for local

12

inmates awaiting access to a MHCB unit were becoming increasingly unacceptable and dangerous.

Most of the remaining unresolved CAP items involved the provision of scheduled structured therapeutic activities to EOP inmates in both general population and administrative segregation. Programming space for the general population EOP depended on completion of construction, still a year off, while insufficient programming for the administration segregation EOP hub unit apparently was tied to a lack of adequate staffing resources. The provision of clinical monitoring of suicidal inmates discharged from a MHCB unit or the OHU needed some work, as did mental health services in the new administrative segregation unit.

Despite its considerable MHSDS caseload (consistently over 1,100 inmates) in a variety of complex programs (the PSU, an EOP administrative segregation unit, a MHCB unit and large EOP and 3CMS programs, mostly for Level IV inmates), CSP/Sac continued to outshine its institutional peers in the provision of most aspects of mental health services. During the next or 16th round of review, the facility needs to address its remaining medication management deficiencies, provide peer review for psychologists and psych social workers, provide additional programming to EOP inmates in the EOP administrative segregation unit and improve the clinical monitoring of suicidal inmates and mental health services in the new ASU to qualify for a paper review in subsequent monitoring rounds. Even more pressing, of course, is the acquisition of some relief in the pressure on the facility's MHCB unit, tied in part to the anticipated expansion of its MHCB capacity by 12 beds in December 2005.

**Folsom State Prison (Folsom)**
November 18, 2004 – November 19, 2004

Mental health staff at Folsom reported that insufficient clinical staff was available to provide adequate mental health services. The facility was allocated 1.5 psychiatric positions, but the half-time position was vacant. A long-time contract psychiatrist provided consistently some 40 to 100 hours a month and was assigned to the administrative segregation unit, which at the time of the monitor's visit housed 22 3CMS and 2 EOP inmates. This left the permanent, full-time psychiatrist to cover the 483 general population 3CMS inmates in Folsom at the time of the monitor's visit, a formidable task. Moreover, he was presumably expected to handle up to 599 general population 3CMS inmates, the program's full capacity. The institution clearly needed some additional psychiatric resources.

On the other hand, a senior psychologist and six case managers, including contracted clinicians, were available in mid-November to handle the total MHSDS population of 505 inmates. One case manager was assigned full-time to administrative segregation; the rest were assigned to the general population 3CMS program and the preparation of BPT reports. That staffing met the ratio stipulated in the program guides for a 3CMS program, yet staff reported that case managers' caseloads ranged from 105 to 134 inmates. Other vacancies at the time of the monitoring visit included positions for a psych tech and an office tech. Nursing staff vacancies were minimal.

14

Issues Resolved:

> New arrivals were provided with timely mental health assessments.

> Paroling inmates were provided with discharge medications.

> Problems with the lack of private office space for clinical contacts were resolved.

Quality Management:

Folsom developed appropriate structures to underpin its quality assurance process. The quality management committee met monthly and maintained meeting minutes. Peer review was conducted for psychologists and psych social workers together on a weekly basis. Psychiatrists met for peer review monthly.

There were some problems with the QIT process. Participation by line staff in QITs was minimal. Moreover, based on information from members of various QITs, it was unclear whether audits and studies surveyed representative samples of adequate size.

Medication Management:

The institution was in the process of revising its local medication management policy and operating procedure to add guidelines on the handling of medication non-compliance. Although the local operating procedure also lacked provisions on laboratory testing for inmates on mood-stabilizing medications or the acquisition of informed medication consent forms, the institution seemed to have a reasonably effective mechanism in place for conducting laboratory testing of inmates on mood-stabilizing medications, and informed medication consent forms were generally found in inmates' charts, although they were not always updated annually. Laboratory work reportedly was ordered and drawn in a timely manner for inmates on mood-

15

stabilizing medications, but the results of testing were not always returned timely or entered in inmates' charts. The institution needed to audit this issue to confirm compliance.

Continuity of medication on internal changes in housing locations remained somewhat of a problem. An institutional audit of 20 intra-institutional transfers found that three of the surveyed inmates missed at least one dose. The missed deliveries appeared to be due to the failure of MTAs to check daily movement sheets on a regular basis. Also, psychiatric appointments were not always scheduled with inmates prior to the renewal dates for their medication orders because a psychiatrist was not available. Most appointments, however, occurred within one to four weeks after notification of an impending renewal date, and medication continuity was generally maintained. Problems with continuity of medication on arrival were resolved in an earlier monitoring round and remained so.

The lack of psychiatric resources created some problems with follow-up to medication non-compliance. Procedures for identifying and referring inmates who failed to show up for medication or refused to take their medications were generally followed, but non-compliant inmates were not always seen by a responding psychiatrist within ten days.

HS medications were rarely provided; only four caseload inmates at Folsom received psychotropic medications on a HS basis. At least some psychiatrists seemed disinclined to prescribe HS medications because they believed it would be logistically difficult to do so. An institutional memo, requiring approval of all HS medications by the health care manager, reinforced this impression.

16

Procedures were in place for treating inmates arriving from other CDC institutions with medication orders and for handling arriving inmates who claimed they were on medications but had no proof. Psychiatric responses to staff and inmate referrals on arrival were generally timely. Staff reported that the average response time for urgent referrals was 24 hours and that non-urgent referrals were usually assessed within seven days. Medication errors were documented with regularity. The new MARs were being used, reviewed by supervisors weekly and filed in inmates' charts. There was no roster or list of inmates designated to receive DOT, but the implementation of DOT and nurse-administered medications was reportedly audited informally by supervisory observation.

Mental Health Assessments for the Disciplinary Process:

Folsom appeared relatively compliant with the revised procedures for mental health input into the disciplinary process. The institution completed training in the use of mental health assessments in mid-2003. Staff reported that 250 employees were trained, including both mental health clinicians and custody officers. New staff reportedly received on-the-job training in the process, and new custody supervisors were provided with a training packet. Despite these efforts, the monitor met some 15 months later with five clinicians, three of whom reported they had received no formal training in the preparation of mental health assessments. One of the three, a permanent employee hired in mid-2004, confessed he had never heard of the mental health assessment process, but one of the contract clinicians reported receiving information on how to complete a mental health assessment from another clinician. Nonetheless, the institution seemed to be handling mental health assessments adequately.

17

All EOP inmates and 3CMS inmates exhibiting bizarre or unusual behavior were referred for mental health assessments in relation to their disciplinary infractions. The institution tracked all requests for mental health assessments. Four EOP inmates received RVRs during the monitoring period, while 152 3CMS inmates were charged with disciplinary infractions, three of whom were referred for a mental health assessment due to their unusual behavior. The monitor reviewed ten RVRs for 3CMS inmates where mental health assessments were not requested and found the decision not to request a mental health assessment in each case to be reasonable. No RVRs for self-injurious behavior were written during the monitoring period, and no caseload inmates were referred to the district attorney.

Mental health assessments prepared for the RVR process were, for the most part, clear and helpful, although the quality of the assessments varied depending on the preparing clinician. One clinician, for example, concluded in a number of cases that an inmate's mental disorder might have impacted his behavior, but failed to explain specifically how it might have done so. The institution appeared to have a mechanism in place to ensure that RVR mental health assessments were completed by someone other than the inmate's case manager. Clinicians reportedly interviewed inmates and reviewed their UHRs in connection with the preparation of assessments.

Hearing officers appeared to take mental health input into account. Hearing officers appropriately discussed the information in the mental health assessments and indicated whether the assessments influenced their decisions and/or the sanctions imposed. Punishment was mitigated in some cases based on recommendations in the mental health assessments.

18

Transfers:

Most EOP inmates continued to be transferred to appropriate programs in a timely manner. Of 12 inmates transferred to EOP programs during the monitoring period, 11 were transferred within 60 days. Indeed, the average time from endorsement to transfer for these 11 inmates was just 14 days. It took 100 days to transfer the final inmate due to the lack of an available bed. While staff indicated that an inmate could be moved more quickly than the stated timelines if clinically necessary, there did not appear to be a specific mechanism in place for identifying caseload inmates who might require an expedited transfer. The monitor reviewed the charts of seven EOP inmates awaiting transfer at the time of the monitor's visit and found that they did not always receive appropriate treatment while their transfers were pending. All were seen appropriately by a psychiatrist, but two had not been seen by a case manager during the two weeks preceding the monitor's visit. It was unclear why these inmates were missed.

The timeliness of transfers to an EOP administrative segregation hub unit during the monitoring period was difficult to assess because so few were eligible for such transfers. Just four inmates were transferred to an EOP administrative segregation hub unit during the period. Among these four EOP inmates, the transfer of one was delayed two weeks beyond the 60-day timeline; the transfer of another was delayed longer primarily because of hospitalizations; and two were transferred timely. The issue needed further review.

EOP inmates in administrative segregation received appropriate treatment while awaiting transfer to an EOP hub unit. Psych techs conducted rounds in the administrative segregation unit seven days a week, making visual contact with all inmates

in the unit. EOP inmates in the unit were offered weekly out-of-cell case management contacts, as well as out-of-cell contacts with a psychiatrist.

Inmates in need of a MHCB level of care were transferred to the appropriate unit at CSP/Sac within 24 hours of referral. Whatever problems CSP/Sac might have had with access to its own MHCB unit, it apparently did not affect Folsom, at least through November 2004. The institution continued to maintain a handwritten log for all OHU and MHCB transfers, recording the inmates' names, admission dates, return dates, case managers and reasons for moving.

Other CAP Issues:

        a.  Partial Compliance

IDTT meetings continued to improve during the monitoring period. An institutional audit from July 2004 indicated that psychiatrists attended 96 percent of IDTT meetings, compared to 79 percent during the preceding monitoring period. Correctional counselors attended 80 percent of IDTT meetings. An institutional audit for September 2004 indicated that 94 percent of inmates attended their IDTT meetings. According to institutional audits for July, August and September 2004, initial treatment plans were completed in conjunction with IDTT meetings for more than 90 percent of newly arriving inmates. Treatment plans, however, were typically generic; the most recent treatment plan forms used at the institution included generic pre-printed entries. Treatment plans were also often incomplete.

Significant progress had been made in implementing Folsom's MHTS. An institutional audit found a nine-percent error rate when comparing data from the

MHTS with information contained in inmates' charts. This issue will be resolved provided this level of compliance continues during the next monitoring period.

Institutional Summary:

Mental health staff vacancies increased somewhat during the monitoring period. While case manager vacancies typically were covered fully by contractors, permanent and contracted psychiatrists were hard pressed to meet the needs of the caseload population, which, at the time of the monitoring visit was some 20 percent shy of capacity.

Solid quality management structures and procedures were in place, but some aspects of the QIT process needed further refinement. Strong progress was found in the provision of mental health assessments in the disciplinary process for caseload inmates. Similarly, effective mechanisms for transferring inmates to higher levels of care showed continuing improvement.

In the last of the four special issues for review in this round of monitoring, i.e. medication management, Folsom again showed promising progress. It was developing and implementing appropriate local medication management policies and procedures, and reportedly handled effectively follow-up to medication non-compliance, distribution of parole medications, implementation of DOT and documentation of medication errors. Audits were needed to confirm compliance in these and some other areas, such as the timeliness of whole process of laboratory testing. Continuity of medications on changes in internal housing locations and the utilization of HS medications required further improvement.

In addition, the facility resolved three of its outstanding CAP items during the monitoring period and demonstrated progress toward compliance in other areas, such as the timeliness and composition of IDTT meetings and implementation of its MHTS. The one area stubbornly resisting improvement was the quality and documentation of treatment plans.  Overall, mental health services at Folsom were largely consistent with program guide requirements.  As a result, Folsom will require only a paper review during the next, or 16th, round of review.

## Service Area B

Service Area B includes Pelican Bay State Prison (PBSP), High Desert State Prison (HDSP) and the California Correctional Center (CCC).

### Pelican Bay State Prison (PBSP)
August 5, 2004 – August 6, 2004

PBSP had just a couple of mental health staffing vacancies, limited to an opening for a half-time psych tech and an office tech.  Among the auxiliary staff, six of 39 nursing positions and 1.5 of 15.5 medical records positions were unfilled.  In addition, seven of 29 MTA positions were functionally vacant, although five of these were covered by contractors.

Issues Resolved:

The quality of treatment plans was adequate.

Mental health assessments were usually completed for appropriate caseload inmates receiving RVRs.

Quality Management:

The quality assurance process at PBSP continued to improve.  The facility's quality management committee met several times a week between January 1

and June 30, 2004, and minutes were kept of meetings. During the same time period, the mental health subcommittee met weekly, also maintaining regular minutes.

The institution chartered six QITs during the seven months preceding the monitor's visit. Most mental health staff appeared to be familiar with the QIT process and received relevant feedback even when not directly involved in a particular team's work.

Chart reviews were conducted on a regular basis, routinely sampling ten percent of the mental health caseload. The peer review process was making strides. Peer review meetings for psychiatrists, psychologists, psych social workers and psych techs occurred monthly between January 1 and June 30, 2004. Attendance at meetings improved, and minutes reflected chart reviews and discussions of relevant issues.

Medication Management:

Problems with continuity of medication were reportedly minimal. PBSP had adequate procedures in place for ensuring continuity of medications on arrival. The institution received 149 inmates with orders for psychotropic medications from January 1 through June 30. No inmates claiming to be on medication arrived without documentation during this period. Interruptions in medication for inmates changing housing locations were unlikely, because most medications, except for rare specialized orders, were available in the various housing units and did not need to be transported with inmates when they were relocated. Finally, according to the institution, medications were renewed in a timely manner because inmates reportedly were seen by a psychiatrist prior to the expiration of their medication orders.

PBSP maintained a parole medication log identifying caseload inmates who were offered and received or rejected medications. Parole medications were reportedly provided to all inmates discharged from the institution.

PBSP had not yet formally approved an operating procedure for medication non-compliance. Follow-up to medication non-compliance was problematic, although some referrals for non-compliance were made and some follow-up psychiatric appointments were scheduled. An institutional review of 23 charts examining referrals for medication non-compliance found ten charts that did not record timely follow-up to reported non-compliance. Additional training was provided to psychiatrists in late May on this issue.

Reports on medication errors were completed routinely and compiled by the institution. Prescribing psychiatrists were reportedly informed of errors as they occurred, but the institution had yet to audit the issue.

Clinicians did not consistently order appropriate laboratory testing for inmates on mood-stabilizing medications, although psychiatrists reported that they generally received results from ordered testing in a timely fashion. Clinicians did not always respond to abnormal test results.

HS medications were not administered at PBSP. The last medication deliveries occurred between 6:30 and 7:30 p.m. All inmates on psychotropic medications received DOT. Procedures for DOT were not documented, but staff reported that DOT was periodically observed by nursing supervisors. PBSP tracked inmates on Keyhea orders and, according to the institution, renewals were sought in a timely manner. There were 90 inmates on Keyhea orders in PBSP during May and June 2004.

MARs were generally legible.  A recent audit of 56 charts demonstrated that 93 percent of the MARs were clearly written.  A 52-chart audit, however, showed that only seven percent of MARs for the previous month were filed in surveyed Uniform Health Records (UHRs).  It appeared that no-shows and medication refusals were documented on the MARs, although there were some conflicting audit results on this issue.

Informed medication consent forms were not always present in inmates' charts.  An institutional audit of 43 UHRs found a 72-percent rate of compliance.

Mental Health Assessments for the Disciplinary Process:

PBSP tracked requests for mental health assessments in the disciplinary process.  The tracking log contained a wide range of information, including names of clinicians completing the assessments, assessment outcomes and the decisions of hearing officers.  The institution had just instituted a review procedure requiring hearing officers to document their reasons for rejecting clinicians' conclusion that mental illness contributed to an inmate's behavior.  Training on the mental health assessment process was provided to clinical staff and hearing officers in 2003.

Staff indicated, and the monitor's spot checks confirmed, that EOP and MHCB inmates involved in the disciplinary process consistently received mental health assessments.  The monitor, however, was unable to determine from available institutional data whether 3CMS inmates with RVRs for infractions possibly involving bizarre or uncharacteristic behavior were referred for assessments.  The monitor reviewed a sample of cases involving 3CMS inmates with RVRs for whom mental health assessments were

not requested and found only one instance suggesting that a mental health assessment might have been useful.

<u>Transfers:</u>

The average length of stay for inmates in the MHCB unit ranged from 5.15 to 9.47 days, with most admissions coming from the PSU. The number of MHCB beds reportedly was inadequate. The MHCB unit was generally filled by inmates from other CDCR institutions at the start of each weekend, despite a local history of needing to admit two to three inmates from PBSP each weekend. The institution also experienced frequent delays in physically returning clinically discharged inmates to their sending institutions. The shortage of bed space was compounded by the use of the MHCB unit for long-term nursing care.

Transfers to DMH/SVPP improved. During the 12 months preceding the monitor's visit, 34 inmates were referred to DMH/SVPP. Of these, 26 were actually transferred to DMH/SVPP; four were transferred to DMH/APP at CMF; one referral was rescinded; two were rejected; and one was still pending. Staff complained that the DMH/SVPP referral process was burdensome, taking ten to 18 hours to prepare each referral package. The institution reported that approximately half of transferred inmates were returned from DMH/SVPP with good outcomes. No referrals to ASH occurred during the monitoring period.

Appropriate discharge procedures were not always followed for inmates returned from DMH/SVPP. Staff at PBSP generally received a fax on an impending discharge or a telephone call from the clinical assessment team at DMH/SVPP. The

institution, however, had some past problems in obtaining discharge summaries or other paperwork related to returned inmates.

The number of referrals to DMH/APP from January through June 2004 ranged from zero to six per month. The time from referral to transfer during this period averaged 7.74 days.

Other CAP Issues:

a. Partial Compliance

The timeliness of psychiatric responses to mental health referrals improved. The monitor's review of institutional data indicated that clinical responses to staff and inmate referrals were generally timely. PBSP adopted a local standard of three days for addressing referrals. Of 33 inmates referred to mental health during one audited 90-day period, 14 inmates were seen the same day or within 48 hours; another 14 inmates were seen within three to seven days; and five inmates were seen more than a week after a referral.

On average, only 8.78 percent of 3CMS inmates were not seen by their case managers with the frequency indicated in their treatment plans. Group therapy was offered to some 3CMS inmates. A study was needed to determine how much group therapy needed to be provided.

EOP inmates in the general population program were offered an average of 11.79 hours of structured therapeutic activities per week. PSU inmates were offered an average of 12.63 hours of structured out-of-cell activities per week.

Custody checks for suicidal inmates discharged from the MHCB unit improved. An institutional review of relevant logs found that custody checks were

completed for 100 percent of eligible inmates. This issue will be resolved if compliance continues at this level during the next monitoring period.

The administrative segregation population in PBSP increased significantly with the opening of its new administrative segregation unit. Caseload inmates were barred from placement in the new unit, where psych tech rounds were conducted daily and mental health screenings of new arrivals reportedly occurred on the day of their arrival or the following day. The institution tracked all new admissions to the unit, as well as the completion of their mental health screenings.

Most, but not all, caseload inmates in the old administrative segregation unit were seen weekly. Due to the unavailability of office space, out-of-cell clinical contacts frequently occurred without adequate sound privacy. According to institutional data, more than 50 percent of inmates declined offered out-of-cell contacts.

During the monitoring period, a new issue emerged at PBSP that created a demand for the provision of some expanded mental health services in the facility's old administrative segregation unit. The issue involved EOP inmates in the PSU program, whose level of mental health care was reduced from EOP to 3CMS, although they were still serving a SHU term. The PSU was reserved for EOP inmates, and virtually all 3CMS inmates were excluded from the PBSP SHU pursuant to an order in <u>Madrid</u>. The only other facility in CDCR capable of housing Level IV 3CMS inmates with a SHU term was the CSP/Corcoran SHU, where bed space was only intermittently available. This left those PSU inmates, whose level of mental health care was reduced to 3CMS, in the PBSP administrative segregation unit awaiting bed space in the CSP/Corcoran SHU for relatively extended periods of time. The placement of these inmates, often fragile

28

following their discharge from the intensive PSU atmosphere, strained the relatively light mental health clinical resources in the PBSP administrative segregation unit. While there was, and continues to be, some uncertainty over the number of inmates falling within this category, as well the length of their stays in the PBSP administrative segregation unit, it was clear that the needs peculiar to their mental health treatment had to be addressed. The defendants were developing a program to meet those needs.

<u>Institutional Summary:</u>

Mental health staffing was virtually complete, and the institution continued to operate its 3CMS, EOP and PSU programs effectively. Among the areas focused on during this monitoring round, the quality assurance process at PBSP grew stronger; transfers to higher levels of care were usually timely; and significant improvement occurred in the implementation of the mental health assessment process for RVRs involving seriously mentally disordered inmates.

Medication management was working well, with a few exceptions. Interruptions in medications were reportedly rare; paroling inmates generally received discharge medications; MARs were legible; DOT was performed; Keyhea orders were tracked and renewed when appropriate; and medication errors were reported and followed-up. On the other hand, monitoring of medication non-compliance was erratic; laboratory testing was inconsistent; informed consent forms were sometimes missing; and HS medications were not delivered in accordance with departmental policy.

Relative to its CAP, PBSP continued to demonstrate impressive compliance, resolving two more issues and making progress in most other unresolved areas. Improvement was noted in the timeliness of psychiatric responses to mental health

referrals, the availability of scheduled structured therapeutic activities for EOP inmates and the provision of custody checks for suicidal inmates discharged from the MHCB unit. Problems were noted with the availability of bed space in the MHCB unit and confidential office space in the administrative segregation unit. Improved services for EOP inmates in the administrative segregation unit awaiting transfer to the CSP/Corcoran SHU needed to be implemented and evaluated. Overall, PBSP continued to make excellent progress toward compliance with its CAP and the mandates of <u>Coleman</u>. Once expanded services in administrative segregation are implemented, the facility should be ready for paper reviews.

**<u>High Desert State Prison (HDSP)</u>**
September 20, 2004 – September 22, 2004
December 29, 2004

HDSP continued to be plagued by a lack of psychiatrists. Psychiatric staffing, which has been inadequate for seven years, developed into a full-blown crisis during this monitoring period. HDSP has had no permanent psychiatrists on staff for the last two years, and all five staff psychiatrist positions remained vacant throughout the monitoring period. In addition, the chief psychiatrist position, which was filled in April and May by a contract psychiatrist, became vacant again in June 2004, when the contract psychiatrist was terminated without a replacement.

From April 1 through August 31, 2004, HDSP employed a succession of 16 short-term, part-time psychiatric contractors; together the contractors covered on average only 3.7 of five allocated positions. The turnover rate among contract psychiatrists, attributable mostly to forced terminations and disgruntled resignations, was substantial. No psychiatric coverage was available at all in the MHCB unit for eight days

30

during the period from February 1 through July 31, 2004. At another point, the institution was forced to function without a psychiatrist on site or on call for a twelve-day period in August and September. During these gaps in psychiatric coverage, psychologists covered the facility, and non-psychiatric physicians managed medication. See the case reviews in Exhibit A, which consist largely of a litany of the dysfunctional impact on treatment of the lack of consistent, competent psychiatric services at HDSP.

At the time of the monitor's September visit, only one full-time contract psychiatrist covered the institution during weekdays and two part-time contract psychiatrists were available on weekends, supplemented by an unknown amount of telemedicine on one yard. The situation improved slightly by December. By then, eight contract psychiatrists, about half of whom had been working consistently at the facility every other week for a few months, covered roughly 2.3 of the six vacant psychiatrist positions. Beginning in September, the institution also increased its use of telemedicine from one housing yard to three, with each yard scheduled for eight hours of telemedicine per week. HDSP was in the process of converting its chief psychiatrist position to a senior psychiatrist position.

Despite the high turnover in contract clinicians, it was apparent in September that HDSP provided little or no guidance to its new contract psychiatrists during much of the monitoring period. By December, one of the psychologists had compiled a written packet of forms and instructions on program requirements for contract psychiatrists.

Non-psychiatric mental health staffing improved, causing the overall mental health vacancy rate to drop from 41 percent in April 2004 to 29 percent in

31

September. Positions for one psychologist, two psych social workers and one psych tech were vacant. Long-term contractors more than covered all case manager vacancies.

Auxiliary staffing also progressed in some categories, but staffing vacancies remained high among MTAs and pharmacy personnel, as did turnover in these categories. Ten of 29 MTA positions and four of six pharmacy positions were vacant; 2.5 of the pharmacy vacancies were covered by contractors. Staffing among other categories of auxiliary staff was good. All laboratory positions were filled; only one vacancy existed in the medical records department; and just 6.8 of 31.8 RN positions were vacant.

During much of the monitoring period, an extraordinary influx of inmates from county jails caused the reception population to quadruple, and the mental health caseload rose to 784 inmates, 20 percent above the institution's 3CMS program capacity. In September, 97 3CMS inmates were in reception, compared with 28 inmates in the preceding April. Case managers assigned to the mainline typically had caseloads of 150 inmates and were frustrated by the deterioration in the nature of their practice from case management to crisis intervention. Hundreds of general population inmates, including 67 3CMS inmates, were housed in makeshift dormitories located in gymnasiums and dayrooms throughout the institution. Clinicians were concerned about caseload inmates being pressured and victimized by other inmates in these cramped settings. Moreover, the increased dispersal and movement of caseload inmates throughout the institution, according to staff, compromised continuity of care and the scheduling of appointments.

In mid-October, the influx of inmates slowed and by mid-November, the department had closed HDSP to new MHSDS arrivals, including mainline transfers and

MHCB placements. As a result, the mental health population began to drop, and caseload inmates were once again aggregated in one or two buildings on each yard.

Issues Resolved:

Lengths of stay in the MHCB unit met guidelines.

Inmate charts were generally available during clinical contacts.

Quality Management Issues:

The quality assurance process improved somewhat as HDSP developed an increased ability to capture data and conduct competent audits. The institution's efforts at problem-solving, however, were often inadequate.

The institution's overall quality management committee, which met monthly, included representatives from multiple disciplines. Psychiatrists, however, were almost never present, and mental health issues were not usually discussed. The mental health subcommittee was also scheduled to meet monthly, but meetings were occasionally missed, and participation was erratic.

The institution initiated two QITs during the monitoring period, but it was too early for the results to be available. No documentation was provided to the monitor on the activities of QITs chartered in prior monitoring rounds. Many audits, especially those conducted early in the current monitoring period, were methodologically flawed and based on small sample sizes over limited periods of time. Follow-up to these questionable audits was generally confused and inadequate.

Monthly chart reviews improved. Charts were selected randomly and used to audit a number of different specific treatment areas. Often, significantly more than ten charts were reviewed.

Peer review, initiated for two disciplines during an earlier monitoring round, halted during the monitoring period.

Medication Management:

Continuity of medication on arrival seemed to improve somewhat. Continuity orders were generally issued within 24 hours for inmates arriving on verified medications. Not all inmates, however, received their medications within a day of their arrival. Institutional audits of this issue were inadequate. The audits seemed to conclude that most inmates received their medications within a day of their arrival, but gaps of up to four days were apparent in the data. The monitor reviewed the charts of 19 inmates arriving with verified medications and found timely continuity orders issued for all but one of the reviewed inmates. Insufficient information was available to determine when all of these inmates actually received their medications, but four received their first doses within 24 hours, while two others experienced gaps of two and six days respectively. New arrivals on medication were often not assessed for six weeks to four months. The institution had not audited medication continuity for inmates arriving without orders. Staff's review of charts of five inmates arriving without verified medication found delays ranging from one to five months in assessing the medication needs of all five.

Continuity of medication on intra-institutional housing changes appeared to improve and edged closer to compliance. Four separate institutional audits of inmates moving between general population yards showed compliance rates varying from 72 to 90 percent. Again, the audits were not entirely reliable due to the small size of the audited sample. An internal audit of inmates moving from reception to the general population showed that 77.7 percent of audited inmates received their medications within

34

24 hours. The institution did not audit medication continuity for inmates discharged from

the MHCB unit during the monitoring round, but audits in previous rounds reflected a

high rate of continuity for these transfers. The monitor reviewed the charts of seven

inmates whose housing locations were changed. Six of these inmates did not miss a

single dose, while the seventh experienced an interruption of two days.

Continuity of medication on the renewal of medication orders was a

widespread problem that showed no sign of improvement. A pharmacy program

introduced over a year ago to fill prescriptions automatically kept losing data, and the

institution failed to correct the problem. Audits using this database were highly

unreliable; other audits, based on too small a sample, yielded widely varying results from

44 to 82-percent compliance. A significant number of medications apparently were

allowed to expire. The monitor's chart reviews uncovered interruptions in medication,

ranging from two days to two months, with several five-day gaps. Medications were

often renewed by psychiatrists without seeing the inmates.

Staff acknowledged frequent delays in the delivery of medications.

Reportedly, medication often took two days, and occasionally longer, from the time of

prescription to reach inmates. Three institutional audits showed timely delivery in only

58 to 76 percent of cases. The monitor's chart reviews confirmed that actual delivery of

medication generally occurred two days after an order was written.

Some psychiatric prescription practices were still a matter of concern. A

completed suicide in 2003 generated a CAP noting that psychiatrists changed

medications too quickly and wrote change orders without stating a rationale. While the

monitor's chart reviews did not find specific instances of precipitous changes in

medication, numerous medication orders lacking any supporting rationale were found. Chart reviews also revealed examples of psychiatrists' terminations of medication without inmate contact and failures to monitor inmates taken off medication for as long as 12 to 16 months.

The provision of parole medications to inmates discharged from the institution improved. An institutional audit, based on inmates' charts, found that only nine inmates were eligible for parole medications during one three-month period. Of those nine inmates, all but one received their medications on release.

Follow-up to medication non-compliance remained problematic. An institutional audit found improved record-keeping of refusals and no-shows, but failed to assess whether non-compliant inmates were consistently referred to mental health. There was evidence, in the inmate histories reviewed by the monitor, that some appropriate referrals were made, but the histories also indicated that multiple referrals sometimes needed to be generated before inmates were seen.

HDSP had good procedures in place for reporting and correcting medication errors. According to institutional data, on average, 12 medication errors were reported monthly. Between April and September 2004, 53 nursing errors, 13 pharmacy errors and three prescription errors reportedly occurred, representing approximately .02 percent of all prescriptions distributed. The medication error procedures had a number of checks aimed at identifying and rectifying mistakes. In addition, the pharmacy had drug interaction and dosage software to correct prescription problems.

Medication was not administered DOT at HDSP. According to staff, only one inmate was on DOT at the institution in September, although a separate list indicated

36

that a few other inmates might have been on DOT. The small number of inmates on

DOT was a concern, especially given reported evidence of hoarding and the sale of

medications in the facility. DOT procedures had improved by December; new IDTT

forms, which contained a section requiring an assessment of an inmate's DOT needs,

were in use; and correctional officers were required to inform mental health if

medications were found during cell searches. Institutional documentation indicated that

nurse-administered medication was audited regularly. The monitor observed a psych tech

distributing medications in September and noted the psych tech sometimes left the cell

before the inmate had taken his medication.

The quality of MARs improved. Institutional audits found one or more

blanks in 45 of 700 MARs, but the monitor's chart reviews uncovered only a few blanks.

HDSP audits found that MARs were filed in UHRs about 92 percent of the time.

HS medications were not prescribed at the institution.

There were reports during the monitoring period that arriving inmates

were taken off their current medications, or had their medications changed, due to local

formulary restrictions and rigid prescription practices. According to staff, inmates

arriving on Zyprexa were routinely switched to less expensive Geodon. Moreover, both

Wellbutrin and Seroquel were off-formulary medications. An institutional audit found a

small number of inmates arriving on non-formulary medications, which were not

reordered. In contrast, the monitor's expert reviewed the charts of five inmates who

complained of such problems and found no evidence of inappropriate discontinuation of

medications in any of the reviewed charts; a separate chart review by the monitor

similarly uncovered few problems of this nature. As a result of the institutional audit, the

37

chief medical officer reported that he began to write continuity orders for inmates arriving on non-formulary medications.

A high percentage of caseload inmates at HDSP, some 45 percent, apparently were not on any medications. The monitor's expert thought that percentage was unusual. Staff suggested that, while many of these un-medicated inmates were not in full-blown crisis, a general sub-clinical deterioration existed among them, resulting in management difficulties, increased agitation, impulsivity and depression. The institution needed to audit this issue carefully to confirm the percentage of inmates on medication and establish priorities for clinical review of inmates' medication needs.

Informed medication consent forms were not consistently filed in inmates' charts. An institutional audit of current consent forms found just 41 to 53-percent compliance on this issue.

The monitor did not conduct a review of charts focused specifically on whether blood-level testing was obtained for inmates on mood-stabilizing medications, but found several individual charts and inmate histories indicating that appropriate blood tests were not always ordered.

<u>Mental Health Assessments for Disciplinary Process:</u>

Contrary to departmental policy, all serious infractions involving caseload inmates at HDSP were referred for mental health assessments. On the other hand, no requests for an assessment were made for non-caseload inmates exhibiting bizarre or uncharacteristic behavior. Several of the referred RVRs, such as those involving smoking in state buildings or manufacturing alcohol, seemed unlikely to have been influenced much by mental illness. A psych social worker spent roughly 25 hours a week

38

completing the some 50 mental health assessments requested monthly. The facility intended shortly to decentralize responsibility for completing the assessments among all case managers. Given case managers' consistently high caseloads, imposition of responsibility for preparing assessments seemed a dubious strategy for improving the quality of assessments and seemed unmindful of the need to have assessments prepared by a clinician other than the charged inmate's primary clinician. Training would also be needed to ensure that the much larger pool of clinicians preparing assessments knew the requirements of their task.

The quality of clinical assessments improved somewhat. A well crafted institutional audit for a one-month period found that mental health assessments were completed adequately, and inmates were regularly interviewed as part of the assessments. Completed assessments concluded that mental illness may have influenced the inmates' behavior in less than 20 percent of audited cases. Given the excessive breadth of referrals for assessments, the relatively low percentage of cases found to be influenced by mental illness was not surprising. This improvement pre-dated the anticipated dispersal of the task of preparing assessments more widely among all case managers.

The impact of mental health assessments on the deliberations of hearing officers appeared to increase. Institutional audits found that, except in a few cases, reports by hearing officers reflected consideration of mental health input. Of eight relevant charts reviewed by the monitor, hearing officers either dismissed the disciplinary charges or reduced the penalty based on mental health input. The RVR log contained additional examples of hearing officers dismissing infractions, reducing charges or

39

mitigating punishments based on clinical information, even in a few instances that involved threats to an officer or another inmate.

HDSP's system for tracking RVRs was adequate in most respects, although it failed to reflect inmates' level of mental health care. According to the data, RVRs were occasionally written for self-injurious behavior. Most of these were dismissed, but some were processed without the input from mental health required by departmental policy. Data on referrals to the district attorney's office was confusing; it was unclear, for example, whether any of the 26 instances of battery or attempted battery on an officer had been referred.

Transfers:

Referral logs were maintained regularly, but lacked some important data, particularly information related to EOP transfers. The institution ceased to maintain its internal priority transfer list, which historically was inaccurate and incomplete.

3CMS inmates did not generally remain in reception beyond the 90-day timeline. Institutional data recorded just three inmates with excessive stays in reception during the monitoring period.

Documentation reflected increasingly consistent compliance with EOP transfer timelines. According to institutional data, 21 EOP inmates were transferred during the period from April 8 through September 20, 2004. Only three of these transfers exceeded the timelines, taking 68, 78 and 91 days respectively. No EOP administrative segregation inmate waited longer than 60 days for transfer. Eight of the ten transferred EOP administrative segregation inmates were moved within 30 days, while transfers for two others took 35 and 36 days. At the time of the monitor's September visit, 13 EOP

40

inmates were awaiting transfer, only two of whom had been waiting longer than 60 days, one for disciplinary reasons and one due to court proceedings. Transfer logs showed that endorsement procedures were generally conducted in a timely manner, although endorsements were delayed several months in a handful of transfers. In contrast to earlier monitoring rounds, the availability of EOP bed space elsewhere did not appear to be a problem.

Treatment of EOP inmates awaiting transfer, a previously resolved issue, deteriorated over the past year and a half. At least two institutional chart audits showed that EOP inmates did not consistently receive weekly clinical contacts. Indeed, it appeared that at least some inmates on three different housing yards received only half the required number of contacts. Data from the MHTS reflected an even worse level of compliance in this area.

Inmates seemed to have timely and reasonable access to HDSP's MHCB unit, and care in the unit was generally good. Contract psychiatrists were deployed on a priority basis to provide coverage first for the MHCB unit, through daily rounds and IDTT meetings three days a week, before going to general population yards. Problems occurred, however, with maintaining psychiatric continuity in the unit.

Another problem arose from HDSP's need to find an appropriate placement for inmates discharged from its MHCB unit who were sent from other CDCR institutions. For example, EOP inmates sent to the HDSP MHCB unit from institutions without an EOP program could not be returned to the sending institution; they needed to be sent to an institution with an EOP. That often involved delay because EOP beds were not always immediately available. One possible response, and one apparently adopted to

41

some extent by HDSP, was to reduce the level of care of inmates discharged from the MHCB unit to 3CMS, sometimes irrespective of their need for an EOP level of care, and return them to the sending institution, almost all of which had at least a 3CMS program. Some sending institutions claimed that the 3CMS inmates returned to them from HDSP actually required an EOP level of care; HDSP, they claimed, simply downgraded their level of care to get rid of them and clear one of its own MHCBs. The MHCB log seemed to confirm such a pattern over a period of several months of downgrading all inmates who arrived from other institution at an EOP level of care to a 3CMS level of care on discharge; that pattern continued, but to a lesser extent, after the acting chief psychiatrist was terminated in mid-2004.

Inmates were generally discharged from the MHCB unit within ten days. According to the MHCB log, apart from inmates waiting for a DMH bed, all but three were discharged within ten days or only a day or two later. The longest stay was 15 days. More specifically, 176 inmates were discharged from the MHCB unit from the end of March to the end of August 2004; 24 of the 35 inmates who remained in the unit longer than ten days were awaiting transfer to DMH. The lengths of stay of only five inmates admitted to the MHCB unit exceeded ten days for purely clinical reasons. A number of inmates, however, remained in the MHCB unit over ten days before the institution decided to refer them to DMH. Problems with finding a bed or returning inmates to their sending institutions were rare, perhaps due in large part to the practice described above, and did not cause MHCB length of stays to exceed specified timeframes.

Similarly, multiple admissions to the MHCB unit did not appear to be a problem. Institutional summaries showed that only two inmates had three or more MHCB stays during the monitoring period.

HDSP was successful in referring inmates to DMH/APP at CMF, but the delay between referral and transfer was, in some instances, excessive. According to institutional data, 23 transfers to the APP occurred from April 1 to September 13, 2004. The average time between referral and transfer was 12 days, with one delay as long as 30 days. The timeliness of transportation declined significantly. Contrary to transfer guidelines, the lapse between bed assignment and transfer exceeded 72 hours in 11 of the 23 transfers. In all 11 cases, the bed number was issued on a Thursday or Friday, making it almost impossible to comply with the 72-hour requirement, since DMH/APP did not accept new admissions on Fridays; in some instances, however, the delay exceeded the weekend. Between the monitor's September and December visits, 15 referrals were made to DMH/APP, six of which were rescinded because the inmates' condition improved. The time from referral to acceptance was greatly improved with all bed numbers issued within nine days or less. Transportation time and total time to transfer could not be calculated due to gaps in data.

Transfers to DMH/SVPP remained difficult and untimely. HDSP transferred one inmate to DMH/SVPP during the monitoring period. According to the MHCB log, it took nine weeks and two referrals to complete this transfer.

No referrals to ASH occurred during the monitoring period. HDSP indicated that it no longer transferred inmates directly to PSUs. Rather, inmates were transferred to an administrative segregation hub unit to await a PSU placement.

43

Other CAP Issues:

a. Partial Compliance

The provision of timely initial mental health assessments improved during the monitoring period. The percentage of MH-4s completed within five working days of an inmate's arrival rose to 66 percent, an improvement over the preceding monitoring period but approximately the same level of compliance reported in the 13th monitoring round. Completion of initial treatment plans was apparently more timely. Institutional audits showed that all inmates received MH-2s within at least a day of the prescribed timeline. That audit, however, was conducted before the surge in new arrivals, which may have compromised compliance in this area at least temporarily. The monitor reviewed a limited sample of treatment plans and found the quality of some to be questionable, doing little more than repeat program guide requirements by rote.

The composition of IDTT meetings continued to improve, except for participation by psychiatrists. Correctional counselors were regularly in attendance, and inmates were consistently present as well. An institutional audit showed that psychiatrists participated in roughly 22 percent of IDTT meetings. Since that audit, the institution suffered further loss of psychiatric staff, which probably reduced even that slight rate of psychiatric participation.

Psychiatric response to mental health referrals was poor and often delayed. An internal audit, based on unreliable MHTS data, found that the average response time for routine and urgent referrals ranged from ten to 12 days, far in excess of the institution's goal for routine referrals of five working days. The monitor reviewed inmate histories for 50 referrals and noted that, while better than half of referred inmates were

44

seen by a psychiatrist within two weeks, it took between three weeks and two months for psychiatrists to respond to more than a third of them. Between the monitor's visits, however, the institution reportedly increased its use of automated scheduling in order to provide timelier psychiatric responses to referrals.

Clinicians' access to inmates for clinical services remained reasonable, despite continued lockdowns in two of the housing yards; in September, inmates on one yard had been locked down for 15 months, while inmates on another yard had been locked down for six months. The monitor reviewed clinical appointments for the entire institution over a four-month period and found that less than one percent of mental health appointments were cancelled for custody reasons and only five percent were cancelled by mental health staff. Significant delays, sometimes up to seven weeks, often occurred in rescheduling cancelled appointments, and some appointments were never rescheduled. The monitor also reviewed inmate histories for 20 percent of inmates on long-term lockdown status. The records showed that most inmates on lockdown status received regular psychiatric and case management contacts at 90-day intervals and that many inmates received more frequent contacts. Some problems in obtaining access to psychiatric care affected approximately 28 percent of locked-down inmates. Fewer problems arose with access to case management care, but a small number of contacts were overdue anywhere from two weeks to three months.

The availability of treatment space declined. The sudden surge in the population made it difficult to find adequate confidential space for interviews and group therapy. During much of the monitoring period, clinical contacts occurred largely at cell-front, or in holding cells or rooms without sound privacy.

45

Treatment services for MHCB inmates showed some improvement. HDSP historically performed well in completing admission notes and treatment plans in a timely manner and updating treatment and discharge plans. Two institutional audits showed a continuing degree of substantial compliance in these areas. The institution also increased its conduct of suicide risk assessments, addressing a past problem. According to institutional audits, 82 percent of inmates received a suicide risk assessment on entry to the unit, although only 60 percent received such an assessment on discharge. In addition, MHCB inmates were consistently provided daily clinical and psychiatric contacts. The MHCB log, however, indicated that case managers were not being notified timely that discharged inmates were being returned to their housing yards.

During the early part of the monitoring period, the use of restraints created some problems, with claims and reports that restraints and medication changes were imposed punitively in the MHCB unit. In September, the monitor reviewed the involuntary treatment log and found that most of the allegedly questionable uses of restraints occurred in May; indeed, nine restraint orders were issued in May, contrasted with zero to three orders in the subsequent months. This issue, however, appeared to become largely moot with the departure in June of the acting chief psychiatrist. Moreover, the institution developed new restraint and seclusion protocols aimed at controlling future misapplications of restraints. An institutional audit for the period from May through August found 13 uses of restraints. According to the audit, appropriate restraint orders were located in 11 of the surveyed charts; reasons for the application of restraints were stated in roughly half of the cases; and medical assessments were conducted within 24 hours in 66.6 percent of the cases. By December, the institution's

46

effort to improve MHCB staffing and monitor the use of restraints more closely had

substantially reduced the use of restraints and improved the therapeutic environment of

the MHCB unit.

The restraint log maintained by the institution was incomplete in

September and included neither the duration of nor rationale for a significant portion of

the uses of restraints. The quality of the restraint log improved substantially by

December, and the length of time inmates remained in restraints and the reason for their

use were documented regularly.

The provision of mental health services to inmates in administrative

segregation improved somewhat during the monitoring period, but was still inadequate.

The facility instituted new procedures to identify arriving administrative segregation

inmates and reportedly made an effort to address the backlog of mental health screenings

for inmates in administrative segregation. An institutional audit of 20 percent of new

administrative segregation inmates found that all but one had been screened. The

screenings, however, were not administered by a member of the mental health staff, but

were simply passed out to inmates to fill in. Psych tech rounds were observed by the

monitor and appeared more complete than in the past. While an institutional audit found

90-percent compliance with the requirement for daily psych tech rounds, none of the

charts of inmates in administrative segregation reviewed by the monitor documented

seven-day rounds. Most charts contained a summary of five days at best, and more than

half the charts had whole weeks missing. Similarly, HDSP's audit of case management

contacts in administrative segregation reflected a 90-percent compliance rate, while the

monitor's chart review found that only half of the reviewed charts contained

47

documentation of weekly case management contacts, with multiple gaps in contact, some of several weeks. Most, if not all, clinical contacts in administrative segregation occurred at cell-front.

The timeliness of initial IDTT meetings and treatment plans for administrative segregation inmates improved moderately. According to an institutional audit, 60 percent of initial IDTT meetings were held in administrative segregation prior to initial ICC hearings as required by departmental policy. Psychiatrists rarely attended IDTT meetings in administrative segregation. Although correctional counselors reportedly participated in IDTT meetings on a regular basis, the monitor's chart reviews found occasions when correctional counselors were absent.

HDSP continued to provide appropriate clinical follow-up to suicidal inmates discharged from the MHCB unit. An institutional audit found full compliance with required clinical follow-up monitoring. A high percentage of inmates apparently also received appropriate custody monitoring as well. The monitor reviewed UHRs of five inmates for whom five-day follow-up was ordered and found that clinical follow-up was fully documented in four instances, while custody checks were noted in three.

The provision of pre-release services improved. Parole lists were more accurate and a log had been created. An institutional audit of TCMP contacts was methodologically flawed. Staff estimated at least 70 percent of inmates were seen by TCMP clinicians, but acknowledged that a sizeable percentage of inmates were seen only once prior to their release, instead of twice as called for in the TCMP contract.

No progress had been made in implementing the MHTS. Much of the data in the system, particularly referral and pharmacy information, reportedly was inaccurate,

and audits relying on this information were unreliable. Tracking was mostly accomplished through manual logs. The institution needed to conduct a concordance study to evaluate the usefulness of the system for auditing purposes.

        b. Non-Compliance

        The availability of group therapy for 3CMS inmates declined. During the monitoring period, forty-nine inmates participated in eight groups on three different housing yards, a smaller number of inmates than in prior monitoring rounds. At the time of the monitor's September visit, only nine inmates were enrolled in one anger management group. Staff indicated that it was difficult to run groups due to large case management caseloads, lockdowns, inadequate escort services, restrictions on mixing different blocks of inmates and insufficient access to program space. On a positive note, the need for group therapy was typically considered at IDTT meetings. An institutional audit of almost ten percent of mainline charts found that IDTTs consistently considered inmates' needs for group therapy and addressed the issue in completed and filed treatment plans.

        Previously resolved problems with access to inmates in the MHCB unit emerged again during the monitoring period. Clinical staff reported poor access to inmates, custody-imposed restrictions on inmate movement and the termination of out-of-cell programming due to inadequate officer coverage, rigid security protocols and poor scheduling. All inmate interviews in the MHCB unit, with the exception of IDTT meetings, occurred at cell-front through the food port. The CTC exercise yard was not made available for use by MHCB inmates during the monitoring period.

New Problem:

>3CMS inmates did not consistently receive quarterly case management contacts.

Institutional Summary:

Relentless psychiatric shortages left the institution scrambling to provide some basic elements of mental health care. Increases in the caseload population exacerbated the shortage during much of the monitoring period. The department's decision to close the institution to new arrivals in mid-November may have helped reduce, at least temporarily, some of the enormous strains on the institution's mental health resources.

Among the four issues of focus during this round of monitoring, HDSP's quality assurance process continued to mature, except for the implementation of peer review. Some improvement in the mental health assessment component of the disciplinary process was also discernible. In particular, assessments more consistently identified the influence of mental health on behavior, and hearing officers documented more frequently their consideration of mental health input. Contrary to departmental policy, all serious infractions involving caseload inmates were referred to mental health, generating far more assessments than necessary.

The institution also increased its ability to transfer inmates more readily to higher levels of care. In particular, EOP transfers were more timely; lengths of stay in the reception center and MHCB unit were reduced; access to the MHCB unit improved; and transfers to DMH/APP occurred more smoothly. The institution still had difficulty with transferring inmates to DMH/SVPP and ASH, as well as providing quality treatment to EOP inmates awaiting transfer.

50

Medication management remained largely and persistently problematic. Some progress was observed in the continuity of medications on intra-institutional transfers, the provision of parole medications, elimination of medication errors and the quality of MARs, but elsewhere progress was hard to identify. Continuity of medication on arrival and the renewal of medication orders was erratic; deliveries of ordered medication were often delayed; psychiatric prescription practices were inadequate; follow-up to medication non-compliance was poor; DOT generally did not occur; HS medications were unavailable; and informed medication consent forms were often missing from inmates' charts. Most of these difficulties, as well as the facility's relatively low usage of psychotherapeutic medications, were attributable to the continuing dearth of permanent psychiatrists and complete reliance on contracted psychiatric services.

Despite its staffing deficiencies, HDSP was able to resolve two CAP items and make some progress in other areas. Mental health assessments were completed more timely; clinicians' access to inmates even during lockdowns was surprisingly good; the quality of MHCB treatment improved even in the face of psychiatric shortages; clinical follow-up of suicidal inmates discharged from the MHCB unit occurred more regularly; and pre-release services were gradually expanding. Meanwhile, the institution struggled with the timeliness of psychiatric responses to referrals, the availability of treatment space, the use of restraints and the provision of group therapy for 3CMS inmates. The MHTS was inaccurate and inadequate, resulting in audits that were unreliable and obstructed determination of the institution's compliance with outstanding requirements.

Some issues resolved in the past, such as the frequency of case management contacts and clinical access to MHCB inmates, reappeared.

HDSP's serious and chronic problem with the acquisition of permanent psychiatrists needed, and needs, to be addressed more directly and effectively than the defendants have addressed it over the past seven years. The department cannot continue to maintain a 12-bed MHCB unit, house some 700 to 800 3CMS inmates and operate a not insubstantial reception function in an institution utterly devoid of permanent psychiatric staffing, where a constantly changing horde of part-time contract psychiatrists without meaningful training, orientation or clinical supervision badly manage medications and treatment in a physically remote environment. The potential risk of such a situation nearly became reality in mid-2004, when an incompetent psychiatrist with eccentric concepts about medication and the use of restraints, was temporarily put in charge of all psychiatric services in the institution. The courage of a local whistle-blower and pretty quick intervention by DCHCS ended the crisis, but also served to underline the necessity for defendants to address aggressively HDSP's lack of psychiatric resources. The time has clearly come to reconsider the wisdom of maintaining a MHCB unit and a large caseload of 3CMS inmates in this institution that has long been unable to attract and retain psychiatric staff.

### California Correctional Center (CCC)
September 23, 2004

The mental health staff at CCC consisted of a psychologist, two psych techs and a clerical employee. An allocated position for a half-time psychiatrist, a position that has never been filled, was vacant, as was a position for a psych tech. The institution used telemedicine, apparently successfully, to provide psychiatric care when

52

needed. A contract clinician was employed during the psychologist's vacation, but not at other times.

Auxiliary staffing was nearly complete, except for a functional vacancy rate of nearly 50 percent among MTAs. Of 19 MTA positions allocated to CCC, four were vacant and five were uncovered because employees were on leave. The MTA vacancies were only partly covered by registry personnel. According to the institution, a quarter-time nursing position was vacant, and no vacancies among pharmacy staff were reported.

Only one caseload inmate was in the facility at the time of the monitor's visit, but the institution was expecting an influx of general population inmates from country jails.

Quality Management:

The quality assurance process continued to progress. The quality management committee met erratically, convening five times in the preceding ten months. Minutes of the meetings reflected substantive discussions, but the committee lacked custody representation. The mental health staff was too small to form a subcommittee, but there were few problems with, or barriers to, the delivery of mental health services at CCC. The suicide prevention committee met monthly. A quality assurance operating policy was completed just days before the monitor's visit.

QITs had been chartered on a number of mental health issues, including parole medications and suicide watches. Staff indicated that monthly chart reviews were impractical in light of the rapid inmate turnover at CCC. Similarly, peer review was not possible with the institution's limited staff. The institution made little use of the MHTS

53

for tracking appointments and referrals or for ducating. Instead, staff maintained manually detailed logs of treatment and transfer-related data, supplemented by computer logs outside the MHTS.

Medication Management:

There was an operating policy for medication management in effect at CCC, but it did not cover all medication issues. Institutional records showed that 313 clinical and custody staff had been trained in medication management procedures, and implementation of the procedures was generally good.

CCC had procedures for providing medications to inmates on arrival, changes in housing locations and renewal of medication orders. These procedures appeared to work reasonably well to ensure continuity of medication, although no audits had been conducted to confirm compliance.

CCC also had a reasonable system in place for providing discharge medications to inmates paroling from the institution. Just three caseload inmates were paroled from CCC in the last two and a half years.

Follow-up to medication non-compliance did not appear to be a problem. No-shows were reportedly escorted by custody to receive their medication. Inmates who refused their medications were required to sign a refusal form and scheduled for a telemedicine appointment. According to staff, incidents involving cheeking, hoarding or medication non-compliance occurred infrequently, less than once a month.

Tracking of laboratory testing for inmates on mood-stabilizing medications improved, but the institution failed to capture all relevant information on the issue. Most of the few inmates on mood-stabilizing medications in the facility

throughout the monitoring period had orders for laboratory testing. The monitor found only six inmates with prescriptions for medication for whom no laboratory tests had been ordered; four of these inmates had been transferred before laboratory tests could have been ordered and one was on a medication that did not require testing. Tests were generally drawn and reviewed in a timely manner. About 90 percent of the inmates on mood-stabilizing medications had blood tests drawn within a week; the rest did not have any testing during their brief stays at CCC. Approximately 85 percent of tests were reviewed within a week of their return. According to staff, telemedicine appointments to follow-up test results were scheduled within two weeks to four weeks.

CCC's medication management policy did not distinguish between DOT and nurse-administered medication. According to the institution, MTAs were accustomed to performing DOT, and correctional officers often observed inmates taking their medications during pill lines. Staff estimated that about five inmates had DOT orders at any given time.

The medication management operating procedure at CCC did not cover HS medications. There did not appear to be any obstacle to the HS administration of medications at CCC but, according to staff, HS medications were not generally ordered for mental health inmates. Some medications were distributed between 7:00 and 8:00 p.m., which suggested that it would not be difficult to provide HS medications, if ordered.

No inmate was on a Keyhea order during the monitoring period, but the institution had a method for conducting initial screenings that was likely to capture any arriving Keyhea inmate.

Clinical response to inmate referrals was generally timely; responses to the 281 referrals received during the monitoring period took, on average, four days. Staff believed that telemedicine appointments were scheduled with a psychiatrist within a week of a request, although there was no documentation confirming this belief. Psych techs reportedly responded to staff referrals in administrative segregation.

Mental Health Assessments for the Disciplinary Process:

CCC did an excellent job of implementing the revised process for mental health input in disciplinary decision-making. Institutional records indicated that 83 mental health and custody staff were trained in the assessment procedures when they went into effect in May 2003. Since then, the institution reportedly provided on-the-job training periodically to staff involved in disciplinary adjudications. A good log was maintained to track RVRs.

Among 55 caseload inmates housed in CCC during the monitoring period, five inmates received RVRs. All five were found to meet the criteria for mental health assessments. In addition, staff reported, and logs confirmed, that incidents of potentially bizarre behavior among general population inmates were consistently referred to mental health for review. There were no infractions issued for self-injurious behavior, and no charges against caseload inmates were referred to the district attorney's office.

Inmates were interviewed and charts reviewed in connection with mental health assessments. C-files, however, were not always reviewed; moreover, given the size of the mental health staff, it was not practical for mental health assessments to be completed by a clinician who was not the case manager. Of the five mental health assessments completed during this monitoring period, only one assessment concluded

that the inmate's behavior was influenced by mental illness. Mental health input impacted on the outcome in this one case. Documents showed that the hearing officer expressly dismissed the charges in response to the mental health information.

Transfers:

Caseload inmates had good access to higher levels of care. CCC did not use the MHTS to track transfers, but the institution maintained satisfactory handwritten transfer logs. According to the logs, 18 caseload inmates were sent inappropriately to CCC, while 37 inmates were identified by CCC staff as requiring 3CMS treatment during the monitoring period. The longest time to transfer for any of these inmates was 42 days, well within the court-imposed transfer guidelines, while some transfers took as little as one day to complete. Caseload inmates awaiting transfers received at least weekly case management contacts. Group therapy was also available weekly whenever the institution had a sufficient number of caseload inmates.

Transfers from the administrative segregation unit were timely. No EOP inmates were housed in the institution during the monitoring period, but seven 3CMS inmates spent some time in administrative segregation. The longest stay of any caseload inmate in administrative segregation was 22 days. Mental health services in administrative segregation were in compliance with program guides. Psych techs made rounds seven days a week; in addition, EOP inmates, if present, reportedly were seen daily by a case manager. Beginning in early 2004, the institution undertook to conduct a mental health screening of all inmates already in administrative segregation, as well as those newly admitted to the unit. The monitor's review of 31 charts found that most

inmates had received mental health screenings, but some had not been screened within a year and some screenings were delayed.

Lengths of stay in the OHU occasionally exceeded specified time frames. The monitor reviewed all 29 OHU admissions for this monitoring period and found that four inmates remained in the unit longer than 72 hours; the longest stay was 15 days. There appeared, however, to be legitimate reasons for these delays. CCC had recently decided that it would no longer conduct suicide watches in the OHU. Instead, inmates in need of such monitoring would be sent to a MHCB unit. Treatment in the OHU was adequate, with representatives of all health care disciplines participating in daily rounds.

Transfers to the MHCB unit at HDSP were made in a timely manner. Mental health staff, however, complained that HDSP appeared increasingly resistant to accepting MHCB transfers from CCC. Four of the nine MHCB referrals made to HDSP during this monitoring period were rejected, including a few inmates clinical staff at CCC thought were psychotic. CCC mental health staff was also concerned that some inmates were returned from the MHCB unit to CCC before being stabilized.

Institutional Summary:

CCC was adequately staffed and, as a result, able to screen, treat and transfer mental health inmates effectively. Mental health input into the disciplinary process was working well. Transfers to higher levels of care were timely and, except for some recent questions about transfers to the MHCB unit at HDSP, access was good. Progress had been made in implementing the quality assurance process, and medication management was generally effective. Coordination between the administration and mental health and custody staff at CCC was excellent, and the institution was able to

58

meet program guide requirements and go beyond requirements in some areas. CCC needs only a paper review in the next round of monitoring.

<b><u>Service Area C</u></b>

This service area includes <u>Mule Creek State Prison (MCSP)</u> and <u>Sierra Conservation Center (SCC)</u>.

**<u>Mule Creek State Prison (MCSP)</u>**
December 15, 2004 – December 17, 2004

Vacancies among mental health staffing positions at MCSP remained relatively light. Positions for 1.25 psychiatrists, 2.5 psychologists and 2.5 psych social workers were vacant. Another psychiatrist position was functionally vacant for six months during the monitoring period, while the clinician was assigned to CSP/SQ, and one psych tech was on long-term leave.

A stable group of contract clinicians more than covered the case manager vacancies, but only half of the psychiatric vacancies were handled by contractors. A contract employee covered for the psych tech on leave. Few vacancies existed among the auxiliary staff.

<u>Quality Management:</u>

The institutional quality management committee was slow in forming, but after September met almost weekly. The composition of the committee was relatively interdisciplinary. The mental health subcommittee met monthly, instead of biweekly as required. Designated custody, pharmacy and medical records personnel and psych techs were routinely absent from meetings. The quality of discussions in both committees was mixed, although the committees focused increasingly on substantive issues. Custody attendance at meetings of the suicide prevention committee was poor. The monitor

59

received minutes from each of the committees covering a portion of the monitoring period.

Just three QITs related to mental health issues were active. All three had been chartered the month before the monitor's visit. Apart from a QIT on the MHTS, which appeared to be engaged in analyzing and solving problems associated with the tracking system, no documentation was available on the progress of the other QITs.

The institution routinely conducted audits of both outstanding problems and resolved CAP issues. Although sample sizes for these audits were small and the methodology was not shared with the monitor, the audits appeared capable of providing ongoing oversight. The institution needed to develop a mechanism for sharing the results of audits with staff.

Regular chart reviews substituted inadequately for peer review at MCSP. A multidisciplinary group comprised of a representative from each clinical discipline met monthly through May and then just twice during the remainder of 2004. The committee reviewed a substantial number of charts.

Medication Management:

Continuity of medication on arrival remained unchanged during the monitoring period. Two institutional audits found that 75 percent of inmates arriving with verified prescriptions received their medications within 24 hours. Chart reviews by the monitor's expert found some gaps in medication ranging from one day to a week. No data was available on inmates who arrived without verified orders, but the institution had recently chartered a QIT to study this issue.

Continuity of medication when changing housing locations also remained unchanged. Two institutional audits indicated that 84 percent of inmates received timely medications when moved to a new housing unit. A QIT was chartered to study this issue, too.

Continuity of medication on renewal of medication orders was problematic. Increasing expirations reportedly were attributed to problems with the pharmacy computer. Some inmates interviewed by the monitor reported experiencing three to five-day gaps in medication at the time of renewals.

MCSP had a system for providing paroling inmates with discharge medications. It appeared, from forms signed by inmates, that a significant number of inmates received parole medications, but no data was available to confirm what percentage of paroling inmates actually received their medications. The institution needed to audit this issue to determine whether any paroling inmates were being overlooked.

The Keyhea process appeared to be working well most of the time. The Keyhea log indicated that orders were either initiated or renewed for 34 inmates during the monitoring period, 21 of whom were in the institution at the time of the monitor's visit. Renewals of Keyhea orders were generally timely, and hearing dates were scheduled prior to the expiration of existing orders. The department's computerized data on Keyhea inmates was still not available to MCSP, with the result that one arriving inmate with a current order was not identified in a timely manner and went without medication for nine days.

Follow-up to medication non-compliance improved, but remained erratic. An institutional audit indicated that 50 percent of inmates referred for non-compliance were seen within seven days. Staff reported that all non-compliant inmates were referred to mental health, but the monitor's chart review uncovered instances where non-compliant inmates were not referred, as well as instances of delayed follow-up.

MCSP had a system in place for dealing with medication errors. An institutional report indicated that 34 medication errors occurred during the monitoring period, most of which were discovered before medications were delivered to inmates.

Staff reported that a substantial portion of psychotropic medications at MCSP were prescribed DOT. An institutional printout identified 481 inmates on DOT medications, a relatively large number. The monitor observed some 3CMS pill lines where inmates apparently expected DOT procedures to be applied. Spot checks by RN supervisors confirmed that nurse-administered procedures were also employed routinely. In contrast, the monitor observed one evening EOP pill line, where no DOT procedures and few nurse-administered procedures were followed. Two recent incidents, moreover, involved the discovery of one EOP inmate who had managed to hoard 100 psychotropic pills and a cache of more than 700 pills in a housing yard.

Significant progress was made in implementing procedures for HS medications. During the preceding monitoring period, the institution assessed the need for the HS administration of medication. During the monitor's most recent visit, the institution provided a list of 170 inmates on HS medications. Audits showed 100 percent compliance with the administration of HS medication after 8:00 p.m.

Chart reviews revealed some continued problems with laboratory testing. The monitor's expert found that laboratory tests were ordered according to expected standards, but clinical staff indicated that the results were not always returned in a timely manner, with some results taking weeks to be returned. Reportedly, no mechanism existed for informing psychiatrists routinely of abnormal results.

Informed medication consent forms were consistently found by the monitor's expert in inmates' charts.

Mental Health Assessments for Disciplinary Process:

MCSP provided training on the revised mental health assessment process for input into disciplinary proceedings in mid-2003. Since then, new employees reportedly were required to watch a three-hour training video on the assessment process and received training manuals.

Institutional data indicated that only ten 3CMS inmates were referred for mental health assessments during all of 2004.

Execution of the mental health assessment process improved during the monitoring period. Staff had a structure in place to ensure that assessments were completed by clinicians other than accused inmates' case managers. The monitor reviewed approximately 60 assessments and concluded that clinicians generally followed the correct process, including interviewing the inmates and reviewing inmates' C-files and UHRs. Mental illness was found to have affected an inmate's behavior in about 25 percent of the RVRs reviewed by the monitor.

It appeared that hearing officers frequently took mental health input into account in reaching their determinations, but the institution's record-keeping had only

recently begun to improve, making it difficult to assess this issue adequately. Punishment, however, was mitigated for 24 of 29 inmates whose behavior was found to have been influenced by mental illness.

The number of inmates referred to the district attorney's office for criminal charges was not high, but the institution's referral process and the district attorney's decision-making process were extremely slow, leading to commensurately lengthy stays in administrative segregation for too many fragile MHSDS caseload inmates. It was unclear whether the institution was monitoring these cases adequately.

Transfers:

EOP transfers were generally timely. Reportedly, there were no difficulties in transferring inmates to MCSP's EOP program. In 2004, 13 Level IV EOP inmates were transferred to other institutions. Although the information available on these transfers was limited, it appeared that most inmates waited one to seven weeks after their endorsement to be transferred.

Lengths of stay in the MHCB unit were sometimes excessive. Among 236 MHCB admissions during this monitoring period, some 12 percent extended beyond program guide timelines by more than a few days for a variety of reasons. More recently, lengths of stay worsened, with about half of the extended stays lasting three to five weeks. Since as early as March 2004, MCSP began using so-called "potty" or contraband cells, essentially holding cells where inmates suspected of ingesting contraband were retained and watched, when sufficient space in the MHCB unit was unavailable. The use of these cells apparently began to increase in August; they were used for inmates in need of a MHCB level of care on 14 occasions between August and

64

the time of the monitor's December visit.  Reportedly, inmates were placed in these cells for less than 24 hours, but evidence indicated that inmates sometimes remained in the cells for longer periods of time.  The cells had no beds and, although monitored by security, were not located in a clinical area where inmates requiring stabilization could be monitored and treated adequately.  Apparently, some clinicians felt pressure not to admit inmates to the MHCB unit because of this problem.

The quality of care provided in the MHCB unit met most program guide requirements, except for the provision of daily psychiatric rounds and completion of suicide risk assessments.  Institutional audits found that daily psychiatric rounds occurred 70 percent of the time, while suicide risk assessments were completed for only 22 percent of MHCB inmates admitted to the unit.  Suicide risk assessments, on the other hand, were completed consistently for all inmates discharged from the unit.

Some caseload inmates remained in administrative segregation for lengthy periods of time.  Most of the extended stays were attributable to untimely handling of disciplinary charges and related classification matters.  A few inmates in administrative segregation were awaiting available bed space in Level III and Level IV EOP units, a SHU or a PSU.  Mental health screenings for inmates arriving in administrative segregation appeared to be conducted timely.

MCSP referred inmates to all of the available DMH programs during the monitoring period, including 22 to DMH/CMF programs, two to ASH and five to SVPP.  About one-third of all transfers were untimely, often because inmates admitted to the MHCB unit were not referred to DMH for as long as three to four weeks after their admission to the unit.  The actual time to transfer after referral varied; ASH transfers took

65

just four days and transfers to DMH/CMF were generally completed within two weeks, while SVPP transfers took anywhere from nine days to two months. Five inmates returned from DMH to MCSP through the psych and return process. Staff reported that psych and return procedures were consistently followed, but the monitor found the requisite discharge summary in just one of three reviewed and relevant charts.

Transfers to a PSU appeared to occur timely. Ten such transfers were completed during the monitoring period, and two inmates were endorsed and awaiting transfer to a PSU at the time of the monitor's visit. Data was not available for all of these transfers, but there was no evidence of undue delays in referrals and most post-endorsement waits lasted only two to four weeks.

Other CAP Issues:

a. Partial Compliance

The provision of five-day clinical monitoring for suicidal inmates discharged from the MHCB unit was adequate. According to an institutional audit, the compliance rate for clinical follow-up for discharged inmates was 100 percent. No data was available on required custody checks.

Institutional Summary:

MCSP had few mental health staffing vacancies, and most unfilled positions were covered by contractors. Among the four issues focused on during the monitoring round, transfers to higher levels of care were generally handled well. The exception involved some inmates admitted to the MHCB unit whose subsequently identified need for a DMH level of inpatient care did not generate an actual referral for up to three to four weeks. This led to some extended stays in the MHCB unit and, in turn, to

66

problems with access to the MHCB unit for other inmates in crisis in the institution. The result was an increasing and disturbing use of the holding or contraband cells, totally inappropriate for the housing of seriously mentally disordered inmates in need of a MHCB level of care, for 24 hours or apparently even longer periods.

Most quality assurance structures were in place at MCSP, but the overall management of quality was not developing as anticipated. Quality management committees developed late; often met erratically; and frequently lacked appropriate membership. Audits were conducted, but the facility's monthly chart-review process was an inadequate substitute for peer review. Implementation of the mental health assessment component of the RVR process, on the other hand, was advancing reasonably well. Progress in the completion of mental health assessments was notable, and hearing officers apparently took mental health input into consideration in determining the outcome of disciplinary hearings. Record-keeping for the process and the referral of non-EOP inmates for mental health assessments needed further examination and work.

Medication management also improved, but several issues still needed to be addressed. The institution's systems for providing parole medication, DOT-administered medications and Keyhea medications, as well as procedures for identifying medication errors, showed continuing progress. Its provision of HS medications was exemplary. Continuity of medication, particularly on renewal, and follow-up to medication non-compliance remained deficient.

The institution continued to provide adequate mental health services and meet program guide requirements in both its 3CMS and EOP programs. Only a few CAP items, most of them related to medication management, remained unresolved. During the

upcoming round of review, MCSP will initiate a Level IV SNY for up to 150 EOP

inmates, an undertaking that involves a new and important mission for the institution, as

well as a key component of the defendants' efforts to comply with the requirements of

Coleman.   Its success in this new effort, as well as its success in dealing with the

problem of access to the MHCB unit for inmates in crisis, will determine largely the

extent of future monitoring of MCSP in this case.

### Sierra Conservation Center (SCC)
September 9, 2004 – September 10, 2004

SCC filled most of its mental health positions during the monitoring

period.  Among 15.5 allocated positions, only one psychiatrist and one clerical position

were vacant.  The psychiatric vacancy was almost entirely covered by two long-term

contract clinicians.  Some psych tech positions were vacant for a few months during the

monitoring period, but a contract social worker covered some of the unfilled hours, and

the positions were occupied by the time of the monitor's visit.  All but one auxiliary

position was filled or covered by contract employees.

Although staffing stabilized during the monitoring period, SCC still lacked

adequate psychiatric coverage.  Psychiatric caseloads exceeded 300 inmates.

Psychiatrists complained that they did not have time to meet together or attend IDTTs

because of direct services demands.  SCC did not have an allocated position for a chief

psychiatrist and, as a result, the psychiatrists at SCC received no clinical supervision or

guidance.  Coordination among clinical staff members also suffered from the absence of

mental health leadership, and disagreements frequently arose between the mental health

and medical staffs.  Although authorized to use telemedicine, SCC had not sought to do

so in over a year.

Quality Management:

        SCC's quality management protocols were still in draft form. The institution needed to finalize and implement its quality assurance plan.

        The composition of the quality management committee was appropriately interdisciplinary, but minutes showed gaps of several months between meetings. Although the committee engaged in some substantive discussions, many of the same issues were covered repeatedly for a year or more without identifying any effective remedial actions. The mental health subcommittee met at least monthly and generally more often, but there was little discussion of quality assurance issues during these frequent meetings.

        SCC chartered a number of QITs during the monitoring period, but most teams did not function as problem-solving groups. The institution completed frequent chart reviews and a large number of audits quarterly, most of which were done well. Peer review also developed further during the monitoring period, but only among psychologists. The mental health staff employed a variety of tracking instruments, including the MHTS, on a regular basis to monitor quality assurance activities.

Medication Management:

        SCC's new medication management operating procedures had been in draft form for at least ten months. The procedures conformed to departmental standards, except for the definition of non-compliance. SCC needed to finalize its operating procedures in this area.

        Continuity of medication on arrival improved, but institutional studies varied widely, suggesting that compliance was somewhat erratic. SCC had procedures

for providing 30-day continuity orders for inmates arriving with current medication orders. Data underlying a staffing audit indicated that 85 percent of inmates arriving on medication were seen by a psychiatrist within a month; none of the 40 audited cases, however, showed any medication discontinuity. A MHTS printout listed few inmates who had not been seen by a psychiatrist within five to six weeks of their arrival. On the other hand, nursing staff conducted a larger audit and found that only 55 percent of arriving inmates received their medications within 24 hours. Continuity problems among inmates arriving at SCC without verified medication orders were greater. The institution did not audit this issue, but the monitor's extremely limited audit found several cases in which it took between three to five weeks for inmates to be assessed.

Continuity of medication on changes in intra-institutional housing locations appeared adequate. Internal lists reflected 376 housing moves among caseload inmates with only one medication gap of three days. Chart reviews similarly showed good continuity for inmates moving to administrative segregation. The institution needed to conduct an audit to confirm this level of compliance.

SCC had a system for ensuring continuity of medication on renewal, but it was not always effective. Substantial mental health and nursing audits showed timely renewals in all but one instance, although chart notes on renewal orders were lacking in about ten percent of inmates' UHRs. The monitor reviewed the charts of 13 percent of the inmates at SCC long enough to have had three or more routine orders and found that 79 percent of these inmates received their medications without interruption. The monitor's expert found numerous medication gaps on the Level III yard.

70

Follow-up to medication non-compliance was poor.  SCC documented lots of non-compliance; hundreds of monthly incidents totaled 1,329 in a six-month period, with many inmates non-compliant on multiple occasions.  Psych techs monitored non-compliance, compiling weekly lists and ducating inmates to see psychiatrists.  Many inmates with repeated incidents of non-compliance were reported, but no mechanism was employed to catch duplicate or pending appointments, nor did staff appear to feel they could cancel a meeting with an inmate they had just seen in response to another referral for medication non-compliance.  An institutional audit of 35 charts found that 60 percent of non-compliant inmates were seen within seven days.  It was unclear whether the audit measured MTAs' referrals when appropriate or the timeliness with which inmates were seen.  Printouts seem to indicate that non-compliant inmates were typically seen within one to two weeks, but a substantial number of inmates were not seen for three to eight weeks.  Nursing audits indicated that relevant clinical information on inmates' non-compliance was available to psychiatrists conducting follow-up in only a quarter of cases.

Problems persisted with the provision of parole medications to inmates discharged from the institution.  Data provided by the institution showed significant gaps, moderate performance and insufficient oversight.  Procedures described in the past for identifying paroling inmates and ensuring their receipt of medications appeared adequate, but no information on the implementation of these procedures was available.

SCC had a system in place for reporting medication errors, but no data on the number of actual errors was provided to the monitor.

The institution had difficulty providing laboratory testing for inmates on mood-stabilizing medications.  The system was so deficient that psychiatrists reportedly

71

were reluctant to order mood stabilizers. In addition, the institution did not have any protocols for medication workups or monitoring procedures.

Chart reviews and staff interviews indicated that no inmates were on DOT medications at SCC, although there was evidence reportedly of inmates "cheeking" some medications, particularly Wellbutrin. Considering that Wellbutrin, apparently widely prescribed at SCC, was distributed typically in crushed or powdered form, the monitor's expert questioned the legitimacy of the "cheeking" charges. Documentation indicated that custody officers did not assist at pill lines. Nursing supervisors monitored medication distribution in Level II housing and administrative segregation and found good compliance.

Medications were generally delivered in a timely manner. An institutional audit found that 92 percent of medications were delivered on time. Delivery times were appropriately spaced throughout the day. On the other hand, the institution continued to have difficulty with the provision of HS medications. Only five inmates had HS prescriptions during the preceding monitoring round; none were on HS medications during this monitoring round. Psychiatrists indicated that they were reluctant to prescribe HS medications due to an institutional memorandum requiring approval by the health care manager of all HS prescriptions. Staff complained that in a few instances the pharmacy interpreted this memorandum as requiring that all HS prescriptions be distributed during the regular late afternoon/early evening medications delivery.

The most recent MAR forms were generally in inmates' charts, but chart reviews indicated that many of the MARs were still incomplete. Not only were there

72

numerous blank spaces, but many of the notations on the MARs were ambiguous, including checks and dashes the meaning of which were unclear.

Problems with the acquisition of informed medication consent forms had been resolved during an earlier monitoring round, but compliance declined over the last year and a half. Institutional audits found just 65 percent of inmates on medication with current medication consent forms in their charts.

No inmates at the institution were on Keyhea orders at the time of the monitor's visit.

Mental Health Assessments for the Disciplinary Process:

SCC conducted training for 76 employees when the new rule violation procedures went into effect. No information on any subsequent training was provided. Tracking of disciplinary matters improved, but the logs remained incomplete. Logs captured data on relevant categories of information, except the nature of charges. Moreover, not all of the requested data entries were filled in.

Requests for mental health assessments dropped significantly during the monitoring period. Logs indicated mental health assessments were requested in just four percent of RVRs involving caseload inmates, about a third of the number of requests made in the preceding monitoring round. The monitor reviewed a sample of RVRs and found at least a few that should have been referred, including two RVRs for an EOP inmate.

The assessment process appeared to progress, but the monitor did not have sufficient information to document the extent of the reported progress. At least some clinicians interviewed inmates and reviewed their charts and C-files when compiling

assessments.  Mental illness was found to have influenced inmates' behaviors in about 79 percent of the RVRs in which an assessment was requested.  This represented a significant increase; in the preceding monitoring round, only four of 38 assessments reached a similar conclusion.

Mental health input also appeared to have an impact on disciplinary decisions, although the precise extent of the impact was difficult to judge.  Hearing officers dismissed charges or assessed low penalties in all of the RVRs involving mental health assessments, but they did not always explain their reasons for doing so or explicitly associate their decisions with the assessments.  In a number of such instances, however, it was clear that hearing officers adjusted their determinations based on clinicians' mental health input.

During the monitoring period, eight RVRs involving MHSDS caseload inmates were referred to the district attorney's office for possible prosecution, five of which were accepted.  It took the district attorney three to seven weeks to decide whether to accept the cases.  No RVRs were written for self-injurious behavior.

Transfers:

The timeliness of EOP transfers, an issue once resolved in an earlier monitoring period, continued to decline.  According to priority transfer lists, fewer transfers of EOP inmates occurred, but 23 percent of them waited longer than 60 days before they were moved.  None waited longer than a total of three and a half months.  Among the four inmates awaiting transfers to EOP programs at the time of the monitor's visit, only one's wait exceeded the applicable timelines.

74

Lengths of stay in the OHU improved slightly. Of 130 OHU admissions, 22 percent exceeded the three-day time frame, compared with 27 percent during the preceding monitoring round. The pertinent log reflected that a number of inmates, whose symptoms persisted for a day or more, were transferred to MHCB units. The longest stay of 36 days in the OHU involved an EOP inmate, who was considered unsafe in the general population. Some stays were extended marginally beyond three days so that an IDTT meeting could be held to review their situation. Multiple admissions to the OHU were numerous. Almost half of the 130 OHU admissions during the monitoring round were accounted for by 19 inmates.

SCC continued to provide reasonable treatment services for caseload inmates in the OHU. Suicide risk assessments were completed for most inmates, but audits showed that 19 percent of inmates did not receive suicide risk assessments on their admission to the unit. Institutional audits confirmed that inmates new to the OHU were generally assessed within 24 hours by the admitting psychiatrist; inmates admitted by non-psychiatric physicians were assessed by psychologists on the next business day. Psychologists conducted daily weekday rounds in the unit, while psych techs conducted rounds on weekends.

Transfers to MHCB units appeared timely. Printouts showed 31 transfers to MHCB units during the monitoring period, all of which were completed within 24 hours. Staff complained that EOP inmates were sometimes inappropriately returned from MHCB units as 3CMS inmates, delaying their treatment and requiring SCC clinicians to begin the classification process again. OHU logs showed three inmates whose level of

care was changed on their return from a MHCB unit; it was unclear whether other inmates were also reclassified.

According to institutional audits, 90 percent of caseload inmates were generally identified within a day of being transferred to the administrative segregation unit. Some conflicting documentation left unclear the frequency with which psych techs made rounds in the administrative segregation unit. Staff audits showed near complete compliance, while departmental audits reported only 60 percent compliance with daily psych tech rounds.

EOP administrative segregation inmates were transferred to appropriate programs in a timely manner. Institutional audits showed that none of the EOP inmates in administrative segregation during the monitoring period remained there longer than 60 days, and none of the EOP inmates in the unit at the time of the monitor's visit had been there for more than 60 days.

SCC did not send inmates directly to any DMH facility.

Other CAP Issues:

a. Partial Compliance

The frequency of psychiatric contacts appeared to improve slightly during the monitoring period, but some inmates still were not seen in a timely fashion. A well-executed institutional audit indicated that 75 percent of inmates were seen by a psychiatrist at least every 90 days. The MHTS printout indicated that 99 percent of inmates on medication were seen by a psychiatrist during the preceding 90 days; a smaller printout of 16 administrative segregation inmates indicated that each surveyed inmate had seen a psychiatrist within the preceding two months. Audits also showed that

psychiatrists planned to see a substantial number of inmates more often than every 90 days, but were able to do so only about 60 percent of the time.  Part of the problem involved the length of time it took to reschedule missed appointments.  Institutional audits, confirmed by the monitor's data analysis, indicated that only half of missed appointments were rescheduled within two weeks, with the longest rescheduling time running from one to two months.  In addition, psychiatrists took on average three more weeks to see inmates.  Inmates taken off medication generally were not monitored appropriately, with outlying inmates waiting eight months to a record three-and-a-half years for follow-up.

The timeliness of psychiatric responses to referrals slowed slightly.  The monitor's data analysis showed problems with the timely transmission of staff and inmate referrals; about 16 percent of referrals took between three and 27 days for transmission. Psychiatric response times were untimely in about 29 percent of cases.  The longest response times took from six weeks to four and a half months.  This issue was complicated by the shortage of confidential meeting space, particularly in the administrative segregation unit.

The timeliness of initial treatment plans improved during the monitoring period, but the extent of the improvement was unclear.  An institutional audit indicated that 90 percent of initial treatment plans in the preceding six months were completed within required timelines, but a departmental audit for the same period found only about 50-percent compliance.  Both figures were higher than the 45-percent compliance rate reported in the 13th round of review.  Conversely, the timeliness of treatment plan updates appeared to decline, although it was impossible to determine with certainty the extent of

77

the decline. An institutional audit showed that just 60 percent of treatment plan updates were completed in a timely manner, while a departmental audit found a 69-percent compliance rate. The MHTS printout, however, showed timely treatment plan updates in all but one case. Finally, the quality of treatment plans was problematic, with individualization being the exception rather than the rule. The monitor's expert's review of treatment plans for Level III inmates found them generally inadequate, with some misdiagnoses and inadequate treatments.

The frequency of case management contacts in administrative segregation remained unchanged during the monitoring period. According to an institutional audit, 80 percent of caseload inmates in administrative segregation were seen weekly by their case managers. IDTT meetings for these inmates occurred more often than every 90 days.

The provision of pre-release planning for paroling inmates showed some improvement. SCC relied entirely on TCMP contractors for pre-release planning services. Institutional audits found documentation of TCMP contacts with 82 percent of paroling inmates. Psychiatric contacts with this population also improved, with audits showing that all inmates were seen by a psychiatrist within 90 days of their release.

b. Non-Compliance

Once again, the provision of group therapy remained unchanged. Less than five percent of the 3CMS caseload received any group therapy. At the time of the monitor's visit, just 20 inmates attended five groups; 22 inmates had attended groups earlier in the monitoring round. About 80 inmates were on a waiting list, demonstrating both the demand for groups and the institution's inability to meet this treatment need.

According to staff, the lack of appropriate space was a principal obstacle to initiating more groups. Difficulty with sound and visual privacy for groups held in the Level II yard resulted in reduced participation.

Psychiatrists did not participate in administrative segregation IDTT meetings. Institutional audits showed that 90 percent of administrative segregation inmates had timely initial IDTT meetings, and all inmates had timely IDTT updates, but crucial psychiatric participation was missing.

Although the CAP item pertaining to SCC's suicide prevention committee was resolved during an earlier monitoring period, the frequency of the committee's meetings was declining; minutes of meetings indicated that the committee met only three times during the eight months preceding the monitor's visit. Few members attended the meetings, and discussions did not focus on suicide-related matters.

Suicide prevention follow-up was also inadequate. Institutional audits indicated that 81 percent of suicidal inmates returned from a MHCB unit elsewhere or from the OHU received five-day clinical follow-up after being discharged. Two separate audits found that custody checks of discharged suicidal inmates were made as required in just 69 and79 percent of audited cases. The monitor's smaller chart review found a 67-percent rate of compliance for both clinical and custody follow-up. In most instances of non-compliance, clinicians missed one day in the series of five-day follow-up, whereas the gaps in custody coverage were more widespread.

New Problems:

> The bus screening process was flawed; a significant percentage of newly arrived inmates were not appropriately referred to mental health as needed.

79

Initial mental health assessments, or MH-4s, for newly arrived inmates were not always completed in a timely fashion.

Not all inmates were seen by their case managers every 90 days.

<u>Institutional Summary:</u>

There was less turnover among permanent and contract staff during the monitoring period, but allocated psychiatric staffing was inadequate for treatment needs. The shortage was compounded by a lack of mental health leadership and supervision and internal conflicts with the medical side of the facility's health care services.

Among the four focus areas of monitoring, SCC showed some improvement in the quality and impact of its mental health assessment process for disciplinary charges involving caseload inmates. While requests for assessments declined during the monitoring period, the number of assessments finding that mental illness affected the assessed inmates' behaviors increased significantly. Mental health assessments also seemed to have greater impact on the outcome of disciplinary hearings.

Some improvement was also noted in the timeliness of transfers to higher levels of care, particularly for transfers to MHCB units and of EOP inmates to programs elsewhere in CDCR. Quality assurance efforts, on the other hand, demonstrated some deterioration. SCC was slow to implement quality assurance structures; responses to negative audit results were inadequate; and almost no problem-solving activities occurred.

Medication management was replete with problems. The institution had difficulty providing follow-up to medication non-compliance, medications to paroling inmates, laboratory testing of inmates on mood-stabilizing medications, DOT therapy and HS medications. MARs were often incomplete; informed medication consent forms were

80

missing frequently; and little useful information on medication errors was available. On the positive side, medication appeared to be delivered in a timely manner and continuity of medication on arrival, changes in housing locations and renewals was better, although not without some gaps.

Among SCC's remaining CAP items, some improvement was noted in the frequency of psychiatric contacts, the timeliness of initial treatment plans and the provision of pre-release services. In contrast, the timeliness of psychiatric responses to referrals declined, as did the timeliness of treatment plan updates and the overall quality of treatment plans. Little group therapy was offered to 3CMS inmates; psychiatrists rarely participated in IDTT meetings; the suicide prevention committee met infrequently; and custody follow-up of suicidal inmates discharged from a MHCB unit or the OHU was poor. New problems emerged with bus screenings, timely initial mental health assessments and the frequency of case management contacts.

This was not a particularly productive monitoring period for mental health services in SCC. While staff focused on inmate care in some important ways, including suicide follow-up by clinicians and the provision of yard time to OHU inmates, and some gains occurred in a few areas of treatment, compliance efforts in many crucial areas stalled. Although psychiatric resources at SCC were stretched thin, the institution coped poorly with greater relative resources than a number of other CDCR institutions enjoyed. The principal problem appeared to be a lack of effective management and supervision. Resolving that problem is critical if SCC is ever to comply with its CAP and the requirements of Coleman.

## Service Area D

Service Area D includes the California Medical Facility (CMF), the California State Prison, Solano (CSP/Solano), California State Prison, San Quentin (SQ) and the Deuel Vocational Institution (DVI).

### California Medical Facility (CMF)
February 22, 2005 – February 23, 2005

Staffing allocations increased at CMF during the monitoring period. The institution received additional positions for 1.5 psychiatrists, a senior psychologist, four staff psychologists, 3.5 psych techs, a recreational therapist, an occupational therapist, two nurses and 1.5 office techs. As a result of the increase in allocations and considerable staff turnover, the vacancy rate among mental health staff rose from 12.4 percent in the preceding monitoring period to 15.2 percent in February 2005. Institutional data identified openings for two psychiatrists, a senior psychologist, two staff psychologists, two psych social workers, 3.5 psych techs, two recreational therapists, two nurses, a half-time office tech and three medical transcribers.

According to staff, the high degree of turnover among clinicians at CMF was attributable to expanding DMH programs, which were expected to continue attracting substantial numbers of CDCR personnel. Contract clinicians adequately covered case manager vacancies, but vacancies for psychiatrists, psych techs and recreational therapists were not fully covered. No figures were provided on auxiliary staffing.

During the monitoring period, the population of the EOP administrative segregation hub unit increased to as high as 75 inmates. At the time of the monitor's visit, the count was 60 inmates, compared with a program capacity of 56. Although

82

contract clinicians reportedly were diverted to cover the population increases, clinicians

in the unit indicated that their caseloads often exceeded nine inmates and at times

included as many as 20 inmates, resulting in a diminution in mental health services.

Issues Resolved:

> Supervised outdoor recreational therapy was provided.

> Informed medication consent forms were consistently completed, updated
> and filed.

Quality Management:

The quality assurance process improved significantly during the

monitoring period. The mental health quality management committee provided regular

reports to the institutional governing body. Minutes of meetings were kept and provided

to the monitor. Eight QITs were operating within the institution during the nine months

preceding the monitor's visit, five of which had completed their studies and disbanded.

Peer review for psychiatrists and psychologists had been underway for six months, but

peer review for psych social workers was initiated only recently.

Medication Management:

The institution revised its local medication management operating

procedure during the monitoring period. Despite some improvement and the promise of

additional assistance from HCSD related to Plata, CMF still had major problems with the

delivery of medication.

Supervisory staff reported increased problems with continuity of

medication on the renewal of medication orders, reportedly resulting in an increase in

referrals for medication non-compliance. According to quality assurance materials,

MTAs also complained about continuity of medication following discharges from
DMH/APP and on other intra-institutional transfers.

Medication non-compliance was reportedly identified and addressed
expeditiously in the EOP, but remained problematic in the 3CMS program. Staff
reported a dramatic increase in the number of referrals for non-compliance following
implementation of new non-compliance criteria. The increase in referrals appeared to
have strained the limited psychiatric resources of the 3CMS program, creating problems
with continuity of medications and psychiatric attendance at IDTT meetings.

Medication administration improved in general population 3CMS and
EOP units. CMF discontinued the distribution of medications to inmates in their cells
and instituted pill lines in each housing wing. The pill lines reportedly took 45 minutes
to complete. While these procedural changes increased the efficiency of medication
distribution, activities in the housing units were interrupted during pill lines, and some
aspects of mental health programming were disrupted. Medication was still distributed to
inmates in their cells in administrative segregation units and the HIV unit. DOT, which
was prescribed for all EOP inmates, was problematic in the administrative segregation
unit due to limited visibility at cell-front.

MARs were well maintained generally, but they were not readily available
on housing units for medications administered by injection. As a result, deliveries of
injected medications were not always documented, leaving the mistaken impression that
prescribed injections were not being provided.

Medication prescription practices improved. An institutional audit
indicated that 90 percent of medication orders included a rationale; similarly, the audit

showed that 90 percent of prescriptions were consistent with inmates' symptoms. According to staff, however, it commonly took two weeks to fill medication orders.

Psychiatrists did not appear to order HS medications at CMF. Inmates prescribed p.m. medications were allowed to choose whether to take their medications from 3:00 to 4:00 p.m. or from 7:00 to 8:00 p.m. The last medication pass often ended around 9:00 p.m., suggesting that some inmates could receive HS medications after 8:00 p.m. if so ordered.

CFM did not adequately document medication errors. The institution's medication error report listed few errors, but staff reported many more. The monitor observed three inmates identify medication errors during one medication distribution in an EOP housing unit. Although all of the errors were corrected by the MTA, none of the mistakes was documented.

Mental Health Assessments for the Disciplinary Process:

CMF did not adequately track RVR data, making it difficult to assess compliance in this area. The institution maintained a log of mental health assessments prepared for the disciplinary process, but key information was often missing from the log, and some entries were inaccurate. A recently revised log, while more complete, still contained inaccuracies. The monitor compared the revised log to inmates' C-files and found three instances in which the log incorrectly recorded the outcome of mental health assessments.

Mental health assessments were generally prepared according to protocols. Clinicians other than the involved inmates' case managers usually completed the assessments, and inmates were consistently interviewed and their charts consulted during

85

the preparation of mental health assessments. Clinicians complained that custody staff referred too many 3CMS inmates and indicated they sometimes declined to complete these assessments. According to the revised assessment log, 79 percent of 3CMS inmates involved in disciplinary infractions were referred for assessments.

Hearing officers appeared to respond appropriately to mental health assessments. Their dispositional reports typically included an accurate recital of the contents of mental health assessments, although hearing officers sometimes failed to explain how clinical input was considered or why it was discounted in reaching a disposition. Moreover, the hearing officers sometimes appeared to assess the influence of mental illness based on the inmate's behavior at the disciplinary hearing, rather than on the clinician's assessment of the inmate's level of functioning at the time of the infraction.

A training memorandum on the mental health assessment process was distributed to staff in September 2004, explaining the requirements for disciplinary hearings in cases involving mental health inmates. Some of the language in the memorandum seemed to suggest that a disposition could be based on an inmate's mental condition at the time of the hearing.

Transfers:

Access to MHCB care improved significantly. In 2004, CMF established a psychiatric admissions unit (PAU), a ten-bed MHCB unit within DMH/APP, which provided greater access to crisis care. Under the new system, inmates thought to require a MHCB level of treatment were assessed by psychiatric evaluation services for 24 hours and either admitted to the PAU, returned to their housing unit or admitted to the APP. Inmates who were not stabilized within ten days in the PAU were reportedly referred to

86

the APP. According to institutional data, the number of APP admissions declined, as did lengths of stay in the APP, following implementation of the PAU. DMH admission data showed that 151 inmates were admitted to DMH/APP from CMF from April 1 through August 31, 2004; in contrast, 143 inmates were referred to the PAU from September 1, 2004 through January 31, 2005, of which only 27 percent were admitted to DMH/APP. The same data also showed that the average length of stay in the DMH/APP from May 1 to August 31, 2004 was 52 days, compared with 33 days during the last four months of 2004. Institution of the PAU/PES structure allowed CMF to cut its proportional use of DMH/APP bed days by more than half, from 40 to less than 20 percent. Subsequently to the monitoring visit, CMF promulgated written policies and procedures on the operation of its PAU.

Access to ASH appeared adequate. According to monthly progress reports, CMF referred five or six inmates to ASH each month from May 1 to December 31, 2004. There were 45 referrals in total, of which 12 were rejected by ASH for clinical reasons.

Access to the DMH intermediate care facility (ICF) and the day treatment program (DTP) at CMF also improved. The DTP was relocated and the capacity of both programs was expanded in early 2005. The DTP was only partially filled at the time of the monitor's visit, but at that time staffing resources were insufficient to service the program at its full capacity. Programmatic activities were not yet fully operational, and it was unclear whether available programming space would be adequate for both fully occupied programs.

The psych and return process at CMF was problematic.  In November 2004, the department unilaterally changed its psych and return protocols to permit DMH/APP to return inmates to sending reception centers upon their discharge, rather than retaining them in CMF, for completion of their initial classification process.  In late February, the special master recommended strongly a prohibition on returns to reception centers, which lacked adequate mental health resources to treat inmates discharged from DMH/APP.  The institution confirmed that such transfers had been suspended in March.

Other CAP Issues:

        a.  Partial Compliance

Institutional data continued to show that EOP inmates were offered, on average, more than ten hours of scheduled structured therapeutic activities per week.  The institution's management information system for August 2004 indicated that EOP inmates received an average of 12.6 hours of weekly therapy.  Lockdowns, staff training, holidays and planning meetings, however, were responsible for the cancellation of nearly one-third of all scheduled program hours during the period from August 2004 to January 2005; other groups were inexplicably cancelled.  Of eight EOP therapy groups scheduled for one day during the monitor's visit, two were cancelled.  As many as two to five groups per week were reportedly interrupted or cancelled due to medication delivery, while routine activities such as yard recreation impinged on group space.  In addition, inmate interviews confirmed the monitor's limited observation that most therapy groups lasted only 40 minutes rather than the scheduled full hour.  On the other hand, the institution had managed to reduce the number of cancellations of groups due to fog.

According to institutional data, the aggregate EOP refusal rate for structured therapeutic activities decreased slightly from August through December, but the percentage of refusals was still high at roughly 30 percent. Meanwhile, the refusal rate for EOP inmates in administrative segregation increased from 14.75 percent to approximately 30 percent. Limited programming space in the EOP administrative segregation unit may have contributed to the high refusal rate. Programming cells, moreover, did not provide adequate audio privacy and were configured so that individual inmates could not always hear one another.

The quality and variety of treatment groups reportedly improved in the months preceding the monitor's visit, but due to the large number of EOP inmates and the limited amount of programming space, many therapeutic activities were still not driven by treatment needs. Most EOP inmates were assigned to a standard cadre of groups, which included anxiety management, health education and occupational therapy. The groups were large, but some effort was undertaken to divide inmates by level of functioning and amenity to treatment. Insufficient materials and the repetitive use of videos diminished the quality of certain groups.

Follow-up monitoring of suicidal inmates discharged from DMH/APP improved. A newly implemented policy required IDTT meetings for all inmates discharged from DMH/APP, at which the need for follow-up monitoring was considered. Institutional audits and the monitor's review of charts indicated that inmates discharged from DMH/APP, who were deemed to require follow-up, were consistently seen by a clinician for five days. Another QIT concluded that appropriate custody checks were also usually completed, although documentation of custody checks was not always forwarded

89

to the suicide prevention coordinator for accurate tracking.  Staff acknowledged that, contrary to departmental policy, suicide risk assessment checklists were not always completed on admission to and discharge from DMH/APP, although clinicians regularly assessed the risk of suicide upon discharge.

A pilot project was underway linking the institution's management information system to the pharmacy's software and data from an outpatient psychiatric program.  Completion of the pilot project was expected in March 2005.

New Problem:

> The monitor's expert encountered a number of seriously psychotic inmates in administrative segregation, most of whom had not been referred to a higher level of care.  See Exhibit C, case reviews 11-13, 18 and 22.

Institutional Summary:

Allocations of mental health staff increased during the monitoring period, but the institution suffered from significant clinical staff turnover.  Both factors contributed to an increase in the percentage of vacant positions.  Increases in the administrative segregation caseload strained resources and required dispersal of the excess population in a number of locations, complicating the efficient delivery of treatment services.

In three of the four areas that were the focus of this round of monitoring, CMF showed considerable improvement.  Quality management was significantly better.  Mental health assessments in the disciplinary process were usually completed according to protocols, although RVR logs needed further work.  The number of 3CMS inmates referred for mental health assessments at CMF was higher than anywhere else in CDCR, causing some clinical backlash.  Access to higher levels of care improved all across the

90

board during the monitoring period. A more workable system for vetting admissions to MHCBs in DMH/APP resulted in more organized and effective access; the ICF/DTP were relocated and expanded, although neither had reached anywhere near their respective capacities; and ASH seemed readily accessible. Delayed administrative discharges from DMH/APP led to an unacceptable decision, subsequently reversed, to return some inmates, who were clinically discharged from DMH/APP, back to the reception facilities that sent them for completion of their initial classification process.

While local operating procedures for medication management were updated and revised, the medication delivery system at CMF continued to struggle in a number of areas. Follow-up to medication non-compliance was erratic for 3CMS inmates; MARs were not available when medications were delivered by injection; there were delays in filling prescriptions; medication errors were not adequately documented; HS medications were not being prescribed; and continuity of medication reportedly remained troubled.

In regard to its CAP, CMF resolved two items and progressed in some others. Efforts to provide ten hours weekly of scheduled structured therapeutic activities to EOP inmates in general population advanced somewhat, while providing the same level of treatment activities to inmates in the hub EOP administrative segregation encountered difficulties related largely to substantially increased population. Follow-up monitoring of suicidal inmates discharged from DMH/APP began to be provided routinely. On the other hand, the monitor's expert found some seriously psychotic inmates in the administrative segregation unit, many of whom needed to be referred to a higher level of care.

91

CMF needs to address its medication management difficulties and provide adequate treatment services to caseload inmates in administrative segregation during the upcoming round of review to earn reduced subsequent monitoring.

## California State Prison, Solano (CSP/Solano)
December 1, 2004 – December 3, 2004
January 24, 2005

The vacancy rate among mental health staff at CSP/Solano dropped from 38 to 25 percent during the monitoring period as the institution filled positions for a psychiatrist, a senior psychologist, a staff psychologist, a psych tech and a half-time office tech. In December, positions for a psychiatrist, five psychologists, a psych social worker and 2.5 office techs remained vacant. Simultaneously with the decline in vacancies, the percentage of unfilled positions covered by contractors rose from 32 to 57 percent. Contract clinicians covered almost all vacant psychiatrist positions and all but 1.7 of vacant case manager positions.

Despite these improvements, increases in the caseload population continued to strain the ability of staff to provide adequate mental health services. The mental health population rose from 1,280 3CMS inmates in June of 2004 to 1,324 on November 30, some ten percent higher than the facility's programmed population capacity. The MHSDS population peaked at 1,405 inmates in early November at the point when the temporary flood of commitments from county jurisdictions began to ebb. In the face of this population increase, the institution reported a shortage of case managers, with clinicians having caseloads ranging from 140 to 184 general population 3CMS inmates and some 50 administrative segregation 3CMS inmates.

92

Among auxiliary staff, four of the full complement of seven pharmacy positions, including all pharmacist positions, were vacant, as were 8.6 of 21.6 RN positions. Many of these positions had been vacant for a year or more. Staff complained, once again, that allocations for MTAs, RNs, pharmacy employees and medical records personnel had not kept pace with the incremental population increases over the preceding eight years. Mental health staff attributed problems with medication management and medical records primarily to insufficient allocations of auxiliary nursing and MTA staffing.

The CTC and MHCB unit had been renovated and reopened in mid-July of 2004, although HVAC problems that developed in early summer of 2005 led to increasing problems that threatened to close the MHCB unit entirely.

Issues Resolved:

The institution maintained adequate records on transfers to DMH.

Problems with obtaining records of inmates' prior mental health histories were resolved.

Quality Management:

In December, CSP/Solano had in place required quality management committees, but not much activity associated with quality management was discernible. The composition of the quality management committee was appropriately interdisciplinary, and the committee met semi-monthly. During the monitoring period, however, the committee focused almost exclusively on ensuring licensure of the renovated CTC, and few other mental health topics were addressed. Although the mental health quality management subcommittee met once or twice a month, it did not do much

93

more than distribute general departmental information and receive problem statements from QITs.

In the seven weeks between the monitor's first and second visits, CSP/Solano made some limited progress in reorganizing its quality assurance efforts. In particular, the institution began to prioritize issues and provide staff with training on problem-solving and auditing techniques.

The QIT process was not operating as intended. In December, six QITs had been chartered, but, with one exception, none of the teams had accomplished much. The composition of most of these QITs was inappropriate. One exceptional QIT chartered to improve participation in the IDTT process and help develop more individualized treatment plans generated some excellent training materials. Additional QITs had been chartered and staffed by the time of the monitor's late January visit. A QIT on medication management identified 11 problem areas, which it intended to address serially beginning with lengthy pill lines. The pace of progress, however, was disappointing; it seemed likely that the QIT would take months to complete its work on pill lines before beginning to address other critical medication issues.

No peer review process was yet in place.

Routine audits were conducted regularly, but a significant portion of the audits conducted were methodologically flawed. Moreover, no audits had yet been undertaken for roughly half of the deficiencies identified in the facility's CAP. After the December monitoring visit, a newly constituted QIT on medication management studied pill lines in mid-January to determine how long inmates actually waited in line. While

94

this QIT study indicated a willingness to analyze and understand the problem, the study's methodology and results were confused and flawed.

The accuracy of CSP/Solano's MHTS remained a concern. The institution attempted to compare its MHTS data with chart entries, but the data sets employed were not equivalent, and the conclusions reached were unreliable. The monitor compared nine inmate histories with charts and found only a few instances where the charts contained more information than the histories. The monitor also noted, however, numerous inaccuracies in some MHTS reports, including coding errors in referral response reports, data gaps in EOP tracking history data and missing data from IDTT review reports. Discrepancies were also identified between the institution's priority transfer report and EOP tracking histories.

Medication Management:

Most aspects of medication delivery and management at CSP/Solano were inadequate. Continuity of medication on arrival was particularly problematic. An institutional audit of 35 inmates arriving at CSP/Solano during the reporting period indicated that only 40 percent received their medications within a day of their arrival. The monitor's more limited chart review found that medication orders were issued in a timely manner, but found frequent two-day gaps in the delivery of ordered medications. Chief reason for these delays was the pharmacy's closure during evenings and weekends. The monitor's expert also found several inmates who were not assessed by a psychiatrist for up to a month after their arrival, a lengthy period even for inmates with current orders for medications. In addition, some 90-day medication orders reportedly were sometimes inexplicably dropped a week or two after their start date.

Continuity of medication for inmates moving between housing units was also deficient. Institutional policy on intra-institutional transfers was inadequate. Even if followed exactly, the medication protocols seemed to ensure that inmates would miss at least one or two doses of their medications in their new locations. Although the institution had not audited this issue, staff admitted that protocols were not followed consistently and inmates often missed several doses. A problem was also noted with the transfer of inmate MARs.

Similarly, the institution had problems with continuity on the renewal of medication orders. The monitor's review of inmate histories and charts, in addition to inmate interviews, indicated that lapses in medications on renewal were common. As with medication delivery for new arrivals, inmates frequently experienced gaps of more than a day.

Follow-up to medication non-compliance was erratic. The institution's CAP required that non-compliance referrals be reviewed within five days, but the institution had not audited this issue. Chart reviews by the monitor's expert found 14 instances of medication non-compliance that met operational criteria for referral. Only five of the inmates involved in these 14 instances were referred for non-compliance, and some of those referred were never seen by a psychiatrist in response to the non-compliance referral. Anecdotal information suggested that non-compliance was not consistently reported. Nursing staff reportedly sometimes discontinued medications without psychiatric review or approval by simply removing MARs belonging to non-compliant inmates. There was also a problem with psychiatric follow-up of inmates whose medications were discontinued; some were not seen for nine months or more after