cessation of delivery of their medications.  MTAs also reportedly issued RVRs totally inappropriately to inmates who were non-compliant with their medications.

Problems with medication changes without a rationale seemed to have eased.  Nursing audits of 35 charts indicated that new medication orders and changed orders were regularly accompanied by progress notes with stated rationales.  The monitor's charts reviews found no instances of medication changes without a rationale. Inmates, however, complained that they were rarely seen by the same psychiatrist for two consecutive appointments, and inmate histories often confirmed such complaints.  The monitor found multiple examples of psychiatric discontinuity in inmates' charts.

Laboratory tests for inmates on mood-stabilizing medications often were not drawn, nor were the results reported on in a timely manner.  Staff indicated, and the monitor's small chart review confirmed, that laboratory results were often not filed in UHRs for six weeks or more.  Chart reviews also reflected that psychiatrists sometimes failed to order appropriate laboratory tests.  The institution had yet to audit this issue or the timeliness of psychiatric responses to abnormal laboratory test results.

The institution continued to have trouble implementing the DOT administration of medications.  Although inmates reported that correctional officers assigned to pill lines did require inmates to open their mouths in order to ensure that they swallowed their medications, DOT procedures were not well developed and a number of deficiencies were noted.  Labels in MARs did not distinguish between nurse-administered and DOT medications, with the result that all of the labels in MARs for psychotropic medication seemed to indicate DOT administration.  Nonetheless, inmates in administrative segregation were not removed from their cells to receive their

medications; CSP/Solano did not maintain a list of inmates with histories of hoarding, overdoses or non-compliance for purposes of prescribing DOT; and nurses administering medications reportedly did not follow protocols to crush Wellbutrin.

The institution established pills lines during the monitoring period to replace existing medication delivery systems within units, but both inmates and staff reported lengthy pill lines. In one instance, inmates reported waiting over two hours in an evening pill line, being recalled to their housing unit for count and then being returned again to the pill line. Some inmates acknowledged refusing their medications rather than waiting in the long lines.

CSP/Solano did not appear to provide HS medications. No medications were delivered HS during the monitor's visit, and nursing audit forms noted that medications were not delivered HS.

CSP/Solano had developed a policy for the provision of medications for paroling inmates, but no institutional audit had been conducted to verify compliance with the required procedures.

The acquisition of informed medication consent forms continued to be problematic occasionally. Institutional audits found current consent forms in 85 percent of reviewed charts. The monitor's more limited chart review found consent forms in 62 percent of reviewed charts.

Institutional logs indicated that just three inmates were on Keyhea orders at the institution during 2004. Staff maintained that there was little need for Keyhea orders among CSP/Solano's 3CMS population.

MARs were better maintained during the monitoring period, but the monitor continued to find blanks on many forms. Nursing audits found a high degree of incomplete or illegible MARs.

Mental Health Assessments for the Disciplinary Process:

The institution had established a RVR log, which recorded clinicians' findings, hearing officers' consideration of clinical input and the outcomes of disciplinary hearings. According to the RVR log, from July 1 through November 30, mental health assessments were completed for ten inmates, including one MHCB inmate, seven 3CMS inmates and two non-caseload inmates. Another nine inmates, three EOP and six 3CMS inmates, were referred to mental heath for assessments during this period, but had not had a hearing at the time of the monitor's visit. Compared with other CDCR institutions with comparable MHSDS caseloads, the number of assessments seemed low. The quality of assessments varied; some were helpful, while others contained little substantive information. Clinicians generally met with inmates in preparing their assessments.

It appeared from the information provided by the institution that hearing officers regularly considered mental health input and used it often to dismiss infractions and reduce penalties. Clinicians concluded that mental illness may have influenced inmates' behavior in seven of the ten completed cases. In six of these, accused inmates were either found not guilty or the charges were dismissed or reduced.

Transfers:

EOP transfers appeared to occur timely according to MHTS data. During the period from July 1 through November 30, 19 EOP inmates were transferred to appropriate programs within required timelines. Only one transfer exceeded the 60-day

99

timeline; in fact, 58 percent of the transfers were accomplished within 30 days. Of six EOP inmates awaiting transfer at the time of the monitor's visit, none had been waiting longer than 60 days.

Renovations to the MHCB unit were completed in July, 2004. Since then, the length of stay in the unit had improved. Of 88 admissions that occurred during the monitoring period, 32 remained in the unit longer than ten days. Most of the extended stays, however, were either short in duration or occurred for reasons beyond the institution's control. The monitor found that only about four percent of extended stays occurred for reasons fully within the institution's control. The average length of stay was 9.77 days, while the longest was 21 days.

In the early summer of 2005, the HVAC system in the CSP/Solano CTC apparently collapsed, leading to an evacuation of the CTC and its MHCB unit for an indefinite period. The loss of the 13 MHCB slots at CSP/Solano represented a serious setback to CDCR's overall MHCB capacity, and, in combination with other MHCB closures, led to a genuine crisis in the defendants' ability to provide a sufficient number of MHCBs for the system. While efforts were underway to fix the errant HVAC system, it appeared that repairs might not be finished until September 2005. Meanwhile, of course, CSP/Solano's MHCB population needed to be moved elsewhere and exerted increased pressure on CDCR's already strained MHCB capacity.

Access to DMH/APP appeared to be adequate. According to the DMH referral log, 15 referrals were made to DMH/APPP from July 1 through November 2, two of which were rescinded, while 13 resulted in transfers. All the referrals were made in a timely manner from the MHCB unit. The average time between referral and transfer was

7.5 days, with a range of three to 13 days. Transfers consistently occurred within 72 hours of a bed assignment.

No referrals were made to SVPP, ASH or the ICF at CMF during the monitoring period.

Only one inmate was returned to CSP/Solano from DMH during the monitoring period. Psych and return procedures appeared to have been followed, in that a discharge summary was located in the inmate's chart. The inmate, however, appeared to have experienced a month-long gap in medication on his return, at least according to his MAR.

Other CAP Issues:

a. Partial Compliance

It was unclear whether the institution had corrected its problem with untimely intake assessments that re-surfaced during the preceding monitoring period. An institutional audit of 86 new arrivals indicated that 97 percent received an intake assessment within five days of arrival. On the other hand, data from the MHTS suggested that the intake assessment process continued to break down at least intermittently. Of 470 new arrivals for whom MHTS data was available, 85 percent were seen in a timely manner. While most inmates were seen within a few days of the five-day deadline, 16 were not seen for a long time, anywhere from two weeks to three months, or, in a few cases, never.

Some improvement in the composition of IDTT meetings occurred during the monitoring period. An institutional audit found that classification staff attended 77 percent of audited meetings. The monitor reviewed 19 charts and found that all but three

101

or four reflected a correct IDTT composition. Psychiatric attendance at IDTT meetings reportedly was adequate, but the institution had not yet audited the issue.

Many initial treatment plans were not completed within 14 working days of arrival. Institutional audits showed that between 25 and 41 percent of initial treatment plans were untimely. The monitor's chart reviews confirmed erratic compliance in this area. As noted above, a QIT developed some excellent training materials aimed at enhancing clinicians' treatment planning skills, but the training had not yet taken place.

Documentation of case management contacts was improved. Progress notes generally contained relevant clinical information. If compliance continues at this level, the issue will be resolved during the next monitoring period.

The frequency of case management contacts with 3CMS inmates remained inconsistent. An institutional chart audit found that, depending on the case manager, the percentage of 90-day contacts that were timely as of mid-November varied from 76.9 to 100 percent, with an average of 88 percent. The monitor's limited chart reviews suggested that only about 60 percent of inmates were seen regularly at required intervals, although the contacts were not usually overdue by more than a few days. Inmates, however, complained that they were often seen by different case managers.

Some problems remained with the provision of weekly case management contacts for inmates in administrative segregation. Documentation showed lapses in about half of reviewed charts. Many of the lapses occurred in the earlier part of the monitoring period, suggesting that some improvement occurred during the monitoring round. Progress notes revealed that many inmates continued to decline out-of-cell contacts.

102

CSP/Solano established procedures for providing pre-release planning, including provision for discharge medications, to paroling inmates. The institution believed that these procedures were being followed, but had not audited the issue to determine the actual degree of compliance.

b. Non-Compliance

The timeliness of clinical responses to referrals was poor. The MHTS referral tracking report reflected inconsistencies but was unreliable; it also failed to distinguish between urgent and routine referrals. According to the flawed MHTS report, 471 referrals occurred from July 1 through November 1, 2004, only one-third of which were seen within two weeks. The longest response times were up to 57 days. Transmission delays were widespread, with some referrals taking up to 40 days to get to mental health. Only one-third of referrals were clearly received by mental health within two days of being written. Clinical responses to referrals appeared slightly more expeditious for inmates in general population. The MHTS referral tracking report listed referral dates for 54 inmates with completed appointments. According to the data, 80 percent of these inmates were seen within two weeks. Referral dates were not listed for more than 40 percent of referrals, however, making it impossible to know the response time for a significant portion of general population inmates. Transmission delays were also a problem. Only one-quarter of 54 referrals were received by mental health within two days; the greater portion of the referrals took between three and ten days to reach the mental health department.

The amount of group therapy offered to 3CMS inmates declined during the monitoring period due to limited program space and high case manager caseloads.

103

The number of groups went from 13 to three, and the number of inmates enrolled in groups decreased from 110 to 33, or from nine percent of the caseload to two percent. Institutional audits and the monitor's chart reviews both indicated that consideration of group therapy was rarely documented during IDTT meetings.

The frequency of case management contacts with EOP inmates appeared to have slipped during the monitoring period. An institutional audit of a large sample of EOP inmates indicated that some 50 percent of inmates were seen on a weekly basis by their case managers. Staff believed that the audit exaggerated non-compliance. The MHTS tracking history for 48 EOP inmates reflected a rate of compliance varying from 46 percent to 89 percent, depending on a number of different variables. As indicated above, most EOP inmates were transferred to appropriate programs in a timely manner.

Mental health screenings for inmates transferred to the administrative segregation unit were not always completed in a timely manner. The monitor reviewed the charts of nine administrative segregation inmates and found only two with current screenings. Psych techs reportedly were not informed immediately when inmates were placed in administrative segregation and did not have sufficient time to complete the screenings consistent with required time frames.

Documentation of psych tech rounds in administrative segregation and the overflow unit was deficient. Isolation logs for the month of November 2004 showed that, while daily rounds were conducted and all inmates checked every day, psych techs failed on numerous occasions to sign the logbook providing arrival and departure times. Documentation deficiencies appeared to occur frequently when regularly assigned staff

104

members were absent, suggesting that additional training was needed for staff assigned to cover the unit temporarily

Clinical follow-up of suicidal inmates discharged from a MHCB unit worsened during the monitoring period. From July 29 through November 18, 37 inmates required follow-up, but institutional logs showed that only 68 percent of these inmates received five consecutive days of clinical follow-up. More than half of the gaps in follow-up occurred on weekends, indicating a possible problem with weekend coverage. The institution collected tracking forms related to custody checks, but had not assessed the information contained in the forms. The monitor received documentation on custody checks for just six inmates. All six inmates were followed by custody for five days, but custody follow-up was complete for only one-third of the inmates; gaps in contact varied from minimal lapses each day to multiple-hour lapses, particularly during afternoons when custody staff were often busy with other, competing tasks.

Despite improvements noted during the last monitoring round, the adequacy of program space continued to be a problem. The limited physical plant, exacerbated by high inmate caseloads, inadequate custody coverage and conflicting program schedules, resulted in inadequate programmatic services. Office space was also restricted, especially as additional staff was hired to provide services for the increasing inmate population. Requests by the institution for funds to build additional clinical space were repeatedly denied.

There continued to be a problem with unfiled chart materials, due in part to large staff turnover in the medical records section. According to quality assurance minutes, an eight-foot backlog of unfiled documents existed just prior to the monitor's

105

visit. Overtime had been authorized, reportedly because of the impending monitoring

visit, and the backlog improved somewhat. The monitor's chart reviews found some

UHRs that were organized and current, while others were disorganized or missing

documents. Institutional audits confirmed that MARs were frequently missing from the

charts.

New Problem:

> Access to inmates in the CTC was poor; custody officers remained in interview rooms during clinical contacts, despite the fact that inmates were handcuffed. Administrative segregation inmates were not removed from their cells for psychiatric contacts on weekends due to a shortage of custody escorts.

Institutional Summary:

The number of mental health staffing vacancies at CSP/Solano declined,

while contract coverage increased, although a slight shortage of case managers persisted.

Problems continued also with the adequacy of auxiliary staff allocations, particularly in

the pharmacy and medical records sections.

Among the four issues of focus in this round of monitoring, CSP/Solano's

quality assurance process remained inadequate, although limited improvement occurred.

Some CAP items were audited, but the MHTS was not consistently reliable and many

institutional studies were methodologically flawed. No peer review was conducted.

Similarly, most aspects of medication management were problematic. Procedures for

ensuring continuity of medication on arrival, intra-institutional transfers and renewals

were not working; no mechanism had been developed for DOT or HS medications; pill

lines were too long; instances of medication errors continued; laboratory tests were

untimely; follow-up to medication non-compliance was poor; MARs were often illegible

106

and incomplete; informed consent forms were often missing from UHRs; and audits had not been conducted on medication non-compliance, psychiatric responses to abnormal laboratory test results or the provision of parole medications. In addition, continuity of psychiatric treatment was poor, although problems with medications being changed without a rationale improved.

CSP/Solano appeared to provide adequate access to higher levels of mental health care during the monitoring period. Transfers to EOPs and DMH programs appeared to occur in a timely manner, and the length of stays in the MHCB unit declined. Progress was also notable in mental health input into the disciplinary process, although some mental health assessments were still not helpful. Meanwhile, the proportion of MHSDS inmates' RVRs referred for assessments seemed relatively small.

Among the institution's CAP items, some improvement was noted in the composition of IDTT meetings and the frequency of case management contacts with 3CMS inmates and administrative segregation inmates. Problems persisted, however, with the timeliness of intake assessments, the completion of initial treatment plans, the timeliness of psychiatric responses to referrals, the provision of group therapy, the frequency of case management contacts with EOP inmates, suicide prevention follow-up, the timeliness of mental health screening for inmates admitted to administrative segregation, documentation of psych tech rounds in administrative segregation, limited program and office space and the untimely filing of materials in inmates' charts.

Overall, while CSP/Solano made progress in some areas, it was encountering great difficulty in organizing its quality assurance process, complying with medication management requirements and resolving a substantial number of significant

107

CAP issues.  CSP/Solano was unlikely to escape continuing close monitoring in the foreseeable future.

### California State Prison, San Quentin (SQ)
October 25, 2004 – October 28, 2004
February 2, 2005 – February 3, 2005
March 29, 2005 – March 30, 2005

SQ continued to have a problem with mental health staffing vacancies, but some improvement was noted between the early February and late March visits.  In March, three of nine allocated psychiatrist positions were vacant, but that was less than the five vacancies in February.  The number of unfilled case manager positions, which had been as high as 14.8 early in the monitoring period, declined to seven by the end of March.  SQ also relied heavily on contracted services, and all but one of its psychiatric and case manager vacancies were covered by contracted clinicians in March.

Vacancies among the auxiliary staff were clearly problematic at times, but the information provided by the institution on most of these positions was sparse and confusing.  It was also impossible to determine with accuracy the amount of contract coverage utilized to cover vacancies among these auxiliary positions.  It appeared, however, from the institution's status report that, at some point, as many as 15.25 of 28.4 RN positions and at least 11 MTA positions were vacant.

The population of caseload inmates in the reception center, which had soared early in the monitoring period, was significantly reduced by the time of the monitor's March visit.  The number of EOP administrative segregation inmates and the number of 3CMS condemned inmates also declined during the same interval.

108

Quality Management:

SQ's quality assurance process improved significantly during the monitoring period. The quality management committee met almost weekly and received reports from the mental health program subcommittee twice monthly. The subcommittee was composed of appropriate members who met weekly and retained oversight of all QITs. The monitor's expert attended a meeting of the subcommittee and observed several useful discussions of QIT reports.

The QIT process, which had been slow in getting started, appeared to be quite active. As many as 11 QITs were chartered by the end of the monitoring period. Four of the QITs were effectively identifying obstacles and seeking remedies; four others appeared just to be conducting audits; and the remaining three seemed largely inactive. Better feedback to staff not directly involved in the QIT process was needed.

Chart audits had been conducted monthly at SQ since May 2004. Peer review for psychiatrists, psychologists and psych social workers also began about the same time. Peer review meetings occurred quarterly, and minutes from the meetings were maintained.

The institution expanded the use of its MHTS to track mental health services and prepare reports. The institution also expanded treatment areas using the MHTS to schedule appointments and ducat inmates. Some problems persisted with the extent of congruence between data from UHRs and the MHTS. Large institutional studies reflected a congruence rate of 78 to 82 percent, while smaller studies reported lower congruence rates between 60 and 65 percent. A QIT had been chartered to address

the issue, but possible data entry problems created uncertainty about the reliability of many of the institutional audits conducted during the monitoring period.

Medication Management:

The institution approved a revised medication management operating procedure during the monitoring period. A new audit tool was developed and awaiting implementation, and a medication errors log was also established. On the other hand, the monitor's attempts to audit medication management issues were often frustrated by the incomplete and inadequate status of so many UHRs.

Continuity of medication on arrival appeared to have improved, although delays were still frequent. Newly arriving inmates reportedly received medications within 36 to 48 hours. An institutional audit of 50 new arrivals found that 92 percent received their medications within a day; a smaller institutional audit of 25 inmates also found a 92-percent compliance rate. The sampling method for these audits, however, was unclear, and the results of a small audit by the monitor were inconsistent with the institution's findings. By the time of the monitor's March visit, the institution reported that bridge orders were being written for 28 days for arriving inmates waiting to see a psychiatrist.

Continuity of medication following housing changes was significantly better. An institutional audit of 40 charts in July 2004 showed that medication was delivered without interruption in 97.5 percent of surveyed cases. Audits for several subsequent months reflected similarly high levels of compliance. As for continuity of medication on renewals, clinicians sometimes renewed medication orders without seeing the inmate.

110

Implementation of medication non-compliance procedures made some progress, but problems remained. Non-compliance referrals varied widely, ranging from 150 in September to 62 in October and 120 in November. While the data indicated that numerous referrals for non-compliance occurred, the institution had made so far no effort to determine whether all non-complaint inmates were referred. The timeliness of psychiatric responses to referrals for non-compliance was still poor, albeit somewhat improved. An institutional audit provided in October showed that 56 percent of non-compliance referrals were seen within seven days as required, compared with 37 percent during the prior monitoring period. The monitor's analysis of data in February showed that just under half of non-compliance referrals were seen within targeted time frames. The longest waits for follow-up ranged from four to seven weeks. The monitor found many cases in which multiple referrals, more than a week apart, were needed before inmates were seen. SQ offered inmates the opportunity to participate in medication non-compliance groups, but had not yet assessed the effectiveness of these groups. The monitor's expert reviewed the charts of six inmates participating in such groups and found evidence of improved medication compliance in five of the charts.

The institution made some limited progress in obtaining laboratory tests for inmates on mood-stabilizing medications. Institutional audits showed an improvement in the number of blood levels obtained; November audits indicated that laboratory tests were ordered for 89 percent of inmates on mood-stabilizing medications within the past six months. The audits, however, failed to determine whether laboratory tests were actually conducted and the results obtained in a timely manner; whether test results were reviewed by the ordering psychiatrists; or whether psychiatrists conducted

111

appropriate follow-up of testing outcomes or re-scheduled inmates who did not show up for ordered testing. Problems with laboratory testing were compounded by the apparent failure of the MHTS to capture all of the inmates on medications requiring laboratory testing. In addition, laboratory testing was often inappropriately delayed for inmates placed on new mood-stabilizers. Although October data showed that all inmates were tested within six months of their initial prescriptions, laboratory tests were ordered promptly as required by protocols for only half of eligible inmates. In October, the monitor's expert reviewed the charts of six inmates on mood-stabilizing medications and found that, even when blood levels were conducted for a prescribed medication, other appropriate laboratory tests were not obtained at the same time.

        The provision of medications to paroling inmates improved. SQ maintained a log of paroling inmates who received medications on discharge. Institutional audits showed that 92 percent of inmates on medication released on parole in July and 96 percent of those released in August were provided with discharge medications. Fewer then three percent of inmates refused medications on discharge.

        Improved DOT was noted, except in the adjustment center. According to audits by nursing supervisors, DOT was observed 24 times in September, and no problems were found. Staff confirmed periodic observations and supervision of MTAs dispensing DOT medications. Early in the monitoring round, SQ developed a list of all inmates requiring DOT; a printout compiled and provided to the monitor in March identified 348 inmates on DOT in the institution. The monitor's expert observed the administration of morning medications in the adjustment center and found that recently

installed solid cell doors impeded the observation of inmates while they were swallowing their pills, although mouth checks were performed subsequently.

Informed medication consent forms reportedly were consistently filed in inmates' charts. The monitor's chart review confirmed the presence of written consent forms, although some of them were generic. The majority of MARs reviewed by the monitor were legible, but at SQ data was not entered in the MARs at the actual time of medication distribution. In addition, the monitor found a number of MARs missing from inmates' UHRs.

SQ continued to administer HS medications after 8:00 p.m.

Mental Health Assessments for the Disciplinary Process:

The institution made good progress implementing its procedures for the preparation of mental health assessments for caseload inmates involved in disciplinary adjudications. A system was in place to ensure that inmates' assessments were completed by clinicians other than their case managers. Clinicians apparently interviewed inmates and reviewed their charts and C-files prior to completing the mental health assessments. Approximately 16 percent of 3CMS inmates and all EOP inmates charged with disciplinary infractions received a mental health assessment. The monitor reviewed about half of all cases in which caseload inmates were determined not to need mental health assessments and found most of these decisions reasonable; the monitor found five cases in which the inmate arguably should have been referred for an assessment, but was not.

The quality of mental health assessments also improved. Additional training, which included the distribution of model assessments, was provided for clinical

113

staff. There also appeared to be an excellent orientation program on how to complete assessments for contractors and new clinicians. In October, the monitor reviewed approximately half of the assessments completed by 11 different clinicians during the monitoring round and found that most contained useful information. A few of the assessments, completed by three of the clinicians, were done poorly with little or no constructive information. An institutional audit of 27 assessments concluded that all but one had been adequately completed. Most of the assessments reviewed by the monitor for EOP inmates concluded that mental health was a factor in the inmate's behavior, and about half of the reviewed assessments for 3CMS inmates reached a similar conclusion.

The impact of mental health input on the disposition of disciplinary infractions appeared to be improving, but remained somewhat erratic. The monitor reviewed the findings and dispositions in roughly two-thirds of those cases where inmates' behavior was found to be influenced by mental health factors. In more than half of the cases reviewed, the hearing officers expressly referred to the mental health assessments and indicated how they had affected decisions. In most of those cases, the inmate was found not guilty, the case was dismissed, the charges were reduced or the penalty was mitigated in response to the clinical input on mental health. On the other hand, hearing officers failed to document any consideration of mental health input in a number of cases. An institutional audit found that hearing officers inconsistently followed disciplinary policies, and additional training on this point had been scheduled.

RVRs were not issued for self-injurious behavior. Infractions involving 33 caseload inmates were referred to the local district attorney, five of which were accepted for prosecution. Most of the delays in these cases were attributable to the

114

institution, which took from three weeks to two months to refer inmates for prosecution, while the district attorney's decision was generally made in less than a week.

Transfers:

The timeliness of transfers to EOP programs was unclear. Only two EOP inmates were awaiting transfer in October, neither of whom had been waiting beyond the mandated timeline. The institution, however, was unable to provide information on the timeliness of EOP transfers during the rest of the monitoring period.

Some improvement was noted in referrals for MHCB transfers. The number of MHCB referrals increased dramatically from 44 during the preceding monitoring round to 87 in the four months prior to the monitor's October visit. On the other hand, the timeliness of MHCB transfers worsened. Only 40 percent of referred inmates were transferred on time due to increased delays in MHCB acceptance. According to institutional logs, it took three days or more, and typically five to seven days, for a MHCB unit elsewhere in CDCR to accept half of the referred inmates; the longest acceptance time was 12 days. Transportation was usually timely, although the physical movement of a few inmates was delayed as long as 11 days. There appeared to be only minimal clinical contacts between SQ's OHU staff and the staff at receiving MHCB units. As a result, staff complained that Keyhea orders were not always pursued and DMH transfers were sometimes cancelled. Contact between OHU and MHCB staff was much better when inmates returned to SQ. Despite this, staff estimated that no written information was received by SQ for ten to 20 percent of returning inmates. In addition, mental health staff at SQ complained that inmates were often returned from MHCB units without any discernible improvement in their mental condition. Indeed, at

115

least 12 inmates were readmitted to the OHU shortly after their return from a MHCB unit.

The OHU was beginning once again to look more like a *de facto* MHCB unit than a short-term safe environment. The percentage of inmates remaining in the OHU beyond the three-day time frame increased from 11.7 percent during the preceding monitoring period to 27 percent early in the current monitoring period and up to almost 50 percent by the time of the monitor's March visit. Delays were often the result of waits for available MHCB or DMH beds, but some others were attributable to SQ practices. For example, inmates frequently were not referred promptly to a higher level of care; some inmates were in the OHU for more than 48 hours before a referral was made; and, on some occasions, inmates were not referred for a week. Referrals of 14 inmates to a MHCB unit were rescinded, although the inmates remained in the OHU. A number of inmates discharged from the OHU were readmitted the same or next day, in effect extending their length of stay. Finally, some inmates remained for lengthy periods in the OHU without ever being referred to a MHCB. The average stay in the OHU for inmates awaiting transfer to a MHCB unit was six days; the longest OHU stay was 16 days.

Referrals to DMH appeared to be timely. A new procedure for admissions to DMH reportedly was instituted in August 2004, and staff received related training. The number of transfers reportedly increased from one to nine during the monitoring period, while several additional inmates transferred to MHCB units were subsequently transferred to DMH at SQ's request. Transfers occurred to each of DMH's programs for CDCR males; the longest wait for a transfer to DMH was 23 days. The time from OHU admission to acceptance in DMH programs at CMF and SVSP was typically about two

116

weeks. Two referrals were made to ASH, one of which was rescinded, while the other had been pending for a little more than three weeks at the time of the monitor's October visit.

In the three months preceding the monitor's March visit, two additional transfers to DMH occurred and two more were pending. One of these four referrals was to DMH/APP at CMF, while the others were for DMH intermediate care. The acute transfer was completed in ten days, while the others took one to two months. A few inmates returning to SQ from DMH were inappropriately placed directly in a housing unit without notification to their case managers of their arrival, rather than in the OHU as required by institutional policy.

At the time of the monitor's October visit, the length of stays of caseload inmates in SQ's reception center was a serious problem. The population of caseload inmates in the reception center had increased dramatically, growing 37 percent just during the four preceding months, and the overall reception count was so high beds were set up on "broadways" and in other equally undesirable locations. The endorsements of numerous inmates needed to be renewed multiple times because of lengthy delays. While data was not entirely reliable, something like 36 percent of 3CMS and 86 percent of EOP transfers waited longer than the specified timelines.

Matters improved substantially by the time of the monitor's March visit. More transfers were completed in a more timely manner, and lengths of stay for EOP inmates were shorter. The improvement reflected a considerable drop in the overall reception population, which had spiked in mid-2004 due to a system-wide surge in commitments to CDCR from local jails. SQ also adopted a computerized management

information system that enabled it to track inmates who left the institution temporarily while retaining their original arrival dates, providing thereby more accurate information on actual transfer delays. Information in the system, however, was consistently complete only for general population EOP inmates. Data on EOP inmates in administrative segregation and 3CMS inmates was erratic. According to the new computerized system, 33 transfers of EOP inmates occurred between the monitor's February and March visits, one-third of which were timely. Nearly all of the 33 had been transferred in five months or less, but a few took up to 20 months. By the time of the monitor's March visit, the length of stays of 31 percent of MHSDS inmates in reception exceeded specified timelines. Staff did not seem to identify inmates in need of accelerated transfers.

Mental health services to caseload inmates in reception declined, due in large part to the surge of EOP inmates during the monitoring period. According to the raw data available from the institution, only about half of EOP inmates in reception received weekly case management contacts, with compliance rates varying from 23 to 80 percent in different months. Group therapy for EOP reception center inmates was discontinued in August 2004. On the positive side, all EOP inmates were seen at least every 30 days and were always seen within time frames ordered by psychiatrists. Institutional audits for July 2004, confirmed by the monitor's review, indicated that 80 percent of 3CMS reception center inmates who were not taking medication were seen monthly by their case managers. In contrast to the preceding monitoring period, the institution made an attempt to audit mental health contacts with 3CMS inmates who were on medication in the reception center. All of the audited inmates apparently were seen by a psychiatrist within 90 days, but more than a third of inmates for whom more frequent

contact was prescribed were not seen as scheduled. The percentage of reception inmates reportedly taking medications, just 17 percent, seemed low.

The psych and return process was not working well. Clinicians at SQ were not regularly contacted by MHCB units or by DMH when inmates were returned. Staff also did not always receive the documentation required for returning inmates. The charts of some inmates returned to SQ from DMH contained discharge summaries, but other charts did not. Although EOP inmates sent to MHCB units elsewhere were not supposed to be returned to SQ, printouts provided to the monitor in February indicated that several such inmates had been readmitted to the institution.

The wait for an available PSU bed improved for the six PSU inmates transferred during the monitoring period. While the time to endorsement ranged from five to 11 months, beds were generally available within one week to three months of endorsement. One PSU transfer, completed after the October visit, was endorsed in a timely manner and waited three months for a bed.

Other CAP Issues:

a. Partial Compliance

Psychiatric responses to staff and inmate referrals improved. Although inaccuracies in the MHTS made it difficult to quantify compliance precisely, referrals were more timely, and the number of unanswered referrals declined. The monitor's review of inmate histories for EOP inmates found 20 psychiatric referrals, most of which were seen within a week, with only a few taking as long as two weeks and one taking 26 days. Data from a reliable, although small, audit of 3CMS referrals was consistent with the progress in responses to those of EOP inmates. SQ had a problem with the efficiency

119

of its internal mail system. A draft report by a QIT established to study the timeliness of psychiatric responses indicated that, due to delays in institutional mail, it took an average of three days for referrals to be received and processed by mental health staff. On the other hand, the institution seemed to have a fairly effective system for rescheduling missed appointments. Among the 17 missed appointments noted in the monitor's review of inmate histories, all but one was rescheduled within a week.

The timeliness of IDTT meetings for caseload inmates in administrative segregation reportedly was good. Institutional audits found that better than 90 percent of EOP inmates in administrative segregation received timely initial IDTT meetings. Quarterly IDTT updates were documented in most instances, but some meetings for updating were missed. Results from the monitor's review of charts were not quite as favorable. Flaws in the MHTS database may have accounted for the discrepancy between the institutional audit and the chart reviews.

The timeliness of IDTT meetings for 3CMS inmates in administrative segregation also improved during the monitoring period. According to institutional audits, initial IDTT meetings were held in a timely manner for just 56 percent of 3CMS administrative segregation inmates in September, so the institution began scheduling an additional weekly IDTT meeting for 3CMS just before the monitor's February visit. By March, the percentage of 3CMS inmates receiving timely initial IDTT meetings was only slightly less than for EOP inmates. Inmate attendance at IDTT meetings, which had risen to 80 percent in September, declined to 70 percent in November. Most IDTT meetings were attended by representatives of all the required disciplines, although a small portion of meetings did not have a full team. The monitor attended IDTT meetings in

administrative segregation in February. Meeting discussions were reasonably interdisciplinary, but the office where the IDTT meetings were held lacked sufficient audio privacy. In March, the monitor's expert attended IDTT meetings, which had been moved to a better location. No correctional counselor attended these meetings, but the rest of the team engaged in an excellent discussion of the treatment needs of the inmates under review. The IDTT did not usually address medication non-compliance, even in extreme cases, and treatment often seemed to be driven as much by the level of the inmate's cooperation as by clinical judgments.

Treatment for MHSDS inmates in the OHU showed some progress during the monitoring period, but the quality of services provided in the unit continued to be the subject of complaints. During the monitoring period, SQ made some administrative and clinical changes in the unit; a psychiatrist and an experienced psychologist were assigned to cover the OHU, constituting an increase in the staffing of the unit. The institution also began holding weekly IDTT meetings to assess difficult inmates with multiple admissions. A number of inmates with multiple admissions, who were sent to and returned from a MHCB unit, did not have any evidence of an IDTT meeting in their charts. IDTT meetings were reportedly provided for OHU inmates as they were needed, but the criteria were not clearly defined. The institution made an interview area available for clinicians to meet confidentially with inmates on the unit, but logs showed that more than 70 percent of inmate interviews occurred at cell-front, including a substantial number of IDTT meetings. The OHU physical plant, which was a matter of serious concern in October, improved by the time of the monitor's February and March visits. Broken tiles had been removed and new tiles installed in cells; window screens in some

cells had been replaced; and an evaluation of the sprinkler system and air ventilation grates was underway. On the other hand, non-break-away shower heads and some remaining window grates continued to constitute safety hazards, particularly for suicidal inmates.

The frequency of case management contacts with EOP inmates in administrative segregation appeared to increase during the interval between the monitor's first and final visits during the monitoring period. Institutional data for October through December indicated that between 95 and 100 percent of EOP inmates in administrative segregation received weekly case management contacts, while an institutional audit in March, confirmed by the monitor's chart reviews, indicated that 90 percent of inmates received weekly case management contacts. The percentage of administrative segregation EOP inmates seen out-of-cell, while still inadequate, had increased from 35 percent in the preceding monitoring round to between 50 and 74 percent. In contrast, the percentage of 3CMS administrative segregation inmates receiving timely case management contacts decreased from 93 percent in October to 76 percent in November, apparently due to staffing changes. The percentage of 3CMS inmates receiving out-of-cell contacts, only 50 to 65 percent from October through December, was significantly lower than among EOP inmates. The institution reportedly adjusted for discrepancies in the MHTS when gathering data on out-of-cell contacts. Psychiatric contacts were even more problematic; inmates were often seen by different psychiatrists, a high proportion of contacts were missed and medications were sometimes renewed without inmate contacts.

EOP inmates in administrative segregation were not offered ten hours of structured therapeutic activities a week, but studies showed improved programming

practices in the unit. Reportedly, staff schedules had been adjusted to allow clinicians more time for programming activities; more escort coverage had been provided; and weekend therapy had been introduced. In addition, the subject matter of therapeutic groups was more diverse, and the composition and meeting times of groups were more stable. Institutional data for November indicated that EOP inmates in administrative segregation were offered between 7.1 and 8.1 hours of therapy a week and received on average between two and 5.2 hours weekly, depending on their housing area. Three holidays in November may have helped reduce somewhat the total of offered therapy hours. Weekly tallies for the three months preceding the monitor's March visit indicated that inmates in administrative segregation received on average nine hours of therapeutic activities a week. Problems with inmates refusing therapy, noted during the October visit, continued. In February, data indicated that attendance at group sessions was generally only around 50 percent. Flaws in the MHTS database made it difficult to confirm the exact amount of therapy provided in administrative segregation. Therapy lists available to the monitor in October, for example, showed the names of only three-quarters of the inmates in administrative segregation, making it unclear what, if any, therapy was offered to the others.

SQ made an effort to extend mental health services to caseload inmates in the condemned men's unit. Institutional audits indicated that 100 percent of IDTT meetings in this unit were completed on time from October through December. According to institutional data, EOP inmates in the unit were offered approximately 8.6 hours of structured therapy weekly during November, but actually received only between .69 and two hours a week, depending on their housing location. An institutional audit for

123

the period from October through December indicated that 100 percent of EOP inmates in

the condemned men's unit received weekly case management contacts, but, due largely to

inmate refusals, only 29 to 61 percent of the contacts occurred out-of-cell. Between 93

and 95 percent of 3CMS inmates in the unit received timely case management contacts,

with 50 to 65 percent of contacts occurring in an office setting. Once again, however,

the flawed MHTS made some of the institution's data unreliable.

The mental health screening of inmates newly admitted to the

administrative segregation unit continued to make progress. In August 2004, the

institution initiated a change in the screening procedures, directing the screening of all

inmates who did not have an assigned level of care within 72 hours of their initial ICC

hearing. Implementation of the new procedures had not yet been audited.

The suicide prevention policy was revised just prior to the October

monitoring visit, but suicide prevention follow-up remained erratic through February.

While some components of suicide prevention were effective, others were troubled.

Problems continued with custody rounds, the completion of suicide risk assessments and

timely notice to case managers of the need for clinical follow-up. According to

institutional audits through September, compliance with requirements for custody rounds

ranged between 16 and 40 percent. Audits from January 2005 showed improvement in

the completion of suicide risk assessment checklists and five-day clinical follow-up of

suicidal inmates discharged from the OHU. During the monitor's February visit, the

monitor's expert reviewed the charts of eight inmates discharged from the OHU. Suicide

risk assessments were found in seven of the charts; discharge summaries were present in

only half of the charts; and five-day clinical follow-up was documented inconsistently in

UHRs, apparently due to problems with medical records filing.  A more positive chart review followed during the monitor's March visit.  Among the eight charts reviewed then, the monitor found 100-percent compliance with both clinical and custody follow-up.  An institutional audit of 30 charts reflected similar results.

Pre-release planning for general population inmates remained good.  The MHTS had improved enough so clinicians had access to release dates through the system.  TCMP employees continued to see inmates two or three times a month and to work with the institution's medical records department to ducat inmates and retrieve charts.  It was not clear to what extent pre-release planning occurred for reception center inmates, but minutes from the quality assurance meetings indicated that TCMP social workers had some difficulty gaining access to inmates in reception.

SQ's problems with maintaining complete medical records continued, in part due to staff and supervisory vacancies and reliance on contracted clerical help.  Filing backlogs in October reportedly were reduced, thanks to a concerted effort to update filing.  Despite the effort, chart reviews frequently revealed missing bus screenings, IDTT notes, treatment plans, psych tech summaries and MARs.  Medication orders sometimes did not match progress notes, MHTS entries or MARs.  Charts were often disorganized, with misfilings and documents filed out of chronological sequence.  Missing documents made it difficult to assess accurately the provision of mental health services.  Although an institutional audit found that charts for reception inmates in administrative segregation were available for 81 percent of clinical contacts during a one-month sample period, inmate C-files and UHRs often were unavailable for initial ICC hearings.  The department was expected to provide a medical records

125

specialist/supervisor to revamp SQ's medical records department as part of the remedial plan for Plata.

### b. Non-Compliance

Psych tech rounds in administrative segregation, an issue resolved in an earlier monitoring period, was problematic once again. While psych techs apparently made daily rounds in the administrative segregation unit, psych tech summaries were missing from some inmates' charts. A small institutional audit early in the monitoring period found no evidence of psych tech rounds in 40 percent of audited cases. Because psych techs were responsible for distributing medications in the administrative segregation unit, little time was left to speak with inmates. The monitor observed rounds in administrative segregation during the February visit and noted that psych techs were not making visual contact consistently with non-caseload inmates.

Institutional Summary:

Clinical staffing vacancies continued to plague SQ, but the number of vacancies began to fall during the latter part of the monitoring period. Among the four issues for focus during this round of monitoring, SQ showed progress in implementing components of its quality management system. Problems with the reliability of the facility's MHTS, however, raised some doubts about the accuracy of institutional audits and made it difficult sometimes to monitor compliance adequately. SQ also progressed in implementing the mental health assessment component of its disciplinary procedure. The quality of mental health assessments improved and the input of mental health clinicians seemed to have an increasing impact on the disposition of RVRs.

There was improvement in some areas of medication management, but data collection problems made it difficult to assess compliance in other areas. Some significant progress was noted in the continuity of medications on entry and internal changes in location, the provision of parole medications, the acquisition of informed medication consent forms and the provision of parole medications, DOT and HS medications. Other areas, such as follow-up to medication non-compliance, laboratory testing of inmates on mood-stabilizing medications, timely provision of ordered medications and psychiatric contact on the renewal of prescriptions reflected some progress, but still needed much work.

Referrals and transfers to DMH programs improved during the monitoring period, but the length of stays of MHSDS inmates in reception rose precipitously during the earlier months of the monitoring period due in large part to a temporary mid-2004 spike in the overall reception center population. The surge in reception population began to recede later in the monitoring period, and the movement of reception inmates began to return to normal. MHCB referrals increased, but the timeliness of actual transfers decreased, putting increased pressure on SQ's OHU, which began again to assume inappropriately the characteristics of an ersatz MHCB unit despite severe shortages of clinical and physical resources.

With regard to its CAP, SQ resolved no identified deficiencies during the monitoring period, but managed to improve mental health services to caseload inmates in administrative segregation and the condemned men's units, including more frequent case management contacts and somewhat increased structured therapeutic activities. Psychiatric responses to referrals, initial mental health screenings in administrative

127

segregation, suicide prevention follow-up, treatment of inmates in the OHU and pre-release planning also continued to improve.  Filing backlogs were substantially reduced, but missing and misfiled documents continued to limit the usefulness of many charts.

Overall, while SQ continued to struggle with the adequate provision of services in a number of areas, as well as the development of effective tools with which to track and measure accurately the status of its compliance, this monitoring period appeared, perhaps, to have marked a turning point.  After some seven years of waxing and waning compliance, the facility began to show some signs of settling into a stable pattern of progress in meeting the demands of its CAP and Coleman.  It remains to be seen whether SQ can maintain and expand on that stability during the next few rounds of review.

### Deuel Vocational Institution (DVI)
November 1, 2004 – November 3, 2004

Staff vacancies at DVI increased during the monitoring period.  The chief psychologist position was vacant, along with positions for a clinical psychologist and a psych social worker.  Contract psychiatrists, psychologists and social workers provided between 520 and 849 hours of coverage each month from April through September 2004; in October, contract psychiatrists provided services equivalent roughly to 1.5 full-time clinicians, and four contract case managers provided services equivalent to 2.75 full-time clinicians.  All staffing vacancies were covered regularly through contracted services.

Due to the earlier expansion of reception functions at DVI and the mid-2004 surge in commitments to CDCR from local California jails, the number of new arrivals continued to climb.  Throughout the monitoring period, some 1,800 inmates were processed monthly through reception, with several months seeing more than 2,000

128

arrivals. The number of inmates in the OHU and administrative segregation spiked
concomitantly. In one extended period, the population in the administrative segregation
unit swelled to approximately 600 inmates, making it the largest administrative
segregation unit in CDCR. At one point, DVI also had the highest total of MHCB
referrals of any institution in CDCR. During the last two months of the monitoring
period, however, the number of inmates in administrative segregation declined
significantly.

   Despite the soaring reception population, no further mental health staffing
positions were allocated after the initial expansion of the reception center in the spring of
2003. Local clinicians reported that existing staff allocations were insufficient to handle
the huge surge in the number of inmates arriving at DVI throughout much of 2004. A
chief and three staff psychiatrists, with some additional contract help, were repeatedly
described as insufficient to treat the some 700 to 800 MHSDS inmates in the facility and
cover for the increased flow of reception processing as well. Similarly, the bulging
administrative segregation population was said to stretch severely available case
management resources.

<u>Issues Resolved:</u>

   Lockdowns no longer interfered with the delivery of medications.

   Institutional monitoring of the use of restraints was adequate.

   The MHTS was fully operational.

Quality Management:

The quality assurance process continued to make progress during the monitoring period. The quality management committee met monthly or more often in some months and maintained minutes for each meeting. The committee chartered a QIT for each CAP item, identifying an audit schedule, fixing a sample size and developing a methodology for each issue. The monitor reviewed several QIT studies and noted a number of productive remedial action plans, including the development of new procedures and new forms. Chart reviews were still conducted monthly, but no peer review had as yet been initiated. The transient reception status of all but about 300 caseload inmates in DVI created some unique peer review challenges for the facility, leading it to request clarification and guidance from headquarters on how best to structure its local peer review. DVI was awaiting a response to this request at the time of the monitor's visit.

Medication Management:

DVI essentially abandoned the use of its CAP to monitor implementation of its medication management policies. Only laboratory testing was still addressed within the CAP framework. Instead of relying on the CAP, the institution developed extremely detailed and comprehensive medication management operating procedures. The shift, however, did not appear to generate much improvement, and the monitor found some serious problems with the delivery and management of medications throughout the institution but particularly in the reception center.

Continuity of medication on arrival remained erratic. Institutional audits indicated that more than 30 percent of inmates arriving with verified medication orders

experienced some interruption in their medications. Status of the continuity of medication for inmates changing housing locations and the renewal of medication orders was unclear, because institutional audits in these areas were methodologically flawed. The monitor's chart reviews indicated that gaps in medication on renewal were still a problem. Formulary medications reportedly were delivered within one day of prescription, but the monitor's chart reviews indicated that the delivery of ordered formulary medications was often considerably less timely than reported.

DVI had not effectively implemented its policy on medication errors. An institutional audit found just one such error. The committee responsible for handling and cataloging error reports, however, did not function during the monitoring period, so the actual extent of medication errors was unknown. The institution needed to re-examine its process for identifying, reporting, correcting and documenting medication errors.

Follow-up to medication non-compliance was erratic. MTAs reportedly referred only occasionally inmates who refused or were suspected of hoarding medications. Although the monitor observed one direct referral on a pill line for non-compliance during the monitoring visit, in a subsequent review of laboratory studies the monitor found several examples of non-compliant inmates who were not referred for psychiatric follow-up.

The provision of parole medications reportedly improved considerably. DVI developed new policies and procedures that made the process more orderly, but the institution still did not keep a log of inmates who actually received their parole medications. DVI reportedly audited the provision of medications to paroling inmates on a weekly basis. An audit for the week of September 25, 2004 indicated that medications

131

were ordered for all 45 inmates paroled from the institution. Pharmacy documents indicated that at least 31 of the 45 actually received their medications; two prescriptions were not filled; and two inmates refused their medications when offered. The actual audits were not provided to the monitor, who was unable to confirm the reported progress.

A QIT study was needed to assess the status of laboratory testing for inmates on mood-stabilizing medications. The institution had adopted a system for obtaining laboratory tests that effectively bypassed the need for a psychiatrist's order to initiate testing. Instead, local protocols for laboratory testing directed an office technician (OT) to generate request slips to draw blood for the testing of all inmates on mood-stabilizing medications. Psychiatrists could order additional studies as needed on inmates' contact sheets. The OT tracked all laboratory requests in a database, but apparently no one else understood the operation of the tracking system, a serious problem when the assigned OT was absent. This protocol raised some concerns about the legality of drawing blood for tests in the absence of a physician's order and also left unaddressed the issue of whether psychiatrists appropriately responded to abnormal test results under the system. Institutional audits of the protocol reported good compliance, but the monitor reviewed ten charts of inmates on mood-stabilizing medications and found that the laboratory testing protocol had been followed fully in only one of the ten reviewed cases.

DOT practices appeared to be only partially implemented. DVI did not maintain a roster of inmates designated for DOT-administered medications but reported that a few inmates received medications on DOT. The monitor observed a pill line and found that the nurse-administered medication process worked well. MARs available

132

during the pill line confirmed the presence of several inmates for whom medications were to be DOT-administered, but the monitor was uncertain whether the institution had as yet implemented an effective process for the administration of medications requiring DOT. New MARs were used at DVI and filed regularly in inmates' charts. Blank spaces rarely occurred after introduction of the new MARs.

The institution did not appear to be tracking Keyhea orders adequately. The institution reported that there were no inmates on Keyhea orders in DVI during the monitoring period, but a list provided later to the monitor identified two inmates as being on Keyhea orders. The MARs reviewed by the monitor during the observation of a pill line also listed one inmate with a Keyhea order.

DVI administered no medications on an HS basis. At the time of the monitor's visit, the pharmacist rewrote any written medication orders for HS medications to require "p.m." administration. The health care manager indicated that this practice would be changed.

Institutional audits from July 1 through September 30 showed continuing problems with the regular procurement of informed medication consent forms for psychotropic medications.

Mental Health Assessments for the Disciplinary Process:

Implementation of revised mental health assessment procedures for MHSDS inmates charged with disciplinary infractions showed some progress. Initial training on the procedures occurred in 2003, but the institution continued to provide custody and clinical staff with ongoing training throughout 2004.

133

DVI had a system to ensure proper identification of caseload inmates involved in RVRs. The institution also maintained a log tracking requests for mental health assessments, which included the date of the request, the date the assessment was completed, the name of the clinician completing the assessment and the outcome of the assessment. The monitor was unable to determine the number of 3CMS or non-caseload inmates who were referred for mental health assessments from the data provided during the monitoring visit. A sample of reviewed RVRs for 3CMS inmates who were not referred for mental health assessments contained no evidence to suggest that any of the reviewed RVRs involved inmates exhibiting bizarre or unusual behavior warranting an assessment.

Hearing officers appeared to take mental health input into consideration. Clinicians were required to complete a RVR assessment worksheet assessing 11 factors possibly affecting an inmate's mental health status, as well as 14 other factors with a potential impact on accountability or the mitigation of sanctions. Clinicians were also required to complete a RVR assessment note for each inmate, detailing the clinician's findings, recommendations and rationale. DVI also developed a worksheet that required hearing officers to reach a determination and document their conclusion on each aspect of the disciplinary infraction, including mental health.

The institution reportedly did not issue disciplinary violations for self-injurious behavior. Only one RVR involving a caseload inmate was referred to the district attorney during the monitoring period.

134

Transfers:

DVI maintained a number of transfer logs, but the information in the logs was not always complete. The DMH referral log failed to include bed numbers, endorsement dates or reasons for delays in transfer. The MHCB log also did not include reasons for rejections or delays.

The timeliness of EOP transfers improved, except for EOP inmates in administrative segregation. According to an institutional audit for the period from April 14 though September 30, 2004, 57 inmates were transferred to EOP programs or paroled prior to their transfer. The average waiting time from referral to transfer was 40 days; 86 percent of EOP transfers were completed within required time frames. An October 2004 audit indicated that 100 percent of non-administrative segregation EOP transfers occurred within specified timelines. In contrast, the audit found that only 13 percent of EOP inmates in administrative segregation were transferred to an appropriate program in a timely manner. Of the 37 EOP inmates at DVI at the time of the monitor's visit, 20 had been waiting beyond the transfer timeline; the average wait for EOP inmates delayed in reception was 100.4 days. Two of the pending transfers involved EOP inmates in administrative segregation who had been waiting for 77 and 83 days respectively. Transfer delays were due, in part, to the large increase in the reception population, but another significant reason, and one which was beyond DVI's control, was the scarcity of CDCR beds in programs for which reception inmates were endorsed. Only one request for an accelerated transfer occurred during the monitoring period, and that inmate was paroled after waiting 35 days for a transfer. The institution indicated that no formal

mechanism existed to identify inmates in need of expedited transfers; the decision to seek an expedited transfer was up to the individual clinician.

According to institutional data, 457 3CMS inmates were in reception awaiting transfer as of October 20, 2004. Some 25 percent of these inmates had been waiting longer than 90 days, with delays ranging from a day to as many as 332 days in one exceptional case.

The need to process so many reception inmates reportedly limited the availability of mental health services to EOP inmates in reception. Specifically, group therapy, which the institution had offered in the past but was not required in the program guide, was cancelled during the monitoring period for reception EOP inmates, although the facility indicated its intention to restore group activities again at some future point when the reception population returned to normal.

The timeliness of MHCB transfers, an issue resolved in an earlier monitoring round, also re-surfaced with the large influx of reception inmates. An institutional audit for the period from March 31 through June 30, 2004 indicated that 79 inmates were transferred to MHCB units, 82 percent of whom were transferred within required timelines. MHCB referrals became more problematic immediately after that study. Another audit for July 2 through September 28, 2004 listed 66 MHCB referrals, only 37 of whom were transferred within 24 hours. Transfers were particularly difficult to accomplish during the summer months due to a lack of available MHCB bed space elsewhere in CDCR. According to institutional logs, transfer delays began to decline again in September, but staff reported that placement problems continued in October.

Some progress was made in regard to DMH transfers. For most of the
monitoring period, DVI reportedly was unaware that inmates could be transferred directly
to ASH. In October 2004, the institution referred a caseload inmate to ASH, but did not
succeed in transferring him. DVI staff reported that ASH raised a number of demands for
documentation that delayed acceptance of the referral until the inmate got too close to
release for the proposed transfer to ASH.

Corrective Actions Issues:

        a. Partial Compliance

Treatment plans were significantly improved. The monitor reviewed 40
3CMS treatment plans. While many of the plans developed early in the monitoring
period were still generic, those written later on were more individualized and were
prepared in conjunction with an IDTT attended by all of the required participants. If this
level of compliance can be maintained for another monitoring period, the issue will be
resolved.

The timeliness of clinical responses to inmate and staff referrals remained
somewhat erratic. The institution reported some slippage in the timeliness of clinical
responses to routine referrals. Pursuant to local procedures, inmates already scheduled
for clinical appointments within three to five days of their referral were seen at the time
of the pending scheduled appointment. An institutional audit for the period from July 1
through September 30, 2004 indicated that inmates for whom a separate referral
appointment was made were seen on average within eight days. The audit did not track
responses to urgent or emergency referrals.

The timeliness of initial assessments showed significant improvement. An institutional audit in October 2004 indicated that initial assessments were completed in a timely manner 100 percent of the time. The institution attributed progress in this area to a system of checks developed during the monitoring period to ensure that clinicians were notified of new arrivals. This issue will be resolved if the institution can maintain this level of compliance during the next monitoring period.

After years of delay, DVI was able finally to address deficiencies in the physical safety of observation cells in the OHU. The institution reported a number of modifications, most of them confirmed by the monitor's expert. Two of the observation or quiet rooms were renovated, lexan windows and new vents were installed, larger food ports were added and safety screws were utilized. Two other such cells remained to be modified similarly.

The suicide prevention committee began to develop more fully in mid-2004. Meeting minutes showed broader attendance and fuller agendas after March 2004. By summer, the committee was in compliance with departmental directives on suicide prevention. This issue will be resolved if compliance continues through the next monitoring period.

DVI continued to have a problem with follow-up monitoring by custody staff of suicidal inmates discharged from the OHU. In particular, the institution had difficulty initiating custody checks within 24 hours of an inmate's release from the OHU. An institutional audit demonstrated that only about 50 percent of discharged inmates received timely follow-up.

138

The filing of medical records improved.  DVI reportedly made significant changes in the scheduling and supervision of clerical staff in the medical records section.  An early October institutional audit found only three inches of unfiled documents.  This issue will be resolved if compliance continues for another monitoring period.

Some improvement was also noted regarding clinicians' access to mental health records during clinical contacts.  An institutional audit for September 27 through October 1, 2004 found that records were available in 72 percent of clinical meetings, compared with 66 percent during the preceding monitoring period.  DVI did not distinguish those medical records that were unavailable because they were not yet at the institution following an inmate's transfer from elsewhere to DVI from those medical records that were already at the institution but unavailable for other reasons.

b.  Non-Compliance

The timeliness of mental health screenings and evaluations for reception center inmates, although resolved earlier, slackened somewhat during the monitoring period.  An August institutional audit found that screenings were completed tardily for ten percent of the 2,345 inmates who arrived during the month.  In addition, the audit showed that 16 percent of mental health evaluations for these reception center inmates were also completed untimely.

The institution continued to experience some problems in providing MTA rounds during Stage-3 heat alerts.  An institutional audit of heat-plan operations on September 8, 2004 indicated that no rounds were conducted because the medical

139

department was not notified of the alert. The thirteenth monitoring report found similar notification oversights during the summer of 2003.

Institutional Summary:

DVI struggled to provide fully adequate mental health services to its temporarily surging reception population. The facility's requests for enhanced allocations principally of psychiatric staff did not generate additional resources, and available staffing resources were stretched by DVI's changed mental health mission, now focused overwhelmingly on reception, and the mid-2004 spike in the number of reception inmates committed to CDCR from local jails.

Among the four issues specifically covered in this round of monitoring, DVI did reasonably well in continuing to develop its quality management infrastructure, with the exception of peer review, for which it was seeking guidance from Sacramento. The facility implemented carefully and well its process for providing mental health input into disciplinary dispositions of infractions involving MHSDS caseload inmates.

Timely access to higher levels of mental health care became more complex for DVI as the size of its reception function increased. Problems remained with the movement of inmates in need of a MHCB level of care, EOP inmates in administrative segregation and some portion of 3CMS inmates in reception. The delays among these three elements of the population seemed attributable, in large part, to a lack of readily available appropriate bed space elsewhere in CDCR to accommodate the increasing flow of commitments from county jails.

The distribution and management of medications, an issue largely within DVI's control, progressed poorly during the monitoring period. Continuity of medication

on arrival, a problem of increasing dimension given the facility's expanding reception role, continued to elude solution, while some local eccentricities, such as largely leaving the ordering of laboratory testing for inmates on mood-stabilizing medications in the hands of an OT and empowering the local pharmacist to veto psychiatrists' orders for HS medications, created self-inflicted barriers to compliance. In addition, the handling of medication errors, responsiveness to medication non-compliance, the acquisition of informed medication consent forms and the tracking of Keyhea orders all needed further work. The delivery of parole medications seemed improved but needed better documentation.

Despite the challenges associated with the changing size and nature of its population, DVI was still able to resolve three of its CAP issues during the monitoring period and edge closer to the resolution of several others. Treatment plans were improved; initial mental health assessments were more timely; the physical safety of OHU observation cells, at last, was being addressed meaningfully; the suicide prevention committee was functioning more effectively; clinicians' access to mental health records during clinical contacts was better; and medical documentation was being filed more readily in inmates' UHRs.

DVI's continued ability to reduce in whole or in part nearly all of its CAP deficiencies, especially while adjusting to the demands of its new mission, represented encouraging progress. Transfers and access to higher levels of care are probably not issues DVI can settle on its own, but if the facility hopes to move on to a paper review after the next round of monitoring, it must do something in the next six months to address

directly its deficient medication management practices. That overall issue remains the key obstacle to avoiding on-site monitoring in subsequent rounds of review.

**Service Area E**

This service area includes <u>California State Prison, Corcoran (CSP/Corcoran)</u>, the <u>California Substance Abuse Treatment Facility (CSATF)</u>, <u>Pleasant Valley State Prison (PVSP)</u> and <u>Avenal State Prison (ASP)</u>.

**California State Prison, Corcoran (CSP/Corcoran)**
November 15, 2004-November 17, 2004
February 15, 2005-February 16, 2005
April 25, 2005-April 28, 2005

As of the monitor's April visit, CSP/Corcoran reported vacancies in positions for one chief psychiatrist, six staff psychiatrists, 16 psychologists, one psych social worker, two recreational therapists and 2.1 psych techs. Three of these psychiatrist and eight of the case manager positions represented recent allocations for a planned expansion of the institution's MHCB unit that turned out to be unfeasible and was cancelled. Reportedly, the hiring of a staff psychiatrist and two psych social workers was imminent. The institution cited positively the efforts of DHCS in helping to recruit the psychiatrist, perhaps a hint of cooperation and coordination that might continue.

All of the institution's psychiatric and case manager vacancies could not be covered by contracted clinicians. Of the seven vacant psychiatrist positions, only about half were filled through the use of contract psychiatrists, all of whom worked in the facility only on weekends. On the other hand, most of the vacant psychologist positions, other than those allocated for the now-defunct MHCB expansion, were filled by contracted psych social workers, about half of whom had been providing services for longer than six months at CSP/Corcoran. Nonetheless, throughout the monitoring period,

142

the functional vacancy rate remained largely unchanged at approximately 18 percent, an unacceptably high vacancy rate for an institution with a mental health caseload as large and complex as CSP/Corcoran's.

Vacancies among auxiliary staff continued to fluctuate during the monitoring period. Nursing vacancies soared to 47, including RN supervisors, while MTA vacancies declined to just five. The vacancy rate among medical records staff improved marginally, and the facility used approximately 300 hours of overtime monthly for existing records-keeping staff, which resulted in a backlog of filing ranging from one to four weeks, depending on the source of the estimate.

During the preceding monitoring period, a breakdown in the provision of escort officers, particularly in the SHU, so essential to ensuring access for the delivery of mental health services in heightened security environments, created a serious impediment to the delivery of mental health services. Even before the previous monitoring period ended, additional escort teams, formed from existing resources, were assigned to the SHU and administrative segregation to improve access to mental health care. Interviewed clinical staff in each of the monitor's visits throughout the current monitoring period indicated that the system of escort teams implemented in mid-2004 continued to provide adequate access to caseload inmates, particularly in the SHU. This issue was resolved.

The institution also continued to monitor and supervise more closely and effectively the use of force by custody staff against caseload inmates. A report finalized in November on the issue raised as many questions as it answered, and demonstrated that some 86 percent of incidents involving the use of force against seriously mentally

143

disordered inmates occurred on an emergency basis, precluding any opportunity for the intervention of mental health clinicians to calm agitated caseload inmates before force was applied. The report, which was based essentially on videotaped interviews with some mental health staff and inmates willing to go on record with complaints about the behavior of custody staff on their living units, found allegations of custody staff abuse and misbehavior of caseload inmates unsubstantiated. Meanwhile, the long backlog of unreviewed use of force reports was gradually whittled down; new accelerated procedures for review were initiated; a manual on the use of force was developed; and training on the use of force was increased. The manual, which compiled disparate memorandums generated by departmental and institutional administrators over the past five years on the use of force, was a disappointment and had no obvious practical utility.

Nevertheless, when the monitor reviewed the use of force in CSP/Corcoran in April, a full year after the issue arose, the situation in regard to the use of force was found to have changed dramatically. The number of instances involving the use of force against caseload inmates decreased substantially. MHSDS inmates were, for the first time in memory, the object of fewer uses of force than non-caseload inmates; district attorney referrals of caseload inmates declined sharply, largely due to a new and more limited agreement with the local district attorney; and, perhaps most importantly, institutional administrators reviewed more critically and quickly reports on the use of force and intervened actively to identify ill-advised and poorly executed uses of force and prescribe corrective remedies.

Also during the monitoring period, the much discussed "cultural assessment" of CSP/Corcoran occurred. The outcome of the assessment, shared recently

144

with the institutional administration, was awaiting a response from the warden, who was on temporary leave for health reasons, to be followed by continued interaction and planning among the consultants who conducted the assessment and institutional staff and administrators. Whatever the final outcome of the assessment or its ultimate contribution to enhanced cooperation among the various constituencies in CSP/Corcoran, in the year since the disturbing monitoring exit interview in April 2004, the warden and his administrative staff have managed to address gradually and effectively in a variety of ways the issues raised about custody staff's dysfunctional role in the delivery of mental health services in the SHU and administrative segregation. The principal change has been the heightened level of accountability imposed on custody line staff and local supervisors, a level that must be maintained if the changes are to become permanent.

<u>Issues Resolved:</u>

> Cooperation between correctional officers and mental health staff was satisfactory.

> Inmates discharged from the institution received a 30-day supply of medications.

> The results of laboratory tests ordered for inmates on mood-stabilizing medications were obtained and noted by physicians in a timely manner.

> Data was entered timely in the MHTS.

<u>Quality Management:</u>

The quality assurance process at CSP/Corcoran continued to evolve. The quality management committee met weekly and kept minutes that reflected activities more accurately. The quality assurance process was useful in that it allowed institutional administrators and staff to identify problems and develop solutions. Documentation of quality assurance efforts changed in September 2004 to conform to <u>Plata</u> requirements.

145

Audits of medication management were conducted by staff responsible for the administration of medication. Turnover among supervisory nursing staff, however, contributed to an inconsistent audit schedule. Many audits were not completed or were done inaccurately. Small sample sizes remained a problem. Some audits relevant to mental health issues were done independently of mental health staff and were often unhelpful in ascertaining accurately the status and nature of problems.

The structure and scope of the quality management effort outstripped staff's capabilities. Not all QITs were active and not everyone listed as members were aware that they were part of a particular QIT. Some key staff was unaware of QITs directly related to their work. Audits were often small in size with inadequate methodological explanations but covered numerous areas critical to mental health treatment. Despite these limitations, the audits that were conducted were often informative for staff and sometimes served as a basis for change.

Most members of the mental health staff were involved in and aware of quality assurance activities conducted within the mental health department. Many received feedback about their work and viewed quality management favorably. Peer review was underway in January 2005 for all mental health disciplines except psychiatry. Monthly chart reviews were performed regularly, and results were submitted to HCSD, as required.

Use of the MHTS developed substantially during the monitoring period. It emerged as the vehicle through which information about mental health services was communicated to staff at all levels. Regular use of the MHTS provided case managers with information about their caseloads. The MHTS provided psychiatrists with timely

information on the expiration of medication orders. Supervisors used the MHTS for monthly reports on new arrivals, case management contacts, IDTT meetings and other clinical contacts. The MHTS was still unable to produce placement chronos, making it difficult to track changes in levels of care. Supplemental logs were developed by supervisors to capture information the MHTS did not collect, such as data on MHCB admissions, transfers to higher levels of care and completion of five-day clinical follow-up. Data entry into the MHTS was timely, but the accuracy of audits based on the data entered had not been confirmed; audits based on MHTS data, however, were considered by many to be more accurate than audits based on a review of medical records.

Medication Management:

The institution focused considerable attention and effort on medication management, but improvements during the monitoring period were limited. The local operating procedure was revised again to conform to Plata requirements. The institution struggled unsuccessfully to conduct meaningful audits of medication management on an established schedule.

Apart from small sample sizes, unexplained or inadequate methodology often limited the ability to generalize from audit results. Audits of medication non-compliance issues, continuity of medications on arrival and changes in housing locations and the use of HS medication consistently yielded more positive results than the anecdotal reports of staff and inmates on the same subjects.

The use of DOT in the administration of medications improved. The local policy was revised, and a central list of inmates on DOT was maintained. A QIT looked at medication administration, but made no recommendations on the use of DOT and

147

nurse-administered medication in the EOP or SHU. Food ports in the SHU were no longer opened for the delivery of medications; instead, medication was passed through a gap around the door. Under revised policy, nurse-administered medication required the presence of a correctional officer in the unit when medications were delivered, but reportedly correctional officers were not always available when medications were passed.

Practices surrounding the use of HS medications improved. The number of caseload inmates with HS orders increased from four to 113. Although administrators believed that HS medications were delivered after eight p.m., line staff and inmates reported that it was delivered before 8 p.m.

Blood levels of inmates on mood-stabilizing medications were obtained generally, and test results were reviewed by clinicians and followed up appropriately. Audits did not focus on whether orders for testing were written in all required cases.

Discharged inmates typically received a 30-day supply of medication. The pharmacy compiled a list of inmates who were offered and received and/or rejected medication at time of discharge.

Medication continuity appeared to improve, but the degree of improvement could not be ascertained with confidence. An institutional audit found that medication orders were rewritten for 70 percent of new arrivals within eight hours of their entry. Audits of medication continuity for inmates who moved within the institution consistently found that doses were not missed. In contrast to these audit findings, line staff and inmates reported that medication deliveries were often interrupted by changes in location. Because of the conflict between audit results and widespread contrary perceptions, it was difficult to formulate any effective approach for improving medication

148

continuity.  Interruptions in medications for inmates discharged from the MHCB were found to be a specific problem in the past, but no audit limited to that phenomenon was conducted.  Audits of responses to medication non-compliance found extremely high rates of compliance with institutional policy.  In this area, too, anecdotal reports contradicted audit results.  An institutional audit found that 84 percent of 49 sampled medical records contained a MAR covering the preceding month.  Eighty-eight percent of the available MARs were complete and legible.  Another institutional audit found that numerous renewed medication orders expired without corresponding progress notes, suggesting that orders were renewed or discontinued in the absence of inmate contact.

There was a problem with the tracking of <u>Keyhea</u> orders.  <u>Keyhea</u> orders for four inmates inadvertently lapsed during the monitoring period.  It was uncertain whether <u>Keyhea</u> hearings were initiated for all inmates who needed one.

<u>Mental Health Assessments for the Disciplinary Process:</u>

Implementation of the revised RVR process was mixed.  Some mental health assessments provided useful information that was relied on by hearing officers, who subsequently mitigated sanctions.  Even in the absence of a useful mental health assessment, hearing officers at times dismissed charges or mitigated penalties expressly for mental health reasons.  On the other hand, some mental health assessments were glaringly inadequate, and some inmates were punished for behaviors associated with mental illness even when mental health assessments provided pertinent information.

Requests for mental health assessments remained stable at roughly 125 to 150 in a six-month period.  Mandated referrals for assessments of EOP and MHCB inmates accounted for 50 to 80 assessments.  About half of all assessments were for EOP

inmates and some 20 to 25 involved inmates who were in crisis and treated in the MHCB.

Approximately 35 to 40 mental health assessments were requested for 3CMS inmates.

Referrals of non-caseload inmates, whose offenses involved bizarre or uncharacteristic

behavior, declined. Between July and November 2004 six non-MHSDS caseload inmates

were referred for mental health assessments in connection with disciplinary infractions.

Only one non-caseload inmate was referred for a mental health assessment from

November to March.

Mental health assessments were attached to completed RVR reports and

filed in inmates' C-files. An institutional audit in February found that hearing officers

often failed to document the content of mental health assessments in the disposition of

cases. The warden subsequently issued a memo that directed hearing officers to review

mental health assessments prior to conducting disciplinary hearings. Documentation

aside, the quality of the revised RVR process varied widely. Deficiencies were found in

both legal and clinical aspects of the handling of RVRs through the end of the monitoring

period.

In one case, statements in the RVR indicated that the hearing officer did

not accept the relevance of mental health input, citing the California penal code's

proscription against the use of diminished capacity as a defense in criminal proceedings.

Mental health assessments were sometimes inadequate, omitting, for example,

information on the inmate's behavior at the time of the offense. Others used jargon,

acronyms or idiosyncratic or vague language unlikely to be of much use to hearing

officers. One mental health assessment completed for a past offense committed at

another institution ruled out the influence of mental illness but failed to refer to any

interview or other source of information that might have justified the conclusion. That

offense involved sexual behavior. Mental health assessments of another EOP inmate,

who incurred repeated RVRs for refusing to go into his cell, throwing tooth powder,

covering his window, spitting in the direction of correctional officers, engaging in sexual

misbehavior and making inflammatory comments, indicated that he was unstable and his

behavior was influenced by his mental illness. Nonetheless, the inmate continued to

forfeit credit each time a new charge was heard. In a third case, an inmate with a <u>Keyhea</u>

order incurred multiple RVRs, one associated with an incident in which he pulled away

from a correctional officer who was escorting him to be involuntarily medicated. Mental

health assessments provided useful information in these cases, but maximum losses of

credit were assessed, although the inmate's privileges were left intact. In explaining

these dispositions, hearing officers cited mental health assessments as the basis for the

inmate's retention of privileges.

     CSP/Corcoran's January 2005 agreement with the district attorney

specifically ruled out referrals for spontaneous pushing or kicking. No cases associated

with a calculated use of force were referred to the district attorney. Only 11 incidents

met the criteria for referral to the district attorney over a seven month period; eight were

referred. All involved 3CMS inmates. Two cases involved indecent exposure; four

involved weapons; one was a case of a battery on an inmate; and one was for the

attempted murder of a correctional officer. The institution typically took three to four

months, but sometimes as long as five months, to decide whether to refer an incident to

the district attorney. The district attorney reached a decision within one month in five

cases; three cases had been pending for over three months. One indecent exposure case

and one weapons case were accepted for prosecution. The number of referrals dropped

sharply from the preceding monitoring period, when 22 cases involving caseload inmates

were referred to the district attorney from March through October 2004.

Transfers:

   Access to DMH's acute care was reported by staff to be good. Logs of

referrals to DMH were fragmented, incomplete, difficult to decipher and no longer

included the dates of acceptance or a DMH bed assignment. From October through April

7, CSP/Corcoran made 48 referrals to DMH/APP at CMF. All were transferred within 72

hours of receipt of a bed number. Nine referrals did not result in a transfer to acute care.

Information on the disposition of seven of the cases that did not go to acute care was not

available; of the remaining two, one referral was rejected and one was rescinded because

the inmate paroled prior to transfer. Processing times were reported for half of the cases

actually transferred to acute care. On average, 8.5 days elapsed between referral and

acceptance and 2.2 additional days between acceptance and the assignment of a bed

number. Nine psych and return inmates came back to CSP/Corcoran between October 1

and March 31. Three UHRs were available for the monitor's review; all three contained

a discharge summary from DMH. No fax cover sheets or psych and return chronos were

in the UHRs. None of the discharge summaries contained a recommendation regarding

level of care. Clinical staff at DMH reportedly did not contact clinical staff at

CSP/Corcoran about returning inmates. Information was passed from classifications staff

at DMH to the Chief Psychologist at CSP/Corcoran through a designated correctional

counselor.

Access to DMH/SVSP's intermediate care facility improved but fell short of the demand. Only seven inmates were transferred, although 23 were accepted. Cases that were not designated as high priority were accepted but were transferred much more slowly, if at all. CSP/Corcoran referred 34 inmates to DMH/SVSP between January 27 and April 7. While twenty-three were accepted, only seven were transferred by April 25. Seven referrals were rejected, while one was rescinded. On average, 19 days elapsed between referral and transfer of the seven inmates actually sent to the program. Sixteen of the 23 accepted inmates were awaiting beds. Fourteen had been waiting for a month or longer, while nine had been waiting 48 days or more. No referrals were made to ASH during the monitoring period.

CSP/Corcoran had a problem with making appropriate and timely referrals to DMH intermediate inpatient programs. Staff frequently took three weeks or more after identifying an inmate in need of an intermediate inpatient level of care to generate a referral to DMH. There were indications, moreover, that not all inmates in need of an intermediate inpatient level of care were actually referred. Staff identified 18 inmates in need of intermediate inpatient care in advance of the unidentified needs assessment (UNA), which was conducted in CSP/Corcoran in February. The visiting UNA review team identified seven more. The institution's subsequent referral log showed that just 12 referrals, rather than the combined total of 25 that were recommended for referral, were made to DMH intermediate programs. Only four were actually transferred. Five were accepted and awaiting transfer. One was rescinded because the inmate paroled. What happened to the remaining 15 (the 13 who apparently were not referred, as well as the

two referred but not accounted for) was unclear from the data provided during the monitor's April visit.

Care provided to inmates in crisis beds and the staff's ability to monitor the operations of the MHCB unit improved. Out-of-cell treatment was provided. A recreational therapist made use of a courtyard, and individual counseling sessions were held in a confidential setting. An IDTT meeting attended by the monitor's expert was notably improved over those observed in the past.

The average length of stay in the MHCB unit was less than ten days, although 20 percent of admissions stayed longer than ten days. A QIT was chartered to examine lengths of stay in the MHCB unit. Inmates were moved out of the MHCB unit soon after they were clinically discharged. Institutional audits found that 81 percent of treatment plans were completed within three days of admission to the MHCB unit. Audits of suicide risk assessments found they were completed for 83 percent of admitted inmates, but only 77 percent of those discharged. At least ninety-five percent of inmates referred to the MHCB unit for suicide-related behavior were admitted. Eighty-four percent of daily psychiatry rounds were documented. The designation of eight MHCBs for use by NKSP during the latter's CTC renovation increased the local workload. CSP/Corcoran clinicians were critical of the amount of time NKSP staff spent treating their MHCB referrals and the type of IDTT meetings they provided.

Transfers to PSUs typically took four months, but much longer delays occurred in a number of cases. Overall, the wait for PSU beds was reduced. Transfers within four to five months typically involved individuals already serving a SHU term, who were found to need an EOP level of care and free of all complicating disciplinary

and/or classification factors. PSU transfers involving EOP inmates in administrative

segregation with newly acquired SHU terms were subject to lengthy delays. The

defendants' policy commitment in April 2004 to move inmates in need of a PSU

placement in spite of pending disciplinary charges was essentially inoperative.

At the time of the monitor's April visit, 37 inmates were awaiting a PSU

placement. Ten inmates were transferred from CSP/Corcoran to PSUs from November

through January. Five more transfers to PSUs occurred in April. Five cases were

removed from the list of pending PSU transfers; two no longer needed an EOP level of

care and three had completed their SHU terms in administrative segregation. The stays

of these last three in EOP administrative segregation ranged from 223 to 388 days. In

one case, staff took 206 days to assess a SHU term, and the inmate's status was then

changed to SNY. By the time an ICC addressed the SNY issue, the end of the inmate's

SHU term was imminent. In another case, a SHU term was assessed within 106 days, but

the CSR did not review the case. By the time the oversight was discovered, termination

of the SHU term, again, was imminent. In the third case, a SHU term was assessed

within 108 days. The charges and SHU term were reduced on supervisory review, by

which time the end of the SHU term was once again imminent.

During the monitoring period, some ameliorative approaches to delayed

transfers to PSUs emerged. Fewer delays were related to ICC decisions, and at least 12

inmates awaiting transfer, who were decompensating in administrative segregation, were

referred to higher levels of care. Three other inmates were released early from a SHU

term or administrative segregation to an EOP program for mental health reasons. In one

case requiring approval of a departmental review board, it took the institution six months

to obtain the required authorization for transfer. The inmate was transferred three weeks after the authorization was received.

While the ability to trace the sources of delay in PSU transfers improved, efforts to expedite the transfers were largely unsuccessful. The monitor's review of transfers to PSU found that preventable delays accounted for a significant number of long stays in administrative segregation or the SHU. In several cases, a lack of CSR endorsement added three to four months to the wait. Breakdowns in the institution's processing of cases occurred regularly, and it appeared that processing was stalled by pending disciplinary charges in other instances. The transfer of one EOP inmate was delayed six months because a classification services representative (CSR) withheld endorsement to a PSU until a BPT hearing was held. In the same case, nearly six months more elapsed between endorsement and transfer. In another case, an inmate with SHU status was designated EOP, but his case was not referred to the CSR for endorsement for over three months. The CSR endorsed transfer to a PSU six weeks later. The inmate was transferred to a PSU within ten weeks, seven months after he was found to need a PSU placement. Several cases of inmates who threatened, assaulted or battered staff and subsequently were treated in a MHCB unit or DMH/APP were reviewed. Adjudication of the charges took six months in one such case and 11 months in another.

<u>Other CAP Issues:</u>

a. Partial Compliance

EOP inmates housed in general population were not seen weekly by a case manager, although EOP inmates in administrative segregation were. The institution was unable to offer enough mental health treatment to EOP inmates in administrative

segregation when the census exceeded 54, but succeeded in providing nearly ten hours per week to inmates during most of the monitoring period.

Weekly case management contacts occurred with 77 to 97 percent of caseload inmates in administrative segregation during the period from November through March. The 77-percent nadir was associated with staff absences and turnover.

Response time to referrals to psychiatry, which lengthened during the preceding monitoring period, was reduced in the current monitoring period.

The expansion of custody escort teams and treatment space resulted in improved access to mental health treatment in the SHU. Quarterly case management contacts were made with 85 to 93 percent of 3CMS inmates in the SHU from October through March. During the same time, timely case management contacts with 3CMS inmates in the general population ranged from 83 to 98 percent.

Group treatment for 3CMS inmates housed in the SHU began in February. Four groups met twice monthly in February and March. Two more groups were slated to begin in April. Two groups for 3CMS inmates in the general population were also slated to begin in April.

Provision of five-day follow-up of suicidal inmates discharged from the MHCB unit increased from 90 to 95 percent from October to March but fell short of full compliance. Institutional administrators reported that inmates were considered for admission to a MHCB unit when clinically warranted but could not substantiate the report due to inadequate MHCB logs and misfiled documentation.

The frequency of the use of restraints declined by 50 percent from July through March compared with their use during the preceding monitoring period.

Duration of time in restraints was also cut nearly in half. Supervisory staff discovered that an out-of-date policy on the use of restraints was mistakenly printed and followed during the monitoring period.

### b. Non-Compliance

The institution still had difficulty with the timeliness of assessments of new caseload inmates and the conduct of full-fledged IDTT meetings. Treatment plans were not updated as frequently as required for many EOP and 3CMS inmates. The quality of IDTT meetings was compromised repeatedly by the absence of psychiatrists and/or correctional counselors. The SHU had the distinction of hosting the most timely IDTT meetings for both initial treatment plans and updates.

Medical records remained problematic. A large audit of UHRs found that over 20 percent contained records of the wrong inmate, while documents were filed out of order in 17 percent, and 36 percent had documents filed in the wrong sections. Large amounts of overtime and untrained assistants were used to reduce the filing backlog. Mental health staff reported that documentation of completed treatment was not reliably filed in medical records. UHRs were often unavailable to mental health staff when they attended ICC meetings in administrative segregation and the SHU.

Institutional Summary:

Problems with the acquisition and retention of permanent mental health staff, as well as the procurement of some categories of contracted staff, continued to impinge on CSP/Corcoran's ability to provide adequate mental health services. Increasing allocations of staff did not translate reliably into immediately available clinical bodies.

158

The institution's quality assurance process continued to develop. Custody administrators and supervisors of medical and mental health disciplines worked together reasonably well on quality management issues. The institution stumbled on the development and conduct of meaningful audits of medication management. Use of the MHTS improved substantially, and mental health staff's quality management initiatives relied heavily on the MHTS. Peer review was underway for psychologists and psych social workers, but not for psychiatrists.

Major problems in the management of medications remained, but improvements occurred in the use of HS medications and the monitoring of blood levels of inmates on mood-stabilizing medications. The number of caseload inmates with HS orders increased, although reports on the delivery of HS medications before or after eight p.m. conflicted. Discharged inmates appeared to receive regularly a 30-day supply of medication. Medication continuity appeared to improve for inmates who moved within the institution, but the extent of the improvement was unknown. MARs, present more often in UHRs, indicated that some orders for the renewal of psychotropic medications expired, while others were written without inmate contact. Keyhea orders were not tracked closely enough to prevent inadvertent lapses.

Access to DMH/APP was adequate, but incomplete logs made it difficult to ascertain whether unsuccessful referrals were handled appropriately. Access to DMH inpatient intermediate care improved slightly, but the supply of beds failed to meet the growing demand. Many referrals were accepted as appropriate, but only a third of these acceptances resulted in actual transfers. No referrals to ASH were submitted during the monitoring period. The institution also was not routinely referring all inmates in need of

an inpatient intermediate level of care. The lag between the recognition of a need for intermediate care, when it did occur, and completion of a referral often took too long.

Treatment provided in the MHCB unit improved as did the staff's ability to monitor its operations. Problems persisted with the documentation of daily psychiatric rounds, and lengths of stay crept upward, with twenty percent of stays in the MHCB unit exceeding ten days. An out-dated policy on the use of restraints was applied throughout the monitoring period. Substantial reductions in both the frequency and duration of the use of restraints occurred during the monitoring period.

Access to mental health treatment in the SHU improved due to the enhanced availability of escort officers and expanded treatment space. Group treatment was initiated in the SHU and expanded in the general population. EOP inmates in administrative segregation met weekly with a case manager and were provided with close to ten hours of structured therapeutic treatment weekly, provided the unit's census was at or below capacity. Case management contacts with 3CMS inmates in administrative segregation occurred weekly during most of the monitoring period.

The institution still had difficulty with the timely assessment and provision of IDTT meetings for newly arrived inmates. Medical records remained problematic; documents frequently were missing and/or misfiled. UHRs were not always available for use by mental health staff attending ICC meetings.

CSP/Corcoran still had much to do both to comply fully with its CAP and meet required standards in the areas of quality and medication management, the mental health assessment process for RVRs involving seriously mentally disordered inmates and transfers to higher levels of care. Nonetheless, the most recently completed monitoring

160

period witnessed considerable improvement over the preceding one, when the provision of mental health services in CSP/Corcoran seemed beset with difficulties. The turn-around was welcome and a credit to institutional mental health and custody leadership. Now the facility needs to maintain that progress.

### California Substance Abuse Treatment Facility (CSATF)
October 12, 2004 – October 15, 2004

CSATF had vacancies for 2.5 psychiatrists, a psychologist, a psych social worker and a recreational therapist. The institution undertook an intensive effort to recruit and retain mental health staff during the monitoring period. Between July and September 2004, the institution hired a new chief psychiatrist and filled openings for 1.5 psychiatrists, a senior psychologist and three staff psychologists; only one psychologist position became vacant during this period. As a result, the vacancy rate fell from 30 to 14 percent. All allocated positions at the institution were filled either with permanent employees or long-term contractors. Case mangers' caseloads averaged 132 inmates in general population and 30 to 35 inmates in administrative segregation. CSATF continued to hire auxiliary staff; nursing and MTA vacancies were filled by a combination of overtime and registry personnel.

Clinical leadership at CSATF was strong, and the working relationship between mental health and custody staffs was good everywhere except in the MHCB unit, where the relationship between the two staffs was marked by tension and poor communication. Clerical services continued to be stretched thin during the monitoring period. Expanding use of the MHTS limited clerical support available for clinicians and administrators.

During the preceding monitoring period, DHCS in Sacramento made a concerted effort to reduce the number of mental health inmates at CSATF, resulting in the lowering of the caseload population from a high of 1,200 in August 2003 to 963 in July 2004. The decrease in the mental health census gave the institution an opportunity to train new staff and implement additional program guide requirements. At the time of the monitor's visit, the facility was open to new intakes again, and the census stood at 983 MHSDS inmates. The institution's overall MHSDS capacity was 999 inmates.

Issues Resolved:

3CMS inmates were consistently seen by their case managers at least quarterly.

Treatment for MHCB inmates, including the provision of recreational therapy, was adequate.

Mental health inmates mistakenly placed in the new ASU were consistently identified and promptly removed; inmates who were designated 3CMS inmates while housed in the ASU were also removed from the unit within 24 hours.

Continuity of medication on arrival at the institution was no longer a problem.

Procedures for DOT administration of medication were properly conducted.

The suicide prevention committee met monthly in accordance with program guidelines.

Quality Management:

The quality assurance process progressed during the monitoring period. The institutional health care quality management committee met twice a month during the six months preceding the monitor's visit, and meetings were well attended by custody, medical and mental health representatives. The quality of the committee's

162

minutes improved and reflected meaningful efforts to address service delivery problems. Each subcommittee of the quality management committee had a regular schedule for reporting to the committee. The mental health subcommittee met monthly and was scheduled to meet twice a month beginning in October. Minutes of meetings reflected an increased emphasis on problem solving starting in June 2004. According to the institution, all committee members and all members of the medical and mental health staffs had been trained in the quality management process, and training was to be provided for new employees.

Nine QITs had been chartered since the inception of the quality management system, with two QITs chartered during the monitoring period. QITs underway at the time of the monitor's visit were reviewing the timeliness of responses to mental health referrals, the availability of mental health treatment space and the frequency of clinical contacts. Each QIT analyzed data and devised remedies, many of which were implemented. Mental health clinicians were not, however, consistently informed of the outcome of QIT studies.

Audits were routinely completed on a variety of issues either monthly or quarterly by the mental health staff. At least five or six of these audits were developed and implemented during the monitoring period. A chart review committee had been formed in September 2003; the committee reviewed approximately 30-40 charts per month. Peer review had not yet been implemented at CSATF.

Medication Management:

Institutional monthly audits for July through September 2004 found continuity of medication for new arrivals to be 100-percent compliant. According to the

163

audits, medications were ordered for inmates within eight hours of their arrival and delivered to them within a day.  The methodology of the audits conducted on the issue was reasonable.  The monitor's review of charts found only four new arrivals at the facility with current medication orders.  Although two of the inmates did not receive their medications within 24 hours, the sample was too small to refute the institution's well-constructed monthly audits.

Continuity of medication on intra-institutional transfers improved.  An institutional audit found that 73 percent of inmates received their medications in a timely manner after changing housing locations.  Audits found 100-percent compliance for inmates moved to the MHCB unit.  Continuity of medication was more difficult to assess for inmates discharged from the MHCB unit, but it appeared that at least some inmates experienced a one to two-day gap in medication.  Compliance in this area was compromised by the fact that MARs did not always follow transferred inmates to their new housing units in a timely manner.

Follow-up to medication non-compliance improved greatly.  Institutional audits indicated 100-percent compliance with follow-up procedures.  According to the institution's status report, inmate refusals and no-shows were reliably noted on MARs; inmates were consistently referred to mental health in an appropriate manner; and inmates were generally seen by a psychiatrist within seven days of a referral.  The issue will be resolved during the next monitoring period, if compliance continues at this level.

Laboratory testing appeared to be conducted for inmates on mood-stabilizing medications.  The institution conducted a small audit of only seven charts and found all but one compliant with testing requirements.  According to the audit, laboratory

164

tests were ordered, conducted, returned and reviewed on time. In contrast, the monitor's more limited review of just four charts on this issue found that test results were not always returned or entered in inmates' charts in a timely manner. The monitor also found that test results were not reviewed by prescribing clinicians and appropriate adjustments were not made in response to test results in two of the four charts reviewed. Both of these audits were too small to be dispositive.

DOT procedures were properly administered. An institutional audit of 25 percent of inmates on DOT medications indicated that the requirement for DOT-administration was properly noted in inmates' MARs. Observation of DOT procedures by supervisory staff confirmed compliance; supervisors also observed procedures for nurse-administered medications.

CSATF maintained a log of caseload inmates who were offered and received medications upon their discharge from the institution on parole. An institutional audit for the period from July through September 2004 found that 92 percent of paroling inmates received their medications at the time of their release.

The administration of HS medications also improved. Psychiatrists no longer reported any obstacles to prescribing medications on an HS basis. Approximately 20 to 30 inmates a month received HS medications, a number that represented a still relatively small percentage of the MHSDS caseload at CSATF.

Keyhea orders were rarely sought, and no inmate was on a Keyhea order at the time of the monitor's visit. CSATF did track inmates with a Keyhea order when they were in the institution, but the departmental list of such inmates was usually inaccurate.

165

Chart reviews indicated that MARs were generally filed in inmates'
UHRs. Portions of some MARs, however, were blank.

Informed medication consent forms were also generally filed in inmates'
UHRs. Sometimes psychiatric progress notes corresponding to medication orders and
renewals were absent from reviewed files.

<u>Mental Health Assessments for the Disciplinary Process:</u>

Implementation of the mental health assessment process progressed
somewhat during the monitoring period, but the institution still lacked a comprehensive
tracking record for monitoring RVRs and their disposition. Rather, each yard generated
its own list of RVRs, which were organized in slightly different ways covering different
periods of time. As a result, determining with accuracy the number of RVRs issued to
caseload inmates during the monitoring period was a formidable and nearly impossible
task. It appeared that approximately 250 caseload inmates received RVRs from June
through August 2004.

Mental health input was beginning to have an impact on the outcome of
disciplinary proceedings, but the impact thus far was small. Only about four percent of
caseload inmates receiving RVRs were referred for assessments. Specifically, just 11
caseload inmates and two non-caseload inmates were referred for mental health
assessments during the monitoring period. Of the 13 assessed inmates, clinicians
determined that mental illness affected the behavior of six. Hearing officers either
dismissed or reduced the charges in two of these six cases based on the mental health
input. The monitor's review of C-files, however, indicated that hearing officers did not
always consider the content of the mental health assessments in their decision-making.

166

The institution was in the process of finalizing procedures for reviewing infractions issued against inmates for self-injurious or suicidal behavior. No RVRs were issued for such behavior during the monitoring period.

Transfers:

The timeliness of EOP transfers, an issue resolved in an earlier round of monitoring, resurfaced as a problem, at least for EOP inmates with "sensitive" or protective custody needs. From June 1 through October 14, three of 14 EOP transfers from CSATF took longer than 60 days to complete. All three involved sensitive needs inmates and took 90, 103 and 119 respectively days to accomplish. Similarly, of the five EOP inmates awaiting transfer at the time of the monitor's visit, three had been waiting less than 60 days, while the other two, both with sensitive custody needs, had been awaiting transfer 91 and 96 days respectively.

Lengths of stay in the MHCB unit increased during the monitoring period. Although this issue, too, was resolved earlier, institutional data indicated that 62 of the 161 admissions to the MHCB unit during the monitoring period lasted longer than ten days. Of these 62 admissions, eight were waiting for available beds in the administrative segregation unit at CSATF; 13 were waiting for transfers to DMH; 23 were delayed for administrative reasons; and 26 were retained for clinical reasons.

Access to DMH/APP at CMF was described as good. Delays in transferring inmates appeared no longer than at other CDCR facilities. Between June 1 and September 28, CSATF transferred nine inmates to DMH/APP. The average time between referral and transfer was 16 days, with one transfer taking 44 days. All of the transfers occurred within 72 hours of bed assignments. The monitor, however, found a

167

number of inmates who were treated in the MHCB unit for long periods of time before clinicians decided to refer them to DMH. Four inmates who were in the MHCB unit in July and August remained there for 17, 19, 24 and 31 days respectively before being referred.

Four inmates were returned from DMH/APP to CSATF during the six months preceding the monitor's visit, but three of the inmates were no longer in the institution and their charts were not available for the monitor's review. Psych and return protocols were followed for the remaining inmate; the inmate's chart contained, as required, a DMH discharge summary, a faxed coversheet and a MHSDS placement chrono.

Other CAP Issues:

      a.  Partial Compliance

There was some improvement in the completion of initial intake assessments. Institutional audits indicated that clinicians conducted appropriate intake assessments for 93 percent of arriving inmates, but a significant percentage of assessments were not completed in a timely manner. According to the audits, only 67 percent of initial intake assessments in August and 85 percent of assessments in September were completed within five days. Clinicians sometimes were not notified of an inmate's arrival for two days, delaying the assessment process.

The timeliness of initial assessments by psychiatrists continued to improve. Institutional audits from August and September 2004 showed 100-percent compliance.

The IDTT process continued to improve during the monitoring period. Institutional audits for the period from July through September 2004 found that 92 percent of general population IDTT meetings were completed within 14 working days. The timeliness of IDTT meetings in administrative segregation also improved, but the compliance rate was just 69 percent. The audit did not assess whether the composition of the IDTTs was consistent with program guide requirements. The monitor's chart reviews found one IDTT meeting in which neither a psychiatrist nor a correctional counselor participated, as well as a second meeting that failed to identify any participants.

Treatment plans were generally completed and updated pursuant to program guide requirements. Institutional audits for July through September 2004 found that initial treatment plans were completed for 96 percent of new arrivals within the 14-day time limit. Similarly, audits showed that treatment plan updates were completed every 12 months for 94 percent of inmates. The monitor's expert found that the quality of the treatment plans was significantly better as well. This issue will be resolved, if compliance continues through the next monitoring period.

Some progress was made in the timeliness of clinical responses to mental health referrals. A QIT chartered to study the issue implemented a pilot project for the period from August through October 2004. The results of the study were still pending at the time of the monitor's visit. Both inmates and staff, however, described problems with the internal mail system in the institution that impacted negatively on the timeliness of clinical responses to referrals throughout the institution. Mental health staff did not always respond to mental health referrals from inmates in the new administrative segregation unit within five working days as required.

169

Group therapy continued to be offered to 3CMS inmates on all housing yards. CSATF had ongoing problems with the availability of confidential treatment space for group therapy. A QIT had been chartered to study the facility's space constraints, and it appeared that the chapel might be made available for group therapy. Inmates interviewed by the monitor were positive about the benefits of the group therapy offered to them. This issue will be resolved once the problem of program space is rectified.

There was a lingering question as to whether the CTC had sufficient custody staffing to meet the needs for operating an effective MHCB unit. A QIT had been chartered to address the issue.

It was unclear to what extent the institution provided timely pre-release discharge planning for paroling inmates. Case managers received parole lists regularly and cooperation between case managers and the TCMP social workers reportedly was adequate, but CSATF had not yet audited this issue.

Chart reviews and staff interviews confirmed that psych techs made daily rounds in the new administrative segregation unit, and mental health screenings were completed in a timely manner on arrival there. Screenings, however, were generally conducted at cell-front.

The MHTS still suffered from delayed data entry. As of September 24, 2004, data entry was delayed approximately three weeks. Charts were reportedly maintained in a disorganized manner.

170

Institutional Summary:

        Mental health staffing at CSATF took a quantum leap during the monitoring period. Permanent staffing vacancies were cut in half and, with contracting, the institution reportedly was fully staffed clinically. Between the staffing improvements and the temporary reduction in the institution's MHSDS caseload mandated by headquarters, CSATF had some space to regroup its mental health program. It took advantage of the opportunity fully.

        Among the issues of focus for this round of review, the quality assurance process at CSATF continued to mature and was functioning well. The one missing element was peer review. Medication management showed considerable progress, particularly with respect to continuity of medications, follow-up to medication non-compliance, DOT, HS medications and the provision of parole medications.

        Accessibility to more intensive levels of care improved for the most part. Transfers to DMH occurred relatively smoothly and in a reasonably timely manner, and access to MHCB care was available. Movement of EOP inmates out of the institution slowed somewhat during the monitoring period, especially for the handful of EOP inmates with sensitive custody needs, a problem largely out of CSATF's control. Implementation of the mental health assessment process in the handling of RVRs, on the other hand, progressed only marginally. Documentation of assessments was inadequate and needed to be standardized and upgraded. The confused available evidence indicated that the impact of assessments was, as yet, limited.

        CSATF's progress during the monitoring period in addressing the mental health deficiencies documented in its CAP was noteworthy particularly given the

171

institution's past struggles.  Expanded staffing, fewer caseload inmates and better

cooperation between custody and mental health staff all contributed to a much improved

level of mental health care in the facility.  Six CAP items were resolved, and progress

continued in many other areas.  Initial intake assessments and psychiatric assessments

were timelier; the IDTT process was more effective; the quality of treatment plans was

better; and group therapy was improved.  Despite the progress, some issues needed

further effort.  Programming space for group therapy was inadequate; data entry into the

MHTS lagged by some three weeks; and UHRs were disorganized.  Responses to

referrals from the new administrative segregation unit were sometimes untimely, and

apparently all, or nearly all, mental health screenings in the new unit occurred at cell-

front.

CSATF's accomplishments during the monitoring period were significant,

and the institution seemed to have kicked off its heels the dust of its former status as a

"troubled" facility with conspicuously inadequate mental health services.

### Pleasant Valley State Prison (PVSP)
September 13, 2004 – September 14, 2004

At the time of the monitor's visit, positions for three psychiatrists, a senior

psychologist, two case managers, a half-time psych tech and a half-time office tech were

vacant.  In addition, the chief psychologist was on a special assignment involving the

department's unmet inpatient bed needs assessment, expected to last until April 2005, and

the senior psychologist was serving as the acting chief psychologist.  Another senior

psychologist had been transferred to CSATF, and a case manager was on leave. The

institution employed a cadre of contract psychiatrists who provided services equivalent to

six full-time psychiatric positions; contractors also covered all of the vacant case manager

172

positions, including the position left functionally vacant by the case manager on leave, and the part-time psych tech position.

The mental health population at PVSP increased significantly during the monitoring period due to a caseload capacity raised from 1,199 MHSDS inmates in March 2004 to 1,449 inmates in September. Despite the 20-percent increase in caseload, the number of allocated mental health positions reportedly was not enhanced commensurately, nor was the institution's allocation of auxiliary staff positions. By September, case management caseloads ranged from 105 to as high as 195 inmates. While five of the 16 beds in the infirmary were allocated for MHCB occupants, the MHCB census was generally ten or 11. The increased population, combined with the limitations on staff and space, was beginning to impact negatively on the timeliness and quality of mental health services provided in the facility.

Quality Management:

The quality assurance process was well established at PVSP. The monitor reviewed multiple audits in September and found consistently sound methodologies and accurate data. The concordance rate between MHTS data entries and UHR documentation was good. Internal reviews of some issues, namely, treatment plans, medication prescription practices and intake evaluations, were insufficiently comprehensive.

Medication Management:

Most medication management issues, but not all, had been resolved at PVSP during earlier monitoring rounds. The institution continued to provide continuity of medication on arrival, follow-up to medication non-compliance and laboratory testing

173

for inmates on mood-stabilizing medications. Informed medication consent forms routinely were obtained and filed in inmates' UHRs, and the Keyhea process was fully implemented. According to institutional audits, one of the major areas of remaining non-compliance was continuity of medication for inmates on changes in intra-institutional housing locations.

Inmates paroling from the institution routinely received medications at the time of their discharge. The institution audited the charts of ten inmates who were released on parole, all of whom received their medications before they were discharged. In a related area, another institutional review of 33 charts found that some 75 percent of paroling inmates were seen by a TCMP social worker prior to their release, and the meetings were documented in inmates' UHRs.

HS medications remained a problem. Only eight inmates were on HS medications at PVSP. Given a population of some 1,450 3CMS inmates, the number of inmates on HS medications was inexplicably small. Moreover, institutional records revealed that HS medications were inappropriately delivered at 5:00 or 6:00 p.m., instead of after 8:00 p.m., as required by departmental policy.

Mental Health Assessments for the Disciplinary Process:

There was progress in some aspects of the mental health assessment process for disciplinary charges involving seriously mentally disordered inmates at PVSP. The institution completed its training of mental health and custody staff on the new assessment process. The institution also maintained a log tracking inmates with RVRs. The log contained much useful information, but failed to record the date of request for a mental health assessment, the date the assessment was completed, the name

174

of the clinician preparing the assessment and the hearing officer's consideration of the assessment.

From May 1 until mid-September, just 34 RVRs were written for 3CMS inmates at PVSP. Ten of the inmates involved in these cases were referred for mental health assessments. The quality of assessments reviewed by the monitor varied, but most were poorly written. Moreover, the mental health input did not appear to impact appreciably on the outcome of disciplinary proceedings. The monitor's chart review revealed that hearing officers paid little attention to the information in mental health assessments. Further specific training was needed both for clinicians preparing assessments and hearing officers applying them to specific cases.

The monitor's review of disciplinary records found RVRs inappropriately issued to inmates experiencing psychotic episodes, engaging in self-mutilation or suicidal gestures and failing to comply with medications.

Transfers:

Transfers to higher levels of care were vigorously pursued by staff at PVSP. EOP inmates were usually transferred in a timely manner. Among 12 EOP inmates housed in PVSP from May through September 2004, six were transferred in less than 60 days. The remaining six inmates were still at PVSP, but had been awaiting transfer for less than 60 days. PVSP did not appear to consider expedited transfers for any EOP transfers. Institutional audits showed that EOP inmates received weekly clinical contacts while awaiting transfer.

Some exceptional inmates had extended lengths of stay in the MHCB unit or multiple MHCB admissions, but most were discharged from the unit within ten days.

175

During the monitoring period, only one inmate remained in the MHCB unit longer than ten days and just six inmates had three or more admissions to the unit. Nine caseload inmates were in the MHCB unit at the time of the monitor's visit, with lengths of stay ranging from two to 46 days, the latter for a transferee from SQ.

DMH transfers occurred in a timely manner. During the monitoring period, 16 inmates were transferred to DMH. On average, 10.8 days elapsed between a clinician's referral to actual transfer.

Other CAP Issues:

a. Partial Compliance

The timeliness of clinical intake assessments, an issue resolved in an earlier monitoring period, was again problematic. An institutional audit of 539 new arrivals found that 76 percent of inmates received MH-4s within the specified time frame. According to the institution, the slippage in this area was the direct result of increased caseloads.

Some problems emerged during the monitoring period with mental health services in the administrative segregation unit. In particular, a correctional counselor apparently participated only rarely in IDTT meetings in the unit. The monitor's expert observed IDTT meetings in the unit, in which the participating psychiatrist did not review medication problems and changes appropriately with inmates, but simply gave them a medication consent form to sign, without addressing inmates' concerns. The review process conducted by the psychiatrist was inappropriate and did not meet applicable policy and procedural guidelines.

Institutional Summary:

PVSP had limited mental health staffing vacancies, which were covered by contractors, but staff allocations had fallen behind expanding program capacity. As a result, case managers' caseloads were higher than mandated by program guides, reaching in some cases as many as 195 inmates, and some services were not being delivered in a timely manner.

Among the issues of focus during this round of monitoring, the quality assurance process at PVSP was doing well and transfers to higher levels of care were generally made in a timely manner. Most medication management issues had already been resolved and remained so. Some problems with continuity of medication on intra-facility transfers and HS medications persisted.

Implementation of the mental assessment process for RVRs involving seriously mentally disordered inmates, on the other hand, was incomplete. The quality of mental health assessments was erratic; hearing officers did not consistently incorporate mental health input into their findings; and some inmates were inappropriately charged with infractions for self-injurious behavior and medication non-compliance. On the other hand, the number of RVRs written in the institution involving caseload inmates was remarkably low.

PVSP earlier had resolved most of its CAP deficiencies, although it experienced some backsliding in the timeliness of clinical intake assessments during the monitoring period. While the increasing caseload was a cause for concern, PVSP remained on course towards full compliance with its CAP. It needed, however, to

177

address deficiencies in its mental health assessment process for disciplinary infractions involving caseload inmates.

### Avenal State Prison (ASP)
September 15, 2004 – September 16, 2004

Psychiatric staffing became a serious problem at ASP during the monitoring period. All 1.5 allocated psychiatrist positions were vacant, and there were no viable candidates for the vacancies. The institution used three contract psychiatrists as well as telemedicine to cover a portion of the unfilled hours that varied from month to month. Last fall, the only psychiatrist on duty was away from the facility due to a family emergency for approximately three weeks, and no alternative coverage was available. An emergency institutional memorandum on medication renewals, dated September 24, 2004, encouraged non-physician staff to review inmate records during the psychiatrist's absence and write medication orders to be countersigned by non-psychiatric physicians. This inappropriate process for the renewal of medications apparently, at least according to the memorandum, had DHCS's approval, but was largely a dead letter because local clinicians did not comply with the proposed process.

In addition to psychiatric vacancies, ASP had openings for a psychologist, two psych techs and a half-time office tech. Contractors regularly covered most, but not all, of the vacant hours. A newly hired psych tech was expected to begin employment the week following the monitor's visit.

The morale of the mental health staff was low. Case managers found it particularly difficult to provide treatment without adequate psychiatric staffing. Fortunately, population numbers decreased at ASP during the monitoring period, leaving the institution with a steady but manageable flow of new arrivals and a MHSDS caseload

178

that fell from 1,150 to 880 inmates. Case managers' caseloads also declined and, on average, included 110 inmates. On the other hand, even with 880 inmates on the MHSDS caseload, ASP's allocation of 1.5 psychiatric positions, if filled, would leave the full-time psychiatrist with a caseload of 586 inmates.

Quality Management:

The quality assurance process at ASP stalled during the monitoring period. Although the mental health quality management committee met routinely, psychiatrists did not attend on a regular basis, reducing thereby the effectiveness of the process, particularly with respect to issues involving medication management and referrals. The institution also discontinued without explanation several previously initiated audits. Many of the completed audits were methodologically flawed due to the small number of samples audited, often too few to be meaningful.

Medication Management:

Continuity of medication was problematic for inmates on arrival, changes in intra-institutional housing locations and renewal. Institutional audits indicated that just 29 percent of newly arriving inmates received their medications within 24 hours. No institutional audits had been conducted of medication continuity on intra-institutional housing changes. Institutional audits on the renewal of medication orders were seriously flawed. Although ASP had a caseload population of nearly 900 inmates, the audit of expirations on medication renewals included only 20 charts. The unexpected absence for three weeks of the institution's only psychiatrist resulted in numerous medication expirations; efforts to have non-physicians evaluate inmates for medication management

and to have non-psychiatric physicians renew orders for expiring medications were simply not carried out.

Follow-up to medication non-compliance was weak. Although staff reported that inmates who refused their medications or failed to show up for medications three consecutive times were referred to mental health within a week, the institutional audit of this issue found zero-percent compliance. Inmates also complained about lack of follow-up to medication non-compliance.

It was unclear whether inmates in administrative segregation continued to receive their medications after prescription changes because the institution had not audited this problem. The monitor reviewed the charts of seven administrative segregation inmates, but could not track medication changes because relevant MARs were not present in most of the reviewed charts.

Although ASP reported that no inmates were on Keyhea orders, the monitor found one inmate with a Keyhea order in the facility during the monitoring visit. One contract psychiatrist reportedly refused to acknowledge requests by inmates to withdraw their consent for psychotropic medication. The psychiatrist continued to write orders for the same medications, without ever evaluating the appropriateness of involuntary medication administration for these inmates through the Keyhea process.

Inmates complained of long pill lines, some reportedly lasting up to an hour, but indicated that DOT was performed. ASP reported that it did not provide HS medications.

Mental Health Assessments for the Disciplinary Process:

Implementation of the mental health assessment process for MHSDS inmates charged with disciplinary infractions was inadequate. The disciplinary log was incomplete and included neither inmates' levels of care nor the outcomes of mental health assessments. The records of mental health assessments were highly disorganized, but it appeared that there were no requests for assessments during the first eight months of 2004. Furthermore, ASP had no record of how many 3CMS inmates received RVRs during that period. Apparently appropriate training on the mental health assessment process in discipline disciplinary procedures was reportedly conducted, but no documentation was available to substantiate the assertion.

Transfers:

EOP transfers were generally timely. During the monitoring period, 19 EOP inmates were housed at ASP. On average, transfers were completed within 25 days. In the case of one inmate, whose transfer was delayed for almost 60 days, the institution arranged a special transport to CMC. Most of the staff, however, did not appear to be aware of any process for expedited transfers.

The timeliness of MHCB transfers was erratic. ASP reportedly discontinued using its OHU as a MHCB unit and attempted to transfer inmates to appropriate programs within 24 hours. According to institutional policy, all EOP inmates were reportedly housed in the infirmary for better access while awaiting transfer. The monitor's review of data on OHU admissions revealed that 33 inmates were housed in the unit for longer than 72 hours, 12 of whom were EOP inmates. Two inmates with extended stays were held in the OHU beyond specified time frames for medical reasons,

181

and five were delayed for custody reasons while waiting for housing assignments. Ten inmates held in the infirmary longer than 72 hours were admitted on a weekend or holiday.

ASP no longer transferred inmates to DMH; the institution transferred inmates only to EOP programs and MHCB units.

Other CAP Issues:

a. Partial Compliance

The timeliness of initial mental health assessments declined somewhat during the monitoring period. An institutional audit showed that 84 percent of inmates received an assessment within five working days, compared with 92 percent during the preceding monitoring period.

The timeliness of initial treatment plans also declined slightly. An institutional audit found that treatment plans were completed within 14 days for 85 percent of arriving inmates, compared with 88 percent during the preceding monitoring period.

EOP inmates were generally seen weekly by case managers while awaiting transfer. The monitor reviewed the MHTS inmate histories for ten EOP inmates and found that all but one was seen weekly.

b. Non-Compliance

Due to the staffing shortages, psychiatrists did not participate regularly in IDTT meetings. Chart reviews, as well as staff and inmate interviews, indicated that psychiatrists were not present at IDTT meetings held in general population housing yards, although a psychiatrist reportedly signed the MH-2 treatment plans. Staff reported

that psychiatrists were in attendance at IDTT meetings held in the administration segregation unit and the OHU, as well as at meetings held to consider changes in level of care, but there was no documentation to that effect in the charts. In the absence of a psychiatrist, information in the inmates' charts on medication non-compliance and refusals frequently was not considered at the IDTT meetings. Correctional counselors were said to attend IDTT meetings on a regular basis, but the institution did not conduct an audit of this issue. Correctional counselors did not usually bring C-files with them to IDTT meetings, and the correctional counselor in attendance often was unfamiliar with the inmates being reviewed.

Group therapy for 3CMS inmates grew more scarce as the number of groups offered decreased during the monitoring period from six to two. The institution had a shortage of office space, which exacerbated the difficulty of providing therapy. In addition, a new requirement that psychiatrists see inmates in the housing yards worked to displace some groups.

The provision of daily psych tech rounds in administrative segregation, an issue earlier resolved, was a problem once again. An institutional audit for the period from January through August 2004 found only a 43-percent rate of compliance with the requirement for daily rounds. Psych tech rounds were said to have improved after June when clinical supervision of the psych techs was returned to mental health, but no documentation confirmed this. In addition, there appeared to be some problem with weekly case management contacts in administrative segregation. In one instance, no backup coverage was provided when the case manager for administrative segregation went on vacation for two weeks in August.

The quality of progress notes reviewed by the monitor appeared poor, with many containing only minimal information and at least one-third of them illegible.

The MHTS remained unreliable. The institution had not audited the concordance rate between UHRs and MHTS data during the monitoring period, but staff indicated that the system was often inaccurate.

Some inmates on heat-sensitive medications complained that during the preceding summer they were not allowed into their housing units when a heat alert was announced, but the allegations could not be confirmed.

New Problem:

Spanish interpreters were not consistently available.

Institutional Summary:

ASP's pace of progress toward full implementation of its CAP and compliance in the four areas of focus during the monitoring period was disappointing. Already thin psychiatric staffing deteriorated further, leading to serious problems in a wide range of areas dependent on psychiatric services.

Among the four issues looked at during this round of review, quality assurance stalled, and implementation of the mental health assessment process in disciplinary actions involving caseload inmates simply was not functional. With the dearth of psychiatric services during much of the monitoring period, medication management made little headway. Continuity of medication, follow-up to medication non-compliance, renewal of medication orders, the delivery of HS medications, maintenance of MARs and pill lines were all deficient. Only in the area of transfers was

the facility able to sustain some progress. EOP transfers were generally completed within the prescribed time limits, although the timeliness of some MHCB transfers was erratic.

No CAP items were resolved during the monitoring period. Psychiatric attendance at IDTT meetings, unsurprisingly, was poor; the timeliness of initial mental health assessments and treatment plans declined; group therapy for 3CMS inmates was substantially reduced; and both daily psych tech rounds and weekly case management contacts in administrative segregation were inconsistent.

Clearly, the key to progress for ASP is the procurement of adequate psychiatric resources. The reduced population and available case management resources, both permanent and contractual, helped ease some of the stress on psychologists and psych social workers, but many of ASP's problems indicated the critical nature of psychiatric resources to a system so heavily dependent on psychotropic medications. The spell last September, when the facility was left with no psychiatric coverage, created ethical and professional problems for clinicians, as well as serious treatment deficiencies for inmates. No wonder morale among the facility's mental health staff was low. It is probably optimistic to hope that ASP can turn all of this around in just one monitoring period, but recent staffing data from DHCS indicates that the facility has filled at least the half-time psychiatric vacancy and is more regularly acquiring contracted services equivalent in most months to a full-time psychiatrist.

### Service Area F

Service Area F includes Salinas Valley State Prison (SVSP) and the

California Training Facility (CTF).

### Salinas Valley State Prison (SVSP)
September 14- September 16, 2004
January 5-January 7, 2005
April 4-April 6, 2005

During the monitoring period, the vacancy rate among permanent mental

health staff at SVSP decreased from 40 to 29 percent. Positions for five staff

psychiatrists, two psych social workers, five psych techs and three recreational therapists

remained vacant. The position of chief psychiatrist, long vacant, was slated to be filled in

May 2005. A candidate had been hired and had a start date of May 11, 2005. Staff

reported that allocations of staffing were insufficient to meet the demand for services.

There were, for example, no staff allocations to cover leave. The institution submitted a

request for ten additional clinicians and a senior psychologist position early in 2005.

Contract coverage during the monitoring period, particularly among

psychiatrists, was inadequate. In September 2004, the facility contracted for psychiatric

services equivalent to one full-time psychiatrist; in February 2005, no psychiatric services

were contracted. In those same months, SVSP hired the equivalent of 7.7 case managers

in September and 5.5 in February. As of mid-March 2005, SVSP still was unable to

replace any of its three recreational therapists who quit in March 2004 after an inmate

physically attacked one of them. Twelve psych tech positions were allotted; five were

filled. On the other hand, the institution was able to procure the services of contracted

LVNs, hiring the equivalent of 6.6 full-time employees in February 2005, covering some

vacancies among psych techs, RNs and MTAs.

186

Auxiliary staffing did not improve. Four of 28 allocated MTA positions were removed, leaving SVSP with 24. Six MTAs were on staff, but two of the six were out on extended leave. One of two senior MTA positions was filled by an individual who served in an acting capacity; the other was vacant. The allocation of nursing positions was increased by 10.5 FTE to 35.1, but numerous nursing positions were vacant. SVSP typically had the highest rate of RN vacancies of any CDCR institution.

The size of the 3CMS caseload grew from 993 in August 2004 to 1,044 in April 2004. The EOP capacity of 193 was often exceeded, reaching 213 in April 2005. The number of inmates with sensitive custody needs treated at the 3CMS level of care reached 405.

Quality Management:

The quality assurance process improved substantially during the monitoring period. The mental health quality management committee met regularly, once weekly beginning in August 2004, and reported to the institutional quality management committee. That committee was revamped and its composition changed to conform to departmental standards.

Action items, a seldom used but readily available tool in DCHCS's quality management program, were the primary means of addressing systems issues. The QIT process, which had been floundering, was found to be unnecessarily ponderous because systemic problems could be identified readily by personnel familiar with the operations of the institution. Quality improvement audits addressed important targets and were useful to the institution. Psychologists were engaged in peer review. Peer review among psych social workers started but was hampered by the low number of psych social

187

workers, just two, in the facility and uncertainty over the legal implications of combining

peer review for the two different categories of case managers. There was no psychiatric

peer review among the two permanent psychiatrists on the mental health staff.

Documentation of quality assurance activities improved over the course of the 15th

monitoring round.

Implementation of the MHTS, which had been problematic, improved but

remained out of compliance. In addition, efforts to ascertain concordance between UHR

entries and MHTS data improved. Institutional audits done each month between August

2004 and February 2005 found concordance rates of 92 to 100 percent. Staff with 3CMS

caseloads reported confidence in using MHTS data to manage their caseloads. The

MHTS was not useful, however, in tracking the timeliness of responses to referrals and

tracked inadequately EOP contacts that deviated from scheduled activities and MHCB

admissions and discharges.

Medication Management:

The management of medications was a focus of quality assurance activity

by both the MHQMC and the institutional QMC. A number of action items,

accompanied by directives generated by custody supervisors, helped improve standard

operating procedures and resulted in better continuity of medication for newly arrived

inmates and those re-located within the institution. Some difficulties persisted for

inmates transferred from administrative segregation to the general population and those

discharged from the MHCB unit. Improvements were also made in tracking and auditing

medication continuity, although these gains in continuity of medication had not yet been

institutionalized. Some significant problems with the administration of medication

188

remained, including the delivery of HS medication prior to 7:00 p.m. and the failure to provide medication via DOT to all inmates on Keyhea status. In addition, during October and December 2004, two common psychotropic medications were not administered as ordered in one yard because the institution's supply of both was depleted.

Response to medication non-compliance was inconsistent according to staff reports, but hard data on the issue was unavailable. A new staffing pattern designed to facilitate communications between MTAs and psychiatrists on each yard housing 3CMS general population and special needs inmates was implemented. The non-compliance procedure was observed by a supervisory MTA after the new arrangement was in place and believed to be working, but no audit results were provided.

Troubling signs indicated that medication administration was neither well observed nor well documented in the EOP units. Anecdotal reports of hoarding, both oral and written, surfaced frequently. Non-compliance with medication did not always elicit a response. Many MARs of EOP inmates were unintelligible, making it impossible for treatment providers to know whether or when medication was administered.

Psychiatrists continued to renew prescriptions for some inmates without seeing them. Institutional audits from June 2004 through January 2005 indicated that medication orders were written without inmate contact in as many as 32 percent of the cases audited. The range varied from six to 32 percent; typically 16 to 17 percent of orders for psychotropic medication were written in the absence of inmate contact. No rationale for changes in medication was documented in about half of all audited cases. Some improvement in the acquisition of informed consent forms for the use of psychotropic medication was noted. Inadequate consent forms were revised. The

189

frequency with which informed consent forms were obtained, however, remained low, ranging from 22 to 53 percent. The institution's ability to identify and effectively address these problems improved demonstrably even in the vacuum created by the lack of adequate psychiatric staff, a fact that boded well for future improvement.

Compliance with requirements for laboratory blood-work was poor and declined further during the monitoring period. Institutional audits during June 2004 through February 2005 indicated that laboratory tests obtained for inmates on mood-stabilizing medications ranged from a low of 49 percent to a high of 70 percent. Laboratory tests were ordered in a higher percentage of cases, ranging from 67 to 96 percent, but frequently were not ordered as needed. The percentage of abnormal test results, which increased dramatically during preceding monitoring rounds, remained high; close to half of all lab results were abnormal. Responsive reaction occurred in only about half of the cases of abnormal lab results.

Records of Keyhea orders were neither current nor well organized. Staff often did not know when inmates with current Keyhea orders arrived at the institution or when the expiration of Keyhea orders for EOP inmates was imminent. Important procedural deadlines were tracked only informally. Discussions of the renewal of Keyhea orders were not always held or documented; psychiatrists' presentations at hearings in support of petitions were uninformative in some instances; and rationales for denial and/or appeals were not routinely recorded. In a small number of reviewed cases, it was apparent that orders were inadvertently allowed to expire.

Mental Health Assessments for the Disciplinary Process:

Problems with responses to disciplinary infractions involving mentally ill inmates that were reported during the preceding round of review persisted during this latest monitoring period. Referrals were rarely made in three of the four yards where some 900 3CMS inmates were housed. Nearly all requests for mental health evaluations were generated in the yard that housed the facility's EOP and its administrative segregation units. The number of assessments requested in the three 3CMS yards grew nominally from zero to a handful during the monitoring period. Despite the paucity of referrals, completion of mental health assessments requested in connection with disciplinary charges was not always timely, nor was their content always pertinent. Audits conducted by staff at the institution were small in sample size. Documentation of RVRs typically recorded accurately whether the offender was on the mental health caseload and at what level of care. The general content of mental health assessments and a confirmation when hearing officers considered mental health issues in the disposition of the charges were also noted. A few cases indicated that, despite substantial compliance with the assessment process for RVRs, the clinical involvement and mitigation envisioned for the revised process was not always realized. In one reviewed case, a hearing officer explicitly disagreed with the mental health assessment that the inmate was psychotic at the time of the infraction. While the maximum sanction was not imposed, a credit loss of 121 days was levied. Another case generated by a dispute over an assignment to a double cell included a statement in the mental health assessment citing appropriate clinical justification for single-celling the accused inmate; this case was still

pending. A SHU term was imposed in the case of a psychotic inmate with a <u>Keyhea</u>
order, despite specific contrary recommendations by the mental health evaluator and the
senior hearing officer. In a few cases, sanctions were mitigated by hearing officers
relying on mental health assessments. Charges were dismissed in one reviewed case.

   Overall, documentation of the mental health assessment process for RVRs
involving caseload inmates improved. A single comprehensive log incorporated
information previously recorded in multiple records, although it lacked information on
the disposition of recorded disciplinary adjudications. The institution apparently
recognized some of the shortcomings of the assessment process and took steps to
improve it during the monitoring period. The associate warden for health care audited a
small number of cases, which indicated the need for some additional training, and in
September 2004 directives were issued to facility captains and chief disciplinary officers
on requirements for the assessment process. When the expected improvements were not
realized, a correctional counselor was assigned to review all RVRs with the authority to
recommend that a RVR be reheard, reissued, or referred for a mental health assessment.
The results of that measure were pending review.

Transfers:

   SVSP continued to maintain a transfer log in the MHCB unit that captured
all pertinent information. The average length of stay in the MHCB unit increased from
8.7 to 10.8 days from March through August 2004. Although flawed and covering only a
portion of the monitoring period, institutional data indicated that the number of inmates
who remained in the MHCB unit longer than ten days and were not awaiting transfer to a
higher level of care also increased, as did the number of multiple admissions. Solid data

on multiple admissions and the number of stays in the MHCB unit exceeding ten days were unavailable. The institution's ability to account for its use of crisis beds appeared to have deteriorated. The monitor's review of the institution's computerized information sources found none that was accurate. A manual log maintained in the MHCB unit appeared to be the sole accurate record of admissions and discharges.

SVSP relied most heavily on DMH/APP in CMF. The majority of inmates with conditions warranting a DMH inpatient level of care were referred to DMH/APP and accepted. The length of time that elapsed between referrals and transfers was usually a matter of two weeks or more. Access to SVPP was more restricted, due largely to lack of available beds and issues of compatibility with other inmates already in the program. Two inmates were accepted and transferred to ASH. Delays in transfers to DMH/APP exceeded 72 hours after the receipt of a bed assignment in 38 percent of transfers. Transfers to SVPP, located on the grounds of SVSP, all occurred within 72 hours.

The clinical threshold for initiating referrals to a higher level of care was excessively high. During preceding monitoring rounds, case reviews typically resulted in the identification of inmates who clinically were in need of a higher level of care but were not referred to any DMH program. The unmet needs assessment conducted in early 2005 identified over a dozen SVSP inmates who needed an inpatient level of care but had not been referred. Even after these and other inmates in need of DMH inpatient care were identified, referrals were not always made in a timely manner.

Other CAP Issues:

a. Partial Compliance

193

The institution moved aggressively to comply with the requirement that 3CMS inmates be seen at least quarterly by case managers. On average, case managers' caseloads numbered around 140 inmates. Weekly MHTS audits of the entire caseload by supervisors, in concert with correction of omissions, resulted in 86 to 95 percent of the caseload being seen at least quarterly from April through August 2004. Toward the end of 2004, the rate of compliance fell with the drop attributed to the holiday season. Reviews of MHTS records and UHRs by the monitor found few missed contacts. The issue will be resolved if compliance is sustained.

Treatment plans improved significantly. The use of prototypes to train clinicians to write more effective treatment plans was successful. Plans were current, individualized and almost always considered whether group treatment was indicated. The plans were often difficult to locate in the UHR because they were misplaced within the file. Institutional audits of treatment plans were adequate in size and method.

The ability to track missed appointments using the MHTS was refined, thereby correcting earlier erroneous reports indicating that nearly 50 percent of all appointments were missed. Cancellations of scheduled group treatment sessions on two yards, however, were found to be high, over 50 percent, which was consistent with earlier reports. The mental health quality management committee targeted the problem of custody-related cancellations in those yards for daily attention by the associate warden for health care. Custody-related cancellations were believed to be associated with inconsistent enforcement of rules for priority ducats and a 25-percent vacancy rate among correctional officers at SVSP. A weekly group session for 3CMS inmates observed by the monitor's expert appeared to be relevant and useful to the participants. The amount

194

of group treatment provided to 3CMS inmates, although noticeably improved in amount, content and organization did not meet the demand.

IDTT meetings for 3CMS inmates housed in the general population were held annually, as required. There were problems with the composition of teams, access to relevant information and follow-up of any salient custody issues that arose. Correctional counselors remained resistant to bringing central files to the meetings. Attendance by a psychiatrist, particularly one familiar with presented inmates, was not assured.

The frequency and timeliness of IDTT meetings for 3CMS and EOP inmates in administrative segregation continued to improve, coming close to a 90-percent rate of compliance. There were still problems, however, with the composition of teams, participation by correctional counselors and the quality of meetings. Some tension existed between the need to hold IDTT meetings prior to the initial ICC hearings to meet timeline requirements and the ability to conduct meaningful IDTT meetings. It was not uncommon for the IDTT meeting to serve as a forum for a psychiatric interview with scant discussion of the treatment plan among team members and with the presented inmate. The practice of having a supervising psychologist represent the assigned case manager was discontinued during the monitoring period.

The frequency of case management contacts with EOP inmates, which re-emerged as a problem during the preceding monitoring round, improved. Over 90 percent of EOP inmates received weekly individual case management sessions during the first half of the current monitoring round, with the exception of a dip to 87 percent in July. No information was available on more recent maintenance of the improvement.

195

Missed contacts, which were analyzed on a case-by-case basis by supervisory staff, were associated with staff leave, both scheduled and unscheduled.

The provision of scheduled structured therapeutic activities for EOP inmates also improved during the monitoring period. All EOP patients were scheduled for at least ten hours of structured therapeutic activities each week, with the exception of 15 individuals for whom it was clinically contraindicated. Cancellations associated with lockdowns, searches and gang-related violence disrupted treatment in June and July, moving compliance out of reach during those months. Hours of treatment actually received by individuals also improved. It appeared that the majority of EOP inmates, about 85 percent, were enrolled in group treatment and attended at least ten hours of treatment per week barring cancellations. A constellation of measures implemented toward the end of the monitoring period doubled group attendance. Those measures included the addition of three new licensed psych techs who provided organized outdoor activities in the absence of recreational therapists; high levels of organization and vigilance on the part of correctional officers; disincentives applied for missed sessions, such as loss of yard time; and the threat of loss of AIA status via RVRs and classification committee actions. Outdoor organized activities that were observed were carried out as intended, and records reflected participation by individuals.

Most indoor group sessions were attended by 15 to 17 participants, with typically just two or three absentees. Tardy arrivals impeded the utility of all groups; it was common for a substantial number of participants to arrive ten to 20 minutes late for a 50-minute session due to routines associated with release from their respective buildings. The monitor's experts observed a large number of group meetings in May 2005. The