quality of the groups was high. Group leaders used a wide variety of materials; topics were relevant to the members of the groups; modes of communication were effective; discussion was facilitated; and members of the groups were engaged on an individual basis in a therapeutic manner. Interviewed inmates, including some who did not typically attend groups, gave favorable appraisals of the group treatment provided at SVSP. The content and process of the EOP groups were better here than in EOP treatment groups conducted elsewhere in CDCR.

> b. Non-Compliance

The institution lacked any meaningful way to track either the timeliness or effectiveness of clinical responses to staff and inmate referrals. There was hope that a change requiring the triaging of referrals and scheduling of appointments in each yard rather than handling them at a central point might result in faster responses and better records, but no data were available on the effect of this change.

The percentage of 3CMS inmates in administrative segregation receiving weekly out-of-cell case management contacts varied depending on the housing unit. Across all administrative segregation buildings, about 40 percent of 3CMS inmates were seen out of their cells weekly, which represented some improvement over past performance. The increase in out-of-cell contacts was attributed to changes in clinical and custody staff and a reduction in the number of 3CMS inmates housed in two of the buildings with the most impediments to the delivery of mental health treatment. Also, in contrast to the preceding monitoring period, no inmates in need of a higher level of care were found by the monitor's experts in administrative segregation.

197

On the other hand, scanty custody coverage, the frequent redirection of officers and brief windows of opportunity for mental health contacts reduced the frequency of out-of-cell case management contacts in other administrative segregation units. Shortages of correctional officers often delayed the delivery of breakfast, which in turn delayed the start of clinical contacts and reduced the overall opportunity for contacts. Medical appointments trumped mental health appointments; the two often competed for the same office space. Hatches between interview rooms and central control posts overhead remained open. When an office was used by medical staff, mental health clinicians sometimes conducted their interviews in the housing unit itself, which did not afford visual privacy.

Psychiatric coverage in administrative segregation was quite problematic. Attempts to facilitate meetings between psychiatrists and 3CMS inmates did not reliably result in contacts. When questions about the risk of suicide arose, a mental health clinician frequently did not see the individual for up to four hours later; during the interval, the inmate in question was typically placed in a holding cell and observed by a correctional officer. In summary, while mental health services in administrative segregation were gradually improving, basic program mandates remained out of reach due to lack of resources, human and otherwise.

The capacity to treat EOP inmates in administrative segregation improved with the addition of ten new holding cells, essentially doubling programming capacity. Once the new cells become usable for groups, 40 to 50 EOP inmates will be able to receive ten hours of group treatment weekly. The arrangement of the cells was problematic. Visual and auditory lines of communication were sufficiently obstructed to

198

compromise meaningful group interaction and treatment. The amount of group treatment offered was also increased by more efficient use of available hours, full clinical staffing of the EOP administrative segregation unit and the availability of a "floater" clinician who led groups and made individual contacts as needed. Two group sessions observed in the established group space, one of which was led by a floater, were therapeutic. Interviewed inmates spoke favorably about the groups and individual sessions. Confidentiality was preserved during both group and individual contacts. Escort officers knew the EOP inmates well, facilitated their attendance at appointments and maintained excellent records of attendance and reasons for refusal. Although compliance with program guide requirements was not achieved, it was evident that through sustained collaboration between mental health and custody staff a fully functioning treatment program for EOP inmates in administrative segregation was in place and continued to move toward compliance.

Questions about psych tech rounds raised during the preceding monitoring period were put to rest. Although documentation of psych tech rounds in the UHRs was inconsistent, the monitor's review of other sources of information and discussions with staff led to the conclusion that rounds were made as required throughout the monitoring period. Monitoring of psych tech rounds was stepped up. UHR reviews done in April 2005 by the monitor found that weekly summaries of psych tech rounds of segregated MHSDS inmates were present from January 2005 forward. Institutional audits found that psych tech rounds were conducted as required.

New Problems:

>Vitek hearings did not conform to legal requirements.

>Logs of the use of holding cells in administrative segregation were incomplete and inaccurate.

Institutional Summary:

Staffing vacancies continued to stretch resources. The vacancy rate among mental health staff, however, decreased to 29 percent, and the addition of several psychologists and the continued strong use of contracted services seemed to signal an upturn in the institution's evolving capacity to provide a better grade of mental health services. While the caseload population continued to grow slightly, the pace of the growth appeared to slacken during much of the monitoring period.

Among the four areas focused on during this round of review, SVSP showed progress in its quality management efforts. The efforts were better organized; documentation was improved; and staff used audits more effectively to monitor progress toward goals. Readily identifiable problems were sometimes addressed collaboratively through the quality assurance process, some with good results. The MHTS also emerged as a useful tool for management, at least, of the general population 3CMS program.

Medication management remained erratic. Modest improvements were made in continuity of medication for inmates changing location within the institution. The content of informed consent forms improved, but informed consent was not regularly obtained. Two areas that progressed during earlier rounds slipped backward during the current monitoring period. Changes in medication orders were no longer accompanied routinely by a documented rationale, and HS medications were no longer delivered after

7:00 p.m. MARs were commonly unintelligible; prescriptions were often renewed by psychiatrists without seeing patients; responses to medication non-compliance were inconsistent; and laboratory testing and the follow-up of abnormal results were often lacking. Tracking of inmates on Keyhea orders and consistent implementation of DOT orders also fell short.

Documentation of disciplinary proceedings involving mentally ill inmates improved somewhat, as did the institution's ability to monitor its compliance with the revised mental health assessment process. Nearly all referrals for mental health assessments were generated in EOP and administrative segregation units. Review of cases where referrals were made and mental health assessments completed found that adherence to established procedures did not necessarily achieve the intended results. Mental health assessments did not always provide pertinent information, and, when pertinent information was provided, it was sometimes ignored or rejected by hearing officers. To improve the efficiency of the revised mental health assessment process, SVSP issued directives to facility captains and chief disciplinary officers and assigned a correctional counselor to review all RVRs.

SVSP continued to maintain a log that captured important information on transfers to higher levels of care. Access to acute inpatient DMH beds was adequate, although too many inmates were not transferred to the DMH/APP at CMF within 72 hours of being assigned a bed. Access to intermediate DMH care at SVPP was limited by a lack of beds and, sometimes, restrictive enmities between referred inmates and those already in the program. In contrast to the recent past, when no inmates from SVSP were treated at ASH, two inmates were accepted and transferred during the monitoring period.

Referrals to a higher level of care were not always made as clinically warranted; the threshold for referral to higher levels of care was often set too high. Once inmates in need of a higher level of care were identified, referrals were not always made in a timely manner.

With regard to the facility's CAP, improvements were noted in the quality of treatment plans, quarterly case manager contacts with 3CMS inmates, weekly individual contacts with EOP inmates and the amount of treatment provided to EOP inmates. All three of these problems were close to resolution. Mental health treatment in administrative segregation for both 3CMS and EOP inmates improved significantly, but needed further work, especially for 3CMS inmates. More group therapy was provided to general population 3CMS inmates because custody and mental health staffs were collaborating to reduce cancellations and no-shows. The institution continued to struggle with the composition of IDTTs, availability of central files at IDTT meetings and the overall quality of IDTT meetings.

SVSP made some significant strides during the monitoring period and began to demonstrate a growing and encouraging ability to identify and address more effectively its many problems in the four particular areas focused on in this round, as well as among other long-lived deficiencies in its CAP. Given SVSP's history of struggle with so many aspects of its mental health services, the monitor's characterization of the quality of EOP group activities as among the best in CDCR was especially heartening.

Also encouraging was the institution's swift reaction to the monitor's discovery during the early January visit of the misuse in administrative segregation of the so-call retention ring. The retention ring was a piece of quarter-inch rebar fashioned into

202

a steel hoop approximately twelve inches in diameter, which, according to institutional policy, was to be used to control an inmate with a history of refusing to surrender his handcuffs or when staff had reason to believe that an inmate was going to be disruptive or assaultive during a move. The retention ring was to be attached to an inmate's handcuffs as he was taken out of one location, removed during escort and reattached to his handcuffs until he was placed in the new location. Once the inmate was safely locked into the cell, holding cell or shower, the retention ring was then to be removed. In January, the monitor learned that, contrary to local policy, the retention ring was being used commonly in administrative segregation units to immobilize potentially suicidal inmates placed in holding cells pending a mental health evaluation. In some cases, suicidal inmates spent four hours standing in holding cells, their backs pressed against the cell door and their cuffed hands placed behind their backs and through the cuff port, as they were required to hold the retention ring or endure the considerable weight of the ring dangling from their handcuffs. At the conclusion of the January visit, all agreed that this practice, ostensibly intended to prevent self-harm, contravened local policy and would be corrected.

A monitor returned to the facility on February 9, 2005 to determine what actions had been taken to eliminate the offending practice. The institution had taken appropriate steps to stop the improper use of retention rings. Institutional policy was clarified to prohibit specifically the use of the retention ring on suicidal inmates in a holding cell awaiting evaluation; training on the new policy was provided; and custody staff members assigned to administrative segregation units were uniformly aware of proper procedures for using retention rings and providing suicide prevention monitoring.

The monitor also found evidence of early two lapses in the application of the revised policy and noted that utilization of holding cells and retention rings in administrative segregation units needed to be better documented. Despite the initial lapses and inadequate documentation, the monitor found that the institutional administration had moved promptly and effectively to end the abusive practice, once its use became known.

In the next round of monitoring, SVPP needs to focus on continuing its improvement of mental health treatment in administrative segregation for both EOP and 3CMS inmates and the maintenance of complete and accurate records of MHCB use, with particular attention to lengths of stay and multiple admissions. Among the four areas of focus in this round, the institution needs to analyze and move aggressively to remedy its difficulties with the appropriate management of medications and work to enhance the impact of mental health assessments in its disciplinary process.

### California Training Facility, Soledad (CTF)
January 12, 2005 – January 14, 2005

Staff allocations changed somewhat during the monitoring period. Several half-time positions were combined and another position was reclassified, resulting in an increase in allocations for psychologists and psych techs and a decrease in psychiatrist and psych social worker allocations. Most allocated positions were filled, and contracts with few and steady providers more than covered existing vacancies, especially among case managers. The institution appeared to have a strong working relationship between custody and mental health, but better communication and more frequent exchanges of information between the two groups might have helped promote even more collaborative solutions to mutual problems.

CTF received increased numbers of 3CMS inmates in the months preceding the monitor's visit. Since the preceding monitoring visit in September 2003, the institution's MHSDS caseload grew by some 14 percent, rising to 758 3CMS inmates and exceeding the program's capacity of 699. The additional inmates impeded the timeliness of initial IDTT meetings and mental health screenings in administrative segregation.

Issues Resolved:

> Continuity of medication was maintained for inmates on arrival at the institution.
>
> Low functioning 3CMS inmates were appropriately identified and transferred to higher levels of care.
>
> Responsibility for administering non-psychotropic medications in administrative segregation was transferred from psych techs to MTAs and the nursing staff, affording psych techs increased time to assess seriously disordered inmates; psych techs continued to administer psychotropic medications to inmates in administrative segregation.
>
> Suicidal inmates discharged from the OHU received five-day clinical follow-up in their housing units.

Quality Management:

Quality assurance efforts at CTF were fragmented and did not conform to departmental protocols, although some improvement was noted beginning in late December 2004. For most of the monitoring period, attendance at quality management committee meetings was poor; the committee did not receive reports from its subcommittees; and its own minutes were unsigned. During the last quarter of 2004, a mental health quality management committee began to meet twice weekly, and five QITs were chartered. At the same time, however, psychiatric peer review began to languish.

205

Peer review among psychologists continued to occur, but it was limited to the review and discussion of a small number of charts.

The institution assigned a member of the mental health staff to spend substantial time auditing charts. The auditing methods were sound, and the data developed was reliable. Clinicians were generally notified of omissions in UHRs for inmates on their caseloads, but most staff members were not kept informed about other overall quality assurance issues.

Medication Management:

CTF made considerable progress in addressing medication management issues. The institution appeared to provide good medication continuity on arrival and internal housing transfers. Institutional audits also indicated that medications were generally renewed in a timely manner. Of 318 charts audited during the period from June 1 to October 31, 96 percent of medications were renewed within appropriate timeframes. Moreover, inmates were generally seen by a psychiatrist for medication renewal. The monitor's chart reviews, while confirming substantial compliance in this area, did find a few gaps on renewal. Fourteen-day extension orders were sometimes used to avoid interruptions on renewal, but the affected inmates often were not seen by a psychiatrist within the extended time period.

Follow-up to medication non-compliance remained problematic. Although non-compliance was documented regularly in inmates' MARs, non-compliant inmates were not consistently referred to mental health. Some blank spaces in inmates' MARs made it difficult to determine whether inmates were refusing their medications or medications were not delivered.

206

Psychiatric practices related to medication orders improved. There was excellent follow-up after medications were initiated or changed. An institutional audit of 54 new medication orders found that psychiatric follow–up occurred within 30 days of the medication orders in 53 cases. Documentation also showed that clinicians were aware of and responded to reported side-effects, and fewer medication changes occurred without a rationale. An institutional audit found some kind of psychiatric response in 96 percent of 72 surveyed cases in which inmates reported side-effects related to psychotropic medications. Similarly, clinicians documented a rationale for medication changes in 50 of 52 audited cases. If this level of compliance is sustained during the next monitoring round, this issue will be fully resolved.

Practices involving blood-level testing of inmates on mood-stabilizing medications also showed improvement. An institutional audit of 108 inmates taking Depakote, Lithium or Tegretol found that blood levels were ordered, drawn, reported and reviewed in a timely manner for 86 percent of the surveyed inmates. Staff reported that psychiatrists responded to abnormal results in a timely manner as well, but the institution had not yet audited performance in this area. CTF, however, had chartered a QIT to study the issue, which found that psychiatrists did not always receive normal test results because they were often sent directly to medical records for filing. The QIT also discovered that psychiatrists were not consistently informed when inmates refused laboratory testing. A new operating procedure addressing these problems was promulgated in December and was expected to improve performance even further in this area.

Pill lines generally lasted about 20 minutes, but inmates perceived and reported that lines were longer. This perception may have contributed somewhat to medication non-compliance.

Psychotropic medications were virtually always nurse-administered, but the institution studied the DOT process as part of its quality assurance efforts and found that adequate procedures for ordering and administering DOT medications had been implemented. On the other hand, only two inmates had orders for DOT-administered medications at the time of the monitor's visit. Staff indicated that both of these inmates were removed from their housing units and received their medications at a separate window. Medication administration was reportedly supervised, but the supervision was not documented. This issue would be resolved, if compliance continued during the next monitoring period.

Procedures for handling medication errors appeared to have improved, but further monitoring in this area was warranted. The institution purported to document all medication errors, but there were only four such errors recorded since August 27, 2004, none of which included mental health medications. It was unclear how accurately this low number reflected the rate of medication mistakes, since the monitor's chart review found some unreported errors. It appeared from documentation that psychiatrists were generally made aware of errors and any corrective actions taken.

Institutional documentation showed that discharge medications were provided to paroling inmates, but it was unclear whether all paroling inmates actually received their medication.

There was some question whether HS medications were provided in all appropriate situations. Only one inmate was on HS medications in the institution, which seemed inadequate given a caseload regularly hovering around 750 inmates, the vast bulk of them on psychotropic medications.

Informed medication consent forms for psychotropic medications were consistently present in inmates' charts. An institutional audit for the period from June 1 through October 31 audited 409 charts of inmates on psychotropic medications and found that 89 percent contained current and completed medication consent forms. The monitor's chart reviews confirmed substantial compliance in this area. This issue will be resolved if compliance continues at this level during the next monitoring period.

Mental Health Assessments for the Disciplinary Process:

It appeared that mental health assessment procedures for caseload inmates involved in disciplinary infractions were being followed to some extent at CTF, but it was difficult to audit the issue because most caseload inmates who had received mental health assessments in connection with disciplinary proceedings had left the institution. Efforts to document disciplinary hearings for MHSDS caseload inmates were beginning to improve, but institutional tracking data was inconsistent. According to the RVR log, 115 caseload inmates received disciplinary infractions since the preceding monitoring visit, 23 of whom were referred for mental health assessments, while an institutional audit indicated that 112 caseload inmates received disciplinary infractions, only six of whom were referred for mental health assessments. According to the audit, mental health factors were found to have influenced the behavior of two of the six assessed inmates, but RVR documentation indicated that the mental health assessment was considered in only

one of the two cases. In addition, the RVR log was incomplete; it did not record inmates' levels of care, the results of mental health assessments or hearing dispositions.

Transfers:

The institution continued to transfer EOP inmates to appropriate programs in a timely manner. From June 1 to December 7, 2004, there were 41 EOP transfers, none of which took longer than 60 days. Approximately 78 percent of EOP transfers were completed within 30 days and most transfers took no more than one to two weeks. There were ten EOP inmates pending transfer at the time of the monitoring period, only one of whom had been waiting longer than 60 days.

Lengths of stay in the OHU rarely lasted longer than 72 hours. According to institutional data, there were 116 OHU admissions from June 1 to December 20, 2004. While 20 percent of these admissions were delayed beyond 72 hours, most of the prolonged stays occurred in the months of June and July. From August through December, there were only four admissions that remained longer than 72 hours. Moreover, there were very few inmates with multiple admissions to the OHU. Transfers to MHCB units were reportedly completed within 24 hours of referral.

CTF did not transfer inmates directly to DMH. CTF inmates in need of higher levels of care were sent either to EOP programs or MHCB units elsewhere. The CTF mental health staff was aware of the DMH criteria and referral process. CTF referred one inmate to ASH during the monitoring period. This referral was made on January 11 and was pending at the time of the monitor's visit a few days later on January 14.

IDTT meetings were consistently held for inmates discharged from the OHU for whom a higher or lower level of mental health care was recommended. An institutional audit found that IDTT meetings were held for all but one of 21 inmates discharged from the OHU with a recommendation for a changed level of care during the period from June 1 through November 30.

CTF was experiencing some difficulty adhering to a recently promulgated departmental policy requiring the institution to complete mental health screenings for all non-caseload inmates transferred to administrative segregation within 72 hours of placement. An institutional audit in October of eight non-caseload inmates transferred to the administrative segregation unit found that only two received mental health screenings with 72 hours of their placement in the unit. Another audit found that 57 of 59 non-caseload inmates placed in administrative segregation between June 1 and October 31 had mental health screenings completed within the year prior to their admission. The monitor's chart reviews confirmed that mental health screenings were not completed timely for all non-caseload inmates placed in segregation.

The tracking of OHU admissions improved. CTF began using a more sophisticated admissions log during the monitoring period, which included the dates of and reasons for admissions, MHCB referrals and return dates, if applicable, and discharge dates. The log appeared complete and accurate. This issue, too, will be resolved if compliance continues during the next monitoring period.

Other CAP Issues:

a. Partial Compliance

211

The quality of treatment plans continued to improve. An institutional audit of 227 treatment plans completed during the period from June 1 through October 31 concluded that 90 percent were complete and adequately individualized. The most frequent omissions included GAF scores, interventions and parole plans. The monitor's chart review suggested that most treatment plans were complete and individualized, but still found a small, but not insignificant, percentage of plans that were either incomplete or generic, necessitating some further monitoring of this issue.

The timeliness of some aspects of the IDTT process slackened somewhat during the monitoring period. Institutional audits indicated that IDTT meetings were not consistently held within 14 working days of arrival. Delays were attributed to a lack of adequate vacation coverage in July and a large influx of new admissions during October and November. Annual IDTT meetings, on the other hand, continued to be timely. The monitor observed a series of annual IDTT meetings, however, where C-files of the inmates being reviewed were not brought to the meeting and custody staff was unfamiliar with the inmates being reviewed. The timeliness of initial IDTT meetings, though resolved in the preceding round of monitoring, needed further scrutiny.

Psychiatric responses to inmate and staff referrals were increasingly timely. An institutional audit of 69 routine referrals for the period from June 1 to October 31 found that 97 percent of referrals were responded to within ten working days as required by the local operating procedure. Of 258 emergency referrals during the same period, 99 percent were seen within 24 hours. If compliance continues at this level, this issue will be resolved during the next monitoring period.

The provision of group therapy for 3CMS inmates declined during the monitoring period. Programming space for group activities was limited, as were offices and interview rooms. Space constraints were compounded during the monitoring period by extensive earthquake renovations.

It was impossible to determine whether EOP inmates in CTF were seen consistently by their case managers every week. The institutional audit of this issue was inadequate, and most of the inmates whose charts were provided to the monitor had only recently been upgraded to an EOP level of care. The number of EOP inmates in the facility at any one time was low, and, as indicated above, once referred to an EOP level of care their stay in CTF was typically quite short. Nonetheless, the facility needed to document its provision of weekly case management contacts to these EOP inmates.

The bus screening process continued to show improvement. An institutional audit of 107 charts of MHSDS caseload inmates who arrived at CFT between June 1 and October 31 found that bus screening forms were completed for 82 percent of the audited inmates on the day of their arrival. Referred inmates were generally seen by mental health within five days of their arrival, although the institution struggled in recent months to meet this timeframe due to the increasing influx of new arrivals.

b. Non-Compliance

Problems with the ICC process, resolved during an earlier monitoring period, re-surfaced. Specifically, it appeared that clinical input at ICC hearings was routinely limited. The monitor observed ICC hearings for a number of caseload inmates and found that, even though a psychologist was regularly present, mental health

213

information was not readily available. Chart reviews confirmed the lack of clinical input. Part of the problem appeared to be that UHRs were not brought regularly to ICC hearings.

Isolation logs showed that psych tech rounds were regularly conducted in administrative segregation, but inmate charts did not consistently contain documentation of these rounds.

Institutional Summary

Staffing was not a problem at CTF despite some shifts in allocations among different categories of mental health staff. The institution still struggled with the creation of consistent quality assurance structures and procedures. Its management of medications continued to improve and approached substantial compliance in a number of areas, including continuity of medications on arrival, internal transfers and renewal of medication orders; psychiatric practices and follow-up on the initiation of, and subsequent changes to, medication orders; the provision of blood-level testing for inmates on mood-stabilizing medications; the acquisition of informed medication consent forms; the handling of medication errors; and the provision of parole medications. CTF needed only to follow up referrals for medication non-compliance and boost its provision of HS medications to become one of the first institutions in CDC to meet fully its responsibilities relative to the delivery and management of psychotropic medications.

CTF was similarly successful in providing timely transfers of caseload inmates to appropriate levels of care elsewhere in CDCR. On the other hand, the institution's poverty of documentation made it impossible to assess its compliance with

requirements for providing mental health input into the processing of RVRs involving caseload inmates.

In regard to its CAP, the facility managed to resolve four issues during the monitoring period and demonstrate genuine progress on almost all other outstanding deficiencies, including eight others where full compliance was assessed to be quite close. Improvement was also noted in the quality of treatment plans, the timeliness of psychiatric responses to referrals, the tracking of OHU admissions, the provision of clinical follow-up of suicidal inmates discharged from the OHU and bus screening procedures. Problems remained with the timeliness of some aspects of the IDTT process, documentation of psych tech rounds in administrative segregation, the provision of group therapy and clinical input at ICC hearings. CTF has earned a paper review for the next round of monitoring, in which it needs to document its progress in resolving its remaining CAP items and addressing the short-comings of its mental health assessment process for MHSDS inmates who receive RVRs.

**Service Area G**

Service Area G includes the <u>California Men's Colony (CMC)</u>, <u>Wasco State Prison (WSP)</u> and <u>North Kern State Prison (NKSP)</u>.

**California Men's Colony (CMC)**
September 1, 2004 – September 2, 2004

CMC still had a number of key vacancies in its mental health program. Specifically, openings existed for 1.5 staff psychiatrists, a senior psychologist, six staff psychologists, a psych social worker, a psych tech, a recreational therapist and a half-time office tech. About 70 percent of the unfilled mental health positions were covered by contract employees.

215

Auxiliary staffing continued to suffer from a shortage of nurses, MTAs and medical records personnel. The institution had openings in almost half of its allotment of RNs, with 25 of 55 allocated positions vacant; of the six senior RN positions allocated to the institution, one was vacant, another was filled by a retired annuitant and a third was filled but uncovered due to sick leave. CMC was not optimistic about filling these positions because recent salary increases at local hospitals had damaged the institution's competitive edge. About 80 percent of the nursing vacancies, however, were covered by registry nurses. Of 44 MTA positions, 16 were vacant, as was one of five allocated senior MTA positions. The medical records section had five unfilled positions, and mental health supervisors felt that the number of allocated medical records positions was insufficient to handle the increased workload created by the institution's expanding use of its MHTS.

Quality Management:

The quality assurance process at CMC continued to make reasonable progress. The quality assurance structure was organized in accordance with the state's hospital licensing laws and included a quality assurance committee with representatives from each of the clinical departments, the nursing service, hospital administration and health information services. In addition, the institution had an interdisciplinary mental health committee that met monthly.

CMC successfully employed QITs to study a number of issues, including the provision of group therapy and mental health screenings in administrative segregation. These teams collected and analyzed data thoughtfully and devised remedies, which were subsequently implemented.

216

Monthly chart reviews, as mandated by DCHCS, did not occur because the MHTS was not yet sufficiently functional. Instead, chart reviews were conducted monthly through the peer review process. Peer review for psychiatrists appeared to be functioning well. The peer review process for psychologists and social workers needed additional refinement.

Medication Management:

Continuity of medications on internal relocations was generally good. Interruptions in the delivery of medications associated with changes in location reportedly lasted from zero to 24 hours. An institutional audit of 20 UHRs involving inmate movements found interruptions of only slightly longer duration, ranging from 12 to 36 hours after changes in housing locations.

CMC had a system in place to address continuity of medications on renewals, but no data was provided to confirm the degree of the institution's compliance on this issue. According to the institution, appointments were scheduled with psychiatrists prior to renewal dates; 14-day medication continuances were issued by telephone; and inmates were generally seen within the 14-day extension period. Similarly, the institution had established procedures for providing continuity of medication on arrival, but, again, no data was provided to confirm compliance.

Inmates generally received parole medications on discharge from the institution. A log of refusals and returned medications was kept by the pharmacy, but documentation on parole medications was not filed in inmates' UHRs.

Medication non-compliance procedures were in place at CMC. The definition of medication non-compliance, while adequate, did not guarantee that non-

217

complaint inmates would be identified immediately after three missed doses. Rather, it appeared that such inmates would not be captured until weekly MAR summaries were completed.

Laboratory testing for inmates on mood-stabilizing mediations was reportedly ordered, and tests were completed and returned in a timely manner. Psychiatrists reviewed the results and, in response, made adjustments to inmates' medication regimes.

HS medications were prescribed and reportedly delivered after 8:00 p.m., but only to a few inmates. According to clinicians, the nursing staff was insufficient to administer HS medications to a larger group of inmates. The institution needed to develop a plan to administer HS medications whenever clinically indicated. On the other hand, Keyhea orders were generally prescribed for inmates in need of such medication and renewed in a timely manner.

No central list of inmates in CMC on DOT-administered medications was maintained, in large part, because the institutional pharmacy management information system, which was not scheduled for replacement by the new department-wide system until next year, was primitive. Neither was any form of clinical review conducted to evaluate local practices for distinguishing between DOT and nurse-administered medications. RNs reportedly observed the ingestion of medication for Keyhea inmates and for inmates in the OHU and Transitional Living Unit. Nurse-administered medications apparently were observed and supervised on a periodic basis.

The new MARs were in use at CMC, but current MARs were not always filed in UHRs in a timely manner. Refusals and no-shows were documented on the

218

forms, but MARs were sometimes illegible, making it difficult to differentiate among multiple entries. No audit of MARs had been conducted.

Informed medication consent forms were generally filed in inmates' UHRs. Institutional audits found that consent forms were completed for at least 90 percent of all but two of 11 clinical caseloads.

<u>Mental Health Assessments for the Disciplinary Process:</u>

CMC had provided training on the mental health assessment process to both clinical and custody staff from March through July 2004. Documentation showed training dates, participants and the number of training hours provided. Based on observations made during the monitor's visit, some additional training was needed.

The institution tracked all requests for mental health assessments, but not all required data was collected in one log. The primary log, for example, did not contain the names of mental health clinicians who completed assessments. CMC needed to revise its RVR log to collect all of the relevant data in one place.

During the period from April 1 through July 15, 2004, 180 inmates were referred for mental health assessments. Only eight of the requests involved 3CMS inmates; the rest were for EOP inmates. During the same time period, 263 RVRs were written for 3CMS inmates. The monitor reviewed a representative sample of the 3CMS cases that were not referred and concluded, on the face of the reported facts, that assessments were not warranted in the reviewed cases. No RVRs were written for self-injurious behavior during the monitoring period.

Hearing officers appeared to take mental health input into consideration. Hearing officers consistently addressed mental health assessments in their findings and

dispositions and mitigated punishments in a significant number of RVR proceedings involving caseload inmates. From April 1 through July 15, 2004, clinicians concluded that *mental illness influenced caseload inmates' behavior in 88 instances.* According to institutional data, hearing officers reduced the penalty in response to mental health input in 29 of these cases. The monitor reviewed ten cases and found that hearing officers specifically considered mental health information in reaching their decisions; in those cases where the hearing officer rejected the clinical assessments, the reasons for rejections were documented.

Transfers:

Access to higher levels of care improved, at least during the early part of the monitoring period. From April 1 through August 30, 2004, CMC transferred 151 inmates to MHCB units, including at least 26 inmates with two or more MHCB admissions. The OHU log captured some helpful information, but did not aggregate the information in a manner that allowed a calculation of the average time between a MHCB referral and actual transfer. From April through July, between 68 and 100 percent of inmates referred to a MHCB unit were accepted within 24 hours of the referral. Between 94 and 100 percent were transported within 24 hours of acceptance. The average length of stay for inmates in the OHU, who were not referred to a MHCB unit, was 1.81 to 2.05 days; the average length of stay for inmates in the OHU referred to a MHCB unit was 1.68 to 4.64 days. Half of the MHCB referrals during July were made more than 48 hours following admission to the OHU, compared to 24 hours during the preceding three months.

Beginning in August 2004, the overall number of MHCB referrals throughout CDCR began to outpace available beds in MHCB units, meaning that institutions elsewhere were increasingly unlikely to have extra beds for referrals from CMC. This led to the development of an agreement between CDCR and DMH for the latter to develop a resource of 25 beds at ASH for CMC inmates in need of the short-term crisis intervention and care provided heretofore in CDCR's MHCB units. Reportedly, due to Department of Health Services (DHS) licensing regulations, DMH was required to handle this designated population in the same way the agency handled inmates referred to its DMH/APP at CMF. As a result, all of the procedural aspects of transfers of CMC crisis bed inmates to ASH became subject to the same strictures of the Memorandum of Understanding between CDCR and DMH applicable to transfers to DMH/APP.

In addition, because of the limited security available at ASH, inmates from Level III CMC with a history of violence or escape were precluded from transfer. This came as something of a shock in that a struggle had continued for years to get ASH to accept some Level IV inmates, at least on a case-by-case basis, once any predilection for violence or escape had been reviewed and discounted. Now ASH was refusing to accept Level III inmates, long presumed to be appropriate for housing in the dormitory setting of that DMH facility. Between the burdensome paperwork required for these transfers, which exceeded substantially the paperwork associated with standard transfers to MHCB units elsewhere in CDCR, and the heightened custody barriers to transfers from CMC to ASH, the expanded resource of MHCB beds at ASH became, in practice, largely unavailable for CMC inmates in need of temporary crisis care. For example, in May 2005, two of 44 CMC inmates in need of a MHCB level of care were actually transferred

to ASH. With MHCB units elsewhere in CDCR full, the referrals of all of the remaining 42 inmates were eventually rescinded. Once again, the clear needs of CDCR inmates were made to yield to the institutional needs of DMH, and CDCR was forced to abdicate its use of what was an extremely costly resource. More recent discussions with the agencies has produced some prospect of increased access to ASH for CMC inmates in need of a MHCB level of care, but it remains to be seen whether promises will produce results.

During the period preceding the monitor's September 2004 visit to CMC, referrals to other DMH programs increased significantly. Between April 1 and August 31, 2004, 59 inmates were referred from CMC to DMH. Thirty-one of these inmates were transferred to ASH; seven were transferred to DMH/SVSP; 13 were transferred to the DMH/APP at CMF; and eight were rejected. The DMH log was relatively complete, except that it did not consistently reflect the reasons for rejections or the specific DMH facility to which an inmate was referred. It was unclear whether all inmates in need of higher levels of care were referred to appropriate facilities; it was anticipated that the unmet bed needs assessment, which was scheduled to be conducted in late 2004 and early 2005 would answer that question.

Significant delays occurred in the transfer of inmates to PSUs, primarily due to a shortage of beds. Transfer timelines were not met.

Psych and return procedures seemed to be followed more frequently. CMC reportedly received discharge summaries for all inmates returned to the institution from DMH. ASH had just recently begun notifying CMC of returning inmates by

telephone.  In a few instances, remarkably, CMC rejected inmates discharged back to the

facility until CMC was satisfied that the returned inmates were stable.

Other CAP Issues:

      a.  Partial Compliance

      The provision of structured therapeutic activities for EOP inmates

improved.  According to data from the MHTS in late August, EOP inmates were, on

average, offered 10.55 hours of group therapy per week and received 6.15 hours.  The

MHTS only recently began to track the provision of group therapy and did not yet track

school attendance or treatment-driven work assignments.  As a result, the data probably

underestimated the number of hours of structured therapeutic activities offered to and

received by EOP inmates.  This issue will be resolved during the next monitoring period,

if this level of compliance continues.

      The availability of programmatic activities for EOP inmates in the

administrative segregation unit also improved.  A number of different group therapies

were offered to EOP inmates, although more groups were needed.  Participation in group

therapy was significantly lower for EOP administrative segregation inmates than for

general population EOP inmates.  Psych techs made rounds daily in administrative

segregation and evaluated all new arrivals for mental health concerns.  IDTT meetings

were conducted at least monthly, and case management contacts generally occurred

weekly.  Contacts with some 3CMS inmates occurred only every other week whenever a

large influx of admissions entered the unit.

CMC had taken steps to deal with inmates who were unmotivated or resistant to treatment. The institution began enforcing the A1A policy, which required inmates to participate actively in programming to earn day-for-day credit.

In addition, a pilot IDTT had been initiated for non-participating inmates in June 2004; a report on the outcome of the IDTT experiment was anticipated later in the year from the QIT studying the problem. Preliminary data from the first two months of the pilot project indicated that the level of participation improved from 25 to 50 percent.

Implementation of the MHTS improved significantly. Data entry greatly increased as the institution went from entering about ten percent of pertinent information to nearly 70 percent. CMC had not yet conducted a study to assess the accuracy of its data entries. The institution began to use the system for ducating inmates, scheduling appointments and tracking clinical contacts; the system was not yet used for other tracking purposes, including staff and inmate self-referrals and IDTT meetings.

Institutional Summary:

CMC had some mental health staffing vacancies, most of which were covered by contractors, and a much larger number of auxiliary staff vacancies. Among the issues of focus for the round, the institution's quality assurance process continued to make progress; mental health input into the disciplinary process was usually effective; and inmates seemed to have better access to more intensive higher levels of care, except for those in need of transfer to PSUs, at least through the time of the monitor's visit. Shortly thereafter, access to a MHCB level of care approached crisis proportions, and the joint efforts of CDCR and DMH to create an alternative means for meeting the need failed conspicuously.

224

Medication management reportedly remained effective.  Although few studies were conducted to verify compliance, it appeared that medications were routinely continued without interruption on arrival, changes in location and renewal.  CMC reportedly provided adequate parole medications, laboratory testing for inmates on mood-stabilizing mediations, follow-up to medication non-compliance, HS medications, Keyhea orders and completed informed medication consent forms.  On the other hand, procedures for DOT and nurse-administered medication were not fully documented or supervised, and MARs were sometimes illegible and filed in an untimely manner.

Among the institution's dwindling number of unresolved CAP items, EOP inmates, including those in administrative segregation, were offered and received increased structured therapeutic activities, but EOP inmates in administrative segregation participated in available activities at a lower rate.  The institution had taken some initial steps to encourage unmotivated inmates to participate in programmatic activities and more data was being entered in the MHTS.  Overall, CMC's mental health program operated reasonably well, and issues formerly resolved appeared to remain settled.  Additional studies, as the MHTS became more operational, were needed to confirm continued compliance in some areas.

### Wasco State Prison (WSP)
February 22, 2005 – February 23, 2005

WSP was essentially fully staffed with a vacancy rate among mental health staff of only 3.8 percent.  Just two positions were unfilled, one for a psychologist and one for a psych social worker that was in the process of being reclassified to a psychologist position.  All psychiatrist, psych tech and clerical positions were filled.  Case manager caseloads were under 100 inmates in the 3CMS program and reception,

while case managers in the EOP program and administrative segregation had caseloads of 20 to 30 inmates. Psychiatric caseloads varied, but none exceeded 250 inmates.

Contract psychiatrists were used to cover between one to 2.5 psychiatric vacancies earlier in the monitoring round before permanent clinicians were eventually hired. Contract psychologists were employed to cover one position or less during a two-month period earlier in the monitoring period.

Auxiliary staff positions were mostly filled. Two MTA and two medical records positions were vacant. Twelve vacant RN positions and three pharmacist positions were all covered by contractors.

Issues Resolved:

WSP provided continuity of medication on renewal.

3CMS inmates received case management contacts at least every 90 days.

Quality Management:

Quality assurance remained strong at WSP. The quality management committee functioned well, regularly meeting monthly and maintaining minutes. The mental health subcommittee also met monthly, but the composition of the committee was unclear; the number of staff members present varied from 12 in October to four in December, and custody members were frequently absent. Good discussions of key issues were noted in the minutes.

Only two QITs were newly chartered at WSP during the monitoring period. Although one of these QITs focused exclusively on a mental health issue, there did not appear to be a pressing need for additional QITs to work on mental health problems. The QITs were organized and performed well.

226

Monthly chart reviews were conducted, providing the basis for meaningful and well planned audits. Institutional audits assessed compliance with outstanding CAP requirements and monitored issues already resolved. The MHTS was used effectively for quality management purposes.

The peer review process was working well. Psychiatrists met quarterly for peer review, and other clinicians met monthly. A substantial number of cases/charts were reviewed at these peer review meetings.

Medication Management:

WSP had a helpful local operating policy for the management of medications. The policy, however, did not cover laboratory testing or informed medication consent forms. The institution's overall system for the delivery of medications had some significant deficiencies. The institution had undertaken initiatives to remedy these problems, but it was too early to assess their impact. Specifically, the institution recently hired a third senior MTA to focus on medication management and sought and obtained approval to construct medical rooms and pill windows in reception center housing units.

Continuity of medication for arriving inmates was erratic. Institutional audits were too small to be dispositive, but the institution acknowledged that it did not consistently provide medication to caseload inmates within 24 hours of their arrival. WSP had clear procedures for providing medication to inmates arriving with valid prescriptions. The institution also had procedures for referring new arrivals on undocumented medications to psychiatrists for evaluation. The monitor's review of bus screenings indicated that these inmates were referred for evaluations generally the same

227

day they arrived, but some did not receive their medications within appropriate timelines. A limited institutional review of 33 arriving inmates found that 78 percent received their first dose of medication within 24 hours.  The monitor's chart reviews found that continuity on arrival was erratic, with delays of up to four days.

Continuity of medication for inmates whose housing locations were changed was poor.  Institutional audits showed timely receipt of medication in only 44 percent of intra-facility transfers.

Continuity of medication on renewal, on the other hand, was much improved.  The monitor's chart review confirmed that appointments were scheduled with prescribing psychiatrists before renewal dates passed.  Although the institution provided renewal continuity, too many inmates were ducated for multiple appointments and seen more than once for the same renewal, creating an unnecessary drain on resources.

WSP had a mechanism in place for identifying paroling inmates and providing them with a 30-day supply of medication on discharge.  Parole medication forms documented caseload inmates who were offered and received or rejected discharge medications; the forms were not, however, filed in inmates' UHRs.

Follow-up to medication non-compliance was extremely poor. Institutional audits indicated that only one-sixth to one-third of inmates referred for non-compliance were seen in a timely manner.  Data from the MHTS was slightly more positive, showing a timely response to more than half of referrals for non-compliance. The extent to which all inmates non-compliant with their medication were referred to mental health was impossible to verify, but institutional audits uncovered some non-compliant inmates who had not been referred.

WSP's data on laboratory testing was badly organized, making it nearly impossible to assess compliance in this area. Moreover, the institution tracked only the interval between an order for testing and the drawing of blood. WSP did not attempt to verify whether laboratory tests were ordered for all inmates on mood-stabilizing medications, tests results were returned in a timely fashion, psychiatrists reviewed the test results or medication adjustments were made in response to abnormal results.

Practices with respect to the distribution of medications needed to be reviewed. The institution's medication policy appropriately distinguished between DOT and nurse-administered medications. All medications, however, were actually delivered as nurse-administered, even though the staff referred to some medication delivery as DOT. As a result, no clinical reviews were conducted to verify the distinction between DOT and nurse-administered medications, although nurse-administered procedures were regularly observed and supervised.

WSP had a local protocol for obtaining a Keyhea order, but the institution reportedly made every effort to transfer potential Keyhea inmates as soon as possible. There were no Keyhea inmates at WSP during the monitor's visit.

HS medications were not provided at WSP. Moreover, WSP conducted its last pill line of the day during the early afternoon at approximately 2:30 p.m.

Informed medication consent forms were present in most, but not all, charts. Institutional audits found completed consent forms for 68 to 81 percent of medications, but the audits seemed to apply an unnecessarily strict standard. The monitor's review of charts appeared to confirm the higher percentages found in the institution's audits.

The timely filing of MARs reportedly improved, but there were significant problems with incomplete MARs. WSP was not using the new MARs apparently because they were incompatible with the institution's pharmaceutical software. The monitor reviewed a sample of MARs and found them to be generally legible.

WSP had a system in place for generating, completing and compiling medication error reports. The reports contained a great deal of relevant information; they were submitted to the pharmacy and presented at pharmacy services committee meetings, which occurred every two months. The monitor received documentation of 33 medication errors that occurred during the preceding year.

Mental Health Assessments for the Disciplinary Process:

WSP had not implemented the new mental health assessment component of the disciplinary process adequately. No information on staff training on this issue was provided.

The number of caseload inmates receiving RVRs was consistent with the percentage of mental health inmates in the population; no infractions were written for self-injurious behavior. Only about two inmates a month were referred to mental health for bizarre or inappropriate behavior, and clinical staff determined about ten percent of these referrals did not need a mental health assessment. Most of these judgments appeared appropriate, but assessments appeared warranted among some of these referrals.

Little information about the mental health assessment process was readily available. The institution described a process designed to ensure that assessments were completed by clinicians other than the inmates' case managers, but to confirm the effectiveness of the process one had to determine the location of the assessed inmate and

the assessing clinician. A large portion of mental health assessments, 76 percent, found that mental illness was a factor in assessed inmates' behavior, but the quality of the mental health input could not be evaluated because most of inmates' C-files were not available. For the same reason, it was impossible to determine the impact of mental health input on hearing officers' decisions.

Transfers:

Lengths of stay in the MHCB unit improved. The MHCB unit had an average of 32 admissions a month over the preceding nine months; approximately 18 percent of admitted inmates remained in the unit longer than ten days. Most stays beyond the ten-day timeline lasted just a day or two or were referred to DMH. Only about seven percent of MHCB admissions remained longer than ten days without a referral. During the same nine-month period, 24 inmates were admitted three or four times to the MHCB unit. Over half of these inmates were referred to DMH.

Timely transfers for reception center inmates remained problematic. WSP did not retain data in its MHTS on reception center inmates once they were transferred out of the institution, except for inmates transferred to EOP administrative segregation hub units. The only data available on the timeliness of reception center transfers was related to inmates currently in the unit, who represented only a small portion of the approximately 4,500 inmates housed in the reception center during the monitoring period. Roughly 35 to 40 percent of caseload inmates in reception at the time of the monitor's visit had been in the center beyond mandated transfer timelines. Among general population EOP inmates in reception, 23 were overdue for a transfer, with delays up to

seven months. There was no evidence that expedited transfers were considered for EOP
inmates in reception.

Transfers of EOP inmates in administrative segregation typically occurred
within or shortly after the mandated 30-day timeline. Logs showed that, during the
monitoring period, all EOP administrative segregation inmates were transferred within 45
days and most were transferred within 30 days. On the other hand, MHTS printouts
indicated that more than half of the 54 3CMS inmates in administrative segregation at the
time of the monitor's visit had been there longer than 90 days, with the longest stay being
for one year. The monitor reviewed the C-files of about a quarter of 3CMS inmates in
administrative segregation beyond 90 days and found extremely lengthy delays, many of
which seemed preventable. Problems with untimely processing of RVRs, classification
errors and lengthy gang validation efforts resulted in extending inmates' lengths of stay
in administrative segregation by as much as seven months. Shorter delays were
sometimes the result of problems with generating required mental health paperwork.

Transfers to DMH programs were generally timely. During the nine
months prior to the monitor's visit, WSP made 34 referrals to DMH. Most of the
referrals were to DMH/APP at CMF, but some inmates were referred to each of the
available DMH programs/facilities. Referrals were generally initiated within inmates'
first ten days in the MHCB unit, but a few were not referred until 15 to 22 days after their
admission to the unit. WSP had significant transportation delays, which held up about a
quarter of the DMH transfers for as long as four to five days after the assignment of a
DMH bed number. Transfer times to DMH/APP ranged from two to 27 days, but

typically were under two weeks.  Transfers to DMH/SVPP and ASH took between six to seven weeks to complete.

Psych and return procedures were followed erratically.  According to the institution, DMH did not always send required discharge summaries, and DMH clinicians did not usually call to notify WSP clinicians that inmates were returning.  The monitor reviewed the charts of five returning inmates and found discharge summaries for only three.

Other CAP Issues:

a. Partial Compliance

IDTT meetings continued to be held in a timely manner, but problems with the participation of correctional counselors persisted.  While correctional counselors reportedly attended IDTT meetings for 3CMS inmates on their caseloads, no audit was conducted to confirm the level of their participation.  Correctional counselors still did not typically bring C-files to IDTT meetings and were often unfamiliar with the inmates presented.

Problems with the quality of treatment plans continued.  Chart reviews indicated that 15 percent of UHRs did not contain a treatment plan.  Treatment plans uniformly lacked individualization and were, as a result, inadequate.  All treatment plans reviewed by the monitor required clinical contact only every 90 days.  The monitor's expert, however, identified some inmates in interviews who needed to be seen more frequently than every 90 days.

The timeliness of psychiatric responses to staff and inmate referrals appeared to improve somewhat, but institutional printouts from the MHTS were so

233

incomplete, over-inclusive and inconsistent that it was impossible to determine

compliance. The printouts, however, indicated that emergency referrals were handled the

day they were received, and priority referrals were often seen within a day. There was

some evidence in the MHTS that self-referrals were often seen within a week; of 75 self-

referrals with complete data, 46 were seen within a week and another 23 were seen within

two weeks. In addition, the monitor reviewed inmate histories for 46 mental health

referrals and found that most were seen within a week and 90 percent within two weeks;

it took up to six weeks for the remaining inmates to be seen. Frequent delays in

transmitting self-referrals to mental health, a problem identified more than 15 months

earlier, had still not been addressed and, indeed, seemed worse. More than half of 91

referrals reviewed took from three to 18 days to reach mental health staff.

Some slippage occurred in treatment for MHCB inmates. According to

staff, follow-up IDTT meetings for inmates remaining in the MHCB unit occurred only

78 percent of the time. The monitor's review of MHCB charts and inmate histories

confirmed the absence of consistent evidence of follow-up IDTT meetings for inmates

remaining in the unit longer than a week.

The timeliness of mental health screenings and evaluations in reception

declined in the months prior to the monitor's visit. An institutional audit for May through

September found that 97 percent of arriving inmates were screened within seven days of

their arrival, compared with 85 percent from October through December. Audits also

indicated that 67 percent of evaluations from May through September were completed

within 18 days, compared with 59 percent from October through December. The

institution had chartered a QIT to address this issue, but no remedy had been implemented as yet.

Privacy during clinical encounters in administrative segregation improved marginally, but many clinical contacts still took place in non-confidential settings. Chart reviews indicated that more than half of clinical contacts in administrative segregation occurred at cell-front, where there was little or no sound privacy. The institution reported that staff had been working to encourage inmates to come out of their cells for interviews, but fear for safety and gang-related concerns continued to discourage many inmates from leaving their cells. WSP reportedly had a no-show rate of 30 to 50 percent for out-of-cell activities in administrative segregation.

The organization of medical records improved greatly. Materials were filed in charts in a timely manner and generally in chronological order. Staff reported that records were consistently available during scheduled clinical appointments. This issue will be resolved if compliance continues at this level for another monitoring period.

The suicide prevention committee met monthly, except for November, but attendance was often a problem. Minutes of the meetings were brief, and the format of the minutes did not comport with departmental requirements. The committee had not yet focused adequately on serious suicide attempts. Suicide watch/precautions appeared problematic once again and needed to be monitored further. Although internal policy required suicide precaution checks every 15 minutes, nursing rounds documented checks every 30 minutes. Some checks were suspended for an hour and a half during the morning shift change.

b. Non-Compliance

Follow-up monitoring of suicidal inmates discharged from the MHCB unit remained unchanged. Clinical follow-up was provided regularly, but custody follow-up continued to be provided only inconsistently. An institutional audit of a one-month period showed that only 50 percent of indicated custody checks were conducted. Inmate histories revealed a slightly better rate of compliance, with about two-thirds of discharged inmates receiving complete follow-up.

New Problem:

Custody staff frequently did not attend IDTT meetings in administrative segregation and the MHCB unit.

Institutional Summary:

The mental health staffing picture at WSP was as good as anywhere in CDCR, with a vacancy rate of less than five percent, which resulted in reasonable clinical caseloads. Auxiliary staffing was not far behind. Among the issues focused on during this monitoring round, the facility had all of the components of its quality management system up and running effectively. Local QITs were well organized and efficient; audits were sound and generated reliable data. Peer review was in place.

Transfers to DMH and transfers of EOP administrative segregation inmates to hub units elsewhere occurred in a timely manner, but a significant proportion of reception inmates remained in WSP longer, and in some cases much longer, than they were supposed to under operative timelines. Lengths of stay in the institution's MHCB unit were down.

On the other hand, deficiencies in the transparency of the facility's mental health assessment process for handling RVRs precluded any meaningful evaluation of its effectiveness. Documentation of training, meaningful logs tracking the preparation, use

236

and impact of assessments and accessible information on the outcome of disciplinary hearings all needed to be developed.  Medication management presented more mixed results.  Progress on some issues, like the continuity of medications on the renewal of prescriptions, was offset by lingering problems, such as follow-up to medication non-compliance, laboratory testing of inmates on mood-stabilizing medications, HS medications, informed medication consent forms, MARs and continuity of medication on arrival and changes in housing location.

WSP managed to resolve two CAP items during the monitoring period and reported progress in some unresolved CAP matters.  The timeliness of psychiatric responses to referrals and the organization of medical records were significantly improved.  A number of problems persisted, however, ranging from the lack of C-files at IDTT meetings to custody follow-up of suicidal inmates, the quality of treatment for MHCB inmates and the quality of treatment plans.

Although some other formerly resolved issues were also threatening a come-back, the monitoring period was a relatively good one for WSP.  The institution needed to maintain its forward progress and prevent backsliding in order to qualify for a paper review status in the next round of monitoring.  In particular, it needs to implement fully the mental health assessment process for RVRs and alleviate its medication management deficiencies.

### North Kern State Prison (NKSP)
September 14, 2004 – September 16, 2004

The chief psychiatrist position continued to be vacant.  In addition, positions for 1.5 staff psychiatrists, a half-time psychologist, a psych social worker, a recreational therapist and a half-time office tech were also vacant.  Contract clinicians

237

covered all of the vacant psychiatrist and psychologist positions, but not the psych social worker vacancy. The institution was in the process of requesting the conversion of a psychiatrist position to a senior psychiatrist position in order to provide much needed clinical supervision.

Issues Resolved:

NKSP had a process in place for the monthly review of inmate charts in all programs.

Suicidal inmates discharged from the MHCB unit were consistently provided clinical follow-up.

Quality Management:

The institution's quality management infrastructure was developing nicely. During the monitoring period, NKSP also began a review of all program areas and an assessment of remaining deficiencies identified in its CAP. The mental health quality management committee, which had been in existence for more than a year, continued to meet monthly and maintain minutes of each meeting. An overall health care quality assurance committee was formed in the months preceding the monitor's visit.

Seven QITs were chartered during the monitoring period. Institutional peer review audits were conducted on a monthly basis, and the peer review process appeared to be functioning adequately for psychiatrists, as well as psychologists and psych social workers.

Medication Management:

The facility had not yet finalized its local medication management policy, impeding both staff training and the conduct of institutional audits. Nonetheless, there was some improvement in medication continuity. A reliable process was in place to

238

ensure medication continuity on arrival at the facility. Continuity of medication for inmates changing housing locations within the facility was also good, except for inmates transferring from the reception center to the general population on A-yard.

The timeliness of medication renewals improved significantly during the monitoring period. An institutional audit found that 92 percent of renewals were timely, but recent reports indicated that medication expirations may have increased again after another psychiatrist position became vacant.

Follow-up to medication non-compliance at NKSP was inadequate. An institutional audit indicated that just six percent of referrals for medication non-compliance received a psychiatric follow-up. The audit failed to assess other aspects of medication non-compliance, such as whether MTAs were referring all non-compliant inmates. The monitor found no documentation of any supervisory review of the follow-up process for medication non-compliance.

HS medications were not generally administered. According to the institutional log, HS medications were prescribed only in the CTC and by one psychiatrist on one reception yard.

The facility experienced some problems with the timely filling of psychiatric prescriptions on weekends. Contract psychiatrists frequently wrote prescriptions on the weekend, which the pharmacy did not always seem able to handle effectively, despite the fact that all pharmacy positions were filled or covered by contractors.

The institution had a system for providing paroling inmates with medications on discharge and was also able to monitor medication errors. On the other

239

hand, the institution still had not audited the provision of laboratory testing for inmates on mood-stabilizing medications.

The problem with issuing heat cards to caseload inmates on heat-sensitive medications, which had been resolved during an earlier monitoring period, arose once again. The monitor found a number of caseload inmates on heat-sensitive medications without the required heat cards.

Mental Health Assessments for the Disciplinary Process:

Institutional data and the monitor's analysis of disciplinary logs revealed some serious systemic problems with implementation of the institution's mental health assessment process and indicated that further training was needed. The mental health logs did not consistently record important information, such as the completion dates of mental health assessments, the results of the assessments and the decisions of the hearing officers in response to clinical findings.

During the period from February through May 2004, only 18 mental health assessments were completed, but RVRs failed to indicate the appropriate level of care for 42 percent of caseload inmates not referred for mental health assessments. As a result, it was impossible to verify whether all MHSDS inmates eligible for a mental health assessment actually received one. An institutional audit, moreover, indicated that custody staff had difficulty identifying caseload inmates and/or determining bizarre behavior. In six cases provided to the monitor involving EOP inmates, the hearing officers unnecessarily considered whether the inmates' behavior was bizarre or unusual. On the other hand, the institution's audit did find that mental health assessments typically were attached to RVRs, as required.

240

Hearing officers often failed to document their consideration of mental health assessments in their findings and/or sentences. An institutional audit for the period from February through May 2004 showed no documentation of consideration of mental health input in 15 percent of the hearing officers' findings and 31 percent of their dispositions. The monitor's review of the handling of RVRs found that, while hearing officers noted minimally that mental health assessments had been completed, they made no reference to the substance of the clinical input.

Staff reportedly had received training in the revised mental health assessment process in disciplinary procedures, but the institution could not document which staff members had attended the training.

Transfers:

The institution maintained a transfer log that recorded all relevant transfer data, except the date inmates returned from a higher level of care. NKSP was able to use its MHTS to track transfers and aggregate data on various categories of transfer.

The timeliness of EOP transfers remained largely static during the monitoring period. MHTS data for the period from March 15 through September 15, 2004 reflected 91 completed EOP transfers. The average length of time from endorsement, not referral, to transfer was 39 days, six days longer than the average delay when the institution's CAP was originally developed. Of 19 transfers pending at the time of the monitor's visit, eight were already untimely.

Of 14 inmates transferred from NKSP to DMH between May and July 2004, the delay between the assignment of a bed number and actual transfer was two to eight days. No inmates were rejected by DMH during the monitoring period. Of the 14

transfers to DMH, only one had returned to NKSP at the time of the monitor's visit. DMH regularly notified the nursing staff of returning inmates, but did not notify clinicians directly. Although nurses reportedly informed local clinicians of the anticipated returns, no formal procedure governing the method and time of such notification was in effect. Discharge summaries generally accompanied inmates on their return to NKSP, but were not faxed to the institution in advance.

NKSP reportedly had a mechanism for expediting transfers to higher levels of care when needed, but no accelerated transfers were reported during the monitoring period.

Other CAP Issues:

a. Partial Compliance

Most EOP inmates received weekly case management contacts, but some did not. An institutional audit indicated that 83 percent of EOP inmates awaiting transfer were seen by case managers on a weekly basis.

Custody participation in IDTT meetings in the MHCB unit and in general population reportedly improved, but no audit had been conducted to determine the actual composition of meetings. Psychiatric participation in general population IDTT meetings, however, slackened during the monitoring period due to the loss of psychiatric staff.

Case management contacts with caseload inmates in the administrative segregation unit were occasionally problematic. An institutional audit indicated that weekly contacts occurred for 85 percent of inmates in the unit. Contacts appeared to occur regularly out-of-cell.

Some problems remained with the organization of inmate charts, although the frequency of misfiled or missing documents declined somewhat. There was, moreover, no evidence of any significant filing backlog. Inmate medical records were often unavailable for clinical encounters.

Institutional Summary:

Among the four issues that were the focus for this round of monitoring, quality management at NKSP continued to evolve; chart reviews were performed in all programs; relevant committees met regularly and kept minutes; QITs were being chartered; and peer review was close to full implementation. Transfer logs were well maintained, and access to DMH programs generally was adequate and timely. Some EOP transfers continued to be delayed.

Medication management showed both improvements and remaining problems. Continuity of medications generally continued to progress; parole medications were provided; and mediation errors were monitored. On the other hand, psychiatric follow-up to medication non-compliance barely occurred at all; the use of HS medications was erratic; problems with the timely filling of prescriptions on weekends persisted; and heat cards for inmates on heat-sensitive medications were not always issued.

Implementation of the process for providing mental health assessments for caseload inmates with disciplinary charges was floundering. Disciplinary logs were incomplete; some custody staff was confused about which inmates needed to be referred for mental health assessments; and hearing officers inconsistently documented their consideration of mental health input. The new process thus far seemed to be having little

243

impact on the handling of RVRs involving seriously mentally disordered inmates.

The institution made some progress during the monitoring period in implementing its CAP; two issues were resolved, and improvements in other areas continued to occur. Caseload inmates in administrative segregation received case management contacts more regularly; custody participation in IDTT meetings improved; and inmate charts were better organized. Not surprisingly, given the facility's difficulties in recruiting and retaining permanent psychiatrists, psychiatric participation in IDTT meetings declined during the monitoring period.

If the institution hopes to emerge from the next round of review with a recommendation for reduced future monitoring, NKSP will have to address more aggressively its deficiencies in the management of medications and its implementation of the mental health assessment process for caseload inmates involved in disciplinary infractions.

## Service Area H

This service area includes California State Prison, Los Angeles County (CSP/LAC) and the California Correctional Institute (CCI).

### California State Prison, Los Angeles County (CSP/LAC)
December 1-3, 2004

During the monitoring period, mental health staffing at CSP/LAC declined, particularly in psychiatry. The functional vacancy rate, after factoring in contractual hours, was 16 percent, up from the 11-percent vacancy rate reported during the preceding monitoring period. Nearly half of the 8.5 staff psychiatry positions were vacant. The use of contractors covered only 1.43 of four vacant psychiatry positions.

244

One recreational therapist, one psych tech and two office tech positions were also vacant. None of these positions was covered by contractors.

One of five senior psychologist positions and four of 21 staff psychologist positions were vacant. All five psych social worker positions were filled. The use of contract psych social workers and psychologists more than covered case manager vacancies, with the resulting staffing exceeding allocated positions by the equivalent of roughly eight full-time clinicians.

The pharmacy was short of staff with just two of five pharmacist positions filled permanently. Contractors covered two of the vacant positions, leaving one position uncovered. The supervisory pharmacist II position was one of the two covered by contractors. The medical records section was close to being fully staffed; only one position for a health records technician II was vacant. Both senior MTA positions were filled; only one of 30 allocated MTA positions was vacant.

Issues Resolved:

Psychiatrists routinely saw inmates who started or stopped psychotropic medications for follow-up within a month of the change.

Responses to inmate and staff referrals were timely.

Inmates on mood-stabilizing medications regularly received blood-level testing.

Therapeutic contacts with EOP inmates were documented adequately.

Custody staff monitored suicidal inmates discharged from the MHCB unit.

Inmates discharged clinically from the MHCB unit were transferred timely to their appropriate housing locations elsewhere in the institution.

Mental health entries, including medication orders, were filed timely in UHRs.

245

Quality Management:

           CSP/LAC's local operating procedure for quality management was not kept up to date, nor did implementation of institution-wide quality management measures show much progress during the monitoring period. The infrastructure implemented during the preceding monitoring round remained largely unchanged. Problems with the composition of committees and attendance of key members were not corrected. The institutional quality management committee maintained records of meetings, chartered quality improvement teams, received reports and oversaw the mental health quality management committee in accordance with departmental guidelines. The identity of members of key committees, however, was unclear even to other members and key staff.

           The mental health quality management committee maintained good records. The composition of the mental health quality management committee included custody staff, but they missed many meetings; documentation showed that at least one meeting had no custody staff at all in attendance. The position of health care services liaison, which had been filled by a high-ranking custody administrator, was eliminated. Mental health quality improvement teams neither functioned as intended nor fulfilled their purpose. Membership on quality improvement teams was generally restricted to supervisory staff and often lacked representation from disciplines that should have been included. A sample of UHRs was reviewed monthly and submitted to headquarters. Audits were confined largely to noting the presence or absence of required documentation. Psych social workers did not have peer review. The disciplines of psychology and psychiatry held quarterly peer review meetings. Aside from peer review,

few members of the mental health staff were knowledgeable about quality assurance efforts nor did they know the results of audits that were directly relevant to their work.

Medication Management:

Medication management was monitored by the institutional quality management committee, which was responsive to CAP items. Pharmacy staff, RNs and a senior MTA worked collaboratively with the chief psychiatrist on issues that overlapped with mental health treatment. Staff audits found that MTAs did not reliably refer inmates who were non-compliant with their medications to mental health. More training was provided to MTAs, but the main impediment to making referrals reportedly was the size of workloads. No one had addressed the workload problem. When referrals for non-compliance were received, mental health staff saw the inmate in a timely fashion.

Continuity of medication improved in some discrete areas but remained, nonetheless, a widespread, multifaceted problem. Efforts to improve the continuity of medication included a revision of local operating procedures based on CDC's statewide medication management policies and procedures. Neither audit tools nor audits were complete or available in sufficient quantity to assess the status of CSP/LAC's medication delivery system.

Medication was usually given to inmates released on parole. The compliance rate fell below 90 percent during one month, when six of 25 inmates released did not receive medication. The obstacle to compliance during that month was identified and remedied. This problem will be resolved in the next monitoring round if compliance is sustained.

Continuity of medication for new arrivals in the institution remained problematic. Problems appeared to be related to a combination of pharmacy practices and MTA workload issues. Problems with medication continuity when inmates moved within the institution seemed to be related primarily to a failure to implement existing local procedures for the management of medication when internal moves occurred. MTAs often did not receive the form designed to notify them of transfers from other custody staff.

The pharmacy could not use locally available software to track medication expirations. To prevent expirations, psychiatrists wrote 90-day medication orders with three 90-day refills, an unacceptable and inappropriate practice. No audits of medication expirations or renewals were conducted.

The monitor found problems with medication continuity for a number of inmates returning from DMH facilities. Bus screenings of inmates who returned to CSP/LAC from higher levels of care elsewhere seemed to rely on the self-reports of arriving inmates rather than a review of records, resulting too often in a failure to refer psych and return inmates to mental health for appropriate medication orders.

The problem of monitoring the blood levels of inmates on mood-stabilizing medications was resolved according to audit data, but the institution needed to monitor and ensure that laboratory tests were ordered as warranted, results were reviewed by a physician and appropriate follow-up was delivered. In one case reviewed by the monitor's expert, an inmate with an affective disorder who was unstable for months incurred multiple disciplinary infractions during that time. Fortunately, the revised

248

mental health assessment process for disciplinary matters involving caseload inmates seemed to work as intended in this case. (See case review ten in Exhibit O.)

The use of HS medications, which appeared to be resolved during the preceding round, was again problematic. HS medications were rarely prescribed by psychiatrists.

Mental Health Assessments for the Disciplinary Process:

While improvement was realized by the end of the monitoring period, the handling of mental health assessments for disciplinary infractions involving mentally ill inmates was inadequate throughout most of the period. In some cases, however, the assessment process worked reasonably well. During the monitoring period, 166 EOP inmates received RVRs that prompted mental health assessments. Sanctions were mitigated in 21 of these cases (14 percent). In early 2004, nearly a dozen 3CMS inmates were referred for mental health assessments, but none of 175 3CMS inmates who received RVRs between April and December was referred.

Staff maintained a comprehensive log in which monthly reports and RVRs were filed in an accessible manner. These organized records greatly facilitated staff's ability to conduct audits and identify difficulties with clinicians' completion and hearing officers' use of mental health assessments. A July 2004 audit found the overall quality of the assessments to be unacceptable, with language used by clinicians frequently unclear and many assessments incomplete. The audit resulted in a second round of training for custody and mental health staff, and a subsequent audit in November found significant improvements in the quality of assessments, although one contract clinician, who

prepared many of the assessments compiled during the monitoring period, continued to provide incomplete and unhelpful evaluations.

The documentation filed by some hearing officers reflected misunderstandings about the process. Among 15 reviewed RVRs, hearing officers misstated the findings contained in two mental health assessments, where clinicians found mental health factors to be influential in the reported offenses. The hearing officers in both cases reported erroneously that no mental health factors were involved. Some hearing officers took into account the inmate's mental condition at the time of the hearing when judging accountability for the offense. There were also cases in which hearing officers applied their own understanding of the standard for not guilty by reason of insanity and found the accused inmate guilty, irrespective of the clinical information in the mental health assessment. Supervisory staff acknowledged these problems and reported that hearing officers now understood their task, although they had received no formal retraining.

One inmate received multiple RVRs for sexual misconduct identified by assessing clinicians as attributable to his mental illness involving a sexual compulsion. The monitor's expert's review of the inmate's disciplinary record found that appropriate mental health assessments were provided and penalties were correspondingly mitigated. The inmate, however, was not referred to a higher level of care or provided treatment for his compulsive disorder. (See case review eight in Exhibit O.) Inmate clerks inappropriately typed the final versions of RVRs, a task that provided them with access to mental health assessments prepared for the disciplinary process.

Transfers:

Access to higher levels of inpatient DMH care did not improve at CSP/LAC, nor did the institution's ability to monitor its referrals.  Tracking data for transfers to higher levels of care remained cumbersome and incomplete.  CSP/LAC did not maintain a comprehensive log that contained all of the information required for accurate tracking.  Some essential elements of information, such as date of acceptance and the name of the facility or program to which the referral was made, were omitted from logs.  Different logs contained different information.  Staff reported, and available information confirmed, that acceptance and transfer times slowed significantly during the monitoring period.  Earlier in 2004, inmates were typically accepted within three days and transferred within 48 to 72 hours of their acceptance.  During the monitoring period, although acutely ill inmates were referred to DMH's acute psychiatric program within ten days of admission to a MHCB unit, acceptance took an average of nine days, ranging from zero to 21 days.   On average, 12 additional days, ranging from zero to 28, elapsed from acceptance to actual transfer.

None of the referrals made to higher levels of care was rejected.  One inmate was referred, accepted and transferred to ASH.  Access to DMH intermediate care beds at SVSP was not good.  Twelve inmates were referred and accepted by DMH/SVSP, but only two were transferred.  Delays for the remaining inmates ranged from 35 to 75 days, while one outlier had been awaiting transfer for five months.  The transfer of one inmate in need of DMH inpatient care was prevented for five weeks for custody reasons, but the obstacles were eventually cleared and he was transferred to DMH/APP at CMF.

CSP/LAC experienced difficulty in identifying and appropriately treating inmates who returned from higher levels of care. Communication on inmates returned from DMH was deficient. As indicated above, bus screenings did not compensate for the communication gap. Although staff reported receiving a call from DMH on roughly a fourth of returned inmates and a discharge summary for about three-fourths, the monitor's review of the records of seven returned inmates found only two discharge summaries.

During the monitoring period, CSP/LAC made 42 referrals to a PSU. Twenty were transferred. Not all could be accounted for, but information about some cases was available. The institution was unable to provide the date of referral to PSU for 11 of the 20 transferred inmates. For the remaining nine, it required an average of 69 days, with a range of 15 to 121 days, from referral to actual transfer. Two inmates paroled; four were not transferred because their early release dates had expired or become too short; and the level of care of seven dropped from EOP to 3CMS. One inmate was transferred to an EOP; one went to DMH; and one went to ASH. At the end of the monitoring period, one inmate was awaiting transfer to SVPP, and five were awaiting transfer to a PSU.

Only three individuals had three or more admissions to the MHCB unit during the monitoring period. All three were considered for a higher level of care; one was transferred to ASH.

252

Other CAP Issues:

        a. Partial Compliance

        The backlog of filing in medical records was eliminated by September 2004. Documentation of inmates' recent stays in facilities providing higher levels of care was often missing, leaving local providers of mental health care bereft of important clinical information on inmates returned to CSP/LAC from elsewhere

        Staff reported that the MHTS continued to be useful, but it crashed several times. Technical support provided when the system crashed, whether internal or external, was inadequate.

        Group treatment for 3CMS inmates was provided in three of the four yards. Group treatment in the A-Yard was discontinued due to a recent influx of 3CMS inmates from another institution. Mental health staff and inmates appraised the content of the groups favorably. Attendance was reduced and sessions started late because ducats did not ensure the release of inmates for group treatment. Therapists often had to call buildings to request the release of inmates enrolled in groups.

        The amount of scheduled structured therapeutic activities provided to general population EOP inmates held steady, but fell short of offering EOP inmates ten hours of treatment weekly. Disruptions to routine operations, such as lockdowns, holidays and staff absences, resulted in cancellations of group sessions nearly every week. Attendance rates for EOP inmates housed in buildings D-1 and D-2 differed, with D-2 inmates consistently missing more sessions. The difference was attributed to a variety of causes, including inadequate public announcements, delayed releases and staff preoccupation with other matters. A new approach to group treatment at CSP/LAC was

253

introduced during the monitoring period. Inmates were grouped by level of functioning and enrolled in several core groups that were augmented by electives. The quality of observed groups was high; inmates were actively engaged. They reported that they found the groups useful. The size of the monitored groups ranged from four to 12 inmates.

Documentation of clinical contacts with EOP inmates continued to improve. Many entries made by case managers and psych techs were rich in clinical information. Records of group treatment were not summarized and filed in UHRs for two months during the monitoring period, but that oversight was corrected. Congruency between MHTS and UHR entries for EOP inmates housed in the D-1 building remained above 90 percent. Entries for inmates housed in D-2 were less accurate but improved. Discrepancies between the dates of some entries varied by a few days. Steps were taken to improve the accuracy of entries. If compliance is sustained, this problem will be resolved in the next monitoring round. Most EOP inmates housed in general population had weekly meetings with their case managers in a private setting that afforded confidentiality; a small number of individual contacts, however, were made in the dayroom.

Compliance with the requirement for quarterly IDTT meetings for mental health caseload inmates in administrative segregation was sustained. The institution took steps to improve the quality of the meetings by training clinicians, and correctional counselors began to attend IDTT meetings regularly late in the monitoring period. Central files were not always brought to meetings. Custody input into mental health treatment was not restricted to IDTT meetings, but was also provided daily in a meeting attended by custody and mental health participants. If regular attendance of correctional

254

counselors with C-files is sustained, this problem will be resolved during the next monitoring round.

Case managers typically were notified when inmates were discharged from the MHCB unit. Case managers saw 80 percent of these inmates within ten days of their discharge. The follow-up of inmates discharged from higher levels of care remained only partially compliant, however, because notification of the return of inmates from DMH was unreliable.

Some inmates, who needed more intensive treatment in the EOP or referral to a higher level of care, did not receive treatment appropriately targeted at their conditions and were not referred elsewhere. (See, for example, case reviews four, eight, 11, and 12 in Exhibit O.)

An increase in the number of EOP inmates in administrative segregation resulted in lengthening waits for transfer to other institutions, longer stays in administrative segregation, reduced confidentiality in clinical contacts, declining staff-to-inmate ratios, fewer available escort officers and a diminishing quality of group treatment for administrative segregation EOP inmates. Issues with the appropriate celling of inmates also increased with the growing population. Although clinical recommendations for single and double-celling were made by the IDTT, implementation of the recommendations was chaotic. Practices of both mental health and custody staff with regard to single and double-celling were inconsistent and misunderstood.

The number of EOP inmates in administrative segregation rose from under 40 to over 50 during much of the monitoring round. There were also 85 3CMS inmates in administrative segregation. The EOP capacity was 45 inmates, with five case manager

positions allocated. Four of the case manager positions were vacant, meaning that the unit was staffed almost entirely by contractors. Some clinicians were reassigned from other programs on an *ad hoc* basis to maintain the 1:9 ratio between case managers and inmates. Individual case management contacts were not made in a confidential setting. The quality of groups varied, and some groups observed by the monitor's expert were not therapeutic. Attendance at groups was low. Staff believed that two more escort officers were needed to meet mandates for the treatment of 45 EOP and 85 3CMS inmates.

Lengths of stay were prolonged by case factors that limited available choices for placement elsewhere, such as positive Clark evaluations and SNY designations. Multiple pending disciplinary charges, SHU terms and imminent parole dates also inhibited movement. These factors, moreover, were often compounded by inefficiencies and breakdowns within the institution. Reviewed cases revealed infrequent ICC hearings, lost or stalled paperwork, delayed CSR endorsements and further delays in transfer following endorsements. Staff reported that completed RVRs were not forwarded to correctional counselors, leaving these counselors unaware that disciplinary charges had been adjudicated and the process for transferring the involved inmates could proceed. Another procedural snag occurred when hearing officers presided over both RVR hearings and administrative reviews, an error that required the tainted RVRs to be reissued and reheard.

Misconduct and turmoil in the EOP associated with hoarded canteen items had a corrosive effect on the working alliance between custody and mental health staffs at all levels, from line staff through supervisors and administrators. Correctional officers and inmates in the EOP were disciplined. Distortions of fact and widespread mistrust

256

impeded communication between mental health and custody staffs. Events leading up to the investigation of hoarding, as well as its aftermath, had a deleterious effect on the handling of issues difficult to manage even in ideal circumstances, including the use of administrative segregation to protect or punish EOP inmates, decisions on single and double-celling, responses to allegations of harassment and the integration of mental health information in the disciplinary process. Case reviews and anecdotal reports pointed to pronounced problems in all of those areas. Institutional administrators attempted to respond to some of these problems, but their efforts were hampered by conditions that impeded objective appraisal and open communication.

b. Non-Compliance

Inmates newly admitted to administrative segregation were not always screened by mental health staff. The monitor found 29 inmates who had not received a mental health screening when they entered administrative segregation. Available information on 21 of these inmates indicated that screenings were overdue, on average, some 38 days. Audits indicated that inmates in administrative segregation generally had informed medication consent forms in their UHRs, although psychiatrists did not routinely explain the risks associated with heat-sensitive medications.

Institutional Summary:

The functional vacancy rate for mental health positions at CPS/LAC rose from 11 to 16 percent during the monitoring period. Psychiatry was hardest hit. The shortfall of psychiatrists and the inability of the pharmacy to track expiring medication orders combined to spawn an unacceptable practice of renewing medication orders for up to a year without personal psychiatric contact. Much of medication management in

257

CSP/LAC remained a problem, although there were improvements in monitoring blood levels of inmates on mood-stabilizing medications and timely follow-up when new medications were initiated or old ones discontinued. The administration of HS medication dropped off, and the institution did not maintain a central list of inmates with DOT orders.

Implementation of the quality assurance process stalled during the monitoring period and remained only partially implemented. Tracking of referrals to higher levels of inpatient DMH care remained inadequate. Transfers to higher levels of care slowed, as did transfers to other CDCR institutions. Significant delays in moving EOP inmates to other institutions were attributed in part to the disorganized processing of transfers within the institution. Implementation of the new mental health assessment process continued to be erratic, although documentation was well organized and facilitated the staff's ability to conduct audits and identify problems.

The institution resolved seven of its CAP issues during the monitoring period but lost ground in others. In addition, a period of turmoil in the general population EOP had a deleterious effect on the working alliance between custody and mental health staffs. As a result, the institution was struggling to resolve problems with single and double-celling, discipline, maintenance of a therapeutic milieu in the EOP and the use of administrative segregation for EOP inmates with problems in the general population.

The ample use of contract psych social workers and psychologists enabled the institution to maintain its compliance in areas already resolved and continue work on other as yet unresolved deficiencies identified in its CAP. Responses to referrals were more timely; documentation of the treatment of EOP inmates improved; offerings of

structured therapeutic activity increased for most EOP inmates; and IDTT meetings in administrative segregation were held in a more timely manner and were better attended. Missing health documentation for inmates returning from stays in more intensive levels of care elsewhere was a problem for current treatment.

During the next monitoring period, CSP/LAC needs to end the practice of permitting inmate clerks to type final RVRs and expedite procedures for transferring inmates to higher levels of mental health care and treatment programs in other CDC institutions. It also needs to identify inmates returning from DMH facilities and provide them with appropriate treatment. Timely and adequate rounding in all administrative segregation units also needs to be a high priority.

## California Correctional Institution (CCI)
November 8, 2004 – November 10, 2004

Over 40 percent of CCI's allocated clinical mental health positions (12.5 of 30 positions) were vacant. Vacancies included positions for a senior psychiatrist, 2.5 staff psychiatrists, seven psychologists and a psych social worker. Contract clinicians covered 1.75 of the 3.5 vacant psychiatrist positions and 6.75 case manager positions. In addition, two psychology interns worked four days a week. The vacancy rate among auxiliary staff was 18.7 percent, including openings in 11 of 43 MTA positions and ten of 37 RN positions.

In early 2004, the institution's caseload capacity was raised to 1,199 inmates and additional mental health positions were allocated. Since then, the actual mental health population fluctuated from just fewer than 1,300 to over 1,400. At the time of the monitor's visit, the caseload population included 1,289 3CMS inmates and 15 EOP

259

inmates. Over 24 percent of the facility's overall inmate population was on the mental health caseload.

Issues Resolved:

>Reception center inmates received mental health screenings in a timely manner.

>The length of pill lines was no longer a problem.

>Sufficient office space was provided for clinicians, even in Facility IV B.

Quality Management:

The quality assurance process was quite active at CCI and showed significant progress. The quality management committee and the mental health subcommittee met weekly on a routine basis. No psychiatrist served regularly on the overall quality management committee because of the shortage of psychiatrists.

The institution chartered numerous QITs to address outstanding CAP items and monitor issues already resolved. During the monitoring period, 17 QITs completed their projects, bringing the total of completed QITs to 28. The reporting format followed by the QITs continued to improve, and staff indicated they were receiving increasing feedback from the various teams.

Monthly chart reviews were conducted regularly. Psychiatrists met for peer review weekly; psychologists, together with psych social workers, also met for weekly peer review. Minutes of meetings indicated that peer review activities were primarily focused on reviewing UHRs for the presence or absence of specified criteria.

Medication Management:

CCI had difficulty eliminating its chronic medication deficiencies. Implementation of a medication management operating procedure, however, helped

260

improve some areas, and extending pharmacy hours on Fridays and in advance of holidays helped to address problems resulting from insufficient pharmacy coverage on weekends and holidays.

Continuity of medication on arrival and changes in housing locations remained problematic. Institutional audits of continuity found varying rates of compliance in different housing units for both new arrivals and inmates recently placed on medication, with compliance rates ranging from 33 to 83 percent. Medication continuity for relocated inmates was somewhat better, due largely to provisions in the new operating procedures and refinements in the handling of documents tracking the internal transfers of caseload inmates. Even with these improvements, continuity of medication on changes in location remained inadequate in some areas of the institution, with compliance rates ranging from 60 to 100 percent.

Continuity of medication on renewal improved. An institutional audit for May through August 2004 indicated that 93 percent of medications were renewed prior to their expiration date. Medications were not generally renewed without psychiatric contact.

CCI maintained a parole medication log, which showed that parole medications were usually provided to inmates discharged from the institution. An institutional audit for September found that 93 percent of paroling 3CMS inmates received medications upon discharge. The institution had significant problems with compliance in May and June, but a QIT helped to identify and resolve some of the obstacles to performance. CCI needed to demonstrate it could maintain this level of compliance over a sufficiently extended period of time.

261

Follow-up to medication non-compliance was poor. An institutional audit for September found that inmates were not always seen by psychiatrists within ten days of a referral for non-compliance. On the other hand, the audit demonstrated that medication non-compliance was documented in MARs, which were routinely filed in inmates' UHRs.

The institution was just beginning to address the issue of medication errors. An operating procedure was developed recently on reporting and correcting medication errors.

Follow-up psychiatric care was not provided in a timely fashion after medication changes. An institutional study of four separate housing locations in CCI found that, on average, only 40 percent of inmates were seen by a psychiatrist within seven days of a recommended clinical visit. Compliance rates ranged from a low of 20 percent to 79 percent. Lack of compliance appeared to be related to psychiatric staff vacancies.

Laboratory blood-work was not consistently provided for inmates on mood-stabilizing medications. A protocol had been developed to assist psychiatrists in ordering appropriate laboratory tests, but implementation of the protocol was occurring slowly. Institutional audits showed an increase in compliance from May to August 2004, although compliance rates varied from 30 to 90 percent depending on the medications and testing involved.

The status of implementation of DOT procedures remained unchanged during the monitoring period. Institutional audits for May, July, August and September showed 100-percent compliance. The reliability of these results, however, was somewhat

262

questionable because DOT staff knew they were being observed for audit purposes. The institution needed to assess the distribution of medication through some unannounced observations and interviews.

The Keyhea tracking system was not working. CCI was unable to receive accurate information, specifically a list of Keyhea inmates, on a timely basis from the department. Keyhea orders were not initiated at CCI.

At the tine of the monitor's visit, 74 inmates were prescribed psychotropic medications on an HS basis. Institutional audits for the preceding three months indicated that inmates received their HS medications, but the most recent audit reflected some difficulties with the administration of HS medications, attributable to MTA vacancies. HS medications were generally delivered before 8:00 p.m.

The new MAR form was not in use at CCI in the months preceding the monitor's visit. MARs were generally legible and filed in inmates' UHRs. Supervisors reviewed MARs approximately twice monthly. Informed medication consent forms were also filed regularly in inmates' charts.

Mental Health Assessments for the Disciplinary Process:

The institution maintained a disciplinary log that tracked much helpful information, including requests for mental health assessments. The disciplinary logs also noted the outcome of assessments and whether inmates' mental illnesses were determined to have contributed to their behavior. The log did not, however, record inmates' levels of care. In addition, gaps often occurred in the log relative to clinicians' findings and hearing officers' responses.

Progress was made in implementing the mental health assessment process. According to the institution, all 18 EOP inmates who received RVRs from January through September were referred for mental health assessments. It was impossible to determine the number of 3CMS inmates referred for mental health assessments because the institutional tracking documents failed to record inmates' levels of mental health care. It appeared, however, that during most of the monitoring period all caseload inmates were referred for assessments, regardless of their level of care, creating a significant burden for clinicians. More recently, CCI identified and trained a single clinician to complete mental health assessments for EOP inmates and 3CMS inmates exhibiting unusual or bizarre behavior. The institution reported that it did not issue RVRs for self-injurious behavior.

The timeliness of clinical responses to requests for mental health assessments in the disciplinary process also improved. Mental health assessments were completed within an average of 1.2 days from the date of the request, as compared to 6.59 days during the preceding monitoring period. On the other hand, it took an average of 19 days from the date of the RVR to complete assessments and as many as 82 days in some instances.

The impact of mental health assessments on the outcome of RVRs was unclear. Disciplinary logs tracked the impact of mental health assessments on the disposition of infractions, but the information was often incompletely recorded in the logs. It was apparent that not all hearing officers incorporated the findings in mental health assessments into their findings and dispositions. In response, the institution conducted follow-up training in October 2004. The training covered a range of topics

264

related to the assessment process, including the mitigation of penalties as a possible response to a determination that mental illness influenced the behavior of accused inmates. Institutional documentation confirmed that 19 hearing officers were trained over a period of three days.

RVRs involving 27 caseload inmates were referred to the local district attorney, from which the district attorney decided to prosecute two.

Transfers:

Most reception inmates were transferred to appropriate programs in a timely manner. According to EOP transfer logs, which appeared to be complete, 16 EOP inmates were referred for transfer from March through September. Eleven of these inmates were transferred or paroled within specified time frames; another inmate's level of care was reduced to 3CMS; and the remaining four inmates experienced delays of three or four days beyond the transfer guidelines. CCI had an approved operating procedure in effect for expediting the transfers for EOP and 3CMS inmates. Pursuant to the policy, inmates who could not be managed in a general population setting but did not meet the requirements for transfer to a MHCB unit were to be placed on an accelerated transfer track. Between March and September, one EOP inmate was transferred pursuant to this expedited transfer policy. CCI also had a practice of using special transports for EOP and MHCB transfers, thereby minimizing delays caused by the unavailability of bus seats.

Treatment provided EOP inmates awaiting transfer was acceptable. Approximately 22 percent of EOP inmates, however, were not seen by a clinician every

week. The length of the time between contacts was unclear from the institutional data, but the weekly contacts appeared to occur within every nine to ten days.

EOP administrative segregation inmates were also transferred within required timelines. According to the institution, eight EOP administrative segregation inmates were referred to appropriate locations from March through September. Seven of these inmates were identified as requiring a clinically indicated expedited transfer within 30 days, and all but one was transferred within the specified 30 days. The exception was transferred within 35 days, and the relatively minor delay was attributed to the lack of an available bed within the 30-day limit.

CCI maintained a comprehensive OHU log, which tracked the dates of OHU admissions, referrals, transfers and returns. The dates of acceptances of referrals by DMH were also included, but the dates on which DMH/APP assigned bed numbers to CCI referrals were not recorded. No CCI referrals to DMH/APP were rejected during the monitoring period.

CCI had an operating procedure for DMH psych and returns, which was followed in most instances. CCI generally received a telephone call identifying returning inmates, but inmates were returned occasionally without prior notice. Discharge summaries were usually faxed to CCI prior to an inmate's return. Discharge orders and progress notes accompanied most inmates coming back to CCI. Some EOP inmates referred for higher care were sent back to CCI, an institution without an EOP program, as 3CMS inmates. CCI felt that some of these changes in inmates' level of care were not driven by clinical factors. When the change in level of care was determined to be

clinically inappropriate, the institution reassigned the inmates to an EOP level of care and initiated the transfer process.

Other CAP Issues:

       a. Partial Compliance

       Pre-release services to paroling inmates reportedly were provided regularly. An institutional audit showed that 95 percent of paroling inmates received pre-release counseling.

       CCI continued to make progress in implementing its MHTS. Data reportedly was entered into the system on a daily basis. Problems with the accuracy of the system had been resolved earlier, and an institutional audit measuring the concordance of MHTS and UHR data found only a five-percent discrepancy rate between the two sources. Despite this, CCI did not use the MHTS to track transfers to higher levels of care. Data on these transfers was maintained in a separate tracking system on local computers. Staff agreed that MHTS-generated information on referrals and transfers to higher levels of care was inaccurate. A MHTS printout listing psych and returns, for example, was inconsistent with mental health logs. The institution was seeking departmental assistance to address the problem.

       Although the issuance of heat cards was resolved earlier, not all inmates on heat-sensitive medications received a heat card during the summer of 2004.

Institutional Summary:

       CCI continued to experience a considerable number of mental health vacancies, many of which were covered by contractors, as well as a high population of caseload inmates. Among the four focus issues for this round of monitoring, the facility

267

showed a steadily expanding quality assurance capability. Implementation of the assessment process for seriously mentally disordered inmates charged with disciplinary offenses improved, although the impact of mental health input on hearing officers' determinations remained sometimes doubtful. Considerable improvement was noted in transfers to more intensive levels of mental health care.

A few medication management issues showed some progress, but, for the most part, the administration of medications remained troubling. Medication renewals occurred more timely; parole medications were provided more consistently; DOT seemed adequate, although audits were not entirely reliable; and the distribution of HS medications improved marginally. On the other hand, continuity of medication on arrival and changes in housing locations was weak; follow-up to medication compliance was untimely; medication errors were barely addressed; the provision of laboratory blood-work was erratic; and the Keyhea process was poorly implemented.

The institution was able to resolve three pending CAP issues during the monitoring period. In addition, pre-release services were expanded for paroling inmates, and the MHTS was considerably improved. Problems with repeated admissions to the OHU and the distribution of heat cards, earlier resolved, re-emerged. Overall, CCI made considerable progress during the monitoring period, but needed to address its medication management problems if it looked for a reduction of monitoring in future rounds of review.

## Service Area I

Service Area I includes the California Institution for Men (CIM) and the

California Rehabilitation Center (CRC).

### California Institution for Men (CIM)
August 23, 2004 – August 24, 2004
December 13, 2004 – December 14, 2004

In August, CIM had vacancies for four psychiatrists, a senior psychologist,

2.9 staff psychologists, 2.9 psych techs, a recreational therapist and 1.5 office techs.

Nothing had changed relative to these vacancies by the time of the monitor's December

visit, although the institution reportedly anticipated losing an additional psychiatrist and

psychologist later in the month. Most of the vacant mental health positions at CIM

represented new positions that were allocated and funded in early 2004. Contract

psychiatrists covered all of the psychiatric vacancies.

Vacancies among auxiliary staff were compounded by the number of

employees on leave. Only one of 87 MTA positions was vacant, but 11 MTAs were on

long-term sick or military leave. Seven of 92 nursing positions were vacant, while four

nurses were on long-term sick leave. In the pharmacy, just one pharmacy tech position

among 16 pharmacy staff positions was vacant.

Issues Resolved:

>Laboratory blood tests for inmates on mood-stabilizing medications were
>consistently ordered and completed.

>The institution appropriately monitored temperatures in all areas of the
>housing units.

Quality Management:

The institution's quality management committee met monthly during the early part of the monitoring period; by December, the committee was meeting weekly, and subcommittees were reporting on activities at each meeting. Minutes of the meetings were kept, reflecting meaningful efforts to address problems impeding the delivery of mental health services.

Some other quality assurance components continued to improve. QITs were chartered and, by the monitor's December visit, several had been successfully completed. Some important and beneficial changes in the MHSDS were implemented as a result of QIT efforts. Monthly chart reviews were conducted, but results of the reviews were not shared generally with mental health staff. No peer review process had as yet underway in the facility.

Medication Management:

Although somewhat improved, continuity of medication on arrival remained erratic. Institutional audits of newly arriving inmates, completed in August, showed that medications were ordered within eight hours of arrival for 29.7 percent of inmates, an unacceptably modest increase from the 13 percent recorded during the preceding monitoring period. According to another audit, 70.6 percent of inmates received their first dose of medication within a day of their arrival. Audit results provided in December indicated that 81 percent of arriving inmates received their medications within a day. Institutional audits from both visits were methodology unsound, raising questions about the reliability of the results. The institution had not yet audited continuity of medication for inmates arriving without medication documentation.

270

Continuity of medication on intra-facility changes in location improved during the monitoring period, but the extent of the improvement was unclear. According to an institutional audit, 100 percent of inmates changing housing locations received their medications without interruption. Staff, on the other hand, while acknowledging significant improvement in the area, continued to report problems with medication continuity on housing changes. Additional and more carefully structured audits were needed to confirm compliance.

Similarly, the extent to which the institution ensured continuity of medication on the renewal of medication orders was unclear. CIM did not appear to have a reliable system for scheduling appointments prior to the expiration of medications. Nor did the institution have a method for determining whether scheduled renewal appointments actually occurred. The institution's status report in August indicated that 93.6 percent of inmates had their medications renewed, discontinued or changed before the date of their expiration, while appropriately supportive progress notes were found in 87.2 percent of reviewed charts.

Follow-up to medication non-compliance was poor. According to internal documentation, only 10.6 percent of non-compliant inmates were seen within seven days of a referral, compared with 50 percent in earlier monitoring. Additional training in this area was needed.

CIM had an adequate system for ensuring that paroling inmates received a supply of medications at discharge. Institutional audits for the period from October 2003 through July 2004 indicated that, on average, 87 percent of inmates actually received parole medications. The institutional status report in August found a compliance rate of

92 percent. Parole medications were reportedly mailed to parole officers for inmates who failed to receive their medication on discharge from the facility. CIM maintained a logbook of inmates receiving or refusing parole medications.

Institutional audits of 191 inmates on Depakote and Lithium indicated that laboratory tests were ordered and returned for all surveyed inmates. Approximately 82 percent of the results were filed in inmates' UHRs for review by psychiatrists. Appropriate adjustments were also noted in response to laboratory tests results.

Psychotropic medications were prescribed on a HS basis for a small number of inmates. The institution indicated that additional training for psychiatrists on this issue was needed.

MARs were not maintained adequately. According to an institutional review in August 2004, only 13 percent of MARs were complete and legible. In August, 68.4 percent of MARs from the previous month reportedly were filed in inmates' UHRs. A review of 80 charts conducted prior to the monitor's December visit confirmed continuing problems with the timely filing of MARs. Weekly supervisory reviews of MARs were not conducted.

CIM reported that CDCR had a system-wide problem producing a list of inmates on Keyhea orders, making it difficult for CIM to identify inmates arriving with active Keyhea orders. Problems were also encountered during efforts to transfer inmates with Keyhea orders to DMH facilities. A QIT was chartered to address this issue. Keyhea orders reportedly were sought for all inmates in need of involuntary medications, and Keyhea renewals reportedly were sought for all inmates identified with existing Keyhea orders.

272

Medication errors were reportedly documented, and summaries of reported errors were compiled and presented to the quality management committee. The institution indicated that procedures for DOT and nurse-administered medications were observed and supervised, but no central record of reported observations was kept.

Outdated informed medication consent forms had been replaced with a new, improved form. Signed medication consent forms were present in 84.7 percent of audited inmates' charts.

Mental Health Assessments for the Disciplinary Process:

CIM continued to make progress in implementing its mental health assessment process, but the number of requests for assessments was relatively low. The institution maintained a reasonably complete disciplinary log. According to the log, RVRs had been written for 73 3CMS inmates, 12 EOP inmates and two MHCB inmates during the monitoring period. Mental health assessments were requested and completed for all 14 of the EOP and MHCB inmates and three of the accused 3CMS inmates. During the monitoring period, charges against two EOP inmates were referred to the district attorney's office, one of which was rejected; the other was still pending.

The quality of mental health assessments varied. Many of the reports lacked narrative information. The monitor's expert concluded that additional training was needed for clinicians preparing the assessments. Inmates reportedly were interviewed by clinicians in connection with their assessments, but C-files were not reviewed and UHRs were available only half the time.

Hearing officers often, but not always, took mental health input into consideration. In August, the monitor reviewed 15 RVRs, nine of which indicated that

273

submitted mental health assessments had an impact on hearing officers' decisions, resulting in dismissals, reductions in charges or reductions in penalties; four indicated that no mental health factors were considered; one case was dismissed on other factors; and one inmate was found guilty, despite an assessment that mental health factors influenced his behavior. Charts reviewed by the monitor in December similarly documented consideration of mental health input by hearing officers.

Transfers:

The timeliness of EOP transfers from administrative segregation appeared to improve, although the data was somewhat unreliable. In August, the average time from referral to transfer of EOP inmates in administrative segregation was 18 days, down from 26 days in the preceding monitoring period. The percentage of EOP inmates transferred within 30 days increased from 63 percent in the preceding monitoring period to 80 percent by August and 90 percent by December. Between August and December, 19 EOP inmates were transferred to EOP administrative segregation hub units; only three of these transfers took longer than 30 days. EOP inmates were seen weekly in administrative segregation by case managers while awaiting transfer. The institution reportedly conducted staff training on expediting the transfer of EOP inmates. In August, staff identified 30 EOP inmates in need of expedited transfers, but they were able to transfer just nine of the inmates within the 30-day expedited timeline; by December, staff had attempted to expedite the transfer of five additional inmates and succeeded in transferring one within the 30-day timeframe

Problems persisted with repeated admissions to the MHCB unit. Institutional data from April 1 to July 31, 2004 showed that multiple admissions

constituted 20 percent of all admissions to the MHCB unit and 45 percent of inmates admitted multiple times were admitted on more than three occasions.

The number of caseload inmates remaining in the reception center overlong increased early in the monitoring period. A review of the institution's priority transfer list dated August 8 revealed that 55 percent of EOP inmates in reception were transferred to appropriate programs within 60 days, compared with 60 percent during the preceding monitoring round. Of the 53 EOP inmates waiting beyond 60 days in August, 26 had been in the reception center between 90 and 120 days and 11 had been there between 120 and 150 days. The percentage of 3CMS inmates transferred within 90 days also declined according to the priority transfer list, falling from 84 percent to 70.8 percent. Again, the institutional transfer data, while clearly indicating a pattern of delayed transfers, was not completely reliable. Transfer statistics for the six months preceding the December monitoring visit were slightly improved, showing 63 percent of EOP inmates and 85 percent of 3CMS inmates transferred in a timely manner. A QIT had been chartered in September to address the issue of timely transfers. The QIT met weekly and recommended new procedures that were implemented two weeks prior to the monitor's December visit. Problems with the provision of treatment for EOP inmates in reception were resolved in an earlier monitoring round; EOP inmates continued to be seen weekly by case managers, as were high-risk 3CMS inmates, while other 3CMS inmates were seen quarterly.

The timeliness of DMH referrals slowed during the monitoring period. According to institutional data, CIM referred ten inmates to ASH, 13 to DMH/APP at CMF and two to DMH/SVPP. The average time from referral to transfer increased

275

during the monitoring round from 19.4 to 21.5 days.  Except for referrals to DMH/APP, a

"DMH coordinator" at CIM triaged all clinical referrals, rejecting about 40 percent; many

of these rejections were deemed inappropriate by subsequent reviewers, including

Coleman experts and clinicians conducting CDCR's unmet needs assessment in late 2004

and early 2005.  The additional level of triage also delayed some referrals, particularly

when the coordinator was on vacation or ill; in some instances, the triage decision was

not made for a month following a referral.  The triage process unnecessarily interfered

with and delayed clinical determinations about appropriate levels of care; the monitor's

expert condemned the practice strongly.  CIM, meanwhile, successfully used the appeal

process to challenge referral rejections by DMH, and all of the facility's referrals were

eventually transferred.

Other CAP Issues:

    a.  Partial Compliance

Psychiatric responses to urgent mental health referrals generally occurred

within one to two days.  Response times for non-urgent referrals were not tracked by the

institution.

Clinical access to inmates improved with the assignment of two additional

escort officers to the clinics.  The institution's status report indicated that psychiatric

contacts occurred in confidential interview space.

The MHCB caseload was generally high, and treatment services in the

MHCB unit suffered.  The hospital was licensed for 18 MHCB inmates, but the average

daily MHCB census ranged from 24 to 32 inmates.  Clinical contacts, except for IDTT

meetings, were usually conducted at cell-front reportedly attributed to limited custody

and clinical staffing allocations and physical plant limitations. The monitor's expert attended an IDTT meeting for four inmates in August and found that, while IDTT meetings occurred regularly in the unit, their quality was poor. Discussion about presented inmates was limited, and neither UHRs nor C-files were available. The number of psychiatrists assigned to the MHCB unit rose from three to four by December, and the attendance of supervisors at IDTT meetings increased. As a result, the quality of IDTT meetings improved. Problems with the availability of UHRs were resolved as a result of a QIT, and summaries of case factors were available at the time of the meetings in place of complete C-files. Despite the improvements, at an IDTT meeting observed by the monitor's expert in December, multidisciplinary discussion of treatment alternatives remained limited, the threshold for referral to inpatient DMH programs was set too high and input from correctional staff was not elicited. Participation of nursing staff in IDTT meetings was sporadic. The institution reportedly planned to provide MHCB inmates with greater out-of-cell time, and a QIT had been chartered to address the necessary changes.

The frequency of case management contacts in administrative segregation improved, but documentation of contacts declined. In August, audits and chart reviews confirmed that inmates were seen weekly by their case managers. Chart reviews in December indicated that inmates refused approximately 40 percent of all weekly case management contacts. One reviewed chart revealed the inmate had no weekly case management contacts, and the charts of two others suggested that the quality of reported weekly contacts was poor. Inmates' charts were not routinely requested for weekly case management contacts and were unavailable about 20 percent of the time.

The timeliness of psychiatric follow-up for reception center inmates improved, but remained somewhat problematic. In August, institutional audits showed that psychiatric appointments were completed within a week of the scheduled date for 84 percent of surveyed inmates in two reception units, but only 34 percent of the inmates in a third reception unit. By December the percentages in all three units improved, but especially in the third, resulting in somewhat reduced disparity.

The institution's status report, confirmed by interviewed staff, indicated that a more accurate list of paroling inmates had been developed, and discharge planning services for paroling inmates had improved.

The filing of documentation in mental health records continued to be a problem. In August, filing backlogs reportedly measured about 12-inches high or the equivalent of 24 hours of filing. Institutional audits indicated that 81 percent of all medical records were filed within 24 hours. Staff complained that files were frequently unavailable for scheduled clinical appointments. In November 2004, a medical records supervisor was hired. The monitor discovered in December that case management notes had not been filed for the previous four to six weeks, primarily because progress notes were not sent to the medical records department in a timely manner.

The MHTS was still in the early stages of development at CIM. At the time of the monitor's August visit, some staff members were well trained on the system, while others were not trained at all. The MHTS was used only for ducating purposes. Audits were not conducted, nor were reports generated, using MHTS data, and concern about the reliability of the data in the system was well-founded. As a result, the institution experienced difficulties scheduling inmates for timely follow-up appointments,

especially inmates whose medications were about to expire. By December, CIM had established a MHTS quality assurance subcommittee. A memorandum was circulated to all mental health staff stressing the importance of completing tracking sheets appropriately, and a team from CSP/LAC conducted training at CIM, largely focused on developing MHTS reports and downloading pharmacy data. The data entry backlog had increased to seven days, and doubts lingered about the reliability of the data and reports generated by the system. The institution maintained that the clerical staff at CIM was insufficient to implement the MHTS effectively. CIM, which had not requested additional clerical staffing, needed to assess the adequacy of its clerical allocations.

b. Non-Compliance

Inmates interviewed in August frequently complained that they had not received heat cards.

Institutional Summary:

CIM had a number of staff vacancies that needed to be filled, although contract psychiatrists covered most psychiatric vacancies. Among the four focus issues for this round of review, CIM's quality assurance process continued to develop, except for peer review. The QIT process led successfully to several changes that helped improve the facility's delivery of mental health services. Transfer data was not entirely reliable, but the pace of EOP administrative segregation transfers appeared to quicken. While the speed of transfers out of reception slowed early in the monitoring period, it began to improve by the end of 2004. With the exception of its pre-formal referral triage process, which delayed DMH referrals unnecessarily, CIM continued to enjoy reasonably ready access to DMH programs. Multiple admissions to the MHCB unit were again a problem.

279

Implementation of the mental health assessment process in the handling of disciplinary charges was well underway. Assessments were completed regularly and mental health input sometimes had an impact on hearing officers' determinations. Yet the number of requests for assessments seemed low; the quality of some assessments was poor; and additional training was needed. Performance in various aspects of medication management was also erratic. Laboratory testing, the provision of parole medications, completion of informed medication consent forms and continuity of medication on arrival, changes in housing locations and renewals showed improvement, but other aspects of medication management were problematic, including follow-up to medication non-compliance, HS medications, MARs and the Keyhea process. Some audits of medication management issues were methodologically flawed and left the extent of compliance obscured.

Relative to the institution's CAP, two more issues were resolved during the monitoring period, and progress continued in some other areas. Access to inmates, discharge planning, the frequency of case management contacts in administrative segregation, psychiatric follow-up in the reception center, discharge planning and the filing of medical records all progressed. Response times for urgent referrals were good, but tracking of responses to routine referrals was needed. Problems included a lack of adequate documentation of case management contacts in administrative segregation, a generally unreliable MHTS and poor access to medical records. Inmate reports of a lack of heat cards needed to be investigated and corrected, if confirmed. The quality of mental health care in the MHCB unit grew better during the long monitoring period, but needed further work particularly with respect to IDTT meetings.

On the whole, CIM's implementation of its CAP, the program guides and various applicable Coleman mandates progressed during the monitoring period, albeit at an erratic pace. The institution still faced a number of problems that needed a concerted and focused effort to resolve.

### California Rehabilitation Center (CRC)
January 24, 2005 – January 26, 2005

During the preceding year, CRC's mental health staffing underwent significant change. In August 2004, the chief psychiatrist was transferred to another facility, and the allocated position for a chief psychiatrist was eliminated, while an existing position for a senior psychiatrist was converted to one for a supervising senior psychiatrist. The latter position was vacant. The facility's remaining 2.5 psychiatrist positions were reduced to just one half-time position, which was also vacant, leaving CRC bereft of permanent psychiatric staff resources. Throughout the monitoring period, CRC was able to contract for the services of roughly 1.0 to 1.5 psychiatrists each month, with one repeat contractor providing some 80 percent of the contracted services. An additional psychiatrist was on loan from CIW one or two days a week from September through December 2004. Nonetheless, complete reliance on non-permanent psychiatrists, combined with the lack of either a chief or senior psychiatrist to supervise contracted clinical services, resulted in some increasing problems with continuity of care and frequent medication changes.

Meanwhile, the facility's allocated mental health staff included ten clinical psychologists, among whom there were no vacancies. In addition, the facility had full-time positions for one psych social worker and one psych tech, both filled. This somewhat unusual staff configuration reflected CRC's mental health caseload (the

281

facility lacked an administrative segregation unit) and the difficulties the institution encountered in retaining permanent psychiatrists. Whether the new staff composition will meet the mental health needs of the caseload remains to be seen.

Vacancies among other categories of mental health staffing included only one half-time office tech. Among auxiliary staff, vacancies were limited to one of 20 RN positions and two pharmacy tech positions. Both of the latter positions were covered by contractors, who were applying for permanent employment.

Issues Resolved:

Clinical intake assessments were generally completed within five working days.

Inmates were seen regularly by a psychiatrist within 14 days of arrival.

IDTT meetings were held in a timely manner.

Quality Management:

The quality assurance process continued to improve. CRC had a quality management committee, a mental health quality management committee and a suicide prevention committee, all of which met monthly. Two QITs were formed during the monitoring period. Peer review was in place for psychologists, but not for psychiatrists or social workers. The quality assurance process at CRC appeared to address important mental health issues.

Medication Management:

Continuity of medication on arrival slipped somewhat during the monitoring period. An institutional audit showed that 89 percent of newly arrived male inmates and 78 percent of newly arrived female inmates received their medications within 24 hours. This compared with 94 percent during the preceding monitoring period.

Continuity of medication on transferring housing locations continued to be good.

Problems with medication expirations remained resolved. The facility had a good system in place utilizing seven to 14-day orders to ensure medication in case of missed appointments. The MHTS tracked expiring medications and prompted the scheduling of psychiatric appointments. The monitor found no evidence of any significant deficiencies in this area.

CRC had an effective system for monitoring medication non-compliance and providing follow-up contact, but the number of non-compliant inmates was high, particularly among male inmates. An institutional audit found that MTAs generally referred inmates for medication non-compliance when appropriate. MARs were generally complete and filed in inmates' charts in a timely manner, but there were some occasional blank spaces. The high rate of non-compliance appeared largely related to problems with the pill lines.

The length of pill lines was a significant problem at CRC, particularly the morning pill line for male inmates. This line generally lasted for approximately 1.5 hours, with even longer lines on weekends and holidays. In addition, pills lines frequently did not start on time and sometimes ended before medication distribution was complete. These problems led sometimes to conflicts among waiting inmates and resulted in some inmates failing to show up for their medications. A QIT was formed to address the issue, but it met only once in January 2005.

CRC seemed to obtain laboratory test results in a timely manner. Moreover, test results were apparently reviewed, even when the psychiatrist who ordered the tests was not present at the facility. The monitor's sample review was too small to

determine whether psychiatrists ordered laboratory tests in all appropriate cases. Given the difficulties with psychiatric staffing, this issue needed continued monitoring.

Unwarranted medication changes, an issue resolved in the past, were once again a problem. Inconsistent psychiatric coverage resulted in frequent medication changes with insufficient rationales, as well as problems with psychiatric follow-up of medication changes.

Compliance with the requirement for obtaining informed medication consent forms seemed to have improved somewhat during the monitoring period. An institutional audit showed an 87-percent rate of compliance compared with the preceding monitoring period report of 78 percent, although the monitor's more limited review found a 79-percent compliance rate.

It did not appear that there was a consistent method at CRC for identifying inmates in need of DOT. There were conflicting reports concerning whether psychotropic medications were administered by nurses or DOT. The institution did not document any monitoring of pill lines for the proper administration of DOT.

An adequate mechanism existed for the provision of parole medications. CRC maintained a list of discharged inmates who received medication. Problems with the delivery of medication for inmates paroling on weekends occurred occasionally.

No inmates were prescribed HS medications at CRC. The institution indicated that it would issue a special pass for the late administration of medication if HS medications were prescribed for any inmate. At the time of the monitor's visit, there were nearly 900 caseload inmates at CRC; the failure to provide any of these inmates with HS medications was unacceptable.

Mental Health Assessments for the Disciplinary Process:

Documentation of the new RVR procedures at CRC was poor. Data provided by the institution was from the preceding monitoring period and did not include any mental health assessments. CRC did not indicate inmates' mental health status on RVR documents. Custody staff also failed to indicate the inmates' mental health status on the RVR log, and the mental health assessment log was blank. These deficiencies made it virtually impossible to identify the total number of 3CMS inmates who received disciplinary infractions during the monitoring period. For the period from January 1, 2003 through June 30, 2004, 272 3CMS inmates received disciplinary infractions, but mental health assessments were requested for only five of these inmates. The institution retroactively generated a log of mental health assessments for the period from July through December 2004, which indicated that mental health assessments were requested for six 3CMS and one non-caseload inmate. These numbers seemed low, but it was difficult to gauge the extent to which they were problematic in the absence of meaningful documentation on the preparation and use of and responses to mental health assessments.

Apparently, custody officers most often submitted requests for mental health assessments directly and informally to accused inmates' clinicians. Thus, while CRC had established a process to ensure that case managers would not perform assessments for inmates on their caseloads and would review inmates' UHRs, although not their C-files, in preparing assessments, custody's direct and informal requests effectively bypassed the established process. As a result, the mental health department was unable to monitor the quality of assessments. Similarly, in the absence of formal,

written mental health assessments, the monitor was unable to assess whether hearing officers considered mental health input in reaching their determinations.

No RVRs for self-injury were issued. Four 3CMS inmates charged with disciplinary infractions were referred to the district attorney's office; three of these referrals were pending and one had been accepted for prosecution.

Further training in this area was needed. According to institutional documents, mental health staff and hearing officers were trained in the new RVR procedures in 2003. No new training had taken place since that time, although new hearing officers had been hired. In addition, the institution had never trained any of its correctional line staff, even though correctional officers usually decided whether 3CMS inmates had acted in a bizarre or uncharacteristic manner in the commission of a disciplinary infraction.

Transfers:

3CMS inmates in the reception center were transferred routinely to general population programs within four to six weeks. The transfers of 22 inmates were pending at the time of the monitor's visit; none had been in reception for more than 90 days.

EOP transfers also continued to be timely. EOP inmates were sent to CIM and CIW within a day of being identified. CRC also continued to track inmates transferred to CIM and CIW to determine the length of their wait in those facilities for placement in an EOP. Of fourteen male inmates transferred to CIM during the monitoring period, two waited more than 60 days for an EOP placement; of ten female inmates transferred to CIW, one waited 96 days for an EOP placement. CRC developed

new procedures to overcome the communication deficiencies responsible for delaying this last transfer.

In the past, inmates in need of a MHCB level of care were transferred to the MHCB unit at either CIM or CIW within eight hours of identification. Due to a shortage of beds at these facilities, CRC began transferring 3CMS inmates to other MHCB units in the CDCR system and, for the first time, held inmates in the OHU pending their transfer. CRC also began housing inmates in the OHU to assess whether transfers to a higher level of care were warranted. The institution did not, however, maintain a log of OHU admissions, and notes were not kept on the treatment provided to inmates in the OHU. A review of monthly reports on OHU admissions revealed that 28 inmates were admitted to the OHU from July 2004 through January 2005. Most of these inmates were transferred to an appropriate unit on the day of their admission, but five inmates remained in the OHU for one day; two remained there for two days; and three inmates remained in the unit for four, five and six days respectively.

No inmates were transferred directly to DMH from CRC. Inmates were sent to CIM or CIW for such referrals and were returned after their discharge to these two facilities. There were two inmates from CRC at ASH at the time of the monitor's visit, but no transfers of CRC inmates to DMH were pending.

Other CAP Issues:

a. Partial Compliance

The composition of IDTT meetings improved during the monitoring period. The monitor's chart review found that correctional staff was present 98 percent of the time, compared with 37 percent during the preceding monitoring period.

287

Psychiatric staff was present only 82 percent of the time, a slight but, given the staffing shortages, hardly surprising decrease from the 85 percent recorded during the preceding monitoring round

> b. Non-Compliance

Timely psychiatric follow-up remained a problem at CRC due largely to the shortage of staff. For male inmates, the percentage of inmates scheduled for follow-up appointments within the time frame requested by a psychiatrist ranged from a high of 70 percent in May to a low of ten percent in September 2004. The percentage of female inmates with timely follow-up appointments ranged from a high of 83 percent in June to a low of 13 percent in December 2004.

The institution continued to use inmate helpers to type ducats, despite the monitor's repeated disapproval of this practice. Using inmate helpers in this manner is a breach of confidentiality. Both inmate and staff continued to report persistent problems with inmates not receiving ducats for scheduled appointments.

Institutional Summary:

The reconfiguration of the mental health staff left programs at CRC rich in case managers but with sparse psychiatric resources. With a caseload population between 800 and 900, 1.0 to 1.5 contract psychiatrists were inadequate, even if inmates were seen by their case managers every other week and sometimes even weekly.

Among the four special issues reviewed during the monitoring period, quality management at CRC continued to improve. Similarly, the delivery and management of medications showed overall progress. The facility monitored and responded well to medication non-compliance and regularly provided parole medications.

Continuity of medication associated with internal transfers and the renewal of medication orders was good; laboratory testing was handled timely; and informed medication consent forms were obtained more regularly. On the other hand, the length of pill lines was a significant problem that apparently contributed to a high rate of medication non-compliance in the facility; there was some slippage in medication continuity on arrival; and, not surprisingly given the difficulty with psychiatric staffing, unexplained and unwarranted medication changes were increasing. Finally, there was little evidence of working policies in regard to DOT and HS medications.

CRC had put into place the policies necessary for the preparation of mental health assessments in the RVR process and provided initial training, but implementation of the policies had apparently gone awry, and the documentation of assessments was too erratic to permit determination of the quality of assessments and any impact they might be having on hearing outcomes. The institution needed to apply its policies, train new hearing officers in them and develop decent documentation to assess their effectiveness. It has been well over two years since the revised mental health assessment system was introduced, but it seemed to have only a marginal role in the disposition of disciplinary infractions involving MHSDS inmates in CRC.

Transfers of caseload inmates out of reception occurred in a timely manner, as did those of EOP inmates. Most inmates in need of a MHCB level of care were transferred expeditiously to MHCB units elsewhere, although some inmates of late were held in the OHU pending their transfers. Inmates from CRC did not transfer directly to DMH, but they did have access to these facilities through CIM and CIW.

289

Among lingering deficiencies in the facility's CAP, the composition of IDTT meetings had improved, while timely psychiatric follow-up and the use of inmate helpers to prepare ducats remained problematic. The latter continued despite explicit CDCR policy prohibiting the practice that is now almost ten years old.

In the next round of monitoring, scrutiny will focus on CRC's development of procedures for DOT and HS medications; implementation and documentation of its mental health assessment system for disciplinary infractions by caseload inmates; and correction of problems with pill lines and over-long stays in the OHU among caseload inmates awaiting transfer to MHCB units elsewhere. The facility also needs to stop using inmate clerks to generate ducats for mental health appointments. Finally, the monitoring team will assess the effects of the fairly dramatic reconfiguration of CRC's mental health staff. Positive findings on these issues will qualify CRC for paper reviews in future monitoring rounds.

### Service Area J

This service area includes R.J. Donovan Correctional Facility (RJD), Ironwood State Prison (ISP), Calipatria State Prison (CAL), Centinela State Prison (CEN) and Chuckawalla Valley State Prison (CVSP).

### Richard J. Donovan Correctional Facility (RJD)
November 1- November 3, 2004
January 7, 2005
January 21-January 22, 2005
May 16-May 17, 2005

Throughout the monitoring period, RJD continued to struggle with inadequate clinical resources. According to DCHCS data, as of March 2005, 4.5 of 15.5 allocated psychiatrist positions (nearly 30 percent) were vacant, while ten of 46 allocated

case manager positions (nearly 22 percent) were also vacant. Contracting did not fill these vacancies. In February, roughly 2.6 of the vacant psychiatrist positions and 4.3 of the case manager vacancies were covered by contractors, in both cases less than half of the unoccupied positions. Three of nine allocated senior psychologist-supervisor slots were also empty. Three of six allocated positions for recreational therapists were vacant, as were both allocated positions for mental health records technicians. None of these positions was covered with contract services. Finally, some key clinical management positions were vacant for most of the monitoring period. The institution was without a chief psychiatrist until November or a chief psychologist until January.

At the time of the monitor's January visits, the facility had a MHSDS caseload of over 1500 inmates with a complex array of general population and reception 3CMS and EOP programs, an active reception function, an EOP administrative segregation hub unit and a substantial number of 3CMS inmates in administrative segregation. While new mental health positions had been approved and funded in mid-2004, they remained largely unfilled.

Considering RJD's limited mental health staffing, the institution did well during the monitoring period just to halt its spiraling descent into non-compliance and begin a slow process of retrieval. The case reviews in Exhibit S, however, most of which were assembled during the early part of monitoring period, indicate more clearly than the following report how deep the spiral was and how distressed the provision of mental health services became during much of the monitoring period.

Quality Management:

The quality assurance process at RJD continued to evolve in structure and content. The quality management committee and the mental health quality management subcommittee met regularly kept minutes and chartered QITs. The utility and quality of audits conducted during the monitoring period varied widely. Audits on informed medication consent forms, inpatient records in UHRs and the availability of, and loose filings among, medical records were small in scope but sound in method. An audit on the length of pill lines was largely useless. Psychiatrists and psychologists continued to perform peer review.

Concrete measures to improve the utility of the MHTS undertaken during the preceding monitoring period resulted in modest improvement, but the system was still largely incapable of supplying data for aggregate reports. The MHTS, for example, could not perform straightforward audits of initial mental health contacts and IDTT meetings for inmates newly arriving at RJD.

Medication Management:

Medication management improved little during the monitoring period, and pervasive deficiencies were apparent. Problems with the expiration of medication orders, continuity of medications and medications-related record-keeping were all prominent. One institutional audit of 39 medication orders written for general population inmates found 13 expired orders. Expirations occurred at an even higher rate in administrative segregation, where an audit found nine of 15 orders expired.

At the end of 2004, the local operating procedure for medication management was again revised. An effort was also undertaken to train staff responsible

292

for administering medication in four key aspects of medication management, namely, consistent record keeping, expiring medication orders, non-compliance and the administration of medication to inmates with Keyhea orders. One notable flaw in the revised policy and procedures permitted medication orders to be rewritten without patient contact for a time period extending well beyond the normal 14-day bridge period.

It was too early to assess systematically the results of the late 2004 changes in policy and procedures, but staff cited noticeable improvement in some areas. Reportedly, medication continuity improved when the location of caseload inmates changed, and the incidence of non-compliance associated with inmates' failure to show up for pill lines declined significantly. Custody staff had participated in drafting, promulgating and implementing provisions in the revised policy and procedures for non-compliance, length of pill lines and continuity of medication when inmates were moved within the facility. Correctional officers with lists of inmates on medication were posted at pill-line windows. They collected information on the length of the line and helped locate and escort those who failed to appear. Unfortunately, they also occasionally wrote RVRs for inmates escorted to the pill line who refused their medications, characterizing the rejections as a failure to follow an order.

Effective medication management was often stymied by inaccurate medication expiration lists and a lack of cooperation among health care disciplines. Under the latest policy revision, when inmates were moved within the institution, custody staff was to use a revised version of the daily movement sheet that required signatures to confirm that medication administration records had also been transferred to the new location.

293

HS medications were administered after 8:00 p.m. in all but one yard, where problems with tower coverage, MTA staffing and other logistical impediments forced earlier deliveries. Psychiatrists wrote many orders for "HS or pm," a medication management problem that was addressed during in-service training.

Psychiatrists received two in-service training sessions on monitoring the blood levels of inmates on mood-stabilizing medications. A new method for making laboratory results available to psychiatrists when they saw inmates was also initiated.

A small institutional audit of informed medication consent forms found that in a sample of 33 UHRs drawn from one yard, 24 contained a consent form. Eight of the forms were over a year old. Four UHRs contained refusal forms.

Mental Health Assessments for the Disciplinary Process:

The new mental health assessment process went into effect at RJD in May 2003, and both mental health and custody staff were trained in the new process. The revised disciplinary process reportedly had been fully implemented during the preceding monitoring period. The institution maintained a log; mental health assessments were informative and used by hearing officers; and sanctions were mitigated in some cases.

The disciplinary process in general needed to be reformed. Review of cases of some inmates with lengthy stays in administrative segregation highlighted what appeared to be characteristic problems that slowed or even halted the process, resulting in excessively long stays in administrative segregation and reception. Months were often consumed in investigating allegations of extortion, threats, conspiracy, gang affiliation or enemy concerns. Violations of procedural aspects of the RVR process, involving generally the failure of hearing officers to conform with procedural requirements,

294

frequently caused considerable delay. Faulty hearings required that the RVR be re-issued and re-heard. In one reviewed case, a flawed hearing took four months to be rescheduled and decided; in another case involving a SHU term, the hearing, disposition and review by an ICC took 11 weeks to complete. Supervisory procedural reviews often took another month. Two months after a supervisor's decision to overturn one reviewed case, a new RVR had yet to be re-issued. The involved inmate had been in administrative segregation for over six months, with processing the pending charge consuming half the period. The institution often took up to two months to refer cases to the local district attorney, while the district attorney, pursuant to an agreement with RJD, could take up to a year to decide whether to prosecute. In several of the cases reviewed, the level and intensity of mental health treatment required by the involved inmates escalated sharply.

Transfers:

In contrast to the preceding monitoring round, when RJD initiated no referrals to acute inpatient DMH care and transfers to ASH slowed slightly, case managers became more accountable during this monitoring period for failures to refer inmates to inpatient DMH care. In November 2004, when decompensated inmates were found to be neither identified nor considered for referral to inpatient DMH care, the institution undertook to upgrade its access to DMH program. A single clinician coordinated all referrals and maintained a log of referrals and transfers. Correctional counselors provided the necessary classification information, and office techs copied needed portions of UHRs. Twenty-three of 26 inmates identified as needing an inpatient level of care during the unmet needs assessment were referred to DMH.

295

Staff continued to complain that discharge summaries from DMH were not helpful. Some summaries reached the institution so long in advance of the inmate's actual return that the clinical information provided was dated by the time of the inmate's arrival. Some inmates returned without any discharge summaries at all.

RJD was often unable to meet transfer timelines for 3CMS and EOP inmates in its reception center. In May 2005, 137 of 373 caseload inmates in reception had been there overlong. The transfer process broke down for many reasons, some preventable, others not. Transfers delayed by disciplinary and legal problems were not automatically resumed once the problems were resolved. CSR endorsements expired unnoticed, and necessary CSR appointments occasionally were simply not scheduled. Changes in the level of mental health care nullified prior endorsements, which could result in further delays of weeks or months. Missing medical and mental health chronos could bring the processing of inmates to a halt. On one given day in May, 211 of 1,930 transfers from reception had been delayed for at least a month due solely to missing health-related chronos. Transfers of inmates with pending disciplinary adjudications occurred only rarely. According to staff, in almost all cases a RVR needed to be adjudicated prior to transfer because the outcome could change the case factors governing placement.

Parole revocation hearings also delayed transfers. Correctional counselors routinely did not process transfers for an estimated 25 percent of inmates in reception until they were notified of the outcome of revocation hearings. Inmates slated to be released within 30 days were ineligible for transfer. Staff reported that subsequent to

296