Valdivia, with its requirement for accelerated revocation hearings, the number of inmates released from the reception center, at least temporarily, increased substantially.

The priority transfer list generated by the MHTS was inaccurate. The list generated during one week in May contained the names of 45 inmates not even included in the MHSDS caseload. Several caseload inmates were listed more than once with different transfer deadlines in each listing. Movement out of reception, once the transfer process was completed, remained uncertain and subject to further delay due to the lack of available beds elsewhere. Even with beds available, transportation delays could block movement. During one week in May, RJD requested 186 bus seats but received just 69, a proportion staff reported as not untypical.

Other CAP Issues:

a. Partial Compliance

The frequency of case management contacts with 3CMS inmates continued to improve, but compliance varied depending on the housing location. The rate of compliance in Yard III was limited by space and custody constraints.

Patterns of the use of MHCBs did not change during the monitoring period. While the average length of stay in the MHCB unit was seven days, 17 percent of admissions (42) remained in the MHCB longer than ten days. Twelve were awaiting transfer to a DMH hospital, and 14 were in the process of preparing for Keyhea hearings. Only two stays, both exceeding 20 days, fell into neither of these categories.

Although a QIT was formed during the preceding monitoring period to address problems with the identification and handling of decompensating and high-risk inmates, problems in this regard persisted. Suicide risk assessments were not routinely

297

conducted on admission to the MHCB unit. Suicidal inmates discharged from the MHCB unit generally, but not always, received the required full five-day clinical follow-up.

Directives for reduction of the backlog of unfiled medical documents were issued in July 2004 and apparently helped to shrink the backlog. Audits of clinicians' access to medical records during inmate contacts also showed improvement. During the month of September 2004, records were available during 74 percent of clinical contacts.

Some aspects of the institution's heat plan that appeared to have deteriorated somewhat over the past three years were re-tooled during the monitoring period. In mid-2004, RJD conceded that heat cards were not always provided to caseload inmates on heat-sensitive medications, and some confusion about the distribution of heat cards was apparent. By the end of 2004, psychiatrists had been trained to issue heat cards when they wrote orders for heat-sensitive medications, and heat cards were routinely issued to inmates who needed them. When the local medication management policy was revised at the end of 2004, a requirement for the distribution of lists of inmates on heat-sensitive medications was reiterated. Despite these improvements, the monitor found some unaddressed ventilation problems and inadequate monitoring of temperatures in some housing units.

An institutional audit indicated that treatment plans for EOP inmates were current in 85 percent of cases, an improvement over the 72 to 79-percent compliance rate found during the preceding monitoring period.

b. Non-Compliance

As in the past, the medical records of many inmates recently treated in the MHCB unit did not contain essential information. One institutional audit found no inpatient records in the UHRs of five of 16 reviewed inmates.

EOP inmates were not provided adequate treatment. The small amount of structured therapeutic activities offered, fewer than five hours per inmate per week, and the amount received, fewer than three hours weekly, remained a substantial problem. EOP inmates were no longer able to participate in education or hold work assignments outside of the EOP unit. The staff reported that the new restriction was the result of a headquarters' directive that prohibited EOP inmates from mingling with non-EOP inmates. Just 16 percent of all EOP inmates (27) were offered three educational groups, led by case managers, which met for several hours each weekday. Community meetings were not held. Some of the treatment provided reportedly consisted of largely meaningless in-cell activity. Discharges of EOP inmates to the 3CMS level of care were questionable in some cases. In an effort to improve EOP treatment, staff revamped existing groups, made supervisory changes and adopted new methods of identifying inmates who were not doing well.

Case managers did not meet weekly with all mental health caseload inmates housed in administrative segregation. Lengths of stay in administrative segregation were unnecessarily long for some inmates and were attributable both to unavoidable delays and the dilatory processing of disciplinary adjudications and classification changes.

Allegations of abuse and retaliation were voiced by staff and inmates in the EOP unit during monitoring visits in July and again in November. Staff morale in the unit was low and affected treatment adversely. Institutional administrators had appropriately initiated investigations of the allegations of custody staff misconduct raised by mental health staff, as well as inmates. The outcome of these investigations needed to be monitored closely.

Institutional Summary:

RJD floundered early in the monitoring period but seemed to rally somewhat later through some more focused local efforts and with assistance from DCHCS. Few significant improvements resulted, but at least further backsliding was halted. Mental health services in the facility remained deficient in many key areas. The underlying cause of the continuing failure was the institution's inability to attract permanent mental health clinicians or find effective contractors to fill vacant clinical positions.

Medication management improved in two specific areas and inched toward overall progress by once again revisiting and revising local policy and procedures for the administration of medications. Custody staff also began to be involved in the articulation of improved policies and practices for the distribution of medications. Some concrete steps were undertaken to improve record keeping, respond immediately to pill-line no-shows and ensure that inmates moving within the institution received medication without interruption. Most other medication management problems remained unresolved, pending full implementation of the newly developed local operating policy and procedures.

300

Transfers of caseload inmates out of reception remained slow. Roughly a third of all caseload inmates stayed in the reception center beyond applicable timelines. Causes for delay often could be traced to the ponderously slow and inefficient processing of RVRs. Parole revocation hearings also contributed significantly to transfer delays, as did the lack of mental health program beds elsewhere in CDCR and transportation difficulties. For many of the same reasons, lengths of stay in administrative segregation were unnecessarily long.

Quality assurance continued to develop incrementally. The MHTS was still not useful for performing audits, although its operational utility for staff improved somewhat. Audits were variable in quality. Peer review was underway for both psychiatrists and psychologists. The mental health assessment process for the handling of disciplinary charges was reasonably well-documented, generated some useful assessment and resulted in some positive outcomes.

The institution did not manage to resolve any of its outstanding CAP deficiencies during the monitoring period. Timely treatment plan updates for EOP inmates progressed modestly. The availability of medical records for clinical contacts and the back-log in the filing of mental health documentation saw some improvement, but records related to recent MHCB stays were often missing from UHRs. The institution's awareness of the heat plan improved, as did the distribution of heat cards. The frequency of case manager contacts with 3CMS inmates improved somewhat but was still problematic on one yard. The institution developed further its process for identifying inmates in need of an inpatient level of care and, following the local conduct

301

of the department-wide unmet needs assessment, did an acceptable job of referring inmates earmarked for transfer during the assessment.

On the other hand, mental health treatment provided to EOP inmates remained inadequate.  Fewer than five hours of treatment per week were offered, and access to work assignments and educational classes outside the EOP unit was terminated. Problems persisted with appropriate responses to decompensating inmates and the appropriate assessments of suicide risk in some cases.

RJD still has a long way to go to comply with its CAP and the mandates of Coleman.  One can only hope that this monitoring round marked both the nadir of RJD's compliance efforts and a critical turning point.  The institution must begin again to develop competent and effective mental health services for its large population of seriously mentally disordered inmates.

### Ironwood State Prison (ISP)
October 12, 2004 – October 13, 2004

ISP had allocated positions for a chief psychiatrist and a staff psychiatrist, both of which were filled.  ISP's only psychologist position, two of its three psych tech positions and a half-time office tech position were vacant.  In addition, the institution's third psych tech was on extended leave.  Two contract psychologists adequately covered the psychologist vacancy.  The institution reportedly attempted to obtain contractors for the vacant psych tech positions, but no coverage had as yet been procured.

ISP continued to have a small mental health census.  At the time of the monitor's visit, only 11 caseload inmates were in the institution.

Issues Resolved:

> Treatment plans were formulated for MHCB inmates in conjunction with IDTT meetings, which were held regularly three times a week in the unit.

> Problems with DOT were resolved.

Quality Management:

The institution had just implemented a new quality assurance team during the week preceding the monitor's visit, so it was too soon to determine its effectiveness. The previous quality management committee met monthly and chartered two QITs. This issue appeared resolved, assuming that quality assurance efforts continued at this level. The size and nature of the mental health staff and the caseload precluded the usefulness of peer review.

Medication Management:

Medication management functioned adequately at ISP. There did not appear to be any significant problems with continuity of mediation on arrival or changes in housing locations. The institution had only a few paroling inmates, but parole mediations were consistently provided when inmates were discharged from the facility. Medication errors were tracked, but only three errors were documented during the year, and none of the errors was due to nursing mistakes. Informed medication consent forms for psychotropic medications were present routinely in inmates' medical records.

ISP had implemented DOT effectively. All medications were nurse-administered in the MHCB unit and administrative segregation units, while DOT was conducted by correctional officers for inmates receiving medication in the general population. The monitor's review of charts confirmed the provision of DOT at ISP. HS medications apparently were not provided for general population inmates.

Mental Health Assessments for the Disciplinary Process:

Documentation of staff training on the new mental assessment component of the RVR process was provided. ISP maintained a comprehensive log of mental health assessments, including dates of assessments, clinical findings and dispositions of cases, as well as whether the assessments were considered by the hearing officers. According to the log, six assessment requests were made during the monitoring period, five for 3CMS inmates and one for a MHCB inmate. Mental health assessments apparently were completed appropriately; five of the assessments concluded that mental illness had influenced the inmates' behavior.

The monitor's review of just two available charts indicated that hearing officers did not consider mental health input in reaching their determinations. The narrative sections of the dispositions did not even refer to the mental health assessments in either of the two reviewed cases.

Transfers:

Lengths of stay in the MHCB unit were excessive. The average length of stay for MHCB inmates was 15 days, with stays ranging from four to 34 days. The average stay for clinical reasons was about nine days. Approximately 25 percent of MHCB inmates had clinical lengths of stay longer than ten days.

ISP inmates had timely access to higher levels of care at DMH. From April 22, 2004 to the time of the monitor's visit, ten inmates were transferred from ISP to CMF. Institutional information provided to the monitor indicated that transfers took, on average, two weeks from referral to transportation. Staff reported that 3CMS inmates

were generally transferred elsewhere within 90 days, and EOP inmates were generally transferred within 30 days.

Other CAP Issues:

a. Partial Compliance

The frequency of IDTT meetings for 3CMS inmates was an issue that had been resolved in the past, but the composition of the meetings remained problematic. The monitor found that psychiatrists were not always present at IDTT meetings.

There was no change in the frequency of psychiatric contact for inmates in the MHCB unit. ISP did not provide daily psychiatric coverage on weekends and holidays in the unit, and no on-call system existed at the institution.

Due to psych tech vacancies, the institution used psychiatrists and psychologists to perform psych tech rounds in the administrative segregation unit. Documentation of rounds was present in the isolation log, but was not always in medical records.

b. Non-Compliance

The provision of weekly case management contacts for administrative segregation inmates, an issue resolved in an earlier round, re-emerged. The monitor noted significant lapses in weekly case management contacts for administrative segregation inmates. Moreover, the majority of clinical contacts apparently occurred at cell-front.

ISP did not have a system in place for five-day clinical follow-up of suicidal inmates released from the MHCB unit.

305

Institutional Summary:

        Two CAP issues were resolved during the monitoring period.  Staffing at the facility remained relatively unique; although both of the institution's allocated psychiatrist positions were filled, the facility lacked daily psychiatric coverage in its MHCB unit; psychiatrists were not always present for IDTT meetings; and no psychiatric coverage was available on weekends and after hours.  The quality assurance process continued to monitor compliance; the administration and delivery of medication was acceptable, except for HS medications; access to higher levels of care seemed readily available, although the average length of stay in the MHCB unit exceeded program guide requirements; and mental health assessments in the disciplinary process were properly requested and completed, but hearing officers apparently did not always consider mental health input in reaching decisions.

        The frequency of case management contacts in administrative segregation had declined, and the institution did not have a system for providing five-day clinical follow-up of suicidal inmates discharged from the MBCH unit.  Overall, ISP still had some CAP issues to resolve, but was close to full compliance.

**Calipatria State Prison (CAL)**
October 27, 2004 – October 28, 2004

        CAL had vacancies for three psych techs.  The institution's other clinical mental health positions were filled, including positions for a psychiatrist, two psychologists and two other psych techs.  The psych techs coordinated their work schedules to provide seven-day coverage; other clinicians covered daily rounds during psych tech absences.  The MHSDS caseload in the facility at the end of October consisted

306

of 14 3CMS inmates and two EOP inmates. In early January, the caseload included one EOP and 17 3CMS inmates.

Issues Resolved:

Psychiatric responses to inmate self-referrals were timely.

Quality Management Issues:

The quality assurance process continued to improve. The mental health quality management subcommittee met almost weekly, and the suicide prevention committee met monthly. Attendance at quality management meetings was somewhat problematic during much of the monitoring period; departmental changes in the format of the meetings in mid-September required attendance by additional personnel, only some of whom participated in the October meeting. Minutes of the meetings were maintained and reviewed by the monitor. Chart audits of caseload inmates were performed regularly. Peer review was not conducted due to the small size of the institution.

Medication Management:

Medication management issues were generally in compliance. There were no problems with continuity of medication on arrival, when changing housing locations or on renewals. MARs adequately documented the administration of medications, and informed medication consent forms were present in inmates' charts.

CAL did not track medication errors. Minutes from the suicide prevention committee meeting in May, however, reported some medication errors in the administrative segregation unit. The institution needed to monitor this problem.

Psychotropic medications were generally nurse-administered at this facility, although some administrative segregation inmates in practice may have received

307

DOT. There were no inmates on Keyhea orders at CAL, and no inmates were on mood-stabilizing medications in need of regular laboratory testing.

<u>Mental Health Assessments for the Disciplinary Process:</u>

CAL did not track its RVR process sufficiently to allow a meaningful evaluation of the operations or impact of requested mental health assessments of inmates charged with infractions. Logs synopsized neither the results of clinicians' assessments nor the outcomes of disciplinary hearings where assessments were submitted. More importantly, because the tracking system did not even record inmates' levels of care, it was impossible to determine whether any non-caseload inmates might have been referred for mental health assessments for bizarre or uncharacteristic behavior.

The institution provided no documentation of staff training in the revised process for mental health input into disciplinary determinations. Chart reviews suggested that some aspects of these procedures were often ignored.

The mental health assessment process itself was applied somewhat erratically. Clinicians interviewed accused inmates and reviewed inmate charts for each assessment, but C-files were not routinely reviewed by the assessing clinician, and it was unclear whether assessments were completed by a clinician who was not the inmate's case manager. According to institutional data, only 11 requests for assessments were filed during the monitoring period.

The monitor reviewed six completed assessments and found all of them well prepared. The forms were completed fully, and clinicians provided supporting narratives. On the other hand, RVR practices did not adhere fully to established departmental procedures. Staff appeared unaware of CDCR policies on the rules for

disciplinary infractions involving self-injurious behavior, and one inmate was issued a RVR for suicidal behavior without the required procedural protections.  Interestingly, all caseload inmates issued RVRs at CAL were referred for mental health assessments, although departmental policy required the referral only of MHCB and EOP inmates and 3CMS inmates and non-caseload inmates whose behavior was bizarre or uncharacteristic. Due to the size of the MHSDS population at the institution, this approach was not particularly burdensome.

Hearing officers did not consistently comply with the requirements of the mental health assessment process.  The monitor reviewed disciplinary decisions for all eleven caseload inmates charged with infractions during the monitoring period and found that none of the decisions summarized the content of the mental health assessments or explained the hearing officers' consideration of the clinical assessment.

Transfers:

CAL used its MHTS to track 3CMS, EOP and MHCB transfers.  The institution did not separately track transfers for caseload inmates mistakenly sent to the institution, even though these inmates were subject to shorter transfer timelines.

Access to the OHU was adequate.  The OHU admissions log, however, did not always include reasons for admissions or discharge dates.  For the period from April 1 to October 28, there were 49 mental health admissions to the OHU for which complete information was available.  During this seven-month period, ten admitted inmates remained in the unit longer than 72 hours.  Eight of the extended admissions remained from four to six days, although two remained in the OHU for 18 days.  At the

time of the monitor's visit, one inmate had been in the OHU for seven days because he feared for his safety in general population or administrative segregation.

3CMS inmates were generally transferred within prescribed time frames. Of the 73 3CMS inmates transferred from CAL during the period from May to October, all but one were transferred within 90 days of their referrals. Indeed, 69 of these inmates were transferred within 60 days of their referrals.

Transfers of EOP inmates and EOP administrative segregation inmates were consistently completed within transfer timelines. During the period from May 1 to October 8, all nine EOP inmates in the facility were transferred from CAL within 60 days of their referral. Inmates transferred to CAL to participate in court proceedings, however, sometimes remained at the facility for months; two caseload inmates in CAL at the time of the monitor's visit had been in the institution for more than five months. Both inmates received medication and weekly case management contacts throughout this period.

Inmates in need of a MHCB level of care were transferred in a timely manner. From May 28 to September 30, CAL transferred 12 inmates to MHCB units in six different CDCR institutions. According to data from the MHTS, all of these transfers occurred within 24 hours of the referral.

Other CAP Issues:

a. Partial Compliance

The timeliness of initial clinical intake assessments improved. An institutional audit of 183 referrals showed that 88 percent of inmates were seen within five working days.

310

Problems with daily psych tech rounds in administrative segregation were resolved during an earlier monitoring period. The monitor, however, observed rounds during a tour of the administrative segregation unit and found that, while daily rounds were conducted consistently, the whole process often took just 20 minutes, a totally inadequate amount of time to complete comprehensive and interactive meetings.

Five-day clinical follow-up of suicidal inmates discharged from the OHU or returned from a MHCB unit improved. According to institutional data, five-day follow-up was ordered on 22 occasions; all of the ordered monitoring rounds were completed or were interrupted by the inmate's return to the OHU. The institution, however, did not track custody follow-up, and it was impossible to determine whether custody checks were completed as required.

Institutional Summary:

Among the issues of focus for this round of monitoring, the institution's quality assurance process improved; medication management was adequate; and transfers to higher levels of care were generally timely. CAL needed to focus on the full implementation and documentation of the revised mental health assessment process and, particularly, the extent to which hearing officers took mental health input into consideration in their dispositions. RVR logs were also inadequate, and staff training on the issue was undocumented.

CAL was close to full compliance with its CAP and all of the requirements of Coleman. During the monitoring round, the institution resolved one of its four remaining CAP items, while maintaining progress in other areas. Psych tech

311

rounding in administration segregation and custody monitoring of suicidal inmates discharged from the OHU needed to be tightened up.

### Centinela State Prison (CEN)
October 26, 2004 – October 27, 2004

CEN had vacancies in positions for a psych tech and a recreational therapist. Contractors covered half of the psych tech vacancy from April through June 2004 and provided coverage equivalent to 1.2 psychiatrists and a half-time psychologist from April through July. A departmental memorandum in March, 2004 informed the institution that its MHCB unit, reportedly unbeknownst to local mental health staff, had been deactivated in August 2003 and instructed staff to stop filling vacancies for the MHCB unit with contracted staff. This development resulted in the reduction of contracted services during the later part of the monitoring period. During August 2004, a single contract psychologist worked just 60 hours. The facility continued to have a full-time staff psychiatrist and psychologist.

At the time of the monitor's visit, three EOP and 21 3CMS inmates were housed in CEN, all awaiting transfer to mental health programs. The need for mental health treatment for all of these inmates was identified only after their arrival at CEN.

Quality Management:

The quality management committee and the suicide prevention committee met monthly, but no separate mental health subcommittee functioned at CEN, and no mental health QITs were established. Chart audits were performed every month. Peer review was conducted for psychologists, but not for the single part-time psychiatrist.

Medication Management:

        Medication management improved at CEN. Medication continuity was not typically a problem for inmates arriving, changing housing locations or needing renewals. There was adequate tracking of medication non-compliance by psych techs, and informed consent forms were consistently found in inmates' charts. No inmate was on a Keyhea order, nor were any on HS medications.

        On the other hand, inmates complained that DOT was performed inconsistently, although all inmates reportedly were administered medications by DOT monitored by MTAs and custody staff.

Mental Health Assessments for the Disciplinary Process:

        CEN did not maintain a tracking log for RVRs issued to caseload inmates or completed assessments. Documentation of training in the mental assessment process was also unavailable. No RVRs were issued for self-injurious behavior.

        All caseload inmates involved in disciplinary infractions at CEN were referred to mental health, regardless of whether they exhibited bizarre or uncharacteristic behavior. Given the consistently small number of caseload inmates at CEN, the broadly inclusive referral of all caseload inmates was not burdensome. Only 30 RVRs were referred for mental health assessments during the year preceding the monitor's visit. Assessment recipients included 17 3CMS inmates, two EOP inmates, nine non-caseload inmates referred for bizarre behavior and two inmates whose mental health status was unrecorded.

        The quality of mental health input into the disciplinary process varied. Eight assessments were incomplete. Due to the small number of clinicians at CEN, most

mental health assessments were completed by inmates' case managers. Assessments generally involved an inmate interview and chart review, while C-files were rarely reviewed. Of the 30 assessments completed, four concluded that mental illness might have influenced the assessed inmates' behavior.

The impact of mental health assessments was unclear. The institution had not audited the issue, and, while the mental health assessments were available to the monitor, it was impossible, given the absence of adequate documentation, to determine whether the hearing officers considered the assessments in reaching their decisions.

Transfers:

CEN used the MHTS to track 3CMS and EOP transfers. A manual log tracked all OHU admissions, and a computer log retained information about MHCB transfers.

3CMS inmates were generally transferred from CEN in a timely fashion. From April 24 through September 30, 2004, 123 inmates were identified at CEN as needing a 3CMS level of care. Only two of these inmates waited longer than 90 days for a transfer. During the same period, seven 3CMS inmates and non-caseload inmates on psychotropic medication were mistakenly transferred to CEN. Most of these inmates reportedly spent less than a week at CEN; chronos showed that all of the inmates were transferred back to the sending institution within the 21-day timeline.

The timeliness of EOP transfers was also good. During the period from April 24 through September 30, seven EOP inmates were transferred from the institution, all of them within 60 days. The wait from acceptance to transfer averaged 21 days, with

a range from seven to 40 days. None of the three EOP inmates in the institution at the time of the monitor's visit had been there longer than 60 days.

The accelerated transfer process also functioned quite well at CEN. Five of the seven EOP inmates transferred during the monitoring period waited less than 30 days. Similarly, 52 of the 123 3CMS inmates were transferred in less than 30 days.

Lengths of stay in the OHU were generally in accord with required timelines. From May 1 through October 15, 34 inmates were admitted to the OHU. Of these, all but four were discharged within 72 hours or less. The remaining admissions lasted four, six, seven and 11 days respectively.

MHCB transfers were usually made in a timely manner. From April 24 through September 20, 16 inmates were transferred to MHCB units in other CDCR facilities, 15 of them within 24 hours of their referrals; the other inmate was transferred within two days of his referral. CEN did not transfer inmates directly to DMH.

Other CAP Issues:

a. Partial Compliance

Clinical access to caseload inmates improved significantly after suffering a setback during the preceding monitoring period. According to the MHTS, the frequency of missed or cancelled appointments went from 54.6 percent of 714 appointments in late April to 20 percent of 2,279 appointments in late September.

Institutional logs showed that clinical follow-up of suicidal inmates was regularly provided to the 16 inmates discharged from a MHCB unit or the OHU during the monitoring period. Custody follow-up, however, was not consistently documented.

The MHTS provided improved scheduling and tracking information, showing that some newly arrived inmates were still not seen in a timely manner after being referred to mental health. MHTS data from April 20 through September 30 indicated that 23 percent of referrals from bus screenings did not receive clinical contact within seven calendar days. The monitor reviewed the inmate histories for eight of these referrals, and found only one that was delayed by the inmate's refusal to participate; in all of the other cases initial appointments were either cancelled or scheduled untimely.

b. Non-Compliance

Some lapses occurred in documentation of weekly case management contacts with EOP inmates housed in general population, an issue resolved earlier.

Problems recurred with the documentation of weekly case management contacts in administrative segregation, another issue formerly resolved. Chart reviews and inmate interviews, however, confirmed that daily psych tech rounds were conducted regularly, and inmates continued to receive timely mental health screenings on arrival in the administrative segregation unit and the administrative segregation overflow unit.

Institutional Summary:

Staffing vacancies and the use of contract clinicians decreased during the monitoring period due to the closure of the MHCB unit and conversion of the CTC into an OHU. Among the issues focused on during this monitoring round, the institution's overall health care quality management committee met more regularly than in the past, but no mental health subcommittee existed. Peer review was limited due to the small size of the staff, but chart reviews were conducted routinely. Medication management functioned well, although some problems with DOT reportedly persisted. Transfers to

316

higher levels of care were accomplished expeditiously, and lengths of stay in the OHU declined. On the other hand, implementation of the mental health assessment component of the disciplinary system remained incomplete. The institution did not maintain a comprehensive log of the handling of RVRs involving MHSDS inmates; mental health input was often incomplete; and the extent to which hearing officers took mental health information into account was unclear.

In regard to pending CAP issues, clinical access to inmates and MHTS tracking and scheduling information improved. Some problems continued with custody follow-up for suicidal inmates and with the timeliness of clinical contacts with inmates referred during bus screenings. Some slippage was also noted in weekly case management contacts with EOP inmates in general population and caseload inmates in administrative segregation. On the whole, CEN was close to full implementation of its CAP, and future paper monitoring seemed appropriate.

### Chuckawalla Valley State Prison (CVSP)
October 14, 2004 – October 15, 2004

CVSP had a vacancy for a half-time psychiatrist, which was covered by a long-term contract clinician from mid-June until just prior to the monitor's visit. A new contract psychiatrist reportedly was scheduled to begin shortly, but, in the interim, the lapse in psychiatric coverage was expected to impact negatively on medication management and clinical contacts. CVSP historically lacked pharmacy coverage on weekends and holidays, but the institution recently lost coverage on Mondays and Tuesdays as well.

Only nine mental health inmates were housed in CVSP at the time of the monitor's visit, none of whom was an EOP inmate.

317

Quality Management:

   The quality assurance process appeared to be effective at CVSP. The quality management committee met monthly, as did the mental health subcommittee and the suicide prevention committee. No QITs were functioning at the time of the monitor's visit, and peer review was difficult in the facility due to the limited size and categories of staff.

Medication Management:

   CVSP had a system for providing arriving inmates with their medications, but the institution did not track either continuity of medication or medication errors. Record reviews, however, revealed no gaps in medication, and the monitor found no evidence of problems associated with the expiration of medications. Effective systems for the provision of parole medications and the follow-up to medication non-compliance were in place.

   DOT was routinely provided to administrative segregation inmates and all caseload inmates during the first two weeks of medication. No inmates were on Keyhea orders at the time of the monitor's visit, and informed medication consent forms for psychotropic medications were present in inmates' charts. Problems with laboratory testing of inmates on mood-stabilizing medications remained resolved. Only one inmate at CVSP at the time of the monitor's visit was on a mood-stabilizing medication. That inmate had been started on Depakote only recently, and no laboratory tests had yet been conducted, but the inmate was reportedly scheduled for blood-work the following week.

As a result of the recent absence of psychiatric staffing, medication modifications and renewals were made not infrequently without documentation of actual clinical contacts and, perhaps, without any clinical contact.

Mental Health Assessments for the Disciplinary Process:

The mental health assessment process for RVRs involving caseload inmates had been implemented at CVSP, but the institution's disciplinary logs did not capture all relevant data. Specifically, the logs did not include the outcome of mental health assessments nor indicate whether mental health assessments were considered by hearing officers in their dispositions.

During the monitoring period, 16 caseload inmates received RVRs, generating six requests for mental health assessments. None of these inmates were still at CVSP, so the monitor was unable to review C-files for the dispositions in their cases.

Transfers:

The timeliness of transfers to appropriate mental health programs remained compliant. Five EOP inmates were transferred from CVSP during the monitoring period. All of the EOP inmates and all but one 3CMS inmate were transferred within specified timelines.

Inmates were sent to MHCB units from CVSP and not directly to DMH.

Other CAP Issues:

a. Non-Compliance

Clinical follow-up of suicidal inmates discharged from a MHCB unit was erratic. Suicidal inmates returned to CVSP from a MHCB unit were held in the OHU for 24 hours. Follow-up for these inmates did not begin until after their stay in the OHU.

319

Three inmates were returned to CVSP from MHCB units during the monitoring period, only one of whom received the complete five-day follow-up.

Institutional Summary:

CVSP continued to meet most program guides requirements, but the recent deprivation of all psychiatric coverage was a source of concern. The quality assurance process was progressing nicely. Access to higher levels of care was timely, and the quality of care provided to inmates awaiting transfers to mental health programs remained good. Similarly, the mental health assessment component of the RVR process had been implemented, although the disciplinary log was incomplete.

Medication management appeared to be functioning well, but the institution had not conducted any audits of continuity of medication to confirm compliance. Moreover, due to the recent absence of a psychiatrist in the facility, inmates were not always seen by a psychiatrist in connection with medication changes and renewals. Overall, CVSP remained substantially in compliance with its CAP and the requirements of Coleman.

## Service Area K

Service Area K includes the California Institution for Women (CIW) and the women's portion of the California Rehabilitation Center (CRC), but the mental health services available for both male and female inmates in the latter facility have already been discussed in Service Area I, above.

### California Institution for Women (CIW)
November 29, 2004 - November 30, 2004

CIW's 3CMS population increased substantially from 417 to 515 inmates during the monitoring period. The institution also housed 116 EOP inmates at the time of the monitor's visit.

CIW reported few staffing vacancies during the monitoring period, but one psychiatrist apparently anticipated retiring soon after the monitor's visit. In addition, openings existed for a senior psychologist, a roughly half-time psychologist and a psych tech. A half-time psychologist already working at the institution was expected to fill the part-time vacancy within the month. Considerable tension existed among staff members and departments throughout the institution, but the facility had recently undergone a cultural assessment intended to address what appeared to be excessive familiarity between staff and inmates.

Quality Management:

CIW still used its own approach to quality management, rather than the CDCR-wide system, but it was unclear whether this would continue. The mental health quality assurance committee met regularly, but reports by the committee, which were generally narrow in focus, repeatedly failed to recognize adequately the need for improvement. A number of QITs had been chartered, but some were discontinued even though the issues they were established to address remained unresolved. No formal peer review existed.

Medication Management:

Problems with medication management for EOP inmates persisted, including unprocessed medication orders and gaps in medication for new arrivals to the

321

unit and for inmates moving between the Outpatient Housing Unit (OPHU), the equivalent elsewhere to an OHU, and the EOP unit. Staff attributed these discontinuities to nursing shortages in the EOP program. Medication administration for inmates on Keyhea orders was also erratic.

The administration of HS medications continued to be a problem. At the time of the monitor's visit, no CIW inmates were on HS medication, i.e., none had medication orders requiring her medication(s) to be delivered in an evening distribution. Earlier, some difficulties in delivering HS medications to an administrative segregation inmate were noted, but at least some medications were prescribed for HS delivery. Staff indicated that HS medications were not ordered for EOP or OPHU inmates because the process for their delivery was too cumbersome. Some inmates in other programs complained that they received their medications so early, they fell asleep at 6:00 or 7:00 p.m.

Some 3CMS inmates complained to the monitor about lengthy pill lines, an issue that had been resolved earlier. Pill lines were reportedly an hour or longer on occasions, with weekend pill lines sometimes even longer. Some inmates also reported problems with follow-up to medication non-compliance.

Mental Health Assessments for the Disciplinary Process:

Training regarding mental health input into the disciplinary process had been provided to all appropriate clinical and custody staff. The institution documented these training efforts.

CIW adequately tracked all requests for mental health assessments. According to institutional data, 31 EOP inmates were charged with disciplinary

322

infractions during the monitoring period, all of whom were referred for mental health assessments. Of the 144 3CMS inmates with disciplinary infractions, only three were referred for assessments. The monitor did not have sufficient opportunity to determine whether decisions regarding mental health assessment referrals for 3CMS inmates were made appropriately, but mental health staff indicated that some additional cases should have been referred.

The institution had a process for ensuring that mental health assessments were completed by clinicians other than the accused inmate's case manager. Case managers assigned to conduct mental health assessments reportedly interviewed inmates and reviewed their charts, but not their C-files, in preparing assessments.

Hearing officers appeared to take mental health input into account in reaching their determinations. They appropriately discussed the impact of mental health assessments in their findings and reportedly reduced penalties based on mental health information. The monitor's chart reviews confirmed that penalties were sometimes reduced based on mental health assessments. There were no infractions issued for self-injurious behavior.

Transfers:

Some EOP inmates remained in the reception center for periods longer than 60 days. At the time of the monitor's visit, 44 EOP inmates were in the reception center, seven of whom had been there beyond 60 days. In contrast, EOP inmates in administrative segregation were regularly transferred in a timely manner. CIW transferred three EOP inmates to an administrative segregation hub unit at VSPW during the monitoring period, all within the required 60 days. While unendorsed EOP inmates in

323

the reception center were offered the same amount of therapy as EOP inmates in general population, their freedom of movement was more limited. Unendorsed EOP inmates were only allowed about five hours a day of out-of-cell-time as compared with nine hours a day for general population EOP inmates.

Although CIW offered EOP inmates at least ten hours of scheduled structured therapeutic activities per week, most inmates received fewer hours. A one-week institutional sample of group attendance showed that 94 of 116 EOP inmates at CIW received less than ten hours of structured therapeutic activities weekly. On average, documentation indicated that EOP inmates received approximately five hours of structured therapeutic activities per week, but this included nine inmates who received between 17 and 21.75 hours a week. The monitor interviewed approximately 20 percent of EOP inmates, many of whom reported attending a maximum of three groups a week. Offered groups reportedly were cancelled often, and inmates complained that they were not called for their groups on a daily basis and received no follow-up when they refused to attend group therapy. Inmates also complained that meetings with their psychiatrist were brief, lasting only three to five minutes, and that the psychiatrist was often disrespectful. Although a significant difference persisted between the hours of scheduled structured therapeutic activities offered to EOP inmates and the number of hours actually received, the QIT formed earlier to address this issue had been discontinued. EOP inmates continued to live under highly restrictive conditions, with no self-help groups, education classes or hobby shops and no opportunity to walk around the large track in the main yard like other inmates in the institution. Some confusion persisted, at least in the

minds of some inmates, about the status and function of self-help groups conducted by inmate peer leaders, which were referred to as mental health group therapy.

Inmates at CIW had good access to MHCB care. CIW maintained a fairly detailed MHCB transfer log that included most of the necessary information, except for clinical acceptance dates, endorsement dates and the dates when bed numbers were issued. According to the log, MHCB transfers were timely. The institution had transferred 13 inmates from the OPHU to MHCB units during this monitoring period, all of whom were transferred within 72 hours.

CIW also maintained a comprehensive DMH transfer log. Transfers to PSH were consistently made in a timely manner. For the 37 transfers to PSH that occurred during the monitoring period, the average length of time from referral to acceptance at PHS was 1.2 days, while the average length of time from referral to transfer was 2.4 days.

Other CAP Issues:

a. Partial Compliance

The provision of confidential interview space for OPHU inmates was still a problem. The new CTC, which was originally slated to open in June 2003 and then in March 2004, was not yet finished. It was unclear when the unit would be complete and ready to receive inmates.

b. Non-Compliance

Untimely psychiatric responses to some inmate referrals continued to be a problem. Inmates complained and staff verified that responses to urgent referrals were

often delayed. It sometimes took five to seven days for inmates to be seen for follow-up in response to urgent referrals.

Implementation of heat-risk procedures was not always fully documented. Several Stage-2 heat alerts occurred in administrative segregation during September, but the log in which shower access for inmates on heat-sensitive medications was recorded was incomplete. The institution estimated that cooling measures in administrative segregation were logged about 80 percent of the time. It was unclear whether the problem was one of proper documentation or the actual provision of required measures related to heat alerts. Both staff and inmates, moreover, agreed in reporting that the SAP building was extremely hot during the summer months. Staff was unable to determine whether temperatures were monitored for the SAP building during the summer months.

New Problem:

> Inmates in administrative segregation frequently were not seen by a psychiatrist individually or privately, but typically only in an IDTT meeting.

Institutional Summary:

CIW had few staff vacancies. The institution's progress in the four issues focused on during this round of monitoring, meanwhile, was mixed. Access to MHCB units and DMH was timely, although some delays in transfers of EOP inmates out of reception continued. Implementation of new disciplinary procedures for caseload inmates showed solid progress despite some lingering concerns about the appropriate extent of the use of mental health assessments among 3CMS inmates charged with disciplinary infractions. On the other hand, several critical medication issues needed considerable attention, including continuity of medication for EOP inmates, HS

medications and, according to inmates, lengthy pill lines and follow-up to medication non-compliance. Finally, quality assurance efforts were near a standstill, and the mental health staff badly needed to reinvigorate its quality assurance structures and activities.

No new CAP items were resolved during the monitoring period. Moreover, untimely psychiatric responses at least to urgent referrals reportedly re-emerged as a problem, as did documentation of some aspects of the institution's heat plan. The failure to complete construction of its CTC as scheduled left the facility without appropriate space for confidential contacts with caseload inmates in the OPHU.

CIW had long been considered to be on the fast track to reduced monitoring because earlier it was quickly responsive to the bulk of the deficiencies identified in its CAP. But during the last few rounds, internal bickering has forestalled continuing progress, nowhere more glaringly than in the area of quality assurance. The institution can qualify for paper reviews following the next round of monitoring, if it can jump-start its quality assurance efforts, deal with its medication shortcomings and follow-up to medication non-compliance, and demonstrate continuing progress in addressing its few remaining unresolved CAP issues.

## Service Area L

This service area includes the Central California Women's Facility (CCWF) and Valley State Prison for Women (VSPW).

### Central California Women's Facility (CCWF)
October 7, 2004 – October 8, 2004

Although positions for 2.5 psychiatrists remained vacant, CCWF made some progress in filling other mental health positions. Two of three vacant psychologist

positions were filled just prior to the monitor's visit, while a third was expected to be filled by the end of the month. Similarly, the institution hired a psych social worker during the monitoring period, leaving openings for two psych social workers and a supervising psych social worker. Contract clinicians were utilized to cover psychiatric vacancies.

Issues Resolved:

Initial treatment plans were prepared in a timely manner for 3CMS inmates.

EOP inmates generally received ten hours of structured therapeutic activities per week.

The frequency of psychiatric contacts with EOP inmates was adequate.

The suicide prevention committee was operational.

Inmate charts were regularly available for clinical contacts.

Quality Management:

The mental health subcommittee of the quality management committee met monthly. Minutes of the meetings reflected numerous audits, but no QITs were underway in the institution at the time of the monitoring visit. The peer review process was still in the early stage of development; psychiatric peer review had begun recently, and peer review for case managers was scheduled to begin.

Medication Management:

Continuity of medication on arrival was still something of a problem. Inmates arriving from country jails or other CDCR institutions with verified medication orders received 14-day continuity orders, but not all inmates were seen by a psychiatrist within 14 days of their arrival. Institutional audits indicated that the percentage of

328

inmates seen by a psychiatrist within 14 days varied from 85 percent in June to 100 percent in July and 50 percent in August 2004, but it was impossible to determine from this data how many inmates actually experienced a gap in medication. Moreover, the institution did not appear to have procedures in place for arriving inmates who, without verifying orders, claimed to be on medications. Continuity of medication for inmates on changing housing locations within the facility, meanwhile, was adequate.

Problems possibly resurfaced during the monitoring round with respect to medication delays. An extremely limited institutional audit indicated that medications were not always received within 24 hours of their prescription.

Follow-up to medication non-compliance may also have slipped during the monitoring period. The rate of medication non-compliance reflected in MARs was still low, only 15 percent, but it was unclear whether all non-compliant inmates were referred to mental health. The institutional audit of this issue was methodologically unsound.

Efforts to evaluate laboratory testing for inmates on mood-stabilizing medication improved. Institutional audits, for the first time, assessed compliance for all appropriate medications, specifically Depakote, Lithium, Tegretol and Mellaril. Data from the studies, however, showed poor compliance with required testing for some of the documented medications. Blood tests, for example, were drawn for only 53 percent of inmates taking Lithium, whereas tests were drawn on 80 percent of inmates taking Depakote. The institution still did not audit whether blood tests were completed timely, reviewed by a psychiatrist and filed in inmates' charts.

329

Development of adequate DOT procedures continued to lag. The DOT portion of the local operating procedure did not mirror departmental medication management policy in at least one important area. Departmental policy required that inmates who appeared to be violating DOT procedures be removed from their cells to verify their compliance, but CCWF's local policy did not include that requirement. No DOT medications, moreover, were formally prescribed at the time of the monitoring visit, suggesting that CCWF had yet to implement its DOT procedures.

According to the institution, a procedure was in place for reporting medication errors. Staff reported that between ten to 15 errors had been reported to date, but no confirming summary of or data on errors was provided to the monitor.

HS medications were simply not available in the institution. Clinical staff complained that they were expressly forbidden to prescribe such medication even when clinically indicated.

No information was available on the provision of discharge medications for paroling inmates.

Mental Health Assessments for the Disciplinary Process:

CCWF tracked requests for mental health assessments. According to institutional data, mental health assessments were generally completed in a timely manner on the day following a request for an assessment. In no case was an assessment completed more than 14 days after the rule violation. Mental health assessments were completed for 32 inmates involved in the disciplinary process between May and October 2004. Of these, 13 assessments involved EOP inmates, 13 involved 3CMS inmates and eight involved general population inmates. The institutional data reflected that a mental

330

health assessment was not completed for one EOP inmate involved in a disciplinary proceeding during the covered period, but no explanation was offered for the oversight. Mental health assessments were not requested for 176 3CMS inmates facing disciplinary charges. The monitor reviewed rule violations for 17 randomly selected 3CMS inmates, who were not referred for an assessment, and found no evidence of bizarre or unusual behavior that would have warranted a referral. It appeared that decisions to refer 3CMS inmates for an assessment typically were made appropriately.

The RVR log did not track the decisions made by hearing officers. The monitor, however, reviewed RVRs for 11 inmates and found that hearing officers considered mental health findings in four of the five cases where clinicians determined that the inmates' mental disorders impacted on their behavior.

The RVR log did not track mitigating factors, but hearing officers seemed to take mental health factors into account in assessing penalties in at least some cases. Hearing officers mitigated penalties because of mental health factors in three of the fives cases in which clinicians concluded that the inmates' mental illness contributed to their behavior.

No inmate received a disciplinary infraction for self-injurious behavior during the monitoring period. The monitor did not receive any data on referrals to the district attorney.

Transfers:

Inmates at CCWF appeared to have timely access to higher levels of care. The institution maintained a computerized DMH transfer log, as well as a computerized

331

log of transfers to its MHCB unit. The institution also tracked admissions to its EOP unit.

Transfers to DMH were timely. There were 17 transfers to Patton State Hospital (PSH) from March 1 through September 15, 2004. Most transfers occurred within two to three days of the referral; no transfers took more than six days from referral. No referrals were rejected by PHS, and no inmates were waiting for transfers at the time of the monitoring visit.

Inmates discharged from DMH were not returned directly to CCWF, but were sent first to CIW. Similarly, discharge summaries were sent to CIW and not CCFW. Discharge summaries for psych and return inmates returned eventually to CCWF via CIW were available to clinicians only if they had been placed in the inmates' chart.

CCWF's transfer log for its MHCB unit included dates of admission, clinical discharge and actual discharge. CCWF reported seven inmates who remained in the MHCB unit after their clinical discharge and 11 inmates with repeat admissions, although only one inmate had three admissions during the monitoring period.

There were 17 caseload inmates in administrative segregation at the time of the monitoring visit. None of these inmates had been in the unit beyond the required time guidelines.

332

Other CAP Issues:

        a. Partial Compliance

        CCWF continued to provide group therapy for some, but not all, 3CMS inmates for whom such treatment was indicated. The number of groups offered to 3CMS inmates was not fully adequate.

        The timeliness of psychiatric responses to inmate referrals remained unchanged. The mental health referral log and the MHTS indicated that 70 percent of routine referrals from August 1 through August 31, 2004 were seen within seven calendar days, as required by CCWF's internal standards.

        The composition of IDTT meetings improved, but still was not fully compliant. An institutional audit for the period from June 1 through August 31 indicated that psychiatrists attended 91 percent of IDTT meetings, while custody officers attended 83 percent.

        The frequency of psych tech rounds in administrative segregation, an issue previously resolved, was again problematic. Some psych techs failed to document their rounds in progress notes as required. An institutional memo was issued reminding psych techs to document their rounds.

        Inmates referred during bus screenings were not seen consistently by clinicians within three working days. Institutional audits for three separate weeks in June, July and August found that clinicians saw referrals from bus screenings within the required timeframe 92 percent, 70 percent and 84 percent of the time, respectively.

        The provision of five-day clinical follow-up for suicidal inmates released from the MHCB unit improved. Ten inmates were discharged from the MHCB unit on

five-day follow-up during the monitoring period, all of whom received the mandated clinical contacts. Custody checks reportedly continued to occur, but no confirming data was provided.

The filing of inpatient records in inmates' UHRs improved. The institution had taken steps to address the filing backlog and deal with other filing problems as they arose.

Institutional Summary:

CCWF filled some of its vacant mental health positions and resolved five CAP items during the monitoring period, while making significant progress in a number of other areas. No CAP items were found to be substantially out of compliance.

Quality assurance efforts continued to develop, although peer review was still not fully underway. Mental health input into the disciplinary process was handled reasonably well, and hearing officers appeared to take clinical input into account in determining some outcomes and penalties. Transfers to higher levels of care generally occurred in a timely manner.

The management of medications, however, needed further work. Some problems persisted in the continuity of medication on arrival, follow-up to medication non-compliance, the administration of DOT and the delivery of medications within 24 hours of their prescription. On the other hand, laboratory testing of inmates on mood-stabilizing medications and procedures for monitoring medication errors showed some improvement. The one glaring failure was the institution's prohibition of the use of HS medications.

Relative to other CAP items, partial compliance was noted in psychiatric responses to referrals, group therapy for 3CMS inmates, the composition of IDTT meetings, follow-up of suicidal inmates discharged from the MHCB unit and the filing of inpatient records in inmates' charts. Psych tech rounds in administrative segregation and clinical review of inmates referred to mental health during bus screenings needed some attention.

Overall, CCWF continued to make significant progress toward compliance with the plans, policies and protocols provisionally adopted by the court in this case in 1997. In the next round of monitoring, CCWF needs to eradicate effectively its aversion to the use of HS medications; develop meaningful DOT procedures and practices; and sustain its continuing improvement in other medication-related areas. If it can accomplish these three goals, the institution will qualify for paper reviews in future monitoring rounds.

### Valley State Prison for Women (VSPW)
October 4, 2004 – October 6, 2004

VSPW filled its open position for chief psychologist during the monitoring period, but a significant number of vacant mental health positions remained. Vacancies existed for 3.5 psychiatrists, a senior psychologist, 2.5 staff psychologists, 2.3 psych social workers and two psych techs. The institution employed contract clinicians to cover many, but not all, of these vacancies. Contractors covered approximately two-thirds of vacant psychiatrist positions, one-third of vacant psychologist positions and roughly a half of vacant psych social workers and psych tech positions.

335

Quality Management:

   The mental health quality management committee, which used to meet monthly, met only three times during the six months prior to the monitor's visit. Institutional audits conducted during the monitoring period were consistently methodologically flawed, hampering significantly the institution's efforts to develop an effective system to monitor compliance with its mental health policies and procedures.

   The institution, however, began finally to establish QITs. Eight QITs were underway in the institution, including one on peer review, one on mental health services in administrative segregation and one on implementation of medication management procedures. Most of the QITs seemed to focus on routine management tasks rather than creative interdepartmental solutions to persistent problems. Peer review made little progress. The peer review committee had yet to do much more than conduct audits of CAP items for Coleman monitoring purposes.

Medication Management:

   The new medication management procedure implemented in May 2004 contained some confusing provisions, but the operating procedure was scheduled to be reviewed in December 2004 to resolve lingering ambiguities. The definition of medication non-compliance, for example, needed clarification.

   The status of continuity of medication for inmates arriving at VSPW was unclear. Institutional audits of the issue were methodologically flawed, but some data suggested that continuity for inmates arriving on medication in the reception center retrogressed. Data on medication continuity for arriving inmates who went straight to

general population instead of the reception center and for inmates changing housing locations were flawed. Although VSPW had a brief and undated policy for handling inmates who arrived without verified medication orders, its effectiveness was not regularly audited.

Medication continuity on the renewal of medication orders remained an intermittent problem. Appointments with prescribing psychiatrists were generally scheduled in a timely manner, but were not always conducted as scheduled. An institutional audit indicated that 83.9 percent of renewals involved no interruptions. Among the remaining renewals, the average interruption in medication lasted 5.1 days, with delays ranging from one to 14 days. In contrast, 98 percent of renewals involving simply a refill of current medication orders were completed with no interruptions in medication. This latter issue will be resolved, if compliance continues during another monitoring period.

Poor auditing made it difficult to determine the extent of follow-up to medication non-compliance. Although VSPW tracked referrals for non-compliance, institutional audits did not adequately assess the timeliness of psychiatric responses. Nor did the institution make any effort to assess whether all instances of non-compliance were identified. The defendants objected that VSPW possessed a process for reporting medication non-compliance, but what was lacking, again, was any meaningful assessment of its effectiveness.

The institution began to develop a system for reporting medication errors during the monitoring period. Between April 5 and July 27, 2004, 23 medication errors

were reported to the medication management subcommittee, but no information was developed on their nature or who was responsible for the errors.

The extent to which laboratory testing was provided for inmates on mood-stabilizing medications was uncertain. An institutional audit of this issue looked at just five inmates on mood-stabilizing medications for longer than six months. The audit indicated that laboratory tests were conducted and results returned for all five inmates. The two tests resulting in abnormal results were followed-up appropriately. Nonetheless, the study was too limited in scope to be dispositive. Psychiatrists complained that laboratory test results were not returned in a timely manner, but the audit did not measure timeliness. At least one interviewed clinician was reluctant to prescribe mood-stabilizing medications due to problems with obtaining laboratory testing results. VSPW had an exceptionally small number of inmates on mood-stabilizing medications, particularly for an institution with a reception center.

VSPW did not maintain a comprehensive record of all inmates receiving DOT. Apparently, all inmates on psychotropic mediations were listed on their MARs as receiving DOT due to an error in pharmacy labels. Psych techs and nurses needed to be trained in this area. On the other hand, all psychiatrists had been trained to distinguish between DOT and nurse-administered medications and understood that psychotropic mediations were not administered DOT unless ordered by a physician. Psychiatrists reportedly were beginning to write DOT orders for some inmates. Custody staff reportedly was not always present at pill lines to check the DOT administration of medications.

338

HS medications were still not prescribed at VSPW, although psychiatrists reportedly received in-service training on the issue. The institution had not developed any procedures for the administration of HS medications.

There were no inmates on Keyhea orders at VSPW at the time of the monitor's visit. No information on parole medications was available, although reportedly the institution had plans to develop a parole medication log and study the provision of these medications to inmates about to be discharged from the facility.

Mental Health Assessments for the Disciplinary Process:

The monitor was unable to assess the effectiveness of the RVR process at VSPW because of incomplete data. Several mental health assessments, for example, had no corresponding disciplinary documents, while some disciplinary documents for caseload inmates had no mental health assessments. The RVR tracking log, moreover, was not congruent with other mental health lists, raising doubts as to the reliability of the information it contained.

The institution continued to provide mental health staff with appropriate training on the preparation of mental health assessments for caseload inmates. Documentation indicated that 272 clinical and custody staff received training on the assessment process, and a training memorandum that clarified the requirements for mental health input into the disciplinary process was distributed following the monitor's visit during the preceding round of review.

VSPW maintained a tracking log of mental health assessments that included most relevant information, including the dates of requests for assessments, the names of clinicians completing assessments, results of the assessments and hearing

339

officers' responses. According to the tracking log, 339 RVRs were written for caseload inmates during the monitoring period. Mental health assessments were completed for 12 3CMS inmates, ten EOP inmates and three non-caseload inmates. Given the shortcomings of the overall data on RVRs, it was impossible to assess whether 3CMS inmates exhibiting bizarre or unusual behavior were referred for mental health assessments.

Some major shortcomings in the RVR process at VSPW included the failure of hearing officers to consider consistently mental health assessments in their findings and dispositions. Mental health problems were found to be a contributing factor in 12 of 24 mental health assessments completed in mid-2004, but hearing officers apparently considered the clinical findings in just four of these 12 instances. Hearing officers mitigated punishment in four cases but failed to respond to clinicians' recommendations for mitigation in two other cases.

Transfers:

Although most EOP transfers were timely, a number of inmates remained in the reception center for long periods of time. Of 35 EOP inmates scheduled for transfer to a higher level of care in mid-2004, 19 were transferred within required timeframes; four were delayed beyond the transfer deadlines; no data was available for three inmates; and the remaining inmates were either paroled prior to transfer or were out-to-court. At the time of the monitor's visit, four EOP inmates had been in the reception center at VSPW for more than 60 days.

There were 22 admissions to the MHCB unit during the monitoring period. The stays of six of these MHCB admissions exceeded ten days, but only one

340

inmate had multiple admissions. The monitor found some evidence that transfers to
higher levels of care were sometimes delayed due to pending disciplinary charges or
referrals to the district attorney's office. No accelerated transfers from VSPW occurred
during the monitoring period.

        VSPW maintained an effective DMH transfer log that contained most,
although not all, relevant transfer data, including dates of referral, dates of transfer and
reasons for transfer delays. According to the log, 12 transfers to DMH occurred in mid-
2004. Eleven of these transfers were accomplished within two days of the referral, while
the other took six days to complete.

        Inmates returning from PSH were initially discharged to CIW prior to
being sent to VSPW; discharge summaries were picked up in person by CIW employees
before the inmates were discharged. According to staff, CIW generally, but not always,
provided advance notice to VSPW of returning inmates. Discharge summaries were
frequently received at VSPW no earlier than the week the inmates were discharged and in
some cases after they were returned. Inmates discharged from PSH were initially housed
in VSPW's OHU at an EOP level of care and reportedly seen by a psychiatrist within
seven days.

Other CAP Issues:

        a. Partial Compliance

        The quality of treatment plans remained erratic. Institutional audits were
methodologically flawed, and it was unclear what percentage of inmates had complete
treatment plans. There were still problems with individualized treatment plans.

341

The institution made progress in requesting the treatment records of inmates with prior hospitalizations. An institutional audit showed that appropriate requests had been made in 90 percent of reviewed charts. This issue will be resolved if compliance levels remain the same during the next monitoring period.

b. Non-Compliance

The timeliness of IDTT meetings declined during the monitoring period. An institutional audit indicated that only 25 percent of new arrivals received an initial IDTT meeting within 14 calendar days during the period in mid-2004, compared to 75 percent during the preceding monitoring period. The percentage of arrivals receiving timely IDTT meetings rose to 42.8 percent in August. The timeliness of annual IDTT meetings also declined from 91 percent during the preceding monitoring period to 77.7 percent. On the other hand, the percentage of IDTT meetings attended by all required participants increased to 95 percent.

The timeliness of psychiatric responses to inmate requests and staff referrals was uncertain. Institutional audits reported that inmates requesting to be seen were contacted on average within seven days, but the studies were, once again, flawed. Audit data reflected the date referrals were received by mental health rather than the date of the actual referral; the audit also mixed all referrals without regard to their source. In addition, the institutional log failed to track urgent referrals.

EOP inmates in administrative segregation were not offered ten hours of structured therapeutic activities weekly. The institution reportedly offered inmates 9.84 hours of therapy a week but, according to the MHTS, inmates on average actually participated in less than half of the total offered. Limited programmatic space and

342

lockdowns impeded the provision of additional therapy. There continued to be a low concordance rate between MHTS data on programming and other sources of programming data.

Problems with daily psych tech rounds in administrative segregation, resolved during an earlier monitoring period, resurfaced due in part to staff vacancies and turnover. Psych techs were supervised by nursing administrators, rather than mental health administrators, without the benefit of clearly delineated supervisory lines or job descriptions. As a result, psych techs did not perform some duties required by the program guides. In particular, documentation of daily rounds deteriorated. Because psych techs were regularly assigned to distribute medications, little time was left to meet with inmates in a confidential setting.

Institutional Summary:

Mental health vacancies at VSPW continued to be covered only partially by contract employees. Vacancies, particularly among psychiatrists and psych techs, impeded the provision of mental health services and the implementation of important policies and procedures.

Among the four issues that were the focus of this round of review, VSPW's quality management process began to conduct some useful QITs. Flawed audits, however, inhibited efforts to assess institutional problems and develop targeted responses. The institution continued to make progress in transferring inmates to higher level of care, although some inmates still experienced delays. Local clinicians were not always provided with advance notice of and discharge summaries for inmates returning from PSH.

343

In contrast, medication management showed little progress in addressing multiple problems. The institution developed a system for reporting medication errors and, despite some troubles with DOT, psychiatrists were beginning at least to write DOT orders. Due to poor auditing, however, continuity of medication in nearly all areas was uncertain. Continuity appeared to worsen for inmates arriving in reception on medication, but seemed to improve on renewals and refills. Unreliable data also made it difficult to assess the status of follow-up to medication non-compliance and laboratory testing for inmates on mood-stabilizing medications. HS medications were still not being administered.

Incomplete data also made it difficult to assess mental health assessments in the handling of RVRs. The institution tracked requests for mental health assessments, but did not collect sufficient data on RVRs generally to permit a determination of whether inmates exhibiting uncharacteristic or bizarre behavior were appropriately referred for assessments. Hearing officers did not consistently consider mental health input in their findings and decisions.

VSPW resolved no new CAP items during the monitoring period. EOP inmates in administrative segregation did not receive sufficient therapy; the timeliness of IDTT meetings regressed; and psych tech rounds in administrative segregation were inadequate. The quality of treatment plans was uncertain, as was the timeliness of psychiatric responses to inmate and staff referrals. Overall, progress in meeting the requirements of the CAP and mandates on medication management and the mental health assessment process in disciplinary determinations largely stalled. VSPW clearly needs to

develop better auditing methods and improve its quality assurance efforts if it hopes to better its performance in the next monitoring round.

## SUMMARY

This summary looks at a number of issues, including those that were the focus of special scrutiny during the monitoring period and others that have been of long-standing interest and concern. This 15th monitoring period was prolonged because 21 of the department's 32 institutions had not been visited by a monitoring team since late 2003 or early 2004 due to the fact that the 14th round of review was an abbreviated one. Hence, the 15th round of review for these 21 facilities covered an almost 18-month stretch. Moreover, unlike most recent rounds of review, during which a growing number of institutions received only a paper review, a need was felt to visit all 32 CDCR institutions during this 15th round.

The long-term issues addressed in this monitoring round included, again, staffing, transfers and access to care, quality management and the distribution and management of medications. Some additional issues of special focus included implementation of the revised mental assessment component of the disciplinary process, the exclusion from and mental health services for the ten new administrative segregation units opened in CDCR over the past two years and the referrals of disciplinary charges involving MHSDS caseload inmates to local district attorneys.

Some additional events that occurred during the monitoring period also required review, analysis and response, such as the growing crisis in accessibility to a MHCB level of care and the continuing inadequacy of access to DMH programs

345

highlighted by the unmet needs assessment that was conducted and concluded during the period.

This summary will focus briefly on each of these issues. Meanwhile, the development of a final set of program guides continued to inch toward completion. An important indirect effect also began to be felt during the monitoring period from the impending appointment of a receiver in the Plata case. And, finally, suicides in CDCR escalated significantly during the monitoring period for reasons that are just beginning to be subjected to analysis.

Staffing:

As of May 1, 2005, the vacancy rate among permanent psychiatrists in CDCR was 33.79 percent, with 73 vacancies among 216.05 allocated positions. This represented a considerable increase over the department's vacancy rate of 26.55 reported for January 2004 in the 13th round report. For psych social workers the vacancy rate was 24.03 percent, with 34.80 vacancies among 144.80 allocated positions. Among psychologists, 80.30 of 488.90 allocated positions were vacant for a vacancy rate of 16.42 percent. The vacancy rate among all permanent case managers, i.e., including both psychologists and psych social workers, was roughly 17 percent, consistent with the percentages reported over the past several monitoring periods.

The defendants continued to rely on the use of contracted clinical services to cover vacant permanent positions. In June 2005, the month closest to May for which data on contracting were available, CDCR contracted for the services of the equivalent of 36.07 full-time psychiatrists, supplemented by 270 hours of telemedicine psychiatry. This reduced the actual or functional vacancy rate among psychiatrists to 16.3 percent,

quite a jump from the functional vacancy rate of 2.4 percent reported in January of 2004.
For the first time in several years of monitoring psychiatric staffing, the defendants were
found to be out of compliance with the June 12, 2002 Order requiring them to contain the
vacancy rate among psychiatrists, including contracted services, within a maximum of
ten percent. The vacancy rate, moreover, is likely to worsen due both to increases in the
as yet unfilled positions allocated in the FY2005-06 budget and the enhanced training
qualifications for new psychiatric hires incorporated in the emerging revision of the
program guides.

   The impact of contracting on case managers was more productive. In June
2005, CDCR contracted for 15,541.35 hours of clinical case management services, the
equivalent of 97.1 full-time clinicians, from private-sector psychologists and psych social
workers, which reduced the actual or functional vacancy rate among case managers
system-wide to 2.7 percent, up fractionally from the percentage reported in January 2004.
Individual contract case managers, moreover, tended more often than contract
psychiatrists to work the monthly equivalent of a full-time clinician.

   Among other categories of mental health staff, contracting reduced the
functional vacancy rate among psych techs to ten percent, down marginally from rates
reported in 2003 and 2004. Vacancies among mental health clerical staff declined
somewhat to just over 11 percent, down from 14 percent in January 2004.

   The defendants' May staffing data indicated that the department's
complement of nurses specifically dedicated to the provision of services within mental
health programs included 146.4 allocated RN and 28.7 supervisory RN positions. The
vacancy rate among the RN positions was 36 percent (representing 53.4 vacancies) and

among supervisory RN positions, 37 percent (representing 10.7 positions). The department's April data on all nursing positions, medical and mental health, and vacancies reflected a lower vacancy rate of 30 percent, but did not distinguish between RNs and supervisory RNs. The April department-wide statistics indicated that, after contracting for registry services, the functional vacancy rate among all CDCR RNs was 17 percent. The contracting data on RNs allocated for mental health programs indicated that, after contracting, the functional vacancy rate was roughly 32 percent, nearly double the department-wide rate. It was unclear whether the department's data on contracting for mental health positions included all RN registry contracts because only two institutions (ASP and SVSP) reported any data at all on contracted nursing services in their mental health staffing reports. Further skewing the data was the fact that 50.6 of the 64.1 reported RN vacancies in mental health programs, nearly 80 percent, occurred in just four institutions (CIM, CSATF, CSP/Corcoran and SVSP). CSP/Corcoran alone accounted for 32 or half of all RN vacancies in mental health programs, but the facility reported no contracting for RNs in its data on contracted mental health services compiled and submitted monthly to headquarters.

The overall vacancy rate among MTAs rose to 22.85 percent in May 2005. The two institutions with the highest percentage of MTA vacancies were the contiguous facilities of CTF and SVSP, with vacancy rates respectively of 68.86 and 60.94 percent. Surprisingly, the vacancy rate among CSP/Corcoran MTAs, 28.46 percent, ran only slightly higher than the departmental average, while the vacancy rate at CMF was a relatively high 42.38 percent.

Meanwhile, the size of the MHSDS caseload continued to expand. In early May, the total mental health population stood at 28,877, up 7.5 percent from January 2004, leaving program capacity lagging by nine percent. Under operable staffing formula, these numbers required an increase in mental health staffing across the board in the FY 2005-06 budget, on top of the substantial addition of 51.25 mental health positions just for CSP/Corcoran. This, in turn, means that vacancy rates during the second half of 2005 will rise further as the new positions are institutionalized and slowly filled.

As suggested already, vacancies were not spread evenly among all CDCR institutions. Three institutions (CCI, CSP/Corcoran and VSPW) had significant vacancies among both psychiatrists and case managers, which they were unable to fill through contracting. CCI and VSPW struggled to meet many of their programmatic requirements in spite of the vacancies, while CSP/Corcoran, with larger and more complex mental health caseloads than the other two facilities, were simply incapable of meeting many of their programmatic requirements. CSP/Corcoran, as noted, received an infusion of allocated positions via the recently enacted FY2005-06 budget, but it remains to be seen how many of them it can fill.

A second tier of seven institutions (ASP, CCWF, CRC, CSP/LAC, Folsom, HDSP, RJD and SCC) had significant psychiatric vacancies, which they were able to cover only partially with contractors, although they were able to obtain contracted services to fill most or all of their case manager vacancies. The inability to attract either permanent or contract psychiatrists was especially problematic at HDSP, where several years have passed since the facility was able to procure and keep a permanent

psychiatrist. Contracted psychiatrists at the facility were largely unsupervised in the absence of any permanent psychiatrist on the staff. At ASP, a dramatic loss of clinicians left the facility's 1.5 allocated psychiatrist positions vacant with no viable replacement candidates for the vacancies. While the institution used three contract psychiatrists to cover the vacancies, during one three-week period, the only psychiatrist on duty was away from the facility due to a family emergency, and no alternative coverage for the some 880 seriously mentally disordered inmates in ASP was available. More recently, the disparity between psychiatric resources and caseload rose sharply due to the location at the facility of a SNY and an expansion of the 3CMS caseload capacity to 1,099 inmates, while the facility remains without a permanent psychiatrist and has managed to procure the services of from one to 2.2 unsupervised contracted psychiatrists monthly throughout 2005.

A recurrent short-fall in contract psychiatric coverage at CSP/LAC represented slippage since the preceding monitoring round; SCC's problem appeared attributable to an inadequate allocation of psychiatrists, rather than a recruitment issue. Vacancies among supervisory clinical positions at RJD further compromised local efforts to deal effectively with staffing shortages. For both CRC and Folsom, the loss of a single psychiatrist represented a major blow. Another trio of facilities (CSATF, CSP/Solano and SVSP) showed some improvement in recruiting permanent clinicians but remained short of staff because of a limited capacity to attract contracted clinicians. SVSP also had difficulty in procuring the services of psychologists.

Another substantial group of institutions continued to have vacancies among permanent positions, but were consistently able to fill all or most of their clinical

vacancies through contracting. This group included CIM, CIW, CMC, CTF, MCSP, NKSP and, surprisingly, SQ. SQ, plagued throughout most of the preceding and present monitoring period by escalating permanent vacancies and inadequate contracting, began to show progress by the time of the monitor's third visit to the institution in March, when the recruitment of psychiatrists and case managers reduced permanent vacancies among both categories. By the end of March, also, more aggressive contracting left all but vacancies for one psychiatric and one case manager covered by contracted clinicians.

A handful of other institutions reported some local staffing complications. CMF and PVSP attributed recent losses of mental health staff to defections to DMH. CMF had to contend with the lure of employment in DMH programs located within CMF itself, that took the form of better pay, e.g., among psych social workers, or considerably less overtime, as with RNs and MTAs. In PVSP, the new DMH facility at Coalinga, contiguous with PVSP, offered more money and a considerably enhanced physical working environment. At DVI, with its increased reception role, the surge of county jail commitments in late 2004 simply overwhelmed existing staffing resources, although once the tide ebbed in early 2005, things began to return to normal. The desert institutions (CAL, CCC, CEN, CVSP and ISP) managed to cover their reduced caseloads adequately with a small contingent of permanent mental health staff members, augmented by limited contracting.

The principal staffing concern is the expansion in the percentage of vacancies, after contracting, among psychiatrists during the monitoring period. More recent data on both permanent vacancies and psychiatrist contracting shows only marginal improvement. The percentage of vacancies among allocated psychiatrist

351

positions went from 33.79 percent in May to 33.5 percent in July. Contracting and

telemedicine brought the functional vacancy rate down slightly in July to 14.2 percent,

compared with 16.3 percent in May, but still in excess of the mandated ten percent. The

July data, like that from May, does not include increases in allocated positions included

in the FY2005-06 budget. Moreover, while the overall data is troubling, the uneven

distribution of the shortages inflicts severe damage on mental health programs in those

facilities experiencing a disproportionate share of the vacancies.

It is time for the defendants to address this problem more aggressively.

The project to assess and possibly re-adjust the missions of CDCR institutions may

provide a solution by reducing the number and complexity of programs in facilities

unable to recruit and retain mental health clinicians, such as ASP, CSP/Corcoran, HDSP

and RJD, and relocating them in facilities with better hiring track records. Another

approach might be a substantial increase in the salaries offered to clinicians in areas

where recruitment efforts have failed. "Substantial" in this context means something

akin to the $20,000.00 annual increase ordered by the court to all CDCR psychiatrists

early in this case. Whatever expedient is adopted, the defendants need to begin planning

now to provide the staff they have described as necessary to maintain effective mental

health programs wherever such programs are offered.

A related and final aspect of staffing, alluded to on occasion in these

reports in the past, needs to be revisited. While the CDCR's MHSDS has grown

exponentially over the past decade in terms of staff and inmate population, the mental

health staff at DCHCS in Sacramento has not kept pace. In fact, data provided by the

defendants in response to a court order requiring its production indicated that the mental

health component of the DCHCS consisted, as of March 2005, of 7.25 clinicians, 2.25 of whom were on loan from institutions; a project director; a health program specialist; a FTE support staff of 6.1, including two clerks; and a combined FTE of 0.6 consultants and retired annuitants. This tiny band is responsible for managing what has become one of the largest mental health systems, if not the largest, in the world. By September 2005, the MHSDS had 1,850.21 allocated mental health positions and a caseload just 37 inmates short of 30,000.

   The central office staff in Sacramento has not experienced an expansion even remotely commensurate with the growth of staff and caseload. Recent central office expansion has been limited to the engagement of retired CDCR annuitants, usually former wardens, the part-time temporary assignments of institutional clinicians to headquarters and the employment of a pair of consultants, all of them included in the figures given above for March 2005. The core of the central office staff consists of institutional clinicians "promoted" to Sacramento because of their success in local programs. On arrival at headquarters, they receive no training or apprenticeship in the planning, management, financing, policy formation or organizational aspects of their new leadership roles; they must learn all of these skills by trial and error while dealing immediately with each day's crises. The system they manage, moreover, is intensely dynamic; daily changes come relentlessly and ceaselessly not only from the inexorable growth of the system, but also from a flood of court orders and the demands of attorneys that cannot be ignored. Worse yet, for those institutional clinicians lured to headquarters by the vision of broadening their impact on the mental health system, transfer to Sacramento means the loss of institutional R&R increments just when they must adjust to

a considerably more expensive environment.  Add uncertainty about the shape of future

management of DCHCS as a result of the pending appointment of a receiver in <u>Plata</u>, and

the defendants' retention of the small but dedicated and competent headquarters staff they

currently possess is miraculous.  Most of the factors in this complicated stew probably

cannot be solved immediately, but right now the practice of penalizing headquarters

personnel financially for their willingness to help organize and manage the huge and

complex MHSDS must be corrected and the size of the staff increased.

<u>Quality Management</u>:

The administrative infrastructure for quality management, including both

an oversight health care quality management committee and a subordinate mental health

committee, continued to evolve in most facilities during the monitoring period.  Visiting

monitor teams found that committee meetings occurred regularly and minutes of

proceedings were kept, and the interdisciplinary composition of most committees

conformed with departmental policy.  Some deficiencies were found.  The composition of

quality management committees was insufficiently interdisciplinary in CSP/LAC and

MCSP; committee meetings occurred erratically in CTF; and deliberations were

described as unfocused in SCC.

Within institutions, the chartering of quality improvement teams (QITs) to

collect data on perceived problems and identify and remedy their causes remained the

key process for fostering local systemic improvements.  QITs were found to be an

effective instrument for promoting overall program quality in six institutions (CIM,

CSATF, DVI, NKSP, RJD and WSP).  A variety of specific deficiencies were found in

the operations of QITs conducted in ASP, CSP/Corcoran, CSP/LAC, Folsom, HDSP,

MCSP and SCC, ranging from too few QITs being chartered; the collection of data on problems without the development of a subsequent analysis or remedy; the failure to include on teams clinicians from the areas designated for study; and the failure to share results widely with staff ultimately responsible for implementing the identified remedies.

Another important component, focusing on improvement of the quality of clinical care, was professional peer review among psychiatrists, psychologists and psych social workers. Peer review has been, perhaps, the most difficult piece of an effective quality management system for most institutions to develop. Some institutions with a significant staff of clinicians and a variety of mental health programs (ASP, CIM, CIW, CSP/Solano, CSATF, DVI, HDSP, MCSP and VSPW) have still not put together a peer review process for any category of their clinicians. CSATF and MCSP reported the use of regular monthly chart reviews in lieu of a peer review process, but chart reviews are not an adequate substitute for *bona fide* peer review. The former involves the examination of UHRs in enumerated areas to determine whether policies and procedures have been followed; peer review involves an objective, professional critique of clinical diagnoses and care in specific cases to analyze, consider and enhance the clinical judgments and skills of fellow professionals.

A number of other institutions reported that peer review was functioning among one or two categories of clinicians, but not all three. Seven institutions (CCI, CMC, CMF, Folsom, NKSP, PBSP, SQ and WSP) reported peer review as functioning among all three categories of clinicians. Desert institutions with small and/or largely contractual staffs and limited caseloads acknowledged considerable difficulty in structuring peer review. The department might want to think of developing a regionally-

355

based circuit-riding process that supplies outside clinicians periodically to conduct peer review with clinicians in such facilities.

The monitor found overall mental health quality management efforts adequate in six institutions, including CCI, CMC, CMF, NKSP, PBSP and WSP, and improving in seven others, including CRC, CSP/Corcoran, CSP/Solano, DVI, RJD, SQ and SVSP. Among the rest quality management efforts were erratic, stalled, undocumented or uncertain about how to proceed, given limited allocated staff.

Medication Management:

Over the past two years, the principal development in the management of medication has been the department's revision and implementation of its system-wide policy in response to directives in the Plata case. Throughout this monitoring period, as well as in the preceding round of review, many institutions continued to work on local policy and procedures on medication to bring them into conformance with the no-longer new departmental version. Despite the passage of time, a number of these local policies continued to exclude some elements of medication management essential for the treatment of seriously mentally disordered inmates, while some others remained inconsistent with departmental policy. The distinction between direct observation therapy (DOT) and nurse-administered medication, for example, was frequently muddled, and instructions for their use were articulated poorly. The local policies of 15 institutions contained either no information on DOT or confused directions for its use.

DOT and Nurse-Administered Medications: The revised departmental policy included clearer definitions of DOT and nurse-administered medications and directions for their implementation. Pursuant to the changes, most inmates taking

356

psychotropic medication were no longer required to be observed while swallowing their medications. Only inmates deemed to be at risk for abusing or hoarding medications were to be given DOT orders. Several institutions, including CMF, MCSP and PBSP declined to adopt the shift. At PBSP, all psychotropic medications were distributed DOT, and, reportedly, DOT procedures were observed periodically by supervisors. CMF continued to use DOT for all EOP inmates. MCSP had over 450 inmates on DOT orders.

Elsewhere, some institutions adopted an approach that seemed to reflect more accurately the thrust of the new departmental policy. In these facilities, DOT procedures were established and used in selected cases, while a list of inmates on DOT was maintained and the administration of DOT was observed periodically by supervisors. CSP/Corcoran, for example, maintained a list of inmates on DOT and chartered a QIT to examine related issues and make recommendations on the appropriate use of DOT and nurse-administered medication for EOP inmates in general population and administrative segregation. SQ maintained a list of inmates on DOT, and supervisors reportedly monitored implementation.

At the opposite extreme, some institutions seemed to have abandoned the use of DOT at all or local procedures on its use were hopelessly muddled. CCWF had no inmates on DOT; HDSP had few inmates on a confusedly kept list despite reports of hoarding and selling medications throughout the prison. Folsom did not have a list of inmates with DOT orders, but reported that DOT was monitored by supervisors. DVI reported that some inmates had DOT orders, but kept no list. VSPW had appropriate procedures in place for DOT, but they had not yet been implemented. At CSP/Solano, all MARs for caseload inmates specified DOT, which meant that inmates with histories

357

of hoarding or overdosing were not reliably identified for careful DOT medication administration. At SVSP, DOT apparently was not ordered for all inmates with Keyhea orders. While the policy at WSP distinguished between DOT and nurse-administered medication, staff who administered medications did not, using nurse-administered procedures for all orders.

It was difficult to understand why the relatively straightforward language of the departmental policy was so difficult to articulate and implement at the local level. Local medication delivery practices, even those considerably more onerous to follow, seemed to trump efforts to simplify the distribution of medications. The department needs to do much more educational work with institutions to ensure the ultimate implementation of its new approach to the DOT, nurse-administered distinction.

Continuity of Medication: Continuity of medication presented problems at three critical junctures, including arrival in an institution, following an internal change of location and on the renewal of medication orders. Most institutions did not systematically audit all three of these aspects of medication continuity. Limited available data indicated that six institutions (ASP, CSP/LAC, CSP/Solano, DVI, MCSP and RJD) were unable to sustain medication continuity consistently on any of the three occurrences.

Capable local audits and the monitor's observations confirmed that the struggle to maintain continuity at two of the three critical junctures was not regularly successful in six institutions (CCI, Folsom, HDSP, SCC, SQ and WSP). Interruptions were confirmed at one of the three junctures in eight other institutions, including CCWF, CIM, CMC, CMF, CSATF, NKSP, SVSP and VSPW.

Elsewhere the lack of reliable and systematic information precluded any realistic assessment of medication continuity. The poverty of data generally reflected imperfect record keeping and inadequate auditing rather than an absence of problems. On the other hand, some institutions that had successfully resolved local continuity earlier typically focused their auditing resources on other unresolved deficiencies, but probably needed to do some random audits of medication continuity from time to time.

Laboratory Testing: Nearly all institutions were aware of the importance of monitoring inmates on mood-stabilizing psychotropic medications through laboratory testing, and most conducted audits related to some aspect(s) of the issue. HDSP and NKSP were the exception; neither had conducted any such audits, and the monitor found several cases at HDSP where blood levels of inmates on mood-stabilizing medications were simply not being monitored. CMC reported that blood levels of inmates on mood-stabilizing medications were monitored appropriately but provided no corroborative documentation or data.

Audits of laboratory work needed to examine each step in the testing process, including the ordering of tests in all necessary cases, the drawing of blood, actual timely testing and analysis, the returning and filing of results in the UHR and timely clinical follow-up to abnormal results. Most institutional audits looked at one or more of these steps; only rarely did local audits look at all of them.

Medication Non-compliance: Institutions' success in handling medication non-compliance varied widely. Some lacked well-established procedures or had procedures that were only partially implemented. Institutions least effective in addressing medication non-compliance were ASP, CCI, CIM, DVI, NKSP, SCC,

359

CSP/Solano and WSP. Critical deficiencies typically included poor adherence to procedures, insufficient interdisciplinary cooperation, inadequate record-keeping, lack of supervisory oversight and flawed audits. These problems led, in turn, to under-identification of non-compliant inmates, response failures to multiple referrals of the same inmate and, in many cases, long delays in referrals and psychiatric intervention. No evidence of procedures for responding to medication non-compliance was found at ASP, while poorly developed procedures at NKSP were followed rarely. While its performance on this issue was poor, WSP distinguished itself by the quality of its audit and the degree of supervisory oversight. The methodology for the audit was highly sophisticated and tackled the tough assessment of whether all non-compliant inmates were referred when warranted.

Based either on past performance or audits of current practices, some institutions appeared to be doing reasonably well in handling medication non-compliance. These institutions typically had well-established working procedures and had audited at least some of the important steps in their response procedures. Audits conducted even at the best performing institutions, however, typically failed to examine whether referrals for non-compliance were made whenever warranted and were conveyed in a timely fashion to mental health staff. Audits usually started at the point where referrals were received by mental health staff.

CSATF was close to full compliance on this issue. CCC, CVSP, Folsom, ISP and PVSP had a history of appropriate responses to non-compliance, and the monitor found no major breakdowns in compliance, although some signs of slippage were discernible. CSP/LAC earlier reached compliance on this issue, but a recent institutional

audit found that referrals were not always timely triggered due to a shortage of MTAs. Like some other institutions that had previously resolved this problem, PBSP did not audit its procedure but probably needed to do so; a small sample of records reviewed by the monitor showed that only half of 23 inmates referred for non-compliance were seen by a psychiatrist in a timely manner.

Another group of facilities, including CCWF, CMF, CTF, HDSP, MCSP and SQ, succeeded in establishing routine procedures and monitoring their effectiveness by maintaining generally useful records and conducting decent audits. Timely psychiatric contacts with inmates referred for non-compliance typically occurred about 50 percent of the time in these facilities. SQ continued to experience problems in responding consistently to medication non-compliance but demonstrated sufficient progress to raise its performance from abysmal to nearly acceptable. At CMF, non-compliance procedures were implemented fully for the EOP but not for the 3CMS population. HDSP improved its record-keeping and found that some inmates were referred multiple times before being seen by a psychiatrist. Responses to non-compliance referrals were less timely at CCWF, and the institution did not audit whether referrals were made whenever warranted. CTF and MCSP responded to referrals appropriately, although the monitor found that referrals were not always made when warranted.

Despite myriad other problems with medication management, RJD was ahead of most institutions in its coordinated approach to medication non-compliance. Although the language of its revised policy failed to clearly distinguish between the right to refuse medication and the need to show up at a pill line, which led to some disciplinary charges that punished, in effect, inmates for exercising the former, the use of correctional

361

officers to escort inmates who failed to show up for the pill line reportedly resulted in improved compliance.

Procedures for handling non-compliance reportedly were in place in other CDCR institutions, but whether they were fully implemented and worked as intended was uncertain in the absence of supportive data or audits.

HS Medications:  Discouragingly limited progress occurred in the handling of HS medications during the monitoring period.  MCSP had 180 inmates on HS medications, which were appropriately administered after 8:00 p.m.  HS medications were ordered for a reasonable proportion of the MHSDS caseload at CSP/Corcoran, but it was unclear whether the medications were delivered before or after 8:00 p.m.  SQ regularly administered HS medications after 8:00 p.m.  CSATF had a relatively small number of caseload inmates on HS medications, some 20 to 30 a month, but interviewed psychiatrists reported no obstacles to writing orders for HS medications.  CCI had 74 caseload inmates on HS medications, but delivery generally occurred before 8:00 p.m. due to vacant MTA positions.

Most CDCR institutions, including ASP, CCWF, CIM, CIW, CMC, CMF, CRC, CSP/LAC, CSP/Sac, CSP/Solano, CTF, HDSP, ISP, PBSP, PVSP, SCC, VSPW and WSP, still did not prescribe HS medications at all or did so only rarely.  In institutions where local procedures required a written supervisory endorsement of HS orders, few such orders were written.  In CCWF, staff expressed to the monitor their belief that HS orders were forbidden; in CMC, staff reported that sufficient RNs were available to deliver HS medications to no more than a few inmates;  in CMF, staff expressed their belief, apparently erroneous, that the last medication pass in EOP

362

occurred late enough to effectively serve as HS administration; in WSP, the last medication pass of the day occurred at 2:30 p.m.; among PVSP's MHSDS caseload of over 1,400 3CMS inmates, just eight had HS orders; the number of inmates with HS orders dropped from 80 to nine at CSP/Sac during the monitoring period. Neither institutions nor DCHCS appeared willingly to take on this issue, initially ignited by a careless and obtuse central office directive and vastly complicated by local shortages of MTAs and RNs.

More than two years ago in July 2003, the court ordered the defendants to include in their new medication policy a provision requiring evening distribution, i.e., no earlier than 8:00 p.m., of HS medications, as well as some supervisory psychiatric oversight or peer review structure not so burdensome as to preclude or unnecessarily discourage the prescription of HS medications when clinically appropriate. The defendants included the mandated post-8:00 p.m. distribution requirement for HS medications in their new policy, but have failed to remove local obstacles to the clinically appropriate use of HS medications in 19 institutions, where such medications were never or rarely prescribed. Further judicial incentive may be required in the absence of some form of effective departmental intervention.

Keyhea Process: A problem with the statewide Keyhea tracking list emerged during the monitoring period. Institutions could no longer rely on the list distributed by DCHCS that supposedly identified new institutional admissions with current Keyhea orders from elsewhere in CDCR. The lack of an accurate centralized list was a problem for all institutions. Left to their own devices, few facilities were able to track inmates with Keyhea orders accurately. At MCSP, where Keyhea orders were

initiated or renewed for 34 inmates during the monitoring period, a new admission with a current Keyhea order went unidentified. The monitor also found an unidentified recent admission with a current Keyhea order at ASP.

Parole Medications: Institutional provision of psychotropic medications to inmates released on parole continued to improve generally throughout CDCR during the monitoring period. CIM, CSATF and SQ kept adequate records on this issue and conducted methodologically sound audits that confirmed a high level of compliance. ISP and HDSP released few inmates on parole, but nearly all of them received a supply of medication.

Most institutions reported that local procedures for providing a supply of medication to inmates released on parole worked well, but few had conducted audits to substantiate the reports. Records indicated that paroled inmates were given at departure a supply of current medications in CSP/Corcoran, CMC and PVSP. CTF, DVI, CSP/LAC, MCSP, NKSP, PBSP, CSP/Sac, CSP/Solano and WSP all had procedures in place that appeared to work but none of them systematically tracked the actual delivery of medications to departing inmates. VSPW did not maintain a log of inmates provided with medication on release, and SCC did not consistently provide medication to paroling inmates.

Informed Medication Consent Forms: Informed medication consent forms were regularly obtained and filed in inmates' UHRs in ASP, CCI, CMC, CSATF, CSP/Corcoran, CTF, ISP, PVSP and SQ. CTF had an unusually high level of compliance on this issue. Although informed medication consent forms were routinely present in UHRs at SQ, some of the forms were generic. Folsom also typically obtained informed

364

medication consent, but some forms were over a year old.  At CSP/LAC, some clinicians apparently did not explain the risks associated with heat-sensitive medications to all inmates for whom they were prescribed.  CIM's compliance rate on this issue rose to 85 percent, and outdated forms were replaced with improved ones.  Procurement of informed consent remained problematic at CSP/Solano.   Informed medication consent forms were often missing from UHRs in CSP/Sac, DVI, HDSP, PBSP, SCC and SVSP.

Medication Administration Records (MARs):  DVI regularly used the recently revised MAR forms, which were consistently complete, legible and filed in inmates' UHRs.  A credible audit of MARs at HDSP confirmed that the new MARs were filled out fully and filed in UHRs close to 92 percent of the time.  The new forms were in use at Folsom, where they were reviewed weekly by supervisors.  MARs were filled in legibly at PBSP but were not always filed in UHRs in a timely manner.  At CCI, MARs were generally legible and filed in UHRs, but the new form was not in use.

MARs were often missing from UHRs, incomplete or unintelligible at CMC, SCC and CSP/Solano, although the legibility of MARs at CSP/Solano showed improvement.  Generally, unclear annotations and blanks were less common during the monitoring period.  SQ was unusual in that MARs were legible, but entries were made later, not at the time of distribution.  MARs were not filed in many UHRs reviewed by the monitor.  WSP did not adopt the new MAR forms because they were reportedly incompatible with the pharmacy's software.  At WSP, MARs were too often incomplete but they were generally legible and filed in a more timely manner.

Other miscellaneous problems with the distribution of medication were attributable in some institutions to systemic failures in processing medication orders and

administering medication. While these problems impacted adversely on MHSDS caseload inmates, they frequently were not within the control of mental health staff. Reports of antiquated or flawed pharmacy computer software and severely understaffed pharmacies were common. Problems with the processing of orders in a timely manner occurred at CIW, CCWF and CSP/LAC. Accurate expiration lists could not be obtained at RJD. At NKSP, contract psychiatrists wrote orders on weekends, but the pharmacy could not handle them expeditiously. Because the pharmacy at CSP/Solano was closed during evenings and weekends, some orders were not processed timely. An inability to identify and fix problems with a new automated ordering system in the pharmacy at HDSP resulted in lost data and numerous expirations. Antiquated software was blamed for blocking the use of new MAR forms at WSP and creating medication labels that wrongly specified the DOT administration of orders at CSP/Solano and VSPW. Similar problems related to the pharmacy were reported by CMC, but new MAR forms were in use there despite the age of the pharmacy's software program.

Other obstructions to effective medication management varied. The ability to administer medications as ordered was often and episodically compromised by vacancies among MTAs and RNs, unclear practices, poor adherence to established procedures and constraints imposed by security concerns. Visual obstruction posed by solid doors in secure units often defeated effective DOT. Pill lines ranging up to one or two hours in duration at ASP, CIW, CRC and CSP/Solano were troubling, particularly given the increased risks for inmates on heat-sensitive medications associated with high summer temperatures. A shortage of MTAs jeopardized the resolved status of medication non-compliance at CSP/LAC but elicited no corrective action. The allocation

of an extra 45 minutes to distribute medications in the CMF EOP solved a medication

management problem but created a new one by abbreviating EOP programming.

Institutions with an adequate complement of staff in the various mental

health and medical positions involved in the distribution and management of medications

and cooperation between the mental health and medical disciplines sufficient to

collaborate on audits of mutual interest demonstrated visible improvements consistently

in medication management. CTF was the only CDCR institution that improved in all

areas of medication management during the monitoring period. Inadequate record-

keeping and audits in many institutions put the identification and resolution of problems

out of reach. Often facilities did not know whether the problems found in too small a

sample of surveyed cases reflected isolated incidents or systemic breakdowns.

Staffing, leadership and the articulation of clear policy and procedures

were the necessary components of a successful regimen for distributing and managing

medications. Few institutions had yet to put all three together, but progress in many of

them was discernible. On the other hand, progress in such areas as responses to

medication non-compliance and DOT vs. nurse-administered medications seem painfully

slow in many facilities, while the overall response to requirements to provide HS

medications where clinically appropriate was grossly inadequate in nearly two-thirds of

CDCR institutions. The long failure to develop an accurate and reliable department-wide

management information system for pharmacy matters remained a continuing liability.

<u>Mental Health Assessments for the Disciplinary Process</u>:

Documentation at the institutional level of mental health input into the

disciplinary process continued to develop slowly. The major recording tool was a log of

cases referred for a mental health assessment, which was supposed to capture essential

milestones in the preparation of assessments and the outcome of the ensuing disciplinary

hearing. Logs were inadequate or incomplete in 14 institutions, including ASP, CAL,

CCWF, CEN, CMC, CMF, CRC, CSATF, CVSP, NKSP, PVSP, SCC, VSPW and WSP.

The lack of accurate and complete logs often made an evaluation of the process onerous,

requiring an alternative review of large quantities of full RVRs to ascertain an

institution's compliance with the mandated process. Even that alternative was not always

adequate because some facilities (e.g., CAL, CCI, CRC, NKSP) failed to record an

inmate's level of mental health care either in RVR logs or individual RVRs.

Documentation of training for personnel in the assessment process, on the other hand,

was generally available. Only ASP, CSP/LAC and WSP seemed unable to produce

documentation of staff training. MCSP, on the other hand, provided evidence of

continuing, as well as initial, training and also had available a useful training video on the

assessment process for new hires.

> The quality of mental health assessments generally improved during the monitoring period, with some exceptions. Most facilities ensured that the clinician preparing the assessment was not the inmate's primary clinician; the inmate accused of the infraction was generally interviewed; UHRs were regularly reviewed as part of the process; C-files were less frequently examined; a majority of assessments contained some narrative explanation of the possible influence of the inmate's mental illness on the inmate's behavior. Clinicians at DVI were required to complete an assessment worksheet identifying 11 factors possibly affecting an inmate's mental health status, as well as 14 other factors with a potential impact on accountability or the mitigation of sanctions. DVI clinicians, moreover, were required to complete a RVR assessment note for each inmate, detailing the clinician's findings, recommendations and rationale. Hearing officers at RJD reportedly found clinicians' assessments clear, informative and useful, a characterization heard only rarely.

> In mid-2004, a CSP/LAC audit found the quality of assessments to be

inadequate and prescribed additional training; a follow-up audit in November 2004 noted

improvement except in assessments prepared by one clinician, who was subsequently

given an additional dose of training. At CRC, the poor performance of the formal assessment process reportedly was attributed to a local practice of informal consultation between correctional officers and clinicians about caseload inmates charged with infractions. Unfortunately, it was difficult to confirm the existence, much less the effectiveness, of the undocumented informal process.

In most institutions, the task of preparing assessments was spread among several clinicians. An exception was CSP/Sac, where one psych social worker prepared all assessments for a large and complex caseload population. For a while, the preparation of assessments was assigned to one clinician at HDSP, but the function was subsequently dispersed. At institutions with small mental health staffs and only a few RVRs generated by a correspondingly small caseload population, it was often impossible to employ independent clinicians to prepare assessments.

The revisions to the mental health assessment process completed in late 2002 sought to identify when mental illness contributed to misbehavior that resulted in RVRs and help disciplinary hearing officers craft outcomes that reflected the difficulties seriously mentally inmates, especially those in crisis, encountered in controlling their behavior. The original assessment process, as well as the revisions, sought to limit the rote escalation in custody levels of seriously mentally inmates, whose disruptive behavior was attributable, in whole or part, to mental illness. The revisions also recognized that the effort to provide meaningful mental health assessments of all inmates on the MHSDS caseload receiving a RVR imposed an impossible burden on available mental health resources and resulted in largely worthless assessments and/or the abandonment of other essential mental health services. The revisions, then, sought to focus assessments on the

369

most seriously mentally ill inmates at the MHCB and EOP levels of care, for whom

assessments were made mandatory whenever they received a RVR.  MHSDS caseload

inmates at the 3CMS level of care and non-caseload inmates would not be referred for a

mental health assessment unless their behavior at the time of the infraction "would

reasonably be considered bizarre, unusual of uncharacteristic for that inmate."

      The revised version of the mental health assessment process began to be

implemented in institutions in early to mid-2003.  After some eighteen months of

operation, the number of non-caseload inmates referred system-wide for assessments was

small; monitoring teams found fewer than 100 such referrals throughout CDCR.  Because

of the sheer volume of RVRs written regularly in Level III and IV institutions, it was

difficult to assess whether non-caseload inmates, who may meet the criteria in the revised

policy for referral, were, or were not, being referred.  The size of the representative

sample needing to be reviewed to make any tenable conclusion exceeded the resources of

the Coleman monitoring effort.

      Referral for assessment of 3CMS inmates with RVRs, who met the

criteria, was considerably better, but inconsistent.  In CSP/LAC, with a 3CMS population

in excess of a thousand inmates, no 3CMS inmates were referred during the monitoring

period.  The decision as to whether a 3CMS inmate needed a mental health assessment

was made at CSP/LAC by the employee reporting the behavior, generally a correctional

officer, with review by a senior hearing officer.  At SVSP, also with a 3CMS population

of roughly a thousand inmates, only a handful of 3CMS inmates with RVRs were

referred for a mental health assessment.  MCSP had just five referrals of 3CMS inmates

in all of 2004, while CIW referred three of 144 inmates charged with infractions for an

assessment.  CRC referred five 3CMS inmates in the year preceding the monitor's visit, and ASP made none in all of 2004.

The question raised by this data is how many were not referred, who should have been.  The answer is not easy to determine.  During a three-and-a-half month period reviewed by the monitor, CMC, with a 3CMS population of about a thousand, referred just eight 3CMS inmates for an assessment among 263 3CMS inmates receiving RVRs.  CMC, however, was one of five institutions where the monitor during the 15th round of review looked at a representative sample of 3CMS inmates charged with disciplinary infractions, who were not referred for an assessment, to determine whether they should have been referred but were not.  Among the reviewed sample of 3CMS cases not referred at CMC, mental health assessments did not appear to be warranted, based at least on the facts reported in the examined RVRs.

The five institutions where the monitor conducted this same monitoring exercise included a reception center (DVI), a facility for female inmates (CCWF), a Level IV institution with a mix of MHSDS programs (PBSP), a Level III institution with a predominantly 3CMS MHSDS caseload (Folsom) and CMC with its large array of MHSDS programs and populations.  In all five facilities, after examining a representative sample of 3CMS inmates with RVRs who were not referred, the monitor was able to identify just one inmate who arguably should have been referred, but was not. This initial sampling may indicate simply that looking at RVRs alone is not enough to support a conclusion.  Further analysis of the issue and testing is needed.  This first look, though, did not find lots of 3CMS inmates who met the criteria and were not referred.

371

Conversely, the monitor found in all 32 CDCR institutions extremely few EOP or MHCB inmates who received a RVR and was not referred for a mental health assessment. Based on reviewed documents and observations everywhere in CDCR, EOP and MHCB inmates charged with disciplinary infractions were routinely referred for assessments. In four institutions (CAL, CCI, CEN and HDSP), all MHSDS inmates, whatever their level of care, were automatically referred for an assessment whenever they received a RVR. In CMF, clinicians complained that too many 3CMS inmates, amounting to 79 percent of all 3CMS inmates charged with an infraction, were referred for an assessment.

Other complicating variables included the wide diversity among institutions in the overall number and nature of RVRs issued and the function or mission of different facilities. Reception centers, for example, seemed to generate fewer RVRs, at least for MHSDS inmates, than other facilities. Some institutions with substantial numbers of 3CMS inmates (e.g., ASP, CTF and PVSP) apparently issued few RVRs to caseload inmates. Desert facilities with small MHSDS caseloads obviously rarely issued RVRs to caseload inmates.

Variations in the accuracy and reliability of data, as well as disparities in the periods for which information was kept and provided to the monitor during the 15th round of review, made it difficult to calculate the total of cases referred for assessment and the percentage of cases in which clinicians found inmates' behavior to have been influenced by their mental illness. Analysis of the complex available data suggested that, not surprisingly, behavior was traced in part or whole to mental illness for the bulk of EOP and MHCB inmates for whom an assessment was prepared; the percentage was

372

smaller for assessed 3CMS inmates. In SQ, for example, where assessments were prepared for all EOP inmates and 16 percent of 3CMS inmates with RVRs, clinicians found mental illness to be a factor in almost all EOP RVRs and about half of 3CMS assessments. At WSP, where fewer assessments were requested and prepared, 76 percent reportedly cited mental illness as contributing to the assessed behavior. This high percentage was impossible to confirm because the C-files for transferred reception inmates, the major group of RVR recipients at WSP, were no longer available in the institution.

Most facilities, especially those with a substantial population of caseload inmates at the EOP and MHCB levels of care, kept better data on the outcome of cases in which an assessment was prepared and submitted to a hearing officer. The information available on outcomes indicated that somewhere between one-third and one-half of assessments resulted in some sort of modification in the outcome of the disciplinary process, whether through dismissal of or reduction in the charge or a reduction in the sanction imposed.

The range of attention given to assessments varied considerably. In CSP/Sac, 40 percent of assessments resulted in reductions in charges or sanctions; MCSP, in a shorter period and with fewer assessments, documented reductions in charges or penalties in over 80 percent of submitted assessments. Even in SCC, where the number of assessments prepared declined sharply, reductions occurred in ten of 13 cases with an assessment, compared with four reductions among 38 assessments in the preceding monitoring period. In CIM, the monitor determined that reductions occurred as a result of the assessment in nine of 15 randomly selected and reviewed RVRs.

373

Hearing officers in CMC consistently considered assessments, reduced charges and reductions when considered appropriate and documented their reasons for rejecting assessments. PBSP had established an explicit presumption in favor of accepting a clinician's mental health assessment and required a hearing officer to detail in writing the reasons for a rejection of a clinician's finding.

On the other hand, in CSP/LAC, where hearing officers documented their consideration of assessments in 65 percent of cases where assessments were filed, reductions occurred in roughly 14 percent of cases with an assessment. Hearing officers in CSP/LAC sometimes looked erroneously at the inmate's behavior during the hearing to determine impact of the behavior at the time of the offense, misread or misunderstood clinicians' input or, more rarely, sought to apply a not-guilty-by-reason-of-insanity standard during the hearing. In a number of other institutions, including CAL, CEN, ISP, NKSP and PVSP, hearing officers did not document their consideration of assessments and only infrequently reduced charges or sanctions. Most of these facilities had small MHSDS caseloads and limited opportunities for preparing and considering assessments. Some other facilities (CCWF, CIW, CMF, CSP/Solano, CSP/Corcoran, Folsom, HDSP and WSP) reported that hearing officers considered assessments and reduced charges and/or sanctions, but lacked sufficiently accurate, complete or reliable data to confirm the reports.

During the monitoring period, SVSP recognized that its assessment process was inadequate and took steps to improve it. After an audit by the associate warden for healthcare of a small number of cases involving assessments, the need for additional training on the process was clear, and specific directives were issued to facility

captains and chief disciplinary officers to supervise the process more closely. When the improvement anticipated from these measures did not occur, a senior correctional counselor was assigned to review all RVRs with the authority to recommend that they be reheard, reissued or referred for a mental health assessment. When an audit in CCI indicated that hearing officers did not regularly incorporate mental health assessments into their findings and dispositions, the institution conducted follow-up training. The provided training focused on the mitigation of penalties as a potential response to a determination that mental illness influenced the behavior of accused inmates. Local documentation indicated that 19 hearing officers received the training during a three-day period. Among other steps designed to improve the performance of its assessment process, DVI developed a worksheet that required hearing officers to reach a determination and document their conclusion on each aspect of the disciplinary infraction, including mental health. Although the effects of these adjustments remain to be determined, all of them represent a useful example of the conjunction between quality assurance and a specific substantive issue.

The overall impact of the still-developing revised mental health assessment process has not yet been as significant as was hoped. Certainly no perceptible plunge in the number of EOP inmates in administrative segregation or PSUs has occurred. On the other hand, emerging indications of indirect impact are encouraging. For example, during the 17 months between January 2004 and May 2005, while the overall MHSDS population increased by approximately 7.5 percent and the EOP population increased by nine percent, the number of EOP inmates in PSU or administrative segregation grew by just six inmates from 659 to 665, while the

375

percentage of EOP inmates in a PSU or administrative segregation unit actually declined from 19.9 percent to 18.4 percent. When every other category of population seemed to be expanding inexorably, this slight downturn may be more significant than it appears. Local implementation of the assessment process, moreover, was progressing further in institutions with substantial mental health programs and population, while the impact of the assessment process was marginal in facilities with few mental health programs and inmates. As clinicians in facilities with large MHSDS caseloads become more comfortable with the assessment process and hearing officers are better trained to use assessments effectively, there is reason to hope that the impact of the assessment process will expand.

Transfers:

       During the monitoring period, transfers to more intensive levels of mental health programming and treatment deteriorated sharply and widely. A long-suspected under-utilization of Department of Mental Health (DMH) beds by CDCR was confirmed by the Unidentified Needs Assessment (UNA) conducted jointly by CDCR clinicians and the monitor's experts, which was completed in March 2005. Meanwhile, the availability of Mental Health Crisis Beds (MHCBs), the department's sole internal resource for providing short-term crisis care for unstable and suicidal inmates, underwent a shrinkage that became by mid-2005 a critical issue with severe impact on CDCR's most seriously mentally disordered inmates. This issue remains unresolved. Also during the monitoring period, the waiting list for the admission to Psychiatric Service Units (PSUs) for EOPs with a SHU term, imposed on inmates who are viewed as a danger to themselves or others, expanded steadily, and mental health caseload inmates continued to spend long

periods in reception awaiting transfer to EOP and 3CMS general population programs. All of this meant that a growing number of the most seriously mentally ill inmates in CDCR were not receiving in a timely fashion the levels of care they needed.

>DMH:

In as early as 1998, during negotiations over the assimilation of the Gates consent degree with Coleman, CDCR acknowledged a need to determine whether some of its most seriously mentally ill inmates were being overlooked for treatment in DMH inpatient programs. That acknowledgement led to a seven-year effort to determine the existence and extent of any such unmet need. In March 2005, completion of the long-delayed assessment finally confirmed and quantified the unmet need. The so-called UNA (Unidentified Needs Assessment) found 512 CDCR inmates, who were not referred for inpatient DMH care although they were clinically appropriate for such a referral, including 435 inmates in need of an intermediate level of care and 77 in need of acute inpatient care, representing respectively 14 and two percent of the department's total EOP population. Subsequent classification data from the UNA indicated that two-thirds of the inmates identified for referral to intermediate inpatient care required Level IV custody, as did 60 percent of those identified for referral to acute inpatient care.

>Intermediate Inpatient DMH Care: On March 30, 2005, CDCR submitted a proposal to provide intermediate inpatient care to all inmates in the department requiring that level of mental health treatment, including those newly identified in the UNA. The proposal contained an updated projection of the department's current and future inpatient bed needs that incorporated the UNA findings, calculated the gap between available inpatient beds and projected needs and identified immediate,

intermediate and long-range strategies to meet those needs. Projected bed needs, unfortunately, did not contain a breakdown by custody level of the anticipated demand for intermediate inpatient DMH care, a critical element of any sound plan. The key long-term strategy identified in the plan was the construction of three regional facilities, each with 1,500 beds, to house expanded inpatient programs, as well as other intensive care programs for CDCR inmates most seriously mentally ill and presenting the most difficult custody challenges. Full delivery of this decidedly long-range strategy was scheduled to occur in 2013.

Scarcely was review of the proposed March plan completed when the California General Assembly declined to fund the next phase of development of the three regional facilities, leaving the defendants bereft of any long-range strategy and requiring a return to the drawing board. The legislative rejection came at a time when CDCR was facing mounting criticism on a number of fronts and budgetary pressures to curb expenditures were intense. The rejection was based essentially on the department's inability to justify adequately the nature and extent of the anticipated need for so large an undertaking.

Following the legislative move, the defendants submitted a revised proposal in mid-August 2005. The UNA found 280 Level IV male inmates in need of referrals to intermediate inpatient care. The August plan proposed the development of 36 additional single-celled Level IV intermediate inpatient care beds at CMF by relocating the present DMH-operated Day Treatment Program (DTP) elsewhere within CMF and using the vacated DTP space. Initial renovation of the DTP area, inadequate from a custody perspective, was to be undertaken immediately with inmate labor, but the space

378

lacked air conditioning, required for licensure by the Department of Health Services (DHS) under applicable California law. The 36 cells would have to be evacuated in April 2006 to install air conditioning, a process slated to take some two years. Meanwhile, the department would begin the conversion of two Level IV general population living units at Salinas Valley State Prison (SVSP) into a 112-cell, DHS-licensed facility for DMH intermediate inpatient inmates. Initial renovations at SVSP were to focus on providing cells to accommodate the 36 inmates who needed to be removed from CMF in April 2006 for the installation of air conditioning in the former DTP cells, so rapid funding and completion of the renovation work at SVSP was critical. The overall construction work for the 112 beds at SVSP was scheduled for completion in March, 2009, which, together with the 36 single cells in CMF, would provide CDCR with an additional 148 single-celled intermediate inpatient DMH beds for Level IV inmates.

The defendants presently are operating a 64-bed intermediate inpatient DMH program at SVSP, the Salinas Valley Psychiatric Program (SVPP), which they intend to double to 128 beds, also by March 2009. These 128 beds, in addition to the 148 beds already described, would provide the defendants with an overall total of 276 Level IV intermediate inpatient beds at CMF and SVSP. That total, however, is somewhat deceptive. The original 64-bed DMH program in SVSP, which was designed to house volatile and seriously mentally ill Level IV inmates with a history of violence, contained just 32 single cells and eight dormitories with four beds each. In the roughly three years the DMH program at SVSP has been in operation, the 32 dormitory beds have never been fully occupied. For all but the last two months of that period, only half of the dormitory beds in the DMH program at SVSP have been occupied. Through mid-August 2005, an

average of 17 of the 32 dormitory beds at SVPP was empty, meaning that about a quarter

of the 64 most expensive beds in all of CDCR to construct and operate have been left

largely empty for custody or security reasons.  Even after extraordinary efforts in the face

of a steadily growing waiting list for admission to the SVPP, the program has still not

been able to fill all of the dormitory beds; on October 11, 2005, seven of the 32 dormitory

beds remained empty.

   In January 2005, in response to the growing need for Level IV

intermediate inpatient DMH beds, the defendants decided to convert dormitory space in

CMF into a Level IV intermediate inpatient DMH unit.  While staffed to handle 44 Level

IV intermediate inpatient inmates, the actual population of the unit fluctuated between a

quarter and a third of its capacity, meaning that somewhere between 29 and 33 of these

highly expensive beds also were empty on any given day during the first eight months of

2005, until the space was earmarked for another conversion, this time to house the

displaced DTP program.

   The vacancies resulting from the single-celled design at SVPP and CMF

cost CDCR and the State big money, and, because the dormitory beds could not be used

safely to house Level IV inmates in need of intermediate inpatient care, they contributed

substantially to the growing backlog of Level IV CDCR inmates in need of this level of

care.  Nonetheless, the defendants initially decided that the 64 beds to be added to the

existing SVPP would include 32 single cells and 16 double-cells, a decision they have

now abandoned in favor of a plan for the construction of 64 single cells in the expanded

SVPP.  The reconfiguration required substantial changes in the scope of the project,

requiring Department of Finance (DOF) review and approval.  In their objections to the

draft version of this report, the defendants reported that DOF approved the necessary

changes in September 2005; the Public Works Board also endorsed the changes at its

subsequent September meeting; and the Pooled Money Investment Board approved

interim financing for the revised project in November. The project reportedly is now "in

architectural programming," and CDCR anticipates that preliminary plans will be

submitted to the Public Works Board in June 2006 with an estimated date of construction

completion in March 2009.

Now nine months after the UNA identified a substantial and growing need

for Level IV intermediate inpatient DMH beds, the number of beds needed to meet that

specific need has still not been calculated. Moreover, the defendants' most recent plan

for meeting only part of the now clear need will require four years, while the immediate

commitment of construction funding and activity to convert and renovate the space

formerly occupied by the DTP at CMF will yield just 36 Level IV intermediate inpatient

DMH beds, but only until April 2006, when air conditioning must be installed.

Acute Inpatient DMH Care: As indicated earlier, the UNA also found a

substantial number (77) of CDCR inmates who needed acute inpatient DMH care but had

not been referred for such care by CDCR clinicians. The reluctance of some institutional

clinicians to make referrals to DMH's Acute Psychiatric Program (APP) at CMF may be

attributable to long waiting lists for admission that have historically and episodically

delayed transfers, often leaving institutions to rely on local mental health resources to

shepherd acutely psychotic inmates through their crises. Over much of the past 12 to 18

months, however, the APP at CMF has only rarely had a wait list for admissions, due to

much better coordination of admissions by CDCR and DMH administrators and

aggressive efforts to reduce the length of stays of inmates in the APP. The result of the

latter effort has cut the current average length of stay in APP to just over 50 days, about

where it should be for a short-term acute care program. The APP has also had to absorb

for the past three years inmates from CMF in need of a MHCB level of care, i.e., up to

ten days of crisis intervention and stabilization before the inmate is returned to regular

institutional MHSDS programming. The absorption of that population has also helped

reduce the average length of stay in APP.

More recently, due in part, no doubt, to the UNA and its discovery of 77

inmates in CDCR in need of acute inpatient care, APP beds have been consistently filled

and a waiting list has reappeared. In addition, the UNA findings suggested that the

lingering history of waiting lists and delays may have artificially deflated the number of

APP referrals, which are now climbing again. In any event, none of the planning

documents generated in response to the UNA has addressed the department's need to

expand its capacity to provide acute inpatient DMH care to meet the expanding need

being pushed, among other causes, by an inexorably rising MHSDS population

commensurate with CDCR's growing overall population. The defendants presently lack

a plan to meet this need and must develop one.

Over the past seven to eight years, CDCR and DMH have struggled to

shape an inter-agency relationship that is mutually acceptable and responsive to the needs

of CDCR inmates for inpatient DMH treatment and care. During much of that time, due

to the lack of facilities with a level of security compatible with the custody requirements

of CDCR's most volatile inmates and the obligation to protect its staff and patients from

assault and intimidation, DMH has consistently refused to accept CDCR referrals for

intermediate inpatient care that presented serious security risks. This has left CDCR without the means to provide an intermediate inpatient level of mental health care for that portion of its Level IV population with an assaultive, predatory history. In contrast, an acute inpatient DMH care has always been provided in the APP housed within a secure CMF, with ample custody staffing at hand.

The need to provide a program of intermediate inpatient DMH care for tough Level IV inmates became increasingly clear in the late 1990's, and DMH agreed to establish and operate such a program within a high security CDCR institution. Inexplicably, the defendants decided to site the program in Salinas Valley State Prison (SVSP), where CDCR has always found it particularly difficult to hire and retain mental health and medical staff. Vacancies, for example, among MTAs and RNs at SVSP are regularly the highest in CDCR. Next and equally inexplicably, as indicated earlier, DMH designed a 64-bed facility that included 32 single cells and eight dormitory-style rooms with four beds each. Neither of these decisions was shared with the court, and perhaps not with CDCR, until it was a *fait accompli*. Originally scheduled to be operational in 2001, the SVPP program came on line in late 2003; due to its design problems it has never been fully occupied.

Meanwhile, during the past seven or eight years, DMH has insisted repeatedly, publicly and privately, its willingness to accept Level IV CDCR inmates. In fact, DMH has accepted only a limited number of Level IV CDCR inmates, almost all of whom have had no history of violence or predation. That exception, moreover, which precludes the bulk of CDCR's Level IV inmates, has long been an explicitly stated bar to admission to DMH intermediate inpatient programs in the annually renewed inter-agency

383

agreement. During that same period, DMH has also repeatedly held out to CDCR, and the court, the prospect that the new DMH facility with 1,500 beds under construction at Coalinga and currently accepting patients would allow DMH to accommodate more Level IV CDCR inmates. This prospect also turned out to be illusory. Coalinga may be able to absorb some CDCR inmates in need of intermediate inpatient care, but the facility is not much more secure than Atascadero State Hospital (ASH), where most intermediate inpatient care is presently provided by DMH to CDCR inmates. DMH did not share information about the security limitations of its Coalinga facility with CDCR until June 2004 or the court until even later. Coalinga, absent a promptly executed physical retrofit to enhance security, offers no solution to CDCR's need for sufficiently secure space within which to provide intermediate inpatient care to Level IV violence-prone inmates.

Thus, CDCR's current capacity for hard-to-place Level IV inmates in need of intermediate inpatient DMH care is limited to 50 to 60 DMH/SVPP beds, with an additional 36 projected to come on line in relatively soon in CMF in the space formerly occupied by the DTP, at least until April 2006. The presently evolving plan promises to possibly another 112 beds in March 2009, some 39 months away. As of October 11, 2005, with 56 of its beds filled, SVPP had a waiting list of 129 CDCR inmates. CDCR can not now provide the level of mental treatment clinically proscribed for these 129 inmates, some of the most seriously mentally ill inmates in the system, and suggests it may have the ability to take care of some of them in another three and a half years. But even that estimate is hedged with warnings about how deliberately and slowly executive and legislative financing agencies act. The 39-month estimate, it turns out, will be hard to meet.

384

This so-called plan is simply unacceptable. The various agencies of government of the State of California, including the Executive Office of the Governor, The Department of Finance, the Department of Health Services, DMH and CDCR need to put together a plan to address this problem now and present it to the California General Assembly for its immediate review and, one hopes, approval.

The defendants' paucity of resources for the provision of intermediate inpatient care to Level IV inmates is not a recent development. In 1998, CDCR committed to conduct an assessment to determine the extent of the suspected need, but took seven years to complete the assessment. DMH has long operated under the protective assumption that it had no obligation to provide mental health services for CDCR inmates who might represent a danger to DMH programs and staff, although it knew well it was the only source of inpatient care available to CDCR. For its part, CDCR has long assumed it has met its obligation to provide mental health services to these most difficult to place inmates by executing its inter-agency agreement with DMH, even though it knew, or should have known, that DMH did not, and would not, accept these violence-prone Level IV inmates. CDCR has a direct obligation under the terms of the Coleman remedy to provide clinically identified treatment services to this group of CDCR inmates. That obligation has simply disappeared in the crack between the false assumptions CDCR and DMH. If the two agencies cannot figure out some way to meet their mutual obligations here, the Governor of California, a named defendant in the Coleman suit, needs to intervene and get it done.

It is not as though the defendants must develop such a plan from scratch. The landscape is littered with the shards of previous proposals that could be refined and

fused together with the glue of intelligent commitment.  The CDCR Mental Health

Master Plan, developed with the consulting help of HOK (Hellmuth, Obata &

Kassabaum, Inc.) in late 2004, recommended the construction of three regional 1,500-bed

high security mental health facilities with concentrated programs for CDCR populations

most difficult to provide with mental health programs appropriate to their custody levels.

The master plan had its faults, including a poorly thought-through, but clearly embryonic,

institutional design suggesting the construction of a maximum security prison with a few

treatment rooms added.  But there are a number of more appropriate and promising

models available for the treatment or mental health aspects of any potential regional

facility, including the mental health programming complex emerging at CSP/Sac, the

SVPP model already operated by DMH within a secure CDCR institution and DMH's

own treatment oriented facility at Coalinga.  Such a facility might house a mix of CDCR

mental health programs, including a Psychiatric Services Unit (PSU), an EOP

administrative segregation unit, a Correctional Treatment Center (CTC) with a large

MHCB unit and a general population EOP program, as well as DMH acute and/or

intermediate inpatient unit.  The size of any facility, or facilities, should be based on a

much better calculation of the department's future need than currently exists.  Its location

should be driven by the selected area's ability to provide mental health and medical staff,

including RNs and MTAs, to staff the facility.  While some initial thought for such a

facility, or facilities, already exists in the department's master plan, the completion of any

part of that approach will take five to seven years and represents, at best, a long-range

solution.

386

Some shards for an interim approach also dot the landscape. The department's proposal, outlined above, represents the framework for some more immediate relief, but it is entirely contingent on the defendants' ability to energize and accelerate the financial and construction components of State government, which left to their standard procedures and pace will convert a possible interim solution into a long-range one. Here, again, it is clear that DMH and CDCR alone are impotent to generate the needed energy and acceleration required; prompt action here will require a focused attack by all of the involved agencies of State government under the leadership of the named defendant in this case.

Other interim approaches are possible. A portion of the new Coalinga facility might be hardened and made secure enough to house and provide intermediate inpatient care to difficult Level IV CDCR inmates. Some part of the increased mental health housing under construction at CSP/Sac might be devoted to an interim DMH intermediate inpatient program. Any selected interim proposal, however, must be taken off the standard track of project development, which requires years to finance, design, engineer and construct, and treated as a true emergency. The hallmark of the implementation of the frequently complex remedy in Colman has been the patience of the court, monitor and plaintiffs with the slow pace of its development. This particular problem has been brewing for seven years, and the defendants now seek to parlay their egregious delay in determining accurately the extent of the problem to justify a minimum of four more years to address just a part of the now fully defined problem. This is not a time for patience and the acceptance of the State's traditional reliance on the inevitably slow but unavoidable bureaucratic dance on the proposal-killing ground. The failure to

387

develop a responsive plan to deal effectively and expeditiously with the provision of intermediate inpatient DMH care to Level IV CDCR inmates will result in the monitor's recommendation to the court to impose sanctions, as will any lack of diligence in implementing the adopted plan.

MHCB:  A first hint of the developing problem with the availability of MHCB space occurred in December 2004, when a visiting monitoring team discovered that MCSP was using so-called "potty" or contraband cells, essentially holding cells where inmates suspected of ingesting contraband were retained and watched, when sufficient space in the local MHCB unit was unavailable.  These cells reportedly were being used about two or three times a month, and inmates were placed in them for less than 24 hours, although some evidence suggested that inmates might sometimes have remained in the cells longer.  The cells had no beds and, although observed by custody staff, were not located in a clinical area where inmates requiring stabilization could be monitored and treated.  The described overflow of MCSP inmates awaiting admission to a MHCB was initially assumed to be a local problem because other institutions were not reporting access problems to monitoring teams.  MCSP, moreover, was anticipating the creation of a SNY for Level IV EOP inmates, which included physical renovations and the development of a small OHU in addition to the CTC in the facility, which seemed to point to a local and temporary dislocation.

During the preceding round of review, monitoring teams found the length of stays in MHCB units relatively stable.  The department's monthly statistical data on mental health programs regularly included information on the average daily census of MHCB units and length of stays in the units, but no indicator that a waiting list for

transfers to MHCB units was developing. Only CMC reported serious difficulties in

moving MHCB referrals to a MHCB unit elsewhere in CDCR. CMC had recently been

shorn of its Locked Observation Unit (LOU), which had long served as the facility's *de*

*facto* equivalent for a MHCB unit, and the extent and cost of physical renovation required

to obtain licensure of the LOU precluded any prospect of its continuing or future use. In

response, the defendants reported they had negotiated an agreement with DMH to

provide up to 25 MHCBs for CMC at ASH, with which CMC had a long history of

cooperative relations.

On the eve of a policy meeting with parties and counsel in mid-June 2005,

the defendants provided plaintiffs and the monitor with a report on MHCB referrals,

which indicated that delays in access to a MHCB unit had risen sharply in April and May,

with an average of 40.3 referred inmates in April and 46.8 in May awaiting transfer

weekly. Back-up data on the institutional impact in April provided by the department

was more alarming; 22 CDCR institutions had referred a total of 227 inmates to MHCB

units elsewhere, only 48 of whom (21 percent) were actually transferred. The referrals of

the remaining 179 inmates were rescinded, of whom 116 were no longer deemed to be in

need of a MHCB level of care; 61 were eventually placed in MHCB units within the

referring institutions; and two were referred to DMH. Institutions with their own MHCB

units, which still needed to refer inmates elsewhere because their own beds were filled,

accounted for 119 of the 227 referrals. CIM alone, with an ability to provide a MHCB

level of care to 18 inmates in its General Acute Care Hospital (GACH), referred 83

inmates elsewhere in April, representing nearly 70 percent of the 119 referrals generated

by institutions with a MHCB unit. None of CIM's 83 referrals resulted in a transfer to an

MHCB unit somewhere else in CDCR. Among institutions without a MHCB unit, CMC referred 41 inmates elsewhere in April; SQ referred 25; CCI, 16; and DVI, 10. Of this total of 92 referrals, 25 (27 percent) resulted in an actual transfer. No comparable breakdown was provided for May, but data provided subsequently indicated that the situation was even worse, with just 13 percent of 300 referrals actually transferred. Among other questions raised by the data, it was unclear why CMC, with a MHSDS population of some 1,700 inmates and no MHCB unit generated some 40 MHCB referrals a month, while CIM, with a MHSDS population of some 1,300 inmates and a MHCB unit for 18, had twice as many referrals monthly.

The defendants attributed the escalating waiting list for transfers to MHCB units to a variety of causes, the most serious of which was a substantial reduction in the number of beds in MHCB units available for use. Completion of renovations in and the closure of the NKSP CTC to allow it to prepare for DHS licensure cost the system ten beds, while the loss of 13 more was attributable to the need to shut down the CTC in CSP/Solano for repairs to the heat, ventilation and cooling system (HVAC) inadequately installed during its recent licensure-related renovation. In addition, the CTC at CEN was downgraded to an OHU as long ago as mid-2003, reducing the count of MHCBs by an additional five. In CSATF, the local psychiatric staff *sua sponte* imposed a cap on MHCBs of 14, down two from its rated capacity of 16. These losses alone accounted for a reduction in the MHCB count for males of 30, bringing the total available down from 182 beds to 152. In the meantime, the deal with DMH for the use of up to 25 beds in ASH for MHCB referrals from CMC was not providing the anticipated relief. CMC's

disproportionally large share of failed MHCB referrals was directly attributed to the mere trickle of inmates actually being transferred to ASH.

At the mid-June policy meeting, the defendants committed themselves to efforts to expedite the licensure process at NKSP and repair of the HVAC at CSP/Solano, while trying to work out a stipulated agreement with the plaintiffs in <u>Budd</u> authorizing the defendants to use both facilities in whole or in part until they were fully licensed. They also agreed to explore with DMH ways of increasing the transfer of inmates to ASH of CMC inmates with a need for a MHCB level of care.

In August, the defendants provided data on MHCB referrals and transfers for July. The situation was steadily worsening. Referrals to a MHCB level of care rose slightly from April's count of 227 to 239, but only 30 transfers (12.55 percent of all referrals) actually occurred. Meanwhile, the department had issued memoranda with directives on housing requirements for inmates referred to a MHCB but awaiting transfer and conducted a survey of institutions to determine what each facility was using to house the backed-up MHCB population. The directives were responsive and gave clear directions to institutions to prioritize carefully the assignment of alternative housing to those with the most serious needs and provide needed observation and treatment. It remains to be seen what the impact of the directives will be in institutions with extremely limited acceptable alternative housing arrangements.

Following the receipt of the July data, the monitor visited CSP/Solano to see at first hand progress in dealing with the HVAC problem in the CTC. The institution had moved rapidly to expedite repairs and expected to complete them by October 1. There were, however, ominous sounds about the need for another DHS licensing review

391

as a consequence of the repairs, a process experience has shown to be invariably tedious and time-consuming. Moreover, CDCR seems to feel that the only way it can successfully pass DHS muster is by keeping the facility empty until the licensure inspection is conducted, the scheduling and completion of which can take many months.

Also in August, the monitor visited ASH in company with CDCR and CMC clinicians and administrators to get a better grasp of the causes for the hitherto slight use by CMC of DMH beds set aside to provide MHCB treatment. DMH provided a breakdown of referrals and rejections for the period from October 1, 2004 to the end of July, 2005, during which time CMC referred 55 inmates to ASH for MHCB treatment, all but five of whom were accepted. CMC clinicians claimed that ASH rejected even Level III referrals with any history of violence. The ASH summary of referrals identified just two rejections citing the referred inmates' history for violence; one acceptance noted the transferring inmate's high risk for, and history of, violence towards staff. CMC clinicians countered that they limited their referrals to ASH based on their long experience with ASH and their knowledge of who will be rejected. CMC clinicians also complained that the documentation required to support transfers to ASH was considerably more onerous than that required for referrals to MHCB units elsewhere in CDCR. The ASH data indicated, however, that CMC clinicians referred a total of just 32 inmates to ASH for MHCB treatment in the first seven months of 2005, an average of 4.5 a month, all but three of whom were accepted. Available CDCR data indicated that CMC clinicians referred 85 inmates to MHCB units elsewhere in CDCR in April and July, not one of whom was transferred.

The meeting at ASH ended with some promising proposals for limiting referral documentation, an agreement to assemble ASH and CMC clinicians and administrators within the week to consider 19 pending referrals, the development of a weekly or twice-weekly inter-agency committee of high-level supervisors to review and possibly expedite CMC referrals to ASH, and the redirection of some MHCB referrals from CDCR institutions other than CMC to ASH.

Data on the results of these actions has not yet been presented, but early verbal reports are not encouraging. Although the physical repairs of the HVAC at CSP/Solano were completed as scheduled, the department apparently decided not to allow this 13-bed MHCB unit to accept referrals from elsewhere in CDCR until the DHS inspection is complete. The NKSP MHCB unit apparently is still not in use, pending its DHS inspection. No stipulated agreement on the interim occupation of these beds has been filed to date by the parties in Budd. Results of the joint efforts of CMC and ASH are as yet unknown.

The program guides provisionally adopted by the court in mid-1997 established the remedy endorsed by the parties to Coleman and the court for the defendants' provision of constitutionally acceptable mental health treatment. Those program guides required the defendants to place seriously mentally disordered inmates found by clinicians to be in crisis or at risk for injury to self or others in a MHCB within 24 hours. The tight timeline for a transfer to an environment capable of providing intensive monitoring, stabilization and treatment, along with 24-hour nursing observation and care, reflected the fact that admissions to MHCB units often involved suicidal behavior. For similar reasons, confinement of seriously mentally disordered inmates in

393

OHUs, which are simply local infirmaries without assigned mental health staff or 24-hour nursing care, was strictly limited to 72 hours. Policies and procedures added over the past eight years and subsumed within the program guides spell out in detail the particulars of observation, monitoring and treatment required for suicidal inmates. MHCB units are the only facilities capable of meeting these requirements in CDCR. Now, however, each month in CDCR, somewhere between 200 and 300 inmates clinically referred for care that can only be provided in a MHCB unit are placed in alternative housing where, at the very best, they receive only a portion of the monitoring and treatment that plaintiffs, defendants and the court all agree is minimally required. The department's own statistics indicate that some 90 percent of these 200 to 300 inmates awaiting transfer monthly were referred to a MHCB because they were suicidal and/or a danger to self. This situation represents an extremely serious and continuing violation of the orders of the court in this case.

Over three years ago, the defendants' consultant, Tucker Alan Inc., projected that the department would need 224 beds to provide adequate care for male inmates in CDCR in need of a MHCB level of mental health care in 2005. In mid-2005, CDCR had a total of 152 operable MHCBs, which together with the half-dozen placements of CMC inmates in ASH and 15 to 20 placements of CMF inmates in APP, gave the department the equivalent of some 175 to 180 male MHCB beds. It should come as no surprise that there is a shortfall of some 50 MHCBs in CDCR.

In fairness to the defendants, when the Tucker Alan projection was finally articulated in 2002, CDCR planned and sought and obtained financial approval for the construction of a 50-bed MHCB unit within the CMF complex. But the development of

394

this unit was left to the normal budgetary, architectural, engineering, construction and

financing vicissitudes of state building projects. By January of 2005, when the unit

needed to be in place, work on the project was suspended because the just-completed

schematic design indicated the cost of the unit would be $8 million more than the $18.6

million originally allocated for its construction. The defendants managed to get the

project fully back on the budgetary track in September 2005, but completion had slipped

further, and the unit is unlikely to be ready for occupancy until September 2008.

Meanwhile, the defendants need to adopt immediately and aggressively

creative alternatives to meet their obligations to these 200 to 300 inmates in need monthly

of non-existent MHCBs. Unfortunately, few immediate, aggressive or creative ideas or

activities are discernible. CDCR and DHS officials continue to wrestle over licensing

inspection schedules and bureaucratic jots and tittles, while MHCBs sit empty and their

intended occupants languish in OHUs, holding cells, contraband cells or worse; DMH

and CDCR clinicians and administrators point accusatory fingers at each other and insist

on the priority of their respective priorities, while as many as 83 inmates in CIM and 44

inmates in CMC, most of them clinically determined to be suicidal, remain inadequately

observed and poorly treated; even counsel engage in legal skirmishes over the terms of a

stipulation that might help to clear away some of the bureaucratic rationale for delaying

the full occupation of the MHCB units at NKSP and CSP/Solano, while inmates are

shuttled off to inadequate substitutes for the MHCBs they should be occupying. The

mental health component at DCHCS, as indicated above, has barely enough staff to track

and calculate the dimensions of the crisis, much less the resources of management and

planning necessary to dissect its causes and develop a reasonable remedy.

The problem of inadequate MHCBs, in all likelihood, will endure until at least mid-2008. A 12-bed MHCB unit is due to be activated imminently in the newly opened Kern Valley State Prison, and the construction of another unit of 12 beds is scheduled to be completed at CSP/Sac in December 2005. If the defendants were able to get its full current complement of 177 MHCBs (182 less the non-existent five at CEN) for males actually up and running, add these 24 new beds, get ASH to accept the 25 MHCB referrals they are being paid to treat, and continue to place 15 to 20 CMF inmates in need of a MHCB level of care in DMH/APP, they just might be able to bridge the gap to the 2008 completion of the 50-bed MHCB unit at CMF. Fulfillment of all of these conditions, however, will require urgent, effective and coordinated action on the part of CDCR, DMH and DHS. Moreover, updated and more accurate population plans and projections will need to be developed to determine whether the addition of 50 additional MHCBs in 2008 will suffice to meet the then-existing need, given the surging overall CDCR population.

PSUs: During the monitoring period, the list of inmates referred to a PSU but awaiting transfer also continued to climb, reaching 43 in early May. For some time, the defendants have assured the monitor and the court that a 64-bed PSU at CSP/Sac was under construction and would be ready for initial occupancy by March 2006. It is important that the projected timeline be met.

Reception EOP and 3CMS Transfers:

Whatever progress was reported in the preceding round of review, or in the early part of the current review, in the timeliness of transfers of MHSDS inmates out of reception into general population programs has been largely cancelled by the recently

396