escalating growth in the overall CDCR population and the concomitantly increasing number of MHSDS inmates in reception. For example, in August 2003, the five major reception centers of CIM, DVI, NKSP, SQ and WSP housed a total of roughly 3,018 EOP and 3CMS inmates awaiting transfer or parole. By August 2005, that number rose to 3,988, an increase just short of a full third. The growth reflects several factors including, perhaps most importantly, the surge in CDCR's overall population and the untimely expansion of the capacity of general population MHSDS programs to meet actual program needs. Staffing for mental health programs increases only on a *post facto* basis, i.e., after CDCR reports to the Department of Finance (DOF) twice annually the actual growth of the MHSDS population by program. DOF then includes a request for expanded MHSDS staffing in the upcoming annual or supplemental budget proposal. To report the requisite population growth, seek and obtain funding for expanding program staff and actually obtaining the bodies to fill newly allocated positions generally takes eight to ten months. Thus, as long as the MHSDS caseload remains in a state of growth, program capacity in terms of staffing will continue to trail actual program population. Meanwhile, just because staffing is allocated does not mean physical space exists in the system for housing expanded MHSDS programs, so further delays often occur.

It is difficult to see how the defendants can escape from this bureaucratic box. One response, and one included in the revised program guides, which are wending their way toward judicial approval, is to increase mental health staff in reception centers to enable the provision of adequate interim monitoring and treatment for EOP and 3CMS inmates stuck overlong in reception. For the moment, pushing the program guide

revision to completion appears to be the best and quickest route to addressing this problem.

Mental Health Services in "New" Administrative Segregation Units:

        In October 2002, the court prohibited the defendants from housing seriously mentally disordered inmates in any of its newly constructed administrative segregation units (ASUs) without first submitting a plan to address concerns about the potentially harmful effects of their physical configuration on the mental health of inmates already suffering from mental illness. The order followed the opening of the first such unit in CSATF in mid-2002 and applied to all ten of the department's planned new structures. While the order itself did not spell out the particulars of the prohibition against the placement of MHSDS inmates in these units, the defendants eventually agreed to exclude MHSDS inmates from the units; remove any MHSDS inmates mistakenly placed in the units within 24 hours of detection of the mistake; conduct daily psych tech rounds of the entire population of the units; refer inmates with mental health problems in the unit promptly to mental health clinicians; and remove general population inmates subsequently identified as needing to be included in the MHSDS caseload within 24 hours.

        During the first half of 2005, the monitor completed two tours of each of the ASUs (CAL, CEN, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, HDSP, PBSP, PVSP and SVSP) in order to assess the defendants' compliance with the court's prohibition and the measures adopted to enforce it. The monitor found no MHSDS inmates in any of the ASUs at the time of the various visits. In four facilities (CEN, CAL, HDSP and PBSP), fewer than five MHSDS inmates were mistakenly placed in the

ASU during the first half of 2005. In the remaining institutions, the number of mistaken placements ranged from seven at CSP/Corcoran to 15 at CSP/Sacramento. A few institutions (CSP/LAC, CSP/Sac, HDSP, PBSP and PVSP) failed to remove such inmates routinely from the ASUs within 24 hours of their placement. Most of these failures lasted less than 72 hours and often occurred during weekends and holidays.

The number of inmates subsequently identified as requiring MHSDS services in the ASUs varied considerably among the ten institutions. Only one inmate was designated 3CMS and removed from ASUs at HDSP and SVSP during the first half of 2005. At the opposite end of the spectrum, PVSP placed 43 inmates and SVSP some 26 in the MHSDS, perhaps because these facilities adopted relatively low thresholds for the inclusion of inmates in these units in their MHSDS. The remaining institutions placed between four and fifteen ASU inmates in the mental health caseload during the reporting period. Nearly all of the inmates included in the MHSDS were removed from the ASU within 24 hours of their inclusion, although PVSP and CSP/LAC needed to improve their performance in this area.

The number of mental health referrals generated by ASU inmates also varied widely among the ten institutions. Three facilities (CAL, HDSP and SVSP) averaged less than five referrals a month; four institutions (CEN, CSP/Corcoran, CSP/Sac and CSATF) averaged five to ten referrals a month; and three institutions (CSP/LAC, PBSP and PVSP) averaged greater than ten referrals per month. Four institutions (CSP/Corcoran, CSP/LAC, HDSP and PBSP) did not routinely respond to referrals from ASU inmates within five working days.

Inmates arriving in the units were regularly provided with a mental health screening, the so-called 31-item questionnaire used throughout CDC to identify potential candidates for a more thorough mental health evaluation and possible inclusion in the MHSDS caseload. In all but one institution (PVSP), mental heath screens were consistently administered within 72 hours of an inmate's placement in the ASU, regardless of when the inmate was last screened. At PVSP, a mental health screen was completed shortly after the initial ICC hearing, if the committee decided to retain the inmate in the ASU. During the monitoring visit in May 2005, administrators at PVSP indicated that its policy would be changed to ensure that all inmates placed in the ASU would be screened within 72 hours. Nearly all mental health screens in eight of ten prisons were administered at cell front. Only CSP/Sacramento and CSATF reported most screens being conducted in private settings. More needed to be done to encourage ASU inmates to complete mental health screens in private settings and ensure that refused screens routinely resulted in immediate referrals to mental health.

Daily psych tech rounds were conducted and documented regularly in all of the visited facilities, and interviewed inmates confirmed such rounds. Documentation in a few institutions revealed insignificant and sporadic gaps in daily rounds, usually the result of psych tech coverage issues. Nonetheless, monitoring during the first half of 2005 identified some common challenges faced by psych techs completing rounds in ASUs. Psych techs continued regularly to encounter inmates sleeping in dark cells. As previously suggested, psych techs making rounds in these facilities should be equipped with flashlights to observe inmates in darkened cells. Also, a significant proportion of inmates housed in these ASUs belonged to prison gangs that prohibited members from

participating in the mental health services. Gang members, then, were reluctant to interact with psych techs during daily rounds. It would be helpful if psych techs distributed materials during their rounds not overtly associated with mental health, such as word puzzles, handouts, sports pages or calendars, providing thereby a non-threatening cover for routine contacts and encouraging greater interaction with inmates who were gang members. At SVSP, psych techs completed rounds with medical staff, usually MTAs, to blur the distinction between medical and mental health services. Finally, to avoid encountering sleeping and nude inmates, a fairly common compliant among female psych techs, correctional officers might routinely announce psych tech rounds in advance over the unit's public address system.

      The quality of local logs and tracking reports improved significantly during the first half of 2005. With the exception of CSP/Corcoran and CSP/Sacramento, institutions adequately tracked ASU referrals and the movement of MHSDS inmates in and out of the ASUs. Due to high turnover among psych techs in CSP/Corcoran, poor tracking made it difficult to assess compliance relative to ASU requirements, although the assignment of a full-time psych tech in May, 2005 was expected to improve tracking. At CSP/Sacramento, MHTS tracking data was inconsistent with UHR documentation, making it impossible to assess fully the institution's response to mental health referrals.

      Overall, the defendants were in compliance with the basic requirement of the court order to keep MHSDS inmates out of the new ASUs. Administrators and line staff in all ten institutions were clearly familiar with the restrictions, requirements and timeframes associated with the delivery of mental health services in the ASUs. While a few institutions needed to improve compliance with referral timelines and the removal of

MHSDS inmates from the units, no flagrant and/or intentional violations of the applicable court mandates and associated agreements were found. All ten institutions were consistently and substantially compliant with screening and rounding requirements, although the privacy of screenings and the quality of psych tech rounds needed further work.

District Attorney Referrals:

CDCR institutions refer inmates' misconduct to local district attorneys pursuant to Title 15, §3316, subsection (a) of the California Code of Regulation, which provides:

> [A]ll criminal misconduct by persons under the jurisdiction of the department or occurring on facility property shall be referred by the institution head or designee to appropriate authorities for possible investigation and prosecution when there is evidence substantiating each of the elements of the crime to be charged.

Subsection (b) of §3316 provides an exception to the referral requirement, which reads in part, "criminal misconduct shall not be referred to the local district attorney if the local district attorney has submitted written notification to the institution head including criteria determining that specified crimes shall not be prosecuted if the crime involved meets such criteria." Many institutions have concluded that section (a) requires the referral of any potentially criminal misconduct to the local prosecutorial authorities, but a number of district attorneys have reached agreements with institutions limiting such referrals. The resulting agreements typically spell out the nature of offenses that will be referred, define the elements which must be present to warrant referrals and illustrate minimum characteristics of misconduct that meet referral standards. Some agreements identify circumstances in which a referral is mandated, e.g., any incident

resulting in an inmate's death. The agreements typically lay out general investigative procedures and applicable standards of evidence. Some referral agreements include a miscellaneous, catch-all category for "other" felonies, while other agreements specifically provide that transfers elsewhere of involved inmates, whether suspects, victims or witnesses, should be "avoided" while a referral is pending.

The application of §3316 resulted in widely varying standards for referrals and impacted inconsistently on the institutional disciplining of CDCR inmates, whether caseload or non-caseload. Institutional responses to §3316 had potentially important impact on the disciplinary process, because inmates could elect to postpone the institution's administrative disciplinary proceedings pending a decision on charges referred to and accepted by a local district attorney. Referrals also affected importantly the endorsements of MHSDS inmates awaiting transfers to other programs and facilities, their length of stays in administrative segregation and the cumulative length of their prison terms. Institutions only rarely appeared to consider the provability of the referred charge, the likelihood of a conviction, the possible availability of more adequate sanctions within the institution's administrative disciplinary process, the length of time the inmate might already be serving or relevant mental health considerations before referring RVRs to local prosecutors.

The monitor's examination of the district attorney referral process indicated that the time frame within which institutions completed their own criminal investigations and actually made referrals and local district attorneys decided to prosecute could be quite lengthy. Some cases were not referred by an institution until five months after a RVR was written. In some cases, district attorneys took over a year to notify the

403

institution whether they intended to prosecute. Some district attorneys provided periodic updates to institutions, while several institutions checked regularly with prosecutors to determine the status of referred cases. Some institutions never checked with the local prosecutor on pending cases at all; they simply waited until they were notified of the district attorney's decision.

The bulk of cases referred to district attorneys resulted from batteries committed against staff members, usually correctional officers, but sometimes non-custody staff. "Battery" encompassed a wide range of actions, including "gassing" (throwing liquids), poking, pinching, kicking, biting, spitting or closing a food port on a correctional officer's hand or fingers. Such incidents appeared to generate an automatic referral, regardless of the circumstances, the inmate's level of mental health care or functioning or the actual or potential injury involved in the incident. Some of the referred "batteries" involved extremely minor acts, e.g., throwing an empty paper cup, shoving a tray so the food "touched" a correctional officer. Significant discretion apparently existed with regard to cases of attempted battery, and many such attempts were not referred.

Incidents involving "gassing" were almost always referred to a district attorney, even in cases where it was unclear that the thrown liquid included bodily fluids or when the liquid was known to be simply water or juice. Other broad categories generally resulting in referrals included the possession and/or use of weapons, narcotics possession/trafficking, indecent exposure to staff, forced sex, and threats against staff or "public officials." The monitor's examination of district attorney referral statistics showed that only a small percentage of referrals were actually accepted for prosecution.

404

Patterns of referral varied widely among CDCR institutions. It was difficult to make direct comparisons because available data covered different times and varied lengths of time. Not surprisingly, Level IV institutions referred cases involving MHSDS caseload inmates to a local district attorney more often than other institutions. Referrals of charges against caseload inmates were highest in SVSP, where 76 cases were referred in a four-month period. In a comparable period of four months, CCI referred 27 cases; SQ referred 33 cases in what appeared to be a seven-month period; CSP/LAC reportedly referred 20 cases during the monitoring round; CSP/Corcoran referred just 15 cases in a seven-month period, none of which arose from a use-of-force incident. Among Level III facilities, the number of referrals of caseload RVRs ranged from nine in RJD to 33 in MCSP. All of the RJD referrals involved EOP inmates; all but one of the MCSP referrals dealt with drug-related charges. The institutional variations were starkest among facilities with large reception functions. WSP referred 17 cases involving four EOP and 13 3CMS inmates in a nine-month period, while DVI referred just one case of a MHSDS inmate accused of murder to the local district attorney. Folsom referred no MHSDS cases at all.

The quality of the data, no less than its wide disparity, defied easy generalization. Some cases apparently were rarely referred to a district attorney, including those involving self-injury, mutual combat with and/or battery on a fellow-prisoner, resisting a correctional officer and cell extractions. Referrals of compulsive sexual behavior, typically including exhibitionism and public masturbation, were unpredictable; some institutions referred most RVRs involving such charges to a district attorney, while others referred few or none. SQ and SVSP were at the high end of the

spectrum, with SQ referring six such cases in a seven-month period and SVSP referring three in a four-month period.

Overall, referrals to district attorneys seemed to be largely a local matter, with institutions left on their own to fashion relations with nearby prosecutorial authorities. Some anecdotal evidence suggested that local politics occasionally played a pivotal role in the relationship, especially when tight election races focused candidates' attention on the need to extend the fight against crime even within prison walls. Most institutions, moreover, apparently accepted whatever local district attorneys demanded; there was not much evidence of the negotiation of terms of agreements. The result, unsurprisingly, was wide disparity in referral practices among CDCR institutions, reflecting in part, perhaps, the department's long but fading history of institutional autonomy. It seems singularly inappropriate in this day and age that practices governing referrals for criminal prosecution should be left to the discretion of institutional administrators, who, without legal counsel and subject to local political pressures, may negotiate agreements with district attorneys that result in widely disparate handling of similar criminal actions involving CDCR inmates.

The department needs to examine this issue and develop some uniform approach. Depending on the department's own assessment of the nature and extent of the disparity problem, remedial options might include the articulation of standards governing such agreements, a standard form of agreement for negotiating relations with local district attorneys or the assumption of responsibility by the department for the negotiation of all such agreements. Even in the absence of an agreement with a local district

attorney, institutional administrators need common guidance on the appropriate and applicable standards for referring cases to local prosecutors.

Custody Staff Problems:

Each of the last three compliance reports has included discussion of allegations of harassment and abuse by custody staff of MHSDS inmates raised by caseload inmates or mental staff or both. As noted before, although interviewed caseload inmates often complain to monitoring teams about harassment by custody staff, it is nearly impossible for the monitor to confirm such reports. Monitors lack the training, time or mandate to investigate individual inmate complaints about custody staff misconduct. When such allegations have been reported by a number of interviewed inmates in institutions, monitoring teams have regularly shared the allegations during exit interviews with the warden or other custody representatives, who regularly have promised to investigate the allegations. On two earlier occasions, inmate charges of abuse in CSP/Corcoran and CSP/LAC were confirmed by mental health staff, some of whom themselves reportedly felt intimidated by custody staff. In both of those instances, the monitor sought and obtained specific court orders requiring the defendants to investigate, discipline and take steps to prevent further abuse. To the extent that the ensuing high level of departmental and institutional administrative attention resulted in disciplinary action, transfers and closer supervision, overtly inappropriate conduct apparently diminished, and tensions between mental health and custody staff seemed to abate in both facilities.

One byproduct of the situation in CSP/Corcoran was an effort on the part of the department to come to grips with possible sources of custody staff antipathy

407

toward mental health staff and inmates by conducting a so-called institutional cultural assessment. It took more than a year to put the project together, find an independent consultant and conduct the assessment, but the department's selected consultant, the Criminal Justice Institute, delivered its completed assessment in August 2005. While the report was optimistic that the leadership and custody and program staffs at CSP/Corcoran were ready for changes in the institution's culture, the description of the existing culture confirmed, at least in part, the underlying conflict between custody and mental health staff and caseload inmates. Many correctional officers, who were interviewed or participated in focus groups, expressed resentment at inmates' unlimited access to health care. For them, medical treatment in a prison was a privilege, not a right, and many believed inmates did not deserve it. If the care would not, or was not, available to correctional officers and their families on the street, many felt it should not be provided to inmates. Again, these were not the views of all custody staff, but they were views of many correctional officers. The assessment attributed, in part, the emphasis on security and control as opposed to treatment and rehabilitation at CSP/Corcoran to the facility's 17-year reputation as a facility designed to house a population characterized as the "worst of the worst," an epithet calculated to reinforce daily the perceived need for tough discipline and tight security.

The assessment is long on description and analysis of the culture and full of confidence it can be improved, but woefully short on concrete ideas for turning it around. The assessment identifies the underlying obstacle clearly: ". . . (N)o comprehensive strategy has been developed at Corcoran because the purpose of imprisonment and the job of corrections is (sic) viewed as fundamentally different by the

Department's leadership and Corcoran's staff." The assessment also makes clear that judicial intervention has, to date, had limited, if not adverse, impact on custody staff attitudes. The more punitive and intrusive courts and the department become, the more defensive and resistant has been the reaction of custody staff.

During the monitoring period, the monitor encountered complaints from inmates about custody staff harassment and abuse of caseload inmates in a number of institutions, but was unable to confirm the reports in interviews with mental health clinicians or other staff or through record reviews. Inmates' reports of custody staff misconduct were shared with custody administrators in the relevant institutions. Plaintiffs' counsel regularly provide monitoring teams in advance of site visits with the names of inmate correspondents who have reported instances of physical abuse or verbal harassment of either themselves or other MHSDS caseload inmates. The monitor interviews, checks on, or reviews the records of some or all of these referred inmates, depending on constraints of time, available records and/or continued residence in the facility. These cases sometimes raise questions that the monitor cannot resolve; such cases frequently involve accusations of retaliation, excessive use of force, disrespectful treatment and, sometimes, poor clinical judgment. In those instances where clear error appears or an inmate failed to receive needed attention, the monitor will review the situation with institutional clinical or custody administrators and make recommendations for rectification. In less clear cases, the monitor regularly brings the case to the attention of local administrators and asks that it be reviewed or investigated.

The monitor continued to hear inmate complaints about harassment, abuse and disrespectful treatment in CSP/Corcoran and CSP/LAC, but mental health staff no

longer confirmed such reports. The monitor, nonetheless, shared the reports with administrators in both facilities. Relations between custody and mental health staffs meanwhile seemed to improve in CSP/Corcoran, but deteriorate in CSP/LAC, where the busting of an inmate "extortion" ring in the general population EOP heightened tensions among custody staff, mental health staff and inmates. The monitor also continues to receive and review use of force incident reports from CSP/Corcoran, as well as complaints from plaintiffs' counsel about continuing violence involving caseload inmates in the CSP/Corcoran SHU. These issues will be monitored closely in the 16th round of review, already underway in some facilities.

These compliance reports have pointed out repeatedly the need for cooperation between institutional custody and mental health components to the provision of adequate mental health care. Most correctional officers in most CDCR institutions conduct themselves professionally, compassionately and competently while executing their assigned duties involving interaction with seriously mentally disordered inmates. They are a credit to their department, their union and, most particularly, to themselves. Some seriously mentally disordered inmates, for their part, are deeply troubled, anti-social and quick to take offense at real or perceived disrespect. Having said all that, some correctional officers, especially in tension-filled high-security settings, lack the personality for, or training or interest in, interacting effectively with seriously mentally disordered inmates. The department and its institutional administrators need to provide enough training and supervision to control these correctional officers or weed them out of their custody rosters. Until that happens, ugly instances of physical and verbal abuse will continue to occur.

## RECOMMENDATIONS

At the conclusion of the draft version of this report, the monitor

recommended the following remedial orders based on the summary and analysis provided

in the body of the 15th round report:

1.  The defendants should be required to submit within 60 days from
    entry of the court's order a plan for reducing the rate of vacancies
    among psychiatrists system-wide, after contracting, to no more
    than ten percent, as well as a plan for maintaining the rate of
    vacancies among psychiatrists at ASP, HDSP and VSPW also at a
    maximum of ten percent.  That portion of the plan addressed to the
    three specific institutions might include increases in R&R
    differential payments, the reduction of MHSDS population and/or
    programs offered in the facilities, the relocation of programs in
    those facilities elsewhere or any combination of these approaches.
    The defendants are reminded that PBSP, an institution no less
    remote than any of these three facilities, and possessing once a
    much more notorious public image, succeeded quite spectacularly
    in overcoming its inability to recruit and retain psychiatrists and all
    other categories of mental health staff.  It is an example worth
    replicating.

2.  The defendants should be required to submit within 60 days from
    entry of the court's order a plan to expand the DCHCS central
    office mental health staff commensurate with the growth and
    present size of the CDCR mental health staff and caseload; the
    plan should also address the issue of compensation for
    headquarters staff and provide a scale of pay that assures that
    clinicians (including psychiatrists, psychologists, psych social
    workers, psych techs and RNs), policy and program developers
    and supervisors (including health program specialists and analysts)
    and correctional counselors, who work at the central office receive
    a level of salary higher than that of any comparable institutional
    clinicians, including whatever R&R differential pay such
    institutional clinicians may be entitled to.

3.  Defendants should be required to submit within 60 days from entry
    of the court's order a plan for the provision, in conjunction with
    DMH or otherwise, of acute and intermediate inpatient beds for all
    seriously mentally ill male and female inmates in CDCR clinically
    determined to be in need of these levels of inpatient care.  The plan
    must address interim and long-range needs based on up-dated
    population projections; detail any financial and construction plans,

411

timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY2006-2007 Budget.

4. The defendants should be required to build 64 single cells in the presently planned expansion of the Salinas Valley Psychiatric Program operated by DMH for Level IV violent inmates at Salinas Valley State Prison.

5. The defendants should be required to submit within 60 days from entry of the court's order a plan for the provision of Mental Health Crisis Beds for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of mental health care. The plan must address interim and long-range needs based on up-dated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY2006-2007 Budget.

The draft version deemed it critical that the defendants' plans include a long-range solution to the rising need to provide mental health programs in secure settings, whether the programs be acute or intermediate inpatient DMH care or CDCR mental health programs, such as MHCB units, PSUs, EOP hub administrative segregation units and EOP SNYs. Unconfirmed rumors suggested that CDCR was about to undertake the construction of three new institutions, one of which, if the rumors were accurate, ought to address the needs articulated in this report.

Most of the recommendations in the draft report were not new; most dealt with issues that were the subjects of earlier judicial orders in this case:

- On June 12, 2002, the court ordered the defendants to maintain the vacancy rate among psychiatrists at a maximum of ten percent, including contracted services.

- On July 26, 2004, the court ordered the defendants to develop a plan within 60 days for replicating in HDSP the strategies for the procurement of permanent and contracted clinical staff used effectively in PBSP.

412

- On October 4, 2004, the court directed the defendants to submit to the special master by March 31, 2005 their plan to meet any unmet need for inpatient care documented in the unmet needs assessment.

- On October 4, 2002, the court directed the defendants to submit within 60 days a plan to provide MHSDS inmates clinically referred to a Mental Health Crisis Bed (MHCB) level of care with both immediate and long-term access to treatment appropriate to that level of care.

During the 15th round, CDCR clearly ceased to comply with the first of these cited orders, which required the maintenance of the vacancy level among psychiatrists system-wide at ten percent or less. As for the others, the defendants, while submitting required relevant plans in a timely fashion, were unable to obtain the essential support and cooperation of other executive agencies, including the Department of Mental Health (DMH), the Department of Health Services (DHS), the Department of Finance (DOF), the Department of Personnel Administration (DPA) or the Legislature to implement them. As the summary indicates, some fellow-executive agencies were so preoccupied with their own priorities, they failed to comprehend or respond to the judicial compulsion under which CDCR was operating. In some instances, CDCR's own responsive plans were based on incomplete data or poor analysis or contained inadequate remedies. In other instances, proposals were presented and justified inarticulately and failed to obtain credibility with other agencies and, particularly, the Legislature.

The defendants reported in their comments on the draft version of this report that a multi-agency group consisting of CDCR, DMH, DOF, DHS and DPA has recently been established at the direction of the Governor and was meeting regularly to ensure an integrated and cooperative effort to comply with the requirements of Coleman.

413

That is an encouraging, and much needed, development. Without some such continuing coordination, the defendants are unlikely to implement effectively the remedies recommended in this report.

In their objections to the draft version of the monitor's report, the plaintiffs sought considerable expansion of the first recommendation. They complained that ordering the defendants simply to develop a plan for meeting the ten-percent vacancy goal for psychiatric staffing was inadequate. The defendants, they insisted, must meet the ten-percent vacancy goal within 60 days or face harsher enumerated remedies within 90 days. The objection inaccurately suggested that the defendants had never been able to meet the court's ten-percent mandate, thereby ignoring the fact that from late 2002 through mid-2005, the defendants met it consistently. Suggested sanctions for failing to meet the goal included a population cap on any individual offending institution and, more vaguely, some sort of CDCR-wide population cap. Given the nature of the requirement, the timelines demanded by the plaintiffs for meeting the ten-percent goal are quixotic, while their proposed sanctions apparently are to be imposed without any intervening judicial proceeding on the nature, extent or cause of any failure to meet the goal or the likely success of the proposed sanctions. The first draft recommendation remains unchanged in this final version.

Plaintiffs and defendants alike criticized the second draft recommendation. The defendants sought greater substantive specificity, while the plaintiffs asked for more stringent timelines. In their objections to the monitor's draft report, the defendants indicated that DOF and DPA have already undertaken steps to restore the R&R lost by institutional staff members transferred to headquarters, which will be implemented within

414

30 days of the court's order. The defendants also committed to the initiation of a workload study to determine increased compensation for the categories of headquarters staff identified by the monitor.

The defendants noted correctly that not all positions in the central office mental health component necessarily required, or deserved, higher pay than comparable institutional personnel. The headquarters staff, for example, includes a group of clinicians who provide mental health services via telemedicine; their services should be compensated on a par with institutional clinicians. Increased compensation should be directed at the core of headquarters staff, who perform system-wide planning, training, management and monitoring functions.

The monitor's original recommendation also called for an expansion of the headquarters mental health staff, in response to which the defendants promised to undertake and complete within 60 days workload studies to determine the need for expanded staff. The plaintiffs' objections, echoing the findings of this report, identified a number of areas where central office planning, training, monitoring, coordinating, evaluation and general overall management are unequal to the present demand, including quality management, the mental health assessment component of the disciplinary process, transfers, oversight of the new stand-alone administrative segregation units, the MHCB crisis, relations with DMH and suicide tracking and follow-up. In the absence of adequate management resources, the DCHCS mental health leadership has simply been swamped by all of these issues. It has proven to be counter-productive to pile escalating demands on a management cadre that is largely untrained, under-paid and much too small to respond effectively to the myriad of issues persistently hurled at them. The need for

415

more and better motivated headquarters mental health staff is clear. Once the appropriate need for additional staffing is quantified, it must be met promptly.

The fourth draft recommendation sought a court order requiring the defendants to configure the planned 64-bed expansion of the DMH intermediate inpatient program at Salinas Valley State Prison for 64 single cells. The defendants reported in their objections that necessary steps to adopt the suggested configuration, as indicated above, have been undertaken. The recommendation will be retained to ensure against future backsliding.

Both sides objected to the monitor's draft third and fifth recommendations. The defendants sought an extension of the deadline for submitting their plans for the provision of an adequate number of DMH inpatient beds and Mental Health Crisis Beds to April 17, 2006 in order to "optimize the likelihood of legislative approval" for funding both plans. That request is granted in the amended recommendations, below.

The plaintiffs used their commentary on the draft recommendation requiring the defendants to develop a plan for DMH inpatient beds to focus blame for the current shortfall principally on DMH, while demanding specific additional remedial provisions, some that already have been addressed by the defendants and some that are incorporated in the final version of the recommendation that follows. Similarly, the plaintiffs focused their objections to the draft recommendation on MHCB beds on CDCR's culpability for the present mess and added 13 discrete remedial prescriptions to the monitor's more general draft recommendation. The plaintiffs, in effect, undertake in their objections to write the defendants' plan, leaving them to fill in the logistical

416

interstices. The final version of this recommendation adopts some, but not nearly all, of the plaintiffs' suggestions.

As is their wont, counsel for the plaintiffs sought multiple additional orders covering a wide variety of issues. Four specific recommendations were sought in areas that were the subject neither of monitoring or factual reporting during the 15th round of review. These included a pilot project for the delivery of mental health services in the Pelican Bay State Prison administrative segregation unit; psych tech rounding in standard administrative segregation units (as opposed to rounding in the new, stand-alone administrative segregation units); post-15[th] round compliance issues at Robert J. Donovan Correctional Facility, which will be addressed on an interim basis during the current round; and video-monitoring of inmates on suicide watch, an issue that was made a particular subject of the on-going 16th round of review, not the 15th. Inadequacies in psych tech rounding of the CSP/Corcoran SHU, for which the plaintiffs seek another corrective order, were identified in the 14th round of review and resulted in increased staffing allocations for the CSP/Corcoran SHU, which were not appropriated by the California General Assembly or established for recruitment at the institution until well into the 16th round of review.

In three other areas identified by the plaintiffs as ripe for remedial orders, sufficient data on the nature, extent and cause of the cited problems were lacking to support the recommended solutions. The trio of issues included the timeliness – or untimeliness – of transfers of seriously mentally disordered inmates from reception centers to regular mental health programs; the failure of the mental health assessment process for caseload inmates charged with disciplinary infractions to identify sufficient

417

numbers of 3CMS inmates for inclusion in the assessment process; and delays in the transfer of apparently appropriate EOP inmates to Psychiatric Services Units.

Five of these eight issues identified by the plaintiffs for immediate remedy also involve proposed revisions to the plans, policies and protocols provisionally approved by the court in mid-1997, the so-called program guides, which have been the subject of negotiation among parties and the monitor for nearly three years and are now ready to be submitted to the court for approval. The appropriate place for resolution of these issues is in the upcoming debate on the revised program guides.

The plaintiffs' last call for a specific remedial order was in the area of medication management. Clearly the monitor found during the 15th round of review many instances of non-compliance in one or another aspect of the management of medications in different institutions, but overall compliance in most facilities continued to improve. Moreover, the overwhelming majority of instances of non-compliance often stemmed from inadequate psychiatric resources in the offending institutions. In the two areas where non-compliance was widespread, namely, the tracking of Keyhea orders and HS medications, the fault appeared to arise from a lack of support from headquarters in the first and a lack of effective central office oversight in the second. If a strengthened headquarters staff cannot correct these last two issues, further remedies will be developed. Meanwhile, recommendations specifically designed to address both psychiatric shortages and insufficient central office oversight are already included in this report.

The <u>final</u> recommendations of the monitor at the conclusion of this 15th

compliance report are, therefore, as follows:

1.  The defendants should be required to submit within 60 days from entry of the court's order a plan for reducing the rate of vacancies among psychiatrists system-wide, after contracting, to no more than ten percent, as well as a plan for maintaining the rate of vacancies among psychiatrists at ASP, HDSP and VSPW also at a maximum of ten percent. That portion of the plan addressed to the three specific institutions might include increases in R&R differential payments, the reduction of MHSDS population and/or programs offered in the facilities, the relocation of programs in those facilities elsewhere or any combination of these approaches. The defendants are reminded that PBSP, an institution no less remote than any of these three facilities, and possessing once a much more notorious public image, succeeded quite spectacularly in overcoming its inability to recruit and retain psychiatrists and all other categories of mental health staff. It is an example worth replicating.

2.  The defendants should be required to submit within 60 days from entry of the court's order a plan to expand the DCHCS central office mental health staff commensurate with the growth and present size of the CDCR mental health staff and caseload; the plan should also address the issue of compensation for headquarters staff and provide a scale of pay that assures that clinicians (including psychiatrists, psychologists, psych social workers, psych techs and RNs), policy and program developers and supervisors (including health program specialists and analysts) and correctional counselors, with responsibility for planning, developing, monitoring and evaluating system-wide programming and policy receive a level of salary higher than that of comparable institutional clinicians, including whatever R&R differential pay such institutional clinicians may be entitled to.

3.  Defendants should be required to submit by April 17, 2006 a plan for the provision, in conjunction with DMH or otherwise, of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in CDCR clinically determined to be in need of these levels of inpatient care. The plan must address interim and long-range needs based on up-dated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction

419

and financial elements of the plan are sufficiently timely for inclusion in the FY2006-2007 Budget. An element of the plan should include a detailed analysis of upgrading the physical security of DMH's Coalinga State Hospital that results in a reasoned report on the feasibility – or infeasibility – of the use of some portion of that facility for the inpatient treatment of Level III and/or IV CDCR inmates.

4.  The defendants should be required to build 64 single cells in the presently planned expansion of the Salinas Valley Psychiatric Program operated by DMH for Level IV violent inmates at Salinas Valley State Prison.

5.  The defendants should be required to submit by April 17, 2006 a plan for the provision of Mental Health Crisis Beds for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of mental health care. The plan must address interim and long-range needs based on up-dated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY2006-2007 Budget. The response to interim needs should include a plan to accelerate the staffing and licensing of the new MHCB unit at Kern Valley State Prison and the new MHCB unit as CSP/Sacramento by June 30, 2006, as well as a plan for expediting the construction, staffing and licensing of the new MHCB unit at California Medical Facility.

The recommendation for enhanced planning resources is designed in large measure to allow existing headquarters staff to focus on one overall area that is critical for moving this case toward resolution. Coleman will not be ended until the defendants can demonstrate an ability to provide meaningful mental health care for the most seriously mentally ill inmates in CDCR. Such care is especially difficult to provide when serious mental disorders are combined with personality disorders involving a penchant for volatility and violence.

420

The monitor's most recent reports have focused steadily and largely on this relatively small portion of the MHSDS caseload population most in need of intense mental health treatment and heightened security. And over the past decade, the defendants have gradually developed programs to address the treatment needs of this core of seriously mentally disordered inmates at the apex of the MHSDS pyramid of treatment and security, including programs for Level IV EOP inmates in need of protective custody on a Special Needs Yard, EOP inmates in administrative segregation, EOP inmates with a SHU term (PSUs), inmates in need of a MHCB level of care and Level IV inmates with a history of violence in need of intermediate inpatient DMH care.

The problem is that the availability of such programs has not kept pace with the expansion of the MHSDS or the overall CDCR populations, and over the past decade, the population of the former has risen proportionally much faster and higher than the latter. In addition, the recently completed Unidentified Needs Assessment indicated that, in the absence of available beds, institutional clinicians were not referring numerous inmates actually in need of inpatient DMH mental health care, resulting in an instant expansion in the demand for inpatient DMH programs. Thus, CDCR now needs more MHCBs and PSU beds and lots more Level IV inpatient DMH beds than it currently possesses. Currently long waiting lists for these beds mean that suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment. Some plans for further expansion of these programs have been developed in response to court orders, but they proceed fitfully and awkwardly, beset by bureaucratic obstacles that threaten to delay their realization for years. Other plans lack essential legislative funding, without which they cannot advance. It is time for the

defendants, not just CDCR, to finalize and expedite existing, disparate and uncoordinated plans to expand the capacity of MHSDS programs the most seriously mentally ill core population.

The defendants' recent history of developing erratic plans or plans they are unable subsequently to implement suggests the present need for something more than just another requirement for the generation of yet more plans. Whatever the formal response of the parties to the recommendations in this final version of the 15th report on compliance, the monitor respectfully requests the court to hold a hearing to ensure that the defendants understand precisely what burdens they will be expected to bear in response to whatever proposed recommendations are incorporated in the court's final order, or in the alternative, schedule a hearing for the end of April 2006 to assess the adequacy of the plans presented by the defendants in response to the court's directives.

Respectfully submitted

/s/ Michael Keating, Jr.
Special Master

January 13, 2006

422