## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.**

    **Plaintiffs,**

        **vs.**                     **No. CIV S-90-0520 LKK JFM P**

**ARNOLD SCHWARZENEGGER, et al.,**

    **Defendants.**

## FIFTEENTH MONITORING REPORT OF THE SPECIAL MASTER
## ON THE DEFENDANTS' COMPLIANCE WITH
## PROVISIONALLY APPROVED
## PLANS, POLICIES AND PROTOCOLS

## EXHIBITS

J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158

EXHIBIT  A

High Dessert State Prison (HDSP)

September 20, 200 – September 22, 2004
December 29, 2004

B-Yard

1.      Inmate A

Inmate A was seen by the monitor's expert in a group. He reported taking Trazodone for depression, which he found helpful with no side effects. His only complaint was that he had not seen a psychiatrist in more than 90 days. There was, he stated, literally "no mental health program" for inmates. Inmate A received no therapy.

Assessment:

This inmate suffered from under-treated depression.

2.      Inmate B

Inmate B reported that he had been on Zyprexa 10 mg and Remeron 45 mg per day. He had taken Zyprexa for ten years and found it helpful for his major depressive disorder. He had a history of sexual and physical abuse and occasionally heard voices. He hated to be around people and complained that he was very heavy. He had weighed as much as 248 pounds and was once down to 218 pound.

Inmate B was given blood sugar checks periodically. He hated the psychiatrist, who once took him off all his medications. He was currently on a two-week extension of his medications. Having had medication expiration problems in the past, he worried about a potential expiration gap.

The inmate wrote a 602 grievance about the psychiatrist, who he reported had thrown him off all his medications saying he did not need them. The discontinuation of the inmate's medication had happened 120 days ago and he reported that he was back on medications. It was unclear whether he had actually had a response to his grievance.

Assessment:

This inmate had a history of medication expiration problems. He also had a negative relationship with his treating psychiatrist.

3.      Inmate C

Inmate C was seen in a group by the monitor's expert. He reported taking Geodon 20 mg b.i.d. for "voices". The medication was only moderately helpful, in that he still got episodes of anger, stress, depression, etc. His thought processes appeared to be a little blocked. These problems were exacerbated following his involuntary move from B2, where he had been housed for years.

Inmate C needed and wanted to have therapy or counseling, but could not get it. He complained that in the spring he was on Sinequan and Zyprexa, which he found helpful,

2

but a psychiatrist stopped all of his medications stating that he could not have Zyprexa. This inmate experienced many medication changes. The last psychiatrist he saw placed him on Geodon.

Assessment:

Inmate C experienced a problem with continuity of psychiatric care. He also complained of the inappropriate discontinuation of his medications in the past. The inmate was pharmacologically under-treated.

4.    Inmate D

Inmate D was seen by the monitor's expert in a group. He reported taking Geodon 40 mg in the morning and 80 mg in the evening, which in his housing unit meant anywhere from 5:00 to 7:00 p.m. The medication was modestly helpful, but the inmate indicated that his previous regimen of Trilafon and Trazodone was more helpful to him. The inmate had been placed on Haldol during the spring, which produced side effects. The Geodon, however unhelpful it may have been, at least, did not cause him any side effects.

Inmate D stated that he hated the psychiatrist, who would not change the Geodon. He found the psychiatrist unhelpful, but saw him recently. His case manager was very helpful to him. He had seen the case manager recently and 60 days prior to that. The inmate had some delusional thinking, indicating that his previous psychiatrist wanted to help the correctional officers kill him.

Inmate D's inmate history was reviewed. It confirmed that he was seen by the psychiatrist two weeks prior to his interview with the monitor's expert and four months prior to that. He had seen the same psychiatrist three times this year and one different psychiatrist earlier in the year. His history confirmed his current medication regimen.

Assessment:

This inmate was pharmacologically under-treated. He experienced some discontinuity in his psychiatric care and had a negative relationship with his psychiatrists.

5.    Inmate E

Inmate E was seen by the monitor's expert in a group. He reported taking Prozac 20 mg q.a.m. He indicated that he had anxiety, which was particularly bad at night, but that his medications were helpful with his depression. Inmate E reported having pain in his side for 30 minutes after taking his morning Prozac.

The inmate saw a psychiatrist every 90 days. He found that the psychiatrist was not particularly helpful, because he did not listen and did not take very much time. Inmate E reported seeing numerous psychiatrists over the last year.

Assessment:

This inmate was generally under-treated. He had a negative relationship with his current psychiatrist. He saw numerous psychiatrists over the course of the year, creating a problem with discontinuity of psychiatric care.

6.    Inmate F

Inmate F was seen by the monitor's expert in a group. He reported taking Risperdal and Remeron. He still heard voices, despite his medications. The inmate reported that he had paranoid schizophrenia and a manic depressive illness. Inmate F occasionally became very depressed over the last several months. He had seen the psychiatrist yesterday. Before that, he had not seen a psychiatrist for four months.

The inmate reported that his medications expired two months ago and that he waited 45 days to get on medication again. The MTA, he said, had been very helpful and gave him several 15-day continuity orders. This had happened on two occasions this year.

Assessment:

This inmate was under-treated. He did not receive adequate psychiatric contact and he suffered severe discontinuity of medication upon renewal.

7.    Inmate G

Inmate G was seen by the monitor's expert in a group. He reported that he had asked for his medications to be discontinued and was taking no medications currently. Inmate G had been on Paxil for six to eight months. He was doing fine and coping well. He felt that the medications were hurting him.

Assessment:

This inmate was competent to refusal medications. He was stable without any treatment services. Inmate G was a candidate for discharge from the MHSDS.

8.    Inmate H

Inmate H was seen by the monitor's expert in a group. He reported that he had taken Paxil 40 mg q.a.m. for approximately two years. The medication was helpful to him and he experienced no side effects. It had been four to five months since he had seen a psychiatrist. The inmate had once stopped his medications for two days with adverse reactions. He had not stopped taking his medication since then.

4

Assessment:

This inmate was stable, but had not received sufficient psychiatric contacts.

9.    Inmate I

Inmate I was seen by the monitor's expert in a group. He reported taking Zyprexa 20 mg at night around 5:30 or 6:00 in the evening. He also took Lithium 600 mg b.i.d. and had just had a blood level drawn. He was taken off Thorazine and Seroquel, both of which caused him numerous side effects. His only side effects were occasional hunger related to blood sugar swings and a weight increase of 13 pounds. Inmate I received periodic blood tests for his medications.

Assessment:

Inmate I reportedly received adequate care.

10.    Inmate J

Inmate J was seen by the monitor's expert in a group. He reported taking Lithium 600 mg b.i.d. and Geodon 40 mg per day, which was a new medication for him. He had been hearing voices for the last several months, which he described as benevolent or occasionally gibberish. He had seen his case manager last week and reported that he was very anxious about his voices and that he was having severe sleep problems. Inmate J had always heard voices from time to time. He had stopped his previous medications and had only been on Geodon for five days. The inmate reported asking for help and sending self-referrals for a month before he was seen. Inmate J also complained of a three-day gap in his seizure medications, Dilantin 400 mg per day KOP.

Inmate J had been on the B2 housing unit for three years and was having difficulty adjusting to B3, his new housing unit. He had seen a psychiatrist, who started his medications, five days ago, for 15 or 20 minutes. He resented being seen in the dayroom because of the lack of privacy there. With respect to his Lithium, his last blood level test was two months ago and was reportedly normal. None of the inmate's medications gave him any side effects.

Inmate J reported that he had many recent losses in his family and among friends. Clinically, he appeared to be very agitated and his speech was somewhat pressured. He has sent numerous referrals asking for therapy. He saw his case manager, who he thought was very helpful, 90 days ago, but was not getting therapy.

A review of his inmate history confirmed that Inmate J was last seen by a psychiatrist on September 10, 2004. He had generally seen a psychiatrist every two months of this year. His diagnosis was mood disorder NOS, which seemed to be an inappropriate diagnosis.

5

Assessment:

Inmate J was apparently misdiagnosed and under-treated generally. He was having adjustment problems, since he was moved involuntarily from his housing unit. He received no response to numerous referrals he sent to mental health. Inmate J was in need of individual or group therapy.

11.    Inmate K

Inmate K was seen by the monitor's expert in a group. He reported taking Lithium 300 mg b.i.d.; he had taken Lithium 300 mg per day for 18 years. He also reported taking Geodon for the last four years. He was taking 80 mg of Geodon per day, a reduction from his previous dosage of 160 mg six months ago. Inmate K felt that the medications were working well.

The inmate reported that 1200 mg of Lithium per day produced tremors, bleeding and numerous side effects. He also had renal problems with an increased creatinine, which was now down to normal at 1.5. The inmate's last Lithium level was 0.4, which was clinically acceptable, but therapeutically low. Inmate K reported occasional drowsiness, but felt he was doing well.

Assessment:

This inmate was receiving adequate care.

12.    Inmate L

Inmate L was seen by the monitor's expert in a group. He reported taking Keppra and Seroquel. He wanted Ritalin, which he found to be extraordinarily helpful for his adult ADD.

The inmate reported being in a crisis bed over a year ago. At that time, he was taking 2000 mg of Depakote twice per day and was reportedly very violent. He indicated that he was doing well on his current medications. He did, however, have side effects, including an upset stomach; nursing staff, he said, would not get him any Maalox. Inmate L indicated that he was unable to see a psychiatrist for months, when he was in the B2 housing unit.

A review of his inmate history confirmed that he last saw a psychiatrist on July 21, 2004. His last two psychiatric visits were in response to referrals; one visit was for refusing medication. The visits were very brief. Inmate L's previously scheduled visit with the psychiatrist was April 14, 2004. The inmate saw four different psychiatrists this year.

Assessment:

This inmate's medications appeared to be helpful, but the inmate needed a medication review to determine whether there were indications for taking Ritalin. The inmate was experiencing side effects and adjustment difficulties following his removal from the B2 housing unit. He needed a medical review. Inmate L had been seen by four different psychiatrists this year, resulting in discontinuity in his psychiatric care.

## C-Yard

13.    Inmate M

Inmate M was seen by the monitor's expert in a group. He arrived a year ago from CSP/Solano on OxyContin and Methadone for pain; he was also on Zoloft at CSP/Solano. A psychiatrist discontinued the inmate's medications, after he had been at HDSP for two weeks. Inmate M said that mental health called him an "addict" and took him off psychotropic medications as well as his pain medications. The inmate was currently having what he described as significant pain, but was getting no medications for it. His depression had come back because of stress, however, he expected to parole in 18 days. Inmate M wrote a 602 grievance seven or eight weeks ago, but had received no response.

Inmate M saw a case manager four months ago, but complained that he was seen in the dayroom and that the meeting was not private. He had seen the TCMP social worker, who he described as very thorough. While the inmate was seen in a racially mixed group, like other inmates, he had been locked down for greater than a year and a half.

Assessment:

The discontinuation of this inmate's medication was inappropriate. Inmate M needed pain relief.

14.    Inmate N

Inmate N was seen by the monitor's expert in a group. The inmate indicated that he had arrived at HDSP two years ago as of January. He was on no medications at the time of the monitoring visit because a psychiatrist at HDSP refused, he said, to give him "sleepers". Inmate N had previously received therapy and anti-depressants for his depression and post-traumatic stress disorder related to his Vietnam experiences. The psychiatrist, he said, told him that "all you Vietnam vets want is drugs".

Inmate N was a 3CMS inmate, who complained of nightmares, sleep disturbance and other symptoms of post-traumatic stress disorder. He received no medications and no group therapy, although he indicated that he wanted to participate in therapy. Inmate N indicated that his last case management meeting was cancelled several months ago. He last saw a case manager four months ago. He had written many requests to see a

psychiatrist about his medication and had waited months. After the meeting, Inmate N showed the monitor's expert his head, which had many scars; the inmate appeared to be somewhat demented. He had been endorsed for 3CMS for many months, but had not been transferred.

A review of his inmate history confirmed Inmate N's arrival date as January 14, 2003. A psychiatrist had discontinued his Remeron more than a year ago. Although he was not on any medication, the inmate had been seen on four occasions this year. His last psychiatric visit was on July 22, 2004. His last case manager contact was July 26, 2004. This inmate's memory difficulties should be taken into account in evaluating his statements regarding mental health contacts.

Assessment:

Medication for this symptomatic inmate was inappropriately discontinued. The inmate was not receiving needed non-pharmacological mental health services and had not received an appropriate response to self-referrals.

15.    Inmate O

Inmate O was seen by the monitor's expert in a group. He reported taking Trazodone 100 mg. He described the medication as helpful and without having side effects. The inmate reported, however, that his medication frequently expired, sometimes for three to four weeks. He indicated that he applied for refills, but the process did not seem to work. He last saw a psychiatrist two months ago and a case manager one month ago.

Assessment:

This inmate experienced frequent medication expirations, resulting in discontinuity of care.

16.    Inmate P

Inmate P was seen by the monitor's expert in a group. He had been examined one year prior to this evaluation. He had a two to three-year history of narcolepsy and cataplexy. This inmate had received an adequate and extensive neurological evaluation, substantiating his neurological condition. Nevertheless, Inmate P had repeated difficulties obtaining Modafinil, a stimulant which is approved for use in narcolepsy.

Last year, a record review confirmed that Inmate P was not receiving the Modafinil which had been prescribed for him. His case was then taken to the CMO, who agreed that he should be getting the medication that had been ordered and promised to rectify the problem. According to Inmate P, he began to receive his medication shortly after the last monitoring visit. Inmate P reported that he never had any problems taking the medication, as he was first in line along with the insulin-dependent diabetics; his medications were crushed and he took it regularly. The medication was, however,

8

discontinued. The psychiatrist again ordered Modafinil on July 22, 2004, but the prescription was not filled. The inmate believed that the CMO was interfering with the medication. Inmate P indicated that he appealed this matter and won his appeal at the directors' level, but that he still had not received his medications.

The inmate's last psychiatric contact was July 22 and his last case management visit was on July 6, 2004. The inmate had been seen three times by his case manager and six times by a psychiatrist. He reported that he was satisfied with his mental health care, although he took no psychotropic medications.

Assessment:

This inmate's case was taken, once again, to the CMO, who promised to rectify matters and get him the medication that he needed. Inmate P was receiving adequate mental health care.

17.    Inmate Q

Inmate Q had been in this facility for eight years and was interviewed by the monitor's expert in a group. He described himself as "tired of everything" as he has been locked down for so long. He is off medications because his psychiatrist wanted to monitor him for a while without it. Since that time, he had not been seen by a psychiatrist. His medications were, he felt, questionably helpful.

When Inmate Q was not in lockdown, he was working. He was becoming more irritable and impatient; he tried to meditate without much help. He was very frustrated and needed to talk about his frustrations. He described himself as blacking out occasionally with severe headaches. His mental health clinicians were described as helpful, but overloaded. According to the inmate, it was very difficult to get a follow-up visit. Inmate Q wanted group, or any kind of therapy, but could not have it.

The inmate's medical complaints included a calcium deposit on his hand and weakness and tingling related to trauma to his wrist.

Assessment:

This inmate was referred to the CMO, to rule out carpal tunnel syndrome. He was not receiving adequate mental health treatment. He received no medications and no therapy.

18.    Inmate R

Inmate R was seen by the monitor's expert in a group. He indicated that he took no medications and that he had been off Trazodone and Zyprexa for one month. The inmate was openly gay and giggled without provocation. He behaved in a somewhat effeminate manner. He described his mental state as "up and down". He last saw a psychiatrist three months ago and was taken off medications at his own request. He saw his case

manager yesterday. He was an ex-EOP inmate who was discharged from the SVSP EOP one year ago. He was functioning marginally.

Assessment:

Overall, this apparently stable inmate was receiving adequate care. He elected not to take medications and to rely on case management.

19.   Inmate S

Inmate S was seen by the monitor's expert in a group. He was taking medications, which he could not name, to calm his mood swings and anger outbursts. He described his medications as unhelpful to him, even though he began a new medication in April. His last psychiatric visit was one month ago. He saw a case manager two weeks ago and a few months before that. He struggled with his symptoms on a daily basis and was disappointed that the new medication was not helping him. He also had high blood pressure. He had blood tests in April. Inmate S had no recent RVRs, although he spent some time in the SHU in the year 2000. Whatever side effects he had with his medications have since worn off.

A review of his inmate history revealed that his last psychiatric contact was on August 13; his last case management contact was on July 13, 2004. Inmate S's diagnosis was adjustment disorder with depressed mood. He had been seen by three different psychiatrists between May and August 2004, but had no psychiatric visits before that. The inmate made five self-referrals this year and received no apparent response. The inmate's medications included Prozac 20 mg q.a.m., which was last prescribed on August 13, and Risperdal 0.5 mg q.a.m., which was last prescribed on July 30, 2004. The inmate had no change in this particular medication regimen since April 5, 2004, when he first began receiving medication during an MHCB stay.

Assessment:

This inmate was not receiving adequate psychiatric treatment and mental health care.

20.   Inmate T

Inmate T was seen by the monitor's expert in a group. He reported taking medications, which he believed were Paxil or Prozac. He described the medications as not helpful. Inmate T had been an EOP inmate in the past. He had a history of violent outbursts, unchanged by medication. He had taken many different medications in the past. The inmate saw a case manager every month and was promised a psychiatric referral, which had not occurred. He was very stressed and frustrated by the long-term lockdown and his anger was very near the surface.

A review of his inmate history indicated that this inmate's last psychiatric contact was July 30, 2004, six weeks prior to his interview with the monitor's expert. He had been

10

seen by a psychiatrist four times this year. His medication record indicated that he was on Prozac 20 mg q.a.m., which was last prescribed on August 3, 2004. He had been on Seroquel in 2002. His current diagnosis was substance-induced psychotic disorder with hallucinations.

Assessment:

This inmate was only partially treated psychiatrically. Overall, his mental health care was inadequate under the circumstances of a long standing lockdown.

EXHIBIT B

<u>Mule Creek State Prison (MCSP)</u>

December 15, 2004 – December 17, 2004

1.    Inmate A

This 3CMS inmate was housed in general population on the A-yard, Level IV.  He was diagnosed with Schizophrenia, paranoid type, but was not treated with psychotropic medications at the time of the monitoring visit.

Inmate A arrived at MCSP from the SHU at CSP/Corcoran on September 14, 2004.  He had been receiving a 3CMS level of care while at CSP/Corcoran and had three MHCB admissions since February 2004 for command auditory hallucinations and suicidal ideation.  This inmate had been treated with Seroquel and Wellbutrin while at CSP/Corcoran and these medications were continued upon his transfer to MCSP. Subsequent progress notes indicated that the inmate had frequent complaints regarding his medications; he eventually discontinued his psychotropic medications.

Inmate A's history of complaints regarding medications, medication refusal and subsequent decompensation was documented in his UHR.  He was seen by a psychiatrist on December 15, 2004, after he had been non-compliant with medications for several weeks.  At that time, his medications were discontinued at his request and against medical advice.  He was reportedly stable at the time of the monitoring visit.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation in the inmate's chart indicating that medications were ordered upon his arrival to MCSP.  The inmate's MARs reflected that the medications were received on the second day after his arrival in the facility; Inmate A arrived late on September 14 and received morning medications on September 16.

- The inmate's MARs reflected multiple instances of medication non-compliance, but there was no documentation indicating that he had been referred by the MTA to mental health.  There was documentation of follow-up by a psychiatrist, but this occurred several weeks after the inmate had discontinued his medications.

- The inmate's MARs for September and October had multiple blank spaces.

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- The inmate's IDTT meeting included the necessary participants.

- There was documentation of quarterly case manager contact in the inmate's UHR.

2

- The inmate's chart contained documentation of consistent psychiatric contact; the inmate's medications were discontinued at his request, but he did not appear to meet Keyhea criteria.

2.    Inmate B

This 3CMS inmate was housed in general population on the A yard. He was diagnosed with Depressive Disorder, NOS, and rule-out Psychotic Disorder, NOS. He was treated with Remeron 15 mg/day and Risperdal 1mg/day.

Inmate B arrived at MCSP on May 5, 2004 from SCC where he was receiving a 3CMS level of care. Progress notes indicated that the inmate had a history of medication non-compliance with hoarding; this behavior reportedly continued after his transfer to MCSP. It appeared that Inmate B's medications were held on October 24, 2004, after he was found cheeking his medications. He was seen by the psychiatrist one week later and his medications were changed to liquid.

Inmate B was reported to be essentially stable until December 13, 2004, when he complained of increased paranoia. He was seen by the psychiatrist on the following day and Risperdal was added for 'questionable' psychotic symptoms.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was documentation of consistent case management contacts at least quarterly in the inmate's chart.

- The inmate's chart contained documentation of consistent psychiatric contact with appropriate medication management.

- Documentation of medication continuity upon the inmate's arrival to MCSP was located in the inmate's UHR.

- There was no documentation showing that the inmate had been referred by a MTA to mental health for medication non-compliance and hoarding. Rather, a referral was made to medicine.

- Despite the lack of a mental health referral, it appeared that the inmate's medications were changed to liquid and rapidly dissolving preparations in response to reports of non-compliance by the case manager.

3

- There was documentation in the inmate's MAR as well as in his clinical progress notes indicating that the MTA held the inmate's medications on October 24, 2004. The MTA's progress note indicated that a telephone order was received regarding the discontinuation of Inmate B's medications, but there was no documentation of an actual order present in the inmate's medical record.

- The inmate's IDTT meetings documented the necessary participants.

3.    Inmate C

This 3CMS inmate was housed in general population on the A yard. He was diagnosed with Major Depressive Disorder, in full remission, but he was not treated with psychotropic medications at the time of the monitoring visit.

Inmate C was transferred from DVI to MCSP on September 7, 2004. He was placed into the 3CMS program while at DVI and was treated with Wellbutrin; this medication was continued upon the inmate's arrival at MCSP. Inmate C apparently went out to court and returned on September 28, 2004. He was housed in the administrative segregation unit for approximately one week and then returned to general population. He was reportedly doing well and his depression had resolved. The last progress note in his chart was dated October 27 by a psychiatrist, indicating that the inmate requested the discontinuation of his medications. His medications were discontinued at that time.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation of quarterly case management contacts in the inmate's chart.

- There appeared to be a lapse in medication continuity when the inmate returned from court in late September for approximately one week.

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was no documentation of a referral to mental health by the MTA after periods of medication non-compliance.

- The inmate's MARs had blank spaces; the MARs also documented the inmate's failure to appear for medications.

- The inmate's IDTT meetings in administrative segregation and in the 3CMS program included the necessary participants.

4

4.    Inmate D

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Bipolar Disorder, NOS, ADHD and Borderline Personality Disorder. He was treated with Geodon 10 mg IM every evening and Strattera 100 mg/day. The inmate was on Keyhea orders because he presented a danger to himself or others; his Keyhea order was scheduled to expire on December 25, 2004. This care provided to this inmate's was reviewed at the request of plaintiff's attorneys.

Inmate D was transferred to MCSP on January 8, 2004 from DVI. He was placed on Keyhea orders while at DVI due to his repeated severe self-injurious behavior and assaultive behavior toward the staff. He was transferred from DVI as an EOP inmate. While in the EOP, the inmate presented with lability, impulsivity and on occasion, treatment refusal.

On May 26, 2004, Inmate D was admitted to the MHCB after making a noose. He was discharged at the 3CMS level of care on June 14, 2004 to the administrative segregation unit and charged with threats to a custody officer. He was readmitted to the MHCB unit from June 17 to June 21, after he presented with recurrent suicidal ideation in the administrative segregation unit. One week later, he reported ingesting some pills and exhibited head banging; he was readmitted to the MHCB from June 28 to July 1. During this admission, he reportedly remained in five-point restraints and refused medications. He was discharged to DMH after this admission for further stabilization. The DMH information was not present in the inmate's record, but he was returned to the administrative segregation unit from DMH on July 15, 2004.

Subsequent progress notes indicated that the inmate continued to present with impulsivity and to threaten staff and himself. His medications were adjusted frequently due to his complaints as well as non-compliance with cheeking. On September 15, 2004, Inmate D reported that he swallowed razor blades, however, X-rays indicated otherwise. On December 8, he reported vague suicidal ideation without plan. He was evaluated by a psychiatrist and his medications were again adjusted. Inmate D continued to have episodes of medication non-compliance. He requested a change to an EOP level of care. Staff reported that Inmate D had indicated that he wanted to change his level of care to affect his transfer to a SHU.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Inmate D's chart contained documentation of weekly case management contact in the administrative segregation unit.

- There was documentation of consistent psychiatric contact in the inmate's chart.

5

- Although this inmate was appropriately admitted to the MHCB unit when he presented with suicidal behavior, there were lapses in the documentation of five-day follow-up after his discharge.

- Appropriate laboratory testing for treatment with mood-stabilizing medications was conducted for this inmate.

- Inmate D was appropriately referred and transferred to DMH after he had three MHCB admissions.

- Inmate D's IDTT meetings included the necessary participants.

- This inmate was enrolled in group therapy in the administrative segregation unit.

Inmate D was receiving a 3CMS level of care at the time of the monitoring visit. It appeared that the recent behaviors he exhibited were a result of his Axis II diagnoses and not a consequence of his Bipolar Disorder. It did not appear that an EOP level of care was warranted at this time, but in light of his lability, treatment resistance and history of instability, his level of care should be frequently reassessed.

5.    Inmate E

This 3CMS inmate was housed in general population on the A yard. He was diagnosed with Psychotic Disorder, NOS. He was treated with Seroquel 150 mg/day and Prozac 80 mg/day.

Inmate E was transferred to MCSP on October 14, 2003, from DVI as a 3CMS inmate. He remained in general population throughout the review period. Progress notes indicated that although he had episodes of mild depressive symptoms and questionable mild psychotic symptoms, he was reportedly stable and compliant with medications after adjustments were made.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation of quarterly case management contacts in the inmate's chart.

- Documentation of informed consent for treatment with psychotropic medications was also in the inmate's chart.

- The inmate's IDTT meetings included the necessary participants.

6

6.    Inmate F

This inmate was housed on the EOP unit. He was diagnosed with Schizophrenia, undifferentiated type and treated with Risperdal 4 mg/day, Lithium 900 mg/day and Prozac 20 mg/day.

Inmate F was transferred to MCSP on October 5, 2000 from CMC. He had been in the EOP since that time. Progress notes indicated that he regularly attended group therapy. He exhibited chronic delusional thinking and auditory hallucinations. He was compliant with medications, but missed some doses. The last progress note on December 13, 2004 indicated that the case manager was referring the inmate to the psychiatrist due to an increase in auditory/visual hallucinations and poor sleep.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was documentation showing that the inmate received weekly case management contact in the EOP program.

- There was documentation of informed consent for treatment with psychotropic medications in the inmate's chart.

- Appropriate laboratory testing for treatment with Lithium was conducted for Inmate F.

- This inmate received consistent psychiatric contact with appropriate medication management.

7.    Inmate G

This inmate was housed on the EOP unit. He was treated with Effexor XR 300 mg/day, Buspar 20 mg/day, Risperdal 4 mg/day, Remeron 45 mg/day and Strattera 120 mg/day. He was diagnosed with Bipolar II Disorder and ADD.

Inmate G was transferred from CIM to MCSP on September 30, 2003. He had been receiving an EOP level of care since October 2003. Progress notes indicated that he was functioning well in the EOP program until September 2004, when he presented with an increasingly depressed mood and suicidal ideation without plan or intent. He was seen by a psychiatrist and his medications were adjusted with resolution of symptoms. He attended groups and was compliant with medications. Subsequent progress notes indicated some continued mood instability, but the inmate appeared to be doing well in the EOP program.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- The inmate's EOP IDTT meetings included the necessary participants.

- There was documentation in the inmate's chart of weekly case management contacts. In some rare instances, contact was delayed longer than one week.

- There was documentation of consistent psychiatric contact in the inmate's chart.

8.    Inmate H

This inmate was in the EOP program. He was diagnosed with Schizoaffective Disorder and treated with Zydis 20 mg/day and Geodon IM, if he refused oral medications. He was on a Keyhea order for grave disability; the order was expected to expire on July 7, 2005.

This inmate was transferred to MCSP from CTF on September 13, 2001. He had been in the EOP program since at least May 2002. Progress notes indicated that Inmate H attended group therapy and was compliant with medications, despite his lack of insight regarding his mental illness. His Keyhea order was renewed due to grave disability on July 7, 2004.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The inmate's EOP IDTT meetings had the necessary participants.

- There was documentation of good medication compliance for this inmate on a Keyhea order.

- There was documentation of consistent psychiatric contact in the inmate's chart.

- There was a lapse in the documentation of weekly case management contacts from November 17 to December 14, 2004.

9.    Inmate I

This inmate was in the EOP program. He was diagnosed with Bipolar I Disorder and treated with Depakote 1000 mg/day, Paxil 20 mg/day and Benadryl 100 mg/day.

8

Inmate I was transferred to MCSP from CSP/Sac on January 20, 1999. He was upgraded from a 3CMS level of care to an EOP level during April 2003. Progress notes indicated that the inmate was doing well in the EOP program, but he had some periods of increased anxiety, tremor and hyperactivity. The most recent psychiatric progress notes indicated that Inmate I was mildly depressed. His Paxil was decreased and laboratory studies were ordered.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Appropriate laboratory testing for treatment with Depakote was conducted for inmate I.

- The inmate's EOP IDTT meetings included the necessary participants.

- Informed consent for treatment with psychotropic medications was obtained from Inmate I.

- There was documentation of weekly case management contacts in the inmate's chart.

10.    Inmate J

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Adjustment Disorder, with mixed disturbance of emotions and conduct. He was treated with Seroquel 400 mg/day and Wellbutrin 150 mg/day.

Inmate J was transferred from PVSP to MCSP on August 11, 2004. He had been receiving a 3CMS level of care since at least 2002. The inmate had been housed in the administrative segregation unit during his stay at MCSP due to enemy concerns. The clinical staff reported that he was medication-seeking, particularly for benzodiazepines and Neurontin. Inmate J's medications were briefly discontinued due to this issue and due to his non-compliance; the medications were subsequently reinstated. The inmate frequently refused out-of-cell clinical contacts, but it appeared that he was functioning well on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate's diagnosis was inconsistent with the medications that he was prescribed.

- Informed consent for treatment with psychotropic medications was obtained from the inmate.

9

- There was documentation of weekly case management contact in administrative segregation.

- The inmate's administrative segregation IDTT documented the necessary participants.

EXHIBIT C

<u>California Medical Facility (CMF)</u>

February 21, 2005 – February 22, 2005

1.      Inmate A

Mental health documentation for Inmate A extended back to October 2004, but only
Volume C of the chart was reviewed by the monitor's expert. Inmate A had been at CMF
since 2002 and was treated at the EOP level of care.

Inmate A had diagnoses of Major Depressive Disorder, severe, with psychotic features, Alcohol
Dependence and ASPD. He also had memory loss, which was a focus of his treatment. The
inmate had completed six months of AA. He hit his head on the top bunk in June 2004, suffered
a bump and a bruise and vomited one hour after the impact. He was scheduled for referral to
occupational therapy in May. The inmate's parole date is September 2005. The plan was to
retain him in the EOP unit until he was paroled.

The inmate had orders for Ziprasidone 120, Paxil 40 and Cogentin. He also had asthma and took
medication for chronic medical conditions. A neurological consult found that he had
"nonspecific bilateral white matter disease" possibly associated with alcohol ingestion or early
Alzheimer's Disease.

The inmate's treatment plan called for therapeutic work. Inmate A worked on the tier. There
was individualized documentation of his work activity in his UHR. Inmate A was reported to be
a hard worker who always did a good job. During the month of December, Inmate A attended
eight hours of recreational therapy; he was scheduled for 31 hours of recreational therapy, but
attended eight hours; he refused four hours and 19 hours were cancelled. During January, the
inmate attended 11 hours of recreational therapy. Records of the inmate's other groups were in
his UHR, but the information was difficult to interpret. It appeared that he participated in far
more than ten hours of structured therapeutic activities per week.

Inmate A had been seen monthly by a psychiatrist since October. Psychiatric notes were
perfunctory, indicating that the inmate was stable and that his medication orders were renewed.
The inmate had raised the issue of decreasing his medication dosage, since he had no auditory
hallucinations, but the dose was already low and remained the same.

Case management contacts with this inmate were made weekly. Most case management contacts
were at cell front; some contacts were made by the inmate's regular case manager and some were
made by a substitute clinician in the absence of the regular case manager. A minority of the
inmate's contacts with his case manager occurred in an office setting. Case management
contacts were recorded by the automated summary as lasting one quarter of an hour.
Documentation suggested that the inmate had discussed issues of concern with his case manager.

An IDTT meeting was held in January 2005, and the inmate's treatment plan was updated.
According to classification information in the treatment plan, this was the inmate's first
incarceration. He was serving a six-year sentence for the rape of a mentally disabled person;
he, too, is considered mentally disabled. The IDTT meeting was attended by a full treatment

team. The treatment plan noted that the inmate had difficulty with concentration that affected his ability to hold a conversation and to read. A goal of treatment was helping him understand and cope with his memory loss.

As part of the inmate's Developmental Disability Program (DDP) documentation, a CASE dated November 24, 2004 was in the UHR. The assessment was detailed and specified adaptive supports that the inmate needed. Inmate A's use of written language was poor and he was assessed to need help with all written work. He was said to be unaware of the 602 process. The examiner questioned whether the inmate was functioning at the DD3 level or higher.

Assessment:

The depressed, mentally retarded inmate's mental health treatment was consistent with program guide requirements from October 2004 through January 2005. The monitor's expert concurred with the treatment provider's assessment that Inmate A was doing well in the structured environment of the EOP unit.

2.      Inmate B

This 3CMS inmate had diagnoses of Major Depressive Disorder, severe, with psychotic features, in partial remission, Polysubstance Dependence, Post-Traumatic Stress Disorder, Mild Mental Retardation and Personality Disorder NOS. There was no CASE in his UHR, so no information regarding his developmental disability, his level of adaptive functioning and his need for prompting or monitoring was available to the mental health staff.

Inmate B had orders for Prolixin Decanoate 12.5 q 14 d, down from 25 mg in November and 37.5 in September and October. Buspar and Effexor were also part of his medication regimen. Records regarding the administration of Prolixin were inadequate and possibly inaccurate, as indicated below.

Inmate B had an IDTT meeting in December 2004. According to his treatment plan, he was serving a seven-year sentence and was due to be released in January 2006. Subjective remarks on the treatment plan indicated that that Inmate B needed supervision to manage his life, was easily exploited, engaged in predatory behaviors, and had a "watch dog" in his housing unit. It was noted that he responded only when spoken to directly.

An earlier treatment plan, written in the EOP unit and dated September 2, 2003, gave a diagnosis of Psychotic Disorder NOS. It said that while in Unit IV "he was prostituted and paid protection with his canteen." A history of physical and sexual abuse continued to be enacted. Inmate B's Developmental Disability Designation was to be changed to D1A. At that time, the inmate said that he had faked suicidal ideation to affect a housing move. The team planned to observe him in the EOP unit for three months and return him to the 3CMS level of care, if warranted. Inmate B eventually returned to the 3CMS level of care and to Unit IV at his request. He exhibited mild hypomania in the EOP unit and apparently tired of the EOP groups.

3

The inmate's UCC hearing in June 2004 considered changing his assignment to education, in response to questions about whether the inmate had a GED. Later notes, written in November by his social worker, gave his subjective report as follows: "I wanted to say that I can't go to school because I can't concentrate because of the voices that I hear. I can't go down there and sit for hours. I have a hyper disorder. I have been like this since I was a kid. I want to be medically unassigned or get a job as a porter...This school thing has me depressed. I don't like to be around people. I just want to be left alone." Despite his report, he was sent to attend school on a trial basis. Clinical notes indicated that the inmate was no longer hearing voices at this time and that his dose of anti-psychotic medication had been lowered for that reason.

Inmate B reported an intensification of visual and auditory hallucinations during the summer of 2004 and his dose of Prolixin was increased. He reported EPS in August.

Information in the inmate's MARs regarding missed doses of medication was not consistent with reports by providers; providers clearly indicated that the inmate received Prolixin, perhaps to the extent that he was overmedicated. According to the MARs, however, the inmate received one dose of Prolixin in September, but missed the second one; he got both doses in October, but none in November or December.

Although the inmate's dose of medication was lowered, a psychiatrist in November observed that he smiled inappropriately, exhibited an elevated gaze and had a flat affect. The possibility that he was overmedicated with Prolixin was raised. He was noted to be sleeping a lot in December and January. The inmate's progress notes contained little clinical information. A quarterly case management contact was missed early in February.

Assessment:

This inmate's mental health treatment was not consistent with program guide requirements. His treatment plan should have called for case management contacts more frequently than quarterly. A quarterly case management contact was missed, with the result that the inmate was not seen by a case manager for nearly four months.

Inmate B's developmental disability and academic problems were not adequately considered during his UCC hearing. He became increasingly depressed due to his assignment to school. His vulnerability was not monitored carefully. He was probably victimized and attempted to flee by eliciting a higher level of care.

The inmate was seen frequently by a psychiatrist and medication adjustments were responsive to his reports and his presentation. The inmate's MARs were inaccurate, as they indicated that he did not receive Prolixin, even when there were signs that it was administered.

3.    Inmate C

Inmate C was treated at the 3CMS level of care. Only the second volume of this inmate's UHR was reviewed by the monitor's expert. As part of his DDP documentation, a 128 C 2 was in the UHR from December 2003. It showed that the inmate was designated DD2. He was described

as cognitively very low functioning and as child-like and vulnerable. Inmate C was housed in Unit IV.

According to a recent progress note dated December 30, 2004, Inmate C had a history of gunshot wounds to the head. He needed assistance with reading and writing. He said that he has a friend on the unit who looks out for him. He attended a day treatment program at the time of the monitoring visit.

Inmate C arrived at CMF in September 2004 on a life sentence following a 3rd strike. He had 79 points. Although currently treated at a 3CMS level of care, there were indications in his chart that Inmate C had been in an EOP unit at another facility earlier in 2004. He was described as high functioning, while in the EOP unit in March and April 2004. A treatment plan written in October 2004 questioned the inmate's level of functioning. There were reports that he had a 12.2 GE reading level and that he was predatory. There was no CASE in the inmate's UHR but, in October 2004, he was interviewed briefly and the need for a further Clark evaluation was noted.

The inmate had deferred diagnoses on a treatment plan written in October 2004, when he was new to the unit. No diagnostic clarification had been done as of February 23, 2005. He was ordered Seroquel 700 and Zoloft 100 and was largely compliant with his medication. He had been seen by a case manager twice since he arrived; both meetings were initial contacts.

Assessment:

Although case management contacts were made quarterly and an initial IDTT meeting was held promptly, this inmate had not received any meaningful mental health treatment. His medication was continued and administered, but it was not clear what illness was being treated. Diagnostic clarification was needed.

Inmate C's DDP status was not well documented in his UHR. There was conflicting information regarding his levels of adaptive functioning and academic achievement.

4.    Inmate D

Inmate D was treated at the 3CMS level of care in Unit IV. He is serving a life sentence for a 3rd strike. His name appeared on a list of persons who are developmentally disabled and have deficits in adaptive functioning. There was, however, an indication in a progress note that he had been removed from the DDP prior to November 2004.

Inmate D was discharged from the EOP program around May 2004. He said he wanted to go back to Unit IV to avoid stressors and because he missed his friends there. He also said that he had wanted to leave Unit IV because he was being picked on, but that the person doing it was now gone. Once transferred back in Unit IV, a 3CMS IDTT meeting was held in a timely manner.

The inmate's treatment plan showed diagnoses of Major Depressive Disorder, recurrent, in full remission, Polysubstance Dependence, in a controlled environment, Mild Mental Retardation,

5

history of head injury at age 8 and a GAF of 65. He had been medicated with Paxil 10 and Vistaril 50 for at least the past six months and appeared to be largely compliant with medication. No interruptions were noted on the inmate's MARs.

Inmate D was seen by his case manager monthly. From June through October, he said that he was readjusting well and appeared to enjoy the day treatment program. He was seen as highly influenced by his environment and as benefiting from good support by people in the environment. The inmate's case management report in November was less positive. At that point, the inmate found his housing unit stressful and wanted to change locations. His speech was rapid and disorganized. The note said that he was removed from the DDP in April 2004, but needed to be reconsidered for DDP status, as his cognitive impairment was evident and he used to be a client at a regional center. The inmate was upset that he had lost contact with his family due to his offense and asked for help in contacting them. He continued to do poorly through December and January. He had difficulty during the holidays; he felt irritable and depressed and he slept more. Although he was not doing well when seen on January 5, 2005 by a different case manager, he was only slated for 90-day follow-up.

Assessment:

The mental health treatment of this depressed, mentally retarded inmate was appropriate for part, but not all, of the monitoring period. Given his evident difficulties in November and December 2004 and in January 2005, Inmate D should have received clinical contact more often than quarterly. He should not have been removed from the DDP. He seemed to have been victimized at the 3CMS level of care, which may have precipitated his move to the day treatment program.

5.    Inmate E

Inmate E was treated at the EOP level of care. He had a history of committing sex crimes and was found incompetent to proceed in 1982 and in 1984. His commitment offense was assault on a female resident of the regional center adult group home where he resided.

The inmate arrived at CMF from WSP in September 2004. A CASE done in July 2004 designated him DD2 and said he was dependent upon staff in his group home, was easily confused, did not know what was expected of him and needed occasional prompts for self-care.

The inmate had a timely IDTT meeting when he arrived at CMF. His treatment plan was updated quarterly. He had diagnoses of Psychotic Disorder NOS, (PRO), Alcohol Abuse by history and Mental Retardation. He was medicated with Zyprexa 15 and Zoloft 50. He also took Benadryl 150 q evening. In addition, he had asthma and liver trouble with reported black outs. He became depressed and began hearing voices in May 2004, subsequent to the death of his mother in January 2004.

This inmate's medication continuity was sustained upon his arrival at CMF. He was sad and reported suicidal ideation about ten days after arriving. He was seen on an emergency basis in the clinic, evaluated and determined not to be at risk of suicide. No risk assessment checklist

was found in the inmate's UHR. He was seen weekly by his case manager. He reported problems with his cellmate shortly after he arrived, which was addressed by his case manager.

Documentation of recreational therapy during the month of September showed that Inmate E was scheduled for 14 hours of therapy, but that 11 hours were cancelled. The inmate participated in two hours of recreational therapy and refused one hour. An institutional summary showed that Inmate E was scheduled for 29 hours of therapy, including recreational therapy, of which 21 hours were cancelled. Overall, Inmate E attended seven hours of therapy and refused one hour.

Inmate E was sometimes described as disheveled and malodorous. He was compliant and cooperative. There was no indication that the groups he attended were suitable for his level of functioning or his issues of concern, which included bereavement. He seemed to be doing better at the end of 2004; he was not as sad, but his hygiene needed improvement. His participation in group activities also needed improvement. His case manager was attentive to the first anniversary of his mother's death

Assessment:

This inmate's mental health treatment met program requirements, but was not adequate for him. Although the inmate's treatment plan was individualized in that it listed behavioral targets, there was no indication that the treatment he actually received addressed those targets. The inmate received the same treatment as other inmates on his side of the wing.

6.    Inmate F

Inmate F had a slim one volume UHR, suggesting that he had not been in custody very long. Classification information often found in clinical documents was absent from his file. Inmate F arrived at CMF around February 9 or February 19, 2005. He was at an EOP level of care. Prior to February, the inmate was in the EOP unit at CSP/LAC. He had been sent from WSP's reception center to the EOP at LAC, after exhibiting signs of paranoia and impaired functioning. He was enrolled in the DDP.

Inmate F had a diagnosis of Schizophrenia, paranoid type, and a history of head trauma. While at CSP/LAC he was treated with Haldol. He said that it helped with his auditory hallucinations. It was continued when he arrived at CMF.

The inmate did not do well in the EOP at CSP/LAC. He was re-evaluated on December 7, 2004, found to be very vulnerable and designated DD3. A 128 C 2 and a CASE done earlier at CSP/LAC indicated that he was DD2 and needed many different types of adaptive supports. He was transferred two months later. According to a progress note dated before the inmate left CSP/LAC, his cell was messy, he did not want to come out of his cell and he avoided contact with clinicians.

Since arriving at CMF, Inmate F had one initial contact with a psychiatrist. The note contained in the UHR was devoid of information. It seemed that this inmate's self-report was taken at face value. The writer did not know, for example, that Inmate F had a developmental disability and

that his level of adaptive functioning was so low that it triggered his transfer to CMF. Although the inmate's prescription for Haldol was continued, the note said that an atypical anti-psychotic might be considered in the future.

Assessment:

Inmate F was not able to benefit from EOP treatment at CSP/LAC. Appropriately, he was re-evaluated and sent to an institution designated for DD3 inmates. The transfer took approximately two months. This inmate's medication continuity was sustained when he changed institutions.

Once he arrived at CMF, Inmate F was locked down; it is SOP for newly arrived EOP inmates to be confined to their cells for their first two weeks in the unit. Inmate F, however, was seen only once in this time. Given his low level of functioning and withdrawn behavior prior to transfer, the inmate should have elicited more clinical attention and been prompted to participate in daily activities very shortly after arrival.

7.    Inmate G

This was Inmate G's first incarceration. He was serving a six-year sentence and his release date was in March 2007. His name appeared on a list of inmates in the DDP program; he was designated DD2. That designation indicated that he probably scored in the Borderline range of intellectual functioning and had been found to require adaptive support, such as prompting and monitoring, to help him complete prison routines. Only Volume C of his UHR was reviewed by the monitor's expert.

Inmate G had a diagnosis of Schizophrenia, paranoid type and was medicated with Seroquel 600, Effexor 225, Benadryl and Atarax. He was treated at the EOP level of care.

There was a recent 128 C 2 in the inmate's UHR that said he was illiterate and had a history of victimization concerns. There was no further information in Volume C of the inmate's UHR about his cognitive and adaptive levels of functioning and nothing to indicate how these levels had been addressed in the EOP since August 2004.

Inmate G was transferred from the administrative segregation unit in August 2004. At that time, he was psychotic. He was paranoid, delusional and said he was afraid to eat. His affect was flat and he did not interact spontaneously. He did not understand his UCC meeting in November. Progress notes from November through February reported that his presentation was inconsistent. In February, about six months after his discharge from administrative segregation, Inmate G's condition had not improved, although he had been treated in at least two different EOP wings. At times, he was described as stable and functioning at a typical EOP level. Most notes, however, described on-going sleep disturbance, anxiety, paranoia and other signs and symptoms of distress. He had recurrent thoughts of hurting himself, but always contracted for safety. His speech was difficult to understand and his thought processes were illogical. An updated treatment plan was done in the context of an IDTT meeting in January 2005. A progress note

8

written on February 15, 2005 said that the inmate would be referred to the MHCB unit, if he decompensated further.

Reportedly, Inmate G was referred to and rejected by the ITP in March 2004 and by ASH in 2003. Staff considered referring him to a higher level of care but, in light of that history, did not.

Assessment:

The provision of mental health services to Inmate G was carried out in a timely manner, but the EOP level of care was not meeting his needs. The inmate needed a higher level of care.

8.      Inmate H

Inmate H came to CMF from CMC in April 2004. At the time of the monitoring review, he had diagnoses of Psychotic Disorder due to head injury and substance abuse, Polysubstance Dependence, Personality Disorder NOS and Mental Retardation, severity unspecified. He had a history of suicide attempts by hanging. His most recent suicide attempt was in 2003; it was precipitated by pressure associated with his sentence. Inmate H was treated at the EOP level of care.

The inmate was medicated with Seroquel 600 and Depakote 1500. He missed many doses in August. His MARs for September and October had some blanks and some puzzling notations, but it appeared that the inmate received most doses. He was compliant with his medication in November, December and January.

Inmate H's name appeared on a current list of developmentally disabled inmates; he was designated DD2. His UHR contained a CASE done in 2001 at the request of an ICC because he was deteriorating. According to the CASE, the inmate had a developmental disability, a serious mental illness and a seizure disorder. He was found to require prompts for self care, living skills and self advocacy. He was said to be easily influenced by peers and to have a poor understanding of prison culture and resources. He was not able to read. Oral communication needed to be in short sentences. A different source of information said that he had a reading level of 2.2.

Early in 2004, Inmate H was very concerned about his mother's health and his own. Throughout September and October, he asked for books on tape so he could have something to do in his cell. He said he had vision problems and that these problems were reportedly the reason for his transfer from CMC. His case manager helped him further his request for tapes and assisted him in filling out a request to see the dietician. Inmate H was able to use visualization techniques taught by his case manager to cope with incarceration.

Progress notes reflected that Inmate H was cooperative and compliant with medication. His level of distress rose and receded. He was described as needy. He usually appeared disheveled, but his hygiene was good. He worked on the tier. His participation in recreational therapy was low. He met with his case manager weekly; many of the contacts were at cell front. He was seen monthly by a psychiatrist.

Inmate H reported that he was afraid of his cell mate, who talked all night. He continued to complain of problems with his cell mate for three months, from November through January. He had been awaiting books on tape for several months, when they arrived at the end of January.

The inmate received quarterly IDTT meetings. The staff's assessment was that the structure of the EOP program was helpful to this inmate.

Laboratory blood tests were ordered in April, July and September. The inmate was ducated many times, but did not keep the appointments. Laboratory tests were completed in January 2005, but the inmate's Valporic Acid level was not measured. Inmate H appeared to take Depakote for seizures.

Assessment:

This inmate's mental health treatment met program guide requirements, but the treatment of his seizure disorder was not adequate. His Depakote order, written by medical staff for treatment of seizure disorder, lapsed for six days in November, but his MAR indicated that the medication was administered without interruption. His Valporic Acid level had not been checked since, at least, April 2004.

Inmate H received case management and psychiatric contacts with the requisite frequency, but many case management contacts were made cell front.

The inmate's case manager helped him advocate for himself to obtain needed accommodations. The monitor's expert concurred with the staff's assessment that the structure of the EOP program was helpful to the inmate.

9.    Inmate I

Inmate I most recently arrived at CMF in September 2004, but he had been treated there previously. Although Inmate H was due to be released in January, apparently his discharge date was changed. There was no TCMP chrono in the inmate's UHR. Only the last of his five-volume UHR was reviewed.

Inmate I had diagnoses of Psychotic Disorder NOS, Depressive Disorder NOS, Polysubstance Dependence, Seizure Disorder and a history of head trauma. He also had a history of suicide attempts. He had orders for Seroquel 600, Dilatin 300 and Prozac 40. Notes elsewhere in the chart indicated that he had no teeth and was on a liquid diet.

The inmate's initial IDTT meeting was timely, but was held at cell front due to an institutional lockdown on January 27, 2005. The meeting was attended by a full team of the required participants. The meeting took note that the inmate had a DD1 designation and that he said he could not read and had been on SSI. He was, however, described as interviewing well, comprehending questions and answering clearly. His expressive language was apparently good.

10

Regarding the inmate's developmentally disabled status, there was no CASE in his UHR. Therefore, no objective information regarding his level of adaptive functioning or his need for adaptive support, such as occasional monitoring, prompting or help with written material, was available to the mental health staff.

In October, Inmate I refused most groups. He was described as unmotivated and made little to no progress. He exhibited dramatic improvement in all three areas in November, but in December he was said to have lost weight and to have felt depressed. He reported auditory hallucinations and his dose of Prozac was increased. Inmate I was very concerned about his health because he continued to lose weight and to experience tremors throughout December, January and February.

He was seen weekly by his case manager and discussed issues of emotional concern. He was seen monthly by a psychiatrist. There was documentation of his group therapy attendance, but it was difficult to understand. Inmate I participated in many hours of structured therapeutic activity in recent months.

Assessment:

EOP treatment met most of the targets in the program guide and was appropriate for this depressed, presumably mentally retarded inmate. The inmate's initial IDTT meeting, however, was held at cell front, a non-confidential setting that most likely precluded meaningful discussion involving the inmate. Psychiatric treatment was well documented and was responsive to the inmate's reports. There was no TCMP chrono in his UHR.

10.     Inmate J

Inmate J arrived at CMF in October 2004. He had a timely IDTT meeting and a quarterly update. A 128 C 2 done in November 2004 at CMF showed that he was designated DD2 and indicated that he needed one-step instructions in simple language and maybe occasional prompts to maintain hygiene and grooming; he was listed as at risk of possible victimization. The inmate said that he had been pressured to give away canteen items in the past. He had deficits in memory, concentration and comprehension. He was also hearing impaired. He had a history of trauma; he saw his mother killed when he was an adolescent. He assured CMF staff that he was high functioning and could do well in the mainline.

Inmate J had diagnoses of Schizoaffective Disorder, Polysubstance Dependence, a seizure disorder and a history of head trauma and Hepatitis C and HTN. He also had a history of suicide attempts. He had orders for Zyprexa 15, Dilantin 100, Trazodone 300 and Atarax 75 bid.

There was a current treatment plan in the inmate's chart and he had been seen monthly by a psychiatrist. His treatment plan was not individualized in the sense that the groups to which he was assigned did not necessarily focus on issues of concern to him. Nor did the plan consider his ability to participate meaningfully in standard EOP groups. The inmate may have needed accommodations related to his hearing impairment, his academic level or his cognitive abilities, but none were specified in his treatment plan.

Inmate J was contacted by his case manager weekly, but he did not seem to like case management contacts. According to progress notes that began November 2, 2004 and went through February 16, 2005, Inmate J was stable and doing adequately. The inmate did not appear to get much out of the group he attended. He was described as cooperative, but minimally active. He was said to get along with his cell mate.

The inmate recently asked again to go to the 3CMS program. He seemed less certain of his ability to function there as his possible discharge date from the EOP program drew near, but he still wanted to go to the mainline. His case manager noted that because of his hearing impairment, their conversations were loud. The progress note said that the inmate contradicted himself often throughout the interview. He was easily misunderstood and easily confused.

Assessment:

Inmate J's EOP treatment met the targets in the program guide, but was not sufficiently individualized to be meaningful to him. Presumably, Inmate J received the same treatment as the other inmates on his side of the wing. His mental health treatment was inadequate.

11.     Inmate K

Inmate K was an administrative segregation inmate. He was actively hallucinating and delusional during the course of his group interview with the monitor's expert. He became increasingly agitated and distracted as time progressed. The inmate reported that he had been "deceased for ten years" and was waiting to see the doctor to get his "technical booster shots."

The inmate's record indicated that he was referred on January 19, 2005 to the B3 medical clinic and refused to speak. The record further indicated that he had multiple refusals and no shows for scheduled appointments and that he refused laboratory testing. It also noted that the inmate believed that he had been "dead for a decade" and that he should be receiving birth control shots. Inmate K was referred to DMH on January 28, 2005, but he was refused admission because his parole date was noted as March 18, 2005. He had been held on P3, since that time.

The inmate had a chrono for multiple medication refusals from July thru October 2004, but was medically cleared for administrative segregation on October 10, 2004. He had a long history of indecent exposure and multiple 115 disciplinary infractions. There was no indication in the record that he was referred to the newly established MHCB unit.

Assessment:

This administrative segregation EOP inmate was not receiving services or referrals consistent with his mental health needs or program guides.

Inmate K was quite paranoid during the course of the interview, and reported there was a need for more structure and more programming, but also reported that COs take advantage of mentally ill patients and write them up for no reason.

12

12.    Inmate L

Inmate L was an administrative segregation inmate. He reported that he was "doing alright", but was distracted during his group interview with the monitor's expert and could not focus on the content of the group discussion. The inmate's UHR showed that he was admitted to CMF on July 31, 2001, with a diagnosis of Schizophrenia. Although he was prescribed Risperdal Consta, he was noted on the MAR to have refused his injections on December 2, 16 and 30, 2004 and on January 13, 2005. His injectible medication was discontinued on January 27, 2005. His valproic acid was also discontinued after he refused it seven times in December.

Progress notes indicated that the inmate had consistent delusions that he was "King Tut","the devil" and "the creator." Despite his refusals of medications and some refusals of out-of-cell activities, it was noted that the inmate continued to attend groups and received 21 hours of structured therapeutic activities in January 2005. Psych tech notes indicated that he had complied with medications, even after they were discontinued. The inmate's treatment plan reflected that the plan was "to wait him out" with regard to his medication non-compliance.

Assessment:

This administrative segregation EOP inmate was not receiving services or referrals consistent with his mental health needs or program guides.

13.    Inmate M

Inmate M arrived at CMF on October 14, 2004. He was an EOP administrative segregation inmate. At the time of his group interview with the monitor's expert, he was actively psychotic, characterized by auditory hallucinations, disorganized thought processes, irrelevant responses and agitation. The other inmates in the interview group reported that this inmate was in need of help and that he had been to DMH because he flashed officers and spread his feces. The inmates also reported that the MTAs frequently passed by this inmate's cell without giving him medication because he was "too crazy."

Inmate M's chart indicated that he was diabetic. There were concerns that the inmate was not receiving his medications for diabetes. Inmate M's record indicated that he was prescribed Seroquel, Abilify, Risperdal Consta (IM), Depakote, Insulin and Benadryl. The inmate's MAR for his injectible medication was kept separately; discussion with the MTA on the unit revealed that the MTA had no way of knowing whether the inmate was actually receiving his injectible medication. The UHR also included a psychiatric progress note of February 15, 2005, documenting that the inmate last received his Risperdal Consta by injection on December 14, 2004, even though it was ordered to be given every two weeks. The MTA, however, presented information from the separate injectible medication book, indicating that the inmate received his last injection on February 23, 2005.

A review of the inmate's record indicated, in addition to the above medication, Inmate M was to get fasting blood sugars every morning and evening. There was inconsistent documentation that

these had been done and wide fluctuations in his a.m. fasting blood sugar, ranging from 97 to 236.

Staff also reported that MTAs may have sometimes arrived on the unit after 7:00 a.m. and after breakfast was already over, so that finger sticks for monitoring this inmate's diabetes were likely to be inaccurate. This was brought to the attention of clinical and administrative staffs, who reported that a local operating procedure would be developed regarding diabetes, providing for breakfast trays to be held until after the MTA sees the inmate and monitors his blood glucose.

There was no bus screening in the inmate's UHR. There were, however, notes from RJD in August 2004 that indicated the inmate had been babbling nonsense. On February 17, 2005, the case manager noted that the treatment team recommended referring Inmate M to a higher level of care, such as SVSP's ITP. The note also indicated that the team "will continue to observe for further decompensation for DMH APP." The monitor's expert was informed that Inmate M had been referred to DMH the previous Friday and, after a medical evaluation regarding his diabetes, would be moved to DMH on the day of the monitoring visit.

Assessment:

This is a terribly embarrassing case indicating poor medical and mental health management for an inmate who was clearly seriously and persistently mentally ill and had a complicating condition of diabetes, which had been poorly managed. There were multiple errors in documentation and deficient implementation of appropriate treatment planning and management. This inmate was not receiving services consistent with his level of care and the program guides. The mismanagement of this inmate's diabetes, as referenced above, may have contributed to his disorganized mental status.

14.    Inmate N

This 3CMS administrative segregation inmate was seen in a holding cell because he had set his cell on fire. The inmate had been in the holding cell for several hours. Custody staff reported that the inmate frequently engaged in disruptive behavior and requested to see the psychiatrist. The inmate had been transferred to administrative segregation one and a half months prior to this monitoring visit. He was receiving Seroquel, Vistaril and medications for HIV.

On interview, Inmate N reported that he had informed psych techs of his problems, but they "don't do nothin'". The inmate reported that he had been at an EOP level of care in the past, but was reclassified in September 2004 to a 3CMS level of care. He believed that he should be in the EOP program, where the psychiatrists "talk to you" and the clinicians are "helpful." The inmate stated that he had racing thoughts and did not know why he set his cell on fire.

Review of this inmate's record indicated that DOT was ordered for all medications. The inmate's diagnosis remained Adjustment Disorder, but his MH-2 dated February 7, 2005 reported that he had threatened to hang himself and had displayed a noose while in his cell. The plan for this inmate was to consult the senior psychiatrist regarding a referral to DMH. There was no documentation that this was done at that time.

14

A February 14, 2005 progress note indicated that the inmate continued to receive Seroquel for his "Adjustment Disorder." On February 22, 2005, the inmate set his cell on fire and asked for to be moved to an EOP level of care. The plan was to transfer the inmate to CSP/Corcoran. The psychiatrist arrived on the unit to see him, after he was interviewed by the monitor's expert.

Assessment:

This inmate's care and treatment should be reassessed for his overall mental health needs, including his reports of racing thoughts as well as his apparently impulsive and potentially dangerous behaviors.

15.    Inmate O

This inmate was seen by the monitor's expert in his cell on the S3 unit. He reported that he was "okay" and was taking no medications. He further reported that he was in the S3 unit because he "won't make it on the yard." Review of his record indicated that he had been at CMF since September 18, 2002. He received Risperdal from May through September 2003. He had not received any medications since that time; it is not clear, however, from the record whether his medication was discontinued for therapeutic reasons or because it had "run out."

The inmate's MARs for 2003 did not give any meaningful picture of his response to medication or his level of compliance during that period. A MH-2 dated December 13, 2004 indicated that he was seen at cell front by the IDTT meeting because he would not come out of his cell; the inmate, it was noted, "always refused to come out of his cell for one-to-ones." The treatment team reported that Inmate O had no problems, except that he was constantly talking.

Inmate O's diagnosis was Bipolar Disorder, most recent episode hypomanic. A suicide risk assessment was completed on January 28, 2005, after the inmate learned of his mother's death; it concluded that the inmate was not at risk for harm to himself. The record clearly indicated that Inmate O did not attend any groups and was currently receiving no medication or other interventions, except clinical cell front contacts.

Assessment:

This inmate's care and treatment appeared to be inadequate. He should be reassessed to determine his appropriate level of need.

16.    Inmate P

This inmate was seen by the monitor's expert in his cell on S3. He was very loquacious and invited the expert into his cell for a drink. Notably, he had magazine cut outs of alcoholic beverages encompassing most of his wall. The inmate reported he was having "no problems", except that he would much rather have a drink. Based on the interview, the inmate's overall condition appeared to be stable. Inmate P did not believe he had any additional mental health needs. He was taking no medications.

Assessment:

This inmate's care and treatment appeared to be adequate for his current level of need.


17.    Inmate Q

This inmate was seen by the monitor's expert in a group. The inmate arrived at CMF on November 2, 2002 and was subsequently transferred to ASH in 2003. He returned to CMF on December 30, 2003 and initially received Thorazine 100mg crushed for five days because his "chart not available." His previously prescribed medication from ASH of Haldol was reinstituted after that time and he was accepted for an MDO in May 2005.

Documentation showed that Inmate Q refused 43% of the structured therapeutic activities offered to him, although the MHTS indicated a 34% rate of refusal. This underreporting of refusals appeared consistent with other records reviewed.

Assessment:

Inmate Q's care and treatment were not adequately documented in the record and his rate of refusal was greater than that reported in computer generated documents. His acceptance as MDO in May 2005 appears to be appropriate.

18.    Inmate R

This inmate was invited to a group interview; the monitor's expert also attempted to interview him at the cell front. Inmate R, however, refused to come out of the cell and would not speak. Other inmates believed that the inmate was "sick" and they reported that sometimes he would not eat.

According to the inmate's chart, he was transferred from RJD to CMF on April 15, 2003 with a positive bus screening. His medications were Haldol 35mg/day, Paxil 60mg/day and Trazodone 200mg/day; his prescriptions for Paxil and Trazodone were discontinued on February 15, 2005. Review of the inmate's MARs indicated that he was taking his medications prior to their discontinuation. Inmate R's diagnosis was Psychotic Disorder Secondary to Head Injury with Hallucinations. He had a GAF of 48.

The inmate had been in administrative segregation as an EOP inmate since December 30, 2004. The most recent progress note in the inmate's chart was dated February 17, 2005 by a case manager who indicated that the inmate was decompensating. According to the note, the case manager attempted to see the inmate in a one-to-one out-of-cell setting, but the inmate could not "dress himself" in a jumpsuit for ten minutes and gave up. The note went on to describe the inmate as sitting on the bed staring at a wall without moving. The inmate was eating, but was unable to answer questions because of his preoccupation with internal stimuli; his cell was clean. The assessment indicated that the inmate was actively psychotic with impaired functioning.

16

Despite this, the plan was to continue monitoring the inmate and document grave disability. The note also indicated that an ITP referral was considered, but not initiated. In contrast, a psych tech note on the same date found the inmate calm with fair hygiene, appropriate and complaint manner and normal mood.

Assessment:

This inmate's care and treatment appeared to be grossly inadequate. As a result of a discussion with the case manager, it was determined that the inmate would be referred to the APP as gravely disabled for a 23-hour bed placement on the day of the monitoring visit. It was unclear why this inmate was not referred much sooner to a MHCB unit or an acute psychiatric program, given his clearly deteriorating condition as documented in the UHR.

19.    Inmate S

This 3CMS administrative segregation inmate had been transferred from CSP/Corcoran to CMF in November 2004. He reported that he was in a single cell because he had hurt his cell mates "40 times or more" and could not be in a cell with another inmate. The inmate confirmed that the psych tech made rounds each day in administrative segregation, but added that the psych tech made "minimum contact, but sometimes talks to you."

Inmate S reported that he saw the case manager each week, but that "98%" of the time it was at cell front. The inmate was currently prescribed Zoloft and Benadryl. Although the inmate reportedly received his medication at 3:00 p.m., he claimed that he held onto it until later in the evening to help him sleep. Inmate S indicated that he saw the psychiatrist every 60 to 90 days. He stated that he was currently doing fine because, "I'm narcissistic as a mother fucker." He believed that the mental health services were of low quality, but that they were adequate for his needs.

Assessment:

This inmate appeared to be stable, but "holding" his medications to take it closer to bedtime was reflective of problems with his medication prescription and administration.

20.    Inmate T

This 3CMS administrative segregation inmate reported that he had been in the "hole" for nine months. He also reported that he had a diagnosis of Bipolar Disorder and Heroin Dependence. Inmate T acknowledged that he had been seeing the psych tech every day and the case manager each week. He reported that he saw the psychiatrist approximately two weeks ago for a "brief time – 30 seconds".

Inmate T indicated that his son had recently died; he stated that he was prescribed Paxil for his bad dreams regarding his son. He had not noticed much change, but he kept talking with other inmates when he had a chance. Inmate T had no complaints, except for the shortness of mental

health contacts and the discontinuation of his Neurontin, which he was taking for back pain;
Inmate T was told that Neurontin was "contraband."

Assessment:

This inmate's care and treatment should be reassessed to determine the need for a higher level of
care given his current psychosocial stressors related to the death of his son.

21.    Inmate U

This 3CMS administrative segregation inmate reported that he had been at CMF for four years.
He indicated that he had been in the EOP program for four years and that "they made me 3CMS"
approximately one month ago. According to the inmate, he was currently taking Olanzapine and
Trazodone. He did not want to be placed at the 3CMS level of care.

Inmate U acknowledged that he saw and talked with the psych techs each day. He stated that he
always saw the case manager and psychiatrist at cell front, except for one time when he saw the
psychiatrist in the sergeant's office. The inmate reported that he had an IDTT meeting
approximately four months ago. He added that he was doing okay, but there were "no groups
here and I need them."

Assessment:

This inmate's care and treatment should be reassessed to determine the appropriateness of his
care at the 3CMS level.

22.    Inmate V

This EOP administrative segregation inmate was admitted to the CDC in 1984. He had a history
of Bipolar Disorder and had been treated with Lithium, Paroxetine and Risperdal. On June 20,
2004, the inmate attempted to hang himself at CSP/LAC. The notes in his chart indicated that he
was cuffed to a gurney under the watch of two correctional officers and a nurse every 30 minutes
until June 21, 2004 when he was held in the TTA. A Lithium level was ordered, but there were
no results in the record. The inmate remained on suicide watch until he was transferred to the
APP. A Lithium level from July 6, 2004 was 1.2, within the therapeutic range.

Inmate V was subsequently seen in the emergency room from DMH on July 27, 2004 for
possible Lithium toxicity. A blood test of July 29 indicated that his Lithium level was 1.6 (toxic)
and his CPK was 255 (elevated). He had returned to the emergency room at that time because of
continued confusion and was subsequently transferred to an outside hospital. There were some
very confusing pharmacy labels in the inmate's record, indicating that the start date of his
Lithium, Paroxetine and Risperdal was June 2, 2004 with a stop date of June 21. A MH-2 dated
December 29, 2004 referred to the inmate's history of suicide attempts by hanging, cutting and
swallowing pins and metal, including the most recent June attempt via hanging. There was,
however, no reference to the inmate's toxicity, no reference to the possibility of the inmate
hoarding his medications, no explanation as to the reason for the Lithium toxicity on a

therapeutic dose of 900 mg and no discussion of whether the toxicity could have been accidental or a possible suicide attempt. The record indicated that the inmate appeared to be stable currently. His medications had been changed to Depakote, instead of Lithium.

Assessment:

Although this inmate's current level of functioning appeared to be stable, his most recent treatment plan did not address his Lithium toxicity and possible causes of this toxicity. Nor did the plan address the inmate's possible need for a higher level of care, such as an ICF. Given the inmate's history and current EOP administrative segregation status, the inmate should be reevaluated to assure that he was at the appropriate level of care.

EXHIBIT D

California State Prison, Solano (CSP/Solano)

December 1, 2004 – December 3, 2004

1.      Inmate A

This 3CMS inmate was housed in general population. He was diagnosed with Mood Disorder, NOS and Psychotic Disorder, NOS, and treated with Seroquel 300 mg/day.

Inmate A arrived at CSP/Solano on February 2, 2002 and had been in the 3CMS program for the duration of his stay at the institution. The inmate was followed consistently by his case manager and the psychiatrist in general population. The psychiatrist noted that attempts had been made to wean the inmate off Seroquel and to switch to an anti-depressant medication, since the inmate had not exhibited recent psychotic symptoms; these attempts, however, failed. The inmate was transferred to the administrative segregation unit sometime during October 2004 for unspecified reasons. He was returned to general population sometime during mid-November and was reportedly stable on medications.

<u>Assessment:</u>

The following comments were noted regarding the care provided to this inmate:

- The inmate's IDTT meetings in both general population and administrative segregation included all of the necessary participants.

- There was documentation of case management contact in general population every 90 days.

- There was a lapse in the documentation of weekly case management contact in administrative segregation between October 28 and November 12, 2004.

- The inmate's MARs for August through October 2004 included multiple blank spaces, which indicated possible medication discontinuity.

2.      Inmate B

This EOP administrative segregation inmate was diagnosed with Schizophrenia, paranoid type. He was not treated with psychotropic medications at the time of the monitoring visit.

It appeared that this inmate had been housed at CSP/Solano since at least March 2003. He had at least one prior MHCB admission while at PVSP during October 2003. There were multiple staff referrals present in the inmate's medical record from various prisons, describing the inmate as disorganized with bizarre and paranoid behavior.

At the beginning of the monitoring period in July 2004, Inmate B was housed in the administrative segregation unit and was receiving a 3CMS level of care. This inmate

was consistently described as exhibiting paranoid delusional thinking of various somatic concerns; his behavior was characterized as withdrawn, bizarre and uncooperative. Inmate B consistently refused treatment with psychotropic medications. The administrative segregation treatment team recommended placing the inmate at the EOP level of care due to his continued psychosis and treatment resistance.

Inmate B was transferred to the MCSP administrative segregation hub unit on September 23, 2004. He was in the unit for approximately one week and then downgraded to the 3CMS level of care and returned to CSP/Solano. Inmate B remained with the above mentioned symptoms and the administrative segregation treatment team again recommended an EOP level of care. The inmate reportedly received an 18-month SHU term during his ICC meeting on October 6, 2004.

The monitor's expert attempted to interview this inmate. The inmate presented in a manner consistent with the demeanor described in his UHR. He refused out-of-cell clinical contact and appeared withdrawn, with bizarre and disorganized behavior.

Assessment:

Inmate B clearly required an EOP level of care. It was disturbing that the inmate was downgraded at MCSP to a 3CMS level of care without an adequate clinical assessment.

Additional comments regarding the care provided to this inmate included the following:

- The inmate's administrative segregation IDTT meeting documented the necessary participants.

- There were lapses in the UHR documentation of weekly case management contact in the administrative segregation unit. The MHTS generated inmate history, however, did document weekly case management contacts. This appeared to be a medical records issue.

3. Inmate C

This EOP inmate was housed in administrative segregation. He was diagnosed with Psychotic Disorder, NOS, and treated with Geodon 40 mg/day and Benadryl 75 mg/day.

Inmate C arrived at CSP/Solano on January 21, 2004 from Folsom. He was receiving a 3CMS level of care at the time of transfer. The inmate was transferred to the administrative segregation unit for protective custody during July, 2004. Progress notes indicated that he refused out-of-cell clinical contacts and appointments and that he did not have mental health complaints.

On October 26, 2004, an IDTT meeting concluded that the inmate had deteriorated in administrative segregation and found that he was psychotic with delusional thinking and

3

auditory hallucinations. Inmate C was then upgraded to the EOP level of care. Subsequent progress notes continued to document that the inmate refused out-of-cell contacts and had no mental health complaints.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Documentation in the UHR, confirmed by the expert's MHCB review, showed lapses in this inmate's weekly case management contact while in the administrative segregation unit.

- Clinical contacts for this inmate were consistently conducted at cell-front by the case manager, using pre-printed forms.

- The inmate's MARs contained multiple blank spaces as well as documentation of medication non-compliance. There was no documentation of any mental health referral or any follow-up to medication non-compliance.

- Information, such as the chrono related to the change in Inmate C's level of care, was missing from the UHR.

- The inmate's informed consent for psychotropic medications had expired.

4.    Inmate D

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder, with psychotic features, and treated with Geodon 120 mg/day and Celexa 30 mg/day.

Inmate D arrived at CSP/Solano on April 27, 2004 from DVI. He was housed in general population at the beginning of the review period in July. Progress notes described the inmate as having some difficulty with depression. The inmate's previous medications, Wellbutrin and Seroquel, were switched to Doxepin and Thorazine on July 23, 2004. Inmate D continued to present with some lability of mood, but showed partial improvement during October.

On November 21, 2004, Inmate D was admitted to the MHCB unit after he presented with bizarre and disorganized behavior on the yard. He was hospitalized from November 21 to November 30, 2004. While in the hospital, the inmate was upgraded to the EOP level of care. The inmate's medications were also switched to Geodon and Celexa and he was discharged to the administrative segregation unit. The inmate reported that he was charged with a felony, specifically battery on a staff person.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was documentation for Inmate D of quarterly case management contacts in general population.

- This inmate was appropriately admitted to the MHCB unit, after exhibiting psychotic behavior.

- A MHCB discharge summary was present in the inmate's UHR, but the actual progress notes regarding the admission were not present.

- There was no documentation that five-day follow-up was ordered after the inmate was discharge from the MHCB unit, but it was too early to expect this information to be present in the record.

5.     Inmate E

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Psychotic Disorder, NOS, and treated with Seroquel 300 mg/day, Benadryl 150 mg/day and Prozac 40 mg/day.

Inmate E arrived at CSP/Solano on November 11, 2003 from CIM. He had been on the 3CMS roster since his arrival at the institution and was housed in administrative segregation since January 23, 2004. The inmate reported that he had been charged with possession of drugs and was awaiting placement in a sensitive needs yard at MCSP. Virtually all of the progress notes indicated that the inmate had no mental health complaints and that he refused out-of-cell clinical contact.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There were lapses in the documentation of weekly case management contacts in the administrative segregation unit.

- Case management progress notes were pre-printed and indicated that the inmate declined out-of-cell clinical contacts. All of the progress notes were virtually identical. The inmate's administrative segregation IDTT meeting documented the presence of all the necessary participants.

- Informed consent forms for treatment with psychotropic medications were present in the UHR.

- The inmate's MARs were adequately completed with only rare blank spaces.

6.    Inmate F

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Psychotic Disorder, NOS, and treated with Seroquel 350 mg/day and Wellbutrin 150 mg/day.

Inmate F arrived at CSP/Solano on March 29, 2004 from CIM, where he was in the EOP program. He had a history of multiple, brief MHCB admissions at CIM. It was unclear why he was transferred to CSP/Solano, but he was downgraded to the 3CMS level of care at his initial IDTT meeting on April 14, 2004.

Inmate F was transferred to administrative segregation on August 21, 2004. Subsequent progress notes indicated that he reported occasional auditory hallucinations; the staff questioned the validity of the inmate's complaints. A psychiatric progress note dated October 26, 2004 indicated that psychological testing would be considered for diagnostic clarification.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There were lapses in the documentation of the inmate's weekly case management contacts in administrative segregation.

- The majority of case management contacts in administrative segregation occurred at cell-front.

- Progress notes were frequently pre-printed.

- The inmate's administrative segregation IDTT meeting documented the necessary participants.

- Informed consent forms for treatment with psychotropic medications was present in the inmate's UHR.

- The last MAR present in the inmate's UHR was from July, five months prior to the date of the monitoring visit; MARs were generally complete, with rare blank spaces.

6

7.    Inmate G

This 3CMS inmate was housed in administrative segregation. He was diagnosed with Psychotic Disorder, NOS and treated with Geodon 80 mg/day. His case was reviewed at the request of the plaintiffs' attorney to evaluate the appropriateness of his mental health treatment.

Inmate G arrived at CSP/Solano on July 29, 2003 and had been on the 3CMS caseload since that time. He was transferred to the administrative segregation unit on May 24, 2004; the inmate reported that he was charged with over-familiarity towards staff. Progress notes indicated that Inmate G was seen by the medical staff for an apparent fungal groin infection on June 22, 2004. One progress note indicated that the inmate had received multiple disciplinary infractions, which he felt were unjustified. It appeared that the inmate had some conflicts with his case manager, but the most recent progress notes indicated that he was stable without overt evidence of psychosis or depression.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There were some lapses in the documentation of this inmate's weekly case management contacts in administrative segregation. Case management contacts were predominately at cell-front in the unit.

- The inmate's IDTT meetings in administrative segregation documented the necessary participants.

- Informed consent forms for psychotropic medications were present in the inmate's chart.

- The last MAR in the inmate's UHR was from August, four months prior to the monitoring visit.

- This inmate appeared to be at the appropriate level of care.

Inmate G had multiple disciplinary infractions for masturbation. Prior to these incidents, the inmate had been imprisoned for six of the last seven years and had received only two infractions during that time; neither of these infractions was sexually related. The inmate's C-file supported his report regarding the receipt of disciplinary charges for over-familiarity with staff; the charges were based on a letter with sexual content. This was followed by nine RVRs for indecent exposure as well as two unrelated RVRs. Although this was a sudden and drastic change from the inmate's history, no mental health assessment was sought for any of the infractions. Inmate G's UHR showed little, if any, mention by clinicians of his disciplinary charges and no evaluation of his behavior. Several of the inmate's

7

charges were referred to the district attorney's office, although the office had declined to prosecute all of the referrals to date.

8.    Inmate H

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and Obsessive Compulsive Personality Disorder and treated with Prozac 20 mg/day and Benadryl 50 mg/day.

Inmate H arrived at CSP/Solano in December 2002 from RJD on the 3CMS caseload. Progress notes indicated that he presented with intermittent anxiety and depressive symptoms, including ruminations and obsessive thoughts. He was last seen for clinical contact by a psychiatrist on October 29, 2004, possibly for non-compliance; Inmate H was reportedly off his medications for one month and presented, at that time, with anxious/depressed moods and increased obsessive thinking.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with Prozac was not present in the inmate's UHR.

- The September MAR indicated that the inmate's medication had been discontinued, but there was no physician's medication discontinuation order in the chart. It appeared that the MTA or nurse administering medications may have stopped the inmate's medications after a period of medication non-compliance without a doctor's order.

- Although there was documentation of case management contact at least every 90 days in the chart, the inmate's last case management contact was several days overdue.

- The inmate's chart did not contain a MTA referral or any documentation of timely mental health follow-up after a period of medication non-compliance.

- The inmate's annual IDTT meeting was not due until January 2, 2005.

9.    Inmate I

This 3CMS inmate was housed in general population. He was diagnosed with Mood Disorder, NOS, and treated with Trazodone 100 mg/day and Risperdal 2 mg/day.

Inmate I arrived at CSP/Solano during December 2002 and had been in the 3CMS program since that time. He was followed in general population by his case manager and psychiatrist who indicated that, although the inmate was experiencing some sadness, his depression was decreasing.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- There was informed consent for treatment with psychotropic medications present in the inmate's chart.

- The inmate's MARs were complete and indicated treatment compliance.

- There was documentation of consistent psychiatric contacts reflected in the inmate's UHR.

- The inmate was last seen for case management contact on August 31, 2004. The progress note in the chart indicated that Inmate I did not show up for his scheduled clinical appointment on November 17, 2004 and that the appointment was rescheduled; there was, however, no documentation that he had been seen by the time of the monitoring visit.

10.    Inmate J

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and treated with Trazodone 100 mg/day.

Inmate J had been housed at CSP/Solano since August 6, 2001. He had been on the 3CMS caseload since that time. Progress notes indicated that he had a long history of sporadic medication compliance. A psychiatric note reported that the inmate had not shown up for morning medications during August; the inmate cited work schedule conflicts as the reason for his non-compliance. The most recent progress note dated October 29, 2004 indicted that the inmate was depressed and anxious regarding an upcoming murder trial.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- The informed consent form for Trazodone in the inmate's chart had expired.

- The inmate's October MAR revealed a pattern of medication refusals and no-shows for medication. There was no documentation in the chart