indicating that the inmate was referred by a MTA the for his non-compliance. There was a MTA referral dated August 18, 2004 and documentation in the chart of mental health follow-up for an earlier episode of non-compliance.

- There was documentation of quarterly case management contacts in the inmate's chart.

- The inmate's recent IDTT meeting documented the necessary participants.

11.    Inmate K

This 3CMS inmate was housed in general population. He was diagnosed with Bipolar I Disorder and treated with Prozac 60 mg/day, Zyprexa 10 mg/day, Trazodone 150 mg/day and Depakote 750 mg/day.

Inmate K had been in the 3CMS program throughout the monitoring period; the previous volumes of his UHR were not available for review. Progress notes indicated that the inmate was followed consistently by his case manager and psychiatrist and that he was essentially stable on his medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- Laboratory testing for treatment with Depakote had not been completed since October 6, 2003, a period of greater than one year.

- The inmate's annual IDTT was timely and included the necessary participants.

- There was documentation of consistent psychiatric contacts in the inmate's UHR.

- The chart also contained documentation of at least quarterly case management contacts

12.    Inmate L

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and treated with Trazodone 100 mg/day.

Inmate L arrived at CSP/Solano on April 2, 2002. He had been in the 3CMS program since September 2002. Progress notes indicated that the inmate was essentially stable from a mental health standpoint; the inmate, however, had experienced continuing weight loss that was not attributed to his depression. A referral had been submitted to the medical department during August, but Inmate L had not been evaluated at the time of the monitoring visit.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with Trazodone was in the inmate's chart.

- The inmate's MARs were complete; the MARs documented medication compliance.

- The inmate's annual IDTT meeting was timely and included the necessary participants.

- There was documentation of consistent psychiatric evaluation with appropriate medication management contained in the chart.

- There was documentation of quarterly case management contact also contained in the inmate's UHR.

EXHIBIT E

California State Prison, San Quentin (SQ)

October 25, 2004 – October 28, 2004

1.    Inmate A

This EOP condemned inmate was seen by the monitor's expert during an IDTT meeting in the Adjustment Center. He was on a Keyhea order based on a history of weight loss and grave disability. According to the mental health staff, the inmate attended therapy groups five days a week; the inmate, however, reported that he attended therapy four days a week and indicated that he was often the only inmate in the group, as other inmates refused to attend groups routinely.

Inmate A had been seen by the expert on previous monitoring visits. He reported that he was doing "okay" in the Adjustment Center. There was a good discussion of the inmate's current treatment and the need to continue his Keyhea order to assure that he received his anti-psychotic medication. The inmate was also on an anti-depressant, which he took voluntarily.

Assessment:

This inmate's overall care and treatment appeared to be appropriate, but he was not receiving ten hours of structured therapeutic programmatic activities as required for EOP inmates. The inmate reported and staff confirmed that other inmates did not like the two-hour group therapy sessions and frequently refused services.

2.    Inmate B

This 3CMS condemned inmate's history was reviewed by the monitor's expert during an IDTT meeting in the Adjustment Center. The inmate refused to attend his IDTT meeting. According to his history, Inmate B described himself as being a Marine in 1967, although he was born in 1961. The inmate also described himself as a "killing machine." He had been an EOP inmate, but was converted to a 3CMS inmate, which reportedly caused him to become angrier and to begin refusing to attend IDTT meetings. The inmate was reported to have requested "anger management" therapy. Inmate B was diagnosed with Paranoid Schizophrenia and treated with Thorazine. He was reported to be compliant with his medication.

Assessment:

This inmate's care and treatment appeared to be appropriate for the 3CMS level of care, but it was not clear why the inmate's status had been changed from EOP to 3CMS.

3.    Inmate C

This 3CMS condemned inmate's history was reviewed by the monitor's expert at an IDTT meeting. The inmate refused to attend the IDTT meeting. The mental health staff reported that the inmate "never comes out" of his cell, with the exception of showering one or two times per week.

2

Inmate C was at DMH in 2001 and was discharged with no diagnosis. The psychiatrist did not believe the inmate's signs and symptoms and the case manager reported that the inmate admitted making up symptoms of auditory hallucinations. Despite this, the inmate was prescribed Seroquel, an anti-psychotic, without a clear explanation of the reason for the prescription.

Assessment:

This inmate's care and treatment were unclear, as he did not have a diagnosis of a psychotic disorder, but continued to receive anti-psychotic medication. He, like other inmates, refused to attend his IDTT meeting.

4.    Inmate D

This 3CMS condemned inmate's history was reviewed by the monitor's expert at an IDTT meeting. The inmate refused to attend the treatment planning meeting. Inmate D reportedly acknowledged ties to the PGF gang and did not participate in mental health treatment because of racial issues.

Inmate D had a history of Bipolar Disorder. Although he had reported doing "pretty well on the meds," he had become hypomanic without them, receiving RVRs for indecent exposure. Indeed, the inmate was in the Adjustment Center at the time of the monitoring visit because of indecent exposure/masturbation associated with his hypomania. The inmate was not any psychotropic medications.

Since the inmate would not attend his IDTT meeting, the expert attempted to interview him in his cell. The inmate's first statement was "talk to my lawyer." After that, however, he agreed to speak with expert as part of the Coleman case and reported that the mental health staff was "not doing their jobs." Inmate D believed that custody staff should not be present during IDTT meetings because that was a violation of his rights. The inmate's entire conversation focused on his legal situation and his belief that custody staff should not be a part of IDTT meetings. The inmate was not psychotic and, although his speech was somewhat pressured, he was easily redirected and did not evidence any symptoms of a psychosis.

Assessment:

This inmate's care and treatment appeared to be appropriate for someone guarded and resistant to treatment. His treatment plan, however, was in need of review to determine whether his indecent exposure and masturbatory activities were part of a bipolar disorder which should be treated with mood-stabilizing medications. The potential for a Keyhea order based on these behaviors should also be explored.

3

5.    Inmate E

This 3CMS condemned inmate's history was reviewed by the monitor's expert at an IDTT meeting. The inmate refused to attend the meeting. Inmate E was reportedly a member of the Crips and his participation in out-of-cell activities had declined; instead of going to the yard three times a week, he was going approximately five times a month.

The staff believed that Inmate E was delusional. He only talked to one staff member, had a diagnosis of Psychotic Disorder NOS and refused psychotropic medications. The plan was to place the inmate at the EOP level of care in order to address his symptoms more actively.

Assessment:

This inmate needed more intensive mental health treatment and should have been treated at an EOP level of care.

6.    Inmate F

This 3CMS condemned inmate's history was reviewed by the monitor's expert during an IDTT meeting in the Adjustment Center. Inmate F also refused to attend his IDTT meeting. According to staff, the inmate was diagnosed with Paranoid Psychosis and Major Depression. He also had a history of heroin abuse and a history of attempting to hang himself in 1996. Inmate F was converted from Grade A to Grade B approximately two months prior to the monitoring visit because he used heroin in the facility. The treatment team's determination was to retain him at a 3CMS level of care.

Assessment:

This inmate's care and treatment appeared to be inadequate. According to staff reports, the inmate was deteriorating. He had been refusing to attend IDTT meetings and to participate in other activities, since his classification change from Grade A to Grade B condemned. Inmate F's treatment should be reviewed to consider an EOP level of care, if his condition did not stabilize.

7.    Inmate G

This 3CMS administrative segregation inmate was seen by the monitor's expert during an IDTT meeting. This was the inmate's initial IDTT meeting, since he was new to the MHSDS. Inmate G reported that a correctional officer discouraged him from coming to the IDTT meeting by stating that, if he went to the meeting, his cell would be tossed. The inmate was prescribed Paxil and Seroquel. He indicated that he wanted to engage in mental health treatment.

4

Assessment:

This inmate's care and treatment appeared to be appropriate, although his report that custody staff discouraged his participation in the IDTT process by threatening him that his cell would be tossed needed to be followed-up. This matter was referred to the administration for review.

8.    Inmate H

Inmate H had been at SQ for one month and was currently in the reception center. He had a history of Bipolar Disorder, Schizophrenia and Manic Depressive Disorder. He had been treated with Haldol and Thorazine in the past, but reportedly had not received any medication since July. The inmate was interviewed by one of the psychiatrists in the infirmary area, after being referred by custody for behavior described as agitated and escalated. The inmate was found to be hypomanic, with pressured and circumstantial speech. The psychiatrist determined that he should be placed in the OHU for further review and stabilization.

Assessment:

This inmate's care and treatment were inadequate in the reception center. The inmate had not been receiving medications, despite his history of severe and persistent mental illness. The determination by the psychiatrist to place Inmate H in the OHU was appropriate, as was the inmate's agreement to begin treatment with Risperdal. A medication consent form was signed during the inmate's meeting with the psychiatrist.

9.    Inmate I

This EOP reception center inmate's record was reviewed by the monitor's expert. The inmate arrived at SQ on September 27, 2004 from a country jail. Inmate I had been on medication in the county jail and his bus screening upon arrival at SQ was positive for having a mental history. Despite this, no referral was made and the inmate was not placed on medications.

Inmate I was admitted to the OHU from October 4 through October 6, 2004 with a diagnosis of Psychotic Disorder NOS and treated with Risperdal. An appropriate consent form was found in the inmate's UHR.

Assessment:

This inmate's care and treatment were inadequate on arrival at SQ, as he did not receive his medications until he was transferred to the OHU on October 4. The inmate was returned to the reception center two days later, but was subsequently readmitted to the OHU because his condition had not improved. Inmate I's current treatment appeared to be adequate.

10.    Inmate J

Inmate J was one of three inmates who returned to the SQ OHU from an MHCB unit and then returned to a MHCB unit directly from the OHU, rather than being placed in the general population. This inmate originally arrived at SQ on April 30, 2004 from a county jail. His bus screening was negative. After arrival, he was placed on Geodon and Benadryl, but no medication consent forms were located in the record.

The inmate was in the SQ OHU from September 23 through September 28, 2004. Inmate J's admission to the OHU followed his attempted overdose and hanging on September 22, which he reported was related to his safety concerns as a gang dropout. The inmate was then transferred to the CSATF MHCB unit from September 28 through October 7, 2004, with a diagnosis of Psychotic Disorder NOS. He returned to SQ on October 8 from CSATF and remained in the OHU until October 15, 2004, when he was transferred to the MHCB unit at CSP/Solano. He remained in the MHCB unit from October 15 through October 21, 2004. Inmate J returned from CSP/Solano on October 21 and was placed in the OHU until October 27, 2004.

Five-day follow-up was not conducted for this inmate upon his return from CSATF on October 7. Instead, he was placed in the OHU and it was decided that five-day follow-up would not begin until he was returned to regular housing. As noted above, the inmate did not leave the OHU until October 15, 2004, was then transferred to CSP/Solano and returned to the OHU at SQ where he remained at the time of the monitoring visit.

Assessment:

This inmate's care and treatment appeared to have been inadequate. After his transfer to a MHCB unit, he was returned to the OHU at SQ and subsequently transferred to another MHCB unit because he was not stable. His lengths of stay on each occasion in the OHU exceeded 72 hours.

11.    Inmate K

Inmate K was admitted to SQ on October 22, 2004. His bus screening was positive. The inmate was placed in the OHU on suicide precautions from October 22 through October 24, 2004 because of voices telling him to kill himself. He was diagnosed with Depressive Disorder NOS and prescribed Prozac. After leaving the OHU, the inmate was placed at a 3CMS level of care. An undated suicide risk assessment, presumably done at the time of admission, indicated a moderate risk of suicide. There was no suicide risk assessment upon the inmate's release from the OHU found in the chart.

Assessment:

This inmate was determined to be in need of an OHU level of care on admission and was appropriately transferred to the OHU. The inmate's care and treatment appeared to be

appropriate, with the exception of a flawed suicide risk assessment form on admission and the absence of a suicide risk assessment prior to the inmate's release from the OHU.

12.    Inmate L.

This EOP reception center inmate was seen by the monitor's expert in the OHU and his mental health records were reviewed. Inmate L arrived at SQ on June 18, 2004. Since then, he had nine OHU admissions, all as a result of statements indicating the inmate's intent to harm himself. The inmate had not exhibited any overt suicidal behaviors, with the exception of having cut his finger, which he explained was accidental while he was attempting to make a candlewick.

Inmate L had been receiving Wellbutrin and Seroquel, although he reported that he missed his Wellbutrin for three days after a housing change. The inmate had changed housing location twice since his admission because of safety issues and his level of discomfort in particular housing units. A DDP screening on November 6, 2003 indicated that the inmate was NCF during a previous admission. He was diagnosed with Depressive Disorder NOS and Personality Disorder NOS. On interview, the inmate indicated that he would be "okay" to go to a different housing unit on that same day. Unfortunately, later in the afternoon, he began banging his head and opened a cut on his forehead, which necessitated his placement in restraints in the OHU. The inmate's discharge from the OHU was cancelled and he was considered for transfer to a MHCB unit; such a transfer appeared to be an appropriate disposition.

Assessment:

This inmate's course of treatment was being reviewed and consideration was being given to transferring the inmate to a MHCB unit; both MCBH placement and ICF transfer should be considered. Inmate L's current placement was appropriate.

13.    Inmate M

Inmate M had been in administrative segregation, but was transferred to the OHU, then to a MHCB unit and subsequently to DMH. He returned to the OHU, was then placed on a general population tier and next transferred back to the OHU. Thereafter, he was admitted to a MHCB unit and was returned from DMH to the OHU. The inmate was seen by the monitor's expert in the OHU upon his return from DMH.

Inmate M indicated that he continued to feel suicidal, but would try going back to administrative segregation. He reported that he heard voices telling him to kill himself because of homosexual acts. The inmate had a diagnosis of Schizophrenia and was receiving Prolixin. He was not mentally stable and was in need of further treatment review.

7

Assessment:

It was strongly recommended that this inmate be transferred to the ICF at DMH for stabilization and more comprehensive, long-term care.

14.    Inmate N

This EOP reception center inmate was seen by the monitor's expert in the OHU. The inmate had been in the OHU a month before the monitoring visit and was transferred to a MHCB unit. This was his fifth transfer to a MHCB unit in what appeared to be a five-month period. On return from the MHCB unit, Inmate N was placed in the OHU in a smock on suicide watch because he continued to report "these people are devil worshippers – can't visit mom." The inmate indicated that he heard voices, including the voice of a "lady gonna kill someone." Inmate N reported that he was not sure the devil was in him or somewhere else. He had refused Geodon, which had been prescribed for him, because it was "not Seroquel." The inmate requested Seroquel and appeared to have had trials of Seroquel that had not resulted in his stabilization.

Assessment:

This inmate was in need of transfer to an acute psychiatric program at DMH. This was strongly recommended to the staff.

15.    Inmate O

This 3CMS condemned inmate was seen by the monitor's expert in the adjustment center; he had been seen during previous monitoring visits. On this visit, the inmate reported that he was doing well and that he continued to receive Depakote, Wellbutrin and Artane. The inmate was very concerned that his Wellbutrin might be discontinued because other inmates abused that medication. He said that his psychiatrist, whom he saw every 30 to 60 days, assured him that he would continue to receive his Wellbutrin; this appeared appropriate given the inmate's status in the adjustment center.

The inmate indicated that he was taking Artane for Bruxism, which had occurred when he used other neuroleptics in the past and which had occurred at night when he was sleeping. A review of the inmate's record indicated that his last MH-2 was October 12, 2004, which he attended even though he was housed in the adjustment center. The inmate's diagnoses remained Bipolar Disorder and Narcissistic Personality Disorder. He also was seeing a case manager weekly. His record indicated that he was receiving appropriate treatment.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current level of need. The staff indicated a willingness to explore obtaining a mouth guard for him to use at night should he have any problem with Bruxism.

8

16.    Inmate P

This EOP administrative segregation inmate was seen by the monitor's expert during an IDTT meeting, which was his 90-day update. Inmate P appeared to be housed in administrative segregation because of safety issues. The inmate reported that he felt better; the mental health staff noted that there had been an improvement in the inmate's condition since his last IDTT meeting and the initiation of Zoloft.

Inmate P had a diagnosis of Major Depressive Disorder, Severe, with Psychotic Features, and was a gang dropout. The treatment staff believed that the inmate was going to parole in approximately 90 days, but the correctional counselor indicated that his parole was expected in two weeks. Because of this discrepancy, there was no pre-parole plan in place for the inmate.

Assessment:

This inmate's care and treatment appeared to be appropriate, although pre-parole planning had not occurred as required because the treatment team was not aware that his parole was pending within two weeks. On further inquiry, the treatment team reported that the parole list was frequently inaccurate and that this inmate, specifically, was not on the list.

17.    Inmate Q

This EOP reception center inmate was seen by the monitor's expert during an IDTT meeting. A review of the inmate's mental health record indicated that he was admitted to SQ on October 11, 2004. There was no C-file available for this inmate. Inmate Q reported he had received Geodon two years ago and was requesting that Geodon be reinstituted for him. The treatment team agreed that he should be placed on anti-psychotic medication and continued at the 3CMS level of care.

Assessment:

This inmate's care and treatment appeared to be appropriate for his mental health needs.

18.    Inmate R

This EOP condemned inmate was seen by the monitor's expert at an IDTT meeting. He had been at SQ for ten years and had returned recently from the APP at DMH in early October 2004 on a Keyhea order. He was on a Keyhea order secondary to grave disability, as his condition had deteriorated; the inmate had a fixed delusional system, had engaged in rambling writings and had washed himself in his toilet filled with feces. Inmate R received Depakote and Lithium in liquid form.

Custody staff reported that the inmate's condition had improved; when not on medications, Inmate R was noted to be extremely agitated, with pressured speech related to his delusions regarding the transcriptionist at his trial. The inmate's Lithium level was noted as 0 in his UHR.

Assessment:

This inmate's care and treatment appeared to be appropriate. It was a matter of concern, however, that his Lithium level was reported as 0, given that he was on liquid medications.

19.    Inmate S

This EOP administrative segregation inmate was seen by the monitor's expert in an IDTT meeting. This inmate had been seen during the last monitoring visit in the adjustment center. At that time, the inmate appeared to be highly agitated and in a manic state. Since then, the inmate had been transferred to DMH and returned on a Keyhea order.

During the course of the IDTT meeting, Inmate S recognized the expert and other staff from the previous monitoring visit, apologized for his behavior and reported that he felt much better on medication, in contrast to the last monitoring visit when he was not receiving medications. At the time of the last monitoring visit, this inmate's care and treatment were inadequate for his mental health needs.

Assessment:

This inmate demonstrated marked improvement and was an example of the impact that effective and adequate treatment can have on an inmate's condition. Inmate S's care and treatment appeared to be appropriate at this time.

20.    Inmate T

This 3CMS inmate's record was reviewed by the monitor's expert. Inmate T had an IDTT meeting at CSP/Solano on January 2, 2004 and received diagnoses of Mood Disorder NOS and Adjustment Disorder with Depression. He was placed on Wellbutrin, for which a consent form dated January 19, 2004 was in his UHR.

Inmate T arrived at SQ on July 19, 2004 with a negative bus screening. A chrono of September 10, 2004 indicated that the inmate was not on the mental health caseload. A psychiatric note from September 23, 2004 indicated that he was designated as a 3CMS inmate and that Wellbutrin continued to be prescribed. No MH-4 was located in the inmate's record.

Assessment:

The documentation in this inmate's record indicated that he was not on the mental health caseload, but also that he was a 3CMS inmate. The inmate's status needed to be clarified to ensure that he received the appropriate mental health services at the 3CMS level of care.

21.    Inmate U

This EOP reception center inmate's record was reviewed by the monitor's expert. Inmate U had been transferred to DMH on August 20 and returned to the reception center at SQ on October 21, 2004. He was diagnosed with Schizophrenia Paranoid Type and prescribed Haldol; he was on a Keyhea order.

Inmate U had an IDTT meeting on October 25, 2004. The meeting was appropriately attended by the required representatives of all disciplines and a good treatment plan was developed. The inmate was identified as developmentally disabled. He received a RVR for throwing a tray, which he reported was in response to voices. The status of this RVR was not clear.

Assessment:

This inmate's care and treatment appeared to be appropriate, but the status of the inmate's disciplinary infraction and related mental health assessment was not clear from the record.

22.    Inmate V

This condemned inmate's record was reviewed by the monitor's expert. Inmate V had been in the CDC system since 1985 and at SQ since approximately December 1991. He had not been on medications since 1999. The inmate had received RVRs for gassing three correctional officers in November 2003. Inmate V's most recent IDTT meeting on October 25 indicated that his level of care should be changed to EOP. The record indicated the inmate refused to come out of his cell. He talked to only one female correctional officer and refused to speak with other staff members. His weekly case management contacts have been all at cell-front. The inmate received a diagnosis of Psychotic Disorder NOS at a previous IDTT meeting on May 17, 2004.

Assessment:

This inmate was in need of more assertive and active treatment. The determination to change his level of care to EOP appeared to be appropriate. A Keyhea order may also be needed for this inmate.

23.    Inmate W

The record of this condemned EOP administrative segregation inmate was reviewed by the monitor's expert. There was no bus screening from his arrival at SQ found in the inmate's record. The inmate's last bus screening was at DVI in December 2003.

Inmate W was designated 3CMS in June 2004, when he was transferred to the OHU because of psychotic symptoms. He was placed at the EOP level of care upon his release from the OHU on July 1, 2004. The inmate signed a refusal to attend EOP group therapy in July. It appeared that he refused Risperdal, although it had been ordered for him, and was only receiving Benadryl. The inmate's case manager had made multiple requests for a medication evaluation, which had not occurred at the time of the monitoring visit.

Assessment:

This inmate's care and treatment were inadequate. Inmate W needed to have a psychiatric evaluation, particularly regarding his medication interventions.

24.    Inmate X

This EOP condemned inmate was seen in the adjustment center by the monitor's expert and his record was reviewed. He was seen during a group meeting, but was the only inmate present. Inmate X was receiving Risperdal and Zoloft; consent forms for these medications were present in the inmate's chart. There were weekly case management notes also in the inmate's UHR.

Inmate X refused to attend his IDTT meeting on August 30, 2004, but the meeting was otherwise appropriately attended by representatives of the required disciplines; an adequate treatment plan was developed at the meeting for the inmate. The inmate also refused to attend his IDTT meeting during the monitoring visit. Inmate X had a diagnosis of Major Depression with Psychotic Symptoms.

Assessment:

This inmate's care and treatment were in need of review, given that the inmate had refused to attend his last two IDTT meetings. Furthermore, the fact that he was the only member in a "group" therapy should also be explored by the treatment staff.

25.    Inmate Y

This 3CMS inmate's record was reviewed by the monitor's expert. Inmate Y entered the CDC system on March 23, 2003 and had been housed at CSP/Solano, CMF and SQ. A MH-2 dated February 25, 2004 recorded a diagnosis of Schizoaffective Disorder and Alcohol Dependence. The inmate was treated with Navane, Artane and Remeron. The record indicated that the inmate missed his medications from August 18 through September 3, 2004, despite the fact they were reordered on September 1, 2004 pursuant

12

to a psychiatrist's note. There was no explanation for this gap in the inmate's medication administration.

Assessment:

This inmate's care and treatment were inadequate in that he did not receive his medications consistently as prescribed.

26.    Inmate Z

This EOP reception center inmate's mental health record was reviewed by the monitor's expert. The inmate had been on a Keyhea order since his arrival at SQ on June 17, 2004. His bus screening on arrival was negative, but he was admitted to the OHU from June 24 through June 25 and transferred to the MHCB unit at CSP/Sac from June 25 through July 13, 2004. The inmate returned to the OHU from July 13 through July 14 and was placed in administrative segregation after his return.

There was no five-day follow-up noted in the record upon the inmate's discharge from the OHU. The inmate received an IDTT meeting on August 17, 2004, while in administrative segregation, but there was no correctional counselor in attendance. The treatment plan developed at this meeting was not individualized. Inmate Z's diagnosis was noted as Bipolar Disorder with a GAF of 41. He was currently on a Keyhea order and receiving Risperdal, Const aim q two weeks and Depakote liquid. The inmate was noted to be paroling in approximately one month. While he had been seen weekly by a case manager, he had consistently refused to attend group therapy.

Assessment:

This inmate's discharge planning needed to be accelerated, given his approaching parole date. Inmate Z's treatment plan should also be revised and the treatment plan recommendations included in his pre-release discharge plan.

27.    Inmate AA

This 3CMS reception center inmate's record was reviewed because of his multiple OHU and MHCB admissions. Inmate AA arrived at SQ on January 9, 2004. He had a diagnosis of Schizoaffective Disorder. The inmate was admitted in succession to the OHU from July 8 through July 13, to the MHCB unit at CSP/Solano from July 17 through July 29, to the OHU from August 17 through August 23, to the MHCB unit at RJD from August 23 through August 31 and to the OHU from August 31 through September 1.

Five-day suicide prevention follow-up was appropriately conducted for the inmate from September 3 through September 7 upon his discharge from the OHU. The inmate was noted as a "no show" in his next mental health note from September 30, 2004. Inmate

13

AA was not referred to DMH and he remained at the 3CMS level of care despite his troubled treatment course.

Assessment:

This inmate's care and treatment appeared to be inadequate in that he was not referred to a higher level of care, despite his multiple OHU and MHCB admissions. The inmate received poor follow-up and he was kept at a 3CMS level of care, rather than placed at least at the EOP level of care.

28.    Inmate BB

The monitor's expert reviewed Inmate BB's mental health record and found the documentation of mental health care provided virtually non-existent. It was unclear whether the inmate was a reception center inmate and what the date of his admission to the institution was. There was a diagnosis of Adjustment Disorder in the chart, but the inmate's UHR was essentially empty, except for a DDP evaluation dated August 3 and mental health notes from August 11 and October 20, 2004. There were no bus screening or any psychiatric orders.

Assessment:

This inmate's care and treatment were not possible to evaluate based on the documentation in the UHR, which was extremely poor. The inmate needed to be seen and evaluated to determine his mental health needs.

EXHIBIT  F

Deuel Vocational Institution (DVI)

November 1, 2004 – November 3, 2004

1.    Inmate A

This inmate arrived at DVI on August 9, 2004 from a county jail. The arriving documents included a diagnosis of Manic-Depressive Disorder; the inmate was on no psychotropic medications. On the day of arrival, Inmate A received a telephone order for "bridge medications," which restarted his Paxil of 40 mg and Remeron 30 mg for 30 days, without an evaluation by the psychiatrist. On the same day, he also received a mental health evaluation with a suicide risk assessment. Information regarding the inmate's medications in the POC was elicited. A telephone order for these medications was obtained. The inmate was "detoxing" in reception and requested his medications as he was extremely anxious.

Inmate A's mental health screening on August 13, 2004 was positive. A psychiatric referral, which was in the chart, was made. A chrono indicated that the inmate was requesting his Seroquel and Trazodone.

On August 20, 2004, the inmate's MH-7 was completed. Inmate A had a history of MHCB care and treatment in the POC. He had multiple suicide attempts by laceration of his wrists, including more than ten attempts over the last few months as an outpatient. While the inmate experienced audiovisual hallucinations, there was no sign of depression. He had a long history of mood and psychotic symptoms and had been on an EOP level of care for some time.

Inmate A's diagnosis was Psychosis NOS. The inmate received an urgent psychiatric referral. An EOP level of care chrono was written and the inmate's treatment plan called for weekly case management visits. The inmate history revealed that Inmate A had been treated at DVI since 2000. He was sent to the MHCB unit at HDSP between June 16 and June 23, 2004. On return to DVI, the inmate paroled at the end of June 2004.

The inmate's first psychiatric progress note was dated August 31, 2004. That evaluation was conducted without benefit of any records or UHR. Inmate A was diagnosed with Major Depressive Disorder with Psychotic Features and Polysubstance Dependence. On Axis III, the inmate had HBP, asthma and a knee injury. The psychiatrist re-started the inmate's long-standing prescription for Seroquel 600 mg b.i.d., Remeron 45 mg per day and Lexapro 20 mg. The inmate's Paxil was discontinued. By early September, the inmate was still very symptomatic, but improved according to progress notes; by early October, his MSE was unremarkable. On November 2, 2004, Inmate A was still awaiting EOP placement and was overdue. A decision was made to get a clinical step-up.

2

Assessment:

- This inmate's initial medications were prescribed without a valid basis and without a psychiatric evaluation.

- The wrong medications were initially prescribed for Inmate A.

- Psychiatric response to the multiple referrals for this inmate was delayed.

2.    Inmate B

This inmate arrived at DVI on July 15, 2004 and received a positive screening on July 22, 2004. Inmate B's MH-7 was completed on July 28, 2004, and an EOP chrono was generated. At that time, the inmate was on Wellbutrin and Zyprexa. Inmate B had a history of overdosing on medications twice in county jails. Clinically, he was depressed, anxious and very irritable; his audio hallucinations were under partial control. The inmate had an Axis I diagnosis of MDD with psychotic features and a GAF of 55.

A review of the physicians' orders and MARs for this inmate during July 2004 revealed that Zyprexa 7.5 mg q.p.m. was ordered on July 16, 2004, along with Wellbutrin 100 mg b.i.d. Inmate B, however, did not begin receiving these medications until July 20, 2004, after a four-day gap. The inmate's medication compliance was variable. Through October, he only took between 70 and 80 percent of his prescribed doses.

On August 19, 2004, a psychiatrist ordered a Depakote workup and prescribed Zyprexa 10 mg h.s. The inmate's Depakote was titrated upwards, beginning with 500 mg q.p.m. for a week and culminating in 1000 mg q.p.m. for 90 days. No blood level tests were ordered.

On October 21, 2004, Inmate B arrived back from county jail having been out-to-court. A continuity order for his medications was written along with a psychiatric referral. On the same day, Depakote 1000 mg q.p.m. was prescribed along with Zyprexa 20 mg q.p.m. Psychiatric progress notes from August 21 and September 2, 2004 confirmed the orders indicated above. No order for DOT was ever written, despite the fact that the inmate often missed greater than 50 percent of his prescribed doses of medication and had a history of multiple overdoses. There were no laboratory studies completed during the year 2004.

The inmate's last case manager visit was on September 23, 2004 and his last clinical contact was on October 9, 2004, at which time the inmate presumably went out-to-court. A staff referral chrono from October 21, 2004 was not in the inmate's chart and there was no response to the referral noted. The inmate at that time was stable, asymptomatic and programming very well.

3

Assessment:

- This inmate experienced medication discontinuity on his arrival at DVI.

- There was no DOT order written for Inmate B, despite the inmate's history of non-compliance and overdoses.

- No Depakote levels were in the inmate's chart and it appeared that no levels were ordered.

- Clinical contacts with Inmate B lapsed.

- There was a failed referral for the inmate to mental health.

3.    Inmate C

This inmate's chart was reviewed as part of a study of laboratory testing. Inmate C was currently on 400 mg of Tegretol b.i.d. This was the inmate's first prescription for this medication. On June 17, 2004, a CBC and TSH were ordered. A Tegretol level was ordered in the MHCB unit; the results showed a 7.3 level, with four to 12 constituting the normal range. There was an October 26, 2004 order for a CBC, chem-24, TSH, hepatic profile and Tegretol level.

Assessment:

- Laboratory protocols were followed with regard to his inmate.

4.    Inmate D

This inmate's chart was reviewed as part of a study of laboratory testing. There was a 30-day order for Tegretol 200 mg t.i.d. dated October 14, 2004 in the chart; the order was signed by a medical physician related to a seizure disorder. Inmate D had come from the county jail where he had refused Tegretol.

On October 24, 2004, Inmate D experienced a seizure and a blood level test was ordered. The inmate's Tegretol was increased to 650 mg t.i.d. and *STAT* Valium 5 mg PO was given. The inmate refused Tegretol at that time. There was no MAR written regarding the delivery of this medication, even after the fact, and no times were listed in the progress note for either the order or the administration of medication.

Assessment:

- The protocol for administering psychotropic medications was not

4

followed.

- *STAT* orders were not well documented; the delivery times were unclear and there were no MARs completed.

5.   Inmate E

This inmate's chart was also reviewed as part of a study of laboratory testing.

Inmate E was on Tegretol, Depakote and Valium. A review of the inmate's MARs reflected an October 4, 2004 audit by MTAs noting that the inmate had missed greater than 50 percent of his medications in one week. There was a Tegretol order dated October 5, 2004 for 200 mg b.i.d., and laboratory tests for a CBC, TSH, chem-24 and Tegretol levels were ordered on October 15, 2004.

There was an initial Depakote order on September 30, 2004 titrating the Depakote upwards to 500 mg b.i.d. over a one-week period. In addition on that date, there was a *STAT* order for Valium 5 mg PO at 17:15, which was given to the inmate at 17:36. A March 29, 2004 Depakote order for 250 mg b.i.d. was accompanied by orders for liver function tests and a Depakote level. There were no laboratory test results whatsoever in the UHR for 2004. There were laboratory studies from December of 2003 in the inmate's chart.

Assessment:

- The protocol for psychotropic medications was not followed.

- The Depakote protocol was followed, but laboratory test results were not in the chart.

- This inmate was not referred to mental health for medication non-compliance.

- Appropriate and timely documentation of a *STAT* order was found in the inmate's chart.

- Laboratory studies ordered in March and October 2004 were not completed.

6.   Inmate F

There was an October 20, 2004 start for Depakote ER 500 mg q.p.m., which was increased on October 27, 2004 to 1000 mg q.p.m. for 90 days. No laboratory tests or blood levels related to this medication were ordered. The above medications were listed on pharmacy labels, but there were no physicians' orders for the medication found in the inmate's chart.

Assessment:

- The protocol for psychotropic medication was not followed; no laboratory studies or bloods levels were ordered.

- The pharmacy appeared to have increased the inmate's Depakote without a physician's order or psychiatric note.

7.   Inmate G

Inmate G was prescribed Depakote ER 500 mg q.p.m. x 90 days and Thorazine by a psychiatrist. Two weeks later, a different psychiatrist changed the Thorazine to Zyprexa. The pharmacy label on the MAR indicated an October 3, 2004 start for the Depakote, which constituted a four-day gap in medication. No laboratory tests were ordered related to this medication, a fact which was not picked up by a second psychiatrist. There were, in fact, no laboratory studies whatsoever in the inmate's chart.

Assessment:

- The protocol for psychotropic medication was not followed in this inmate's case.

- This inmate experienced discontinuity of medication following a prescription for a formulary drug.

- There were no laboratory studies in the inmate's chart.

8.    Inmate H

The monitor's expert reviewed a flimsy file for this inmate, which contained no mental health progress notes or orders for mental health medications. There was an order for Depakote written by a medical physician. Prescriptions for other medications, including Lithium, were written by psychiatrists. The inmate's next Depakote order, dated October 15, 2004, was written by a psychiatrist. There were no laboratory studies or blood levels ordered for Inmate H.

Assessment:

- This inmate's medical record was fragmentary.

- The protocol for psychotropic medication was not followed for Lithium in this inmate's case.

6

9.    Inmate I

Inmate I's chart contained a new prescription, dated September 24, 2004, for Lithium 300 mg a.m., 600 mg p.m., written by a medical physician, along with a psychiatric referral. There was no time frame specified for the medication. The pharmacy label indicated that the medications were for one month with an October 24, 2004 stop date. A review of the inmate's MAR revealed that the medication was not administered for three and a half days following the initial order. No laboratory tests were ordered.

Inmate I was screened by a case manager on September 25, 2004. The inmate wrote a request to be seen for a medication re-order on October 19, 2004. There were no psychiatric progress notes in the inmate's chart. The inmate's medication was renewed by a psychiatrist.

Assessment:

- The protocol for psychotropic medication was not followed for Inmate I.

- This inmate experienced discontinuity of medication for three and a half days on arrival.

- This inmate was prescribed Lithium by a psychiatrist without any evaluation or psychiatric note.

- No blood levels or laboratory studies were ordered for this inmate and there were none in the inmate's chart.

10.    Inmate J

Inmate J was currently taking Lithium and Depakote. The inmate's MARs reflected an initial Depakote order dated August 6, 2004 for 1500 mg q.p.m. with a November 4, 2004 stop date. That order was written by a medical physician. On September 9, 2004, a medical physician increased the inmate's Depakote to 2000 mg q.p.m., with a psychiatric referral. That referral requested a response "within 24 hours." A referral chrono was in the chart.

The inmate's initial psychiatric order was dated September 15, 2004, prescribing Lithium for the first time. The prescription was for 300 mg q.p.m. and a blood level was ordered within the next 30 days. Inmate J was sent to a MHCB unit at MCSP on September 13, 2004; he returned on September 24. Lithium was ordered for this inmate at MCSP.

Following the inmate's return to DVI, Depakote and Lithium were reordered on September 24, 2004 and a psychiatric referral was again sent. The only

7

psychiatric progress note in the inmate's chart was dated October 20, 2004, when the inmate's medications were renewed. A scheduled mental health evaluation never occurred. A review of the laboratory section of the inmate's chart revealed laboratory results for chem-24 and CBC from May 2004, but found no laboratory studies thereafter.

Assessment:

- The protocol for psychotropic medication was not followed either at MCSP or subsequently at DVI.

- There was no psychiatric response to multiple mental health referrals.

- This inmate's psychiatric medication was renewed without a mental health evaluation and without any orders for laboratory tests or blood levels.

- A Lithium level ordered at MCSP on September 15, 2004 was never completed.

11.    Inmate K

Inmate K arrived at DVI on September 29, 2004 on Lithium, which was started in a county jail on September 21, 2004. An order dated September 29, 2004, continuing the inmate's Lithium 300 mg b.i.d. for 30 days, was accompanied by a psychiatric referral. On October 22, 2004, the inmate's Lithium was discontinued by a psychiatrist who concluded that the inmate had received Lithium in the county jail merely for irritability. The inmate's diagnosis on Axis I was a history of mood disorder NOS. No blood levels or laboratory tests were ordered by the physicians involved in the inmate's case.

Assessment:

- The medical physicians did not follow the protocols for psychotropic medications in this case.

12.    Inmate L

Inmate L returned to DVI on August 4, 2004 after being out-to-court. He had been on Lithium long-term and was also on Prozac at the time of his return to DVI. The inmate went out-to-court again and returned to DVI on September 29, 2004.

There were orders continuing the inmate's Lithium 300 mg b.i.d. for 30 days as well his Prozac that were written on August 5, 2004. These medications were renewed, nine days late, on September 14, 2004 by medical physicians.

A review of the inmate's first September 2004 MARs revealed that all of the days were blank until the inmate Lithium was started on September 15, 2004. A second MAR for the same month revealed a start date of September 16 for Lithium; according to this MAR, the inmate took the prescribed Lithium every day until September 21, 2004. The inmate's chart contained an October 3, 2004 medication renewal order, styled a "bridging" order in a telephone order by a psychiatrist.

The inmate's MAR for November 2004 was handwritten; the old MAR form was used. Between October 3 and October 6, the inmate took only six of eight medication doses. An MAR audit conducted on October 25, 2004 indicated that the inmate had missed greater than 50 percent of his prescribed medication doses. There were medication gaps reflected in the October MAR from September 29 until October 3 and from October 6 until October 22, 2004. A case manager note dated October 7, 2004 indicated that the inmate had stopped taking his medications. There were no psychiatric notes relating to any of these matters, including medication orders.

Assessment:

- This inmate experienced psychiatric and medical discontinuity secondary to going out-to-court; there was a failure to refer the inmate for medication non-compliance.

- This inmate experienced medication discontinuity on arrival and at renewal.

- There were orders for medication in the inmate's chart without a mental health evaluation and without a psychiatric note.

Treatment Plan Studies

13.    Inmate M

Inmate M received a MH-2 treatment plan on March 10, 2004 in the form of a two-page MH-2 update. He had received an emergency referral to mental health and was seen on March 5. The plan was fragmentary and judged to be inadequate. The inmate was not on medications and depressed. There were no strategies in the plan for dealing with these problems.

Assessment:

- Inmate M had an inadequate current treatment plan.

14.     Inmate N

Inmate N received his initial IDTT meeting on April 14, 2004. A MH-3 evaluation was typed and very comprehensive. A MH-2 was conducted by the full treatment team on April 14, 2004 based on that evaluation. It was extremely brief and not individualized.

Assessment:

- Inmate N had a brief and inadequate treatment plan.

15.     Inmate O

Inmate O was seen at an IDTT meeting on April 21, 2004; a treatment plan was written at that time. The plan was fragmentary and incomplete. A problem check list attached to the treatment plan was unused.

Assessment:

- Inmate O had a brief and inadequate current treatment plan.

16.     Inmate P

Inmate P received a MH-2 treatment plan on August 4, 2004, which was created by a full treatment team. The inmate's diagnoses and problems were mentioned and specific treatments included.

Assessment:

- This inmate's treatment plan was much fuller than previous treatment plans and judged to be adequate. Clinical staff indicated that that plan was typical of the plans currently being developed.

EXHIBIT  G

California State Prison, Corcoran (CSP/Corcoran)

November 15, 2004 – November 17, 2004
February 15, 2005 – February 16, 2005
April 25, 2005-April 28, 2005

1.    Inmate A

This inmate was interviewed in a group setting. He has been in the CSP/Corcoran SHU for over six months. He reported prior experience in the PSU at PSPB and in the SHU at CCI. He reported that about a year ago he had been receiving medications in the PSU via a <u>Keyhea</u> order. The inmate also complained about the lack of clinical contact in the SHU.

This inmate had not been receiving prescribed Zoloft as reported, despite the physician's order having been signed off by nursing staff.

This inmate reported being offered about nine hours per week of outdoor recreational time. He also described difficulties with correctional officers at CSP/Corcoran.

Psych tech rounds were documented in the UHR for the month of October 2004.

<u>Assessment</u>:

The complaints voiced by this inmate relevant to his medications and infrequent clinical contact were confirmed by a review of his UHR. There was no MAR for Zoloft in his UHR. This inmate was not receiving mental health care consistent with program guide requirements or with his clinical needs.

Problems relevant to documentation (e.g., the lack of an updated treatment plan referenced in a progress note) were also apparent.

2.    Inmate B

This inmate reported that he had not received HS medication promised to him by a physician. He also reported being offered approximately 4.5 hours per week of outdoor recreational time, which was inconsistent with a review of his 114s, which indicated closer to 10 hours per week.

The inmate came from CSP/LAC to CSP/Corcoran on 6/04/04. Information obtained from staff indicated that he was seen by a CM on 11/1/04, had an IDDT on 11/4/04 and was scheduled to see a psychiatrist during 11/27/04.

<u>Assessment</u>:

This inmate is again receiving 3CMS care after being discharged from the caseload at another institution some four years ago. His UHR had no documentation of prescribed HS medications. Medical records filing issues are clearly a problem.

2

3.    Inmate C

This inmate was housed in the SHU.  He was interviewed in a group.  Review of his UHR indicated that he had not had an IDTT.  His treatment plan was outdated. Psych tech rounds were documented.  Labs were ordered and results were noted as required.  He was seen by a psychiatrist on a quarterly basis, but case management contacts were missed.

Assessment:

Case management contact and treatment planning were not consistent with program guide requirements.

4.    Inmate D

This inmate was housed in the SHU.  He was interviewed in a group.  Review of his UHR indicated that he was seen on a quarterly basis by a case manager and a psychiatrist.  He had a current treatment plan and a recent IDTT.  Weekly psych tech rounds were documented in the UHR.

Assessment:

Treatment was consistent with program guide requirements.

5.    Inmate E

This inmate was housed in the SHU.  He was interviewed in a group.  He reported that he was placed in a strip cell several weeks ago following a return from the MHCB. However, review of documentation by the SHU captain was inconsistent with this report.

Review of his UHR indicated that he was seen weekly on psych tech rounds and quarterly by a psychiatrist.  A case management contact was missed.  His treatment plan was current and an IDTT meeting was documented.

Assessment:

Case management contacts were not consistent with program guide requirements.

6.    Inmate F

This inmate was housed in the SHU.  He was interviewed in a group.  Review of his UHR showed that an IDTT meeting was held recently, but there was no

treatment plan in the record. He was seen quarterly by a case manager and a psychiatrist. A planned psychiatry contact at an interval of 6 weeks was not made.

Assessment:

Case management contacts were consistent with program guide requirements. An updated treatment plan was not present in the UHR.

7.    Inmate G

The fourth volume of this inmate's four volumes of healthcare records was reviewed. The healthcare record review was requested related to this inmate's level of care which was changed from EOP to C3MS.

This inmate was treated in the MHCB for 13 days beginning January 5, 2005. Suicidal thinking was a prominent part of his initial presentation. His admitting diagnosis was an adjustment disorder and his discharge diagnosis was schizoaffective disorder.

A previous MHCB admission occurred on August 26, 2004. His five-day MHCB course of treatment was characterized by significant improvement with the use of antidepressant medications and apparently related to the brief change in his environment. Discharge diagnosis was chronic schizophrenia.

The inmate's treatment plan was dated June 23, 2004 and was scheduled to be updated three months later. He was described as being noncompliant with treatment. An EOP level of care was determined to be appropriate. A need for diagnostic clarification was indicated.

On June 30, 2004 this inmate reported suicidal thinking. He was subsequently treated in the MHCB from June 30-July 6, 2004. He was discharged back to the GP EOP. Subsequent progress notes documented regular follow-up with this inmate, who often refused to come out of the cell for interviews, which meant that he was seen at the cell-front by his clinical case manager.

During late August 2004 this inmate was transferred to the administrative segregation EOP for reasons not clearly documented in the UHR. Review of the health care record indicated that it was not uncommon for this inmate to refuse to participate in treatment, but he was described as generally being compliant with medications.

During January 2005 he flooded his cell and was very angry at custody staff. His January 2005 MHCB admission has already been discussed.

A January 11, 2005 summary of a C-File review for RVR assessment purposes indicated this inmate had been incarcerated related to a third-strike offense. His mental illness was assessed to have contributed to his alleged infraction (tentative aggravated battery on a police officer-spitting).

4

Weekly contacts, generally at cell-front due to the inmate's refusal to leave his cell, were documented in his UHR. Psych tech rounds on a daily basis were also documented.

A RVR was written on March 16, 2005 for masturbation.

An April 6, 2005 treatment plan update indicated that the inmate was to be monitored due to his long history of resistance and refusal to participate in treatment. His presentation was consistent with paranoid schizophrenia by history, polysubstance dependence, antisocial personality disorder and rule out paranoid personality disorder. He currently had a SHU term. His level of care was changed to 3CMS at his request and with the approval of mental health staff. The reasons for this change were not documented but were told to me by one of the clinical supervisors.

This inmate was again treated in the MHCB due to suicidal thinking on April 8, 2005. He was discharged three days later and received five-day follow-up. No documentation was present in the chart relevant to this MHCB admission.

Assessment:

Adequate documentation was lacking relevant to the rationale for the change in his level of care from EOP to C3MS, although it may have been a reasonable decision based on information obtained from one of the clinical supervisors. Documentation relevant to his most recent MHCB admission was lacking, which may have been a medical records issue.

This inmate should have another treatment plan review with specific reference to whether his level of care needs to be changed.

5

EXHIBIT H

California Substance Abuse Treatment Facility (CSATF)

October 12, 2004 – October 15, 2004

1.    Inmate A

This inmate was seen by the monitor's expert in a group. A review of his UHR revealed that he was transferred to CSATF on September 13, 2004 from CCI. Upon his arrival, Inmate A had two sets of orders for Trilafon, Artane and Paxil. One of these sets was a telephone order that had not been signed by a physician. The other was a 21-day order that would last through October 4, 2004. The inmate's medications, however, was not renewed until October 7, 2004.

A psychiatric note on dated October 7, 2004 was mostly illegible and provided minimally useful information. The note did not reference any medications or changes in medications; nor did the note mention the fact that the inmate's medications expired on October 4, 3004. There was no psychiatric note in the inmate's record during the month of September 2004. A psychologist's note of September 16, 2004 made reference to a completed MH-4, MH-2 and SRA, but none of these documents was located in the chart during this monitoring visit.

Assessment:

This inmate's comments and his UHR both indicated that his medications lapsed for at least a three-day period. The inmate's medications were changed without any documented justification by the psychiatrist. Inmate A's care and treatment appeared to be inadequate and needed to be reviewed by the treatment team.

2.    Inmate B

This inmate was also seen by the monitor's expert in the group. A review of his UHR revealed that he had been transferred to CSATF on December 19, 2001 from ISP. He had a negative bus screening at that time. The inmate was placed on the MHSDS while at CSATF. His recent treatment record indicated that he saw a case manager at least every three months from December 2003 through September 2004. He also saw a psychiatrist on January 29, 2004 and March 29, 2004 as well as on June 17, 2004 when his Celexa was discontinued and his medication was changed to Remeron and Geodon without explanation.

Review of the inmate's MARs revealed multiple blanks in July and August for both Remeron and Geodon with no indication of any follow up. The inmate attended a weekly anger management group beginning on September 15, 2004. Inmate B's treatment plan of August 26, 2004 indicated a diagnoses of Psychotic Disorder NOS and head trauma by history. The timeliness and the quality of the inmate's treatment plan were appropriate.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current mental health needs, although his medication was changed, substituting one antidepressant with a different antidepressant at a much lower dosage, without an adequate explanation in the psychiatric progress notes.

2

3.    Inmate C

Inmate C was also seen by the monitor in the group. A review of the inmate's UHR revealed that he was transferred from RJD to CSATF on August 6, 2003. The inmate's bus screening was positive, but his medications, Risperdal and Depakote, were discontinued upon arrival. The inmate reported that he was not receiving medications and that he did not believe he needed them. The inmate's treatment plan of August 19, 2004 indicated diagnoses of Intermittent Explosive Disorder and Antisocial Personality Disorder. The inmate's UHR documented case management visits on a quarterly basis.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current mental health needs.

4.    Inmate D

Inmate D was also seen by the monitor's expert in the group. He is an above the knee amputee. Inmate D expressed multiple complaints about the mental health program as well as about custody officers. His UHR revealed that he had been transferred to CSATF from NKSP on January 31, 2003. He reported that he was placed in administrative segregation for one year after his arrival at CSATF.

Inmate D indicated that his medications were changed on multiple occasions from Zoloft to Seroquel and that the dosage of his medication was also changed. He also reported that he was given a medication that had not been ordered for him, which he believed was Elavil. This inmate also received Remeron from July 23 through July 31, 2004, however, there was no informed consent and no order for Remeron found in this inmate's record. A further review of the record revealed that this inmate had been given medication prescribed for a different inmate with the same last name. Inmate D received medication that was prescribed for another inmate for approximately eight days; the medication was then abruptly discontinued, even though the psychiatrist's order in the other inmate's chart was written for three months. The medication labels that CSATF used on the MARs indicated that the medication label had been placed in the wrong inmate's chart. This was brought to the attention of the Director of Nursing who researched the issue and found that a medication error had occurred.

The documentation in the inmate's chart was confusing with regard to treatment planning. The treatment plan of February 11, 2003 was in the record, but the next treatment plan was dated July 15, 2004, which would mean that the treatment plan was more than five months late. The inmate's treatment plan indicated diagnoses of Depressive Disorder NOS and Polio by history. The changes in medication for this inmate were not justified in the psychiatric progress notes or in the treatment plan. The UHR indicated that the inmate was seen by a psychiatrist twice in May and once in July of 2004 and by his case manager approximately every two to three months. In contrast, the inmate reported that he had not been seen by his case manager and had not received a treatment plan.

3

Assessment:

This inmate's care and treatment should be reviewed for consistency of interventions, particularly regarding medication management. There was clearly a medication error identified in this inmate's record that was not reported by facility staff as one of the errors they knew about. Further, although this inmate had multiple complaints and requested "monetary damages" regarding his complaints, his overall care appeared to be appropriate at this time, with the exception of medication management.

5.      Inmate E

This inmate, too, was seen by the monitor's expert in the group and his UHR was reviewed. The inmate was transferred from CSP/Corcoran to CSATF on August 4, 2003. The inmate's bus screening was positive and he was referred to mental health for treatment.

This inmate's course of treatment was difficult to track. After being referred for a mental health evaluation in August 2003, Inmate E was seen for an evaluation in November 2003, at which time it was determined that he was not appropriate for a 3CMS level of care. Inmate E had been at the 3CMS level of care prior to his transfer to CSATF since May 16, 2000.

Inmate E had been on psychotropic medication since May 13, 2004 at CSATF, but there was no chrono in the inmate's record indicating he had been placed on the 3CMS level of care once again. A psychiatric progress note dated August 19, 2004 indicated that the inmate should contact mental health prn, although a treatment plan of the same date indicated the inmate's psychosis was due to polysubstance abuse. Despite the fact that the monitoring visit was in October 2004, there was a curious note dated December 7, 2004, indicating that an IDTT meeting had been held. There were no other case management notes, except for three notes indicating that the inmate attended anger management therapy in September.

Assessment:

This inmate's care and treatment were unclear from the clinical record, but were consistent with his report that he was not seen by the mental health staff on a regular basis. Inmate E's care and treatment should be evaluated for appropriateness.

6.      Inmate F

This inmate was also seen in a group and his chart reviewed. Inmate F had been transferred from CCI to CSATF on September 1, 2004. When the inmate arrived, he was taking Celexa, which was subsequently changed to Elavil and Zoloft without justification in the psychiatric progress notes. No treatment plan had been completed for Inmate F since his admissions to CSATF. This inmate was also in an anger management group and the group notes for him were remarkably similar to those of other inmates in the same anger management group.

4

Assessment:

This inmate's care and treatment appeared to be appropriate, with the exception of the failure to document any clinical justification for the change in antidepressant medication.

7. Inmate G

This inmate had been requested to attend a group meeting with the monitor's expert, but he refused. His record was reviewed and it was noted that he had been transferred to CSATF from CCI on September 13, 2004. Inmate G was referred to be seen by psychiatry within 21 days. This 21-day notation in the physician's orders was a consistent finding in the records of new admissions.

Inmate G's last psychiatric medication order was prior to his transfer to CSATF; the order was for Remeron and was dated March 11, 2004. There was no indication that the inmate's medication was continued after expiration in June 2004. A case management note at CSATF on September 16, 2004 was the only mental health note in the record since the inmate's transfer. According to the note, the case management interview was attempted at cell front as the inmate declined to come out of his cell. Inmate G was described as irritable and angry; he refused to answer questions regarding suicidal ideation, homicidal ideation, auditory hallucinations or visual hallucinations. There was mention in the note of a plan to ducat the inmate the next week, but no indication in the record that the inmate had been ducated or seen after September 19.

The inmate's last treatment plan was written at CCI prior to his transfer on March 25, 2004. It indicated a diagnosis of Psychotic Disorder NOS and was completed by a psychology intern. There was no other signature on the treatment plan.

Assessment:

This inmate's care and treatment were not appropriately or fully addressed. It appeared that the inmate's most recent treatment plan was incomplete and authored by a psychology intern. Furthermore, the sole documented attempt by mental health staff to interview the inmate since his transfer to CSATF found him to be uncooperative. Documentation of the contact did not reference the inmate's previous diagnosis of Psychotic Disorder. The plan to ducat the inmate to be seen the following week did not appear to have occurred. This inmate's current clinical condition was unknown. Inmate G refused to come to the group meeting and was referred to the chief psychologist for follow-up.

8. Inmate H

This inmate's record was reviewed with specific attention to laboratory testing for Depakote. Inmate H had been receiving Depakote prior to his transfer from CCI on June 10, 2004. His Depakote level on March 10, 2004 at CCI was 48 (sub-therapeutic) on a dosage of Depakote ER 750 mg q day. A Depakote level was ordered on June 29, 2004 at CSATF, while the inmate was on the same dosage; however, it was not recorded as having been drawn until August 5, 2004 at which time the level was 37.8 (sub-therapeutic). There is no notation by a psychiatrist indicating any attempt to correlate dosage with blood level for this inmate. A subsequent valproic acid level test was

5

ordered for October 7, 2004, after the inmate's dosage had been increased to 1500 mg as per the physician's orders, but this blood level had not been drawn at the time of the monitoring visit.

Assessment:

This inmate's laboratory testing for Depakote was incomplete and untimely. The orders, sub-therapeutic blood levels and lack of psychiatric progress notes were unclear and inadequate.

9.    Inmate I

Inmate I was seen by the monitor's expert in a group and his record was reviewed. The inmate was transferred from CSP/Corcoran on May 22, 2003. The inmate reported that it took him two weeks to get his medications after his arrival, but his clinical record did not have MARs dating back to May 2003 to determine whether or not this complaint was legitimate. This inmate had multiple complaints when interviewed, including complaints against plaintiffs' counsel.

Inmate I had been placed on Geodon after his transfer to CSATF. The inmate received a good treatment plan dated April 16, 2004, which indicated a diagnosis of Major Depressive Disorder with Psychotic Features. This inmate's complaints against plaintiffs' counsel, the mental health staff and "Coleman" were based on his belief he should have received monetary damages for his alleged complaints.

The inmate reported that he was placed in administrative segregation on April 9, 2004. He began refusing Geodon on April 29, 2004 and was noted on June 22, 2004 to have reported that he "is feeling better" without Geodon. He had notes in the record on July 1, 2004 and September 6, 2004, indicating that he believed he was "doing okay on Zoloft." The record indicated that he was seen at cell-front while in administrative segregation approximately once every one to two weeks, with several refusals noted.

Assessment:

This inmate's care and treatment should be reevaluated to determine whether his antipsychotic medication should be restarted, as he appeared to have a number of paranoid beliefs and looseness of association on interview. His complaints regarding medication management, particularly delays in getting medication upon admission, could not be verified at the time of the monitoring visit.

10.    Inmate J

This inmate was also seen by the monitor's expert in a group. A review of his UHR indicated that the inmate was admitted to CSATF on January 4, 2002 with a positive bus screening and a referral to mental health. Inmate J was on two psychotropic medications, but there were no informed medication consent forms in the record, with the exception of a Peroxetine consent form from September 2004; oddly, the inmate was not prescribed Peroxetine.

A treatment plan dated January 8, 2003 provided a diagnosis of Major Depressive Disorder, while a treatment plan update from January 29, 2004 indicated a diagnosis of Depressive Disorder NOS. The treatment plan, which was completed by a psychiatrist and a social worker, appeared to address the inmate's current treatment needs.

Assessment:

This inmate's care and treatment appeared to be appropriate for his current level of need.

11.    Inmate K

This inmate was seen by the monitor's expert during an IDTT meeting in the MHCB unit. He had been admitted to the MHCB unit on October 5, 2004. The inmate had had a variety of diagnoses, most recently Bipolar Disorder, and had been treated with Depakote and Geodon. The inmate's valproic acid level was 54.

Inmate K had been housed on the special needs yard at CSATF as he was on the 3CMS and DDP caseloads, had an above left knee amputation and had a right foot amputation causing him to ambulate in a wheelchair. This was the inmate's third admission to the CTC within one month, with admissions on September 13, September 28 and October 5, 2004. The psychiatric admission note of September 26, 2004 was from a previous admission; the inmate's record did not have the most recent psychiatric admission note for the inmate's October 5 admission.

Inmate K reported that he was "uncomfortable in the yard", referencing the dormitory setting as problematic. He also had civil commitment proceedings that were pending. This inmate reported repeated suicidal threats, which he acknowledged were "to get off the yard." Inmate K was well known to the MHCB staff. The mental health staff had considered referring the inmate to a DMH program, but a more appropriate course would be for the transitional case manager who had seen him with regard to the possible discharge to attend his civil commitment proceeding and coordinate the inmate's treatment with his current case manager at CSATF. The inmate appeared to agree with this plan as well as with possible increased case management visits.

Assessment:

This inmate's care and treatment appeared to be appropriate. Consideration was given to transferring the inmate to a higher level of care.

12.    Inmate L

This inmate was also seen at an IDTT meeting in the MHCB unit. Inmate L had been transferred to the MHCB unit from CVSP on October 13, 2004, the day prior to his IDTT meeting. The inmate's diagnoses were Major Depression and Adjustment Disorder. This inmate reported that he had been "green lighted" by a gang relative to his commitment offense. He had been transferred from RJD to CVSP and then to CSATF within the last nine months. Inmate L indicated that he had problems at the first two placements and "couldn't handle" the population.

The inmate reported suicide attempts at age 18 and approximately two weeks prior to admission; he also reported threats to kill himself. The treatment team discussed this inmate and whether he should be designated a 3CMS inmate by medical necessity based on his self reported depression and his political situation. The correctional officers in the MHCB unit were not present during the IDTT discussion and the correctional counselor indicated that he would contact CVSP to determine the inmate's need for protective custody. The treatment team determined that no medication would be prescribed until the inmate was further evaluated.

Assessment:

This inmate's care and treatment appeared to be appropriately managed for his current level of need.

13.    Inmate M

This inmate was seen at an IDTT in the MHCB unit. He had been admitted to the MHCB unit on October 7, 2004 from the special needs yard at CSATF. The inmate had an R suffix and reported that he had been assaulted on the yard. He also appeared, based on his reports of difficulty hearing and ataxia to have a possible middle ear problem.

Inmate M was prescribed Geodon. A very good IDTT progress note was filled out at the time of the treatment team meeting. Once again, notably, there was no correctional officer input into the IDTT, regarding this inmate's behavior while in the MHCB unit or previously on the yard.

Assessment:

This inmate's care and treatment appeared to be appropriate. The inmate, however, was nearing the time limits for disposition, and both his clinical and custody matters needed to be reviewed prior to a determination as to the most appropriate housing and treatment planning for him.

14.    Inmate N

A review of this inmate's UHR indicated that he had been admitted to the MHCB unit from October 4 through October 14, 2004. Inmate N had a diagnosis of Bipolar Disorder. There was a very good psychiatric admission note dated October 4, as well as a very good treatment plan dated October 7, 2004 in the inmate's chart.

Assessment:

This inmate's care and treatment appeared to be appropriate to his needs, but his disposition had not been determined at the time of the treatment plan meeting.

15.    Inmate O

A review of this inmate's UHR revealed that he had been admitted to the MHCB unit on October 10, 2004. There was a very good psychiatric admission note dated October 11 and an IDTT progress note dated October 12 in the chart. There was also a suicide risk

8

assessment completed on this inmate; the assessment was good, but it was completed on the old form.

Assessment:

This inmate's care and treatment appeared to be appropriate to his level of need.

16.    Inmate P

This inmate's UHR was reviewed as he had been admitted to the MHCB unit on September 30, 2004. The chart contained a very good psychiatric admission note of October 2, 2004 and a good suicide risk assessment on the new form completed on the same date.

Assessment:

This inmate's MHCB work-up was appropriate and of good quality, however, his length of stay exceeded the ten-day time guideline and his ultimate disposition remained unclear.

17.    Inmate Q

A review of this inmate's UHR showed that he had been admitted to the MHCB unit on September 29, 2004. There was a very good psychiatric admission note from that date and appropriate MHCB treatment planning documents in the chart. The inmate had a diagnosis of Schizophrenia. His care and treatment in the MHCB unit appeared to have been appropriate, but he remained in the MHCB unit for 15 days, exceeding the length of stay timeline.

Assessment:

This inmate's care and treatment appeared to have been appropriate, with the exception of an excessive length of stay in the MHCB unit. His disposition was unclear at the time of the review. Inmate Q should have been referred to a higher level of care. It should be noted that during the course of the inmate's IDTT meeting, a correctional officer, at the direction of a lieutenant, requested information from the treatment team as to why the inmate still remained in the MHCB unit. Once again, correctional officers had not been participating in the IDTT process. As a result, information had not been exchanged during the course of the inmate's MHCB stay; such an exchange would have been beneficial and would have probably addressed the lieutenant's questions more directly.

18.    Inmate R

This inmate's UHR was reviewed. He had been transferred from WSP on May 27, 2003 with a negative bus screening. Inmate R's chart contained an informed consent form for Abilifi dated July 21, 2004. The inmate subsequently signed a refusal form on August 3 and his Abilifi was discontinued on August 9 by a physician's order. The inmate's treatment plan of August 12 provided diagnoses of Major Depressive Disorder Recurrent, Anxiety, ADHD and Polysubstance Abuse. There was no indication in the record as to

why Abilifi, an antipsychotic, had been prescribed given these diagnoses.  Quarterly case management contacts were documented in the inmate's record.

Assessment:

This inmate's care and treatment were unclear.  There was no reason documented for prescribing an antipsychotic medication given the inmate's diagnoses.

19.    Inmate S

This inmate's UHR was reviewed.  He was transferred from SQ on May 29, 2004 with a negative bus screening.  A treatment plan dated January 14, 2004, while the inmate was in administrative segregation at a 3CMS level of care, indicated diagnoses of Amphetamine Dependence and Depressive Disorder NOS.   The inmate was subsequently prescribed Remeron and Depakote.  There was a consent form for Remeron in the chart, but not for Depakote.  The consent form for Remeron appeared to be a "local" CDC form used at CSATF but not at other facilities, which may have been an old form that had been replaced.

Assessment:

This inmate's care and treatment appeared to be appropriate, except that the inmate's chart did not contain the proper consent forms for medication management.

20.    Inmate T

A review of this inmate's UHR showed that he was transferred from Calipatria on April 16, 2003.  Inmate T was at a 3CMS level of care and in the DDP program as a D1A inmate.  There were appropriate progress notes from the psychiatrist in the inmate's UHR.

A consent form for Seroquel dated September 28, 2004 was in the inmate's chart, but there was no psychiatrist's order in the record prescribing Seroquel.  It could not be determined from the record whether this was a filing delay.  The case management note from October 6, 2004 made no mention of medications.  The inmate's treatment plan of July 21, 2004 was of poor quality; with regard to the inmate's diagnoses, the plan referenced an MH-2 dated April 20, three months earlier.

Assessment:

This inmate's care and treatment were not clear.  The treatment plan was of poor quality and did not provide any diagnoses.  The current management of the inmate, particularly with regard to medication management, was also unclear.


21.    Inmate U

This inmate was transferred from WSP on July 25, 2002 with a positive bus screening and referred for mental health services.  The inmate was diagnosed with Amphetamine Induced Disorder with Hallucinations, other substance, and Antisocial Personality

Disorder. The inmate's treatment plan of October 14, 2004 was adequate for his needs. Inmate U was prescribed Geodon and Wellbutrin; appropriate medication consents forms were found in the inmate's chart. Quarterly case management contacts were also documented.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

22.    Inmate V

A review of this inmate's UHR indicated that he was transferred from SQ on May 23, 2003 with a negative bus screening and subsequently placed in the MHSDS. Inmate V had an adequate treatment plan date August 12, 2004. His chart contained documentation of quarterly clinical case management contacts. Although the inmate was noted to have refused Paxil on October 4, 2004, there was no psychiatric note located in the file regarding the inmate's mental status and medication needs.

Assessment:

This inmate's care and treatment should be reviewed to determine his current need for psychotropic medications and his diagnoses.

23.    Inmate W

This inmate was transferred from HDSP to CSATF on June 18, 2003. The inmate had diagnoses of Generalized Anxiety Disorder and Antisocial Personality Disorder. Inmate W was prescribed Zoloft on August 25, 2004. There was a medication consent form for the Zoloft in his chart. The chart also contained an appropriate treatment plan dated August 12. It appeared that the inmate had been receiving quarterly case management contacts.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

24.    Inmate X

This inmate was transferred from DVI on January 23, 2004. The inmate had a diagnosis of Mood Disorder NOS, as referenced in his treatment plan of February 3, 2004. The inmate was not prescribed any medications. His chart contained documentation of quarterly case management contacts.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

11

25.    Inmate Y

This inmate was transferred from WSP on April 14, 2004 with a negative bus screening. He appeared to have been cleared for general population on April 11, 2003, while at WSP, even though he had been in the 3CMS program prior to that time. From the inmate's record, it appeared that he had not been seen by mental health staff at CSATF since August 12, 2004, but it was unclear whether he had been returned to the 3CMS caseload. There was no chrono found in the inmate's file, the inmate was on no current medications and there was no treatment plan located in his file.

Assessment:

This inmate's clinical status and level of care should have been reviewed to determine the appropriateness of including him in the MHSDS.

26.    Inmate Z

This inmate was transferred from CSP/LAC on February 28, 2003. The inmate had an appropriate treatment plan dated May 13, 2004 and a diagnosis of Major Depressive Disorder with Psychotic Features. The inmate's GAF was noted as 62. Interventions appeared to be appropriate.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

12

EXHIBIT I

Pleasant Valley State Prison (PVSP)

September 13, 2004 – September 14, 2004

1.    Inmate A

Inmate A was admitted to the MHCB unit on July 28, 2004 from SQ because of his
bizarre behavior and aggressiveness towards staff.   The inmate had been in the EOP
administrative segregation unit prior to his transfer from SQ and it was determined that
he would require an EOP level of care upon completion of his MHCB treatment.   The
inmate had a diagnosis of Schizoaffective Disorder.

A MH-2 dated August 2, 2004 indicated the inmate was being prescribed emergency
medications, but because he became cooperative with medication administration, no
Keyhea order was pursued at that time.  Inmate A subsequently decompensated and
began to threaten the staff with injury, including telling the chief psychiatrist that he
wanted to cut her and disembowel her.  On September 3, 2004, the Keyhea process was
reinitiated as the inmate had refused his medications consistently and was continuing to
decompensate and exhibit threatening behaviors toward staff.  The inmate was referred to
DMH's APP program and was awaiting acceptance into that program.  On interview, he
presented as hostile and angry, with disorganized speech.

Assessment:

This inmate was appropriately referred to the APP program.  He may have been a
candidate for a thirty-day expedited transfer to an EOP program at one point, but his
condition began to improve.  Later, due to medication non-compliance, the inmate
decompensated and was in need of an APP program at the time of the monitoring visit.

2.    Inmate B

Inmate B was a PVSP inmate when he was admitted to the MHCB unit on September 2,
2004.  On interview, the inmate reported that he was 27 years old and had been in the
CDC system since age 16.  He reported that he had been in the Youth Authority custody
prior to his admission to CDC.  The inmate further stated that he felt "hopeless", had a
lengthy sentence and had chronic suicidal ideation.

Review of the inmate's UHR revealed a MH-2 dated September 7, 2004 with diagnoses
of Post-Traumatic Stress Disorder, Depressive Disorder NOS and Anti-Social Personality
Disorder.  The inmate's MH-2 needed to be more individualized, indicating the inmate's
specific pathology.  It was notable that no correctional counselor was in attendance at the
inmate's IDTT meeting.  This inmate had been referred to the APP program at DMH.

Assessment:

Inmate B's admission the MHCB unit appeared to be appropriate.  His referral to the
APP program also appeared to be appropriate, given his level of pathology and
dysfunction.

3.    Inmate C

Inmate C was a PVSP inmate when he was admitted to the MHCB unit on September 12, 2004. He remained on suicide watch at the time of the monitoring visit, but no Suicide Risk Assessment was present in the inmate's UHR. The inmate was diagnosed with Adjustment Disorder NOS and Depressive Disorder NOS. His MH-2 of September 13, 2004 indicated a need for continued suicide watch and stabilization with medications.

Assessment:

This inmate's admission to MHCB unit appeared to be appropriate. His treatment plan, however, needed to be more individualized and specific to his pathology.

4.    Inmate D

Inmate D was admitted to the MHCB unit from NKSP on September 11, 2004. The inmate had been at SVSP prior to his transfer to NKSP in August 2004. He had also been hospitalized at ASH and paroled in August 2000. Inmate D had a broken left arm; on interview, he vaguely described slipping on a substance on the floor and breaking his arm prior to his transfer to PVSP.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

5.    Inmate E

Inmate E was admitted to the MHCB unit from SQ on September 5, 2004. A MH-2 dated September 7, 2004 indicated that the inmate had a diagnosis of Psychosis NOS and was currently treated with Abilify. There was no correctional counselor in attendance at the inmate's IDTT meeting. The notes in the inmate's UHR indicated that he had demonstrated some improvement, but he was not stable enough to be returned to SQ and his level of care had not yet been determined.

Assessment:

Inmate E's level of care should be determined promptly to facilitate a transfer to a higher level of care, if he did not stabilize within the next two or three days.

6.    Inmate F

Inmate F was a 3CMS administrative segregation inmate admitted to the institution on June 21, 2003. He was seen by the monitor's expert in an IDTT meeting. The inmate

3

reported that he had a history of Bipolar Disorder and Seizure Disorder. He also indicated that he had been at the 3CMS and EOP levels of care.

Inmate F believed that he had court ordered therapy and that he was not receiving appropriate treatment. The mental health staff offered the inmate individual case management sessions each week, medication therapy and group therapy, but the inmate reported that he did not cooperate with these activities because he believed that the therapy was not "what the court ordered." Inmate F reported that he refused to take medications because he thought that he was not getting the treatment he should have. He further stated that he did not attend therapy groups because he did not believe that therapy was helpful to him.

According to the inmate's statement, he had been hospitalized at ASH and PSH as well as at Metro and Nappa State Hospitals. No C-file was available during this inmate's IDTT meeting to review his disciplinary and hospital history. When interviewed, the inmate had mildly pressured speech and was agitated.

Assessment:

Inmate F's mental status appeared stable and the treatment currently offered to him in administrative segregation appeared to be appropriate. The inmate's C-file should be located and he should have a more comprehensive IDTT assessment to better determine his overall mental health needs.

7.    Inmate G

This 3CMS administrative segregation inmate was admitted to the administrative segregation unit on September 7, 2004, after having received a disciplinary infraction for resisting staff. He was seen by the monitor's expert in his initial IDTT meeting. The inmate was extremely articulate and described his current level of functioning well, including the fact that he had been on B-yard as a participant in a CSP/Sac program and that he participated in anger management groups.

Inmate G reported, and his medical record confirmed, that he was taking Wellbutrin. The inmate, however, stated that he got his HS dosage of Wellbutrin at approximately 5:00 p.m. each night, fell asleep by 8:30 to 9:00 p.m. and was awake again by 3:00 a.m. He believed that he needed medication both in the morning and at night to help control his mood swings and hyperactivity. The inmate gave a good description of a hypo-manic to manic presentation. He also had appropriate questions regarding medication management.

During the course of the inmate's IDTT meeting, the psychiatrist gave the inmate a consent form for Wellbutrin, but did not address the inmate's concerns that Wellbutrin could cause seizures as well as affect his unborn children in the future. The psychiatrist

The inmate had a negative bus screening at PVSP on December 22, 2003, based on an updated MH-2, and was removed from the MHSDS as having no Axis I pathology. He received no further mental health treatment until May 27, 2004, when he was admitted to the CTC after having been placed in administrative segregation on disciplinary charges for assaulting a correctional officer (spitting); the charges carried a possible 12-month SHU term. Inmate J subsequently had four admissions to the CTC from May 27 to June 2, June 10 to June 15, July 29 to August 5 and August 18 to August 27, with a variety of diagnoses including Adjustment Disorder, Psychotic Disorder, Major Depressive Disorder, Schizoaffective Disorder and Personality Disorders. At the time of the monitoring visit, the inmate had been returned to the administrative segregation unit and was receiving Wellbutrin. Inmate J was evaluated as part of the unmet needs assessment and it was determined that he should be placed at the EOP level of care or in a PSU, if he received a SHU term based on the aforementioned disciplinary charges.

Assessment:

This inmate's care and treatment were reviewed as part of the needs assessment and the inmate was determined to require a higher level of care.

12.    Inmate L

This inmate's UHR was reviewed because he had an order for HS medications. While the physician's order stated that the inmate's medications of Seroquel and Celexa should be given at bed time, the MARs indicated that the medications were given at approximately 6:00 p.m., rather than at 8:00 to 10:00 p.m.

Inmate L was admitted to the CTC from July 26 to August 6 and appropriately received five-day follow-up from August 7 to August 11. The inmate, however, missed his medications on August 7, 2004. The inmate's most recent MH-2 was dated April 8, 2004 and indicated that he had a diagnosis of Post-Traumatic Stress Disorder secondary to war time experiences.

Assessment:

This inmate's prescription for medications was not being delivered at bedtime as ordered. The inmate also experienced a gap in medication for at least one day after a change in housing from the CTC to a general population yard.

13.    Inmate M

This inmate's UHR indicated that he was admitted to PVSP from the reception center at WSP on July 12, 2004 with diagnoses of Major Depressive Disorder and Borderline Personality Disorder. He was on suicide watch in the MHCB, but no suicide risk assessment form was located in the inmate's chart.

7

The inmate received three days of follow-up after his discharge from the MHCB on July 26, 2004, but was returned to the MHCB because of cuts on his arm. He then received five-day follow-up from August 3 through August 7, after returning to general population. There was a notation of an IDTT meeting conducted on August 2, 2004, but there was no corresponding MH-2 in the record. Progress notes dated September 10, 2004 indicated that the inmate was receiving appropriate care.

Assessment:

Inmate M's care and treatment appeared to be appropriate. There was, however, no explanation for the lack of a suicide risk assessment prior to the inmate's transfer to the MHCB. There was also no explanation for the absence of a MH-2 in the chart.

14.    Inmate N

Inmate N was admitted to the MHCB from July 21 to July 26, 2004. He received five-day follow-up from July 27 to July 31, 2004. The inmate's MHCB admission appeared to have been appropriate and suicide prevention follow-up was conducted on each of the five days following the inmate's discharge. On the other hand, a suicide risk assessment dated July 20, 2004 was incomplete in that there was no evaluation of the inmate's risk and the only source of information cited was an interview with the inmate; the sections of the assessment form relating to review of the UHR, C-file and other material were left blank. There was no MH-4 in the inmate's UHR. There was also no MH-2 in the chart. In the absence of a MH-2, there was nothing in the inmate's file to indicate that an IDTT meeting had been conducted for Inmate N.

Assessment:

The suicide risk assessment for this inmate was incomplete and the inmate's treatment plan could not be located in the chart. The inmate's treatment in the MHCB, however, appeared to be appropriate, as was the provision of five-day suicide prevention follow-up.

15.    Inmate O

This inmate was transferred to PVSP on August 26, 2004 from CCI. A MH-2 from September 1, 2004 was appropriate as was a MH-4 dated August 30, 2004. Inmate O was prescribed Remeron and, according to the documentation in his record, was stable and responding well to this treatment.

Assessment:

This inmate's care and treatment appeared to be appropriate to his level of need.

16.    Inmate P

This inmate's record was reviewed in order to evaluate the comprehensiveness of his treatment planning. Inmate P received a MH-2 on August 2, 2003 and a second, annual MH-2 on July 27, 2004. He was diagnosed with Depressive Disorder NOS and Generalized Anxiety Disorder and prescribed Geodon, Buspar, Depakote and Zoloft.

Assessment:

Inmate P's care and treatment appeared to be appropriate, based on the documentation in the record.

17.    Inmate Q

This inmate's UHR was also reviewed in order to assess the comprehensiveness of his treatment planning. An appropriate MH-2 dated November 2, 2003 was found in the inmate's chart and the inmate's course of treatment was described in the progress notes. Inmate Q was placed on a Keyhea order on August 24, 2004 and was receiving Zyprexa and Zoloft, according to his records.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

18.    Inmate R

This inmate's UHR was reviewed because he had reported to the monitor that he was not being seen by the mental health staff. Review of his UHR indicated that he was admitted to the CDC system on December 4, 2000. Inmate R had a diagnosis of Schizophrenia Paranoid Type and was prescribed Zoloft and Zyprexa. The records indicated that he had refused his medications repeatedly until they were discontinued on September 14, 2003 and May 4, 2003.

The chart also contained forms documenting the inmate's refusal to meet with his case manager on February 5, February 24, March 21 and March 22, 2004. There were, however, notes from August 3 and August 31, 2004, indicating that the inmate met with his case manager and expressed a desire to be discharged from the 3CMS program. The inmate's GAF was estimated at 66 in the August 31 note. According to the record, Inmate R was informed that he would not be discharged from the 3CMS program until he had been free of medication and symptoms for at least six months.

Assessment:

Inmate R reported that he had not been seen by mental health staff in several months, but his UHR indicated that he was seen by a case manager in August, after having refused

9