appointments during the previous months. The inmate's medications appeared to have been discontinued after he refused them; there was no indication in the record of a need to restart the inmate's medications over his objection.

19.    Inmate S

This inmate's UHR was reviewed in order to assess the comprehensiveness of his treatment planning. There was a document that purported to be a MH-2 additional page dated August 23, 2004 in the inmate's chart, but it was actually a MH-1 addendum. The information in this addendum was incomplete and did not address the inmate's diagnosis of Psychosis NOS. The inmate was receiving Seroquel and Remeron. His GAF was estimated at 65.

Assessment:

This inmate's care and treatment were not clearly documented in his UHR. An updated treatment plan was required to document the inmate's treatment needs and interventions.

20.    Inmate T

This inmate's UHR was also reviewed to evaluate the comprehensiveness of his treatment planning. Inmate T was admitted to the CDC system on October 13, 1995. He had a current diagnosis of Dysthymic Disorder with Anxiety and Poly-substance Dependence, as reported on a MH-2 dated August 3, 2004. The inmate was receiving Paxil. Progress notes indicated that he had adjusted well to this medication.

Assessment:

This inmate's care and treatment appeared to be appropriate for his level of need.

21.    Inmate U

This inmate's UHR was reviewed in order to assess his treatment interventions. Prior to Inmate U's transfer to PVSP, a suicide risk assessment was completed for him at SVSP on July 20, 2004. The assessment indicated that the inmate was at low risk, but it also indicated that the inmate refused to answer questions and was placed on a 24-hour custody watch.

There was no update of the suicide risk assessment, no reevaluation of the inmate's level of care and no indication of the inmate's cooperation or lack of cooperation with the assessment process. A MH-2 that was completed on September 12, 2004 indicated that the inmate was diagnosed with Psychotic Disorder NOS and Amphetamine Dependence. The MH-2, however, did not address the inmate's history of suicidality or his need for treatment of methamphetamine dependence.

<u>Assessment:</u>

The suicide risk assessment conducted for this inmate at SVSP was incomplete. There was no explanation of how the inmate could be assessed as a "low risk", given his refusal to participate in the assessment process. The suicide risk assessment should have been repeated.

22.    Inmate V

This inmate's UHR was reviewed in order to assess the comprehensiveness of his treatment planning. The inmate's treatment plan of December 2, 2003 indicated a diagnosis of Paranoid Schizophrenia and treatment with Zyprexa. The treatment plan was not adequately individualized relative to the inmate's presenting problems.

<u>Assessment:</u>

This inmate's treatment plan should have been reviewed for comprehensiveness and quality.

EXHIBIT  J

Avenal State Prison Round (ASP)

September 15, 2004 - September 16, 2004.

1.    Inmate A

Inmate A was admitted to ASP on March 4, 2004. His bus screening at that time was positive and he was placed in the 3CMS level of care. The inmate was diagnosed with Paranoid Schizophrenia and was receiving Zyprexa and Vistaril. He was admitted to the OHU from August 30 to August 31, 2004 because of his threats to "find an elementary school and kill children." The inmate was subsequently admitted to administrative segregation and received five-day follow-up after his discharge from the OHU.

An IDTT meeting of September 8, 2004 reassigned the inmate to the EOP level of care and placed him on a transfer list. Inmate A's prior MH-2 was completed on March 17, 2004, while he was at the 3CMS level of care; a psychologist and a psychiatrist attended the meeting. The inmate's chart was reviewed by the monitor's expert because he was being transferred to an EOP program the morning of the first day of the monitoring visit.

Assessment:

This inmate's care and treatment currently appeared to be appropriate and his transfer was within time guidelines. His placement at the 3CMS level of care for six months was questionable, given both his history and clinical findings upon arrival at ASP in March 2004.

2.    Inmate B

This inmate chart was also reviewed by the monitor's expert because he was being transferred to another prison on the first morning of this monitoring visit. He had a diagnosis of Schizoaffective Disorder and was receiving Prolixin, Wellbutrin and Remeron. The inmate had a MH-2 dated September 1, 2004, which was adequate; the MH-2 indicated that the inmate was at the EOP level of care. The inmate had been at the 3CMS level of care since May 5, 2004, when he was transferred from DVI to ASP. The last chrono in the inmate's record indicated that he was at the 3CMS, not EOP, level of care. The staff indicated there was a chrono, dated September 1, 2004, reassigning the inmate to the EOP level of care, but that chrono was not in the inmate's UHR. Indeed, the transfer form for this inmate indicated that his level of care was 3CMS, not EOP.

Assessment:

This inmate's referral to an EOP program was appropriate, but the documentation in the inmate's UHR, including a transfer form and the most recent chrono, indicated that the inmate was at the 3CMS, not EOP, level of care. The likelihood of Inmate B being placed at

the wrong level of care at the receiving facility was increased by these errors. The inmate's transfer form was corrected, but the chrono was not located prior to his transfer.

3.    Inmate C

This inmate was seen by the monitor's expert at the inmate's request during the monitoring tour. The inmate reported that his medications had expired approximately four weeks prior to the monitoring visit and it took two weeks for them to be reordered. He reported that he had been an EOP inmate at CMC prior to his transfer to ASP. Review of the inmate's record indicated a diagnosis of Bipolar Disorder Severe with Psychotic Features. Inmate C was prescribed Haldol, Wellbutrin and Depakote. On interview, the inmate reported that he had made multiple requests to see a psychiatrist and to have his medications renewed, but he had not been seen for four months. The inmate further reported that he was scheduled to be paroled within the next two weeks and had not received a ducat for parole medications.

Assessment:

This inmate's care and treatment appeared to be inadequate. According to both his interview and his UHR, Inmate C had not received adequate psychiatric assessments and had missed medications for approximately two weeks, despite continued requests to have his medications renewed.

4.    Inmate D

Inmate D was admitted to CDC on September 13, 2003 through NKSP and was classified as a 3CMS inmate. Inmate D arrived at ASP on September 1, 2004 from CIM with a positive bus screening. He was also prescribed TB medications for a positive PPD. A MH-2 on September 7, 2004 was inadequate as there was no psychiatrist in attendance. The MH-2 referred to a MH-4 completed on that same date; the MH-4 referred to a medical file for Axis III diagnoses and made no reference to the inmate being treated with a prophylactic for TB. It appeared the inmate's level of care was changed to EOP after his arrival at ASP, and Inmate D was awaiting transfer to an EOP program at the time of the monitoring visit.

Assessment:

This inmate apparently required an EOP level of care and was scheduled for an appropriate transfer. Inmate D was awaiting transfer to an EOP institution.

5.    Inmate E

Inmate E was also an EOP inmate awaiting transfer. The inmate was diagnosed with Major Depressive Disorder and treated with Seroquel, Buspar and Remeron. The inmate was admitted to CDC on May 13, 2003 through NKSP and was transferred to ASP on July 29, 2003. The inmate's level of care was reported as changed to EOP on July 15, 2004. A MH-2 on September 9, 2004 was inadequate because no psychiatrist was in attendance; the MH-2 indicated that the inmate was placed at the EOP level of care. There was also a psychiatric note dated September 14, 2004, which was illegible, had no diagnosis and indicated that no medications were planned.

Assessment:

This inmate's care and treatment were inadequate. Inmate E had been waiting for at least 60 days for transfer to an EOP program.

6.    Inmate F

Inmate F was transferred from CTF to ASP on November 20, 2003, after reporting that he had been sexually assaulted. The inmate was seen by the monitor's expert in a group with other inmates and his record was reviewed. He reported that he had been committed to the OHU on 11 occasions and that he had difficulty receiving his medications consistently.

The inmate was taking Wellbutrin, Remeron, Zyprexa, Buspar, Zoloft and Trazadone, but most of these medications were discontinued on January 23, 2004, with the exception of Wellbutrin and Remeron. The inmate's MARs recorded that the inmate also received Haldol, Zoloft and Remeron for periods in January without any accompanying psychiatric orders. This appeared to have occurred when the inmate was in the OHU on three occasions during that month. A more extensive review of the record indicated that the inmate had been placed in the OHU on four occasions from November 25, 2004 through January 8, 2005. Since arriving at ASP, the inmate had been in the OHU for more than three days on at least three occasions. Despite this, no clinical note suggested he had been referred to a MHCB unit or an EOP program.

Assessment:

This inmate's care and treatment appeared to be inadequate in that he was not receiving consistent medication management. Moreover, he had multiple OHU admissions without documented evidence of a referral to a MHCB unit or any other higher level of care. The inmate's overall functioning indicated that he should probably be at an EOP level of care.

7.    Inmate G

This 3CMS inmate had been transferred from the reception center at WSP to ASP on April 1, 2004. His diagnosis was Schizoaffective Disorder with Borderline Intellectual Functioning, but there was no Axis III, IV or V on his most recent MH-4, dated April 6, 2004. A delayed MH-2, dated April 21, 2004, noted the presence of a psychologist, but no psychiatrist, at the inmate's IDTT meeting. There was an additional one-page undated MH-2 in the inmate's chart, which was the second of two pages; no signatures and no problems were noted in the MH-2. Consent forms for Seroquel and Zoloft were present in the inmate's record, and telemedicine contacts with a psychiatrist were noted on August 10 and September 7, 2004.

Assessment:

This inmate's care and treatment appeared to be inadequate because the inmate's diagnostic criteria were incomplete, and his treatment plan did not have multidisciplinary participation.

8.     Inmate H

This 3CMS was transferred from PVSP to ASP on November 20, 2001. The inmate was diagnosed with Dysthymic Disorder and Hepatitis C. He was treated with Paxil, but there was no consent form in the inmate's record. A MH-4 of February 6, 2004 added this inmate to the 3CMS roster. A case manager's note of May 13, 2004 indicated that a psychiatrist discontinued the inmate's Neurontin, but there was no note from the psychiatrist documenting this. There were notes in the chart from April 6, April 13 and May, 18, 2004, all of which were illegible. As a result, it was unclear which disciplines wrote the notes. A MH-2 of July 3, 2004 did not reflect any psychiatric presence at the inmate's IDTT meeting; no problems were identified in the MH-2.

Assessment:

This inmate's care and treatment appeared to be inadequate in that the documentation in the UHR did not demonstrate appropriate psychiatric assessments or reflect the inmate's participation in his own treatment planning process.

9.     Inmate I

The monitor's expert reviewed this 3CMS inmate's chart specifically with regard to medication management. The inmate was prescribed Lithium 1200mg/day as of July 27, 2004, but a consent form only provided consent for up to 1,000mg/day. Inmate I's MARs for June and July had multiple blanks. The inmate's Lithium level in May was inadequate at 0.72. Inmate A was noted to have refused his medications on July 28, 2004. A case management note of August 26, 2004 indicated that the inmate was refusing medications because they "knock me out."

A psychiatric note dated July 17, 2004 diagnosed the inmate with Bipolar Disorder in remission and specified follow-up in two days, which did not appear to have occurred. A psychiatric note from August 3, 2004 indicated that the inmate was not taking his medications, but felt "okay". A third psychiatric note from August 10, 2004 was mostly illegible but indicated that the inmate was refusing his medications. There was no psychiatrist in attendance at the inmate's IDTT meeting of July 21, 2004. The inmate's treatment plan was weak in that it did not include a problem list and the treatment objectives were generic; there was no indication of the inmate's progress in meeting his treatment plan goals.

Assessment:

This inmate's care and treatment appeared to be inadequate. The documentation in his chart was sometimes illegible and his treatment plan was not specific as to his clinical needs.

10.     Inmate J

Inmate J was transferred from DVI to ASP on May 14, 2003 with a positive bus screening that included attempted suicide at age 19. On October 30, 2003 and July 6, 2004, the inmate refused his medications. A psychiatric note of July 20, 2004 indicated that the inmate had reported that he was passing out on Lithium; the psychiatrist noted that it was "difficult to

understand why." The inmate's Lithium was discontinued on that date and Visteril was started.

An IDTT meeting of August 18, 2004 was attended by a psychologist, a correctional counselor and the inmate, but no psychiatrist was in attendance. The inmate's diagnoses at that time were Bipolar Disorder and Methamphetamine Dependence. The treatment plan did not identify any problems or list any target behaviors.

Assessment:

This inmate's care and treatment appeared to be inadequate. Documentation of the inmate's mental health interventions was poor, and no psychiatrist participated in the preparation of the inmate's treatment plan.

11.    Inmate K

Inmate K was a 3CMS inmate transferred from NKSP to ASP on May 12, 2004. He had a diagnosis of Major Depressive Disorder and was treated with Remeron. Medication consent forms dated April 17 and June 10, 2004 were in the inmate's chart. On May 13 and August 9, the inmate refused his Remeron and his refusals were noted as "chronic."

An IDTT meeting of June 9, 2004 did not document participation by a psychiatrist. The treatment plan described the inmate as functioning in a general population setting with no problems or target behaviors identified. The target objectives listed in the treatment plan were generic. A psychiatric note of June 10, 2004 indicated that the inmate was a new arrival and that he was prescribed Remeron. A case management note of August 9, 2004 indicated that the inmate was "doing pretty good" with a plan for "cognitive restruction." A note of September 7, 2004 indicated that the inmate was not seen for a clinical contact because no information had been sent to the telemedicine psychiatrist prior to the inmate's appointment.

Assessment:

This inmate's care and treatment appeared to be inadequate. The clinical assessment of this inmate lacked adequate psychiatric involvement. The inmate's treatment plan was not individualized. The inmate's medication refusal was not incorporated into the treatment planning process.

12.    Inmate L

This inmate was transferred to ASP from NKSP on August 3, 2004. He had a June 2004 "chrono" which indicated that he was a 3CMS inmate. Inmate L was receiving Seroquel, Depakote and Wellbutrin; his medication consent forms were in his UHR. The inmate's MARs indicated that he was taking his medication and a telemedicine contact on August 17, 2004 was adequate. An IDTT meeting on August 16, 2004 did not include a psychiatrist and referenced the inmate's MH-4 from August 5, 2004. Other than the absence of a psychiatrist in the treatment plan meeting, the treatment plan itself was adequate.

Assessment:

Although this inmate's treatment plan was adequate, there was no evidence of participation by a psychiatrist in the treatment planning process.

13. Inmate M

This inmate was transferred to ASP on October 29, 2003. He was diagnosed with Bipolar Disorder and was receiving Haldol, Depakote and Wellbutrin; consent forms for these medications were not in the inmate's UHR. The inmate's MARs indicated that he was taking his medication. There was a blood level in the chart for Valproic Acid of 77.8 from May 21, 2004, which was in the therapeutic range, but there were no subsequent blood levels and no prior blood levels located in the inmate's record.

Inmate M was noted to be paroling on September 24, 2004, but the last case management note in the inmate's chart was from July 20, 2004 and did not mention discharge planning. The inmate's last MH-2, dated November 5, 2003, was a generic treatment plan with no psychiatric participation.

Assessment:

This inmate's care and treatment appeared to be roughly adequate, with the exception that there was no discharge planning recorded in the inmate's UHR, and no psychiatrist was in attendance at the inmate's most recent treatment planning meeting, approximately ten months prior to this monitoring visit.

14.    Inmate N

This 3CMS inmate was diagnosed with Depression NOS and treated with Paxil. He had a consent form in place and his MARs indicated that he was taking his medication. The inmate had case management contacts on May 11 and July 2, 2004. He had telemedicine psychiatric contacts on June 11 and August 17, 2004. The inmate had an IDTT meeting on March 3, 2004, but no psychiatrist was in attendance at that meeting.

Assessment:

This inmate's care and treatment appeared to be adequate, but there was no psychiatrist in attendance at his most recent treatment planning meeting.

15.    Inmate O

Inmate O was transferred to ASP on April 2, 2004 from DVI. The inmate had diagnoses of Psychotic Disorder and Borderline Intellectual Functioning and was prescribed Risperdal. A MH-2 of April 21, 2004 indicated that no psychiatrist was in attendance at the treatment planning meeting, but, with the exception of psychiatric input, the treatment plan was good. The inmate was seen by a case manager on July 20, 2004 and by a telemedicine psychiatrist on August 24, 2004.

Assessment:

This inmate's care and treatment appeared to be adequate, but there was no psychiatrist in attendance at his treatment plan.

16.    Inmate P

Inmate P was transferred from CCI to ASP on July 29, 2004. The inmate had a diagnosis of Schizophrenia Paranoid Type and was prescribed Abilify, Depakote and Prozac. Despite his July arrival date, the inmate's first appointment with a psychiatrist was not until August 24, 2004, approximately 25 days after he entered the institution, and his medication was renewed.

A MH-2 and a MH-4 were completed on August 6, 2004. The inmate's IDTT meeting included only a psychologist and the inmate. This inmate was also diabetic and received bridge orders on July 30, 2004 to cover his diabetes. It was unclear, but it appeared that the inmate did not receive his antipsychotic medications from August 1 thru August 23; there was no MAR in the inmate's record for this period.

Assessment:

This inmate's care and treatment upon arrival at ASP appeared to be inadequate. There was very limited participation by a psychiatrist in the inmate's clinical assessment and treatment planning.

17.    Inmate Q

This inmate was transferred from DVI to ASP on April 27, 2004 and received a positive bus screening. He was treated with Seroquel, Benadryl and Tegretol; there were consent forms for these medications in place. The inmate's MARs from July and August had multiple blanks, and there were no MARs in the inmate's UHR for June or September. A MH-2 from May 3, 2004 documented attendance by a psychologist and correctional counselor at the inmate's IDTT meeting, but neither a psychiatrist nor the inmate were documented as participating in the meeting. There were good psychiatric notes in the chart dated May 18, July 26, August 27 and September 14, 2004. Adequate case management notes dated May 3 and August 12, 2004 were also present in the chart, but the case management notes contained no indication or evidence of parole planning.

Assessment:

This inmate's care and treatment appeared to be inadequate in that there were multiple blanks on his MARs, raising questions as to the level of this inmate's medication compliance and the adequacy of medication administration. Despite good psychiatric notes, there was no evidence of pre-parole planning for this inmate.

18.    Inmate R

This inmate was transferred to ASP on May 26, 2004 from SQ. There was a MH-2 dated June 1, 2004 in the chart, which documented attendance at the inmate's IDTT meeting by a

psychologist and a MTA; no psychiatrist attended the meeting. The inmate's MH-2 referenced an inadequate MH-4 completed on June 1, 2004. The inmate was prescribed Paxil; a consent form for this medication was dated June 29, 2004. Inmate R was noted as refusing his Paxil on August 15, 2004. Despite this, there were orders in the inmate's chart to continue his Paxil without any notes by a psychiatrist regarding the inmate's medication management.

Assessment:

This inmate's medication management appeared to be inadequate and his treatment plan failed to address his medication non-compliance.

EXHIBIT K

Salinas Valley State Prison (SVSP)

September 14-September 16, 2004
January 5-January 7, 2005
April 4-April 6, 2005

1.    Inmate A

One portion of the following case review (shown in italics) was done during Unmet Needs Assessment (UNA) reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. The case was reviewed a second time when it was included in a September 2004 sample of EOP inmates with long lengths of stay in administrative segregation. A follow-up review was conducted in April 2005, after the inmate was sent to DMH and returned to SVSP.

According to the administrative segregation roster provided by the institution on 9/14/04, Inmate A was placed in administrative segregation on 12/12/03 due to battery on a peace officer. Notations indicated that the "CSR approved an additional 90 day ASU extension. Return to CSR by 9/15/04 with update."

When his case was reviewed by the UNA team in August 2004, he was deemed to be in need of an acute DMH level of care. He was in administrative segregation on 9/14/04 when his case was reviewed a second time. He was doing better in April 2005 following his stay at DMH.

_UNA Review:_

_Review of I/P's discharge summaries written at DMH Vacaville in 2000 and 2001 indicated that he was seriously mentally ill and exhibited disruptive behavior throughout his first year of incarceration. He was treated at the acute level of care approximately 5 times in 2001, moving back and forth between APP and Ad Seg. He was apparently quite ill in the community for approximately 5 years prior to his incarceration, receiving psychiatric treatment, and undergoing psychiatric hospitalizations, at least from age 19 or 20._

_Psychotic diagnoses, affective disorder, drug dependence, and malingering all present across known psychiatric history. On Keyhea for most of his 4 years of incarceration. No insight into his illness. Described as withdrawn, refusing treatment, and harboring religious delusions during a stay in acute care in 2001. He also has a history of refusing medication for treatment of his diabetes._

_He was housed in the EOP Ad Seg in August 2004, where he had been housed since he returned to SVSP in December 2003. [He was resistant to treatment in the EOP from Jan-Dec 2003. He was discharged to 3CMS at his request but lasted there only briefly before returning to the EOP.]_

_He was uncooperative, verbally provocative, and spitting in October 2003. He broke several windows. He incurred an infraction for refusing to follow an order. After approximately one week of such behavior, he was referred to the MHCB and a Keyhea_

2

*order was sought. His GAF was assessed at 15 on 10/27/03. He remained at DMH in Vacaville for approximately 4 weeks, returning to SVSP around December 11. The RVR evaluation for an October offense (failure to follow order) was done on December 18. The Keyhea order was renewed on 12/4/03 for 12 months on grounds of grave disability.*

*His most recent medication order was for 20 mg of Zydis, with a back up of Haldol IM if refused.*

*Throughout June and July 2004 he was psychotic and delusional. His cell was described as messy and he was reportedly poorly groomed. An IDTT meeting held on 6/29/04 assessed his GAF at 40. During that period of time he was described as malordorous, menacing, guarded, dismissive, paranoid, and angry. He refused CCM contacts and was seen cellfront. He had not been programming at least since April.*

*According to a review of the C-file a 6 month SHU term could be imposed in connection with an assault on staff that took place around October 23, 2003. He is serving a life sentence, he has 70 points and is at Level IV.*

*Team Discussion: I/P appears to require DMH acute level of care.*

September 2004: Inmate A was in administrative segregation on 9/14/04. His windows were papered with unusual documents. He refused to come out of cell for an interview. He spontaneously voiced loosely connected ideas of persecution. Correctional officers reported that he refused most contacts and had been paranoid and disruptive for a long period of time. In their view, he was notoriously difficult to manage. He was said to scream out of his cell at night. The 114 file indicated he had come out for a shower twice during the past two weeks.

Assessment in September:

He was psychotic but had not been referred to a higher level of care. Staff was unaware of the UNA team's finding that he needed acute care. An administrative assistant reported that he was slated for transfer to a PSU.

April 2005: On 8/18/04, the UNA team recommended acute care for this patient. He was resistant to treatment, clinically deteriorating. He was not sent immediately. He received an MH-4 evaluation on 8/31/04 when he was placed in the administrative segregation EOP.

It was noted that he refused all aspects of treatment and was delusional, grossly dysfunctional, with poor ADLs, was very aggressive to staff and refused a cell-mate. It was noted that he had been "ordered by Coleman" to DMH/APP. He kept deteriorating until a month later when he was admitted to the MHCB on 9/23/04 with a diagnosis of Bipolar Disorder most recent episode manic. On Axis III he had high blood pressure and controlled diabetes. His prior medications included Geodon 40 mg b.i.d. and IM for refusal. He has been on a Keyhea, which was extended on 12/04/04 to 12/02/05. In the

MHCB he was started on Lithium 600 mg t.i.d. x 5 and then 1200 mg per day, along with Haldol 10 mg b.i.d. with 5 mg b.i.d. IM for refusal. His Geodon was re-started on 9/29/04.

He was referred to DMH/APP on 9/30/04 and was transferred on 10/08/04. He was discharged back to SVSP as a psych & return on 1/25/05. The clinical picture documented in the notes was that of a very stable, high functioning patient, with a clear mental status. His current medications consisted of Risperdal 1 mg a.m. and 4 mg p.m. IM, with Haldol 10 mg IM p.r.n. for refusal. He continued to take Risperdal consta 37.6 mg q 2 weeks, which was his discharge medication from DMH.

Assessment in April:

Referral to DMH/APP was delayed until the patient deteriorated and went to a MHCB. He was now functioning well and was clinically stable.

2.    Inmate B

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. The case was reviewed a second time when it was included in a September 2004 sample of EOP inmates with long lengths of stay in administrative segregation.

According to the administrative segregation roster provided by the institution on 9/14/04, Inmate B was placed in administrative segregation on 8/7/03 due to battery on an inmate. While in segregation he incurred three additional SHUable RVRs. Notations indicated that "CSR approved SHUw/MERD of 10/25/04 & PSU transfer to SAC-PSU. Transfer approval expires 9/25/04."

*UNA Review:*

*I/P was in Ad Seg on 8/16/04. The case was reviewed in an IDTT meeting on 7/26/04. According to the check off form, he met Criteria 1 & 2, meaning that he had disturbed emotions, perceptions, thought processes, and/or impaired cognitions that have not responded sufficiently to at least 6 months of treatment to the degree that facilitated adequate levels of functioning in his environment, and he had been in Ad Seg. The team decided not to refer him to DMH because he was stable in ASU and they were actively using strategies to stabilize him. He was also said to be developmentally disabled.*

*CCM note dated 8/9/04 reported that the I/P said he dislikes the red liquid, it upsets his stomach. Officers reported that he has been putting his feces out of the cell door and was naked in his cell most of the weekend. The CCM noted that the cell was stinky and the window was dirty. He was described as rambling. Another recent note said he had paper sticking out his ears and spoke with word salad. When questioned he said the paper was to block out the voices.*

4

*He incurred a 115 for spitting on staff in July 2004. He had a 6 month <u>Keyhea</u> in April 2003 that was extended in October, but allowed to lapse in April 2004. His medication order appeared to have lapsed around July 4 and was not renewed until July 19.*

*Staff interviewed on 8/16/04 said he was psychotic. Only during the past 3 weeks has a psychiatrist been working intensively on establishing a medication regimen. The psychiatrist, Dr. Rankin, reportedly tries for 3 months before referring to a higher level of care. When interviewed the following day, Dr. Rankin said that he saw this patient as in need of hospitalization and had no intention of suggesting delaying referral in this case or any others.*

*<u>Team Discussion:</u> We think he needs acute care. He's deteriorated since July. His CCM began working on a referral immediately.*

Staff reported on 9/15/04 that he had been referred to DMH/SVPP. He remained in administrative segregation at the EOP level of care during the four weeks that elapsed between the UNA review and the site visit.

Assessment:

This is an example of a person with a long length of stay in administrative segregation who was in need of a higher level of care but was not referred. Mental health treatment was inadequate; it did not meet program guide requirements. Medication orders and a <u>Keyhea</u> order lapsed.

3.    Inmate C

This case was reviewed because Inmate C had multiple MHCB admissions. The MHTS history indicated that he had been at SVSP since he came through WSP's reception center two years ago. He was apparently treated at the EOP LOC prior to that, but, as clinical notes indicated, he was treated at the EOP LOC and in a crisis bed in 2001. In 2001 he wrote a suicide note and either jumped, or attempted to jump, from a tier.

Inmate C was housed in administrative segregation on 9/14/04, having been placed there about four weeks earlier, on 8/9/04, for threatening staff. Clinical notes indicated that he had been on B Yard until 8/9, when he was told that he was not welcome there. Various clinical notes pointed to a move from EOP administrative segregation to 3CMS, followed by a return to EOP administrative segregation. The transition from EOP to 3CMS was discussed with him over a period of several weeks, during which time he declared he was ready to make the move.

His presentation in 2004 was variously described as childlike, cooperative, goal oriented, demanding, manipulative, argumentative, clear, coherent, with rambling speech, poor insight and poor grooming and hygiene. He sometimes reported auditory hallucinations. He seemed to resort to threats of hurting himself and/or complaints that others have injured him when he wanted to have an effect on the behavior of others.

According to MHTS data, Inmate C was in the MHCB from 7/20-22/04, on 8/4/04, and from 8/5-8/7/04. A medical report dated 8/30/04 showed that he was taken to the CTC on 8/30/04 because he was unable to speak. A report dated 8/28/04 indicated that he had a cut/laceration/slash beside his right eye, and when examined he reported, "Officers beat me up."

On at least two occasions he was admitted to the MHCB after voicing intent to injure himself. Metal was found to be missing from a MHCB cell he occupied. Following the first MHCB stay, five days of follow-up were conducted on 7/23-7/27. He also had five days of follow-up on 8/17-8/21, not associated with an MHCB discharge. He was evaluated in the CTC on 8/28/04 by a psychiatrist. He was given Prolixin Decanoate and Vistaril, with a plan to initiate Geodon and return him to the EOP administrative segregation unit.

A treatment plan dated 7/1/04, which coincided with an IDTT meeting in which his LOC was changed from EOP to 3CMS, gave diagnoses of Schizophrenia, undifferentiated type, Polysubstance Dependence, in institutional remission-partial, and Personality Disorder with narcissistic and paranoid traits. His GAF was assessed as 60. He was treated with Seroquel 400 and Lithium 900 at that time. He admitted having been non-compliant with medication and misusing medication in recent months. He was described as becoming disorganized during times of increased stress, becoming verbally agitated easily, and demanding certain medication in a belligerent and hostile manner. The team agreed that he had reached maximum therapeutic benefit after 14 months and granted his request to be discharged from the EOP LOC. They noted that he had been slated for discharge from the EOP in February 2004 until drug seeking behavior subverted the plan. The signatures of the team showed only two participants, suggesting that a full team was not present at the IDTT meeting.

Due to deficiencies in the UHR, it was not possible to determine how often or in what manner he was seen while in administrative segregation, nor whether his new CCM in GP was notified of his arrival on the yard. His UHR contained a number of recent staff referrals and one suicide risk evaluation form, but whether responses to the referrals were timely and appropriate could not be determined. The number of suicide risk evaluations seemed low given his recent history of treatment. The sequence of medication orders was also in disarray. Changes in medication, rationales and the duration of orders were unintelligible. Only one medication that was recently ordered had a corresponding informed medication consent form. An un-standardized, inadequate consent form dated 7/27/04 was in the UHR. The most recent Lithium level was obtained in January 2004; it was sub-therapeutic. Medication non-compliance triggered referrals and was sometimes discussed during mental health contacts.

Assessment:

Mental health treatment did not meet this inmate's needs nor was it consistent with program guide requirements. Documentation in the medical record was poor.

Medication orders and MARs were unintelligible. Blood levels for Lithium were not monitored. There was no planned approach to treatment in this case. There was a lack of interdisciplinary care, a series of uncoordinated responses to non-compliance and poor psychiatric continuity. Interventions were driven by crises precipitated by the patient and varied more by provider and circumstance than clinical factors.

4.    Inmate D

This case was in the sample of inmates with multiple MHCB admissions. Inmate D was admitted to the MHCB three times since May 2004 and was treated at DMH/APP as a psych and return patient from March through May 2004. He was housed in administrative segregation and treated at the EOP LOC at the time of the September 2004 site visit. Clinical notes indicated that he was awaiting transfer to a Level III yard at MCSP and recently incurred a RVR for refusing to accept a cellie.

Strangely, there were no outpatient progress notes on blue paper that mentioned his ten-day MHCB stay in July. The inpatient record of that stay was appended to a thick packet of documentation stemming from his DMH stay. Weekly contacts were missed during that period, but the first note following his discharge from the MHCB did not mention that he had been in the MHCB, nor were five days of post-discharge follow-up documented.

Progress notes suggested that during the end of June and through July he was quite depressed, trying to cope one day at a time, and was usually seen at cell-front due to lockdowns. There were also references to missed medication and expired orders and a request to obtain medication. During that period of time, weekly IDTT reviews determined that he did not need to be referred to DMH.

Inpatient records were filed out of sequence and not tabbed by location, level of care, or date. Review of documentation associated with the MHCB stay of 7/17-7/27 indicated the following:

Inmate D tried to hang himself, said he was tired of living and felt hopeless and worthless. He was in a safety cell from 7/16-7/21. He was admitted to the MHCB on a Saturday. He was treated with Geodon, Effexor, Haldol, and Cogentin. There was no indication that he received medication after he was discharged from the MHCB. The only July MAR in the UHR was generated prior to his admission to the MHCB. It was blank from when he was admitted through the end of the month.

Prior to a recent MHCB admission, he was placed in a holding cell pending psychiatric evaluation. When he did not contract for safety and reported hearing command hallucinations to kill himself, he was admitted pending bed availability. Clinical documentation indicated that 24 hours elapsed between positive evaluation for admission and actual admission. He remained in the MHCB for eight days. UHR review showed an MHCB admission at MCSP in June 2003.

Inpatient documents from DMH/APP indicated that he was treated for Major Depressive Disorder, recurrent, severe, with psychotic features. Diagnoses also included Polysubstance Dependence, Borderline PD, obesity, and HTN. He was medicated with Effexor and Seroquel. He was described in the discharge summary as not responding well to medication, being withdrawn from therapeutic and social activities, and as having achieved maximum benefit. His GAF at discharge was assessed as 41. He has a life-long history of depression and an extensive history of suicide attempts; one sibling and another close relative committed suicide.

He was seen for five days of follow-up when he was discharged from the MHCB at the end of August 2004. At the time of discharge he had orders for Geodon, Paxil, and Risperidone. Although he was housed in administrative segregation and seen for clinical follow-up, his medication did not reach him until the third day after his discharge. Although MARs indicated he had current orders, there was no order found in the physician's orders section of the UHR.

When interviewed in a private setting in administrative segregation on 9/16/04 he was clean and well groomed. His conversation was logical and relevant. His mood was depressed; affect was constricted. He said he had not slept for four days. He thought that his medication regimen was not working. He had reported that to his CCM the day before and believed he would soon be seen by a psychiatrist. An urgent self-referral that he made through an officer had elicited an immediate CCM contact.

In the interview, Inmate D seemed at times on the verge of tears while discussing neutral topics. He said that he was in administrative segregation because he refused to give up his SNY status, so he could not program in the GP portion of the EOP. He said that he was slated for a transfer to the SNY EOP at MCSP. He reported that he had been suicidal in the past and that the only thing that kept him going at this time was the nine hours of group treatment he attended weekly.

Assessment:

Mental health treatment was inadequate. Medical records were not well organized. MARs and orders were inconsistent. Medication continuity after he was discharged from the MHCB on two occasions was poor. Medication continuity was interrupted after he returned from DMH and later, during the month of June. Mental health treatment that he received at SVSP was inadequate. Five-day follow-up, as well as routine follow-up, was missed subsequent to one MHCB stay. Due to his elevated risk of suicide and multiple crisis bed admissions, he warranted referral to a higher level of care. Clinical and custodial matters were handled poorly with regard to his SNY status and the use of administrative segregation pending transfer to an institution that met his needs.

5.    Inmate E

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005.

8

This case was reviewed a second time in September 2004 by the monitor's expert. An abridged review was done by the monitor in January 2005 to ascertain whether the revised RVR process was followed.

According to the administrative segregation roster provided by the institution on 9/14/04, Inmate E was placed in administrative segregation on 8/11/04 due to attempted battery on an inmate.

*UNA Review:*

*This 45 y.o. I/P was in the EOP in August 2004. He was not participating well. Staff interviewed on 8/17/04 reported that he was not doing well, his level of functioning was deteriorating, and that his behavior was very problematic. Since he arrived in April 2004 he had hit other inmates on several occasions, claiming that they had yelled all night. He made a similar claim subsequent to an assault in 2001. He has a history of serious head injury and substance abuse.*

*At SVSP he was ordered a complex regimen of psychotropics and medication for treatment of hepatitis and asthma. There were questions about whether the steroids he was taking increased his agitation. He had orders for Zydis 10, Trilafon 8, Mometarsore spray, Albuterol, Prilosec, Meclizine, Lactulose Sol, Dilantin, and Propranolol.*

*At SVPP he was ordered Olanzapine 25, Sertraline 100 a.m., Burprorion 500 a.m./500 p.m., Remeron 200 a.m./500 p.m., Gabapentin 400 a.m./400 p.m., and Abilify 7.5 a.m.*

*Team Discussion:*  *I/P appears to meet criteria for DMH Intermediate Care.*

September 2004: Inmate E remained in administrative segregation as of 9/15/04. He had been seen weekly, usually at cell-front, by a CCM and had been seen by psychiatry. He attended a group session on anger management, but it was the only group session documented in his UHR.

Notations on the administrative segregation roster indicated that a 60-day extension was granted on 9/7/04, with return by projected MERD of 10/19/04.

Review of the C-file indicated that mental health assessments consistently concluded that mental health was a factor in his behavior leading to RVRs. Mental health input was considered by hearing offers and sanctions were mitigated. He did not lose time; SHU terms were simultaneously assessed and commuted.

Progress notes indicated that staff was considering him for single-cell status and a referral to DMH on 9/2. He was again considered for DMH on 9/15/04. It was unclear from the UHR whether he was referred.

A subsequent review by the monitor focused on the RVR process. Inmate E, an EOP inmate, was issued a RVR on 8/11/04 for attempted battery on an inmate w/o serious

bodily injury (he attempted to hit another inmate). An 8/19/04 mental health assessment concluded that mental illness contributed to the inmate's behavior, adding "He is psychotic; he hears voices which interfere with his decision making. However, he can control his actions and should be held accountable." The clinician further concluded that mental health factors should be considered by the hearing officer when assessing a penalty, adding "He should suffer consequences for his actions, but not at the highest level. He needs to understand that he will be punished." At a 9/7/04 hearing, this inmate was found guilty and assessed 90 days forfeiture of credit. The inmate's MHSDS level of care and the content of the mental health assessment were accurately and fully represented in the completed RVR. Based on input from the clinician, the SHO elected to mitigate punishment by opting to retain all privileges.

Assessment:

Clinical documentation of his referral to DMH was missing from the UHR. He was in need of a higher level of care and had been so for at least a month. An administrative assistant checked other records and found that he was referred to DMH/SVPP. RVR protocols were followed. Disciplinary adjudication considered mental health factors; penalties were mitigated.


6.    Inmate F

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. This case was reviewed a second time in September 2004 by the monitor's expert. Inmate F incurred two disciplinary infractions in August 2004; he was in need of a higher level of care at that time. An abridged review was done by the monitor in January 2005 to ascertain whether the revised RVR process was followed.

*UNA Review:*

*This 41 y.o. Creole I/P had been in the EOP throughout the past year. He was referred because he does not actively participate in structured therapeutic activities.*

*He has a diagnosis of Schizophrenia, paranoid type. Throughout 2004 he was medicated with 12.5 mg of Perphenazine. He was largely compliant with medication in June and July.*

*On 8/18/04, the day of this review, he argued with an officer and was sent to the MHCB. Review of the UHR indicated that he had consistently reported psychotic symptoms since May 2004. Throughout that time he was also emotionally engaged with clinicians, often discussed relevant topics, and was considering a choice of cellie. He was described as suspicious, argumentative, evasive, angry, hypomanic. In May he had poor hygiene and reported tactile hallucinations and paranoid delusions about hostile actions by people around him. He was described as effeminate and concerned about how others viewed*

*his sexual identity. IDTT summaries written at that time indicated he was stable and did not warrant referral to a higher level of care.*

*Review of the C-file showed that he has 90 points, Level IV. He has not attempted escape nor does he have a pending SHU term. He has been involved in 3 violent incidents since June 2001, a cell-fight, mutual combat, and possession of a weapon.*

<u>*Team Discussion:*</u> *It was felt that this I/P had met criteria for DMH Acute Care since May of this year. It was recommended that he be referred to DMH Acute Care.*

September 2004: When interviewed in a confidential setting in administrative segregation on 9/16/04, Inmate F was dressed in a jumpsuit, stood in a holding cell and wore handcuffs. Cuffs were applied because he was awaiting his turn at the ICC hearing. He was somewhat disheveled but looked as if he had made an effort to be presentable. He was small in stature and gave the impression of being effeminate. He was not well oriented to time; he did not know the month or the season, but did know the year. He did not know the name of the President of the U.S. He said he had no idea what to expect in his ICC meeting. His fund of information was small but memory for recent events was intact. His concentration was poor. Mood was neutral, affect was appropriate. He was polite and compliant.

At that time, staff reported that he had been referred to DMH/SVPP.

Subsequent review by the monitor in January 2005 found that this EOP inmate was issued a RVR on 8/8/04 for mutual combat. An 8/19/04 mental health assessment concluded that mental illness contributed to the inmate's behavior, adding, "His distorted thinking interferes with his understanding of social situations." The clinician also concluded that the hearing officer should consider mental health factors when assessing a penalty, adding, "His psychosis should be considered." The clinician also wrote: "I/M is disorganized and unable to attend to the essential elements of conversation." At an 8/25/04 hearing, this inmate was found guilty and assessed 90 days forfeiture of credit. The inmate's MHSDS level of care and the content of the mental health assessment were accurately and fully represented in the completed RVR. Based on input from the clinician, the SHO elected to mitigate punishment by recommending that the ICC suspend the SHU term associated with this RVR.

This inmate received another RVR on 8/18/04 for battery on a peace officer. While being cuffed, the inmate spun around and grabbed the officer's right shoulder. The officer took the inmate to the ground and placed cuffs on him. An 8/19/04 mental health assessment concluded that mental illness contributed to the inmate's behavior, adding, "The inmate continues to be actively delusional and overly reactive: this is the second incident in about two weeks. This incident triggered the starting of forced medication." The clinician also recommended that the hearing officer consider mental health factors when assessing a penalty, adding, "He is being referred to CMF to be treated for his psychosis, in addition to a Keyhea." At an 8/25/04 hearing, he was found guilty and assessed 150 days forfeiture of credit. The inmate's MHSDS level of care and the content of the mental

health assessment were accurately and fully represented in the completed RVR. Based on input from the clinician, the SHO elected to mitigate punishment by recommending that the ICC suspend the SHU term associated with this RVR. At a 9/16/04 ICC hearing, he was given an eleven-month SHU term and was retained in administrative segregation, pending CSR review and PSU transfer. He was subsequently transferred to DMH/SVPP. At the time of the C-file review, this inmate appeared to be housed in DMH/SVPP and involuntarily medicated per a Keyhea order initiated following these incidents.

Assessment:

This EOP inmate had been in evident need of a higher level of care for approximately five months. After being identified as in need of a higher level of care in August, he was transferred to DMH/SVPP for intermediate care sometime after mid-September. Subsequent review found that he had been admitted and transferred by January 2005.

Although RVR protocols were followed, full forfeiture of credit was assessed in response to two disciplinary incidents, despite ample evidence that this inmate's behavior was, in large part, the result of uncontrolled psychosis. In addition, an eleven-month SHU term was imposed, despite the SHO's recommendation that the ICC suspend SHU terms associated with the RVRs.

7.    Inmate G

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. This case was reviewed a second time in September 2004 by the monitor's expert.

According to the administrative segregation roster provided by the institution on 9/14/04, Inmate G was placed in administrative segregation on 9/9/04. No reason for the placement was listed. However, when his C-file was reviewed in August, it was noted that he had recently committed several offenses of a sexual nature.

*UNA Review:*

*I/P is a 45-year-old Caucasian EOP placed at SVSP. He is incarcerated for rape and has had multiple staff sexual assaults and related 115s since his incarceration. He has been at SVSP for the past 9 months and is currently prescribed lithium and Resperidol. He reported that the medication was for mood swings, hearing voices, and because he often cuts himself. In 2002 he was admitted on 6 occasions to a MHCB as a result of cutting himself. He is described as perserverating on themes with sexual fantasies, being extremely impulsive, and having difficulty determining/maintaining boundaries with others.*

*His mental health history began when he was 13-years of age and he was prescribed medication for behavioral difficulties. He was diagnosed as having Schizophrenia, Paranoid type at Atascadero State Hospital in 1986-87. His primary diagnosis was:*

*Paranoid Schizophrenia; Borderline Intellectual functioning, and Borderline/Antisocial Traits. He was removed from Atascadero State Hospital for "pinching a lady on her tity." He reported that he used to sniff paint and glue and had received head trauma from fighting, an auto accident, etc.*

*He was placed in an MHCB on 6/23/04 for reported increased ideation to cut his self and he wanted an increase in his medications. He cut his forearm because he could not remain in the cell all day during lockdown, reporting that the anxiety was overwhelming. He has had numerous reports of self injury and is currently on a Keyhea through 1/4/05.*

*Upon interview, the I/P presented as lucid and organized. He reported that he has been at Chino, WASCO, Corcoran, Mule Creek, and Lancaster State prisons. He related that he gets transferred as he gets in trouble. He has exposed himself to staff on several occasions. He described himself as having mood swings, hearing voices, and cutting himself "a lot."*

*His classification information indicates that he is a Level IV Inmate with a classification score of 163. He does not have a current SHU term pending and has not had acts of violence in the past 5 years nor attempted an escape.*

*Team Discussion: Initially, this I/P was not seen as requiring a higher level of care as he presented as manifesting the same baseline of behavior that was noted throughout his history. However, upon review of the C-file, it was noted that he has had several 115s within the past several months all related to sexual acting out behavior. Given his commitment offense, history, staff assaults, impulsivity and apparent preoccupation with sexual fantasies and compulsive acting out behavior, it was felt that he falls in a special category and may be appropriate for a DMH program to address his sexual acting out behavior.*

September 2004: Two mental health assessments done for two disciplinary infractions of a sexual nature differed in their conclusions. One concluded that mental health was a factor in his behavior; the more recent assessment, done in August 2004, concluded that it was not.

Assessment:

Mental health assessments done for disciplinary hearings did not provide consistent information on the effect of the inmate's mental disorder upon his behavior. Given his history and diagnoses, it seemed clear that his repetitive sexual offenses were associated with his psychopathology. Staff did not appear to recognize that he needed to be sent to DMH for treatment. He was not referred to a higher level of care during the month that elapsed between the UNA review and the monitoring visit.

8.    Inmate H

This case was reviewed twice, once in September 2004, when it was in a sample of EOP inmates with long lengths of stay in administrative segregation, and a second time in January 2005. The September review included information obtained from the monitor's review of the C-file.

According to monthly summaries provided by central office, Inmate H was in administrative segregation on 7/9/04 and had a length of stay of 129 days. At the time of the site visit on 9/15/04, he had GP status and was housed in D-3, which housed both segregated and general population EOP inmates. The C-file did not indicate that he had been on administrative segregation status at SVSP in 2004.

Inmate H had a history of disciplinary infractions at CMF in 2003 and SVSP in 2004.

This inmate arrived at SVSP from CMF on 1/21/04. His initial EOP IDTT was held on 1/29/04. A treatment plan update indicated that he was retained in EOP with a diagnosis of delusional disorder and a GAF of 49. His symptoms consisted of "grandiose delusions related to his artistic creativity and impact on the motion picture industry." According to inpatient records, he was admitted to DMH/APP after cutting himself in the reception center at WSP. Upon admission to DMH/APP, he presented as depressed, sad and delusional, complaining repeatedly about a mouse in his mattress. He was discharged from DMH/APP to the EOP program at CMF on 8/15/03 with diagnoses of Delusional Disorder NOS and rule out Psychosis NOS, with a GAF of 40. All psychiatric medications were discontinued on 10/24/03 and had not been ordered since. He was transferred to SVSP on 1/21/04. CCM contacts immediately preceding the incident indicated that the inmate was paranoid, guarded and non-communicative. Immediately following the incident, he was referred to the MHCB for a Keyhea evaluation based on his danger to others. This evaluation apparently concluded that he did not meet criteria for a Keyhea order, as he was not prescribed medications as of September 2004.

According to the monitor's review of the C-file, Inmate H was issued a RVR on 4/18/04 for mutual combat. While returning from yard, this inmate got in a fight with another EOP inmate, which required the use of pepper spray. A 4/28/04 mental health assessment prepared in response to the RVR concluded that mental illness may have influenced the inmate's behavior, adding: "[Inmate H] is delusional and his impulse control is minimal. He presents himself as confrontational and aggressive." The clinician further wrote, "Exhibits history of psychotic thoughts and anti-social behavior. Delusional thinking is extreme and psychotropic drug regimen appears inconsistent. [Inmate H] is volatile." The C-file contained no documentation or reference to this incident, perhaps indicating that the RVR was dismissed.

According to a recent treatment plan update done for an IDTT meeting held 7/29/04, Inmate H had a current diagnosis of Delusional Disorder and a recent GAF of 49. He was not treated with medication. He continued to be treated at the EOP LOC. Progress notes indicated that his attendance at groups recently rose to around 50 percent.

14

ago. Neither resulted in the desired result. He remained psychotic for much of the next year.

Apparently, staff focused more on the negative results of his DMH treatment in 2003 than his continued psychotic state. Given the added benefit of observations over a long period of time, particularly those associated with a disciplinary infraction in April, another Keyhea hearing should have been initiated. If appropriate treatment could not be provided at the EOP level of care, he should have been referred to a higher level of care again.

This case was also an example of contradictory information on an inmate's administrative segregation status. Central office lists indicated he had been in administrative segregation for approximately five months, but the C-file and the institution's administrative segregation roster showed he had not been in segregation in 2004.

On a positive note, the mental health assessment for his RVR contained relevant information about his mental illness and appeared to have been useful in adjudication of his infraction. The absence of the RVR from the C-file suggested that it was dismissed.

9.    Inmate I

This case was reviewed twice, once in September 2004 and a second time in January 2005, when Inmate I's IDTT meeting was observed. At that time, he was treated at the 3CMS level of care. Staff was considering whether he needed to be returned to the EOP level of care.

This case illustrated errors in documents associated with both MHCB admissions and administrative segregation housing. It was included in the sample of inmates with multiple admissions to the MHCB. In September, Inmate I's name appeared on only one electronically generated list of people with multiple admissions. It was omitted from a list generated by a different source.

An IDTT meeting attended by a full team was held on 7/22/04. The plan showed a diagnosis of Bipolar II Disorder and a GAF of 49. He was treated with Seroquel and Depakote. Strangely, lab results for Lithium found a level of .3 in July 2004, despite no recent orders for Lithium. VPA levels were ordered but not obtained. In July he was seen three times out of cell and once at cell-front due to a lockdown.

Inmate I was in the MHCB from 8/19-8/23 and 9/6-9/8/04. The UHR also showed that he had been in the MHCB at CSP/Corcoran from 1/22/04-2/2/04 and 3/1/04-3/8/04. The UHR contained some information on additional MHCB admissions. It indicated that he was also admitted on suicide precautions on 8/31 or 9/1 because he tied fabric around his neck while in a holding cell. Apparently the MHCB at SVSP was full, and movement to another institution was discussed with central office staff and ultimately rejected for custodial reasons. A note indicated that a different I/P would be moved rather than Inmate I.

Inmate I has cheeked razors. He was admitted to MHCB around 8/19/04 for possible ingestion of razor blade. No obvious injuries were found. Medical notes indicated that he swallowed and passed a razor blade in March 2004.

He was held for two nights in a holding cell in the ER because he swallowed a "caustic substance." His behavior was described as goal directed and seemed to be a reaction to his cellie not allowing him to return to the cell they had shared. He voiced a wish to go to ASH to receive treatment for trauma associated with a history of sexual abuse. Earlier that month he voiced a wish to go to A-Yard. He needed five-day follow-up from 9/1-9/6, but none was documented in the UHR. He was followed for five days after his 8/23/04 discharge.

Progress notes indicated that Inmate I readily "ups the ante and attempts to split staff." An X-ray dated 8/23/04 showed a razor blade in his abdomen.

According to inpatient records filed in the UHR, he overdosed on Seroquel around 9/5/04 because he received a "Dear John" letter. He was treated at a community hospital, then admitted to the MHCB upon his return to SVSP. He was described on 9/6/04 as determined to kill himself and saying, "I am tired of living." While in the MHCB in a safety cell on 11/14/04 he punctured his forehead with a metal object, smeared the door with feces and refused to cuff up to leave the cell. Medical documents indicated that he banged his head and reported that he swallowed the handle of a spoon at the end of November. He bit his wrist around 12/11/04, causing bloody lacerations.

Staff considered referring him to ASH in August but did not. From August through December, the prospect of referral to DMH was used in his treatment as an incentive. Goals included 30 and 60-day periods of good behavior in order to earn the referral. The staff's impression was that although overdoses were not intended to be lethal and were undisguised attempts to achieve certain goals, he might inadvertently succeed in inflicting serious injury or committing suicide.

Neither his medication regimen nor compliance was well established. He had orders for Effexor, Artane, and Risperidone in November and December. In September he had been treated with Depakote, Seroquel, Zoloft, and Effexor.

His compliance with medication in December was poor. According to his MARs, he was not in his cell when medication was administered on 12/4, 12/5, 12/6, 12/13, and 12/20. He refused on 12/1 and 12/2. The pharmacy's stock of Effexor had run out on 12/4, so the a.m. dose was not administered. He refused medication on the afternoon of 12/4. On 12/6 the medication that was ordered was again unavailable. From 12/14-31 he took medication as ordered on all but two days. The MAR blocks for Effexor and Artane were left blank on 12/24, 12/25, and 12/26.

The most recent progress note, dated 1/4/05, indicated that he was doing well, coping adequately with stressors and had met with his CCM out of cell to discuss issues of

emotional concern, including self-injury and self-care. He appeared to be in an optimistic frame of mind on that date.

Assessment:

Mental health treatment did not meet program guide requirements. Risk of self-injury or suicide did not elicit adequate responses over a lengthy period of time.

There was no follow-up subsequent to his discharge from the MHCB in September 2004, although five-day follow-up was warranted and was carried out subsequent to his August 2004 stay. Use of a holding cell in the CTC for two days pending bed availability was inadvisable.

Errors in lists of MHCB admissions and administrative segregation housing were evident in this case.

Interruptions in medication administration attributable to institutional problems rather than patient refusal were problematic during the month of December. Monitoring blood levels of a mood-stabilizing medication was wholly inadequate. He was on Depakote and a level was ordered but not obtained. The UHR contained results of a Lithium level, but he was not prescribed Lithium.

The staff's assessment that he might inadvertently inflict serious injury or commit suicide via overdose should not be taken lightly. If mental health staff believed that he needed a higher level of care, such as a DMH intermediate level program, he should have been referred.

10.    Inmate J

This case illustrated errors in documents associated with MHCB admissions. It was listed on one log as a case of multiple admissions to the MHCB but omitted entirely from another log. It appeared that Inmate J was in the MHCB twice in the past four months. In June he was in the MHCB because he intentionally overdosed on Zyprexa and Thorazine. He was also in the MHCB in May due to suicidal behavior. He had a long history of attempted self-injury. Five-day follow-up was done on both occasions.

Inmate J had been treated at the EOP LOC and housed in GP for at least six months. EOP treatment plans for the past six months were not located in the appropriate section of the UHR. A further search of the record failed to uncover them. According to MARs, he was ordered Zyprexa and Thorazine in June. At the end of July, Effexor was initiated, and no order for Zyprexa was rewritten. He was compliant with medication during those months.

He was apparently lost to mental health follow-up after he was discharged from the MHCB early in June. He was not seen again until a psychiatry contact occurred on 6/24/04. He was then seen weekly at cell-front for two weeks, but then lost to follow-up

again from 7/2-7/27/04, when he was seen in an IDTT meeting and his LOC was changed to 3CMS. At the time of the monitoring visit on 9/15/04, he was housed in GP and treated at the 3CMS LOC. The treatment plan prepared in connection with the 3CMS IDTT meeting, which was attended by a full team, showed a diagnosis of Schizophrenia, paranoid type and a GAF of 58. That same date he reported that he was depressed and wished to restart Effexor. An order was written in response to his request.

Assessment:

Mental health treatment did not meet program guide requirements. Although at the time of the review he was receiving appropriate treatment at the 3CMS level of care, Inmate J was lost to follow-up twice, once in June and once in July, during a period of time when his recent course of treatment indicated a need for vigilant follow-up. He was not seen weekly while in the EOP. The UHR did not contain an EOP treatment plan associated with his EOP treatment during June and July.

11.    Inmate K

Inmate K was familiar to the monitor's expert from previous visits. In the past, he was treated at the EOP LOC and was disabled by paranoid delusions concerning CDC staff. He was treated at the 3CMS LOC as of September 2004.

Review of recent UHR documents indicated the inmate had asthma and sickle cell trait. He had an acute medical problem in May 2004. He lost 24 lbs in four months and had an abdominal mass. An urgent scan was ordered, and a six-week supply of Resource was provided. The scan was done and results were filed in the UHR.

Inmate K was treated at the 3CMS LOC throughout 2004. He had current orders for Risperdal 2 and Prozac 20 in September 2004. He was housed in GP and enrolled in a coping skills group. Recent progress notes reported a lack of inhibition and inappropriate sexual comments. Overall, he was described as well oriented with relevant conversation and intact reality testing. He was seen quarterly by his CCM and every eight weeks by a psychiatrist.

He was observed during a mental health treatment group that met on B-Yard on 9/15/04. He appeared to be well oriented. His hygiene was good and he was carefully groomed. He wore glasses. He did not offer spontaneous speech but seemed to listen to the discussion. A medical note written in July indicated the he had lost his hearing aids. A mental health note written in September indicated that he was awaiting transfer due to his hearing status.

Assessment:

Mental health treatment met program guide requirements.

12.    Inmate L

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. The inmate was reviewed a second time in September 2005 because the UNA team had decided that the case should be revisited in one month.

*UNA Review:*

*This 21 y.o. White I/P was treated at the EOP LOC. He had a diagnosis of Major Depressive Disorder, severe, with psychotic features. He was medicated with Risperdal 3, Depakote 1500, Seroquel 300, Effexor 50 bid. MARs for June and July indicated that he received nearly all doses.*

*According to a recent progress note, he has spent 33 of the last 36 months in Ad Seg and is uncomfortable in GP. This is his first incarceration in an adult institution. It was not possible to discern from the UHR why he moved from Ad Seg to GP in July. Review of the C-file showed that he had 138 points and was at Level IV. The record was negative for violence and escape attempts within the past 5 years. He does not have a pending SHU term.*

*Records suggested that he participated in structured therapeutic activities while in Ad Seg. Due to a fairly recent change in local SOP, his CCM did not change when his housing status changed.*

*According to CYA records in the UHR, he has a history of self-injury and psychopharmacological treatment for anxiety and depression. He was on a 24 hour suicide observation on 8/7/04, at which time he was assessed as being at low risk. Subjective reports were that he spent the watch period in the CTC in a "contraband area" due to lack of space elsewhere. The week before he requested a CCM session on an urgent basis and reported feeling severely depressed in relation to the past loss of a close family member. He was said to be losing weight. Staff responded to his emotional distress with intensified interventions.*

*He was in an MHCB in April 2004 for several days due to suicidal ideation and inflicting superficial lacerations on his wrist. He also reported taking 20-30 Seroquel pills. He was treated on an emergency basis with charcoal. His speech was slurred. At that time he complained of auditory hallucinations, sleep disturbance, and loss of familial support. He was also in the MHCB for several days in May, when his risk was assessed as moderate. Questions were raised regarding his report that his mother had died. He was tearful and withdrawn.*

*Most concerning in recent progress notes were poor appetite, weight loss, urgent requests to see CCM, suicidal ideation, tearfulness, depression, and 24 hour watch in the CTC. Weekly IDTT reviews, however, said he was stable and did not meet the criteria*

*for DMH referral. The written summaries of the IDTT reviews were inconsistent with clinical notes spanning the same period.*

*Team Discussion: He needs the ICF level of care to treat his depression aggressively and to address the issues of repeated self-injury and persistent suicidal ideation.*

*Staff reported that the watch was not a suicide watch, but that he wanted more space far way from his cellie for a few hours after working through emotional issues during a session. He spent the night in a cell in the visit area of the D yard and felt better the next day. In contrast to the written notes, staff reportedly orally that he actively participates in structured therapeutic activities, exhibits a full range of emotions, engages readily with others, and has blossomed since coming to GP from Ad Seg.*

*In light of oral reports by staff, we reconsidered the previous decision and decided to revisit this case and make a determination one month hence. During the interim, staff planned to continue to treat him at the EOP LOC*

When interviewed in a non-confidential setting on 9/16/04, Inmate L continued to be housed in the GP section of the EOP. He was neatly dressed and well groomed. Thought processes were logical and relevant, memory and concentration were unremarkable. His emotional range was severely constricted, his mood was dysphoric and his affect was flat. Psychomotor slowing was evident. He appeared to be severely depressed. He reported that his appetite was poor and that he had not eaten his last two meals due to lack of appetite. He thought he had lost weight. He said that he slept little because he tried not to sleep to avoid disturbing sounds and voices. He said he was not taking medication ordered (reportedly Depakote and Risperdal) because it did not help. He was reluctant to attend groups because they veered off on tangents, to which he reacted by leaving. He said he was very uncomfortable socializing with others. He said he found weekly individual CCM sessions, held in a confidential setting, helpful but he was reluctant to rely upon them fully. He thought of suicide frequently and had constant feelings of worthlessness. He said that he could only guarantee his safety on a day-to-day basis.

Assessment:

This inmate was at substantial risk of self-injury or suicide. Although he appeared to benefit from weekly individual CCM sessions, he required more intensive treatment to ameliorate the level of risk. Staff was apprised of this finding. Subsequent discussion with the UNA team that reviewed the case in August resulted in the decision that he should be referred to a DMH/intermediate level of care.

13.    Inmate M

This case was on the UNA list but was not reviewed during the visit of 8/16-8/18/04 due to time constraints. The inmate, however, was reviewed in September 2004; his case was subsequently discussed by the UNA team and added to the UNA cases. Italicized text was excerpted from the UNA report submitted in March 2005.

*UNA Review:*

*This 44 y. o. I P was treated in the EOP at SVSP since February 2004 for Major
Depressive Disorder, recurrent, severe, with psychotic features. He was referred
because he has been in Ad Seg for over 2 months. He also has an extensive history of
substance abuse. He was medicated with 3 mg of Risperidone.*

*Although he voiced a wish to spend his time at ASH and said he disliked the EOP, he
participated fairly well and readily engaged with clinicians.*

*A treatment plan written at that time described him as experiencing paranoia,
hallucinations, and bouts of anger, depression, and severe mood swings. He reportedly
had suicidal ideation and poor social and occupational skills. He had very poor impulse
control and was treatment resistant. No IDTT summaries were provided.*

*Review of the C-file showed 63 points, Level IV, and a pending SHU term. He had no
escape attempts within the past 5 years but had been involved in a violent incident.
Clinical notes indicated that he was endorsed to an SNY and was housed in Ad Seg at the
end of June. A clinical note indicated that he had committed a violent sex crime prior to
his incarceration.*

*Team Discussion: I/P is appropriately placed at the EOP LOC. Presumably, he is
awaiting transfer to a PSU.*

Inmate M was being treated at the EOP LOC in September 2004. His level of care had
moved between 3CMS and EOP at least twice during the past six months, and he had two
or three stays in the MHCB during that time. He was also treated by medical staff
because he swallowed foreign objects, such as a spoon, which was identified via CT scan.
UHR documents indicated he had an extensive history of swallowing household objects
and abdominal surgeries. While treated at a higher level of care in the past he was given
a diagnosis of Munschausen's.

In September 2004 he was treated with Carbamazepine 200 bid. A treatment plan written
in July 2004 showed diagnoses of Schizoaffective Disorder, Intermittent Explosive
Disorder, Antisocial PD, and Borderline PD. His GAF was assessed as 40 in July. The
team decided to retain him in EOP for 90 days.

The course of his treatment in July, August and September belied a lack of
multidisciplinary coordination and did not reflect a planned approach. There was little
consideration of alternative diagnostic formulations, targets of treatment or indicated
pharmacological interventions. Treatment was provided by different psychiatrists, who
sometimes saw him without benefit of the UHR, and seemed to be driven by his demands
and other non-specific factors rather than by a well considered approach. Case manager
notes indicated that his CCM was aware of salient issues and tried to address them.

22

Assessment:

Mental health treatment met the technical requirements of the program guide but was clinically inadequate. The level of care at which Inmate M was treated was less important than whether his treatment reflected a multidisciplinary plan that was consistently implemented. This case illustrated the shortcomings associated with the practice of holding pro forma IDTT meetings in some units.

Although the IDTT met regularly and updated the treatment plan, mental health treatment was not actually provided in accordance with a considered plan. As stated above, there was little consideration of the diagnostic formulation, targets of treatment or pharmacological interventions that might become a useful part of his treatment. This case underlined the fact that a single provider working in a complex milieu, no matter how skilled, could not, alone, provide adequate treatment. Multidisciplinary treatment was needed but not provided.

14.    Inmate N

Inmate N was reportedly transferred to ASH after his case was reviewed during the UNA in August 2004, but he was back at SVSP for court appearances at the time of the January 2005 site visit. He assaulted a staff member at SVSP in June 2004, reportedly while he was on out-to-court status, and was being prosecuted by the DA. Review of his C-file provided details about his history and how charges were adjudicated but contained no indication that he had been to ASH or another DMH program recently.

According to the UHR, he was treated at CSP/Sac in the PSU on 10/29/04. While there, he told a treatment provider that he had a "melt down" while at SVSP but that he "got back together" while at ASH and was now doing much better at CSP/Sac.

His presentation varied widely over time. When not medicated, he was delusional and dangerous. When medicated and calm, he presented as organized and coherent. Since returning to SVSP for trial in late October, he was compliant with mental health treatment and met regularly with his CCM to discuss issues of emotional concern. He also, apparently, had been storing feces in containers in his cell. He consistently voiced the belief that officers targeted him for mistreatment. It was not possible to discern whether there was a factual basis to his beliefs or if he was expressing paranoid ideas.

When at SVSP in June 2004, he incurred a disciplinary charge while he was not on medication. Records in the UHR suggested that his Keyhea order expired in June while he was at SVSP. Early in July, he was described as malodorous, unkempt, tangential, expansive and exhibiting flight of ideas. The mental health assessment done in connection with the RVR, in which he threw a food tray hitting an officer, reported that he was psychotic and off medication at the time.

According to oral reports of the Keyhea coordinator, Inmate N had recently won two appeals related to Keyhea orders and was not, therefore, currently subject to a Keyhea order. There were no written records of recent Keyhea petitions or appeals.

There was a second problem with medication, which occurred late in December 2004, when he was at SVSP for trial. His order for Seroquel ran out around 12/23/04. His CCM was aware of the expiration and tried without success to get him to psychiatry.

According to UHR documentation, Zydis 20mg qhs/Haldol Decanoate if po refused was ordered for 14 days on 12/31/04 in the absence of patient contact.

Although he had been coming out of his cell to see his CCM, he refused two psychiatry contacts after his order expired. Delays in administering his medication orders continued even after they were rewritten without patient contact. Once an order was written, it was not filled right away. He still had not seen a psychiatrist and he remained without medication as of 1/5/05, nearly two weeks after his order for Seroquel expired. He was described most recently as angry, agitated, poorly groomed and irritable. Staff planned to consider initiating a Keyhea procedure.

His CCM had no idea how long he might be at SVSP. He reportedly appeared in court on 1/4/05. The hearing was continued until 1/21/05.

Subsequent review of his C-file indicated that Inmate N returned to CDC in 1986 to serve a life sentence for murder and attempted murder. In 1996, he began showing signs of mental illness, including paranoia, vomiting and weight loss, and was placed in 3CMS at CSP/Corcoran.

In April 1997, he was admitted to DMH/APP presenting with paranoid ideation, not eating, vomiting and weight loss (38 pounds). He attacked an MTA while at DMH and a Keyhea hearing was initiated. He was returned to CDC. His Keyhea order expired in May 1998 and in September 1998, he allegedly murdered his cellmate at CSP/Sac.

A Keyhea order was reinstated in September 1998. A Keyhea order renewal was rejected near the end of 2002. He was admitted to DMH/APP in May 2003 after becoming assaultive (kicked a correctional officer) while medication non-compliant.

A Keyhea order was reinitiated and renewed for six months on 7/3/03. He returned to SVSP and was subsequently transferred to the PSU at CSP/Sac.

In April 2004, the court ordered that he be hospitalized, as he was deemed incompetent to stand trial for charges related to the staff assault. He was on a waiting list to get into ASH during April, May, June, July and August 2004. Neither the C-file nor the UHR contained documentation indicating what happened with regard to the hospitalization at ASH. According to movement records, he was transferred back and forth between SVSP and the PSU at CSP/Sac numerous times during 2004 but was not transferred to ASH or another DMH facility.

While at SVSP in June 2004 on out-to-court status he was issued two RVRs. In late October 2004, he returned to SVSP on OTC status and remained at SVSP through January 7, 2005.

This inmate was issued a RVR on 6/26/04 for willfully obstructing a peace officer. While in a holding cell in administrative segregation in handcuffs, a retention ring and leg irons, he refused to return to his assigned cell, yelling, "I'm going to hit you in the head with this ring" and spitting at staff. He was extracted from the holding cell with OC pepper spray.

A 7/15/04 mental health assessment concluded that mental illness contributed to the inmate's behavior, adding, "'They violated my constitutional rights'. IM denied that he refused to come out of the cell. 'I was hearing voices that day, they pepper sprayed me'. It is of note that I had to wait several days until his meds kicked in before doing the RVR."

The clinician also recommended that the hearing officer consider mental health factors when imposing a penalty, pointing to the inmate's statement, "They did not give them [meds] to me, no. I had not been taking medication. I am a Federal agent. I'm an undercover FBI agent against the CDC."

At an 8/11/04 hearing, he was found guilty, but was not assessed loss of credit because due process timeframes were not met. In explaining the disposition, the hearing officer wrote: "Mental Health Assessment notes behavior as being influenced by mental illness. However, SHO does not concur with [the doctor's] annotations. Therefore, no mitigation is warranted."

One day earlier, on 6/26/04, this inmate received a RVR for battery on a peace officer. During delivery of the evening meal, he flung his food tray, hitting an officer's face and upper torso with the tray and the food on the tray. A 7/21/04 mental health assessment concluded that mental illness contributed to the inmate's behavior: "Inmate was off of medications at the time of the incident and experienced the incident as part of a psychotic episode." The clinician also recommended that the hearing officer consider mental health factors when assessing a penalty, adding, "[This inmate] has a long history of mental illness and had been in some instances adjudicated incompetent to stand trial and provide an adequate defense. He has been endorsed for ASH."

At the 8/7/04 hearing, he was found guilty and assessed 121 days forfeiture of credit. In explaining this disposition, the SHO wrote: "Mental Health Assessment, completed by [the doctor], which indicated that [this inmate's] mental disorder appears to contribute to the behavior that led to the RVR. Per review of Mental Health Assessment, SHO deems mitigation as warranted. Considering Mental Health Mitigation, SHO assesses minimum loss of time credits at 121 with no suspension of privileges." The SHO later wrote: "SHO disagrees with [the doctor's] assessment. Mental health assessment states [the inmate] meets with his clinician on a regular basis and as such is responsible to take his

medication and to inform medical staff of any irregularity. However, in this case, [the inmate] intentionally did not take his medication, thus resulting in a behavior change which led to this incident."

Assessment:

Inadequate mental health treatment helped perpetuate the cycle of psychosis and violence in which this inmate and those who came into contact with him were caught. His history showed that he was violent and dangerous to others when unmedicated but his treatment at SVSP seemed uninformed by this history and oblivious to the immediate consequences of medication lapses.

Transfers in and out of SVSP so that he could appear in court on charges that he incurred while SVSP when he was not on medication led to another cycle of interrupted medication, psychosis, staff assaults and more charges.

A Keyhea order was allowed to lapse (or the petition was not sustained), and medication orders expired twice when he was returned to SVSP. He was not seen by a psychiatrist as needed nor referred for treatment in a crisis bed or to higher levels of care. Since he was known to be dangerous when off his medication, it is conceivable that poor mental health treatment may have contributed to disciplinary infractions and other undesirable outcomes.

Written records regarding Keyhea petitions were not kept. Staff relied on memory and informal tracking methods. If, in fact, Keyhea petitions were filed but not sustained, there was something wrong with the way the process was handled or the state's position was presented ineffectually. It was clear that shortly after his Keyhea order expired, he was malodorous and floridly psychotic.

Although the disciplinary adjudication was compliant in that it conformed to the revised protocol for the preparation of mental health assessments, it fell short in that the SHO apparently responded to the submitted mental health assessments inappropriately. In the first case, the hearing officer disagreed with the mental health assessment and concluded that mitigation was unwarranted. In the second case, the hearing officer mitigated the penalty but held the inmate accountable for refusing medications, favoring his own judgment about decision-making during a psychotic episode more heavily than the judgment of a trained professional.

15.    Inmate O

This EOP inmate had been segregated for approximately one year. According to the MHTS inmate history, he had a diagnosis of Major Depressive Disorder NOS. The UHR also contained recent diagnoses of Schizoaffective Disorder, Adjustment Disorder, and Schizophrenia, paranoid type. In some respects, he impressed treatment providers as being higher functioning than many EOP residents with long histories of serious and persistent mental illness of the schizophrenic variety. He was lower functioning in that

he staged hunger strikes and lost significant amounts of weight. During those periods, he also refused medication and reported experiencing psychotic symptoms. In January 2005, his regimen included Seroquel 800, Remeron 15, Dilantin, Atarax and Cogentin. He also had orders for food supplements.

According to the MHTS inmate history, which contained some duplicate entries, he had IDTT meetings quarterly, participated in a large number and variety of EOP activities and was seen weekly by his CCM and monthly by a psychiatrist. Almost all of the EOP treatment sessions that he missed were cancelled for institutional reasons rather than missed due to his refusal to participate.

On 1/6/05, Inmate O reported that his hunger strike was over and that he had been seen by medical staff the week before.

Assessment:

Mental health treatment of this EOP inmate in administrative segregation was consistent with program guide requirements.


16.    Inmate P

According to clinical records, Inmate P violated conditions of his parole in 2000 and was re-incarcerated for a term of three years. Since that time he has incurred many RVRs. Some were referred to the DA. He may have had a SHU term imposed.

Inmate P was treated at the EOP LOC. The diagnostic picture was unclear despite voluminous medical records. The UHR contained a wide variety of diagnoses, including Schizophrenia, paranoid type, Schizoaffective Disorder, Bipolar type, Psychotic Disorder NOS, Mood Disorder NOS, BPD, ASPD, and Borderline Intellectual Functioning. He has been described as intelligent, articulate, a good advocate for himself, goal directed capable of planning covert agendas and sophisticated at times. He suffered a significant head injury at the age of five, resulting in the loss of consciousness for one week, and had a history of ADHD, special education and the receipt of SSI support since he was 15. His family remained involved in his treatment through the present.

He had a Keyhea order that expired in December 2004. No renewal was sought. He was being treated at the 3CMS LOC in January 2005. When his ICC meeting was observed on 1/6/04, staff said that they were considering whether he needed an EOP LOC.

During the past several months, Inmate P exhibited a pattern of behavior marked by a wide range of variability in levels of functioning. He engaged in defiant behavior, precipitated a crisis, incurred an infraction(s) and went to the MHCB. He followed that trajectory in August and again in October. He complained of feeling depressed when he was housed in administrative segregation for an extended period of time. His level of functioning ranged from a GAF of 29 to 65.

Treatment was responsive to his clinical needs. He was seen for five-day follow-up in August and October. Records were unclear about his admission to the MHCB in October, but he was admitted in August. He may also have been admitted to the MHCB in November, but, again, records were inconclusive and perhaps were missing from the UHR.

He was seen regularly by psychiatry and weekly by a CCM. His medication was adjusted. Zyprexa was changed to Zydis, and the Lithium order was changed to specify liquid form. According to progress notes, he discussed issues of emotional concern with his CCM. He recently signed a release of information and staff subsequently spoke with his mother about his treatment. He presented as alert, engaging and upbeat at the end of October. He was also described as needing more than the usual amount of attention.

Assessment:

This inmate had many hallmarks of a person with an intellectual disability. Mental health treatment was responsive to his needs and consistent with program guide requirements, with the possible exception of a lapse in his Keyhea order in December 2004.

17.    Inmate Q

This 28-year-old EOP inmate had been incarcerated for approximately ten years. He was serving a term of 25 years to life. He arrived from CMC at SVSP's EOP in March 2004. He was treated at DMH/SVSP from 4/14/04-10/5/04.

He had a diagnosis of Bipolar Disorder and was treated with Lithium, Lamictal, and Seroquel in November 2004. He had a history, both recent and remote, of discussing overdosing on Lithium. He also has a history of MHCB admissions and self-injury or threats of self-injury.

An IDTT meeting attended by a full team was held in October shortly after he arrived back at SVSP's EOP unit. He was enrolled in groups and seen weekly on an individual basis by a CCM. According to an MHTS inmate history, during the month of November he attended 27 group sessions on substance abuse, emotional intelligence, self-esteem, humor as medicine, problem solving and coping.

MARs indicated that he was largely compliant with his medication regimen in November and December. At the end of December, he was referred to his CCM by a correctional officer who noticed red marks on his neck shortly after he was moved between housing units due to mutual combat. He was interviewed at cell-front and denied suicidal intention (SI), but his explanation for the burns was not persuasive. He appeared to be despondent and depressed and was considered for MHCB admission. A suicide risk assessment was completed; his level of risk was judged to be high.

Although there was no further documentation in the UHR, a review of logs showed that he was not admitted to the MHCB. Staff reported that he was in a holding cell in D-4 and was to be escorted by a correctional officer to the MHCB for further evaluation. By the time he reached the MHCB, he reportedly denied SI and was not admitted. There was no clinical record of this reported MHCB visit. He was not admitted nor was he scheduled for five-day follow-up on his return to the yard. In addition, there were reportedly logistical problems in the MHCB; no holding cell apparently was available by the time he was escorted there.

According to an MHTS inmate history, he refused to attend three groups during the past week. He had also been refusing his morning dose of medication. According to a CCM note written on 1/3/05, he appeared to be doing fine. He denied any suicidal ideation.

According to staff who knew him, his presentation differed in a significant way following his stay at DMH/SVPP. Before, he appeared to be effeminate. Since he returned, he has not appeared effeminate. He also has less anxiety about his legal issues than he exhibited in March.

Although Inmate Q reported that he was not in distress about his sexual identity, he repeatedly became involved in altercations arising from perceptions, or misperceptions, about his sexuality. His EOP treatment emphasized safety issues, adjustment to conditions of incarceration and matching his functioning with his living environment. He did not seem to feel endangered by security concerns over any previous gang affiliations. He often said he wanted to live in administrative segregation.

Assessment:

Mental health treatment met his needs and largely conformed to program guide requirements. Documentation regarding assessment of suicide risk was missing. There was a lack of documentation associated with elevated suicide risk, evaluation for MHCB admission and the decision not to admit. There was no DMH/SVPP discharge summary in the UHR.

18.    Inmate R

Inmate R's levels of functioning varied widely. At the time of the review in January 2005, he was treated at the 3CMS LOC and housed in administrative segregation. He may have been in administrative segregation for much of the past 14 months, but apparently was in the GP in C yard early in 2004. He may also have had a current SHU term.

His UHR indicated he had moved in and out of the MHSDS caseload at least twice during the past four years. Recent progress notes raised questions about whether he had Borderline Intellectual Functioning, although he passed a Clark screening done in 2003. His judgment and insight were recently assessed as impaired and his speech was described as slurred, slow and concrete. His thought was said to be impoverished in

content. The possibility of whether he had an Adjustment Disorder, a Mood Disorder or a Personality Disorder was also considered.

Over one year ago, in October 2003, while in administrative segregation, he was described as grandiose, oppositional and concerned about correctional officers and fearful for his personal safety. He refused clinical contacts and threatened to file charges against correctional officers. At that time he was ordered Sertraline. One year later, toward the end of 2004, he continued to discuss the same matters. His medication had changed. At the end of 2004, he had orders for Wellbutrin and Risperdal, with which he was compliant.

He often refused mental health contacts even as he remained compliant with medication. He was described as reporting symptoms of paranoia about custody staff, boarding up, flooding and gassing staff. During a five-day period in October 2004, he did not receive Wellbutrin. According to notations on the MAR, that medication was not available.

Regarding his most recent psychiatric treatment, IDTT meetings were held on a quarterly basis but treatment plan updates were filed in different locations in the UHR. There was a discrepancy about whether he was treated with medication in August. Although MARs showed that he had been on the same regimen for months, a progress note written when he refused to meet with his CCM out of cell indicated that he was not on medication. He was seen by psychiatry on 6/23, 7/27 and 12/20, but his dosage of medication was adjusted in August without a corresponding note documenting patient contact. CCM notes frequently contained references to medication management. Documentation of PT rounds for the last three months of 2004 was not in his UHR.

Inmate R was more engaged in mental health treatment at the end of August than he was later in 2004. He came out for a CCM contact and requested another meeting out of cell, which was not possible due to security reasons. Shortly thereafter he went on a hunger strike and said he had tried everything to get attention but failed. He was evaluated for MHCB admission; his level of risk was found to be negligible. He was placed on a 24-hour suicide watch. There was no further documentation. Staff's explanation of the standard operating procedure for a 24-hour suicide watch in place was as follows:

*When suicide risk becomes an issue either the inmate is sent to the MHCB or evaluated by two clinicians; if both agree that an evaluation at the MHCB is unnecessary, they can elect to place him on a 24-hour custody watch that is conducted in his housing unit. The watch consists of an officer observing him once per hour for 24 hours.*

Inmate R's condition was described as deteriorating in September but stabilizing in October. During an October IDTT meeting, attended by a full team, his GAF was assessed as 65.

He was assessed by staff in November 2004 and found not to be in need of a higher level of care. He reportedly sought a transfer, which was recently denied. A clinical note dated 11/29/04 indicated that he had an NGRI hearing scheduled and would soon be sent

to DMH for evaluation. He allegedly assaulted a peace officer approximately one year ago.

In December 2004 he complained of pain associated with a fractured jaw joint. Medical notes indicated that he had difficulty with mastication. Progress notes indicated he had complained of pain in his jaw for several months and consistently demanded to see a doctor.

Inmate R inmate entered administrative segregation on 9/3/03. A 10/20/04 MH-2, reviewed by a full IDTT, continued him in 3CMS with diagnoses of Mood Disorder NOS and Personality Disorder NOS with antisocial and borderline features and a GAF of 65. Targeted problems included treatment noncompliance, inappropriate sexual behavior and staff manipulation. Interventions included monthly psychiatric evaluations, quarterly IDTT reviews and weekly CCM contacts. The treatment plan did not indicate whether the team considered or recommended group therapy, recreation groups, work assignments or education assignments.

Assessment:

Documentation regarding medication management and response to threats of self-injury was inadequate. It did not include essential information regarding a suicide watch, which was apparently conducted in a housing unit. A local procedure related to suicide prevention departed from statewide suicide prevention efforts in that regard.

IDTT meetings were held quarterly. Medication orders were written without patient contact. Medication errors and inconsistencies were noted in the UHR. Nearly all case manager contacts were at cell-front. His treatment did not consider all pertinent mental health factors and lacked coherence. It was driven by reactions to immediate events rather than conceptualized and delivered according to a plan.

Consistent complaints regarding pain in his jaw elicited little response.

Some documents in the UHR were filed in the wrong locations. Documentation of psych tech rounds was absent for the last quarter of 2004.

19.    Inmate S

This patient was interviewed individually and privately. Following the interview, his UHR, current MAR, inmate history from the MHTS, and the 114 log were reviewed.

Inmate S arrived at SVSP on 4/26/04 as an EOP and "sensitive needs" inmate, which accounted for his presence in administrative segregation. He indicated he was doing "all right" and was simply waiting for the "soft" yard at MCSP's Level III EOP.

The inmate reported that his medications had "just stopped"; he stated he had occasionally missed them for two or three days or for as long as a week in the past.

When he returned from CMF, he reportedly experienced a week-long interruption in the delivery of his Risperdal. He reported that he felt no different off his medication than on it; he said he was very tired while on it. Now, however, he felt more alert, so much so, he had not slept in nine days and had the shakes. He saw his case manager weekly and privately in a holding cell. He reported he did not have a heat card.

Inmate S was having command hallucinations (homicidal) and problems with cell mates. He also has difficulty with his interactions with correctional officers. He stated they always threatened him with a RVR if he refused a cell mate and claimed they confined him for several days in a holding cell. Now, however, he reported, he had a good cell mate.

The inmate's current MAR revealed only a blank on 5/11/04. There were also refusals of eight doses of medication over four days. A review of his April MAR indicated he arrived on 4/26/04 from CMF on Zoloft. He returned from DMH/APP with a diagnosis of Major Depressive Disorder with Psychotic Features on Risperdal 5 mg hs, Zoloft 100 mg q.a.m., and Vistaril 75 mg t.i.d. The chart indicated that a continuity order for his medications for 30 days was not written until 4/28/04 and started the next day. The order, however, was written for only 4 mg h.s., and a close look at his MAR indicated that his Risperdal, in fact, was never administered. Consequently he was without his Risperdal for three weeks. MARs prior to his transfer to DMH/APP indicated interruptions in his Zyprexa and Risperdal for weeks at a time. Refusals during that time period were confirmed.

Assessment:

Numerous medication discontinuities were noted, including gaps on arrival, unexplained gaps in the regular delivery of medications and a failure to write an order for an antipsychotic medication; one order written for an under-dose was never, in fact, administered. This inmate had no heat card. He saw his case manager weekly and privately in a holding cell, but he had strained relations with correctional officers, especially as his psychosis increased.

Inmate S was referred to the chief psychologist for immediate review.

20.    Inmate T

Plaintiffs' attorneys requested review of this inmate, who appeared to them to be doing poorly in the administrative segregation EOP unit.

The health care record of this inmate was reviewed, with a focus on the documentation present since the May 18-21 2004 site visit. An earlier July 15, 2003 Clark assessment indicated this inmate did not have any developmental disabilities. He was noted to have been classified previously as DD2. The 2003 assessment found that the inmate did not have any adaptive support needs. Yet, a July 28, 2004 IDTT update noted again that Inmate T seemed to have moderate mental retardation, despite the 2003 determination

32

that he did not meet Clark criteria. He was described as having a low tolerance for frustration and limited coping and problem-solving skills.

Review of the declaration in support of a Keyhea order, dated January 15, 2004, summarized this inmate's violent behavior, which included stabbing another inmate on October 2, 2003 and assaulting other inmates on October 16, 27 and November 30, 2003. These assaults appeared to be related to the presence of auditory and visual hallucinations. On January 15, 2004 an administrative judge approved a Keyhea order for six months.

Review of physician orders indicated that Zyprexa Zydis 7.5 mg po q am was ordered for ten weeks beginning on March 18, 2004. The UHR lacked documentation on the rationale for this order.

Progress notes in the UHR since June 2004 indicated that most of Inmate T's CCM contacts were at cell-front. He was housed in the administrative segregation EOP during this time.

A July 2, 2004 psychiatrist note indicated that this 33-year-old single Hispanic male reported a history of depression. His presentation was consistent with a mood disorder NOS, rule out an explosive disorder, rule out antisocial personality disorder. The plan was to continue EOP group therapy and return to clinic in six weeks.

An August 16, 2004, a CCM note indicated that this inmate again did not receive his medications for about three days, which resulted in increased symptoms. Weekly contacts with his clinical case manager continued to be at cell-front.

A September 23, 2004 psychiatrist note indicated that the inmate refused to see the psychiatrist for a scheduled appointment. He was re-ducated to see the psychiatrist on October 7, 2004, but again did not show. He was re-ducated to be seen in another two weeks, but refused to see the psychiatrist.

An October 27, 2004 IDTT progress note reported the inmate had reached maximum benefit from EOP and was able to function with C3MS support. He was also described as meeting criteria for DD2. Diagnoses now included major depressive disorder with psychotic features, intermittent explosive disorder, and mild to moderate mental retardation by history.

A November 2, 2004 progress note documented that this inmate reportedly was not doing well. He was requesting transfer to a different prison that would be closer to his family. He began seeing a different case manager on this date.

On November 8, 2004, this inmate was seen at cell-front due to the unavailability of correctional officers. He continued to complain of chronic auditory hallucinations on November 15, 2004. His EOP status was changed to 3CMS "at his request so that he

could be transferred to a facility with a DD2 program." He reported being in the administrative segregation unit because "they say that I stabbed a rapist."

Out-of-cell contacts occurred with his clinical case manager on a weekly basis beginning on November 8, 2004. He complained of increasing auditory hallucinations on December 1, 2004, which appeared related to increased stress due to a court hearing. Cell-front interviews with the CCM again resumed beginning December 10, 2004.

Group psychotherapy notes were not present in the UHR beginning in October 2004. They were replaced by inmate history forms from the MHTS, which indicated whether an inmate attended a particular group therapy but provided no information on either the group or the inmate's level of participation.

Assessment: A variety of problems in the clinical management of this inmate included the following:

- Lack of adequate follow-up by a psychiatrist.

- Lack of the use of antipsychotic medications despite a diagnosis of a major depressive disorder with psychotic features and the inmate being on a Keyhea order when the diagnosis was made.

- Inadequate documentation of the decision to discontinue (or not renew) antipsychotic medications.

- Apparent confusion about the inmate's meeting DD2 criteria.

- Inadequate documentation of group therapies.

- Issues related to housing and level of care: apparently the inmate's transfer to a DD2 institution would not occur until his trial relevant to pending assault charges was completed. His SHU term was due to expire in April 2005, which would result in a transfer to GP EOP due to his DD2 status. He would not be transferred to another institution until his trial was completed, the timing of which, according to his CCM, was exceedingly uncertain.


21.    Inmate U

This inmate was interviewed privately and individually. Following the interview, his current MAR, his UHR, his 114s and inmate history were reviewed.

He reported being "worse" in the EOP. When he arrived at the institution last year he was a 3CMS. He was currently "having a lot of stress, sees flashes and demons." He had been seeing things and hearing voices for the last year.

He complained that correctional officers laughed at him whenever he said he was hearing voices, so he stabbed a guy and went to administrative segregation. He also stated he "went off" in D-1 when he was hallucinating and was subsequently placed in MHCB on Suicide Watch. Then he was sent to DMH/APP and returned on 2/02/04 as an EOP inmate on a Keyhea order. He was placed immediately in D-2 and reported it took two weeks to get his medications. At that time, while in D-2 without his medication, he "went off" again on correctional officers. He indicated he got a cell mate, even though he was on walk-alone status, because he was threatened with a RVR if he did not accept a cell mate.

A review of his current MAR revealed a blank only on 5/11/04. He was on Paxil only, as he had indicated. He was sent to DMH/APP on 12/15/03 and discharged back to this institution on 2/02/04. His diagnosis was Major Depressive Disorder with Psychotic Features. He was on a Keyhea order until 7/13/04. He also had a history of cheeking medications. His discharge summary indicated that he was on Paxil. On his return from DMH/APP, his bus screening indicated that he was on medication, but no continuity order was written, so he received no medication. The next order for psychotropic medications was dated 4/16/04. At that time Paxil 10 mg q.a.m. was re-ordered. A review of the inmate history from the MHTS reveals that he had been prescribed Olanzapine and IM Haldol p.r.n. for refusal during March and April. Those medications reportedly were discontinued, but no such orders were filed in the UHR.

A September 22, 2004 psychiatrist note described the presence of chronic, command auditory hallucinations. Despite the inmate's self-report, he was assessed to have clinically improved since his previous August 11, 2004 appointment with the same psychiatrist. It was thought that he was probably at his baseline state. No medication changes were made at that time. The plan was to see him again in 30 days. Medications included Zoloft 100 mg po q am, Risperdal 2 mg po b.i.d. and Cogentin 2 mg po b.i.d.

On October 21, 2004, this inmate reported to the same psychiatrist an episode of blurry vision several days earlier. His presentation was consistent with a psychotic disorder NOS with strong somatic symptoms. He was assessed to be at his baseline state. Medications were continued.

On November 16, 2004, he again described the presence of chronic auditory hallucinations. He was assessed by a different psychiatrist, who stated that Risperdal was ineffective. His medication was not increased due to side effects. Abilify 15 mg po a.m. was added to his medications. A neurology consultation was initiated due to an apparent seizure disorder. The plan was to see this inmate again in one week. No later psychiatrist notes were in the UHR.

The inmate was housed in the administrative segregation EOP. Review of weekly clinical case manager contacts during December 2004, which generally occurred at cell-

front, reflected widely varied presentations. On December 27, 2004, he was noted to be disheveled in appearance with chronic auditory hallucinations.

The most recent IDTT meeting occurred on October 13, 2004. He was diagnosed as having a psychotic disorder NOS, polysubstance dependence and an antisocial personality disorder. The most recent treatment plan was dated September 24, 2004.

Assessment:

This inmate was receiving inadequate psychiatric follow-up and medication management. He should have been on an anti-psychotic medication. Medication discontinuity occurred on his return to SVSP from DMH/APP and medication orders apparently were missing from the UHR. His treatment was not consistent with program guide requirements.

22.    Inmate V

Staff reported that the inmate was manic-delusional and would not leave his holding cell, where he was interviewed. He was in an acute mental health crisis. Historically he assaulted correctional officers on several occasions and had a brief stay at DMH. He was subsequently returned to the same yard where the correctional officers, whom he assaulted, were still working. He was also, on multiple occasions, caught with pills in his cell.

The inmate was escorted to the interview room, having agreed to the encounter. He reported that he was "a Federal undercover officer" and was grossly delusional. He admitted he did not take medications, but only so he wouldn't hit the wrong cop. He felt he should not be in prison and was agitated about this. He whispered about "confidential" matters and had delusions of grandeur. He reported he was in DMH several years ago.

Information from the C-file indicated Inmate V was awaiting transfer to the EOP at CSP/Corcoran. A review of his MAR revealed he had a March 21 order for Seroquel 200 mg t.i.d. and Prolixin 5 mg q.a.m. He was also taking Trileptal. From February, he appeared to have taken these medications daily. Until March 21, he had taken nearly all of his medications.

A review of his UHR confirmed he was on the above-listed medications for three months with little apparent benefit. He arrived from CSP/Sac with mild delusions but was now grossly psychotic and dysfunctional.

He had a difficult and stressful time in administrative segregation and was probably in need of acute DMH care. A review of chronos indicated he was at the EOP level of care and was apparently referred to MHCB from 3/14 to 3/17/05. Progress notes confirmed that he stabilized rapidly in the MHCB unit and was returned to the EOP.

Assessment:

After reviewing these findings, senior clinical staff agreed the inmate needed acute inpatient care but probably would benefit more ultimately from an inpatient DMH/ICF program. This inmate was too psychotic to function adequately where he was; he consistently refused case management and group services. Group psychotherapy was, in fact, contraindicated for this acutely ill patient.

23.    Inmate W

Staff reported that this inmate was awaiting transfer to the SNY at MCSP. He did not attend any groups.

On interview, the inmate indicated he was feeling worse and was uncomfortable having to sit in a "cage" to participate in a group. He also felt he had problems with other inmates because his own problems were enough for him to contend with. He had written plaintiffs' counsel on these matters. He had been referred to ASH but was rejected because he had enemies there. He was in DMH/APP from October to December 2004 after a suicide attempt. He explained these circumstances in a rational way without evidence of a thought disorder, agitation or pressure.

He agreed to go to DMH/SVSP, if sent. He reported he had "nothing to live for" and frequently felt that life was basically over for him. He was anxious and felt like killing himself frequently over the last year to year and a half. He was helped somewhat by his stay in DMH/APP. That hospitalization had occurred after several weeks in a MHCB unit, where he attempted to hang himself. He had been on a Keyhea since his stay at ASH during 2000. He indicated strongly that if he lost his single-cell status or was sent back to MCSP, he will kill himself. His EPRD was 7/20/09 and he was a max RS.

His current MAR indicated he was prescribed Risperdal 1 mg q.p.m. and had missed two of three doses in April. He was also on Risperdal consta. He has refused Lithium for three doses during April. A review of his March MAR confirmed that he had consta on March 1 and 15, 37.5 mg q 2 weeks. His Lithium was continuously refused.

A review of Inmate W's UHR revealed that his last consta injection on 3/29/05 was refused. His Keyhea order of 9/02/04 expired on 3/01/05. A February hearing was continued until 3/17/05 and then again until 4/14/05.

A review of his MHCB admissions revealed he was admitted on 1/07/05 for suicidal ideation. The diagnosis at that time was Bipolar Disorder I, most recent, depressed, along with Mixed Personality Disorder on Axis III. He refused to eat at that time and after an 11-day stay was discharged to EOP. He was discharged on consta 37.5 mg q 2 weeks, Prozac concentrate 60 mg q.a.m. and Lithium 600 mg concentrate b.i.d. His previous admission to MHCB on 9/27/04 resulted in a referral to DMH/APP on 10/01/04.

It was noted that he had extremely poor coping skills in the administrative segregation EOP and "did not try to get better." He was diagnosed as having an obvious narcissistic personality disorder. He was discharged from CMF on 12/08/04 having had three previous DMH admissions. He was in ASH from February 2000 to April 2001 and in DMH/APP from October 2001 to February 2002. It was during that admission that he indicated he would kill himself if he got a cell mate or had to go back to MCSP. He had a history of hording Lithium.

It is unclear what happened to his discharge order for Prozac, and the patient appeared to have never received it. His Lithium was changed to 600 mg q.p.m. on 2/05/05, but he began to refuse it.

Assessment:

This inmate needed a higher level of care and was not programming effectively in the EOP. The DMH/SVPP program might have been beneficial for him since the treatment setting would place him in a single cell at least initially. Medication orders did not follow him when he was discharged from the MHCB unit.

24.     Inmate X

This inmate was interviewed on the recommendation of staff who reported that he rarely attended groups.

He indicated that he was "ready for release" and that, after 11 years, "they are setting me free." He had been in the EOP for seven to nine years. He appeared to be grossly delusional with respect to discharge issues. A review of his 114s indicated that he was placed in administrative segregation on 3/11/05 for indecent exposure.

With respect to groups, medications and case manager visits, he indicated in a quite delusional fashion that he goes only to those groups he likes and takes only those medications he wants. His 114s indicated many refusals to attend group or case manager visits.

His MARs revealed that he took Zydis 20 mg q.p.m. and had taken all of his doses for four days in April. He was also on p.r.n. Zyprexa 20 mg q.8.h. and Benadryl h.s. for agitation.

Chronos noted that he might cheek medications, although he was not on DOT in administrative segregation. He also had an order for p.r.n. IM Geodon, which suggested he was on a Keyhea order. That order was not in his chart, nor was he on the Keyhea list.

Complicating his case, supervisory staff reported that, while he came to this facility with a gross thought disorder, during his first three weeks in the facility, the psych tech gave the inmate all the Wellbutrin he wanted. The patient regularly wrote kites for more medication; the psych tech was subsequently fired.

A review of Inmate X's UHR revealed that he arrived on 2/09/05 on Zyprexa Zydis from CMF. He had been sent to DMH/APP from NKSP. He spent most of his time in administrative segregation for indecent exposure and, subsequently, DMH. The diagnosis from DMH in its discharge summary of 10/15/04 was Schizo-Affective Disorder and Polysubstance Dependence.

While at DMH/APP, he was not going to groups or one to one counseling sessions. Notes indicated that he was considered for the ITP on P2 "when it opens". The ITP or Day Treatment Program at CMF on P2 was open when the inmates returned to SVSP in early February 2005.

According to his C-file, Inmate X was transferred to SVSP because of escalating violence; he needed, at least temporarily, a 180-degree design with the increased structure of Level IV. A review of historical information revealed that in 2003 he assaulted a nurse from behind. She required three surgeries. He also attacked a patient causing him to have eye surgery. His EPRD was June 2008.

He arrived in the general population EOP but, as indicated above, an RVR led to his placement in administrative segregation on 3/11/05.

He was transferred to SVSP on 2/09/05 and his medications have never changed since then. His first progress note was not written until 3/02/05, but he was regarded historically as highly assaultive. He was placed in the MHCB unit on 3/18/05 with an initial treatment plan of 3/21/05. His diagnosis was Paranoid Schizophrenia, Severe, with Severe Antisocial Personality Disorder on Axis II.

Assessment:

This inmate was clinically incapable of benefiting from group treatment services because he was too grossly and persistently mentally ill. He required a higher level of care and was a candidate only for SVPP due to his high level of custody and history of assaultiveness.

He had not been referred to a higher level of care. Records regarding his medication regimen were unclear.

25.   Inmate Y

This inmate was interviewed because he did not attend group on the day of the site visit. The interviewed inmate indicated that he was not sure which groups he was in. He reported seeing his case manager every week and did not go to yard because he did not like the cages. In reviewing the 114 with him, he indicated that on the morning of 3/29/05 he was listed as having refused, but he said, "Nobody asked him to come out." He reported that he likes groups and they make him think about things. He convincingly named the topics that he liked in groups and what they made him think about. The 114

39

was consistent with his statements that only one out of three groups was missed on average during March and April, and usually in the mornings.

The C-file indicated Inmate Y was at an INS hold. He was doing Life and was out-to-court here from CSP/Sac. His MAR was reviewed and revealed that he was taking Abilify 10 mg and missed two of three doses in April. He took it every day during March. He was also on Olanzapine and Zyprexa Zydis 20 mg p.m. and Depakote 750 mg concentrate b.i.m., all of which were stopped without renewal on 3/31/05.

There was no need to review his UHR.

Assessment:

He participated in most of his groups. He credibly and convincingly indicated that he was often, particularly in the morning, not asked to come out to group. His medication orders had expired.

26.    Inmate Z

Staff indicated that this inmate did not believe that he is mentally ill and never comes out of his cell for either case manager or group visits.

The inmate refused to come to the interview room and was interviewed at cell-front. He indicated he refused to come out because he is not mentally ill. He was in D7 and then 8 with protective custody inmates who were grossly mentally ill. He felt he got "tricked" into making these moves and feared that if he came out again, he would be tricked into going to DMH.

He claimed to be a "full-blooded Japanese" from east L.A., but did appear to understand Japanese. He showed the interviewer a number of "studies," which were written materials and "confidential." The materials appeared to be incoherent. The stack of papers was large and thematically quite disordered. He had a prominent thought disorder including loose, disorganized and obviously paranoid thought processes.

A review of his UHR revealed a diagnosis of Schizophrenia, Chronic Undifferentiated Type, with a GAF of 30. He was brought to administrative segregation on 12/15/04 as the victim of a battery. He denied mental illness and had received several RVRs while in administrative segregation for threats. He remained isolated and did not take Yard. He was placed at the EOP level of care on 3/09/05 for head banging, racial slurs and provoking other inmates. He was worse at night.

A review of his medication orders reveals that he was on Depakote ER 2000 mg q.h.s. on 12/03/04 for 30 days. That medication was tapered in January and, refusing medications, he had been on no medications since then. Consequently he had no MAR.