Assessment:

This inmate was too grossly psychotic to participate in or benefit from group treatment services. He appeared to require a higher level of care. He was not functioning effectively in the EOP setting. A placement in a DMH/ICF would be appropriate. He had not been referred to a higher level of care.

27.    Inmate AA

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. He was found to need a higher level of care but was not referred. The case was reviewed a second time in April 2005.

*UNA Review:*

*An April 8, 2004 IDTT EOP indicated that this inmate's diagnosis was major depressive disorder, recurrent, unspecified. Symptoms included anxiety, depression and auditory hallucinations.*

*Depakote was currently prescribed. Previously prescribed medications included Haldol and Paxil.*

*A July 1, 2004 EOP IDTT indicated that this inmate was going to be referred to DMH. Subsequent progress notes indicated that DMH referral continued to be discussed with this inmate, who appeared to be more receptive to such a referral. During this period of time he also was demonstrating clinical improvement. The most recent progress note, dated August 5, 2004, indicated that a DMH referral continued to be discussed with this inmate.*

*Information was obtained from this inmate's case manager. This inmate has been assessed by the clinician to be appropriate for a referral to SVPP. The referral is not yet completed due to logistical issues, which essentially involved needing to learn how to initiate/complete the referral packet.*

*Classification level: IV*
*Classification score: 97*
*SHU term: no*
*Act of violence: no*
*Attempts or completed acts of escape: no*

*Team Discussion: This I/P would appear appropriate for a DMH intermediate level of care setting.*

In July of 2004 the IDTT determined that the inmate was a candidate for SVPP. There were logistical problems with referral, meaning that the referring clinician(s) were not

totally familiar with the process. In August of 2004 the UNA team agreed with this decision and found that a referral to the ICF at SVSP was appropriate. Inmate AA, however, was never referred and was described subsequently as "stable in EOP."

The inmate had been admitted to the EOP in administrative segregation on 7/11/01. By April 2004 he was still experiencing auditory hallucinations, symptoms of severe depression and suicidal impulses. He went to groups but did not participate. By July he evidenced the same severe symptomatic picture.

In September of 2004 the notes mentioned a referral to DMH. He was regarded as "stable" (meaning dysfunctional) in EOP. He functioned as a porter, was not participating in groups (he was said to "listen") and his family had abandoned him. According to the notes he lived a "sparse" existence, isolating himself with depression and auditory hallucinations.

His medications at that time were Remeron 30 mg per day and Haldol Decanoate 100 mg IM. He was said to have a "fair response" to this medication. The IDTT decided that he did not meet the criteria for referral and retained him in EOP.

In March 2005 he was on the same medications, about as symptomatic as he had been, and remained dysfunctional. Progress notes by the case manager indicated that he "accepts that he is doing the best that can be expected" and described him as a ... "long-term, low profile inmate who keeps to himself".

Assessment:

This is a severely ill inmate who is low functioning and needs a period of intensive treatment and a medication change in a high-custody DMH/ICF.

28.    Inmate BB

On 8/17/04 the UNA team recommended Inmate BB for a referral to DMH/ICF but did not review the case because the institution indicated that they already planned to refer him to a higher level of care. He was not referred until 10/08/04 and was accepted. It was not clear which DMH program accepted him. In any event, he was never actually transferred to a higher level of care. When observed by the monitor's expert in his cell on April 5, 2005, the inmate was obviously psychotic.

The note for the inmate's latest IDTT meeting on 3/24/05, which the inmate refused to attend, indicated the inmate had a history of mixed personality disorders (borderline and narcissistic) and arrived at SVSP in February of 1999. He was referred to DMH in November of 2001, returning in July of 2003.

His history indicated that he was mentally ill prior to his entry into CDC in 1992. He attempted suicide in February of 1991 and again in 1993. In CDC he was placed on a Keyhea order because he was noncompliant with his medications. During the year prior

to the August 2004 UNA study, he had refused all groups and case manager visits, indicating that "nothing is wrong with me." Little had changed since then according to the progress notes.

The first mention of the DMH referral appeared in a 1/04/05 progress note, which mentioned that "he continues to need a DMH level of care." This comment came from his case manager, who indicated a week earlier that the inmate was coping adequately with current stressors. There was no indication in the record that any follow-up calls occurred.

Assessment:

This patient apparently was accepted by DMH in October, but has waited over six months for a transfer to a higher level of care. Staff have neither followed-up this referral nor documented any efforts to do so.

29.    Inmate CC

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005.

The UNA team recommended Inmate CC for a referral to DMH/ICF on 8/17/04. He was not referred until 10/05/04 and was accepted on 10/16/04. He received a bed number on 11/19/04 but never went because he was an "improving EOP."

*UNA Review:*

*This 26 y.o. I/P was treated at the EOP LOC. He had been given diagnoses of Schizophrenia, paranoid type and Schizophrenia, undifferentiated type. He lived in a board & care home in the community. He was in the EOP at RJD in 2003, moving to the EOP at SVSP within the past year. He was referred due to his low level of participation in structured therapeutic activities.*

*He was medicated with Risperdal 2 and Depakote 750 bid in August 2004. The most recent VPA level, obtained in January 2004, was in the therapeutic range. For the most part, he was compliant with medication for the past 4 months, missing few doses. Summaries of IDTT discussions said that his baseline level of functioning was low, that he was stable, and referral to a higher level of care was not warranted.*

*Review of the C-file showed that he had 70 points, Level IV, and had been involved in acts of violence within the past 5 years. He did not have a pending SHU term.*

*Information in the UHR indicated that he was involved in mutual combat, for which he received a 115, on 18 April 2004. The mental health evaluation said that he had poor compliance with medication, no insight into his mental illness, poor impulse control, and did not have a clear understanding of his surroundings.*

*Records of psychiatric hospitalizations while in the community in 2000 and 2001
described him as suffering from schizophrenia and depression. He stabilized rapidly on
Zoloft and an antipsychotic.*

*Team Discussion: I/P appears to need antidepressant medication and a referral to DMH
ICF level of care.*

His diagnosis was Paranoid Schizophrenia, and his medications consisted of Depakote
750 mg q.p.m. and Risperdal 2 mg q.p.m.

Inmate CC suffered from acute anxiety in July of 2004 after a "man-down" incident in
the administrative segregation EOP unit. He became extremely anxious, ruminating and
dysthymic. On 8/03/04 he was reported to be eating feces, which was making him
physically ill. He had a prominent thought disorder at the time. Clinical notes confirmed
that since then those stressors have proven to be short-term and he has recovered
clinically to baseline levels.

Assessment:

His referral was appropriately rescinded, which is not unusual after a ten-week wait
following referral.

30.    Inmate DD

This 24 y.o. 3CMS inmate was housed in administrative segregation; he had arrived at
SVSP within the past few weeks. He was initially housed in a GP yard, but enemy
concerns resulted in the administrative segregation placement. Since arriving at SVSP he
had requested SNY status.

When interviewed individually on 4/4/05 in a confidential setting with a mental health
staff person present, he was alert, adequately oriented and spoke relevantly. He reported
that he was illiterate, a fact that was documented in his UHR. He did not speak
spontaneously, and his communications were simplistic and brief. He did not elaborate
on matters that normally elicit explanations. He reported that his cellie helped him with
written work and he had not yet seen a correctional counselor about his SNY request. He
reported that he had worked in the kitchen at CMF, was fired after arguing with a
correctional officer, and then was reinstated. He believed the correctional officer had
been trying to tell him to do something and that his failure to understand the instructions
and his subsequent display of anger resulted in his being fired.

Review of the UHR and oral reports of a clinician who knew him indicated that Inmate
DD probably had Borderline Intellectual Functioning, became depressed upon being
incarcerated, and coped poorly with stress. When stressed, he reported hearing voices
and said he was suicidal. In the past he reported making an attempt to hang himself. His
level of adaptive functioning was usually adequate but he sometimes had trouble

44

comprehending oral instructions, responded angrily to ambiguous or contentious social interactions and got into trouble. He has no difficulty with ADLs. As noted above, he required assistance with all written materials.

He was serving a first incarceration. He was incarcerated in 1999 or 2001 and had a release date of 2011. He had been at several institutions during his five years in CDC. A clinical note said that his points had risen to 59 since he was incarcerated due to a series of non-violent disciplinary infractions. A clinical note listed among his infractions unauthorized use of a telephone, theft of an inmate's property, resisting staff, delaying lock-up, covering windows and piercing.

Clinical notations probably based upon self-reports indicated that he was born prematurely, housed in a group home as an adolescent, found incompetent to proceed and was a Regional Center client. He had reported trying to hang himself several years ago because he missed his mother. He also reported overdosing on pills once and cutting his wrist once.

Although he had been in CDC custody for at least four years, the first Clark evaluation found in the UHR was done in July 2004 at CMF. He was designated DD1, indicating the he was vulnerable to victimization or pressure by other inmates and needed assistance with paperwork but otherwise had an adequate level of adaptive functioning. The July 2004 documentation indicated that he had been designated DD2 prior to that and would be considered for possible removal from the Developmental Disability Program (DDP) in the future. He was, in fact, removed from the DDP on 10/28/04 while still at CMF. According to a CASE evaluation "he exhibited no deficits/problems in adaptive functioning." He got along well with other inmates and his 115s were attributed to his personality style. He was treated at the 3CMS LOC at CMF and prescribed Zoloft.

He arrived at CMF in May 2004 and remained there for about ten months. During that time he was in and out of administrative segregation and the hospital; he may have been at a community hospital for medical care. Progress notes were not very informative.

He asked to be removed from the DDP in September 2004. He said he did not like the way officers spoke to him, that they treated DDP inmates "like kids." He did not want to attend school, to which he had been assigned. He reported to a clinician on 1/13/05 that he was having problems with other inmates in his unit but was reluctant to elaborate. On 2/23/05 he cut his wrist. He told a clinician that he was upset about not hearing from his family for several years and that other inmates were picking on him. A note written at CMF and dated 2/25/05 said he was in DMH for one day, from 2/24-2/25 due to suicidality. Three days later he was seen in the clinic, reported hearing voices and was returned to his housing unit in short order.

He arrived at SVSP on 3/2/05 by way of CSP/Sac. A bus screening was done. He was first seen by mental health on 3/8/05 in the context of an initial UCC meeting. He was moved from the B-Yard shortly after he arrived. His first IDTT meeting at SVSP was held on 3/16/05. He was seen individually in preparation for the meeting. He looked

45

worse than he had been described in the past. He was malodorous, reported auditory hallucinations and said he had cut his wrist early in March. He was retained at the 3CMS LOC on grounds of medical necessity. The treatment plan, which addressed depression, was individualized. It was held before the ICC meeting. Documentation for attendance at the IDTT was incomplete, and no conclusion was drawn regarding the composition of the team. He was given a diagnosis of Adjustment Disorder with depressed mood.

His single psychiatry contact was on 3/23/05; it was at cell-front due to lack of available escort officers. Zoloft was ordered. The first dose was administered the following day. Although a 30-day order for Zoloft was written on 3/3 when he arrived at SVSP, there was no record in the UHR of it being administered.

Assessment:

Medication continuity on arrival at SVSP was not sustained. Intake processing at SVSP was timely, and the treatment plan was individualized. The IDTT may not have been attended by a full team. Lack of an escort officer resulted in a psychiatry contact being made at cell-front.

Inmate DD's treatment at CMF was fragmented and may not have been responsive to his needs. It may have been interrupted by multiple changes of location. He may have been removed from the DDP rolls inappropriately.

Documents were missing from the UHR. There was no CASE evaluation prior to 2004. There was no record of his overnight stay in the CMF DMH/MHCB unit. There were no risk assessment forms.

His move from DD2 to DD1, and then off of the DDP rolls, was associated with immediate observable problems in daily functioning. There were indications that he had difficulties with other inmates and compliance with daily routines. He continued to get into trouble and be housed in more restrictive conditions. His CCM appropriately referred him for a DDP evaluation.

31.   Inmate EE

This 3CMS inmate was in administrative segregation. He was previously at the 3CMS LOC in a GP yard. He was moved to administrative segregation in January 2005 subsequent to incurring a RVR for mutual combat.

When interviewed individually on 4/4/05, Inmate EE was oriented and well groomed and responded relevantly to questions. He reported that most of his contacts with case managers were in an office.

He was seen quarterly while in GP and weekly while in administrative segregation. He had an IDTT meeting attended by a full team within two weeks of arriving in administrative segregation. A diagnosis of Impulse Control Disorder was given. He was

seen by a psychiatrist at his request. He requested medication, but the psychiatrist did not agree that medication was warranted.

Documentation of mental health treatment in administrative segregation was complete and filed in the UHR. Psych tech rounds were documented weekly, as were CCM contacts. Only one CCM contact was shown as occurring at cell-front. Inmate EE successfully made a transition between case managers. One case manager did not document whether contacts were out of cell or in an office.

Assessment:

Mental health treatment in administrative segregation for this inmate was consistent with program guide requirements.

32.    Inmate FF

Only the last of four volumes of this inmate's UHR was reviewed. This 49 y.o. 3CMS inmate was housed in administrative segregation. When interviewed on 4/4/05, he exhibited intense affect but was able to exercise control over his behavior. His speech was rapid, bordering on pressured. He was not easily redirected. He was preoccupied with the many injustices he had reportedly experienced. According to a clinical note, he was serving 29 years to life and had 28 points.

He incurred infractions for inappropriate sexual behavior at long intervals suggestive of a pattern, perhaps one associated with fluctuations in the acuity of his mental illness. He reported being in administrative segregation since 2003, a fact that was corroborated by his UHR. A bus screening in the UHR gave an arrival date at SVSP in 1999.

He had diagnoses of Schizophrenia, paranoid type, and ASPD. His GAF was assessed as 65 in November 2004. He had orders for Zydis 20 hs and Paxil 50 pm. In December orders for Zydis, Remeron, and Risperdone were written. He consistently refused medication from December through February. According to MARs, he consistently refused medication. He was recently transferred from one case manager to another because he exhibited sexual behavior during more than one appointment.

He had quarterly IDTT meetings during the past six months but not before. An IDTT meeting attended by a full team was held in January 2005 and was associated with an individualized treatment plan. There was an interval of ten months between plans.

The October 2004 plan was individualized but neglected to mention inappropriate sexual behavior directed at staff. A full team attended the meeting.

He incurred a RVR recently and a mental health assessment was conducted. The assessment found that mental health factors were not influential in the behavior associated with the infraction. The infraction involved staff and sexual behavior.

Discussions with staff indicated that his treating clinicians had not known him for more than six months. His presentation over the past six months had varied little from that described above. It was assumed to be his baseline level of functioning by his treating clinicians. Those who knew him two years ago when he was treated at the EOP LOC described him as talking normally, rather than exhibiting pressured speech; being able and willing to discuss a variety of topics relevantly; and being compliant with medication. A new volume of his UHR had been started recently; treating clinicians were not familiar the details of his treatment history dating from his stay in the EOP. The inmate's stance toward his present clinicians had been angry and avoidant for the past six months.

Assessment:

This inmate had presented in an unusual manner for at least the past six months. Mental health staff was not responsive to his need for treatment. Although he was able to sustain adequate cognitive organization and did not openly express paranoid delusions, he exhibited signs of decompensation, such as intense affect, preoccupation with persecution and pressured speech. He may have been experiencing an exacerbation of his mental illness. He had been non-compliant with medication for the past four months. Although his condition was perceived as stable by his treating clinicians, it was not stable in the sense that he was doing well. He had not exhibited the signs of psychosis described above when he was in the EOP unit, which was within the past two years.

The mental health assessment done for disciplinary purposes was not thorough. Whether his sexually inappropriate behavior was associated with a mental illness or fluctuations in his level of functioning was not ascertained, but that question needed to be examined. The recent assessment indicated that mental illness was not a factor in the offense, but in light of his history and recent medication non-compliance, more information needed to be brought to bear on that determination.

33.    Inmate GG

This 3CMS inmate was in administrative segregation. He had been in a GP yard at SVSP until approximately ten days earlier, when he was placed in administrative segregation due to enemy concerns. He arrived at SVSP from SQ in February 2005.

When interviewed individually on 4/4/05, he reported that his medication changed without notice when he transferred from SQ to SVSP. He believed that his current sleep disturbance and high level of stress was due to the medication change. He was neatly groomed, alert and grossly oriented. He was relevant in conversation; his mood and affect were unremarkable.

At SQ he was placed at the 3CMS LOC and treated with Trazodone 250, Zoloft 200, and Abilify 15.

There was no bus screening form from SVSP in the UHR, documenting his arrival in the facility on 2/22/05. Medication orders, however, were written that day; they continued the regimen that prescribed at SQ. He was seen one month later by a psychiatrist and the regimen was adjusted in response to his reports. There was no February MAR in the UHR from SVSP, so medication continuity upon arrival could not be confirmed. When he saw a psychiatrist, he reported that he had not received Trazodone since he arrived. After it was ordered on March 23, the first dose was administered on March 24.

He was housed in a GP yard for less than two weeks. He was seen by a CCM there within six days of arriving. He was moved to administrative segregation before an IDTT meeting was held. He had an IDTT meeting, preceded by an individual meeting, within two weeks of his arrival in administrative segregation. A full team attended the meeting. What appeared to be an individualized addendum to the prior treatment plan was unmarked by name or date. There were no chronos from SVSP in the UHR.

Documented mental health treatment in administrative segregation included PT rounds for two of four weeks and two CCM contacts. One weekly CCM contact was cancelled due to a custody emergency and one scheduled for the last week of March was missed. He had one psychiatry contact at SVSP; it was made at cell-front due to lack of escort officers.

Assessment:

Intake processing by mental health for this new arrival was timely, but essential documentation, including, a bus screening form, a mental health chrono, a MAR and a clearly identified updated treatment plan, was missing. The sole psychiatry contact and the two case manager contacts were at cell-front due to a custody emergency and a lack of escort officers in the administrative segregation buildings. Fifty percent of psych tech notes documenting rounds were also missing.

34.    Inmate HH

This 3CMS inmate arrived at SVSP in 2003. He had been in administrative segregation since January 2005. He had a pending RVR at the time of the review in April. There was apparently controversy over his move to an SNY.

He was treated for Adjustment Disorder, depressed type. In administrative segregation, he was seen weekly by a CCM. Very few of the contacts were at cell-front; most were in an office. Psych tech rounds were documented weekly for January and February; there were no notes from in March. He had an IDTT meeting attended by a full team within two weeks of arriving in administrative segregation. An individualized addendum to the treatment plan was written. He expressed suicidal ideation on 2/25/05. A risk assessment was done; his risk was low. He was seen daily for the next five days for follow-up as planned.

Assessment:

While he was in administrative segregation his mental health treatment met program guide requirements. He was assessed for risk of self-injury appropriately, and five-day follow-up was completed and documented.

35.    Inmate II

This EOP inmate elected to remain in his cell during programming hours on the day of the site visit.

When interviewed in his cell on 4/5/05, Inmate II was agitated and pacing rapidly. He had great difficulty stopping to talk. He made gestures indicating that he was in mental distress. With great effort and after several attempts, he was able to organize himself and pause long enough to answer several questions relevantly, but he also expressed delusional beliefs. He said that he did not sleep last night but had instead pulled out his teeth. Teeth were missing but it was evident that they had not been extracted recently. He also reported he was going home the following day. He named Africa as his destination, but he was not from Africa.

Staff reported that he had a problem with his cellie a few days before and had just been released from confined-to-quarters status. He was single-celled on 4/5/05, the day he was observed in his cell by the expert.

He had a diagnosis of Schizophrenia, paranoid type. He was ordered Remeron 15, Zyprexa/Zydis 20, and Risperdal 2 bid on 12/1/04. Two months later, early in February, Risperdal was increased to 3 bid and Zyprexa was lowered with the aim of discontinuing it within ten days. Remeron was increased to 30.

He participated in EOP groups in December, but no documentation indicated that he had attended any groups during the past three months. He was seen weekly by his CCM, and his decompensation was well documented. During the past three months he was seen twice by a psychiatrist. Zyprexa was discontinued without a rationale during the period when he was described as delusional, dirty, disheveled, thought disordered and decompensating. All CCM contacts were made in an office with one exception. He had a quarterly IDTT meeting, but it occurred at the beginning of his downward trend.

Assessment:

Mental health treatment was inadequate. He should have been referred to a higher level of care in January and continued to need it as of April 5, 2005, but that need was not identified by staff. The case was brought to the attention of supervisory staff. The treatment provided by psychiatry was divorced from his treatment as a whole.

36.   Inmate JJ

This 3CMS inmate was housed in administrative segregation in January 2005 due to a RVR for weapons possession. He used a wheelchair. When he was interviewed in a non-confidential setting on 4/4/05, he expressed concerns about his medical treatment and services/accommodations due him. His style of communicating was contentious. He reported that he felt extremely stressed. He had reported suicidal ideation earlier in the morning to staff and was in a triangular holding cell under continual observation by an officer pending a mental health evaluation.

Regarding the observation period, mental health staff reported that he could remain on observation in the holding cell for up to four hours until they could evaluate him. The protocol for responding to reported suicidal ideation during business hours was for a case manager to do an initial interview and make a decision regarding the need for a subsequent interview by a psychiatrist. Then a determination would follow on whether admission to the MHCB or another intervention was appropriate.

Inmate JJ had an IDTT meeting within two weeks of his arrival in administrative segregation. A full team attended the meeting. An updated treatment plan was written. It was individualized. He has a diagnosis of Bipolar Disorder, mixed, unspecified. He was treated with 50 mg of Seroquel at his insistence. A panel of three psychiatrists saw him to discuss his medication preferences. They were unable to persuade him to accept a different regimen.

The UHR contained documentation of weekly PT rounds and two psychiatry contacts within the past three months. Only two of the case manager contacts were held in an office during a three-month period. More than half were at cell-front, and a large proportion were missed for various reasons, including the absence of a CCM, the inmate's medical appointment, lack of escort officers and a custody lockdown.

Assessment:

Mental health treatment was consistent with program guide requirements. His opinionated and demanding style of expressing himself alienated everyone in his environment, including his treatment providers. The timely IDTT meeting, individualized treatment plan, psychiatry contacts, and psych tech rounds met program guide requirements. Too many case manager contacts were missed or made at cell-front. He needed a case manager who able to meet with him frequently enough out of cell to build rapport and teach skills.

37.   Inmate KK

This EOP inmate was rejected by DMH on 1/6/05. He had been treated with Trilafon and Cogentin for over two years. Staff decided that he needed to be referred to DMH in October 2004. He was isolative, had poor hygiene, refused nearly all staff contacts and slept too much. His presentation remained much the same for the next several months.

51

Steps toward effectuating his move to a higher level of care were halting and eventually led to a rejection.

He signed a due process waiver on 12/7/04 and was referred on 1/5/05. He was rejected the following day. When the CCAT reviewed the rejected referral on 1/13/05 it was recommended that he be given a trial of an atypical antipsychotic. The order for Trilafon was renewed, however, on 1/31/05. He had not had a trial of another medication as of April 5, 2005.

He had a quarterly IDTT meeting on 2/3/05 attended by a full team. The diagnosis of Schizophrenia, undifferentiated type, was retained; his GAF was assessed as 40. A treatment plan dated 2/24/05 was individualized. An annotation indicated that his participation in recreational therapy was about 20 percent, his attendance at EOP didactic groups was 12.2% and he met with his case managed when scheduled roughly 60 percent of the time. There were no other indicators in the UHR, however, that documented participation in treatment occurred beyond individual CCM contacts. The plan called for a trial of Clozapin/Clozaril and transfer to a different EOP where it could be administered. He remained compliant with Trilafon through March 2005.

### Assessment:

Mental health treatment for this inmate was inadequate. A referral to a higher level of care should have been made earlier. Once it was made, however, he was not admitted. The reason for referral was diagnostic clarification, which may have militated against acceptance. The referral form, on the other hand, provided details about his regressed condition.

Unresponsive psychiatric treatment was evident in this case. He had been on Trilafon for a long time with poor results, but no trial of an atypical antipsychotic was initiated, despite a recommendation for such made by CCAT in January, over two months earlier. At the time of the April review, he continued to need a higher level of care and a trial of a different antipsychotic.

### 38.    Inmate LL

One portion of the following case review (shown in italics) was done during UNA reviews on August 16-18, 2004 and excerpted from the report issued in March 2005. Staff disagreed with the recommendation to refer him to an intermediate, DMH level of care; no referral was made. The case was reviewed a second time in April 2005.

### *UNA Review:*

*I/P is a 24-year-old Caucasian EOP I/P who is currently at SVSP. He was transferred to SVSP on 10/18/00 from CMF as an EOP. He was sentenced to life in prison for killing his adopted family during his first "psychotic break". He has been diagnosed with: Schizophrenia, Paranoid Type; Antisocial and Schizotypal Personality Disorders.*

*On 6/1203 he was described as being productive, working first watch in the kitchen but keeping to himself. He would stay in his cell all day and would eat his only cooked meal in the AM where he could see others making it. He would then take a bag lunch/dinner for later. He was paranoid of others and fearful that he may harm others so he stays away from them. He thinks that he was "a mistake" and shouldn't have been born. He related that there was no point in living except for his belief in the Bible and that he does not know what would happen in the after life. He has a long history of mental illness and violent history since early childhood. He made multiple attempts to kill himself in juvenile hall and is described as being learning disabled. He has a history of assaulting inmates and officers.*

*More recently, he was admitted to the SVSP MHCB (2/3 – 25/04) as he had become agitated and increasingly paranoid secondary to losing his job. He was concerned that there was poison in his food and it was noted that he had a long history of paranoid ideation. He was diagnosed as DHD at age 7 and Schizophrenic at age 17. He had a head injury when he was 10 years of age. He related that he had AH and in 2000 reported finding metal shavings in his food. He asked for packaged food and has remained paranoid regarding his food. He would become agitated, angry and engage in banging behavior. Notes indicate that it was discussed with the Case Manager that the I/P should be referred to ICF DMH. However, notes indicate that although the I/P had initially consented to go to DMH while in the MHCB (2/5/04), he was notified that he had been accepted (2/25/04) and was awaiting a bed. He apparently stated that he did not want to go to DMH and it was not pursued further. On 3/12/04, a MD note indicated that his psychiatric medications had not been renewed because he had refused an appointment and he had subsequently been off medications since 3/9/04. On 3/9/04 he engaged in a fight with a fellow Inmate in the kitchen and on 3/12/04 was found with a razor.*

*Conversations were held with the former Case Manager and the MHCB clinician. The I/P was currently prescribed Seroquel 400mg.*

*Classification information indicates that the I/P is a Level IV I/P with a classification score of 83. He does not have a pending SHU term but did serve a 3 month SHU term in AdSeg in 3/03 for battery on an Inmate. He has not attempted escape.*

*Team Discussion: It was the team decision that this I/P has not been adequately stabilized, that he continues to show signs of emotional decompensation, and that he has an unmet need and should be reconsidered for a DMH ICF referral.*

At the time of the April 2005 review, his CCM was working with him on attending a group. He remained resistant as of March 9, but his CCM believed he was less resistant than he was in the past. There was no objective change in his presentation. Only four CCM contacts occurred out-of-cell, but contact was made weekly since December 29, 2004. He was seen twice by a psychiatrist during the period; no medication changes were made. He had a quarterly IDTT meeting on 1/6/05. The meeting was attended by a full

53

team and generated an individualized treatment plan. The plan was unrealistic in that its goal for him was to attend 80 percent of group activities without specifying how staff was supposed to get him to attend groups.

He was content with his job and his routine and insistent that he must maintain them in order to survive. He had a predictable environment and wanted to keep it. He did not want to go to DMH because he would lose his job and his television, the two things most important to him. Reasons for the high number of non-confidential CCM contacts included staff training, lockdowns and his refusal to come to the office.

Assessment:

Although the ostensible reason for not referring him to a higher level of care was that he was improving, his functioning over the past several months seemed unchanged. His argument in favor of sustaining his routine was persuasive in light of his current level of functioning in comparison to his situation a year ago.

He was seen by different psychiatrists. Psychiatry decisions were weighted toward his presentation during any single contact rather than informed by a multidisciplinary plan.

His unpleasant manner of interacting seemed to alienate treatment providers and militate against a closer examination of his case, as well as meaningful individual contacts. Treatment was provided at the requisite intervals but was not informed by his clinical needs.

When faced with frustration, his coping skills and response set were restricted to an extremely narrow range. His ability to regulate his emotions seemed poor. Whether his cognitive and adaptive functioning were significantly below what was needed to adapt to prison life warranted further inquiry. Isolated observations made by different clinicians over a period of several months resulted in neither a systematic examination of his clinical picture nor a referral for a complete evaluation by the Clark psychologist.

The case was discussed with a staff member, who planned to bring it to the attention of the inmate's case manager.

39.    Inmate MM

This 3CMS inmate arrived at SVSP from CCI in June 2004. He had life without parole status. He was taking Prozac when he arrived. He also had a Seizure Disorder, for which he took Tegretol. Previously, he was in a SHU, where he was treated for Major Depression in 2003. He was housed in administrative segregation when he arrived at SVSP but was moved to a GP yard and remained there until the last week of March 2005, when he incurred an RVR and was placed in administrative segregation. He had an IDTT in GP that was not attended by a correctional counselor.

He was seen more frequently than quarterly by a CCM in GP and was enrolled in a Lifer Group in November. The group did not meet in February, and case manager contacts were impeded by a lockdown that month. Psychiatry contacts were made frequently and were out of cell; medication continuity was sustained. The reason for close follow-up by psychologists and psychiatrists was unknown. There was no clinical documentation that indicated he was not doing well or that close follow-up was warranted.

Although he had had an ICC meeting, no IDTT meeting had yet been held. He had not yet been in administrative segregation for two weeks.

Assessment:

Mental health treatment as planned was consistent with program guide requirements, but the scheduled delivery of treatment was impeded by lockdowns. He was slated to attend group treatment for months but did not have the opportunity to participate in a meaningful way before he was moved to administrative segregation.

40.   Inmate NN

This inmate was in administrative segregation at the time of the review. He was not on the mental health caseload. According to clinical notes, he was sent to SVSP in February for MHCB treatment. It seemed likely to the reviewer that he was held in SVSP's administrative segregation in March to keep him separated from staff at CTF.

Clinical notes indicated the he had assaulted several officers at CTF prior to February 2005. He may have been in administrative segregation at CTF prior to his transfer to SVSP. Clinical notes also said that he had been due to parole in June, but the DA had elected to prosecute the charges stemming from the incident at CTF.

Inmate NN was in the MHSDS at the 3CMS LOC from March-June 2004. He was a new arrival in March when he was placed on the caseload. He immediately said that he wanted to be discharged and claimed that he invented his symptoms and continued to say that during his stay in CTF. At an IDTT meeting in June, it was agreed that he would be discharged. He was given diagnoses of Alcohol Abuse, r/o Dependence and ASPD. His presentation was described as irritable and tangential by several clinicians across time.

He became extremely upset on 2/4/05 at SVSP and stated he planned to kill himself with a razor blade unless his demands were met. He said that he was medically ill with a hernia and a staph infection. He has since self-referred to medical staff at SVSP and complained of pain. Among his demands was access to medical treatment. He wrote notes on 2/4, stating he was on a hunger strike, in pain, and ready to die. He also said he could not walk and needed a wheelchair.

At CTF, he was seen by a psychologist at 5 p.m. on 2/4/05. He was described as depressed and agitated with suicidal ideation and a plan. He was also said to be tangential and delusional. He was referred to psychiatry to consider MHCB admission.

He was admitted and moved to the MHCB at SVSP on that date. He remained in the MHCB until 2/10/05, when he was discharged back to CTF.

He was apparently turned around and sent back to SVSP the same day. He was presumably housed in administrative segregation when he returned to SVSP. His presence there was unknown to mental health staff for a week. He was seen one week after his arrival by a CCM, who wrote a detailed clinical note. His presentation was consistent with that described earlier by others. He precipitated a crisis by saying he was suicidal because of his legal trouble. A risk assessment found that his risk was low. Five-day follow-up was completed and documented in the UHR. He was seen by a psychiatrist, diagnosed with Adjustment Disorder, and put on Depakote and Vistaril on 2/21/05.

He precipitated another crisis about two weeks later by making threats. He was seen by a psychologist, who wrote a detailed note and used an SRAC to discern that his level of risk was negligible.

<u>Assessment</u>:

Mental health treatment did not meet program guide requirements. A new admission to administrative segregation, who was presumably at high risk, arrived via an unusual route and his presence was not detected by mental health staff.

Psychiatry treatment was divorced from the inmate's mental health history. Mental health treatment was initiated based on clinical need, but the paperwork necessary to place him back on the caseload was not prepared. He was not seen on psych tech rounds until he had been in administrative segregation for over a month. Two CCM contacts were missed in March.

Response to suicidal ideation was appropriate.

EXHIBIT  L

California Training Facility at Soledad (CTF)

January 12, 2005 – January 14, 2005

1.    Inmate A

This inmate's UHR indicated that he had been treated at the 3CMS level of care for at least three years. His diagnoses had evolved from Schizophrenia to Psychotic Disorder NOS in remission to Adjustment Disorder with anxiety. He discontinued his Seroquel in April 2002 and tried Trazodone and Rispderdal for one month. He had not taken anti-psychotic or anti-depressant medication since 2002. Inmate A remained on the 3CMS caseload and was seen quarterly by a case manager. Although he had received a RVR within weeks of discontinuing his medications and consistently reported problems sleeping, he seemed to function adequately for over a year without medication. He attended a music rehabilitation group in 2003.

During the summer of 2003, Inmate A experienced two sudden and severe psychosocial stressors and was observed in the OHU overnight. He continued to be treated at the 3CMS level of care and to report sleep disturbance. Early in 2004, he reported hearing voices of deceased friends and family during the night. He was referred to psychiatry for a medication evaluation. He initially said that he would take psychotropic medication, but quickly changed his mind. He was ordered Vistaril for his sleeping problems and was considered for discharge from the caseload by the prescribing psychiatrist, who noted that the inmate had no qualifying Axis I diagnosis.

An IDTT meeting was held for the inmate and he was retained on the caseload and referred to the music rehabilitation group. Within a few weeks, Inmate A was placed in administrative segregation in connection with an investigation into drug trafficking. He was prescribed Benadryl for sleep. He was seen weekly by a case manager in administrative segregation. Psych tech rounds were documented by means of a weekly summary, which contained relevant clinical information. Although frustrated by the length of the investigation and his segregation, which was over six months in duration, and despite his sleep disturbance and feelings of sadness and depression, Inmate A functioned adequately. He was eventually released with charges filed against him.

According to documents in the UHR, Inmate A self-referred to mental health in writing on September 13, 2004. The referral was received on September 20, but the inmate had already been seen on September 18.

In September 2004, a quarterly IDTT meeting was held for inmate A and he was discharged from the MHSDS caseload. The IDTT meeting was attended by a full interdisciplinary team. One week later, the inmate reported hearing voices and requested medication. Risperdal 3 was ordered and psychiatric follow-up was planned for one week later. The inmate was seen in an IDTT meeting a week later and placed back on the mental health caseload at the 3CMS level of care. Once again, the meeting was attended by all of the required participants. Inmate A was diagnosed with Psychotic Disorder NOS and Seizure Disorder.

After his release from segregation, which may have been in November 2004, Inmate A continued to take Risperdal. According to his MARs, the inmate was compliant with his

medication in September and October, but missed several doses in November and did not pick up his medication at all in December. There were no referrals for medication non-compliance in the inmate's UHR. Mental health clinicians made no notation in the chart, regarding the inmate's medication non-compliance.

Assessment:

Inmate A was seen quarterly by a case manager while in the 3CMS general population. His treatment plans were individualized. Quarterly IDTT meetings were held for the inmate in administrative segregation. Case management contacts were made weekly in segregation and daily psych tech rounds were documented thoroughly. Many case management contacts were made at cell front, due to the inmate's refusal to come out for meetings. The inmate's mental health treatment generally met program guide requirements and was responsive to his presentation.

This inmate's medication non-compliance did not elicit a referral to mental health. The most recent consent form for Risperdal in the inmate's chart was signed in 2002.

Inmate B

This 3CMS inmate was in and out of administrative segregation several times in 2004. He had a diagnosis of Psychotic Disorder NOS and a recent GAF of 65. He was medicated with Risperdal 3 and Vistaril 100. He refused Rispderal six times during the last ten days of December and missed around five doses of his medication in November. The inmate's compliance was also poor in September and October, when he missed or refused many doses.

The inmate's dose of Risperdal was increased in September because he complained that it was not working well enough. There was no indication in the UHR that non-compliance referrals were sent to mental health or that the psychiatric department was aware of the inmate's problems with medication compliance.

Inmate B's treatment plan was individualized. The inmate's IDTT meetings were attended by full interdisciplinary teams.

A mental health screening was completed for Inmate B upon his placement in administrative segregation in May, but no screening was located in the UHR related to the inmate's placement in segregation. Inmate B had an IDTT meeting in administrative segregation in November, but he was not present at the meeting. Documentation indicated that he was seen daily on rounds by a psych tech and weekly by a case manager. When the inmate was in general population, he was seen quarterly by a case manager.

An informed consent form for Risperdal was in the inmate's UHR, but there was no consent form for Vistaril.

3

Assessment:

This inmate's mental health treatment conformed with program guide requirements, with the exception of a missed mental health screening in administrative segregation, a missing consent form and the lack of any psychiatric response to the inmate's medication non-compliance.

3.    Inmate C

This EOP inmate had a diagnosis of Major Depressive Disorder, severe, Polysubstance Dependence in institutional remission and Seizure Disorder, secondary to MVA in 1986. The inmate's seizures were poorly controlled and he wore protective headgear. Inmate C was medicated with Elavil 50 and Phenobarbital, both pursuant to orders for DOT.

Inmate C was doing better in February 2004. His depression was in partial remission and his GAF was assessed at 75. The inmate took 100 mg of Thorazine, at that time. By July, when he was seen for a quarterly case management contact, Inmate C was doing poorly. He reported discontinuing his Thorazine because of he was getting headaches. Instead, Benadryl was prescribed. The inmate was not sleeping well and was feeling volatile and isolative. In August, Inmate C was referred to a psychiatrist by his case manager and Zyprexa was ordered. The inmate received a follow-up contact three weeks later and the dose of his medication was raised from 2.5 to 10 mg.

The chart review by the monitor's expert was truncated because the inmate's records were needed for another purpose.

Inmate C's level of care was changed to EOP on November 11, 2004, when his GAF was assessed as 35. A classification meeting was held a few days later to initiate transfer to an EOP program at another institution. The inmate was still at CTF as of January 14, 2005. A physician had, unfortunately, put a medical hold on the inmate's transfer to the EOP program at CMF because he was scheduled for an MRI. While awaiting transfer, Inmate C was housed in the general population and seen weekly by a case manager.

Assessment:

This inmate's mental health treatment met program guide requirements in this demanding case, but the inmate had been waiting for a transfer to an EOP program longer than 60 days.

4.    Inmate D

Inmate D's level of care was changed from 3CMS to EOP on December 23 2004 in the context of an urgent IDTT meeting. The inmate had a diagnosis of Major Depressive Disorder with psychotic processes, r/o Schizoaffective Disorder. His GAF was assessed at 40. The inmate was treated with Celexa, Risperdal and Benadryl through March 2004, when his medication regimen was changed in response to his presentation. Inmate D's

prescription for Celexa was dropped in favor of Paxil. The inmate intermittently reported high levels of stress and auditory hallucinations.

Inmate D arrived at CTF in September 2003 and had an IDTT meeting at that time. He also had an IDTT meeting in March because he was housed in administrative segregation. IDTT meetings were held quarterly while the inmate was segregated. The IDTT meetings were attended by a full interdisciplinary team. The lack of documents in the inmate's UHR suggested that he had missed an annual IDTT meeting in September 2004.

The period of Inmate D's segregation coincided with his increased reports of distress, beginning two months after he arrived in administrative segregation. The inmate complained of nightmares, sleep disturbance and depressive symptoms. He was seen weekly by a case manager and his medication was increased. The inmate's MARs indicated good medication compliance. After he had been segregated for approximately seven months, clinical notes indicated that a SHU term was imposed on the inmate. The balance of his term was suspended and he was released to CTF's mainline population. Clinical notes indicated that he was waiting for a disposition by a district attorney.

Inmate D was seen for 3CMS follow-up about two months after he was released from administrative segregation. The psychologist who saw him was responsive to his presentation and scheduled him for a follow-up appointment and for a second opinion regarding his mental health needs one week later. There were no records in the chart indicating that the inmate was seen as planned. According to the progress notes, Inmate D was not seen again for a month, when a second opinion was obtained and it was agreed that the inmate needed an EOP level of care.

After he was designated an EOP inmate, Inmate D was seen weekly by a case manager.

Assessment

While Inmate D was treated in the general population at the 3CMS level of care, he was seen quarterly by a case manager. His treatment plans were individualized. Quarterly IDTT meetings were held while the inmate was in administrative segregation. Case management contacts were conducted weekly in segregation. No documentation of daily psych tech rounds was filed in the UHR.

There was a delay in the clinical response to this inmate's need for a higher level of care. No suicide risk assessment tool was used to determine whether the inmate was at an elevated risk level.

This inmate's mental health treatment generally met program guide requirements and was responsive to his presentation. The inmate had been waiting to transfer to an EOP institution for 21 days at the time of the monitoring visit, but he did not seem to require an expedited transfer.

5.    Inmate E

This 3CMS inmate was diagnosed with Schizophrenia, paranoid type, and treated with Haldol 5 and Cogentin, a regimen with which he was largely compliant throughout 2004. Current informed consent forms for these medications were in the inmate's chart.

The inmate had an IDTT meeting attended by a full interdisciplinary team in June 2004, at which an individualized treatment plan was written. Inmate E was seen monthly by either a case manager or a psychiatrist during the second half of 2004 and was described as stable.

A routine referral written by a staff member at the inmate's request resulted in a mental health contact one week later. A case management chrono dated September 24, 2004 stated that the inmate had a significant mental illness and the potential for violent behavior. The chrono suggested that the inmate be given single cell housing.

Assessment

This inmate's mental health treatment met program guide requirements. Clinical response to a referral was timely. The recommendation for a single cell on the basis of the inmate's potential for violence was noteworthy.

6.    Inmate F

Inmate F arrived at CTF in September 2004 from DVI. He had been placed at the 3CMS level of care at DVI and medicated with Thorazine 300; his GAF was assessed at 50. Medication continuity was sustained for this inmate when he arrived at CTF.

Upon arrival at CTF, Inmate F was referred to mental health from bus screening. He was seen six days later by a mental health clinician and five weeks after arrival by a psychiatrist who changed his regimen to Risperdal 2. One month later, his Risperdal was increased to 4. Current informed consents forms for these medications were filed in the inmate's UHR.

Inmate F was treated at the 3CMS level of care at CTF for Schizophrenia, paranoid type (PRO), r/o Cocaine Induced Psychotic Disorder and Substance Dependence. His GAF was assessed at 60 in September 2004. He had a timely IDTT meeting attended by a full interdisciplinary team and an individualized treatment plan. He was seen at least quarterly by a case manager.

The inmate had been non-compliant with his medication on many occasions during the past three months. He was referred for non-compliance in September, but not subsequently.

When interviewed by the monitor's expert in a small group on January 14, 2005, Inmate F was somewhat disheveled, but responded when addressed. His speech was normal in rate and tone and the content of his conversation was relevant and logical.

Assessment:

This inmate's mental health treatment largely conformed to program guide requirements, but there were some exceptions.

Medication continuity was sustained upon inmate F's arrival. The inmate's subsequent medication non-compliance did not, however, elicit an appropriate response. Inmate F's medication was changed in response to his complaints, but not all of his treatment providers seemed fully aware that he was not taking prescribed medication as ordered.

Psychiatric practice in this inmate's case was consistent with program guide requirements. A rationale was provided when the inmate's medication orders were changed and the inmate was given a follow-up appointment one month after a new medication was initiated.

7.    Inmate G

When interviewed by the monitor's expert in a small group on January 14, 2005, Inmate G was disheveled and quite talkative. His speech was normal in rate and a bit loud in tone; the content of his conversation was relevant and logical. This 3CMS inmate reported that he had previously been treated at the EOP level of care.

Inmate G arrived at CTF in May 2004 from Folsom, where he had been treated at the 3CMS level of care. He had a diagnosis of Schizoaffective Disorder. He experienced a high level of stress at Folsom and exhibited signs and symptoms related to the stress, such as hair loss. The inmate reported feeling sad and depressed both at Folsom and at CTF. He was taking Wellbutrin and Geodon at Folsom. Medication continuity was sustained upon his arrived at CTF.

The inmate was referred to mental health from bus screening and seen by a mental health clinician in a timely manner. An IDTT meeting, which may not have been attended by a custody representative, was also timely. The inmate's MH-4 and MH-2 were completed in a cursory manner and were not individualized.

Inmate G was followed more closely by a psychiatrist than by his case manager. Medication changes were made in response to his reports and follow-up appointments were appropriately scheduled. Although the inmate was in distress and reported hallucinations, he was seen at two-week intervals and placed on a waiting list for group treatment.

The inmate missed most of his doses of medication in September, October, November and December. No referrals for non-compliance were filed in the inmate's UHR. His

7

regimen included Geodon, Wellbutrin and Tegretol. Although the inmate complained of side effects, there was no indication that the psychiatrist was aware of his non-compliance problem.

Assessment:

Overall, this inmate's mental health treatment was consistent with program guide requirements, except that there was no response to the inmate's medication non-compliance and his treatment plan was cursory.

8.      Inmate H

This 3CMS inmate was interviewed by the monitor's expert in a group on January 14, 2005. His presentation was unremarkable. His conversation was logical and relevant. He reported that his medication had recently expired, but that was not borne out by the documentation in his UHR.

Inmate H had diagnoses of Psychotic Disorder NOS and Polysubstance Dependence. He was treated with Paxil and Zyprexa. Current informed consent forms for these medications were in the UHR.

The inmate was seen at the requisite intervals by a psychiatrist and his case manager. He had a current, individualized treatment plan written in the context of an IDTT meeting that was attended by a full interdisciplinary team.

Assessment:

This inmate's mental health treatment met program guide requirements.

9.      Inmate I

Inmate I was interviewed by the monitor's expert on January 14, 2005. He was neatly dressed, well oriented, logical and relevant in conversation. The inmate was treated for Psychotic Disorder NOS in remission, Major Depressive Disorder, recurrent, moderate, and Polysubstance Dependence in institutional remission.

The inmate had a current, individualized treatment plan and met at the requisite intervals with treatment providers. A recent IDTT meeting was attended by a full interdisciplinary team.

Inmate I was largely compliant with his medications. Current informed medication consent forms were filed in the UHR.

Assessment:

This inmate's mental health treatment met program guide requirements.

8

10.    Inmate J

This inmate had been treated at the 3CMS level of care in 2003 at CTF. He arrived back at CTF from a country jail with current psychotropic medication orders in April 2004 and was again treated at the 3CMS level of care.

The inmate's Lithium and Geodon were continued upon his arrival at the institution by order of a medical physician. He did not see a mental health clinician or have an IDTT meeting until he had been at CTF for over one month.

Inmate J had a diagnosis of Schizoaffective Disorder and was medicated with Depakote, Benadryl and Zyprexa. He had a current treatment plan that was somewhat individualized, but had many blank spaces. There did not appear to be a custody representative at the inmate's IDTT meeting.

The inmate's Valporic Acid level was below therapeutic range in June, but the inmate's levels were not tested again for four months, despite the psychiatrist's order. Psychiatric follow-up was not conducted as planned.

A progress note indicated that the inmate went to the pill window and was sent to psychiatry with a note saying that his medication order had expired when, in fact, it had not. A quarterly case management contact appeared to have been missed; contact was made at 120 days rather than at 90 days.

Assessment:

This inmate's mental health treatment did not conform to program guide requirements. The inmate's intake processing was deficient, laboratory tests were not obtained as needed and the IDTT process did not serve its purpose.

11.    Inmate K

Inmate K had not been on the mental health caseload for approximately four years since being treated for anxiety with Prozac for a short time in 2001.

He came to the attention of mental health staff in December 2004 because he was anxious and wanted to resume taking Prozac. An IDTT meeting was held the first day the inmate was seen and he was placed on the 3CMS caseload with a diagnosis of Panic Disorder without agoraphobia and a GAF of 65. The inmate's treatment plan was individualized and his IDTT meeting was attended by all of the required participants. Inmate K was considered for a relaxation group and Prozac was initiated.

The inmate met with a psychiatrist one month later as planned. A current informed consent form for Prozac was found in the inmate's UHR.

9

Assessment;

This inmate's mental health treatment met program guide requirements.

12.    Inmate L

Inmate L arrived at CTF in September 2004. Prior to that, he was treated at the 3CMS level of care at CSP/Solano and was sent out to a county jail, where his medication was reportedly interrupted. The inmate arrived at CTF with current orders for Remeron and Zyprexa.

Inmate L was referred to mental health from bus screening and seen within six days. The inmate's medication continuity was sustained upon admission to the facility.

Inmate L had diagnoses of Major Depressive Disorder, moderate, Substance Induced Psychotic Disorder and Polysubstance Dependence by history. He had a current individualized treatment plan developed in a timely fashion at an IDTT meeting attended by all of the required participants.

Current informed medication consent forms were filed in the UHR. The inmate's medication orders for Remeron and Zyprexa ran out on January 7 and were not rewritten until January 11, 2005.

Assessment;

Overall, this inmate's mental health treatment met program guide requirements, with the exception of medication discontinuity caused by an inadvertent lapse in orders when the inmate went out to county jail.

13.    Inmate M

Inmate M was treated at the 3CMS level of care for Opioid Induced Mood Disorder, Opioid Induced Psychotic Disorder and Cocaine Dependence. He had an individualized treatment plan that was developed at an IDTT meeting attended by all of the required participants. The inmate was medicated with Effexor, Vistaril and Zyprexa. His MARs indicated that he was compliant with his medication regimen. Current informed medication consent forms were filed in the inmate's UHR.

Inmate M did not receive quarterly psychiatric contact. His mediation order was prevented from expiring on January 12, 2004 by a medical physician who renewed his prescription without direct inmate contact. The inmate received quarterly case management contacts.

Assessment:

This inmate's mental health treatment met program guide requirements, with the exception of a missed quarterly psychiatric contact that resulted in a narrowly averted lapse in medication continuity. The expiration of this inmate's medication orders was prevented by an order that was written without inmate contact by a medical physician.

15.    Inmate N

Inmate N was paroled in March 2004. He violated parole and was transferred from country jail to NKSP in July 2004. In November, he was treated via telemedicine at the 3CMS level of care at CCC. He was given a diagnosis of Psychotic Disorder NOS and Major Depressive Disorder, recurrent, and prescribed Remeron.

Inmate N arrived at CTF on December 23, 2004 and was seen for the first time in an IDTT meeting attended by all of the required participants within five days of his arrival. The inmate was assigned an EOP level of care on December 28, 2004 and seen in a UCC hearing one week later.

The inmate's medication was interrupted for two days when he arrived at CTF. He was seen frequently by a psychiatrist and by a case manager. Paxil was added to his regimen in an effort to reduce his depression and auditory hallucinations.

Assessment:

This inmate's mental health treatment met program guide requirements. Continuity of medication was interrupted for two days upon the inmate's arrival at the institution.

16.    Inmate O

At the time of the monitoring visit, Inmate O was treated at the EOP level of care. The inmate was known to the mental health staff as he had been treated at the 3CMS level of care during the end of 2003 and the first months of 2004.

Inmate O was placed on Celexa by a psychiatrist who saw him on November 2, 2004. He was followed up two weeks later as planned. One month later, he had an IDTT meeting and was placed on the 3CMS caseload. The meeting was attended by a full interdisciplinary team. The inmate's treatment plan, however, was completed in a cursory manner.

Inmate O reported feeling frustrated and depressed. He was dissatisfied with his medical treatment. Another IDTT meeting was held about five weeks later. The inmate was described as motivated, but not responding to treatment. He was designated as needing an EOP level of care.

Assessment:

This inmate's mental health treatment met program guide requirements, with the exception of a delayed IDTT meeting. Psychiatric follow-up was appropriately conducted when the inmate's medication was changed and in response to the inmate's reports of side effects. Inmate O's treatment plan was not individualized.

17.    Inmate P

This 3CMS inmate was treated for Bipolar Disorder, in remission, with Zyprexa and Trazodone. His medication orders were due to expire on December 9, 2004, but his psychiatrist renewed them for ten days without direct inmate contact. He was then seen one week later. The inmate's MARs indicated that he was compliant with his medications.

Inmate P received quarterly or nearly quarterly visits by a psychiatrist and a case manager. His treatment plan was undated, but individualized. His IDTT meeting was attended by all of the required participants. The inmate's chart contained current informed medication consent forms.

Assessment:

This inmate's mental health treatment met program guide requirements. The expiration of the inmate's medication order, however, was averted by an order that was written without inmate contact.

18.    Inmate Q

Inmate Q was placed in administrative segregation on January 8, 2005. His initial ICC meeting was observed by the monitor's expert on January 13, 2005. The meeting was attended by a psychologist. Brief, but appropriately targeted, questioning by the psychologist at the meeting elicited useful information without being intrusive. The inmate's UHR was unavailable during the meeting, which was attributed to the fact that Inmate Q was housed in a location remote from the main facility.

Assessment:

Mental health input into the ICC meeting was hampered by lack of the inmate's UHR. Given the inmate's housing prior to his placement in administrative segregation, it was clear that Inmate Q was not on the MHSDS caseload. It was not clear from the chart whether the inmate received a mental health screening as required after his admission to administrative segregation.

19.    Inmate R

Inmate R was placed in administrative segregation because he was suspected of being the victim of battery. Inmate R's initial ICC meeting was observed by the monitor's expert on January 13, 2005. The meeting was attended by a psychologist. Brief, but appropriately targeted, questioning by the psychologist elicited useful information without being intrusive.

The inmate's UHR was unavailable during the meeting, which was attributed to the fact that he was housed in a remote location. Inmate R was scheduled to parole in February 2005.

Assessment:

It was not clear whether Inmate R received a mental health screening as required after his admission to administrative segregation. The psychologist who attended the inmate's ICC meeting documented his findings on a progress note written on a MH-3 form to be placed in loose filing. His ability to provide the ICC with information was hampered by the absence of the inmate's UHR. Inmate R was not a caseload inmate. Appropriate caution and concern for Inmate R's well being were demonstrated by mental health staff and by the actions of the ICC committee.

20.    Inmate S

Inmate S was serving a short sentence; it was his first term of incarceration. The inmate was placed in administrative segregation on January 4, 2005 due to enemy concerns. His initial ICC meeting was observed by the monitor's expert on January 13, 2005.

The ICC meeting was attended by a psychologist. Brief, but appropriately targeted, questioning by the psychologist elicited useful information without being intrusive. The inmate's UHR was unavailable during the meeting, which was attributed to the fact that he was housed in a location remote from the main facility.

Assessment:

Mental health input into the ICC meeting was hampered by the absence of the inmate's UHR. Inmate S was not on the mental health caseload. It was not clear whether he received a mental health screening as required after admission to administrative segregation.

20.    Inmate T

Inmate T was placed in administrative segregation on January 10, 2005 due to problems associated with his legal paperwork. The inmate's ICC meeting was observed by the monitor's expert on January 13, 2005. The inmate's demeanor during the meeting was

atypical and stood in marked contrast to the vast majority of inmates seen by the committee on that day.

Inmate T was scheduled to be paroled in May 2005, but his release date had been pushed back six months due to his refusal to sign release paperwork. At the end of the ICC meeting, he refused to sign routine paperwork giving emergency contact information for use in the event that his designees had to be notified of untoward events.

The ICC meeting was attended by a psychologist. The UHR was unavailable during the meeting, which was attributed to the fact that the inmate's housing location was remote from the main facility. Conflicting information regarding the inmate's treatment history arose during the meeting.

Inmate T was retained in administrative segregation pending a BPT hearing on a disciplinary infraction associated with his refusal to sign release papers.

Assessment:

It was not clear whether this inmate received a mental health screening as required after his admission to administrative segregation. Inmate T's behavior was suggestive of the possible presence of a cognitive processing problem, a thought disorder or some type of mental or emotional impairment. The inmate needed a full mental health evaluation.

The inmate had been segregated for six days prior to the ICC meeting, but no mental health information was available to the committee. The purpose of having a mental health representative present at the ICC meeting was not fulfilled in this case.

21.    Inmate U

Inmate U had only recently arrived at CTF in December 2004. He was placed in administrative segregation on January 9, 2005 due to a fight with another inmate. Inmate U's initial ICC meeting was observed by the monitor's expert on January 13, 2005. The ICC meeting was attended by a psychologist. The inmate's UHR was available during the meeting.

During the ICC meeting, Inmate U appeared to be well oriented, logical and relevant in conversation. He was also oppositional and provocative.

Review of the chart showed that the inmate had a negative bus screening at CTF and no history of psychiatric treatment. There was no mental health screening associated with his January admission to administrative segregation found in the inmate's UHR. There was, however, a negative screening that was completed in September 2004.

14

Assessment:

Mental health input into the ICC process for this inmate was appropriate. There was no
mental health screening associated with his recent stay in administrative segregation filed
in the UHR. The inmate had, however, received a bus screening within the past month
and a mental health screening approximately four months before. Both were negative.

22.    Inmate V

Inmate V was placed in administrative segregation around January 8, 2005 due to a fight
with another inmate. His initial ICC meeting was observed by the monitor's expert on
January 13, 2005. During the ICC meeting he smiled so broadly and so frequently that it
eventually seemed inappropriate. The ICC meeting was attended by a psychologist. The
inmate's UHR was available during the meeting. Review of the UHR showed that the
inmate had a negative bus screening at CTF in April 2004.

Inmate V was briefly on the MHSDS roster upon admission to CDC in 2002 because he
felt stressed by incarceration. No medication was prescribed to treat his depression and
the inmate was discharged from the caseload a short time later. He had not had mental
health treatment since that time.

The inmate's UHR did not contain a mental health screening associated with his January
admission to administrative segregation. He was, however, seen by the psych tech who
covered the administrative segregation unit on January 8. The psych tech signed a
medical report form documenting the inmate's minor injuries.

Assessment:

No mental health screening was performed for Inmate V subsequent to his admission to
administrative segregation. It was unfortunate that so little mental health information
was available for the ICC meeting that the purpose of having a mental health clinician
attend the ICC was not fulfilled. This inmate's case warranted a full mental health
evaluation.

23.    Inmate W

Inmate W's initial ICC meeting was observed by the monitor's expert on January 13,
2005. The ICC meeting was attended by a psychologist, but the inmate's UHR was not
available at the meeting. Inmate W's presentation during the meeting was unremarkable.

A later review of the inmate's UHR indicated that he did not have a recent mental health
screening, but was screened in February 2004. The inmate did not appear to have a
significant history of psychiatric treatment. The correctional counselor present at the ICC
meeting said that no history of psychiatric treatment was noted in the central file.

15

Assessment:

The UHR contained no mental health screening associated with Inmate W's January admission to administrative segregation.

24.    Inmate X

Inmate X arrived at CTF in May 2004 and was placed in segregation on December 18, 2004 due to battery on an inmate. His ICC meeting was observed by the monitor's expert on January 13, 2005. He was given a two-month SHU term with a MERD of February 3, 2005.

The inmate requested a sensitive needs designation and was up for endorsement to two institutions. He was retained in administrative segregation pending transfer. Review of his UHR showed that a psychologist attended his initial ICC meeting. No mental health screening was found in the inmate's chart.

Assessment:

No mental health screening was completed for Inmate X when he entered administrative segregation in December 2004.

25.    Inmate Y

Inmate Y was injured in his housing yard on December 4, 2004. He was placed in administrative segregation that same day. A mental health screening, completed on December 9, 2004, was negative.

Inmate Y's ICC meeting was observed by the monitor's expert on January 13, 2005. His UHR was available for the meeting and a psychologist was in attendance. The inmate presented in a good mood, with bright affect and good social skills at the meeting.

Review of the UHR indicated that Inmate Y took Zyprexa and Risperdal for about four months in a reception center in 2001. He reported mild auditory hallucinations. His results on a 31-question mental health screening in 2003 were negative. The inmate had not been seen by mental health again until he was segregated in December 2004.

Assessment:

A mental health screening was completed for this inmate within five calendar days following his admission to the administrative segregation unit.

26.    Inmate Z

Inmate Z was placed in administrative segregation following his involvement in a riot in December 2004. An initial ICC meeting, held on November 24, 2004, was attended by a

16

psychologist. Inmate Z's ICC meeting was observed by the monitor's expert on January 13, 2005. His UHR was available at the meeting and a psychologist was present.

According to a BPT evaluation completed in 2002, Inmate Z had no significant psychiatric history. The inmate had not received mental health treatment at CTF. The chart did not contain the required mental health screening related to the inmate's December admission to the administrative segregation unit.

Assessment:

No mental health screening was completed when the inmate entered administrative segregation in December 2004.

27.    Inmate AA

According to the UHR, Inmate AA was admitted to administrative segregation on or around November 11, 2004. He was from CIM and was on out-to-court status. A mental health screening completed on November 18, 2004 found no significant psychiatric problem. Inmate AA was not on the MHSDS caseload.

Assessment:

This inmate received a mental health screening when he entered the administrative segregation unit in December 2004.

28.    Inmate BB

Inmate BB was placed in administrative segregation on November 21, 2004. He was not on the MHSDS caseload. A chart review by the monitor's expert found found that a mental health screening was completed as required for Inmate BB on November 24, 2004 shortly after he entered segregation. A psychologist attended the inmate's initial ICC meeting.

Assessment:

A mental health screening was conducted for Inmate BB when he entered administrative segregation in December 2004.

29.    Inmate CC

Inmate CC's ICC meeting was observed by the monitor's expert on January 13, 2005. The inmate had been segregated at the time for two months, but no UHR was available for the meeting. A psychologist attended the meeting, the purpose of which seemed to be a SHU review. Inmate D was serving a life sentence and was waiting to transfer to the SHU at CSP/Corcoran or CCI.

It appeared from the meeting that the inmate may have had a pending referral to the district attorney office as well as a BPT hearing scheduled for January 25, 2005. During the meeting, Inmate CC said that he had been serving his sentence since age 17 and that, in light of his favorable pre-parole status, it made little sense for him to incur a charge of weapons possession two months before a scheduled BPT hearing. He said that he felt stressed and needed to see a mental health worker.

The ICC committee needed a Madrid chrono. The psychologist requested that the inmate's UHR be brought to the meeting so that the needed chrono could be provided prior to the conclusion of the meeting.

Assessment:

Because the inmate's UHR was unavailable in the meeting, mental health staff was unable to provide much information. If Inmate CC had recently been added to the mental health rolls, that fact presumably would have been discovered and reported by the psychologist in the meeting. It was not clear whether the inmate received a mental health screening upon admission to the administrative segregation unit.

30.    Inmate DD

Inmate DD's ICC review was observed by the monitor's expert on January 13, 2005. The inmate had been in administrative segregation nearly all of 2004, but had not been at CTF very long. He was awaiting transfer to a sensitive needs yard.

The inmate's UHR was not available in the ICC meeting, but the psychologist who attended the ICC review requested that it be brought to the meeting.

The expert's chart review showed that a mental health screening was completed shortly after the inmate was placed in administrative segregation.

Assessment:

This inmate received a mental health screening upon his December admission to administrative segregation.

31.    Inmate EE

Inmate EE's ICC review was observed by the monitor's expert on January 13, 2005. His UHR was available at the meeting and a psychologist was in attendance. During the meeting, Inmate EE was neatly dressed, well groomed and spoke logically, although his articulation was indistinct due to a pronounced congenital defect.

Inmate EE had been in administrative segregation approximately nine months since May 2004. He had been awaiting a transfer for some portion of that time. The inmate's endorsement to another prison had expired. The purpose of the ICC meeting was to

18

trigger a fresh endorsement. There was no mental health screening in the inmate's UHR dated later than 1997. The psychologist at the ICC meeting reported that Inmate EE did not have mental health problems.

Assessment:

Inmate EE did not receive a mental health screening upon his May admission to the administrative segregation unit.

32.    Inmate FF

This inmate's UHR was reviewed by the monitor's expert. Inmate FF had been in administrative segregation since around September 16, 2004 and had received a mental health screening on that date. The inmate was not on the MHSDS caseload.

Inmate FF was found unresponsive in his cell on December 6, 2004 and required medical intervention. Documentation in his chart stated that the area around him had an odor of alcohol.

Assessment:

This inmate received a mental health screening upon his placement in administrative segregation.

33.    Inmate GG

This inmate's UHR was reviewed by the monitor's expert. Inmate GG had been in administrative segregation since around December 9, 2004. The inmate was not on the MHSDS caseload. He had a mental health screening on December 13, 2004.

Assessment:

This inmate received a mental health screening upon his admission to the administrative segregation unit.

34.    Inmate HH

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Post-Traumatic Stress Disorder and treated with Thorazine 100 mg/day.

Inmate HH was transferred from CIM to CTF on June 30, 1999. He was not followed by mental health at that time. In November 2003, Inmate HH escaped after he received a third strike resulting in a life sentence. He was recaptured, but was shot in his back. The inmate was referred to mental health after presenting with depressed mood, insomnia and poor concentration. He was placed on the 3CMS caseload for medical necessity in December 23, 2003.

Recent progress notes indicated that the inmate was much improved on medication and was essentially stable.

Assessment:

Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record. The inmate's MARs had occasional blank spaces, but medication compliance was generally documented.

There was documentation of weekly case management out-of-cell contacts in the administrative segregation unit. Notes of IDTT meetings in administrative segregation documented attendance by all of the required participants.

35.    Inmate II

This 3CMS inmate was housed in the administrative segregation unit. Under Axis I, Inmate II was believed to be experiencing a phase of life problem, after receiving a life sentence. He was not treated with psychotropic medications at the time of the monitoring visit.

Inmate II was transferred to CTF from a county jail on September 20, 2004. He was not previously on the mental health caseload. He exhibited signs of depression and anxiety after receiving a life sentence and was referred to mental health. The inmate was placed on the 3CMS roster for medical necessity on October 4, 2004. Subsequent progress notes indicated that he was stable and was programming in administrative segregation without medications.

Assessment:

The inmate's chart contained documentation of weekly out-of-cell case management contacts in the administrative segregation unit. Notes of the inmate's IDTT meetings in administrative segregation documented the presence of all the required participants.

This inmate reported some continued depression during his interview with the monitor's expert. There was no documentation of any psychiatric contact for this inmate. The clinical staff was made aware of the inmate's complaints.

36.    Inmate JJ

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder with psychotic features and treated with Effexor XR 75 mg/day, Risperdal 3 mg/day, Cogentin 0.5 mg/day and Benadryl 100 mg/day.

Inmate JJ was transferred to CTF from HDSP on September 3, 2004. He had been on the 3CMS caseload prior to his transfer. Inmate JJ was placed in the administrative segregation unit on September 29, 2004 for battery on an inmate. Progress notes indicated that he experienced some increase in depression and auditory hallucinations with pacing. Adjustments were made to his medication and he reportedly showed improvement and was stable at the time of the monitoring visit.

Assessment:

Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record. The inmate's MARs documented consistent medication compliance.

It appeared that there was a lapse in medication continuity for three to four days during early October, 2004. There was also a lapse in the documentation of weekly case management contacts in the administrative segregation unit from October 2 to October 21, 2004. Weekly contacts were otherwise well documented.

37.     Inmate KK

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder, classified as DD1A and treated with Wellbutrin XL 300 mg/day and Zyprexa 20 mg/day.

Inmate KK was transferred to CTF on July 27, 2004 from WSP. He was on the 3CMS caseload at the time of transfer and continued at that level of care upon his arrival. Progress notes initially indicated that the inmate was stable and compliant with his medications, but the inmate began to exhibit very poor hygiene and was referred to mental health on January 5, 2005. In response, the inmate was seen by a case manager who indicated that an attempt would be made to expedite the inmate's transfer to an appropriate CDC facility.

Assessment:

Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record. The inmate's MARs contained occasional blank spaces, but medication compliance was generally documented.

There was documentation indicating that the inmate received his medications upon arrival at the institution within one day. There was also documentation that the inmate received weekly case management contacts in the administrative segregation unit and quarterly case management contacts in general population. Documentation of IDTT meetings indicated the presence of all the required participants.

21

38.    Inmate LL

This EOP inmate was housed in general population. He was diagnosed with Depressive Disorder, NOS and Anxiety Disorder, NOS and treated with Buspar 40 mg/day, Trazodone 200 mg/day and Benadryl 100 mg/day prn.

Inmate LL was transferred from NKSP to CTF on January 28, 2004. The inmate received a 3CMS level of care at the time of transfer; a review of his UHR revealed that he had been a 3CMS inmate or a non-caseload inmate for the past five years. The inmate had last been treated with anti-psychotic medications in 1997 but, since that time, had not received psychotropic medications.

A review of progress notes during the past six months revealed that the inmate consistently complained of depressed and anxious moods. Buspar was added to his medication regimen in August and his medications were further increased in December. During December, a staff referral indicated that the inmate was paranoid and concerned that he would hurt someone. There was, however, no evidence in the chart that Inmate LL was psychotic at that time. The inmate was placed on the EOP caseload on January 4, 2005 and was awaiting transfer to an EOP facility at the time of the monitoring visit.

Assessment:

There was documentation of consistent quarterly case management contacts while Inmate LL was classified as a 3CMS inmate. The decision to upgrade the inmate to the EOP level of care was questionable. It appeared that further evaluation of the inmate's symptoms and an adequate medication evaluation, rather than an immediate increase to the EOP level of care, were warranted.

Informed consent forms regarding treatment with psychotropic medications were present in the inmate's medical record. IDTT meetings documented the attendance of all the required participants.

39.    Inmate MM

This EOP inmate was housed in general population. He was diagnosed with Psychotic Disorder, NOS and treated with Abilify 10 mg/day.

Inmate MM had been housed at CTF in the 3CMS program. He was admitted to the OHU after presenting with bizarre, psychotic behavior on June 11, 2004. The inmate was upgraded to the EOP level of care on June 21, 2004 and transferred to the MHCB unit at CMC for stabilization. While at CMC, Inmate MM was returned to the 3CMS level of care on July 14, 2004.

At his IDTT meeting on November 22, 2004, Inmate MM was provided with a diagnosis of Dementia, NOS. He was reportedly stable off medications. The inmate reported auditory hallucinations, which were believed to be the result of head trauma, to the psychiatrist who saw him two days later. Inmate MM was treated with Seroquel at that time. His medication was later switched to Abilify due to side effects. The inmate remained in the 3CMS program at CMC until December 29, 2004, when he was returned to CTF. Upon his return to CTF, he reported continued auditory hallucinations and was returned to the EOP level of care on January 4, 2005. He was awaiting an expedited transfer to an EOP facility at the time of the monitoring visit.

Assessment:

As this inmate had only recently been upgraded to the EOP level of care, it was too early to determine the frequency of his case management contacts. This inmate's course of treatment, which entailed upgrade to the EOP level of care, transfer to a MHCB unit, downgrade to the 3CMS program and return to the EOP level of care, highlighted the lack of communication and coordination between treating clinicians at CMC and CTF. Continued monitoring at the EOP level of care appeared to be warranted for this inmate.

There was documentation indicating that continuity of medication had been maintained for this inmate upon his arrival at CTF. The inmate's initial IDTT meeting included all of the required participants. Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record.

40.     Inmate NN

This 3CMS inmate was housed in general population. He was diagnosed with Depressive Disorder, NOS and treated with Risperdal 6 mg/day, Benadryl 150 mg/day and Zoloft 50 mg/day.

Inmate NN arrived at CTF in the summer of 2003. He had been in the 3CMS program since August 28, 2003. Progress notes indicated that the inmate had some symptoms of "paranoia" and sleep disturbance, but was generally stable.

Assessment:

Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record. Although the inmate's MARs documented medication non-compliance, there was no documentation that the inmate had been referred to mental health by the MTA or that the inmate had received a mental health evaluation.

The inmate's chart contained documentation of quarterly case management contacts in the 3CMS program. Documentation of the inmate's annual IDTT meeting indicated the presence of all the required participants.

EXHIBIT M

Wasco State Prison (WSP)

February 22, 2005 – February 23, 2005.

1.     Inmate A

This 3CMS inmate was housed in the reception center on the B facility.  He was diagnosed with Bipolar Disorder NOS and treated with Seroquel 800 mg/day, Benadryl 100 mg/day and Celexa 20 mg/day.

Inmate A was transferred from county jail to WSP on April 12, 2004; he had reportedly been out-to-court.  On September 2, 2004, the inmate was seen for a mental health evaluation due to bizarre behavior.  He was placed in the 3CMS program at that time pursuant to a MH-7.  The actual chrono indicated that the inmate was placed into the 3CMS program on September 15, 2004.

Inmate A was reportedly paranoid with guardedness and delusional thinking.  He was placed in administrative segregation on September 7, 2004 in connection with a staff assault; the inmate claimed he thought that the officer was a terrorist and threw a trash can at him.  Inmate A was seen by a psychiatrist on the same date and was placed on Seroquel, Vistaril and Remeron.  Subsequent progress notes indicated that the inmate's psychotic symptoms gradually improved.

This inmate frequently refused out-of-cell clinical contacts.  He occasionally participated in group therapy in the administrative segregation unit.  Prior to his release from administrative segregation, Inmate A was reportedly compliant with medications and stable.  On February 4, 2005, this inmate was seen by a psychiatrist due to increased mood swings, hostility and energy level.  His Seroquel was increased and his Celexa was decreased at that time.  A note on February 10, 2005 indicated that the inmate was moved to the B facility in the reception center on February 8, 2005.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in this inmate's medical record.

- Blank spaces were noted in the inmate's MAR, making it unclear whether the inmate refused or failed to show up for medication or if the inmate's medications were unavailable.

- The inmate's administrative segregation IDTT meetings had the necessary participants at one meeting, but lacked custody presence at another meeting.

- There was no documentation of weekly case management contact for this inmate in the administrative segregation unit.

- There was no documentation of attempts at conducting out-of-cell clinical contacts in the administrative segregation unit for Inmate A.

2.    Inmate B

This EOP inmate was housed in the reception center on the B facility. He was diagnosed with Schizoaffective Disorder and treated with Buspar 75 mg/day, Depakote 1000 mg/day and Geodon 80 mg/day.

Inmate B arrived at WSP on December 28, 2004 from a county jail. He had been prescribed the above psychotropic medications at the jail as well as at other facilities in the CDC system during a previous incarceration; the inmate's medications were ordered on the day of his arrival at WSP. Inmate B had been paroled from the EOP program at CMC and he was returned to the EOP program upon his admission to WSP. Progress notes indicated that he was seen consistently by his case manager and was reportedly stable on medications. The inmate, however, had some chronic involuntary movements.

Assessment

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- Appropriate laboratory testing for treatment with Depakote was not conducted for this inmate.

- There was documentation of weekly case management contacts in the inmate's chart.

- There was documentation of medication continuity for Inmate B upon arrival at WSP.


3.    Inmate C

This EOP inmate was housed in the reception center on the D facility. He was diagnosed with Psychotic Disorder, NOS, and treated with Zyprexa 15 mg/day, Buspar 30 mg/day, Remeron 30 mg/day, Artane 10 mg/day, Buspar 60 mg/day, Wellbutrin 300 mg/day and Benadryl 100 mg/day.

Inmate C arrived at WSP on January 6, 2005 from a county jail. He had paroled from WSP five months before and was re-incarcerated due to a parole violation. The inmate was seen by a psychologist on January 10, 2005, after the housing officer referred him to mental health due to "disrespectful behavior toward other inmates." Inmate C reportedly had been off his medications for two to three weeks. He was seen by the psychiatrist on the same day that he was referred and his medications were ordered. Subsequent progress notes indicated that the inmate presented with withdrawn behavior, blunted affect, perseveration and loose associations after prolonged interview.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- Inmate C experienced a lapse in medication continuity upon arrival at WSP; the inmate's medications were not ordered until four days after his arrival at the facility.

- There was documentation of weekly case management contact in the inmate's chart.

4.    Inmate D

This EOP inmate was housed in the administrative segregation unit. He was diagnosed with Schizoaffective Disorder and treated with Risperdal 4 mg/day and Wellbutrin 300 mg/day.

Inmate D arrived at WSP on November 9, 2004 from a county jail. He reported that he had previously paroled from the EOP program at RJD. The inmate's MH-7 was completed on November 15, 2004 and Inmate D was placed into the EOP program. He had reportedly been off his medications for several months at that time.

It appeared that Inmate D was placed in administrative segregation on November 9, 2004 due to an assault on a peace officer. The inmate was seen by a psychiatrist on the following day and no medications were ordered; a diagnosis of Possible Adjustment Disorder was provided. According to a progress note in the chart, Inmate D refused medications at that time. Subsequent progress notes indicated that the inmate presented with poor insight and judgment. He continued to refuse medications, but was not thought to meet criteria for involuntary medications.

Inmate D gradually decompensated and on December 20, 2004 was admitted to the MHCB unit in five-point restraints due to agitation and disorganization. He showed gradual improvement as a result of treatment with the above medications and was discharged back to the administrative segregation unit after one week. Subsequent progress notes indicated that he exhibited some psychomotor agitation and inappropriate affect at times, but was felt to be essentially stable.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

4

- There was documentation indicating that all of the necessary participants were present at one of the IDTT meetings held in the administrative segregation unit for Inmate D; custody staff was not present, however, at another IDTT meeting in administrative segregation.

- There was documentation of weekly case management contact for this administrative segregation inmate.

- There was no documentation of custody presence at the inmate's MHCB IDTT meeting.

- Documentation indicated that the inmate received five-day suicide prevention follow-up after being discharged from the MHCB unit.

EXHIBIT  N

<u>North Kern State Prison (NKSP)</u>

September 14, 2004 – September 16, 2004

1.    Inmate A

This inmate was housed in the MHCB unit. He was diagnosed with Psychotic Disorder, NOS and treated with Seroquel 600 mg/day, Risperdal 5 mg/day and Zoloft 50 mg/day.

Inmate A was transferred from a county jail to NKSP on August 3, 2004. His bus screening indicated that he had a history of a psychotic disorder, as well as a history of suicide attempts. The inmate was referred to mental health at the time of his arrival at the facility. The psychotropic medications he was receiving at the county jail were continued upon his arrival at NKSP.

Inmate A was placed on the 3CMS caseload on August 18, 2004. Five days later, the inmate reported auditory hallucinations telling him to harm himself. He was subsequently transferred to the MHCB unit at CSP/Sac on September 9, 2004 and presented with suicidal ideation and a suicide attempt by stabbing himself with a pencil. It appeared that this inmate had a total of four MHCB hospitalizations prior to September 9, 2004. Most, if not all, of these hospitalizations resulted from probable psychotic symptoms and suicidal ideation. The last psychiatric progress note indicated that the inmate remained with suicidal ideation and auditory hallucinations.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Referral to DMH was indicated, given this inmate's multiple MHCB admissions. There was, however, no documentation that a higher level of care had been considered for this inmate during this hospitalization.

- Timely IDTT meetings with the appropriate participants were conducted for Inmate A.

- The inmate's chart contained documentation of daily psychiatric or psychology contact in the MHCB unit.

2.    Inmate B

Inmate B was housed in the MHCB unit. He was diagnosed with Psychotic Disorder, NOS, as well as Major Depressive Disorder with psychotic features. He was treated with Risperdal 4 mg/day and Zydis 20 mg/day.

This inmate was transferred from a private correctional facility to NKSP on September 11, 2004 and admitted to the MHCB unit on suicide precautions. Inmate B's progress notes indicated that he was experiencing auditory hallucinations, anorexia and paranoid delusions. There was no indication that the inmate had been previously treated with psychotropic medications. Inmate B's progress notes showed that he was followed

2

consistently by the clinicians in the MHCB unit. The inmate's last progress note indicated that he remained fearful, with depressed mood and anxiety.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- The inmate's chart contained documentation of daily clinical contacts by a psychiatrist or psychologist in the MHCB unit.

- Timely IDTT meetings were conducted with the appropriate participants present for Inmate B.

3.    Inmate C

Inmate C was housed in the MHCB unit. He was diagnosed with Psychotic Disorder, NOS and treated with Seroquel 800 mg/day and Zydis 30 mg/day.

This inmate was transferred from county jail to NKSP on July 6, 2004. He arrived having been prescribed Seroquel at the county facility and reportedly having had a recent suicide attempt. A referral to mental health was generated at the time of his transfer to NKSP. It appeared that the inmate was transferred to the reception center and was seen by a psychiatrist one week after his arrival at the facility; Seroquel was ordered at that time. Inmate C was seen on the following day by a psychologist. The inmate presented with depressed mood and was placed on the 3CMS caseload.

Inmate C was admitted to the MHCB unit on September 9, 2004, after complaining of suicidal ideation and presenting with hostile and uncooperative behavior.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- It did not appear that this inmate received his Seroquel at the time of his admission to NKSP. There was no documentation in the inmate's medical records indicating that he received Seroquel at the county facility. It was unclear, however, whether this accounted for his delayed medication prescription at NKSP.

- The inmate's initial MH-7 was not located in his medical record, but there was a reference in a later progress note regarding the presence of this missing form. This appeared to be a possible medical records issue.

- Inmate C received daily clinical contact with a psychologist or psychiatrist in the MHCB unit.

- Timely IDTT meetings with the necessary participants were conducted for Inmate C.

4.    Inmate D

This EOP inmate was housed on the A yard in general population. He was diagnosed with Schizophrenia, paranoid type and prescribed Risperdal 6 mg/day.

Inmate D was transferred from county jail to NKSP on June 18, 2004. His bus screening indicated that the inmate was previously treated with Risperdal and that he had a history of auditory hallucinations as well as multiple suicide attempts. Inmate D received a mental health screening four days after his arrival at the facility and was referred to mental health. It appeared that he was prescribed Risperdal at the time of his entry to the institution. An MH-7 was completed on July 12, 2004, recommending a 3CMS level of care. The inmate was seen for an initial psychiatric evaluation on July 16, at which time his medications were continued.

Inmate D was transferred to general population on August 27, 2004 and seen by a case manager on September 3, 2004. A MH-2 was completed on September 8, 2004. The IDTT of the same date recommended an EOP level of care due to the inmate's significant symptoms of thought disorder. Inmate D was last seen by the case manager on September 14, when he was noted to be experiencing paranoid delusional thinking regarding his food and difficulty understanding his 100-year to life prison sentence. The clinician indicated that the inmate was stable and that weekly clinical contacts would continue.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Continuity of medication was maintained for this inmate upon arrival to the institution. It appeared that the inmate's medications were delivered on the day after his arrival.

- The inmate's MARs indicated that he was generally compliant with his medications.

- A timely mental health screening was completed for the inmate upon initial arrival at NKSP.

- A MH-7 was completed, but it was not completed within 14 days of the inmate's arrival.

- This inmate was appropriately recommended for an EOP level of care due to his symptomatology.

- The inmate's chart contained documentation of weekly case manager contact after the inmate was transferred to the EOP program.

4

- An IDTT meeting in general population did not include the involvement of a psychiatrist.

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

5.    Inmate E

This 3CMS inmate was housed in the general population. He was diagnosed with Bipolar Disorder and treated with Remeron 45 mg/day and Depakote 1000 mg/day.

Inmate E arrived at NKSP on June 17, 2004 from a county jail. His bus screening indicated that he had a history of treatment with psychotropic medications and a diagnosis of schizophrenia. He was seen for a mental health evaluation on June 21, 2004, which recommended a 3CMS level of care. His mental health screening was performed on June 23, 2004 and was positive for mental health concerns. The subsequent progress notes by the psychiatrist indicated that the inmate had some mood instability, but was essentially stable on medications.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- There were informed consent forms for treatment with psychotropic medications present in the inmate's medical record.

- The inmate's medications were continued upon his arrival to the facility. The inmate's original MAR was not present in his medical record, making it impossible to determine whether medications were actually delivered in a timely manner.

- The appropriate laboratory testing for treatment with Depakote was not conducted for this inmate. A valporic acid level was obtained, but liver function tests and a complete blood cell count were not obtained. The psychiatric, in the last progress note, indicated that he would "consider obtaining CBC and liver function tests".

- The inmate's MH-7 and mental health screening forms were completed in a timely manner.

- This inmate was scheduled to be paroled in the next several months. Documentation of a TCMP chrono was present in the inmate's medical record.

6.    Inmate F

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder, NOS. A diagnosis of Adjustment Disorder was also present in his medical record. He was treated with Zoloft 150 mg/day.

This inmate had been at NKSP since November 2001. He was housed in general population throughout the monitoring period. The progress notes in the inmate's chart indicated that he was followed consistently by a case manager and psychiatrist. A review of the inmate's MARs indicated that he refused virtually all of his medication for the months of June, July and August. A July progress note documented the inmate's medication refusal. The progress notes also documented the inmate's intermittent depression and passive intermittent suicidal ideation. The most recent IDTT meeting conducted on September 15, 2004 indicated that Inmate F continued to present with some depressive symptoms and that he had resumed his antidepressant medications.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record.

- Although Inmate F's MARs documented consistent medication non-compliance, there was no documentation in the medical record indicating that the MTAs referred this inmate to mental health. It should be noted that the mental health supervisory staff reported that an alternative mechanism was in place for notifying mental health about inmates who were non-compliant with their medication, but documentation of this mechanism was not routinely located in the medical records.

- Documentation of quarterly case management contacts was present in the chart.

- Consistent psychiatric contacts were documented in the inmate's chart.

- An annual IDTT meeting was conducted in a timely manner, but there was no psychiatrist present at the meeting.

7.    Inmate G

This EOP inmate was housed in the reception center. He was diagnosed with Schizophrenia, paranoid type and treated with Seroquel 800 mg/day, Zoloft 50 mg/day and Buspar 20 mg/day.

Inmate G was transferred from a county jail to NKSP on August 24, 2004. Inmate G's bus screening, and his accompanying information from the county jail, indicated that he had a significant history of mental health treatment. The inmate's medications were