continued upon his arrival to the facility. A mental health screening, completed two days after his arrival, was positive for mental health concerns.

It appeared that a MH-7 was completed on September 1, 2004, recommending an EOP level of care, but this form was not found in the inmate's medical record. Inmate G was seen by a psychologist on September 10. 2004 and was noted to be anxious and depressed. He was referred to a psychiatrist and seen on that day, at which time he complained of the same symptoms. His medications were adjusted at that time.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were present in the medical record.

- The inmate's medications were continued upon his arrival to the facility; his MARs confirmed that his medications were delivered on the day following his entry to the institution.

- The inmate's mental health screening was timely.

- It was difficult to determine whether the inmate was seen on a weekly basis by a case manager due to missing documentation in the medical record.

8.    Inmate H

This 3CMS inmate was housed in administrative segregation. He was diagnosed with Post Traumatic Stress Disorder and Major Depressive Disorder. He was not treated with psychotropic medications at the time of the monitoring visit.

This inmate had been at NKSP since October 2001 and had been housed in administrative segregation during the entire monitoring period. The progress notes in the inmate's chart indicated that he was followed consistently by the case manager and the psych techs while in the segregation unit. The inmate frequently appeared to decline out-of-cell clinical contacts. He was reportedly stable off medications, which were discontinued in May 2004. The last IDTT meeting which was conducted for this inmate on September 15, 2004, indicated that he was symptom free and that consideration was being given to removing him from the mental health caseload if he remained symptom free until 2005.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

7

- The inmate's chart contained documentation of weekly case management contacts, with the exception of a minor lapse between July 28 and August 12, 2004.

- There was good documentation of daily psych tech rounds in the administrative segregation unit.

- The IDTT meetings held for this inmate in administrative segregation were timely and included the necessary participants, with the exception of the IDTT held on September 15, 2004, when the psychiatrist was reportedly ill.

9.    Inmate I

This 3CMS inmate was housed in the reception center. He was diagnosed with Major Depressive Disorder with psychotic features and was treated with Seroquel 300 mg/day and Zoloft 25 mg/day.

Inmate I was transferred from a county jail to NKSP on June 15, 2004. He received a mental health screening three days after his arrival at the institution, which indicated mental health concerns. A MH-7, completed on June 21, 2004, recommended a 3CMS level of care for Inmate I. The evaluation also documented the inmate's paranoid symptoms.

Inmate I was first seen by a psychiatrist on June 26, 2004, at which time his medications were adjusted in response to his complaint of symptoms. It was noted on July 20, 2004 that the inmate was refusing medications. At that time, the psychiatrist discontinued his Zoloft and decreased his Seroquel. The inmate was seen by a case manager for follow-up three days later, at which point he requested the resumption of Zoloft. Inmate I was seen by a psychiatrist on August 8, 2004, at which time Zoloft was restarted and the dosage of Seroquel was increased.

There was an order in the chart dated September 2, 2004, indicating that Inmate I's Seroquel was discontinued by the psychiatrist due to observed cheeking of medications. There was no accompanying progress note regarding this issue. The inmate was seen for psychiatric evaluation two days later when his medications were resumed.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record.

- There appeared to be medication continuity upon this inmate's entry to the facility; Inmate I's medications were delivered the day following his arrival.

- The inmate's mental health screening and his MH-7 were completed in a timely manner.

- Psychiatric contact was consistently documented in the chart.

- There was documentation of at least quarterly case manager contact in the inmate's chart.

- This inmate had a significant history of medication non-compliance. It appeared that the clinical staff had noted this inmate's medication non-compliance and had attempted to address the issue through clinical follow-up.

10.     Inmate J

This 3CMS inmate was housed in the reception center. He was diagnosed with Depressive Disorder, NOS, but was not treated with psychotropic medications at the time of the monitoring visit.

This inmate was transferred from county jail to NKSP on August 13, 2004. The information from the county jail indicated that the inmate had a history of recent treatment with Risperdal and Wellbutrin. Inmate J received a mental health screening on August 17, 2004 and was cleared for general population. A MH-7 was completed on August 25, 2004, which reported that the inmate complained of situational depression regarding his parents' deaths earlier in the year. Inmate J was placed at a 3CMS level of care for medical necessity at that time. The psychologist also indicated that the inmate needed a psychiatric evaluation, but there was no documentation that he had been seen by the time of the monitoring visit.

Assessment:

This inmate arrived at NKSP on Risperdal and Wellbutrin, but he had not yet been seen for psychiatric evaluation and medications had not yet been ordered for him. This information was conveyed to the chief psychologist for resolution.

An MH-7 and a mental health screening were conducted in a timely manner.

11.     Inmate K

This 3CMS inmate was housed in general population. He was provided with a provisional diagnosis of Schizoaffective Disorder and treated with Prozac 40 mg/day and Seroquel 300 mg/day.

Inmate K arrived at NKSP on June 11, 2004. He received a mental health screening four days after his arrival. He was seen by a psychologist who completed an MH-7 on June 21, 2004 and noted that the inmate had suicidal ideation and possible cognitive impairment. The psychologist completed a suicide risk assessment finding that the inmate was not currently suicidal, but recommending that the inmate receive one-week

follow-up by a case manager. He also referred the inmate for Clark testing and a psychiatric evaluation.

Inmate K was not seen again for clinical contact until July 9, 2004, when he was seen by a psychiatrist and his medications were adjusted. He was next seen for follow-up on September 8, 2004 by a case manager. The inmate was subsequently transferred to the general population yard. On September 15, 2004, the inmate's case manager completed a suicide risk assessment, as well as an MH-4, detailing the inmate's history of treatment and indicating that he was at low risk for suicide. The inmate was last seen in an IDTT meeting, at which time a recommendation made to continue him in the 3CMS program.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were present in the chart.

- The inmate had been treated briefly with Depakote and appropriate laboratory testing was present in his medical record.

- It was a matter of concern that this inmate was seen for a mental health evaluation and a recommendation was made for clinical follow-up in one week, which did not occur. This was particularly disturbing in view of the clinician's concern regarding the inmate's possible suicidal ideation.

- There was documentation of case management contact in general population at least every 90 days.

- A timely IDTT meeting was conducted for Inmate K in general population, but there was no psychiatrist present at that meeting.

12.    Inmate L

This 3CMS patient was housed in general population. He was diagnosed with Depressive Disorder, NOS and treated with Seroquel 300 mg/day.

Inmate L had been housed at NKSP since February 2004. It appeared that he was placed on the 3CMS caseload on February 9 of that same year. Progress notes indicated that the inmate was essentially stable on medications during the monitoring period.

Assessment:

The following comments were noted regarding the mental health care provided to this inmate:

- Informed consent forms for treatment with psychotropic medications were present in the inmate's medical record.

- There was documentation of quarterly case manager contact in the inmate's chart.

- Psychiatric contacts were consistently documented.

- It appeared that the inmate's Seroquel prescription had expired on September 14, 2004. This information was forwarded to the chief psychologist for follow-up.

- A review of the inmate's MARs for the months of July and August 2004 indicated that Inmate L was consistently non-compliant with his medications. The progress notes did not mention the inmate's medication non-compliance nor was there any evidence in the chart that the inmate had been referred to mental health by the MTAs.

- There were frequent notes in the chart, indicating that the medical record was not available for clinical contacts.

13. Inmate M

This 3CMS inmate was housed in administrative segregation. His medical record was reviewed to determine the frequency of case manager contacts in the segregation unit.

Assessment:

There were some lapses in the documentation of weekly case management contact for Inmate M between June 9 and June 24, 2004 and again between June 28 and August 12, 2004.

14. Inmate N

This 3CMS inmate was housed in administrative segregation. His medical record was reviewed to determine the frequency of case manager contacts in the segregation unit.

Assessment:

Inmate N was seen on a weekly basis by a case manager while in administrative segregation.

15 Inmate O

This 3CMS inmate was also housed in administrative segregation. His medical record, too, was reviewed to determine the frequency of case manager contacts in that unit.

Assessment:

Inmate O was seen on a weekly basis by a case manager in administrative segregation.

EXHIBIT O

California State Prison, Los Angeles County (CSP/LAC)

December 1, 2004 – December 3, 2004

1.    Inmate A

This inmate had been treated in the EOP program at CSP/LAC throughout the monitoring period. He was treated for Major Depressive Disorder, without psychotic features, and maintained on a regimen of Risperdal and Effexor. The inmate was non-compliant with Effexor throughout the month of October. His MAR clearly recorded no shows and refusals. An IDTT meeting was convened regarding the inmate's non-compliance. Laboratory tests were ordered; results were obtained within five days and reviewed by a psychiatrist at the next follow-up appointment, approximately two weeks later.

The inmate's UHR contained notes of weekly case management contacts, nearly all of which were made in the dayroom. Issues of emotional concern were discussed during these meetings and appropriate responses elicited. Group attendance records for the months of April, June, and July were in the UHR. These records indicated that the inmate was offered over 14 hours of treatment weekly; the records also contained annotations regarding the number of therapy hours that were completed, the number of hours that were refused by the inmate and number of groups that were cancelled by staff. Excused inmates absences were also documented. The inmate's UHR contained no records of group therapy since July.

Assessment:

This inmate's mental health treatment met program guide requirements, except for the lack of documentation regarding structured therapeutic activities since July.

2.    Inmate B

Inmate B was treated in the EOP administrative segregation unit. He had diagnosed with Adjustment Disorder with mixed moods, ASPD and, according to a treatment plan written six months earlier, Post-Traumatic Stress Disorder and Major Depression with psychotic features. He had a history of head trauma and alcohol abuse. The inmate's recent treatment plans were individualized regarding problems and targets, but generic in terms of interventions and modalities.

In November 2004, Inmate B was medicated with Thorazine 100 pm, Mirtazapine 30 hs and Sertraline 150. According to the October MAR, the inmate's evening medications were administered at 6 p.m. and his HS medications were administered at 8 p.m. The inmate's medication refusals were noted by the nurse or MTA.

IDTT meetings were held quarterly for the inmate. The two most recent meetings were attended by a full interdisciplinary team. Single cell status was considered and recommended.

In October and November, the inmate attended all or nearly all the structured therapeutic activities that were offered to him in administrative segregation. He attended two hour-long group meetings in the morning and in the afternoon three days per week. He also

2

used the yard and participated in structured therapeutic activities on the weekend. Inmate B was seen weekly by a case manager. He was seen out-of- cell, but not in a confidential setting. The inmate typically completed more than ten hours of therapeutic activities each week.

Documentation of this inmate's treatment was complete and contained clinical information indicating that he had discussed issues of emotional concern with the mental health staff. Inmate B was seen at least monthly by a psychiatrist. Weekly psych tech notes were particularly informative. The inmate was consistently described as being in emotional distress during much of the past six months.

Inmate B was admitted to the MHCB unit once, for a two-day stay in June 2004. According to the inmate's MHCB record, Inmate B was found unconscious in his cell on June 1, 2004. He responded quickly to ammonium; although initially disoriented, his vitals and glucose were WNL. A nasogastric flush found no evidence of pills. Laboratory tests found no indication of illicit substance use, intoxication or benzodiazepines. The inmate recovered rapidly and was discharged from the MHCB unit within two days. Documentation in his chart showed that he received five-day follow-up upon discharge from the unit.

Inmate B was reportedly upset about the loss of his case manager of two years. He discussed that loss in subsequent individual sessions.

A medical consult was triggered by his reports of chest pain, pounding headaches and left hemi-sensory numbness. A neurology consult was also initiated.

Assessment:

This inmate's mental health treatment conformed to program guide requirements. His medication non-compliance was well documented.

The inmate was housed in administrative segregation pending transfer to a different Level IV EOP program. He was not found guilty of committing a disciplinary infraction, but was retained in segregation because he was believed to pose a threat to other EOP inmates.

3.     Inmate C

Inmate C was housed in the administrative segregation unit. In June 2004, he had been treated at the 3CMS level of care for an Adjustment Disorder. A review of his most recent treatment records indicated that the inmate had been treated at the EOP level of care at least since August 2004. There was, however, no chrono in the chart, showing when the inmate's level of care changed from 3CMS to EOP. Inmate C had a diagnosis of Mood Disorder NOS. He was medicated with Remeron 45 and Risperdal 1 bid. His regimen was changed recently in response to his reports of side effects.

3

In July 2004, Inmate C was in the MHCB unit on an extended suicide watch, precipitated by the presence of a noose, but no marks, around his neck and self-reported razor ingestion. His stay in the MHCB unit exceeded ten days. The inmate was released with a step down chrono to C-Yard on July 26, 2004.

His medication regimen was changed in September when he reported side effects. In the same month, he also expressed concerns about having a cellmate.

Inmate C attended group treatment and met with his case manager in the EOP program in October. He was scheduled for a transfer to D-Yard around October 21, 2004. About this time, he complained of receiving a written death threat associated with his imminent release from "initial status." He reacted by giving the note to an officer and by throwing bodily fluids out of his cell. He also exhibited a noose that was tied around his neck and around a light fixture. He agreed to petition for a transfer to administrative segregation.

The inmate was treated at the EOP level of care in administrative segregation in November. He attended group therapy, participated in structured yard time and met individually with a case manager. During a typical week in November, according to UHR documentation, Inmate C participated in at least 13 hours of structured therapeutic activities. Progress notes reflected the content of his group therapy sessions and contained relevant clinical information regarding the inmate's mental health.

Assessment:

This inmate's mental health treatment in the general population EOP program and in the EOP administrative segregation unit was consistent with program guide requirements. Documentation regarding the date his level of care changed, however, was missing from the chart.

This inmate's case had parallels with certain cases of completed suicides by inmates who were neither exceptionally depressed nor severely mentally ill, but who expressed pronounced fears for their personal safety. The respective roles of mental health and security were not easily distinguishable in this inmate's history. Inmate C expressed concerns regarding his personal safety over a period of four months. During that time, his level of care went from 3CMS to EOP. His behavior was, at times, extreme and could have been perceived as intended to draw attention to his safety concerns.

4.     Inmate D

Inmate D was treated at the EOP level of care. He had a current Keyhea order, but his UHR was not very informative regarding his recent psychiatric treatment.

Case factors indicated that Inmate D was serving a life sentence for an unusually severe offense. He had no pending charges, but erroneously reported that he had open cases for homicide. He also verbalized grandiose delusions, regarding his accomplishments in the free world.

4

At the time of the monitoring visit, Inmate D was prescribed Geodon 160, with an IM backup due to his Keyhea status. The inmate's MARs indicated that he was largely compliant with his medication for the past four months. Prior to that, the inmate was largely non-compliant with his medication in March and April. Refusals were well-documented on the MARs.

Although the inmate's treatment plan was individualized and updated quarterly, he was enrolled in therapy groups that did not match those on his plan. Progress notes indicated that the inmate participated actively in group therapy most of the time. He was seen quarterly by a psychiatrist.

The inmate's UHR contained indicators that he had required acute care and that he was, in fact, recently treated in an MHCB unit or at DMH or both. Despite this, there were no definitive records of recent inpatient treatment. The inmate may have had acute care admissions in March and April of 2004, but the records of his treatment during that time were incomplete or missing from his UHR. Similarly, although the inmate may have been transferred to DMH in June or July of 2004, the records associated with those moves to and from acute care were also deficient. The UHR did not contain a discharge summary from DMH or a note indicating that the inmate had gone there for treatment. The only reference to the possibility that the inmate had been in an acute care facility was a note on the MHCB record indicating that he was referred for acute care.

During this monitoring period, UHR documentation suggested that the inmate was housed mostly in the general population and, at times, in administrative segregation. The inmate's movements between the general population EOP and the EOP administrative segregation unit were not explained by any notes in his UHR. It was not possible to glean even basic information, such as the date of any housing location change and the length of stay in administrative segregation, from the information in the chart.

Inmate D attended structured therapeutic activities in general population in July and in administrative segregation during some portions of October and November, but the number of hours of therapy that the inmate actually received was not readily discernable. Inmate D met weekly with his case manager and also participated regularly in yard activities in November. As recently as November 19, 2004, Inmate D discussed issues of personal concern with his case manager, including feeling pressured to accept a cellmate. He reported believing that staff discriminated against him due to his Christianity. In a departure from his typical behavior, the inmate refused to attend groups during the last week of November.

A rough history of Inmate D's recent psychiatric treatment indicated that he was admitted to the MHCB unit in May 2004 for psychosis, after he exhibited mutism, and a Keyhea hearing was initiated. Following a stay of four days, the inmate was discharged with orders for five-day follow-up and a plan for referral to DMH.

According to the MHCB discharge summary, the inmate's condition had deteriorated over a period of six months. He had refused medication for the preceding six weeks and had withdrawn from EOP activities. As early as February, he was the subject of urgent staff referrals because he was directing urine outside his cell toward passersby. He also shouted incomprehensible language for hours at a time. Mental health staff described him as bizarre, threatening and unapproachable. He was escorted to the clinic and stat medication was administered.

Inmate D was elsewhere in March and April, but there were no clinical notes in his UHR during that span of time. When documentation resumed in May, the inmate was described as mute, unresponsive and unhygienic. He also refused to participate in EOP activities.

After another gap of several weeks in clinical documentation, notes dated May indicated that Inmate D was in administrative segregation, being treated at the EOP level of care. He attended group therapy sessions, but was not very interactive. By July, his presentation had changed to "talkative" and "pressured."

Little conclusive documentation regarding treatment at a higher level of care was available in the UHR. Subjective reports provided orally by a clinician indicated that the inmate was treated by DMH at Vacaville for a month.

Assessment:

Documentation regarding this inmate's recent psychiatric treatment, particularly treatment provided in a hospital setting, was poor. The course of the inmate's illness was difficult to discern in the absence of complete records, but it appeared that he had been very ill during much of 2004. Incomplete records compromised the ability of mental health staff to provide appropriate treatment. Although Inmate D seemed to be doing a bit better at the time of the monitoring visit, he continued to express grandiose delusions and had, in the last week, begun refusing to engage in therapeutic activities. The inmate's condition warranted more targeted and intensive treatment.

Custody staff reported that he the inmate did not have an open case.

5.      Inmate E

Inmate E was treated at the EOP level of care. He was diagnosed with a Delusional Disorder, grandiose type. He was described as exhibiting religiosity and having no insight into his illness.

The inmate had a current treatment plan written in the context of an IDTT meeting, which was attended by a full interdisciplinary team. He was treated with Geodon and Effexor in July, but soon thereafter refused psychotropic medication. The inmate attended several EOP therapy groups weekly, participated in recreational therapy and met with his individual case manager.

6

Inmate E's release date was January 26, 2005. The mental health staff at CSP/LAC had tried to make psychiatric appointments for the inmate at the VA, but no contact by a TMCP social worker was documented in the UHR. The inmate's crystallized delusions impeded his ability to participate appropriately in discharge planning. His delusions regarding the CIA were an impediment to his willingness to allow the VA to be contacted on his behalf.

Recent clinical notes described the inmate as grandiose, delusional, highly religious, lacking in insight and articulate.

Assessment:

This EOP inmate apparently had an imminent release date, but had not been seen by a TCMP social worker. His mental health treatment met EOP program guide requirements.

6.     Inmate F

Inmate F was awaiting transfer to a different institution for custodial reasons and was housed in administrative segregation pending his transfer. At his request, he was seen in administrative segregation briefly for a non-confidential interview by the monitor's expert. He had been treated for a short time at the EOP level of care in April and May, but was soon determined to require only a 3CMS level of care. He remained at the 3CMS level of care in administrative segregation at the time of the monitoring visit.

Progress notes indicated that the inmate felt stressed by other inmates, cut himself, received a RVR for self-mutilation and was placed in administrative segregation in June 2004. Due to transfer delays, Inmate F's case was discussed during a joint mental health and custody rounds meeting held in the administrative segregation unit. Custody and mental health staff were aware of the inmate's security and mental health issues and attempted to expedite his transfer to another institution.

Inmate F had a diagnosis of Schizoaffective Disorder, bipolar type, and a recent GAF of 60. He was seen frequently by the mental health staff. According to the inmate's history generated by the MHTS, the inmate was offered at least weekly visits by a case manager and monthly contact with a psychiatrist but, according to the inmate's UHR, he received no further mental health treatment. Half of the inmate's case management contacts were recorded as cell-front. Out-of-cell contacts in the administrative segregation unit were typically made in mesh holding cells on the floor of the common area. Due to environmental factors, among them nearby foot traffic, these clinical meetings were not typically confidential.

There was a gap in the inmate's medication administration in August and September 2004 that was due to routing or filing problems with his written medication orders. Inmate F was being treated with Remeron and Paxil, but his order for Remeron, which was written for only 30 days, expired. The Remeron prescription order was missing from

the inmate's UHR but, according to a MAR and a subsequent psychiatric note, the inmate had received Remeron for one month. The inmate was restarted on Remeron and followed-up within 60 days, as indicated by the prescribing psychiatrist. The interruption in medication was approximately two weeks in duration.

Assessment:

This inmate's mental health treatment largely conformed to program guide requirements, but there were lapses. The inmate's medication administration was interrupted for approximately two weeks and his case management contacts were not held in a confidential setting.

7.      Inmate G

Inmate G had been treated at the 3CMS level of care for at least several months preceding the monitoring visit. He was considered for a change to an EOP level of care at a recent IDTT meeting, but was retained in the 3CMS program. In addition to considering the inmate for a higher level of care, the record indicated that he was recently considered for single-cell status. The question of single-cell status, however, was not mentioned again in the UHR.

A cursory review of Inmate G's psychiatric treatment for the past six to seven months indicated that the inmate's level of functioning had shown signs of deterioration. On June 22, 2004, Inmate G walked away from a mental health appointment that had been initiated by a referral. He was located and seen by a clinician. The inmate was described as hostile at that time. Subsequently, he was seen twice by a case manager and at least twice by a psychiatrist during the third quarter of 2004. During that time, progress notes and an AIM checklist indicated that the inmate exhibited involuntary movements of his lips and jaw. He also paced in his cell, which irritated his cellmate. Inmate G repeatedly asked clinicians to help him obtain a single cell. In September, he reported to his case manager that his cellmate had complained that Inmate G was "standing over him."

A psychiatrist who saw the inmate on October 7, 2004, in response to a staff referral, decided to continue with his current regimen. Later progress notes, written in November, indicated that Inmate G was not doing well. He reported experiencing sleep disturbance and pacing in his cell. He exhibited tangential speech and impaired cognitive functioning. Notes dated November 4 and November 17, 2004 indicated that the staff plan was to try to stabilize Inmate G with medication and continue to treat him at the 3CMS level of care.

Assessment:

The mental health staff was not sufficiently responsive to this inmate's apparent problems over an extended period of time. It was likely that Inmate G was functioning at the low end of the 3CMS range and at the high end of the EOP range. He might have been able to live successfully in the general population at the 3CMS level of care with appropriate

8

mental health treatment and a favorable combination of environmental factors. As his illness waxed and waned, Inmate G's ability to adapt to his immediate environment changed and he required treatment of different levels or intensity. Alternatively, he might have been maintained successfully at a lower level of care, if his environment had been a hospitable one.

The 3CMS mental health staff did not adequately consider whether individual factors warranted a recommendation in favor of single-cell status for this inmate. When staff was asked about the single-cell matter in regard to this case, it was reported that Inmate G, or any other inmate on the mental health caseload, would have to have a GAF of less than 50 to warrant a single-cell recommendation and that a GAF that low would automatically result in a transfer to the EOP caseload. Since the team decided to retain this inmate in the 3CMS program, the single-cell matter was rendered moot without further discussion. Therefore, the resolution of the matter was not documented explicitly in the UHR, as it had been resolved implicitly in accordance with standard operating procedures in the 3CMS program.

8.    Inmate H

Inmate H had been treated at the 3CMS level of care for a few months preceding the monitoring visit. Prior to that, as recently as May, or possibly as late as August, 2004, the inmate was treated at the EOP level of care. He had been in administrative segregation for at least the last eight months. IDTT meetings were held on a quarterly basis for this inmate, but one of the resulting treatment plans was written several weeks later. The diagnoses listed on the inmate's treatment plans were incomplete, as recent plans did not include the inmate's Compulsive Sexual Disorder.

Documentation in the inmate's UHR indicated that the inmate's behavior posed severe difficulties to some EOP clinicians and at least one clinician had gone on record as refusing to work with the inmate. Documentation indicated that Inmate H had a history of assault and posed a threat to staff.

The change in this inmate's level of care was made in the context of an IDTT meeting attended by a full interdisciplinary team. The inmate was given a diagnosis of Impulse Control Disorder, NOS, with a GAF of 50. The inmate's Paxil was discontinued at his request in September and restarted in November also at the inmate's request.

According to a review of the inmate's C-file, Inmate H incurred seven RVRs associated with exhibitionistic and other inappropriate sexual behavior between May 25 and July 12, 2004. Mental health evaluations, conducted in connection with all of the infractions, concluded that the inmate had a Compulsive Sexual Disorder that influenced his behavior. The only sanction imposed on the inmate was a 90-day loss of credit time. Most charges were invalidated by due process violations involving timeframes.

Assessment:

Based on a review of the UHR, this inmate's condition in recent months appeared no different than his behavior earlier in 2004. Inmate H appeared to be functioning at a low level, repeatedly incurring disciplinary infractions. Treatment in administrative segregation at the 3CMS level of care conformed to program guide requirements, except that clinical contacts may have lacked privacy. IDTT meetings were held quarterly and level of care changes were made within the context of those meetings. Disciplinary documentation was present in the inmate's UHR and mental health assessments related to the inmate's infractions provided relevant information. Sanctions against the inmate were mitigated based upon mental health input in one instance.

In light of the inconsistent diagnoses concerning this inmate's sexual behavior and the evident impairment in his ability to adjust to routine conditions of incarceration, Inmate H should have been referred to an intermediate care facility for diagnostic clarification, and, if warranted, treatment of a compulsive sexual disorder.

9.      Inmate I

Inmate I was treated at the EOP level of care in administrative segregation at the time of the monitoring visit. Review of his UHR confirmed the inmate's reluctance to move from the EOP to the 3CMS level of care. This inmate's level of care was changed twice recently in the context of IDTT meetings. He was treated at the EOP level of care, discharged to the 3CMS program, transferred back to the EOP caseload, housed again in the EOP general population unit briefly and then moved to administrative segregation.

After stating that he was reluctant to leave the EOP program, Inmate I was retained at the EOP level of care and moved to administrative segregation housing. The inmate attended therapy groups while in the EOP administrative segregation unit and received case management contacts. He discussed issues of emotional concern with the case manager, including his perception that he was segregated for no reason.

Inmate I was currently medicated with Geodon, Haldol, Cogentin and Benadryl. MARs indicated that his medication compliance was generally good over the past two to three months.

The inmate's UHR did not contain documentation of recent psych tech rounds. There was, however, an excellent psych tech note made recently, containing informative clinical information.

Assessment:

This inmate's mental health treatment in general population and in administrative segregation conformed to EOP program guide requirements, with the exception of missing documentation of psych tech rounds and possibly the lack of confidentiality

during individual case management contacts. Mental health staff attributed the absence of psych tech notes to medical records problems.

10.    Inmate J

Inmate J was treated at the EOP level of care and housed in general population. According to the inmate's history from the MHTS and his UHR, Inmate J saw his case manager weekly, met monthly with a psychiatrist and attended several therapy groups weekly. He also used the yard.

He was treated for a Mood Disorder, NOS, with Risperidone and Lithium. His compliance with his medication regimen was good for the past few months, but the inmate had experienced a period of instability. Progress notes indicated that his medication was expiring in April and again in May 2004 and that new orders were written.

Progress notes also indicated that the inmate needed Lithium level testing in May and that he experienced a dystonic reaction in June 2004. During June, July, and August, progress notes described the inmate's mood as labile and irritable. In July, Inmate J expressed concerns about his personal safety to his case manager, who discussed with him how to distinguish real from perceived threats. The inmate incurred a disciplinary infraction late in May, two more in mid-August and a fourth in September. In October, he was described as reporting poor sleep and exhibiting pressured speech. He incurred a fifth disciplinary infraction recently, around November 29, 2004. A progress note dated November 18, 2004 described the inmate's manner as agitated and hostile and indicated that his cognitions were paranoid. Progress notes written during the past six months also described him as socializing well with other inmates in the yard and as advocating effectively for himself.

The documentation in the inmate's UHR concerning laboratory testing was not clear. Although there was an indication in the chart that laboratory tests were ordered in July, results were either not obtained or obtained for a different inmate, but filed in the inmate's UHR.

Assessment:

Inmate J was not stable and incurred a number of disciplinary infractions. It was unclear whether his medication regimen had been managed appropriately, but there were signs that it had not been. It was not possible to reach a conclusion regarding the adequacy of monitoring Inmate J's Lithium levels, due to the presence of conflicting documentation in the UHR.

11.    Inmate K

Inmate K was treated in the administrative segregation unit at the EOP level of care. He was also designated as developmentally disabled, with a cognitive impairment that had a

detrimental impact on his level of adaptive functioning in a correctional environment. He was treated for Schizoaffective Disorder. He was described as delusional in July 2004 and was also said to be paranoid, depressed and anxious. The inmate incurred a RVR for battery on an officer.

Inmate K's medication regimen included Trazodone and Risperidone at the time of the monitoring visit. In response to the inmate's reports, his medication had been adjusted during the past 16 weeks and the rationales for these adjustments had been documented.

When seen by the monitor's expert in a group interview, Inmate K appeared to be under stress. He told the expert that he had filed many 602s about matters that were unsatisfactory to him and felt that retaliation was inescapable. He was neatly dressed, well groomed and spoke articulately.

Review of the inmate's history from the MHTS and his UHR indicated that he received a great deal of EOP treatment. Inmate K attended several therapy groups weekly, used the yard and met with his case manager regularly. His treatment was well documented. IDTT meetings were held quarterly for Inmate K. The inmate's level of care was changed from 3CMS to EOP in August 2004. A single cell was recommended for the inmate in September.

There was a poor degree of concordance between medication orders shown on the MHTS inmate history and the orders written in the inmate's UHR.

Assessment:

This inmate's level of functioning had deteriorated despite intensive treatment. He was unable to cope with environmental stressors and his mood disorder. He needed to be referred to a higher level of care or housed in an environment to which he could adapt.

12.    Inmate L

This inmate was returned to CSP/LAC from DMH around October 21, 2004. He was sent to acute care in June following a stay of about 30 days in the MHCB unit at CSP/LAC. He was non-compliant with his medication prior to admission to the MHCB unit and had been involved in a fight about two weeks earlier.

Inmate L had a diagnosis of Schizophrenia, undifferentiated type, and a designation as DD2. The DD2 designation implied that he was cognitively impaired to the extent that his ability to conform his behavior to correctional routines unaided was poor; as a result, he was supposed to receive prompting, monitoring and extra supervision.

Inmate L was housed in administrative segregation immediately upon his return to CSP/LAC, where he was treated at the EOP level of care. Within a week, he was described in progress notes as delusional, refusing to attend groups and unresponsive to staff. He reportedly said that he wanted a single cell. An IDTT meeting was held for the

inmate in a timely manner. Three weeks later, one month after Inmate L's return from acute care, a psychiatrist noted that an order for Haldol IM, written upon the inmate's return to CSP/LAC, had never been administered.

Assessment:

The treatment provided to this seriously mentally ill, mentally retarded, low functioning inmate was inadequate in May, before he was sent to DMH, and remained so during the month since his return.

13.    Inmate M

According to the MHTS, Inmate M was referred to DMH, but there was no information in the inmate's UHR regarding the referral, such as the date it was made or the outcome. The inmate was treated at the EOP level of care for Bipolar I Disorder, most recent episode depressed, severe, without psychotic features. He was treated with Paxil and Zyprexa. He appeared to be doing well at the time of the monitoring visit.

In September 2004, Inmate M asked to be moved to the 3CMS level of care, but was retained at the EOP level of care by his treatment team. A large number of treatment refusals were recorded on the MHTS summary, but were not mentioned in the case management notes. Inmate M participated in two to three therapy groups weekly, used the yard and met with his case manager regularly. IDTT meetings were held for the inmate at least quarterly.

Assessment:

Inmate M experienced a rough transition from acute care back to the EOP program earlier in 2004, which was complicated by discontinuity of medication and inadvisable changes in his medication regimen. Despite this, the treatment provided during the past six months was consistent with program guide requirements and appeared to benefit the inmate. There were inconsistencies between the data in the MHTS and the clinical documentation regarding Inmate M's level of participation in treatment.

EXHIBIT  P

California Correctional Institution (CCI)

November 8, 2004 – November 10, 2004

1.    Inmate A

This inmate was seen by the monitor's expert in a group interview and reported good access to his case manager and psychiatrist.  He generally had favorable comments regarding the mental health services offered at CCI.

The mental health record of this inmate was reviewed.  The following elements of his clinical record were present:

| A CCI bus screening dated June 18, 2003 | The most recent treatment plan dated June 9, 2004, the quality of which was good, except for interventions | Quarterly case management contacts dated April 20, June 9, September 3, October 12, October 15 and October 28, 2004 | An IDDT meeting dated June 16, 2004 | Regularly documented psychiatric contacts | Current consent forms | Current legible MARs |
|---|---|---|---|---|---|---|

Assessment:

This inmate had good access to mental health care, which had increased in frequency due to recent family deaths.

2.    Inmate B

This inmate reported infrequent contacts with his case manager.  He was also displeased with the medications that had been prescribed for him by his psychiatrist.

The mental health record of this inmate was reviewed.  The following elements of his clinical record were present:

| A CCI bus screening dated May 1, 2003 | The recent treatment plan dated August 6, 2003, the quality of which was adequate | Well documented quarterly case management contacts dated April 21, June 16, September 3, October 15 and October 22 | An IDDT meeting dated December 2, 2003 | Good regularly documented psychiatric contacts | Current consent forms | Current legible MARs |
|---|---|---|---|---|---|---|

Inmate B received treatment for a depressive disorder.  He subsequently declined psychotropic medications due to side effects.  He received regular case management visits for monitoring purposes.

2

Assessment:

This inmate's IDTT meeting was not timely and his treatment plan was outdated. His case management and psychiatric contacts, however, were timely and clinically appropriate.

3.      Inmate C

This inmate was not very talkative during a group therapy session attended by the monitor's expert. He acknowledged that he had not experienced any problems with continuity of medication, but described fairly infrequent contacts with his case manager.

The mental health record of this inmate was reviewed. The following elements of his clinical record were present:

| A CCI bus screening dated May 12, 2003 was noted during an IDTT meeting, but not present in the second volume of the chart | The most recent treatment plan was not present in the second volume of the chart, although an inmate contact sheet indicated that the treatment plan was completed in May 2002 | Well documented quarterly case management contacts dated April 28, July 21, September 2 and September 10 | An IDDT meeting dated May 12, 2004 | Good, regularly documented psychiatric contacts | Current consent forms | Legible MARs, using the old forms |
|---|---|---|---|---|---|---|

Assessment:

This inmate received timely and clinically appropriate contacts with his case manager and psychiatrist. The inmate's treatment plan had not been updated in a timely manner. It was unclear why the institution was still using the old MAR forms.

4.      Inmate D

This inmate described poor access to mental health clinicians, but was vague about the actual frequency of his contacts. The mental health record of this inmate was reviewed. The following elements of his clinical record were present:

| A CCI bus screening dated September 3, 1999 | The most recent treatment plan dated September 15, 2003, which was too generic | Well documented quarterly case management contacts dated April 21, April 23, July 14, October 15, October 22 and October 26 | An IDDT meeting dated June 2, 2004 | Psychiatric contacts had not occurred since March 2003 as the inmate was no longer on medication and had not shown up for a follow-up appointment on November 3, 2004 | Current consent forms | MARs were not relevant to this inmate's treatment, since he was no longer on medication |

Assessment:

This inmate had been diagnosed with a Major Depressive Disorder in remission. He was receiving timely mental health follow-up.

5.      Inmate E

This inmate was very negative concerning his access to mental health services. He described very infrequent contacts with his case manager and psychiatrist.

The mental health record of this inmate was reviewed. The following elements of his clinical record were present:

| A CCI bus screening dated March 5, 2003 | The most recent treatment plan dated August 8, 2003, which was too generic | Quarterly case management contacts dated June 9, October 15 and October 22 | An IDDT meeting dated May 5, 2004 | Psychiatric contacts had not occurred since October 15, 2003; the inmate last received medication on November 3, subsequently refusing his medications, which were then discontinued | Current consent forms | Legible MARs |

4

Assessment:

Inmate E's diagnosis was Depressive Disorder, NOS in remission. The frequency of clinical contacts reported by this inmate was consistent with the expert's UHR review, but the inmate had recently been refusing clinical contacts. This inmate's mental health care did not meet program guide requirements.

6.    Inmate F

Inmate F was quiet throughout a group interview with the monitor's expert. The inmate's health record was reviewed. The following elements of his clinical record were present:

| A CCI bus screening dated October 2, 2001 | The most recent treatment plan dated August 2, 2003, which was too generic | Quarterly case management contacts dated April 21, July 14 and October 15 | An IDDT meeting dated May 5, 2004; a note in the chart indicated that a treatment plan had been reviewed, but the plan was not located in the chart | Good, regularly documented psychiatric contacts | Current consent forms | Legible MARs, using the old forms |
|---|---|---|---|---|---|---|

Assessment:

Except for lack of an updated treatment plan, this inmate was receiving mental health services consistent with program guide requirements.

7.    Inmate G

The mental health record of this SHU inmate was randomly selected for review by the monitor's expert. The most recent treatment plan in the inmate's chart was dated April 14, 2004. Inmate G was diagnosed with Major Depression with psychotic features and treated with Risperdal and Prozac. The inmate's treatment plan was not adequately individualized.

Documentation of daily psych tech rounds was present in the inmate's UHR. This inmate also had regular contacts with a psychiatrist and a case manager, although most of the case manager contacts appeared to be at cell-front. Inmate G's most prominent symptom had been paranoid thinking and his most significant concern was to remain housed in a single cell.

5

<u>Assessment:</u>

Given this inmate's psychotic features and his placement in the SHU, it was unclear why he had not been considered for a higher level of mental health care.

8.    Inmate H

The mental health record of this SHU inmate was randomly selected for review by the monitor's expert. Inmate H's treatment plan was updated on August 17, 2004, but was generic. He was diagnosed as having a Schizoaffective Disorder (depressive type).

On May 11, 2004, Inmate H reported the presence of auditory hallucinations and paranoid thinking. Seroquel was prescribed on May 17, 2004, following a psychiatric assessment. An IDTT meeting was held for the inmate on May 18, 2004. Another IDTT meeting was held on June 15, 2004, due to the inmate's continued psychotic symptoms. At that time, Inmate H was assessed to require an EOP level of care

Inmate H was transferred to the EOP program at CSP/LAC during July 2004. His condition was noted to be worsening at the end of July. An August 9 treatment plan indicated that the inmate had stabilized with increased clinical contacts and now required a 3CMS level of care. The inmate was transferred back to CCI on August 25, 2004.

Progress notes dated October 18 and November 1, 2004 indicated that the inmate appeared lethargic and was again complaining of increased auditory hallucinations. Documentation of daily psych tech rounds was present in the inmate's chart.

<u>Assessment:</u>

This inmate's deteriorating clinical presentation was identified appropriately and he was transferred to an EOP program, where he significantly improved. He subsequently returned to CCI on a 3CMS level of care and appeared to be gradually decompensating again, which was most likely related to the nature of his segregated housing environment. Inmate H needed close monitoring and possibly a transfer back to an EOP setting.

9.    Inmate I

The UHR of this administrative segregation inmate was selected at random for review by the monitor's expert. The inmate's most recent treatment plan was dated October 18, 2004. The content of his treatment plan was generic in nature.

Inmate I was diagnosed as having a Polysubstance Dependence and Antisocial Personality Disorder. The inmate's diagnoses were not consistent with the diagnoses documented in his progress notes. A June 10, 2004 note by the psychiatrist indicated a history of depression and psychosis. According to this note, the inmate suffered from a Psychotic Disorder, NOS and

Depressive Disorder, NOS which were in fair remission. The inmate's medications included Seroquel and Zoloft.

Inmate I was found to be doing well by a psychiatrist on September 3, 2004. He was again seen by a case manager during weekly administrative segregation rounds on October 1, 2004. An individual out-of-cell cell contact with the case manager occurred on October 18, 2004. An IDTT meeting was conducted for Inmate I on October 27, 2004.

Assessment:

Although this inmate was clinically doing well, he was not receiving case management contacts in a manner consistent with program guide requirements. In addition, the inmate's most recent treatment plan was not consistent with the information consistently documented in his recent progress notes.

EXHIBIT  Q

<u>California Institution for Men (CIM)</u>

August 23, 2004 – August 25, 2004
December 13, 2004 – December 14, 2004
March 14, 2005 – March 15, 2005

1.    Inmate A

The mental health record of this inmate was reviewed with a focus on progress notes written since June 2004.  Inmate A had a positive bus screening dated June 9, 2004 and was seen by a psychiatrist on June 14, 2004, at which time Geodon was prescribed.  The inmate was then transferred to the East Yard on June 22, 2004.

Inmate A was subsequently admitted to the MHCB unit on June 29, 2004, due to psychotic symptoms.  He was discharged by July 6, 2004 and received appropriate and timely follow-up by both a psychologist and psychiatrist.

Inmate A had received his medications via a Keyhea order from September 2003 through March 2004 at CMC.

Assessment:

It was not clear whether Inmate A received his psychotropic medications in a timely fashion.  Based on a review of the inmate's UHR, including his MARs, it appeared that he did not receive his first dose of Geodon until June 14, 2004, five days following his admission to the institution.  This gap in medication most likely contributed to his subsequent admission to the MHCB unit.

2.    Inmate B

This inmate's March 17, 2004 bus screening was positive from a mental health perspective.  The inmate was seen by the monitor's expert in a group interview, at which time he reported that he felt his clinical contacts were helpful.  Review of his UHR documented that Inmate B was seen on a regular basis by mental health staff; his meetings with the psychiatrist were timely.

The inmate was treated in the MHCB unit from May 29 to June 8, 2004, due to the presence of psychotic symptoms.  He received five-day follow-up upon his transfer from the MHC unit.  Documentation of discharge planning was also present in the inmate's chart.

Assessment:

This inmate was receiving appropriate mental health care.

3.    Inmate C

The mental health record of this inmate was reviewed by the monitor's expert.  Inmate B had a bus screening dated March 29, 2004, which was positive from a mental health perspective.  He had been at CIM since March 30, 2004.  Documentation of timely visits by a psychiatrist was present in the inmate's medical record.

2

Inmate B was transferred to the MHCB unit at CIM on June 27, 2004. He received five-day follow-up upon his discharge from the unit. The inmate had received weekly case management follow-up since his MHCB discharge. On August 23, 2004, he was again seen by a psychiatrist, who diagnosed him with Major Depressive Disorder and prescribed medications, including Zoloft and Risperdal.

Assessment:

This inmate had received appropriate mental health treatment at CIM.

4.    Inmate D

This inmate's October 8, 2003 bus screening was positive from a mental health perspective. The inmate's initial psychiatrist assessment resulted in a diagnosis of Polysubstance Dependence with the Axis II diagnosis deferred. The inmate's medical chart was not available for the psychiatrist at that time and medications were not prescribed.

Review of the inmate's MH-4 and MH-7 assessments indicated diagnoses that included Major Depressive Disorder, recurrent, Adjustment Disorder, Alcohol Dependence and Psychotic Disorder NOS.

Inmate D was subsequently placed in the administrative segregation unit around January 2004, where he remained at least through March 2004. On February 23, 2004, the psychiatrist reported that the inmate continued to demonstrate no psychotic symptoms and symptoms of a major depressive disorder. A July 1, 2004 note indicated the inmate was being discharged from 3CMS program.

Assessment:

Inmate D's varied diagnoses were not very well documented in the chart. The inmate's most recent assessment indicated that he was functioning well and no longer needed to receive mental health treatment.

5.    Inmate E

This inmate's September 15, 2003 bus screening at CRC was positive from a mental health perspective. A September 22, 2003 progress note indicated a history of Schizophrenia, paranoid type. During December 2003, Inmate E was noted to be stable without the use of psychotropic medications.

The inmate was seen for a 90-day follow-up visit by his case manager on March 11, 2004, at which time he indicated a desire to be removed from the 3CMS caseload. A June 15, 2004 report described the inmate as exhibiting symptoms of depression, which resulted in a referral to the psychiatrist. According to the case manager's note of June 15, Inmate E was functioning marginally.

3

Following a psychiatric evaluation on June 21, 2004, Inmate E was started on Prozac. The inmate's last clinical case manager note was dated June 28, 2004.

Assessment:

This inmate was receiving appropriate mental health care.

6.    Inmate F

This inmate's June 21, 2004 bus screening was positive from a mental health perspective. A July 14, 2004 progress note indicated that the inmate wanted to be prescribed Seroquel and Wellbutrin in contrast to Risperdal. The inmate's presentation at the time was consistent with Schizoaffective Disorder.

A follow-up psychiatric note dated August 4 indicated that Inmate F was doing well with his medications. He was seen again by the psychiatrist about two weeks later.

Assessment:

This inmate was receiving appropriate mental health treatment.

7.    Inmate G

This 3CMS inmate had been in the reception center for over 90 days. He was seen by a TCMP on July 21, 2005 for a 45-day interview. The inmate had been at CIM until September 25, 2004. He arrived back at CIM on October 8, 2004 and was endorsed to MCSP on February 28, 2005.

Inmate G was treated for Major Depressive Disorder, recurrent. He had a prescription for Remeron in August 2004; new orders for Remeron were written five days after his arrival. The inmate's 90-day Remeron order was due to expire, but it was rewritten by a clinician without inmate contact one week prior to the expiration date. The inmate's MARs indicated that he took his medication continuously during this incarceration.

The inmate was seen by a psychiatrist twice within the first week of his arrival and by a psychiatrist again one month later. He was seen twice more by a psychiatrist on February 16 and March 3, 2005.  Three of the contacts were without benefit of the inmate's UHR; only a floppy chart was provided. No further clinical contacts were documented in the inmate's file. Inmate G's level of functioning appeared to be adequate.

The inmate experienced some delays in receiving mental health services. Inmate G's BPT hearing was on November 11, 2004, five weeks after he arrived at the institution. The inmate's C-file was audited within two weeks on December 4, 2004. There was a significant delay of 11 weeks in endorsement, which was not associated with any particular obstacles; the endorsement process simply did not move forward.

4

Assessment:

Medication continuity was good for Inmate G, despite poor access to his UHR. The inmate had no case management contacts, although his length of stay was more than 150 days.

8.    Inmate H

This 3CMS inmate was in the reception center for over 90 days. He arrived at CIM on December 2, 2004. An intake audit was done on December 15, but the inmate was still awaiting endorsement as of March 9, 2005, over 80 days later. It was likely that the endorsement was delayed pending medical chronos. The inmate's 90-day mental health chrono expired on March 6, 2005, perhaps while the needed medical chronos were being acquired.

No UHR was provided to the monitor's expert. According to the MHTS inmate history, Inmate H had a diagnosis of Bipolar I Disorder, manic, severe, with psychotic features. He was treated with Abilify 100 and Wellbutrin 75 bid, crushed in water. He was seen for an initial intake by a case manager two days after his arrival at CIM. Medication orders were renewed for Inmate H on five occasions to prevent expirations. Three different psychiatrists were listed on the history form and two additional contacts were listed simply as "contract doctor." Without the inmate's UHR, it was not possible to determine whether his medication orders were written by a clinician without inmate contact or whether the inmate was seen by a psychiatrist.

When seen by the expert in a group interview on March 14, 2005, Inmate H was neatly dressed, well groomed but unshaven and able to speak logically. He expressed concern about his endorsed.

Assessment:

The expert could not reach a determination about the adequacy of Inmate H's mental health treatment due to absence of a UHR. The inmate should have had a 90-day case management contact around March 2, but he did not.

9.    Inmate I

This EOP inmate was admitted to CIM on August 12, 2004. He had been in the reception center for nearly seven months. A revocation hearing was held within eight days of his arrival at the institution. Inmate I incurred a 115 disciplinary infraction three weeks after arriving because he allegedly chased another inmate out of the clinic, while beating him about the head with his fists.

The inmate's C-file was audited on September 15, 2004, 12 days after the disciplinary infraction was committed. The disciplinary adjudication, one month following the

offense, resulted in a credit loss of 61 days on October 18, 2004. The last action in the matter was on October 26, 2004, when the inmate accepted an offer and signed an unconditional waiver. He remained in the reception center ten weeks later. An ICC commuted a two-month SHU term on November 23, 2004. The inmate's release date was April 9, 2005.

Inmate I lost 90 days credit for assaulting another inmate in September 2004. His level of care was changed from 3CMS to EOP on September 15, 2004, about ten days after he incurred the infraction. The inmate's mental health assessment concluded that mental health was a factor in the inmate's behavior and that the inmate needed a staff assistant for his disciplinary hearing. The mental health input was considered by the hearing officer and documented on the disciplinary forms.

The inmate's presentation changed little during the past seven months. He had orders for Geodon in September and October, but did not take it. Because of his refusal, his medication orders were discontinued. No medication orders had been written for the inmate since that time. The inmate received many weekly clinical contacts. He refused some and was seen cell front. Inmate I always answered questions in a relevant manner, denied any distress and was polite. Progress notes occasionally pointed to signs of psychosis, such as slowed cognitive processing or appearing to be preoccupied with internal stimuli. A clinical note written in March said that the inmate was psychotic, but guarded, withdrawn, responding to internal stimuli, alert and fully oriented. The inmate denied all problems and was physically aggressive toward other inmates. According to the note, he reportedly urinated and defecated on the floor of his cell.

When interviewed by the monitor's expert in a group on March 14, 2005, Inmate I's affect was bizarre, but he responded appropriately to questions. Other inmates reported that he was victimized by some inmates in his housing area.

Assessment:

Inmate I had for many months needed a higher level of care. Assuming the inmate left the institution on his release date, he would have remained in the reception center for nine months.

In March, staff decided to refer the inmate to the ICF. This was an example of the way in which the threshold for referrals to higher levels of care was changing, but the inmate could not be transferred given that he had only three weeks left to serve on his sentence.

10.    Inmate J

Inmate J was released from CDC on September 7, 2004 and returned to custody just under three months later. He arrived at CIM on December 2, 2004 and was admitted to the hospital. He was described as manic, provided a diagnosis of Delusional Disorder and given Risperdal and Depakote on an emergency involuntary basis. During a Keyhea hearing, the inmate's argument against the involuntary administration of medication was

6

persuasive and his medication was discontinued. He was designated an EOP inmate on December 13, 2004 and had a BPT hearing on January 7, 2005. An audit was completed on January 19, 2005. The inmate had a release date of March 17, 2005.

Inmate J remained in the reception center over 90 days. No UHR was available for review by the monitor's expert, but the record of his hospitalization and a small number of follow-up notes were provided in a floppy chart. There was very little clinical information available about the inmate's level of functioning during the past three months. Inmate J was seen by a case manager once in January and twice in February. He seemed to have a paranoid disorder and religious preoccupations; he was able to express his concerns eloquently. His delusional beliefs were long standing.

When interviewed by the expert in a group on March 14, 2005, the inmate's presentation was markedly unusual. He was neatly dressed, well groomed and responded relevantly to questions, but his demeanor and affect were highly atypical.

Assessment:

It appeared that the inmate was returned to custody because he needed mental health treatment. He did not, however, meet the criteria for a Keyhea order. Although Inmate J remained in the reception center for over three months, he received little or no treatment. His level of functioning needed to be examined to determine whether he should be referred to a higher level of care. Another approach might have been to have consistent weekly EOP contacts to discuss issues of concern to him in a therapeutic manner. There was, however, no good treatment approach available to the institution in this case.

11.    Inmate K

Inmate K was treated at the EOP level of care. He had been at CIM for over three months. The inmate had two very brief admissions to the MHCB unit for suicide ideation. Inmate K was released from the MHCB unit with orders for five-day follow-up and prescriptions for Seroquel and Wellbutrin. His MARs indicated that the inmate was compliant with his medication regimen in January and February. When seen by the monitor's expert in a group interview on March 14, 2005, the inmate was neatly dressed, well groomed and responded logically to questions. He appeared to be fairly high functioning. The inmate expressed concerns about whether he would be allowed to continue his medication regimen, which he said was effective for him.

This EOP inmate had been in the reception center for more than 100 days. He was endorsed to MCSP's EOP sensitive needs yard on February 4, 2004. A bus seat had been requested for Inmate K each week for the past five weeks, but the inmate had not been transferred yet because no beds were available.

Assessment:

This inmate's mental health treatment was adequate. The inmate's endorsement took 60 days, but the inmate's transfer was delayed due to lack of beds at the receiving institution.

12.    Inmate L

This 3CMS inmate had been in the reception center over 90 days. Inmate L arrived at CIM on October 25, 2004 and was immediately designated 3CMS. His C-file was audited on November 23 and his case was assigned to a correctional counselor just over one month later. The correctional counselor completed working on the inmate's case on February 22, about seven weeks later, after obtaining an updated 3CMS chrono, which expired after 90 days. From February 22 though March 19, the case was awaiting CSR endorsement.

The first mental health contact noted in the inmate's UHR was not until almost three months after his arrival. It was not possible to discern how or why this inmate came to the attention of a psychiatrist. There were no mental health contacts in the chart aside from an initial MH-7, a 3CMS chrono and a routine referral to a psychiatrist that was dated soon after the inmate arrived. Inmate L reported that he was in distress and heard voices. Risperdal and Remeron were ordered on February 22, 2005. The inmate was seen for follow-up by a psychiatrist approximately two weeks later.

Assessment:

This inmate's mental health intake was largely adequate, but the inmate was not seen by a psychiatrist until he had been at CIM for three months. A routine referral generated upon intake did not result in contact with a psychiatrist. The inmate received appropriate psychiatric follow-up after the start of medication.
Classification processing was delayed for this inmate by a one-month gap in assigning the case to a correctional counselor, which was followed by a seven-week processing period. Three weeks had elapsed between the completion of processing and a visit by the CSR related to endorsing the case. The inmate was waiting for endorsement as of March 14, 2005, when the case was reviewed by the monitor's expert.

13.    Inmate M

When he came from county jail to CIM, Inmate M reported that he was treated for depression and was taking Lithium, Neurontin, Seroquel and Wellbutrin. The inmate's medication regimen was initially continued at CIM. Medication orders were written the day after he arrived and the first doses were administered two days after arrival. An IDTT meeting was held within two weeks and the inmate was designated 3CMS.

Clinicians at CIM suspected that Inmate M's level of intellectual functioning was well below the average range. MARs indicated that medication continuity was sustained for

this inmate from October 2004 through February 15, 2005. MARs for December 2004 and January 2005 were in the inmate's floppy file that was provided to the monitor's expert for review.

The inmate remained tearful and depressed, although he was medication compliant. His mediation order expired on February 15, 2005; he was seen that day by a psychiatrist and his medication regimen was changed. Seroquel, Neurontin and Wellbutrin were discontinued, but Lithium was retained and Abilify, Buspar and Celexa were added. A progress note indicated that the inmate accepted the new regimen.

When Inmate M was interviewed by the expert in a group on March 14, 2005, he was neatly dressed and well groomed. He responded logically to questions. His affect was angry and intense; his speech was loud. Others in the group reported that the inmate's manner had been calmer in the past and that he was uncharacteristically angry and pressured. The inmate was preoccupied with changes in his medication.

Inmate M reported that he had been doing well on Seroquel and Wellbutrin, but that a psychiatrist saw him and told him his medications were being changed. The inmate felt that the psychiatrist was not familiar with his case and was not interested in obtaining information by reviewing the record or asking him questions. He thought that the psychiatrist had simply called him to the office to notify him of the medication change. Inmate M was seen by a different psychiatrist two weeks later. He reported that he was compliant with his new medication regimen, but dissatisfied with it, and asked for Seroquel and Wellbutrin. Laboratory tests were ordered and no changes were made in the inmate's medication.

Inmate M was seen five times by a psychiatrist, but there were no records indicating he was seen by a case manager during his incarceration. He had been at CIM for over five months, having arrived on October 4, 2004. He was designated a 3CMS inmate shortly after his admission. The inmate's C-file was audited on December 18. Inmate M was endorsed for the sensitive needs yard at CSATF on January 18, 2005, one month after the audit. He was still waiting to move eight weeks later.

Assessment:

Half of the transfer delay in this inmate's case was due to the eight weeks that had elapsed since his endorsement. The three-week delay between his hearing and the audit might have been shorter; similarly, the six-week wait for a hearing could have been less. The time from the C-file audit to the inmate's endorsement was one month.

This inmate's mental health treatment was inadequate in that he had not been seen by a case manager despite his five-month stay in the reception center. Inmate M's Lithium levels were not monitored adequately. Moreover, his medication regimen was changed without a rationale.

9

14.    Inmate N

Inmate N was admitted to CIM on January 4, 2005. The inmate's C-file was audited on March 3, two months after his admission to the institution.   No further action had been taken in the inmate's case.

Inmate N was an EOP inmate with a life sentence who had been in the reception center for more than 60 days.  The inmate was a new commitment who was briefly in CIM's hospital at the beginning of January.  He was discharged from the hospital with a diagnosis of Adjustment Disorder, a GAF of 45, plans for five-day follow-up and 90-day orders for Seroquel and Wellbutrin.  According to the inmate's UHR, he was seen for four of the five days of follow-ups.  He was also seen by a clinician most weeks for EOP follow-up.  According to his MARs, the inmate was compliant with his medication since being discharged from the hospital.

An IDTT meeting was held for Inmate N and his diagnosis was changed to Major Depressive Disorder, with psychotic features by history, with a r/o of Bipolar Disorder with psychotic features.  When seen by the monitor's expert in a group interview on March 14, 2005, the inmate was neatly dressed, well groomed and very quiet.  He appeared to attend to the discussion, but did not speak spontaneously.  His level of depression was found to be severe during weekly case management contacts.

As a new commitment, Inmate N's reception center processing would be time more consuming.  Due to a typing backlog, a three-week delay was expected.  The institution reported that new computers on site were expected to alleviate this problem in the future, as counselors would be able to type their own work.

Assessment:

This inmate's mental health treatment in the reception center was adequate, but did not meet his treatment needs as an EOP inmate.  Reception center processing for Inmate N was overlong, but not unusual for a newly committed inmate with a life sentence.

15.    Inmate O

This EOP inmate had been in the reception center for more than 100 days.  He had a BPT hearing within three weeks of his arrival at the institution.  The inmate's C-file was not audited for another month.  At that time, reception center processing for Inmate O was halted, pending the receipt of medical and mental health chronos.  Processing had not progressed during the following eight weeks.

Inmate O was treated for Psychosis, NOS with Zyprexa, Wellbutrin and Dilantin.  The inmate exhibited signs of psychosis, depression and paranoia in December 2004, when he had an IDTT meeting.  He was seen weekly almost continuously from his arrival through March 7, 2005.  In February, the inmate was described as suffering from cognitive confusion; he was having difficulty communicating and was easily confused.  Despite

10

these apparent problems, he was oriented and his conversation was relevant. Inmate O was compliant with his medication through January 2005, but there were no records of medication administration beyond February 7, even though the inmate's medication orders were current until April 1.

Assessment:

Inmate O's reception center processing was delayed for eight weeks due to missing medical and mental health chronos. His medication may not have been administered for the last three weeks of February. If Inmate O did receive his medication during this period, then the mental health treatment provided to him in the reception center would have been adequate. The treatment, however, did not meet his EOP needs.

16.    Inmate P

This EOP inmate had been in the reception center for over 90 days. Inmate P paroled in October 2004 and returned to CIM on December 8, 2004. He was placed in CIM's hospital upon his arrival at the institution because he expressed suicidal ideation and exhibited signs of psychosis. He was given a diagnosis of Psychosis, NOS and treated with Seroquel 300 bid. He was discharged with orders for five-day follow-up and was seen for four of the five follow-up visits.

An IDTT meeting was held for Inmate P just over two weeks after his discharge from the hospital. The inmate's diagnosis was changed to Schizoaffective Disorder, Bipolar type, r/o Bipolar Disorder. He did not give a good account of his mental health history.

The inmate's UHR contained documentation of only three clinical contacts in January and February; all of these contracts were at cell front. The MHTS inmate history, however, showed more case management contacts. After three weeks, during which time the inmate was seen in preparation for his IDDT meeting and in an IDTT meeting, Inmate P was seen weekly from mid-January through March 3. He was described as generally responsive, but also uncooperative. His demeanor was sometimes unusual and his affect was often flat.

The inmate had a Seroquel order that was current through March 10. According to his MARs, Inmate P was compliant with Seroquel after he left the hospital throughout December. He did not show up for medication pick up during the first few days of January. The January MAR was blank from January 5 to January 12. It then showed that medication was administered continuously to Inmate P from January 14 through January 31.

Inmate P was not seen by a psychiatrist outside the hospital until he was referred on an urgent basis on March 3 because he refused the mouth check during DOT. The note indicated that he was uncooperative, demanding and insulting. The inmate continued to refuse to comply with DOT procedures, despite being told that his Seroquel would be discontinued if he did not comply. The psychiatrist discontinued the inmate's Seroquel

without an adequate clinical rationale. The only rationale given was that the inmate would not follow orders.

When interviewed by the monitor's expert in a group on March 15, 2005, Inmate P responded relevantly to questions. His appearance was similar to that of many persons with a long history of severe mental illness. He exhibited flat affect, psychomotor slowing and appeared to be lower functioning than most people. He reported that his Seroquel was cut off because he did not want to take it in crushed form.

The inmate received notification of his BPT hearing on January 21, 2005, six weeks after he arrived at CIM. He was endorsed to RJD February 23, 2005. His release date was June 8, 2005.

Assessment:

This inmate's mental health treatment was inadequate. There was an unexplained gap in his medication administration for one week in January.

Psychiatric practice for Inmate P was capricious and uninformed by clinical concerns, such as the inmate's recent hospitalization, his EOP history and his need for pharmacological treatment. Documentation of weekly case management contacts was missing from the inmate's UHR. It appeared, however, that the inmate was followed closely by his case manager. His IDTT was not attended by a psychiatrist.

There was an interval of one month between the resolution of Inmate P's BPT proceedings and his endorsement to a receiving institution.

17.    Inmate Q

Inmate Q arrived at CIM on December 1, 2004. His BPT hearing was held on January 5, but his C-file was not audited for a month until February 9, 2005. Inmate Q was endorsed to RJD on February 23, 2005. He was waiting for a bus seat as of March 15, 2005. This EOP inmate had been in the reception center over 100 days.

Inmate Q was in CIM's hospital due to suicidal ideation in December, approximately two weeks after he arrived at CIM. He was discharged with orders for Zyprexa and Zoloft; he also had orders for five-day suicide prevention follow-up. The MHTS inmate history showed five-day follow-up contacts.

Inmate Q was seen by a psychiatrist four days after discharge from the hospital. He said he did not want to take Zyprexa, but that Zoloft was very helpful. No MARs for this incarceration were in the inmate's UHR. Laboratory tests were ordered and follow-up was scheduled for two weeks to consider a trial of Tegretol. Inmate Q was seen as scheduled and his medication regimen discussed. The inmate reiterated his desire not to take Zyprexa, but said he needed a mood stabilizer. Laboratory test results were not back, so the inmate was scheduled for follow-up in two weeks and his Zyprexa was

continued pending that follow-up. Laboratory results were available at the follow-up appointment and were reviewed by the psychiatrist.

This Q was not seen again for six weeks. His Zyprexa was discontinued and he was started on Tegretol. The inmate's prescription for Zoloft was continued. A Tegretol level test was ordered about three weeks later. Only three case management contacts were documented during a ten-week period in the UHR. The MHTS inmate history showed weekly case management contacts throughout the inmate's time in general population.

Assessment:

This inmate's mental health treatment was adequate. Psychiatry practice was responsive and appropriate with the exception of a missed two-week follow-up. There were discrepancies between the inmate's UHR documentation and his MHTS records. There was no indication in the UHR that five-day follow-up occurred, but contacts for all five days were documented on the MHTS inmate history. The inmate's UHR did not contain any record of case management contacts for December, January and the first three weeks of February, but contacts were indicated on the MHTS record.

One month elapsed between the inmate's BPT hearing and the correctional counselor's audit of his C-file.

18.    Inmate R

Inmate R was an EOP inmate. According to a progress note written shortly after he arrived at CIM, Inmate R reported that he stopped taking his medication, was having auditory hallucinations that told him to kill himself and had placed a pellet gun to his head. His sister called his parole agent and Inmate R was violated and brought to CIM. He reported that he was supposed to take Seroquel and Wellbutrin. He had been prescribed Risperdal in April 2004 while at CIM. When he returned to custody in October, he was started on Geodon. The prescribing physician said he was being treated for depression. Other documents, however, indicated that he was being treated for Schizophrenia. Inmate R complained that Geodon was not helping enough for the first three weeks that he took it. The inmate was seen by a psychiatrist for follow-up two months later and his Geodon was renewed. MARs indicated that he was compliant with medication throughout this incarceration.

A nearly illegible progress note contained very little relevant clinical information. Inmate R was seen weekly, either in group or individually, by his case manager from October 2004 through January 2005. The inmate reported problems with another inmate in his housing unit and asked for a move for safety reasons. He was moved to the East facility within days.

This EOP inmate was in the reception center for over five months. Inmate R arrived at CIM on October 8, 2004. He incurred a disciplinary infraction on October 20, 2004. His

13

BPT hearing was three months later on January 20, 205. Adjudication of the inmate's infraction was completed on November 17, 2004. An intake audit was done January 27, 2005, over four months after the inmate's arrival and over three months after the adjudication of his 115 infraction was completed. The correctional counselor noted "completed" on February 26, 2005. A new EOP chrono was obtained on February 23, 2005 and the inmate was endorsed to RJD on that date. He was awaiting a bus seat as of March 15.

Inmate R's October infraction was for mutual combat. According to the inmate's report to the staff who saw him shortly after the incident, the infraction involved a fight about whose turn it was to use the toilet. A request for a mental health evaluation was made two days later with a due date two weeks in the future. The mental health assessment noted that Inmate R was an EOP inmate and concluded that mental health factors were not influential in the offense and did not need to be considered when penalties were assessed. By way of explanation, the assessment indicated that the inmate was interested in evading responsibility for his actions in the offense. According to staff reports, Inmate R was the only inmate remaining in the institution that had a 115 disciplinary infraction and a related mental health assessment.

Inmate R had a D1A designation and had documented problems with reading and writing. He needed a staff assistant for disciplinary hearings and BPT hearings. He needed extra time to comprehend spoken language and to respond to questions. He was vulnerable to victimization, as he was perceived by others as "slow" and unable to advocate for himself.

When interviewed by the monitor's expert in a group on March 15, 2005, Inmate R reported that he had incurred a 115 in September for mutual combat. He responded relevantly to questions. He was similar in appearance to many persons whose functioning has been significantly impaired by a serious and persistent mental illness. He appeared to be lower functioning than many inmates housed in the general population.

Assessment:

This inmate's mental health treatment was appropriate, but the related mental health assessment was prejudicial.

This very low functioning EOP inmate was in the reception center too long because his parole agent brought him in for mental health treatment, he fought for the use of a toilet and then his case was allowed to languish for weeks between steps.

19.    Inmate S

This EOP inmate was due to parole in April 2004. He had been at CIM since November 22, 2004. His length of stay in the reception center was nearly 120 days. He had a BPT hearing on December 30, 2004, within five weeks of his arrival at the institution. A C-

14

file intake audit was completed on January 4, 2005 and the inmate endorsed to the sensitive needs yard at MCSP on February 14, 2005.

Inmate S was not seen by a psychiatrist until he had been at CIM for three weeks. He made a self-referral four days after arriving at the institution, reporting that he had received no Lithium since he arrived and that he was in great need of his medication. A Lithium order was written on November 29, 2004, one week after the inmate's arrival. It was on the same MAR as a medication order for Seroquel that was written in September, when the inmate was briefly at CIM. Both orders were current, as the earlier order was written for 90 days, and both medications were administered beginning November 29, the date the new order started. Medication continuity for both Seroquel and Lithium was sustained from November 29, 2004 through February 2005.

Inmate S's diagnoses and treatment were similarly confused. The inmate may have had a psychotic disorder, a mood disorder or both. The inmate received frequent case management contacts, but only one psychiatric contact. No laboratory tests were found in the inmate's UHR for this incarceration.

Although Inmate S had a normal Clark screening in 2001, he exhibited behaviors that were suggestive of a cognitive impairment or deficits in his ability to advocate for himself. The inmate was a victim of childhood sexual abuse, had sexually abused children as an adult and was fearful of others. In the past, he was fearful and reluctant to be paroled to the community. He wanted to depend upon others to help him negotiate routine daily demands.

Assessment:

It was unclear what this inmate's main problems were and what he was being treated for.

EXHIBIT R

California Rehabilitation Center (CRC)

January 24, 2005 – January 26, 2005

1.    Inmate A

This female inmate was in the 3CMS program. She was diagnosed with Mood Disorder, NOS and Post-Traumatic Stress Disorder. She was treated with Remeron 45 mg/day, Seroquel 500 mg/day and Vistaril 75 mg/day.

Inmate A was transferred to CRC from VSPW on October 20, 2004. She was assigned a 3CMS level of care while at VSPW during August 2004. She was treated with Risperdal, Remeron and Vistaril while at VSPW. These medications were ordered upon her arrival at CRC; MARs documented that she received the medications within 24 hours of arrival.

Upon her arrival to CRC, Inmate A was noted to have difficulty dealing with dormitory living and displayed mood instability. She was first seen by the psychiatrist on December 15, 2004, when she reportedly had nightmares, depressed mood and poor sleep. Her Risperdal was discontinued and Seroquel was started. At her last psychiatric visit, the inmate reportedly had increased auditory hallucinations. In response, her Vistaril was increased.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- The inmate's chart contained documentation of medication continuity on arrival at CRC.

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- This inmate's initial contact with a psychiatrist was delayed for almost two months after the inmate's arrival at CRC.

- There was good documentation of almost weekly case management contact for this inmate during her period of instability. Weekly, rather than quarterly, visits were clinically indicated.

- The inmate's initial IDTT meeting documented the necessary participants.

2.    Inmate B

This female inmate was in the 3CMS program. She was diagnosed with Bipolar II Disorder and treated with Zyprexa 10 mg/day, Buspar 60 mg/day and Lithium 1050 mg/day.

Inmate B was transferred from VSPW to CRC on April 28, 2004. She was not on the mental health caseload at the time of transfer. Inmate B requested to be seen by mental health on June 18, 2004, due to depression, insomnia and severe mood swings. She was seen by the psychologist on July 1, 2004. An IDTT meeting was held on that date and the inmate was placed in the 3CMS program and referred to a psychiatrist.

Inmate B was seen by the psychiatrist on July 12, 2004. She was given a diagnosis of Mood Disorder, NOS and treated with Wellbutrin. On July 23, she was seen by another psychiatrist who started Zyprexa. Five days later, she was seen by the original psychiatrist, who discontinued the Zyprexa and started her on Lithium with an increase in Wellbutrin. The inmate later presented with some increased agitation due to situational stressors and her Wellbutrin was increased again; she was also given a trial of Risperdal, at that time. At her next case management visit on August 12, 2004, the inmate was reportedly improved.

During September, Inmate B began reporting severe leg cramps and worsening mood. Buspar was added to her medication regimen. On October 25, 2004, a Lithium level was ordered. At her next psychiatric visit on November 17, 2004, the inmate complained of continued leg spasms. In response, Cogentin and Buspar were increased. The psychiatrist noted that the inmate's Lithium level was elevated at the time of evaluation. At the next psychiatric visit on December 12, 2004, the psychiatrist reported continued racing thoughts and slurred speech. The note also reported that Inmate B's Lithium level was elevated and her Lithium dosage was decreased from 1200 mg/day to 1050 mg/day. No repeat Lithium level was ordered.

The inmate was briefly switched from Risperdal to Seroquel, which was subsequently discontinued due to nausea and vomiting. The last psychiatric progress note indicated that the Inmate B had continued auditory hallucinations, depression, anxiety attacks, crying spells, racing thoughts and hopelessness. Her Zyprexa and Buspar were increased. The psychiatrist indicated in the progress note that laboratory studies would be obtained, but there was no documentation that this occurred.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- An elevated Lithium level was obtained on October 28, 2004. A repeat level on November 30, 2004 remained elevated. Although the Lithium dosage was decreased on January 5, 2005, there was no documentation that a repeat Lithium level test was actually ordered by the psychiatrist. This information was forwarded by the monitor's expert to the senior psychologist.

- The inmate's December MAR reflected consistent medication non-compliance with Risperdal between December 17 and December 22, 2004. The psychiatric and case management progress notes did not reflect any knowledge of this problem.

- The psychiatric care provided to this inmate was a matter of concern in that the inmate's medications were frequently changed without documentation of any clinical rationale. The clinical presentation reflected in the UHR indicated that Inmate B remained unstable, despite the frequent, multiple medication changes. This presentation suggested that a higher level of care might be indicated in order to stabilize this inmate.

- The inmate's initial IDTT meeting documented the necessary participants.

- There was documentation in the inmate's chart of at least quarterly case management contacts. In fact, the inmate was seen at least monthly.

This inmate was subsequently interviewed by the monitor's expert. Her clinical presentation during the interview did not coincide with the description of her presented by the psychiatrist in the UHR. The inmate reported some continuing symptoms and regular meetings with the psychiatrist "to adjust my medications and to try different ones". This inmate did not appear to require a higher level of care at this time, but her case illustrated the problems with the provision of psychiatric care at this facility.

3.    Inmate C

This female inmate was in the 3CMS program. She was diagnosed with Schizoaffective Disorder and treated with Trileptal 600 mg/day and Benadryl 75 mg/day.

Inmate C arrived at CRC on May 23, 2004 from a county jail. She had been on the 3CMS caseload prior to an earlier release on parole from CRC. Inmate C had been treated with Risperdal, Trazodone, Lithium and Celexa as recently as March 2003. It did not appear that she was treated with psychotropic medications prior to her transfer from the county jail.

Inmate C was seen by a psychiatrist on May 17, 2003, when she reported auditory hallucinations. She was then treated with Trileptal and Risperdal. She was returned to the 3CMS program on May 20, 2004. The inmate began showing some improvement after subsequent medication adjustments. Her most recent progress notes indicated that she was relatively stable with decreased auditory hallucinations. Her MARs reflected poor medication compliance.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Medications were not ordered for this inmate on her arrival at CRC, but it did not appear that she was treated with medications at the county jail.

- The inmate's initial IDTT meeting included the necessary participants.

- There was documentation of more than quarterly case management contact in the inmate's chart.

- The inmate's chart also contained documentation of consistent psychiatric contacts.

- The inmate's MARs reflected medication non-compliance. Clinical progress notes did not clearly document a response and follow-up to the inmate's medication non-compliance. The facility reported that MTA referrals for female inmates who were non-compliant with medications were not included in their UHRs. Lists of non-compliant inmates were reportedly provided to mental health for scheduling.

- Informed consent for treatment with Trileptal was not located in Inmate C's UHR.

4.    Inmate D

This female inmate was in the 3CMS program. She was diagnosed with Major Depressive Disorder, with psychotic features. She was not treated with psychotropic medications at the time of the monitoring visit.

This inmate arrived at CRC on November 12, 2003 from CCWF. She was on the 3CMS caseload at the time of the monitoring visit. In early summer 2004, Inmate D was treated with Risperdal and Tegretol for mood instability and auditory hallucinations. She had a history of medication refusal and, during July, she signed a refusal of her medications. At that time, she had barely discernible auditory hallucinations and was reportedly stable.

Inmate D's medications were discontinued on July 21, 2004. She was subsequently followed consistently by her case manager. The psychiatrist documented that she remained with depressive symptoms on October 29, 2004. The inmate, however, refused to resume medications reportedly due to problems with the pill line.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- The inmate's annual IDTT meeting documented the presence of the necessary participants.

- Problems with the pill line reportedly resulted in this inmate's medication non-compliance and ultimate refusal to continue with medication.

- There was documentation in the inmate's chart of case management contact more often than quarterly. More frequent than quarterly contact was clinically indicated for this inmate.

- The inmate continued to receive consistent psychiatric contact and monitoring after her medication refusal.

- There was documentation of medication non-compliance follow-up by mental health staff in the inmate's chart.

- Informed consent for treatment with Risperdal was present in the inmate's UHR, but consent for Tegretol was not located in the UHR.

- There was no documentation of appropriate laboratory tests being ordered for treatment with Tegretol.

5.    Inmate E

This female inmate was in the 3CMS program. She was diagnosed with Bipolar Disorder, NOS and Amphetamine Dependence. She was treated with Lithium 900 mg/day and Prozac 20 mg/day.

This inmate was transferred from CCWF to CRC on August 4, 2004. She was not on the mental health caseload at the time of transfer, but was referred to mental health by custody staff after presenting with "bizarre behavior," specifically head banging. The mental health clinician noted her history of self-injurious behavior and lability.

Inmate E was placed on the mental health caseload on August 30, 2004. She was started on Lithium during September; Prozac was also added. She reportedly showed improvement in her symptoms. The most recent progress notes indicated that Inmate E was stable on medications.

Assessment:

The following comments were noted regarding the care provided for this inmate

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- Appropriate laboratory testing for treatment with Lithium was conducted.

- The inmate's MARs indicated overall medication compliance.

- The inmate's initial IDTT meeting included the necessary participants.

- There was documentation in the inmate's UHR of consistent psychiatric contacts.

6.    Inmate F

This male inmate was in the 3CMS program. He was diagnosed with Bipolar II Disorder, NOS and treated with Depakote ER 1500 mg/day.

This inmate was transferred from DVI to CRC on August 13, 2004. He had been treated with Depakote and Lithium at DVI. These medications were ordered on the day of the inmate's arrival at CRC.

Inmate F was placed on the 3CMS caseload on August 25, 2004. Subsequent progress notes indicated that he was stable on medications. He reportedly refused Lithium and this medication was discontinued.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with Depakote was not present in the inmate's UHR; consent for Lithium was present.

- Appropriate laboratory testing for treatment with Lithium and Depakote were conducted.

- There was documentation of medication continuity on arrival, with administration of medication occurring on the first day of the inmate's arrival at CRC.

- The inmate's initial IDTT meeting included the necessary participants.

- The inmate's UHR contained documentation of mental health follow-up after reported medication non-compliance.

7.    Inmate G

This male inmate was in the 3CMS program. He was diagnosed with Schizoaffective Disorder, depressive type and treated with Remeron 45 mg/day, Benadryl 50 mg/day and Risperdal 4 mg/day.

Inmate G was transferred from CIM to CRC on July 21, 2004. He was on the 3CMS caseload at the time of transfer. He had been treated with Risperdal and Cogentin at CIM and these medications were continued upon transfer. At his first IDTT meeting, the treatment team noted the inmate's history of paranoid ideation, auditory hallucinations and substance abuse and continued him at the 3CMS level of care. He subsequently was noted to be non-compliant with his morning medications. The most recent progress notes indicated that Inmate G reported problems sleeping, with poor appetite and chronic auditory hallucinations. In response, his medications were adjusted.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with Risperdal was present in the inmate's UHR; consent for Remeron, however, was not located in the record.

- Inmate G's medications were ordered and received within 24 hours of his arrival at the facility.

- There was documentation in the inmate's chart of mental health follow-up after this inmate's referral for medication non-compliance.

- The inmate's initial IDTT meeting included the necessary participants.

- The inmate's UHR contained documentation of at least quarterly case management contacts.

- There was documentation of consistent psychiatric contacts, but nearly all of the inmate's contacts were with a different psychiatrist involving medication changes.

8.    Inmate H

This male inmate was in the 3CMS program. He was diagnosed with Schizoaffective Disorder, depressed type and treated with Abilify 15 mg/day and Effexor XR 150 mg/day. He was also classified as D1A.

Inmate H was transferred from CCI to CRC on October 7, 2004. He was on the 3CMS caseload at the time of transfer and was treated with medications. His medications were continued upon transfer to CRC. After his transfer to CRC, the inmate was seen consistently by a psychiatrist and case manager. Although he reported some depressive symptoms, Inmate H was reportedly stable on medications after some adjustments.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with psychotropic medications was present in the UHR.

- This inmate's medications were continued within 24 hours of his arrival at CRC.

- The inmate's initial IDTT meeting included the necessary participants.

- There was documentation in the inmate's chart of consistent psychiatric contacts.

- The chart also contained documentation of at least quarterly case management contacts.

9.    Inmate I

This male inmate was in the 3CMS program. He was diagnosed with Schizoaffective Disorder, depressed type; an alternative diagnosis of Schizophrenia, paranoid type was also present in the UHR. He was treated with Effexor 225 mg/day, Trazodone 150 mg/day and Geodon 160 mg/day.

This inmate was transferred from RJD to CRC on June 21, 2004. He had previously been receiving an EOP level of care at RJD until May 4, 2004 when he was upgraded to a 3CMS level of care. His medications were continued on his arrival at CRC.

Inmate I's case manager at CRC documented his history of paranoid delusional thinking, particularly regarding the poisoning of his food. Subsequent progress notes indicated that the inmate presented with restricted affect, but no evidence of overt psychosis. There was documentation that Inmate I was non-compliant with his morning medications. This issue was apparently addressed by the mental health staff. Subsequent progress notes indicated that the inmate was essentially stable after medication adjustments. He was scheduled to parole on January 28, 2005.

Assessment:

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- There was documentation in Inmate I's chart of medication continuity on his arrival at CRC.

- The chart contained documentation of at least quarterly case management contacts.

- There was documentation of appropriate discharge planning by the facility's psychiatric social worker and case manager.

- There was appropriate mental health follow-up after this inmate's referral for medication non-compliance.

10.    Inmate J

This male inmate was in the 3CMS program. He was diagnosed with Schizoaffective Disorder, depressed type; an alternative diagnosis of Depressive Disorder, NOS was also noted. Inmate J was treated with Risperdal 2 mg/day and Paxil 20 mg/day.

Inmate J was transferred from NKSP to CRC on April 30, 2004. He was on the 3CMS caseload prior to his transfer, but had not been recently treated with psychotropic medications. During June 2004, the inmate complained of increased depression with auditory hallucinations. In response, the psychiatrist restarted Risperdal. The inmate's Risperdal was adjusted and he was treated with a series of different anti-depressant medications. He was ultimately treated with Paxil which appeared to address the inmate's symptoms of depression.

<u>Assessment:</u>

The following comments were noted regarding the care provided for this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's UHR.

- The inmate's initial IDTT meeting documented the necessary participants.

- The chart contained documentation of at least quarterly case management contacts.

- There was documentation of consistent psychiatric contacts.

- Documentation of mental health follow-up after the inmate's referral for medication non-compliance was in the inmate's UHR.

EXHIBIT S

Richard J. Donovan Correctional Facility (RJD)

November 1- November 3, 2004
January 7, 2005
January 21-January 22, 2005
May 16-May 17, 2005