- The chart did not document weekly case management contact for this inmate after his placement on the mental health roster in the administrative segregation unit.

- The inmate received a mental health screening upon his arrival in the administrative segregation unit.

13.    Inmate M

This 3CMS inmate was housed in general population.  He was diagnosed with Major Depressive Disorder and treated with Zoloft 50 mg/day.

Inmate M had been housed at CEN since November 2001.  He was not previously on the mental health roster.  On October 7, 2004, the inmate submitted a self-referral to mental health due to his depressive symptoms.  He was seen by a psychiatrist five days later, given the above diagnosis and prescribed Zoloft.  He was also placed on the 3CMS roster at that time.  The inmate's last psychiatric contact occurred on October 25, at which time he was reportedly improved on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- An informed consent form for treatment with psychotropic medication was present in the inmate's medical record.

- Inmate M was appropriately placed on the mental health roster.

- The chart contained documentation of case management contacts by the psychiatrist at least every ninety days after the inmate's placement on the 3CMS roster.

14.    Inmate N

This 3CMS inmate was housed in general population.  He was diagnosed with Major Depressive Disorder and treated with Zoloft 50 mg/day.

Inmate N was transferred from CCI to CEN on February 25, 2004.  He was not previously on the mental health roster.  The inmate sent a self-referral to mental health on August 1, 2004, reporting racing thoughts and depression.  He was seen by a psychiatric nurse 11 days later and referred to a psychologist.  Inmate N was seen by a psychologist on September 22, at which time he reported continued depressive symptoms and was referred to a psychiatrist.  The inmate was seen by a psychiatrist on October 12, provided with the above diagnosis, treated with Zoloft and placed on the 3CMS roster.  On

October 25, Inmate N was seen for psychiatric follow-up; the inmate reported some improvement in his symptoms at this meeting. His treatment with Zoloft was continued.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- An informed consent form for treatment with psychotropic medication was present in the inmate's medical record.

- There was documentation of case management contact by the psychiatrist at least every ninety days after the inmate was placed on the mental health roster.

15.    Inmate O

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and treated with Zoloft 50 mg/day.

Inmate O had been housed in CEN since March 2001. He was not previously on the mental health roster, but he was followed consistently by mental health staff due to persistent complaints of depression. Although these contacts were initially sporadic, the frequency increased during August 2004. On August 31, the inmate was seen by a psychiatrist, provided the above diagnosis and started on Zoloft. He was also placed on the mental health roster. Subsequent follow-up appointments by the psychologist and psychiatrist indicated that the inmate showed some improvement on medication.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- The inmate had a timely IDTT meeting that included the necessary participants.

- The inmate's chart contained documentation of case management contact at least every ninety days after the inmate's placement on the 3CMS roster.

11

EXHIBIT  W

Chuckawalla Valley State Prison (CVSP)

October 14, 2004 – October 15, 2004

1.    Inmate A

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and treated with Paxil 20 mg/day.

Inmate A was transferred from ISP to CVSP on May 21, 2004. The inmate was not previously on the mental health caseload. On August 3 and again on August 8, 2004, the medical staff referred the inmate to mental health due to his complaints of depressive symptoms. Inmate A was seen for an initial evaluation by a psychologist on August 17, at which time he was described as having depressive symptoms. The psychologist then referred the inmate to a psychiatrist. He was seen by a psychiatrist on August 25, given a diagnosis of an Adjustment Disorder and treated with Vistaril. The inmate was seen by the psychiatrist again approximately one week later and his Vistaril was increased. On September 15, Inmate A presented to the psychiatrist with worsening depressive symptoms. At that time, he was placed on the 3CMS roster and was treated with Paxil. The most recent progress notes indicated that the inmate was improving on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately placed on the mental health caseload after presenting with depressive symptoms.

- Informed consent for treatment with Paxil was present in the inmate's medical record.

- The inmate received a timely IDTT meeting, at which all the required participants were in attendance.

- There was documentation of the required case management contacts in the inmate's chart.

- This inmate's psychiatric assessment and treatment appeared to be clinically appropriate.

2.    Inmate B

This 3CMS inmate was housed in general population. He was diagnosed with Depressive Disorder, NOS, and treated with Remeron 15 mg/day.

Inmate B was transferred from Wasco to CVSP on March 7, 2003. He was seen for an initial psychiatric evaluation on September 7, 2004, when he complained of depressive symptoms. He was treated with Remeron and was placed on the 3CMS roster at that time.

An IDTT meeting was conducted on September 15, when a MH-2 was completed. The inmate was last seen by a psychologist on October 4. He was reportedly stable on medications at that time.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately placed on the mental health roster.

- An informed consent form for treatment with psychotropic medications was present in the inmate's medical record.

- The inmate's IDTT meeting was timely and included the necessary participants.

- Inmate B was seen by a case manager at least every ninety days.

- This inmate's psychiatric assessment and treatment were clinically appropriate

3.    Inmate C

This inmate was housed in the OHU. He was diagnosed with Major Depressive Disorder with psychotic features and treated with Zoloft 50 mg/day and Abilify 15 mg/day.

Inmate C was transferred from RJD's reception center to CVSP on October 13, 2004. A review of the inmate's medical record indicated that he was started on Paxil and Risperdal at RJD and later was switched to Zoloft and Abilify. The inmate's medications were continued upon his arrival to CVSP. Inmate C's mental health screening indicated that he was cleared for general population.

Inmate C was placed in the OHU after presenting with suicidal ideation upon his arrival at CVSP. The inmate also had a history of self injurious behavior. Inmate C was seen by a psychologist on the day after his arrival, at which time he was reportedly experiencing severely depressed mood, rambling speech and auditory hallucinations. Although Inmate C was treated with psychotropic medications by a psychiatrist, there was no mental health chrono in his file indicating that he had been placed on the mental caseload.

Assessment:

It was a mater of significant concern that this inmate with a history of severe depressive symptoms, treatment with psychotropic medications and recent suicidal ideation was transferred from RJD to CVSP. There did not appear to be a chrono in the inmate's medical record indicating that he was placed in the mental health program. Furthermore, despite the inmate's presentation at CVSP with depressive symptoms and suicidal ideation, he was not on suicide precautions at the time of his interview with the monitor's expert in the OHU.

Inmate C presented with severely depressed mood, auditory hallucinations (including command hallucinations) and current suicidal ideation with plan and possible intent. The inmate's case was discussed with the mental health staff and the chief medical officer. Recommendations were made for the immediate transfer of this inmate to a MHCB unit and for the placement of the inmate on suicide precautions. The facility's initial plan had been to delay the inmate's transfer until there was a psychiatrist on site;

this plan was not clinically acceptable, due to the severity of the inmate's symptoms and the fact that a psychiatrist was not scheduled to be on site for three days.

4.      Inmate D

This 3CMS inmate was housed in general population. He was diagnosed with Bipolar I Disorder and treated with Depakote 375 mg/day.

Inmate D was transferred from CIM to CVSP on April 22, 2004. He was not on the mental health caseload at the time of transfer. He was seen for an initial evaluation by the psychiatrist on September 15, at which time the inmate's history of treatment for Bipolar Disorder was noted. The inmate indicated that he wished to resume his medication due to recent mood swings. In response, he was treated with Depakote. An IDTT meeting was conducted for Inmate D on September 22. The inmate was last seen by a psychologist on September 27, when he was reportedly stable on medications.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with Depakote was not present in the inmate's medical record.

- Appropriate laboratory testing for treatment with Depakote was not conducted.

- This inmate was appropriately placed on the mental health caseload.

- Inmate D received an IDTT meeting that included the necessary participants.

- The inmate was seen by a psychologist at least every 90 days.

5.      Inmate E

This 3CMS inmate was housed in general population. He was diagnosed with Major Depressive Disorder and treated with Prozac 20 mg/day.

Inmate E was transferred from Wasco to CVSP on December 9, 2003. The inmate was referred to mental health on September 15, 2004 because he was exhibiting depressive symptoms. Inmate E was seen two days later by a psychiatrist who indicated that the inmate was serving a life sentence and had problems with depression as well as heroin dependence. The inmate was placed on Prozac and referred to narcotics anonymous. He was seen ten days later by a psychologist, at which time he continued to exhibit depressive symptoms. Inmate E was last seen by the psychologist on October 12; at that time, his depressive symptoms had reportedly improved.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Inform consent for treatment with Prozac was present in the inmate's medical record.

- This inmate was appropriately placed on the mental health roster.

- This inmate's psychiatric assessment and treatment appeared to be appropriate.

- Inmate E received a timely IDTT meeting that included the necessary participants.

- The inmate was seen by a psychologist at least every 90 days.

6. Inmate F

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Major Depressive Disorder and treated with Prozac 40 mg/day.

Inmate F was transferred from Centinela to CVSP on May 25, 2004. He was not previously on the mental health caseload. The inmate was referred to mental health by a MTA on September 15, 2004 because he requested a mental health evaluation. Inmate F was seen by a psychiatrist on September 20, given a diagnosis of Major Depressive Disorder, treated with Prozac and placed on the mental health roster. It appeared that the inmate was transferred to the administrative segregation unit on September 24 for safety concerns. On October 4, Inmate F was seen by a psychologist, at which time he reported continued depressive symptoms. On October 12, the inmate indicated that a recent increase in medications had not yet been effective.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Informed consent for treatment with psychotropic medications was present in the inmate's medical record.

- This inmate was appropriately placed on the mental health caseload.

- The inmate's chart contained documentation of weekly case management contacts in the administrative segregation unit.

- The chart also contained documentation of daily psych tech rounds in the administrative segregation unit.

- It appeared that this inmate's medications were increased by medical providers on two occasions, however, there were no accompanying progress notes documenting actual clinical contact in either instance.

7.    Inmate G

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Depressive Disorder, NOS, as well as Schizophrenia, paranoid type, and treated with Risperdal 4 mg/day and Paxil 20 mg/day.

Inmate G was transferred from NKSP to CVSP on March 26, 2003. He was seen for an initial mental health evaluation on August 26, when he complained to a psychologist of depressive symptoms. He was seen by a psychiatrist on the following day and treated with Paxil. On August 31, the psychologist noted that the inmate had not been taking his medications and that he wished to be removed from the mental health program because he would have to be transferred to another facility.

Subsequent progress notes indicated that the inmate had variable compliance with medications. On September 22, the psychiatrist indicated that the inmate's depressive symptoms had returned and that he was experiencing auditory hallucinations; the inmate was again prescribed Paxil and Risperdal. On October 4, Inmate G was seen by a psychologist, at which time he continued to complain regarding his medications as well mood instability. The psychologist indicated an intent to confer with the chief medical officer regarding an adjustment to the inmate's medications. An order by the medical officer for an increase in the inmate's Risperdal was noted in the medical record on that day.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately placed on the mental health caseload.

- Informed consent for treatment with psychotropic medication was present in the inmate's medical record.

- There was documentation of medication and treatment refusal present in the inmate's medical record.

- It appeared that there was follow-up regarding the inmate's medication non-compliance.

- The inmate received an IDTT meeting, which included the necessary participants.

- The inmate's chart contained documentation of weekly case management contact in the administrative segregation unit.

- The chart also contained documentation of daily psych tech rounds in the administrative segregation unit.

It appeared that this inmate's Risperdal was increased without evidence of actual clinical contact. This disturbing practice was also noted in other case summaries. It seemed to be the result of efforts to provide medication continuity during periods when there was no psychiatrist present in the facility.

6

8.    Inmate H

This 3CMS inmate was housed in the administrative segregation unit. He was diagnosed with Depressive Disorder, NOS, and treated with Prozac 20 mg/day.

Inmate H was transferred from Wasco to CVSP on July 9, 2004. He was seen by a psychologist on September 2, after reporting depressive symptoms. He was seen by a psychiatrist on September 15, at which time he was treated with the above mentioned medication. It appeared that this inmate was transferred to the administrative segregation unit on or about October 5, 2004. Subsequent progress notes indicated that the inmate appeared to be coping well in administrative segregation with mild depressive symptoms.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- This inmate was appropriately placed on the mental health caseload.

- Informed consent for treatment with Prozac was present in the inmate's medical record.

- This inmate was seen on a weekly basis by a case manager in the administrative segregation unit.

- The inmate's chart contained documentation of daily psych tech rounds in administrative segregation.

- Inmate H received a timely IDTT meeting, which included the necessary participants.

9.    Inmate I

This 3CMS inmate was housed in general population. He was diagnosed with Methamphetamine Dependence and Antisocial Personality Disorder and treated with Prozac 20 mg/day.

Inmate I was transferred to CVSP on September 2, 2004 from another CDC facility. Although he was not on the mental health caseload at that institution, a review of the inmate's medical record indicated that he was evaluated by a psychiatrist on July 9, 2004 and provided with a diagnosis of Depressive Disorder, NOS. He was then treated with Remeron, which was continued until his transfer to CVSP.

Two days after his arrival at CVSP, Inmate I was seen by the psych tech who noted that the inmate had been treated with Remeron, by his report, for insomnia. The psych tech consulted with the chief medical officer regarding the continuation of the inmate's medications. The inmate was reportedly asymptomatic at that time. A telephone order was obtained to discontinue the inmate's Remeron.

Inmate I was seen for a psychiatric evaluation three days later. No psychiatric diagnosis was provided at that time as the inmate was without symptoms. Follow-up was recommended on an as needed basis. The inmate was next seen by the psychiatrist on September 20, at which time the inmate reported depressed mood. Inmate I was prescribed Prozac and placed on the 3CMS caseload at that time. Subsequent progress notes indicated that the inmate showed improvement in his depressive symptoms and was compliant with his medication.

Assessment:

The following comments were noted regarding the care provided to this inmate:

- Similar to other case summaries, it appeared this inmate's medications were discontinued without evidence of actual clinical contact.

- Informed consent for treatment with Prozac was present in the inmate's medical record.

- The inmate's chart contained documentation of case management contact at least every 90 days.

- The inmate received a timely IDTT meeting, which included the necessary participants.

EXHIBIT  X

<u>California Institution for Women (CIW)</u>

November 29, 2004 – November 30, 2004

1.    Inmate A

This inmate's case was marked by multiple admissions to CIW and a backlog of medical records filing, leading to confusion regarding the level of medication continuity provided.

Inmate A was a 3CMS reception center inmate with two recent admissions to CIW. The inmate initially came to CIW on September 4, 2004 from a county facility. Her most recent bus screening was dated November 12, 2004. She may have been out-to-court in the interim. Her medical and psychiatric histories were documented by the bus screeners at the time of both admissions; the inmate had a history of depression and was currently treated with Remeron. Inmate A was seen within three days of admission in September by mental health staff and by a psychiatrist. She was placed on the 3CMS roster in September.

An initial review of the inmate's UHR indicated that she had not been seen during the two-week period since her readmission to CIW in November. A search of unfiled medical records, however, uncovered additional documentation. According to these documents, Inmate A was also seen in a timely manner by mental health staff and by a psychiatrist when she returned to CIW in November. The inmate was again placed on the 3CMS roster and Remeron was ordered. Interviewed staff members surmised that the inmate had been out-to-court. The same staff members also reported that it was not unusual for documentation associated with an inmate's return from court to be found in loose filing, rather than in the UHR.

The inmate's MARs did not show sustained medication continuity. Changes in the inmate's housing locations undoubtedly complicated the delivery of her medication. According to the MARs found in the inmate's UHR, she was prescribed Trazodone at CIW in February 2004 and took it for the 15 days that it was ordered. There were no MARs for the months contiguous to February, suggesting that the inmate may have only received Remeron for the duration of her initial 15-day order.

In September 2004, Remeron was ordered at CIW, but administered for only two days. The inmate signed an informed consent form. After a break of 26 days, during which no data was entered on the inmate's MAR, the MAR was annotated in a manner that suggested Inmate A was out-to-court for at least part of that time.

Assessment:

Missing documentation made it impossible for treatment providers to tell whether medication continuity was sustained during the inmate's two stays at CIW. The MARs that were available indicated that the inmate's medication continuity was interrupted. A recent MAR was almost completely blank, raising a question as to why standard operating procedures were not followed. Current informed consents were filed in the UHR. Bus screening and mental health evaluations were completed in a timely manner and served their purposes.

2.      Inmate B

This was a case of a low functioning, mentally ill inmate who received discharge planning, but remained out on parole for only a brief period of time. Inmate B paroled in June, coming back to CIW in August 2004.

Although Inmate B was being treated at the 3CMS level of care immediately prior to her parole, she had been an EOP inmate previously. After her return to CIW from parole, she was again treated at the EOP level of care. The inmate also had an acute care hospitalization in February 2004, during which she was secluded and/or restrained at CIW in the OPHU.

A discharge note written by a mental health clinician indicated that the inmate was low functioning and in need of help in order to succeed on parole. Mental health staff made an effort to reach her SSI agent to obtain assistance with arranging placement in a community program. A chrono indicated that the inmate was seen by a TCMP case manager in April, May and June. The TCMP chrono indicated that SSI was discussed.

When readmitted to CIW in August, Inmate B was seen in a timely manner. At that time, the inmate told a member of the mental health staff that she did not want to take medication. She was not seen by a psychiatrist until over a month had passed.

As of November, Inmate B was treated with Depakote 500 bid and Zyprexa 10. A Valporic Acid level was ordered on November 15, 2004, but no results were found in the UHR as of November 30, 2004. The most recent Valporic Acid level was dated February 2004. Staff reported that it typically took about ten days from the time a laboratory test was ordered to the time the result of the test was returned to the institution. Laboratory test results usually were not filed in inmates' UHRs until reviewed by the ordering physicians, resulting in additional filing delays.

Assessment:

Although she was treated at the EOP level of care, Inmate B was not seen for a psychiatric evaluation for over one month after she was readmitted to CIW in August. Laboratory results were expected to take least ten days to return after being ordered; no laboratory results were in the inmate's record, although two weeks had passed since they were ordered. Despite discharge planning, the inmate remained out on parole for less than two months.

3.      Inmate C

This EOP inmate was on reception center status. She arrived at CIW on November 8, 2004 and reported to the bus screener that she had been taking 400 mg of Seroquel in the county jail. Paperwork from the jail was found in the inmate's UHR; it indicated that she was not on medication there.

3

When interviewed by the monitor's expert in a group on November 29, 2004, Inmate C reported that she could not obtain Seroquel at CIW because it was not allowed. She also reported that she did not receive any medication for several days after arriving at CIW.

Documentation regarding psychiatric treatment during the inmate's first three weeks at CIW was fragmented and unintelligible. It was not possible to deduce fundamental facts regarding her movements in and out of the EOP unit or to determine the clinical basis for her admission to the OPHU. It was also difficult to ascertain whether the inmate had an outstanding medication order at a time when she was reportedly non-compliant with her medication. Documentation in the inmate's chart was not inconsistent with her complaints that she had been admitted to the OPHU, not because she was suicidal or non-compliant with medication, but because she exhibited undesirable, demanding and oppositional behavior.

During the month of November, Inmate C continued to complain that she had not received medication since arriving at CIW. Later notes indicated that the inmate reported auditory hallucinations instructing her to injure herself. Inmate C was subsequently transported to the OPHU for an immediate psychiatric evaluation. She remained in the OPHU for five days during which time Risperdal and Benadryl were initiated. The inmate was discharged back to the EOP program. A few days later, the inmate's medication regimen was changed to Risperdal and Remeron; no rationale was given in the UHR for this change. The inmate continued to ask for Seroquel.

Inmate C's MH-4 had been completed since she arrived on November 8, but no IDTT meeting had yet been held due to her reception center status.

The inmate's recent treatment was guided by a preliminary diagnosis of Schizoaffective Disorder. To date, Inmate C's treatment included only individual clinical contacts. The inmate's treatment in the OPHU consisted of four clinical contacts, one for each day the inmate was in the unit.

Assessment:

Although not required by the program guides, an IDTT meeting might have been useful in developing a treatment plan to address Inmate C's undesirable behaviors in a more therapeutic manner.

4

4.      Inmate D

This EOP inmate had been at CIW for approximately one month at the time of the monitoring visit in November 2004. Inmate D was on reception center status.

The inmate's bus screening was timely. It indicated that the inmate had a history of psychiatric treatment. Inmate D was referred to mental health by the bus screener and was seen in a timely manner by a psychologist and a psychiatrist. She had been treated with Abilify and Lithium, since her arrival at CIW in October 2004. Inmate D was seen for follow-up by a psychiatrist three weeks after her initial medication order and was found to be stable on her regimen. She was not seen every week by her case manager.

Informed consent forms were in the inmate's UHR. A cursory review of the inmate's chart indicated that she was treated as an inpatient at PSH in 2002. The record also indicated that she was released on parole in 2003 from an EOP level of care.

Inmate D's EOP treatment in October and November 2004 was guided by diagnoses of Schizoaffective and Bipolar Disorders. Because she was on reception center status, the inmate had not had an IDTT meeting yet. When seen by the monitor's expert in a group interview on November 29, 2004, Inmate D appeared to be well oriented and able to respond in a relevant manner to questions.

Assessment:

This inmate's treatment met program guide requirements. She was seen by a psychologist and by a psychiatrist upon arrival and her medication was ordered within 24 hours of entry to the institution. No laboratory tests had been ordered yet, but the inmate received appropriate psychiatric follow-up.

5.      Inmate E

This EOP inmate arrived at CIW in mid-September 2004. Paperwork from the county jail and the inmate's bus screening indicated that she was treated with psychotropic medication while in jail. Medication was administered at CIW the day after the inmate arrived.

Inmate E was immediately housed in the EOP unit with other reception status EOP inmates. She was still on reception center status at the end of November. In October, the inmate reported that she felt depressed due to psychosocial stressors associated with her recent incarceration and with her locked down status. Inmate E rarely got out of her cell to attend treatment and was prohibited by policy from participating in the informal social and recreational activities that were part of the daily routine in the EOP unit. She reported that she had access to the small fenced-in yard attached to the EOP building five days per week during a scheduled yard time.

5

Documentation in the inmate's UHR indicated that she was enrolled in a total of seven therapy groups; some of the groups met weekly, while others were held only on alternate weeks. Inmate E attended a total of four groups during a two-week period in September. Although 14 groups were scheduled for her during that period of time, ten were cancelled.

Inmate E was seen by a case manager individually most weeks and by a psychiatrist more frequently than monthly. Her Lithium levels were checked and her complaint of side effects resulted in a referral to nursing for non-compliance, a psychiatric appointment and a change in her medication regimen. When interviewed by the monitor's expert in a group on November 29, 2004, Inmate E appeared to be oriented, alert and able to engage in relevant conversation.

Assessment:

This inmate had been on reception center status for a period exceeding time guidelines; she remained unendorsed more than 70 days after she arrived at the institution. Although the psychiatric treatment provided was responsive to Inmate E's clinical needs and met program guide requirements, she was not doing well. The combination of living under highly restrictive reception center conditions and being offered few EOP activities was detrimental to her mental health.

EXHIBIT  Y

Central California Women's Facility (CCWF)

October 7, 2004 – October 8, 2004

1.      Inmate A

This inmate was interviewed in the unit by the monitor's expert, who knew the inmate from previous monitoring visits. Inmate A appeared to be very hypomanic and anxious, rule out akathesia. She complained that she had been kept for 13 days in a "management cell" in the EOP unit. The cell was inspected and the inmate's social worker was interviewed by the expert. The social worker confirmed that a team decision had been made, and a chrono written, placing the inmate in a management cell for management purposes. The inmate had been hypomanic and agitated. The cell had only a mattress on the floor and was, otherwise, a regular administrative segregation cell devoid of any property or furnishings. A review of the inmate's chart confirmed that the inmate's 13-day stay was for the reasons indicated by the social worker.

Diagnostically, Inmate A had a diagnosis of severe Borderline Personality Disorder on Axis II with a history of severe self-mutilization. She was taking a combination of Prozac and Zyprexa, both of which when taken individually had been helpful to her in the past. The senior supervising psychiatrist was asked to review her case. The following week, during the UNA study, the senior supervising psychiatrist indicated that the combination of drugs the inmate was taking was causing dyskinesia; in response, the medication was stopped. Unfortunately, as the psychiatrist indicated, the inmate had been placed back in the management cell for the entire weekend by new nurses for very inappropriate reasons. Inmate A was thereafter removed from the management cell and her medication regimen was reinstated with appropriate doses of the same medications.

Assessment:

- The inmate's placement in a management cell was inappropriately handled. No limitation was placed on the inmate's length of stay in the cell and the inmate received no observation while in the cell. The management cell was impermissibly being utilized as a de facto OHU.

- Staff, particularly nursing staff, needs training regarding the signs and symptoms of side effects of psychotropic medications and in the criteria for utilization of the management cell. In addition, policies and procedures need to be generated regarding the use of these cells. It was counter productive to place an agitated inmate who is in a mental health crisis in such a cell absent enhanced observation and treatment.

- Policies regarding return visits for inmates newly started on medication required review. Earlier psychiatric intervention could have avoided all of these problems.

2.    Inmate B

This inmate's chart was reviewed as part of a wider study of the need for higher levels of care.

Inmate B had been a 3CMS inmate at CCWF as late as October 2003. She experienced many mental health crises in a short period of time in November of 2003 and was placed at an EOP level of care on December 18, 2003 with a GAF of 35. She was sent from VSPW to CCWF on December 22, 2003.

Inmate B's MH-4 of January 9, 2004 indicated that she was extremely bizarre and too psychotic to even communicate with staff. Her functioning was grossly reduced as was her psychomotor activity. While in the MHCB unit, Inmate B was placed on Zyprexa. She was discharged to an EOP level of care with a diagnosis of schizoeffective disorder, bipolar type, and a history of cocaine abuse. The inmate was also hospitalized at PSH in 1990.

The inmate's mental status evaluation at the time of her last treatment plan on September 23, 2004 indicated that her thought processes were good, but she experienced auditory hallucinations and delusions of grandeur. There was no change in her diagnosis. Her psychotic symptoms included grossly hypersexual speech and conduct, which had become chronic and significantly impaired her functioning. It was decided to retain her until her parole in April of 2005. Despite her functional limitations and gross psychotic thought processes, Inmate B had greater than 80% participation in groups. She had been medication compliant throughout the year. She has been on Zyprexa Zydis 20 mg for several months. Recently Mellaril, Benadryl and Cogentin were discontinued and Thorazine was added. Remeron 45 mg per day was also added.

Assessment:

- Pharmacological and other mental health treatment services for this inmate were adequate; the inmate had participated actively in these services.

- Inmate B was medication compliant and had adequate trials of antipsychotics, including an adequate trial of Zyprexa Zydis.

- The inmate needed to be transferred for clinical reasons to the PSH intermediate care facility. She continued to experience severe and chronic psychiatric symptoms which, in fact, interfered with her functioning. Inmate B was not responding well to adequate treatment; she may benefit ultimately from a Clozaril trial. Psychiatrists tried to augment the inmate's Zyprexa, but she should have been placed on a different atypical medication before trying Clozaril.

3.    Inmate C

This inmate's chart was reviewed as part of a wider study of the need for higher levels of care.

Inmate C was placed at an EOP level of care at VSPW during March 2004. She was transferred on March 30, 2004 to CCWF's EOP program. Her EOP level of care was continued in a chrono dated April 7, 2004 with a GAF of 45. A review of this inmate's UHR revealed that she was a second term, second strike inmate incarcerated for assault on a correctional officer in a county jail. Her estimated parole date was December 18, 2004. There was a TCMP chrono in her file, indicating a parole review on October 7, 2004.

While in the MHCB unit at CCWF on April 6, 2004, an MH-4 was completed, revealing a very violent criminal history. The inmate had no pre-CDC psychiatric hospitalization history, but she had been in the MHCB unit and SCU at CIW on several occasions. She had been treated for depression and overdose in 2002. At that time, she was placed on Zyprexa and Celexa and discharged to the EOP level of care. She was compliant with her medication. Her diagnoses at the time was Major Depressive Disorder, Severe, with Psychotic Features along with Substance Abuse History. Her GAF was 45. A diagnosis of eating disorder was added in June 2004.

Progress notes showed an order dated September 13, 2004 for Risperdal 3 mg q.p.m. and Prozac 90 mg q week. Her Zyprexa had been discontinued in July and she was placed on Risperdal at that time. Recent progress notes indicated that she was flat, but clear of psychotic symptoms. She was eating, and purging, and anticipating a December parole. Inmate C was very active in group therapy and was a very high functioning participant in one-to-one case management visits. The inmate's social withdrawal had improved. Most of the psychiatric medication efforts for this inmate revolved around dealing with her eating disorder.

Assessment:

- This inmate received adequate after-care parole planning.

- Good pharmacologic and other mental health care were provided for this very difficult but improving mental health inmate.

4.    Inmate D

This inmate's chart was reviewed as part of a wider study of the need for higher levels of care.

Inmate D was a 3CMS inmate while at CCWF. Her level of care was increased to the EOP program in a chrono dated April 21, 2004; the chrono included behavioral alerts of "aggressive"; she was on medications and had a GAF of 40. The inmate had been

4

referred from D-yard on April 9, 2004. She had a history of EOP care and was last discharged on December 3, 2003 to a 3CMS level of care. Her diagnoses at that time were Paranoid Schizophrenia and Polysubstance Dependence on Axis I. She was placed on Zyprexa Zydis 20 mg per day on April 28, 2004, an increase from her previous levels. Celexa was added in May 2004 and Haldol on May 26, 2004.

The inmate's attendance at clinical activities, including groups, was good. Inmate D functioned much better after Haldol was added to her medications. She was symptomatically improved; by June, the inmate no longer had auditory hallucinations and was engaged in treatment. She was up for a phase change at that time. She was placed on Phase II on August 4, 2004 and also on the MDO list. Topamax was started for indications that were not clear and the inmate's Haldol was discontinued by a medical physician because of the inmate's decreased blood pressure.

Inmate D experienced a mental health crisis on September 9, 2004 and was placed in a strip cell for suicidal ideation. After a one-hour clinical intervention, she was returned to her housing. Inmate D's Topamax was systematically increased to 100 b.i.d., her Haldol was reinstated in mid-September at 15 mg per day and her Zyprexa Zydis was continued. By September 28, 2004, psychiatric notes indicated that the inmate's medications were helping her.

The monitor's expert interviewed the inmate's case manager, who agreed that the inmate was improving functionally. Her acting out, paranoia and passive suicidal ideation had been unexpected. She improved following that crisis with better medication treatments.

Assessment:

- The medicine and mental health departments at CCWF needed to communicate more effectively when an inmate's major psychotropic medication was discontinued. A psychiatric review of Inmate D's medication needs would have been preventive.

- The use of a management cell on a short term basis for this inmate was appropriate.

- Overall, pharmacologic and other mental health treatments were good for this improving inmate.

EXHIBIT Z

Valley State Prison for Women (VSPW)

October 4 - October 6, 2004

1.    Inmate A

This inmate was interviewed at her request in the SHU.  She complained that the court ordered her to be transferred to Napa State Hospital (NSH), but indicated that there were problems with the transfer.  She was extremely tearful and angry about her legal situation and her transfer.

Inmate A also reported that she was in the emergency room the week preceding the monitoring visit for an overdose of Inderal, a drug she was taking for a sinus arrhythmia. The inmate indicated that she was transferred to an outside hospital from the emergency room.  Inmate A said that she received Ativan and Haldol concentrate two times while in the emergency room.  At the outside hospital, she received 2 mg of Ativan IV along with fluids.  Inmate A complained that, after her return to VSPW and while housed in a safety cell, she experienced a bad reaction to Haldol, which consisted of a swollen neck, throat and tongue for 12 hours.  A correctional officer, she alleged, refused to help her with the allergic reaction, saying, "I don't care if you die".

A review of Inmate A's UHR confirmed many elements of her recent history.  Medical notes confirmed that the inmate had reportedly taken seven to eight Benadryl tablets and 11 or 12 Inderal capsules.  According to her chart, the inmate refused Ipecac in the VSPW emergency room and was transferred to an outside hospital.  There was no record from the outside hospital in the inmate's UHR.  The inmate was placed in the OHU upon her return from the hospital on September 23, 2004.  Inmate A's medications were then changed to Inderal b.i.d. (crushed) and Benadryl concentrate.  She was also scheduled for five-day suicide prevention follow-up.  The inmate had a diagnosis on Axis I and II of severe Borderline Personality Disorder, with a recent history of near fatal hanging.

There were no case manager notes after September 20, 2004.  In light of the dearth of recent progress notes, the monitor interviewed Inmate A's treating psychiatrist.  The psychiatrist confirmed the inmate's diagnosis and indicated that she was on Zyprexa 10 mg h.s.  He also confirmed administering IM Cogentin to the inmate in the emergency room, after she complained of an allergic reaction to Haldol.

The inmate's chart reflected numerous discussions with the inmate about her pending transfer to NSH.  According to the chart, NSH was apparently refusing to take the inmate back and the inmate's team, with the assistance of counsel, was trying to get her moved to PSH.  The program supervisor confirmed the recent history of attempts to get the inmate transferred to PSH and also indicated that she had an appointment with an attorney scheduled for next week.  This information was communicated to the inmate.

A review of the inmate's history revealed numerous mental health contacts since September 17, 2004, including several IDTT meetings.  The inmate was at the 3CMS level of care in the SHU.  A review of her past medication history revealed that she had

2

been on Lithium 600 mg q.p.m., during the month of July. Her Lithium level was normal as of June 10, 2004. Her last Lithium order, dated June 18, 2004, indicated "cancel all medications at patient's request." A note by the case manager on the same day indicated that the inmate said she never refused Lithium and stated that, in fact, she needed it. The psychiatrist's plan was to re-order the medication with follow-up after one month. At her one-month follow-up, the inmate was doing well, although she was experiencing lower extremity edema and was awaiting transfer to NSH. On August 3, 2004, a psychiatric progress note indicated that the psychiatrist had "heard in passing" from a nurse that the inmate had stopped her Lithium and was declining psychiatric follow-up. The psychiatrist, at that point, discontinued her medications. By August 10, 2004, the inmate was again in a safety cell on suicide watch.

Assessment:

- This inmate's medication management was inadequate.

- Inmate A received appropriate crisis management for an overdose and for a medication allergic reaction. She reported, however, that a correctional officer inappropriately refused to refer her when her allergic reaction began in the OHU.

- It was likely that this inmate needed a higher level of care. She had numerous emergencies, case manager contacts and group therapy from time to time during the reporting period.

- The VSPW program staff was doing all in their power to assist with the inmate with what were essentially legal difficulties in transferring to a state hospital. If the transfer is not effectuated, the monitor was of the opinion that Inmate A should be treated at an EOP level of care.

2.    Inmate B

This EOP inmate was housed in the SHU. She was interviewed privately by the monitor, who was familiar with her from prior evaluations. Inmate B reported, and her record confirmed, that she spent a year and a month at PSH. She indicated that she weighed 125 pounds when she was transferred to PSH, but now weighs 229 pounds. Inmate B was put on Lithium, Depakote and Zyprexa in the hospital. She reported that her mother is diabetic and on oral hypoglycemics and that her grandmother is also diabetic. The inmate believed that she now has an eating disorder because she eats compulsively. Clinically, she had no thought disorder and her hygiene was good. She was showering regularly and exhibited no bizarre behavior.

The inmate gave a very positive report about her experience at the hospital. She was in a women's issues group, an anger management group and a walking group for six months at the hospital. All of the criminal charges against her were dismissed, she reported, on the grounds of permanent incompetence to stand trial. Inmate B had been back at VSPW since June of this year. She had a cellmate and was allowed yard privileges. She was not

participating in groups, indicating that they were "the same old stuff". She disliked what she perceived as childish activities, including coloring books and movies. She preferred to talk to her "disembodied" voices.

Inmate B further reported that she was in the OHU a few weeks prior to the monitoring visit. She swallowed shampoo in an effort to kill herself because she had not received any communications from her family. She felt much neglected by them and reported that her mother won't fill out her visitor cards.

Volume VII of the inmate's UHR was reviewed. According to her chart, Inmate B returned from PSH on June 9, 2004. Her discharge summary indicated that the inmate's Lithium and Depakote levels were normal. Her Lithium level was 0.73 (0.8-1.4 normal) and her Depakote level was 37 (50-100 normal range). The inmate's prior weight could not be located in the chart, but the monitor recollected that she was comparatively thin one year before.

Inmate B was transferred to an outside hospital in connection with her shampoo overdose. She was cleared medically by the hospital on August 26, 2004 and returned to VSPW the same day. Upon her return, she was admitted immediately to the OHU for suicide prevention follow-up and was discharged on August 30, 2004. The psychiatric evaluation completed prior to the inmate's discharge from the OHU did not indicate any need for MHCB care.

Prescriptions were written in the OHU for Lithium carbonate 600 mg q.a.m., 900 mg q.p.m., Depakote 500 mg b.i.d., and Zyprexa 20 mg q.p.m. Depakote and Lithium levels were obtained during the week of September 6, 2004. The treating psychiatrist on a weekly basis wrote an order asking for the serum levels, but they were never done. An EKG was ordered on June 29, 2004 and taken on July 13, 2004, but was never routed to the psychiatrist.

Inmate B received an Axis I diagnosis of Bipolar I Disorder, Manic, rule out Post-Traumatic Stress Disorder. On Axis III, Inmate B had hypothyroidism and obesity. On Axis V, her GAF was 37. A psychiatric note also says that the inmate's tremor was better after her Zyprexa was decreased to 10 mg q.p.m.

Inmate B's medical record confirmed her hypothyroidism and indicated that her decreased thyroid functioning had been found incidental to her laboratory and medication work-ups. There was never any thyromegaly. Inmate B was currently on Synthroid and was euthyroid as of August 10, 2004. The inmate's liver function tests, however, were increased as was BUN. There was no blood sugar apparent in the inmate's laboratory studies and Hepatitis A, B and C were ruled out.

A review of the inmate's history confirmed her general refusal to involve herself in mental health groups, particularly recreational therapy. Between September 1 and October 5, 2004, Inmate B had nine case management contacts.

Assessment:

- Inmate B was treatment resistant. The inmate's treatment plan should be changed to include efforts to overcome her treatment resistance. She was a willing participant in groups while at PSH.

- There were delays in sending the inmate's EKG and laboratory results to her treating physician.

- Inmate B was considerably improved clinically compared to one year ago.

- This inmate's name was given to the program supervisor and chief psychologist by the monitor for a work-up of her obesity.

3.    Inmate C

This inmate's chart was reviewed as an example of a 3CMS inmate in administrative segregation. Inmate C arrived at VSPW on July 5, 2004. Her first treatment plan was dated July 13, 2004 with a diagnosis of Schizo-Affective Disorder, Depression and Polysubstance Dependence with a GAF of 55. The inmate's problems included Cognitive Impairment, a history of Auditory Hallucinations and Depression along with Impulse Control. The inmate's treatment plan specified case management contacts every week and medications.

A review of the case management notes starting in July 2004 revealed one contact in July and the last case manager contact on August 4, 2004. Three attempted contacts in July were stymied for lack of a correctional officer escort. On the third occasion, the inmate was sleeping.

Inmate C was taking Celexa 600 mg concentrate q.p.m., which was last prescribed on September 14, 2004. She had been taking Zyprexa, which was discontinued on July 19, 2004. At that time, she was on Celexa 40 mg concentrate. There was no evidence of psychosis at that time. The inmate was seen monthly. The last psychiatric note was dated August 18, 2004.

Assessment:

- This inmate's mental health care was inadequate.

- Inmate C's treatment plan was grossly inadequate.

4.    Inmate D

Inmate D was an EOP inmate who arrived at VSPW in May 2004. A MH-7 was completed for her the same day. Inmate D was in administrative segregation in June of 2004 for battery on a police officer. She was awaiting a hearing when she became

5

suicidal. She was admitted to the OHU, placed on suicide watch and prescribed Abilify and Trazodone on June 4, 2004. She was also scheduled for a RVR hearing the following week. Inmate D was discharged back to the administrative segregation EOP unit and was seen frequently over the next several weeks.

A psychiatric note, dated June 18, 2004, reevaluating the inmate's medications was conducted cell-side for lack of a correctional officer escort. At that time, the inmate was still taking Abilify and Trazodone. The inmate's condition was regarded as improving and her level of care was deemed appropriate.

Inmate D was again placed in the OHU on June 19, 2004 because "voices were telling her to hang." She improved by June 21 and was discharged and placed on five-day follow-up, all of which was fully documented. A suicide risk assessment was done prior to her discharge.

During the month of July, many of the inmate's therapy groups were cancelled due to insufficient officer coverage for out-of-cell visits; four groups were cancelled because of an incident in the group therapy room that necessitated extensive cleaning; lock-downs were a common cause of cancellations. Many visits were conducted at cell front because of lockdown and inadequate officer coverage.

The inmate was readmitted to a safety cell in the OHU on August 27, 2004. At that time, Abilify was tapered and Remeron was discontinued; Seroquel was initiated and titrated up from 100 mg for five days and then to 500 mg per day; Trazodone was re-prescribed for 200 mg q.p.m. The inmate's Seroquel was adjusted on September 22, 2004 to Seroquel 400 mg crushed q.p.m.

No treatment plan was found in the chart. Inmate D had just received SHU time for a disciplinary infraction.

Assessment:

- This difficult inmate received good psychiatric medication management.

- The inmate was frequently placed in the SHU's OHU.

- Inmate D's participation in therapy was poor; groups were frequently cancelled.

- A higher level of care should be considered if the inmate does not stabilize.

- There was no treatment plan whatsoever in the inmate's chart.

5.    Inmate E

Inmate E was an administrative segregation EOP inmate who arrived at VSPW in July 2004. Volume VI of her UHR was reviewed. No treatment plan could be found in the

6

inmate's chart, but an MH-4 dated May 25, 2004 diagnosed her as having severe paranoid schizophrenia. At that time, the inmate was on Risperdal and Artane. The inmate had nine OHU admissions since May.

On July 16, 2004, Inmate E was referred to the MHCB unit. She remained in the MHCB unit from July 19 until July 20, when she was returned as a "malingerer." The discharge summary indicated that her smearing of feces was a manipulative effort to get to PSH. A chrono dated August 2, 2004 indicated that the inmate was seen in her safety cell by a psychiatrist who called her a manipulator. He wrote three informational chronos related to her admissions to the OHU, indicating that she was not really suicidal. The psychiatrist wrote that the inmate was trying to get out of administrative segregation or go to PSH. Inmate E also had a chrono dated August 11, 2004 noting a GAF of 30 and assigning her to an EOP level of care.

With respect to medications, the inmate was on Risperdal prior to the early August OHU admission. After that admission, the same psychiatrist who wrote the three aforementioned chronos tapered the inmate's Risperdal and put her on Geodon. A psychiatric note date August 30, 2004 indicated that Inmate E was functioning very well after two weeks of Geodon.

A review of her inmate history revealed many refusals to attend recreational therapy up until the end of September 2004; the inmate also missed many groups for institutional reasons. Inmate E's group attendance improved starting in early September.

Assessment:

- This inmate's chart reflected an unresolved diagnostic conflict.

- No treatment plan could be found in the inmate's chart.

- Otherwise, this very difficult, but improving, inmate received adequate mental health care, including medications.

6.    Inmate F

Inmate F arrived at VSPW in 2001 and was a 3CMS inmate until September of 2003. Her diagnosis in Axis I was Post-Traumatic Stress Disorder, history of mood disorder NOS and polysubstance dependence. She had a seizure disorder in Axis III.

Inmate F was placed in administrative segregation following a disciplinary infraction for battery on staff and mutual combat. On entry in administrative segregation, her mental health screening was positive and she was referred for a mental health evaluation. Her treatment plan was updated in administrative segregation. Inmate F was expected to be paroled within a year.

7

There was great diagnostic conflict between the administrative segregation psychiatrist and the psychologist working with Inmate F. The psychologist saw her as having a severe mood disorder related to a history of severe childhood physical and sexual abuse. The psychologist's diagnostic impressions revolved around a psychotic process with mood disorder, or R/O MDD with psychotic features. The psychologist recommended a 3CMS level of care. The inmate was referred to a psychiatrist, who after extensive review of her UHR concluded that her history did not suggest a psychotic process and that there were no indications for medications. The psychiatrist recommended discharging the inmate to general population.

An IDTT meeting on September 14, 2004, consisting only of the inmate's case manager, increased her level of care to EOP, ostensibly to increase mental health contact with her. The case manager had found her to be symptomatic with depressed mood and in need of medications. Another psychologist at that time concurred with the diagnosis of a psychotic process and Post-Traumatic Stress Disorder, but also found her to be somewhat paranoid as well as angry.

A review of the inmate's file revealed poor concordance between her inmate history and her chart. In particular, mental health services were listed in the inmate history that were not reflected in the inmate's chart during the month of September. Mental health documentation in the chart ended on September 24, 2004. It appeared that the inmate attended several groups just prior to September 24.

Assessment:

- The inmate's chart reflected a serious unresolved diagnostic conflict.

- There did not appear to be a clinical foundation for increasing the inmate to an EOP level of care. Procedures followed in changing Inmate F's level of care were irregular.

- This inmate's IDTT consisted of only one clinician. Such a meeting was not consistent with the purposes of the IDTT process.

- Inmate F had an adequate treatment plan, but was not receiving the clinical services appropriate to the EOP level of care. She had attended only several recreational therapy groups.

- There was no mental health documentation in the inmate's chart after September 24, 2004.

7.    Inmate G

This was an EOP SHU inmate, who was referred by treating clinicians for evaluation; she was also part of the unidentified-need study.

8

Inmate G had been treated at the EOP level of care long-term at both CIW and CCWF. She was placed in administrative segregation at CCFW on January 20, 2004 for two counts of battery on staff. She arrived at VSPW with a SHU term from CCWF on July 20, 2004 and was placed on walk-alone status. A mental health evaluation completed on January 27, 2004 in connection with those two disciplinary infractions did not recommend any mitigation of punishment.

Inmate G's current diagnoses were Schizoeffective Disorder, Bipolar type, Tardive Dyskinesia, mild, and Polysubstance Dependence on Axis I. On Axis II, she was diagnosed with Borderline Intellectual Functioning and Antisocial and Personality Disorder. On Axis III, she was blind OS, with anemia and a history of tuberculosis. Her GAF on Axis V was 45 on August 2, 2004. Inmate G's treatment plan indicated that she was "responding to internal stimuli". Although she was calm, her speech was somewhat pressured. Her cognitive functioning was reduced (DDP 1) and she had a pronounced thought disorder with disorganization.

The inmate liked Haldol, Cogentin, Depakote and Topamax. Her treatment plan was to continue these medications, group therapy and weekly case management visits. During August, the inmate refused most of her therapy groups; in addition, some groups were cancelled. The inmate also refused one-to-one private case management contacts, as well as all medications. She insisted, on a delusional basis, that she receive Ensure. She was not considered a candidate for a Keyhea order.

By the end of August 2004, Inmate G was grossly psychotic. According to her UHR, she had lost 130 pounds. She was seen by a psychiatrist on September 2, 2004 pursuant to a custody referral. Her ADLs were grossly unsanitary. Inmate G agreed, during the psychiatric interview, to take Abilify. The last psychiatric note in the inmate's chart was dated October 6, 2004. This note indicated that the inmate was demanding Resource to keep from vomiting, wanted to go to PSH and was responding to internal stimuli. According to the psychiatric note, Inmate G laughed inappropriately, was experiencing auditory hallucinations and probably had a delusional thought disorder. The Abilify, which had been at 30 mg per day for three weeks, was continued. There were no documented case management visits after September 2, 2004.

Assessment:

- The inmate's treatment plan was never modified to address the issue of treatment resistance.

- This inmate's therapy groups were frequently cancelled due to institutional reasons.

- Referrals to mental health failed for this grossly psychotic and deteriorating inmate who was losing weight rapidly.

- Inmate G's medication compliance was never clear.

9

- The inmate's case management visits apparently stopped in early September.

- This inmate's name was given to the chief psychologist as an inmate in need of immediate transfer to PSH.