1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

13

14 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

15              UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17 RALPH COLEMAN,                          )   No.:  Civ S 90-0520 LKK-JFM
                                           )
18         Plaintiffs,                      )   **PLAINTIFFS' OBJECTIONS TO THE**
                                           )   **FIFTEENTH MONITORING REPORT**
19 vs.                                      )   **OF THE SPECIAL MASTER ON**
                                           )   **DEFENDANTS' COMPLIANCE WITH**
20 ARNOLD SCHWARZENEGGER, et al.,           )   **PROVISIONALLY APPROVED PLANS,**
                                           )   **POLICIES AND PROTOCOLS**
21         Defendants                       )
                                           )        **HEARING**
22                                          )
                                           )   Date:       To be determined
23                                          )   Time:       To be determined
                                           )   Location:   Courtroom 4
24 ───────────────────────────────         )               The Honorable Lawrence K.
25                                                          Karlton

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 4

    I.     DEFENDANTS SHOULD BE ORDERED TO PROVIDE THE
          SPECIAL MASTER AND PLAINTIFFS WITH A DRAFT OF THEIR
          PLANS TO EXPAND MHCB AND DMH INPATIENT BEDS ON
          MARCH 15, 2006. ....................................................................................... 4

    II.    THE COURT SHOULD ISSUE AN ORDER REQUIRING
          DEFENDANTS TO ENSURE THAT DAILY PSYCHIATRIC
          TECHNICIAN ROUNDING OCCURS IN THE NINE INSTITUTIONS
          WHERE PROBLEMS ARE NOTED IN THE FIFTEENTH REPORT ............... 6

    III.   THE COURT SHOULD ORDER DEFENDANTS TO PROVIDE
          RECEPTION CENTER EOP TREATMENT TO EOP INMATES WHO
          HAVE BEEN HELD IN THE RECEPTION CENTER FOR MORE
          THAN 60 DAYS ....................................................................................... 11

CONCLUSION ............................................................................................................... 17

i

PLTFS' OBJ TO THE 15TH MONITORING REPORT OF THE SPECIAL MASTER ON DEFS' COMPLIANCE WITH PROVISIONALLY
APPROVED PLANS, POLICIES AND PROTOCOLS, No.: Civ S 90-0520 LKK-JFM

# TABLE OF AUTHORITIES

## FEDERAL CASES

Coleman v. Wilson,
        912 F. Supp. 1282 (E.D. Ca. 1995).................................................................2, 12

## FEDERAL STATUTES

Fed. R. Civ. P. 53 (g) ........................................................................................3

**INTRODUCTION**

Plaintiffs bring these Objections to the <u>Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols</u> ("15th Report" or "Special Master's Report") in order to engage the Court's assistance and oversight powers in three critical areas where defendants' lagging programs for the mentally ill are currently placing *Coleman* class members at great risk.

<u>First</u>, defendants have now struggled for many years to respond to severe bed shortages in their two most intensive mental health programs: (1) Mental Health Crisis Beds ("MHCB"), which are licensed mental health programs inside CDCR prisons designed to safely house, stabilize and treat inmates in an acute mental health crisis for up to ten days, and (2) Department of Mental Health ("DMH") inpatient psychiatric beds, which are located both within CDCR prisons and in DMH hospitals and provide the highest and most intensive level of mental health care in licensed programs run by DMH clinicians. Plaintiffs support the Recommendations (numbers Three and Five) of the Special Master to require that defendants produce a comprehensive plan by mid-April 2006 for expanding the number of MHCB and DMH inpatient beds to meet the now documented needs of the plaintiff class. Plaintiffs also support the Special Master's request that the Court hold a hearing shortly after the plans are made public in April to assess their adequacy.

Plaintiffs request that the Court modify the proposed recommendations to require that defendants make a draft version of their plans available to the Special Master and plaintiffs at least 30 days earlier, on March 15, 2006, in order to allow for meaningful input concerning the plans prior to the end of the budget cycle in mid-May 2006 (less than a month after the current deadline for the plans). Plaintiffs also ask that the Court request the presence of representatives from the Governor's Office, the Department of Mental Health, and the Department of Finance at the April hearing.

<u>Second</u>, this Court has already ordered specific relief for inmates in administrative segregation units and other locked care units. As the Court recognized following the trial below, these units are particularly dangerous for mentally ill inmates, because inmates are

1

1  isolated in their cells for long periods of time with little human contact. *Coleman v. Wilson*,

2  912 F. Supp. 1282, 1320 (E.D. Ca. 1995) (adopting, over defendants' specific objection, the

3  finding by the Magistrate Judge that administrative segregation placement causes mentally ill

4  inmates to decompensate). One key element of the mental health programs required by this

5  Court's remedial orders is daily rounding by a psychiatric technician to check on the

6  functioning of each inmate and identify inmates who are becoming suicidal or otherwise

7  beginning to decompensate in the harsh locked-down conditions. The Special Master found

8  that nine institutions are not conducting or documenting adequate rounds in their

9  administrative segregation units on a daily basis, as required by current Court Orders, but did

10  not recommend any additional remedy. Plaintiffs request an Order from the Court to ensure

11  the Wardens of these prisons comply with this Court's existing orders.

12      Third, this Court adopted transfer timelines for certain mentally ill inmates housed in

13  Reception Centers because of the inability of these Reception Centers to provide the required

14  intense level of mental health care. 4/13/01 Order ¶ 4; Special Master's Recommendation for

15  Transfer Timelines, filed January 3, 2000 at 5. The current number of *Coleman* class members

16  waiting for treatment in overcrowded CDCR Reception Centers has increased dramatically in

17  the six months since the end of the Fifteenth Round of Monitoring, and is now approaching, on

18  a percentage basis, the percentage of mentally ill inmates waiting for treatment in Reception

19  Centers that was found unconstitutional by this Court at the time of trial. Declaration of

20  Michael W. Bien In Support of Plaintiffs Objections to the Special Master's 15th Monitoring

21  Report ("Bien Dec.") at ¶¶ 3, 4. Given the growing numbers of mentally ill in the CDCR's

22  Reception Centers, plaintiffs ask that the Court order defendants to create treatment programs

23  for Enhanced Outpatient Program ("EOP") inmates in the Reception Centers whose transfer

24  has been delayed.

25      Plaintiffs raised timely objections with the Special Master in each of these three areas in

26  response to the Draft Report. Bien Dec. at ¶ 2 and Ex. A. These three major problem areas

27  have all now been studied and are well understood. The Court and the Special Master can now

28  act with confidence in compelling more certain compliance by defendants using the modestly

2

1    more intrusive remedies sought by plaintiffs in this motion.[1]

2        Plaintiffs' request is made more urgent by the dangerous current conditions that

3    defendants themselves admit exist today due to severe overcrowding. CDCR officials in their

4    own internal memos have declared an "emergency" and "a severe crisis" due to the combined

5    effects of severe overpopulation and understaffing. Bien Dec. ¶ 5 and Ex. D. In an

6    extraordinary October 25, 2005 Memo to CDCR Secretary Hickman, the current conditions are

7    discussed with alarm by CDCR Adult Division Director John Dovey:

> The California Department of Corrections and Rehabilitation's
> (CDCR) total inmate population reached 166,148 as of October 12,
> 2005. This historic population high has caused significant
> population pressures resulting in public safety concerns for the
> CDCR as well as the counties in our state. . . . The CDCR is
> experiencing staffing shortages in a broad range of areas. These
> range from Correctional Officer, medical/mental health staffing,
> case records analysts, etc. . . .

13   Bien Dec. ¶ 5 and Ex. D. Since this memo was written, the CDCR has accepted another 2,000

14   inmates, raising the total population to 168,001. Bien Dec. and Ex. C. These conditions are

15   made more dangerous by the lack of adequate clinical leadership and oversight in headquarters,

16   as noted by the Special Master in support of Recommendation 2. 15th Report at 411

17   (recommending that the Court require defendants to develop a plan within 60 days to expand

18   central office clinical staff and improve compensation for central office clinical staff

19   members).

------------------------------------------------------------

[1] The standard of review for Findings and Recommendations of the Special Master in this case is governed by Federal Rule of Civil Procedure 53, which was extensively amended in 2003. Rule 53 requires a *de novo* review of the challenged Findings and Recommendations of a Special Master when a party files objections. See Fed. R. Civ. P. 53 (g) (3) ("The court must decide *de novo* all objections to findings of fact made or recommended by the special master" unless the parties and the court agree otherwise) and Fed. R. Civ. P. 53 (g) (4) ("The court must decide *de novo* all objections to conclusions of law made or recommended by a master."). This Court's December 11, 1995 Order of Reference, which was based on the prior version of Rule 53, is inconsistent with this standard and states that the standard of review for findings of fact will be "clearly erroneous." See 12/11/06 Order of Reference at 8, ¶ C. Plaintiffs will shortly prepare a proposed amended Order of Reference for adoption by the Court to address this and other inconsistencies.

**ARGUMENT**

**I.    DEFENDANTS SHOULD BE ORDERED TO PROVIDE THE SPECIAL MASTER AND PLAINTIFFS WITH A DRAFT OF THEIR PLANS TO EXPAND MHCB AND DMH INPATIENT BEDS ON MARCH 15, 2006.**

In the final version of the 15th Report, the Special Master extended until April 17, 2006 the timeframe he had initially proposed in Recommendations Three and Five for defendants to produce plans for expanding the number and availability of inpatient beds and MHCB beds. 15th Report at 416, 419-420.  Defendants requested this extension in their objections to the Draft Report in order to "be permitted sufficient time to prepare and present the plan in a manner to optimize the likelihood of legislative approval for funding this bed plan."  12/12/05 Defendants' Responses and Objections to the Draft Fifteenth Monitoring Round of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Defendants' Objections") at 11.  Defendants' Objections did not include any evidence or any additional explanation as to why this extension of time would improve the likelihood of legislative approval, and there is little reason to credit this explanation for the delay.  *Id.* Plaintiffs' Objections to the Draft Report asked the Special Master to require defendants' plan at an even earlier date.  Bien Dec. ¶ 2 and Ex. A (Plaintiffs' Objections to Draft Report at 10).

The Special Master granted defendants' request to extend the time period until April 17, 2006, apparently accepting defendants' explanation concerning the need for the extension at face value. 15th Report at 416.  Plaintiffs object to this extension of time.  Defendants have now known about the critical shortfalls in inpatient and MHCB beds for at least a year, and they are now in violation of numerous existing court orders on these issues.  Bien Dec. ¶ 6. Moreover, the April 17, 2006 deadline requested by defendants is too late in the budget process for the Special Master, plaintiffs, or the Court to make significant changes to the plans and still allow time for the plans to be adopted by the Legislature as a part of the May Revise process. The budget process for the next fiscal year is already well underway.  Attached as Exhibit H to the Bien Declaration is a document titled "General Budget Timetable" which was downloaded from the Department of Finance Website.  Bien Dec. ¶ 13 and Ex. H.  This document shows

4

that the "May revise" period for adding items into the budget for the next fiscal year will be closed on May 14, 2006 when the Department of Finance "issues its May Revision of General Fund revenues and expenditures, including Finance Letters" to the Legislature. *Id.* The April 17, 2006 deadline proposed by defendants and adopted by the Special Master would allow a period of less than a month in which plaintiffs and/or the Special Master could seek to negotiate changes to the plan, or to ask the Court to order changes in the plan.  In effect, unless defendants' plans are comprehensive and appropriate, the proximity of the deadline to the close of the budget cycle will force the plaintiffs and the Special Master to choose between accepting an inadequate plan,[2] or waiting another full budget cycle and another full year for defendants to produce and fund an adequate remedy for these long-standing problems.  By requiring the plans to be produced a month early for review in *Coleman*, the Court can substantially reduce the risk of further delay.

Defendants have known the details about the severe shortage of DMH beds since March 2005, and have also known about the significant shortfall of MHCB beds since at least January of 2005.  Bien Dec. ¶ 6.  Defendants have wasted nearly a year and have yet to come forward with adequate plans to address these problems and to submit them to the Court and Legislature.

---

[2] When required to produce similar plans to solve the problem of inadequate bed space in the past, defendants have repeatedly failed to produce adequate or effective plans to address these very problems. 15th Report at 413 (listing some of the past orders on DMH and MHCB access and capacity).  On the issue of access to DMH inpatient care, the Court has issued at least 11 Orders in the last seven years. Bien Dec. ¶ 7.  In response to these orders, defendants have produced at least six inadequate plans to study and/or meet the unmet need for inpatient care.  *Id.*  Finally, last spring, in a report dated March 30, 2005, defendants finally produced an adequate study of the scope of their unmet need for inpatient care. Bien Dec. ¶ 8.  Unfortunately, while the March 30, 2005 report contained an appropriate assessment of the scope of the problem, it also included a deeply flawed plan to meet the identified need for 400 additional acute and intermediate beds. See Bien Dec. ¶ 8 and Ex. F and G. After the plaintiffs and the Special Master shared their objections with defendants, the Special Master gave defendants a new deadline of August 15, 2005 for submitting a revised plan.  Bien Dec. ¶ 9. On August 15, 2005, defendants submitted a second plan to meet the need identified in the March 2005 study, and this second plan was also inadequate, as the Special Master spelled out to defendants in great detail in an August 30, 2005 letter. Bien Dec. and Ex. G.  This failure in turn led to the current requirement in the 15th Report that defendants produce yet another plan on or before April 17, 2006. Bien Dec. ¶ 10.

Defendants' record of producing adequate plans in response to the Court's orders on the MHCB issue is similarly bleak. Bien Dec. ¶ 11.

15th Report at 377-378 (UNA study completed on March 30, 2005 found 512 inmates with unidentified needs for inpatient care), and at 389-80 (defendants first provided information to the Special Master concerning long MHCB waiting lists in June 2005). Indeed, since they received the Draft 15th Report of the Special Master on November 4, 2005, defendants have known that they would be required to include funding for their DMH and MHCB expansion plans in the current year's budget. However, defendants failed to include any information about the funding for expanding these programs in the Governor's Budget when it was issued on January 10, 2006. Bien Dec. ¶ 12.

For that reason, plaintiffs request that the Court impose a deadline of March 15, 2006 for defendants to produce a draft of the new plan to the Special Master and plaintiffs. The Court should also schedule a hearing for April, 2006 at which the adequacy of the plan should be reviewed, as recommended by the Special Master. 15th Report at 422. In scheduling this hearing, plaintiffs request that the Court specifically invite officials from the Department of Finance, the Department of Mental Health ("DMH") and representatives of the Governor's Office to attend in order to ensure that no barriers exist to smooth adoption and implementation of these critical remedial plans.

## II. THE COURT SHOULD ISSUE AN ORDER REQUIRING DEFENDANTS TO ENSURE THAT DAILY PSYCHIATRIC TECHNICIAN ROUNDING OCCURS IN THE NINE INSTITUTIONS WHERE PROBLEMS ARE NOTED IN THE FIFTEENTH REPORT

Although the impact of overcrowding and staffing shortages is felt in all housing units within the CDCR, in the administrative segregation units the impact can be deadly. For example, defendants' own suicide report for 2004 found that sixty-one percent (61%) of the suicides occurred in administrative segregation units. Bien Dec. ¶ 14 and Ex. I (Defendants' Annual Suicide Report for 2004 at 12.) As the CDCR population has soared,[3] institutions have

---

[3] As of January 30, 2006, the total population of inmates in CDCR prison reached an all-time high of 168,001, an increase of 5,506 inmates in the last 12 months. Bien Dec. ¶ 4 and Ex. C.

1  been forced to open new administrative segregation overflow units that are often inadequately

2  staffed, using the limited Licensed Psychiatric Technician ("LPT") positions that have been

3  previously allocated and filled for existing administrative segregation units. Bien Dec. ¶ 5 and

4  Ex. D (September 1, 2005 Knowles Memo at 4 states "many ASUs statewide continue to house

5  inmates in overflow beds"). The LPT is required to round every inmate in every administrative

6  segregation unit seven days a week to determine whether there is a need for mental health

7  intervention, including crisis care. Bien Dec. ¶ 15 and Ex. J (Duty Statement, Psychiatric

8  Technician, Administrative Segregation, filed with the Court and provisionally approved as

9  part of the 1997 Program Guides). The psychiatric technician is required to interact with each

10  inmate housed in an administrative segregation unit in a manner and for an amount of time that

11  is sufficient both to ascertain the inmate's current mental health condition and to clearly

12  document the inmate's level of functioning so that any decline in the inmate's level of

13  functioning over time can be noted. *Id.*

14       The Court established this rounding obligation early in the case and over the years has

15  issued a number of remedial orders requiring additional plans and documentation from

16  institutions that have failed to comply with this critical Order. 7/29/99 Order ¶ 6(a) (ordering

17  defendants to provide seven-day a week psych tech coverage in each administrative

18  segregation unit); 7/23/99 Order ¶ 6(a); 4/24/02 Order ¶ 4 (specific remedial order after CSP-

19  Lancaster found in violation of 7/23/99 Order); 6/12/02 Order ¶ 5 (ordering defendants to

20  develop a plan to provide sufficient psych techs to conduct rounds seven days a week at 15

21  prisons where rounding found insufficient and directing defendants to report monthly on psych

22  tech rounding in the administrative segregation units at CSP-Corcoran, San Quentin, and

23  Salinas Valley State Prison).

24       In response to the Draft Fifteenth Report, plaintiffs filed objections with the Special

25  Master that requested a recommendation for a similar remedial order against the Wardens of

26  the eight institutions that either failed to document their compliance with this order or else

27  were essentially found not to be in compliance with Court's July 27, 1999 Order. Bien Dec. ¶

28  2 and Ex. A (Plaintiffs' Objections to the Draft 15th Monitoring Report at 27). Five of these

eight institutions have been the subject of previous remedial orders regarding non-compliance with daily psych tech rounding.[4]

The Special Master denied plaintiffs' request, asserting that psych tech rounding was not a primary subject of monitoring during the 15th Round review. Final 15th Report at 417. The evidence supporting plaintiffs' request, however, is set forth in both the draft and the final version of the report.  Bien Dec. ¶ 2 and Ex. A (Plaintiffs' Objections to the Draft 15th Report at 28, fn.19).

For example, at Avenal State Prison ("ASP"), the monitors found that the institution was no longer in compliance with the daily rounding requirements.  15th Report at 183. During the first eight months of 2004, an audit by the institution found only forty-three percent (43%) compliance with the requirement for daily rounding.  *Id.*  During the last two years, two suicides occurred in the administrative segregation unit at ASP, on March 3, 2004 and August 18, 2005.  Bien Dec. ¶¶ 16, 17.

Similarly, at Central California Women's Facility ("CCWF"), during the monitoring tour in October, 2004, the monitors found that "[t]he frequency of psych tech rounds in administrative segregation, an issue previously resolved, was again problematic.  Some psych techs failed to document their rounds in progress notes as required." 15th Report at 333.  Two suicides occurred in the administrative segregation unit at CCWF in 2004, on July 1, 2004 and November 19, 2004.  Bien Dec. ¶¶ 16, 18.

At Valley State Prison for Women ("VSPW") the 15th Report notes "[p]roblems with daily psych tech rounds in administrative segregation, resolved during an earlier monitoring period, resurfaced due in part to staff vacancies and turnover...psych techs did not perform some duties required by the program guides.  In particular, documentation of daily rounds deteriorated.  Because psych techs were regularly assigned to distribute medications, little time was left to meet with inmates in a confidential setting." 15th Report at 343.

---

[4]  Calipatria, Solano, San Quentin, SCC, CCWF (6/12/05 Order ¶ 5).

At Sierra Conservation Center ("SCC"), conflicting documentation made it difficult to reach a conclusion about the provision of daily psych tech rounding. Staff audits reported almost one hundred percent (100%) compliance, while departmental audits reported only sixty percent (60%) compliance. 15th Report at 76.

At Solano State Prison, in both the administrative segregation unit and the administrative segregation overflow unit, the documentation of the psych tech rounding was found deficient. 15th Report at 104-105. Although the isolation logs were completed for the month of November 2004, psych techs did not consistently sign the log book when they entered and left the administrative segregation housing units. *Id.* There was also no documentation of psych tech rounding in the inmates' unit health records – which is critical for establishing a baseline from which to judge future decompensation. Bien Dec. ¶ 15 and Ex. J. There have been two suicides in the administrative segregation units at Solano in the last year, on September 3, 2005 and December 4, 2005. Bien Dec. ¶¶ 16, 19.

At San Quentin State Prison psych tech rounds had been a resolved issue; in the 15th Round, the monitors found it problematic again. 15th Report at 126. While the monitor concluded that psych tech rounding was "apparently happening," psych tech summaries were missing from some charts and an institutional audit done during the early part of the monitoring period found "no evidence of psych tech rounds in 40 percent of audited cases." *Id.* The monitor observed rounds in one of the administrative segregation units in February 2005, and noted that the "psych techs were not making visual contact consistently with non-caseload inmates." *Id.* There have been two suicides of non-caseload inmates in the administrative segregation units at San Quentin in the last seven months, on June 9, 2005 and June 25, 2005. Bien Dec. ¶¶ 16, 20.

At CSP-Sacramento, the monitors concluded that inadequate daily psych tech rounds were conducted in the newly activated administrative segregation unit. 15th Report at 12. There have been two suicides in the new administrative segregation unit at CSP-Sacramento in recent years, on November 7, 2004 and March 5, 2005. Bien Dec. ¶¶ 16, 21.

Finally, at the time of the monitoring tour, Calipatria had vacancies for three psych techs which resulted in coverage by fewer staff and inadequate rounding that was described by the monitor as a process that "took just 20 minutes, a totally inadequate amount of time to complete comprehensive and interactive meetings." 15th Report at 311.

In addition to the eight institutions above, plaintiffs request that the remedial order include California Training Facility ("CTF").[5] During the monitoring tour, inadequate documentation of psych tech rounding was identified as a problem. 15th Report at 214. Although the isolation logs showed that psych tech rounding was occurring regularly, inmate charts did not contain any documentation of the rounds. *Id.* Moreover, in the past several months, plaintiffs' counsel received several letters from CTF reporting that psych techs were not rounding daily in the administrative segregation unit. Bien Dec. ¶ 23; Declaration of Meghan Lang in Support of Plaintiffs' Objections to Fifteenth Monitoring Report ("Lang Dec.") at ¶ 2. On January 25, 2006, plaintiffs' counsel interviewed nine *Coleman* class members who were housed in either the X-wing or the O-wing administrative segregation units at CTF. Lang Dec. ¶ 9. Eight of the nine inmates reported that the psych tech was only coming to their cells one day a week, rather than the mandated daily rounding. *Id.* The ninth inmate reported that he was on "informal suicide watch" and was monitored daily by a psych tech. *Id.*

The population pressures currently being experienced within CDCR, which frequently require institutions to create new administrative segregation overflow units, present a challenge to institutions in that they must comply with existing court orders without additional staffing resources. Bien Dec. ¶ 5 and Ex. D. The provision of psych tech rounding in administrative segregation units is the only mental health care provided to the non-caseload inmates housed in these units. The importance of this daily check cannot be overstated in this system where in 2004 non-mental health caseload inmates comprised the majority of the inmates who

---

[5] CTF was found non-compliant with daily psych tech rounding and was subject to a previous remedial Order. (6/12/05 ¶ 5.)

1  committed suicide in administrative segregation. Bien Dec.¶ 14, Ex. I (Defendants' Annual

2  Suicide Report for 2004 at 12). These administrative segregation housing units, which are

3  characterized by harsh conditions, limited out of cell time, the absence of programming, high

4  security, and other major stressors, had a suicide rate in 2004 of 248 per 100,000. Bien Dec.

5  ¶ 14 and Ex. I at 10. The CDCR had an overall suicide rate in 2005 of 24 per 100,000. Bien

6  Dec. ¶ 22. The national rate for suicides in prisons is 14 per 100,000. Bien Dec. ¶ 22 and Ex.

7  K (August 2005 U.S. Bureau of Justice Statistics Report stating that prison suicide rates have

8  dropped to 14 per 100,000). Within the CDCR in the year 2005, more suicides occurred in the

9  locked housing units than in the mainline housing units, despite the fact that only 4-5% of the

10 inmate population is housed in these units. Bien Dec. ¶ 2 and Ex. D (September 1, 2005

11 Knowles Memo at 4, indicating total CDCR administrative segregation population of 8,280).

12      Given the pressures faced by the local institutions, the staffing shortages, the reported

13 back-sliding in the documentation and provision of quality, daily psych tech rounding to

14 inmates housed in administrative segregation units, plaintiffs request that the Court provide a

15 clear message to local institutions that they will be held responsible for compliance with this

16 Court's Orders. Plaintiffs request the following remedial order:

17      Within 30 days of the order of the Court, and each month thereafter, the Wardens at the

18 following institutions shall be directed to file a declaration under oath that identifies each unit

19 at the institution which is operating as an administrative segregation unit and certifies that

20 appropriate daily psych tech rounding is being provided and documented for all inmates

21 housed in each administrative segregation unit within their institution: Avenal State Prison,

22 CCWF, VSPW, SCC, Solano, San Quentin, Calipatria, CTF and CSP-Sacramento.

23

24 **III.   THE COURT SHOULD ORDER DEFENDANTS TO PROVIDE RECEPTION**

25 **CENTER EOP TREATMENT TO EOP INMATES WHO HAVE BEEN HELD IN THE RECEPTION CENTER FOR MORE THAN 60 DAYS**

26      Approximately thirteen percent (13%) of the CDCR's mentally ill population (roughly

27 3,900 inmates) are classified as needing an Enhanced Outpatient Program ("EOP") level of

28 care. Bien Dec.¶ 3 and Ex. B (most recent monthly statistics, at R1-4, report a total of 3,950

1  EOP inmates out of a total mental health population of 30,272).  EOP patients are housed in

2  sheltered treatment programs separated from general population inmates in a limited number of

3  designated CDCR institutions.  Bien Dec. ¶ 24.  These programs are required to provide a

4  minimum of ten hours per week of structured therapeutic activities to their patients, including

5  group therapy, recreational therapy, education, individual counseling, daily living skills and

6  other treatment modalities.  *Id.*  When an inmate enters the CDCR, he or she goes through a

7  classification process that includes medical and mental health screening in one of the CDCR's

8  Reception Centers.  *Id.*  If, as a result of the mental health screening process, an inmate is

9  identified as needing an EOP level of care, the inmate remains housed among general

10  population inmates in the locked down conditions of the Reception Center until transferred to

11  one of the designated mainline EOP programs.  *Id.*

12      EOP inmates are currently experiencing long Reception Center delays prior to transfer

13  to a mainline facility.  As the Special Master explains in the 15th Report:

15      Whatever progress was reported in the preceding round of review,
        or in the early part of the current review, in the timeliness of
16      transfers of MHSDS inmates out of reception into general
        population programs has been largely cancelled by the recently
        escalating growth in the overall CDCR population and the
17      concomitantly increasing number of MHSDS inmates in reception.
        For example, in August 2003, the five major reception centers of
18      CIM, DVI, NKSP, SQ and WSP housed a total of roughly 3,018
        EOP and CCCMS inmates awaiting transfer or parole.  By August
19      2005, that number rose to 3,988, and increase just short of a full
        third.

21  15th Monitoring Report at 396-97.

22      In 1995, this Court found significant and unconstitutional delays in access to care,

23  noting that "there were backlogs of 300-400 inmates awaiting transfer to enhanced outpatient

24  psychiatric programs at California Men's Colony or California Medical Facility."  *Coleman v.*

25  *Wilson*, 912 F.Supp. 1282, 1309 (E.D. Cal 1995).  Ten years later, the number of EOP patients

26  waiting for placement in the CDCR's Reception Centers has reached 524 patients.  Bien Dec. ¶

27  3 and Ex. B (October 2005 data).  In other words, when adjusted to account for the increase in

28  the prison population during the last ten years, the percentage of inmates waiting for transfer to

1   a full-fledged EOP treatment program is essentially the same in 2005 as it was in 1992. Bien

2   Dec. ¶¶ 3, 4 and Ex. B, C.

3         At the outset of this case, the Court adopted transfer timelines requiring that inmates

4   identified as needing EOP care be transferred to an EOP treatment program within sixty days,

5   or thirty days if clinically indicated. 4/3/01 Order ¶ 4. This timeline implicitly acknowledged

6   the difficulty of fully staffing every Reception Center to provide full treatment programs for

7   EOP patients as soon as they were identified within the system. Plaintiffs sought a shorter

8   timeline. Bien Dec. ¶ 24. The 1997 Program Guides did not require treatment programs for

9   EOP inmates in the Reception Centers. See generally, 1997 Program Guides.

10        At times, when the Reception Center population has been smaller and staffing has been

11  better, Reception Centers have nevertheless offered some additional clinical care to EOP

12  patients waiting for transfer. Due to recent population pressures, the Special Master reports

13  that these programs have ended. For example, at San Quentin Reception Center, the 15th

14  Report notes that group therapy for EOP patients in the Reception Center has recently been

15  discontinued because of the "surge of EOP inmates during the monitoring period." 15th

16  Report at 118. Similarly, at the DVI Reception Center, the 15th Report finds that the

17  requirement to process so many Reception Center inmates "limited the availability of mental

18  health services to EOP inmates in reception. Specifically, group therapy, which the institution

19  had offered in the past, but was not required in the program guides, was cancelled during the

20  monitoring period for reception EOP inmates, although the facility indicated its intention to

21  restore group activities again at some future point when the reception population returned to

22  normal." 15th Report at 136.

23        The 15th Report includes ample documentation of the general inability of Reception

24  Centers to provide even the limited weekly case manager contact to EOP patients. At San

25  Quentin Reception Center, only half of the EOP patients received a weekly case manager

26  contact, with compliance varying from twenty-three percent (23%) to eighty percent (80%)

27  depending on the month. 15th Report at 118. At CCI Reception Center, twenty-two percent

28  (22%) of the EOP patients were not seen weekly. *Id.* at 265-66. At High Desert Reception

1   Center, EOP patients housed in the Reception Center did not consistently receive weekly

2   contacts. *Id.* at 41. Finally, at North Kern Reception Center, seventeen percent (17%) of the

3   EOP patients did not receive weekly case manager contacts. *Id.* at 242.

4       The 15th Report also documents CDCR's failure to transfer EOP inmates out of

5   Reception Centers within the sixty day transfer timeline. At San Quentin, the monitor reported

6   on the status of Reception Center delay at two visits. First, in October 2004, the monitor found

7   that overall Reception Center count was high and that more than eighty-six percent (86%) of

8   the EOP patients waited longer than the transfer timelines. 15th Report at 117. During a

9   second visit in March 2005, when the Reception Center population had dropped, the monitor

10   found that thirty-one percent (31%) of the mental health population was delayed in being

11   transferred. *Id.* The current status of transfer delay at San Quentin Reception Center with the

12   surging CDCR population is likely to be close to or higher than the October 2004 figure. At

13   DVI, which was visited by the monitor in November 2004, "of the 37 EOP inmates at DVI at

14   the time of the monitor's visit, 20 had been waiting beyond the transfer timeline." 15th Report

15   at 135-6. The reasons cited for the delayed transfers were the large increase in the Reception

16   Center population and the scarcity of beds in programs for which the Reception Center patients

17   were endorsed. *Id.* At Wasco Reception Center, which was visited during February 2005, the

18   monitor reported that 23 EOP patients were overdue for transfer, "with delays up to seven

19   months." 15th Report at 231. At North Kern Reception Center, which was visited during

20   September 2004, the monitor concluded that the "timeliness of EOP transfers remained largely

21   static during the monitoring period…of 19 transfers pending at the time of the monitor's visit,

22   eight were already untimely." 15th Report at 241. CIM Reception Center was monitored in

23   August and December 2004. In August 2004, among the EOP patients delayed in transfer, 26

24   had been in the Reception Center for at least three months, and 11 had been there for at least

25   four months. *Id* at 275. The December 2004 data does not report the length of the delayed

26   stay, but the monitors noted that thirty-seven percent (37%) of the EOP patients in the CIM

27   Reception Center were not transferred to EOP programs within the transfer timelines. *Id.*

28   Valley State Prison for Women's Reception Center was monitored in October 2004 and at the

1   time of the visit, four EOP inmates had been in reception for longer than 60 days.  15th Report

2   at 340.

3       The dangerousness of this failure is exacerbated by a general inability to identify and

4   transfer those more fragile inmates envisioned under the transfer timeline as requiring an

5   expedited transfer within 30 days.  15th Report at 118 (San Quentin did not identify any

6   inmates in need of accelerated transfer); 135 (DVI only made one request for accelerated

7   transfer); 232 (at Wasco State Prison there was no evidence that expedited transfers were

8   considered for any EOP inmates in the Reception Center); 242 (at NKSP there were no

9   expedited transfers during the review period); 265 (at CCI only 1 EOP inmate was transferred

10  pursuant to the expedited procedure during a seven month review period); 341 (at VSPW no

11  expedited transfer occurred during the review period).

12      The CDCR's inability to transfer Reception Center EOP patients to treatment programs

13  within sixty days has been identified as a serious problem during numerous monitoring reports

14  with little, or no progress over time.[6]  Plaintiffs have repeatedly sought recommendations to

15  address these delays.[7]

16

_____

17      [6] Eleventh Monitoring Report of the Special Master on the Defendants' Compliance with
18  Provisionally Approved Plans, Policies and Protocols at 256; Twelfth Monitoring Report of the Special
    Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at
19  63, 144, 153-54, 176, 179 and 196; Thirteenth Monitoring Report of the Special Master on the
    Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 26, 68-69, 76,
20  149, 157, 176-7, 180, and 193;  Fourteenth Monitoring Report of the Special Master on the
    Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 20, 68, and 125.
21  11th Report at 256 (Reception Centers "have neither the staff nor physical facilities to provide the level
    of treatment and monitoring these inmates need, and the failure to provide needed treatment,
22  sometimes for months, imposes severe hardship and suffering on some of those left waiting.")

23      [7] In objections to the Draft Eleventh Monitoring Report, plaintiffs requested a recommendation
    directing Health Care Services Division to develop a plan within sixty days to identify and address the
24  system-wide factors contributing to the failure to comply with the court-ordered transfer timelines for
    Reception Center EOPs.  Bien Dec. ¶ 25, Ex. L (Plaintiffs' Objections to Draft Eleventh Monitoring
25  Report, May 23, 2003).  In objections to the Draft Twelfth Monitoring Report, plaintiffs requested a
    recommendation that defendants implement a system to track EOP patients housed in Reception
26  Centers and develop a plan within 30 days to identify and address the system-wide and local problems
    contributing to the failure to comply with the transfer timelines.  Bien Dec. ¶ 26 and Ex. M (Plaintiffs'
27  Objections to Draft Twelfth Monitoring Report, November 25, 2003).  Finally, in objections to the
    Draft Thirteenth Monitoring Report, plaintiffs requested several recommendations to address
28  continued transfer delay of EOP patients housed in the Reception Centers. Bien Dec. ¶ 27 and Ex. N

(continued . . .)

1    The reports on Reception Centers in the 15th Report took place before the recent spike

2  in the CDCR Reception Center population, which internal CDCR memos assert has negatively

3  impacted on the compliance with transfer timelines and on the provision of mental health care

4  to the fragile EOP patients housed in these units.  Bien Dec. ¶ 5 and Ex. D (October 25, 2005

5  Memorandum from John Dovey to Roderick Hickman and September 1, 2005 Memorandum to

6  Wardens from Mike Knowles setting forth various procedures for reducing population

7  pressures including expedited reviews of ASU and SHU cases); 15th Report at 396.

8    The number of EOPs waiting for treatment in Reception Centers has increased

9  dramatically from May 2005 when there were 375 EOP patients housed in the Reception

10  Centers, to August 2005, when there were 537 EOP patients housed in the Reception Centers.

11  Bien Dec. ¶ 3.  Even without this current data on Reception Center transfer delay, there is

12  sufficient evidence in the Final 15th Report and in prior reports, that demonstrates defendants

13  on-going failure to comply with the court-ordered transfer timelines for the fragile EOP

14  patients housed in the Reception Centers.  See 15th Report at 396-97.

15    After acknowledging this growing problems of reception center EOP delays, the Special

16  Master indicates that a remedy may not be necessary at this time due to augmentations in

17  mental health staffing in Reception Centers that defendants will implement once the new

18  Program Guides are approved.  See 15th Report at 397 ("One response, and one included in the

19  revised program guides, which are wending their way toward judicial approval, is to increase

20  mental health staff in reception centers to enable the provision of adequate interim monitoring

21  and treatment and treatment for EOP and 3CMS inmates stuck overlong in reception.").

22  However, the revised program guides will require only a weekly case manager contact, not the

23  type of sustained treatment interventions that EOP inmates require to maintain their level of

24

25  _____

(continued from previous page)

26  (Plaintiffs' Comments and Objections to the Draft Thirteenth Monitoring Report, May 26, 2004).
None of these requested recommendations have been granted by the Special Master and no remedial

27  orders have been issued to address this on-going violation of the transfer timelines.  Two EOP
Reception Center patients committed suicide in 2005.  Bien Dec. ¶ 22.

28

PLTFS' OBJ TO THE 15TH MONITORING REPORT OF THE SPECIAL MASTER ON DEFS' COMPLIANCE WITH PROVISIONALLY
APPROVED PLANS, POLICIES AND PROTOCOLS, No.: Civ S 90-0520 LKK-JFM

1  functioning.  Bien Dec. ¶ 24.  Given the dangerous, isolated, locked-down conditions in the

2  CDCR's overcrowded Reception Centers, a more comprehensive treatment program should be

3  made available to EOPs who have been in the Reception Center for a long period of time, or

4  who are considered fragile and at risk by their case managers.  *Id.*

5       Plaintiffs request an order that defendants develop and implement a plan within 60 days

6  to create designated Reception Center EOP units that can provide at least ten hours of

7  structured therapeutic treatment to (1) all EOP Reception Center patients that have been

8  waiting longer than 60 days in a Reception Center and (2) all "at risk" EOP Reception Center

9  patients who have been determined to need enhanced care while they wait to be transferred.

10

11  **CONCLUSION**

12       For all of the reasons set forth above, plaintiffs respectfully ask that the Court enter the

13  following remedial orders designed to speed defendants' compliance in various areas where

14  there have been repeated failures to comply:

15       •    An Order setting a deadline of March 15, 2006 for defendants to produce a draft

16           of the new plan to the Special Master and plaintiffs.  The Order should also

17           schedule a hearing for April, 2006 at which the adequacy of the plan should be

18           reviewed.  In scheduling this hearing, plaintiffs request that the Court specifically

19           invite officials from the Department of Finance, the Department of Mental

20           Health ("DMH") and representatives of the Governor's office to attend in order

21           to ensure that no barriers exist to smooth adoption and  implementation of these

22           critical remedial plans.

23       •    An order that within 30 days of the order, and each month thereafter, the

24           Wardens at the following institutions shall be directed to file a declaration under

25           oath that identifies each unit at the institution which is operating as an

26           administrative segregation unit and certifies that appropriate daily psych tech

27           rounding is being provided and documented for all inmates housed in each

28           administrative segregation unit within their institution:  Avenal State Prison,

1    CCWF, VSPW, SCC, Solano, San Quentin, Calipatria, CTF and CSP-

2    Sacramento.

3    •    An Order that defendants develop and implement a plan within 60 days to create

4    designated Reception Center EOP units that can provide at least ten hours of

5    structured therapeutic treatment to (1) all EOP Reception Center patients that

6    have been waiting longer than 60 days in a Reception Center and (2) all "at risk"

7    EOP Reception Center patients who have been determined to need enhanced care

8    while they wait to be transferred.

9    Dated:  February 2, 2006

10    Respectfully submitted,

11    _Michael W. Bien (signature)_

12    Michael W. Bien

13    Rosen, Bien & Asaro, LLP
      Attorneys for Plaintiffs