PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

             Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

             Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**DECLARATION OF MICHAEL W.
BIEN IN SUPPORT OF PLAINTIFFS'
OBJECTIONS TO THE FIFTEENTH
MONITORING REPORT OF THE
SPECIAL MASTER**

**HEARING**

Date:           To be determined
Time:           To be determined
Location:     Courtroom 4
                    The Honorable Lawrence K.
                    Karlton

MWB Decl ISO Plfs' Objections to 15th Progress Report (Final) 2-1-06, 489-3.DOC

DECLARATION OF MICHAEL W. BIEN ISO PLTFS' OBJ TO THE 15TH MONITORING REPORT OF THE SPECIAL MASTER,
No.:  Civ S 90-0520 LKK-JFM

MICHAEL W. BIEN DECLARES:

1.      I am a member of the Bar of this Court and of the firm, Rosen, Bien & Asaro, one of the attorneys for the plaintiff class in this litigation. I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Plaintiffs' Objections to the 15th Monitoring Report of The Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols ("Plaintiffs' Objections").

<u>Objections To The Special Master's Draft 15th Report</u>

2.      Plaintiffs' counsel received the Draft 15th Monitoring Report of the Special Master on November 4, 2005. After receiving an extension in which to file objections, plaintiffs filed objections to the Draft Report with the Special Master on December 12, 2005. Attached hereto as Exhibit A is a true and correct copy of Plaintiffs' December 12, 2005 Objections to the Draft 15th Report. Plaintiffs' Objections to the Draft Report raised each of the issues we are now raising with the Court. Plaintiffs asked the Special Master to shorten the time period in which defendants are required to present their plans for inpatient and DMH bed expansion. See Exhibit A at 10, 16. In addition, plaintiffs asked the Special Master to recommend a remedial order to address problems identified in the draft report at nine institutions with providing and documenting daily psychiatric technician rounds of all inmates in the administrative segregation units. See Exhibit A at 28. Finally, plaintiffs asked the Special Master to recommend that defendants be ordered to create Enhanced Outpatient Programs ("EOPs") for inmates who are waiting in the reception centers for EOP placement and are at risk of decompensation without such treatment. See Exhibit A at 18.

<u>The CDCR's Current Problems With Overcrowding And Understaffing</u>

3.      The CDCR is becoming increasingly overcrowded, in both its reception center and its mainline units. The number of EOP inmates waiting in CDCR reception centers for EOP placement is also growing, as the Special Master also recognizes. See 15th Report at 397 ("Whatever progress was reported in the preceding round of review, or in the early part of the current review, in the timeliness of transfers of MHSDS inmates out of reception into general

1  population programs has been largely cancelled by the recently escalating growth in the overall

2  CDCR population and the concomitantly increasing number of MHSDS inmates in reception.")

3  The number of EOP inmates waiting in California Department of Corrections and

4  Rehabilitation ("CDCR") Reception Centers for transfer to a treatment program has been

5  calculated by members of my staff, under my supervision, using data produced by defendants

6  as part of the monthly statistical package pursuant to the Court's January 19, 1999 Order.   We

7  reviewed the monthly data for October 2004, and May, August, and October of 2005.   These

8  time periods were selected in order to allow us to establish the general trend during the last

9  year, including whether the recent spike in EOP reception center cases has been maintained for

10  several months (we determined that, in fact, it has been maintained for several months).   The

11  calculations by my staff were relatively simple – they simply added together the EOP

12  populations for each reception center as listed in the monthly population report.   These

13  calculations established that there were 338 EOP inmate-patients in reception centers in

14  October 2004, 374 EOP inmate-patients in May 2005, 537 EOP inmate-patients in August

15  2005, and 524 EOP inmate-patients in October 2005.   Attached hereto as Exhibit B are true

16  and correct copies of excerpts from monthly statistical reports used by plaintiffs to make these

17  calculations, including reports produced to plaintiffs on December 13, 2004 (containing data

18  for October 2004), January 25, 2006 (containing data for October 2005), October 20, 2005

19  (containing data for August 2005), and August 16, 2005 (containing data for May 2005) which

20  include figures for the number of EOP patients in each reception center.   These figures show

21  that the number of EOP patients awaiting transfer in reception centers has not changed very

22  much since the time this case was tried in the early 1990s.   The number of inmates waiting for

23  transfer to EOP programs at the time of trial in 1993 was 300-400.   See *Coleman v. Wilson*,

24  912 F.Supp. 1282, 1309 (E.D. Cal. 1995).   I also asked my staff to use the most recent

25  statistical data for October 2005 to calculate what percentage of the total mental health

26  population is made up of EOPs.   The October 2005 data in Exhibit B reports a total EOP

27  population of 3,951 and a total mental health caseload population of 30,272, which means that

28  EOPs make up thirteen percent (13%) of the total mental health population.

4.      The population of the CDCR at the time of the trial of this action in early 1993 was 113,000.  See June 6, 1994 Findings and Recommendations at fn 28.  The CDCR's current population as of January 25, 2006 is 168,001.  Attached hereto as Exhibit C is a true and correct copy of a CDCR weekly population report downloaded by my staff from the CDCR website on February 1, 2006, which reflects a current total population of 168,001.  Using the EOP backlog at the time of trial, 350, and the population at the time of trial of 113,000, my staff has calculated the ratio of EOP patients in reception centers to total population for 1993 as .00309.  Using the current EOP population in reception centers of 524 and the current population of 168,000 yields an extraordinarily similar ratio of .00311.  Thus, the percentage of inmate-patients identified as EOP and awaiting transfer in reception centers is unchanged from 1993.

5.      Attached hereto as Exhibit D are true and correct copies of two internal CDCR memoranda concerning the current population crisis in the CDCR, including an October 25, 2005 memorandum from CDCR Adult Division Director John Dovey to CDCR Secretary Roderick Hickman, and a September 1, 2005 memorandum from Adult Division Acting Deputy Director Mike Knowles to Wardens and other CDCR staff members.  These memos were provided to our office by a reporter and by the legal department of the CDCR, respectively.  They were submitted to the Special Master and defendants along with plaintiffs' Objections to the Draft 15th Report, and defendants did not dispute their authenticity.  Mr. Dovey, in his October 25, 2005 memo, is candid about the extent of the population pressures currently facing the CDCR:

> This historic population high has caused significant population pressures resulting in public safety concerns for the CDCR as well as the Counties in our State.  The following factors have led to thye population crisis . . . [discussing high levels of county intake, significant monthly increases in the CDCR population, court cases impacting the reception center process]
>
> Health Care Transfer Limitations – Even when general population beds are available for transferring of RC inmate, there are often limitations to the number of inmates with mental health or medical needs that a given institution can accept in a given week due to court imposed sanctions for example in Coleman v. California the CDCR has agreed to time constraints in which an inmate is seen by

1
2
3

> a mental health clinician within 14 days of arrival to establish
> program needs. As such, the number of inmate is limited to staff's
> ability to perform those evaluations. We also have clinical staffing
> rations and when we are unable to maintain those staffing rations
> we are further limited.

4  Mr. Dovey goes on to discuss the impact of the lack of automation on the current problems,

5  noting that the CDCR's information management systems are "grossly inadequate." Finally,

6  the memo notes the impact of current staffing shortages "in a broad range of areas" including

7  custody and mental health staff and notes that the need to train new staff presents another

8  challenge to the department. The September 1, 2005 Memo from Deputy Director Knowles is

9  similarly concerned with overcrowding, noting that the CDCR is currently "experiencing a

10 severe bed crisis." Mr. Knowles implements a series of steps designed to speed placement of

11 inmates by speeding up reception center processing, moving appropriate cases to lower

12 security levels, reviewing administrative segregation cases and reviewing single celled cases.

13 These two memos establish that the CDCR has now been aware for approximately six months

14 that it is experiencing extraordinary staffing and overpopulation problems. In spite of this

15 knowledge, the CDCR has not taken any steps to inform the Special Master or the Court of

16 these problems or to acknowledge that they are having an impact on mental health care to

17 *Coleman* class members.

18 <u>Defendants' Past Efforts To Address MHCB And Inpatient Bed Shortfalls</u>

19     6.      Defendants have known about the current shortfall in Mental Health Crisis Beds

20 (or "MHCB beds") for more than a year. MHCBs are licensed crisis units within many CDCR

21 institutions which provide acute crisis care with 24-hour nursing care to suicidal inmates and

22 other inmates experiencing a mental health crisis. Defendants first revealed the MHCB

23 shortage to plaintiffs and the Special Master in a May 11, 2005 meeting with plaintiffs and the

24 Special Master, which I attended. Defendants made clear at the time that there had been a

25 shortage of MHCB beds since the summer of 2004. The shortage continues to this day.

26 Attached hereto as Exhibit O is a true and correct copy of a chart entitled "Summary of Mental

27 Health Crisis Bed Referrals and Transfers for September 2005" which was prepared by

28 defendants and produced to plaintiffs as part of the monthly statistical package on January 25,

2006. The document shows that during the month of September 2005, there were 317 referrals from CDCR institutions to a MHCB unit at another institution. Of these 317 referrals, only 40 inmates, or thirteen percent of the total number of referrals, were actually placed in a MHCB.

Defendants have also known that they would be required to produce and fund a plan for expanding DMH inpatient beds for nearly a year. At the very least, they have known of the need for a specific plan since they completed their Unidentified Needs Assessment ("UNA") study on March 30, 2005. Nevertheless, defendants have not acted with diligence in producing a comprehensive plan to expand MHCB and DMH access and to include such a plan in the recently issued Governor's budget. As a result, the severe backlog of inmates waiting for placement in a DMH inpatient program continues to this day. Attached hereto as Exhibit P is a true and correct copy of defendants' most recent bi-weekly report on inpatient programs, which shows that the waiting list for the SVPP inpatient program run by DMH was 105 inmates as of January 17, 2006.

7.    The Court has issued at least eleven (11) Orders on the issue of the adequacy of existing DMH inpatient resources and access to those resources in the last seven years. These Orders include the following: 5/22/98 Stipulation and Order (in exchange for reduction in ASH beds to 200, defendants promised a new SVPP facility by 2001 – the facility did not open until 2004 and it has proved impossible to use roughly 25 percent of its beds because they are in dorms unsuitable for high custody inmates); 7/26/99 Order at 9 (requiring a plan "for expediting the transfers of seriously mentally disordered inmates to programs with the level of care to which they have been referred"); 8/28/00 Order at 1 (ordering implementation of recommendations in Dr. Koson's Report on improving access to DMH beds); 4/4/01 Order (adopting timelines for transfers to higher levels of care); 6/27/01 Order at 4 ("On or before July 6, 2001, defendants shall submit to the parties and to the special master the Department of Mental Health inpatient bed usage study and needs assessment"); 3/4/02 (granting third extension of time for defendants to complete inpatient bed study until March 31, 2002 and noting that "no extension of the deadline granted in the previous paragraph will be granted for any reason"); 5/7/02 Order at 3 (rejecting study completed in Spring 2002 and requiring

1     defendants to design a new study with the Special Master and his experts and submit a plan for

2     the study by July 31, 2002); 10/8/02 Order (extending time and directing the parties to meet

3     with Special Master concerning study of unmet need); 1/19/04 Order at 4 ("defendants shall

4     complete their study of unmet inpatient bed needs by March 31, 2004"); and 7/9/04 Order

5     (setting date of 7/30/04 by which time defendants "with the assistance of the special master's

6     experts, shall complete the design for and submit to the special master a plan for the execution

7     of an unmet inpatient bed needs study").

8         8.    In response to these orders, defendants produced at least six inadequate plans to

9     study and/or meet the unmet need for inpatient care. Finally, last spring, in a report dated

10     March 30, 2005, defendants produced an adequate study of the scope of their unmet need for

11     inpatient care. Unfortunately, while the March 30, 2005 report contained an appropriate

12     assessment of the scope of the problem, it also included a deeply flawed plan to meet the

13     identified need for 400 additional acute and intermediate beds. The plaintiffs provided

14     defendants with detailed objections to the UNA plan in a letter dated April 29, 2005. Attached

15     hereto as Exhibit E is a true and correct copy of plaintiffs' April 29, 2005 letter. Special

16     Master Keating and his experts also provided detailed objections in a conference call on the

17     plan.

18         9.    After the plaintiffs and the Special Master shared their objections with

19     defendants, the Special Master gave defendants a new deadline of August 15, 2005 for

20     submitting a revised plan. On August 15, 2005, defendants submitted a second plan to meet

21     the need identified in the March 2005 study. This second plan was also inadequate. Plaintiffs

22     sent letters detailing our objections to the August 15, 2005 plan on August 17, 2005 and

23     August 23, 2005, true and correct copies of which are attached hereto as Exhibit F.

24         10.    The Special Master sent a letter to defendants on August 30, 2005 which also

25     provided defendants with a detailed account of the serious shortcomings of their plan and

26     which noted that he was "deeply dissatisfied with the adequacy of the Department's overall

27     plan." Attached hereto as Exhibit G is a true and correct copy of the Special Master's August

28

30, 2005 Letter. The failure of the August 15, 2005 plan in turn led to the current requirement in the 15th Report that defendants produce yet another plan on or before April 17, 2006.

11.    The Court and Special Master have also issued numerous specific orders and recommendations relevant to MHCB capacity, including:  1/15/01 Special Master's Report on Defendants' Expedited Process for Transfers to a Mental Health Crisis Bed Level of Care at 1, 7 (noting "system-wide shortfall of MHCB beds"); 12/20/01 Order (requiring a plan for improved MHCB access within 30 days); 10/8/02 Order at 3 (requiring within 30 days a plan to provide "both immediate and long-term access" to MHCB care) and at 4 (requiring plans for long-term MHCB access at both CMC and CMF within 90 days). In response to these MHCB orders, defendants produced a number of plans for improving access to MHCB care, each of which proved inadequate over the long term, including a January 18, 2002 Letter and Plan, a December 6, 2002 Letter and Plan, and a January 3, 2003 Letter and Plan.

<u>The Budget Cycle And Defendants' Remedial Plans</u>

12.    After the Governor's Budget for 2006-2007 was published on January 10, 2006, my staff reviewed the budget for items relating to mental health funding for MHCB beds or DMH beds. Although the budget includes some previously disclosed items, such as the 64 bed DMH expansion at SVSP, and the 50 bed CMF MHCB expansion, the budget does not include any comprehensive new spending plan to address the critical shortfalls that have been identified in MHCB and DMH bed space.

13.    Defendants have not shown diligence in getting their plans for expanding MHCB and inpatient capacity into the budget. Attached hereto as Exhibit H is a true and correct copy of a document entitled "General Budget Timetable" that was downloaded from the California Department of Finance's website at http://www. dof.go/fisa/bag/GenBdTbl.htm by a member of my staff on August 8, 2005.  This chart shows that the budget cycle, for all practical purposes, comes to an end on May 14, 2005, when the Department of Finance submits its "May Revise" to the Legislature. By waiting until April 17, 2005, defendants, in addition to making it difficult for plaintiffs and the Special Master to seek changes if the plans are inadequate, will also provide the Legislature with very little time to review the proposals.

The Recent Surge In Suicides In The CDCR And In Locked Units

14.    Attached hereto as Exhibit I is a true and correct copy of the California Department of Corrections and Rehabilitations' "Annual Suicide Report for 2004," which is dated September 26, 2005 and which was received by my office on September 29, 2005.  The report contains the CDCR's own internal analysis of trends and data relating to suicides that took place in the CDCR in the 2004 calendar year.  For example, the CDCR's Report found that, although only 4.5 percent of the total inmate population was housed in administrative segregation in 2004, sixty-nine percent (69%) of the suicides in 2004 occurred in the administrative segregation units.  Annual Report at 10.  Based upon the number of suicides and the population of inmates in their administrative segregation units, the Report calculated the suicide rate in the CDCR Administrative Segregation Units in 2004 to be about 248 per 100,000.  *Id*.  The Report concluded that "[i]n 2004, the suicide rate in ASU was clearly much higher than would be expected."  *Id*.  The Annual Report examined the administrative segregation suicides and found that sixty-one percent (61%) of these inmates were non-caseload inmates.  Annual Report at 11.  Among all the inmates who committed suicide in 2004, forty-six percent (46%) had a prior history of suicide attempts or significant suicide gestures.  At least four were inmates who were not on the mental health caseload.  Annual Report at 13.  CDCR has refused to track suicide attempt history of inmates who are not on the mental health caseload.  The Report also notes that about half of the suicides were inmates who were not on the mental health caseload, but some of these had previously been on the caseload.  Annual Report at 13.  CDCR has refused to track former caseload inmates in their Inmate Mental Health Identifier System.

15.    The obligation to provide daily rounds in Administrative Segregation Units was imposed by the Court in a July 29, 1999 Order.  See 7/29/99 Order at ¶ 6(a).  This critical order recognized the importance of daily checks on inmates in these locked units where inmates are isolated and where deterioration of an inmate's mental condition can be more difficult to recognize.  The nature of the interaction between the psychiatric technician and the inmate is also very important.  Attached hereto as Exhibit J is a true and correct copy of the Duty

8

1    Statement for Administrative Segregation Unit Psychiatric Technicians that was filed as with

2    the Court as part of the 1997 Program Guides.  The Court provisionally approved these

3    Program Guides in an Order dated June 27, 1997.  As the duty statement makes clear, it is

4    critical the psychiatric technician stop and speak with each inmate in a manner sufficient to

5    establish a baseline of functioning that will allow the psychiatric technician or other staff to

6    determine whether the inmate's mental health has begun to deteriorate under the pressures of

7    the administrative segregation placement.  When inmates become psychotic or suicidal, the

8    psychiatric technician is supposed to identify the problem and ensure that the inmate is moved

9    to a higher level of care, such as an MHCB unit.

10           16.    The CDCR prepares a Suicide Report for each inmate who commits suicide in

11   the CDCR within 60 days of the death and provides the Special Master and plaintiffs' counsel

12   with a copy of this report.  Included in the report is information about the mental health status

13   of the inmate, his or her prior suicide attempt history, the location of the suicide, the manner in

14   which the inmate attempted suicide, the type of emergency response by the officers, and the

15   adequacy of the mental health care provided to the inmate prior to the suicide.  My office

16   reviews the Suicide Reports provided by the CDCR and has summarized the following suicides

17   cited to in Plaintiffs' Objections:

18           17.    On March 3, 2004, a non-caseload inmate committed suicide by hanging in the

19   administrative segregation unit at Avenal State Prison.  He had a history of prior suicide

20   attempts by hanging and had become withdrawn and isolated prior to his suicide, refusing yard

21   and showers.  On August 17, 2005, an inmate on the mental health caseload committed suicide

22   by hanging in the administrative segregation unit at Avenal State Prison.  He had a history of

23   prior suicide attempts, with his most recent one at the end of February 2005, which resulted in

24   a hospitalization in a community hospital.  The Suicide Report found that during his last two

25   weeks in the unit, the inmate did not receive the required weekly clinical contacts.

26           18.    On July 1, 2004, an inmate on the mental health caseload committed suicide by a

27   medication overdose in the administrative segregation unit at Central California's Women's

28   Facility ("CCWF").  She had a previous serious hanging attempt in the administrative

segregation unit on June 6, 2004. The Suicide Report found that on June 6, 2004, this inmate was placed on suicide watch in administrative segregation rather than a Mental Health Crisis Bed in violation of CDCR's Suicide Prevention Policy. On November 19, 2004, an inmate on the mental health caseload committed suicide by hanging in the administrative segregation unit at CCWF. She reported a prior suicide attempt on October 22, 2004. The Suicide Report identified a failure by the Psych Tech to make a clinical referral after noting decompensation by the inmate.

19.    On September 3, 2005, an inmate on the mental health caseload committed suicide by hanging in the administrative segregation unit at Solano State Prison. He had reported a history of prior suicide attempts. He was in administrative segregation because he reported safety concerns in July 2005. On December 4, 2005, an inmate on the mental health caseload committed suicide by hanging in the administrative segregation unit at Solano State Prison. He was housed in an administrative segregation overflow unit.

20.    On June 9, 2005, a non-caseload inmate committed suicide by hanging in administrative segregation at San Quentin State Prison. He requested placement in the unit two days before his suicide for safety concerns. The Suicide Report found that he had submitted an emergency request to be seen that was received by nursing staff more than 18 hours before his suicide, but he was not seen. On June 25, 2005, a non-caseload inmate committed suicide by hanging in the administrative segregation unit at San Quentin State Prison. He had also requested placement in the unit for safety reasons. The Suicide Report found that there was no mental health screening when he was placed in the unit in May 2005 as required by the Program Guides.

21.    On November 7, 2004, a non-caseload inmate committed suicide by hanging in the new administrative segregation unit at CSP-Sacramento. He had previously reported a suicide attempt. According to the Suicide Report, the week before his suicide, the inmate stopped speaking to staff and just stared ahead. The inmate was referred for a routine mental health evaluation after a week but committed suicide the day before he was to be seen by a mental health clinician. On March 5, 2005, a non-caseload inmate committed suicide by

1  hanging in the new administrative segregation unit at CSP-Sacramento. According to the

2  Suicide Report, eleven days prior to his suicide, the inmate stopped speaking and eating. After

3  a medical evaluation for possible hunger strike, he was referred for a mental health evaluation.

4  He committed suicide at 1:10 a.m. the next day, before being seen by the clinician.

5    22.    In addition to the annual suicide report discussed supra in paragraph 16,

6  defendants also provided a suicide review log on January 6, 2006 to plaintiffs' counsel and the

7  Special Master. The log lists all 2005 deaths that defendants considered suicides as well as

8  MHSDS deaths that are possible suicides, along with the location of all of the suicides.

9  Defendants also provide death notifications shortly after inmates die that usually indicate the

10 location of a suicide. My staff and I routinely review all of this information, and use it to

11 create a database of our own tracking inmates suicides, locations, and key information relevant

12 to each suicide. Based on our review of all of these materials, including defendants' log,

13 defendants' death notices, and defendants' suicide reports, my office has concluded that there

14 were at least 40 suicides in the CDCR in 2005 and that at least 16 of the 40 suicides occurred

15 in administrative segregation units and SHU units. One additional suicide occurred in an

16 orientation unit that was a locked down unit which defendants described as comparable to an

17 administrative segregation unit. By way of contrast, only 15 of the 40 suicides took place in

18 mainline and EOP housing units. There were four Reception Center suicides, including two

19 EOP patients in 2005. The remaining five suicides took place in mental health crisis units

20 inside prisons or in DMH unit. Based on the 40 suicides that took place in the CDCR in 2005,

21 my staff has calculated that the CDCR suicide rate for 2005 was 24 per 100,000. The national

22 suicide rate for prisons in 2002 was 14 per 100,000. Attached hereto as Exhibit K is a true and

23 correct copy of an August 2005 Federal Bureau of Justice Statistics report on suicide in prison

24 and jails which gives the national rate for prison suicides of 14 per 100,000.

25                    Problems With Psychiatric Technician Rounding At CTF

26    23.    My office frequently corresponds with inmates at various institution about issues

27 in the case, including care and treatment in administrative segregation. We received letters

28 from the Correctional Training Facility ("CTF") in Soledad on October 20, 2005 and

December 13, 2005, which indicated that psychiatric technician rounds were not taking place on a daily basis in the X-Wing administrative segregation unit. Because of these letters and our general concern about the high suicide rates in locked units in the CDCR, I directed Meghan R. Lang, an associate in my office, and *Coleman* co-counsel, Claudia Center and Lewis Bossing, to interview caseload inmates housed in the administrative segregation units at CTF on January 25, 2006. Declaration of Meghan E. Lang in Support of Plaintiffs' Objections to the Fifteenth Monitoring Report of the Special Master ("Lang Dec.") at ¶ 3. The attorneys interviewed nine inmates in administrative segregation units, including X-Wing and O-Wing administrative segregation. Lang Dec. ¶ 7. Eight of the nine Correctional Clinical Case Management System ("CCCMS") inmates interviewed by the attorneys indicated that they do not receive rounding by a psychiatric technician on a daily basis. *Id.* These eight inmates did report that they are seen once a week by a mental health person but were unclear whether they were being seen by a case manager or a psychiatric technician. *Id.* This is a violation of the Court-ordered standard of daily rounding of all inmates housed in administrative segregation units. 7/29/99 Order ¶ 6(a). The ninth inmate reported that he did receive daily rounding by a psychiatric technician, but he believed this was because he was on "informal suicide watch." *Id.* CTF was not monitored during the Sixteenth Round monitoring by the experts because of its performance during the Fifteenth Round and, to the best of our knowledge, CTF has not been visited by a *Coleman* monitor since January 14, 2005 (the Fifteenth Round visit).

Reception Center EOP Cases

24. Enhanced Outpatient Program or "EOP" inmates are required to be housed in one of the CDCR's 12 institutions with an EOP program. Inmates in EOP programs are to be housed separately from general population inmates. EOP inmates participate in yard separately from mainline inmates. EOP programs are required under the 1997 Program Guides to provide a minimum of ten hours per week of structured therapeutic activities to their patients, including group therapy, recreational therapy, education, individual counseling, daily living skills and other treatment modalities. When an inmate enters the CDCR, he or she goes through a classification process that includes medical and mental health screening in one of the

CDCR's Reception Centers. If, as a result of the mental health screening process, an inmate is identified as needing an EOP level of care, the inmate remains housed among general population inmates in the locked down conditions of the Reception Center until transferred to one of the designated mainline EOP programs. Currently operative transfer timelines for EOP inmate require that they be transferred to an EOP program within 60 days of their identification as EOP inmates. However, the timeline also requires that the transfer must be accomplished within 30 days if clinically necessary. 4/3/01 Order ¶4. At the time this was proposed, plaintiffs sought a shorter transfer timeline because the 1997 Program Guides require no treatment for EOP patients while housed in reception centers. In the Revised Program Guides the mental health staff in the reception centers will be augmented to meet the requirement to provide EOP patients with a weekly case manager contact. No additional treatment is required.

25.    In Objections to the Draft Eleventh Monitoring Report, plaintiffs requested a recommendation directing Health Care Services Division to develop a plan within sixty days to identify and address the system-wide factors contributing to the failure to comply with the court-ordered transfer timelines for Reception Center EOPs. Attached hereto as Exhibit L is a true and correct copy of plaintiffs' May 23, 2005 Objections to the Draft Eleventh Monitoring Report of the Special Master.

26.    In Objections to the Draft Twelfth Monitoring Report, plaintiffs requested a recommendation that defendants implement a system to track EOP patients housed in Reception Centers and develop a plan within 30 days to identify and address the system-wide and local problems contributing to the failure to comply with the transfer timelines. Attached hereto as Exhibit M is a true and correct copy of plaintiffs' November 25, 2003 Objections to the Draft Twelfth Monitoring Report.

27.    In Objections to the Draft Thirteenth Monitoring Report, plaintiffs requested several recommendations to address continued transfer delay of EOP patients housed in the Reception Centers. Attached hereto as Exhibit N is a true and correct copy of plaintiffs' May 26, 2004 Objections to the Draft Thirteenth Monitoring Report.

1    I declare, under penalty of perjury, that the foregoing is true and correct and that this

2  declaration is executed in San Francisco, California on February 2, 2006.

Michael W. Bien

DECLARATION OF MICHAEL W. BIEN ISO PLTFS' OBJ TO THE 15TH MONITORING REPORT OF THE SPECIAL MASTER,
No.: Civ S 90-0520 LKK-JFM