# Exhibits A through B

**Exhibit A**

SANFORD JAY ROSEN
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

December 12, 2005

<u>BY EMAIL AND REGULAR MAIL</u>

J. Michael Keating, Jr.
Special Master
2351 Sussex Lane
Fernandina Beach, FL 32034

Re:    *Coleman v. Schwarzenegger*
       Plaintiffs' Objections to the Draft 15th Monitoring Report
       <u>Our File No. 489-3</u>

Dear Mr. Keating:

Plaintiffs' objections to the <u>Draft Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols</u> ("Draft Report") are made at a time of crisis in the CDCR and increasing danger to the plaintiff class.  Our extensive comments and objections reflect the current state of the CDCR's mental health system – the system is extremely strained by overcrowding, resulting in clinical and custody staff shortages, and insufficient beds at the critical DMH inpatient and MHCB levels-of-care.  CDCR reception centers are backlogged and unable to adequately process inmates, causing the mentally ill to languish in RC environments where they are locked in their cell most of the time and do not receive meaningful mental heath care.  Suicides in the CDCR have reached an all time high rate.

The overcrowding crisis has led CDCR officials to characterize the current situation in internal memoranda as a "severe bed crisis," and a "population crisis," which is creating "an imminent and substantial threat to the public safety…requiring immediate action" and "unprecedented recommendations."  *See* Attached October 25, 2005 Memorandum from John Dovey to Roderick Hickman (**Exhibit A**); September 1, 2005 Memorandum to Wardens from Mike Knowles (setting forth various procedures for reducing population pressures including expedited reviews of ASU and SHU cases, encouraging movement of inmates to lower security levels, and requiring reviews of single-celled cases in all ASU units) (**Exhibit B**).  Yet defendants have failed to acknowledge this "crisis" in the *Coleman* process or in any filings with the Court or the

J. Michael Keating
December 12, 2005
Page 2

Special Master. The only CDCR responses to the crisis that plaintiffs have been made aware of are the lock downs caused by staff shortages, the delays in access to treatment and higher levels of care, and the mass transfers of inmates throughout the CDCR designed to squeeze even more human beings into the already overcrowded system.

Severe clinical and custodial staffing shortages are one measure of the current crisis. In a recent letter to the Prison Law Office, the CCPOA Chapter president at CMF candidly describes the dangerous situation created by these shortages:

> CMF is a medical and psychiatric prison hospital. . . . Most of our programs are court mandated and/or court monitored. Due to this, CMF is not allowed to shut down programs as other institutions have done to alleviate correctional staffing shortages. CMF is running over 60 vacant correctional positions. Adding together these vacancies and additional coverage needs, one can see the vacancy rate climb to unmanageable levels. CMF is heading for disaster. All staff members and inmates are at great risk and this institution will not be safe to work or live in. CMF will no longer be able to provide services as required by the courts and state laws.

December 8, 2005 Letter from CCPOA CMF Chapter President Steve Cox to the Prison Law Office (**Exhibit C**).

Defendants are unable or unwilling to take the actions necessary to control overcrowding in the system. Defendants' decision to abandon the parole reforms set forth in the Valdivia stipulated injunctions directly contributed to the current population crisis. As a result, the CDCR, rather than moving towards compliance with *Coleman* Court Orders and Program Guide standards, is falling further behind. These dire conditions require that the Special Master and the Court consider additional remedies including population caps and fines based, for example, on ongoing violations of the Court-mandated staffing ratios. *See Morales-Feliciano v. Parole Board of Commonwealth of Puerto Rico*, 887 F.2d 1 (1st Cir. 1989) (approving the use of daily per inmate fines as a remedy for defendant's failure to reduce prison overcrowding). Only by controlling population and limiting overcrowding will defendants be able to move, once again, towards compliance with the minimum standards of mental health care required by the Eighth Amendment to the United States Constitution.

Plaintiffs' specific objections to the Draft Report focus first on modifications to the four recommendations made by Special Master Keating at the end of the Report. Each of the four recommendations requires defendants to develop a new plan to remedy an area of significant and longstanding difficulty: (1) psychiatric vacancies at remote prisons, (2) expansion and retention of central office mental health management staff, (3) expansion of DMH inpatient bed capacity, and (4) expansion of MHCB bed capacity. As the Special Master notes in the Draft Report, defendants have already developed

J. Michael Keating
December 12, 2005
Page 3

remedial plans for each of these areas in response to prior court orders.  *See* Draft Report at 413-414.  Defendants' prior efforts in these areas have all failed, and in most of these areas they have repeatedly failed.  When a defendant proves incapable of correcting longstanding Constitutional violations, it is both necessary and appropriate for Courts and monitors to require a more intrusive level of supervision in the process of remedial development and implementation.  *See Stone v. City and County of San Francisco*, 968 F.2d 850, 864 (9th Cir. 1992) (approving highly intrusive remedy after defendant repeatedly failed to address constitutional problems); *Hutto v. Finney*, 437 U.S. 678, 687 (1978) ("In fashioning a remedy, the Court had ample authority to go beyond earlier orders and to address each element contributing to the violation.  The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions…").

In our comments below, plaintiffs propose a series of modestly more intrusive remedial measures and implementation deadlines designed to focus and guide defendants in their efforts to develop and implement effective strategies to address these problems.

Plaintiffs also request additional recommendations to address a number of the persistent, long-standing, and serious problems documented in the Draft Report, including: (1) the CDCR's failure to comply with the court-ordered transfer timelines for EOP patients in reception centers; (2) the CDCR's system-wide medication problems, including poor continuity of medication, failure to implement DOT, failure to provide HS medications, failure to follow up on medication non-compliance, failure to order and follow up on laboratory testing of inmates on mood stabilizers, and the collapse of the statewide Keyhea tracking system; (3) the failure of the existing RVR policy to provide for a meaningful mental health assessment to 3CMS patients; (4) the documented, persistent and preventable PSU transfer delays of EOP patients housed in the administrative segregation and SHU units at Corcoran State Prison; (5) concerns raised by the "pilot program" proposed for the PBSP administrative segregation unit ; (6) defendants' failure to comply with the court-ordered seven-day-a-week psych tech rounding in at least eight CDCR institutions; (7) the need for a series of focused orders regarding RJD, including a population cap and focused assistance to enable the institution to address its long term, on-going failures; and (8) the need for an order requiring DMH and the CDCR to work together to create a procedure that ensures that discharge summaries accompany all CDCR inmates discharged from DMH and that these summaries end up in each inmate's UHR.

J. Michael Keating
December 12, 2005
Page 4

I.      **Modifications to Special Master's Recommendations in the Draft Report**

    A.      **Recommendations One and Two – Psychiatry Staffing and Headquarters Staffing:**

       Recommendations One and Two require defendants to submit plans within 60 days from the entry of the Court's order.  Recommendation One concerns psychiatrist vacancies system-wide, singles out Avenal State Prison, High Desert State Prison, and Valley State Prison, and requires a plan for reducing vacancies to no more than ten percent.  Recommendation Two addresses the need to expand DCHCS central office mental health staff so that it is commensurate with the present size of the CDCR mental health staff and caseload.  Recommendation Two also requires defendants to address the issue of inadequate compensation for headquarters staff.

       While plaintiffs wholeheartedly agree that Court Orders are necessary to address these problems, we disagree with the form of the proposed orders:  In the past, orders that only require defendants to develop a plan have not been effective.  Experience has shown that only orders that also require implementation can ensure a prompt and effective remedy.[1]

---

[1]      For example, on July 26, 2004, the Court directed defendants to develop a plan within 60 days from the date of the order, for providing care in the SHU at CSP/Corcoran meeting the standards in the revised Program Guides.  July 26, 2004 Order at ¶ 1B.  Defendants prepared a plan and submitted it on September 26, 2004.  The Plan lay dormant for many months until the conclusion of the next monitoring round produced another set of recommendations ordering defendants to include in the FY2005-006 budget a request for sufficient clinical staff to implement the new services.  March 7, 2005 Order at ¶ 8.  More than a year later, with clinical vacancy rates close to 50%, Corcoran is no closer to realizing the goal of the July 26, 2004 Order.  In fact, it remains unclear whether the necessary custody positions were ever requested.  The additional clinical and custody staffing required in order to provide for the standard of care in the Revised Program Guides are only now being recruited.  As recently as September 16, 2005, the court monitors reported that there was no psych tech rounding of general population inmates housed in the SHU despite the fact that the Revised Program Guides mandated rounding of general population inmates at least every other week.  Revised Program Guides, Chapter 8, 12-8-6.

       In another example, on June 9, 2005, the Court ordered defendants to submit to the Special Master within 30 days a plan for dealing with the hazard of large-mesh ventilation screens in the administrative segregation cells of caseload inmates.  June 9, 2005 Order at ¶ 1.  The timeline of this Order conveyed a sense of urgency about the required plan.  The Plan submitted by defendants, however, demonstrates no such urgency – it includes a several year timeframe to study the issue and no commitment to replace even a single large-mesh ventilation screen.  The final bullet of the Plan states:  "Based upon the outcome of the feasibility study, the

(continued on next page)

J. Michael Keating
December 12, 2005
Page 5

Recommendation One should be amended to require that defendants develop and implement a plan to achieve full compliance with existing staffing ratios for psychiatrists, system-wide, at no more than ten percent vacancy rate, by March 1, 2006. This requirement was already ordered by the District Court in its June 12, 2002 Order. *See* 6/12/02 Order at ¶ 1. If defendants cannot bring their programs into compliance with this critical court-ordered staffing ratio by April 1, 2006, then it is clear that harsher and more intrusive remedial measures are necessary and justified. If defendants do not correct their ongoing violation of the June 12, 2002 Order by April 1, 2006, then the Special Master should recommend that the Court place a cap on the population at each particular institution that is out of compliance, and, if necessary, impose a system-wide population cap. It would also be appropriate at that time to consider a system of fines based on population in excess of the Court-ordered ratios.

Defendants' own memoranda suggest that such a population cap may be necessary given the current staffing crisis. *See* Exhibit A, October 25, 2005 Dovey Memo (noting that "even when general population beds are available for transferring reception center inmates, there are often limitations to the number of inmates with mental health or medical needs that a given institution can accept in a given week due to court imposed sanctions"). Such a recommendation gives the defendants ultimate control over the situation in that the appropriate ratio can be achieved either by hiring the required psychiatrists or by reducing the prison population.

For similar reasons, Recommendation Two should be amended to require three critical components that will enhance accountability and speed implementation of the remedy. First, the Recommendation must require that defendants develop and submit a plan for the expansion of DCHCS central office mental health staff no later than 60 days from entry of the court's order and in any event in time for inclusion in the FY2006-2007 Budget. Defendants should also be required to obtain any necessary authority from all applicable agencies as soon as possible and no later than 60 days after the FY2006-2007 Budget is approved to hire the DCHCS expanded central office mental health staff.

Second, the Recommendation must require defendants to provide a monthly update on the status of their compliance with the staffing ratios for psychiatrist and all other clinical positions and with the implementation of the plan for expansion of DCHCS central office staff.

Third, as part of their staff expansion, defendants must be required to create three specific DCHCS staff positions with management control and supervisory authority over

---

(continued from previous page)
CDCR will develop recommendations and pursue their implementation. To be determined, dependant on decisions made in aforementioned tasks." July 8, 2005 Letter to Michael Keating from George Sifuentes and John Dovey, at 4.

J. Michael Keating
December 12, 2005
Page 6

certain key remedial issues. Defendants should be required to hire an individual with extensive experience in hospital or mental health administration to manage the CDCR's current system of inpatient hospitalization and also to manage the future expansion of the inpatient system. In connection with the ongoing problem with access to MHCB care, discussed further in connection with Recommendation Four below, defendants should be required to hire an experienced administrator to manage the MHCB system and the expansion of that system. Finally, in connection with plaintiffs' request below for a new recommendation on medication management issues, defendants should be required hire an experienced manager to oversee the CDCR's medication management systems.

**B.     Recommendation Three: Acute and Intermediate Inpatient Beds**

Plaintiffs object to the recommendation concerning DMH inpatient care as insufficiently specific about the plan requirements and lacking implementation timelines.

Defendants have already been given numerous opportunities to develop an adequate plan to address the severe current shortages of inpatient beds – and they have repeatedly failed to do so. As the Draft Report notes, the process of getting defendants to produce an accurate assessment of unmet need for inpatient care started during the *Gates-Coleman* merger negotiations and led to "a seven-year effort to determine the existence and extent of any such unmet need." *See* Draft Report at 377. After seven years of failed efforts, an adequate assessment was finally completed last spring:

> The so-called UNA study found 512 as yet unreferred CDCR inmates clinically appropriate for referral to an inpatient DMH level of care, including 425 inmates in need of intermediate care and 77 in need of acute inpatient care, representing respectively 14 and two percent of the department's total EOP population. Subsequent classification data from the UNA study indicated that two-thirds of the inmates identified for referral to intermediate inpatient care required Level IV custody, as did 60 percent of those identified for referral to acute inpatient care.

Draft Report at 377.

Unfortunately, after taking more than seven years and conducting more than four failed studies of the need for inpatient care before completing an accurate study, defendants have now caused further delay by submitting two inadequate plans to address the need identified in the study.

The first plan, produced on March 30, 2005, did not adequately address the identified need, and unduly delayed building necessary inpatient beds at every level. On April 29, 2005, plaintiffs sent a letter outlining the extensive problems with this first plan, including its failure (1) to address the identified need for acute inpatient care (APP beds), (2) to include enough Level III ICF beds, (3) to include enough Level IV ICF beds, (4) to address the unmet need identified in the study for inpatient care for women, (5) to

J. Michael Keating
December 12, 2005
Page 7

provide meaningful short-term and medium-term remedial measures to address the
shortage of inpatient beds and (6) to remedy the training and supervision issues behind
the ongoing failure of CDCR clinicians to refer all appropriate cases for inpatient care.
*See* Plaintiffs' April 29, 2005 Objections to UNA Plan (**Exhibit D**). Plaintiffs also
objected to the failure of the CDCR to adequately enlist DMH in providing ICF care to
CDCR inmates in the short term. Id. In conference calls and meetings with defendants
and plaintiffs after the plan was produced, the Special Master and his experts raised these
and many similar concerns.

The second plan was dated August 15, 2005. The second plan was again
inadequate. Plaintiffs set forth extensive objections to the plan in letters dated August 17
and August 23, 2005 (**Exhibit E**). In addition, the Special Master provided extensive
comments to defendants in his August 30, 2005 Letter to CDCR Undersecretary
Woodford, which identified many of the same problems:

- Once again, the plan did not address the projected shortfall of acute APP
  beds.

- The plan did not adequately address Level I, II, and III needs for ICF beds.

- Once again, the plan did not address the needs of female inmates.

- The plan did not address the identified shortfall in Level IV ICF beds.
  Indeed, the plan did not provide for significant new numbers of Level IV
  ICF beds until the middle of 2008, except for 36 new beds beginning this
  fall at CMF.

- The plan did not address the needs of inmates currently waiting for transfer
  to the SVPP ICF program.

- The plan contained numerous "caveats about the availability of funding for
  both the construction and operational costs of the plans' various elements."
  August 30, 2005 Letter at 5. *See also*, Draft Report at 385 ("The 39-month
  estimate [for building the 112 bed ICF unit in D-Quad at SVSP] it turns
  out, will be hard to meet.")

August 30, 2005 Letter from Michael Keating (**Exhibit F**). In the Special Master's
August 30 letter, he also objected to the defendants' proposed slow pace of construction,
stating, "*defendants must treat this issue as the genuine emergency that it is.*" August 30,
2005 Letter at 5.

It is now abundantly clear that defendants have not done so. Defendants have
known that their latest plan was inadequate since the end of August, but have allowed
three more months to pass without correcting any of the identified problems. Given this
lack of diligence, we request that the length of time for the development of plans be
shortened to 45 days from the date of the ultimate Court Order, while keeping the

J. Michael Keating
December 12, 2005
Page 8

requirement in the existing Recommendation Three that defendants "ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY2006-2007 Budget." *See* Draft Report at 413.

One area where the evidence of lack of diligence by the State of California is overwhelming is in the unwillingness of DMH to participate in solving this crisis – even though DMH is under the direction of the Governor, the lead defendant in this case. The Draft Report makes clear that DMH has played a central role in development of the current crisis situation:

> DMH has also repeatedly held out to the CDCR, and the court, the prospect that the new DMH facility with 1,500 beds under construction at Coalinga and currently accepting patients would allow DMH to accommodate more Level IV CDCR inmates. This prospect also turned out to be illusory. Coalinga may be able to absorb some CDCR inmates in need of intermediate inpatient care, but the facility is not much more secure than Atascadero State Hospital (ASH), where most intermediate inpatient care is presently provided by DMH to CDCR inmates. DMH did not share with CDCR, or the court, information about the security limitations of its Coalinga facility until early 2005. . . . <u>DMH has long operated under the protective assumption that it had no obligation to provide mental health services for CDCR inmates who might represent a danger to DMH programs and staff, although it knew well it was the only source of inpatient care available to the CDCR.</u>

Draft Report at 384-385 (emphasis added). This history of DMH placing its own bureaucratic ends before the welfare of mentally ill CDCR prisoners continues to this day. Attached hereto is a memo and some tracking documents with ASH population projections that were recently obtained by plaintiffs from DMH through a California Public Records Act request. These documents show an ongoing unwillingness of DMH to participate in the solution to this crisis, even as their own population crisis eased in recent months. The first attached document is a March 30, 2005 Letter from John Rodriguez to Renee Kanan explaining that DMH will place the goal of reductions in DMH population ahead of serving CDCR inmates, even as it enjoys a surplus of beds in the wake of the opening of CSH:

> As the beds are vacated at ASH [by Coalinga-bound departures], DMH management will develop and follow a population management plan to reduce the over-bedding at the hospitals by redistributing the population back into the state hospitals' licensed bed capacity. Once this occurs and there is adequate staffing and funding, then DMH can provide the additional 125 beds to the CDC. Until DMH management completes the redistribution, DMH will not

J. Michael Keating
December 12, 2005
Page 9

know where in the system these beds will be available – CSH or
ASH. It should be noted that based on the DMH ten-year population
projections, after the 125 beds are provided for the CDC, the
remaining beds in the system will be needed for growth in the
populations that DMH is legislatively authorized to serve.

March 30, 2005 Rodriguez letter at 1 (**Exhibit G**). Clearly, treating CDCR inmates is not
an important priority for DMH. Indeed, also attached hereto is a October 27, 2005 e-mail
from Cindy Radavsky to Tom Voss and others discussing the need to go back to the
*Coleman* court and seek approval to remove the 50 CDCR inmates that are to be housed
in CSH in fiscal year 2006-2007. *See* 10/20/05 Radavsky E-mail (**Exhibit H**).

Also attached hereto are several population charts that show ASH's population
crisis has eased considerably in recent months and is projected to drop precipitously in
the coming months (**Exhibit I**). It is clear from these charts that ASH currently has the
ability, with overbedding, to house as many as 1528 inmates. Despite this ability, ASH
appears committed to reducing overbedding rather than treating decompensated, severely
ill CDCR inmates.[2] In fact, population figures from October 10, 2005 show ASH with a
population of 1315. The same chart shows that ASH is permitted an over-bedded
capacity of 1526 – <u>meaning that at the present time ASH has more than 200 available
beds that could be used to treat CDCR ICF patients</u>. (*See* Exhibit I at 10/10/05 Chart)
These beds were available on October 10, 2005, and presumably remain available now.
This is true even though the same chart shows that only 47 SVPs had been transferred to
CSH as of October 10, 2005. The number of available beds at ASH should increase
substantially in the next few months as CSH comes on line more fully.

Given the misrepresentations made to the Court and the Special Master over the
years by DMH officials, see Draft Report at 383-384, it is clear that DMH must be
required by court order to actively participate in this round of inpatient planning along
with the CDCR. DMH, along with DHS, should be named in the ultimate order from the
Court on this issue and required to submit plans and reports to the Court and the Special
Master alongside the CDCR.

---

[2]    Interestingly, these documents show that the DHS official primarily responsible for
pressuring DMH to limit the duration of its overbedding to within one year of the opening of
CSH is the same DHS official responsible for trying to force the closure of the ICF program at
CMF last year – Paul Hendrix. See Attached December 17, 2004 e-mail from Michael Tucker to
Cindy Radavsky, discussing meeting with Paul Hendrix, at ¶ 4 (stating that Paul Hendrix insisted
in a December 14, 2004 meeting that overbedding at ASH must cease with 1 year of the opening
of CSH) (**Exhibit J**).

J. Michael Keating
December 12, 2005
Page 10

Plaintiffs request that the Special Master's existing recommendation be augmented as follows to focus and guide defendants development of a remedial plan and to give defendants a deadline for implementation:

3.      Defendants, in conjunction with DMH, and DHS, should be required to submit within 45 days from entry of the court's order a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in CDCR clinically determined to be in need of these levels of inpatient care. The plan must address 100% of the identified interim and long-range needs based on up-dated population projections and the results of the UNA study, detail any financial and construction plans, timetables and staffing requirements needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 2006-2007 Budget. All identified needs must be addressed by programs to be fully operational no later than January 1, 2008.

In addition, the plan must include the following:

(a)      Defendants and DMH shall prepare a report concerning the feasibility of hardening a portion of the new CSH facility and providing care to Level III and Level IV CDCR patients therein. Defendants shall provide detailed documentation concerning any alleged security problems that prevent them from doing so, including written reports by qualified security professionals explaining why this newly built maximum security state hospital for sexually violent predators is not capable of housing Level III and IV CDCR prisoners and what staffing or construction, if any, is necessary to permit such housing at CSH.

(b)      Defendants, the Department of Health Services ("DHS") and DMH shall report on the feasibility of immediately expanding the ICF treatment program at ASH for CDCR inmates rather than reducing overbedding there. This report should include the steps necessary to add a minimum of 75 new beds in addition to the 175 new beds previously promised by DMH for CDCR inmates at ASH and CSH by mid-2006.

(c)      Defendants and DMH shall develop a plan that sets forth the feasibility and cost of accelerating the pace of construction so that (1) the planned 112-bed Level IV ICF in the current SVSP D-yard EOP space is available to begin treating inmates by December 31, 2006 rather than mid-2008, and (2) the planned 64-bed expansion of the SVPP program is open and ready for occupancy by July 1, 2007, rather than 2009. This plan shall include reports from

J. Michael Keating
December 12, 2005
Page 11

the various contractors responsible for the projects and should
consider options such as working 2-3 shifts a day and seven days a
week.

(d)     Defendants' plan shall include an ongoing training and
supervision component for ensuring that CDCR clinicians refer all
appropriate cases to inpatient care and that CDCR headquarters
monitors and supervises the process of referral.

(e)     DMH and CDCR should be directed to jointly submit a
plan or procedure within 30 days from the entry of the court's order
that will ensure that DMH discharge summaries for all CDCR
inmates sent to DMH are promptly provided and placed in the
inmate's UHR when they return from DMH.[3]

Defendants' seven-year delay in assessing and addressing the need for inpatient
care is outrageous and irresponsible. The result is that extremely ill individuals suffer in
severely decompensated states. This denial of care amounts to an severe, ongoing,
knowing violation of the Eighth Amendment. The denial of care to such individuals is
widespread. For example, the Draft Report explains that at CSP-COR, the UNA study
identified 25 cases that should have been referred for inpatient care. When visiting
Corcoran several months later, the monitors reviewed these cases and found that just 12
of these 25 cases had been referred to inpatient care, and that only 4 of the 25 cases were
actually transferred. *See* Draft Report at 152; see also Draft Report at 192 (similar
problems at SVSP). This situation is unacceptable. Defendants must not be permitted to
take another seven years to implement an adequate remedy.

## C.    Recommendation 4:  Provision of Adequate MHCB Beds

The Draft 15th Report contains ample documentation of the widespread problems
caused by the severe shortage of MHCB beds that has existed since at least mid-2004 at

---

[3]        The 15th Report notes problems with access to DMH inpatient discharge summaries at
many institutions. *See* Draft 15th Report at 10 (SAC: DMH discharge summaries often
missing); 26 (PBSP: problems obtaining discharge summaries); 65 (MCSP: DMH discharge
summaries found in just one of three charts reviewed for recently returned inmates from DMH);
118 (SQ charts of "some inmates returned to SQ from DMH contained discharge summaries,
others did not"); 232 (WSP: "DMH did not always send required discharge summaries"); 251
(LAC: discharge summaries missing from 5 of 7 charts reviewed for inmates returned from
DMH); 295 (RJD: "Some inmates returned [from DMH] without any discharge summaries at
all"); 231 (CCWF: problems with DMH discharge summaries getting into UHRs; summaries
sent to CIW instead of CCWF). This problem was noted frequently during the UNA reviews and
was a reported problem in the recent November 2005 SVSP monitoring tour.

J. Michael Keating
December 12, 2005
Page 12

almost every CDCR institution.  In addition to revealing the severity of the shortage, the
report documents serious management problems at many MHCB units.[4]  As noted in the

---

[4]        *See* 15th Draft Report at 8, 9, 12 (CSP-SAC: beginning in the summer of 2004, MHCB
access at CSP-SAC "*erratic*," overflow inmates who were waiting for MHCB beds in the SAC
OHU "*sometimes spent four to seven days in the OHU waiting for a MHCB to become
available*;" by October 2004, MHCB access at SAC "*slowed even further due to a system-wide
shortage of beds in MHCB units*" with the result that "*temporary housing arrangements for local
inmates awaiting access to a MHCB unit were becoming increasingly unacceptable and
dangerous*"); 25 (PBSP:  "*The number of MHCB beds reportedly was inadequate*" and the
"*shortage of bed space was compounded by the use of the MHCB unit for long-term nursing
care.*"); 40, 48 (HDSP:  long psych and return delays in discharging MHCB inmates, reports that
EOP inmates downgraded to 3CMS by HDSP MHCB staff in order to facilitate removing them
from MHCB); 63-64 (MCSP: excessive MHCB lengths of stay worsening "*with about half of the
extended stays lasting three to five weeks*;" also extensive use of "potty" cells when space in
MHCB unavailable, starting in March 2004; these "potty" cells were used on 14 occasions
between August and December 2004. "*The cells had no beds and, although monitored by
security, were not located in a clinical area where inmates requiring stabilization could be
monitored and treated adequately.*"  As a result of the shortages, "*some clinicians felt pressure
not to admit inmates to the MHCB unit.*"); 99 (CSP-SOL: 13 bed MHCB closed in early Summer
2005 for six months, resulting in "*a serious setback to CDCR's overall MHCB capacity*"); 114-
115 (SQ: "*Only 40 percent of referred inmates were transferred on time due to increased delays
in MHCB acceptance.  According to institutional logs, it took three days or more, typically five
to seven days, for a MHCB unit elsewhere in CDCR to accept half of the referred inmates; the
longest acceptance time was 12 days.*" Also, "*inmates frequently were not referred promptly to a
higher level of care*"); 135 (DVI: timeliness of MHCB transfers again became a problem starting
in the summer of 2004); 156 (COR: inadequate MHCB logs made reporting difficult); 166
(SATF: 68 of 161 MHCB admissions stayed longer than 10 days); 172, 174 (PVSP: crowding
causing quality of care problems in MHCB, some excessive lengths of stay in MHCB); 180
(ASP: timeliness of MHCB transfers "erratic"); 192 (SVSP: difficult to review because "*the
institution's ability to account for its use of crisis beds appeared to have deteriorated*"); 220-221
(CMC: "*Beginning in July 2004, the overall number of MHCB referrals throughout the CDCR
began to outpace available beds in MHCB units,*" and once a new ASH referral process for acute
care intended to remedy the problem at CMC began, the new referral process was overly
bureaucratic and many Level III CMC inmates were rejected by ASH for custody reasons,
resulting in there being only a few transfers); 274-75 (CIM: problems with repeat admissions to
the MHCB unit and "*The MHCB caseload was generally high, and treatment services in the
MHCB unit suffered.  The hospital was licensed for 18 MHCB inmates, but the average daily
census ranged from 24 to 32 inmates.*"); 286 (CRC: increasing problems accessing MHCB care
resulted in increased use of OHU); 296-297, 300 (RJD: noting some excessive lengths of stay
and noting quality problems with "*identification and handling of decompensating and high-risk
inmates,*" and failure to conduct required suicide risk assessments, missing records from MHCB
stays); 303 (ISP: "*Lengths of stay in the MHCB unit were excessive.  The average length of stay*

(continued on next page)

J. Michael Keating
December 12, 2005
Page 13

conclusion of the Draft Report, this "situation represents an extremely serious and continuing violation of the orders of the court in this case." Draft Report at 394.

Although the biggest problem with MHCB care is simply the shortage of beds, some portion of the MHCB crisis can be addressed through short-term policy changes. For example, MHCB beds are being used for long-term medical care patients in some institutions. *See* Draft Report at 25. The CDCR should be ordered to immediately issue a policy forbidding institutions from using MHCB beds for medical patients, and reserving all CTC "swing" beds for MHCB usage. (Plaintiffs understand that the CDCR has plans to open a new program for long-term medical care cases at CMF in a portion of the GACH there. As part of their response, defendants should provide detailed information about this unit and its impact on access to MHCB beds).

Similarly, in some institutions, inmates are waiting in MHCB units for many days after their clinical discharge, needlessly filling scarce beds. For example, at ISP, the Draft Report indicates inmates remain in the MHCB unit for an average of six days after their clinical issues are resolved. Draft Report at 303. Defendants should also be ordered to expedite transfers of such cases out of MHCB units.

The shortage of MHCB beds, although severely exacerbated during the last year, is not a new problem. Defendants should have foreseen this shortfall and planned for it. MHCB care is an essential part of defendants' mental health system, and it is the subject of numerous court orders and many reports of the Special Master. *See* 11/15/01 Special Master's Report on Defendants' Expedited Process for Transfers to a Mental Health Crisis Bed Level of Care at 1, 7 (noting *"system-wide shortfall of MHCB beds."*); 12/20/01 Order (requiring a plan for improved MHCB access within 30 days); 10/8/02 Order at ¶ 3 (requiring within 30 days a plan to provide *"both immediate and long-term access"* to MHCB care) and at ¶ 4 (requiring plans for long-term MHCB access at both CMC and CMF within 90 days). In response to these orders, defendants produced three plans for improving access to MHCB care, and each has proved inadequate over the long term. *See* 1/18/02 Letter and Plan; 12/6/02 Letter and Plan; 1/3/03 Letter and Plans.

It has now been clear for at least eighteen months that these plans for improving MHCB access have been a total failure.[5] DCHCS has done little while this problem has

---

(continued from previous page)

*for MHCB inmates was 15 days, with stays ranging from four to 34 days. The average length of stay for clinical reasons was about nine days,*" no system in place for 5-day follow up of suicidal inmates released from the MHCB). By way of contrast, women's institutions generally reported good access to MHCB care. See Draft Report at 324 (CIW), 331-32 (CCWF), 339 (VSPW).

[5]    As we explained in our July 7, 2005 letter, these plans relied heavily on a series of assumptions that have not turned out to be true, including: (1) the assumption that "when the new SVSP DMH program opens in early 2003 . . . some patients in the Acute Psychiatric Program

(continued on next page)

J. Michael Keating
December 12, 2005
Page 14

become a full-blown crisis. The time has come for closer supervision and more intrusive orders regarding MHCB issues.

Recent monthly data from DCHCS confirms the extent of the current crisis:

Referrals to External MHCBs

| Month | Total # Ref | Sent | Not Sent |
|-------|-------------|------|----------|
| April 2005 | 228 | 48 (21%) | 180 (79%) |
| May 2005 | 300 | 41 (14%) | 259 (86%) |
| June 2005 | 320 | 55 (17%) | 265 (83%) |
| July 2005 | 239 | 30 (13%) | 209 (87%) |
| August 2005 | 310 | 38 (12%) | 272 (88%) |

These figures demonstrate that problems with MHCB access are growing worse with each passing month.

The lack of MHCB beds is a product of a series of ongoing management failures:

- Eighteen months ago, when DCHCS first learned of this crisis, it should have attempted to respond to it immediately with additional funding in this year's budget. Nor did defendants bring the crisis to the attention of the Special Master. The failure to act at that time means inmates will wait at least a year longer for even short-term relief. The next budget cycle is already well underway. Defendants must act now to secure additional MHCB resources.

- This crisis was foreseeable. In 2002, defendants' own Tucker Alan Study projected a need for **224** MHCB beds in 2005 (based on a projected male inmate population of 150,409). *See* July 29, 2002 Revised Tucker Alan

---

(continued from previous page)
(APP) at CMF/DMH will be transferred there" and that "this should free up MHCB beds statewide" (12/6/02 Plan at 2); (2) the assumption that the new Coalinga State Hospital would free up beds at ASH and SVPP which CDC could use for MHCB Care (12/6/02 Plan at 3); (3) the assumption that the department could open "20 or more" MHCB beds at Corcoran, (12/6/02 Plan at 2), a plan that defendants announced at the June 2005 All parties meeting that they had abandoned because they do not believe they can staff such a unit at Corcoran, and (4) the assumption that the CDC could provide MHCB-type care for up to five inmates in the CMC hospital, which has been abandoned, according to defendants' 6/3/05 HCPU report on MHCB availability. Moreover, all of defendants' past MHCB capacity projections included the 5-bed MHCB unit at Centinela, which was shut down (with no announcement to plaintiffs or the Special Master) at some undisclosed time in the past.

J. Michael Keating
December 12, 2005
Page 15

Study at 46, Exhibit 4. As of this week, the CDC's website reports a current male inmate population of 156,315. *See* November 28, 2005 Weekly Population Report (**Exhibit K**). Adjusted for this jump in population, the CDC currently needs to have at least **233** MHCB beds for men. However, according to the most recent available monthly data, there are only **153** male MHCB beds available. 9/12/05 HCPU Report (SOL, NKSP and CEN closed) (**Exhibit L**). Thus, there is a present shortfall of **80** MHCB beds. Almost this entire shortfall was projected by defendants' own experts in 2002.

- Even now, this life-threatening crisis in mental health care is not being addressed with the necessary sense of urgency by defendants. For example, the HCPU data for August shows that across the system, there are 111 inmates housed in CTC beds for long term medical care. *See* 9/12/05 HCPU Report (attached hereto). The use of CTC beds for long term care cases is expensive and wasteful

Inadequate MHCB management and planning may also be costing inmates' lives. During the past year, a number of completed suicides took place when the inmate should have been transferred to an MHCB but was not, or under circumstances where there is no explanation for the failure to refer the inmate to an MHCB.[6] Moreover, in the year to date, there has been a surge in suicides. So far in 2005 there have been at least 39 suicides and two additional suspicious deaths by overdose that are still being investigated.

The MHCB crisis alone is more than ample justification for the Draft 15th Report's recommendations concerning improvements in central office staffing. The existing Recommendation Four on page 413 of the Draft Report should be expanded in the manner set forth below:

---

[6]     *See* Suicide Report for David Foster (11/12/04 MCSP suicide took place the day after inmate placed in a body cavity search cell rather than the MHCB unit for suicidal ideation), Suicide Report for Regino Solorio (roughly a month before his October 2004 suicide at CSP-Sacramento, inmate placed in a strip cell on his ad seg unit for suicidal concerns but not referred to MHCB unit); Khou Suicide Report (1/3/05 suicide of SVSP inmate on five day follow-up after treatment for several days in "treatment and triage area" following suicide attempt); Suicide Report for Armando Bustamante V-46902 (Folsom inmate moved into holding cell after saying he "couldn't take it anymore" in his ASU cell; he was subsequently considered for MHCB referral to SAC but referral not made; the LPT who decided not to refer indicated the inmate appeared to be improving, but also admitted that such referrals are very difficult to make, discouraging such referrals).

J. Michael Keating
December 12, 2005
Page 16

4.    The defendants should be required to submit within 45 days from the entry of the court's order a plan for the provision of Mental Health Crisis Beds for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of mental health care. The plan must address interim and long-range needs based on updated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 006-2007 Budget. The plan shall also include the following elements:

(a)    A plan and schedule for maximizing the use and availability of all MHCB beds in the short term by (1) moving long term medical care cases out of CTCs, (2) expediting discharges from MCHB units of inmates whose clinical need for MHCB placement has ended, (3) expanding the MHCB swing beds available in the short-term through staffing augmentations, (4) continuing to operate the eight overflow MHCB beds at Corcoran that were used for NKSP inmates while the NKSP MHCB unit was closed recently.

(b)    As part of the plan, defendants should provide updated Tucker-Allen MHCB capacity projections for the next six years. These updated projections shall take into account the current overflow MHCB population that is inappropriately housed in OHUs, administrative segregation units, and ZZ cells, and should include a plan to phase out of dangerous and unauthorized current use of OHUs, administrative segregation units, and ZZ cells used for these patients. The overall MHCB expansion plan should provide for enough new MHCB beds to meet the needs identified in this projection by January 1, 2008.

(c)    A plan for accelerating the staffing and licensing of the new MHCB unit at Kern Valley State Prison, and the new MHCB beds at CSP-SAC, so that they are both licensed and operational by June 30, 2006, and a plan for accelerating the construction, staffing, and licensing of the new MHCB unit at CMF so that it fully licensed and operational by January 1, 2008. Defendants shall also cease their current practice of removing patients from CTC units in order to facilitate licensing surveys. Defendants shall also meet with DHS officials and the Special Master and Plaintiffs' counsel to explore ways of accelerating licensing of the remaining CTC units and new units built in the future.

(d)    A plan to ensure that DCHCS population management staff are available 7-days-a-week to coordinate placements of inmates needing MHCB care.

J. Michael Keating
December 12, 2005
Page 17

## II.  **Plaintiffs' Request For Additional Recommendations**

### A.  **The CDCR's On-going Failure to Comply with Court-Ordered Reception Center Transfer Timelines**

The CDCR's inability to transfer EOP patients housed in reception centers within sixty days to EOP programs has been identified as a serious problem during numerous monitoring reports with little, or no progress over time.[7]  Plaintiffs have repeatedly sought recommendations to address these delays.  To date, none of these have been adopted.  It is time to act.

In Plaintiffs' Objections to the Special Master's Eleventh, Twelfth, and Thirteenth Draft Monitoring Reports, we requested a requirement that defendants develop a plan to identify and remedy system-wide factors contributing to the failure to timely transfer reception center EOPs, and track individual EOP inmates in reception centers.  *See* Plaintiffs' Objections to the Draft Eleventh Report, May 29, 2003; Plaintiffs' Objections to the Draft Twelfth Report, November 25, 2003; Plaintiffs' Objections to the Draft Thirteenth Monitoring Report, May 26, 2004.  None of these requests were adopted.

The Fourteenth Monitoring round was reduced in scope and covered only eleven institutions, including six reception centers.  Although plaintiffs did not request another recommendation addressing reception center delay, the Report did include documentation of transfer delays at all of the receptions except for Valley State Prison.[8]

The current reception center data provided monthly by the Department of Correctional Health Care Services ("DCHCS") is incomplete.  The data generally does not indicate the reason for delays in transfers of EOP RC inmates.  Without this critical data, DCHCS cannot begin to develop a remedy that will bring defendants into

---

[7]   *See* Eleventh Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 256; Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 63, 144, 153-54, 176, 179 and 196; Thirteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 26, 68-69, 76, 149, 157, 176-7, 180, and 193;  Fourteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 20, 68, and 125. See 11th Report at 256 (reception centers "have neither the staff nor physical facilities to provide the level of treatment and monitoring these inmates need, and the failure to provide needed treatment, sometimes for months, imposes severe hardship and suffering on some of those left waiting.")

[8]   CCI: 12% took longer than 60 days; CIM:  40% took longer than 60 days; SQ: 41% were waiting longer than 60 days at the time of the visit; HDSP:  Data still not entirely reliable or complete but it appeared that timeliness of EOP transfers slightly improved with 21% delayed; RJD: % of EOPs remaining longer than 60 days increased slightly from 31% to 35% and back to 32% in June).

J. Michael Keating
December 12, 2005
Page 18

compliance with Court-ordered time frames. Moreover, there is a need to determine whether there is a shortage of SNY or EOP beds system wide causing the delays.[9]

The 15th Draft Report again documents the on-going and persistent delays in transferring EOPs from reception centers. *See* Draft Report at 116, 134, 230, 240, 264, 274, and 339. The treatment given to EOP patients while they reside in these reception centers is minimal, with the best institutions providing only a weekly case manager contact. At many RCs, EOP patients receive less. *See* Draft Report at 117 (<u>SQ</u>: only half of the EOP patients in reception were seen weekly by case managers, with compliance varying from 23 to 80 percent some months); 241 (<u>NKSP</u>: 17% of the EOP patients in reception were not seen weekly); 264 (<u>CCI</u>: 22% of the EOP patients in reception were not seen weekly); 40 (<u>HDSP</u>: treatment of RC EOP patients deteriorated; EOPs did not consistently receive weekly contacts); 295, 298 (<u>RJD</u>: 137 of 373 caseload inmates in reception had been there overlong…EOP inmates were not provided adequate treatment).

The RC transfer timelines and the minimal RC treatment requirements were developed in tandem and are interdependent – the parties clearly envisioned that rapid reception processing would make a full-fledged RC EOP treatment program unnecessary. Unfortunately, RC processing delays have worsened significantly in recent years, making the promise of rapid transfer illusory. Given the current population crisis, this situation is likely to continue to deteriorate in the foreseeable future.

This situation necessitates additional orders to prevent further injury to vulnerable class members who face extended RC stays in stressful, locked-down conditions. Plaintiffs request a requirement that defendants develop and implement a plan within 30 days from the entry of the court's order for creation of several reception center EOP units that can provide at least ten hours of structured therapeutic treatment to (1) all EOP reception center patients that have been waiting longer than 60 days in a reception center and (2) all "at risk" EOP reception center patients who have been determined to need enhanced care while they wait to be transferred.

**B.** **<u>Medication Issues – Continuity of Medication, DOT, HS Medication Administration, Follow Up on Medication Non-Compliance, Lab Testing and Statewide Keyhea Tracking System</u>**

The Draft Report documents widespread ongoing problems with medication management and laments the "painfully slow" progress that has been made on the

---

[9]     *See* Monthly Reports file in response to January 19, 1999 court order, dated October 18, 2005, RC Processing for MHSDS Inmates, attached hereto (CCI RC EOP, reporting no delay codes; NKSP RC EOP, reporting no delay codes; CCWF RC EOP, reporting error codes; CIM RC EOP, reporting "Other Delay" for delay code; DVI RC EOP, reporting no delay codes; SQRC-47 EOP overdue, 2 Delay codes provided; Wasco RC EOP-28 overdue, 1 delay code of "Other delay code").

J. Michael Keating
December 12, 2005
Page 19

provision of HS medications, DOT medications, and in addressing medication non-compliance. *See* Draft Report at 367. These and other medication problems have been found consistently in prior reports[10], and the time has come for more aggressive intervention in the management of defendants' medication efforts.

In particular, a remedy is needed to address each of the following longstanding, widespread problems:

(a)    Poor Follow-Up on Medication Non-Compliance. The Draft Report documents problems with referrals for and the scheduling of follow-up appointments for medication non-compliant inmates at nearly every institution.[11] Given the longstanding and near universal existence of these problems (albeit with some minor

---

[10]    *See* Fourteenth Report at 170:  "These findings reflected accurately that the institutions monitored during this round continued to experience some serious problems in delivering and managing medications effectively"; *see* Thirteenth Report at 248:  "Again, for a system that relies so heavily on the use of psychotropic medications to treat mental illness and stabilize mentally disordered inmates, effective medication management is critical.  The ability of the newly implemented policy, now supposedly fully installed in all CDC institutions, to assure such effective management needs to be assessed."

[11]    *See* Draft 15th Report at 15 (FOL:  "The lack of psychiatric resources created some problems with follow-up to medication non-compliance."); 23 (PSBP:  "Follow-up to medication non-compliance remained problematic"); 35 (HDSP:  "Follow-up to medication non-compliance remained problematic."); 61 (MCSP:  Follow up "improved but remained erratic."); 70 (SCC:  "Follow up to medication non-compliance was poor"); 83 (CMF:  Follow up "remained problematic in the 3CMS program"); 95 (SOL:  Follow up "erratic."); 110 (SQ:  "Timeliness of psychiatric response to referrals for non-compliance was still poor" and some inmates waited four to seven weeks for an appointment); 130 (DVI:  "erratic" follow up to medication non-compliance); 179 (ASP:  "follow up to medication non-compliance was weak."); 188 (SVSP:  "response to medication non-compliance was inconsistent... Non-compliance with medication did not always elicit a response"); 205 (CTF:  "Follow up to medication non-compliance remained problematic."); 227 (WSP:  "Follow up to medication non-compliance was extremely poor."); 238 (NKSP:  follow up "inadequate"); 246 (LAC:  "MTAs did not reliably refer inmates who were non-compliant with their medications to mental health"); 261 (CCI:  "Follow up to medication non-compliance was poor."); 270 (CIM:  poor follow up); 291 (RJD:  "pervasive deficiencies" apparent in medication management generally, with problems with expiration of medication orders and continuity of medication "prominent" problems); 321 (CIW:  "some inmates reported problems with follow-up to medication non-compliance"); 238 (CCWF:  follow-up to medication non-compliance may have "slipped during the period"); 336 (VSPW:  "poor auditing made it difficult to determine the extent of follow-up to medication non-compliance."). *See also* Summary Section at 359-360 (noting ongoing nature of problem and generally abysmal performance in this area).

J. Michael Keating
December 12, 2005
Page 20

variations in the extent of the problems), it is clear that the time has
come to address this issue systemically.

    (b)    <u>HS Medications</u>.  HS medications do not appear to be
an option for clinicians and patients at the majority of CDCR
institutions.[12]  This problem persists despite clear direction from the
Special Master and his monitors and from the Court.[13]  In the
summary section on this issue, the monitor notes that "*Neither
institutions nor DCHCS appeared willingly to take on this issue,
initially ignited by a careless and obtuse central office directive and
vastly complicated by local shortages of MTAs and RNs.*"  Given
this unwillingness to correct the issue, it is clear that defendants
must be given a clear order to do so by a date certain.

    (c)    <u>Continuity Upon Arrival, Changes In Housing Units or
Upon Renewal of Medication Orders</u>.  The area of medication
continuity is another area of widespread, well-documented
problems.[14]  The problems with continuity have been identified in

---

[12]    *See* Draft Report at 7 (SAC: number of inmates on HS medications increased to 80 in
June 2004 but decreased to about 9 in July 2004); 15 (FOL: "HS medications were rarely
provided; only four caseload inmates at Folsom received psychotropic medications on an HS
basis"); 23 (PBSP "HS medications were not administered at PBSP"); 36 (HDSP:  "HS
medications were not prescribed at the institution."); 79 (SCC: difficulty providing HS
medications); 84 (CMF: no HS medications); 97 (SOL: no HS medications); 105 (SOL: no HS
meds procedure); 132 (DVI: no HS medications); 147 (COR: HS medications delivered before 8
p.m.); 173 PVSP (HS medications a problem); 179 (ASP did not provide HS meds); 188 (SVSP:
HS meds provided before 7:00 pm); 208 (CTF: only one inmate on HS meds at the institution);
217 (CMC provides HS to only a few inmates); 228 (WSP: no HS medications, last pill line of
the day conducted at 2:30); 238 (NKSP: HS meds "not generally administered"); 262 (CCI: some
inmates on HS medications, but difficulties in the administration of HS meds; also, all HS meds
delivered before 8:00 pm); 271 (CIM: HS provided to a small number of inmates); 283 (CRC: no
HS medications prescribed); 302 (ISP – no HS meds for general population inmates); 321 (CIW:
no inmates on HS meds); 329 (CCWF: no HS medications); 343 (VSPW: no HS medications
being administered)

[13]    June 25, 2003 Order directing defendants to include in their new medication policy a
provision that requires evening distribution of HS medications no earlier than 8 p.m. and a
supervisory psychiatric oversight or peer review structure that is not so burdensome that it
precludes or unnecessarily discourages the prescription of HS medications when clinically
appropriate.  ¶5.  Also reported on extensively in the Thirteenth Monitoring Report at 246-249;
Fourteenth Report at 170.

[14]    *See* Draft Report at 15 (FOL: "somewhat of a problem"); 34 (HDSP: "continuity of
medication on renewal of medication orders was a widespread problem that showed no sign of

(continued on next page)

J. Michael Keating
December 12, 2005
Page 21

previous monitoring rounds.[15]  The time has come to order a more
focused, statewide remedy.

      (d)   <u>DOT medication distribution</u>.  This is another critical
medication area where defendants' efforts are lagging.[16]  As noted in

---

(continued from previous page)
improvement"); 59-60 (MCSP: Chart reviews by experts "found some gaps in medication
ranging from one day to a week" and continuity upon renewal of orders remained problematic);
82 (CMF: "CMF still had major problems with the delivery of medications"); 94, 95 (SOL:
"Most aspects of medication delivery and management at CSP/Solano were inadequate.
Continuity of medication upon arrival was particularly problematic" and "Continuity of
medication for inmates moving between housing units was also deficient"); 129-130 (DVI: poor
continuity upon arrival and upon renewal); 147 (COR: "medication deliveries were often
interrupted by changes in location."); 173 (PVSP: despite good performance on medication
issues in other areas, medication continuity upon internal transfers remained a problem.); 178
(ASP: "Continuity of medication was problematic for inmates on arrival, changes in intra-
institutional housing locations, and renewal."); 226 (WSP: "continuity of medication for arriving
inmates was erratic" and continuity "for those whose housing location changed was poor."); 247
(LAC: continuity a problems for arriving inmates, and when inmates moved housing within the
institution; also problems with medication continuity for inmate returning from DMH; continuity
of medications when prescriptions renewed was not reviewed); 260 (CCI: continuity on arrival
and on changes in housing "remained problematic"); 269 (CIM: continuity on arrival a problem,
other continuity issues unclear); 321 (CIW: noting "gaps in medication for new arrivals" to the
EOP unit and noting erratic medication administration for inmates on Keyhea); 328 (CCWF:
problems with medication gaps on arrival); 335-336 (VSPW: continuity for newly arriving
inmates "retrogressed;" continuity on the renewal of medications "remained an intermittent
problem"). See also Summary Section at 359 (noting widespread problems at many institutions
and a lack of data elsewhere).

[15]    *See* Fourteenth Report at 167 ("Because the continuity of medications associated with
changes in location within a facility involves inmates totally within the control of CDC and the
institution at both ends of the movement, one expected substantially fewer interruptions than on
inmates' arrival from outside the institution or CDC.  The incidence of such interruptions,
contrary to expectation, was considerable...administrative segregation units, administrative
segregation overflow units and SHUs, typically involved the longest delays in medication
delivery.");  See Thirteenth Report at 249.

[16]    *See* Draft Report at 35 ("Medication was not administered DOT at HDSP"); 61 (MCSP:
"The monitor observed one evening EOP pill line where no DOT procedures and few nurse-
administered procedures were followed."); 105 (SOL: no DOT procedures); 131 (DVI: DOT
procedures only partially implemented); 188 (SVSP: failure to provide medications DOT to all
Keyhea inmates); 188 (SVSP: noting "troubling signs that medication administration was neither
well observed nor well documented in the EOP units" and "anecdotal reports of hoarding, both
oral and written."); 228 (WSP: "all medications, however, were actually delivered as nurse-

(continued on next page)

J. Michael Keating
December 12, 2005
Page 22

the summary section, "[t]he department needs to do much more educational work with institutions to ensure the ultimate implementation of its new approach to DOT, nurse-administered medication." *See* Draft Report at 358. Defendants are unable to act without clear guidance and specific deadlines.

(e)    Laboratory Testing. This is another area where statewide training and oversight is needed to correct widespread problems.[17] The failure to do this testing places inmates at great risk. Defendants must be required to address this issue quickly and systemically.

(f)    Keyhea Tracking: Finally, the inability of the CDCR to effectively track MHSDS inmates for whom Keyhea Orders are obtained is quite serious, and requires immediate attention. In at least one suicide, the failure to track a Keyhea Order, which expired after the inmate transferred to Corcoran, was identified as a problem in the Suicide Report's Corrective Action. *See* Suicide Report of Walton, E-09742.

Plaintiffs request the following recommendations to address the medication management issues discussed above: (1) defendants should be directed to provide

---

(continued from previous page)
administered, even though the staff referred to some medication delivery as DOT."); 312 (CEN: "inmates complained that DOT was performed inconsistently"); 329 (CCWF: "development of DOT procedures continued to lag"); 357 (VSPW "had appropriate procedures in place, but they had not yet been implemented.")

[17]    *See* Draft Report at 23 (PBSP: "Clinicians did not consistently order appropriate laboratory testing for inmates on mood-stabilizing medications . . .. Clinicians did not always respond to abnormal test results."); 37 (HDSP: "appropriate blood tests were not always ordered"); 62 (MCSP: "some continued problems with laboratory testing"); 70 (SCC: The institution had difficulty providing laboratory testing for inmates on mood-stabilizing medications."); 105 (SOL: lab tests untimely); 111 (SQ: problems with lab testing); 131 (DVI: "the monitor reviewed 10 charts of inmates on mood-stabilizing medications and found that the laboratory testing protocol had been followed fully in only one of the ten reviewed cases."); 189 (COR: lab tests "frequently were not ordered as needed" and "responsive reaction occurred in only about half of the cases of abnormal results"); 228 (WSP: unable to review issue because data on issue collected by WSP badly organized); 238 (NKSP: no audit done of whether appropriate lab testing being done); 261 (CCI: "Laboratory blood work was not consistently provided for inmates on mood stabilizing medications."); 293 (RJD: no report on whether lab testing being done appropriately); 337 (VSPW: "The extent to which laboratory testing was provided for inmates on mood-stabilizing medications was uncertain.)

J. Michael Keating
December 12, 2005
Page 23

additional system-wide training within sixty days to all CDCR institutions on each of these issues, (2) defendants should be directed to implement within sixty days an accurate, updated Keyhea Tracking List that is the responsibility of an actual, named person within CDCR who will provide the updated list monthly to all CDCR institutions, and (3) defendants should be required, as part of its expansion of DCHCS staff, to create a position for a person with experience in correctional health care management to manage the CDCR's medication efforts system-wide.

## C.    Modification of the RVR Policy Is Required to Provide A Mental Health Assessment Component to Appropriate 3CMS Patients

In 2001, Judge Karlton ordered defendants to revise their policies and procedures for conducting the assessment of MHSDS inmates charged with RVRs, and to implement the new procedures. 12/19/01 Order at ¶ 4.

Nearly five years later, the CDCR has implemented an RVR policy that provides some but not all of EOP and MHCB patients with mental health assessments. In roughly one-third to one-half of the assessed cases, the procedure results in "some sort of modification in the outcome of the disciplinary process, whether through dismissal of or reduction in the sanction imposed." Draft Report at 373. For this small group of *Coleman* class members, the RVR Policy, while imperfect and a work in progress, offers some hope of addressing the Court's concern that "mentally ill inmates who act out are typically treated with punitive measures without regard for their mental status." *Coleman v. Wilson*, 912 F.Supp.1292, 1320 (E.D.Cal. 1995).

The Draft Report, however, clearly documents the inaccessibility of the mental health assessment component of the RVR process for 87% of the *Coleman* class – namely, those 3CMS patients who are charged with a rules violation:

> In CSP/LAC, with a 3CMS population in excess of a thousand inmates, no 3CMS inmates were referred during the monitoring period…At SVSP, also with a 3CMS population of roughly a thousand inmates, only a handful of 3CMS inmates with RVRs were referred for a mental health assessment. MCSP had just five referrals of 3CMS inmates in all of 2004, while CIW referred three of 144 inmates charged with infractions for an assessment. CRC referred five 3CMS inmates in the year preceding the monitor's visit and ASP made none in all of 2004.

*See* Draft Report at 270-271. Despite these findings, the Draft Report does not conclude that the current process is inadequate for 3CMS inmates. Rather, a "test" was developed at five sites to determine whether there are 3CMS patients charged with RVRs who **should** have been referred. The "test" was limited to a review of the face of the RVR. Based only upon the facts alleged in the RVR, it was determined that in the five prisons where a "sampling" of 3CMS patients were reviewed, only **one** additional 3CMS patient

J. Michael Keating
December 12, 2005
Page 24

was identified who "arguably" should have been referred but was not. *See* Draft Report at 371. The actual size of the "sampling" was not indicated in the Draft Report.

Plaintiffs have strong objections to this finding. First, this type of sampling is on its face inadequate to test whether 3CMS patients at these institutions were appropriately referred for a mental health assessment. The current standard for a referral is whether the particular inmate's behavior is unusual, uncharacteristic or bizarre *for that inmate*. But reviewing the face of an RVR is an impossible way to tell whether the inmate should have been referred.[18]

Moreover, such a test misses the point: Almost no 3CMS inmates are being referred for mental health assessments despite the Draft Report which documents the CDCR's lack of compliance with basic Program Guide requirements at all institutions, including medication management, which for the majority of 3CMS patients is the only mental health care provided to them. Under such conditions it is absurd to accept that there are virtually **no** 3CMS patients in the CDCR whose mental illnesses contributed to the behavior that led to the RVR which they were issued.

From a broader policy perspective, the facts in the Draft Report speak for themselves. 3CMS patients, who comprise 87% of the Coleman class, have been excluded from the mental health assessment process. That process was identified by the Court as the most effective means of remedying two serious problems of a constitutional dimension -- punishment when behavior results from mental illness and excessive placements of mentally ill inmates in isolated and therapeutically damaging administrative segregation units. *See* 12/21/98 Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding at 4.

Plaintiffs have previously proposed modifications to the RVR policy to ensure that more 3CMS patients would receive mental health assessments. *See* Plaintiffs 10/25/02 Letter to Keating. We proposed the following expansions of the class of persons automatically given an assessment to include (1) all 3CMS inmates charged with a serious rules violation that could result in a SHU term or DA referral and (2) any 3CMS patient with multiple RVRs during a specified period of time. The numbers of 3CMS patients in administrative segregation and SHU, and the deterioration experienced by these patients supports an extension of this remedy. We have also suggested requiring that a certain percentage of 3CMS patients at each institution to be automatically referred for a mental health assessment when issued an RVR in order to ensure that some of these

---

[18]    At a minimum, testing the appropriateness of 3CMS referrals should include a review of the inmate's UHR (to review medication compliance, recent crisis bed admissions, recent clinical notes, chronos re recent behavior) and the inmate's central file (to look for a counseling chrono re unusual behavior, pattern of recent RVRs, note re recent death in the family, recent court decision, etc.).

J. Michael Keating
December 12, 2005
Page 25

MHSDS inmates are provided with this remedy and to provide institutions with an incentive to develop appropriate screening tools.

Plaintiffs request (1) a recommendation that within 90 days from entry of the court's order defendants provide additional system-wide training to all custody staff, including hearing officers on the mental health component of the RVR Policy and file a report with the Special Master on the completion of this training, and (2) that the Special Master direct defendants to modify the existing RVR policy to provide mental health assessments to the group of 3CMS patients who are issued serous rules violations that could result in a SHU term or DA referral and to all 3CMS patients who have been issued three or more RVRs within a three month period of time.

**D.    Persistent PSU Transfer Delays at CSP-Corcoran**

Corcoran's failure to transfer EOP patients housed in their Administrative Segregation Hub and SHU unit into PSU beds is not a new issue. Transfers to the PSUs slowed during the Fourteenth Round. *See* Fourteenth Report at 178.

During the 15th Round monitoring at Corcoran, the monitor found that the "defendants' policy commitment in April 2004 to move inmates in need of a PSU placement in spite of pending disciplinary charges was essentially inoperative." *See* Draft Report at 154. According to the monitor who reviewed the numerous cases of EOPs waiting at Corcoran for PSU transfer:

Preventable delays accounted for a significant number of long stays in administrative segregation or the SHU. In several cases, a lack of CSR endorsement added three or four months to the wait. Breakdowns in the institution's processing of cases occurred regularly, and it appeared that processing was stalled by pending disciplinary charges in other instances. The transfer of one EOP inmate was delayed six months because a classification services representative (CSR) withheld endorsement to a PSU until a BPT hearing was held. In the same case, nearly six months more elapsed between endorsement and transfer. In another case, an inmate with SHU status was designated EOP, but his case was not referred to the CSR for endorsement for over three months.

*See* Draft Report at 155. The process to expedite PSU transfers developed by defendants in response to the January 12, 2004 Order has not been implemented at CSP-Corcoran. *See* Defendants' Plan filed in response to January 12, 2004 Order, attached hereto (referencing timelines for PSU endorsements) (**Exhibit M**).

Plaintiffs request a recommendation that CSP-Corcoran immediately implement the process developed by defendants in response to the January 12, 2004 Order. In addition, the Warden of CSP-Corcoran should be directed to prepare a monthly report which is filed with the Special Master listing all EOP patients housed in their SHU and

administrative segregation units, along with the status of any SHU term, pending RVR hearing, CSR endorsement, BPT hearing and an explanation for each EOP patients' retention at CSP-Corcoran. The Warden at CSP-Corcoran shall be directed to transfer EOP patients endorsed for a PSU bed within sixty days.

E.    **Modification of the "Pilot Project" in the Administrative Segregation Unit at Pelican Bay State Prison.**

The Draft Report addresses defendants' PBSP "Pilot Project" to provide expanded services in administrative segregation for inmates discharged from the PSU and for inmates placed in administrative segregation for non-disciplinary reasons. *See* Draft Report at 27-28. Plaintiffs were provided with a copy of the "Pilot Project" by Madrid Special Master John Hagar and have had an opportunity to review it.

Although plaintiffs' comments address some specific concerns about the Pilot Project, we fully support the general concept that these inmates should be provided with increased clinical programming and property so that they will not decompensate. There are also patients housed in administrative segregation for disciplinary purposes, who for clinical reasons will require the increased services of the Pilot Project and should be included in the program, and defendants should implement staffing ratios that will permit services to at least some inmates in this additional group.

However, plaintiffs object to the Pilot Project's failure to comply with existing Coleman Program Guide Standards that mandate weekly case manager contacts in administrative segregation. *See* Program Guides, Section 8-7, May 1997. The Pilot substitutes weekly case manager contacts with a case manager contact every two weeks and an unspecified amount of group therapy (the specific amount to be determined by the patients' Level, an IDTT process which may find the patient ineligible due to a compelling clinical or custody reason and by the number of patients refusing groups). The program makes no provision for patients who refuse group therapy or who are found ineligible for group therapy by their IDTT. At the very least, these excluded patients must be provided with a private, confidential weekly session with their case manager. All other patients should also be provided with a private, confidential weekly case manager session, as well as the "enhanced mental health services".

The Pilot Project uses a Level System in order to encourage participation in treatment and good behavior within the administrative segregation unit. Patients who do not participate actively will have their Step Levels reduced without reference to their own treatment plan. However, for a treatment resistant patient, 50% participation may be full participation. Under the Pilot Project, such a level of participation would not be rewarded, but instead would likely result in a removal of the patient's appliances and a drop in his Level to reduced group therapy. The Pilot Project should be modified to require an IDTT decision regarding any Step reduction for lack of participation-- reductions in Step Levels must be approved by an IDTT rather than by custody staff.

J. Michael Keating
December 12, 2005
Page 27

The Pilot Project -- with the modifications discussed above -- is an important step in recognizing the increased clinical needs of EOP patients discharged from PSU programs, as well the clinical needs of 3CMS patients housed in administrative segregation units for long periods of time while they wait for SNY placements, investigations or DA referrals.

The same clinical concerns that underlie the program at PBSP apply to inmates discharging from the CSP-SAC PSU. Similar clinical concerns also support expansion of this protocol to cover 3CMS patients who are housed in SAC's administrative segregation. The Monthly DCHCS documents list one hundred and three (103) 3CMS patients in SAC's administrative segregation unit with lengths of stay greater than 180 days. (**Exhibit N**: Health Care Placement List, 9/2/05, provided December 8, 2005.) By way of contrast, PBSP only has twenty-one (21) such inmates. *See* **Exhibit N**.

Plaintiffs request a recommendation that defendants amend the PBSP Pilot Project to provide weekly case manager contacts to meet existing Coleman Program Guides standards. Plaintiffs also request a recommendation that defendants be directed to develop and implement a plan in time for inclusion in the FY2006-2007 Budget for expansion of the Pilot Project at PBSP to CSP-Sacramento's administrative segregation unit.

**F.**     **Psych Tech Rounding in Administrative Segregation Units**

On July 23, 1999, the Court ordered defendants to provide seven-day a week psych tech coverage in each administrative segregation unit. 7/23/99 Order at ¶ 6(a).

Due to persistent problems implementing this Order, the Court has issued several subsequent orders on the same issue. First, on April 24, 2002, the Court issued an order directed at CSP-Lancaster when it was determined that the institution was in violation of the Court's July 1999 Order. 4/24/02 Order. The April 2002 Order forbade any transfers of EOP administrative segregation inmates to CSP-Lancaster until the Special Master determined that psych tech rounding was occurring seven days a week and that CSP-Lancaster had developed an adequate plan for providing structured therapeutic activities for its EOP patients. *See* 4/12/02 Order at ¶ 4.

Later, the Court addressed inadequate psych tech rounding at fifteen CDCR prisons in the June 12, 2002 Order. 6/12/02 Order at ¶ 5. That Order also directed defendants to ensure that daily rounds were actually provided in the administrative segregation hubs at CSP-Corcoran, San Quentin and Salinas Valley State Prison. *See* 5/12/02 Order at ¶ 6. This data is reportedly monthly in the DCHCS documents.

The Draft Report identifies renewed problems with psych tech rounding system-wide that must be addressed immediately. Hopefully these new problems do not indicate any recent institutional expectations that psych tech rounding requirements will be changing because of the Revised Program Guides. This issue is contested and will be

J. Michael Keating
December 12, 2005
Page 28

litigated by plaintiffs. The existing Court orders remain in place. The Draft Report does not include data on psych tech rounding at many of the institutions monitored during the 15th round monitoring period. (Corcoran, SATF, CCI, CMC, SVSP, CIM, RJD, CRC, ISP, WSP, LAC, CTF). Presumably psych tech rounding at these institutions remains resolved. However, the Draft Report documents psych tech rounding failures at eight institutions.[19] Subsequent monitoring at RJD revealed that staff may actually be falsifying documentation to show compliance.

The population pressures currently being experienced within CDCR, which frequently require the use of administrative segregation overflow units, presents a challenge to institutions that must comply with existing court orders without additional staffing resources.

Plaintiffs request a recommendation that defendants be directed to issue a memorandum within 30 days from the entry of the court's order to all CDCR institutions setting forth the court-ordered psych tech rounding requirements for administrative segregation units, including overflow units. To the extent that any institution fails to comply with the court ordered requirement and knowingly misrepresents their compliance to the court monitors, there should be sanctions sought against the Warden of that institution and the CDCR. The Wardens at those institutions that failed to comply with psych tech rounding during the 15th round monitoring or were unable to show compliance (Avenal, CSP-Sacramento, SCC, San Quentin, Calipatria, CCWF, Solano, and Valley State) should be directed to certify through a report filed with the Special Master monthly that psych tech rounding seven days a week is currently occurring in the administrative segregation units at their institution. If psych tech rounding is not occurring seven days a week, the Warden must provide an explanation and a timeline for coming into compliance.

---

[19]    At Avenal there was 43% compliance with daily psych tech rounding for January through August 2004 with some improvement said to have occurred after June 2004 with no documentation to support it (at 182); at CSP-Sacramento daily psych tech rounds not conducted in newly activated ASU (at 11); at SCC the frequency of psych tech rounds was unclear with departmental audits reporting only 60 percent compliance with daily rounding and staff audits showing near compliance (at 75); at Solano documentation of psych tech rounds in administrative segregation and the overflow unit were deficient (at 103); at SQ psych tech rounds in administrative segregation, an issue previously resolved, were problematic once again (at 125); at CAL the time spent rounding was inadequate to complete comprehensive and interactive meetings (at 310); at CCWF the frequency of psych tech rounds in administrative segregation, which had been resolved, was problematic again (at 332); and at VSPW problems with psych tech rounding, which had been resolved, resurfaced due in part to staffing vacancies and turnover. (at 342).

J. Michael Keating
December 12, 2005
Page 29

### G.    SHU Psych Tech Rounding Report

The Draft Report is silent on the quality and quantity of psych tech rounding that the monitors observed during the 15th round tours in the CCI and Corcoran SHUs. Both institutions have CAP items that address psych tech rounding in their SHU units. *See* Corcoran CAP Item 31; CCI CAP Item 33.

The monitors visited Corcoran three times during the monitoring period and during two of the phone exits psych tech rounding in the SHU was discussed. Plaintiffs request that information regarding Corcoran's provision of psych tech rounding to inmates housed in the Corcoran SHU be reported in the Final Fifteenth Report.

The Coleman monitors toured CCI in November 2004. The 14th Monitoring Report noted that psych techs conducted daily rounds of the administrative segregation unit, but there was no report on SHU rounding. *See* Fourteenth Report at 10. However, during the phone exit after the 14th round visit to CCI, the monitors reported on psych tech rounding practices in the SHU, yet this data was not included in the Fourteenth Monitoring Report. Similarly, there is no report on the status of psych tech rounding in the CCI SHU in the current Draft Report. The Draft Report does identify increased caseloads at CCI and a staffing vacancy rate of 40 percent but no data on whether psych tech rounding in the SHU has been maintained at required levels. *See* Draft Report at 258. Plaintiffs request that information regarding the status of psych tech rounding to inmates housed in the CCI SHU be reported in the Final Fifteenth Report.

### H.    Specific Order to Address RJ Donovan

In the past the Court has issued specific orders designed to assist individual institutions in need of focused attention by DCHCS staff.[20] RJD has previously been the subject of this type of order. *See* 7/26/04 Order at ¶¶1A, C, and D (imposing a population cap on its hub EOP administrative segregation program, requiring the development of a plan for replicating in RJD strategies for the procurement of permanent and contracted clinical staff used effectively at PBSP, and requiring the development of a plan to provide focused assistance from headquarters).

The Plan submitted to the Court in response to the July 26, 2005 Order did not adopt the proposal for bonuses which were effectively used at PBSP in filling staffing vacancies. According to the Plan submitted

---

[20]    *See, e.g.*, July 26, 2004 Order ¶ 1: Defendants shall develop brand new plans to bring Corcoran, HDSP. RJD, and SVSP into compliance with their respective corrective action plans (CAPs), the program guides, and the plans, policies and protocols provisionally approved by this court in mid-1997.

J. Michael Keating
December 12, 2005
Page 30

> [t]he current situation at RJD is unlike what prevailed earlier at PBSP, or
> that prevails now at HDSP, which justify the application of special
> compensation. RJD is located in what is considered one of the premier
> places in California to work and live, due to its tropical weather and close
> proximity to a major urban environment, complete with multiple
> universities.

September 27, 2004 Letter to Keating at 3 (**Exhibit O**). Instead, the Plan identified lack
of proper management and a general shortage of licensed psychiatric technicians as the
reasons for the staffing shortages at RJD and noted that these factors were being
addressed. No specifics were provided in the Plan. (Id.)

The Draft Report documents serious staffing vacancies that have not been
sufficiently addressed by the plan developed in response to the July 26, 2004 Order.
Vacancies in psychiatry (30%), case managers (22%), senior psychologists (33%), and
recreational therapists (50%) adversely affect the program. See Draft Report at 289-290.
The institution does not use contractors to fill most vacant positions and the staffing
vacancies impact on medication management, adequacy of treatment for caseload
patients in reception centers and administrative segregation, and on staff relationships
with each other and with inmates in the EOP unit. See Draft Report 291-298.

The Draft Report concludes with the hope that "this monitoring round marked
both the nadir of RJD's compliance efforts and a critical turning point." See Draft Report
at 301. Unfortunately, the report during the 16th Monitoring period does not indicate a
turn-around for RJD. According to the Phone Exit on November 7, 2005, over-crowding
in the reception center, the mainline and the administrative segregation units has
seriously impacted on the ability of the institution to provide adequate mental heath care.
Despite the July 26, 2004 Order capping the Hub population at 63, the institution
reportedly violated this order repeatedly -- on May 16, July 5-8, July 14, August 22, and
September 12-15, 2005. Phone Exit, November 7, 2005. In addition to the
administrative segregation overflow unit that has consistently failed to provide adequate
mental health care (Building 7, Facility 2), the institution has also created an
administrative segregation overflow unit (Building 16), which is located on a reception
center yard and has no access to a recreational yard. Mentally ill inmates housed in this
"ad hoc" ad seg unit have not been provided with required daily psych tech rounds
despite reports from the institution, including apparently falsified documentation.
Similarly, although the heat log in the housing units indicated that the temperature was 70
degrees every day, the thermometers in the units were broken and could not have
registered these temperatures. These revelations regarding the institution's
documentation of psych tech rounding and heat logs raise serious concerns and indicate a
need for closer scrutiny by DCHCS while the institution struggles with its multiple
missions, understaffing, overcrowding and leadership concerns.

J. Michael Keating
December 12, 2005
Page 31

RJD needs at least as much focused attention as that given to CSP-Lancaster following the March 11-13, 2002 monitoring tour there and the discovery that the institution was not conducting psych tech rounding seven days a week as reported. In that case, the Special Master recommended specific orders directed at Lancaster to ensure that the institution was carefully monitored by both DCHCS and the monitors before additional caseload inmates could be transferred to the institution. These orders ensured that the CDCR and CSP-Lancaster understood the seriousness of the reporting responsibilities and staffing obligations imposed by the Court. Furthermore, it ensured that the EOP patients housed at the facility had a chance at receiving adequate mental health services. Defendants were not permitted to resume expansion of the EOP population at Lancaster until certification to the court by the Special Master that the institution had met certain requirements of the April 24, 2002 Order.

RJD cannot solve its current crisis without Court-ordered direct assistance from CDCR. Such assistance must include reduction in the institution's overall population, reduction of the caseload population and directed assistance in hiring. Furthermore, there must be consequences for the institution's failure to participate in the monitoring process in good faith. Plaintiffs request that the Special Master direct defendants to develop and implement within 60 days from the entry of the Court's order a plan for reducing the population – both total prison and caseload population – at RJD to ensure that the institution has adequate mental health staff to meet its staffing ratios for its current caseload population, including its reception center population. Furthermore, the Warden of RJD and the Director of CDCR shall be directed to file with the Special Master certified monthly reports detailing the institution's compliance with the following: (1) July 26, 2004 Order limiting the Hub Population to a maximum of 63 patients; (2) daily psych tech rounding in all of its administrative segregation units, including all overflow units; (3) accurate temperature logs for all housing units during the spring and summer 2006; and (4) no EOP patients are housed in the overflow administrative segregation units.

Finally, the Special Master should direct defendants to develop a plan sufficiently timely for inclusion in the FY2006-2007 Budget for replicating in RJD the strategies for the procurement of permanent and contracted clinical staff used effectively at Pelican Bay State Prison, as previously ordered on July 26, 2004. 7/26/04 Order at ¶ 1C.

I.      **Report on Video-Monitoring**

Defendants informed plaintiffs on May 16, 2005 that they had replaced one-on-one suicide watch of inmates by an officer sitting at the inmate's cell door with video-monitoring at a minimum of nineteen different CDCR institutions. At that time, plaintiffs requested copies of the institutional operating procedures as well as any statewide directives regarding video monitoring. Through the review of the CDCR Memorandum to the field, as well as a review of the institutional procedures, it became evident that

J. Michael Keating
December 12, 2005
Page 32

video monitoring of inmates on suicide watch was first implemented in 2001 to save officer overtime pay.  *See* January 19, 2001 Memorandum to All Wardens from Larry Witek, attached hereto (**Exhibit P**).

Suicide watch procedures, OHU and MHCB facilities have been monitored in Coleman for years.  Plaintiffs requested that the Fifteenth Report include the court monitors' observations of the video-monitoring practice being utilized by defendants in their OHUs and MHCBs system-wide.  To the extent that monitors observed this during their current round tours, we requested that this data be included in the Final Fifteenth Report.

It is our understanding that the implementation of the Video-Monitoring Policy recommended by the court monitors at the June 16, 2005 Policy meeting and distributed to the field in the July 22, 2005 Memorandum is being reviewed during the 16th Round monitoring visits.  Plaintiffs request that an interim report on video-monitoring practices be issued so that any necessary modifications of the Policy recommended by the court monitors or recommendations regarding the current practices at institutions can be made without waiting for the completion of the Special Master's Sixteenth Monitoring Report.

## CONCLUSION

Plaintiffs recognize that these lengthy comments and requested recommendations place additional duties upon defendants at a time that CDCR is facing multiple demands. It is clear, however, that absent Court orders, defendants cannot act.  Unfortunately, the issues identified above all require attention to prevent class members from continued harm.  Many of these issues have been flagged repeatedly and the time for action is now and not at some speculative time when CDCR becomes better organized or populations decrease or staffing improves.  Prevention and aggressive preservation of what Coleman has achieved is critical at this point.  Plaintiffs' recommendations, including the revisions to the Draft Report's Recommendations are listed below:

### Draft Report Recommendations with Modifications

1.      The defendants shall develop and implement a plan to achieve full compliance with existing staffing ratios for psychiatrists, system-wide, at no more than ten percent vacancy rate, by March 1, 2006.  Included shall be a plan for maintaining the rate of vacancies among psychiatrists at ASP, HDSP and VSP also at a maximum of ten percent.  If defendants are not in compliance with the court-ordered staffing ratios for psychiatrists by April 1, 2006, the Special Master shall make recommendations to cap the caseload population at particular institutions or system-wide.  The plan shall consider the need for increases in R & R differential payments, the reduction of MHSDS population and/or programs offered in the facilities, the relocation of programs in those facilities elsewhere or any combination of these approaches.

J. Michael Keating
December 12, 2005
Page 33

2.      The defendants shall develop and submit no later than 60 days from entry of the court's order a plan for the expansion of DCHCS central office mental health staff commensurate with the growth and present size of the CDCR mental health staff and caseload in time for inclusion in the FY2006-007 Budget and should include in the plan the creation of three specialized DCHCS positions to address DMH inpatient, MHCB, and Medication Management efforts system-wide. Defendants should also be required to obtain any necessary authority from all applicable agencies as soon as possible and no later than 60 days after the FY2006-2007 Budget is approved to hire the DCHCS expanded central office mental health staff positions. The plan must address the issue of compensation for headquarters staff and provide a scale of pay that assures that clinicians (including psychiatrists, psychologists, psych social workers, psych techs and RNs), policy and program developers and supervisors (including health program specialists and analysts) and correctional counselors, who work at central office receive a level of salary higher than that of any comparable institutional clinicians, including whatever R&R differential pay such institutional clinicians may be entitled to. Defendants shall be required to provide a monthly update to the Special Master on the status of their compliance with the staffing ratio for psychiatrists and all other clinical positions and with the implementation of the plan for expansion of the DCHCS central office mental health positions.

3.      Defendants, in conjunction with DMH, and DHS, should be required to submit within 45 days from entry of the court's order a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in CDCR clinically determined to be in need of these levels of inpatient care. The plan must address 100% of the identified interim and long-range needs based on up-dated population projections and the results of the UNA study, detail any financial and construction plans, timetables and staffing requirements needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 2006-2007 Budget. All identified needs must be addressed by programs to be fully operational no later than January 1, 2008.

In addition, the plan must include the following:

(a)      Defendants and DMH shall prepare a report concerning the feasibility of hardening a portion of the new CSH facility and providing care to Level III and Level IV CDCR patients therein. Defendants shall provide detailed documentation concerning any alleged security problems that prevent them from doing so, including written reports by qualified security professionals explaining why this newly built maximum security state hospital for sexually violent predators is not capable of housing Level III and IV CDCR prisoners and what staffing or construction, if any, is necessary to permit such housing at CSH.

J. Michael Keating
December 12, 2005
Page 34

   (b)  Defendants, the Department of Health Services
("DHS") and DMH shall report on the feasibility of immediately
expanding the ICF treatment program at ASH for CDCR inmates
rather than reducing overbedding there. This report should include
the steps necessary to add a minimum of 75 new beds in addition to
the 175 new beds previously promised by DMH for CDCR inmates
at ASH and CSH by mid-2006.

   (c)  Defendants and DMH shall develop a plan that sets
forth the feasibility and cost of accelerating the pace of construction
so that (1) the planned 112-bed Level IV ICF in the current SVSP D-
yard EOP space is available to begin treating inmates by December
31, 2006 rather than mid-2008, and (2) the planned 64-bed
expansion of the SVPP program is open and ready for occupancy by
July 1, 2007, rather than 2009. This plan shall include reports from
the various contractors responsible for the projects and should
consider options such as working 2-3 shifts a day and seven days a
week.

   (d)  Defendants' plan shall include an ongoing training and
supervision component for ensuring that CDCR clinicians refer all
appropriate cases to inpatient care and that CDCR headquarters
monitors and supervises the process of referral.

   (e)  DMH and CDCR should be directed to jointly submit a
plan or procedure within 30 days from the entry of the court's order
that will ensure that DMH discharge summaries for all CDCR
inmates sent to DMH are promptly provided and placed in the
inmate's UHR when they return from DMH.

  4.  The defendants should be required to submit within 45 days from the entry
of the court's order a plan for the provision of Mental Health Crisis Beds for all seriously
mentally ill male and female inmates in CDCR within 24 hours of a clinical
determination that they require that level of mental health care. The plan must address
interim and long-range needs based on updated population projections; detail any
financial and construction plans, timetables and staffing requirement needed to meet the
needs; and ensure that construction and financial elements of the plan are sufficiently
timely for inclusion in the FY 006-2007 Budget. The plan shall also include the
following elements:

   (a)  A plan and schedule for maximizing the use and availability
of all MHCB beds in the short term by (1) moving long term medical care
cases out of CTCs, (2) expediting discharges from MCHB units of inmates
whose clinical need for MHCB placement has ended, (3) expanding the

J. Michael Keating
December 12, 2005
Page 35

MHCB swing beds available in the short-term through staffing augmentations, (4) continuing to operate the eight overflow MHCB beds at Corcoran that were used for NKSP inmates while the NKSP MHCB unit was closed recently.

(b)    As part of the plan, defendants should provide updated Tucker-Allen MHCB capacity projections for the next six years.  These updated projections shall take into account the current overflow MHCB population that is inappropriately housed in OHUs, administrative segregation units, and ZZ cells, and should include a plan to phase out of dangerous and unauthorized current use of OHUs, administrative segregation units, and ZZ cells used for these patients.  The overall MHCB expansion plan should provide for enough new MHCB beds to meet the needs identified in this projection by January 1, 2008.

(c)    A plan for accelerating the staffing and licensing of the new MHCB unit at Kern Valley State Prison, and the new MHCB beds at CSP-SAC, so that they are both licensed and operational by June 30, 2006, and a plan for accelerating the construction, staffing, and licensing of the new MHCB unit at CMF so that it fully licensed and operational by January 1, 2008.  Defendants shall also cease their current practice of removing patients from CTC units in order to facilitate licensing surveys.  Defendants shall also meet with DHS officials and the Special Master and Plaintiffs' counsel to explore ways of accelerating licensing of the remaining CTC units and new units built in the future.

(d)    A plan to ensure that DCHCS population management staff are available 7-days-a-week to coordinate placements of inmates needing MHCB care.

**Additional Recommendations**

5.    The defendants shall develop and implement a plan within 30 days from the entry of the court's order for the creation of several reception center EOP units that can provide at least ten hours of structured therapeutic treatment to (1) all EOP reception center patients that have been waiting longer than 60 days in a reception center and (2) all "at risk" reception center patients who have been determined to need enhanced care while they wait to be transferred.

6.    The defendants shall be directed to provide additional system-wide training within 60 days from the entry of the court's order to all CDCR institutions regarding the following medication management concerns:  Medication non-compliance standards, HS medication prescriptive indicators, DOT procedures, medication continuity and laboratory testing requirements.

J. Michael Keating
December 12, 2005
Page 36

7.    The defendants shall be directed to implement within 60 days from the entry of the court's order an accurate, updated Keyhea Tracking list that is the responsibility of an actual, named person within CDCR who will provide the updated Keyhea Tracking List monthly to all CDCR institutions. Defendants shall be directed, as part of their expansion of DCHCS staff, to create a position for a person with experience in correctional health care management to manage the CDCR's medication efforts system-wide.

8.    The defendants shall be directed to provide additional system-wide training to all custody staff, including hearing officers, on the mental health component of the RVR Policy, and file a report with the Special Master on the completion of the training. This training shall occur within 90 days from the entry of the court's order.

9.    The defendants shall be directed to modify the existing RVR policy to include the provision of mental health assessments to 3CMS patients who are issued RVRs for serious rules violations that could result in a SHU term or DA referral and to 3CMS patients who have been issued 3 or more RVRs within a 3 month period of time.

10.   Defendants shall be directed to immediately implement the process to expedite PSU transfers developed by defendants in response to the January 9, 2004 Order. The Warden of CSP-Corcoran shall be directed to prepare a monthly report which is filed with the Special Master listing all EOP patients housed in their SHU and administrative segregation units, along with the status of any SHU term, pending RVR hearing, CSR endorsement, BPT hearing, and an explanation for each EOP patient's continued retention at CSP-Corcoran. The Warden shall be directed to transfer EOP patients endorsed for a PSU bed within 60 days.

11.   Defendants shall be directed to amend the PBSP Pilot Project to provide weekly case manager contacts to meet existing Coleman Program Guide standards. Plaintiffs also request a recommendation that defendants be directed to develop and implement a plan for expansion of the Pilot Project developed for PBSP to CSP-Sacramento's administrative segregation unit in time for inclusion in the FY2006-2007 Budget.

12.   Defendants shall be directed to issue a memorandum within 30 days from the entry of the court's order to all CDCR institutions setting forth the Court-ordered requirement for seven-day a week psych tech rounding in all administrative segregation housing units, including overflow units. The Wardens of Avenal, CSP-SAC, SCC, San Quentin, Calipatria, CCWF, Solano and Valley State shall be required to certify through a report filed with the Special Master that psych tech rounding is occurring seven days a week in the all of the administrative segregation units at their institutions. If psych tech rounding is not occurring, the Warden must provide an explanation and a timeline for coming into compliance in the report filed with the Special Master.

J. Michael Keating
December 12, 2005
Page 37

  13. The defendants shall be directed to develop and implement within 60 days from the entry of the court's order a plan for reducing the population at RJD to ensure that the institution has adequate mental health staff to meet its staffing ratios for its current caseload population, including its reception center population. The Warden of RJD and the Director of CDCR shall be required to file with the Special Master certified monthly reports detailing the institution's compliance with the following: (1) the July 26, 2004 Order limiting the Hub population to a maximum of 63 patients, (2) daily psych tech rounding in all of its administrative segregation units, including all overflow units, (3) accurate temperature logs for all housing units during the spring and summer 2006; and (4) no EOP patients are housed in the overflow administrative segregation units. Defendants shall be directed to develop a plan sufficiently timely for inclusion in the FY2006-2007 Budget for replicating in RJD the strategies for the procurement of permanent and contracted clinical staff used effectively at PBSP, as previously ordered on July 26, 2004. 7/26/04¶1C.

  Please feel free to contact me if you have any questions regarding our comments and objections.

      Sincerely,

      ROSEN, BIEN & ASARO, LLP

      By: Jane E. Kahn

JEK:ts
cc: Matthew A. Lopes, Jr.
  Lisa Tillman, AG
  Michael Stone, CDCR Legal
  Kerry Hughes
  Mohamedu Jones
  Dennis Koson
  Jeff Metzner
  Ginny Morrison
  Paul Nicoll
  Ray Patterson
  Melissa Warren
  Tricia Williams

**Exhibit B**

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                                          ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF CORRECTIONS**
Health Care Services Division
P.O. Box 942883
Sacramento, CA  94283-0001

**RECEIVED**

DEC 1 3 2004

**Rosen Bien & Asaro**

November 30, 2004

J. Michael Keating
Office of the Special Master
2351 Sussex Lane
Fernandina Beach, FL 32034

Dear Mr. Keating:

**RE: INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Enclosed are various monthly reports that are responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties meeting.

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.

2. MHSDS Hiring Activity Report.  This report shows allocated staff and vacancy rate information for the most recent period available.

3. Health Care Placement Unit (HCPU) Information Report, Summary and Administrative Segregation Greater than 60 Days Sections (October 2004).

4. Mental Health Contract Services and Telemedicine Monthly Report for all disciplines (October 2004).

5. California Department of Corrections (CDC) Reception Center (RC) Monthly Report (September 2004).

6. Monthly Summary of Mental Health Crisis Bed Use by Institution (September 2004).

7. Referrals for Transfer to the Department of Mental Health (DMH- October 2004).

8. Atascadero State Hospital (ASH) Discharges (October 2004).

9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program (Population Report- October 2004).

10. The DMH Monthly Report of CDC Patients in DMH Hospitals - Summary and Penal Code 2684 (October 2004).

11. Suicide Report (October 2004).

J. Michael Keating
Page 2

12. Statistics on Contracted Registered Nurse (RN) Use (August 2004).

13. RC Processing for MHSDS Inmate Patients (October 2004).

14. Medical Technical Assistant (MTA) Vacancy Report (October 2004).

15. Allocated Case Manager positions and vacancies for the EOP Administrative Segregation Hub institutions (October 2004)

16. EOP inmates waiting for transfer to a Psychiatric Services Unit (PSU) (October 2004).

17. Audit reports on Psychiatric Technician rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP) (October 2004).

If you have any questions, please contact me at (916) 324-0876.

Sincerely,

RENEE KANAN, M.D.
Deputy Director (A)
Health Care Services Division

Enclosures

cc:  John Dovey, Chief Deputy Director, Field Operations (with enclosures)
     Cheryl K. Pliler, Deputy Director, Institutions Division (with enclosures)
     Kathleen Keeshen, Deputy Director, Legal Affairs Division (w/o enclosures)
     Tim Shively, Correctional Counselor II, Institutions Division (with enclosures)
     Matthew Lopes, Deputy, "Coleman" Special Master (with enclosures)
     Jeffrey L. Metzner, M.D., "Coleman" Expert (with enclosures)
     Dennis F. Koson, M.D., "Coleman" Expert (with enclosures)
     Kerry Hughes, M.D., "Coleman" Expert (with enclosures)
     Melissa G. Warren, Ph.D., "Coleman" Expert (with enclosures)
     Raymond F. Patterson, M.D., "Coleman" Expert (with enclosures)
     Paul Nicoll, "Coleman" Expert (with enclosures)
     Lisa Tillman, Deputy Attorney General, Office of the Attorney General (with enclosures)
     Judi Lemos, Staff Attorney, Legal Affairs Division (with enclosures)
     Michael Bien, Rosen Bien and Associates (with enclosures)
     Donald Specter, Prison Law Office (with enclosures)
     Timothy Fishback M.D., Chief Psychiatrist, Clinical Policy and Programs (with enclosures)



# Mental Health Population - Placement Per Institution

### Download Date October 22, 2004

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP        *II* | 899 | 829 | 92% | | 2 | | | 831 |
| ASP Ad-Seg | | 37 | | | 2 | | | 39 |
| CAL        *I,IV  +* | | 8 | | | 2 | | | 10 |
| CAL Ad-Seg | | 8 | | | | | | 8 |
| CCC        *I,II,III* | | 5 | | | | | | 5 |
| CCC Ad-Seg | | 1 | | | | | | 1 |
| CCI        *I,II,III,IV  *   | 1,119 | 966 | 86% | | 6 | | | 972 |
| CCI Ad-Seg | | 39 | | | 2 | | | 41 |
| CCI-RC | | 177 | | | 8 | | | 185 |
| CCI-SHU | 80 | 114 | 143% | | | | | 114 |
| CCWF | 739 | 641 | 87% | 54 | 53 | 98% | 12 | 694 |
| CCWF Ad-Seg | | 24 | | | | | | 24 |
| CCWF-RC | 110 | 148 | 135% | | 2 | | | 150 |
| CEN        *III,IV* | | 12 | | | 2 | | 5 | 14 |
| CEN Ad-Seg | | 7 | | | | | | 7 |
| CIM        *I* | 327 | 474 | 145% | | 4 | | 18 | 478 |
| CIM-RC | 672 | 584 | 87% | | 101 | | | 685 |
| CIM-RC--Ad-Seg | | 32 | | | 1 | | | 33 |
| CIW | 202 | 429 | 212% | 75 | 95 | 127% | | 524 |
| CIW Ad-Seg | | 7 | | | 1 | | | 8 |
| CIW-RC | 247 | 83 | 34% | | | | | 83 |
| CMC        *I,II,III* | 1,049 | 1,021 | 97% | 530 | 531 | 100% | 0 | 1,552 |
| CMC Ad-Seg | | 45 | | 54 | 41 | 76% | | 86 |
| CMF        *I,II,III* | 599 | 575 | 96% | 600 | 579 | 97% | | 1,154 |
| CMF Ad-Seg | | 5 | | 58 | 67 | 116% | | 72 |
| CMF** | | 100 | | | 0 | | | 100 |
| COR        *I,III,IV  +  *   | 499 | 500 | 100% | 150 | 113 | 75% | 23 | 613 |
| COR Ad-Seg | | 101 | | 63 | 40 | 63% | | 141 |
| COR-SHU | 450 | 389 | 86% | | | | | 389 |
| CRC-M      *II* | 599 | 761 | 127% | | | | | 761 |
| CRC-W | 249 | 154 | 62% | | | | | 154 |
| CTF        *I,II* | 699 | 631 | 90% | | 6 | | | 637 |
| CTF Ad-Seg | | 62 | | | | | | 62 |
| CVSP       *I,II* | | 4 | | | | | | 4 |
| CVSP Ad-Seg | | 6 | | | | | | 6 |
| DVI        *I,II* | 278 | 203 | 73% | | 13 | | | 216 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
   the respective DDPS identifier systems.

" + " is a 270 Design Facility. " * " is a 180 Design Facility.

Grand Totals do not include MHCB data

Health Care Placement Unit

R1-1

10/22/2004

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| DVI Ad-Seg | | 23 | | | 1 | | | 24 |
| DVI-RC | 171 | 365 | 213% | | 24 | | | 389 |
| FOL          I,II | 599 | 456 | 76% | | 3 | | | 459 |
| FOL Ad-Seg | | 9 | | | 1 | | | 10 |
| HDSP       I,III,IV | 650 | 659 | 101% | | 4 | | 12 | 663 |
| HDSP Ad-Seg | | 71 | | | 3 | | | 74 |
| HDSP-RC | 49 | 44 | 90% | | 3 | | | 47 |
| ISP          I,III | | 5 | | | 2 | | 5 | 7 |
| ISP Ad-Seg | | 3 | | | 3 | | | 6 |
| LAC        I,III,IV + | 1,149 | 1,052 | 92% | 300 | 278 | 93% | 13 | 1,330 |
| LAC Ad-Seg | | 71 | | 45 | 54 | 120% | | 125 |
| MCSP      I,II,III,IV + | 799 | 849 | 106% | 180 | 175 | 97% | 10 | 1,024 |
| MCSP Ad-Seg | | 32 | | 36 | 22 | 61% | | 54 |
| NCWF | | 0 | | | | | | 0 |
| NKSP       I,III | 215 | 180 | 84% | | 2 | | 10 | 182 |
| NKSP-RC | 584 | 672 | 115% | | 23 | | | 695 |
| NKSP-RC--Ad-Seg | | 53 | | | 1 | | | 54 |
| PBSP       I,IV | 349 | 244 | 70% | 64 | 64 | 100% | 6 | 308 |
| PBSP Ad-Seg | | 91 | | | | | | 91 |
| PVSP       I,III | 1,199 | 1,341 | 112% | | 6 | | 5 | 1,347 |
| PVSP Ad-Seg | | 91 | | | 2 | | | 93 |
| RJD        I,III | 901 | 743 | 82% | 330 | 322 | 98% | 14 | 1,065 |
| RJD Ad-Seg | | 86 | | 63 | 52 | 83% | | 138 |
| RJD-RC | 298 | 313 | 105% | | 38 | | | 351 |
| SAC        I,IV | 699 | 669 | 96% | 192 | 197 | 103% | 15 | 866 |
| SAC Ad-Seg | | 143 | | 49 | 33 | 67% | | 176 |
| SATF       II,III,IV | 899 | 834 | 93% | | 2 | | 16 | 836 |
| SATF Ad-Seg | | 161 | | | 3 | | | 164 |
| SCC         I,II,III | 499 | 558 | 112% | | 4 | | | 562 |
| SOL         II,III | 1,199 | 1,323 | 110% | | 12 | | 13 | 1,335 |
| SOL Ad-Seg | | 68 | | | | | | 68 |
| SQ          I,II | 350 | 314 | 90% | | 35 | | | 349 |
| SQ Ad-Seg | | 113 | | 36 | 34 | 94% | | 147 |
| SQ-RC | 549 | 728 | 133% | | 83 | | | 811 |
| SVSP      I,IV | 949 | 873 | 92% | 192 | 172 | 90% | 10 | 1,045 |
| SVSP Ad-Seg | | 112 | | 45 | 36 | 80% | | 148 |
| VSPW | 581 | 656 | 113% | | 2 | | | 658 |
| VSPW Ad-Seg | | 10 | | 9 | 3 | 33% | | 13 |
| VSPW SHU | | 11 | | | 9 | | | 20 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.
" + " is a 270 Design Facility.  " ** " is a 180 Design Facility.

Grand Totals do not include MHCB data

Health Care Placement Unit

R1-2

10/22/2004

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| VSPW-RC | 168 | 143 | 85% | | 8 | | | 151 |
| WSP  *l,lll* | 217 | 210 | 97% | | 3 | | 6 | 213 |
| WSP-RC | 732 | 888 | 121% | | 46 | | | 934 |
| WSP-RC--Ad-Seg | | 64 | | | | | | 64 |
| Totals : | 22,622 | 24,513 | 108.4% | 3,125 | 3,436 | 110.0% | | 27,949 |

| PSU | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 127 | 99.2% |
| SAC | 128 | 117 | 91.41% |
| Total PSU: | 256 | 244 | 95.31% |

| DMH | | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 106 | 103 | 97% |
| DMH CMF-AIP | 150 | 126 | 84% |
| DMH CMF-ICF | 39 | 25 | 64% |
| DMH CMF-DTP | 44 | 22 | 50% |
| DMH SVPP | 64 | 52 | 81% |
| Totals : | 403 | 328 | 81.4% |

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 26,406 | 28,521 | 108.0% |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.
" * " is a 270 Design Facility, " * * " is a 180 Design Facility.

Grand Totals do not include MHCB data

Health Care Placement Unit

R1-3

10/22/2004



## Combined Mental Health Population Per Institution

*Includes Ad-Seg, SHU, Reception Center and GP Mental Health Populations Combined*

### Download Date October 22, 2004

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP | 899 | 866 | 96% | | 4 | | | 870 |
| CAL | | 16 | | | 2 | | | 18 |
| CCC | | 6 | | | | | | 6 |
| CCI | 1199 | 1296 | 108% | | 16 | | | 1312 |
| CCWF | 849 | 813 | 96% | 54 | 55 | 102% | 12 | 868 |
| CEN | | 19 | | | 2 | | 5 | 21 |
| CIM | 999 | 1090 | 109% | | 106 | | 18 | 1196 |
| CIW | 449 | 519 | 116% | 75 | 96 | 128% | | 615 |
| CMC | 1049 | 1066 | 102% | 584 | 572 | 98% | | 1638 |
| CMF | 599 | 680 | 114% | 658 | 646 | 98% | | 1326 |
| COR | 949 | 990 | 104% | 213 | 153 | 72% | 23 | 1143 |
| CRC-M | 599 | 761 | 127% | | | | | 761 |
| CRC-W | 249 | 154 | 62% | | | | | 154 |
| CTF | 699 | 693 | 99% | | 6 | | | 699 |
| CVSP | | 10 | | | | | | 10 |
| DVI | 449 | 591 | 132% | | 38 | | | 629 |
| FOL | 599 | 465 | 78% | | 4 | | | 469 |
| HDSP | 699 | 774 | 111% | | 10 | | 12 | 784 |
| ISP | | 8 | | | 5 | | 5 | 13 |
| LAC | 1149 | 1123 | 98% | 345 | 332 | 96% | 13 | 1455 |
| MCSP | 799 | 881 | 110% | 216 | 197 | 91% | 5 | 1078 |
| NKSP | 799 | 905 | 113% | | 26 | | 5 | 931 |
| PBSP | 349 | 335 | 96% | 64 | 64 | 100% | 6 | 399 |
| PVSP | 1199 | 1432 | 119% | | 8 | | 5 | 1440 |
| RJD | 1199 | 1142 | 95% | 393 | 412 | 105% | 14 | 1554 |
| SAC | 699 | 812 | 116% | 241 | 230 | 95% | | 1042 |
| SATF | 899 | 995 | 111% | | 5 | | 16 | 1000 |
| SCC | 499 | 558 | 112% | | 4 | | | 562 |
| SOL | 1199 | 1391 | 116% | | 12 | | 13 | 1403 |
| SQ | 899 | 1155 | 128% | 36 | 152 | 422% | | 1307 |
| SVSP | 949 | 985 | 104% | 237 | 208 | 88% | 10 | 1193 |
| VSPW | 749 | 820 | 109% | 9 | 22 | 244% | | 842 |
| WSP | 949 | 1162 | 122% | | 49 | | 6 | 1211 |
| **Totals** | 22622 | 24513 | 108% | 3125 | 3436 | 110% | 168 | 27949 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

the respective DDPS identifier systems.

Health Care Placement Unit

R1-4

10/22/2004

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA  94283-0001

**RECEIVED**

JAN 2 5 2006

**Rosen Bien & Asaro**

January 19, 2006

J. Michael Keating, Jr.          via:   Lisa Tillman
Office of the Special Master             Deputy Attorney General
2351 Sussex Lane                         Department of Justice
Fernandina Beach, FL  32034              1300 I Street, Suite 125
                                         P. O. Box 944255
                                         Sacramento, CA  94244-2550

**RE: INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Keating:

Enclosed are the monthly reports for October 2005, responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties meeting.

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History (October 2005).
2. MHSDS Hiring Activity Report.  This report shows allocated staff and vacancy rate information for the most recent period available (October 2005).
3. Health Care Placement Unit (HCPU) Information Report, Summary and Administrative Segregation Greater than 60 Days Sections (October 2005).
4. Mental Health Contract Services and Telemedicine Monthly Report for all disciplines (October 2005).
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report (October 2005).
6. Monthly Summary of Mental Health Crisis Bed use by Institution (October 2005).
7. Referrals for Transfer to the Department of Mental Health (DMH-October 2005).
8. Atascadero State Hospital (ASH) Discharges (October 2005).
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program (Population Report-October 2005).
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals – Summary and Penal Code 2684 (October 2005).
11. Suicide Report (October 2005).
12. Statistics on Contracted Registered Nurse (RN) Use (October 2005).
13. RC Processing for MHSDS Inmate Patients (October 2005).

J. Michael Keating, Jr.
Page 2

14. Medical Technical Assistant (MTA) Vacancy Report (October 2005).
15. Allocated Case Manager positions and vacancies for the EOP Administrative Segregation Hub institutions (October 2005).
16. EOP inmates waiting for transfer to a Psychiatric Services Unit (PSU) (October 2005).
17. Audit reports on Psychiatric Technician rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP) (October 2005).
18. Summary of Mental Health Crisis Bed Referrals and Transfers (September 2005).
19. Mental Health Crisis Bed Wait List (September/October 2005).
20. Correctional Treatment Centers and CDCR General Acute Care Hospitals Health Care Placement Issues (as of November 15, 2005).

If you have any questions, please contact me at (916) 323-6811.

Sincerely,

*Original Signed By*

RENEE KANAN, M.D., M.P.H.
Deputy Director
Division of Correctional Health Care Services

Enclosures

cc:   Peter Farber-Szekrenyi, DR. P.H., Director, DCHCS (w/o enclosures)
      Matthew Lopes, Deputy "Coleman" Special Master (with enclosures)
      Jeffrey L. Metzner, M.D., "Coleman" Expert (with enclosures)
      Dennis F. Koson, M.D., "Coleman" Expert (with enclosures)
      Kerry Hughes, M.D.,. "Coleman" Expert (with enclosures)
      Melissa G. Warren, Ph.D., "Coleman" Expert (with enclosures)
      Raymond F. Patterson, M.D., "Coleman" Expert (with enclosures)
      Paul Nicoll, "Coleman" Expert (with enclosures)
      Lisa Tillman, Office of the Attorney General (with enclosures)
      Michael Stone, Office of Legal Affairs (with enclosures)
      Michael Bien, Rosen Bien and Associates (with enclosures)
      Donald Specter, Prison Law Office (with enclosures)
      Virginia Morrison, Esq. (with enclosures)
      Mohamedu F. Jones, Esq. (with enclosures)
      Patricia Williams, Esq. (with enclosures)
      Doug McKeever, DCHCS (with enclosures)
      Tim Fishback, M.D., DCHCS (with enclosures)
      Margaret McAloon, Ph.D., DCHCS (w/o enclosures)

# Mental Health Population  -  Placement Per Institution

### Download Date October 14, 2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP *II* | 1,099 | 1,060 | 96% | | 9 | | | 1,069 |
| ASP Ad-Seg | | 38 | | | 4 | | | 42 |
| CAL *I,IV* + | | 24 | | | 5 | | | 29 |
| CAL Ad-Seg | | 8 | | | 1 | | | 9 |
| CCC *I,II,III* | | 4 | | | | | | 4 |
| CCC Ad-Seg | | 0 | | | | | | 0 |
| CCI *I,II,III,IV* | 1,053 | 979 | 93% | | 14 | | | 993 |
| CCI Ad-Seg | | 59 | | | 9 | | | 68 |
| CCI-RC | 166 | 159 | 96% | | 12 | | | 171 |
| CCI-SHU | 130 | 129 | 99% | | 1 | | | 130 |
| CCWF | 739 | 799 | 108% | 54 | 74 | 137% | 12 | 873 |
| CCWF Ad-Seg | | 26 | | | | | | 26 |
| CCWF-RC | 110 | 160 | 145% | | 3 | | | 163 |
| CEN *III* | | 26 | | | | | | 26 |
| CEN Ad-Seg | | 12 | | | 1 | | | 13 |
| CIM *I* | 366 | 537 | 147% | | 2 | | 18 | 539 |
| CIM-RC | 633 | 626 | 99% | | 154 | | | 780 |
| CIM-RC--Ad-Seg | | 43 | | | 11 | | | 54 |
| CIW | 349 | 466 | 134% | 75 | 92 | 123% | | 558 |
| CIW Ad-Seg | | 14 | | | | | | 14 |
| CIW-RC | 100 | 116 | 116% | | 2 | | | 118 |
| CMC *I,II,III* | 1,049 | 1,095 | 104% | 580 | 570 | 98% | 0 | 1,665 |
| CMC Ad-Seg | | 39 | | 54 | 48 | 89% | | 87 |
| CMF *I,II,III* | 599 | 548 | 91% | 600 | 592 | 99% | | 1,140 |
| CMF Ad-Seg | | 2 | | 58 | 67 | 116% | | 69 |
| CMF** | | 88 | | | 0 | | | 88 |
| COR *I,III,IV* +* | 499 | 281 | 56% | 150 | 157 | 105% | 23 | 438 |
| COR Ad-Seg | | 161 | | 54 | 43 | 80% | | 204 |
| COR-SHU | 450 | 471 | 105% | | | | | 471 |
| CRC-M *II* | 599 | 794 | 133% | | | | | 794 |
| CRC-W | 249 | 146 | 59% | | | | | 146 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Since September 9, 2005, DMH CMF-ICF and DMH CMF-DTP capacities and population data have been and continue to be unreliable until housing changes are complete.

Health Care Placement Unit

*R1-1*

10/14/2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CTF  I,II | 699 | 758 | 108% | | 10 | | | 768 |
| CTF Ad-Seg | | 17 | | | | | | 17 |
| CVSP  I,II | | 22 | | | | | | 22 |
| CVSP Ad-Seg | | 4 | | | | | | 4 |
| DVI  I,II | 85 | 125 | 147% | | 5 | | | 130 |
| DVI Ad-Seg | | 44 | | | 10 | | | 54 |
| DVI-RC | 364 | 443 | 122% | | 42 | | | 485 |
| FOL  III | 599 | 557 | 93% | | 7 | | | 564 |
| FOL Ad-Seg | | 56 | | | 1 | | | 57 |
| HDSP  I,III,IV | 654 | 446 | 68% | | 2 | | 10 | 448 |
| HDSP Ad-Seg | | 59 | | | 6 | | | 65 |
| HDSP-RC | 45 | 65 | 144% | | 5 | | | 70 |
| ISP  I,III | | 8 | | | | | 5 | 8 |
| ISP Ad-Seg | | 4 | | | | | | 4 |
| KVSP  I,IV | 349 | 162 | 46% | | | | 0 | 162 |
| KVSP Ad-Seg | | 14 | | | | | | 14 |
| LAC  I,III,IV + | 1,149 | 1,155 | 101% | 300 | 295 | 98% | 13 | 1,450 |
| LAC Ad-Seg | | 47 | | 54 | 55 | 102% | | 102 |
| MCSP  I,II,III,IV + | 999 | 892 | 89% | 215 | 220 | 102% | 10 | 1,112 |
| MCSP Ad-Seg | | 30 | | 36 | 33 | 92% | | 63 |
| NCWF | | 0 | | | | | | 0 |
| NKSP  I,III | 215 | 77 | 36% | | | | 10 | 77 |
| NKSP-RC | 584 | 668 | 114% | | 61 | | | 729 |
| NKSP-RC--Ad-Seg | | 42 | | | 1 | | | 43 |
| PBSP  I,IV | 349 | 245 | 70% | 64 | 65 | 102% | 6 | 310 |
| PBSP Ad-Seg | | 50 | | | | | | 50 |
| PBSP SHU | | 11 | | | | | | 11 |
| PVSP  I,III | 1,199 | 1,362 | 114% | | 12 | | 5 | 1,374 |
| PVSP Ad-Seg | | 133 | | | 2 | | | 135 |
| RJD  I,III | 901 | 760 | 84% | 330 | 334 | 101% | 14 | 1,094 |
| RJD Ad-Seg | | 111 | | 63 | 54 | 86% | | 165 |
| RJD-RC | 298 | 342 | 115% | | 87 | | | 429 |
| SAC  I,IV | 849 | 777 | 92% | 192 | 200 | 104% | 15 | 977 |
| SAC Ad-Seg | | 96 | | 49 | 56 | 114% | | 152 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Since September 9, 2005, DMH CMF-ICF and DMH CMF-DTP capacities and population data have been and continue to be unreliable until housing changes are complete.

Health Care Placement Unit

R1-2

10/14/2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| **SATF** II,III,IV | 1,049 | 979 | 93% | | 4 | | 16 | 983 |
| **SATF Ad-Seg** | | 150 | | | 1 | | | 151 |
| **SCC** I,II,III | 499 | 485 | 97% | | 15 | | | 500 |
| **SCC Ad-Seg** | | 4 | | | 1 | | | 5 |
| **SOL** II,III | 1,199 | 1,329 | 111% | | 5 | | 13 | 1,334 |
| **SOL Ad-Seg** | | 78 | | | 5 | | | 83 |
| **SQ** I,II | 350 | 424 | 121% | | 78 | | | 502 |
| **SQ-RC** | 549 | 493 | 90% | | 47 | | | 540 |
| **SQ-RC--Ad-Seg** | | 68 | | 36 | 5 | 14% | | 73 |
| **SVSP** I,IV | 999 | 938 | 94% | 192 | 183 | 95% | 10 | 1,121 |
| **SVSP Ad-Seg** | | 180 | | 45 | 55 | 122% | | 235 |
| **VSPW** | 606 | 664 | 110% | | 4 | | | 668 |
| **VSPW Ad-Seg** | | 10 | | 9 | 7 | 78% | | 17 |
| **VSPW SHU** | | 30 | | | 8 | | | 38 |
| **VSPW-RC** | 143 | 138 | 97% | | 9 | | | 147 |
| **WSP** I,III | 217 | 121 | 56% | | 3 | | 6 | 124 |
| **WSP-RC** | 732 | 1,059 | 145% | | 79 | | | 1,138 |
| **WSP-RC--Ad-Seg** | | 55 | | | 8 | | | 63 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
   the respective DDPS Identifier systems.

" + " is a 270 Design Facility.   " * " is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Since September 9, 2005, DMH CMF-ICF and DMH CMF-DTP capacities and population data have been and continue to be unreliable until housing changes are complete.

Health Care Placement Unit

R1-3

10/14/2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| Totals : | 23,871 | 25,697 | 107.6% | 3,210 | 3,951 | 123.1% | | 29,648 |

| | PSU | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 125 | 97.7% |
| SAC | 128 | 115 | 89.84% |
| Total PSU: | 256 | 240 | 93.75% |

| | DMH | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 131 | 124 | 95% |
| DMH CMF-AIP | 150 | 135 | 90% |
| DMH CMF-ICF | 76 | 38 | 50% |
| DMH CMF-DTP | 44 | 38 | 86% |
| DMH SVPP | 64 | 49 | 77% |
| Totals : | 465 | 384 | 82.6% |

The ASH cap includes the 25 APP beds.

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 27,802 | 30,272 | 108.9% |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* + * is a 270 Design Facility. * ** is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Since September 9, 2005, DMH CMF-ICF and DMH CMF-DTP capacities and population data have been and continue to be unreliable until housing changes are complete.

Health Care Placement Unit

R1-4

10/14/2005

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA 94283-0001



**RECEIVED**

OCT 2 0 2005

Rosen Bien & Asaro

October 18, 2005

J. Michael Keating, Jr.            via:    Lisa Tillman
Office of the Special Master              Deputy Attorney General
285 Terrace Avenue                        Department of Justice
Riverside, RI 02915                       1300 I Street, Suite 125
                                          P. O. Box 944255
                                          Sacramento, CA 94244-2550

**RE: INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Keating:

Enclosed are the monthly reports for August 2005, responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties meeting.

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History (August 2005).
2. MHSDS Hiring Activity Report. This report shows allocated staff and vacancy rate information for the most recent period available (August 2005).
3. Health Care Placement Unit (HCPU) Information Report, Summary and Administrative Segregation Greater than 60 Days Sections (August 2005).
4. Mental Health Contract Services and Telemedicine Monthly Report for all disciplines (August 2005).
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report (July 2005).
6. Monthly Summary of Mental Health Crisis Bed use by Institution (July 2005).
7. Referrals for Transfer to the Department of Mental Health (DMH-August 2005).
8. Atascadero State Hospital (ASH) Discharges (August 2005).
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program (Population Report-August 2005).
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals – Summary and Penal Code 2684 (August 2005).
11. Suicide Report (August 2005).
12. Statistics on Contracted Registered Nurse (RN) Use (June 2005).
13. RC Processing for MHSDS Inmate Patients (August 2005).

J. Michael Keating, Jr.
Page 2

14. Medical Technical Assistant (MTA) Vacancy Report (August 2005).
15. Allocated Case Manager positions and vacancies for the EOP Administrative Segregation Hub institutions (August 2005).
16. EOP inmates waiting for transfer to a Psychiatric Services Unit (PSU) August 2005.
17. Audit reports on Psychiatric Technician rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP) (August 2005).
18. Summary of Mental Health Crisis Bed Referrals and Transfers (August 2005).
19. Mental Health Crisis Bed Wait List (July/August 2005).
20. Correctional Treatment Centers and CDCR General Acute Care Hospitals Health Care Placement Issues (as of September 12, 2005).

If you have any questions, please contact me at (916) 323-6811.

Sincerely,

*Yulanda Mynha*

RENEE KANAN, M.D., M.P.H.
Director (A)
Division of Correctional Health Care Services

Enclosures

cc:    Matthew Lopes, Deputy "Coleman" Special Master (with enclosures)
       Jeffrey L. Metzner, M.D., "Coleman" Expert (with enclosures)
       Dennis F. Koson, M.D., "Coleman" Expert (with enclosures)
       Kerry Hughes, M.D.,. "Coleman" Expert (with enclosures)
       Melissa G. Warren, Ph.D., "Coleman" Expert (with enclosures)
       Raymond F. Patterson, M.D., "Coleman" Expert (with enclosures)
       Paul Nicoll, "Coleman" Expert (with enclosures)
       Lisa Tillman, Office of the Attorney General (with enclosures)
       Michael Stone, Office of Legal Affairs (with enclosures)
       Michael Bien, Rosen Bien and Associates (with enclosures)
       Donald Spector, Prison Law Office (with enclosures)
       Virginia Morrison, Esq. (with enclosures)
       Mohamedu F. Jones, Esq. (with enclosures)
       Patricia Williams, Esq. (with enclosures)
       Doug McKeever, DCHCS (with enclosures)
       Tim Fishback, M.D., DCHCS (with enclosures)
       Margaret McAloon, Ph.D., DCHCS (w/o enclosures)

# Enclosure 3

## Health Care Placement Unit
## Information Report

### August 2005



# Mental Health Population  -  Placement Per Institution
### Download Date August 26, 2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop. | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP        _II_ | 899 | 1,083 | 120% | | 5 | | | 1,088 |
| ASP Ad-Seg | | 40 | | | 4 | | | 44 |
| CAL        _I,IV_   + | | 26 | | | 3 | | | 29 |
| CAL Ad-Seg | | 10 | | | 1 | | | 11 |
| CCC        _I,II,III_ | | 2 | | | | | | 2 |
| CCI        _I,II,III,IV_  * | 903 | 1,124 | 124% | | 16 | | | 1,140 |
| CCI Ad-Seg | | 25 | | | 2 | | | 27 |
| CCI-RC | 166 | 132 | 80% | | 11 | | | 143 |
| CCI-SHU | 130 | 88 | 68% | | 3 | | | 91 |
| CCWF | 739 | 745 | 101% | 54 | 66 | 122% | 12 | 811 |
| CCWF Ad-Seg | | 25 | | | 2 | | | 27 |
| CCWF-RC | 110 | 171 | 155% | | 1 | | | 172 |
| CEN        _III_ | | 25 | | | 2 | | | 27 |
| CEN Ad-Seg | | 8 | | | | | | 8 |
| CIM        _I_ | 366 | 508 | 139% | | 7 | | 18 | 515 |
| CIM-RC | 633 | 652 | 103% | | 181 | | | 833 |
| CIM-RC--Ad-Seg | | 36 | | | 3 | | | 39 |
| CIW | 349 | 464 | 133% | 75 | 102 | 136% | | 566 |
| CIW Ad-Seg | | 14 | | | 4 | | | 18 |
| CIW-RC | 100 | 107 | 107% | | 4 | | | 111 |
| CMC        _I,II,III_ | 1,049 | 1,072 | 102% | 530 | 551 | 104% | 0 | 1,623 |
| CMC Ad-Seg | | 47 | | 54 | 36 | 67% | | 83 |
| CMF        _I,II,III_ | 599 | 560 | 93% | 600 | 576 | 96% | | 1,136 |
| CMF Ad-Seg | | 3 | | 58 | 69 | 119% | | 72 |
| CMF** | | 98 | | | 1 | | | 99 |
| COR        _I,III,IV_  + * | 499 | 284 | 57% | 150 | 137 | 91% | 23 | 421 |
| COR Ad-Seg | | 167 | | 54 | 52 | 96% | | 219 |
| COR-SHU | 450 | 452 | 100% | | | | | 452 |
| CRC-M      _II_ | 599 | 748 | 125% | | | | | 748 |
| CRC-W | 249 | 174 | 70% | | | | | 174 |
| CTF        _I,II_ | 699 | 692 | 99% | | 8 | | | 700 |
| CTF Ad-Seg | | 9 | | | | | | 9 |
| CVSP       _I,II_ | | 12 | | | 1 | | | 13 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.

* + " is a 270 Design Facility. * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door
retrofit.

Health Care Placement Unit

R1-1

8/26/2005

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CVSP Ad-Seg | | | 1 | | | | | | 1 |
| DVI | I,II | 85 | 129 | 152% | | 7 | | | 136 |
| DVI Ad-Seg | | | 39 | | | 12 | | | 51 |
| DVI-RC | | 364 | 463 | 127% | | 51 | | | 514 |
| FOL | III | 599 | 583 | 97% | | 6 | | | 589 |
| FOL Ad-Seg | | | 45 | | | 3 | | | 48 |
| HDSP | I,III,IV | 654 | 482 | 74% | | 3 | | 12 | 485 |
| HDSP Ad-Seg | | | 55 | | | 5 | | | 60 |
| HDSP-RC | | 45 | 69 | 153% | | 2 | | | 71 |
| ISP | I,III | | 11 | | | | | 5 | 11 |
| ISP Ad-Seg | | | 6 | | | | | | 6 |
| KVSP Ad-Seg | | | 2 | | | | | | 2 |
| LAC | I,III,IV | 1,149 | 1,167 | 102% | 300 | 293 | 98% | 13 | 1,460 |
| LAC Ad-Seg | | | 50 | | 45 | 55 | 122% | | 105 |
| MCSP | I,II,III,IV | 799 | 951 | 119% | 215 | 214 | 100% | 10 | 1,165 |
| MCSP Ad-Seg | | | 27 | | 36 | 40 | 111% | | 67 |
| NCWF | | | 0 | | | | | | 0 |
| NKSP | I,III | 215 | 84 | 39% | | | | 10 | 84 |
| NKSP-RC | | 584 | 651 | 111% | | 42 | | | 693 |
| NKSP-RC--Ad-Seg | | | 38 | | | 1 | | | 39 |
| PBSP | I,IV | 349 | 244 | 70% | 64 | 71 | 111% | 6 | 315 |
| PBSP Ad-Seg | | | 51 | | | | | | 51 |
| PBSP SHU | | | 14 | | | | | | 14 |
| PVSP | I,III | 1,199 | 1,380 | 115% | | 6 | | 5 | 1,386 |
| PVSP Ad-Seg | | | 124 | | | 2 | | | 126 |
| RJD | I,III | 901 | 734 | 81% | 330 | 321 | 97% | 15 | 1,055 |
| RJD Ad-Seg | | | 100 | | 63 | 49 | 78% | | 149 |
| RJD-RC | | 298 | 340 | 114% | | 91 | | | 431 |
| SAC | I,IV | 699 | 731 | 105% | 192 | 197 | 103% | 15 | 928 |
| SAC Ad-Seg | | | 89 | | 49 | 69 | 141% | | 158 |
| SATF | II,III,IV | 899 | 994 | 111% | | 2 | | 16 | 996 |
| SATF Ad-Seg | | | 150 | | | 1 | | | 151 |
| SCC | I,II,III | 499 | 501 | 100% | | 14 | | | 515 |
| SCC Ad-Seg | | | 5 | | | 1 | | | 6 |
| SOL | II,III | 1,199 | 1,246 | 104% | | 10 | | 13 | 1,256 |
| SOL Ad-Seg | | | 80 | | | 4 | | | 84 |
| SQ | I,II | 350 | 417 | 119% | | 79 | | | 496 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* + ' is a 270 Design Facility. * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Health Care Placement Unit

R1-2

8/26/2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| SQ-RC | 549 | 481 | 88% | | 41 | | | 522 |
| SQ-RC--Ad-Seg | | 78 | | 36 | 5 | 14% | | 83 |
| SVSP          IV | 949 | 899 | 95% | 192 | 203 | 106% | | 1,102 |
| SVSP Ad-Seg | | 177 | | 45 | 41 | 91% | 10 | 218 |
| VSPW | 606 | 654 | 108% | | 4 | | | 658 |
| VSPW Ad-Seg | | 16 | | 9 | 6 | 67% | | 22 |
| VSPW SHU | | 25 | | | 7 | | | 32 |
| VSPW-RC | 143 | 121 | 85% | | 5 | | | 126 |
| WSP          III | 217 | 134 | 62% | | 1 | | | 135 |
| WSP-RC | 732 | 1,109 | 152% | | 79 | | 6 | 1,188 |
| WSP-RC--Ad-Seg | | 67 | | | 10 | | | 77 |
| **Totals :** | 22,971 | 25,417 | 110.6% | 3,151 | 3,901 | 123.8% | | 29,318 |

| | PSU | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 123 | 96.1% |
| SAC | 128 | 103 | 80.47% |
| Total PSU: | 256 | 226 | 88.28% |

| | DMH | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 131 | 127 | 97% |
| DMH CMF-AIP | 150 | 140 | 93% |
| DMH CMF-ICF | 84 | 51 | 61% |
| DMH CMF-DTP | 60 | 52 | 87% |
| DMH SVPP | 64 | 49 | 77% |
| Totals : | 489 | 419 | 85.7% |

The ASH cap includes the 25 APP beds.

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 26,867 | 29,963 | 111.5% |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.

* + * is a 270 Design Facility. * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Health Care Placement Unit

R1-3                8/26/2005

**BILL LOCKYER**
*Attorney General*

State of California
**DEPARTMENT OF JUSTICE**



1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

August 12, 2005

RECEIVED

AUG 1 6 2005

ROSEN BIEN & ASARO

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02915

RE:    Coleman v. Schwarzenegger
       USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

    Please find enclosed defendants' set of monthly reports for the month of May 2005.

                        Sincerely,

                        *[signature]*

                        LISA A. TILLMAN
                        Deputy Attorney General

            For    BILL LOCKYER
                   Attorney General

*Enclosure

cc. w/o enclosure:
Matthew Lopes
~~Michael Bien~~
Steve Fama

30030751.wpd

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, *Governor*

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA  94283-0001

August 9, 2005

J. Michael Keating                        via:    Lisa Tillman
Office of the Special Master                      Deputy Attorney General
285 Terrace Avenue                                Department of Justice
Riverside, RI  02915                              1300 I Street, Suite 125
                                                  P.O. Box 944255
                                                  Sacramento, CA  94244-2550

Dear Mr. Keating:

**RE: INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Enclosed are the monthly reports for May 2005, responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties meeting.

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History (MAY 2005).

2.  MHSDS Hiring Activity Report.  This report shows allocated staff and vacancy rate information for the most recent period available (MAY 2005).

3.  Health Care Placement Unit (HCPU) Information Report, Summary and Administrative Segregation Greater than 60 Days Sections (MAY 2005).

4.  Mental Health Contract Services and Telemedicine Monthly Report for all disciplines (MAY 2005).

5.  California Department of Corrections (CDC) Reception Center (RC) Monthly Report (APRIL 2005).

6.  Monthly Summary of Mental Health Crisis Bed Use by Institution (APRIL 2005).

7.  Referrals for Transfer to the Department of Mental Health (DMH- MAY 2005).

8.  Atascadero State Hospital (ASH) Discharges (MAY 2005).

9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program (Population Report- MAY 2005).

J. Michael Keating
Page 2

10. The DMH Monthly Report of CDC Patients in DMH Hospitals - Summary and Penal Code 2684 (MAY 2005).

11. Suicide Report (MAY 2005).

12. Statistics on Contracted Registered Nurse (RN) Use (MARCH 2005).

13. RC Processing for MHSDS Inmate Patients (MAY 2005).

14. Medical Technical Assistant (MTA) Vacancy Report (MAY 2005).

15. Allocated Case Manager positions and vacancies for the EOP Administrative Segregation Hub institutions (MAY 2005).

16. EOP inmates waiting for transfer to a Psychiatric Services Unit (PSU) (MAY 2005).

17. Audit reports on Psychiatric Technician rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP) (MAY 2005).

18. Summary of Mental Health Crisis Bed Referrals and Transfers (MAY 2005).

19. Mental Health Crisis Bed Wait List (APRIL/MAY 2005).

20. Correctional Treatment Centers and CDC General Acute Care Hospitals Health Care Placement Issues.

If you have any questions, please contact me at (916) 323-6811.

Sincerely,

RENEE KANAN, M.D., M.P.H.
Director (A)
Division of Correctional Health Care Services

Enclosures

cc:    Matthew Lopes, Deputy "Coleman" Special Master (with enclosures)
       Jeffrey L. Metzner, M.D., "Coleman" Expert (with enclosures)
       Dennis F. Koson, M.D., "Coleman" Expert (with enclosures)
       Kerry Hughes, M.D., "Coleman" Expert (with enclosures)
       Melissa G. Warren, Ph.D., "Coleman" Expert (with enclosures)
       Raymond F. Patterson, M.D., "Coleman" Expert (with enclosures)
       Paul Nicoll, "Coleman" Expert (with enclosures)
       Lisa Tillman, Office of the Attorney General (with enclosures)
       Michael Stone, Office of Legal Affairs (with enclosures)

J. Michael Keating
Page 3

Michael Bien, Rosen Bien and Associates (with enclosures)
Donald Specter, Prison Law Office (with enclosures)
Yulanda Mynhier, DCHCS (with enclosures)
Timothy Fishback M.D., DCHCS (with enclosures)
Doug McKeever, DCHCS (with enclosures)
Margaret McAloon, Ph.D., DCHCS (w/o enclosures)

# Enclosure 3

## Health Care Placement Unit Information Report

### MAY 2005



# Mental Health Population - Placement Per Institution
### Download Date May 6, 2005

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP *II* | 899 | 1,038 | 115% | | 7 | | | 1,045 |
| ASP Ad-Seg | | 37 | | | 1 | | | 38 |
| CAL *I,IV* + | | 15 | | | 1 | | | 16 |
| CAL Ad-Seg | | 7 | | | | | | 7 |
| CCC *I,II,III* | | 3 | | | | | | 3 |
| CCC Ad-Seg | | 1 | | | | | | 1 |
| CCI *I,II,III,IV* * | 903 | 1,008 | 112% | | 10 | | | 1,018 |
| CCI Ad-Seg | | 63 | | | 3 | | | 66 |
| CCI-RC | 166 | 184 | 111% | | 15 | | | 199 |
| CCI-SHU | 130 | 125 | 96% | | | | | 125 |
| CCWF | 739 | 704 | 95% | 54 | 66 | 122% | 12 | 770 |
| CCWF Ad-Seg | | 18 | | | 1 | | | 19 |
| CCWF-RC | 110 | 157 | 143% | | 1 | | | 158 |
| CEN *III* | | 24 | | | | | 5 | 24 |
| CEN Ad-Seg | | 11 | | | | | | 11 |
| CIM *I* | 366 | 472 | 129% | | 3 | | 18 | 475 |
| CIM-RC | 633 | 491 | 78% | | 110 | | | 601 |
| CIM-RC--Ad-Seg | | 37 | | | 3 | | | 40 |
| CIW | 349 | 433 | 124% | 75 | 111 | 148% | | 544 |
| CIW Ad-Seg | | 9 | | | 2 | | | 11 |
| CIW-RC | 100 | 108 | 108% | | 1 | | | 109 |
| CMC *I,II,III* | 1,049 | 1,086 | 104% | 530 | 525 | 99% | 0 | 1,611 |
| CMC Ad-Seg | | 43 | | 54 | 44 | 81% | | 87 |
| CMF *I,II,III* | 599 | 570 | 95% | 600 | 596 | 99% | | 1,166 |
| CMF Ad-Seg | | 4 | | 58 | 71 | 122% | | 75 |
| CMF** | | 92 | | | 3 | | | 95 |
| COR *I,III,IV* +* | 499 | 297 | 60% | 150 | 148 | 99% | 23 | 445 |
| COR Ad-Seg | | 140 | | 63 | 59 | 94% | | 199 |
| COR-SHU | 450 | 454 | 101% | | 1 | | | 455 |
| CRC-M *II* | 599 | 666 | 111% | | | | | 666 |
| CRC-W | 249 | 108 | 43% | | | | | 108 |
| CTF *I,II* | 699 | 710 | 102% | | 15 | | | 725 |
| CTF Ad-Seg | | 20 | | | | | | 20 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
   the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * *** is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Health Care Placement Unit

*R1-1*

5/6/2005

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CVSP | I,II | | 3 | | | | | | 3 |
| CVSP Ad-Seg | | | 1 | | | | | | 1 |
| DVI | I,II | 85 | 121 | 142% | | 7 | | | 128 |
| DVI Ad-Seg | | | 50 | | | 3 | | | 53 |
| DVI-RC | | 364 | 504 | 138% | | 31 | | | 535 |
| FOL | III | 599 | 494 | 82% | | 5 | | | 499 |
| FOL Ad-Seg | | | 43 | | | 1 | | | 44 |
| HDSP | I,II,IV * | 654 | 524 | 80% | | | | 12 | 524 |
| HDSP Ad-Seg | | | 58 | | | 3 | | | 61 |
| HDSP-RC | | 45 | 36 | 80% | | 1 | | | 37 |
| ISP | I,II | | 10 | | | | | 5 | 10 |
| ISP Ad-Seg | | | 4 | | | | | | 4 |
| LAC | I,II,IV + | 1,149 | 1,078 | 94% | 300 | 274 | 91% | 13 | 1,352 |
| LAC Ad-Seg | | | 74 | | 45 | 46 | 102% | | 120 |
| MCSP | I,II,III,IV + | 799 | 989 | 124% | 180 | 190 | 106% | 10 | 1,179 |
| MCSP Ad-Seg | | | 37 | | 36 | 26 | 72% | | 63 |
| NCWF | | | 0 | | | | | | 0 |
| NKSP | I,II | 215 | 194 | 90% | | | | 10 | 194 |
| NKSP-RC | | 584 | 592 | 101% | | 31 | | | 623 |
| NKSP-RC--Ad-Seg | | | 51 | | | 3 | | | 54 |
| PBSP | I,IV * | 349 | 238 | 68% | 64 | 69 | 108% | 6 | 307 |
| PBSP Ad-Seg | | | 63 | | | | | | 63 |
| PBSP SHU | | | 16 | | | | | | 16 |
| PVSP | I,II | 1,199 | 1,294 | 108% | | 3 | | 5 | 1,297 |
| PVSP Ad-Seg | | | 129 | | | 1 | | | 130 |
| RJD | I,II | 901 | 709 | 79% | 330 | 317 | 96% | 15 | 1,026 |
| RJD Ad-Seg | | | 82 | | 63 | 53 | 84% | | 135 |
| RJD-RC | | 298 | 315 | 106% | | 59 | | | 374 |
| SAC | I,IV * | 699 | 741 | 106% | 192 | 188 | 98% | 15 | 929 |
| SAC Ad-Seg | | | 94 | | 49 | 63 | 129% | | 157 |
| SATF | II,III,IV * | 899 | 960 | 107% | | 4 | | 16 | 964 |
| SATF Ad-Seg | | | 166 | | | 2 | | | 168 |
| SCC | I,II,III | 499 | 562 | 113% | | 13 | | | 575 |
| SCC Ad-Seg | | | 2 | | | 2 | | | 4 |
| SOL | II,III | 1,199 | 1,215 | 101% | | 5 | | 13 | 1,220 |
| SOL Ad-Seg | | | 55 | | | 1 | | | 56 |
| SQ | I,II | 350 | 415 | 119% | | 67 | | | 482 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
    the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Health Care Placement Unit

R1-2

5/6/2005

|  | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity |  |
| SQ-RC | 549 | 503 | 92% |  | 37 |  |  | 540 |
| SQ-RC--Ad-Seg |  | 72 |  | 36 | 7 | 19% |  | 79 |
| SVSP        UV | 949 | 887 | 93% | 192 | 180 | 94% | 10 | 1,067 |
| SVSP Ad-Seg |  | 152 |  | 45 | 31 | 69% |  | 183 |
| VSPW | 606 | 622 | 103% |  | 2 |  |  | 624 |
| VSPW Ad-Seg |  | 9 |  | 9 | 8 | 89% |  | 17 |
| VSPW SHU |  | 27 |  |  | 3 |  |  | 30 |
| VSPW-RC | 143 | 159 | 111% |  | 3 |  |  | 162 |
| WSP        UII | 217 | 153 | 71% |  | 1 |  | 6 | 154 |
| WSP-RC | 732 | 945 | 129% |  | 66 |  |  | 1,011 |
| WSP-RC--Ad-Seg |  | 60 |  |  | 6 |  |  | 66 |
| Totals : | 22,622 | 24,643 | 108.9% | 3,125 | 3,609 | 115.5% |  | 28,252 |

| PSU | | | |
|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 123 | 96.1% |
| SAC | 128 | 102 | 79.69% |
| Total PSU: | 256 | 225 | 87.89% |

| DMH | | | |
|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity |
| ASH | 131 | 143 | 109% |
| DMH CMF-AIP | 150 | 113 | 75% |
| DMH CMF-ICF | 84 | 42 | 50% |
| DMH CMF-DTP | 60 | 51 | 85% |
| DMH SVPP | 64 | 51 | 80% |
| Totals : | 489 | 400 | 81.8% |

The ASH cap includes the 25 APP beds.

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 26,492 | 28,877 | 109.0% |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Beginning 4/28/05, SAC Ad-Seg EOP population includes some PSU inmates due to the PSU cell door retrofit.

Health Care Placement Unit

R1-3

5/6/2005