**Exhibits C through H**

**Exhibit C**

```
Data Analysis Unit                           Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                             State of California
Offender Information Services Branch                                   January 30, 2006
                         WEEKLY REPORT OF POPULATION
                       AS OF MIDNIGHT January 25, 2006
```

|  | FELON/ OTHER | CIVIL ADDICT | TOTAL | CHANGE SINCE 01/26/05 NO. | PCT. | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|---|
| **TOTAL CDC POPULATION** | | | | | | | | |
| A. TOTAL INSTITUTIONS | 166,707 | 1,294 | 168,001 | +5,519 | +3.3 | | | |
| (MEN, Subtotal) | 155,657 | 940 | 156,597 | +4,868 | +3.2 | | | |
| (WOMEN, Subtotal) | 11,050 | 354 | 11,404 | +651 | +6.0 | | | |
| 1. INSTITUTIONS/CAMPS | 161,230 | 1,294 | 162,524 | +5,707 | +3.6 | 87,250 | 186.3 | 164,159 |
| INSTITUTIONS | 156,898 | 1,294 | 158,192 | +5,579 | +3.6 | 83,342 | 189.8 | 160,121 |
| CAMPS(CCC & SCC) | 4,332 | | 4,332 | +128 | +3.0 | 3,908 | 110.8 | 4,038 |
| 2. COMMUNITY CORR. CTRS. | 5,343 | 0 | 5,343 | -170 | -3.0 | 7,545 | 70.8 | |
| CCF PRIVATE | 2,387 | | 2,387 | -228 | -8.7 | 2,752 | 86.7 | |
| CCF PUBLIC | 2,458 | | 2,458 | -13 | -0.5 | 2,461 | 99.9 | |
| DRUG TREATMT FURLOUGH | 242 | | 242 | +97 | +66.8 | 1,056 | 22.9 | |
| PRIVATE WORK FURLOUGH | 98 | | 98 | -10 | -9.2 | 1,103 | 8.9 | |
| PRISONER MOTHER PGM | 63 | | 63 | -3 | -4.5 | 70 | 90.0 | |
| FAMILY FOUNDATION PGM | 62 | | 62 | -5 | -7.4 | 70 | 88.6 | |
| WORK FUR. IN CUSTODY | 33 | | 33 | -8 | -19.5 | 33 | 100.0 | |
| 3. DMH STATE HOSPITALS | 134 | | 134 | -18 | -11.8 | | | |
| B. PAROLE | 113,919 | 1,826 | 115,745 | +1,324 | +1.1 | | | |
| COMMUNITY SUPERVISION | 112,341 | 1,826 | 114,167 | +1,377 | +1.2 | | | |
| COOPERATIVE CASES | 1,578 | | 1,578 | -53 | -3.2 | | | |
| C. NON-CDC JURISDICTION | 1,973 | 0 | 1,973 | -169 | -7.8 | | | |
| OTHER STATE/FED. INST. | 541 | | 541 | -38 | -6.5 | | | |
| OUT OF STATE PAROLE | 1,216 | | 1,216 | -134 | -9.9 | | | |
| OUT OF STATE PAL | 124 | | 124 | -10 | -7.4 | | | |
| CYA-W&IC 1731.5(c) INSTITUTIONS | 92 | | 92 | +13 | +16.4 | | | |
| D. OTHER POPULATIONS INMATES | 21,467 | 303 | 21,770 | -65 | -0.2 | | | |
| OUT-TO-COURT, etc. | 1,880 | 54 | 1,934 | +107 | +5.8 | | | |
| ESCAPED | 247 | | 247 | -9 | -3.5 | | | |
| PAROLEES (PAL/RAL) | 19,340 | 249 | 19,589 | -163 | -0.8 | | | |
| TOTAL CDC POPULATION | 304,066 | 3,423 | 307,489 | +6,609 | +2.1 | | | |

```
CHANGE FROM LAST WEEK
   A. TOTAL INSTITUTIONS         +9       -1       +8
          (MEN, Subtotal)        +1       -4       -3
          (WOMEN, Subtotal)      +8       +3      +11
   B. PAROLE                   +280       +8     +288
   D. PAROLEES (PAL/RAL)       -173       -5     -178
```

This report contains the latest available reliable population figures from OBIS.  They have been carefully audited, but are preliminary, and therefore subject to revision.

Figure excludes institution based camps.  Total persons in camps, including base camps, are 4,421 .  Base camp at CMC is included in institution counts.

Report # TPOP-1W.  Questions:       (916) 327-3262  (CALNET) 467-3262.

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT January 25, 2006

| INSTITUTIONS/CAMPS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| MALE | | | | | | |
| ASP  (AVENAL SP) | 7,073 | | 7,073 | 3,114 | 227.1 | 7,028 |
| CCC  (CAL CORRECTL CTR) | 6,025 | | 6,025 | 3,682 | 163.6 | 5,750 |
| CCI  (CAL CORRECTL INSTITN) | 5,638 | | 5,638 | 3,020 | 186.7 | 5,558 |
| CIM  (CAL INSTITN FOR MEN) | 6,473 | 11 | 6,484 | 3,078 | 210.7 | 6,615 |
| CMF  (CAL MEDICAL FACIL) | 3,159 | | 3,159 | 2,315 | 136.5 | 3,351 |
| CMC  (CAL MEN'S COLONY) | 6,530 | 1 | 6,531 | 3,884 | 168.2 | 6,604 |
| CRC  (CAL REHAB CTR, MEN) | 3,032 | 878 | 3,910 | 1,814 | 215.5 | 3,952 |
| CAL  (CAL SP, CALIPATRIA) | 4,219 | | 4,219 | 2,508 | 168.2 | 4,268 |
| CEN  (CAL SP, CENTINELA) | 4,890 | | 4,890 | 2,316 | 211.1 | 5,103 |
| COR  (CAL SP, CORCORAN) | 5,192 | | 5,192 | 3,016 | 172.1 | 5,134 |
| LAC  (CAL SP, LOS ANGELES CO) | 3,809 | | 3,809 | 2,200 | 173.1 | 4,684 |
| LARC (CAL SP RC, LOS ANGELES) | 565 | | 565 | 400 | 141.3 | 400 |
| SAC  (CAL SP, SACRAMENTO) | 3,282 | | 3,282 | 1,898 | 172.9 | 3,244 |
| SQ   (CAL SP, SAN QUENTIN) | 5,475 | 11 | 5,486 | 3,661 | 149.8 | 5,681 |
| SOL  (CAL SP, SOLANO) | 5,957 | | 5,957 | 2,658 | 224.1 | 5,660 |
| SATF (CAL SATF AND SP - COR) | 7,245 | | 7,245 | 3,591 | 201.8 | 7,027 |
| CVSP (CHUCKAWALLA VALLEY SP) | 4,045 | | 4,045 | 1,738 | 232.7 | 3,860 |
| CTF  (CORRL TRAING FAC) | 7,101 | 2 | 7,103 | 3,319 | 214.0 | 7,001 |
| DVI  (DEUEL VOCATL INSTITN) | 3,697 | 12 | 3,709 | 1,787 | 207.6 | 3,551 |
| FOL  (FOLSOM SP) | 4,054 | | 4,054 | 2,475 | 163.8 | 4,249 |
| HDP  (HIGH DESERT SP) | 4,578 | 5 | 4,583 | 2,534 | 180.9 | 4,752 |
| IRON (IRONWOOD SP) | 4,681 | | 4,681 | 2,200 | 212.8 | 4,653 |
| KVSP (KERN VALLEY SP) | 3,321 | | 3,321 | 2,718 | 122.2 | 4,636 |
| MCSP (MULE CREEK SP) | 3,845 | | 3,845 | 1,700 | 226.2 | 3,837 |
| NKSP (NORTH KERN SP) | 5,303 | 7 | 5,310 | 2,918 | 182.0 | 5,387 |
| PDC  (PITCHESS DETENT CTR-RC) | 1,163 | | 1,163 | 0 | - | 1,292 |
| PBSP (PELICAN BAY SP) | 3,451 | | 3,451 | 2,376 | 145.2 | 3,582 |
| PVSP (PLEASANT VALLEY SP) | 4,932 | | 4,932 | 2,298 | 214.6 | 5,028 |
| RIO  (RIO COSUMNES COR CTR-RC) | 230 | | 230 | 0 | - | 250 |
| RJD  (RJ DONOVAN CORR FACIL) | 4,557 | | 4,557 | 2,308 | 197.4 | 4,443 |
| SVSP (SALINAS VAL SP) | 4,364 | | 4,364 | 2,914 | 149.8 | 4,510 |
| SRTA (SANTA RITA CO. JAIL-RC) | 657 | | 657 | 0 | - | 750 |
| SCC  (SIERRA CONSERV CTR) | 6,122 | 1 | 6,123 | 3,606 | 169.8 | 6,107 |
| WSP  (WASCO SP) | 6,003 | 12 | 6,015 | 3,314 | 181.5 | 6,066 |
| MALE  TOTAL: | 150,668 | 940 | 151,608 | 81,360 | 186.3 | 154,013 |
| FEMALE | | | | | | |
| CIW  (CAL INST FOR WOMEN) | 2,502 | 4 | 2,506 | 1,346 | 186.2 | 2,270 |
| CRC  (CAL REHAB CTR, WOMEN) | 455 | 329 | 784 | 500 | 156.8 | 680 |
| CCWF (CENT CAL WOMEN'S FACIL) | 3,802 | | 3,802 | 2,029 | 187.4 | 3,490 |
| RIO  (RIO COSUMNES COR CTR-RC) | 16 | | 16 | 0 | - | 20 |
| VSP  (VALLEY SP) | 3,787 | 21 | 3,808 | 2,015 | 189.0 | 3,686 |
| FEMALE  TOTAL: | 10,562 | 354 | 10,916 | 5,890 | 185.3 | 10,146 |
| INSTITUTIONS/CAMPS TOTAL: | 161,230 | 1,294 | 162,524 | 87,250 | 186.3 | 164,159 |

#TPOP-1, Page 2

```
WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT January 25, 2006
                                 FELON/    CIVIL           DESIGN   PERCENT   STAFFED
MALE   INSTITUTIONS              OTHER    ADDICT   TOTAL   CAPACITY OCCUPIED  CAPACITY
ASP    (AVENAL SP)               7,073             7,073    3,114    227.1     7,028
CCC    (CAL CORRECTL CTR)
         Camps                   1,893             1,893    1,708    110.8     1,708
         Level I                 1,583             1,583      866    182.8     1,456
         Level II                1,521             1,521      608    250.2     1,393
         Level III               1,028             1,028      500    205.6     1,193
CCI    (CAL CORRECTL INSTITN)
         Level I                 1,191             1,191      617    193.0     1,237
         Level II                1,552             1,552      664    233.7     1,695
         Level IV                1,071             1,071      500    214.2     1,075
         IV A-Main                 963               963      555    173.5       703
         IV B-Main                 275               275      228    120.6       581
         IV B-SHU                  586               586      456    128.5       267
CIM    (CAL INSTITN FOR MEN)
         Level I                 2,744       1     2,745    1,420    193.3     2,760
         East - Reception Center   975       4       979      400    244.8       990
         Reception Center - Central 1,302    5     1,307      618    211.5     1,455
         Reception Center - West  1,452       1     1,453      640    227.0     1,410
CMF    (CAL MEDICAL FACIL)
         Level I                   139               139      117    118.8       177
         Level II                  392               392      250    156.8       410
         Level III               2,628             2,628    1,948    134.9     2,764
CMC    (CAL MEN'S COLONY)
         East                    3,733       1     3,734    2,425    154.0     3,750
         West                    2,797             2,797    1,459    191.7     2,854
CRC    (CAL REHAB CTR, MEN)      3,032     878     3,910    1,814    215.5     3,952
CAL    (CAL SP, CALIPATRIA)
         Level I                   355               355      208    170.7       358
         Level IV                3,864             3,864    2,300    168.0     3,910
CEN    (CAL SP, CENTINELA)
         Level I                   337               337      208    162.0       408
         Level III               4,422             4,422    1,608    275.0     3,815
         Level IV                  131               131      500     26.2       880
COR    (CAL SP, CORCORAN)
         Level I                   853               853      492    173.4       826
         Level III                 343               343      200    171.5       342
         Level IV                2,802             2,802    1,300    215.5     2,720
         SHU                     1,178             1,178    1,000    117.8     1,200
         PHU                       16                16       24     66.7        46
LAC    (CAL SP, LOS ANGELES CO)
         Level I                   330               330      200    165.0       400
         Level III/IV            3,479             3,479    2,000    174.0     4,284
LARC   (CAL SP RC, LOS ANGELES)   565               565      400    141.3       400
SAC    (CAL SP, SACRAMENTO)
         Level I                   362               362      362    100.0       384
         Level IV                2,920             2,920    1,536    190.1     2,860
SQ     (CAL SP, SAN QUENTIN)
         Level I                   105               105      234     44.9       215
         Level II                1,956             1,956    1,073    182.3     1,929
         Condemned                 609               609      587    103.7       635
         Reception Center        2,805      11     2,816    1,767    159.4     2,902
SOL    (CAL SP, SOLANO)
         Level II                3,323             3,323    1,458    227.9     3,080
         Level III               2,634             2,634    1,200    219.5     2,580
SATF   (CAL SATF AND SP - COR)   7,245             7,245    3,591    201.8     7,027
CVSP   (CHUCKAWALLA VALLEY SP)
         Level I                   392               392      208    188.5       408
         Level II                3,653             3,653    1,530    238.8     3,452
CTF    (CORRL TRAING FAC)
         Central-II              3,097       2     3,099    1,409    219.9     3,051
         North-II/III            2,888             2,888    1,400    206.3     2,860
         South-I                 1,116             1,116      510    218.8     1,090
DVI    (DEUEL VOCATL INSTITN)
         Level I                   18                18      176     10.2       231
         Level III                 697               697      532    131.0       942
         Reception Center        2,982      12     2,994    1,079    277.5     2,378
FOL    (FOLSOM SP)
         PSAP                      49                49      200     24.5       200
         TTP                       220               220      203    108.4       203
         Level I                   378               378      296    127.7       471
         Level II                1,685             1,685    1,067    157.9     2,027
         Level III               1,722             1,722      709    242.9     1,348
#TPOP-1A
```

```
WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                MIDNIGHT January 25, 2006
```

| MALE | INSTITUTIONS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|
| HDP | (HIGH DESERT SP) | | | | | | |
| | Level I | 377 | | 377 | 200 | 188.5 | 400 |
| | Level II | 114 | | 114 | 120 | 95.0 | 120 |
| | Level III | 862 | | 862 | 400 | 215.5 | 1,002 |
| | Level IV | 2,727 | | 2,727 | 1,714 | 159.1 | 2,850 |
| | Reception Center | 498 | 5 | 503 | 100 | 503.0 | 380 |
| IRON | (IRONWOOD SP) | | | | | | |
| | Level I | 384 | | 384 | 200 | 192.0 | 400 |
| | Level III | 4,297 | | 4,297 | 2,000 | 214.9 | 4,253 |
| KVSP | (KERN VALLEY SP) | | | | | | |
| | Level IV | 2,769 | | 2,769 | 1,984 | 139.6 | 3,770 |
| | Level I | 397 | | 397 | 200 | 198.5 | 200 |
| | Adseg | 154 | | 154 | 264 | 58.3 | 396 |
| | CTC | 1 | | 1 | 270 | 0.4 | 270 |
| MCSP | (MULE CREEK SP) | | | | | | |
| | Level I | 379 | | 379 | 200 | 189.5 | 392 |
| | Level III | 2,487 | | 2,487 | 1,000 | 248.7 | 2,335 |
| | Level IV | 979 | | 979 | 500 | 195.8 | 1,110 |
| NKSP | (NORTH KERN SP) | | | | | | |
| | Level I | 261 | | 261 | 208 | 125.5 | 358 |
| | Level III | 498 | | 498 | 500 | 99.6 | 868 |
| | Reception Center | 4,544 | 7 | 4,551 | 2,210 | 205.9 | 4,161 |
| PDC | (PITCHESS DETENT CTR-RC) | 1,163 | | 1,163 | 0 | - | 1,292 |
| PBSP | (PELICAN BAY SP) | | | | | | |
| | Level I | 338 | | 338 | 296 | 114.2 | 384 |
| | Level III/IV | 2,013 | | 2,013 | 1,024 | 196.6 | 1,931 |
| | SHU | 1,100 | | 1,100 | 1,056 | 104.2 | 1,267 |
| PVSP | (PLEASANT VALLEY SP) | | | | | | |
| | Level I | 295 | | 295 | 208 | 141.8 | 408 |
| | Level III | 4,637 | | 4,637 | 2,090 | 221.9 | 4,620 |
| RIO | (RIO COSUMNES COR CTR-RC) | 230 | | 230 | 0 | - | 250 |
| RJD | (RJ DONOVAN CORR FACIL) | | | | | | |
| | Level I | 321 | | 321 | 200 | 160.5 | 392 |
| | Level III | 2,743 | | 2,743 | 1,500 | 182.9 | 2,899 |
| | Reception Center | 1,493 | | 1,493 | 608 | 245.6 | 1,152 |
| SVSP | (SALINAS VAL SP) | | | | | | |
| | Level I | 374 | | 374 | 280 | 133.6 | 400 |
| | Level IV | 3,990 | | 3,990 | 2,634 | 151.5 | 4,110 |
| SRTA | (SANTA RITA CO. JAIL-RC) | 657 | | 657 | 0 | - | 750 |
| SCC | (SIERRA CONSERV CTR) | | | | | | |
| | Camps-Men | 2,116 | | 2,116 | 1,880 | 112.6 | 2,010 |
| | Level I | 1,329 | | 1,329 | 618 | 215.0 | 1,378 |
| | Level II | 1,602 | 1 | 1,603 | 608 | 263.7 | 1,634 |
| | Level III | 1,075 | | 1,075 | 500 | 215.0 | 1,085 |
| WSP | (WASCO SP) | | | | | | |
| | Level I | 285 | | 285 | 200 | 142.5 | 392 |
| | Level III | 636 | 1 | 637 | 500 | 127.4 | 773 |
| | Reception Center | 5,082 | 11 | 5,093 | 2,614 | 194.8 | 4,901 |
| MALE TOTAL: | | 150,668 | 940 | 151,608 | 81,360 | 186.3 | 154,013 |
| | | | | | | | |
| FEMALE INSTITUTIONS | | | | | | | |
| CIW | (CAL INST FOR WOMEN) | | | | | | |
| | Institution | 1,917 | 4 | 1,921 | 916 | 209.7 | 1,505 |
| | Reception Center | 262 | | 262 | 110 | 238.2 | 445 |
| | Camps-Women | 323 | | 323 | 320 | 100.9 | 320 |
| CRC | (CAL REHAB CTR, WOMEN) | 455 | 329 | 784 | 500 | 156.8 | 680 |
| CCWF | (CENT CAL WOMEN'S FACIL) | | | | | | |
| | Institution | 3,137 | | 3,137 | 1,623 | 193.3 | 2,588 |
| | Reception Center | 651 | | 651 | 393 | 165.6 | 887 |
| | Condemned | 14 | | 14 | 13 | 107.7 | 15 |
| RIO | (RIO COSUMNES COR CTR-RC) | 16 | | 16 | 0 | - | 20 |
| VSP | (VALLEY SP) | | | | | | |
| | Institution | 2,989 | | 2,989 | 1,571 | 190.3 | 2,946 |
| | Reception Center | 732 | 21 | 753 | 400 | 188.3 | 678 |
| | SHU | 66 | | 66 | 44 | 150.0 | 62 |
| FEMALE TOTAL: | | 10,562 | 354 | 10,916 | 5,890 | 185.3 | 10,146 |
| INSTITUTIONS/CAMPS TOTAL: | | 161,230 | 1,294 | 162,524 | 87,250 | 186.3 | 164,159 |

#TPOP-1A, PAGE 2

**Exhibit D**

# Memorandum

Date    :    October 25, 2005

To      :    Roderick Q. Hickman
             Secretary
             California Department of Corrections and Rehabilitation

Subject :    MODIFICATION TO CORRECTIONAL OPERATIONS DUE TO COMPELLING
             OPERATIONAL NECESSITY

The California Department of Corrections and Rehabilitation's (CDCR) total inmate population reached 166,148 as of October 12, 2005. This historic population high has caused significant population pressures resulting in public safety concerns for the CDCR as well as the counties in our State. The following factors that have led to the population crisis as well as real and potential consequences are:

- **High Levels of County Intake** - The Fall 2005 projections for the first quarter of fiscal year (FY) 2005/06 identified an average male intake of 9,537 male offenders per month. In the first quarter of FY 2005/06, CDCR received an average of 10,102 male offenders per month.
- **Significant Monthly Increases in CDCR's Total Population** - The average monthly increase in the total inmate population for July-September 2005 was 809. The CDCR has not experienced increases of this magnitude since 1997 when, the overall population was only 155,013 (September 30, 1997) compared to the population today of 166,148.
- **County Jail Public Safety** - County jails such as Los Angeles have indicated that misdemeanor offenders housed in the jails are being released after having served only 10 percent of their sentence. Los Angeles has to release offenders early in part due to the CDCR's inability to move inmates from County jails to State prisons expeditiously.
- **Court Cases Impacting the Reception Center (RC) Process** - The Department has been subjected to numerous court mandates, in re *Coleman*, in re *Armstrong*, in re *Plata*, in re *Valdivia*, and in re *Clark*. The mandates created additional workload in RCs that have contributed to longer processing times. In 2000, the average processing time for a male inmate was 58.9 days. Thus far in 2005, the average processing time for male inmates has grown to 69.5 days.
- **Health Care Transfer Limitations** - Even when General Population beds are available for transferring of RC inmates, there are often limitations to the number of inmates with mental health or medical needs that a given institution can accept in a given week due to court imposed sanctions for example in *Coleman v. California* the CDCR has agreed to time constraints in which an inmate is seen by a mental health clinician within 14 days of arrival to establish program needs. As such, the number of inmates is limited to the staff's ability to perform those evaluations. We also have clinical staffing ratios and when we are unable to maintain those staffing ratios we are further limited.
- **Lack of Automation** - The CDCR's information systems are grossly inadequate to meet the needs of the RC and contribute significantly to an inmate's length of stay in the RC.
- **Staffing Shortages** - The CDCR is experiencing staffing shortages in a broad range of areas. These range from Correctional Officers, medical/mental health staffing, case records analyst, etc. Not only is hiring staff at many institutions challenging, but those staff must be trained once hired.

Roderick Q. Hickman
Page 2

- **RC Population Reduction at San Quentin (SQ)** - Due to concerns of the *Plata* court in regards to medical care at SQ, the CDCR has reduced the RC population at SQ at a time when there is a critical need for RC beds.
- **County Jail Population Capacities** - The Pitchess Center (Los Angeles County Sheriff's Jail) has been consistently housing CDCR Parole violators in numbers that exceed the contract capacity of 1292 for several months during 2005, while RC have been at capacity levels and unable to accept intake for this type of inmate. A separate capacity in the Los Angeles County Jail for "local assistance" beds is also affected by our inability to accept inmates sentenced to State prison by the courts, in the RCs and has reached highs of 2000+ with current totals at 1387. We have also exceeded the contract capacities at Santa Rita (Alameda County Jail) with a CDCR population of 700+ and must reduce this to below 625. Other County officials from Orange, San Bernardino, Riverside, and San Diego have also requested that extra inmates be delivered to CDCR as a result of jail overcrowding for new commitments and other inmates returning to State prison.
- **County Jails Not Accepting Parole Violators** - Due to the influx of parole violators as stated above, counties such as Riverside, San Diego, and Alameda have, at times, stopped accepting the delivery of additional parole violators, thus requiring parole agents to deliver violators directly to the RC. This exacerbates the situation, in that the County may not accept cases that would be held for Our Hold Only.
- **Bridging Education Program** - In early 2004, the CDCR implemented the Bridging Education Program (BEP). The BEP provided inmates arriving at RCs with day-for-day credit, if eligible. This has created a significant population of inmates housed in RCs that cannot transfer based on their imminent parole date of less than 30 days.

Based on the above facts, we believe that an imminent and substantial threat to the public safety exists requiring immediate action. In a separate document, I will be forwarding some unprecedented recommendations to modify a variety of correctional operations to alleviate the significant population pressures that are affecting public safety.

If you have any questions, please contact me at 445-7688.

JOHN DOVEY
Director
Division of Adult Institutions

cc: Joyce Hayhoe
    Brigid Hanson
    Mike Knowles
    Tim Virga
    Dean Borg
    Associate Directors
    Wardens
    Kathleen Dickinson

State of California

**Memorandum**

Department of Corrections and Rehabilitation

Date    :    September 1, 2005

To      :    Associate Directors-Division of Adult Institutions
             Wardens
             Classification Staff Representatives
             Classification and Parole Representatives
             Correctional Counselor IIIs-Reception Centers

**RECEIVED**

NOV 2 8 2005

**Rosen Bien & Asaro**

Subject:    **INSTITUTION BED MANAGEMENT**

As you are aware, the California Department of Corrections and Rehabilitation (CDCR) is experiencing a severe bed crisis. Many factors play a role leading to this situation. The intake of inmates from counties is above the spring projections, Reception Centers (RC) are experiencing ever increasing challenges in their ability to process cases, and no available beds for the inmates that are endorsed at RCs. Additionally, institutions having numerous inmates housed in inappropriate beds; e.g. Administrative Segregation Unit (ASU) overflows, institutions not compacting inmates, and some institutions not maintaining staffed capacity. The Department has approached the point where it may need to refuse county intake. Every day it becomes more difficult to find a bed for an inmate coming from the counties.

On August 17, 2005, the CDCR inmate population weekly Wednesday count reached another new all-time high of 165,378 inmates. That is 157 inmates higher than the previous high of 165,221 inmates reached on October 6, 2004.

The spring projections reflected an average monthly intake of 9,395 inmates. From March through July 2005 the average monthly intake was 9,877 inmates, 582 inmates above the spring projections.

There are several counties that have postponed delivery to the Department pending RC bed availability. That intake includes but is not limited to approximately 470 inmates from Orange County, 240 inmates from San Bernardino County, 700 inmates from Los Angeles County, and 1,464 parole violators in local assistance beds.

**RC Production**

Many factors contribute to the overcrowded RCs. One contributing factor is processing times. In 2000, the average mean days for a male inmate in an RC was 58.9 days. In 2005, the average mean days for a male inmate in an RC is 69.2 days.

In order to immediately reduce the backlog of inmates in RCs, it is imperative that inmates are processed as expeditiously as possible. RCs should maximize current staff's ability to process cases. That can be accomplished by establishing and

Associate Directors-Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Page 2

enforcing expectations of productivity; and properly managing overtime, vacation schedules, and vacant positions.

Effective immediately, each Friday every RC is expected to have as many cases ready for the Classification Staff Representative (CSR) to review the following week that is equal to or greater than the projected county intake for that week. If the RC is projecting county intake at 500 inmates, they will have a minimum of 500 cases ready for CSR review by the preceding Friday. Inmates already endorsed by the CSR are not to be included in those numbers. All RCs will continue to report to the Classification Services Unit (CSU) on each Friday afternoon the number of cases ready for review. The Associate Director of the RCs will monitor these numbers weekly. These cases will not be projected for endorsement but actual cases ready for immediate endorsement.

Many endorsed cases in RC's are redirected weekly. For example, if an inmate is endorsed to Folsom State Prison (FSP) I but FSP does not have an available bed that week, the inmate may be redirected to San Quentin State Prison (SQ) I. On Tuesday or Wednesday CSU routinely contacts every RC advising them of cases to be re-directed. It has become a common occurrence that the identified cases are not getting redirected. Statewide Transportation Unit will schedule a bus seat for that inmate but the case does not get endorsed to SQ I, resulting in an empty bus seat. Effective immediately, all RCs will ensure every case identified to be re-directed shall be presented to a CSR for proper endorsement.

CSU will ensure enough CSRs are available to review the number of cases called in Friday afternoon by the RCs.

Out of Level

On July 2, 2002, the Deputy Director, Institutions Division, signed a memorandum (DD 56-02) entitled, "Retention of Inmates and Reduction of Transfers Administrative Bulletin 91/16)." In that memorandum it states, "Level I, II, or III General Population (GP) inmates will automatically be retained for up to one year at their current institution upon the institution's request if the inmate's classification score has changed by no more than one level, and if the inmate does not meet Camp, Minimum Support Facility (MSF), Community Correctional Facility (CCF), or Community Correctional Reentry Center (CCRC) eligibility criteria and has one year or less to serve." This directive has caused most institutions to have numerous inmates out of level. There are significant amounts of inmates in level III beds with a

Associate Directors-Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Page 3

level II classification score. There are significant numbers of inmates in level II beds with a level I classification score. There are significant numbers of inmates coded "E" or eligible for MSF placement housed within a secured perimeter. This directive is hereby rescinded; with the exception that there continues to be no in-level transfers unless there is a medical/mental health necessity (of the inmate) or transfers required to maintain the safety and security of the institution.

The Department has a shortage of level III celled housing and an abundance of MSF housing. In order to move inmates from RCs to level III celled housing, movement must be created from the level III celled housing. Inmates that can move to level I or II housing should be moved. Most of the level II housing is currently full so movement must be created from those beds. In order to create that movement, inmates that are eligible to go to MSFs from secure level I's and level II's should be moved. The Department has numerous vacant MSF beds and even more MSF beds that can be activated.

Effective immediately, any inmate eligible to transfer to a lower level institution, including inmates whose classification score may be evaluated at a semi-annual classification review, shall be referred to the CSR for immediate transfer or the appropriate override based upon case factors. If the lowest security level an inmate is eligible for is within that institution then the case shall be referred to the Classification and Parole Representative (C&PR) for immediate endorsement.

CSU will be producing lists to every prison identifying inmates that are out of level and may be eligible to transfer to a lower level institution. Every institution will be expected to have a minimum of 30 inmates endorsed, including C&PR endorsements, and ready for transfer every week until there are no inmates out of level.

MSF Placement

Currently, there are approximately 7,160 inmates coded "E" or eligible for MSF placement housed in a level II prison.

Effective immediately, all inmates that are coded "E" shall be reviewed and referred to the CSR for transfer to an MSF. Institutions are directed to ensure all archive files are ordered and reviewed, all "R" suffix reviews shall be completed, all violence case-by-case reviews shall be completed, and potential holds shall be resolved. If

Associate Directors-Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Page 4

an inmate is no longer eligible for MSF placement, the case shall be referred to the CSR for the appropriate coding.

CSU will be producing lists of inmates to every prison identifying inmates that may be eligible for MSF placement or movement to a lower level institution. Once the institution receives the list it is expected that the institution produce a minimum number of 30 inmates weekly for CSR review until all inmates have been reviewed.

**Administrative Segregation Reviews**

The Administrative Segregation Unit (ASU) overflow has created a reduction in available celled housing throughout the Department. Many ASUs statewide continue to house inmates in overflow beds while not maintaining their budgeted ASUs at staffed capacity. The primary reason for not maintaining budgeted ASUs at staffed capacity is inmates being single celled. On August 19, 2005, there were 1,918 inmates out of 8,280 inmates single celled in ASU. Of those 1,918 inmates, only 943 inmates had an "S" suffix. The institutions' inability to compact inmates who are double cell approved has created a major reason for ASU overflow and the resulting loss of general population beds.

The July Administrative Segregation Unit Bed Utilization Report identifies approximately 1,679 inmates in ASU are pending investigation and approximately 2,726 inmates are pending the disciplinary process.

When an institution goes into ASU overflow, they utilize GP cells. That usage reduces the ability to move inmates from RCs into a celled environment. To further exacerbate the shortage of celled housing statewide, several institutions are not compacting inmates in the GP to ensure they remain at staffed capacity.

Effective immediately, all ASU cases shall be reviewed for appropriate housing.
- Any inmate pending investigation shall be identified and a completion date for that investigation shall be assigned.
- Any inmate pending the disciplinary process shall be reviewed and the disciplinary process shall be completed expeditiously.
- Every inmate that is single celled shall be reviewed to ensure that the April 25, 2003, Deputy Director memorandum entitled "Double-Cell Housing Policy" is being adhered to. If an inmate is double cell approved, it is expected that ASU staff will daily take an aggressive approach to identify a

Associate Directors-Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselor IIIs-Reception Centers
Page 5

compatible cell partner. Institutions are directed to compact their ASUs as much as possible.

- Every inmate that has an active Security Housing Unit (SHU) term shall be reviewed to determine the need for continued segregation. If a SHU term can be suspended and the inmate could be released or transferred to another GP institution, the Institution Classification Committee (ICC) should suspend that SHU term.
- All ICCs shall ensure all inmates in ASU with SHU terms are reviewed 45 days prior to the Minimum Eligible Release Date (MERD). The ICC shall refer that inmate to the appropriate GP housing at that Pre-MERD.

In this time of population crisis the Department must take drastic steps in order to continue to accept county intake. Your continued support and hard work is the foundation for the success of our Department. You are being asked to reach higher than ever before.

But until such time, it is imperative that institutions continue to compact both the ASU population and the GP population, RCs become more efficient in processing inmates, and institutions remain at staffed capacity.

If you have any additional questions, please contact me at (916) 324-4214 or via e-mail at mike.knowles@cdcr.ca.gov.

**Original Signed By**

Mike Knowles
Deputy Director (A)
Division of Adult Institutions

Attachments

cc: John Dovey            Renee Kanan, M.D.        Dave Lewis
    Sandra Duveneck       Patrick Boyd             Kathleen Keeshen
    Richard Rimmer        Tim Virga                George Sifuentes
    Kathleen Dickinson    Timothy Fishback         Sue Facciola
    Linda Rianda          Yulanda Mynhier          Doug McKeever
    Health Care Managers  Ombudsmen

**Exhibit E**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

April 29, 2005

<u>VIA FACSIMILE AND U.S. MAIL</u>

J. Michael Keating, Jr.
Office of the Special Master,
*Coleman v. Schwarzenegger*
2351 Sussex Lane
Fernandina Beach, FL 32034

Tel: (904) 491-7157
Fax: (904) 491-7158

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
PO Box 944244-2550
Sacramento, CA 95814

Tel: (916) 327-7872
Fax: (916) 324-5205

Re:    Coleman v. Schwarzenegger
       Plaintiffs' Objections to UNA Study and UNA Plan
       <u>Our File No. 489-3</u>

Dear Michael and Lisa:

Plaintiffs have the following comments on and objections to Defendants' UNA Plan ("Defendants' Plan" or "the Plan").

Defendants' Plan must be rejected because it is incomplete. The Plan does not address all of the unmet need identified in the UNA Study. Moreover, the Plan submitted by defendants fails to address many of the specific requirements for the Plan previously laid out by the Special Master, including his guidance that the Plan (1) address the need for acute inpatient care, (2) include specific plans for the allocation of resources to the projects set forth in the Plan, (3) include concrete details about staffing and budgetary aspects of the Coalinga State Hospital project, and (4) address the unmet need in the short, medium, and long term.[1] Defendants' Plan fails to address each of these

---

[1] In his June 2, 2004 Recommendations on this issue, the Special Master described in some detail what he expected from this plan: "[T]he defendants need to develop and submit for the court's approval a plan to provide needed intermediate and acute inpatient DMH care to CDC inmates who need such care. The plan needs to be grounded in budgetary construction, and must include specific plans, with supportable timelines, for the allocation of needed financial and physical resources. . . . [T]he plan must address concretely and specifically the joint CDC and DMH budgetary, construction, and staff recruitment aspects of the proposal for its use." Special Master's

(continued on next page)

*    MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**   MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 2

requirements, as explained in detail below. Defendants' Plan must also be rejected because it does not address unmet need for women, because it does not respond with enough urgency to the needs of inmates waiting for transfer to inpatient care, and because it does not address all of the problems and recommendations contained in the UNA Study Report by Dr. Alvarez.

1.    Defendants' Plan, as currently formulated, must be rejected because it does not address all of the need identified in the UNA study. Defendants' Plan to meet the need for inpatient resources identified in the UNA study fails to address all of the unmet need in the short, medium, or long-term in a variety of different categories of inpatient care.

    A.    The Plan does not include enough ICF Beds. Defendants' Plan does not adequately address the unmet need for 385 additional ICF beds found by the UNA study. In the short term, there are no plans for more beds. In the medium term, there are no plans for expanding Level IV beds, which is the category of inpatient beds most needed. Over the long term, defendants' Plan includes proposals to build 64 additional Level IV ICF beds at SVPP, and to acquire 175 new Level III ICF beds from DMH hospitals (50 at CSH and 125 at ASH) by 2009. (Exhibit G, Items 120-123.) However, assuming for simplicity sake a static gap of 385 ICF beds during the next five years, once the planned new beds are built a gap will remain of at least 146 ICF beds in 2009. (Even using defendants' unclear and overly-optimistic application of the Tucker-Allen formula to the unmet ICF need identified by the UNA study, there will be a gap of 61 ICF beds in 2009.)[2]

    B.    The Plan does not include enough APP Beds. Defendants' Plan also does not address the projected gap of 152 APP beds by the year 2009 in the Tucker Allen formula in Attachment E. (See Attachment E at p. 2.) Indeed, there is no mention in the UNA Plan of any efforts to expand APP capacity. (See Special Master's June 2, 2004 Recommendations at ¶ 6.) Even without factoring in the UNA finding of an unmet

---

(continued from previous page)
June 2, 2004 Report on Defendants' Unmet Inpatient Bed Needs Study at 22-23, ¶ 6. During the February 2005 All Parties Meeting, Special Master Keating gave additional information about what he expected from defendants in the plan, noting his expectation that the Plan must include components to address the unmet need in the short, medium and long term.

    [2] Currently there are 269 ICF beds available in the CDC (125 at ASH; 40 on A-3 at CMF, 40 on A-2 at CMF and 64 at SVPP). According to the Plan that is Exhibit G to the UNA Plan (see task list items 120-123 in Ex G), defendants will add another 239 ICF beds by 2009 (50 at ASH once CSH opens in October 2005, 125 at ASH in mid-2006, and 64 at SVPP in 2009), for a total in 2009 of 508 beds. According to the Tucker Allen Projection in Exhibit E, page 3, in 2009 the CDC will need 569 beds (with the 90% occupancy adjustment) for a total gap in 2005 that defendant admit to of 61 ICF beds. Plaintiffs do not agree entirely with the manner in which the numbers have been plugged into the Tucker-Allen formula, as discussed below in greater detail.

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 3

present need of 15 APP beds, the Tucker Allen formula projects a CDC need for 302 total APP beds by 2009. (See Attachment E at page 3.) The CDC currently has 150 APP beds. <u>Defendants must produce a plan to build another 152 APP beds in the next 4 years.</u>

        C.    <u>The Plan does not include enough Level IV Beds.</u>  Defendants' Plan also does not adequately address the need for Level IV beds.  It is clear that the shortage of inpatient beds at Level IV is presently much more acute than at lower custody levels. According to the April 21, 2005 Status Report on the implementation of the new DMH programs at CMF, there are currently 58 Level IV inmates on the waiting list for the Level IV SVPP ICF program.  By way of contrast, the only Level III program with a current waiting list is the CMF A-3 Wing ICF program, which has a waiting list of four inmates. (4/21/05 Status Report.)

        Below is a chart which shows defendants' current and planned ICF beds at different custody levels:

| | Current ICF Beds | Planned  new ICF Beds by 2009 |
|---|---|---|
| Level I-III ICF beds | | |
| • CMF A-3 | 40 | -- |
| • ASH | 125 | 125 (July 2006) |
| • ASH (via CSH) | -- | 50   (October 2005) |
| Total at Level III: | 165 of 269 | 340 (current + planned) of 508 |
| % of all ICF at Level III | 61% (currently) | 67% (in 2009) |
| Level IV ICF Beds | | |
| • CMF A-2 | 40 | -- |
| • SVPP | 64 | 64  (sometime in 2009) |
| Totals at Level IV | 104 of 269 | 168 (current + planned) of 508 |
| % of all ICF at Level IV | 39% (currently) | 33% (in 2009) |

        This chart shows that currently, only 39% of available ICF beds are Level IV beds. <u>However, the chart also shows that this ratio will get worse over time.  By 2009, the percentage of ICF beds available at Level IV will shrink to 33% of available ICF beds.</u>

        The custody data gathered to date as part of the UNA study process suggests that the percentage of the unmet inpatient need that is Level IV need is between 50% and 65% of all inpatient demand, which is much larger than the percentage of all ICF beds that are currently Level IV.  The summary of UNA custody data provided by Dr. Alvarez in

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 4

advance of the April 22, 2005 conference call indicates that out of the 318 UNA cases for
which custody data was collected during the study, 205 ICF cases were Level IV while
the remaining 113 were Levels I-III. So of the ICF cases for which custody data was
collected, 65% (205/318) were Level IV ICF cases.

     Similarly, the significantly more complete custody data provided by defendants in
an Excel spreadsheet sent by e-mail on the day of the April 22, 2005 conference call
shows that 58% of all inmates referred to inpatient programs and tracked in the Excel
spreadsheet are Level IV inmates.[3] (A modified version of the first page of defendants'
Excel spreadsheet that has been annotated to include three extra columns summarizing
available custody data is attached hereto as Exhibit A).

     Clearly, there is a significant shortfall of Level IV ICF beds that will continue into
the foreseeable future. Defendants must reconfigure their plan to include construction of
more level IV inpatient beds. They must also take steps to lower the custody level of
MHSDS inmates by providing annual 4 point classification score reductions to inmates
who are participating in the EOP programs, and by eliminating the discriminatory 4-point
classification score addition at initial classification for inmates with a history of mental
illness. Mentally ill inmates are much more difficult to treat and much more expensive to
treat when they are Level IV inmates.

     D.    The Plan does not address unmet bed needs for women. The
Defendants' Plan is also inadequate because it does not address the unidentified need for
inpatient beds for women. The UNA Study found a total of 11 ICF and 2 APP cases of
unmet need at women's prisons.[4] The total EOP population at these three women's
facilities is 146, so the finding is a unmet need in the women's prisons of about 8% of all
EOPs. This is smaller than the finding of unmet need in the men's prisons of 14% of all
EOPs, but it is still a significant finding of unmet need that defendants must address.

     2.    Defendants' Plan should be rejected because it does not address the serious,
ongoing problems with inpatient referrals with enough urgency. Defendants' Plan to
address the need identified in the bed study is flawed because it does not have the

_____

    3 Both sets of data provided by defendants for estimating the number of Level IV inmates referred to
inpatient care are imperfect. The data sent by Dr. Alvarez notes that no custody information was available for
another 114 inmates. However, even if all of the missing data were from Level III inmates, the percentage of UNA
identified cases which are Level IV cases would still be at least 50%. The data in the excel spreadsheet is somewhat
over-inclusive, because it includes some cases not identified in the UNA process. Using the data in the excel
spreadsheet, plaintiffs added three columns giving the number of Level IV cases and the percentage of Level IV
cases for each institution for which data was provided. A copy of plaintiffs revised spreadsheet is attached hereto as
Exhibit A.

    4 According to Attachment B to the UNA Plan, the UNA study found 3 women at CIW needing ICF care,
4 women at VSPW needing inpatient care (3 ICF and 1 APP), and 6 women at CCWF needing inpatient care (5 ICF
and 1 APP).

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 5

necessary sense of urgency. According to defendants' plan, there are currently 203 individuals who were identified during the UNA study as needing an ICF level of care who have not been referred to inpatient care. (See Attachment B to Defendants' Plan.) This is a serious and even potentially life-threatening problem. Many of these cases were identified last Fall and have been waiting six months or more for referral to the needed level of care. An additional 28 inmate-patients are waiting for referrals to APP care – referrals that were supposed to be made immediately following the UNA site visits. (Extra remedial attention and headquarters assistance should be provided to Lancaster, which according to Attachment B has only referred 10 ICF cases and has 52 ICF cases waiting for referral. Extra attention and headquarters supervision should also be provided to SAC with 39 ICF cases waiting for referral, and to CMF with its 33 ICF cases and 7 APP cases waiting for referral.)

This situation is extremely dangerous, and defendants have a duty to take immediate action to ensure that these inmates are given appropriate mental health care while they wait and to ensure that they are transferred to inpatient care as soon as possible. One of Dr. Alvarez' recommendations in the UNA Report is that the CDC create a new DMH referral coordinator position at each institution to track and expedite DMH referrals. (See Attachment B, UNA Report at 9.) This critical recommendation is not addressed anywhere in Defendants' Plan .

The time-table for many of the other projects listed in Exhibit G should be sped up given the urgency of the current situation. For example, Defendants' Plan includes a deadline of January 10, 2006 for development of an improved IDTT process to identify, refer and track inmate-patients referred for inpatient care (Tasks 43-48). Defendants must speed up this critical process. The UNA study report by Dr. Alvarez clearly document that the existing IDTT process was a one-time event at most institutions and has not resulted in an improvement in referrals. (See UNA Study Recommendations, Attachment B at p 8.) The UNA report by Dr. Alvarez also found that CDC mental health programs have a "*culture of high acceptance of, and a higher tolerance for, pathology and decompensated states that, outside of an institutional setting, would not be acceptable.*" (Attachment B at 8.) The report recommends additional training of CDC staff in this regard. (Id.) There is no provision in the task list specifically addressing this problem. (See Attachment G.) These issues must be urgently addressed.

Many other timelines in the Plan are overly long. For example, investigating the feasibility of contracting for inpatient services at private facilities like Sylmar in San Diego (task 114 on page 8 of Exhibit G) is schedule to take nearly six months. Similarly, it is hard to understand why tasks 117 and 118 (exploring creating ICF beds at COR or SATF, and exploring option of converting GACH to CTC and then CTC beds to ICF care) are expected to take eight to ten months (until 11/8/05 and 12/30/05 respectively). Other projects with overly long schedules include task 53 (researching and designing a

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 6

proposal for a behavior management system has a deadline of 6/1/07) and task 58 (developing a long term care program for chronic mentally ill cases has a deadline of 1/31/07).

      3.    <u>More Pressure Needs to Be Placed on DMH to Assist the CDC in Providing Critical Inpatient Services to CDC Inmates.</u>  DMH Director John Rodriguez' letter concerning how many DMH beds will be made available to CDC inmates in the coming years is very troubling.  The letter, which is attached to Defendants' Plan as Exhibit D, states that once ASH is able to move ASH patients to the new Coalinga State Hospital, rather than giving the vacated beds to CDC inmates, DMH will use the surplus beds at ASH to "develop and follow a population management plan to reduce the over-bedding at the hospitals by redistributing the population and bring the population back into the state hospitals licensed bed capacity.  Once this occurs and there is adequate funding and staffing, then the DMH can provide the 125 additional beds to CDC."  This is unacceptable.

      The relationship between DMH and the CDC needs to change so that CDC inmates are not last in line in DMH's priorities.  Plaintiffs are prepared to go to the Court on this issue.  DMH must give CDC inmates in need of inpatient care priority over reductions in over-bedding to satisfy DHS officials.  If DMH is concerned about pressure from the State Department of Health Services (DHS), plaintiffs would be more than willing to write to DHS directly concerning the urgent need for these beds, and willing to ask the Court to intervene with DHS, as the Court did last Fall in the licensing problems at CMF.  (Unfortunately, because of security considerations, DMH hospitals can only provide limited relief to the CDC, since they cannot take most Level IV inmates.)

      Defendants' Plan is also inadequate with respect to overall DMH issues.  For example, in his June 2, 2004 Recommendations, Special Master Keating specifically asked that any portion of the plan involving Coalinga State Hospital "address concretely and specifically the joint CDC and DMH budgetary, construction, and staff recruitment aspects of the proposal for its use."  (Special Master's June 2, 2004 Report on Defendants' Unmet Inpatient Bed Needs Study at 22-23, ¶ 6.)  There is no detail of this sort in defendants' Plan.

      4.    <u>The Manner in Which the UNA Results Were Added to the Tucker Alan Formula Relies On Unrealistically Short Lengths of Stay and Does Not Properly Increase the Finding of Unmet Need As Population Grows.</u>  Plaintiffs object to the manner in which the UNA findings have been added into the Tucker Alan projections for two main reasons.  First, the projections for the years 2005-2010 rely on unrealistically short lengths of stay in the DMH inpatient programs.  (See Attachment E to UNA Plan.)  For example, the projections for SVPP are based on an average length of stay of 159.68 days.[1] (Attachment E at 1, 3.)  This is a year-to-date figure for actual LOS at SVPP this year. However, this length of stay is shorter than would normally be the case, because SVPP

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 7

has been prematurely discharging a significant number of cases which present custody problems as well as cases where the inmate resists treatment. See Attachment B at 9 (recommendations from Dr. Alvarez documenting finding during UNA study that DMH is discharging CDC inmates *"for a variety of reasons that are not related to clinical improvement"* including treatment resistance, and assaultive or suicidal behavior.) Moreover, this length of stay is shorter than the length of stays historically in inpatient programs for CDC inmates. During the DMH transfer training video from August 2004, Cynthia Radavsky of DMH told CDC clinicians to expect a typical length of stay for their patients referred to DMH programs of 7-8 months (or 215 to 245 days). The use of an artificially short length of stay reduced the projected demand without any justification.

Defendants should not rely upon reduced length of stay figures until they can show that they can successfully treat patients with shorter stays in DMH.

In addition, plaintiffs object to the failure to adjust the UNA demand as CDC population increases when plugging the UNA data into the Tucker Alan formula. (See Exhibit E at 3.) The Tucker Alan formula is supposed to be responsive to increases in population during the next five years, allowing the department to predict and respond to growing need for inpatient care beds as the overall CDC population grows. However, the Level IV SVPP figures in the projections do not increase in response to increasing population. (See Exhibit E at 1, 3) (projections for total bed days for years 2005-2010 do not increase for SVPP). In addition to resulting in an artificially low projection of future demand, this freezing of the SVPP demand will result in an inappropriate balance between the total number of Level I-III beds on the one hand, and Level IV beds on the other. The CMF ICF demand figures also are not increased to reflect the growth of overall CDC population. (Exhibit E at 1, 3) (UNA adjustment beds days do not increase for 2005-2010 for CMF ICF).

5.    The Plan Should Address All of the Recommendations in the UNA Report. There are a number of very good recommendations made by Dr. Alvarez in the UNA Report. (See Attachment B at pp 7-10.) The Plan addresses some, but not all of these recommendations. The Plan does not address the recommendation, discussed above, that each institution be provided with the funding to create a full-time DMH referral coordinators. The Plan does not address the finding that the referral process for DMH remains overly burdensome, sometimes requiring an entire days work by the referring clinician. The Plan does not address the finding, also discussed above, of a CDC "*culture of high acceptance of, and a higher tolerance for, pathology and decompensated states that, outside of an institutional setting, would not be acceptable.*" The UNA report recommended additional training of CDC staff in this regard. There is no provision in the task list specifically addressing this problem or providing this training. The UNA report finds CDC inmates are being prematurely discharged from DMH for a variety of reasons that are not clinical in nature. This is not addressed. Finally, the report finds that

J. Michael Keating
Lisa Tillman
April 29, 2005
Page 8

discharge summaries from DMH continued to be lacking in Unit Health Records. This is also not addressed in the Plan.

     6.    <u>Defendants should be ordered to provide a monthly report on the status of the initiatives set forth in the plan, including documentation and news of any new initiatives to address these important issues.</u> The UNA Plan includes the outlines of many promising efforts to improve inpatient care in the CDC. As defendants implement the Plan in the months and years ahead, they should be required to make a monthly report to plaintiffs and the Special Master concerning the status of the various initiatives set forth in the plan. The reports should also include any additional initiative or projects that are added to this Plan in the months and years ahead.

     In addition, as part of the monthly reporting process, defendants should be asked to report on whether they believe they have the management resources available in headquarters to address and resolve the various elements of this problem and this plan.

     Please feel free to contact me with any questions or comments about these issues.

                   Sincerely yours,

                   ROSEN, BIEN & ASARO, LLP

                   By: Tom Nolan

cc:    Mr. Lopes
       Mr. van de Erve
       Dr. Warren
       Dr. Metzner
       Dr. Patterson
       Dr. Hughes
       Dr. Koson
       Mr. Nicoll
       Co-counsel

**Plaintiffs' Revision to UNA Chart to Include Summary of Available Custody Data (See Last Three Columns)**

| Institution | UNA Reviewed | UNA +ICF | UNA +APP | Inst +ICF | Inst +APP | Total ICF | Total APP | Total Positives | Currently in DMH | Referred/Admitted/Discharged | Referred/On Waiting List | Awaiting Referral | Paroled | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMF | 69 | 25 | 3 | 22 | 5 | 8 | 65 | | | | | 21 | 65 | 0.322076923 | | |
| CMC | 14 | 1 | 0 | 58 | 8 | 7 | 67 | | | | | 21 | 84 | 0.25 | | |
| FLD | 48 | 20 | 5 | 18 | 2 | 8 | 45 | | | | | 9 | 52 | 0.173076923 | | |
| LAC | 240 | 15 | 3 | 44 | 7 | 3 | 62 | | | | | 9 | 81 | 0.173076923 | | |
| SAC | 30 | 8 | 1 | 67 | 3 | 6 | 81 | | | | | 47 | 64 | 0.734375 | | |
| SVSP | 34 | 8 | 4 | 4 | 0 | 16 | 32 | | | | | 112 | 121 | 0.925619835 | | |
| CIM | 39 | 11 | 0 | 4 | 0 | 4 | 16 | | | | | 12 | 16 | 0.75 | | |
| CCWF | 11 | 5 | 3 | 0 | 3 | 17 | 32 | | | | | 10 | 30 | 0.333333333 | | |
| SQ | 34 | 16 | 3 | 3 | 5 | 5 | 6 | | | | | 4 | 9 | 0.444444444 | | |
| CEN | 7 | 1 | 0 | 0 | 19 | 3 | 0 | | | | | 10 | 20 | 0.5 | | |
| DVI | 0 | 0 | 1 | 1 | 0 | 0 | 0 | | 0 | | | no info | | | | |
| ISP | 2 | 0 | 0 | 1 | 2 | 1 | 3 | | 0 | 0 | 0 | no info | | | | |
| PVSP | 4 | 0 | 2 | 2 | 4 | 1 | 6 | | 0 | 0 | 0 | no info | | | | |
| SATF | 5 | 3 | 0 | 0 | 0 | 0 | 4 | | | | | 1 | 1 | 1 | | |
| SOL | 3 | 0 | 0 | 0 | 3 | 1 | 6 | | 0 | 0 | 0 | 3 | 8 | 0.375 | | |
| VSPW | 24 | 8 | 2 | 2 | 1 | 1 | 4 | | | | | no info | | | | |
| CCI | 22 | 7 | 1 | 34 | 3 | 3 | 3 | | 0 | 0 | 0 | 1 | 1 | 1 | | |
| PBSP | 22 | 6 | 4 | 22 | 5 | 5 | 30 | | | | | 1 | 5 | 0.2 | | |
| COR | 18 | 3 | 0 | 11 | 0 | 0 | 17 | | | | | 29 | 34 | 0.852941176 | | |
| MCSP | 4 | 18 | 0 | 0 | 0 | 0 | 3 | | 0 | 0 | 0 | 28 | 33 | 0.797979798 | | |
| CIW | 13 | 3 | 2 | 0 | 0 | 0 | 15 | | | | | 12 | 12 | 0.333333333 | | |
| NKSP | 0 | 6 | 5 | 11 | 4 | 0 | | | | | | 1 | 3 | 0.333333333 | | |
| WSP | | | | | | | | | 0 | 0 | 0 | no info | | | | |
| HDSP | | | | | | | | | | | | 4 | 6 | 0.666666667 | | |
| | | | | | | | | | | | | 7 | 8 | 0.875 | | |
| **TOTALS** | | 543 | 43 | 34 | 34 | 77 | 435 | 512 | | | | 334 | 581 | 0.574870912 | | |

UNA Reviewed — Total cases meeting criteria that were not referred and were reviewed by UNA team
UNA +ICF — Cases reviewed by UNA and found positive for unidentified need at the ICF level
UNA +APP — Cases reviewed by UNA and found positive for unidentified need at the APP level
Inst +ICF — Cases in process of referral to ICF DMH at institution on date of UNA visit
Inst +APP — Cases in process of referral to APP DMH at institution on date of UNA visit
Total ICF — Total ICF cases in process of referral on date of UNA visit
Total APP — Total APP cases in process of referral or identified by UNA as appropriate for ICF
Total Positives — All cases identified as appropriate for referrals to higher level of care on date of UNA site visit
Currently in DMH — All UNA identified/referred cases currently housed at DMH
Referred/Admitted/Discharge — All UNA Identified/referred cases admitted and subsequently discharged
d
Length of Stay — Number of months housed at DMH
Referred/On Waiting List — All UNA referred, but still on the waiting list
Awaiting Referral — All UNA Identified, but awaiting referral
Paroled — All UNA Identified, but since have been paroled

**Exhibit F**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

August 17, 2005

<u>VIA E-MAIL AND U.S. MAIL</u>

Lisa A. Tillman                          Michael Stone
Deputy Attorney General                  CDC Legal Affairs Division
1300 I Street, Suite 125                 PO Box 942883
P.O. Box 944255                          Sacramento, CA 94283-0001
Sacramento, CA 94244-2500

E-mail: michael.stone2@corr.ca.gov

Email:  lisa.tillman@doj.ca.gov

   Re: *Coleman v. Schwarzenegger*
     Plaintiffs' Objections to August 15, 2005 UNA Level IV Bed Plan
     <u>Our File No. 489-3</u>

Dear Lisa and Michael:

  Plaintiffs object to defendants' new UNA bed plan sent to plaintiffs and the
Special Master on August 16, 2005. Although the Plan includes some promising, if
excessively delayed, plans to expand single-celled Level IV ICF capacity at CMF and
SVPP, it <u>only</u> addresses these Level IV ICF capacity issues. The Plan fails to address a
number of other significant problems identified by the Special Master when he asked
defendants to present a new plan, and the Plan also fails to address the key concerns
previously raised by plaintiffs' counsel about earlier plans:

  1. <u>There is no plan to expand APP capacity</u>: The Plan must be rejected
because there is no plan component that addresses the projected shortfall in acute (APP)
beds at CMF. See May 12, 2005 Tillman Letter at the attachment dated May 2, 2005,
providing new UNA projections at p. 4 (projecting a need for 374 total APP beds by
2010). This APP shortfall has been repeatedly singled out by the Special Master as
something that defendants need to address in their UNA plan.[1]

---

[1] Defendants have contended that they do not see a problem with APP access currently, and that as a result they do
not foresee a shortfall in the future. However, as detailed in plaintiffs' June 28, 2005 letter, we are concerned by
extremely short current APP stays, and also about the quality of care currently being provided in the APP program.
The findings of the UNA Report support the conclusion that the current low level of APP utilization is not a sign of
lack of need, but rather reflects these quality problems, and also reflects a reluctance on the part of CDC clinicians
to refer appropriate cases based on the historical difficulty of accessing this program

* MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
** MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Lisa Tillman
Michael Stone
August 17, 2005
Page 2

2.    The Plan does not adequately address the shortfall of Level III ICF Beds:
There is no Plan component that addresses the need to increase referrals to Level III ICF
programs and no plan to sufficiently expand Level I-III ICF capacity to address the unmet
Level III need identified in the UNA study.[2]   Even after all of the Level III ICF bed
expansions planned in the March 30, 2005 Plan are built, there will be a shortfall of 85
Level III ICF beds by 2010.

3.    The Plan does not provide for enhanced treatment to inmates waiting for
transfer to an ICF program: There is no specific and realistic plan to augment care
provided in EOP programs to inmates who have been identified as needing ICF level of
care but cannot be sent to an ICF program because of the bed shortage.  Such a plan
would require specific augmentations to staff and programming in every EOP program
where ICF inmates are waiting.  The most recent bi-weekly report indicates that there are
108 inmates on the waiting list for the SVPP ICF program.

4.    Training:  The Plan does not address the need for substantial and sustained
training of CDC clinicians to overcome the historical unwillingness of such clinicians to
refer all appropriate cases to ICF and APP level of care at DMH.  Defendants need to do
additional, more frequent training of their clinicians to overcome the existing clinical
culture of "*acceptance of, and higher tolerance for, pathology and decompensated states
that, outside of an institutional setting, would not be acceptable.*"  See Alvarez UNA
Study Report at 8.  The recent two-hour-long training in the new DMH MOUs was
inadequate in both scope and duration to overcome this longstanding mind set and to
sufficiently educate CDC clinicians about various DMH resources.  (A videotaped copy
of the training has been promised by defendants' counsel, but plaintiffs' counsel have yet
to receive it).

5.    The Plan does not include sufficient details about budgetary, staffing, and
construction plans and timetables:  In his June 2, 2004 recommendations to the Court on
the UNA Plan, the Special Master stated that defendants' UNA Plan "*needs to be
grounded in budgetary and construction reality, and must include specific plans, with
supportable timelines, for the allocation of needed financial and physical resources. . . .
[T]he plan must address concretely and specifically the joint CDC and DMH budgetary,
construction, and staff recruitment aspects of the proposal for its use.*"  Special Master's
June 2, 2004 Report on Defendants' Unmet Inpatient Bed Needs Study at 22-23, ¶ 6.  The
current plan provides additional proposal for new projects, but does not include

---

[2]  The May 2, 2005 Updated UNA demand charts (provided by defendants under a May 12, 2005 cover letter)
project a need for 237 Level III ICF beds at ASH and 124 Level III ICF beds at CMF (for a grand total of 362 Level
III ICF beds, or 402 beds when adjusted for the 90 percent occupancy factor) at CMF by 2010.  In contrast, the
March 30, 2005 UNA Plan at Exhibit G (page 9) includes plans to add only enough Level III beds (50 from CSH in
the Fall of 2005, 125 at ASH in mid-2006, along with existing 100 beds at ASH and 40 at CMF) to provide a total of
only 315 total Level III beds by 2010.  This means that defendants' own figures project a shortfall of 85 Level III
ICF beds by 2010.

Lisa Tillman
Michael Stone
August 17, 2005
Page 3

additional underlying detail such as staffing proposals and ratios for the new programs, construction timetables, copies of the BCP's necessary to implement the plan, or other critical information that would allow the Special Master and plaintiffs to assess how realistic and complete the planning is for the proposed new programs.

    6.    <u>The Plan does not expand Level IV capacity fast enough and does not provide any details about how the CDC will address demand for ICF care in the short run</u>: Like defendants' initial March 30, 2005 UNA Plan, the August 15, 2005 UNA Plan does not expand Level IV capacity as quickly as possible, and also does not address demand for Level IV ICF care in the short term. The chart on page 10 of the new Plan makes clear that the Plan will result in the creation of only 36 new Level IV ICF beds between now and July of 2008, and that all of these new beds will actually be replacing the underutilized Level IV dorm beds on A-2 at CMF. That means that plaintiffs will have to wait nearly three years for any new Level IV beds to come on line. Why will it take <u>three years</u> to create the new ICF in existing EOP space at SVSP?

    Given this enormous delay in delivering new resources, it is very important that defendants take immediate steps to address the unmet treatment needs of individuals identified as needing ICF care but unable to access such care due to the current severe bed shortage. Defendants need a detailed, realistic plan to augment staffing and programming during the next three years (unless they can find other locations that provide ICF care to inmates) for all inmates waiting for ICF care. Defendants also need to have a formal written policy that they share with clinicians in the field concerning augmentation of care provided to inmates waiting for ICF care.

    7.    <u>The new Plan does not address unmet need for women for ICF care</u>. Like the earlier Plan, the new Plan does not address the unmet need for 11 ICF beds for women identified in the UNA study.

    8.    <u>Defendants should provide an update on the status of the various initiatives in the March 30, 2005 Plan and also provide an update on the status of negotiations with DMH and control agencies over the new plans</u>. The new Plan does not include any information updating the status of the various efforts set forth in the Task List provided with the initial March 30, 2005 UNA Plan. Is there an up to date task list that defendants can share with plaintiffs and the Special Master? What is the status of negotiations with DMH over the new programs? What is the status of negotiations for funding with various control agencies? Does HCSD believe that its relationship with DMH has improved sufficiently since the launch of the CCAT referral review process?

    The UNA Plan presents defendants with a series of extremely difficult management issues. Nevertheless, defendants need to do significantly more to ensure that the now well-documented needs of Coleman class members for significantly

Lisa Tillman
Michael Stone
August 17, 2005
Page 4

enhanced access to acute mental health care is adequately addressed in both the short and long term.

Please feel free to contact me with any questions or concerns about these issues.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Tom Nolan

cc:   J. Michael Keating, Jr.
      Matthew Lopes
      Experts (e-mail only)
      Co-counsel

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

August 23, 2005

<u>VIA E-MAIL AND U.S. MAIL</u>

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2500

Email: lisa.tillman@doj.ca.gov

Michael Stone
CDC Legal Affairs Division
PO Box 942883
Sacramento, CA 94283-0001

E-mail: michael.stone2@corr.ca.gov

Re:    *Coleman v. Schwarzenegger*
Additional Objections to August 15, 2005 UNA Plan and
Request for MHCB Information and A Plan to Expand MHCB Capacity
<u>Our File No. 489-3</u>

Dear Lisa and Michael:

Plaintiffs have three additional objections to defendants' August 15, 2005 UNA Plan, which supplement the objections in our prior August 17, 2005 letter. Plaintiffs' additional objections are that (1) the new Plan will result in the loss of 20 DTP beds at CMF and will displace SVSP EOP inmate beds without adequately safeguarding of the needs of the inmates in these programs, (2) the new Plan does not address the acute shortage of MHCB beds, and (3) defendants need to update the parties on the status of other pending inpatient expansion projects including the new Coalinga State Hospital and the promised expansions in ASH bed availability.

1.    <u>Plaintiffs object to the loss of 20 DTP beds and to the displacements of inmates in the EOP at SVSP and the DTP at CMF.</u> Defendants' August 15, 2005 Plan will require the loss of 20 DTP beds at CMF, will require unspecified new construction, and will also require the movement of MHSDS inmates in the P-2 DTP program and in the SVSP EOP program to new locations. There is no plan to replace 20 of the lost CMF DTP beds. In addition, the plan provides no detailed information about how the needs of inmates in the displaced SVSP EOP programs will be addressed, and no information about how much disruption will be caused by the changes to these programs. The plan states that the SVSP EOP units will move to CSP-SAC (as apparently will the PBSP PSU

Lisa Tillman
Michael Stone
August 23, 2005
Page 2

program), but the plan provides little or no detail about how this will be accomplished and how SAC will handle the large influx of new caseload inmates.

DTP program displacement and loss of 20 DTP beds: We understand from the Plan that the existing P-2 DTP program will be moved back to the A-2 unit at CMF. However, the Plan does not explain what will happen while construction is being done in P-2? Nor does it explain when exactly defendants will move the DTP to A-2, or how the CDCR will replace the 20 lost DTP beds when the 60-bed P-2 DTP is moved into the 40-bed A-2 wing? Plaintiffs request significantly more detailed information about these issues and a plan for 20 additional replacement DTP beds.

In addition, the Plan calls for the creation of a new DMH Level IV ICF program in the D-5 and D-6 EOP housing units at SVSP. Construction is scheduled to take place in D-5 and D-6 beginning at an unknown date to initially create the 36 Level IV ICF beds. No detail is given concerning the nature and extent of the required construction and how much of the EOP will need to be shut down, if any, to facilitate the construction, or when the EOP will be shut down and transferred to SAC. The plan includes no information about where at CSP-SAC the new EOP units will be located. Nor is there any information about whether construction will be required at CSP-SAC. Is there adequate treatment space at CSP-SAC for a large expansion of the EOP programs? Is there adequate supervisory staff? Are there enough MHCB beds at SAC? Is there enough office space for the additional mental health staff? How will moving the PSBP PSU to SAC impact the new EOP units? Will any construction at SVSP displace EOP patients in those wings prior to the planned May 1, 2006 transfer of the 36 Level IV ICF patients from the DTP program? Will the 36 Level IV ICF patients be housed in both existing EOP buildings (D5 and D6)?

Defendants need to provide more detailed information regarding these ancillary impacts of their Plan. Is there an overall plan for consolidation and configuration of these various mental health programs at CSP-SAC that has not been shared with plaintiffs? We request a copy of any plans available with more detailed information about these efforts.

2.    The critical shortage of MHCB beds is not addressed in the new plan. Plaintiffs August 17, 2005 letter includes objections to the failure of the August 15, 2005 plan to address APP beds, Level III ICF beds, and ICF beds for women. The plan is also inadequate because it does not address the short and long term shortage of MHCB beds. Since the MHCB shortage became clear to plaintiffs earlier this summer, we have repeatedly asked that defendants address this shortage as part of their August 15, 2005 Plan for expanding ICF and APP bed capacity. Defendants have yet to address this critical issue.

The 50-bed MHCB expansion at CMF is not due to be completed until 2009. It is not clear that even those 50 new MHCB beds will solve the problem, and any relief from

Lisa Tillman
Michael Stone
August 23, 2005
Page 3

the CMF beds is four years away. What is defendants' plan for MHCB access in the interim? Is there any possibility of expediting the construction of the CMF beds? If defendants are not forthcoming with a plan, the Special Master should order them to produce one as soon as possible.

In addition, defendants have not yet provided additional information about the specific problems with existing MHCB usage at CSP-Solano and at ASH. We ask for a written update on the departments' efforts to resolve the barriers to full utilization of these two urgently needed MHCB programs.

3.    Defendants need to provide updated information on the status of other pending inpatient expansion projects including Coalinga State Hospital and the promised expansions in ASH bed availability. Defendants March 30, 2005 UNA plan included plans for numerous initiatives to expand ICF capacity. Defendants have not provided updates on the status of many of these initiatives. For example, is the new DMH facility at Coalinga set to open up on schedule? Will 50 additional ASH beds be made available as a result of the CSH opening and will they be available in October of this year as promised in the March plan? What about the plans for 125 more ASH beds next summer, are they still on track?

Please contact me with any questions or concerns about these matters.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Tom Nolan

cc:    J. Michael Keating, Jr.
       Matthew Lopes
       Experts (e-mail only)
       Co-counsel

**Exhibit G**

**J. Michael Keating, Jr.**
**Office of the Special Master**
*Coleman v. Schwarzenegger*

RECEIVED

SEP 0 2 2005

ROSEN BIEN & ASARO

285 Terrace Avenue
Riverside, RI 02915
(401) 383-9313
Fax: (401) 383-9314
E-mail: jmichaelkeatingjr@yahoo.com

August 30, 2005

Jeanne S. Woodford, Undersecretary
Department of Corrections and Rehabilitation
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-001

Re:    **Defendants' Intermediate Care Facility Bed Plan**

Dear Ms. Woodford:

I have received and reviewed CDCR's Intermediate Care Facility Bed Plan, as have my monitors and experts. Last week Matthew Lopes and I had an opportunity to meet with you and your staff, as well as representatives from the CDCR Secretariat and other state agencies with key roles in the development and execution of the plan. Meanwhile, plaintiffs' counsel have also commented on the proposed plan.

The plan as currently structured is inadequate. Before addressing its inadequacies, it is necessary to recount yet again, and briefly, the history of this issue. In 1998, during negotiations over the merger with Coleman of the Gates consent degree, which then oversaw the delivery of mental health services in the California Medical Facility (CMF), parties acknowledged a need to determine whether some of the most seriously mentally ill inmates in CDCR were being overlooked for treatment in Department of Mental Health (DMH) inpatient programs. That acknowledgement led to a much-delayed, seven-year effort to determine the existence and calculate the extent of any such unmet need. In March 2005, the long-delayed assessment confirmed and quantified the unmet need. The Unmet Needs Assessment (UNA) found 512 CDCR inmates clinically appropriate for referral to an inpatient DMH level of care, including 435 inmates in need of intermediate care and 77 in need of acute inpatient care, representing respectively 14 and two percent of the department's total EOP population. Subsequent classification data from the UNA indicated that two-thirds of inmates identified for referral to intermediate

Jeanne S. Woodford, Undersecretary
August 30, 2005
Page 2

inpatient care required Level IV custody, as did 60 percent of those identified for referral
to acute inpatient care.

On March 30, 2005, CDCR submitted, as directed by the court, a plan to provide
intermediate and acute inpatient care to inmates identified in UNA as requiring that level
of treatment. The March plan contained a refined projection of the department's current
and future inpatient bed needs that included the findings of the UNA study, calculated the
gap between available inpatient beds and projected needs and identified immediate,
intermediate and long-range strategies to meet those needs. The key long-term strategy
identified in the plan was the construction of three regional facilities, each with 1,500
beds, to house expanded inpatient programs, as well as other intensive treatment
programs for CDCR inmates most seriously mentally ill and presenting the most difficult
custody challenges. Full delivery of this decidedly long-range strategy was scheduled to
occur in 2013.

Scarcely was review of the proposed March plan completed when the California State
Assembly declined to fund the next phase of development of the three regional facilities,
leaving the defendants bereft of their long-range strategy and requiring a return to the
drawing board. The notably shrunken result was the mid-August 2005 Intermediate Care
Facility Bed Plan that is the subject of this letter.

The UNA assessment found 280 Level IV male inmates in need of referrals to
intermediate inpatient care. The submitted plan proposes the development within 60 days
of 36 single-celled Level IV intermediate inpatient care beds at CMF by relocating the
present DMH-operated Day Treatment Program (DTP) elsewhere within CMF and using
the vacated DTP space. Required renovation of the DTP area, presently double-celled
and inadequate from a custody perspective, will be undertaken forthwith with inmate
labor. This space for 36 beds, however, cannot be fully renovated immediately and will
initially lack air conditioning, which is required for licensure by the Department of
Health Services (DHS) under applicable California law. These 36 cells will need to be
evacuated in April 2006 to allow the required installation of the HVAC upgrades needed
for licensing, a process slated to take some two years. Meanwhile, the department plans
to convert two Level IV general population living units at Salinas Valley State Prison
(SVSP) into a 112-cell, DHS-licensed facility for Level IV DMH intermediate inpatient
inmates. Initially, required renovations will focus on converting enough cells to
accommodate the 36 inmates who must be removed from CMF in April 2006 to make
way for further license-related HVAC renovations, so rapid funding and renovation work
is absolutely critical just to maintain the addition of the 36 single-celled beds through the
projected completion of the initial phase of the SVSP renovation in July 2008. The

Jeanne S. Woodford, Undersecretary
August 30, 2005
Page 3

overall construction work at SVSP is scheduled for completion in March, 2009, which, together with the completed renovation of the 36 single cells in CMF, will provide CDCR with an additional 148 single-celled intermediate inpatient beds.

The defendants already possess a 64-bed intermediate inpatient program at SVSP, which they intend to double by March 2009, providing 128 intermediate inpatient beds in addition to the 148 beds described, or an overall total of 276 beds. That total, however, is misleading. Due to a significant planning blunder, the 64-bed DMH program in SVSP designed for volatile and seriously mentally ill Level IV inmates with a history of violence contained just 32 single cells and eight dormitories with four beds each. In the two and a half years the DMH program at SVSP has been in operation, many of the dormitory beds have been consistently unoccupied. From May 2005 through mid-August, for example, only 17 of these 32 cells on average have been filled, meaning that roughly a quarter of the most expensive beds in all of CDCR to construct and operate have been empty for custody or security reasons. In January, the defendants sought to supplement Level IV DMH intermediate inpatient beds by using, again, available dormitory space in CMF. While staffed by DMH to handle 44 Level IV intermediate inpatient inmates, the actual population of the unit has fluctuated between a quarter and a third of its capacity, meaning that somewhere between 29 and 33 of these similarly extraordinarily expensive beds have been empty on any given day over the past eight months. This experience certainly seems to confirm CDCR's need for single-cell beds to accommodate Level IV intermediate DMH inpatient inmates and accounts, no doubt, for the fact that the department's current plan for Level IV intermediate inpatient beds includes only single-celled beds. Nonetheless, DMH's initial design for the 64 beds to be added to the existing program at SVSP includes 32 single cells and 16 double-cells. Acceptance of this design would mean that just half of the total of 128 beds in the DMH program at SVSP would be single-celled, which, together with the 148 additional beds described above, would give the department 212 single-celled beds and 64 dormitory or double-celled beds of dubious utility.

The plan submitted by the department in response to the UNA assessment fails on several counts:

1.  The first major inadequacy of the plan is reflected in its title. Instead of dealing with the gap between available beds and projected needs for all categories of inpatient care found in the UNA study, including acute as well as intermediate, for female as well as male inmates, and for Level I, II and III as well as Level IV inmates, the present plan focuses solely on the provision of single-celled intermediate care beds for Level IV male inmates. While the need for inpatient care for the excluded categories

Jeanne S. Woodford, Undersecretary
August 30, 2005
Page 4

may not be as large and currently crisis-driven as that for Level IV
intermediate inpatient male inmates, the need for inpatient care for these
other categories identified in the UNA assessment must be planned for and
met.

2. The plan does not meet the gap between available beds and the current or
projected need for Level IV intermediate inpatient care identified in the
UNA. UNA found 280 Level IV male inmates in need of a referral to
intermediate inpatient DMH care. The department's March 2005 plan
identified and projected the need for inpatient intermediate care for all
security levels, rather than distinguishing between Level IV and other
custody levels, so one is left only with the 280 UNA figure as a potential
guide for projecting the department's future need for Level IV
intermediate inpatient beds. That number, of course, is a static figure, to
which must be added the number of Level IV inmates already receiving
intermediate DMH inpatient care, as well as discharge rates, lengths of
stay and the projected impact of CDCR's steadily growing overall
population and mental health caseload. Yet the plan provides for just 36
additional beds through July 2008, when 20 more beds will become
available. Another 56 beds are scheduled to be ready by March 2009, as
are the 64 beds, 32 of them single-celled, resulting from doubling the
existing DMH program at SVSP. This is simply too little, too late. The
inmates who are the targets of this plan are unquestionably the most
seriously mentally ill inmates in all of CDCR. Any objective reading of
the individual case reviews included in the UNA study indicates clearly
the consequences of failing to provide an appropriate level of care for
these inmates, who are often housed in the most restrictive environments
in CDCR where the provision of meaningful mental health services is a
continuing challenge. The defendants' plan simply does not adequately
address the need for Level IV intermediate DMH inpatient care.

3. The plan also fails to address how the department intends to meet the
needs of the some 114 Level IV CDCR inmates who, by the end of August
2005, have already been referred to and accepted by the intermediate
inpatient DMH program at SVSP but are awaiting admission. The
department's plan concedes it will be able to provide beds for just 36
additional inmates so situated until July 2008. Meanwhile, CDCR's
Mental Health Crisis Bed units, which provide the department's most
intensive, internal level of mental health treatment, are already critically
overstressed. What will happen to these wait-listed inmates, and those

Jeanne S. Woodford, Undersecretary
August 30, 2005
Page 5

with similar needs who follow them, from October 2005 to July 2008 and
March 2009?

4. Not only is the plan insufficiently responsive to the size and urgency of
the UNA findings, it is also subject to repeated caveats about the
availability of funding for both the construction and operational costs of
the plan's various elements. Indeed, familiarity acquired over the past ten
years with defendants' ordinary procedures for funding and completing
extensive renovation and construction projects suggests that the timetable
contained in the plan is visionary. It took over five years for the
defendants to activate the first DMH program at SVSP, double the time
initially projected. The defendants must treat this issue as the genuine
emergency it is. There is a need here to assure that funding for the design
of the physical renovations at CMF and SVSP central to the plan will be
provided immediately, so the required construction can begin as
scheduled. Equally, there is a need to provide CDCR and DMH promptly
with sufficient staffing to meet the clinical and custody requirements of
the plan as it unfolds. As always, such funding will be subject to
legislative review and approval, but in the long history of this case, the
California State Assembly has consistently responded favorably to issues
effectively presented to them as genuine emergencies.

5. The design for the expanded DMH program at SVSP is fatally flawed.
Nothing in the experience of the past two and a half years justifies the
construction of 32 single cells and 16 double cells. DMH's design for the
original structure was a costly blunder, and there is no evidence to support
the proposed design for expansion of the unit. CDCR has a demonstrated
need for single cells for the housing of its Level IV inpatient DMH
inmates, reflected in its submitted plan, which the DMH program at SVSP
must meet.

The purpose of this letter is twofold. While deeply dissatisfied with the adequacy of the
department's overall plan for addressing its need to provide inpatient DMH care as
demonstrated in the UNA assessment, the submitted proposal does contain a concrete
plan to alleviate one aspect of the need. First, I want you to know that I endorse the
usefulness of the proposed plan as a start in addressing this one component of the
department's need for inpatient DMH care. The reason I do so formally is because I have
watched for over a decade the various executive agencies of State government, including
those responsible for finance, licensing, mental health and corrections, hesitate or fail to

Jeanne S. Woodford, Undersecretary
August 30, 2005
Page 6

act at inordinate length in the absence of a specific endorsement from the court or the
court's master, and it is crucially important to preclude such hesitation with regard to this
piece of the defendants' plan. Secondly, I want to discourage in the strongest terms
possible the adoption of DMH's proposed physical design for the expansion of the
DMH/CDCR program at SVSP. If necessary I will seek a direct order from the court
prohibiting adoption of the currently proposed design.

I also want to remind the defendants that the Governor is a named defendant in this suit
and his executive agencies are as fully accountable for their activities in regard to
Coleman as he is. Finally, I plan to address the department's broader need for inpatient
care in the upcoming 15th round compliance report.

I understand that the department is undergoing currently a multi-level and complex round
of reorganization, compounded by the uncertainty generated by the impending
appointment of a receiver for health care. I am cognizant of the difficulties associated
with all of these multiple developments. On the other hand, I know that the single largest
obstacle to the department's escape from the Coleman litigation is the provision of
physical and staffing resources adequate to meet the needs of the three or four percent of
the mental health caseload most in need of the most intensive level of care and treatment.
I am fully committed to helping the department to overcome this obstacle as promptly
and efficiently as possible.

Sincerely yours,

J. Michael Keating, Jr.
Special Master

cc.    John Dovey
       Renee Kanan, M.D.
       Kathy Keeshen, Esq.
       Michael Bien, Esq.
       Donald Specter, Esq.
       Lisa Tillman, Esq.
       Doug McKeever
       Matthew Lopes, Esq.

**Exhibit H**

## GENERAL BUDGET TIMETABLE

| | |
|---|---|
| January, early | Departments submit approved (updated) BCPs and final Supplementary Schedules (Operating Expenses and Equipment, Equipment, Federal Funds and Reimbursements) to the Department of Finance (DOF). |
| January 10 | Governor (and DOF) submits Governor's Budget and Budget Bill to the Legislature by this date. |
| January 10 to mid-January | DOF submits updated BCPs and Supplementary Schedules to Legislative budget staff. |
| January, mid to late | DOF initiates Deficiency Bill based on Governor's Budget. |
| February 1 | DOF provides to the Legislature all proposed statutory changes (Budget Trailer Bills), as prepared by the Legislative Counsel, that are necessary to implement the Governor's Budget. |
| February, early | Departments submit non-May Revision Finance Letter requests to the Department of Finance (DOF). |
| February, mid | DOF releases Salaries and Wages Supplement (Sch. 7A). |
| February, third week | Legislative Analyst Office (LAO) releases the Analysis of the Budget Bill and Perspectives and Issues. |
| February, late, to mid-March | DOF and departments prepare responses (rebuttals) to LAO's Analysis. |
| February, late, to mid-March | DOF budget staff discuss Finance Letter requests and meet with departments. |
| February to late-May | Legislative budget subcommittee staff hold budget pre-hearings with LAO, DOF and departments. |
| February to late-May | Legislative Budget Subcommittees hold budget hearings. |
| March | DOF Program Budget Managers and Director of Finance hold Finance Letter Hearings with departments, as needed. |
| April 1 | DOF submits non-May Revision and non-Capital Outlay Finance Letters to the Legislature. |
| April, early | DOF and departments update Supplementary Schedule of Revenue and Transfers (Sch. 10R) for May Revision. |
| April | DOF and SCO issue Finance Conversion Code instructions and |

|  | report for the Salaries and Wages Supplement (Sch. 7A). |
|---|---|
| April | DOF budget staff analyze May Revision requests and meet with departments. |
| April, mid-month | DOF issues technical budget instructions for the fiscal year following the upcoming one. |
| April, late, to early May | DOF Program Budget Managers, Director of Finance and Governor, hold May Revision hearings/meetings with departments, as needed. |
| May 1 | DOF submits Capital Outlay Finance Letters to the Legislature. |
| May 14 | DOF issues May Revision update of General Fund revenues and expenditures, including Finance Letters, and Deficiency Bill update to the Legislature. |
| May, late, to 1st week of June | Budget Subcommittees report to Full Budget Committees; Budget Bills sent to the Floors |
| June, early to mid | Budget Conference Committee meets; Budget Bills sent to Floors |
| June 15 | Constitutional deadline for Legislature to pass Budget Bill. |
| June, mid to late | DOF updates Deficiency Bill; Fiscal Committees hear and Legislature passes Deficiency Bill; Governor signs Deficiency Bill; and DOF issues Executive Orders to SCO for deficiency allocations. |
| June, mid to late (assuming the Budget is passed on time) | Governor decides Budget Bill vetoes. |
| June, late (assuming the Budget is enacted on time) | Budget Act and Budget Trailer Bills are printed. |
| July 1 | State's fiscal year begins. |
| July, mid to late (assuming the Budget is enacted on time) | LAO issues the Supplemental Report (Language) for the Budget Act. |
| July, mid to late (assuming the Budget is enacted on time) | DOF releases Final Budget Summary and Final Change Book. |

Case 2:90-cv-00520-KJM-SCR      Document 1751-2      Filed 02/03/06      Page 43 of 44

| | |
|---|---|
| July, late | DOF issues initial past year Supplementary Schedule of Appropriations (Sch. 10) to departments. |
| July, end of | Departments submit to the State Controller's Office (SCO) and State Treasurer's Office (STO) year-end financial statements for the General Fund, feeder funds and a few other funds. |
| July, mid | DOF issues budget policy letter |
| August, early to mid | DOF issues annual price letter for the budget (next fiscal) year; and the Department of General Services (DGS) issues the Price Book. |
| August, mid | DOF issues initial planning estimates to departments. |
| August, mid to late | DOF issues initial budget galley to departments. |
| August, mid to late | SCO issues Schedule 8 Tabulation, supplemental tabulations for Schedule 8 and Schedule 7A, Abolished Vacant Position Report and the Blanket Position Expenditure Report to departments. |
| August, mid to late | DOF transmits Sch. 7A galley to departments. |
| August, 3rd week | Departments submit year-end financial statements for all other funds (those not due by the end of July). |
| August, late | Departments submit initial past year Sch. 10s to DOF. |
| August, late, to early September | Departments submit Budget Bill Section 3.60 worksheets to DOF |
| September to early October | Departments submit baseline budget galley and all supporting schedules to DOF. |
| September to mid-October | DOF issues updated past year Sch. 10s and initial current and budget year Sch. 10s to departments. |
| September to mid-October | Departments submit completed 7As and Sch. 8s to DOF. |
| September, 2nd week | Departments submit Budget Change Proposals (BCP), including Budget Bill Language changes, to DOF. |
| September, mid | DOF issues Sch. 10Rs to departments. |
| September, mid-October | DOF budget staff hold budget discussions and meetings with departments. |
| September, late | Departments submit Sch. 10Rs to DOF. |

| | |
|---|---|
| October, early | DOF issues instructions regarding payment of Board of Control Claims, Department of Justice Settlements and Judgments. |
| October | DOF Program Budget Managers hold budget hearings with departments, as needed. |
| October | Departments submit, for budgets without any open issues, update budget galley and supporting documents to reflect decisions. |
| October, mid | DOF issues assessments for General Administrative Charges (Pro Rata) to Special Fund departments, and the State Wide Cost Allocation Plan (SWCAP) to departments with federal funds. |
| November, early to mid | Director of Finance holds budget hearings with departments, as needed. |
| November, early to mid | DOF and departments update Sch. 10Rs. |
| November, early to 3rd week | Departments submit, for budgets without any open issues, update budget galley and supporting documents to reflect decisions. |
| December, 2nd week | DOF briefs Governor on updated General Fund revenues and expenditures, and preliminary status of budget for current and budget years. |
| December, mid | Governor holds budget meetings and makes decisions. |
| December, mid to 3rd week | Departments submit updated budget galley and supporting documents to reflect Governor's decisions. |
| December, mid to late | DOF finalizes Governor's Budget, Governor's Budget Summary, Governor's Budget Highlights and Budget Bill. |

I:\Wp\MISC\General Budget Timetable.doc