**Exhibits I through M**

**Exhibit I**

# Memorandum

| | | |
|---|---|---|
| Date | : | September 26, 2005 |
| To | : | Roderick Q. Hickman<br>Secretary<br>California Department of Corrections and Rehabilitation |
| Via | : | J. S. Woodford<br>Undersecretary<br>California Department of Corrections and Rehabilitation |

**RECEIVED**

**SEP 2 9 2005**

**Rosen Bien & Asaro**

Subject : **ANNUAL SUICIDE REPORT FOR 2004**

Attached please find the 2004 Annual Suicide Report. The report summarizes data from the 26 suicides that occurred within the California Department of Corrections and Rehabilitation during calendar year 2004.

If you have any questions, please contact Helen Steenman, Ph.D., Senior Psychologist, Division of Correctional Health Care Services (DCHCS), at 324-7480.

RENEE KANAN, M.D.
Director (A)
Division of Correctional Health Care Services

Attachment

cc: Joe McGrath, Chief Deputy Secretary, Adult Operations
J. P. Tremblay, Assistant Secretary, Office of Public and Employee Communications
Joyce Hayhoe, Assistant Secretary, Office of Legislative Affairs
Ryken Grattel, Assistant Secretary, Office of Research
Elizabeth Siggins, Assistant Secretary, Juvenile Justice Policy
John Dovey, Director, Division of Adult Institutions (DAI)
Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations
   Branch, DCHCS
Regional Administrators, DCHCS
Associate Directors, DAI
Timothy Fishback, M.D., Chief (A), Mental Health Program, DCHCS
Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
Margaret McAloon, Chief Psychologist, Mental Health Program, DCHCS
Helen Steenman, Ph.D., Senior Psychologist Specialist, Mental Health Program, DCHCS
J. Michael Keating, *Coleman* Special Master
Matthew Lopes, *Coleman* Deputy Master
Michael Bien, Rosen, Bien & Asaro, LLP
Donald Specter, Prison Law Office
Raymond Patterson, M.D., *Coleman* Expert
Lisa Tillman, Deputy Attorney General, Department of Justice
Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs
Doug McKeever, Project Director, Mental Health Program
Tim Shively, CC III, DAI
Wardens
Health Care Managers
Chiefs of Mental Health
Suicide Prevention Coordinators

P.O. Box 942883
Sacramento, CA 94283-0001

**Division of Correctional Health Care Services**

# Executive Summary of Suicide Prevention and Response Program

## *2004 Annual Suicide Report*



*An Analysis of Inmate Suicide Data in 2004*

Calendar Year 2004

9/24/2005

# *Suicide Prevention and Response Program 2004 Annual Suicide Report*

## Executive Summary

Suicide is currently recognized as the third leading cause of death in prisons. The California Department of Corrections and Rehabilitation (CDCR) established a Suicide Prevention and Response Program in 1996 as part of the implementation of the Mental Health Services Delivery System (MHSDS), in response to the *Coleman v. Schwarzenegger* federal litigation. Since 1997, the Division of Correctional Health Care Services (DCHCS) has maintained databases to track all inmate deaths, including a separate database specifically for tracking inmate suicides. Various demographic and historical variables are included such as criminal and CDCR incarceration history, mental health history, and treatment. The sources of the data include information gathered during Suicide Reviews (a.k.a. Psychological Autopsies) which include review of Central Files, Unit Health Records, logs, incident reports, interviews with CDCR clinical and custody staff, other inmates, and sometimes family members.

The Mental Health Program (MHP) produces yearly reports containing suicide statistics for purposes of continuous improvement and in response to a *Coleman* federal court mandate. These annual reports describe some of the findings in the data for the year. Each year, new variables are added to the database, and as the database develops over time, it is expected that information may emerge which can be used to improve the CDCR Suicide Prevention and Response Program. The process of acquiring meaningful data is slow given the relative infrequency of suicide, and the reader is cautioned not to over-interpret the significance of apparent trends.

## Overview of 2004 Suicides

There were 26 verified suicides in the CDCR in 2004, reduced from a spike of 36 in 2003. Out of approximately 400 suicide attempts in CDCR institutions in 2004, only two percent were successfully completed. This rate was a decrease from seven percent completions in 2003. A documented serious suicide attempt was defined as one for which a CDCR 837 Incident Report was written. (Note: Total suicide attempts for 2004 was extrapolated from CDC 837 data available from June through December, as data for January through May were incomplete.) Incident Reports are typically prepared by custody staff. The number of actual attempts may be under-reported.

Suicides occurred at 16 of the 32 active CDCR prisons, including one at a fire camp administered by a prison. The following table lists the number of suicides at the CDCR institutions where they occurred.

## Number of 2004 Suicides by Institution

| Institution | Number of Suicides |
|---|---|
| ASP | 1 |
| CCC (fire camp) | 1 |
| CCWF | 3 |
| CEN | 1 |
| CIM | 1 |
| CMC | 2 |
| CMF | 3 |
| COR | 1 |
| DVI | 2 |
| FOL | 2 |
| MCSP | 2 |
| NKSP | 1 |
| PBSP | 2 |
| RJD | 1 |
| SAC | 2 |
| SVSP | 1 |
| **Total** | **26** |

The suicide rate for the CDCR in 2004 was 15.9 per 100,000. The average rate of suicides in the CDCR over the past 15 years has been 15.3. For all State Prison inmates in the United States combined, the national average was 16.25 per 100,000 in 2000 and 14 per 100,000 in 2002. (Bureau of Justice Statistics, 2000 and 2002 respectively). The suicide rate in the Texas prison system, which is comparable in size to the California prison system, is 17 per 100,000 in 2002 (Bureau of Justice Statistics, 2002). Recent research (White, Schimmel, & Frickey, 2005) indicates that the rate of suicide in prisons nationwide is about the same as for males in the general population (about 18-20 per 100,000), which they suggest is the most appropriate comparison rate for Texas. The national average for suicides (males and females, all ages) in the United States is 12 per 100,000.

## NUMBER AND RATE OF CDCR SUICIDES
### CALENDAR YEARS 1990 – 2004

| YEAR | NUMBER OF CDCR SUICIDES | CDCR AVERAGE DAILY POPULATION | RATE PER 100,000 |
|---|---|---|---|
| 1990 | 15 | 90,103 | 17 |
| 1991 | 13 | 100,750 | 13 |
| 1992 | 15 | 105,238 | 14 |
| 1993 | 29 | 114,909 | 25 |
| 1994 | 18 | 124,036 | 15 |
| 1995 | 22 | 131,321 | 17 |
| 1996 | 19 | 141,159 | 13.5 |
| 1997 | 18 | 152,004 | 11.8 |
| 1998 | 21 | 158,189 | 13.3 |
| 1999 | 24 | 160,970 | 14.9 |
| 2000 | 14 | 161,567 | 8.7 |
| 2001 | 27 | 160,000 | 16.8 |
| 2002 | 21 | 158,694 | 13.2 |
| 2003 | 36 | 160,772 | 22.4 |
| 2004 | 26 | 163,346 | 15.9 |
| TOTALS | 318 | (2,077,463) | 15.3 |

## Demographics for 2004 Suicides

Three of the 26 inmates completing suicide in 2004 were female (11.5 percent). Females comprised 6.6 percent of the total inmate population in 2004. All three of these suicides occurred at one institution, although there are four prisons housing females in the CDCR. In previous years there had been one suicide of a female inmate in 2001, and prior to that there had been none since before 1980.

Three of the inmates committing suicide were married, and two others were listed as separated. The remainder were single, including five never-married and one divorced, with the rest unspecified. Information regarding marital status was usually found in the inmate's Central file, and was not always current.

In previous years, the highest incidence of suicides has been among Caucasians, followed by Hispanics at an increasing rate. In 2004, Hispanics surpassed Caucasians, accounting for 46 percent of the suicides in contrast to their representation in the total inmate population of 36.3 percent. Caucasians accounted for only 31 percent of suicides in 2004, closer to their overall representation in the inmate population of 28.4 percent. The number of suicides among African American inmates continued to be low at about 11.5 percent. African American inmates accounted for 29.5 percent of the CDCR inmate population. This rate was the same as in 2003. (The suicide rate for African American males in the population of the United States is also much lower than that for Caucasian males.) The "Other" group this year included three Asian inmates and one of middle-eastern descent. These also accounted for about 11.5 percent of CDCR suicides, greater than their representation of 5.8 percent in the inmate population at large.

## 2004 Suicides by Ethnicity

| Ethnic Group | Number of Suicides | Percent Suicides | Percent of Total CDCR population* |
|---|---|---|---|
| African American | 3 | 11.5 | 29.5 |
| Caucasian | 8 | 31 | 28.4 |
| Hispanic | 12 | 46 | 36.3 |
| Other | 3 | 11.5 | 5.8 |

*As of December 31, 2004*

The chart below illustrates the percent of suicides by ethnicity as compared to the total representation of that ethnic group in the inmate population as of December 31, 2004.



In 2004, the youngest inmate to commit suicide was 21-years-old, and the oldest was age 61. The 30-39 age group, following the trend of previous years, had the greatest proportion of suicides at 58 percent, exceeding their representation in the inmate population. What was unusual in 2004, however, was the relatively high degree of suicides among younger inmates, with 31 percent being in the 20-29 age range. In 2003, the second highest proportion was seen among inmates in the 40-49 age range, while in 2004 the proportion of suicide among inmates in their 40s was quite low.

## 2004 Suicides by Age

| Age Range | Number of Suicides | Percent Suicides | Percent of Total CDCR Population* |
|---|---|---|---|
| 20-29 | 8 | 31 | 30.5 |
| 30-39 | 15 | 58 | 32.2 |
| 40-49 | 1 | 4 | 25.9 |
| 50 + | 2 | 8 | 10.2 |

*As of December 31, 2004*



Occupation and stability of employment in the community have been difficult to track with accuracy among inmates who committed suicide. Most had very poor work histories, and many were unskilled laborers.

Educational level has not been a meaningful variable among suicides. The range was between seven and 15 years of education. The majority of inmates in the suicide group had between 10 and 12 years of education or a General Equivalency Diploma.

Ability to communicate in English was tracked in 2004. One inmate only spoke Spanish, two others had a limited ability to communicate in English with a primary language of Spanish, and one inmate was hearing impaired.

The season of the year has never clearly appeared as a meaningful variable in CDCR suicides, although the month of January is starting to emerge as a potentially high-risk month. In 2004, there were spikes occurring in January, June, and November. In 2003, major spikes were seen in January and March.



The time of day that suicides were discovered has also not revealed any notable trends over the years, dispelling the common belief that suicides are more likely to happen at night. In reports of

this type time is often examined by dividing the day into quarters. The first and last quarters of the day represent the night hours and the second and third quarters represent the day hours. In 2004, there were 13 suicides discovered between 6:00 a.m. and 6:00 p.m., and 13 between 6:00 p.m. and 6:00 a.m., an equal number day or night. Looking at the quarters another way, however, 16 suicides were discovered between midnight and noon, while only 10 were discovered between noon and midnight. The correspondence between time of discovery and actual time of suicide is uncontrolled, because the time the inmate actually committed the act is nearly always unknown (the exceptions being if the inmate was discovered before he expired). Medical autopsy reports typically do not provide an estimated time of death.



Time of suicide discovery was further examined by watch or shift. In 2003, there were no differences in the number of suicides found on each watch. However, in 2004 half of the suicides (13 of 26) were discovered during first watch, when the least number of staff are present.

### 2004 Suicides – Time of Discovery

| Watch | Number of Suicides |
|---|---|
| 1st Watch (2300-0700) | 16 |
| 2nd Watch (0700 – 1500) | 7 |
| 3rd Watch (1500 – 2300) | 6 |

In terms of day of the week, in 2004 the highest number of suicides occurred on a Wednesday, closely followed by Sunday. The fewest suicides occurred on Saturday and Tuesday. By contrast, in 2003 the largest number occurred on Saturday. Day of the week per se has not proven to be a meaningful variable over the years for predicting suicides in the CDCR.



When the days are clustered into workweek (Monday through Friday) and weekend (Saturday and Sunday), suicides are slightly more likely to occur on a weekend. In 2004, 31 percent happened on a weekend (which is 28 percent of the week). In 2003, 37 percent of suicides occurred on a weekend. This trend has appeared for several years, but does not seem to be as pronounced as might be commonly expected.

Continuing another trend seen in previous years, by far the most frequently employed method for completing suicide in the CDCR is by hanging, and this is also reported for correctional settings throughout the world. It is the most available method, and perhaps the most difficult to prevent. In 2004, two of the reported suicides in CDCR were from medication overdose, and the remainder, 92 percent, were by hanging. In most years, including 2003, hanging has been used in approximately 86 percent of CDCR suicides.

## Sentencing and Term Issues

Typically, having a very long or life sentence appears to be significantly associated with suicide among inmates. In 2004, 46 percent of the inmates had either Life or sentences greater than 15 years, and 53 percent had sentences of greater than 10 years. This was consistent with data from previous years, although the trend was not as pronounced. By contrast, only 14.5 percent of the inmate population was classified as a Lifer, with or without parole. None of the suicide inmates in 2004 had been sentenced based on a "third strike."

**Sentence Length in 2004 Suicides - Inmates**

| | |
|---|---|
| < 2 years | 2 |
| 2-5 Years | 6 |
| 6-10 years | 4 |
| 11-15 years | 2 |
| 15-20 years | 0 |
| 20-80 years | 5 |
| Indeterminate Life (may parole) | 4 |
| LWOP | 3 |

In addition to sentence, actual time left to serve was also considered. This was calculated as anticipated release date minus date of death. In 2004, these data were striking. Twelve of the 26 inmates (46 percent) of the inmates had more than 15 years left to serve, or an indeterminate parole date, which was not unexpected. Surprisingly, another 12 inmates had fewer than five years to serve, and six of these inmates had fewer than six months before parole. One of these inmates had a parole date just two weeks away.

### Remaining Time to Serve for 2004 Suicides - Inmates

| | |
|---|---|
| Less than 6 months | 6 |
| 1-5 years | 6 |
| 6-10 years | 0 |
| 11-15 years | 1 |
| More than 15 years (including Lifers) | 12 |
| Undetermined (PVRT) | 1 |

Inmates serving a first term have consistently been highly represented among inmate suicides. It is believed that this may indicate that difficulty adjusting to a prison environment is a risk factor for suicide. In 2004, sixteen of the inmates (62 percent) were serving their first term. Eight (40 percent) were second termers, while just two (8 percent) were multi-termers. Eight inmates were noted to have returned to CDCR on parole violations.

Another variable supporting the idea of poor adjustment to prison as a risk factor is that a subgroup of inmates committing suicide have often not been in prison for very long. In 2004, the range of time served since the last CDCR admission was from 2 days to 14 years. Six inmates (23 percent) committing suicide had served less than six months, which would be expected. Ten (38 percent) had served less than two years. Fourteen (54 percent) had served less than five years. However, the remaining 12 inmates had served more than 6 years of their sentences, and of these, 7 had been in prison for more than 10 years.



Recent new charges and/or recent court hearings adding new time are sometimes a factor in suicides. In 2004, one inmate committed suicide a week after returning from court with his sentence changed from seven years to 80 years. Two other inmates had pending charges for crimes committed in prison, and one additional inmate was upset about a pending Security Housing Unit (SHU) term.

## *Criminal History*

Violent criminal history has always had a high correlation with inmate suicides. In 2004, 62 percent of these inmates had committed a violent crime, a higher percentage than in the inmate population at large (about 51 percent with crimes against persons), but not as high as in recent years (e.g. 74 percent of suicides in 2003).

Twenty-three percent had a history as sexual offenders, in contrast with 34 percent in 2003, but still higher than the 13.5 percent of the total inmate population. Sex offenders are always at risk of harm from other inmates, which is sometimes a factor in these cases.

Forty-two percent had some sort of gang affiliation, the significance of which is unknown. Sometimes gang affiliation may be a protective factor in that the inmate has a "family" of sorts within the prison environment. However, inmates that have dropped out or otherwise fallen into disfavor with their gang may become a target of gang retaliation, which was determined to be a factor in at least two suicides in 2004.

At least 54 percent of these inmates had a juvenile criminal history. These factors are summarized in the table below. Where the information was available, comparisons were made with the total inmate population.

**Crime Factors for 2004 Suicides**

| *Factor* | *Present* | *Absent* | *Unknown* | Percent of Suicides | Percent in Total Population |
|---|---|---|---|---|---|
| Violent Crime | 16 | 10 | 0 | 62 | 51 (crimes against persons) |
| Sex Offense History | 6 | 20 | 0 | 23 | 13.5 (PC 290 registration required) |
| Gang Affiliation | 11 | 12 | 3 | 42 | N/A |
| Juvenile History | 14 | 11 | 1 | 54 | N/A |

## Custody Issues

Six of the inmates who completed suicide in 2004 (23 percent) had job assignments at the time. This appears to reflect a slight increase over previous years.

The tendency toward violent behavior among CDCR suicides is reflected by custody classification level, as higher custody level inmates have typically been over-represented in the suicide group. In 2004 the trend continued, but not as strongly as seen in recent years. Ten

(38 percent) of the 26 inmates committing suicide were at the highest security, Level IV. In 2003, it was 54 percent.

| Custody Classification Level | Number of Suicides | Percent of Suicides | Percent Male Inmates* |
|---|---|---|---|
| I | 2 | 7.6 | 14 |
| II | 4 | 15 | 32 |
| III | 6 | 23 | 33 |
| **IV** | **9** | **34.6** | **21** |
| Reception Center | 2 | 8 | 0 |
| Female | 3 | 11.5 | 0 |

*Not available for females

Five inmates in 2004 were known to have Immigration and Naturalization Service (INS) holds. This was not necessarily a negative factor, as in at least one case the inmate was eager to return to the support of his family in Mexico.

## Housing

Twenty-two (**84 percent**) of the 26 inmates committing suicide in 2004 were single-celled at the time. In 2003, it was 60 percent. The average from 1999 through 2003 was 68 percent.

In recent years, an increasing proportion of suicides have occurred in the Administrative Segregation Units (ASU). In 2004, 69 percent of the suicides were in ASU. By contrast, only about 4.5 percent of the total inmate population was housed in ASU. In 2003, 50 percent of all suicides were in ASU, while in 2002, 24 percent occurred in ASU. The average for 1999 - 2003 was 38 percent in ASU.

The suicide rate in CDCR ASU in 2004 was calculated to be about 248 per 100,000. Jails and lock-ups typically report much higher rates than prisons. By comparison, the rate reported for jails and lock-ups is reportedly 107 per 100,000. In 2004, the suicide rate in ASU was clearly much higher than would be expected. In addition, only one inmate who committed suicide in 2004 was housed in a Security Housing Unit (SHU); the incidence in SHU has been low.

| Housing | Number | Percent |
|---|---|---|
| ASU | 18 | 69 |
| EOP | 2 | 7 |
| GP | 1 | 4 |
| RC | 1 | 4 |
| SHU | 1 | 4 |
| SNY/GP | 1 | 4 |
| TLU (OHU) | 1 | 4 |
| Fire Camp | 1 | 4 |
| ***TOTAL*** | **26** | **100** |

Because of the significant number of suicides occurring in ASU settings, these data were examined closely in 2004.

### 2004 Suicides in ASU

| Inmate | How long in ASU | Reason for Placement | MH LOC | Sentence |
|--------|-----------------|----------------------|--------|----------|
| 1 | 8 days | *Safety* | GP | 5 yrs |
| 2 | 2 mos | *Safety* | GP | 2 yrs 8 mo |
| 3 | 14 mos | New sentence | GP | 21 yrs |
| 4 | 7 wks | RVR | EOP | 56 yrs |
| 5 | 1 day | Bring in drugs | GP | 15 yrs - Life |
| 6 | 4 days | *Safety (sex offender)* | CCCMS | 3 yrs |
| 7 | 2 days | *Safety (gang)* | GP | 3 yrs |
| 8 | Yrs (Indet SHU) | Assault inmate | GP | 3 + 17 = 20 |
| 9 | 14 hrs | Mutual combat | EOP | 10 yrs |
| 10 | 7 wks | Behavior | GP | 16.4 yrs - Life |
| 11 | 2 days | Contraband | GP | 5 yrs, 8 mo |
| 12 | 3 wks | New sentence | GP | 80 yrs |
| 13 | 1 wk | Behavior | CCCMS | 2 yrs |
| 14 | 4 mos | Assault | EOP | 9 yrs |
| 15 | 15+ mos (valid gang) | RVR | GP | LWOP |
| 16 | 1 day | Refuse order | CCCMS | 12 yrs |
| 17 | 1 mo | Assault staff | CCCMS | 40-life |
| 18 | 2 wks | *Safety* | GP | 5 yrs |

Of the 18 inmates committing suicide in 2004 in ASU, three (16 percent) had been there for no more than one day, five (28 percent) had been there less than 72 hours (the cut-off for mental health screening for GP inmates), and nine (50 percent) had been in ASU for two weeks or less. Of the five who were in ASU less than 72 hours, three of these were GP.

Three inmates had been in ASU for over six months. Two of these happened to be the two that occurred in "stand alone" ASUs, both of whom were serving a SHU term.

Five of the 18 (28 percent) were in the ASU to keep them safe from other inmates.

All of the inmates committing suicide in ASU were single-celled at the time.

## Physical Plant Issues

The issue of attachment method for hangings came to the fore during 2004, largely as a result of reports from previous years in which recommendations were occasionally made for institutions to replace the large mesh ventilation screens that had used as attachment devices in those particular cases. A study of attachment methods used in hangings was undertaken during this year. Of the 24 hangings in 2004, six (25 percent) attached the ligature to a vent alone, with one additional inmate attaching ends of the ligature between a vent and bunk for a total of 29 percent using the vent. Another seven (29 percent) attached their noose to a bunk only, or 33 percent counting the vent/bunk combination. The remaining third (eight inmates) used a light fixture

(two), window or window screen (three), ladder (one), or shelf (two). Statistics for use of attachment devices in ASU mirrored the overall group (i.e. 29 percent using a vent).

## Mental Health Issues

In 2004, 54 percent of the suicides occurred among inmates who were not in the MHSDS. This is consistent with previous years, as the average for non-MHSDS suicides for the previous five years (1999 through 2003) was 46 percent. Conversely although the average percentage of patients in the MHCSD was 13.3 percent from 1999 – 2003, 54 percent of suicides occurred among patients in the MHCSD.

Nineteen percent were in the Correctional Clinical Case Management System (CCCMS), and 27 percent were in the Enhanced Outpatient Program (EOP). This was a reversal of the usual trend, in which CCCMS suicides were the most frequent among MHSDS inmates. In 2004, there were no suicides at higher levels of care (i.e. inpatient settings).



Upon examining level of care by housing placement, it is interesting to note that the proportions of GP, CCCMS, and EOP inmates who were in ASU when they committed suicide, are roughly similar to the proportions of these different levels of care overall for 2004 suicides.

### Number of Inmates by Housing and Level of Care

| Housing | CCCMS | EOP | GP |
|---------|-------|-----|-----|
| GP | 1 | 0 | 2 |
| EOP | 0 | 3 | 0 |
| ASU | 3 (16%) | 4 (22%) | 11 (61%) |
| SHU | 1 | 0 | 0 |
| RC (HIV) | 0 | 0 | 1 |
| **Total** | **5 (19%)** | **7 (27%)** | **14 (54%)** |

Information regarding mental health history of inmates prior to entering prison is most often based on inmate self-report documented somewhere in the records. In 2004, prior mental health history was indicated for about 10 (38 percent) of the inmates. Three of these were not in the MHSDS at the time of their suicide.

There was evidence that eight (31 percent) of the inmates had at least one suicide attempt prior to entering the CDCR, and several of these had multiple attempts. The incidence of previous suicide was substantially lower than in 2003, when it was around 50 percent. Of these eight inmates, four were EOP, two were CCCMS, and two were GP. The two GP inmates had no known psychiatric history.

Nine inmates (35 percent) had previously made either one or more suicide attempts or significant suicidal gestures while in the CDCR. Two of the nine were GP inmates. All of them had attempts within the past year.

Only five of these were the same inmates who had attempts prior to CDCR, meaning that a total of 12 inmates (46 percent) had some history of suicide.

Eighty-three percent of the inmates had a known history of illegal drug use or substance abuse. Because a high percentage of inmates in general have a drug history, its utility as a distinguishing characteristic of suicides is uncertain, however, substance abuse is a risk factor for suicide among the non-prison population.

### *Mental Health History Prior to Incarceration*

| *Factor* | *Present* | *Absent* | *Unknown* | Percent of Known |
|---|---|---|---|---|
| Psychiatric History | 10 | 16 | 0 | 38 |
| Suicide History before CDCR | 8 | 18 | 0 | 31 |
| Suicide Attempts in CDCR | 9 | 17 | 0 | 35 |
| Any Suicide History | 12 | 14 | 0 | 46 |
| Substance Abuse History | 20 | 4 | 2 | 83 |

Most recent mental health diagnosis was examined by broadly classifying the various given Axis I diagnoses into mood disorder, psychotic disorder, or primary drug dependence. Mood disorders were by far the most prominent, being given as the primary diagnosis in 11 cases (42 percent). Psychotic disorders were the primary diagnosis in only four cases, and drug dependence was primary in two cases. Thirteen inmates (50 percent) were given an Axis II disorder, the most common being Antisocial Personality.

A variety of stressors were associated with the 2004 suicides, although in some cases there were no identifiable precipitating events. Three inmates had serious physical medical conditions that may have contributed to their decision to commit suicide. Two were on lockdown. Other concerns included fearfulness and anxiety relating to their situation, gang problems, pending new charges and/or new sentence, and loss of emotional and/or monetary support. In many cases the inmates gave no indication that they would commit suicide, and in most cases the event came as a surprise to staff. Ten inmates left some type of suicide note or letter.

## Summary and Recommendations

There were 26 verified completed suicides in the CDCR in 2004, reduced from a spike of 36 in 2003. The CDCR suicide rate in 2004 was 15.9 per 100,000, and the average CDCR rate over the past 15 years was 15.3. The national rate for suicides in the U.S. is 12 per 100,000, and for males it is 18 per 100,000. For all State Prison inmates in the U.S. combined, the national average was 16.25 per 100,000 in 2000. (BOJ Statistics, 2000). Therefore, the rate of suicides in the CDCR did not appear to be different than similar populations.

Furthermore, only about two percent of all CDCR documented attempted suicides were completed in 2004, a decrease from seven percent in 2003 and eight percent in 2002.

All of the suicides occurred at 16 of the 32 CDCR prisons active in 2004. Most of these prisons experienced either one or two suicides, while two prisons had three suicides each.

Three (11.5 percent) of the 26 suicides in 2004 were females, disproportionate to the inmate population (6.6 percent). In the previous 23 years, there had only been one other documented female inmate suicide. All three of these suicides occurred at the same institution.

As in previous years, and consistent with findings in other prison systems nationwide, the inmate committing suicide was more likely to be male, Caucasian or Hispanic, in his 30s, unmarried, with a poor work history and 11th grade education. He was likely to have committed a violent crime or a sex crime, be serving his first term, and have a long sentence with a lot of time left to serve or little chance of parole. However, a surprising subset of suicide inmates did not have much time to serve. Another subset, which may have been overlapping, were of inmates who had not been in prison for very long. Most were Level IV custody.

Season of the year, time of day, and day of the week did not appear to be predictive of suicides in 2004 or in previous years. Slightly more suicides happened during first watch. Wednesday experienced the most suicides, followed by Sunday. Spikes were seen in November, January, and June. Suicides in CDCR did not increase during the holidays in 2004 or in previous years.

Most inmates completing suicide were single-celled, and the most frequent method employed was hanging (92 percent). The other method used in 2004 was medication overdose. Ventilation grills were used as ligature attachment devices for 29 percent of hangings. Bunks were used in 33 percent of hangings (one used both bunk and vent). Other attachment devices included light fixtures, windows, ladders, and shelves.

Consistent with previous years, about half (14, or 54 percent) of the suicides were inmates who were not in the MHSDS. More EOP inmates were represented (27 percent) then have been seen in previous years. There were no suicides in inpatient settings in 2004. Although only 12 inmates were in MHSDS when they died, others had previously been in MHSDS and primary Axis I diagnoses were available for 17 inmates. The majority of these were mood disorders. Eighty-three percent had a known substance abuse history.

The most outstanding feature of the 2004 suicides was that 69 percent were in the ASU and of these, 61 percent were not in the MHSDS. In other words, 42 percent of all the 2004 suicides were inmates not included in MHSDS, who were housed in an ASU. Although suicide rates for jails and lockups (i.e. ASU) are much higher than for prisons nationally (107 per 100,000), the CDCR rate for ASU suicides in 2004 was 248 per 100,000, as calculated against the average daily ASU population.

All ASU suicides occurred in single cells, and all were accomplished by hanging (use of attachment devices was in same proportion as for total suicides). Five inmates (28 percent of those in ASU) were in ASU for safety reasons. Fifty percent had been in ASU for no more than two weeks, while just 16 percent had been in ASU for over six months. However, only one suicide occurred in a SHU.

Ten (38 percent) of the 26 inmates had some psychiatric history prior to CDCR, although three of these were not in the MHSDS when they committed suicide. Thirty-one percent had attempted suicide in the community, 35 percent had prior attempts in the CDCR, and altogether 46 percent had made a previous suicide attempt at some time in their lives. Any history of prior suicide attempts should be considered a primary risk factor for possible suicide.

Five inmates in 2004 had INS holds, although in at least one case this was not a negative factor. One inmate did not speak English, two had limited English ability, and one was hearing impaired.

One inmate had returned from court with a new sentence, two were pending new charges, and one was upset about a pending SHU term. Three of the inmates had serious medical conditions that may have contributed to their suicide. Only six had job assignments.

During 2004 up to the present (mid-2005), efforts have been made to increase staff awareness of suicide factors and prevention. A Suicide Prevention and Response Focus Improvement Team (SPR-FIT) at DCHCS, a multi-disciplinary group including representation from DCHCS, Institutions, Facilities Management, and Risk Management Divisions, meets weekly to identify system issues and recommend policy changes to address these issues.

The institutions have been directed to ensure that all inmates entering ASU are screened for mental health issues, to ensure that new arrivals are promptly identified and contacted by mental health staff, and to increase daily communications between custody and mental health staff in these settings. A list of significant stressors that have been found to contribute to suicides has been distributed, and will be incorporated into the annual departmental training in suicide prevention, which is currently being updated. Provision of services for foreign language inmates has been mandated, and further training in cultural awareness is planned.

The monthly Suicide Prevention Videoconference continues to be a useful venue for ongoing communication between DCHCS and the institutions regarding suicide issues. A full day of training on Suicide Risk Assessment by a nationally recognized expert in prison suicides was provided and mandated for all clinical staff in April 2005. The Emergency Response protocol is currently under review by the Division of Adult Institutions.

Corrective actions were recommended for the majority of suicides reviewed in 2004.  Issues that were identified included:

- Improper emergency response
- Incomplete or missing documentation
- Poor medication distribution practices: Medications not delivered as ordered, failure to deliver timely medications, failure to document delivery, failure to renew expired medications
- Lack of follow-up when medications are changed or discontinued
- Poor clinical evaluations
- Counter-transference issues
- Lack of use of file information in evaluations, lack of file availability
- Timely initial mental health assessment
- Adequate follow-up for missed mental health appointments
- Lack of timely mental health screening in ASU
- Improperly conducted mental health rounds in ASU
- Failure of medical and mental health to coordinate care
- Poorly conducted Suicide Risk Assessments, or failure to conduct at all
- Lack of privacy for assessments
- Shortage of Mental Health Crisis Beds
- Inappropriate use of "strip cells" in ASU for suicidal inmates
- Acute anxiety going unrecognized and untreated
- Making routine mental health referrals when urgent referral was appropriate
- Failure to make any mental health referral despite obvious signs of distress
- Failure to schedule mental health follow-up when referrals were made
- Not using a translator when indicated
- Poor communication when referring between levels of care
- Dropping *Keyhea* renewal

In addition to addressing system issues, the follow-up for institution level Corrective Action Plans continues to improve, with enhanced tracking and increased accountability.

The Mental Health Program Subcommittee at DCHCS will continue to review and track suicide cases.  Continued efforts in staff development, improved polices, diligent follow-up with corrective actions, and increased expectations of accountability are some of the ways that CDCR hopes to maintain adequate suicide prevention and response.  Special attention has been and will continue to be devoted to trying to reduce the high rate of suicide in ASU, and to the ongoing challenge of providing adequate resources such as higher levels of care (e.g. mental health crisis beds).

The responsibility for suicide prevention is a departmentwide effort with full participation from the Division of Adult Institutions, and the rest of the CDCR.  It is essential that correctional officers communicate their observations to mental health staff daily, especially in ASU settings. The Division of Adult Institutions is lending increasing support to suicide prevention, and it is hoped that this trend will continue and will be reflected by each prison.

**Exhibit J**

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDES

# MAY 1997



## HEALTH CARE SERVICES DIVISION

CALIFORNIA DEPARTMENT OF CORRECTIONS
PUBLIC SAFETY, PUBLIC SERVICE

**Mental Health Services Delivery System  Program Guides - Health Care Services Division**



## SECTION 8:  ADMINISTRATIVE SEGREGATION

### A. PURPOSE

The Administrative Segregation Mental Health Services (Ad/Seg MHS) program is part of the California Department of Corrections' Mental Health Services Delivery System (MHSDS). This program guide outlines program policies and provides basic institutional operational procedures to assure the effective delivery of clinical services to inmates with serious mental disorders who, for custodial reasons, require housing in Administrative Segregation.

### B. RESPONSIBILITY

1. Overall institutional responsibility for the program shall rest jointly with the Health Care Manager and the Warden.

2. Institutional operational oversight of the Ad/Seg MHS shall be the responsibility of the Chief Psychiatrist, at institutions with such positions, and mental health clinical staff designated by the Health Care Manager at all others.

3. Custodial responsibilities, including initial placement, disciplinary actions, correctional counseling services, classification, inmate movement, and daily management shall rest with the warden or designee.

4. Individual clinical case management, including treatment planning and placement determinations, shall be approved by an Interdisciplinary Treatment Team (IDTT), consisting of, at a minimum, the assigned clinical case manager, Chief Psychiatrist (or highest ranking mental health clinician), and custodial administrator at the rank of Captain or above.

### C. PROGRAM GOALS AND OBJECTIVES

The goal of the Ad/Seg MHS program is to provide necessary mental health services for the population of seriously mentally disordered inmates who, for custodial reasons outlined in California Code of Regulations Title 15, Section 3335, require placement in Ad/Seg. Specific program objectives include the provision of:

---

Revised May 1997

# DUTY STATEMENT

## PSYCHIATRIC TECHNICIAN, ADMINISTRATIVE SEGREGATION

Description:  Under the direct supervision of the Supervising Senior Psychologist and clinical supervision of the Director of Nursing, the Administrative Segregation Psychiatric Technician is responsible for providing assistance to inmates in Administrative Segregation with mental health needs.  This is the primary staff person responsible for timely identification of current Mental Health Services Delivery System inmates, monitoring all inmates placed in Ad/SEG, for need for treatment, and implementing the assigned treatment plan adopted by the Interdisciplinary Treatment Team (IDTT) for the inmates' care.  Normal activities include making daily clinical rounds, participating in the IDTT, assisting inmates in Activities of Daily Living, supervising Recreational Therapy, administering mental health screening questionnaires, coordinating treatment activities with custody and clinical staff, and distribution of prescribed medications.  Close contact will be maintained with the Clinical Case Manager in charge of the treatment delivery and tracking of all inmates with identified serious mental disorders.  Specific duties include:

20%    Administering Mental Health Screening Questionnaire to inmates retained in Administrative Segregation beyond ten days

15%    Supervision of Activities of Daily Living and Recreational Therapy for inmates with identified mental health treatment needs

25%    Conducting daily clinical rounds and monitoring of all inmates in Administrative Segregation for signs and symptoms of mental illness

10%    Distribution of prescribed psychotropic medications to inmates in Administrative Segregation

10%    Participation in Interdisciplinary Treatment Team reviews

10%    Liaison activities with Custody personnel in management of seriously mentally disordered inmates in Administrative Segregation

5%    Professional development, including participation in professional training and conferences, upgrading of automation skills, etc.

5%    Other Duties as Required

**Exhibit K**

U.S. Department of Justice
Office of Justice Programs



# Bureau of Justice Statistics
# Special Report

August 2005, NCJ 210036

# Suicide and Homicide in State Prisons and Local Jails

By Christopher J. Mumola
*BJS Policy Analyst*

Data from new Bureau of Justice Statistics (BJS) data collections offer the first opportunity to analyze the personal characteristics, current offenses, and environmental factors surrounding inmate deaths in local jails and State prisons nationwide.

To implement the Death in Custody Reporting Act of 2000 (PL 106-297), BJS began collecting inmate death records from all local jails in 2000 and expanded reporting to include State prisons in 2001. In this first report from the Deaths in Custody Reporting Program, data from 2000 to 2002 highlight inmate and facility characteristics related to high risks of suicide and homicide.

Jail suicide rates declined steadily from 129 per 100,000 inmates in 1983 to 47 per 100,000 in 2002. In 1983 suicide accounted for the majority of jail deaths (56%), but by 2002, the most common cause of jail deaths was natural causes (including AIDS) (52%), well ahead of suicides (32%). Suicide rates in State prison fell from 34 per 100,000 in 1980 to 16 per 100,000 in 1990, and have since stabilized.

State prison homicide rates dipped sharply from 1980 (54 per 100,000) to 1990 (8 per 100,000). By 2002 prison homicide rates had declined further, down to 4 per 100,000. Homicide rates in local jails were more stable, declining slightly from 5 per 100,000 in 1983 to 3 per 100,000 in 2002.

## Highlights

| Cause | Local jail inmate deaths | | | | State prison inmate deaths | | |
|-------|------|------|------|----------------------|------|------|----------------------|
|       | 2000 | 2001 | 2002 | 2000-02 percent | 2001 | 2002 | 2001-02 percent |
| All causes | 912 | 953 | 978 | 100% | 2,878 | 2,946 | 100% |
| Illness | 462 | 432 | 459 | 47.6% | 2,304 | 2,379 | 80.4% |
| AIDS | 60 | 59 | 50 | 5.9 | 270 | 245 | 8.8 |
| Suicide | 289 | 315 | 314 | 32.3 | 169 | 168 | 5.8 |
| Homicide | 17 | 22 | 20 | 2.1 | 39 | 48 | 1.5 |
| Accident | 25 | 35 | 35 | 3.3 | 23 | 31 | 0.9 |
| Intoxication | 37 | 58 | 54 | 5.2 | 35 | 37 | 1.2 |
| Other/unknown | 22 | 32 | 46 | 3.6 | 38 | 38 | 1.3 |

**State prison, local jail suicide rates have fallen sharply since the 1980's**



Suicides per 100,000 inmates

- In 2002 the suicide rate in local jails (47 per 100,000 inmates) was over 3 times the rate in State prisons (14 per 100,000 inmates).

- The suicide rate in the Nation's 50 largest jail systems (29 per 100,000 inmates) was half that of other jails (57 per 100,000).

- Violent offenders in both local jails (92 per 100,000) and State prisons (19 per 100,000) had suicide rates over twice as high as those of nonviolent offenders (31 and 9 per 100,000 respectively).

**Homicide rates in State prisons dropped 93% from 1980 to 2002**



Homicides per 100,000 inmates

- Homicide rates were similar in local jails (3 per 100,000) and State prisons (4 per 100,000).

- 67% of homicide victims in State prisons had served at least 2 years; 37% had served 5 years.

- Violent offenders were the victims of most State prison homicides (61%), and their jail homicide rate (5 per 100,000) was over twice that of nonviolent offenders (2 per 100,000).

## The Death in Custody Reporting Act of 2000

The passage of the Death in Custody Reporting Act of 2000 (DICRA, PL 106-297) dramatically altered programs collecting data on inmate deaths. Prior to the act, BJS conducted annual counts of State prisoner deaths. Counts of jail inmate deaths were collected in the Census of Jails, which is conducted every 5 or 6 years. For both populations, death counts were obtained by gender and by general cause categories, such as illness/natural causes, AIDS, suicide, and homicide. These aggregate counts of deaths did not allow for analysis of individual death cases.

DICRA was attached as a grant requirement of the Violent Offender Incarceration and Truth-in-Sentencing (VOI/TIS) incentive grant program. Beginning in 1996, these grants provided over $2.5 billion to all 50 States and U.S. Territories for expanding prison capacity to house violent offenders for longer periods. Each State receiving VOI/TIS funds was required under DICRA to report:

*"on a quarterly basis, information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility (including any juvenile facility) that, at a minimum, includes —*

*(A) the name, gender, race, ethnicity, and age of the deceased;*
*(B) the date, time, and location of death; and*
*(C) a brief description of the circumstances surrounding the death."*

BJS developed a new series of collections to meet the mandates of the act. Aggregate counts of deaths were replaced by detailed, individual inmate death records, collected every 3 months from over 3,000 jail jurisdictions, 50 State prison systems, juvenile correctional authorities in all 50 States, and roughly 18,000 State and local law enforcement agencies nationwide. These new data collections were phased in over 4 years, with local jails reporting in 2000, followed by State prisons in 2001 and State juvenile authorities in 2002. A network of statewide law enforcement reporters began submitting arrest-related death records to BJS in 2003.

With these new collections, BJS has enhanced both the frequency and scope of its data on inmate mortality. Among other improvements, BJS now collects information on specific medical causes of death, as determined by a coroner or medical examiner. BJS replaced a general category of "illness/natural causes," with specific categories of medical conditions related to mortality, such as cancer, heart disease, and hepatitis C. A detailed analysis of these fatal medical conditions will be the focus of the next report from this data collection series.

## Long term trends show steep declines in rates of State prisoner homicide and local jail inmate suicide

Over the past two decades, State prison and local jail inmate mortality rates have displayed some dynamic changes. Suicide was the leading cause of death among jail inmates in 1983 (129 per 100,000 inmates); by 1993 that rate had been cut by more than half (54 per 100,000 inmates), and illness/natural cause (67 per 100,000) had become the most common cause of jail deaths. By 2002 the jail suicide rate (47 per 100,000) had fallen to nearly a third of the 1983 rate. Rates of death from AIDS-related causes in jails also declined; the 2002 rate (8 per 100,000) was less than half of the 1988 rate (20 per 100,000). As a result of these reductions, the overall mortality rate in local jails dropped 37% between 1983 and 2002.

State prison suicide rates have historically been much lower than those of jails, but these also dropped sharply from 34 per 100,000 in 1980 to 14 per 100,000 inmates in 2002. Even more dramatic was the decline in homicide deaths, from 54 per 100,000 inmates in 1980 to 8 per 100,000 inmates in 1990, and to 4 per 100,000 inmates in 2002. With the introduction of new therapies during the 1990's, AIDS-related mortality rates in State prison fell rapidly from 100 per 100,000 inmates in 1995 to 15 per 100,000 inmates 5 years later. Overall State prisoner mortality rates have grown slightly (6%) since 1980, mostly due to illness/natural causes (up 40% since 1980).

| Year | Local jail inmate mortality rate, per 100,000 inmates | | | | |
| | All causes | Illness/ natural cause | AIDS | Suicide | Homicide |
|---|---|---|---|---|---|
| 2002 | 147 | 69 | 8 | 47 | 3 |
| 2001 | 151 | 68 | 9 | 50 | 3 |
| 2000 | 147 | 74 | 10 | 47 | 3 |
| 1999 | 154 | 64 | 13 | 54 | 5 |
| 1993 | 149 | 67 | 15 | 54 | 4 |
| 1988 | 199 | 82 | 20 | 85 | 3 |
| 1983 | 232 | 88 | -- | 129 | 5 |

Note: Mortality rates are based on average daily population for each year. Data on deaths for 1983-99 are from the Census of Jails; data from 2000-02 are from the Deaths in Custody data series.
-- Not available.

| Year | State prison inmate mortality rate, per 100,000 inmates | | | | |
| | All causes* | Illness/ natural cause | AIDS | Suicide | Homicide |
|---|---|---|---|---|---|
| 2002 | 246 | 198 | 20 | 14 | 4 |
| 2001 | 242 | 194 | 23 | 14 | 3 |
| 2000 | 238 | 190 | 15 | 16 | 5 |
| 1995 | 308 | 165 | 100 | 16 | 9 |
| 1990 | 228 | 187 | -- | 16 | 8 |
| 1985 | 239 | 163 | -- | 26 | 24 |
| 1980 | 233 | 141 | -- | 34 | 54 |

Note: Mortality rates for 1980-2000 are based on death counts of sentenced prisoners and the December 31 jurisdiction population as collected in the National Prisoner Statistics (NPS) program. Rates for 2001-02 are based on counts from the Deaths in Custody Reporting Program and the NPS June 30 custody population count.
*Excludes executions.    -- Not available.

**Table 1. State prison jurisdictions: Number of prisoner deaths, suicides, and homicides, and mortality rates, per 100,000 prisoners in custody, 2001-02**

| Region and jurisdiction | Number of prisoner deaths, 2001-02 | | | Average annual mortality rate (2001-02) per 100,000 prisoners held at midyear | | |
|---|---|---|---|---|---|---|
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **U.S. total*** | 5,815 | 337 | 87 | 244 | 14 | 4 |
| **Northeast** | 887 | 46 | 5 | 257 | 13 | 1 |
| Connecticut | 60 | 9 | 0 | 162 | 24 | 0 |
| Maine | 13 | 1 | 0 | 370 | 28 | 0 |
| Massachusetts | 49 | 3 | 0 | 239 | 15 | 0 |
| New Hampshire | 11 | 0 | 0 | 224 | 0 | 0 |
| New Jersey | 129 | 3 | 0 | 225 | 5 | 0 |
| New York | 360 | 21 | 3 | 264 | 15 | 2 |
| Pennsylvania | 248 | 6 | 2 | 327 | 8 | 3 |
| Rhode Island | 11 | 2 | 0 | 155 | 28 | 0 |
| Vermont | 6 | 1 | 0 | 217 | 36 | 0 |
| **Midwest** | 1,057 | 77 | 11 | 221 | 16 | 2 |
| Illinois | 158 | 20 | 2 | 178 | 22 | 2 |
| Indiana | 97 | 6 | 3 | 246 | 15 | 8 |
| Iowa | 20 | 3 | 0 | 123 | 18 | 0 |
| Kansas | 43 | 4 | 0 | 248 | 23 | 0 |
| Michigan | 227 | 11 | 1 | 231 | 11 | 1 |
| Minnesota | 28 | 2 | 0 | 215 | 15 | 0 |
| Missouri | 122 | 6 | 1 | 210 | 11 | 2 |
| Nebraska | 15 | 0 | 0 | 190 | 0 | 0 |
| North Dakota | 4 | 0 | 0 | 192 | 0 | 0 |
| Ohio | 229 | 8 | 2 | 254 | 9 | 2 |
| South Dakota | 15 | 4 | 2 | 262 | 71 | 34 |
| Wisconsin | 99 | 13 | 0 | 245 | 32 | 0 |
| **South** | 2,717 | 121 | 40 | 267 | 12 | 4 |
| Alabama | 172 | 2 | 1 | 342 | 4 | 2 |
| Arkansas | 73 | 8 | 2 | 322 | 36 | 9 |
| Delaware | 31 | 4 | 0 | 222 | 28 | 0 |
| Florida | 365 | 11 | 3 | 251 | 8 | 2 |
| Georgia | 199 | 10 | 4 | 217 | 11 | 4 |
| Kentucky | 77 | 1 | 1 | 325 | 4 | 4 |
| Louisiana | 150 | 2 | 0 | 381 | 5 | 0 |
| Maryland | 141 | 13 | 6 | 293 | 27 | 12 |
| Mississippi | 69 | 2 | 0 | 228 | 7 | 0 |
| North Carolina | 128 | 8 | 2 | 197 | 12 | 3 |
| Oklahoma | 115 | 2 | 4 | 260 | 5 | 9 |
| South Carolina | 116 | 2 | 3 | 267 | 5 | 7 |
| Tennessee | 112 | 2 | 3 | 317 | 6 | 8 |
| Texas | 804 | 49 | 10 | 273 | 17 | 3 |
| Virginia | 140 | 4 | 1 | 227 | 6 | 2 |
| West Virginia | 25 | 1 | 0 | 357 | 14 | 0 |
| **West** | 1,154 | 93 | 31 | 213 | 17 | 6 |
| Alaska | 22 | 3 | 0 | 263 | 36 | 0 |
| Arizona | 139 | 6 | 1 | 247 | 11 | 2 |
| California | 625 | 52 | 21 | 196 | 16 | 7 |
| Colorado | 94 | 5 | 2 | 268 | 14 | 6 |
| Hawaii | 20 | 2 | 0 | 195 | 19 | 0 |
| Idaho | 26 | 3 | 0 | 243 | 28 | 0 |
| Montana | 11 | 1 | 0 | 199 | 19 | 0 |
| Nevada | 52 | 3 | 2 | 260 | 15 | 10 |
| New Mexico | 26 | 4 | 2 | 221 | 34 | 17 |
| Oregon | 57 | 5 | 0 | 259 | 23 | 0 |
| Utah | 14 | 4 | 1 | 170 | 49 | 12 |
| Washington | 60 | 4 | 2 | 192 | 13 | 6 |
| Wyoming | 8 | 1 | 0 | 260 | 33 | 0 |

Note: All mortality rates are calculated based on custody populations for June 30.
*Excludes 9 total prisoner deaths reported by the District of Columbia in 2001. None of the 9 deaths was a suicide or homicide. The District of Columbia transferred all prisoner custody operations to the Federal Bureau of Prisons during 2001.

**Nationwide, 337 State prisoners committed suicide during 2001-02**

Suicide and homicide accounted for a combined 7% of all State prisoner deaths during 2001-02 (table 1). The average annual suicide rate of State prisoners (14 suicides per 100,000 prisoners) was a third of that of local jail inmates (48).

Prison suicide rates showed wide variation at the State level. New Hampshire, Nebraska, and North Dakota all reported no suicide deaths during the 2-year period. Another six States had suicide rates of 5 per 100,000 prisoners or lower. Thirteen States had suicide rates of at least 25 per 100,000 prisoners, led by South Dakota (71), Utah (49), Vermont, Alaska, and Arkansas (each with 36).

In most State prison systems, suicides were rare events. Only 9 States reported as many as 10 prisoner suicides during this period, with 42% of all suicides taking place in four States. California (52), Texas (49), New York (21), and Illinois (20) reported 142 of the Nation's 337 State prisoner suicides. About half of all States (24) recorded 3 or fewer suicides.

**87 State prisoners became victims of homicide over 2 years**

Most States did not have any prisoner homicides in the course of a year. During 2001, 31 States reported no prison homicides; 29 States did not report a homicide during 2002. Three States reported 43% of all homicides — California (21), Texas (10), and Maryland (6). No other State reported more than 5 homicides during 2001-02.

Homicide rates were low in most States, and 5 had a rate of at least 10 homicides per 100,000 prisoners, led by South Dakota (34) and New Mexico (17). However, even in these 5 States, a combined total of 13 homicides were reported over 2 years.

**Table 2. The 50 largest jail jurisdictions: Number of inmate deaths and suicides and mortality rates per 100,000 inmates, 2000-02**

| | Number of inmate deaths, 2000-02 | | Average annual mortality rate, 2000-02 | | | |
| | | | Per 100,000 inmates — average daily population | | Per 100,000 inmates — at risk[a] | |
| Jurisdiction | All causes | Suicide | All causes | Suicide | All causes | Suicide |
|---|---|---|---|---|---|---|
| Total | 1,037 | 180 | 167 | 29 | 11 | 2 |
| Los Angeles, CA | 105 | 12 | 180 | 21 | 19 | 2 |
| New York City, NY | 99 | 9 | 224 | 20 | 27 | 3 |
| Cook County, IL | 48 | 3 | 157 | 10 | 15 | 1 |
| Maricopa County, AZ | 31 | 10 | 141 | 45 | 8 | 3 |
| Philadelphia County, PA | 41 | 6 | 198 | 29 | 33 | 5 |
| Dade County, FL | 46 | 3 | 231 | 16 | 14 | 1 |
| Harris County, TX | 52 | 7 | 243 | 32 | 15 | 2 |
| Dallas County, TX | 29 | 7 | 145 | 34 | 9 | 2 |
| Orleans Parish, LA | 14 | 2 | 77 | 10 | 6 | 1 |
| Broward County, FL | 29 | 3 | 200 | 21 | 13 | 1 |
| San Bernardino County, CA | 14 | 5 | 92 | 33 | 5 | 2 |
| San Diego County, CA | 23 | 6 | 153 | 39 | 8 | 2 |
| Shelby County, TN | 22 | 0 | 140 | 0 | 11 | 0 |
| Orange County, CA | 6 | 1 | 42 | 7 | 3 | 1 |
| Santa Clara County, CA | 14 | 5 | 115 | 40 | 8 | 3 |
| Alameda County, CA | 29 | 4 | 242 | 34 | 17 | 2 |
| Orange County, FL | 15 | 1 | 124 | 8 | 8 | 1 |
| Bexar County, TX | 26 | 2 | 245 | 20 | 12 | 1 |
| Baltimore City, MD | 39 | 9 | 381 | 88 | 27 | 6 |
| Hillsborough County, FL | 16 | 4 | 156 | 39 | 8 | 2 |
| Sacramento County, CA | 20 | 8 | 206 | 81 | 11 | 4 |
| Riverside County, CA | 8 | 4 | 92 | 46 | 5 | 3 |
| Tarrant County, TX | 10 | 2 | 92 | 18 | 6 | 1 |
| Milwaukee County, WI | 7 | 0 | 70 | 0 | 3 | 0 |
| Jacksonville City, FL | 30 | 3 | 341 | 35 | 20 | 2 |
| Pinellas County, FL | 14 | 2 | 174 | 26 | 10 | 1 |
| Davidson County, TN | 24 | 2 | 291 | 25 | 21 | 2 |
| Clark County, NV | 21 | 8 | 279 | 107 | 8 | 3 |
| Fulton County, GA | 9 | 3 | 105 | 35 | 9 | 3 |
| King County, WA[b] | 3 | 0 | 55 | 0 | 3 | 0 |
| Wayne County, MI | 17 | 8 | 208 | 97 | 13 | 6 |
| DeKalb County, GA | 7 | 0 | 78 | 0 | 6 | 0 |
| Palm Beach County, FL | 13 | 0 | 176 | 0 | 7 | 0 |
| Kern County, CA | 8 | 4 | 103 | 51 | 7 | 3 |
| Travis County, TX[c] | 11 | 2 | 141 | 26 | 7 | 1 |
| Franklin County, OH | 10 | 4 | 142 | 55 | 7 | 3 |
| Allegheny County, PA | 16 | 6 | 208 | 80 | 17 | 6 |
| Marion County, IN | 16 | 2 | 218 | 27 | 14 | 2 |
| Essex County, NJ | 12 | 1 | 180 | 14 | 16 | 1 |
| Suffolk County, MA[d] | 2 | 0 | 29 | 0 | 4 | 0 |
| El Paso County, TX | 10 | 2 | 154 | 33 | 9 | 2 |
| Fresno County, CA | 14 | 3 | 205 | 44 | 11 | 2 |
| Oklahoma County, OK | 7 | 3 | 119 | 51 | 5 | 2 |
| Cobb County, GA | 5 | 3 | 77 | 47 | 4 | 3 |
| Cuyahoga County, OH | 7 | 1 | 116 | 17 | 7 | 1 |
| Hamilton County, OH | 11 | 5 | 182 | 83 | 8 | 4 |
| Hudson County, NJ | 11 | 1 | 200 | 17 | 23 | 2 |
| San Francisco City/Co., CA | 9 | 4 | 154 | 73 | 6 | 3 |
| York County, PA | 4 | 0 | 73 | 0 | 10 | 0 |
| Mecklenburg County, NC | 3 | 0 | 52 | 0 | 2 | 0 |

Note: A specified cause of death was not provided for 6 deaths reported in 2000 (5 from New York City and 1 from Marion County), 11 deaths in 2001 (2 each from Bexar County and Jacksonville City, 1 each from Orleans Parish, Broward, San Diego, Hillsborough, Tarrant, Clark, and Suffolk counties), and 10 deaths in 2002 (2 from Alameda County, and 1 each from Dade, Broward, Bexar, Hillsborough, Milwaukee, King, Franklin, and Hamilton counties).
[a]The at-risk jail population combines the January 1 count with the number of annual admissions.
[b]King County data include only the years 2001-02.
[c]Travis County data for 2002 exclude the Travis County Substance Abuse Treatment Facility.
[d]Suffolk County data for 2000 exclude the Suffolk County House of Corrections.

**Suicide rate in the Nation's 50 largest jail jurisdictions half that of all other jails**

There are over 3,300 local jails operated by county and municipal jurisdictions nationwide. Jails typically hold unsentenced offenders, those sentenced to less than a year, and offenders sentenced to longer terms who are awaiting transfer to State prison. As a result, almost every State prisoner has been through a period of jail confinement.

Over a 3-year period (2000-02), the Nation's 50 largest jail jurisdictions reported a total of 1,037 deaths from all causes (table 2). This death count represented a higher overall mortality rate (167 per 100,000 inmates in the average daily population) than other jails (140 per 100,000).

Mortality rates varied widely among the top 50 jurisdictions. Twelve of these 50 jurisdictions had overall mortality rates of fewer than 100 deaths per 100,000 inmates, led by Suffolk County, Massachusetts (29), Orange County, California (42), and Mecklenburg County, North Carolina (52). Another 16 of the top 50 jurisdictions had rates of 200 or more deaths per 100,000 inmates, led by Baltimore City, Maryland (381), Jacksonville City, Florida (341), and Davidson County, Tennessee (291).

The 50 largest jail jurisdictions collectively had a comparatively low prevalence of suicide. Inmate suicides accounted for 17% of all deaths in these 50 largest jurisdictions but were the cause of 41% of the deaths in all other jails. The suicide rate of the 50 largest jurisdictions (29 per 100,000) was half that of all other jails (57).

Eight of the top 50 jurisdictions reported no suicides during 2000-02, and another 4 jurisdictions had a suicide rate of 10 per 100,000 or less. Ten of these jurisdictions also had suicide rates of at least 50 per 100,000 inmates, led by Clark County, Nevada (107), Wayne County, Michigan (97), and Baltimore City, Maryland (88).

## During 2002 the Nation's smallest jails had a suicide rate 5 times that of the largest jails

On an average day in 2002, over 40% of the nation's jails housed fewer than 50 inmates, while 2% of all jails held at least 1,500 inmates. Rates of inmate suicide were closely related to jail size, with the smallest facilities recording the highest suicide rates.

| Number of inmates in jail | Local jail mortality rate, per 100,000 inmates, 2002 | |
|---|---|---|
| | All causes | Suicide |
| Total | 147 | 47 |
| Fewer than 50 | 313 | 177 |
| 50-99 | 159 | 77 |
| 100-149 | 120 | 50 |
| 150-249 | 107 | 48 |
| 250-499 | 124 | 53 |
| 500-999 | 102 | 33 |
| 1,000-1,499 | 133 | 43 |
| 1,500-1,999 | 150 | 32 |
| 2,000 or more | 173 | 32 |

Note: Mortality rates are based on average daily population (ADP) during the calendar year; table excludes 47 jail facilities, which did not report valid ADP data.

The Nation's largest jail facilities recorded the lowest suicide rates (32 per 100,000 inmates). The suicide rate rose steadily as jail size decreased and was over 5 times higher (177 per 100,000) in jails holding fewer than 50 inmates. However, given their small populations, these jails accounted for 14% of all jail suicides.

### Jail suicide rates drop by over 90% when based on "at-risk" population

BJS has usually based jail mortality rates on the average daily population of inmates (an ADP of under 700,000). A more sensitive measure of jail mortality would reflect the far larger number of persons admitted into these facilities over the entire year (nearly 13 million). All of these persons admitted are at risk of dying while held in jail.

Past attempts to collect admission data for a whole year were unsuccessful, because many jail information systems do not keep cumulative counts of admissions. As part of the new Deaths in Custody records, BJS collected annual admission data, which can be used to calculate an at-risk measure of mortality for the Nation's largest jails.

While the 50 jurisdictions had an average daily population of 207,471 over the 3-year period, these same jails had an average of 2,827,133 admissions each year. As a result, the at-risk mortality rates of these jurisdictions are far lower. The ADP rate of overall mortality in the top 50 jurisdictions (167 per 100,000) was 15 times the at-risk rate (11). The ADP-based suicide rate for these 50 jurisdictions (29 per 100,000) was 14 times the at-risk suicide rate for these facilities (2 per 100,000).

### Males and white inmates had the highest rates of suicide in jails

Among local jail inmates, mortality rates varied across demographic subgroups (table 3). In terms of deaths from all causes, male inmates had a higher death rate (150 per 100,000 inmates) than females (130). Gender was a stronger factor in suicide rates: males (50 per 100,000) were 56% more likely to commit suicide than female jail inmates (32). The homicide rate of male jail inmates was low (3 per 100,000) and female inmates did not experience a single homicide during 2000-02.

The most common cause of death among jail inmates was illness (48% of all jail deaths during 2000-02). As a result, the overall mortality rates of jail inmates steadily rose with age. Among jail inmates age 18-24, the mortality rate was 60 per 100,000; this rate was 3 times higher for inmates age 35-44 (179), and over 11 times higher for inmates age 55 or older (694). The only exception to this pattern was the death rate of jail inmates under age 18 (138 per 100,000), who made up less than 2% of all jail deaths.

Jail suicide rates also increased with inmate age. Inmates age 18-24 were the least likely to commit suicide (38 suicides per 100,000 inmates); this rate increased 24% for inmates age 25-34 (47), and 39% for inmates age 35-44 (53). The oldest inmates, age 55 or older, had the highest rate of suicide (58 per 100,000) among adult inmates.

The youngest jail inmates were the exception to this pattern; jail inmates under 18 had the highest suicide rate in local jails (101 per 100,000). Given their relatively small numbers, inmates under the age of 18 committed 35 of the 918 jail suicides recorded nationwide over 3 years.

Table 3. Local jail and State prison inmate mortality rates, per 100,000 inmates, by selected characteristics

| Characteristic | Average annual mortality rate, per 100,000 inmates | | | | | |
|---|---|---|---|---|---|---|
| | Local jail inmates, 2000-02 | | | State prison inmates, 2001-02 | | |
| | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All Inmates** | 148 | 48 | 3 | 244 | 14 | 4 |
| **Gender** | | | | | | |
| Male | 150 | 50 | 3 | 251 | 14 | 4 |
| Female | 130 | 32 | 0 | 140 | 10 | 0 |
| **Age** | | | | | | |
| Under 18 | 138 | 101 | 0 | 52 | 52 | 0 |
| 18-24 | 60 | 38 | 3 | 34 | 14 | 3 |
| 25-34 | 99 | 47 | 2 | 63 | 14 | 3 |
| 35-44 | 179 | 53 | 4 | 182 | 14 | 4 |
| 45-54 | 349 | 52 | 7 | 571 | 13 | 3 |
| 55 or older | 694 | 58 | 0 | 2,019 | 13 | 4 |
| **Race/Hispanic origin** | | | | | | |
| White, non-Hispanic | 219 | 96 | 3 | 327 | 22 | 5 |
| Black, non-Hispanic | 118 | 16 | 3 | 207 | 8 | 2 |
| Hispanic | 98 | 30 | 3 | 243 | 18 | 7 |

Note: Jail inmate mortality rates are per 100,000 inmates held, based on average daily population (ADP). Inmate populations of various demographic subgroups are estimates based on the Annual Survey of Jails and the 2002 Survey of Inmates in Local Jails. State prison rates are per 100,000 inmates held in custody on June 30. Prisoner demographic subgroups are estimates based on the June 30 National Prisoner Statistics custody counts and demographic data from the National Corrections Reporting Program.

Inmate age did not have any clear relationship to jail homicide rates, which were no higher than 7 per 100,000 inmates for all age groups. Both the youngest (under 18) and oldest (55 or older) inmates had no homicide deaths during 2000-02.

**White jail inmates 6 times more likely to commit suicide than black inmates and 3 times more likely than Hispanic inmates**

Mortality rates displayed substantial differences by race and ethnicity. Death rates from all causes for both black (118 per 100,000 inmates) and Hispanic (98) jail inmates were at least 20% below the overall jail inmate mortality rate (148). But the death rate of white jail inmates (219 per 100,000) was 86% higher than that of black inmates and over twice as high as the rate for Hispanic inmates.

Differences across racial/ethnic categories were more pronounced in jail inmate suicide rates. The suicide rate of white jail inmates (96 per 100,000 inmates) was more than triple that of Hispanic inmates (30) and was 6 times the suicide rate for black inmates (16). White inmates accounted for nearly three-quarters of all jail inmate suicides during 2000-02.

Unlike the overall mortality and suicide rates, homicide rates were not related to race/ethnicity. White, black and Hispanic jail inmates were all equally likely to be victims of a homicide (3 deaths per 100,000 inmates).

**State prisoners age 45 or older made up 17% of inmates but 66% of deaths**

Just as in local jails, male State prisoners had higher overall mortality rates than female prisoners. While this difference was modest in local jails (the male death rate was 15% higher), males (251 deaths per 100,000 prisoners) were 79% more likely than females (140) to die in State prison during 2001-02.

In contrast, male and female suicide rates in State prisons were similar (14 suicides per 100,000 males, compared to 10 per 100,000 females). In local jails men were over 50% more likely than women to commit suicide.

The increase in mortality rates seen in older jail inmates was also evident among older State prisoners. The overall death rate was lowest for State prisoners age 18-24 (34 per 100,000). The death rate was over 5 times higher for State prisoners age 35-44 (182) and nearly 17 times higher for prisoners age 45-54 (571). The mortality rate of the oldest prisoners, age 55 or older, was highest (2,019 – or 59 times higher than the rate for prisoners age 18-24).

Deaths attributed to "illness/natural cause" made up 80% of all State prison deaths reported during 2001-02. Two-thirds of all State prison deaths involved inmates age 45 or older, though such inmates represented 17% of all State prisoners held during 2001-02.

| Inmate age | Number of inmate deaths | |
| --- | --- | --- |
| | Local jails, 2000-02 | State prisons, 2001-02 |
| All inmates* | 2,834 | 5,818 |
| Under 18 | 48 | 3 |
| 18-24 | 323 | 149 |
| 25-34 | 609 | 507 |
| 35-44 | 896 | 1,323 |
| 45-54 | 667 | 1,809 |
| 55 or older | 291 | 2,027 |

*Excludes 9 jail inmates and 6 State prisoners whose ages were not reported.

Despite the close relationship between age and the overall mortality rates in State prison, inmate age was not related to suicide rates. State prisoner suicide rates ranged from 13 to 14 suicides per 100,000 prisoners for every age group over 18. The suicide rate of State prisoners under 18 was 4 times higher (52 per 100,000), but this age group accounted for less than 0.3% of State prisoners and had 3 suicides nationwide over 2 years. By comparison, 116 prisoners age 25-34 committed suicide during 2001-02.

Age also showed no relationship to State prison homicide rates, with all age groups over age 18 recording a homicide rate of either 3 or 4 per 100,000 inmates. No reported homicides involved State prisoners under age 18 during 2001-02.

**Black inmates had the lowest suicide and homicide rates in State prisons**

As in local jails, white inmates had the highest overall mortality rate (327 deaths per 100,000 prisoners). While the mortality rate of white jail inmates was 86% higher than that of blacks and 123% higher than that of Hispanics, the differences in State prison were smaller. White State prisoners were 35% more likely than Hispanic inmates (243 per 100,000) and 58% more likely than black prisoners (207) to die during 2001-02.

White inmates had the highest suicide rate of all State prisoners (22 suicides per 100,000 inmates). This rate was 22% higher than the Hispanic suicide rate (18 per 100,000). By comparison, white inmates in local jails were 3 times more likely than Hispanics to commit suicide. Black inmates had the lowest suicide rate of all State prisoners (8 per 100,000). Blacks were about a third as likely as whites to commit suicide in State prison and less than half as likely as Hispanics.

Homicide rates were less than 10 per 100,000 State prisoners for all racial/ethnic groups during 2001-02. Hispanic inmates were the most likely to be killed in State prisons (7 homicides per 100,000 inmates), which was over 3 times the homicide rate of black inmates (2 per 100,000). The homicide rate for white inmates (5) almost matched the rate for all State prisoners (4).

## Violent offenders committed suicide at nearly triple the rate of nonviolent offenders in jails

The death rate of violent offenders in local jails (212 per 100,000) was 75% higher than that of nonviolent offenders (121), but this difference was larger in cases of suicide (table 4).

The suicide rate of violent jail inmates (92 per 100,000) was nearly triple that of nonviolent offenders (31). Kidnaping offenders had the highest suicide rate (275), followed by those inmates held for rape (252) or homicide (182).

|  | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
|---|---|---|---|
| Current offense | All causes | Suicide | Homicide |
| Violent | 212 | 92 | 5 |
| Nonviolent* | 121 | 31 | 2 |

*Excludes offenders with "other/unspecified" current offenses.

Among all nonviolent offenders, only probation/parole violators had a suicide rate of at least 100 per 100,000 (118). Drug offenders were found to have the lowest rates of mortality, particularly suicide. Drug offenders were the only group that had fewer than 100 deaths from all causes per 100,000 jail inmates (92). The suicide rate of drug offenders (18 per 100,000) was the lowest among offender groups. Violent offenders (92) were 5 times more likely to commit suicide than drug offenders, and public-order offenders were more than twice as likely to commit suicide (42).

## Local jails had an average of fewer than 20 inmate homicides each year

Over 3 years (2000-02), there were 59 jail inmate homicides reported nation-wide, resulting in a rate of 3 jail inmate homicide deaths per 100,000 inmates. Violent offenders were the most likely to be killed in local jail (5 homicides per 100,000 inmates), followed by property and public-order offenders (3 for both). Drug offenders (1 per 100,000) had the lowest homicide victimization rate of all offenders.

Kidnaping offenders had the highest rate of jail inmate homicide (15 per 100,000 inmates — 5 times the rate for all inmates), followed by inmates held for rape (9) and violation of parole/ probation (7). But even among these offenders with the highest homicide rates, a combined total of eight homicides took place nationwide over this 3-year period.

Table 4. Average annual jail inmate mortality rates, by most serious current offense, 2000-02

| Current offense | Number of local jail inmate deaths, 2000-02 | | | Average annual mortality rate, per 100,000 local jail inmates, 2000-02 | | |
|---|---|---|---|---|---|---|
|  | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| All offenses | 2,843 | 918 | 59 | 148 | 48 | 3 |
| Violent offenses | 1,026 | 447 | 24 | 212 | 92 | 5 |
| Homicide* | 162 | 87 | 3 | 338 | 182 | 6 |
| Kidnaping | 54 | 37 | 2 | 401 | 275 | 15 |
| Rape | 56 | 29 | 1 | 489 | 252 | 9 |
| Other sexual assault | 122 | 51 | 0 | 227 | 95 | 0 |
| Robbery | 130 | 48 | 3 | 121 | 44 | 3 |
| Assault | 377 | 144 | 14 | 168 | 64 | 6 |
| Property offenses | 530 | 164 | 16 | 113 | 35 | 3 |
| Burglary | 139 | 58 | 4 | 108 | 45 | 3 |
| Larceny/theft | 148 | 36 | 4 | 110 | 27 | 3 |
| Arson | 12 | 4 | 0 | 208 | 70 | 0 |
| Fraud | 91 | 28 | 3 | 97 | 30 | 3 |
| Drug offenses | 434 | 85 | 7 | 92 | 18 | 1 |
| Possession | 197 | 43 | 3 | 95 | 21 | 1 |
| Trafficking | 184 | 34 | 4 | 79 | 15 | 2 |
| Public-order offenses | 765 | 200 | 12 | 160 | 42 | 3 |
| Weapons | 35 | 13 | 1 | 91 | 34 | 3 |
| Obstruction of justice | 144 | 40 | 4 | 192 | 54 | 5 |
| Traffic | 86 | 23 | 1 | 121 | 32 | 1 |
| Driving while intoxicated[b] | 113 | 22 | 1 | 92 | 18 | 1 |
| Drunkenness/morals[c] | 92 | 23 | 1 | 282 | 71 | 3 |
| Violation of parole/ probation[d] | 249 | 66 | 4 | 448 | 118 | 7 |

Note: All mortality rates were calculated using average daily population counts from the Annual Survey of Jails and offense distribution estimates from the Survey of Inmates in Local Jails, 2002.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes drunkenness, vagrancy, disorderly conduct, unlawful assembly, morals, and commercialized vice.
[d]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

## Drug offenders had the lowest suicide and homicide rates of all State prisoners

State prison mortality rates showed similar patterns by offense type (table 5). Violent offenders not only had the highest overall mortality rate (312 deaths per 100,000 prisoners), they were the only State prisoners with a death rate of at least 200 per 100,000 prisoners held. Property and public-order offenders each had a rate of 184 deaths per 100,000, followed by drug offenders (166).

Compared to violent offenders in local jails (92 suicides per 100,000 inmates), the suicide rate of violent offenders in State prison (19 per 100,000) was much lower. But among State prisoners, violent offenders were more than twice as likely to commit suicide as nonviolent offenders (9 per 100,000).

Kidnapers had the highest suicide rate (36 per 100,000 prisoners), followed by offenders held for homicide (29), sexual assault (23), and assault (20). Among nonviolent offenders, probation/parole violators had the highest suicide rates (18 per 100,000), followed by offenders held for arson (16), burglary (14), and obstruction of justice (14). Drug offenders recorded the lowest suicide rates of all State prisoners (6 per 100,000 inmates).

The rate of homicide in State prison was 4 per 100,000 prisoners, and varied little across offense types. Three types of offenders had as many as 10 homicides per 100,000 prisoners — arsonists (16), kidnapers (15), and probation/parole violators (12). Among these three categories with the highest homicide rates, the number of homicides was small, with a total of nine prisoners killed over 2 years.

State prisoners convicted of fraud and driving while intoxicated had the lowest rate of homicide, with zero homicides reported for 2001-02.

## Nearly half of jail suicides occurred in the first week of custody

Jail inmate suicides were heavily concentrated in the first week spent in custody. Forty-eight percent of all jail suicides during 2000-02 took place during the inmate's first week following admission. In particular, almost a quarter of all jail suicides took place either on the date of admission to jail (14%) or the following day (9%).

| Time served after admission | Percent of jail inmate suicides, 2000-02 |
|---|---|
| Same day | 13.7% |
| Next day | 9.0 |
| 2-7 days | 24.9 |
| 8-14 days | 9.6 |
| 15-30 days | 7.7 |
| 31-60 days | 10.6 |
| 61-180 days | 14.0 |
| 181 days or more | 10.4 |

The frequency of jail suicides slowed after the initial week, with the second week of custody accounting for 10% of jail suicides. The next 2 weeks in custody (days 15 to 30) accounted for even fewer suicides (8%). Despite this early concentration of suicides, more suicides took place after the 60th day in jail (24%) than during the first 2 days (23%).

The median time served in jail prior to committing suicide was just over 1 week (9 days), but this period of time varied across demographic and criminal offense categories (table 6). Females spent less than half as much time as males in jail prior to committing suicide (median time served: 4 days for females and 10 days for males). The median length of time served by Hispanic inmates prior to suicide (23 days) was over twice as long as the time for white inmates (9 days) and nearly 4 times longer than that for black inmates (6 days).

| Table 5. Average annual State prison inmate mortality rates, by most serious current offense, 2001-02 | | | | | | |
|---|---|---|---|---|---|---|
| | Number of State prison inmate deaths, 2001-02 | | | Average annual mortality rate, per 100,000 State prison inmates, 2001-02 | | |
| Current offense | All causes | Suicide | Homicide | All causes | Suicide | Homicide |
| **All offenses** | 5,824 | 337 | 87 | 244 | 14 | 4 |
| **Violent offenses** | 3,691 | 229 | 53 | 312 | 19 | 4 |
| Homicide[a] | 1,295 | 89 | 16 | 417 | 29 | 5 |
| Kidnaping | 151 | 5 | 5 | 454 | 36 | 15 |
| Rape | 344 | 14 | 1 | 299 | 12 | 1 |
| Other sexual assault | 803 | 36 | 8 | 523 | 23 | 5 |
| Robbery | 552 | 28 | 11 | 171 | 9 | 3 |
| Assault | 485 | 44 | 11 | 217 | 20 | 5 |
| **Property offenses** | 904 | 58 | 18 | 184 | 12 | 4 |
| Burglary | 447 | 36 | 9 | 177 | 14 | 4 |
| Larceny/theft | 199 | 10 | 4 | 209 | 10 | 4 |
| Arson | 35 | 2 | 2 | 277 | 16 | 16 |
| Fraud | 128 | 6 | 0 | 209 | 10 | 0 |
| **Drug offenses** | 853 | 33 | 11 | 166 | 6 | 2 |
| Possession | 278 | 10 | 5 | 224 | 8 | 4 |
| Trafficking | 485 | 21 | 6 | 188 | 8 | 2 |
| **Public-order offenses** | 319 | 13 | 4 | 184 | 7 | 2 |
| Weapons | 36 | 2 | 1 | 67 | 4 | 2 |
| Obstruction of justice | 53 | 2 | 1 | 381 | 14 | 7 |
| Driving while intoxicated[b] | 123 | 2 | 0 | 263 | 4 | 0 |
| Violation of parole/ probation[c] | 32 | 3 | 2 | 194 | 18 | 12 |

Note: All mortality rates were calculated using June 30 custody prisoner counts from the National Prisoner Statistics program and 2002 offense distribution estimates from the National Corrections Reporting Program.
[a]Includes murder and manslaughter.
[b]Includes driving while intoxicated and driving under the influence of drugs or alcohol.
[c]Includes parole or probation violations, escape, AWOL, and flight to avoid prosecution.

Of all offender groups, public-order offenders spent the shortest time in custody prior to committing suicide; half of their suicides took place in the first 3 days of custody. Property and drug offenders each had a median time served of about a week (7 and 8 days, respectively) prior to suicide. Violent offenders spent the longest time in custody prior to suicide; half of their suicides took place after spending 3 weeks in jail (20 days).

## 7% of State prison suicides took place during the first month

In State prison, suicides were less concentrated around admission. Sixty-five percent of jail suicides occurred in the first 30 days, but 7% of prison suicides took place during the first month. Most State prison suicides (65%) took place after the inmate's first year of confinement, and 33% took place after the inmate had served at least 5 years in prison.

| Time served since admission | Percent of State prisoner suicides, 2001-02 |
|---|---|
| Less than 1 month | 7.4% |
| 1-5 months | 14.9 |
| 6-11 months | 12.5 |
| 12-23 months | 11.0 |
| 24-59 months | 21.4 |
| 60-119 months | 18.5 |
| 120 months or more | 14.3 |

The median time served in State prison prior to a suicide (30 months) was over 100 times longer than in local jails (9 days). Male (30 months) and female (29 months) State prisoners spent almost identical amounts of time in prison before committing suicide. However, race was related to the length of time served prior to suicide. Half of all suicides by white inmates occurred in the first 21 months of custody, while the corresponding figures for black (40 months) and Hispanic inmates (49 months) were twice as long.

Violent State prisoners spent more time in custody prior to suicide than other offenders (median time served was 45 months). Drug offenders were the only other offender group who served a median of at least a year in State prison prior to their suicides (18 months), followed by property (10 months) and public-order offenders (9 months).

## At least 80% of suicides in prison and jail occurred in the inmate's cell; time of day not a factor

The vast majority of both local jail (80%) and State prison (87%) inmate suicides took place within the inmate's cell or room (table 7). Temporary

holding areas (lockups) were the next most common location of suicide events (10% in jails, 4% in prisons). Common areas such as cafeterias, libraries, and recreational areas were the scene of very few suicides (6% in jails, 3% in State prisons), as were areas outside of the correctional facility (2% of jail suicides, 3% percent of prison suicides).

Suicide events in both local jails and State prisons showed little relationship to the time of day. Aside from morning hours (20% of jail suicides), the frequency of suicides in other parts of the day varied from 24% (during after-noon hours) to 28% (evening and overnight hours). Similar data were reported for suicides in State prisons. Twenty percent of State prisoner suicides took place in the morning, with all other times of day varying from 25% (evening and overnight hours) to 30% (afternoon hours).

In both local jails (94%) and State prisons (89%), the majority of suicide events were followed up by the performance of an autopsy or post-mortem examination by a medical examiner or county coroner.

---

**Table 6. Time served since admission by jail inmates and State prisoners committing suicide, by selected characteristics**

| | Median time served since admission* | |
|---|---|---|
| Characteristic | Local jail inmate suicides, 2000-02 | State prisoner suicides, 2001-02 |
| All inmates | 9 days | 30 months |
| **Gender** | | |
| Male | 10 days | 30 months |
| Female | 4 | 29 |
| **Race/Hispanic origin** | | |
| White, non-Hispanic | 9 days | 21 months |
| Black, non-Hispanic | 6 | 40 |
| Hispanic | 23 | 49 |
| **Current offense** | | |
| Violent | 20 days | 45 months |
| Property | 7 | 10 |
| Drug | 8 | 18 |
| Public-order | 3 | 9 |

*The median time served is that length of time at which half of the inmates spent less time in custody, and the other half spent more.

---

**Table 7. Time of day and location of suicide events in local jails and State prisons**

| | Percent of inmate suicides | |
|---|---|---|
| | Local jail inmates, 2000-02 | State prisoners, 2001-02 |
| **Time of day** | | |
| Overnight (midnight-6 a.m.) | 28.0% | 24.7% |
| Morning (6 a.m.-noon) | 19.5 | 19.9 |
| Afternoon (noon-6 p.m.) | 24.1 | 30.4 |
| Evening (6 p.m.-midnight) | 28.4 | 25.0 |
| **Location of suicide event** | | |
| Inmate's cell/room | 80.8% | 86.6% |
| Temporary holding area | 9.6 | 4.0 |
| Common area[a] | 6.1 | 3.0 |
| Outside of the facility[b] | 2.3 | 3.0 |
| Elsewhere | 1.1 | 3.4 |
| Number of suicides[c] | 918 | 337 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or work release, under community supervision by the jail/prison, or in transit to/from the facility.
[c]Time of day was not reported for 12 jail and 41 prison suicides; location was not reported for 6 jail and 39 prison suicides.

## Most jail homicides occurred at least 2 weeks after admission

During 2000-02 the number of homicides in the more than 3,000 jail jurisdictions nationwide had an average of fewer than 20 each year. In State prisons, which held nearly 1.2 million inmates nationwide, there were fewer than 50 homicides each year during 2001-02.

These homicide counts resulted in a rate of less than 5 homicides per 100,000 inmates in both State prison (4 per 100,000) and local jail (3 per 100,000 inmates, based on ADP). In the 50 largest jails nationwide, the at-risk rate of homicide averaged 0.4 per 100,000 inmates held during the year.

| Time served after admission | Percent of jail inmate homicides, 2000-02 |
|---|---|
| Same day | 5.3% |
| Next day | 7.0 |
| 2-7 days | 17.5 |
| 8-14 days | 15.8 |
| 15-30 days | 10.5 |
| 31-60 days | 14.0 |
| 61-180 days | 14.0 |
| 181 days or more | 15.8 |

Unlike suicides, homicides in local jails were not concentrated in the first few days following admission. Twelve percent occurred in the first 2 days in custody, but 54% took place after the inmate had served at least 2 weeks in jail. The median length of time served prior to a homicide death (29 days) was triple that of suicide deaths in local jails (9 days).

## Two-thirds of homicide victims in State prison had served at least 2 years in prison; nearly 40% had served 5 years or more

The initial months following admission to prison accounted for a small percentage of State prisoner homicides (table 8). One percent of prison homicides took place during the victim's first month in prison, and less than a tenth of homicide victims had served fewer than 6 months (8%). A fifth of homicides involved State prisoners who had served less than a year.

Among the 5,824 total prisoner deaths reported nationwide during 2001-02, fewer than 20 were homicides of a first-year inmate. Sixty-seven percent of State prison homicide victims had spent at least 2 years in prison, while 37% had served at least 5 years.

The median time served in State prison by homicide victims was 44 months. Hispanic homicide victims (with a median time served of 22 months) were killed after serving less than half

| Table 8. Time served, time of day, and location of homicide events in State prisons, 2001-02 | Percent of State prison homicides, 2001-02 |
|---|---|
| **Time served after admission** | |
| Less than 1 month | 1.1% |
| 1-5 months | 6.9 |
| 6-11 months | 11.5 |
| 12-23 months | 13.8 |
| 24-59 months | 29.9 |
| 60-119 months | 24.1 |
| 120 months or more | 12.6 |
| **Time of day** | |
| Overnight (midnight-6 a.m.) | 11.4% |
| Morning (6 a.m.-noon) | 38.6 |
| Afternoon (noon-6 p.m.) | 28.6 |
| Evening (6 p.m.-midnight) | 21.4 |
| **Location of homicide event** | |
| Inmate's cell/room | 60.5% |
| Temporary holding area | 2.6 |
| Common area[a] | 28.9 |
| Outside of the facility[b] | 2.6 |
| Elsewhere | 5.3 |

[a]Includes cafeteria, exercise yard, library, day room, recreational area, and workshops.
[b]Includes inmates on work details or at work release sites, under community supervision by the prison, or in transit.

as much time as white (46 months) or black (55 months) prisoners.

Public-order offenders were the most likely to be killed early in their prison terms, with a median time served of just under 2 years (23 months). The median term served by both drug (40 months) and property (45 months) offenders was about twice as high. Violent offenders had the longest amount of time served in prison prior to being killed, with a median term of almost 5 years (55 months).

| Characteristic | Median time served after admission: State prisoner homicides, 2001-02 |
|---|---|
| All inmates | 44 months |
| **Race/Hispanic origin** | |
| White, non-Hispanic | 46 months |
| Black, non-Hispanic | 55 |
| Hispanic | 22 |
| **Current offense** | |
| Violent | 55 months |
| Property | 45 |
| Drug | 40 |
| Public-order | 23 |

Prison suicides took place almost exclusively inside the deceased's cell or room (87%); no other location accounted for even 5% of suicide events. However, over a quarter of all prison homicides (29%) took place in common areas within prisons, such as cafeterias, libraries, workshops, and recreational yards. A small percentage of homicide events took place in either a temporary holding area or a location outside of the prison facility (3% for each). Prisoners' cells or rooms (61%) were the most likely scene of a homicide in State prison.

State prison homicides were over 3 times more likely to occur during the morning (39% of homicides) than between midnight and 6 a.m. (11%).

Nearly all State prison homicides (92%) resulted in an autopsy or post-mortem exam of the deceased. All but 8 of 87 prisoner homicides during the 2-year period were committed by other inmates (91%). Of those "other homicide" events, most involved escape attempts or cases in which assailant identity was not established.

**Homicide rate of U.S. residents, when standardized, 10 times the rate of jail inmates in 2002**

According to rates compiled by the Centers for Disease Control and Prevention (CDC), the U.S. resident population experienced 6 homicides and 11 suicides per 100,000 residents (table 9). The homicide rates for both State prisoners (4) and jail inmates (3) were lower than that for the U.S. population. Suicide rates for both State prisoners (14) and jail inmates (47) were higher than the rate for the resident population. However, reliable comparisons of such rates require closer analysis.

The demographic compositions of inmate populations do not reflect those of the U.S. resident population. In 2002 the U.S. population was 51% female, 81% white, and 22% age 55 or older; by comparison, the State prison population was 6% female, 50% white, and 4% age 55 or older.

The suicide and homicide rates of these demographic subgroups vary substantially. For example, the homicide rate of black males age 18-24 in the resident population (108 per 100,000) was over 8 times that for white males of the same age (13). As a result, the differing rates of death seen in the general population and correctional facilities reflect differences in demographic makeup as much as differences in the relative safety of these environments.

To improve the comparison of mortality risks, the resident population rates can be standardized by age, race, and gender to match the proportions seen in prisons and jails. The resulting rates estimate what the resident population mortality rates would be if the resident population had the same demographic composition as prisons and jails.

Standardized to match the State prison population, the resident population had a homicide rate (35 per 100,000) nearly 9 times the rate of homicide in

State prisons (4). Standardizing to match local jail demographics yields a greater difference the resident rate (32 per 100,000) being nearly 11 times higher than the rate in jails (3).

State prisoners had a higher rate of suicide (14 per 100,000) than the overall resident population (11). Once standardized to match the State prisoner population, the U.S. resident rate of suicide (18) exceeded that of State prisoners in 2002.

The standardized resident suicide rate (17 per 100,000) was less than half of the jail suicide rate based on ADP (47). However, an at-risk rate of jail suicide would be a more appropriate comparison, but not all jails reported the needed admission data. Based on the at-risk measure of suicide for the top 50 jail jurisdictions, an at-risk jail suicide rate for all jails would likely be less than a tenth of the ADP measure. (See page 5.)

**Methodology**

BJS phased in data collection activity under the Death in Custody Reporting Act of 2000 (PL 106-297), with the first collection of death records covering only local jail facilities. The 2000 jail collection covered the entire calendar year (the act became law in October of 2000), while subsequent collections were done on the quarterly basis required by the act.

BJS requires a quarterly report from all jails which had an inmate death during the period. All jails were instructed to

complete an annual summary of death reports and population counts (to allow for calculation of death rates).

Jail response rates for all 3 years were over 99%. In 2000, 3,063 jurisdictions responded, and 9 refused, for a response rate of 99.7%. Data for 2001 was submitted by 3,049 jurisdictions, with 2 refusals, for a response rate of 99.9%. In 2002, data were submitted by 3,030 jurisdictions and refused by 6, for a response rate of 99.8%.

Quarterly collection of State prison inmate death records began in 2001. These records were collected from State departments of corrections, rather than from each prison facility. For all years, BJS has had 100% participation from all 50 State prison systems. Data were also collected from the District of Columbia for 2001 in which it still operated a prison system, prior to transferring sentenced felons to the custody of the Federal Bureau of Prisons.

Copies of all questionnaires collected under the Deaths in Custody series can be found on the BJS website at <http://www.ojp.usdoj.gov/bjs/quest.htm>.

*Standardized U.S. resident death rates*

Homicide and suicide rates for specific age, race, and gender groups within the U.S. population can be queried from the Centers for Disease Control and Prevention's online injury mortality reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>.

**Table 9. Mortality rates of U.S. resident population and State prison and local jail inmate populations, per 100,000 residents, 2002**

| Cause of death | Deaths per 100,000 residents, 2002 | | | | |
|---|---|---|---|---|---|
| | U.S. resident population rate | State prisons | | Local jails | |
| | | Standardized U.S. resident rate | State prisoner rate[e] | Standardized U.S. resident rate | Local jail inmate rate[b] |
| Suicide | 11 | 18 | 14 | 17 | 47 |
| Homicide | 6 | 35 | 4 | 32 | 3 |

Note: U.S. resident population mortality rates are taken from the Centers for Disease Control and Prevention's injury mortality reports <http://webappa.cdc.gov/sasweb/ncipc/mortrate.html>. BJS standardized those rates by age, race, and gender to match the characteristics of the State prison and local jail inmate populations.
[e]State prisoner rates of suicide and homicide are based on June 30 custody population.
[b]Local jail inmate rates of suicide and homicide are based on average daily population (ADP).

For example, the 2002 suicide rate for white females, age 35-44, was 7.8 per 100,000. These rates were then standardized to match the characteristics of State prison and local jail populations by weighting the rates by the proportion of all inmates represented by that subgroup. The sum of all of the weighted subgroup rates provides the standardized rate for the resident population.

Population proportions for these gender, race and age subgroups of inmates were derived from the National Corrections Reporting Program (for State prisoners) and the 2002 Survey of Inmates in Local Jails (for jail inmates).

*Population bases for mortality rates*

Annual mortality rates were based on different population counts:

1. For prisons the custody population on June 30 of each year

2. For local jails the average daily population in each calendar year.

Estimates of the population at risk for the largest jail jurisdictions combined the population on January 1 and admissions during the year.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Lawrence A. Greenfeld is director.

Christopher J. Mumola wrote this report, under the supervision of Allen J. Beck. Doris J. James, Lauren E. Glaze, and Rebecca L. Medway verified the report, and Tom Hester edited it.

Christopher J. Mumola, under the supervision of Allen J. Beck, designed the survey, developed the questionnaires, and monitored data collection and data processing.

Data collection and processing of State prison death records were carried out by Lara Reynolds. Data collection and processing of local jail death records were carried out by Pamela Butler, Margaret Ferguson, Patricia Torreyson, and Pearl Chase, under the supervision of Charlene Sebold, Governments Division, Census Bureau, U.S. Department of Commerce.

August 2005   NCJ 210036

**Office of Justice Programs**
Partnerships for Safer Communities

http://www.ojp.usdoj.gov

**Obtain the most recent counts of inmate deaths from *Key Facts at a Glance* on the BJS Internet site:**

http://www.ojp.usdoj.gov/bjs/
glance/shipj.htm

**Exhibit L**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

ERNEST GALVAN
RICHARD HARDACK
JANE KAHN
THOMAS NOLAN
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

May 29, 2003

VIA FACSIMILE AND U.S. MAIL

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02195

Re:    Plaintiffs' Objections to the Draft Eleventh Monitoring Report
        Our File No. 489-3

Dear Mr. Keating:

Plaintiffs have the following comments and objections to the draft version of the Eleventh Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft Report"). Plaintiffs' comments and objections to the Draft Report focus on the need for additional recommendations by the Special Master to address the closure of CMF's Intermediate Inpatient Care Program, the continued under-utilization of DMH and DMH transfer delays, the significant transfer delay of EOP inmates housed in reception centers and administrative segregation units, and the continued "troubled" status of CSATF and Corcoran. Furthermore, these comments will address our concerns with the process of paper reviews that have been conducted to date.

1.    CMF Intermediate Inpatient Care Program Closure

The Draft Report is justifiably critical of the Department's plans to close the intermediate care units at CMF in favor of the Level IV SVSP DMH beds, noting that "the inappropriateness of placing a Level III occupant of the totally open dorm DTP in CMF in the Level IV intermediate inpatient program at SVSP for psychotic, behaviorally disordered, violent inmates seems obvious." Draft Report at 265. Apparently this is not obvious to defendants, who continue to plan on just such a course of action. The Special Master has repeatedly found that defendants have failed to meaningfully address the consequences of their plan to close the CMF intermediate care DMH units. See September 3, 2002 Special Master's Report on Defendants' Inpatient Bed Need Study and Plan for Development of Programming Needs at 18 (finding that the Day Treatment Program "occup[ies] an entirely unique clinical niche in the MHSDS. A program that has been operating since 1988 and is completely occupied now must be filling some treatment needs."); id. at 18 ("The submitted plan's suggestion that the 64-bed ICF facility under development at Salinas Valley State Prison (SVSP) somehow represents an

J. Michael Keating, Jr.
May 29, 2003
Page 2

adequate substitute for the 39 intermediate treatment beds at CMF is a bit disingenuous, given that the SVSP program is designed for Level IV inmates with a turbulent history, not Level III inmates from a dormitory setting."). Nevertheless, the Draft Report does not recommend any specific action in response to defendants continued pursuit of their inappropriate closure plans.

On October 8, 2002, the district court affirmed your September 3, 2002 recommendation by ordering defendants to provide a clinical justification for the closure of the CMF ICF and Day Treatment Programs. Defendants did not do so. See Defendant' January 3, 2003 "Rationale." Defendants' alleged clinical rationales were almost entirely concerned with budgetary and licensing problems, and did not address the clinical needs of this population. See Plaintiffs' January 24, 2003 Letter to Mr. Keating Objecting to Defendants' Rationales for Closing Day Treatment and Intermediate Treatment Programs at CMF.

Given defendants' failure to provide a clinical rationale for the elimination of these programs, the Draft Report should be modified to recommend that defendants be ordered to keep the CMF intermediate programs open. The recommendation should further provide that if defendants wish to shut down these program, defendants must first seek leave of the district court to do so in a noticed motion setting forth defendants' concrete plans for meeting the treatment needs of the inmates currently served by these two programs.

   2.    DMH Issues – Training and Recordkeeping

The Draft Eleventh Report contains no information concerning access to DMH and referrals to DMH in the summary sections for many CDC institutions. It is not clear whether or not the issue was examined by monitors in those institutions.

The Draft Eleventh Report, where it does address this issue, includes significant and troubling findings. See Draft Eleventh Report at 18 (at **PBSP** "the timeliness of transfers to CMF/DMH had deteriorated since the monitor's last visit. The average time from referral to transfer was ten days as compared with 4.48 days in early 2002. Actual transfer delays ranged from four to 20 days…. PBSP had been informed that CMC/ASH would not accept any Level IV referrals. The institution was awaiting the opening of the intermediate care unit at SVSP, but staff reported having received "informal" indications that many of the PSU inmates in need of an intermediate level of inpatient care would not meet the criteria for admission to the SVSP program."); 22-23 (at **HDSP** "The time from a referral to CMF/DMH and the assignment of a bed number was typically from seven to 18 days. Delays of from five to 20 days occurred thereafter in transporting roughly 15 percent of referred inmates, who had received bed numbers from CMF/DMH. Three referrals were rejected, one of which involved an inmate who was re-admitted to the MHCB unit three times within six weeks after the rejection and placed on a Keyhea order. In the opinion of the monitor's expert, reasons for the rejection of two reviewed

J. Michael Keating, Jr.
May 29, 2003
Page 3

referrals were inappropriate and impermissible under the DMH/CDC MOU."); 27 (also at
**HDSP**, discussing confusion among clinicians concerning availability of ASH and
procedures for transfers to ASH); 45 ("**CMF's** disproportionate use of DMH/APP beds
impeded prompt access to acute inpatient care for inmates from other CDC institutions.
The average delay between referral and admission for inmates from elsewhere in the
CDC was 11 days, with thee longest delays running not uncommonly to more than three
weeks. . . . Despite the favored access to DMH/APP provided to CMF inmates, CMF
clinicians reported that psychotic inmates sometimes remained in the EOP general
population program and EOP administrative segregation awaiting transfer to DMH/APP.
Staff further complained that some inmates were returned prematurely without adequate
stabilization. For all of these reasons, some mental health staff in CMF continues to
express some reluctance to refer inmates to DMH/APP for a MHCB level of care. . . . ");
60-61 (at **Solano**, the large number of overlong stays in MHCB unit "were attributable to
delays in transfers to DMH or an EOP administrative segregation hub unit."); 89 (at
**Corcoran**, problems with timeliness of referrals to CMF/DMH, "with many inmates
waiting three to seven weeks after their admission to the MHCB unit before being
referred to CMF/DMH. The number of inmates referred to CMF/DMH also declined,
and some inmates in need of acute inpatient care, who should have been referred, were
not. While only 11 inmates were referred to CMF/DMH during the monitoring period,
63 inmates remained in the MHCB longer than ten days, several inmates had as many as
six to nine re-admission to the MHCB unit and ten inmates were placed in mechanical
restraints multiple times, all pretty clear indices that the potential for referrals outpaced
actual referrals. The monitor's experts identified specific inmates in the accompanying
case reviews whose course of treatment required more aggressive intervention at higher
levels of treatment, including an inpatient DMH level of care, who were inappropriately
retained in the CSP/Corcoran MHCB unit."); 108 (unclear how transfers to DMH from
**SATF** fared during the review period because the institution did not maintain a log of
such transfers); 113 (also unclear whether inmates from **PVSP** being transferred
appropriately due to record-keeping problems); 127 (at **SVSP** "the extended length of
stay for some inmates in the MHCB unit combined with the large number of multiple
admissions to the unit suggested that additional transfers to higher levels of care might be
warranted. The institution reported that only one inmate with three or more admissions
to the MHCB unit was referred to DMH."); 130 (also at **SVSP**, DMH referral log
incomplete); 161 (at **NKSP**, "[t]he DMH tracking log was incomplete and failed to
capture referral and acceptance dates for half of the inmates transferred to CMF/DMH.");
173 (five of six charts of inmates returning from DMH to **LAC** did not have evidence in
their charts of any notice of their return or a DMH discharge summary; in addition, some
inmates not seen for three to ten days following return from DMH); 187 (**CIM** clinician
"responsible for liaison with DMH routinely delayed seven to 15 days before referring
inmates to an inpatient level of care."); 191 (**CIM** also "appeared to be having problems
again with transferring inmates to CMF/DMH." CIM also experiencing high levels of

J. Michael Keating, Jr.
May 29, 2003
Page 4

rejections from ASH. Also, monitor found "Psychiatrists, inexcusably, were reportedly reluctant to refer inmates to CMF/DMH because inmates had often been rejected in the past."); 201 (finding at **RJD** of numerous long stays in MHCB, apparently without referrals to higher levels of care); 202 (transfers from **RJD** to CMF/DMH "became untimely once again." Also, found problems with transfer logs to CMF/DMH not recording many transfers. Also, for those inmates whose times were recorded on log, "average time between referral and transfer was 11 days, with individual delays ranging up to 20 days."); 205 (increased waits at **ISP** for DMH beds).

Several recommendations to the Court should flow from these factual findings.

First, the Special Master should recommend an order that defendants develop and submit to him a set of written guidelines and training materials to be distributed to all MHSDS clinicians on the criteria and procedures for referrals to inpatient care at CMF, SVSP and ASH. See Draft Report at 262 ("reports and rumors of a waiting list for entry into APP served as a disincentive to some institutional clinicians, who justified to themselves a refusal to make the referral to DMH/APP because of the anticipated delays in transfer." The Draft Report also states that "defendants needed to address" this issue).

Second, the repeated finding that DMH transfer data is not being properly logged underscores the need for a Court Order requiring defendants to track data concerning DMH transfers as well as data concerning inmates with frequent admission to MHCB units who are not referred to a higher level of care. Defendants have already been repeatedly ordered to track transfer information by the district court. See July 26, 1999 Order at ¶ 8; January 13, 2000 (granting defendants an additional six months to comply with ¶ 8 of the July 1999 Order); July 3, 2000 Order at ¶¶ 1, 4 (granting a further extension). This tracking system was supposed to record, for all mental health transfers, the date of referral, classification, endorsement and actual movement of the inmate to a higher level of care. Id.

Particularly given the focus of the next monitoring round on transfers to higher levels of care, it is critical that the Special Master's experts be given accurate data on this issue. The Draft Report should seek a court order requiring defendants to immediately ensure that all institutions are tracking all of the relevant transfer information above, and, in addition, the date of DMH acceptance, for all mental health transfers. Moreover, the recommendation should make clear that defendants should record the date of "referral" as the date of the clinical decision to refer an inmate to a higher level of care, not the date that any paperwork required for a referral was complete. In addition, in order to track DMH candidates who were not referred, the Eleventh Report should include a recommendation that each institution with a MHCB unit should be required to track inmates who have been referred to the unit more than three times in the last six months, and to fill out a form for each such inmate indicating whether a transfer to a higher level of care was considered for the inmate, and if no such transfer was made, why it was not clinically appropriate.

J. Michael Keating, Jr.
May 29, 2003
Page 5

> 3.    EOP Transfer Delay in Reception Centers

Although the department has not yet implemented a tracking system for length of stay of EOP inmates in reception, the individual institutions reported their data during the Eleventh Round monitoring tours. (See Draft Report at 21, 70, 75, 152, 158, 182, 187, 202 and 219.) Aside from DVI, compliance with the transfer guideline had not improved at any of the institutions, and had in fact, deteriorated at several of the reception centers during this monitoring round. (See Draft Report at 219, CIW – During the Tenth Round, 50% of the EOPs had a length of stay longer than 60 days, compared to 70% of the EOPs during the Eleventh Round; at 202,  RJD – The number of caseload inmates housed in the reception center beyond the transfer timelines increased significantly since the Tenth Round monitoring visit.) The Draft Report highlighted the need for "considerable departmental assistance to sort out and rectify the confluence of delays associated with parole revocation, classification and available bed space that lengthened the stays of caseload inmates in reception." (Draft Report at 71, Emphasis Added.)

The lack of any significant clinical resources devoted to the EOP population delayed in the reception centers, coupled with the lengthy stays identified in the Draft Report mandates the need for a recommendation that directs HCSD to develop a plan within 60 days to identify and address the system-wide factors contributing to the failure to comply with the court-ordered transfer timelines for reception center EOPs.

> 4.    EOPs in Administrative Segregation

Plaintiffs' concerns regarding EOPs housed in administrative segregation relate to two factors. The first concern is defendants' continued failure to comply with the court ordered transfer timelines for EOP inmates housed in non-HUB administrative segregation units. The second concern relates to the length of stay of EOP inmates housed in the HUB facilities, either because of an inadequate number of PSU beds, PSU transfer delay because of pending disciplinary actions or other factors, including lack of Level IV EOP sensitive needs housing.

> (a)    Hub Transfer Delay

Transfer guidelines require that EOP inmates housed in non-HUB facilities be transferred to HUB facilities within 30 days. The Draft Report mis-states the standard in the summary section – stating that "EOP inmates housed in administrative segregation units in CDC's 23 non-hub institutions were to be transferred within a maximum of 60 days." (Draft Report at 253,.256)

At Solano, the length of time to transfer its EOP inmates in ad.seg. increased during the 11th round monitoring period because its HUB facility was full. The institution reported that CMF was the only transfer option for its EOP inmates housed in its ad.seg. unit. (See Draft Report at 60). This was clearly not the intent of the policy

J. Michael Keating, Jr.
May 29, 2003
Page 6

developed by HCSD establishing ASU hubs.  There was no exception to the transfer
guideline created if the institution's designated HUB facility was full.

At DVI, only 60 percent of the EOP inmates housed in the psychiatric
administrative segregation unit were transferred within 30 days, and some took up to 130
days.  (See Draft Report at 81.)  Moreover, it was noted in the report, that when an EOP
inmate housed in ad.seg. went to the OHU and returned to ad.seg., his time in ad.seg.
began over and could, therefore, have been underreported.  (Id.)

Although not every institutional report discussed LOS of ad. seg. EOPs in non-
Hub facilities, a review of the monthly HCSD documents indicates that there are EOP
inmates in these facilities with very long stays.  (See HCSD documents, dated March 21,
2003, reporting on EOPs in Non-Hub ad.segs.:  CTF – Simon, J-70570 (190 days); NKSP
– Goodwin, T-54741 (160 days), Jenkins, P-12077 (96 days); SATF – Gonzalez, T-26828
(139 days); Wasco – Herrera, K-25312 (178 days), Flemings, P-55938 (200 days),
Gettes, T-55802 (117 days); DVI – Morse, J-05536, (125 days), Huhtala, J-98568 (118
days), Rose, P-15490 (84 days); Solano – Granville, P-96020 (166 days), Zepeda, P-
45383 (98 days).)

There is no justification for these types of stays in non-Hub facilities.  The
Eleventh Report must contain a recommendation directing HCSD to develop a plan
within 30 days detailing how it will ensure compliance with the court-ordered transfer
timeline for EOP inmates housed in non-HUB ad.seg. facilities.  Defendants are clearly in
violation of the existing court order, and plaintiffs will be required to initiate contempt
proceedings if defendants do not rapidly come into compliance with this court order.

(b)    Lengths of Stay in Hub Ad. Seg. Units

Plaintiffs' second concern relates to the length of stay in the HUB ad.seg.
facilities, especially those HUB facilities that are providing a grossly inadequate level of
mental health care to its EOP population.  As documented in the Draft Report, while
several of the Hub Facilities offered ten hours of structured therapeutic activities to their
EOP ad.seg. population, none of the EOP inmates received ten hours of therapeutic
activities.  (Draft Report at p. 8, Sac – received 3.5-4 hours; p. 32, Mule Creek – offered
6, received 2-4 hours; p. 44, CMF – 10 scheduled but many cancelled routinely; p. 69,
SQ – offered 3 hours but many cancelled and refused due to lack of privacy; strip search
procedures; p. 95, Corcoran – 1-4 hours received per week; p. 130, SVSP – No report on
hours, but 8 of 12 EOP ad.seg. did not have timely IDTT or updated treatment plans; p.
144, CMC – Did not offer EOP adequate programming; p. 162, Lancaster – No report on
hours offered or received; p. 198, RJD – Did worse this round – offered 6.6 and received
4.8; p. 238, VSPW – Offered ten, received 8.)

Of particular concern to plaintiffs are the HUB ad.seg. units at San Quentin, CMC,
Corcoran, and Salinas Valley.  San Quentin had thirteen (13) EOP inmates listed in the
March 2003 HCSD documents with length of stays ranging from 140 to 707 days.

J. Michael Keating, Jr.
May 29, 2003
Page 7

Corcoran had twelve (12) EOP inmates housed in its ad.seg. unit with lengths of stay ranging from 121 days to 641 days and five (5) EOP inmates housed in its SHU with lengths of stay ranging from 121 to 222 days. Salinas Valley had ten (10) EOPs housed in its ad.seg. with lengths of stays ranging from 110 to 276 days. CMC had ten (10) EOPs housed in its ad.seg. with lengths of stay ranging from 101 to 311 days. Each of these ad.seg EOP programs provided insufficient treatment hours.

Defendants developed the PSUs as programs for housing EOP inmates who needed an EOP level of care and secure housing. The ad.seg. housing, including the HUB facilities for EOP inmates, were never intended to house severely mentally ill inmates for months on end, especially with the current failure by HCSD to implement adequate mental health programs within these facilities. It was for this very reason that plaintiffs objected to defendants' proposed PSU transfer guidelines, which exempt EOP inmates housed in ad.seg. units who have pending 115s or DA referrals and can remain in these units for months to a year while these are resolved. However, there may be other reasons why EOPs are backlogged in these EOP ad.seg. HUBs, and defendants must carefully track these EOP inmates with long stays in the ad.seg. HUB units to determine the causes. For example, on a recent tour of Lancaster, plaintiffs saw a group of Level IV EOP sensitive needs inmates housed in ad.seg. because there is no longer a Level IV EOP sensitive needs yard and no clear direction from HCSD on what to do with these EOP inmates.

Plaintiffs request a recommendation directing HCSD to create a log of all EOP ad.seg. inmates housed in the HUB facilities beyond 60 days with their length of stay and reasons for placement and retention in the EOP ad.seg. housing unit. Furthermore, plaintiffs request that HCSD be directed to report back to the Special Master the results of their analysis of this log with a plan for moving EOP inmates housed in San Quentin, Corcoran, CMC and Salinas Valley State Prison ad.seg. HUB facilities with lengths of stay longer than 60 days to PSU housing or to mainline or sensitive needs EOP units. For those EOP inmates housed in all other ad.seg. HUB facilities with lengths of stay longer than 90 days, HCSD should submit a plan for moving these inmates to PSU housing or to mainline or to sensitive needs housing.

5.    CSATF and Corcoran

Both CSATF and Corcoran were identified in the Draft Report as the two institutions among all of the CDC institutions that had not made any progress during the last monitoring period. (See Draft Report at 277.) Given the progress of the other institutions, including the other eight institutions that were described as non-compliant in the report but had made progress during the last round of monitoring, the gap between those non-compliant institutions and CSATF and Corcoran is described as even greater. Corcoran and CSATF were described as "severely impacted by staffing vacancies and an inability to cover clinical shortages with contracted services". (Draft Report at 278.)

The individual sections on each of these institutions are very troubling. Corcoran's section is a catalogue of on-going, serious problems. (See Draft Report at 85-100.) The Institutional Summary contains a discussion of the complexity of the mental health delivery system at Corcoran, which includes a large mental health population within the SHU, and the Report suggests that the same type of focused attention paid to Pelican Bay because of the <u>Madrid</u> litigation is needed to help Corcoran bring its complex mix of MHSDS programs into compliance. Plaintiffs agree that Corcoran cannot hope to make the necessary improvements without the special support from Central Office that it needs to fully staff its programs, to adequately train its correctional and mental health staff, and to address the many deficiencies identified in this most recent Draft Report.

According to the Draft Report, "CSATF's delivery of mental health services continued to be handicapped by a significant number of clinical staffing vacancies." (Draft Report at 101). Furthermore, the Draft Report identified problems with timeliness of initial assessments by psychiatrists (at 107), with the IDTT process (<u>Id.</u>), with availability of group therapy for 3CMS inmates (<u>Id.</u>), with adequate treatment in the MHCB unit (<u>Id.</u>), with weekly case manager contacts in ad.seg.(at 108), with maintaining a DMH transfer log (<u>Id.</u>), with continuity of medications on arrival (<u>Id.</u>), with continuity of medications upon changed housing locations (at 109), with medication non-compliance follow-up (<u>Id.</u>), with clinical follow-up of suicidal inmates discharged from the MHCB (<u>Id.</u>), and with the provision of pre-release planning (<u>Id.</u>).

At the time of the monitoring visit there was a moratorium on transfers of 3CMS inmates to CSATF, which has since been lifted. In the recent phone exit from CSATF on May 7, 2003, at the conclusion of the 12th round monitoring visit, the monitors reported the same grim staffing vacancies, as well as the troubling fact that CSATF will now be receiving fifteen (15) new 3CMS inmates every week.

Plaintiffs believe that there must be a specific recommendation contained in the Eleventh Report that addresses the fact that both Corcoran and CSATF need HCSD assistance in addressing their continued failure to fill their staffing vacancies, which contributes to many of their CAP deficiencies. This recommendation must go further, however, and direct HCSD to develop a plan to identify the steps that the department will take to ensure that Corcoran can adequately address its complex MHSDS mission and implement the provisionally approved plans, policies and protocols.

6.     Paper Review Process

Plaintiffs have serious concerns about the paper review process. First, the adoption of this process appears to have been premature at each institution where such a review took place during the 11th round monitoring.

In reviewing the Tenth Report sections on CAL, PVSP and CVSP. it was unclear to plaintiffs why these institutions were designated for paper reviews. According to the

Tenth Report, CAL did worse on a number of CAP items including timely clinical intake assessments, private case manager contacts in administrative segregation, and inappropriate transfers back to CAL from MHCBs. (See 10th Report at 201)  Problems with timely responses to inmate self-referrals persisted with only 55% of these referrals being seen within five days. (Id.).  Nevertheless, CAL was monitored during the 11th Round through a paper review, and according to the Draft Report, the institution's performance on timeliness of clinical intake assessments declined again. (See Draft Report at 211.)  In fact, "[O]nly 36 percent of initial assessments were completed within five days of arrival or referral, representing a substantial decrease in compliance since the preceding monitoring period." (Id.)  "The timeliness of responses to inmate self-referrals also worsened since the preceding monitoring period." (Id.).  Other areas of performance, where CAL had been in compliance, were no longer compliant, such as daily psych tech rounding and the quality assurance process. (at 212).  There is no indication in the Draft Report that CAL will receive a regular monitoring visit next round despite its poor performance on the paper review.

PVSP moved to paper review despite the Tenth Report review which did not find it had fully implemented its CAP.  PVSP was in partial compliance with many CAP items, was non-compliant with medication continuity issues, had made little progress with its QA process, and had conducted no formal audits. (See Tenth Report at 104-105).

In its paper review in the 11th round monitoring, PVSP failed to provide documentation that was adequate for the monitors to assess many of the CAP items. According to the Draft Report:  "The results of this first paper review of PVSP were not encouraging.  Basic staffing problems grew; progress in resolving open CAP items was not great; and, most disappointing of all, the documentation provided for the paper review was neither thoughtfully prepared nor thorough." (Draft Report at 116.)  The section concludes that "another similarly ineffective paper review in the next round will lead to a resumption of monitoring visits." (Id.).  Plaintiffs request clarification on the standard applied when an institution fails on a paper review.

CVSP was designated for a paper review as part of the Institutional Summary of the Tenth Monitoring Report despite a finding that there were two CAP items that needed further scrutiny – "the change in contracting for a psychiatrist and eventual implementation of the new process for mental health input in the disciplinary process." (10th Report at 207.)  In addition, a new problem was identified during the 10th Round tour – lack of group therapy for caseload inmates in need of such treatment. (Id.)  This remained a problem during the 11th Round monitoring tour. (See Draft Report at 217.)

Plaintiffs also believe that the adoption of the paper review process is premature at the sixteen institutions listed as eligible for such review at the conclusion of the Draft Report. (See Draft Report at 277.)  Paper review status must be based not only on compliance over a period of time with programs guides and CAPs, but also with a

separate and specific determination that a prison's reporting and self-auditing mechanisms are adequate and accurate.

We request clarification of the standards used for determining when an institution is ready for a paper review and when an institution is determined to require a return to regular monitoring status because of poor performance. We request clarification of what a paper review monitoring tour consists of. We also request notice, beyond the monitoring schedule, of those institutions that the Special Master proposes to monitor under paper review before each round of monitoring begins. Finally, we object to a paper review of the new RVR policy, the new HS medication policy, the QA process, the new suicide prevention policy, DMH transfers and issues relevant to the changes in the Program Guides that are implemented by defendants at those institutions that are on paper review status.

If you have any questions regarding our comments and objections, feel free to contact me.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:ts

cc:    Matthew A. Lopes, Jr.
       Jennifer A. Neill
       Coleman Co-counsel

**Exhibit M**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

ERNEST GALVAN
JANE KAHN
NAJEEB KHOURY
THOMAS NOLAN
AMY WHELAN
MARAKA L. WILLITS
SARAH L. OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

November 25, 2003

<u>VIA FACSIMILE AND U.S. MAIL</u>

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02195

Re:    Plaintiffs' Objections to Draft Twelfth Monitoring Report
       Our File No. 489-3

Dear Mr. Keating:

Plaintiffs have the following comments and objections to the draft <u>Twelfth Monitoring Report of the Special Master on Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols</u> ("Draft Report").

Plaintiffs' objections focus on the need for additional recommendations to address (1) postponing of the decision on whether defendants may close CMF's Intermediate Inpatient (ICF) and Day Treatment Care(DTP) Programs, (2) the significant transfer delays of EOP patients housed in reception centers, (3) the persistent failure of certain EOP ad.seg. Hub programs to provide an EOP level of care, (4) the troubling reports of use of force against mentally ill prisoners at Corcoran State Prison, and (5) the housing needs of Level IV EOP Sensitive Needs patients; and (6) the replacement of the lost allocated psychiatrist position at NKSP.

1.    <u>Defendants' Effort to Close CMF's ICF/DTP Programs</u>:

Both the Draft Report and exit reports from recent tours document an inpatient mental health system in crisis.  As stated in the Draft Report, the CDC's system for providing inpatient care is hindered by numerous serious problems, including excessive delays in transfers, stalled and/or deeply troubled implementation of new referral procedures, staff confusion in the field concerning referral procedures and criteria, mixed messages from headquarters concerning the availability of various resources and the criteria for each program, improper use of scarce acute inpatient resources to serve other functions, non-existent or inadequate discharge summaries by DMH, the failure of DMH to document its reasons for referral rejections, an appeals process for rejections that is not functioning, and the failure to refer all appropriate cases to inpatient care programs.

*    MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**   MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

The Draft Report notes serious problems with and confusion around inpatient referrals at many, many institutions. At Pelican Bay, the monitors found that "Nothing changed during the monitoring period with respect to the transfer of inmates in need of intermediate inpatient DMH care. CMC/ASH was still reportedly reluctant to accept Level IV inmates, and the opening of the intermediate care unit at SVSP had been postponed." (Draft Report at 16). The Report also noted that "psych and return procedures for inmates discharged from CMF/DMH were not functioning well" and that discharge summaries from CMF/DMH often did not include any clinically useful information. (Draft Report at 17). At HDSP, the monitors found that the "unavailability of DMH beds" kept inmates in the MHCB for more than ten days. (Draft Report at 21). The Report also finds the following at HDSP:

> ...[C]onfusion about CMC's role with respect to ASH transfers seemed to have limited the number of referrals from HDSP during the monitoring period. Only four inmates were referred to ASH from September through March, and two of the referrals were rejected. As an alternative, staff sent inmates to DMH/APP, clearly an inappropriate use of scarce acute inpatient resources.
>
> The timeliness of transfers to CMF/DMH, similarly, did not change much during the monitoring period. From October through March, 54 inmates were referred to CMF/DMH. The average interval between referral and assignment of a CMF/DHM bed number was 8.3 days; the length of time between an assignment of a bed number and transfer was 3.1 days. The appeal process for challenging rejected referrals did not appear to be working well, in part, because DMH sometimes failed to provide written rejections.

(Draft Report at 24). The Report also found that "[t]ransfers to both ASH and DMH/APP were not always timely" from HDSP. (Draft Report at 27).

At the California Medical Facility, the monitors found that "CMF inmates in need of a MHCB level of care continued to occupy a significant number of DMH/APP beds, reducing access to acute inpatient care for inmates from other CDC institutions. . .From November 1 through April 30, 44 percent of inmates admitted to DMH/APP were from CMF. The length of stay of CMF inmates in DMH/APP remained high. The average length of stay for the period from November 1 through April 30 was 66 days. In the opinion of the monitor's expert, many of these inmates should have been stabilized in DMH/APP and transferred expeditiously to ASH for sub-acute treatment." (Draft Report at 41). The Draft Report also finds that "the waiting list for beds at DMH/APP grew during the monitoring period from ten to 20 inmates; inmates were on the waiting list for

J. Michael Keating, Jr.
November 25, 2003
Page 3

an average of 3.8 days after their referrals were accepted, with some inmates waiting up to eight days for admission." (Draft Report at 41).

The Draft Report also finds that Solano is not keeping a proper log of transfers to DMH. (Draft Report at 51). At San Quentin, the monitors found a handful of cases where inmates had "multiple OHU and MHCB admissions, up to as many as twelve within weeks or a few months, before being referred to DMH." (Draft Report at 56). At Corcoran, the monitors found that there were no direct referrals to ASH or the SVPP program, that the psych and return procedures were not working, and that charts for inmates returning from DMH did not contain discharge summaries. (Draft Report at 80). At CSATF, the monitors found that inmates with three or more MHCB admissions were not even considered for referral to DMH. (Draft Report at 91). Also at CSATF, "[s]taff acknowledged that some inmates clinically in need of DMH care were not referred for transfer due, in part, to staff turnover and, in part, because transfers to ASH were not generally considered." (Draft Report at 98). At Pleasant Valley, the Report finds that the average length of time from referral to transfer to DMH APP for inpatient care was 23 days and that there were no referrals at all to intermediate care at ASH. (Draft Report at 103). The Report documents inadequate DMH transfer logs from CTF. (Draft Report at 125). At CMC, the report finds that the need to transfer inmates to an MHCB at another institution prior to transferring the inmate to ASH created new difficulties and hurdles to ASH referrals. (Draft Report at 129-130). At NKSP, the experts were concerned that "NKSP may have failed to refer some inmates who needed a higher level of care to appropriate DMH inpatient programs" and noted that "[j]ust six of 23 inmates with three MHCB admissions were referred to DMH, and only 21 referrals were made to DMH programs during the preceding nine months despite a growing reception population, a substantial rate of admissions to the MHCB unit and a number of EOP inmates with long stays in reception." (Draft Report at 139-140). At CIM, the monitors found problems with timely referrals to DMH and that psychiatrists were reluctant to refer inmates to CMF/DMH (Draft Report at 171-172).

It is clear that the CDC's inpatient programs are in a state of flux. The new DMH program at SVPP is partially open, but problems with referrals remain, including, as noted in your November 17, 2003 letter, widespread confusion about whether the program will take involuntary cases. In the Draft Report's Summary section, an expectation is noted that "determination of the fate of the ICF and DTP will occupy much of the 13th round of monitoring." (Draft Report at 223). In addition, the Report notes that during the monitoring period "management of transfers at both the departmental and institutional levels to the whole range of DMH inpatient programs became increasingly confused and uncertain." (Draft Report at 223).

This confusion is exacerbated by the absence of any useful assessment as to how many inpatient beds the CDC actually needs. The long awaited, court-ordered inpatient

bed needs assessment has been delayed once again, entirely due to defendants' lack of diligence. The report finds that at the end of the monitoring period, "defendants were no closer to performance of the required study than they were at the round's beginning." (Draft Report at 224).

Given these myriad problems and uncertainties, plaintiffs ask that the Special Master add several recommendations at the end of the Report concerning DMH inpatient care:  1) the determination as to whether defendants should be permitted to close the DMH ICF/DTP programs at CMF be delayed until at least one month after defendants complete an adequate inpatient bed unmet needs assessment and any other study of inpatient bed demand; 2)  defendants and DMH should be required to revise the written materials, forms and training governing referrals to DMH ICF programs to simplify and expedite the process, clearly state that involuntary patients will be accepted and clarify the procedures for Vitek hearings (which should be held at the DMH institution); 3) defendants should be required to establish written policies and procedures for prioritizing and managing waitlists for patients accepted to DMH programs including HQ responsibilities; 4) defendants (CDC) should be required to document, track and report on all patients rejected by DMH inpatient programs, appeals taken and results—we have determined that individual medical files do not regularly contain documentation of DMH's rejections and that DMH's report (included in the monthly package) does not confirm with CDC records; (5) defendants should be required to report on their current short, medium and long-term projections of need for all types of inpatient beds (including by security level), including any plans to supplement the Tucker Allan "snap-shot" with updated utilization review studies.

2.     EOP Transfer Delay in Reception Centers

The Draft Report documents significant and ongoing transfer delays for EOP patients housed in reception centers throughout the CDC. At San Quentin, 50% of the EOPs remained in the reception center beyond the transfer guidelines, with a group of men housed there for one to two years, few of whom were reportedly endorsed because of complex security needs. (Draft Report at 59). At North Kern, "[l]ittle progress had been made in the timely transfers of EOP inmates from the reception center to appropriate programs elsewhere." (Draft Report at 143)  Nearly half of the EOPs had been there longer than 60 days, with nine having stays ranging from 110 days to two years. (Id.) At Wasco, where the length of stay for many EOPs exceeded 60 days, "the reason for the delay was unknown in many instances." (Draft Report at 134). CCI continued to have excessive delays in transferring their EOP patients, which were under-reported because the institution restarted the counting whenever an EOP patient returned from an MHCB unit, court or a hospital. (Draft Report at 164.) CIM, which had begun tracking their EOP patients who entered the reception center in order to facilitate the transfer process, continued to report 50% of their transfers were taking 120 days. (Draft

November 25, 2003
Page 5

Report at 167.)  RJD had problems getting their EOP patients in reception with extended stays endorsed according to the monitor, and 39% of their EOPs in reception had been there longer than 60 days. (Draft Report at 182.)  At Valley State Prison, the issue of timely transfers of EOP patients in reception to EOP programs was no longer resolved; one-third of the transfers now took longer than 60 days. (Draft Report at 209.)  It was unclear from the Draft Report whether the reception center delay  problems were due to local delay factors or EOP bed unavailability system-wide.

In plaintiffs' objections to the Eleventh Report, plaintiffs requested that the Special Master make a recommendation that directed Health Care Services Division to develop a plan to identify and address the system-wide factors contributing to the failure to comply with the court-ordered transfer timelines for reception center EOPs.  (See Letter to Keating re Plaintiffs' Objections to Eleventh Report, dated May 29, 2003.)  This recommendation was not adopted despite a clear statement in the report that the significance of the untimely transfers is the fact that reception centers "have neither the staff nor physical facilities to provide the level of treatment and monitoring these inmates need, and the failure to provide needed treatment, sometimes for months, imposes severe hardship and suffering on some of those left waiting." (Draft Report at 256.)

Plaintiffs have waited patiently for defendants to implement the transfer guidelines.  The numbers of EOP patients waiting for transfer in the reception centers is similar to the numbers of mentally ill inmates housed in reception centers at the time of the Coleman trial. ("In 1991 and again in 1992, there were backlogs of 300-400 inmates awaiting transfer to enhanced outpatient psychiatric programs at California Men's Colony and California Medical Facility.", Coleman v. Davis, 912 F. Supp. 1282, 1309.)  What is troubling about the current situation is that there are empty beds in many of the EOP programs throughout the state, and it appears that at least one-third of those EOP patients waiting for an EOP program either in reception centers or in prisons without EOP programs could be accommodated in the current system.

Defendants must be required to evaluate the reasons why its EOP patients are not being promptly endorsed and transferred to the existing empty beds within the system.  The tracking system that defendant promised to implement in July 2003 has never been implemented to plaintiffs' knowledge.  Only after defendants have identified the reasons for their failure to comply with the transfer guidelines, can appropriate planning occur.

Plaintiffs request a recommendation that HCSD be directed to immediately implement a tracking system of all EOP patients housed in the reception centers and to develop a plan within 30 days to identify and address the system-wide factors and local institutional problems contributing to the failure to comply with the court-ordered transfer timelines for reception center EOP patients.

3.    EOP Ad. Seg Hubs

Plaintiffs have long objected to the housing of severely mentally ill inmates in ad.seg. units throughout the CDC. In a 1999 Order, Judge Karlton adopted a staffing ratio for administrative segregation which included one full-time case manager for every nine EOP patient housed in ad.seg. with the goal of providing ten hours a week of structured therapeutic activities for EOP patients in the administrative segregation units. (See Court Order, July 23, 1999.) A later order, after the EOP hub administrative segregation units were created, required that the defendants meet the staffing ratio of one case manager for every nine EOP patients. (See Court Order, October 24, 2001.) Plaintiffs have waited patiently for these EOP hub administrative segregation units to provide an EOP level of care to the EOP patients housed there, many of whom remain there for months to years.

In Plaintiffs' Objections to the Eleventh Report, plaintiffs identified Hub ad.seg. units that provided insufficient treatment hours and housed EOP patients with significant lengths of stay. (i.e. San Quentin: 13 patients with LOS from 140 to 707 days; Corcoran: 12 patients with LOS from 121 to 641 days; Salinas Valley: 10 patients with LOS from 110 to 276 days; and CMC: 10 patients with LOS from 101 to 311 days.) (See Plaintiffs' Objections to the Draft Eleventh Monitoring Report, dated May 29, 2003.) Plaintiffs requested a recommendation directing HCSD to create a log of all EOP ad.seg. patients housed in the Hub facilities beyond 60 days with their length of stay and reasons for placement and retention in the ad.seg. housing unit. (Id.) Furthermore, out of concern for the poor performance of the institutions identified in the Eleventh Report who had considerable numbers of EOP patients with long stays in their Hub units, plaintiffs requested that HCSD be directed to report back to the Special Master with a plan for moving EOP patients housed in San Quentin, Corcoran, CMC and Salinas Valley ad.seg. facilities beyond 60 days to PSU housing or to GP EOP Units. (Id.)

The Twelfth Report documents the continued struggle of the Hub facilities to provide an EOP level of care to the EOP patients housed there. Plaintiffs have long contended that this housing should be short-term because of the impossibility of providing the type of EOP program provided in the PSUs. Indeed, the Special Master identified these differences in a letter to the Deputy Director of Health Care Services, noting that there are more psych techs allocated to the PSU program and better trained custody staff which "is present and trained to help facilitate the treatment programs that are central to the unit's function." (See Keating's Letter to Roseanne Campbell, dated May 19, 2003.)

Of particular concern to plaintiffs in the Twelfth Report are the EOP hub programs at San Quentin and CMC. San Quentin's program was reported to be providing approximately three hours of treatment to their EOP patients housed in the ad.seg. unit, where more than half of them had been housed there longer than ninety (90) days. (Draft

Report at 57, 59). In fact, a review of the most recent Health Care Services Division (HCSD) documents, dated November 6, 2003, reporting September 26, 2003 data, indicates that there were 19 EOP patients housed in San Quentin's ad.seg. housing unit for lengths of stay ranging from 100 to 1136 days.

CMC's ad.seg. EOP program was able to offer only three hours of structured therapeutic activities to its EOP patients with the addition of seven treatment cells, and according to the Draft Report, "**[t]here were no existing plans that would enable the facility to comply with the requirements to offer ten hours of therapeutic activities per week.**" (emphasis added)(Draft Report at 129.)

Plaintiffs request a recommendation that San Quentin and CMC be ordered to provide a plan within 60 days of how they will comply with the requirements to offer ten hours of therapeutic activities per week. If San Quentin and CMC are unable to provide such a plan, plaintiffs request a recommendation that EOP patients housed in those Hub ad.seg. units be transferred to other Hub facilities after 60 days. Furthermore, plaintiffs request a recommendation that HCSD create a log of all EOP patients housed in the Hub ad.seg. facilities beyond 60 days with their length of stay, and reasons for placement and retention in ad.seg. Plaintiffs believe that HCSD and the local institutions must carefully identify and track these patients to ensure that they are moved to other treatment locations as quickly as possible.

### 4.    Excessive Use of Force At Corcoran

In the Eighth Monitoring Report the use of force against mentally ill inmates at Corcoran was first described as needing attention. (See Eighth Monitoring Report at 84). According to the Report, the monitor reviewed incident reports of excessive OC spray use in confined spaces and "[s]ome of these incidents involved the suppression of a suicide attempt; a PSU transfer; and reactions to bizarre behavior that resulted in immediate admission to the MHCB unit." (Id.)

The problem of excessive force against mentally ill inmates at Corcoran was again documented in the Ninth Round of monitoring. (See Ninth Monitoring Report at 72). After reviewing incident reports involving use of OC spray on seriously mentally disordered inmates, the monitor concluded that almost half of the reports indicated excessive use of the OC spray on these inmates. (Id.)

During the Tenth Round of Monitoring, Corcoran's practice of excessive use of OC spray in situations involving mentally ill inmates continued and more than half of the incidents reviewed involved "excessive discharges of OC spray, ranging from 22 to more than 100 seconds." (See Tenth Monitoring Report at 91.)

The Eleventh Monitoring Report described improvement in the use of OC spray on mentally ill inmates, with the monitors noting that although half of the incidents

involved a <u>considerable</u> amount of OC spray, the amount was lower than in the past, with bursts described in seconds rather than in exhausted canisters, and with waiting periods between applications well documented. (<u>See</u> Eleventh Report at 88.) There was no report on the appropriateness of the use of OC spray in the incidents evaluated.

In the Twelfth Report, the use of pre-planned force is identified as a continuing problem at Corcoran. (Draft Report at 85.) OC spray was used in troubling circumstances and in excessive amounts. (<u>Id</u>.) A 40mm launcher was aimed directly at two mentally ill inmates contrary to policy. Mental health clinicians were not called upon for mental health intervention in order to avoid the use of OC spray and other pre-planned force against mentally ill inmates at Corcoran. (<u>Id</u>.)

During the 13th Round Monitoring tour of Corcoran, the monitors, Special Master, CDC Legal and plaintiffs' counsel were provided with the institution's Corrective Action Plan, which included Corcoran's Mental Health Quality Management Committee Minutes. In the September 9, 2003 Minutes, there is an Ancillary Report on Use of Force, and according to this Report, of the 481 use of force incidents to date, 254 involved mental health inmates. (<u>See</u> September 9, 2003 Minutes, page two, attached hereto.)

Plaintiffs believe that it is critical for the Special Master to make a recommendation to the Court regarding the excessive use of force against mentally ill inmates that continues unabated at Corcoran State Prison. Plaintiffs request that Corcoran State Prison be required to develop new specific procedures and training limiting the use of force on mentally ill prisoners, take effective administrative disciplinary action to investigate and respond to violations of the procedures and submit their use of force reports monthly to the Special Master for review. After six months, the Special Master should make findings based upon these reviews regarding what additional measures the Court should order at Corcoran.

5.    Level IV Sensitive Needs EOP Program

The Draft Report includes an extensive discussion of the closing of the Level IV EOP Sensitive Needs Yard at LAC. (Draft Report at 9-11 and 146-150). Plaintiffs object to the Special Master's failure to make recommendations requiring defendants to address the unique security and mental health needs of the SNY Level IV EOP population.

The Draft Report directly avoids addressing the "impact of the loss of their sensitive needs status on the inmates' ultimate safety, an impact the Coleman monitor is not qualified to assess...." (Draft Report at 11.) It is undisputed that Level IV EOP SNY inmates were forced to choose between SNY status, which was only offered in a CCCMS yard or EOP mental health treatment without SNY status. This issue cannot and should not be avoided and is not beyond the ability of the Master to assess or the Court to evaluate. EOP is not a voluntary program. A class member in need of EOP care may not

be required to compromise his security needs in order to obtain necessary mental health care. The issues that were monitored in relation to this special group of class members -- whether the treatment at SAC was better or worse than the mental health treatment at LAC, or whether the transferred prisoners were decompensating, were not the appropriate issues. Rather, the issue to be monitored was whether or not these prisoners who were forced to give up their SNY status in order to remain in the EOP mental health program, were subjected to threats, attacks or other violence – either in the mainline EOP or when moved to the GP mainline as some of the transferred EOP patients were. This issue was inappropriately ignored by the Master. The Master regularly reviews "custody" and housing issues in the context of the case (use of force issues, for example). This issue is no different.

The failure of defendants to establish a Level IV EOP SNY yard will continue to result in inappropriate and dangerous housing of class members and denial of the appropriate level of care to others who require EOP but refuse to give up SNY status. As the Draft Report notes, the soft yard at SAC is filled and there is a "lengthening queue of EOP inmates with special needs for whom the defendants lacked sufficient, or sufficiently specialized, beds." (Draft Report at 150.)

In addition to the 42 EOP SNY patients who were transferred out of Lancaster when the Level IV SNY yard was closed, there are other Level IV SNY EOP patients waiting in ad.seg. units for transfer to Mule Creek's SNY yard and to the 'soft yard" at SAC. [Note: This is based upon responses to questionnaires that plaintiffs sent to EOP ad.seg. patients housed in the ad.seg. EOP units at Corcoran and Salinas Valley.] In addition to those ad.seg. EOP patients waiting for a bed at Mule Creek or SAC, there are those inmates housed on the CCCMS SNY yards who, from time to time, will require EOP level of care.

Plaintiffs request a recommendation that HCSD be directed to establish the numbers of Level IV EOP patients already recommended for or endorsed to Mule Creek's SNY or SAC's "soft yard", including but not limited to, those EOP patients that were housed in the SNY yard at LAC who transferred to SAC, Mule Creek, CMC, Pelican Bay and CMF, and develop a plan within 60 days to address the immediate housing needs of these Level IV SNY EOP patients.

6.    Loss of NKSP Psychiatrist Position

Following all of the assurances the parties have received that the budget crisis would not effect allocated MHSDS staffing, the Draft Report notes that NKSP lost an allocated psychiatrist position (although the Report does not indicate the reason for the loss of the position). (Draft Report at 139.) Plaintiffs ask the Report include a recommendation that defendants be ordered to re-allocate the lost position, as well as the lost pharmacist position at the same facility.

J. Michael Keating, Jr.
November 25, 2003
Page 10

7.    <u>Report on Suicides Completed in the CDC in 2002</u>

In the Report on Suicides Completed in the CDC in 2002, there are a series of calculations of the suicide rate in the CDC for the past five years.  (Report at 8.)  We rechecked the calculations and there is an error in the rate calculated for 1999 – the actual rate is 15.5 (not 19.9).

If you have any questions regarding our comments and objections, please feel free to contact me.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By:  Jane E. Kahn

JEK:pj

cc    Matthew A. Lopes, Jr.
       Jennifer A. Neill
       Coleman Co-counsel

CALIFORNIA STATE PRISON-CORCORAN
MENTAL HEALTH QUALITY MANAGEMENT COMMITTEE MINUTES
September 09, 2003

**Attendance:** Please see attached accountability sheet.

I.    **Previous Minutes**

The minutes from the September 02, 2003 meeting were distributed and reviewed for any changes or corrections. No issues were noted.

II.    **Committee Reports**

A.    **Chart Review Committee**
S. Bindler, Ph.D. Chair. 160 charts were reviewed for the month of August, 2003. The overall compliance rate ranged from a low of 48% to a high of 80%. These rates include areas of known chronic deficiencies such as the presence of a CCI and a psychiatrist at IDTT. The presence of a CCI is being addressed through a new schedule developed by the Assistant C&PR and the facility CCIIs. The lack of a psychiatric presence at all IDTTs is directly related to lack of staffing.

Close examination of the audit results show that while most staff are fairly compliant, there are several staff members who appear to have greater difficulty in this area. This is a supervisory issue. Dr. Bindler will do an analysis of the audits and provide this to the case managers' supervisor.

There does appear to be a continued problem with meeting timeframes as specified in the MHSDS Program Guide (e.g., MH2, MH4). The MHQMsC agreed that the need for a QIT was indicated. See recommendations section for more information.

III.    **Quality Improvement Team Status Report**

A.    **Psychotrophic Medication Criteria for Testing**
Dr. Juarez, Chair. Deadline extended to September 23, 2003. A draft proposal was submitted to the committee for review. A final report will be submitted to the MHQMsC on 9/23/03.

B.    **PSU Transfer Timelines**
P. McClure, Chair. Deadline extended to September 23, 2003. A written report was submitted but the QIT had not met. It was determined that the QIT needed to meet to review issues related to endorsement and transfer of inmates to PSU and provide a final report to the MHQMsC after that meeting. A final report is expected 9/23/03.

Page Two
**Mental Health Quality Management Committee**
September 9, 2003

IV.    **Ancillary Reports**

   **A. Inmate Appeals**
   L. Salinas absent.  No report.

   **B.  Use Of Force**
   Mr. Terle produced two reports for use of force incidents in 2003.  One report
   contained information for the entire year and one report contained more recent
   data (i.e., June -  August).  Mr. Terle's review of the year-to-date data indicated
   that the number of MHSDS inmates involved in use of force incidents was not
   proportional to their numbers in the overall inmate population.  Specifically, of
   481 incidents, 254 involved MH inmates.  Discussion regarding this fact
   followed.  Mr. Terle explained that he was continuing to refine the reports to
   indicate inmates who had multiple incidents and include some additional
   information related to the incident.

   The MHQMsC recommended that following these further revisions of the report,
   a QIT should be chartered to examine the data and make recommendations to the
   MHQMsC.

   **C.  MHCB Length of Stay Report**
   Dr. Bindler reports 79 admissions for August, with an average LOS 7.22 days, 17
   stays over 10 days, and longest stay of 22 days. Mental Health Crisis Bed staff
   had a meeting and it was decided that if an inmate was not discharged in 10 days,
   documentation will be provided in the chart as to why the inmate is still
   hospitalized.  A log incorporating the reason for extended stays has been
   implemented and will be utilized for future study to determine the need for a QIT.

   **D.  Other Information Pertinent to Mental Health Services**
   The new 3B building cannot be occupied for groups/inmate contact until the
   observation windows are installed and the alarms are working.  To ensure an
   organized transition as the building is activated and mental health services are
   consolidated on 3B yard, a QIT was chartered to address these issues.  See
   recommendation section for more information.

V.    **Discussion**
   Dr. Perrien has changed the timeframe for review and deadline for submission for
   Coleman statistics to June 1st through September 15th and September 22, 2003,
   respectively.

**Page Three**
**Mental Health Quality Management Committee**
**September 9, 2003**

Discussion regarding continued difficulty with UHR availability in ICC/UCC was held. The MHQMsC recommended that a QIT be established to address this issue. Carts to move UHRs from the clinics to the buildings have already been ordered. See recommendation section for more information.

Issues raised by the Coleman monitors and internal audits regarding referral timeframes were discussed. A QIT was chartered by the MHQMsC to analyze the situation and recommend a plan of action. See recommendation section for further information.

VI.    **Recommendations**
    A.    Program Guideline Timeframes QIT
                Chair:  S. Bindler, Ph.D
                CCM   SHU-CCCMS
                CCM   AD SEG/SHU-EOP
                CCM   ADSEG-CCCMS
                CCM   CCCMS MAINLINE
                CCM   EOP MAINLINE
                OT-will be designated later.
    Deadline is October 15, with a preliminary report in 2 weeks.

    B.    3B Consolidation QIT
                Chair: D. Stockman, AW
                Don Hicinbothom, CCII
                S. Bindler, PhD
                M. Seykora, LCSW
    Deadline is September 30, 2003.

    C.    UHR availability for ICC/UCC QIT
                Chair:  M. Chiurazzi, Psy.D.
                L. Cano-CCII Specialist
                D. Leon-Business Manager II
                D. Tepperman, L.C.S.W.
                CCM Ad seg/mainline – to be named
                OT-Robin Breedlove

    Deadline for report is October 15.

Page Four
Mental Health Quality Management Committee
September 9, 2003

      D.     Referral timeline QIT
             Chair:  J. Juarez, M.D.
             M. Perrien, Ph.D.
             M. Talisman, M.D.
             R. Fischer, Ph.D.
             R. Gomez, M.S.W.
             H. Martinez, OT
             R. Breedlove, OT

             Deadline:  October 30, 2003.

VII.   **Next Meeting Scheduled:**


**THE NEXT MEETING OF THE MHQMsC WILL BE <u>TUESDAY, SEPTEMBER 23, 2003,</u> AT <u>1330 HOURS</u> IN THE MENTAL HEALTH TRAILERS.**


**M. PERRIEN, Ph.D.,**
Mental Health Services
California State Prison-Corcoran

## MENTAL HEALTH QUALITY MANAGEMENT COMMITTEE ATTENDANCE

| Required Members | AUG 12 Pres | Ex | Ab | SEP 2 Pres | Ex | Ab | SEP 9 Pres | Ex | Ab | SEP 23 Pres | Ex | Ab | OCT 7 Pres | Ex | Ab |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrews, J.R. | √ | | | | | √ | √ | | | | | | | | |
| Berkson, R. | √ | | | Desig | | | Desig | | | | | | | | |
| Bindler, S. | √ | | | √ | | | √ | | | | | | | | |
| Breedlove, R. | | √ | | | √ | | Desig | | | | | | | | |
| Chiurazzi, M. | √ | | | √ | | | √ | | | | | | | | |
| Elder, D. | √ | | | √ | | | | | √ | | | | | | |
| Gage, C. | | √ | | √ | | | √ | | | | | | | | |
| Haven, B. | - | | | √ | | | √ | | | | | | | | |
| Klarich, J. | - | - | - | - | - | | √ | | | | | | | | |
| Lowden, R. | | | √ | Desig | | | Desig | | | | | | | | |
| Obaiza, J. | √ | | | | √ | | Desig | | | | | | | | |
| Ortiz, D. | √ | | | | | √ | | | √ | | | | | | |
| Perrien, M. | √ | | | √ | | | √ | | | | | | | | |
| Salinas, L. | √ | | | | √ | | | √ | | | | | | | |
| Seykora, M. | | √ | | √ | | | √ | | | | | | | | |
| Stockman, D. | √ | | | | | √ | √ | | | | | | | | |
| Terle, C. | √ | | | √ | | | √ | | | | | | | | |
| Vermillion, M. | | √ | | √ | | | √ | | | | | | | | |
| Wright, V. | Desig. | | | Desig | | | Desig | | | | | | | | |
| Zamora, S. | | √ | | √ | | | √ | | | | | | | | |
| **Attendees** | | | | | | | | | | | | | | | |
| Uranga, P. | √ | | | | | | | | | | | | | | |
| Lewis, J. | | | | | | | √ | | | | | | | | |