| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER Bar No.: 83925<br>STEVEN FAMA Bar No.: 99641<br>KEITH WATTLEY Bar No.: 203366<br>General Delivery<br>San Quentin, California 94964<br>Telephone: (415) 457-9144 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE Bar No.: 53588<br>Three Embarcadero Center<br>San Francisco, California 94111<br>Telephone: (415) 393-2000 |
| ROSEN, BIEN & ASARO, LLP<br>MICHAEL W. BIEN Bar No.: 096891<br>JANE E. KAHN Bar No.: 112239<br>THOMAS NOLAN Bar No.: 169692<br>155 Montgomery Street, 8th Floor<br>San Francisco, California 94104<br>Telephone: (415) 433-6830 | HELLER, EHRMAN, WHITE &<br>McAULIFFE<br>RICHARD L. GOFF Bar No.: 36377<br>701 Fifth Avenue<br>Seattle, Washington 98104<br>Telephone: (206) 447-0900 |
| THE LEGAL AID SOCIETY –<br>EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER Bar No.: 158255<br>LEWIS BOSSING Bar No.: 227402<br>600 Harrison Street, Suite 120<br>San Francisco, CA 94107<br>Telephone: (415) 864-8848 | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

) No.: Civ S 90-0520 LKK-JFM
)
) **PLAINTIFFS' OBJECTIONS TO THE**
) **SPECIAL MASTER'S REPORT AND**
) **RECOMMENDATIONS ON**
) **DEFENDANTS' REVISED PROGRAM**
) **GUIDE**
)
) **HEARING**
)
) Date:       To be determined
) Time:       To be determined
) Location:  Courtroom 4
)               The Honorable Lawrence K.
)               Karlton

TABLE OF CONTENTS

Introduction ...................................................................................................................................1

Objections to Chapter 1:  Program Guide Overview ..................................................................1

Objections to Chapter 2:  Reception Center Mental Health Assessment ....................................7

Objections to Chapter 3:  Correctional Case Management System ............................................8

Objections to Chapter 4:  Enhanced Outpatient Program ...........................................................8

Objections to Chapter 5:  Mental Health Crisis Bed ("MHCB") ................................................9

Objections to Chapter 6:  Department of Mental Health Inpatient Programs ...........................10

Objections to Chapter 7:  Administrative Segregation .............................................................11

Objections to Chapter 8:  Security Housing Unit .....................................................................13

Objections to Chapter 9:  Psychiatric Services Unit .................................................................14

Objections to Chapter 10:  Suicide Prevention and Response ..................................................15

CONCLUSION ..........................................................................................................................15

# TABLE OF AUTHORITIES

*Coleman v. Wilson,*
    912 F.Supp. 1282, 1320 (E.D.Ca. 1995).................................................................................2

The <u>Special Master's Report and Recommendations on Defendants' Revised Program Guide</u> ("the Report" or "Special Master's Report") was filed on February 3, 2006. In the Report, the Special Master states that "[t]he purpose of the report is to submit for the court's final approval that 95 percent of the revised Program Guide that the parties and the special master agree to and initiate a process for resolving the five percent of remaining issues that continue to elude resolution." Special Master's Report at 4. Plaintiffs support the recommendation that defendants should be ordered to immediately implement their Revised Program Guide, subject to the exceptions noted by the Special Master. We file these objections to set forth our specific remaining objections to the proposed Program Guide. We have not included evidence or argument concerning our objections, as we support the Special Master's recommendation of further proceedings to develop a process for presenting and resolving the remaining objections. Special Master's Report at 11 (Recommendation 3). For some of the disputes, plaintiffs request reasonable discovery and an evidentiary hearing; others may be resolved on legal issues. Plaintiffs have submitted a proposed order to assist the Court in its effort to specify which portions of the Revised Program Guide it is approving and which areas are not yet finally decided and remain in dispute.

Set forth below are plaintiffs' remaining specific objections to each chapter of the Program Guide proposed by defendants and recommended for approval by the Special Master:

**Chapter 1: Program Guide Overview**

<u>12-1-8 and 12-1-9</u>: <u>Psychiatrist qualifications</u>: Plaintiffs agree to withdraw our objection on the issue of psychiatrist qualifications in light of the resolution of the issue set forth by the Special Master in the Report. Special Master's Report at 4-5. However, the Revised Program Guide submitted to the Court by defendants still includes the "grandfather clause" that the Special Master indicates defendants have withdrawn. See Revised Program Guides at 12-1-8 (under Standard Program Staffing, the last sentence in the first paragraph says "psychiatrists hired after [date left blank] shall meet the following training requirements").

<u>12-1-9</u>: <u>Clinical Input into the Disciplinary Process</u>: In response to this Court's finding after trial that defendants were punishing inmates with mental illnesses without taking into

account the role of their mental illness, see *Coleman v. Wilson*, 912 F.Supp. 1282, 1320 (E.D.Ca. 1995), the defendants developed a system for providing clinical assessments of such inmates for use in the disciplinary hearing reviewing the infraction. These clinical assessments are required for all 3,900 Enhanced Outpatient Program ("EOP") inmates who live in sheltered housing units and receive intensive mental health care. However, for the majority of the *Coleman* class -- the CDCR's 27,000 Correctional Clinical Case Management System ("3CMS") inmates who live in the general population -- these assessments are provided only in extremely limited circumstances. Plaintiffs object to the Revised Program Guide standard for referring these 3CMS patients for a mental health assessment. See Revised Program Guides at 12-1-9 ("All inmates in CCCMS or non-MHSDS inmates who receive a [disciplinary infraction] and who exhibit bizarre, unusual, or uncharacteristic behavior shall be referred for a Mental Health Assessment.") This standard, which is currently employed by the CDCR, does not result in a meaningful review of the role of mental health in the disciplinary infractions incurred by the vast majority of the plaintiff class. Plaintiffs propose the expansion of the class of persons automatically given an assessment to include: (1) all 3CMS inmates charged with a serious rules violation that could result in a SHU term or DA referral, (2) any 3CMS patient with multiple rules violations during a specified period of time.

<u>12-1-10 and 12-1-11</u>: <u>Tracking Caseload History and Suicide Attempt History</u>: In order to facilitate suicide prevention efforts and improve mental health screening of inmates admitted to administrative segregation, plaintiffs have long sought to require that defendants develop a computerized system to track all former-caseload inmates. Defendants actually tracked this information in the early years of this Court's supervision of its mental health system, but eliminated this tracking system without notice to plaintiffs or the Special Master. Plaintiffs object to defendants' failure to include in the Program Guide a computerized system that tracks former members of the mental health caseload.

This Court's June 9, 2005 Order, which adopted recommendations from the Special Master's Report on 2003 Suicides, requires that defendants track mental health caseload inmates with a history of suicidality. However, plaintiffs sought a broader suicide history

tracking requirement as part of the Program Guide process. Plaintiffs object to defendants' failure to expand their Suicide History Tracking System to include general population inmates with a suicide attempt history. Given the extraordinarily high current number of suicides recently in the CDCR, which include a substantial number of suicides by general population inmates with a history of suicidal behavior, plaintiffs continue to object to defendants' failure to track suicidality history for general population inmates.

12-1-11 through 12-1-13: <u>Transfer Guidelines</u>:

The Special Master's Report states that plaintiffs' remaining objections to the Program Guide "included six specific complaints about the timelines for transfers to more intensive levels of care within the defendants' MHSDS." See Special Master's Report at 9. The Master goes on to assert that "[a]ll of the protested timelines represent improvements over their predecessors that tied time limits on transfers, especially those to the Department of Mental Health, to the availability of bed space in the receiving program, rather than to a CDCR clinician's referral." *Id.*

Plaintiffs respectfully disagree with these characterizations of both plaintiffs' position and of the defendants' timelines. In fact, plaintiffs' objection to three of the time periods below is precisely that the Revised Program Guide timeline <u>continues to link the time limit for transfer to the availability of bed space in the receiving program</u>. In fact, except for plaintiffs' contention below that the timeline for transfer to DMH intermediate inpatient care is simply too long, each objection to a proposed timeline below is based on language in the Revised Program Guide that appears to be included so that defendants may avoid the burden of a strict transfer timeline which starts with the identification of actual clinical need.

(A) <u>Identification-Referral Times</u>: Plaintiffs object to the distinction between "identification" and "referral" in the defendants' timelines for transfers into clinical care programs. With the exception of the Department of Mental Health ("DMH") transfer timelines, there are no specific timeframes established for the period between identification and referral. The Special Master's prior Recommendations for Transfer Timelines adopted timelines that "take as a starting point the date of a clinician's referral of a seriously mentally

disordered inmate to a specific level of treatment and care." See Ex. A to Declaration of Michael W. Bien in Support of Plaintiffs' Objections to the Special Master's Report on Defendants' Revised Program Guide ("Bien Dec"), 1/3/01 Special Master's Recommendations for Transfer Timelines at 6. In new language first presented on September 9, 2005, defendants define "referral" as "the date the level of care change is documented on a Mental Health Placement Chrono." See Revised Program Guide at 12-1-11. This is an administrative action that has no fixed timeframe and is unrelated to the time when an inmate's clinical need for a higher level of care is identified by his or her clinician. *Id.* Plaintiffs maintain our objection and our position that all timelines should run from the initial identification of clinical need to the actual transfer.

(B) <u>Transfer to the Department of Mental Health Acute Psychiatric Program ("APP") at California Medical Facility</u>: Plaintiffs withdraw our objection to the extended timeframe which allows 10 calendar days plus two working days from identification to transfer to the DMH-run Acute Psychiatric Program (APP) at CMF.

(C) <u>Timeline Contingent on Acceptance by the Department of Mental Health</u>: Plaintiffs continue to object to the caveat "if accepted to DMH" in the transfer timeline grid on 12-1-13 for transfers to both the intermediate and acute inpatient care programs. If the Department of Mental Health ("DMH") does not "accept" the inmate because of insufficient beds, the clinical timelines for referral should still apply. In effect, this is another attempt by defendants to tie the transfer timelines to bed availability. A strict timeline starting with clinical identification of need is necessary in order to force defendants to control their relationship with DMH, to expand the number of inpatient beds available, and/or to develop appropriate alternatives to the existing DMH programs. Defendants must provide access to inpatient care within the clinically mandated time frame.

(D): <u>Transfer to DMH Intermediate Care Facilities ("ICFs")</u>: Plaintiffs object to the Program Guide provision allowing a thirty-seven (37) to forty-four (44) calendar day timeframe for transfers to DMH intermediate inpatient care programs like Atascadero State Hospital ("ASH") and the Salinas Valley Psychiatric Program ("SVPP"). See Revised

Program Guide at 12-1-13. This timeline is roughly double the time period of twenty-one (21) calendar days previously agreed to by defendants and recommended by the Special Master in April 2005. See Ex. B to Bien Dec, 9/12/03 Letter from Jennifer Neal at 2 ("Defendants agree to incorporate the suggested timelines for transfer to DMH" and setting forth 20 day time period for transfer to ICF level of care); Ex. C to Bien Dec, 4/6/05 Special Master's Draft Report on Revised Program Guides at 9-10 ("Based on the experts' opinion in this regard, the special master recommends that the timelines allow . . . three calendar weeks from a referral to an intermediate DMH program to actual transfer."). Defendants' newly expanded time frame includes 30 calendar days between referral and actual transfer to an ICF program, and another five to ten <u>working</u> days between identification and referral, depending upon whether the inmate needs to be given a due process hearing. See Program Guides at 12-1-13. There is no basis for doubling the referral period previously agreed to by defendants and plaintiffs and found appropriate by the Court experts. The roughly forty-day time period is excessive and clinically inappropriate.

(E): <u>Psychiatric Services Unit ("PSU") Transfers</u>: The PSU is a psychiatric treatment program for EOP-level of care inmates with a Security Housing Unit ("SHU") term. Plaintiffs object to the proposed 60-day timeframe for transfer into the PSU program because it is linked to CSR endorsement rather than to the identification of clinical need. See Revised Program Guide at 12-1-13. The proposed timeline does not address existing delays in processing and transferring EOP inmates in administrative segregation EOP programs to the higher level of care PSU programs. The Special Master previously expressed a well-founded concern about linking transfer timelines to CSR endorsement, stating that "[b]y using the date of endorsement as the baseline for timing transfers, the defendants effectively sabotage the purpose of the timelines, which are designed specifically to ensure that inmates have timely access to the level of care a clinician deems necessary." Ex. A to Bien Dec, 1/3/01 Special Master's Recommendations for Transfer Timelines at 5. Plaintiffs agree with this concern and will maintain this objection. Absent a transfer timeline for PSU patients linked to clinical identification, the CDCR will not develop the necessary PSU beds and classification processes

5
PLFS' OBJ TO THE SPECIAL MASTER'S REPORT AND RECS ON DEFS' REVISED PROGRAM GUIDE, No: S 90-0520 LKK-JFM

for moving these patients rapidly out of Hub EOP Administrative Segregation Units to their treatment programs.

(F): <u>EOP Outpatient Housing Unit ("OHU") transfers</u>: When inmates at institutions without an EOP program are determined to require an EOP level of care, they often wait for long periods of time in their institution's infirmary or "OHU" until an EOP bed is available at another institution. OHU's do not provide an EOP level of mental health care. Plaintiffs object to defendants' proposed EOP OHU transfer timeline, which is also linked to endorsement, unlike the other EOP transfer timelines. See Revised Program Guide at 12-1-13. If adopted, the provision would legitimize the current pattern of extremely long transfer delays for EOPs housed in OHUs. The placement of "fragile" EOP patients in OHUs at institutions without EOP programs should be addressed as a short-term crisis in EOP and licensed Mental Health Crisis Bed ("MHCB") capacity and not codified as an ongoing Program Guide treatment standard.

(G) <u>Transfer Guidelines for EOP Patients housed in Hub EOP Administrative Segregation Units ("ASUs")</u>: "Hub" EOP Administrative Segregation Units are ordinary CDCR Administrative Segregation Units in which EOP treatment programs have been poorly implemented. Hub Administrative Segregation Units have insufficient program space and inadequate clinical staffing when compared to PSU programs. These programs generally are not providing the required 10-hours per week of EOP treatment, and in any event the conditions in these units are harsh and dangerous to inmates with severe mental illness. EOP inmates in these programs tend to be isolated in their cells for much of the day, and the treatment they do receive is provided in cramped metal cages covered with mesh that the CDCR calls "treatment modules." Plaintiffs object to the failure of defendants to develop a transfer timeline for removal of EOP patients housed in these Hub EOP Administrative Segregation Units. Long-term housing in these dangerous units must be limited to 60 days. Transfer guidelines for EOP ASU patients will ensure that institutions process Rules Violation Reports ("RVRs"), referrals to local District Attorneys for prosecution, and investigations in a timely manner so as to either return EOP patients to their mainline housing or, if warranted,

transfer them rapidly to a PSU program. For those EOP patients housed, sometimes for years at a time, in these Hub EOP ASUs because of the defendants' failure to provide sufficient Level IV EOP Sensitive Needs Yard beds for inmates with safety issues, the transfer timelines will ensure that defendants develop sufficient beds.

12-1-14 and 12-1-15: Program Guides Revision Policy and Procedure

Plaintiffs object to this proposed Program Guide Revision Policy and Procedure which permits defendants to unilaterally change the Program Guides. See Revised Program Guides at 12-1-14 and 15. Plaintiffs also object to the procedure recommended by the Special Master, which provides for only 14-days notice before defendants implement changes to the Court-ordered Program Guide. See Special Master's Report at 11. The Revision Policy and Procedure must provide at least thirty days (30) written notice to the Special Master and plaintiffs of proposed changes to the Program Guides, with a requirement that the parties meet and confer over the proposed changes. If no agreement is met, the burden will be on the plaintiffs to file a motion for a hearing concerning the proposed Program Guide revisions.

**Chapter 2: Reception Center Mental Health Assessment**

Classification Issues: Annual Point Reductions for EOP Participation: Defendants indicated in early January 2006 that they agreed to the Special Master's recommendation that EOP inmates who participate in their EOP program should be given annual four point classification score reductions. Ex. D to Bien Dec, Defendants' 1/6/06 Letter at 3 (stating that "defendants agree with the Special Master's recommendation" that "EOP inmates receive annual point reductions in their classification scores for participation in their EOP-related programs."). However, the defendants have not incorporated this requirement into the Revised Program Guide that they filed with the Court, and the Special Master has not repeated the recommendation in his filing with the Court. Plaintiffs agree with the Special Master's recommendation on this issue regarding annual four point reductions for EOPs who participate in their EOP programming.

Initial Classification Addition of Four Points for History of Mental Illness: On a related issue, plaintiffs object to the CDCR practice of assigning four extra classification score points

at initial classification for inmates with a history of mental illness. This practice is based on irrational stereotypes about individuals with mental illness and results in mentally ill inmates being assigned to higher security prisons where they spend more time in their cell and mental health care is more difficult to access.

<u>Extended Reception Center Stays</u>: Plaintiffs also object to defendants' refusal to add mentally ill inmates to the existing procedures for providing general population privileges and credits to disabled inmates who remain in reception centers for extended periods due to their disability. Existing procedures provide such general population privileges and credits to disabled inmates with mobility, vision and hearing disabilities who are retained overlong in the reception centers because of their disability.

**Chapter 3: Correctional Case Management System**

<u>12-3-2</u>: Plaintiffs object to defendants' refusal to include a policy that requires that 3CMS patients will be housed at security levels commensurate with their classification points and will not be excluded from access to the same broad range of programs, services and opportunities available to general population inmates due to their participation in the Mental Health Services Delivery System ("MHSDS"). Existing procedures that require housing 3CMS patients at higher security levels discourage mentally ill inmates from participating in the 3CMS program and from taking their medications. For example, 3CMS inmates are not permitted to be housed in most Level I yards.

**Chapter 4: Enhanced Outpatient Program**

<u>12-4-4</u>: Plaintiffs object to defendants' refusal to ensure that EOP patients will be housed in EOP programs at security levels commensurate with their classification points and will not be excluded from access to the same broad range of programs, services and opportunities available to general population inmates due to their participation in the EOP program. Currently, the lowest security level program for EOP inmates is a Level III program, and most EOP programs exclude EOP inmates from participating in mainline work, vocational, educational and recreational programming.

**Chapter 5: Mental Health Crisis Bed ("MHCB")**

<u>Mental Health Patients in Outpatient Housing Units ("OHUs")</u>: Although plaintiffs agree to most of the provisions within Chapter 5, we do not agree to or ratify in any manner the practice of placing mentally ill inmates into unlicensed Outpatient Housing units for crisis observation and/or treatment. For that reason, plaintiffs object to the existing discussion of OHU treatment protocols and ask that a new provision be added to them calling for the elimination of the use of Outpatient Housing Units for providing crisis care or treatment to mentally ill inmates within a fixed number of years.

<u>12-5-7</u>: Plaintiffs withdraw our prior objection concerning this page.

<u>12-5-26 & 27</u>: Plaintiffs object to the provision that allows for the discharge of an inmate-patient from the OHU by a single clinician. This clinician can be a physician with no mental health training. Instead of this provision, plaintiffs propose system-wide adoption of the operational procedures developed by CDCR staff members at CSP-Sacramento for use in their new Mental Health-OHU. According to the relevant SAC operational procedure, an inmate-patient may be removed from the OHU based upon an order by a psychologist, psychiatric social worker or psychiatrist/physician after consultation with an informal interdisciplinary clinical team, which includes, but is not limited to a psychiatrist, nursing staff and a custody representative. Other circumstances where the interdisciplinary clinical team is required include: (1) every 72 hours for inmate-patients pending Mental Health Crisis Bed placement; and (2) within 48 hours of placement to assess the need for higher level of care or release to prior housing. Although, as noted above, plaintiffs object to the use of the OHU as a *de facto* MHCB unit, until the use of OHUs is eliminated, these clinical safeguards are necessary when providing mental health crisis care.

<u>12-5-27</u>: Plaintiffs object to this Program Guide section, which permits the housing of "fragile" EOP patients in OHUs while they wait for transfer to a mainline EOP program. See Objection to OHU to EOP transfer timelines, *supra*, at 6. If there is a shortage of EOP beds, the solution is to expand EOP bed capacity.

**Chapter 6: Department of Mental Health Inpatient Programs**

The transfer timelines discussed in connection with Chapter 1 above should also be included in Chapter 6.

12-6-1: Given defendants' modification of the relevant language, plaintiffs withdraw our objection concerning the need for defendants to commit to providing timely access to inpatient care to all inmates who require such care.

12-6-3: Although defendants have modified some language in this regard, plaintiffs object to language which remains in the Program Guide restricting lengths of stay in the Acute Psychiatric Program at CMF to 45 days. See 12-6-3 at ¶ 5 ("inmates admitted to the APP shall be inmates anticipated to be stabilized sufficiently for release from DMH within 30 to 45 days.") There is no existing higher level of care program to which CDCR inmates can be transferred if they cannot be stabilized after 30 to 45 days in the APP.

12-6-7 to 12-6-8 and 12-6-15: Plaintiffs object to the requirement that inmates must have "an Axis I major (severe) mental disorder with active symptoms" to be admitted to the DMH intermediate level of care programs or to the DMH day treatment program. This level of treatment should also be available on a medical necessity basis for inmates without a "major (severe)" Axis I diagnosis, and for inmates referred for testing or diagnostic clarification.

12-6-9: Given defendants' modification of the relevant language, plaintiffs withdraw our prior objection to the provision that required clinicians to contact the C&PR concerning custody issues before referring a patient to DMH.

12-6-15: Plaintiffs object to two of the criteria set forth in the Revised Program Guide for deciding whether an inmate may be admitted to the Day Treatment Program (DTP) at CMF – Admissions Criteria 4 ("Able to function in a structured therapeutic setting with minimal staff prompting") and Admissions Criteria 5 ("Able to participate in own treatment planning"). Revised Program Guide at 12-6-15. These criteria have been previously criticized by the Special Master's experts because they require a higher level of functioning for referrals to the DTP program than has historically been required. See Ex. E to Bien Dec, 1/18/05 Letter from Michael Keating to Defendants concerning DTP ("The admissions criteria seem to identify

exclusively higher functioning and volunteer inmate/patients who are verbal and motivated. Traditional day treatment programs, however, have focused more often on lower functioning inmate/patients who might benefit from activities more highly structured than CDC's EOP program without requiring the long-term stabilization of an intermediate care program. The implicit exclusion of inmate/patients with primary Axis II diagnoses . . . is problematic because sometimes these are the very inmate/patients who might benefit most from a day treatment program.") In fact, the Court's July 9, 2004 Order prohibits defendants from changing the DTP program at CMF. 7/9/04 Order ¶ 5. Plaintiffs continue to object to the use of these overly restrictive criteria that will exclude inmates who require inpatient care.

### Chapter 7: Administrative Segregation

<u>12-7-2</u>: Plaintiffs object to defendants' failure to include a form and/or protocol to be used in conjunction with this section, as well as the Security Housing Unit ("SHU") and Psychiatric Services Unit ("PSU") sections, that requires prior consideration of the patient's likelihood of decompensation when he or she is placed in segregated housing, based upon a review of the patient's health record and a review of his or her past history of decompensation in locked units. The form should also allow a clinician to make a recommendation for alternative placement in appropriate cases. The development of such a protocol would provide substance and specific guidance to the existing language in the Program Guides, which lists "likelihood of decompensation" as one relevant factor to be considered on initial placement in segregated housing. See Revised Program Guide at 12-7-2, ¶ 4.

<u>12-7-4</u>: Plaintiffs object to the reduction in daily psych tech rounding for non-MHSDS inmates in administrative segregation from daily rounds to once a week rounds.

<u>12-7-6</u>: Plaintiffs object to the reduction in individual clinical case management contacts for 3CMS inmates housed in administrative segregation from weekly clinical contacts to every other week clinical contacts.

The Special Master's Report points out that these last two objections concern proposed reductions in care, unlike most of the program guide provisions in dispute, and that therefore "the defendants ought to be required to continue to meet currently mandated requirements for

daily psych tech rounds of non-caseload inmates and weekly case management contracts with 3CMS inmates in administrative segregation." Special Master's Report at 6.

However, the Special Master's report nonetheless later recommends that the Court "adopt formally and finally the submitted Program Guide as quickly as possible" without specifically exempting these sections, which are in the Revised Guides submitted by the defendants to the Court. See Special Master's Report at 10; see Revised Program Guide submitted to the Court by defendants at 12-7-4 and 12-7-6. In order to clarify that the Court is not adopting this or the other disputed Program Guide provisions, plaintiffs have carefully prepared a proposed form of order for the Court that is significantly different from the sweeping approval recommended by the Special Master. See Plaintiffs' Proposed Order, filed herewith.

Enhanced Outpatient Program Care in Administrative Segregation

12-7-6: ¶ H.1. b. This section provides that transfer to an appropriate ASU EOP Hub institution treatment setting will occur within 30 days of placement at the EOP level of care designation. As discussed above, plaintiffs object to this section if the transfer timeline is triggered by the date of the Mental Health Placement chrono, rather than at the time which the patient's case manager refers him or her to EOP level of care.

12-7-8: Other Treatment Activities: In treatment planning for therapy programs for EOP ASU patients, there should be a requirement for an individualized assessment of each patient's specific risk for violence towards others. Based on this assessment, for appropriate inmates, therapy options should include group therapy outside of treatment cages (which defendants call "treatment modules") as well as individual therapy outside of these treatment cages. For example, there is currently a large group of EOP inmates in administrative segregation units around the state who are placed their because of their need for protective custody – what the CDCR calls "Sensitive Needs." These inmates are languishing in administrative segregation units because the CDCR has not created enough Level IV Sensitive Needs Yards. The inmates generally have no history of violence, yet they are required to do all of their mental health programming in cages in locked units.

**Chapter 8: Security Housing Unit**

12-8-2: The Special Master's Report states that plaintiffs seek "application of the exclusionary rule adopted in Madrid to all SHU units in the CDCR." Special Master' Report at 8. This is an incomplete description of plaintiffs' objection. Plaintiffs are requesting that appropriate exclusionary criteria be developed for the other SHU units in the state, which include the Corcoran SHU, the Valley State Prison for Women ("VSPW") SHU, and the SHU at California Correctional Institute – Tehachapi. These procedures should be developed based on a specific clinical assessment of each SHU unit and the risk each SHU unit poses to mentally ill inmates.

12-8-4: As noted above in connection with plaintiffs objections to Program Guide Chapter 7, plaintiffs request implementation of a new protocol that will provide for meaningful review of each inmate-patient's "likelihood of decompensation" prior to placement in the SHU. The same type of protocol developed for screening administrative segregation inmates should be employed for screening of inmates prior to their placement in a Security Housing Unit. See Objection to 12-7-2, *supra*.

12-8-5: Sources of Referral for Mental Health Services: Plaintiffs object to the defendants' failure to include a requirement that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in the SHU. Special Master Keating recommended that defendants adopt this provision in his April 6, 2005 Draft Report on Revised Program Guides. See Ex. C to Bien Dec, 4/6/05 Special Master's Draft Report on Revised Program Guides at 12-13 (stating that such a screening would reach inmates who are referred to SHU following a long stay in administrative segregation and explaining that "[p]rolonged detention in administrative segregation can have deleterious effects on inmates' mental health, and a requirement is needed, paralleling the requirement at paragraph E.6. at page 12-7-4 of Chapter 7, that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in a SHU.") The Special Master's final report

does not address this prior recommendation. Plaintiffs will maintain their objections to the absence of this important mental health screening prior to placement in a Security Housing Unit.

12-8-6: Plaintiffs retain our objection to the provision of reduced psych tech rounding to both MHSDS and non-MHSDS inmates in the SHU. See Revised Program Guide at 12-8-6, ¶ 5 (providing for weekly psychiatric technician or case manager rounds of caseload inmates and every other week rounding of non-caseload inmates in the SHU). SHU inmates should receive at least the same frequency of rounding as administrative segregation inmates. All SHU inmates should be provided with daily psychiatric technician rounding, including general population SHU inmates.

12-8-9: Plaintiffs retain our objection to this provision which requires that 3CMS housed in the SHU be provided with an individual clinical case manager contact only once every 30 days (or more frequently if clinically indicated). Plaintiffs' position is that 3CMS inmates housed in the SHU should be provided with a weekly individual clinical case manager contact, which is the same frequency of case manager contacts provided to administrative segregation 3CMS inmates.

Enhanced Programming and Treatment

Plaintiffs object to defendants' refusal to include provisions in the Program Guide for enhanced programming and improved conditions for inmate-patients with mental illness housed in the SHU. In addition, plaintiffs request procedures to ensure clinical input as to any custody policies or procedures that change conditions or programming in the SHU.

Screen of all Non-caseload Housed in CCI, Corcoran and VSPW SHUs

Plaintiffs object to defendants' refusal to include a requirement for a one-time screen of all non-caseload inmates currently housed in the Corcoran, the VSPW and the CCI SHUs using the 31 Question mental health questionnaire already developed in this case.

**Chapter 9: Psychiatric Services Unit**

12-9-8 & 9: Required Treatment: Plaintiffs object to the requirement that EOP inmates in the PSU must be located in cages in order to receive mental health care. Plaintiffs seek a

requirement that the PSU treatment program include an individualized assessment of each patient's ability to program in a group or individual setting outside of cages. The PSU program must provide treatment programs outside of these cages so that inmate/patients can transition to less restrictive programs in prison and in the community.

**Chapter 10: Suicide Prevention and Response**

<u>12-10-15 & 16</u>: <u>Guidelines for clinician-ordered suicide precautions</u>: Plaintiffs object to the absence of custody observation at staggered intervals not to exceed 15 minutes (*e.g.,* 5, 10, 7, 9 minutes) as part of the behavioral checks for inmates placed on suicide precautions in the MHCB or OHU. See Revised Program Guides at 12-10-15. See also, Ex. F to Bien Dec, excerpts from Correctional Mental Health Care Standards and Guidelines for Delivering Services, 2003, at 228. The Program Guide standard is an unsafe level of observation for suicide precautions.

<u>12-10-17</u>: <u>Video-Monitoring</u>: Plaintiffs object to the use of video-monitoring to replace direct, constant, cell front staff observation of inmates on suicide watch. Plaintiffs have no objection to video-monitoring which is used as a supplement to, but never as a substitute for, constant observation by staff.

<u>12-10-21-22</u>: <u>Emergency Response and CPR</u>: Plaintiffs agree with the Special Master that this section must be revised to conform with the final amended policy on emergency response and CPR.

## CONCLUSION

For all of the reasons set forth above, plaintiffs respectfully request that the Court enter an order as set forth below and in the Proposed Order filed herewith. The Proposed Order is consistent with the Special Master's Report and Recommendations.

Plaintiffs request that the Court's order clearly specify which portions of the Revised Program Guide are being approved and which portions will be the subject of further proceedings and further orders. There are several different relevant categories: <u>First</u>, the majority of the Revised Program Guide is undisputed and can be approved at this time. <u>Second</u>, the provisions that would reduce the frequency of rounding and case manager contacts

in Administrative Segregation units should be singled out as not approved at this time. Moreover, defendants should be ordered to continue to provide the level of care in Administrative Segregation units presently mandated by the 1997 Program Guide. <u>Third</u>, as to those other specific provisions in the Revised Program Guide to which plaintiffs object, the Court should order them implemented but note that they are not final and are subject to further Court Orders. <u>Fourth</u>, as to the additional provisions requested by the plaintiffs, the Court should indicate that these will be subject to further proceedings. <u>Finally</u>, the Court should adopt the Special Master's recommendation concerning certain provisions that are likely to be resolved or clarified in the next 30 days.

Thus, plaintiffs request that the Court order as follows:

1. The court hereby approves the undisputed provisions of the January 2006 Revised Program Guide, and orders defendants to immediately implement all such provisions.

2. The following disputed sections of the Revised Program Guide would, if implemented, reduce the amount of care currently mandated by the 1997 Program Guides. As to these disputed sections, the requirements of the 1997 Program Guide shall continue to apply until plaintiffs' objections have been heard and decided:

    a. On page 12-7-4 of the Revised Program Guide, the defendants' proposed reduction in daily psych tech rounding for non-MHSDS inmates in administrative segregation to once a week rounds. The 1997 Program Guide requirement of daily rounds shall continue to apply.

    b. On page 12-7-6 of the Revised Program Guide, the defendants' proposed reduction in individual clinical case management contacts for 3CMS inmates housed in administrative segregation to every other week clinical contacts. The 1997 Program Guides requirement of weekly clinical contacts shall continue to apply.

3. Plaintiffs have filed and maintained objections to various additional provisions in the Revised Program Guides. Defendants are hereby ordered to immediately implement these sections of the Revised Program Guide, even though they remain in dispute. These remaining disputes are set forth in plaintiffs' objections. In addition, plaintiffs request that certain

additional requirements be added to the Revised Program Guide. The court, after consultation with the parties and the special master, will determine an appropriate procedure for hearing plaintiffs' objections and schedule these remaining issues for resolution.

4. The special master and the parties are directed to finalize the provisions of the Program Guide related to the review of psychiatrist qualifications, staffing ratios, CPR and video monitoring within 30 days. The parties are also directed to report to the court concerning the resolution of those matters within 45 days.

Dated: February 17, 2006

Respectfully submitted,

Michael W. Bien
Rosen, Bien & Asaro, LLP
Attorneys for Plaintiffs