PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.:  Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' REVISED PROGRAM GUIDE** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| | **HEARING** |
| | Date:        To be determined |
| | Time:        To be determined |
| | Location:   Courtroom 4 |
| | The Honorable Lawrence K. Karlton |

MICHAEL W. BIEN DECLARES:

1.      I am a member of the Bar of this Court and of the firm, Rosen, Bien & Asaro, one of the attorneys for the plaintiff class in this litigation.  I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify.  I make this declaration in support of Plaintiffs' Objections to the Special Master's Report and Recommendations on Defendants' Revised Program Guide.

2.      Attached hereto as Exhibit A is a true and correct copy of the Special Master's Recommendation for Transfer Timelines, dated January 3, 2001.

3.      Attached hereto as Exhibit B is a true and correct copy of a September 12, 2003 Letter from Jennifer Neal to Special Master Keating in which defendants agreed to a twenty-one (21) day transfer timeline for referrals to the Department of Mental Health's Intermediate Care Facility ("ICF") inpatient care programs.

4.      Attached hereto as Exhibit C is a true and correct copy of Special Master Keating's Draft Report on Revised Program Guides, dated April 6, 2005.

5.      Attached hereto as Exhibit D is a true and correct copy of defendants' January 6, 2006 Letter in which defendants agreed to the Recommendation of the Special Master that "EOP inmates receive annual point reductions in their classification scores for participation in their EOP-related programs."

6.      Attached hereto as Exhibit E is a true and correct copy of a January 18, 2005 letter from Michael Keating to defendants setting forth his experts' comments concerning a Memorandum of Understanding ("MOU") between the CDCR and the Department of Mental Health.  The MOU included several of the same admission criteria for the Day Treatment Program to which plaintiffs object in the Revised Program Guide.  In the letter, the Special Master indicates that his experts found that these admission criteria for the Day Treatment Program are overly restrictive, both because of the emphasis on high functioning, motivated inmates able to cooperate with their own treatment planning, and because of the limitation on admission to only inmates with Axis I diagnoses.

1    7.    Attached hereto as Exhibit F are true and correct copies of excerpts from the

2  National Commission on Correctional Health Care's 2003 publication entitled "Correctional

3  Mental Health Care: Standards and Guidelines for Delivering Services." The except consists

4  of Appendix B, which is entitled "Guide to Developing and Revising Suicide Prevention

5  Protocols." The standard cited in plaintiffs' objections regarding suicide observation can be

6  found in Appendix B at page 228 under the heading "Level of Observation." The relevant

7  standard is set forth as follows:  "Two levels of supervision are generally recommended for

8  suicidal inmates: close observation and constant observation. *Close Observation* is reserved

9  for the inmate who is not actively suicidal, but expresses suicidal ideation (*e.g.*, expressing a

10  wish to die without a specific threat or plan) and/or has a recent history of self-destructive

11  behavior. Staff should observe such an inmate at staggered intervals not to exceed every 15

12  minutes (*e.g.*, 5, 10, 7 minutes). *Constant Observation* is reserved for the inmate who is

13  actively suicidal, either threatening or engaging in suicidal behavior." Appendix B at 228.

14  The "Close Observation" standard is the standard that should be applied to inmates who would

15  be given less frequent (hourly) safety checks pursuant to the procedures set forth on Revised

16  Program Guide page 12-10-15 and 12-10-16.

17    I declare, under penalty of perjury, that the foregoing is true and correct and that this

18  declaration is executed in San Francisco, California on February 17, 2006.

19

20                                                    _____

21                                                    Michael W. Bien

22

23

24

25

26

27

28

# Exhibit A

# LITTLE, BULMAN,
## MEDEIROS & WHITNEY, P.C.
### *ATTORNEYS*

Christopher H. Little *
John E. Bulman*
Matthew F. Medeiros*
Christopher C. Whitney*
Fredrika Quinn Little†
Norma P. D'Apolito
Scott K. Pomeroy
Stephen T. Carney*†
Jack J. Vultaggio, Jr.□

J. Michael Keating, Jr.
Henry R. Kates
*Of Counsel*

*Also admitted in Massachusetts
†Also admitted in Connecticut
□Admitted in Massachusetts only

72 Pine Street
Providence, Rhode Island 02903
(401) 272-8080
Facsimile (401) 521-3555
Email: info@lbmwlaw.com

**RECEIVED**
JAN 0 4 2001
ROSEN BIEN & ASARO

January 3, 2001

Clerk's Office
United States District Court
 for the Eastern District of California
501 I Street
Sacramento, CA 95814

RE:     **Ralph Coleman, et al. v. Gray Davis, et al.**
        **No. Civ. S-90-0520 LKK JFM P**

Dear Sir/Madam:

Please find enclosed for filing in the above-referenced matter an original and three copies of the Special Master's Recommendations for Transfer Timelines.

As you will note from the certificate of service, we are enclosing copies of the filing for Judge Karlton, Magistrate Judge Moulds and Haven Gracey, Staff Attorney to Judge Moulds. In the past, we have sent copies directly to all three of these individuals and sent to you, as well, an original and two copies. You indicated to us at the time of an earlier filing, that the two copies we normally filed were distributed to the judges, so we have adjusted our practice by sending you the original and relying on you to distribute the copies to Judge Karlton, Judge Moulds and Ms. Gracey.

If you have any questions about this filing or the distribution of its copies, please call. Thank you for your courtesy.

Sincerely yours,

*J. Michael Keating, J.*

J. Michael Keating, Jr.
Special Master

Enclosures

mastering/cvltrctclkrpt.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,
      Plaintiffs,

    vs.
                                NO. CIV. S-90-0520 LKK JFM P

GRAY DAVIS, et al.,
      Defendants.

## SPECIAL MASTER'S RECOMMENDATIONS
## FOR TRANSFER TIMELINES

On August 28, 2000 the special master submitted recommendations to the court on accelerating the defendants' long delayed development of a plan to manage the transfers of seriously mentally disordered inmates to facilities with treatment programs and resources adequate to their needs. To facilitate the production of an acceptable timetable for transfers, the master recommended that the defendants submit proposed timelines to parties and the master by November 30, 2000, meet subsequently to confer on the proposed schedule and complete a final set of guidelines by December 31, 2000. The court's September 14, 2000 Order adopted these recommendations.

The defendants submitted the required tentative timetable for transfers on November 30, to which they subsequently made adjustments on the eve of a December 15th meeting, where parties were scheduled to confer on the proposed timelines. The defendants' revised timelines (see Exhibit A) were discussed at length on December 15, but fundamental differences remained, and it proved impossible to finalize an acceptable schedule for transfers. The master agreed to revisit and revise the timelines and circulate them among the

parties briefly prior to the December 31, 2000 deadline. This report incorporates the master's proposed timelines and responds to the parties' critique of those timelines.

The issue of transfers and their timing is not new in this case. In May, 1999, a Coleman compliance report identified again, and at some length, widespread problems with transfers to appropriate levels of care as a serious flaw in the decentralized organization of the defendants' Mental Health Services Delivery System (MHSDS) and submitted two recommendations to address the problem. The first urged the need for a system-wide data collection process for capturing information on mental health transfers at the institutional level and recording dates of referral, classification, endorsement and actual movement. The second called for the development of a transfer plan based on an analysis of the data generated by the suggested collection effort. Underlying both recommendations was the absence of empirical data on the length of time between each milestone in the procedural process that occurred between a clinician's referral of an inmate to a higher level of MHSDS care and the inmate's actual transfer to the level of care prescribed. Both recommendations were adopted in a July 26, 1999 Order that gave the defendants 90 days to create a data collection system and until December 31, 1999, to develop a plan for expediting transfers.

Relative to this issue, much of the past 17 months has been consumed by the defendants' creation of its Mental Health Tracking System (MHTS), an internal, computerized management information and tracking system introduced over the course of the past year in all CDC facilities. Because of the

2

need for accurate, dependable empirical data on the lapses between milestones in the transfer process, identified as essential to transfer planning, the defendants twice returned to court to report delays in the deployment of their MHTS, the vehicle destined to provide the missing data. They twice sought, and received, extensions from the court within which to generate needed data and submit their data-driven timelines for transfers. Finally, in mid-2000, the court directed the master to review and report on the situation, resulting in the recommendations and order to which this report responds.

The defendants' new MHTS has unfolded much more slowly than expected. While some institutions have taken full advantage of the system, many are still struggling. In most facilities, the system has emerged as a useful tool for identifying the institutional MHSDS caseload and scheduling, docketing and following up timely clinical contacts with the program caseload. Other data collection functions anticipated for the system have developed more slowly. The MHTS simply does not yet routinely generate data on the intervals at each institution between referrals, classification determinations, endorsements and actual movements that occur before transfers can take place. In the continuing absence of data on these intervals, the defendants find themselves compelled to base their timelines solely on the time between endorsement and transfer, the only interval for which they have credible data and over which they have some control. All of this means that the 17-month wait for the defendants' transfer plan was largely irrelevant, given that the data supporting the current plan was available in mid-1999.

3

"Endorsement" in the context of the timelines occurs when a classification staff representative (CSR) reviews an inmate's central file, including the mental health referral and the institution's recommendation(s) for placement; assesses what facility currently can best meet the inmate's clinical, safety and housing needs; and confirms finally where the inmate will go. Based on a half dozen rounds of formal monitoring in CDC institutions over the past three years, the master finds that endorsements typically, but not always, and depending largely on the timing and frequency of CSR visits to each facility, occur anywhere from four to twelve weeks after a clinical referral to a higher level of care. On the other hand, the department has become relatively adept in facilitating *ad hoc* emergency transfers, especially those involving the movement of suicidal inmates in need of acute inpatient care at the Department of Mental Health's acute care program at the California Medical Facility (DMH/CMF).

Delays in endorsement occur most often because CSRs are roving, circuit-riding officials, who review and endorse recommended transfers in multiple institutions. Like most other personnel, they also take vacations and suffer illnesses. Meticulously reviewing central classification files (C-Files) for all pending transferees and making appropriate transfer decisions is a time-consuming and demanding task. Because the lapse of time between a clinician's referral and CSR endorsement varies and sometimes lasts for months, use of the endorsement date as the baseline for transfer timelines injects massive uncertainty. Reliance on the endorsement date leaves the gap between referral and endorsement uncharted and, to date, largely unchartable,

4

ultimately undermining accountability for delays in getting MHSDS inmates to levels of care determined by clinicians to be necessary and appropriate.

By using the date of endorsement as the baseline for the timing of transfers, the defendants effectively sabotage the purpose of the timelines, which are designed specifically to ensure that inmates have timely access to the level of care a clinician deems necessary. Neither the plaintiffs nor the court are much interested in movement, *qua* movement; it is the delay in access to prescribed appropriate care that makes tardy movements objectionable, a delay that often involves serious decompensation and suffering for severely mentally ill patients whose access to appropriate care is frustrated.

According to the defendants' proposed timelines, for example, a newly arrived inmate in a reception center, who is determined to need an EOP (Enhanced Outpatient Program) level of care, must be transferred within 21 days of endorsement. If a CSR does not review and approve the transfer recommendation for ten to 12 weeks, the inmate may spend as many as 105 days, or 3.5 months, awaiting movement to a program with adequate resources to meet his or her mental health needs.

Inmates whose transfers are thus delayed do not receive adequate interim mental health treatment in reception centers, which lack sufficient clinical staff to provide the intense level of care needed by EOP inmates awaiting transfer, or even the less intensive level of care required by 3CMS (Correctional Clinical Case Management System) inmates. It has long been acknowledged in the monitoring process that the defendants are presently incapable of providing to reception inmates the levels of treatment routinely

5

required by the department's program guides. Were they required to do so, the need for increased staffing levels would be formidable, and the defendants, despite their best efforts, cannot now meet existing staffing requirements.

If the proposed timelines based on the date of endorsement are unacceptably vague, and the defendants cannot provide adequate mental health care to designated transferees awaiting movement, what transfer timelines might work? The recommended timelines that follow take as a starting point the date of a clinician's referral of a seriously mentally disordered inmate to a specific level of treatment and care. The defendants object that a schedule based on the date of referral may preclude adequate review of the security issues involved in transfers, such as safety considerations arising from a transferring inmate's need for protection or the impact of gang affiliations in any new facility. Presumably, if such issues arise, they are addressed currently during the lapse between the institution's classification recommendation and CSR endorsement. While that interval may contract under the timelines proposed here, enough time will remain to determine whether such issues are sufficiently serious and complex in specific cases to justify an exception to the timelines. Neither plaintiffs nor the master object to delays reasonably attributable to concerns for the personal, physical safety of prisoners, so long as such delays are exceptional, justified and the reasons for the delay are recorded.

The timelines suggested here need to be stopgap in nature and duration because they still reflect a lack of accurate data on the length of the intervals between referral and endorsement, as well as the causes for the delays that occur. In the absence of that information, as has been reiterated

6

repeatedly over the past three years, it is premature to articulate final timelines, but seriously mentally disordered inmates should not be put at risk in the meantime for the dearth of data only the defendants can cure.

Again, the tentative timelines suggested here are based on the date a clinician refers an inmate to a higher level of care, although transfers to Department of Mental Health facilities and programs are tied to the receiving institution's <u>acceptance</u> of a clinical referral. The narrative description that follows is supplemented by the chart in Exhibit B.

1.    MHSDS inmates in reception centers, who need a 3CMS level of care, should be transferred within 90 days of their clinical referral, or within 60 days of their referral, if clinically indicated during initial evaluation.

2.    MHSDS inmates in reception centers or any other CDC facility, who need an EOP level of care, should be transferred within 60 days of their clinical referral, or within 30 days of their referral, if clinically indicated.

3.    MHSDS inmates, who need acute short-term inpatient care in an MHCB (Mental Health Crisis Bed) unit, whether in their own or in another facility, should be transferred within 24 hours of their clinical referral.

4.    MHSDS inmates, who need acute inpatient care in a Department of Mental Health facility (CMF/DMH or Patton State Hospital (PSH)), intermediate or day treatment (CMF/DMH or PSH) or long-term intermediate treatment (ASH or PSH), should be transferred within 72 hours of acceptance by, and, in the case of DMH's acute care program at CMF, endorsement to, the designated DMH institution or program.

5.     MHSDS inmates on psychotropic medication in desert institutions at a 3CMS level of care should be transferred within 30 days of their arrival if they have been sent, contrary to policy and inappropriately, to the desert facility with a serious mental disorder requiring a 3CSMs level of care and medication. Inmates who develop a serious mental health disorder requiring a 3CMS level of care and medication while at a desert institution should be transferred within 90 days of their clinical referral, or within 60 days, if clinically indicated.

6.     MHSDS inmates on psychotropic medication in desert institutions at an EOP level of care should be transferred within 21 days of their arrival if they have been sent, contrary to policy and inappropriately, to the desert facility with a serious mental disorder requiring an EOP level of care and medication. Inmates who develop a serious mental disorder requiring an EOP level of care and medication while at a desert institution should be transferred within 60 days of their clinical referral, or within 30 days, if clinically appropriate.

7.     The defendants have recently initiated a program for the consolidation and centralization in a limited number of institutions of administrative segregation inmates in need of an EOP level of care. Because the potential for the decompensation of inmates in administrative segregation is clearly greater than in the general population, there is some reluctance to accept the same timeline applied to the movement to an EOP program of inmates from a reception center or the general population. On the other hand, the security issues surrounding such transfers are critical, and both the newness of the consolidation program and its potential for significant improvement in the

8

treatment provided to EOP inmates in administrative segregation suggest caution. The recommended provisional timeline here is for the transfer of EOP inmates, who need an EOP level of care in administrative segregation, to designated hub facilities within 60 days of referral, or within 30 days, if clinically indicated, coupled with a directive to document and scrutinize these transfers closely to assess the appropriateness of the provisional timeline.

The defendants distinguish between the date of acceptance and the date of endorsement for transfers to the DMH acute care program at CMF, because DMH may not have an unoccupied bed available for inmates "accepted" to its acute care program. For such inmates, "endorsement," rather than "acceptance," signals the availability of a bed and triggers the 72-hour deadline. The defendants have undertaken measures to ease the chronic unavailability of acute care beds in DMH/CMF, and the prospects for limiting the problem sharply are promising.

DMH also notes, oddly for a program providing care for the most acutely ill psychiatric patients in the entire CDC population, that it does not admit patients on weekends and holidays. This practice is particularly troubling for those inmates referred to DMH/CMF on, say, a Wednesday before a long weekend, who may not be admitted until the following Tuesday. This troubling practice is offset by current policy, which permits the immediate movement to CMF from other CDC institutions of suicidal or other extremely emergent cases for possible transfer to a mental health crisis bed in DMH, irrespective of the ban on weekend admissions. CMF inmates also have regular access to DMH acute care

9

inpatient beds, which presently provide MHCB placements for CMF inmate/patients in need of that level of short-term acute inpatient care.

The premise of the availability of beds, which the defendants suggest, at least implicitly, is a continuing and indispensable caveat to the proposed timelines, is particularly troubling to the plaintiffs, who argue that the defendants are responsible for providing sufficient program beds to meet the needs of the entire MHSDS caseload. Ultimately, of course, that is the goal of plaintiffs and defendants alike. In the meantime, a rigid requirement for the timely transfer of inmate/patients to programs already fully occupied, deliberately overcrowding such programs, might well undermine and possibly destroy all of the advances of the past five years, particularly in MHCB and EOP programs. The provisional timelines recommended here do not require the defendants to transfer inmates to mental health programs that are already fully occupied. This acceptance of the relevance of bed availability does not release the defendants from their obligation to provide sufficient resources and programs to meet the mental health needs of the CDC population, which the defendants have struggled honestly over the past years to define and satisfy. It simply recognizes the need to contain the interim damage to an evolving system from an inflexible mandate that overcrowds programs.

In their response to the overall tentative timelines circulated among the parties, the defendants recognized and accepted the unavoidability of timelines based on the date of referral, rather than the date of endorsement. They also sought a period of 120 days within which to prepare for the implementation of the considerably tighter timelines that follow from this

10

concession. It is, accordingly, recommended that the defendants be required to implement and begin meeting these suggested provisional timelines by no later than May 1, 2001. It is further suggested that the special master be directed to review the defendants' compliance with these timelines throughout the remainder of 2001, and report his findings to the court, together with any further recommendations for adjustments in the timelines, by January 31, 2001.

This tentative version of interim timelines for transfers hardly resolves the transfer issue. One can only hope that it spurs the defendants to develop accurate and dependable data on which to base final and reasonable timelines and curbs the plaintiffs' continuing impatience by linking the interim timetable for transfers to clinical determinations.



Respectfully submitted,


J. Michael Keating, Jr.
Special Master


January 3, 2000

## DECLARATION OF SERVICE BY FEDERAL EXPRESS

RECEIVED

JAN 0 4 2001

ROSEN BIEN & ASARO

Case Name:  Ralph Coleman, et al. v. Gray Davis, et al.
U.S.D.C Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 years and not a party to the within entitled cause:  my business address is Little Bulman, Medeiros & Whitney, P.C., 72 Pine Street, Providence, Rhode Island 02903.

On January 3, 2001, I served the attached

### SPECIAL MASTER'S RECOMMENDATIONS FOR TRANSFER TIMELINES

in said cause, placing, or causing to be place, a true copy thereof, enclosed in a sealed enveloped fully prepared and sent Federal Express from Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
Eastern District of California
501 I Street
Sacramento, CA  95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Haven Gracey, Esq.
Senior Staff Attorney to
Chief Magistrate John F. Moulds
U.S. District Court
Eastern District of California
501 I Street, 8th Floor
Sacramento, CA  95814

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd.
Suite M
San Rafael, CA 94901

i

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

John Sugiyama, Esq.
Deputy Director (A), Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Jennifer Weck, Esq.
Deputy Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA 92186-5266

Diane de Kervor, Esq.
Deputy Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, CA 92186-5266

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on January 3, 2001.

jmk\mastering\cert2 fedex.doc

EXHIBIT A

# CDC/DMH REVISED PROPOSAL FOR TIMELINES FOR THE TRANSFER OF MHSDS INMATES

|     | From Setting | LOC | To Setting/LOC | Intra | Inter | Timelines |
|-----|--------------|-----|----------------|-------|-------|-----------|
| 1   | RC | CCCMS | ML CCCMS | X | X | Within 90 Days of Endorsement |
| 2   | RC | EOP | ML EOP | X | X | Within 21 Days of Endorsement |
| 3   | RC | CCCMS/EOP | ML MHCB | X | X | Within 24 Hours |
| 4*  | RC/GP | Any LOC | CMF/DMH Eval | | X | Within 72 hours of Endorsement + |
| 5*  | RC/GP | Any LOC | CMC/ASH Eval | | X | Within 72 hours of Endorsement |
| 6   | CMC-E | Any LOC | ASH Placement | | X | Within 72 hours of Endorsement |
| 7*  | RC/GP – CIW, VSPW, CCWF,NCWF | Any LOC | PSH Placement | | X | Within 72 hours of Endorsement |
| 8   | GP | CCCMS | ML EOP | X | X | Within 21 Days of Endorsement |
| 9   | GP | CCCMS/EOP | ML MHCB | X | X | Within 24 Hours |
| 10** | Desert Inst. | CCCMS | ML CCCMS | | X | Within 90 Days of Endorsement |
| 11** | Desert Inst. | EOP | ML EOP | | X | Within 21 Days of Endorsement |
| 12** | Desert Inst. | CCCMS/EOP | ML MHCB | X | X | Within 24 Hours |

* Excludes Saturdays, Sundays and Holidays
** Inmates on Psychotropic medication are priority transfers
+ Note that suicidal and emergency admission inmate patients will receive priority admission.

**EXHIBIT B**

**TENTATIVE TIMELINES FOR
THE TRANSFER OF MHSDS INMATES**

|  | From Setting | LOC | To Setting/LOC | Intra | Inter | Timelines |
|---|---|---|---|---|---|---|
| 1 | RC | CCMS | GP CCCMS | X | X | Within 90 days of referral; 60 days of referral if clinically indicated |
| 2 | RC | EOP | EOP | X | X | Within 60 days of referral; 30 days of referral if clinically indicated |
| 3 | RC | CCCMS/EOP | MHCB | X | X | Within 24 hours |
| 4 | RC/GP | Any LOC | CMF/DMH Eval |  | X | Within 72 hours of endorsement* |
| 5 | RC/GP | Any LOC | CMC/ASH Eval |  | X | Within 72 hours of acceptance |
| 6 | CMC-E | Any LOC | ASH Placement |  | X | Within 72 hours of acceptance |
| 7 | RC/GP CIW, VSPW, CCWF, NCWF | Any LOC | PSH Placement |  | X | Within 72 hours of acceptance |
| 8 | GP | CCCMS | EOP | X | X | Within 60 days of referral; 30 days of referral if clinically indicated |
| 9 | GP | CCCMS/EOP | MHCB | X | X | Within 24 hours |
| 10** | Desert Inst. | CCCMS | GP CCCMS |  | X | Within 30 days if inappropriately transferred; within 90 days of referral in other cases; 60 days of referral if clinically indicated |

| 11** | Desert Inst. | EOP | EOP | X | X | Within 21 days if inappropriately transferred; within 60 days of referral in other cases; 30 days if clinically indicated |
| 12 | Ad. Seg. | EOP | EOP Centralized Ad. Seg. facilities | | X | Within 60 of referral; 30 days of referral if clinically indicated |

\*       Excludes weekends and holidays, although suicidal and emergency admissions receive expedited priority, may be admitted from CMF within 24 hours and are not placed on a waiting list

\*\*      Inmates on psychotropic medication and priority transfers

LOC     Level of Care
RC      Reception Center
GP      General Population

Exhibit B



**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 324-4361
Facsimile: (916) 324-5205
E-Mail: Jennifer.Neill@doj.ca.gov

*Via Facsimile*

September 12, 2003

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI  02915

> **RECEIVED**
> SEP 1 6 2003
> ROSEN BIEN & ASARO

RE:   RALPH COLEMAN, et al. v. GRAY DAVIS, et al.
        USDC E.D. Cal., Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

Following are Defendants' responses to your final recommendations on sections 1-3 of the Program Guide, as set forth in your July 30, 2003 letter.

1.   Section 1, Overall Treatment Criteria (page 1-5):

Defendants agree to modify the first sentence of paragraph 2, Medical Necessity, as suggested: "2. Medical Necessity.  Mental health treatment will be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:"

Defendants decline the suggestion to incorporate a paragraph setting forth examples of inmate/patients meeting the medical necessity criteria.

2.   Section 1, Standard Program Staffing (paragraph F, page 1-9):

Defendants decline the suggestion to include Board eligibility as the standard for hiring psychiatrists for CDC's MHSDS.

3.   Section 1, Automated Tracking System (paragraph H and I, page 1-10):

Defendants concur that the expanded mental health identifier code is not necessary for the creation of an adequate mental health screening process and the Program Guide will remain as written.

J. Michael Keating, Jr.
September 12, 2003
Page 2

4. <u>Section 1, Transfer Timelines</u> (page 1-12):

Defendants agree to incorporate the suggested timelines for transfer to DMH. Implementation is pending amendment to the MOU or development of an alternate location to provide service.

a.    Acute Care Programs: 72 hours from referral to acceptance/rejection; one week from acceptance to transfer.

b.    Intermediate Care Programs: One week from referral to acceptance/rejection; two weeks from acceptance to transfer.

5. <u>Section 2, Ordering UHRs During Psychological Evaluations</u> (first full paragraph on p. 2-5):

Defendants concur that the absence of a UHR is not fatal to an effective initial mental health evaluation and the Program Guide will remain as written.

6. <u>Section 2, Staff and Self Referrals</u> (page 2-9):

Defendants agree to the suggestion to incorporate into the Program Guide a requirement that all referrals be delivered to mental health services within 24 hours, excluding weekends and holidays.

<u>Attachments</u>

Defendants will include in the attachments to section 1 a chart for PSU staffing as outlined in the Special Master's May 19, 1999 report to the court on staffing ratios and adopted by the court in its July 26, 1999 order.

Please let me know if you need any additional clarification from Defendants regarding these sections.

Sincerely,

JENNIFER A. NEILL
Supervising Deputy Attorney General

For    BILL LOCKYER
Attorney General

See attached for copy list

J. Michael Keating, Jr.
September 12, 2003
Page 3

cc:    Michael W. Bien (via fax)
        Rosanne C. Campbell
        Robin Dezember
        David Gransee
        Judi Lemos
        Matthew A. Lopes, Jr. (via fax)
        Tim Rougeux
        Tim Shively
        Donald Specter (via fax)
        Betty R. Sutton

10015714.wpd

Exhibit C

*J. Michael Keating, Jr.*
**Office of the Special Master**
<u>*Coleman v. Schwarzenegger*</u>

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax:  (904) 491-7158
E-mail:  jmichaelkeatingjr@yahoo.com

April 6, 2005

<u>**VIA E-MAIL AND U.S. MAIL**</u>

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd, Suite M
San Rafael, CA  94901

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA  94104

Lisa Tillman, Esquire
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550

John van de Erve, Esquire
Senior Staff Counsel
Legal Affairs Division
1515 S Street
P. O. Box 942883
Sacramento, CA  94283-0001

Re:    **Coleman et al. v. Schwarzenegger et al.,**
          <u>**No. CIV S-90-0520 LKK JFM P**</u>

Counselors:

Attached is the <u>Special Master's Draft Report on Revised Program Guides</u>.

Counsel and parties have 30 days within which to review the enclosed and submit written
objections.  Objections will be due on May 9, 2005.

Counselors
April 6, 2005
Page Two


I have not included a copy of the revised program guides.  The version of the program
guides on which this report is based is, as indicated in the text of my report, the draft
dated July 2004 and distributed under a cover memorandum from John Dovey, Chief
Deputy Director, dated July 23, 2004, and subsequent revisions to the text submitted in a
letter from Lisa Tillman, Deputy Attorney General, in a letter to the Special Master dated
September 17, 2004.  I trust you all have retained copies of these two documents.  If not,
let me know, and I will have them provided to you.

If you have any questions, give me a call.



Sincerely yours,



J. Michael Keating, Jr.
Special Master

Enclosure

cc.    Matthew Lopes, Esq.
        Renee Kanan, M.D., Deputy Director, HCSD

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

Plaintiffs,

vs.                                            No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

Defendants.


## SPECIAL MASTER'S DRAFT REPORT
## ON REVISED PROGRAM GUIDES


In January 1997, some 13 months into the mastership in this case, the
court directed the special master to work with the parties to complete and submit for
approval plans, policies and protocols for meeting the requirements of the remedial order.
Five months later, the special master submitted to the court six volumes of materials in
response to this directive, the core of which was the California Department of Corrections
(CDC) Mental Health Services Delivery System Program Guides, essentially a collection
of standards for the delivery of mental health services in the department's various levels
of care. At the same time, the special master reported some continuing differences
among the parties and recommended various approaches for dealing with those
differences. The parties did not contest those recommendations, and on June 24, 1997
the court provisionally approved the submitted plans, policies and protocols and ordered
their implementation.

It was recognized in 1997 that, in many respects, the basic program guides
were a work in progress, hence their provisional adoption. Many of the programmatic

components of the defendant's mental health system were still embryonic and needed

much nurturing. It was uncertain whether some of the standards incorporated in the

program guides were realistic or adequate. All agreed that their implementation needed

close scrutiny and analysis over the next several years. During the implementation

process, some aspects of the provisionally approved plans, policies and protocols were

revisited and amended by the court, while some other provisions were modified and

upgraded by the defendants on their own initiative. The scope of the case, moreover, was

broadened to include all CDC institutions, making the mental health programs at the

California Medical Facility at Vacaville (CMF) and California State Prison, San Quentin

subject to the program guides. Finally, the size of the defendants' mental health caseload

has doubled since the provisional program guides were adopted, growing from 14,293

inmate/patients in July 1997 to 28,676 in January 2005. CDC's mental health caseload is

larger than the entire prison populations of 33 states, according to the Bureau of Justice

Statistics latest national census.

       By late 2002, after more than five years of experience with the

provisionally approved program guides, the special master and the parties agreed that the

time was ripe to revise and update the program guides and seek their final approval. That

agreement initiated a two-year round of meetings among parties, counsel and the special

master and his experts and monitors, during which the original program guides were

subjected to intense review, analysis and negotiation, followed by a seemingly endless

reiteration and critique of draft versions of the final product.

       It is fair to say that everyone involved in this long process agrees that the

revised program guides submitted with this report represent a substantial improvement

over their provisional predecessors. Most of the revisions have resulted in expanded services; in a few instances, services have been reduced. The special master's experts have carefully reviewed the final product, as have plaintiffs' counsel, and have recommended some additional revisions, which will be noted and discussed in this report. While plaintiffs' counsel have concurred with the additional recommendations of the special master, they also insist on the need for further revisions.

The version of program guides submitted with this report was finalized, for the most part, in mid-2004, although some additional modifications in the text were agreed to by the defendants and incorporated in mid-September 2004. Subsequent discussions, aimed at addressing the remaining substantive differences, were unproductive, and the version provided here was last modified formally in September 2004. Yet, as will be discussed below, some aspects of the September 2004 program guides, especially those applicable to inpatient programs provided presently by the Department of Mental Health (DMH), have already undergone modifications and need to be revised accordingly.

The program guides reviewed in this report consist of ten chapters and a brief glossary of terms and acronyms. The original plan to submit mental health forms as an integral part of the program guides was dropped because the forms continue to change and evolve, and the defendants' process for the formal approval of forms takes many months to complete and will further delay the final adoption of the revised program guides. The standards articulated in the program guides, moreover, drive the forms, which must conform with the standards in the guides.

The following discussion will focus only on those chapters of the program guides that, in the view of the special master and his experts, need further revision:

**Chapter 1: Program Guide Overview**

**Page 12-1-8**

Paragraph F:  The text says that Standard Program Staffing Guidelines are attached, but no guidelines are included.   Staffing guidelines, which will require adjustment based on the changes incorporated in the revised program guides, need to be updated no less than other substantive portions of the program guides.

Paragraph F:   The last sentence of this paragraph requires that psychiatrists, to practice within CDC's Mental Health Services Delivery System (MHSDS), must meet the minimum qualifications for the class (i.e., psychiatrists) under California State Personnel Board rules.  Those rules require simply that a psychiatrist meet legal requirements for the practice of medicine in California as determined by the California Board of Medical Quality Assurance or the Board of Osteopathic Examiners and have completed a year of practice in psychiatry or a year in an approved residency in psychiatry.

The cited Personnel Board rules, however, would not qualify a psychiatrist to provide mental health services in one of CDC's Correctional Treatment Centers (CTCs), housing its Mental Health Crisis Bed (MHCB) units, because Title XXII (Section 79567 of the California Administrative Code), which sets minimum licensing requirements for CTCs, defines a psychiatrist differently:

> Psychiatrist means a person who is a licensed physician and surgeon in the State of California except as allowed under Section 2072 of the Business and Professions Code and who is certified by the American Board of Psychiatry and Neurology or the American Osteopathic Board of

4

Neurology and Psychiatry or has completed a residency program in psychiatry approved by the American Medical Association or the American Osteopathic Association.

The special master's psychiatric experts urge the inclusion within the program guides of qualifications for a psychiatrist that match those contained in Title XXII. They note that the requirement for one year of psychiatric residency in the State Personnel Board's rules would not suffice to qualify a physician to undertake the broad range of psychiatric services demanded by a CDC-based practice. The first year of a psychiatric residency typically involves, either alone or in combination with a medical internship, exposure to inpatient care only, ironically the kind of experience likely to be relevant only in an MHCB unit, where Title XXII explicitly bars the employment of any psychiatrist who is not Board-certified or Board-eligible. Training in the delivery of inpatient care is irrelevant to the typical tasks required of most CDC staff psychiatrists because it addresses neither the diagnosis nor treatment of less serious disorders endemic in outpatient settings, which include the vast majority of CDC's overall mental health caseload. Inpatient training and experience alone, moreover, provides little or no knowledge about mental health organization, the range of therapeutic interventions conducted by other mental health professionals or the instruction of others in the principles and practices of psychiatry often required of CDC's institutional staff psychiatrists, particularly when a supervising psychiatrist to assist in unusual, complex or serious cases may be unavailable. Finally, the special master's experts point out that almost all individuals, who have completed just one year of a psychiatry residency, have been either terminated from programs for poor performance or have elected voluntarily to switch specialties.

5

The alternative of "one year experience in the practice of psychiatry" is similarly problematic. The standard is so vague one might argue that a general practice of medicine involves, to some extent, "the practice of psychiatry." The experience of the special master's experts with the few physicians designated by CDC as staff psychiatrists after participating in a Harvard course on psychiatric pharmacology reinforced concerns about the level of skills of minimally qualified CDC psychiatrists. None of the handful of physicians who attended the course and were allowed to function as staff psychiatrists in CDC received the intensive mentoring and supervision promised by the department's then Chief Psychiatrist. At least two of them were, in the experts' estimate, incompetent and were subsequently separated from service with the department. Another, so far from receiving the promised supervision, became shortly the acting chief psychiatrist in one institution. By any measure, the department's experiment with these individuals was deeply troubling, although all were reportedly qualified to serve as staff psychiatrists pursuant to the California State Personnel Board. The Personnel Board's lax rules are particularly dangerous when applied to contracted psychiatrists, who currently provide better than 20 percent of all psychiatric services in CDC, sometimes in institutions able to provide only minimal clinical orientation and supervision.

All psychiatrists hired to provide mental health services in CDC's MHSDS should be required to meet the standard articulated in Title XXII (Section 79567 of the California Administrative Code), which requires that a physician complete four years of a psychiatric residency and be Board-eligible at least.

**Page 12-1-11 (Table of Timelines)**: Generally, the table of timelines articulates and summarizes the intervals of time permitted between the clinical referral of an

6

inmate/patient to a more intense level of mental health care and the referred

inmate/patient's physical transfer to the program. The timeline for transfers to inpatient

programs operated by the Department of Mental Health (DMH) under contract to CDC,

however, represents an exception to the general norm. For all DMH programs, the

timeline identifies the interval of time permitted between DMH's formal "acceptance" of

an inmate/patient clinically referred from a CDC institution and the inmate/patient's

actual transfer. The difference between "referral" and "acceptance" is not spelled out

clearly anywhere in the program guides, not even in Chapter 6, "Department of Mental

Health Inpatient Program," where the relations between CDC and DMH in the provision

of acute and intermediate inpatient care is spelled out in detail.

   The issue is mentioned indirectly in a discussion of admissions to DMH's

acute inpatient program (Chapter 6, at p. 12-6-4, paragraph C.2.), which indicates that

inmate/patients, who have been clinically accepted but whose admission has been

"deferred for lack of bed availability," are to be retained at the referring institution

pending a bed assignment. The next paragraph in Chapter 6 outlines procedures for

prioritizing the admission to acute inpatient care of inmate-patients on the waiting list.

The meaning of "acceptance" when applied to DMH's intermediate inpatient programs is

even more obscure. In a discussion of transfers to intermediate DMH inpatient programs

at p. 12-6-11, paragraph D.4., it is simply noted that, "Inmate-patients who have been

accepted shall be moved via special transport to DMH within 72 hours of acceptance."

   In practice, the link between an identifiably available bed, signaled

through the assignment of a bed number, and acceptance has long been the norm for

admission to DMH inpatient programs, whether acute or intermediate. The table of

timelines and Chapter 6 of the programs guides perpetuate that linkage.  Historically, the substantive rationale for adopting bed space as a critical component in transfers to the acute inpatient program was the fear that overcrowding would destroy such a program quickly and entirely.  A timeline tied to referral, the argument ran, would result in a court order requiring immediate transfers and the subsequent population excess would be catastrophic.

Nothing in the ten-year history of Coleman supports such an argument.  To the contrary, experience over the past seven years with the CDC's Psychiatric Services Units (PSUs), Enhanced Outpatient Programs (EOPs) and, most particularly, Mental Health Crisis Bed (MHCB) units demonstrates clearly that a referral-based timeline does not lead ineluctably to the destruction of these fragile, complex programs through the immediate transfer of everyone referred to them.  The referral-based timelines, however, do require CDC to manage the utilization of these programs more carefully, develop and maintain carefully an accurate measurement of the demand for them and plan and budget the needed expansion of those programs lacking adequate bed space to meet growing demand.

The recently completed assessment of CDC's unmet need for inpatient DMH beds confirms existing anecdotal evidence that institutional clinicians do not fully utilize available DMH clinical resources.  For reasons that remain uncertain, CDC clinicians sometimes fail to refer inmates clearly in need of inpatient care to DMH programs.  Misconceptions about the nature and availability of DMH programs, administrative procedures for referring inmates to DMH programs, historical rejections of referrals and sometimes long delays in effecting transfers all seem to combine to

8

persuade many institutional clinicians that DMH programs are neither reliably nor readily available. Clinicians, particularly those in CDC's most secure Level IV institutions, have largely ceased referring inmates to DMH intermediate inpatient programs.

Both DMH and CDC, separately and jointly, have initiated a number of efforts over the past 18 months to address this problem, including the long delayed opening within CDC's Salinas Valley State Prison of an intermediate program for violent Level IV inmates, the re-tooling of procedures for easier admission to DMH programs and expanding efforts to educate CDC clinicians about the array of existing DMH programs. The results of the assessment of CDC's unmet need for inpatient DMH care suggests that more needs to be done. Meanwhile, timelines tied to clinical referrals will compel CDC to have DMH utilize its program resources more effectively and enable CDC to track more accurately its actual need for DMH beds.

The table of timelines for the transfer of inmate-patients to inpatient DMH programs, in effect, has no firm timeline at all, because all such transfers are dependent on the availability of bed space. Once bed space becomes available and an inmate-patient is "accepted," the timelines are rigorous, allowing just 72 hours for actual transfer. During the course of negotiations over revision of the program guides, the special master's experts have suggested that, once timelines are tied to referrals, the overall interval between referral and physical transfer ought to be enlarged, given CDC's improving ability to reduce length of stays in its increasing number of MHCB beds. Based on the experts' opinions in this regard, the special master recommends that the timelines allow ten calendar days between a referral to an acute DMH inpatient program

and actual transfer, and three calendar weeks from a referral to an intermediate DMH program to actual transfer.

**Chapter 5: Mental Health Crisis Bed**

**Page 12-5-11**

      The third unnumbered paragraph under **Case Reviews and Treatment Plan Update** requires that an Interdisciplinary Treatment Team (IDTT) review each crisis case "as often as necessary, but at least every seven days, weekends and holidays excepted . . . ." The requirement should be for an IDTT review every seven days, without the exception for weekends and holidays. Otherwise, an inmate/patient, who is admitted, say, on a Monday or Tuesday and receives his/her initial IDTT latter that same week, would not need to be scheduled for another IDTT meeting prior to completion of a ten-day stay in a MHCB. The exception here for weekends and holidays is confusing and needs to be expunged.

**Page 12-5-15 to 12-5-19 (Restraint)**

      The special master's experts recommend some language clarifications in this section on the use of restraints, a subject of much discussion and dispute during the revision negotiations. The last line in the third paragraph under <u>Order and Documentation</u> on page 12-5-15 identifies who may serve as an authorized clinician in the application and use of restraints. The authorizing psychologist should be explicitly identified as a "licensed psychologist." Also, while the glossary at the end of the program guides provides a definition of most categories of mental health clinicians in CDC, it does not, and ought to, contain a definition of a "psychiatric RN," as used in this provision.

Nothing in the section on restraint requires constant observation of the inmate-patient in restraints by either nursing or custody staff, but that is the applicable standard of care. Constant observation is not required for inmate-patients in seclusion; visual checks every 15 minutes will suffice, unless otherwise indicated in the seclusion order pursuant, for example, to a suicide watch.

**Page 12-5-26**

The last paragraph on the page indicates that a mental health inmate-patient in an Outpatient Housing Unit (OHU) "shall receive additional (ed.: i.e. after the initial evaluation) evaluations by a mental health clinician at 48 and 72 hours and at least weekly thereafter or as frequently as clinically indicated." In the July 2004 draft of the program guides, the defendants left the line just quoted shaded in gray to indicate they had some difficulty with providing this level of service in an OHU and were investigating the feasibility of providing it. The result of the defendants' investigation was never reported, but the special master's experts found the level of service described in the shaded quotation to be reasonable. Any diminution of the indicated service to what is an extremely small number of inmates would need to be justified.

**Chapter 6:  Department of Mental Health Inpatient Program**

Significant portions of the policies and procedures described in the September 2004 version of this chapter on DMH inpatient programs have undergone subsequent revisions. Referral procedures and documentation have been extensively revised; a new appellate process for contesting rejections and deferrals has been developed and implemented; the Day Treatment Program operated by DMH in the California Medical Facility (CMF), far from being cancelled, has been expanded; and an

11

Intermediate Care Facility for Level IV inmates has been opened at CMF. New

memorandums of understanding between CDC and DMH have been generated to include

these changes. Chapter 6, therefore, needs to be revised and updated again before its

submission to the court for final approval.

**Chapter 8: Security Housing Unit**

**Page 12-8-4**

        Paragraph F on **Sources of Referral for Mental Health Services**

discusses sources for mental health referrals in Security Housing Units (SHUs), but does

not include a mental health screening, as is required for all inmates entering

administrative segregation, who are not already included in the mental health caseload.

The rationale for the exclusion is that inmates placed typically in a SHU come directly

from an administrative segregation unit, where the disciplinary infraction giving rise to

the SHU sentence has been investigated and adjudicated. Most such investigations and

adjudications, it is pointed out, are completed within 90 days or less. All such inmates,

not already on the mental caseload, will have received a mental health screening in

accordance with Chapter 7 of the program guides during their stay in administrative

segregation.

        That rationale is sound in the case of many of the CDC inmates placed in a

SHU. Monitoring of implementation of the provisional program guides over the past

seven and a half years, however, suggests that the adjudication of institutional

disciplinary infractions, particularly those involving serious charges likely to generate a

SHU term, can take many months, sometimes well over a year, to complete. Prolonged

detention in administrative segregation can have deleterious effects on inmates' mental

health, and a requirement is needed, paralleling the requirement at paragraph E.6. at p.

12-7-4 of Chapter 7, that all inmates not already on the mental health caseload, who have

not had a mental health screening within the past 90 days, be administered a mental

health screening within 72 hours of their placement in a SHU.  If the defendants'

rationale for the exclusion of this provision in the program guide for SHUs is accurate,

the insertion of the requirement will not be burdensome.

**Chapter 10:  Suicide Prevention and Response**

**Page 12-10-11**

The full paragraph in mid-page, following the bulleted listing under

paragraph 4 and describing the Suicide Risk Assessment Checklist (SRAC), fails to

include as part of the summary of the risk of suicide some indication to any subsequent

reader/reviewer of the checklist the preparing clinician's estimate of the relative risk of

suicide presented by the inmate-patient.  The description of the relative risk may be as

simple as a grade of high, medium or low.  The rating is not intended to pre-empt the

clinical narrative summary, but should suffice to signal to other clinicians the preparing

clinician's overall estimate of the inmate-patient's relative risk of suicide at the time of

the preparation of the SRAC.

The special master's psychiatric expert, who has prepared for the parties

and court an annual report on all suicides occurring in CDC in each of the preceding five

years, urges emphatically the importance of this minor addition to the SRAC in

enhancing the checklist's utility in preventing suicides.  The special master, therefore,

recommends the insertion in the paragraph describing the SRAC of the following

sentence: "Clinicians shall utilize their best clinical judgment and make a summary of the relative risk of suicide via an appropriate descriptor, such as high, moderate or low." Similarly, the SRAC itself should include a line requiring the preparing clinician to check off one of three boxes, indicating whether the risk of suicide is high, medium or low.

**Page 12-10-21**

The second bullet under paragraph 3 on **Response to Self-injurious Behaviors and Suicide Attempts** directs institutional staff in emergency responses to attempted suicides to provide immediate life support until medical staff arrive to initiate or continue life support measures, "if trained and obligated by duty statement to do so."

During each of the past five years, the annual report on suicides prepared by the special master's psychiatric expert has reported one or more instances in which delays in the immediate application of cardiopulmonary resuscitation (CPR) on the part of custody staff discovering inmates with serious self-inflicted injuries were described as contributing, either possibly or probably, to the successful completion of inmate suicides. In the absence of an explicit requirement to do so in the duty statement for the post they are covering, the defendants contend that correctional officers are not obligated to initiate CPR. They have incorporated that unacceptable position in the revised program guide on suicide prevention and response. In the draft version of the latest annual monitoring report on suicides, the special master has already recommended that the defendants be required to develop within 90 days a policy that requires custody staff to provide immediate life support, if trained to do so, until medical staff arrive to initiate or continue life support measures, irrespective of whether the obligation to do so is part of the particular custody staff member's duty statement. The parties have just filed their

objections to the draft suicide report, and neither side has objected to the substance of this recommendation. The plaintiffs seek a quicker adoption of the recommendation. Adoption of that recommendation will render moot the reference in the proposed program guide to an obligation to provide CPR in such situations in the duty statement obsolete.

**Appendix A: Glossary of Terms**

**Page A-5**

The definition of a psychiatrist needs to be revised to accord with the recommendation on qualifications contained above at p. 4ff.

This report to the court on the revised program guides has expanded and contracted during the past three months as related issues have made their way through contemporaneous monitoring and judicial processes, with outcomes and impacts directly related to the contents of the revised program guides. Central issues on the need for and availability of inpatient DMH programming for CDC inmate-patients have begun to jell only recently, and the resolution of these issues are critically important to the final version of the program guides. The purpose of this report is to begin the movement toward final approval of the revised program guides. As indicated early, negotiations over the components of the guides have occupied a full two years. Many changes in the provisionally approved program guides have been incorporated in the final version. Attached as an exhibit is a summary of the significant changes included in the revision. Most, but not all, of the changes have won the agreement of plaintiffs' counsel, as well as the special master and his experts. This report lays out for the parties additional provisions the special master and his experts believe to be necessary. It is anticipated that the parties will have objections to some of the recommendations contained in this report,

as well as their own recommendations for modification of other provisions of the draft program guides and/or additional provisions.

The parties will have 30 days within which to file their written objections to this report. The special master will respond to the objections, make any appropriate revisions in his recommendations based on the objections and file a final report with the court by June 1, 2005. Thereafter, further objections shall be subject to judicial review.

The special master's report on the original plans, policies and protocols in May 1997 contained a process for any future modifications to the plans. Between now and the dismissal of this case by the court, it is recommended that the same process be adopted and followed for any subsequent changes in the program guides sought by the defendants. The process should include the following steps:

1.  Defendants shall submit, with a copy to plaintiffs, a copy of the proposed revision to the program guides to the special master fourteen days prior to its effective date. If there is a *bona fide* emergency, this time period may be reduced by an appropriate amount, but in no event shall the proposed program guide revision be submitted to the master later than its effective date.

2.  If the master determines that the revision(s) conflict with any of the court's orders in this case, he will work with the defendants to reconcile the conflict.

3.  If reconciliation is impossible, the master shall file a report with the court which sets forth his findings as to why the defendants' proposed revision(s) to the program guides violate the court's order(s). He shall also make recommendations as to what actions should be taken concerning the proposed revision(s).

When the special master submitted the original program guides to the court in May 1997, they were accompanied by another five volumes of materials associated with the still embryonic mental health system unfolding within CDC. These materials included training manuals; a miscellany of informational documents on the then current status of the defendants' efforts to comply with the <u>Coleman</u> court order; a copy of the then current CDC Drug Formulary; a handbook of mental health forms; and a then current policy and procedures manual for Correctional Treatment Centers, in which MHCB units were located. Apart from the program guides, most of these documents have been superseded, extensively revised or replaced entirely. Nonetheless, the program guides submitted with this report do not purport to address the issues raised in these other volumes.

Respectfully submitted,

_____
J. Michael Keating, Jr.
Special Master

April 6, 2005

**EXHIBIT**

**SUMMARY OF SIGNIFICANT REVISIONS
IN THE PROGRAM GUIDES**

Chapter 1: Overview

- The definition of medical necessity is broadened.

- Mental health input into the disciplinary process is established.

- Timelines for transfers are spelled out and tightened.

Chapter 2: Reception

- Provisions for privacy, use of interpreters, handling of refusals and the acquisition of prior records are included for bus screenings.

- Treatment in reception is required: For EOP, weekly case management and monthly psychiatric contacts; for 3CMS, case management contact within 30 days of placement in 3CMS and quarterly thereafter and quarterly psychiatric contact.

- Requirements for a mental health referral process, together with clear timelines, are established.

Chapter 3: Correctional Clinical Case Management System

- Composition of the inter-disciplinary team (IDTT) is clarified to include the psychiatrist and primary clinician actually assigned to the inmate-patient.

- Inmate-patients with three or more MHCB admissions within six months automatically are to be evaluated for transfer to DMH.

- A process is established for the clinical and custody monitoring of suicidal inmate-patients released from a MHCB unit or Outpatient Housing Unit (OHU).

- The process for coordination of paroling 3CMS inmate-patients through the Transitional Case Management Program to a Parole Outpatient Clinic is described.

Chapter 4: Enhanced Outpatient Program

- Recognizes that not all EOP inmate-patients can participate in or benefit from ten hours weekly of scheduled structured therapeutic activities. Such an inmate-patient's IDTT must decide, provide a written rationale for the reduced schedule and meet monthly thereafter to review and increase treatment activities or refer to a higher level of care.

- The required weekly case management contact may occur in a group session, but the case manager must meet individually with the inmate-patient individually at least every other week.

- A psychiatric contact is required at least monthly.

- Up to four hours of vocational and/or educational programming will count toward ten-hour weekly goal, if the benefit of such participation is identified in the inmate-patient's treatment plan.

- Documentation is required at least monthly of inmate-patients' attendance at treatment activities, together with a description of their participation. Recreational and/or occupational therapy may be considered as scheduled structured therapeutic activity, but only if conducted by a recreational/occupational therapist, psych tech or other qualified professional.

- EOP inmate-patients may be discharged to the 3CMS program, but not out of the mental health caseload.

- The particulars of the EOP for condemned inmate-patients at San Quentin and the Central California Women's Facility are spelled out. Condemned EOP inmate-patients are entitled to the same services provided to all other EOP inmate-patients, subject to the caveat that they will receive "treatment services commensurate with their demonstrated ability to safely participate in the offered services." Grade B condemned EOP inmate-patients, the equivalent of administrative segregation status elsewhere in CDC, also receive daily psych tech rounds.

- Programs and services at San Quentin before, during and immediately after an actual execution are curtailed, but psych techs will continue to make daily rounds.

Chapter 5: Mental Health Crisis Bed

- In the case of unresolved disputes over the appropriateness of a particular referral to a MHCB unit, the referred inmate-patient will be admitted and evaluated.

- Inmate-patients admitted to a MHCB for self-injurious behavior, suicidal ideation or signs and symptoms of suicide potential shall be administered a Suicide Risk Assessment on their admission and discharge.

- Any inmate-patient admitted to a MHCB three or more times in a six-month period shall be evaluated for a referral to an inpatient DMH program.

- An initial IDTT meeting is to be held within 72 hours of an inmate-patient's arrival in a MHCB unit and at least weekly thereafter.

- Inmate-patients in a MHCB are to be seen daily by a psychiatrist or psychologist; on weekends, the clinician on call or the MOD will make daily rounds.

- A psychiatrist will evaluate an inmate-patient's medications twice weekly.

- Inmate-patients clinically discharged and awaiting transfer in a MHCB unit shall be offered additional rehabilitation therapy and other treatment activities, as clinically indicated.

- Requirements are established for clinical review of mental health inmate-patients in an OHU.

Chapter 6: Department of Mental Health Inpatient Program

- As indicated in the text above, this chapter needs to be revised again to include changes made over the past three months to earlier versions.

Chapter 7: Administrative Segregation

- Psych tech rounds are to be conducted daily for inmate-patients on the mental health caseload and weekly for all inmates in the administrative segregation unit not currently on the caseload.

3

- A metal health evaluation will be administered for all newly arriving inmates, who are not presently included in the mental health caseload.

- 3CMS inmate-patients in administrative segregation shall receive daily psych tech rounds; an individual meeting with their assigned case manager every other week or more frequently as clinically indicated; medication treatment and monitoring by psychiatric and nursing staff; group therapy when clinically deemed appropriate; and supportive care for activities of daily living, when necessary.

- EOP inmate-patients in administrative segregation shall receive an initial IDTT meetings within 14 days of arrival and at 90-day intervals thereafter; daily psych tech rounds; weekly individual contact with an assigned case manger; a psychiatric evaluation every 30 days; and ten hours weekly of scheduled structured therapeutic activities. EOP inmate-patients are to be transferred within 30 days of their placement in an EOP level of care to an appropriate administrative segregation hub unit.

- EOP inmate-patients will be processed through the disciplinary process on a priority basis, and pending rule violation reports shall not delay transfer to a hub administrative segregation unit.

- Interviews with inmate-patients and inmates in administrative segregation will be held in a private setting unless the security of the institution or the safety of staff will be compromised. Clinical monitoring and routine interviews, including clinical staff daily rounds, may be provided through cell-front contacts as clinically appropriate and depending on the cooperation of the inmate-patient or inmate.

Chapter 8: Security Housing Unit

- EOP inmate-patients with a SHU term are to be transferred to a Psychiatric Services Unit (PSU); while awaiting placement in a PSU, they should be transferred to an EOP administrative segregation hub unit. EOP inmates are not housed in a SHU.

- 3CMS inmates who meet the exclusion criteria contained in the Madrid order may not be housed in the Pelican Bay SHU.

- Psych tech rounds are conducted weekly for inmate-patients on the mental health caseload and every other week for inmates not on the caseload.

- 3CMS inmates in a SHU receive quarterly IDTT reviews; contacts with a clinical case manager at least every 30 days or more frequently as clinically indicated; weekly psych tech rounds; medication evaluation, review and monitoring of compliance by psychiatric and nursing staff; and some group therapy and social skills training.

Chapter: Psychiatric Services Unit

- Referrals to a PSU shall not be delayed because of unresolved disciplinary infractions or referrals of disciplinary matters to a local D.A.

Chapter 10: Suicide Prevention and Response

- This chapter is entirely new; the provisionally approved program guide did not directly address the issue of suicide. In fact, it was unclear whether suicide prevention was included in the Coleman remedy until it was expressly incorporated as part of the suit in the merger of the Gates consent decree with the Coleman remedy.

Exhibit D



**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov



January 6, 2006

J. Michael Keating, Jr.                                   *Via Email and US Mail*
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034

RE:    *Coleman v. Schwarzenegger*
       USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

        Defendants submit this set of responses to your letter of December 13, 2005 concerning outstanding Program Guide issues. To the extent defendants accept some of your recommendations requiring a revision of certain parts of the Program Guide, defendants will endeavor to submit those revisions to you and to counsel within the next three weeks.

### *Chapter 1: Program Guide Overview*

**a. Special Master's Statement:**
12-1-9: Psychiatrist qualifications: Qualifications, as stated, are acceptable. On the basis of the data on the qualifications of existing psychiatrists in the system provided by defendants, the attempt to grandfather currently employed psychiatrists is unacceptable. I will recommend additional review of the credentials of existing psychiatrists and, based on the outcome of these reviews, the imposition of appropriate limitations on practice and the provision of adequate supervision on a case-by-case basis. I will seek a role for the special master's experts in these reviews.

**Defendants' Response:**
Defendants agree to the recommendation to conduct an additional review of the credentials of existing psychiatrists and, based on the outcome of these reviews, the imposition of appropriate limitations on practice and the provision of adequate supervision on a case-by-case basis. Defendants agree to consider a role for the special master's experts in these reviews, perhaps in terms of determining objective criteria to be used in the reviews as opposed to determining any personnel matters.

J. Michael Keating, Jr.
January 6, 2006
Page 2

**b. Special Master's Statement:**
12-1-9: Staffing ratios: It is my understanding that the defendants intend to attach existing ratios pending approval of the revised guides. I will accept that, but also recommend the defendants be required to file revised and updated staffing ratios within 30 days of the court's approval of the program guides.

**Defendants' Response:**
Defendants will attach existing staff ratios pending approval of the revised guides. Without waiving the confidentiality accorded agency budget documents (including budget change proposals), defendants accept the recommendation to file revised and updated staffing ratios within 30 days of the court's approval of the Program Guide. Should the timing of the filing of any updated staffing ratios coincide with the preparation and submission of budgetary documents, defendants will so notify the Special Master and seek an extension in which to file updated staffing ratios.

**c. Special Master's Statement:**
12-1-11: Automated tracking system: Plaintiffs argue that the system should identify and track permanently all inmates discharged from the MHSDS. I will not recommend this addition.

**Defendants' Response:**
Defendants join in the Special Master's decision to not recommend this addition.

**d. Special Master's Statement:**
12-1-11, 12: Transfer guidelines: The re-constituted timelines have three remaining identified problems: 1.) The new distinction between "identification" and "referral"; 2.) the extension of the timeline for transfers to acute DMH programs to 12 days from identification, mitigated by the limitation of the time between identification and referral to two days; and 3.) the extension of the timeline for transfers to intermediate DMH programs to up to 40 days from identification. I will accept these timelines and recommend their adoption to the court.

**Defendants' Response:**
Defendants join in the Special Master's recommendation.

**e. Special Master's Statement:**
I believe that, after the lengthy discussion of transfers to a PSU during our 9/16/05 meeting, everyone agreed to mark the beginning of the tolling period for transfers to PSU from the date of endorsement.

**Defendants' Response:**
Defendants agree with the Special Master's statement.

J. Michael Keating, Jr.
January 6, 2006
Page 3

**f. Special Master's Statement:**
I also believe parties agreed that the 30-day timeline for transfers from an OHU to an EOP was acceptable, subject to the explanation and limitations spelled out on 12-5-27.

**Defendants' Response:**
Defendants agree with the Special Master's statement.

### *Chapter 2: Reception Center Mental Health Assessment*

**a. Special Master's Statement:**
Classification issues:  The plaintiffs seek elimination of the four-point addition to the classification score of seriously mentally disordered inmates entering CDCR.  While my experts agree with the plaintiffs on this issue, it raises jurisdictional and legal issues only the court can decide.  I will recommend that EOP inmates receive annual point reductions in their classification scores for participation in their EOP-related programs.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

### *Chapter 6: Department of Mental Health Inpatient Program*

**a. Special Master's Statement:**
12-6-1:  The introductory paragraph needs to articulate CDCR's responsibility for providing acute and intermediate inpatient care in a timely manner to those CDCR inmates clinically determined to be in need of such care and subsequently acknowledge that DMH is currently the vehicle selected by CDCR to meet that responsibility.  I will recommend the incorporation of language to this effect in the introduction.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

**b. Special Master's Statement:**
12-6-9:  In ambiguous language, paragraph IV, B, 4 seems to require an institutional referring clinician to determine the custody appropriateness of a referral to an intermediate inpatient DMH program prior to making the referral.  The meaning and extent of the requirement is inarticulately expressed and needs to be more clearly and accurately defined in this manual for institutional clinicians.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

J. Michael Keating, Jr.
January 6, 2006
Page 4

### *Chapter 7: Administrative Segregation*

**a. Special Master's Statement:**
12-7-2: The plaintiffs seek in paragraph C4 a process for determining the likelihood of decompensation of MHSDS inmates entering administrative segregation that would result in placement elsewhere. The plaintiffs similarly seek such a determination upon the entry of caseload inmates into a SHU or PSU. My experts have consistently advised that such determinations are clinically difficult to make and characteristically generate high numbers of false positives. The existing language explicitly lists likelihood of decompensation as one among a number of other relevant factors to be considered on initial placement in administrative segregation, a SHU or a PSU and is sufficient.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

**b. Special Master's Statement:**
12-7-4: The revised guide calls for weekly psych tech rounds of non-MHSDS inmates in administrative segregation; plaintiffs want daily rounds of non-caseload inmates. Based on the opinion of my experts, I will recommend the former.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

**c. Special Master's Statement:**
12-7-6: The revised guide calls for individual clinical case management contacts with 3CMS inmates in administrative segregation every other week or more frequently as clinically indicated; plaintiffs seek weekly case management contacts for 3CMS inmates in administrative segregation. Based on the opinion of my experts, I will recommend the former.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

### *Chapter 8: Security Housing Unit*

**a. Special Master's Statement:**
12-8-5: The revised guide calls for psych tech/clinician rounds of caseload inmates weekly and non-caseload inmates every other week; the plaintiffs seek daily psych tech/clinician rounds of caseload and non-caseload inmates daily. Based on the opinion of my experts, I will recommend the former.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

J. Michael Keating, Jr.
January 6, 2006
Page 5

**b. Special Master's Statement:**
12-8-10: The revised guide calls for individual clinical case management contacts every 30 days or more frequently as clinically indicated with 3CMS inmates in a SHU; the plaintiffs seek weekly case management contacts. Based on the opinion of my experts, I will recommend the former.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

### *Chapter 10: Suicide Prevention and Response*

**a. Special Master's Statement:**
12-10-17: Video monitoring: The plaintiffs view video monitoring unfavorably and specifically object to the provision allowing one correctional officer to view as many as six inmates on video at one time. My experts believe that the ratio of observers to observed is less crucial than the size, quality and scope of the monitoring equipment, the availability of fully trained relief observers and the faithful execution and recording of scheduled interpersonal observations and contacts.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

**b. Special Master's Statement:**
12-10-21, 22: The provisions on emergency responses and the provision of CPR need to conform with the final amended policy on peace officers' responsibility for providing immediate life support.

**Defendants' Response:**
Defendants agree with the Special Master's recommendation.

J. Michael Keating, Jr.
January 6, 2006
Page 6

    Defendants are grateful to the Special Master and his expert staff for their work on the Program Guide. Defendants respectfully submit this statement of their responses to the Special Master's list of outstanding Program Guide issues.

                Sincerely,

                LISA A. TILLMAN
                Deputy Attorney General

      For    BILL LOCKYER
            Attorney General

cc: Michael Bien, Esq.
    Steve Fama, Esq.
    Matthew Lopes, Esq.

30075467.wpd

Exhibit E

### *J. Michael Keating, Jr.*
**Office of the Special Master**
<u>*Coleman v. Schwarzenegger*</u>

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
E-mail: jmichaelkeatingjr@msn.com

January 18, 2005

**<u>VIA FEDERAL EXPRESS</u>**

Donald Specter, Esq.
Prison Law Office
2173 East Francisco Blvd, Suite M
San Rafael, CA 94901

Michael Bien, Esq.
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

Judi L. Lemos, Esq.
Staff Counsel, Legal Affairs Division
California Dept. of Corrections
1515 S Street
P. O. Box 942883
Sacramento, CA 94283-0001

Lisa A. Tillman, Esq.
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2500

**Re:   Coleman et al. v. Schwarzenegger et al.,
<u>No. CIV S-90-0520 LKK JFM P</u>**

Counselors:

As promised after Friday's hearing on the ICF/DTP, here are the comments of my experts on the draft CDC/DMH memorandum of understanding for the DTP:

1.  Page B-2, paragraph H1b (see also pp. B-7, paragraphs 5 and 6; B-8, paragraph B-7(3)):  The MOU needs to specify with greater clarity for institutional clinicians what constitutes acceptance.  I think, under the current program guide timelines, acceptance equals clinical

Counselors
January 18, 2005
Page Two

acceptance, plus bed assignment. Nowhere does the MOU make that clear. As I have indicated elsewhere, the new program guide will address this issue differently, but until the new provisions are debated, approved and implemented, clinicians in the field ought to understand that the assignment of a bed number is a component of the term, "acceptance," as applied in this MOU.

2. Pages B-3 and B-4, paragraph H: The provisions described for handling suicides here differ in several particulars from those included in the draft MOU for intermediate care services (at pp. A-25, 26, paragraph XIV). Among the differences are who is responsible for conducting the review, access to DMH reports on suicides to DHS, possible access to information available to DMH that may not be part of the UHR and, perhaps, final say over implementation of recommended corrective actions. Reasons for the differences are not readily discernible.

3. Page B-5, paragraph V: The admission criteria seem to identify exclusively higher functioning and volunteer inmate/patients, who are verbal and motivated. Traditional day treatment programs, however, have focused more often on lower functioning inmate/patients, who might benefit from activities more highly structured than CDC's EOPs without requiring the long-term stabilization of an intermediate care program. The implicit exclusion of inmate/patients with primary Axis II diagnoses, such as borderline, schizoid or schizotypal personality disorders is problematic because these are sometimes the very inmate/patients who might benefit most from a day treatment program. The DTP ought to be available to inmate/patients whose Axis II disorders have effectively impaired their functioning and prevented adequate adjustment to routine requirements.

Taken together, paragraphs V5, 6 and 7 can be read and implemented to exclude cognitively impaired inmate/patients, who are unable to articulate their treatment needs sufficiently to facilitate early intervention; who do not verbalize their motivation for treatment, or who are unable to function in a structured therapeutic setting without staff prompting.

Lastly, my experts found the completely voluntary nature of the program troublesome. Experience with other DMH programs demonstrates that inmate/patients transferred involuntarily to inpatient

Counselors
January 18, 2005
Page Three

settings sometimes adapt quickly and become voluntary participants. The admission criteria seem to exclude from the DTP anyone who has not consented in advance in writing to full participation in the program.

Given the admission criteria, the failure of the draft MOU to identify the program's goals, objectives or mission is a notable deficiency. Unlike all other DMH programs operated for CDC inmate/patients, the DTP does not undertake explicitly to restore participants to mainline CDC outpatient programs, nor does it identify any targeted timeframe within which most participants might be expected to return to a CDC program. While experience with the DTP suggests that some inmate/patients may need to be retained in the program for some period of time because of the chronic nature of their disorders, the absence of any temporal guideline invites the overlong retention of other inmate/patients whose return to a CDC EOP may be feasible and desirable.

4.    Page B-5, paragraph A1: It is probably correct to generalize that referrals from CDC to the DTP will be, at least, at an EOP level of care. Plenty of EOP inmates in CDC, who are at an EOP level of care and may be appropriately referred to the DTP, however, are not housed in a CDC facility with a formal EOP. The distinction represents a small but important difference.

If you have any questions about any of these comments, please give me a call.

Sincerely yours,

J. Michael Keating, Jr.
Special Master

cc.    Matthew A. Lopes, Esq.
       Renee Kanan, M. D.
       Tim Fishback, M.D.

Exhibit F

# Correctional Mental Health Care

# Standards and Guidelines
for Delivering Services

Second Edition

© 2003 National Commission on Correctional Health Care



National Commission on Correctional Health Care
P.O. Box 11117
Chicago, Illinois 60611
(773) 880-1460
Fax (773) 880-2424
www.ncchc.org

ISBN 0-929561-16-3

© 2003 National Commission on Correctional Health Care

PREFACE TO T

PREFACE TO T

ACKNOWLEDG

ACKNOWLEDG

INTRODUCTIO
About NCCHC
Using This Publi
The Legal Conte
The Foundation
Cross-Reference

SECTION A: GO
M-A-01    Access
M-A-02    Respo
M-A-03    Medic
M-A-04    Admir
M-A-05    Polici
M-A-06    Contir
M-A-07    Emerg
M-A-08    Comn
M-A-09    Privac
M-A-10    Proce
M-A-11    Grieva

SECTION B: M/
M-B-01    Infecti
M-B-02    Enviro
M-B-03    Kitche
M-B-04    Ectopa

SECTION C: PE
M-C-01    Creder
M-C-02    Clinic:
M-C-03    Contir

## APPENDIX B

# Guide to Developing and Revising Suicide Prevention Protocols

Lindsay M. Hayes
Project Director
National Center on Institutions and Alternatives

*All correctional facilities, regardless of size, should have a comprehensive suicide prevention program that addresses several key components.*

## Training

The essential component to any suicide prevention program is properly trained staff, who form the backbone of any correctional facility. Very few suicides are actually prevented by mental health, medical or other professional staff because suicides are usually attempted in housing units, and often during late evening hours or on weekends when they are generally outside the purview of program staff. These incidents, therefore, must be thwarted by correctional staff who have been trained in suicide prevention and have developed an intuitive sense about suicidal inmates. Correctional staff are often the only personnel available 24 hours a day; thus, they form the front line of defense in preventing suicides.

All direct care, medical, and mental health personnel, as well as any staff who have regular contact with inmates, should receive 8 hours of initial suicide prevention training, followed by 2 hours of refresher training each year. The initial training should include why the environments of correctional facilities are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, components of the facility's suicide prevention policy, and liability issues associated with inmate suicide. The two-hour refresher training should include a review of predisposing risk factors, warning signs and symptoms, and review of any changes to the facility's suicide prevention plan. The annual training should also include general discussion of any recent suicides and/or suicide attempts in the facility.

In addition, all staff who have routine contact with inmates should receive standard first aid and cardiopulmonary resuscitation (CPR) training. All staff should also be trained in the use of various emergency equipment located in each housing unit. In an effort to ensure an efficient emergency

Correctional Mental Health Care: Standards and Guidelines

response to suicide attempts, "mock drills" should be incorporated into both initial and refresher training for all staff.

Identification/Referral/Evaluation

Intake screening and on-going assessment of all inmates is critical to a correctional facility's suicide prevention efforts. It should not be viewed as a single event, but as an on-going process because inmates can become suicidal at any point during their confinement, including the initial admission into the facility, after adjudication when the inmate is returned to the facility from court; following receipt of bad news or after suffering any type of humiliation or rejection; confinement in isolation or segregation; and following prolonged a stay in the facility.

In addition, although there is no single set of risk factors that mental health and medical communities agree can be used to predict suicide, there is little disagreement about the value of screening and assessment in pre-venting suicide. Research consistently reports that approximately two-thirds of all suicide victims communicate their intent some time before death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than those who have never made an attempt.

Intake screening for suicide risk may be contained within the medical screening form or as a separate form. The screening process should include inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health treatment/hospitalization; recent signifi-cant loss (job, relationship, death of family member/close friend, etc.); history of suicidal behavior by family member/close friend; suicide risk during prior confinement; and arresting/transporting officer(s) belief that the inmate is currently at risk. Specifically, inquiry should determine the following:

- Was the inmate a medical, mental health or suicide risk during any prior contact and/or confinement within this facility?

- Does the arresting and/or transporting officer have any information (e.g., from observed behavior, documentation from sending agency or facility, conversation with family member) that indicates inmate is a medical, mental health or suicide risk now?

- Have you ever attempted suicide?

- Have you ever considered suicide?

- Are you now or have you ever been treated for mental health or emotional problems?

- Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?

- Has a family member/close friend ever attempted or committed suicide?

- Do you feel there is nothing to look forward to in the immediate future (expressing helplessness and/or hopelessness)?

- Are you thinking of hurting and/or killing yourself?

Although an inmate's verbal responses during the intake screening process are critically important to assessing the risk of suicide, staff should not exclusively rely on an inmate's denial that they are suicidal and/or have a history of mental illness and suicidal behavior, particularly when their behavior and/or actions or even previous confinement in the facility suggest otherwise.

The process should also include referral procedures to mental health and/or medical personnel for a more thorough and complete assessment.

The intake screening process should be viewed as similar to taking your temperature, it can identify a current fever, but not a future cold. Therefore, following the intake screening process, should any staff hear an inmate verbalize a desire or intent to commit suicide, observe an inmate engaging in any self-harm, or otherwise believe an inmate is at risk for suicide, a procedure should be in place that requires staff to take immediate action to ensure that the individual is constantly observed until appropriate medical, mental health, and/or supervisory assistance is obtained.

The screening and assessment process is only one of several tools that increases the opportunity to identify suicide risk in inmates. This process, coupled with staff training, will only be successful if an effective method of communication is in place at the facility.

Communication

Certain behavioral signs exhibited by the inmate may be indicative of suicidal behavior and, if detected and communicated to others, can reduce the likelihood of suicide. In addition, most suicides can be prevented by correctional staff who establish trust and rapport with inmates, gather

Correctional Mental Health Care: Standards and Guidelines

pertinent information, and take action. There are essentially three levels of communication in preventing inmate suicides: between the arresting/transporting officer and correctional staff; between and among facility staff (including correctional, medical and mental health personnel); and between facility staff and the suicidal inmate.

In many ways, suicide prevention begins at the point of arrest. During *Level 1*, what an arrestee says and how they behave during arrest, transport to the facility, and at intake are crucial in detecting suicidal behavior. The scene of arrest is often the most volatile and emotional time for the individual. Arresting officers should pay close attention to the arrestee during this time; suicidal behavior may be manifested by the anxiety or hopelessness of the situation, and previous behavior can be confirmed by onlookers such as family members and friends. Any pertinent information regarding the arrestee's well-being must be communicated by the arresting or transporting officer to correctional staff. It is also critically important for correctional staff to maintain open lines of communication with family members who often have pertinent information regarding the mental health status of inmates.

During *Level 2*, effective management of suicidal inmates is based on communication among correctional personnel and other professional staff in the facility. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information and make appropriate referrals to mental health and medical staff. At a minimum, the facility's shift supervisor should ensure that appropriate correctional staff are properly informed of the status of each inmate placed on suicide precautions. The shift supervisor should also be responsible for briefing the incoming shift supervisor regarding the status of all inmates on suicide precautions. Multidisciplinary team meetings (to include correctional, medical and mental health personnel) should occur on a regular basis to discuss the status of inmates on suicide precautions. Finally, the authorization for suicide precautions, any changes in suicide precautions, and observation of inmates placed on precautions should be documented on designated forms and distributed to appropriate staff.

During *Level 3*, facility staff must use various communication skills with the suicidal inmate, including active listening, staying with the inmate if they suspect immediate danger, and maintaining contact through conversation, eye contact, and body language. Correctional staff should trust their own judgment and observation of risk behavior, and avoid being misled by others (including mental health staff) into ignoring signs of suicidal behavior.

Poor com
mental health p
referral agencie
of many custoc
lack of respect,
facilities that m
suicides.

Housing

In determ
inmates, correc
and/or mental l
and sometimes
convenient for
of isolation esc
individual from
inmates should
medical infirma
clothing (exclu
(e.g., restraint c
should be avoic
the inmate is pl
assignments sho
with the inmate
confinement.

All cells de
resistant, free o
cells should cor
ceiling/wall air
not contain any
towel racks on
provides an eas
contain a heavy
enough to allow
Finally, each ho
equipment, incl
and rescue tool
should ensure t

Poor communication between and among correctional, medical, and mental health personnel, as well as outside entities (e.g., arresting or referral agencies, family members) is a common factor found in the reviews of many custodial suicides. Communication problems are often caused by lack of respect, personality conflicts and boundary issues. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.

Housing

In determining the most appropriate housing location for a suicidal inmates, correctional facility officials (with concurrence from medical and/or mental health staff) often tend to physically isolate (or segregate) and sometimes restrain the individual. These responses might be more convenient for all staff, but they are detrimental to the inmate since the use of isolation escalates the their sense of alienation and further removes the individual from proper staff supervision. To every extent possible, suicidal inmates should be housed in the general population, mental health unit, or medical infirmary, located close to staff. Further, removal of an inmate's clothing (excluding belts and shoelaces) and the use of physical restraints (e.g., restraint chairs or boards, leather straps, handcuffs, straitjackets) should be avoided whenever possible, and used only as a last resort when the inmate is physically engaging in self-destructive behavior. Housing assignments should be based on the ability to maximize staff interaction with the inmate, not on decisions that heighten depersonalizing aspects of confinement.

All cells designated to house suicidal inmates should be suicide-resistant, free of all obvious protrusions, and provide full visibility. These cells should contain tamper-proof light fixtures, smoke detectors and ceiling/wall air vents that are protrusion-free. In addition, the cells should not contain any live electrical switches or outlets, bunks with open bottoms, towel racks on desks and sinks, radiator vents, or any other object that provides an easy anchoring device for hanging. Each cell door should contain a heavy gauge Lexan (or equivalent grade) clear panel that is large enough to allow staff a full and unobstructed view of the cell interior. Finally, each housing unit in the facility should contain various emergency equipment, including a first aid kit, pocket mask or face shield, Ambu-bag, and rescue tool (to quickly cut through fibrous material). Correctional staff should ensure that such equipment is in working order on a daily basis.

Levels of Observation

In regard to suicide attempts in correctional facilities, the promptness of the response is often driven by the level of supervision afforded the inmate. Medical evidence suggests that brain damage from strangulation caused by a suicide attempt can occur within 4 minutes, and death often within 5 to 6 minutes. Two levels of supervision are generally recommended for suicidal inmates: close observation and constant observation. *Close Observation* is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-destructive behavior. Staff should observe such an inmate at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). *Constant Observation* is reserved for the inmate who is actively suicidal, either threatening or engaging in suicidal behavior. Staff should observe such an inmate on a continuous, uninterrupted basis. In some jurisdictions, an intermediate level of supervision is utilized with observation at staggered intervals that do not exceed every 5 minutes. Other aids (e.g., closed-circuit television, cell mates) can be used as a supplement to, but never as a substitute for, these observation levels. Finally, mental health staff should assess and interact with (not just observe) suicidal inmate on a daily basis.

Intervention

Following a suicide attempt, the degree and promptness of the staff's intervention often foretells whether the victim will survive. National correctional standards and practices generally acknowledge that a facility's policy regarding intervention should be threefold. *First*, all staff who come into contact with the inmate should be trained in standard first aid procedures and cardiopulmonary resuscitation (CPR). *Second*, any staff member who discovers an inmate engaging in self-harm should immediately survey the scene to assess the severity of the emergency, alert other staff to call for medical personnel if necessary, and begin standard first aid and/or CPR as necessary. *Third*, staff should never presume that the victim is dead, but rather should initiate and continue appropriate life-saving measures until relieved by arriving medical personnel. In addition, medical personnel should ensure that all equipment utilized in responding to an emergency within the facility is in working order on a daily basis.

Finally, although not all suicide attempts require emergency medical intervention, *all* suicide attempts should result in immediate intervention and assessment by mental health staff.

Reporting/Noti

In the even should be notif the victim's fan outside authori the incident sho knowledge of t

Critical Incider

An inmate inmates. Staff r tion officials. F a correctional o earlier?" Reside a facility. Such which staff and offered immed Stress Debriefi in crisis interve paramedics, fir staff and inmat dent, develop a ways of dealin CISD process o to 72 hours of

Every cor requiring medi through a mon through a psyc review should The review, se be required to inquiry of: 1) dures relevant staff; 4) pertin victim; 5) poss recommendati medical or me

Reporting/Notification

In the event of a suicide attempt or suicide, all appropriate officials should be notified through the chain of command. Following the incident, the victim's family should be immediately notified, as well as appropriate outside authorities. All staff who came into contact with the victim before the incident should be required to submit a statement including their full knowledge of the inmate and incident.

Critical Incident Staff Debriefing/Mortality Review

An inmate suicide is extremely stressful for both staff and other inmates. Staff may also feel ostracized by fellow personnel and administration officials. Following a suicide, misplaced guilt is sometimes displayed by a correctional officers who wonders: "What if I had made my cell check earlier?" Residents are often traumatized by critical events occurring within a facility. Such trauma may lead to suicide contagion. When crises occur in which staff and inmates are affected by the traumatic event, they should be offered immediate assistance. One form of assistance is Critical Incident Stress Debriefing (CISD). A CISD team, comprised of professionals trained in crisis intervention and traumatic stress awareness (e.g., police officers, paramedics, fire fighters, clergy, mental health personnel), provides affected staff and inmates an opportunity to process their feelings about the incident, develop an understanding of critical stress symptoms, and develop ways of dealing with those symptoms. For maximum effectiveness, the CISD process or other appropriate support services should occur within 24 to 72 hours of the critical incident.

Every completed suicide, as well as serious suicide attempt (i.e., requiring medical treatment and/or hospitalization), should be examined through a mortality review process. If resources permit, clinical review through a psychological autopsy is also recommended. Ideally, the mortality review should be coordinated by an outside agency to ensure impartiality. The review, separate and apart from other formal investigations that may be required to determine the cause of death, should include a critical inquiry of: 1) the circumstances surrounding the incident; 2) facility procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; 5) possible precipitating factors leading to the suicide; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

Guide for t
of an Inma

Name: ___
Reg. No.: __
Date of Birth

I    Backgr
     Educati
     Marital
     Religio
     Race/E
     Offens
     Senten
     Occupa
     Releas

II   Health
     Physic
           P
     Social
           P
     Psycho
           P
     Suicid
     Medic
     Menta
           I
     Abuse
           A
     Assaul
     Institu

230                         National Commission on Correctional Health Care

National Cor