# EXHIBIT A - ENCLOSURE 3

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**OFFICE OF THE SECRETARY**

1515 S Street, Sacramento, CA 95814
P.O. Box 942883
Sacramento, CA 94283-0001



J. Michael Keating, Jr.                     via:    Lisa Tillman
Office of the Special Master                        Deputy Attorney General
285 Terrace Avenue                                  Department of Justice
Riverside, RI 02915                                 1300 I Street, Suite 125
                                                    P. O. Box 944255
                                                    Sacramento, CA 94244-2550

RE: **PLAN TO INCREASE THE NUMBER OF SINGLE-CELLED INTERMEDIATE
CARE FACILITY BEDS AT THE CALIFORNIA MEDICAL FACILITY AND
SALINAS VALLEY STATE PRISON**

Dear Mr. Keating:

Please find enclosed the Intermediate Care Facility Bed Plan outlining the California
Department of Corrections and Rehabilitation's (CDCR) plan to increase the number of single-
celled intermediate care facility beds for Level IV high custody inmate-patients at the
California Medical Facility and Salinas Valley State Prison. This plan represents the CDCR's
effort to immediately increase the number of aforementioned beds through modifications of
existing facilities within both prisons. If implemented as proposed, there will be a total of 212
single-celled intermediate care facility beds on a staggered schedule by March 2009, with 36 of
these beds becoming available in October 2005.

If you need clarification on any aspect of this status report, please contact Renee Kanan, M.D.,
Director (A), Division of Correctional Health Care Services (DCHCS), at (916) 323-6811, or
Nadim Khoury, M.D., Deputy Director (A), Clinical Policy and Programs Branch, DCHCS, at
(916) 324-0876.

Sincerely,

JEANNE S. WOODFORD                          JOHN RODRIGUEZ
Undersecretary                              Deputy Director
Department of Corrections and Rehabilitation  Long Term Care Services
                                            Department of Mental Health

Enclosure

J. Michael Keating, Jr.
Page 2

    cc:   Joe McGrath, Chief Deputy Secretary, Adult Operations
          Bruce Slavin, General Counsel, Office of Legal Affairs
          John Dovey, Director, Division of Adult Institutions
          Renee Kanan, M.D., M.P.H., Director (A), DCHCS
          Michael Genest, Director (A), Division of Support Services
          Nadim Khoury, M.D., Deputy Director (A), Clinical Policy and Programs Branch,
             DCHCS
          Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations Branch,
             DCHCS
          George Sifuentes, Deputy Director, Facilities Management
          Kathleen Keeshen, Deputy Director, Legal Affairs Division
          Dave Lewis, Associate Director, Fiscal Services
          Cindy Radavsky, Assistant Deputy Director, Long Term Care Services, Department of
             Mental Health
          Eileen Cubanski, Assistant Secretary, Health and Human Services Agency
          James Tilton, Program Budget Manager, Corrections/General Government Unit,
             Department of Finance

# INTERMEDIATE CARE FACILITY BED PLAN

PLAN TO INCREASE THE NUMBER OF SINGLE-CELLED INTERMEDIATE
CARE FACILITY BEDS AT THE CALIFORNIA MEDICAL FACILITY AND
SALINAS VALLEY STATE PRISON

## INTRODUCTION:

In conjunction with the Court appointed experts in the *Coleman v. Schwarzenegger* lawsuit, the California Department of Corrections and Rehabilitation (CDCR) conducted the Unidentified Needs Assessment (UNA) study. The UNA study determined that there is a current need to treat 287 Level IV high custody inmate-patients in non-acute Correctional Treatment Center (CTC)/ Intermediate Care Facility (ICF) beds, hereby referred to as ICF beds in this document. This need for ICF beds for Level IV high custody inmate-patients drives the actions described in this "ICF Bed Plan."

This "ICF Bed Plan" will result in a total of 212 single-celled Level IV ICF beds by the end of March 2009. The "ICF Bed Plan" has three phases:

- *Phase I* is designed to provide 36 single-celled ICF beds within the next 60 days to accommodate the immediate treatment requirements of the Level IV high custody inmate-patients, through temporary modifications to the California Medical Facility (CMF). Permanent modifications to these beds will be made after the first beds in Phase II are available, with an expected completion by August 2008.
- *Phase II* will provide 112 single-celled ICF beds for Level IV high custody inmate-patients at Salinas Valley State Prison (SVSP), with 36 of these beds becoming available within the next nine months. The first 36 beds will initially replace the temporary beds at CMF while permanent modifications are made.
- *Phase III* will provide an additional 64 single-celled ICF beds at SVSP by March 2009 through completion of a construction project that has already been approved and funded.

The "ICF Bed Plan" provides further detail and a timeline indicating the anticipated number of the aforementioned beds available for occupancy from October 2005 to March 2009.

This "ICF Bed Plan" assumes that, where necessary, additional funding and authority needed from the Legislature and other state oversight and regulatory entities will be provided. If it is not provided consistent with this proposed plan, implementation could be delayed and the plan may require future alteration.

The "ICF Bed Plan" will be coordinated with the CDCR "Right Prison/Right Mission" project that begins a consolidation of institution missions in prisons that are best suited for their accomplishment. This project includes a review of the current placement and distribution of the CDCR's mental health programs in order to improve its ability to provide adequate care to all required levels of care. The review of the mental health programs is designed to improve both the facilities and staffing required for the delivery of adequate care, and is intended to complement the existing Mental Health Service Delivery System (MHSDS), a system resulting from experience over the last ten years.

# INTERMEDIATE CARE FACILITY BED PLAN

**BRIEF HISTORY:**

The MHSDS was implemented beginning in 1993/94 with a design that was based on recommendations of a mental health care consultant firm, Scarlett Carp Associates (SCA) that had been contracted for this purpose. SCA utilized a group of subcontracted experts in correctional mental health and health care architects to complete a full study of the then current mental health treatment in the Department, (currently named the CDCR). The system in existence at that time was a model that consisted primarily of concentrations of mentally ill inmates at treatment centers located at the California Medical Facility (CMF), California Men's Colony (CMC) and California Institution for Men (CIM), with by far the largest concentration at CMF and CMC. The consultant's report recommended a greater dispersal of mental health services from this model to provide for at least some mental health services in every prison.

The MHSDS would consist of several levels of care ranging from those requiring case management, to those that require hospitalization. When applied to the prison system, this model was determined beneficial also to address: (1) findings that significant numbers of inmates feigned mental illness in order to be transferred to one of the treatment center prisons where prison life was considered to be much better; (2) prisons that did not have mental health services would transfer problem inmates to a treatment center prison based on assumed but undiagnosed mental illness; (3) mental illness existed to some degree among the inmate population throughout the prisons notwithstanding the ability to transfer to a treatment center prison. To the extent that mental illness occurred in non-treatment center prisons, it was largely untreated. (Mental illness can be expected to occur at a higher rate in prison than it does in the general free population, and was thought to occur at a higher rate than was known at the time.)

This approach would better address the mental health needs of inmates throughout the prisons by providing case management at all prisons, and enhanced treatment on site or at a nearby location. Thus, Enhanced Outpatient and Mental Health Crisis treatment was "clustered" in a number of strategically placed prisons.

The highest levels of care were inpatient treatment either at the Intermediate level or the Acute level, provided under contract by the Department of Mental Health.

The four levels of care were designed to operate in concert, attempting to stabilize inmate-patient's illness and behavior so as to permit them to attain their highest level of functioning within the prison population and lowest custody level feasible. Movement between the levels of care was considered to be primarily two-way: that is, inmate-patients that needed and received a higher level of care would be transferred to such care and could be returned to lower levels of care as their conditions stabilized. It was recognized that a certain number of inmate-patients would suffer chronic mental illness and would not respond well to treatment, although the number or percentage of chronic cases was not known. These chronic cases would not necessarily move down the level of care ladder. While adequate functioning in the general population is desirable for all

# INTERMEDIATE CARE FACILITY BED PLAN

inmates, achieving the highest level of functioning for a mentally ill inmate will not always include general population. Many if not most mentally ill inmates can achieve only a minimal level of functioning, considering the degenerative nature of major mental illness.

The conduct of the SCA study occurred simultaneously with the trial in *Coleman v. Schwarzenegger* although it concluded at an earlier date. The entire general plan for implementing the model recommended by SCA preceded the order of the court in *Coleman*, although the detailed policies required for implementation of the program were developed after and as a result of the *Coleman* order. In addition, both SCA and the evolving trial in Coleman indicated that the Department did not have the means of routinely identifying mental illness in its inmate population, which meant that only those inmates that were severely "acting out" were being treated. Responding to this issue, the Department put into place a universal screening process for mental illness at all reception centers and all incoming inmates began to be screened, and if positive, assessed for mental illness. Development of training on signs and symptoms of mental illness also was undertaken in order to provide custody officers and other staff the ability to make referrals to clinicians for mental health assessments. Despite the SCA Report and the other changes in identifying mental illness, in 1995 the order of the court in *Coleman* was released. This order required the development of detailed policies to govern the mental health program: the initial Provisional Mental Health Program Guides were implemented in 1996.

Implementing the mental health program conceived in the SCA Report was a massive undertaking that was the first of its kind in a large prison system. It included construction of Correctional Treatment Centers for Mental Health Crisis Beds (MHCB) (as well as medical care), training of clinical, custody and other staff and the development of the means for determining and obtaining appropriate staffing levels, as well as assuring the application of the Program Guide requirements for all levels of care. This implementation has been managed in concert with the monitoring process of the *Coleman* court since 1995.

The current mental health program requirements, while being refined in a revised set of Program Guides, has changed minimally and is still organized as initially conceived.

It is through ongoing monitoring and management of the mental health program, that the CDCR has identified a strategic need to match bed capacity within each level of care with the needs for mental health services within its inmate-patient population. Presently, as noted above, the CDCR has an increased need for ICF beds for Level IV high custody inmate-patients. Therefore, the CDCR is proposing the following plan to address the short-term immediate need and the long-term strategic plan to match bed capacity with the mental health needs of its inmate-patient population.

# INTERMEDIATE CARE FACILITY BED PLAN

**PLAN OVERVIEW:**

*Phases I and II:*
The CDCR plans to modify existing facilities at California Medical Facility (CMF) and at Salinas Valley State Prison (SVSP) in order to create 148 single-celled ICF beds for Level IV high custody inmate-patients, and activating these beds incrementally from October 2005 through March 2009. In order to create single-cell ICF bed capacity within the shortest possible timeframe, the CDCR will perform initial facility modifications allowing Level IV inmate-patients requiring ICF level of care to be housed in 36 single-cells at CMF on an interim basis from October 2005 through April 2006. Beginning May 2006, these Level IV inmate-patients at CMF will be transferred to 36 single-cell ICF beds at SVSP. Once all the CMF inmate-patients are transferred to SVSP, the CDCR will continue to undertake facility modifications at CMF so that Level IV inmate-patients requiring ICF level of care may be housed in the 36 single-cells at CMF throughout the year. Facility modifications will continue at SVSP after April 2006 until a total of 112 single-celled ICF beds for Level IV inmate-patients are completed. Once the ICF beds are occupied, the DMH will operate the ICF program within each institution. The anticipated construction completion date for all 148 beds is March 2009.

*Phase III:*

The CDCR received authority and funding in the 2005 Budget Act to design and build an additional 64-Bed Mental Health Facility at SVSP. The anticipated construction completion date for this facility is March 2009.

**PLAN SCOPE:**

This plan is separated into three phases with the first two phases further subdivided into immediate, intermediate, and long-range objectives. Each objective outlines the scope of work required to achieve the stated objective within the indicated time period. Each phase is not mutually exclusive with work being undertaken at any time in order to obtain the stated objectives by the end of the indicated time period.

## Phase I. *California Medical Facility (CMF):*

**I.A:** *Immediate Objective (August 1, 2005 to October 1, 2005):* Perform the necessary facility modifications in order to start housing Level IV high custody inmate-patients requiring ICF level of care in 36 single-cells at CMF by October 1, 2005.

The current Level IV ICF inmate-patients at CMF will be transferred from the four-man and eight-man dormitory setting in the A-2 housing unit, to another appropriate dormitory setting, such as SVSP. The inmate-patients in the P-2 housing unit, which currently contains the Day Treatment Program (DTP), will then be transferred to the A-2 housing unit. Facility modifications can then be performed on the P-2 housing unit in order to convert the existing space to 36 single-celled ICF beds.

# INTERMEDIATE CARE FACILITY BED PLAN

Before the CDCR can house the Level IV high custody inmate-patients requiring ICF level of care in the P-2 housing unit on a permanent basis, the P-2 housing unit must meet California Code of Regulations (CCR) Title 22 and 24 licensing requirements. The CDCR will need to make significant facility modifications, such as installing air conditioning to the P-2 housing unit, in order to obtain permanent licensure. Therefore, the CDCR proposes to provide 36 single-celled ICF beds at CMF, without full facility modifications or air conditioning, by October 1, 2005, at which time the process of admission and bed placement will be initiated. It is estimated that admission and bed placement can place four to five inmate-patients per week, resulting in full occupancy within seven to nine weeks post October 1, 2005. It is proposed that these inmate-patients be taken from the list of Level IV inmate-patients waiting placement into the single cells at SVSP.

The CDCR will then continue to house Level IV ICF inmate-patients at CMF through April 2006. This time period was chosen due to the CMF heat plan deactivating at that time and area temperatures are lower at that time of the year. Inmate-patients receiving services in the mental health program may be treated with certain psychotropic medications that compromise the inmate-patient's ability to tolerate heat, and exposing these inmate-patients to a hot climate presents significant health risks. Beginning April 2006, these inmate-patients would then be transferred from CMF to SVSP in order to avoid the high outside temperature. Once all these inmate-patients have been transferred, the installation of air conditioning and other facility modifications will be made at CMF in order to house inmate-patients throughout the year.

*Facility Modifications:*
In order to house Level IV ICF inmate-patients at CMF as proposed, some facility modifications will be required before October 1, 2005. These facility modifications are based upon program flexibility granted from licensing agencies, and the CDCR's ability to demonstrate alternate methods of compliance to the CCR Title 22 and 24 requirements.

*Staffing:*
The DMH will operate the ICF program within CMF once the facility modifications have been completed. The DMH and CDCR have an existing compliment of clinical and custody staff for both the Level IV ICF program, currently in the A-2 housing unit, and the DTP currently in the P-2 housing unit. As facility conversions are completed, the DMH and CDCR plan to redirect this existing staff to operate both the ICF program for single-celled Level IV high custody ICF inmate-patients in the P-2 housing unit, and the DTP in the A-2 housing unit.

**I.B:** *Intermediate Objective (October 1, 2005 to July 2006):* Level IV inmate-patients requiring ICF level of care will be housed from October 1, 2005 to April 30, 2006, at which time these inmate-patients will be transferred to SVSP, as previously outlined.

# INTERMEDIATE CARE FACILITY BED PLAN

*Facility Modifications:*
The CDCR will develop a funding request for the remainder of the facility modifications to be performed at CMF. It is anticipated that 20-25 percent of this funding request will represent the cost of designing the facility, with the remaining 75-80 percent representing the cost of construction. Due to the large cost of completing all the facility modifications to CMF, the CDCR will be unable to redirect current year funding to cover all these expenses. Therefore, the CDCR will submit a funding request via the formal Capital Outlay Budget Change Proposal (COBCP) process. The CDCR's ability to complete the full facility modifications required to allow Level IV inmate-patients needing ICF level of care to be housed at CMF throughout the year, is predicated on this funding request being approved. If the CDCR's request is approved in the 2006 Budget Act, it is expected that funding for this project will become available in July 2006.

*Staffing:*
While the P-2 housing unit is under modification, beginning May 2006 and continuing as outlined in I.C: Long-Range Objective, DMH will redirect the P-2 staff to fill vacancies in the other DMH programs (e.g. acute, intermediate, and day treatment), thereby reducing overtime.

**I.C:** *Long-Range Objective (July 2006 to July 2008):* Complete the full facility modifications in order to house Level IV inmate-patients requiring ICF level of care at CMF throughout the year by July 2008.

*Facility Modifications:*
Full facility modifications to the P-2 housing unit will be started upon receipt of funding for the project. Conceptual timeframes estimate that once funding is received it will take 24 months to design and complete the facility modifications to the P-2 housing unit. Subsequent to the facility modifications, the appropriate authorizing agencies will need to review and license the P-2 housing unit.

## Phase II. *Salinas Valley State Prison (SVSP) – Modification (112 single-celled ICF beds):*

**II.A:** *Immediate Objective (September 1, 2005 to May 1, 2006):* Perform the necessary facility modifications in order to start housing Level IV inmate-patients requiring ICF level of care in 36 single-cells by May 1, 2006.

The CDCR proposes to convert housing units D-5 and D-6 at SVSP into 112 single-celled licensed ICF beds for Level IV inmate-patients, with DMH operating these beds once available. The current general population housed in the D-5 and D-6 units will be transferred to other general population beds within the CDCR system. These housing units will then be modified to comply with CCR Title 22 and 24 licensing requirements. The CDCR will need to make significant facility modifications and request additional funding for both DMH clinical staff and CDCR staff, in order to obtain licensure for both housing units. In order to maximize the current staffing resources at SVSP, the CDCR

# INTERMEDIATE CARE FACILITY BED PLAN

proposes to transfer the Enhanced Outpatient Program (EOP) population at SVSP to California State Prison, Sacramento (SAC), where CDCR is more successful in recruiting the mental health staff necessary to operate this program. The mental health professionals currently staffing the EOP population at SVSP could then be available to be hired by DMH to operate the ICF program. It is anticipated that the required facility modifications and staffing in order to operate the EOP at SAC will be completed and in place by May 2006.

Due to timing and fiscal constraints, the conversion of both housing units must be completed in increments. The first priority is to convert and staff 36 single-celled ICF beds in one housing unit, by May 1, 2006, allowing for the inmate-patients at CMF to transfer to SVSP before the temperatures at CMF are too high to maintain the treatment program at that location. Pending funding approval, the CDCR will then fully modify the second housing unit at SVSP, producing 56 single-celled ICF beds, with an anticipated construction completion date of July 2008. Beginning July 2008, the CDCR will transfer the ICF inmate-patients provisionally housed in the 36 single–celled ICF beds to the 56 single-celled ICF bed housing unit at SVSP, or to the P-2 housing unit at CMF. Once vacant, full facility modifications of the initial housing unit will be performed, with an anticipated construction completion date of March 2009. By the end of March 2009, the CDCR facility modifications to the initial housing unit will be completed providing an additional 56 single-celled ICF beds, resulting in a total of 112 single-celled ICF beds for both housing units at SVSP. As bed capacity increases, any unoccupied beds will be filled via the list of Level IV inmate-patients waiting placement into the single-celled ICF beds at SVSP.

*Facility Modifications:*
This plan requires initial facility modifications be completed within a short time frame. These facility modifications are based upon program flexibility granted from licensing agencies and the CDCR's ability to demonstrate alternate methods of compliance to the CCR Title 22 and 24 requirements. Obtaining this objective requires that the CDCR complete these facility modifications so that Level IV inmate-patients requiring ICF level of care can be housed in at least 36 single cells. These initial modifications can be funded from a redirection of existing resources.

*Staffing:*
To operate a 112-bed ICF program at SVSP additional staff, for both CDCR and DMH, will be needed.

**II.B:** *Intermediate Objective (May 1, 2006 – July 2006):* By July 2006, receive funding and authority to complete the full facility modifications at SVSP.

Starting May 1, 2006, Level IV inmate-patients requiring ICF level of care will be housed in 36 single-cells at SVSP. By this time, up to a maximum of 36 Level IV ICF inmate-patients will have been transferred from CMF to these single-cells at SVSP as previously described. Beginning May 1, 2006, the EOP population at SVSP will begin transfer to SAC, predicated on construction being completed.

# INTERMEDIATE CARE FACILITY BED PLAN

*Facility Modifications and Staffing:*
Conversion of the remaining cells at SVSP will require additional resources. The CDCR will submit a funding request via the formal COBCP process. It is anticipated that of the funding requested for the facility modifications at SVSP, 20-25 percent will represent the cost of designing the facility with the remaining 75-80 percent representing the cost of construction. The CDCR's ability to complete the full facility modifications required to allow Level IV inmate-patients needing ICF level of care to be housed at CMF throughout the year, is predicated on this funding request being approved. If the CDCR's request is approved in the 2006 Budget Act, it is expected that funding for this project will become available in July 2006.

To operate a 112-bed ICF program at SVSP additional staff, for both CDCR and DMH will be needed. Funding for the required program support staff for the remaining 76 beds of the ICF program will be requested through the annual budget process consistent with the timing of the facility availability and the lead time needed to recruit and train staff.

The CDCR's ability to complete the full facility modifications and fully staff the ICF program at SVSP is predicated on approval of these funding requests.

**II.C:** *Long-Range Objective (July 2006 to March 2009):* Complete facility modifications of the remaining housing units, in order to create a total of 112 Level IV ICF beds by the end of March 2009.

*Facility Modifications:*
Full facility modifications to the remaining housing units will be started upon receipt of funding for the project. Conceptual timeframes estimate that once funding is received it will take 32 months to design and complete the full facility modifications to the D-5 and D-6 housing units. Subsequent to the facility modifications, the appropriate authorizing agencies will need to review and license both housing units.

*Staffing:*
Additional staff for both CDCR and DMH must be hired prior to completion of the facility modifications. As stated previously funding must be allocated to support these positions and time allowed to recruit and hire sufficient staff in order to operate the ICF program at SVSP.

## Phase III. *Salinas Valley State Prison (SVSP) – New Construction (64 single-celled ICF beds):*

Phase III Objective: Provide an additional 64 single-celled ICF beds for high custody Level IV inmate-patients through additional construction at SVSP. This project has already received funding and authorization from the Legislature. The anticipated construction completion date for this project is March 2009.

# INTERMEDIATE CARE FACILITY BED PLAN

**PLAN SCHEDULE:**

| INTERMEDIATE CARE FACILITY BED PLAN | | |
|---|---|---|
| **MAJOR MILESTONES** | | |
| **Action** | **Comments** | **Target Completion Date** |
| **Phase I:** | **California Medical Facility (CMF)** | |
| *I.A: Immediate (August 1, 2005 to October 1, 2005):* | | |
| I.A.1: Perform Facility modifications at the P-2 housing unit in order to provisionally house 36 Level IV ICF inmate-patients in single cells. | | 10/1/05 |
| I.A.2: Begin to provisionally house 36 Level IV ICF inmate-patients in single-cells in the P-2 housing unit. | Inmates to be housed in P-2 from 10/1/05 to 4/30/06. | 10/1/05 |
| *I.B: Intermediate (October 1, 2005 to July 2006):* | | |
| I.B.1: Transfer the 36 provisionally housed Level IV ICF inmate-patients in the P-2 housing unit to Salinas Valley State Prison. | Predicated on successful completion of II.A.1 and II.A.2. | 5/1/06 |
| I.B.2: Develop and submit the funding request for additional facility modifications to the P-2 housing unit in order to license and operate 36 single cells for Level IV inmate-patients requiring ICF level of care throughout the year. | Funding request subject to the constraints of the budget process. | 10/30/05 |
| *I.C: Long-Range (July 2006 to July 2008):* | | |
| I.C.1: Perform facility modifications on the P-2 housing unit in order to house 36 level IV inmate-patients in single cells throughout the year. | 24 months once funding is secured to complete the design and facility modifications to the P-2 housing unit. | 7/31/08 |
| **Phase II:** | **Salinas Valley State Prison (SVSP) - Modification** | |
| *II.A: Immediate (September 1, 2005 to May 1, 2006):* | | |
| II.A.1: Perform facility modifications on the D-5 and D-6 housing units in order to provide 36 single-celled ICF beds. | | 5/1/06 |
| II.A.2: Recruit and hire the required clinical and custody staff to operate the initial 36 single-celled ICF beds. | Predicated on successful completion of II.A.1. | 5/1/06 |
| II.A.3: Develop and submit the funding request for additional facility modifications to the D-5 & D-6 housing unit in order to license and operate the remaining single cells for Level IV inmate-patients requiring ICF level of care throughout the year. | Funding request subject to the constraints of the budget process. | 10/30/05 |
| *II.B: Intermediate (May 1, 2006 – July 2006):* | | |
| II.B.1: Receive funding and authority to complete the full facility modifications at SVSP. | | 7/1/06 |

# INTERMEDIATE CARE FACILITY BED PLAN

| INTERMEDIATE CARE FACILITY BED PLAN | | |
|---|---|---|
| **MAJOR MILESTONES** | | |
| **Action** | **Comments** | **Target Completion Date** |
| **II.C:** *Long-range (July 2006 to March 2009):* | | |
| II.C.1: Perform facility modifications on the remaining portions of housing units D-5 and D-6 in order to provide 112 single-celled ICF beds. | 32 months once funding is secured to complete the design and facility modifications to the D-5 and D-6 housing units. | 5/30/09 |
| II.C.2: Recruit and hire additional clinical and custody staff in order to operate the ICF program. | Predicated on successful completion of II.C.1. | 5/30/09 |
| **Phase III:**         **Salinas Valley State Prison (SVSP) – New Construction** | | |
| **III:** *Long-Range (September 1, 2005 to March 2009)* | | |
| III.1: Complete design and construction of an additional 64 single-celled ICF beds for Level IV high custody inmate-patients. | Project already authorized and funded through budget process. | 3/31/09 |

## PLAN TIMELINE FOR SINGLE-CELLED ICF BEDS:

| INTERMEDIATE CARE FACILITY (ICF) BED PLAN | | | | |
|---|---|---|---|---|
| **ANTICIPATED NUMBER OF SINGLE-CELLED ICF BEDS** | | | | |
| **Timeframe (From – To):** | **CMF[1]** | **SVSP[2]** | **Total** | **Comments:** |
| October 2005 – April 2006 | 36 | 0 | 36 | Duration = 7 months |
| May 2006 – June 2008 | 0 | 36 | 36 | Duration = 25 months |
| July 2008 – February 2009 | 36 | 56 | 92 | Duration = 8 months |
| March 2009 -- ongoing | 36 | 112 | 212 | [*]March 31, 2009, is the anticipated construction completion date of 64 single-celled Level IV ICF beds at SVSP, (Phase III). |
| | | 64[*] (new construction) | | |

[1] California Medical Facility (CMF) P-2 Housing Unit
[2] Salinas Valley State Prison (SVSP) D-5 and D-6 Housing Units

**EXHIBIT A - ENCLOSURE 4**

California Department of Corrections and Rehabilitation and    Enclosure IV
Department of Mental Health

## ADDENDUM 1 TO
## MEMORANDUM OF UNDERSTANDING
## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## And
## CALIFORNIA DEPARTMENT OF MENTAL HEALTH
## For
## Intermediate Care/Non-Acute Services

1. This is an addendum to Section IV B 3; page ICF-9; of the current Memorandum of Understanding (MOU). CDCR and DMH signed the MOU on June 6, 2005. The MOU expires on June 30, 2008.

2. The MOU specifies a priority admission order if all clinical factors are equal for Salinas Valley Psychiatric Program (SVPP).

3. This addendum to the MOU specifies additional guidelines to maximize occupancy of the four-man cells. The addendum will be revised to read:

   3. If there is a waiting list, inmate-patients on the SVPP Clinical Assessment Team (CAT) referral waiting list will be reviewed in the daily Program meetings. Prioritization for admission is based upon the clinical acuity of the patient at the time of referral; the capabilities of the institution to provide mental health treatment and programs and any change of clinical conditions that justify moving the patient to the top of the list. Institutions may petition the HCSD Chief Psychiatrist or Chief Psychologist to move an inmate-patient to the top of the waiting list based on clinical need. If after review, the HCSD Chief Psychiatrist/Psychologist determines that the inmate-patient-patient should be a priority, they will contact the SVPP CAT team and have the patient moved to the top of the list.

   a). If all clinical factors are equal, priority shall be assigned based on current placement in the following order: Psychiatric Services Unit (PSU); Mental Health Crisis Bed (MHCB); other DMH placement (Vacaville Acute Psychiatric or Intermediate Program or Atascadero State Hospital); Administrative Segregation Enhanced Outpatient Program (Ad Seg EOP) Hub; Administrative Segregation, General Population (Ad Seg GP); Enhanced Outpatient Program (EOP); and General Population (GP).

   b). To maximize occupancy within the SVPP 4-man cells the SVPP CAT may elect to accept admissions outside of the placement order as defined in 3a above.

      1). SVPP CAT may accept EOP-GP referrals provided such single cell admissions do not occupy more than four (4) cells within SVPP.

California Department of Corrections and Rehabilitation and    Enclosure IV
Department of Mental Health

4. This addendum will remain in effect through June 30, 2008.

**SIGNATORS**


_____       _____
Peter Farber-Szekrenyi    (Date)       JOHN RODRIGUEZ    (Date)
Director                               Deputy Director
Division of Correctional Health Care Services  Long Term Care Services
Department of Corrections and Rehabilitation   Department of Mental Health

**EXHIBIT A - ENCLOSURE 5**

California Department of Corrections and Rehabilitation and    Enclosure V
Department of Mental Health

**ADDENDUM 1 TO**
**MEMORANDUM OF UNDERSTANDING**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**And**
**CALIFORNIA DEPARTMENT OF MENTAL HEALTH**
**For**
**Acute Psychiatric Services**

1. This is an addendum to all relevant sections of the current Memorandum of Understanding (MOU) that outline the relationship between the Department of Mental Health's (DMH) Atascadero State Hospital (ASH) and the California Department of Corrections and Rehabilitation's (CDCR) California Men's Colony (CMC). CDCR and DMH signed the MOU on June 6, 2005. The MOU expires on June 30, 2008.

2. The MOU specifies that CMC may refer cases of inmates at CMC in need of acute psychiatric care to ASH.

3. This addendum to the MOU specifies that CDCR's California Institution for Men (CIM), California Correctional Institution (CCI) and Deuel Vocational Institution (DVI) may also refer inmates at CIM in need of acute psychiatric care to ASH.

This addendum designates that CMC, CIM, CCI and DVI will be interchangeable in the sections of the MOU that specify responsibilities of the prison in its relationship to the ASH acute psychiatric program.

4. This addendum will remain in effect through June 30, 2008.

**SIGNATORS**

_____        _____
Peter Farber-Szekrenyi    (Date)         JOHN RODRIGUEZ    (Date)
Director                                 Deputy Director
Division of Correctional Health Care Services   Long Term Care Services
Department of Corrections and Rehabilitation    Department of Mental Health

**EXHIBIT A - ENCLOSURE 6**

# Coalinga State Hospital

# Coleman Bed Conversion Study

April 5, 2006

Prepared for:

California Departments of

Mental Health

and

Corrections and Rehabilitation

Prepared By:

California Department of General Services
Real Estate Services Division
Project Management Branch

## Executive Summary

This document has been developed to assist the California Department of Corrections and Rehabilitation (CDCR) and the California Department of Mental Health (DMH) in responding to a Coleman court order to study the feasibility or non-feasibility of housing and providing required inpatient mental health non-acute intermediate level of care to CDCR high custody/high security Level IV patients at Coalinga State Hospital (CSH). The focus of the study is to determine the physical plant alterations required to convert CSH to CDCR high custody/high security Level IV design guidelines.

The hospital is in Coalinga, Fresno County adjacent to the CDCR's Pleasant Valley State Prison. CSH opened in September of 2005 and is licensed as an Acute Psychiatric Hospital. The existing facility most closely aligns with CDCR Level II security criteria.

The CSH was designed and constructed to house and treat 1,500 Sexually Violent Predators (SVP). The SVPs are committed to the Department of Mental Health under civil statutes for treatment and rehabilitation; not the continuation of punishment in a prison setting. The SVPs are generally mentally high functioning, non-volatile and character disorder rather than psychotic. Recent legislation and policy changes have enabled DMH to house and treat 50 CDCR Level I, II, and III patients as well as other DMH mental health commitment classifications.

The CDCR mental health non-acute intermediate level of care inmates classified as "high custody/high security Level IV" have a documented history of violence and volatility within a prison setting. The clinical profile is one of a poorly coping, cognitively comprised, vulnerable population with varying degrees of psychotic acuity.

The CSH was designed and constructed as a minimum-security facility (most akin to CDCR Level I) within a medium-security perimeter (most akin to CDCR Level II). While this approach meets the requirements of the Sexually Violent Predator (SVP) population, it does not meet the physical plant standards set forth by the CDCR for a Level IV high custody/high security population, and therefore, extreme alterations to the physical plant will be necessary.

CDCR design guidelines require that Level IV facilities be enclosed within a lethal electrified perimeter fence. CDCR and DMH have determined that a lethal fence would be inappropriate at Coalinga State Hospital due to the SVP's civil commitment status and litigious nature; and due to environmental impacts on wildlife. The inclusion of a lethal perimeter conflicts with DMH's treatment philosophy. In lieu of the lethal electrified perimeter the Departments have opted for an enhanced double fenced perimeter with manned guard towers.

The basis of this study was to provide a minimum of 50 CDCR high custody/high security beds. In terms of the architectural space program required to meet the CDCR's mental health treatment program goals, there are inefficiencies borne out of the conversion under consideration. Given the existing building footprint and necessary existing structural and infrastructure components, preliminary studies make it apparent

that the end result of the proposed conversion will consume approximately 30% more space than had it been constructed as a stand-alone, build-to-suit "standard" 64-bed Correctional Treatment Center mental health program facility.

In the conceptual scheme one hundred (100) DMH SVP beds would need to be demolished to construct 52 CDCR high custody/high security Level IV beds and program treatment administrative space. Analysis of the impact on DMH's statewide population management and development of the cost/ timeline required to replace the 100 lost SVP beds within the existing system is outside the scope of this study.

Due to the nearly complete demolition and reconstruction of the existing treatment unit required to retrofit CSH SVP beds to CDCR Level IV high custody/high security beds, both the project duration and the total costs will be significant. Based on the information reviewed and provided by the CDCR and DMH, and assuming budget authority in July 2007, it is estimated that the "best case "project timeline facility activation would occur in late June 2012, with a total project cost estimated to be $35 million. In a second scenario, the "likely case" project timeline facility activation would occur in November 2013, with an increased cost due to additional legal fees and construction escalation. If a lethal electrified perimeter is installed the timeline will likely extend to May 2014 with correspondingly escalated construction costs.

Many challenges may further impact the timeline and cost. The regional and community opposition to "high custody/high security" patients being housed at CSH is anticipated to be high. Delays due to legal actions filed by the public will postpone construction, activation and escalate the project cost. Other policy and operational elements that may extend the timeline and increase the cost include: community mitigations, segregation of patient populations, Department managerial and operational responsibilities, impact to current labor agreements, debt service options and limitations, and the impact of bed reduction on DMH's statewide population management.

## Table of Contents

Introduction ...................................................................................................................1
Purpose......................................................................................................................1
Background ................................................................................................................1
Assumptions...............................................................................................................2
Coalinga State Hospital Facility Overview ...................................................................4
   Infrastructure...........................................................................................................4
   Secured Hospital Facility ........................................................................................4
   Facilities Outside of the Security Perimeter.............................................................5
Community Relationship............................................................................................17
California Environmental Quality Act (CEQA) Process ................................................17
Coalinga State Hospital Financial Obligations ...........................................................18
Criteria for Facility Conversion..................................................................................18
   Codes and Standards ............................................................................................18
   Facility Narrative ...................................................................................................18
   Comparison of CDCR Level IV Security Criteria v. Current Coalinga State Hospital
   Security..................................................................................................................22
   Architectural Program Summary and Data Sheets..................................................28
Conceptual Level IV Unit Plan...................................................................................31
   Convert Two Existing CSH Units (100-Beds) to Level IV Unit (52-Beds)....................31
   Estimated Project Costs.........................................................................................32
   Estimated Project Timeline ....................................................................................32
Conclusion ...............................................................................................................33

## Introduction

The purpose of the Coalinga Coleman Bed Conversion Study is to determine the physical plant alterations required to convert a portion of California Department of Mental Health (DMH) Coalinga State Hospital (CSH) to California Department of Correction and Rehabilitation (CDCR) maximum security (Level IV) facility requirements. The patients under consideration for treatment in the converted beds are CDCR inmates who are high custody/high security patients that require inpatient mental health non-acute intermediate level of care. The goals of the study include:

- Identify the Coalinga State Hospital physical plant components that require alteration to conform to CDCR Level IV criteria.
- Establish criteria to resolve the "less than Level IV" physical plant deficiencies.
- Identify the architectural programmatic needs to provide mental health treatment at CSH consistent with CDCR's "Salinas Valley Psychiatric Program (SVPP)".
- Conceptualize the facility demarcation between the civil commitment DMH patients and penal code committed CDCR high custody/high security Level IV patients.
- Identify potential constraints affecting the physical plant alterations.
- Establish an implementation timeline for physical plant alterations
- Identify the costs associated with the physical plant alterations.

## Purpose

This document has been developed to assist the CDCR and DMH in responding to a Coleman court order to study the feasibility or non-feasibility of housing and providing required inpatient mental health non-acute intermediate level of care to CDCR high custody/high security Level IV patients at Coalinga State Hospital. The scope of the study prepared by the California Department of General Services (DGS) and its consultant team is limited to the physical plant alterations required to convert a portion of Coalinga State Hospital to CDCR high custody/high security Level IV security criteria. Operation, treatment program and custody criteria have been supplied by the Departments of Mental Health and Corrections and Rehabilitation. Analysis of staffing levels and operational alternatives are outside the scope of DGS's component of the study. Determination of the feasibility or non-feasibility of the conversion plan is the responsibility of DMH and CDCR.

## Background

The California Department of Corrections and Rehabilitation is in need of additional non-acute intermediate level of care beds to provide mental health treatment to high custody/high security (Level IV) patients. The Coleman court has ordered that CDCR and DMH study the potential for incorporating high custody/high security Level IV beds at Coalinga State Hospital.

The Coalinga State Hospital (CSH) is operated by the California Department of Mental Health. CDCR provides perimeter security. Approximately 2,500 DMH and 40 CDCR personnel (three shifts) will be required to staff the facility at maximum occupancy. The facility is in Coalinga, Fresno County adjacent to the CDCR's Pleasant Valley State Prison. CSH opened in September of 2005. The Coalinga State Hospital is licensed as an Acute Psychiatric Hospital in accordance with Section 1250 of the California Health and Safety Code and conforms to the California Code of Regulations Titles 22 and 24.

The CSH was designed and constructed to house and treat 1,500 Sexually Violent Predators (SVP). The SVPs are committed to the Department of Mental Health under civil statutes (Welfare and Institutions Code 6600 et. seq) for treatment and rehabilitation; not the continuation of punishment in a prison setting. The SVP patients have been diagnosed with a mental disorder that predisposes them to violent criminal sexual acts. Ten percent of the SVP suffer from a major mental illness that is severe and persistent in nature.

The physical plant at Coalinga State Hospital was designed specifically for the SVP population, who generally are mentally high functioning, non-volatile, and character disordered rather than psychotic. The SVP patients are housed in 50 patient housing units and dependant on behavior demonstrated, are allowed a high degree of unescorted movement within the facility. The majority of patient services and treatment program activities are provided outside of the housing units. The existing facility most closely aligns with a CDCR Level II security criteria consistent with the other State Hospitals.

The CDCR ICF patients classified as "high custody/high security Level IV inmates" have a documented history of violence and volatility in a prison setting. The subject population "*is one of a poorly coping, cognitively comprised, vulnerable population with varying degrees of psychotic acuity. This population has undeveloped social skills, chronic impairment in areas of reasoning, decision-making, reality perception, susceptibility to stress and environmental change and a compromised ability to adapt to change. Level IV inmates in need of acute intermediate level of care must be housed in the maximum-security single cells as these provide the most controlled and safest living environment for both inmates and staff.*" CDCR typically provides services and treatment to Level IV patients within the patient's housing unit. Patient movement within the prison is strictly orchestrated by custody staff with the patients in restraints.

## **Assumptions**

Based on a joint one day working session with the Departments, review of studies and reports prepared by the California Department of Corrections and Rehabilitation, and review of existing CDCR mental healthcare facility plans, the following summarized items were deemed critical to the required facility design as presented in this report.

---

[1] CDCR Salinas Valley State Prison Additional 64-Bed Mental Health Facility (61.35.007), Capital Outlay Budget Change Proposal, 2005-2006

- The physical plant at Coalinga State Hospital was designed specifically for the Sexually Violent Predator (SVP) population. The existing facility most closely aligns with a CDCR Level II security criteria.

- The SVP patient population consists of individuals who are involuntarily committed to the Department of Mental Health because they have a mental disorder that, if left untreated outside of a secure environment, would lead to their committing future violent sexual offences.

- Ten percent of the SVP patient population will be diagnosed with a major mental illness requiring intensive psychiatric care.

- The California Department of Corrections and Rehabilitation is in need of additional non-acute intermediate level of care beds for high custody/high security inmates.

- The basis of this study's timelines and cost estimates is the physical plant conversion of CSH treatment units to accommodate fifty (50) CDCR high custody/high security Level IV patients.

- The CDCR patients classified as "high custody/high security Level IV" have a documented history of violence and volatility in a prison setting.

- CDCR Level IV inmates in need of non-acute intermediate level of care must be housed in maximum-security single cells as these provide the most controlled and safest living environment for both inmates and staff.

- All patient services and treatment will be provided to the CDCR patients within the patient's housing unit.

- CDCR patient movement will be restricted to the Level IV housing unit and associated yard.

- CDCR patient visitors will be escorted to a non-contact visiting area within the Level IV housing unit

- CDCR patients will be admitted direct to the Level IV housing unit from the transferring facility.

- The Level IV housing unit must be "self-sufficient"; that is, space shall be allotted for all patient service and treatment programs, including group rooms, exam rooms, dining facilities, visiting facilities, recreation rooms, barbershop, medical exam and medical triage, etc.

- The DMH patient population and CDCR Level IV patient population shall be completely segregated.

- Level of care and custody staff shall be administrated by associative Coalinga State Hospital and Pleasant Valley State Prison management units.

**Coalinga State Hospital Facility Overview**

**Infrastructure**

The Coalinga State Hospital, administrated by the California Department of Mental Health is a maximum security 1,500-bed acute psychiatric hospital. The hospital is located in the City of Coalinga, Fresno County, California. The facility will employ approximately 2,500 staff members and provide housing and treatment for 1,500 patients.

The campus of one and two story buildings totals 1.2 million square feet. The site development consists of onsite utility distribution (water, sewer, natural gas, electricity, communication systems) and site drainage and flood control systems. Specific elements include roadways, parking lots, walkways, landscaping, fencing, storm water retention basin, a Central Plant, Wastewater Treatment Plant, a Water Booster Station, and emergency power generation.

**Secured Hospital Facility**

The Secured Hospital Facility consists of a 1500-bed licensed psychiatric hospital. The Department of Mental Health administers patient treatment and services, and polices the internal secured facility (the buildings and "no mans land"). All staffs posted "inside" are employees of the DMH. The CDCR is responsible for perimeter security (the fence line and beyond). Employees posted to the sallyports and towers are CDCR staff. Early in the design process DMH and CDCR discussed the benefits and determents of various security perimeters. The DMH and CDCR assessed the public's concern for safety, the SVPs civil commitment status and litigious nature, DMH's treatment philosophy, the State's potential liability, environmental issues and staffing costs to determine that a non-lethal perimeter fence system would be the most appropriate for the SVP population.

The perimeter selected by DMH and CDCR is a double "Chuckwalla style" fence consisting of an interior candy cane fence secured to a grade beam with no climb fabric topped and with a roll of razor tape. The exterior fence is faced with eight coils of razor tape. The fences are protected by redundant perimeter security electronic systems, an above ground microwave motion detection system and a buried coaxial cable ground motion detecting system. The facility is serviced through two sallyports, one specifically for vehicles and the other for pedestrians. The staff posts include two pre-cast concrete guard towers 32 feet tall at the sallyports and three prefabricated officer stations, one at ground level in the vehicle sally port and two raised on berms. A substantial "no-mans-land" exists between the fence line and the hospital.

The facility is subdivided into security areas. The primary demarcation line is the exterior wall facing the "no-mans land" and the roof deck. The overall hospital is subdivided into smaller internal zones.

The 930,000 square feet secured hospital includes the following: twenty-eight 50-patient housing/treatment units; 50-patient infirmary unit; 30-patient orientation unit; 20-pateint transition unit; program administration offices; patient dining; central medical services; recreation; library services; academic education services; pastoral services; patient and

visitor meeting areas; substance abuse services; pharmacy services; central supply; central hospital support; and vocational education.

The hospital is organized into four housing/treatment pods. Two dining/retherm kitchen facilities serve two pods each. The primary patient services and treatment program modules are accessed from a central mall. All pedestrian circulation is internal to the hospital mall and monitored from two fixed officer posts. Patients have access to two large shared "common" outdoor spaces: a central park courtyard that is landscaped with trees, lawn, shrubs, boulders and pathways and a softball field.

The fifty person housing/treatment units include ten four-man bedrooms and ten single bedrooms, nurse station, medication room, communal toilet and shower rooms, level-of-care staff offices, interview/exam rooms, group therapy/conference rooms, quiet room, day room, staff break room, storage and utility rooms. The patients have access to two unit yards, one sports orientated with playing courts and the other a meditative garden space. The patients have free access within the patient designated areas of their assigned treatment unit. The bedroom doors are commercial grade with non-locking hardware. The bedrooms are not "wet rooms", that is they do not include individual toilet or sink fixtures as do patient bed rooms in CDCR health care facilities. The bedrooms, communal toilets and showers all contain "modesty" panels or curtains ensuring a degree of privacy to the patients.

The one and two story structure utilizes concrete slab on grade, spread and pier footings, a braced steel structural frame system and areas of concrete masonry structure, concrete pan filled roof deck, and a concrete masonry veneer exterior skin. Interior partitions and ceilings generally consist of plaster and lath systems over metal studs. The mechanical system consists of distributed water system with roof mounted air handlers. The electrical system, which includes extensive emergency power consists of 120V distribution throughout the facility. Telephone, data and low voltage security systems are distributed throughout the facility.

The finishes are consistent with Title 22 and include: painted plaster walls and ceilings, acoustical tile ceilings, vinyl tile and ceramic tile flooring, carpeting, and privacy curtains. The doors and hardware are primarily commercial grade.

**Facilities Outside of the Security Perimeter**

The Administration Building (63,000 SF) is a two story office building that houses approximately 350 staff and includes classrooms, conference areas, and a staff cafeteria.

The Processing Building (11,000 SF) is an office building that houses approximately 30 staff and includes classrooms and the main pedestrian sallyport/processing area.

The Central Warehouse (34,800 SF) includes an office suite for six staff and racked and opening storage areas.

The Plant Operation Shops (18,100 SF) includes two one-story buildings that house the maintenance shops.

The Plant Operations Administration and Warehouse (11,800) includes an office suite for twelve staff and racked and open storage areas.

Volatile/Hazardous Material Storage (2,000 SF)

The Motor Vehicle Building (4,800) provides vehicle maintenance for the facilities fleet.

The Central Plant Building (24,000 SF) houses a control room, office area, the heating and cooling equipment for the entire campus and the emergency power generators.

The Central Kitchen (44,000 SF) includes an office suite for 25 staff, quick chill food preparation kitchen and food warehouse and storage areas.



The Coalinga State Hospital, administrated by the California Department of Mental Health is a 1,500 bed acute psychiatric hospital. The hospital is located in the City of Coalinga, Fresno County, approximately 220 miles south of Sacramento and 200 miles north of Los Angeles





Vehicular Sallyport: The interior fence is a "candy cane" configuration. The officer post is at ground level within the Sallyport. The tower officer controls movement in and out of the facility. The lighting is "non" high mast fixture type, typical throughout the campus.





Coalinga State Hospital - Main Facility Floor Plan



Dining Rooms: CSH has two Dining complexes; each consists of a retherm kitchen and eight dining rooms that seat 50 patients at once. The dining complexes are accessed from the central mall.



Central Mall: Aka "Route 66", most patient services and treatment program modules are located off the central mall. All staff and patient circulation is via interior corridors and atrium spaces. Circulation is not segregated between staff and patient. Patients, although monitored, are unrestrained and mostly unescorted throughout the hospital.



Central Park;  This "common area" landscaped park is accessible from the central mall, "Route 66". DMH patients are allowed free access.



The Large Chapel is a component of the Pastoral Services treatment module.



**TYPICAL TREATMENT UNIT BUILDING PLAN (TWO UNITS)**



Typical Nurse Station



Typical Treatment Unit Wing:  The doors are equipped with "storage room" locksets.  This type of hardware is design to prohibit access from the corridor into a room, yet allows free access from the room into the corridor. Therefore the patients can not be locked into the bedrooms.



Exterior View of typical Treatment Unit Nurse Station



Observation Room foyer



Interior View of typical Treatment Unit Nurse Station



Tub Room

**Typical Treatment Unit Views**



Treatment Unit Garden
Courtyard



Treatment Unit Activity
Courtyard



Treatment Unit Activity
Courtyard



Coalinga State Hospital
Administration Building





## Community Relationship

The City of Coalinga is approximately seven miles from the Hospital site. Early in the site selection process the DMH established a policy of pursuing development of a site only if the local jurisdiction supported the project. The site selection process considered every state prison site in California and several other State owned and non-State owned sites as well. The State (DMH, CDCR and DGS) conducted numerous public education forums as well as presented and discussed the project at local agency and service organization meetings throughout California.

In late 1998, the State requested concurrence from the City of Coalinga to study the suitability of locating a State Hospital for the treatment of SVPs on State owned property adjacent to Pleasant Valley State Prison. Having received concurrence from the City to study the site, the State conducted an intensive public outreach program in the community. After much public debate, the Coalinga City Council and the Fresno County Board of Supervisors issued resolutions supporting the design and construction of a new State Hospital for the treatment of Sexually Violent Predators in March of 1999. In October of 2000, the Director of the Department of Mental Health certified the environmental documents selecting Coalinga as the location for the first new State mental health hospital to be constructed in California in over fifty years.

Throughout the public outreach process the public repeatedly voiced concern over the "type" of patient to be housed and treated at the hospital, specifically the public safety and security risk that the SVP's would pose to the community. An intense educational effort by DMH to inform the public of the clinical profile of the SVP population alleviated many of the concerns, however, it is clear from comments received during the site selection process that the community strongly opposes CDCR high custody/ high security patients being housed and treated at Coalinga State Hospital.

Coalinga State Hospital is viewed by local residents as a major asset to the community and has a convivial relationship with the City of Coalinga and the County of Fresno. The Department of Mental Health has a very positive reputation in the community as a responsive governmental entity for delivering on all pledges and following through on all promises made during the site selection process.


## California Environmental Quality Act (CEQA) Process

Any major physical alterations to Coalinga State Hospital will require the documentation and public review pursuant to the California Environmental Quality Act (CEQA). Based on comments received from the community during the 2000 Environmental Impact Report expressing concern for public safety due to the patient type intended to be housed at Coalinga it is anticipated that the alterations necessary to accommodate CDCR high custody/high security patients will be met with fervent opposition by the community and region. The likelihood of legal action opposing the alterations is high. Assuming the State would prevail, the project timeline is likely to be delayed a minimum of four to eight months during the environmental review/preliminary plan stage while the matter is determined by the Court.

## Coalinga State Hospital Financial Obligations

The total project cost for Coalinga State Hospital is approximately $395 million. The State elected to sell Public Works Board Lease/Revenue Bonds to finance the project. The bonds were issued in the Spring of 2004. The 30-year bonds are secured by the site and physical facility and are reimbursed by revenue generated from lease payments received from the Department of Mental Health. A comprehensive review of the site and facility lease agreements is outside the scope of this study. Bond Counsel would need to determine debt service options and identify any subsequent financial or schedule impacts to a physical plant alterations project.

## Criteria for Facility Conversion

**Codes and Standards**

The Coalinga State Hospital is designed and constructed to conform to the following major codes and standards:

1995 California Building Code
1995 California Mechanical Code
1995 California Plumbing Code
1995 California electrical Code
1995 California Fire Code
California Code of Regulations, Title 19. Public Safety, State Fire Marshal
California Code of Regulations, Title 22 Social Security. Division 5, Licensing and Certification of Health Care Facilities
California Code of Regulations, Title 24. Americans with Disabilities Act Accessibility Guidelines (ADAAG) (minus elevator exception) or Uniform Accessibility Standards
State Administrative Manual
NFPA 101 Life Safety Code, Chapters 5 and 13, 1991 edition
Accreditation Manual for Hospitals. Joint Commission on Accreditation of Healthcare Organizations, 1997.

Any major alterations to the facility will need to conform to updated versions of the above listed codes and standards. For the purposes of this study it is assumed that the Level IV beds will be licensed as a distinct part Correctional Treatment Center (CTC non-acute). It is notable that when limiting the project to alterations of the existing structure it will be nearly impossible to meet the full standards of the updated codes, although "near compliance" can be achieved.

**Facility Narrative**

The following narrative identifies the issues associated with the conversion of a two 50 bed (100 beds total) Treatment Units at Coalinga State Hospital (CSH) into a 52 bed high custody/high security (Level IV) distant part Correctional Treatment Center (CTC) for the California Department of Corrections and Rehabilitation (CDCR).

▪ As previously stated in this report, CSH most closely aligns with a CDCR Level II facility. The Hospital was designed and constructed as a minimum-security facility

within a medium-security perimeter. While this approach meets the requirements of the Sexually Violent Predator (SVP) population, it clearly does not meet the physical plant standards set forth by the CDCR for a Level IV high custody/high security CTC inmate/patient population, and therefore, extreme alterations to the physical plant would be necessary.

- Despite all methodologies and modifications assumed to be utilized for the proposed project, it will be nearly impossible to meet the full standards of the CDCR for this facility type when limiting the work to remodeling, although "near compliance" can be achieved.

- Due to the nature of the proposed conversion, it has been determined by the project team (including DGS, DMH, CDCR, and the A/E team), from both the physical plant and operational points of view, that the proposed project must occur on the ground floor of the existing two-story building. This decision was due to structural limitations, inclusion of extensive plumbing and other infrastructure modifications, as well as basic operational concerns.

- While the Treatment Unit sleeping room wings are constructed with fully grouted and reinforced exterior walls and a number of load-bearing interior walls, the exterior walls of the core of the unit (containing program support components such as offices, nurse stations, showers and toilets rooms, storage, exam rooms, etc.) as well as most internal demising walls, are of minimum-security construction which do not comply with CDCR standards. The exterior shell of the treatment unit core cannot be further secured beyond the provision of bars or grating at the exterior windows.

- In order to maximize the internal security of the core as well as the sleeping unit wings, in addition to meeting – to the highest extent possible – the programmatic requirements of the CDCR's "standard" Level IV CTC, it will be necessary to essentially demolish the majority of the first floor internal walls of the Treatment Unit, with the exception of those walls that serve to support the basic structure of the building (load-bearing walls, steel columns, and framing), as well as those rooms that are currently utilized for the distribution of basic, essential utilities throughout the unit (including electrical, low-voltage and telecommunication rooms).

- The level of required demolition and subsequent reconstruction of the facility to CDCR-Level IV CTC standards will be extensive, including substantial if not complete demolition and replacement of the concrete slab, removal and replacement/reconfiguration of all internal systems (new electrical, mechanical, plumbing, low-voltage & security, fire & life safety, lighting, etc. to each sleeping room and all other reconfigured spaces), new "hardened" interior walls and finishes, and exterior window systems, etc.

- In terms of the architectural space program required to meet the proposed facility's goals, there are inherent inefficiencies borne out of the conversion under consideration. Given the existing building footprint and necessary existing structural and infrastructure components, preliminary studies make it apparent that the end result of the proposed conversion will consume approximately 30% more space than had it been constructed as a stand-alone, build-to-suit "standard" 64-bed CTC program facility.

- The building footprint and resulting available square footage is literally set in concrete (although new construction may be considered an option to meet end-program requirements), there is a deficit of approximately 5,000 square feet in overall space needs. In the following concept sketch, the programmed housing and treatment portions of the facility have been adequately accommodated; while the administration component falls approximately 50% short of CDCR program requirements (please refer to the Architectural Program Summary and Data Sheets chapter of this study). A separate stand-alone administration building could be built beyond the Treatment Unit being considered or administration space may be found within the existing facility, however, this investigation is beyond the scope of this study.

- CDCR and DMH have determined that a lethal fence would be inappropriate due to the SVP's civil commitment status and litigious nature; and due to environmental impacts on wildlife. The inclusion of lethal perimeter conflicts with DMH's treatment philosophy. In lieu of a lethal fence, CDCR guidelines require guard towers at 700' intervals along the overall security fence perimeter surrounding CSH, which would require the construction of six new towers (in addition to the two existing) at appropriate intervals along the line of the perimeter fence.

- The existing Treatment Unit design provides for two "internalized" exterior active courtyards and one passive (meditation garden) courtyard. These courtyards are shared between the first and second floors. In order to fulfill the requirements of the proposed Level IV CTC, both of the active courtyards will require the installation of fully fenced and/or walled (including a security mesh enclosure overhead) outdoor recreation ("walk alone") areas. One of the two courtyards will also need to serve as a vehicular sallyport and main entry to the facility. These proposed layouts are illustrated in the following concept sketch.

- The centrally located passive garden courtyard located between the Treatment Unit wings could remain for use by the second floor DMH SVP patients, although this area is landscaped with trees, lawn, shrubs, boulders and pathways that due to the proximity to the Level IV facility could be considered a security/safety risk. The implementation of the proposed project could preclude the use of these outdoor areas for the DMH patients located on the second floor of the unit, which may pose operational challenges for that area of CSH.

- Per the CDCR and DMH, the proposed CTC must remain isolated from the CSH facility. The issue of visitation from family/legal counsel and others must be considered. Facility access, circulation, security, etc. for these individuals will need to be explored in greater depth to develop an operationally acceptable solution.

- The issue of visual contact between second-floor civil commitment DMH residents and first-floor CDCR residents (i.e. from day rooms and sleeping rooms to the centralized passive garden at grade) was discussed among all stake-holders and determined not to be a major concern. Therefore, no suggestions have been made to attempt to remediate this issue.



KMD ARCHITECTS & PLANNERS
MARCH 10, 2006

FEASIBILITY STUDY - COALINGA STATE HOSPITAL-COLEMAN STUDY
CSH UNIT 8 CONVERSION TO CDCR ICF

**Comparison of CDCR Level IV Security Criteria v. Current Coalinga State Hospital Security**

The following table compares the major physical plant components of a CDCR's Level IV security standards and with the current physical plant components at Coalinga State Hospital. The photos that follow are construction photos that demonstrate some of the technical considerations outlined in the table below.

| ITEM | LEVEL IV REQUIREMENTS | CURRENT CSH | IMPACT |
|---|---|---|---|
| Security Fence Perimeter | Enhanced perimeter fence security required. (Lethal Electrified fence is typical) | Perimeter fence designed as Chuckwalla fence (without standard Guard Towers spacing). | Reconfigure existing fence line and add Guard Towers every 700'. |
| Vehicular Sallyport | Separate Vehicle Sallyport required. | Existing CSH Vehicle Sallyport not per CDC Standards. | Demolish existing Exercise Yard and construct new Vehicle Sallyport. |
| Pedestrian Sallyport | Sallyports into unit required. | Not provided. | Add multiple Pedestrian Sallyports and Control Points. |
| Building Perimeter | Walls equal to 8" cmu with rebar at 8" oc each direction required. | Exterior cmu walls at Treatment Unit wing provided. 4"x8"x16" solid block over 6" metal studs at Treatment Unit core provided. | At Treatment Unit Core, additional 8" reinforced wall will need to be added. All exterior doors and windows will need to be changed out for higher level security. |
| Exterior Window and Door Construction | High security windows and doors required. | Medium security windows and high security doors provided. | All exterior windows will need to be changed out for higher security level. |
| Interior Security Perimeters. | Walls equal to 8" cmu with rebar at 8" oc each direction required. | Gypsum plaster or abuse-resistant gyp board over metal studs provided. | Replace interior studs at security areas. |

| ITEM | LEVEL IV REQUIREMENTS | CURRENT CSH | IMPACT |
|---|---|---|---|
| Interior Security Perimeter windows and doors. | High security windows and doors required. | Medium security windows and doors provided. | Replace interior windows and doors in security areas. |
| Patient Toilets and sinks | Individual toilets and sinks required. | Communal washrooms with toilets and sinks provided. | Remove existing communal washroom and install individual toilets and sinks in Bedrooms. |
| Patient Showers | Gang showers on Unit wings required. | Central gang shower provided. | Remove existing gang shower and install gang showers at each Unit wing. |
| Mechanical System | Security grilles required at all security perimeter required. | Security grilles not provided. | Reconfigure ductwork for new layout and install security grilles. |
| Low Voltage System | Monitoring and control of security perimeter and Patient doors required. | Exterior perimeter doors monitoring. | Install low-voltage security system. |
| Nurse Call System | Each bedroom must be equipped with a nurse call system that is activated and deactivated from the corridor wall | Nurse call system in infirmary unit only. | Install specialized nurse call system in each bedroom. |
| | | | |



Coalinga State Hospital, note the rebar spacing is at 24 inches

The top photo is of an exterior wall of a typical Treatment Unit patient wing at Coalinga State Hospital, the bottom photo is of the an exterior wall at a typical CDCR CTC.  One of the most significant custody/security variances between CSH and the CDCR Level IV design guidelines is the amount of steel re-enforcement bar (rebar) within the masonry walls.  At CSH the rebar is spaced as necessary for structural re-enforcement, that is at 24 inches vertically and horizontally, CDCR Level IV design guidelines require that reinforcement bars be placed at 8 inches vertically and horizontally for custody/security reasons.



Vertical rebar at 8 Inches

CDCR Correctional Treatment Center



The top photo is of Coalinga State Hospital Treatment Unit door installation, the bottom photo is of CDCR CTC corridor. Note the difference between the grade of doors and frames. The CSH has installed heavy duty commercial grade doors, frames, and hardware. The patient bedrooms and most patient accessible areas within the CSH Treatment Unit are equipped with "storage room" locksets; i.e., the lockset is intended to keep patients "out". CDCR Level IV design guidelines require detention grade doors, frames and hardware. Detention Hardware is designed specifically to keep patients "in".





The top photo is of a typical Nurse Station on a Coalinga State Hospital Treatment Unit. The walls are constructed of high impact gypsum board, backed with security lath, over metal studs, finished with plaster and paint. The bottom photo is of the interior (the roof has not been framed) of a CDCR CTC. Note that the interior partition walls as well as the exterior walls are constructed of reinforced masonry.





The top photo is of a typical communal toilet room at Coalinga State Hospital Treatment Unit. Since the CSH patients are never "locked-in" the bedrooms, they have free access to the toilet room. The bottom photo is of a standard CTC bedroom, which includes toilet and sink fixtures within the secured cell. Conversion of the CSH patient bedrooms to secured and plumbed cells will require extensive demolition and reconstruction of the existing facility, including removal of the existing concrete slab to accommodate the new plumbing.



**Architectural Program Summary and Data Sheets**

The following table compares the architectural program areas of a "prototypical" 64-Bed CTC ICF to the proposed conversion of two 50-patient (100 Beds) Treatment Units at Coalinga State Hospital. The building footprint and resulting available square footage is literally set in concrete (although new construction may be considered an option to meet end-program requirements), there is a deficit of approximately 5,000 square feet in overall space needs. It is noted that not all Administration components will fit within the existing footprint of the Coalinga housing unit. A "best guess" has been made to accommodate as many areas as possible. It is feasible, although operational impacts would need to be mitigated, that the renovated facility may utilize a portion of the Coalinga State Hospital's Program Administration space. It is also assumed that the existing Coalinga Pharmacy will provide services to the Level IV CDCR patients.

| Room Name/Functional Area | Original 64-Bed ICF Program | | | Housing Unit #8 Conversion Program | | |
|---|---|---|---|---|---|---|
| | Program NSF | Qty. of Areas | Total NSF | Program NSF | Qty of Areas | Total NSF |
| **PATIENT HOUSING WINGS (4)** | | | | | | |
| Patient Room - wing type 1 | 135 | 30 | 4,050 | 155 | 28 | 4,340 |
| Patient Room (H.C. Access) - wing type 1 | 155 | 2 | 310 | 220 | 2 | 440 |
| Patient Room - wing type 2 | 135 | 30 | 4,050 | 155 | 26 | 4,030 |
| Patient Room (H.C. Access) - wing type 2 | 155 | 2 | 310 | 155 | 2 | 310 |
| Handwashing Station | 10 | 4 | 40 | 5 | 4 | 20 |
| Patient Shower | 45 | 8 | 360 | 45 | 8 | 360 |
| Interview Room | 100 | 4 | 400 | 300 | 4 | 1,200 |
| Total Net Subtotal for Four Housing Wings (NSF) | | | 9,520 | | | 10,700 |
| | | | | | | |
| **TREATMENT UNIT - CENTRALIZED AREAS** | | | | | | |
| | | | | | | |
| Nurses Station | 400 | 2 | 800 | 338 | 2 | 676 |
| Medication Room | 150 | 1 | 150 | 144 | 1 | 144 |
| Mental Health Observation Room | 135 | 2 | 270 | 185 | 2 | 370 |
| Mental Health Observation Room (HC Access) | 155 | 2 | 310 | 215 | 2 | 430 |
| Safety Room | 50 | 3 | 150 | 100 | 4 | 400 |
| Supervising Nurse | 100 | 1 | 100 | 144 | 1 | 144 |
| Supervising MTA | 100 | 1 | 100 | 144 | 1 | 144 |
| Group Room - Original Program | 610 | 3 | 1,830 | 610 | 2 | 1,220 |
| Group Room (Large) - Conversion Program | 0 | 0 | 0 | 870 | 1 | 870 |
| Recreation Therapy Room | 480 | 1 | 480 | 480 | 1 | 480 |
| Medical Exam/Treatment Room | 150 | 1 | 150 | 210 | 1 | 210 |
| Tub Room | 100 | 1 | 100 | 100 | 1 | 100 |
| Phlebotomy Chair Alcove | 15 | 1 | 15 | 15 | 1 | 15 |
| Patient Phone Alcove | 15 | 1 | 15 | 10 | 2 | 20 |
| Alcove Storage | 15 | 1 | 15 | 48 | 1 | 48 |
| Clean Utility/Linen Storage | 100 | 1 | 100 | 112 | 1 | 112 |
| Soiled Utility/Linen Storage | 100 | 1 | 100 | 112 | 1 | 112 |
| Staff Toilet | 50 | 1 | 50 | 50 | 2 | 100 |

| Housing and Treatment | Original 64-Bed ICF Program | | | Housing Unit #8 Conversion Program | | |
|---|---|---|---|---|---|---|
| Room Name/Functional Area | Program NSF | Qty. of Areas | Total NSF | Program NSF | Qty. of Areas | Total NSF |
| Patient Toilet | 50 | 2 | 100 | 50 | 2 | 100 |
| Janitor's Closet | 35 | 2 | 70 | 35 | 2 | 70 |
| Total Net Subtotal for Centralized Areas (NSF) | | | 4,905 | | | 5,765 |
| | | | | | | |
| SUPPORT SPACES | | | | | | |
| Patient Dining | | | | | | |
| Dining Room | 870 | 1 | 870 | 844 | 1 | 844 |
| Tray/Trash Collection | 10 | 1 | 10 | 10 | 1 | 10 |
| Food Staging | 20 | 1 | 20 | 20 | 1 | 20 |
| Support Areas | | | | | | 0 |
| General Storage | 768 | 1 | 768 | 792 | 1 | 792 |
| Supply Storage | 65 | 1 | 65 | 100 | 1 | 100 |
| Hazardous Waste Storage | 60 | 1 | 60 | 112 | 1 | 112 |
| Trash Storage | 125 | 1 | 125 | 126 | 1 | 126 |
| Janitor/Housekeeping Supply Storage | 90 | 1 | 90 | 120 | 1 | 120 |
| Clean Linen Receiving/Holding | 135 | 1 | 135 | 168 | 1 | 168 |
| Soiled Linen Holding | 100 | 1 | 100 | 112 | 1 | 112 |
| Telecommunications/Data Closet | 20 | 1 | 20 | 160 | 1 | 160 |
| Security | | | | | | 0 |
| Control Station | 140 | 1 | 140 | 140 | 1 | 140 |
| Gear/Equipment Storage | 80 | 1 | 80 | 80 | 1 | 80 |
| Staff Support Areas | | | | | | 0 |
| Staff Breakroom | 200 | 1 | 200 | 260 | 1 | 260 |
| Staff Lockers | 80 | 1 | 80 | 98 | 1 | 98 |
| Staff Toilets | 50 | 2 | 100 | 50 | 2 | 100 |
| Visitation | | | | | | 0 |
| Non-Contact Visitation - 3 (1 HC Access) | 0 | 0 | 0 | 350 | 1 | 350 |
| Sallyport | 0 | 0 | 0 | 198 | 1 | 198 |
| | | | 0 | | | 0 |
| | | | 0 | | | 0 |
| Total Net Subtotal for Support Services (NSF) | | | 2,863 | | | 3,790 |
| **Housing and Treatment: Total Functional Net Subtotal** | | | **17,288** | | | **20,255** |

| | Original 64-Bed ICF Program | | | Housing Unit #8 Conversion Program | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| PROGRAM ADMINISTRATION | | | | | | |
| Executive Director | 150 | 1 | 150 | 150 | 1 | 150 |
| Program Director | 125 | 1 | 125 | 125 | 1 | 125 |
| Hospital Admin. Resident II | 125 | 1 | 125 | 125 | 1 | 125 |
| Nursing Coordinator | 125 | 1 | 125 | 140 | 1 | 140 |
| Executive Secretary | 100 | 1 | 100 | 100 | 1 | 100 |
| Office Technician | 70 | 1 | 70 | 70 | 1 | 70 |
| Waiting | 15 | 2 | 30 | 15 | 2 | 30 |
| Functional Net Subtotal (NSF) | | | 725 | | | 740 |

| Administration Components | Original 64-Bed ICF Program | | | Housing Unit #8 Conversion Program | | |
|---|---|---|---|---|---|---|
| **LEVEL-OF-CARE TREATMENT STAFF** | | | | | | |
| Senior Psychologist | 125 | 1 | 125 | 200 | 1 | 200 |
| Staff Psychiatrist | 110 | 2 | 220 | 100 | 2 | 200 |
| Clinical Psychologist | 110 | 2 | 220 | 100 | 2 | 200 |
| Psych. Social Worker | 80 | 4 | 320 | 104 | 2 | 208 |
| Rehab Therapist | 80 | 4 | 320 | 74 | 3 | 222 |
| Functional Net Subtotal (NSF) | | | 1,205 | | | 1,030 |
| | | | | | | |
| **HEALTH INFORMATION MANAGEMENT** | | | | | | |
| Health Records Technician (HRT II) | 100 | 1 | 100 | 100 | 1 | 100 |
| Health Records Technician (HRT I) | 80 | 2 | 160 | 70 | 2 | 140 |
| Medical Transcriber | 64 | 1 | 64 | 70 | 1 | 70 |
| Office Technician - Typist (OT-T) | 70 | 1 | 70 | 70 | 1 | 70 |
| Medical Records Storage | 160 | 1 | 160 | 140 | 1 | 140 |
| Functional Net Subtotal (NSF) | | | 554 | | | 520 |
| | | | | | | |
| **PERSONNEL** | | | | | | |
| Associate Personnel Analyst (APA) | 120 | 1 | 120 | 0 | 0 | 0 |
| Personnel Services Specialist (PSS) | 80 | 1 | 80 | 0 | 0 | 0 |
| Office Technician - Typing (OT-T) | 70 | 1 | 70 | 0 | 0 | 0 |
| Personnel Storage | 120 | 1 | 120 | 0 | 0 | 0 |
| Functional Net Subtotal (NSF) | | | 390 | | | 0 |
| | | | | | | |
| **OTHER DMH STAFF POSITIONS** | | | | | | |
| Accounting Office Technician | 80 | 1 | 80 | 0 | 0 | 0 |
| Information Systems | | | | | | |
| AISA | 130 | 1 | 130 | 0 | 0 | 0 |
| Computer Network | 80 | 1 | 80 | 0 | 0 | 0 |
| Dietician | 80 | 1 | 80 | 0 | 0 | 0 |
| Housekeeping Supv. I | 80 | 1 | 80 | 0 | 0 | 0 |
| Functional Net Subtotal (NSF) | | | 450 | | | 0 |

* Not all Administration components will fit within the existing footprint of the existing housing unit. A "best guess" has been made to accommodate as many areas as possible. It is also possible that the renovated facility may utilize a portion of the main facility's Program Administration space.

| | | | | | | |
|---|---|---|---|---|---|---|
| **CDCR STAFF POSITIONS** | | | | | | |
| Correctional Counselor I | 100 | 1 | 100 | | | |
| Functional Net Subtotal (NSF) | | | 100 | | | 0 |
| | | | | | | |
| **STAFF SUPPORT** | | | | | | |
| Conference Room | 235 | 1 | 235 | 240 | 1 | 240 |
| Copier/Supply Storage | 85 | 2 | 170 | 112 | 1 | 112 |
| Training | | | | | | |
| Training Officer | 100 | 1 | 100 | 0 | 0 | 0 |
| Training Room | 900 | 1 | 900 | 0 | 0 | 0 |
| Men's Staff Toilet | 155 | 1 | 155 | 0 | 0 | 0 |
| Women's Staff Toilet | 155 | 1 | 155 | 0 | 0 | 0 |
| Janitor Closet | 25 | 1 | 25 | 40 | 1 | 40 |
| Drinking Fountain | 10 | 1 | 10 | 10 | 1 | 10 |
| Functional Net Subtotal (NSF) | | | 1,750 | | | 402 |
| **Administration: Total Functional Net Subtotal** | | | **5,174** | | | **2,692** |

| Administration Area | Original 64-Bed ICF Program | | Housing Unit #8 Conversion Program | |
|---|---|---|---|---|
| | | | | |
| NOTE: Pharmacy Services have not been provided due to lack of available space and proposed utilization of the main CSH Pharmacy. | | | | |

| Room Name/Functional Area | Original 64-Bed ICF Program | | | Housing Unit #8 Conversion Program | | |
|---|---|---|---|---|---|---|
| | Program NSF | Qty. of Areas | Total NSF | Program NSF | Qty of Areas | Total NSF |
| EXTERIOR FUNCTIONAL AREAS | | | | | | |
| Outdoor Exercise | | | | | | |
| Yard Access/Sallyport | 380 | 2 | 760 | 380 | 2 | 760 |
| Group Exercise Yards | 3,500 | 2 | 7,000 | 3,500 | 2 | 7,000 |
| Small Exercise Yards | 150 | 2 | 300 | 150 | 2 | 300 |
| Outdoor Exercise Subtotal (GSF) | | | 8,060 | | | 8,060 |
| | | | | | | |
| Food Service | | | | | | |
| Exterior Grade Freezer | 125 | 1 | 125 | 125 | 1 | 125 |
| Outdoor Foodservice Subtotal (GSF) | | | 125 | | | 125 |
| | | | | | | |
| Total Exterior Functional Area (GSF) | | | 8,185 | | | 8,185 |

## Conceptual Level IV Unit Plan

### Convert Two Existing CSH Units (100-Beds) to Level IV Unit (52-Beds)

Based on the architectural program previously outlined this study has determined that two 50-bed SVP units (100 beds total) could be converted to one 52-bed high custody/high security Level IV unit.

Keeping the building footprint intact there is a deficit of approximately 5,000 square feet in overall space needs. It is noted that not all Administration components will fit within the existing footprint of the Coalinga housing unit. An attempt has been made to accommodate as many areas as possible. It is feasible, although operational impacts would need to be mitigated, that the renovated facility may utilize a portion of the Coalinga State Hospital's Program Administration space. It is also assumed that the existing Coalinga Pharmacy will provide services to the Level IV CDCR patients.

In the concept sketch, the programmed housing and treatment portions of the facility have been adequately accommodated; while the administration component falls approximately 50% short of CDCR program requirements. A separate stand-alone administration building could be built beyond the Treatment Unit being considered or

administration space may be found within the existing facility, however, this investigation is beyond the scope of this study.

**Estimated Project Costs**

Based on quantity take-offs of the conceptual floor plan and knowledge of the existing facility capacities the total project cost, which includes funds for architectural and engineering design services, project management, inspection services, regulatory review, premium for working within an operating security perimeter, demolition, construction, construction contingency, and construction escalation is estimated to be approximately $35 million. Refer to Appendix A for cost estimate details.

At the request of CDCR, DGS has determined the cost to construct a lethal perimeter fence at CSH would be approximately $8,000,000, which is approximately $600,000 more than the cost to enhance the existing perimeter with guard towers. The inclusion of a lethal perimeter as part of an alterations project will extend the California Environmental Quality Act process timeline, and therefore the total project duration and cost. If the CEQA process determines that mitigation habitat is needed, additional time and cost impacts will be encountered to identify and purchase the necessary habitat. A variety of technical issues pertaining to the underground utility loop locations and continued operation of the security electronic monitoring detection systems will complicate and extend the design and construction installation process.

**Estimated Project Timeline**

The project timelines assume a project authorization via the Budget Act of 2007/2008. The timelines include durations for selecting and retaining architects and engineers, developing an architectural program and preliminary plans, development of CEQA documents, a public outreach component, approval by the State Public Works Board, development of working drawings, regulatory review, construction bid process, construction and activation. Two project timeline scenarios were developed. The first assumes a "best case" project timeline, that is, one that flows from one phase to the next with minimum disruption. The other assumes that at least a couple of delays will be encountered.

Per the "best case" project scenario the earliest beds could be activated is late June 2012. This scenario includes only a minor time contingency in the form of a delay due to public opposition during the CEQA process. The other task durations are aggressive, but obtainable.

In the "likely case" scenario the earliest beds could be activated is November 2013. It assumes that delays will be experienced during project authorization, the CEQA process, regulatory review, the public bid process and construction. The task durations have been adjusted to carry a small contingency.

If the Departments determine that a lethal electrified perimeter should be pursued the "likely case" scenario timeline will extend a minimum of six months to May 2014 due to a more rigorous CEQA process and the complexities of the construction sequencing required to install the perimeter in an operating facility.

Refer to the Appendix B for timeline details.

## Conclusion

Due to the extreme alterations required to retrofit 100 CSH SVP beds to accommodate 52 CDCR Level IV high custody/high security beds, both the project duration and the total costs will be significant. Based on the information reviewed and provided by the CDCR and DMH, it is estimated that the "best case" project timeline facility activation would occur in late June 2012, with a total project cost estimated to be $35 million. In a second scenario, the "likely case" project timeline facility activation would occur in November 2013, with an increased cost due to additional legal fees and construction escalation. If a lethal electrified perimeter is installed the timeline will likely extend to May 2014 with correspondingly escalated construction costs.

Many challenges may further impact the timeline and cost. The community opposition to "high custody/high security" patients being housed at CSH is anticipated to be high. Delays due to legal actions filed by the community will postpone construction/activation and escalate the project cost. Other policy and operational elements that may extend the timeline and increase the cost include: community mitigations, segregation of patient populations, Department managerial and operational responsibilities, impact to current labor agreements, debt service options and limitations, and the impact of bed reduction on DMH's statewide population management.

# APPENDIX A

## COST ESTIMATE DETAIL

**DEPARTMENT OF GENERAL SERVICES**
**REAL ESTATE SERVICES DIVISION - PROJECT MANAGEMENT BRANCH**
**PROJECT COST SUMMARY**

| | | | |
|---|---|---|---|
| PROJECT: | Conversion to I.C.F. Facility | CONCEPT ESTIMATE: | C6DMH47AP |
| LOCATION: | Coalinga | EST. / CURR'T. CCCI: | 4603 / 4603 |
| CUSTOMER: | Department of Mental Health | DATE ESTIMATED: | 3/27/2006 |
| DESIGN BY: | N/A | ABMS NO: | N/A |
| PROJECT MGR: | P. McCormick | PREPARED BY: | JDE |
| TEMPLATE: | Design / Bid / Build - Bond | DOF PROJ. I.D. NO.: | N/A |

**DESCRIPTION**

The project consists of the design, demolition, and reconstruction required to convert two 50 bed (100 beds total) Treatment Units at Coalinga State Hospital into a 52 bed high custody/high security (Level IV) distant part Correctional Treatment Center (CTC) for the California Department of Corrections and Rehabilitation.

**ESTIMATE SUMMARY**

| | |
|---|---|
| Sitework | $5,716,900 |
| Demolition | $1,359,400 |
| Substructure | $739,100 |
| Structure | $158,300 |
| Enclosure, Vertical | $861,500 |
| Enclosure, Horizontal | $25,400 |
| Support Items | $177,300 |
| Internals, Vertical | $2,734,500 |
| Internals, Vertical | $1,326,400 |
| Finishes, Special | $80,400 |
| Interiors | $337,800 |
| Specialties | $253,300 |
| Equipment & Furniture | $126,700 |
| Special Construction | $0 |
| Conveying | $52,400 |
| Plumbing/F/Protection | $1,375,800 |
| H.V.A.C. | $1,920,900 |
| Electrical | $2,422,600 |
| 0 | $0 |
| 0 | $0 |

| | |
|---|---|
| **ESTIMATED TOTAL CURRENT COSTS:** | **$19,669,000** |
| Adjust CCCI From 4603 to 4603 | $0 |
| **ESTIMATED TOTAL CURRENT COSTS ON MARCH 2006** | **$19,669,000** |
| Escalation to Start of Construction  48   Months @  0.42% / Mo.: | $3,965,300 |
| Escalation to Mid Point  12   Months @  0.42% / Mo.: | $1,191,200 |
| **ESTIMATED TOTAL CONTRACTS:** | **$24,825,500** |
| Contingency At:  7% | $1,737,800 |
| **ESTIMATED TOTAL CONSTRUCTION COST:** | **$26,563,300** |

## SUMMARY OF COSTS
## BY PHASE

| | |
|---|---|
| PROJECT: Conversion to I.C.F. Facility | CONCEPT ESTIMATE: C6DMH47AP |
| LOCATION: Coalinga | DATE ESTIMATED: 3/27/2006 |
| ABMS #: N/A | |

| | | |
|---|---|---|
| CONSTRUCTION DURATION: | 24 MONTHS | |
| ESTIMATED CONTRACT: | $24,825,500 | $24,825,500 |
| CONSTRUCTION CONTINGENCY: | $1,737,800 | $1,737,800 |
| TOTAL: | $26,563,300 | $26,563,300 |

| CATEGORY | ACQUISITION STUDY 00 | PRELIMINARY PLANS 01 | WORKING DRAWINGS 02 | CONSTRUCTION 03 | TOTAL |
|---|---|---|---|---|---|
| **ARCHITECTURAL AND ENGINEERING SERVICES** | | | | | |
| A&E Design | | $1,037,700 | $1,146,900 | $546,200 | $2,730,800 |
| Construction Inspection | | | | $993,000 | $993,000 |
| Construction Inspection Travel | | | | $372,400 | $372,400 |
| PSCA & Contract Management | | $25,000 | $12,000 | $35,000 | $72,000 |
| Advertising, Printing and Mailing | | $0 | $35,700 | | $35,700 |
| Construction Guarantee Inspection | | | | $124,100 | $124,100 |
| **SUBTOTAL A&E SERVICES** | $0 | $1,062,700 | $1,194,600 | $2,070,700 | $4,328,000 |
| | | | | | |
| **OTHER PROJECT COSTS** | | | | | |
| Special Consultants (Soils/Survey) | | $372,400 | $124,100 | $324,100 | $820,600 |
| Materials Testing | | | | $198,600 | $198,600 |
| Project/Construction Management | | $164,140 | $208,700 | $372,700 | $745,540 |
| Contract Construction Management | | | $186,200 | $1,055,100 | $1,241,300 |
| Site Acquisition Cost & Fees | | | | | $0 |
| Agency Retained Items | | | | $192,000 | $192,000 |
| DVBE Assessment | | | | $66,700 | $66,700 |
| School Checking | | | $0 | | $0 |
| Hospital Checking | | | $372,400 | | $372,400 |
| Essential Services | | | $0 | | $0 |
| Handicapped Checking | | | $4,800 | | $4,800 |
| Environmental Document (Neg. Dec.) | | $25,000 | | | $25,000 |
| Due Diligence | | | | | $0 |
| Other Costs - (SFM) | | $2,760 | $9,200 | $53,800 | $65,760 |
| Other Costs - (Permit/Regulatory Fees) | | | | | $0 |
| Other Costs - (Group 2 Equipment) | | | | | $0 |
| **SUBTOTAL OTHER PROJECT COSTS** | $0 | $564,300 | $905,400 | $2,263,000 | $3,732,700 |
| | | | | | |
| TOTAL ESTIMATED PROJECT COST | $0 | $1,627,000 | $2,100,000 | $30,897,000 | $34,624,000 |
| LESS FUNDS TRANSFERRED | $0 | $0 | $0 | $0 | $0 |
| LESS FUNDS AVAILABLE NOT TRANSFERRED | $0 | $0 | $0 | $0 | $0 |
| CARRY OVER | $0 | $0 | $1,627,000 | $3,727,000 | $5,354,000 |
| BALANCE OF FUNDS REQUIRED | $0 | $1,627,000 | $3,727,000 | $34,624,000 | $34,624,000 |

FUNDING DATA & ESTIMATE NOTES

| PROJECT: | Conversion to I.C.F. Facility | | CONCEPT ESTIMATE: | C6DMH47AP |
|---|---|---|---|---|
| LOCATION: | Coalinga | | DATE ESTIMATED: | 3/27/2006 |
| ABMS #: | N/A | | | |

## FUNDING DATA

| Chapter / Item | Phase | Amount | Totals |
|---|---|---|---|
| **Fund Transfers** | | | |
| N/A | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| **Total Funds Transferred** | | | $0 |
| | | | |
| **Funds Available Not Transferred** | | | |
| N/A | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| 0 | 0 | $0 | |
| **Total Funds Available not Transferred** | | | $0 |
| | | | |
| **Total Funds Transferred and Available** | | | $0 |

## ESTIMATE NOTES

1. The construction costs in this estimate are indexed from the CCCI Index as of the date of estimate preparation to the CCCI index that is projected as of MARCH 1, 2006. The project estimate is then escalated for a 12 month period to an assumed construction midpoint. Additionally, the project has been escalated to the assumed start of construction.

2. The Agency may have retained items that are not included in this estimate. RESD has not verified Agency retained pricing.

3. Special Consultant costs include Survey w/ Topo Map, Geotechnical, Asbestos / Lead Survey & Monitoring, and Utility Design Fees.

4. 0

5. 0

6. 0

7. 0

8. 0

9. 0

10. 0

# APPENDIX B

# CONCEPTUAL TIMELINES



## Coalinga Coleman Bed Conversion - Best Case Scenario

| ID | | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 1 | | Budget Authority 2007/2008 | 1 day | Mon 07/02/07 | Mon 07/02/07 |
| 2 | | Select/Retain Architects/Engineers | 20 wks | Tue 07/03/07 | Mon 11/19/07 |
| 3 | | Architectural Programming | 8 wks | Tue 11/20/07 | Mon 01/14/08 |
| 4 | | Preliminary Plans | 18 wks | Tue 01/15/08 | Mon 05/19/08 |
| 5 | | Public Outreach/CEQA Documentation | 26 wks | Tue 11/20/07 | Mon 05/19/08 |
| 6 | | Court Action | 26 wks | Tue 05/20/08 | Mon 11/17/08 |
| 7 | | PWB Approval | 6 wks | Mon 12/01/08 | Fri 01/09/09 |
| 8 | | Working Drawings | 26 wks | Mon 01/12/09 | Fri 07/10/09 |
| 9 | | Regulatory Review | 12 wks | Mon 07/13/09 | Fri 10/02/09 |
| 10 | | Bid/Award | 26 wks | Mon 10/05/09 | Fri 04/02/10 |
| 11 | | Construction | 104 wks | Mon 04/05/10 | Fri 03/30/12 |
| 12 | | Activation | 12 wks | Mon 04/02/12 | Fri 06/22/12 |
| 13 | | Commence Patient Move-In | 1 day | Mon 06/25/12 | Mon 06/25/12 |

Project: Base schedule
Date: Fri 03/24/06

| | | | | | |
|---|---|---|---|---|---|
| Task | | Summary | | Rolled Up Progress | |
| Split | | Rolled Up Task | | External Tasks | |
| Progress | | Rolled Up Split | | Project Summary | |
| Milestone | | Rolled Up Milestone | | | |

Page 1



## Coalinga Coleman Bed Conversion - Likely Case Scenario

| ID | ❶ | Task Name | Duration | Start | Finish |
|----|----|-----------|----------|-------|--------|
| 1 | | Budget Authority 2007/2008 | 1 day | Tue 09/04/07 | Tue 09/04/07 |
| 2 | | Select/Retain Architects/Engineers | 20 wks | Wed 09/05/07 | Tue 01/22/08 |
| 3 | | Architectural Programming | 8 wks | Wed 01/23/08 | Tue 03/18/08 |
| 4 | | Preliminary Plans | 18 wks | Wed 03/19/08 | Tue 07/22/08 |
| 5 | | Public Outreach/CEQA Documentation | 26 wks | Wed 01/23/08 | Tue 07/22/08 |
| 6 | | Court Action | 52 wks | Wed 07/23/08 | Tue 07/21/09 |
| 7 | | PWB Approval | 6 wks | Mon 08/03/09 | Fri 09/11/09 |
| 8 | | Working Drawings | 26 wks | Mon 09/14/09 | Fri 03/12/10 |
| 9 | | Regulatory Review | 16 wks | Mon 03/15/10 | Fri 07/02/10 |
| 10 | | Bid/Award | 32 wks | Mon 07/05/10 | Fri 02/11/11 |
| 11 | | Construction | 130 wks | Mon 02/14/11 | Fri 08/09/13 |
| 12 | | Activation | 12 wks | Mon 08/12/13 | Fri 11/01/13 |
| 13 | | Commence Patient Move-In | 1 day | Mon 11/04/13 | Mon 11/04/13 |

| | | | | |
|---|---|---|---|---|
| Project: Base schedule | Task | | Summary | | Rolled Up Progress |
| Date: Fri 03/24/06 | Split | | Rolled Up Task | | External Tasks |
| | Progress | | Rolled Up Split | | Project Summary |
| | Milestone | ◆ | Rolled Up Milestone | ◇ | |



# Coalinga Coleman Bed Conversion - Likely Case Scenario w/ E-Fence

| ID | ❶ | Task Name | Duration | Start | Finish |
|----|---|-----------|----------|-------|--------|
| 1 | 📅 | Budget Authority 2007/2008 | 1 day | Tue 09/04/07 | Tue 09/04/07 |
| 2 | | Select/Retain Architects/Engineers | 20 wks | Wed 09/05/07 | Tue 01/22/08 |
| 3 | | Architectural Programming | 8 wks | Wed 01/23/08 | Tue 03/18/08 |
| 4 | | Preliminary Plans | 20 wks | Wed 03/19/08 | Tue 08/05/08 |
| 5 | | Public Outreach/CEQA Documentation | 52 wks | Wed 01/23/08 | Tue 01/20/09 |
| 6 | | Court Action | 52 wks | Wed 01/21/09 | Tue 01/19/10 |
| 7 | 📅 | PWB Approval | 6 wks | Wed 01/20/10 | Tue 03/02/10 |
| 8 | | Working Drawings | 26 wks | Wed 03/03/10 | Tue 08/31/10 |
| 9 | | Regulatory Review | 16 wks | Wed 09/01/10 | Tue 12/21/10 |
| 10 | | Bid/Award | 32 wks | Wed 12/22/10 | Tue 08/02/11 |
| 11 | | Construction | 134 wks | Wed 08/03/11 | Tue 02/25/14 |
| 12 | | Activation | 12 wks | Wed 02/26/14 | Tue 05/20/14 |
| 13 | | Commence Patient Move-In | 1 day | Wed 05/21/14 | Wed 05/21/14 |

Project: Base schedule
Date: Tue 04/04/06

| | | | | | |
|---|---|---|---|---|---|
| Task | ▬▬▬ | Summary | ▬▬▬ | Rolled Up Progress | ▬▬▬ |
| Split | ·········· | Rolled Up Task | ▬▬▬ | External Tasks | ▬▬▬ |
| Progress | ▬▬▬ | Rolled Up Split | ·········· | Project Summary | ◄──► |
| Milestone | ◆ | Rolled Up Milestone | ◇ | | |

Page 1