PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

No.: Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OBJECTIONS TO
DEFENDANTS' INPATIENT, MHCB
AND EOP BED PLANS**

**HEARING**

Date:        April 26, 2006
Time:        3:30 pm
Location:   Courtroom 4

The Honorable Lawrence K. Karlton

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

ARGUMENT .......................................................................................................8

I.     THE COURT SHOULD APPROVE DEFENDANTS' LONG RANGE PLAN FOR INTERMEDIATE AND ACUTE INPATIENT BEDS AND ORDER DEFENDANTS TO IMPLEMENT THIS PORTION OF THEIR PLAN ...............8

II.    DEFENDANTS' INTERIM PLAN FOR ICF BEDS IS INADEQUATE AND THE COURT SHOULD REJECT IT .........................................................10

    A,    Defendants' Plan for Interim Expansion of Level IV ICF Beds is Inadequate And the Court Should Order Defendants to Maintain the Level IV Treatment Program At CMF while Moving Forward With An Expanded Level IV Program at SVSP. .......................................................10

    B.    DMH Has Not Yet Provided a Single One of the 50 Promised Beds At Coalinga State Hospital for CDCR Inmate-Patients, And Appears to Be Reluctant to Provide Such Care at CSH or at ASH. ..........................11

II.    DEFENDANTS' PLAN TO EXPAND MHCB CARE MUST BE REJECTED BECAUSE IT DOES NOT CREATE ANY NEW PERMANENT MHCB BEDS AND IT DOES NOT DO ENOUGH TO EXPEDITE THE CONSTRUCTION AND LICENSING OF PREVIOUSLY APPROVED BEDS. ..............................17

IV.    DEFENDANTS' EOP BED EXPANSION PLAN DOES NOT ADEQUATELY ADDRESS THE SHORTAGE OF EOP BEDS AND DOES NOT ADEQUATELY ADDRESS THE NEED FOR TREATMENT SPACE .....20

CONCLUSION ...................................................................................................22

1

## **INTRODUCTION**

2    Governor Schwarzenegger and the other state officials responsible for compliance with

3    the remedial Orders of this Court have, once again, demonstrated their inability or

4    unwillingness to seriously address the unconstitutional and dangerous current conditions in the

5    CDCR.  These conditions result in needless deaths, injuries, pain and suffering among the

6    plaintiff class, prisoners with serious mental illness incarcerated in California's prisons.

7    Defendants and related state agencies, such as the Department of Mental Health, have come

8    forward with excuses, finger-pointing and delay, coupled with promises of as yet unapproved

9    construction projects "anticipated" to be completed in _2011_.  See Defendants 4/17/06 Plan to

10   Expand Inpatient and MHCB Beds ("Defendants' Plan").  While we fully endorse the long-

11   range proposed projects, it is far too little and far too late to affect the critical _current_ need

12   which Defendants' plan leaves largely unaddressed.

13   The long-range projects are necessary but not sufficient to address the need projected in

14   defendants' latest population reports (which, despite the Court Order, are _not_ taken into

15   account in the Bed Plan).  In addition, the Court must assure that the Governor and all those

16   associated with each and every aspect of these projects take all steps necessary to accelerate

17   the schedule so that these overdue resources rapidly become functioning, useful and fully-

18   staffed mental health treatment beds and not merely expensive, empty or underutilized

19   buildings, which provide little or nothing for the plaintiff class.

20   The record in this case, however, is already established:  defendants are unable or

21   unwilling to address these ongoing Constitutional violations even when ordered to do so by the

22   Court.  Critical aspects of the mental health delivery system are treated as "ordinary business"

23   of the State, subject to the usual snail's pace, bureaucratic wrangling, turf wars and budget

24   manipulations.  The defendants are apparently comfortable and unconcerned with what they

25   have euphemistically identified as "gaps" in their bed plans:  years and years where

26   defendants, with actual knowledge of a serious unmet need for treatment at the highest levels

27   of mental health care, consciously and deliberately ask this Court to approve a plan to _not_

28   provide the required mental health care.  Defendants are asking the Court to endorse conduct

1   that in and of itself violates the Eighth Amendment.  This the Court must not do.

2       Under these extraordinary circumstances of runaway prison overcrowding and

3   acknowledged inability on the part of defendants to address their Constitutional duties, the

4   Court must consider additional remedies to protect the Constitutional right to be free from

5   cruel and unusual punishment of the more than 30,000 currently identified plaintiff class

6   members.  The available options include fines, population caps, receivership and contempt.  In

7   addition, the Court must add the Director of the Department of Mental Health, Stephen W.

8   Mayberg, as a party.  DMH will not and does not accept any direct responsibility for providing

9   prompt access to inpatient psychiatric care for the plaintiff class.

10      Judge Henderson's October 3, 2005 Findings of Fact and Conclusions of Law Re:

11  Appointment of Receiver, <u>Plata v. Schwarzenegger</u>, No. C 01-1351 (N.D. Cal.), 2005 WL

12  2932253, is directly relevant to the question before this Court:  Do these defendants have the

13  will, the skills, the ability and the power to plan, fund and implement the Court orders

14  necessary to remedy the ongoing Constitutional violations?  The answer is clearly no.  The Bed

15  Plan submitted by defendants is certainly not a basis for this Court to have confidence in these

16  defendants.

17      Defendants have not complied with Paragraph 3 of this Court's March 3, 2006 Order.

18  3/3/06 Order, ¶ 3.  The Bed Plan does *not* provide "acute and intermediate beds for all

19  seriously mentally ill inmates in the CDCR clinically determined to be in need of these levels

20  of inpatient care."  It is not based on "updated population projections" and does not fully

21  address "interim and long-range needs."  *Id.*  While a study of Coalinga was included, the

22  study is *not* "a reasoned report on the feasibility – or infeasibility – of the use of some portion

23  of that facility for the inpatient treatment of Level III and/or IV CDCR inmates."  *Id.*

24      Nor have defendants complied with Paragraph 5 of the March 3, 2006 Order.  The Bed

25  Plan does *not* provide "for the provision of Mental Health Crisis Beds for all seriously ill male

26  and female inmates in CDCR within 24 hours of a clinical determination that they require that

27  level of mental health care."  3/3/06 Order, ¶ 5.  It is not based on "updated population

28  projections" and does not fully address "interim and long-range needs."  *Id.*  Defendants

1   conclude that they do not need any more MHCB beds despite the fact that plaintiff class

2   members are being housed – and are dying – in dangerous and inappropriate locations while

3   they await transfer to nonexistent MHCB and DMH beds.

4        Defendants' Plan apparently rejects (or ignores?) a specific direction in ¶5 of the

5   Court's Order to address the immediate severe shortage of MHCB beds. The Court ordered

6   defendants to include a plan "to accelerate the staffing and licensing of the new MHCB unit at

7   Kern Valley State Prison and the new MHCB Unit at CSP-Sacramento by June 30, 2006, as

8   well as a plan for expediting the construction, staffing and licensing of the new MHCB unit at

9   California Medical Facility." There is no plan to staff and license these MHCB units by June

10  30, 2006. In fact, the "target date for the SAC MHCB licensing survey is August 15, 2006,"

11  there is no target date listed for KVSP at all and the CMF project is targeted for a survey on

12  August 15, 2008. 4/17/06 Plan at Enclosure VII.

13                                    BACKGROUND

14       Defendants' mental health care system is currently experiencing a severe shortage of

15  beds at nearly every level of care, including: (1) Mental Health Crisis Beds ("MHCBs"),

16  which are units inside prisons where mentally ill individuals receive treatment for suicidality

17  and other acute mental health crises in a licensed setting with rich mental health staffing and

18  24-hour nursing care, (2) Intermediate Care Facility Beds ("ICF beds"), which are inpatient

19  mental health treatment units operated by the Department of Mental Health ("DMH") that

20  provide diagnostic and treatment programs for severely mentally ill individuals, (3) Acute

21  Psychiatric Program Beds ("APP beds"), which are acute inpatient beds operated by DMH for

22  individuals having a severe mental health crisis which cannot be stabilized adequately in an

23  MHCB unit, and (4) Enhanced Outpatient Program Beds ("EOP beds") sheltered treatment

24  programs within CDCR institutions that provide long-term housing and treatment programs

25  that offer a minimum of 10 hours a week of therapeutic programming in a safe environment.

26  The shortage in each of these categories is extremely serious: Each month, several hundred

27  inmates are referred for MHCB care but cannot be placed. Kahn Dec. ¶ 15 and Ex. J. There is

28  a current waiting list for ICF care of 123 inmates, even though all indications are that many

1    inmates need inpatient care are not being referred. Kahn Dec. ¶ 4 and Ex. D. Finally, there is

2    a current EOP bed shortage that, even with the 370 new EOP beds that defendants plan to open

3    by January 2007, will still number nearly 1100 beds in Fiscal Year 2007-2008. See 4/17/06

4    Plan at Enclosure II.

5        After two failed efforts and a year of delay, defendants have now filed their third plan to

6    increase access to inpatient DMH beds. See Defendants' Plan. Defendants' inadequate plan

7    includes a symbolic but useless component to "expedite" the construction of MHCB beds,

8    nearly two years after they first became aware of the growing and dangerous shortage in this

9    area, and a component to address a small part of the massive EOP bed shortage. See

10   Defendants' Plan at 9-11.

11       These severe bed shortages are having catastrophic consequences for members of the

12   *Coleman* class. Because of the shortages, inmates who are intensely suicidal or psychotic

13   languish in inappropriate locations where they cannot access treatment, and where their mental

14   health deteriorates. There are a number of cases in recent years where the denial of access to

15   inpatient or MHCB care contributed to a suicide, or to serious self-inflicted injury. Declaration

16   of Jane Kahn in Support of Plaintiffs' Objections to Inpatient and MHCB Bed Plan ("Kahn

17   Dec."), ¶¶ 11, 14, 18, 21, 22; see also Special Master's Draft 2004 Suicide Report at 6 (draft

18   finding to which defendants have not objected that *During the year, a significant number of*

19   *inmates who were referred or should have been referred to higher levels of care, including*

20   *DMH, were not considered for referral, were not referred, had their referral cancelled or were*

21   *waiting transfer pursuant to a referral when they died.*").

22       These bed shortages are also contributing to the extremely high 2005 suicide rate of 26

23   per 100,000, which is significantly higher than the national average of 14 suicides per 100,000.

24   Kahn Dec. ¶ 23. The CDCR suicide rate has been significantly higher than the national

25   average in each of the last three years. Kahn Dec. ¶ 24. Moreover, in the first three months of

26   2006, there have been 13 suicides – an average monthly rate that is even higher than the rate in

27   2005. *Id.* Conditions for *Coleman* class members are becoming steadily more dangerous due

28   to increasing crowding and continuing staff shortages, problems for which there is no solution

in sight.  Kahn Dec. ¶ 3 and Ex. C (October 25, 2005 Dovey Memo) and Ex. A (Spring 2006 population projections stating that on "June 30, 2011, the population is projected to be 193,195, which is 11,721 (6.5 percent) higher than [projected in] Fall 2005.").

The severe current bed shortages require that defendants set aside business as usual and undertake urgent efforts to reform and expand their mental health bed system.  The Court must act now to ensure that defendants develop and implement appropriate solutions to the current bed crisis:

- The Court should approve defendants' long term plan to expand ICF beds and APP beds, and order defendants to implement that portion of their plan.  While accepting the long term plan, the Court should order defendants to report on what steps they can take to speed the opening of these new long term beds, as well as any steps that can be taken to ensure timely opening of the beds, which are currently scheduled to open five years from now, in June of 2011.

- The Court should rule that the interim steps in defendants' plan to expand ICF beds are inadequate and order defendants to submit a new plan within 30 days that will create significantly more Level IV ICF beds in the near future.

- To that end, the Court should rule that due to the inadequacy of the Plan's interim measures to expand Level IV ICF beds, defendants may not close the 36-bed Level IV ICF program at CMF which they are currently seeking permission to close and move to SVSP.  In addition, defendants should be ordered to move forward with the opening of the 36-bed Level IV ICF program currently scheduled to open in May of 2006 at SVSP, and to double the size of that program as soon as possible so that it can accommodate 72 Level IV inmates.

- The Court should find that defendants' assessment of their need for MHCB beds is inadequate, and should order defendants to conduct a new assessment of their future need for MHCB beds.  In planning for future MHCB capacity, defendants should be ordered to plan to build enough MHCB beds to eliminate the use of unlicensed Outpatient Housing Units ("OHUs") for the observation and treatment of mentally ill

inmates, and to account for the large monthly list of MHCB cases that are unable to secure placement.

- The Court should order defendants to recalculate their future needs for mental health beds of various types using the current Spring 2006 Population Projections, which project a June 2006 population that is 2,865 (1.7 percent) higher than the Fall 2005 Population Projection defendants used in developing their plans, a June 2007 population of 177,738, which is 5,719 (3.3 percent) higher than the Fall 2005 Population Projections, and a June 2011 population of 193,195, which is 11,721 (6.5 percent) higher than Fall 2005 Population Projections.

- The Court must direct the Governor's Office and the Department of Mental Health to keep the Court and the parties in *Coleman* apprised of any CRIPA settlement position DMH takes in negotiations with the United States Department of Justice that could impact the ability of DMH to provide care to the Coleman class – prior to agreeing to any such terms.  See Defendants' Plan at Enclosure XII.  In addition, the Court should order that Steven W. Mayberg, the Director of DMH, be added as a defendant.

- The Court should order defendants to immediately take additional steps to expedite the opening of planned MHCB beds system-wide, and to expedite the opening of interim beds.

- The Court should order defendants to develop a plan within 60 days to eliminate the entire EOP beds shortage projected in Enclosure II to Defendants' Plan (as adjusted by the most recent population projections) no later than 2011, and to construct sufficient program space for the new EOP programs on an expedited basis – well before the currently planned date for completion of construction of such space of June of 2011.

- The Court should order defendants to develop a plan within 30 days to address the backlog of mentally ill in reception centers.  The plan should include, at minimum, clinical staffing and treatment space to assure that EOP patients receive EOP level of care no later than 60 days after they are identified or earlier, if necessary.  The Plan should also address acceleration of the remedial and intermediate sanctions provisions

-6-

of the <u>Valdivia</u> Injunction (which the Governor halted in 2005) to divert technical

parole violators from prisons and plans to improve pre-release planning, parole

services and diversion programs for the seriously mentally ill.  That is, the plan should

address efforts to limit recidivism and to limit population in light of defendants'

inability to comply with the Constitutional mandates for minimally adequate mental

health care.

In general, while the April 17, 2006 Bed Plan addresses some prior gaps in defendants' plans,

including the need to expand acute care and to expand acute and inpatient care for women, the

new plans are disappointing in that they appear to focus exclusively on the very long term.  All

of the permanent new inpatient beds announced in Defendants' Plan are scheduled to open in

June of 2011.  This is unacceptable.  In the recently issued Fifteenth Report, the Special Master

warned defendants about the seriousness of their current predicament:

> This is not a time for patience and the acceptance of the State's
> traditional reliance on the inevitably slow but unavoidable
> bureaucratic dance on the proposal-killing ground.  <u>The failure to
> develop a responsive plan to deal effectively and expeditiously
> with the provision of intermediate inpatient DMH care to Level IV
> CDCR inmates will result in the monitor's recommendation to the
> court to impose sanctions, as will any lack of diligence in
> implementing the adopted plan.</u>

15th Monitoring Report of the Special Master at 387-88.  Defendants have been given ample

opportunities to develop appropriate plans to expand inpatient and MHCB beds – the Court has

issued eleven orders requiring defendants to assess their need for inpatient beds and plan for

appropriate expansion of their programs and there are also numerous outstanding orders

concerning MHCB care.[1]  Defendants need to do much more to address their bed shortages,

---

[1] When required to produce plans to solve the problem of inadequate bed space in the past, defendants have repeatedly failed to produce adequate or effective plans to address these very problems. 15th Report at 413 (listing some of the past orders on DMH and MHCB access and capacity).  On the issue of access to DMH inpatient care, the Court has issued at least 11 Orders in the last seven years. Kahn Dec. ¶ 6 (listing orders).  In response to these orders, defendants have produced at least six inadequate plans to study and/or meet the unmet need for inpatient care.  <u>Id.</u>  Finally, last spring, in a report dated March 30, 2005, defendants finally produced an adequate study of the scope of their unmet need for inpatient care. Kahn Dec. ¶ 7.  Unfortunately, while the March 30, 2005 report

(continued . . .)

1   and they need to do it much sooner.  As the Special Master recommends, the Court must

2   consider additional remedies beyond the issuance of additional orders, including contempt,

3   fines, population caps and receivership.

## ARGUMENT

**I.   THE COURT SHOULD APPROVE DEFENDANTS' LONG RANGE PLAN FOR INTERMEDIATE AND ACUTE INPATIENT BEDS AND ORDER DEFENDANTS TO IMPLEMENT THIS PORTION OF THEIR PLAN**

7          The April 17, 2006 Bed Plan is defendants' third effort to address the inpatient bed

8   shortages documented in the March 15, 2005 Unidentified Needs Assessment, an assessment

9   which itself was only done correctly after many years of failed efforts to adequately study the

10  need for inpatient beds.  On the positive side, defendants' bed plan includes 320 new Level IV

11  ICF beds (in addition to the 64 permanent ICF expansion already approved for SVPP) and 300

12  new APP beds.  These 384 new Level IV ICF beds, along with the 175 Level I–III bed

13  expansions already promised by DMH (but not yet provided) for June of this year at

14  Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH) should be sufficient to

15  address the unmet need identified in the UNA study.  Ex. E to Kahn Dec. March 30, 2005

16  UNA Plan at Attachment E and May 11, 2005 updated chart at 1, 3 (projecting a need for 631

17  male ICF beds by the end of fiscal year 2010).  The 300 new APP beds also appear to be

18  sufficient to address the shortage of APP beds identified in the UNA study.  *Id.* at 2, 4

19  (projecting a need for 374 male APP beds by the end of fiscal year 2010).  The Court should

20  order defendants to promptly move forward with these bed expansion plans.  Defendants

21  should be commended for bringing together the necessary agencies and personnel to execute

22

23  contained an appropriate assessment of the scope of the problem, it also included a deeply flawed plan
    to meet the identified need for 400 additional acute and intermediate beds.  *Id.* at ¶ 8 and Ex. F.  After
24  the plaintiffs and the Special Master shared their objections with defendants, the Special Master gave
    defendants a new deadline of August 15, 2005 for submitting a revised plan.  Kahn Dec. ¶ 9.  On
25  August 15, 2005, defendants submitted a second plan to meet the need identified in the March 2005
    study, and this second plan was also inadequate, as the Special Master spelled out to defendants in
26  great detail in an August 30, 2005 letter.  Kahn Dec. ¶ 10 and Ex. H.  This failure in turn led to the
    current requirement in the 15th Report that defendants produce yet another plan on or before April 17,
27  2006.  Kahn Dec. ¶ 10.  Defendants' record of producing adequate plans in response to the Court's
    orders on the MHCB issue is similarly bleak.

28

1  this portion of their plan.

2      The major problem with defendants' plan is that these new beds are not currently

3  scheduled to open unit June of 2011 – more than five years from today.  In the interim,

4  defendants' plans are inadequate and threaten continued harm to the plaintiff class.  Moreover,

5  given that past inpatient bed construction projects of this type have been characterized by

6  repeated construction delays and significant delays in initial staffing and licensing, the Special

7  Master (or the Receiver) will need to closely supervise defendants' development and

8  implementation of these new ICF facilities to ensure that these facilities actually open in June

9  of 2011 as promised.  Intensive supervision is necessary to ensure that the delays and errors

10 which plagued the initial 64 bed ICF project at SVPP are not repeated with the new

11 construction projects planned.  15th Report of the Special Master at 383 ("*The need to provide*

12 *a program of intermediate inpatient DMH care for tough Level IV inmates became*

13 *increasingly clear in the late 1990's, and DMH agreed to establish and operate such a*

14 *program.  Inexplicably, the defendants decided to locate the program in Salinas Valley State*

15 *Prison, where CDCR has always found it particularly difficult to hire and retain mental health*

16 *and medical staff. . . Originally scheduled to be operational in 2001, the SVPP program came*

17 *on line in late 2003, due to its design problems it has never been fully operational.*")  The

18 Coalinga State Hospital project continues to be plagued by similar delays in construction and

19 staffing and is years and years behind its originally promised date of full operation.  See Kahn

20 Dec. ¶ 2 and Ex. B; 15th Report of the Special Master at 384 ("*During the same period, DMH*

21 *repeatedly held out to CDCR, and to the court, the prospect that the new DMH facility with*

22 *1,500 beds under construction at Coalinga and currently accepting patients would allow DMH*

23 *to accommodate more Level IV CDCR inmates.  This prospect also turned out to be illusory…*

24 *DMH did not share information about the security limitations of its Coalinga facility with*

25 *CDCR until June 2004 or the court until even later.*")

26

27

28

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INPATIENT, MHCB AND EOP BED PLANS, NO.:  CIV S 90-0520 LKK-JFM

1 | **II.    DEFENDANTS' INTERIM PLAN FOR ICF BEDS IS INADEQUATE AND THE
2 | COURT SHOULD REJECT IT**

3 | Defendants' interim plan for ICF beds is inadequate, both as to Level IV ICF beds and
4 | as to Level I-III ICF Beds.  The Plan must be rejected.

5 | **A. Defendants' Plan for Interim Expansion of Level IV ICF Beds is Inadequate And
the Court Should Order Defendants to Maintain the Level IV Treatment Program
6 | At CMF while Moving Forward With An Expanded Level IV Program at SVSP.**

7 | Defendant have already created the <u>only</u> new Level IV ICF beds that, if their Plan is

8 | accepted, will be produced during the next three years – the paltry 36 ICF bed unit which

9 | opened at CMF last Fall.  See 4/17/06 Plan at 4-5.  Even with these 36 beds fully occupied,

10 | there is a current Level IV waiting list for the SVPP ICF program of 123 inmates.  Kahn Dec.

11 | Ex. D.  Defendants' plan is to spend three years constructing and licensing an additional 112

12 | "temporary" Level IV beds at SVSP which will open in 2009 and will remain open for only

13 | two years, until the new permanent 128-bed ICF expansion at SVSP opens in 2011.  See

14 | Defendants' Plan at 4-5.  This portion of defendants' plan is irrational and wasteful.

15 | As part of this plan, defendants argue that they must be permitted to close the current

16 | 36-bed unit at CMF later this month in order to retrofit the unit with air conditioning and other

17 | amenities required by licensing authorities.  *Id*.  Defendants have indicated that they are

18 | concerned about the heat risks to ICF patients associated with remaining in the P-2 unit at

19 | CMF during the hot summer months.  Kahn Dec. ¶ 12.  Defendants' plan is to transfer these 36

20 | beds into a newly retrofitted housing unit at SVSP.  *Id*.  There are a number of serious

21 | problems with this plan.  First, the planned unit at SVSP is also not air-conditioned.  Second,

22 | there is no reason that CMF cannot close and retrofit a different unit that is not currently

23 | housing Level IV ICF patients.  Third, using the heat safety measures required by the May 11,

24 | 1992 heat injunction in this case, CMF has been able to safely house and treat more than 600

25 | EOP inmates for more than 13 years without a single serious heat-related injury or death.  *Id*.

26 | There is no reason to think that DMH will be unable to adopt similarly effective alternative

27 | cooling procedures for its ICF unit this Summer.

28 | Moreover, even with the 36-bed Level IV program at CMF fully operational and full,

the waiting list or the SVPP program is currently 123 inmates (none of whom are housed in air conditioned facilities!). Ex. D to Kahn Dec. (4/10/06 waiting list for SVPP). Thus, unless changes are required, defendants' plan is essentially to allow this large list of waiting inmates to continue to grow during the next three years, until more "temporary" beds are finally brought on line in the Summer of 2009. See Defendants Plan at 4-5. This plan is unacceptable. The Court should order defendants to continue to operate the 36-bed ICF program located in the P-2 housing unit at CMF. In addition, the Court should order defendants to aggressively move forward with the new Level IV program at SVSP which is set to open in this May.

During a conference call concerning defendants' bed plans on April 11, 2006, the parties discussed the decision to only open one 36-bed ICF unit at SVSP this Summer. Kahn Dec. ¶ 12. Defendants revealed that they examined the option of opening 64 beds during the Summer of 2006, but decided not to do because they wanted to retrofit two entire units at SVSP in order to meet licensing requirements in 2009. *Id.* Defendants have been able to prepare the 36-bed unit at SVSP in less than a year. *Id.* Because of the urgency of the need for Level IV ICF treatment space, the Court should order defendants to submit a plan for opening two 36-bed units at SVSP rather than a single unit. Defendants' Plan states that this option was considered and rejected "based on current experience with construction and the time it would take, approximately two years, to make the housing units licensable even with DHS program flexes." Defendants' Plan at 18. However, defendants were able to create the first 36-bed unit at SVSP in less than a year. They do not explain what prevents them from creating a second, identical unit at SVSP in the next year.

**B. DMH Has Not Yet Provided a Single One of the 50 Promised Beds At Coalinga State Hospital for CDCR Inmate-Patients, And Appears to Be Reluctant to Provide Such Care at CSH or at ASH.**

DMH has repeatedly failed to deliver on its promise to provide inpatient care to CDCR inmates at CSH and ASH, and there are indications in the current bed plan that DMH intends to back out of its obligation to provide additional beds at ASH and CSH this year. See 15th Report at 377-378 (history of CSH delays). In an October 2004 Hearing, DMH Deputy

1  Director Rodriguez told this Court that DMH would be able to provide the CDCR with 50 beds

2  at Coalinga State Hospital in September 2005. He also represented to the Court that an

3  additional 125 beds could be provided for CDCR patients in 2006 at either Coalinga or ASH.

4  See Kahn Dec. ¶ 13 and Ex H (Excerpts from Rodriguez testimony at 10/29/04 Hearing). In

5  spite of these promises to the Court, DMH has yet to provide the CDCR with a single bed at

6  CSH. Kahn Dec. ¶ 13 and Ex. B.

7    The fact remains: CSH is a brand new high security mental hospital that is already

8  built. It has a capacity of 1500 beds! It is virtually empty. The Court should order the

9  Governor, DMH and CDCR to designate 500 beds at CSH for CDCR patients and transfer the

10  patients to CSH as soon as CSH gets licensed at that level. DMH has a whole series of excuses

11  and explanations for the delay in opening CSH – other than its own failures. The latest excuse

12  is that Judge Henderson and his Orders in Plata are to blame for DMH's inability to hire the

13  clinical staff necessary to actually open beds at CSH. Kahn Dec. Ex B (LOA Analysis of

14  DMH budget bill at report at 5 – "*[DMH] indicates that its difficulties in hiring and retaining*

15  *staff stem in part from the recent federal Plata court case*.") It should be no surprise to DMH

16  that it would be difficult to hire staff for CSH given its location and inadequate pay scales.

17  The Court's Order concerning CSH should include a requirement that DMH pay appropriate

18  amounts to hire the staff necessary to fill the open positions.

19    Moreover, in the April 17, 2006 plan, defendants and DMH have the audacity to suggest

20  for the first time that no more ICF beds are necessary, asserting that: "*Despite the progress that*

21  *the CDCR and DMH have made to increase the capacity of the bed usage at ASH, the number*

22  *of referrals for acute care services and intermediate/non-acute services remains low. Upon*

23  *further study and review by the CDCR, the shortage of referrals is related in large part to the*

24  *overall lack of need for mental health services for lower custody inmate-patients*." See

25  Defendants' Plan at 7. Defendants do not provide any information about what type of "further

26  study" was conducted that determined that there is a lack of need for ICF beds for Level I-III

27  inmates. However, this conclusion is directly contrary to the findings in last year's Court-

28  approved UNA study. See March 30, 2005 UNA Study. The UNA study found that there

1   were 436 CDCR inmates with an unmet, unidentified need for ICF care. *Id.* at Attachment A,

2   Table 2. Later estimates were made by the experts and the study authors that that two-thirds of

3   these ICF cases were Level IV cases, with the remainder Level I-III. See 15th Report at 377

4   (estimate that two-thirds of UNA ICF cases Level IV). That means that the study found that

5   the CDCR has a current need for an additional 145 Level I-III ICF beds. Thus, the problem is

6   not lack of need, but rather, a lack of appropriate referrals. The UNA Study proved that a

7   significant percentage of EOP patients needed inpatient psychiatric care and had not been

8   identified or referred by CDCR clinicians. 15th Report of the Special Master at 377 ("*The so*

9   *called UNA (Unidentified Needs Assessment) found 512 CDCR inmates, who were not referred*

10  *for inpatient care although they were clinically appropriate for such a referral, including 435*

11  *inmates in need of an intermediate level of care and 77 in need of acute inpatient care,*

12  *representing respectively 14 and two percent of the department's total EOP population.*").

13  Nothing has changed since last year and in fact, conditions, due to overcrowding and

14  understaffing, are much worse.

15          The CDCR needs to do more to encourage staff to refer all appropriate cases to DMH,

16  especially Level I-III inmates for whom there is more space. The CDCR must take aggressive

17  action to train staff and to establish procedures that require mental health clinicians to regularly

18  review their caseload for appropriate cases to refer to inpatient care and to overcome the UNA

19  study finding that the CDCR has "*a culture of acceptance of, and a higher tolerance for,*

20  *pathology and decompensated states that, outside of an institutional setting, would not be*

21  *acceptable.*" 3/30/05 UNA Plan at Attachment A, page 8. In light of this finding, the CDCR

22  employee who drafted the UNA study recommended "*[a]dditional training . . . with regard to*

23  *identifying individuals who are not functioning at baseline, who are at high risk, and who*

24  *require a referral to a higher level of care.*" *Id.* There is no indication that this critical UNA

25  study recommendation has been implemented in any subsequent training sessions. The

26  solution to the absence of referrals is not to cut the number of beds available at ASH and CSH.

27  Rather, the solution is to provide appropriate training to CDCR clinicians. See 15th Progress

28  Report of the Special Master at 421 ("the recently completed Unidentified Needs Assessment

1  indicated that, in the absence of available beds, institutional clinicians were not referring

2  numerous inmates actually in need of inpatient DMH mental health care.")

3      As the Special Master found, DMH is also directly responsible for the lack of referrals:

4  DMH continues to reject patients referred for admission, to require burdensome and endless

5  forms, to impose inappropriate admission and exclusionary criteria, and to pretend that the

6  Memorandum of Understanding (MOU) that DMH negotiated (over the objections of the

7  Special Master and plaintiffs) is itself the obstacle to referrals and admissions.  See 15th Report

8  of the Special Master at 385 ("DMH has long operated under the protective assumption that it

9  had no obligation to provide mental health services for CDCR inmates who might represent a

10  danger to DMH programs and staff, although it knew well it was the only source of inpatient

11  care available to the CDCR.  For its part, CDCR has long assumed it has met its obligation to

12  provide mental health services to these most difficult to place inmates by executing its inter-

13  agency agreement with DMH, even though it knew, or should have known, that DMH did not,

14  and would not, accept these violence-prone Level IV inmates.  CDCR has a direct obligation

15  under the terms of the Coleman remedy to provide clinically identified treatment services to

16  this group of CDCR inmates.  That obligation has simply disappeared in the crack between the

17  false assumptions of CDCR and DMH.  If the two agencies cannot figure out some way to

18  meet their mutual obligations here, the Governor of California, a named defendant in the

19  Coleman suit, needs to intervene and get it done.")  This is nonsense.  Patients are dying

20  waiting to get into DMH beds and DMH continues to operate with empty beds in many of its

21  programs reserved for CDCR patients.  Nothing in Defendants' Plan addresses these

22  fundamental problems.

23      In several other attachments to Defendants' Plan, there are suggestions that DMH

24  intends to raise more obstacles to its commitments to provide treatment to CDCR inmates at

25  Coalinga State Hospital and Atascadero State Hospital.  DMH is openly informing the Court

26  that they are not part of the solution and will continue to be a greater and greater part of the

27  problem.

28      For example, Enclosure XII to the April 17, 2005 Plan is a document entitled "Federal

Investigation Impacting Treatment in Department of Mental Health State Hospitals." 4/17/06 Plan, Enclosure XII. This enclosure discusses a pending investigation of DMH Hospitals by the United States Department of Justice under the Civil Right for Institutionalized Person Act ("CRIPA"), 28 U.S.C. § 1997. *Id.* The enclosure suggests that the US Department of Justice investigation and a potential pending settlement may impact DMH's ability to provide care to CDCR inmates because CRIPA demands that DMH develop a "recovery model" of treatment which is *"difficult at best with inmates returning to the prison environment and is conflicting with the incarceration mission and security needs of high custody Level IVs."* *Id.* In light of these concerns, the Court should order DMH and defendants to provide notice and an opportunity to be heard to the plaintiffs and the Special Master in this case prior to entry into any settlement agreements in the CRIPA case that will impact the ability of DMH to provide care in its hospitals to CDCR inmates.

A second enclosure relevant to DMH's role is entitled "Constitutional Issues of Securing Coalinga State Hospital for Treatment of Level IV High Custody California Department of Corrections and Rehabilitation Inmates." 4/17/06 Plan, Enclosure VII. This enclosure suggests that unspecified class action lawsuits and "complaints" by Sexually Violent Predators ("SVPs") in the past have argued that it is unconstitutional to house SVPs in the same institution as civilly committed individuals. *Id.* The enclosure then speculates that housing CDCR inmates at Coalinga "may lead to allegations that conditions are more punitive or penal." *Id.* These vague, unsubstantiated legal concerns are not sufficient grounds to deny treatment to CDCR inmates at CSH or ASH.

The Coalinga Study

A final enclosure relevant to DMH is defendants' Coalinga State Hospital Coleman Bed Conversion Study. 4/17/06 Plan, Enclosure VI. Not surprisingly, the study lists numerous expensive and time-consuming steps that would need to be taken to *"meet the physical plant standards set forth by the CDCR for a Level IV high custody/high security population"* and concludes that such a conversion would be very expensive and likely take until November *2013* to accomplish. See Enclosure VI at Executive Summary. Defendants, rather than

complying with the Court's Order, together set up a straw man and knocked it down. The Court ordered defendants to provide "a reasoned report on the feasibility – or infeasibility – of the use of some portion of that facility for the inpatient treatment of Level III and/or IV CDCR inmates." 3/3/06 Order, ¶ 3. One can only conclude that CSH, which is the highest security facility ever built by DMH, is intended to house Sexually Violent Predators, is surrounded with prison fences and guarded by CDCR custody employees, can safely house – without any construction or modifications whatsoever – any CDCR prisoner other than a tiny percentage of Level IV prisoners who, in addition to being Level IV, also have some actual indicia of danger or violence.

Nothing in the "study" takes into account the historical success of ASH, a lower security facility than CSH, in treating Level IV inmates. In testimony in October 2004 before this Court, DMH Deputy Director Rodriguez confirmed that CSH is a higher security facility than ASH. Kahn Dec. ¶ 13 and Ex. H. During the testimony regarding various DMH facilities including Atascadero, Patton, and Coalinga, Mr. Rodriguez testified that "Coalinga will be our highest security facility" and that, while hospital police officers patrolled the perimeter fence at ASH, at Coalinga, CDCR officers patrol the perimeter. *Id*

Defendants should be required to find an inpatient bed for each of the 123 Level IV individuals now on the SVPP waiting list at ASH, CSH, SVPP or CMF – the beds now exist. The security concerns are clearly overblown. If CDCR and DMH cannot make the decisions, the Special Master should retain a custodial expert to make the decisions.

Defendants' Plan includes a number of other projects of questionable utility in expanding access to ICF care in the short and medium term. A plan to allow certain EOP inmates priority in gaining access to SVPP ICF beds could modestly increase utilization of the dorms at SVPP, reducing the waiting list for placement there. See Defendants' Plan at 6. However, any gains in this area could come at the expense of PSU and EOP ad seg inmates who are waiting for ICF placement in much more dire conditions. A plan to expedite MTA background checks in DMH facilities could facilitate staffing in existing ICF programs, but is unlikely to have any impact on the capacity of existing programs. See Defendants' Plan at 8.

1    Finally, a plan to allow direct admission from CIM and DVI to the acute beds at ASH is

2    unlikely to make much difference in ICF beds, which is where there is the most pressing

3    shortage of beds.  See Defendants' Plan at 7.

4

5    **III.    DEFENDANTS' PLAN TO EXPAND MHCB CARE MUST BE REJECTED
         BECAUSE IT DOES NOT CREATE ANY NEW PERMANENT MHCB BEDS
6        AND IT DOES NOT DO ENOUGH TO EXPEDITE THE CONSTRUCTION
         AND LICENSING OF PREVIOUSLY APPROVED BEDS.**
7

8         For nearly two years, the defendants have been experiencing a severe and dangerous

9    shortage of MHCB beds.  Every month, hundreds of critically mentally ill CDCR inmates are

10   referred to MHCB beds and are refused access because the beds are full.  See Kahn Dec. ¶ 15

11   and Ex. J.  Unable to access inpatient care in a licensed setting, these patients instead are

12   housed in various ad hoc locations where they can be placed on suicide watch.  *Id.* at ¶ 16 and

13   Ex. K.  These alternative locations have included small holding cages, administrative

14   segregation cells, unlicensed OHUs and various other bare cells intended for short term use as

15   holding cages.  *Id.*  Perhaps in order to discourage inmates from seeking placement in these

16   scarce beds, inmate-patients held on suicide watch in many, many prisons are frequently held

17   in inappropriate, excessively punitive conditions.  Kahn Dec. ¶ 19 and Ex. M.  Often these

18   suicidal inmates are stripped naked and not provided with a suicide-proof mattress, gown or

19   blanket.  *Id.*  No therapy is provided.  *Id.*  In the Summer of 2005, at MCSP, custody staff's

20   union representative complained to defendants about the dangerous suicide watch conditions

21   employed there.  Kahn Dec. ¶ 20 and Ex. O.  In the last two years, a number of inmates have

22   died or had extremely adverse outcomes while housed in OHUs rather than MHCB units.

23   Kahn Dec. ¶¶ 21-22; Special Master's Draft 2004 Suicide Report at 6 (draft finding to which

24   defendants have not objected that "*During the year, a significant number of inmates who were*

25   *referred or should have been referred to higher levels of care, including DMH, were not*

26   *considered for referral, were not referred, had their referral cancelled or were waiting*

27   *transfer pursuant to a referral when they died.*")

28        In response to these dire conditions, defendants promise more business as usual.

1    Defendants plan provides nothing new: they will move forward with the previously announced

2    50-bed CMF MHCB unit which has already been plodding along for three years. Defendants

3    failed to comply with the Court's Order (¶ 5) to expedite construction and licensing of this

4    critical facility (they claim to have saved two months but lost a few weeks, 4/17/06 Plan at 11).

5    If defendants cannot figure out how to accelerate this project, the Court should consider taking

6    the project away from defendants.

7         In spite of the specific directive in the Court's March 3, 2006 Order to defendants to

8    "accelerate the staffing and licensing of the new MHCB units at KVSP and CSP-SAC by June

9    30, 2006," defendants have done nothing to comply. 3/3/06 Order at ¶ 5. In fact, the "target

10   date for the SAC MHCB licensing survey is August 15, 2006," there is no target date listed for

11   KVSP at all and the CMF project is targeted for a survey on August 15, 2008. 4/17/06 Plan at

12   Enclosure VIII. Indeed, defendants' plan actually appears to abandon plans to license the

13   MHCB unit at KVSP in the near future in favor of a new plan to covert the unit into an OHU

14   for long term care patients designed to open up CTC space at other institutions for additional

15   MHCB beds. See 4/17/06 Plan at 10, ¶ 3.

16        Defendants' MHCB plan fails to comply with the Court's Order in other respects.

17        First, Defendants' Plan it is not a plan "to provide beds to all CDCR inmates who need

18   such beds within 24 hours of clinical determination," as required by the Court's Order. 3/3/06

19   Order at ¶ 5. Such a plan must be predicated on an accurate assessment of the defendants'

20   current and future needs for MHCB care. Defendants have never conducted such an

21   assessment. Presumably, in calculating their future need for MHCB beds, defendants used

22   some version of the formula for MHCB beds set forth in the July 29, 2002 Tucker Alan Study

23   attached to their bed plan as Enclosure I. However, it appears that the Tucker Alan study did

24   not include additional MHCB beds to account for the mentally ill individuals in CMF's large

25   mental health program. See 4/17/06 Plan, Enclosure I, at 19. Moreover, the Tucker Alan

26   study simply projected forward the existing patterns of MHCB usage at the time, without

27   assessing whether all appropriate cases were being referred for MHCB care. *Id.* The Tucker

28   Alan report also based its finding on a current CDCR MHCB capacity of 183 beds (including

-18-

38 "Swing Beds" in adjacent CTCs which were provided with augmented staffing). *Id.* In fact, however, the CDCR's MHCB capacity was lower then and continues to be lower than previously thought, as demonstrated by defendants' own survey of available beds. Enclosure VIII to Defendants' Plan is a Survey of Available MHCB Beds. See 4/17/06 Plan at Enclosure VIII. Although Enclosure VIII purports to show that the CDCR has 221 MHCB beds, upon closer examination, the relevant number of male MHCB beds is actually only 164 beds, once the CMF and ASH acute DMH beds used for MHCB purposes are removed. Moreover, the survey revealed that the capacity of several existing MHCB programs is 18 beds lower than previously reported – MCSP has 2 fewer MHCB beds than reported, LAC is staffed for 4 fewer MHCB beds than reported, PBSP is staffed for 4 fewer MHCB beds than reported, CSP-SAC has 2 fewer MHCB beds than previously reported, SATF contends its staffing is for 2 fewer MHCB beds than previously reported, and Solano State Prison's newly licensed MHCB unit can take 4 fewer MHCB cases than previously reported due to physical plant issues. See 4/17/06 Plan, Enclosure VII.

Moreover, monthly reports on MHCB transfers to other institutions provided by defendants show that currently, every month, several hundred inmates are referred for MHCB care who cannot be accommodated and therefore are denied needed MHCB treatment. Kahn Dec. Ex. J. There is no indication that defendants have incorporated a figure to reflect this population in projections concerning future MHCB need. The Court must order them to do so.

Second, the MHCB plan is not based on "updated" population projections as required by the Court's Order. Defendants' Plan indicates that the source of the population estimates used to calculate bed need in Enclosure II to the Plan is based on Fall 2005 population projections. Defendants' Report at 3. However, the Legislative Analysts Office ("LAO") has recently issued an analysis of the CDCR's budget request indicating that the Fall population projections were too low. See Ex. B to Kahn Dec. Excerpts from LAO report at D-34. This analysis was confirmed by the Spring 2006 Population projections released this week, which project a June 2006 population that is 2,865 (1.7 percent) higher than the Fall 2005 Population Projection, a June 2007 population of 177,738, which is 5,719 (3.3 percent) higher than the

Fall 2005 Population Projections, and a June 2011 population of 193,195, which is 11,721 (6.5 percent) higher than Fall 2005 Population Projections. Kahn Dec. Ex. A. If these new population figures are correct, then defendants will need 6.5 percent more mental health beds at every level of care by 2011 than they currently project. The Court should order defendants to recalculate their future bed need using the updated Spring 2006 population projections.

Third, the plan does not detail all of the financial, construction and staffing elements necessary to meet the goals in the plan. See 3/3/06 Order at ¶ 5. For example, Defendants' Plan states that defendants will implement a targeted "Hire Above Minimum" pay augmentation in selected regions and enhanced pay differentials in other regions in order to facilitate hiring of new staff for MHCB programs. Defendants' Plan at 10. However, defendants provide no details concerning the size of these pay augmentations or the location of these pay augmentations. *Id.* Similarly, defendants plan to increase MHCB capacity in the short term by converting GACH and OHU beds at CIM and CMC. Defendants' Plan at 10. However, each of these projects involves substantial barriers to success which are difficult to assess without substantially more detail concerning the proposed time-frame for the projects, the costs of the projects, and the licensing waivers and staffing augmentations necessary for the projects.

## IV.  DEFENDANTS' EOP BED EXPANSION PLAN DOES NOT ADEQUATELY ADDRESS THE SHORTAGE OF EOP BEDS AND DOES NOT ADEQUATELY ADDRESS THE NEED FOR TREATMENT SPACE.

Defendants' plan for EOP bed expansion barely addresses the newly revealed shortage of EOP beds. Enclosure II to Defendants' Plan is a chart entitled "Closing the Gap" which projects bed need and bed capacity for various categories of beds out over the next five years. This Court has previously ordered defendants to assure that adjustments for growth in the EOP population were built in to the budget process through staffing ratios. 7/26/99 Order at 2; See October 8, 2002 Order (adopting Special Master's September 3, 2002 Recommendations requiring defendants to implement the Tucker Alan Beds Needs Study, which includes EOP beds, with "proposals for MHSDS staffing *and construction* based on the bed needs study.").

1    There is no justification or explanation by defendants for their failure to provide for the needs

2    of the EOP population given these orders which have been in place since 1999.

3        Defendants' chart indicates that the CDCR has a current shortfall of 1180 EOP beds,

4    including a shortfall in Level IV EOP beds of 620 beds.  Defendants' Plan at Enclosure II.

5    Defendants' Plan also includes several new EOP bed expansions.  See Defendants' Plan at 8.

6    First, defendants have cancelled a planned closure of the EOP unit at Salinas Valley State

7    Prison.  *Id.* at 9. This unit was going to be moved to CSP-SAC, in part because of the

8    difficulties SVSP has had in obtaining staff for the unit.  *Id.*  The plan now is to keep the SVSP

9    unit open while moving ahead with the EOP expansion at CSP-SAC, which will produce 192

10   additional Level IV beds at CSP-SAC by January of 2007.  *Id.*  Second, defendants plan to

11   double the size of the Level III EOP program at MCSP, adding 180 new beds.  *Id.*  Third,

12   defendants plan to add 115 new Level IV SNY EOP beds at MCSP by January 2007, although

13   this project was previously announced to plaintiffs and the Special Master, and in fact plaintiffs

14   expected the unit to open this Summer.  Kahn Dec. ¶ 26.  Finally, defendants will add another

15   150 Level IV EOP beds at LAC in 2011.  Defendants' Plan at 8.  Thus, defendants EOP

16   expansion plans include 352 new EOP beds in the next year, and then another 150 EOP beds in

17   June of 2011.

18       The Court should order these EOP augmentations implemented as a necessary first step.

19   However, even with all of these program expansions, defendants are still projected to have a

20   shortfall of 1090 EOP beds in Fiscal Year 2007-2008, and a gap of 1336 EOP Beds in June of

21   2011.  The Court should order defendants to develop a plan within 60 days to eliminate the

22   entire EOP beds shortage projected in Enclosure II to Defendants' Plan (as adjusted by the

23   most recent population projections) no later than 2011, and to construct sufficient program

24   space for the new EOP programs on an expedited basis – well before the currently planned date

25   for completion of construction of such space of June of 2011.

26       The Court should also order defendants to develop a plan within 30 days to address the

27   backlog of mentally ill in reception centers.  The plan should include, at minimum, clinical

28   staffing and treatment space to assure that EOP patients receive EOP level of care no later than

60 days after they are identified or earlier, if necessary. The Plan should also address acceleration of the remedial and intermediate sanctions provisions of the <u>Valdivia</u> Injunction (which the Governor halted in 2005) to divert technical parole violators from prisons and plans to improve pre-release planning, parole services and diversion programs for the seriously mentally ill. That is, the plan should address efforts to limit recidivism and to limit population in light of defendants' inability to comply with the Constitutional mandates for minimally adequate mental health care.

## CONCLUSION

For all of the reasons set forth above, plaintiffs respectfully request that the Court take the following actions with respect to defendants' plans for expanding inpatient and MHCB beds:

- The Court should approve defendants' long term plan to expand ICF beds and APP beds, and order defendants to implement that portion of their plan. While accepting the long term plan, the Court should order defendants to report on what steps they can take to speed the opening of these new long term beds, as well as any steps that can be taken to ensure timely opening of the beds, which are currently scheduled to open five years from now, in June of 2011.

- The Court should rule that the interim steps in defendants' plan to expand ICF beds are inadequate and order defendants to submit a new plan within 30 days that will create significantly more Level IV ICF beds in the near future.

- To that end, the Court should rule that due to the inadequacy of the Plan's interim measures to expand Level IV ICF beds, defendants may not close the 36-bed Level IV ICF program at CMF which they are currently seeking permission to close and move to SVSP. In addition, defendants should be ordered to move forward with the opening of the 36-bed Level IV ICF program currently scheduled to open in May of 2006 at SVSP, <u>and</u> to double the size of that program as soon as possible and no later than January 2007, so that it can accommodate 72 Level IV inmates.

- The Court should find that defendants' assessment of their need for MHCB beds is

inadequate, and should order defendants to conduct a new assessment of their future need for MHCB beds.  In planning for future MHCB capacity, defendants should be ordered to plan to build enough MHCB beds to eliminate the use of unlicensed Outpatient Housing Units ("OHUs") for the observation and treatment of mentally ill inmates, and to account for the large monthly list of MHCB cases that are unable to secure placement.

- The Court should order defendants to recalculate their future needs for mental health beds of various types using the current Spring 2006 Population Projections, which project a June 2006 population that is 2,865 (1.7 percent) higher than the Fall 2005 Population Projection defendants used in developing their plans, a June 2007 population of 177,738, which is 5,719 (3.3 percent) higher than the Fall 2005 Population Projections, and a June 2011 population of 193,195, which is 11,721 (6.5 percent) higher than Fall 2005 Population Projections.

- The Court must direct the Governor's Office and the Department of Mental Health to keep the Court and the parties in *Coleman* apprised of any CRIPA settlement position DMH takes in negotiations with the United States Department of Justice that could impact the ability of DMH to provide care to the Coleman class – prior to agreeing to any such terms.  See Defendants' Plan at Enclosure XII.  In addition, the Court should order that Steven W. Mayberg, the Director of DMH, be added as a defendant in this case.

- The Court should order defendants to take additional steps to expedite the opening of planned MHCB beds system-wide, and to expedite the opening of interim beds, and to comply with the Court Order concerning the accelerated licensing and staffing at CMF, SAC and KVSP MHCB beds.  If defendants are unable to comply with the Court's 3/3/06 order on this issue, the Court should take this project away from defendants.

- The Court should order defendants to develop a plan within 60 days to eliminate the entire EOP beds shortage projected in Enclosure II to Defendants' Plan (as adjusted by

the most recent population projections) no later than 2011, and to construct sufficient program space for the new EOP programs on an expedited basis – well before the currently planned date for completion of construction of such space of June of 2011.

- The Court should order defendants to develop a plan within 30 days to address the backlog of mentally ill in reception centers. The plan should include, at minimum, clinical staffing and treatment space to assure that EOP patients receive EOP level of care no later than 60 days after they are identified or earlier, if necessary. The Plan should also address acceleration of the remedial and intermediate sanctions provisions of the <u>Valdivia</u> Injunction (which the Governor halted in 2005) to divert technical parole violators from prisons and plans to improve pre-release planning, parole services and diversion programs for the seriously mentally ill. That is, the plan should address efforts to limit recidivism and to limit population in light of defendants' inability to comply with the Constitutional mandates for minimally adequate mental health care.

- The Court should consider all available remedies to assure compliance with the remedial order, including population caps, fines, contempt and receivership.

- The Court should order DMH to increase salaries for clinical staff at CSH and ASH as much as necessary to attract qualified staff to these positions.

- The Court should require the CDCR to conduct additional training and/or to create additional procedures to ensure that CDCR clinicians refer all appropriate cases to inpatient care.

- The Court should order defendants and DMH to find an inpatient bed for each of the 123 Level IV individuals now on the SVPP waiting list at ASH, CSH, SVPP, or CMF.

/ / /

/ / /

/ / /

/ / /

/ / /

1   If defendants and/or DMH are unwilling or unable to do so, the Court should direct the

2   Special Master to retain a custodial expert to make the decisions for them.

3

4   Dated:  April 21, 2006

5                                               Respectfully submitted,

6

7

8                                               Michael W. Bien
                                                Rosen, Bien & Asaro, LLP
9                                               Attorneys for Plaintiffs

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INPATIENT, MHCB AND EOP BED PLANS, NO.:  CIV S 90-0520 LKK-JFM