PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>     Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>     Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' IN-PATIENT AND MHCB BED PLAN**<br><br>**HEARING**<br><br>Date:     April 26, 2006<br>Time:     3:30 P.M.<br>Location: Courtroom 4<br>The Hon. Lawrence K. Karlton |

I, Jane Kahn, hereby declare:

1. I am an attorney admitted to practice law in California and an associate of the law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case. I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Plaintiffs' Objections to Defendants' In-Patient and MHCB Bed Plan ("Plaintiffs' Objections").

<u>Defendants Current Overcrowding and Understaffing Problems</u>

2. The CDCR is becoming increasingly overcrowded. Attached here as Exhibit A is a true and correct copy of the CDCR's Spring 2006 Population Projections. According to the Executive Summary, the population projections in the report have increased substantially over the Fall 2005 Population Projections. The Spring 2006 Population Report projects a June 2006 population that is 2,865 (1.7 percent) higher than the Fall 2005 Population Projection defendants used in developing their bed plans, a June 2007 population of 177,738, which is 5,719 (3.3 percent) higher than the Fall 2005 Population Projections, and a June 2011 population of 193,195, which is 11,721 (6.5 percent) higher than Fall 2005 Population Projections. The Legislative Analyst's Office ("LAO") recently issued an analysis of the CDCR's budget request which confirmed the higher-than-anticipated increase in inmate population. The LOA Report on Coalinga notes that by 2006 the patient population was projected to be about 680 patients, however, due to delayed staffing efforts, the patient population was well below the number assumed in January 2006. DMH reportedly advised the LOA that soon after the *Plata* ruling, efforts to recruit and hire additional clinical staff at Coalinga became difficult in part because compensation levels at Coalinga were not competitive with nearby prisons. The LAO Report indicated that recent caseload information indicates that none of the CDCR 50 beds have been occupied. Attached hereto as Exhibit B is a true and correct copy of excerpts from the LAO Report at D-33-35 and the Analysis of the 2006-2007 Budget Bill, pages 1-7.

3. The leadership of the CDCR has issued several memoranda in recent months concerning the current overpopulation crisis. Attached hereto as Exhibit C is a true and

correct copy of an October 25, 2005 Memorandum by CDCR Director of Adult Institutions John Dovey. The Memorandum reports that the "historic" population high of 166,148 at that time (the population has since surpassed 170,000) "has caused significant population pressures resulting in public safety concerns for the CDCR" and requires "unprecedented recommendations to modify a variety of correctional operations."

<u>The Shortage of ICF Beds and Defendants' Plans for Expansion</u>

4. The Unidentified Needs Assessment or "UNA Study" that was completed last year identified a significant shortage of both Level I-III ICF beds and Level IV ICF beds. The Level IV ICF bed shortage is more readily apparent in routine document productions because there has been a large and persistent waiting list of Level IV inmates waiting for placement into the SVPP ICF program. Attached hereto as Exhibit D is a true and correct copy of an April 11, 2006 Report from the CDCR clinical leadership which documents that as of April 10, 2006 there was a 123 inmate waiting list for the Level IV ICF program at SVPP.

5. Although there is not a waiting list, there is also a current shortage of Level I-III ICF beds. That current shortfall of ICF beds is documented in the March 30, 2005 UNA study. That study found that there were 435 CDCR inmates with unidentified and previously unmet need for ICF inpatient care. See Exhibit E hereto, March 30, 2005 UNA Study at Attachment A, Table 2. Later estimates were made that 66 percent of this unmet need was for Level IV beds, with the remainder consisting of Level I-III inmates. See 15th Report at 377. That means that the UNA study found unmet need for 145 Level I-III ICF beds. For that reason, plaintiffs disagree with defendants' assertion on page 7 of their plan that there is a lack of demand for lower security ICF beds. Defendants need to take aggressive actions to ensure that all appropriate cases are being referred for inpatient care.

6. The Court has frequently issued orders in the past requiring defendants to study their unmet need for inpatient care. The Court has issued at least eleven (11) Orders on the issue of the adequacy of existing DMH inpatient resources and access to those resources in the last seven years. These Orders include the following: 5/22/98 Stipulation and Order (in exchange for reduction in ASH beds to 200, defendants promised a new SVPP facility by

-2-

2001 – the facility did not open until 2004 and it has proved impossible to use roughly 25 percent of its beds because they are in dorms unsuitable for high custody inmates); 7/29/99 Order at 9 (requiring a plan "for expediting the transfers of seriously mentally disordered inmates to programs with the level of care to which they have been referred"); 8/28/00 Order at 1 (ordering implementation of recommendations of Dr. Koson's Report on improving access to DMH beds); 4/4/01 Order (adopting timelines for transfers to higher levels of care); 6/27/01 Order at 4 ("On or before July 6, 2001, defendants shall submit to the parties and to the special master the Department of Mental Health inpatient bed usage study and needs assessment"); 3/4/02 Order (granting third extension of time for defendants to complete inpatient bed study until March 31, 2002 and noting that "no extension of the deadline granted in the previous paragraph will be granted for any reason"); 5/7/02 Order at 3 (rejecting study completed in Spring 2002 and requiring defendants to design a new study with the Special Master and his experts and submit a plan for the study by July 31, 2002); 10/8/02 Order (extending time and directing parties to meet with Special Master concerning study of unmet need); 1/19/04 Order at 4 ("defendants shall complete their study of unmet inpatient bed needs by March 31, 2004"); and 7/9/04 Order (setting date of 7/3/04 by which defendants "with the assistance of the special master's experts, shall complete the design for and submit to the special master a plan for the execution of an unmet inpatient bed needs study").

7. Finally, after many failed studies, defendants produced an adequate assessment, the March 30, 2006 UNA plan. Attached hereto as Exhibit E is a true and correct copy of Exhibit E from that study, which projected defendants' need for various types of ICF and APP beds for several years into the future. Also attached as part of this exhibit is a true and correct copy of an updated version of this chart provided by defendants in May 2005 projecting a higher need for beds at all levels of care based on updated population projections.

8. While the March 30, 2005 report contained an appropriate assessment of the scope of the problem, it also included a deeply flawed plan to meet the identified need for 400 additional acute and intermediate beds. The plaintiffs provided defendants with detailed objections to the UNA plan in a letter dated April 27, 2005. Attached hereto as Exhibit F is a

true and correct copy of plaintiffs' April 27, 2005 letter. Special Master Keating and his experts also provided objections in a conference call on the plan.

9. After the plaintiffs and the Special Master shared their objections with defendants, the Special Master gave defendants a new deadline of August 15, 2005 for submitting a revised plan. On August 15, 2005, defendants submitted a second plan to meet the need identified in the March 2005 study. The second plan was also inadequate. Plaintiffs sent letters detailing our objections to the August 15, 2005 plan on August 17, 2005 and August 23, 2005, true and correct copies of which are attached hereto as Exhibit G.

10. The Special Master sent a letter to defendants on August 30, 2005 which also provided defendants with a detailed account of the serious shortcomings of their plan and which noted that he was "deeply dissatisfied with the adequacy of the Department's overall plan." Attached hereto as Exhibit H is a true and correct copy of the Special Master's August 30, 2005 Letter. The failure of the August 15, 2005 plan in turn led to the current requirement in the 15th Report that defendants produce yet another plan on or before April 17, 2006.

11. The lack of in-patient intermediate care beds for Level IV inmates has resulted in serious injury and death to members of the plaintiff class. In the Special Master's Draft 2004 Report, there were at least two EOP suicides identified where the failure to refer these patients to intermediate in-patient care contributed to the inmate's death. Special Master's Draft 2004 Report at 42 and 90. The time to file comments and objections to this Draft Report has expired and neither party objected to these findings.

12. On April 11, 2006, I participated in a phone conference with Special Master Keating, plaintiffs' counsel Michael Bien, Thomas Nolan and Keith Wattley, counsel for defendants and representatives from CDCR. During that phone conference the parties discussed defendants' draft Bed Plan. One of the subjects discussed were the SVSP ICF units that are scheduled for retrofit in 2009. One of the three 36-bed units has already been retrofitted and will be open for occupancy in the summer of 2006. The project was completed in less than eight months. Plaintiffs requested an explanation why the other SVSP units to be retrofitted could not be expedited given the serious Level IV ICF bed shortage. Defendants'

only response to plaintiffs' request were some vague licensing concerns but they agreed to consider plaintiffs' request. In their Bed Plan filed on April 17, 2006, defendants state that this option was considered and rejected "based on current experience with construction and the time it would take, approximately two years, to make the housing unit licensable even with DHS program flexes". Defendants' Plan at 18. Defendants also discussed their plan to close the current Level IV ICF 36-bed unit at CMF and transfer those patients to the new ICF unit at SVSP. Plaintiffs objected to this plan during the phone conference because of the current shortage of Level IV ICF beds and requested that defendants retain that unit. Defendants indicated that their plans to close the unit were based upon their need to retrofit the unit with air conditioning and other amenities required by licensing authorities. Defendants stated that they are concerned about the heat risks to ICF patients associated with remaining in the P-2 unit at CMF during the hot summer months. There are a number of serious problems with defendants' plan to transfer these patients to the unit at SVSP and close the unit. First, defendants plan to close down a critically needed 36-bed Level IV ICF unit at CMF because it lacks air-conditioning even though SVSP is also not air-conditioned. Second, there is no reason why CMF cannot retrofit another unit that is not currently housing ICF patients for a future unit and retain the current critical program. Third, using the heat safety measures required by the May 11, 1992 heat injunction in this case, CMF has been able to safely house and treat more than 600 EOP patients for more than 13 years without a single serious heat-related injury or death. There is no reason to think that DMH will be unable to adopt similarly effective alternative cooling procedures for its ICF unit this summer.

13. On Friday, October 29, 2004, John Rodriguez, Deputy Director of the Department of Mental Health, testified during the hearing on defendants' motion to modify a court order to close the day treatment program at CMF. During his testimony regarding the various DMH facilities including Atascadero, Patton State Hospital and Coalinga State Hospital, Mr. Rodriquez testified that "Coalinga will be our highest security facility". Mr. Rodriguez testified that while hospital police officers provide perimeter security at Atascadero State Hospital, at Coalinga State Hospital, CDCR custody officers provide the perimeter

security. Attached hereto as Exhibit I is a true and correct copy of the Reporter's Transcript, Friday, October 29, 2004, at 53. During his testimony, Mr. Rodriguez told the Court that DMH would be able to provide the CDCR with 50 beds at Coalinga State Hospital in September 2005 and an additional 125 beds at either Atascadero or Coalinga once Coalinga was opened. Exhibit I at 44-48. Despite the fact that Coalinga State Hospital has accepted patients, no CDCR patients have yet been transferred to Coalinga State Hospital. Exhibit B, LAO Analysis of 2006-2007 Budget.

14.  In two Suicide Reports completed by CDCR's Suicide Case Review Focused Improvement Team in 2005, the failure to refer the Level IV patients to DMH was identified as a serious problem in the case reviews. In the first suicide, which occurred on July 2, 2005, the patient who was housed in the PSU program at CSP-Sacramento, was described as severely mentally ill, un-medicated and not programming in the PSU. Although he was often "considered" for a referral to a DMH level of care, his case manager never referred him. A review of this patient's medical records provided clear evidence of the need for inpatient care, however, because of the shortage of Level IV ICF beds, a DMH referral was likely to have resulted in placement on the lengthy waiting list for an ICF bed. The second suicide involved an EOP patient who was housed in the administrative segregation unit at CSP-Sacramento for 322 days. The Suicide Report identified the failure to refer this suicidal and psychotic patient to DMH. Here again, the clinician failed to refer a Level IV patient, who was likely to remain on a waiting list for the DMH bed that he desperately needed. One of the reasons these clinicians failed to refer their patients was probably their knowledge of the unavailability of DMH beds for this Level IV population.

### The Shortage of MHCB Beds and Delays In Access to MHCB Care

15.  Under the Program Guide requirements, inmates found to be in crisis or at risk for injury to self or others must be placed in a licensed MHCB unit within 24 hours. January 2006 Revised Program Guide, Ch. 5, 12-5-3. Some institutions with MHCB units also house inmates experiencing mental health problems in Outpatient Housing Units or "OHUs." OHUs are simply local infirmaries without assigned mental health staff or 24 hour nursing care.

Under the Program Guides, OHUs are not permitted to house seriously mentally disordered inmates for longer than 72 hours (or longer than 24 hours if an inmate is determined to be suicidal). January 2006 Revised Program Guide, Ch. 5, 12-5-26-27. Every month, hundreds of critically mentally ill CDCR inmates are referred to MHCB beds that do not exist. 15th Monitoring Report at 394. Defendants have provided the Special Master and plaintiffs with monthly reports documenting the numbers of inmates referred and placed in MHCB beds. Attached hereto as Exhibit J is a true and correct copy of Defendants' Mental Health Crisis Bed-Monthly Reports, for the months of April to July 2005 and January and February 2006. These reports document the number of inmates referred to MHCB beds, the number of inmates placed in an MHCB bed, the days the inmates waited for a placement, and the number of MHCB referrals that were rescinded. For example, in April 2005: there were 227 MHCB referrals, with only 48 of the inmates placed in an MHCB. Of the 48 inmates transferred, only 21 cases were transferred within the required timeframes. In February 2006, there were 230 MHCB referrals, with only 67 placed in an MHCB. Of the 67 transferred, only 30 were transferred within the required timeframes. Despite the lack of progress in placing inmates in need of MHCB care, defendants have failed to adequately address the serious MHCB bed shortage in their Bed Plan.

16.    In July 2005, in response to the MHCB shortage the CDCR issued memorandum to all Wardens, Health Care Managers and Chiefs of Mental Health to standardize procedures for housing inmate-patients in need of a MHCB in alternative settings. Attached hereto as Exhibit K is a true and correct copy of a July 21, 2005 Memorandum entitled, "Standardization of Mental Health Crisis Bed Admission Procedures." The memo is signed by Adult Institutions Director John Dovey and Health Care Services Director Rene Kanan. The July 21, 2005 Memorandum was issued in recognition of the fact that the CDCR was desperately short of MHCB beds and was placing inmates in unsafe, unmonitored settings within institutions without any guidance from CDCR headquarters. The memo instructed institutions to house inmates in need of MHCB care in alternative settings pending MHCB transfer in the following order of preferred locations: Inpatient beds; outpatient housing units;

outpatient housing unit overflow cells; large holding cells with water/toilets including, but not limited to "ZZ cells"; large holding cells without water/toilets, such as "Contraband cells"; Treatment and Triage area or other clinic examining room; other unit-housing where complete and constant visibility can be maintained; small holding cells that are designed for the inmate-patient to sit or stand may be used for up to four hours; holding cells within the licensed bed area of the CTC. Many of these alternative locations have inappropriate, excessively punitive conditions. None have appropriate clinical staffing.

17. In response to the July 2005 Memorandum, a chart was prepared and distributed to the Special Master and plaintiffs' counsel which identified alternative MHCB waitlist housing for each institution. Attached hereto as Exhibit L, is a true and correct copy of Mental Health Crisis Bed Waitlist Housing Plan by Institution. These alternative housing sites have no clinical staffing. In some of the locations, patients are unable to sit for any period of time and must be rotated in and out of the location after a four hour period of time. The result is that every month, many inmates, who have been determined to be suicidal, "remain inadequately observed and poorly treated." 15th Report at 394.

18. My law firm receives inmate correspondence from *Coleman* class members which is reviewed daily by our paralegals. I instructed the *Coleman* paralegals to identify inmates who wrote to our office about suicide watch that occurred outside of an MHCB setting since August 2005. In order to better understand the experience of these inmates, we developed a questionnaire that we sent to inmates who wrote to us about their experiences on suicide watch in holding cells, ZZ cells, adseg units, and contraband cells. Attached hereto as Exhibit M is a true and correct copy of a blank Suicide Watch Questionnaire. We received approximately 23 questionnaires in response from inmates housed at SVSP, CCI, Corcoran, Lancaster, and Kern Valley State Prison who were placed on suicide watch or suicide precautions. Fourteen of these inmates were housed in contraband observation rooms, ZZ cells, adseg housing, and holding cells in various locations throughout the prisons. Eleven reported that they were not provided with mattresses and seven reported that they were not provided with a suicide smock during their suicide watch. All but one inmate reported that

they would not tell custody or clinical staff again if they were feeling suicidal because the "suicide watch" conditions they experienced were so punitive. They described feeling humiliated and cold in their "naked" state. We also received numerous letters from inmates who were placed in alternative sites on suicide watch who did not return questionnaires who also reported that they were not provided with appropriate suicide smocks, mattresses and blankets. The overall impression from the questionnaires and correspondence regarding the suicide watch conditions in the alternative locations was that patients found the conditions oppressive and non-therapeutic. Under those circumstances, a suicidal inmate is quite likely to avoid reporting suicidal feelings.

19. I accompanied the *Coleman* monitors on a tour of CSP-Sacramento on December 19-20, 2005. During that tour we were informed that the institution had been using alternative ZZ cells (holding cells with toilets that are located in corridors outside of housing units) since Spring 2005 for suicide watch because of inadequate MHCB beds at the institution. CSP-Sacramento has both an MHCB and an OHU, yet the clinical staff reported that both of these units were often full and they were forced to place inmates on suicide watch in the ZZ cells. In an effort to standardize the suicide watch procedures in the ZZ cells, CSP-Sacramento developed a Post Order for the correctional officers who are assigned to conduct suicide watch on inmates who are placed in ZZ cells on suicide watch. Attached hereto as Exhibit N is a true and correct copy of the CSP-Sacramento ZZ Cell Post Order. There is no clinical staffing assigned to the ZZ watch. We received letters from several inmates placed on suicide watch in ZZ cells at CSP-Sacramento in August 2005 who reported that they were not provided with mattresses, but were only given a blanket to sleep on during their placement in the cell.

20. In the summer of 2005, at Mule Creek State Prison, administrative segregation units were used for housing and observation of suicidal inmates. The custody staff's union representative complained to Warden Campbell and the Chief Psychologist about the dangerous suicide watch procedures employed in that housing unit. Attached hereto as Exhibit O is a true and correct copy of the August 3, 2005 Letter to the Mule Creek State

Prison Health Care Manager and Warden from CCPOA President Latimore, regarding the use of administrative segregation housing for suicidal inmates.

21. The lack of adequate MHCB beds in 2004 and 2005 has resulted in the housing of psychotic, dangerous patients in OHU beds who should be housed in licensed MHCBs because of their serious mental health conditions. I reviewed the medical and central files of two of these patients – both of whom were admitted to OHUs on suicide watch. The first inmate, who severely injured himself while monitored on suicide watch, was transferred to the reception center at San Quentin on September 8, 2005 (after a ten-month commitment at Atascadero State Hospital to restore his competency to stand trial.) Upon arrival in the reception center, he was initially classified as 3CMS level of care, but was quickly reclassified as EOP. He was placed in administrative segregation when he arrived at the reception center for his safety but was not provide with the ten hours of therapeutic activities mandated for EOP patients housed in these units. During his stay in the unit, he was described by clinical staff as floridly psychotic, agitated, and with unkempt appearance. He refused most out of cell activities, including showers and yard. Despite his clear decompensation, there was no effort made to refer him to an MHCB bed, DMH or to put him on involuntary medications. There is no evidence of any clinical contact with this patient after November 1, 2005. On November 20, 2005, he was admitted to the OHU at San Quentin because he was behaving in an acutely psychotic manner and had put fecal matter in his eyes, on his body and had bruising on his face. San Quentin does not have an MHCB unit. The inmate was placed on suicide watch with custody officers observing him on a video monitor. Plaintiffs were provided with a copy of the video tape made of this suicide watch. I watched the video tape and observed this inmate being placed in the OHU in his tee-shirt, which he removed and gave to the officer. He was left naked in the cell with a blanket and mattress on the floor. He did not wrap the blanket around his body, but left it lying on the floor. He alternated between sitting on the floor rocking back and forth, standing and sitting quietly. At one point, he put his fingers in his eyes and appeared to gouge them. In the video, he is then observed for the next hour and twenty minutes to be rocking back and forth, stumbling around the cell, and

holding his head and eyes in pain before an officer or medical technician comes to his food port and speaks to him. When an officer or other staff person finally notices his injuries, it appears that he is told to put his hands through the food port to "cuff up", but he is unable to do so at first. He sits down facing the door backwards but cannot reach the food port sitting. He then stands up and tries to put his hands through the food port facing forward, but pulls his arms out and turns around to be cuffed. Finally, the door is opened and he is removed from the cell. The patient's medical records indicate that he was transported to Marin General Hospital where the doctors attempted to save his eyes but he was left blinded.

22. The second file that I reviewed concerns an EOP patient, with previous suicide attempts, who was placed on suicide watch and died in the OHU at DVI reception center on November 30, 2005. This patient was well known to DVI clinical staff because he had been admitted to the OHU repeatedly over the years, however, during previous admissions when there were adequate MHCB beds he was quickly transferred to a prison with an MHCB unit. (See, e.g. DVI OHU to Corcoran MHCB on 1/18/02 to 1/24/02; DVI OHU to SATF MHCB on 9/10/02 to 10/7/02; DVI OHU to Solano MHCB on 4/4/03 to 4/15/03 and DVI OHU to Mule Creek MHCB on 4/30/03 to 5/5/03.) This patient had been involuntarily medicated within CDCR in both 2002 and 2003 because of a history of medication non-compliance and serious decompensation when off his medications. Unfortunately, when this EOP patient returned to the reception center at DVI in August 2005, there were insufficient MHCB beds system-wide, and despite persistent psychotic and suicidal symptoms, he was kept in an OHU bed at DVI for twelve days (8/15/05 to 8/26/05). During this OHU admission, his cell was described as decorated with excrement and food, he was described as wearing rolled up paper in his ears and around his penis, yelling in a psychotic state. This EOP patient paroled out in early November 2005 and was returned to custody as a parole violator on November 17, 2005 in a psychotic state. He was placed in the DVI OHU when he arrived in the reception center and was retained there for a week despite *Coleman* mandates prohibiting the housing of psychotic, suicidal inmates in OHUs for more than 24 hours. He was noted to be in a manic, agitated and delusional state even five days after his admission, yet he was not referred for

transfer to an MHCB bed at that time. This EOP patient was discharged two days later, with slightly pressured speech, and a diagnosis of Bipolar, Manic, severe with psychotic features. The OHU, where this patient was repeatedly housed, did not have the clinical capability to initiate the involuntary medication petition that was necessary for this patient. On November 29, 2005, he was admitted to the OHU again because he reported he wanted to hurt himself, he appeared confused, and the clinician noted that the housing unit officer stated that the inmate had no sense of "where he was or what he was supposed to do." He was admitted to the OHU at 9:45 a.m. for suicide observation by a video camera monitoring system. Defendants provided plaintiffs with a video tape containing the first two hours of the suicide watch. The remaining 19 hours of suicide watch were not recorded as required by defendants' own suicide watch procedures or the tape was lost. On the video-tape that I viewed, this EOP patient was placed in the OHU cell in a suicide smock without a mattress or blanket. The cell had no toilet except for a hole in the floor. The patient appeared quite agitated and rarely sat still for more than a minute or two at a time. According to the Incident Report provided in the medical records, when the patient was discovered dead in his OHU cell at 6:45 a.m., he was described by the responding officer as rigid with rigor mortis, pale, cold to the touch with mottled pooled extremities due to lack of blood flow. The RN's note indicated that no CPR was undertaken because based upon the rigor mortis and pooling of the blood, which takes about 3-4 hours to manifest, the patient had already been dead for a significant amount of time when he was found at 6:45 a.m. Clearly the inadequate clinical and suicide watch procedures in these OHU units make them inappropriate for the housing of suicidal and psychotic patients. Defendants' failure to provide for an immediate solution to the inadequate MHCB beds system-wide will result in additional pain and suffering to *Coleman* class members who require crisis bed care not available in OHU, holding cells, ZZ cells, and other alternative settings utilized by CDCR to house suicidal and decompensated inmates.

### The CDCR's Current Suicide Rate

23. Under my supervision, paralegals in our firm track all CDCR suicides in a database. We add the name of each inmate who commits suicide, and other key data relevant

to the suicide to the database when we receive suicide notifications and suicide reports from the defendants. We also cross-check our database against the Special Master's and defendants' annual suicide reports, and make adjustments to our tracking data where necessary. According to our current tracking log, which does not count several deaths whose cause is currently reported to be unclear (cases which may upon further review turn out to be additional suicides), in 2005, plaintiffs counted 41 suicides in the CDCR. We did not include four deaths reported by defendants as non-suicides, which we have not yet reviewed. We have reviewed two additional deaths reported by defendants as non-suicides, and on the basis of our review of the inmate-patients' central and medical records (and the CDCR's death reviews), we have decided to include these two deaths in our suicide count: (1) the 9/25/05 death of a 3CMS patient, with suicidal history, housed on death row at San Quentin who overdosed on his medications; and (2) the 7/02/05 death of an EOP patient, with suicidal history, who was floridly psychotic and died by suffocation in his cell. National suicide rates reported by the Bureau of Justice Statistics are based on the rate per 100,000 inmates, with the state prison suicide rate figured at 14 per 100,000 inmates as reported by the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails, which was issued by the U.S. Department of Justice in August 2005. Attached hereto as Exhibit P is a true and correct copy of the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails. My staff calculated the CDCR suicide rate for 2005 by taking the ratio of 2005 suicides to the total current population of male CDCR inmates (41/156,374) and multiplying that ratio by 100,000. The resulting CDCR suicide rate per 100,000 is 26.21, which rounds down to a rate of 26 per 100,000, which is almost double the state prison rate reported by the U.S. Department of Justice in August 2005.

24. In 2003, there were 36 suicides in CDCR in a population of approximately 155,722 resulting in a suicide rate of 23.1 per 100,000. Special Master's Draft Suicide Report at 9. In 2004, there were 26 suicides in CDCR in a population of approximately 163,346 resulting in a suicide rate of 15.9 per 100,000. *Id.* In 2005, the suicide rate as figured above was 26 per 100,000. In 2005, plaintiffs received notification of eight suicides that occurred

during the first three months of 2005. By contrast, in 2006, during the first three months of the year, plaintiffs had already been notified of thirteen suicides that occurred within CDCR.

<u>The Severe EOP Bed Shortage Is Harming Patients</u>

25. On March 2, 2006, the Court ordered defendants to respond to plaintiffs' contention in their objections to the 15th Round Monitoring Report "that the percentage of mentally ill inmates awaiting treatment in Reception Centers is approaching unconstitutional levels and they ask that defendants be required to create treatment programs for enhanced outpatient inmates in the Reception Centers." 3/2/06 Order. In response defendants informed the Court that CDCR was "developing a plan to increase EOP capacity at several institutions in order to facilitate the timely transfer of EOP inmate-patients out of the reception centers and into a more suitable treatment environment." Defendants' Response to Plaintiffs' Request for Court Orders Re: Psych Tech Rounds and Reception Center Care, dated March 17, 2006, Ex. A, at 2.

26. On April 17, 2006, defendants filed with the Court their Statewide Mental Health Bed Plan. Enclosure II to Defendants' Plan is a chart entitled "Closing the Gap" which indicates that the CDCR has a current shortfall of 1180 EOP beds, including a shortfall in Level IV EOP beds of 620 beds. The Bed Plan provides for an additional 352 EOP beds in 2006-2007, as well as the 115 Level IV SNY EOP beds at Mule Creek State Prison that defendants previously announced to the Special Master and plaintiffs more than a year ago during Policy Meetings in February 2005 and July 2005. In fact, plaintiffs were then told that the MCSP expansion would be completed in the Summer 2006. Only in 2011 does defendants' Bed Plan provide for an additional 150 EOP beds. The Bed Plan makes no other provisions for the immediate shortage of 1090 EOP beds, which will impact significantly on reception center EOP patients who receive inadequate mental health services while they wait for transfer to EOP beds that defendants have neither planned nor built.

27. Pursuant to the January 19, 1999 Court Order, the CDCR provides monthly reports on the bed capacity and actual population of EOP and CCCMS patients located at each CDCR institution. Attached hereto as Exhibit Q is a true and correct copy of the most recent

monthly report provided by CDCR to the Special Master and plaintiffs, dated March 22, 2006, reporting the Mental Health Population data download for December 30, 2005. According to this data, there were at least 556 EOP patients housed in the CDCR reception centers in December 2005 waiting for transfer to an EOP program. Although the Court-ordered transfer timelines require that EOP patients be transferred to EOP treatment programs within 60 days, most of the reception center EOPs are not transferred to programs in a timely fashion. 15th Report at 396-97. (See, e.g. CCI: 11/30/05 RC Data reporting 5 overdue transfers with pending average length of 103.50 days; CIM: 11/30/05 RC Data reporting 22 overdue transfers with pending average length of 121.18 days; CIW: 11/30/05 RC Data reporting 9 overdue transfers with pending average length of 93.44 days; DVI: 11/30/05 RC Data reporting 16 overdue transfers with pending average length of 128.50 days; HDSP: 11/30/05 RC Data reporting 2 overdue transfers with pending average length of 101.00 days; NKSP: 11/30/05 RC Data with 37 overdue transfers with pending average length of 235.16 days; RJD: 11/30/05 RC Data with 18 overdue transfers with pending average length of 103.39 days; SQ: 11/30/05 RC Data with 45 overdue transfers with pending average length of 175.11 days; Wasco: 11/30/05 RC Data with 44 overdue transfers with pending average length of 137.41 days. Attached hereto as Exhibit R is a true and correct copy of the most recent reception center data provided by defendants pursuant to the January 19, 1999 Court Order.) The reason for these delayed transfers is no longer a mystery. There are simply insufficient EOP beds available to transfer reception center EOP patients to and while these EOP patients wait for available treatment beds they are provided with minimal care and suffer mental health harm.

28.    On April 6, 2006, I traveled to CSP-Lancaster with a paralegal from our office to interview EOP and 3CMS patients housed in the reception center and mainline facilities. We interviewed four EOP reception center patients and reviewed their medical and central files. Three of the inmates had been in the reception center for at least three months. One had arrived in February 2006. None of these EOP patients had documents in their files indicating that they had been endorsed for transfer to an EOP program. In fact, three of the four reported

that their correctional counselor had informed them that they would be paroling out of the reception center. One patient, a 19 year old who had arrived in December 2005, seemed unaware of his surroundings and his medical records reflected this level of dysfunction. All of these patients reported minimal mental health care – limited to a weekly case manager contact and medical review by a psychiatrist – which was confirmed through our file reviews. EOP programming in a mainline prison includes at least ten hours of weekly therapeutic activities. During the interviews, all of these inmates reported that they are cell fed, and are only out of cell for showers three times a week, yard once a week, and their medical appointments. Some of their clinical appointments were cell-front. These patients are provided with less out of cell time than inmates who are housed in administrative segregation. 15 CCR §3343(g) and (h) (requiring ten hours of yard per week for adseg inmates). One of the patients that we interviewed was a 19 year old returned to custody in December 2005, who was diagnosed as Psychotic, with a possible Organic Brain Injury. He believed that he was paroling out in June 2006, although according to the clinical notes he had some confusion over whether he was in prison or a hospital setting. He had several crisis admissions for suicidal ideation, and was doing poorly in the reception setting. He continued to giggle during most of the interview and focused on getting contact information for his mother. Another EOP patient that we interviewed was a 21 year old returned to custody in January 2006, with a diagnosis of Psychotic Disorder, who was described by his clinician as bizarre and catatonic, with paper stuffed in both ears. He brought "writings" to the interview that were illegible and was quite difficult to interview. The failure to transfer these EOP reception center patients in a timely manner significantly impacts on their access to adequate mental health treatment, including adequate diagnoses, medication management and symptom stabilization.

29. One of the 2005 suicides involved an EOP patient housed in the reception center at California Institute for Men. This patient had a history of multiple suicide attempts and was housed in the reception center from June 16, 2005 until his suicide on November 1, 2005. The Suicide Report prepared by CDCR identified multiple problems with his care including the failure to refer him to DMH, problems with suicide risk assessments and missing custody

suicide prevention follow-up hourly checks. The Suicide Report did not identify the failure to provide this EOP patient with appropriate EOP level of mental health care while he was housed in the reception center for more than four months during which time he decompensated and became acutely suicidal. The housing of EOP patients in reception centers without the provision of EOP level of care has not been identified by CDCR as the clear constitutional failure that it is.

    I declare, under penalty of perjury, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on April 21, 2006.

Respectfully submitted,

*/s/ Jane Kahn*

Jane Kahn
Rosen, Bien & Asaro
Attorneys for Plaintiffs

I DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT, AND THAT THIS DECLARATION OF JANE KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' IN-PATIENT AND MHCB BED PLAN, NO.: CIV S 90-0520 LKK-JFM