1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

   BINGHAM, McCUTCHEN, LLP
   WARREN E. GEORGE Bar No.: 53588
   Three Embarcadero Center
   San Francisco, California  94111
   Telephone: (415) 393-2000

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

   HELLER, EHRMAN, WHITE &
   McAULIFFE
   RICHARD L. GOFF Bar No.: 36377
   701 Fifth Avenue
   Seattle, Washington  98104
   Telephone: (206) 447-0900

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

14 Attorneys for Plaintiffs

13

15                 UNITED STATES DISTRICT COURT

16                 EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN,                    )  No.:  Civ S 90-0520 LKK-JFM
                                      )
19        Plaintiffs,                 )  **CORRECTED EXHIBITS E-G TO**
                                      )  **DECLARATION OF JANE KAHN IN**
20  vs.                               )  **SUPPORT OF PLAINTIFFS'**
                                      )  **OBJECTIONS TO DEFENDANTS' IN-**
21  ARNOLD SCHWARZENEGGER, et al.,    )  **PATIENT AND MHCB BED PLAN**
                                      )
22        Defendants                  )           **HEARING**
                                      )
23                                    )  Date:        April 26, 2006
                                      )  Time:        3:30 P.M.
24                                    )  Location:    Courtroom 4
                                      )  The Hon. Lawrence K. Karlton
25  _____   )

26

27

28

# EXHIBIT

# E

**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



| RECEIVED |
| :---: |
| APR 0 4 2005 |
| ROSEN BIEN & ASARO |

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

March 30, 2005

J. MICHAEL KEATING, Jr.
Special Master
2351 Sussex Drive
Fernandina Beach, FL  32034

RE:    Coleman v. Schwarzenegger
       <u>USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P</u>

Dear Mr. Keating:

Please find enclosed the results of the Unidentified Need Assessment and, for your review and approval, the plan to provide intermediate and acute inpatient care to inmate-patients who need such care.  This package consists of the following items:
-the March 30 cover letter,
-the Mental Health Tiered Care Project and Resource Management Plan Summary,
-the Attachment Index,
-Attachments A through H.

Please contact me if you have any questions or concerns.

Sincerely,

LISA A. TILLMAN
Deputy Attorney General

For    BILL LOCKYER
       Attorney General

cc: Matthew Lopes
    Michael Bien
    Steve Fama

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                    ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF CORRECTIONS**
**P. O. Box 942883**
**Sacramento, CA  94283-0001**



March 30, 2005


J. Michael Keating, Jr.            via:    Lisa Tillman
Office of the Special Master               Deputy Attorney General
2351 Sussex Lane                           Department of Justice
Fernandina Beach, FL  32034                1300 I Street, Suite 125
                                           P. O. Box 944255
                                           Sacramento, CA  94244-2550

**RE:**  RALPH COLEMAN, et al. v. ARNOLD SCHWARZENEGGER, et al. USDC, Eastern
        District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

In accord with the court's order of October 5, 2004, please find enclosed the results of the
Unidentified Need Assessment and, for your review and approval, the plan to provide
intermediate and acute inpatient care to inmate-patients who need such care.

If you have any questions, please contact me at (916) 445-6597, or Renee Kanan, M.D., Deputy
Director (A), Health Care Services Division, at (916) 323-6811.

Sincerely,


JOHN DOVEY
Chief Deputy Director
Field Operations


Enclosures


cc:  G. Kevin Carruth, Undersecretary, Youth and Adult Correctional Agency
     J. S. Woodford, Director, California Department of Corrections
     Ernest C. Van Sant, Chief Deputy Director, Support Services
     Renee Kanan, M.D., Deputy Director (A), Health Care Services Division
     Suzan Hubbard, Deputy Director (A), Institutions Division
     Dave Lewis, Deputy Director (A), Financial Services Division
     Kathy Keeshen, Deputy Director, Legal Affairs Division
     John Rodriguez, Deputy Director, Department of Mental Health

## MENTAL HEALTH TIERED CARE PROJECT
## AND RESOURCE MANAGEMENT
## PLAN SUMMARY

Pursuant to *Coleman v. Schwarzenegger on October 5, 2004,* an order pertaining to unidentified needs in the Department of Corrections' Mental Health Program for inpatient services. This order required the Department to submit to the court the results of its study entitled the "Unidentified Need Assessment" (UNA) and to develop and submit for the court's approval a plan to provide needed intermediate and acute inpatient DMH care to CDC inmates who need such care. The Department is required to submit to the Special Master by March 31, 2005 its plan to "meet any unmet need for inpatient care documented in the assessment." In addition, the order adopted the recommendations of the Special Master that were previously filed with the court which stated, in pertinent part:

> "The plan needs to be grounded in budgetary and construction reality, and must include specific plans, with supportable timelines, for the allocation of needed financial and physical resources. If, as seems inevitable at this point, some portion of the defendants' long-term plan depends on the construction and staffing of DMH's new facility at Coalinga, that portion of the defendants' plans must address concretely and specifically the joint CDC and DMH budgetary, construction and staff recruitment aspects of the proposal for its use."

The Department's Plan includes seven basic elements necessary to address treatment needs that may have previously have been unidentified:

(1) The UNA Report, which is incorporated into the Plan (Attachment A);

(2) The disposition and present status of each of the inmate/patients identified in the UNA Report requiring referral, or who were involved in the referral process for acute care (APP) and Intermediate Care (ICF) (Attachment B);

(3) A description of the "UNA Factor"—the number of cases that the UNA Report identifies for referral for APP or ICF solely as a result of the UNA process; in other words, cases that but for UNA would not have been so referred (Attachment C);

(4) A description of the Department's forecasting formula for APP and ICF bed need (Attachment D);

(5) A demonstration of the results including the UNA Factor into the baseline population of the forecasting formula to produce a revised mental health inpatient bed need, based on adding the UNA Factor (Attachment E);

(6) A comparison of the revised bed need with currently available and forecasted bed availability that demonstrates any "gap" or need that exceeds APP or ICF capacity (Attachment F);

(7) The project plan detailing the methods of addressing this need including measures designed to improve the existing referral and treatment processes, and a description of a bed management plan to be used to minimize any continuing unmet need for inpatient care, facilitate efficient use of available beds, and expand the current capacity (Attachment G).

The Plan is set forth in a schedule of three phases:

*Phase I (Immediate Strategies)*: Addresses the needs of the specific inmate-patients identified by the UNA Report including monitoring and tracking these inmate-patients for the purpose of assuring their appropriate treatment and establishing whether their treatment is consistent with the current inpatient programs or whether treating these inmate-patients requires other approaches. Included are the establishment of "wait list" management and the monitored provision of appropriate level-of-care services to those awaiting transfer to an inpatient bed. A renewed focus on training of both referring and receiving clinicians will be delivered based on the findings of the UNA Report. This training will focus on addressing what had been an unidentified need, as well as on treatment needs generated by identifying this need. The UNA results will be incorporated into the "Tucker Allen" forecasting formula to better establish planning numbers for future bed need.

*Phase II (Intermediate Strategies)*: Includes implementing a bed management plan seeking more efficient and effective use of available beds while exploring any potential for increasing the number of beds within a relatively short term. These strategies will require the active participation of management and staff from the Department of Mental Health to produce joint outcomes that effect increased bed availability, and subsequent use of standard admission and discharge criteria, utilization oversight and converting beds from other programs for inpatient use. The bed management plan will include ongoing methods such as utilization review and renewed planning for the future.

*Phase III (Long-Range Strategies)*: Focuses primarily on the long-term development of inpatient facilities for overall expansion of beds available to meet the forecasted need as modified by the UNA Factor. Regular updates for this formula will reflect improved use of existing beds, through better utilization management, better understanding of the referring and receiving clinicians relative to inmate-patient treatment needs, better use of standards for admission and discharge, as well as development of additional treatment determined as the individual UNA cases are monitored.

In the attachments, the strategies set forth above are described in detail and demonstrated in graphics and data in order to meet the precision required by the court. It should be acknowledged, however, that the demand on inpatient beds defined by the UNA Report might not be achieved readily through interim treatment measures. That is, sufficient inpatient beds to fully meet demand may not be possible for some time to come.

It is also worth noting that given this is a multi-year plan modifications will be made to account for up-to-date information on our systems and processes.

Phase I—This Phase runs from March through May, 2005.
> The milestones of Phase I involve strategies to ensure that inmate-patients requiring APP/ICF levels of care are identified and receive the appropriate level of care in a timely manner. This will include modifying the forecasting model to include the UNA results.

2

Phase II—This Phase runs from March 2005 through October 2009.

The milestones of Phase II involve strategies to develop and impellent a bed management program in order to ensure the appropriate use of presently available APP/ICF beds, and increasing the number of these that are available for use. Identification and establishment of additional beds for use during this intermediate period, improvement of existing processes for monitoring the provision of appropriate levels of care, exploration of new treatment programs or designations that are necessary for providing appropriate treatment for inmate-patients identified as a result of UNA, and further refining the nature of the "gap" between need and available beds to form a planning basis are major efforts of this Phase.

Phase III—This Phase runs through 2013.

The primary milestones of this Phase involve refining the concepts set forth in the Statewide Mental Health Facility Study, and to incorporate the inpatient beds needed to fill the "gap" resulting from revised bed need forecasts. This will be a focused planning and facility development effort concentrating on producing three regional correctional health facilities.

**The Unidentified Need Report (UNA)**

The completion of this Report marked the first time that the practices of referral to higher levels of care of CDC clinicians who were treating inmate-patients in the Mental Health Enhanced Outpatient Program (EOP) was specifically studied. The study team reviewed inmate-patients in the EOP during the period of the Assessment and concluded that a significant number were not being referred even though their mental health condition required such referral. This Report is attached (its 500 pages of supporting data is provided on a CD included with this report) and referenced here as the basis for the Plan being submitted.

The operative numbers contained in the Report that demonstrate "unidentified need" are: (1) 512 total "positives" of inmate-patients that were or should have been in the process of being referred; (2) 186 of this total number were identified by the UNA team and had not been identified by the CDC clinicians; (3) 400 inmate-patients determined to constitute the total number of "unidentified need" (the number but for UNA occurring would not have been referred to a higher level of care.) Phase I of the Plan addresses the 512 inmate-patients as the total number of positives. The "gap" between existing beds and beds needed is established adding the 400 total unidentified need to the bed need forecasts, which forms the basis for the planning number for Phase II and beyond.

Tracking and monitoring of the 512 inmate-patients is important to assure that they receive the care that their mental health conditions require <u>and</u> to provide important information on the referral processes and treatment levels of the existing mental health system. While questions arise with respect particularly to the 400 cases of unidentified need, special attention is required for the 186 inmate-patients that were not identified by the CDC clinicians even as a secondary effect of UNA. These inmate-patients may

3

require treatment programs not currently available, notwithstanding improvements to the referral processes. The UNA Report is not the conclusion but the beginning of the Plan to provide an evolving mental health program that is responsive to changing conditions.

### Disposition and Present Status of the 512 Inmate-Patients

A report on the disposition and present status of the 512 inmate-patients is attached to this plan and provides information necessary for both the tracking and monitoring of their treatment to ensure it is provided appropriately, and also for planning improvements to the current system and defining potentially new programs. A summary of the present status of these inmate-patients accompanies this report.

### UNA Factor

The UNA factor describes the number of inmate-patients to be added to the "Tucker Allen" forecast model to produce a revised bed need that better reflects the inpatient bed capacity requirements. This number is 400 based on the assessment of the UNA team as described in the UNA Report.

### "Tucker Allen" Bed Forecast Model

The "Tucker Allen" model provides a five-year forecast of inpatient bed needs through computations of a set of variable factors that are acted on by the computer with formulas put in place by Tucker Allen at the conclusion of its study of the CDC mental health treatment system. Variables are updated either semi-annually or annually depending on their type (total prison population numbers are updated with Spring and Fall forecasts semiannually.) Average length of stay is another variable and is updated annually. A more complete description of this process and how the formula works is included in the attachment that demonstrates the results of adding in the 400 "unidentified need" to the model.

### Results of the Revised Forecast of Bed Need

The results of adding the UNA Factor to the forecast model are attached and demonstrate a revised present and future need for APP and ICF beds. Forecasts both with and without the "UNA Factor" are included to show the effect of including this Factor. In addition, a graph depicting the forecasted need and available beds by date demonstrate the "gap" that will be the concern of planning efforts, which are intended to reduce it through better processes and treatment and through a bed expansion program described in Phase III.

### Improvements to the Current System of Care and Expansion of Beds

These elements of the Plan are described in Phase II of the Plan and Schedule, and in Phase III of the Plan including the concepts of the Statewide Mental Health Facility Study previously submitted to the Special Master. The combination of these Phases will address comprehensively the provision of inpatient mental health services as well as form the structure for managing all mental health beds required for treatment.

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT INDEX

A.  UNA REPORT.

B.  INMATE-PATIENT STATUS MATRIX (INMATES IDENTIFIED AS NEEDING A REFERRAL DURING UNA).

C.  "UNA FACTOR" DESCRIPTION.

D.  DEPARTMENTAL FORMULA FOR FORECASTING – BED STUDY METHOD DOCUMENTATION.

E.  RESULTS OF BED NEED FORECASTING.

F.  GAP (COMPARISON OF CURRENT BED AVAILABILITY TO FORECASTED NEEDS).

G.  PROJECT SCHEDULE.

H.  MEMO FROM DMH ON AVAILABILITY OF ADDITIONAL BEDS.

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT A

## UNA REPORT

# MENTAL HEALTH TIERED CARE PROJECT

## Unidentified Needs Assessment (UNA) Report

by William F. Alvarez, Ph.D.[1]

*Introduction:*

The Unidentified Needs Assessment (UNA) project was implemented to help determine with greater accuracy the total number of inmate/patients (I/Ps) in the California Department of Correction's (CDC) mental health population who may require inpatient DMH (Department of Mental Health) level of care. This effort was implemented in response to a Federal Court Order (see Appendices A1 and A2).

*Methodology:*

A cross-sectional design was utilized involving an assessment of each of the Institutions having either a Mental Health Crisis Bed (MHCB) unit and/or EOP program. Institutions that functioned as a Reception Center were also included, resulting in the involvement of 24 CDC Institutions.

The specific methodology determining criteria for inclusion in the study and the method for assessment involving teams of Coleman and Health Care Services Department (HCSD) experts was developed jointly with a Coleman Expert (Melissa Warren, Ph.D.) The final methodology (See Appendix B) was modified to address feedback and concerns raised by legal representatives and was approved for use by the Federal Court (see Appendix A2).

Prior to full implementation of the UNA project, a pilot assessment was conducted at Salinas Valley State Prison (SVSP) on August 16, 17 and 18, 2004. Legal representatives from CDC and Plaintiff's representatives in Coleman, et. al. vs. Schwarzenegger observed the process. Additionally, orientation and training of the UNA team members was conducted on September 8, 2004. This latter training involved review of case summaries from the SVSP pilot effort for the purposes of establishing inter-rater reliability.

To notify the Institutions regarding participation in UNA and proposed site visit dates, a Memorandum (see Appendix C) signed jointly by the Deputy Directors of Health Care Services and Institutions Divisions was sent (9/21/04) to each of the Institutions'

---

[1] The findings represented in this report reflect the efforts of many professionals. However, the views expressed here are not to be interpreted as necessarily reflecting the views of those individuals or HCSD.

# MENTAL HEALTH TIERED CARE PROJECT

Wardens, Health Care Managers, and Mental Health Program Managers. The Methodology for UNA was sent as an attachment to this memo.

The final UNA site visit dates and UNA team members are presented in Table 1.

*Comments on Implementation of Methodology:*

Some additional methods were implemented to assure the integrity of the effort and findings.

Although many of the Institutions responded to the UNA Memorandum sent out to the Institutions from HCSD, others did not. This variability in response to the memo was also reflected in variability in the preparedness and cooperation across Institutions.

UNA team members initially contacted each of the Institutions and/or made site visits a week or more prior to the UNA site visit to help orient and prepare Institutions. Despite these efforts, UNA team members found some of the initial Institutions to be less then well prepared and additional efforts were required during the UNA site visits to ensure that appropriate cases were identified, charts available, etc. Subsequently, an additional procedure was put into place in which UNA team members were at the Institutions for several days leading up to the site visit date to help prepare the Institution (generally a minimum of two days). At some of these Institutions the UNA team members took on major responsibility for the preparatory work.

During the preparations, lists of clients identified by Institutional Clinical staff were reviewed, collated and verified. Some Institutions had been regularly conducting Intermediate Care Facility (ICF) reviews through the Interdisciplinary Treatment Team (IDTT) process. However, the majority of the Institutions had not been maintaining proof of practice binders and had not been forwarding copies of the IDTT review form to Sacramento on a regular basis (the forms that had been sent had been collected and entered into a data base by a staff member at Pleasant Valley State Prison (PVSP) to assist with the UNA efforts).

The initial ICF IDTT review form (See Appendix D) had been designed and forwarded to Institutions prior to, and separate from, the UNA effort. With the implementation of UNA, the ICF IDTT review form, which contained 7 criteria, was modified (See Appendix E) to more accurately reflect and include the criteria designated in the Methodology Section of UNA. UNA team members supplied the newer version of the ICF IDTT review form to each of the Institutions and, when necessary, converted the criteria numbers already collected utilizing the old ICF forms into the new criteria numbers. The resultant tables and information presented in this report reflect the use of the new criteria numbers (Criteria 1 through 14).

# MENTAL HEALTH TIERED CARE PROJECT

Some Institutions had not implemented the practice of weekly ICF IDTT reviews and did so only in preparation to the UNA site visit. It was sometimes necessary to instruct Institutional Supervisors to meet with their staff, go over the criteria, make determinations regarding whether Inmate/Patients (I/Ps) met criteria and document their decision regarding whether to refer or not to a higher level of care. At some Institutions UNA members met with the EOP staff during the preparatory site visit to generate lists of I/Ps who met criteria.

Several iterations of lists were generated by HCSD to help identify I/Ps who had had three or more MHCB admissions within the 6 months prior to the UNA site visit. However, these lists were found to be inadequate resulting in the implementation of a new procedure. Specifically, at each Institution a list was generated of any I/P who had had at least one MHCB admission during the past six months. The UHR's were subsequently reviewed by UNA team members to ascertain whether that I/P had had additional MHCB admissions while at prior Institutions.

Institutions also found criteria 14 (EOP in Administrative Segregation [AdSeg]) to be somewhat ambiguous and UNA team members either reviewed all EOP AdSeg Charts to screen for those that met criteria and/or met with EOP AdSeg Clinical staff to review cases and identify those that met clinical criteria.

In summary, assuring appropriate identification of I/Ps who met criteria for inclusion in UNA involved multiple methods and the generation and collation of various lists, i.e.: ICF IDTT generated lists; MHCB admission lists; Rule Violation Reports (RVRs); AdSeg Census lists; Mental Health Tracking System (MHTS) reports of treatment compliance, etc..

The I/Ps who met at least one of the designated criteria (1 through 14) and who were not in the process of being referred to DMH were reviewed by UNA teams. The teams consisted of at least one Coleman expert and one HCSD expert. To ensure inter-rater reliability on assessments, during the initial UNA site visits, the case discussions generally involved all of the UNA team members on site. As the UNA effort progressed, cases were generally discussed in two-member teams (one Coleman and one HCSD member) although the opportunity to discuss cases among more than the initial UNA team was often utilized to help clarify issues and maintain inter-rater reliability.

The written case summary of each case reviewed by UNA was prepared by the team member who took primary responsibility for reviewing the case and presenting it to the other team member(s) (see Appendix F for Institutional Summaries and individual I/P Case Summaries). There was uniformity in arriving at conclusions and recommendations as no decision was rendered until all team members felt confident regarding the conclusion. Although all decisions were made in a uniform manner and reflect unanimity

# MENTAL HEALTH TIERED CARE PROJECT

in conclusions rendered, there was variability in the written case summaries based on reviewer's individual styles and differences.

During the site visit, data was also collected on the number of I/Ps who had been identified by the Institutional staff as warranting referral to a DMH setting but who had not, as of yet, been transferred. The gathering of consistent and accurate data again required differing degrees of effort on the part of UNA staff across Institutions. DMH logs were not uniformly implemented or maintained. Some Institutions did not maintain a centralized DMH log while others maintained DMH logs but the logs did not include the names of all I/Ps who were in the process of referral (i.e.: I/P had been designated as being referred by the IDTT review process but not included in the log as a referral package had not yet been completed).

It is important to note that the decision by Institutions to refer I/Ps to DMH was apparently often made in response to the preparation process for the UNA site visit, suggesting that many of the I/Ps identified as being in the process of referral at the time of the UNA site visit would have been "unidentified" had the UNA site visit not occurred.

A weekly census of the number of I/Ps at the various DMH settings was sent to the UNA team by HCSD on a weekly basis. This data represented the census of I/Ps at DMH on a particular day in the week for each week as well as the Percentage of Capacity (Appendix F). DMH Patient Log spreadsheets for DMH ICF (Appendix G), APP (Appendix H), and SVPP (Appendix I) were also provided at the conclusion of the UNA site visits (March, 2005). DMH Atascadero did not provide an electronic data base of the patient log but did provide 2684 Referral Data Summary tables for each of the four quarters of 2004. A Summary Monthly Report of CDC Patients in DMH Hospitals; Cumulative total of all patients treated during the month was provided for the months of August, 2004 through January, 2005 (Appendix J).

*Results:*

*UNA Findings:*

The UNA effort resulted in the identification of 796 I/Ps that met criteria for inclusion in UNA. Of the 796 I/Ps identified, almost half (47%; N=375) had met more than one criteria; 179 of the I/Ps were housed in an AdSeg setting; 161 (21%) had greater than 2 MHCB admissions in the past 6 months; and 495 (65%) were exhibiting chronic psychiatric symptoms that had either not improved with 6 months of EOP treatment or < 6 months of treatment if in a Reception Center. A minimum of 183 of the I/Ps had had a prior DMH placement and at minimum of 64 I/Ps had had prior psychiatric hospitalizations while not in custody.

# MENTAL HEALTH TIERED CARE PROJECT

Of the 796 I/Ps identified (see Table 2), UNA team reviews involved 470 I/Ps that had been identified as meeting criteria for UNA but not referred to DMH. The remaining 326 I/Ps were designated as having met criteria and in the process of referral to a DMH setting (292 at the Intermediate Level [ICF] and 34 at the Acute Level [APP]).

In assessing the 470 I/Ps, UNA teams reviewed UHRs and conducted a minimum of 45 interviews with I/Ps and 63 interviews with clinicians regarding specific I/Ps. This process resulted in UNA teams identifying an additional 186 I/Ps as being appropriate for referral to a higher level of care (143 at the intermediate level [ICF] and 43 at the acute level [APP]).

In total, the UNA effort resulted in the identification of 512 I/Ps as appropriate for referral to a higher level of care (435 ICF and 77 APP). Utilizing monthly EOP census data (see Table 3), the number of I/Ps identified as appropriate for a higher level of care represented 14% of the total EOP population (12% requiring ICF level of care and 2% requiring APP level of care).

*DMH Data:*

Data was collected regarding DMH usage during the time period UNA was in place.

The census of total I/Ps at DMH on the Wednesday of each week during the UNA study is presented in Table 4 and reflected in Figures 2, 3 and 4. Figure 1 indicates the total census of CDC I/Ps at DMH while Figure 2 distinguishes the census by DMH facility. Figure 3 indicates the percentage of capacity at each facility being utilized. It should be noted that, due to the dormitory setting and custody issues, DMH-SVPP is reported to be at full capacity although the actual numbers indicate they are operating below capacity.

A review of the DMH census data suggests that the DMH usage has, with the exception of Atascadero, remained stable over time. The increase in the census at Atascadero State Hospital (ASH) appears to be related to the UNA site visit at CMC with a subsequent increase in the number of referrals at that time. The general increase in the total census of DMH usage over time generally reflects the increase with ASH usage. The increase noted in February of 2005 reflects the beginning of the distinction in data between ITP (Intermediate Treatment Program) and DTP (Day Treatment Program) beds. As the graph indicates, the number of ITP beds utilized increased while DTP remained fairly stable. The percentage of capacity utilized was, again, fairly consistent with the exception of increased usage of ASH beds and a decrease in the percent capacity usage of SVPP.

# MENTAL HEALTH TIERED CARE PROJECT

Table 5 displays the referrals made to DMH APP by CDC Institutions over an 11 month period as well as a summary of the number of acceptances and rejections. Table 6 displays similar information for DMH CMF ICF and Table 7 for DMH SVPP. Table 8 displays the quarterly data for DMH ASH over a one year period.

As the aforementioned Tables 5 through 7 report all referrals to DMH facilities and do not distinguish those that were accepted, an additional table was generated from data gleaned from the Patient Referral Logs from each of the facilities. Those results, reflecting number of I/Ps accepted at the various DMH facilities over periods of time (11 months for APP; 7 months for ICF; 12 months for ASH; and 7 months for SVPP) are displayed in Table 9. As there were inter-DMH transfers and referrals, Table 9 also includes the acceptances of I/Ps to the varying DMH facilities from other DMH facilities.

A review of the data indicates evident variability of DMH usage across Institutions with CMF having the greatest number of I/Ps placed in DMH settings (N=212), followed by CMC (N=97), and CSP-SAC (85).

*Discussion of Implications for Increased Bed Requirements:*

The question of interpreting the current results of UNA relative to the issue of number of beds needed is a central one. Although it is clear that the cases reviewed and identified by UNA teams reflect an "unidentified need" (143 ICF and 43 APP), the issue of interpreting the meaning of the number of I/Ps identified by the Institution as appropriate for referral to a higher level of care (292 ICF and 34 APP) needs further discussion.

While it was evident that Institutions were identifying and referring I/Ps in specific response to the UNA site visit and that there was not equanimity in the prior referral process to DMH across Institutions (i.e.: CMF being the single greatest referral source to DMH), it is reasonable to assume that a percentage of those cases identified by Institutions during the UNA site visit are those that would have been identified and referred to DMH as part of the ongoing and regular practice of the Mental Health Programs at the Institutions. In other words, those cases would not be representative of an "unidentified" need and would serve to over-inflate the total number of UNA I/Ps identified as "positive" and in need of a higher level of care by UNA.

Although there may be several approaches to addressing this issue, the current author chose to analyze the regular and ongoing DMH usage over a period of time as a means of determining an adjustment factor to the total number of cases identified by the UNA effort. That is, UNA results reflected an assessment at a discrete moment in time while referral to DMH was an ongoing and regular process. Therefore, one strategy would be to estimate the number of cases that would normally be referred to DMH for a specific time period. This number could then be utilized as an estimate of the number of

# MENTAL HEALTH TIERED CARE PROJECT

case that that would have been regularly identified by the Institution and should therefore not be includes as "unidentified". This number could serve to adjust the total number of UNA identified cases to more accurately reflect "unidentified" need.

In arriving at the adjustment factor, the total number of acceptances at each of the DMH facilities, displayed in Table 9, were divided by the number of months over which the data was collected to arrive at an estimate of the average monthly referrals to DMH. Excluded from the total were those I/Ps that were transferred from one DMH facility to another as this would not represent a referral from an Institution to DMH. The total number, length of time, and average, are displayed in Table 10.

The results suggest that there were, on average, 39 placements into an Intermediate Care Facility and 60 into an Acute Psychiatric Placement per month. Adjusting the final UNA results (excluding findings from the women's facilities as these were not reflected in the DMH averages) would suggest that the estimated "unidentified" need would be 385 at the Intermediate Level and 15 at the Acute Level for a total of 400 Unidentified Needs (11% of the total EOP Census).[2]

Certainly, in assessing the need for beds, there must be an analysis of the type of beds required and this should involve both clinical and custodial issues. For example, it is evident that there is an unmet need with regard to I/Ps who have a propensity to act out as a result of both clinical Axis I and characterological issues and this is reflected in the fact that, at the completion of the UNA effort, there were 52 I/Ps who had been accepted to SVPP but were waiting for a bed opening.

Additional analysis of the data collected in the UNA effort, including classification information, is yet to be conducted.

*Observations and Recommendations:*

In completing the UNA project there were a number of noteworthy observations:

---

[2] A secondary analysis, for comparison purposes, was conducted on the CMF DMH usage. CMF was chosen for review as this Institution, whether as a function of proximity or general clinical perspective, has historically been more active in referring to DMH as opposed to other Institutions and <u>may</u> more accurately reflect expected referral rates. The results of an analysis of the DMH data bases to assess the number of I/Ps who were in DMH placements during the dates of the UNA site visit are displayed in Table 11.

The results indicate that there were 81 I/Ps from CMF at DMH on the dates of the UNA site visit (78 ICF and 3 APP). Incorporating this data into the data gathered on the dates of the UNA site visit would result in a total of 146 I/Ps that would be appropriate for referral to a higher level of care (135 ICF and 11 APP). Utilizing a total EOP population of 708 (including those I/P that were at DMH) suggests that 19% of the total CMF EOP population would be identified as requiring an ICF level of care and that 2% would require an APP level of care.

# MENTAL HEALTH TIERED CARE PROJECT

- The ICF IDTT review was not being implemented uniformly throughout the Institutions, with some not having begun the procedure until preparing for the UNA site visit. There were indications that, for many Institutions, preparation for the UNA site visit was viewed as a one time occurrence with no suggestion that the process of reviewing criteria and consideration for referral to a higher level of care would continue in a systematic way. It is recommended that additional training be put in place and that the ICF IDTT review process be monitored through systematic centralized data collection and analysis.

- Despite an increased awareness in preparation for the UNA site visit, there remained a substantial number of I/Ps who remained "unidentified" and whose decompensated condition was apparently assessed by staff to be baseline functioning and acceptable. There were some indications of "Institutionalization" of clinical staff with a culture of acceptance of, and a higher tolerance for, pathology and decompensated states that, outside of an institutional setting, would not be acceptable. Additional training is recommended with regard to identifying individuals who are not functioning at baseline, who are at high risk, and who require a referral to a higher level of care.

- As noted above, it was apparent that preparation for the UNA site visit was viewed by some Institutions as similar to that of a <u>Coleman</u> site visit in which a good deal of preparation was required for a discrete event as opposed to the evaluation of an ongoing process. It is recommended that a follow-up process be implemented to ensure continued monitoring of the review and referral process. It was also of concern that, despite Institutional efforts in preparation for the UNA site visit, there remained a good number of I/Ps that were not identified. It may be appropriate for Health Care Division to implement a regular UNA-like process to monitor and assist the Institutions in appropriately identifying cases.

- The maintenance of DMH referral tracking at the Institutions varied greatly with some Institutions not maintaining a tracking log and many logs not accurately reflecting the number or state of referral for many I/Ps that had been referred. It would be recommended that a systematic and universal tracking system be implemented across Institutions and that this data be centrally collected on a regular basis.

- It was evident that, despite training efforts on the part of HCSD, there remained some confusion regarding the DMH referral process. For example, some Institutional staff remained unaware that referral to DMH could be made outside of a MHCB setting and within a GP EOP program. Additional training would be recommended.

# MENTAL HEALTH TIERED CARE PROJECT

- The referral process to DMH continues to be time consuming and was reported, on average, to take an entire work day to complete for one I/P.

- There are varying methods across Institutions regarding how a referral is made. For example, one Institution had a Referral Coordinator who took on primary responsibility for organizing and tracking the referral process while other Institutions had no centralized referral process and one Institution had a Referral Coordinator who served as a "gatekeeper" and determined whether a referral would be made or not regardless of the primary clinician's assessment. It would be recommended that additional staffing be made available to Institutions for a position as DMH Referral Coordinator and that this position be one designated to monitor, coordinate and track the referral process.

- There is a reticence to refer based on frustration of Institutional staff that the time and effort required to make a referral yields unsatisfactory results. For example, staff reported that I/Ps would be referred for diagnostic clarification and would return with little or no clarification. There was continued anecdotal evidence that I/Ps would not benefit from their stay in DMH and, in some cases, appear to be clinically deteriorated. A tracking by CSP-SAC of 92 I/Ps who had been referred to DMH and returned provided some data with regard to that issue. Of the 92 I/Ps clinically assessed upon their return from DMH:
    - 51 (55%) had been judged to be clinically the same with no change;
    - 27 (29%) had been judged to be clinically better; and
    - 14 (15%) had been judged to be clinically worse upon their return.

Despite significant concerns raised throughout the UNA effort across almost all Institutions regarding the efficacy of a DMH referral, to this author's knowledge, there has been no quality assessment or program evaluation conducted by CDC regarding whether DMH is meeting the needs of I/Ps referred by CDC. It would be recommended that such an assessment be conducted.

Although some data is available for assessment regarding utilization, it does not appear that this data is currently being systematically analyzed in a meaningful way. For example, data available indicates that I/Ps are being discharged from DMH for a variety of reasons that are not related to clinical improvement (i.e.: "I/P does not want to be here; I/P is not cooperating with groups; I/P is aggressive; I/P made verbal threats; I/P threatened to hurt himself if he was not discharged; I/P involved in mutual combat, etc.").

There are also questions regarding the variability in length of stays at DMH Facilities. For example, while some I/Ps are returned to the Institution after very brief hospitalizations at an Intermediate Level, others remain for extended periods

# MENTAL HEALTH TIERED CARE PROJECT

of time (i.e.: one I/P has been in an ICF setting for 12 years while others are returned after 2 weeks). There is also question as to why some I/Ps are remaining within an Acute Setting for extended periods of time (almost a year).

- Discharge Summaries from DMH continued to be lacking in the Unit Health Records. In the process of review by UNA team members, discharge summaries often had to be requested from DMH. Once reviewed, there was also great variability in the usefulness of the Discharge summaries.

- Conversely, there was evidence that, upon stabilization and return from DMH, the medication regimes for I/Ps were apparently changed shortly after return to CDC with little or no clinical justification. This sometimes resulted in decompensation and a renewed referral to a higher level of care. Policy and education regarding the process for returning from a DMH setting needs to be enhanced and implemented.

- There continues to be variability regarding the quality of implementation of EOP programs. In some cases the decision regarding whether to recommend Intermediate Care was, in part, based on the extent to which the I/P could receive appropriate treatment within the current setting. Review of records in many instances revealed that an I/P's deteriorated (or deteriorating) condition had not been adequately addressed through appropriate changes in the existing treatment plan (though, in some cases, it appeared likely that, with appropriate modifications in treatment, the I/P could be maintained in the current setting, it was also clear that these modifications had not occurred across an extended period of time.).

The above mentioned represent some of the observations noted during the UNA effort and, although not complete, are intended to be helpful in identifying areas for improvement and clarification.

# MENTAL HEALTH TIERED CARE PROJECT

Table 1.
UNA Site
and
Team

| Inst. | Dates | Team Members Present |
|-------|-------|----------------------|
| SVSP | 8/16-18/04 | JM, MW, WA |
| PVSP | 9/14/04 | RP, WA |
| CMC | 9/27-28/04 | BL, DK, DS, JM, WA |
| SATF | 10/12/04 | DS, JM, WA |
| ISP | 10/12/04* | DS, KH, WA |
| VSPW | 10/12/04 | BL, DK, RP |
| CCWF | 10/13/04 | BL, DK, RP |
| CENT | 10/26/04* | DS, KH, WA |
| RJD | 11/1-2/04 | BL, DS, KH, RP, TR, WA |
| DVI | 11/4/04 | BL, DK, WA |
| CCI | 11/8/04 | BL, JM, KH, WA |
| CSP-SOL | 12/1/04 | KH, TR, WA |
| CSP-SAC | 12/6/04 | BL, DS, JM, KH, MW, RP, TR, WA |
| CMF | 12/7-9/04 | BL, DS, JM, KH, MW, RP, TR, WA |
| CIM | 12/14-15/04 | BL, JM, MW, WA |
| SQ | 12/20-21/04 | BL, DS, JM, MW, TR, WA |
| LAC | 1/10-11/05 | BL, DS, JM, KH, MW, WA |
| PBSP | 1/18-19/05 | BL, DS, JM, KH, MW, RP, WA |
| CORC | 2/16-17/05 | BL, DS, JM, MW, WA |
| MCSP | 2/17-18/05 | KH, TR |
| CIW | 2/17-18/05 | DS, MW |
| NKSP | 3/7/05 | BL, KH, MW, WA |
| WASCO | 3/7-8/05 | BL, KH, MW, WA |
| HDSP | 3/10/05* | MW, TR |

Visit Dates

Members

\* Site visit unnecessary per institutional reviews and contacts

Key:

| | | |
|-----|---|---|
| BL | - | J. Bradley Lumpkin, Ph.D., HCSD |
| DK | - | Dennis F. Koson, M.D., Coleman expert |
| DS | - | Deserie Sinacori, Psy.D., HCSD |
| JM | - | Jeffrey L. Metzner, M.D., Coleman expert |
| KH | - | Kerry C. Hughes, M.D., Coleman expert |
| MW | - | Melissa G. Warren, Ph.D., Coleman expert |
| RP | - | Raymond F. Patterson, M.D., Coleman expert |
| TR | - | Ted Ruggles, Ph.D., HCSD |
| WA | - | William F. Alvarez, Ph.D., HCSD |

# MENTAL HEALTH TIERED CARE PROJECT

**Table 2**

**Summary of UNA Findings**

| Institution | UNA Reviewed | UNA +ICF | UNA +APP | Inst. +ICF | Inst. +APP | TOTAL +ICF | TOTAL +APP | TOTAL Positives |
|---|---|---|---|---|---|---|---|---|
| CMF | 69 | 25 | 3 | 32 | 5 | 57 | 8 | 65 |
| CMC | 14 | 1 | 0 | 58 | 8 | 59 | 8 | 67 |
| RJD | 48 | 20 | 5 | 18 | 2 | 38 | 7 | 45 |
| LAC | 40 | 15 | 3 | 44 | 0 | 59 | 3 | 62 |
| SAC | 30 | 8 | 1 | 67 | 5 | 75 | 6 | 81 |
| SVSP | 34 | 8 | 4 | 4 | 0 | 12 | 4 | 16 |
| CIM | 39 | 11 | 14 | 4 | 3 | 15 | 17 | 32 |
| CCWF | 11 | 5 | 1 | 0 | 0 | 5 | 1 | 6 |
| SQ | 34 | 16 | 3 | 3 | 0 | 19 | 3 | 22 |
| CEN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DVI | 7 | 1 | 1 | 1 | 0 | 2 | 1 | 3 |
| ISP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PVSP | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| SATF | 4 | 0 | 2 | 2 | 2 | 2 | 4 | 6 |
| SOL | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VSPW | 5 | 3 | 0 | 0 | 1 | 3 | 1 | 4 |
| CCI | 2 | 0 | 1 | 2 | 0 | 2 | 1 | 3 |
| PBSP | 44 | 8 | 2 | 22 | 1 | 30 | 3 | 33 |
| CORC | 27 | 7 | 1 | 18 | 4 | 25 | 5 | 30 |
| MCSP | 22 | 6 | 0 | 11 | 0 | 17 | 0 | 17 |
| CIW | 18 | 3 | 0 | 0 | 0 | 3 | 0 | 3 |
| NKSP | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WASCO | 13 | 6 | 2 | 5 | 2 | 11 | 4 | 15 |
| HDSP | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 |
| TOTALS: | 470 | 143 | 43 | 292 | 34 | 435 | 77 | 512 |

UNA Reviewed - Total cases meeting criteria that were not referred and were reviewed by UNA team

UNA +ICF     -   Cases reviewed by UNA and found positive for unidentified need at ICF level

UNA +APP     -   Cases reviewed by UNA and found positive for unidentified need at APP level

Inst +ICF     -   Cases in process of referral to ICF DMH at Institution on date of UNA visit

Inst +APP     -   Cases in process of referral to APP DMH at Institution on date of UNA visit

Total ICF     -   Total ICF cases in process of referral or identified by UNA as appropriate for ICF

Total APP     -   Total APP cases in process of referral or identified by UNA as appropriate for APP

Total Positives     -   All cases identified as appropriate for referral to a higher level of care on date of UNA site visit

# MENTAL HEALTH TIERED CARE PROJECT

Table 3

Percentage of EOP Population Identified

as Appropriate for Referral to a Higher Level of Care

| Institution | EOP Pop* | TOTAL +ICF | Percent of EOP | TOTAL +APP | Percent of EOP | TOTAL Positives | Percent of EOP |
|---|---|---|---|---|---|---|---|
| CMF | 627 | 57 | 9% | 8 | 1% | 65 | 10% |
| CMC | 573 | 59 | 10% | 8 | 1% | 67 | 12% |
| RJD | 406 | 38 | 9% | 7 | 2% | 45 | 11% |
| LAC | 340 | 59 | 17% | 3 | 1% | 62 | 18% |
| SAC | 360 | 75 | 21% | 6 | 2% | 81 | 22% |
| SVSP | 203 | 12 | 6% | 4 | 2% | 16 | 8% |
| CIM | 110 | 15 | 14% | 17 | 15% | 32 | 29% |
| CCWF | 51 | 5 | 10% | 1 | 2% | 6 | 12% |
| SQ | 123 | 19 | 15% | 3 | 2% | 22 | 18% |
| CEN | 2 | 0 | 0% | 0 | 0% | 0 | 0% |
| DVI | 45 | 2 | 4% | 1 | 2% | 3 | 7% |
| ISP | 5 | 0 | 0% | 0 | 0% | 0 | 0% |
| PVSP | 10 | 0 | 0% | 1 | 10% | 1 | 10% |
| SATF | 10 | 2 | 20% | 4 | 40% | 6 | 60% |
| SOL | 6 | 0 | 0% | 0 | 0% | 0 | 0% |
| VSPW | 19 | 3 | 16% | 1 | 5% | 4 | 21% |
| CCI | 16 | 2 | 12% | 1 | 6% | 3 | 19% |
| PBSP | 195 | 30 | 15% | 3 | 2% | 33 | 17% |
| CORC | 169 | 25 | 15% | 5 | 3% | 30 | 18% |
| MCSP | 193 | 17 | 9% | 0 | 0% | 17 | 9% |
| CIW | 101 | 3 | 3% | 0 | 0% | 3 | 3% |
| NKSP | 32 | 0 | 0% | 0 | 0% | 0 | 0% |
| WASCO | 56 | 11 | 20% | 4 | 7% | 15 | 27% |
| HDSP | 10 | 1 | 10% | 0 | 0% | 1 | 10% |
| TOTALS: | 3571 | 435 | 12% | 77 | 2% | 512 | 14% |

* Census of EOP population for the month the UNA site visit was conducted.

# MENTAL HEALTH TIERED CARE PROJECT

| | 10/6/04 | 10/13/04 | 10/20/04 | 10/27/04 | 11/3/04 | 11/10/04 | 11/17/04 | 11/24/04 | 12/1/04 | 12/8/04 | 12/15/04 | 12/22/04 | 12/29/04 | 1/5/05 | 1/12/05 | 1/19/05 | 1/26/05 * | 2/2/05 | 2/9/05 | 2/16/05 | 2/23/05 | 3/2/05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH # | 92 | 94 | 100 | 106 | 113 | 118 | 115 | 118 | 119 | 120 | 119 | 119 | 120 | 112 | 114 | 115 | 117 | 116 | 114 | 122 | 120 | 124 |
| AIP # | 130 | 137 | 127 | 126 | 124 | 130 | 124 | 126 | 141 | 139 | 140 | 133 | 136 | 129 | 128 | 130 | 123 | 117 | 117 | 124 | 123 | 127 |
| ICF # | 51 | 50 | 48 | 49 | 49 | 49 | 47 | 52 | 52 | 55 | 52 | 59 | 59 | 59 | 58 | 62 | 35 | 37 | 44 | 45 | 51 | 53 |
| SVPP # | 56 | 53 | 53 | 55 | 54 | 55 | 51 | 54 | 52 | 53 | 51 | 51 | 50 | 49 | 48 | 46 | 48 | 47 | 42 | 44 | 41 | 46 |
| TOTAL # | 329 | 334 | 328 | 336 | 340 | 352 | 337 | 350 | 364 | 367 | 362 | 362 | 365 | 349 | 348 | 353 | 323 | 317 | 317 | 335 | 335 | 350 |
| DTP # | | | | | | | | | | | | | | | | | 33 | 33 | 31 | 35 | 32 | 29 |
| ASH % | 87 | 89 | 94 | 100 | 107 | 111 | 108 | 111 | 112 | 113 | 112 | 112 | 113 | 106 | 108 | 109 | 110 | 109 | 108 | 115 | 113 | 117 |
| AIP % | 87 | 91 | 85 | 84 | 83 | 87 | 83 | 84 | 94 | 93 | 93 | 67 | 91 | 86 | 85 | 87 | 82 | 78 | 78 | 83 | 82 | 85 |
| ICF % | 61 | 60 | 58 | 59 | 59 | 59 | 57 | 63 | 63 | 66 | 63 | 71 | 71 | 71 | 70 | 75 | 42 | 44 | 52 | 54 | 61 | 63 |
| SVPP % | 88 | 83 | 83 | 86 | 84 | 86 | 80 | 84 | 81 | 83 | 80 | 80 | 78 | 77 | 75 | 72 | 75 | 73 | 66 | 69 | 64 | 72 |
| TOTAL % | 82 | 83 | 82 | 83 | 84 | 87 | 84 | 87 | 90 | 91 | 89 | 90 | 91 | 87 | 86 | 88 | 80 | 78 | 78 | 83 | 83 | 87 |
| DTP % | | | | | | | | | | | | | | | | | 55 | 55 | 52 | 58 | 53 | 48 |

Table 4

DMH Weekly Census

* ICF divided into DTP and TTP from 1/26/05 onwards

# MENTAL HEALTH TIERED CARE PROJECT

**Figure 1**
**TOTAL DMH CENSUS**



# MENTAL HEALTH TIERED CARE PROJECT



**Figure 2**
**DMH Census by DMH setting**

# MENTAL HEALTH TIERED CARE PROJECT

**Figure 3**
**Percentage of Capacity at DMH Facilities**



**Table 5**
**DMH APP Summary**
**4/1/04 – 3/1/05**

| Inst: | Number | % | Inst: | Number | % | Inst: | Number | % | Inst: | Number | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 0 | 0% | CSP-SAC | 66 | 8% | WSP | 43 | 5% | CSP-LAC | 40 | 5% |
| CCC | 0 | 0% | SCC | 0 | 0% | CAL | 0 | 0% | PBSP | 38 | 5% |
| CMC | 33 | 4% | SQ | 14 | 2% | CCI | 1 | 0% | RJD | 32 | 4% |
| CTF | 1 | 0% | CSP-COR | 68 | 8% | CEN | 0 | 0% | CSP-SOL | 40 | 5% |
| FSP | 0 | 0% | DVI | 0 | 0% | CIM | 61 | 8% | CMF | 112 | 14% |
| HDSP | 49 | 6% | NKSP | 38 | 5% | CRC | 0 | 0% | ASH | 0 | 0% |
| MCSP | 25 | 3% | SATF | 55 | 7% | CVSP | 0 | 0% | ITP | 5 | 1% |
| PVSP | 18 | 2% | SVSP | 38 | 5% | ISP | 16 | 2% | SVPP | 23 | 3% |

**Facility Total**    816

| | | | |
|---|---|---|---|
| Accepted | 684 | | 83.82% |
| Rejected | 11 | | 1.35% |
| Withdrawn | 111 | | 13.60% |
| Referred | 0 | | 0.00% |
| Deferred | 0 | | 0.00% |
| Pending CAT | 10 | | 1.23% |
| Total | 816 | | 100.00% |

**Table 6**
**DMH ICF Summary**
**8/2/04 – 2/28/05**

| Inst: | # | % | Inst: | # | % | Inst: | # | % | Inst: | # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 0 | 0% | CSP-SAC | 0 | 0% | WSP | 2 | 1.5% | CSP-LAC | 1 | 0.7% |
| CCC | 0 | 0% | SCC | 0 | 0% | CAL | 0 | 0.0% | PBSP | 0 | 0.0% |
| CMC | 2 | 1% | SQ | 5 | 4% | CCI | 0 | 0.0% | RJD | 26 | 19.0% |
| CTF | 0 | 0% | CSP-COR | 0 | 0% | CEN | 0 | 0.0% | CSP-SOL | 0 | 0.0% |
| FSP | 0 | 0% | DVI | 0 | 0% | CIM | 0 | 0.0% | CMF | 49 | 35.8% |
| HDSP | 0 | 0% | NKSP | 0 | 0% | CRC | 0 | 0.0% | ASH | 0 | 0.0% |
| MCSP | 1 | 1% | SATF | 0 | 0% | CVSP | 0 | 0.0% | DTP | 1 | 0.7% |
| PVSP | 1 | 1% | SVSP | 0 | 0% | ISP | 0 | 0.0% | SVPP | 9 | 6.6% |
| APP | 40 | 29% | | | | | | | | | |

|  |  |
|---|---|
| **Facility Total** | **137** |

| | | |
|---|---|---|
| ITP Referrals | 102 | 74.5% |
| DTP Referrals | 35 | 25.5% |
| Total Referrals | 137 | 100.0% |
| Accepted | 97 | 70.80% |
| Rejected | 3 | 2.19% |
| Withdrawn | 32 | 23.36% |
| Referred | 0 | 0.00% |
| Deferred | 0 | 0.00% |
| Pending CAT | 5 | 3.65% |
| Total | 137 | 100.00% |

**Table 7**
**SVPP Summary**
**8/2/04 – 3/8/05**

| Institution | Number | % | Institution | Number | % | Institution | Number | % | Institution | Number | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 0 | 0% | CSP-SAC | 34 | 21% | WSP | 4 | 2% | CSP-LAC | 12 | 8% |
| CCC | 0 | 0% | SCC | 0 | 0% | CAL | 0 | 0% | PBSP | 32 | 20% |
| CMC | 2 | 1% | SQ | 2 | 1% | CCI | 1 | 1% | RJD | 10 | 6% |
| CTF | 0 | 0% | CSP-COR | 9 | 6% | CEN | 0 | 0% | CSP-SOL | 0 | 0% |
| FSP | 0 | 0% | DVI | 0 | 0% | CIM | 6 | 4% | CMF | 7 | 4% |
| HDSP | 0 | 0% | NKSP | 1 | 1% | CRC | 0 | 0% | ASH | 0 | 0% |
| MCSP | 6 | 4% | SATF | 0 | 0% | CVSP | 0 | 0% | CMF-VPP | 10 | 6% |
| PVSP | 0 | 0% | SVSP | 17 | 11% | ISP | 0 | 0% | CMC-E | 6 | 4% |

Facility Total = 159

| | | |
|---|---|---|
| Accepted | 110 | 69.18% |
| Rejected | 11 | 6.92% |
| Withdrawn | 7 | 4.40% |
| Referred | 6 | 3.77% |
| Deferred | 3 | 1.89% |
| Pending CAT | 22 | 13.84% |
| Total | 159 | 100.00% |

# MENTAL HEALTH TIERED CARE PROJECT

**Table 8**
**DMH ASH Quarterly Reports**
**2004**

| | | 1/1-3/31/04 | 4/1-6/30/04 | 7/1-9/30/04 | 10/1-12/31/04 |
|---|---|---|---|---|---|
| CIM | Accepted | 8 | 8 | 3 | 13 |
| | Denied | | 2 | | 1 |
| CMC | Accepted | 9 | 4 | 23 | 28 |
| | Denied | 7 | 8 | 6 | 4 |
| CMF | Accepted | 13 | 17 | 21 | 16 |
| | Denied | 10 | 6 | 7 | 5 |
| CORC | Accepted | | | | |
| | Denied | 1 | | | |
| MCSP | Accepted | 1 | 1 | | 5 |
| | Denied | | | 1 | |
| PVSP | Accepted | 1 | | | |
| | Denied | | | | |
| RJD | Accepted | 3 | 4 | 2 | 10 |
| | Denied | 1 | | | |
| SVPP | Accepted | 1 | | | 1 |
| | Denied | | | 1 | |
| SVSP | Accepted | | | 2 | |
| | Denied | | | | |
| DVI | Accepted | | | | |
| | Denied | | | | 1 |
| SQ | Accepted | | | | |
| | Denied | | | | 1 |

# MENTAL HEALTH TIERED CARE PROJECT

Table 9

| Institution: | APP: 4/04-3/05 (11 months) | DMH-JCF 6/04-2/2/05 (7 months) | DMH-ASH 1/04-12/1/04 (12 months) | DMH-SVPP 8/04-3/05 (7 months) | |
|---|---|---|---|---|---|
| CCI | 1 | | | 1 | 2 |
| CCWF | n/a | n/a | n/a | n/a | n/a |
| CEN | | | | | |
| CIM | 35 | | 32 | 3 | 70 |
| CIW | n/a | n/a | n/a | n/a | n/a |
| CMC | 25 | 2 | 64 | 6 | 97 |
| CMF | 101 | 41 | 67 | 3 | 212 |
| CORC | 64 | | | 6 | 70 |
| DVI | | | | | |
| HDSP | 44 | | | | 44 |
| ISP | 15 | | | | 15 |
| LAC | 33 | | | 8 | 41 |
| MCSP | 22 | | 7 | 4 | 33 |
| NKSP | 34 | | | | 34 |
| PBSP | 37 | | | 25 | 62 |
| PVSP | 12 | | 1 | | 13 |
| RJD | 26 | 15 | 19 | 6 | 66 |
| SAC | 59 | | | 26 | 85 |
| SATF | 45 | | | | 45 |
| SOL | 33 | | | | 33 |
| SQ | 10 | 1 | | 1 | 12 |
| SVSP | 29 | | 2 | 13 | 44 |
| VSPW | n/a | n/a | n/a | n/a | n/a |
| WASCO | 40 | | | 3 | 43 |
| DMH ITP | 5 | | | | 5 |
| DMH DTP | | 1 | | | 1 |
| DMH SVPP | 14 | 8 | 2 | | 24 |
| DMH APP | | 29 | | 5 | 34 |
| TOTALS: | 684 | 97 | 194 | 110 | 1085 |

Summary of Accepted I/Ps at DMH Facilities Over Various Time Periods

# MENTAL HEALTH TIERED CARE PROJECT

**Table 10**

**Monthly Average of DMH Acceptances**

| DMH Facility: | Total I/Ps Accepted | # of Months | Average per Month |
|---|---|---|---|
| VPP-APP | 665 | 11 | 60 |
| VPP-ICF | 59 | 7 | 8 |
| SVPP | 105 | 7 | 15 |
| ASH | 192 | 12 | 16 |

**Table 11**

**CMF I/Ps at DMH at**

**Time of UNA Site Visit**

| DMH: | # I/Ps |
|---|---|
| APP | 3 |
| VPP-ICF | 33 |
| DTP | 2 |
| SVPP | 1 |
| ASH | 42 |

MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT B

### INMATE-PATIENT STATUS MATRIX

(Inmates Identified As Needing A Referral During UNA)

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT B

| INSTITUTIONS | TOTAL POSITIVES | REFERRED/ADMITTED/DISCHARGED UNA/ICC | REFERRED/ADMITTED/DISCHARGED UNA/APP. | REFERRED/ADMITTED/DISCHARGED IDTT/ICF | REFERRED/ADMITTED/DISCHARGED IDTT/APP | REFERRED ON WAITING LIST | PAROLED/TRANSFERRED | AWAITING REFERRAL APP. | AWAITING REFERRAL ICF |
|---|---|---|---|---|---|---|---|---|---|
| CMF | 65 | 19 | 1 | 0 | 0 | 0 | 0 | 7 | 33 |
| CMC | 67 | 0 | 0 | 43 | 3 | 0 | 2 | 5 | 15 |
| RJD | 45 | 20 | 5 | 0 | 2 | 0 | 0 | 0 | 20 |
| LAC | 62 | 7 | 3 | 0 | 0 | 0 | 2 | 0 | 52 |
| SAC | 81 | 1 | 0 | 39 | 2 | 0 | 8 | 3 | 39 |
| SVSP | 16 | 8 | 4 | 3 | 0 | 0 | 0 | 0 | 1 |
| CIM | 32 | 11 | 11 | 5 | 0 | 0 | 10 | 4 | 0 |
| CCWF | 6 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| SQ | 22 | 10 | 3 | 0 | 0 | 0 | 0 | 0 | 9 |
| CEN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DVI | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| ISP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| PVSP | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| SATF | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| SOL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| VSPW | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CCI | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 |
| PBSP | 33 | 5 | 1 | 14 | 1 | 0 | 0 | 1 | 1 |
| COR | 30 | 7 | 1 | 18 | 4 | 0 | 0 | 1 | 11 |
| MCSP | 17 | 3 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| CIW | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| NKSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| WSP | 15 | 2 | 0 | 4 | 2 | 0 | 0 | 2 | 0 |
| HDSP | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| TOTALS | 512 | 100 | 30 | 133 | 18 | 0 | 22 | 28 | 203 |

## MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT C

## "UNA FACTOR" DESCRIPTION

# MENTAL HEALTH TIERED CARE PROJECT

## The "UNA Factor"

Referencing the UNA Report... "The results suggest that there were, on average, 39 placements into an Intermediate Care Facility and 60 into an Acute Psychiatric Placement per month. Adjusting the final UNA results (excluding findings from the women's facilities as these were not reflected in the DMH averages) would suggest that the estimated "unidentified" need would be 385 at the Intermediate Level, and 15 at the Acute Level for a total of 400 Unidentified Needs (11% of the total EOP census.)" This is the number that is applied to forecast the "gap" between available beds and beds needed.

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT D

# DEPARTMENTAL FORMULA FOR FORECASTING –

# BED STUDY METHOD DOCUMENTATION

# MENTAL HEALTH TIERED CARE PROJECT

## Bed Study Method Documentation

### Inpatient Components:

All inpatient components are developed by using a discharge rate. Future changes to the discharge rate are made by applying a discharge rate factor.

The data source for the CMF DMH Acute program, DMH intermediate level of care (the CMF ITF and ASH, in the past) and Patton program for women is the download of all admits and discharges from all DMH locations, obtained from the DMH website. This information is imported into a database, by inmate number, admit and discharge date. The data source for all CDC MHCBs is the HCCUP – from the all facility census data submitted by the institutions.

Data are averaged by fiscal year.

Steps for developing discharge rates for inpatient components:

1. On a monthly basis a list of all inmates located in DMH facilities is downloaded from the DMH website. Before the download occurs, any records from the prior month in which the discharge date was null are deleted. (These records will be picked up with the new month's download). The new month's download is then added to the table in which all prior month's activities are housed.

2. This same process is followed for importing data from HCCUP for MHCB patients.

3. Only records with discharge dates are used.

4. Length of stay (LOS) is computed by discharge date less admission date. The LOS for each inmate is rolled up into an average LOS (ALOS).

5. Records are grouped by fiscal year.

6. The number of months included in each fiscal year's data set is determined. For most past periods, this would be 12, but for the most recent period, it is helpful to know upon how many months the calculated discharge rate is based. If less than 12 months are available, the data are annualized.

7. The number of discharges per fiscal year are counted, and then annualized.

8. The actual total inmate population, either male or female, at the end of the fiscal year is used. For the most recent period, the current month's population is used.

9. The discharge rate is the annualized discharges divided by the total population divided by 1000.

# MENTAL HEALTH TIERED CARE PROJECT

10. Patient days are the annualized discharges times the ALOS.

11. The average daily census is patient days divided by 365.

### Outpatient Components:

All outpatient components are developed by using a census rate. Future changes to the census rate are made by applying a census rate factor. A census rate is used with outpatient components because there is no "admission date" or "discharge date" available for these components.

Rather, the data source for these components is the DDPS download. This data source shows where every inmate in every state prison is located, by bed number, on a given day. A mental health code is used to extract those included in the MHSDS. This mental health code identifies the inmate as EOP or CCCMS. The bed number identifies where the inmate is located, e.g., Ad Seg, SHU, PSU, EOP General or General Population.

Individual data points are collected, generally the first business day of the month. Data are then averaged by fiscal year. For the more distant time periods, information was available only quarterly. Beginning in FY 2002, data were available monthly.

Steps for developing census rates for outpatient components:

1. The data for one specific date per month are downloaded into a database.

2. Records are grouped by fiscal year.

3. The number of months included in each fiscal year's data set is determined. The fiscal year's data are averaged to determine an average daily census.

4. For most components, the actual total inmate population, either male or female, at the end of the fiscal year is used. For the most recent period, the current month's population is used. The exception is the PSU component for which the Level IV male inmate population is used.

5. The census rate is determined by: the average census / (the population / 1000).

### Development of 5 year Projections

Once the past discharge rates and census rates are calculated, the information is transferred to a spreadsheet in Excel. Through calendar year 2001, the data are taken from the Tucker Alan July 2002 Bed Study. Beginning in 2002, data are converted to the fiscal year, as all department projections are based on fiscal year. Therefore, there is a 6-month overlap of data between calendar year 2001 and fiscal year 2002.

The rate of change in the discharge rate or census rate is determined. This is the discharge rate factor (DRF) or census rate factor (CRF). It is the means by which any

# MENTAL HEALTH TIERED CARE PROJECT

projected increase (or decrease) in the prevalence rate can be recognized. The prevalence rate is the number of seriously mentally disordered inmates as a percentage of the total inmate population. It is assumed that the rate of increase in the prevalence rate will lessen over time. Therefore, the rate of change between two periods is determined and then divided by the number of years in the projection period (i.e., 5 or 6 years). This is the annual adjustment factor. Each year during the adjustment period, the discharge rate or census rate is increased by the DRF or CRF, less the annual adjustment factor.

With the exception of male MHCBs, none of the inpatient components were showing a growth trend in FY 2003. There were not enough months of data available from FY 2004 to determine whether this decrease would continue to be the case. Therefore, no DRF was applied to the inpatient components, except for male MHCB.

For the outpatient components, the CRF was based on the full FY of 2003. The two female components for EOP (EOP-GP and EOP-Ad Seg) showed a negative CRF in FY 2003. However, no decrease was applied, as the caseload in these programs is very small.

The projections are adjusted twice a year, at the same time of the department's population projections are released.

The outpatient components become part of budget requests for staffing twice a year. The 5 or 6 year projections are provided to the Facilities Management Division in order that they may incorporate the information into their facilities planning. This would include the need to expand program space as well as the need to convert more GP housing units to EOP.

Increases needed in MHCBs would become the subject of a budget change proposal. Any expansion of MHCBs must be tied to the contruction of a facility to deliver the service. With the construction of the new facility at CMF as well as the recent expansion into the 4th wing at COR, future growth for the next several years should be accommodated.

Adjustments to the other inpatient components would be the subject of future negotiations of the interagency agreement between CDC and DMH.

Other special adjustments:

1. In the past the DDPS data did not show sufficient detail in the data for the ICF at CMF and the Day Treatment program at CMF. Beginning last in FY 2003, that breakdown became available, as well as the number of cases at the SVPP at Salinas Valley. Therefore, the 7/2003 statistics are used in conjunction with the ASH data available from the DMH website to determine the male intermediate level of care.

# MENTAL HEALTH TIERED CARE PROJECT

2. The cases identified as Day Treatment more consistently represent an EOP level of care, and therefore, Day Treatment cases (based on DDPS 7/2003 statistics) are included as an adjustment to EOP.

3. The TA bed study reflected an adjustment of 25 cases that in the past were located in the LOU at CMC and included these cases in the projection of male MHCBs. While these cases are no longer located in the LOU, the trend does yet reflect the transfer of these cases to MHCB settings. Therefore, the MHCB projections for males are increased by these 25 cases to ensure this need is covered.

4. For the male population, EOP cases located in the SHU are included in the PSU projections. However, for females, EOP cases located in the SHU are included in the Ad Seg projections.

5. The most recent trends show a smaller wait list to enter the PSU. This is because additional beds have been added at SAC. This smaller wait list number of 10 is included in the projections.

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT E

## RESULTS OF BED NEED FORECASTING

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT E (NEW ICF) page 1 of 4



| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for CRF |
|---|---|---|---|---|---|---|---|
| **Atascadero State Hospital** | | | | | | | |
| Population | 153,970 | 156,888 | 159,801 | 162,589 | 164,884 | 166,238 | |
| Discharge Rate/1000 | 1.12 | 1.24 | 1.33 | 1.40 | 1.44 | 1.44 | 0.03 |
| Discharge Rate Factor | | 0.105 | 0.079 | 0.052 | 0.026 | | |
| ALOS | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | |
| Annualized Discharges | 172 | 194 | 213 | 228 | 238 | 240 | |
| Patient Days | 30,767 | 34,691 | 38,089 | 40,771 | 42,559 | 42,817 | |
| Average Daily Census | 84 | 95 | 104 | 112 | 117 | 118 | |
| **Salinas Valley Psychiatric Program** | | | | | | | |
| Discharge Rate/1000 | 10.47 | 10.47 | 10.47 | 10.47 | 10.47 | 10.47 | |
| Discharge Rate Factor | 0.327 | 0.327 | 0.327 | 0.327 | 0.327 | 0.327 | |
| ALOS | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | |
| Discharges | 115 | 115 | 115 | 115 | 115 | 115 | |
| Patient Days | 18,341 | 18,341 | 18,341 | 18,341 | 18,341 | 18,341 | |
| Average Daily Census | 50 | 50 | 50 | 50 | 50 | 50 | |
| **California Medical Facility - Intermediate Treatment Facility including Day Treatment** | | | | | | | |
| Discharge Rate/1000 | 0.99 | 1.06 | 1.10 | 1.13 | 1.13 | 1.13 | |
| Discharge Rate Factor | 0.088 | 0.086 | 0.044 | 0.022 | | | 0.022 |
| ALOS | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | |

SVPP wasn't operational before 2003. Information not available before 2004

# MENTAL HEALTH TIERED CARE PROJECT

## Combined Intermediate Care Program Forecast for Males

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Discharges | 152 | 166 | 176 | 183 | 186 | 187 |
| Patient Days | 31,216 | 34,091 | 36,145 | 37,583 | 38,199 | 38,404 |
| Average Daily Census | 86 | 93 | 99 | 103 | 105 | 105 |
| ASH & ITF / SVPP | 220 | 238 | 253 | 266 | 272 | 273 |
| Adjust for occupancy factor (90%) | 245 | 265 | 281 | 295 | 302 | 304 |

## CMF ACUTE

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for DRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 156,888 | 159,801 | 162,599 | 164,884 | 166,236 | |
| Discharge Rate/1000 | 7.10 | 8.05 | 9.11 | 10.29 | 11.61 | 11.61 | |
| Discharge Rate Factor (DRF) a/ | 0.136 | 0.134 | 0.132 | 0.130 | 0.128 | - | 0.002 |
| ALOS | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | |
| Discharges | 1,093 | 1,263 | 1,456 | 1,673 | 1,914 | 1,930 | |
| Patient Days | 56,246 | 64,994 | 74,926 | 86,093 | 98,494 | 99,318 | |
| Average Daily Census | 154 | 178 | 205 | 236 | 270 | 272 | |
| Adj for 90% Occupancy Standard | 171 | 198 | 228 | 262 | 300 | 302 | |

a/ Discharge Rate Factor (DRF) is the percentage change between 2 years.

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT E (INTERMEIATE CARE WITH UNA) page 3 of 4

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for CRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 156,888 | 159,801 | 162,589 | 164,884 | 166,238 | |
| **Atascadero State Hospital** | | | | | | | |
| Discharge Rate/1000 | 1.12 | 1.24 | 1.33 | 1.40 | 1.44 | 1.44 | 0.03 |
| Discharge Rate Factor | - | 0.105 | 0.079 | 0.052 | 0.026 | | |
| ALOS | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | |
| Annualized Discharges | 172 | 194 | 213 | 228 | 238 | 240 | |
| Patient Days | 30,767 | 34,891 | 38,089 | 40,771 | 42,559 | 42,917 | |
| Adjustment for UNA | 31,132 | 35,114 | 38,553 | 41,268 | 43,078 | 43,440 | |
| **Salinas Valley Psychiatric Program** | | | | | | | |
| Discharge Rate/1000 | 10.47 | 10.47 | 10.47 | 10.47 | 10.47 | 10.47 | |
| Discharge Rate Factor | 0.327 | 0.327 | 0.327 | 0.327 | 0.327 | 0.327 | |
| ALOS | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | |
| Discharges | 115 | 115 | 115 | 115 | 115 | 115 | |
| Patient Days | 18,363 | 18,363 | 18,363 | 18,363 | 18,363 | 18,363 | |
| Adjustment for UNA | 18,044 | 18,044 | 18,044 | 18,044 | 18,044 | 18,044 | |
| **California Medical Facility - Intermediate Treatment Facility including Day Treatment** | | | | | | | |
| Discharge Rate/1000 | 0.99 | 1.06 | 1.10 | 1.13 | 1.13 | 1.13 | 0.022 |
| Discharge Rate Factor | 0.088 | 0.066 | 0.044 | 0.022 | 0.022 | | |
| ALOS | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | |
| Discharges | 152 | 166 | 176 | 183 | 166 | 187 | |
| Patient Days | 31,216 | 34,091 | 36,145 | 37,583 | 38,199 | 38,404 | |
| Adjustment for UNA | 26,287 | 28,287 | 26,287 | 28,287 | 28,287 | 26,287 | |
| **Combined Intermediate Care Program Forecast for Males** | | | | | | | |
| ASH & ITF / SVPP | 428 | 456 | 481 | 500 | 512 | 514 | |

SVPP wasn't operational before 2003. Information not available before 2004

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT E (CMF ACUTE WITH UNA) page 4 of 4

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for DRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 156,888 | 159,801 | 162,559 | 164,884 | 166,236 | |
| Discharge Rate/1000 | 7.10 | 8.05 | 9.11 | 10.29 | 11.61 | 11.61 | |
| Discharge Rate Factor (DRF) a/ | 0.135 | 0.134 | 0.132 | 0.130 | 0.128 | | 0.002 |
| ALOS | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | |
| Discharges | 1,093 | 1,263 | 1,456 | 1,673 | 1,914 | 1,930 | |
| Patient Days | 56,246 | 64,994 | 74,926 | 86,093 | 98,494 | 99,316 | |
| Adj for Unidentified Need | 772 | 772 | 772 | 772 | 772 | 772 | |
| Average Daily Census | 156 | 180 | 207 | 238 | 272 | 274 | |

Adj for 90% Occupancy Standard

a/ Discharge Rate Factor (DRF) is the percentage change between 2 years.

**MENTAL HEALTH TIERED CARE PROJECT**

## ATTACHMENT F

## GAP

(Comparison Of Current Bed Availability To Forecasted Needs)

# MENTAL HEALTH TIERED CARE PROJECT

### Gap Analysis

The following graphs indicate bed needs with and without the "UNA Factor" in order to demonstrate the impact of UNA on forecasted need. As of March 2005, there are 429 beds available to CDC for intermediate care (ICF) and 131 available for acute care. In September 2005, 50 beds will become available through DMH, in 2009 an additional 189 will become available. This results in a total known capacity of 668 by 2009. This information also indicates a gap of bed needs of 172 in 2005, 177 in 2006, 107 in 2007, 160 in 2008, 146 in 2009, and 150 in 2010.

# MENTAL HEALTH TIERED CARE PROJECT



| | Total ICF & Acute Beds Needed with UNA | Total ICF & Acute Beds Needed without UNA | ICF & Acute Beds Available | Gap with UNA | Gap without UNA |
|---|---|---|---|---|---|
| Year to Date 2005 | 357 | 357 | 429 | 72 | 72 |
| Projected Year End 2005 | 601 | 416 | 429 | -172 | 13 |
| Projected Year End 2006 | 656 | 463 | 479 | -177 | 16 |
| Projected Year End 2007 | 711 | 433 | 604 | -107 | 171 |
| Projected Year End 2008 | 764 | 557 | 604 | -160 | 47 |
| Projected Year End 2009 | 814 | 602 | 668 | -146 | 66 |
| Projected Year End 2010 | 818 | 606 | 668 | -150 | 62 |

Note: Year to Date With and Without UNA is the same as projected number for UNA are not until Year End 2005

# MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT G

## PROJECT SCHEDULE

# MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 1 | | **Phase I: Immediate Strategies** | 54 days | Wed 3/9/05 | Mon 5/23/05 | |
| 2 | | **Objective A: Ensure that all inmate-patients identified in the Unidentified Needs Assessment (UNA) study have been placed or will receive timely placement in the appropriate level of care.** | 54 days | Wed 3/9/05 | Mon 5/23/05 | |
| 3 | | **Task A.1: Develop a report indicating the current status of the inmate-patients that were identified as needing APP/ICF level of care on the date of the UNA visit.** | 15 days | Wed 3/9/05 | Wed 3/30/05 | Acute Psychiatric Program (APP); Intermediate Care Facility (ICF) |
| 4 | | A.1.1: Review UNA data. | 8 days | Wed 3/9/05 | Fri 3/18/05 | |
| 5 | | A.1.2: Determine the present status of all inmate-patients listed in the UNA data who were in the process of referral to APP/ICF level of care and include the following criteria: (see comments) | 11 days | Tue 3/15/05 | Tue 3/29/05 | Criteria: 1) Institution, 2) current level of care, 3) whether referred, 4) level of care needed, 5) date identified, and 6) date referred. |
| 6 | | A.1.3: Complete report. | 0 days | Wed 3/30/05 | Wed 3/30/05 | |
| 7 | | **Task A.2: Implement a process to ensure that all inmate-patients identified in the UNA data as needing APP/ICF level of care receive appropriate treatment.** | 42 days | Fri 3/25/05 | Mon 5/23/05 | Monitoring of the UNA identified inmate-patients will continue until at least 10/30/05. |
| 8 | | A.2.1: Draft memo template notifying institutions that inmate-patients identified as needing APP level of care shall be referred to APP level of care immediately. | 6 days | Fri 3/25/05 | Fri 4/1/05 | |
| 9 | | A.2.2: Draft memo template notifying institutions that inmate-patients identified as needing ICF level of care shall be referred to ICF level of care and the requirement for the referral may be appealed. (see comments) | 6 days | Fri 3/25/05 | Fri 4/1/05 | The appeal process is to be used if the inmate-patient has significantly improved. This process will include Health Care Services Division (HCSD) review of Interdisciplinary Treatment Team (IDTT) notes as indicated in Subtasks A.2.5 to A.2.7. |
| 10 | | A.2.3: Insert into the memo templates the names of inmate-patients identified by UNA as needing either APP/ICF level of care who have not been referred. | 7 days | Fri 4/1/05 | Mon 4/11/05 | |
| 11 | | A.2.4: Memo approval and distribution. | 0 days | Mon 4/11/05 | Mon 4/11/05 | |
| 12 | | A.2.5: Collect the IDTT progress notes supporting the appeal for ICF referrals of UNA identified inmate-patients from the institution. | 10 days | Tue 4/12/05 | Mon 4/25/05 | |
| 13 | | A.2.6: HCSD review of the IDTT progress notes for documentation sufficiency. (see comments) | 10 days | Tue 4/26/05 | Mon 5/9/05 | If appeal documentation is sufficient then the inmate-patient will remain in the California Department of Corrections (CDC). |

## MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | O | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 14 | | A.2.7: If appeal documentation is insufficient then the HCSD will review the IDTT notes and set-up a clinical case conference. (see comments) | 10 days | Tue 5/10/05 | Mon 5/23/05 | Final decision made by Coordinated Clinical Assessment Team (CCAT) or referred to Department of Mental Health (DMH) Assistant Deputy Director and CDC Chief of Mental Health. |
| 15 | | A.2.8: Develop a process to track inmate-patients including the following components: (see comments) | 11 days | Mon 4/11/05 | Mon 4/25/05 | Components: 1) Inmate-patients rejected by DMH/CCAT; 2) Inmate-patients with a DMH length of stay less than 30 days; 3) A 10% random sample of inmate-patients treated at DMH more than 30 days. |
| 16 | | A.2.9: Track and monitor inmate-patients identified by Subtask A.1.2( for a period of 6 months and assess processes. (see comments) | 0 days | Mon 4/4/05 | Mon 4/4/05 | Monitoring of the UNA identified inmate-patients will continue until at least 10/30/05. |
| 17 | | Task A.3: Implement a placement wait list management process to ensure UNA identified inmate-patients receive appropriate care pending transfer to APP/ICF level of care. | 22 days | Mon 4/11/05 | Wed 5/11/05 | Monitoring of wait list to be ongoing following implementation. |
| 18 | | A.3.1: The IDTT team shall review the inmate-patient's treatment plan every 30 days and modify as necessary. (see comments) | 22 days | Tue 4/12/05 | Wed 5/11/05 | The Chief of Mental Health or supervisor/managerial designee shall be present at these IDTT reviews. |
| 19 | | A.3.2: The IDTT shall review the appropriateness of the inmate-patient's medications. | 22 days | Tue 4/12/05 | Wed 5/11/05 | |
| 20 | | A.3.3: The IDTT shall review the appropriateness of increasing the number of rounds as required. | 22 days | Tue 4/12/05 | Wed 5/11/05 | |
| 21 | | A.3.4: The IDTT shall review the appropriateness of increasing the frequency of individual sessions. | 22 days | Tue 4/12/05 | Wed 5/11/05 | |
| 22 | | A.3.5: The IDTT shall review the appropriateness of increasing the frequency of psychiatric sessions. | 22 days | Tue 4/12/05 | Wed 5/11/05 | |
| 23 | | A.3.6: The IDTT shall review the appropriateness of consulting with additional clinicians. | 22 days | Tue 4/12/05 | Wed 5/11/05 | |
| 24 | | A.3.7: The IDTT shall review the appropriateness of increasing the hours of group therapy or recreational activities. (see comments) | 22 days | Tue 4/12/05 | Wed 5/11/05 | (Designated institutions will pilot a subset of DMH treatment protocols as determined in Phase II Objective A.) |
| 25 | | A.3.8: Monitor wait list and intervene for immediate transfer of inmate-patients that are decompensating. (see comments) | 0 days | Wed 5/11/05 | Wed 5/11/05 | Ongoing. |
| 26 | | **Phase II: Intermediate Strategies** | 1060 days | Wed 3/9/05 | Tue 3/3/09 | |
| 27 | | **Goal: Develop and implement a bed management program in order to ensure the appropriate use of presently available APP/ICF beds.** | 757 days | Wed 3/9/05 | Fri 2/1/08 | |

# MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | ● | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 28 | | Objective A: Implement appropriate exchange of treatment protocols with DMH at designated CDC institutions. | 178 days | Wed 3/30/05 | Thu 12/1/05 | |
| 29 | | Task A.1: Collect DMH treatment protocols. | 1 day | Wed 3/30/05 | Wed 3/30/05 | |
| 30 | | Task A.2: Analyze and select DMH treatment protocols. | 21 days | Mon 4/4/05 | Mon 5/2/05 | |
| 31 | | Task A.3: Develop training for selected DMH treatment protocols. | 109 days | Tue 5/3/05 | Fri 9/30/05 | |
| 32 | | Task A.4: Analyze UNA study to select designated institution(s) for pilot program of DMH treatment protocols. | 8 days | Thu 3/31/05 | Mon 4/11/05 | |
| 33 | | Task A.5: Train staff on selected DMH treatment protocols at the designated institutions. | 43 days | Mon 10/3/05 | Wed 11/30/05 | |
| 34 | | Task A.6: Implement DMH treatment protocols at the designated institutions. | 43 days | Mon 10/3/05 | Wed 11/30/05 | |
| 35 | | Task A.7: Monitor compliance and effectiveness with the exchange of treatment protocols with DMH. (see comments) | 0 days | Thu 12/1/05 | Thu 12/1/05 | Monitoring will be ongoing. |
| 36 | | Objective B: Revise the bed need forecast based on the UNA results that factors in the unidentified need and will be used in the planning process for the three regional mental health facilities in Phase III and will be tied to the budget process. | 575 days | Mon 3/21/05 | Fri 6/1/07 | |
| 37 | | Task B.1: Run a new forecast using the Tucker Alan formula that includes the UNA results to indicate AFP/ICF bed needs. | 9 days | Mon 3/21/05 | Thu 3/31/05 | |
| 38 | | Task B.2: Compare revised bed needs to available AFP/ICF beds both current and forecasted to demonstrate any gap between bed availability and bed needs. | 4 days | Mon 3/28/05 | Thu 3/31/05 | |
| 39 | | Task B.3: Utilize the gap between bed needs and bed availability in the planning process for the three regional /mental health facilities in Phase III. (see comments) | 567 days | Thu 3/31/05 | Fri 6/1/07 | Planning necessary for Phase III. The finish date for this task coincides with the anticipated construction of the first mental health facility in Phase III. |
| 40 | | Task B.4: Utilize the gap between bed needs and bed availability in the budget request process for the Mental Health Services Delivery System (MHSDS). (see comments) | 0 days | Mon 7/4/05 | Mon 7/4/05 | Ongoing. |
| 41 | | Task B.5: Continue to refine the forecasting methodology to reflect the effectiveness in changes to the MHSDS. (see comments) | 0 days | Fri 4/1/05 | Fri 4/1/05 | To be performed every six months on an ongoing basis. |
| 42 | | Objective C: Develop and implement MHSDS changes based on analysis of the UNA study to ensure inmate-patients requiring APP/ICF level of care are appropriately identified. | 365 days | Wed 3/9/05 | Tue 8/7/06 | |

## MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | ❻ | Task Name | Duration | Start | Finish | Comments |
|----|----|-----------|----------|-------|--------|----------|
| 43 | | Task C.1: Improve the current IDT process that is used to identify, refer, and track inmate-patients requiring AFP/ICF level of care. | 220 days | Wed 3/9/05 | Tue 1/10/06 | Monitoring of the revised IDT process is ongoing following implementation. |
| 44 | | C.1.1: Analyze and recommend improvement(s) to the existing IDT process. (see comments) | 75 days | Fri 4/8/05 | Thu 7/21/05 | This Subtask to include receiving approval for improvement(s) to the IDT process. |
| 45 | | C.1.2: Develop training plan and implement revised IDT process. | 123 days | Fri 7/22/05 | Tue 1/10/06 | |
| 46 | | C.1.3: Train institutional staff on revised IDT process. | 67 days | Mon 10/10/05 | Tue 1/10/06 | |
| 47 | | C.1.4: Develop QMAT tools to monitor the entire referral process between CDC and DMH including the IDT process. | 220 days | Wed 3/9/05 | Tue 1/10/06 | |
| 48 | | C.1.5: Implement QMAT process. (see comments) | 0 days | Tue 1/10/06 | Tue 1/10/06 | Ongoing. |
| 49 | | Task C.2: Develop and apply an assessment tool for process and treatment outcomes that reflects the results of the UNA in terms of the current program requirements or levels of care. (see comments) | 65 days | Wed 3/9/05 | Tue 6/7/05 | i.e. did UNA identify inmate-patients that do not fit in the current level of care structure. |
| 50 | | Task C.3: Conduct a program conference with selected CDC and DMH managers and clinical staff to review current program requirements and proposed changes. | 42 days | Thu 6/2/05 | Sat 7/30/05 | |
| 51 | | Task C.4: Reinforce a joint CDC/DMH clinical management team to determine ongoing operational issues relative to all levels of care. (see comments) | 262 days | Mon 8/1/05 | Tue 8/1/06 | This CDC/DMH clinical management team may be incorporated into QMAT. |
| 52 | | Objective D: Develop rehabilitative and clinical programs to meet the mental health needs of inmate-patients. | 545 days | Mon 5/2/05 | Fri 6/1/07 | |
| 53 | | Task D.1: Research and design a proposal for a behavior management program. | 545 days | Mon 5/2/05 | Fri 6/1/07 | |
| 54 | | D.1.1: Meet with stakeholders. | 20 days | Mon 5/2/05 | Fri 5/27/05 | |
| 55 | | D.1.2: Full development of the behavior management program resource analysis. | 112 days | Fri 5/27/05 | Mon 10/31/05 | |
| 56 | | D.1.3: Pending program approval, request financing for the program. (see comments) | 112 days | Fri 5/27/05 | Mon 10/31/05 | Funding request is for fiscal year 2006/2007. |
| 57 | | D.1.4: Implement the behavior management program. (see comments) | 110 days | Mon 1/1/07 | Fri 6/1/07 | Implementation to follow funding approval. |
| 58 | | Task D.2: Develop a long-term care program for chronic mentally ill inmate-patients. | 458 days | Mon 5/2/05 | Wed 1/31/07 | |
| 59 | | D.2.1: Analyze the possibility of long-term placement for chronic mentally ill inmate-patients to DMH. | 197 days | Mon 5/2/05 | Tue 1/31/06 | |

## MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | ⏰ | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 60 | | D.2.2: Explore a long-term care program for chronic mentally ill patients. | 458 days | Mon 5/2/05 | Wed 1/31/07 | |
| 61 | | D.2.2.1: Determine community standards for the chronic mentally ill. | 197 days | Mon 5/2/05 | Tue 1/31/06 | |
| 62 | | D.2.2.2: Identify resources required. | 42 days | Mon 9/4/06 | Tue 10/31/06 | |
| 63 | | D.2.2.3: Develop BCP/Finance letter if needed. | 66 days | Wed 11/1/06 | Wed 1/31/07 | Budget Change Proposal (BCP) |
| 64 | | Task D.3: Direct institutions to charter QITs to group inmate-patients discharged from EOP to CCCMS in areas designed to facilitate therapeutic interaction. | 44 days | Fri 7/1/05 | Wed 8/31/05 | Quality Improvement Team (QIT); Enhanced Outpatient Program (EOP); Correctional Clinical Case Management (CCCMS) |
| 65 | | Objective E: Improve oversight, coordination, and management of the current contract with DMH in order to maximize the utilization of DMH resources. | 324 days | Wed 3/9/05 | Mon 6/5/06 | |
| 66 | | Task E.1: Implement and manage the revised DMH MOUs relative to admissions, discharges, utilization management and joint CDC-DMH policy and process management. | 260 days | Mon 4/4/05 | Fri 3/31/06 | Memorandum of Understanding (MOU) |
| 67 | | Task E.2: Administer Kennedy K Axis rating upon referral to a DMH program in order to measure the inmate-patient's level of functioning. (see comments) | 285 days | Mon 5/2/05 | Mon 6/5/06 | Kennedy K Axis rating will be used to measure the effectiveness of DMH treatment by applying instrument upon referral and upon discharge. |
| 68 | | E.2.1: Research the rating tool, contract, and cost to acquiring the Kennedy K Axis rating. | 46 days | Mon 5/2/05 | Mon 7/4/05 | |
| 69 | | E.2.2: Develop recommendation and obtain HCSD approval. | 6 days | Tue 7/5/05 | Tue 7/12/05 | |
| 70 | | E.2.3: Acquire tools and materials. | 38 days | Wed 7/13/05 | Fri 9/2/05 | |
| 71 | | E.2.4: Organize training. | 66 days | Mon 9/5/05 | Mon 12/5/05 | |
| 72 | | E.2.5: Train staff and implement. | 66 days | Tue 12/6/05 | Tue 3/7/06 | |
| 73 | | E.2.6: Monitor the process and evaluate the effectiveness of the process. (see comments) | 0 days | Mon 6/5/06 | Mon 6/5/06 | Monitoring to begin on 6/5/06 and be ongoing. |
| 74 | | Task E.3: Implement Kennedy K Axis rating upon discharge from DMH program in order to measure the inmate-patients level of functioning upon return to CDC. (see comments) | 130 days | Tue 12/6/05 | Mon 6/5/06 | Implementation and monitoring of this rating for referral and discharge to proceed simultaneously. |
| 75 | | Task E.4: Refine and specify the discharge criteria from APP/ICF level of care. | 130 days | Wed 3/9/05 | Tue 9/6/05 | |

# MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | ☺ | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 76 | | E.4.1.1: Recommend any necessary changes and obtain DMH approval of modified discharge criteria for APP/ICF level of care. | 130 days | Wed 3/9/05 | Tue 9/6/05 | |
| 77 | | E.4.1.1: Analyze and compare current APP/ICF discharge criteria to identify other industry standard discharge criteria that may be useful. | 130 days | Wed 3/9/05 | Tue 9/6/05 | |
| 78 | | Task E.5.: Develop and implement a DMH tracking tool that will provide a monthly summary of the referrals and transfers to all DMH including the following: reasons for acceptance and rejection, status of appeals (continued see comments). | 25 days | Mon 4/4/05 | Fri 5/6/05 | (continued) bed number, teletype authorizations or endorsements for transfer by CDC classification, actual transfer, pending transfers, all transfers that actually referred, rejected, or completed during the preceding month. |
| 79 | ▦ | E.5.1: Collect and monitor DMH referrals on a monthly basis. (see comments) | 25 days | Mon 4/4/05 | Fri 5/6/05 | Monitoring of DMH referrals to be done on a continual basis starting on 5/6/05. |
| 80 | | Objective F: Develop and implement techniques to maximize bed utilization within all DMH programs. | 740 days | Fri 4/1/05 | Fri 2/1/08 | |
| 81 | | Task F.1: Implement techniques to maximize bed utilization with the DTP program. | 274 days | Mon 5/16/05 | Thu 6/1/06 | Day Treatment Program (DTP) |
| 82 | ▦ | F.1.1: Assess current utilization of the DTP and provide recommendations to maximize use of the program. | 144 days | Mon 5/16/05 | Thu 12/1/05 | |
| 83 | | F.1.2: Approve recommended measures to maximize utilization of the DTP. (see comments) | 23 days | Fri 12/2/05 | Tue 1/3/06 | Obtain DMH approval for recommended measures. |
| 84 | ▦ | F.1.3: Train staff on revised DTP. | 64 days | Tue 1/3/06 | Fri 3/31/06 | |
| 85 | ▦ | F.1.4: Implement recommended measures. | 64 days | Tue 1/3/06 | Fri 3/31/06 | |
| 86 | ▦ | F.1.5: Monitor and evaluate utilization of the DTP. (see comments) | 0 days | Thu 6/1/06 | Thu 6/1/06 | Monitoring to continue for a one year period. Estimated finish date of monitoring is 6/1/07. |
| 87 | | Task F.2: Develop management reports to be used by HCSD Quality Management System to appropriately monitor the usage and availability of APP/ICF beds. | 740 days | Fri 4/1/05 | Fri 2/1/08 | |
| 88 | ▦ | F.2.1: Identify data required for effective management reports. | 42 days | Fri 4/1/05 | Mon 5/30/05 | |
| 89 | ▦ | F.2.2: Develop tracking tool for interim management reports of APP/ICF beds while computer-based system is being developed. | 42 days | Fri 4/1/05 | Mon 5/30/05 | |

# MENTAL HEALTH TIERED CARE PROJECT

Attachment G

| ID | ⊞ | Task Name | Duration | Start | Finish | Comments |
|---|---|---|---|---|---|---|
| 90 | ⊞ | F.2.3: Implement interim process to collect, track, and distribute management report for APP/ICF beds while computer-based system is implemented. | 132 days | Wed 6/1/06 | | |
| 91 | | F.2.4: Develop or acquire computer-based system for production of management reports. (see comments) | 0 days | Tue 10/3/06 | Tue 10/3/06 | The projected time needed for this task is sixteen months. Estimated start date is 10/3/06 with an estimated completion date of 2/1/08. |
| 92 | ⊞ | F.2.5: Implement computer-based system to produce management reports. (see comments) | 0 days | Fri 2/1/08 | Fri 2/1/08 | Including ongoing maintenance, training, and staffing to support this system. The projected start date is 2/1/08 with an estimated completion date of 2/1/12. Exact timeframe to be identified when Subtask F.2.4 is completed. |
| 93 | ⊞ | F.2.6: Monitor usage and availability of APP/ICF beds through the Mental Health Subcommittee or Focus Improvement Team (FIT). (see comments) | 0 days | Thu 12/1/05 | Thu 12/1/05 Ongoing. | This Subtask will begin after Subtask F.2.3 is completed. This Subtask will be ongoing once started. |
| 94 | | Objective G: Develop the means for providing the appropriate level of care treatment for inmate-patients of all classification levels. | 195 days | Mon 4/4/05 | Fri 12/30/05 | |
| 95 | ⊞ | Task G.1: Review classification process and provide recommendations for placing mental health inmate-patients at the lowest security level institution. | 25 days | Mon 4/4/05 | Fri 5/6/05 | |
| 96 | ⊞ | G.1.1: Analyze the distribution and causes of level IV points to determine the potential for classification overrides for specific inmate-patients with high scores but low behavior problems. | 25 days | Mon 4/4/05 | Fri 5/6/05 | |
| 97 | ⊞ | G.1.2: Determine whether any inmate-patients referred to SVPP may receive an override and be placed in another ICF location or directly into the dormitory at SVPP. | 25 days | Mon 4/4/05 | Fri 5/6/05 | Salinas Valley Psychiatric Program (SVPP) |
| 98 | ⊞ | Task G.2: Implement a controlled test of any new process using appropriate and approved classification overrides. | 170 days | Mon 5/9/05 | Fri 12/30/05 | |
| 99 | | Objective H: Ensure inmate-patients receive quality mental health services within CDC to reduce decompensation and the need for a higher level of care. | 282 days | Thu 3/17/05 | Fri 3/17/06 | |
| 100 | ⊞ | Task H.1: Ensure appropriate credentialing, privileging, peer review and standards of care. | 282 days | Thu 3/17/05 | Fri 3/17/06 | |
| 101 | ⊞ | Task H.2: Design, develop, and implement mental health programs that will minimize decompensation and the need for a higher level of care. | 282 days | Thu 3/17/05 | Fri 3/17/06 | |
| 102 | ⊞ | Task H.3: QMAT monitoring of policy, clinical practice, and program, along with providing recommendations for improvement. (see comments) | 282 days | Thu 3/17/05 | Fri 3/17/06 | |

Project: Mental Health Tiered Care Project
Date: Wed 3/30/05

Attachment G

## MENTAL HEALTH TIERED CARE PROJECT

| ID | ① | Task Name | Duration | Start | Finish | Comments |
|----|---|-----------|----------|-------|--------|----------|
| 103 | | **Objective I: Ensure quality diagnostic clarification services are performed in a cost effective manner.** | 198 days | Mon 5/2/05 | Wed 2/1/06 | **Quality Management Committee (QMC)** |
| 104 | | **Task I.1: Obtain an outside contract to perform diagnostic clarification services until QMC approves other alternatives.** | 198 days | Mon 5/2/05 | Wed 2/1/06 | |
| 105 | ▦ | I.1.1: Develop scope of work to be performed by contractor. | 67 days | Mon 5/2/05 | Tue 8/2/05 | |
| 106 | ▦ | I.1.2: Send out invitations for bid. | 44 days | Wed 8/3/05 | Mon 10/3/05 | |
| 107 | ▦ | I.1.3: Develop and approve contract. | 87 days | Tue 10/4/05 | Wed 2/1/06 | |
| 108 | | **Task I.2: QMC to approve the diagnostic clarification battery.** | 67 days | Mon 5/2/05 | Tue 8/2/05 | |
| 109 | ▦ | I.2.1: Recommend a diagnostic clarification battery to the QMC. (see comments) | 67 days | Mon 5/2/05 | Tue 8/2/05 | Procurement of the diagnostic battery is contingent upon funding. |
| 110 | ▦ | Task I.3: Monitoring diagnostic clarification services through QMAT and utilization management. (see comments) | 0 days | Wed 8/3/05 | Wed 8/3/05 | Ongoing. |
| 111 | | **Goal: Increase the number of APP/ICF beds.** | 1060 days | Wed 3/9/05 | Tue 3/31/09 | |
| 112 | | **Objective J: Increase bed capacity through community contracts.** | 123 days | Mon 3/14/05 | Wed 8/31/05 | |
| 113 | | **Task J.1: Analyze the option of contracting with community hospitals or centers to provide mental health or medical services to inmate-patients.** | 123 days | Mon 3/14/05 | Wed 8/31/05 | |
| 114 | ▦ | J.1.1: Analyze the option of contracting with community hospitals such as Sylmar to treat ICF/APP inmate-patients. | 79 days | Mon 3/14/05 | Thu 6/30/05 | |
| 115 | ▦ | J.1.2: Analyze ways to improve referring medical inmate-patients to community hospitals in order to increase capacity for mental health inmate-patients. | 88 days | Mon 5/2/05 | Wed 8/31/05 | |
| 116 | | **Objective K: Increase the number of beds available through conversion of existing CDC facilities.** | 343 days | Wed 3/9/05 | Fri 6/30/06 | |
| 117 | | **Task K.1: Evaluate the feasibility of adding ICF beds at the California State Prison, Corcoran (COR) or the California Substance Abuse Treatment Facility (SATF) that would allow level IV inmate-patients.** | 175 days | Wed 3/9/05 | Tue 11/1/05 | |
| 118 | ▦ | Task K.2: Analyze the option of converting GACH to CTC level of care and then convert CTC beds to MHCBs or ICF beds. | 175 days | Fri 12/30/05 | | General Acute Care Hospital (GACH); Correctional Treatment Center (CTC); Mental Health Crisis Bed (MHCB) |

Attachment G

## MENTAL HEALTH TIERED CARE PROJECT

| ID | ⦿ | Task Name | Duration | Start | Finish | Comments |
|----|---|-----------|----------|-------|--------|----------|
| 119 | ▦ | Task K.3: Analyze the option of re-opening Northern California Women's Facility to service the mental health population. | 180 days | Mon 1/2/06 | Fri 6/30/06 | |
| 120 | | Objective L: Add 239 beds through new construction and negotiated contracts with DMH by April 2005. | 912 days | Fri 9/30/05 | Tue 3/31/09 | All projects are currently in process and finish dates are anticipated. |
| 121 | ▦ | Task L.1: Coalinga State Hospital - DMH 50 additional beds. | 0 days | Fri 9/30/05 | Fri 9/30/05 | |
| 122 | ▦ | Task L.2 DMH 125 additional beds. Location of these beds to be determined by DMH population management. | 0 days | Mon 7/3/06 | Mon 7/3/06 | |
| 123 | ▦ | Task L.3: SVPP - 64 additional beds. (see comments) | 544 days | Thu 3/1/07 | Tue 3/31/09 | $28,000,000 is the anticipated cost for this project. Funding is pending budget approval for fiscal year 2005/2006. |
| 124 | | **Phase III: Long-range Strategies** | 0 days | Tue 1/1/13 | Tue 1/1/13 | |
| 125 | ▦ | Objective A: Construction of three regional facilities, each with a 1,500 bed capacity by January 2013. (see comments) | 0 days | Tue 1/1/13 | Tue 1/1/13 | The three potential sites are projected to be in the range of 1.1 billion dollars. At a minimum 100 ICF beds will be available at each hub institution. |

Project: Mental Health Tiered Care Project
Date: Wed 3/30/05

## MENTAL HEALTH TIERED CARE PROJECT

## ATTACHMENT H

## MEMO FROM DMH

## ON AVAILABILITY OF ADDITIONAL BEDS



### CALIFORNIA DEPARTMENT OF
# Mental Health

**1600 9th Street, Sacramento, CA 95814**
**(916) 654-2413**

March 30, 2005

Renee Kanan, M.D., Acting Deputy Director
Health Care Services Division
Department of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001

Dear Dr. Kanan:

Following is the DMH population management plan and status report on Coalinga State Hospital (CSH) hiring, licensure, and construction as requested for submission to Mr. Keating.

Coalinga State Hospital (CSH) is scheduled to activate 250 beds (200 for SVPs and 50 for CDC 2684's) in September 2005. These 250 beds will all be filled with patients transferred from Atascadero State Hospital (ASH). Because of safety concerns, DMH will fill the new facility with familiar patients rather then new or unfamiliar patients while DMH is working out the bugs of a new facility. DMH will fill the 50 vacant 2684 beds at ASH with new admissions per the ICF MOU. These admissions will be phased in and as many admissions accommodated per week as is reasonable to the overall transfer workload and to maintain licensing compliance and hospital safety and security.

Beginning November 2005, CSH will receive a maximum of 100 SVP's a month from ASH until all SVP's are transferred to CSH. The current census as of March 3, 2005 is 554. The 100 transfers a month is dependent on CSH having adequate level-of-care staff to treat the patients each month.

As the SVP beds are vacated at ASH, DMH management will develop and follow a population management plan to reduce the over-bedding at the hospitals by redistributing the population and bring the population back into the state hospitals licensed bed capacity. Once this occurs and there is adequate staffing and funding, then the DMH can provide the 125 additional beds to CDC. Until DMH management completes the redistribution, DMH will not know where in the system these beds will be available-CSH or ASH. It should be noted that based on the DMH ten-year population projections, after the 125 beds are provided to CDC, the remaining beds in the system will be needed for growth in the populations that DMH is legislatively authorized to serve.

Renee Kanan, Acting Deputy Director
March 30, 2005
Page 2
**Coalinga State Hospital Status Report**

- **Construction**

Coalinga State Hospital (CSH) remains on track to activate in September 2005. The
Central Warehouse, Central Plant and the Administration Building have been completed,
turned over to DMH and are currently occupied with staff. The Treatment Facilities and
Infrastructure, Motor Vehicle Building, and Firehouse Addition are in process.

- **Licensing**

DMH and the local Department of Health Services (DHS) licensing office began discussions
on the process for licensing CSH on February 28, 2005. Two members of the State
Facilities Unit (SFU) were given a tour on CSH the second week of March. The licensing
application is scheduled for submission to DHS in April 2005 and the initial survey has been
tentatively scheduled for late July or early August 2005.

- **Staffing**

DMH is planning to schedule their first round of bargaining with the unions for April 2005.
The CSH hiring schedule, staffing plans and timetable follows:

NON-LEVEL OF CARE HIRING:

*Phase I January 2002 (6.0 positions)*
*Phase II June 2003 (15.0 positions)*
*Phase III May 2004 (83.0 positions)*

All of these Phases have been completed with the exception of 18.0 of the 25.0 Phase III
Hospital Police Officers positions currently in the last stage of the hiring process.

*Non-Level of Care Hiring Phase IV January 2005 (69.0 positions)*

The examinations and testing needed to complete these additional hires is complete at this
time and 25 hires have already been completed for this phase. Testing of additional
Hospital Police Officers has been completed and 25 additional officers will be starting upon
completion of backgrounds and psychological testing anticipated for completion by April 1,
2005.

*Non-Level of Care Hiring Phase V June 2005 (258.0 positions)*

The examination and testing needed to complete these hires is nearly completed at this
time as many of these positions are being added to address impending workload and earlier

Renee Kanan, Acting Deputy Director
March 30, 2005
Page 3

phases were primarily supervisors hired to facilitate activation and were responsible for conducting examinations and testing of their subordinate staff.

*Non-Level of Care Hiring Phase VI July 2005 (39.6 Positions Pending Budget Approval)*

These are all Hospital Police Services positions established to provide coverage for the 50-bed CDC Intermediate Care Unit of the facility. The current testing and hiring process already includes a candidate pool that exceeds the total Hospital Police Services allocation and these positions will be filled upon signature of the budget and the authorization to hire.

LEVEL OF CARE HIRING:

Level of Care Phase V July 2005 (265.0 Positions Pending Budget Approval)

This Level of Care hiring Phase is for the activation of 250 beds including 200 Infirmary and SVP Treatment Program beds, and 50 CDC Intermediate Care Treatment beds.

Recruitment Activities for the Clinical staffing in these units has included attendance at national and in state professional conventions and meetings, job fairs, and recruitment events. From these conferences we have developed a list of interested persons from each discipline, maintained contact with them on the progress of construction and in some cases have flown them to California for hiring interviews to obtain list eligibility for their classification. In a number of cases we are assisting them with obtaining a California license so they may come to work fully licensed and able to perform.

If you need further information, please contact either myself or Cindy Radavsky, Assistant Deputy Director, at 654-2413.

Sincerely,

JOHN RODRIGUEZ
Deputy Director

c:    Cindy Radavsky

**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555.
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

**RECEIVED**

MAY 1 6 2005

**Rosen Bien & Asaro**

May 12, 2005

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02915

*Via Overnight Mail*

RE:     Coleman v. Schwarzenegger
        USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

Please find enclosed additional documents concerning the UNA Bed Plan as well as documents providing status reports on certain agenda items for the All-Parties meeting on May 16, 2005.

Please contact me if you have any questions or concerns.

Sincerely,

LISA A. TILLMAN
Deputy Attorney General

For     BILL LOCKYER
        Attorney General

*Enclosure

See attached courtesy copy list

J. Michael Keating, Jr.
May 12, 2005
Page 2


cc: Matthew Lopes
    Steve Fama
    Michael Bien
    Dennis Koson
    Jeffrey Metzner
    Melissa Warren
    Mohamedu Jones
    Paul Nicoll
    Ray Patterson
    Patricia Williams
    Virginia Morrison
    Kerry Hughes



30003986.wpd

New ICF
Year to Date Date as of 5-2-05

Attachment C

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for CRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 156,898 | 159,801 | 162,589 | 164,884 | 166,236 | |
| **Atascadero State Hospital** | | | | | | | |
| Discharge Rate/1000 | 1.12 | 1.24 | 1.33 | 1.40 | 1.44 | 1.44 | |
| Discharge Rate Factor | - | 0.105 | 0.079 | 0.052 | 0.026 | - | 0.03 |
| ALOS | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | |
| Annualized Discharges | 172 | 194 | 213 | 228 | 238 | 240 | |
| Patient Days | 30,757 | 34,691 | 38,089 | 40,771 | 42,598 | 42,897 | |
| Average Daily Census | 84 | 95 | 104 | 112 | 117 | 118 | |
| **Salinas Valley Psychiatric Program** | | | | | | | |
| Discharge Rate/1000 | 1.12 | 1.27 | 1.39 | 1.49 | 1.53 | 1.53 | |
| Discharge Rate Factor | 0.132 | 0.132 | 0.099 | 0.066 | 0.033 | - | 0.03 |
| ALOS | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | |
| Discharges | 172 | 199 | 223 | 241 | 253 | 265 | |
| Patient Days | 27,465 | 31,776 | 35,609 | 38,483 | 40,399 | 40,718 | |
| Average Daily Census | 75 | 87 | 98 | 105 | 111 | 112 | |
| **California Medical Facility - Intermediate Treatment Facility including Day Treatment** | | | | | | | |
| Discharge Rate/1000 | 0.82 | 0.82 | 0.82 | 0.82 | 0.82 | 0.82 | |
| Discharge Rate Factor | | | | | | | 0 |
| ALOS | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | |
| Discharges | 126 | 129 | 131 | 133 | 135 | 138 | |
| Patient Days | 25,877 | 26,493 | 26,903 | 27,314 | 27,725 | 27,930 | |
| Average Daily Census | 71 | 73 | 74 | 76 | 76 | 77 | |
| **Combined Intermediate Care Program/Forecast for State Hospitals** | | | | | | | |
| ASH & ITF / SVPP | 230 | 255 | 276 | 292 | 304 | 307 | |
| Adjust for occupancy factor (90%) a/ | 256 | 283 | 306 | 325 | 337 | 341 | |

SVPP wasn't operational before 2003.
Information not available before 2004.

SR/agedcl/data/Projections
5/11/2005 1:52 PM

CMF Acute
Year to Date Data as of 5-2-05

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for DRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 156,888 | 159,801 | 162,569 | 164,864 | 166,236 | |
| Discharge Rate/1000 | 7.10 | 8.02 | 9.00 | 10.04 | 11.12 | 11.12 | |
| Discharge Rate Factor (DRF) a/ | 0.138 | 0.129 | 0.122 | 0.115 | 0.108 | | 0.007 |
| ALOS | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | |
| Discharges | 1,093 | 1,258 | 1,438 | 1,632 | 1,834 | 1,849 | |
| Patient Days | 56,246 | 64,737 | 73,999 | 83,983 | 94,378 | 95,150 | |
| Average Daily Census | 154 | 177 | 203 | 230 | 259 | 261 | |
| Adj for 90% Occupancy Standard | 171 | 197 | 226 | 256 | 288 | 290 | |

a/ Discharge Rate Factor (DRF) is the percentage change between 2 years.

Intermediate Care with UNA
Year to Date Data as of 6-2-05

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for CRF |
|---|---|---|---|---|---|---|---|
| **Atascadero State Hospital** | | | | | | | |
| Population | 153,970 | 156,888 | 159,801 | 162,589 | 164,884 | 166,236 | |
| Discharge Rate/1000 | 1.12 | 1.24 | 1.33 | 1.40 | 1.44 | 1.44 | |
| Discharge Rate Factor | - | 0.105 | 0.079 | 0.052 | 0.026 | - | 0.03 |
| ALOS | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | 178.82 | |
| Annualized Discharges | 172 | 194 | 213 | 228 | 238 | 240 | |
| Patient Days | 30,757 | 34,691 | 38,089 | 40,771 | 42,559 | 42,917 | |
| Adjustment for UNA | 31,132 | 35,114 | 38,553 | 41,268 | 43,078 | 43,440 | |
| Average Daily Census | 148 | 157 | 144 | 136 | 109 | 170 | 191 | 210 | 225 | 235 | 237 | |
| Discharge Rate/1000 | 1.12 | 1.27 | 1.39 | 1.49 | 1.53 | 1.53 | |
| Discharge Rate Factor | | 0.132 | 0.099 | 0.066 | 0.033 | | 0.03 |
| ALOS | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | 159.68 | |
| Patient Days | 172 | 199 | 223 | 241 | 255 | 255 | |
| Patient Days | 27,465 | 31,776 | 35,609 | 38,483 | 40,399 | 40,718 | |
| Adjustment for UNA | 23,392 | 27,064 | 30,328 | 32,776 | 34,408 | 34,680 | |
| Average Daily Census | 25 | 42 | 78 | 139 | 161 | 181 | 195 | 205 | 207 | |
| Discharge Rate/1000 | 0.82 | 0.82 | 0.82 | 0.82 | 0.82 | 0.82 | |
| Discharge Rate Factor | | | | | | | 0 |
| ALOS | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | 205.37 | |
| Discharges | 126 | 129 | 131 | 133 | 135 | 136 | |
| Patient Days | 25,877 | 26,483 | 26,903 | 27,314 | 27,725 | 27,930 | |
| Adjustment for UNA | 16,128 | 16,512 | 16,768 | 17,024 | 17,280 | 17,408 | |
| Average Daily Census | 115 | 118 | 120 | 124 | 123 | 124 | |
| ASH & ITF / SVPP | 424 | 470 | 511 | 541 | 563 | 568 | |
| Adjust for occupancy factor (90%) | 471 | 522 | 567 | 601 | 626 | 631 | |

SVPP wasn't operational before 2003
Information not available before 2004

CMF Acute with UNA
Year to Date Data as of 5-2-05

| Year | FY Ending 2005 | FY Ending 2006 | FY Ending 2007 | FY Ending 2008 | FY Ending 2009 | FY Ending 2010 | Annual Adj Factor for DRF |
|---|---|---|---|---|---|---|---|
| Population | 153,970 | 158,898 | 158,801 | 162,589 | 164,884 | 166,238 | |
| Discharge Rate/1000 | 7.10 | 8.02 | 9.00 | 10.04 | 11.12 | 11.12 | |
| Discharge Rate Factor (DRF) a/ | 0.138 | 0.129 | 0.122 | 0.115 | 0.108 | - | 0.007 |
| ALOS | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | 51.46 | |
| Discharges | 1,093 | 1,258 | 1,438 | 1,632 | 1,834 | 1,849 | |
| Patient Days | 56,246 | 64,737 | 73,999 | 83,983 | 94,378 | 95,160 | |
| Adj for Unidentified Need | 19,395 | 18,870 | 21,570 | 24,460 | 27,510 | 27,735 | |
| Average Daily Census | 199 | 229 | 282 | 297 | 384 | 337 | |
| Adj for 90% Occupancy standard | 221 | 254 | 291 | 330 | 371 | 374 | |

a/ Discharge Rate Factor (DRF) is the percentage change between 2 years.

SRiegel/data/Projections 5/11/2005 1:48 PM

**CLASSIFICATION DATA FOR**
**UNIDENTIFIED NEEDS ASSESSMENT**

Attachment D

| ID | INSTITUTION | INMATE NAME | CDC # | PRIOR CDC #s | CLASS LEVEL | CLASS SCORE |
|---|---|---|---|---|---|---|
| 1 | SQ | | | P79931, S04110, S04134 | MAX | UNCLASS |
| 2 | SVSP | | | | IV | 52 |
| 4 | SVSP | | | | IV | 117 |
| 7 | SVSP | | | | IV | 111 |
| 9 | SVSP | | | | IV | |
| 11 | SVSP | | | | IV | 71 |
| 12 | SVSP | | | | IV | 83 |
| 13 | SVSP | | | | IV | 69 |
| 16 | SVSP | | | | | |
| 35 | SVSP | | | | IV | 59 |
| 41 | SVSP | | | | | |
| 42 | PVSP | | | | III | 51 |
| 43 | PVSP | | | | III | 44 |
| 44 | PVSP | | | | | 17 |
| 45 | CMC-E | | | | III | 31 |
| 46 | CMC-E | | | | IV | 54 |
| 47 | CMC-E | | | | II | 27 |
| 49 | CMC-E | | | | IV | 58 |
| 52 | CMC-E | | | | III | 37 |
| 53 | CMC-E | | | | I-MAX | 13 |
| 54 | CMC-E | | | | III | 34 |
| 55 | CMC-E | | | | III | 39 |
| 56 | CMC-E | | | | III | 28 |
| 58 | CCWF | | | | | |
| 59 | CCWF | | | | III | 16 |
| 60 | CCWF | | | | IV | 59 |
| 61 | VSP | | | | | 89 |
| 62 | VSP | | | | | |
| 63 | CCWF | | | | II | 22 |
| 64 | CCWF | | | | I | 1 |
| 65 | CCWF | | | | IV | 116 |
| 66 | CCI | | | | | |
| 68 | CMF | | | | III | 39 |
| 71 | CMF | | | | II | 19 |
| 72 | CMF | | | | IV | 119 |
| 73 | CMF | | | | III | 45 |
| 74 | CMF | | | | III | 48 |
| 75 | CMF | | | | 1 | 19 |
| 76 | CMF | | | | III | 70 |
| 77 | CMF | | | | III | 43 |
| 78 | CMF | | | | 1 | 42 |
| 79 | CMF | | | | IV | 57 |
| 81 | CMF | | | | 1 | 2 |
| 82 | CMF | | | | III | 45 |
| 83 | CMF | | | | III | 31 |
| 84 | CMF | | | | II w/ a level III override | 25 |
| 86 | CMF | | | | III | 44 |
| 87 | CMF | | | | II with a level III override | 0 |

## CLASSIFICATION DATA FOR
## UNIDENTIFIED NEEDS ASSESSMENT

Attachment D

| ID | INSTITUTION | INMATE NAME | CDC # | PRIOR CDC #s | CLASS LEVEL | CLASS SCORE |
|----|-------------|-------------|-------|--------------|-------------|-------------|
| 88 | CMF | | | | II with a level III override | 24 |
| 89 | CIM | | | | IV | 61 |
| 90 | CIM | | | | III | 39 |
| 92 | CIM | | | | IV | 136 |
| 93 | CIM | | | | III | 36 |
| 94 | CIM | | | | II | 27 |
| 95 | CIM | | | | I | 17 |
| 96 | CIM | | | | IV | 55 |
| 99 | CIM | | | | II | 19 |
| 100 | CIM | | | | | |
| 101 | CIM | | | | III | 33 |
| 104 | CIM | | | | IV | 64 |
| 105 | CIM | | | | IV | 71 |
| 120 | SVSP | | | | IV | 86 |
| 121 | SVSP | | | | IV | 88 |
| 123 | SVSP | | | | IV | 63 |
| 125 | SVSP | | | | IV | 298 |
| 128 | SVSP | | | | IV | 92 |
| 129 | SVSP | | | | IV | 90 |
| 131 | SVSP | | | | IV | 138 |
| 132 | SVSP | | | | IV | 312 |
| 134 | SVSP | | | | IV | 70 |
| 138 | SVSP | | | | IV | 70 |
| 140 | SVSP | | | | IV | 71 |
| 143 | SVSP | | | | IV | 127 |
| 144 | SVSP | | | | IV | 85 |
| 145 | SVSP | | | | IV | 103 |
| 148 | SVSP | | | | IV | 62 |
| 149 | SVSP | | | | IV | 52 |
| 150 | SVSP | | | | IV | 95 |
| 151 | SVSP | | | | IV | 97 |
| 159 | CCF | | | | II | 8 |
| 160 | CCF | | | | II | 4 |
| 161 | CMC-E | | | | MED A | 28 |
| 162 | CMC-E | | | | MED AR | 19 |
| 163 | CMC-E | | | | MAX | 20 |
| 164 | CMC-E | | | | CLO B | 51 |
| 165 | CMC-E | | | | CLO BS | 39 |
| 166 | CMC-E | | | | MED A | 19 |
| 167 | CMC-E | | | | MED AR | 23 |
| 168 | CMC-E | | | | MED A | 3 |
| 170 | CMC-E | | | | MED AR | 59 |
| 171 | CMC-E | | | | MED A | 19 |
| 172 | CMC-E | | | | MAX | 23 |
| 173 | CMC-E | | | | MED A | 45 |
| 174 | CMC-E | | | | III | 12 |
| 175 | CMC-E | | | | CLO B | 30 |
| 176 | CMC-E | | | | CLO BR | 51 |
| 177 | CMC-E | | | | MED A | 50 |

REDACTED

## CLASSIFICATION DATA FOR
## UNIDENTIFIED NEEDS ASSESSMENT

Attachment D

| ID | INSTITUTION | INMATE NAME | CDC # | PRIOR CDC #s | CLASS LEVEL | CLASS SCORE |
|----|-------------|-------------|-------|--------------|-------------|-------------|
| 178 | CMC-E | | | | MAX | 77 |
| 179 | CMC-E | | | | MED A | 46 |
| 180 | CMC-E | | | | MED A | 19 |
| 181 | CMC-E | | | | MAX | 120 |
| 182 | CMC-E | | | | MAX | 74 |
| 183 | CMC-E | | | | MED AS | 43 |
| 184 | CMC-E | | | | III | 42 |
| 185 | CMC-E | | | | CLO BS | 43 |
| 186 | CMC-E | | | | MED A | 33 |
| 187 | CMC-E | | | | MED A | 15 |
| 188 | CMC-E | | | | MED A | 19 |
| 189 | CMC-E | | | | MED A | 46 |
| 193 | CMC-E | | | | MED AS | 16 |
| 195 | CMC-E | | | | MAX | 67 |
| 196 | CMC-E | | | | MAX | 68 |
| 197 | CMC-E | | | | MED A | 13 |
| 198 | CMC-E | | | | MED A | 43 |
| 199 | CMC-E | | | | MED AR | 19 |
| 200 | CMC-E | | | | MED AR | 39 |
| 201 | CMC-E | | | | MED AR | 26 |
| 202 | CMC-E | | | | MED A | 50 |
| 203 | CMC-E | | | | MED AR | 19 |
| 204 | CMC-E | | | | MAX | 51 |
| 205 | CMC-E | | | | CLO B | 30 |
| 206 | SATF | | | | IV | 79 |
| 207 | SATF | | | | IV | 257 |
| 209 | SATF | | | | CLO BR | 125 |
| 210 | SATF | | | | MAX R | 57 |
| 211 | SATF | | | | II | 21 |
| 212 | SATF | | | | MED A | 20 |
| 213 | SATF | | | | III | 33 |
| 214 | RJD-CF | | | | III | 45 |
| 215 | RJD-CF | | | | III | 19 |
| 216 | RJD-CF | | | | III | 14 |
| 217 | RJD | | | | III | 21 |
| 218 | RJD-RC | | | | MAX | 31 |
| 219 | RJD | | | | III | 34 |
| 220 | RJD-CF | | | | III | 46 |
| 221 | RJD-CF | | | | III | 20 |
| 222 | RJD-CF | | | | III | 41 |
| 223 | RJD | | | | III | 37 |
| 225 | RJD | | | | III | 26 |
| 226 | RJD-CF | | | | III | 48 |
| 227 | RJD | | | | III | 27 |
| 228 | RJD-CF | | | | I | 4 |
| 231 | RJD | | | | III | 28 |
| 232 | RJD | | | | III | 9 |
| 233 | RJD-CF | | | | III | 35 |
| 234 | RJD | | | | III | 29 |
| 235 | RJD-III | | | | III | 33 |

## CLASSIFICATION DATA FOR
## UNIDENTIFIED NEEDS ASSESSMENT

Attachment D

| ID | INSTITUTION | INMATE NAME | CDC # | PRIOR CDC #s | CLASS LEVEL | CLASS SCORE |
|----|-------------|-------------|-------|--------------|-------------|-------------|
| 236 | RJD-CF | | | | III | 34 |
| 239 | RJD | | | | III | 45 |
| 241 | RJD | | | | III | 44 |
| 248 | RJD | | | | III | 50 |
| 249 | RJD | | | | II | 23 |
| 250 | RJD-RC | | | | MAX S | 62 |
| 254 | RJD-III | | | | III | 34 |
| 255 | RJD | | | | III | 50 |
| 261 | RJD-RC | | | | MAX | 103 |
| 265 | RJD | | | | I | 14 |
| 266 | RJD-RC | | | | MAX-S | 129 |
| 268 | RJD | | | | III | 19 |
| 270 | RJD | | | | III | 35 |
| 272 | RJD | | | | III | 50 |
| 273 | RJD-CF | | | | III | 46 |
| 276 | RJD | | | | III | 39 |
| 280 | RJD | | | | III | 47 |
| 283 | RJD | | | | III | 30 |
| 291 | RJD | | | | III | 39 |
| 295 | RJD | | | | III | 26 |
| 296 | RJD-CF | | | | III | 38 |
| 298 | RJD-CF | | | | III | 33 |
| 309 | RJD | | | | III | 48 |
| 312 | RJD | | | | III | 34 |
| 314 | RJD-CF | | | | III | 8 |
| 326 | RJD-RC | | | | MAX S | 49 |
| 330 | RJD-CF | | | | II | 25 |
| 331 | RJD-CF | | | | III | 29 |
| 332 | RJD | | | | III | 43 |
| 333 | RJD-III | | | | IV | 72 |
| 334 | RJD-CF | | | | III | 40 |
| 341 | RJD-RC | | | | MAX | 103 |
| 349 | RJD | | | | III | 52 |
| 350 | RJD-CF | | | | II | 19 |
| 356 | RJD-RC | | | | MAX S | 63 |
| 357 | RJD | | | | III | 13 |
| 362 | CMC-E | | | | III | 31 |
| 365 | CMC-E | | | | III | 47 |
| 366 | CMC-E | | | | III | 35 |
| 377 | CMC-E | | | | III | 57 |
| 381 | CMC-E | | | | IV | 65 |
| 383 | CMC-E | | | | IV | 63 |
| 385 | CMC-E | | | | II | 21 |

REDACTED

SRiegel:Data\UNA\Classification Data
5/11/2005

4

# EXHIBIT

# F

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

April 27, 2005

<u>VIA FACSIMILE AND U.S. MAIL</u>

| | |
|---|---|
| J. Michael Keating, Jr.<br>Office of the Special Master,<br>*Coleman v. Schwarzenegger*<br>2351 Sussex Lane<br>Fernandina Beach, FL 32034<br><br>Tel: (904) 491-7157<br>Fax: (904) 491-7158 | Lisa A. Tillman<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>PO Box 944244-2550<br>Sacramento, CA 95814<br><br>Tel: (916) 327-7872<br>Fax: (916) 324-5205 |

Re:    Coleman v. Schwarzenegger
          Plaintiffs' Objections to UNA Study and UNA Plan
          <u>Our File No. 489-3</u>

Dear Michael and Lisa:

Plaintiffs have the following comments on and objections to Defendants' UNA Study and UNA Plan ("Defendants' Plan").

1.    <u>Defendants' Plan, as currently formulated, must be rejected because it does not address all of the need identified in the UNA study.</u>

A.    <u>The Plan does not include enough ICF Beds</u>:  Defendants' Plan does not adequately address the unmet need for 385 additional ICF beds found by the UNA study. Defendants' Plan includes proposals to build 64 additional Level IV ICF beds at SVPP, and to acquire 175 new Level III ICF beds from DMH hospitals (50 at CSH and 125 at ASH) by 2009.  (Exhibit G, Items 120-123.)  However, assuming for simplicity sake a static gap of 385 ICF beds during the next five years, <u>once the planned new beds are built a gap will remain of at least 146 ICF beds in 2009.</u>  (Even using defendants' unclear and overly-optimistic application of the Tucker-Allen formula to the unmet ICF need identified by the UNA study, there will be a gap of 61 ICF beds in 2009.)[1]

---

[1] Currently there are 269 ICF beds available in the CDC (125 at ASH; 40 on A-3 at CMF, 40 on A-2 at CMF and 64 at SVPP).  According to the Plan that is Exhibit G to the UNA Plan (see task list items 120-123 in Ex G), defendants

*    MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**  MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 2

    **B.**    <u>The Plan does not include enough APP Beds</u>: Defendants' Plan also does not address the projected gap of 152 APP beds by the year 2009 in the Tucker Allen formula in Attachment E. (See Exhibit E at p. 2.) Indeed, there is no mention in the UNA plan of <u>any</u> efforts to expand APP capacity. Even without factoring in the UNA finding of an unmet present need of 15 APP beds, the Tucker Allen formula projects a CDC need for 302 total APP beds by 2009. (See Attachment E at page 3.) The CDC currently has 150 APP beds. <u>Defendants must produce a plan to build another 152 APP beds in the next 4 years.</u>

    **C.**    <u>The Plan does not include enough Level IV Beds</u>: Defendants' Plan also does not adequately address the need for Level IV beds. It is clear that the shortage of inpatient beds at Level IV is presently much more acute than at lower custody levels. According to the April 21, 2005 Status Report on the implementation of the new DMH programs at CMF, there are currently 58 Level IV inmates on the waiting list for the Level IV SVPP ICF program. By way of contrast, the only Level III program with a current waiting list is the CMF A-3 Wing ICF program, which has a waiting list of four inmates. (4/21/05 Status Report.)

    Below is a chart which shows defendants' current and planned ICF beds at different custody levels:

| | Current ICF Beds | Planned new ICF Beds by 2009 |
|---|---|---|
| **Level I-III ICF beds** | | |
| • CMF A-3 | 40 | -- |
| • ASH | 125 | 125 (July 2006) |
| • ASH (via CSH) | -- | 50   (October 2005) |
| Total at Level III: | 165 of 269 | 340 (current + planned) of 508 |
| % of all ICF at Level III | 61% (currently) | 67% (in 2009) |
| **Level IV ICF Beds** | | |
| • CMF A-2 | 40 | -- |
| • SVPP | 64 | 64  (sometime in 2009) |
| Totals at Level IV | 104 of 269 | 168 (current + planned) of 508 |

will add another 239 ICF beds by 2009 (50 at ASH once CSH opens in October 2005, 125 at ASH in mid-2006, and 64 at SVPP in 2009), for a total in 2009 of 508 beds. According to the Tucker Allen Projection in Exhibit E, page 3, in 2009 the CDC will need 569 beds (with the 90% occupancy adjustment) for a total gap in 2005 that defendant admit to of 61 ICF beds. Plaintiffs do not agree entirely with the manner in which the numbers have been plugged into the Tucker-Allen formula, as discussed below in greater detail.

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 3

    % of all ICF at Level IV    39% (currently)    33% (in 2009)

This chart shows that currently, only 39% of available ICF beds are Level IV beds. However, the chart also shows that this ratio will get worse over time. By 2009, the percentage of ICF beds available at Level IV will shrink to 33% of available ICF beds.

The custody data gathered to date as part of the UNA study process suggests that the percentage of the unmet inpatient need that is Level IV need is between 50% and 65% of all inpatient demand, which is much larger than the percentage of all ICF beds that are currently Level IV. The summary of UNA custody data provided by Dr. Alvarez in advance of the April 22, 2005 conference call indicates that out of the 318 UNA cases for which custody data was collected during the study, 205 ICF cases were Level IV while the remaining 113 were Levels I-III. So of the ICF cases for which custody data was collected, 65% (205/318) were Level IV ICF cases.

Similarly, the significantly more complete custody data provided by defendants in an Excel spreadsheet sent by e-mail on the day of the April 22, 2005 conference call shows that 58% of all inmates referred to inpatient programs and tracked in the Excel spreadsheet are Level IV inmates.[2] (A modified version of the first page of defendants' Excel spreadsheet that has been annotated to include three extra columns summarizing available custody data is attached hereto as Exhibit A).

Clearly, there is a significant shortfall of Level IV ICF beds that will continue into the foreseeable future. Defendants must reconfigure their plan to include construction of more level IV inpatient beds. They must also take steps to lower the custody level of MHSDS inmates by providing annual 4 point classification score reductions to inmates who are participating in the EOP programs, and by eliminating the discriminatory 4-point classification score addition at initial classification for inmates with a history of mental illness. Mentally ill inmates are much more difficult to treat and much more expensive to treat when they are Level IV inmates.

D.    <u>The Plan does not address unmet bed needs for women</u>:

The Defendants Pan is also inadequate because it does not address whether the department needs to add beds to address the unidentified need for inpatient beds for

---

[2] Both sets of data provided by defendants for estimating the number of Level IV inmates referred to inpatient care are imperfect. The data sent by Dr. Alvarez notes that no custody information was available for another 114 inmates. However, even if all of the missing data were from Level III inmates, the percentage of UNA identified cases which are Level IV cases would still be at least 50%. The data in the excel spreadsheet is somewhat over-inclusive, because it includes some cases not identified in the UNA process. Using the data in the excel spreadsheet, plaintiffs added three columns giving the number of Level IV cases and the percentage of Level IV cases for each institution for which data was provided. A copy of plaintiffs revised spreadsheet is attached hereto as Exhibit A.

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 4

women.  The UNA Study found a grand total of 11 ICF and 2 APP cases of unmet need at women's prisons.[3]  The total EOP population at these three women's facilities is 146, so the finding is a unmet need in the women's prisons of about 8% of all EOPs.  This is smaller than the finding of unmet need in the men's prisons of 14% of all EOPs, but it is still a significant finding of unmet need that defendants must address.

  2. Defendants' Plan should be rejected because it does not address the serious, ongoing problems with inpatient referrals with enough urgency.  Defendants' Plan to address the need identified in the bed study is flawed because it does not have the necessary sense of urgency.  According to defendants' plan, there are currently 203 individuals who were identified during the UNA study as needing an ICF level of care who have not been referred to inpatient care.  (See Attachment B to Defendants' Plan.) This is a serious and even potentially life-threatening problem.  Many of these cases were identified last Fall and have been waiting six months or more for referral to the needed level of care. An additional 28 inmate-patients are waiting for referrals to APP care – referrals that were supposed to be made immediately following the UNA site visits. (Extra remedial attention and headquarters assistance should be provided to Lancaster, which according to Attachment B has only referred 10 ICF cases and has 52 ICF cases waiting for referral.  Extra attention and headquarters supervision should also be provided to SAC with 39 ICF cases waiting for referral, and to CMF with its 33 ICF cases  and 7 APP cases waiting for referral.)

  This situation is extremely dangerous, and defendants have a duty to take immediate action to ensure that these inmates are given appropriate mental health care while they wait and to ensure that they are transferred to inpatient care as soon as possible.  One of Dr. Alvarez' recommendations in the UNA Report is that the CDC create a new DMH referral coordinator position at each institution to track and expedite DMH referrals.  (See Attachment B, UNA Report at 9.)  This critical recommendation is not addressed anywhere in defendants' plan.

  The time-table for many of the other projects listed in Exhibit G should be sped up given the urgency of the current situation.  For example, defendants' plan includes a deadline of January 10, 2006 for development of an improved IDTT process to identify, refer and track inmate-patients referred for inpatient care (Tasks 43-48).  Defendants must speed up this critical process.  The UNA study report by Dr. Alvarez clearly document that the existing IDTT process was a one-time event at most institutions and has not resulted in an improvement in referrals.  (See UNA Study Recommendations, Attachment B at p 8.)  The UNA report by Dr. Alvarez also found that CDC mental health programs have a "*culture of high acceptance of, and  a higher tolerance for,*

---

[3]  According to Attachment B to the UNA Plan, the UNA study found 3 women at CIW needing ICF care, 4 women at VSPW needing inpatient care (3 ICF and 1 APP), and 6 women at CCWF needing inpatient care (5 ICF and 1 APP).

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 5

*pathology and decompensated states that, outside of an institutional setting, would not be acceptable.*" (Attachment B at 8.) The report recommends additional training of CDC staff in this regard. (Id.) There is no provision in the task list specifically addressing this problem. (See Attachment G.) These issues must be urgently addressed.

Many other timelines in the Plan are overly long. For example, investigating the feasibility of contracting for inpatient services at private facilities like Sylmar in San Diego (task 114 on page 8 of Exhibit G) is schedule to take nearly six months. Similarly, it is hard to understand why tasks 117 and 118 (exploring creating ICF beds at COR or SATF, and exploring option of converting GACH to CTC and then CTC beds to ICF care) are expected to take eight to ten months (until 11/8/05 and 12/30/05 respectively). Other projects with overly long schedules include task 53 (researching and designing a proposal for a behavior management system has a deadline of 6/1/07) and task 58 (developing a long term care program for chronic mentally ill cases has a deadline of 1/31/07).

3.    <u>More Pressure Needs to Be Placed on DMH to Assist the CDC in Providing Critical Inpatient Services to CDC Inmates</u>:  DMH Director John Rodriguez' letter concerning how many DMH beds will be made available to CDC inmates in the coming years is very troubling.  The letter, which is attached to defendants' plan as Exhibit D, states that once ASH is able to move ASH patients to the new Coalinga State Hospital, rather than giving the vacated beds to CDC inmates, DMH will use the surplus beds at ASH to "*develop and follow a population management plan to reduce the over-bedding at the hospitals by redistributing the population and bring the population back into the state hospitals licensed bed capacity. Once this occurs and there is adequate funding and staffing, then the DMH can provide the 125 additional beds to CDC.*" This is unacceptable.

The relationship between DMH and the CDC needs to change so that CDC inmates are not last in line in DMH's priorities. If necessary, plaintiffs are prepared to go to the Court on this issue. DMH must give CDC inmates in need of inpatient care priority over reductions in over-bedding to satisfy DHS officials. If DMH is concerned about pressure from the State Department of Health Services (DHS), plaintiffs would be more than willing to write to DHS directly concerning the urgent need for these beds, and willing to ask the Court to intervene with DHS, as the Court did last Fall in the licensing problems at CMF. (Unfortunately, because of security considerations, DMH hospitals can only provide limited relief to the CDC, since they cannot take most Level IV inmates.)

4.    <u>The Manner in Which the UNA Results Were Added to the Tucker Alan Formula Relies On Unrealistically Low Lengths of Stay and Does Not Properly Increase</u>

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 6

the Finding of Unmet Need As Population Grows. Plaintiffs object to the manner in which the UNA findings have been added into the Tucker Alan projections for two main reasons. First, the projections for the years 2005-2010 rely on unrealistically low lengths of stay in the DMH inpatient programs. (See Attachment E to UNA Plan.) For example, the projections for SVPP are based on an average length of stay of 159.68 days. (Attachment E at 1, 3.) This is a year-to-date figure for actual LOS at SVPP this year. However, this length of stay is shorter than would normally be the case, because SVPP has been prematurely discharging a significant number of cases which present custody problems as well as cases where the inmate resists treatment. See Attachment B at 9 (recommendations from Dr. Alvarez documenting finding during UNA study that DMH is discharging CDC inmates *"for a variety of reasons that are not related to clinical improvement"* including treatment resistance, and assaultive or suicidal behavior.) Moreover, this length of stay is shorter than the length of stays historically in inpatient programs for CDC inmates. During the DMH transfer training video from August 2004, Cynthia Radavsky of DMH told CDC clinicians to expect a typical length of stay for their patients referred to DMH programs of 7-8 months (or 215 to 245 days). The use of an artificially low length of stay reduced the projected demand without any justification.

Defendants should not rely upon reduced length of stay figures until they can show that they can successfully treat patients with shorter stays in DMH.

In addition, plaintiffs object to the failure to adjust the UNA demand as CDC population increases when plugging the UNA data into the Tucker Alan formula. (See Exhibit E at 3.) The Tucker Alan formula is supposed to be responsive to increases in population during the next five years, allowing the department to predict and respond to growing need for inpatient care beds as the overall CDC population grows. However, the Level IV SVPP figures in the projections do not increase in response to increasing population. (See Exhibit E at 1, 3) (projections for total bed days for years 2005-2010 do not increase for SVPP). In addition to resulting in an artificially low projection of future demand, this freezing of the SVPP demand will result in an inappropriate balance between the total number of Level I-III beds on the one hand, and Level IV beds on the other. The CMF ICF demand figures also are not increased to reflect the growth of overall CDC population. (Exhibit E at 1, 3) (UNA adjustment beds days do not increase for 2005-2010 for CMF ICF).

5.    The Plan Should Address All of the Recommendations in the UNA Report. There are a number of very good recommendations made by Dr. Alvarez in the UNA Report. (See Attachment B at pp 7-10.) The plan addresses some, but not all of these recommendations. The plan does not address the recommendation, discussed above, that each institution be provided with the funding to create a full-time DMH referral coordinators. The plan does not address the finding that the referral process for DMH remains overly burdensome, sometimes requiring an entire days work by the referring

J. Michael Keating
Lisa Tillman
April 27, 2005
Page 7

clinician. The plan does not address the finding, also discussed above, of a CDC "*culture of high acceptance of, and a higher tolerance for, pathology and decompensated states that, outside of an institutional setting, would not be acceptable.*" The UNA report recommended additional training of CDC staff in this regard. There is no provision in the task list specifically addressing this problem or providing this training. The UNA report finds CDC inmates are being prematurely discharged from DMH for a variety of reasons that are not clinical in nature. This is not addressed. Finally, the report finds that discharge summaries from DMH continued to be lacking in Unit Health Records. This is also not addressed in the Plan

      6.   <u>Defendants should be ordered to provide a monthly report on the status of the initiatives set forth in the plan, including documentation and news of any new initiatives to address these important issues</u>. The UNA Plan includes the outlines of many promising efforts to improve inpatient care in the CDC. As defendants execute the plan in the months and years ahead, they should be required to make a monthly report to plaintiffs and the Special Master concerning the status of the various initiatives set forth in the plan. The reports should also include any additional initiative or projects that are added to this plan in the months and years ahead.

     In addition, as part of the monthly reporting process, defendants should be asked to report on whether they believe they have the management resources available in headquarters to address and resolve the various elements of this problem and this plan.

     Please feel free to contact me with any questions or comments about these issues.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Tom Nolan

cc:   Mr. Lopes
      Mr. van de Erve
      Dr. Warren
      Dr. Metzner
      Dr. Patterson
      Dr. Hughes
      Paul Niccol
      Co-counsel

# EXHIBIT

# G

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

August 17, 2005

<u>VIA E-MAIL AND U.S. MAIL</u>

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2500

Email: lisa.tillman@doj.ca.gov

Michael Stone
CDC Legal Affairs Division
PO Box 942883
Sacramento, CA 94283-0001

E-mail: michael.stone2@corr.ca.gov

Re:   *Coleman v. Schwarzenegger*
      Plaintiffs' Objections to August 15, 2005 UNA Level IV Bed Plan
      <u>Our File No. 489-3</u>

Dear Lisa and Michael:

Plaintiffs object to defendants' new UNA bed plan sent to plaintiffs and the Special Master on August 16, 2005. Although the Plan includes some promising, if excessively delayed, plans to expand single-celled Level IV ICF capacity at CMF and SVPP, it <u>only</u> addresses these Level IV ICF capacity issues. The Plan fails to address a number of other significant problems identified by the Special Master when he asked defendants to present a new plan, and the Plan also fails to address the key concerns previously raised by plaintiffs' counsel about earlier plans:

1.    <u>There is no plan to expand APP capacity</u>: The Plan must be rejected because there is no plan component that addresses the projected shortfall in acute (APP) beds at CMF. See May 12, 2005 Tillman Letter at the attachment dated May 2, 2005, providing new UNA projections at p. 4 (projecting a need for 374 total APP beds by 2010). This APP shortfall has been repeatedly singled out by the Special Master as something that defendants need to address in their UNA plan.[1]

---

[1] Defendants have contended that they do not see a problem with APP access currently, and that as a result they do not foresee a shortfall in the future. However, as detailed in plaintiffs' June 28, 2005 letter, we are concerned by extremely short current APP stays, and also about the quality of care currently being provided in the APP program. The findings of the UNA Report support the conclusion that the current low level of APP utilization is not a sign of lack of need, but rather reflects these quality problems, and also reflects a reluctance on the part of CDC clinicians to refer appropriate cases based on the historical difficulty of accessing this program

*    MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**   MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Lisa Tillman
Michael Stone
August 17, 2005
Page 2

2.    The Plan does not adequately address the shortfall of Level III ICF Beds:
There is no Plan component that addresses the need to increase referrals to Level III ICF
programs and no plan to sufficiently expand Level I-III ICF capacity to address the unmet
Level III need identified in the UNA study.[2]   Even after all of the Level III ICF bed
expansions planned in the March 30, 2005 Plan are built, there will be a shortfall of 85
Level III ICF beds by 2010.

3.    The Plan does not provide for enhanced treatment to inmates waiting for
transfer to an ICF program: There is no specific and realistic plan to augment care
provided in EOP programs to inmates who have been identified as needing ICF level of
care but cannot be sent to an ICF program because of the bed shortage.  Such a plan
would require specific augmentations to staff and programming in every EOP program
where ICF inmates are waiting.  The most recent bi-weekly report indicates that there are
108 inmates on the waiting list for the SVPP ICF program.

4.    Training:  The Plan does not address the need for substantial and sustained
training of CDC clinicians to overcome the historical unwillingness of such clinicians to
refer all appropriate cases to ICF and APP level of care at DMH.  Defendants need to do
additional, more frequent training of their clinicians to overcome the existing clinical
culture of "*acceptance of, and higher tolerance for, pathology and decompensated states
that, outside of an institutional setting, would not be acceptable.*"  See Alvarez UNA
Study Report at 8.  The recent two-hour-long training in the new DMH MOUs was
inadequate in both scope and duration to overcome this longstanding mind set and to
sufficiently educate CDC clinicians about various DMH resources.  (A videotaped copy
of the training has been promised by defendants' counsel, but plaintiffs' counsel have yet
to receive it).

5.    The Plan does not include sufficient details about budgetary, staffing, and
construction plans and timetables:  In his June 2, 2004 recommendations to the Court on
the UNA Plan, the Special Master stated that defendants' UNA Plan "*needs to be
grounded in budgetary and construction reality, and must include specific plans, with
supportable timelines, for the allocation of needed financial and physical resources. . . .
[T]he plan must address concretely and specifically the joint CDC and DMH budgetary,
construction, and staff recruitment aspects of the proposal for its use.*"  Special Master's
June 2, 2004 Report on Defendants' Unmet Inpatient Bed Needs Study at 22-23, ¶ 6.  The
current plan provides additional proposal for new projects, but does not include

---

[2]  The May 2, 2005 Updated UNA demand charts (provided by defendants under a May 12, 2005 cover letter)
project a need for 237 Level III ICF beds at ASH and 124 Level III ICF beds at CMF (for a grand total of 362 Level
III ICF beds, or 402 beds when adjusted for the 90 percent occupancy factor) at CMF by 2010.  In contrast, the
March 30, 2005 UNA Plan at Exhibit G (page 9) includes plans to add only enough Level III beds (50 from CSH in
the Fall of 2005, 125 at ASH in mid-2006, along with existing 100 beds at ASH and 40 at CMF) to provide a total of
only 315 total Level III beds by 2010.  This means that defendants' own figures project a shortfall of 85 Level III
ICF beds by 2010.

Lisa Tillman
Michael Stone
August 17, 2005
Page 3

additional underlying detail such as staffing proposals and ratios for the new programs, construction timetables, copies of the BCP's necessary to implement the plan, or other critical information that would allow the Special Master and plaintiffs to assess how realistic and complete the planning is for the proposed new programs.

6.    The Plan does not expand Level IV capacity fast enough and does not provide any details about how the CDC will address demand for ICF care in the short run: Like defendants' initial March 30, 2005 UNA Plan, the August 15, 2005 UNA Plan does not expand Level IV capacity as quickly as possible, and also does not address demand for Level IV ICF care in the short term. The chart on page 10 of the new Plan makes clear that the Plan will result in the creation of only 36 new Level IV ICF beds between now and July of 2008, and that all of these new beds will actually be replacing the underutilized Level IV dorm beds on A-2 at CMF. That means that plaintiffs will have to wait nearly three years for any new Level IV beds to come on line. Why will it take three years to create the new ICF in existing EOP space at SVSP?

Given this enormous delay in delivering new resources, it is very important that defendants take immediate steps to address the unmet treatment needs of individuals identified as needing ICF care but unable to access such care due to the current severe bed shortage. Defendants need a detailed, realistic plan to augment staffing and programming during the next three years (unless they can find other locations that provide ICF care to inmates) for all inmates waiting for ICF care. Defendants also need to have a formal written policy that they share with clinicians in the field concerning augmentation of care provided to inmates waiting for ICF care.

7.    The new Plan does not address unmet need for women for ICF care. Like the earlier Plan, the new Plan does not address the unmet need for 11 ICF beds for women identified in the UNA study.

8.    Defendants should provide an update on the status of the various initiatives in the March 30, 2005 Plan and also provide an update on the status of negotiations with DMH and control agencies over the new plans.  The new Plan does not include any information updating the status of the various efforts set forth in the Task List provided with the initial March 30, 2005 UNA Plan. Is there an up to date task list that defendants can share with plaintiffs and the Special Master? What is the status of negotiations with DMH over the new programs? What is the status of negotiations for funding with various control agencies? Does HCSD believe that its relationship with DMH has improved sufficiently since the launch of the CCAT referral review process?

The UNA Plan presents defendants with a series of extremely difficult management issues. Nevertheless, defendants need to do significantly more to ensure that the now well-documented needs of Coleman class members for significantly

Lisa Tillman
Michael Stone
August 17, 2005
Page 4

enhanced access to acute mental health care is adequately addressed in both the short and long term.

Please feel free to contact me with any questions or concerns about these issues.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP


By: Tom Nolan

cc:   J. Michael Keating, Jr.
       Matthew Lopes
       Experts (e-mail only)
       Co-counsel

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

August 23, 2005

VIA E-MAIL AND U.S. MAIL

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2500

Email:  lisa.tillman@doj.ca.gov

Michael Stone
CDC Legal Affairs Division
PO Box 942883
Sacramento, CA 94283-0001

E-mail: michael.stone2@corr.ca.gov

Re:   *Coleman v. Schwarzenegger*
      Additional Objections to August 15, 2005 UNA Plan and
      Request for MHCB Information and A Plan to Expand MHCB Capacity
      Our File No. 489-3

Dear Lisa and Michael:

    Plaintiffs have three additional objections to defendants' August 15, 2005 UNA Plan, which supplement the objections in our prior August 17, 2005 letter.  Plaintiffs' additional objections are that (1) the new Plan will result in the loss of 20 DTP beds at CMF and will displace SVSP EOP inmate beds without adequately safeguarding of the needs of the inmates in these programs, (2) the new Plan does not address the acute shortage of MHCB beds, and (3) defendants need to update the parties on the status of other pending inpatient expansion projects including the new Coalinga State Hospital and the promised expansions in ASH bed availability.

    1.    Plaintiffs object to the loss of 20 DTP beds and to the displacements of inmates in the EOP at SVSP and the DTP at CMF. Defendants' August 15, 2005 Plan will require the loss of 20 DTP beds at CMF, will require unspecified new construction, and will also require the movement of MHSDS inmates in the P-2 DTP program and in the SVSP EOP program to new locations.  There is no plan to replace 20 of the lost CMF DTP beds.  In addition, the plan provides no detailed information about how the needs of inmates in the displaced SVSP EOP programs will be addressed, and no information about how much disruption will be caused by the changes to these programs.  The plan states that the SVSP EOP units will move to CSP-SAC (as apparently will the PBSP PSU

*     MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**    MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Lisa Tillman
Michael Stone
August 23, 2005
Page 2

program), but the plan provides little or no detail about how this will be accomplished and how SAC will handle the large influx of new caseload inmates.

DTP program displacement and loss of 20 DTP beds:  We understand from the Plan that the existing P-2 DTP program will be moved back to the A-2 unit at CMF. However, the Plan does not explain what will happen while construction is being done in P-2?  Nor does it explain when exactly defendants will move the DTP to A-2, or how the CDCR will replace the 20 lost DTP beds when the 60-bed P-2 DTP is moved into the 40-bed A-2 wing?  Plaintiffs request significantly more detailed information about these issues and a plan for 20 additional replacement DTP beds.

In addition, the Plan calls for the creation of a new DMH Level IV ICF program in the D-5 and D-6 EOP housing units at SVSP.  Construction is scheduled to take place in D-5 and D-6 beginning at an unknown date to initially create the 36 Level IV ICF beds. No detail is given concerning the nature and extent of the required construction and how much of the EOP will need to be shut down, if any, to facilitate the construction, or when the EOP will be shut down and transferred to SAC.  The plan includes no information about where at CSP-SAC the new EOP units will be located.  Nor is there any information about whether construction will be required at CSP-SAC.  Is there adequate treatment space at CSP-SAC for a large expansion of the EOP programs?  Is there adequate supervisory staff?  Are there enough MHCB beds at SAC?  Is there enough office space for the additional mental health staff?  How will moving the PSBP PSU to SAC impact the new EOP units?  Will any construction at SVSP displace EOP patients in those wings prior to the planned May 1, 2006 transfer of the 36 Level IV ICF patients from the DTP program?  Will the 36 Level IV ICF patients be housed in both existing EOP buildings (D5 and D6)?

Defendants need to provide more detailed information regarding these ancillary impacts of their Plan.  Is there an overall plan for consolidation and configuration of these various mental health programs at CSP-SAC that has not been shared with plaintiffs?  We request a copy of any plans available with more detailed information about these efforts.

2.   The critical shortage of MHCB beds is not addressed in the new plan. Plaintiffs August 17, 2005 letter includes objections to the failure of the August 15, 2005 plan to address APP beds, Level III ICF beds, and ICF beds for women.  The plan is also inadequate because it does not address the short and long term shortage of MHCB beds. Since the MHCB shortage became clear to plaintiffs earlier this summer, we have repeatedly asked that defendants address this shortage as part of their August 15, 2005 Plan for expanding ICF and APP bed capacity.  Defendants have yet to address this critical issue.

The 50-bed MHCB expansion at CMF is not due to be completed until 2009.  It is not clear that even those 50 new MHCB beds will solve the problem, and any relief from

Lisa Tillman
Michael Stone
August 23, 2005
Page 3

the CMF beds is four years away. What is defendants' plan for MHCB access in the interim? Is there any possibility of expediting the construction of the CMF beds? If defendants are not forthcoming with a plan, the Special Master should order them to produce one as soon as possible.

In addition, defendants have not yet provided additional information about the specific problems with existing MHCB usage at CSP-Solano and at ASH. We ask for a written update on the departments' efforts to resolve the barriers to full utilization of these two urgently needed MHCB programs.

3.    Defendants need to provide updated information on the status of other pending inpatient expansion projects including Coalinga State Hospital and the promised expansions in ASH bed availability. Defendants March 30, 2005 UNA plan included plans for numerous initiatives to expand ICF capacity. Defendants have not provided updates on the status of many of these initiatives. For example, is the new DMH facility at Coalinga set to open up on schedule? Will 50 additional ASH beds be made available as a result of the CSH opening and will they be available in October of this year as promised in the March plan? What about the plans for 125 more ASH beds next summer, are they still on track?

Please contact me with any questions or concerns about these matters.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP


By: Tom Nolan

cc:    J. Michael Keating, Jr.
       Matthew Lopes
       Experts (e-mail only)
       Co-counsel