Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, DC  20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

**REPORT ON SUICIDES COMPLETED
IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
IN CALENDAR YEAR 2004**

## I.  Overview and Introduction

This is the sixth annual report on completed suicides in the California Department of
Corrections (CDC)[1] submitted as part of the Special Master's continuing review of the
defendants' overall compliance with court mandated remedies and requirements in
Coleman v. Schwarzenegger.  To set the suicide rate in CDC in some national
perspective, past reports have provided statistics on the incidence of suicide in the general
U.S. population and correctional institutions.  The most recent data from the U.S.
Department of Justice's Bureau of Justice Statistics indicates that state prison suicide
rates dropped from 54 per 100,000 inmates in 1980 to 14 per 100,000 in 2002.  This
represents a slight increase from the incidence rate of 12 per 100,000 cited in the
preceding report on suicides in CDC in 2003.

The data analysis and recommendations provided in this report follow the same format
used in these reports of the special master on suicides in CDC since 1999.  The report
includes two tables: Table 1 summarizes collected demographic data, while Table 2
provides a summary of mental health information on CDC inmates who completed
suicides while incarcerated in 2004.  The tables represent an extreme distillation of the 26
case reviews, which constitute the heart of this report, and provide in graphic form the
data on which the summary analysis is based.

The vast bulk of the data captured in this report has been generated pursuant to the
defendants' still evolving suicide review process.  The process requires the preparation of
a Suicide Report for each death that includes an executive summary and a more detailed
narrative, typically with sections covering the suicide incident itself, the medical autopsy,
background information, mental health history, medical history, the deceased inmate's
institutional functioning and personality dynamics, precipitating events, pre-suicidal
functioning and motive for suicide.  Sources of information for the various sections may
include custody incident reports, death reports, central classification records, uniform

---

[1]  In 2005, the California Department of Corrections was reorganized and incorporated into the larger
California Department of Corrections and Rehabilitation.  Throughout this report, the department will be
referred to as the California Department of Corrections, the applicable appellation in 2004.

health records (UHRs), coroners' autopsy reports, interviews with custody, mental health and medical staff, inmates and kin of the deceased, reports from institutional Investigative Services Units, a variety of possibly relevant unit logs and the deceased inmate's trust account and personal property. Each report ends with conclusions drawn from an analysis of the assembled data and specific recommendations for local and/or departmental actions to address the problems identified in the report. The final component in the review process is a subsequent report from the institution on implementation of the corrective action plan (CAP) included in the Suicide Report.

The reporting process together with its framework of supportive documentation has evolved gradually over the past six years, as chronicled in previous annual reports on suicides in CDC. The department's overall policies and procedures for the review and reporting of suicides, which were finalized in January 2002, established specific time frames for the completion of reviews by clinical and administrative components of CDC. They also mandated the development and implementation of CAPs, which became an integral part of the department's suicide prevention strategy. In response to the special master's report on CDC suicides in 2003, the court directed the defendants in June 2005, after the completion of review of the suicides covered in this report, to develop procedures to ensure implementation of the CAPs included in suicide reports and required them to submit regularly to the special master a summary description of the methods and outcomes of investigations of staff for incompetence, malfeasance or negligence referred to investigatory or disciplinary channels.

Meanwhile, CDC continued to generate its own annual statistical reports on suicides. The department's summary on suicides completed in 2004 was issued in September 2005. The CDC reports, valuable in many ways, do not provide information on the potential foreseeability or preventability of reported inmates' deaths. They do, however, collate much useful information on likely precipitating events for inmate suicides. Equally useful was the defendants' statistical compilation on suicides in the department during the five-year period from 1999 to 2003, which was issued in January of 2005. During that period, the incidence rate of suicides in the department averaged 14.5 per 100,000 inmates.

Those reports, no less than this report and its predecessors, confirm that the placement of inmates in administrative segregation is a consistently high-risk factor for suicide. The need for timely screening and assessment of individuals placed in administrative segregation, whether or not they have been participants in the Mental Health Services Delivery System (MHSDS) and receiving mental health care, is absolutely critical. Data on suicides in 2004, moreover, indicated that half of the suicides committed in administrative segregation occurred within the first two weeks of the inmates' placement.

Another aspect of the department's evolving suicide review process is the generally improving timeliness of submission of most of the required reports in most cases. Nonetheless, some cases did not meet mandated timelines. To a considerable extent, delays in the handful of errant cases were attributable to more effective and intrusive corrective actions demanded by the department. Institutions increasingly are being

required to develop and implement corrective actions that go beyond enhanced training and the review of policies and procedures. The CAPs described in this report often required institutions to establish quality improvement teams (QITs), conduct extensive audits of performance, ensure effective peer review of clinical judgments, create new policies and procedures and more effectively enforce existing standards with improved monitoring and supervisory practices.

While most of the review documents for the 26 suicides completed in calendar year 2004 were provided timely, a quartet of reports required supplemental reports on a range of elements in the recommended CAPs that pushed completion way beyond mandated timelines. The untimeliness of reports resulting from the department's insistence that responding institutions improve or demonstrate more complete compliance with recommended remedies reflects well on the overall suicide review process.

The overall quality of the defendants' Suicide Reports continued to improve, and the data provided in most reports permitted a reasonably objective assessment of the application of relevant policies and procedures. Helpful data was sometimes unavailable because institutional clinicians had neither requested nor collected it during the course of the inmate's incarceration. In other cases, following the suicide, the institution failed to gather complete data and provide it to the department.

While sometimes uneven, the quality of the defendants' review, analysis and recommendations for remedial actions in individual reports continued gradually to improve. Many of the plans for corrective action described in the case reviews in Appendix B to this report were thoughtful and clinically appropriate, raising questions about the quality of evaluation and treatment services, communication and coordination among mental health, medical, and custody staffs and individual cultural or disability barriers to the delivery of effective mental health services in specific cases. More rarely, reviews reflected some clinicians' preoccupation with the character logical problems of deceased inmates that somehow were seen as excusing the clinicians' downplaying or ignoring legitimate mental illness and/or indicators of risk for suicide. See, for example, Case Reviews Nos. 9, 21, 23 and 26. Some few recommendations for corrective actions simply invoked repetitively the need for better orientation, education and/or training of permanent and contracted staff on established policies and procedures or cited, again repetitively, recurring documentation problems including undated, unsigned, illegible or uninformative clinical notes and forms.

On the other hand, institutional responses particularly to critical reviews were often inadequate. In problematic cases, institutions failed either to comprehend or respond to recommended remedies, especially when they included directions to establish adequate and timely supervisory practices, including individual counseling, progressive discipline where indicated, increased peer review and audits with more thoughtful and targeted methodologies to demonstrate the achievement of intended outcomes. The quality of departmental review of institutional remedial responses also varied significantly. In some instances, issues related to delayed access to more intensive levels of mental health care, untimely responses to referrals, the lack of confidentiality during screenings and intake

assessments, particularly in administrative segregation, or other deviations from policy that were identified in the review process for correction were allowed to go unaddressed. Finally, in some cases where recommendations were made for the investigation of clinical or custody staff involved in one or another aspect of the suicide, the results have either not been provided or provided in so cursory a form as to be useless.

As in past years, <u>Coleman</u> experts and monitors reviewed information on completed suicides during their regularly scheduled institutional visits, and the resulting information has been included in this report. Comments from plaintiffs' counsel on pending or completed suicide reviews have also been considered and, where appropriate, cited.

The terms "foreseeable" and "preventable" are used in this report, as in the preceding reports on suicide, to analyze the adequacy of suicide prevention responses in each of the reviewed suicides. These concepts have already been discussed in considerable detail, reviewed and critiqued by the parties and confirmed by the court as appropriate.

Suicides are "foreseeable" where information already available about an inmate indicates the presence of a substantial or high risk for suicide, which requires reasonable clinical, custody and/or administrative intervention(s) to prevent self harm. Determination of foreseeability includes, but is not limited to, an assessment of the level of risk for suicide, whether high, moderate, or low to none. Demonstrated adequate completion of the defendants' standard Suicide Risk Assessment Checklist (SRAC) varied in the suicides reviewed in this report, with some institutions employing their own local forms and criteria. The department has tried to standardize implementation of the SRAC and employed video conferences to train clinical staff in the use of the SRAC and criteria for determining levels of suicide risk. Despite these efforts, the case reviews of suicides in 2004 indicate that some clinicians, and at times some institutions, have not used the SRAC when indicated. As previously defined, a high risk of suicide requires the immediate monitoring by clinical and custody staff to ensure that the inmate remains in a safe environment until evaluated further and/or transferred to a more appropriate clinical setting. Inmates assessed with a "moderate" risk of suicide typically present a more ambiguous set of circumstances requiring significant clinical judgment, a judgment that needs to be based on adequate training and timely assessments in an appropriate and confidential setting to determine the most appropriate and relevant interventions to prevent suicide or other self-injury. Even individuals evaluated with "low risk," "no risk," or "negligible risk" for suicide may require some degree of monitoring and subsequent evaluation with appropriate notification to clinical and custody staff of the potential for self-injury and/or suicidal ideation or activity.

A significant number of the Suicide Risk Assessments (SRAs) described in the cases reviewed for this report failed to estimate the level of suicide risk found in the assessed inmates. The department developed and implemented its new checklist or form for SRAs during 2004, but the revised form eliminated the checked boxes formerly used to estimate different levels of risk and, instead, required the clinician conducting the assessment to provide a narrative assessment of the level of the inmate's risk for suicide. Review of the narrative assessments involved in suicides completed in 2004 indicated that clinicians

4

sometimes failed to estimate specifically the level of risk for suicide posed by the inmate at the time of the evaluation, leaving subsequent clinical reviewers in doubt about the level of risk found earlier and the extent of safety planning intended to be applied. Further, a number of reviewed SRAs were based solely on an interview with the inmate and failed to incorporate information from the UHR, central classification file or referral sources, including custody staff who often observed significant behavior and could provide useful input into clinical management planning for individual inmates.

"Preventable" applies to those situations in which, if some additional information had been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy, the likelihood of a completed suicide might have been reduced substantially. The concept includes situations where inmates report self-injurious behaviors and threats but do not receive appropriate evaluation or treatment, are not transferred to a more clinically appropriate and safe environment or fail to receive appropriate life-saving procedures, such as timely CPR.

The placement of inmates at risk for self-injury or suicide in a safe environment, such as inpatient DMH programs, Mental Health Crisis Bed (MHCB) units or Outpatient Housing Units (OHUs) with enhanced or constant observation, has been an ongoing practice in CDC. In 2004, only one suicide was completed in one of these enhanced settings, namely, the Transitional Living Unit of CMC. The provision of five days of clinical follow-up, as well as more limited custody follow-up, for suicidal inmates released from these higher levels of care and/or observation has expanded steadily but still did not occur universally in 2004. The purpose of the clinical follow-up is to monitor and evaluate the inmate's adjustment in his/her "regular" housing after release from a more intensely monitored and protected environment. One suicide in 2004 was completed by an inmate during the five days of clinical follow-up.

The 26 suicides completed in CDC in 2004 represented a substantial decrease from the 36 suicides that occurred in 2003. With an inmate population of approximately 163,346 CDC's suicide rate per 100,000 inmates was 15.9. Another four deaths were initially identified as possible suicides during the year, but all were subsequently determined by the defendants not to be suicides. The four included one inmate who was determined to have bled to death accidentally from an uncapped shunt utilized for dialysis, one who was subsequently determined to have been a victim of homicide, one who died as the result of the use of force and one whose death was ruled to be a restraint-related accidental death.

The first completed suicide for calendar year 2004 occurred on January 13, 2004, and the last occurred on December 2, 2004. The documents provided by CDC for each suicide included, as in previous years, the deceased inmate's UHR, official incident reports, the autopsy report, if one was conducted, the Suicide Report, the Executive Suicide Report, and, where relevant, the facility's implementation report of corrective actions recommended in the Suicide Report. Corrective actions were recommended in 23 of the 26 suicides that occurred in 2004. Institutional responses to the recommended corrective actions were due within 90 days of receipt of the Suicide Report, although the process of

review of the submitted responses at headquarters often delayed distribution of the reports for weeks or months.

Among the suicides documented in Appendix B to this report, it is notable that 18 of the 26 suicides completed in 2004 (69.2 percent) involved hangings in administrative segregation cells. All 18 were single-celled. Two suicides involved inmates, who needed medication, were known to be non-compliant with their medications, met requirements for involuntary medication via the Keyhea process and whose Keyhea orders had expired just weeks before their suicides. At least three cases involved inmates who needed placement in a Mental Health Crisis Bed or a Department of Mental Health inpatient program, but instead were placed in a holding cell on "strip cell" status where they committed suicide. During the year, a significant number of inmates who were referred or should have been referred to higher levels of care, including DMH, were not considered for referral, were not referred, had their referral cancelled or were awaiting transfer pursuant to a referral when they died. Ten of the case reviews for the year indicated that apparent or real delays in the immediate initiation of CPR may have contributed to the completion of the suicide.

Appendix A provides the timelines for the completion of the various elements of the then existing suicide review process according to policy. These timelines were usually, but not always, met for 2004 suicides. Delays occurred in the completion of some CDC Suicide Reports and some institutional responses to recommended corrective actions. As noted earlier, more rigorous reviews of institutional responses at headquarters resulted in additional directives to revise, modify or otherwise improve deficient responses to CAPs and provide additional information on audits, Quality Improvement Team (QIT) results, training events or management and supervisory practices. When the Suicide Report included a recommendation for an investigation, the results were typically shared with the special master much later.

Appendix B provides the narrative case summaries of the 26 CDC inmates who committed suicide in 2004.

## II. Discussion

Twenty-six suicides were completed in CDC in calendar year 2004, down ten from 2003. No completed suicides of CDC inmates occurred in DMH inpatient facilities in 2004. The three suicides of female inmates in 2004 tripled the total of female suicides in CDC since 1990. The sole preceding suicide of a female inmate during that 16-year span occurred in 2001 at CIW. The following data summarizes much of the information presented graphically in Tables 1 and 2 on the 26 completed suicides.

- o   Frequency of suicides by facility

    CCWF                3
    CMF                 3

6

SAC          2
PBSP         2
CMC          2
FSP          2
DVI          2
MCSP         2
SVSP         1
CEN          1
COR          1
ASP          1
RJD          1
CIM          1
NKSP         1
ERCC (Eel River
  Conservation Camp) 1

o  Single-cell housing                            22 of 26 (84.6%)

o  Single-cell housing in administrative
     segregation or a SHU (1)                     19 of 26 (73.1%)

o  On MHSDS caseload at time of death            13 of 26 (50%)

o  History of past mental health treatment       20 of 26 (76.9%)

o  History of past suicidal behavior             15 of 26 (57.6%)

o  Housing in EOP (1) or TLU in CMC (1)          2 of 26 (7.7%)

o  On a Keyhea order                              2 of 26 (7.7%)
     (Keyhea orders on 2 other inmates expired
     weeks before inmates' deaths)

o  Severe or life-threatening illness            3 of 26 (11.5%)

o  Inmates incarcerated for sex offenses
     (R Suffix)                                   4 of 26 (15.4%)

o  Method

     Hanging                                      24 of 26 (92.3%)
     Overdose                                     2 of 26 (7.7%)

- o   Age range

      Under 18        0      (0%)
      18-30          10      (38.5%)
      31-40          13      (50%)
      41-50           1      (3.8%)
      50+             2      (7.7%)

- o   Race

      Hispanic                    12 of 26 (46.2%)
      Caucasian                    8 of 26 (30.8%)
      African-American             3 of 26 (11.5%)
      Pacific Islander             2 of 26 (7.7%)
      Other (Armenian)             1 of 26 (3.8%)

- o   Gender

      Male                        23 of 26 (88.5%)
      Female                       3 of 26 (11.5%)

- o   Indications of inadequate treatment (including, e.g., canceled appointments not rescheduled, no response to referrals, past medical records not reviewed, unsupported diagnoses, noncompliance with treatment without reassessment, assignment to inappropriate level of care, failure to provide five-day clinical follow-up, failure to provide immediate CPR)        20 of 26 (76.9%).

As indicated, 20 of 26 (76.9%) of completed suicides in 2004 involved some measure of inadequate treatment or intervention.  That represents an increase in the number of suicides so identified in 2003.  This category includes, in addition to the indices of inadequate care listed above, insufficient communication among clinical, medical and custody staffs, the failure to review documented histories in medical records, central files and/or referral forms and a failure to provide timely screening and assessment of inmates on intake in administrative segregation.  A number of inmates, moreover, were not considered for referral to a higher level of care or placed on the mental health caseload, when they should have been.

The annual suicide rate per 100,000 inmates in CDC since 1998 has been as follows:

1998 – 22 suicides in a population of approximately 158,159
        resulted in a suicide rate of 13.9/100,000

1999 – 25 suicides in a population of approximately 160,970
        resulted in a suicide rate of 19.9/100,000

2000 – 15 suicides in a population of approximately 160,855
resulted in a suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
resulted in a suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
resulted in a suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722
resulted in a suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
resulted in a suicide rate of 15.9/100,000

## III. Summary of Observations and Recommendations

From 1999 to 2004 the suicide rate for inmates in CDC ranged from a low of 9.3/100,000 in 2000 to a high of 23.1/100,000 in 2003, compared to the national average for correctional institutions of 12 to 14/100,000 during most of that same time period. The difference between the national and CDC rates provides a standard against which to measure the department's record in dealing with suicides. From an incredibly low rate of suicides in 2000 to significantly higher rates in 1999, 2001 and 2003, with intermediate rates in 1998 and 2002, the department has had over this six-year period an average annual rate of suicides per 100,000 inmates of 16.47[2].

This report indicates that 76.9% (20 of 26) of suicides completed in 2004 were foreseeable, preventable or both based on the definitions used in this review and the information that was, or should have been, available to clinical staff. The findings also confirm that the department's process for developing both local and system-wide corrective responses to deficiencies identified in individual completed suicides continued to improve, but still reflected some significant substantive inconsistencies.

An analysis of the case reviews provided in Appendix B allows some generalizations, many of which are consistent with conclusions reached in earlier annual reports on suicides in CDC.

- o The three suicides among women in 2004 were a shock. The number surpassed the total number of suicides for women in CDC in the previous 16 years combined. All three of these suicides were foreseeable or preventable; two of them were both foreseeable and preventable.

---

[2] These figures on the annual suicide rate differ somewhat from the rates reported in the department's five-year report on suicides. The department's calculations were based on the average daily CDC population during the given year, while these reports have used the department's population count on the last day of the covered year.

9

o   In ten of the 26 case reviews of suicides in 2004 (38.5 percent), delays in the
    immediate initiation of CPR were cited as potentially contributing to successful
    completion of the suicide. The report on suicides in 2003 led to a mid-2005 court
    order directing the defendants to develop and implement a policy requiring
    custody staff trained to do so to provide immediate life support measures,
    including CPR, in responding to medical emergencies, including suicides. The
    completeness of the defendants' response has been the subject of court pleadings
    and negotiation throughout the past six months and will be a focus of monitoring
    during the 17th compliance review that begins in March 2006.

o   The failure of clinicians to make use of available information to ensure that
    inmates are fully and appropriately screened, assessed and treated remained a
    dominant problem. In too many cases, completed suicides occurred when
    information in a UHR or central file, had it been reviewed by mental health
    clinicians during interviews with inmates, might have alerted mental health staff
    to inmates' potential for suicide. The lack of appropriate screening in confidential
    settings for new intakes into administrative segregation, including the
    administration of Suicide Risk Assessments, was also an important recurring
    problem. Both of these problems represent essentially inadequate clinical
    practices on the part of the department's clinicians, although the second problem
    often seemed to involve inadequate custody escort resources and private interview
    space in administrative segregation units.

o   Inadequate treatment interventions included the failure to place inmates in need of
    more intensive treatment in appropriate mental health programs or units. This
    failure, which contributed to a number of 2004 suicides, was confirmed by the
    Unmet Needs Assessment conducted by the Special Master's experts and CDC
    clinicians. That assessment, conducted in early 2005, led to a requirement that the
    defendants substantially expand the availability of DMH inpatient programs.

o   Two completed suicides in 2004 involved inmates whose Keyhea orders expired
    within weeks of their completed suicides. In both cases, the inmates were non-
    compliant with medications, resulting in each case in predictable decompensation.
    The expiration of the inmates' Keyhea orders was attributable to the failure to
    anticipate and pursue renewal of the orders, rather than to improvement in the
    inmates' mental health symptoms or condition. Other medication-related issues
    contributing to suicides in 2004 included the hording of medications (two suicides
    resulted from overdoses) and the slow response, or failure to respond at all, to
    non-compliance with medications.

o   Large-mesh screens covering air ventilation ducts particularly in administrative
    segregation cells to which a noose can be attached to accomplish suicide by
    hanging emerged as an issue in 2003 and resulted in a June 9, 2005 court order
    requiring the defendants to develop a plan for dealing with the large-mesh
    ventilation screens in administrative segregation cells in which mental health

10

caseload inmates are housed. In 2004, 18 of the 26 completed suicides occurred in administrative segregation units, all but one of which were accomplished by hanging. Five of the 17 hangings involved the large-mesh screens. In the remaining 12, the noose was attached to a variety of anchors, including bunks (in seven instances), light fixtures (two), windows (two) and a shelf (one). While physical plant structure is an important element of prevention efforts to reduce the incidence of suicide in administrative segregation units, the careful, thorough screening of inmates entering administrative segregation, daily rounding by psych techs as required by departmental directives and the prompt identification of inmates whose conditions may be deteriorating, followed by appropriate assessments in a confidential setting and referrals to appropriate levels of mental health treatment, are even more important.

o   While the suicide review process continued to improve, identification of facility versus departmental issues and the documentation of efforts to achieve the objectives, goals, and outcomes for corrective actions specified in some suicide reports varied widely. In some instances, implementation problems were local and involved individual clinician/correctional officer/treatment team issues, as well as human resource and other resource allocation concerns. In some other instances, the suicide review too readily accepted institutional failures as inevitable.

Based on a review of the suicides completed in CDC in 2004, there appears to be less need of new recommendations than a greater need to focus on the full implementation of the recommendations included in the predecessors to this report, namely:

1.   Implement fully all of the elements of the suicide review process already in place, including both institutional and departmental follow-up to corrective action plans and submission to the special master of documentation on the outcome of investigations of staff misconduct, negligence and errors.

2.   Conclude the pilot project at Pelican Bay State Prison and finalize and submit to the special master forthwith a system-wide plan for dealing with the large-mesh ventilation screen issue.

3.   Fix the now broken mechanisms for tracking and maintaining Keyhea orders for the involuntary medication of inmates in need of psychotropic medications.

4.   Continue to work on improving timely access to DMH inpatient placements, particularly for Level III and Level IV inmates, and focus greater training, supervisory and peer review efforts on the placement of decompensating inmates in appropriate levels of mental health care.

5.   Determine whether clinicians' failure to review and utilize existing UHRs and central files, including probation reports, was attributable to difficulties in access to pertinent records or faulty clinical practices. The department needs to address

the accessibility issue, a problem shared by all of the components of health care services. In the meantime, increased training, supervisory and peer review efforts need to be focused on clinicians' review and use of available records and documentation.

6.  Undertake increased efforts to understand more clearly and respond adequately to the potential for suicide among the department's female inmates. Fortunately, no female offenders in CDC committed suicide in 2005.

7.  Implement fully the finally approved policy on the application of CPR by custody staff.

In 2004, 69.2 percent of all CDC suicides (18 of 26) occurred in administrative segregation, up from an already high 48.5 percent in 2003 (17 of 35). In both years, a majority of the suicides completed in administrative segregation involved inmates who were not on the mental health caseload at the time of their deaths (11 in 2003; ten in 2004). The defendants need to analyze this rising trend more closely and focus more energy and resources on reversing it. Policies and practices appeared to be in place to deal with the problem, including mental health screenings and, where indicated, suicide risk assessments of inmates newly placed inmates in administrative segregation, regular psych tech rounding of caseload and non-caseload inmates, more frequent clinical contacts with caseload inmates, regular interdisciplinary team meetings and classification hearings, but the number of suicides in administrative segregation went unabated. These policies and practices were fully implemented in 2001 and 2002. In the latter year, just 27.2 percent of suicides in CDC occurred in administrative segregation (six of 22).

The individual case reviews of suicides in 2004 in Appendix B suggest that some initial screenings, SRAs and many psych tech rounds were performed perfunctorily and most often at cell-front or in holding cells, where the lack of privacy often precluded meaningful inmate participation, especially for those inmates placed in administrative segregation for protective reasons. Based on the information in the suicide reports, it is uncertain whether these inadequacies reflected poor clinical practices, a lack of adequate mental health staff, insufficient correctional officers to escort inmates to interview space, inadequate confidential space for clinical contacts or some combination of all of these factors.

From all of this comes the single specific recommendation of this report:

*   The defendants need to develop by May 31, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units.

As is so often the case, neither party contests the specific findings in the draft version of this report of the special master's expert on suicides in 2004, but both object to the proffered recommendation. The defendants insist the recommendation is unnecessary and redundant, while the plaintiffs find the stated recommendation unsatisfactorily vague and also want additional recommendations.

The defendants' objection is posited on the fact that the reportedly "escalating" percentage of suicides occurring in administrative segregation units noted in 2004 ceased to escalate further, based on a preliminary review of suicides in 2005. Of course, data on 2005 suicides were neither complete nor fully available when the draft version of this report was being composed. The judgment in the draft report on the escalation in the percentage of suicides occurring in administrative segregation, moreover, was based on performance during the two preceding years, as well as 2004 itself. In 2002, six suicides occurred in administrative segregation cells (27 percent of total suicides in that year); in 2003, 17 suicides occurred in administrative segregation (47 percent of the suicide total); and in 2004, 18 of a total of 26 suicides (69 percent) occurred in administrative segregation. That history certainly reflects an escalating trajectory in the percentage of CDC suicides occurring in administrative segregation.

The defendants report that a significantly reduced 37 percent of the department's suicides occurred in administrative segregation in 2005, a year in which the overall number of suicide soared to its highest total ever. The defendants attribute the decline in the number of suicides in administrative segregation in 2005, moreover, to their own aggressively proactive measures, which essentially make the special master's recommendation redundant. The plaintiffs respond with a somewhat different analysis of suicides in 2005, which points to the overall increase in suicides, lumps together all suicides occurring in any "locked unit" and discounts from the total of 2005 suicides those that occurred in unusual units where previously suicides rarely, if ever, occurred. Whatever the arguments over the significance of the 2005 data on suicides, the ratio of suicides among the administrative segregation population was relatively and extraordinarily high in 2004 and 2005 and continues, apparently, to be high in the current year.

In their objections, the defendants list eight explicit measures already adopted to respond to suicides in administrative segregation. In addition, other pending or planned improvements are cited, two of which are dependent on requests included in the FY2006-07 budget for additional resources to meet certain Program Guide enhancements. The plaintiffs argue that the defendants' citation of memoranda and directives to institutional administrators is an ineffective substitute for a genuine plan. The plaintiffs, for example, point to a February 2005 decision of a Division of Adult Institutions Executive meeting cited by the defendants that reiterated the expectation, formally announced in an earlier memorandum, that inmates admitted to administrative segregation units will be double-celled unless otherwise "precluded." In 2004, all 18 inmates in administrative segregation who committed suicide were single-celled; preliminary data from 2005 suggests that all but one or two of all inmates who committed suicide in administrative segregation were single-celled. More needs to be done to make custody managers of

administrative segregation units address the single-celling issue; it is a matter of life or death.

Another suggestion from the plaintiffs encourages a system-wide operating protocol for the performance of psych tech rounds in administrative segregation that includes specific guidance on the nature of rounding for both caseload and non-caseload inmates and the documentation required to record performance of psych tech rounding tasks. These points affirm the requirement in the draft version of this report that the defendants develop a plan by May 31 to address suicides in administrative segregation. In addition to citing memoranda, the plan should include a more detailed prescription for their operational implementation. In particular, the issues of single-celling and measures for the operational improvement of psych tech rounding need to be incorporated in the plan.

Plaintiffs also seek a recommendation that would require the defendants to replace "the large-mesh ventilation screens in all administrative segregation units within 90 days" of an order. This issue needs some background. In the report on suicides in 2003, the special master noted that nine inmates in administrative segregation used the large-mesh ventilation screens in their cells to hang themselves. This led to a June 2005 order requiring the defendants to submit a plan for dealing with the hazard of large-mesh ventilation screens in administrative segregation units. On July 8, 2005, the defendants filed a report which indicated that in late 2004 they had initiated a process for ascertaining the feasibility of replacing existing ventilation screens in administrative segregation cells with a so-called "S-Vent," which purported to be a suicide-proof screen. The defendants contracted with a manufacturer of the S-Vent screen to test its compatibility with the department's HVAC systems in 20 locked unit cells in California State Prison, Corcoran. The testing process found that the S-Vent screen so inhibited the ventilation of cells, it was unusable.

In the defendants' July 8, 2005 response, Facilities Management personnel also reported that "the size variations of the whole design offer little or no significant deterrence to an inmate intent on suicide." The response also stated that "staff readily demonstrated the ability to quickly thread materials through even the smallest openings (3/16") in a manner that would be robust enough to create a hanging mechanism. This appears to be validated by published vendor caveats that their respective products are not suicide proof." Facilities Management letter, dated July 8, 2005, to the special master, pp.1-2.

Meanwhile, the special master in Madrid, troubled by the suicide of Pelican Bay State Prison inmates in the newly opened administrative segregation by means of the large-mesh screens, obtained an agreement from the defendants in mid-July 2005 to replace existing vents in the newly opened, so-called "stand alone" administrative segregation facility with 3/16th inch vents within six months.

In 2004, five of the 18 suicides that occurred in administrative segregation involved a hanging that used the present large-mesh air vent screen, i.e., with openings that are 5/16th of an inch. Among other anchors for the remaining 12 suicides by hanging that occurred during 2004 in administrative segregation units (one administrative segregation

suicide involved a drug overdose) were light fixtures, window fixtures and latches, double bunk tops, a bunk ladder and a book shelf. Administrative segregation cells are not "safety cells," where inmates suspected of being at high risk for suicide are housed. Safety cells, located typically in Correctional Treatment Centers, Mental Health Crisis Bed units or Outpatient Housing Units, have been purged of all architectural features and furnishings that might contribute to a possible suicide, including sinks and toilets. If an administrative segregation inmate is deemed to be at risk for suicide, CDCR policy dictates his or her removal forthwith to a Mental Health Crisis Bed unit or an Outpatient Housing Unit. This explains why the defendants' current lack of an adequate supply of Mental Health Crisis Beds is so serious and dangerous. Installing 3/16th-inch vent screens will not make administrative segregation cells safety cells, and experience suggests that inmates intent on suicide will use light fixtures, window fixtures or latches, double bunks, bunk ladders or book shelves to anchor a noose. Moreover, given that the best alternative to the current large mesh screens is a screen with 3/16th-inch openings, which apparently is an ineffective deterrent to an inmate intent on hanging him or herself, a requirement that the defendants replace "the large-mesh ventilation screens in all administrative segregation units within 90 days" is inappropriate.

The defendants' July 8, 2005 response contained an outline of a proposed feasibility study to assess the conversion of large mesh screens in administrative segregation cells to the smaller mesh size of no more than 3/16th of an inch. Several of the milestones laid out in the proposal have passed, and it is time to revisit the feasibility assessment and map out further appropriate steps. This does not require an order of the court to accomplish.

Lastly, the plaintiffs complain that the defendants have failed to implement the court's June 9, 2005 order to develop a plan within 60 days for a process to track the suicidal history of inmates in CDC's mental health caseload in the Mental Health Tracking System and/or any successor information system used by the department. The original plan, they assert, was too vague and unspecific especially in regard to timelines for its full implementation. The criticism is accurate and deserved. Neither the plaintiffs nor the special master presently know whether modifications to the defendants' Mental Health Tracking System to retrieve and highlight suicidal history in the records of inmates on the Mental Health Services Delivery System have been fully installed and are now operating on a routine basis. The special master will ensure that monitoring teams determine the status of the modifications during institutional site visits remaining to be conducted during the present 17th round of monitoring and in the next round as well.

The plaintiffs also raise a substantive issue about the tracking of non-caseload and former caseload inmates with a suicide history. In the pending litigation over various aspects of the Program Guide, the plaintiffs are seeking a code identifier for all CDC inmates with any past involvement in the Mental Health Services Delivery System. The original impetus for the recommendation in the report on suicides in 2003 on tracking caseload inmates with a suicidal history came from the case of an inmate, who was in and out of the caseload during a lengthy incarceration and whose status at the time of his suicide was uncertain. The Suicide Report for this case noted clinicians' failure to track the

15

inmate's suicidal history and suggested the potential utility of the Mental Health Tracking System for reminding clinicians of the presence of a suicide history. That utility prompted a fairly simple and straightforward response: the defendants have pledged to create a field in the Mental Health Tracking System to alert clinicians to a caseload inmate's suicide history. The defendants claim they have instituted the required change, and it is time to determine whether they have done so operationally at the institutional level.

**Appendix A**

**Tracking Timelines for Preparation of Documents on Completed Suicides**

| | Event/Document | Timeline |
|---|---|---|
| 1 | Date of Death | 0 hour |
| 2 | Chief Medical Officer to Death Review Coordinator (DRC) | 8 hours |
| 3 | Initial Inmate Suicide Report (Form 7229B) by Suicide Prevention Coordinator to DRC | 2 business days |
| 4 | DRC to Mental Health Suicide Prevention Coordinator (MHSPC) | 3 business days |
| 5 | MHSPC appoints Mental Health Suicide Reviewer (MHSR) | 5 business days |
| 6 | MHSR writes Preliminary Report; Notifications of suspected misconduct to Suicide Review Committee (SRC) | 15 days |
| 7 | SRC completes Review and Adds Corrective Action Plan (CAP); Review to MHSR to Complete Executive Report | 30 days |
| 8 | MHSR submits Executive Report and all documents to SRC to complete Final Suicide Report | 60 days |
| 9 | Facility, Warden, and CMO or HCM implement CAP | 120 days |
| 10 | Report on implementation of CAP by facility Warden and CMO or HCP to SRC | 150 days |

17

**EXHIT B**

**<u>Case Reviews of Suicides Completed</u>**
**<u>in the California Department of Corrections</u>**
**<u>in Calendar Year 2004</u>**

# REPORT ON SUICIDES COMPLETED
## IN THE CALIFORNIA DEPARTMENTOF CORRECTIONS
## IN CALENDAR YEAR 2004

### Case Reviews

**1. Inmate X01378**
Brief History:  This inmate was a 35-year-old Hispanic female who committed suicide by
hanging on 1/13/04 in the Enhanced Outpatient (EOP) housing unit at the Central
California Women's Facility (CCWF).  The inmate was a part of the Mental Health
Services Delivery System (MHSDS) at the EOP level of care, and was the sole occupant
of a double cell.  The inmate entered the California Department of Corrections (CDC)
through the reception center at Valley State Prison for Women (VSPW), having pled
guilty to possession of a controlled substance, which resulted in a 16-month term in CDC.
The Suicide Report noted a lack of clarity in the record as to whether she had been
admitted to Patton State Hospital (PSH) from a county jail prior to being admitted to
CDC.  The inmate was transferred to CCWF on 12/24/03.

The inmate was discovered on 1/13/04 at approximately 10:39am by a painter and an
inmate worker who were painting the second tier housing in the 504 EOP program.
Those two individuals notified a correctional officer that an inmate was "hanging herself
in cell 210."  Officers responded and discovered the inmate on the floor, slumped over in
a kneeling position with a sheet tied around her neck and suspended from the upper bunk
in her cell.  The Incident Report indicated that a licensed practical nurse (LPN), who was
part of the EOP medical staff, arrived while the sheet was being removed from the
inmate's neck and began performing CPR assisted by a correctional officer.  The inmate
was transported to the CCWF emergency room via Stokes litter and medical gurney at
approximately 11:23am.  A physician pronounced the inmate dead at that time.  An
autopsy was performed on 1/13/04 by a pathologist for the Madera County Coroner's
office.  The cause of death was listed as hanging.  Samples were taken for toxicology
analysis.  The toxicology report of 1/21/04 revealed no illegal drugs or alcohol detected
in the samples.  The presence of Zyprexa and Benadryl was detected.

The Suicide Report contained the inmate's criminal history and described the
commitment offense as having occurred on 4/7/03, when the inmate was stopped in her
vehicle because of malfunctioning equipment.  She failed a sobriety test and was
subsequently charged with possession of a controlled substance and being under the
influence of a controlled substance (methamphetamine).  She pled guilty to possession of
a controlled substance and was sentenced to 16 months beginning on 9/23/03.  She did
not enter VSPW until 10/1/03.  It was not clear whether she had a psychiatric or other
type of hospitalization during the intervening time period.

The inmate had a history of multiple arrests (more than five) involving controlled
substances, driving under the influence of alcohol and other charges, including disorderly

conduct and cruelty to a child. Records indicated that she had served two previous prison terms in CDC, the last of which occurred between 6/11/97 and 12/30/97. Particulars on the first term were not provided. The inmate apparently had a different CDC number during the earlier incarceration.

The inmate was admitted to CDC via the VSPW reception center on 10/1/03. Her bus screening was positive, indicating the inmate had been treated for mental illness, was taking psychotropic medication, had experienced hallucinations and had been diagnosed as Schizophrenic and Manic Depressive. The bus screening indicated the inmate denied thoughts of hurting herself or having ever attempted suicide.

On 10/2/03 the inmate was seen by two different psychology interns, one of whom administered a Developmental Disability Program (DDP) screening instrument, while the other documented the inmate's history of having been treated at PSH in July 2003 and current reports of active hallucinations, racing thoughts, paranoid thoughts and depression; the inmate again denied suicidal thoughts. The intern referred the inmate for psychiatric evaluation. The Suicide Report stated that the inmate was seen by a psychiatrist on 10/13/03 and diagnosed with a Psychotic Disorder NOS rule out Schizophrenia with prescriptions of Risperdal, Topamax, and Trazodone. The psychiatrist's note of 10/13/03 was not provided for review.

According to the Suicide Report, the inmate was seen for follow-up by a psychiatrist on 10/27/03. All of her medication was increased at that time. Evaluations by a psychiatrist on 11/4 and 11/10/03 indicated the inmate continued to have psychotic symptoms; her medications were either continued or increased. A psychiatrist's note of 12/4/03 indicated that the inmate was seen in response to a "crisis referral." The note described her as having attempted suicide on four past occasions and having been hospitalized at PSH for two months. The note also reported that the inmate was first prescribed psychotropic medications approximately four to five years prior to the interview. The psychiatrist indicated a number of positive and negative symptoms of psychosis and noted a negative suicide evaluation. The psychiatrist decreased her medications. From 10/1 through 12/18/03, different psychiatrists continued, decreased, increased and finally decreased her psychotropic medications. The inmate was evaluated on 12/22/03 by a psychologist who indicated the inmate was continuing to decompensate and was increasingly anxious about a possible recommendation for an EOP level of care. The interdisciplinary treatment team (IDTT) reviewed the recommendation, and the inmate was placed in EOP. On 12/24/03, she was transferred to CCWF.

A MH-4 dated 12/17/03 indicated the Uniform Health Record (UHR) was not available but described the inmate's report of her arrest and past treatment. The account included family history and history of treatment at PSH in July 2003, as well as at other mental health facilities, and her suicide attempt by hanging in early 2003. New diagnoses offered on the MH-4 included PTSD, Panic Disorder without Agoraphobia, Psychotic Disorder NOS, and Alcohol Abuse in institutional remission, with a GAF of 52. A subsequent MH-4 dated 1/5/04 was reviewed. It, too, contained information on the inmate's history, including the fact that she was placed on a suicide watch on 12/18/03.

The MH-4 stated the inmate "does not endorse psychotic symptoms or suicidal ideation, and does not appear to be responding to internal stimuli, has good self-care, is medication compliant and may be seeking medication for anxiety" and recommended discharge to the Correctional Clinical Case Management System (3CMS) level of care. New diagnoses offered on this MH-4 were rule out Bipolar Disorder, diagnosis deferred with borderline traits and anti-social traits, with a GAF of 60. An IDTT was held on 1/7/04 for an initial review of EOP placement and it was determined that she "does not meet criteria for EOP level of care." It was unclear from the signatures on the treatment plan whether a psychiatrist attended the IDTT meeting. A clinical case manager (CCM) and a recreation therapist signed in the appropriate places to document their presence. A chrono of 1/7/04 indicated the inmate's new level of care was 3CMS with a global assessment of function (GAF) score of 60 and contained a behavioral alert about the inmate's medication seeking.

A psychologist's assessment note on 1/7/04 indicated that the inmate reported a history of sexual molestation, physical abuse and a family history of mental illness. The inmate reported that she had been receiving SSI benefits for four or five years because of her severe mental illness. The assessment also included statements by the inmate that she had thoughts of suicide but no plan in December 2003. She also reported an attempted hanging two years prior to this incarceration when she hospitalized herself at a psychiatric hospital. The psychologist's note included the inmate's statement that claustrophobia "triggers" her hopelessness and that she currently did not want to leave her cell because she did not want to become involved with inmates who might be using drugs. The psychologist's note also indicated that the inmate reported occasional thoughts about suicide but stated she would not hurt herself.

The following day, 1/8/04, the inmate was seen by a psychologist after being referred by a correctional officer. The officer described her as appearing to be talking to herself and wandering aimlessly. The psychologist evaluated the inmate and reported that she was cooperative and calm but guarded with flat affect, appeared anxious and was reporting auditory hallucinations and persecutory beliefs. Based on this, the psychologist assessed the inmate's GAF score as 50 and referred her back to the EOP program. She was transferred back to EOP housing that day. On 1/9/04, the inmate was re-evaluated by the psychologist who had evaluated her earlier and recommended the 3CMS level of care placement. The inmate stated that she thought she belonged in a mental institution rather than a prison, even if it meant her time might be extended. The psychologist further noted that the inmate was cooperative, her appearance was within normal limits and her behavior was manipulative with agitated activity. This psychologist indicated the inmate reported suicidal ideation, which she attributed to anxiety, and denied any current intent to harm herself. The psychologist indicated the inmate reported auditory hallucinations and compliance with medication. The psychologist opined that the inmate's claims of auditory hallucinations and thoughts of suicide were inconsistent with her presentation. The plan was to continue to assess the inmate and obtain the UHR and central file under her previous CDC number to verify her reported psychiatric history. It did not appear that this information was received prior to the inmate's death.

The Suicide Report noted that the inmate's last contact with a health care professional occurred on 1/13/04, when she came for her morning medication. She was described at that time as being "in good spirits" and reportedly stated, "I feel good – I get to see the doctor tomorrow for anxiety meds." The next note in the record, dated 1/13/04, was medical staff's description of the inmate's emergency room visit and attempted treatment after she was discovered hanging in her cell. A physician's earlier note on 1/5/04 indicated the inmate's blood pressure was elevated and would continue to be monitored for two weeks. That note also suggested that mental health should evaluate the inmate for anxiety.

The Suicide Report identified a number of documentation errors or problems with the inmate's UHR. A review of the record by an RN consultant to CDC indicated that the nursing notes did not meet acceptable standards for assessment of the inmate's chest pain and anxiety. A review by a physician consultant to CDC indicated that given the inmate's history the workup for her chest pain and complaints was inadequate and none of the treatment suggested by medical staff addressed the inmate's extreme anxiety.

The Suicide Report referred to two letters found in the inmate's property in which she "states she is sad." There were no references to any specific note indicating her intent to commit suicide.

The Suicide Report identified five problem areas and recommended corrective actions:

Problem 1: Mental health staff had difficulty clarifying this inmate's diagnosis.
Recommendation: Training should be provided to staff on anxiety disorders, the risk of suicide, the importance of completing a Suicide Risk Assessment (SRA), consideration of double-cell housing for at-risk inmates, and drug addiction and the short and long-term effects of drugs on human functioning.

Problem 2: Some inmates were apparently aware that the deceased inmate was making comments about committing suicide, but none believed she would actually kill herself.
Recommendation: The institution should consider providing educational information to inmates in the EOP housing unit on when to notify staff about other inmates' difficulty with coping and/or verbalizing suicidal intent.

Problem 3: Several psychiatrists attempted to manage this inmate's anxiety and other symptoms without success. She was seen by several contract psychiatrists who changed her medication with little regard for continuity of care.
Recommendation: Provide training to CDC and contract psychiatrists to emphasize the importance of not changing treatment levels until the inmate is stabilized. The recommendation also referred to statewide video conferences planned to address the issue of polypharmacy.

Problem 4: The inmate had a history of drug abuse. Although she received some medical testing, neither a cardio workup nor an EKG were performed.

Recommendation:  Medical and mental health staff needed to work together to address symptoms in a coordinated manner and provide training to medical and nursing staff on the need to exchange information on both medical and mental health symptoms. A statewide video conference being planned to address issues of medical problems in mental health patients was noted.

Problem 5:  Documentation problems were noted in the UHR.
Recommendation:  Provide training to staff on legal and ethical standards for documentation.

CCWF submitted a memorandum dated 8/30/04 to Health Care Services Division (HCSD) in response to the Suicide Report of this inmate.  The cover memorandum indicated that mental health supervisors and staff received training in the relevant issues recommended in the Suicide Report.  The institution provided an agenda and a list of attendees at psychiatry staff meetings where covered topics included peer review notes, medication management, psychiatry chart audit results and an update on anxiety disorders.  A sign-in sheet for a psychiatry staff meeting on 6/24/04 indicated that in-service training on anxiety disorders was provided to psychiatrists.  These institutional responses appeared to be consistent with the Suicide Report's recommendations mandating "supporting documents" for the delivery of recommended training.

**Findings:**  This suicide did not appear to have been foreseeable; the decedent did not make known to staff imminent threats to harm herself.  The death might arguably have been preventable with better coordination among her mental health treatment team and medical staff and more thorough SRAs.  The inmate had numerous changes of medication regimens by different psychiatrists without apparent collaboration among the mental health treatment team members or the psychiatrists who made the changes.  In addition, behaviors observed by custody staff, some mental staff and medical staff were not integrated into an organized and comprehensive treatment plan.  Contradictory assessments by psychology staff about whether she should have been at the EOP level of care appeared to have been made in the absence of documented review and consideration of the inmate's past and current behavior.

The inmate reported symptoms consistent with a psychotic disorder as well as an anxiety disorder (PTSD).  The approach to her reported symptoms and the historical factors indicating that she was at an increased risk for self-harm did not appear to have included a comprehensive evaluation of all relevant factors.  The Suicide Report recommendations did not require any outcome measurements or studies to ascertain or encourage appropriate collaboration among mental health staff in complex cases, and between mental health staff and medical staff when both departments have had contact and involvement with a specific inmate.  While the training provided can certainly be helpful, no measures were identified to determine whether improvement in managing inmates with complex histories and symptomatology, such as that demonstrated by this inmate prior to her death, occurred in the future.

## 2. Inmate E81250

Brief History: This 62-year-old Caucasian male incarcerated at Salinas Valley State Prison (SVSP) completed suicide on 1/18/04 by an overdose of medications. The inmate was in the 3CMS level of care in the MHSDS and was housed on a Sensitive Needs Yard (SNY). The inmate was admitted to CDC on 1/15/91 via the San Quentin (SQ) reception center, having been convicted of two counts of first-degree murder. He was serving a life sentence without possibility of parole.

On 1/18/04 at approximately 7:08am the floor officer in facility A Building/5 was notified by this inmate's cellmate that the inmate was experiencing some medical problem. The officer responded to the inmate's cell and found that the inmate was "breathing but unresponsive." After the officer sounded his alarm, custody and medical staff responded. They discovered that the inmate was breathing with extreme difficulty and had a pulse but was unresponsive. An emergency response vehicle was summoned, but at 7:18am the inmate stopped breathing and did not have a pulse. CPR and other medical efforts were begun. These efforts were continued when an ambulance and paramedic arrived at 7:39am. The resuscitative efforts stopped at the direction of EMS staff at 7:42am. The inmate apparently was not transported to the ER by the emergency response vehicle; his body was left in the cell.

The Incident Report indicated the inmate's condition showed no signs of victimization, and the possibility of suicide was being investigated because the inmate "had been placed on 24-hour observation in a housing unit due to several letters he had written to his wife." The Incident Report also stated that the inmate had a cut on the first finger of his right hand which was actively bleeding when staff first responded to his cell. The Coroner's Report of 2/11/04 indicated "this was a death of suicidal cause and origin, and no further investigation is warranted by the coroner's office." The toxicology report indicated that the inmate had Gabapentin (Neurontin) and Pseudoephedrine at toxic levels, reported respectively as 85.5 mg/L (blood range 2-6mg/L) for Gabapentin, and 2.32mg/L (blood range .5-.8mg/L) for Pseudoephedrine. The blood levels for Gabapentin and Pseudoephedrine were extremely high. According to the toxicology report dated 1/23/04, there is no potentially toxic level known for Pseudoephedrine, although the lethal level is greater than 19mg/L. The Suicide Report noted that the inmate had a plastic baggie tied around his neck by a blue string which included "end of life instructions and 2 mortuary business cards."

This inmate was serving a life sentence without parole that began on 1/15/91 following his conviction in October 1990 on two counts of first-degree murder. He had been housed at SQ, Folsom, and SVSP, where he was placed on 7/31/03 on a SNY. This transfer was in concert with his work-up for possible hip surgery and a MRI. He had experienced chronic pain and medical problems since at least 2/18/03. He filed several 602s (CDC inmate grievance forms) because he felt that his medical treatment was inadequate. His complaints included not being provided with results of his MRI studies and inadequate pain management.

This inmate's medical conditions were reported as Adhesive **Osteomyelitis** in the left hip, Hypertriglyceridemia, and borderline Diabetes Mellitus. At the time of his death, his left hip arthritis was estimated to have been present for approximately 11 years. He had received treatment for his chronic hip pain with various analgesics, including Motrin, Naprosin, Baklofin, Omethasin and Vicodin. Left hip osteoarthritis and mild degenerative arthritic changes were noted secondary to x-ray examinations on 2/20/03 and 6/20/03. A permanently mobility-impaired (lower extremities) DPM was completed by a physician on 7/10/03. A health care services physician's Request for Services form indicated a principal diagnosis of possible avascular necrosis on 9/19/03 and the need for an MRI. An MRI screening scheduled for 9/29/03 was performed on 10/7/03, with a report received on 12/1/03.

Although incarcerated in CDC since 1991, this inmate did not receive mental health services until December 12, 2001. At that time, based on a clinical case manager's evaluation, a diagnosis of Major Depressive Disorder single episode was made and a referral to psychiatry was initiated. His GAF score was estimated at 60. He was placed in the MHSDS at the 3CMS level of care. SRAs were administered on 12/12/01 and 1/3/02. They indicated that the inmate consistently denied any suicidal attempts or plans and agreed to report any suicidal thoughts to staff. The risk assessments all concluded there was no need for any referral. Treatment plans were dated 12/12/01, 1/3/02, 2/19/02, 2/4/03, 4/11/03 and 8/20/03. All of the treatment plans indicated the inmate continued to be treated for depression and, once started on psychotropic medications, he was compliant with his medications. The majority of these treatment plans, including the most recent treatment plan of 8/20/03, did not specify conditions or concerns on Axis III (physical disorders or conditions). The most recent treatment plan, dated 8/20/03, noted on Axis III, "see UHR," while the treatment plan on 4/11/03 had "none reported" on Axis III.

The inmate was transferred from a dormitory to administrative segregation in January 2003 for safety reasons. Mental health progress notes indicated the inmate did not receive his Celexa for several days in February 2003 and reported having significant trouble sleeping, a lack of energy and depression. Remeron was added to his regimen of Celexa at that time. The inmate was subsequently released from administrative segregation pending transfer to a custody Level III institution. It was noted in a progress note of 4/11/03 that the inmate was programming well, was compliant with mental health treatment and his wife, children, and grandchildren visited him weekly. There was an indication that the family had recently moved to Sacramento. A subsequent progress note indicated the inmate continued to suffer from Depressive Disorder NOS and had some periods of being down and withdrawn, but his main problem was the painful left hip, which by that time had immobilized him. These notes indicated the inmate did not leave his cell much of the time because of the pain in his hip and stated that his medication was "like drinking a glass of water." The inmate was subsequently transferred to SVSP SNY, and a progress note of 8/15/03 described him as stable with plans to continue his medications. He was recommended for group treatment at that time. The psychiatrist at SVSP discontinued his Celexa and continued only the Remeron on 8/20/03. The inmate's medication order, however, appeared to have run only through 11/12/03, and no

follow-up occurred by psychiatric staff after 8/20/03. His antidepressant medication appeared to have expired without psychiatric follow-up, although his MAR noted in November 2003, "psychiatrist aware of med expiring." Progress notes indicated the inmate had reported his psychotropic medications were tolerated well and were helpful, but he continued to have complaints of pain and problems getting pain medication prescriptions refilled. The last progress note provided was dated 1/12/04. It indicated the inmate had contracted to keep himself safe and reported no suicidal ideation or plan. The note also indicated that he was "feeling much less angry and depressed, and had spoken to his wife after writing 'desperate' letters." The inmate reported that he was not receiving his medications, and his sleep remained poor.

According to the Suicide Report, a correctional officer generated a crisis referral by means of a 128B chrono on 1/12/04, because he was concerned that the inmate was possibly suicidal. The correctional officer provided copies of three letters the inmate had written that were described as "reflecting his death and funeral." The officer also informed the psychologist that the inmate's central file indicated he had considered suicide before he was arrested for his commitment offenses. The chrono reportedly indicated that the contract psychologist/case manager intended to place the inmate in the Mental Health Crisis Bed (MHCB) unit for observation. This crisis appointment of 1/12/04 appeared to be the first time that a CCM had seen the inmate since 8/22/03, a gap of almost five months between appointments.

Although no SRA dated 1/12/04 was included in the records provided, the Suicide Report indicated that an SRA on that date identified several risk factors, including a history of suicidal ideation, the inmate's Caucasian race, a history of mental illness, chronic illness, recent suicidal ideation, current insomnia, lack of a perceived support system and recent rejection or loss. The level of suicide risk was estimated as "low." Despite the Suicide Report's reference to a 1/12/04 SRA, the only SRAs provided for review were dated 12/12/01 and 1/3/02.

A MH-3 note written by the psychologist on 1/12/04 reported that the inmate contracted to keep himself safe. The plan was to "See PRN and ongoing right now during" (sic). There was no comment about an actual assessment of the inmate, and in the area on the form for indications of suicidality, suicidal ideation was circled as "absent." The CCM decided not to admit the patient to the MHCB. That conclusion appeared to have been reached without a review of the UHR or central file, or reference to the correctional officer's statements in the referral for a crisis appointment on 1/12/04.

The UHR contained a quarterly case management contact note dated 11/25/03 by a different psychologist, apparently conducted without the inmate's UHR. The lack of psychiatric follow-up on the expiration of the inmate's medications in November 2003 did not appear to have been noticed or noted by mental health staff.

The Suicide Report also included information about pertinent anniversary issues that were available in the UHR and/or central file. Anniversary dates of note included the end of the inmate's second marriage in December/early January of 1987, his entry into CDC

in January 1991, and the celebration of his 15th wedding anniversary with his third wife on 12/28. On 12/31/03, the inmate learned of his third wife's intention to end their relationship. Based on available documentation, these factors did not appear to have been known to mental health staff. The inmate, as indicated, was also in chronic pain and had written 602s to complain that he was not being treated appropriately. He had been off his antidepressant medications for two months at the time of the evaluation on 1/12/04.

The Suicide Report identified seven problems and associated recommendations:

Problem 1: Psychiatric medication changes for this newly arrived inmate were not followed up to assess their efficacy or identify any medication-related problems.
Recommendation: Establish a Quality Improvement Team (QIT) to develop a clinically appropriate procedure for psychiatric follow up after medication changes.

Problem 2: Orders for medications expired without psychiatric follow-up.
Recommendation: A QIT should review existing procedures and make corrections to ensure adherence to medication management policy.

Problem 3: Psychiatric follow-up did not occur in accordance with applicable 3CMS MHSDS guidelines to ensure that medication was effective and appropriate
Recommendation: A QIT was needed to determine whether this was a systems problem or a personnel problem and take steps to correct it.

Problem 4: Lack of available information about the history of the deceased inmate impeded patient care.
Recommendation: A QIT should be conducted to ensure that UHR and central files are available for initial assessments and UHRs are available for each clinical contact.

Problem 5: Extreme delay in reporting this death as a suicide. Initially reported as a "natural" death on a 7229A, dated 1/18/04, the event was reported as a possible suicide to HCSD by phone on 3/3/04. It was not reported as a suicide on a 7229B until 4/20/04.
Recommendation: A QIT should establish local policy and procedures for immediate referral for suicide review when evidence or circumstances suggested suicide as the possible mode of death.

Problem 6: The deceased's body was placed back in his cell rather than being removed to an appropriate location in the Correctional Treatment Center (CTC).
Recommendation: The institution should review the rationale for this decision, determine whether local policy was followed, review and revise the local policy as needed to conform with departmental policy and train medical and custody staff in the appropriate handling of the bodies of deceased inmates prior to their removal from the institution.

Problem 7: Inmate was able to hoard the medication used to overdose.
Recommendation: Staff needed to review and ensure compliance with nurse administered and direct observation therapy (DOT) procedures for administering medications by conducting at least one audit of medication passes on each yard.

The Suicide Report was dated 9/22/04. SVSP responded to the Suicide Report's corrective action plan recommendations on 1/13/05. The cover letter from SVSP indicated that several QITs were formed to address the following problems:

- Orders for medication expiring without psychiatric follow-up;
- Psychiatrists' failure to meet MHSDS guidelines ensuring that ordered medication was effective and appropriate;
- Lack of available information on inmates' histories;
- Extreme delay in reporting this death as a suicide;
- Treatment of the deceased inmate's body; and,
- The deceased inmate's hoarding of medications.

Although a number of issues were identified by the institution for correction, essentially all of the recommendations were reported as of 2/28/05 as ongoing or requiring no further action. HCSD responded to the SVSP's submission on 1/31/05, indicating that several key recommendations were not addressed or were missing from the facility's follow-up report, including:

- Audits for six months of psychiatric follow-up of medications;
- Audits for two months of the availability of central files during IDTT meetings;
- Documentation on the timely reporting of suicides;
- Because results of the DOT/nurse-administered audit were unacceptably low, audits needed to be continuously conducted and submitted until 85-per cent compliance was reached.

SVSP subsequently responded on 2/16/05, indicating it would address these issues and provide appropriate follow-up documentation over the next six months. Additional documentation was submitted by SVSP on 6/14/05 on three ongoing audits. The audits were examining follow-up to expiring medications audit, DOT administration of medications and the availability of central files for IDTT meetings.

**Findings:** This inmate's death may have been foreseeable and was certainly preventable. The inmate's early care and treatment for Depressive Disorder appeared to have been generally appropriate until his transfer to SVSP, where coordination was lacking between medical and mental health staff relative to the inmate's reports of chronic pain and between custody and mental health staff about possible changes in the inmate's relationship with his wife. In response to the correctional officer's appropriate referral for a crisis evaluation on 1/12/04, the contract psychologist who performed the evaluation apparently failed to consider information available in the inmate's central file and UHR or provided by the referring correctional officer.

28

The reference in the Suicide Report to an SRA completed on 1/12/04 was not verifiable in the documents reviewed. The progress note written by the psychologist who saw the inmate on 1/12/04 did not clearly document suicidal risk factors or situational factors that had recently changed, including the inmate's letters to his wife, discussion with the inmate about those letters, or the rationale for determining that the inmate's risk for suicide was "low" and that he should not be admitted to the MHCB unit. Nor did the note document any consideration of an admission to the MHCB for an evaluation and further assessment.

Although the inmate's medications expired two months prior to the evaluation and had not been renewed, he was not referred for further review or evaluation by the treatment team, a psychologist or a psychiatrist. The method of his suicide pointed to serious problems with the implementation of nurse-administered and/or DOT medications. His ability to hoard enough medication to put together the fatal overdose or obtain medications from others indicated problems with medication administration.

The decision to perform CPR and move the inmate back into the cell rather than transport him to the CTC emergency room was unexplained. It was identified as a problem for further review in the Suicide Report by HCSD.

The response by SVSP was untimely and inadequate. It did not provide outcome measures to show that problem areas identified in the Suicide Report were reviewed and improvements made. Neither the particulars surrounding this individual's death nor the systems issues that were identified, such as medication management, evaluation of inmates in crises, crisis management and collaboration between medical and mental health staff, were demonstrated as having been reviewed and rectified.

### 3. Inmate V11066

Brief History: This 35-year-old Hispanic male committed suicide by hanging on 1/21/04 at Centinela State Prison (CEN) while housed in administrative segregation. He was the only occupant of the cell at the time of his death. He did not receive mental health treatment during his incarceration.

On 1/21/04 at approximately 9:00pm a correctional officer making routine security checks discovered the inmate in his administrative segregation cell apparently sitting at the end of the lower bunk with a sheet around his neck. The inmate was unresponsive. The officer activated his alarm to which a sergeant, an officer and an MTA responded. A medical emergency cell extraction was ordered by the sergeant who removed the noose from the inmate's neck and began CPR. The MTA arrived with additional officers and continued CPR as the inmate was transported on a Stokes litter to a medical emergency cart and subsequently to the emergency room. CPR continued. An effort to intubate the inmate was unsuccessful. He was pronounced dead at approximately 9:15pm. An autopsy conducted on 1/23/04 indicated the cause of death as hanging. A toxicology report indicated a blood alcohol level of .10% with no further explanation.

This inmate had a juvenile history of arrest in 1984 involving an assault on another person allegedly because the victim had threatened his son. At age 18 he was convicted as an adult of assault with a firearm resulting in a three-year sentence to the California Youth Authority (CYA). He violated probation and finished his term in CDC. At the time of his death he was serving his second term in CDC.

The commitment offense for his second incarceration occurred in July 1993 and involved the possession and sale of cocaine, for which he was sentenced to one year in jail. He violated probation by leaving the state and obtaining employment in Nevada. He also had a dirty urine while on probation. A warrant was issued for his arrest on October 6, 1995. He was returned to CDC on 10/22/03 despite a probation officer's recommendation that probation be reinstated because he had been supporting his family through regular employment in Nevada. Because of the probation violation he was eventually sentenced to serve the full six-year term and was returned to CDC via the North Kern State Prison (NKSP) reception center on 10/22/03.

A bus screening on 10/22/03 at NKSP indicated he had dental complaints but was negative for mental health problems. The Sheriff's department transfer summary from LA County also indicated no mental health problems or treatment for this inmate while in the county. A DDP screening on 10/24/03 indicated the inmate had normal cognitive functioning. A mental health screening conducted on 10/24/03 indicated that the inmate was not suffering from a mental illness, and no referral to a mental health professional was indicated. He was transferred to CEN on 12/23/03.

At CEN on 12/23/03, a bus screening indicated that the inmate was on preventive treatment for tuberculosis and had a complaint of a broken tooth, but was again negative for any mental health problems. The inmate was subsequently placed in the CEN administrative segregation unit on 1/14/04. The record indicated that he reported to a sergeant that he had been threatened by the Mexican mafia and had provided information on inmates selling illegal drugs in the yard.

A psychiatric contact was made on 1/17/04 in response to an emergency verbal referral (not documented in the record) made by a licensed psych tech (LPT) on 1/16/04. The LPT who made the referral believed the inmate was delusional, paranoid and overtly psychotic. A progress note written on 1/17/04 by a psychiatrist indicated the inmate refused to come for an interview, stating, "I don't want anyone here to see me talking to a psychiatrist." This note also indicated that the chart was not available to the psychiatrist. Despite the emergency request, the inmate was not seen until the following day.

The record indicated the inmate was concerned that his family would be killed and requested an emergency phone call, which was refused. The inmate was seen during the weekend by another LPT, who initiated a routine referral on 1/18/04. He was scheduled to see a mental health clinician on 1/22/04, the day after he committed suicide. The inmate reportedly was seen each day during his stay in administrative segregation,