including, 1/21/04, the morning of his death, by an LPT. No psychotic symptoms were noted.

The Suicide Report indicated a correctional lieutenant at CEN informed the inmate's wife of his death on 1/21/04. The decedent's wife told the lieutenant that she had received a letter indicating the inmate's concerns that the Mexican mafia would kill his family and advising her that she should contact the FBI. The inmate's wife also requested protection. The warden generated a memorandum requesting that the Southern Region Law Enforcement Investigations Unit contact the FBI and local law enforcement agencies about her concerns. The Suicide Report noted further that an inmate who lived in the cell adjacent to the deceased inmate's reported that on the day of his suicide the inmate had been trying to get the attention of custody staff by "yelling, screaming, and banging on his door continuously for well over five minutes," but gave up when there was no response. The inmate neighbor also reported that the decedent had been pressured by other inmates to commit suicide.

According to the Suicide Report, a 1/26/04 progress note from a supervising registered nurse (SRN) indicated "she had heard from another registered nurse and two LPT's that after the suicide the C.O.'s, while passing out routine supplies on the tier where the inmate had been housed were saying to the inmates, 'Do you want a noose with that.'" The report indicated the SRN recommended an investigation be initiated. An investigation was initiated.

The Suicide Report identified four problems and associated corrective recommendations:

Problem 1: The inmate should have been seen by a psychiatrist on 1/16/04.
Recommendation: Develop an operating procedure for the immediate evaluation of emergency referrals in administrative segregation and train contract clinicians on its provisions.

Problem 3: Clinicians working outside normal business hours did not have access to the inmate's UHR.
Recommendation: An operating procedure making UHRs available on weekends, holidays and outside normal business hours needed to be established and disseminated.

Problem 3: Mental health and custody staff in administrative segregation communicated inadequately about the inmate.
Recommendation: Mental health and custody staff needed additional training on the importance of exchanging information about inmates under their care.

Problem 4: Staff should never taunt or make jokes with inmates about suicidal behavior, especially after a recent suicide.
**Recommendation:** Investigation of custody staff conduct in Building 5 following the suicide.

CEN staff submitted a follow-up report on 1/28/05. It reported that the institution had developed a Suicide Prevention Operation Procedure that explained the procedure for emergency evaluations; hired two full-time clinical staff to conduct monthly quality assurance chart audits; and adopted a requirement that all new contract staff participate in orientation and training prior to starting work in the CEN CTC. The report also included an attachment from the CEN CTC Policy and Procedure Manual on authorized access to health records services area; materials relevant to Suicide Prevention Training for mental health and custody staff in administrative segregation; memoranda from the warden on monitoring inmates discharged from the MHCB unit; and training attendance sheets for Suicide Prevention.

The investigation of custody staff misconduct reportedly was unable to identify inmates, who had been subjected to any of the alleged misbehavior, or custody staff, who had witnessed any such behavior, willing to substantiate what the SRN had heard about inmates being asked if they wanted a noose with their supplies.

A supplemental report on corrective actions was submitted by the CEN warden on 2/02/05, which indicated that the investigation, which included interviews with two registered nurses (RNs), two LPTs and the SRN, who reported the allegations of misconduct, concluded that no evidence existed to support the allegations. The report recommended that no further action be pursued relative to this issue.

Plaintiffs' counsel complained that the fact-finding investigation was so inadequate it raised serious questions about the competency of the individual(s) who conducted it, the warden and whoever reviewed and approved it, as well as the commitment of those individuals to eradicate the "code of silence." Plaintiffs' counsel felt strongly that those allegations that custody staff had committed serious misconduct, including efforts to encourage the inmate to kill himself, were inadequately investigated. Additionally, those who reviewed and approved the fact-finding did so despite serious and obvious questions about the adequacy of the investigation. CDC, they argued, should conduct a formal investigation of the original allegations and the failure of the investigative process in this case.

**Findings:** This inmate's death did not appear to have been foreseeable, but might have been preventable. The inmate indicated to custody staff serious concerns with regard to his own and his family's safety, and during at least one interview with clinical staff was viewed as psychotic and decompensating. Psychiatric staff did not respond in a timely manner to an emergency referral and, when a psychiatrist did respond, indicated the inmate refused to be interviewed. When he was seen the following day, the documentation suggested strongly that the assessment was inadequate, and no SRA was conducted. Although the inmate had not been in the MHSDS and had not previously reported suicidal ideation, his change in mental status and reported fears for his own safety that led to his move to administrative segregation and an emergency referral were not adequately evaluated by mental health staff.

The scope and quality of the investigation of custody misbehavior appeared to be inadequate based on the documentation provided. For example, the incriminating progress note of the SRN was not provided, while the exculpatory statements of clinical staff during the investigatory process were all included.

### 4. Inmate E09742

Brief History: This inmate was a 33-year-old African American male who committed suicide by hanging at California State Prison, Corcoran (CSP/Corcoran) on 1/23/04. He was housed in the Security Housing Unit (SHU) and was the only occupant of his cell. He was treated at the 3CMS level of care at the time of his death. He had been under a Keyhea order for involuntary medication, which expired approximately one week prior to his death.

A correctional officer discovered the inmate at approximately 9:33pm hanging by a sheet from the air vent in the cell he occupied alone. The officer activated his alarm, and an emergency cell entry team of three officers was assembled and entered the cell. They cut the inmate down and removed him from the cell. The officers began CPR and called for an emergency transport vehicle. The vehicle transported the inmate to the General Acute Care Hospital (GACH), where he was pronounced dead by a physician at 10:03pm.

This was the deceased inmate's first adult incarceration in CDC. He entered CDC on 10/10/90 via the reception center at Deuel Vocational Institution (DVI) as a parole violator with a new term secondary to having pled guilty to two counts of residential burglary. He received a sentence of 12 years and 4 months for the two new offenses. The inmate was paroled in January 1989 from CYA. He had been committed to CYA after a conviction for burglary in the first degree. He had difficulties with his placement with his grandparents and was ultimately rearrested after testing positive for cocaine.

During the course of his incarceration, this inmate incurred a remarkably high number of rule violation reports (RVRs), including threats against staff, setting his cell on fire, aggravated assaults on staff and assaults on inmates. Because of his batteries on staff, the inmate received two convictions with added prison time. This additional time included a two-year sentence imposed in May 2002 and another sentence in December 2003 based on a guilty plea to battery, attempted battery and associated charges.

He also had a number of MHCB admissions with suicidal ideation and/or behavior. The suicidal behaviors included cutting himself on the wrists with objects and thoughts of hanging or otherwise injuring himself. He had filed 602s alleging unfair treatment by clinical staff and asserting dissatisfaction with their reports. On 2/14/02, an administrative law judge ordered that the inmate be placed on involuntary psychotropic medication because he was a danger to himself by reason of his mental disorder. Keyhea orders were subsequently continued until the last one lapsed just a week before the inmate's death. In their Keyhea petitions, clinicians at Pelican Bay State Prison (PBSP) represented that the inmate had become a danger to himself, in part, because of his history of poor medication compliance. The petitions also referred to the inmate's history

of multiple assaults on custody staff, recurrent depression with suicidal ideation and multiple episodes of self-mutilation. These acts of self-harm and mutilation were described as including a laceration to his left wrist in June 2000, threats to swallow razors that were in his mouth in July 2000 and cutting both arms with a staple in August 2000. Other staff interventions were required because the inmate had possession of various pieces of metal or glass in September, November and December 2000. He had also set fire to his cell in the past.

In December 2003, this inmate was admitted to CSP/Corcoran's MHCB because of suicidality. He remained in the MHCB until 1/15/04, when he was returned to the SHU. The Suicide Report referred to a suicide pact the inmate had formed with another inmate who was housed nearby in the MHCB. The report implied that the suicide pact was intended to make a political statement regarding abusive behavior by correctional staff and poor mental health care, as well as possibly motivating his family to file a lawsuit and receive money for his completed suicide. The Suicide Report also suggested that the inmate's motivation for writing to the plaintiffs' counsel in Coleman might possibly have been to support a future lawsuit by his family.

The inmate was being treated at the 3CMS level of care while housed in the CSP/Corcoran SHU. He was admitted to the MHCB from 12/31/03 through 1/15/04 because of suicidal ideation. His diagnoses were Depressive Disorder, Polysubstance Abuse and Antisocial Personality Disorder. Although the GACH admission data sheet indicated the inmate was admitted with "severe depression," the SRA of 1/02/04 by a social worker indicated the inmate was at "low risk." A second SRA conducted on 1/16/04 (not on the official CDC SRA form) also indicated the inmate was at "low risk." He remained in the MHCB through 1/15/04 after he was clinically discharged.

A note by the on-call CCM on 1/16/04 indicated the inmate had been seen because of a "referral from Coleman Case." This note said the inmate was released from the "(G)ACH-5 day has been conducted however, in addition I/M was seen by CM." The note stated the inmate had met Keyhea criteria, but the order had expired. It also reported that the inmate had taken all of his medications and reportedly planned to continue taking his medications. Despite compliance with his medication, the note indicated the inmate requested to continue on his Keyhea order. The on-call CCM indicated a plan to refer this request to the regular CCM. The inmate was encouraged to inform staff of any suicidal ideations or mental health concerns that he might be experiencing. The inmate was noted to have been somewhat depressed. The CCM's information on five-day follow-up and the inmate's compliance with medications after the Keyhea order expired was inconsistent with other information in the record.

The Suicide Report indicated that the ER psychiatrist who evaluated the inmate one day prior to his suicide determined the inmate was not in need of admission to the MHCB unit and discontinued his medications. No SRA conducted at the time of this admission to the ER was included in the provided documentation.

The Suicide Report identified five problems and corrective recommendations:

Problem 1:  On 10/31/03 this inmate went out to court in Del Norte County related to a battery on staff, allegedly committed while he was housed at PBSP.  During the court proceedings, he was housed at PBSP.  Staff there had initiated the renewal of his Keyhea order, which was due to expire on 1/11/04.  However, the order was allowed to expire shortly after he returned to CSP/Corcoran on 12/31/03.

Recommendation:  CSP/Corcoran needed to establish a procedure to ensure that the Keyhea list in the Mental Health Tracking System (MHTS) is reviewed daily and expiring orders are addressed promptly.  Institutions that have scheduled Keyhea hearings should not send inmates to the other institutions until the hearings are completed.

Problem 2:  The CCM believed the inmate was at risk for suicide and referred him to the ER for admission to the MHCB unit.  The ER psychiatrist did not review the inmate's UHR or the referring clinician's note and decided not to admit the inmate and discontinue his medications.

Recommendation:  Clinicians need to review the record and, if possible, talk to the referral source.  The institution should establish a QIT to study and develop ways to improve communication among clinicians and decision makers about admissions to MHCB, particularly for inmate-patients referred for suicide concerns.

Problem 3: The contract psych social worker did not complete the SRA Checklist properly when she evaluated the inmate in the ER.

Recommendation:  The institution should establish a system for training contract clinicians on documentation requirements and monitoring their clinical work.

Problem 4:  The UHR did not document five-day follow-up after the inmate's final discharge from the MHCB unit.

Recommendation:  The institution needed to develop a system to ensure that five-day follow-up is completed, provide training to staff on the requirement and conduct audits to confirm compliance.

Problem 5:  Documentation problems were noted in the UHR, the most common of which was the failure to note the time of actual documentation.

Recommendation:  Clinical staff needed to be trained on the standards for documentation.

The Suicide Report was dated 5/19/04.  The follow-up on the corrective action plan for this inmate's suicide was dated 3/14/05, based on a 2/09/05 submission from CSP/Corcoran.  The institution provided supporting documents such as local operating procedures, appendices for staff training and audit tools.  The response cited corrective actions directed at its procedures for monitoring Keyhea orders; training on the administration of SRAs and team-building, together with attendance sheets; a final report from a QIT chartered in March; scheduled training for new and contract clinicians; an order to monitor requirements for five-day follow-up after MHCB discharges; and training on UHR documentation.  Development of a statewide policy addressing inter-institutional communications about pending Keyhea hearings was deferred to HCSD.

Plaintiff's counsel submitted letters on 10/4/04 and 4/4/05 critical of the Suicide Report's focus on the "suicide pact" rather than more obvious clinical failures and CSP/Corcoran's attachment of a "blank audit form" without including actual monthly audits of five-day follow-up of inmates discharged from the MHCB unit.

**Findings:** This inmate's suicide appeared to have been both foreseeable and preventable. The inmate had numerous admissions to MHCB units because of suicidal ideation and/or self-harming behaviors. He was under a Keyhea order because of the deterioration in his functioning when not receiving psychotropic medications. The breakdown in communication between PBSP and CSP/Corcoran on the inmate's pending Keyhea renewal led to the subsequent lapse of his Keyhea order.

The evaluations by MHCB clinicians, including particularly that by the ER psychiatrist, without the completion of a SRA were unexplained. The clinical determination to return the inmate to housing and discontinue his medications, when he was so recently on a Keyhea order, was inexplicable. Moreover, given the inmate's history, the lack of documented five-day follow-up after his final MHCB hospitalization was inexcusable. This inmate's death appeared foreseeable because he reported suicidal ideation and had a clear history of suicidal ideation and self-harming behaviors. In addition, he had a history of Keyhea orders for involuntary medication tied precisely to the likelihood that he would harm himself in the absence of medication. The death was preventable because, had an SRA been completed and had he been housed in an MHCB, the inmate would have been under more consistent suicide-related monitoring.

**5. Inmate V06645**
Brief History:  This inmate was a 21-year-old Hispanic male who committed suicide by hanging on 2/11/04 in the reception center at Deuel Vocational Institution (DVI).  He was serving his first term in CDC.  He was admitted on 9/12/03, having pled guilty to unlawful sexual intercourse with a minor and corporal injury on his spouse.  He received a sentence of 32 months and was housed in a single-cell in administrative segregation secondary to safety reasons at the time of his suicide.

He was discovered on 2/11/04 at approximately 9:20pm by a correctional officer conducting "securities" prior to the 9:30pm count in administrative segregation.  He was found hanging in his cell from a noose made from a sheet that was connected to the cell's ventilation grill.  The officer activated his alarm and radioed for assistance.  Custody and medical staff responded, and an ambulance was called.  The inmate was removed from the cell, and life-saving measures were initiated.  He was transported to the emergency room.  The ambulance arrived and the inmate was subsequently pronounced dead at 9:32pm by an emergency medical technician from the ambulance crew.  Review of the incident report indicated that the inmate was handcuffed after having been cut down and the handcuffs were not removed until the inmate was in the emergency room.  The incident report indicated that "life-saving measures were begun promptly and continued as inmate was transported to the emergency room."  However, the life-saving measures

36

were unspecified and it was uncertain whether CPR was administered in the cell. The initial Inmate Death Report indicated that the inmate was transported to the emergency room and "IV with NaCl started. CPR started. O2 started." The ER notes reported that the inmate was discovered at 9:30pm, an IV was started at 9:40pm, and CPR was started at 9:41pm.

A coroner's 2/12/04 report indicated the cause of death to be asphyxia by hanging, and the death was classified as a suicide. The records also included a suicide note without date or signature that was extremely difficult to read. The note consisted of five pages of hand written script and appeared to be addressed to the inmate's girlfriend. The note cited the deceased inmate's stress and concern because his girlfriend had not written him, might be pregnant, might not want to be with him and did not come to visit him. It also noted his belief that his girlfriend might leave him, expressed his love for his girlfriend and reported that his head hurt. The letter ended with the cryptic phrase, "see you in ill," without further explanation.

Various documents indicated that the inmate was not in the MHSDS program. The Suicide Report confirmed that he was not in the MHSDS, but also cited a psychologist's decision to place the inmate at the 3CMS level of care on the day prior to his death on the basis of a custody referral.

The inmate may have had a criminal justice history as a juvenile; the record referred to an evaluation for fighting in juvenile hall. The inmate reportedly was arrested at age 19 for robbery and had arrests for threatening crime with intent to terrorize, assault with a deadly weapon not a firearm, exhibiting a dangerous weapon, trespass, fight/challenge to a fight in a public place, and battery of a non-cohabitant former spouse. Whether these arrests resulted in convictions was not clear. His arrest for the instant offense seemed to have been related to his 16-year-old girlfriend of at least two years. He was living with the girlfriend and her family. The inmate was arrested after the family called the police about an argument between him and the girlfriend.

When the inmate entered CDC on 9/12/03, his bus screening was negative. He did not have a mental health evaluation in the reception center until 11/18/03, more than two months after his admission. The evaluation appeared to be in response to a self-referral.

The mental health evaluation of 11/18/03 indicated that the inmate had a history of special education, SSI for a "mental" reason and a mental health history since childhood. He had also been treated with Wellbutrin. The inmate reported no prior psychiatric hospitalizations and denied any history of suicide attempts. The evaluation noted that the inmate "hears voices" but "appears to be doing ok." The diagnostic impression given on this mental health evaluation was Adjustment Disorder with anxious mood and a GAF of 70. The inmate received a second reception center mental health evaluation on 2/10/04 which indicated an abnormal development problem as "ADHD, hyperactive." Other diagnoses included Polysubstance Dependence and Adjustment Disorder with mixed anxiety, along with Depression (provisional), rule out Major Depressive Disorder. The

37

initial plan was for the inmate to be referred for a psychiatric evaluation, which the CCM was scheduled to follow-up in one week.

According to the MHTS the inmate was seen for a follow-up appointment on 12/17/03. There was no documentation in UHR on this contact. A DDP evaluation on 9/12/03 found that the inmate had normal cognitive functioning. A psychiatrist's 1/13/04 medical evaluation progress note did not indicate the reason for the appointment but reported that the inmate was hearing voices and having problems sleeping, as well as experiencing other vegetative depressive symptoms. No medication was prescribed at that time. It was not clear whether the psychiatrist knew that the inmate had been prescribed Wellbutrin in the past. A follow-up appointment was scheduled, but the psychiatrist was not available and the appointment was not rescheduled.

The reception center mental health assessment of 2/10/04, the day before the inmate's death, appeared to have occurred in response to a referral by correctional officers. The evaluator indicated the inmate believed his father was sexually involved with his girlfriend. He was sad and tearful and reported having problems with sleep and appetite. At this time the inmate was placed at the 3CMS level of care, although no chrono was found in the records reviewed. The inmate's cellmate apparently moved out that same day, claiming that the inmate yelled all night. The cellmate also stated that the deceased inmate called him names, challenged him to a fight and alleged that people were putting things in his food. After being in the cell with the inmate for less than two days, the cellmate reportedly asked to be moved and told custody that the inmate was hearing voices.

The decedent was initially placed in administrative segregation in Annex A for safety reasons after reporting that he was a gang drop out and had enemies at DVI. He was endorsed to a SNY at MCSP. On 2/05/04, his endorsement to MCSP was rescinded, and he was endorsed for transfer to a SNY at CSP/LAC.

The Suicide Report noted that the inmate was seen by different clinicians, some of whom did not document their contacts. These failures to document contacts impeded the effective overview of the inmate's obviously difficult adjustment.

The Suicide Report identified three problems and corresponding corrective recommendations:

Problem 1: The inmate was handcuffed after being cut down when he was discovered.
Recommendation: There was a need for institutional and HCSD review of the guidelines for the use of handcuffs in emergency responses.

Problem 2: Documentation was incomplete. Reasons for evaluation were not provided on MH-7s, and the clinical contact on 12/17/03 was not documented at all. More complete notes might have facilitated better understanding and diagnosis in subsequent contacts.

Recommendation: This case should be presented in a mental health staff meeting to emphasize documentation issues, and a memorandum should be sent to all mental health staff reminding them of the critical importance of thorough documentation. Repeated and documented mental health contacts might require clinicians to take a closer look at underlying issues.

Problem 3: The inmate was in reception administrative segregation for five months.

Recommendation: The Suicide Prevention Committee needed to evaluate why this inmate remained in administrative segregation in reception for so long a period.

The Suicide Report was dated 7/09/04. DVI provided a follow-up report on its corrective action plan on 11/12/04. In response to the first problem, DVI reported that a 10/18/04 meeting of the Emergency Response Review Committee (ERRC) endorsed as standard practice in administrative segregation the handcuffing of inmates in such situations for safety and security reasons. The second problem was addressed in a mental health staff meeting on 8/11/04 that discussed and emphasized the importance of accurate and timely documentation. A copy of the agenda and an attendance sheet for that meeting were provided. The length of the deceased inmate's stay in reception administrative segregation was attributed to his referral to the Mule Creek State Prison (MCSP) SNY, where beds were not readily available. Eventually he was endorsed to a SNY at California State Prison, Los Angeles County (CSP/LAC) on 2/05/04, along with a recommendation to increase the number of SNY beds.

In a letter on this suicide, plaintiffs' counsel raised concerns **about** placing the inmate in handcuffs after he was cut down as a barrier to the immediate initiation of CPR. The minutes of the 10/18/04 ERRC meeting reflected no discussion of the delays or impediments to the delivery of CPR occasioned by the need to handcuff dead or dying inmates. The letter also requested information on any follow-up that occurred at DVI on this issue and the current policy and practice at the institution when an inmate is found hanging in administrative segregation. More generally, plaintiffs' counsel questioned the defendants' overall process for reviewing the implementation of corrective action plans contained in Suicide Reports.

**Findings:** This inmate's suicide did not appear to have been foreseeable. In light of his history and his clearly decompensating mental health after his arrival at DVI, it might have been preventable, if there had been better coordination of his care. While the Suicide Report referred to the handcuffing issue, it did not examine the time delay from his discovery at approximately 9:30pm until the initiation of CPR at 9:41pm in the triage area of the emergency room. DVI's follow-up response to the Suicide Report failed to address adequately the poor documentation of clinical contacts. Lastly, although this inmate denied a mental health history at his bus screening, clinical staff learned during subsequent evaluations that he did have a troubled mental health history. That knowledge, however, did not result in his inclusion in the MHSDS caseload until the day before his suicide.

### 6. Inmate P43083

Brief History:  This inmate was a 22-year-old Hispanic male who committed suicide by hanging in his single cell in the administrative segregation unit of Avenal State Prison (ASP) on 3/3/04.  He was convicted of a second strike on 11/22/02 based on two burglary charges resulting in a 21-year sentence.  At that time, he returned to CDC via the reception center at Wasco State Prison (WSP) as a parole violator with a new term.  The inmate was not receiving services in the MHSDS.

He was discovered by a correctional officer who was taking a count in the administrative segregation unit.  He was housed alone in a double-cell.  At approximately 2:40am he was found hanging from a sheet attached to a light fixture.  The officer notified his partner to request medical assistance and informed a sergeant.  The officer also attempted to get some response from the inmate by banging on his cell door, an attempt that was unsuccessful.  The sergeant responded, an ambulance was requested, and a cell door shank bar was utilized to open the cell door.  Custody staff entered the cell, and an MTA arrived and began CPR.  The inmate was subsequently placed on a Stokes litter, carried to a gurney and transported to the emergency room.  CPR was continued during transport.  The outside ambulance and crew arrived at approximately 3:05am.  At 3:06am a paramedic ordered that CPR stop and pronounced the inmate dead.

When the inmate was discovered hanging from a sheet his hands were tied behind his back with a strip of sheet and his legs were bent such that his feet were resting on the bottom bunk and they were also tied.  A cloth was stuffed in his mouth.  There were two notes on his desk as well as various letters from family members.  There was also a letter in the outgoing mail addressed to the inmate's mother.  The letter was retrieved.  It was dated 3/2/04 and written in Spanish.  He wrote to his mother thanking her for a package she had sent to him, asked her forgiveness and stated that he loved her even though he had made her cry and suffer because of his behavior.

An autopsy report conducted by the office of the coroner in King's County on 3/4/04 indicated the cause of death was asphyxia due to hanging.  The death was classified as a suicide.  Toxicology screening indicated there was no evidence of illicit drugs or alcohol in the inmate's system.

The inmate's first incarceration in CDC occurred in 1999 when he was 17-years-old. He was convicted on three burglaries and incarcerated for approximately one year. The inmate was paroled in May 2000 with a release to the United States Immigration and Naturalization Service (INS) and deported to Mexico.  He subsequently returned to the United States, where he incurred a number of charges, including absconding, failure to report to the Parole and Conditions Supervision Division, failure to notify his parole officer of a change of address and possession of drug paraphernalia.  He was convicted in March 2001 for possession of a controlled substance, which resulted in revocation of his parole and a return to custody for ten months.  During his incarceration he went back to court in October 2001 to face two burglary charges, which resulted in his second strike

and the 21-year sentence. The inmate's suicide occurred one day prior to the anniversary of his arrest on 3/04/99, which led to his first incarceration.

In the ten months following his return from court with a new sentence in December 2002, the inmate received three RVRs. In January 2003 he was charged with delaying a peace officer in the performance of his duties related to gang activities. On 9/8/03 he incurred an RVR for disobeying orders related to gang activities. On 10/29/03 he was charged with battery on staff requiring the use of force. The third RVR could have resulted in a third strike for the inmate. Records indicated that the inmate became more isolated and reclusive after receiving RVR in October.

Although this inmate was not involved in the MHSDS, he had a history of drug dependency and attempted suicide by hanging. The inmate was in administrative segregation from 12/3/02, after his return from court with a second strike and a close custody status. During this extended stay in administrative segregation, the inmate had several ICC reviews. Due to the RVRs, his custody score increased and his custody level was raised to Level IV. He was briefly transferred from ASP to Pleasant Valley State Prison (PVSP) for just over one week in October 2003 but was returned to ASP because of the change in his custody level.

A developmental disability screening in October 2003 indicated that the inmate had normal cognitive functioning. The inmate's last bus screening occurred when he was transferred to PVSP in October 2003. That bus screening indicated no history of mental illness or prior suicide attempts. The inmate had medical evaluations and physical examinations. With the exception of a history of having been treated for positive PPD, he did not have medical problems and was not receiving any medical treatment at the time of his death.

The Suicide Report identified three problems with associated recommendations:

Problem 1: On 6/18/99, when the inmate entered prison for the first time, he reported a hanging attempt "over his criminal charges." Those charges were minor in comparison to the legal predicament in which he found himself prior to his suicide. Although he denied any history of suicidal behavior in subsequent screenings there was no indication that any mental health clinician adequately assessed the suicide risk given this known history.
Recommendation: Clinical staff needed training on the necessity of reviewing historical information in the record whenever an evaluation is conducted. This would include a review of bus screenings, prior mental health evaluations and any probation officers' reports in the central file. These documents should be referenced in evaluations. Supervisors should audit evaluations to ensure compliance.

Problem 2: This inmate had a history of not coping well when faced with possible imprisonment. While in prison on a relatively short sentence, he went out to court to face pending burglary charges and returned with a 21-year second strike. At the time of his death, he was facing a possible third-strike conviction and a life sentence for the two

batteries on correctional officers. Staff and inmates noticed a change in his behavior, but no mental health referral was initiated.

    <u>Recommendation</u>: The institution needed to provide training for clinical and custody staff on the suicide risks associated with adverse legal proceedings and decisions and establish a QIT to develop a system to identify inmates receiving negative news about the length of their prison confinements, so staff can appropriately monitor and refer them.

    <u>Problem 3</u>: The inmate had been in an administrative segregation unit for 11 months when he assaulted staff. He was initially placed in administrative segregation because he retuned from court with a 21-year sentence and needed to be transferred to a prison with a higher custody level.

    <u>Recommendation</u>: The institution needed to review the length of the inmate's stay in administrative segregation to determine why it was so long and what could be done to prevent excessive length of stays in administrative segregation.

The Suicide Report, dated 7/9/04, was responded to by ASP staff on 11/01/04 with a follow-up report on corrective actions taken. The follow-up report indicated that the training recommended in the first problem had been conducted and attendance sheets were attached. The recommended audits would also be conducted. In response to the second problem, training for clinical and custody staff on the suicide risks associated with adverse legal decisions had been conducted. In addition, a QIT was established on 8/25/04 to develop and implement a new process for tracking such information and getting it to mental health staff. Minutes of the 8/25/04 meeting were provided. The QIT planned to review existing policies/procedures and/or training materials relative to suicide prevention/recognizing signs and symptoms of mental illness and discuss the establishment of a "critical information notice" for use by transportation teams and records of the court personnel. A follow-up meeting was scheduled for 9/31/04. No minutes from the follow-up meeting were provided.

In response to the third identified problem, a supervisory classification counselor reviewed the inmate's long stay in administrative segregation and concluded that he could identify no classification issues that required remedial action. He noted that each change in the inmate's case factors received prompt classification staff attention and classification committee reviews. He attributed some of the length of the stay to the inmate's refusal to attend his final two classification committee hearings. The review indicated that the inmate had been housed in administrative segregation for approximately 446 days and, with the exception of the delayed transfer to RJD, "the majority of the delay can be directly attributed to the inmate's nonconforming behavior."

**Findings:** This suicide did not appear to have been foreseeable because the inmate did not report to staff any intent to harm himself. However, his suicide might possibly have been preventable had, during his extended stay in administrative segregation, an appropriate and thorough mental health assessment occurred that included a review of his full recorded mental history with its report of a past suicide attempt prior to his first incarceration and his continuing difficulties involving a potential third-strike conviction.

**7. Inmate K25394**
Brief History: This 25-year-old Filipino male committed suicide by hanging in his single cell in the EOP administrative segregation program at the California Medical Facility (CMF) on 3/28/04. The inmate was admitted to CDC via the reception center at Richard J. Donovan Correctional Facility (RJD) on 10/24/96. He was transferred on 3/22/01 to the Department of Mental Health Acute Psychiatric Program (DMH/APP) at CMF and subsequently to the CMF EOP program or other DMH programs until the time of his death.

At approximately 12:25pm on 3/28/04, a clinical support officer was picking up library books from inmates on the P3 EOP administrative segregation unit. As the officer passed this inmate's cell, he observed the inmate hanging by a sheet from the rear window of the cell. The inmate's left foot and left leg were slightly bent and resting on the bed. His right foot was touching the floor. The officer notified the P3 housing officer, who retrieved the emergency cut-down tool and along with a third officer proceeded to the cell. The third officer activated his personal alarm and notified B1 emergency room medical staff via the institutional radio. The inmate's cell was opened and the inmate was cut down and lowered to the mattress, which was on the floor of his cell. The noose was untied. The inmate was not responsive to voice commands, did not appear to be breathing and a pulse was not found. When the sergeant entered the cell, an Ambu bag was passed to him, and CPR was begun. An MTA and a registered nurse arrived with the automatic external defibrillator (AED) and the sergeant placed the AED on the inmate's body and received an analysis of "no shock". The inmate was placed on a backboard, lifted onto a gurney, and transported to B1 emergency room. CPR was continued en route. The efforts were unsuccessful. The inmate was pronounced dead at 12:58pm by a doctor in the B1 emergency clinic. A 3/29/04 autopsy report from the Office of the Coroner for the County of Solano determined the cause of death as asphyxia due to hanging. The toxicology report showed the presence of Atropine, Benadryl, and other drugs, none of which were at toxic levels.

This inmate's first arrest was at age 14. He had subsequent arrests for vandalism, vehicle theft, receiving stolen property and failure to comply with conditions of parole. He was a ward of the juvenile court at age 15. He was committed to a residential treatment facility for approximately six months and was in juvenile hall for a short time. He had been kicked out of his parental home shortly before the instant offense at age 17. He was a member of the street gang called the "Oriental Boys." He reportedly supported himself by dealing drugs, primarily methamphetamine, which he also used. The instant offense involved the inmate having shot and killed a 20-year-old victim in April 1996, approximately three months before his 18th birthday, resulting in a conviction of first-degree murder. He was sentenced to 25 years to life with a ten-year enhancement for the use of a handgun. He was also involved in a gang-related drive-by shooting approximately six weeks prior to the instant offense. He went back to court and was convicted of 18 counts of attempted murder, as well as additional counts of assault with a semi-automatic firearm, conspiracy to commit murder, etc., resulting in a total of 57

counts and an additional sentence of three consecutive life terms. He was committed to the CDC and entered reception at RJD on 10/24/96. The inmate remained at RJD after his trial until March 1999, when he was transferred to SVSP. He was transferred to the DMH/APP at CMF on 3/22/01.

He had no history of mental illness, treatment for mental illness or outpatient psychiatric treatment prior to his incarceration. As noted, he did have a history of polysubstance abuse including methamphetamine, alcohol, and marijuana. The inmate denied a history of being sexually abused. He reported he quit school at about the tenth grade to run with his gang. After his incarceration, the inmate was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features, PTSD, Amphetamine Abuse and Antisocial Personality Disorder. The inmate was initially screened at RJD on 10/10/97. That screening indicated no mental illness. While still in the reception center, however, he was referred by staff for a mental health evaluation because of screaming and what appeared to be psychiatric symptoms. On 10/10/97 he was placed at the 3CMS level of care and prescribed Benadryl despite some concerns that he might have been feigning mental illness. His symptoms did not improve and in January 1998 he was placed at the EOP level of care. The inmate was transferred to SVSP on 3/23/98, where remained at the EOP level of care. He was noted to be improving, and his level of care was changed to 3CMS in August 2000.

In September 2000 the inmate was admitted to an MHCB after he was raped by another inmate and found in a fetal position. Following the sexual assault, the inmate was described as very depressed, unresponsive and bizarre, such that the diagnoses of Major Depressive Disorder with psychotic features and PTSD were added to the Antisocial Personality Disorder previously ascribed. The inmate returned to the EOP program in October 2000. He appeared to be adjusting until February 2001, when he attempted to hang himself at SVSP after he was placed in administrative segregation for assault on another inmate. The assault was reportedly precipitated by the way the victim had looked at him.

The inmate remained in the MHCB until 2/22/01 and was discharged as improved. However, he returned on 2/25/01 because of suicidal ideation and threats to harm himself. The inmate was transferred from the MHCB to the DMH/APP unit at CMF on 3/22/01, where he remained until 7/31/01. Upon his discharge to CMF he was placed on the P3 unit, which served as the EOP administrative segregation unit. He was returned to DMH/APP on 9/5/01 because he had become withdrawn. He remained at DMH until 3/20/02. The inmate had apparently stopped taking his medications. A Keyhea application was initiated on 9/11/01 on grounds of grave disability. This application was denied, but a subsequent Keyhea petition was upheld a year later. The inmate began to take medications voluntarily. He was transferred to Atascadero State Hospital (ASH) on 3/20/02 for further care at a sub-acute level.

The inmate remained at ASH for approximately two months. He was transferred back to CMF because he assaulted another patient and a female staff member. He was placed at the EOP level of care. He continued to report hearing voices that told him to hurt himself

and others and he remained depressed. In addition to his history of attempting to hang himself, as noted above, he cut his wrists in June 2002. His condition continued to deteriorate, and he was transferred back to the DMH/APP program on 8/23/02, where he remained until 11/26/02. His return was associated with his having been observed kicking an inmate who was lying on the floor. The inmate reported that he did this because he felt hopeless over never getting out of prison. He continued to report that voices were telling him to kill himself and others and stated that he could not contract for his own safety. Once again he had stopped taking medications.

On 10/3/02 the inmate was determined to be a danger to self. A Keyhea petition was approved for a six-month period of involuntarily administered psychotropic medications through 4/1/03. After the Keyhea order was issued the inmate engaged in self-injurious behavior. He cut himself and attacked another patient. Medication became more effective and he demonstrated some improvement. He was discharged back to the EOP program at CMF on 11/26/02. Keyhea orders were renewed every six months, and one was in effect at the time of his death on 3/28/04. Despite his improved functioning, the inmate at times did not participate in EOP program activities. He also assaulted or had conflicts with inmates and staff. The EOP staff referred him to ASH in December 2003. The referral was rejected in February 2004 because of the inmate's history of assault while at ASH. However, the staff at ASH suggested the inmate might be more appropriate for the DMH program at SVSP, i.e., the Salinas Valley Psychiatric Program (SVPP). Despite the ASH recommendation, the CMF team did not make a referral to SVPP. According to the records they did not think the inmate needed a higher level of care.

The inmate continued to exhibit assaultive behavior. He was placed in the EOP administrative segregation unit in January 2004 and again in February 2004 because of assaults on other inmates. His last placement in segregation was on 2/10/04. He remained there until his death. His participation in structured therapeutic activities was variable. While in administrative segregation, he continued to have weekly case manager contacts, and his Keyhea orders remained in effect. At the time of his death the inmate was prescribed Depakote, Effexor, Risperdal Consta, and Benadryl, with Haldol injectible and Benadryl injectible prescribed if he refused his Keyhea-ordered medications. A mental health assessment conducted pursuant to the disciplinary process found that the inmate's mental illness had contributed to his assaultive behavior. The mental health staff at CMF did not initiate a referral to a higher level of care, including SVPP. The last note in the inmate's UHR was dated 3/26/04. It indicated that the inmate was scheduled for 12 hours of structured therapeutic activities, but he was seen at the cell door because he refused to come out of his cell. The note indicated the inmate was not programming or attending groups at that time and that his participation had deteriorated. The note also indicated levels of risk. His risk for suicide was indicated as "medium," aggression as "medium," self injury as "medium," and his unpredictability was "medium."

The Suicide Report contained some conflicting information on whether CMF mental health staff made a referral to SVPP after the inmate was denied admission to ASH in

February 2004. The Suicide Report stated that the inmate had been endorsed to SVSP (unknown if to the SVPP) in early March 2004, but the endorsement was cancelled due to his pending RVRs.

The Suicide Report concluded that the inmate received appropriate mental health care. No recommendations were made to CMF.

**Findings:** This suicide did not appear to have been foreseeable because the inmate was not indicating imminent suicidal ideation or threats to harm himself. He had a history of suicidal behaviors and a clinical course that indicated he was very difficult to treat and manage, both because of his Major Depressive Disorder and related symptoms including suicidality and assaultive behaviors to others. The assaultive behavior preceded his incarceration and continued thereafter. His assaultiveness and symptoms of depression appeared to be exacerbated when he was not taking psychotropic medications. The clinical staffs at CMF and DMH pursued involuntary medication via the Keyhea mechanism, which was approved and documented as having been administered.

This inmate's death might have been preventable had he been referred and transferred to SVPP. Although the inmate was referred to ASH, the referral was rejected in February with a suggestion by ASH staff that he be referred to SVPP. The record is unclear as to whether or not a referral to SVPP was made. The Suicide Report indicated that the inmate was referred by CMF and endorsed for transfer to SVSP, but it was unclear whether the referral was to the SVPP. No documentation provided with the Suicide Report supported a referral to SVPP. In any event, the endorsement was cancelled due to the inmate's receipt of RVRs for assaultive behavior. His treatment and management appeared to have required an SVPP level of care. Had it been arranged, his suicide might have been prevented.

**8. Inmate E55754**
Brief History: This 32-year-old Caucasian male completed suicide by hanging at approximately 11:45am on 4/11/04 while housed in a single cell in administrative segregation at Folsom State Prison (Folsom).

At approximately 11:45am on Sunday April 11, 2004, the inmate was observed by a correctional officer making rounds hanging by a sheet attached to a light fixture/connector in his single administrative segregation cell. The officer sounded his alarm, and the responding officer was told to get the emergency cut-down kit. Three officers subsequently entered the cell, cut the inmate down and placed him on a gurney on which he was transported to the clinic. CPR was begun by an RN after arrival at the clinic. The inmate was pronounced deceased at approximately 11:50am. The inmate was noted to have tied his hands together at the wrists by a piece of torn sheet and left a suicide note. The note stated "I'm sorry for what I have done. Please forgive me. My wife didn't bring it in." An autopsy was conducted on 4/13/04 and the autopsy findings indicated the cause of death as hanging. A toxicology screen was negative for drugs and alcohol.

The inmate had an extensive criminal justice history beginning at approximately age nine in Oklahoma when he was arrested for burglary. He subsequently was arrested for burglary, theft and truancy and was placed with relatives. He was placed in group homes in California by the age of 13. He was committed to the CYA on three counts of burglary and received a commitment of seven years. He was paroled in April 1987 at age 15. He was on parole when he committed the instant offense in January 1989. That offense involved the stabbing of a drug dealer multiple times for which he was convicted of second-degree murder and sentenced to 15 years to life. The inmate was admitted to CDC on 5/31/90 via the DVI reception center. From June 1996 until the time of his death, he had served time at DVI, PVSP, North Kern State Prison (NKSP) and ultimately at Folsom. He married a former girlfriend's stepmother during his incarceration. His wife continued to visit him twice weekly and visited him the day before his suicide.

His institutional adjustment was unremarkable with the exception of his having been in administrative segregation in September 2003 for assault on an inmate. He was released from administrative segregation after an investigation, and no RVR was filed. The inmate's second administrative segregation placement occurred on 4/10/04, the day before his death. His placement in administrative segregation was for possession of approximately 14 grams of marijuana that was found secreted in his rectum after a visit from his wife and mother. Reports noted that his mother was not an eligible visitor as a convicted felon, but she was permitted on that date to visit with him. Prior to this he was at custody Level II with 19 points. He was actively involved in the pursuit of parole.

The inmate had a history of polysubstance abuse including marijuana, methamphetamine, and cocaine, but no history of mental illness. While housed in the CYA, he was noted to have met the criteria for Antisocial Personality Disorder with a history of substance abuse. He had not been diagnosed with any mental illness or mental disability and had no history of suicidal behaviors. The inmate had Board of Prison Terms (BPT) psychosocial evaluations in 1993, 1997, 1999 and 2002, all of which indicated no evidence of mental health problems. The evaluation on 2/19/02 indicated "there is still no evidence of any mental or emotional problems in this case." Further review of the records indicated the inmate had a mental health interview on 7/28/98 and was assessed as having a temporary problem but no need for further mental health services.

The inmate's only other contact with a mental health clinician appeared to have occurred on the morning of his death, when a psych tech making rounds indicated he had seen the inmate, who told the psych tech, "I'm fine get lost." This contact was documented on a CDC 114A. There was no progress note in the records reviewed reflecting any more extensive contact or observation by the psych tech. On neither of the admissions to administrative segregation in September 2003 or April 2004 was a mental health screening completed.

The inmate was quite concerned about finding that he had Hepatitis C in a liver biopsy in December 2003 and by one in February 2004 indicating that he had cirrhosis. He was not receiving any treatment for Hepatitis C.

The Suicide Report, dated July 9, 2004, identified one problem:

Problem:  No mental health screening was administered when the inmate was earlier admitted to administrative segregation.

Recommendation:  The institution should establish a procedure to ensure that all general population inmates entering administrative segregation without a mental health screening within the past year receive a screening within a week of the placement; create a log to track inmates entering administrative segregation in need of a screening; and submit a monthly audit of the log for the next three months to HCSD.

On October 21, 2004, Folsom submitted a corrective action plan on this inmate's suicide that included a draft policy and procedure for conducting mental health screenings shortly after inmates' entries into administrative segregation.  It required custody to provide a daily movement sheet that would be reviewed by a LPT on the first day following an inmate's placement.  It specified that general population inmates without a screening within the preceding year would receive a mental health screening interview within seven days of placement in administrative segregation, using the reception center screening questionnaire.  The LPT was to complete the screening and, where appropriate, refer inmates with positive screenings to the administrative segregation CCM for evaluation. Folsom also noted that its LPT staff was inadequate and a screening of all general population inmates in administrative segregation had not yet been completed.  A draft copy of the local screening policy and an audit of the log were attached.  The audit indicated that 26 inmates were admitted to administrative segregation between July 2003 and October 2004 but contained no further information.

**Findings:**  This inmate's completed suicide did not appear to have been foreseeable because he presented no signs of an imminent threat to himself.  There was some remote possibility it might have been preventable if he had been screened on his 2003 admissions to administrative segregation.  He also had accumulated some recent complicating stressors, including his diagnoses of Hepatitis C and cirrhosis of the liver.  He had apparently reported pain as a result of these illnesses, but was not receiving treatment. He had also just been discovered with a controlled substance on his person after a visit, a circumstance likely to have a pronounced negative impact on his pending efforts for parole.  Even under the revised policy on administrative segregation screening, the inmate would not probably have received a screening prior to his suicide, which occurred the day after he was admitted.  Finally, CPR was not initiated until the inmate was transferred to the clinic.  Although the transfer reportedly took only five minutes, the first responders apparently undertook no efforts to perform CPR.

**9.  Inmate T43420**
Brief History:  This inmate was a 25-year-old Hispanic male who completed suicide by hanging at approximately 9:05pm on April 25, 2004 at Robert J. Donovan Correctional Facility (RJD).  He was housed in administrative segregation in a single cell for safety reasons.  He was admitted to CDC on 3/28/02 via the reception center at WSP for his first

prison term. He was at the 3CMS level of care for medical necessity at the time of his death. His anticipated parole date was May 8, 2004. He was scheduled to be released to the INS for deportation.

At approximately 9:05pm on April 25, 2004 a correctional officer conducting an hourly security check discovered the inmate hanging in his cell in administrative segregation. The officer notified a sergeant who retrieved the cut-down tool. The officer and sergeant cut the sheet that appeared to extend from the inmate's neck to the upper bunk. Two other officers responded, one with an ambu-bag and one with a gurney. The sergeant and discovering officer entered the cell and, after cutting the inmate down, initiated CPR. The inmate was subsequently transported via the emergency transport vehicle to the CTC, where CPR continued until the arrival of paramedics at approximately 9:33pm. The paramedics administered epinephrine and atropine and briefly reestablished a cardiac rhythm, but the rhythm flat-lined as the inmate was being moved from the CTC to the ambulance. Despite continued CPR, the inmate was pronounced dead at 9:56pm at Scripps Chula Vista Hospital. An autopsy was performed at the Office of the Medical Examiner of San Diego County on 4/26/04. The reported cause of death was hanging and the manner of death was suicide. Toxicology screens were negative for alcohol and illegal drugs.

The inmate was serving a three-year sentence on plea bargains to two counts of lewd acts upon a child. He entered the reception center at WSP on 2/04/02. The instant offense in this case involved the 12-year-old daughter of a friend of the inmate. Apparently the family of the victim, including the father, mother, brother and the victim all shared an apartment with the defendant and another couple.

Directly after his incarceration he had an R-suffix (sex offender) affixed and was transferred from WSP to California Men's Colony (CMC). Although the inmate's initial custody score placed him at Level I, it was subsequently raised to Level II due to the allocation of 19 points for cases involving violence/sex. While at CMC-West the inmate was assigned a staff assistant because a test of Adult Basic Education found a reading score of 4.0. He was subsequently transferred to CEN and had an immigration warrant filed as a detainer against him that required him to return him to Mexico upon parole. He was transferred to CEN on 3/12/04.

On 4/11/04 this inmate was admitted to the MHCB unit at CEN as a "danger to self" and placed on suicide watch. He received Ativan, and a SRA was completed the same day. Records revealed that someone "found inmate in the holding tank with left wrist cut actively bleeding." The records described the inmate as having slashed his left wrist with a razor as well as having attempted to slash the left side of his neck. He was determined to be at "high risk" for suicide. The SRA identified a number of suicide risk factors and indicated the inmate was talked out of a holding cell before slicing his neck.

He was treated in the emergency room of El Centro Regional Medical Center and returned to CEN's MHCB unit. The ER report indicated he also took approximately five grams of Tylenol in addition to making self-inflicted lacerations. The inmate was seen

on April 12, 2004 by the IDTT in the MHCB unit. The MH-2 recorded the inmate's concerns that other inmates might try to kill him because of his crime, as well as concerns about his INS hold and potential deportation. On April 13, 2004, he arrived at RJD's MHCB by special transport.

A health screening performed by an RN was incomplete in that responses to questions on mental illness and suicidal thoughts and behaviors were left blank. However, the RN concluded that the inmate did represent a danger to himself and others. The inmate was placed on suicide precautions. The psychiatric admission note made reference to the inmate's past behavior, including the self-inflicted lacerations while in a holding cell and his attempted overdose with Tylenol. The inmate was noted as Spanish-speaking only, although other notes in the record prior to this date indicated he was conversant enough in English to complete several tasks and provide information. The note also indicated that the inmate stated the reason he cut himself was "fear for my safety". The psychiatrist concluded the inmate's diagnoses were Adjustment Disorder vs. Depression with a GAF score of 50. Subsequent notes indicated the inmate continued to report his fear of other inmates harming him if he returned to CEN or the RJD general population.

On April 15, 2004 the inmate pulled out eight of the ten sutures that were sewn into his left wrist after the previous self-inflicted laceration. The inmate continued to report fears of being discharged and killed by other inmates. At this time he was again placed on suicide precautions in a safety smock and placed at the 3CMS level of care. The inmate continued to report his fear of other inmates on the yard although he was described as having essentially no known mental illness with the exception of poor insight and judgment at times. In other notes he was described as having disturbances in mood. He also told staff that he was not suicidal but that if he were to be moved back to general population he might as well kill himself because he would be killed by other inmates.

A note dated April 19, 2004 written by a psychiatrist indicated the inmate had done well over the weekend and that he continued to be afraid that he would be harmed by someone. The psychiatrist informed him that he would get "a 115 for further acts as he is attempting to stay at the MHCB 'until I leave CDC.' " His insight and judgment were reported as fair, but : "Despite being told numerous times that he can't live in CTC still asked that he can." The SRA administered on that date by a psychiatrist identified nearly identical risk factors. That SRA, however, did not provide an evaluation of the level of risk or a recommended plan to refer the inmate to his primary clinician/case manager. Nor did it contain any additional comments. The inmate was to be discharged from the MHCB on 4/20/04. He reported to custody staff that he was afraid for his safety given his sex-offender designation. Based on his safety concerns he was placed in administrative segregation. The inmate was subsequently discharged to the 3CMS level of care in administrative segregation with no medications or diagnosis noted.

Prior to discharge, the inmate spoke with the watch commander about his placement in administrative segregation and his 3CMS level of care. The inmate was noted to have been relieved and ready for discharge. He was scheduled for follow-up with psychiatry within two weeks. He was noted to have little insight and few coping skills, and the

record indicated his impulsivity including his having cut himself with a razor and attempting to overdose while in a holding cell. He was finally discharged from the MHCB and was seen on the first of five days of follow-up on 4/22/04. He reported occasional suicidal thoughts but no plan. He agreed and contracted verbally not to harm himself. He was subsequently seen for the next three days of follow-up with the assistance of custody staff who translated his statements. Each of the resulting notes recorded that he denied suicidal ideation or plan, contracted for safety and did not need to be readmitted to the CTC or reevaluated by a psychiatrist.

He committed suicide on the fourth of the five days of scheduled follow-up, after having been seen by a psychologist earlier that same day. At approximately 8:20pm, a correctional officer, who was walking the tier during an hourly round to check on suicidal inmates released from the MHCB, saw the inmate.

The Suicide Report identified the three problems and corrective actions:

Problem 1: The inmate was diagnosed as having an Adjustment Disorder with depressed mood and was most often described as anxious and fearful. Despite his obvious level of distress, medication for these symptoms was not ordered.
Recommendation: The institution should conduct peer review on the performance of the treating MHCB psychiatrist. Although the individual psychiatrist was no longer at RJD, the peer review should be held anyway to raise awareness among other psychiatrists of the need to address and medically treat such symptoms. This case represented the second instance within the year where untreated acute anxiety ended in suicide.

Problem 2: The inmate was placed at the 3CMS level of care following a MHCB placement of ten days, when he was demonstrably not yet stable, as evidenced by his self-injurious behavior and suicidal gestures just one day prior to his discharge.
Recommendation: The institution needed to conduct training emphasizing the importance of clinical judgment in determining stability prior to discharges from the MHCB unit and careful consideration of the level of care for suicidal inmates discharged from a MHCB, particularly those continuing to exhibit symptoms.

Problem 3: The inmate was experiencing threats due to his sex-related crime. Demands by other inmates for paperwork to prove the crime of commitment often results in threats and harm, greatly increasing the safety concerns of sexual offenders.
Recommendation: HCSD needed to work with Institutions Division to consider a system-wide change to eliminate references to crimes of commitment when that information is included in documentation accessible to inmates, reducing thereby the potential for threats and attacks against inmates with R-suffixes.

Staff at RJD responded to the Suicide Report of 9/21/04 with a memorandum that pre-dated the Suicide Report. Dated 5/03/04, the memorandum from the chief psychiatrist instructed psychiatrists, psychologists and social workers to review the MHSDS Program Guide Overview Section. In-service training (IST) sign-in sheets for training on the

program guides relative to levels of care and MHCB criteria were attached to the memorandum.  The response provided a second memorandum, dated 6/02/04, which indicated that medical necessity criteria were discussed with psychiatrists on 5/24/04 within the context of the deceased inmate's treatment and care.  The response also noted that the inmate was expected to be extradited to Mexico, and CDC had no policy on addressing continuity of care needs outside the jurisdiction of the state.  The response indicated that the chief psychologist would look for alternative models for planning for parole in such circumstances, but current policy was being followed when the suicide occurred.

**Findings:**  This inmate's suicide appeared to have been both foreseeable and preventable. The inmate had identified with particularity the stressors in his life, including his imminent and consistent fears of death should he be placed in general population and his relief at the safety he felt in the MHCB.  He had also already demonstrated his impulsivity by taking an overdose of Tylenol and cutting himself while in a holding cell. Even after contracting for his safety, he repeated his threat to harm himself if he felt unsafe in general population.  The follow-up cell-side interviews for this inmate after he was placed in administrative segregation, with a correctional officer acting as a translator, probably did not result in a particularly candid or full sharing of the inmate's concerns and fears, given the inmate's fear of other inmates.

The failure to consider referral to a higher level of care, such as DMH, or more comprehensive evaluations during the five-day follow-up period was not explained. Finally, despite the inmate's impulsivity, stated depression and escalating symptoms of anxiety, it did not appear that any consideration was given to the possible use of medication to ameliorate his impulsivity, anxiety and judgment.

**10. Inmate T47210**
Brief History:  This 22-year-old Hispanic male committed suicide by hanging on 5/16/04 at approximately 12:01am at Deuel Vocational Institution (DVI).  He had been housed in the administrative segregation unit in a single cell since the afternoon of 5/14/04, following a fight with another inmate.  He was returned to CDC on 5/13/04.  His original commitment to CDC occurred on 3/25/02 through reception at DVI.  He was paroled on 12/2/03 and returned as a parole violator on 5/13/04.  This inmate had never received any mental health services during his stay in CDC.

A correctional officer discovered the inmate at approximately 12:01am on 5/16/04 during a routine institutional count.  The correctional officer notified other custody staff, who responded promptly.  The inmate was cut down from the top rung of the bunk ladder and transported to the DVI infirmary at 12:03am.  After his arrival in the infirmary medical staff began CPR, which was continued along with other medical interventions.  At approximately 12:20am paramedics arrived at the facility and continued CPR.  They telephoned a physician at Joaquin Hospital, who pronounced the inmate dead at 12:28am. The Incident Report indicated the inmate was last seen alive in his cell by custody staff at approximately 10:10pm on 5/15/04.

The inmate's first commitment to CDC on 3/25/02 followed his conviction on a charge of assault with a deadly weapon not a firearm with great bodily injury. The inmate stabbed and robbed an 18-year old male victim while seeking drugs. He received a three-year sentence. He was subsequently transferred to SCC. He was paroled on 12/2/03.

On 5/13/04, when he was returned to DVI for violation of parole, he was described as a Hispanic gang member with connections to the Mexican Mafia. The record indicated that he was interviewed by an assistant gang investigator to whom he described his involvement with the "Southerners," including his having been instructed to violate his parole and target specifically the inmate he fought with on the day after his return to DVI. The inmate told the assistant gang investigator that the targeted inmate was on a "hit list" of the Mexican Mafia because of illegal activities in the community. The inmate returned to prison to attack the targeted inmate. The attack took the form of a physical fight and resulted in the now deceased inmate sustaining injuries to his nose with "profuse bleeding." The inmate told the assistant gang investigator that he feared he himself would now be placed on the hit list because he had not attacked the targeted inmate with a weapon. Essentially he had not followed orders and had brought shame and disrespect to his father who was a member of the Mexican Mafia. The inmate was subsequently placed in administrative segregation because of the altercation and safety concerns related to his gang status.

After his death, a suicide note addressed to his girlfriend was discovered in the inmate's cell. The suicide note declared his love for her, apologized and stated he wished to be cremated and wanted his possessions to go to her. A coroner's report dated 5/16/04 indicated the causes of death as asphyxia and hanging and classified the death as a suicidal hanging. The toxicology screening revealed "no common acidic, neutral or basic drugs detected. No blood ethyl alcohol detected."

Bus screens on 3/25/02 and 5/14/02 were negative with the exception of allergy to phenosporin. A mental health screening on 6/24/03 indicated the inmate was cleared for general population with no restrictions. A brief screening report of 6/20/03 indicated the inmate was not suffering from a mental illness and referral to a mental health professional was not indicated. An undated mental health screening by a LPT indicated a "good adaptive functional assessment" and "routine mental health needs." There was no bus screening associated with his return to DVI on 5/13/04 in the materials reviewed.

The Suicide Report made reference to the inmate having been "cleared on all previous screenings" and that there had not been time for a mental health screening on his current admission. The Suicide Report also stated that the inmate should have been seen during rounds on 5/15/04 by the licensed psych tech, but the psych tech reported that she "walked past the cell but did not check him."

The Suicide Report identified two problems and recommended the following corrective actions:

Problem 1: Mental health rounds in administrative segregation for general population inmates reportedly were not properly conducted because one psych tech could not talk to all inmates and perform all other psych tech duties on the weekend.

Recommendation: During rounds the psych tech must make sufficient contact with each administrative segregation inmate to ascertain inmates' mental condition. This is particularly true for new arrivals to the unit, including inmates who are not MHSDS inmates. DVI needed to provide adequate mental health coverage on weekends, and all new arrivals needed to be identified and contacted by the psych tech doing rounds for the first five days after placement in administrative segregation.

Problem 2: DVI has had three suicides on J-Wing during the seven months from October 2003 to May 2004.

Recommendation: DVI should house new arrivals to J-Wing closer to the front of the unit on the lower tiers where they can receive closer custody observation and contact.

DVI provided a follow up report, dated 11/18/04, on the corrective action plan regarding this suicide. The Suicide Report was dated 8/16/04. The DVI response included a copy of a memo from a supervising registered nurse on the issue of clinical coverage on weekends and provided memoranda on policies and procedures from HCSD on mental health screening for administrative segregation inmates. The response reported that a psych tech reviews Daily Movement Sheets to identify new arrivals in administrative segregation and screen them. Psych techs reportedly now had the capability of managing the psychiatric needs of administrative segregation inmates seven days per week and can spend more time with inmates housed in administrative segregation because of more manageable housing placements. The memo further stated that psych techs were able to coordinate treatment with the case manager and a psychiatrist assigned to inmates in J-Wing.

The placement of new arrivals in J-Wing closer to the front of the unit on the lower tiers reportedly was not feasible because of the large number of new arrivals each day. Only two tiers in J-Wing are used for administrative segregation, all J-Wing administrative segregation inmates eventually must be transferred to L-Wing.

**Findings:** This inmate's death did not appear to have been foreseeable, but it might possibly have been preventable if an appropriate bus screening had been conducted on his return to DVI in May 2004. While the Suicide Report noted that the psych tech round conducted the day prior to his suicide was inadequate, it did not identify as a problem the absence of a bus screening upon the inmate's return to the DVI reception center on 5/13/04. In addition, the Suicide Report did not note that CPR was not initiated promptly by the first responders, the correctional officers who first discovered the inmate hanging in his cell. The Incident Reports indicated that CPR was not begun until after the inmate arrived at the DVI infirmary. Last, the DVI response asserted that the corrective recommendation to house newly arriving inmates in closer proximity to custody staff was not feasible. The materials received for review contained no further comment or response from HCSD on this issue.

54

**11. Inmate J98320**

Brief History: This inmate was a 32-year-old African American male who committed suicide by hanging at approximately 4:20pm on 6/11/04 in the administrative segregation unit at Pelican Bay State Prison (PBSP). The inmate was housed alone in administrative segregation. He was a general population inmate not enrolled in the MHSDS. The inmate was admitted to CDC on 3/11/96 via reception at WSP.

At approximately 4:20pm the inmate was discovered hanging from the air vent in his cell by correctional officers conducting an afternoon count. Upon discovery, a medical emergency was declared and when sufficient staff arrived at cell front the officers entered the cell and began CPR. The inmate was transported to the CTC. Despite continued CPR, he was pronounced dead at 4:48pm via communications between a Sutter Coast emergency room doctor and paramedics who arrived on the scene. An autopsy was performed on 6/15/04. It indicated the cause of death was asphyxia due to hanging and the manner of death was suicide. A toxicology screen revealed no evidence of alcohol or illicit drugs at the time of the inmate's death.

The inmate had a juvenile criminal record beginning with a conviction for burglary at age 13 and subsequent convictions for grand theft and assaulting a police officer with a firearm. After his release from CYA on parole in October 1991, the inmate was re-arrested in 1995 for threatening a store clerk with a firearm and taking $500. He received a three-year sentence for the robbery of the store clerk. He entered CDC on 3/11/96 at WSP and was subsequently transferred to PBSP on 4/3/96. In January 1997, the inmate was convicted of two counts of assault with a deadly weapon. He assaulted another inmate with a baseball bat and attempted to hit a correctional officer. He received an additional 17-year sentence for those offenses. The inmate had been transferred to CSP/Corcoran and placed in the SHU in June 1997. He was transferred to HDSP in December 1998 and eventually to PBSP in January 2002 because of enemy concerns.

He was not placed in MHSDS at any time during his incarceration and a developmental disabilities evaluation done in March 2004 indicated he had normal cognitive functioning. The inmate's record indicated he was preoccupied with religious themes that may have influenced the assault on an inmate that resulted in the additional 17-year term. In bus and mental health screenings, he consistently denied that he had any mental health problems or refused to cooperate with the screening process. Plaintiff's counsel questioned whether the inmate ever received an appropriate mental health screening after 1996 because of his refusal to cooperate.

The inmate refused a mental health screening at PBSP on 2/4/02 when he was admitted to the administrative segregation unit, but a screening was completed on 2/14/02. The inmate was referred by custody staff in November 2003 and was seen by mental health staff on 11/17/03 because he was having problems with his next-door neighbor. No Axis I diagnosis was made, and mental health follow-up was determined to be unnecessary.

A 11/26/03 initial ICC was completed based on what appeared to be an interview of the inmate and a review of the central file that determined that the inmate was not in need of mental health treatment. On 12/18/03, 2003 a clinician completed a SHU mental health screening utilizing information from the 1996 CDC reception center mental health screening because the inmate refused to participate in a repeat mental health screening for placement in the SHU. This screening also referred to the 2/4/02 screening that was refused by the inmate. The inmate again refused a mental health screening and mental health services on 1/24/04.

On 3/15/04, a mental health screening chrono was completed by a psychologist when the inmate was moved to the newly opened administrative segregation unit from the old administrative segregation unit. The chrono seemed to indicate that the psychologist neither interviewed the inmate nor reviewed his central file or UHR. On 4/14/04, a classification chrono was completed by a mental health clinician who indicated that no mental health treatment was needed at that time based on an interview of the inmate and review of his central file.

Based on an on-site review by one of the monitor's psychiatric experts, mental health assessments of the inmate were completed in July 2000 and on 11/17/03, although the March 2004 screening did not include a UHR review as required by policy. The inmate's UHR, moreover, contained progress notes relating to the SHU mental health screening assessments in which the inmate refused to participate.

Plaintiffs' counsel questioned the timeliness of the mental health assessment following a referral on 6/08/04, which was scheduled to be conducted by a senior psychiatrist on 6/14/04. The inmate was seen on 6/08/04 by an MTA who referred him to an RN, who subsequently scheduled the inmate to be seen for a routine mental health referral on 6/14/04. The inmate was scheduled to be seen for a routine mental health evaluation within five working days from the time of the referral as per policy.

The inmate's most recent SHU term began because of an RVR on 11/19/03 for an assault on an inmate. The inmate had numerous SHU terms, beginning in 1997, all involving threats, attempted battery or assault on other inmates. The inmate was known to have had 22 RVRs, 11 of which had to do with his refusals to accept a cellmate, threatening cellmates or assaulting cellmates. He was endorsed for an indeterminate SHU term in April 2004. The inmate was noted to have spent most of his time by himself and in single cells and appeared to be an extremely devout Muslim.

No suicide note was discovered in the property of this inmate. There were two notes, including one to his father from August 2003. They provided information about his difficult relationships with his father and with another individual.

The neighbor at whom the inmate was yelling in the early morning hours of 6/08/04 was moved by custody staff the following day, and the inmate's yelling through the night did not recur.

The Suicide Report dated 8/06/04 identified one problem and corrective recommendation:

Problem:  Although a routine mental health referral was scheduled, the inmate committed suicide before the scheduled appointment.

Recommendation:  Due to the high rate of suicides in administrative segregation units, a policy was needed to ensure that all mental health referrals in administrative segregation units are seen as soon as possible and, at least, within the same week.

In response to the Suicide Report of 8/06/04, PBSP provided a follow-up report dated 9/29/04.  In that memorandum PBSP staff indicated that they had been instructed by HCSD to implement a corrective action to schedule administrative segregation inmates, who were not currently being seen by mental health but were referred for routine mental health evaluation, within three days of the referral. Referrals received on Fridays were to be seen the following Monday unless the referral was determined to be urgent.  The policy was to go into effect immediately according to the memorandum dated 9/15/05 by the chief psychiatrist and chief psychologist at PBSP.

**Findings:** This inmate's suicide did not appear to have been foreseeable or preventable. The inmate had a difficult institutional adjustment particularly when it was necessary for him to be involved with other inmates in a potential housing situation.  He had not received mental health services but was being treated in the chronic care clinic for asthma.  The inmate was noted to have engaged in unusual or bizarre behavior several days prior to his completed suicide, but he was referred for routine mental health evaluation. He was scheduled to be seen within policy timeframes.  Plaintiff counsel's questions regarding the screenings the inmate had received in the past were noted and reviewed, but the failed screenings did not appear to have contributed to this inmate's suicide.

**12.  Inmate P10904**
Brief History: This inmate was a 27-year-old Hispanic male who committed suicide by hanging at approximately 12:55am on 06/16/04.  The inmate was housed in a single administrative segregation cell at the California Men's Colony (CMC).  The inmate was at the EOP level of care at the time of his death.  This inmate was admitted to CDC via the reception center at WSP on 06/24/98.

At approximately 12:55am on 06/16/04, a correctional officer was conducting a security check in the administrative segregation units.  In the annex overflow he discovered the inmate in a single cell hanging by a sheet tied around his neck and attached to a window latch.  The officer attempted to call in a medical emergency on his radio but was not successful.  He ran from the second floor of Building 4 to a foyer area and yelled down to the first floor officer who was able to contact control via radio and request an emergency transport vehicle.  At approximately 12:59am, control called for the emergency transport vehicle and officers, including a sergeant, obtained a cut-down tool, secured the cells and cut the inmate down.  The inmate was removed from his cell, and CPR was initiated by

custody staff.  At approximately 1:02am fire department staff relieved custody staff and continued CPR while the inmate was transported to the emergency room where he arrived at approximately 1:15am.  Life saving measures were continued but were unsuccessful.  He was pronounced dead at 1:38am.

A coroner's report completed by the San Luis Obispo County sheriff/coroner's department on 06/16/04 determined the cause of death as asphyxia by hanging and the manner of death as suicide.  Toxicology results indicated the inmate had Sertraline in his blood sample at a level of 0.18mg/L (therapeutic range 0.05/0.25mg/L).  No suicide note found in this inmate's property after his death.

The inmate entered CDC on 06/24/98 at WSP.  Later in 1998 he was transferred to Ironwood State Prison (ISP) and to Correctional Training Facility (CTF).  He was admitted to CMC-East in January 1999, where he remained until the time of his death.  He was serving his first incarceration in CDC, but had previous arrests for possession of a dangerous weapon, possession of marijuana and threatening a crime with the intent to terrorize.  These offenses apparently did not result a state prison term.  As a juvenile he had an arrest for vandalism and was involved with two street gangs.  Other background information indicated that the inmate's mother and sister were both incarcerated at the time of his arrest at the age of 21.  The inmate's incarceration in CDC followed his guilty plea to two counts of child molestation.  He was originally charged with eight counts of child molestation and related charges, including procurement of a child for sexual purposes and petty theft.  He was sentenced to a ten- year prison term.

During his incarceration the inmate was identified as being a member of a Hispanic gang and therefore was placed in administrative segregation at ISP because of enemy concerns.  This inmate had five stays in administrative segregation, including 12/19-20/00 for battery on an inmate without serious injury; 05/23/01 for mutual combat; 10/18 through 22/02 for refusing to program; 5/23/03 secondary to being observed as being involved in a riot between rival gangs.  His final placement in administrative segregation was on 06/15/04 at approximately 11:00am for mutual combat with another inmate.  A medical report of injury or unusual occurrence form dated 06/15/04 indicated the inmate was in a fight and suffered abrasions or scratches on both hands but no other injuries.  He was released to custody.  The Suicide Report referred to a psych tech contact during the third watch on 6/15/04, but the inmate's UHR contained no notes from that visit.

The inmate was not receiving any medical services at the time of his death and a Developmental Disabilities Program (DDP) evaluation in October 2002 indicated he had normal cognitive functioning.

Mental health history indicated the inmate had reported depressive symptoms three times in the past including at ages 11, 16 and 18, when he was placed in foster care, broke up with a girlfriend and was rejected by the military, respectively.  The inmate was seen for a comprehensive evaluation on 3/18/04 when he reported mild to moderate depression and was concerned about his future due to his sex offender status and registration.  He requested to talk with a psychiatrist to get medications.  He was seen that same day by a

psychiatrist who recorded that the inmate reported periods of depression but not suicidal ideation. The psychiatrist concluded that the inmate had "significant depression" but was hesitant to take any psychotropic medications, despite the psychiatrist's urging him to do so. He was not added to the MHSDS, and was advised to return for services if he needed them.

A note dated 04/20/04 by a psychiatrist indicated the inmate presented with sleep and appetite problems as well as anxiety over his possible parole in two years. The psychiatrist concluded that the inmate's diagnosis was Adjustment Disorder with anxiety, with a GAF score of 60, and needed supportive therapy through the 3CMS program. On 04/29/04 the inmate was seen on an urgent basis because another inmate reported to a staff member that the inmate was feeling depressed and might be at risk of hurting himself. The clinician indicated that the inmate said that he was not considering hurting himself but that he wanted to be seen as soon as possible. The inmate reported ongoing/worsening depression and anxiety, which he claimed had become "unbearable." The inmate was subsequently seen by clinicians on 05/04 and 05/07. He reported anxiety and depression related to possibly paroling and having no skills and agreed to take a trial of anti-depressants. During the 05/04/04 appointment with a psychiatrist, the inmate acknowledged he had "fleeting" suicidal thoughts and needed to be in an EOP. On 05/17/04, a treatment team meeting met. The IDTT meeting was attended by two psychologists and someone with an illegible signature, but no psychiatrist appeared to be in attendance. The IDTT changed the inmate's diagnosis to Major Depressive Disorder recurrent, mild, as well as Alcohol and Cannabis Abuse and Personality Disorder NOS, planned to place him at the EOP level of care, get him involved in group therapies and see him in individual contacts. No medication was recommended at the time of the IDTT meeting or included in his treatment plan.

The inmate was subsequently seen on 06/06/04 and 06/14/04 by a CCM, but he failed to appear for an appointment on 06/04/04 with a psychiatrist. A note of 6/14/04 by the CCM indicated the inmate denied suicidal ideation and was generally coping well. The note also indicated the inmate was starting to deal with his "underlying issues but still avoids his feelings." The conclusion was that the inmate was making slow progress and should continue at the EOP level of care. This was the last contact with mental health staff prior to his suicide.

The inmate was treated with Sertraline and Trazodone since May 2004 when he was placed in the MHSDS. There were notes at least once per week by the CCM and or psychiatrist from the time he was placed in the EOP program through his death on 6/14/04.

The Suicide Report identified one problem with corrective recommendations:

    Problem: Evening medications were not provided to the inmate on his placement in administrative segregation.
    Recommendation: The institution should audit continuity of medications for inmates placed in administrative segregation for the past three months, prepare an

analysis of the audit results, develop and implement a corrective action plan (CAP) for the problems identified in the analysis and audit medication continuity for three months after implementing the CAP.

The Suicide Report was dated 09/29/04. The follow-up report and corrective action plan provided by CMC was dated 03/11/05. It consisted of an audit of continuity of medication administration for inmates admitted to administrative segregation annex or administrative segregation central. The audit was conducted from November 2004 through February 2005. The audit indicated that there were a number of problems with medication administration. It concluded that only 57 percent of all medications ordered were received timely following a transfer to administrative segregation. Factors identified as contributing to interruptions in medications included the failure to notify nursing staff of transfers by custody, difficulties in transferring MARs, the need for additional psych techs and heavy reliance on contracted psych techs. All of these issues were targeted to be addressed through meetings among supervisors, examination of the reasons for the slow transfer of MARs, assessment of the need for additional psych techs and effort to reduce reliance on contract psych techs by recruiting a full complement of psych techs. No positions were budgeted for coverage in the event that any psych techs were absent.

HCSD indicated that additional follow up by CMC was to be provided by July 31, 2005. CMC requested an extension through September 30, 2005 to implement the CAP. Plaintiffs' counsel objected to the lack of diligence and urgency with which both CMC and headquarters have implemented the recommendations in the Suicide Report, citing the 180-day time frame for implementation of the corrective actions included in Suicide Reports.

**Findings:** This inmate's suicide did not appear to have been foreseeable or preventable. There were active efforts to evaluate and treat the inmate at the time of his placement in administrative segregation on the day prior to his suicide. The absence of psych tech notes in the documents provided suggested that notes were made in a log or other document, but they were not included in the UHR. Whether the evaluations were comprehensive cannot be determined. However, given the inmate's behaviors, his involvement with custody staff and observations made by custody staff, it cannot be determined whether he would have reported any suicidal intent, had he experienced it on 06/15/04.

### 13. Inmate E62410

Brief History: This inmate was a 34-year-old Hispanic male who committed suicide by hanging in his single cell in the Willis administrative segregation unit at CMF on 6/17/04. He was a general population inmate who was not receiving mental health services at the time of his death. He entered the CDC via the DVI reception center on 5/6/94, having been transferred from CYA, where he was initially committed on 8/2/90.