On 6/17/04 at approximately 12:58pm a correctional officer conducting a security check in the Willis administrative segregation unit at CMF walked past this inmate's cell and determined that she could not observe the inmate. As she moved closer to the cell she saw what appeared to be the inmate standing by his sink with his hands on the sink and a white noose around his neck that was attached to the air vent above the sink. The officer yelled to the inmate, who did not respond, and activated her personal alarm. A sergeant and additional officer responded and entered the cell, utilized the cut-down tool to cut the noose that appeared to be made from a bed sheet, lowered the inmate to the floor and began performing CPR. An MTA responded and assisted the sergeant in performing CPR. The inmate was subsequently placed on a gurney and taken to the B-1 clinic for medical treatment. Efforts at resuscitation were unsuccessful. The inmate was pronounced dead at 2:23pm. The temperature of his body was noted as 98.6 during his treatment in the B-1 clinic.

The inmate left a letter to his attorney in his property. He asked the attorney to tell his mother that the inmate had gone to heaven and would watch over her. The letter stated it was very important that the attorney tell the inmate's mother that he had been "reading my spiritual book every day and I pray every day. Tell her that I love her very much and my family. Not to worry about me and just let me go to heaven with God and I will watch over my mother and to protect my family." The letter added that the inmate could not write directly to his mother because he did not want to hurt her and he wanted the attorney to tell her for him. He concluded the letter with "at last I am in heaven. Just let me go now. Thank you." An autopsy report done by the Solano County Coroner on 6/18/04 indicated the cause of death was asphyxia due to hanging (minutes). A toxicology report was not provided.

The inmate had no criminal history prior to the instant offense. The instant offense occurred when the inmate and two friends were sitting in front of a house, and the victim approached and began speaking to them. One of the friends, a cousin of the decedent, indicated they should rob the victim. As they walked the victim home, the decedent began punching the victim and knocked him to the ground. The cousin stabbed the victim to death. The inmate was 18 at the time. He told his family about the killing. After he was arrested, he reported that his cousin actually committed the homicide. The cousin, who was a juvenile, was committed to CYA for three years, a girlfriend received probation, and this inmate, the only adult, was convicted of second-degree murder and grand theft. He received a sentence of 16 years and four months to life. He was committed to CYA on 8/2/90 and at the age of 24 transferred to CDC on 5/6/94. During his incarceration the inmate was transferred from DVI to CSP-LAC, SVSP, CMC and eventually to CMF on 3/15/01.

Since age five the inmate had a hearing impairment secondary to an ear infection and an associated speech impediment. He also had lost sight in his right eye due to a car accident. He had a history of marijuana, PCP, LSD and cocaine abuse. Alcohol appeared to be his drug of choice. He began using alcohol at age 15. A psychiatric evaluation in July 1993 described the inmate as having feelings of inadequacy and insecurity, a learning disability and showing remorse for his crime. The transfer

summary of April 1994 from CYA to CDC, however, indicated the inmate's performance in CYA programs was average to sub-standard largely because of his "using his handicaps" to avoid dealing with issues. For example, the inmate would turn off his hearing aid to avoid participating in group discussions. A BPT mental health evaluation conducted in August 1998 described the inmate as having low average intellectual capacity but found no evidence of mental illness. A bus screening conducted when he was transferred from CSP/LAC to SVSP left blank the question about any current mental health problems. He had a second bus screening at the time of his transfer from SVSP to CMC on 9/18/00, which indicated no mental health history, but gave a 'yes' answer to current mental health problems. No referral was generated based on this bus screening.

The inmate had another bus screening when transferred from CMC-East to CMF on 3/15/01. That bus screening indicated no mental illness and no mental health history. Also on 3/15/01, the inmate had a suicide prevention screening. The reason for the screening was not stated. Questions regarding drug or alcohol history on the psychiatric history were both checked yes, and the psych evaluation referral form was also filled out 'yes,' but, again, no follow-up resulted from this screening and referral. On 4/24/01 the inmate self-referred because of "sleeping too much." An evaluation by a psychologist found no Axis I mental disorder with the exception of alcohol and drug use/abuse by history. A psychiatric evaluation on 2/5/02 indicated no mental disorder and noted that the inmate "feels depressed because he has nothing to do." The inmate was seen by a psych social worker on 10/7/02 in the Willis administrative segregation unit because a MTA found a misplaced sick call slip that said the inmate/patient was suicidal. The inmate was referred to a psychiatrist and was seen on 10/9/02. Again, he was determined to have no mental health diagnosis, and no medications were prescribed.

On 5/1/04 a medical report of injury or unusual occurrence noted that the inmate stated he was suicidal in order to get out of a dormitory. The notation indicated the inmate appeared paranoid with bouts of anger, but an administrative segregation chrono written that same date (signature illegible) indicated the inmate reported suicidal ideation because he did not want to go to the J-1 unit because of fears for his life. The mental health staff member concluded the inmate was not suicidal, and the plan was to transfer him to a different unit. On 6/15/04, the CCM on call saw the inmate because he reported being depressed and feeling unsafe from other inmates in the Willis unit. The inmate had received an RVR for battery on an inmate, but it was subsequently thrown out. The inmate reported he believed the "institution" was against him. He was also concerned that other inmates thought he was a snitch because he was moved from J-1 to the Willis Unit on 5/1/04. The note indicated the inmate's sleep and appetite were disturbed, and the inmate asked the CCM to call Investigative Services. The CCM contacted the inmate's classification counselor, who informed her that the inmate had made allegations against custody staff and might have been self-medicating on the day that he was sent to Willis unit. The CCM opined the inmate was experiencing situational stressors and poor judgment but was not an acute risk at that time. The CCM contact of 6/15/04 was the last mental health contact with the inmate prior to his suicide other than daily psych tech rounds made in the administrative segregation unit.

In addition to his hearing, speech and visual impairments, the inmate was also positive for Hepatitis C and had been treated for MRSA (Methacillin Resistant Staff Aurias). This inmate was placed in administrative segregation on three occasions during his ten years of incarceration in CDC, including administrative segregation at CMC in March 2001 for refusing to stand for count and having a bad attitude that continued when he was transferred to CMF on 3/16. He was segregated a second time from 8/6/02 through 12/13/02, when he was placed in the Willis unit while being investigated for gang activity subsequent to a riot. His third placement in administrative segregation, again in the Willis unit, occurred on 5/1/04 because of reported fear for his safety in the J-1 unit. While in the J-1 unit, he requested correctional officers who entered the dormitory unit for a count that he be locked up. He subsequently became disruptive and exhibited bizarre behavior including kicking the holding cell door and refusing to cooperate with custody staff in the J-1 unit. Following medical and psychiatric clearances in the B-1 clinic, the inmate was placed in administrative segregation pending classification review for appropriate program and housing.

This inmate's central file indicated the RVR for battery which precipitated his transfer to the Willis unit was never written or given to the inmate, so no mental health evaluation was requested in connection with the disciplinary process. The description of the inmate's bizarre behavior in the administrative segregation placement note also recorded that the inmate was cleared psychiatrically for placement in administrative segregation. The inmate had a classification hearing on 5/7/04, during which an American Sign Language interpreter was present. Documentation of that hearing indicated the inmate was placed in administrative segregation because the battery charge against a peace officer was being investigated. Some additional annotations on the inmate's behavior and status while in administrative segregation were recorded in the administrative segregation Isolation Log. These indicated that the psych tech made daily rounds in the unit that usually lasted 45 minutes during the week and ten minutes a day on weekends. Lastly, the 6/15/04 clinician's note had the signature cut off of the bottom. The Suicide Report referred to the author as a psychologist, but interviewed staff members indicated the author was a psych social worker.

The Suicide Report identified two problems and associated corrective recommendations:

    Problem 1: The psychiatrist wrote a note on the inmate's admission to administrative segregation that a p.r.n. was to be ordered, but no order was written. The signature on the note was illegible.
    Recommendation: The institution should identify the doctor, find out what happened and form a QIT to devise a procedure to prevent such errors from recurring.

    Problem 2: Psych tech staffing in administrative segregation units was insufficient to allow time individual psych techs adequate contact with inmates to establish rapport and elicit concerns with implications for suicidal behavior.
    Recommendation: The HCSD Suicide Prevention and Response Focus Improvement Team (SPR-FIT) needed to forward a recommendation for increased LPT

staffing in administrative segregation units system-wide to the HSCD Quality Management Committee Mental Health Program Subcommittee.

On 12/13/04, a follow up corrective action plan was submitted by staff from CMF and distributed in a memorandum dated 1/25/05 in response to the Suicide Report of 9/22/04. The CMF response to the first problem reported that a review found that the psychiatrist's order was noted and written by nursing staff. That fact apparently was overlooked when the case was being reviewed. An attachment also indicated that an order for Vistaril 75mg p.o., dated 5/1/04, was written.

In response to the second problem, CMF indicated it needed enhanced psych tech staffing in all administrative segregations unit, but acknowledged that this was essentially a HCSD issue. Minutes were provided of a 1/3/05 SPR-FIT subcommittee meeting at HCSD, which recorded that HCSD was in the process of drafting a proposal to increase psych tech staffing in administrative segregation units, which would be forwarded to the MHQMS.

Plaintiffs' counsel submitted a letter on 10/4/04 on this inmate's suicide, asserting that the corrective action plan inadequately addressed problems identified in the Suicide Report. The inmate's placement in the Willis unit violated a court order prohibiting the placement of mentally ill inmates in the unit. Although the inmate was not technically in the MHSDS caseload at the time of his placement in the Willis unit, he subsequently expressed symptoms of depression to clinicians and should have been placed on the caseload and removed from the unit. The letter also referenced the Suicide Report's documentation of the inmate's reported symptoms during his earlier placement in the Willis unit in 2002, which should have precluded his placement there subsequently in 2004.

The plaintiffs' letter also pointed to the medication order that was apparently neither written nor filled. The MAR was not provided, and it was unclear whether the inmate ever received the medication, although the medication order appeared to have been written in the doctor's orders section. Finally, the letter complained that the CCM contact on 6/15/04

The letter from plaintiffs' counsel also referred to the Suicide Report's documentation of the inmate's decompensation and reported symptoms during his stay in the Willis unit in 2002 as an indication that he should not have been placed in the Willis unit in 2004. The letter also noted that the CCM contact on 6/15/04 should have included a sign language interpreter, and the failure to do so should have been noted and addressed in the Suicide Report. The plaintiffs' letter demanded modification of the Suicide Report in response to these various complaints.

**Findings:** This inmate's suicide did not appear to be foreseeable, but it may well have been preventable had his symptoms of depression and "bizarre behavior" prior to his placement in the Willis administrative segregation unit been thoroughly evaluated and addressed or had he been removed from the Willis unit when evaluated by the CCM on

6/15/04. The Suicide Report indicated the clinician who evaluated the inmate on 6/15/04 was the on-call psychologist, although subsequent review of the documentation indicated the signature was illegible. Staff on site reported that the clinician was a psych social worker. Regardless of the identity of the clinician who saw the inmate on 6/15/04, the inmate displayed signs and symptoms of acute mental illness and reported depression and feelings of being unsafe in the Willis unit. Because the court order in the Gates merger prohibited the placement of seriously mentally disordered inmates in the Willis unit, the inmate should have been placed in alternative housing and more thoroughly evaluated using an interpreter to help determine his mental health needs and appropriate housing.

**14. Inmate E59943**
Brief History: This inmate was a 34-year-old white male who committed suicide by hanging on 6/23/04 in his single cell in the Willis administrative segregation unit at the California Medical Facility (CMF). The inmate was returned to CDC and CMF on 8/06/02 as a parole violator with a new term. He remained at CMF until his death. The inmate's last commitment to the CDC was based on a 6/5/02 guilty plea to vehicle theft and possession of a controlled substance, for which he received a sentence of three years and eight months.

On 6/23/04 at approximately 6:35am, a correctional officer delivering breakfast in the Willis unit to first tier inmates discovered the inmate hanging by a sheet tied to the air vent at the rear of the cell. His feet were suspended approximately two feet above the floor. The officer activated her personal alarm and radioed for assistance. Three officers responded to the cell. These officers cut the inmate down and began CPR. An MTA arrived and staff placed the inmate on a gurney to transport him to the B-1 medical clinic emergency room. While en route two MTAs continued to perform CPR. The inmate was pronounced dead at approximately 6:50am in CMF's emergency room. The autopsy report dated 6/24/04 indicated the inmate's cause of death was asphyxia due to hanging. A toxicology screening was submitted, but no results were reported.

The inmate had a long and convoluted criminal justice history dating back to age 15. He served time in CYA, a county jail and CDC. He was committed to CYA in November 1985 at the age of 16 for burglary and car theft. He was subsequently committed to CDC for assault on another ward in CYA in July 1990. During his CDC tenure, he spent time in DVI, ASP, MCSP, SQ, CMC, CEN and CMF. He was paroled from CDC several times. His last parole in January 2002 from CMF ended with subsequent violations of conditions of parole and new charges that resulted in his return to CMF on 8/6/02. The charges included assault with great bodily injury and use of a deadly weapon, unlawful driving or taking of a vehicle, receiving stolen property, vehicle theft, possession of methamphetamine, possession of a controlled substance and failure to follow his conditions of parole.

Over the years the inmate received a number of health screenings and mental health reception center assessments, which indicated no need for mental health treatment but noted prior treatment for Adjustment Disorder and various descriptions of depression.

He was placed at the 3CMS level of care by reason of medical necessity in February 2003 after reporting to a mental health clinician his depression over the change in his release date from January 2003 to November 2004 because his parole violation and new conviction were running consecutively rather than concurrently. Vistaril and Celexa were prescribed. An IDTT in February 2003 indicated that the inmate's condition was improving with medication and anticipated a transfer to CIM. Two days later, however, the inmate reported that he was feeling depressed secondary to his separation from his wife and having to serve additional time. The inmate remained at the 3CMS level of care until he was removed by an IDDT on 4/29/03, based on his improvement and the determination that his Adjustment Disorder with depressed mood had been resolved. Based on evaluations in April 2003, his depression was diagnosed as in remission and Celexa was discontinued. At the time of his death, the inmate was not involved in the MHSDS and was not receiving any mental health treatment.

This inmate had a number of medical problems including being HIV positive since 1998 (he was receiving anti-viral treatments), seizure disorder secondary to a motor vehicle accident since August 2002, severe traumatic arthritis of the left shoulder, Hepatitis C and diabetes. The inmate was screened for the Developmental Disabilities Program (DDP) in May 2002 and found to have normal cognitive functioning.

The inmate had no further mental health contact until 6/21/05, when he was seen by a psychologist because of a custody referral. He had been found with six padlocks and keys in his possession. These items were considered contraband and potential escape paraphernalia by custody. The psychologist interviewed the inmate and determined that he did not have any suicidal or homicidal thoughts and "appeared almost cheerful and is under no distress." A psych social worker subsequently saw the inmate and apparently mistakenly marked the box on the resulting chrono that indicated the inmate was not psychiatrically cleared for administrative segregation placement. The clinician's note of the contact clearly recorded that the inmate was not currently a participant in the MHSDS. The inmate was placed in administrative segregation on 6/21/04. He was moved to a different cell on 6/22/04, where he committed suicide on the following day. It was noted in the records that he had refused his medical medications for the two days he was in administrative segregation.

The Suicide Report identified two problems and associated corrective actions:

     Problem 1: Documentation for this inmate in different institutions contained numerous errors. Dates, times, signatures, titles, etc. were often missing.
     Recommendation: Because this same issue had been noted in a previous suicide at CMF, future medical and mental health staff meetings needed to address the problem. HCSD also needed to discuss this issue in a future monthly suicide prevention video teleconference.

     Problem 2: Openings in the mesh screens covering air vents in the Willis unit cells were large enough to allow inmates easily to tie something to them. In addition, the placement of the sinks in the cell allowed easy access to the vent.

Recommendation:  All institutions should be directed by Institutions Division to retrofit the vents in administrative segregation cells to prevent something from being tied to them, and CMF should proceed with plans for retrofitting.

In response to the Suicide Report of 10/18/04, CMF submitted a follow-up report on its corrective action plan on 1/31/05.  In its response, CMF indicated that discussions of proper documentation with clinical staff occurred on a regular basis and would continue to occur.  The response reported also that the issue of modification of cell vents was being addressed by headquarters.

**Findings:**  This inmate's suicide did not appear to have been foreseeable or preventable. Nothing in his long history, his own reports or observations made by others pointed to any change in his mental status indicative of an increased likelihood of self- harm. Retrospectively, it appeared that the possibility of receiving a third strike might have precipitated the suicide.  Staff could not, however, have been aware of his distress regarding this issue without some voluntary indication from him.


**15. Inmate W85854**
Brief History: This 23-year-old Caucasian female committed suicide by an overdose of medication while housed alone in an administrative segregation cell at the Central California Women's Facility (CCWF).  Her suicide occurred on 7/1/04.  The inmate was at the 3CMS level of care at the time of her death.  She had been admitted most recently to CDC and CCWF on 1/1/04.

On 7/1/04 at approximately 2:00am, a correctional officer conducting a security check in administrative segregation observed this inmate lying face down on the floor of her single cell.  The officer knocked on the cell door, called the inmate's name, and ultimately went to the sergeant's office to notify the sergeant of the situation.  The sergeant and officer returned to the cell and subsequently ordered an alarm to summon medical and additional custody staff.   The cell was finally opened at approximately 2:18am.  Medical staff, including an MTA and an RN, arrived on the scene at approximately 2:22am, and CPR was initiated.  Emergency medical treatment continued until 2:39am, when EMS personnel arrived via ambulance.  At 2:45am the inmate was determined to be dead by EMS medical personnel.  It appeared that from the time of the inmate's discovery to her death, she was not removed from the cell or tier area to an infirmary or emergency room.

An autopsy and toxicology examination was conducted by the sheriff/coroner's office of the County of Madera on 7/3/04. Toxicology results were received on 7/19/04. Based on the autopsy and toxicology results, the cause of death was determined to be an overdose of Olanzapine.  The toxicology results indicated Olanzapine levels of 863mg/ml (potentially toxic greater than 250mg/ml).

The inmate had a considerable adult criminal justice history.  Her first incarceration in CDC was on 8/8/00 at CCWF on a two year-sentence for receiving stolen property.  She paroled on 4/16/01 from CIW.  She was returned for her second incarceration on 6/23/03

due to revocation of parole. She paroled again on 11/1/03. She was arrested on 11/30/03 for second-degree burglary. Another two-year term was imposed, which she began serving on 1/1/04.

She also had a juvenile history from the age of 13, including arrests for burglary, vehicle theft and battery, as well as a restraining order involving family members. She had a history of prior substance abuse including methamphetamine, marijuana and alcohol.

This inmate's disciplinary record during her last incarceration included several RVRs. She received a RVR on 2/25/04 for "arcing to light candle" related to her attempting to light a candle in the laundry room. She received a RVR on 3/19/04 for battery on a peace officer on the way to a medical appointment. She appealed the guilty finding on that RVR, but the appeal was denied. She received a nine-month mitigated SHU term with placement in administrative segregation from approximately 3/19/04 until the time of her death on 7/1/04.

She received two RVRs in May 2004 for breaking her cell window. There was a question as to whether she broke the window with her foot or head. Her last RVR was on 6/6/04 for battery (spitting) on a peace officer. These RVRs were pending at the time of her death. The district attorney had decided to prosecute her for the 6/6/04 battery on a peace officer as of 6/28/04, although staff reported that the inmate had not received notification of that decision prior to her death.

The inmate had two mental health evaluations in connection with the June RVRs. The resulting mental health assessments were completed on 6/18/04 and 6/25/04. The first found that her behavior was not attributable to her mental illness but she had poor coping skills, difficulty controlling her anger and limited tolerance for stress. The second evaluation indicated that her disorder had contributed to her behavior without further explanation.

Her history of mental health treatment while in CDC included two admissions to a MHCB unit and treatment at the EOP level of care. She was initially was placed at the EOP level of care in August 2003. She remained at the EOP level of care through October 2003. She had a history of cutting her wrists and head-banging as reflected in records from her placement in an MHCB from 10/25-27/03, immediately prior to her parole on 11/1/03.

Upon her return to CDC two months later on 1/1/04, she was placed at the 3CMS level of care at CCWF. While being treated at the 3CMS level of care, she engaged in a series of self-injurious incidents. She attempted to cut her wrists on 2/17/04. A treatment plan dated 3/29/04 gave diagnoses of Methamphetamine Dependence and Borderline Personality Disorder. Treatment was to be targeted at her poor coping skills and anger management. She had superficial scratch marks on both arms on 5/21/04. She was placed on "observation status" in administrative segregation after she broke the window of her cell on 5/26/04. That status was discontinued after 6/1/04, but no housing change occurred. She continued to be housed in administrative segregation after 6/01/04 as a

regular administrative segregation inmate without special precautions. After the discontinuation of observation status on 6/1/04, she attempted suicide by hanging on 6/6/04. A suicide note indicated that she was sorry, but she could not keep on living this way; she hated her life and did not understand why she was the way that she was. Subsequent to that attempt, she was sent to a community hospital where she remained for nine days.

As a result of that serious suicide attempt, the inmate was hospitalized at University Medical Center (UMC) in Fresno from 6/6-15/04. On her return to CCWF, she was admitted to the MHCB unit for roughly nine days. Provided records did not contain any information on her stay in the MHCB from 6/15 through approximately 6/24/04.

She was discharged from the MHCB on anti-psychotic medications but with no orders for anti-depressant medications. She was seen for five days of follow-up contacts from 6/25-29/04 that indicated she was adjusting appropriately but had medical complaints.

She reported difficulty breathing on 6/25, 6/26, 6/27 and 6/30/04 and was seen in the ER on at least two occasions. She was provided with two inhalers. She was also scheduled for x-rays, medical follow-up and psychiatric follow-up.

The inmate's last mental health contact was on 6/30/04, the day before her death. It occurred at cell-front because she was not feeling well and did not want to come out of her cell. She was reported as having no complaints or issues with the exception of an irritable mood. Her medications included Olanzapine and Albuterol (an inhaler for her breathing difficulties), and her Paxil and Trazodone had not been discontinued but did not appear to have been given after her suicide attempt of 6/6/04.

Although treated at the 3CMS level of care at the time of her attempted hanging, the records did not document that she was considered for a higher level of care, such as EOP or DMH. Reviewed records did not indicate that SRAs were conducted when she was placed on "observation status" in administrative segregation or after her attempted hanging precipitated admission to a MHCB and external hospitalization. Further, her anti-psychotic medication was continued, but her anti-depressant medication was discontinued without clear indications to the reasons.

In April 2004, the inmate requested multiple medical appointments because of various pains in her chest and for an HIV test. She received a brief intervention of prednisone secondary to her difficulty breathing after returning from UMC Fresno on 6/15/04. The inmate was noted to have been abusing the inhalers of Albuterol and Azmacort, which were provided to her secondary to her breathing difficulty. An order was written to take the inhalers away from her on 6/30/04 and have them nurse-administered, although no entries in the MAR reflected removal of the inhalers. No inhalers were found in her property, nor did any available documentation indicate that nurse-administered inhalers were provided.

Although the inmate overdosed on Olanzapine, her dosage was just 20mg per day while in administrative segregation, a setting in which she would have had limited contact with other inmates.

The Suicide Report identified six problems and associated recommendations:

Problem 1:  There was an 18-minute delay in the emergency response after the inmate was discovered lying facedown on the floor of her cell.
Recommendation:  CCWF should conduct a fact-finding inquiry and both institutional and HCSD Emergency Response Review Committees should conduct a review and make appropriate recommendations.

Problem 2:  Faulty emergency equipment (defibrillator) may have added to the delay in the emergency response.
Recommendation:   Procedures for regular equipment checks and maintenance needed to be reviewed.

Problem 3:  The inmate was not improving at the 3CMS level of care and should have been evaluated for a higher level of care.  The combination of prominent Axis II features and the chronic presence of depressive symptoms presented a challenge to clinicians.  This combination possibly interfered with clinical judgment in the administration and analysis of SRAs.
Recommendation:  Mental health clinicians needed training in evaluating the need for increasing levels of care, including the suicide risk potential of co-morbid Axis I and Axis II disorders, consideration of counter-transference issues and differentiating between Bipolar Disorder and Borderline Personality Disorder diagnoses.

Problem 4:  Once identified as a danger to herself, the inmate was not placed in a closely supervised mental health setting, such as a MHCB unit.  Placement on suicide precaution in the housing unit is a violation of CDC Suicide Prevention Policy.
Recommendation:  The institution needed to conduct an investigation of this issue, review with all staff the department's relevant Suicide Prevention Policy and provide appropriate training.

Problem 5:  On the mental health assessment form dated 6/25/04 for the RVR process, the clinician indicated positively that the inmate's mental disorder contributed to her behavior but did not explain the answer as required and did not recommend any mitigation.
Recommendation:  A supervisor should ensure that the clinician involved is properly counseled and trained on this issue.

Problem 6:  The inmate was in a MHCB from 6/15-24/04, but no inpatient record was in her UHR for this crisis bed stay.
Recommendation:  A QIT should be formed to develop a responsive plan to ensure that UHR filings are current and complete and audits should be conducted with the results provided to demonstrate compliance.

The Suicide Report was dated 9/28/04. Institutional corrective responses to the Suicide Report were provided on 1/7/05 and 5/24/05. In the first response, while CCWF staff indicated that a medical response time of five to seven minutes was appropriate, the institution had initiated a category-two investigation into the circumstances surrounding this case. The facility also reported that the defibrillator used in this instance was not defective. Rather, staff had placed electrodes on a patient with no sinus rhythm and, in its absence, the AED would not deliver defibrillation. Materials and a signed IST attendance sheet for training in procedures for considering and referring for higher levels of care, evaluating the suicide risk potential of co-morbid Axis I and Axis II disorders, consideration of counter-transference issues and differentiating between Bipolar Disorder and Borderline Personality Disorder diagnoses were also provided.

In response to CCWF's initial rejoinder, HCSD required on 3/30/05 a follow-up report to include a copy of the warden's memorandum on the fact-finding inquiry regarding the custody response, a copy of the EERC minutes on the response, documentation of training on ER equipment maintenance and checks, documentation of the investigation into the placement of a suicidal inmate in a non-mental health unit, documentation of participation in the recommended Suicide Prevention Policy training and information on the charter of a QIT regarding timely UHR filings.

CCWF's second follow-up report on 5/24/05 provided additional documentation was complete with the exception of information on the pending investigation into the emergency response.

**Findings:** This inmate's death appeared to have been both foreseeable and preventable. She had a history of mental illness and suicide attempts and, on one occasion, was placed inappropriately on observation in an administrative segregation cell because of behaviors dangerous to self or others.

Although the inmate had been in an MHCB shortly before her death and the subsequent five days of clinical follow-up were appropriately provided, a referral to a higher level of care apparently was never considered. The inmate had been at the EOP level of care during a previous incarceration and had a number of stressors clearly known to staff, including medical complaints of difficult breathing, psychiatric complaints of depression and suicidal ideation, a suicide attempt by hanging that required outside hospitalization, discontinuation of her anti-depressant medications, the potential for a third strike for the battery on a peace officer and/or the possible imposition of another SHU term were all factors that should have alerted mental health and custody staff alike to the potential for further self-destructive behaviors.

In addition, the absence of information and documentation on the inmate's MHCB stay impeded the ability of clinical staff to manage her care and treatment after her discharge from the MHCB unit. Further, the lethal dosage of Olanzapine reported in the toxicology report following her death would have required the hoarding of over 40 days of her daily

20mg dosage of the drug, an issue that was not even addressed in the Suicide Report's list of problems and corrective actions.

Finally, the emergency response by custody staff on discovering the inmate apparently resulted in a substantial delay in the initiation of CPR, possibly a significant and preventable contributor to the inmate's successful suicide.

## 16.  Inmate K59858

Brief History:  This inmate was a 36-year-old Hispanic male who committed suicide by hanging on 7/4/04 at approximately 8:55am at Mule Creek State Prison (MCSP).  The inmate was receiving services in the EOP program.  His cellmate notified staff that the inmate was hanging.  The inmate entered CDC on 7/15/97 via the reception center at NKSP.

The inmate was discovered by his cellmate when the cellmate returned from group therapy.  There was some discrepancy in the actual timeline in the documentation. The Incident Reports indicated the cellmate began to yell "man down" at 8:55am on 7/4/04. The preliminary summary written by a psychiatrist stated the time of death as 8:45am, an approximate difference of ten minutes.

Reports filed by the involved officers indicated that two correctional officers arrived at Building 6 in Facility B, a SNY, in response to a man-down alarm.  The officers reported they found the inmate on his back and unresponsive on the cell floor and a sheet was hanging from the air vent.  The cellmate had just returned from an EOP group, discovered the inmate and yelled "man down."  The cellmate reported to a MTA that he found his cellmate hanging in their cell, at which time he held the cellmate's legs, pulled the sheet from his neck and lowered him to the floor.  A medical code was called and the fire department and an ambulance were summoned.  The records indicated that CPR was not begun by first responding officers, who waited until medical personnel arrived at the cell.

The cellmate subsequently reported that when he lowered this inmate to the floor he thought the inmate might still be breathing, but when staff arrived within a few seconds they did not initiate CPR or take vital signs.  The cellmate reported that vital signs were not taken for about ten or 15 minutes until medical staff arrived.  A note dated 7/4/04 written by an MTA stated that, upon primary assessment, he found the inmate "unresponsive, with shallow respiration, and a faint pulse...urine and feces noted on garments."

The inmate was subsequently transported to the emergency room.  CPR and respiratory support via an Ambu bag were started while en route to the emergency room.  The MTA's report was not present in the documents provided.  The Suicide Report referred to a request for the report, but it had not been received from MCSP at the time of the Suicide Report.

Notes written in the emergency room indicated the inmate arrived at 9:02am, and registered nurses "initiated" support via an Ambu bag and initiated CPR. The inmate was subsequently transferred to Sutton Amador Hospital, where he arrived at 9:55am. He was pronounced dead at 9:59am. An autopsy report by the Amador County Office of the Coroner, dated 7/6/04, indicated the cause of death as asphyxia (minutes), due to hanging (minutes). Toxicology screening revealed no alcohol or illegal drugs in the sample. The report was silent relative to psychotropic medications.

This inmate entered CDC on 7/15/97 having been found guilty of four charges of lewd acts by force upon a child under 14. The inmate received eight years for each of these counts, which were to run consecutively, resulting in a 32-year sentence. On arrival at CDC in the reception center at NKSP in July 1997, the inmate had a mental health screening and was cleared for general population. The inmate did not report, as has been reflected in other records, that his mother may have committed suicide.

In November 1997, the inmate had an INS hold placed on him. He was endorsed for a SNY placement based on his fears for his safety. Also in November 1997, a CCM referred the inmate to the SVSP MHCB because of depressed mood and suicidal ideation with plans to kill himself if he had to go back to court and face 17 additional counts of child molestation.

In the November 1997 interview with the CCM, the inmate admitted a history of multiple suicide attempts and a plan to cut his wrist, and also disclosed his mother's suicide in August 1983 by shotgun. His diagnoses at that time were rule out Major Depression and Adjustment Disorder NOS with a notation that the inmate was suicidal. The inmate also reported that a brother had attempted to commit suicide and that he had been sexually abused by his father and forced to have sex with his sisters. An MH-2 was completed in November 1997 with the same diagnoses shown above, but the inmate's GAF score was estimated at 27 by a social worker, 29 by a psychologist, and 64 by a psychiatrist. Antidepressant medication (Zoloft) and Benadryl were started at that time, and Haldol was subsequently added to his medication regimen. Prior to his discharge from the MHCB, the inmate's Haldol was decreased and he was placed at the 3CMS level of care. Although improved, the inmate was noted to have demonstrated vegetative signs of depression as well as suicidal ideation, and his diagnoses were revised to Major Depression, recurrent, Pedophilia and Borderline Personality Disorder, with a GAF of 50.

In December 1997, the inmate reported he no longer wanted to take psychotropic medications and signed a refusal slip. He was to have a follow-up by a psychiatrist within one week. There was no documentation in the record of whether the follow-up visit occurred. One stressor identified by the inmate was an anticipated court hearing in December 1997 that appeared to have been related to a loss of parental rights. He waived his right to be there and, therefore, did not have to attend. The inmate was seen for his 90-day follow up contacts by a CCM in March and August 1998, the latter some two months late. The inmate's condition was noted to have continued to improve. By December 1998, he had a GAF of 75 and was recommended for removal from the MHSDS.

He did not come to the attention of mental health staff again until September 1999, when he reported fears for his safety from other inmates. He was admitted to the SVSP MHCB with a diagnosis of Psychosis NOS and a GAF of 22. At that time, he was noted to be paranoid with delusions of telepathy and possible hallucinations. He was prescribed Zyprexa and placed on suicide precautions. He stabilized and was discharged from the MHCB to the EOP level of care with a diagnosis of Major Depressive Disorder with psychotic features and a GAF of 45. He remained in the EOP program at SVSP from October 1995 until his transfer to SATF at the 3CMS level of care in January 2000.

The change in level of care from EOP to 3CMS appeared to have been made to facilitate his transfer to a SNY. Some difficulties in medication compliance and administration emerged in February 2000, when the inmate reported he would like to stop taking psychotropic medications so he could work. In June 2000, however, he complained that he was not getting his Zyprexa and was having difficulty thinking. The record indicated the inmate's order for Zyprexa had been discontinued in May 2000. In July 2000, Zyprexa and Zoloft were reordered, but approximately three hours later his Zyprexa was discontinued by the same psychiatrist who had re-ordered it along with Zoloft on that same day.

In October 2000 the inmate had an IDTT. An MH-2 and MH-4 were completed. The notes indicated the IDTT was held in absentia. The diagnosis and plan were based on UHR review alone. The diagnosis at this time was rule out Pedophilia with a GAF of 65. The inmate remained at the 3CMS level of care and was seen by a CCM.

In March 2001 he was referred to a psychiatrist, but he did not show up for the appointment, and there was no indication that it was rescheduled. He subsequently reported that, although he was doing fine without medication, he had some depression. His level of suicide risk was estimated as low, although no SRA was performed.

Roughly two month later, this inmate had his third MHCB admission. In May 2001, he presented with abdominal pain and was subsequently diagnosed with Depression NOS with psychosis and placed on suicide precautions. He was seen by a psychiatrist who prescribed Zyprexa and Thorazine based on the inmate's agitated depression and nihilistic thoughts. At that time, the inmate's risk for suicide was estimated as high, but again no SRA was included in the documents provided. He was noted to have little insight into his mental illness and was referred to the EOP level of care. A psychiatrist subsequently noted the inmate had delusional thinking and suicidal potential because he stated he wanted family members to be notified in case of his death and indicated he should be buried alive because this was a "family tradition." The inmate was discharged from the MHCB unit in June 2001, placed at the EOP level of care and prescribed Zyprexa and Paxil.

Despite the inmate's endorsement for an EOP level of care and transfer to CSP/Lancaster, his assigned CCM erroneously believed the inmate was 3CMS and did not see him weekly as required in the EOP program. The inmate apparently did not have CCM

appointments for approximately two months until December 2001, when his medications were renewed by a psychiatrist, who found him to be stable. The inmate participated in EOP programming from January through April 2002, but requested a return to 3CMS and reportedly stopped taking psychotropic medications.

He continued to experience delusions about his food being drugged or tampered with and thought that prison officials would sell his body parts after his death. He was also noted to be showing more evidence of depression with suicidal ideation, but no SRA was apparently conducted during his appointments with CCMs and psychiatrists or in connection with IDTT meetings. His condition continued to deteriorate. He reported he had been hording medications in August and September 2002. A cell search revealed horded medications, which were removed. In September the inmate's Benadryl was discontinued by a psychiatrist. It was noted that the inmate was involved in a mutual combat incident with his cellmate in November 2002, but he did not receive an RVR.

Eventually, the inmate was endorsed for the SNY at MCSP and transferred on 1/9/03. He continued on Zyprexa and Paxil, but requested and obtained a decrease in both medications shortly after his arrival at MCSP. New diagnoses of Alcohol Dependence, Cocaine Dependence and Antisocial Personality Disorder were added after his arrival at MCSP. The inmate had a SRA that noted his risk for suicide was "none to minimal." He participated in EOP programming. His symptoms of depression appeared to wax and wane over time. He was evaluated as generally stable. His dose of Zyprexa was further decreased. He made inquiries relative to changing his level of care to 3CMS with a plan by staff that the change would be considered after some additional time in the EOP program. Despite the inmate reporting "odd ideas," which appeared to be delusional in content, along with levels of increased anxiety, his level of care was changed to 3CMS in May 2003.

The Suicide Report indicated that the change in level of care appeared to be based on the inmate's request and his CCM's imminent departure from the unit, rather than on his clinical picture. In June 2003, his medications were discontinued by a psychiatrist after the inmate reported he had not been taking them for one week. In September, the inmate was reporting physical pain. He was referred by custody staff to mental health because he refused medical attention. The inmate reportedly denied suicidal ideation but agreed to be placed back on Zyprexa and to start Remeron. At that time, the CCM noted that the inmate had visibly deteriorated without medication and also noted his non-compliance with the newly ordered Zyprexa and Remeron. The inmate was subsequently transferred back to the EOP level of care on 9/29/03, with diagnoses of Disassociative Disorder NOS, Depressive Disorder NOS, rule out Psychotic Disorder, Polysubstance Dependence and Personality Disorder NOS, with a GAF of 49. He was noted to have a minimal risk of suicide at that time. In October 2003, his medications were renewed, he participated in EOP programming and he was monitored for suicidal ideation. A psychiatrist noted in December 2003 that the inmate was improved and reported he was not hearing voices telling him to kill himself, which he had heard in the past.

In March 2004, the inmate was still participating in EOP programming.  Notwithstanding the problems in September 2003 just described, progress notes indicated that he had not had any psychotic symptoms for the past 12 months.  The inmate had an IDTT meeting in April 2004 and was given a diagnosis of Major Depressive Disorder with psychotic features in Remission with medications.   The other diagnoses listed above were continued at that time.

In June 2004, his Paxil was reordered and Remeron was discontinued because of weight gain.  At that time, the dose of Zyprexa was once again lowered by a psychiatrist.  Based on improvement as noted by the psychiatrist, his Zyprexa was lowered once more a week later, and his CCM noted "great improvement."  Based on continued improvement, on 6/29/04, a psychiatrist discontinued the inmate's Zyprexa and maintained his Paxil.

The inmate had an IDTT meeting on 7/1/04.  He was continued at the EOP level of care. It was noted that he was compliant with his medication and was participating in the EOP program.  His medications at that time were Vistaril and Paxil.  He was not on an anti-psychotic since Zyprexa had been discontinued on two days earlier.

The Suicide Report made reference to the omission of SRAs performed during the course of the inmate's treatment.  With the exception of one SRA in January 2003, clinicians repeatedly failed to administer SRAs despite constant changes in his level of care and his history of suicidal ideation and attempts.

Review of the records also suggested that MCSP staff may have reviewed only Volume II of this inmate's extensive UHR and, therefore, were unaware of some of his earlier functioning problems, particularly with regard to medication compliance and symptoms.

The Suicide Report identified two problems and associated corrective recommendations:

Problem 1: Conflicting documentation of and reports on the emergency response raised questions about whether life support measures were administered in a timely manner

Recommendation:  The institution should conduct an investigation into the emergency response.

Problem 2:  The recently revised and expanded SRA checklist was never used for this inmate.  Its use might have focused the attention of staff on a chronically present moderate to high risk of suicide for this individual.

Recommendation:  Staff training was needed on the use of the SRA Checklist in the intake procedure for all mental health inmates and at other appropriate times. Training should include the need for reviewing prior records including previous volumes of the UHR and central files to obtain complete information.

MCSP provided a follow-up response on 12/31/04 to the Suicide Report that was dated 9/28/04.  The response indicated that the warden had initiated an investigation of the emergency response in the case on 12/17/04, which was still in progress, and that training

on the use of the SRA Checklist was conducted on 11/30/04. The training agenda and sign-in sheets were provided.

This inmate's death was reviewed on site by one of the <u>Coleman</u> monitors, who noted the inmate's regular pattern of extreme depression and psychotic symptoms followed by medication compliance and participation in treatment activities. References to some of the suicide risk factors were noted, including two important July anniversaries for the inmate. The monitor's review also raised questions about the timeliness and nature of the emergency response.

**Findings:** This inmate's death did not appear to have been foreseeable because he did not report suicidal thoughts or plan in the days immediately prior to his suicide. His death, however, might well have been prevented if SRAs had been administered during the frequent periods when he was symptomatic and non-compliant with his medications or in an MHCB. Moreover, if information about his suicidal history and his cyclical pattern of recovery and decompensation been documented and communicated by MCSP clinicians, effective intervention might have occurred. He also had documented periods of hoarding medication, along with wide variability in his diagnoses and GAF scores over time. Last, the emergency response to this inmate's hanging and the failure of the first responders to initiate CPR promptly may also have contributed to this inmate's completed suicide. Documentation indicated he had evidence of respiration and a pulse after he was discovered. Prompt emergency interventions might well have supported a successful recovery.

## 17. Inmate T69011

Brief History: This inmate was a 22-year-old Filipino male who completed suicide at Folsom on 8/4/04. He was single-celled in the administrative segregation unit when he completed suicide by hanging. At the time of his death, the inmate was in general population at Folsom and was not receiving mental health services.

At approximately 2:30am on 8/4/04, two correctional officers conducting an institutional count discovered the inmate hanging by a sheet tied to the top bunk in his cell. Artificial respiration was attempted and the inmate was transported by gurney to the Folsom clinic; full CPR, however, did not begin until after the inmate's arrival at the clinic. A paramedic pronounced the inmate dead at approximately 3:10am.

An Autopsy Report indicated the cause of death was asphyxia by hanging and the manner of death was suicide. The postmortem toxicology screen was positive for caffeine, but did not reveal any alcohol, medications or illegal drugs. The inmate left a suicide note addressed to his family, indicating his feelings of hopelessness and stating that "this life is no life." He thanked his family for their support, expressed sorrow for all he had done and asked their forgiveness.

This was the inmate's first incarceration in the CDC system and his only known criminal history. He had been charged with 108 felony counts, which consisted of 54 counts of

possession of explosive devices and 54 counts of possession of explosive devices with intent to injure persons or personal property. All but two of the counts were dismissed and the inmate received a seven-year sentence on 10/1/02. The inmate was admitted to the reception center at SQ on 10/4/02 after his conviction and transferred on 11/27/02 to Folsom. Reports indicated that the inmate had expressed a desire to surpass the Columbine High School killings, but following his incarceration he was reportedly a model prisoner.

The inmate was out to court from 5/11/04 thru 6/28/04. During this time, the appellate court decided that the dismissal of the inmate's other 106 felony counts had been inappropriate and a new sentence of 80 years was imposed on 6/23/04. The inmate was returned to Folsom on 7/8/04, where he was reclassified and endorsed for transfer to a Level IV prison. The inmate was placed in administrative segregation on 7/14/04 and was awaiting transfer to CSP/Corcoran or HDSP when he killed himself.

The inmate had been in the county jail for approximately 17 months prior to his admission to CDC. His diagnoses in the county jail included Major Depressive Disorder and Borderline Personality Disorder with a GAF score estimated at 50. The inmate experienced suicidal and homicidal thoughts, and even wrote a suicide note, while in jail. He was treated with Paxil, Wellbutrin and Benadryl in jail and his condition reportedly improved. These medications were continued, with an increase in Wellbutrin, while the inmate was in the reception center at SQ. The inmate missed his medications for approximately the first five days after his arrival in CDC.

Despite reported improvement through the use of anti-depressants, the inmate began refusing medications in December 2002, shortly after his arrival at Folsom. These refusals were noted by a MTA, who referred the inmate to a psychiatrist. The inmate did not, however, receive a timely psychiatric follow-up evaluation due, in part, to an institutional lock-down; the psychiatrist did not go to see the inmate on his yard during the lockdown period, although the inmate was seen by a case manager during this time. The inmate also failed to attend several scheduled appointments in December 2002 and January 2003. It appeared that the inmate's medications expired in early January 2003. The inmate remained at the 3CMS level of care for one year after the expiration of his medications and reportedly was stable.

The inmate's pre-trial mental health evaluations reported a four-year history of depression as well as the inmate's plans for committing suicide while in jail. Other records indicated that his depression actually began in childhood. There were also references in the inmate's file indicating that he hoped he would be discovered prior to implementing his plans for mass murder.

During his incarceration, the inmate was a tutor in English for other inmates. His DDP evaluation in October 2002 indicated normal cognitive functioning. The inmate did not report a history of significant alcohol or drug abuse. A MH-2 completed on 1/15/03 indicated that the inmate was stabilized off medications. His diagnoses were given as Major Depressive Disorder Single Episode and Rule Out Personality Disorder NOS, with

78

a GAF of 65. The MH-2 included signatures by the case manager and psychiatrist, although there were repeated notes by the psychiatrist who rescheduled the inmate's appointments because of lock-downs or fog. The inmate's last IDTT meeting was held on 2/27/04, at which his diagnosis was given as Major Depression in Full Remission, with a GAF of 90. A related chrono indicated that the inmate should be removed from the MHSDS. The records showed that the inmate had a classification hearing on 7/22/04, after having been placed in administrative segregation, with "terrorist threat" as the documented reason. The clinician noted "no mental health issues, or medical issues." The segregation log indicated that the inmate was seen by a psych tech while in administrative segregation from 7/14 through 8/3/04, the day prior to his death. This inmate had been treated with INH and Pyridoxine from July 2003 through January 2004 as prophylaxis for tuberculosis.

The inmate's Suicide Report, dated 9/28/04, identified three problems and recommended corrective actions for each of the problems as follows:

Problem 1: This 3CMS inmate did not receive a mental health assessment for 48 days after his arrival at Folsom, although the program guides required an assessment within five days.
Recommendation: The Suicide Report recommended that the institution provide documentation that the program guide timeline of five days has been met for at least 85% of the mental health assessments for arriving inmates during the past six months. If not, the institution should provide documentation on the steps undertaken to correct the deficiency.

Problem 2: The inmate refused his medications from the time he arrived at Folsom until his prescription expired 38 days later. The psychiatrist docketed the inmate three times for appointments, but the inmate was not seen reportedly because Folsom was on lock-down, and the psychiatrist never went to the inmate's housing unit to see him.
Recommendation: The psychiatrist had been counseled in June 2004 by the chief psychiatrist about seeing no-shows and reportedly had started to go to the housing units to see chronic no-show inmates. The institution needed to document that this practice was maintained.

Problem 3: The inmate returned from court under obviously stressful circumstances, with a drastically increased sentence resulting in an endorsement to Level IV.
Recommendation: Folsom should form a QIT to establish a mechanism for referrals to mental health of inmates returning from court with significantly altered case factors.

In response to the 11/12/04 Suicide Report, Folsom staff prepared a follow-up report on recommendations flowing from this inmate's suicide on 4/15/05. As for the first problem, a promptly organized QIT audit of MH-4s prepared of 17 newly arrived inmates found 82.4% compliance with the five-day timeline. Another QIT, chartered on 11/3/04, demonstrated that the 85-percent compliance target was met during the preceding six

months. The QIT planned to continue auditing the timeliness of mental health assessments for new arrivals. A QIT meeting on MH-4s was scheduled for 3/24/05.

With regard to the second problem, Folsom's response indicated that the facility was not on lock-down status when the psychiatrist failed to see the inmate who was a repeat no-show. The inmate was eventually seen in the psychiatrist's office on 3/5/03. According to the psychiatrist, the inmate refused his medications and the psychiatrist then discontinued them; the inmate's medication did not expire. While the psychiatrist who was counseled went as directed to see no-show inmates in their housing areas after June 2004 as ordered, psychiatrists did not routinely do so. Although Folsom was on several extended lock-downs from November 2004 to February 2005, the institution asserted that the senior psychologist was able to ducat the majority of inmates scheduled for appointments.

In response to third problem, Folsom reported that a QIT was chartered on 11/3/04 to address mental health referrals for inmates returning from court with drastically altered case factors. A memorandum was issued by the Associate Warden with modifications to the initial housing review form that required the questioning of inmates returning from court on any revisions to their sentences or legal status that might have occurred. This new form reportedly was put into effect on 3/22/05. A number of documents supporting the described responses were attached to the Folsom follow-up report.

**Findings:** This inmate's suicide did not appear to have been foreseeable because he failed to communicate suicidal thoughts or intent to staff. The inmate's bus screening on his entry to Folsom indicated that he had been treated for mental illness earlier, but he was then feeling well. The inmate's death, however, might have been prevented if he had received a more comprehensive screening when placed in the administrative segregation unit. His records indicated the inmate had not been involved in the MHSDS since early 2003. Policy required the administration of a mental health screening for inmates placed in administrative segregation who were not on the MHSDS caseload and had not received a screening within the previous year. Finally, while rescue breathing was begun while the inmate was transported to the Folsom clinic, CPR was not initiated until after the inmate's arrival at the clinic.

## 18. Inmate H49594

Brief History: This inmate was a 35-year-old Hispanic male who completed suicide at California Men's Colony (CMC) on 8/4/04. He was single-celled in the Transitional Living Unit (TLU) in CMC-East where he completed suicide by hanging. The inmate was treated at the EOP level of care at the time of his death. The inmate was admitted to the CDC system via the RJD reception center on 9/24/92.

According to institutional records, a correctional officer conducting a security check in the TLU at approximately 11:13pm observed the inmate hanging from a noose made from a bed sheet and tied to the steel mesh on the inside of the cell door window. The inmate was hanging with his face and upper torso facing the cell door, his head

approximately seven inches below the food port and his feet extended behind him towards the center of the cell. The officer called the control booth and requested an emergency transport vehicle. At approximately 11:14pm, the control booth contacted the fire department and requested the vehicle. The sergeant and an additional officer responded to the emergency, but the cell door could be opened only a few inches. The officer retrieved the cut-down tool and the sergeant reached into the cell, cut the sheet above the inmate's head and removed the noose from the inmate's neck. The inmate was taken from the cell, and CPR was initiated by the sergeant and officer. The incident report noted that the sergeant and a registered nurse provided compressions and ventilation. At 11:17pm, the emergency transport vehicle arrived. The fire department continued to perform CPR on route to the emergency room. The transport vehicle arrived at the emergency room at approximately 11:24pm and life-saving measures were continued without success. A physician pronounced the inmate dead at 11:59pm.

An Autopsy Report dated 8/5/04 indicated the cause of death as asphyxia by hanging. The postmortem toxicology screen found that the inmate had a blood level of 219mg/mL of mirtazapine, which was above the affective range of five to 90mg/mL and below the potentially toxic range of 300mg/mL or more. The report also found multiple superficial incised wounds on both of the inmate's forearms. The Suicide Report noted that the inmate had written a number of words and letters in blood on the walls of his cell, including "pride," "respect," "loyalty," "CDC" and possibly "M", which may have explained the superficial lacerations on his forearms.

The inmate had a history of minor arrests for public drunkenness, but this appeared to be the inmate's first incarceration in CDC. The inmate was serving a sentence of 28 years to life on charges of murder in the first degree and assault with a firearm. His conviction grew out of an incident in which he shot his supervisor and killed an assistant supervisor at his place of employment. According to the records, the inmate stated to police that he had been carrying a weapon to his job for two days, waiting for an opportunity to kill his supervisor and assistant supervisor because they were "harassing him." The inmate reportedly told witnesses he would shoot at the police so they would kill him as a "suicide by cop" death.

The inmate reported that he had a history of alcohol use, beginning at approximately six years of age, and of aggressive and violent behavior when intoxicated. He also reported a history of methamphetamine use, starting at around age 18, and admitted to using PCP. The inmate had been physically abused by both parents and had a positive family history for mental illness. The inmate gave a different mental health history, along with his drug and alcohol history, to different examiners. He reported having mental health problems as an adolescent, which included talking to himself, experiencing racing thoughts and hearing "God's voice"; he also reported being suicidal when he was ten. The inmate claimed he heard voices before the instant offense and, in a different evaluation, indicated that he had attempted suicide 20 times. The inmate indicated that he joined a street gang in high school. He claimed that he left the gang prior to the instant offense but that, while a member of the gang, he carried a gun and participated in drive-by shootings.

In January 1992, while in a detention facility prior to his incarceration in CDC, the inmate was diagnosed with a Paranoid Delusional Disorder; that diagnosis was changed to Atypical Psychosis versus Malingering in March 1992. After his admission to CDC, the inmate was diagnosed at RJD with Undifferentiated Schizophrenia. In addition to Schizophrenia, the inmate's medical records reflect a number of other diagnoses, including Schizoaffective Disorder, Malingering and Methamphetamine Dependence. The inmate was treated most consistently with Paxil, but his medication regimen had included Olanzapine, Seroquel, Benadryl, Depakote, Pamelor, Elavil, Trilafon, Desyrel, Navane, Lithium and Remeron.    The inmate's most recent Keyhea order was dated 1/6/04, with an expiration date of 7/4/04.

The inmate was treated primarily at the EOP level of care. He was, however, transferred to the 3CMS program for a brief time and returned to the EOP level of care on 2/5/02. His symptoms at the time included depression, paranoid and grandiose delusions, suicidal ideation, suicide attempts and other self-injurious behaviors. On 4/15/02, the inmate was transferred to ASH, where he remained until 11/1/02. He was discharged from ASH to CMC-East and placed initially in the locked observation unit (LOU), where he reported hallucinations, racing thoughts and mood lability, as well as flashbacks from childhood involving abuse by his father, mother and siblings. Staff questioned whether his psychotic symptoms were "real," given that he had been able to function well in the therapeutic milieu at ASH.

A psychological evaluation, performed in April 2003, provided diagnoses of Adjustment Disorder with depressed mood, Methamphetamine dependence, Alcohol dependence, and Mixed Personality Disorder with antisocial, borderline and paranoid features and a GAF score of 50. As part of this evaluation, psychological testing concluded that the inmate did not show elevated scales consistent with his reported symptoms of psychosis. The evaluation recommended that the inmate be maintained at the EOP level of care, but indicated that he would be appropriate for 3CMS care "when his risk for self harm decreases."

The inmate did not remain stable and was admitted to different MHCB units on six occasions, all related to suicidal ideation, suicide attempts and self-injurious behaviors. Specifically, he was admitted to MHCB units in CSP/Corcoran in March 2003 because he cut his arm with a razor; in CSP/Solano in August for lacerating his arm and in September 2003 for suicidal ideation; in CSATF in February 2004 for suicidal ideations; and in PBSP in July 2004 because of lacerations to his neck. The Discharge Summary from PBSP indicated a diagnosis of Schizophrenia Paranoid Type, chronic, found the inmate improved with no overt delusions or hallucinations and indicated that he was "not suicidal." The inmate was discharged at that time on Depakote and Seroquel.

On his return to CMC on 7/27/04, the inmate was housed in the LOU for five-day follow-up and subsequently transferred to the TLU on 7/28/04, where follow-up continued. During the course of the follow-up, the inmate's mental condition deteriorated. He was seen in an IDTT meeting on 7/29/04 and found to have delusions, but no suicidal ideation. The following day, the treatment team noted that the inmate had continued to

have delusions and auditory hallucinations. A decision was made to refer him back to ASH and to continue housing him in the TLU until transfer. The inmate's last mental health contact on 8/4/04 reported a continued increase in auditory hallucinations and sleep disturbances. There was no documentation to indicate that a suicide risk assessment was performed during this inmate's stay at CMC after his return from ASH, despite his deteriorating condition. A review of the records indicated that the inmate's referral to DMH was not completed prior to his suicide on 8/4/04. The inmate appeared to be compliant with his medications of Lithium, Seroquel and Remeron. It was, however, unclear from the records whether there had been a renewal application of the inmate's Keyhea order, which was scheduled to expire on 7/4/04.

The inmate's Suicide Report, dated 11/12/04, identified four problems and recommended corrective actions as follows:

Problem 1: The inmate was inappropriately housed in the TLU at CMC after his discharge from a MHCB unit. According to MHSDS program guides, EOP inmates discharged from a MHCB unit or an OHU must be housed in a designated EOP unit and offered therapeutic activities.
Recommendation: The suicide report recommended that CMC develop a local policy signed by the warden and health care manager, indicating that EOP inmates will be housed and treated in accordance with the MHSDS program guides.

Problem 2: The inmate received five-day follow-up in the LOU and TLU at CMC after his discharge from a MHCB unit. According to CDC suicide prevention policy, contained in HCSD memo 03-113 dated 7/14/03, five-day post-MHCB follow-up is to be conducted in an inmate's normal housing unit in order to facilitate the transition back to regular housing. If possible, the primary case manager should conduct the follow-up contacts.
Recommendation: CMC should develop a local policy signed by the warden and the health care manager, requiring five-day follow-up to be conducted in an inmate's regular housing unit pursuant to departmental policy.

Problem 3: There was no discharge summary from the inmate's July 2004 MHCB admission at PBSP. According to program guides, discharge summaries must always accompany an inmate on return to the sending institution.
Recommendation: PBSP should conduct an inquiry to determine the extent of this problem and provide evidence of compliance with program guide requirements.

Problem 4: There was no physician follow-up to abnormal laboratory results from the inmate's February 2004 MHCB admission at CSATF.
Recommendation: CSATF should develop a local operating procedure clarifying the responsibility of the physician or psychiatrist to follow-up abnormal findings resulting from a MHCB admission physical prior to transferring the inmate to another institution.

In response to the Suicide Report, the warden and health care manager from CMC submitted a follow-up report on the institution's efforts to implement the recommendations included in the Suicide Report on 4/18/05. CMC indicated that it was in the process of verifying that its policies were in accordance with MHSDS program guidelines, including those related to the TLU and EOP guidelines for therapeutic hours in the TLU. No corrective action follow-up reports on the Suicide Report's recommendations for PBSP and CSATF were provided.

Plaintiffs' counsel submitted additional information from an inmate who claimed to have observed custody staff while they responded to the discovery of the deceased inmate. The information was provided to "aid investigators in their efforts to determine whether this death was preventable and whether responding staff acted properly in handling the incident." Plaintiffs' counsel reported the inmate as stating that the deceased was discovered by a MTA, who attempted to speak with him for approximately ten minutes before notifying custody staff. The observing inmate further alleged that a sergeant performed three sets of chest compressions over another ten-minute period while "cracking jokes with on-looking officers," resulting in a 30-minute delay between the discovery of the inmate and the arrival of an ambulance. The observing inmate also claimed that he was harassed and threatened by both clinical and custody staff. Plaintiffs' counsel requested "specific action" to ensure that the inmate did not suffer retaliation.

**Findings:** This inmate's death appeared to have been both foreseeable and preventable. The inmate was placed inappropriately in the LOU and subsequently in the TLU, where his mental condition continued to deteriorate. While the inmate was seen daily by a treatment team, he received no other therapeutic services consistent with his EOP level of care. Although he did not report imminent thoughts of harming himself, the inmate had a history of suicidal ideation, suicidal behaviors and self-injurious behaviors when his condition deteriorated in the past. No SRA, which would have required an assessment of both static and dynamic suicide risk factors, was conducted after the inmate's arrival at CMC. Furthermore, clinical staff decided to retain the inmate in the TLU and refer him back to ASH, rather than to a MHCB unit, a referral that might have been accomplished within 24 hours. In contrast, the referral to ASH was not completed prior to the inmate's death. Lastly, while the incident reports and Suicide Report indicated that the inmate was removed from his cell and CPR was initiated promptly, the letter from plaintiffs' counsel raised questions about the timeliness of these actions and the appropriateness of staff behavior. No documents indicating any review or follow-up to the issues raised by plaintiffs' counsel were provided.

## 19. Inmate V48794

Brief History: This inmate was a 38-year-old Hispanic male who completed suicide by hanging at North Kern State Prison (NKSP) on 9/13/04. He was single-celled at the time of his death due to reported safety concerns, but he was not in protective custody. The inmate was in general population and was not involved in the MHSDS. He was admitted for his first term in CDC on 8/27/04.

A correctional officer conducting a routine security check discovered the inmate sitting on the floor between the toilet and the lower bunk at approximately 5:28am. The inmate had a tee-shirt covering his eyes and a sock in his mouth; a sheet, tied around his neck but not attached to anything, was assumed to have been previously attached to the upper bunk. The inmate had dried blood on his face and there was blood on the wall between the toilet and lower bunk. A MTA at the scene began CPR when the inmate was removed from his cell and placed on a gurney prior to transporting him to the CTC. The inmate was subsequently taken by ambulance to the hospital where he was pronounced dead at approximately 6:33am.

An autopsy reported the cause of the inmate's death as "asphyxia" due to ligature strangulation. The postmortem toxicology screen indicated no presence of illegal drugs or alcohol. The Suicide Report stated that the inmate suffered bruises from assaults that had occurred in the county jail and after his transfer to the reception center at NKSP, which were not noted in the Autopsy Report.

According to the record, the inmate received an initial health screening on 8/27/04, which indicated that he had a blackened left eye and bilateral redness secondary to an altercation that occurred at the county jail five days prior to his admission to CDC. He was receiving antiviral medications, as he had been diagnosed HIV-positive in 1995. His medications were listed on a Confidential Medical/Mental Health Transfer Summary from the country jail, as was his allergy to penicillin. The inmate received a mental health screening on 8/31/04 and was cleared for general population placement. A developmental disability screening on that same date indicated normal cognitive functioning.

The inmate had a criminal history that included two convictions for disorderly conduct and an arrest warrant from 9/7/01 for a violation of the health and safety code. The inmate was arrested in February 2002 for inflicting injury to a cohabitant and in April 2002 for possession of a narcotic controlled substance. He was placed on probation for one year. He subsequently violated his probation and, in August 2004, was sentenced to 16 months in prison. The inmate was incarcerated in the reception center at NKSP for 17 days prior to his completed suicide.

Interviews with the inmate's family did not reveal any mental health history.

After his incarceration in CDC, the inmate had seven housing changes which appeared to be related to conflicts with other inmates and to the inmate's safety issues; the inmate was concerned that his homosexuality put him at risk of violence and he was afraid that other inmates might believe he was a child molester. Two days prior to the inmate's death, his last cellmate assaulted him. The inmate was housed alone after this assault.

The inmate left two suicide notes, which were described in the Suicide Report as "poorly written." The inmate referred in his notes to being gay and his fear that he could be

killed because he was gay. He requested that his father be called to talk to his mother and that his father be told that the inmate loved him.

The Suicide Report indicated that all policies and procedures were followed. There were no recommendations for corrective actions.

**Findings:** This inmate's completed suicide did not appear to have been foreseeable or preventable. The inmate had no history of mental illness or treatment for mental illness. He also had no history of suicidal ideation or behaviors and did not indicate to staff any intention to harm himself. The difficulties he encountered during his brief incarceration in CDC and the multiple moves related to his safety issues were matters of concern, but the inmate was not placed in protective custody because he did not identify any specific enemies.

**20. Inmate B39303**
Brief History: This inmate was a 59-year-old Caucasian male who committed suicide by hanging at Pelican Bay State Prison (PBSP) on 10/15/04. He was double-celled and was not receiving mental health services at the time of his death. The inmate was admitted to CDC on 11/21/90 with a life sentence plus six years and was transferred to PBSP on 1/29/91, where he remained until his death.

At approximately 2:35pm on 10/15/04, the inmate's cellmate returned from the exercise yard and reported to custody staff that he discovered the inmate dead in their cell. An ISD investigation reported that the deceased inmate had told his cellmate he would beat him in getting out of prison. The cellmate told investigators that he found this strange because the deceased inmate had a life term. The cellmate reported that the cell was dark when he returned from yard; the light was out and the cell window was covered with cardboard. When he turned on the light, the cellmate found the inmate slumped forward with a sheet around his neck and the other end of the sheet tied to the upper bunk. The cellmate reported that he was able to remove the sheet from the inmate and called for help to a control booth officer. The control booth officer indicated in his report that he had released both inmates to the yard on that day, but that the inmate did not have his identification and had to return to his cell to get it. The inmate then informed the officer that he did not want to go to yard and his cell was closed. Medical staff was called when the inmate was discovered and began performing CPR. The inmate was transferred to the hospital and pronounced dead at 3:31pm.

An autopsy report, dated 10/20/04, indicated the cause of death was asphyxia due to hanging. The coroner's report made reference to "a very faint scratch on the right cheek but no other evidence of trauma to the face, and a ligature mark about the neck typical for hanging." The postmortem toxicology screen showed no evidence of alcohol or illegal drugs. The inmate left a signed suicide note with the following statement, "Would like to give all my reasons for dieing-leaving this world for better or worse-but the only thing I have wanted to for many years. And I pray for the strength to success this time."

The inmate had a long criminal justice history, beginning at approximately age 13 when he attempted to kill his stepfather in Colorado. His first incarceration in CDC occurred in 1972 for burglary and rape. Records indicated that the inmate raped a female apartment manager, returned a week later and repeated the same crime against the same victim. Courtroom testimony indicated that at least four other women had similar experiences with him. Three of the four psychiatrists who examined the inmate before trial concluded that he was responsible for his criminal acts.

The inmate entered CDC in January 1972, serving an indeterminate sentence of three years to life, but was paroled from CMC in August 1977. He returned to CDC in April 1978 on a five-year prison term for robbery and threats against a number of women. He was paroled in May 1981, but returned to CDC in July 1981, with an eight-year sentence and another second five-year concurrent sentence for the robberies and threatened rapes of two women apartment managers. The inmate was paroled in October 1985 and returned to prison in September 1986 on a parole violation related to receiving stolen property. He paroled in February 1987, returned to prison again as a parole violator in September 1988 and was paroled a last time in January 1989. On 10/2/89, the inmate confronted a female apartment manager at gunpoint and shot her through the head, killing her. The case was profiled on America's Most Wanted, and the inmate turned himself into police on 10/4/90. He received a life sentence without parole plus six years and was returned to CDC on 1/29/91.

The inmate's record indicated that he spent five years from approximately age 16 to 21 in a mental health facility in Colorado related to his attempt to kill his stepfather, but no details on his treatment there were available. The inmate was admitted to CMC-East from 1/15/77 to 1/17/77, after he cut himself superficially on his left forearm. At that time, the inmate indicated that he had come close to hanging himself a few days earlier because he was heavily indebted and fearful for his safety. He reportedly wrote a suicide note and letter, but these were not included in the documents reviewed. The discharge summary from CMC-East listed a diagnosis of Depressive Neurosis Acute in remission. In addition, the inmate had physical health problems of diabetes and glaucoma.

The inmate was seen on September 2003 by a psychologist, after he was referred for refusing his diabetes and hypertension medication. The inmate was described as polite and cooperative. He was not receiving mental health services, and an assessment by a psychologist determined that no such services were needed because the inmate had no psychiatric diagnosis. The plan was for mental health staff to follow up any self-referrals.

The inmate was admitted to the MHCB unit from 3/26-29/04, after reporting that he had attempted to suffocate himself with a plastic bag. The inmate stated repeatedly that he would continue to try to harm himself. He subsequently informed staff that he owed money on the yard and did not feel positive about his life. Despite this, he improved over the course of three days and was discharged with no suicidal/homicidal ideation. He was given a diagnosis of Anti-Social Personality Disorder and Phase of Life Problem, with a GAF score of 70. The inmate did not receive a SRA before, during or at the conclusion

of this MHCB admission. The inmate's housing location was changed upon his discharge from the MHCB unit and five--day follow-up was conducted. The inmate was responsive, friendly and cordial; he denied suicidal ideation. His sleep also improved, and he no longer had debt concerns. Overall, the inmate was determined to be clinically stable and follow-up was terminated after the fifth day.

The inmate received five RVRs during the long course of his incarceration, for refusing to obey orders, altering personal property and failing to meet work expectations. The failure to meet work expectations resulted in the inmate losing his job in the kitchen in February 2004. Prior to the inmate's death, custody staff received confidential information indicating that the inmate's life might have been in danger because of his debts. The inmate was placed in administrative segregation at that time but, after a classification hearing on 4/14/04, he was returned to general population. Staff reported that they did not believe the inmate to be in any danger after his earlier housing change, and the inmate appeared to get along well with his cellmate. He was not placed in the MHSDS.

The Suicide Report identified two problems and corrective recommendations:

Problem 1: No SRA was completed when this inmate was discharged from the MHCB unit, although the inmate was admitted for an alleged suicide attempt.
Recommendation: According to departmental policy in HCSD memo DD-113-03, dated 7/14/03, the mental health manager should ensure that all mental health staff and physicians serving as POD or MOD are trained in when and how to administer SRAs.

Problem 2: A mental health screening was not done when this inmate was admitted to the administrative segregation unit although current policy requires a mental health screening on entering the administrative segregation unit for all non-MHSDS caseload inmates who have not had a screening within the previous year.
Recommendation: The institution should establish procedures to ensure that all general population inmates receive mental health screenings within one week of entering the administrative segregation unit, if they have not had a screening in the past year. A mechanism, such as a log, was needed to track inmates determined to require a screening and an audit of the log should be conducted within two months.

In response to the Suicide Report, PBSP staff submitted a follow-up report on the corrective actions recommended following this suicide. With regard to the first problem, PBSP indicated that the referenced memo "does not require a SRA to be completed when a patient is discharged from MHCB." Related training on SRA requirements, however, was provided to mental health staff and primary care providers, and attendance sheets were attached. With regard to the second problem, staff reportedly followed a memorandum, dated 8/16/04 and entitled, "Mental Health Screening for Administration Segregation Inmates." A copy of the mental health screening log for the prior two months was submitted. The senior psych tech provided additional review, and improved procedures were developed, resulting in a reported compliance rate of 96.5 percent.

**Findings:** This inmate's death did not appear to have been foreseeable or preventable. The utilization of SRAs and the timeframes for confidential mental health screenings for all newly admitted administrative segregation inmates have been the subjects of discussions among the <u>Coleman</u> parties, and changes are anticipated in the pending revisions to the provisionally approved program guides.

### 21. Inmate T04981

Brief History: This inmate was a 30-year-old Hispanic male who completed suicide by hanging at California State Prison, Sacramento (CSP/Sac) on 10/21/04. The inmate was housed in administrative segregation and was receiving an EOP level of care at the time of his death. The inmate was readmitted to CDC via the reception center at NKSP on 1/8/01 and transferred to CSP/Sac on 11/4/03.

At approximately 6:33am on 10/21/04, a correctional officer delivering the morning meal banged on the deceased inmate's cell door and received no response. The officer was initially unable to locate the inmate in his cell but, by using his flashlight, was able to make out the inmate standing and facing the double bunk. The inmate was the only occupant of the cell and, on closer observation, the officer noticed that the inmate's head appeared to be secured to the top bookshelf by a piece of cloth. The officer activated his alarm, and staff responded. Upon entering the cell, staff discovered that the inmate had a cloth noose, which had been partially obscured by his hair, wrapped around his neck and tied to the bunk. The cloth was pulled from the bookshelf and the inmate lowered to the ground and handcuffed. He was then placed on a Stokes litter and transported on a rolling gurney to the emergency room, where he arrived at approximately 6:37am. Medical staff began evaluating the inmate, cut the noose from his neck and started CPR at approximately 6:39am. An ambulance was called and arrived at around 6:55am. A paramedic subsequently pronounced the inmate dead at 6:59am. A suicide note was found in the inmate's cell written in Spanish. The translation of that note read, "I am going to kill myself for no process" and "I killed myself for no process or protection." There was also a crude drawing of what appeared to be a syringe with drops or footsteps coming from an extended needle.

An autopsy conducted on 10/22/04 determined the cause of death was hanging and the method of death was suicide. The toxicology screen indicated that no alcohol was detected in the inmate's blood specimen. The report, however, found that the inmate had an elevated level of Celexa in his blood, or 290mg/mL which was above the normal range of 9 to 200mg/mL. He also had a non-elevated level of Geodon, or 0.2mg/mL with a limit noted as 4.0mg/ml.

The inmate was not a legal resident of California and appeared to have entered the United States from Mexico at the age of 14 or 15. He reportedly obtained a legitimate California identification card from the Department of Motor Vehicles based on the use of an alias. The inmate had a criminal justice history beginning with two arrests for burglary at the age of 17, with a reported stay in juvenile hall. In 1992, he was arrested for attempted robbery and kidnapping to commit robbery and committed to CYA. The incident

involved three victims, one of whom he threatened with a knife. The inmate was transferred from CYA to CDC in February 1994 and paroled in September 1995. His original CDC number was removed in September 1998. The inmate had several other arrests for driving without a license, burglary, receiving stolen property and battery, for which he received either local jail time or probation. His current incarceration grew out of an incident in which the inmate assaulted and robbed three victims in a family home and threatened to kill them with a knife. He was charged with robbery, assault with a deadly weapon not a firearm with great body injury likely, threatening a crime with intent to paralyze, forging an official seal, trespass and destroying standing timber. He was committed to PSH in January 2000 and was found incompetent to stand trial. The inmate was subsequently restored to competency and convicted in December 2000 of first-degree burglary.

The inmate entered CDC at NKSP on 1/8/01 with a nine-year sentence; part of his sentence had been served while he was evaluated and treated at PSH. This was the inmate's second CDC admission and he was assigned a new number. Based on a mental health evaluation on admission, the inmate was placed in the MHSDS at the 3CMS level of care. He was prescribed Zyprexa, consistent with his medication prescription prior to his incarceration. Evaluation and treatment records from PSH for the period from January through October 2000 were not available for review. The inmate appeared to have some language difficulties, but this was not clearly reflected in the record, which contained only a few notes indicating that a translator was used during mental health contacts with this inmate.

The inmate apparently had two self-injurious or suicidal episodes prior to his CDC incarceration, cutting his wrist in 1999 and attempting to hang himself while in custody elsewhere in 2000. He was reportedly non-compliant with medication and signed a medication refusal form on 1/13/01. He was referred by a correctional officer to the emergency room on 1/27/01 with complaints of depression and suicidal ideation. He was admitted to the MHCB unit from 1/27 to 2/1/01 with a diagnosis of depression. There was some confusion in the admission notes with the psychologist indicating that the inmate had no history of psychiatric hospitalization or suicide attempts, while other staff appeared aware of the inmate's two past suicide attempts and his nine-month stay at PSH. At the time of his discharge from the MHCB unit, the inmate continued to comply with his medication. He was subsequently readmitted to the MHCB unit from 2/14-21/01 with complaints of suicidal ideation and a belief that someone was trying to harm him. At that time, the inmate was described as "extremely paranoid," and his diagnosis was Schizoaffective Disorder, depressed type. A SRA completed on 2/15/01 indicated that the inmate was at suicide level "0 = no ideation no plan no intent." The inmate was prescribed Zyprexa, Risperdal and Zoloft, but he continued to refuse medications and was discharged from the MHCB unit without any psychotropic medication. The inmate requested a transfer to DMH, but he remained at NKSP at an EOP level of care. Over time, the inmate had a number of diagnoses including Paranoid Schizophrenia and Psychotic Disorder NOS.