The inmate was transferred on 3/13/01 to RJD, where he continued to refuse his medications, experienced depressive symptoms and paranoia and requested a transfer to DMH. His level of care was changed from EOP to 3CMS in July 2001, with the notation that the inmate "refuses EOP." The inmate's level of care was subsequently changed back to EOP, then to 3CMS in July and to EOP again in August 2001. Notes by mental health staff during this time indicated that the inmate had a GAF score of 45 to 50, complained of suicide ideation and wanted to stay in the EOP program but was refusing to take his medication or participate in programming. A SRA on 7/19/01 indicated that the inmate was at moderate risk for suicide, one day after an IDTT meeting recommended referring the inmate to the 3CMS program because of his non-participation in the EOP program. A psychologist note on 11/7/01 reported the inmate as saying, "I feel like hurting myself- I'm depressed." The inmate went on to indicate that he wanted a single cell and asked whether he had to "go to administrative segregation or the infirmary" to get one.

The inmate received a MH-2 on 1/3/02, which reviewed the inmate's history of being placed alternately at 3CMS and EOP levels of care and concluded that he should be placed at the 3CMS level of care. The inmate remained at that level of care until March 2002, when he was admitted to the MHCB unit for suicidal ideation. He remained in the MHCB unit from 3/24 to 4/2/02, when he was returned to the 3CMS level of care. The inmate threatened suicide in June 2002 and was admitted to the MHCB unit in July 2002 for a two-week period. During that admission, he was medicated involuntarily and discharged to the EOP level of care although a referral to DMH was considered.

Between September 2002 and April 2003, the inmate was transferred to CCI, CMC and PVSP. From 4/16 to 4/28/03, he was housed in the MHCB unit at PVSP, reporting suicidal ideation and requesting a transfer to PSH. He was discharged to CMC and housed in May in the LOU, secondary to self-reported suicidal ideation if he were to be returned to administrative segregation. The inmate was subsequently treated in the MHCB unit at ISP and, in June 2003, transferred to the APP at CMF. He was discharged to the EOP program at CMF in August 2003. He promptly became non-compliant with his medications and his symptoms of paranoia, depression and suicidal ideation returned. The inmate was readmitted to the DMH/APP from 9/2 through 10/27/03. A Keyhea order was instituted on 10/9/03 based on the inmate presenting a danger to others.

The inmate was transferred to CSP/Sac in November 2003. He was initially placed in the OHU because of suicidal ideation and subsequently transferred to the EOP program. The inmate continued to have depressive symptoms as well as cognitive symptoms, including problems with memory and reported confusion. He assaulted an inmate in the EOP program and was placed in administrative segregation on 1/22/04, where he was reportedly depressed and isolated, but with no suicidal ideation. The inmate received a SHU term in April 2004 based on the assault charge and remained at the EOP level of care in administrative segregation. The SHU term expired before the inmate could be transferred to a PSU, but he remained in administrative segregation because of enemy concerns in the EOP program. Notes indicated that the inmate was depressed and continued to threaten to harm himself, if not placed in a hospital. The inmate continued

to refuse anti-depressant medications, although he was under a Keyhea order for anti-psychotic medications. On 9/16/04, the inmate received a second SHU term stemming from charges of sexual battery on staff.

Between September and November 2004, the inmate requested to be transferred to ASH or another DMH facility because of his depression and suicidal ideation; he also made requests for single-cell status. Approximately eight days after the sexual battery, the inmate's case manager noted that the inmate had attempted to kiss a female correctional officer. The inmate again reported suicidal ideation, but he was placed in a strip-cell in administrative segregation. The inmate reportedly denied suicidal ideation when told of the plan to strip his cell and was informed that he would have his sheets and other property returned to him on the following day. The Suicide Report references this interaction and states "since the clinician did not believe the inmate was in any real danger the only rational for this decision appeared to be to punish the inmate for making suicidal threats." The records demonstrated that SRAs were not routinely conducted when this inmate articulated suicidal ideation or intent.

The inmate's Keyhea order was renewed on 3/24/04, noting that the inmate was a danger to others. The inmate's MARs for 2004 indicated that he was prescribed Geodon and Benedryl. Celexa was also added to this regimen in July 2004. The inmate's last MH-2 dated 9/29/04, continued the diagnosis of Schizophrenia, but indicated that the inmate threatened to harm himself "if he doesn't get his way" and described the inmate as having "unprovoked assaultive behavior." His condition, however, was noted as improved.

A progress note by a psychologist dated 10/8/04 implied that the inmate had been considered for transfer to a DMH program and needed to cooperate with the treatment program at CSP/Sac "if such a request is to be expedited." The psychologist note indicated that the inmate had "strong symptoms of serious mental illness," continued to request hospitalization and talked "constantly…about suicidal ideation." The inmate subsequently reported to the same psychologist on 10/13/04 that he did not have suicidal ideation. On 10/15/04, however, the inmate reported to a different psychologist that, although he did not have suicidal ideation, he wanted to be hospitalized for the remainder of his term or for life because of his depression. According to the psychologist's note on 10/15/04, the inmate stated he would "bite hands to cause bleeding." When the psychologist saw him on 10/20/04, the inmate indicated that he would cut or hang himself, but he did not have a way to do it. There was no documentation in the records reviewed that SRAs were completed by clinicians at CSP/Sac in response to the inmate's reports of suicidal ideation.

The inmate had 11 RVRs for mutual combat, battery on another inmate, disrespect towards staff (masturbation) and two for sexual battery on staff. The inmate had a two-week stay in administrative segregation in November 2001 based on mutual combat at RJD, a two-month stay at the California Correctional Institution (CCI) SHU from September through November 2002 for sexual battery on staff, a longer stay in the CMC EOP administrative segregation unit from November 2002 to March 2003 and a stay in the EOP administrative segregation unit at CSP/Sac from January 2004 until the time of

his death. The inmate was single-celled and on walk-alone status during his last administrative segregation stay. The inmate had been endorsed for the PSU at CSP/Sac on 10/19/04, two days prior to his death. The inmate also had an INS hold placed on him in February 2001.

The Suicide Report noted that this inmate was sentenced to prison, rather than found insane or remanded to a state hospital, and concluded that, "unfortunately there is really no place within the current CDC MHSDS for an inmate patient such as this who probably required long term chronic inpatient care." There was no indication in the inmate's records that he had been referred at any time to an intermediate care program in DMH for a longer length of stay based on his chronic and severe mental illness.

The Suicide Report identified three problems along with recommended corrective actions, as follows:

    <u>Problem 1</u>: It is not CDC policy to "strip" an inmate's cell to prevent self harm. If there is sufficient concern about the inmate's safety, he should be referred to a MHCB unit.
    <u>Recommendation</u>: The institution should initiate corrective disciplinary action for the psychologist and psychiatrist who colluded in placing the inmate in a strip cell on September 24, 2004.

    <u>Problem 2</u>: No SRA was conducted at CSP/Sac either when the inmate was placed in the OHU for suicidal thoughts or by general population, EOP or administrative segregation EOP clinical staff in response to the inmate's numerous suicidal threats. Furthermore, the inmate was never referred to a higher level of care, even though he became more depressed about receiving an extended SHU term and made clear statements that he wanted to hang or cut himself.
    <u>Recommendation</u>: CSP/Sac should provide training to all clinical staff on the use of SRAs, determinations of suicide risk and referrals to higher levels of care. This training should be more detailed than the training on the suicide policy and SRAs provided on 10/29/04 at CSP/Sac. It was also recommended that HCSD provide training on SRAs.

    <u>Problem 3</u>: Mental health staff never used a translator, even though this inmate clearly had limited facility with English. In addition, there was no evidence that cultural differences were considered in the evaluation and treatment of the inmate.
    <u>Recommendation</u>: Training should be conducted with all clinical staff on the use of translators and on effectively addressing cultural issues in mental health assessments and treatment.

In response to the Suicide Report, CSP/Sac prepared a follow-up report on the corrective action plan for this inmate. With respect to the first problem, the follow-up report indicated that the clinicians responsible for placing the inmate in a strip cell were issued a "counseling record" on 3/2/05 and provided with CSP/Sac's current suicide prevention policy. In response to the second problem, training on suicide prevention was provided

by the institution in October/November 2004, while HCSD conducted training for suicide risk management in April 2005. The third problem reportedly was addressed by the provision of mandatory cultural diversity training in April 2005. Sign-in sheets for all of the aforementioned training were provided.

Plaintiffs' counsel submitted a letter stating they were "heartened by the improved quality of recent Executive Suicide Reports." They then raised several objections to the recommendations included in the Suicide report, including the absence of attention to the failure to initiate CPR more promptly, administer SRAs to this inmate or refer him to DMH. The letter further asserted that, while the training provided may have been appropriate to address the failure to administer SRAs, the failure to refer to DMH required "special training aimed at clinicians working in the CSP/Sac administrative segregation units." Counsel also expressed concern over the failure to address the inmate's excessively long stay in the administrative segregation EOP unit despite his apparent decompensation. Further, counsel pointed out that the Suicide Report did not address the IDTT's failure to assess in advance whether the inmate's continued placement in administrative segregation would result in decompensation. Plaintiffs' counsel concluded by commending CSP/Sac for its past suspension of SHU terms when the need for mental health treatment made it appropriate to do so, but suggested that this case raised concerns in this regard.

**Findings:** This inmate's suicide appeared to be foreseeable and preventable. The inmate made numerous reports of suicidal ideation, but clinicians at CSP/Sac apparently interpreted his reports as attempts to avoid placement in administrative segregation, obtain treatment in a psychiatric hospital or other higher levels of care or single-cell housing. SRAs were not completed for the inmate; no in-depth evaluation of the inmate's statements was made; nor was any longitudinal evaluation of the inmate's statements conducted. At the same time, the inmate was maintained on a Keyhea order for involuntary medication as a "danger to others." There appeared to be some confusion among staff at different facilities about what medications were covered by the Keyhea order until July 2004, when the inmate was placed on both anti-psychotic and anti-depressant medications.

Despite numerous MHCB, OHU and DMH/APP admissions and the inmate's extended stay at PSH prior to his CDC incarceration (the records from which were not obtained), clinicians apparently never considered sending the inmate to an intermediate level of inpatient care. The inmate's psychotic symptoms were described as "vague," but he was also said to have "extreme paranoia," depression and suicidal ideation. The inmate's "unprovoked attacks" on others apparently were not considered to be an aspect of his mental illness that required more aggressive treatment and referral to a higher level of care, but only as a justification for a Keyhea order for involuntary medication. Although this inmate expressed suicidal ideation, which waxed and waned over time, and a desire or need to be placed in a psychiatric hospital, the staff at CSP/Sac did not provide the level of assessment and coordinated treatment of the mental health and custody issues required by an inmate in need of involuntary treatment for severe and persistent mental illness. Lastly, the failure of the first responders to initiate CPR led to an approximately

six-minute delay in the application of CPR and may have been a preventable potential contributor to this inmate's death.

## 22. Inmate E66294

Brief History:  This inmate was a 32-year-old African American male who completed suicide by hanging at California State Prison, Sacramento (CSP/Sac) on 11/7/04.  The inmate was single-celled in administrative segregation and was not receiving any mental health services at the time of his death. The inmate had been in CDC custody since 11/24/92 with a sentence of life without parole.

At approximately 4:00pm on 11/7/04, a correctional officer making the count discovered the inmate hanging by a sheet that was braided and threaded through the air vent in his cell.  The officer activated his alarm and several officers, along with a sergeant, responded to the area.  The control booth officer, however, could not open the cell because paperback books were jammed under the door.  When the books were removed, the officers were able to pull the cell door open.  An officer first entered the cell with a shield and, after he received no response from the inmate, other officers entered, cut the sheet from the air vent and placed the inmate on a Stokes Liter and gurney.  At approximately 4:05pm, a MTA and the sergeant began CPR on the inmate, who was then taken to the emergency room.  CPR was administered to the inmate during transport and was continued by medical staff in the emergency room.  Fire department paramedics attempted additional life-saving efforts when they arrived, but were unsuccessful.  The inmate was pronounced dead at 4:24pm.

An autopsy conducted on 11/8/04 determined that the cause of death was asphyxia by hanging.  The postmortem toxicology screen found no evidence of alcohol, medications, illegal drugs or caffeine.  No suicide note was discovered.

The inmate's first involvement with the criminal justice system apparently occurred at the age of 13, when he was convicted of robbery and assault with a deadly weapon; he was housed in juvenile hall and placed in various community probation programs.  Shortly after he turned 18, the inmate had a number of arrests related to his membership in the CRIP gang.  His involvement with CDC began in August 1990 with a conviction for second-degree robbery, which resulted in a three-year sentence.  The inmate escaped in February 1992 and was rearrested and charged with escape from CDC, grand theft auto and a first-degree murder he committed after his escape.  The inmate received a life sentence without the possibility of parole.

The inmate had been in administrative segregation since January 2004.  During his incarceration, he had received five SHU terms and 23 disciplinary infractions for serious rules violations, including assaults, attempted murder, the manufacture of alcohol and other violations that resulted in a classification score of 385 points.  The inmate's most recent RVR involved the attempted murder of another inmate.  This incident had been referred to the district attorney's office, but was declined.  As a result, the inmate was cleared for possible transfer to a fifth SHU term.

The inmate had not received mental health services during his incarceration as an adult, although there was a reference in the records to his having received some group therapy as an adolescent. On the day of the inmate's suicide, custody staff referred the inmate for a mental health evaluation because he had stopped talking to staff for a week and had refused breakfast, lunch and yard that day. This inmate was described as polite to staff, quiet and "a righteous convict," who did not ask for anything. The inmate was also noted to have spent much of his time writing rap songs, reading and corresponding with family.

The records indicated that the inmate was seen for a mental health screening on 9/9/04, when the district attorney declined to file charges. The clinician who saw him reported "no mental health concerns." The inmate was also seen by the psych tech on daily rounds in administrative segregation. There was no indication that the psych tech noticed any of the changes in the inmate's behavior that were noted by the administrative segregation custody staff. There was no information in the documents clarifying the psych tech's observations on daily rounds.

In a letter dated 6/21/05, plaintiffs' counsel expressed their concerns that this inmate had "suddenly becoming mute and reportedly just stared ahead when officers spoke to him." Plaintiffs' counsel wanted defendants to provide additional training for custody staff and psych techs to recognize early signs of mental health decompensation for inmates housed in administrative segregation units. Counsel also suggested that defendants establish clear referral standards.

The Suicide Report concluded that all policies and procedures appeared to have been followed and accepted standards of care were met. No corrective actions were recommended.

**Findings:** This inmate's suicide did not appear to be foreseeable or preventable based on the documents provided and reviewed. There was some question about the absence of documentation of the psych tech's observations in administrative segregation during the last week of this inmate's life, when he exhibited a number of behavior changes. The suicide also raised the issue of the timeliness of referrals of inmates undergoing behavioral changes in administrative segregation.

### 23. Inmate K74084

Brief History: This inmate was a 30-year-old Caucasian male who completed suicide by hanging at Mule Creek State Prison (MCSP) on 11/12/04. At the time of his death, the inmate was being treated at a 3CMS level of care and was receiving five-day suicide prevention follow-up in the administrative segregation unit after being discharged from the MHCB unit. This inmate had been admitted to CDC via the reception center at NKSP on 11/12/97, with a 12-year sentence.

At approximately 10:50pm on 11/12/04, an administrative segregation officer was making welfare checks and observed the inmate sitting on the lower bunk with his back against the wall and a noose around his neck that was tied to the upper bunk. The officer

notified staff of a medical emergency and was brought a cut-down tool. The inmate did not respond to the officer's attempts to get his attention by knocking on the door. On entering the cell, the officer cut the inmate down. According to the officer's report, a MTA immediately began CPR on the inmate. The inmate was placed on a Stokes Liter and medical cart and transported to the CTC emergency room. He was subsequently moved to the hospital. A correctional officer assigned to hospital coverage noted that the inmate was admitted to the hospital at approximately 1:28am for attempted suicide. An incident report indicated that at approximately 3:51am a Code Blue was called for this inmate because of respiratory failure. The inmate was removed from the ventilator at approximately 6:00am and was pronounced dead at 7:07am by a physician at the hospital.

An autopsy conducted on 11/15/04 indicated the cause of death was asphyxiation due to strangulation. A postmortem toxicology screen detected Acetaminophen, but found no evidence of alcohol or illegal drugs in the specimen. The report noted that the inmate had regained a pulse and was intubated prior to his transfer to the hospital.

Records indicated that this was the inmate's first CDC incarceration. He entered CRC on 12/30/97 on charges of lewd acts with a child under 14 with force and violence and first-degree burglary, stemming from an incident in which he attempted to rape a seven-year-old girl in her bedroom. The inmate received an eight-year prison term for the sex offense and a consecutive four-year term for first-degree burglary. At the time of his suicide, the inmate had been in CDC for seven years.

The inmate did not receive mental health services until November 2001 when he referred himself for an assessment while at Calipatria State Prison (CAL). A mental health evaluation was conducted by a psych tech who noted vegetative signs of depression, but the inmate denied any history of suicidal behavior and suicidal ideation. Based on a subsequent evaluation in December 2001, the inmate was diagnosed with Anxiety Disorder NOS with Depression and was placed at the 3CMS level of care. He was also treated with Paxil and Benadryl. His Paxil was subsequently changed to Effexor because the inmate complained that he felt worse with Paxil. The inmate also reported his concern that he might be transferred to general population housing in another facility. The inmate was seen in January 2002 by a psychiatrist and requested that his medication be discontinued because he felt worse. The inmate also reported that he had been endorsed to MCSP. His medication was changed to Trazodone because he was not sleeping well.

The inmate was transferred to MCSP and received a mental health evaluation or MH-4 on 2/4/02. During this evaluation, the inmate reported his concerns about housing, particularly gym housing, and indicated that he wanted help from mental health in obtaining a single cell. He was subsequently diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, Narcissistic Personality Disorder and Antisocial Personality Traits, with a GAF score of 68. A suicide risk assessment completed at that time noted his risk factor as "none." The inmate remained at the 3CMS level of care attributable to medical necessity. At that time, the inmate was housed on a SNY. In February 2002, the inmate's medication was discontinued at his request. Although the

inmate was supposed to remain on the MHSDS caseload for one year following the discontinuation of his medication, he was removed from the 3CMS caseload.

By January 2004, vegetative signs of depression had begun to recur. The inmate was demonstrating poor job performance and attendance and was referred by staff for a mental health evaluation. He initially saw a psych social worker but, in February 2004, saw both a psychiatrist and psychologist. The inmate also had an IDTT meeting, at which he was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder. He was placed on Prozac and returned to the MHSDS at the 3CMS level of care due to medical necessity. In addition to other depressive symptoms, his primary complaints were inability to sleep and "skin conditions." His Prozac was subsequently discontinued and Vistaril was prescribed in March 2004. Although the inmate's sleep improved, he continued to report being "stressed" and, in May 2004, his Vistaril was discontinued, despite his continued complaints of sleep difficulties and anxiety.

The inmate continued to have 90-day contacts with a case manager. On 9/30/04, the inmate indicated to his CCM that he was nervous and stressed about the possibly of being moved to gym housing. He said that he would figure "something out" so he did not have to go to the gym. The CCM noted no improvement in the inmate's condition since July 2004. He was found to have minimal current suicide and violence risks and was cleared to live with a compatible cellmate.

On 11/9/04, the inmate was seen by a psychiatrist who found that he was dysphoric and frustrated, but otherwise within normal limits; the psychiatrist noted that the inmate "denies suicidal ideation/plan." The inmate's diagnosis, at this time, was Adjustment Disorder NOS Rule Out Mood Disorder NOS. Remeron was prescribed for the first time, with a plan for follow-up in 90 days. The psychiatrist also noted that the inmate had made a statement on 11/20/01, "which indicated he may have been familiar with DSM criteria for mental health." On that same day, the inmate was seen by a CCM who indicated that the inmate had been moved to administrative segregation because he "does not want to go to gym" and "can't stand dayroom floor." The CCM noted that the inmate was nauseous and vomited and said he was "petrified of gym." The inmate was referred to mental health later that day by a psych tech and a custody officer when he repeated his fear of going to the gym stating, "They want me to move to an E-bed and I can't do it." He was further reported to have said, "CDC's putting me in a corner with no way out." The inmate was seen by a psychologist who noted his history and indicted that he currently "reports suicidal ideation, without clear, current and active plan," but with limited insight and judgment. The plan was to consult with psychiatry, return the inmate to his current cell location and assess him clinically each day.

The inmate was seen the next day in an IDTT meeting on 11/10/04, after his placement in administrative segregation. The IDTT noted that the inmate was in administrative segregation for "refusing assigned housing." Medications ordered on 11/9/04 were, according to the record, "N/A yet." A SRA was completed by the psychiatrist. Although the assessment did note that the inmate was Caucasian as an ethnicity risk factor, it did not make any reference to the inmate's history as a sex offender; the only protective

factor listed was the inmate's family support. According to the assessment, the inmate had affective instability, felt hopeless, had suicidal ideation and was agitated and fearful for his safety. There was a notation on the SRA indicating that the inmate was very angry and frustrated about being housed in a dayroom. Despite this, the estimate of risk was said to be "absent or trace."

Later that evening, the inmate inflicted a superficial laceration on his left arm and was described by treating medical staff as having severe depression, with no safety contract. The on-call psychiatrist placed him in the body cavity search cell on one-to-one suicide precautions because no MHCB beds were available in the CTC. The following morning, the inmate was seen in this holding cell by an on-call contract psychiatrist, but the records indicated that the inmate's UHR was not available. The psychiatric note indicated that the inmate had a "litany of complaints" and noted the inmate's objections to going to an E-bed. The inmate was described as alert, oriented times three, oppositional and calm, but calculating and agitated. His mood was described as angry and hostile. The psychiatrist indicated that the inmate "claims he has suicidal ideation." Despite this, the psychiatrist diagnosed Adjustment Disorder, Rule Out Malingering, and stated "no recent stressor or precipitant noted." The plan was to return the inmate to his living unit, continue his prescription for Remeron, adding Seroquel to his regimen, and follow up in one to two weeks.

A SRA was completed on 11/11/04 and, like the previous assessment, was incomplete in that it did not note the inmate's sex offense. The assessment did record the inmate's ethnicity, suicide ideation/threats, previous suicide attempts and the fact that this was his first prison term. It also noted the inmate's recent suicidal ideation, current insomnia and poor appetite, but no protective factors were noted. The estimate of risk was "absent or trace," with a comment that the "patient is low risk for suicide – no noted precipitant." According to the records, the psychiatrist ordered five-day follow-up after being informed by a nurse that such follow-up should be ordered.

On the first day of follow-up, 11/11/04, the inmate was seen by a nurse who indicated that he was reporting depression, which was assessed as "moderate." The nurse's note remarked on the inmate's recent stressor, indicating that he had just been informed by the IDTT of his impending return to the gym. The inmate continued to report sleep disruption and changes in appetite. While he denied suicidal thoughts, it was noted that he had evidence of a cut on his left wrist. The inmate was further described as experiencing hopelessness/helplessness. He reportedly remarked, "I'm just marking time." There was, however, no explanation for this statement, and no SRA was conducted following this interview. On the second day of follow-up, the inmate's behavior and mood were depressed, his sleep fair, his affect flat and his speech slow; the follow-up note indicated that the inmate denied suicidality "today" and referred to the fact that the inmate had been placed in the body cavity cell on 11/11/04 for "suicidal ideation." Less than two hours after this clinical contact, the inmate was discovered hanging in his cell.

In addition to his mental health issues, this inmate appeared to have dermatologic lesions, including a chronic scrotal rash and psoriasis. He also had knee and ankle pain, but the cause of these pains was unclear. The inmate had requested an exclusion from gym housing based on his skin lesions, some of which were subsequently determined to be Herpes Simplex. In seeking an exclusion from gym housing, the inmate requested assistance from the medical department. In search of the exclusion, he also requested assistance from custody due to his safety concerns and from mental health because of his depression and suicidal ideation. His request for exclusion from gym housing, however, was denied as not being clinically indicated.

The inmate had received RVRs on approximately seven occasions during his incarceration for being out of bounds, mutual combat, attempting to move contraband through a work area, failure to report to his job assignment and obstructing a peace officer. The charge of obstruction occurred on 11/2/04 and was related to the inmate's refusal to move to an E-bed in gym housing. He had been placed in administrative segregation on at least three occasions, all related to his safety concerns because of his crime and refusal to move to gym or dormitory housing. The inmate's IDTT meeting was apparently combined with his classification hearing as the warden, an assistant warden, correctional counselor, captain, sergeant and clinical staff were all in attendance.

The Suicide Report referred to the last evaluation by the contract psychiatrist who removed him from the body cavity search cell and returned him to housing. This psychiatric interview included information that was not recorded in the inmate's UHR. Specifically, the inmate's affect and behavior were described in the following manner, "Reluctant to talk with her much at all, wouldn't tell her what his charge was, stood in a corner of the cell, and looked at her out of the corner of his eyes without making direct eye contact." The psychiatrist also reported that, when questioned about suicidal ideation/intent, the inmate "would not give her a straight answer but rather would give her long and tangential responses", adding "yeah, I could do that if I were pushed to go to an E-bed." The inmate described to the psychiatrist his plan to cut his wrists "better than before." The psychiatrist indicated that it was her understanding that the inmate was going back to administrative segregation; had she thought there was any chance he would go to an E-bed, the psychiatrist stated that she would have admitted the inmate to the MHCB unit. The psych social worker, who had the last clinical contact with the inmate, believed the inmate understood and accepted that there would be an opportunity to meet with him and discuss his concerns again after the transfer.

The Suicide Report identified six problems and recommended the following corrective actions:

   Problem 1: This inmate should have been placed in a MHCB unit at the time of his self-injurious behavior on 11/10/04, when he was observed as being obviously in distress. Even though a bed was not available, the doctor's order should have been to admit him to a MHCB when one became available, and Sacramento (Health Care Placement Unit) should have been contacted to help find a bed. Custody may place an

inmate awaiting a MHCB in the body cavity search cell overnight, but MHCB staff needed to be involved in clearing the inmate to return to a housing unit.

   Recommendation:  The institution should initiate a QIT to clarify local policies for admission to the MHCB unit, noting that physicians' orders cannot be written for custody placement.  If an inmate requires MHCB care after hours and no bed is available, the physician should admit the inmate to the MHCB when a bed becomes available and contact HCPU.  Such an inmate should be seen by the MHCB clinical team before being cleared to return to housing.

   Problem 2:  The contract psychiatrist who saw this inmate the morning after his placement in the body cavity search room failed to evaluate him adequately.  The psychiatrist was new to CDC and did not understand the housing issue, did not know the inmate's crime of commitment and did not recognize his level of distress, with the result that she focused instead on characterological pathology.

   Recommendation:  In addition to ensuring, as noted above, that inmates held pending admission to the MHCB should be cleared by the MHCB clinical team before being returned to their housing unit, MCSP policy should require timely training for all new clinical staff, especially contractors, emphasizing the need to have records available whenever an assessment is made and encouraging consultation with other staff.  HCSD should provide training materials to registries to train contract staff prior to commencing work at CDC.

   Problem 3:  A number of staff members evaluated the inmate for suicide risk without having the inmate's UHR available.  Staff cannot adequately conduct an evaluation without background information.

   Recommendation:  The institution should develop local procedures through the QIT process to assure the availability of UHRs for clinical contacts.

   Problem 4:  The SRAs conducted for this inmate failed to address all risk factors.  The conclusions reached by the assessments, that the inmate had only "absent/trace risk," moreover, were not supported by the clinical risk factors that were identified.

   Recommendation:  The institution should train all clinical mental health staff on the identification of suicide risk factors and the proper evaluation of risk.  The institution needed to have a plan to train new staff arriving subsequently to the initial training session.

   Problem 5:  The inmate's interview and evaluation in the body cavity search cell lacked privacy because another inmate was present in the next cell.  This may have impeded the assessment of the inmate, who was very fearful due to the nature of his crime and most likely would not have wanted to discuss it in a non-confidential setting.

   Recommendation:  Local policy needed to bring inmates held in the body cavity search cell pending MHCB admission back to the MHCB for evaluation by the MHCB clinical team.  The evaluation should occur in an appropriate private setting, such as the IDTT room.

Problem 6: The inmate's IDTT meeting in administrative segregation and his classification hearing were held at the same time. IDTT meetings should be held separately and preferably prior to classification hearings. The clinicians who saw the inmate in the administrative segregation unit when he was in distress merely referred him to another clinician. There was no clinical recommendation or plan for relieving his distress

Recommendation: The institution should review its policy and procedures on IDTT meetings and classification hearings; a three-month audit should be conducted to ensure that IDTT meetings are conducted separately from classification hearings. Further training should be provided to staff on clinical problem-solving and treatment planning to develop effective responses to inmates in distress.

In its responsive report to the Suicide Report, MCSP cited with regard to the first and fifth problems its submitted copy of the new MHCB admission policy, dated May 2005, which was revised to incorporate the recommendations specified in the Suicide Report. Staff training on the revised policy reportedly was provided. As to the second problem, a copy of the institution's policy on contractor training and training attendance sheets were provided as evidence of implementation. In response to the third problem, an institutional memorandum dated 3/21/05 indicated that a key ring had been placed in the main control room to facilitate round-the-clock availability of UHRs to health care personnel.

As for the fourth problem, the institution provided training for the clinical staff on 11/30/04, which included information on the use of SRA forms, the facility's constant observation policy and the use of observations rooms for mental health inmates. Attendance sheets were attached. With regard to problem six, a memorandum dated 3/30/05 indicated that IDTT meetings at MCSP are generally held in conjunction with classification hearings, but the IDTT meeting usually precedes the classification hearing or is held separately if classification and IDTT schedules do not coincide.

**Findings:** This inmate's suicide appeared to have been foreseeable and preventable. The inmate had a history of static and dynamic suicide risk factors, which were directly related to fears for his safety if placed in a dormitory or gym housing. The inmate had requested placement in administrative segregation in the past for safety reasons because of his crime and, by his report, because he had a scrotal rash that required him to have some degree of privacy. The inmate had been identified by both custody and clinical staffs as having increased fears regarding possible placement in an E-bed or in gym housing. He did, in fact, describe himself to one clinician as "petrified." The inmate further reported that he felt CDC was backing him into a corner. These statements and the inmate's history appeared to be grossly underestimated by several clinicians. It seemed from comments made on the inmate's SRAs, as well as in progress notes, that clinicians focused on characterologic pathology, failed to review the inmate's UHR for historical references, were ignorant of the inmate's history as a sex offender and grossly underestimated his risk for suicidality.

102

Finally, clinical staff evaluating this inmate did not seem to understand the importance of his placement in the body cavity search cell and his subsequent return to housing, which the inmate anticipated would most likely result in his placement in an E-bed or the gym. Apparently, this placement was not seen as a relevant clinical and custodial issue during his final classification/IDTT meeting. The Suicide Report recommended corrective actions for these problems, and MCSP staff responded with corrective action plans that included training and revisions of applicable local operating procedures.

## 24. Inmate #V08244

Brief History: This inmate was a 35-year-old Caucasian male who completed suicide by hanging at the Eel River Conservation Camp on 11/17/04. At the time of his death, the inmate was housed in general population and was not receiving mental health services. He had been admitted to CDC via the reception center at SQ on 9/29/03 to serve a sentence of 76 months.

At approximately 5:30am on 11/17/04, a correctional officer conducting the morning count discovered the inmate hanging from a rafter in the exercise area at the Eel River Conservation Camp. The inmate was suspended by what appeared to be an exercise rope. Upon discovering the inmate, the officer ran across the yard to notify his commanding officer by telephone. After calling the sergeant and lieutenant, he retrieved a cut-down tool, cut the rope "without disturbing the knots and anchoring device" and lowered the inmate to the floor. The lieutenant arrived at the camp at 6:00am and notified the sheriff's office and county coroner. At approximately 8:10am, the deputy county coroner arrived at the camp and noted the body was still warm to the touch, with no rigormortis in the extremities. CPR was not initiated by any staff, and no call was made to 911. No suicide note was found in the inmate's property.

The coroner conducted an investigation into the inmate's death, but no autopsy was performed. The cause of death was found to be asphyxia, due to hanging, and the manner of death was determined to be a suicide. A postmortem toxicology screen found no evidence of alcohol or illegal drugs in the sample.

This inmate's criminal history started at age 18 with an arrest for vandalism. The inmate had a number of subsequent arrests, resulting in three felony and 13 misdemeanor convictions for crimes, including vandalism, hit and run, extortion, possession of controlled substance, transportation/sale of controlled substance, use of controlled substance and threats. At the time of his death, the inmate was serving a sentence for six years and four months on convictions for threats to commit a crime with intent to terrorize resulting in death or great bodily injury and for possession of a controlled substance.

The inmate had a history of multiple drug abuse, including marijuana, methamphetamine, heroin, cocaine, LSD, mushrooms and alcohol and reported having used methamphetamine and alcohol on the day of his arrest. The inmate received outpatient treatment and treatment at one inpatient program for his substance abuse and periodically

attended NA and AA meetings. He reported having checked himself into a "psych ward" for approximately eight hours when he had been abusing methamphetamine. According to his records, the inmate reported having symptoms of ADHD, but he apparently never received any treatment for ADHD or any special educational placements.

Pretrial evaluations found that the inmate had some left parietal neuropsychological damage of the brain that could have resulted from chronic drug and alcohol abuse, which was associated with his delusional beliefs that he had supernatural powers and with his possible participation in activities as a Satanist. The evaluation process also contained reports that the inmate, because of his brain damage, might have suicidal potential. The evaluation also suggested that his polysubstance abuse was associated with psychotic thinking, such that he might become a paranoid schizophrenic.

After entering CDC on 9/29/03, the inmate received an initial mental health screening at the SQ reception center, which was negative, and was cleared for release to custody. A physical examination found that he had hypertension, obesity and Hepatitis C and the inmate was referred for an abdominal ultrasound. The inmate was also referred for a psychiatric consultation, although the reason for the psychiatric consultation was not described. A developmental disability evaluation on 10/1/03 determined that the inmate had normal cognitive functioning. The inmate received a reception center mental health evaluation, or MH-7, also on 10/1/03, which determined that he was not in need of mental health services and did not meet the criteria for inclusion in the MHSDS. The inmate was given a diagnosis of Amphetaminmate Dependence as part of this evaluation, but no treatment services were recommended.

This inmate was transferred to California Correctional Center (CC) 11/19/03 and was cleared by a psychologist for camp placement on 11/26/03. In the interim, a correctional counselor referred the inmate to mental health on 11/24/03, after reviewing his central file and discovering that the inmate had reported symptoms of visual hallucinations, delusions, bizarre behavior and a history of psychiatric care. This referral was not received by the mental health department until 12/1/03. A re-evaluation by a psychologist on 12/5/03 indicated that the inmate had no mental illness and no need for mental health follow-up. The psychologist conducting the re-evaluation did not indicate on the MH-3 whether the inmate's UHR or central file had been reviewed, but the inmate admitted to the psychologist that he experienced hallucinations while intoxicated on methamphetamine. The inmate was trained as a firefighter and, on 7/27/04, transferred to the Devil's Garden Camp. Shortly thereafter, the inmate was described by his supervisor as a good worker.

The inmate's last mental health contact appeared to be on 9/29/04, when he was seen by a psychologist on a referral by the camp's sergeant. The referral was dated 9/18/04, but was not received at CCC until 9/27/04. The inmate received a mental health evaluation on 9/29/04, which described him as "bright, organized, responsive, and with stable mood"; he was noted, however, to have worrisome dreams. The psychologist conducting the evaluation concluded that the inmate had no signs or symptoms of mental illness and that he displayed insight. According to the psychologist, the inmate denied suicidal

ideation as well as perceptual and thought content disturbances. The psychologist indicated that he would see if the inmate could be cleared to return to camp. The sergeant who made the referral reported that the inmate had "deja veux of himself getting hurt or killed while fighting a fire on 10/7/04." The inmate had apparently requested a return to CCC and told the staff at the camp that he did not want to fight fires. He told the psychologist, however, that he wanted to return to the Eel River Camp instead of staying at CCC. On 10/21/04, the inmate received a chrono transferring him from the Devil's Garden Camp to the Eel River Camp.

According to the Suicide Report, a major stressor for the inmate was his fear that, once paroled, he might receive another felony conviction resulting in a third-strike sentence. The inmate's father reported that the inmate's appeal had been heard on 10/18/04 and that a decision would be forthcoming within approximately 30 days. The Suicide Report indicated that the inmate had told another inmate on the night prior to his suicide that his appeal had gone through, which "somehow meant that his daughter was going to be murdered." The inmate was visited by his father at the Eel River Camp on the weekend prior to his suicide and, according to the record, his father did not have any concerns about his son's safety.

The Suicide Report identified four problems and recommended corrective actions as follows:

Problem 1: Emergency response procedures were clearly inadequate. There was significant delay in obtaining assistance and in cutting down the inmate. No medical personnel were summoned, and 911 was not called.

Recommendation: The institution's emergency response committee needed to conduct a fact finding investigation to determine that adequate emergency procedures are in place. The associate warden for the camps should review and discuss correct emergency response procedures with the camp commanders and ensure that the staff is trained.

Problem 2: The psychotic nature of the inmate's crime and the psychosis described in his court competency evaluation were never taken into consideration by mental health clinicians evaluating the inmate because his central file was never reviewed, even though a correctional counselor found enough documentation in the central file to refer the inmate to mental health.

Recommendation: The institution should have a policy requiring a correctional counselor at CCC, who finds something of concern in an inmate's central file, to copy the relevant document and send it to the psychologist along with the referral. This procedure was adopted by the institution's suicide prevention response committee following the inmate's death.

Problem 3: The formatted mental health notes, or MH-3s, at CCC did not include notations, indicating whether the records were reviewed.

Recommendation: CCC needed to add this notation to the MH-3 format.

Problem 4:  Although this inmate was returned from a camp specifically for a psychological evaluation, his evaluation seemed cursory.

Recommendation:  When an inmate is referred for a mental health evaluation based on a behavioral concern, including inmates returned from a camp for this reason, the evaluation should be comprehensive and include file reviews and documentation on a mental health evaluation form.  Mental health referrals of returned inmates should be audited to ensure that evaluations are documented on a MH-4 form.  HCSD also needs to discuss this as a system-wide issue in an upcoming suicide prevention video conference.

In response to the Suicide Report, CCC staff submitted a follow-up report on the corrective action plan for this suicide.  The CCC submission contained a number of attachments, including a 5/5/05 memorandum from a staff psychologist entitled "Clarification of Suicide Report," indicating that an undated letter from the inmate had been delivered after the Suicide Report was written; a 3/14/05 memorandum by an Associate Warden of the Camp Division entitled "Response to Medical Emergencies" that outlined the appropriate responsive reactions to a medical emergency; a 5/9/05 memorandum from the Deputy Director of Institutions Division entitled "Suicide Review of Inmate V08244"; minutes from suicide prevention committee meetings on 11/24/04 and 1/26/05; and information on the training provided for correctional counselors on 1/13/05.

There was also information on the initiation of investigations into the mental health evaluation of the inmate conducted on his arrival at SQ, the actions of the correctional officer who discovered the inmate and the actions of the two supervisors who were notified at their homes by the discovering correctional officer.  As a result of these reviews, several changes had been initiated, including:  (1)  written directions were established on the responsibilities of camp staff when they discover a suicide; (2) training of all camp staff on the appropriate responsive actions expectations when discovering a medical emergency was provided; (3) the distribution of cellular telephones or appropriate mobile phones for staff at conservation camps was planned by June 2005; (4) first aid and CPR training was to be provided and updated for all conservation camp staff by June 2005; and (5) classification hearings were made mandatory for all inmates returned to CCC or Sierra Conservation Camp (SCC) for mental health evaluations, prior to returning inmates to a camp program.

This follow-up materials identified several departmental issues raised during review of this suicide, including:  (1) the requirement for officers to conduct CPR; (2) the requirement for mental health providers regularly to review the central files of inmates; (3) the requirement that inmates who are returned to the institutions from camps must have a classification hearing prior to their placement back in a minimum setting; (4) requirements for correctional counselors on mental health referrals during the reception process; (5) the need for the program support unit and northern regional staff to analyze the budgeting rationale for assigning just one correctional officer to work in the camp settings on the first watch.

Plaintiffs' counsel's 1/27/05 letter raised many of these same issues, including the clinical failures during the inmate's processing in the reception center at SQ and later at CCC; the failure of the correctional officer who discovered the inmate to cut him down quickly and initiate CPR; and the failure of clinical staff to review the inmate's UHR and central file.

**Findings:** This inmate's suicide did not appear to have been foreseeable as he did not report suicidal or self-harming ideation or intent during the course of his incarceration in CDC, although he may have had a number of other possibly psychotic symptoms. The inmate had a substantial history of polysubstance dependence, suffered possibly from related brain damage and, in the opinion of an outside examiner, was or might become a paranoid schizophrenic. His death might have been preventable had the inmate received appropriate and adequate evaluations after he was identified as having difficulties and referred to mental health by custody staff. The inmate' mental health evaluations were incomplete and cursory, and significant information in both his UHR and central file was not reviewed. The Suicide Report identified a number of facility as well as systems issues, and the follow-up responses by CDC attempted to address those issues.

The most troubling circumstance in this inmate's completed suicide involved the first responder's reaction on discovering the hanging inmate. The correctional officer apparently had no equipment to sound an alarm without leaving the scene, did not immediately cut the inmate down and relieve stricture, did not try to access medical personnel via 911 and, after cutting the inmate down, did not perform CPR. The inmate's body was subsequently described as warm to touch with no rigormortis. The inmate's vital signs at the time of his discovery were not reported, and no efforts to provide CPR and/or obtain medical assistance to support this inmate's life were documented. This is an egregious example of individual, institutional and system-wide failures.

## 25. Inmate #W87924

Brief History: This inmate was a 42-year-old Caucasian female who completed suicide by hanging at the Central California Women's Facility (CCWF) on 11/19/04. At the time of her death, the inmate was single-celled in administrative segregation and receiving MHSDS services at the 3CMS level of care. She had been admitted to CDC via the reception center at CCWF on 12/4/00.

At approximately 12:29am on 11/19/04, a correctional officer conducting an institutional count in the administrative segregation unit discovered the inmate hanging by a sheet tied to a shelf in her cell. The officer activated his personal alarm, banged on the door to get a response from the inmate and, as other officers arrived, received the cut-down tool from a control booth officer. The cell was entered, the sheet cut and the inmate placed on the floor. An officer, a MTA and a nurse examined the inmate and found that she was cold to the touch and had no pulse or respiration. She was placed on a gurney, transported to the infirmary and pronounced dead by a physician at approximately 1:52am. The records indicated that no attempt was made to perform CPR.

An autopsy conducted on 11/20/04 determined the cause of death to be asphyxia due to hanging. Postmortem toxicology results were pending and not included in the documents reviewed.

This was the inmate's first incarceration. The inmate had been convicted in October 2000 of second-degree murder, arising out of an incident in which she shot her former boyfriend in a motel. The inmate reported a history of abuse by the victim and claimed that she had to kill him because he was going to kill her. The inmate also reported that the conflict with her former boyfriend concerned a child they had together and her giving the child up for adoption. The murdered victim's mother reported that the inmate had sold her eight-month-old child for $15,000. This, according to the victim's mother, was the cause of the argument. The inmate attempted to plead not guilty by reason of insanity based on a history of mental illness and Battered Spouse Syndrome, but was determined to be sane and convicted. She was given a sentence of 15 years to life, plus 25 years enhancement for use of a weapon, with the result that she had a 40 year to life sentence that began when she entered CCWF on 12/14/00. The innate was subsequently transferred to VSPW on 3/21/01 and returned to CCWF on 3/3/04.

On 12/18/00, shortly after her admission to the CDC, the inmate received a mental health screening. As noted in the screening, the inmate reported signs and symptoms of a possible mood disorder, major depression or thought disorder and indicated that she had been diagnosed with Schizophrenia and Bipolar Disorder. Her developmental disability evaluation of 12/18/00 indicated that she had normal cognitive functioning. Based on her mental health screening, the inmate was placed in the mental health program at the 3CMS level of care. The inmate was admitted to the CCWF MHCB unit on 1/4/01 because she claimed to be having visual and auditory hallucinations and said that she would "wind up harming herself or others." The inmate remained in the MHCB unit from 1/4/01 through 1/8/01. Staff reported that she was an unreliable source of information based on her "market suggestibility" regarding mental health symptoms, as well as her admission at the end of an interview "that she is in fact lying out of fear of not looking mentally ill."

The inmate reported that her first psychiatric symptoms began with "life," but subsequently changed the date to age "12" and later to "grade school." She described hearing voices that controlled her and reported that her mother and brother had the same symptoms. During her MHCB admission, she denied any history of inpatient psychiatric treatment, but said that she had been on "all" psychiatric medications. The inmate also reported a seizure disorder. A MH-2 conducted on 1/5/01 diagnosed her with Malingering and Alcohol Dependence in Institutional Remission as well as a Personality Disorder NOS with Antisocial and Borderline Traits, with a GAF of 65. The MH-2 concluded that her insight and judgment were extremely limited. With respect to a risk of suicide, the inmate stated, "I can't promise what I'll do." At the time of her discharge from the MHCB unit, treatment staff determined that the inmate did not require five-day follow-up. In an interview after the suicide, the inmate's mother and sister indicated that the inmate had received outpatient treatment at a mental health clinic and that she had reported hearing voices, seeing things and experiencing strange dreams. Her sister

recalled that these symptoms started at an early age, but her mother indicated that they began in high school.

After her transfer to VSPW on 3/21/01, the inmate began to report psychotic symptoms, including voices telling her to harm herself. She was placed on suicide precautions on 3/29/01 and transferred to the MHCB unit at CCWF, where she remained until 4/4/01. She was discharged back to VSPW with diagnoses of Personality Disorder NOS, Malingering and Alcohol Dependence. The inmate continued at the 3CMS level of care. She received Tegretol, ostensibly for reported seizures, and Neurontin. The inmate subsequently signed consents for Risperdal, Prozac, Trazodone, Mellaril and Seroquel. The inmate's working diagnosis at VSPW was Schizoaffective Disorder and she continued to report symptoms of psychosis, including hallucinations and paranoia as well as suicidal ideation, feelings of helplessness and hopelessness and anxiety over a possible nervous breakdown. Over time, her diagnoses included Schizophrenia, as well as Rule Out Bipolar Disorder, Major Depression and Malingering. The inmate continued to receive anti-psychotic and anti-depressant medications as well as Tegretol and Albuterol over the next two years without interruption. In addition, she also had trials of Lithium and Remeron.

The inmate obtained a job working in the school at VSPW. In August 2003, her supervisor requested a mental health evaluation and classification review because of the inmate's deteriorating condition; she was having difficulty following instructions and retaining information and she needed constant supervision. The referral was filed in the inmate's central file and did not come to the attention of mental health staff. The inmate, however, received a follow-up psychiatric appointment in September 2003 and had contact with a CCM in October 2003. In the course of these clinical visits, it was determined that the inmate was unable to work because of hearing voices.

In November 2003, the inmate was prescribed Zyprexa and Remeron. In December 2003, she first reported that she was "very suicidal" and the following day denied suicidal ideation or intent. A suicide risk assessment completed at that time listed a number of risk factors, including suicidal ideation/threats on the day before the assessment. The psychologist conducting the assessment concluded that the estimate of risk was low and referred the inmate to a psychiatrist for medication review. Additionally, the psychologist indicated that the inmate had denied "suicidality today but should be monitored at least weekly for changes. Consider for referral to EOP." Approximately one hour later, the inmate was seen by a psychiatrist who diagnosed Psychotic Disorder NOS, but opined that the inmate was "clinically not a danger to self or others at this time" and noted that the inmate signed a "contract of no self harm." The plan was to have the inmate to talk to staff when she felt suicidal and staff to monitor her carefully. There is no notation in the record to suggest that the psychiatrist conferred with the psychologist about the inmate's management needs.

In January 2004, the inmate was seen by a psychiatrist who reported that the inmate continued to hear voices and prescribed Zyprexa and Remeron. In February 2004, a psychiatrist assessed her as having Psychotic Disorder NOS and increased her Zyprexa.

The psychiatrist concluded "patient needs to be seen in IDTT to transfer her to Patton State Hospital via EOP." There is no indication in the record that the inmate was referred to PSH. An IDTT meeting on 2/24/04 reviewed the inmate's treatment and determined that she should be at the EOP level of care. On 3/3/04, the inmate was transferred to the EOP program at CCWF.

On 3/8/04, an IDTT noted that the inmate denied mental health concerns, but identified problems with low self esteem and depressed mood as well as poor concentration, lack of energy and social withdrawal. The IDTT diagnosed Rule Out Malingering and Personality Disorder and placed the inmate back in the 3CMS program. A MH-3 of that date indicated that the inmate was a "first termer: second degree murder...sentenced to two consecutive life terms." This note also referred to her extensive mental health history, her inconsistent reporting of information and her prescription for Remeron and Zyprexa. The note included the inmate's statement, "This is a big mistake. I shouldn't be here," and reported her assertion that she was transferred to an EOP level of care due to an "anxiety attack." The IDTT concluded that inmate was "very contradictory in current presentation from previous notes from VSPW clinician" and removed her from the EOP program. A note of 3/23/04 indicated the inmate was informed of her upcoming discharge from the EOP program and told that she would stay at CCWF. According to the note, the inmate was "elated", adding "I'm glad I'm staying here, I was tired of that place (VSPW) anyway." While at the 3CMS level of care at CCWF, the inmate was described as having some reported difficulties with sleeping and programming as an education porter; she also experienced periods of depression and anxiety, while denying suicidal and homicidal ideation. Her medications were changed to Trazodone and Risperdal.

In late August, the inmate began to report that she was experiencing increased symptoms, including voices that were more disturbing to her. Based on a correctional officer's referral, the psychiatrist increased the inmate's Risperdal and Vistaril. In September, the inmate had two episodes of physiological distress in which she could not move or was panting and could not stop. Each time, no physical basis was found for her complaints and she was referred to a psychiatrist. The inmate received four clinical contacts for medication non-compliance and signed a medication refusal form. As a result, her medication was discontinued on 10/1/04. The same day, the inmate asked a psychiatrist how she could get to PSH. On 10/2/04, the inmate presented herself at the clinic, stating that she was suicidal and planned to kill herself; the mental health staff believed that her statements were related to her question about PSH and she was diagnosed as Malingering. No SRA appeared to have been completed at that time. The inmate reported abdominal pain on 10/8 and 10/15/04, but the medical staff could find no physiological basis for her complaint. A 10/19/04 psychiatric note indicated that the inmate had been missing appointments "after she feigned suicidality to gain admission to PSH." The note also indicated that the inmate had stopped taking all her medications.

On 10/22/04, the inmate received a disciplinary infraction for attempted battery on a peace officer with a deadly weapon. The officer involved in the incident described the inmate as swinging a razor blade approximately eight inches from his face. According to the officer,

the inmate ceased swinging the blade when ordered to stop with pepper spray aimed at her face. A mental health assessment indicated that there were no mental health factors that would interfere with the inmate's ability to understand the disciplinary process. The assessment also concluded that the inmate's mental disorder did not appear to contribute to her behavior. The inmate was subsequently placed in administrative segregation pending her hearing. On interview, the inmate reported that she did not recall anything about the incident and had "blacked out." The inmate was charged with attempted battery and was facing a possible SHU term and referral to the district attorney's office. This was clearly the inmate's most serious infraction while incarcerated, but she had received earlier RVRs for refusing to report to work, possession of hot medications (cheeking medications) and conspiracy to manufacture alcohol to which she had pled guilty.

On 10/31/04, following her placement in administrative segregation, the inmate reported chest pain and asked to see the psychiatrist for a life or death situation. She was evaluated by a nurse who determined that there was no physiological basis for her complaints and by a psychiatrist who reported that the inmate was attempting to manipulate staff. She was seen by a case manager on 11/1, 11/4, 11/8 and 11/17/04 and by a psychiatrist on 11/9/04. In those appointments, the inmate reported that she had not been sleeping for several weeks and was "out of her mind" when the attempted assault occurred. During her month in segregation, the inmate came out of her cell for yard or showers only a few times. The administrative segregation psych tech reported that the inmate had a strong body odor and bad breath. The inmate also reported that she was hallucinating and threatened to harm herself if she did not get medication. Despite these reported symptoms and observations of her deteriorating condition, the inmate's medications were not restarted. Moreover, there was no documented consideration for a transfer to a MHCB unit during her stay in administrative segregation. A CCM informed the inmate, during her 11/19/04 meeting, that she would be scheduled to see the psychiatrist the following week, but the inmate committed suicide two days later.

According to the Suicide Report, three inmates reported that the deceased inmate had told the administrative segregation sergeant that she felt suicidal and needed help on the day prior to her suicide. The sergeant reportedly thought that she was manipulative and threatened to issue a disciplinary infraction. The institution was investigating the inmates' allegations. The Suicide Report also referred to an Investigative Services Unit (ISU) review of writings found in the inmate's cell. In the writings that she left, the inmate indicated that she had mental problems prior to her attempted assault on the correctional officer and requested leniency as she did not want to be sent to the SHU at VSPW. She also described "spirits" tormenting and controlling her, talked about her hallucinations and expressed suicidal ideation. Although the Suicide Report indicated that CPR was not attempted when this inmate was discovered, the inmate's Death Report, dated 11/19/04, noted that emergency procedures including CPR were administered promptly by a nurse.

The Suicide Report identified six problems and recommended corrective actions as follows:

Problem 1:  Staff did not provide CPR after discovering the inmate hanging, and did not document rigormortis or morbidity as justification for not doing so.

Recommendation:  The institution's emergency response committee should review this case and determine why CPR was not provided.  Training should be provided to nursing staff regarding CDC policy and proper documentation.

Problem 2:  The psych tech making rounds in the administrative segregation unit noted that the inmate had poor hygiene and other ADLs, but evidently did not recognize this as a sign of mental illness and did not refer the inmate to mental health.

Recommendation:  CCWF should provide remedial training to mental health staff on the need to make contact with inmates during rounds, the signs and symptoms of mental illness and the importance of making referrals.  The institution planned to provide training to all clinical staff on 2/17/05.

Problem 3:  Some mental health staff viewed this inmate as a malingerer and manipulative.  This made it more difficult for them to appreciate the evident symptoms of her mental disorder.  Staff must realize that being mentally ill and being manipulative are not mutually exclusive conditions.  Mentally ill inmates have poor coping skills and their cries for help, which can be manifested in odd ways like assaulting staff, must be recognized.  This appeared to be an on-going issue at CCWF.

Recommendation:   The chief psychologist needed continually to address this issue in suicide prevention meetings and staff meetings.  Mental health staff should also make this issue a focus of on-going peer review.

Problem 4:  The inmate's symptoms of psychosis were evidently discounted by the psychiatrist over the course of several meetings at a time when medications might have been helpful.

Recommendation:  The senior psychiatrist should address this issue with the psychiatric staff at meetings and in the peer review process.

Problem 5:  Two inmates reported that on the day the inmate attempted to assault an officer with a razor blade, her locker was searched and a torn sheet with a noose was found.  In her writings, the inmate reported that she attempted to hang herself on the morning of this incident, although a MTA injury report, dated 10/22/04 and completed prior to the inmate's placement in administrative segregation, did not find any marks on the inmate's neck.  The information about the hanging apparatus was not communicated to the mental health staff.

Recommendation:  The ISU should continue its investigation of these reports.

Problem 6:  Three inmates reported that on the day prior to the suicide, the inmate informed the administrative segregation sergeant that she felt suicidal and the sergeant threatened to issue a RVR when she did not stop saying this.  Another inmate reported that the inmate would hold a piece of paper for staff to read when they walked by her cell door.

Recommendation:  Here, too, the ISU should continue its investigation into these reports.

CCWF's response to the Suicide Report attached a number of documents, including a memorandum indicating that the corrective recommendations had been undertaken and were nearing completion and that further "proof of practice" documentation would be provided. With respect to the first problem, a memorandum dated 7/26/05 was submitted on a meeting of the emergency response committee to review this suicide. The memorandum referred to statements by the nurse and the MTA who failed to perform CPR. The nurse reportedly stated that CPR was "not continued due to the presence of lavidity/rigor." The MTA reported that she "discontinued CPR at the direction of the RN." The actual minutes from the meeting were still pending. As for problem two, sign-in sheets for the recommended training were provided. In response to problem three, minutes from suicide prevention committee meetings on 3/1/05 and 5/2/05 were attached. These minutes reflected a discussion of the need to do thorough clinical reviews of cases where both mental health and manipulation issues are present. The minutes also reflected a discussion of mental health assessments for disciplinary proceedings, five-day follow-up, repeat crisis bed admissions and attempted suicides.

Minutes from a psychiatry staff meeting on 4/28/05 were submitted in response to the fourth problem, which contained a detailed discussion of this inmate's suicide. No dispositive evidence had been collected on the incident described in problem five. Information about the noose found in the inmate's locker did not come to light until after the inmate's death, and the ISU "did not feel that a formal investigation was likely to produce additional information." In contrast, the investigation of events described in problem six continued, but the estimated completion date had been extended.

**Findings:** This inmate's suicide was probably foreseeable and appeared to have been preventable. The inmate complained inconsistently but frequently of having suicidal ideation and suicidal intent, including such a statement during her stay in administrative segregation. ISU investigations were ongoing, and it had not yet been determined whether the alleged statements were actually made by the inmate to an administrative segregation sergeant shortly before her death. If such statements were made, the sergeant had a responsibility to notify mental health to see the inmate.

There were numerous occasions when the inmate reported a variety of symptoms and other occasions when she denied those same symptoms. The staff at CCWF consistently appeared to be of the opinion that the inconsistencies were indicative of malingering and, therefore, did not require active mental health treatment. The staff at VSPW, however, indicated that these symptoms required higher levels of care, including MHCB and EOP treatment. The inmate's placement in administrative segregation and her deterioration there, as indicated by her declining involvement with the mental health staff, her periodic complaints of psychotic and suicidal symptomatology and her worsening ADLs and hygiene, should have prompted a more complete evaluation and review by the IDTT. The Suicide Report recognized the need to develop treatment and management approaches for both mental illness <u>and</u> symptoms of malingering in the care of the same inmate. There seems to have been a fundamental failure on the part of the staff at CCWF to address both the inmate's symptoms of mental illness and her characterological

pathology. More comprehensive evaluations, information sharing and treatment interventions, such as medication management, should have been a part of this inmate's overall care and management. Lastly, the decision not to perform CPR and the conflicting documentation about this issue did not appear to have been adequately addressed by the institution's response to the recommended corrective action in the Suicide Report.

## 26. Inmate #D97784

Brief History: This inmate was a 35-year-old Armenian male who completed suicide by hanging at California Institution for Men (CIM) on 12/2/04. At the time of his death, the inmate was single-celled in administrative segregation and was not receiving any mental health services. The inmate had been returned to CDC via the reception center at NKSP on 6/5/01 and transferred to CIM on 8/9/04.

At approximately 5:55am on 12/2/04, two correctional officers observed the inmate slumped forward and sitting on the floor of his cell between the bunk and the cell bars. The inmate had a white cloth tied around his neck and the end of the cloth was tied to the upper bunk. One of the officers ran to the second floor of the administrative segregation unit and, using an institutional land line, alerted staff of the situation. A sergeant and other officers came in reply. The inmate was not responsive to the staff's verbal attempts to rouse him. He was then administered a one second burst of OC pepper spray, to which he also did not respond. A cut down tool was used to free the cloth from around the inmate's neck. The inmate was then restrained, removed from the cell and escorted out of the administrative segregation unit.

A MTA arrived at approximately 6:03am, while the inmate was being moved to an emergency vehicle for transportation to the CIM Hospital at 6:05am. According to the MTA, the inmate appeared to be "pulseless, warm to the touch, and had no evidence of respiration." The emergency room admission record indicated that the inmate arrived with no respiration and no pulse. A Code Blue was called and CPR was initiated. The inmate was unresponsive; his color pale and his skin cool to the touch. It appeared that CPR was begun at approximately 6:15am, but not prior to the inmate's arrival in the emergency room. The inmate was subsequently pronounced dead by a physician at 6:40am. The inmate's Death Report, however, indicated that emergency procedures following his suicide act were promptly applied.

An autopsy conducted on 12/3/04 determined the cause of death to be hanging and the manner of death to be suicide. A postmortem toxicology report found trace amounts of Benadryl in the inmate's blood sample.

The inmate first became involved in the criminal justice system as a juvenile at age 16. Between the ages of 16 and 18, he had four arrests for theft. As an adult, he was arrested for auto theft in 1988 and entered CDC as an adult for the first time on 10/4/88 with a three-year sentence. He was paroled and returned to custody on at least six occasions either as a parole violator or with new charges, including disregard for the safety of

others, illegal possession of tear gas, burglary, possession of marijuana and auto theft. The inmate's current term began on 6/5/01, when he was convicted of evading an officer with willful disregard and given a five-year sentence. The record identified the inmate as a foreign national. There was an INS hold on the inmate and it was likely that he would be deported if paroled again. His earliest possible release date was 5/12/05, approximately five months from the time of his death.

The inmate had a long history of polysubstance abuse and/or dependence, including use of marijuana, cocaine and heroin. It appeared that the inmate had entered at least one drug rehabilitation program, but his treatment was not completed. According to a sheriff's report dated 6/5/01, the inmate had been treated with Motrin and Zoloft while in the county jail. He did not, however, appear to have received any other treatment for mental illness prior to his return to the CDC system in June 2001. A mental health evaluation administered in the reception center at NKSP recommended treatment at the 3CMS level of care. The inmate was initially diagnosed with Major Depression and prescribed Motrin and Zoloft.

The inmate was transferred from NKSP to Folsom in August 2001. While at Folsom, the inmate attempted to hang himself as a result of gang problems. He was transferred to the MHCB unit at CSP/Sac from 8/2 to 8/29/2002. At that time, he was given a diagnosis of Mood Disorder NOS with a GAF score of 46, and his level of care was changed to EOP. His medications were changed to Wellbutrin and Lithium and he was transferred to RJD. The inmate remained at the EOP level of care at RJD. In August 2003, he was seen by a psychiatrist because he had stopped taking his medications. He was set to have a trial period of three months off medications with follow-up by the psychiatrist, but the inmate was transferred to CIM on 8/9/03, where he remained until his death.

At CIM on 8/25/03, a psychiatrist agreed with the inmate to change his medications back to Zoloft and Zyprexa, which the inmate felt had worked more effectively for him. In March 2004, an IDTT met and determined that, while the inmate's diagnosis remained the same, his level of care should be changed from EOP to 3CMS. A SRA completed prior to this level-of-care change indicated that the inmate had a history of several suicide acts, including the aforementioned attempted hanging in Folsom, as well as an overdose of pills and another attempted hanging in 2000. The SRA determined that the inmate was not in crisis and was not suicidal. By May 2004, the inmate was complaining that his Wellbutrin caused insomnia and appetite loss. In response, the psychiatrist decreased his dosage. The inmate stopped taking his medications in July 2004, as a result of which they were discontinued by the psychiatrist. The inmate appeared to be stable, with follow-up scheduled in three months.

The inmate was seen by a psychiatrist on 8/10/04. At that time, he denied experiencing any mood swings, depressive symptoms or suicidal or homicidal ideation and reported that his sleep and appetite were good. He admitted, however, that he had occasional auditory hallucinations, but the psychiatrist noted the inmate's statement that "he can live with it." The plan was to conduct laboratory work and follow-up the inmate in eight weeks.

115

On 9/13/04, the inmate made a self-referral to the CCM, requesting a transfer to "Central" (reception center central at CIM). He reported that he was feeling intolerant of other inmates and wanted to be removed from the 3CMS caseload since he had been off psychiatric medications for two months. The case manager followed up with the inmate four days later. At that time, the inmate asked, "What if I told you that I was faking it all along? I never heard voices and I faked the S/A's so I could get out of Folsom after my celly attacked me." According to the CCM's note, the inmate claimed that he had faked his symptoms so he could get into the EOP program. The inmate denied all depressive symptoms, as well as any mood lability. The CCM indicated that due to the inmate's "admission of malingering symptoms he is removed from CCCMS as of this date." His diagnosis was changed to Malingering and Polysubstance Dependence. His removal from the 3CMS caseload was to be completed as of 9/17/04.

The inmate was seen by a psychiatrist for a follow-up appointment on 10/8/04. The psychiatrist reported that the inmate seemed "a little disorganized and vague," but he denied any symptoms of Bipolar Disorder or psychosis. The psychiatrist also noted that the inmate was "very circumstantial and vague" and that he had lied in the past to get out of the prison he was in because "the place was haunted." The psychiatrist's plan was to observe the inmate without psychiatric medication and follow-up in two weeks.

The inmate was seen by a different psychiatrist on 10/19/04. During this appointment, the inmate reported that two weeks earlier he had experienced a panic attack, but he denied any depression or suicidal thoughts. The inmate's mental status was recorded as calm and cooperative, with moderately depressed mood and appropriate affect. He did not have hallucinations, suicidal ideation or homicidal ideation. The psychiatrist assessed the inmate as having a panic disorder. He planned to start Paxil 20mg and return the inmate to the clinic in three weeks. The psychiatrist did not comment on placing the inmate back in the MHSDS and may not have been aware that the inmate had been removed from the caseload in September 2004. This was the last mental health note in the inmate's record. There was no indication that the follow-up appointment to check on the inmate's Paxil was ever conducted. The inmate's MAR demonstrated that he had stopped taking his Paxil on 11/10/04 and had signed a refusal form. There was no documentation in the record that the inmate was referred again to the psychiatrist after he signed the refusal form.

An emergency admission sheet dated 11/20/04 indicated that the inmate had facial bruises and a small laceration on his back. The inmate reported that he had experienced a seizure, but the physical examination revealed a puncture wound in the middle of his back that did not require extensive treatment. The inmate was subsequently placed in administrative segregation for safety reasons. There was no documentation that he received a mental health screening on entering administrative segregation. The records indicated that the inmate was referred by a psych tech to a psychologist on 11/22/04 because he had been on psychotropic medications in the past. There was no documentation that a subsequent evaluation occurred.

The Suicide Report identified five problems and recommended corrective actions as follows:

Problem 1: Delays in filing medical documents and moving UHRs from the minimum support facility to the central records section may have impeded this inmate's care with regard to medications and his status in the MHSDS.

Recommendation: The institution needed to form a QIT to determine whether policies, procedures and practices for the maintenance of UHRs are effective. Weekly audits should be conducted for two months.

Problem 2: This inmate's MHSDS status was noted as general population on the administrative segregation placement document. All general population inmates are required to have a mental health screening within 72 hours of admission to the administrative segregation unit, but there was no indication that this was completed for the inmate.

Recommendation: The institution should form a QIT to ensure that current procedures for mental health screenings in the administrative segregation unit accurately reflect CDC policy. Staff should be provided with training in order to ensure that all general population inmates receive a mental health screening within the 72 hours of admission to the unit.

Problem 3: After being placed in the administrative segregation unit, the inmate was referred to a psychologist for an evaluation. The evaluation did not, however, take place. There may have been a systems problem with how referrals were tracked.

Recommendation: The institution needed a QIT to review procedures for making and tracking referrals and conduct an audit of mental health referrals and follow-up.

Problem 4: There was no indication that a formal IDTT meeting was held, as required, within five days of the inmate's arrival at CIM and no indication when the inmate was removed from the 3CMS caseload.

Recommendation: Staff should be trained on MHSDS guidelines for changes in level of care. A QIT should be formed to conduct a review of the procedures for tracking new inmates and scheduling IDTT meetings for them.

Problem 5: The psychiatrist who assessed the inmate as having a panic disorder made a note in the UHR for a follow-up visit within three weeks. There was no indication that this follow-up was scheduled or completed.

Recommendation: CIM should form another QIT to review procedures for tracking and scheduling follow-up appointments. The QIT should also conduct weekly inquiries of inmates who are on psychotropic medications but do not have psychiatric appointments scheduled.

Problem 6: The use of pepper spray on an inmate in distress seemed questionable.

Recommendation: The institution should review emergency response procedures and practices with regard to the use of pepper spray.

CIM did not provide a follow-up response to the Suicide Report in the documents received prior to the completion of this report.

**Findings:**  This inmate's suicide did not appear to have been foreseeable because he neither reported suicidal ideation or intent nor requested any additional mental health services.  Moreover, his behavior did not appear to change significantly prior to his suicide except for the reported panic attack prior to his placement in administrative segregation.  The inmate's suicide, however, might have been preventable if he had received appropriate screening as a general population inmate placed in administrative segregation; the psych tech's referral following his placement in administrative segregation had been followed-up; or a follow-up psychiatric appointment had been conducted as planned three weeks after the 10/19/04 interview or when the inmate signed a refusal slip for psychotropic medications.