**EXHIBIT A**

WAN J. KIM
Assistant Attorney General
SHANETTA Y. CUTLAR (CA Bar No. 169849)
Chief, Special Litigation Section
BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
LEE R. SELTMAN (CA Bar No. 168857)
MARY R. BOHAN (DC Bar No. 420628)
WILLIAM G. MADDOX (DC Bar No. 000020540)
JACQUELINE CUNCANNAN (DC Bar No. 462985)
MATTHEW J. DONNELLY (IL Bar No. 6281308)
ANITA C. SNYDER (NY Bar No. 3910494)
Trial Attorneys
United States Department of Justice
Civil Rights Division
    Special Litigation Section
    950 Pennsylvania Avenue, N.W.
    Washington D.C.  20035
    (202) 514-6255

DEBRA W. YANG
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
GARY L. PLESSMAN
Assistant United States Attorney
Chief, Civil Fraud Section
HOWARD DANIELS (CA Bar No. 081764)
Assistant United States Attorney
    300 North Los Angeles Street
    Federal Building, Room 7516
    Los Angeles, CA  90012
    (213) 894-4024

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | STIPULATION FOR CONSENT |
| | ) | JUDGMENT AND AGREEMENT |
| STATE OF CALIFORNIA; THE | ) | |
| HONORABLE ARNOLD SCHWARZENEGGER, | ) | |
| Governor of the State of | ) | |
| California, in his official | ) | |
| capacity only; STEPHEN W. MAYBERG, | ) | |

Director of the California
Department of Mental Health, in )
his official capacity only; )
SHARON SMITH NEVINS, Executive )
Director of Metropolitan State )
Hospital, in her official )
capacity only; and DAVE GRAZIANI, )
Executive Director of Napa )
State Hospital, in his official )
capacity only, )
)
    Defendants. )
_____)

IT IS HEREBY STIPULATED AND AGREED by the parties hereto as follows:

A.  This Stipulation and the proposed Consent Judgment at Exhibit "A" represent a complete settlement of this case, the Complaint in which was filed contemporaneously herewith.

B.  This matter was instituted by the United States of America pursuant to the Civil Rights of Institutionalized Persons Act, ("CRIPA") 42 U.S.C. § 1997.

C.  The United States is authorized to institute this civil action by 42 U.S.C. § 1997a and has met all prerequisites for the institution of this civil action prescribed by the statute.

D.  The parties to this Stipulation (collectively, "the Parties") are the State of California ("State"); the Honorable Arnold Schwarzenegger, Governor of the State of California; Stephen W. Mayberg, Ph.D., Director of the California Department of Mental Health; Sharon Smith Nevins, Executive Director of Metropolitan State Hospital ("Metropolitan"); Dave Graziani, Executive Director of Napa State Hospital ("Napa"), and their successors, contractors, and agents (collectively, the "California Parties" or "California"); and the United States (the "United States" or "DOJ").

E. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345. Venue is appropriate pursuant to 28 U.S.C. § 1391(b). This Stipulation is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Stipulation will be the United States District Court for the Central District of California.

F. The California Parties have authority and responsibility for the operation of Metropolitan State Hospital, Napa State Hospital, Patton State Hospital, and Atascadero State Hospital, and of any facility that supplements or replaces these hospitals (collectively, the "State Hospitals") and/or are officers of the Executive Branch of the State of California.

G. The State Hospitals are institutions covered by CRIPA and operated by the State to provide psychiatric treatment and other protections, supports, and services to persons with mental illness. The State has authority and responsibility for the operation of the State Hospitals and is responsible for the implementation of this Stipulation.

H. On March 21, 2002, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, notified the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Metropolitan, and the Director of the California Department of Mental Health, of his intention to investigate allegations of unconstitutional and unlawful conditions at Metropolitan pursuant to 42 U.S.C. § 1997.

I.   Following a thorough investigation, on May 13, 2003, and on February 19, 2004, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, issued findings letters pursuant to 42 U.S.C. § 1997b(a)(1), which informed the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Metropolitan, and the Director of the California Department of Mental Health that the Attorney General had reasonable cause to believe that persons residing in, or confined to, Metropolitan were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States.

J.   On January 26, 2004, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, notified the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Napa, and the Director of the California Department of Mental Health, of his intention to investigate allegations of unconstitutional and unlawful conditions at Napa pursuant to 42 U.S.C. § 1997.

K.   Following a thorough investigation, on June 27, 2005, the Attorney General of the United States, by and through the Acting Assistant Attorney General, Civil Rights Division, issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which informed the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Napa, and the Director of the California Department of Mental

Health, that the Attorney General had reasonable cause to believe that persons residing in or confined to Napa were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States.

L.  On April 9, 2004, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, notified the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Patton, and the Director of the California Department of Mental Health, of his intention to investigate allegations of unconstitutional and unlawful conditions at Patton pursuant to 42 U.S.C. § 1997.

M.  Following a thorough investigation, on the date hereof, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which informed the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Patton, and the Director of the California Department of Mental Health that the Attorney General had reasonable cause to believe that persons residing in, or confined to, Patton were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States.

N.  On February 16, 2005, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, notified the Governor of the State of

California, the Attorney General of the State of California, the Executive Director of Atascadero, and the Director of the California Department of Mental Health, of his intention to investigate allegations of unconstitutional and unlawful conditions at Atascadero pursuant to 42 U.S.C. § 1997.

O.    Following a thorough investigation, on the date hereof, the Attorney General of the United States, by and through the Assistant Attorney General, Civil Rights Division, issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1), which informed the Governor of the State of California, the Attorney General of the State of California, the Executive Director of Atascadero, and the Director of the California Department of Mental Health that the Attorney General had reasonable cause to believe that persons residing in, or confined to, Atascadero were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States.

P.    In accordance with 42 U.S.C. § 1997b, after the passage of 49 days hereof, the United States shall file an amended complaint to address its claims of unlawful conditions at Patton and Atascadero, and to name those facilities' Executive Directors as Defendants in this matter.  With the amended complaint, the United States shall file a motion to amend the proposed Consent Judgment at Exhibit "A" hereto so that the proposed Consent Judgment applies with equal force and effect to Patton, Atascadero, Metropolitan, and Napa.  The California Parties shall not oppose the United States' motion to amend the proposed

Consent Judgment at Exhibit "A" so that it applies with equal force and effect to Patton, Atascadero, Metropolitan, and Napa.

Q.  The conditions of confinement, care, treatment, and rehabilitation of the State Hospitals' residents ("residents") implicate rights that are secured and protected by the Constitution and laws of the United States.  The Parties entering into this Stipulation recognize these legal interests, and for the purpose of avoiding protracted and adversarial litigation, agree to the provisions set forth herein.

R.  The provisions of this Stipulation and the proposed Consent Judgment at Exhibit "A" are a lawful, fair, and appropriate resolution of this case.

S.  This Stipulation is legally binding and judicially enforceable by the Parties, and it shall be applicable to and binding upon all of the Parties, their officers, agents, employees, assigns, transferees, subsidiaries, and successors.

T.  With the exception of the findings letters referenced in paragraphs I, K, M, and O hereof, and any technical assistance recommendations by the United States regarding facility conditions, no prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein.  This Stipulation and the proposed Consent Judgment at Exhibit "A" contain the entire agreement between the Parties and wholly cancel, terminate, and supersede any and all previous and/or contemporaneous oral agreements, negotiations, and commitments

and writings between the Parties thereto with respect to this CRIPA action.

U.   Pursuant to a separate Settlement Agreement executed on the date hereof, between the United States and the State, the Parties have agreed that entry of the proposed Consent Judgment at Exhibit "A" shall also resolve a contemporaneous investigation by the United States Department of Justice related to Medicare/Medicaid claims at Metropolitan.

V.   After notification of the initial CRIPA investigation of Metropolitan in 2002, and continuing from time to time thereafter, the State voluntarily undertook initiatives to address outstanding concerns with regard to the protections, services, and supports provided at the State Hospitals. California and its officials have acted in good faith and have voluntarily undertaken significant measures to enhance confinement, care, treatment, and rehabilitation for residents.

W.   The Parties jointly have agreed upon the Enhancement Plan (the "Plan"), to address outstanding concerns that affect or have affected the State Hospitals' residents.  The provisions of the Plan are set forth in their entirety in the proposed Consent Judgment in Exhibit "A" attached hereto.

X.   The specific means to be employed in implementing the Plan are matters within the California Parties' discretion, and they shall be accepted so long as they are consistent with the purpose of this Stipulation and the Plan, the purpose of which is to secure the rights, privileges, and immunities of the State

Hospital residents that are protected by the Constitution of the United States and federal laws.

Y.    The Parties reserve the right to withdraw consent to this Stipulation in the event that the proposed Consent Judgment at Exhibit "A" is not approved by the Court in its entirety.

Z.    The Parties agree that any records produced pursuant to this Stipulation and the proposed Consent Judgment at Exhibit "A" may be shared only with the following:

(1) the Court, including public submissions and filings;

(2) the Monitor, persons assisting the Monitor, and any expert(s) or consultant(s) selected or retained by the Parties pursuant to this Stipulation and the proposed Consent Judgment at Exhibit "A";

(3) all counsel of record in this matter;

(4) staff and clerical personnel involved in the preparation, and review of, the submissions and reports for counsel of record; and

(5) United States and other governmental officials, as necessary, in order to carry out law enforcement responsibilities.

Notwithstanding the foregoing, the United States shall adhere to the requirements of federal law, including the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the State shall adhere to state law, including the state Public Records Act ("PRA"), Cal. Gov't Code § 6254, et seq.  In the event of a request pursuant to FOIA or the PRA for records produced pursuant to this Stipulation, the Parties agree to assert all applicable exemptions in protecting the confidentiality of information

1  contained therein.  All Parties shall be responsible for

2  maintaining the confidentiality of records in their possession.

3  Submissions to the Court that contain identifying information of

4  residents (such as their full name, address, or social security

5  number) shall be filed with the Court using pseudonyms or the

6  residents' initials.

7      AA.  All Parties shall bear their own costs, including

8  attorney's fees.

9      BB.  The Parties agree to defend the provisions of this

10 Stipulation and the proposed Consent Judgment at Exhibit "A".

11 The Parties shall notify each other of any court or

12 administrative challenge to this Stipulation or the proposed

13 Consent Judgment at Exhibit "A".  In the event any provision of

14 this Stipulation or the proposed Consent Judgment at Exhibit "A"

15 is challenged in any local or state court, removal to the United

16 States District Court for the Central District of California

17 shall be sought.

18     CC.  Failure by any Party to enforce this entire Stipulation

19 and the proposed Consent Judgment at Exhibit "A" or any provision

20 thereof with respect to any deadline or any other provision shall

21 not be construed as a waiver of its right to enforce other

22 deadlines or provisions.  In the event any provision of this

23 Stipulation and the proposed Consent Judgment at Exhibit "A" is

24 declared invalid for any reason by a court of competent

25 jurisdiction, said finding shall not affect the remaining

26 provisions of this Stipulation or the proposed Consent Judgment

27 at Exhibit "A".

28

DD.  If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Stipulation and the proposed Consent Judgment at Exhibit "A" the California Parties shall notify the Monitor and the United States in writing within thirty (30) calendar days of the time that the California Parties become aware of the unforeseen circumstance and its impact on their ability to perform under the Agreement.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure.  The California Parties shall implement all reasonable measures to avoid or minimize any such failure.

EE.  Notice under this Stipulation and the proposed Consent Judgment at Exhibit "A" shall be provided by courier or overnight delivery to the California Parties to:

Chief Counsel,
California Department of Mental Health
1600 9th Street, Room 153
Sacramento, CA  95814

and to the United States to:

Chief
Special Litigation Section
Civil Rights Division
United States Department of Justice
601 D Street, N.W.
Washington, D.C.  20004

FF.  The California Parties will comply at all times with 42 U.S.C. § 1997d.

GG.  It is intended that the Parties will pursue a problem-solving approach so that litigation will not be necessary and any disagreements can be minimized and the energies of the Parties can be focused on the task of meeting the needs of the

11

residents and achieving the outcomes set forth in this
Stipulation and the proposed Consent Judgment at Exhibit "A".
The Parties, notably two governmental agencies exercising their
expertise, intend to work together to resolve differences.  The
Parties will look to the Monitor to assist in measuring
compliance and providing assistance toward this goal and in
furtherance of the Parties' goals in reaching this Agreement.  It
is the intention of the Parties that there be no Special Master
assigned to this case.  The United States agrees to confer with
the State in a good faith effort to attempt to reach agreement
regarding remedy of the alleged deficiencies.  The United States
may seek enforcement of this Stipulation and the proposed Consent
Judgment at Exhibit "A" from the Court consistent with this
Stipulation and the proposed Consent Judgment at Exhibit "A" if
the United States determines, in its sole discretion, that
engaging in further good faith discussions with the State is
fruitless.

HH.  The individuals signing this Stipulation on behalf of
the California Parties represent and warrant that they are
authorized by such Parties to execute this Stipulation.  The
United States signatories represent that they are signing this
Stipulation in their official capacities and that they are
authorized to execute this Stipulation.

II.  This Stipulation may be executed in counterparts, each
of which constitutes an original and all of which constitute one
and the same agreement.  Facsimiles of signatures shall
constitute acceptable, binding signatures for purposes of this
Stipulation.

JJ.  The Parties stipulate and agree that a Consent Judgment in the form of Exhibit "A" attached hereto may be entered immediately without further notice or hearing.

DATED:  This 28th day of April, 2006.

_____
WAN J. KIM
Assistant Attorney General

_____
SHANETTA Y. CUTLAR
Chief, Special Litigation Section

_____
BENJAMIN O. TAYLOE, JR.
LEE R. SELTMAN
MARY R. BOHAN
WILLIAM G. MADDOX
JACQUELINE CUNCANNAN
MATTHEW J. DONNELLY
ANITA C. SNYDER
Trial Attorneys
United States Department of Justice
Civil Rights Division

_____
DEBRA W. YANG
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
GARY L. PLESSMAN
Assistant United States Attorney
Chief, Civil Fraud Section
HOWARD DANIELS (CA Bar No. 081764)
Assistant United States Attorney

✗ by Frank Kortum (AUSA)
(per telephone authorization)

13

DATED:    This _1st_ day of _May_, 2006.


_Kimberly Belshé_
KIMBERLY BELSHE
Secretary, State of California
Health and Human Services Agency


FRANK S. FURTEK
Chief Counsel, State of California
Health and Human Services Agency


STEPHEN W. MAYBERG
Director, California Department
Of Mental Health


CYNTHIA RODRIGUEZ
Chief Counsel, California
Department of Mental Health

14

```
 1  WAN J. KIM
    Assistant Attorney General
 2  SHANETTA Y. CUTLAR (CA Bar No. 169849)
    Chief, Special Litigation Section
 3  BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
    LEE R. SELTMAN (CA Bar No. 168857)
 4  MARY R. BOHAN (DC Bar No. 420628)
    WILLIAM G. MADDOX (DC Bar No. 000020540)
 5  JACQUELINE CUNCANNAN (DC Bar No. 462985)
    MATTHEW J. DONNELLY (IL Bar No. 6281308)
 6  ANITA C. SNYDER (NY Bar No. 3910494)
    Trial Attorneys
 7  United States Department of Justice
    Civil Rights Division
 8       Special Litigation Section
         950 Pennsylvania Avenue, N.W.
 9       Washington D.C.  20035
         (202) 514-6255
10
    DEBRA W. YANG
11  United States Attorney
    LEON W. WEIDMAN
12  Assistant United States Attorney
    Chief, Civil Division
13  GARY L. PLESSMAN
    Assistant United States Attorney
14  Chief, Civil Fraud Section
    HOWARD DANIELS (CA Bar No. 081764)
15  Assistant United States Attorney
         300 North Los Angeles Street
16       Federal Building, Room 7516
         Los Angeles, CA  90012
17       (213) 894-4024

18  Attorneys for the United States of America

19              UNITED STATES DISTRICT COURT

20         FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                  WESTERN DIVISION

22  UNITED STATES OF AMERICA,          )   CASE NO. _____
         Plaintiff,                    )
23                                     )
         vs.                           )
24                                     )   CONSENT JUDGMENT
    STATE OF CALIFORNIA; THE           )
25  HONORABLE ARNOLD SCHWARZENEGGER,   )
    Governor of the State of           )
26  California, in his official        )
    capacity only; STEPHEN W. MAYBERG, )
27  Director of the California         )
    Department of Mental Health, in    )
28  his official capacity only;        )
```

```
1  SHARON SMITH NEVINS, Executive    )
   Director of Metropolitan          )
2  State Hospital, in her            )
   official capacity only; and DAVE  )
3  GRAZIANI, Executive Director of   )
   Napa State Hospital, in his       )
4  official capacity only,           )
                  Defendants.        )
5  _____)
```

6       Simultaneously herewith, Plaintiff, the United States of

7  America filed a Complaint under the provisions of 42 U.S.C.

8  § 1997 against the Defendants, seeking to remedy an alleged

9  pattern or practice of conduct that was alleged to deprive

10  patients of Metropolitan State Hospital, in Norwalk, California,

11  and Napa State Hospital, in Napa, California (collectively, and

12  including any facility that supplements or replaces them, the

13  "State Hospitals") of rights, privileges, and immunities secured

14  or protected by the Constitution or laws of the United States.

15  On the same date, the Parties in this matter filed a Stipulation

16  for Consent Judgment and Agreement ("Stipulation").

17       Noting the general principle that settlements are to be

18  encouraged, particularly settlements between governmental

19  entities, and having considered the Stipulation and the terms of

20  the measures, set forth herein, that the Defendants agree to

21  undertake to improve conditions at the State Hospitals, it is

22  ORDERED, ADJUDGED AND DECREED that pursuant to the Stipulation,

23  and good and reasonable cause appearing therefore, Judgment shall

24  be entered in this matter pursuant to the following terms and

25  conditions:

26

27

28

2

PART I

ENHANCEMENT PLAN

------------------------------------------------------------------

**Table of Contents**

A.    Definitions . . . . . . . . . . . . . . . . . . . . – 5 –

      1.    Effective Date . . . . . . . . . . . . . . – 5 –

      2.    Consistent With Generally Accepted Professional
         Standards of Care . . . . . . . . . . . . – 5 –

B.    Introduction . . . . . . . . . . . . . . . . . . – 5 –

C.    Integrated Therapeutic and Rehabilitation Services
    Planning . . . . . . . . . . . . . . . . . . . . – 6 –

      1.    Interdisciplinary Teams . . . . . . . – 6 –

      2.    Integrated Therapeutic and Rehabilitation Service
         Planning . . . . . . . . . . . . . . . . . – 8 –

D.    Integrated Assessments . . . . . . . . . . . . . . – 19 –

      1.    Psychiatric Assessments and Diagnoses . . – 20 –

      2.    Psychological Assessments . . . . . . . . – 24 –

      3.    Nursing Assessments . . . . . . . . . . . – 28 –

      4.    Rehabilitation Therapy Assessments . . . . – 30 –

      5.    Nutrition Assessments . . . . . . . . . . – 31 –

      6.    Social History Assessments . . . . . . . . – 33 –

      7.    Court Assessments . . . . . . . . . . . . – 34 –

E.    Discharge Planning and Community Integration . . . . – 38 –

F.    Specific Therapeutic and Rehabilitation Services . . – 40 –

      1.    Psychiatric Services . . . . . . . . . . . – 40 –

      2.    Psychological Services . . . . . . . . . . – 45 –

3.   Nursing Services . . . . . . . . . . . . . . .   - 49 -

4.   Rehabilitation Therapy Services  . . . . .   - 52 -

5.   Nutrition Services . . . . . . . . . . . . .   - 53 -

6.   Pharmacy Services . . . . . . . . . . . . .   - 55 -

7.   General Medical Services . . . . . . . . .   - 55 -

8.   Infection Control  . . . . . . . . . . . .   - 57 -

9.   Dental Services  . . . . . . . . . . . . .   - 58 -

10.  Special Education  . . . . . . . . . . . . .   - 59 -

G.   Documentation  . . . . . . . . . . . . . . . . .   - 61 -

H.   Restraints, Seclusion, and PRN and Stat Medications   - 61 -

I.   Protection From Harm . . . . . . . . . . . . . .   - 65 -

1.   Incident Management  . . . . . . . . . . .   - 65 -

2.   Performance Improvement  . . . . . . . . .   - 72 -

3.   Environmental Conditions . . . . . . . . .   - 74 -

J.   First Amendment and Due Process  . . . . . . . .   - 75 -

--------------------------------------------------------------------

4

A.   Definitions

    1.   Effective Date

        The Effective Date will be considered the first day of the month following the date of execution of the agreement by all parties.  Unless otherwise specified, implementation of each provision of this Plan shall begin no later than 12 months after the Effective Date.

    2.   Consistent With Generally Accepted Professional Standards of Care

        A decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards as to demonstrate that the person responsible based the decision on such accepted professional judgment.

B.   Introduction

    Each State Hospital shall use a Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery. Therapeutic and rehabilitative services provided by each State Hospital shall be based on evidence-based practices and practice-based evidence, shall be age-appropriate, and shall be designed to:  strengthen and support individuals' recovery, rehabilitation, and habilitation; enable individuals to grow and develop in ways benefitting their mental health, physical health, and well being; and ensure individuals' reasonable safety, security, and freedom from undue bodily restraint.  Relationships between each State Hospital's staff and the individuals whom they serve shall be positive, therapeutic, and respectful.

1    Each individual served by each State Hospital shall be
2 encouraged to participate in identifying his or her needs and
3 goals, and in selecting appropriate treatment options.
4 Therapeutic and rehabilitation services shall be designed to
5 address each individual's needs and to assist individuals in
6 meeting their specific recovery and wellness goals, consistent
7 with generally accepted professional standards of care.  Each
8 State Hospital shall ensure clinical and administrative
9 oversight, education, and support of its staff in planning and
10 providing care and treatment consistent with these standards.
11 C.    Integrated Therapeutic and Rehabilitation Services Planning
12    Each State Hospital shall provide coordinated,
13 comprehensive, individualized protections, services, supports,
14 and treatments (collectively "therapeutic and rehabilitation
15 services") for the individuals it serves, consistent with
16 generally accepted professional standards of care.  In addition
17 to implementing the therapeutic and rehabilitation planning
18 provisions set forth below, each State Hospital shall establish
19 and implement standards, policies, and practices to ensure that
20 therapeutic and rehabilitation service determinations are
21 consistently made by an interdisciplinary team through integrated
22 therapeutic and rehabilitation service planning and embodied in a
23 single, integrated therapeutic and rehabilitation service plan.
24    1.    Interdisciplinary Teams
25        The interdisciplinary team's membership shall be
26    dictated by the particular needs and strengths of the
27    individual in the team's care.  At a minimum, each State
28

6

1    Hospital shall ensure that the team shall:

2    a.    Have as its primary objective the provision of

3          individualized, integrated therapeutic and

4          rehabilitation services that optimize the

5          individual's recovery and ability to sustain

6          himself/herself in the most integrated,

7          appropriate setting based on the individual's

8          strengths and functional and legal status and

9          support the individual's ability to exercise

10         his/her liberty interests, including the interests

11         of self determination and independence;

12   b.    Be led by a clinical professional who is involved

13         in the care of the individual;

14   c.    Function in an interdisciplinary fashion;

15   d.    Assume primary responsibility for the individual's

16         therapeutic and rehabilitation services, and

17         ensure the provision of competent, necessary, and

18         appropriate psychiatric and medical care;

19   e.    Ensure that each member of the team participates

20         appropriately, by competently and knowledgeably

21         assessing the individual on an ongoing basis and

22         by developing, monitoring, and, as necessary,

23         revising the therapeutic and rehabilitation

24         services;

25   f.    Ensure that assessment results and, as clinically

26         relevant, consultation results, are communicated

27         to the team members, along with the implications

28

7

of those results for diagnosis, therapy and
rehabilitation by no later than the next review;

g.  Be responsible for the scheduling and coordination
of assessments and team meetings, the drafting of
integrated treatment plans, and the scheduling and
coordination of necessary progress reviews;

h.  Consist of a stable core of members, including at
least the individual served; the treating
psychiatrist; the treating psychologist; the
treating rehabilitation therapist; the treating
social worker; the registered nurse and
psychiatric technician who know the individual
best; one of the individual's teachers (for
school-age individuals); and, as appropriate, the
individual's family, guardian, advocates,
attorneys, and the pharmacist and other staff;

i.  Not include any core treatment team members with a
case load exceeding 1:15 in admission teams (new
admissions of 90 days or less) and, on average,
1:25 in all other teams at any point in time; and

j.  Not include staff that is not verifiably competent
in the development and implementation of
interdisciplinary treatment plans.

2.  Integrated Therapeutic and Rehabilitation Service
Planning.

Each State Hospital shall develop and implement
policies and protocols regarding the development of
therapeutic and rehabilitation service plans, referred to as

8

1   "Wellness and Recovery Plans" ("WRP") consistent with

2   generally accepted professional standards of care, to ensure

3   that:

4       a.   Individuals have substantive input into the

5            therapeutic and rehabilitation service planning

6            process, including but not limited to input as to

7            mall groups and therapies appropriate to their

8            WRP.

9       b.   Therapeutic and rehabilitation service planning

10           provides timely attention to the needs of each

11           individual, in particular:

12           i.    initial therapeutic and rehabilitation

13                 service plans (Admission Wellness and

14                 Recovery Plan ("A-WRP")) are completed within

15                 24 hours of admission;

16           ii.   master therapeutic and rehabilitation service

17                 plans (WRP) are completed within 7 days of

18                 admission; and

19           iii.  therapeutic and rehabilitation service plan

20                 reviews are performed every 14 days during

21                 the first 60 days of hospitalization and

22                 every 30 days thereafter.  The third monthly

23                 review is a quarterly review and the 12th

24                 monthly review is the annual review.

25      c.   Treatment, rehabilitation, and enrichment services

26           are goal-directed, individualized, and informed by

27           a thorough knowledge of the individual's

28

9

1                    psychiatric, medical, and psychosocial history and

2                    previous response to such services.

3        d.    Therapeutic and rehabilitation service planning is

4                    based on a comprehensive case formulation for each

5                    individual that emanates from interdisciplinary

6                    assessments of the individual consistent with

7                    generally accepted professional standards of care.

8                    Specifically, the case formulation shall:

9              i.   be derived from analyses of the information

10                   gathered from interdisciplinary assessments,

11                   including diagnosis and differential

12                   diagnosis;

13            ii.  include a review of:  pertinent history;

14                   predisposing, precipitating and perpetuating

15                   factors; previous treatment history; and

16                   present status;

17            iii. consider biomedical, psychosocial, and

18                   psychoeducational factors, as clinically

19                   appropriate, for each category in § C.2.d.ii

20                   above;

21            iv.  consider such factors as age, gender,

22                   culture, treatment adherence, and medication

23                   issues that may affect the outcomes of

24                   treatment and rehabilitation interventions;

25            v.   support the diagnosis by diagnostic

26                   formulation, differential diagnosis, and

27                   Diagnostic and Statistical Manual-IV-TR (or

28                   the most current edition) checklists; and

vi.   enable the interdisciplinary team to reach
sound determinations about each individual's
treatment, rehabilitation, enrichment and
wellness needs, the type of setting to which
the individual should be discharged, and the
changes that will be necessary to achieve
discharge.

e.   The therapeutic and rehabilitation service plan
specifies the individual's focus of
hospitalization (goals), assessed needs
(objectives), and how the staff will assist the
individual to achieve his or her goals/objectives
(interventions).

f.   Therapeutic and rehabilitation service planning is
driven by individualized needs, is strengths-based
(i.e., builds on an individual's current
strengths), addresses the individual's motivation
for engaging in wellness activities, and leads to
improvement in the individual's mental health,
physical health, and well being, consistent with
generally accepted professional standards of care.
Specifically, the interdisciplinary team shall:

i.   develop and prioritize reasonable and
attainable goals/objectives (e.g., at the
level of each individual's functioning) that
build on the individual's strengths and
address the individual's identified needs

11

and, if any identified need is not addressed, provide a rationale for not addressing the need;

    ii.  ensure that the objectives/interventions address treatment (e.g., for a disease or disorder), rehabilitation (e.g., skills/supports, motivation and readiness), and enrichment (e.g., quality of life activities);

    iii. write the objectives in behavioral, observable, and/or measurable terms;

    iv.  include all objectives from the individual's current stage of change, or readiness for rehabilitation, to the maintenance stage for each focus of hospitalization, as clinically appropriate;

    v.  ensure that there are interventions that relate to each objective, specifying who will do what, within what time frame, to assist the individual to meet his/her needs as specified in the objective;

    vi.  implement interventions appropriately throughout the individual's day, with a minimum of 20 hours of active treatment per week.  Individual or group therapy included in the individual's WRP shall be provided as part of the 20 hours of active treatment per week;

12

1        vii.   maximize, consistent with the individual's

2                 treatment needs and legal status,

3                 opportunities for treatment, programming,

4                 schooling, and other activities in the most

5                 appropriate integrated, non-institutional

6                 settings, as clinically appropriate; and

7       viii.  ensure that each therapeutic and

8                 rehabilitation service plan integrates and

9                 coordinates all services, supports, and

10               treatments provided by or through the State

11               Hospital for the individual in a manner

12               specifically responsive to the plan's

13               therapeutic and rehabilitation goals.  This

14               requirement includes, but is not limited to,

15               ensuring that individuals are assigned to

16               mall groups that link directly to the

17               objectives of the individual's treatment plan

18               and needs;

19     g.  Therapeutic and rehabilitation service plans are

20        revised as appropriate to ensure that planning is

21        based on the individual's progress, or lack

22        thereof, as determined by the scheduled monitoring

23        of identified criteria or target variables,

24        consistent with generally accepted professional

25        standards of care.  Specifically, the

26        interdisciplinary team shall:

27       i.   revise the focus of hospitalization

28               objectives, as needed, to reflect the

individual's changing needs and develop new
interventions to facilitate attainment of new
objectives when old objectives are achieved
or when the individual fails to make progress
toward achieving these objectives;

ii.  review the focus of hospitalization, needs,
objectives, and interventions more frequently
if there are changes in the individual's
functional status or risk factors (i.e.,
behavioral, medical, and/or psychiatric risk
factors);

iii.  ensure that the review process includes an
assessment of progress related to discharge
to the most integrated setting appropriate to
meet the individual's assessed needs,
consistent with his/her legal status; and

iv.  base progress reviews and revision
recommendations on data collected as
specified in the therapeutic and
rehabilitation service plan.

h.  Individuals in need of positive behavior supports
in school or other settings receive such supports
consistent with generally accepted professional
standards of care.

i.  Adequate active psychosocial rehabilitation is
provided, consistent with generally accepted

14

professional standards of care, that:

i.    is based on the individual's assessed needs
      and is directed toward increasing the
      individual's ability to engage in more
      independent life functions;

ii.   has documented objectives, measurable
      outcomes, and standardized methodology;

iii.  is aligned with the individual's objectives
      that are identified in the individual's WRP;

iv.   utilizes the individual's strengths,
      preferences, and interests;

v.    focuses on the individual's vulnerabilities
      to mental illness, substance abuse, and
      readmission due to relapse, where
      appropriate;

vi.   is provided in a manner consistent with each
      individual's cognitive strengths and
      limitations;

vii.  provides progress reports for review by the
      Interdisciplinary Team as part of the WRP
      review process;

viii. is provided 5 days a week, for a minimum of 4
      hours a day (i.e., 2 hours in the morning and
      2 hours in the afternoon each weekday), for
      each individual or 2 hours a day when the
      individual is in school, except days falling
      on state holidays;

15

ix.   is provided to individuals in bed-bound

status in a manner and for a period that is

commensurate with their medical status;

x.   routinely takes place as scheduled;

xi.   includes, in the evenings and weekends,

additional activities that enhance the

individual's quality of life; and

xii.  is consistently reinforced by staff on the

therapeutic milieu, including living units.

j.   Adequate individualized and group exercise and

recreational options are provided, consistent with

generally accepted professional standards of care.

k.   Individuals who have an assessed need for family

therapy services receive such services in their

primary language, as feasible, consistent with

generally accepted professional standards of care

and that these services, and their effectiveness

for addressing the indicated problem, are

comprehensively documented in each individual's

chart.

l.   Each individual's therapeutic and rehabilitation

service plan identifies general medical diagnoses,

the treatments to be employed, the related symptoms

to be monitored by nursing staff (i.e., registered

nurses ("RNs"), licensed vocational nurses

("LVNs"), and psychiatric technicians) and the

means and frequency by which such staff shall

16

1        monitor such symptoms, consistent with generally

2        accepted professional standards of care.

3    m.  Children and adolescents receive, consistent with

4        generally accepted professional standards of care:

5        i.  therapy relating to traumatic family and

6        other traumatic experiences, as clinically

7        indicated; and

8        ii.  reasonable, clinically appropriate

9        opportunities to involve their families in

10       treatment and treatment decisions.

11   n.  Policies and procedures are developed and

12       implemented consistent with generally accepted

13       professional standards of care to ensure

14       appropriate screening for substance abuse, as

15       clinically indicated.

16   o.  Individuals who require treatment for substance

17       abuse are provided appropriate therapeutic and

18       rehabilitation services consistent with generally

19       accepted professional standards of care.

20   p.  Group facilitators and therapists providing

21       therapeutic and rehabilitation services (in groups

22       or individual therapy) are verifiably competent

23       regarding selection and implementation of

24       appropriate approaches and interventions to address

25       therapeutic and rehabilitation service objectives,

26       are verifiably competent in monitoring individuals'

27       responses to therapy and rehabilitation, and

28       receive regular, competent supervision.

q. Group facilitators and therapists providing therapeutic and rehabilitation services in the field of substance abuse should be certified substance abuse counselors.

r. Transportation and staffing issues do not preclude individuals from attending appointments.

s. Adequate oversight to treatment, rehabilitation, and enrichment groups is provided to ensure that individuals are assigned to groups that are appropriate to their assessed needs, that groups are provided consistently and with appropriate frequency, and that issues particularly relevant for this population, including the use of psychotropic medications and substance abuse, are appropriately addressed, consistent with generally accepted professional standards of care.

t. Treatment, rehabilitation, and enrichment services are monitored appropriately against rational, operationally-defined target variables and revised as appropriate in light of significant developments, and the individual's progress, or lack thereof.

u. Individuals are educated regarding the purposes of their treatment, rehabilitation, and enrichment services. They will be provided a copy of their WRP when appropriate based on clinical judgment.

v. Staff educate individuals about their medications, the expected results, and the potential common

18

1            and/or serious side effects of medications, and

2            staff regularly ask individuals about common and/or

3            serious side effects they may experience.

4        w.  Interdisciplinary teams review, assess, and develop

5            positive clinical strategies to overcome

6            individual's barriers to participation in

7            therapeutic and rehabilitation services.

8   D.   Integrated Assessments

9        Each State Hospital shall ensure that, consistent with

10  generally accepted professional standards of care, each

11  individual shall receive, promptly after admission to the State

12  Hospital, an accurate and comprehensive assessment of the

13  conditions responsible for the individual's admission, to the

14  degree possible given the obtainable information at the time of

15  admission.  Thereafter, each individual shall receive an accurate

16  and comprehensive reassessment of the reasons for the

17  individual's continued hospitalization whenever there has been a

18  significant change in the individual's status, or a lack of

19  expected improvement resulting from clinically indicated

20  treatment.  The individual's interdisciplinary team shall be

21  responsible for investigating the past and present medical,

22  nursing, psychiatric, and psychosocial factors bearing on the

23  individual's condition, and, when necessary, for revising

24  assessments and therapeutic and rehabilitation plans in

25  accordance with new information that comes to light.  Each State

26  Hospital shall monitor and promptly address deficiencies in the

27  quality and timeliness of such assessments.

28

                              19

1.   Psychiatric Assessments and Diagnoses

Each State Hospital shall provide all of the individuals it serves with routine and emergency psychiatric assessments and reassessments consistent with generally accepted professional standards of care; and:

    a.   Each State Hospital shall use the diagnostic criteria in the most current Diagnostic and Statistical Manual of Mental Disorders ("DSM") for reaching the most accurate psychiatric diagnoses.

    b.   Each State Hospital shall ensure that all psychiatrists responsible for performing or reviewing psychiatric assessments:

        i.   are certified by the American Board of Psychiatry and Neurology ("ABPN") or have successfully completed at least three years of psychiatric residency training in a Accreditation Counsel for Graduate Medical Education accredited program; and

        ii.   are verifiably competent (as defined by privileging at initial appointment and thereafter by reprivileging for continued appointment) in performing psychiatric assessments consistent with the State Hospital's standard diagnostic protocols.

    c.   Each State Hospital shall ensure that:

        i.   within 24 hours of an individual's admission to the State Hospital, the individual

20

receives an Admission Medical Assessment that
includes:

1)    a review of systems;

2)    medical history;

3)    physical examination;

4)    diagnostic impressions; and

5)    management of acute medical conditions.

ii.    within 24 hours of an individual's admission
to the State Hospital, the individual
receives an Admission Psychiatric Evaluation
that includes:

1)    psychiatric history, including a review
of presenting symptoms;

2)    complete mental status examination;

3)    admission diagnoses;

4)    completed AIMS;

5)    laboratory tests ordered; and

6)    consultations ordered.

iii.    Within 7 days of an individual's admission to
the State Hospital, the individual receives
an Integrated Psychiatric Assessment that
includes:

1)    psychiatric history, including a review
of present and past history;

2)    psychosocial history;

3)    mental status examination;

4)    strengths;

5)    psychiatric risk factors;

21

1          6)    diagnostic formulation;

2          7)    differential diagnosis;

3          8)    current psychiatric diagnoses;

4          9)    psychopharmacology treatment plan; and

5          10)   management of identified risks.

6     d.  Each State Hospital shall ensure that:

7          i.    clinically justifiable diagnoses are provided

8                for each individual, and all diagnoses that

9                cannot be clinically justified for an

10               individual are discontinued no later than the

11               next review;

12         ii.   the documented justification of the diagnoses

13               is in accord with the criteria contained in

14               the most current DSM (as per DSM-IV-TR

15               Checklist);

16         iii.  differential diagnoses, "deferred," or

17               "rule-out" diagnoses, and diagnoses listed as

18               "NOS" ("Not Otherwise Specified") are timely

19               addressed (i.e., within 60 days), through

20               clinically appropriate assessments, and

21               resolved in a clinically justifiable manner;

22               and

23         iv.   "no diagnosis" is clinically justified and

24               documented.

25    e.  Each State Hospital shall ensure that psychiatric

26        reassessments are conducted at a frequency that

27        reflects the individual's clinical needs.  At a

28        minimum the reassessments are completed weekly for

22

the first 60 days on the admissions units and monthly on other units.

    f.   Each State Hospital shall ensure that psychiatric reassessments are documented in progress notes that address the following:

        i.    significant developments in the individual's clinical status and appropriate psychiatric follow up;

        ii.   timely and justifiable updates of diagnosis and treatment, as clinically appropriate;

        iii.  analyses of risks and benefits of chosen treatment interventions;

        iv.   assessment of, and attention to, high-risk behaviors (e.g., assaults, self-harm, falls) including appropriate and timely monitoring of individuals and interventions to reduce risks;

        v.    responses to and side effects of prescribed medications, with particular attention to risks associated with the use of benzodiazepines, anticholinergic medications, polypharmacy (use of multiple drugs to address the same condition), and conventional and atypical antipsychotic medications;

        vi.   timely review of the use of "pro re nata" or "as-needed" ("PRN") and "Stat" (i.e., emergency psychoactive) medications and

1        adjustment of regular treatment, as

2        indicated, based on such use; and

3    vii.   verification, in a clinically justifiable

4        manner, that psychiatric and behavioral

5        treatments are properly integrated.  The

6        psychiatrist shall review the positive

7        behavior support plan prior to implementation

8        to ensure consistency with psychiatric

9        formulation, document evidence of regular

10        exchange of data or information with

11        psychologists regarding differentiation of

12        learned behaviors and behaviors targeted for

13        psychopharmacological treatments, and

14        document evidence of integration of

15        treatments.

16    g.  When individuals are transferred between treatment

17        teams, a psychiatric transfer note shall be

18        completed addressing:  review of medical and

19        psychiatric course of hospitalization, including

20        medication trials; current target symptoms;

21        psychiatric risk assessment; current barriers to

22        discharge; and anticipated benefits of transfer.

23    2.  Psychological Assessments

24    a.  Each State Hospital shall develop and implement

25        standard psychological assessment protocols,

26        consistent with generally accepted professional

27        standards of care.  These protocols shall address,

28        at a minimum, diagnostic neuropsychological

24

assessments, cognitive assessments, and
I.Q./achievement assessments, to guide
psychoeducational (e.g., instruction regarding the
illness or disorder, and the purpose or objectives
of treatments for the same, including medications),
educational, rehabilitation, and habilitation
interventions, and behavioral assessments
(including functional assessment of behavior in
schools and other settings), and personality
assessments, to inform positive behavior support
plans and psychiatric diagnoses.

b.  Each State Hospital shall require the completion of
cognitive and academic assessments within 30 days
of admission of all school-age and other
individuals, as required by law, unless comparable
testing has been performed within one year of
admission and is available to the interdisciplinary
team.

c.  Each State Hospital shall ensure that all
clinicians responsible for performing or reviewing
psychological assessments and evaluations are
verifiably competent in the methodology required to
conduct the assessment.

d.  Each State Hospital shall ensure that all
psychological assessments, consistent with
generally accepted professional standards of care,
shall:

25

i.     expressly state the clinical question(s) for
       the assessment;

ii.    include findings specifically addressing the
       clinical question(s), but not limited to
       diagnoses and treatment recommendations;

iii.   specify whether the individual would benefit
       from individual therapy or group therapy in
       addition to attendance at mall groups;

iv.    be based on current, accurate, and complete
       data;

v.     determine whether behavioral supports or
       interventions (e.g., behavior guidelines or
       mini-behavior plans) are warranted or whether
       a full positive behavior support plan is
       required;

vi.    include the implications of the findings for
       interventions;

vii.   identify any unresolved issues encompassed by
       the assessment and, where appropriate,
       specify further observations, records review,
       interviews, or re-evaluations that should be
       performed or considered to resolve such
       issues; and

viii.  Use assessment tools and techniques
       appropriate for the individuals assessed and
       in accordance with the American Psychological
       Association Ethical Standards and Guidelines
       for testing.

26