**COLEMAN V. SCHWARZENEGGER**
**CASE NO. CIV S-90-0520 LKK JFM P**
**EXHIBIT 1**
**TO RESPONSE TO OSC RE: JOINDER OF STEPHEN MAYBERG,**
**DIRECTOR OF DEPARTMENT OF MENTAL HEALTH, AS A DEFENDANT**




SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

In re                                    No. 05F09064    Dept. 21

DAVID OSBURN,
CORNELIUS HOLMES,
ERIC DARIUS TRUJILLO, and
AIAT TRUONG                    ORDER GRANTING HABEAS CORPUS

On Habeas Corpus.
_____/

TO:  LOU BLANAS, SACRAMENTO COUNTY SHERIFF,
     JAN SCULLY, SACRAMENTO COUNTY DISTRICT ATTORNEY,
     STEPHEN W. MAYBERG, DIRECTOR OF CALIFORNIA DEPARTMENT OF
        MENTAL HEALTH,
     BILL LOCKYER, CALIFORNIA ATTORNEY GENERAL,
     PAULINO DURAN, SACRAMENTO COUNTY PUBLIC DEFENDER,
        KELLY LYNN BABINEAU, ASSISTANT PUBLIC DEFENDER,
     COUNTY COUNSEL OF SACRAMENTO COUNTY, and
     SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES


     Petitioners are all defendants in pending criminal cases

before the Sacramento County Superior Court, all of whom have

been found incompetent to stand trial and ordered committed to

Napa State Hospital pursuant to Penal Code § 1370.

Additionally, the Sacramento County Sheriff has been ordered in each case to deliver each petitioner, respectively, to Napa State Hospital. Yet, each had been sitting in the Sacramento County Jail for several months, without being delivered to Napa State Hospital. Petitioners claim this is an unlawful restraint, and cite Oregon Advocacy Center v. Mink (9th Cir. 2003) 322 F.3d 1101 in support.

An order to show cause issued on October 18, 2005, and briefing followed as discussed below. An evidentiary hearing was held on January 20, 2006, February 10, 2006, and March 3, 2006.

**BACKGROUND**

Petitioner David Osburn has two cases pending with this court: Case Nos. 04F05546 and 04F08409. In both, on April 13, 2005, Judge Kenny initially found petitioner Osburn incompetent to stand trial, and committed him to Napa State Hospital for 3 years or until he regains competency, and found that Osburn is in need of psychotropic medication and ordered that Napa State Hospital may administer it on a voluntary or involuntary basis. The matters were both returned to court on June 2, 2005, at which time Judge Bakarich found that Napa State Hospital could not involuntarily administer the medications to Osburn but that Osburn had agreed to voluntarily take all medications prescribed

by psychiatric doctors at the hospital.    Judge Bakarich also recommitted Osburn at that time to Napa State Hospital for 3 years or until Osburn regains competency.

A formal order issued on June 2, 2005, indicating that Osburn had consented to the administration of anti-psychotic drugs, suspending the criminal proceedings, ordering "that the defendant be and he is remanded to the custody of the Sheriff of the County of Sacramento to be by him delivered to the Department of Health at the Napa State Hospital to be there confined in accordance with the terms of this Order," ordering "the Superintendent of the Napa State Hospital" to "commence an immediate examination" of petitioner "and within ninety (90) days" to submit a written report to the court the result of that examination and the estimated time required to restore petitioner to competence, ordering that anti-psychotic drugs may be administered to Osburn and instructions on how to proceed should Osburn withdraw his consent to their administration, ordering the Superintendent to furnish the court with specified periodic reports should Osburn remain committed beyond 90 days, and committing Osburn "to the Department of Health of the State of California at Napa State Hospital for a period not to exceed the maximum term of: three (3) years with credits of 213 days, or until defendant is restored to sanity."

Petitioner Cornelius Holmes is the subject of Case No.

04F10237.  He was initially found not competent to stand trial on April 8, 2005, by Judge Marlette, and referred to ConRep.  On May 6, 2005, Judge Marlette ordered him committed to Napa State Hospital for a maximum term of 3 years.  A formal order was prepared and issued on May 6, 2005, with similar directives as in the Osburn order discussed above, including "that the defendant be and he is remanded to the custody of the Sheriff of the County of Sacramento to be by him delivered to the Department of Health at the Napa State Hospital to be there confined in accordance with the terms of this Order."  A second order was issued, on August 26, 2005, with the same directives and order of remand to the Sheriff and delivery to Napa.

Petitioner Eric Trujillo is the subject of Case No. 04F06833.  On February 16, 2005, Judge Kenny found Trujillo incompetent to stand trial, and referred him to ConRep.  On April 20, 2005, Judge Kenny committed Trujillo to Napa State Hospital, until he is restored to competency.  On July 13, 2005, Judge Kenny signed a formal order committing Trujillo to Napa State Hospital, containing directives similar to those in the Osburn order and including that "the defendant be and hereby is remanded to the custody of the Sheriff of the County of Sacramento to be by him delivered to the Department of Health at the NAPA STATE HOSPITAL."

Petitioner Aiat Troung is the subject of Case No. 04F06746.

On February 17, 2005, Judge Kenny found Troung incompetent to stand trial, and referred him to ConRep.   On July 22, 2005, Judge Sumner issued a written order, suspending criminal proceedings and ordering Troung "remanded to the custody of the Sheriff of the County of Sacramento to be delivered to the Department of Mental Health at the Napa State Hospital," to be confined there for not more than three years with 354 days of credit.   Other directives similar to the Osburn order were included, as well.

**HABEAS PETITION**

On October 4, 2005, petitioners Osburn, Holmes, Trujillo, and Troung, by and through their attorney, the Sacramento County Public Defender's office, filed the instant petition for writ of habeas corpus.

Osburn alleges that although he was committed to Napa State Hospital on June 2, 2005, he remained in the Sacramento County Jail without being delivered to Napa State Hospital as ordered that date, until October 4, 2005, the date of the filing of the instant petition, when he was finally delivered to Napa State Hospital.   He admits that the case is technically moot as to him, but wishes to remain a petitioner in the case and have the mootness overlooked as to him.

Holmes alleges that although he was ordered committed to

Napa State Hospital on May 6, 2005, as of October 4, 2005, the date of the filing of the instant petition, he was still awaiting transfer to Napa State Hospital. Holmes did not note that the commitment order was reissued on August 26, 2005, but that does not affect his claim that months still have gone by without his being delivered to Napa as ordered by the court. Holmes was eventually delivered to Napa, thus the case is technically moot as to him as well.

Trujillo alleges that he was committed to Napa on April 20, 2005, but that he, too, as of October 4, 2005, the date of the filing of the instant petition, was still awaiting transfer to Napa State Hospital. Trujillo did not note that the commitment order was formally issued on July 13, 2005, but again that does not affect his claim that months still have gone by without his being delivered to Napa as ordered by the court. Trujillo was eventually delivered to Napa, thus the case is technically moot as to him as well.

Troung alleges that he was ordered committed to Napa on July 22, 2005, but that he, too, as of October 4, 2005, the date of the filing of the instant petition, was still awaiting transfer to Napa State Hospital. Truong was eventually delivered to Napa, thus the case is technically moot as to him as well.

Petitioners all claim that their detentions in the county

jail, pending delivery to Napa State Hospital violated their rights because they were not receiving treatment for their condition that could result in their prompt return to competence.  They claimed in the petition that if they cannot be delivered to Napa, that they must either be placed on outpatient status or released altogether.

They cite Oregon Advocacy Center v. Mink (9th Cir. 2003) 322 F.3d 1101 in support.

**RETURN**

Captain Glenn Powell, on behalf of Sacramento County Sheriff Lou Blanas, filed a return on October 21, 2005.  The return claims that the transfers have been held up by the court and defense counsel, because the original commitments did not contain language concerning the administration of psychotropic drugs to the petitioners as now required by Penal Code §§ 1369 and 1370.  The return, however, admits that those matters were corrected months ago, and that petitioners remained in the county jail for months thereafter without delivery to Napa State Hospital.

The return then faults Napa State Hospital with the Sheriff's failure to comply with the court's orders in petitioners' underlying cases, for their delivery to Napa State Hospital, by claiming that Napa has no bed space for the

appropriate housing.

The return claims in heading I, on page 2 of the return, that petitioner David Osburn has already been transferred to a mental health facility, but then in the text claims that no justiciable issue exists as to petitioner "Holmes," because his transfer has been effected.

The return then claims that "Holmes" has now been approved for transfer, but that Napa will require at least six more weeks, as of October 21, 2005, before the transfer "can" occur. The return claims that Trujillo has been approved for transfer, but no classification/bed availability date has been determined, as of October 21, 2005. The return claims that Troung's approval was delayed due to error at Napa, and that the error has been discovered and rectified and that "classification proceedings will commence forthwith."

The gist of the return, however, appears to be that the Sheriff had no intention of delivering Holmes, Trujillo, or Troung to Napa State Hospital, until Napa told him that a bed was available for each respectively. Meanwhile, these three remained in the county jail, without treatment for their incompetency.

**TRAVERSE**

The Sacramento County Public Defender's office, on behalf of petitioners, filed a traverse on October 31, 2005.

The traverse denies that the transfer of Osburn to a state hospital renders the habeas petition moot, because the case poses an issue of broad public interest that is likely to recur and the court has inherent discretion to resolve the issue, citing In re M. (1970) 3 Cal.3d 16, 19, in support. Further, the traverse points out that three of the named petitioners were still in custody of the Sacramento County Jail.

The traverse then cites Mink, supra, and quotes from it regarding a similar case in Oregon, which will be discussed further below, in support of the original petition.

**ADDITIONAL BRIEFING**

On November 2, 2005, the court ordered additional briefing, on the following questions:

(1) Are beds not available at Napa State Hospital, for California criminal defendants found incompetent to stand trial? Are they available but not for a lengthy period of time?

(2) If not available or not available for beyond seven days from the date of the incompetency commitment order, what other available public or private treatment facility approved by the community program director is available within seven days of an

incompetency commitment order?

(3) Should this court issue a permanent injunction, that when the Sacramento County Sheriff receives an order of the Sacramento County Superior Court directing the Sheriff to deliver a jail inmate to Napa State Hospital, or other available public or private treatment facility approved by the community program director, that the Sheriff must do so within seven days of the date of the incompetency commitment order, as was ordered by the Ninth Circuit in the comparable case of Oregon Advocacy Center v. Mink (9th Cir. 2003) 322 F.3d 1101?

(4) Should such an injunction include a provision that if the Sheriff finds any reason for being unable to comply with any incompetency commitment order, within seven days of the date of the order, that the Sheriff must immediately report back to the court regarding any inability to comply, so that the court may immediately schedule a new hearing on the matter, at which time alternative placement or outpatient placement will be considered?

The Sheriff's Department filed a supplemental return on November 14, 2005, claiming that the current delays in transporting incompetents is attributable to the lack of bed space within the state Department of Mental Health, and that there are no suitable local alternatives for felony incompetent defendants.

The Attorney General, on behalf of both his office and the state Department of Mental Health, filed a supplemental return on November 14, 2005, claiming that the total population in the state Department of Mental Health state hospital system has increased in recent years, and that a new state hospital, Coalinga State Hospital, has been built and opened in September 2005. Coalinga has begun to receive patients, and eventually will house 1500 patients. When the process is completed, some patients at other hospitals will be transferred there, making beds available at the other state hospitals. However, the complete opening of Coalinga is not finished, as necessary clinical staff has not yet been fully hired, the hiring process having gone slower than anticipated. In November 2005, the capability was to house only 100 patients, and it was then anticipated that in six months, which would be May 2006, there would be 350 patients there. As for Napa State Hospital, Welf. & Inst. Code § 7200.06(a) prohibits that hospital from housing more than 980 patients committed under the various provisions of the Penal Code (only one of which is for incompetents to stand trial). Napa is filled to this limit, and no additional Penal Code patient may be admitted until a current patient is discharged. The Attorney General then stated, without support, that "there are public and private treatment facilities, approved by the community program director, that may be

available within seven (7) days of a [Penal Code § 1370] incompetency commitment order" from Sacramento County Superior Court. (As has become apparent, as discussed below, this is not so.)

Petitioners filed a supplemental traverse on November 28, 2005, reiterating their position.

On December 1, 2005, the court ordered further supplemental briefing.

On December 12, 2005, the Attorney General filed a second supplemental return, claiming that there are several facilities in Sacramento County, in addition to the Sacramento County Jail, that provide inpatient services, and that the Sacramento County Mental Health Treatment Center currently treats misdemeanant incompetents to stand trial. However, attached to the second supplemental return is an affidavit from Dr. Mark Grabau, the community program director for the Central Valley Conditional Release Program (ConRep), who attested that although there are several public and private local facilities that provide inpatient psychiatric services, that Dr. Grabau is aware of no facility in Sacramento County that would be willing to accept felony Penal Code § 1370 patients.

On December 21, 2005, petitioners filed a second supplemental traverse, reasserting their position.

On December 22, 2005, County Counsel filed a second

supplemental return, attaching a declaration from Kathleen Henry, Sacramento County's Director of Mental Health, attesting that there are no outpatient programs available to Sacramento County felony Penal Code § 1370 committees, nor are there any private or public facilities that have been approved by the community program director that currently accept such patients. There is a policy not to accept felony incompetents, as opposed to misdemeanant incompetents, nor has there been any recent change in that policy due to the lack of bed space in the state hospitals.

On January 3, 2006, petitioners filed another supplemental traverse, again reasserting their position.

On January 3, 2006, the court issued another order, bringing in the Sacramento County Department of Health and Human Services into the matter and allowing that department to be represented, if it chose to do so, by the County Counsel, who had already appeared on behalf of the Sheriff's Department.

On January 13, 2006, County Counsel appeared on behalf of the county's Department of Health and Human Services, and adopted the previously-filed returns on its behalf. County Counsel also argued that the court cannot order the county health department to change its policy of not admitting felony Penal Code § 1370 committees at the county facility of Sacramento County Mental Health Treatment Center. County

Counsel argued that it would violate Cal. Const., art. III, § 3, the separation of powers provision ("The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution"), for this court to order the county to change its policies so as to remedy a state problem.

The matter was then set for evidentiary hearing.

**EVIDENTIARY HEARING**

Testimony was given at an evidentiary hearing before the court on this matter.

Nancy Purtell testified that she is the chief executive officer at Sierra Vista Hospital, and is responsible for full operations of the entire facility (RT1-33 ["RT1" referring to January 20, 2006 session of evidentiary hearing]). The facility is an acute care facility, and is not intended to be a long-term care facility (RT1-34). It is a locked facility (RT1-36). There are 72 beds in total, behind locked doors (RT1-36). At the time of the hearing 71 of those 72 beds were occupied (RT1-36).

At first, Ms. Purtell testified that there have been "incompetent" persons declared incompetent to stand trial who have come there, and is limited to persons who meet an

-14-

individual dangerousness assessment, whether charged with a misdemeanor or a felony, as there are concerns for the facility, if there will be any dangerousness or physical harm risk to others, including staff, at the facility (RT1-35). However, upon cross-examination, she clarified that the facility does not accept Penal Code § 1368 committees (RT1-37), and that only those declared incompetent under a conservatorship are accepted (RT1-38). The facility does not have the capability to give the security and support necessary for handling Penal Code § 1368 committees (RT1-39).

John Grozdanic testified that he is a facility liaison for the Sacramento County Mental Health Treatment Center (RT1-41). The facility is a locked facility with a capacity of 100 patients (RT1-41). It accepts misdemeanor Penal Code § 1370 committees on a case-by-case basis, and has a competency program (RT1-42). The facility does not accept felony Penal Code § 1370 committees (RT1-43).

Mr. Grozdanic testified to his mistaken belief that Penal Code §§ 1367, 1370, and 1370.01 provide that misdemeanor incompetents are to be treated in a local facility while felony incompetents are to be taken by sheriff to a state hospital (RT1-43). In reality, that is not so; rather, Penal Code § 1367 provides only that misdemeanor incompetents are governed by Penal Code §§ 1367.1 and 1370.01, while felony incompetents are

governed by Penal Code § 1370, subdivision (b) which allows for commitment either to state hospital or to a local facility or outpatient services in such felony cases.

Mr. Grozdanic testified that the Sacramento County Mental Health Treatment Center has never taken a felony incompetent, and that he did not believe that the facility would have the capability of dealing with such an individual (RT1-43). The facility does not have specially trained people to deal with felons (RT1-44). The facility also does not accept persons who will not be able to have competency restored, such as brain-damaged persons and developmentally disabled persons (RT1-45). The misdemeanants who are accepted are taken for restoration of competency, and then are returned to the jail (RT1-46). Grozdanic was not aware of any outpatient program for a Penal Code § 1370 incompetent (RT1-46). The hospital is an acute short treatment facility (RT1-48). The security guard is not armed, and if someone commits a crime in the hospital, the police department is called to handle it (RT1-54).

Diane Johnston testified that she is an admission supervisor and supervising registered nurse at Napa State Hospital, and has worked there since 1984 (RT1-55). There are various types of committees there, including Penal Code § 1370 committees (RT1-56). There are six buildings, four or five of which house patients (RT1-56). There is a 980-bed area in the

1  secure treatment area (RT1-57).   Generally, the Penal Code §

2  1026 (not guilty by reason of insanity) and 2972 committees

3  (MDOs) are housed together, and the Penal Code § 1370 committees

4  are housed together (RT1-58).

5     Ms. Johnston testified that a Penal Code § 1370 packet is

6  first received by the facility's forensic office, which looks to

7  make sure all the required documentation is there (RT1-59).  The

8  packet gets dated, and information is put in a computer (RT1-

9  60).   The subject of the packet is then placed on a waiting

10  list, until the subject's name comes to the top and is scheduled

11  for admission (RT1-62).   The system is like a first-come/first-

12  serve basis (RT1-62).   There is no classification that occurs

13  (RT1-62).   A Penal Code § 1370 waits for a Penal Code § 1370

14  bed, and is not placed in with another group (RT1-62--RT1-63).

15  Penal Code § 1370 committees receive numerous services to help

16  restore them to competency (RT1-70).   When Penal Code § 1370

17  committees first arrive at the facility, some are in fairly good

18  condition if they have been taking their medication in the

19  jails, but occasionally they are decompensated (RT1-71).

20

21  Without the facility's services, it would be difficult to

22  restore these persons to competency (RT1-72).

23     Ms. Johnston testified that Napa is allowed to keep 980

24  beds in the secured treatment area, that that is a legislative

25  limit (RT1-72).   This testimony is a reference to Welf. & Inst.

Code § 7200.06(a).

Ms. Johnston testified that as of the day of her testimony, Napa had 975 patients, and that when one is discharged another is admitted within three business days (RT1-73). Right now, there is an average backlog of about 120 committees with a complete package and ready to go, and 140 that are incomplete, waiting to get into Napa (RT1-78--RT1-79). For a person with a complete package, right now the average wait is about six months (RT1-79). Nor can these persons be moved to Atascadero, as that facility is full as well (RT1-79). Rather, Napa is now working with Metropolitan State Hospital in Norwalk (RT1-79). The other state hospitals are also overcrowded (RT1-79). This backlog began occurring last spring, when more Northern California counties were added to Napa's housing list, that had previously been handled at Atascadero (RT1-80--RT1-81).

John Rodriguez testified that he is a deputy director for long-term care services at the State Department of Mental Health (RT1-83). He is responsible for the operation of the five state hospitals, the two psychiatric programs, a conditional release program, and some forensic evaluation services (RT1-83). The state hospitals are Atascadero, Coalinga, Napa, Patton, and Metropolitan (RT1-83). These hospitals have not guilty by reason of insanity patients, incompetent to stand trial patients, mentally disordered offender patients, sexually

violent predator patients, and adult prisoners and juvenile ward patients, as well as LPS civil commitment patients (RT1-83--RT1-84). Atascadero has 1239 licensed forensic beds, for all the different types of criminal defendant judicially committed patients (RT1-86). Coalinga has 1500, Metropolitan has 376, Napa has 980, and Patton has 1287 (RT1-87).

The total forensic population of patients treated by the Department of Mental Health increased from 2000 to the present, due to the addition of two new commitment categories, that of sexually violent predators and that of mentally disordered offenders (RT1-91--RT1-92). Also, the numbers of incompetent to stand trial and not guilty by reason of insanity have been growing, due to an underlying growth in the California population (RT1-92). The Department of Corrections is also under pressure, as it does not provide the kind of services that the Department of Mental Health can give (RT1-92).

In 2004, the total forensic population in California state hospitals was 4,112 (RT1-95). Atascadero, Patton, and Coalinga are the highest security facilities, and can take any type of patient regardless of level of security (RT1-97). Napa and Metropolitan can take only low or medium-risk patients (RT1-97). Napa is the Northern California reception center meant for Penal Code § 1370 patients (RT1-127), but high risk persons would actually go to Atascadero or Patton (RT1-128). Staff at the

state hospitals are instructed to make sure that as soon as a Penal Code § 1370 patient is restored to competency that the patient is discharged and another takes the patient's place (RT1-97). Atascadero does not have a statutory upper limit for forensic patients, but has an arrangement with the licensing agency to identify places for patients whose numbers exceed the hospitals licensed capacity (RT1-98). The hospitals look for opportunity for overbedding (RT1-99). As of January 11, 2006, Atascadero was overbedding by 46 individuals (RT1-101). There is also overbedding at Metropolitan and Patton (RT1-101). There is not supposed to be overbedding at Napa, as statute limits the number to 980 (RT1-102).

Patton had a cap of 1336, but when need for overbedding became apparent the Legislature granted a temporary reprieve from that cap, until September 2006 when the 1336 cap will again be in place (RT1-102--RT1-103). Eventually, Coalinga will be able to house 1500 forensic beds (RT1-105). However, Coalinga is still in the process of attempting to recruit personnel to staff the facility (RT1-104--RT1-105). There has been a decline in civil LPS commitments and some vacant beds for them, because the counties have come up with alternate ways to treat them (RT1-105). Rodriguez testified it is not possible for the Department of Mental Health to do any more overbedding than it is already doing (RT1-106). Also, the Department of Mental

Health is running over 100,000 hours per month of overtime in the state hospitals.

In the next six months, it is hoped that there will be enough staff at Coalinga to have 350 SVPs at Coalinga (RT1-107-- RT1-108). That will have some positive effect, but will not solve the waiting problem, especially since sometime this year Coalinga is also supposed to take another 50 patients from the Department of Corrections and Rehabilitation (RT1-108). Once Coalinga becomes fully operational and has space for 1500 forensic beds, that will reduce the current backlog at Napa for the admission of Penal Code § 1370 patients and increase the total number of forensic beds in the state hospital system by about 38 percent (RT1-109). Coalinga will not be up to this level, however, for at least three more years; right now it only has 139 forensic patients, due to lack of adequate staff, and these are only SVPs from Atascadero (RT1-115--RT1-116).

The Department of Mental Health is also looking into further future alternatives, such as building additional units (RT1-109). The civil LPS committees to the state hospitals are the most difficult patients who need the level of treatment at the state hospital level rather than local level; there is no subpopulation of them to be pushed back to the counties so as to make room for the committees charged with felonies (RT1-111). Though actually are plenty of available LPS beds, they are

outside the security perimeter and it would be too dangerous to use them for a forensic patient (RT1-112). At Napa, the cap is 980 forensic patients, but if that cap were removed it would be physically possible to do some overbedding of 20 or 30 more forensic patients in the security area, but staff would be needed (RT1-134--RT1-135).

Mark Grabau testified that he is the community program director for the Central Valley Conditional Release Program, commonly known as "ConRep" (RT1-140). ConRep is a conditional release program for patients who have committed violent felonies, and the program monitors and treats over 70 patients on an outpatient basis (RT1-140). The program also helps prescribe treatment for over 280 inpatients in the state hospital system (RT1-140).

The program responds to judicial orders to provide placement evaluations for patients who have been found either incompetent to stand trial or been found guilty by reason of insanity (RT1-140). When there is a local, the program considers whether the person should be housed in a local facility as opposed to a state hospital (RT1-140). The program deals with 16 Northern California counties, which have varying levels of psychiatric services available for inpatient setting (RT1-141). Dr. Grabau is familiar with Sacramento County and contemplated facilities, but is not aware of any genuine

possibility or facility for placement at this time (RT1-141). Rather, the only options right now for a Penal Code § 1370 patient is either outpatient counseling or a state hospital (RT1-146).

Dr. Grabau testified that Sacramento Mental Health Hospital is a county-funded short-term inpatient facility that treats misdemeanant Penal Code § 1368 patients (RT1-141). Sacramento Mental Health Hospital cannot treat felony Penal Code § 1368 patients, due to their physical plant limitation, as there is a large open treatment area that could not be quarantined from the general population (RT1-142). Also, the facility is at capacity for licensed bed placements, and has staffing shortages (RT1-142). The hospital is not interested in receiving any Penal Code § 1370 felony individuals (RT2-40). However, the facility does accept "Murphy" conservatorships. These are for persons found incompetent to stand trial, are gravely disabled and cannot be brought to competency over a three-year period, may have violent felony histories, and who then are committed under the civil conservatorship statutes (RT2-45, RT2-48--RT2-49).

Dr. Grabau testified that Sierra Vista, a private hospital, has never been an option for the state Department of Mental Health or ConRep in the past (RT1-143). Nobody has ever been recommended to be housed there, and the average length of stay there is very short (RT1-143). It could be a possibility, if it

met various requirements (RT1-145). This, or some other local inpatient locked facility with an appropriate restoration to competency program, if it existed, would be an option to be considered for Penal Code § 1370 felony individuals, alternatively to state hospital or outpatient treatment (RT2-39--RT2-40).

Dr. Grabau testified that under the Penal Code, in making recommendations as to where Penal Code § 1370 felony individuals should go, he is supposed to consider public, private, local facilities, or state hospitals, but the state hospital is the fundamental reality of where these patients are sent (RT2-6 ["RT2" referring to February 10, 2006 session of evidentiary hearing]). If a serious felony is involved, there is no individual evaluation and it is an automatic recommendation to a locked facility; only in 15 or 20 percent of the cases is more of an individual assessment made (RT2-6). When an individual assessment is made, the two options are only outpatient counseling or the state hospital, because that is all that is available (RT2-6--RT2-7).

Dr. Grabau testified that the automatic recommendation for state hospital is based on statute (RT2-44); this was an apparent reference to Penal Code § 1370(a)(1)(B)(ii), that actually provides otherwise, that in certain sex offense and violent felony cases that the placement is in a state hospital

or alternative placement as specified in that statute under limited circumstances; the statute does not render the commitment to the state hospital automatic in these cases. When pressed on the point, Dr. Grabau said that the statute requires a locked facility rather than per se the state hospital, but again emphasized that currently the only available locked facility is the state hospital (RT2-44). Again, this still was not truly reflective of Penal Code § 1370(a)(1)(B)(ii), which requires somewhat differently in certain circumstances.

Dr. Grabau testified that Sacramento County is in a better position right now to treat patients in the jail, than are most of the other counties in ConRep (RT2-7). The Sacramento jail has an affiliation with the University of California-Davis, with psychiatric services available (RT2-7). However, the jail services do not include any type of restoration of competency program, and would still require that patients be held in jail cells (RT2-7).

Dr. Grabau testified that he had an opportunity to speak with Nancy Purtell, the chief executive officer at Sierra Vista, and with one of her assistants, Kevin Henry, and Purtell and Henry are currently willing to consider possibly taking some Penal Code § 1370 clients (RT2-9). The approach would be conservative, so as to choose patients that would most benefit from the Sierra Vista setting and would not pose risk to the

community or other patients on the floor (RT2-10).  Sierra Vista would be provided with a referral packet and other necessary paperwork, and a conference would be had with Sierra Vista's assessment team before a recommendation would be made (RT2-10).

Dr. Grabau expressed a willingness to try this alternative (RT2-10).  If there are 15 percent of this county's Penal Code § 1370 patients without an extensive criminal background and an active substance dependence problem, it might be something to tried at Sierra Vista (RT2-29).  There would need to be some adjustments made, however, to have a secure place in the hospital there to house the Penal Code § 1370 felons (RT2-30).

Dr. Grabau testified that he believes that what is required for a Penal Code § 1370 patient is a well-run licensed board and care facility that is staffed 24 hours a day, will insure medication ingestion and compliance, will keep the patients contained, and will provided ongoing psychiatric care and individual counseling to prepare the patient to understand the legal process (RT2-13).

Dr. Grabau testified that if psychiatric services are provided to a Penal Code § 1370 patient at the Sacramento County jail for about 30 days, that would aid in stabilizing the patient and ultimately reduce the time in which the patient is brought to competency (RT2-14--RT2-15).

Dr. Grabau testified that there are three general

categories of Penal Code § 1370 patients (RT2-19).  First, there is the type of patient that ConRep was designed for, that being the chronically mentally ill who has committed a violent act purely because of mental illness, generally against a caretaker (RT2-19).  Second, there is the patient who is predominantly criminally focused and criminally oriented, who has developed a mental illness, and who, under medication, poses certain management challenges in the community (RT2-19--RT2-20).  Third, there are patients who are "scattered", who either have completely malingered or are organically brain injured and in need of services to maintain a quality of life (RT2-20).  In evaluating any of these, Dr. Grabau looks at the entire criminal history, to assess how violent the person has actually been and how quickly the person becomes violent upon showing psychotic symptoms (RT2-21--RT2-22).  Substance abuse is also examined, as is how long the person had been in inpatient treatment in the past and how much the person has complied with treatment restrictions (RT2-22).

Dr. Grabau testified that in 2005, there was not one recommendation made for outpatient treatment of a Penal Code § 1370 patient (RT2-23).  This is because there was no clear cut case presented to Dr. Grabau that would warrant a placement in the community (RT2-23).  Since 1999, there have only been 7 patients in ConRep who were incompetency to stand trial patients

(RT2-24).

Dr. Grabau testified that in other counties, specifically Del Norte and Humboldt County, the Penal Code § 1370 have been kept in the jails for five or six months waiting to go to the state hospital, and many of them have gone unmedicated (RT2-27--RT2-28).

Nancy Purtell returned to the witness stand, and testified that there is a possibility Sierra Vista could consider taking Penal Code § 1370 individuals (RT2-51). Ms. Purtell had an opportunity to speak with Dr. Grabau about this possibility, and it is something that Purtell is open to exploring, so long as an individualized assessment of each individual could occur (RT2-52). As CEO of the facility, Ms. Purtell is the person who can say "yes" to a contract for this (RT2-52). Sierra Vista is a locked facility (RT2-53). It is an inpatient counseling facility, has an outpatient program, and has a program for chemical dependency issues (RT2-53). Sierra Vista would not be prepared to create a forensic unit, but would be prepared for those individuals who would fit the population there, without much change to the facility and within the existing services (RT2-54--RT2-55). The process for arranging this could take about five months (RT2-55). Ms. Purtell would not feel comfortable taking a violent felon into the facility's general population, but a nonviolent felon would not be a risk to the

-28-

rest of the population (RT2-56). Again, it would be a mixture of the patients, and not a separation into a different unit (RT2-57). And, Dr. Grabau represented to Ms. Purtell that there would be about 15 percent of the 1370 population who meet Ms. Purtell's considerations, and that with screening and understanding of Sierra Vista's needs, ConRep would be able to prescreen individuals and not refer those who would be a risk for Sierra Vista (RT2-58).

John Grozdanic was recalled to the stand, and testified that in 2003, the Sacramento County Mental Health Treatment Center admitted eight misdemeanor Penal Code § 1368 patients, in 2004 admitted twelve such cases, and in 2005 admitted thirty such cases (RT2-61). The average stay of these patients is 14 days (RT2-73). The facility is not equipped to house a 1370 for potentially three years, because the facility is an acute short-term facility (RT2-73--RT2-74). The licensing cap currently is 100 (RT2-74). The facility does not have a substance abuse program (RT2-74).

Karen Gray testified that she is a records officer and the transportation coordinator in the Sacramento County sheriff's department (RT3-3 ["RT3" referring to March 3, 2006 session of evidentiary hearing]). One of her duties is to coordinate the transportation of Penal Code § 1370 inmates (RT3-4). She gets involved when she receives the document package from the court,

at which point she begins to make arrangement for the delivery of that person to the appropriate state hospital (RT3-4).

Napa wants additional documents, beyond those required in Penal Code § 1370, concerning behavior incident reports from the jail, as well as the medical and psychological records from the jail (RT3-5--RT3-6). Napa wants the additional materials, to help them assess the inmate's behavior and what appropriate housing would be (RT3-21). A package of all the documents, called an intake package, is put together, and then hand-delivered to the Napa hospital if the sheriff's department is going to be there within a couple of days, or mailed if the sheriff's department is not going to go there (RT3-6--RT3-7). The intake packets are readily available (RT3-6).

The inmate, however, is not delivered at the same time as the intake packet, as the hospital requires the packet to be submitted in advance, then places the inmate on a waiting list for a bed (RT3-7). This has been running about six months (RT3-8). Currently, there are several inmates at the jail awaiting transportation to Napa, who have been there for a few months, but for whom no intake package has yet been received from the committing court; the individual courts are inconsistent in getting the intake packages to the jail (RT3-13--RT3-15). Ms. Gray reviews the list of inmates about once a week, and if it has been a prolonged period of time she contacts the committing

court's clerk and asks what the delay is or where the package is; sometimes they have no answer, and sometimes they say they are waiting for additional documents, typically the crime report that is needed by them from the district attorney's office (RT3-16--RT3-17).  Once the intake package is received by Napa, if it is not complete Napa will send a letter to the committing court requesting additional documents or that a document be changed (RT3-17).  If Napa can take an inmate, Napa's admissions office will call Gray and set a specific date for delivery, typically offering a choice of three dates in the following week (RT3-18).  Not all of the inmates go to Napa; female inmates go first to Patton, a hearing disabled inmate has gone to Patton, an inmate with an escape history has gone to Atascadero, and a developmentally disabled inmate has gone to Porterville; others could be sent to Metro (RT3-22--RT3-24).  Napa is the only state hospital that requires extra documents beyond the requirements of Penal Code § 1370 (RT3-26).

Dr. Gregory Sokolov testified that he is a psychiatrist and the medical director of the Sacramento County jail psychiatric services, which is a division of UC Davis Department of Psychiatry (RT3-28).  He has dealings with Penal Code § 1370 inmates, who may be his patients for clinical care (RT3-29).  There are different levels of psychiatric care at the jail (RT3-29).  The gravely disabled are put in the 18-bed inpatient

psychiatric unit in the main jail (RT3-29--RT3-30). The rest of the care at the jail is outpatient care of inmates housed in general population (RT3-30). Care is provided to 650 inmates, including the 30 inmates typically there who are Penal Code § 1370 committees (RT3-32). Penal Code § 1370 committees can be inpatient at the jail; some are right now (RT3-33--RT3-38). Not all the Penal Code § 1370 committees are necessarily treated by the psychiatric services (RT3-37).

The jail's psychiatric services does not give any treatment to Penal Code § 1370 committees for restoration of competency (RT3-38). The staff is not trained to do that, and it is beyond the staff's capabilities and beyond the contract with the sheriff's department (RT3-38). The services just treat people in the sheriff's custody who have mental health problems, who may include Penal Code § 1370 committees (RT3-41). Penal Code § 1370 restoration treatment does involve medication, and most of these people are getting the medication, but they are not given treatment regarding understanding of court proceedings (RT3-42). The psychiatric services also gives care to the inmates at Rio Cosumnes Correctional Center (RCCC) (RT3-44). There are three or four psychiatrists and three to four clinicians working at both the main jail and RCCC a day (RT3-45--RT-47). None of the group counseling, whether run by a psychiatrist or a clinician, focuses primarily on any type of a Penal Code § 1370 need (RT3-

50).   The services is running with a minimum number of staff (RT3-60).

Wade Jordahl testified that he is the assistant administrator and program director at the Crestwood American River Behavioral Health Center in Carmichael (RT3-72--RT3-73). He oversees the mental health services department and other departments (RT3-73).   The facility has 53 beds and is a locked facility (RT3-74, RT3-80).   Most of the beds are filled by civil LPS conservatorships of gravely disabled persons; 50 of the beds are so filled at this time (RT3-93--RT3-94).   The facility does accept patients who have been declared incompetent to stand trial, and currently has two from Yolo County on a Penal Code § 1370 hold and one on a Murphy's conservatorship (RT3-75, RT3-77).

Somebody from the county mental health system will call and refer a client, and the facility requests an information packet, which is then reviewed for determining whether the individual is appropriate for the facility (RT3-75).   The individual must be between 18 and 65, and has to have an Axis I diagnosis, as facility regulations require that (RT3-76).   The facility will not accept someone who is currently actively aggressive or violent; the person can have a certain degree of that, but the behavior must be something that the facility can handle (RT3-76--RT3-77).   Fire-starting behavior would be looked at very

closely, as would persons charged with sex assaults (RT3-77, RT3-85). Persons charged with murder would be looked at closely, but the facility has had such persons in the past (RT3-85). However, the facility does not provide competency restoration services, and has not initiated training to determine whether the person has been restored to competency (RT3-78). It is only county personnel who come in to review the records and meet with the individual, who determine that (RT3-78--RT3-79). The county person comes in every few weeks and does some work toward restoration of competency (RT3-87).

The facility just treats the individual on a multi-faceted basis, regarding the mental illness and behavior deficits (RT3-88). The facility would not be opposed to doing that, if it had some training (RT3-79). Currently, one of the incompetents to stand trial from Yolo County is charged with misdemeanor cruelty to animals and the other is there for misdemeanor trespassing; past clients, not currently there now, have been charged with felonies (RT3-79, RT3-85, RT3-89).

The Murphy's conservatee had assaulted an individual with a stick, causing blindness; he is currently permitted staff-supervised outings (RT3-91). There have probably been three persons charged with a felony there in the past seven years; two were for murder, one for sexual assault; Mr. Jordahl did not know, however, whether they were there for restoration of

competency or not, but he did remember that the charges were recent in their history (RT3-89, RT3-90). Another person had committed murder in the past but was there on drug charges (RT3-89--RT3-90). Mr. Jordahl would consider accepting at the facility an individual who had been off medication and was using some type of illegal substance, and had a delusion or command hallucination and committed a murder, but is now receiving treatment and is no longer using illegal substances and instead is on medication such that the mental illness is under control, and does not exhibit severe violent behavior (RT3-91). That the person is charged with a felony in and of itself does not exclude the person from admission at the facility (RT3-99). Jordahl does not know, however, whether the facility has ever accepted a 1370 committee from Sacramento County (RT3-100).

John Rodriguez was recalled to the stand, and testified that currently, about 15 patients are being transferred from Atascadero to Coalinga state hospital per week (RT3-102). This is an increase from five and then ten per week that had previously occurred (RT3-102--RT3-103). As of March 1, 2006, there are 193 at Coalinga, and it is expected to have 375 persons there by June 2006 (RT3-103). Recruitment efforts for staff is ongoing (RT3-104--RT3-104). Pay increases are being sought and many have been obtained (RT3-105--RT3-108). No patients have been moved from Napa to Coalinga, as Coalinga was

constructed for sexually violent predators (SVPs) (RT3-110). Moving the SVPs out of Atascadero frees up space there, and patients from Napa and other hospitals then can be moved to Atascadero, although these can be filled by patients from other counties, by correctional inmates, and by SVPs and MDOs (RT3-110--RT3-111).

Mr. Rodriguez is aware that Napa is currently requiring more legal documents for the intake packet than is required under the Penal Code, and he intends to change that (RT3-115). He wants to get all the hospitals consistent in terms of those requirements, right out of the statute (RT3-116).

**Mr. Rodriguez has not made any efforts to ask the Legislature to increase the number of bed spaces beyond the 980 cap at Napa (RT3-118). Rodriguez does not foresee the backup problem now being experienced being eliminated in 2006, but he does foresee it being reduced (RT3-119). The problem is statewide, and many other counties are experiencing backlogs similar to Sacramento County (RT3-117--RT3-118).**

Mr. Rodriguez testified that, looking to the future, there will still be a need for additional forensic beds, even when Coalinga is up to capacity (RT3-121). He is looking at options, including securing more beds at Metropolitan, doing new or remodeling construction at Patton State Hospital, and construction at Atascadero, where there are already plans

drafted for 258 additional beds (RT3-122).    The Department of Corrections and Rehabilitation has a building plan to build more inpatient programs at Vacaville, Salinas Valley, and a new place in Sacramento (RT3-122).

Sandy Damiano testified that she is the executive director of the Mental Health Treatment Center (RT3-125).    The treatment center has two programs: a crisis stabilization unit that functions as a psychiatric emergency room and accepts patients directly from law enforcement and ambulance, and an inpatient unit that is licensed as a psychiatric facility with a 100-bed program designed for acute hospitalization for a very brief stay (RT3-127).    The average length of stay in the inpatient unit is five days (RT3-128).    The facility is not equipped to house Penal Code § 1370 patients.

The facility is not a locked secured unit and does not have separate contained units within the inpatient unit (RT3-129). The doors on the unit are locked to prevent people from leaving, but there is no capability to lock down between units or the day room (RT3-129).    The facility would not be able to separate out vulnerable people from felons (RT3-129).    The facility contracts with a security agency, but they are not trained to deal with patients; if there is a disturbance, it is attended to by clinical staff, and if there is a crime, law enforcement is called (RT3-129--RT3-130).    People have been arrested for crimes

such as assault, sexual assault, and arson (RT3-130). The facility would not have a program for restoration of competency of felons (RT3-132). The facility does provide for misdemeanant "1370" committees, and usually has one or two patients (RT3-131, RT3-132).

In 1992 or 1993, there was an agreement between the state Department of Mental Health and the county's Department of Mental Health and Human Services, that the county would take responsibility for the misdemeanors and the state would continue to take responsibility for the felonies (RT3-131). In 2005, there were 27 misdemeanant incompetents in the facility, and in 2003 there were 8 or 10 or 12 (RT3-133--RT3-134).

As for Murphy's conservatees, the facility provides treatment while they are waiting for placement (RT3-134). In 2005, there were three Murphy's patients, in 2004 there were two, in 2003 there were four, and in 2002 there were six (RT3-135). The current policies of the facility are in the process of being revised, but the proposed draft revision does not change anything significantly with regard to felons (RT3-137). The facility has a 100-person limit, and if exceeded could cause the facility to lose its license (RT3-137--RT3-138).

**EXHIBITS**

Various exhibits were admitted into evidence.

Exhibit A gives the figures on forensic beds and actual

number of forensic patients at the various state hospitals. Atascadero, Metropolitan, Napa, and Patton are all shown to be above capacity; Coalinga, the new facility, is the only one with very few patients, being 139 on January 11, 2006 as opposed to an ultimate capacity of 1500.

Exhibit B shows the growth in the number of forensic patients in the state hospitals since 1987.

**Exhibit C is a copy of the state Department of Mental Health's Special Order No. 319.05, dated July 5, 2005, that to ensure that security limitations are not exceeded, the state hospitals *are to admit judicially committed individuals in accordance with departmental admission guidelines*, in a manner that ensures the most appropriate treatment and recognition of security requirements while minimizing disruption and costly transfers.**

The special order directed that Atascadero, Patton, and after September 5, 2005, Coalinga, are designated as the most secure facilities that may treat individuals rated at any security level. Metropolitan and Napa are the low and medium risk facilities, and that Metropolitan cannot accept those charged with murder, rape, child molestation, or other sex crimes. The special order directs where MDOs and SVPs are to be housed, as well as NGIs. As for male incompetents to stand trial under Penal Code § 1370, those from mostly Southern and

Central California counties are to go to Patton or Atascadero; those male incompetents from all other counties, including Sacramento County, are to be directly admitted at Napa or Metropolitan.  Other designations are also made.

Exhibit D is a copy of the state Department of Mental Health's Special Order No. 903.05, dated July 23, 2004, directing that each person committed under a Penal Code section is assessed for potential for escape, to be made either before or at the time of admission.

Exhibit E is a copy of an April 29, 1993 memorandum from the state Department of Mental Health, discussing misdemeanant incompetents and restoration of competency.  It has no realistic relevance to this case.

Exhibit F is a glossary of terms.  It has little relevance to this case.

Exhibit G is a competency assessment instrument rating form.  It has little relevance to this case.

Exhibit H is a list of inmates transferred to state hospital in 2005.  Exhibits I and J are lists of inmates waiting for the transfer, since July 2005.

Exhibit K is a February 6, 2006 memorandum from the Department of Personnel Administration, concerning salary inequities and resultant adjustments, within the Department of Mental Health.

Exhibit L is a memorandum from the state Department of Mental Health, concerning recruitment efforts for Coalinga State Hospital.

Exhibit M is a document from the Mental Health Treatment Center, concerning Murphy's conservatorship admissions to the inpatient unit there.

Exhibit N is a copy of the Sacramento County Mental Health Treatment Center's policy and procedure on patients referred there by court order of Penal Code "Section 1370" for restoration of competency.  It makes no mention of whether the person is to be a misdemeanant or felony committee.

**FURTHER PLEADINGS**

In between sessions of the evidentiary hearing, counsel for petitioners filed a "Proposed Resolution" on February 9, 2006. Counsel nevertheless suggested to the court that certain remedial matters should be considered:  (1) the intake process to any state hospital should be uniform and not require any more than is required under Penal Code § 1370(a)(2)(C)(3); (2) Napa should function on a "first-come first-serve" basis; (3) ConRep should evaluate possible local alternatives for felony Penal Code § 1370 committees, including at Sierra Vista and Sacramento County Mental Health Treatment Center, which should need to cooperate with ConRep; (4) Sacramento County Mental Health

Treatment Center should be ordered to take felony Penal Code §
1370 committees when possible; (5) the 980-bed space limitation
at Napa should be found to be unconstitutional; (6) Metro should
be reconfigured so that there are more beds in the secured area;
(7) Atascadero should be ordered to take both medium and high
risk patients; (8) if a Penal Code § 1370 committee is held at
the county jail more than 7 days after the commitment order, the
committee should be returned to the court calendar to resolve
the issue of the unlawful detention and to consider other
possible placements, (9) the Sacramento County Jail should
prepare a list of all the Penal Code § 1370 committees currently
housed in the county jail.

On March 1, 2006, the Attorney General filed a request that
this court take judicial notice of the Sacramento County Grand
Jury Final Report 2003-2004, which contains a part entitled
"Sacramento County Jail Health Inmate Psychiatric Services."
The request was repeated at the evidentiary hearing, and granted
at that time (RT3-157).  The report's main focus, however, was
on preventing jail suicides, and makes no mention of Penal Code
§ 1370 committees and what kind of treatment they are receiving.
It has little relevance to the instant proceeding.

**FINDINGS OF FACT**

The court makes the following findings of fact:

(1)  Sacramento  County  Superior  Court  criminal  felony defendants  who  have  been  found  incompetent  to  stand  trial,  and who  have  been  ordered  committed  to  the  state  hospital  pursuant to  Penal  Code  §  1370,  are  being  held  in  the  Sacramento  County Jail  for  months  while  awaiting  transportation  to  a  state hospital.

(2)  While  being  so  held  in  the  county  jail,  these  felony incompetents  are  administered  needed  psychiatric  medications, but  receive  no  treatment  toward  restoration  of  competency.

(3)  Under  current  policies  of  the  state  Department  of Mental  Health,  these  Sacramento  County  felony  Penal  Code  §  1370 committees  are  to  be  initially  transported  to  Napa  State Hospital,  and  not  any  other  state  hospital,  and  only  after:

(a)  An  intake  packet  has  been  sent  to  Napa  State Hospital,  that  includes  documentation  required  by  that facility  well  beyond  what  is  required  by  Penal  Code  § 1370(a)(2)(C)(3),

(b)  The  defendant  has  been  placed  on  a  waiting  list, after  the  intake  packet  is  received,  and

(c)  A  bed  becomes  available  to  the  defendant  on  the waiting  list.

(4)  In  some  cases,  there  has  been  a  delay  by  a  court department,  in  getting  to  the  jail  an  intake  packet  that includes  all  of  the  documents  required  by  Napa  State  Hospital,

beyond what is required by Penal Code § 1370(a)(2)(C)(3).

(5) There are no available local alternatives for felony Penal Code § 1370 committees to placement in a state hospital in existence in Sacramento County at the present time, either inpatient or outpatient. Therefore, when the community program director gives the required evaluation to the court pursuant to Penal Code § 1370(a)(2)(A), before the court renders a Penal Code § 1370 commitment order, the director in all cases is unable to recommend any placement other than in the state hospital, for all felony case incompetents to stand trial.

## ANALYSIS UNDER MINK & ORDER

The court has already chosen to overlook the mootness of this matter with regard to the specific petitioners, all of whom have now been transferred to the state hospital, as the matter is one of broad public interest that is likely to recur (In re M., supra).

As the court has now found, criminal defendants being found incompetent to stand trial by the Sacramento County Superior Court are being held at the Sacramento County Jail for months at a time, without being delivered to the Department of Mental Health as ordered by the court. The Sheriff states that he is not delivering them because Napa State Hospital has informed him that no beds are available.

Case law has long held that a criminal defendant may not be held indefinitely without treatment.    Indeed, it was first held in Jackson v. Indiana (1972) 406 U.S. 715 and In re Davis (1973) 8 Cal.3d 798 that a criminal defendant committed as incompetent to stand trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he or she will attain that capacity in the foreseeable future, and if not, that the state must either institute civil commitment proceedings or release the defendant. And, even if it is determined that the defendant probably soon will be able to stand trial, his or her continued commitment must be justified by progress toward that goal.

In an Oregon case similar to the situation at bar, the Ninth Circuit has more recently found the rights of persons found incompetent to stand trial to have been violated (Mink, supra, 322 F.3d 1101):

> ". . . . This case presents the question of what happens when the state mental hospital (Oregon State Hospital or 'OSH'), which is charged with evaluating and treating mentally incapacitated defendants, refuses to accept such defendants on a timely basis. Plaintiffs contend that OSH's delays in accepting mentally incapacitated defendants violate those defendants' substantive and procedural due process rights. OSH argues that it is the county jails' responsibility to maintain and treat incapacitated defendants until OSH has an open bed.    After a bench trial, the district court agreed with the plaintiffs and entered an injunction requiring OSH to admit defendants within seven days of a trial court's

finding of their incapacity to proceed to trial. We have jurisdiction under 28 U.S.C. § 1291, and we affirm. . . .

"After a bench trial, the district court found that, during 2001 and early 2002, incapacitated criminal defendants spent on average about one month in county jails before OSH accepted them for the requisite evaluation and treatment. In many cases, defendants had to wait two, three or even five months. The court also spelled out in a series of factual findings -- for the most part undisputed by OSH -- the harms suffered by defendants who are relegated to a wait-list status and remain in jail until OSH has room for them. We set out the most relevant undisputed findings here:

"9. Jails can provide medication management for people who are willing to take medications, but cannot administer medication involuntarily, except in a life-threatening emergency. When resources permit, treatment for 'unfit to proceed' defendants may possibly include basic clinical psychiatry and intervention. Such treatment is designed to stabilize the inmate. However, some inmates, particularly those with personality disorders, refuse or do not respond to medication, and do not otherwise respond to the treatment the jails can provide.

"10. None of the jails in which these persons are held is able to provide treatment designed to restore a person found unfit to proceed to competency. People found unfit to proceed are often overtly psychotic and require special housing or segregation. They are unpredictable and disruptive, taking up valuable resources needed for the care of other inmates. If they refuse to take medications, they often decompensate rapidly. They often are confined in their cells for 22 to 23 hours a day because of their behavior. This exacerbates their mental illness.

"11. Necessarily, the jails' only system for controlling inmates is disciplinary, which is

behavior-driven. Such a system is ineffective for mentally ill persons, and possibly harmful.

"12.  Unlike the county jails, OSH has the capacity to treat a person's mental illness. Each of the units housing persons found unfit to proceed is staffed by a full-time psychiatrist, a psychologist, a mental health specialist, a recreation counselor, a social worker, a mental health technician and nurses.

"13.  In addition to assessment, medication evaluation and management, and individual and group psychotherapy, OSH provides legal skills training three times a week to assist patients in learning about the law, pleas, and returning to court. This treatment is designed to enable a person to regain fitness to proceed to trial.

"17.  .  .  .  This population has a high suicide risk, and psychosis can be an emergency requiring immediate treatment.

"18.  .  .  .  Depriving [persons deemed unfit to proceed] of necessary medical treatment increases the likelihood that they may decompensate and suffer unduly. The delays also hamper efforts to provide effective representation regarding their criminal prosecution.

"19.  .  .  .  [A]s the client spends weeks and months in jail awaiting hospitalization, the[e] evaluation [required by state law] is delayed .  .  .  .  [F]or people declared to be unable to aid and assist, delays in the subsequent evaluative process can postpone the opportunity for a trial for much longer than 60 days.

"20.  The jails have the capacity to transport inmates to a treatment facility within 24 hours. The reason they do not transport the inmates is because defendants refuse to accept them.

".  .  .  .

"Plaintiffs sued OSH on March 19, 2002, seeking injunctive and declaratory relief.  .  .  .

"The district court held a bench trial on April 8, 2002, and issued its findings of fact and conclusions of law on May 9. It held that (1) OAC had standing to sue on behalf of its constituents, mentally incapacitated criminal defendants, and MPD had standing to sue in its own right; and (2) OSH was violating the incapacitated defendants' Fourteenth Amendment due process rights by unreasonably detaining them in county jails that lack the facilities to treat and restore the defendants' mental health. The district court entered an injunction requiring OSH to admit mentally incapacitated defendants within seven days of the judicial finding of their incapacity to proceed to trial.

"Thereafter, OSH moved to stay the injunction pending appeal and to clarify and modify the injunction so that the seven-day period would begin to run upon OSH's receipt of notice of a finding of unfitness. On May 27, 2002, the district court denied both motions. OSH timely appealed. . . .

"OSH does not dispute that mentally ill persons who are accused of crime have constitutionally protected due process rights that the state is obliged to honor. Nor does OSH seriously contest that jails are inferior to OSH in their ability to evaluate and treat mentally ill defendants, or that defendants denied needed care are harmed thereby. Rather, OSH's primary defenses are that (a) neither OAC nor MPD has standing to sue and (b) in any event, liability lies not with OSH -- which under its reading of the Oregon statute has no duty to mentally ill defendants until it has a bed available and actually takes custody of them -- but with the county jails who have the legal duty to maintain and care for the defendants until OSH can accept them. . . .

"OSH argues that plaintiffs OAC and MPD lack standing to bring this suit. . . .

"Finally, OSH argues that OAC has failed to establish the second constitutional requisite of

standing -- a causal connection between its
injuries and OSH's conduct. Specifically, OSH
argues that any injury to incapacitated
defendants and OAC is not fairly traceable to
OSH's actions because, before OSH has beds
available and actually takes custody of
incapacitated criminal defendants, Oregon
counties, not OSH, have the duty to provide these
defendants with constitutionally adequate care.
If the county jails were providing adequate
treatment, then incapacitated criminal defendants
and OAC would not suffer any injury or adverse
effect. Therefore, even if the delay in treatment
causes injury, OSH is not the cause of the delay.
We disagree.

"Under Oregon law, OSH has the duty to accept and
treat mentally incapacitated criminal defendants.
The question is whether that duty resides in or
shifts to county jailers until such time as OSH
has an available bed for and accepts the
defendant. The answer is found in the plain
meaning of the governing statute. . . .

"Here, the Oregon legislature's intent is clear
from the text of the statute. The plain meaning
of the text is unambiguous. ORS § 161.370(2)
provides in relevant part:

"If the court determines that the defendant lacks
fitness to proceed, the proceeding against the
defendant shall be suspended . . . and the court
shall commit the defendant to the custody of the
superintendent of a state mental hospital
designated by the Department of Human Services or
shall release the defendant on supervision for so
long as such unfitness shall endure. The court
may release the defendant on supervision if it
determines that care other than commitment for
incapacity to stand trial would better serve the
defendant and the community.

"(Emphasis added.) OSH is the only designated
state mental hospital. Significantly, the statute
makes no mention of any intermediary, county jail
or otherwise, to whom the court can commit a
mentally incapacitated defendant before either

committing the defendant to OSH or releasing the
defendant on supervision. [fn. 8 omitted.] By
statute, therefore, the court has only two
alternatives: it can commit the defendant to OSH
or release the defendant on supervision. There is
no middle ground.

"A fair reading of the statute's text leads to
the conclusion that it is aimed directly at
keeping mentally incompetent defendants out of
county jails, not at conferring responsibility on
those jails for interim treatment. OSH's
statutory duty is triggered whenever a court
decides to commit a defendant to OSH rather than
release the defendant.

"OSH argues that a former version of ORS §
161.370, which was passed in 1999 but which
expired at the end of 2001 due to a sunset
provision, reflects a deliberate decision by the
Oregon legislature to make counties responsible
for the care and treatment of incapacitated
criminal defendants until OSH accepts them. As we
have said, the prior version of the statute is
part of its context under Oregon jurisprudence,
but the 1999 statute does not detract from our
reading of the current law.

"The pre-1999 version of the statute resembled
the current version. . . .

"In 1998, a state fire marshal and health care
accreditation organizations had cited OSH for
overcrowding. The Oregon legislature revised ORS
§ 161.370 temporarily to give OSH an opportunity
to address that problem. The legislature's
decision in 2001 to restore the statute to its
pre-1999 version, excising all references to
periods of delay and conditions on transfer to
OSH, suggests that the legislature intended what
the statutory text now provides: courts are
either to commit incapacitated defendants to OSH
(not to county jails) or release them under
supervision. The sunsetting of the old version
also can be understood as OSH urges, as a
legislative signal that there now is no time
limit on OSH's taking custody of incapacitated

criminal defendants, so that county jails must care for them in the interim. But the historical context of ORS § 161.370 by no means compels OSH's interpretation. Because the historical context can be read either way, we interpret the current text to mean what it says: the trial court may either commit an incapacitated defendant to the custody of OSH or may release such a defendant under supervision. Under the first option, OSH has the correlative duty to accept custody.

"We therefore conclude that under Oregon law, it is not the counties but OSH that has the duty to accept and treat incapacitated defendants once they have been certified as such by a circuit court. Consequently, OSH's argument that OAC lacks standing for want of a causal link between its injuries and OSH's untimely acceptance of incapacitated defendants must fail.

"In sum, OAC meets the constitutional requirements for standing, and prudential requirements pose no obstacle. OAC has standing to sue on behalf of [**35] its constituents -- the mentally incapacitated defendants. . . .

"OSH challenges the injunction entered against it on the merits. OSH argues that the district court violated principles of federalism when it determined that OSH, rather than Oregon's counties, must provide timely treatment to incapacitated criminal defendants. OSH also argues that the district court erred in concluding that OSH violated due process and in requiring that criminal defendants be given mental health treatment within seven days of being declared unfit. Again, we address each argument in turn. . . .

"OSH argues that it is for the Oregon legislature, not the federal courts, to decide which entity within the Oregon state government must provide and pay for the treatment of mentally incapacitated criminal defendants. Furthermore, OSH argues, the Oregon legislature has already decided that the county jails must

provide for such treatment until OSH has a bed available. On this basis, OSH concludes that the district court's injunction violates principles of federalism because it contravenes a decision within the exclusive province of the Oregon legislature.

"We need not address OSH's federalism argument, however, because it is premised on an interpretation of ORS § 161.370 that we have already rejected. Under Oregon law it is OSH, not counties, that has the duty to accept incapacitated defendants once they have been certified as such by a circuit court. The injunction is consistent with the legislative choice embodied in the statute, and thus with principles of federalism. . . .

"The district court held that criminal defendants declared unfit to proceed to trial under ORS § 161.370 have the right under substantive and procedural due process to 'reasonably timely transport to a treatment facility.' OSH violates that right, the district court held, by failing to admit incapacitated criminal defendants within seven days of the issuance of the court order declaring them unfit. As we noted earlier, OSH does not dispute that mentally ill persons accused of a crime have due process rights that the state is obliged to honor. Nor does OSH seriously contest that jails are inferior to OSH in their ability to evaluate and treat mentally ill defendants, or that defendants denied needed care are harmed thereby. OSH argues, however, that (1) any alleged substantive due process violation must be measured by the deliberate indifference standard; (2) the district court failed to engage in the individualized assessment required by the deliberate indifference standard; and (3) under such an individualized assessment, OSH was not deliberately indifferent to the needs of any individual incapacitated criminal defendant. [fn. 10 omitted.]

"In assessing the merits of OSH's due process arguments, we are mindful that by statute OSH is solely responsible for the timely treatment of

incapacitated criminal defendants so that they may become competent to stand trial. We are also mindful of the undisputed harms that incapacitated criminal defendants suffer when they spend weeks or months in jail waiting for transfer to OSH. These harms include the following: Although jails can sometimes provide treatment to stabilize a patient, they cannot restore a patient to competency. Thus, incarceration in a county jail delays an incapacitated criminal defendant's possible return to competency. The disciplinary system that jails use to control inmates is ineffective for, and possibly harmful to, incapacitated criminal defendants. Because of their unpredictable or disruptive behavior, they are often locked in their cells for 22 to 23 hours a day, which further exacerbates their mental illness. Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly. These and other undisputed harms, together with OSH's statutory mandate to provide timely restorative treatment, support our conclusion below that OSH's delay in admitting incapacitated criminal defendants violates their substantive due process rights.

"First, we reject OSH's claim that the deliberate indifference standard governs the due process rights of incapacitated criminal defendants. Pretrial detainees, whether or not they have been declared unfit to proceed, have not been convicted of any crime. Therefore, constitutional questions regarding the conditions and circumstances of their confinement are properly addressed under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment's protection against cruel and unusual punishment. . . .

"Rather than look to the protections of the Eighth Amendment for a guiding standard, we look instead to the Supreme Court's and our own substantive due process jurisprudence. Before determining and applying the appropriate standard

for imposing liability, we identify the substantive due process rights at issue.

"Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment. . . . We have held that civilly committed persons must be provided with mental health treatment that gives them 'a realistic opportunity to be cured or improve the mental condition for which they were confined.' [citations omitted.] 'Lack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation.' [citation omitted.] Notably, Oregon's statutory scheme for the identification and treatment of incapacitated criminal defendants recognizes and seeks to protect these liberty interests.

"Whether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state. [citation omitted.] We conclude that such a balance favors the mentally ill defendants awaiting trial.

"Here, OSH has not advanced, nor do we discern, a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months. OSH's refusal to accept such defendants not only contravenes the legislature's statutory mandate that OSH provide them with restorative treatment, it also undermines the state's fundamental interest in bringing the accused to trial. [citation omitted.] While they are detained in jail, incapacitated criminal defendants do not receive care giving them a realistic opportunity of becoming competent to stand trial. We conclude that OSH violates the substantive due process rights of incapacitated criminal defendants when it refuses to admit them in a timely manner.

"We draw support for our conclusion from the Supreme Court's decision in Jackson v. Indiana,

406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972), which held that, under the Due Process Clause, a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future . . . . Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal. . . .

"Although Jackson involved a pretrial commitment to a mental health facility for three and one-half years, rather than pretrial detention for several weeks or months in a county jail, the principles enunciated in Jackson apply to the case before us. Here, Oregon courts commit persons found unfit to proceed to the care of OSH in order for OSH to evaluate, treat and restore their mental health so that judicial proceedings may resume. See ORS § 161.370. As the district court found, only a mental hospital like OSH, not a county jail, can fulfill those purposes. Only OSH has the highly trained staff and other resources needed to identify and treat an incapacitated criminal defendant's mental illness. County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses. Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals.

"We conclude that OSH's significant, ongoing violations of substantive and procedural due process [fn. 12 omitted] are sufficient to support the district court's injunction. [fn. 13 omitted.]
"We conclude that OAC has standing to bring suit and that OAC's claims are not moot. We also

uphold the district court's injunction requiring OSH to admit mentally incapacitated criminal defendants within seven days of a judicial finding of incapacitation. [fn. 14 omitted.] "The order of stay pending appeal is dissolved."

This court finds Mink, supra, to be persuasive authority (see People v. Bradley (1969) 1 Cal.3d 80, 86; see also Etcheverry v. Tri-Ag Service, Inc. (2000) 22 Cal.4th 320, 321 [reaffirming Bradley rule]).

In this case, California'S is statute provides for a scheme similar to that in Oregon in many respects. Penal Code § 1367(b) provides that Penal Code § 1370 governs felony criminal defendants found mentally incompetent to stand trial. Penal Code § 1370(a)(1) provides in pertinent part that (emphasis added):

"(B) If the defendant is found mentally incompetent, the trial or judgment shall be suspended until the person becomes mentally competent.

"(i) In the meantime, the court shall order that the mentally incompetent defendant be delivered by the sheriff to a state hospital for the care and treatment of the mentally disordered, or to any other available public or private treatment facility approved by the community program director that will promote the defendant's speedy restoration to mental competence, or placed on outpatient status as specified in Section 1600.

"(ii) However, if the action against the defendant who has been found mentally incompetent is on a complaint charging a felony offense specified in Section 290, the

prosecutor shall determine whether the defendant previously has been found mentally incompetent to stand trial pursuant to this chapter on a charge of a Section 290 offense, or whether the defendant is currently the subject of a pending Section 1368 proceeding arising out of a charge of a Section 290 offense. If either determination is made, the prosecutor shall so notify the court and defendant in writing. After this notification, and opportunity for hearing, the court shall order that the defendant be delivered by the sheriff to a state hospital or other secure treatment facility for the care and treatment of the mentally disordered unless the court makes specific findings on the record that an alternative placement would provide more appropriate treatment for the defendant and would not pose a danger to the health and safety of others.

"(iii) If the action against the defendant who has been found mentally incompetent is on a complaint charging a felony offense specified in Section 290 and the defendant has been denied bail pursuant to subdivision (b) of Section 12 of Article I of the California Constitution because the court has found, based upon clear and convincing evidence, a substantial likelihood that the person's release would result in great bodily harm to others, the court shall order that the defendant be delivered by the sheriff to a state hospital for the care and treatment of the mentally disordered unless the court makes specific findings on the record that an alternative placement would provide more appropriate treatment for the defendant and would not pose a danger to the health and safety of others."

". . . ."

"(D) A defendant charged with a violent felony may not be delivered to a state hospital or treatment facility pursuant to this subdivision

-57-

unless the state hospital or treatment facility has a secured perimeter or a locked and controlled treatment facility, and the judge determines that the public safety will be protected.

"(E) For purposes of this paragraph, "violent felony" means an offense specified in subdivision (c) of Section 667.5.

"(F) A defendant charged with a violent felony may be placed on outpatient status, as specified in Section 1600, only if the court finds that the placement will not pose a danger to the health or safety of others.

And, Penal Code § 1370(a)(2) provides in relevant part as follows:

"(2) Prior to making the order directing that the defendant be confined in a state hospital or other treatment facility or placed on outpatient status, the court shall proceed as follows:

"(A) The court shall order the community program director or a designee to evaluate the defendant and to submit to the court within 15 judicial days of the order a written recommendation as to whether the defendant should be required to undergo outpatient treatment, or committed to a state hospital or to any other treatment facility. No person shall be admitted to a state hospital or other treatment facility or placed on outpatient status under this section without having been evaluated by the community program director or a designee. . . ."

Penal Code § 1370 was first amended in 1974 to provide for incompetency to stand trial commitment to either a state hospital or an available public or private hospital, sanitarium, or facility to promote a speedy restoration of mental competence

(1974 Stats., ch. 1511, § 6 (AB 1529)).   Legislative history indicates that the amendments to the statute were a direct response to Jackson v. Indiana (1972) 406 U.S. 715 and In re Davis (1973) 8 Cal.3d 798 (see Enrolled Bill Report on AB 1259 prepared by the Health and Welfare Agency, Department of Health [Appendix A]; see also Statement in Support of Assembly Bill No. 1529 [Appendix B]).   Legislative history also indicates that the amendments were also a direct attempt to make it possible for other facilities, in addition to the state hospital, to develop programs for incompetent defendants (see Enrolled Bill Report on AB 1259 prepared by the Health and Welfare Agency, Department of Health [Appendix A]; see also Statement in Support of Assembly Bill No. 1529 [Appendix B]).

In 1975, the Legislature made further changes to Penal Code § 1370, pursuant to an assembly bill introduced by Assemblyman Lanterman (1975 Stats., ch. 1274 (AB 1229).   The amendments changed the alternative to state hospital to be that of any other available public or private mental health treatment facility approved by the county mental health director; and for the first time added the requirement that the county mental health director first evaluate the defendant and make a recommendation to the court on an appropriate placement. Legislative history indicates that the Legislature recognized that AB 1529 had provided the court an "option" for local

commitment of persons found incompetent to stand trial, and that AB 1229 was to provide a further "option" for outpatient treatment in lieu of commitment to a state hospital after evaluation by the local mental health director and recommendation to the court.

AB 1229 also provided for 100 percent state funding for local inpatient or outpatient treatment of judicially committed patients, as noted in the legislative history, by enacting former Welf. & Inst. Code § 5710.1 (see Fact Sheet -- Assembly Bill 1229 (outpatient treatment) [Appendix C]).

In the Enrolled Bill Report on AB 1229 prepared by the Health and Welfare Agency, Department of Health [Appendix D], specific findings were stated as follows:

> "1.  At present judicially committed persons . . . . receive inpatient treatment only in state hospitals.  While PC 1370 allows local commitment since passage of AB 1529 in 1974, that bill failed to bring such treatment under Short-Doyle financing, so courts continue to use state hospitals.  Local inpatient care for certain persons as proposed could shorten time under court commitment because the patient would remain closer to community resources which can be brought to bear on his rehabilitation, and because of easier access to and coordination among the various elements of the mental health and criminal justice systems which must cooperate in his eventual release from commitment.  For this reason the higher daily cost of local inpatient care in most cases may well be offset by a shorter total period of such care than in a state hospital.  There are appropriate safeguards proposed, such as evaluation and recommendation by local mental health officials, the requirement

for use of local facilities which are approved, and for transfer between state and local inpatient facilities.

"2.  Present law provides no option for the court to order outpatient care as an alternative to judicial commitment.  With the kind of screening for dangerousness, supervision, and reporting, and transfer to inpatient care when indicated that this bill would provide, outpatient should be an effective and reasonably safe alternative for a significant proportion of persons now committed to inpatient care.  For reasons of improved local coordination mentioned above, because outpatient care is considerably less expensive and is infinitely less restrictive than inpatient care, the bill represents an improvement.  Evaluation of progress while on outpatient care might also allow earlier termination of commitment.  The provisions for input from all concerned parties into decisions on both local inpatient and outpatient status are comprehensive.

"3.  Present cost of treating judicially committed persons is entirely borne by the state. While this bill appropriately places proposed local services to this population within the Short-Doyle system, which is financed 90/10, the proposal for 100% state reimbursement follows the logic of a workload transferred from state to local programs.  Savings to the state to counterbalance cost of reimbursement of local services would result from lower admissions to and average population in state hospital programs for judicially committed persons."

The Enrolled Bill Report on AB 1229 prepared by the Department of Finance [Appendix E] contained similar findings.

The Short-Doyle Act has since been supplanted by the Bronzan-McCorquodale Act (Welf. & Inst. Code § 5600 et seq.); and former Welf. & Inst. Code § 5710.1, which had provided for

100 percent reimbursement by the state to the county for the cost of local treatment of a Penal Code § 1370 committee, was self-repealed in 1986 (see 1984 Stats., ch. 1327, § 70.5).

It is clear that in enacting Penal Code § 1370(a)(1) and (2), the Legislature hoped that local alternatives would be created, either public or private or both, to state hospital, as well as local outpatient programs, even for violent or sex offenders. The Legislature also contemplated that counties would or might provide for local alternatives, knowing that the costs would be reimbursed by the state. The legislation, however, does not appear to have given rise to any duty by the counties to in fact provide for such local alternatives.

It is abundantly clear that the constitutional rights of felony Penal Code § 1370 committees are being violated as each day passes and they remain in the Sacramento County Jail awaiting transfer to a state hospital.

If the Department of Mental Health continues to fail in its responsibility to provide mandated treatment to § 1370 committees in violation of Jackson, Davis, and Mink, the result will be the constitutionally compelled release of such persons.

This is not what the Legislature intended when it put into law the requirements set forth in § 1370 et seq. In doing so it structured a mechanism by which to remove from the streets and neighborhoods mentally incompetent defendants – many of them

1  very dangerous - so they may be maintained in custody while

2  being treated to return them to competence to stand trial for

3  the charges against them.   The Legislature did not intend for

4  the Department of Mental Health to comply with only some § 1370

5  commitment orders, leaving other individuals charged with

6  serious felonies to be discharged, putting the public at risk.

7  The statutory mandate is clear and the Department is not in

8  compliance.

9     As a constitutional violation has been found, a proper

10  remedy needs to be instituted by this court.  Mink's remedy was

11  to order Oregon's state department of health to admit those

12  incompetent to stand trial within seven days of a judicial

13  finding of incapacitation.   A remedy along those lines now

14  appears to the court to be proper at this time.

15     Therefore,

16

17     IT IS **HEREBY ORDERED** that the petition for writ of habeas

18  corpus is **GRANTED**.

19     IT IS **FURTHER ORDERED** that 60 days from the issuance of

20  this order, the Sheriff of Sacramento County shall deliver to

21  Napa State Hospital all felony Penal Code § 1370 committees who

22  more than seven days previously were ordered committed to Napa

23  State Hospital pursuant to Penal Code § 1370, and who are still

24  sitting in the Sacramento County Jail awaiting that delivery,

25  and that thereafter, the Sheriff of Sacramento County shall

deliver to Napa State Hospital all felony Penal Code § 1370 committees ordered committed to Napa State Hospital pursuant to that statute, within seven days of the order of commitment.

IT IS **FURTHER ORDERED** that Napa State Hospital accept delivery of those Penal Code § 1370 committees, house them, and give them treatment the Legislature directed pursuant to Penal Code § 1370 et seq.

---

The Legislature entrusted the Department of Mental Health with important responsibilities.  If the Department requires additional resources or statutory changes in order to carry out its duties, it would presumably notify the Legislature in a timely manner.

Were the Department to inform the Legislature it is unable to provide those under commitment with the treatment required both by statute and by the Constitution, thereby requiring release of persons who may pose a danger, this court has no present basis to doubt the Legislature would respond quickly and appropriately.  Accordingly, it is premature for this court to order remedial relief that would venture into policy or administrative matters entrusted to the Legislative or Executive branch.

1    The court's order today is simple and narrow: The

2  Department of Mental Health may no longer fail to provide the

3  treatment required by law and the Constitution. Nor may the

4  Department look to the courts to lighten its workload by

5  ordering the release of individuals in contravention of

6  statutory procedures the legislature carefully crafted to

7  protect the public.

8

9       DATED:    APR 2 6 2006          STEVE WHITE

10                                   JUDGE OF THE SUPERIOR COURT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25