**EXHIBIT B**

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    Arnold Schwarzenegger, *Governor*

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento  CA 94283-0001



April 7, 2006

J. Michael Keating, Jr.                              via:    Lisa Tillman
Office of the Special Master                                 Deputy Attorney General
2351 Sussex Lane                                            Department of Justice
Fernandina Beach, FL  32034                                1300 I Street, Suite 125
                                                           P. O. Box 944255
                                                           Sacramento, CA  94244-2550

## RE: PROGRAM GUIDE IMPLEMENTATION

Dear Mr. Keating:

This letter is to inform you of the California Department of Corrections and Rehabilitation's (CDCR) strategy for implementing the January 2006 Program Guide.

The majority of the Program Guide revisions were completed with the defendants-plaintiffs-court expert's workgroup in July 2004.  Since then, CDCR has been taking steps to prepare for implementation.  To date, CDCR has implemented many of the new requirements via amending memoranda (see enclosure).

The remaining new requirements will require staff training. Some will also require additional resources. In October of 2004, a field survey was conducted by the Division of Correctional Health Care Services (DCHCS) to assist in determining what additional staff (and equipment) would be necessary in order to comply with the new requirements.  In January of 2006, the Division revisited its resource assessment and generated a Spring Finance Letter as part of the annual budget process for fiscal year 2006-07. Those requests are pending approval by the Department of Finance and the legislature.  In the coming months, DCHCS will focus on filling existing vacancies and establishing any new positions approved by the legislature. Simultaneously, DCHCS will conduct a workload and efficiency study, to be completed in advance of the next budget cycle.  The results of the study will allow the Department to more accurately identify any targeted resource adjustments during the next budget process.

The court approved the January 2006 Program Guide (minus a few provisions that are pending resolution) on March 2, whereupon CDCR began its implementation strategy. On March 13, DCHCS convened a three-day meeting in Sacramento with its institutional mental health leadership.  At this meeting, preliminary training was provided in the form of a general overview of the major new Program Guide requirements. That group also began the work of formulating a system-wide training strategy.

J. Michael Keating, Jr.
Page 2

Initial DCHCS implementation steps include, among others, notifying labor unions as necessary, allocating resources (pending approval), recruitment and hiring of new headquarters and field staff, reproduction and distribution of the Program Guide to staff, developing training for trainers, and assisting the institutions in writing new local operating procedures. DCHCS will also propose compliance parameters and, once approved, monitor performance on an ongoing basis. The institutions will ensure that staffs are appropriately trained and working toward optimal compliance in the shortest time frames possible (see below).

In addition, it was understood that the revised Program Guide document would require final changes (staffing ratios, psychiatrist qualifications, cardiopulmonary resuscitation, and video monitoring - due to the court on April 17, 2006), and final review to detect spelling, grammatical, formatting and naming convention errors, as well as to ensure consistency between chapters. Those sections that the court identified as subject to dispute (with suspended implementation pending resolution) will appear in "strikethrough format" with notes inserted delineating current requirements. The new forms required by the revised Program Guide are in the final stages of formatting and the internal approval process.

The following target dates for completion of tasks related to implementation are as follows:

**March 2006 (All completed)**
- March 13-15, 2006: Preliminary training for mental health leadership
- Training *strategy* development
- Program Guide revisions related to cardio-pulmonary resuscitation, video-monitoring, and staffing ratios
- Final document review and editing – Chapters 1 - 4
- Late stages of budget process for resources – meetings with Department of Finance and Legislative Analyst's Office prior to legislative hearings

**April 2006**
- Final document review and editing – Chapters 5 – 10
- Finalization of forms
- Submission of disputed Program Guide sections to the court
- Development of post-tests for Program Guide: Chapters 1- 7
- Development of training regarding new requirements: Chapters 1-5
- Print and proof final format (clean version) of all Program Guide chapters (pending court approval)
- Program Guide revisions related to psychiatrist qualifications

**May 2006**
- Reproduction (paper and digital) of final Program Guide document and forms
- Development of post-tests for Program Guide: Chapters 8-10
- Development of training regarding new requirements: Chapters 6 – 10
- Development of training for correctional counselors and officers
- Develop workload and efficiency study
- Notice labor unions as necessary

J. Michael Keating, Jr.
Page 3

### June 2006
- Statewide distribution of Program Guide and forms
- Memorandum to institutions regarding implementation: local operating procedure revision requirements, training requirements, additional resource allocations (pending approval), and preparation for workload and efficiency study
- Train management, supervisors, and designated trainers at each institution
- Conduct statewide video training for all mental health clinicians

### July 2006
- Establish positions for Program Guide implementation (after budget is released)
- DCHCS will monitor staff training
- Train mental health leadership to generate management reports when monitoring compliance with implementation key indicators
- Collect local operating procedures for determination of "best practices"

### August 2006
- Hire new staff into positions (pending approval) at headquarters and institutions
- Continued monitoring of staff training
- Begin workload and efficiency study
- Continued monitoring of implementation and compliance
- Distribute "best practice" examples of local operating procedures to the field

### September 2006 *through* December 2006
- Continuing workload and efficiency study
- Continued monitoring of implementation and compliance
- Identification of barriers to implementation and develop solutions
- Complete workload and efficiency study in November
- Develop any needed adjustments to resources in preparation for next budget cycle

### January 2007
- Final report on Program Guide implementation and compliance

J. Michael Keating, Jr.
Page 4


If unforeseen events alter the proposed schedule, such as a delay in the release of the Budget, DCHCS will notify you. For questions, feel free to call Dr. Tim Fishback at (916) 324-5236.

Sincerely,


PETER FARBER-SZEKRENYI, DR. P.H.
Director
Division of Correctional Health Care Services


Enclosure

cc: John Dovey, Director, Division of Adult Institutions
    Renee Kanan, M.D.; Deputy Director, DCHCS
    Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations Branch,
    Tim Fishback, M.D., Chief of Mental Health; Chief Psychiatrist, DCHCS
    Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs; OLA
    Katie Riley, Staff Counsel, Correctional Law Unit, OLA

**EXHIBIT C**

*BILL LOCKYER*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

**RECEIVED**

MAY 2 5 2006

**Rosen Bien & Asaro**

May 22, 2006

J. Michael Keating, Jr.                          *Via Overnight Mail*
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034

RE:    Coleman v. Schwarzenegger
       USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

       Please find enclosed the May Revise documents for clinical staffing and capital outlay.

                              Sincerely,

                              LISA A. TILLMAN
                              Deputy Attorney General

              For    BILL LOCKYER
                     Attorney General

Enclosure
cc. with enclosure:
Michael Bien

30121274.wpd

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Program

STAFFING ALLOCATION COMPARISON

<u>STATE OF OHIO DEPARTMENT OF CORRECTIONS</u>

***Administrator, Bureau of Mental Health Services,*** indicates Ohio, which has exited federal court supervision under *Dunn v. Voinovich,* uses the following ratios (as of 6/15/05):

|  | Reception Outpatient | Psychiatric Outpatient | RTU/Crisis Stabilization |
|---|---|---|---|
| Psychiatrist | 1:100 | 1:250 | 1:80 |
| Psychiatric/MR Nurse | 1:50 | 1:100 | 1:25 plus 6 RNs (for 24 hr staffing regardless of size) |
| Psychologists/LISW | 1:100 | 1:150 | 1:80 |
| Social Worker/Psych. Asst. | 1:100 | 1:50 | 1:50 |
| Activity Therapist | 0 | 0 | 1:30 |

<u>STATE OF WASHINGTON DEPARTMENT OF CORRECTIONS</u>

***Final Report Health Care Facility Master Plan***, DLR Group in assoc. with Pulitzer/Bogard & Assoc., L.L.C., 2000, cited in *United States: Mentally Ill Mistreated in Prison*, Human Rights Watch Oct. 22. 2003 at p. 95:

| Psychiatrist | 1:200 offenders with outpatient mental needs |
|---|---|
| Supv. Psychologist | 1 per institution |
| Mental Health Professional | 1:75 seriously mentally ill prisoners |
| Mental Health Nurse | 1:100 |

# OHIO DEPARTMENT OF CORRECTIONS
# MENTAL HEALTH STAFFING RATIOS

### BOMHS Staffing Ratios for Inmates with a Serious Mental Illness
### By Level of Care

| Type of Staff | Reception Outpatient | Psychiatric Outpatient | RTU/Crisis Stabilization |
|---|---|---|---|
| Psychiatrist | 1:100 | 1:250 | 1:80 |
| Psychiatric/MR Nurse | 1:50 | 1:100 | 1:25 plus 6 RNs (For 24 hr. staffing/regardless of size) |
| Psychologists/ LISW | 1:100 | 1:150 | 1:80 |
| Social Workers/ Psychology Asst. | 1:100 | 1:50 | 1:50 |
| Activity Therapist | 0 | 0 | 1:30 |

June 15, 2005

California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Program

**STAFFING ALLOCATION COMPARISON**

**AMERICAN ASSOCIATION FOR CORRECTIONAL PSYCHOLOGY**
(now American Association for Correctional Psychology and Forensics)

*Criminal Justice and Behavior*, Vol 27, No. 4, Aug. 2000 at p.449, the Association requires the following minimum psychology staff to inmate ratios for accreditation:

| | |
|---|---|
| General | 1:150-160 |
| Special Pop | 1 FT Psychologist: 50-75 adult inmates |

# CRIMINAL JUSTICE AND BEHAVIOR
Volume 27, Number 4, August 2000

Special Issue:  Standards for Psychology Services in Jails, Prisons,
Correctional Facilities, and Agencies

CALIFORNIA STATE LIBRARY

JUL 2 7 2000

SERIALS UNIT

*Contents*

Special Issue Editorial
CURT R. BARTOL

Preface     DAVID S. GLENWICK

AACP Standards:
A Historical Overview (1978 to 1980)     430
RICHARD ALTHOUSE

Standards for Psychology Services in Jails,
Prisons, Correctional Facilities, and Agencies
STANDARDS COMMITTEE, AMERICAN ASSOCIATION     433
FOR CORRECTIONAL PSYCHOLOGY

Drug Treatment Availability and Effectiveness:
*Studies of the General and Criminal Justice Populations*     495
ARTHUR J. LURIGIO

Sage Periodicals Press ⓢ A Division of Sage Publications, Inc.
Thousand Oaks • London • New Delhi

---

# CRIMINAL JUSTICE
# AND BEHAVIOR

EDITOR: Curt R. Bartol
*Castleton State College*

BOOK REVIEW EDITOR: Anne M. Bartol
*Castleton State College*

MANAGING EDITOR: Sarah Brecknock

EDITORIAL ASSISTANTS: Suzanne Daniels
Debra Bruns
Elizabeth M. Wall

FOUNDING EDITOR: Stanley L. Brodsky

### EDITORIAL BOARD

George T. Bergen, *Castleton State College*
James Bonta, *Ministry of Solicitor General, Canada*
Stanley L. Brodsky, *University of Alabama*
Barry R. Burkhart, *Auburn University*
John S. Carroll, *Massachusetts Institute of Technology*
Carl B. Clements, *University of Alabama*
Joseph H. Evans, *University of Nebraska Medical Center*
Mary A. Finn, *Georgia State University*
Paul Gendreau, *University of New Brunswick*
John J. Gibbs, *Indiana University of Pennsylvania*
David S. Glenwick, *Fordham University*
Ann Goetting, *Western Kentucky University*
Mann Gold, *University of Michigan*
Alan M. Goldstein, *John Jay College of Criminal Justice*
John R. Graham, *Kent State University*
J. Thomas Grisso, *University of Massachusetts*
Robert D. Hare, *University of British Columbia*
Steven D. Hart, *Simon Fraser University*
Kirk Halbran, *Allegheny University of the Health Sciences*
Allen K. Hess, *Auburn University at Montgomery*
Peter B. Hoffman, *U.S. Sentencing Commission*
Seth C. Kalichman, *Medical College of Wisconsin*

Raymond A. Knight, *Brandeis University*
Mary P. Koss, *University of Arizona*
Robert B. Levinson, *Rockville, MD*
Steven G. LoBello, *Auburn University at Montgomery*
Arthur J. Lurigio, *Loyola University*
Doris L. MacKenzie, *University of Maryland*
Douglas B. Marlowe, *Medical College of Pennsylvania*
William L. Marshall, *Queen's University Kingston*
John A. McKillip, *Southern Illinois University*
Edwin I. Megargee, *Florida State University*
J. Reid Meloy, *University of California, San Diego*
Max I. Mobley, *Arkansas Department of Corrections*
John T. Monahan, *University of Virginia*
Leonard Morgenbesser, *New York State Department of Corrections*
James Ogloff, *Simon Fraser University*
D. Wayne Osgood, *Pennsylvania State University*
Anthony J. Pinizzotto, *Behavioral Science Unit, FBI Academy*
Robert A. Prentky, *Joseph J. Peters Institute*
Marnie E. Rice, *Pentanguishene Mental Health Centre*
R. Barry Ruback, *Pennsylvania State University*
Patrick H. Tolan, *University of Illinois at Chicago*
Tony Toneatto, *Addictions Research Foundation*
Eric F. Wagner, *Florida International University*
Glenn D. Walters, *Federal Bureau of Prisons*

## Officers of the American Association for Correctional Psychology

PRESIDENT: John L. Gannon, Central Coast Consultancy, 897 Oak Park Blvd., #124, Pismo Beach, CA 93449
PAST-PRESIDENT: David S. Glenwick, Department of Psychology, Fordham University, Bronx, NY 10458
TREASURER: Richard I. Fehant, P.O. Box 246, Carterville, IL 62918
SECRETARY AND MEMBERSHIP CHAIRPERSON: J. Tyler Carpenter, Southeast Correctional Center, Bridgewater, MA 02324; and Vincent Vazaro, P.O. Box 188, Englewood, NJ 07631

For Sage Periodicals Press: Mark Gage, Beverly McCutchon, and Rose Tylak

Official Publication of the American Association for Correctional Psychology

RIMINAL JUSTICE AND BEHAVIOR

uration for mental health program design; psychological screening of security staff employed in specialized mental health units; classification for mental health program assignments; training of institutional and agency staff; assessment, diagnosis, and treatment of mental illness; crisis intervention; and both advocacy for and evaluation of correctional mental health programs and services.

## Discussion

In the context of steadily increasing incarceration rates, the need for, and the roles of, psychologists in correctional systems have significantly expanded. In addition to the traditional assessment and treatment of mental disorders (e.g., depression, anxiety, sleep disorders, suicide, and psychosis), the emergence of new mental disorders (e.g., post-traumatic stress disorder), additional assessment and expert testimony roles (e.g., risk assessment for parole boards, involuntary commitment for treatment, and forensic assessment of sex offenders for civil commitment), and consultation services (e.g., psychological screening of security staff) have created new professional dimensions and consultation and training requirements.

Whereas it is important to consult and collaborate with other services, it would not be appropriate for correctional psychologists to assume roles not consistent with and/or directly related to the provision of psychological mental health services to the offender and/or the correctional system such that (a) the scope of psychological services becomes blurred or blended with other services (e.g., security or social services) and (b) needed mental health treatment resources are decreased. There should be no doubt among offenders or nonpsychological staff (e.g., correctional administrators, security staff, and social workers) what the scope of psychological services entails; how they contribute to the correctional agency, system, and offender; and the ethical/professional standards that apply to and guide them.

## STAFFING REQUIREMENTS

12. At the facility (and at the headquarters level in multisite organizations), there is at least one person responsible for psychological services who has a doctoral degree from a regionally accredited univer-

AACP Standards Committee/REVISED STANDA

sity or professional school in a program that is primarily psychological in nature, who is licensed/certified for the independent practice of psychology by the state where the facility is located, and who has training/experience specific to the field of correctional psychology.

## Discussion

The intent of this standard is to set the minimum credential level for psychology supervisory staff. Psychological services provided by psychology staff who do not meet this credential standard (e.g., psychology interns, trainees, students, and paraprofessionals) will be supervised by a qualified (e.g., licensed) psychologist who retains final responsibility and accountability for the decisions and services provided. Such supervision will be documented and occur at least once weekly at the rate of 1 hour of direct, face-to-face, individual supervision for every 40-hour workweek, or as required by state licensing boards. Supervisory documentation will be maintained in the staff's supervisory file for the duration of the supervisory relationship.

If the supervision is for the purposes of credentialing or licensing, then the supervisory documentation shall be maintained as required by the credentialing authority.

13. The minimum ratio of full-time psychology staff to adult inmates is 1 for every 150 to 160 inmates. In specialized units (e.g., drug treatment and special management units for mentally ill inmates), the minimally acceptable ratio is 1 full-time psychologist for every 50 to 75 adult inmates. The minimum ratio in facilities for juvenile offenders is 1 full-time psychologist for every 60 to 75 juveniles in general population and 1 full-time psychologist for every 20 to 25 juveniles in a special management unit.

For jail facilities, there will be sufficient access to psychological staff to meet the crisis and mental health needs of the inmates. To the greatest degree possible, staff composition shall reflect ethnic, racial, gender, and linguistic characteristics of offenders.

In jail settings, the following minimum staffing pattern applies:
A. average daily population fewer than 10—psychologist on call;
B. average daily population between 11 and 75—contract psychologist in the facility at least 8 hours per week;

C. average daily population between 76 and 125—contract psychologist in the facility at least 16 hours per week;

D. average daily population more than 125—at least one full-time psychologist.

## Discussion

It is understood that as the mental health needs and characteristics of our offender populations change, it becomes difficult to define "average." Nonetheless, the intent of this standard is to ensure that the number of available psychological services staff will meet the general and specific psychological assessment, program, and treatment needs of an average adult or juvenile inmate population. Such a mental health service level should be sufficient to be in keeping with legally defined and community guidelines (see Preamble). Except as noted in the jail standards, these ratios assume that the staff member is a full-time staff member at the facility.

There is an expectation that the number of psychological services staff will increase if the level of special needs and/or program intensity differs from average. Furthermore, each correctional facility, organization, and agency is expected to have an affirmative action plan that requires that staffing be reflective of the cultural characteristics of the offender population.

## PROFESSIONAL DEVELOPMENT

14. A written plan, approved by the chief psychologist and facility, organization, and/or agency administration, requires psychology staff to receive orientation training as well as regular continuing education appropriate to their psychological activities. Documentation of these training experiences will be maintained by both the individual psychology staff and the employing agency.

## Discussion

Providing psychological services in correctional facilities is a unique task and often requires particular prior experience or, for new

psychology personnel, specific orientation and training. Nevertheless, the provisions of psychological services in correctional and community settings will be in conformity with the current APA ethical and practice standards and specialty guidelines (e.g., forensic) and the individual's state licensing/certifying agency when applicable.

In general, there are three levels of orientation: (a) to the correctional facility or agency, (b) to the correctional organization (in multifacility organizations), and (c) to the functioning of psychologists in a correctional setting. At the facility level, this should occur within the first month of employment and be managed by the chief psychologist (for other psychological services staff); at the organizational level, this may occur within the first 4 months of employment and should be addressed in a formal orientation to the correctional service as a whole: specialty training should commence within the first 5 months and continue as appropriate.

Staff members at all levels of psychological skill require ongoing continuing education to maintain optimum skill levels and to ensure the highest quality of psychological services. They may require additional training to meet and/or maintain state licensure or certification standards. Each psychologist should have a documented training plan consistent with his or her training needs, and the employing agency should provide adequate training time and funding to meet those needs.

## III. ETHICAL GUIDELINES

### GENERAL PRINCIPLE

15. All psychological services (e.g., screening, assessment, treatment, referral, transfers, expert testimony, and forensic reports) will comply with the current American Psychological Association and forensic specialty principles and guidelines as well as federal law, state statutes, and licensing and administrative codes in the jurisdiction of the facility or agency. In the event that there is a conflict among or between practice standards, the standard that provides for the highest level of professional practice shall be followed.

Correctional Mental Health Care: Standards and Guidelines

Care for the Terminally Ill). In a correctional setting, usual community practices in group therapies may need to be modified to prevent inmates from wielding power over their peers.

Provided there is sufficient supervision, inmates may also be used to clean the mental health service units or handle biohazardous wastes (e.g., dirty linens or utensils). If inmates clean the mental health service unit, they are supervised closely and directly in areas that hold mental health records, medications, syringes, needles, sharp instruments, or supplies. When inmates handle biohazardous waste, they may do so only after receiving appropriate training including use of protective materials. Training and protective materials for inmate workers who handle biohazardous waste should adhere to OSHA guidelines and should be documented.

## M-C-07    Staffing Levels

The 2003 NCCHC *Prison Standards* state: "A written *staffing plan* assures that a sufficient number of health staff of varying types is available to provide adequate and timely evaluation and treatment consistent with contemporary standards of care."

Compliance Indicators
1.  All aspects of the standard are addressed by written policy and defined procedures.
2.  The responsible health authority approves the staffing plan.
3.  The adequacy and effectiveness of the staffing plan are assessed by the facility's ability to meet the health needs of the inmate population.

Mental Health Considerations

The mental health considerations for this standard take into account the diversity in staffing across correctional systems and the importance of an individualized mental health staffing plan that clarifies mental health staff functions and how these functions relate to the supportive mental health functions provided by other health care staff and corrections staff. An intent of this standard is that the health care delivery system has sufficient numbers and types of health staff, including mental health and substance abuse staff, to care for the inmate population.

46

The numbers and types of mental health care and substance abuse professionals required depend upon the size of the facility, the scope of mental health and substance abuse treatment on site (e.g., outpatient, psychiatric infirmary, residential treatment unit), the needs of the inmate population, and the organizational structure (e.g., hours of service, use of assistants, scheduling). Consideration is given to labor intensive activities when developing a staffing plan. Such activities include medication distribution, routine group therapy services, sick call, and cell checks in segregated housing. These and other factors are to be reflected in the staffing plan.

Volunteers and students are not included in the staffing plan for delivering basic health or mental health services.

A prescribing provider is a licensed individual, such as an MD/DO, NP, or PA, who is authorized to write prescriptions. While it is not possible to specify exact provider-to-patient ratios, the amount of prescribing provider time must be sufficient to ensure that there is no unreasonable delay in patients receiving necessary care, and that care ordered is received in a timely fashion.

Physician time, including psychiatrist time, must be sufficient to fulfill both clinical and administrative responsibilities. Clinical duties include, but are not limited to, conducting mental health evaluations; evaluating and managing patients in clinics or psychiatric infirmaries; monitoring other providers by reviewing and co-signing charts; reviewing laboratory and other diagnostic test results; and developing individual treatment plans. Administrative responsibilities include, but are not limited to, reviewing and approving policies, procedures, protocols, and guidelines; participating in staff meetings; conducting in-service training programs; and participating in quality improvement programs. Where permitted by state law, psychiatric nurse practitioners or physician assistants under the supervision of a psychiatrist can substitute for a portion of the psychiatrist's time seeing patients.

The sufficiency of the staffing plan can be assessed by a number of factors, including adequacy of support staff to provide necessary care, efficiency of the mental health clinic design, extent of waiting lists for mental health groups, individual or medication therapies; case-mix acuity of patients, timeliness and thoroughness of mental health clinician encounters, and timeliness of responses to crisis referrals.

Correctional Mental Health Care: Standards and Guidelines

When there is a separate mental health authority, the designated mental health clinician reviews and approves the mental health staffing plan annually just as the medical authority does for the medical staffing plan. The written staffing plan should ensure that sufficient numbers of mental health staff are available to provide necessary mental health and substance abuse services (e.g., adequate screening, assessment, crisis intervention, group and individual treatment, special needs treatment planning for inmates with chronic or acute mental health needs, discharge planning and appropriate service collaboration with security and other health staff).

When a facility designates a mental health clinician as responsible for mental health or substance abuse issues, appropriate duties regarding administration and quality improvement should be delegated to this clinician.

An adequate number of health care staff depends on many factors. This standard does not provide set staffing ratios since a greater supply of RNs might diminish the needs for LPNs, or the availability of psychologists and psychiatric midlevel practitioners could decrease the demand for psychiatric time. Similarly, a facility with a large mental health treatment unit or substance abuse residential treatment unit would require more psychiatrists, psychiatric nurses or substance abuse staff than population-based ratios may require.

## M-C-08    Health Care Liaison

The 2003 NCCHC *Prison Standards* state: "A designated, trained *health care liaison* coordinates the health delivery services in the facility on those days when qualified health care professionals are not on site."

Compliance Indicators
1.  All aspects of the standard are addressed by written policy and defined procedures.
2.  The health care liaison is trained by, and under the joint supervision of, the responsible physician and the facility administrator or their designee.
3.  Duties assigned to the health care liaison post are appropriately carried out.

# WASHINGTON DEPARTMENT OF CORRECTIONS
# MENTAL HEALTH STAFFING RATIOS

Home

News Releases

About HRW

Get Involved

Publications

Info by Country

Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues

Arms
Children's Rights
Economic, Social &
Cultural Rights
HIV/AIDS
International Justice
LGBT Rights
Prisons
Refugees
Torture and Abuse
United Nations
Women's Rights
More...

Campaigns

Film Festival

Photo Galleries

Audio / Video

Site Map

Contact Us

RSS



## United States: Mentally Ill Mistreated in Prison

### More Mentally Ill in Prison Than in Hospitals

(New York, October 22, 2003) Mentally ill offenders face mistreatment and neglect in many U.S. prisons, Human Rights Watch charged in a report released today.

**❝ Prisons have become the nation's primary mental health facilities. But for those with serious illnesses, prison can be the worst place to be. ❞**

**Jamie Fellner
Director, U.S. Program of Human Rights Watch**

One in six U.S. prisoners is mentally ill. Many of them suffer from serious illnesses such as schizophrenia, bipolar disorder, and major depression. There are three times as many men and women with mental illness in U.S. prisons as in mental health hospitals.

🖶 Printer Friendly Version

**Related Material**

Ill-Equipped: U.S. Prisons and Offenders with Mental Illness
Report, October 22, 2003

U.S. Senate Passes Mentally Ill Offender Treatment and Crime Reduction Act
Press Release, November 5, 2003

Free Email Newsletter

Contribute to Human Rights Watch

The rate of mental illness in the prison population is three times higher than in the general population.

According to the 215-page report, Ill-Equipped: U.S. Prisons and Offenders with Mental Illness, prisons are dangerous and damaging places for mentally ill people. Other prisoners victimize and exploit them. Prison staff often punish mentally ill offenders for symptoms of their illness – such as being noisy or refusing orders, or even self-mutilation and attempted suicide. Mentally ill prisoners are more likely than others to end up housed in especially harsh conditions, such as isolation, that can push them over the edge into acute psychosis.

"Prisons have become the nation's primary mental health facilities," said Jamie Fellner, director of Human Rights Watch's U.S. Program and a co-author of the report. "But for those with serious illnesses, prison can be the worst place to be."

Woefully deficient mental health services in many prisons leave prisoners undertreated – or not treated at all. Across the country, prisoners cannot get appropriate care because of a shortage of qualified staff, lack of facilities, and prison rules that interfere with treatment.

According to Human Rights Watch, the high rate of incarceration of the mentally ill is a consequence of underfunded, disorganized, and fragmented community mental health services. State and local governments have shut down mental health hospitals across the United States, but failed to provide adequate alternatives. Many people with mental illness – particularly those who are poor, homeless, or struggling with substance abuse problems – cannot get mental health treatment. If they commit a crime, even low-level nonviolent offenses, punitive sentencing laws mandate imprisonment.

"Unless you are wealthy, it can be next to impossible to receive mental health services in the community," said Fellner: "Many prisoners might never have ended up behind bars if publicly funded treatment had been available."

The Human Rights Watch report is based on more than two years of research and hundreds of interviews with prisoners, corrections officials, mental health experts and attorneys.

It describes prisoners who, because of their illness, rant and rave, babble incoherently, or huddle silently in their cells. They talk to invisible companions, living in worlds constructed of hallucinations. They lash out without provocation, beat their heads against cell walls, cover themselves with feces, mutilate themselves until their bodies are riddled with scars, and attempt suicide.

The Human Rights Watch report documents how prisoners with mental illness are likely to be picked on, physically or sexually abused, and manipulated by other inmates, who call them "bugs." For example, a prisoner in Georgia, who is both mentally ill and mildly retarded, has been raped repeatedly and exchanges sex for commissary items such as cigarettes and coffee.

Mentally ill prisoners can find it difficult if not impossible to comply with prison rules, and end up with higher than average rates of disciplinary infractions. Security staff – who usually lack training in mental illness – do not distinguish between the prisoner who is disruptive or fails to obey an order because of illness and a prisoner who causes problems for other reasons.

Mentally ill prisoners have been punished for self-mutilating ("destroying state property"); attempting suicide with a torn sheet ("destroying state property"); for yelling and kicking cell doors because of hearing voices ("creating a disturbance"); for throwing papers at a guard while delusional ("battery"); and for smearing feces on the cell door ("being untidy"). Untrained staff escalate confrontations with mentally ill prisoners, sometimes using excessive force. Several mentally ill prisoners have died from asphyxiation after struggling with guards who used improper methods to control them.

Over the past two decades, prison mental health services in the United States have improved – usually because of prisoner litigation. But the surging number of mentally ill men and women entering prison has outrun the availability of services. Public officials have been unwilling to provide the funds necessary to ensure adequate

treatment for all the mentally ill offenders who need it.

"Prison officials are being asked to do something they aren't equipped to do," said Fellner. "Prisons are designed for punishment, not as places to provide comprehensive mental health treatment. If people with mental illness must be incarcerated, they should be housed in facilities designed and funded to meet their mental health needs."

Human Rights Watch urged the U.S. Congress to enact legislation proposed by Senator Mike DeWine (R-Ohio) and Congressman Ted Strickland (D-Ohio) that would provide federal grants to divert mentally ill offenders into treatment programs rather than jail or prison, and to improve the quality of mental health services provided to jail and prison inmates.

Human Rights Watch also recommended the use of independent mental health experts to assess mental health services in each prison system, urged elected officials and the heads of correctional agencies to ensure that mentally ill prisoners receive mental health services consistent with community standards of care, and called for rules to prevent housing prisoners with mental illness in isolated confinement or super maximum security prisons.



Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | What You Can Do | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2004, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA

**EXHIBIT D**

1   BILL LOCKYER
    Attorney General of the State of California
2   JAMES M. HUMES
    Chief Assistant Attorney General
3   FRANCES T. GRUNDER
    Senior Assistant Attorney General
4   ROCHELLE C. EAST
    Supervising Deputy Attorney General
5   LISA A. TILLMAN, State Bar No. 126424
    Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 327-7872
8    Fax: (916) 324-5205

9   Attorneys for Defendants
    CF1997CS0003
10

11                 IN THE UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13

14

15  **RALPH COLEMAN, et al.,**              CASE NO. CIV S-90-0520 LKK
                                             JFM P
16                          Plaintiffs,
                                             **DEFENDANTS' DISCOVERY
17         v.                                CONFERENCE STATEMENT**

18  **ARNOLD SCHWARZENEGGER, et al.,**       Hearing:    June 13, 2006
                                             Time:       11:00 a.m.
19                          Defendants.      Courtroom: 25
                                             Judge:      The Honorable John
20                                                       F. Moulds

21                          **INTRODUCTION**

22         This action arose many years ago, with judgment finally rendered in 1995.  In the

23  ensuing years, the Special Master and his team of experts have monitored compliance with the

24  Court's orders.  The monitoring has consisted of in-person tours of each and every adult

25  correctional facility, preparation and negotiation of the Program Guide (a set of policies and

26  procedures for mental health care), and oversight of internal policies and decisions.

27         At this juncture, Defendants endeavor to resolve outstanding Program Guide issues in

28  an expeditious manner in order to facilitate closure of the case.  The crux of providing a

DISCOVERY CONFERENCE STATEMENT

                                        1

1   constitutionally-adequate mental health care delivery system involves an adequate set of policies

2   and procedures for such care. Defendants respectfully submit to this Court their understanding

3   of the discovery issues surrounding the Revised Program Guide.

**II.**

**STATUS REPORT ON ISSUES STATED IN COURT'S ORDER**

On March 2, 2006, Judge Karlton requested a report on certain Program Guide issues

as follows:

**1.  Policy on Cardiopulmonary Resuscitation.**

The parties have agreed to the language in the Revised Program Guide providing the

court-mandated policy for the administration of cardiopulmonary resuscitation to inmates.

**2.  Policy on Board Eligible Status For Psychiatrists.**

The parties have agreed to the language in the Revised Program Guide providing that

all newly hired psychiatrists must have board eligible status to be employed by Defendants. The

parties are presently preparing a stipulation concerning (1) the language to be used in the

Revised Program Guide, (2) the June 1, 2006 deadline for submitting the plan to evaluate those

psychiatrists who are not board eligible, and (3) the time frame for evaluation of those

psychiatrists who are not board eligible. A plan has been submitted to Plaintiffs' counsel and

Special Master Keating regarding the evaluation of psychiatrists who are not board eligible.

**3.  Policy on Videomonitoring of Patients on Suicide Watch.**

As stated in the previous status conference statement, the parties have agreed to the

language in the Revised Program Guide stating that effective April 10 there is a  moratorium on

the use of videomonitoring as the sole means of providing suicide watch.

The parties have agreed upon a 45-day period for notice in the event of any re-

institution of video monitoring as a sole means for performing suicide watch. The parties

have filed a stipulation on this policy.

**4.  Staffing Ratios.**

The parties have met and conferred about Defendants proffered staffing ratios in

administrative segregation units, Enhanced Outpatient Programs (EOP), and CCCMS.

DISCOVERY CONFERENCE STATEMENT

2

1  Defendants have indicated that these ratios will be reviewed pending a workload study. A

2  contract for the study is necessary. Once the contract is completed, Defendants will provide

3  Plaintiffs with the completion date of that study.

**III.**

**DEFENDANTS' RESPONSE TO OTHER ISSUES STATED**

**IN PLAINTIFFS' STATEMENT**

7  Defendants object to Plaintiffs' introduction of issues outside the court order of March

8  2, 2006 into this hearing. Without waiving said objection, Defendants provide a limited

9  response to those issues as follows:

10  **1.  Non-Cage Treatment Option for PSU and EOP Administrative Segregation**

11  **Inmates**

12  Defendants have agreed to consider this concept.

13  **2.  Classification Issues**

14  Special Master Keating's report on the Program Guide identified disputed

15  classification issues, including the elimination of the four points added to the classification score

16  of inmates entering into CDCR with a history of mental illness, the addition of a requirement for

17  the housing of EOP and CCCMS inmates in security levels commensurate with their

18  classification  scores, and an end to exclusion of EOP and CCCMS from participation in the

19  programs and services available to the general population. (Report at p. 8.)

20  In their responses to the Draft Report on the Revised Program Guide, defendants

21  agreed to the recommendation that EOP inmates receive annual point reductions in their

22  classification scores for participation in their EOP-related programs. (Def. Response to Draft

23  Report at p. 3.) Defendants are presently working on the implementation of this concept.

24  Defendants assert this Court lacks jurisdiction in this case to hear all the classification

25  issues listed in Special Master Keating's Final Report on the Revised Program Guide. Plaintiffs'

26  counsel may argue the listed classification issues fall within the parameters of a claim under the

27  Americans with Disabilities Act or the Rehabilitation Act. However, judgment in this action was

28  based on the  Eighth Amendment. Indeed, Plaintiffs chose to voluntarily dismiss their

DISCOVERY CONFERENCE STATEMENT

3

1  Rehabilitation Act claim prior to entry of judgment in this matter.  Therefore, this Court does not

2  have jurisdiction to determine the classification issues listed in the Final Report.

3      Further, the legal issues contained in each of the listed classification issues will require

4  the development and determination of specific, individual claims and defenses under the

5  Americans with Disabilities Act.  Such claims and defenses are not properly heard by this Court

6  in the course of an evidentiary hearing on the Program Guide.

7      To the extent Plaintiffs' counsel seeks discovery related to alleged discrimination

8  issues in this case, Defendants direct this Court's attention to other cases pending before this

9  Court under the Americans with Disabilities Act brought by Plaintiffs' counsel and against

10  Defendant. (*See, Hecker v. California Department of Corrections and Rehabilitation*, E.D. Case

11  No. S-05-2441, *Klemaske v. California Department of Corrections and Rehabilitation*, E.D. Case

12  No. S-04-1750, *Wilson v. Woodford*, E.D. Cal. Case No. S-05-0876.)  Defendants reiterate that

13  the *Coleman* action is brought under the Eighth Amendment and so no discovery of issues under

14  the Americans with Disabilities Act should be permitted.  Before any discovery of such claims

15  and defenses is permitted, Defendants request this Court permit briefing on the apparent

16  dovetailing of these issues in *Coleman* with other pending actions filed by Plaintiffs' counsel

17  against the California Department of Corrections and Rehabilitation under the Americans with

18  Disabilities Act.

19                                          **IV.**

20      **DEFENDANTS' RESPONSE TO PLAINTIFFS' PROCEDURAL ISSUES**

21      Plaintiffs request this Court determine their right to discovery certain issues in the

22  Revised Program Guide and to obtain tour binders.  Defendants hereby provide their response to

23  Plaintiffs' issues.

24      **1.    Discovery Requested by Plaintiffs.**

25      Plaintiffs seek the right to discovery, yet their request is untrammeled by any statement

26  of the issues sought to be discovered or the sought means of discovery.  In correspondence,

27  Plaintiffs' counsel has stated the broadly the need to conduct discovery over a period of several

28  months, with tours of institutions by their experts and depositions of Defendants' staff.

DISCOVERY CONFERENCE STATEMENT

1   Defendants cannot agree at this time to such broad discovery, particularly after a decade of

2   monitoring with production and tours already provided to Plaintiffs' counsels..

3          Indeed, Defendants' counsel has informed Plaintiff counsel that no discovery is

4   necessary given the ongoing years of tours to the facilities and the ongoing production of internal

5   documents in response to Special Master Keating's requests and, quite often, Plaintiffs' requests.

6   Indeed, the post-trial status of this case makes any sought discovery untimely under the Federal

7   Rules of Civil Procedure, Rules 26 and 30.  Such discovery is after the close of discovery under

8   Rule 26 and in the absence of a court order permitting discovery after entry of the verdict in this

9   matter.  Indeed, the discovery phase of *Coleman* ended years ago with the completion of the trial

10  and entry of judgment.  The discovery statutes do not provide for discovery during the remedial

11  phase of a class action suit.  The Order of Reference in this case does not permit discovery by

12  Plaintiffs.

13         Defendants urge this Court to deny Plaintiffs' broad request to conduct discovery into

14  Program Guide issues.  The Program Guide is supposed to enable closure of this case, not reopen

15  issues for discovery and litigation.  Indeed, the Order of Reference specified the responsibility of

16  the Special Master is to work with Defendants.  Defendants have followed the counsel of

17  Special Master Keating and his experts in writing the Revised Program Guide.  Any discovery

18  and litigation of these outstanding Program Guide issues undermines these years of work in

19  negotiating the Program Guide and brings the parties back to the starting point of this case.

20  Defendants respectfully request this Court simply approve the Revised Program Guide and let

21  Defendants move to the next and hopefully final steps of a compliant mental health system.  In

22  the alternative, Defendants respectfully request to brief Plaintiffs' counsel's request for

23  discovery.

24         **2.    Plaintiffs' Request for Tour Binders.**

25         Special Master Keating has monitored compliance with court orders by touring,

26  personally and with his team, each and every adult correctional facility often once, if not twice, a

27  year.  Plaintiffs' counsels have often been a participant in these tours, with the "attorney tours"

28  or tours involving for Plaintiffs' counsels' participation scheduled to accommodate Plaintiffs'

DISCOVERY CONFERENCE STATEMENT

1    counsels' vacations and with the number of attorney tours negotiated at the start of every tour

2    cycle. The tours begin with a review of binders of statistical information prepared by the

3    institution and end with an informal teleconference conveying the Special Master's experts'

4    findings to Plaintiffs' counsels, institutional staff, and defense counsels. The tours result in

5    monitoring reports prepared by Special Master Keating, with recommendations for court orders.

6    The parties have the opportunity to object and have, indeed, objected to the Special Master's

7    findings and recommendations before court orders issue.

8        Defendants are now in the seventeenth round of tours. Plaintiffs' counsel now seek the

9    tour binders for those tours that they are not invited to attend. Defendants state that these

10   materials are produced to simply facilitate the Special Master's tours (and are produced to

11   Plaintiffs' counsel when on those tours to also enable their expeditious participation). The

12   production of tour binders to plaintiffs' counsel before, during or after non-attorney tours will be

13   unduly burdensome to Defendants. The materials will become litigation documents for use by

14   Plaintiffs' counsel in bringing or opposing motions, and so will have to be reviewed by in-house

15   and outside counsel before production. The fact that the tours do not involve attorneys should be

16   read an indicator that Plaintiffs' counsel do not have a right to these materials.

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

DISCOVERY CONFERENCE STATEMENT

# CONCLUSION

1

2    Defendants will continue to discuss outstanding issues with Plaintiffs' counsel in the

3    hope of obtaining informal resolution of those issues.  Defendants are willing to

4    brief key issues, such as Plaintiffs' request for discovery and for production of the tour binders.

5    Dated: June 2, 2006

6                        Respectfully submitted,

7                        BILL LOCKYER
                         Attorney General of the State of California

8                        JAMES M. HUMES
                         Chief Assistant Attorney General

9                        FRANCES T. GRUNDER
                         Senior Assistant Attorney General

10                       ROCHELLE C. EAST
                         Supervising Deputy Attorney General

11

12

13                       */s/ Lisa Tillman*
                         LISA A. TILLMAN

14                       Deputy Attorney General

15                       Attorneys for Defendants

16

17       30124948.wpd

18

19

20

21

22

23

24

25

26

27

28

DISCOVERY CONFERENCE STATEMENT

7

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Coleman v. Schwarzenegger**

Case No.:        **CIV S-90-0520 LKK JFM P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On June 2, 2006, I served the attached Defendants' Discovery Conference Statement by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

Pete Cockeroft, H-86887
California State Prison, Sacramento
FA2-205 - H86887
P.O. Box 290066
Represa, CA 95671-0066

Kimberly S. Davenport
California Medical Association
221 Main Street
San Francisco CA 94105

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 2, 2006, at Sacramento, California.

| A Buckley | /s/ A Buckley |
|-----------|---------------|
| Declarant | Signature |

30125012.wpd