**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs,**

      **vs.**                  **No. CIV S-90-0520 LKK JFM P**

**ARNOLD SCHWARZENEGGER, et al.,**

    **Defendants.**

**<u>SPECIAL MASTER'S REPORT ON THE STATUS AND SUFFICIENCY
OF THE DEFENDANTS' BUDGET REQUESTS FOR STAFFING TO
IMPLEMENT THE REVISED PROGRAM GUIDE</u>**

        On March 3, 2006, after nearly four years of intensive negotiations, the court formally and finally approved all of the undisputed portions of the revised Program Guide and ordered the defendants to implement the newly approved provisions immediately. The original and provisional Program Guide, which represented essentially a manual of standards for the delivery of mental health services in the various programs operated by the California Department of Corrections and Rehabilitation (CDCR), was approved by the court in June 1997. During the subsequent five years a growing body of court orders and departmental policy changes introduced substantial changes to many aspects of the original Program Guide, and the parties and the special master's experts and monitors began in late 2002 the task of preparing a corrected and revised Program Guide that included all of these programmatic developments for the court's final approval.

The order for immediate implementation of the provisions approved by the court in early March 2006 flowed from the fact that negotiations for most of the Program Guide revisions were completed in July 2004, and CDCR had already undertaken important steps to expedite their introduction. For example, in an April 7, 2006 letter to the Special Master, the Director of the Division of Correctional Health Care Services (DCHCS) of CDCR reported that his division had conducted an October 2004 field survey to help determine what additional staff and equipment would be necessary to comply with the new requirements. In addition, the letter noted that CDCR had revised its earlier assessment of required staffing resources in January and formally sought funding for the needed positions for the FY2006-07 budget process in anticipation of the court's approval of the bulk of the Program Guide revisions. The letter expressed the expectation that DCHCS would be focusing during the coming months on filling existing vacancies and establishing any new positions approved by the Legislature. See Exhibit A, <u>Letter from Director of Division of Health Care Services to the Special Master</u>, dated April 7, 2006, at p.1.

While approving the bulk of the revised Program Guide over which there was no dispute among the parties, the court scheduled for May 19, 2006 a status conference to address the short list of unresolved issues. At that conference, plaintiffs' counsel represented that the Department of Finance had rejected some portion of CDCR's request for mental health staffing to implement the Program Guide. Counsel for the defendants responded that they were providing additional information on budgeting decisions to the special master that very day. On May 25, 2006, the court directed the

special master to submit a report on the status and sufficiency of the defendants' budget requests for staffing to implement the revised and court-approved Program Guide.

As indicated in the April 2006 letter cited above from the Director of the DCHCS, the department undertook a field study in 2004 to determine the levels of staffing needed to implement the Program Guide revisions. That field study resulted in a Budget Change Proposal (BCP), dated June 8, 2005, that provided input on staffing needs in the May revise process for the FY2005-06 budget. A copy of that BCP from last year's budgeting cycle was provided to the special master and the plaintiffs once the May revise budgeting process was complete. See Exhibit B, California Department of Corrections May Revise Letter: Coleman Guidelines to the Mental Health Services Delivery System at Corcoran, Fiscal Year 2005/2006.

In the June 2005 BCP, CDCR sought $4.1 million for 51.25 mental health positions to implement the guidelines in the revised Program Guide in administrative segregation and secure housing units at California State Prison, Corcoran (CSP/Corcoran). That portion of the request responded to a specific order of the court directing the defendants to provide those services in those facilities.

The BCP also included an extensive analysis of the changes in policies and practices required system-wide to implement the revised Program Guide, the approval of which was anticipated to occur in FY2005/06. Based on its detailed assessment of changes to the original Program Guide of June 1997, the BCP concluded that implementation would require the allocation of 822.1 permanent mental health staff field positions and 21.2 limited field positions. The BCP offered alternative strategies for the allocation of the recommended staffing enhancements, one calling for the allocation

3

of all of required positions in FY2005/06, another spreading the allocations out over a two-year period. See Exhibit B, at pp. 40-42.

A third alternative suggested the allocation in FY2005/06 of the just the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran, while the fourth proposed strategy posited the possibility of allocating none of the resources requested to implement the revised Program Guide. Both of these suggestions were coupled with the following warning:

> Failure to implement the revised MHSDS Program Guides with requested resources will lead to increased litigation costs and is likely to lead to a Court Order which may be more costly than the current proposal. Failure to provide constitutionally adequate mental health treatment may harm inmates and is a violation of inmate's (sic) rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment.
> Exhibit B, at p. 42.

The Department of Finance (DOF) ignored the warning and elected the third alternative, approving just the funding proposed for CSP/Corcoran. As predicted in the CDCR BCP, the revised Program Guide was formally adopted by the court within FY2005/06 on March 3, 2006. No written rationale for the rejection by DOF of CDCR's recommendation for the staffing allocations identified as necessary to implement the revised Program Guide was provided. Verbal reports cited DOF's objection to the number of staffing allocations requested, the adequacy of the justification for the request and the absence of a currently existing court order specifically approving the pending revised Program Guide as reasons for the rejection.

By early March 2006, when the court approved the revised Program Guide, both CDCR and the DOF knew they could no longer avoid the allocation of additional mental health staffing resources to implement the mandated revisions. CDCR responded by including in its annual Finance Letter for Fiscal Year 2006-07 another request for staffing resources to implement the revised Program Guide. This was the document requested by the special master to evaluate for the court the sufficiency of resources finally recommended to the California General Assembly by the defendants. A copy of the letter was eventually provided under seal in response to the court's orders of June 15, 2006 and June 19, 2006. See Exhibit C, <u>California Department of Corrections and Rehabilitation Finance Letter for Fiscal Year (FY) 2006/07</u>, undated.

To implement the revised Program Guide, this second BCP sought 509.56 permanent positions, down 38 percent from the 822.1 positions requested in the FY2005/06 May Revise Finance Letter. No limited field positions were requested. The requested positions, moreover, were justified not by reference to an analysis of the increased workload demands imposed by the Program Guide revisions, but by acknowledged needs in specific areas of service, with some focus on those elements of programming in these service areas likely to be impacted more broadly by the revisions. The targeted areas also corresponded with program elements where the department was experiencing the most difficulty in providing adequate treatment services due to escalating population pressures. These areas included administrative segregation units, where suicide rates were disproportionally high; reception centers, where the flood of new arrivals was swamping available processing staff, who were short of resources to monitor and treat reception inmates awaiting transfer to mainline programs for long

periods; and so-called mental health outpatient units, where increasing numbers of inmates in crisis, often suicidal in nature, were placed while awaiting entry to Mental Health Crisis Bed units.  The request for allocations in these three areas sought 299.98 positions for administrative segregation, 71.6 for reception centers and 72.98 for mental health outpatient units.   The total of 444.56 positions represented 87 percent of the 509.56 positions requested in response to revisions in the Program Guide.  The remaining 65 positions involved shifts and expansion among psych tech supervisors and quality management personnel.

Exhibit D provides the <u>California Department of Corrections and Rehabilitation Finance Letter for Fiscal Year (FY) 2006/07</u>, which included the defendants' final proposal for staffing to implement the Program Guide revisions submitted to the California General Assembly.  This exhibit was among a series of DOF finance letters provided to the special master and plaintiffs' counsel on May 19, 2006 in response to concerns over the adequacy of staffing resources requested to implement the revised Program Guide.

In this final proposal, DOF apparently requested 254.6 positions to implement the Program Guide revisions, although that sum was greater than the parts actually described in the details of the finance letter.  The actual request sought 71.6 positions for reception centers and 72.98 positions for mental health outpatient housing units as requested by CDCR.  In addition, the letter requested nine unit supervisory positions for Consolidated Care Centers; an upgrade of ten existing licensed psych tech to senior psych tech positions; nine health program specialists to help with quality management; and six senior psychologists for named institutions with high administrative

segregation populations. Added up, all of these came to just 168.58 newly allocated

positions and ten upgraded positions, meaning that the requested allocation actually

sought just 66.2 percent of the 254.6 positions advertised in the document's cover page.

See Exhibit D, pp. 7-10. The 162.58 figure also represented just 33 percent of CDCR's

request for 509.56 positions to implement the revisions in its 2006/07 BCP and 20.5

percent of CDCR's request for 822.1 positions in its FY2005/06 BCP.

DOF's final submission also excised all but six of the 299.98 positions

CDCR requested for administrative segregation, which CDCR justified not only by

reference to the revised Program Guide but also by citing still unfulfilled specific court

orders on administration segregation dating from 1999 and 2001. See Exhibit D, at p. 1.

In discussions of staffing for implementation of the revised Program

Guide during the May revise process with CDCR administrators, verbal assurances were

provided that whatever proposals emerged would include funding to conduct an

independent work study of mental health staff functions under the new Program Guide to

validate current allocations and identify any need for additional staffing in the next fiscal

year budget. While alluded to only in passing in Exhibit D (at p.2), the defendants'

finance letter on headquarters staffing noted a lack of data sufficient to determine

workload requirements with confidence under the revised Program Guide and requested

an allocation of $400,000 to conduct a workload study "to corroborate and ensure

appropriate ongoing staffing levels for Headquarters and the field." No timeline for the

completion of the study was given, nor was any commitment to use the resulting data

spelled out.

Summary:

By early 2005, CDCR had developed an estimate of what levels of mental health staffing would be necessary to implement the revised Program Guide. That initial projection was compiled by the department's own clinicians and reflected their actual experience in struggling to implement the original program guides provisionally approved in June 1997. The analysis, which was accompanied by a detailed breakdown of the operational impact of each change in the Program Guide, was provided in the department's FY2005/06 BCP (Exhibit B). The projected staffing need was high, higher even than anyone at CDCR's DCHCS had anticipated, but it was supported by detailed workload data and an analysis more thorough and thoughtful than any preceding such study conducted by the defendants over the past decade. DOF, moreover, was clearly put on notice that revisions to the Program Guide would be concluded and adopted by the court during FY2005/06. For reasons not articulated in any of the provided documents, DOF elected in FY2005/06 to seek just the 51.25 mental health positions for the programming in CSP/Corcoran specifically mandated by the court and otherwise ignore the pending Program Guide revision.

CDCR apparently learned its lesson, and in the following year the department's proposal for mental health staffing to implement the revised Program Guide was reduced by nearly 40 percent and abandoned any reliance on a functional analysis to justify the shrunken request. This time the department justified its request for increased staffing by tying requested increases to areas certifiably troubled by inadequate services and already subjected to the court's scrutiny, condemnation and remedial orders. The new strategy worked no better, and DOF rejected all but two percent of the staffing requested for administrative segregation and reduced by another third CDCR's already

sharply reduced estimate of the resources it needed to implement all of the additional functions imposed by the court and adopted by the department during the preceding 7.5 years and incorporated in the revised Program Guide.

DOF attempted to retrieve some credibility by ascribing its rejection of CDCR's requests for staffing to implement the revisions in the Program Guide to a lack of confidence in CDCR's determination of workload requirements associated with the changes and promising to fund a workload study "to corroborate and ensure" appropriate staffing levels. The last study undertaken by the defendants with major financial impact on the delivery of mental health services was an assessment of CDCR's inability to meet the treatment needs of its most seriously and dangerously mentally ill inmates, the so-called UNA or Unmet Needs Assessment. The defendants took seven years to plan, fund, design and execute that study, and it would not yet be complete if the special master's experts had not in the end played a major role in its execution. Given the experience of the past decade, a study funded in the FY2006/07 budget could not be counted on to produce meaningful recommendations for inclusion in the FY2007/08 budget.

In retrospect, the defendants' reluctance to make public CDCR's most recent BCP, because it might reveal the "deliberative" aspects of the budgeting process is deeply ironic. By cloaking the decisions of DOF behind a wizard's curtain of "deliberation," the defendants manage only to obscure any rational understanding of the resulting budget determinations. What the withheld document, in conjunction with these other documents from the budgeting process, suggests is the complete absence of any thoughtful, rational or deliberative process at all. The defendants may have some

countervailing reasons for their responses to CDCR's BCPs, but no available evidence supports the actual responses; instead, they seem arbitrary and capricious.

The defendants' budget request to the California General Assembly does not appear to provide nearly sufficient mental health staff to allow CDCR to implement the revised Program Guide fully. While CDCR's BCP for FY2005/06 might have seemed excessive in its estimate of needed staff, nothing in the record refutes either the BCP's analysis of the detailed workload changes included in the new Program Guide or its estimate of the mental health staff needed to fully implement the revisions. Any risk of an inflated estimate was surely squeezed out of CDCR's BCP for FY2006/07. Once again, nothing in the record supports DOF's rejection of that BCP.

The desire to conduct a formal workload study to ensure the accuracy of proposed mental health staffing levels for implementation of the revised Program Guide is understandable, but it comes too late. Such a study should have been undertaken during FY2005/06 to "corroborate" the workload analysis of CDCR staff included in the FY2005/06 BCP. At this point, the suggestion to conduct an open-ended study, combined with an 80-percent reduction in CDCR's original estimate of the mental health staffing needed to implement the revised Program Guide, is transparently insufficient and unacceptable.

Recommendation:

The defendants should be required to incorporate the mental health staffing proposals included in CDCR's FY2006/07 BCP (Exhibit C) for implementing the Program Guide revisions. Any workload study funded by the defendants ought to be

required to submit findings and recommendations sufficiently timely to be incorporated

in the FY2007/08 budget cycle.

Respectfully submitted,

/s/  J. Michael Keating, Jr.

_____

J. Michael Keating, Jr.
Special Master