**Exhibit C**

California Department of Corrections
And Rehabilitation Letter
Fiscal Year (FY) 2006/07

(Marginal notes were in the document provided.)

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
FINANCE LETTER
FISCAL YEAR (FY) 2006/07

**INSTITUTION/DIVISION:** Division of Correctional Health Care Services     **NUMBER:**
**TITLE:** Mental Health Program

## A. NATURE OF REQUEST

In 1995, a federal class action lawsuit (*Coleman v. Schwarzenegger*) found that the California Department of Corrections and Rehabilitation (CDCR) violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates. The CDCR, Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) at Headquarters, and the institutional Mental Health Services Delivery System (MHSDS) intend through this proposal to comply with the *Coleman* court's orders (see Attachment 1).

The CDCR DCHCS mission is to protect the health and safety of the public and CDCR staff by providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patient potential for violence and its associated costs. CDCR DCHCS MHSDS most critical areas of service delivery which are in need of immediate staffing are: Administrative Segregation Unit, Correctional Clinical Case Management System (ADSEG-CCCMS); Security Housing Unit, Correctional Clinical Case Management System (SHU-CCCMS); Administrative Segregation Unit, Enhanced Outpatient Program (ADSEG-EOP); Mental Health Outpatient Housing (MH-OHU), and Mental Health Reception Centers (RC).

This Finance Letter (FL) addresses the minimum necessary Headquarters staffing for compliance with the Special Master's recommendations, which are currently being adopted as final orders by the *Coleman* court. This FL also addresses the 1999 and 2001 *Coleman* court orders regarding staffing of the ADSEG-CCCMS program and requests assistance in filling the growing psychiatry vacancies.

Review of current recruitment and program needs and requirements has led DCHCS to conclude that the most effective and efficient method of confronting the critical staffing shortage is to focus on meeting the staffing mandates of the 1999 and 2001 court orders and attacking current vacancies. While resolving these issues, the proposed workload study will determine the staffing needs of the 2006 MHSDS Revised Program Guide (see Attachment 3) without delaying their implementation. By proceeding in this fashion, DCHCS intends to immediately address existing inmate-patient mental health needs and staffing issues while simultaneously developing the necessary staffing methodology that will quantify and standardize the human resource requirements crucial to meeting the federal court mandated level of services.

1

This FL is divided into three sections. The first section addresses the staffing needs in the most critical care areas in the field institutions, and staffing necessary to comply with the 1999 and 2002 court orders. The second section addresses the Headquarters MHP staffing required for compliance with the pending 2006 *Coleman* court order. The third section addresses the methodology of reducing the ever growing psychiatry vacancies and maintaining the vacancy rate at less than 10 percent.

This FL is requesting a total of **$8.7 million for FY 2005/06, and $83.1 million without current R&R and one time standard equipment costs and 657.6 positions for FY 2006/07**.

### SECTION I.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

In 1997, CDCR established initial policies and procedures for providing mental health services at all CDCR institutions through the MHSDS Program Guide, which was provisionally approved by the court. Revisions to the Program Guide have been an ongoing requirement of the *Coleman* case. As a result, each revision has resulted in amending memoranda to the field requiring additional workload, changing timelines and/or new programs. These amending memoranda have been included in the pending 2006 MHSDS Revised Program Guide.

Implementing the 2006 MHSDS Revised Program Guide is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation. However, timing of resource allocation will appear to be more sagacious after completing a workload study to determine the necessary staffing that will quantify and standardize the human resource requirements critical in meeting the federal court mandated level of services.

At this time, CDCR DCHCS is requesting MHSDS staffing to implement the 1991 and 2001

It is important to note that the plaintiffs in *Coleman* are requesting that the court impose additional mental health service requirements to the 2006 MHSDS Revised Program Guide. These additional requirements are opposed by CDCR DCHCS.

This FL is requesting **$39.1 million without current R&R and one time standard equipment costs and 509.56 positions** to provide support to implement the 2006 MHSDS Revised Program Guide, which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level, to be **implemented on July 1, 2006** (see Attachment 2).

### SECTION II.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH PROGRAM (MHP) – HEADQUARTERS

The second section addresses the necessary MHP Headquarters staffing required for compliance with the pending *Coleman* court order. Recently, the federal court's Special Master specifically noted that there are inadequate DCHCS mental health leadership and

2

management resources which prevents effective response "to the myriad of issues persistently hurled at them." The Special Master also found that various areas of noncompliance with currently required elements of mental health care in the institutions, and with future planning efforts, were due to a lack of ability to provide Headquarters support and Central Office oversight. On January 19, 2006, in a meeting with All Parties in the Coleman case, the Special Master and court experts extensively emphasized the need for a team of Headquarters' staff devoted to quality management assurance. This FL is requesting **$10.7 million and 100.0 positions** to provide Headquarters support, which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level, to be **implemented on July 1, 2006.**

CDCR DCHCS is also requesting funds for extraordinary travel expenses for the Quality Management Assistance Program (QMAP) and Psychological Testing Units, quarterly meetings for the Psychological Testing staff and leadership staff, and miscellaneous equipment needs. In addition, CDCR DCHCS is requesting the above mentioned workload study of field and Headquarters' functions to identify, standardize and quantify the human resource requirements of the MHP and DCHCS.

### SECTION III.   DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS) - PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES

The third section relates to reducing psychiatry vacancies and maintaining the vacancy rate at less than ten percent. Currently the vacancy rate is between 30-80 percent depending on the location of the institution.

This FL is requesting **$8.7 million in current year, and 48.0 positions and $33.2 million in budget year** to provide funding for the vacant positions and pay differential, to be **implemented on March 1, 2006 and July 1, 2006, respectively.**

For your convenience, a listing of the Acronyms is under Attachment 40.

Below is a summary of the positions being requested under each section:

### SECTION I.   DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

In order to implement the 2006 MHSDS Revised Program Guide, the CDCR DCHCS is requesting the following permanent positions (see Attachment 2 for summary of positions and resources):

1. **299.98 Permanent Positions for ASU CCCMS**
   - 18.5 Psychiatrists
   - 37.0 Clinical Psychologists
   - 99.18 Psychiatrist Technicians
   - 38.0 Office Technicians
   - 44.8 EOP Clinical Psychologists
   - 32.0 Senior Psychologist Supervisors
   - 30.5 Correctional Officers

3

00067

2. **71.6 Permanent Positions for Mental Health RC Processing**
   - 51.0 Clinical Psychologists
   - 20.6 Correctional Counselor Is

3. **72.98 Permanent Positions for Mental Health OHU weekend coverage**
   - 8.0 SPs
   - 17.98 CPs
   - 38.71 LPTs
   - 8.29 OTs

4. **9.0 Permanent Positions with Institution Level Supervision and Upgrading 10.0 LPTs to 10.0 Senior LPTs (Sr. LPT)**
   - permanently upgrade 10.0 LPTs to 10.0 Sr. LPTs
   - 9.0 Unit Supervisors.

5. **56.0 Permanent Field Positions for Program Performance Evaluation and Court Compliance**
   - 28.0 Health Program Specialist Is (HPS I)
   - 28.0 OTs

6. **Permanent Positions for DCHCS – Capital Outlay**
   These positions are being requested through the Litigation Support FL.

7. **RC Screening and Diagnostic Clarification**
   - $748,800 per year for a two year pilot program
   - $30,000 for supplies

8. **Additional Equipment Resources**
   - one-time funding of $1,114,604
   - ongoing funding of $50,000 for additional equipment

<u>Summary of Request</u>:

- **509.56 Permanent Positions**
- **$778,800 ongoing funding for RC Screening and Diagnostic Clarification**
- **$1,114,604 one-time funding and $50,000 ongoing funding for equipment**
- **$61,680 ongoing funding for position upgrade (LPT to Sr. LPT)**

**SECTION II.   DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH PROGRAM (MHP) – HEADQUARTERS**

In order to implement the Mental Health Program – Headquarters portion of the Court Order, the CDCR DCHCS is requesting the following permanent positions (see Attachments 15 for summary of positions and Attachment 16 for MHP's Organization Chart):

4

00068

1. **4.0 Permanent Positions for Statewide Mental Health Program Director (SWMHPD)**
   - 1.0 CEA
   - 1.0 Associate Health Program Adviser (AHPA)
   - 1.0 Executive Secretary I (ES I)
   - 1.0 OT

2. **3.0 Permanent Positions for the Psychiatry Services Branch (PSB)**
   - 1.0 AHPA
   - 1.0 Secretary
   - 1.0 OT

3. **1.0 Permanent Position for the Tele-Psychiatry Section**
   - 1.0 OT

4. **Project Management Unit**
   These positions are being requested through the Litigation Support FL.

5. **4.0 Permanent Positions for the Clinical Operations Branch (COB)**
   - 1.0 CEA
   - 1.0 AHPA
   - 1.0 Secretary
   - 1.0 OT

6. **52.0 Permanent Positions for the Quality Management Assistance Program (QMAP)**
   - 3.0 Chief Psychologists - Regional Mental Health Directors (RMHD)
   - 6.0 Senior Psychologists (Specialist)
   - 6.0 Senior Psychiatrists (Specialist)
   - 6.0 Nurse Consultants, Program Review (NCPR)
   - 6.0. Sr. LPTs
   - 5.0 Facility Captains (FC)
   - 2.0 Retired Annuitants (RA)
   - 3.0 Staff Services Manager I (SSM I)
   - 3.0 HPS Is
   - 6.0 AHPAs
   - 3.0 Secretaries
   - 3.0 OTs

   *[handwritten annotation: ? different from QMAT]*

7. **1.0 Permanent Position for the Centralized Clinical Case Management Unit (CCCM) Unit**
   - 1.0 OT

8. **4.0 Permanent Positions for the Utilization Management (UM) Unit**
   - 4.0 NCPRs

9. **4.0 Permanent Positions for the Clinical Policy and Programs Development and Clinical Evaluations (CPPD&CE) Branch**
   - 1.0 CEA

5



00069

- 1.0 AHPA
- 1.0 Secretary
- 1.0 OT

10. **14.0 Permanent Positions for the Clinical Policy and Programs Development (CP&PD) Unit**
    - 4.0 Senior Psychologist (Specialist)
    - 1.0 Psychiatric Social Worker (PSW)
    - 1.0 Sr. LPT
    - 1.0 Research Analyst II (Social/Behavioral)
    - 1.0 AHPAs
    - 1.0 Secretary
    - 5.0 OTs

11. **13.0 Permanent Positions for the Psychological Testing and Forensic Evaluation (PT&FE) Unit**
    - 9.0 CPs
    - 2.0 SSA/AGPAs
    - 1.0 AHPA
    - 1.0 Secretary

12. **Extraordinary Travel and Quarterly Meetings ($2.1 million)**
    - $1,249,560 ongoing funding for Extraordinary Travel for Quality Management Assistance Team (QMAT)
    - $312,390 ongoing funding for Extraordinary Travel for Psychological Testing
    - $270,000 ongoing funding for Travel Differential for QMAT and Psychological Testing
    - $56,960 ongoing funding for Quarterly Psychological Testing meetings
    - $202,920 ongoing funding for Quarterly Leadership meeting

13. **Miscellaneous Headquarters' Equipment ($107,514)**
    - $73,449 one-time funding for miscellaneous equipment
    - $34,065 ongoing funding for miscellaneous equipment

14. **Workload Study ($400,000)**
    - $400,000 one-time funding for workload study

## Summary of Request:

- **100.0 Permanent Positions**
- **$2.1 million ongoing funding for Extraordinary Travel**
- **$73,449 one-time funding and $34,065 ongoing funding for miscellaneous equipment**
- **$400,000 one-time funding for a Work Load Study.**

00070

# SECTION III. DIVISION OF CORRECTIONAL HEALTH CARE SERVICES - PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES

In order to implement the Psychiatry Vacancy Rate Reduction Strategies portion of the Court Order, the CDCR DCHCS is requesting the following (see Attachment 30 for summary of positions and resources):

## FY 2005/06

1a. **Hiring-Above-Minimum – Psychiatry Series ($1,214,099)**
   - $1,214,099 ongoing funding for Hiring-Above-Minimum, effective March 1, 2006

2a. **Hiring-Above-Minimum – All Other Mental Health Classifications ($3.1 million)**
   - $3.1 million ongoing funding for Hiring-Above-Minimum, effective March 1, 2006

3a. **Pay Differential for CDCR's Psychiatry Series ($3.9 million)**
   - $3.9 million ongoing funding for Pay Differential, effective March 1, 2006

4a. **Pay Differential for CDCR's DCHCS Headquarters' Mental Health Classifications ($163,328)**
   - $163,328 million ongoing funding for Pay Differential, effective March 1, 2006

5a. **Pay Differential for CDCR's Kern Valley State Prison (KVSP) and North Kern State Prison (NKSP) Mental Health Clinicians ($26,004)**
   - $26,004 ongoing funding for Pay Differential, effective March 1, 2006

6a. **Pay Differential for Other Mental Health Classifications in the Central Valley ($263,344)**
   - $263,344 ongoing funding for Pay Differential, effective March 1, 2006

## Summary of Request for FY 20005/06

- $86,290 ongoing funding for Hiring-Above-Minimum – Psychiatry Series
- $3.1 million ongoing funding for Hiring-Above-Minimum – All other mental health classifications
- $3.9 million ongoing funding for Psychiatry Series Pay Differential
- $163,328 ongoing funding for DCHCS Headquarters mental health classifications Pay Differential
- $26,004 ongoing funding for KVSP and NKSP Mental Health Clinicians
- $263,344 ongoing funding for Other Mental Health Classifications in the Central Valley

00071

**FY 2006/07**

1b. **Hiring-Above-Minimum – Psychiatry Series ($3,642,298)**
   - $3,642,298 ongoing funding for Hiring-Above-Minimum

2b. **Hiring-Above-Minimum – All Other Mental Health Classifications ($9.4 million)**
   - $9.4 million ongoing funding for Hiring-Above-Minimum

3b. **Pay Differential for CDCR Psychiatry Series ($11.4 million)**
   - $11.4 million ongoing funding for Pay Differential

4b. **Pay Differential for CDCR's DCHCS Headquarters' Mental Health Classifications ($489,984)**
   - $489,984 ongoing funding for Pay Differential

5b. **Pay Differential for CDCR's Kern Valley State Prison (KVSP) and North Kern State Prison (NKSP) Mental Health Clinicians ($78,012)**
   - $78,012 ongoing funding for Pay Differential

6b. **Pay Differential for Other Mental Health Classifications in the Central Valley ($790,032)**
   - $790,032 ongoing funding for Pay Differential

7b. **Emergency Contracts ($3 million)**
   - $3 million ongoing funding for Placeholder for Emergency Contracts

8b. **Online Exams ($1.7 million)**
   - $600,000 one-time funding for development
   - $1.1 million ongoing funding for annual maintenance costs to administer 15 online exams

9b. **12.0 Permanent Positions for Office of Workforce Planning and Selection (OWP&S)**
   - 1.0 Staff Services Manager II (SSM II)
   - 2.0 SSMI
   - 3.0 Associate Governmental Program Analysts (AGPA)
   - 2.0 Associate Personnel Analysts (APA)
   - 2.0 Personnel Selection Technician (PST)
   - 1.0 Office Assistant (OA)

10b. **4.0 Permanent Positions for the Office of Personnel Services (OPS)**
   - 1.0 PST
   - 1.0 APA
   - 2.0 Senior Personnel Specialists

11b. **33.0 Permanent Positions for the Adult Institutions - Statewide**
   - 33.0 OTs

**12b. LiveScan**

This equipment is included in the FY 2006/07 Plata Order Spring FL.

**13b. Capital Outlay for OPS ($121,219)**
- $121,219 one-time funding for 25 modular workstation for the Office of Personnel Services (OPS)

## Summary of Request for FY 06/07

- $258,869 ongoing funding for Hiring-Above-Minimum – Psychiatry Series
- $9.4 million ongoing funding for Hiring-Above-Minimum – All other mental health classifications
- $11.4 million ongoing funding for Psychiatry Series Pay Differential
- $489,984 ongoing funding for DCHCS' Headquarters' mental health classifications Pay Differential
- $78,012 ongoing funding for KVSP and NKSP Mental Health Clinicians
- $790,032 ongoing funding for Other Mental Health Classifications in the Central Valley
- $3 million for a placeholder for Emergency Contracts
- $600,000 one-time funding for development and 1.1 million ongoing funding for annual maintenance of 15 Online Exams
- 15.0 Permanent Positions for Headquarters
- 33.0 Permanent Position for the Field
- $121,219 one-time funding of 25 modular workstations for OPS

## B. BACKGROUND/HISTORY

On June 25 1991, a class action complaint (*Coleman vs. Schwarzenegger, et al.*) was filed against CDCR alleging that the department ". . . under color of state law . . . acted with deliberate indifference depriving the plaintiff class of their rights to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth amendments to the United States Constitution."

The United States District Court for the Eastern District of California ultimately found that the state and prison officials had acted with deliberate indifference to the medical needs of inmates with serious mental disorders by ignoring the advice of their own experts regarding the deficiencies that had existed in the correctional system for years. The court found that CDCR DCHCS MHSDS was a constitutionally inadequate system that lacked the necessary elements for delivery of adequate mental health care, such as: screening and identification of mentally ill inmates; prompt access to mental health professionals for diagnosis and treatment; patient access to necessary and appropriate levels of care as determined by clinicians, including outpatient care; residential care, crisis care, and inpatient care; medical records and an information management system; and a quality assurance system. The court concluded that California's system could not and did not meet the serious medical needs of mentally ill inmates incarcerated in its prisons and, on June 6, 1994, it was recommended that the district court order the appointment of a Special Master and that state and prison officials develop and implement forms, protocols, and plans necessary to remedy constitutional violations.

After 11 years of implementing the court's orders and the mandated services, as well as preparing for the implementation of the 2006 MHSDS Revised Program Guide, CDCR and DCHCS have determined that current resources are insufficient to implement the newly mandated 2006 MHSDS Revised Program Guide in a manner consistent with the court's requirements and level of community standards of quality care. Failure to implement the 2006 MHSDS Revised Program Guide will continue the current status of mentally ill inmates going undiscovered, undiagnosed, and untreated, while at the same time being subjected to conditions that aggravate their illnesses. Due to limited resources, those mentally ill inmates, who currently do receive some form of treatment, suffer needless extended and medically harmful delays in access to necessary psychiatric care.

CDCR DCHCS researched other states' correctional mental health staffing and found their mental health population small compared to California's, and that some states base their staffing on total inmate population in determining their mental health staff to inmate ratios (see Attachment 23). CDCR DCHCS also reviewed the American Association for Correctional Psychology accreditation requirements (see Attachment 24), which recommended a ratio of one FT psychologist for every 50-75 adult inmates; the National Commission on Correctional Health Care, which provided guidelines (see Attachment 25); and Human Rights Watch (see Attachment 26), which recommended that each prison system conduct an assessment to "ensure mentally ill prisoners receive mental health services consistent with community standards of care".

California has the largest mental health population in the nation. The CDCR DCHCS is responsible for administering the critical Mental Health Program for a population of nearly 170,000 inmates, including over 31,000 inmate-patients enrolled in the MHSDS. Of the over 31,000 inmates identified as seriously mentally ill, over 5,000 are high risk and in either residential or other in-patient treatment settings. Over 25,000 inmates are receiving psychotropic medications, usually twice every day.

To continue a MHSDS that is understaffed, significantly overworked, and lacking a quality assurance program places inmates and inmate-patients at risk, and the state, CDCR and key decision makers in danger of being found in contempt of court. Standardizing the delivery of mental health care in accordance with generally accepted medical practice, the National Commission on Correctional Health Care, community standards, and the law is consistent with the CDCR's Strategic Plan and DCHCS's Goals and Initiatives to manage the inmate and parolee population in a safe, efficient, and cost effective manner.

To date, the State of California has spent $28,970,085 (see Attachment 38) in monitoring and attorney fees in the *Coleman* matter. To continue current operations without making adequate provision for complying with the court's mandates and mental health professional standards will leave the State open to further litigation and expenses associated with additional court imposed remedies that may be avoided by implementing the proposed improvements.

CDCR is, therefore, requesting Headquarters positions to manage the increased workload relating to implementation and monitoring of the 2006 MHSDS Revised Program Guide. The proposed Headquarters structure is consistent with those of the Dental and Medical Programs, with each program under a Statewide Program Director.

00074

In addition, if the current vacancy rates are not reduced to under ten percent, CDCR will be in violation of the pending court order that addresses psychiatry vacancies, and inmate-patients will continue to be harmed by inadequate and insufficient access to care.

The resources requested in this FL will provide the minimal staffing level necessary to comply with court mandates and assist in extricating the state from federal judicial oversight.

## C. STATE LEVEL CONSIDERATIONS

CDCR acknowledges in its legislatively approved Strategic Plan that it is morally and constitutionally obligated to provide health care services to incarcerated offenders. The plan notes that a fundamental level of health care is necessary for incarcerated individuals' successful return and integration into the community and concedes that radical changes are necessary in the Department's health care systems to ensure efficient delivery of quality, cost-effective health care services.

As mentioned above, to date, $28,970,085 of CDCR's budget has been consumed by the *Coleman* plaintiffs' attorneys and Special Master. This does not include CDCR staff and Attorney General time required to respond to *Coleman* related inquiries, audits, hearings, and mandates. Failure on the part of CDCR to provide these mandated services at a constitutionally adequate level through implementation of the revised standards will leave the State open to additional litigation and costs associated with further court action and potential additional lawsuits.

As noted in the Special Master's January 2006 report:
> "*Coleman* will not be ended until the defendants can demonstrate an ability to provide meaningful mental health care . . .The defendants' recent history of developing erratic plans or plans they are unable subsequently to implement suggests the present need for something more than just another requirement for the generation of yet more plans."

Standardizing the delivery of mental health care is an essential, critical step to managing the inmate and parolee population and providing necessary mental health care in a safe, efficient, and the most cost effective manner possible. By providing the resources required to comply with the pending federal court order and the mandated policies and procedures essential to providing constitutionally adequate mental health care, CDCR will take an important step toward self-directed management of MHSDS.

In providing inmate-patient mental health services, MHSDS provides a continuum of inpatient care from a contractual relationship with DMH for acute and intermediate, as well as a short-term crisis, inpatient care program within CDCR institutions.

## D. FACILITY/CAPITAL OUTLAY CONSIDERATIONS

Implementation of the 2006 MHSDS Revised Program Guide will have facilities/capital outlay impacts at Headquarters and in each institution. Additional office and treatment space will be needed in order to provide workspace and mental health treatment areas (see Attachment 21). This will be addressed in CDCR's Litigation Support FL.

11

Currently, two areas of Human Resources (HR) have maximized their existing office space (even turning conference rooms into staff workstations) and cannot expand to absorb the additional staff positions requested herein. The two affected HR offices include: Office of Personnel Services (OPS) and Office of Workforce Planning and Selection (OWP&S).

If these offices cannot be relocated elsewhere within CDCR's Headquarters building, there will be a need to either relocate one or both to a different location within Sacramento or reconfigure existing space with modular furniture. Based on cost methodology obtained from CDCR's Facility Leasing Section, here is the projected cost for each option for both offices:

**Office of Personnel Services (OPS)**

1. **Expand On Existing Floor** (1515 S Street, North) @ $0 cost
   - If OPS can relocate or expand elsewhere on its existing lease, there would be no additional cost to the existing lease agreement.
   - If this option is not feasible, then it would be necessary for OPS to obtain partial modular furniture as follows.

2. **Partial Modular Furniture Reconfiguration ($121,219 one time)**
   - This is the projected cost to reconfigure partial existing space with modular furniture for 25 workstations (see Attachment 21A).

**Office of Workforce Planning and Selection (OWP&S)**

1. This request is included in the FY2006/07 Succession Management Plan FL.
2. If OWP&S's facility considerations are approved within this FL, the request made herein can be deleted.
3. If one of these offices is approved for relocation, the remaining office could expand into the vacating space.

## E. JUSTIFICATION

The following pages are the justification for:

Section I.    Division of Correctional Health Care Services (DCHCS), Mental Health Services Delivery System (MHSDS) –
2006 Revised Program Guide Resources

Section II.   Division of Correctional Health Care Services (DCHCS),
Mental Health Program (MHP) – Headquarters

Section III.  Division of Correctional Health Care Services (DCHCS),
Psychiatry Vacancy Rate Reduction Strategies

## SECTION I. DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

The court found that DCHCS MHSDS was an inadequate system that lacked, in whole or in part, the necessary elements for delivery of adequate mental health care. The 2006 MHSDS Revised Program Guide are policies and procedures that are consistent with the court's requirements.

Since there are new functions in the 2006 MHSDS Revised Program Guide and insufficient workload data available upon which to base an objective, meaningful conclusion as to the appropriate number and level of personnel necessary to adequately carry out the new duties, DCHCS used the following methodology to determine the number of positions needed for the majority of the staffing in this FL except for ADSEG-CCCMS.

The following methodology was utilized to determine the number of positions needed for the majority of the staffing in this section:
- New functions were identified and listed (see Attachment 4);
- Duties and time required to perform the new functions were identified and listed (see Attachment 5);
- Tasks were compared with 1997 court mandated ratios (see Attachment 6);
- Tasks were correlated with American Medical Association's Current Procedural Terminology (CPT) codes (see Attachment 7); and
- Based on the current inmate population (see Attachment 8), the total workload impact per year was determined.

The exception to the above methodology is ADSEG-CCCMS which is driven by the 1999 and 2001 Coleman court orders as delineated below:

"(1)   The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS (*1:100 case manager to inmates*) programs should be provisionally approved by the court, with the exception of the existing ratio of psychiatrists to inmates in the 3CMS program, which should be subject to further review;

(2)   Defendants should be directed to adopt and implement within 90 days the following staffing ratio for administrative segregation:

   (a)   Seven-day weekly coverage in each administrative segregation unit by a psych tech, accomplished by adding a 0.61 psych tech position to each of the 30 positions now authorized;

   (b)   One half-time psychiatrist to each administrative segregation unit;

   (c)   One full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed;

00078

      (d)    One additional full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities;

      (e)    One full-time clerical position to support the work of the administrative segregation clinical team..."

In addition, for each case manager, 2.2 correctional officers (COs) were required for escort.

Since the court is demanding immediate improvement in mental health staffing and inmate-patient access to services, DCHCS proposes to immediately address the court's mandates by requesting a total of **299.98** positions in ADSEG-CCCMS.

Once these positions are filled, CDCR will conduct a workload study of MHSDS and Headquarters functions to identify, standardize and quantify workload data, determine actual need, and adjust staffing as appropriate based on the results of the study (see Attachment 28).

MHSDS serves the majority of inmates with serious mental disorders through the CCCMS, which is available at all institutions. An effective CCCMS program ensures timely access to mental health care and outpatient services delivered through a well-designed clinical case management system and is the most cost-effective means of maintaining adequate institutional functioning among inmates with serious mental disorders. CCCMS facilitates the linking of inmate-patients to needed services and provides sustained support while accessing these services.

CCCMS inmates who engage in criminal behavior or behavior requiring disciplinary intervention while in the prison system are placed in ADSEG-CCCMS while awaiting adjudication for these offenses. Should they be found guilty and be assigned additional time than already served in ADSEG, they then go into SHU-CCCMS.

1. <u>**Administrative Segregation Unit, Correctional Clinical Case Management System (ADSEG-CCCMS)**</u>

The court has reported in a number of its reports that the Special Master's view the ADSEG environment as one which requires a heighten degree of treatment intervention for the inmate to maintain a CCCMS level of function. The 1997 *Coleman* Requirements states an average Clinical Case Manager (CCM) to patient staffing ratios across the program sizes for CCCMS is 1:100. ADSEG-CCCMS CCMs' duties were never staffed separately from the CCCMS general population (GP) despite the court's additional treatment requirements when GP CCCMS are transferred into ADSEG.

Staffing in ADSEG-CCCMS has been a consistent concern of the *Coleman* case Special Master. From 1999 to 2005, the completed suicides in ADSEG-CCCMS and SHU-CCCMS account for 49 percent of all suicides in the CDCR inmate population.

Based on the 1999 Coleman court order, DCHCS proposes to immediately address the court's mandates by requesting a total of **299.98** positions in ADSEG-CCCMS.

00079

2. **Mental Health Reception Center (RC)**

The MHSDS provides universal screening for all incoming inmates at Reception Centers and directs transfers from the Reception Center to the treatment facility for further evaluation and/or treatment if needed.

The bulk of the Intake Assessment requirements and Treatment Planning requirements described in the CCCMS GP Section will be the responsibility of RC staff. The 2006 MHSDS Revised Program Guide requires that EOP LOC patients be seen weekly until transfer (but does not require the ten hours of weekly structured therapeutic activities). According to the resource analysis data collected, for RC related duties, the caseloads should be reduced by 50 percent from the current staffing allocated. The current RC duties were never staffed separately from the CCCMS LOC duties, and the ratio below takes this into account along with the 2006 MHSDS Revised Program Guide duties.

Based on the above formula and population statistics for October 2005, DCHCS is requesting **51.0 Psychologist (Clinical)** positions and **20.6 Correctional Counselor Is** for a total of 71.6 positions for the RC.


3. **Mental Health Outpatient Housing Unit (MH-OHU)**

The 2006 MHSDS Revised Program Guide requires seven-day per week coverage in for mental health patients in any OHU. Additional weekend clinical staffing is requested in institutions that have a significant OHU population and no MHCB (where weekend staffing is requested above). These five institutions are Avenal State Prison (ASP), CCI, CMC-East, NKSP, and SQ.

Based on the above formula and the February 6, 2006 population status for MH-OHU, DCHCS is requesting **72.98** positions.


4. **Institution Level Supervision**

Currently, 265.6 LPTs are supervised by 26.7 Supervising Registered Nurse I (SRN I) staff members and two Sr. LPTs. At this time, this FL is only requesting Sr. LPTS to compensate for the existing LPTs (265.6). The total number of Supervisors required for a one Supervisor: ten LPT ratio at institutions with more than ten LPTs = 15 - *Less 3.0 Sr. LPT upgrades allocated to COR in FY 2005/06* = a need for 12.0 Sr. LPTs. Twelve recommended supervisors – two (current Senior LPT supervisors at SAC) = 10 Supervisors. The Sr. LPT classification has not been regularly used to supervise LPTs, but is recommended to ensure appropriate supervision relative to scope of practice (i.e., group therapy duties). Senior LPTs can still perform LPT duties if necessary. Total Ratio - one Sr. LPT: 10.0 LPT (at institutions with more than ten LPTs = a need for 10.0 Sr. LPT positions. This FL requests permanent upgrading of 10.0 LPTs to Sr. LPT positions

Unit Supervisors are required to provide supervision for Senior. LPTs across shifts at institutions with multiple mental health missions. Unit Supervisor positions have not

previously been designated in CDCR. The CDCR duty statement for this position has been developed based on the Department of Personnel Administration specifications. The Unit Supervisor ensures the administration of the routine nursing services across correctional mental health units and custody levels; coordinates the work of the nursing staff and acts as a liaison between Unit staff on varying shifts; trains and develops shift leads; instructs LOC nursing personnel in nursing processes, habilitation, and rehabilitation techniques for inmate-patients; and provides continuous management and supervision of Units that offer routine and supportive nursing services for developmentally disabled or mentally ill inmate-patients.

One Unit Supervisor is required at each institution with multiple mental health missions including: RC, CCCMS, ASU-CCCMS, GP-EOP, ASU-EOP, and/or PSU. Unit supervisors at this time are requested for mental health "consolidated care center" institutions in the "CDCR Right Prison, Right Mission" plan. The 9 institutions are: CIM, CIW, CMC, CMF, LAC, MCSP, PBSP, RJD, and SAC.

Requesting 9.0 Unit Supervisors to be allocated to the nine Consolidated Care Centers.

Summary of positions needed to accomplish adequate Supervision Levels. These positions are requested effective July 1, 2006.

- Permanently Upgrade 10.0 LPTs to 10.0 Sr. LPTs
- 9.0 Unit Supervisors

### 5. Performance Evaluation and *Colman* Court Case Compliance

The Quality Management System is required, by the *Coleman* and *Plata* court cases, in order to provide adequate performance management and to ensure compliance with mental health policies and procedures. Quality Management requirements specific to mental health involve identification of problems in delivery of mental health services, establishment of QIT, tracking progress of QIT, conducting Suicide Prevention Focused Improvement Team (FIT) meetings (including development and implementation of corrective action plans when a suicide occurs), conducting Mental Health Subcommittee meetings, and facilitating an overall data-based approach to bed utilization. All meetings require documentation, which is sent to other Quality Management Committees at the institution and at Headquarters. Although an analyst has been designated at some institutions for the purpose of health care quality management, a dedicated HPS I for mental health quality management is required to ensure that these important duties are completed as required. This position will also be responsible for oversight of tracking reasonable accommodation offered to MHSDS inmates who are part of the class action *Armstrong* court case. Each HPS I require clerical support in order to complete duties associated with taking meeting minutes, copying, tracking, filing, and communications.

Request 1.0 dedicated HPS I at each institution without a restriction to running a mental health mission (restricted institutions are Calipatria State Prison (CAL), California Correctional Center (CCC), Centinela State Prison (CEN), Ironwood State Prison (ISP), Chuckawalla Valley State Prison (CVSP)) = 28.0 HPS Is.

00081

Request 1.0 Mental Health Quality Management dedicated OT at each institution without a restriction to running a mental health mission (restricted institutions are CAL, CCC, CEN, ISP, CVSP) = 28.0 OTs.

Summary of positions needed to accomplish Quality Management. These positions are requested effective July 1, 2006.

- 28.0 HPS Is
- 28.0 OTs

## 6. Division of Correctional Health Care Services (DCHCS) – Capital Outlay

This section is included in the Litigation Support FL.

## 7. Reception Center (RC) Screening and Diagnostic Clarification

The Million Clinical Multiaxial Inventory – III (MCMI-III) test can be administered in approximately 30 minutes, either individually or in a group setting. Research indicates that this test is a valid and reliable diagnostic tool to assist in objectively triaging patients for immediate mental health needs, determining mental health diagnosis, as well as predicting future needs for mental health intervention. This test may also be used to predict reaction to authority, escape risk, sexual predation/victimization, disposition to malinger, response to crowding/isolation, suicidal tendencies, and amenability to treatment (see Attachment G: Retlzaff, P., Stoner, J., and Kleinsasser, The Use of the MCMI-III in the Screening and Triage of Offenders, *International Journal of Offender Therapy and Comparative Criminology, 46, 3, 319-332*).

The use of this test, along with a standard computer generated report of results, is proposed for use at RCs, for all newly arriving inmates who have a positive mental health screening indicator (approximately 20,000 inmates per year). A more rigorous interpretation/analysis of results is proposed for use with current inmate-patients at EOP LOC, when diagnostic clarification is needed (approximately 3,000 per year). See Attachment H for sample report.

The use of this instrument is expected to reduce overall mental health program cost. Data generated from the standard use of the MCMI-III at RCs will be used to determine appropriate mental health LOC, thereby reducing inappropriate placements into mental health programs. Use of the MCMI-III at EOP LOC will significantly reduce the use of costly DMH beds for diagnostic clarification.

This FL requests a total for $778,800 in ongoing funding - $748,800 per year for contract funding for a two year pilot program for valid and reliable test to predict mental health needs of inmates arriving in RC and to aid diagnostic clarification in EOP Level-of-care (LOC) and $30,000 for supplies for implementation of a pilot program for valid and reliable test to predict mental health needs of inmates arriving in RCs and to aid diagnostic clarification in EOP LOC (see Attachment I). Request for funding is to be effective July 1, 2006.

00082

## 8. Additional Equipment Resources

An initial cost for equipment and supplies is estimated at **$1,164,604** to implement the 2006 MHSDS Revised Program Guide. The equipment and supply costs are based on a per unit estimate for basic office support equipment such as copiers, facsimile machines and shredders as well as clinical materials such as testing forms, pre-printed forms for documentation in the Unit Health Record and group therapy handout materials.

Quantities were determined as follows: (Please see a complete breakdown on the equipment request table in Attachment B.)

- Treatment cells – Nine cells per 33 institutions
- Copiers/Fax Machines/Television – One per institution (except desert institution – CVSP, ISP, CAL, CEN
- Laptops – One laptop for each five Clinicians
- Shredders – One per institution
- Dictation Equipment – One per institution with MHCB
- Golf Cart – One per institution with remote access to Health Records
- Group Therapy Materials – Estimated number of inmates in Program

CDCR is requesting one-time funding of $1,114,604 and ongoing funding of $50,000 for equipment to be effective July 1, 2006.

19

00083