1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

   BINGHAM, McCUTCHEN, LLP
   WARREN E. GEORGE Bar No.: 53588
   Three Embarcadero Center
   San Francisco, California  94111
   Telephone: (415) 393-2000

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

   HELLER, EHRMAN, WHITE &
   McAULIFFE
   RICHARD L. GOFF Bar No.: 36377
   701 Fifth Avenue
   Seattle, Washington  98104
   Telephone: (206) 447-0900

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

13

14 Attorneys for Plaintiffs

15                UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN,                    )  No.:  Civ S 90-0520 LKK-JFM
                                     )
19        Plaintiffs,                )  **PLAINTIFFS' OBJECTIONS TO**
                                     )  **DEFENDANTS' JUNE 15, 2006**
20 vs.                               )  **REVISED INTERIM BED PLAN**
                                     )
21 ARNOLD SCHWARZENEGGER, et al.,    )
                                     )
22        Defendants                 )
   ──────────────────────────────── )

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 6

ARGUMENT .............................................................................................................. 7

I.    DEFENDANTS' NEW INTERIM BED PLAN FAILS TO ADDRESS THE USE OF EXISTING MHCB BEDS BY LONG-TERM CARE PATIENTS AND DOES NOT ELIMINATE THE 75-BED MHCB SHORTAGE ...................................................................................................... 7

    A.    The Plan Does Not Address The Use Of MHCB Beds For Long-Term Care Medical Patients ...................................................................... 7

    B.    The New Interim Bed Plan Fails To Close The 75-Bed MHCB Shortage Defendants Have Admitted Currently Exists ......................... 9

        1.    The "New" 25-Bed MHCB Program At DMH-Vacaville ............ 10

        2.    The CMC MHCB Bed Proposal Is A Welcome Expansion Of MHCBs, But Defendants Must Fully Staff The Unit And Identify The Specific Licensing Barriers They Wish The Court To Waive ...................................................................... 12

        3.    The CIM Plan Does Not Add New MHCB Beds Beyond The GACH Beds Already Being Used For MHCB Cases ............ 13

    C.    Defendants Have Not Adequately Explored Other Options To Expand MHCB Beds ...................................................................... 14

II.    DEFENDANTS' PLANNED EXPANSION OF ICF RESOURCES STILL LEAVES A GAP OF 140 ICF BEDS UNTIL 2009 AND MUST NOT COME AT THE EXPENSE OF SCARCE EOP BEDS ............................. 16

    A.    The CMF Plan Must Be Modified So That No EOP Beds Are Lost At CMF ...................................................................................... 16

    B.    Defendants Do Not Identify The Specific Licensing Waivers They Are Seeking From The Court ................................................. 17

    C.    Defendants' New Interim Bed Plan Does Not Eliminate The Shortage Of ICF Beds ................................................................... 19

CONCLUSION ........................................................................................................ 19

1

**INTRODUCTION**

2        On June 15, 2006, in response to this Court's May 2, 2006 Order, defendants provided

3    the Special Master and plaintiffs with their *Interim Intermediate Care Facility and Mental*

4    *Health Crisis Bed Plan, June 2006* ("New Interim Bed Plan").[1]  Defendants' New Interim Bed

5    Plan contains three principal improvements over earlier plans:

6        •    For the first time, the plan includes a commitment to build 50 new Mental Health

7             Crisis Beds ("MHCBs") at California Men's Colony ("CMC"), although no time-

8             frame for the project is given (and the beds will not be available for at least

9             several years);

10       •    The plan includes a commitment to open, by June 30, 2007, a new 30-bed ICF

11            unit in the P-3 wing at the California Medical Facility (CMF), which will nearly

12            double the number of Level IV intermediate inpatient care (ICF) beds at CMF;

13       •    The plan includes a commitment to expedite construction of an additional 40

14            Level IV ICF beds in the D-5 and D-6 wings at Salinas Valley State Prison

15            (SVSP) (in addition to the initial 36-bed unit and the second 36-bed ICF unit

16            ordered by this Court in its May 2, 2006 Order), so that SVSP will have a total of

17            112 new ICF beds open by mid-2007.

18   These are welcome new projects and defendants should be ordered to proceed with them.

19       Despite these improvements, however, defendants' New Interim Bed Plan fails to

20   address the current and immediate shortage of MHCB and ICF beds identified in defendants'

21   own projections.  Particularly in the area of MHCB beds, the new plan mostly just shuffles

22   around existing resources, rather than securing the new crisis beds that are desperately needed

23   by inmates who are suicidal or experiencing other mental health crises.  Several of the other

24

25   _____

26       [1] Although the Court's May 2, 2006 Order specifically required that defendants "file"
     their revised interim bed plan within 45 days of the Court's order, defendants did not file a

27   copy with the Court. See 5/2/06 Order at ¶ 4.  Plaintiffs have included a copy of defendants'
     June 15, 2006 New Interim Bed Plan with the Declaration of Jane Kahn filed herewith.  See

28   Kahn Dec. Ex. A.

initiatives in the new plan will require considerable management time and energy, but are unlikely to yield substantial improvements in the ability of class members to access higher levels of mental health care in a timely manner.  There are five major problems with the plan:

First, the plan does not create sufficient MHCBs to remedy the current 75 MHCB bed shortage identified by CDCR Health Care Director Farber-Szekrenyi in testimony to this Court.  See Declaration of Jane Kahn in Support of Plaintiffs' Objections to Defendants' June 15, 2006 Bed Plan ("Kahn Dec."), Ex. B at 74:24-25.  Defendants contend that their New Interim Bed Plan will result in an additional 83 MHCB beds.  Kahn Dec. Ex. A (New Interim Bed Plan) at 2.  In fact, however, the only MHCB beds that are net additions in the New Interim Bed Plan are the 42 MHCB beds at CMC that this Court recently ordered.  5/2/06 Order, ¶ 13.  It remains to be seen when and whether this CMC unit should be fairly counted as an MHCB rather than an Outpatient Housing Unit ("OHU"), given that it was opened without appropriate clinical staffing.  Defendants must be ordered to create at least another 33 MHCB beds to meet the shortfall they concede exists.  See Argument I.B., *infra*.  Defendants also fail to address ongoing delays in staffing and licensing previously "counted" MHCB beds such as those at CIW, KVSP and SAC, which apparently will not be available in the time-frame previously represented by defendants (and ordered by this Court, in the case of SAC and KVSP).

Second, the MHCB shortfall that defendants concede exists is not, in fact, the entire shortfall.  Defendants' estimated shortfall of 75 MHCB beds does not account for the current widespread use of MHCB beds for long-term care medical patients, nor does it account for the cases not referred to MHCB care because clinicians know these programs are full.  Recent reports from the field indicate that this situation has worsened in recent months.  At just three institutions recently visited, the monitors reported that 19 of the CDCR's 164 current MHCB beds – more than 10 percent of the available MHCB beds system-wide – are presently being used for long-term care medical patients.  In coordination with the *Plata* court, this Court should order defendants to move these long-term care medical patients to a different setting,

such as a community hospital or a skilled nursing facility, within the next 60 days, in order to make room for mental health patients in crisis.  See Argument I.A., *infra*.

The fact is that defendants are unable to provide this Court with a reliable count of the actual number of MHCB beds that are staffed, licensed, available and operating, nor can defendants competently predict when additional MHCB beds will be constructed, licensed, staffed and ready for operation.  The Court, together with the Special Master (and the Receiver, if necessary), must require defendants to remedy this management deficiency.

Third, the ICF portion of defendants' new plan, taken together with the additional short-term ICF resources required by the Court's May 2, 2006 Order, means that defendants will build a total of 142 additional Level IV ICF beds at CMF and SVSP by mid-2007.  However, once these new beds are finished, a gap of at least 140 Level IV ICF beds will remain between mid-2007 and the opening of the new permanent 64-bed SVSP ICF unit in March of 2009.  See Kahn Dec. Ex. G (Enclosure II to Defendants' April 17, 2006 Bed Plan) (projecting a shortage of 285 Level IV ICF beds in Fiscal Year 2007/2008).  Defendants must be ordered to fully address this gap.  See Argument II, *infra*.

Fourth, the bed expansions in the New Interim Bed Plan come at the expense of other medical and mental health programs currently experiencing severe shortages:

- In order to open the new 30-bed ICF program at CMF in the P-3 wing, defendants will permanently close the 67-bed EOP program in the CMF's M-3 wing.  Kahn Dec. Ex. A (New Interim Bed Plan) at 15 ("This plan, once fully implemented, adds 30 ICF beds at the expense of 67 general population EOP beds at CMF.")  As this Court is well aware, there is currently a shortage of more than 1,000 EOP beds system-wide.  See Kahn Dec. Ex. G (defendants' "Closing the Gap" Spreadsheet showing Fiscal Year 2007/2008 shortfall of 1098 EOP beds even with all currently planned EOP expansions).  The Court rejected defendants' inadequate plan for EOP beds in the May 2, 2006 Order, yet defendants have failed to address this critical issue in the interim plan and, in fact, have made the problem worse by sacrificing EOP beds for ICF beds.

1    • The plan to open 25 MHCB beds at CMF will come at the expense of scarce APP

2    beds at CMF. Defendants admit that this is not an addition of new beds but

3    rather an effort to increase utilization of the problem unit at ASH. Kahn Dec. Ex.

4    A (New Interim Bed Plan) at 4 ("The plan as proposed is a method to increase

5    the utilization of beds currently available in the system."). Defendants' plan is to

6    move the 25-bed MHCB unit currently operating at ASH to CMF, and to move

7    25 low-custody CMF APP patients to ASH. This shuffling of resources and

8    acutely ill patients will not create a single additional bed, and may result in a

9    further shortage of APP beds, given the longstanding resistance of ASH staff to

10    accepting CDCR inmates. Remarkably, this new procedure envisions that DMH

11    APP staff at CMF will have to fill out a complete new application package,

12    which ASH clinicians may well decide to reject, in order to transfer this handful

13    of low custody APP patients to another DMH program! This is not a solution to

14    the acknowledged problem, which is the unwarranted resistance and bureaucratic

15    roadblocks created by ASH to accepting CDCR inmates as patients. Nine pages

16    of defendants' plan is devoted to this misguided effort to shuffle beds and

17    patients between two DMH programs. The Court can solve this problem more

18    directly by ordering that DMH allow CDCR clinicians to control admission to

19    the ASH MHCB, or by directly confronting DMH and forcing a change in its

20    admission procedures.

21    • In their plan to expand MHCB capacity at CIM, defendants do not create any

22    new beds but merely formalize the current practice of using 18 General Acute

23    Care Hospital ("GACH") beds as de-facto MHCB beds. The plan does not

24    address dangerous staffing deficiencies there. Defendants' CIM plan is to

25    "license" another 18 of the GACH beds there as MHCB beds (in addition to the

26    18 already so licensed), without adding the necessary clinical resources.

27    Defendants concede that the GACH unit at CIM is already housing 36 MHCB

28    patients at any given time, so there will be no actual net increase of MHCB

-4-

resources.  See Defendants' New Interim Bed Plan at 13 ("The average daily census [of MHCB patients in the GACH at CIM] has been 36 for the last 4-5 months.").

These kinds of trade-offs are unacceptable.  Defendants are robbing Peter to pay Paul. Defendants must expand the number of available ICF beds, EOP beds, APP beds, MHCB beds and long-term care medical beds.  Plaintiffs are not aware of any reason, and defendants provide no reason, why they cannot use a general population unit at CMF when they re-locate the EOP administrative segregation unit currently on P-3, or why the expansion of MHCB beds must come at the expense of existing APP beds at CMF, or why defendants cannot expand the CIM MHCB component of the GACH in a manner that actually creates new MHCB spaces. This is exactly what the Court warned against in the June 8, 2006 joint hearing – defendants are using *Coleman* resources to solve a *Plata* problem and *Plata* resources to solve a *Coleman* problem.  They must not be permitted to continue to do so.

Fifth, the Court should not accept defendants' apparent strategy to magically create MHCB and ICF beds out of thin air, without meeting the relevant California licensing and safety standards, by seeking broad open-ended waivers from the Court.  The Court should not take the extraordinary step of intervening in the State's internal licensing process unless defendants can demonstrate that the Department of Health Services ("DHS") has been unreasonable.  The Court previously ordered defendants to submit a specific list of licensing, staffing and statutory barriers that they are asking the Court to waive in connection with the plan.  5/2/06 Order at ¶ 4 ("Defendants shall include with said interim plan, as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan.")  Defendants have not done so.  See, e.g., Kahn Dec. Ex. A (New Interim Plan) at 12 (no discussion of CMC waivers sought), 14 (request for general suspension of state licensing requirements in connection with CIM project, but no discussion of specific licensing provisions or explanation of why the relevant provisions cannot be met), 20 (no discussion of licensing waivers or issues in connection with SVSP ICF expansion plan).  The Court must require that defendants submit a detailed list of the specific waivers they are seeking with

respect to each project, along with a justification for each specific waiver and a plan for

alternative compliance and/or future compliance.  In its May 2, 2006 Order, this Court wisely

noted that state licensing requirements "serve an important function" and noted that they may

need to "temporarily" give way to make room for measures necessary to cure the Eighth

Amendment violation in this case.  5/2/06 Order at 3:14-4:3.  The Court must ensure that

defendants do not endanger patient safety in implementing the new temporary MHCB

solutions, and must require defendants to justify each individual waiver of a state licensing

requirement.  Moreover, the Court must ensure that defendants address any safety and staffing

issues in implementing these plans as soon as possible.

## STATEMENT OF FACTS

The June 15, 2006 New Interim Bed Plan is defendants' fourth bed plan since last

Spring.  Previous plans were submitted to the Special Master and/or the Court on March 30,

2005, August 15, 2005, and April 17, 2006.  During this past year, as defendants struggled to

develop an adequate plan, the situation for mentally ill inmates inside the defendants' prisons

has grown more dangerous and desperate.  The CDCR is currently experiencing a severe

overcrowding and understaffing crisis.  As of midnight on June 14, 2006, the total population

of the CDCR was 171,527, up 8,061 inmates since a year earlier.  Kahn Dec. ¶ 17, Ex. F.

According to the Governor, the prison system is in crisis and is inappropriately housing more

than 16,000 inmates in gyms, dayrooms, and other areas that were never intended for use as

housing.  *Id.*  Defendants' suicide rate continues to be more than double the national average,

with extremely high rates in the CDCR's crowded administrative segregation units.  Kahn Dec.

¶ 16.  In the first six months of this year, there have been 25 suicides in the CDCR, which can

be annualized to a rate of 50 suicides per year -- a rate that, if it continues for the second half of

this year, would result in an even higher rate than in 2005, when there were 41 suicides, the

highest number of CDCR suicides ever.  *Id.*  In this environment, planning for acute inpatient

care for suicidal inmates and inmates in need of longer-term inpatient stabilization is a critical

life-saving endeavor.  See Special Master's 2004 Suicide Report at 6 ("*During the year, a*

*significant number of inmates who were referred or should have been referred to higher levels of care, including DMH, were not considered for referral, were not referred, had their referral cancelled or were awaiting transfer pursuant to a referral when they died.*").

# ARGUMENT

I.   **DEFENDANTS' NEW INTERIM BED PLAN FAILS TO ADDRESS THE USE OF EXISTING MHCB BEDS BY LONG-TERM CARE PATIENTS AND DOES NOT ELIMINATE THE 75-BED MHCB SHORTAGE**

   A.   **The Plan Does Not Address The Use Of MHCB Beds For Long-Term Care Medical Patients**

Defendants have experienced a severe and dangerous shortage of MHCB beds for several years.  This ongoing shortage makes it impossible to transfer critically mentally ill inmates to crisis beds because all of the available beds are full.  Every month during the last year, a routine document production in this case has shown that between two and three hundred inmates who were referred to an MHCB during the month could not be placed.  For example, in April 2006, 291 inmates were referred to a MHCB at another institution, but only 27 of them were placed.  Kahn Dec. ¶ 14, Ex. D.  In other words, 91 percent of the inmates referred to an MHCB could not be placed.[2]  The Court's May 2, 2006 Order found that defendants' April 17, 2006 Bed Plan did not adequately address this problem in the near-term.  Defendants' New Interim Bed Plan still falls short.

During the hearings on defendants' April 17, 2006 Bed Plan that were held on April 26 and 27, 2006, Dr. Farber-Szekreyni conceded that there is a current shortfall of 75 MHCBs.  Kahn Dec. ¶ 3, Ex. B at 74:24-25.  He also testified that MHCB and Correctional Treatment Center (CTC) beds[3] are frequently occupied by long-term care medical patients and promised

---

[2] This monthly report understates the true extent of the unmet demand for MHCB beds for two reasons: First, it does not include unplaced *internal* MHCB referrals.  Second, it does not account for inmates who were not referred by discouraged clinicians who know that the MHCB units are full.

[3] There are two types of Correctional Treatment Center or "CTC" beds.  Mental Health Crisis Beds are CTC beds for mental health patients.  The remaining CTC beds are reserved for medical patients.  In most CTCs in the CDCR, a certain number of beds are staffed and licensed as mental health beds, although some beds in the past have also been designated as "swing" beds that can be used either for mental health or for medical patients.  The beds discussed here as MHCB beds are staffed and licensed as MHCB beds and are not "swing beds."

that a new interim plan was being developed to address this issue. Kahn Dec. ¶ 4, Ex. B at 20:10-13. When he was asked whether defendants had contracted with any community hospitals to take these patients, Dr. Farber-Szekrenyi responded that: "We have several hospitals that we have had active dialogue with, and we're in the process of contractually working with them, yes." Kahn Dec. ¶ 4, Ex. B at 22:4-6. Although Dr. Farber-Szekrenyi stated that there were no signed contracts yet, he indicated that "we have a pretty good possibility of placing some patients shortly, yes." Kahn Dec. ¶ 4 and Ex. B at 22:11-12.

Following three recent *Coleman* monitoring tours, the experts reported on the use of MHCB beds by long-term care patients. Kahn Dec. ¶¶ 7, 8, 9. On May 5, 2006, the court experts visited Lancaster State Prison and reported that seven of the 12 crisis beds there were occupied by long-term care medical patients. Kahn Dec. ¶ 7. On June 2, 2006, the court experts visited Wasco State Prison and reported that six of the 16 crisis beds there were occupied by inmates requiring long-term medical care. Kahn Dec. ¶ 9. Lengths of stay for these inmates ranged from 30 to 471 days. *Id.* Psychiatric patients who required crisis care were housed in alternative locations, including five short-term areas without toilets and three longer term areas with toilets. *Id.* On June 6, 2006, the experts visited Salinas Valley State Prison and reported that only five or six of the 12 crisis beds were available because the remainder were occupied by long-term care medical patients. Kahn Dec. ¶ 8. As a result of the MHCB shortage at Salinas Valley State Prison, psychiatric patients needing crisis care were placed in holding tanks on suicide precautions. *Id.* Between January 1, 2006 and April 30, 2006, 143 SVSP patients were admitted to holding tanks for crisis care because mental health crisis beds were unavailable. *Id.* The lengths of stay in these holding tanks, which do not have bathrooms and are not clinically staffed, ranged from one to seven days. *Id.* At these three institutions alone, there were nineteen MHCB beds occupied by long-term care medical patients. Kahn Dec. ¶ 13. There are likely to be far more MHCB beds occupied system-wide by long-term medical care patients. *Id.*

Defendants are aware of this problem: one of defendants' attorneys and several representatives from CDCR central office staff have been present on each of the *Coleman*

1    monitoring tour preliminary phone exits discussed above.  Kahn Dec. ¶¶ 6-9.  At the June 8

2    Hearing, plaintiffs' counsel addressed this issue to the Court.  On the same day, after the

3    hearing, during a meeting with Special Master Keating, plaintiffs' counsel, defendants' counsel

4    and representatives from CDCR and DMH, there was discussion regarding the forthcoming

5    New Interim Bed Plan and whether it would address the increasing use of MHCB beds to

6    house long-term care medical patients.  Kahn Dec. ¶ 5.  Defendants stated that they were either

7    unaware of the problem or unable to respond to plaintiffs' concerns.  *Id.*

8        Indeed, the New Interim Bed Plan does not address in any way the use of current

9    MHCB beds by long-term care medical patients and thus overstates the current count of

10   MHCB beds available for the *Coleman* class.  A footnote states that the plan "assumes that all

11   existing MHCBs, along with the additional MHCBs identified in this plan, will be designated

12   and used as MHCBs."  Kahn Dec. Ex. A at fn 1.  This assumption is unwarranted, as

13   defendants are well aware -- given the testimony of Dr. Faber-Szekreyni and the information

14   presented in the *Coleman* monitoring exits.  The reason the actual number of available MHCB

15   beds is unclear is because defendants have failed to accurately investigate and report on this

16   number.  Kahn Dec. ¶ 4 and Ex. C.  Defendants must be directed to provide the Court with an

17   accurate count of the long-term medical patients currently in MHCB beds.  Defendants must

18   also be directed to provide the Court with a plan by July 15, 2006 for moving these patients out

19   of MHCB beds within 60 days.  The Court should work with the *Plata* Receiver in order to

20   ensure that such a plan is appropriately and expeditiously developed and implemented.

21   **B.    The New Interim Bed Plan Fails To Close The 75-Bed MHCB Shortage**
     **Defendants Have Admitted Currently Exists**
22

23       Defendants' New Interim Bed Plan does not provide the 75 new MHCB beds promised

24   by Dr. Farber-Szekreyni during his testimony on April 27, 2006.  Kahn Dec. ¶ 3 and Ex. B.

25   Only one of the three MHCB "expansion" proposals outlined in the Interim Plan – the 42 bed

26   unit at CMC – actually *may* create additional MHCB beds for use by CDCR patients (although

27   it is unclear that the CMC MHCB unit should be counted as an MHCB unit at this time).  The

28   other two proposals do not and will not add any MHCB beds to the system:  the 25 MHCB

beds proposed for DMH-Vacaville would take the space currently occupied by 25 extremely valuable APP beds (which are traded for an equal number of ASH MHCB beds). Kahn Dec. Ex. A (New Interim Bed Plan) at 4. The location of the MHCB unit has changed, but not the number of beds. The MHCB unit inside the General Acute Care Hospital ("GACH") at the California Institute for Men (CIM), which is targeted for expansion by 16 beds, has been operating with an overflow of at least 18 patients for the last four to five months. *Id.* at 13. Thus, the proposed expansion at CIM will not even cover the current overflow of mental health patients filling medical beds in the hospital. Essentially, the CIM proposal does nothing more than seek the Court's blessing for an existing dangerous and inappropriate unit, without including a plan to fix the dangerous conditions. Defendants' plan for CIM does not include staffing for the beds or a proposal to modify the beds to meet licensing standards for immediate use. In fact, these beds may not even be available as touted since their use as MHCB beds is contingent on approval from the *Plata* receiver.

### 1.    The "New" 25-Bed MHCB Program At DMH-Vacaville

The New Interim Bed Plan proposes exchanging 25 MHCB beds at ASH for 25 APP beds at DMH-Vacaville. The reason provided for this decision is that the 25 MHCB beds at ASH have been under-utilized. Kahn Dec. Ex. A. (New Interim Bed Plan) at 3-11. In fact, 19 of the 25 MHCB beds at ASH are currently being used by CDCR patients – meaning that even if it is successful, this elaborate and burdensome plan will only yield six additional beds. *Id.* Rather than correcting the serious and ongoing problems with access to ASH, defendants propose transferring 25 patients and acute beds[4] from the Acute Psychiatric Program at CMF to ASH. *Id.*

This is no solution at all, and the proposal should be abandoned. Instead of approving an elaborate and largely meaningless swap of beds that endangers the CMF APP program, the

---

[4] The April 17, 2006 Bed Plan, Enclosure 2, identified an immediate current shortage of 141 acute beds.

Court should order that the ASH admission obstacles be overcome and remedied in one of several ways. For example, the Court could order DMH and ASH to allow CDCR clinicians to control admissions to the 25 ASH beds under contract to the CDCR for MHCB care, as has been the case with the MHCB beds operated by DMH at CMF. See Fifteenth Monitoring Report of the Special Master at 86.

There are many problems with this proposal. First, currently there is a severe shortage of APP beds in the CDCR. Enclosure II to defendants' April 17, 2006 Bed Plan is a chart projecting demand for various categories of mental health beds into the future. Kahn Dec. Ex. G. The chart is based on the final UNA study and the Tucker-Alan bed need calculation method, and it states that there is a current APP bed shortage for fiscal year 2006-2007 of 141 beds, and a shortage next year of 205 APP beds. Kahn Dec. ¶ 18 and Ex. G. After many years, the referral process for the APP program at CMF has finally been smoothed out so that this scarce resource is carefully allocated to the most needy mental health cases and access is relatively timely. Id. The new plan will interfere with the smooth functioning of the current utilization management process and will probably reduce the number of available APP beds system-wide. Id.

Second, the complex new admission process for the ASH APP beds set forth in the New Interim Bed Plan is quite troubling. Kahn Dec. Ex. A at 3-11. The proposal is that DMH clinicians in the CMF APP program will select 25 low custody CDCR inmates already in the APP program and send them to ASH. Id. However, ASH will not simply accept the referrals from their DMH colleagues. Instead, the CMF APP clinicians (who work for DMH) will have to fill out a complete referral package for each case, and ASH clinicians will review them and reject the cases they do not want. Id. at 6. This two-layer screening is inappropriate. The time has come to finally address this problem with a court order directing ASH to accept all MHCB cases directly, with no burdensome application process and no right to refuse a patient. If a patient is inappropriately sent, ASH can evaluate them and then return them to the CDCR. In addition, the plan will shut down or limit admissions to ASH from two major programs—CIM

and CMC—without making any provision for addressing the needs of those prisons in the interim.  Kahn Dec. Ex. A (New Interim Bed Plan) at 5.

Third, the plan is too burdensome.  It requires a new MOU, new training, staggered transfers of fragile patients in the middle of their treatment programs, and it will require a whole new round of policing the overly restrictive ASH admissions procedures.  Moreover, in order to operate the new MHCB unit at DMH Vacaville, DMH will have to recruit new staff members.  Kahn Dec. Ex. A at 5.  This will be particularly difficult, given that DMH is already in the process of recruiting for the new ICF programs there.  By way of contrast, the ASH crisis bed program is fully staffed and functioning.  Id.

Plaintiffs ask that the Court reject this aspect of the New Interim Bed Plan, and instead issue an order that requires ASH to allow CDCR clinicians to freely admit crisis patients into the 25-bed MHCB unit at ASH.

### 2. The CMC MHCB Bed Proposal Is A Welcome Expansion Of MHCBs, But Defendants Must Fully Staff The Unit And Identify The Specific Licensing Barriers They Wish The Court To Waive

The Court ordered defendants to immediately reopen the Locked Observation Unit ("LOU") at CMC and to use it to provide 36 MHCB beds until further order of the court.[5]  5/2/06 Order ¶ 13.  Plaintiffs welcome defendants' long-term plan to construct a 50-bed MCHB unit at CMC.  However, with respect to the Interim Plan, defendants have not adequately identified the staffing, licensing and other barriers to successfully implementing the new MHCB program in the LOU.  The defendants must provide more specific details regarding this proposed project in the amended long-term plan to be filed in the near future.  5/2/06 Order ¶ 1.  For instance, has this project been approved by the CDCR, the Department

---

[5] Defendants' New Interim Bed Plan provides that CDCR will operate the MHCB beds at CMC until further order of the *Coleman* Court "*or sufficient MHCB beds are available statewide to meet the needs of the mental health patient population.*"  Kahn Dec. Ex. A at 12.  This statement is contrary to the Court order, which provides that defendants may not close the unit without the Court's permission..  5/2/06 Order at ¶ 13.

1  of Finance or the Governor's Office?  Has it been proposed to the Legislature?  When will it

2  open?

3      The Court's May 2, 2006 Order requires defendants to identify a list of barriers to

4  opening the CMC facility and to develop a plan to eventually correct or mitigate the licensing

5  problems.  See 5/2/06 Order at ¶ 3 ("Defendants shall include with the amended long-term plan

6  a list of those projects that can be accelerated as well as a list of any statutory, licensing, or

7  staffing barriers to such acceleration and/or to timely opening of the projects described in the

8  amended long-term plan.").  The CMC portion of the New Interim Bed Plan does not discuss

9  the status of the May Revise requests for funding to the legislature.  Kahn Dec. ¶ 15 and Ex. E.

10  In these requests, defendants sought additional clinical staffing as well as plant modifications

11  to the existing CMC unit in order to accommodate the 42 MHCB patients.  *Id.*  Defendants'

12  New Interim Bed Plan does not address the status of these requests for more resources and

13  funding.  At the moment, the CMC unit is not operating in any way, shape or form as an

14  MHCB Unit and should not be counted as such.  To date, what steps have defendants actually

15  taken to change this unit from EOP beds to MHCB beds?  Have they added any clinical or

16  custody staff to date?  This Court must not permit itself to be used to evade critical state health

17  and safety regulations without detailed representations as to what standards are being waived,

18  why they are being waived, and what steps are being taken to mitigate the danger to the

19  patients created by such waivers.

20          **3.      The CIM Plan Does Not Add New MHCB Beds Beyond The GACH
                     Beds Already Being Used For MHCB Cases**

21

22      The 16 additional MHCB beds identified in the Interim Plan at CIM are medical beds

23  that are already being used as MHCB beds.  Kahn Dec. Ex. A at 13.  Thus, the CIM portion of

24  the New Interim Bed Plan will not increase the number of available MHCB beds.

25  Unfortunately, it also fails to address staffing inadequacies which impact on the clinical care

26  provided to psychiatric patients housed in the medical beds.  Kahn Dec. ¶ 12.  Simply calling a

27  medical bed an MHCB bed without providing the necessary additional clinical staff does not

28  magically convert it into a crisis bed.  After the recent *Coleman* monitoring tour at CIM, the

1  monitors reported that CIM was housing at least thirty MHCB patients in the GACH and was

2  not adequately staffed to provide MHCB level of care to that many patients.  Kahn Dec. ¶ 12.

3      Defendants' Interim Plan for CIM offers two poor alternatives:  defendants propose

4  either suspending state licensing requirements and immediately designating 18 GACH beds as

5  16 MHCBs (provided the *Plata* receiver approves of the plan) **or** undertaking facility

6  modifications for the 16 beds in the GACH, which may take a year if no complications arise.

7  Defendants fail to identify the statutory, licensing or staffing requirements they seek to suspend

8  if they chose to immediately designate medical beds as MHCB beds, as required by the Court's

9  order.  5/2/06 Order ¶ 4.

10      Defendants must be directed to identify the statutory, licensing or staffing requirements

11  that they seek to immediately suspend and provide a timetable for coming into compliance

12  with those requirements.  Furthermore, defendants must confirm that the *Plata* receiver has

13  approved the plan to take 18 medical beds for use as 16 MHCB beds.  At this point, the plan

14  for the CIM MHCB beds appears both preliminary and without direction.  Once again,

15  defendants are seeking Court approval for a waiver of state standards without a sufficient

16  showing or explanation.

17      **C.**    **Defendants Have Not Adequately Explored Other Options To Expand
     MHCB Beds**

18

19      Defendants must consider other options to increase the availability of MHCB beds

20  within the CDCR.  <u>First</u>, and foremost, defendants must address the ongoing use of MHCB

21  beds to house long-term care medical patients who can be moved to community hospitals or

22  nursing homes.  This option should free up a considerable number of MHCB beds currently

23  occupied for long periods of time by long-term care patients.

24      <u>Second</u>, defendants must aggressively address the obstacles to staffing and licensing and

25  accelerating the opening of pending and delayed projects, such as CIW, KVSP, SAC, CMF,

26  SQ, ISP, CMC and others.  At California Institute for Women (CIW), defendants' plan to open

27  a new MHCB in August 2006, after years of delay.  During a *Coleman* monitoring tour at CIW

28  on April 27 and 28, 2006, the monitors discovered that no clinical staffing had ever been

1 submitted for the new MHCB. Kahn Dec. ¶ 11. The 10 new MHCB beds will replace the

2 OHU beds at the prison, which are described as inadequately staffed and unsafe for mental

3 health patients. *Id.*

4       The New Interim Bed Plan explicitly rests on the assumption that all existing MHCB

5 beds and additional beds in the Plan will be used as MHCBs. *Id.*, Ex. A at Fn 1. Enclosure

6 VIII to defendants' April 17, 2006 Bed Plan lists 10 CIW MHCB beds that will be licensed for

7 use by August 15, 2006. Kahn Dec. Ex. C. During the CIW phone exit, Special Master

8 Keating requested additional information regarding the status of any supplemental staffing

9 requests submitted after it was reported that no clinical staffing had been requested for the

10 CIW MHCB beds. *Id.* at ¶ 11. No additional information has been provided to plaintiffs'

11 counsel and the May 2006/2007 Revise documents do not appear to address clinical staffing

12 for these beds. *Id.* Defendants should be ordered immediately to provide information

13 regarding the status of clinical staffing for the CIW MHCB beds.

14       Despite this Court's May 2, 2006 order to open the KVSP and SAC MHCB beds by

15 June 30, 2006, defendants have been unable to do so. Rather than get the job done, defendants

16 are seeking yet another waiver of licensing standards. Kahn Dec. ¶ 19 (discussing defendants'

17 June 26, 2006 request to Special Master Keating for waivers of licensing standards at KVSP).

18 Other pending MHCB projects remain stalled—if resources and energy were devoted to get

19 these projects on line, true "new beds" would be added to the benefit of all prisoners in the

20 system.

21       <u>Third</u>, defendants should consider contracting with DMH for additional beds at ASH or

22 Coalinga that can be utilized as MHCB beds, assuming that the Court or the CDCR can resolve

23 the problems with access to ASH beds. Both ASH and Coalinga State Hospital have additional

24 space where CDCR patients could be housed and stabilized.

25       <u>Finally</u>, the CDCR must address the over-crowding within the system, which is

26 negatively impacting all services, including medical and mental health services. Kahn Dec.

27 Ex. F. This overcrowding results in lockdowns, insufficient housing, cancelled programming

28 (including yard, education and vocational training), and custody shortages that have severe

1   consequences for mental health services.  All of this leads inevitably to a greater number of

2   crisis bed referrals within the system and an escalating suicide rate.  Kahn Dec. ¶ 16.  Unless

3   there is pressure on the Governor to re-evaluate policies that have increased the numbers of

4   parolees returning to prison and have lengthened prison terms, the need for additional MHCBs

5   will continue to grow.

6   **II.     DEFENDANTS' PLANNED EXPANSION OF ICF RESOURCES STILL**
          **LEAVES A GAP OF 140 ICF BEDS UNTIL 2009 AND MUST NOT COME AT**
7         **THE EXPENSE OF SCARCE EOP BEDS**

8          Defendants' New Interim Bed Plan is much more promising with regards to ICF beds.

9   Defendants' New Interim Bed Plan will create 70 short-term Level IV ICF beds beyond the

10  expansions previously ordered by the Court, including 30 new beds at CMF in the P-3 wing

11  and 40 accelerated beds in the D-5 and D-6 wings at SVSP (20 additional beds in each wing

12  beyond the 36 already ordered by the Court).   See 5/2/06 Order at ¶¶ 6, 7, 8.  The defendants

13  should be commended for rapidly putting together a plan to accomplish these expansions, and

14  for coming up with a plan to rapidly resolve the air conditioning problem at CMF.  Compare,

15  Kahn Dec. Ex. A (New Interim Bed Plan) at 18 (new air conditioning in P-wing at CMF to be

16  installed by September 14,  2006) with Ex. B at 33 (testimony of George Sifuentes at April 26,

17  2006 Hearing that it would take 16 to 20 weeks to manufacture and install air conditioning in

18  P-wing).

19         However, there are three serious problems with defendants' plan.  First, the expansion

20  plans at CMF come at the expense of 67 badly needed EOP beds there.  Second, defendants

21  have failed to identify which state licensing standards are to be waived and how the health and

22  safety issues will be addressed or mitigated.  Third, even after the expansion plans are

23  implemented, defendants' own projections in their April 17, 2006 Bed Plan show that there

24  will be a gap of 140 Level IV ICF beds until mid-2009.

25         **A.     The CMF Plan Must Be Modified So That No EOP Beds Are Lost At CMF.**

26         Defendants' expansion in the number of Level IV ICF beds at CMF comes at the

27  expense of 67 badly needed EOP beds.  See Kahn Dec. Ex. A (New Interim Bed Plan) at 15-

28  19.  According to the spreadsheet attached to defendants' April 17, 2006 Bed Plan projecting

need for various categories of mental health beds for the next five years, there will be a gap in EOP beds next year of 1083 beds. Kahn Dec. Ex. G (Closing the Gap Spreadsheet from April 17, 2006 Plan showing a shortfall of 1083 EOP beds in 2007-2008 even after significant EOP expansions at MCSP and CSP-SAC). This shortage of EOP beds is extremely dangerous to class members, and defendants' new proposal will increase the shortage by more than six percent (6%).

Defendants must not be permitted to expand their short-term ICF beds at the expense of EOP beds. CMF has many similar units that are not used for mental health care. Defendants' New Interim Bed Plan explains why defendants cannot pursue two different alternatives (one involving P-1, which houses medical patients, and a second involving the loss of 38 EOP administrative segregation beds at CMF). See Kahn Dec. Ex. A (New Interim Bed Plan) at 16-17. However, the plan does not explain why the P-3 EOP administrative segregation unit cannot be moved to a different wing that does not currently house EOP patients or CCCMS patients or medical patients. Defendants should be ordered to explore moving the administrative segregation overflow unit to another CMF housing unit, or, at the very least, to explain why such a move would not be feasible.

In addition, defendants' plan for addressing the shortage of EOP beds was rejected by this Court as inadequate in the May 2, 2006 Order. 5/2/06 Order, ¶ 2. Defendants' New Interim Bed Plan fails to address this shortage — presumably it will be addressed in the long-term bed plan to be filed by defendants on June 30, 2006. 5/2/06 Order, ¶ 1.

**B.    Defendants Do Not Identify The Specific Licensing Waivers They Are Seeking From The Court**

Defendants' New Interim Bed Plan must be rejected because it does not adequately address the specific licensing, staffing and statutory barriers to their plans. The Court previously ordered defendants to submit a specific list of licensing, staffing and statutory barriers that they were asking the Court to waive. 5/2/06 Order at ¶ 4 ("Defendants shall include with said interim plan, as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan.") Defendants have not done so.

1  Defendants' strategy appears to be to seek unspecified general waivers of State Law from the

2  Court, or to ignore the issue altogether.  See, e.g., Kahn Dec. Ex. A (New Interim Plan) at 12

3  (no discussion of CMC waivers sought), 14 (request for general suspension of state licensing

4  requirements in connection with CIM project, but no discussion of specific licensing

5  provisions or explanation of why the relevant provisions cannot be met), 20 (no discussion of

6  licensing waivers, staffing or statutory issues in connection with SVSP ICF expansion plan).

7     It is essential that the Court only allow waivers of State licensing provisions when

8  defendants have provided a detailed, well-documented request concerning each specific

9  licensing, staffing or regulatory "barrier" to implementation that defendants seek to have

10  waived.  See 5/2/06 Order at ¶ 4.  Even then, the Court should require defendants (1) to attempt

11  to resolve the issue first with DHS by negotiating a waiver or some alternative method of

12  compliance, (2) to develop a plan to bring the facility into compliance with those licensing

13  provisions as soon as possible, and (3) to provide alternative methods of ensuring patient

14  safety.  For example, as this Court is well aware, in connection with the P-2 ICF expansion at

15  CMF, defendants initially argued that they could not keep the CMF unit open this summer

16  because licensing requirements are such that P-2 must be air conditioned during the summer

17  months at CMF.  After discussions between the parties, the Court and the Special Master, it

18  was decided that defendants could use some version of the heat plan currently used by CMF's

19  mainline CDCR mental health units to ensure patient safety in the P-2 Unit this summer.  Kahn

20  Dec. Ex. A (New Interim Bed Plan) at 21-22 (addressing heat issues at CMF).  In addition,

21  defendants now expect to be able to secure air conditioning for the unit by September 14, 2006.

22  Id. at 18.  This is a perfect example of how the Court's intervention can assist defendants in

23  addressing a licensing issue – but this kind of approach requires that defendants address each

24  specific barrier to licensing and attempt to remedy the underlying issue in some alternative

25  fashion.

26

27

28

**C.    Defendants' New Interim Bed Plan Does Not Eliminate The Shortage Of ICF Beds**

Defendants' New Interim Bed Plan, together with the new ICF beds ordered by the Court on May 2, 2006, will result in the creation of 142 new Level IV ICF beds at CMF and SVSP between now and mid-2007.  Unfortunately, according to the projections provided by defendants in connection with the April 17, 2006 Bed Plan, before the New Interim Bed Plan, there would have been a shortfall of 285 Level IV ICF beds in Fiscal Year 2007-2008.  Kahn Dec. ¶ 18 and Ex. G.  With the new beds, that shortfall will be reduced to 143 beds, but that is still a significant shortfall.  Defendants should be ordered to develop a plan that eliminates all of the unmet need for Level IV intermediate inpatient care beds.

## CONCLUSION

For all of the reasons set forth above, this Court should order defendants to implement the bed expansions set forth in the New Interim Bed Plan, but to address the significant shortcomings and gaps in the plan.  Specifically, the Court should order as follows:

1.    Defendants are ordered to implement the 30-bed P-3 intermediate care facility expansion at CMF before June 30, 2007 as provided in their June 15, 2006 Plan.  Defendants are also ordered to implement the 40 Bed D-5 and D-6 Intermediate Care Facility expansion before the December 31, 2006 deadline also set forth in the June 15, 2006 Plan.

2.    Defendants are ordered to provide the Court with a new Plan to address the additional 140-bed gap in interim ICF beds.  (Defendants' own figures indicate that such a gap will continue to exist even after all of the bed expansions in the June 15, 2006 Interim Bed Plan are implemented.)

3.    Defendants are ordered to develop and implement their plan to build a new 50-bed MHCB program at CMC.  Defendants are ordered to provide a schedule to the Court in the next 60 days to the Court for construction, licensing and staffing of the new CMC facility.  In addition, defendants shall provide a list of each specific licensing and staffing requirement that they are asking the Court to order waived in the interim period before this new facility is built in order to permit them to operate the existing CMC LOU as a 42-bed MHCB unit.  The list

provided by defendants shall include a reasonable timetable for coming into compliance with the licensing provisions that defendants will be able to meet over time, a list of those provisions can be met through alternative methods of compliance, and a list of those provisions which defendants believe must be waived by the Court's order. Defendants plan shall also explain whether they have obtained the clinical staffing augmentations deemed necessary in their May 12, 2006 Finance Letter to safely operate the LOU as an MHCB unit. Defendants shall fully staff the CMC MHCB Unit immediately.

4.     Defendants are ordered to develop and file with this Court and the *Plata* Court, by July 15, 2006, a plan for removing long-term medical care patients from MHCB beds and CTC beds that can be used as MHCB beds. In developing the Plan, defendants shall consider moving such patients to community facilities or to skilled nursing facilities. The plan shall include a detailed survey of the CDCR's existing MHCB and CTC beds and shall indicate how many MHCB beds and CTC beds at each facility are occupied by long-term care medical patients or are otherwise unavailable for use as MHCB beds.

5.     Defendants are ordered to file within 30 days a revised plan for opening the new 30 Bed P-3 ICF Unit at CMF which does not require the loss of 67 EOP Beds on M-3 wing at CMF. If other non-mental health units are not available in which to re-locate the EOP administrative segregation population from P-3, defendants must address this additional 67-bed shortage in their interim and long-term plans for addressing the ever expanding EOP bed shortage.

6.     The portion of defendants' plan which involves moving 25 CMF Acute Psychiatric Program beds to Atascadero State Hospital in exchange for 25 MHCB beds is rejected. Instead, defendants and the Department of Mental Health are hereby ordered, within 30-days, to develop a plan to assure that at least 22 of the 25 beds at ASH's MHCB Unit are used by CDCR patients in need of MHCB care at all times. The plan shall consider such options as direct control of admissions to the unit by CDCR clinicians.

7.     Defendants and DMH shall report to the Court concerning the availability of additional short term MHCB beds at ASH or CSH or other DMH facilities within 30 days.

-20-

8.    Defendants shall henceforth seek the permission of the *Plata* receiver to move forward with their plans to house MHCB patients in the 18 General Acute Care Hospital (GACH) beds at the California Institution for Men (CIM). Defendants shall report back to the Court concerning this issue within 30 days, and shall provide the Court with a specific list of the statutory, licensing, and/or statutory barriers to conversion of the CIM GACH unit into an MHCB unit that they are asking the Court to waive. The Special Master is directed to consult with the *Plata* receiver concerning this issue.

9.    Defendants are ordered immediately to fund the clinical staff positions necessary to open the new MHCB unit at the California Institute for Women on the schedule previously provided by defendants. See Enclosure 8 to Defendants 4/17/06 Bed Plan (indicating a target date for DHS licensing survey of August 15, 2006).

10.    If it is not submitted in connection with the revised long-term plan, defendants shall submit a plan on or before July 15, 2006 to accelerate construction of the pending MHCB projects at Ironwood State Prison, California Medical Facility, Kern Valley State Prison, CSP-Sacramento, San Quentin, and California Men's Colony.

The Order should also state that the Court has reviewed the records and files in this case, the evidence presented in connection with this motion and the annual suicide reports of the Special Master for 2004 and 2005, the hearings before this Court, and the evidence presented in connection with the 15th Monitoring Report of the Special Master and the other reports of the Special Master, and that the court finds that these orders are narrowly tailored, and constitute the least intrusive means necessary to secure constitutional mental health care and to reduce avoidable pain, suffering and suicides inside the CDCR. Plaintiffs have filed a proposed form of order along with these objections.

Respectfully submitted,

Thomas Nolan
Rosen, Bien & Asaro
Attorneys for Plaintiffs