1   PRISON LAW OFFICE
    DONALD SPECTER Bar No.: 83925
2   STEVEN FAMA Bar No.: 99641
    KEITH WATTLEY Bar No.: 203366
3   General Delivery
    San Quentin, California 94964
4   Telephone: (415) 457-9144

5   ROSEN, BIEN & ASARO, LLP
    MICHAEL W. BIEN Bar No.: 096891
6   JANE E. KAHN Bar No.: 112239
    THOMAS NOLAN Bar No.: 169692
7   155 Montgomery Street, 8th Floor
    San Francisco, California 94104
8   Telephone: (415) 433-6830

9   THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
10  CLAUDIA CENTER Bar No.: 158255
    LEWIS BOSSING Bar No.: 227402
11  600 Harrison Street, Suite 120
    San Francisco, CA 94107
12  Telephone: (415) 864-8848

13

14  Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

15              UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN,                          )  No.: Civ S 90-0520 LKK-JFM
                                            )
19          Plaintiffs,                     )  **DECLARATION OF JANE E. KAHN IN**
                                            )  **SUPPORT OF PLAINTIFFS'**
20  vs.                                     )  **OBJECTIONS TO DEFENDANTS'**
                                            )  **INTERIM INTERMEDIATE CARE**
21  ARNOLD SCHWARZENEGGER, et al.,          )  **FACILITY AND MENTAL HEALTH**
                                            )  **CRISIS BED PLAN, JUNE 2006**
22          Defendants                      )
                                            )
23  _____     )

24

25

26

27

28

I, Jane E. Kahn, hereby declare:

1.      I am an attorney admitted to practice law in California and an associate of the law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case. I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Plaintiffs' Objections to Defendants' Interim Care Facility and Mental Health Crisis Bed Plan, June 2006 ("Interim Plan").

2.      Defendants sent this Interim Plan to the plaintiffs and Special Master Keating on June 15, 2006, in response to the Court's May 1, 2006 Order. The May 1, 2006 Order stated that:

> Within forty-five days from the date of this order defendants shall file a plan for interim provision of intermediate inpatient beds and mental health crisis beds. Defendants shall include with said interim plan, as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan. 5/2/06 Order ¶ 4.

Because defendants did not file their plan with the Court, in spite of the direction in the May 2, 2006 Order that they do so, I have attached a true and correct copy of defendants' Interim Plan hereto as Exhibit A.

### Defendants' Testimony at the April 26-27, 2006 Hearing Regarding the Scope of the Shortage of ICF and MHCB Beds

3.      On April 17, 2006, defendants filed a Statewide Mental Health Bed Plan ("Defendants' Bed Plan") in response to the Court's March 3, 2006 Order. Plaintiffs filed objections to the plan on April 21, 2006, and the Court held hearings on the matter on April 26 and 27, 2006. During the hearing, a number of state officials provided sworn testimony in response to questions provided to the parties by the Court. Attached hereto as Exhibit B is a true and correct copy of the transcript of the hearing held on April 27, 2006. Dr. Farber-Szekrenyi testified that there is an immediate shortage of 75 mental health crisis beds and 125 intermediate inpatient beds. Ex. B, April 27, 2006 Transcript at 81:22-23. In discussing the shortages and the Bed Plan, Dr. Farber-Szekrenyi stated that, "assuming we do all that we committed to, this is 75 additional beds that we need as we see as the gap." Ex. B, April 27,

1  2006 Transcript at 82:11-12.  When Dr. Farber-Szekrenyi was asked whether the 125

2  Intermediate Care Facility (ICF) beds were in addition to what has been identified in the Bed

3  Plan, he replied: "That is correct.  The same way as the other one is identified, yes."  Ex. B,

4  April 27, 2006 Transcript at  83:3-7.

5      4.    As part of their April 17, 2006 Bed Plan, defendants filed Enclosure VIII, which

6  reflected the results of a survey of the number of MHCB beds available in each MHCB unit.

7  Enclosure VIII sets forth the specific number of MHCB beds at available each CDCR

8  institution.  The survey concluded that defendants currently have 164 MHCB beds available,

9  plus 25 MHCB beds at Atascadero State Hospital (ASH) and 20 MHCB beds at the California

10  Medical Facility (CMF) in the Acute Psychiatric Program (APP) unit.  Attached hereto as

11  Exhibit C is a true and correct copy of Enclosure VIII to defendants April 17, 2006 bed plan.

12  However, there is a serious flaw in the data set forth in Enclosure VIII -- the total count of

13  MHCB beds in each unit is not reduced to reflect those MHCB beds which are occupied by

14  long-term care patients.  This flaw exists in the chart despite common knowledge among

15  CDCR officials that MHCB beds are used for such patients.  During his testimony, Dr. Farber-

16  Szekrenyi was asked whether MHCB and Correctional Treatment Center (CTC) beds were

17  frequently occupied by long-term care patients and Dr. Farber-Szekrenyi replied: "That's

18  correct."  Ex. B, April 27, 2006 Transcript at 21:10-13.  Dr. Farber-Szekrenyi went on to

19  acknowledge that a significant number of the CDCR's MHCB beds are occupied for long

20  periods of time by medical patients whose needs are not acute, but rather chronic, and he

21  promised that "[t]he plan that we are coming up with addresses that issue.  That's one way

22  we're able to make those beds available".  Ex. B, April 27, 2006 at p. 21:25-22:1-8.  When

23  asked about specifics, Dr. Farber-Szekrenyi stated:

24          Well, if I would be able to discuss them with you right now, to tell you the
25          truth, then I would be much closer to answering the question because I haven't
            been able to do that with the process.  But I can tell you basically the issue, the
26          basis of the plans is moving out medical patients to more appropriate levels of
            care, making availability of licensed beds for the crisis patients' needs…
27

28

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INTERIM INTERMEDIATE CARE
FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006, NO.: CIV S 90-0520 LKK-JFM

1  Ex. B, April 27, 2006 Transcript at 20:20-25; 21:1-5. Dr. Farber-Szekrenyi was also asked

2  whether he had contracted with any community hospitals or nursing homes to move the

3  patients in order to free up MHCB beds. In response, he testified that : "We have several

4  hospitals we have had active dialogue with, and we're in the process of contractually working

5  with them, yes." Ex. B, April 27, 2006 Transcript at 22:4-6. Although he admitted that there

6  were no signed contracts as of yet, he did state that "we have a pretty good possibility of

7  placing some patients shortly, yes". Ex. B, April 27, 2006 Transcript at 22:11-12.

8       5.     On June 8, 2006, Michael Bien and I met with Special Master Keating, Lisa A.

9  Tillman, CDCR Staff Attorney Michael Stone, CDCR Manager Doug McKeever, and

10  representatives from Department of Mental Health ("DMH") to discuss defendants' proposal to

11  swap the twenty-five (25) MHCBs at Atascadero State Hospital with twenty-five (25) acute

12  care beds at DMH-Vacaville. This is one of the proposals for "increasing" MHCB beds

13  presented in their Defendants' New Interim Bed Plan. Ex. A at 3. During the discussion of

14  this plan, Michael Bien expressed his concern over the admission process for the APP beds at

15  ASH which permits the ASH clinician to reject a patient referred from the APP program at

16  CMF. Furthermore, the draft plan provided for a separate admissions form for ASH which the

17  DMH representative stated was a longer form. Plaintiffs were concerned that this longer form

18  would discourage referrals to the acute program at ASH. At the conclusion of this meeting, the

19  parties discussed the Interim Plan and I asked defendants whether their plan would address the

20  use of MHCB beds for long-term care patients – a problem identified during the hearing and in

21  recent *Coleman* monitoring tours. At least one of defendants' attorneys has been present on

22  each of the *Coleman* monitoring phone exits in which the use of MHCB beds to house long-

23  term care patients has been reported. Mr. McKeever replied that he was unaware of the use of

24  MHCB beds for long-term care patients. Lisa Tillman said that she was unable to respond to

25  plaintiffs' concerns. Ms. Tillman was present during Dr. Faber-Szekrenyi's testimony on April

26  27, 2006, when he reported to the Court that the Interim Plan would address the use of MHCB

27  beds by long-term care patients.

28

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INTERIM INTERMEDIATE CARE
FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006, NO.: CIV S 90-0520 LKK-JFM

1          17th Round Monitoring Tour Exit Reports

2          on MHCB Bed Use for Long-term Care Patients

3          6.      At the conclusion of each monitoring tour conducted by the *Coleman* experts, a

4   preliminary phone exit conference call is held.  During this exit, the experts provide an over-

5   view of the institution's status on various issues, including medication management, access to

6   DMH and MHCB beds, quality assurance, mental health care in administrative segregation and

7   suicide watch.  The exits participants generally include representatives from CDCR central

8   office, the Special Master's team, plaintiffs' counsel and defendants' counsel.  The phone calls

9   are taped by CDCR staff and plaintiffs' counsel.  The experts generally start each call with the

10  caveat that the exit reports are preliminary in nature and might be revised after the tour based

11  on written documentation collect during the tour.

12         7.      On May 5, 2006, there was a phone exit held at the conclusion of a three and a

13  half-day monitoring tour of CSP-Lancaster by the *Coleman* experts, Dr. Jeffrey Metzner, Dr.

14  Melissa Warren, Dr. Ted Ruggles, and Patricia Williams.  Present on this phone exit were

15  Katie Riley, CDCR Staff Attorney, Dr. Fishback, Chief of Mental Health, Division of Health

16  Care Services, myself and other CDCR central office staff.  The experts reported that there

17  were approximately 4,520 inmates housed at the prison, with 34% (1,543) of them on the

18  mental health caseload.  According to the experts, although the prison has 12 MHCB beds,

19  only five of them are available for crisis care because the remaining seven are occupied by

20  long-term care patients.  Compare Exhibit C hereto (defendants' survey of MHCB beds filed

21  with the court on April 17, 2006 inaccurately reports that LAC has 12 "current" MHCB beds,

22  seven more than were actually available at the time of the May 5, 2006 exit).

23         8.      On June 6, 2006, there was a phone exit held at the conclusion of a three day

24  monitoring tour at Salinas Valley State Prison by *Coleman* experts Dr. Jeffrey Metzner, Dr.

25  Melissa Warren, Paul Nicoll and Mohammedu Jones.  Present on this phone exit were Special

26  Master Keating, Deputy Master Lopes, Lisa Tillman, Michael Stone, CDCR Staff counsel,

27  myself and various central office staff.  The experts reported that there were approximately

28  3944 inmates housed at the prison, with 38% (1,493) of them on the mental health caseload.

The prison was reported to have a total of 12 MHCB beds, but only five or six of them were available for psychiatric patients because the remainder were occupied by long-term care patients. Compare Exhibit C hereto (defendants' survey of available MHCB beds filed with the court in April 2006 inaccurately reported that SVSP had 10 "current MHCBs," five more than the number actually available, according to the exit report). SVSP's Chief Medical Officer, Dr. Lee, reported during the exit that several months earlier the institution was directed by the Health Care Placement Unit in Sacramento to place long-term medical patients in the MHCBs. The *Coleman* experts reported that as a result of the lack of MHCBs, psychiatric patients were placed in holding tanks on suicide precautions. Between January 1, 2006 and April 30, 2006, 143 patients were admitted to holding tanks because mental health crisis beds were unavailable at SVSP. The lengths of stay in these holding tanks ranged from one day to seven days. The holding tanks did not have bathrooms and were not clinically staffed.

9. On June 2, 2006, Coleman experts Dr. Ruggles and Mohammadu Jones held a phone exit at the conclusion of a three day monitoring tour at Wasco State Prison. Present on this phone exit were Paul Nicoll, Tom Nolan, CDCR central office staff and one of defendants' attorneys. The experts reported that there were approximately 6,157 inmates housed at the prison, with 26% (1,608) of them on the mental health caseload. According to the experts, although Wasco's Correctional Treatment Center has 16 licensed beds, access to these beds was consistently impacted by the need to house long-term nursing care patients in them. At the time of the monitoring visit, six of the MHCB beds were occupied by medical patients who had been in the beds for lengths of stay ranging from 30 to 471 days. As a result of this shortage, Wasco has resorted to using alternative sites for housing their mental health inmates waiting for a crisis bed placement. These sites included five short-term areas which do not have toilets, and three longer term areas that have toilets, where patients are often housed for up to 24 hours. Mental health patients are rotated in and out of these alternative sites until an MHCB beds is available in the CTC.

10.    Defendants' Interim Plan fails to address the use of valuable MHCB beds by long-term care medical patients, despite assurances by Dr. Faber-Szekrenyi on April 27, 2006 that the Interim Plan would address this problem.  Furthermore, plaintiffs' counsel raised this concern with defendants on June 8, 2006, to ensure that this serious problem would be addressed by defendants in their New Interim Bed Plan.  The number of MHCB beds occupied by long-term care patients at just three prisons (Lancaster, Salinas Valley State Prison and Wasco) is greater than the 16 MHCB beds that the Interim Plan proposes to add at CIM. However, when discussing the proposed expansion at CIM, the New Interim Bed Plan notes that it is *"predicated upon approval by the Plata Receiver, given the reduction of 18 medical beds at CIM"*.  New Interim Bed Plan at 14.  Defendants should attempt to contract with community hospitals for sub-acute or nursing home beds to house these long-term care patients currently occupying MHCB beds.  Defendants' Interim Plan ignores this option and the reality of unavailable MHCB beds in the field.

11.    On May 5, 2006, there was a phone exit held to report the results of a two day monitoring visit by Dr. Kerry Hughes, Dr. Melissa Warren and Patricia Williams, which occurred on April 27 and 28, 2006 at California Institute for Women ("CIW").  Present on this phone exit were Special Master Keating, Deputy Special Master Lopes, Michael Stone, myself, and various CDCR central office staff.  The experts reported on the status of the new CTC, which will have ten MHCBs.  CIW currently has an Outpatient Housing Unit ("OHU") that was described by the *Coleman* experts as inadequately staffed and unsafe for mental health patients.  The completion of the CTC has been delayed during the last few years, but it was reported during the exit that licensing should be approved in August 2006.  See also Exhibit C (CDCR MHCB survey) (comment section under CIW beds indicates "Target date for DHS licensing survey is 08/16/06.").  Unfortunately, during the April 2006 monitoring visit it was discovered that no mental health staffing package was ever submitted for the new MHCB beds in the CTC -- the original CIW MHCB staffing package that had been submitted in 2003 did not include mental health positions.  As a result, the CTC, which is scheduled to open in August 2006, will not have any clinical staffing for its MHCB beds.  During the phone exit, the

1 experts and Special Master Keating requested additional information about the status of any

2 supplemental staffing requests submitted after it was discovered that no clinical staffing had

3 ever been requested. I have reviewed the May Revise documents for clinical staffing and

4 capital outlay, including several *Coleman* Finance Letters and attachments that were provided

5 to Special Master Keating and plaintiffs on May 18 and May 22, 2006. These documents do

6 not include any requests for clinical staffing for the MHCB beds at CIW. The Interim Plan

7 does not address the mental health staffing needed for this new MHCB unit.

8         12.    Defendants' June 15, 2006 New Interim Bed Plan provides for an additional 16

9 MHCB beds at California Institution for Men ("CIM"), which defendants contend will increase

10 CIM's MHCB capacity to a total of 34 beds. However, the New Interim Bed Plan notes that

11 the average daily census for patients requiring MHCB care at CIM has been 36 for at least four

12 or five months, even though the current allocation of CIM MHCB beds is only 18 beds. On

13 May 17, 2006, there was a phone exit at the conclusion of a two-and-a-half day monitoring

14 tour of CIM by *Coleman* experts Dr. Metzner, Dr. Warren and Patricia Williams. Also present

15 on the phone exit were Special Master Keating, *Coleman* monitor Paul Nicoll, John Dovey,

16 Director of Division of Adult Institutions, Lisa Tillman, Michael Stone, Katie Riley, myself

17 and various CDCR central office staff. The *Coleman* experts reported that the CIM MHCB is

18 licensed and staffed for 18 beds, but that it is regularly occupied by at least 30 patients and is

19 not adequately staffed for the extra beds. During the tour, the *Coleman* experts had been

20 informed that CIM would be allocated twelve more MHCB beds, along with a staffing

21 package. The experts noted, however, that these additional beds will not functionally improve

22 the current system-wide MHCB shortage since CIM is already housing at least that many extra

23 MHCB patients in its General Acute Care Hospital. Furthermore, the Interim Plan provides

24 that prior to designating these additional MHCB beds, the *Plata* Receiver must approve the

25 plan because it will result in the reduction of 18 medical beds at CIM. Defendants request that

26 the Court suspend state licensing requirements so that they may immediately designate the

27 beds currently utilized as MHCB beds as official MHCB beds. Defendants do not, however,

28 identify the licensing requirements they seek to suspend, as required by the Court's order.

7

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INTERIM INTERMEDIATE CARE
FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006, NO.: CIV S 90-0520 LKK-JFM

13. Based upon the CSP-Lancaster, Salinas Valley State Prison and Wasco 17th round monitoring exits, there are at least 19 MHCB beds occupied by long-term care medical patients. This type of information is not always reported in monitoring phone exits particularly if only a few beds at prison are utilized by a long-term care patient, so there are likely to be more MHCB beds occupied system-wide by long-term care patients.

14. On June 9, 2006, defendants provided Special Master Keating and plaintiffs' counsel with the monthly report on MHCB beds. Attached hereto as Exhibit D is a true and correct copy of defendants' June 8, 2006 Monthly MHCB Report, summarizing MHCB referrals and transfers for the month of April 2006. Of the 291 inmates referred to a mental health crisis bed in April 2006, only 27 inmates were placed. Ex. D at Summary Chart. In other words, 91% of the inmates referred for MHCB placement at another institution during April 2006 could not be placed – a total of 264 individuals. This monthly report of MHCB referrals understates the true extend of the unmet demand for MHCB beds for two reasons: First, it does not include internal MHCB referrals which could not be placed. Second, it does not account for those inmates who were not referred at all because their discouraged clinicians knew that the MHCB units were full.

15. On May 18, 2006, Lisa Tillman provided Special Master Keating and plaintiffs' counsel with a copy of a May Revise FY 2006/07 budget document regarding the conversion of the LOU OHU at CMC to an MHCB. Attached hereto as Exhibit E is a true and correct copy of the email from Lisa Tillman attaching several of the May Revise FY 2006-2007 Budget Letters, including one concerning conversion of the CMC LOU to an MHCB. This document identifies additional staffing required to accomplish the conversion, including "nursing staff to monitor and observe inmates because of their high risk for suicide," custody staff "to escort these inmates because they are prone to self-mutilation or attacking other inmates and/or staff." The document also identified office support needs, maintenance work, and facility modifications. There is no timetable provided for the renovations.

16. Under my supervision, paralegals in our firm track all CDCR suicides in a database. We add the name of each inmate who commits suicide, and other key data relevant

8

1  to the suicide to the database when we receive suicide notifications and suicide reports from

2  defendants. We also cross-check our database against the Special Master's and defendants'

3  annual suicide reports, and make adjustments to our tracking data where necessary. According

4  to our current tracking log, which does not count several deaths whose cause is currently

5  reported as unclear (cases which may upon further review turn out to be suicides), in the first

6  six months of 2006, there have been 25 suicides in the CDCR, which would annualize to a rate

7  of 50 suicides a year if the rate continues at the current level for the second half of the year. In

8  2004, there were 26 suicides in the CDCR during the entire year. Special Master's Report on

9  Suicides Completed in the California Department of Corrections in Calendar Year 2004, filed

10 May 9, 2006. In 2005, plaintiffs counted 41 suicides in the CDCR, a rate which is more than

11 twice the national average for prisons and which was the highest number of suicides ever in the

12 CDCR. The Special Master has not yet filed a report on the suicides completed in the CDCR

13 in 2005.

14    17.    The CDCR is becoming increasingly overcrowded, and according to Governor

15 Schwarzenegger, the problem is now reaching crisis proportions. Attached hereto as Exhibit F

16 is a true and correct copy of a the CDCR's Weekly Population Report dated June 19, 2006.

17 The report shows that as of midnight on June 14, 2006, the population of the CDCR was

18 171,527, up 8,064 during the last year. Also attached hereto as part of Exhibit F is a true and

19 correct copy of a news article which appeared in the San Francisco Chronicle on Tuesday June

20 27, 2006 and which quotes the Governor discussing the issue of prison overcrowding.

21    18.    Attached hereto as Exhibit G is a true and correct copy of a chart entitled

22 "Closing the GAP" that was filed by defendants as Enclosure II to their April 17, 2006 Bed

23 Plan. The Chart projects bed need for various categories out over the next five years. The

24 chart shows a current shortage of APP beds of 141 beds. The existing APP admissions process

25 at CMF involves an elaborate process of daily utilization management meetings involving

26 CMF and DMH staff in an effort to maximize the use of the scarce APP beds and to identify

27 which inmate-patients waiting for transfer to the APP program should be given priority for

28 admission into the program. This process was the result of many years of monitoring the

1    admissions process by the Special Master and plaintiffs' counsel.  There are still unacceptable

2    delays in transferring inmates into the APP program.  However, plaintiffs are concerned that

3    the exchange of 20 APP beds with Atascadero State Hospital will interfere with this

4    established, albeit imperfect process.

5          19.    On June 26, 2006, defendants wrote to Special Master Keating asking for

6    specific waivers of state licensing requirements in connection with the KVSP Mental Health

7    Crisis Bed Program.  Unlike defendants' New Interim Bed Plan, the letter at least identified

8    specific licensing barriers that defendants are asking the Court to waive.  However, the letter

9    does not explain why the specific licensing requirements cannot be met, or explain whether the

10   CDCR has considered alternative methods of compliance with the relevant provision, or

11   whether compliance could be achieved over a longer time period.

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' INTERIM INTERMEDIATE CARE
FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006, NO.: CIV S 90-0520 LKK-JFM

1    I declare, under penalty of perjury, that the foregoing is true and correct, and that this

2    declaration is executed in San Francisco, California on June 22, 2006.

3                                           Respectfully submitted,

4

5                                           Jane E. Kahn
                                            Rosen, Bien & Asaro
6                                           Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28