**EXHIBIT B**

Apr27-06.txt

1

```
 1              SACRAMENTO, CALIFORNIA

 2         THURSDAY, APRIL 27TH, 2006 - 9:15 A.M.

 3                   ---oOo---

 4         THE CLERK:  All rise.

 5         Court is in session.

 6         The Honorable Lawrence K. Karlton is presiding.

 7         THE COURT:  Please, be seated.

 8         Good morning, Ladies and Gentlemen.

 9         Folks, I would like to recall each of the witnesses

10    very briefly for a couple of questions which occurred to me

11    last night.

12         Mr. McKeever, will you retake the stand, sir.  I

13    promise you, I won't keep you up there very long.

14         WITNESS MCKEEVER:  Okay, Your Honor.

15         (Doug McKeever, having been previously sworn, resumes

16         the witness stand.)

17                   EXAMINATION BY THE COURT

18    BY THE COURT:

19    Q.    Mr. McKeever, I understood the testimony to be that

20    there is some budget revision opportunity in May, that is you

21    can get supplements if you get your request in by May; is

22    that right or wrong?

23         Do I not understand?

24    A.    My understanding is that there is what is called the

25    May Revise Process.
```

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2

1    Q.      And do you know when it would be necessary to
2    submit -- I gather the way you do that is you start by
3    submitting to the Department of Finance?
4    A.      That be the first step.  Yes, Your Honor.
5    Q.      And do you know how long -- what am I trying to
6    ask -- when you would have to have the revision in to be
7    effective?
8    A.      I don't know the exact date, but I do believe it is
9    coming up within the next few days, weeks.
10          We do have a representative here from the Department
11   of Finance that can probably address that question.
12          THE COURT:  Thank you very much.
13          Do my questions require further inquiry?
14          MS. TILLMAN:  No.
15          THE COURT:  You may step down, sir.
16          Somebody from the Department of Finance, just --
17   Don't be sworn, just tell me.  Just tell me.
18          MS. MANGUM:  The May Revise is released -- is to be
19   released on May 12.  We're still in the process of that.
20          THE COURT:  I'm sorry, ma'am.  You'll have to come to
21   the microphone.  I cannot hear you.
22          MS. TILLMAN:  Do you want her to appear at the
23   podium, Your Honor?
24          THE COURT:  Will you state your name, ma'am?
25          MS. MANGUM:  Sarah Mangum, M-a-n-g-u-m.

Page 2

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3

1        THE COURT:  You're from the Department.

2        MS. MANGUM:  Department of Finance.

3        The May Revise is released on May 12.  We are

4    currently in the process of reviewing it.  We did already

5    receive most May Revise Proposals for the Department of

6    Corrections to review.  However, we would consider, you know,

7    working with them to put forward any proposal that's

8    available.

9        THE COURT:  What is the last date that they could get

10    information or a request to you that could possibly be

11    revised?

12        MS. MANGUM:  I would have to speak with my management

13    to find out the last date, but I believe it would be in the

14    next week or so.

15        THE COURT:  All right.

16        So that what would be required is an order from the

17    Court -- if it is beyond that date, an order of the Court to

18    at least consider it and process it.

19        MS. MANGUM:  I don't believe an order of the Court

20    would be required.  It may be required for us to pursue it

21    with the Legislature through a different vehicle than the

22    budget.

23        THE COURT:  Okay.  Thank you, ma'am.

Apr27-06.txt

24          Mr. Sifuentes, can I ask you to come back again for

25     just a moment.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                    (916) 446-6360

⬚

                                                                    4

1          WITNESS SIFUENTES:  Sure.

2          (George Sifuentes, having been previously sworn,

3          resumes the witness stand.)

4                    EXAMINATION BY THE COURT

5     BY THE COURT:

6     Q.    Mr. Sifuentes, you're going to have to forgive me.  I

7     don't have the documents in front of me, and I'm easily

8     confused at this point.

9          As I understand it, you are in the process of

10    developing beds for Level IV inmates in Folsom; is that

11    correct?

12    A.    No, not at Sacramento.

13         The proposals we have for Level IV, ICF inmates,

14    would be the proposals right now we have is to modify P-2 at

15    CMF, and to modify and add additional beds over at Salinas

16    Valley State Prison.

17    Q.    Okay.  Not at Folsom.  There is something going on at

18    Folsom?

19    A.    There is a project going on at Folsom.  It is Sac. --

20    it is called the Sac. EOP Program.

                          Page 4

Apr27-06.txt

21          In addition to that, they are adding a Correctional

22    Treatment Center which is going to provide some mental health

23    crisis beds.

24    Q.      When will that -- when is it projected that will be

25    accomplished?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

5

1     A.      My understanding is that that project will be done by

2     June 30th.

3               MS. TILLMAN:  Your Honor, if I might interject, which

4     project?

5               WITNESS SIFUENTES:  The CSP-Sacramento.

6               MS. TILLMAN:  EOP?  EOP?

7               WITNESS SIFUENTES:  Yes.

8     BY THE COURT:

9     Q.      You indicated there are beds going in at Salinas

10    right now for Level IV treatment cells, if you will; is that

11    right?

12    A.      That's correct.  We just completed renovation for 36

13    cells.

14    Q.      And you're planning what?

15    A.      At Salinas?

16    Q.      Yeah.

17    A.      Two projects at Salinas.  Number one is a 64 bed ICF,

18    which is in addition to the 64 bed facility that's there.

Page 5

Apr27-06.txt

19    That's one project.

20    Q.    When is that going to be done?

21    A.    The schedule, I believe, calls for it to be done in

22    2009.

23    Q.    Okay.

24    A.    And that's in the plan.

25          The second part of Salinas Valley had to do with

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

6

1    converting some existing housing units that we have there at

2    Salinas and making them available for ICF.  Unfortunately,

3    those can take as long to get done.

4          I mentioned yesterday that we did the 36 beds, and

5    then we had a proposal in the governor's budget to come back

6    and make those code compliant, as well as some other ones.

7    Q.    If the Court ordered the state to expand the number

8    of units that you just put in, double them, you know, with

9    the same waiver provisions and going back later to get them

10   code compliant, how long would that take?

11   A.    Well, the 36 beds at Salinas Valley took seven

12   months.  So I would have to -- assuming it's the same

13   requirements, the buildings would be the same, I would tell

14   you seven to eight months.

15   Q.    All right.

Page 6

Apr27-06.txt

16          Talk to me about Corcoran.  Assume that the Court

17    were to order Corcoran to accept Title IV, dangerous --

18    whatever we call them, high level, you know.

19    A.      High-custody.

20    Q.      Thank you.  High level inmates.  It would require, as

21    I understand from Mr. Rodriguez's testimony, a major change

22    in the physical plant because he says that they're all open

23    dormitories today.

24          A; is that correct?

25          MS. TILLMAN:  Your Honor, if I might clarify, are we

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

7

1    discussing Coalinga State Hospital?

2          THE COURT:  What did I say?

3          WITNESS SIFUENTES:  Corcoran.

4          THE COURT:  I meant Coalinga.

5          MS. TILLMAN:  That's Coalinga, high-custody Level IV?

6    BY THE COURT:

7    Q.      Assume that I would do that.  I'm not going to say

8    I'm going to do any of these things.  I'm trying to

9    understand what my options are.

10          Are you familiar with Coalinga?

11    A.      No.  That project was designed and built by the State

12    Department of General Services for the Department of Mental

13    Health, and I believe they did the feasibility study that was

Page 7

Apr27-06.txt

14    referenced.

15    Q.      I want you to assume -- I don't know it so, but I

16    want you to assume that the present physical condition of

17    Coalinga is such that it's open dormitories, open rooms,

18    people wandering around the place, et cetera, and I ordered X

19    number of -- let's just put a number on it just to get some

20    sense of where we're going -- 30 Level IV, high-custody

21    prisoners to be housed there.

22          How long would it take to convert whatever there is

23    there, if you know, if you can even reasonably estimate?

24    A.      I couldn't, Your Honor.  I couldn't do that.  I am

25    not familiar at all with Coalinga.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

8

1          THE COURT:  Fair enough.  If you can't, you can't.

2          Okay.  I think that answers the question.

3          Thank you, sir.  Will you step down.

4          WITNESS SIFUENTES:  Sure.

5          THE COURT:  Mr. Rodriguez, may I ask you to take the

6    stand again, sir.  Again, it will be very brief.

7          I'm sorry.  Before I do that, did my questions

8    require further questions by counsel?

9          No?

10         No?

Page 8

Apr27-06.txt

11    MS. TILLMAN:  No, thank you.

12         (John Rodriguez, having been previously sworn,

13         resumes the witness stand.)

14                    EXAMINATION BY THE COURT

15    BY THE COURT:

16    Q.    All right.

17         Mr. Rodriguez, will you please again list for me all

18    of the conditions which in your view contra-indicate the

19    placement of high-custody Level IV prisoners at Coalinga?

20    A.    I presume you're asking in terms of the individuals,

21    as well as the facility?

22    Q.    Yeah.

23    A.    I think you noted most of them in terms of its open

24    nature, the construction is built is to hospital standards as

25    opposed to correctional standards, and, you know, the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

9

1    perimeter walls are cylinder block, yada, yada, yada, and the

2    interior walls are, you know, covered with plaster and things

3    like that.

4         And then open access, you can go anywhere you want

5    throughout the building.  Treatment staff space is not on

6    their units generally, although there are rooms for

7    treatment, mostly off unit stuff.

8         Then in terms of the individuals, the high-custody,
                         Page 9

Apr27-06.txt

9  as I understand it, are people who are very dangerous in

10  terms of assaults, escape risks.  There could be other

11  problems with respect to problems they have with other

12  inmates.  As I understand it, those kinds of things.

13  Q.      You know, I understand you're not an architect.  If

14  your answer is "Don't ask me, Judge," I understand it

15  perfectly.

16          Does the configuration of Coalinga lend itself, if

17  necessary, to reconstruction of a wing or a section so that

18  assuming that we had the money, assuming we had the time, all

19  the rest, it would be feasible to create within Coalinga, so

20  to speak, a Level IV wing or section or something?

21  A.      Generally, yes.  And I'm not sure it's an architect

22  question, but if you are doing an aerial view of it, the

23  administration buildings are at the front of the hospital,

24  and you have a walkway into a central area where all the

25  central program services are.  This is where, like, treatment

☐

1  stuff is, the central medical services, the gymnasium, the

2  cafeteria, the barber shop, the chapel, things like that.

3  And it's a big open mall-type area where people can

4  congregate, get a lot of just mingling and things like that.

5          Then off this central area you have four major, I

Apr27-06.txt

6     would call them, pods, if you will.  And that, I think, would

7     be relevant to your question.  Somehow could you block off,

8     tear down, and completely separate that part of the

9     hospital.

10    Q.     A part.

11    A.     Pardon me?

12           A part.  It would involve, though, probably a couple

13    hundred of our beds.  Because it is not pods of 50, it is --

14    You see what I'm saying?  Was that good enough?

15    Q.     It's more than good enough.

16           What I hear you saying, and tell me whether or not

17    I'm hearing you right, is we could take a pod, but that in

18    your view it would be difficult to divide the pod, let's say

19    just stealing 50 beds, with the attendant requirements for

20    treatment and feeding in that pod and custodial personnel.

21           That's probably very, very difficult to do you think?

22    A.     That would be my judgment, sir.

23           THE COURT:  All right.

24           My questions invite questions of counsel?

25           Mr. Bien?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

11

1                        CROSS-EXAMINATION

2     BY MR. BIEN:

3     Q.     Mr. Rodriguez, right now the facility is built and

Apr27-06.txt

4    designed for 1500 beds?

5    A.    Yes.

6    Q.    Right.  And is it correct that you have, what, less

7    than 300 patients?

8    A.    A little less than 300.

9    Q.    So there is a lot of empty space there?

10   A.    In terms of the housing, yes, not in terms of the

11   central program services.

12         THE COURT:  Right.  Thank you, Mr. Bien.  That's

13   helpful.

14         Ma'am?

15                    CROSS-EXAMINATION

16   BY MS. TILLMAN:

17   Q.    Good morning, Mr. Rodriguez.

18   A.    Good morning.

19   Q.    Have you represented any ability of the Department of

20   Mental Health to admit high-custody Level IV inmates into

21   Coalinga State Hospital?

22   A.    No, I never have.

23         MS. TILLMAN:  Thank you.

24         THE COURT:  I don't know what your question was,

25   ma'am.  My apologies.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

12

Apr27-06.txt

1          MS. TILLMAN:  I'm sorry.  The question was whether

2     Mr. Rodriguez had ever represented the ability of Coalinga

3     State Hospital to admit Level IV, high-custody inmates.

4          THE COURT:  One of the impediments is the MOU, but

5     that's easily solved.  I'll just abrogate it.  We have a

6     crisis.  I'm not saying I'm going to do that.  I assure you I

7     don't know what I'm going to do.  But we have a crisis we

8     have to meet somehow.  It's the State's responsibility.

9          Thank you, sir.  You may step down.

10         WITNESS RODRIGUEZ:  You're welcome.

11         THE COURT:  Call your next witness, ma'am.

12         Hang on a second.  You know what, before you do that,

13    Michael, can I ask you to come here.

14         (Court confers with the Special Master off the

15          record.)

16         THE COURT:  Call your next witness, ma'am.

17         MS. TILLMAN:  Your Honor, returning to the list of

18    questions posed by the Court, looking at page 3, Interim

19    Solutions for Mental Health Crisis Beds, we'd like to call

20    Doctor Peter Szekrenyi.

21              PETER FARBER-SZEKRENYI,

22    was thereupon called as a witness herein by the Defendants,

23    and having been sworn to tell the truth, the whole truth and

24    nothing but the truth, was thereupon examined and testified

25    as follows:

Apr27-06.txt

1           THE CLERK:  Take a seat, state your name, spell your

2    last name and speak directly into the microphone.

3           THE WITNESS:  Okay.  My name is Dr. Peter

4    Farber-Szekrenyi, F-a-r-b-e-r, dash, S-z-e-k-r-e-n-y-i.  And

5    I am the Director of the Correctional Health Care Services

6    and also the point person for Governor Schwarzenegger in all

7    health care matters relating to Corrections.

8                          DIRECT EXAMINATION

9    BY MS. TILLMAN:

10   Q.      Dr. Szekrenyi, good morning.

11   A.      Good morning.

12   Q.      How long have you served in your position?

13   A.      Since December 1.

14   Q.      When you say you are the point person for the

15   Governor, are you indicating that you are appointed to your

16   position by the Governor?

17   A.      Yes, I am appointed to my position.  Also in the

18   Plata court matter there was requested a point person to be

19   appointed and I was appointed by the Governor to represent

20   him in the Governor's Office relating to health care matters.

21   Q.      Have you previously served in any position within the

22   California Department of Corrections and Rehabilitation?

23   A.      No, I have not.

24   Q.      Can you give the Court a very short statement of your

25   background and experience in health care administration?

Apr27-06.txt
CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

14

1      Yes.  I've been in health care for about 35 years, 30

2    years out of that at CEO positions for organizations with

3    anywhere from 2 million to 2.5 billion dollar companies that

4    managed health care enterprises of a size equal to this or

5    even larger.

6    Q.      You are familiar with some of the issues then that

7    come up in the course of this hearing regarding the bed

8    plans; is that correct?

9    A.      Yes, I am.

10   Q.      When we look at the question posed by the Court,

11   "what is the time frame for deciding which solutions will be

12   implemented to address the mental health crisis bed issue and

13   when will they implemented," do you have a response?

14   A.      Yes, I do.  I have a response.

15        In our Bed Plan, which we filed with the Court, we

16   mentioned in there on page, I believe, 10, the several

17   alternatives we are reviewing for short-term, if you will,

18   responses to our crisis needs.

19        In addition to that, we have identified in the last

20   couple of days another four or five additional plans that

21   we'd like to pursue.

22        If we are looking, for example, in the short-term

23   strategies for crisis beds, we have a 75 bed need.  We have

24   identified approximately 112 beds that could be utilized.

25        In the area of the ICF bed needs, we identified 125

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

15

1    need.  We came up with approximately 147 beds.

2         What we are asking the Court for is a 60-day time

3    period to make sure we can get these through the system and

4    come up with concrete plans of action within that 60 days,

5    how will we accomplish this task, and what impediments we

6    encounter which the Court then can decide to assist us with

7    in order to achieve it within a short time frame that I think

8    it is feasible.

9         THE COURT:  Doctor, I understand you need 60 days.

10    Can you do it in 30?

11         THE WITNESS:  I will do whatever the Court requires

12    me to do.

13         THE COURT:  I appreciate that, sir.  But what I'm

14    trying to do -- I want to put this on a very short fuse, but

15    I don't want to make it impossible.

16         THE WITNESS:  The 60 days is what I would be

17    comfortable we can do it at.  I will certainly do my best

18    with 30, but if you give me 45 -- not trying to split the

19    numbers -- but you give me 45, I think I'll be able do that

20    if you can give me that latitude.

21         THE COURT:  All right.

22         MS. TILLMAN:  Your Honor, if I might just skip

23    Question No. 2 for a moment and look at Question No. 3 which

24    asks about "Obstacles related to licensing requirements

Page 16

Apr27-06.txt
25    resulting from the State Court decision in Budd," if I might

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

16

1    suggest, Your Honor, that we discuss that further once we

2    actually have these plans presented to the Court and perhaps

3    use it as a topic of discussion at the June 8th hearing, that

4    might be valuable.

5        THE COURT:  All right.

6        I'm perfectly happy to do that.  That makes sense to

7    me.  I just want to remind everyone that when push comes to

8    shove, the State's licensing provisions must be subordinated

9    to the Constitution.

10       I certainly don't want to do that.  I understand that

11   the licensing provisions are valuable standards to ensure the

12   well-being of the patients.  But we're in a desperate

13   situation, and we all ought to recognize that.

14       THE WITNESS:  Your Honor, just a couple of things

15   maybe in terms of giving you some sense of urgency on our

16   part.

17       We have already met with Licensing several times.

18   And I find Licensing to be very supportive and helpful in our

19   need.  And I think they will obey the consequences of some

20   action now versus some requirements they have, which are

21   perfectly legal and right to do so, but in the interest of

22   the crisis that we're in, I think they are more than willing

Apr27-06.txt

23    to take that into account.  So I feel comfortable working

24    with them.

25            Also you need to understand, I come from the private

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

17

1    sector where patient care is predominate.  That's what I am

2    here for.  So I can assure you the patient care is going to

3    come before anything else.

4            THE COURT:  You may proceed, ma'am.

5            MS. TILLMAN:  I have nothing further of this witness.

6            Thank you.

7            THE COURT:  Mr. Bien.

8                         CROSS-EXAMINATION

9    BY MR. BIEN:

10    Q.      Good morning, Doctor.

11    A.      Good morning.

12    Q.      When you came on board, you were informed, were you

13    not, that the Department of Corrections has hundreds of

14    patients who are referred for crisis bed care each month who

15    are not receiving that care?

16    A.      Yes, I'm aware of that.

17    Q.      Okay.  And is it not correct that's the case today?

18    A.      Unfortunately, yes, it is.

19    Q.      Okay.  And you were informed that that has been the

Apr27-06.txt
20    case at least since the summer of 2004?

21    A.      I'm not sure of the date.  Probably prior to my time,

22    but that has absolutely been the case, yes.  More longer than

23    it should be, yes.

24    Q.      And is it not also the case, Doctor, that the

25    Department has had to come with a plan for each prison to


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

▯


18

1    determine which cells are to be used when crisis beds are not

2    available?

3             THE COURT:  Do you understand the question?

4             THE WITNESS:  No, I don't.  Do you mind repeating.

5    BY MR. BIEN:

6    Q.      Are you aware that last summer, the summer of 2005,

7    before you came, but that as a result of pressure from the

8    Coleman Case, from this case, Mr. W issued a memo requiring

9    each warden and health care administrator to develop a plan

10    in light of the crisis of shortage of MHCB beds?

11    A.      No, I'm not aware of that.  No.

12    Q.      Can I show you this document?

13    A.      Sure.

14    Q.      This is --

15             THE COURT:  You want to have it marked?

16             MS. KAHN:  It's an exhibit to the declaration.

17             THE COURT:  It's exhibit what?
Page 19

Apr27-06.txt

18          MR. BIEN:  It's Exhibit K to Jane Kahn's declaration.

19          THE COURT:  All right.  That's fine then.

20          THE WITNESS:  Any specific paragraph you want me to

21     look at or --

22          THE COURT:  Let me start by saying have you ever seen

23     this document before?

24          THE WITNESS:  No, I have not.

25          THE COURT:  What's the point of asking him things


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

                                                              19

1      about it?

2      BY MR. BIEN:

3      Q.      As part of your job, have you made sure that each

4      prison has a plan to address what happens with inmates who

5      are referred for crisis bed care and can't get it?

6      A.      We have daily discussions with each of the prisons in

7      terms of what's happening with the movements of the patients

8      and whether they can or cannot be accommodated.  Yes, we do.

9      Q.      Are you aware that as of January of this year less

10     than five percent of patients referred for crisis bed care in

11     the system received that care within 24-hours?

12     A.      I'm aware that we're not providing proper care that

13     we should be, yes.

14     Q.      You mentioned that you had several plans for beds?

                              Page 20

Apr27-06.txt

15  A.      Yes.

16  Q.      And that we should wait more time -- give you more

17  time to come up with these plans?

18          THE COURT:  Make them concrete is what he said.

19  BY MR. BIEN:

20  Q.      What are the plans?  What are the ideas that you've

21  got?

22  A.      Well, if I would be able to discuss them with you

23  right now, to tell you the truth, then I would be much closer

24  to answering the question because I haven't been able to do

25  that with the process.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


20

1         But I can tell you basically the issue, the basis of

2   the plans is moving out medical patients to more appropriate

3   levels of care, making availability of licensed beds for the

4   crisis patients' needs.

5         So it's going to be movement of those in general

6   care, some construction and some modifications.  We can do a

7   lot in the short order in my opinion, but it has to be make

8   sure we can go through the system.  But in my opinion we can

9   get that accomplished.

10  Q.      So it is correct that you found, when you came to the

11  Department of Corrections, that MHCB beds and correctional

12  treatment center beds were frequently occupied by people on a

Apr27-06.txt

13    long-term basis; is that correct?

14    A.    That's correct.  As my responsibilities in both the

15    medical sides, if you will, medical care, both dental side as

16    well as mental health side, my responsibility is to provide

17    care for all those patients in an appropriate manner.

18        It's very clear that a lot of the acute care beds

19    right now are housing mental health patients.  No question

20    about that, yes.

21    Q.    My question is isn't it correct that a lot of the

22    beds in correctional treatment centers are housing patients

23    for longer terms than the ten days they were designed for?

24    A.    Yes, they are.

25    Q.    Okay.  And some of these patients are medical

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

21

1    patients whose needs are not acute but chronic?

2    A.    Yes, that's correct.

3    Q.    And that's a significant number of the beds that are

4    occupied for long periods of time by this population?

5    A.    Which shouldn't be.  That's correct.

6        The plan that we are coming up with addresses that

7    issue.  That's one way we're able to make those beds

8    available.

9    Q.    Okay.  And one plan that I've heard discussed, in

Apr27-06.txt

10    fact it's been in the Department's documents for years, is

11    why don't we contract with community hospitals and other

12    resources to place some of these men in beds in the community

13    rather than prison?

14    A.      Well, number one is that I think as a general concept

15    that sounds like a good idea.  The problem is that, as you

16    pointed out, acute care hospitals are not able to take these

17    patients because the level of care is not appropriate for

18    acute care hospitals.

19          So I've been very busy in the meantime working with

20    institutions that have a long-term or lower level care

21    facility probability.  And that's why we talking about moving

22    those patients out into an appropriate setting, whether

23    internally to us by a space that I believe we can put them

24    to, or externally, and free up those beds.

25    Q.      Have you contracted with any community hospitals of

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

22

1    any sort, acute or subacute or nursing homes, to begin the

2    process of moving these men out of these beds to these

3    community resources?

4    A.      We had several hospitals we have had active dialogue

5    with, and we're in the process of contractually working with

6    them, yes.

7          Now, please remember, I've been here only four
                              Page 23

Apr27-06.txt

8    months.

9    Q.      I understand that.  But as of this moment do you have

10   any contracts with any hospitals?

11   A.      Signed contract, no.  But we have a pretty good

12   possibility of placing some patients shortly, yes.

13   Q.      So right now there are no signed contracts that allow

14   you to place any patients?

15   A.      Not at the moment.  That's correct.

16   Q.      Would it surprise you if this has been on the agenda

17   of Health Care Services for several years?

18   A.      Let me tell you, a lot of things have been on the

19   agenda, but not accomplished.  My goal is to get them

20   accomplished.  I think and I believe in the Plata situation I

21   was able to do that.

22           And I believe, the same way that I committed to

23   Mr. Keating when I came on board, that he will get just as

24   much of a resource allocation as Plata does because we want

25   to make sure we adequately take care of all the patients


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

▯

23

1    regardless what quarter they fall under.

2    Q.      Isn't it correct that the Department had not paid 58

3    million dollars in fees to community providers of health care

4    as of two months ago?

Page 24

Apr27-06.txt

5   A.      That is correct.  That's the reason Institutions

6   asked the Court to come in and give us the power to pay

7   those.

8           In fact, I was the one that asked for that to come

9   in.

10  Q.      So without a court order, you were unable to get

11  the Department to pay its obligations to health care

12  providers in the community?

13  A.      I'm not sure without a court order.  That's -- I

14  wouldn't -- wouldn't want to say that.  But within a timely

15  fashion I needed to get it done.  That appears the only way

16  we're able to do that.

17  Q.      In other words, you don't go to the court first, I

18  assume first you went within State government and said, "Hey,

19  we got these bills, can you pay them"?

20  A.      That is correct.

21  Q.      And you were unable to get them paid?

22  A.      Not within a timely fashion that's reasonable for me

23  to do that.  Because we haven't paid these providers, it's

24  very hard to talk contracts with them or anything else unless

25  you pay them first for past services.  Standard business.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

24

1           THE COURT:  No kidding.

2           THE WITNESS:  Let's face it, you have to do one thing
                    Page 25

Apr27-06.txt

3   first before you get to the second level.

4   BY MR. BIEN:

5   Q.      This was a very serious problem --

6   A.      Yes, it is.

7   Q.      There were medical care providers that hadn't been

8   paid for months and months?

9   A.      More than that.  More than months and months.

10   Q.      Right.

11          So it is no surprise that they're less than excited

12   about contracting with the State given the treatment the

13   State has treated them -- the manner in which the State has

14   treated them in the past?

15   A.      I think that's a fair statement to say, yes.

16   Q.      That's interfered with your ability to enter into new

17   contracts?

18   A.      Surely made it much tougher, yes, for appropriate

19   reasons.

20   Q.      If I were on the other side of that negotiation, I

21   would ask for a lot more money and I'd ask for it up front.

22   A.      Well, let me put it this way, I'm sure that some of

23   those things we have paid more than we should have.  I'm sure

24   it is part of that equation.

25   Q.      So as a result of the way the State treated providers

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Apr27-06.txt

25

1    in the past, it is going to cost them more money to get the

2    same serves in the future?

3             MS. TILLMAN:  Objection.  Argumentative.  Calls for

4    speculation.

5             THE WITNESS:  I'm not sure of that.

6             THE COURT:  Yeah.  That's the answer.

7             But it wouldn't surprise you if that was part of the

8    process?

9             THE WITNESS:  No.  I'm sure it's part of the

10   negotiation process, yes.  Although, we have some other

11   things that we can negotiate too so I think we can reduce

12   some of those costs.

13   BY MR. BIEN:

14   Q.       Doctor, I assume you participated in preparing the

15   documents filed -- the Bed Plan filed with this Court?

16   A.       I reviewed it, yes, and internally discussed it with

17   my staff, yes.

18   Q.       On page 1 of that plan in the Background -- Do you

19   have it there with you, the Bed Plan?

20   A.       Yes, I have it with me.

21   Q.       Okay.  I quote from under Background:

22            "The prison population has continued to grow faster

23              than CDCR has added permanent capacity.  The total

24                population rose to approximately 168,000 as of

25                January 2006, which is 5000 more than it was in

Apr27-06.txt

26

```
 1    April        2004."
 2    A.        I'm sorry.  Which paragraph are you on?  I'm sorry.
 3    Q.        Under Background?
 4    A.        Yes.  I'm sorry.  Okay.  Yes, I see it.
 5    Q.        "...greater than the forecasted population for
 6              January 2006 in Fall 2005.  The male inmate
 7              population, which presents the greater demand for
 8              mental health care, currently is housed at more than
 9              200 percent of the designed capacity of the prisons
10              in which these inmates are incarcerated, leading to
11              challenges in identifying and dedicating space to
12              mental health treatment programs."
13              Then you go on to -- the State goes on to say:
14              "The population of inmates with serious mental
15              disorders has increased faster than the overall
16              population."
17              Dr. Szekrenyi, isn't it a fact that the overcrowding
18    crisis has made the job of providing treatment for mentally
19    ill prisoners in California far more difficult?
20    A.        Well, you know, you asked me some questions regarding
21    terms of the custodial side, which I am not very familiar
22    with, but the fact someone is overcrowding, that is assuming
23    the statement made in here, any time you have overcrowding it
24    makes it more difficult to move people and get them to a
25    proper place, plus obviously space becomes more premium.
```

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

27

1          So, yes, I think that as a general statement that

2     would be fair to say.

3     Q.      Have you been told that there isn't treatment space

4     available for EOPs.  For example, that you want to set up a

5     program at Sac. and there is a lack of treatment space?

6     A.      I think that every single time we need some more

7     space, whether us or the custody side, we always arm wrestle

8     with that, yes.

9     Q.      And each time that you identify a unit that needs to

10    be converted, there's a cost of a unit that's not available

11    for the rest of the prison population?

12    A.      I'm not sure about that statement.  I think that I'm

13    looking at cost as what is necessary to provide care to our

14    patients.  That's all my interest is.

15          And I have, frankly, every Tuesday, almost every

16    Thursday, at two o'clock, met with the Governor's Office and

17    all participants, all departments that are working for the

18    State government to go over those issues and discuss those

19    and get approvals on those.  So I have a methodology to

20    obtain what I need.

21    Q.      In any of your discussions with the Governor's

22    Office, have you discussed proposals to limit the population

23    going into the prisons?

24    A.      No, I have not.  That's not my role to discuss that

25    from a health perspective.

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

28

1   Q.      Why isn't it your role to discuss that from a health

2   perspective?

3   A.      I don't control the population.  I don't have

4   jurisdiction over or in a sense anywhere information

5   available to me, nor is my role to.  I have to deal with the

6   patients that I have that's coming to me.  That's my

7   responsibility.  How they get there is somebody else's.

8   Q.      Did you hear anyone in the Governor's Office discuss

9   the possibility of attempts to limit the population going

10  into the Department of Corrections?

11  A.      Not that I know of because I'm not privy to those

12  kinds of meetings.  It is not related to health matters.

13  Q.      No one in your presence has discussed efforts to

14  limit the population going into prisons?

15  A.      Not to my knowledge, no.

16  Q.      Have you ever heard of any discussion to limit parole

17  violators who are mentally ill returning to prisons and

18  development other programs for those?

19  A.      I am very much involved in that one, yes, because I

20  have a specific program that I'm trying to look at not to

21  have those prisoners come back to prison but be treated on

22  the outside.  Yes, that's one of my pilot projects.

23  Q.      If such a project was implemented, it would take some

Page 30

Apr27-06.txt

24    of the pressure off of the reception centers who are trying

25    to handle these men?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

29

1    A.      That's correct.

2           MS. TILLMAN:  Your Honor, I'm becoming concerned

3    we're getting into another case called Valdivia.  I'm very

4    hesitant to go there at this point given my expertise in

5    Coleman and not Valdivia.

6           THE COURT:  I fully appreciate your problem.  I am

7    starting to think that at some point I'm going to have to

8    have a hearing in Valdivia, which has to do with this very

9    problem.  And I asked my special master what he thought the

10    effect would be, and he said presently marginal.  And maybe

11    we have to try and figure out some way to make it something

12    less than marginal.  But I would agree with counsel that's

13    probably not the appropriate -- that's not this case's

14    appropriate subject.

15           MR. BIEN:  May I go a little further and tie it back

16    into this case, Your Honor?

17           THE COURT:  You may.

18    BY MR. BIEN:

19    Q.      I'm not talking about procedures.  I'm talking about

20    isn't it a fact, Doctor, that there are parolees coming back

21    to prison for the purpose of getting psychiatric care in the

Page 31

Apr27-06.txt

22    reception centers?

23    A.      That is correct.

24    Q.      Okay.  And are the reception centers designed to --

25    at this moment designed and staffed to provide psychiatric


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                                    30

1     care for short-term parolees who need to be stabilized or

2     returned to the community?

3     A.      Not to my satisfaction.

4     Q.      Are you aware of any program in the MHDS, the

5     existing Coleman treatment program, to provide treatment and

6     stabilization for this purpose, parolees coming in for short

7     terms, then to return them stabilized to the community?

8     A.      Nothing specific.  No.  Just general Coleman

9     population.

10    Q.      Have you been asked to work on a pilot project to

11    provide that?

12    A.      I have proposed a pilot project on that one because I

13    have a special interest in making sure we have a proper way

14    of addressing that issue outside of the confines of our

15    institutions.

16    Q.      Okay.

17    A.      That pilot project is one of my priorities.

18    Q.      Are you aware that a man died at DVI who had been

Apr27-06.txt

19    returned to prison in November of 2005 for the purposes of

20    psychiatric care?

21    A.      I'm sorry.  Prior to my time or not, I'm aware of

22    every death that happens.  After I got here, I got called

23    every night regarding if it happens.  And I'm very much aware

24    of that.  But in that particular case, I'm not aware of it.

25    Q.      You haven't done any review of the death that


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


31

1     occurred on November 29th?

2     A.      I have not personally, no.

3     Q.      Have you discussed the case?

4             There was a picture that was shown around.  I'm sure

5     you saw it yesterday.

6     A.      I did not see it.  I'm sorry.  I was in the court

7     matter here, so I didn't see any picture or news paper

8     articles here.

9     Q.      So you're not aware of this case?

10    A.      Not personally, not at this stage.  Sounds like I may

11    need to be, but not at this stage.

12    Q.      Okay.  You're aware that at DVI, at San Quentin, at

13    other reception centers, they're over burdened with mentally

14    ill prisoners who they're unable to provide treatment for at

15    the moment?

16    A.      Yes.  I'm aware of that.

Page 33

Apr27-06.txt

17  Q.    You're aware that the Department is not meeting its

18  transfer timelines for moving EOPs -- prisoners who need a

19  high level of care, Your Honor -- out of reception centers to

20  EOP programs?

21  A.    I'm aware of it, that we're not meeting the standard

22  of care that we should be providing, yes.

23  Q.    And you're aware that there is a tremendous shortage

24  of mental health crisis beds in the system right now?

25  A.    Absolutely.

32

1   Q.    And that was the case also when you came on board in

2   December?

3   A.    I inherited that, yes.  If that's what you mean, yes.

4   Q.    And the Bed Plan says that you don't see any need for

5   any additional mental health crisis beds in the long-term;

6   isn't that correct?

7   A.    Well, the Bed Plan, I think, addresses those needs,

8   all the needs that I believe in the long-term we need.  The

9   crisis beds or intermediate care or acute beds all have been

10  addressed is my understanding given the population that at

11  that time was forecasted.

12  Q.    Okay.  What is your basis for saying that there's no

13  need for additional mental health crisis beds in the long

Apr27-06.txt

14    range plan?

15    A.    I'm just addressing the issue that Doug McKeever

16    mentioned, that a committee was set up prior to my time,

17    going through this process.

18          My understanding is that based upon the formulas and

19    what they developed and the population base at that time,

20    what they considered that to be, that based on the numbers an

21    adequate appropriation by the year 2011-2012 is when the beds

22    would be coming on line.

23          THE COURT:  Except we now know those projections are

24    wrong.

25          THE WITNESS:  Yes, I understand that.  I'm just


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



                                                          33

1    referring to the plan that was filed at that time.

2    BY MR. BIEN:

3    Q.    Okay.  So besides -- You know the plan is wrong.

4    And --

5    A.    We all realize it needs to be adjusted for the

6    additional population, yes.

7    Q.    Are you aware that the Tucker-Alan Plan, that study

8    done in 2002, was not adjusted based on the UNA Study for

9    purposes of these mental health crisis beds, that number

10    remained the same?

11    A.    No, I'm not aware of that because I'm not involved in
                              Page 35

Apr27-06.txt

12    that technical level.

13    Q.       You understand that based on the UNA Study, a very

14    major adjustment was made for inpatient beds?

15              MS. TILLMAN:   Objection based on lack of

16    foundation.

17              THE COURT:   He's asking whether he's aware of it.

18              THE WITNESS:   I'm not.

19    BY MR. BIEN:

20    Q.       You're not aware --

21    A.       That detail of study, I'm not aware of that.

22              In terms of conclusions, when they came up with it,

23    how they got there, in terms of the methodology employed, no,

24    I'm not.

25    Q.       Okay.   Judge Karlton just said, which I think is

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

34

1    obvious, that there was some serious problems with

2    projections in the Tucker-Alan Study.

3              Do you understand that?

4    A.       I understand Judge Karlton said that, yes.

5    Q.       You understand that the Department's been planning

6    its beds based on the Tucker-Alan Study based on orders from

7    this Court for several years?

8              Do you understand that?

Page 36

Apr27-06.txt

9    A.      Yes.

10   Q.      Okay.  And right now there is a shortage of inpatient

11   beds, correct?

12   A.      My understanding currently is that is not the case.

13   Inpatient beds are not something that we currently need right

14   now.

15   Q.      So you don't think there is any shortage of ICF beds?

16   A.      ICF, absolutely.  125.

17   Q.      There is a serious shortage of Level IV ICF?

18   A.      Serious shortage, yes.

19   Q.      You're comfortable there is no shortage of APP beds?

20          THE COURT:  I don't know what APP are.

21          MR. BIEN:  APP is the highest acute level now at CMF.

22          THE WITNESS:  My understanding, based upon referral

23   patterns and everything else, no, there is not a need there

24   right now.  That's my understanding.

25          That may be wrong, but that's my understanding.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                          35

1    BY MR. BIEN:

2    Q.      Okay.  Are you aware that it can take several weeks

3    for a patient to get from a prison to an APP bed right now?

4    A.      I'm aware it takes longer than it should take, yes.

5           We are working on that process.

6    Q.      Are you aware there have been waiting lists for APP
                        Page 37

Apr27-06.txt

 7    beds in the last few months from time-to-time?

 8    A.      Yes.

 9    Q.      Okay.  And you have submitted to the Legislature a

10    plan to add 350 more APP beds?

11    A.      We have the Bed Plan that you see here.  We have

12    submitted that to the Legislature, yes.

13    Q.      So you do think there is a need for more beds?

14    A.      Yes, there is, down the line.

15    Q.      You agree there is a need for more ICF beds?

16    A.      We agree.

17    Q.      You have a waiting list right now?

18    A.      Yes.  That's the reason we address that issue.

19    Q.      And you agree that there is a tremendous shortage of

20    mental health crisis beds right now?

21    A.      Yes.

22    Q.      And you agree that there's a shortage of EOP beds,

23    Extended Outpatient Beds?

24            MS. TILLMAN:  Enhanced Outpatient Beds.

25    BY MR. BIEN:

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

                                                              36

 1    Q.      Enhanced Outpatient Beds?

 2            THE COURT:  I'm pleased to hear that even the lawyers

 3    don't know what the acronyms are.

Page 38

Apr27-06.txt

4    BY MR. BIEN:

5    Q.    Is that correct?  It's on page 8 of your study?

6    A.    I'll take a look at it just to be sure we're talking

7    about the same thing.

8          (Witness reviews document.)

9          Yes.

10   Q.    "CDCR has an immediate need for EOP beds and

11         recognizes its need to increase capacity in the

12         shortest time possible."

13   A.    Right.

14   Q.    Is it correct that the plan shows a gap of over 1000

15   Enhanced Outpatient Beds?  Your gap?

16   A.    The gap, yes.

17   Q.    Okay.  So you got -- you have shortages at --

18   A.    All levels.

19   Q.    -- all levels?

20   A.    Yes.

21   Q.    Okay.  And you have people who are not getting the

22   care they need at all levels?

23   A.    Unfortunately, yes.

24   Q.    And some of these people are deteriorating and in

25   pain as a result?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

37

1    A.    Yes.

Page 39

Apr27-06.txt

2    Q.      Okay.  And some people are dying as a result?

3            MS. TILLMAN:  Objection.  Calls for speculation.

4    Outside the scope.

5            THE COURT:  Do you have an opinion, Doctor, at this

6    stage whether, in fact, there are deaths being caused by the

7    lack of appropriate psychiatric care?

8            THE WITNESS:  As I understand it -- Let me put it

9    this way, death can occur from two things.  One, either lack

10   of care or giving care -- inappropriate care.  It depends

11   upon what happens in each of those instances.  I'm sure we

12   can look at those deaths.  I'm sure some would have been

13   preventable, yes.

14   BY MR. BIEN:

15   Q.      Okay.  Did you participate in the survey of existing

16   mental health crisis beds to see how many were really

17   available and how many were not?

18   A.      Did I personally participate?  No.

19   Q.      Okay.  Are you responsible for that survey in any

20   way?

21   A.      No, I'm not.  But staff is doing that, whoever was

22   doing that survey.  Doug McKeever, my point person in that

23   one, he would have participated, been involved in that one.

24   Q.      Are you aware that when the Department went out for

25   purposes of making this filing to the Court, I assume, as

Apr27-06.txt

38

1    accurate as it could, went out to confirm how many mental
2    health crisis beds do we really have available, it found a
3    different number than what you had reported to Mr. Keating
4    only a month or two before?
5    A.        I'm not aware of that personally, no.  Like I said,
6    if you have a specific question like that, Doug McKeever
7    would be the more appropriate person to respond to that.
8    Q.        Are you participating in the process of this idea of
9    using LOU -- it is called a Locked Observation Unit, Your
10   Honor -- at California Medical -- CMC, California Men's
11   Colony?
12   A.        I'm aware that it is one of the options we are
13   looking at.  Yes, I am.
14   Q.        And what is that option that you're looking at?
15            This is a -- Want to describe for the Court what a
16   "unit" is?
17   A.        We're looking at the -- Let's see the option of the
18   LOU.  Let me see.  Where are we?
19            I'm trying to find that right now.  I'm sorry.
20            MS. TILLMAN:  Counsel, are you looking at page 10?
21            MR. BIEN:  It is one of the Judge's questions.
22            THE WITNESS:  Enclosure 10, right.  First one, right?
23            MR. BIEN:  Right.
24            MS. TILLMAN:  If I might interject, I had planned to
25   have a different witness testify to question 2 posed by the

Apr27-06.txt
(916) 446-6360

39

1    Court, if the Court desired more testimony.

2              THE COURT:  Let's wait for that.

3              THE WITNESS:  That will be fine.  Thank you.

4    BY MR. BIEN:

5    Q.    So you're not personally involved in that plan?

6    A.    Not at this stage, no, because it is one of the

7    options that came up.  I will be involved with it now in

8    making sure within the 60 days we complete that, get the

9    action done, yes.  When they came up with that originally, I

10   was not involved in that one, no.

11   Q.    You said that -- I don't really know your background.

12   It sounds like you had a lot of great experience.

13         Do you have any experience in actually constructing

14   and licensing health care facilities?

15   A.    Yes.

16   Q.    Okay.

17   A.    I have licensed several facilities.

18   Q.    Were you involved in a facility from point of design

19   through construction to licensing?

20   A.    That's correct.

21   Q.    Okay.  What steps did you take to investigate whether

22   or not the mental health crisis bed project at CMF could be

23   accelerated as ordered by this Court?

24   A.    I haven't taken any personal look at that.  However,

25   I had a discussion with George Sifuentes about some of the

Apr27-06.txt


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

                                                                    40
1    processing, what we can do, and we did come up with some
2    possibilities how we can shorten that process.
3            MS. TILLMAN:  Again, I would interject that that's
4    Question 7 on the Court's list.  I had anticipated presenting
5    George Sifuentes to respond to that.
6            THE COURT:  You're going to recall Mr. Sifuentes?
7            MS. TILLMAN:  Yes, Your Honor.
8            THE COURT:  All right.
9            MR. BIEN:  Your Honor, I think it is important that a
10   man of Dr. Szekrenyi's stature and experience, who can bring
11   to this process -- I will just say some different reality
12   than people who have been involved in the State year after
13   year.  This is exactly what we need now.  And I think I'd
14   like to ask him.
15   BY MR BIEN:
16   Q.      There are various things that can be done in
17   construction projects to speed them up?
18   A.      That's correct.  We have discussed those options.
19   Q.      Some of them are asking the contractor that we'll pay
20   you more if you finish it quicker; isn't that one of the
21   options?
22   A.      Yes, it can be.  Design is as designed.  Not a lot of
23   things can be done.  Yes, options are available, yes.
24   Q.      Can you testify here today that every possible option
25   of accelerating that project has been explored and to your
                              Page 43

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

41

1    satisfaction?

2    A.      No.  But it will be explored within the 60 days or 45

3    days, whatever days we are given to do that, yes.  That is

4    the exact reason why I'm asking for that time frame.

5    Q.      Okay.  So you think there are possibilities for

6    accelerating the project?

7    A.      In my opinion.  But we may need the Court's

8    assistance in terms of actually accomplishing it, yes.

9    Q.      With all due respect, you're aware this was a court

10   order to do this by April 17th, the same court order?

11   A.      I understand in terms of complying with the court

12   order we've given the best effort we could within the State

13   system, but since that time I believe we found some other

14   alternatives that were not previously available to us.

15   Q.      Okay.  So you feel that in complying with the April

16   17th Order as to this CMF MCCV project being accelerated, the

17   State did not explore all possible options?

18   A.      No, I didn't say that.

19           I think the State, within their system and what they

20   are required to do, I think they explored all the options.

21           THE COURT:  We're talking about something else, and

22   that is everybody thinking outside the box.

Page 44

Apr27-06.txt
```
23          THE WITNESS:  Yes.

24          THE COURT:  Everybody stop worrying about what the

25   State process is and making things happen.




             CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                              (916) 446-6360




                                                              42

1            Counsel's question is in your view, you believe that

2    if we stop worrying about the State process, there may be

3    ways of achieving acceleration, even if those require the

4    Court to say that those aspects of the State process will not

5    apply?

6            THE WITNESS:  I believe so.  That's correct.

7    BY MR. BIEN:

8    Q.      So more is possible?

9    A.      In my opinion, thinking outside the box.

10   Q.      And you think it is important that we accelerate

11   these projects?

12   A.      Absolutely.

13   Q.      In fact, it may be life saving to accelerate these

14   projects?

15   A.      As I mentioned before, patient care is my issue.

16   That's what I care about.  That's what I'm here for.  And it

17   is very important to me, life and morbidity and mortality.  I

18   deal with it every day.  It is very important.

19           Like I said, every time a death happens, I get called

20   that night, what it is.  And I know every one of those things
```

Apr27-06.txt

21    happening, and I wish it wouldn't happen.

22    Q.      When we were concerned about ideas for using space,

23    yesterday you heard the discussion about the P-2 Unit at CMF?

24    A.      Yes.

25    Q.      Okay.  And the issue that we as plaintiff's counsel

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

43

1    are considering, and the Court is considering, is do you let

2    the State operate an unlicensed facility that violates

3    standards when the alternative is not having --

4          THE COURT:  Nobody gets treatment.

5          MR. BIEN:  -- nobody gets treatment at all or very

6    poor treatment.  And I think, as you can hear, certainly

7    plaintiff's counsel, very reluctantly, is advocating some

8    compromises in basic patient standards that are established

9    by the State for very good reasons, health and safety

10    standards, but we're concerned that if that door is opened,

11    you know, will the State actually meet the standards in a

12    reasonable time?

13          THE COURT:  You know what, Mr. Bien, don't worry

14    about that.  That's not this witness' problem.  That's mine.

15          If I permit the State -- if I require the State to

16    abandon standards on a temporary basis because of the

17    emergency, I assure you that I will issue an order which

Page 46

Apr27-06.txt

18    requires the State to come into compliance.

19         The only question is that the sensible thing to do.

20    Are we doing more danger -- is it more dangerous or not?  And

21    that is a question that I really do want to ask this witness

22    because I assume that this witness does have expertise.  And

23    that's why I started all of this by asking Mr. Sifuentes what

24    his view of it was, you know, whether we could do it and how

25    long it would take.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

44

1         And I ask you, Doctor, are you familiar with the

2    facility that Mr. Sifuentes oversaw which required 23 waivers

3    to get it done on a timely base, and in your view, is that

4    the appropriate thing to do given the crisis?

5         THE WITNESS:  Well, in my opinion we are looking at

6    what is the incremental value of doing something.

7         If a patient does not receive appropriate care now,

8    if it can be provided by faster care on some level, maybe it

9    is not a hundred percent, it is not complete, you can do

10    better, but it is better than no care at all.  So my opinion

11    is that we should take the shortcuts if you can.

12         And some of those licensing restrictions,`like I

13    said, I think the State is willing to work with us.  Because

14    some of that includes, for instance, pharmacy, some dietary

15    that can be solved in other ways and physically has to be on

Page 47

Apr27-06.txt

16     site.

17         So I believe we can meet the intent of the licensure

18     issues without necessarily having to be the letter of the

19     law, and given the fact we'll have a permanent solution,

20     which is the goal to have, I think they would be more than

21     inclined to work with us given the crisis that we're in.

22         THE COURT:  I think what I heard is something like

23     this and let me paraphrase:  The situation is sufficiently

24     serious that deviations from the ordinary standards which we

25     ought to apply are appropriate.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

45

1         THE WITNESS:  Yes.

2         THE COURT:  I mean, I don't think you can answer this

3     question, but you see Mr. Bien, he's arguing.  He's supposed

4     to be questioning.  Perhaps he doesn't know that.  But there

5     is a serious problem with the continued and accelerated

6     growth in population which raises the specter that we'll

7     never catch up.  We'll be so busy trying to deal with the

8     unforeseen increases or unaccounted for increases that we'll

9     never go back to correct -- to bring the State to full

10     licensure standards.

11         You see what the concerns are?

12         THE WITNESS:  Yes, I see that.  But to tell you the

Page 48

Apr27-06.txt

13    truth, I think most of the time, when I have dealt with

14    licensure in the past, in my past life prior to this, we

15    always had sometimes some licensure waivers, but always a

16    requirement within a certain period of time you come back to

17    standard.

18        I think it's the normal response of a state agent to

19    say, "Look, I will give you a temporary license because I'll

20    accept the reason you want it for, for the greater good, I'll

21    go along with you, but you have to comply by a certain time."

22    And that's usually put into the requirement when you do that

23    so you know exactly when you come back to standard.

24        That's a normal situation that licensing would do.  I

25    think that is certainly acceptable from our standpoint.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

46

1        THE COURT:  All right.

2    BY MR. BIEN:

3    Q.    A lot of things we've been talking about,

4    Mr. Sifuentes' department is construction and size and air

5    conditioning, things like that, but we're most concerned with

6    clinical care, clinical staffing.

7        We don't see -- I don't see in this Bed Plan -- maybe

8    you can tell me where I'm missing it -- any plan to meet the

9    other obstacles the State has had, which is there a plan to

10    fill the clinical positions that are vacant and are stopping

Page 49

Apr27-06.txt

11    you from being licensed at various positions -- various

12    places?

13    A.      Yes, there is a plan.  As far as I'm concerned, I

14    think we need to address the salary issues and we need to

15    address working conditions.  And I intend to do that in short

16    order.

17    Q.      But there is no -- you did not submit that in this

18    plan?

19            THE COURT:  This was a Bed Plan.

20            THE WITNESS:  This is a Bed Plan.

21            MR. BIEN:  Your Honor, in the Bed Plan, in order to

22    license this facility, we need staff.  And you ordered them

23    to both build and license and staff.  And then one of the

24    problems, like the Coalinga problem is it's a beautiful

25    building, it just has no staff.  That doesn't do us any good.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


47

1             THE COURT:  It doesn't do you any good for other

2     reasons as well.

3             MR. BIEN:  Right.

4             THE COURT:  I mean, that's a serious problem that

5     we've -- I'm going to have to talk to you lawyers about when

6     we get finished with the evidence and what we do about that.

7                 I mean, it's just -- with this crisis it is shocking

Apr27-06.txt

8    to me that there are apparently 1000 beds sitting out there,

9    but they're not constructed for what we need.

10            Let me ask you a question, Doctor.

11            THE WITNESS:  Yes.

12            THE COURT:  This occurred to me last night, and I

13    assume I just didn't understand so I haven't asked anybody.

14            Let's assume that we could move a whole bunch of

15    Level III and II and I's -- I don't know how many there are.

16    Apparently, Level IV is the crisis.

17            THE WITNESS:  Yes.

18            THE COURT:  Right now Coalinga will not accept the

19    so-called high-custody Level IVs.

20            Are there enough Level I's and II's and III's that we

21    could just move into Coalinga to free up enough space that we

22    could convert into a Level IV a facility?  Or is that not

23    realistic because the construction costs and the custody

24    requirements for Level IV would just delay any useful help?

25            I don't know.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

                                                              48

1            What's the answer?  Do we know?

2            THE WITNESS:  No.  I don't know the answer to that,

3    but certainly I'd like to explore that.  But I think, as I

4    mentioned to you, the number of beds that we have planned,

5    are currently looking at, should be sufficient to meet our
                            Page 51

Apr27-06.txt

6    crisis needs right now, the 75 beds and the 125 beds gap we

7    have right now.

8         So we will look at this option which you suggested.

9    Everything's on the table as far as I'm concerned.  We need

10   to solve the problem and now.

11        THE COURT:  But I mean, part of this thing is this --

12   counsel is absolutely right, it is this population pressure

13   and the never-ending need to serve this population which

14   grows at a level which exceeds anybody's expectations.

15        Well, okay.  I'm just talking to myself.  That's not

16   a question.  I'm thinking out loud.  It is beside the point.

17        Go ahead.

18   BY MR. BIEN:

19   Q.    Doctor, you're aware that in the Plata Case the

20   receiver has taken steps to improve the ability of the

21   Department to hire clinical staff?

22   A.    Actually, in technical detail, actually the Court

23   did.  The Court demanded that prior to the receiver coming on

24   board.

25   Q.    Where was that mandate?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

49

1    A.    December 1 Mandate.  When I came on board, the same

2    day that was issued.  It required us to provide certain

Apr27-06.txt

3    salary increases to nurses and to physicians in the hiring

4    practice to speed up the process of hiring.  So it provided

5    basically a court order to do something that in their opinion

6    was necessary to get the positions filled.

7         As a consequence of that, I can tell you that we were

8    able to fill most of those positions that we have --

9    Q.     Okay.  And --

10   A.     -- in one form or another.

11   Q.     Is it correct at this moment in time there is no

12   proposal by the Department of Corrections to do the same for

13   mental health classifications that are unfilled?

14   A.     That's not necessarily the case.  We just got

15   finished --

16        MS. TILLMAN:  I should have objected.  I believe we

17   are preparing a response to the Court Order --

18        THE WITNESS:  I was going to say it is due May 1.

19        MS. TILLMAN:  -- on those issues.  We can certainly

20   probably discuss them more fully once those plans are

21   presented.

22        THE COURT:  Those are plans in the works?

23        MS. TILLMAN:  Yes.

24   BY MR. BIEN:

25   Q.     My question stands right now has the mental health

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

50

Apr27-06.txt

1    side of the table done what the medical side of the table has

2    done to fill the vacant positions?

3          As of this moment is there something in place?

4    A.    As of this moment, no. Today, no.

5    Q.    Is it also correct that there has been no finance

6    letter submitted by the Department of Corrections for such

7    authority to hire above minimum and do things like that for

8    the mental health positions?

9          MS. TILLMAN:  Objection.  That calls for confidential

10   information.  Generally speaking, those finance letters are

11   not subject to disclosure.

12         MR. BIEN:  You attached it to this very document.

13   It's attached to the Bed Plan.

14         THE COURT:  The objection is overruled.

15         MS. TILLMAN:  If it is that one, we can discuss it.

16   BY MR. BIEN:

17   Q.    My question is as of March 30th finance letters were

18   submitted; isn't that correct?

19   A.    Yes.

20   Q.    Did the Department submit a finance letter asking for

21   authority to hire staff above minimum -- hiring above minimum

22   for the mental health positions as of March 30th?

23   A.    A request to hire above minimum and also provide

24   R&Rs.

25   Q.    For all mental health staff?

Apr27-06.txt

51

1    A.      At certain places where we feel it is a more severe

2    need, yes.

3    Q.      So you are saying that's already been submitted to

4    the Legislature?

5    A.      It's been requested.  I don't know about the

6    Legislature.  It is requested from the Finance Department.

7    Q.      I can tell you that at the Department of Finance

8    website it lists all such documents, and when I checked it

9    over the weekend, there was no such document listed.

10   A.      We have a request from the Health Care Division, yes.

11   Q.      You don't know whether it has actually gone to

12   Finance?

13   A.      That I don't know.

14   Q.      As of right now, you don't have authority to do such?

15           THE COURT:  Authority from whom?  To submit?

16           MR. BIEN:  Authority to hire.

17           THE WITNESS:  Right now I feel, in my opinion, the

18   salary level we offer is not sufficient to attract

19   candidates.

20   BY MR. BIEN:

21   Q.      Not sufficient?

22   A.      That's correct.

23   Q.      Okay.  But right now you don't -- you haven't gotten

24   over that hump?  You don't have the authority to hire people

25   at the level you need to hire them at?  You don't have the

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

52

1    money to offer?

2    A.    If you ask me at this stage do I have a salary level

3    that's commensurate with what I think it should be to hire

4    somebody, no, I don't have one right now.

5    Q.    And you're going through the normal state process in

6    Coleman?

7          We haven't seen any evidence, but you say you're

8    trying to go through the normal state process.  And if you're

9    successful in getting a finance letter actually submitted and

10   getting it into the May Revise and getting the Legislature to

11   approve it, and the Legislature actually approves the budget

12   and it is signed, wouldn't there also be a several month

13   delay before you actually will be able to use that authority?

14   A.    Through the process it goes through, yes.

15   Q.    Sometimes it's been seven, eight, nine months before

16   someone -- a warden in a particular facility could actually

17   use this money to hire someone; isn't that correct?

18   A.    I don't know about time frame.  I haven't been here

19   long enough to know about that.

20   Q.    Would it surprise you that under the state process

21   you have to go through several steps before this proposal to

22   Finance turns into authority to actually go out and offer

23   Doctor Jones a job at Salinas Valley?

24   A.    No, it would not surprise me.  No.

25   Q.    Is there something that you think you could do to get

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

53

1    the authority to do that more rapidly?

2    A.      I think, yes.

3    Q.      Okay.  Isn't that something that Judge Karlton should

4    consider as an appropriate order in this case?

5    A.      I think we will respond to Judge Karlton -- I think

6    May 1 is when the appropriate response is due to him on the

7    salary issues.

8            Also, I can tell you I will be discussing this with

9    the Governor's Office at two o'clock today in our meeting.

10   It is one of the issues we have been discussing and looking

11   at it.  And we do have a DPA survey clearly indicating that

12   psychiatrists need an increase in salaries.

13   Q.      It is not just psychiatrists that you're having

14   trouble hiring?

15   A.      That is correct.  All the other basically health care

16   components, yes.

17   Q.      One reason you're discussing psychiatrists is that

18   this judge ordered you to do that several months ago; isn't

19   that correct?

20   A.      Well, no.  It is one of the reasons obviously, but

21   not the only reason.  Believe me, health care is my issue.

22   If I can't get staff to provide health care, that's a problem

23   for me with or without court orders.

24   Q.      One of the proposals --
                    Page 57

Apr27-06.txt

25          MR. BIEN:  I'm sorry, Your Honor.  Did you have --


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



54

1          THE COURT:  I'm just thinking.

2          Go ahead.

3    BY MR. BIEN:

4    Q.      One of the proposals that has been discussed in your

5    plan as a possibility as an interim measure is using these

6    Outpatient Housing Units, OHUs, making more use of them for

7    mental health care; is that correct?

8    A.      Well, that's been considered, yes.

9    Q.      Are you aware of any staffing requirements that the

10   Department now has -- mental health clinical staffing for

11   OHUs?

12   A.      We have internal requirements, yes, for staffing

13   OHUs.

14   Q.      Have you reviewed them?

15   A.      I don't know personally exactly what they are in

16   terms of ratios, but I'm pretty well aware generally what

17   they are, yes.

18   Q.      Do you think that the OHU staffing, if it is going to

19   be used for mental health care, should include coverage both

20   during the day and at night?

21   A.      The OHU staffing that we currently have is for

Page 58

Apr27-06.txt

22  medical needs, not for psychiatric needs.  So it needs to be

23  adjusted for that.  Whatever it takes.  It would be a higher

24  level staffing, yes.

25  Q.      Would you agree with me it needs to be 24-hours a day

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

55

1   staffing?

2   A.      That I don't know.  I need to discuss that with my

3   staff and my psychiatrist to find out the answer to that.  I

4   don't know that offhand.

5   Q.      Let's assume, as a hypothetical, that your OHUs are

6   being used for suicide watch, as they are being used, as I

7   can show you, all over the state.  And these suicide watches

8   happen over night?

9   A.      We addressed the suicide watch.  We have one-on-one,

10  24 hours.

11  Q.      Do you have clinical staff on duty, not correctional

12  officers, but clinical staff devoted to the mental health

13  crisis beds, 24-hours a day, seven days a week -- I'm

14  sorry -- devoted to the OHUs 24-hours a day, seven days a

15  week?

16  A.      I don't know that for a fact, no.

17  Q.      The proposal you made, which was discussed with

18  plaintiffs and Mr. Keating, provides only five days of

19  coverage; is that correct?

Page 59

Apr27-06.txt

20    A.    That was proposed.

21    Q.    And it provides no coverage over night for clinical

22    staff?

23    A.    Like I said, I don't know that offhand.

24    Q.    Don't you think it should provide coverage over

25    night?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

56

1    A.    Like I believe I said before, I don't know.  I need

2    to talk to my specialist to find that out.

3    Q.    You don't feel qualified to answer whether or not if

4    you have someone on suicide watch over night --

5    A.    Suicide watch we talked about that.  We've got

6    24-hour coverage.  So please take that off the table because

7    it's been addressed, suicide watch.

8          THE COURT:  I think that there's a disconnect in the

9    question and the answer.

10          THE WITNESS:  Okay.

11          THE COURT:  As I understand the answer it is we've

12    got suicide watch coverage 24-hours a day.  By that you mean

13    there's at least custodial staff.

14          THE WITNESS:  A person appropriate to the watch, yes.

15          THE COURT:  But counsel is asking a different

16    question, which is should there be clinical staff as well as

Apr27-06.txt

17    custodial staff on 24-hour call.

18         I don't know the answer to that.  And I'm not -- the

19    question is do you have an opinion about that, and if your

20    answer is that I can't have an opinion until I understand the

21    process and I've got to talk to my staff, then I'll accept

22    that.

23         THE WITNESS:  I was trying to say that.  I need to

24    talk to my staff to find out, talk to my psychiatrist and to

25    Doug McKeever also.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

57

1    BY MR BIEN:

2    Q.      Are you aware in the program guide standards when

3    someone's on suicide watch, not only should there be someone

4    outside the door watching them constantly, a custodial

5    officer or someone non-clinical, but there should also be a

6    clinician or a nurse making rounds and making notes every 15

7    minutes, half-hour period?

8    A.      We have a policy --

9         MS. TILLMAN:  Objection.  Outside the scope of this

10   hearing.  We have already established that there are programs

11   subject to that litigation.  That might well be one of these

12   issues before the Court at a later time today, what the

13   program guide issues are and what will be litigated.  It

14   seems like we're already litigating at this hearing.
                          Page 61

Apr27-06.txt

15          THE COURT:  I understand, ma'am.  I understand your

16     position.

17          MR. BIEN:  I'm not asking about change.  I'm asking

18     about the existing program guide.

19          THE WITNESS:  What I'm saying, to answer --

20          THE COURT:  No.  Just hang on.  I'm just trying to --

21     I'm trying to balance my need to get this hearing done with

22     my need to know what's going on.

23          I'm going to sustain that objection only on the basis

24     that we're going to have, hopefully, a full-blown hearing

25     about the program.


                CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                              (916) 446-6360


                                                                    58

1           You may proceed, Mr. Bien.

2           MR. BIEN:  May I make an argument about that point,

3      Your Honor?

4           THE COURT:  Yeah.

5           MR. BIEN:  The issue is right now today we're dealing

6      with horrible compromises, and right now today there are

7      people on suicide watch who everyone agrees should be either

8      in a DMH facility or a crisis bed who are instead housed in

9      OHUs or even at Ad. Seg. cells.  We attached that as one of

10     our exhibits.

11          THE COURT:  I know.

Apr27-06.txt

12        MR. BIEN:  So the question is, in the interim, how

13   can the Department put a proposal it doesn't provide staffing

14   to meet their own standard, even in these improper places.

15        We think, at minimum, they have to get the clinical

16   staff that they know are necessary, even if they're in the

17   wrong types of facilities.        ,

18        THE COURT:  I understand your position.

19        Please, go on, sir.

20   BY MR. BIEN:

21   Q.    Doctor, isn't it correct that your -- the Bed Plan

22   does not provide beds, even in 2011, for all the patients

23   that you expect are going to need Enhanced Outpatient Care?

24   A.    I don't know the answer to that, to tell you the

25   truth.  I have to refer to the document to look at that.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬚

59

1    Offhand, I don't know that.

2    Q.    But do you have that page that's called Closing The

3    gap?  It's the chart?

4    A.    What page are you referring to?

5    Q.    I think it's your exhibit -- your Attachment 2; is

6    that right?

7    A.    I don't have Attachment 2 to my filing.

8    Q.    We'll get you a copy in a minute.

9          Are you aware that the Bed Plan submitted does not

Page 63

Apr27-06.txt

10    provide all the beds that are projected to be needed for

11    Enhanced Outpatient in 2011?

12            THE COURT:  He just said he didn't know.

13    BY MR. BIEN:

14    Q.      You're not aware of that fact --

15    A.      I'm not aware of that.

16            THE COURT:  He's got to look at the document is what

17    he said.

18            (Document handed to witness for review.)

19            MR. BIEN:  Your Honor, this is Enclosure 2.

20            THE COURT:  I know.

21            MR. BIEN:  I've handed the witness Enclosure 2 to the

22    Bed Plan.

23    ///

24    ///

25    ///

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

60

1    BY MR. BIEN:

2    Q.      Are you familiar with this document?

3    A.      Yes, I have seen the document.  You talking about the

4    details of it, no, I'm not.  But generally I'm familiar with

5    it, yes.  But not the details of it.

6            Doug McKeever would be a more appropriate person to

Page 64

Apr27-06.txt

7   respond if you have a specific question on it.

8          THE COURT:  This is the document?

9          MR. BIEN:  Right.

10          THE COURT:  Yeah.

11          MR. BIEN:  Your Honor, do you think we should mark

12   it?

13          THE COURT:  It's an exhibit.

14          MR. BIEN:  It's an exhibit.  All right.  Okay.

15   BY MR. BIEN:

16   Q.     On the top line under EOP; do you see that?

17          First line?

18   A.     Yes.

19   Q.     Right.  Isn't it correct that shows that as of July

20   2011, if everything that the State is planning to happen

21   happens, there will be a 1300 bed shortage for Enhanced

22   Outpatient?

23   A.     1336, yes.

24   Q.     1336 beds.

25          And that would be approximately, what, 20 or 30

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

61

1   percent of the population would not have treatment care?

2   A.     Uh-huh.  Yes.

3   Q.     Okay.  Do you think it is appropriate for the

4   Department to propose a long-range plan to provide health

Page 65

Apr27-06.txt

5     care that leaves a gap of 1300 beds in 2011?

6     A.      Well, like I said to you, this whole process started

7     prior to my time coming in.  I was not involved with this

8     process, doing this.  But also you need to understand we have

9     started already a secondary process on our own identifying

10    EOP needs.  So we intend to address that by the time we get

11    to that stage.

12            THE COURT:  The question was somewhat different.

13            THE WITNESS:  I'm sorry.

14            THE COURT:  It really dealt with the mind set.  It

15    said -- I was about to say something very nasty.

16            Is it appropriate for the State to recognize that its

17    proposals will leave 1336 patients without appropriate care.

18            THE WITNESS:  It should address all the needs.

19    That's correct.  It agree with you, it should address it.

20            THE COURT:  I know you didn't do it.  Can you explain

21    to me how this happened?

22            THE WITNESS:  No, I can't.  Like I said,

23    unfortunately, I was not in the process of this one, in doing

24    this thing.  So I'm no the aware of that, no.

25            THE COURT:  All right.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

62

1     BY MR. BIEN:

Apr27-06.txt

2   Q.      Will you commit to us, Doctor, that the next plan we

3   see covers all of the needs that the State itself projects

4   for this patient population?

5   A.      At the next --

6           MS. TILLMAN:  I'm sorry.  Objection.  That's vague.

7   What next plan are we referring to?

8           I think we're here about --

9           THE COURT:  The Doctor has just said that they are in

10  the process of revising the Bed Plan.  And Mr. Bien's

11  question is a very straightforward one.  Will the next

12  proposed Bed Plan actually address need?

13          THE WITNESS:  Yes.  I think the next proposed Bed

14  Plan that we talked about will be updated for the new

15  population base anyway.  And a part of that one will be

16  addressing all the needs.

17          THE COURT:  Folks, we're going to take a 15 minute

18  recess.

19          I have an outside meeting.  I'm probably going to

20  break at 11:30 and reconvene at 2:00.  Is that -- I know

21  you're going to be gone for the meeting.  Are we going to get

22  him done by 11:30?

23          MR. BIEN:  Sure.

24          THE COURT:  All right.

25          Am I inconveniencing anybody else?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Apr27-06.txt

63

1          All right.  That will be the order then.

2          (Off the record at 10:41 a.m.)

3          (On the record at 11:00 a.m.)

4          THE CLERK:  Please, remain seated.

5          Court is now in session.

6          THE COURT:  Please, be seated everyone.

7          Mr. Bien, I am, as you obviously are, troubled by the

8    process by which the Department is always a year behind what

9    it needs.

10          I'm not sure if this hearing is the appropriate

11   hearing to address that, but it is clear to me, counsel, that

12   it's something we've got to think about and how to make it

13   stop happening.

14          I've sort of tried to cut you off from exploring that

15   because I'm not sure this is the right hearing, but I want to

16   assure you that I am as troubled by it as you are.  And we're

17   just going to have to think about what else to do.  So the

18   fact that I've told you let's get on with what this hearing's

19   about doesn't mean that I don't appreciate how right you are

20   about this being a process problem that's got to be solved.

21          Anyway, go ahead.

22          MR. BIEN:  Thank you, Your Honor.

23          I won't belabor that point.

24   ///

25   ///

Apr27-06.txt

64

1    BY MR. BIEN:

2    Q.    Doctor, one of the things you've testified here today

3    is that you need to explore various options, at least for the

4    interim, to make sure that Department can do a better job in

5    providing care for mentally ill patients; is that correct?

6    A.    Yes.  For the short-term, yes.  Address short-term

7    needs.

8    Q.    And there's a short-term crisis?

9    A.    Yes, there is.

10   Q.    Okay.  Have you explored obtaining short-term acute

11   psychiatric care in community hospitals as an option in

12   certain areas of the state?

13   A.    We have not.  Not to date, No.

14   Q.    Why not?

15         THE COURT:  Because they can't get them into the

16   state hospitals.  How are they going to get them into a

17   private one?

18         I'm sorry.  I didn't mean to -- but it's a --

19   BY MR. BIEN:

20   Q.    I guess just to establish that that has not been

21   investigated?

22   A.    It has not been investigated, no.  It doesn't mean it

23   won't be, but it has not been to date, as far as I know.

24         THE COURT:  May I interrupt?  I want to ask a

25   different question.

Page 69

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

65

1          The Department of Mental Health, I mean, they're good

2    at it.  They've managed to get their docs paid the same level

3    as your docs, despite the fact that they won't take the most

4    seriously ill folks.  And we'll see whether that continues.

5          Is it your view that psychiatrists, dealing with

6    Level IV, high-custody are just, by the nature of things,

7    that's not in the -- that's not an attractive body of

8    patients, and there's got to be some inducement to get --

9    some extra inducement to get those folks treated?

10          THE WITNESS:  Yes.  My point of view is that people

11    working the CDCR, in a sense, should be deserving what I

12    consider to be combat pay.  There should be some recognition

13    that the working conditions they are under, the workload, the

14    patients they are dealing with to a large extent are a lot

15    more hazardous and a lot more challenging, if you will, than

16    some of the counterparts in other places, yes.

17          THE COURT:  All right.  Go ahead.

18    BY MR. BIEN:

19    Q.      You testified earlier about a DPA survey of

20    psychiatrist salaries.  Do you recall that?

21    A.      What I mentioned is DPA did a survey on a number of

22    positions, include psychiatrists in there, yes.

23    Q.      Did they determine that the market rate for

24    psychiatric compensation was higher than what the CDC is now

25    offering?

Page 70

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

66

1     MS. TILLMAN:  Your Honor, if I might interject again,

2     I think that goes to the Court Order of March 3, paragraph 1,

3     about reducing psychiatrist vacancies.  We are intending to

4     comply with that Court Order with a plan on its due date of

5     May 2006.  If we could not be premature in that response, I

6     would appreciate it.

7     THE COURT:  I'm going to -- again, this is another

8     subject that I think is of -- I now begin to understand is of

9     critical importance, but this is not the scope of this

10    hearing.

11    MR. BIEN:  I guess the point is, Your Honor, if you

12    look at the chart submitted in this bed plan, the reason some

13    of the crisis beds are not open is that a psychiatrist is

14    missing, staff missing.  And it is -- You can't do one

15    without the other.

16    THE COURT:  I understand.

17    MR. BIEN:  You know --

18    THE COURT:  Is it correct there are beds available

19    which can't be opened because there is not personnel to staff

20    it?

21    THE WITNESS:  That is correct.  Yes.

22    THE COURT:  Okay.

23    MR. BIEN:  That's why, Your Honor, we're concerned