Apr27-06.txt

24    that while it is appropriate that the Court has ordered the
25    long-term review of salaries in the long-term, there is a


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                              67

1    short-term crisis and there needs to be something more than a
2    plan that comes in after the budget year is over to raise
3    salaries, you know, in the future.  That's what we're
4    concerned about.  There is not a sense of urgency on this
5    issue.
6         THE COURT:  May I inquire of counsel, I expect you're
7    the person who most likely knows, is there a request being
8    made through Finance to the Legislature for increased
9    salaries for Corrections psychiatrists -- not just
10   psychiatrists, but psychiatrists and nurses and all of that
11   sort of stuff?
12        MS. TILLMAN:  If I might turn it over to my
13   Department of Finance analyst over here.  My concern is that
14   I'm not permitted to breach confidentiality in terms of
15   requests that haven't been disclosed by way of the usual
16   process to the public because they're still being vetted
17   through Finance.
18        THE COURT:  The Court will order you to do so.  How
19   is that for relieving you of your problem.
20        MS. TILLMAN:  I understand the Court's order.

Apr27-06.txt

21          I would ask Sarah Mangum be responsive to that

22     inquiry.

23          THE COURT:  If you will, ma'am.

24          I understand the reason for that general rule.  I'm

25     just now at a place where I've got to get on with it.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


68

1          Yes, ma'am.

2          MS. MANGUM:  The Department of Corrections and

3     Rehabilitation has submitted a request to Finance.  It has

4     not yet been submitted to the Legislature.

5          THE COURT:  Okay.  But it is contemplated that there

6     will be a further enhancement of staff salary?

7          MS. MANGUM:  It is under review, that concept.

8          MS. TILLMAN:  Your Honor, if I might while

9     Miss Mangum is available, could I have her address one of the

10    issues.  I understand that the Department of Finance has

11    approved and is ready to present to the Legislature another

12    item that was sought by the Department of Corrections in the

13    budget.

14         MS. MANGUM:  Certainly.

15         I just want to inform you that a letter was submitted

16    to the Legislature on April 20th that had two components

17    related to some of the issues raised earlier.  One was it

18    requested funding for staffing at mental health OHU
Page 73

Apr27-06.txt

19    facilities that -- my understanding was the intent was to

20    provide 24-hour coverage -- clinical coverage where needed.

21         The other --

22         THE COURT:  Well, that's the problem.  I mean, the

23    "where needed" is what the problem is.

24         MS. MANGUM:  Well, where it is not already existing

25    is my understanding of what that means.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

                                                              69

1         THE COURT:  Okay.

2         MS. MANGUM:  The other proposal that's related to

3    this is that there was a proposal submitted to the

4    Legislature asking for additional staffing in the human

5    resources area to expedite the hiring process for Coleman

6    positions, similar to Plata, as well as expedite the things

7    like background checks and do a more intensive recruitment

8    effort for health care positions in total making the Coleman

9    process consistent to what was ordered under Plata and

10   provide resources for that.

11        THE COURT:  Thank you, ma'am.

12             CONTINUED CROSS-EXAMINATION

13   BY MR. BIEN:

14   Q.    Doctor, you testified earlier that the process that

15   you're engaged in also in the medical care side, the Plata

Page 74

Apr27-06.txt

16    side, has been working to enhance your ability to hire

17    clinicians; is that correct?

18    A.    That is correct.

19    Q.    Isn't it correct that there's still, as of April

20    15th, a tremendous number of vacancies on the medical side?

21    A.    I don't know if it's tremendous.  More than we want

22    it to be, yes.

23          THE COURT:  There will always be some vacancy?

24          THE WITNESS:  Yes.

25          I think it substantially increased it though, yes.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

70

1    BY MR. BIEN:

2    Q.    Isn't it correct that six prisons have 30 percent or

3    more immediate vacancies as of April 15th?

4          MS. TILLMAN:  This is beyond the scope.  Are we

5    talking medical or mental health figures?

6          MR. BIEN:  Medical.

7          THE COURT:  Why do we care?

8          I do care, but I mean it is not the scope of this

9    order.

10          MR. BIEN:  My point is that even with taking the

11    first step of some extraordinary measures, the State is still

12    not meeting the care -- levels of care that it needs.

13          THE COURT:  I understand.  Go ahead.

Page 75

Apr27-06.txt

14          Let's get on with the Bed Plan, please.

15   BY MR. BIEN:

16   Q.      Going back to other options, you were talking about

17   Community Options.  You haven't explored Community Options

18   for short-term crisis bed kind of stay for mentally ill

19   prisoners; is that correct?

20   A.      No.  Because we feel internally we have those

21   options -- much better options available to us.

22   Q.      Well, you don't right now.  There are no crisis beds

23   available.  You have 200 referrals that are not being met

24   each month.

25   A.      You asked me in terms of did we explore options

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

71

1    internally.  I think the better options are outside.  We went

2    through that before discussing why some of the providers do

3    not talk to us because of lack of payments and other things.

4    So I'm looking at more options and more realistic in the

5    short-term to check those out first before the next level.

6    Q.      Okay.  So the fact is you're not exploring community

7    options at the moment?

8    A.      Community options relative to acute psychiatric need,

9    no.

10   Q.      Okay.  Are you exploring community options relative

Page 76

Apr27-06.txt

11    to subacute psychiatric needs?

12         In other words, looking out and seeing -- the

13    Department of Mental Health is one provider.  There are other

14    mental health providers available in the market place.  There

15    are private providers, there are other public hospitals.

16    Have you explored those options?

17    A.    No.  We feel it is easier to explore the options of

18    moving out medical patients and making room for the

19    psychiatric patients internally, given the circumstances.

20    Q.    You know that there are lots of hospitals that have

21    closed down, there are locked psychiatric units in the

22    community?

23    A.    Yes.  I'm aware of this, that some hospitals are

24    closed down.  Yes.

25    Q.    So you have not explored the option of bringing CDC



CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



72

1    guards and contracting for a locked psychiatric unit in a

2    hospital?

3    A.    No, we have not yet.  No.

4    Q.    Are you aware of discussions concerning using space

5    at Corcoran Hospital, for converting it into a Level IV ICF?

6    A.    We have looked at some of those options, yes.

7    Q.    Are you aware that's been under consideration since

8    March of 2005?

Page 77

Apr27-06.txt

9    A.       I'm not sure how long it has been under

10   consideration, but I know it has been under consideration,

11   yes.  So are some of the other options that are under

12   consideration, but when you start thinking outside the box, a

13   little different methodology employed, you get it achieved.

14   Q.       As of right now, there is no plan to use the space at

15   Corcoran for Level IV ICF beds?

16   A.       It may be.  It is one of the options we are looking

17   at possibly, yes, within that time period we asked for.

18   Q.       Is there also discussion of using some of the

19   hospital space at CIM for mental health crisis beds or some

20   other purposes?

21            THE COURT:  This is Chino?

22            MR. BIEN:  Chino.

23            THE WITNESS:  Yes.

24   ///

25   ///

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬚

73

1    BY MR. BIEN:

2    Q.       And that's something that's mentioned in your Bed

3    Plan as an option; is that correct?

4    A.       It is one of the options we are looking at.  Yes, to

5    answer your question.

Page 78

Apr27-06.txt

6    Q.      What are the issues you are considering in using that

7    space?

8    A.      Like I said, I would prefer not to get into the issue

9    and discussion now.  I asked for the opportunity within the

10   time period to get back.  Generally, as I mentioned to you

11   before, the issues again are the staffing issues,

12   construction and some licensing issues.  Those are generally

13   involved in all those activities.

14          But again, if we can think outside the box, I think

15   we'll be able to manage some of those with an appropriate way

16   of looking at it.

17   Q.      Now that you've been relieved of your duty of

18   silence, can you tell me whether or not the approvals that

19   the Department of Finance has given you for salary increases

20   for mental health clinical staff address the need to staff up

21   OHUs and mental health crisis beds?

22          MS. TILLMAN:  Objection as to "duty of silence."

23          THE COURT:  What he's talking about is that up until

24   just now we don't know that the Department of Finance had

25   gotten approval.  But it is not just the Department of

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬚

74

1    Finance.  As I understand it, it's got to go to the

2    Legislature before anything gets done.

3          THE WITNESS:  Yes.
                    Page 79

Apr27-06.txt

4            THE COURT:  So --

5            MR. BIEN:  My question is -- is this part of the

6    defendants' -- have these defendants asked for what they need

7    at this point or not.  That's really what I'm --

8            THE COURT:  I'm going to say again, please get on

9    with the Bed Plan.  If I say it much more often, Mr. Bien,

10   I'm going to have you sit down.

11           MR. BIEN:  Okay.

12           Again, I'll just -- to me the --

13           THE COURT:  I understand your view.

14           MR. BIEN:  Okay.

15           THE COURT:  I'm sorry.

16           MR. BIEN:  Okay.

17           THE COURT:  I'm very frustrated.

18   BY MR. BIEN:

19   Q.      We've talked about the plan that's going to happen in

20   I guess it is going to be 45 days.  Is it your view that this

21   plan will cover, as your plan did for the Court on April

22   17th, needs through 2011?

23   A.      No.  The plan I'm looking at and addressing is the

24   short-term need that we have identified, the 75 beds in terms

25   of crisis, and 125 beds in terms of the intermediate care.

Apr27-06.txt

1   It strictly addresses that.

2           It doesn't mean we don't look at other things.  And

3   obviously, if we can add more beds available than's needed to

4   contemplate future usage or changing usage, we'll look at it.

5   But it is addressing those specifically because we're in a

6   crisis situation.

7   Q.      Okay.  Isn't it correct that you're also going to be

8   using the spring projections and updating your numbers based

9   on those projections?

10  A.      That's a separate process we are looking at in terms

11  of revising the Bed Plan.  That will be a separate process

12  looking at that.  So I'm just specifically looking at just

13  addressing those two needs right now.

14  Q.      Where did you come up with the number 75 as the

15  number of mental health crisis beds -- additional beds you

16  think you need right now?

17  A.      Well, those were the beds needs identified to me,

18  that was what our requirements are in the internal document

19  that was provided for me in terms of staff feeling that's the

20  appropriate number we need to come and target to resolve.

21  Q.      Seventy-five more than what you have today?

22  A.      Seventy-five is the gap that we are looking at in

23  terms of crisis beds, and 125 is the ICF beds.

24  Q.      Okay.

25  A.      As of today, yes.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Page 81

Apr27-06.txt

76

1    Q.    Okay.  And does that include or exclude the crisis
2    beds that are due to come on-line this summer?
3    A.    That does not include the -- I'm not sure.
4    Q.    In other words --
5    A.    Let's put it this way.  This is the gap that's
6    identified outside of the fact we already committed to in our
7    Bed Plan.  So this is the shortage that after we do what we
8    said in the Bed Plan that's additionally needed.
9    Q.    Okay.  So it's 75 more than the Kern Valley and Sac.
10   and --
11   A.    Everything in the Bed Plan, assuming we do all that
12   we committed to, this is 75 additional beds that we need as
13   we see as the gap.
14   Q.    Okay.  I think that would be tremendously appropriate
15   to get 75 additional beds.
16         THE COURT:  We're really glad you're happy.
17         MR. BIEN:  I just wanted to make sure they weren't
18   counting the same ones.
19         THE COURT:  I understand what you were doing.
20   BY MR. BIEN:
21   Q.    When do you expect an additional 75 beds would
22   actually be able to be available to the Department?
23   A.    As I mentioned to you, give us that 45 days within
24   which I will lay out the plan, the specific details of when
25   we will expect it to be and what are the impediments to get

Page 82

Apr27-06.txt
CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

77

1    to it, support me to look at some way of addressing those as

2    assistance to us in order to achieve it.

3    Q.      And when you talked about the 125 ICF beds, were you

4    talking about 125 in addition to what has been identified in

5    the Bed Plan?

6    A.      That is correct.  The same way as the other one is

7    identified, yes.

8    Q.      Doctor, just to clarify something in the record, I

9    was pressuring you about your clinical opinion about

10   something.  I didn't realize, could you tell the Court what

11   your degree -- your advanced degree is in?

12   A.      I have a Bachelor's Degree in Accounting.  I have an

13   MBA in Finance.  And I have an MBA in terms of Medical

14   Management.  And I have a Doctorate Degree in Public Health.

15   Q.      So you're not a medical doctor?

16   A.      I am not a medical doctor.  That is correct.  Public

17   health.

18   Q.      I don't mean to attack your qualifications --

19   A.      That's fine.  Understood.

20           MR. BIEN:  Thank you, Your Honor.

21           I have no further questions.

22           THE COURT:  Thank you, Mr. Bien.

23           THE WITNESS:  Thank you.

24           THE COURT:  Counsel, anything?  Any Redirect?

25           MS. TILLMAN:  Very quickly.  I know time is running.

Page 83

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬜

78

1                        REDIRECT EXAMINATION

2    BY MS. TILLMAN:

3    Q.      Doctor, you're familiar with the Court Order of March

4    3, 2006, requiring the submission of Bed Plans; is that

5    correct?

6    A.      Yes, I am.

7    Q.      And that Court Order of March 3, 2006, indicated that

8    the defendants would file with the Court a plan for acute and

9    intermediate care beds; is that right?

10   A.      That is correct.

11   Q.      And likewise, the Court Order indicated the

12   defendants shall file a plan for the provision of mental

13   health crisis beds, correct?

14   A.      That's correct.

15   Q.      Was there anything in the Court Order regarding the

16   provision of EOP or Enhanced Outpatient Beds?

17   A.      Not that I'm aware.

18   Q.      Why was that bed -- why was the Bed Plan that was

19   submitted inclusive -- or why did it address EOP beds?

20   A.      Because we were concerned that even if the Court did

21   not ask for us to address, we know we have a tremendous need

22   there.  We need to start planning right now because we're in

23   a crisis mode with all our beds, to make sure we can find a

24   solution to that.  So it is an identified target that we

Page 84

Apr27-06.txt
25    indicated to the Court we are aware of that, and we're taking



CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐



79

1    steps to try and address that.

2    Q.      And those steps will continue?

3    A.      That is correct.  We are currently working on it

4    right now.

5           MS. TILLMAN:  Thank you very much.

6           Nothing further.

7           MR. BIEN:  Your Honor, just for the record, may I

8    show this?  This is responding to this question.

9                        RECROSS-EXAMINATION

10   BY MR. BIEN:

11   Q.      Doctor, are you aware that there is a Court Order

12   dated December 20th, 2001, from this court that required the

13   Department to provide appropriate planning for Enhanced

14   Outpatient Beds?

15   A.      Not offhand, I'm sorry, I'm not.

16           THE COURT:  To tell you the truth, I didn't remember

17   it either.  But I'll take your word for it.  That's the

18   problem with this thing being 11 years old, right?

19           (Document handed to witness for review.)

20           MR. BIEN:  I have marked as the next exhibit the

21   December 20th, 2001, order of this court.

22   BY MR. BIEN:

Page 85

Apr27-06.txt

23    Q.    If you look at paragraph 2, Doctor?

24    A.    What page are you on?

25    Q.    Second page of the order?


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

                                                              80

1    A.    Yes.

2          "Within 30 days," is that the paragraph?

3    Q.    Right.

4          MS. TILLMAN:  Are you suggesting we're a bit late?

5    BY MR. BIEN.

6    Q.    I'm suggesting that there have been numerous orders

7    by this Court to provide planning and actually implement

8    plans to construct staff, enhance outpatient beds.

9          Are you aware of those prior orders?

10   A.    I was not aware of this, no.

11         MR. BIEN:  Thank you.

12         MS. TILLMAN:  Your Honor, we have nothing further for

13   this witness.

14         THE COURT:  Will you step down.

15         MS. TILLMAN:  Before we take our break, may I ask a

16   procedural question?

17         Given the breadth of Dr. Szekrenyi's testimony this

18   afternoon, I believe we have covered -- correct me if I'm

19   wrong in my assessment -- I think we have covered the topics

Apr27-06.txt

20    that were of concern to the Court.

21          THE COURT:  There are some other issues.  I'm not

22    sure that --

23          MS. TILLMAN:  I'm certainly --

24          THE COURT:  I'm looking for the -- where is the --

25          MS. TILLMAN:  Did you want further information in

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

81

1     response to paragraph 6 on page 3?

2           THE COURT:  I do want that.

3           MS. TILLMAN:  Okay.

4           THE COURT:  I do want that.  But I'm also concerned,

5     and I thought I asked a question about the difference in the

6     cost comparison of staff ratios.

7           Oh, here it is.  No, that's not it.

8           Didn't we ask the question about how come DMH is

9     getting so much more staff for the number of beds?

10          MS. TILLMAN:  I don't believe it is part of the Court

11    questionnaire.

12          THE COURT:  Oh, sugar.

13          Find that for me, will you, please.

14          I want to understand why that is.  I'm not

15    criticizing anybody.  I just want to understand how it

16    happened.

17          For some reason it never got into the questions I
                              Page 87

Apr27-06.txt

18    handed you.  I do want testimony about 6.

19          The question, which for some reason never got into

20    the questions that I gave you:  Why is there such a

21    discrepancy in the staffing ratios that DMH can achieve

22    versus those CDCR can achieve?

23          The record shows that DMH will receive 1094 clinical

24    positions for the 670 DMH acute and intermediate care beds

25    while CDCR is looking at a total of 43.8 additional clinical

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

82

1    and custodial staff positions for 714.

2          How can that be explained?

3          I mean, I'm trying to understand how this gets done.

4          That's, I think, not a -- that may be a DMH question,

5    but it may be a Department of Finance question.

6          MS. TILLMAN:  I'll try to determine that over the

7    lunch hour.  I'll check with DOF over the lunch hour.

8          THE COURT:  If you will give me 6, we'll take our

9    recess and come back.

10          MR. BIEN:  Just a lot of the questions we had about

11    crisis beds Dr. Szekrenyi was not able to answer, he referred

12    them back to Mr. McKeever.

13          THE COURT:  You want to recall him?

14          MS. TILLMAN:  Very good.  We'll proceed.

Page 88

Apr27-06.txt

15          THE COURT:  Let's get to 6, if you have somebody that

16  can testify about 6.

17          MS. TILLMAN:  Mr. Sifuentes is available, Your Honor.

18          THE COURT:  Formality requires me to state you are

19  still under oath.

20          WITNESS SIFUENTES:  I understand.

21          (George Sifuentes, having previously been sworn,

22          resumes the witness stand.)

23  ///

24  ///

25  ///


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



                                                          83

1                       DIRECT EXAMINATION

2   BY MS. TILLMAN:

3   Q.      Good morning, Mr. Sifuentes.  You testified before.

4   You've been introduced to the Court.  We need to have you

5   address another issue the Court is concerned about, and that

6   would be number 6 on page 3:

7           "The plan to accelerate the staffing and licensing of

8           the new MHCB units at Kern Valley State Prison and

9           CSP-Sacramento by June 30, what is the status of

10          these facilities."

11          Can you provide a response?

12  A.      I can provide a response in terms of construction.
                            Page 89

Apr27-06.txt

13          The Kern Valley State Prison, the CTC there, I'm
14   assuming that's what is referred to, that's been constructed.
15   And I have certified that building as meeting the building
16   codes.  That was done sometime ago.
17          In regards to CSP-Sacramento, the information I have
18   gotten from the Department of General Services is they expect
19   to have that contractor done and complete with all their work
20   by June 30th.
21          THE COURT:  Okay.  That tells me what I need to know
22   about that except we don't know about staffing.
23          What is the status of staffing for those facilities?
24          Mr. McKeever, can you tell me, if you know?
25          WITNESS MCKEEVER:  Thank you, Your Honor.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                              84

1          There is one item in the Bed Plan that was submitted
2    that addresses the staffing concerns, specifically at Kern
3    Valley, and it addresses increasing what they call a "hiring
4    above minimum" for staff, as well as increased R&Rs,
5    recruitment and retention issues.
6          So there is some plans and proposals that have been
7    submitted to increase the salaries of individuals in hopes of
8    getting Kern Valley staffed so we can get the CTC open.
9          THE COURT:  You may step down, Mr. Sifuentes.

Page 90

Apr27-06.txt

10        WITNESS SIFUENTES:  Okay.

11        THE COURT:  I'm sorry.  When do you hope to be able

12   to actually open the facility?

13        WITNESS MCKEEVER:  Well, we hope to open as soon as

14   we get approval of the increased salaries in order to get the

15   staff down there.

16        THE COURT:  I believe that what I'm asking you is --

17   I beg your pardon.  Do you know what the timeline -- what is

18   the reasonable timeline?

19        WITNESS MCKEEVER:  It's currently in the budget for

20   the Governor.  So once it gets to the Legislature, assuming

21   approval and assuming the Governor's signature at the end of

22   June, the budget would be effective July 1.

23        THE COURT:  All right.  Thank you, sir.

24        All right.  I guess that disposes of everything save

25   and except the question which I just raised.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

85

1        Oh, you want to put --

2        MR. BIEN:  I was just going to ask --

3        THE COURT:  Why don't you come around, and we'll take

4   whatever.

5        (Doug McKeever, having been previously sworn, resumes

6            the witness stand.)

7                         CROSS-EXAMINATION
Page 91

Apr27-06.txt

8    BY MR. BIEN:

9    Q.       Mr. McKeever, for talking about the Sac. MHCB and the

10   Kern Valley MHCB that are both ordered to be constructed,

11   staffed and licensed by June 30th, has there been an

12   appointment made, a schedule for DHS, the licensing people,

13   to inspect these facilities?

14   A.       The application for licensure is being provided to

15   the Department of Health Services next Friday, at which time

16   they will schedule a visit.  And my understanding is that

17   they will schedule that visit within a couple weeks after

18   receiving the application.  So my guess would be that by

19   sometime in May, early June, we should be able to have

20   findings from the Department of Health Services relative to

21   the licensure issues.

22   Q.       For both facilities?

23   A.       Yes.  Applications for both facilities are going in

24   next Friday.

25   Q.       And they've approved a change in the normal process,

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

86

1    which, at least for them, normal is they wait until it is

2    fully staffed and then come and inspect it; isn't that

3    correct?

4    A.       That is correct.  They are, as Dr. Peter mentioned to

Page 92

Apr27-06.txt

5   us earlier, they're granting -- they're giving a lot of

6   latitude to us.  They understand the urgency of this.  And I

7   believe the term that they use is they will put the beds in

8   suspense until such time as staffing is at the facility to

9   actually activate the beds.

10   Q.      Okay.  So are you still -- is it still your plan to

11   actually comply with the Court's orders and open these

12   facilities so they can provide patient care on June 30th,

13   2006?

14   A.      The plan is to have folks there.  Staffing is

15   probably the most problematic issue at both Kern Valley and

16   CSP-Sac.  So I can't say that with certainty they will be

17   open by June.

18           THE COURT:  But that's still the aim?

19           THE WITNESS:  That's our goal.

20   BY MR. BIEN:

21   Q.      Now, under this plan, the process you described to

22   the Court, they can't be opened in June because you don't get

23   authority from the Governor until the earliest to actually

24   start hiring until after the budget is passed in July, and

25   the budget is sometimes passed in August.  Isn't it correct


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


87

1   in order to comply with this order you need authority to

2   start hiring these positions in the next 30 days?

Page 93

Apr27-06.txt

3   A.      Well, we're -- Let me see if I can clarify that for

4   you.  The process that I mentioned is referenced to

5   increasing the salaries of individuals who -- the positions

6   that have already been approved for staffing at Kern Valley

7   and CSP-Sac.

8          Staffing has already been allocated to those two

9   institutions to operate those mental health crisis bed units.

10  So we're already in the recruitment phase, if you will, of

11  getting staff at those institutions.

12         The hiring above minimum, as well as the recruitment

13  and retention efforts would be an add on to those individuals

14  who are up at those two institutions.

15         THE COURT:  What you are telling folks is:  Come on

16  on the basis of what we can give you now, but we believe that

17  we're going to be able to give you this other stuff by the

18  time the budget goes through?

19         THE WITNESS:  That is, at the present time, a tool

20  that's being used by recruitment staff, yes.  But we can't

21  promise that to them.

22         THE COURT:  Of course.  God willing and the river

23  don't rise.

24  BY MR. BIEN:

25  Q.      If you had authority to actually offer the salaries

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Page 94

Apr27-06.txt

88

1    to this group of people now, you would have a greater

2    likelihood of complying with this court order?

3    A.    I would say that that's true.

4         MS. TILLMAN:  We have nothing further, Your Honor.

5         THE COURT:  You may step down again.

6         MS. TILLMAN:  Your Honor, may we excuse Dr. Szekrenyi

7    so he might attend his meeting?

8         THE COURT:  Yes, you may.  Thank you for your

9    services.

10        We will take our recess now and reconvene at two

11   o'clock.

12        (Off the record at 11:33 AM)

13        (On the record at 02:05 PM)

14        THE CLERK:  Please, remain seated.

15        Court is now in session.

16        THE COURT:  Folks, at lunch time the Special Master

17   talked to his monitors and was told as follows:

18        That the OHU that's being closed, that is being

19   converted into a OHU, whatever it is called, has 36 locked

20   beds -- 36 locked beds and across the hall, separated by a

21   door, are an additional 13 beds.

22        It is my understanding that this is being closed

23   because of Budd.  And I'll tell you right now, if that's the

24   reason  -- I mean, CMC, according to my Special Master, has

25   more folks needing mental health services than any facility

Apr27-06.txt

89

1    in California other than CMF.  And we're going to close this
2    and try and get people into other institutions that have no
3    beds because of a licensing problem?
4            We are not going to do that.
5            You know, I promised you I would not issue any orders
6    from the bench because this is a complicated problem.  This
7    is not a complicated problem.  This is a very simple problem.
8    There's 36 beds available for sick people.
9            As of today, that institution, that LOU, will remain
10   open, will be treated as a bed for -- What is it called?
11           Special Master KEATING:  MHCB, Your Honor.
12           THE COURT:  As of today.  This is absurd.
13           I have no desire to be in conflict with the state
14   courts.  I want you to understand that.  But they are
15   enforcing state law, and I am enforcing the Constitution of
16   the United States.  And there will be no close.
17           And in light of that, any other time you're going to
18   close any facility, beds of any kind on the basis of Budd or
19   other licensing, you must first get the permission from the
20   Special Master.  And you may not do it without his
21   permission.
22           It is mind-boggling.
23           Unfortunately, I was told all of this just before I
24   came on the bench so I did not get to process it in a proper
25   way and not be this upset.

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

90

1          All right.  Let's talk about the one remaining issue

2    that I asked you if you would tell me how come DMH manages to

3    get all of these folks, all this staff and we don't.

4          MS. TILLMAN:  Good afternoon, Your Honor.

5          That question requires the assistance of both the

6    Department of Finance personnel as well as the Department of

7    Mental Health personnel.

8          Where would you like them seated to ensure a good

9    conversation occurs?

10          THE COURT:  Whatever is convenient to counsel that

11    you think is useful.

12          You can put one there and one there and we will give

13    them, you know, one of the roving mics.  Whatever is useful.

14          MS. TILLMAN:  The Court has previously met with

15    Mr. Rodriguez.  I know he's sworn.  Miss Sarah Mangum has not

16    been sworn.

17          THE COURT:  She will be now.

18          MS. TILLMAN:  And Mr. Jim Alves is also with the

19    Department of Finance.  That is A-l-v-e-s.

20          THE COURT:  Madam Clerk, swear the two folks.

21          (John Rodriguez, having been previously sworn,

22          resumes the witness stand.)

23          SARAH MANGUM AND JIM ALVES,

24    were thereupon called as witnesses herein by the Defendant,

25    and having been sworn to tell the truth, the whole truth and

Page 97

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

91

1    nothing but the truth, was thereupon examined and testified

2    as follows:

3            THE CLERK:  State your names and spell your last

4    names.

5            WITNESS MANGUM:  Sarah Mangum, M-a-n-g-u-m.

6            WITNESS ALVES:  Jim Alves, A-l-v, as in Victor, e-s.

7            THE COURT:  You guys want to be seated in the jury

8    box, feel free to do so.  Whatever is convenient for you.

9            Ma'am.

10           MS. TILLMAN:  Your Honor, I believe that the

11   witnesses have found it helpful to look at Enclosure 2 of

12   Defendant's Fifth Weekly Status Report.  I have an extra copy

13   if the Court would like it.

14           THE COURT:  That's all right.  You may proceed.

15           Actually, yes.  You know, that's probably easier.

16   Yeah.  It is probably useful.

17           MS. TILLMAN:  The Court is familiar with

18   Mr. Rodriguez' credentials and background.

19           Would the Court like to know about Mr. Alves and

20   Miss Mangum?

21           THE COURT:  Very briefly, please.

22                           DIRECT EXAMINATION

23   BY MS. TILLMAN:

Page 98

Apr27-06.txt
24    Q.     Mr. Alves, could you state your present employment
25    position?


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


92

1    A.     Yes.  I'm a staff financial analyst with the
2    Department of Finance.
3    Q.     How long have you held that position?
4    A.     For approximately 19 months.  And I cover the
5    Department of Mental Health.
6    Q.     Both staffing and capital outlay or just staffing?
7    A.     Just staffing.  State operations issues.
8    Q.     Very good.
9           And Miss Mangum, your present position?
10   A.     I'm a principal program budget analyst.  And my
11   assignment area covers the Department of Corrections and
12   Rehabilitation Health Care Programs.  I've been in that
13   position a year-and-a-half approximately.
14   Q.     Thank you.
15          You've all had the opportunity to review Enclosure 2
16   to the Fifth Weekly Status Report submitted by the
17   Defendants; is that correct?
18          THE COURT:  We have to do this one at a time.  It is
19   the only way it will work.
20   BY MS. TILLMAN:
21   Q.     Miss Mangum, have you reviewed Enclosure 2 of the
Page 99

Apr27-06.txt

22    Fifth Weekly Status Report submitted by defendants?

23    A.    Yes.

24    Q.    Mr. Alves, have you done the same?

25    A.    Yes.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


93

1    Q.    Mr. Rodriguez, have you done the same?

2    A.    Yes.

3    Q.    Thank you.

4          Each of you have -- were here during the Court's

5    questioning about how the DMH staffs up its facilities versus

6    the staff ratios according to CDCR.  You had the opportunity

7    to look at Enclosure 2 to the Fifth Weekly Status Report.

8          Mr. Rodriguez, why don't you start with the answer to

9    the Court's question about the reason for the difference in

10   staffing ratios?

11   A.    I'm looking at page 4 on Enclosure 2, three-quarters

12   of the way down we just have identified the location, the

13   beds, the dollars and the positions.  And using the current

14   staffing ratios that we use at acute and ICF beds we run now

15   at CMF and Salinas Valley, we used those ratios and, of

16   course, multiplied it times the number of beds that we're

17   proposing, using current salaries, and that provides the

18   clinical positions.

Page 100

Apr27-06.txt

19          But in addition, we also -- the folks that do the

20    non-level of care activities in the facilities, like the

21    janitors, for example, they're also included in there because

22    they work for us.

23          And our medical/technical assistants, which are a

24    combination nurse and custodial --

25          THE COURT:  MTA.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

94

1          THE WITNESS:  Exactly.  They are also included in

2    those.  So that's basically taking today's world in terms of

3    ratios, multiplying it out to the projected beds, and that's

4    what we get.

5          THE COURT:  Okay.  And why is it -- why is there this

6    difference?

7          WITNESS MANGUM:  I think it is a clarification issue,

8    not necessarily a ratio issue.  On page 5 there's a list of

9    positions for CDCR custody staff.  These are the estimated

10   level of staff based on current ratios, again for the

11   facilities -- the similar facilities that are currently

12   operated by DMH.  This is the custodial -- I'm sorry -- the

13   custodial staff that would be employed by CDCR for the same

14   facilities as DMH.  So they would work together with DMH

15   employees.

16          THE COURT:  But it also, as I understand it, maybe I

Page 101

Apr27-06.txt

17    don't, maybe I'm wrong, is it not correct that the positions

18    being allowed, accorded, whatever the proper word is, to the

19    Department of Mental -- I'm sorry -- to Corrections includes

20    psychiatric staff and nurses, et cetera?

21         WITNESS MANGUM:  I do not believe these numbers

22    reflect that.

23         THE COURT:  I see.  So this is -- What you are

24    telling me is that these -- that I am incorrect, that these

25    positions are solely custodial positions?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

95

1          WITNESS MANGUM:  Correct.

2          THE COURT:  My Special Master is nodding his head no.

3    Perhaps he can tell us why.

4          SPECIAL MASTER KEATING:  The comparison is not

5    between those two sets of positions.  The comparison is

6    between the DMH allocations on the clinical and whatever, the

7    janitorial and other inclusions, versus the clinical staffing

8    for the 714 beds listed in the second listing that are going

9    to be incorporated in the EOP programs that are part of the

10   development.  And that's the contrast that I think we're

11   interested in hearing about.

12         WITNESS MANGUM:  Okay.  I believe I can answer that

13   somewhat.

Page 102

Apr27-06.txt

14          The numbers reflected in this report for EOP clinical

15     and custodial are based on EOP staffing ratios, as I

16     understand them, that the Department of Corrections has,

17     which is a different level of care.  So it would be a

18     different staffing ratio than DMH.  I don't know the details

19     of those differences.

20          THE COURT:  So what you are telling me is that either

21     the Department of Mental Health is appropriately staffed and

22     the staffing levels are appropriate and Corrections has

23     severely underestimated its needs or vice versa.

24          WITNESS MANGUM:  No.  That's not what I'm intending

25     to tell you.  EOP -- In general, my understanding is the EOP

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

96

1     is a different level of care so clinicians would see those

2     inmates less frequently perhaps than acute or crisis or

3     intermediate.

4          THE COURT:  Go ahead.

5          WITNESS MANGUM:  The other point of clarification I

6     would like to make is that I believe that these numbers are

7     incremental increases.  We do an automatic population

8     adjustment every year based on the projection of EOP

9     population as a percent of total of the Department's

10    population.  And we adjust the level of staffing on the

11    ratios.  So this is just incremental for specific additional

Page 103

Apr27-06.txt

12    facility staff.  So this is not the total staff that would be

13    serving those inmates.

14              THE COURT:  So the other explanation is that because

15    DMH is coming into what's essentially a new facility for

16    them, this is their full staffing versus the 64

17    point-whatever-it-is personnel is simply the incremental

18    adjustment reflecting new population, and that that's got to

19    be added to whatever you've allowed in the past?

20              WITNESS MANGUM:  That's partially correct.  Some

21    clarification.  I think the number of EOP -- the staff

22    associated with this incremental adjustment of EOP staffing

23    is 43.8.  And additionally, it's not simply about new

24    facility, per se.  It's about the increment of staff needed

25    when they have more treatment space because that's what's

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

97

1    being proposed.

2              THE COURT:  Let me read what you just said because it

3    didn't penetrate.

4              (Brief pause.)

5              I'm sorry.  I don't understand what that means.  Will

6    you help me.

7              I understand -- I understand you to be telling me

8    that the EOP patients will receive less frequent treatment

Page 104

Apr27-06.txt

9   than the acute patients, and that will permit some lesser

10   staffing -- requires some reduced staffing.

11        But the other question is -- I mean, unless you are

12   telling me that this 43.6-whatever-it-is is simply a very

13   small percentage of those actually staffing, and that's

14   because of the incremental increase in population, I still

15   don't understand how it could be that different.

16        Do you understand my question?

17        WITNESS MANGUM:  I do.

18        Let me start with the second part, and perhaps

19   Mr. Rodriguez can help with the level of care issue because

20   he's more familiar.

21        THE COURT:  Okay.

22        WITNESS MANGUM:  It is a small percentage of the

23   total staffing, as I understand it.  And it is not that --

24   the staff associated with the number of the population is

25   provided through our population process.  This is not


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


98


1   necessarily the base staffing that would go with the EOP

2   total population.  This is additional staff because we are

3   opening -- the proposal is to open additional program space,

4   and these are the staff associated with that.  So some of

5   them are custodial and some of them are clinical.

6        I don't know the total -- the total base number

Page 105

Apr27-06.txt

7  today.  Sorry.

8      THE COURT:  Mr. Rodriguez.

9      WITNESS RODRIGUEZ:  I was going to add, and I'm not

10  an expert, or I will tell you I don't know much about

11  staffing for EOPs, but by definition an outpatient program

12  generally is staffed on less than 24-hours a day.  You know

13  that.

14      THE COURT:  I understand that.

15      WITNESS RODRIGUEZ:  I think a large factor here is

16  the fact that acute is staffed at a higher for 24-hours a

17  day, ICF is staffed 24-hours a day but lower than acute, but

18  certainly higher than outpatient.  And there may be other

19  factors going on like that.

20      THE COURT:  I hear what you're saying.  And that

21  may -- that may explain.  But when you look at 43 and 700 and

22  something you've got to be -- you've got to be a little

23  flustered.  Maybe I just don't understand it.

24      I think what I want you to do, folks -- and I don't

25  want to take any folks away from you.  I just want to

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

99

1  understand where we are.  You know, why this is such a

2  problem.

3      What I think I want you to do is to file with the

Page 106

Apr27-06.txt

4    court in a week, if that's convenient, an analysis of the

5    totality of the EOP picture versus the totality of the

6    proposed DMH program so that I can look at it and understand

7    what it is that's -- what it is that is really going on.

8         Actually, don't file it with me.  File it with the

9    Special Master.

10        Is that all right with you, Michael?

11        File it with the Special Master.

12        Thank you, folks, for your help.

13        THE COURT:  I think that takes us through the Bed

14   Plan.

15        MS. TILLMAN:  Did you want any additional information

16   on question 7, page 4, Acceleration of CMF Construction?

17        THE COURT:  I'm sorry.  On page 4?

18        MS. TILLMAN:  Page 4, question 7:

19        What is the current projection for completion of the

20   50 bed facility at CMF and why can't it be expedited?

21        THE COURT:  Yeah.  I would like to be told that.  I

22   don't -- if you can just tell me what's going on, fine.  If

23   you need to put somebody on, do that.

24        MS. TILLMAN:  I think Mr. Sifuentes is best

25   qualified, Your Honor.

100

1         THE COURT:  All right.
                    Page 107

Apr27-06.txt

2          MS. TILLMAN:  Thank you.

3          (George Sifuentes, having been previously sworn

4          resumes the witness stand.)

5                    DIRECT EXAMINATION

6     BY MS. TILLMAN:

7     Q.     Good afternoon, Mr. Sifuentes.

8          You heard the question.  Do you have a response to

9     the Court's concern?

10    A.     Yeah.  I don't want to get too long-winded, but

11    about -- when the order came out, one of the questions that

12    was raised is can you accelerate construction of the 50 bed

13    crisis beds at CMF.

14         Now, just from a historical perspective, that project

15    was appropriated a few years ago.  And when you ask for a

16    project, a brand-new project, you go to the Legislature and

17    say, "Hey, I need this amount of money, it's going to take

18    this long to build."  And when you prepare your budget, you

19    prepare it based upon certain project delivery methods.

20         And that is the scope of the project, that is the

21    schedule of the project.  And based upon that information,

22    people make decisions as to whether to appropriate the money

23    and authorize the project or not.  In this case, we were

24    successful in getting the appropriation.

25         At the time the question was raised, "Can you

Apr27-06.txt

101

1    accelerate the schedule," we already had a bid package out on

2    the street.  We had met with contractors, and the bid date

3    was March 9th.  So when it got raised to me, I was probably

4    60 days from bid date.

5         The only thing I could do was to issue what is known

6    as a bid addendum, which I did.  But before that what I did

7    is I got the design team, and I got folks, some of my

8    construction people, and I said, okay, what can I do, given

9    I've got 60 days, and I want to be responsive to the Court.

10         What I felt I could do, and which I did, is I issued

11   a bid addendum asking all contractors who were interested in

12   the project to give me the price by reducing the schedule by

13   60 days.  Because in the document I sent out it had so many

14   days.

15         Now, the reason I can only do that is because current

16   state law says that if I go over 20 percent of an

17   appropriation for a project, I have to stop.  And I felt that

18   any action that would take this project beyond 20 percent was

19   not an action that I thought would meet our objective that we

20   were trying to do.

21         So that's what I did.  We sent it out.  We got the

22   prices.  And right now we have to augment the project by over

23   ten percent.  It's being done.  I expect to have this

24   project, which was originally scheduled for February of '08,

25   to be ready in December of '07.  That's what I asked for.

Apr27-06.txt
(916) 446-6360

⬛

102

1          THE COURT:  Thank you.

2          My questions -- Does this testimony require any

3    further examination?

4                    CROSS-EXAMINATION

5    BY MR. BIEN:

6    Q.     Did anyone ask you to accelerate the project prior to

7    receiving this Court's order?

8    A.     Yeah.  What we had done -- one thing that happened to

9    this project, you may recall, Michael, is we found we had a

10   budget deficit in this project of over seven-and-a-half

11   million dollars.  And we went back through Finance to the

12   Legislature to get additional money so we could continue.

13   And we got that and continued on with the design and tried to

14   get it out as quickly as possible.

15   Q.     So in other words, prior to when you originally

16   started the project and you went over budget before you even

17   started building, then you had to go back and it got delayed?

18   A.     Right.

19   Q.     Okay.  My question is before the Court order, did

20   anyone ask you to accelerate this project?

21          In the last six months has anyone said, "Before you

22   go out to bid --"

23   A.     No.  Not in the last six months, no.

24   Q.     And if you got authority to, let's say, increase the

25   budget by 30 percent, could it be accelerated even quicker?

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

103

1    A.       At this point in time?

2             THE COURT:  Yeah.

3             THE WITNESS:  From today forward?

4             THE COURT:  Yeah.

5             THE WITNESS:  It's a possibility.

6             MR. BIEN:  Thanks.

7             THE COURT:  Thank you, sir.

8             I think that I need counsel to advise me about what

9    I've heard today and what I ought to be doing about what I've

10   heard today.  And I want to ask counsel -- I don't have to

11   tell you I'm in a hurry, but I want to do it right.

12            And I want to invite counsel, if you'll come to the

13   podium, both of you, to advise me about whether getting it

14   right can be done from argument.

15            When I say "getting it right," I'm going to take

16   everything except what I've ordered today under submission.

17   I don't think I need -- well, I need you to advise me as to

18   whether you think briefing would be helpful or whether oral

19   argument on the basis of what we heard will be sufficient.

20            Mr. Bien, what is your view, understanding the

21   Court's concern about getting orders out on an accelerated

22   basis?

23            MR. BIEN:  I think a lot of things have come before

24   the Court in two days, and I think it would be useful to go

25   over some of them.  I also think that we should get some
                          Page 111

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

104

1    clarification here today as to exactly what has been

2    committed to and what's going to happen in the future.

3         So I think that it would be useful, and there may be

4    some need -- for example, you asked me yesterday to remind

5    you about whether DMH needs to be added as a defendant.

6         THE COURT:  I've already decided, I think.

7         MR. BIEN:  And I think defendants have some news on

8    that that they wanted to share with you.

9         THE COURT:  All right.

10        MR. BIEN:  But I think there are some things that

11   would be useful perhaps after we -- and some things just to

12   go over at least for a few minutes with argument from each

13   side.  And then, you know, I think we already have done a bit

14   of briefing.  I guess we feel a lot of urgency in terms of

15   missing the boat that's leaving.

16        THE COURT:  So does the court.  I'm very anxious

17   about the May thing.  Although, Finance has indicated to me

18   that it is possible to go back to the Legislature -- I am

19   correct that -- Yeah.  So it is possible.

20        I assume it gets more difficult the longer we take,

21   but that -- you know -- you know, we are where we are.  And

22   if it is possible -- you know, on the one hand we have this

Page 112

Apr27-06.txt

23    great urgency, and on the other hand, you know, it's foolish

24    to issue orders that either can't be complied with or don't

25    make any sense in light of our needs.   .


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

 

105

1         I mean, it is easy for me to say you will not close

2    the LOU because it is just difficult to understand why

3    anybody would do that, other than they were obeying a state

4    court action or order and I understand that.  But somebody

5    should have gone to the State and said you got no place to

6    put these people.  You understand what I'm saying.

7         MR. BIEN:  It may even be that order needs some

8    clarification because as far as I know the LOU closed almost

9    a year ago.

10        THE COURT:  It will reopen.  It will -- If it is

11   closed now -- I thought it was proposed to be closed?

12        MR. BIEN:  They're proposing to reopen it.

13        THE COURT:  It will be reopened.  They will promptly

14   do whatever it is necessary to get it reopened and get people

15   into those beds, including staffing and whatever else has to

16   be done.

17        I don't know how to say that any clearer.

18        But you're right, maybe we need a little bit of both.

19        MS. TILLMAN:  If I might speak, Your Honor?

20        THE COURT:  I would like very much to hear from you.

Page 113

Apr27-06.txt

21    And I must say I really appreciate your help.  It's very nice

22    when both lawyers are really good and really helpful.

23         Tell me what you think about oral argument, briefing,

24    or what we need to do?

25         MS. TILLMAN:  At this point, Your Honor, I think the


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


106

1    defendants would very much appreciate the Court issuing an

2    order indicating that it has reviewed, approved and adopted

3    as an order of the court the long range plan that was

4    indicated in the Bed Plan.

5         THE COURT:  That I can do.  And I'm satisfied, I

6    think -- although I'll hear from plaintiffs -- I think the

7    long range plan is appropriate, feasible and I will approve

8    it.  And do you have objection to my doing that?

9         MR. BIEN:  Our suggestion was that it be approved,

10    but with the proviso it needs be revised because of the

11    population.

12         THE COURT:  Obviously.  We all agree to that.  I

13    don't think there is any doubt about that.  But beyond that,

14    you're satisfied?  I intend to do that.

15         MS. TILLMAN:  Thank you.

16         THE COURT:  All right.

17         Now, let's talk about the immediate problem.  What do

Page 114

Apr27-06.txt

18    I do, and in regard to that what is the pleasure of the

19    defendants concerning oral argument, briefing or both?

20         MS. TILLMAN:  At this point, I don't see the need for

21    oral argument unless we do provide some briefing.  I think

22    the defendants would very much again appreciate an order

23    indicating that we have 60 days to come up with better

24    strategies to deal with the short-term gap.

25         THE COURT:  You see, I agree I have to give you some

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

107

1    time.  I agree with that.  And 45 days I suppose I have to

2    live with because people can only do what they can do.

3         The problem is I keep finding things, just in the

4    course of this hearing, which you can do now that you don't

5    need an order from the court, you don't need a long range

6    plan.

7         I mean, I find it -- and I'm not criticizing.  I know

8    I am.  But I don't mean it personally.  But it's just

9    inconceivable to me that the LOU got closed a year ago and

10   nobody went to the state court and said, "You know, this is

11   impossible, we don't have any place to put these sick

12   people."

13        MS. TILLMAN:  If I might say, Your Honor, I

14   personally need to take a second look at that LOU issue.  My

15   understanding -- you know, obviously I am not qualified to

Page 115

Apr27-06.txt

16    state all the facts, but I thought it had been closed

17    before -- well before a year ago based upon concerns voiced

18    by the plaintiff class in Budd.

19        So I'm very happy to take a second look at the LOU.

20    I think that was one of the strategies indicated in the Bed

21    Plan to take a look at the LOU and see if we could open it up

22    for care purposes.  But we will pursue that immediately.

23        THE COURT:  You will, I will tell you.

24        MS. TILLMAN:  We're also happy to provide a list of

25    code issues so the Court's familiar with what barriers

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

108

1    exist.

2        THE COURT:  I need to know that.

3        MS. TILLMAN:  And then, again, perhaps a written

4    order that we can take to the Budd court indicating this

5    court's concerns about licensing as a barrier to full use of

6    facilities would be helpful.

7        THE COURT:  We can do that as well.

8        Let me talk to -- I'm going to take a ten minute

9    recess.  I want to talk to my law clerks and Special

10    Master.

11        MS. TILLMAN:  Thank you.

12        (Off the record at 02:34 PM)

Page 116

Apr27-06.txt

13    (On the record at 02:50 PM)

14        THE CLERK:  Please, remain seated.

15        Court is now in session.

16        THE COURT:  Folks, let me first of all say that the

17    simplest thing is in order to accommodate Judge Henderson's

18    schedule, the Plata hearing you heard about will commence at

19    1:30 instead of 10:00 or whatever we told you.  There will be

20    an order out telling you that.

21        I'd like counsel to approach the podium, and I want

22    to tell you what my tentative thoughts are and urge you to

23    talk to me now because I don't think I'm going to wait unless

24    I really hear a good reason to have written briefs.

25        First of all, of course the Court intends to approve

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

109

1    the long-term plan subject to the modification -- the

2    population modification.  I want to see the population

3    modification within 60 days filed with this court.

4        Second, the Court will allow the 45 days for the

5    Department to try and work through the MHCB crisis.  It will

6    be filed here.  The plaintiffs will be given ten days to

7    respond, and the Court will either set a hearing or rule

8    depending on what I got in front of me.

9        And those two things, I think, are very simple.

10    Nobody should care.  I mean, it is giving you a short period,

Page 117

Apr27-06.txt

11    but this is a crisis fellows.

12        My present intention is to order that the 36 beds at

13    CMF being maintained presently, that the heat plan be

14    operated, that the defendants be ordered to do whatever they

15    can -- and I recognize there are limitations -- but whatever

16    they can to maintain the mechanics, to maintain temperature.

17    But that they -- you know, we've gone several years with

18    people there under the heat plan, and thank God we haven't

19    lost anybody.  I'm not saying that's good.  I'm just saying

20    this is a crisis.  We have no place realistically to put

21    people, and that's what we're going to do.

22        The Court intends to order that the defendants make

23    the 36 beds at SV, Salinas Valley, as soon as possible.  That

24    the next 36 beds be processed in the same manner as the first

25    36 with the appropriate waivers made by -- I have a great

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

110

1    deal of confidence in him.  He seems like a terribly sensible

2    human being -- understanding that these are temporary

3    measures.  And as -- I'm sorry Dr. Peter, I can't pronounce

4    your last name.

5        WITNESS SZEKRENYI:  Dr. Peter is fine.

6        THE COURT:  As Dr. Peter says, these are temporary

7    solutions, they have to be brought up to code in due course.

Page 118

Apr27-06.txt

8    We're doing this as an emergency measure.  And an emergency

9    measure means emergency, not forever.

10         The Court is also going to order that the -- you do

11   what must be done to examine -- and I want the Corrections

12   Department rather than the Department of Mental Health, and

13   there's a reason for that -- I want the Corrections

14   Department to examine the waiting list at Salinas Valley.

15   And anybody who is a I, II, III or low IV will be transferred

16   to the -- I don't care whether it is ASH or Coalinga, that

17   doesn't matter to me -- in accordance with the MOU.

18         And to the extent that the MOU does not permit

19   that -- I'm not talking about the high risk folks.  I'm

20   talking about anybody who would qualify under the MOU is to

21   be identified.  I assume it is handful, but somebody has to

22   look at it in a careful, sensible way.  And if there are

23   cases which can't be resolved, if there's some dispute

24   between the Department and Corrections, they'll be resolved

25   by going to the Special Master who will resolve their status.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

111

1         And again, I want to make clear that these are

2    tentative.  And I'm going to ask you folks to go talk to your

3    clients and your principals and make sure that these don't

4    cause so much problem -- I don't think they do, but, you

5    know, you never can tell.

Page 119

Apr27-06.txt

6          Too bad I can't read my handwriting.

7          The 30 bed, Level IV, six months.  Boy, I sure knew

8     what I meant when I wrote it.  Anybody know what I'm talking

9     about?

10         SPECIAL MASTER KEATING:  A reference to the Coalinga

11    study.

12         THE COURT:  Oh, yes.  Thank you, sir.

13         That the Court intends -- Thank you.  The Court

14    intends to direct that a study be done -- a cooperative study

15    between -- with DMH and Department of Corrections about the

16    conversion of 30 beds for Level IVs at either ASH or

17    Coalinga.  I don't care where.

18         If it is not feasible, it isn't feasible.  But I want

19    to know within six months what the costs are and what the

20    feasibility is and what the impediments are.

21         MS. TILLMAN:  If I might ask, Your Honor,

22    high-custody, Level IVs?

23         THE COURT:  Yes, ma'am.  Those are the real people we

24    have no beds for.

25         MS. TILLMAN:  Uh-huh.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

112

1          THE COURT:  Mental Health -- MHCB.  I'm actually

2     getting to do that.  I wish I wouldn't.  By the 1st of July,

Page 120

Apr27-06.txt

3    you'll activate the CTC at Kern Valley and at CVC and at

4    Sacramento.  Or, if you cannot do it by the 1st of July, you

5    will come back to the Court and tell me why.

6         And I want to say that I've given the Department 45

7    days because I think that's realistic, but if there are

8    things that you can identify which you can do, you ought not

9    wait, you ought to do them.

10        I'll take, if you want to talk to your clients -- It

11   doesn't seem to me that any of this represents an undue

12   burden.  But, you know, I don't know.

13        Do you want to talk to your clients or are you

14   satisfied?

15        MS. TILLMAN:  Your Honor, I would like a moment.  I

16   will suggest, if the Court is open to the concept, of

17   indicating in the Court Order regarding the long-term plan

18   that we be -- the defendants be ordered to look at

19   accelerating the construction of those particular projects

20   and report back to the Court, say, within 60 days with

21   readiness to identify any particular statutory, licensing or

22   staffing barriers.

23        THE COURT:  That will be the order.

24        MS. TILLMAN:  Likewise, the same request for the

25   short-term plans that are due in 45 days.  If there are any

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

113

Apr27-06.txt

1    particular barriers, statutory, licensing, or otherwise,

2    we're to identify them for the Court.

3        THE COURT:  And the Court will do whatever it can to

4    make those go away.

5        MS. TILLMAN:  Thank you.

6        MR. BIEN:  Can I just clarify one thing, Your Honor?

7        THE COURT:  Yes.

8        MR. BIEN:  In the short-term, the 45 day plan, I

9    think Dr. Peter said he was also going to address the

10   short-term ICF needs in that period.  Not just --

11       THE COURT:  He is nodding his head yes, that's his

12   intention.

13       MR. BIEN:  Okay.

14       MS. TILLMAN:  Lastly, if it's the desire of the

15   Court, if the Court could order that the Department of Mental

16   Health submit to the Court and to plaintiffs' counsel under

17   seal the Draft Settlement under GRIPA -- or CRIPA, C-R-I-P-A.

18   I understand that the Department of Mental Health has

19   received authority to do so.

20       THE COURT:  That will be the order as well.

21       When you said that, that reminded me of something

22   else that has now just escaped me.

23       Give me a moment.

24       (Brief pause.)

25       Gone.  Will you consult with your clients, please.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360