Apr27-06.txt

114

1           MS. TILLMAN:  Thank you.

2           MR. BIEN:  You had talked about whether you wanted

3      DMH in or out.

4           THE COURT:  Oh, I'm going to take care of that.  DMH

5      is going to be in.

6           (Brief pause.)

7           THE COURT:  Yes, ma'am.

8           MS. TILLMAN:  We're ready to respond.

9           THE COURT:  Mr. Bien?

10          MR. BIEN:  The only other things that we remember

11     were important was the commitment to begin accepting patients

12     into Coalinga in May.  I think it needs to start that ball

13     rolling.  I think it was 50 beds in May, 50 men moving over.

14          And in terms of the revised interim emergency plan,

15     there was also discussion of the EOP bed shortfall.  And I

16     assume that the defendants are addressing it, but I wanted to

17     clarify that should be included in the order.

18          THE COURT:  We'll take care of that.

19          I thought we had modified, and for some reason, which

20     I don't recall, there were going to be 25 moved over.

21          MS. TILLMAN:  I was looking at Mr. Rodriguez.

22          THE COURT:  I can't remember why.

23          MS. TILLMAN:  Nor can I, Your Honor, I just remember

24     the number 25.

25          Do you want to speak to that?

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

                                                              115

1          MR. RODRIGUEZ:  Number one, you don't move 50 people

2     out of Atascadero in a short period of time.

3          Secondly, in talking this morning with the staff at

4     Atascadero, what you don't want to do is be moving people

5     into Coalinga who are on their way back to CDCR.  When

6     they're on their way back to CDCR, you don't move them into

7     Coalinga as a short stop.

8          THE COURT:  Yeah.  I understand.  I don't -- I can

9     live with the 25 being prompt, but I expect the additional 25

10    within -- what do you need, 30 days beyond that?

11         MR. RODRIGUEZ:  Yes.

12         THE COURT:  All right.  That will be the order.

13         MS. TILLMAN:  Your Honor, just some points of

14    clarification.

15         THE COURT:  Sure.

16         MS. TILLMAN:  In regards to the exemption of the LOU,

17    the Locked Outpatient Observation Unit at CMC, its exemption

18    from the Budd order, so to speak, does that exemption apply

19    to all other institutions statewide?

20         THE COURT:  This one is so self-evident that I just

21    don't understand it.  If there are others, I would -- I would

22    suggest that the defendants let me know about them and let me

23    know about the conditions.  I'll take it up with the Special

24    Master.  He can go make a determination whether or not they

25    are in a condition for us to be able to make a similar kind

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

116

1    of order.  I would not do that as a blanket order because I

2    don't know what's out there.

3        MS. TILLMAN:  We might just identify that as a

4    possible barrier in terms of short-term strategies and bring

5    it up to the Special Master's attention.

6        THE COURT:  That would be satisfactory.

7        MR. BIEN:  Your Honor, on that point, as the Court is

8    well aware, we have a class action, and a state court judge,

9    and years of working, and we don't think there is anything

10   inconsistent between the two remedies.  I'm not Budd counsel,

11   but I would think it would be inappropriate to take the state

12   court and Budd counsel out of the loop.  And so we'd like any

13   proposal by the defendants to first try to resolve it in the

14   state court before it goes to you.

15       THE COURT:  May I say I don't -- that's good sense,

16   but I want to know about it and I want to know that they're

17   doing it.

18       What's happened is -- and I don't mean this as

19   criticism.  You know, you're faced with lots of judges giving

20   you lots of orders.  And I don't blame you for sometimes

21   wondering which way to face.  But we've got to know about it.

22   That's what I'm saying.

23       MR. BIEN:  We agree.

24       THE COURT:  They ought to know about it as well.

Page 125

Apr27-06.txt

25          All right.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

117

1           MS. TILLMAN:  The only other point, Your Honor, is

2     the direction that there be a cooperative study accomplished

3     by DMH and CDCR in regards to the housing of Level IVs at ASH

4     or Coalinga.  And may I just point out to the Court I think

5     there is a -- my understanding is that Coalinga is a facility

6     that was built, in part, with the help of the Department of

7     General Services.  They have some expertise.  So within the

8     Court's desire, can we bring them into the dialogue?

9           THE COURT:  That's fine.  That's fine.

10          All I want to do is I want to make sure that people

11    understand that we're not kidding.  There may be insuperable

12    impediments.  I understand that.  But one of the reasons I

13    want the Department of Corrections and Rehabilitation

14    involved is they've got a different stake.

15          And you know -- Well, I've said what I've said.

16          MS. TILLMAN:  We have nothing further.

17    Thank you very much, Your Honor.

18          THE COURT:  Thank you, folks, very much.

19          Let's turn to the two objections that the -- the two

20    remaining objections to the 15th round.

21          Mr. Keating, will you speak to the first one.

Page 126

Apr27-06.txt
22          MS. TILLMAN:  Before we proceed further, may I ask
23   everyone be excused.
24          THE COURT:  Everyone else is excused.  Thank you very
25   much for coming.  Thank you very much for your help.



              CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                              (916) 446-6360



                                                              118
1           SPECIAL MASTER KEATING:   Your Honor, one of the
2    difficulties of stretching this by a day is giving me a night
3    to think about some other things to say.  So if this gets
4    over long or redundant, I'll rely on your discretion to shut
5    me off.
6           THE COURT:  All right.
7           SPECIAL MASTER KEATING:  Some background for this
8    particular issue, in the 15th Round Compliance Report that
9    was submitted to the Court, we found, among other
10   deficiencies in institutions around the department, in nine
11   separate facilities, deficiencies and concerns raised about
12   the adequacy of psych-tech rounds.
13          Psych-tech rounds are, very briefly, conducted
14   preliminarily in administrative segregation units, but in
15   other lock-up units as well.  And they are designed to really
16   be the first step in the triage or the kind of skirmishers
17   and the armies of the mental health clinicians.
18          And their job is the go out to tour the facilities,
19   try and make sure they spot new comers, that they identify
                              Page 127

Apr27-06.txt

20    them, that they make sure that they are evaluated for mental

21    health concerns pursuant to the policies that are in order,

22    that they regularly tour the facilities, observe people, talk

23    to people, both people who are on the caseload and those who

24    are not on the caseload.  Because everybody recognizes that

25    the environment of administrative segregation is intense.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

119

1    People come in because they've been involved either in some

2    sort of fracas or violation -- rule violation or because

3    they're there because of concerns about their own safety.

4         So this is a population that has problems and ought

5    to be looked at pretty closely.

6         And the triage function involves the observations of

7    inmates, interactions with the prisoners themselves, also

8    interactions with custody officers who are working the tiers

9    to find out who they think might have some problems, to go

10    interview those people, talk to them, and determine whether

11    or not there is some need to link them to the professional,

12    either case workers who are psychologists or psyc. social

13    workers or to psychiatrists for further evaluation, further

14    help, further treatment, and induction if they're not members

15    of the caseload into the caseload.

16         That's the sort of functions that the psych-tech

Page 128

Apr27-06.txt

17    performs.

18         In the assessment that we made of the nine

19    institutions, those were all based on monitors' visits.  And

20    let me give a little digression to kind of explain how the

21    monitors review this particular subject and this particular

22    requirement.

23         They're really a bunch of different things that are

24    done.  Some of them are inner-personal in nature.  Our

25    monitor teams, when they go out to the institutions, twice

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

120

1    annually, will talk administrators of the institution, that's

2    both custody and clinical or mental health administrators,

3    they'll talk to clinicians themselves who provide the

4    treatment on the line, and then also as a normal part of

5    every monitoring visit, they will hold a meeting with just

6    clinicians outside of the presence of their supervisors

7    and/or administrators to try and get some more candid

8    feedback from them.

9         They obviously also talk to a number of prisoners in

10    the course of their visit.  Some of them are simply randomly

11    selected, some of the people who are identified to be

12    interviewed come to us really from the plaintiffs who have

13    identified through letters and other communications from the

14    institutions those people who seem to be having some problems

Page 129

Apr27-06.txt

15    with the delivery of mental health in Ad. Seg. or with the

16    attendance of psych-techs or clinicians in Administrative

17    Segregation.

18         If those people show up, we try to not necessarily go

19    directly to them, but include them in a random sample and get

20    them to give some feedback to the people who are monitoring

21    from our perspective.

22         Lastly, obviously, they make personal observations.

23    They go to the Ad. Segregation units and other lock-up units

24    and spend some time walking the tiers, watching the

25    psych-techs, going on rounds with psych-techs to see how

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

121

1    they're conducted.  And in their going around, talking again

2    to those correctional officers who are on the job there as

3    well as clinicians, ask about problems, frequency of

4    attendance, length of times, et cetera, as well as prisoners

5    who are on those facilities.

6         Those are all the inner-personal ways, but none of

7    those is really entirely satisfactory because people are

8    often speaking from their own biases and may have perceptions

9    that are not necessarily fully accurate, whether those are

10    prisoners or clinicians or custody officers.

11         THE COURT:  Sure.

Page 130

Apr27-06.txt

12          SPECIAL MASTER KEATING:  So there are a number of

13   documentary checks that our people perform regularly.  And

14   they perform them typically when they have any suspicions on

15   the basis of their interviews that something is not quite

16   right here.  And amongst those things that they look at are,

17   first of all, the logs in each lock-up unit, which requires

18   that everybody who comes into the unit to sign in, say when

19   they came in, and to sign out and when they went out.

20          Psych-techs are subject to that as well.  If they

21   don't show up, and if they don't sign the logs, then the

22   obvious suggestion is they're not doing their job.

23          Another documentary way of checking their performance

24   of duty is to look at the mental health evaluations that

25   they're supposed to be conducting for people who newly arrive


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



                                                            122

1    in the administrative segregation or lock up context.  And if

2    they're not being performed, then you know they're not doing

3    that aspect of their job.

4          A third requirement in terms of documentation is that

5    the psych-tech write what they call weekly summaries which

6    are summaries of their rounds that are on a daily basis, but

7    that are pulled together each week, and then are put into

8    individual records or charts of the inmates themselves.

9          And the last way -- Well, not quite the last.
                         Page 131

Apr27-06.txt

10  Another individual way, from the perspective of the

11  psych-techs themselves, is by writing progress notes in

12  individual charts for inmates who have become very

13  problematic and to whom they make recommendations for

14  psychiatric follow-up or other kinds of follow-up.

15      And lastly, the institution itself, in the process of

16  the monitorship over the years, has been required to and

17  learned to conduct their own audits of all sorts of subjects,

18  in this case, the extent and frequency with which the

19  psych-tech rounds are conducted in different units in the

20  institutions.

21      So all those are documentary ways of checking the

22  inner-personal sorts of evidence that you generate.

23      With that background of the nine institutions in

24  which there were problems found in the 15th Round, they fell

25  into different pieces of that mosaic.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

123

1      In five of the institutions, the deficiencies found

2  involved problems with the documentation in one or another of

3  those aspects.  That is to say in one instance the logs did

4  not really support the numbers of visits that were reported

5  as being made.  And so we looked at the logs, we found that a

6  problem, and told the institution that's a problem.  If

Page 132

Apr27-06.txt

7    you're not there, and there's no sign in, we don't know

8    whether you are there.

9         THE COURT:  We don't know whether there's a problem

10   or they weren't there.

11        SPECIAL MASTER KEATING:  Or whether they didn't

12   document.

13        THE COURT:  Yeah.

14        SPECIAL MASTER KEATING:  In two other instances,

15   there were some trouble with inmate charts where there should

16   have been summaries, there weren't summaries.  In other

17   inmate charts where there should have been some progress

18   notes, based on what happened to particular prisoners, there

19   should have been progress notes from a psych-tech.  There

20   weren't.

21        So all of those issues are brought up with the

22   institution and with the clinicians on the spot.  And they

23   are reminded that all of these are aspects of monitoring that

24   have to be provided and responded to.

25        In three of the institutions, the deficiencies


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

124

1    involved the quality of the psych-tech rounds themselves.

2    Either they were conducted in way too rapid a session.  The

3    psych-tech signed in at two o'clock and at 2:20 signed out

4    again.  And you just know that with 50, 60, 70 people to see,

Page 133

Apr27-06.txt

5     that's something that's wrong.

6             And other ways of doing that are looking at the
7     summaries which are sloppily put together or irregularly and
8     erratically put together.  That was the case in three of
9     those institutions.  And also, obviously, the quality of the
10    rounds is something that monitors own observations can check
11    on and see.

12            Two of them involved audits conducted by
13    institutions.  And in one of them, this was in Avenal State
14    Prison, they found a long period of time where the amount --
15    the number of rounds provided declined precipitously.  They
16    conducted an audit, confirmed that, and then they reported
17    it.  After the audit was made, and they became aware of the
18    problem, they then addressed the problem.

19            And that's well and good.  That's what the audits are
20    supposed to do.  But the problem in this particular case was
21    that there had been no subsequent audit to document the
22    improvement that they verbally reported.

23            And although we perhaps believe their verbal reports,
24    we still want to see some documentation that supports that.

25            In Sierra Conservation Camp, in the Ad. Seg. unit

125

1     there, there were -- there were two audits conducted, one by

Page 134

Apr27-06.txt

2   the institution, which said everything was fine -- matter of

3   fact, gave them an excellent audit in terms of both quality

4   and the performance -- but there was a departmental audit

5   that came in -- and this is part of the Department's effort

6   to do some oversight of quality control -- they came in and

7   did a audit themselves that questioned whether the success

8   was quite as great as the institution had seen.

9       There was some discrepancies between the monitor on

10  the spot did not have the state audit with all of its

11  methodologies and data that was required so it was hard to

12  know.  But it was an issue.  And we put that issue in front

13  of the institution and expect them to address it before we

14  come back in the next instance.

15      In one of the institutions, the ninth institution

16  that was included in the places with a problem, was in the

17  new Administrative Segregation unit, the stand alone unit,

18  which was the subject, if you will recall, in October of

19  2003, of considerable concern that led to a hearing before

20  you and an order that set very strict limits on how those

21  units could be used and who could be housed in them,

22  et cetera.

23      The stand alone unit opened up at CSP-Sacramento

24  during the 15th Round.  Our people, as they have every since

25  October of 2003, made a visit shortly after it opened to see

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Page 135

Apr27-06.txt

1    whether they were in compliance with the requirements of that

2    particular order.

3         They found some problems with the logs.  But let me

4    give you the statistics on the problems with the logs.

5    Basically, we're in a slightly over seven-month-period since

6    the thing had been opened.  There were seven days in which

7    there were no log entries.  Hard to make out of that a case

8    that PT rounds were not being conducted as they should be

9    conducted.

10        However, in that case also the monitor went on the

11   tour with the PT who had been assigned to that originally,

12   and still really was not very effective, nor was the quality

13   of his particular rounds good.  And he made some suggestions,

14   made some -- and when he goes back again, he will check on

15   those.

16        Those were the nature --

17        THE COURT:  Can I ask a question?

18        It hadn't occurred to me before.  I would have

19   assumed, but maybe I'm just wrong, that there's a rotation in

20   psych-techs so that, you know, people that just see you on

21   your first go round, when you come back, there may be

22   somebody else there.

23        SPECIAL MASTER KEATING:  That happens.  There are

24   vacancies.  There are people who quit, get sick, move

25   elsewhere.  So that happens pretty frequently.

Apr27-06.txt

127

1          Also, incidentally, amongst the nine facilities, six
2     of them satisfied the monitors in preceding rounds that they
3     were in full compliance with the requirement for psych-tech
4     rounds.
5          What happens, though, is, again, through
6     observations, through indications from the plaintiffs,
7     through other things as our monitors go through their general
8     review, suspicions arise.  So even though in an area where
9     there has been compliance reported in the past, they're ready
10    and able to go check and see whether, in fact, that has been
11    maintained.
12         THE COURT:  You know, I'm sorry.  I'm becoming
13    anxious.  You know, some day I want to have us gone from
14    these institutions.  And I know you guys don't believe that,
15    but I can't tell you all how anxious I am for that some day
16    to come.
17         What I am hearing, Michael, and what's a little
18    anxiety provoking --
19         SPECIAL MASTER KEATING:  I know what is coming in
20    terms of the anxiety, and let me address that because that's
21    a perfect segue to, I think, where we're going.
22         I want to -- I want to answer that by talking a
23    little bit about the monitoring process itself.  The teams
24    come from a pool of ten individuals at this point.  And it's
25    been slightly larger or smaller in times in the past, but now

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

128

1    there are ten.  There are four psychiatrists, two

2    psychologists, three attorneys and one individual with a

3    background in public administration.

4          All of those ten people have now been operating in

5    the California Department of Corrections as monitors for

6    eight-to-ten years.  And they have been conducting in these

7    semi-annual reviews what I call a "revolving" tutorial on

8    management and on quality assurance and quality management in

9    these departments.  And what the purpose of it is is to help

10   the institutions develop tools to monitor their own kinds

11   of --

12          THE COURT:  Precisely.

13          SPECIAL MASTER KEATING:  -- failures and deficiencies

14   to be able to identify them and to be able to address them.

15          And I think it is because of that -- I don't mean to

16   in any way denigrate the importance and the real importance

17   of psych-tech rounds because it an essential component of

18   providing mental health services within the locked up context

19   and environment, which is a pervasive and dangerous one, in

20   the CDCR.

21          But the monitoring process is really an effort to get

22   them to do for themselves what must be done if we can ever

23   cut the umbilical cord between the institutions and the

24   system itself.

25          Consequently, even though those deficiencies are

Page 138

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

129

1    identified in the report, I have been in the past -- and the

2    plaintiffs do not contest the findings, what they contest is

3    my failure to come to you with a request for a recommendation

4    that specifically addresses that problem and the elimination

5    of those deficiencies in a way that's satisfactory to them,

6    and not necessarily just satisfactory to them, but makes

7    clear to people that this has to be done and must be done.

8         And I think what I'm saying is that the monitoring

9    process itself is a basic part of educating the institutions

10    to do that sort of thing.  I'm reluctant to in each instance

11    where there are deficiencies, and in the last 400-plus page

12    report, it was 400 and some pages of deficiencies, sometimes

13    institutional, and then the last hundred pages pulls them all

14    together and says that these are the institution-wide things

15    and these are some recommendations.

16         But I think if we have a written order from the

17    Court, particularly when orders already exist about the

18    necessity and the number of PT rounds that have to be

19    conducted, it is redundant.  And I think, in the long-term,

20    damaging to the credibility of the Court and to the process

21    itself to continue to do that.

22         Therefore, I would suggest, that at least relative to

23    this particular objection, that there not be an order from

Page 139

Apr27-06.txt

24    the Court directed to this, but that we be directed in the
25    monitoring process to continue to monitor those things.  And

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

130

1    when those things get out of hand, to come and report to you
2    and get some subsequent order.
3         THE COURT:  All that seems terribly sensible to me.
4    And, you know, part of the problem is there are human
5    failures.  That's going to happen.  Justice Renquist once
6    wrote there is no such thing as a perfect trial.  And those
7    of us who conduct trials know that very well.  You know, we
8    drop the ball more often than anybody wants to admit.
9         And so the fact that you generate these reports and
10   that there's deficiencies, I certainly understand your
11   concerns.  It doesn't mean that the Court has got to get in
12   there if I'm satisfied that the effort is being made to
13   educate the institutions about their responsibilities.
14        You know, I sometimes worry that the plaintiffs don't
15   really understand that it is the responsibility of the
16   defendants to ensure a constitutionally adequate system, that
17   we're only there as long as they have been unable to achieve
18   that end.  And that some day, God willing, we're going to
19   leave.  And if they aren't prepared to do it themselves, you
20   know, this whole effort, all of this investment will be

Page 140

Apr27-06.txt

21    beside the point.

22          That's not to say that I don't expect in ten years

23    somebody sitting in your shoes, Mr. Bien, is going to come

24    back because human beings fail.

25          Well, Mr. Bien, having heard the Master's view, I

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

131

1    take it you -- Well, no, you tell me what your view of it is.

2          MR. BIEN:  We have a slightly different view, again,

3    with all due respect for the Master and the monitors who are

4    doing a fantastic job.

5          In getting ready for this hearing, I was looking at

6    all the prior orders the Court has issued on various things.

7    It was shocking.  I agree with Mr. Keating that just issuing

8    another order to tell people to do something they've been

9    ordered to do is a mistake that we've been -- we've been

10   asking you to do it, and this has been happening, and I think

11   it is not the right route.

12         But we think the solution is not to let people off,

13   the solution is actually to find people in the Department of

14   Corrections who are going to take responsibility for

15   complying with the orders.

16         People at prisons who are designed to do that are

17   called wardens.  And we find that when wardens are

18   responsible for something, it gets done.  And all --

Page 141

Apr27-06.txt

19   we're not asking for a new order that says to do something

20   different, we're merely asking that wardens certify to the

21   Court that they are aware of the orders and that they are

22   complying with them.  That's all we're asking.

23        And the reason -- one reason is, Your Honor, there is

24   a tremendous crisis right now in the systems.  There's

25   tremendous overcrowding.  And each warden is doing a horrible

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

132

1   job that I wouldn't want.  In fact, they're quitting left and

2   right.  So we have a lot of new wardens and acting wardens.

3   But they're being asked to manage prisons that are

4   overcrowded.

5        They have 20 to 25 percent understaffing of custody

6   officers.  Forget about clinical staff.  Custody officers.

7   So units are locked down.  They're opening new Ad. Segs. all

8   the time.  Each time you go to a prison, there is new Ad.

9   Seg. They call them overflow units.

10        Well, they manage to add psych-tech rounds to those

11   units.  And it is an extra thing.  And they have to do that.

12   But they're juggling a lot of things.

13        Mr. Keating and his staff go around, there are ten

14   people, but they don't really visit these prisons very often.

15   To tell you the truth, some of them haven't been visited.

Page 142

Apr27-06.txt
16    You know, Avenal was skipped for a year-and-half, two years.

17    For good reasons.  It's not his job to do this.  It is their

18    job.

19        So we think that the order should start being

20    oriented a little bit more towards, "It's your job, warden,

21    to comply with Coleman."

22        We are also suggesting that to the Department of

23    Corrections, not just to you, but we think one of the major

24    problems with Coleman compliance is that wardens don't lose

25    any points with anyone if they don't comply with Coleman

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

133

1    orders.

2        It doesn't seem to matter to their -- to the

3    Legislature.  It doesn't seem to matter to the boss.  So

4    we're working with the Legislature and governor's office.  It

5    should matter if you're not complying with the order of a

6    federal court.  That should count somewhere in your job

7    evaluation.

8        So we're going to keep on suggesting that the CPR

9    order, which happened this last year, we thought worked

10    pretty well where, you know, there's a stipulation and

11    agreement to solve a problem.  We didn't have to have a

12    hearing where the Court entered an order.  But in order to

13    get the order implemented, we've learned that just sending

Page 143

Apr27-06.txt

14    out a memo, even if it is signed by the Director --

15         THE COURT:  We don't have a director now.

16         MR. BIEN:  We don't even have a director.  But there

17    is so much on their plates, that just -- they get so many

18    memos.  So we think it is time for the institutions -- This

19    is not instead of monitoring.

20         THE COURT:  No, I understand.

21         MR. BIEN:  It time for the institutions to start

22    certifying that they are complying with the order so that,

23    you know, there is someone responsible.  That's really the

24    suggestion.

25         Out of the four hundred pages of stuff, we didn't ask

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

134

1    that every single thing be looked at.  We picked very few

2    things.  But, you know, the other thing that's relevant here,

3    that hasn't been discussed, is that the Special Master just

4    issued a report about suicide.  And one of the report's

5    recommendations is that Department has got to do something

6    about suicides in Ad. Seg. units.

7         Well, this is one of the things that the Department

8    has to do.  And the Department said they are going to do

9    something.  By the way, the Department didn't object to this

10    request by the way.  They said they were going to give you a

Page 144

Apr27-06.txt

11    plan as of tomorrow, I think.  So it's sort of unobjected to.

12         THE COURT:  Well, I understand.

13         MR. BIEN:  I understand this is a balancing of -- the

14    problem with all of this now, and it is the same subject of

15    the hearings, how do we bring the Department into compliance.

16    What's the best?  Carry sticks?

17         And I have to defer to you and Mr. Keating, but I

18    don't know exactly what, but we feel that in some of these

19    areas we need to develop some new strategies.  And I don't --

20    I'm not sure what they are.

21         That's really all I have to say.

22         THE COURT:  Ma'am?

23         MS. TILLMAN:  Thank you, Your Honor.

24         Defendants appreciate the comments of the Special

25    Master, particularly the on-going efforts of the Special


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                              135

1    Master's team to improve performance in this area.

2         As much as the plaintiff is concerned, I think that

3    the defendants have indicated in writing in their statement

4    of March 17th their own recognition that there is a problem.

5    They intend to address that problem through a plan that will

6    be submitted tomorrow.

7         There is no doubt in my mind that Dr. Szekrenyi is

8    committed to not only enabling beds and staffing, but

Apr27-06.txt

9      ensuring quality performance once those beds and staff are in
10     place.
11            THE COURT:  Miss Tillman, I'm not going to do
12     anything at the moment.  I'm going to await your plan, have
13     them Special Master consider it and make recommendations to
14     me.
15            Mr. Bien, I really do understand your concern.  It is
16     not inappropriate.  But, you know, everybody -- the warden's
17     responsible for everything.  To say to him, "Here's something
18     in particular, if you're going to certify, we're going to,
19     you know, somehow or other hold you to your certification,
20     and when we find the next deficiency we're going to put you
21     in jail --" I know you don't mean that, but it is -- Well, at
22     the moment the Court is going to overrule the objection.  But
23     I will ask that the defendants submit their plan and ask the
24     Special Master to evaluate that plan and see whether we need
25     to do something about it.


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360



136

1             The second is the reception center problem.  I mean,
2      everybody agrees this is a horrific problem.  It is unclear
3      to me why it is taking so long to get people out of the
4      reception centers to where they're supposed to go.
5             I don't know whether it's a classification problem.

Page 146

Apr27-06.txt

6   Well, apparently that's -- well, I don't know what it is.

7        Mr. Bien?

8        MR. BIEN:  If you'll indulge me for a second, I'll

9   give a little background as I understand.

10       One thing the Court said at the beginning of our

11  session yesterday is that, you know, there are lots of

12  reasons we have all these problems in the system.  You know,

13  we've closed down mental hospitals, people are in prison that

14  shouldn't be, we've decide the three strikes law things, but

15  I think that what's important for the Court to understand is

16  that this administration has made some decisions that have

17  resulted in this pressure in reception centers and those

18  happen to relate to the Valdivia case.

19       Looking at Exhibit A to the Kahn Declaration, the

20  spring population projections, the Court will see that 62,000

21  people were returned to prison in 2005 for parole violations,

22  the average term, page 15, 3.5 months.  So these are

23  technical violators.  This is the largest group of people

24  that went back to prison in California.

25       This is not the administration line.  That's what the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

☐

137

1   numbers show.  They made a decision last year, as you know,

2   to stop remedial sanctions and start putting people back in.

3        We've been working with them to try to get that back

Page 147

Apr27-06.txt

4   up after this Court's order.  Unfortunately, you learn more

5   about it from your other Special Master.  Fits and starts.

6   It is not really working.

7       Jumping to Coleman now.  There's several populations

8   of people that are filling these reception centers that are

9   making it very difficult.

10      One are these very short-term people who, you know,

11  they are coming in and out, they clog the works.  They never

12  are intended to get out.  By the time they get in, they got

13  two months to serve.  They're not going to get to an EOP

14  program.

15      One of the men from -- the DVI picture I showed you,

16  he was sent back, you know, for -- because he was mentally

17  ill.  The person didn't do anything on the outside.  Parole

18  violator.  Third time in 2005.  Third time in 2005.  Stayed

19  out for five days, ten days.

20      This is a Coleman problem because Coleman includes

21  mental health care, pre-release planning up to the gate,

22  right?

23      Not doing that.

24      THE COURT:  It's a Valdivia problem.

25      MR. BIEN:  No.  It's a Coleman problem.  On the way

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

138

Page 148

Apr27-06.txt

1    out.  He's in prison.  Soon as he's in prison, he's a Coleman
2    class member.  Okay.  They're not doing pre-release planning,
3    getting him ready, okay, effectively yet.  Especially when
4    you're in reception.
5             THE COURT:  That's because he's not --
6             MR. BIEN:  He's only going to be there a little bit,
7    right.
8             DMH, by the way, doesn't like short-termers.  They
9    can't get to DMH.  No matter how sick because they don't like
10   short-termers.  So that is one group.
11            And by the way, defendants are working on this
12   problem.  Okay.  You know, I know they are.  They have some
13   models for it.  They need to do it.  They need to start
14   saying when someone comes back for a month or two, we need to
15   have some problem to stabilize them, getting them ready for
16   parole.  Even if they're only here for month or two, even if
17   they're not going to --
18            THE COURT:  No.  I mean, God bless.  I'm happy
19   they're starting to do that.  But we've got to do something
20   on the Valdivia side.
21            MR. BIEN:  Right.  We have to do something on
22   Valdivia.  I'm saying while they're in there, they're a
23   Coleman class member.  It is bollixing up the works.  It is
24   what are you supposed to do with him?  He's here for a month.
25   Anyway.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Page 149

Apr27-06.txt

139

1        The other problem is they don't have enough EOP beds

2    and crisis beds.  So under Coleman standards, people are

3    supposed to -- if they're identified as EOP, they are

4    transferred to an EOP bed in 60 days.

5        THE COURT:  Right.

6        MR. BIEN:  There are hundreds and hundreds of people

7    who are backed up.  Now, just remember when we had trial,

8    that was one of your findings.  We're back.  It might even be

9    500 or 600 from the most recent statistics.

10        Each reception center has lots of people who are

11    there for 100 days, 120 days.  It is clear they're short of

12    beds.  No question.

13        We don't -- the deal we made in Coleman was, okay,

14    don't treat in reception, get them out quickly, make

15    reception fast, get them to where they need to be.

16        THE COURT:  But we don't have beds for them.

17        MR. BIEN:  We don't have beds.  So we're not asking

18    for a long-term let's change the whole model around.  This is

19    one of the emergency things is to provide a program

20    somewhere, maybe one or two or three of these places, where

21    someone who's identified as EOP and in need of care will get

22    some care, you know, in that time frame.

23        THE COURT:  But, you know, given -- I don't want to

24    say this on the record.

25        I mean, there is a resources problem as well.  Mind

Apr27-06.txt

140

1    you, I understand the human problem.  I don't mean to

2    denigrate it in any way, but there is a resources problem.

3         Parole officers are returning people to prisons

4    because they don't have mental institutions.  I mean,

5    that's -- well, that's not what prisons are for, right?

6         MR. BIEN:  It is not.

7         THE COURT:  But we don't have any programs on the

8    outside.

9         MR. BIEN:  Right.

10        THE COURT:  One of the things that I understand

11   Valdivia was going to do was to address the possibility, and

12   I had thought hopefully, to develop local programs, programs

13   that don't send people to prison.

14        And I don't know what's happening with that.  And I'm

15   meeting with my Special Master Friday for really sort of an

16   informal chat, but I take it from what you're saying that's

17   not going on?

18        MR. BIEN:  Very, very little.

19        And, you know, Southern California has zero beds.  So

20   if you happen to be violated in Southern California, there is

21   no remedial sanctions.  They stop --

22        THE COURT:  Zero.

23        MR. BIEN:  Remedial is the alternative to

24   incarceration.  When they shut it down last year, the

25   counties, you know, had their programs shut down.  And now

Page 151

Apr27-06.txt

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

141

1    they're trying to start them up again, and L.A. County Jail

2    is full and there's no beds.

3         Anyway, so the point is there is this problem in

4    reception.  It is a -- it's one of these crisis issues.  The

5    other man, whose pictures I had in there, the one who gouged

6    his eyes out, he's a long-term.  He's going in for a

7    long-term.  He arrived literally from ASH, from the mental

8    hospital.  He was not going to get out of reception.  You

9    know, he was stuck there, and they were giving him terrible

10   care.

11        I just think that there are some possibilities.

12   They've done this before, like at CIM a couple of years ago,

13   they set up a program for parole violators, EOPs.  There is

14   some possibilities.  We think there should just be an order

15   that they try to develop a plan to address some of the EOPs

16   who are in need of care.

17        THE COURT:  Short-term.

18        MR. BIEN:  And what they've told us is, "Mike, we

19   really want to get them to the real programs.  We want to put

20   more beds in."  I want to do that too.

21        THE COURT:  But it is not realistic if they're

22   there for a month or two.

23        MR. BIEN:  Right.  So that's as best I can explain

24   it, Your Honor.

Page 152

Apr27-06.txt
25            THE COURT:  Miss Tillman?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

                                                          142

1           MS. TILLMAN:  Your Honor, this is a very confusing

2    situation I think for everybody trying to resolve it.  My

3    understanding is that, yes, there are people in reception who

4    need care from mental health serves.

5           My further understanding is that they're not always

6    separated Valdivia versus Coleman class member simply in need

7    of mental health care, rather --

8           THE COURT:  But what Mr. Bien is suggesting or

9    telling me, not suggesting, is that the short-termers, the

10   people who are there for a month or two, because of the delay

11   in classification and moving people out, are never going to

12   get any treatment at all because by the time somebody figures

13   out who they are and whether or not there might be some

14   treatment program appropriate to them, they're gone.

15          MS. TILLMAN:  I think at that point he's referencing

16   Valdivia class members who might need their own particular

17   remedy for this particular situation.

18          THE COURT:  I think that's right.

19          MS. TILLMAN:  Rather than try to address it under the

20   auspices of Coleman, I would prefer that the Court, if we

21   need a joint hearing on this, I am open to it.

22          THE COURT:  I think that's an important point,
                        Page 153

Apr27-06.txt

23    Miss Tillman.  As I said to you earlier, I welcome you very

24    much.  You're very helpful.

25           I don't know what to do about this.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

143

1           Michael, what's your thoughts?

2           I mean this problem appears to be of yet a different

3    order than what we've been talking about.

4           SPECIAL MASTER KEATING:  Your Honor, I think there

5    are two different problems.  One of them is what do you do

6    with those people who come in through reception, are

7    classified as EOP, and then don't move for a long time.

8           Not because they're going out to parole, but because

9    there's either no place out there or because the

10    classifications issues have gotten so confused, back to

11    court, other things, they're held up for longer periods of

12    time.

13           I think it's -- the Department has, incidentally,

14    even though there was no requirement in the original program

15    guides to do so, they decided several years ago to try and

16    provide to each EOP inmate who was there over 60 days with a

17    weekly case manager contact, which is one of the basic

18    elements of the EOP program, and also a monthly psychiatric

19    interview or clinical visit.

Page 154

Apr27-06.txt

20      I'll have to confess that that's often observed in

21    the breach rather than in the delivery simply because the

22    staff to do that was never originally cranked into the

23    staffing under the 1997 program guide.

24          The revised program guide, however, does include that

25    and it basically makes it a requirement that they provide

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

144

1    weekly contacts to inmates who are EOP who have been held

2    over 60 days, it requires a monthly psychiatric contact.

3          I think it may make sense in some of the reception

4    centers -- and reception centers run the gamut -- there are

5    some that have a handful or less of EOP inmates, but there

6    are some others that have substantial numbers.  And ones like

7    North Kern and Wasco State Prison, which have pretty huge

8    reception functions, generate lots of EOP classifications,

9    and many of those sit for a long period of time, it seems to

10    me to make sense that the Department ought to come back with

11    a plan and be required to come back with a plan that says

12    that they will provide those individuals access to care that

13    really combines some sort of mixture that has been applied in

14    the EOP, Ad. Seg. units.

15          That is to say there ought to be some number.

16    Perhaps ten.  When there are ten such prisoners who are

17    classified as EOP, who are held for over 60 days in the

Page 155

Apr27-06.txt

18    institution, that there ought to be at least one clinical

19    case worker and a classification worker who works to try to

20    clear up whatever classification hold ups there are on the

21    individual.  Because that frequently impedes movement.  And

22    also provides a lot more of hands-on individual counseling.

23          Pregnant in the request of the plaintiffs, I think,

24    is a search for the ten hours of weekly structured

25    therapeutic activities, which I think are really very

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

145

1    difficult to make a commitment to offer because of spacing

2    problems in reception, because of other things.

3          I'm not even sure -- that has not been specifically

4    articulated -- but I think that is part of it.  I think it

5    makes more sense if you can provide some individual

6    counseling on some sort of basis that is there for people who

7    are kept over 60 days combined with that classification

8    help.

9          THE COURT:  But I think what I heard from both the

10   plaintiff and defendant is that a significant problem with

11   the EOP identifying prisoners in the reception center is that

12   they don't have any place to put them.

13          SPECIAL MASTER KEATING:  Well, they stay there.  As

14   long as they are staying there until they find a place to put

Page 156

Apr27-06.txt

15    them, they ought to be provided a greater measure of

16    individual counseling and care.  That's what I'm suggesting.

17         It ought to be tied to the time they're in the

18    reception process, and it ought to be tied to as long as they

19    remain in that reception process.  Which then gives them some

20    incentive on classification side to move these people through

21    and get them through faster.

22         It doesn't address the parole problem, and that's a

23    different problem of a different order.

24         THE COURT:  No.  I understand.

25         Miss Tillman, you know, I guess I'm the only one who

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

146

1    is concerned with weighting the Department down with having

2    to come up with so many plans they'll never get anything

3    done.

4         And believe me, I really am serious about that.  I

5    worry about the amount of manpower devoted to plans rather

6    than implementation.  But the problem is, if we don't have a

7    plan, nothing apparently gets done.

8         I am thinking that I'm going to -- I'm going to

9    overrule the objection, accept the Special Master's report,

10    but at the same time direct the Department to develop a plan

11    relative to persons in the reception area in excess of 60

12    days and what kind of program, counseling, or whatever is

Apr27-06.txt

13  appropriate for them and run that by the master and the
14  plaintiff.

15          Not a good idea?

16          Go ahead.  Talk to your folks.

17          (Brief pause.)

18          MS. TILLMAN:  I'm sorry.  What was that time frame
19  you mentioned, Your Honor, in terms of providing the plan to
20  the Court given we've got --

21          THE COURT:  No.  No.  I don't know how long to
22  develop the plan.  I'm talking about a plan for those persons
23  who are -- who are being kept in reception centers in
24  addition to 60 days.  And how long that takes, you tell me
25  what you need.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

147

1           MS. TILLMAN:  We would ask for three months, Your
2   Honor.

3           THE COURT:  Well, I mean -- All right.  Okay.

4           Now, I want to talk about the other problem, which is
5   maybe properly considered a Valdivia problem.  The defendant
6   there, because you run parole, but I mean we expected and
7   contemplated local cooperation and apparently none of that is
8   happening.

9           MR. BIEN:  Can I address that?

Page 158

Apr27-06.txt

10          THE COURT:  I understand this is not the subject of

11    this hearing, but --

12          MR. BIEN:  It's not really the -- I wasn't putting

13    any fault on L.A. County.  I was just saying that the

14    Department had a contract with L.A. County.  They cancelled

15    the contract last year when they decided not to do this.

16    Your Honor then ordered them to do it, and L.A. County said,

17    you know, we're overcrowded, we are under a court order, and

18    plus you screwed us out of, like, 30 million dollars, we're

19    not that excited about contracting with you.

20          And they haven't been able to get through that yet.

21    So it is not like L.A. County did something.  The

22    Department -- the Department could develop programs, and they

23    are looking at that now.  But it's very slow moving.

24          THE COURT:  Well, it is having a horrific impact --

25    apparently it is having a horrific impact upon reception


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


                                                         148

1    centers.

2          I'm going talk to Mr. Riveland Friday.  I know you're

3    not the lawyer for Valdivia.

4          Mr. Bien, I am -- I want to talk to Mr. Riveland, but

5    I'm inclined to think we have to have a hearing and see

6    what -- well, I want talk to him first and see what his views

7    are.

                          Page 159

Apr27-06.txt

8          MR. BIEN:  I think that Miss Tillman's suggestion of
9     a joint hearing is important because Valdivia doesn't have
10    clinicians, doesn't have -- you are talking about a due
11    process hearing system.  So, you know, once they're in the
12    gate, once they're inside of the prison, it's difficult.
13    There needs to be some coordination.
14         THE COURT:  I understand.  But I had -- I don't know
15    why I had the idea that we were -- that one of the important
16    benefits of Valdivia was that there was going to be some
17    effort to provide hearings in which alternatives to
18    imprisonment for violations were going to be developed at the
19    local level.
20         I thought that was one of the expectations of the
21    order.
22         MR. BIEN:  We did to.  It says it.  It says it in the
23    injunction.
24         THE COURT:  But nothing happened?
25         MR. BIEN:  That's what they decided, it wasn't a good


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


149

1     thing.  You know, they had pressure from various places.
2     And, you know, that was -- remember it was the attachment to
3     the injunction rather than the injunction.
4          Anyway, it's fits and starts.
                        Page 160

Apr27-06.txt

5          THE COURT:  Well, we'll have to -- Okay.  We'll have
6     to think about what to do about that.
7          Anyhow, I think that's as far as I'm going to go.
8     You can't be responsible for the fact that people are
9     being -- of course you can be, but it's not your primary
10    concern that people are being returned at a rate that doesn't
11    make any sense for a period of time that doesn't make any
12    sense.  But I do want you to look into some developing of a
13    plan within three months for treatment of those persons who
14    are there within 60 days.
15         You might want to consider, folks, the suggestion
16    made by the Special Master which is to get some
17    classification officer actually in the process of trying to
18    resolve whatever classification problems are causing the
19    delay.  That seems to be at least -- apparently that's a
20    contributing factor.  So you might want to look at that.
21         All right.  That disposes of the two objections.
22         Not very satisfactory dispositions, but the best we
23    can do under the circumstance.
24         We'll now go off the record.
25         (Discussion held off the record.)


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                    (916) 446-6360

                                                    150

1          (Off the record at 4:15 p.m.)
2                     ---o0o---
                 Page 161

Apr27-06.txt

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF CALIFORNIA

3    ---oOo---

Page 162

Apr27-06.txt
```
 4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

 5

 6    RALPH COLEMAN, et al.,

 7          Plaintiff,

 8    vs.                            CASE NO. CIV. S-90-0520 LKK

 9    ARNOLD SCHWARZENEGGER,
      et al.,
10

11          Defendants.

12    _____/

13

14

15

16                          ---o0o---

17

18                      REPORTER'S TRANSCRIPT

19                   THURSDAY, APRIL 27TH, 2006

20    RE:  CONTINUED EVIDENTIARY HEARING RE MOTION FOR COURT ORDER

21

22                          ---o0o---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                   CSR. No. 6926




          CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                           (916) 446-6360
 1                          APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5          ROSEN, BIEN & ASARO, LLP
                      Page 163
```

```
                          Apr27-06.txt
                 155 MONTGOMERY STREET, EIGHTH FLOOR
    6            SAN FRANCISCO, CALIFORNIA  94104

    7            BY:  MICHAEL BIEN,
                      ATTORNEY AT LAW
    8

    9

   10

   11    FOR THE DEFENDANTS:

   12            STATE OF CALIFORNIA, DEPT. OF JUSTICE
                 OFFICE OF THE ATTORNEY GENERAL
   13            1300 I STREET
                 SACRAMENTO, CALIFORNIA  95814
   14
                 BY:  LISA TILLMAN,
   15                 DEPUTY ATTORNEY GENERAL

   16

   17

   18

   19                         ---oOo---

   20

   21

   22

   23

   24

   25




              CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                              (916) 446-6360
    1                        EXAMINATION INDEX

    2                         ---oOo---

    3

    4
         FOR THE DEFENDANTS:
    5
                 EXAMINATION:
    6                                                    PAGE
                            Page 164
```

Apr27-06.txt

7    DOUG MCKEEVER (Previously Sworn)

8        Examination by the Court                              1

9

10    GEORGE SIFUENTES (Previously Sworn)

11        Examination by the Court                             4
          Direct Examination by Ms. Tillman                   83
12        Cross-Examination by Mr. Bien                       85
          Further Direct Examination by Ms. Tillman          100
13        Further Cross-Exam. by Mr. Bien                    102

14

15    JOHN RODRIGUEZ (Previously Sworn)

16        Examination by the Court                             8
          Cross-Examination by Mr. Bien                       11
17        Cross-Examinatin by Ms. Tillman                     11

18        Direct Examination by Ms. Tillman                   91

19

20    DR. PETER SZEKRENYI

21        Direct Examination by Ms. Tillman                   13

          Cross-Examination by Mr. Bien                       17
22        Cont'd Cross-Exam. by Mr. Bien                      69
          Redirect Examination by Ms. Tillman                78
23        Recross-Examination by Mr. Bien                     79

24
                        ---oOo---
25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

⬚        1        EXAMINATION INDEX

2                    ---oOo---

3

4

    FOR THE DEFENDANTS:
5
        EXAMINATION:

6                                                        PAGE

7    SARAH MANGUM

Page 165

Apr27-06.txt

```
 8         Direct Examination by Ms. Tillman              91

 9

10     JIM ALVES

11         Direct Examination by Ms. Tillman              91

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
            CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                           (916) 446-6360
 1                       REPORTER'S CERTIFICATE

 2                           ---oOo---

 3
       STATE OF CALIFORNIA   )
 4     COUNTY OF SACRAMENTO  )

 5

 6

 7         I certify that the foregoing is a correct transcript

       from the record of proceedings in the above-entitled matter.
 8

 9
                           Page 166
```

Apr27-06.txt

10              IN WITNESS WHEREOF, I subscribe this
certificate at Sacramento, California on this 14TH day of
11  MAY, 2006.

12

13

14                          _____

15                          CATHERINE E.F. BODENE,
                            CSR NO. 6926
16

17

18

19

20

21

22

23

24

25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
                (916) 446-6360
⬚        1

         2

         3

         4

         5

         6

         7

         8

         9

        10

Page 167

Apr27-06.txt

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360