*DIVISION OF CORRECTIONAL HEALTH CARE SERVICES*
P. O. Box 942883
Sacramento, CA 94283-0001



June 14, 2006

J. Michael Keating, Jr.                via:    Lisa Tillman
Office of the Special Master                   Deputy Attorney General
2351 Sussex Lane                               Department of Justice
Fernandina Beach, FL 32034                     1300 I Street, Suite 125
                                               P. O. Box 944255
                                               Sacramento, CA 94244-2550

## RE:   INTERIM INTERMEDIATE CARE FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006

Dear Mr. Keating:

In accordance with the May 1, 2006, court order please find enclosed the *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006*. This plan represents the California Department of Corrections and Rehabilitation's (CDCR) efforts to address the immediate need for intermediate and mental health crisis care for its seriously mentally ill patients.

If you need clarification on any aspect of this plan, please contact me at (916) 327-0033, or Renee Kanan, M.D., M.P.H., Deputy Director, Division of Correctional Health Care Services (DCHCS), at (916) 323-6811.

Sincerely,

PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services

Enclosure

J. Michael Keating, Jr.
Page 2

cc:    Melissa Decker, Deputy Cabinet Secretary, Office of the Governor
       James Tilton, Secretary, CDCR
       Bruce Slavin, General Counsel, Office of Legal Affairs, CDCR
       Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs, CDCR
       Michael Stone, Staff Counsel, Office of Legal Affairs
       John Dovey, Director, Division of Adult Institutions, CDCR
       Scott Kernan, Deputy Director, Division of Adult Institutions, CDCR
       Renee Kanan, M.D., MPH, Deputy Director, DCHCS, CDCR
       Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations
          Branch, DCHCS, CDCR
       Tim Fishback, M.D., Chief Psychiatrist, Mental Health Program, DCHCS, CDCR
       Eileen Cubanski, Assistant Secretary, California Health and Human Services Agency
       Frank Furtek, Chief Counsel, California Health and Human Services Agency
       John Rodriguez, Deputy Director, Long Term Care Services, Department of Mental
          Health (DMH)
       Cindy Radavsky, Assistant Deputy Director, Long Term Care Services, DMH
       Nancy Manion, Staff Counsel, Legal Services, DMH
       Bill Avritt, Chief Deputy Director, Department of Personnel Administration
       Sarah Mangum, Principal Program Budget Analyst, Department of Finance
       Doug McKeever, Project Director, Mental Health Program, DCHCS
       Vicki O'Shaughnessy, Staff Services Manager II, Clinical Programs and Policy Unit,
          DCHCS, CDCR

# California Department of Corrections & Rehabilitation

~~~~~~~~~~~~~~~~~~~~~~~

# Division of Correctional Health Care Services



## Mental Health Program And Mental Health Services Delivery System

## Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

## Table of Contents:                                    Page Number

I.    PURPOSE:.................................................................................................... 1

II.   BACKGROUND: ........................................................................................... 1

  COLEMAN COURT ............................................................................................ 1
  MENTAL HEALTH BED PLANNING EFFORTS ................................................... 1

III.  PLAN:.......................................................................................................... 2

  OVERVIEW ...................................................................................................... 2
  SECTION A: MENTAL HEALTH CRISIS BEDS ..................................................... 3
    A.1    Utilize 25 Acute Psychiatric Program (APP) Beds at the California
    Medical Facility (CMF) as Mental Health Crisis Beds .................................... 3
      PLAN SUMMARY: .......................................................................................... 3
      PLAN: ............................................................................................................ 3
        BACKGROUND:............................................................................................. 3
        PROPOSAL:................................................................................................... 4
          PHASE I .................................................................................................... 4
        TRANSFER PLAN: ......................................................................................... 4
        TIMELINES: .................................................................................................. 5
        TRANSPORTATION: ...................................................................................... 6
        TRANSFER PACKAGES: ................................................................................. 6
        DISCHARGES: ............................................................................................... 7
        VPP MHCB: ................................................................................................... 7
        REFERRAL PROCESS TO VPP MHCB: ............................................................ 7
        DISCHARGE PROCESS FROM THE VPP MHCB UNIT: .................................... 9
        BED UTILIZATION: ...................................................................................... 10
        PHYSICAL PLANT: ....................................................................................... 10
          PHASE II .................................................................................................. 10
        ASH BEDS:.................................................................................................. 10
        MOU REVISIONS AND TRAINING:............................................................... 11
    A.2    Operate the Current Outpatient Housing Unit at the California
    Men's Colony as a 42 Bed Mental Health Crisis Bed Unit ........................... 12
      PLAN: .......................................................................................................... 12
    A.3    Increase Mental Health Bed Capacity at the California Institution for
    Men     13
      PLAN SUMMARY: ........................................................................................ 13
      PLAN: .......................................................................................................... 13
        FACILITY MODIFICATIONS (CCR TITLE 24): ........................................... 13
        STAFFING:.................................................................................................. 14
        ISSUES/BARRIERS:..................................................................................... 14
  SECTION B:  INTERMEDIATE CARE FACILITY BEDS .......................................... 15
    B.1    Convert the California Medical Facility's P-3 Housing Unit to 30
    Intermediate Care Facility Beds ..................................................................... 15
      PLAN SUMMARY: ........................................................................................ 15

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

PLAN: ........................................................................................ 15
  BACKGROUND: ........................................................................ 15
  PLAN GOAL: ............................................................................ 17
  PLAN OVERVIEW: .................................................................... 18
  MAJOR IMPLEMENTATION MILESTONES: ............................... 18
  SUNSET OF THE INTERIM ICF BEDS: ..................................... 19
*B.2    Expedited Conversion of the Remaining  76 Intermediate Care*
*Facility Beds at Salinas Valley State Prison* ................................................ 20
  BACKGROUND: ........................................................................ 20
  PLAN: ..................................................................................... 20
*B.3    Maintain the 36 Intermediate Care Facility Beds at the California*
*Medical Facility's P-2 Housing Unit* ........................................................ 21
  BACKGROUND: ........................................................................ 21
  PLAN: ..................................................................................... 21
  STAFFING: .............................................................................. 21
  HEAT PLAN: ............................................................................ 21
**IV.    PLAN SCHEDULE:** ........................................................................ **23**
**V.    ONGOING EFFORTS:** .................................................................... **25**

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

## List of Enclosures                                    Enclosure Number

*Heat Precautions During Inclement Weather* policy                    I
(with cover memorandum)

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

## I.    Purpose:

The purpose of the *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* is to address the interim housing and treatment needs of California Department of Corrections and Rehabilitation's (CDCR) seriously mentally ill patient population, and comply with the applicable mandates of the May 1, 2006, *Coleman* court order.

## II.    Background:

### Coleman Court

On March 3, 2006, the *Coleman* court ordered the CDCR to file, by April 17, 2006, a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in the CDCR clinically determined to be in need of those levels of inpatient care, and for the provision of Mental Health Crisis Beds (MHCBs) for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of care.

In response, the CDCR submitted the *Statewide Mental Health Bed Plan, April 2006,* and the *Coleman* court held hearings on April 26 and 27, 2006, to review this plan.  As a result of these hearings, on May 1, 2006, the *Coleman* court delivered several orders, of which the following is to be addressed by the present *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006*:

> ". . . Within forty-five days from the date of this order (by June 15, 2006) defendants shall file a plan for interim provision of intermediate inpatient beds and mental health crisis beds.  Defendants shall include with said interim plan, as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan. . . "

### Mental Health Bed Planning Efforts

In April 2006, the CDCR continued its mental health bed planning efforts with an established multi-disciplinary group of individuals from within CDCR and other involved state Departments to address the interim need for housing and treatment space for the growing population of patients with serious mental disorders.  The group consisted of representatives from CDCR's Division of Adult Institutions, Human Resources, Budgets, Facilities Management, and Correctional Health Care Services.  Other state agency members represented were the Department of Mental Health (DMH), Department of Health Services (DHS), Department of Personnel Administration (DPA), and the Department of Finance (DOF).

This multi-disciplinary group established several workgroups that met on a regular basis to develop initiatives that could produce, at minimum, an additional 125 Intermediate Care Facility (ICF) beds and 75 MHCBs.  Each

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

initiative developed had to produce additional beds within the following six months to one year (or by June 2007).  The end result of the workgroups' efforts was the development of the *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006*, which includes any statutory, licensing, or staffing barriers to the implementation of any aspect of the plan.

## III. Plan:

### *Overview*

The *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* is separated into two major sections.  The first section, *Section A*, contains three separate plans that once implemented will add a total of 83 MHCBs[1].  This total is derived from the following:

- Plan A.1:  Utilize 25 Acute Psychiatric Program Beds at the California Medical Facility as Mental Health Crisis Beds = 25 MHCBs;
- Plan A.2:  Operate the Current Outpatient Housing Unit at the California Men's Colony as a 42 Bed Mental Health Crisis Bed Unit = 42 MHCBs; and
- Plan A.3:  Increase Mental Health Bed Capacity at the California Institution for Men = 16 MHCBs.

The second section, *Section B*, contains three separate plans that once implemented will add a total of 142 ICF beds. This total is derived from the following:

- Plan B.1:  Convert the California Medical Facility's P-3 Housing Unit to 30 Intermediate Care Facility Beds = 30 ICF beds;
- Plan B.2:  Expedited Conversion of the Remaining 76 Intermediate Care Facility Beds at Salinas Valley State Prison = 76 ICF beds; and
- Plan B.3:  Maintain the 36 Intermediate Care Facility Beds at the California Medical Facility's P-2 Housing Unit = 36 ICF beds.

Each plan within both sections produce interim beds that need to be replaced by permanent beds within new facilities.   The CDCR intends to continue operating the interim beds as described in the *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* unless otherwise ordered by the *Coleman* court, and/or enough permanent beds are available statewide to meet the need of the mental health population.

The Administration is committed to ensuring that appropriate resources are allocated to implement this plan and that this is done in a manner that will not delay implementation. We note that some aspects of this plan will likely require Legislative approval or notification to obtain funding and we will seek this approval in an expedited manner.

---

[1]  The *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* assumes that all existing MHCBs, along with the additional MHCBs identified in this plan, will be designated and used as MHCBs.

Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006

---

*Section A: Mental Health Crisis Beds*

---

# A.1 Utilize 25 Acute Psychiatric Program (APP) Beds at the California Medical Facility (CMF) as Mental Health Crisis Beds

<u>PLAN SUMMARY</u>:

The following two phased plan includes the details to switch the services provided in 25 of the 150 APP beds at the Vacaville Psychiatric Program (VPP) from acute level-of-care to MHCB services for all prisons except CMF, and switch the 25 acute/emergency beds at Atascadero State Hospital (ASH) for California Men's Colony (CMC) and California Institution for Men (CIM) to acute level of care for all prisons.

This plan, once fully implemented, adds 25 MHCBs at the expense of 25 APP beds at CMF.

<u>PLAN</u>:

## BACKGROUND:

Currently the DMH provides 150 acute beds at the Vacaville Psychiatric Program (VPP) operated within the CMF. This program operates in units of single cells and provides acute care services to patients of all custody levels. Upon request from the *Coleman* court and outlined in the acute Memorandum of Understanding (MOU), up to 20 of the 150 beds are designated as MHCBs for CMF until the new MHCB unit at CMF is activated, (scheduled for August 2008).

Concurrently, ASH has 25 acute beds designated for emergency use by CMC and CIM. When these beds were established the following language was agreed to in the Acute MOU: "The California Department of Corrections (CDC), (now CDCR), recognizes that the provision of Acute Psychiatric inpatient services in the state hospital setting presents safety and security issues that are different than DMH inpatient programs and services based within a state prison setting. CDC shall include a thorough custody review of safety and security factors for each patient prior to sending a referral. Patients, who are deemed a significant assault risk, have a history of victimizing other patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall not be referred to ASH. In these cases, CDC shall provide mental health services in a prison setting."

---

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## PROPOSAL:

This plan includes the details to switch the services provided in 25 of the 150 Acute Psychiatric (AP) beds at VPP from acute level-of-care to MHCB services for all prisons except CMF (as noted above they already have 20 dedicated MHCB beds in VPP) and switch the 25 acute/emergency beds at ASH for CMC and CIM to acute level of care for all prisons.  The plan as proposed is a method to increase the utilization of beds currently available in the system.  Establishing the 25 MHCB beds at VPP instead of ASH will increase the number of beds utilized for mental health crisis care.  In addition, the decreased paperwork in the referral packets for the CDCR clinicians for these beds will enable CMF/VPP to accept all levels of custody into these crisis beds.

For planning purposes, MHCBs have an average length of stay of 10 days or less.  The Interdisciplinary team should evaluate daily and determine if the patient will require acute inpatient care, intermediate inpatient care or can return to outpatient care.  Acute care has an average length of stay of 30 to 45 days.  A patient can stay in acute care after 45 days with mutual agreement after utilization review.

This plan requires two phases of implementation.  Phase I will require ASH to complete a clinical review of all 19 patients currently in those 25 beds.  Simultaneously, VPP will need to review the lower custody patients in the APP and identify up to 25 patients that could be transferred to ASH without impacting their clinical care.  Once the 25 beds are available at VPP, they will begin to function as MHCB beds.  Phase II is the direct admissions into the 25 acute beds at ASH and the 25 MHCB beds at VPP.

# PHASE I

## TRANSFER PLAN:

Phase I will require ASH to complete a clinical review of all 19 patients currently in those 25 beds and identify patients for either:  transfer back to CDCR, continued stay in an acute bed, or referral to an intermediate level-of-care.  These moves will occur as clinically appropriate and a date for CMC and CIM to begin to submit referrals to VPP will need to be determined.  VPP will review the referral and determine which level of care and facility is appropriate.  Once ASH receives the pending information, the patient will be transferred from the prison to ASH within 72 hours. This provides continuity of care for patients from CMC and CIM.

Simultaneously VPP will need to review the lower custody patients in the APP and identify up to 25 that could be transferred into the vacant beds at ASH without impacting their clinical care.  Historical data over the past two years

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

indicates there are sufficient patients who meet the ASH criteria. Once CMC and CIM have been notified they can no longer refer their patients for MHCB/emergency bed admissions to ASH, transfers can begin. As these are some of the most fragile patients in the mental health system, it is anticipated that transfers will occur simultaneously yet methodically and on a flow basis to ensure clinical oversight occurs. No more than 5 discharges and 5 admissions per week related to this plan will occur at both ASH and VPP. This limit will not impact other admissions to VPP or to ASH in other commitment categories. At no time will the unit at VPP or ASH be totally empty of patients.

## TIMELINES:

The DMH anticipates beginning the ASH AP discharge and/or transfer process on September 4, 2006, with a target completion date of six weeks after the start date. The following schedule denotes the proposed transfer-admission timelines assuming 25 vacant beds (it could be less if ASH determines there are patients currently in those beds that require acute care):

| Week Of | ASH AP Beds | Patients Transferred Or Discharged | ASH Patient Balance | APP Transfers To ASH | Accumulated APP Transfers |
|---------|-------------|-----------------------------------|---------------------|----------------------|---------------------------|
| 9/4/06  | 25 | 5 | 20 | 0 |    |
| 9/11/06 | 25 | 5 | 15 | 5 | 5  |
| 9/18/06 | 25 | 5 | 10 | 5 | 10 |
| 9/25/06 | 25 | 5 | 5  | 5 | 15 |
| 10/2/06 | 25 | 5 | 0  | 5 | 20 |
| 10/9/06 | 25 |   |    | 5 | 25 |

While attempting to maximize available beds during the transfer process, the DMH will also be recruiting sufficient staff to operate the 25 MHCB's at VPP. The units will be covered utilizing overtime until all hiring has been completed. Therefore, the following schedule denotes the proposed six week transfer-admission timelines (starting one-week after the ASH transfers) to activate the 25-Bed MHCB Unit within VPP:

| Week Of | VPP Acute Beds | Patients Transferred To ASH | VPP MHCB Available Beds | MHCB ADMISSIONS | Accumulated MHCB ADMISSIONS |
|----------|----------------|-----------------------------|-------------------------|-----------------|-----------------------------|
| 9/11/06  | 25 | 5 | 5  | 0 | 0  |
| 9/18/06  | 25 | 5 | 10 | 5 | 5  |
| 9/25/06  | 25 | 5 | 10 | 5 | 10 |
| 10/2/06  | 25 | 5 | 10 | 5 | 15 |
| 10/9/06  | 25 | 5 | 10 | 5 | 20 |
| 10/16/06 | 25 |   | 5  | 5 | 25 |

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## TRANSPORTATION:

All transfers within ASH will be accomplished internally.  All discharged patients will follow the current ASH transportation guidelines.  During Phase I of the transfer program VPP will utilize the current, established method of transportation utilized by CMF.  Patient transfers will generally be accomplished in groups of five patients unless circumstances warrant changes due to the patient's condition and or transportation team availability.

## TRANSFER PACKAGES:

VPP Admission and Discharge Coordinator will provide the ASH Forensic Coordinator with the following:

- DMH Referral/Transfer Form;
- Written consent **or** Due process – documentation of the hearing (use CDCR 128C until CDCR 128-MH6 is implemented), or a valid waiver of the due process hearing is required for referral if the patient refuses to sign consent to transfer;
- Custody Case Factor Sheet; and
- CDCR Suicide Risk Assessment.

The DMH Clinical Assessment Team (CAT) shall fax the referral documentation to the ASH screening clinician, and the clinicians shall consult by telephone. The ASH screening clinician shall indicate at the time whether or not the patient is accepted, and this shall be followed within one to three hours by a fax regarding the decision.

If accepted, the DMH CAT shall notify the institutions PC 2684 Coordinator who will subsequently log the referral and provide the Vitek waiver, referral forms, 128-C referring chrono and the 128-C ASH acceptance chrono to the Classification and Parole Representative's (C&PR) staff.  The PC 2684 Coordinator will work with the C&PR's staff in the completion of the PC 2684 process.  If rejected the ASH Forensic Coordinator will immediately submit the rejection to DMH headquarters for a final decision that will be issued within 24 hours.

At the time of patient transfer from APP to ASH the entire current DMH medical record for the current admission will be scanned onto a Compact Disk as a PDF file, sealed in an envelope and transported with the patient under the care and custody of the transport team.  It is the responsibility of the VPP Medical Records Department to scan the medical record within 48 hours prior to transfer.  Subsequent material will be scanned after the medical record is complete and the VPP Medical Records staff will mail a subsequent disk directly to the ASH Medical Record Department.

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

## DISCHARGES:

Patients admitted to ASH will be considered psych and return patients.  The patients, who are discharged from ASH that cannot be returned to the sending institution due to the fact that the institution cannot provide their clinically designated Level of Care, will be discharged to CMC via the PC 2685 process. CMC will be the hub facility.  CMC will complete the necessary case work including Reception Center (RC) processing, if appropriate, and refer the patient to the appropriate institution. In instances where the sending institutions can handle the Level of Care, CMC-East's(E's) Classification and Parole Representative will contact the sending institution to coordinate transportation arrangements.

Should an emergency discharge on the grounds of an unusual and severe security risk to the DMH program become necessary, these patients will be transferred to CMC within 24 hours.  CMC will complete the necessary case work including RC processing, if appropriate, and refer the patient to the appropriate institution.

## VPP MHCB:

Outlined below is the plan to implement 25 MHCBs on the VPP S-1 unit. Included in the plan is the development of the referral, admission and discharge process, utilization review, timeframes for implementation, and schedule for transfers and clarifications on transportation issues.  The processes for referrals, admissions and discharges listed below are consistent with current MHCB manual procedures.  For more specific elements of the procedures, refer to the MHCB manual.

## REFERRAL PROCESS TO VPP MHCB:

Monday through Friday:

- The DMH Clinical Assessment Team (CAT) will communicate with the Health Care Placement Unit (HCPU) daily at 0700 hours to confirm bed availability;
- The referring clinician contacts the assigned Correctional Counselor III at the HCPU to find a MHCB;
- The referring clinician contacts the VPP psychiatrist to present the case.  The VPP will do a thorough assessment of the referral with available information. The referring clinician shall fax advance supporting documents (MH4, MH2, H&P, med list, 128 C medical clearance chrono, etc.) to help the MHCB Interdisciplinary Treatment Team (IDTT) prepare for the patient;

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

- Upon acceptance, the S-1 unit notifies the VPP CAT of the pending transfer and provides the bed number;
- The CAT will log the referral; and
- The CAT notifies the CMF C&PR of the pending admission and bed number.

Weekends and Holidays:

- Given no discharges will occur on the weekends without supervisory approval, it should be noted that only if a bed is available will this admission process take place;
- The VPP MHCB unit will communicate with the HCPU daily at 0700 hours to confirm bed availability;
- The referring clinician contacts HCPU staff;
- The HCPU staff will contact the VPP unit clinician to verify bed availability;
- The referring clinician will contact the VPP psychiatrist to present the case;
- Upon acceptance, the S-1 unit will provide a bed number and notify the VPP staffing office who will then notify the Watch Commander (WC) of the pending transfer;
- The CMF WC will work with the sending institution's WC to ensure the transfer within 24 hours. The WC will make the appropriate notifications to the C&PR on the next working day; and
- The VPP staffing office will notify the CAT of any weekend, holiday or after hours admissions via voice mail.

No property will be transferred with the patient.

Upon arrival at CMF, all patients will be medically screened and cleared prior to being taken to the VPP MHCB unit.  Patients will be screened either in Receiving and Release (R&R) or the B-1 clinic by at least a Nurse Practitioner.  DMH will not accept the patient until the 128-C medical clearance chrono is completed by the referring CDCR institution and reviewed and signed off by CMF is completed.  Upon medical clearance, CMF will notify DMH to pick-up the patient in either R&R or the B-1 clinic.

Consistent with current procedures, when a patient requires emergency medical treatment, medical evaluation, or is determined to require medical care that cannot be provided in DMH, the patient will be seen in the CMF B-1 clinic and evaluated for appropriate placement and continuing care.

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## DISCHARGE PROCESS FROM THE VPP MHCB UNIT:

Monday through Friday:

- The MHCB unit will prepare a CDCR 128-C discharge chrono and a copy of the Physician's Discharge Summary and deliver it to the CAT;
- The Physician's Discharge Summary will be placed in the Unit Health Record (UHR) and will at minimum, contain the following: course of treatment and response, medications prescribed and response, Suicide Risk Assessment Checklist;
- The CAT will notify the C&PR of the discharge;
- The C&PR will arrange transfer with the receiving institution; and
- The receiving institution will be responsible for transportation.

Weekends and Holidays

- There will be no discharges without Supervisory Approval from the VPP MHCBs on Friday afternoon, weekends and holidays.  Patients admitted for suicidal reasons or placed on suicidal precautions while in the VPP MHCB are not to be discharged on the weekends; and
- The discharge process for Monday through Friday noted above will be utilized once approval has been granted by the Custody and DMH Supervisors.  Transportation will be arranged by HCPU and Custody.

Patients determined to require continued acute psychiatric care will be transferred to an available bed in the DMH APP.  Such transfers shall have priority over referrals from the APP waiting list.

A patient who refuses treatment in the APP will require a VITEK (due process) hearing, which will be conducted by DMH consistent with institutional procedure.

Patients who are discharged and require a Level of Care (LOC) not available at the sending institution will not be sent to that institution; they will be discharged to CMF.  CMF will complete the necessary case work and refer the patient to the appropriate institution.

If a patient is charged with a Rules Violation Report (RVR) while at CMF/DMH and placed in Administrative Segregation Unit/Psychiatric Services Unit, CMF will retain the patient and complete the necessary processes including referring the patient to the appropriate institution.

CDCR will continue to coordinate the discharge of patients from the MHCB as soon as possible.  If the sending institution can accommodate the discharged

LOC, the CMF C&PR will notify the sending institution and coordinate transport arrangements. If the sending institution is not able to accommodate the LOC, CMF will complete the necessary case work and refer the patient to the appropriate institution.  The HCPU will maintain these patients as top priority on the waiting list for transfer.

## BED UTILIZATION:

- Bed Utilization will be reviewed daily in the CMF Bed Utilization Management Meeting (BUMM);
- Data collection and reporting will be performed by the existing DMH UR Nurse; and
- The MHCB IDTT will review each case at regular intervals to determine remaining treatment  course and disposition.

## PHYSICAL PLANT:

The desks and stools within S-1 unit cells present safety issues for staff and patients due to suicidality, forced medication, cell extractions, etc.  Therefore, these items must be removed.  In addition, the doors need reinforcing or replacement.

# PHASE II

## ASH BEDS:

The second phase will be initiated immediately after the initial twenty-five (25) patients have been transferred from VPP APP to ASH.  This phase will include direct transfers into the ASH 25 acute beds and the 25 MHCB beds at VPP.  All acute referrals will be submitted to the acute program at VPP to ensure coordination of bed management and improved utilization.  The DMH CAT shall screen all patient referrals and determine which patients should be admitted to VPP and which patients can be appropriately referred to ASH.  Upon completion of the initial screening the CAT Coordinator shall present the case to the daily BUMM and request a custody review for the appropriateness of transfer based upon custodial grounds.

In the event that the DMH/CMF BUMM members determine a patient is an appropriate candidate for admission into ASH, the CAT Coordinator shall immediately do the following:

- Contact the referring CDCR facility and inform them of the joint decision that the patient will be referred to ASH under the 2684 process; and
- Contact the ASH Forensic Coordinator of the coming referral.

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

Once ASH receives the pending information, the patient will be transferred from the prison to ASH within 72 hours. Should an incomplete packet arrive at either VPP or ASH or if the patient is rejected, the case shall be sent to the Coordinated Clinical Assessment Team (CCAT) for resolution per the procedures outlined in the MOU. In addition for patients that are rejected, the CDCR will provide the *Coleman* Special Master with the names and numbers of those patients who are rejected from ASH and the reasons for the rejection.

## MOU REVISIONS AND TRAINING:

DMH and CDCR will need to revise the Acute MOU and the forms. Once the MOU is revised, training regarding referrals for acute care and MHCBs must be provided to the CDCR mental health staff. The training should include a presentation to both the CDCR clinical staff and C&PR staff. In the interim, CDCR Classifications and Health Care divisions will issue instructions to the facilities for guidance until training can occur.

## A.2  Operate the Current Outpatient Housing Unit at the California Men's Colony as a 42 Bed Mental Health Crisis Bed Unit

<u>PLAN:</u>

On May 1, 2006, the CDCR began the process to operate CMC's Outpatient Housing Unit (OHU), (referred to as the Locked Observation Unit in the May 1, 2006, *Coleman* court order), as a MHCB unit on a temporary emergency basis.  As of June 7, 2006, there were 40 patients receiving MHCB level of care in this unit, with a potential for 42 MHCB patients at full occupancy.  The CDCR plans to operate this MHCB unit until ordered otherwise by the *Coleman* court, or sufficient MHCBs are available statewide to meet the needs of the mental health patient population.

The design of CMC's OHU prohibits licensing this space as a permanent MHCB unit, even if extensive facility modifications were performed.  Therefore, the CDCR is proposing to construct an additional 50-bed Correctional Treatment Center (CTC) at CMC to provide MHCB care.  This 50 bed CTC would serve as a permanent solution to the absence of MHCBs at CMC, which has one of the largest mental health populations within the CDCR[2].  Anticipated construction costs and schedule for this project are presently under development.

---

2 As of June 2, 2006:  Richard J. Donovan (RJD) correctional facility had the largest mental health population with 1,786 patients, and CMC was second with 1,783 patients.  Source: *Combined Mental Health Population Per Institution. Download Date June 2, 2006.*  Health Care Placement Unit. Division of Correctional Health Care Services Division

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## A.3 Increase Mental Health Bed Capacity at the California Institution for Men

### PLAN SUMMARY:

The CDCR proposes the following plan to utilize 18 General Acute Care Hospital (GACH) beds in order to license 16 of these beds for use as MHCBs, increasing CIM's overall MHCB capacity to a total of 34 beds[3].

This plan, once implemented, adds 16 beds for use as MHCBs at the expense of 18 general acute care beds.  The need to satisfy state licensing requirements necessitates the conversion of two general acute care beds for use as treatment rooms resulting in this net loss of two beds.

### PLAN:

The CIM currently operates a GACH with 80 beds, of which 62 are general acute care beds, and 18 are acute psychiatric beds used as MHCBs.  The average daily census for patients requiring a MHCB at CIM has been 36 for the last 4-5 months, resulting in an approximate overflow of 18 patients.  Presently, these overflow patients are placed in CIM's general acute care beds and receive MHCB level of care.

Presently, the proposal is to license 16 existing general acute care beds for use as MHCBs (increasing CIM's overall MHCB capacity to 34 beds), so that CIM meets licensing regulations for its current average census.  Changing CIM's existing general acute care bed license for these 16 beds, requires the CDCR to modify the GACH facility to comply with current building and licensing codes, (*e.g.* California Code of Regulations [CCR] Titles 22 and 24).

### FACILITY MODIFICATIONS (CCR TITLE 24):

The current GACH facility at CIM will require modifications to meet DHS licensure.  It is important to note that CIM has no temporary housing presently available for patients that must be moved while these facility modifications to the GACH are performed.  Therefore, either temporary housing must be constructed through conversion of existing space at CIM, or these patients transferred to another prison.

---

3 Presently CIM has 18 GACH beds that are licensed for acute psychiatric services and are operated as MHCBs.

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## STAFFING:

The CIM has identified and is in the process of requesting the staff necessary to meet the CCR Title 22 licensing requirements.

## ISSUES/BARRIERS:

Due to the condition of the existing GACH facility, the CIM Plant Management staff recommended performing a complete retrofit of the CIM GACH (all four stations), or build a completely new facility.  Implementation of the selected recommendation would ensure adequate and quality health care is provided to the medical and mental health patient population, consistent with the mandates of both the *Coleman* and *Plata* courts.   Full implementation of either recommendation requires an extended timeframe and, therefore, was not considered a viable option for this plan.

The CIM Plant Management staff suggested that it will require approximately 3 months to obtain contracts necessary to complete the facility modifications for the 16 beds in the GACH, and recommended a total project completion time, from the time of project implementation, to be roughly one year.  Further detail regarding the total project completion time is as follows:

- The CIM Plant Management staff estimated that it will take approximately one year to complete the 16 bed GACH conversion project and ensure that the new facility is in compliance with licensing standards.  This timeframe considered that inmate work labor crews may be diverted due to program modifications and/or lock down status which may defer project completion; and
- If temporary housing for these patients must be constructed, then the project will require an additional six months to complete.

If state licensing requirements, similar to those suspended by the *Coleman* court at CMC, are temporarily suspended, then the CDCR may, upon such suspension, immediately designate 16 general acute beds as MHCBs.  This temporary suspension in state licensing requirements, and subsequent designation as MHCBs, would continue until the necessary facility modifications are performed and the 16 additional beds are licensed.

Lastly, implementation of this plan is predicated upon approval by the *Plata* Receiver, given the reduction of 18 medical beds at CIM.

Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006

---

*Section B:  Intermediate Care Facility Beds*

---

# B.1  Convert the California Medical Facility's P-3 Housing Unit to 30 Intermediate Care Facility Beds

## PLAN SUMMARY:

The following plan includes details for an interim 30 single-celled ICF bed program operated by DMH for CDCR Level IV high custody patients at the CMF's P-3 housing unit, beginning June 2007 and continuing until replaced by permanent ICF beds.

This plan, once fully implemented, adds 30 ICF beds at the expense of 67 general population EOP beds at CMF.

## PLAN:

## BACKGROUND:

The CDCR is deficient in the number of ICF beds to meet the current patient demand for these beds.  The CDCR, in collaboration with the DMH, considered various initiatives that could provide sufficient single-celled ICF beds to meet the current need of CDCR's Level IV high custody patient population.  Only initiatives that could produce additional ICF bed capacity within the following six months to one year were considered.  Construction of a new facility to house and treat Level IV ICF patients was not considered a viable option, as the time to complete such a project falls outside this constraint.

One of the viable initiatives given further consideration was increasing the ICF bed capacity on an interim basis for Level IV high custody patients at the CMF's P-3 housing unit.  The P-3 housing unit at CMF was selected as the optimum site because of the following factors:

- The CDCR is planning on installing air conditioning to the entire P-tower[4], (anticipated completion date for this is September 14, 2006);
- The DMH already operates an interim 36 single-celled ICF program at P-2; and
- The P-3 housing unit has treatment space for two day rooms as opposed to space for only one day room in P-1.

Challenges associated with implementing this initiative involve the net loss of beds statewide caused by the conversion of existing space at CMF's P-3 to ICF beds, and the subsequent transfer of the current 38 Administrative

---

4 The P-tower at CMF consists of the P-1, P-2, and P-3 housing units.

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

Segregation (Ad-seg) Enhanced Outpatient Program (EOP) patients in P-3 to an alternate location.  The CDCR, with over 170,000 inmates in prisons and reception centers, housed on average statewide at 190 percent of design capacity[5], is under tremendous pressure to appropriately house its current population.  In an effort to mitigate the population pressures caused by a loss of beds, and ensure that inmate's health care needs are adequately meet, the CDCR considered the following alternatives to the placement of the current patient population in P-3:

- **Alternative 1:**  Move the existing Ad-seg EOP population in P-3 to the M-3 housing unit in CMF with the transfer of the present population of M-3 to other prison locations.  Presently, the M-3 housing unit at CMF contains 67 General Population (GP) EOP patients.  This alternative gains 30 single-celled ICF beds at the expense of 67 GP EOP beds, thereby resulting in a net loss of 37 beds statewide.

  It is important to note that there is currently a waiting list for EOP beds statewide.  The number of patients on this waiting list is variable, however, as of May 19, 2006, there were 319 male inmates housed within CDCR prisons and reception centers that require EOP level of care and were waiting for a vacant EOP bed[6].

- **Alternative 2:**  Move the existing Ad-seg EOP population in P-3 to the P-1 housing unit in CMF.  Presently, the P-1 housing unit at CMF contains 21 patients associated with the *Armstrong* class action lawsuit, 16 medical patients with lower bunk issues, and 37 general population patients.  The *Armstrong* class of patients includes individuals with mobility, hearing, vision, and/or speech disabilities; mental/developmental disorders; and learning disabilities.  Presently there are approximately 22 *Armstrong* patients on the waiting list for placement into CMF, and finding appropriate housing within the state system for this special class of patients is extremely difficult.  In addition, the plaintiffs' attorneys in the *Armstrong* case must approve the plan prior to implementation of this alternative.  Ultimately this alternative gains 30 single-celled ICF beds at the expense of 74 mixed general population beds, thereby resulting in a net loss of 44 beds statewide.

---

5 Source:  WEEKLY REPORT OF POPULATION AS OF MIDNIGHT May 31, 2006. Data Analysis Unit Department of Corrections and Rehabilitation. Estimates and Statistical Analysis Section State of California.  Total population = 170,713
6 Source: Weekly EOP Population Report for the Week of May 22, 2006. Health Care Placement Unit. Division of Correctional Health Care Services.

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

- **Alternative 3:** Move the existing Ad-seg EOP population in P-3 to the I-3 housing unit in CMF[7]. The I-3 housing unit at CMF is presently used as the Ad-seg overflow for Mental Health Services Delivery System (MHSDS) case load patients, and contains up to 38 Ad-seg patients, either at the EOP or Correctional Clinical Case Management System (CCCMS) levels of care. This alternative gains 30 single-celled ICF beds at the expense of 38 Ad-seg EOP beds, thereby resulting in a net loss of 8 beds statewide.

  The loss of 38 Ad-seg EOP beds will leave CMF, the prison with the largest EOP population, without adequate Ad-seg capacity to serve its current population. In addition this alternative reduces CDCR's statewide Ad-seg EOP capacity, an integral part in providing an adequate continuum of mental health care. It is important to note that since January 2006 there has been a statewide waiting list for Ad-seg EOP beds. To date the number of male patients on the waiting list has been variable, with 12 patients waiting for Ad-seg EOP beds as of May 31, 2006[8].

In considering these alternatives, along with the subsequent impacts statewide on housing and patient care, the CDCR recommended the development of a plan based on **Alternative 1**. In order to effectively place the 67 GP EOP patients displaced by this alternative, the CDCR recommended beginning implementation of this alternative in January 2007.

Beginning implementation of **Alternative 1** in January 2007 allows the CDCR time to activate additional GP EOP beds, and to hire additional staff to operate the interim ICF beds at P-3. As described in the *Statewide Mental Health Bed Plan, April 2006*, (previously submitted to the *Coleman* court on April 17, 2006), the CDCR plans to activate additional GP EOP beds at California State Prison – Sacramento (SAC) and Mule Creek State Prison (MCSP) by the end of January 2007. These additional beds, originally planned to help alleviate the waiting list for EOP beds, may be used for the 67 GP EOP patients transferred from CMF's M-3 housing unit under this alternative. Another benefit to beginning implementation in January 2007 is allowing additional time to recruit and hire the staff required to implement this alternative.

## PLAN GOAL:

The DMH will operate an interim 30 single-celled ICF bed program for CDCR Level IV high custody patients at the CMF's P-3 housing unit, beginning June 2007 and continuing until replaced by permanent ICF beds.

---

7 This alternative is equivalent to closing the P-3 Ad-seg EOP to intake and removing the current population through attrition.
8 Source: EOP ASU Wait List as of 5/31/06. Health Care Placement Unit. Division of Correctional Health Care Services.

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

## PLAN OVERVIEW:

This plan proposes to install air conditioning at CMF's P-tower, and in January 2007 begin the process to convert the P-3 housing unit to an interim 30 single-celled ICF bed unit.  In order to achieve the plan's goal the CDCR will at a minimum complete the major implementation milestones outlined below.

## MAJOR IMPLEMENTATION MILESTONES:

*1.  Air conditioning for P-tower:*
The CDCR has begun the process to install air conditioning to the P-tower at CMF.  Presently, the project is on schedule with an anticipated completion date of September 14, 2006.

*2.  Conversion Process for P-3:*
Five to six months is the estimated timeframe to complete the P-3 conversion process, which includes patient movement, facility modifications, and appropriately staffing the interim ICF program.  Implementing this process will require the movement of the existing Ad-seg EOP population in P-3 to the M-3 housing unit in CMF, along with the following:

2.1  The M-3 Housing Unit:
**2.1.1   Initial Patient Movement:**  By January 3, 2007, vacate the 67 GP-EOP patients from CMF's M-3 housing unit, in order to allow facility modifications to begin.  In order to vacate the M-3 housing unit within this timeframe, CMF must close to EOP intake beginning October 16, 2006.  CMF will resume EOP intake once the process of vacating the M-3 housing unit is completed.

**2.1.2   Facility Modifications:**  By February 15, 2007, complete facility modifications at M-3 to accept 38 Ad-seg EOP patients.

**2.1.3   Final Patient Movement:**  Begin moving the Ad-seg EOP patients from P-3 to M-3 on February 15, 2007.

2.2  The P-3 Housing Unit:
**2.2.1   Initial Patient Movement:**  By February 22, 2007, vacate CMF P-3, in order to allow facility modifications to begin.

**2.2.2   Facility Modifications:**  Perform facility modifications and license P-3 to accept 30 ICF patients, using similar program flexes and alternate methods of compliance to those used to license the P-2 ICF program. The anticipated construction completion date for these modifications is May 23, 2007.

**2.2.3   Staffing:**   Complete all necessary steps to ensure sufficient appropriately trained staff (both CDCR and DMH) are available to operate the ICF at CMF's P-3.

**2.2.4   Final Patient Movement:**   Transfer CDCR Level IV high custody patients into the ICF beds in P-3, with an anticipated full occupancy date of June 30, 2007.  This anticipated full occupancy date is dependant upon acquiring the necessary approvals for licensing, (*e.g.* State Fire Marshal's Office and DHS).

## SUNSET OF THE INTERIM ICF BEDS:

The interim 30 single-celled ICF beds at CMF's P-3 housing unit will revert to alternate housing once adequate permanent beds for Level IV high custody ICF patients is constructed.  The CDCR anticipates achieving adequate single-celled ICF beds for these patients, with the completion of the new permanent 64 single-celled ICF facility at SVSP.   This project has an anticipated construction completion date of March 2009.

## B.2 Expedited Conversion of the Remaining 76 Intermediate Care Facility Beds at Salinas Valley State Prison

### BACKGROUND:

In August 2005, the CDCR submitted to the *Coleman* court the *Intermediate Care Facility Bed Plan*, (hereby referred to as the *ICF Bed Plan, August 2005*). Part of this plan outlined CDCR's efforts to convert existing general population housing units to a total of 112 interim ICF beds for Level IV high custody patients at Salinas Valley State Prison (SVSP). As described in the *ICF Bed Plan, August 2005*, conversions to the D-6 housing unit at SVSP have been completed producing 36 ICF beds to date. These beds are currently being filled with Level IV high custody patients requiring ICF level of care, and are therefore **not** included in the current *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006*.

### PLAN:

The *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* proposes to complete the conversion of both general population housing units, D-5 and D-6, to ICF beds at SVSP as described in the *ICF Bed Plan, August 2005* within a shorter timeframe. The balance of the 112 interim ICF beds will be available according to the following staggered schedule by January 2007, (as opposed to the March 2009 timeframe stated in the *ICF Bed Plan August 2005*):

- Complete conversions within the D-6 housing unit to provide an additional 20 ICF beds by August 1, 2006[9]; and
- Conversion of the entire D-5 housing unit to ICF beds began on May 22, 2006, and will be completed by December 31, 2006, resulting in 56 ICF beds.

The DMH and CDCR will ensure appropriate staff are available to begin operation of the interim ICF beds upon completion of construction and licensing.

The *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006* accounts for an additional 76 single-celled ICF beds for high custody patients. These ICF beds are gained at the expense of general population beds.

---

9 This will result in a total of 56 ICF beds for the D-6 Housing Unit.

# B.3 Maintain the 36 Intermediate Care Facility Beds at the California Medical Facility's P-2 Housing Unit

## BACKGROUND:

Per the *ICF Bed Plan, August 2005,* the CDCR planned to deactivate 36 interim single-celled ICF beds for Level IV high custody patients at CMF's P-2 unit beginning May 2006.  However, the May 1, 2006, *Coleman* court order states that the CDCR shall:

> " . . . maintain 36 intermediate inpatient beds at the CMF P-2 unit until further order of the court.  In connection therewith, the defendants (CDCR) are reminded of their obligations under the heat plan developed pursuant to prior orders of this court, and defendants are directed to take every mechanical step presently feasible to maintain appropriate temperatures within said unit . . ."

In complying with this court order, the CDCR has kept CMF's P-2 unit open, thereby increasing CDCR's ICF bed capacity by 36 interim beds.

## PLAN:

The following outlines the steps taken to comply with the May 1, 2006, *Coleman* court order:

**STAFFING:**

Both the DMH and CDCR will ensure appropriate and sufficient staff are available to continue operating the 36 interim ICF beds in CMF's P-2 unit.

**HEAT PLAN:**

Staff Training on the Heat Plan:
The DMH completed staff training on the CMF heat plan by May 12, 2006. Training was two parts: all Vacaville Psychiatric Program (VPP) staff received training on the actual heat plan and expectations, and only the P-2 staff received additional training on recognizing signs and symptoms of heat related illnesses.  Training was documented, recorded in the training data base, and placed in personnel records.  Any staff that missed the training were trained upon return to work.

Patient Training on the Heat Plan:
Training was provided to the patients within the P-2 housing unit on signs and symptoms of heat related illnesses and actions they should take if they

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

notice these symptoms.  This training was completed by March 12, 2006, and is reflected in the patient's medical record.

Supplemental Heat Plan Policy:
CMF and VPP staff developed the enclosed *Heat Precautions During Inclement Weather* policy that details actions required, along with reporting requirements, when the following occurs, (Enclosure I[10]):

- ➢ The CMF heat plan is implemented;
- ➢ The temperature within the P-2 unit reaches 85 degrees Fahrenheit and above; and
- ➢ The temperature within the P-2 unit reaches above 90 degrees Fahrenheit.

All VPP staff received a copy of this policy and by June 3, 2006, had acknowledged that they had read and understood the policy.

The DMH and CDCR will continue to operate the 36 interim ICF beds at CMF's P-2 housing unit until directed otherwise by the *Coleman* court.

---

10 Enclosure I includes the Department of Mental Health Memorandum titled "DMH/CMF Heat Plan", dated May 22, 2006.

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

## IV.  Plan Schedule:

| INTERIM INTERMEDIATE CARE FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006<br><br>**MAJOR MILESTONES** | | |
| --- | --- | --- |
| **Action** | **Comments** | **Target Completion Date** |
| *Section A: Mental Health Crisis Beds (MHCBs)* | | |
| A.1    Utilize 25 Acute Psychiatric Program (APP) Beds at the California Medical Facility (CMF) as Mental Health Crisis Beds | | |
| Discharge/Transfer acute patient in Atascadero State Hospital (ASH) | Completion date is six weeks after start date. | 10/16/06 |
| Transfer/Admit enough patients to activate the 25-bed MHCB unit at the Vacaville Psychiatric Program (VPP). | Completion date is six weeks after start date. | 10/23/06 |
| A.2    Operate the Current Outpatient Housing Unit at the California Men's Colony (CMC) as a 42 Bed Mental Health Crisis Bed Unit | | |
| Begin operating the Outpatient Housing Unit (OHU) at CMC as a MHCB unit on a temporary emergency basis. | | Completed as of 5/1/06 |
| Construct a new 50 bed Correctional Treatment Center at CMC. | * Target completion date is pending project approval through the annual budget process. | To Be Determined* |
| A.3    Increase the Mental Health Bed Capacity at the California Institution for Men | | |
| License 16 GACH beds for use as MHCBs. | ** Target completion date timeframe dependant upon complying with state licensing requirements. | To Be Determined** |

**Interim Intermediate Care Facility and
Mental Health Crisis Bed Plan, June 2006**

| INTERIM INTERMEDIATE CARE FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006 MAJOR MILESTONES | | |
|---|---|---|
| **Action** | **Comments** | **Target Completion Date** |
| *Section B:  Intermediate Care Facility Beds* | | |
| B.1    Convert the California Medical Facility's P-3 Housing Unit to 30 Intermediate Care Facility Beds | | |
| Install air conditioning to P-tower. | | 9/14/06 |
| Vacate M-3 to begin facility modifications | | 1/3/07 |
| Complete facility modifications to M-3 and P-3. | The target completion date is the anticipated construction completion date of the P-3 housing unit. | 5/23/07 |
| Full occupancy of P-3 with ICF patients. | Assumes that staffing and licensing requirements have been met. | 6/30/07 |
| B.2    Expedited Conversion of the Remaining 76 Intermediate Care Facility Beds at Salinas Valley State Prison | | |
| Complete facility modifications to the D-6 housing unit. | | 8/1/06 |
| Full occupancy of D-6 housing unit with ICF patients. | Assumes that staffing and licensing requirements have been met.  The anticipated completion date allows a transfer rate of approximately five patients per week to achieve full occupancy | 9/1/06 |
| Complete facility modifications to the D-5 housing unit. | | 12/31/06 |

**Interim Intermediate Care Facility and**
**Mental Health Crisis Bed Plan, June 2006**

| INTERIM INTERMEDIATE CARE FACILITY AND MENTAL HEALTH CRISIS BED PLAN, JUNE 2006 MAJOR MILESTONES | | |
|---|---|---|
| **Action** | **Comments** | **Target Completion Date** |
| Full occupancy of D-5 housing unit with ICF patients. | Assumes that staffing and licensing requirements have been met.  The anticipated completion date allows a transfer rate of approximately five patients per week to achieve full occupancy | 3/26/07 |
| B.3    Maintain the 36 Intermediate Care Facility Beds at the California Medical Facility's P-2 Housing Unit | | |
| Maintain the P-2 ICF program open. | Per the 5/1/06 court order the P-2 unit has remained open. | Completed as of 5/1/06 |

## V.    Ongoing Efforts:

The CDCR and DMH will periodically re-evaluate the necessity of maintaining the additional interim MHCBs and ICF beds identified in the *Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006*.  If it is determined that enough MHCBs and ICF beds exist to meet the needs of CDCR patients, then the CDCR and DMH, with the *Coleman* court's approval, may change the function of these beds to maximize use of these resources.

Enclosure I



C A L I F O R N I A   D E P A R T M E N T   O F
# Mental Health

## Memorandum

**To:**      All VPP Staff                          **Date:**      May 22, 2006

                                                    **Telephone:**   (707) 449-6504

**From:**    VACAVILLE PSYCHIATRIC PROGRAM
             P.O. Box 2297
             Vacaville, CA. 95696

**Subject:**   **DMH/CMF HEAT PLAN**

As we enter the hot seasonal months it is imperative that all staff be aware of the potential dangers to our patients during this period.  I have ordered mandatory training for all VPP staff regarding the CMF Heat Plan.  I expect staff to be constantly assessing their patients for heat related signs and symptoms, engaging in patient teaching regarding symptom recognition and heat precautions, and taking all necessary measures to ensure the safety and well being of our patients.

P-2, our ICF Level IV unit, requires your special attention.  It currently lacks central air conditioning and I have directed the program to immediately develop and implement a supplemental heat plan policy for that unit.  That plan is attached to this memo.  I expect all staff working on P-2 to be aware of this policy and carefully follow its direction.  Therefore, all staff are hereby directed to read the attached policy to this memo and sign and date the attached signature page, indicating that you have read, understand and will follow the P-2 procedure when working on P-2. It must be returned no later than close of business June 2, 2006, to the I/DTP Program Director's office on A-1 (Mike Sanders' office).  Thank you for your diligent work in this critically important assignment.  Should you have any questions, please contact Mike Sanders, Program Director for the I/DTP at extension 6029.

**Original signed by**
**Stirling C. Price for**

**VICTOR F. BREWER**
Executive Director

cc: S. Price, AED
     M. Veal, Warden (A)
     N. Khoury, MD, Chief, Clinical Services
     M. Sanders, PD
     T. Sutton, PD

**VACAVILLE PSYCHIATRIC PROGRAM**
**P-2 LEVEL IV INTERMEDIATE CARE PROGRAM**
**PROGRAM MANUAL**

**PROCEDURE:**    3.09

**SUBJECT:**           HEAT PRECAUTIONS DURING INCLEMENT WEATHER

**RESPONSIBLE:**    All Staff

**CROSS-**
**REFERENCE:**

## POLICY

It is the policy of the Intermediate Care Program to ensure the safety, health and well being of all patients.

## PROCEDURE

### A. TRIGGERS AND ACTIONS TAKEN

The Intermediate Care Program implements the California Medical Facility (CMF) Heat Plan at the same time as the rest of the institution, as hot weather approaches.

When the CMF Heat Plan is implemented, P-2 shall:

1. Monitor cell temperatures every hour and keep a log of these temperatures.

2. Portable air conditioners shall be used wherever possible.

3. Staff shall undergo training regarding this policy and training regarding the identification and prevention of heat related symptoms in a population being treated for psychotic illness.

4. At each medication pass the medication nurse shall encourage intake of fluids and be aware of and observe for heat related symptoms, reporting any such symptoms immediately to the treatment team.

5. Patient teaching will occur for all P-2 patients—regarding heat precautions and recognition of heat related symptoms.  This teaching shall occur weekly, either in group or individually and be documented in the patient record.

When the temperature on P-2 reaches 85º F and above:

1.   Medical staff and nursing staff will carefully monitor, assess and evaluate all patients. The RN shall assess each patient and document in the Interdisciplinary Notes (IDN) at least one time each shift, and shall notify the treating team physician or the MOD and the Supervising Registered Nurse (SRN) or the Senior Medical Technician (SMTA), if abnormal signs and symptoms are present.

2.   Ice and cold fluids will be made readily available to all patients.

3.   Vital signs will be taken at least twice a day—at 1200 and 1600 hours.

4.   Intake records shall be established on all patients, in order to ensure adequate fluid intake. Output shall also be done when clinically indicated.

5.   Dress down will be allowed.  Patients will be allowed to wear shorts and t-shirts on the unit.

6.   Cool showers will be offered throughout the day and evenings.

7.   Cold towel compresses will be offered.

8.   Cell doors will remain open while patients are in groups, to allow the cells to cool.

9.   Group schedules will be adjusted as necessary to ensure all patients are often out of their cells to cool.  Groups shall run at or near capacity (12) in order to ensure most patients are out of their cells most of the time.

10. Groups may run longer into the evening to allow for cooling of the cells and patients.

11. All patients will be carefully monitored regarding their group attendance.  Patients who refuse to come out of their cells will be carefully assessed by the treatment team.  If treatment team interventions are not successful in obtaining cooperation, the patient may be moved to a higher level of care as necessary.  The treatment team will also notify the Program Director or designee if the patient stays in his cell for one day.

12. Any patient who displays signs and symptoms of heat related illness or side effects from medications shall be immediately evaluated and treated by medical and nursing staff.

13. Patients will be carefully screened for medical conditions that might be exacerbated or complicated by heat exposure and placed elsewhere as appropriate.

## B.  REPORTING REQUIREMENTS:

1.  When the temperature reaches 85º F on the unit, the RN shall notify the SRN/SMTA who will ensure compliance with all provisions of this policy and procedure.

2.  When the temperature reaches 85º F on the unit, the SMTA shall notify the following:

    ▪ The DMH AOD (if after hours)
    ▪ The Program Director

3.  When the temperature reaches 90° F on the unit, the RN shall immediately notify the SMTA who shall immediately notify the Watch Commander.

4.  At any time any staff member observes a patient to be in distress, that staff member shall immediately alert the treatment team and the Registered Nurse or treating physician.

5.  The Registered Nurse shall immediately notify the treating physician (or the MOD), the SRN and the SMTA when any patient is assessed to be suffering from heat related symptoms.

6.  The SRN and SMTA shall immediately notify Program Management of all patients assessed to be having difficulty due to heat related circumstances.

## C. CONTINGENCY PLAN FOR EXTREME CONDITIONS

Should the unit experience extreme heat so that cells remain at temperatures above 90° F and the patients are deemed to be at risk in their cells, all patients will be removed from their cells.  This contingency plan shall be accomplished in the following manner:

1.  The SRN/SMTA shall be notified immediately of this condition.

Enclosure I

2. The SRN/SMTA shall immediately notify the Watch Commander, Program Director and after hours, the DMH AOD.

3. Up to 24 patients will be cared for in the two groups on the unit. The remaining patients will be cared for in the hallway where the temperatures are cooler.

4. The SRN/SMTA will ensure that adequate clinical and custody staff are present.

5. Staff shall adhere to all of the above measures for monitoring patients during heat related circumstances.

I have read, understand and will follow the above policy and procedure [the I/DTP Procedure #309].

Signature: _____

Print Name and Title: _____

Date: _____

4