PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY -- EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

FILED
JUL 10 2006
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

SEALED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, Plaintiffs, vs. ARNOLD SCHWARZENEGGER, et al., Defendants | No.: Civ S 90-0520 LKK-JFM **PLAINTIFFS' MEMORANDUM IN SUPPORT OF SPECIAL MASTER'S RECOMMENDATIONS REGARDING STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDE** **[FILED UNDER SEAL]** |

**THIS DOCUMENT IS FILED UNDER SEAL PURSUANT TO THE DISTRICT COURT'S JUNE 21, 2006 ORDER**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation |
| DCHCS | Division of Correctional Health Care Services. This is the Department in CDCR headquarters that manages medical and mental health care. |
| DOF | Department of Finance. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| MHSDS | Mental Health Services Delivery System. The name given by defendants to their entire mental health system. |
| SHU | Security Housing Unit. |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTRODUCTION AND STATEMENT OF FACTS ..... 1

The CDCR's Proposed 2006/07 Finance Letter That Was Rejected By The Department of Finance ..... 2

Last Year's Finance Letter ..... 8

Dangerous Current Conditions in the CDCR ..... 10

ARGUMENT ..... 11

I. THE COURT SHOULD ADOPT THE RECOMMENDATION OF THE SPECIAL MASTER AND ORDER DEFENDANTS AND THE DEPARTMENT OF FINANCE TO IMMEDIATELY FUND THE FINANCE LETTER ..... 11

II. THE COURT SHOULD ADD THE DEPARTMENT OF FINANCE AS A DEFENDANT IN THIS CASE ..... 13

III. THE COURT SHOULD UNSEAL THE BUDGET DOCUMENT AT ISSUE ..... 15

A. The Documents at Issue Do Not Contain Privileged Information Warranting Sealing ..... 16

B. The Report And Attached Exhibits Should Be Disclosed Now Because of the Strong Policy In Favor of Openness In Court Proceedings Involving Matters Of Public Concern ..... 17

C. Defendants Can Offer No Legitimate Reason For Keeping These Documents Under Seal ..... 19

CONCLUSION ..... 19

-ii-

PLAINTIFFS' MEMORANDUM IN SUPPORT OF SPECIAL MASTER'S RECOMMENDATIONS REGARDING STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDE, NO.: CIV S 90-0520 LKK-JFM

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re "Agent Orange" Product Liability Litigation,
98 F.R.D. 539 (E.D.N.Y. 1983) .......... 18

Anderson v. Dunn,
6 Wheat. 204 (1821) .......... 11

Arkwright Mutual Insurance Co. v. Garrett & West, Inc.,
782 F. Supp. 376 (N.D. Ill. 1991) .......... 18

Coleman v. Wilson,
912 F. Supp. 1282 (E.D. Ca. 1995) .......... *passim*

In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,
101 F.R.D. 34 (C.D. Cal. 1984) .......... 18

Duran v. Carruthers,
678 F. Supp. 839 (D.N.M. 1988) .......... 13

Foltz v. State Farm Mutual Automobile Insurance Co.,
331 F.3d 1122 (9th Cir. 2003) .......... 17

Ford v. Air Line Pilots Association International,
268 F. Supp. 2d 271 (E.D.N.Y. 2003) .......... 14

Hagestad v. Tragesser,
49 F.3d 1430 (9th Cir. 1995) .......... 17

Kaminsky v. Abrams,
41 F.R.D. 168 (D.C.N.Y. 1966) .......... 14

Mississippi Valley Barge Line Co. v. U.S.,
273 F. Supp. 1 (E.D.Mo. 1967) .......... 14

New York State Association for Retarded Children, Inc. v. Carey,
483 F. Supp. 440 (E.D.N.Y. 1977) .......... 14

Nixon v. Warner Communications, Inc.,
435 U.S. 589 (1978) .......... 17

Preiser v. Rodriguez,
411 U.S. 475 (1973) .......... 13

Richmond Newspapers, Inc. v. Virginia,
448 U.S. 555 (1980) .......... 18

Ruiz v. Estelle,
679 F.2d 1115 (5th Cir. 1982) .......... 12

Spain v. Procunier,
600 F.2d 189 (9th Cir. 1979) .......... 11

Spallone v. United States,
493 U.S. 265 (1990) ..... 11

State of Illinois v. United States Department of Health and Human Services,
772 F.2d 329 (7th Cir. 1985) ..... 15

Stone v. City and County of San Francisco,
968 F.2d 850 (9th Cir. 1992) ..... 13

Swann v. Charlotte-Mecklenberg Board of Education,
402 U.S. 1 (1971) ..... 11

United States v. Kentucky Utilities Co.,
124 F.R.D. 146 (E.D. Ky. 1989) ..... 19

United States v. Louisiana,
354 U.S. 515 (1957) ..... 14

United States. v. Moussaoui,
65 Fed. Appx. 881 (4th Cir. 2003) ..... 18

## FEDERAL RULES AND STATUTES

Prison Litigation Reform Act,
18 U.S.C. § 3626 (a)(1) ..... 11

All Writs Act,
28 U.S.C. § 1651 (All Writs Act) ..... 13, 14

Federal Rules of Civil Procedure

Rule 21 ..... 14

Rule 65 ..... 13, 14

## INTRODUCTION AND STATEMENT OF FACTS

On March 2, 2006, this Court ordered defendants to "immediately implement" the Revised Program Guide. 3/2/06 Order at ¶ 1. The Revised Program Guide constitutes defendants' remedial plan to cure the ongoing Constitutional violations in this case. See Defendants' January 2006 Revised Program Guide, filed 2/3/06 ("Defendants' Revised Program Guide"). Because they have not secured the staffing they acknowledge is necessary to implement the Revised Program Guide, defendants cannot plausibly claim to have complied with the Court's Order.

One of the central causes of the defendants' ongoing Constitutional violations has been their failure to provide the plaintiff class with adequate staffing in their mental health care programs. *Coleman v. Wilson*, 912 F. Supp. 1282, 1306-1308 (E.D. Ca. 1995) ("The overwhelming weight of the evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services"). In February of this year, the clinical leaders of the California Department of Corrections and Rehabilitation ("CDCR") made an apparently good faith effort to address this longstanding staffing problem by submitting a budget request for 657 new positions, along with other resources. The CDCR leaders considered these requested positions and resources necessary to implement the new Program Guide and to comply with several past orders of this Court. Shortly thereafter, unknown officials in the Department of Finance rejected this request. See 6/21/06 Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide ("6/21/06 Special Master's Report") at 6-7. The defendants in this case, along with the Department of Finance, must be ordered to fully fund these 657 positions, or else face contempt proceedings. The Special Master has recommended such an order, and his recommendation should be adopted. 6/21/06 Special Master's Report at 10-11.

The Rejected 2006/07 Budget Letter was the second budget request by the CDCR in as many years seeking to expand its staffing in order to improve its general compliance with *Coleman* and to implement the Revised Program Guide. Although this Finance Letter was

much more modest that the first request in the Spring of 2005, it was quickly rejected by the Department of Finance.

The CDCR's Proposed 2006/07 Finance Letter That Was Rejected By The Department of Finance

On February 6, 2006, the Department of Corrections and Rehabilitation, Division of Correctional Health Care Services, submitted a Finance Letter to the State Department of Finance seeking Fiscal Year 2006/07 funding of $87.6 million to establish 657.6 new staff positions intended to enhance the delivery of mental health care. Ex. C to Special Master's 6/21/06 Report (Rejected 2006/07 Finance Letter) at 00024.[1] The Rejected 2006/07 Finance Letter is a thorough and well-documented request for the *minimum* resources the CDCR's clinical leadership believes are necessary to comply with this Court's orders and to deliver Constitutionally adequate mental health care. *Id.* at 00066. Nearly 800 pages of supporting documentation accompany the request. Nolan Dec. ¶ 2 and Ex. A (excerpts from supporting documentation). These supporting documents include a detailed workload study for the positions where augmentation is requested, detailed population data concerning the class of 31,000 mentally ill CDCR inmates, information about current crisis bed and staffing shortages, detailed justifications for the additional custody positions sought to facilitate mental health treatment, detailed staffing request breakdowns with justifications for each position, two additional workload studies, a comparative review of staffing ratios used in other states, a review of staffing ratios recommended by standard-setting organizations such as the National Commission on Correctional Health Care, and a variety of supporting documentation for pay increases sought for psychiatrists. See Nolan Dec. Ex. A (Rejected 2006/07 Finance Letter,

---

[1] Portions of the Rejected 2006/07 Finance Letter are attached to the 6/21/06 Special Master's Report as Exhibit C. However, the Special Master included only the Finance Letter itself, and not the more than 800 pages of voluminous supporting documentations. Excerpts from this broader set of document are attached to the Declaration of Thomas Nolan ("Nolan Dec.") filed herewith under seal as Exhibit A.

excerpts from supporting documentation) at Bates 00132 (Table of Contents from binder of supporting documentation).

The Rejected 2006/07 Finance Letter contains a series of very significant party admissions concerning the CDCR's need for more mental health staff. The Letter emphasizes that the 657 new positions and other resources sought are necessary to comply with this Court's Orders:

> In 1995, a federal class action lawsuit (*Coleman v. Schwarzenegger*) found that the California Department of Corrections and Rehabilitation (CDCR) violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates. The CDCR, Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) at Headquarters, and the institutional Mental Health Services Delivery System (MHSDS) intend through this proposal to comply with the *Coleman* court's orders.

6/21/06 Special Master's Report. Ex. C (CDCR Rejected 2006/07 Finance Letter) at 1 (Bates 00065). The Rejected 2006/07 Finance Letter is broken into three sections. In the first section, the CDCR leadership requests 509.56 positions "which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level." *Id.* at 2 (Bates 00066). The requested positions included 299 positions for administrative segregation, 71.6 positions for reception centers, 72.98 positions for mental health outpatient units (unlicensed infirmaries where suicidal inmates are often improperly held due to the shortage of MHCBs), and 65 other assorted positions including psychiatric technician managers and quality management staff. 6/21/06 Special Master's Report at 6. In the second section, regarding headquarters staffing, the defendants seek 100.0 positions "which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level." Ex. C to 6/21/06 Special Master's Report at 3 (Bates 00067). The third section concerns salary augmentations and other resources needed to attract more psychiatrists to the CDCR, given its chronic understaffing in this area—also required to comply with orders of this Court. *Id.* at 7-9 (Bates 00071 to 00073). The request includes funding for a small number of additional staff positions in headquarters to assist with recruitment and retention. *Id.* It is somewhat unclear which of these positions were approved for inclusion in the final May Revise by the Department of Finance, but it appears

that only the 71 positions for Reception Center and the 72 positions for mental health outpatient units were actually in the final version of the Finance Letter. See 6/21/06 Special Master's Report at 6-7.

In the background section, the CDCR Finance Letter makes a remarkable series of concessions regarding the current state of defendants' mental health program:

> After 11 years of implementing the court's orders and the mandated services, as well as preparing for the implementation of the 2006 MHSDS Revised Program Guide, CDCR and DCHCS have determined that current resources are insufficient to implement the newly mandated 2006 Revised Program Guide in a manner consistent with the court's requirements and level of community standards of quality care. Failure to implement the 2006 MHSDS Revised Program Guide will continue the current status of mentally ill inmates going undiscovered, undiagnosed, and untreated, while at the same time being subjected to conditions that aggravate their illnesses. Due to limited resources, those mentally ill inmates who currently do receive some form of treatment, suffer needless extended and medically harmful delays in access to necessary psychiatric care.

Ex. C to 6/21/06 Special Master's Report at 10 (Bates 00074) (emphasis supplied). In addition to this clear acknowledgment that failure to obtain the requested funding will cause continued severe harm to mentally ill inmates, the Finance Letter frankly acknowledges the legal risks of inaction: "To continue a MHSDS that is understaffed, significantly overworked, and lacking a quality assurance program places inmates and inmate-patients at risk, and the state, CDCR, and key decision makers in danger of being found in contempt of court." *Id.* A similar warning appears later in the Finance Letter, when the authors warn that failure to approve the requested funding "will lead to increased litigation costs and is likely to lead to a Court Order which may be more costly than the current proposal." Nolan Dec. Ex. A (Rejected Finance Letter excerpts) at 51 (Bates 00115). "Failure to provide constitutionally adequate mental health treatment," the Finance Letter continues, "may harm inmates and is a violation of inmates' rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment." *Id.*

The largest single component of the staffing augmentation sought by the CDCR in the Finance Letter is a request for 299 staff positions for providing mental health services in

Administrative Segregation units.[2] Defendants admit in the Rejected Finance Letter that these 299 Administrative Segregation positions are sought to comply with longstanding court orders on Administrative Segregation staffing from 1999 and 2001 that defendants failed to comply with in a timely fashion. *Compare* 6/21/06 Special Master's Report, Ex. C (Rejected Finance Letter) at 14 (Bates 00078) with Nolan Dec. Ex. D (July 26, 1999 Order) at ¶ 6 (CCCMS Ad Seg staffing), and Nolan Dec. Ex. E (October 26, 2001) Order ¶ 1 (EOP Ad Seg Staffing). The Department of Finance rejected all but six of these 299 positions. See 6/21/06 Special Master's Report at 7 ("DOF's final submission also excised all but six of the 299.98 positions CDCR requested for administrative segregation, which the CDCR justified not only by reference to the revised Program Guide but also by citing still unfulfilled specific court orders on administration segregation dating from 1999 and 2001."). The Finance Letter itself also acknowledges the seriousness of the problem of suicides in Administrative Segregation, and the sustained nature of this problem, pointing out that between 1999 and 2005, 49 percent of all suicides took place in Administrative Segregation or SHU units and involved CCCMS inmates. Ex. C to 6/21/06 Special Master's Report (Rejected 2006/07 Finance Letter) at 15 (Bates 00079).

The CDCR's failure to adequately staff the Administrative Segregation units severely impacts on *Coleman* class members because of the harsh conditions and disproportionate number of mentally ill inmates housed in these units. While the *Coleman* class of 31,621 mentally ill inmates is only 18.5 percent of the total CDCR inmate population, they are 44.4 percent of the Administrative Segregation population. See Nolan Dec. Ex. A (Rejected 2006/07 Finance Letter's Attachments) at Bates 00492. See Dr. Jeffrey Metzner, *Mental*

---

[2] This staffing request is based upon an assessment of the workload required to provide CCCMS inmates in administrative segregation with a case manager contact *every other week*. Nolan Dec. Ex. A (Finance Letter supporting documentation at 00512). The Court Order of March 2, 2006 directed defendants to retain *weekly* case manager contacts for CCCMS inmates. 3/2/06 Order. Thus, the 299 positions requested by defendants for administrative segregation units will not be adequate to provide the care ordered by the Court on March 2, 2006.

*Health Considerations for Segregated Inmates*, Appendix D to National Commission on Correctional Health Care 2003 Correctional Standards and Guidelines for Delivering Mental Health Care at 233-34 ("In correctional settings with inadequate mental health services, it is often not difficult to find inmates with serious mental illnesses in segregation housing units because their untreated mental illnesses often result in significant behavioral problems.").

In the June 6, 1994 Findings and Recommendations in this case, the Magistrate Judge found that "placing mentally ill inmates in Administrative Segregation or segregated housing exacerbates the underlying mental illness, induces psychosis, and increases the risk of suicide." 6/6/94 Findings and Recommendations at 52. Psychiatric experts agree: "There is general consensus among clinicians that placement of inmates with serious mental illnesses in settings with 'extreme isolation' is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve." Metzner, *supra*, National Commission on Correctional Health Care Standards at 234.

Thus, it is generally well-established that mentally ill inmates are at great risk of harm when housed in Administrative Segregation units without adequate mental health services. Yet, CDCR failed to adequately staff these housing units where nearly half of the population is mental health inmates. The extremely high suicide rates in the Administrative Segregation units are a result of this failing. In its own review of suicides in the system in the calendar year 2003, the CDCR found that more than half of the inmates who committed suicide were housed in an Administrative Segregation unit. Nolan Dec. ¶ 3, Ex. B (Defendants' 2003 Suicide Report) at 9-10. In 2004 the problem of suicides in Administrative Segregation units continued to escalate. In the Special Master's Report on Suicides Completed in the California Department of Corrections in the Calendar Year 2004 ("Special Master's 2004 Suicide Report"), the Special Master found that 69.2 percent of all the suicides in the CDCR took place in Administrative Segregation. Special Master's 2004 Suicide Report at 12. As a result, the 2004 Suicide Report included only a single recommendation: that defendants develop a plan to address "the escalating percentage of suicides occurring in the Administrative Segregation units." *Id*. In response to this recommendation, defendants are now engaged in an ongoing

remedial process to address this problem, involving the court experts and plaintiffs' expert. Nolan Dec. ¶ 3.

All of the clinical and custody positions sought by defendants in the Rejected 2006/07 Finance Letter are needed to address other areas of great concern, or as defendants put it, to address "the staffing needs in the most critical areas." Ex. C to 6/21/06 Special Master's Report (Rejected Finance Letter) at 2 (Bates 00066). For example, defendants requested 100 positions to augment the management staff in Headquarters. This was in response to a recommendation in the Special Master's Fifteenth Monitoring Report that required defendants to develop a plan to augment headquarters staffing so that it is capable of managing the enlarged caseload population. See 15th Monitoring Report of the Special Master at 352-353, 412 (recommendation five); 3/3/06 Order at ¶ 2. The Rejected Finance Letter sought 100 new positions in headquarters management and quality management directly in response to this Recommendation that became a final Order of this Court. Nolan Dec. Ex. A Finance Letter at 21 (Bates 00085); 3/3/06 Order at ¶ 2.

Similarly, defendants sought to augment clinical mental health staffing in Reception Centers, an area where it is clear that current problems in the CDCR with overcrowding and understaffing are creating particularly severe, life-threatening problems for mentally ill inmates.[3] Nolan Dec. ¶ 4. Reception Centers are prisons to which newly arriving CDCR inmates are sent for classification and screening. *Id.* These facilities conduct medical and psychiatric screening, address safety issues, and place inmates in their general population prison based on various factors. *Id.* In many respects, Reception Centers are like Administrative Segregation units, in that inmates do not have the opportunity to participate in

---

[3] The positions sought in the Finance Letter for Reception Centers were apparently submitted to the legislature as part of the final package, (the 4/3/06 Finance Letter ultimately approved by the Department of Finance). See Exhibit D to 6/21/06 Special Master's Report (4/3/06 Finance Letter approved by Department of Finance) at 7; see also 6/21/06 Special Master's Report at 6 (final proposal from Department of Finance included 71.98 positions for the reception centers). However, as of this time, it is not known whether these positions were approved by the Legislature. In 2005 there were at least seven reception center suicides in the CDCR. Nolan Dec. ¶ 4.

most prison programming and spend much of their time locked in their cell and isolated from others. *Id.*

The number of *Coleman* class members waiting for treatment in overcrowded CDCR Reception Centers has increased dramatically in the last year, and is now approaching, on a percentage basis, the percentage of mentally ill inmates waiting for treatment in Reception Centers that was found unconstitutional by this Court at the time of trial. 2/6/06 Bien Declaration In Support of Plaintiffs Objections to the 15th Monitoring Report at ¶¶ 3, 4. The Finance Letter seeks to augment Reception Center staffing. However, the increases are insufficient to provide adequate mental health care to mentally ill inmates housed in Reception Centers for long periods of time because of overcrowding within the CDCR. Ex. C to 6/21/06 Special Master's Report (Rejected Finance Letter) at 16 (Bates 00080). For example, an Enhanced Outpatient Program ("EOP") patient in the Reception Center will receive extremely limited treatment -- a short case manager contact once a week. Nolan Dec. ¶ 5. Once this patient is finally transferred to an EOP, the inmate will receive 10 hours per week of therapy and other structured therapeutic activities. *Id.* The staffing augmentation requested will not provide adequate case managers and psychiatric technicians in the Reception Centers for EOP patients to receive ten hours of structured therapeutic activities during their long stays. *Id.*

Although significantly reduced from the positions sought by CDCR in their 2005-2006 Finance Letter to implement the Program Guide, Special Master Keating has recommended that defendants fund the current Finance Letter as the bare minimum for implementing the Program Guide until the workload study is complete. 6/19/06 Special Master's Report at 10.

<u>Last Year's Finance Letter</u>

The positions and resources requested in the 2006/07 Rejected Finance Letter are necessary for implementing the Program Guide, and in fact are very likely only a small portion of the new staff positions that defendants will ultimately need to add in order to comply with the Revised Program Guide. This fact is underscored by reviewing the significantly larger staffing augmentation package that was considered and rejected by the Department of Finance last year in connection with a CDCR Fiscal Year 2005/06 Budget Letter. See Exhibit B to

6/21/06 Special Master' Report. The 2005/06 Budget Letter included a detailed review of several alternative staffing packages and funding options with respect to the *Coleman* case. *Id.* The most complete staffing package discussed in last year's Budget Letter would have added a total of 822.1 positions over two years with the goal of fully implementing the Revised Program Guide "beginning July 2005" and of exiting the *Coleman* case within a few years by complying with the case requirements. *Id.* at 40-41. This alternative was not recommended. *Id.* at 43. The only reason given for rejecting the alternative was that the "MHSDS Program Guides have not been given final approval, and requirements may change." *Id.* at 41. Beyond this, as the Special Master explains, "[n]o written rationale for the rejection by DOF of the CDCR's recommendation for the staffing allocations identified as necessary to implement the revised Program Guide was provided." 6/21/06 Special Master' Report at 4. Because of the rejection of these 822 positions by the Department of Finance, no resources were available in early March 2006 when the Court ordered immediate implementation of the Revised Program Guide.

As Special Master Keating explains, following the rejection of last year's request by the Department of Finance, defendants' response was to develop this year's much more modest, narrowly tailored request, which was also rejected, as discussed *supra*:

> …this second BCP sought 509 permanent positions, down 38 percent from the 822 positions requested in the FY 2005/06 May Revise Finance Letter. No limited field positions were requested. The requested positions, moreover, were justified not by reference to an analysis of the increased workload demands imposed by the Program Guide revisions, but by acknowledged needs in specific areas of service, with some focus on those elements of programming in the service areas likely to be impacted more broadly by the revisions. <u>The targeted areas also corresponded with program elements where the department was experiencing the most difficulty in providing adequate treatment services due to escalating population pressures</u>. These areas included administrative segregation units, where suicide rates were disproportionally high; reception centers, where the flood of new arrivals was swamping available processing staff, who were short of resources to monitor and treat reception center inmates awaiting transfer to mainline programs for long periods; and so-called mental health outpatient units, where increasing numbers of inmates in crisis, often suicidal in nature, were placed while awaiting entry to Mental Health Crisis Bed Units.

6/21/06 Special Master's Report at 5-6 (emphasis supplied). Despite the modest, appropriately targeted, and well-justified nature of this year's budget requests, and despite the dire facts on the ground inside the CDCR that supported it, it was rejected by the DOF.

Dangerous Current Conditions in the CDCR

The positions sought in the Rejected 2006/07 Finance Letter are critical to saving the lives of mentally ill inmates at a time when even Governor Schwarzenegger now admits that California's prison system is dangerously overcrowded. 6/26/06 Kahn Dec. ¶ 17 and Ex. F. CDCR officials in their own internal memos have declared an "emergency" and "a severe crisis" due to the combined effects of severe overpopulation and understaffing. 2/3/06 Bien Dec. ¶ 5 and Ex. D. In an extraordinary October 25, 2005 Memo to then CDCR Secretary Hickman, the overcrowded conditions were discussed with alarm by CDCR Adult Division Director John Dovey:

> The California Department of Corrections and Rehabilitation's (CDCR) total inmate population reached 166,148 as of October 12, 2005. This historic population high has caused significant population pressures resulting in public safety concerns for the CDCR as well as the counties in our state. . . . The CDCR is experiencing staffing shortages in a broad range of areas. These range from Correctional Officer, medical/mental health staffing, case records analysts, etc. . . .

2/3/06 Bien Dec. ¶ 5 and Ex. D. Since this memo was written, the CDCR has accepted another 5,500 inmates, raising the total population to 171,578. 6/29/06 Kahn Dec. ¶ 17 and Ex. F . These dangerous conditions were highlighted recently in the first report of the *Plata* Receiver, which noted that one of the major impediments to improving medical care was "systemic long term overcrowding." Nolan Dec. Ex. C (7/5/02 Receiver's First Bi-Monthly Report) at 3. "Most California prisons operate at 200% of capacity," he continued, "with no effective relief in sight." *Id.* These conditions are made more dangerous by the lack of adequate clinical staffing in Administrative Segregation units and reception centers, and by the lack of sufficient leadership and oversight in headquarters. From plaintiffs' perspective, these staffing augmentations in the Rejected 2006/07 Finance Letter are far from sufficient, but they are a critical first step. The Court must order the defendants and the Department of Finance to fund

the positions requested in defendants' 2006/07 Finance Letter and recommended by the Special Master.

## ARGUMENT

### I. THE COURT SHOULD ADOPT THE RECOMMENDATION OF THE SPECIAL MASTER AND ORDER DEFENDANTS AND THE DEPARTMENT OF FINANCE TO IMMEDIATELY FUND THE FINANCE LETTER

The Eighth Amendment is based on "the fundamental premise that prisoners are not to be treated as less than human beings." *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir. 1979). A federal court has broad equitable powers. *Swann v. Charlotte-Mecklenberg Board of Education*, 402 U.S. 1, 15 (1971). In employing these broad powers, courts "exercise '[t]he least possible power adequate to the end proposed.'" *Spallone v. United States*, 493 U.S. 265, 280 (1990) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821)). This is true under both traditional equitable principals, and under the Prison Litigation Reform Act. See Prison Litigation Reform Act, 18 U.S.C. § 3626 (a)(1) (requiring that before a court orders prospective relief in a prison conditions suit that the court find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."). Over the years, this Court and its Special Master have shown great patience and deference towards the state actors in this case. The Special Master negotiated the treatment provisions in the original and the Revised Program Guide with defendants. The Court and the Special Master have allowed defendants to determine what staffing is necessary to implement the Program Guide. The positions defendants were seeking in the rejected Finance Letter were the positions that defendants believed they required and, in defendants' own words, these positions were "the minimum necessary to meet federal court mandated services at a constitutionally adequate level." Ex. C to Special Master's 6/21/06 Report (Rejected Finance Letter) at Bates 00066. It is clear that the package ultimately submitted to the Legislature by the DOF did not meet this minimum standard. *See* 6/21/06 Special Master's Report at 7 ("DOF's final submission also excised all but six of the 299 positions CDCR requested for Administrative Segregation.") Defendants have been given many years and many chances to adequately staff their mental

health programs. It is clear that a court order is now necessary to ensure that defendants have the minimum staffing resources necessary to comply with the Constitution.

This is especially true with respect to the Administrative Segregation staffing portion of the Finance Letter. The Finance Letter acknowledges that defendants sought the relevant Administrative Segregation positions in response to a 1999 Order. See Exhibit C to 6/21/06 Special Master's Report, Rejected Finance Letter at 14 (Bates 00078). Apparently, defendants never bothered to comply with this order. See Nolan Dec. Ex. D. (7//26/99 Order) at ¶ 6 (requiring that defendants implement the new administrative segregation staffing rations "on or before December 31, 1999."). Moreover, the staffing ratios ordered by the Court in 1999 and 2001 were developed in cooperation with defendants and are ratios to which the defendants largely agreed. See Nolan Dec. Ex. D (July 26, 1999 Order) at 3 ("Defendants filed limited objections, objecting principally to the time frame proposed by the special master for implementation of the staffing ratios for administrative segregation."). The Court has waited for more than five years and defendants still have not funded the relevant positions!

"[T]he remedy should begin with what is absolutely necessary. If [those] measures later prove ineffective, more stringent ones should be considered." *Ruiz v. Estelle*, 679 F.2d 1115, 1145-46 (5th Cir. 1982). The staffing package at issue in the Special Master's report is not a generous staffing package – rather, it is clearly the best estimate by the CDCR's clinical leadership as to "the minimum necessary" to deliver mental health services at a constitutional level. Ex. C to 6/21/06 Special Master's Report (Finance Letter) at Bates 00066. Defendants admit -- and the Special Master has repeatedly found -- that current staffing levels in the CDCR are inadequate. The staffing package which the Special Master is recommending the Court to order defendants and the Department of Finance to fund is absolutely necessary. As the Special Master explained, "Any risk of an inflated estimate was surely squeezed out of CDCR's BCP for FY 2006/07. Once again, nothing in the record supports DOF's rejection of that BCP." Special Master's 6/21/06 Report at 10.

The CDCR is currently overcrowded and understaffed, and conditions are deteriorating for mentally ill class members. Notwithstanding these dire conditions, the Special Master and

the Court have clearly gone out of their way to respect principles of comity by giving state officials "the first opportunity to correct the errors made in the internal administration of their prison." *Preiser v. Rodriguez,* 411 U.S. 475, 491-92 (1973). Indeed, the Court has given defendants many opportunities to address the problems in staffing and with suicides in its Administrative Segregation units. Because of the intransigence and resistance of the Department of Finance, defendants' efforts to take appropriate corrective actions have failed. "[W]here federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve." *Stone v. City and County of San Francisco*, 968 F.2d 850, 860-61 (9th Cir. 1992) (quoting from *Duran v. Carruthers*, 678 F.Supp. 839, 847 (D.N.M. 1988), *aff'd*, 885 F.2d 1485 (10th Cir. 1989)). The time has come for this Court to act decisively to enforce the remedy that defendants themselves have selected, by ordering the State to fund the full requested 2006/07 Finance Letter. In order to prevent a re-occurrence of this funding problem, the Court should also add the Department of Finance as a defendant.

## II. THE COURT SHOULD ADD THE DEPARTMENT OF FINANCE AS A DEFENDANT IN THIS CASE

The Department of Finance has clearly interfered with the efforts of the CDCR defendants in this case to comply with a Federal Court order. It has done so in a manner that was, in the words of the Special Master, both "arbitrary and capricious" and that "suggests . . . the complete absence of any thoughtful, rational or deliberative process at all." Special Master's Report at 9-10. The Court should add the Director of the Department of Finance (DOF) as a defendant.

The DOF, as an agency under the direct control of the Governor, a defendant in this action, is already subject to this Court's orders under Federal Rule of Civil Procedure 65. See Fed. R. Civ. P. 65(d) ("*Every order granting an injunction and every restraining order . . . is binding only on the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.*"); see also All Writs Act, 28

U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). Given that the 2006/07 Finance Letter that the DOF rejected repeatedly discusses this Court's orders, it is clear that the DOF has had notice of the Court's orders. However, in the future, it is prudent to ensure that the DOF has notice of each of this Court's orders by making the Director of the Department of Finance a defendant.

There can be no dispute concerning the power of this Court to exercise its discretion under Federal Rule of Civil Procedure 21 and the All Writs Act to order that the Department of Finance be made a party to this action. Fed R. Civ. P. 21; 28 U.S.C. § 1651 (All Writs Act); *Ford v. Air Line Pilots Association International*, 268 F.Supp.2d 271 (E.D.N.Y. 2003) (Rule 21 "grants the court broad discretion to permit a change in the parties at any stage of a litigation."); see *United States v. Louisiana*, 354 U.S. 515, 516 (1957) (allowing addition of parties under Rule 21 where "the just, orderly, and effective determination of [the] issues requires that they be adjudicated in proceeding in which all interested parties are before the Court"). It is well-established that federal courts are vested with "the inherent and statutory power [under the All Writs Act, 28 U.S.C. § 1651] and authority to enter such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise." *Mississippi Valley Barge Line Co. v. U.S.*, 273 F.Supp. 1, 6 (E.D.Mo. 1967); see *id.* ("This rule applies whether or not the person charged with the violation of the judgment or decree was originally party defendant to the action" where the third party had actual knowledge of the court decree and was acting in concert with the defendant). Nor does adding a party for the purpose of effecting a remedy require re-litigation of the merits of the case. See *New York State Association for Retarded Children, Inc. v. Carey*, 483 F. Supp. 440 (E.D.N.Y. 1977). "Rule 21 permits the court to add parties 'at any stage of the action and on such terms as are just.'" *Id.* at 443. See *Kaminsky v. Abrams*, 41 F.R.D. 168, 171 (D.C.N.Y. 1966) (allowing addition of new defendants where failure to add the defendants would result in a multiplicity of litigation and defendants failed to make a sufficient showing of prejudice).

There are a number of affirmative reasons why DOF will not suffer any prejudice from being added as a party. As noted above, the Governor of California, who is directly responsible for the management and operation of the DOF, has always been a defendant in this case and remains a defendant. The Governor oversees DOF and has the authority to direct DOF to take any actions necessary to ensure compliance in this case. California Constitution, Art. 5, §§ 1, 4, 6. As agents and employees of the Governor, it is clear that the orders in this case are already binding on the DOF pursuant to Federal Rule of Civil Procedure 65 and under the All Writs Act. See Fed. R. Civ. P. 65(d) ("*Every order granting an injunction and every restraining order . . . is binding only on the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.*"); see also 28 U.S.C. § 1651. Federal Rule of Civil Procedure 65 "is a codification of the common law rule allowing a non-party to be held in contempt for violating the terms of an injunction when a non-party is legally identified with the defendants or when the non-party aids or abets a violation of an injunction." *State of Illinois v. United States Dept. of Health and Human Services*, 772 F.2d 329, 332 (7th Cir. 1985).

The Department of Finance will also not be prejudiced as a party because it will have liability only for any failure to comply with this court's orders in the future. Finally, making the Department of Finance a party will in some respects benefit the DOF by giving them more complete information about this case and its requirements.

## III. THE COURT SHOULD UNSEAL THE BUDGET DOCUMENT AT ISSUE

The Court's June 21, 2006 Order directed the parties to address whether the Special Master's Report of the same date and attached exhibits should be unsealed. 6/21/06 Order at 2. None of the information contained in the Report, the Finance Letter or the exhibits to the letter is privileged or warrants sealing. Defendants' assertion that the documents are protected under the deliberative process privileged has been rejected by this Court. 6/12/06 Order at 1. Moreover, the information should now be unsealed because of the strong presumption in favor of openness in court proceedings, as well as the additional public interest in the information at

issue in this particular case. The public has a weighty interest in the decisions of state government officeholders, both elected and appointed, in the state budget, and in the state's treatment of mentally ill inmates.

### A. The Documents at Issue Do Not Contain Privileged Information Warranting Sealing

These documents were produced under seal after defendants refused to provide them to the Special Master and plaintiffs when initially requested, after the existence of the documents was revealed in a conference call with parties and the Special Master. See Nolan Dec. ¶ 6. The Special Master requested the budget documents at issue in preparation for his report on the status and sufficiency of defendants' budget request for staffing to implement the court-approved provisions of the Revised Program Guide. See 5/30/06 Order at 1. Defendants refused to provide the documents and sought to submit them under seal. *Id.*; see also Nolan Dec. ¶ 10 and Ex. E (5/30/06 letter from defendants asserting privilege and offering to submit the documents under seal). The Court then ordered defendants to submit a formal assertion of the privilege they asserted with respect to these documents. *Id* at 2. Both parties subsequently filed briefs with the Court regarding defendants' assertion of the deliberative process privilege in connection to the budget documents. See Defendants' Formal Assertion of the Deliberative Process Privilege to Production of Finance Request, with Supporting Memorandum of Points and Authorities, Declarations, filed 6/02/06; Plaintiffs' Opposition to Defendants' Formal Assertion of the Deliberative Process Privilege, filed 6/09/06.

In its Order filed June 12, 2006, this Court rejected defendants' assertion of the deliberative process privilege, and directed that the material be forwarded to the Special Master and plaintiffs. 6/12/06 Order at 1. Defendants then moved to stay the June 12, 2006 Order, and the Court denied the stay. 6/14/06 Order at 2. The Court ordered defendants to produce the documents to the Special Master under seal, and ordered that the Special Master's report be filed under seal as well, yielding the current state of the documents at issue. *Id.* In light of defendants' continued assertion that these documents contained privileged information, the

Court's Order gave them the benefit of the doubt, and offered a chance for the Special Master to review them and issue his report under seal.

It is now clear, however, that the budget documents do not contain any privileged information or information warranting the sealing of the documents. The Court has already rejected defendants' assertion of the deliberative process privilege. 6/12/06 Order at 1. The Special Master, in his June 21 Report, further characterized defendants' assertion of the deliberative process privilege in connection with the Finance Letter as "deeply ironic." 6/21/06 Special Master's Report at 9. He wrote, "By cloaking the decisions of DOF behind a wizard's curtain of 'deliberation,' the defendants manage only to obscure any rational understanding of the resulting budget determinations. What the withheld document, in conjunction with these other documents from the budgeting process, suggests is the complete absence of any thoughtful, rational or deliberative process at all." *Id.* The documents do not include evidence of deliberation. See *Id.* at 9, Ex. C; Nolan Dec. Ex. A. Rather, they are the counterparts to those documents freely produced by defendants without the assertion of privilege last year, which contained detailed information concerning an extremely similar staffing request that was rejected because of the absence of an order to implement the revised Program Guide. Nolan Dec at ¶ 6.

**B. The Report And Attached Exhibits Should Be Disclosed Now Because of the Strong Policy In Favor of Openness In Court Proceedings Involving Matters Of Public Concern**

The United States Supreme Court has recognized the common law right of access to court records. See *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978). Following this precedent, the Ninth Circuit recognizes "a strong presumption in favor of access to court records." *Foltz v. State Farm Mutual Automobile Insurance Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003); see also *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995). There is also a long-recognized First Amendment right of access to court records and proceedings. *See, e.g., U.S. v. Moussaoui*, 65 Fed. Appx. 881, 2003 WL 21076836, (4th Cir. 2003) (not published

in Federal Reporter)[4]. Ninth Circuit courts use a totality of the circumstances analysis in determining whether the presumption of access should be rebutted. See *Foltz*, 331 F.3d at 1135. Under this totality of the circumstances test, the threshold showing required to overcome the right of access is stringent. The Ninth Circuit has held that "[t]his presumption of access may be overcome only 'on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *Hagestad*, 49 F.3d at 1434 (*citing United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir. 1982)). Moreover, as the Fourth Circuit noted in the *Moussaoui* decision, "The value of openness in judicial proceedings can hardly be overestimated. 'The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification.'" 65 Fed. Appx. at 885, *quoting Union Oil Co. v. Leavell,* 220 F.3d 562, 568 (7th Cir. 2000).

The test is even more rigorous where, as here, the public has a strong additional interest given the subject matter of the case and the documents at issue. *See, e.g., In re "Agent Orange" Product Liability Litigation*, 98 F.R.D. 539 (E.D.N.Y. 1983). In *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 101 F.R.D. 34, 38 (C.D. Cal. 1984), the district court found that "Whether stemming from the Federal Rules, the common law or the Constitution, the general presumption of open court records and proceedings would seem to serve the same purpose: 'assuring freedom of communication matters relating to the functioning of the government.'...The interest in access to court proceedings in general may be asserted more forcefully when the litigation involves matters of significant public concern." (*quoting Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980)); see also *Arkwright Mutual Ins. Co. v. Garrett & West, Inc.*, 782 F.Supp. 376, 381 (N.D. Ill. 1991) ("The courts are public institutions and their proceedings should be public unless a compelling

---

[4] A copy of this case is attached to this Memorandum as Appendix 1 pursuant to E.D. Cal. L.R. 5-133(i).

argument for secrecy can be made. The matters with which this case is concerned are of significant and legitimate public concern…The public has a right to know of this resolution.")

In this case, there is a double layer of public interest militating for open access to the Special Master's report and exhibits. Not only does the presumption of public access to court proceedings support disclosure, but also, the public interest in understanding the decisions made by the executive branch of the government. *Cf. United States v. Kentucky Utils. Co.*, 124 F.R.D. 146, 150 (E.D. Ky. 1989) ("[The parties] attempt to assume the posture of private parties who have settled a case…Here, however, the parties are not private parties. One of the parties is the federal government."), *rev'd on other grounds*, 927 F.2d 252 (6th Cir. 1991). The Special Master's report describes his analysis of the response of various government agencies and officers to the Court Order to immediately implement the revised Program Guide. The ways in which the state government chose to respond—or ignore—this Order are of vital importance to the public, particularly where the lives of thousands of mentally ill inmates and tens of millions of dollars of state funding for treatment are at stake. The BCP documents themselves implicate the same grave public interest.

**C. Defendants Can Offer No Legitimate Reason For Keeping These Documents Under Seal**

There are no legitimate reasons that Defendants may proffer for keeping the report and its attached exhibits from the public eye. See *Moussaoui*, 65 Fed. Appx. at 889 ("The burden of establishing that a particular document should be sealed rests on the party promoting the denial of access.") This Court has already rejected defendants' attempt to assert the deliberative process privilege in connection with this information. 6/12/06 Order. The Special Master, in his June 21 report, resoundingly agreed. See Special Master's Report of Budget Requests for Staffing at 9. Given that these documents have already been determined not to be intimately tied to the ability of state agencies to engage in deliberative processes, their availability to the public cannot have a chilling effect on these processes. Rather, their disclosure might produce the desirable effect of encouraging more deliberation to occur. Moreover, such privileges and the sealing of documents in judicial proceedings should not be used by defendants merely to

shield government officials from embarrassment or public criticism, particularly when such important matters of public policy are at stake. *Cf. Kentucky Utils. Co.*, 124 F.R.D. at 150. Finally, any assertion by defendants that the budget documents must be sealed would be disingenuous given past disclosures by defendants of similar information. See Nolan Dec. ¶ 6.

**CONCLUSION**

For all of the reasons set forth above, the Court should adopt the Recommendation of the Special Master and order defendants and the Department of Finance to submit the relevant Finance Letter to the Legislature for immediate funding. The Court should also unseal the relevant records and add the Department of Finance as a defendant in this action. Plaintiffs have included a Proposed Order with this filing which includes proposed findings.

Dated: July 8, 2006

Respectfully submitted,

Thomas Nolan

Thomas Nolan
Rosen, Bien & Asaro
Attorneys for Plaintiffs

# APPENDIX 1

Westlaw.

65 Fed.Appx. 881 Page 1
65 Fed.Appx. 881, 2003 WL 21076836 (C.A.4), 31 Media L. Rep. 1705
**(Cite as: 65 Fed.Appx. 881)**

**H**
Briefs and Other Related Documents
This case was not selected for publication in the Federal Reporter.UNPUBLISHED Please use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Zacarias MOUSSAOUI, Defendant-Appellee,
andABC, Inc.; Associated Press; Cable News Network LP, LLLP; CBS Broadcasting, Inc.; The Hearst Corporation; National Broadcasting Company, Inc.; The New York Times Company; The Reporters Committee for Freedom of the Press; The Star Tribune Company; Tribune Company; and the Washington Post, Movants-Intervenors.
**No. 03-4162.**

May 13, 2003.

Capital defendant, who was indicted on charges arising from his alleged participation in plot that culminated in terrorist attacks, was granted access to one of plot's captured leaders. After government appealed and also petitioned for writ of mandamus, members of media moved to intervene for limited purpose of obtaining access to certain portions of the record and oral argument on appeal. The Court of Appeals held that: (1) Classified Information Procedures Act (CIPA) could not, alone, justify sealing of oral arguments and documents; (2) all classified information filed with Court of Appeals would remain under seal; (3) procedure for handling defendant's unclassified, pro se pleadings filed in Court of Appeals would not be altered; (4) classified, ex parte appendices were properly kept under seal; (5) documents in remaining appendices had to be examined to determine whether disclosure was required; (6) sealing of government's certificate of confidentiality and motion to seal oral argument, and motion to seal certificate of confidentiality and motion to seal oral argument, was not justified; and (7) bifurcated oral argument was warranted.

Motion granted for limited purpose.

West Headnotes

**[1] Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases
Classified Information Procedures Act (CIPA) could not, alone, justify sealing of oral arguments and documents on appeal from decision to grant capital defendant, who was charged in connection with his alleged participation in plot culminating in terrorist attacks within United States, access to one of captured leaders of plot; rather, court was required to determine independently whether, and to what extent, proceedings and documents had to be kept under seal. Classified Information Procedures Act, § 1 et seq., 18 U.S.C.A.App.

**[2] Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases
Court of Appeals would not review classification decisions made by executive branch with respect to its own decision to keep under seal classified information that was filed with court in government's appeal from decision granting capital defendant, who was charged in connection with his alleged participation in plot culminating in terrorist attacks within United States, access to one of captured leaders of plot.

**[3] Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases
All classified information filed with Court of Appeals in relation to appeal in which government challenged decision to allow capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant would remain under seal, given government's compelling interest in protecting security of classified information and disavowal by media intervenors of any desire to obtain release of classified information.

**[4] Records 326 ⚷32**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 881 Page 2
65 Fed.Appx. 881, 2003 WL 21076836 (C.A.4), 31 Media L. Rep. 1705
**(Cite as: 65 Fed.Appx. 881)**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases

In government's appeal from decision granting capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant, Court of Appeals would not alter procedure for handling defendant's unclassified, pro se pleadings filed in Court of Appeals in response to intervention request by members of media, under which pleading was initially filed under seal to allow government opportunity to submit proposed redactions, which were then ruled upon by assigned panel, followed by placement of redacted pleading in public file, inasmuch as redaction was necessary to omit irrelevant and inflammatory material and to prevent defendant from attempting to communicate certain information to others, and public's interest in flow of information was protected by Court of Appeals' exercise of independent judgment concerning redactions.

**[5] Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases

Ex parte appendices filed by government and public defender in government's appeal from decision granting capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant were properly kept under seal, in their entirety, inasmuch as they consisted entirely of classified information.

**[6] Constitutional Law 92 ⚷90.1(3)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(3) k. Interference with Judicial Proceedings; Contempt; Publicity. Most Cited Cases

**Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases

Possibility existed that materials contained within classified appendix and unclassified appendix filed on appeal from decision to grant capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant were subject to intervenor-media members' common law or First Amendment right of access and could be made public following redaction of classified material, or were not judicial records, triggering Court of Appeals' duty to examine each document to determine source of any right of access and, if such right existed, to conduct appropriate balancing to determine whether remainder of document should remain sealed, in whole or in part. U.S.C.A. Const.Amend. 1.

**[7] Records 326 ⚷32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases

Sealing of government's certificate of confidentiality and motion to seal oral argument, and motion to seal certificate of confidentiality and motion to seal oral argument, was not justified on ground that placing such documents in public file would reveal substance of district court order being appealed by government, which granted capital defendant, charged in connection with plot that culminated in terrorist attacks in United States, access to one of captured leaders of plot, inasmuch as nature of district court's order was apparent from text of government's redacted opening brief, which was available to press and general public.

**[8] Records 326 ⚷31**

326 Records
326II Public Access
326II(A) In General
326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases

Even if, as government contended, its appeal from decision to grant capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant was taken pursuant to provision of Classified Information Procedures Act (CIPA), such provision did not contain requirement that in camera hearing be held upon certification that classified information would be revealed by public hearing; therefore, even if appeal was authorized by cited CIPA provision, that fact alone did not mandate that hearing be conducted in sealed courtroom. Classified Information Procedures Act, § 7, 18 U.S.C.A.App.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Constitutional Law 92 90.1(3)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(3) k. Interference with Judicial Proceedings; Contempt; Publicity. Most Cited Cases
First Amendment guarantees right of access by the public to oral arguments in criminal appellate proceedings of Court of Appeals. U.S.C.A. Const.Amend. 1.

**[10] Constitutional Law 92 90.1(3)**

92 Constitutional Law
92V Personal, Civil and Political Rights
92k90 Freedom of Speech and of the Press
92k90.1 Particular Expressions and Limitations
92k90.1(3) k. Interference with Judicial Proceedings; Contempt; Publicity. Most Cited Cases

**Records 326 32**

326 Records
326II Public Access
326II(A) In General
326k32 k. Court Records. Most Cited Cases
In light of First Amendment right of access to criminal appellate proceedings of Court of Appeals and government's compelling interest in security of classified information, bifurcated oral argument was warranted in government's appeal from decision to grant capital defendant access to one of captured leaders of terrorist plot underlying charges against defendant, in which such matters as Court of Appeals' jurisdiction over appeal, separation of powers concerns raised by order, and issue of whether compulsory process would reach enemy combatant held overseas would be addressed in courtroom open to press and general public, with discussions involving reference to classified information reserved for portion of argument to be conducted in sealed courtroom, and with redacted portion of transcript of sealed hearing to be released as soon as practicable after conclusion of argument. U.S.C.A. Const.Amend. 1.

*884 Robert Andrew Spencer, Brian David Miller, Assistant U.S. Attorney, Paul Joseph McNulty, United States Attorney, Michael James Elston, Assistant U.S. Attorney, Alexandria, VA, David John Novak, Richmond, VA, Michael Chertoff, Washington, DC, Kenneth Michael Karas, New York, NY, for Plaintiff-Appellant. Frank Willard Dunham, Jr., Federal Public Defender, Kenneth Paul Troccoli, Anne Michelle Chapman, Office of the Federal Public Defender, Alexandria, VA, Edward B. MacMahon, Middleburg, VA, for Defendant-Appellee. Jay Ward Brown, Thomas Curley, Cameron A. Stracher, Levine, Sullivan & Koch, LLP, Washington, DC, for Intervenor.

**ORDER**

**1 A consortium of media companies and an organization (collectively, "Intervenors")FN1 moves to intervene for the limited purpose of obtaining access to certain portions of the record and oral argument in this appeal. FN2 We grant the motion to intervene for a limited purpose. Our ruling with respect to the motion for access to portions of the record and oral argument is set forth below.

FN1. Intervenors are ABC, Inc.; Associated Press; Cable News Network LP, LLLP; CBS Broadcasting Inc.; The Hearst Corporation; National Broadcasting Company, Inc.; The New York Times Company; The Reporters Committee for Freedom of the Press; the Star Tribune Company; Tribune Company; and The Washington Post.

FN2. A randomly selected panel has been assigned to hear argument in the underlying appeal. A second panel, also randomly selected, has been assigned for the purpose of ruling on these motions.

I.

Zacarias Moussaoui has been indicted on numerous charges stemming from his alleged participation in the al Qaeda plot that culminated in the attacks of September 11, 2001. In the course of preparing for his capital trial, Moussaoui, who is proceeding pro se, sought access to several captured leaders of al Qaeda. The Federal Public Defender, acting as Moussaoui's standby counsel, supported these requests. In a sealed order, the district court granted Moussaoui's request as to one of these operatives. The court directed that the operative's testimony be taken by means of a deposition pursuant to Federal Rule of Criminal Procedure 15, and set forth measures

governing the conduct of the deposition.

The Government timely appealed the order of the district court. In addition to its notice of appeal, the Government filed a petition for a writ of mandamus-styled *In *885 re United States*, --- F.3d ----, No. 03-4261, 2003 WL 21467775 (4th Cir.2003)-seeking the same relief.FN3 Although the appeal and the mandamus petition have not been consolidated, they are being handled together and are scheduled to be argued simultaneously on June 3.

FN3. Intervenors filed substantively identical motions to intervene for a limited purpose and for access to pleadings and oral argument with respect to the petition for a writ of mandamus. Our rulings on Intervenors' motions in this case apply equally to their motions in No. 03-4261.

Due to the sensitive nature of the information involved in this appeal, much of which is classified top secret, the pleadings and motions filed by Moussaoui, standby, and the Government have been filed under seal, at least initially. Additionally, based upon our determination that oral argument would involve extensive discussion of classified material, we granted the Government's motion to seal oral argument. Intervenors now contend that such extensive sealing is both unnecessary and violative of their constitutional and common law rights of access to judicial materials and proceedings.

II.

The right of access to judicial documents exists at common law and under the First Amendment. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir.1988). The common law provides a presumptive right to inspect and copy all judicial records and documents, *see Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), while the First Amendment provides a "guarantee of access ... only to particular judicial records and documents," *Stone*, 855 F.2d at 180. The First Amendment guarantees access when (1) "the place and process have historically been open to the press and general public" and (2) "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Ct. (Press-Enterprise II)*, 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); *see Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir.1989). The right of the press and public to attend judicial proceedings is a creature of the First Amendment. *See In re Knight Publ'g Co.*, 743 F.2d 231, 233 (4th Cir.1984) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (opinion of Burger, C.J.)).

**2 The value of openness in judicial proceedings can hardly be overestimated. "The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification." *Union Oil Co. v. Leavell*, 220 F.3d 562, 568 (7th Cir.2000); *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (opinion of Burger, C.J.) ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."). In criminal proceedings, "[o]penness ... enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co. v. Superior Ct. (Press-Enterprise I)*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984).

Public criminal trials also have "a community therapeutic value":

Criminal acts, especially violent crimes, often provoke public concern, even outrage*886 and hostility; this in turn generates a community urge to retaliate and desire to have justice done.... When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct....

*Id.* at 508-09. This value, of providing to the community at large a sense that justice has been done, is particularly relevant in the prosecution of Moussaoui. Thus far, Moussaoui is the only individual being prosecuted in a civilian court for complicity in the September 11 attacks, and the proceedings have been the subject of intense public interest throughout the country. In this vein, it is significant that no small amount of interest in the trial stems from concern about whether the government is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

affording sufficient protection to Moussaoui's constitutional rights and the rights of other terrorism suspects.

Despite its importance, the right of access-whether guaranteed by the common law or the First Amendment-is not absolute. The common law right of access must yield to the supervisory power of the court to control its own records when "the public's right of access is outweighed by competing interests." *In re Knight Publ'g,* 743 F.2d at 235; *see Nixon,* 435 U.S. at 598 (describing circumstances in which competing interests have outweighed common law right of access). When access is guaranteed by the First Amendment, it may be curtailed only in favor of a compelling Governmental interest, and the limitation of access must be "narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Ct.,* 457 U.S. 596, 606-07, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *see Press-Enterprise I,* 464 U.S. at 510 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.").

*A. CIPA*

**3 The Classified Information Procedures Act (CIPA), 18 U.S.C.A.App. 3 §§ 1-16 (West 2000 & Supp.2003) sets forth procedures for the handling of classified information in criminal cases. It was enacted for the purpose of preventing "graymail," a practice in which a criminal defendant attempts to derail his prosecution by threatening to divulge classified information during trial. *See United States v. Smith,* 780 F.2d 1102, 1105 (4th Cir.1985). Under CIPA, the district court may be required to conduct a pretrial hearing to determine whether classified information the defendant intends to disclose during the course of trial is relevant and admissible. *See* 18 U.S.C.A.App. 3 § 6(a). CIPA further provides that if the Attorney General certifies that a public hearing will result in the disclosure of classified information, the hearing will be held *in camera. See id.* CIPA allows the Government to pursue an interlocutory appeal of certain orders entered pursuant to its provisions. *See id.* § 7(a).

[1] The Government argues that the question of whether the public is entitled to access to the pleadings and argument in this case is answered, in the negative, by CIPA. We disagree with the Government's contention that because this appeal is related***887** to CIPA, all of the materials and the oral argument must be held under seal.[FN4] As Intervenors note, CIPA alone cannot justify the sealing of oral argument and pleadings. *See In re Wash. Post Co.,* 807 F.2d 383, 393 (4th Cir.1986) (noting that the district court must conduct constitutional inquiry even when CIPA applies because "[t]he district court may not simply assume that Congress has struck the correct constitutional balance"); *United States v. Poindexter,* 732 F.Supp. 165, 167 n. 9 (D.D.C.1990) (observing that "CIPA obviously cannot override a constitutional right of access"). Indeed, even in the absence of CIPA, the mere assertion of national security concerns by the Government is not sufficient reason to close a hearing or deny access to documents. *See In re Wash. Post,* 807 F.2d at 391-92. Rather, we must independently determine whether, and to what extent, the proceedings and documents must be kept under seal. *See United States v. Pelton,* 696 F.Supp. 156, 159 (D.Md.1986). As noted below, Intervenors do not seek access to classified information, and any such information will remain under seal.

FN4. Additionally, we note that throughout its opposition to Intervenors' motion, the Government has phrased its arguments as though every document filed with this court contains classified information. This is not correct, and we decline the Government's implicit invitation to gloss over the significant differences in the kinds of materials that have been presented to us.

*B. Balancing the Interests*

*1. Classified Information*

[2][3] At the outset, we note that there can be no doubt that the Government's interest in protecting the security of classified information is a compelling one. *See Dep't of Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). And, Intervenors disavow any desire to obtain the release of classified information.[FN5] We therefore conclude that all classified information filed with this court in relation to this appeal will remain under seal.

FN5. Nevertheless, Intervenors maintain that we need not defer to the classification decisions of the Government. Implicit in this assertion is a request for us to review,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and perhaps reject, classification decisions made by the executive branch. This we decline to do. *See* United States v. Smith, 750 F.2d 1215, 1217 (4th Cir.1984) ("[T]he government ... may determine what information is classified. A defendant cannot challenge this classification. A court cannot question it.").

Intervenors also note that much of the information contained in the pleadings has been reported publicly and suggest that for this reason, sealing is no longer required. This court has previously rejected such an argument, noting that "[i]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *Alfred A Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir.1975); *see* Pelton, 696 F.Supp. at 158 ("[T]here is a difference between speculation and confirmation.").

*2. Moussaoui's Pleadings*

[4] Since the beginning of the proceedings against him in the district court, Moussaoui has filed numerous pro se pleadings in this court, none of which has been classified. Our practice with respect to a pleading by Moussaoui is as follows. *See generally* United States v. Moussaoui, No. 03-4162, 2003 WL 1889018 (4th Cir. Apr. 14, 2003) (order designating court security officer). The pleading is initially filed under seal to provide the Government an opportunity to submit proposed redactions.[FN6] The pleading and motion to redact ***888** are then submitted to the panel assigned to this case, which rules on the pleading and on the motion. The redacted pleading is then placed in the public file.

FN6. The motion to redact is placed in the public file, but the proposed redactions are kept under seal.

**4 Intervenors do not contest the adequacy of this procedure, and we decline to alter it. Redaction of Moussaoui's pleadings is necessary to omit irrelevant and inflammatory material and to prevent Moussaoui from attempting to communicate certain information to others, *see* Special Administrative Measures for Zacarias Moussaoui, § 1(c), *news.findlaw.com/hdocs/docs/moussaoui/usmouss41702gsam.pdf* (last visited May 3, 2003). The interest of the public in the flow of information is protected by our exercising independent judgment concerning redactions. *See* United States v. Amodeo, 44 F.3d 141, 147 (2d Cir.1995) (cautioning that a court may not delegate task of redacting documents); *Pelton,* 696 F.Supp. at 159 n. 2 (noting that court would "carefully compare the redacted version [of a transcript] to the unredacted version for accuracy and to determine whether all the proposed deletions are necessary").

*3. Briefs*

To date, three briefs have been filed: the Government's initial brief, an Appellee's brief filed by the Federal Public Defender, and the Government's reply brief. All of the briefs contain classified information, and for this reason they were initially filed under seal with the Court Security Officer assigned to this case. As of this writing, a redacted version of the Government's initial brief has been placed in the public file, and the remaining briefs will also be filed publicly when the redaction process is complete. In accordance with our duty to independently examine the Government's redactions, we will carefully compare the redacted version of each brief to the unredacted version to ensure that the redactions of unclassified material are no greater than necessary.[FN7] *See* Pelton, 696 F.Supp. at 159 n. 2. That process is not affected by this order.

FN7. We will do the same with the pleadings related to the Government's petition for a writ of mandamus, a redacted version of which is now publicly available.

*4. Joint Appendix*

[5][6] The joint appendix for this appeal consists of four parts: an ex parte appendix filed by the Government, which consists solely of highly classified documents; an ex parte appendix filed by the Federal Public Defender, which also consists solely of classified documents; a classified appendix which contains the remaining classified information pertinent to this appeal, but which is not solely comprised of classified documents; and an unclassified appendix, which is presently under seal because it comprises materials kept under seal by the district court. *See* Local Rule 10(d) (noting that material placed under seal by the district court remains under seal unless the protective order is modified or amended by this court); *cf.* Stone, 855

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.2d at 182 (noting that district court has "superior vantage point" from which to make decisions regarding sealing of materials before it).

For the reasons discussed above, we conclude that the ex parte appendices must be kept under seal, in their entirety, because they consist entirely of classified information. We doubt, however, that either the unclassified information in the classified appendix, or the documents in the unclassified appendix, need to remain sealed in their entirety. As noted above, while the classified appendix contains a number of classified documents, not all of the documents therein are classified, and it appears that at least some of the documents*889 that contain classified information could be made public (assuming a common law or First Amendment right of access attaches) after classified material is redacted. The unclassified appendix contains a wide variety of materials, such as pleadings, hearing and deposition transcripts, and some discovery materials. Some of these documents fall within the common law presumption of access, while others are subject to the greater right of access provided by the First Amendment. Still others may not qualify as "judicial records" at all. *See Amodeo,* 44 F.3d at 145-46 (discussing when a document filed with the court is a "judicial record"). We therefore must examine the unclassified appendix document by document to determine, for each document, the source of the right of access (if any such right exists). *See Stone,* 855 F.2d at 181. As to those documents subject to a right of access, we must then conduct the appropriate balancing to determine whether the remainder of the document should remain sealed, in whole or in part.

****5** The burden of establishing that a particular document should be sealed rests on the party promoting the denial of access. *See Boone v. City of Suffolk,* 79 F.Supp.2d 603, 606 (E.D.Va.1999). Accordingly, we think it is appropriate to require the Government to justify the continued sealing of the unclassified materials in the classified and unclassified appendices. We therefore direct the Government to do the following within ten days of the entry of this order:

- As to the classified appendix, identify, with as much specificity as possible, what material is classified;
- As to each document in the classified and unclassified appendices, present its views concerning whether the document is subject to a common law or First Amendment right of access;
- As to all material identified as (a) unclassified and (b) subject to a right of access, offer argument concerning continued sealing. This argument shall account for the fact that sealing an entire document is inappropriate when selective redaction will adequately protect the interests involved. Any proposed redaction shall be accompanied by a statement of the reason for the proposed redaction.

Upon receipt of the Government's submission, this court will proceed to review the unclassified materials in both appendices and determine which of the documents therein should remain sealed.

*5. Miscellaneous Pleadings*

Presently pending before this court is the Federal Public Defender's motion to disclose or strike the ex parte appendix. The primary documents filed in connection with this motion are the motion itself, the Government's opposition to the motion, and the Public Defender's reply to the opposition. Redacted versions of the first two pleadings have been placed in the public file, and a redacted version of the Public Defender's reply to the opposition will be placed in the public file in due course. As with other redacted documents, we will review the redactions to ensure that they are no greater than necessary.

[7] Intervenors also protest the sealing of (1) the Government's certificate of confidentiality and motion to seal oral argument, and (2) the motion to seal the certificate of confidentiality and motion to seal oral argument. The Government sought to seal these documents on the basis that placing them in the public file would reveal the substance of the district court order presently being appealed. In view of the fact that the nature of the district court order is apparent from the text of the ***890** Government's redacted opening brief, which is available to the press and general public, this justification can no longer stand. We therefore order that the certificate of confidentiality and motion to seal argument, and the motion to seal the certificate of confidentiality and motion to seal oral argument, be unsealed and placed in the public file.

*6. Oral Argument*

[8] It is with respect to oral argument that the Government presses most strongly its claim that CIPA controls. The Government maintains that its appeal of the district court order is taken pursuant to § 7 of CIPA; from this premise, it concludes that the appeal itself is a "CIPA proceeding" which must be held *in camera. Cf. Poindexter,* 732 F.Supp. at 168

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

& n. 10 (stating that First Amendment does not guarantee access to a "CIPA-type" hearing at which "highly sensitive classified materials" would be discussed). However, it is not at all clear that the appeal arises from CIPA-the Government asserts CIPA as only one of three bases for appellate jurisdiction. More important, however, is the significant difference in language between sections 6 and 7 of CIPA. Section 6 explicitly requires the district court to hold an *in camera* hearing if the Attorney General certifies that classified information would be revealed by a public hearing, but § 7 contains no such requirement. *Cf. United States v. Brandon*, 247 F.3d 186, 190 (4th Cir.2001) (noting "fundamental principle of statutory construction that courts are obligated to give effect to Congress's decision to use different language in proximate subsections of the same statute" (internal quotation marks omitted)). We therefore conclude that even if this appeal is authorized by CIPA § 7, that fact alone does not *mandate* that the hearing be conducted in a sealed courtroom.

**6 [9] We are left with the questions of whether the First Amendment guarantees access to the hearing and, if so, whether the sealing of argument is justified by a compelling interest. The first question is easily answered: There can be no question that the First Amendment guarantees a right of access by the public to oral arguments in the appellate proceedings of this court. Such hearings have historically been open to the public, and the very considerations that counsel in favor of openness of criminal trial support a similar degree of openness in appellate proceedings. *Cf. In re Knight Publ'g*, 743 F.2d at 234 (noting "strong presumption in favor of openness" in criminal proceedings).

[10] The second question is more difficult. As discussed above, the Government's interest in the security of classified information is a compelling one, and, as we have noted previously, Intervenors do not seek access to any classified information. However, we believe that argument on several of the issues will not require the discussion of classified information. We therefore order that the oral argument in this appeal will be bifurcated. The first portion of oral argument will take place in a courtroom open to the press and general public. The following issues, and only the following issues, will be discussed during that portion of the argument:

• Whether this court has jurisdiction over the appeal;
• Whether separation of powers concerns mandate reversal of the district court's order;
• Whether compulsory process reaches an enemy combatant held overseas.

While we believe that these issues can be effectively argued without discussion of classified information, it is possible that argument on these issues could lead to *891 brief mention of classified matters. We assume counsel will be mindful of this possibility and will take care to avoid such references in open court. Should counsel believe that reference to classified information is necessary, such a discussion will be reserved to the second part of oral argument, which will be conducted in a sealed courtroom. Argument on all issues involving the discussion of classified information will be reserved to this portion of the hearing.

Unquestionably, our decision to partially seal argument infringes, albeit for good reasons, upon the rights of the press and the public. We believe, however, that this harm can be substantially ameliorated by the release of a redacted transcript of the sealed hearing as soon as is practicable after the conclusion of argument. This will be accomplished through the following procedure. The sealed portion of the hearing will not be recorded but rather will be transcribed by a court reporter. We hereby direct the court reporter to produce a written transcript of the sealed proceedings within 24 hours of the conclusion of argument. This transcript will then be submitted to the Government, which will proceed immediately with a classification review and redaction of the transcript. The entire redacted transcript shall be provided to the court for placement in the public file no later than five business days after the submission of the unredacted transcript to the Government. In order to further limit the harm to the public's right of access, we direct the Government to provide the court with whatever portion of the transcript has been reviewed and redacted to that point by noon of each day between the submission of the unredacted transcript and the release of the final redacted version.

III.

**7 To summarize, we grant Intervenors' motion to intervene for a limited purpose. With respect to Intervenors' motion for access to certain portions of the record and oral argument, we conclude (and Intervenors do not dispute) that all classified information involved in this appeal will remain under seal. For that reason, we deny the motion for access insofar as it concerns the ex parte appendices. The press and general public will be provided access to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unclassified materials in the classified and
unclassified appendices after we have redacted those
materials with the aid of the Government's
submissions, which are due ten days from the date of
this order. As set forth above, the Government must
provide us with reasons for its proposed redactions of
unclassified materials and specifically identify those
materials that are classified. The certificate of
confidentiality and motion to seal argument, and the
motion to seal the certificate and motion to seal
argument, are hereby unsealed and will be placed in
the public file.

Entered at the direction of Chief Judge WILKINS,
with the concurrences of Judge WIDENER and Judge
NIEMEYER.
C.A.4,2003.
U.S. v. Moussaoui
65 Fed.Appx. 881, 2003 WL 21076836 (C.A.4), 31
Media L. Rep. 1705

Briefs and Other Related Documents (Back to top)

• 03-4162 (Docket) (Feb. 12, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**PROOF OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the City and County of San Francisco, California, and not a party to the within action. My business address is 155 Montgomery Street, 8th Floor, San Francisco, California. On the date and in the manner indicated below, I served a true copy of the following documents:

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF SPECIAL MASTER'S RECOMMENDATION REGARDING STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDES**

**DECLARATION OF THOMAS NOLAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN SUPPORT OF SPECIAL MASTERS' RECOMMENDATION REGARDING STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDES**

**PROPOSED ORDER REGARDING SPECIAL MASTER'S JUNE 21, 2006 REPORT ON THE STATUS AND SUFFICIENCY OF DEFENDANTS' BUDGET REQUESTS FOR STAFFING**

on the parties in said action by placing a true copy thereof enclosed in a sealed envelope to be delivered in the manner indicated below and addressed as follows

**BY FEDERAL EXPRESS**

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814

Matthew A. Lopes, Jr.
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

J. Michael Keating, Jr.
Office of the Special Master
*Coleman v. Schwarzenegger*
285 Terrace Ave.
Riverside, RI 02915

Robert Sillen
c/o Judge Thelton E. Henderson
U.S. District Court for
the Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of July, 2006 at San Francisco, California.

Kim Le