1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California 94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California 94104
8  Telephone: (415) 433-6830

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA 94107
12 Telephone: (415) 864-8848

13

14 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

SEALED
**FILED**

JUL 1 0 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

15        UNITED STATES DISTRICT COURT

16        EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN,                        )  No.: Civ S 90-0520 LKK-JFM
                                         )
19        Plaintiffs,                    )  **DECLARATION OF THOMAS NOLAN**
                                         )  **IN SUPPORT OF PLAINTIFFS'**
20 vs.                                   )  **MEMORANDUM IN SUPPORT OF**
                                         )  **SPECIAL MASTER'S**
21 ARNOLD SCHWARZENEGGER, et al.,        )  **RECOMMENDATION REGARDING**
                                         )  **STAFFING TO IMPLEMENT THE**
22        Defendants                     )  **REVISED PROGRAM GUIDE**
                                         )
23                                       )  **[FILED UNDER SEAL]**
                                         )
24 _____)

25

26 **THIS DOCUMENT IS FILED UNDER SEAL PURSUANT TO THE DISTRICT**
27 **COURT'S JUNE 21, 2006 ORDER**

28

1    I, Thomas Nolan, hereby declare:

2        1.    I am an attorney admitted to practice law in California and an Associate at the

3    law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case.

4    I have personal knowledge of the matters stated herein and if called as a witness I could and

5    would competently so testify. I make this declaration in support of Plaintiffs' Memorandum

6    in Support of Special Master's Recommendation Regarding Staffing to Implement the

7    Revised Program Guide.

8        2.    Attached hereto as Exhibit A are true and correct copies of excerpts from the

9    Rejected CDCR 2006/07 Finance Letter, along with excerpts from the 800 pages of

10   supporting documentation filed in support thereof. Some of these documents were attached to

11   the 6/21/06 Special Master's Report on the Status and Sufficiency of the Defendants' Budget

12   Requests for Staffing to Implement the Revised Program Guide as Exhibit C. These

13   documents were prepared by defendants and submitted to the Department of Finance in

14   February or March of 2006 (one of the cover documents is dated February 6, 2006 – see Bates

15   No. 00001). The documents were sent to the Special Master by defendants on or around June

16   19, 2006, and they were subsequently forwarded to plaintiffs' counsel by the Clerk of the

17   Court and the Deputy Special Master following the Court's June 21, 2006 Order.

18       3.    Attached hereto as Exhibit B is a true and correct copy of defendants' own

19   internal 2003 Suicide Report, which reviews suicides during the calendar year 2003 and

20   which was published on August 16, 2004. In 2004, there were 35 suicides in the California

21   Department of Corrections and Rehabilitation ("CDCR"). 2003 Suicide Report at 2. Of these

22   35 suicides, 20 took place in an Administrative Segregation Unit ("ASU") or in a Security

23   Housing Unit ("SHU"). *Id.* at 9. Thus, in 2003, fifty-six percent (56%) of suicides were in

24   Administrative Segregation Units or Security Housing Units. *Id.* In 2004, according to the

25   Special Master's Special Master's Report on Suicides Completed in the California

26   Department of Corrections in the Calendar Year 2004 ("Special Master's 2004 Suicide

27   Report"), 69.2 percent of all the suicides in the CDCR took place in Administrative

28   Segregation. Special Master's 2004 Suicide Report at 12. As a result, the 2004 Suicide

-1-

1  Report included only a single recommendation:  that defendants develop a plan to address

2  "the escalating percentage of suicides occurring in the Administrative Segregation units." *Id*.

3  In response to this recommendation, defendants are now engaged in an ongoing remedial

4  process, involving the court experts and plaintiffs' expert, to address this problem.

5      4.    Reception Centers are prisons to which newly arriving CDCR inmates are sent

6  for classification and screening.  These facilities conduct medical and psychiatric screening,

7  address safety issues, and place inmates in a general population prison based on various case

8  factors.  In many respects, Reception Centers are like Administrative Segregation units, in that

9  inmates do not have the opportunity to participate in most prison programming and spend

10  much of their time locked in their cell and isolated from others.  Reception Centers are one

11  area where overcrowding and understaffing are creating particularly severe, life-threatening

12  problems for mentally ill inmates.  Based on reports from inmate letters, monthly statistics

13  provided by defendants, and other sources, it is clear that inmates are spending longer time

14  periods in Reception Centers waiting for placement in a general population prison, due to

15  shortages of EOP and CCCMS beds.  It appears that the 71.6 positions sought in the Finance

16  Letter for Reception Centers were submitted to the Legislature as part of the final package

17  (the 4/3/06 Finance Letter ultimately approved by the Department of Finance).  See Exhibit D

18  to 6/21/06 Special Master's Report (4/3/06 Finance Letter approved by Department of

19  Finance) at 7; see also 6/21/06 Special Master's Report at 6 (final proposal from Department

20  of Finance included 71.98 positions for the reception centers).  However, as of this time, it is

21  not known whether these positions were approved by the Legislature.  In 2005 there have

22  been at least seven Reception Center suicides in the CDCR, based on a preliminary review of

23  the 2005 suicides for which plaintiffs' counsel has documentation.  These seven suicides were

24  on the following dates at the following Reception Centers:  3/13/05 North Kern State Prison;

25  6/9/05 San Quentin; 6/11/05 Richard J Donovan State Prison; 11/1/05 California Institute for

26  Men; 11/27/05 Wasco State Prison; 11/30/05 Deuel Vocational Institute; 12/10/05 Wasco

27  State Prison.

28

1    5.    The current number of *Coleman* class members waiting for treatment in
2    overcrowded CDCR Reception Centers has increased dramatically during the last year, and is
3    now approaching, on a percentage basis, the percentage of mentally ill inmates waiting for
4    treatment in Reception Centers that was found unconstitutional by this Court at the time of
5    trial. 2/6/06 Bien Declaration In Support of Plaintiffs Objections to the 15th Monitoring
6    Report at ¶¶ 3, 4. A patient who will participate in an Enhanced Outpatient Program ("EOP")
7    once he or she leaves the Reception Center will generally only receive extremely limited
8    treatment -- a short case manager contact once a week for as many months as the EOP-bound
9    inmate waits in the reception center. Once this inmate is finally transferred to his or her
10    permanent institution and into an EOP program, the inmate will receive 10 hours per week of
11    therapy and other structured therapeutic activities. The staffing augmentation requested will
12    not provide adequate case managers and psychiatric technicians in the Reception Centers for
13    EOP patients to receive ten hours of structured therapeutic activities during their delayed
14    transfers.

15    6.    This dispute arose, in part, as a result of an admission during a conference call
16    between the parties concerning various Program Guide issues on May 14, 2006. The
17    participants in the conference call included Special Master Keating, Deputy Special Master
18    Lopes, CDCR Chief Psychiatrist Dr. Timothy Fishback, other CDCR officials, plaintiffs'
19    counsel and defendants' attorneys. During the call, plaintiffs' counsel asked defendants to
20    confirm that they had obtained the staffing necessary to comply with this Court's March 3,
21    2006 Order to implement the Revised Program Guide. In response, Dr. Fishback indicated
22    that the CDCR had in fact sought additional staffing in order to implement the Revised
23    Program Guide, but that the staffing request had been rejected by the Department of Finance.
24    Dr. Fishback indicated that the CDCR did an analysis of what staffing would be needed to
25    implement the new Program Guide, submitted it to the Department of Finance, and that the
26    request was rejected. After this admission, both plaintiffs' counsel and the Special Master
27    requested copies of the Rejected 2006/07 Finance Letter the CDCR submitted to the
28    Department of Finance. Special Master Keating also stated that he was surprised, because he

-3-

1  had been under the impression that defendants' staffing request was going to go forward.
2  Furthermore, the Special Master stated that he was under the impression that defendants were
3  planning to supplement this initial staffing package in the future, after a new time and motion
4  workload study was completed. On May 25, 2006, following a status conference concerning
5  implementation of the Revised Program Guide, the Court ordered the Special Master "to
6  report to the court on the status and sufficiency of defendants' budget requests for staffing
7  augmentations necessary to implement the court-approved portions of the January 2006
8  Revised Program Guide." 5/25/06 Order at ¶ 5. In response to the Special Master's request
9  for the budget documents needed in order to complete this report, the defendants refused to
10  provide the documents and formally asserted the deliberative process privilege before the
11  Special Master. See Exhibit F hereto. The Court then ordered defendants to formally assert
12  the privilege in a pleading and the parties briefed the privilege issue. It should be noted that
13  defendants have disclosed similar budget documents in the past, most notably the 2005/06
14  Budget Request that is attached to the 6/21/06 Special Master' Report at Exhibit B.

15      7.      Attached hereto as Exhibit C is a true and correct copy of the July 5, 2006
16  Receiver's First Bi-Monthly Report in *Plata v. Schwarzenegger*, Northern District California
17  Case No. C-0101351- TEH.

18      8.      Attached hereto as Exhibit D is a true and correct copy of this Court's July 26,
19  1999 Order, which concerned staffing for administrative segregation units.

20      9.      Attached hereto as Exhibit E is a true and correct copy of this Court's October
21  26, 2001 Order, which also concerned staffing in administrative segregation units.

22      10.     Attached hereto as Exhibit F is a true and correct copy of the May 30, 2006 letter
23  from Lisa A. Tillman to Special Master Keating. In the letter, Ms. Tillman asserts the
24  deliberative process privilege with respect to the 2006/07 Rejected Finance Letter from the
25  CDCR and its supporting attachments.

26  //
27  //
28  //

-4-

1    I declare, under penalty of perjury, that the foregoing is true and correct, and that this

2    declaration is executed in San Francisco, California on July 7, 2006.

3

4                                            _Thomas Nolan_
                                            Thomas Nolan
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-
DECLARATION OF THOMAS NOLAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN SUPPORT OF SPECIAL MASTER'S
RECOMMENDATION REGARDING STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDE, NO.: CIV S 90-0520 LKK-JFM

# California Department of Corrections & Rehabilitation

## Division of Correctional Health Care Services



Working Copy

# Mental Health Program

# &

# Mental Health Services Delivery System

**Arnold Schwarzenegger, Governor of California**
**Roderick Q. Hickman, Agency Secretary**
**Peter Farber-Szekrenyi, Dr. P.H., Division Director**
**Tim Fishback, M.D., Chief of Mental Health & Chief Psychiatrist**

**February 06, 2006**

Original Submission

## DOCUMENT ON CPS LETTERHEAD WITH ORIGINAL SIGNATURE ENROUTE

February 6, 2006

Dr. Timothy Fishback
Statewide Mental Health Program Director
Division of Correctional Health Care Services
California Department of Corrections and Rehabilitation
P.O. Box 942883
Sacramento, CA 94283-0001

Re: Summary Report -- CDCR Finance Letter for DCHCS Mental Health Program Headquarters
Staffing

Dear Dr. Fishback:

CPS Human Resource Services (CPS) was retained by the California Department of Corrections
and Rehabilitation (CDCR) to assist the CDCR Division of Correctional Health Care Services'
(DCHCS) Mental Health Program (MHP), as appropriate and necessary, by:

- Consulting with the Department of Finance (DOF) to identify the specific requirements
  and expectations regarding the information and proposals that will be submitted by
  CDCR;
- Reviewing background information compiled by CDCR relating to MHP, current and
  proposed headquarters staffing and organizational structure, and other relevant
  information;
- Identifying and evaluating the programmatic and policy assumptions that form the basis
  of CDCR's proposed headquarters staffing and organizational plans for the Mental
  Health Program;
- Performing organizational, fiscal and human resource analysis necessary to constitute an
  objective validation of those assumptions and the resulting staffing and organizational
  plans;
- Based on the analysis, recommending revisions to the plans as appropriate;
- Preparing a project report as needed to meet the requirements of DOF and CDCR;
- Performing other work as necessary to support CDCR's effort to develop and document
  the need for a headquarters staffing plan and organizational structure appropriate to
  manage the Mental Health Program of CDCR.

CPS commenced work on the project on January 16, 2006. Four meetings were held jointly with
representatives of DOF and CDCR at which DOF's requirements and expectations regarding
justification for the positions that would be requested in CDCR's finance letter (FL) for
headquarters staffing were addressed. In addition, CPS staff worked closely with existing

DCHCS MHP headquarters executive staff reviewing and evaluating relevant available information, contacted representatives of the Mental Health Programs of the Departments of Corrections in select other states, and conducted independent internet research regarding staffing workloads, ratios and organizational structures utilized in the correctional mental health programs of other states.

A number of factors affected CPS' efforts on this project, including:

- A significant lack of objective, meaningful workload data upon which to base an impartial analysis of the actual workload the proposed headquarters staff will confront;
- A simultaneous requirement that DCHCS MHP implement the Revised Program Guide, which will result in increased field workload and staffing requirements that may directly impact the headquarters staff workload;
- An apparent lack (noted by the Federal Court's Special Master in Coleman vs. Schwarzenegger) of sufficient headquarters staffing to fully manage current responsibilities and the demands of the Court, which also limited the availability of personnel to fully prepare and address issues and obtain data relevant to the finance letter;
- A very ambitious timeframe for obtaining data and preparing the finance letter; and
- The large disparity in size between California's prison population and mental health workload versus that of the other states contacted or from which information was obtained.

*Problem of identifying existing workload resources*

Based on the information and timeframe available, CPS has concluded:

1. Insufficient workload data is currently available upon which to base an objective, meaningful conclusion as to the appropriate number and level of personnel necessary to adequately carry out headquarters duties of the DCHCS MHP.
2. Based on the data and information that is available, the staffing and structure proposed in the MHP headquarters finance letter appears to be an appropriate, interim organizational structure and staffing level.
3. Once this interim headquarters organizational structure is established, CDCR should conduct a headquarters workload study to identify objective workload data, use it to determine actual needs, and adjust the headquarters staffing as appropriate based on the results of the study.

Thank you for the opportunity to work with you. Please contact me at (916) 263-3614, ext. 3040 if you have any questions or require additional information.

Sincerely,

David M. Caffrey/bb

David M. Caffrey
Senior Manager

## EXECUTIVE SUMMARY

On June 25 1991, a class action complaint (*Coleman vs. Schwarzenegger, et al.*) was filed against the California Department of Corrections and Rehabilitation (CDCR) and in 1995, the U.S. District Court found that CDCR had violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates.

Since that time, CDCR's Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) has worked to improve the provision of mental health care services to patient inmates and to comply with the federal court's orders.

In 1997, CDCR established initial policies and procedures for providing mental health services at all CDCR institutions through the Mental Health Services Delivery System (MHSDS) Program Guide, which was provisionally approved by the court. Revisions to the Program Guide has been an ongoing mandated with each revision resulting in amending memoranda to the field requiring additional workload, changing timelines and/or new programs.

Implementing the 2006 MHSDS Program Guide is an integral part of DCHCS's strategy to exit the *Coleman* case and to reduce costs related to this litigation. The timing of resource allocation requires coordination of the budget process with the court approval of the revised 2006 MHSDS Revised Program Guide. The Special Master approved the 2006 MHSDS Program Guide and stated that the court will require its implementation on July 1, 2006.

Recently, the federal court's Special Master also specifically noted that there are inadequate Division of Correctional Health Care Services (DCHCS) mental health leadership management resources, which prevents effective response "to the myriad of issues persistently hurled at them." The Special Master also found that various areas of noncompliance with currently required elements of mental health care in the institutions, and with future planning efforts, were due to a lack of ability to provide Headquarters support and Central Office oversight. On January 19, 2006, in a meeting with All Parties in the *Coleman* case, the Special Master and court experts extensively emphasized the need for a team of Headquarters' staff devoted to quality management assurance.

To improve the quality of mental health care provided by CDCR and address court concerns, DCHCS conferred with the court's Special Master and the Department of Finance (DOF) and worked to assess the Mental Health Program's current headquarters and field staffing and organizational needs so as to meet constitutional community standards of quality care in the most effective and efficient manner possible. DCHCS also retained CPS Human Resource Services (CPS), a governmental agency committed to improving human resources in the public sector to assist with specific issues and otherwise support CDCR's efforts to develop and

document the need for headquarters staffing and an organizational structure appropriate to manage MHP.

Over the past few weeks, MHP:

- Met and conferred with DOF on multiple occasions to identify the specific requirements and expectations regarding the information and proposals that will be submitted and to reach concurrence on the methodology being utilized

- Reviewed and evaluated relevant available information and contacted representatives of the Mental Health Programs of the Departments of Corrections in select other states

- Conducted independent internet research regarding staffing workloads, ratios and organizational structures utilized in the correctional mental health programs of other states

- Developed an interim headquarters staffing and structure proposal based on the data and information available

- New field functions were identified and listed

- Duties and time required to perform the new functions were identified and listed

- Tasks were compared with 1997 court mandated ratios

- Tasks were correlated with American Medical Association's Current Procedural Terminology (CPT) codes

- Based on the current inmate population, the total workload impact per year was determined - or -

- The approximate percentage of workload increase per week per staff was determined and the inmate-clinician ratio was adjusted by this percentage (see Attachment 4)

Once this organizational structure is established, CDCR will conduct a workload study to identify more objective workload data, use it to determine actual needs, and adjust the staffing as appropriate based on the results of the study.

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
### DIVISION OF CORRECTIONAL HEALTH CARE SERVICES
### FINANCE LETTER
### FISCAL YEAR 2006-07
### Mental Health Program

| Resources | FY 2005/06 | FY 2006/07 |
|---|---|---|
| Dollars (Thousands) | $8,667 | $87,627 |
| Positions (LT) | 0.0 | 657.6 |
| PY's | 0.0 | 631.6 |

### PURPOSE:

The California Department of Corrections and Rehabilitation (CDCR) Division of Correctional Health Care Services (DCHCS) is requesting $8.6 million in 2005/06 and $87.6 million to establish 657.6 positions and associated costs in 2006/07 to providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patients' potential for violence and associated costs. This Finance Letter (FL) addresses the minimum necessary field and headquarters staffing required for compliance with *Coleman* court orders mandated by the Court Special Master.

### ISSUE:

CDCR DCHCS mission is to protect the health and safety of the public and CDCR staff by providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patients' potential for violence and associated costs. Mental health treatment is provided in CDCR through MHSDS. This Finance Letter (FL) addresses the minimum necessary field and headquarters staffing required for compliance with the Special Master's recommendations for *Coleman* orders. DCHCS is also requesting a workload study of field and headquarters functions to quantify the human resource requirements of the MHP and MHSDS by developing and identifying standardized staffing ratios for mental health services.

### The benefits of this proposal:

Approval will keep the CDCR in compliance with current litigation issues regarding Mental Health Care of inmates.

### BUDGET MANAGEMENT BRANCH RECOMMENDATION:

OBM recommends approval with reservation regarding staffing requirements. The programs/facilities need to manage their vacancies before they hire more staff or generate programs they cannot run due to vacancy issues.

Contact Person: Mary Kostiew                    Phone Number: (916)650-6728

# FINANCE LETTER - COVER SHEET
## FOR FISCAL YEAR 2006/07
DF-46 (WORD Version)(REV 01/06)
*se report dollars in thousands.*

Department of Finance
915 L Street
Sacramento, CA 95814
IMS Mail Code: A-15

| ~CP # | PRIORITY NO. | ORG. CODE 5225 | DEPARTMENT Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM 50 | ELEMENT .30, .50 | COMPONENT | |

TITLE OF PROPOSED CHANGE
Mental Health Program

SUMMARY OF PROPOSED CHANGES

The California Department of Corrections and Rehabilitation (CDCR) Division of Correctional Health Care Services (DCHCS) is requesting $3.5 million in 2005/06 and $87.6 million to establish 657.6 positions and associated costs in 2006/07 to providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patients' potential for violence and associated costs. This Finance Letter (FL) addresses the minimum necessary field and headquarters staffing required for compliance with *Coleman* court orders mandated by the Court Special Master.

| | Current Year | | Budget Year |
|---|---|---|---|
| POS | 0.0 | | 656.8 |
| PY's | 0.0 | | 631.1 |
| $$ | $ 8,667 | | $87,627 |

| REQUIRES ISLATION | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF APPLICABLE: |
|---|---|---|
| ☐ YES ☒ NO | | ☒ ONE-TIME COST   ☐ FUTURE SAVINGS<br>☒ FULL-YEAR COSTS ☐ REVENUE<br>☒ FACILITIES/CAPITAL COSTS |

| PREPARED BY Shama Chaiken 445-4114 | DATE 2/7/06 | REVIEWED BY M. Kostiew | DATE 2/8/06 |
|---|---|---|---|
| DEPARTMENT DIRECTOR | DATE | AGENCY SECRETARY | DATE |

DOES THIS BCP CONTAIN INFORMATION TECHNOLOGY (IT) COMPONENTS?   YES ☐   OR NO ☐
IF YES, DEPARTMENT CHIEF INFORMATION OFFICER SIGNATURE            DATE

FOR IT REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY THE DEPARTMENT OF FINANCE.

DATE        PROJECT #            FSR ☐    OR   SPR ☐

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?

☐ YES    ☐ NO          ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

| DEPARTMENT OF FINANCE ANALYST USE (ADDITIONAL REVIEW) |
|---|
| CAPITAL OUTLAY ☐   OTROS ☐   FSCU ☐   OSAE ☐   CALSTARS ☐ |

This FL is divided into three sections. The first section addresses the staffing needs in the most critical care areas in the field institutions, and staffing necessary to comply with the 1999 and 2002 court orders. The second section addresses the Headquarters MHP staffing required for compliance with the pending 2006 *Coleman* court order. The third section addresses the methodology of reducing the ever growing psychiatry vacancies and maintaining the vacancy rate at less than 10 percent.

This FL is requesting a total of **$8.7 million for FY 2005/06, and $87.6million without current R&R and one time standard equipment costs and 657.6 positions for FY 2006/07.**

## SECTION I.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

In 1997, CDCR established initial policies and procedures for providing mental health services at all CDCR institutions through the MHSDS Program Guide, which was provisionally approved by the court. Revisions to the Program Guide have been an ongoing requirement of the *Coleman* case. As a result, each revision has resulted in amending memoranda to the field requiring additional workload, changing timelines and/or new programs. These amending memoranda have been included in the pending 2006 MHSDS Revised Program Guide.

Implementing the 2006 MHSDS Revised Program Guide is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation. However, timing of resource allocation will appear to be more sagacious after completing a workload study to determine the necessary staffing that will quantify and standardize the human resource requirements critical in meeting the federal court mandated level of services.

At this time, CDCR DCHCS is requesting MHSDS staffing to implement the 1991 and 2001

It is important to note that the plaintiffs in *Coleman* are requesting that the court impose additional mental health service requirements to the 2006 MHSDS Revised Program Guide. These additional requirements are opposed by CDCR DCHCS.

This FL is requesting **$39.1 million without current R&R and one time standard equipment costs and 509.56 positions** to provide support to implement the 2006 MHSDS Revised Program Guide, which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level, to be **implemented on July 1, 2006** (see Attachment 2).

## SECTION II.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH PROGRAM (MHP) – HEADQUARTERS

The second section addresses the necessary MHP Headquarters staffing required for compliance with the pending *Coleman* court order. Recently, the federal court's Special Master specifically noted that there are inadequate DCHCS mental health leadership and

2

Fiscal Detail Continued
**DETAIL OF PERSONAL SERVICES**     **Adult Corr'l Health Care**

| Proposed New | | POSITIONS | | | AMOUNT (,000) | |
|---|---|---|---|---|---|---|
| CLASSIFICATION | CY | BY | SALARY/RANGE | | CY | BY |
| CEA | | 3.0 | 5768 - 11669 | | | 313,866 |
| Sr Psychiatrist, CF -Spec | | 6.0 | 9199 - 11447 | | | 743,256 |
| Staff Psychiatrist,CF | | 26.5 | 8528 - 11181 | | | 3,133,731 |
| Warden | | 1.2 | 8369 - 9049 | | | 125,410 |
| Chief Psychologist | | 3.0 | 5884 - 7509 | | | 241,074 |
| Sr Psychologist, CF -Suprvr | | 32.0 | 5341 - 6807 | | | 2,332,416 |
| Sr Psychologist, CF -Spec | | 10.0 | 4938 - 6483 | | | 685,260 |
| Staff Services Mgr II -Suprvr | | 1.0 | 5211 - 6286 | | | 68,982 |
| Psychologist - Clinical, CF | | 159.8 | 4498 - 5904 | | | 9,973,438 |
| Staff Services Mgr I | | 5.0 | 4746 - 5726 | | | 314,160 |
| Nurse Consultant I | | 10.0 | 4671 - 5562 | | | 613,980 |
| Health Prog Spec I | | 31.0 | 4516 - 5489 | | | 1,860,930 |
| Research Analyst II -Gen | | 1.0 | 4316 - 5247 | | | 57,378 |
| Assoc Pers Analyst | | 3.0 | 4111 - 4997 | | | 163,944 |
| Assoc Govtl Prog Analyst | | 5.0 | 4111 - 4997 | | | 273,240 |
| Assoc Health Prog Advisor | | 12.0 | 4111 - 4997 | | | 655,776 |
| Sr Psychiatric Tech (Safety) | | 26.0 | 3236 - 4309 | | | 1,177,020 |
| Senior Persnl Specialist | | 2.0 | 3418 - 4155 | | | 90,876 |
| Psy   ic Soc Worker, CF | | 1.0 | 3321 - 4139 | | | 44,760 |
| P    ic Techn (Safety) | | 137.9 | 2887 - 3795 | | | 5,528,687 |
| Secty I | | 1.0 | 2822 - 3431 | | | 37,518 |
| ... ..y | | 8.0 | 2510 - 3051 | | | 266,928 |
| Ofc Techn -Typing | | 14.0 | 2510 - 3050 | | | 467,040 |
| Pers Selection Tech | | 3.0 | 2130 - 2998 | | | 92,304 |
| Office Asst -Typing | | 1.0 | 2172 - 2641 | | | 28,878 |
| Pay Differentials | | | | | 8,667,000 | 28,052,846 |
| **TOTAL SALARIES AND WAGES** | | 503.4 | (((((()))))) | | $ 8,667,000 | $ 57,343,698 |

PAGE III-3

*
*
*

**SUPPLEMENTAL INFORMATION**
*Please report dollars in thousands.*
**IDENTIFY ALL PROPOSED ITEMS WHICH FIT INTO THE CATEGORIES LISTED BELOW.**     SEE INSTRUCTIONS

| | CURRENT YEAR | BUDGET YEAR | BUDGET YEAR + ONE |
|---|---|---|---|
| EQUIP - | | 3,017,852 | -3,017,852 |
| C&PS-In | | | |
| C&PS-Ex | | 3,748,800 | |
| ONE-TIMES (ONE-TIMES incls EQUIP & CONTRACTS) | | 3,417,852 | -3,417,852 |
| FULL-YR | | | -1,715,492 |
| OTHR Itms | | 482,708 | |

PAGE III-4

\\\\\\\\\\\\\\\\     E N D   of   PROGRAM:          *Adult Corr'l Health Care*

**STATE OF CALIFORNIA**
**FINANCE LETTER - COVER SHEET**
**FOR FISCAL YEAR 2006/07**
**DF (WORD Version)(REV 01/06)**
*please report dollars in thousands.*

**Department of Finance**
**915 L Street**
**Sacramento, CA 95814**
**IMS Mail Code: A-15**

| P # | PRIORITY NO. | ORG. CODE 5225 | DEPARTMENT Corrections and Rehabilitation |
|---|---|---|---|
| PROGRAM 50 | ELEMENT .30, .50 | COMPONENT | |

**TITLE OF PROPOSED CHANGE**
Mental Health Program

**SUMMARY OF PROPOSED CHANGES**
The California Department of Corrections and Rehabilitation (CDCR) Division of Correctional Health Care Services (DCHCS) is requesting $3.5 million in 2005/06 and $87.6 million to establish 657.6 positions and associated costs in 2006/07 to providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patients' potential for violence and associated costs. This Finance Letter (FL) addresses the minimum necessary field and headquarters staffing required for compliance with *Coleman* court orders mandated by the Court Special Master.

|  | Current Year | Budget Year |
|---|---|---|
| POS | 0.0 | 656.8 |
| PY's | 0.0 | 631.1 |
| $$ | $ 8,667 | $87,597 |

| REQUIRES LEGISLATION | CODE SECTION(S) TO BE AMENDED/ADDED | BUDGET IMPACT—PROVIDE LIST AND MARK IF-APPLICABLE ☒ ONE-TIME COST ☐ FUTURE SAVINGS ☒ FULL-YEAR COSTS ☐ REVENUE ☒ FACILITIES/CAPITAL COSTS |
|---|---|---|
| ☐ YES ☒ NO | | |

| PREPARED BY Sharna Chaiken 445-4114 | DATE 2/7/06 | REVIEWED BY M. Kostiew | DATE 2/8/06 |
|---|---|---|---|
| DEPARTMENT DIRECTOR | DATE | AGENCY SECRETARY | DATE |

DOES THIS BCP CONTAIN INFORMATION TECHNOLOGY (IT) COMPONENTS?    YES ☐    OR  NO ☐
IF YES, DEPARTMENT CHIEF INFORMATION OFFICER SIGNATURE              DATE

FOR IT REQUESTS, SPECIFY THE DATE SPECIAL PROJECT REPORT (SPR) OR FEASIBILITY STUDY REPORT (FSR) WAS APPROVED BY THE DEPARTMENT OF FINANCE.

DATE        PROJECT #              FSR ☐      OR    SPR ☐

IF PROPOSAL AFFECTS ANOTHER DEPARTMENT, DOES OTHER DEPARTMENT CONCUR WITH PROPOSAL?

☐ YES      ☐ NO        ATTACH COMMENTS OF AFFECTED DEPARTMENT, SIGNED AND DATED BY THE DEPARTMENT DIRECTOR OR DESIGNEE.

| DEPARTMENT OF FINANCE ANALYST USE (ADDITIONAL REVIEW) |
|---|
| CAPITAL OUTLAY ☐    OTROS ☐    FSCU ☐    OSAE ☐    CALSTARS ☐ |

**CONTINUATION Sheet** *Corr & Rehab Admin*
**BCP# HCPCO3**    **DEPARTMENT** *CORRECTIONS & REHAB*

Printed:    02/16/06    time:    14:06:32
**FISCAL YEAR**    2006 - 2007

**STATE OF CALIFORNIA**
**BUDGET CHANGE PROPOSAL- FISCAL DETAIL**
**STATE OPERATIONS**
DF-46 (REV 03/05) Alternative
*Please report dollars in thousands*

**REVISION:050831**

PAGE #:    125
Printed:    02/16/06    time:    14:06:32
Data source :W:\TEMP\FLTR216C.Dbf
Report Location:W:\TEMP\ZFSCLD~1.RP1
Report Form  :02DF46Plcy/FaLt>Whse\PY4\siv2_3

| BCP # | HCPCO3 | | DATE | 02/16/06 | TITLE | COLEMAN MHSDS | |
|-------|--------|---|------|----------|-------|---------------|---|
| PROGRAM | ( Consolidated ) | | ELEMENT | | COMPONENT | | |

| PERSONNEL YEARS | PYs CY | PYs BY | CURRENT YR.($,000) | BUDGET YR.($,000) |
|-----------------|--------|--------|--------------------|--------------------|
| TOTAL S & W | | 656.8 | $8,667,000 | $64,044,873 |
| SALARY SAVINGS | | -25.7 | | -$1,458,853 |
| NET TOTAL S & W | 0.0 | 631.1 | $8,667,000 | $62,586,020 |
| STAFF BENEFITS | -- | -- | | $12,760,537 |
| OASDI | | ( | ) | ( 523,346) |
| HEALTH INSURANCE | | ( whole | ) ( ) ( | ( 3,877,255) |
| RETIREMENT - Industrial | | ( dollars | ) ( ) ( | ( 1,447,391) |
| RETIREMENT - Safety | | ( | ) ( ) ( | ( 4,597,870) |
| RETIREMENT - Peace Officer | | ( | ) ( ) ( | ( 844,956) |
| RETIREMENT - Other | | ( . | ) ( ) ( | ( ) |
| WORKERS' COMPENSATION | | ( | ) ( . ) ( . ) ( | ( 1,469,719) |
| IDL, NDI, UI (incl in W.C.) | | ( | ) | — |
| **TOTAL PERSONAL SVCS** | | | $8,667,000 | $75,346,557 |

**OPERATING EXPENSES AND EQUIPMENT**

| | | |
|---|---|---|
| GENERAL EXPENSE | | 218,192 |
| PRINTING | | 35,203 |
| COMMUNICATIONS | | 29,517 |
| POSTAGE | | 13,376 |
| INSURANCE | | 4,408 |
| TRAVEL - IN STATE | | 2,224,444 |
| TRAVEL - OUT OF STATE | | |
| TRAINING | | 58,996 |
| FACILITIES OPERATIONS | | |
| UTILITIES | | |
| CONSULTING & PROFESSIONAL:Interdepartmental | | 8,512 |
| CONSULTING & PROFESSIONAL:External | | 3,748,800 |
| CONSOLIDATED DATA CENTERS | | |
| Health and Welfare Data Center | ( ) ( ) | ( ) |
| Stephen P. Teale Data Center | ( ) ( ) | ( ) |
| DATA PROCESSING | | 1,700,000 |
| EQUIPMENT | | 3,543,394 |
| DEBT SERVICE | | |
| OTHER ITEMS OF EXPENSE (see Supplemental Info sheets) | | 665,601 |
| **TOTAL OPERATING EXPENSES and EQUIPMENT** | | 12,250,443 |

SPECIAL ITEMS of EXPENSE

| TAL STATE OPERATIONS EXPENDITURES | | | $ | 8,667,000 | $ | 87,597,000 |
|-----------------------------------|---|---|---|-----------|---|------------|

PAGE III-2a

**CONTINUATION Sheet** *Corr & Rehab Admin*
**PROG# HCPCO3**          **DEPARTMENT** *CORRECTIONS & REHAB*

Printed:  02/16/06    time:  14:06:32
**FISCAL YEAR**   2006 - 2007

| SOURCE OF FUNDS | ORG | APPROPRIATION NO. REF | FUND | | | | |
|---|---|---|---|---|---|---|---|
| GENERAL FUND | 5225 | 001 | 0001 | $ | 8,667,000 | $ | 87,597,000 |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| FEDERAL FUNDS | 5225 | 001 | 0890 | $ | | $ | |
| OTHER FUNDS · Bond | 5225 | 001 | 0001 | $ | | $ | |
| OTHER FUNDS - IWF | 5225 | 001 | 0917 | $ | | $ | |
| OTHER · Spcl Deposit | 5225 | 001 | 0942 | $ | | $ | |
| OTHER (Lease Paymnt) | 5225 | 003 | 0001 | $ | | $ | |
| OTHER Lottery Educ | 5225 | 001 | 0831 | $ | | $ | |
| REIMBURSEMENTS | 5225 | 501 | 0995 | $ | | $ | |
| General Fund, Prop98 | 5225 | 011 | 0001 | $ | | $ | |
| Corr Trng Fund | 5225 | 001 | 0170 | $ | | $ | |

| LOCAL ASSISTANCE SOURCE OF FUNDS | ORG | APPROPRIATION NO. REF | FUND | $ ( | ) | $ ( | ) |
|---|---|---|---|---|---|---|---|
| GENERAL FUND | 5225 | 101 | 0001 | $ | | $ | |
| SPECIAL FUNDS | 5225 | | | $ | | $ | |
| FEDERAL FUNDS | 5225 | | | $ | | $ | |
| OTHER FUNDS | 5225 | | | $ | | $. | |
| REIMBURSEMENTS | 5225 | 601 | 0995 | $ | | $ | |

PAGE III-2b

*//////////// E N D of CONSOLIDATED DISPLAY ////////////*

00054

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
### FINANCE LETTER
### FISCAL YEAR (FY) 2006/07

**INSTITUTION/DIVISION:** Division of Correctional Health Care Services    **NUMBER:**
**TITLE:** Mental Health Program

### A. NATURE OF REQUEST

In 1995, a federal class action lawsuit (*Coleman v. Schwarzenegger*) found that the California Department of Corrections and Rehabilitation (CDCR) violated the Eighth and Fourteenth Amendments by being deliberately indifferent to the mental health needs of inmates. The CDCR, Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) at Headquarters, and the institutional Mental Health Services Delivery System (MHSDS) intend through this proposal to comply with the *Coleman* court's orders (see Attachment 1).

The CDCR DCHCS mission is to protect the health and safety of the public and CDCR staff by providing timely, cost-effective mental health services for seriously mentally disordered inmates and parolees. Proper screening and treatment of mental illness is the most effective way to reduce inmate-patient potential for violence and its associated costs. CDCR DCHCS MHSDS most critical areas of service delivery which are in need of immediate staffing are: Administrative Segregation Unit, Correctional Clinical Case Management System (ADSEG-CCCMS); Security Housing Unit, Correctional Clinical Case Management System (SHU-CCCMS); Administrative Segregation Unit, Enhanced Outpatient Program (ADSEG-EOP); Mental Health Outpatient Housing (MH-OHU), and Mental Health Reception Centers (RC).

This Finance Letter (FL) addresses the minimum necessary Headquarters staffing for compliance with the Special Master's recommendations, which are currently being adopted as final orders by the *Coleman* court. This FL also addresses the 1999 and 2001 *Coleman* court orders regarding staffing of the ADSEG-CCCMS program and requests assistance in filling the growing psychiatry vacancies.

Review of current recruitment and program needs and requirements has led DCHCS to conclude that the most effective and efficient method of confronting the critical staffing shortage is to focus on meeting the staffing mandates of the 1999 and 2001 court orders and attacking current vacancies. While resolving these issues, the proposed workload study will determine the staffing needs of the 2006 MHSDS Revised Program Guide (see Attachment 3) without delaying their implementation. By proceeding in this fashion, DCHCS intends to immediately address existing inmate-patient mental health needs and staffing issues while simultaneously developing the necessary staffing methodology that will quantify and standardize the human resource requirements crucial to meeting the federal court mandated level of services.

1

This FL is divided into three sections. The first section addresses the staffing needs in the most critical care areas in the field institutions, and staffing necessary to comply with the 1999 and 2002 court orders. The second section addresses the Headquarters MHP staffing required for compliance with the pending 2006 *Coleman* court order. The third section addresses the methodology of reducing the ever growing psychiatry vacancies and maintaining the vacancy rate at less than 10 percent.

This FL is requesting a total of **$8.7 million for FY 2005/06, and $83.1 million without current R&R and one time standard equipment costs and 657.6 positions for FY 2006/07.**

### SECTION I.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

In 1997, CDCR established initial policies and procedures for providing mental health services at all CDCR institutions through the MHSDS Program Guide, which was provisionally approved by the court. Revisions to the Program Guide have been an ongoing requirement of the *Coleman* case. As a result, each revision has resulted in amending memoranda to the field requiring additional workload, changing timelines and/or new programs. These amending memoranda have been included in the pending 2006 MHSDS Revised Program Guide.

Implementing the 2006 MHSDS Revised Program Guide is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation. However, timing of resource allocation will appear to be more sagacious after completing a workload study to determine the necessary staffing that will quantify and standardize the human resource requirements critical in meeting the federal court mandated level of services.

At this time, CDCR DCHCS is requesting MHSDS staffing to implement the 1991 and 2001

It is important to note that the plaintiffs in *Coleman* are requesting that the court impose additional mental health service requirements to the 2006 MHSDS Revised Program Guide. These additional requirements are opposed by CDCR DCHCS.

This FL is requesting **$39.1 million without current R&R and one time standard equipment costs and 509.56 positions** to provide support to implement the 2006 MHSDS Revised Program Guide, which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level, to be **implemented on July 1, 2006** (see Attachment 2).

### SECTION II.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH PROGRAM (MHP) – HEADQUARTERS

The second section addresses the necessary MHP Headquarters staffing required for compliance with the pending *Coleman* court order. Recently, the federal court's Special Master specifically noted that there are inadequate DCHCS mental health leadership and

2



management resources which prevents effective response "to the myriad of issues persistently hurled at them." The Special Master also found that various areas of noncompliance with currently required elements of mental health care in the institutions, and with future planning efforts, were due to a lack of ability to provide Headquarters support and Central Office oversight. On January 19, 2006, in a meeting with All Parties in the *Coleman* case, the Special Master and court experts extensively emphasized the need for a team of Headquarters' staff devoted to quality management assurance. This FL is requesting **$10.7 million and 100.0 positions** to provide Headquarters support, which are the minimum necessary to meet federal court mandated services at a constitutionally adequate level, to be **implemented on July 1, 2006.**

CDCR DCHCS is also requesting funds for extraordinary travel expenses for the Quality Management Assistance Program (QMAP) and Psychological Testing Units, quarterly meetings for the Psychological Testing staff and leadership staff, and miscellaneous equipment needs. In addition, CDCR DCHCS is requesting the above mentioned workload study of field and Headquarters' functions to identify, standardize and quantify the human resource requirements of the MHP and DCHCS.

## SECTION III.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS) - PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES

The third section relates to reducing psychiatry vacancies and maintaining the vacancy rate at less than ten percent. Currently the vacancy rate is between 30-80 percent depending on the location of the institution.

This FL is requesting **$8.7 million in current year, and 48.0 positions and $33.2 million in budget year** to provide funding for the vacant positions and pay differential, to be **implemented on March 1, 2006 and July 1, 2006, respectively.**

For your convenience, a listing of the Acronyms is under Attachment 40.

Below is a summary of the positions being requested under each section:

## SECTION I.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES

In order to implement the 2006 MHSDS Revised Program Guide, the CDCR DCHCS is requesting the following permanent positions (see Attachment 2 for summary of positions and resources):

1.    **299.98 Permanent Positions for ASU CCCMS**
   - 18.5 Psychiatrists
   - 37.0 Clinical Psychologists
   - 99.18 Psychiatrist Technicians
   - 38.0 Office Technicians
   - 44.8 EOP Clinical Psychologists
   - 32.0 Senior Psychologist Supervisors
   - 30.5 Correctional Officers

3

2.  **71.6 Permanent Positions for Mental Health RC Processing**
    - 51.0 Clinical Psychologists
    - 20.6 Correctional Counselor Is

3.  **72.98 Permanent Positions for Mental Health OHU weekend coverage**
    - 8.0 SPs
    - 17.98 CPs
    - 38.71 LPTs
    - 8.29 OTs

4.  **9.0 Permanent Positions with Institution Level Supervision and Upgrading 10.0 LPTs to 10.0 Senior LPTs (Sr. LPT)**
    - permanently upgrade 10.0 LPTs to 10.0 Sr. LPTs
    - 9.0 Unit Supervisors.

5.  **56.0 Permanent Field Positions for Program Performance Evaluation and Court Compliance**
    - 28.0 Health Program Specialist Is (HPS I)
    - 28.0 OTs

6.  **Permanent Positions for DCHCS – Capital Outlay**
    These positions are being requested through the Litigation Support FL.

7.  **RC Screening and Diagnostic Clarification**
    - $748,800 per year for a two year pilot program
    - $30,000 for supplies

8.  **Additional Equipment Resources**
    - one-time funding of $1,114,604
    - ongoing funding of $50,000 for additional equipment

### Summary of Request:

- **509.56 Permanent Positions**
- **$778,800 ongoing funding for RC Screening and Diagnostic Clarification**
- **$1,114,604 one-time funding and $50,000 ongoing funding for equipment**
- **$61,680 ongoing funding for position upgrade (LPT to Sr. LPT)**

### SECTION II.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH PROGRAM (MHP) – HEADQUARTERS

In order to implement the Mental Health Program – Headquarters portion of the Court Order, the CDCR DCHCS is requesting the following permanent positions (see Attachments 15 for summary of positions and Attachment 16 for MHP's Organization Chart):

4

00068

1.  **4.0 Permanent Positions for Statewide Mental Health Program Director (SWMHPD)**
    - 1.0 CEA
    - 1.0 Associate Health Program Adviser (AHPA)
    - 1,0 Executive Secretary I (ES I)
    - 1.0 OT

2.  **3.0 Permanent Positions for the Psychiatry Services Branch (PSB)**
    - 1.0 AHPA
    - 1.0 Secretary
    - 1.0 OT

3.  **1.0 Permanent Position for the Tele-Psychiatry Section**
    - 1.0 OT

4.  **Project Management Unit**
    These positions are being requested through the Litigation Support FL.

5.  **4.0 Permanent Positions for the Clinical Operations Branch (COB)**
    - 1.0 CEA
    - 1.0 AHPA
    - 1.0 Secretary
    - 1.0 OT

6.  **52.0 Permanent Positions for the Quality Management Assistance Program (QMAP)**
    - 3.0 Chief Psychologists - Regional Mental Health Directors (RMHD)
    - 6.0 Senior Psychologists (Specialist)
    - 6.0 Senior Psychiatrists (Specialist)
    - 6.0 Nurse Consultants, Program Review (NCPR)
    - 6.0. Sr. LPTs
    - 5.0 Facility Captains (FC)
    - 2.0 Retired Annuitants (RA)
    - 3.0 Staff Services Manager I (SSM I)
    - 3.0 HPS Is
    - 6.0 AHPAs
    - 3.0 Secretaries
    - 3.0 OTs

7.  **1.0 Permanent Position for the Centralized Clinical Case Management Unit (CCCM) Unit**
    - 1.0 OT

8.  **4.0 Permanent Positions for the Utilization Management (UM) Unit**
    - 4.0 NCPRs

9.  **4.0 Permanent Positions for the Clinical Policy and Programs Development and Clinical Evaluations (CPPD&CE) Branch**
    - 1.0 CEA

5

- 1.0 AHPA
- 1.0 Secretary
- 1.0 OT

10. **14.0 Permanent Positions for the Clinical Policy and Programs Development (CP&PD) Unit**
    - 4.0 Senior Psychologist (Specialist)
    - 1.0 Psychiatric Social Worker (PSW)
    - 1.0 Sr. LPT
    - 1.0 Research Analyst II (Social/Behavioral)
    - 1.0 AHPAs
    - 1.0 Secretary
    - 5.0 OTs

11. **13.0 Permanent Positions for the Psychological Testing and Forensic Evaluation (PT&FE) Unit**
    - 9.0 CPs
    - 2.0 SSA/AGPAs
    - 1.0 AHPA
    - 1.0 Secretary

12. **Extraordinary Travel and Quarterly Meetings ($2.1 million)**
    - $1,249,560 ongoing funding for Extraordinary Travel for Quality Management Assistance Team (QMAT)
    - $312,390 ongoing funding for Extraordinary Travel for Psychological Testing
    - $270,000 ongoing funding for Travel Differential for QMAT and Psychological Testing
    - $56,960 ongoing funding for Quarterly Psychological Testing meetings
    - $202,920 ongoing funding for Quarterly Leadership meeting

13. **Miscellaneous Headquarters' Equipment ($107,514)**
    - $73,449 one-time funding for miscellaneous equipment
    - $34,065 ongoing funding for miscellaneous equipment

14. **Workload Study ($400,000)**
    - $400,000 one-time funding for workload study

**Summary of Request:**

- **100.0 Permanent Positions**
- **$2.1 million ongoing funding for Extraordinary Travel**
- **$73,449 one-time funding and $34,065 ongoing funding for miscellaneous equipment**
- **$400,000 one-time funding for a Work Load Study.**

6

00070

**SECTION III.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES -
PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES**

In order to implement the Psychiatry Vacancy Rate Reduction Strategies portion of the Court Order, the CDCR DCHCS is requesting the following (see Attachment 30 for summary of positions and resources):

<u>FY 2005/06</u>

1a.  Hiring-Above-Minimum – Psychiatry Series ($1,214,099)
   - $1,214,099 ongoing funding for Hiring-Above-Minimum, effective March 1, 2006

2a.  Hiring-Above-Minimum – All Other Mental Health Classifications ($3.1 million)
   - $3.1 million ongoing funding for Hiring-Above-Minimum, effective March 1, 2006

3a.  Pay Differential for CDCR's Psychiatry Series ($3.9 million)
   - $3.9 million ongoing funding for Pay Differential, effective March 1, 2006

4a.  Pay Differential for CDCR's DCHCS Headquarters' Mental Health Classifications ($163,328)
   - $163,328 million ongoing funding for Pay Differential, effective March 1, 2006

5a.  Pay Differential for CDCR's Kern Valley State Prison (KVSP) and North Kern State Prison (NKSP) Mental Health Clinicians ($26,004)
   - $26,004 ongoing funding for Pay Differential, effective March 1, 2006

6a.  Pay Differential for Other Mental Health Classifications in the Central Valley ($263,344)
   - $263,344 ongoing funding for Pay Differential, effective March 1, 2006

<u>Summary of Request for FY 20005/06</u>

- **$86,290 ongoing funding for Hiring-Above-Minimum – Psychiatry Series**
- **$3.1 million ongoing funding for Hiring-Above-Minimum – All other mental health classifications**
- **$3.9 million ongoing funding for Psychiatry Series Pay Differential**
- **$163,328 ongoing funding for DCHCS Headquarters mental health classifications Pay Differential**
- **$26,004 ongoing funding for KVSP and NKSP Mental Health Clinicians**
- **$263,344 ongoing funding for Other Mental Health Classifications in the Central Valley**

7

**FY 2006/07**

**1b.** **Hiring-Above-Minimum – Psychiatry Series ($3,642,298)**
- $3,642,298 ongoing funding for Hiring-Above-Minimum

**2b.** **Hiring-Above-Minimum – All Other Mental Health Classifications ($9.4 million)**
- $9.4 million ongoing funding for Hiring-Above-Minimum

**3b.** **Pay Differential for CDCR Psychiatry Series ($11.4 million)**
- $11.4 million ongoing funding for Pay Differential

**4b.** **Pay Differential for CDCR's DCHCS Headquarters' Mental Health Classifications ($489,984)**
- $489,984 ongoing funding for Pay Differential

**5b.** **Pay Differential for CDCR's Kern Valley State Prison (KVSP) and North Kern State Prison (NKSP) Mental Health Clinicians ($78,012)**
- $78,012 ongoing funding for Pay Differential

**6b.** **Pay Differential for Other Mental Health Classifications in the Central Valley ($790,032)**
- $790,032 ongoing funding for Pay Differential

**7b.** **Emergency Contracts ($3 million)**
- $3 million ongoing funding for Placeholder for Emergency Contracts

**8b.** **Online Exams ($1.7 million)**
- $600,000 one-time funding for development
- $1.1 million ongoing funding for annual maintenance costs to administer 15 online exams

**9b.** **12.0 Permanent Positions for Office of Workforce Planning and Selection (OWP&S)**
- 1.0 Staff Services Manager II (SSM II)
- 2.0 SSMI
- 3.0 Associate Governmental Program Analysts (AGPA)
- 2.0 Associate Personnel Analysts (APA)
- 2.0 Personnel Selection Technician (PST)
- 1.0 Office Assistant (OA)

**10b.** **4.0 Permanent Positions for the Office of Personnel Services (OPS)**
- 1.0 PST
- 1.0 APA
- 2.0 Senior Personnel Specialists

**11b.** **33.0 Permanent Positions for the Adult Institutions - Statewide**
- 33.0 OTs

8

**12b. LiveScan**

This equipment is included in the FY 2006/07 Plata Order Spring FL.

**13b. Capital Outlay for OPS ($121,219)**

- $121,219 one-time funding for 25 modular workstation for the Office of Personnel Services (OPS)

## Summary of Request for FY 06/07

- $258,869 ongoing funding for Hiring-Above-Minimum – Psychiatry Series
- $9.4 million ongoing funding for Hiring-Above-Minimum – All other mental health classifications
- $11.4 million ongoing funding for Psychiatry Series Pay Differential
- $489,984 ongoing funding for DCHCS' Headquarters' mental health classifications Pay Differential
- $78,012 ongoing funding for KVSP and NKSP Mental Health Clinicians
- $790,032 ongoing funding for Other Mental Health Classifications in the Central Valley
- $3 million for a placeholder for Emergency Contracts
- $600,000 one-time funding for development and 1.1 million ongoing funding for annual maintenance of 15 Online Exams
- 15.0 Permanent Positions for Headquarters
- 33.0 Permanent Position for the Field
- $121,219 one-time funding of 25 modular workstations for OPS

## B. BACKGROUND/HISTORY

On June 25 1991, a class action complaint (*Coleman vs. Schwarzenegger, et al.*) was filed against CDCR alleging that the department ". . . under color of state law . . . acted with deliberate indifference depriving the plaintiff class of their rights to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth amendments to the United States Constitution."

The United States District Court for the Eastern District of California ultimately found that the state and prison officials had acted with deliberate indifference to the medical needs of inmates with serious mental disorders by ignoring the advice of their own experts regarding the deficiencies that had existed in the correctional system for years. The court found that CDCR DCHCS MHSDS was a constitutionally inadequate system that lacked the necessary elements for delivery of adequate mental health care, such as: screening and identification of mentally ill inmates; prompt access to mental health professionals for diagnosis and treatment; patient access to necessary and appropriate levels of care as determined by clinicians, including outpatient care; residential care, crisis care, and inpatient care; medical records and an information management system; and a quality assurance system. The court concluded that California's system could not and did not meet the serious medical needs of mentally ill inmates incarcerated in its prisons and, on June 6, 1994, it was recommended that the district court order the appointment of a Special Master and that state and prison officials develop and implement forms, protocols, and plans necessary to remedy constitutional violations.

9

After 11 years of implementing the court's orders and the mandated services, as well as preparing for the implementation of the 2006 MHSDS Revised Program Guide, CDCR and DCHCS have determined that current resources are insufficient to implement the newly mandated 2006 MHSDS Revised Program Guide in a manner consistent with the court's requirements and level of community standards of quality care. Failure to implement the 2006 MHSDS Revised Program Guide will continue the current status of mentally ill inmates going undiscovered, undiagnosed, and untreated, while at the same time being subjected to conditions that aggravate their illnesses. Due to limited resources, those mentally ill inmates, who currently do receive some form of treatment, suffer needless extended and medically harmful delays in access to necessary psychiatric care.

CDCR DCHCS researched other states' correctional mental health staffing and found their mental health population small compared to California's, and that some states base their staffing on total inmate population in determining their mental health staff to inmate ratios (see Attachment 23). CDCR DCHCS also reviewed the American Association for Correctional Psychology accreditation requirements (see Attachment 24), which recommended a ratio of one FT psychologist for every 50-75 adult inmates; the National Commission on Correctional Health Care, which provided guidelines (see Attachment 25); and Human Rights Watch (see Attachment 26), which recommended that each prison system conduct an assessment to "ensure mentally ill prisoners receive mental health services consistent with community standards of care".

California has the largest mental health population in the nation. The CDCR DCHCS is responsible for administering the critical Mental Health Program for a population of nearly 170,000 inmates, including over 31,000 inmate-patients enrolled in the MHSDS. Of the over 31,000 inmates identified as seriously mentally ill, over 5,000 are high risk and in either residential or other in-patient treatment settings. Over 25,000 inmates are receiving psychotropic medications, usually twice every day.

To continue a MHSDS that is understaffed, significantly overworked, and lacking a quality assurance program places inmates and inmate-patients at risk, and the state, CDCR and key decision makers in danger of being found in contempt of court. Standardizing the delivery of mental health care in accordance with generally accepted medical practice, the National Commission on Correctional Health Care, community standards, and the law is consistent with the CDCR's Strategic Plan and DCHCS's Goals and Initiatives to manage the inmate and parolee population in a safe, efficient, and cost effective manner.

To date, the State of California has spent $28,970,085 (see Attachment 38) in monitoring and attorney fees in the *Coleman* matter. To continue current operations without making adequate provision for complying with the court's mandates and mental health professional standards will leave the State open to further litigation and expenses associated with additional court imposed remedies that may be avoided by implementing the proposed improvements.

CDCR is, therefore, requesting Headquarters positions to manage the increased workload relating to implementation and monitoring of the 2006 MHSDS Revised Program Guide. The proposed Headquarters structure is consistent with those of the Dental and Medical Programs, with each program under a Statewide Program Director.

10

In addition, if the current vacancy rates are not reduced to under ten percent, CDCR will be in violation of the pending court order that addresses psychiatry vacancies, and inmate-patients will continue to be harmed by inadequate and insufficient access to care.

The resources requested in this FL will provide the minimal staffing level necessary to comply with court mandates and assist in extricating the state from federal judicial oversight.

## C. STATE LEVEL CONSIDERATIONS

CDCR acknowledges in its legislatively approved Strategic Plan that it is morally and constitutionally obligated to provide health care services to incarcerated offenders. The plan notes that a fundamental level of health care is necessary for incarcerated individuals' successful return and integration into the community and concedes that radical changes are necessary in the Department's health care systems to ensure efficient delivery of quality, cost-effective health care services.

As mentioned above, to date, $28,970,085 of CDCR's budget has been consumed by the *Coleman* plaintiffs' attorneys and Special Master. This does not include CDCR staff and Attorney General time required to respond to *Coleman* related inquiries, audits, hearings, and mandates. Failure on the part of CDCR to provide these mandated services at a constitutionally adequate level through implementation of the revised standards will leave the State open to additional litigation and costs associated with further court action and potential additional lawsuits.

As noted in the Special Master's January 2006 report:
"*Coleman* will not be ended until the defendants can demonstrate an ability to provide meaningful mental health care . . .The defendants' recent history of developing erratic plans or plans they are unable subsequently to implement suggests the present need for something more than just another requirement for the generation of yet more plans."

Standardizing the delivery of mental health care is an essential, critical step to managing the inmate and parolee population and providing necessary mental health care in a safe, efficient, and the most cost effective manner possible. By providing the resources required to comply with the pending federal court order and the mandated policies and procedures essential to providing constitutionally adequate mental health care, CDCR will take an important step toward self-directed management of MHSDS.

In providing inmate-patient mental health services, MHSDS provides a continuum of inpatient care from a contractual relationship with DMH for acute and intermediate, as well as a short-term crisis, inpatient care program within CDCR institutions.

## D. FACILITY/CAPITAL OUTLAY CONSIDERATIONS

Implementation of the 2006 MHSDS Revised Program Guide will have facilities/capital outlay impacts at Headquarters and in each institution. Additional office and treatment space will be needed in order to provide workspace and mental health treatment areas (see Attachment 21). This will be addressed in CDCR's Litigation Support FL.

11

Currently, two areas of Human Resources (HR) have maximized their existing office space (even turning conference rooms into staff workstations) and cannot expand to absorb the additional staff positions requested herein. The two affected HR offices include: Office of Personnel Services (OPS) and Office of Workforce Planning and Selection (OWP&S).

If these offices cannot be relocated elsewhere within CDCR's Headquarters building, there will be a need to either relocate one or both to a different location within Sacramento or reconfigure existing space with modular furniture. Based on cost methodology obtained from CDCR's Facility Leasing Section, here is the projected cost for each option for both offices:

## Office of Personnel Services (OPS)

1. **Expand On Existing Floor (1515 S Street, North) @ $0 cost**
   * If OPS can relocate or expand elsewhere on its existing lease, there would be no additional cost to the existing lease agreement.
   * If this option is not feasible, then it would be necessary for OPS to obtain partial modular furniture as follows.

2. **Partial Modular Furniture Reconfiguration ($121,219 one time)**
   * This is the projected cost to reconfigure partial existing space with modular furniture for 25 workstations (see Attachment 21A).

## Office of Workforce Planning and Selection (OWP&S) ...

1. This request is included in the FY2006/07 Succession Management Plan FL.
2. If OWP&S's facility considerations are approved within this FL, the request made herein can be deleted.
3. If one of these offices is approved for relocation, the remaining office could expand into the vacating space.

## E. JUSTIFICATION

The following pages are the justification for:

| Section I. | Division of Correctional Health Care Services (DCHCS), Mental Health Services Delivery System (MHSDS) – 2006 Revised Program Guide Resources |
| Section II. | Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) – Headquarters |
| Section III. | Division of Correctional Health Care Services (DCHCS), Psychiatry Vacancy Rate Reduction Strategies |

12

00076

# Section I:

# DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# 2006 REVISED PROGRAM GUIDE

13

00077

**SECTION I.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS), MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) – 2006 REVISED PROGRAM GUIDE RESOURCES**

The court found that DCHCS MHSDS was an inadequate system that lacked, in whole or in part, the necessary elements for delivery of adequate mental health care. The 2006 MHSDS Revised Program Guide are policies and procedures that are consistent with the court's requirements.

Since there are new functions in the 2006 MHSDS Revised Program Guide and insufficient workload data available upon which to base an objective, meaningful conclusion as to the appropriate number and level of personnel necessary to adequately carry out the new duties, DCHCS used the following methodology to determine the number of positions needed for the majority of the staffing in this FL except for ADSEG-CCCMS.

The following methodology was utilized to determine the number of positions needed for the majority of the staffing in this section:
- New functions were identified and listed (see Attachment 4);
- Duties and time required to perform the new functions were identified and listed (see Attachment 5);
- Tasks were compared with 1997 court mandated ratios (see Attachment 6);
- Tasks were correlated with American Medical Association's Current Procedural Terminology (CPT) codes (see Attachment 7); and
- Based on the current inmate population (see Attachment 8), the total workload impact per year was determined.

The exception to the above methodology is ADSEG-CCCMS which is driven by the 1999 and 2001 Coleman court orders as delineated below:

"(1)    The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS (*1:100 case manager to inmates*) programs should be provisionally approved by the court, with the exception of the existing ratio of psychiatrists to inmates in the 3CMS program, which should be subject to further review;

(2)    Defendants should be directed to adopt and implement within 90 days the following staffing ratio for administrative segregation:

(a)    Seven-day weekly coverage in each administrative segregation unit by a psych tech, accomplished by adding a 0.61 psych tech position to each of the 30 positions now authorized;

(b)    One half-time psychiatrist to each administrative segregation unit;

(c)    One full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed;

14

(d)     One additional full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities;

(e)     One full-time clerical position to support the work of the administrative segregation clinical team..."

In addition, for each case manager, 2.2 correctional officers (COs) were required for escort.

Since the court is demanding immediate improvement in mental health staffing and inmate-patient access to services, DCHCS proposes to immediately address the court's mandates by requesting a total of 299.98 positions in ADSEG-CCCMS.

Once these positions are filled, CDCR will conduct a workload study of MHSDS and Headquarters functions to identify, standardize and quantify workload data, determine actual need, and adjust staffing as appropriate based on the results of the study (see Attachment 28).

MHSDS serves the majority of inmates with serious mental disorders through the CCCMS, which is available at all institutions. An effective CCCMS program ensures timely access to mental health care and outpatient services delivered through a well-designed clinical case management system and is the most cost-effective means of maintaining adequate institutional functioning among inmates with serious mental disorders. CCCMS facilitates the linking of inmate-patients to needed services and provides sustained support while accessing these services.

CCCMS inmates who engage in criminal behavior or behavior requiring disciplinary intervention while in the prison system are placed in ADSEG-CCCMS while awaiting adjudication for these offenses. Should they be found guilty and be assigned additional time than already served in ADSEG, they then go into SHU-CCCMS.

## 1.     Administrative Segregation Unit, Correctional Clinical Case Management System (ADSEG-CCCMS)

The court has reported in a number of its reports that the Special Master's view the ADSEG environment as one which requires a heighten degree of treatment intervention for the inmate to maintain a CCCMS level of function. The 1997 *Coleman* Requirements states an average Clinical Case Manager (CCM) to patient staffing ratios across the program sizes for CCCMS is 1:100. ADSEG-CCCMS CCMs' duties were never staffed separately from the CCCMS general population (GP) despite the court's additional treatment requirements when GP CCCMS are transferred into ADSEG.

Staffing in ADSEG-CCCMS has been a consistent concern of the *Coleman* case Special Master. From 1999 to 2005, the completed suicides in ADSEG-CCCMS and SHU-CCCMS account for 49 percent of all suicides in the CDCR inmate population.

Based on the 1999 Coleman court order, DCHCS proposes to immediately address the court's mandates by requesting a total of 299.98 positions in ADSEG-CCCMS.

15

## 2.    Mental Health Reception Center (RC)

The MHSDS provides universal screening for all incoming inmates at Reception Centers and directs transfers from the Reception Center to the treatment facility for further evaluation and/or treatment if needed.

The bulk of the Intake Assessment requirements and Treatment Planning requirements described in the CCCMS GP Section will be the responsibility of RC staff. The 2006 MHSDS Revised Program Guide requires that EOP LOC patients be seen weekly until transfer (but does not require the ten hours of weekly structured therapeutic activities). According to the resource analysis data collected, for RC related duties, the caseloads should be reduced by 50 percent from the current staffing allocated. The current RC duties were never staffed separately from the CCCMS LOC duties, and the ratio below takes this into account along with the 2006 MHSDS Revised Program Guide duties.

Based on the above formula and population statistics for October 2005, DCHCS is requesting **51.0 Psychologist (Clinical) positions and 20.6 Correctional Counselor Is** for a total of 71.6 positions for the RC.

## 3.    Mental Health Outpatient Housing Unit (MH-OHU)

The 2006 MHSDS Revised Program Guide requires seven-day per week coverage in for mental health patients in any OHU. Additional weekend clinical staffing is requested in institutions that have a significant OHU population and no MHCB (where weekend staffing is requested above). These five institutions are Avenal State Prison (ASP), CCI, CMC-East, NKSP, and SQ.

Based on the above formula and the February 6, 2006 population status for MH-OHU, DCHCS is requesting **72.98 positions.**

## 4.    Institution Level Supervision

Currently, 265.6 LPTs are supervised by 26.7 Supervising Registered Nurse I (SRN I) staff members and two Sr. LPTs. At this time, this FL is only requesting Sr. LPTS to compensate for the existing LPTs (265.6). The total number of Supervisors required for a one Supervisor: ten LPT ratio at institutions with more than ten LPTs = 15 - *Less 3.0 Sr. LPT upgrades allocated to COR in FY 2005/06* = a need for 12.0 Sr. LPTs. Twelve recommended supervisors – two (current Senior LPT supervisors at SAC) = 10 Supervisors. The Sr. LPT classification has not been regularly used to supervise LPTs, but is recommended to ensure appropriate supervision relative to scope of practice (i.e., group therapy duties). Senior LPTs can still perform LPT duties if necessary. Total Ratio - one Sr. LPT: 10.0 LPT (at institutions with more than ten LPTs = a need for 10.0 Sr. LPT positions. This FL requests permanent upgrading of 10.0 LPTs to Sr. LPT positions

Unit Supervisors are required to provide supervision for Senior LPTs across shifts at institutions with multiple mental health missions. Unit Supervisor positions have not

16

00080

previously been designated in CDCR. The CDCR duty statement for this position has been developed based on the Department of Personnel Administration specifications. The Unit Supervisor ensures the administration of the routine nursing services across correctional mental health units and custody levels; coordinates the work of the nursing staff and acts as a liaison between Unit staff on varying shifts; trains and develops shift leads; instructs LOC nursing personnel in nursing processes, habilitation, and rehabilitation techniques for inmate-patients; and provides continuous management and supervision of Units that offer routine and supportive nursing services for developmentally disabled or mentally ill inmate-patients.

One Unit Supervisor is required at each institution with multiple mental health missions including: RC, CCCMS, ASU-CCCMS, GP-EOP, ASU-EOP, and/or PSU. Unit supervisors at this time are requested for mental health "consolidated care center" institutions in the "CDCR Right Prison, Right Mission" plan. The 9 institutions are: CIM, CIW, CMC, CMF, LAC, MCSP, PBSP, RJD, and SAC.

Requesting 9.0 Unit Supervisors to be allocated to the nine Consolidated Care Centers.

Summary of positions needed to accomplish adequate Supervision Levels. These positions are requested effective July 1, 2006.

- Permanently Upgrade 10.0 LPTs to 10.0 Sr. LPTs
- 9.0 Unit Supervisors

## 5. Performance Evaluation and *Colman* Court Case Compliance

The Quality Management System is required, by the *Coleman* and *Plata* court cases, in order to provide adequate performance management and to ensure compliance with mental health policies and procedures. Quality Management requirements specific to mental health involve identification of problems in delivery of mental health services, establishment of QIT, tracking progress of QIT, conducting Suicide Prevention Focused Improvement Team (FIT) meetings (including development and implementation of corrective action plans when a suicide occurs), conducting Mental Health Subcommittee meetings, and facilitating an overall data-based approach to bed utilization. All meetings require documentation, which is sent to other Quality Management Committees at the institution and at Headquarters. Although an analyst has been designated at some institutions for the purpose of health care quality management, a dedicated HPS I for mental health quality management is required to ensure that these important duties are completed as required. This position will also be responsible for oversight of tracking reasonable accommodation offered to MHSDS inmates who are part of the class action *Armstrong* court case. Each HPS I require clerical support in order to complete duties associated with taking meeting minutes, copying, tracking, filing, and communications.

Request 1.0 dedicated HPS I at each institution without a restriction to running a mental health mission (restricted institutions are Calipatria State Prison (CAL), California Correctional Center (CCC), Centinela State Prison (CEN), Ironwood State Prison (ISP), Chuckawalla Valley State Prison (CVSP)) = 28.0 HPS Is.

17

Request 1.0 Mental Health Quality Management dedicated OT at each institution without a restriction to running a mental health mission (restricted institutions are CAL, CCC, CEN, ISP, CVSP) = 28.0 OTs.

Summary of positions needed to accomplish Quality Management. These positions are requested effective July 1, 2006.

- 28.0 HPS Is
- 28.0 OTs

## 6.   Division of Correctional Health Care Services (DCHCS) – Capital Outlay

This section is included in the Litigation Support FL.

## 7.   Reception Center (RC) Screening and Diagnostic Clarification

The Million Clinical Multiaxial Inventory – III (MCMI-III) test can be administered in approximately 30 minutes, either individually or in a group setting. Research indicates that this test is a valid and reliable diagnostic tool to assist in objectively triaging patients for immediate mental health needs, determining mental health diagnosis, as well as predicting future needs for mental health intervention. This test may also be used to predict reaction to authority, escape risk, sexual predation/victimization, disposition to malinger, response to crowding/isolation, suicidal tendencies, and amenability to treatment (see Attachment G: Retlzaff, P., Stoner, J., and Kleinsasser, The Use of the MCMI-III in the Screening and Triage of Offenders, *International Journal of Offender Therapy and Comparative Criminology, 46, 3, 319-332).*

The use of this test, along with a standard computer generated report of results, is proposed for use at RCs, for all newly arriving inmates who have a positive mental health screening indicator (approximately 20,000 inmates per year).    A more rigorous interpretation/analysis of results is proposed for use with current inmate-patients at EOP LOC, when diagnostic clarification is needed (approximately 3,000 per year).   See Attachment H for sample report.

The use of this instrument is expected to reduce overall mental health program cost. Data generated from the standard use of the MCMI-III at RCs will be used to determine appropriate mental health LOC, thereby reducing inappropriate placements into mental health programs. Use of the MCMI-III at EOP LOC will significantly reduce the use of costly DMH beds for diagnostic clarification.

This FL requests a total for \$778,800 in ongoing funding - \$748,800 per year for contract funding for a two year pilot program for valid and reliable test to predict mental health needs of inmates arriving in RC and to aid diagnostic clarification in EOP Level-of-care (LOC) and \$30,000 for supplies for implementation of a pilot program for valid and reliable test to predict mental health needs of inmates arriving in RCs and to aid diagnostic clarification in EOP LOC (see Attachment I). Request for funding is to be effective July 1, 2006.

18

## 8.   Additional Equipment Resources

An initial cost for equipment and supplies is estimated at $1,164,604 to implement the 2006 MHSDS Revised Program Guide. The equipment and supply costs are based on a per unit estimate for basic office support equipment such as copiers, facsimile machines and shredders as well as clinical materials such as testing forms, pre-printed forms for documentation in the Unit Health Record and group therapy handout materials.

Quantities were determined as follows: (Please see a complete breakdown on the equipment request table in Attachment B.)

- Treatment cells -- Nine cells per 33 institutions
- Copiers/Fax Machines/Television -- One per institution (except desert institution – CVSP, ISP, CAL, CEN
- Laptops – One laptop for each five Clinicians
- Shredders – One per institution
- Dictation Equipment – One per institution with MHCB
- Golf Cart – One per institution with remote access to Health Records
- Group Therapy Materials – Estimated number of inmates in Program

CDCR is requesting one-time funding of $1,114,604 and ongoing funding of $50,000 for equipment to be effective July 1, 2006.

00083

# Section II.

# DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# MENTAL HEALTH PROGRAM

# HEADQUARTERS

00084

**SECTION II.    DIVISION OF CORRECTIONAL HEALTH CARE SERVICES (DCHCS),
MENTAL HEALTH PROGRAM (MHP) - HEADQUARTERS**

The CDCR DCHCS MHP, which has been functioning since 1994, is a decentralized, system-wide concept using standardized evaluation and treatment. The MHP's goal is to provide constitutionally appropriate levels of mental health treatment to the incarcerated serious mentally ill inmate in order to enhance individual functioning and minimize dangerous, destructive, and disruptive behaviors, in the clinically least restrictive environment, consistent with the safety and security needs of both the inmate-patient and the institution.

This FL addresses the staffing for MHP Headquarters required by the *Coleman* court order (see Attachment 29):

"The defendants should be required to submit within 60 days from entry of the court's order a plan to expand the DCHSC central office mental health staff commensurate with the growth and present size of the CDCR mental health staff and caseload; the plan should also address the issue of compensation for headquarters staff and provide a scale of pay that assures that clinicians (including psychiatrists, psychologists, psych social workers, psych techs and RNs), policy and program developers and supervisors (including health program specialists and analysts) and correctional counselors, with responsibility for planning, developing, monitoring and evaluating system-wide programming and policy receive a level of salary higher than that of comparable institutional clinicians, including whatever Recruitment and Retention (R&R) differential pay such institutional clinicians may be entitled to."

The MHP utilizes a variety of professional clinical, custodial and support staff to provide the best available quality of care to seriously mentally disordered inmates. In addition, MHP has a contractual relationship with the Department of Mental Health (DMH), which provides a continuum of inpatient care for acute and intermediate, as well as a short-term crisis, inpatient care program within CDCR institutions. Outpatient care is provided in an array of treatment levels and modalities including day treatment programs and outpatient clinics.

This FL is modeled after the Dental and Medical Programs FLs. Each program is managed by a Statewide Program Director and each has a similar Quality Management Assistance Program.

In order to ensure timely, coordinated and consistent statewide, evidence-based, quality care in the most efficient and cost effective manner possible, CDCR is requesting the following critical positions to oversee the CDCR DCHCS MHP and the accompanied administrative, programmatic, analytical, and clerical support:

## EXECUTIVE OFFICE

### *1.0 Statewide Mental Health Program Director (CEA)*

The Statewide Mental Health Program Director (SWMHPD) will oversee all areas of the Department's MHP and be responsible for administering the critical mental health

21

program for a population of nearly 170,000 inmates with over 31,000 inmates-patients enrolled in the MHSDS for serious/major mental illnesses. Over 5,000 of those enrolled are considered high risk and are either in residential or other in-patient treatment settings. Over 25,000 inmate-patients are receiving psychotropic medications every day. Therefore, the SWMHPD position is requested as a CEA in order to allow for this ultimate reporting structure

The SWMHPD will be responsible for the standardized statewide program development, planning and implementation; overall supervision and administration/management of the MHSDS in the field and the Statewide MHP at Headquarters; compliance with existing laws, regulations and court orders; subject matter expertise to nationwide advisory committees and mental health professional organizations and allied groups, provider organizations, and other public and private agencies; representing the Department on issues regarding mental health before the Legislature, other state departments, federal and local governmental agencies, department staff, and community groups. A psychiatrist must hold this position because this specialty has the broadest area of expertise of any mental health provider classification (see Attachment 22 for detailed task list).

### 1.0 Associate Health Program Adviser (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the SWMHPD and HPS I on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 1.0 Executive Secretary I (ES I)

The ES I will provide complex and sensitive administrative secretarial support to the SWMHPD. This position will be communicating and interacting with all levels of personnel within and outside of CDCR (see Attachment 22 for detailed task list).

### 1.0 Office Technician – Typing (OT)

The OT will provide clerical support for the SWMHPD and AHPA; draft and review sensitive and confidential documents; track assignments, and do other duties as required (see Attachment 22 for detailed task list).

### PSYCHIATRY SERVICES BRANCH (PSB)

The PSB, which is supervised by a Chief Psychiatrist, is responsible for ensuring statewide implementation of the psychiatric components of mental health policies and procedures and provides subject matter expertise on the delivery of psychiatric services in CDCR. This Branch is comprised of two Sections: QMAP Unit and the Tele-Psychiatry Unit. The Chief Psychiatrist reviews and certifies all Mentally Disordered Offender (MDO) reports as required by law. With assistance from the Senior Psychiatrist Supervisor in the Tele-Psychiatry Unit, the Chief Psychiatrist participates in developing, updating and approving all 2006 MHSDS Revised Program Guidelines impacted by psychiatric services including, but not limited to, the following areas: medication management; delivery of

22

psychiatric services; peer review; all aspects of inpatient treatment, *Keyhea* processes (involuntary medication), and Heat Plan procedures and protocols. The Chief Psychiatrist also provides subject matter expertise for the Mental Health Program Subcommittee (MHSubC), Suicide Prevention and Response Focused Improvement Team (SPRFIT). Emergency Review/Death Review Subcommittee (ER/DR), Pharmacy and Medication Management Subcommittee (P&MM), Professional Practice Executive Committee (PPEC), and other meetings and projects as assigned (see Attachment 22 for detailed task list).

DCHCS is requesting the following critical positions to provide direct administrative, programmatic, analytical and clerical support to the Chief, PSB:

### 1.0 Associate Health Program Advisor (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the Chief, PSB on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 1.0 Secretary

The Secretary will provide administrative secretarial support to the Chief, PSB. This position, which will handle sensitive, complex and confidential materials, will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

### 1.0 Office Technician – Typing (OT)

The OT will provide clerical support for the Chief, PSB and AHPA; draft and review sensitive and confidential documents; track assignments, and do other duties as required (see Attachment 22 for detailed task list).

## QUALITY MANAGEMENT ASSISTANCE PROGRAM (QMAP) UNIT

The Senior Psychiatrist (Specialist) in the QMAP Unit reports directly to the Chief Psychiatrist and is part of the QMAP team under the Regional Mental Health Director (RMHD) in the COB.

Please see COB, QMAP Unit, for requested Senior Psychiatry Specialist positions.

## TELE-PSYCHIATRY UNIT

DCHCS currently has one Senior Psychiatrist (Supervisor) who manages the Tele-medicine Program and supervises the tele-psychiatrists. The supervisor ensures continuity of medication to patients and is responsible for maintaining clinical standards of care consistent with the 2006 MHSDS Revised Program Guide, court mandates, and pharmacy guidelines. The existing six SPs provide direct tele-medicine psychiatric

23

00087

services, vital medication evaluation and review of patients in institutions, particularly at remote or temporarily understaffed institutions.

Since the professionals in the Tele-Psychiatry Unit do not have programmatic analytical and support staff, DCHCS is requesting the following staff to assist the Tele-Psychiatry Unit:

### 1.0 Office Technician (OT) – Typing

The OT will provide complex and sensitive clerical support; input and track confidential information regarding report status and conclusions, including Keyhea and Heat Plan data; ensure that timelines are tracked; type and format management reports and other documents including letters and memoranda; perform supporting tasks such as timekeeping, ordering and maintaining supplies, and scheduling (see Attachment 22 for detailed task list).

### PROJECT MANAGEMENT UNIT

The request for positions for the Project Management Unit is contained in the Litigation Support FL.

### CLINICAL OPERATIONS BRANCH (COB)

The COB of the MHP is responsible for ensuring that the CDCR policies and procedures for the delivery of mental health services are implemented and complied with in a standardized and uniform manner. This fosters both the deliverance of quality, cost-efficient and effective health care and diligent risk management. There are three Units of this branch:

- Quality Management Assistance Program (QMAP)
- Centralized Clinical Case Management (CCCM)
- Utilization Management (UM)

The Chief, COB (CEA) will report directly to the SWMHPD and be responsible for clinical and administrative management and oversight of the statewide QMAP, the CCCM, and the UM Units.

DCHCS is requesting the following critical positions to oversee the Branch and to provide direct administrative, programmatic, analytical and clerical support to the Chief, COB:

### 1.0 Chief, Clinical Operations Branch (CEA)

The Chief, COB, will provide clinical, administrative and management oversight of the statewide multi-disciplinary QMAP, CCCMU and UM Units. The position requires a clinical psychologist with extensive knowledge and experience in the provision of mental health services in a correctional environment. This psychologist will supervise three Regional Mental Health Directors (RMHD). The regional directors must be Chief Psychologists who are experienced in managing correctional mental health programs. These Chief Psychologists will have direct supervisory responsibilities over Senior

24

Psychologist (Specialist), and have indirect supervisory responsibilities for other QMAP team members, including facility captains and psychiatrists, and the nurses in the UM Unit. Therefore, the Chief of Clinical Operations position is requested as a CEA in order to allow for this ultimate reporting structure (see Attachment 22 for detailed task list).

### 1.0 Associate Health Program Adviser (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the Chief, COB on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 1.0 Secretary

The Secretary will provide administrative secretarial support to the Chief, COB. This position, which will handle sensitive, complex and confidential materials, will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

### 1.0 Office Technician – Typing (OT)

The OT will provide clerical support to the Chief, COB and the HPS I, draft and review sensitive and confidential documents, track assignments, and other duties as set forth in Attachment 22.

### QUALITY MANAGEMENT ASSISTANCE PROGRAM (QMAP)

QMAP provides programmatic quality assistance by sending multidisciplinary Quality Management Assistance Teams (QMAT) to the 33 CDCR institutions.. These teams are composed of custody, health care, and analytical staff, from both Headquarters and the regional offices. The teams monitor performance with audits, assessments, and analysis of the data collected. Issues addressed include, but are not limited to:

- Access to care, including specialized care such as that provided in an inpatient setting;
- Completeness and appropriateness of patient health records;
- Custody records and processes for determining classification status and rules-violations reports with consideration of mental health status;
- Custody escorting procedures;
- Medication or "pill" lines;
- Seclusion and restraint practices;
- Mental health rounding in the lock-up and condemned units;
- Appropriate staffing and vacancies; and
- The presence of an institutional quality assurance program.

Management reports are then generated which result in corrective action plans and/or resource requests. Traditionally, the DCHCS MHP's QMAP efforts have consisted of a single two-to-five member team (redirected from other duties) tasked with monitoring the entire State of California prison system. The Federal Court has also been providing its own

25

00089

quality assurance monitoring via a team of nationally renowned experts (psychiatrists, psychologists, social workers, and attorneys) serving the *Coleman* Special Master. The cost to the State of California for this federal monitoring has, to date, exceeded $29 million. *Coleman* monitoring rounds occur twice a year on average, and typically result in a several-hundred page report detailing the deficiencies within each institution. The Special Master has long held that CDCR needs to demonstrate that it can manage itself (i.e., identify problems and develop and implement corrective action plans). The staffing and implementation of this requested QMAP Unit will supplant the need for federal monitoring and will allow CDCR to administer and manage a quality mental health care system. Failure to implement QMAP will result in continued and costly litigation and monitoring, continued deliverance of inadequate and insufficient mental health care, and continued violation of constitutional mandates (see Attachment 17 for workload data).

The Mental Health QMAP is modeled on the already-approved QMAP structure for the Medical Program under *Plata* and the Dental Program. Each QMAP region will have two QMAP teams assigned to each of the three regions (North, Central and South), with each team assigned to five or six institutions within its region. Each QMAP team consists of a Senior Psychologist (Specialist), a Senior Psychiatrist (Specialist), a Nurse Consultant Program Reviewer (NCPR), a Sr. LPT, a FC, and a Retired Annuitant (RA) (formerly a Warden or Chief Deputy Warden). The need for each classification is explained below.

As mentioned above, the *Coleman* court's experts monitor each prison twice a year and only conduct audits and assessments. CDCR intends to have each prison monitored on a monthly basis. The regional QMAP teams will not only monitor and assess, but also develop corrective action plans and recommend improvements to local operating procedures towards greater efficiencies utilizing existing resources. If necessary, QMAP teams will assist the institution in seeking adjustments to its resources. Providing assistance with this degree of frequency will help the institutions to improve their MHSDS faster after years of stagnation. It will also help to maintain programmatic gains and/or to identify needed restructuring or enhancements in a more responsive fashion. This process will ultimately benefit the health and well being of inmate-patients.

Under the direction of the Chief of COB, each regional QMAP team will be supervised by a RMHD. The team will also collaborate with the institution's executive staff to effectively achieve and provide proof of practice to the appropriate stakeholders. It is imperative that the team members be knowledgeable and experienced in their areas of expertise to be effective and acknowledged by the prison's executive team.

In order to fulfill the court mandate, replace the *Coleman* Special Master's monitoring team, and provide quality mental health care, DCHCS is requesting the following critical positions to provide direct managerial, administrative, programmatic, analytical and clerical support to the QMAP Unit:

## 3.0 Regional Mental Health Director (RMHD), Chief Psychologist

Each regional multi-disciplinary QMAP team will be under the supervision of a RMHD. In the institutions, the Chief Psychologists serve as the mental health programmatic managers and supervise the largest number of mental health workers. Therefore, this classification is the best suited for the role of RMHD. This position will provide regional clinical and administrative management; oversight for institutional reviews and reports of

26

statewide mental health policy and program implementation; leadership and monitoring of QMAT functions and work product, including management reports; high-level and complex clinical case consultations; and serve as the DMH liaison for QMAP (see Attachment 22 for detailed task list).

## 6.0 Senior Psychologist (Specialist)

The Senior Psychologist Specialists on each QMAT team will report directly to the RMHD and function as the team leader. Senior Psychologist is the classification utilized in the institutions to provide supervision and leadership for the specific programs areas; therefore, this classification is the most qualified to coordinate the QMAP teams that will assist the prison programs. The QMAT Senior Psychologist (Specialist) will coordinate QMAT processes, including monthly visits to each institution with the assigned Regional Administrators, as well as other team members; maintain, track and monitor timely and adequate institutional completion of recommended Quality Improvement Plan (QIP) plans; reports institutional status on compliance issues and remedial actions; and function as the critical assessment/assistance link between institutional and Headquarters Quality Management Systems (see Attachment 22 for detailed task list).

## 6.0 Senior Psychiatrist (Specialist)

As part of each QMAP team, the Senior Psychiatrist (Specialist), although directly reporting to the Chief Psychiatrist in the PSB, will be indirectly reporting to the RMHD. These psychiatrists function as subject matter experts on matters such as the diagnosis and treatment of psychiatric conditions; co-morbid medical conditions and treatments; psychopharmacology strategies and administration; involuntary medication orders ("Keyhea"); appropriate medical documentation; restraint and seclusion medical processes; psychiatrist administered suicide risk assessments, and peer review functions such as pattern of practice investigations (see Attachment 22 for detailed task list).

## 6.0 Nurse Consultant, Program Review (NCPR)

As part of the QMAP team, the NCPRs will indirectly report to the Nurse Consultant, Program Review Lead (NCPRL) (i.e., regional team leader) and the RMHD and directly to the Regional Director of Nursing (RDN). The NCPR will provide nursing expertise and clinical oversight in ensuring compliance with 2006 MHSDS Revised Program Guide and will report institutional status and issues regarding nursing processes and progress on a regular basis to the RMHD. Processes include issues such as nursing administered suicide risk assessments; medication administration procedures; seclusion and restraint procedures, nursing peer review such as pattern of practice investigations, and IDTT participation (see Attachment 22 for detailed task list).

## 6.0 Senior Licensed Psychiatric Technician (Sr. LPT)

As part of the QMAP team, the Sr. LPT will indirectly report to the NCPRL (i.e., regional team leader) and the RMHD and directly to the RDN. The Sr. LPT will provide subject matter expertise in regards to the institutional LPT activities such as mental health rounding on inmates in the lock-up and condemned units; conducting quality and substantive group therapies and activities; collecting and reporting of objective observations about signs and symptoms of mental illness; ensuring appropriate medical

27

documentation; providing one-to-one suicide observation; and distributing medications. Traditionally, these functions have been in significant non-compliance and with questionable proof-of-practice, leading to threats of contempt of court citations. The Sr. LPT will also be responsible for generating management reports on the status of institutional compliance with MHSDS policies and procedures, and on other significant issues and concerns (see Attachment 22 for detailed task list).

## 5.0 Facility Captain (FC)

As part of the QMAP team, the FC, will indirectly report to the RMHD and directly to the Regional Correctional Administrator (RCA). The QMAP FCs will be responsible for providing regional assistance and support to institution staff in the implementation of the 2006 MHSDS Revised Program Guide. The FCs will serve as the liaison between institutional custody supervisors and institutional medical staff. These FCs will audit custody processes such as records and processes for determining classification status and rules-violations reports, taking into consideration the following: mental health status; escorting procedures; use of force procedures; participation in IDTT; seclusion, restraint and suicide watch custodial procedures; annual mental health training for custody staff; and the provision of access to health care. Audit results and process observations are developed in monthly management reports (see Attachment 22 for detailed task list).

## 2.0 Retired Annuitant (RA)

As part of the QMAP team, the RA, who are either retired Wardens or Chief Deputy Wardens, will indirectly report to the RMHD and directly to the RCA. DCHCS has utilized four RA's over the last several years. These retired wardens have been very effective in their roles given their ability to gain direct access to the institution's Warden, Chief Deputy Warden, and Associate Warden of Health Care. These four existing RA Wardens have years of experience with monitoring of the *Coleman* lawsuit and have earned considerable respect with the Special Master and the Court's monitors. DCHCS seeks to augment this model with the addition of two RAs for a total of six, one for each QMAP team. This will allow them to provide statewide coverage for QMAP monitoring, and takes into consideration their limited (half-time) availability.

As part of the QMAP team, the RAs interface with the top custody leadership at the prisons, reporting to those wardens the audit results in real time and jointly developing fast and effective solutions. They provide assistance in developing requests for resource adjustments when needed, and they develop monthly management reports for each institution's custodial processes and procedures (see Attachment 22 for detailed task list).

## 3.0 Staff Services Manager I (SSM I)

The SSM I will plan, organize and direct the work of the HPS I, AHPAs, Secretary, and OT in support of the Regional QMAP teams (see Attachment 22 for detailed task list).

## 3.0 Health Program Specialist I (HPS I)

The HPS I will provide the RMHD with administrative and programmatic support. The HPS I will act as a subject matter expert and assist in the planning, implementation,

28

monitoring and evaluating the MHP and interacting with staff and stakeholders both within and outside of CDCR (see Attachment 22 for detailed task list).

### 6.0 Associate Health Program Adviser (AHPA)

The AHPA will provide analytic support to evaluate confidential information, reports, status and conclusions, and ensure that timelines are met by projecting report requirements; draft management reports from tracked data and other documents; perform supporting research; and manage reporting requirements (see Attachment 22 for detailed task list).

### 3.0 Secretary

The Secretary will provide administrative secretarial support to the RMHD. This position, which will handle sensitive, complex and confidential materials, will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

### 3.0 Office Technician – Typing (OT)

The OT will provide clerical support for the RMHD, SSM I and HPS I; draft and review sensitive and confidential documents; submit QIP and other reports and updates to DCHCS Headquarters; make travel arrangements and process time sheets and travel claims for clinicians in the regions; and do other duties as assigned (see Attachment 22 for detailed task list).

### CENTRALIZED CLINICAL CASE MANAGEMENT (CCCM) UNIT

The CCCM Unit has statewide responsibility for four separate task systems: Suicide Reviews, Inmate-Patient Urgent Responses, Centralized Clinical Assessment Team (CCAT) and DMH Coordination.

This Unit reviews suicide reports for quality and soundness of recommendations and ensures they are completed in a timely manner. The Unit receives notices from plaintiff attorneys or family members that requires an urgent response and ensures patients are seen within the DCHCS Program Guides. The Unit serves as an appellate level for the resolution of clinical disagreements between CDCR DCHCS MHP and the DMH in regards to the need and appropriate placement of CDCR inmates in the inpatient beds managed by DMH. To resolve these appeals CCCM Unit personnel must locate and retrieve records and information from professional personnel throughout the state and attend meetings of field and clinical professionals, managers and administrators from both departments. The Unit recommends corrective actions and/or adverse action to the Chief of Clinical Operations when CDCR field staff consistently mismanages referrals to higher levels of care settings, the consequence of which result in delayed access to critical care, which is another ongoing serious issue that the Federal Court monitors have with CDCR's MHSDS. The Unit also tracks and analyzes patterns of DMH referrals and acceptances/rejections and prepares reports concerning these analyses for DCHCS and the courts.

DCHCS currently has a Senior Psychologist (Specialist) who supervises the Unit and is requesting the following position to provide clerical support to the CCCM Unit:

29

### 1.0 Office Technician – Typing (OT)

The OT will provide clerical support for the Senior Psychologist; draft and review sensitive and confidential documents; establish CCAT calls and track and document responses; maintain up-to-date phone lists for all critical contacts in the prison programs/regions to facilitate urgent response; enter or log information regarding the Units responsibilities; and do other duties as assigned (see Attachment 22 for detailed task list).

### UTILIZATION MANAGEMENT (UM) UNIT

The UM Unit provides RNs who work full-time and on-site at the DMH facilities, which are designated for the CDCR population via an inter-agency agreement.

The RNs in the UM Unit perform bed use review and management for every CDCR mental health patient being cared for in DMH beds. There are eight such programs/facilities:

- Atascadero State Hospital (ASH)
- Patton State Hospital (PSH)
- Metropolitan State Hospital (MSH)
- Coalinga State Hospital (CSH)
- Vacaville programs (3) housed within the walls of the CMF:
  o Acute Psychiatric Program
  o Day Treatment Program
  o Intermediate Care Facility
- Napa State Hospital (NSH)
- Salinas Valley Psychiatric Program (SVPP) housed with the walls of SVSP
- SAC inpatient program

CDCR UM nurses have proved critical in ensuring CDCR inmate/patients at DMH facilities receive quality care while simultaneously managing this vital and limited resource to provide the most effective and efficient utilization. In the absence of this function, CDCR has discovered on occasion that DMH clinical staffs have retained inmate-patients in hospital inpatient beds far beyond clinical necessity, thereby preventing other patients with acute needs from accessing those beds.

DCHCS currently has two RN positions: one who is responsible for the CMF and NSH, and one who is responsible for ASH. CMF and NSH are covered by a single RN due to the limited number of allocated beds at Napa reserved for parolees, and Napa's proximity to CMF.

DCHCS is requesting the following four RN positions to cover the remaining four facilities: one for MSH and PSH, which can be covered by a single RN due to the limited number of applicable beds at PSH (reserved for the female population) and its proximity to MSH (reserved for parolees); one for CSH; one for SVPP, and one for SAC (see Attachment 18 for workload data).

30

### 4.0 Registered Nurse (RN)

As part of the QMAP team, the RN indirectly reports to the NCPRL (i.e., regional team leader) and the RMHD. The RN reports directly to the RDN.

The UM nurses serve as the CDCR MHP's liaison with the DMH facilities and participate in patient treatment teams/planning; audit clinical documentation and ensure discharge summaries and records are prepared to the receiving CDCR institution; monitor inpatient-days to ensure that the inmate-patient's length of stay is appropriate; and develop management reports for DMH and CDCR (see Attachment 22 for detailed task list).

## CLINICAL POLICY & PROGRAM DEVELOPMENT AND CLINICAL EVALUATIONS (CPPD&CE) Branch

The CPPD&CE Branch of the MHP is responsible for developing policies and programs for the delivery of mental health services and the performance of clinical evaluations for psychological testing and forensic purposes. This Branch consists of the Clinical Policy and Program Development (CP&PD) Unit and the Psychological Testing and Forensic Evaluations (PT&FE) Unit.

DCHCS is requesting the following positions to oversee the branch and provide direct administrative, programmatic, secretarial and clerical support to the Chief, CP&PB:

### 1.0 Chief, Clinical Policy and Programs Branch (CEA)

The Chief, Clinical Policy and Program Branch (CP&PB) will report directly to the SWMHPD and provide clinical and administrative leadership and oversight of the CP&PD and the PT&FE Units. The position requires a clinical psychologist with extensive knowledge and experience in the provision of mental health services in a correctional environment. (see Attachment 22 for detailed task list).

This psychologist will supervise two Chief Psychologists who are experienced in managing correctional mental health programs and will have direct supervisory responsibilities over Senior Psychologist Supervisors, Senior Psychologist (Specialist), and Clinical Psychologists, social worker and registered nurses. Therefore, the Chief of Clinical Policy and Programs Branch position is requested as a CEA in order to allow for this ultimate reporting structure (see Attachment 22 for detailed task list).

### 1.0 Associate Health Program Adviser (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the Chief, Clinical Policy and Program Development, and Clinical Evaluations Branch on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 1.0 Secretary

31

The Secretary will provide administrative secretarial support to the Chief, CP&PB. This position will handle sensitive, complex and confidential materials and will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

### 1.0 Office Technician – Typing (OT)

The OT position will provide clerical support for the Chief, CP&PB and the AHPA; draft and review sensitive and confidential documents; and perform other duties as required (see Attachment 22 for detailed task list).

### CLINICAL POLICY AND PROGRAM DEVELOPMENT (CP&PD) UNIT

The CP&PD Unit is responsible for developing and updates all mental health policies and procedures, including the federal court mandated 2006 MHSDS Revised Program Guide and updates. The Unit is responsible for the following programs: training; suicide prevention; program guides; group curriculum planning and development; bed management and planning; mental health compliance management; professional recruitment and development; and the legislatively mandated gender and culturally responsive program.

DCHCS currently has the Chief Psychologist position who will oversees the eight programmatic areas, and five Senior Psychologist Specialists necessary for the Suicide Prevention, Training, Bed Management and Planning, Mental Health Compliance Management, and Professional Recruitment and Development Sections.

DCHCS is requesting the following positions to provide administrative, programmatic, analytical, and clerical support for the Unit Chief:

### 4.0 Senior Psychologist Specialists (Sr. PS)

Due to the clinical complexity of the programs, one Sr. PS will be directly responsible for each of the Sections below

Gender and Culturally Responsive Program Section – The Sr. PS will develop and implement policies and procedures to assure implementation of legislatively mandated gender responsive and culturally diverse programs; ensure that appropriate stakeholders are included in policy development; provide oversight for gender responsive and cultural diversity mental health programs; develop and coordinate training for all staff regarding cultural issues in mental health treatment and on best practices (see Attachment 22 for detailed task list).

Mental Health Compliance Management Section - The Sr. PS will provide clinical oversight and Mental Health Subject Matter Expert (MH SME) for the Mental Health Tracking System and other court mandated mental health tracking systems such as Reception Center Tracking System; provide MH SME to analysts and programmers developing management reports; MH SME database interface to programmers of statewide information technology systems and electronic medical records; serve as liaison between the field and Information Technology staff and interface with institutions to

32

.ensure production of required data for court and management reports (see Attachment 22 for detailed task list).

Bed Planning and Management Section – The Sr. PS will provide subject matter expertise in the development and planning of new mental health beds; develop appropriate policies and programs relevant to the planning and utilization of mental health beds; ensure that appropriate stakeholders are included in policy development; relay information to Mental Health Program regarding trends and decisions at Bed Planning meetings (see Attachment 22 for detailed task list).

Professional Recruitment and Development Section - The Sr. PS will provide oversight for Clinical Internship and Practicum Program; National Health Sciences Loan Reimbursement Program; Continuing Medical and Mental Health Education Units; Licensure, Privileging & Credentialing; policy development and coordination of implementation of standardized psychological testing program with Psychological Testing and Forensic Evaluation Unit; develops policies and ensures that appropriate stakeholders are included in policy development (see Attachment 22 for detailed task list).

### 1.0 Psychiatric Social Worker (PSW)

The Program Guides Section is responsible for system-wide standardization of mental health policies and procedures, including local operating procedures at institutions, and updates to the mandated 2006 MHSDS Revised Program Guide. This Section provides subject matter expertise to the QMAP teams, field staff, and other stakeholders regarding current mental health policies and procedures.

This position requires an experienced Psychiatric Social Worker familiar with correctional mental health treatment systems. It is important to have the PSW profession represented at the DCHCS level to serve as a subject matter expert that will provide consultation with all employee policies and labor relations issues that specifically affect PSWs in the CDCR system (see Attachment 22 for detailed task list).

### 1.0 Senior Licensed Psychiatric Technician (Sr. LPT)

The Group Therapy Curriculum Development Section is responsible for researching best practices in providing group therapy in a correctional setting, developing and implementing a standardized statewide curriculum, and developing standardized training for LPTs who facilitate group therapy. Group therapy is required for all inmate-patients placed at EOP LOC and for a portion of inmates treated in the CCCMS program.

Group therapy is an ongoing requirement and an integral part of mental health treatment. This position requires an experienced Senior Licensed Psychiatric Technician familiar with correctional mental health treatment systems. It is important to have the LPT profession represented at the DCHCS level to serve as a subject matter expert that will provide consultation with all employee policies and labor relations issues that specifically affect LPTs in the CDCR system (see Attachment 22 for detailed task list).

### 1.0 Research Analyst II (Social/Behavioral)

33

The Research Analyst II with a Social and Behavioral specialization will perform technical research and statistical work. This position will perform research and statistical studies involving individual and social aspects of human behavior. The study conclusions will be utilized for test construction, program planning, and implementation in mental health care, vocational rehabilitation, delinquency, and criminal behavior. This position will work on multidisciplinary teams and have primary responsibility for a major project or activity; gather, compile, edit, and interpret quantitative data for the MHP; develop, implement, and monitor systems and procedures to assemble and structure the necessary data; perform a variety of tasks including the more independent, responsible, varied and complex technical research and statistical work; provide consultative advice to various governmental entities and agencies, design and implement research projects; investigates areas where precedents are lacking or where only a sparse body of knowledge or experience in the area exists (see Attachment 22 for detailed task list).

### 1.0 Associate Health Program Adviser (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the Chief Psychologist on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 1.0 Secretary

The Secretary position will provide administrative secretarial support to the Chief Psychologist, CP&PD Unit. This position, which will handle sensitive, complex and confidential materials, will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

### 5.0 Office Technician – Typing (OT)

Clerical support to the Chief Psychologist and Senior Psychologist (Specialist), PSW, and Sr. LPT including typing (extensive policy drafts), filing, memoranda and letter generation, faxing, phone support, requests to the field, organization of information returned from the field, data entry, supplies and equipment ordering for the Unit, scheduling and timekeeping for the branch, meeting scheduling, agendas, minutes, location etc for the Unit (see Attachment 22 for detailed task list).

## PSYCHOLOGICAL TESTING & FORENSIC EVALUATIONS (PT&FE) UNIT

The PT&FE Unit consists of two Sections: Psychological Testing Section and the Forensic Evaluations Section.

The Psychological Testing Section administers numerous psychological tests for diagnostic clarification when clinically indicated. This occurs in the institution and will replace the current strategy of sending inmates to DMH inpatient beds for the same type of testing. This will, in turn, reserve those beds for purely clinical treatment and, thereby, reduce waiting lists for these limited and expensive resources (see Attachment 19 for workload data).

34

The Forensic Evaluation Section conducts legally mandated forensic evaluations and generates reports for submission to the courts or Board of Prison Terms (BPT). Staff for this section will be addressed under the Rutherford FL.

DCHCS is requesting the following positions for the Psychological Testing Section to provide clinical evaluations/testing, administrative, programmatic, analytical, and clerical support for the Unit:

### 9.0 Clinical Psychologists (CP)

An augmentation of 9.0 CPs is requested for specialized administration of psychological test batteries for diagnostic clarification (see Attachment 22 for detailed task list).

### 1.0 Associate Health Program Adviser (AHPA)

The AHPA will plan, implement, monitor and evaluate mental health program reports; review and analyze reports from the field, as well as regulations and legislation and other documents; and advise the Chief Psychologist on potential mental health program impact; formulate polices, procedures and alternatives (see Attachment 22 for detailed task list).

### 2.0 Staff Services Analyst/Associate Government Program Analyst (SSA/AGPA)

The SSA/AGPA will provide analytic support to evaluate confidential information, reports, status and conclusions, and ensure that timelines are met by projecting report requirements; draft management reports from tracked data and other documents; perform supporting research; and manage reporting requirements (see Attachment 22 for detailed task list).

### 1.0 Secretary

The Secretary position will provide administrative secretarial support to the Chief Psychologist, PT&FE Unit. This position, which will handle sensitive, complex and confidential materials, will be communicating and interacting with all levels of personnel within and/or outside of CDCR (see Attachment 22 for detailed task list).

## ADDITIONAL RESOURCES NEEDED FOR THE MENTAL HEALTH PROGRAM (MHP)

### Extraordinary Travel for QMAT and Psychological Testing Staff

This FL is requesting ongoing funding totaling **$1,561,950 for extraordinary travel** - $1,249,560 for QMAT and $312,390 for Psychological Testing staff (see Attachment 14A). These staff are expected to travel to their assigned institutions for three weeks per month to provide assistance in developing and implementing the MHP.

### Travel Differential

This FL is requesting a $500 travel differential for QMAT and Psychological Testing staff to compensate for required travel up to 75 percent of each month. QMAT consists of six teams with six staff in each (i.e., Senior Psychologist (Specialist), Senior Psychiatrist

35

(Specialist), NCPR, Sr. LPT, FC, and RA). The Psychological Testing staff consists of nine CPs. Therefore DCHCS is requesting **ongoing funding of $270,000** for travel differential (see Attachment 14A).

## Quarterly Psychological Testing Meetings

This FL is requesting **ongoing travel funding totaling $56,960** for quarterly meetings with Psychological Testing staff (see Attachment 14A). The quarterly meetings are needed to periodically review and/or update strategies for DMH referrals.

## Quarterly Leadership Meetings

This FL is requesting **ongoing travel funding totaling $202,920** for quarterly meetings with Leadership staff (i.e., chiefs and senior staff) at Headquarters and the field (see Attachment 14A). The quarterly meetings are needed to inform the mental health management in the field of various changes to policies and procedures. This ensures statewide standardization of the MHP.

## Miscellaneous Equipment

This FL is requesting **one-time funding totaling $73,449 and ongoing funding totaling $34,065** for miscellaneous equipment. Attachment 14B is an itemized list and cost of miscellaneous equipment needed for the MHP to accomplish its mission at Headquarters. Cell phones and pagers are need for QMAT and Psychological Testing staff. Each QMAT team requires two laptops and DCHCS is requesting that RMHDs be allowed to lease a vehicle through the Department of General Services – Fleet Administration. Also the DCHCS is requesting one copier and one fax machine for each of the three branches within the MHP, as well as locking Open Shelf file cabinets for the three CEAs and three RMHDs.

## WORKLOAD STUDY

The resources requested herein represent the minimum staffing DCHCS believes necessary to adequately implement and manage the 2006 MHSDS Revised Program Guide so as to provide access, quality, timeliness, and continuity of care that meets minimal constitutional and community standards of care and compliance with court mandates. Because the Department currently does not possess data sufficient to determine workload requirements with an adequate degree of confidence, DCHCS request **one-time funding of $400,000** to conduct a workload study to corroborate and ensure appropriate ongoing staffing levels for Headquarters and the field.

00100

# Section III:

# DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

~~~~~~~~~~~~~~~~~~~~~~

# PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES

37

00101

**SECTION III.   DIVISION OF CORRECTIONAL HEALTH CARE SERVICES, PSYCHIATRY VACANCY RATE REDUCTION STRATEGIES**

CDCR is experiencing a significant problem recruiting and retaining qualified mental health personnel within the system, and cannot keep pace with the increased health care demand. This shortage of mental health staff directly impacts CDCR's ability to provide quality health care services to inmates. This issue is further compounded by the *Coleman* decision, which mandates CDCR to provide an adequate level of mental health service to inmates. The implementation of the court order, which is being overseen by a Special Court Master, requires the institutions fill the mental health related positions irrespective of salary costs. Failure to comply results in millions of dollars of added legal costs in addition to the health care costs that must be paid regardless.

CDCR's inability to attract and retain qualified mental health staff primarily stems from two reasons: (1) unattractive working conditions; and (2) an inability to compete with salaries and benefits paid by private sector and other governmental employers.

Many health care professionals will not work in a prison because:

- Prisons are inherently more dangerous to work in than most other settings. Virtually all the patients are convicted criminals, many of whom are violent and dangerous.

- Health care is the primary mission of health care facilities, while custody and security is of primary importance in an institutional setting. As viewed by clinicians, this relegates the provision of health care to a secondary role in the institution, a status most clinicians find very difficult to accept. The resulting conflict affects not only the kinds of services provided, but also the Department's ability to attract health care professionals into our employment.

- Our institutions are significantly overcrowded, resulting in a much higher workload level than health care professionals experience elsewhere.

- By their very nature, institutions are high-stress environments. The living arrangements of inmates and work necessities of staff, combined with the difficult nature of inmates and the overcrowding make correctional facilities one of the most stressful work environments in our society.

- Correctional institutions have a poor clinical image. To the clinician, they are seen as undesirable treatment environments.

- Institutions are highly litigious environments. Inmates, their lives already heavily immersed in the legal system, will frequently initiate lawsuits. With many clinicians' concerns about malpractice at historic highs, treating patients in this atmosphere is an unattractive prospect.

- Prisons lack professional affiliations for clinicians. They do not maintain contacts or associations with universities, medical research centers or professional societies, since the role of prisons does not normally touch on such organizations.

38

This creates a framework of professional aridity within which prisons clinicians must function.

- The remote locations of many prisons deter clinicians because of professional and cultural isolation. Many locations present not only uncomfortable climates but considerable physical remoteness from the resources and amenities of the State's urban centers. These rural areas also lack the professional association and collegiality so common within clinical and professional communities in urban-suburban locations. Such professional community contacts are very significant to clinicians and professionals, and the lack of such contacts strongly discourages them from moving to any remote location, whether to work in a prison or somewhere else.

Although the State's current benefit package outweighs most offered by the private sector, the compensation currently offered by CDCR is simply not competitive with other employers. This, combined with the unique working environment in a correctional facility, provides no incentive for a health care professional to seek employment in an institution.

### RECRUITMENT & RETENTION (R&R) EFFORTS

The Office of Workforce Planning and Recruitment (OWPR) have conducted extensive recruitment efforts to attract potential applicants to the Department. Efforts included reviewing other methods of successful recruitment from PBSP and the DMH; researching the possibility of utilizing the Federal Loan Repayment Program; researching the possibility of using H1 and J1 Visa candidates; improving advertisements; providing one-on-one direction to institution personnel offices; creating a Psychiatrist/Psychologist Strike Team; advertising in professional manuals, websites, etc; sponsoring recruitment workshops; and working with the State Personnel Board (SPB) to establish on-line/expedited exam processes.

Despite CDCR's efforts, the vacancy rates for the Psychiatry Series (as of January 12, 2006) remain high as shown in Attachments 31.

The existing base salary R&R differentials for the mental health classifications, as shown on Attachment 32, are inadequate. Compensation packages paid in the private sector are generally not disclosed since they are negotiable items. However, a comparison of salaries between the State and various counties has been determined as shown on Attachments 33 and 34. Attachment 35 shows a significant salary lag between the state and private sector based on salary information obtained from the Economic Research Institute (ERI).

### HIRE-ABOVE-MINIMUM – PSYCHIATRY SERIES

CDCR requests ongoing funding of $1,214,099, effective March 1, 2006, and $3,642,297 for FY 2006/07 for Hiring-Above-Minimum Authorization (HAM) to the maximum step of each salary range be applied to the Chief Psychiatrist, Senior Psychiatrist (Specialist), Senior Psychiatrist (Supervisor), and SP positions at all CDCR locations (see Attachment 36).

### HIRE-ABOVE-MINIMUM – ALL OTHER MENTAL HEALTH CLASSIFICATIONS

39

00103

One of the first steps in attempting to correct deficient salaries for mental health classifications is requesting a HAM for all current and incoming employees. Therefore, CDCR requests that a Hiring-Above-Minimum Authorization (HAM) to the maximum step of each salary range (see Attachment 36A) be applied to the following classifications:

| Classification Code | Classification Title |
|---|---|
| 9859 | Chief Psychologist, CF |
| 9282 | Psychiatric Social Worker, CF |
| 8253 | Psychiatric Technician (Safety) |
| 9283 | Psychologist – Clinical, CF |
| 9285 | Psychometrist, CF |
| 9286 | Recreation Therapist, CF |
| 8252 | Senior Psychiatric Tech (Safety) |
| 9287 | Senior Psychologist, CF (Specialist) |
| 9288 | Senior Psychologist, CF (Supervisor) |
| 9290 | Staff Psychologist – Clinical, CF |
| 9291 | Supervising Psychiatric Social Worker I, CF |

Authorizing HAMs for current and potential mental health employees in the above classifications is one of the first critical steps in our long-range efforts to recruit and retain qualified mental health employees. This crucial step will help to retain the professionals we currently have on staff, as well as entice future potential employees with a competitive starting salary. Therefore, CDCR is requesting **ongoing funding of $3.1 million**, **effective March 1, 2006, and $9.4 million for FY 2006/07** for Hiring-Above-Minimum Authorization (HAM) for all mental health classifications with the exception of the psychiatry series. **If the request above for statewide HAMs is denied, Kern Valley State Prison (KVSP) and NKSP will need to be considered separately per the Court Order.** CDCR will submit a proposal for additional pay differentials under separate cover.

## RECRUITMENT AND RETENTION (R&R) DIFFERENTIAL – PSYCHIATRY SERIES

CDCR also requests that additional R&R pay differentials for the Psychiatrist classifications at all CDCR locations be approved for the amounts shown on the table below.

| Position | Proposed Pay Differential Amount |
|---|---|
| Chief Psychiatrist | $4,000 per month |
| Senior Psychiatrist (Specialist) | $3,500 per month |
| Senior Psychiatrist (Supervisor) | $3,500 per month |
| Staff Psychiatrist | $3,000 per month |

40



To determine the amount of the proposed R&Rs, the existing salary and R&R for the Chief Psychiatrist was compared to the salaries obtained from the ERI and public and private sector (Attachment 37). Increasing the R&R for the Chief Psychiatrist by $4,000 places the total salary mid-level between the ERI salary information and just under the salaries for the private sector. No salary data was available the Senior Psychiatrists classifications, therefore, the proposed amount of $3,500 was calculated by decreasing the proposed amount for the Chief Psychiatrist by approximately 10 percent. The proposed amount for SP was decreased incrementally as well to $3,000.

By increasing the R&Rs for these positions, CDCR will be more successful in drawing qualified individuals. Additional R&Rs will encourage retention of current incumbents and serve to attract new employees. **CDCR is requesting current year R&R funding of $3.9 million and budget year R&R funding of $11.4 million to become effective March 1, 2006.** Also, CDCR requests consideration is given to increasing pay differentials for other State agencies, which may be impacted by this proposal.

## RECRUITMENT AND RETENTION (R&R) DIFFERENTIAL – DCHCS MENTAL HEALTH CLASSIFICATIONS

The DPA proposes the additional pay differential reflect a 5% increase above the average pay differentials currently in existence for the classifications listed below.

| CLASSIFICATION | Proposed Monthly R&R |
|---|---|
| Chief Psychiatrist, CF | $7,140.00 |
| Senior Psychiatrist (Supervisor) | $6,510.00 |
| Staff Psychiatrist, CF | $6,300.00 |
| Psychologist-Clinical, CF | $1,795.00 |
| Senior Psychologist, CF (Spec) | $824.00 |
| Senior Psychologist (Supervisor) | $1,840.00 |
| Staff Psychologist – Clinical, CF | $595.00 |
| Chief Psychologist, CF | $2,375.00 |

By increasing the R&Rs for these positions, CDCR will be more successful in drawing qualified individuals to headquarters. Additional R&Rs will encourage retention of current incumbents and serve to attract new employees. **CDCR is requesting current year R&R funding of $163,328 and budget year R&R funding of $489,984 to become effective March 1, 2006 for all DCHCS mental health classifications (see Attachment 37A).**

## RECRUITMENT AND RETENTION (R&R) DIFFERENTIAL – KERN VALLEY STATE PRISON (KVSP) AND NORTH KERN STATE PRISON (NKSP)

CDCR also requests that additional R&R pay differentials for classifications at NKSP and KVSP be approved for the amounts shown on the table below. CDCR also requests R&Rs be approved for NKSP based on the close proximity to KVSP. To determine the amount of the proposed R&Rs, the existing salary and R&R for the requested



41

classifications was compared to the Economic Research Institute (ERI) data obtained from the March 2005 CPS Human Resources Services Survey Report on the SP, CP, PSW, LPT and RT Classifications.

CDCR compared the current maximum base salary plus R&Rs to ERI's 90th percentile data. For the classifications in which there was a salary lag, CDCR proposed a 5 percent increase based on the ERI 90th percentile salary. For the classes in which there was not a salary lag, CDCR proposed a 5 percent increase based on the total of the current maximum base salary and R&R in order to meet the requirements of the court order. If ERI information was not available for a classification, a 5 percent increased increase based on the total of the current maximum base salary and R&R was proposed in order to meet the requirements of the court order.

| Classification | Proposed Pay Differential Amount |
|---|---|
| Chief Psychologist, CF | $420.00 |
| Psychiatric Social Worker, CF | $248.00 (licensed) $239.00 (unlicensed) |
| Psychiatric Technician, Safety | $210.00 |
| Psychologist-Clinical, CF | $384.00 |
| Recreation Therapist, CF | $216.00 |
| Psychometrist, CF | $189.00 |
| Senior Psychologist, CF | $375.00 |

By increasing the R&Rs for these positions, CDCR will be more successful in drawing qualified individuals to NKSP and KVSP. Additional R&Rs will encourage retention of current incumbents and serve to attract new employees. **CDCR is requesting current year R&R funding of $26,004 and budget year R&R funding of $78,012 to become effective March 1, 2006 for all DCHCS mental health classifications (see Attachment 37B).**

## RECRUITMENT AND RETENTION (R&R) DIFFERENTIAL – OTHER MENTAL HEALTH CLASSIFICATIONS – CENTRAL VALLEY

Despite CDCR's efforts, the vacancy rates of mental health classifications remain high at many Central Valley Institutions. For example, the PSW (licensed) (class code 9282) classification has a high vacancy rate at several institutions:



42

00106

| | Total Vac. of Posit ons | Total Vacan cies | Vacancy Rate as of 3/7/05 |
|---|---|---|---|
| Avenal State Prison | 2 | 2 | 0% |
| California State Prison, Corcoran | 15 | 7 | 53% |
| Pleasant Valley State Prison | 1 | 1 | 0% |
| Substance Abuse Treatment Facility | 7 | 3 | 57% |
| Wasco State Prison | 4 | 3 | 25% |
| Totals | 29 | 16 | 45% |

To calculate current vacancy rates, a Management Information Retrieval System report was obtained to show filled and vacant positions for the specified classes on a statewide basis.

Attachment 37C details mental health positions, vacancies, salaries, including current and proposed R&R differentials at ASP, COR, Pleasant Valley State Prison (PVSP), California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), and Wasco State Prison (WSP) for the following classifications:

Chief Psychologist (class code 9859)
Psychiatric Social Worker (class code 9282)
Psychiatric Technician, Safety (class code 8253)
Psychologist-Clinical (class code 9283)
Recreation Therapist (class code 9286)
Senior Psychologist (Supervisor) (class code 9288)
Supervising Psychiatric Social Worker I (class code 9291)

Attachment 37C does not include the following classifications as there are either no positions or recruitment difficulties in the Central Valley for these classifications:

Psychiatric Social Worker (Unlicensed)
Psychometrist (class code 9285)
Senior Psychiatric Technician (Safety) (class code 8252)
Senior Psychologist (Specialist) (class code 9287)
Staff Psychologist-Clinical (class code 9290)

Since the *Coleman* recommendations mention KVSP by name, R&R efforts must be duplicated for nearby institutions in order to minimize the impact to Central Valley mental health programs. CDCR requests R&Rs be approved for ASP, COR, PVSP, SATF, and WSP based on the existing proposal for R&R increases at KVSP and NKSP and their close proximity to other Central Valley institutions. To determine the amount of the proposed R&Rs, the existing salary and R&R for the requested classifications was compared to the ERI data obtained from the March 2005 CPS Human Resources Services Survey Report on the SP, CP, PSW, LPT and RT classifications.

43



CDCR compared the current maximum base salary plus R&Rs to ERI's 90$^{th}$ percentile data. For the classifications in which there was a salary lag, CDCR proposed a 5 percent increase based on the ERI 90$^{th}$ percentile salary. If ERI information was not available for a classification, a 5 percent increased increase based on the total of the current maximum base salary and R&R was proposed in order to meet the requirements of the court order.

| Classification | Proposed Pay Differential Amount |
|---|---|
| Chief Psychologist, CF | $420.00 |
| Psychiatric Social Worker, CF | $248.00 (licensed) $239.00 (unlicensed) |
| Psychiatric Technician, Safety | $210.00 |
| Psychologist-Clinical, CF | $384.00 |
| Recreation Therapist, CF | $216.00 |
| Senior Psychologist, CF | $375.00 |
| Supervising Psychiatric Social Worker I, CF | $275.00 |

By increasing the R&R' for these positions, CDCR will be more successful in drawing qualified individuals to work in its mental health programs. Additional R&Rs will encourage retention of current incumbents and serve to attract new employees. . **CDCR is requesting current year R&R funding of $263,344 and budget year R&R funding of $790,032 to become effective March 1, 2006** for all other mental health classifications in the Central Valley (see Attachment 37C).

### EMERGENCY CONTRACTS

The CDCR has historically bid registry contracts for temporary help psychiatric services. By Public Contracting Code regulations, contracts are awarded to "low bidders". Despite the fact that the CDCR has awarded contracts to multiple bidders in an attempt to provide the largest possible pool of providers, the existing registry contracts have not been able to supply sufficient numbers of qualified staff to alleviate CDCR's need to provide services due to vacant positions. In order to enable the CDCR the ability to procure qualified contract personnel, it is critical that the Department enter into emergency contracts with higher rates of reimbursement, until such time as the vacancy problem can be ameliorated through the hiring of civil servant staff. Pending improvement, the CDCR must use contracts in order to meet the Court's requirement that mental health vacancies cannot exceed 10 percent of the total staffing. Since the CDCR already has existing registry contracts, **this is to request $3 million, (as a placeholder until further analysis is completed)**, to augment current contract funding for mental health classifications.

### HUMAN RESOURCES (HR)

00108

In order to comply with mandates, the CDCR' HR has designed a plan to provide a strategy for examination, recruitment and hiring of mental health classifications named in the *Coleman* Court Matter. The goal is to obtain qualified candidates to fill current and future vacancies for all *Coleman* mental health classifications at all institutions and Health Care Headquarters. These goals cannot be accomplished without additional resources as included herein.

The HR's OWP&S is requesting General Fund monies for the development and annual maintenance costs to administer 15 online exams hosted on the SPB's website, and seven permanent, full-time positions. The following will describe position and onsite exam and host technology needs.

## ONLINE EXAMS (INTERAGENCY AGREEMENT FOR DEVELOPMENT AND ONGOING MAINTENANCE SERVICES)

On December 1, 2005, the CDCR's RN online exam was posted on the SPB website. The online exam process is a key element to move the Department forward with adopting technology-based exam processes, which will further streamline hiring processes and allow the Department to comply with the Court Order. Candidates have immediate access to testing materials and results are provided to the candidate and the Department within one hour of exam completion. As of February 1, 2006, the SP classification is being converted to an SPB on-line exam. Other classifications such as the Chief Psychiatrist, Senior Psychiatrist (Supervisor/Specialist), and other Mental Health classifications will be considered to be converted to an on-line exam process based upon the criticality of the hiring needs.

As of February 1, 2006, the following is the current outcome of the RN online exam process:

600+ RNs on the CMF eligible list
100 candidates given tentative job offers

The SPB development fee per exam is $40,000 and $18,000 for annual, ongoing maintenance. The requested amount of $1,680,000 will cover the development fees ($600,000) and ten years of annual maintenance ($1,080,000) effective July 1, 2006.

The following are positions needed to accomplish these efforts:

## OFFICE OF WORKFORCE PLANNING AND SELECTION (OWP&S)

### 1.0 Staff Services Manager II (SSM II)

The OWP&S cannot absorb any more staff without additional management support. Currently, approximately ten staff report to one manager and the workload suffers because of it. Therefore, with the additional staff required due to the *Coleman* workload, two additional units are being developed, some by redirecting existing staff also. In order to adequately support the workload of new high performance units, a new Section Chief (SSM II) position must be allocated.

45

## 2.0 Staff Services Manager I (SSM I)

As indicated above, the OWP&S cannot absorb any more staff without additional management support. Currently, approximately ten staff report to one manager and the workload suffers because of it. Workload resulting from the *Coleman* court orders demands constant attention and monitoring. The workload cannot be absorbed by existing staff. Therefore, with the new staffing requested, additional management support is required.

## 3.0 Associate Governmental Program Analyst (AGPA)

Performs detailed analyses of classifications, identifying critical classifications and locations; prepares succession management plans, oversees implementation; and conducts statewide advertising, recruitment and hiring processes for *Coleman* designated classifications for assigned institutions. These positions will be primary liaison with the assigned institutions to conduct recruitment workshops, monitor, and work proactively to fill critical classification vacancies. Further, as newly eligible candidates are identified, this position will work with the assigned institutions on list certification and hiring processes and develop and maintain tracking systems to comply with court ordered reporting requirements concerning hiring activities and out of class assignments; analyze hiring activities and efforts; and develop corrective action plan(s).

## 2.0 Associate Personnel Analyst (APA)

Plans and develops complex examinations with program consultants ensuring job-relatedness, equal employment opportunity, management satisfaction, and cost effectiveness. Conduct and lead validation studies for custody and non-custody classifications in addition to the identified fast-track medical classifications to be in compliance with *Coleman* court order. Develops supplemental application examinations to streamline and expedite the examination process. Provides consultation and technical assistance to departmental management and staff on selection issues.

## 2.0 Personnel Selection Technician (PST)

Performs increasingly difficult examination processing functions relating to the SPB's examination system, including on-line entry of applications, reviews applications for minimum qualifications to determine if acceptance or rejection; processes supplemental applications to ensure timely placement on eligible lists; schedules written examinations and/or Qualification Appraisal Panels; meets internal and external examination component timeframes and other critical deadlines.

## 1.0 Office Assistant (OA)

Perform clerical support activities related to recruitment including preparing workshop packets, preparing and mailing recruitment packets and applications to potential candidates.

Current Workload

46

Staff is responsible for conducting research and performing detailed data analysis on Department authorized positions, identifying vacancies, determining upcoming needs, documenting succession plans for positions, continually monitoring staffing needs of the Department, along with performing recruitment activities, including oversight of contracts. In addition, analytical staff is responsible for overseeing institutions recruitment and hiring to ensure critical mental healthcare and education vacant positions are filled. Specific tasks include coordinating and participating in recruitment activities, assisting/guiding potential candidates through the examination and hiring process; providing information to applicants, making sure they are given the proper information as we guide them through the civil service process; and analyzing and overseeing advertisements for candidates.

Without appropriate staffing, only a portion of mental health care recruitment efforts can be addressed. There will be no resources available to conduct workforce planning, ˙succession planning, and recruitment for other classes with significant vacancies. As an example, the vacancy rate for many mental health care classes range from 50 percent to 65 percent (vacancy data as of CDCR's January 2006 *Coleman* response). Medical, Teachers and other professional classes within CDCR have a similar vacancy rate, which also requires recruitment efforts. There are currently insufficient resources to address all of these needs.

Staff also administer CDCR's open/promotional examinations for approximately 500 classifications (for classes other than entry level peace officers); provide job analysis/test validation for examinations; provide delegated testing oversight to the 43 youth and adult facilities throughout the state; and work in conjunction with the programs to develop a comprehensive exam plan that meets both the juvenile and adult needs to ensure critical hiring lists (i.e., education, medical, custody, plant operations, etc.) are established in a timely manner in accordance with the SPB laws and rules to provide promotional opportunities for the departments 50,000+ employees.

Without staff augmentation, the selection activities will be restricted to court mandated workload only, neglecting other major program areas within CDCR. Other than medical classifications, the current annual exam plan includes 112 exams for a variety of classifications used throughout CDCR. With the expedited medical exam process requiring daily scoring and manual notifications which are time intensive, the annual exam plan will be required to be significantly reduced. Thus, the career opportunities for CDCR employees will be inhibited which will have a direct result on departmental vacancy rates.

Requesting positions become effective July 1, 2006.

## OFFICE OF PERSONNEL SERVICES (OPS)

The OPS is requesting 4.0 full-time, permanent positions.

### 1.0 Personnel Selection Technician (PST)

Perform activities related to the expedited hiring process for *Coleman* designated classifications. At the request of the AGPA, orders certification list(s) for medical classifications related to *Coleman*; verifies and inputs codes documented on the certification list; and upon request by a candidate, processes location changes requests,

47

completes and performs requests for transfer of list eligibility, and reactivates candidates after being placed inactive for all adult and juvenile facilities.

## 1.0  Associate Personnel Analyst (APA)

Independently review and approve a variety of classification and compensation actions for all *Coleman*-related medical classifications.  Perform position allocation analysis for medical classes in a manner consistent with the State's classification and pay plan. Review and approve medical classification hiring packages, training and development assignments, hiring-above-minimum requests, and out-of-class requests.  The position will develop and/or prepare new or revised classification specifications and allocation guidelines for medical classifications.  At the request of management, independently conducts special · projects, including salary studies and addresses increased compensation needs for medical classifications.

## 1.0  Senior Personnel Specialist

Responsible for most difficult and complex personnel/payroll and employee benefit issues. As a "staff specialist", researches critical personnel problems and recommends alternative solutions; develops and maintains specialized training programs; reviews various control agency letters, memos, and bargaining contract provisions, develops/revises internal procedures as necessary; prepares management reports, spreadsheets, and charts; drafts correspondence; functions as a team member on personnel-related projects; are coordinators for a variety of personnel/payroll programs; and may act in a lead role (i.e., training, workload, etc.) over lower level staff. Research and respond to various requests for information from both employers and employees.

## 1.0  Senior Personnel Specialist

Performs clerical support for Personnel staff assigned to the *Coleman* workload.  Types complex salary charts and position justifications; determines format and revises a wide variety of reports, compiles original correspondence, prepares monthly and quarterly reports, assist with compilation of tracking hires, and separations using a established database; enters information and responses on court ordered requests. Initiates and distributes various reports to management. Various filing, photocopying, and typing, including designing and updating forms for internal personnel use; assisting with the compilation of training material in preparation for training classes; and taking meeting notes; maintain reference manuals and materials; proofread ·and review all correspondence.  Ensure all outgoing correspondence packages are accurate, complete, and photocopied.

## Current Workload

The workload currently being performed by the existing staff are tied to implementation of the reorganization in redirecting positions; filling existing vacancies; determining appropriate classifications and levels of managers and supervisors; assisting programs in the development of duty statements and position justifications; and determining eligibility of candidates in the hiring process.  Other duties consist of out-of-class review and approvals, hire above minimum approvals and other personnel related function.

48

This office does not have the appropriate staff to perform the additional workload required with the Court Order. Implementing a major reorganization which will require a review of classifications used by both the juvenile and adult programs will use all existing resources. The mental health care needs require additional resources to address classification and ongoing hiring needs.

Requesting positions become effective July 1, 2006

## ADULT INSTITUTIONS (STATEWIDE)

For adult institutions, it is anticipated that permanent full-time positions will be needed as follows.

### 33.0    Office Technician –Typing (OT)

Staff will perform clerical support activities related to the expedited hiring of *Coleman* designated classifications; ensure advertisements for medical classifications are submitted on a timely basis (both internally and externally); secure site(s) to conduct interviews; generate interview schedules; code the certification list(s) based on the results of verbal contacts made by the AGPA; generate the written request for approval· to appoint the selected candidate; generate the hiring package upon receipt of approval to appoint; generate written notifications of waivers applied to those verbally contacted who decline an interview or express to that AGPA they are not interested; and maintain filing systems for historical and audit purposes for those classifications associated with *Coleman*.

Without these positions to support these activities, the existing personnel staff within each institution cannot address the court mandated hiring process for mental health care classes.    They will no longer have the time or resources to devote to perform the delegated testing functions; therefore their local programs will not be able to fill critical vacancies that are non-medical classes.

Requesting positions become effective July 1, 2006

## ANNUAL ONGOING OPERATING EXPENSE AND EQUIPMENT (OE&E)

Live Scan Equipment:

·The request for this equipment is included in the FY 2006/07 Plata Order FL. If the Plata Order FL letter is not approved, then the live·scan portion of that BCP needs to be request through this BCP.

## F. ANALYSIS OF ALL FEASIBLE ALTERNATIVES

**Alternative A:**    Implement the 2006 MHSDS Revised Program Guide and the DCHCS, MHP - Headquarters as specified above, beginning July 1, 2006.    Implement the Psychiatry Vacancy Rate Reduction Strategies as specified above, beginning March 1, 2006.

49

00113

**I.    2006 Mental Health Services Delivery System (MHSDS) – Revised Program Guide Resources**

   a.    Establish 509.56 permanent field positions.

   b.    Permanently upgrade 10.0 LPT to 10.0 Sr. LPT.

   c.    One time funding totaling $741,111 for equipment (computers, copiers, shredders, fax machines, dictation equipment, golf carts and televisions).

   d.    Ongoing funding totaling $50,000 for printing and distribution of new forms.

   e.    One time funding totaling $56,000 for group therapy materials and equipment.

   f.    One time funding totaling $317,493 for inmate treatment cells.

   g.    Ongoing funding totaling $778,800, for contract funding and supplies for use of the MCMI-III psychological testing and diagnostic clarification system.

**II.    Division of Correctional Health Care Services (DCHCS), Mental Health Program (MHP) – Headquarters**

   a.    Establish 100.0 permanent Headquarters' positions.

   b.    Ongoing funding totaling $2.1 million for Extraordinary Travel.

   c.    One-time funding totaling $73,449 and ongoing funding totaling $34,065 for miscellaneous equipment.

   d.    One-time funding totaling $400,000 for a contractor to conduct a workload survey.

**III. Psychiatry Vacancy Rate Reduction Strategies**

**FY 2005/06:**

   a.    Ongoing funding totaling $1,214,099 for Hiring-Above-Minimum for Psychiatry Series.

   b.    Ongoing funding totaling $3.1 million for Hiring-Above-Minimum for all other mental health classifications.

   c.    Ongoing funding totaling $3.9 for Pay Differential for Psychiatry Series.

   d.    Ongoing funding totaling $163,290 for Pay Differential for DCHCS Headquarters' mental health classifications.

   e.    Ongoing funding totaling $26,004 for Pay Differential for KVSP and NKSP mental health clinicians.

   f.    Ongoing funding totaling $263,344 for Pay Differential for all other mental health classifications in the Central Valley.

**FY 2006/07:**

   a.    Ongoing funding totaling $3,642,298 for Hiring-Above-Minimum for Psychiatry Series.

   b.    Ongoing funding totaling $9.4 million for Hiring-Above-Minimum for all other mental health classifications.

   c.    Ongoing funding totaling $11.4 for Pay Differential for Psychiatry Series.

   d.    Ongoing funding totaling $489,984 for Pay Differential for DCHCS Headquarters' mental health classifications.

e. Ongoing funding totaling $78,012 for Pay Differential for KVSP and NKSP mental health clinicians.

f. Ongoing funding totaling $790,032 for Pay Differential for all other mental health classifications in the Central Valley.

g. Placeholder request of $3.0 million for emergency contracts.

h. One-time funding totaling $600,000 and ongoing funding totaling 1.1 million for annual maintenance for 15 Online Exams.

i. Establish 15.0 permanent Headquarters positions.

j. Establish 33.0 permanent Field positions.

k. One-time funding totaling $121,219 for 25 modular workstations for OPS

**Pros:** This alternative would provide compliance with policies and procedures contained in the 2006 MHSDS Revised Program Guide, which were negotiated with all parties in the *Coleman v. Schwarzenegger* court case. This is the most likely alternative to evidentially lead to final exit of the *Coleman* case and reduction of legal costs associated with this case within the next two years. This alternative is consistent with the mission of CDCR "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services.

**Cons:** This alternative requires significant resource allocation to fund positions and equipment to implement the 2006 MHSDS Revised Program Guide. This alternative does not take into account GP CCCMS and GP EOP.

**Alternative B:** Implement requirements of the revised MHSDS Program Guide without requested resources

**Pros:** Requires no funding

**Cons:** Failure to implement the 2006 MHSDS Revised Program Guide with requested resources will lead to increased litigation costs and is likely to lead to a Court Order which may be more costly than the current proposal. Failure to provide constitutionally adequate mental health treatment may harm inmates and is a violation of inmate's rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment. This alternative is not consistent with the CDCR mission.

## G. TIMETABLE

Resource augmentations for FY 2005-06 are requested for implementation effective March 1, 2006. Resource augmentations for FY 2006-07 are requested for implementation effective July 1, 2006

## H. RECOMMENDATION

The CDCR mission "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services is consistent with

51

the revisions in the MHSDS Program Guide. Based on the current recommendations from Legal Affairs Division, the best strategy to exit the *Coleman v. Schwarzenegger* court case is to fully implement the 2006 MHSDS Revised Program Guide. It is therefore recommended that Alternative A be implemented.

52

**Feasible Alternative "A"**
**California Department of Corrections and Rehabilitation**
**Division of Correctional Health Care Services**
Mental Health Services Delivery System - 2006 Revised Program Guide Resources
FY 2006/07

Attachment 2

| | FY 06/07 | |
|---|---|---|
| **Staffing Request Summary** | **Positions** | **Dollars** |
| **1) AdSeg CCCMS and EOP** | | |
| Clinical Psychologist | 37.00 | $2,943,313 |
| Staff Psychiatrist | 18.50 | $2,695,154 |
| Senior Psychologist (Supervisor) | 32.00 | $2,942,592 |
| Correctional Officers (Escorts) | 30.50 | $2,468,121 |
| Licensed Psychiatric Technician | 99.18 | $5,507,465 |
| Office Technician - Typing | 38.00 | $1,857,668 |
| Clinical Psychologist - EOP | 44.80 | $3,563,795 |
| 299.98 | | $21,978,109 |
| **2) Reception Center** | | |
| Clinical Psychologist | 51.00 | $4,056,999 |
| Correctional Counselor I | 20.60 | $1,871,716 |
| 71.60 | | $5,928,715 |
| **3) Mental Health OHU** | | |
| Clinical Psychologist (OHU 7 day per week coverage) | 17.98 | $1,430,291 |
| Staff Psychiatrist | 8.00 | $1,165,472 |
| Licensed Psychiatric Technician | 38.71 | $2,149,566 |
| Office Technician - Typing | 8.29 | $405,265 |
| 72.98 | | $5,150,594 |
| **4) Institution Level Supervision** | | |
| Licensed Psychiatric Technician | -10.00 | ($555,300) |
| Senior Psychiatric Technician | 10.00 | $592,470 |
| Unit Supervisors | 9.00 | $502,956 |
| 9.00 | | $540,126 |
| **5) Performance Evaluation and Court Compliance** | | |
| Health Program Specialist I | 28.00 | $2,217,376 |
| Office Technician - Typing | 28.00 | $1,368,808 |
| 56.00 | | $3,586,184 |
| **6) DCHCS - Capital Outlay** | | |
| Included in Litigation Support Finance Letter | | $0 |
| 0.00 | | $0 |
| **7) RC Screening and Diagnostic Clarification** | | |
| Contract (ongoing) | | $748,800 |
| Supplies (ongoing) | | $30,000 |
| | | $778,800 |
| **8) Additional Equipment Resources** | | |
| Treatment Cells (one-time) | | $317,493 |
| Copier (one-time) | | $261,000 |
| Laptop (one-time) | | $222,600 |
| Shredder (one-time) | | $82,500 |
| Fax Machine (one-time) | | $7,250 |
| Dictation Equipment (one-time) | | $6,290 |
| Golf Cart (one-time) | | $147,000 |
| Television (one-time) | | $14,471 |
| Group Therapy Materials (one-time) | | $56,000 |
| Printing (Forms) (ongoing) | | $50,000 |
| | | $1,164,604 |
| **Total Request** | 509.56 | $39,127,132 |
| 509.56 | | $39,127,132 |

Grand Total (All Three Phases):    657.6    $83,085,903

(Dollars do not include one-time equipment standard funding or current R&R funding for positions listed above.)

Feasible Alternative "A"
California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Services Delivery System Program Guide Impact BCP
FY 2006/07

Attachment 2A

| Staffing Request Summary | 2006/07 Staffing |
|---|---|
| Licensed Psychiatric Technician | 99.18 |
| Licensed Psychiatric Technician | 38.71 |
| Licensed Psychiatric Technicians | -10.00 |
| **Total:** | **127.89** |
| | |
| Psychologist | 37.00 |
| Psychologist | 44.80 |
| Psychologist | 51.00 |
| Psychologist | 17.98 |
| **Total:** | **150.78** |
| | |
| Staff Psychiatrist | 18.50 |
| Staff Psychiatrist | 8.00 |
| **Total:** | **26.50** |
| | |
| Correctional Officer for ASU | 30.50 |
| **Total:** | **30.50** |
| | |
| Correctional Counselor I | 20.60 |
| **Total:** | **20.60** |
| | |
| Office Technician - Typing | 38.00 |
| Office Technician - Typing | 8.29 |
| Office Technician - Typing | 28.00 |
| **Total:** | **74.29** |
| | |
| Senior Psychologist, Supervisor | 32.00 |
| | |
| Senior Psychiatric Technician | 10.00 |
| | |
| Unit Supervisor | 9.00 |
| | |
| Health Program Specialist I | 28.00 |
| | |
| **Grand Total:** | **509.56** |

Feasible Alternative "A"
California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Division of Correctional Health Care Services - Mental Health Program - Headquarters

| Staffing Request Summary | FY 06/07 | | |
|---|---|---|---|
| | Positions | Dollars | |
| **1) Statewide Mental Health Program Director** | | | |
| Statewide Mental Health Program Director (Chief Psychiatrist) CEA | 1.00 | $161,203 | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Executive Secretary | 1.00 | $54,004 | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 4.00 | | $336,691 |
| **2) Psychiatric Services Branch** | | | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Secretary | 1.00 | $48,893 | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 3.00 | | $170,377 |
| **3) Psychiatric Services Branch - Tele-Psychiatry Section** | | | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 1.00 | | $48,886 |
| **4) Project Management Unit** | | | |
| These positions are requested in the Litigation Support BCP. | | $0 | |
| | 0.00 | | $0 |
| **5) Clinical Operations Branch** | | | |
| CEA (Chief Psychologist) | 1.00 | $136,607 | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Secretary | 1.00 | $48,893 | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 4.00 | | $306,984 |
| **6) Quality Management Assistance Program** | | | |
| Regional Mental Health Director (Chief Psychologist) | 3.00 | $310,317 | |
| Senior Psychologist (Specialist) | 6.00 | $520,740 | |
| Senior Psychiatrist (Specialist) | 6.00 | $914,046 | |
| Nurse Consultant Program Reviewer | 6.00 | $486,924 | |
| Senior Licensed Psychiatric Technician | 6.00 | $355,462 | |
| Facility Captain | 5.00 | $602,545 | |
| Retired Annuitant | 2.00 | $267,642 | |
| Staff Services Manager I | 3.00 | $255,495 | |
| Health Program Specialist I | 3.00 | $237,576 | |
| Associate Health Program Advisor | 6.00 | $435,588 | |
| Secretary | 3.00 | $146,679 | |
| Office Technician - Typing | 3.00 | $146,858 | |
| | 52.00 | | $4,679,692 |
| **7) Centralized Clinical Case Management Unit** | | | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 1.00 | | $48,886 |
| **8) Utilization Management Unit** | | | |
| Registered Nurse | 4.00 | $341,952 | |
| | 4.00 | | $341,952 |
| **9) Clinical Policy and Program Development and Clinical Evaluations Branch** | | | |
| Chief (Clinical Psychologist) - CEA | 1.00 | $136,347 | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Secretary | 1.00 | $48,893 | |
| Office Technician - Typing | 1.00 | $48,886 | |
| | 4.00 | | $306,724 |
| **10) Clinical Policy and Program Development Unit** | | | |
| Senior Psychologist, Specialist | 4.00 | $347,160 | |
| Psychiatric Social Worker | 1.00 | $58,643 | |
| Senior Licensed Psychiatric Technician | 1.00 | $59,247 | |
| Research Analyst II (Social/Behavioral) | 1.00 | $86,420 | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Secretary | 1.00 | $48,893 | |
| Office Technician - Typing | 5.00 | $244,430 | |
| | 14.00 | | $917,391 |
| **11) Psychological Testing and Forensic Evaluation** | | | |
| Clinical Psychologist | 9.00 | $715,941 | |
| Staff Services Analyst/Associate Governmental Program Analyst | 2.00 | $150,182 | |
| Associate Health Program Advisor | 1.00 | $72,598 | |
| Secretary | 1.00 | $48,893 | |
| | 13.00 | | $987,614 |
| **12) Extraordinary Travel/Quarterly Meeting** | | | |
| Extraordinary Travel - QMAT (ongoing) | | $1,249,560 | |
| Extraordinary Travel - Forensic (ongoing) | | $312,390 | |
| Travel Differential - QMAT/Forensic ($500 per month) (ongoing) | | $270,000 | |
| Travel for Quarterly Forensic Meetings (ongoing) | | $56,960 | |
| Travel for Quarterly Leadership Meetings (ongoing) | | $202,920 | |
| | 0.00 | | $2,091,830 |

4

00119

Feasible Alternative "A"
**California Department of Corrections and Rehabilitation**
Division of Correctional Health Care Services
Division of Correctional Health Care Services - Mental Health Program - Headquarters

Attachment 15

| | FY 06/07 | |
| --- | --- | --- |
| **Staffing Request Summary** | **Positions** | **Dollars** |
| *13) Miscellaneous Headquarters' Equipment* | | |
| Cell Phones (one-time) | | $10,125 |
| Cell Phone Charges (ongoing) | | $16,200 |
| Pagers (ongoing) | | $945 |
| Open Shelf File Cabinets (6 drawer-locking) (one-time) | | $3,600 |
| Vehicle Leasing (Regionals) (ongoing) | | $16,920 |
| Laptops (one-time) | | $18,000 |
| Fax Machines (one-time) | | $3,762 |
| Copiers (one-time) | | $37,962 |
| | 0.00 | | $107,514 |
| *14) Workload Study* | | |
| Workload Study (one-time) | | $400,000 |
| | | | $400,000 |
| | | | |
| **Total Request** | **100.00** | **$10,744,541** |
| | 100.00 | | $10,744,541 |

(Dollars do not include one-time equipment standard funding or current R&R funding for positions listed above.)

00120

Feasible Alternative "A"
California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Psychiatry Vacancy Rate Reduction Strategies
FY 2006/07

Attachment 30

| Staffing Request Summary | FY 05/06 | | FY 06/07 | | |
|---|---|---|---|---|---|
| | Positions | Dollars | Positions | Dollars | |
| **1) Hiring-Above-Minimum** | | | | | |
| Hiring-Above-Minimum - Psychiatry Series (ongoing) | | $1,214,998 | | $3,642,298 | |
| Hiring-Above-Minimum - All Other Mental Health Classifications (ongoing) | | $3,118,542 | | $9,355,626 | |
| | 0.00 | | | | $17,997,924 |
| **2) Pay Differential** | | | | | |
| Pay Differential - Psychiatry Series (ongoing) | | $3,904,200 | | $11,424,800 | |
| Pay Differential - DCHCS' Headquarters Mental Health Classifications (ongoing) | | $163,326 | | $489,984 | |
| Pay Differential - KVSP and NKSP (ongoing) | | $26,004 | | $78,012 | |
| Pay Differential - All Other Mental Health Classifications - Central Valley (ongoing) | | $263,344 | | $790,032 | |
| | 0.00 | | | | $12,782,626 |
| **3) Emergency Contracts** | | | | | |
| Placeholder for Emergency Contracts | | | | $3,000,000 | |
| | 0.00 | | | | $3,000,000 |
| **4) Online Exams** | | | | | |
| Online development (15 exams) (one-time) | | | | $600,000 | |
| 10 years of annual maintenance (ongoing) | | | | $1,060,000 | |
| | 0.00 | | | | $1,680,000 |
| **5) Office of Workforce Planning and Selection** | | | | | |
| Staff Services Manager II | | | 1.00 | $92,735 | |
| Staff Services Manager I | | | 2.00 | $170,330 | |
| Associate Governmental Program Analyst | | | 3.00 | $225,273 | |
| Associate Personnel Analyst | | | 2.00 | $150,182 | |
| Personnel Selection Technician | | | 2.00 | $91,390 | |
| Office Assistant - Typing | | | 1.00 | $41,019 | |
| | 0.00 | | | | $770,929 |
| **6) Office of Personnel Services** | | | | | |
| Personnel Selection Technician | | | 1.00 | $45,695 | |
| Associate Personnel Analyst | | | 1.00 | $75,091 | |
| Senior Personnel Specialist | | | 2.00 | $127,506 | |
| | 0.00 | | | | $248,292 |
| **7) Adult Institutions - Statewide** | | | | | |
| Office Technician - Typing | | | 33.00 | $1,613,236 | |
| | 0.00 | | | | $1,613,236 |
| **8) Live Scan** | | | | | |
| This funding is requested in the Plata Order Finance Letter. | | | | $0 | |
| | 0.00 | | | | $0 |
| **9) Capital Outlay** | | | | | |
| Modular Workstations (25) (one-time) | | | | $121,219 | |
| | 0.00 | | | | $121,219 |
| **Total Request** | 0.00 | $8,689,517 | 48.00 | $33,214,230 | |
| | 0.00 | | | | $33,214,230 |

(Dollars do not include one-time equipment standard funding or current R&R funding for positions listed above.)

**California Department of Corrections and Rehabilitation
Division of Correctional Health Care Services
Mental Health Program and
Mental Health Services Delivery System**

### TABLE OF CONTENTS

| Name | Tab |
|------|-----|
| *Coleman* Order | 1 |
| Summary of Program Guide Positions | 2 |
| 2006 MHSDS Revised Program Guide | 3 |
| 1997 vs. 2006 Revised Program Guide Workload Requirements | 4 |
| Workload Time Analysis | 5 |
| 1997 *Coleman* Staffing Standards | 6 |
| American Medical Association Current Procedure Terminology (CPT) Codes | 7 |
| Mental Health Population | 8 |
| Correctional Treatment Center Beds | 9 |
| Custody Positions | 10 |
| Senior Licensed Psychiatric Technician | 11 |
| Mental Health OHU | 12 |
| Psychological Testing Supplies | 13 |
| Equipment/Additional Resources | 14 |
| Summary of Mental Health Program Headquarters Positions | 15 |
| Mental Health Program Headquarters Organization Chart | 16 |
| Quality Management Assistance Program (QMAP) Workload | 17 |
| Utilization Management Unit Workload | 18 |
| 1999 & 2001 *Coleman* ADSEG Staffing Orders, 2006 *Madrid & Coleman* Special Masters' Reports | 19 |

-i-

## TABLE OF CONTENTS (continued)

| Name | Tab |
|------|-----|
| Psychological Testing Unit Workload | 20 |
| Headquarters Capital Outlay | 21 |
| Duty Statements | 22 |
| Staffing Models – Other States | 23 |
| American Association for Correctional Psychology | 24 |
| National Commission on Correctional Health Care | 25 |
| Human Rights Watch | 26 |
| Extraordinary Travel Cost | 27 |
| Workload Study Sample | 28 |
| Summary of 15<sup>th</sup> Round *Coleman* Monitoring Report Recommendation | 29 |
| Summary of Psychiatry Vacancy Rate Strategies | 30 |
| Psychiatry Vacancy Rate | 31 |
| Psychiatry Series Salary Information | 32 |
| Salary Survey Report | 33 |
| Economic Institute Salary Information | 34 |
| Cooperative Personnel Services (CPS) Salary Survey | 35 |
| HAM Proposal | 36 |
| *Coleman* Court Order – Psychiatry Salary | 37 |
| *Coleman* Payments | 38 |
| Retention Strategies | 39 |
| Acronyms | 40 |

- ii -

00133

## Mental Health Population - Placement Per Institution

Download Date February 6, 2006

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP            # | 1,099 | 874 | 80% | | 9 | | | 883 |
| ASP Ad-Seg | | 32 | | | 7 | | | 39 |
| CAL          UV  ¢ | | 22 | | | 5 | | | 27 |
| CAL Ad-Seg | | 9 | | | | | | 9 |
| CCC          (R,W | | 1 | | | | | | 1 |
| CCC Ad-Seg | | 2 | | | | | | 2 |
| CCI          UUUV  * | 1,053 | 1,045 | 99% | | 9 | | | 1,054 |
| CCI Ad-Seg | | 126 | | | 15 | | | 141 |
| CCI-RC | 166 | 147 | 89% | | 15 | | | 162 |
| CCI-SHU | 130 | 141 | 108% | | 5 | | | 146 |
| CCWF | 739 | 831 | 112% | 54 | 53 | 98% | 12 | 884 |
| CCWF Ad-Seg | | 27 | | | 1 | | | 28 |
| CCWF-RC | 110 | 130 | 118% | | | | | 130 |
| CEN          # | | 14 | | | 1 | | | 15 |
| CEN Ad-Seg | | 6 | | | | | | 6 |
| C          ¢ | 366 | 588 | 161% | | 11 | | 18 | 599 |
| A-RC | 633 | 564 | 89% | | 156 | | | 720 |
| CIM-RC--Ad-Seg | | 47 | | | 13 | | | 60 |
| CIW | 349 | 430 | 123% | 75 | 117 | 156% | | 547 |
| CIW Ad-Seg | | 19 | | | 3 | | | 22 |
| CIW-RC | 100 | 114 | 114% | | 1 | | | 115 |
| CMC          UR,UT | 1,049 | 1,128 | 108% | 580 | 581 | 100% | 0 | 1,709 |
| CMC Ad-Seg | | 61 | | 54 | 38 | 70% | | 99 |
| CMF          UU,UY | 599 | 566 | 94% | 600 | 597 | 100% | | 1,163 |
| CMF Ad-Seg | | 3 | | 58 | 72 | 124% | | 75 |
| CMF** | | 84 | | | 0 | | | 84 |
| COR          UUV  ¢ ' | 499 | 273 | 55% | 150 | 136 | 91% | 23 | 409 |
| COR Ad-Seg | | 151 | | 54 | 44 | 81% | | 195 |
| COR-SHU | 450 | 452 | 100% | | | | | 452 |
| CRC-M          # | 599 | 825 | 138% | | | | | 825 |
| CRC-W | 249 | 173 | 69% | | | | | 173 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
    the respective DDPS identifier systems.

* ¢ * is a 270 Design Facility.    * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

    \d-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Health Care Placement Unit

R1-!

2/6/2006

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop. |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CTF | ** | 699 | 739 | 106% | | 9 | | | 748 |
| CTF Ad-Seg | | | 21 | | | | | | 21 |
| CVSP | ** | | 13 | | | | | | 13 |
| CVSP Ad-Seg | | | 4 | | | | | | 4 |
| DVI | ** | 85 | 25 | 29% | | 2 | | | 27 |
| DVI Ad-Seg | | | 48 | | | 13 | | | 61 |
| DVI-RC | | 564 | 695 | 123% | | 55 | | | 750 |
| DVI-RC--Ad-Seg | | | 58 | | | 6 | | | 64 |
| FOL | ** | 599 | 552 | 92% | | 8 | | | 560 |
| FOL Ad-Seg | | | 54 | | | 1 | | | 55 |
| HDSP | *** * | 654 | 415 | 63% | | 7 | | 10 | 422 |
| HDSP Ad-Seg | | | 68 | | | 2 | | | 70 |
| HDSP-RC | | 45 | 72 | 160% | | 6 | | | 78 |
| ISP | ** | | 4 | | | 1 | | 5 | 5 |
| ISP Ad-Seg | | | 3 | | | 1 | | | 4 |
| KVSP | ** | 349 | 391 | 112% | | 5 | | 0 | 396 |
| KVSP Ad-Seg | | | 41 | | | 1 | | | 42 |
| LAC | *** * | 1,149 | 1,012 | 88% | 300 | 276 | 92% | 13 | 1,288 |
| J ^C Ad-Seg | | | 37 | | 54 | 82 | 152% | | 119 |
| ?-RC | | | 83 | | | 5 | | | 88 |
| MCSP | *** * | 999 | 1,010 | 101% | 215 | 222 | 103% | 10 | 1,232 |
| MCSP Ad-Seg | | | 44 | | 36 | 40 | 111% | | 84 |
| NCWF | | | 0 | | | | | | 0 |
| NKSP | ** | 215 | 72 | 33% | | 4 | | 10 | 76 |
| NKSP-RC | | 584 | 666 | 114% | | 50 | | | 716 |
| NKSP-RC--Ad-Seg | | | 52 | | | 8 | | | 60 |
| PBSP | ** * | 349 | 230 | 66% | 64 | 72 | 113% | 6 | 302 |
| PBSP Ad-Seg | | | 61 | | | 1 | | | 62 |
| PBSP SHU | | | 11 | | | | | | 11 |
| PVSP | ** | 1,299 | 1,448 | 111% | | 10 | | 5 | 1,458 |
| PVSP Ad-Seg | | | 135 | | | 1 | | | 136 |
| RJD | ** | 901 | 646 | 72% | 330 | 319 | 97% | 14 | 965 |
| RJD Ad-Seg | | | 131 | | 63 | 53 | 84% | | 184 |
| RJD-RC | | 298 | 481 | 161% | | 115 | | | 596 |

***This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.

* + * is a 270 Design Facility. * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, 5Q EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Health Care Placement Unit

R1-2

2/6/2006

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| SAC | LV | 849 | 743 | 88% | 192 | 215 | 112% | 15 | 958 |
| SAC Ad-Seg | | | 60 | | 49 | 58 | 118% | | 118 |
| SATF | L,lll,lV | 1,049 | 1,081 | 103% | | 4 | | 16 | 1,085 |
| SATF Ad-Seg | | | 151 | | | 1 | | | 152 |
| SCC | LV,lll | 499 | 519 | 104% | | 4 | | | 523 |
| SCC Ad-Seg | | | 2 | | | | | | 2 |
| SOL | LV | 1,199 | 1,395 | 116% | | 17 | | 13 | 1,412 |
| SOL Ad-Seg | | | 59 | | | 3 | | | 62 |
| SQ | LV | 350 | 409 | 117% | | 83 | | | 492 |
| SQ-RC | | 549 | 525 | 96% | | 72 | | | 597 |
| SQ-RC--Ad-Seg | | | 84 | | 36 | 12 | 33% | | 96 |
| SVSP | LV | 999 | 1,014 | 102% | 192 | 188 | 98% | 10 | 1,202 |
| SVSP Ad-Seg | | | 202 | | 45 | 43 | 96% | | 245 |
| VSPW | | 606 | 753 | 124% | | 6 | | | 759 |
| VSPW Ad-Seg | | | 17 | | 9 | 8 | 89% | | 25 |
| VSPW SHU | | | 30 | | | 9 | | | 39 |
| VSPW-RC | | 143 | 168 | 117% | | 12 | | | 180 |
| WSP | LIV | 105 | 125 | 119% | | 4 | | 6 | 129 |
| WSP-RC | | 944 | 1,276 | 135% | | 73 | | | 1,349 |
| ?-RC--Ad-Seg | | | 54 | | | 8 | | | 62 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
   the respective DDPS identifier systems.

* + * is a 270 Design Facility.  * * * is a 180 Design Facility.

Grand Totals do not include MHCB data

   Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Health Care Placement Unit

2/6/2006

R1-3

|  | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity |  |
| Totals : | 24,271 | 26,874 | 110.7% | 3,210 | 4,084 | 127.2% |  | 30,958 |

|  | PSU | | |
|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 123 | 96.1% |
| SAC | 128 | 115 | 89.84% |
| Total PSU: | 256 | 238 | 92.97% |

|  | DMH | | |
|---|---|---|---|
|  | Capacity | Current Pop | % of Capacity |
| ASH | 131 | 131 | 100% |
| DMH CMF-AIP | 150 | 139 | 93% |
| DMH CMF-ICF | 76 | 74 | 97% |
| DMH CMF-DTP | 44 | 34 | 77% |
| DMH SVPP | 64 | 47 | 73% |
| Totals : | 465 | 425 | 91.4% |

The ASH cap includes the 25 APP beds.

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 28,202 | 31,621 | 112.1% |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health and HIV numbers are as accurate as the information provided by
the respective DDPS identifier systems.

* + * is a 270 Design Facility. *** is a 180 Design Facility.

Grand Totals do not include MHCB data

Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Health Care Placement Unit

2/6/2006

R1-4

## Combined Mental Health Population Per Institution

*Includes Ad-Seg, SHU, Reception Center and GP Mental Health Populations Combined*

### Download Date February 6, 2006

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP | 1099 | 906 | 82% | | 16 | | | 922 |
| CAL | | 31 | | | 5 | | | 36 |
| CCC | | 3 | | | | | | 3 |
| CCI | 1349 | 1459 | 108% | | 44 | | | 1503 |
| CCWF | 849 | 988 | 116% | 54 | 54 | 100% | 12 | 1042 |
| CEN | | 20 | | | 1 | | | 21 |
| CIM | 999 | 1199 | 120% | | 180 | | 18 | 1379 |
| CIW | 449 | 563 | 125% | 75 | 121 | 161% | | 684 |
| CMC | 1049 | 1189 | 113% | 634 | 619 | 98% | | 1808 |
| CMF | 599 | 653 | 109% | 658 | 669 | 102% | | 1322 |
| COR | 949 | 876 | 92% | 213 | 180 | 85% | 23 | 1056 |
| CRC-M | 599 | 825 | 138% | | | | | 825 |
| CRC-W | 249 | 173 | 69% | | | | | 173 |
| CTF | 699 | 760 | 109% | | 9 | | | 769 |
| CVSP | | 17 | | | | | | 17 |
| DVI | 649 | 826 | 127% | | 76 | | | 902 |
| FOL | 599 | 606 | 101% | | 9 | | | 615 |
| HDSP | 699 | 555 | 79% | | 15 | | 10 | 570 |
| ISP | | 7 | | | 2 | | 5 | 9 |
| KVSP | 349 | 432 | 124% | | 6 | | | 438 |
| LAC | 1149 | 1132 | 99% | 345 | 363 | 105% | 13 | 1495 |
| MCSP | 999 | 1054 | 106% | 251 | 262 | 104% | 5 | 1316 |
| NKSP | 799 | 790 | 99% | | 62 | | 5 | 852 |
| PBSP | 349 | 302 | 87% | 64 | 73 | 114% | 6 | 375 |
| PVSP | 1299 | 1583 | 122% | | 11 | | 5 | 1594 |
| RJD | 1199 | 1258 | 105% | 393 | 487 | 124% | 15 | 1745 |
| SAC | 849 | 803 | 95% | 241 | 273 | 113% | | 1076 |
| SATF | 1049 | 1232 | 117% | | 5 | | 16 | 1237 |
| SCC | 499 | 521 | 104% | | 4 | | | 525 |
| SOL | 1199 | 1454 | 121% | | 20 | | 13 | 1474 |
| SQ | 899 | 1018 | 113% | 36 | 167 | 464% | | 1185 |
| SVSP | 999 | 1216 | 122% | 237 | 231 | 97% | 10 | 1447 |
| VSPW | 749 | 968 | 129% | 9 | 35 | 389% | | 1003 |
| WSP | 1049 | 1455 | 139% | | 85 | | 6 | 1540 |
| **Totals** | 24271 | 26874 | 111% | 3210 | 4084 | 127% | 162 | 30958 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

the respective DDPS identifier systems.

Health Care Placement Unit

2/6/2006

00490

## Mental Health Adseg/SHU/PSU

February 6, 2006

| | MH POPULATION IN AD SEG | | | AD SEG CAPACITY | MH PERCENT OF AD SEG* | | |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| ASP | 7 | 32 | 39 | 190 | 3.68% | 16.84% | 20.53% |
| CAL | | 9 | 9 | 190 | 0.00% | 4.74% | 4.74% |
| CCC | | 2 | 2 | 190 | 0.00% | 1.05% | 1.05% |
| CCI | 15 | 126 | 141 | 281 | 5.34% | 44.84% | 50.18% |
| CCWF | 1 | 27 | 28 | 70 | 1.43% | 38.57% | 40.00% |
| CEN | | 6 | 6 | 190 | 0.00% | 3.16% | 3.16% |
| CIM-RC | 13 | 47 | 60 | 194 | 6.70% | 24.23% | 30.93% |
| CIW | 3 | 19 | 22 | 61 | 4.92% | 31.15% | 36.07% |
| CMC | 38 | 61 | 99 | 176 | 21.59% | 34.66% | 56.25% |
| CMF | 71 | 42 | 113 | 164 | 43.29% | 25.61% | 68.90% |
| COR | 44 | 151 | 195 | 190 | 23.16% | 79.47% | 102.63% |
| CTF | | 21 | 21 | 144 | 0.00% | 14.58% | 14.58% |
| CVSP | | 4 | 4 | 190 | 0.00% | 2.11% | 2.11% |
| DVI | 13 | 48 | 61 | 144 | 9.03% | 33.33% | 42.36% |
| D*** RC | 6 | 58 | 64 | 144 | 4.17% | 40.28% | 44.44% |
| | 1 | 54 | 55 | | | | |
| HDSP | 2 | 68 | 70 | 243 | 0.82% | 27.98% | 28.81% |
| ISP | 1 | 3 | 4 | 190 | 0.53% | 1.58% | 2.11% |
| KVSP | 1 | 41 | 42 | 64 | 1.56% | 64.06% | 65.63% |
| LAC | 82 | 37 | 119 | 190 | 43.16% | 19.47% | 62.63% |
| MCSP | 40 | 44 | 84 | 190 | 21.05% | 23.16% | 44.21% |
| NKSP-RC | 8 | 52 | 60 | 190 | 4.21% | 27.37% | 31.58% |
| PBSP | 1 | 61 | 62 | 198 | 0.51% | 30.81% | 31.31% |
| PVSP | 1 | 135 | 136 | 190 | 0.53% | 71.05% | 71.58% |
| RJD | 53 | 131 | 184 | 190 | 27.89% | 68.95% | 96.84% |
| SAC | 58 | 60 | 118 | 364 | 15.93% | 16.48% | 32.42% |
| SATF | 1 | 151 | 152 | 190 | 0.53% | 79.47% | 80.00% |
| SCC | | 2 | 2 | 190 | 0.00% | 1.05% | 1.05% |
| SOL | 3 | 59 | 62 | 190 | 1.58% | 31.05% | 32.63% |
| SQ-RC | 12 | 84 | 96 | 197 | 6.09% | 42.64% | 48.73% |
| SVSP | 43 | 202 | 245 | 243 | 17.70% | 83.13% | 100.82% |

al Health and HIV numbers are as accurate as the information
provided by the respective DOPS identifier systems.

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

R2-1

Health Care Placement Unit
2/6/2006

| VSPW | 8 | 17 | 25 | 84 | 9.52% | 20.24% | 29.76% |
|---|---|---|---|---|---|---|---|
| WSP-RC  LW | 8 | 54 | 62 | 190 | 4.21% | 28.42% | 32.63% |
| Totals | 534 | 1908 | 2442 | 5504 | 9.70% | 34.67% | 44.37% |

| | MH POPULATION IN PSU | | | PSU CAPACITY | MH PERCENT OF PSU | | |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| PBSP  LIV | 120 | 3 | 123 | 128 | 93.75% | 2.34% | 96.09% |
| SAC | 114 | 1 | 115 | 128 | 178.13% | 1.56% | 179.69% |

| | MH POPULATION IN SHU | | | SHU CAPACITY | MH PERCENT OF SHU | | |
|---|---|---|---|---|---|---|---|
| | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| COR  LIU IV | | 452 | 452 | 1400 | 0.00% | 32.29% | 32.29% |
| VSPW | 9 | 30 | 39 | 44 | 20.45% | 68.18% | 88.64% |
| CCI | 5 | 141 | 146 | 274 | 1.82% | 51.46% | 53.28% |

| Total | 14 | 623 | 637 | 1718 | 0.81% | 36.26% | 37.08% |

Health Care Placement Unit
2/6/2006

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

00492

# CCCMS Population by Classification Score

Download February 6, 2006

Health Care Placement Unit
2/6/2006

| Institution | LEVEL I | | LEVEL II | | LEVEL III | | LEVEL IV | | SAP | | MISC | Total GP | | Total RC | | TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CAP | POP | CAP | POP | CAP | POP | CAP | POP | CAP | POP | POP | CAP | POP | CAP | POP | CAP | POP |
| ASP | 1099 | 142 | | 679 | | 20 | | 4 | | | 61 | 1099 | 906 | | | 1099 | 906 |
| CAL + | | 2 | | 2 | | 2 | | 24 | | | 1 | | 31 | | | | 31 |
| CCC | | 1 | | 1 | | 1 | | | | | | | 3 | | | | 3 |
| CCI · | 352 | 384 | 467 | 451 | 1049 | 27 | 234 | 217 | | | 148 | 1053 | 1227 | 166 | 147 | 1219 | 1374 |
| CCI-SHU · | | 2 | | 1 | | 10 | | 65 | | | 7 | 130 | 85 | | | 130 | 85 |
| CCWF | | 293 | | 201 | | 163 | | 148 | | | 53 | 739 | 858 | 110 | 130 | 849 | 988 |
| CEN | | 2 | | 1 | | 16 | | 2 | | | | | 20 | | | | 20 |
| CIM | 366 | 408 | | 32 | | | | 1 | | | 149 | 366 | 588 | 633 | 611 | 999 | 1199 |
| CIW | | 169 | | 128 | | 90 | | 15 | | | 47 | 349 | 449 | 100 | 114 | 449 | 563 |
| CMC | | 37 | | 357 | 1049 | 708 | | 70 | | | 17 | 1049 | 1189 | | | 1049 | 1189 |
| CMF | | 39 | | 162 | 599 | 303 | | 85 | | | | 599 | 569 | | | 599 | 569 |
| CMF** | | 6 | | 33 | | 26 | | 19 | | | | | 84 | | | | 84 |
| COR + | | 6 | | 22 | | 89 | 499 | 326 | | | 4 | 499 | 447 | | | 499 | 447 |
| COR-SHU + | | 10 | | 27 | | 56 | | 333 | | | 3 | 450 | 429 | | | 450 | 429 |
| CRC-M | | 118 | 599 | 667 | | 5 | | 1 | | | 44 | 599 | 825 | | | 599 | 825 |
| CRC-W | | 30 | | 131 | | | | | | | 12 | 249 | 173 | | | 249 | 173 |
| CTF | | 108 | 699 | 594 | | 43 | | 2 | | | 15 | 699 | 760 | | | 699 | 760 |
| CVSP | | 1 | | 13 | | 1 | | | | | 2 | | 17 | | | | 17 |
| DVI | | 9 | 85 | 20 | | 8 | | 17 | | | 19 | 85 | 73 | 564 | 753 | 649 | 826 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.
MISC Includes all inmates that have not yet received a classification score.
These numbers include Ad-Seg and SHU but not PSU. * * * is a 270 Design Facility. ** is a 180 Design Facility.
**This population includes inmates in Houlton and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates-Coleman Court Order.

R3-1

| Institution | LEVEL I | | LEVEL II | | LEVEL III | | LEVEL IV | | AP | | MISC | Total GP | | Total RC | | TOTALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CAP | POP | CAP | POP | CAP | POP | CAP | POP | CAP | POP | POP | CAP | POP | CAP | POP | CAP | POP |
| FOL | | 5 | | 65 | 599 | 516 | | 18 | | | 4 | 599 | 606 | | | 599 | 606 |
| HDSP | | 11 | 226 | 38 | | 99 | 428 | 319 | | | 18 | 654 | 483 | 45 | 72 | 699 | 555 |
| ISP | | | | | | 6 | | 1 | | | | | 7 | | | | 7 |
| KVSP | | | | 2 | | 6 | 349 | 420 | | | 4 | 349 | 432 | | | 349 | 432 |
| LAC + | | 12 | | 69 | | 157 | 1149 | 804 | | | 7 | 1149 | 1049 | | 83 | 1149 | 1132 |
| MCSP + | | 24 | 897 | 254 | | 424 | 302 | 338 | | | 14 | 999 | 1054 | | | 999 | 1054 |
| NKSP | | 5 | 215 | 10 | | 54 | | 1 | | | 2 | 215 | 72 | 584 | 718 | 799 | 790 |
| PBSP * | | 7 | | 4 | | 18 | 349 | 274 | | | 1 | 349 | 302 | | | 349 | 302 |
| PVSP | | 23 | 1299 | 250 | | 685 | | 633 | | | 12 | 1299 | 1583 | | | 1299 | 1583 |
| RJD | | 21 | 901 | 118 | | 531 | | 33 | | | 74 | 901 | 777 | 298 | 481 | 1199 | 1258 |
| SAC * | | 10 | | 15 | | 25 | 849 | 742 | | | 12 | 849 | 804 | | | 849 | 804 |
| SATF | 325 | 58 | 204 | 372 | | 205 | 400 | 424 | 120 | 160 | 19 | 1049 | 1232 | | | 1049 | 1232 |
| SCC | 258 | 90 | 241 | 194 | | 200 | | 10 | | | 27 | 499 | 521 | | | 499 | 521 |
| SOL | 712 | 173 | 487 | 676 | | 549 | | 25 | | | 31 | 1199 | 1454 | | | 1199 | 1454 |
| SQ | 350 | 69 | | 206 | | 6 | | 102 | | | 26 | 350 | 409 | 549 | 609 | 899 | 1018 |
| SVSP + | | 4 | | 32 | | 338 | 999 | 836 | | | 6 | 999 | 1216 | | | 999 | 1216 |
| VSPW | | 256 | | 188 | | 131 | | 146 | | | 79 | 606 | 800 | 143 | 168 | 749 | 968 |
| WSP | | 8 | 106 | 12 | | 77 | | 18 | | | 12 | 105 | 126 | 944 | 1330 | 1049 | 1455 |
| TOTALS: | 718 | 2,539 | 4,594 | 6,015 | 6,622 | 5,572 | 5,558 | 6,449 | 120 | 160 | 924 | 20,135 | 21,659 | 4,136 | 5,216 | 24,271 | 26,875 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier system.
MISC includes all inmates that have not yet received a classification score.
These numbers include Ad-Seg and SHU but not PSU.  * = * is a 270 Design Facility.  * * = 180 Design Facility.
**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CCC.
These inmates are not counted against the capacity identified in the Gates-Coleman Court Order.

Health Care Placement Unit
2/6/2006

R3-2

## EOP Population by Classification Score

Download Fri... y 6, 2006

| Institution | LEVEL I CAP | LEVEL I POP | LEVEL II CAP | LEVEL II POP | LEVEL III CAP | LEVEL III POP | LEVEL IV CAP | LEVEL IV POP | MISC POP | GP SUBTOTAL | RC POP | TOTALS CAP | TOTALS POP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP + | | 5 | | 10 | | 1 | | | | 16 | | | 16 |
| CAL + | | 1 | | | | | | 3 | 1 | 5 | | | 5 |
| CCI * | | 6 | | 5 | | 6 | | 7 | 1 | 24 | 15 | | 39 |
| CCI-SHU | | | | | | | 0 | 1 | | 1 | | 0 | 1 |
| CCWF | | 14 | | 15 | | 8 | | 12 | 5 | 54 | | 54 | 54 |
| CEN | | | | | | | | 1 | | 1 | | | 1 |
| CIM | | 3 | | | | 7 | | 1 | | 11 | 169 | | 180 |
| CIW | | 50 | | 23 | | 20 | | 7 | 14 | 120 | 1 | 75 | 121 |
| CMC | | 64 | | 241 | 580 | 247 | | 53 | 14 | 619 | | 580 | 619 |
| CMF | | 68 | | 235 | 600 | 242 | | 123 | 1 | 669 | | 600 | 669 |
| COR + | | 8 | | 20 | | 29 | 150 | 123 | | 180 | | 150 | 180 |
| CTF | | 1 | | 8 | | | | | | 9 | | | 9 |
| DVI | | 1 | | 3 | | 2 | | 5 | 4 | 15 | 61 | | 76 |
| FOL | | | | | | 8 | | 1 | | 9 | | | 9 |
| HDSP . | | 1 | | | | 1 | | 6 | 1 | 9 | 6 | | 15 |
| ISP | | | | | | 1 | | | 1 | 2 | | | 2 |
| KVSP | | | | | | 1 | | 5 | | 6 | | | 6 |
| LAC + | | 4 | | 7 | | 36 | 300 | 309 | 2 | 358 | 5 | 300 | 363 |
| MCSP + | | 7 | | 69 | 215 | 86 | | 99 | 1 | 262 | | 215 | 262 |
| NKSP | | | | | | 1 | | 1 | 2 | 4 | 58 | | 62 |
| PBSP . | | | | | | 3 | 64 | 89 | 1 | 73 | | 64 | 73 |
| PVSP | | | | 2 | | 2 | | 7 | | 11 | | | 11 |
| RJD . | | 44 | | 125 | 330 | 148 | | 15 | 40 | 372 | 115 | 330 | 487 |
| SAC . | | 1 | | 4 | | 21 | 192 | 245 | 2 | 273 | | 192 | 273 |
| SATF | | | | 1 | | | | 4 | | 5 | | | 5 |
| SCC | | | | 1 | | 3 | | | | 4 | | | 4 |
| SOL | | | | 8 | | 8 | | 3 | 1 | 20 | | | 20 |
| SQ | | 10 | | 9 | | 5 | | 40 | 19 | 83 | 84 | | 167 |
| SVSP + | | 2 | | 2 | | 16 | 192 | 211 | 2 | 231 | | 192 | 231 |
| VSPW | | 2 | | 2 | | 4 | | 12 | 3 | 23 | 12 | | 35 |
| WSP | | 1 | | | | | | 3 | | 4 | 81 | | 85 |
| **TOTALS:** | 0 | 290 | 0 | 796 | 1,725 | 907 | 898 | 1,365 | 115 | 3,473 | 607 | 2,752 | 4,080 |

Mental Health numbers are as accurate as the information provided by the respective EOPS identifier systems.

MISC includes all inmates that have not yet received a classification score.

These number include Ad-Seg and SHU but not PSU.   * = 's a 180 Design Facility.   + = 's a 180 Design Facility.   . = 's a 270 Design Facility.   These inmates are not counted against the capacity identified in the Court-Coleman Court Order.

***This population includes inmates in Hospice and 23, as well as EOP inmates in Unit IV and V down at CMF. These inmates are not counted against the capacity identified in the Court-Coleman Court Order.

Health Care Placement Unit

2/6/2006

R4-1

# Institution Health Care Treatment Settings

Sorted by treatment setting and institution.

February 6, 2006

| Current Placement | Institution | | Total Beds | Total Active Beds | Number Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| CCCMS | ASP | ff | 1099 | 1099 | 906 | 193 | 82% | | |
| | CAL | CW * | | | 31 | -31 | | | |
| | CCC | M/LII | | | 3 | -3 | | | |
| | CCI | M/LII/IV * | 1053 | 1053 | 1312 | -259 | 125% | | |
| | CCI-RC | | 166 | 166 | 147 | 19 | 89% | | |
| | CCWF | | 739 | 739 | 858 | -119 | 116% | | |
| | CCWF-RC | | 110 | 110 | 130 | -20 | 118% | | |
| | OEN | III | | | 20 | -20 | | | |
| | CIM | I | 366 | 366 | 588 | -222 | 161% | | |
| | CIM-RC | | 633 | 633 | 611 | 22 | 97% | | |
| | CIW | | 349 | 349 | 449 | -100 | 129% | | |
| | CIW-RC | | 100 | 100 | 114 | -14 | 114% | | |
| | CMC | III/IV | 1049 | 1049 | 1189 | -140 | 113% | | |
| | CMF | I/II/III | 599 | 599 | 566 | 33 | 94% | | |
| | CMF** | | | | 84 | | | | |
| | COR | III/IV * | 499 | 499 | 424 | 75 | 85% | | |
| | COR-SHU | * | 450 | 450 | 452 | -2 | 100% | | |
| | CRC-M | II | 599 | 599 | 825 | -226 | 138% | | |
| | CRC-W | | 249 | 249 | 173 | 76 | 69% | | |
| | CTF | I/II | 699 | 699 | 760 | -61 | 109% | | |
| | CVSP | I/II | | | 17 | -17 | | | |
| | DVI | I/II | 85 | 85 | 73 | 12 | 86% | | |
| | DVI-RC | | 564 | 564 | 753 | -189 | 134% | | |
| | FOL | I/II | 599 | 599 | 606 | -7 | 101% | | |
| | HDSP | I/II/IV * | 654 | 654 | 483 | 171 | 74% | | |
| | HDSP-RC | | 45 | 45 | 72 | -27 | 160% | | |
| | ISP | I/II | | | 7 | -7 | | | |
| | KVSP | IV | 349 | 349 | 432 | -83 | 124% | | |

**This population includes inmates in Hospice and 33, as well as HIV inmates in Ucla IV and Y dorm at C&S. These inmates are not counted against the capacity identified in the Coate-Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Coate/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory Isolation and MHCB are included in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

* = * is a 270 Design Facility. *** = * is a 180 Design Facility.

R5-1

Health Care Placement Unit

2/6/2006

00496

| Curre. Placement | Institution | | Total Beds | Total Active Beds | Numb. Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| CCCMS | LAC | LW/V + | 1149 | 1149 | 1049 | 100 | 91% | | |
| | LAC-RC | | | | 83 | -83 | | | |
| | MCSP | LW/IV + | 999 | 999 | 1054 | -55 | 106% | | |
| | NKSP | LW | 215 | 215 | 72 | 143 | 33% | | |
| | NKSP-RC | | 584 | 584 | 718 | -134 | 123% | | |
| | PBSP | HW * | 349 | 349 | 302 | 47 | 87% | | |
| | PVSP | LW | 1299 | 1299 | 1583 | -284 | 122% | | |
| | RJD | LW | 901 | 901 | 777 | 124 | 86% | | |
| | RJD-RC | | 298 | 298 | 481 | -183 | 161% | | |
| | SAC | LW * | 849 | 849 | 804 | 45 | 95% | | |
| | SATF | RW/IV | 1049 | 1049 | 1232 | -183 | 117% | | |
| | SCC | LW/II | 499 | 499 | 521 | -22 | 104% | | |
| | SOL | II,III | 1199 | 1199 | 1454 | -255 | 121% | | |
| | SQ | LW | 350 | 350 | 409 | -59 | 117% | | |
| | SQ-RC | | 549 | 549 | 609 | -60 | 111% | | |
| | SVSP | LV + | 999 | 999 | 1216 | -217 | 122% | | |
| | VSPW | | 606 | 606 | 800 | -194 | 132% | | |
| | VSPW-RC | | 143 | 143 | 168 | -25 | 117% | | |
| | WSP | LW | 105 | 105 | 125 | -20 | 119% | | |
| | WSP-RC | | 944 | 944 | 1330 | -386 | 141% | | |
| | **Totals :** | | 24,141 | 24,141 | 26,872 | -2,731 | 111% | | |
| CDC-Hospice | CMF | LW/II | 17 | 17 | 9 | 8 | 53% | | |
| | **Totals :** | | 17 | 17 | 9 | 8 | 53% | | |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates-Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Gates/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory isolation and MHCB are included in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

" - " is a 270 Design Facility.  " * " is a 180 Design Facility.

RS-2

Health Care Placement Unit
2/6/2006

| Curr. Placement | Institution | Total Beds | Total Active Beds | Num. Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|
| CTC | CEN  *III* | 15 | 13 | 12 | 1 | 92% | | |
| | CMF  *I,A,III* | 50 | 48 | 39 | 9 | 81% | | |
| | HDSP  *I,III,IV *  | 35 | 32 | 29 | 3 | 91% | | |
| | ISP  *I,II* | 15 | | 0 | 0 | 0% | | |
| | LAC  *I,III,IV +* | 18 | 17 | 16 | 1 | 94% | | |
| | MCSP  *I,II,III,IV +* | 12 | 10 | 10 | 0 | 100% | | |
| | NKSP  *I,III* | 18 | 16 | 15 | 1 | 94% | | |
| | PBSP  *I,IV *  | 21 | 19 | 19 | 0 | 100% | | |
| | PVSP  *I,II* | 17 | 15 | 11 | 4 | 73% | | |
| | RJD  *I,III* | 30 | 27 | 24 | 3 | 89% | | |
| | SAC  *I,IV *  | 17 | 16 | 15 | 0 | 100% | | |
| | SATF  *II,III,IV* | 40 | 38 | 36 | 2 | 95% | | |
| | SOL  *II,III* | 17 | 15 | 13 | 2 | 87% | | |
| | SVSP  *I,IV +* | 27 | 24 | 20 | 4 | 83% | | |
| | WSP  *I,II* | 18 | 16 | 16 | 0 | 100% | | |
| | **Totals :** | 350 | 305 | 275 | 30 | 90% | | |
| DMH | ASH: | 125 | 125 | 131 | -6 | 105% | | |
| | **Totals :** | 125 | 125 | 131 | -6 | 105% | | |
| DMH CMF-AIP | CMF  *I,A,III* | 151 | 151 | 139 | 12 | 92% | | |
| DMH CMF-DTP | CMF  *I,A,III* | 44 | 44 | 34 | 10 | 77% | | |
| DMH CMF-ICF | CMF  *I,A,III* | 76 | 76 | 74 | 2 | 97% | | |
| | **Totals :** | 271 | 271 | 247 | 24 | 91% | | |
| DMH SVPP-ICF | SVSP  *I,V +* | 64 | 64 | 47 | 17 | 73% | | |
| | **Totals :** | 64 | 64 | 47 | 17 | 73% | | |

***This population includes inmates in Reception and SI, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Guards-Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Guards/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory isolation and MHCB are included in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

* + is a 270 Design Facility.  *** is a 180 Design Facility.

R6-3

Health Care Placement Unit

2/6/2006

00498

| Current Placement | Institution | | Total Beds | Total Active Beds | Numb. Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| EOP | ASP | II | | | 16 | | | | |
| | CAL | IV * | | | 5 | | | | |
| | CCI | III,IV * | | | 29 | | | | |
| | CCI-RC | | | | 15 | | | | |
| | CCWF | IV | 54 | 54 | 54 | 0 | 100% | | |
| | CEN | III | | | 1 | | | | |
| | CIM | I | | | 11 | | | | |
| | CIM-RC | | | | 169 | | | | |
| | CIW | III | 75 | 75 | 120 | -45 | 160% | | |
| | CIW-RC | | | | 1 | | | | |
| | CMC | I,III | 580 | 580 | 619 | -39 | 107% | | |
| | CMF | I,III | 600 | 600 | 697 | 3 | 100% | | |
| | CMF** | I,II,III | | | 0 | | 0% | | |
| | COR | I,III,IV * | 150 | 150 | 180 | -30 | 120% | | |
| | COR-SHU | | | | 0 | | 0% | | |
| | CTF | I,II | | | 9 | | | | |
| | DVI | I,III | | | 15 | | | | |
| | DVI-RC | | | | 61 | | | | |
| | FOL | II | | | 9 | | | | |
| | HDSP | I,III,IV * | | | 9 | | | | |
| | HDSP-RC | | | | 6 | | | | |
| | ISP | III | | | 2 | | | | |
| | KVSP | IV | | | 6 | | | | |
| | LAC | I,III,IV * | 300 | 300 | 358 | -58 | 119% | | |
| | LAC-RC | | | | 5 | | | | |
| | MCSP | I,II,III,IV * | 215 | 215 | 262 | -47 | 122% | | |
| | NKSP | I,III | | | 4 | | | | |
| | NKSP-RC | | | | 58 | | | | |
| | PBSP | III,IV * | 64 | 64 | 73 | -9 | 114% | | |
| | PVSP | I,III | | | 11 | | | | |
| | RJD | I,III | 330 | 330 | 372 | -42 | 113% | | |
| | RJD-RC | | | | 115 | | | | |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates/Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Gates/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory Isolation and MHCB are included in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

* + is a 270 Design Facility. *** is a 180 Design Facility.

Health Care Placement Unit    2/6/2006

P5-4

| Curre. Placement | Institution | | Total Beds | Total Active Beds | Numb... Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| EOP | SAC | IV * | 192 | 192 | 329 | -137 | 171% | | |
| | SATF | ELOV | | | 5 | | | | |
| | SCC | LUH | | | 4 | | | | |
| | SOL | KW | | | 20 | | | | |
| | SQ | UI | | | 83 | | | | |
| | SQ-RC | | | | 84 | | | | |
| | SVSP | OV + | 192 | 192 | 231 | -39 | 120% | | |
| | VSPW | | | | 23 | | | | |
| | VSPW-RC | | | | 12 | | | | |
| | WSP | UW | | | 4 | | | | |
| | WSP-RC | | | | 81 | | | | |
| | Totals : | | 2,762 | 2,752 | 4,068 | -1,316 | 149% | | |
| GACH CDC | CIM | | 80 | 80 | 77 | 3 | 96% | | |
| | CMC | LUH | 37 | 37 | 18 | 19 | 49% | | |
| | CMF | LUR | 7 | 7 | 5 | 2 | 71% | | |
| | COR | LWV | 75 | 74 | 54 | 20 | 73% | | |
| | Totals : | | 199 | 198 | 154 | 44 | 78% | | |
| HIV | CCWF | | 75 | 75 | | | | | |
| | CIM | | 200 | 200 | | | | | |
| | CIW | | 36 | 36 | | | | | |
| | CMC | LUH | 275 | 275 | | | | | |
| | CMF | LWH | 520 | 520 | | | | | |
| | COR | LWV | 164 | 164 | | | | | |
| | COR-SHU | | 24 | 24 | | | | | |
| | Totals : | | 1,294 | 1,294 | | | | | |

***This population includes Inmates in Hospice and S3, as well as EOP inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Coates-Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Coleman Transition.

Subscripts enter institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory isolation and MHCB are included in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

* • is a 270 Design Facility.   *** is a 180 Design Facility.

Health Care Placement Unit

R5-5

2/6/2006

00500

| Current Placement | Institution | | Total Beds | Total Active Beds | NumL Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| MH OHU | SAC | IV | | | | | | | |
| | **Totals :** | | 20 | 20 | 10 | 10 | 50% | | |
| | | | 20 | 20 | 10 | 10 | 50% | | |
| MHCB | ASP | II | | | | | | | |
| | CIM | I | | | | | | | |
| | CIM | J | | | | | | | |
| | CMC | I-II-III | 18 | 18 | | | | | |
| | COR | I-III-IV | | | | | | | |
| | FOL | III | 23 | 23 | | | | | |
| | HDSP | I-II-IV * | 10 | 10 | | | | | |
| | ISP | I-III | 5 | 5 | | | | | |
| | LAC | I-III-IV + | 13 | 13 | | | | | |
| | MCSP | I-II-III-IV + | 10 | 10 | | | | | |
| | NKSP | I-III | 10 | 10 | | | | | |
| | PBSP | IV * | 6 | 6 | | | | | |
| | PVSP | I-III | 5 | 5 | | | | | |
| | RJD | I-III | 14 | 14 | | | | | |
| | SAC | IV * | 15 | 15 | | | | | |
| | SATF | II-III-IV | 16 | 16 | | | | | |
| | SOL | II-III | 13 | 13 | | | | | |
| | SQ | I | | | | | | | |
| | SVSP | IV + | 10 | 10 | | | | | |
| | WSP | I-III | 6 | 6 | | | | | |
| | **Totals :** | | 174 | 174 | | | | | |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Cases -Coleman Court Order.

Target CMF EOP capacity is 600 upon completion of the Cases/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.

Respiratory Isolation and MHCB are indicated in their respective treatment settings.

Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

* , ** is a 270 Design Facility. *** is a 180 Design Facility.

Health Care Placement Unit
2/6/2006

R5-6

00501

| Current Placement | Institution | | Total Beds | Total Active Beds | Numb Occupied | Vacant/ Over | Occupancy Rate | Reserved | Available |
|---|---|---|---|---|---|---|---|---|---|
| OHU | ASP | H | 28 | 28 | 26 | 2 | 93% | | |
| | CAL | LV + | 18 | 18 | 15 | 3 | 83% | | |
| | CCC | LMU | 19 | 19 | 9 | 10 | 47% | | |
| | CCI | LMU/IV * | 15 | 15 | 15 | 0 | 100% | | |
| | CIW | | 17 | 17 | 8 | 9 | 47% | | |
| | CMC | LMU | 34 | 34 | 22 | 12 | 65% | | |
| | COR | LMU/IV | 20 | 20 | 16 | 4 | 80% | | |
| | CRC-M | LMU/IV | 10 | 10 | 0 | 10 | 0% | | |
| | CRC-W | H | 2 | 2 | 0 | 2 | 0% | | |
| | CTF | LV | 16 | 16 | 8 | 8 | 50% | | |
| | CVSP | LV | 11 | 11 | 6 | 5 | 55% | | |
| | DVI | LV | 25 | 25 | 15 | 10 | 60% | | |
| | MCSP | LMU/IV + | 6 | 6 | 1 | 5 | 17% | | |
| | SAC | HV * | 18 | 18 | 17 | 1 | 94% | | |
| | SCC | LMU | 13 | 13 | 5 | 8 | 38% | | |
| | SQ | LV | 30 | 30 | 24 | 6 | 80% | | |
| | VSPW | | 20 | 20 | 9 | 11 | 45% | | |
| | **Totals :** | | 304 | 302 | 196 | 106 | 65% | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| PSU | PBSP | LV * | 128 | 128 | 123 | 5 | 96% | | |
| | SAC | LV * | 128 | 128 | 116 | 13 | 90% | | |
| | **Totals :** | | 256 | 256 | 238 | 18 | 93% | | |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and V form at OHF.
These inmates are not counted against the capacity identified in the Coleman-Coleman Court Order.

Target OHF EOP capacity is 600 upon completion of the Coleman/Coleman Transition.

Subscripts after institution acronyms indicate security level.

The mental health population numbers include inmates housed in Ad-Seg and SHU.
Respiratory isolation and MHCB are included in their respective treatment settings.
Mental Health Crisis Beds and HIV occupancy numbers have been suppressed due to insufficient data.

+ , * is a 270 Design Facility.  *** is a 180 Design Facility.

Health Care Placement Unit

P5-7

2/6/2006

00502

## ATTACHMENT                                    PROGRAM GUIDE RESOURCES PERMANENT POSITIONS FOR ASU CCCMS

Introduction – including CCCMS Administrative Segregation (ASU)Case Manager to Patient ratio grid
Part I Administrative Segregation CCCMS New Requirements PLUS
Part II CCCMS New Requirements required in ASU

## INTRODUCTION:

Despite significant additional court required timelines and tasks for CCCMS patients in ASU over the last several years no change in staffing ratio currently exists when a CCCMS patient transfers into ASU from General Population (GP). These required additions have accrued since the 1997 Program Guide (PG) are from the 2006 MHSDS Program Guide (PG); are included in the grid on the next page; are explained in detail in the following pages; and include:

- quarterly IDTTs rather than the yearly IDTT required when the same CCCMS patient is in GP (4 fold workload increase)
- case manager contact every 14 days* an increase from once every 90 days in CCCMS GP ( a 6.4 fold workload increase)
- weekly case manager ICC attendance which is held about every 30 days for each patient and is not required in CCCMS GP; at a caseload of 1:40 this would represent an additional 1.5 hours for initials, 2.25 hours per week for follow ups just for attendance (at ratios of 1:100 it represents a total of 9.5 hours)
- additional requirement to include in treatment plan the inmate-patient's security concerns and status of 2.5 hours per week per case manager

*(currently being litigated by plaintiffs to require every 7days)

**The current request is for ASU CCCMS caseload to be 1:40 based on the following task analyses.**

At 1540 inmate patients this indicates that the ratio change alone required by Part I (the ASU changes) requires an additional 23.1Case Manager positions $(38.5 (@ 1:40) - 15.4 (@ 1:100) = 23.1)$
Added to this, the hours required for general CCCMS workload Part II increases requires _____ Case Manager positions for a total of _____ additional Case Managers in ASU

See grid on next page and task details on the following pages of the Attachment.

00512

CASE MANAGER TO PATIENT RATIOS – established court ratios bolded, *proposed italicized.*

| Level of Care | ASU HOUSING | Hrs per wk @1:40 | Hrs per wk@1:100 | GP HOUSING |
|---|---|---|---|---|
| CCCMS | *1:40 Proposed ratio CCCMS ASU* | | | 1:100 established ratio CCCMS GP |
| | • 2006 PG requires quarterly IDTTs | 3 | 7.5 | • requires annual IDTTs |
| | • 2006 PG requires case manager contact every 14 days* | 10.0 @ 30 mins ea | 25.00 @ 30 mins ea | • case manager contact every 90 days |
| | • 2006 PG requires weekly ICC attendance w/evaluation | 12.5 | 31.25 | |
| | • 2006 PG requires including in the Tx plan the patient's security concerns and status | 2.5 | 6.25 | |
| | • TOTAL hrs per wk for these 4 tasks | 28 | 70.0+ | |
| EOP | 1:9 established ratio EOP ASU | | | 1:40 established ratio EOP GP |
| | • requires quarterly IDTTs | | | • requires quarterly IDTTs |
| | • case manager contact every 7 days | | | • case manager contact every 7 days |
| | • requires weekly ICC attendance | | | |
| | • Requirement to include in the treatment plan the inmate-patient's security concerns and status | | | |

*(currently being litigated by plaintiffs to require every 7days)

At 1:100 in CCCMS ASU there are more than 70 hours of required tasks per week per case manager just in the additions and this does not include other required tasks such as crisis intervention, response to referrals, group therapy, staff meetings. At 28 hours a 1:40 ratio is a fulltime caseload when crisis intervention (variable), group therapy (at least 5 hours per week face to face), staff meetings (at least 1 hour per week) @ 34+ hours.

Please note the ASU EOP to GP EOP court derived differential for staffing represents a 72% change while we are requesting only a 60% change for CCCMS from ASU to GP (due to higher group therapy requirements for EOP in both ASU and GP). Should the 7 day requirement requested by the plaintiff be adopted the workload study may demonstrate additional needs. Derivations of constants utilized in calculation of positions are:
• The inmate patient population figures used for equations converting hours required for each task into positions are those of January 28, 2006.
• The State standards indicate the expectation of 1760 work hours per employee per year, rendering an average of 33.86 hours per week
• CPT (Correct Procedural Terminology) Codes (American Medical Association, all rights reserved)

Grey highlights in the following attachment indicate resource request will emanate from requested Workload Study and is NOT requested in Spring 2006 Finance Letter

Part I Administrative Segregation CCCMS New Requirements

| 1997 Requirement | Current Requirement | Estimate of Additional Time Required |
|---|---|---|
| Annual IDTTs | Quarterly IDTTS | At caseload of 1:40 with 4 Initials a week and 3 quarterlies on average @ 30 mins attendance time for Initials and 20 mins for Quarterlies = **3 hours/wk** At a caseload of 1:100 7.5 hours a week.    Already included in 23.1 positions for ratio change |
| Case Manager contact every 90 days | Case Manager Contact every 14 days * | At caseload of 40, 20 patients seen each wk for 30 minutes each = **10 hours/wk** At a caseload of 1:100 25 hours a week.   Already included in 23.1 positions for ratio change |
| Requires a CCM to be present at Institutional Classification Committee meetings. | The assigned case manager (or psychiatrist) shall attend all ICC meetings. **Mental health assessments are required for input into ICC**, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living, ability to understand Due Process proceedings, likelihood of decompensation if retained in ASU, recommendations for alternative placement and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment | These assessments are a significant increase in workload responsibility for ASU CCCMS Case Managers,  Attached CPT codes (national standards) indicate: <br><br> • 45 minutes for a brief Initial Evaluation (1st ICC) <br> • 30 minutes for a Follow up Evaluation (for subsequent ICCs) <br> • At an average of 4 new evaluations on each caseload per week (10%) at 45 minutes each, the average additional requirement is **3 hours,** plus 9 Follow Ups Evaluations per weekly ICC at **4.5 hours** <br> • (based on an average of an ICC hearing every 30 days per inmate patient and a caseload average of 40 (40 – 4 new evals = 36 old at an average of 9 per week every if they have ICC every fourth week) and attendance at ICC for an average of 4 hours for a **TOTAL of 12.5 hours per Case Manager with caseload of 40** 31.25 at caseload of **100** |
| **Reference # 1 under Requested Positions in the Finance Letter** | | **NEW RESOURCES REQUIRED – Requested in 2006 Finance Letter** under change in Case Manager ratio to 1:40 ( part of the 23.1 positions) **TOTAL of 12.5 hours per Case Manager with caseload of 40 and 31.25 at** caseload of 100 |

No separate total of positions for this page, see next page

00514

Part I Administrative Segregation CCCMS New Requirements Continued

| 1997 Requirement | Current Requirement | Estimate of Additional Time Required |
|---|---|---|
| ASU CCCMS Treatment Plans with requirements the same as to GP CCCMS Treatment Plan requirements. | Requirement to include in the treatment plan the inmate-patient's security concerns and status. | Responsibility for regularly tracking and updating treatment plans with security concerns and status requiring<br><br>&bull; 2.5 hours per week increase in duties<br>&bull; at a caseload of 40, performing 10 updates a week an average of fifteen minutes per update<br>&bull; one per patient every 30 days. |
| Reference # 1 under Requested Positions in the Finance Letter | | NEW RESOURCES REQUIRED – REQUESTED IN FINANCE LETTER<br>Under change in Case Manager ratio to 1:40 ( part of the 23.1 positions)<br>TOTAL of 2.5 hours per Case Manager with caseload of 40 and at 6.25 with caseload of 1:100 |

## TOTAL POSITIONS for Part I

With the establishment of the 1:40 Case Manager to patient ratio established for ASU CCCMS requiring 23.1 Case Manager positions, no additional positions are required for the above listed tasks. If ratio change from CCCMS GP of 1:100 is not established then these additional hours would need to be accounted out into positions.

00515

**Part II CCCMS New Requirements also required in ASU**

These items are in addition to the caseload change of 1:40 and increased time requirements. These items are NOT included in the rationale for that change.

| 1997 Requirement | Current Requirement | Estimate of Additional Time Required |
|---|---|---|
| CCM Completes Basic Treatment Plan in 7 days | The responsibility of overall treatment planning within the CCCMS program rests with an IDTT. The CCM documents specific recommendations regarding work, education and substance abuse counseling. The treatment plan must include measurable goals and be completed within 14 days. | • 15 minutes per inmate-patient increased development documentation time. 15 minutes X 1540 patients =385 hours X 4 times per year =1540 hours<br>• 10-15 minutes per inmate-patient IDTT Time increased (minimum). 15 minutes X 1540 patients =385 hours X 4 times per year =1540 hours<br>• Total of at least 25-30 minutes increase per patient per week, 30 mins X 1540 pts = 770 hours<br>1540 + 1540 + 770 = 3850 hours/ 1760 employee hours = 2.2 positions |
| [obscured] | [obscured] The IDTT must meet prior to the ICC. The initial evaluation must occur prior to the IDTT. Treatment Plan must be completed before the 14 day deadline. | [obscured]<br>40 Minutes X 1540 patients = 1027 hours X 4 times per year = 4107 hrs.<br>4107 employee hours = 2.3 positions. |
| No requirement | Inmates who refuse to attend IDTT. The CCM documents the reason for the refusal on the progress note. | Requires follow-up cell front with inmate-patients who refuse = Average Additional 1 hour per week per 40 patients = 38.5 hours statewide for 1.14 additional positions. |
| No requirement. However, group therapy is provided for a small percentage of CCCMS inmates in some institutions. | Group Therapy must be offered to inmates when clinically appropriate. Group therapy notes must be recorded in a monthly summary and include the inmates attendance, behavior in the group, and the progress toward achieving treatment goals. | Although group therapy may be offered by LPTs, the expertise of a psychologist or social worker is required for some group topics. In addition, CCMs will inevitably cover group therapy when an LPT is not available. Additional 3 hours per week per 40 patients = 115.5 hours per week statewide for 3.4 CM positions |
| No requirement | When a CCCMS IDTT recommends transfer to an BOP, the CCM completes a Mental Health Evaluation (see above for time frame). | Additional 1 hour per week when required approximately 1 per 20 patients per month. = 18 hours per week statewide for 0.53 positions |
| No requirement for 5-day follow-up | Increased responsibility for tracking inmate-patients placed in OHU and released with | Additional 15 minutes per day X average of 31 patients per week statewide = 7.75 hours per week = 0.23 positions |

00516

when an inmate-
patient is released
from OHU.

requirement for 5-day follow up.

TOTAL CASE MANAGER POSITIONS requested from this page is 7.5

00517

Part II CCCMS New Requirements also required in ASU Continued

| 1997 Requirement | Current Requirement | Estimate of Additional Time Required |
|---|---|---|
| No requirement | Suicide Risk Assessments (SRAs) are required at minimum – | • SRAs require a minimum of 45 minutes for an initial and 30 minutes for an update when a prior SRA has been completed within the last year. Both include a review of medical records and Cfile, but an update only needs to review back to the date of the prior SRA. |
| | Every initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRAC. | Level I computed 4 New evaluations per week and 9 follow-up evaluations. Each initial SRA = 0.75 hrs and each follow-up evaluation = 0.5 hrs. This represents 4 at 0.75 and 9 at 0.5 for a total of 11 patients at 9.5 hours. |
| | By the referring clinician prior to placement of into an Outpatient Housing Unit (OHU) for continued suicide risk assessment or into a Mental Health Crisis Bed (MHCB) for suicidal ideation, threats, or attempt. | • Time study not yet completed, but recent court requirements are that all intakes require an SRA and there were:<br>o    intakes in Reception Center in the last year<br>o    OHU placements X 2 (in and out) X 4 for quarterly for a year<br>o    MHCB admissions X 2 (in and out) X 4 for quarterly for a year<br>o    DMH Discharges |
| | After hours, on weekends or holidays, when the referring clinician has not completed an SRA, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB. | Total number 20% Initials = _____ X .75 hours =<br>80% updates = _____ X .5 hours = |
| | By the associated IDTT and/or clinician for all inmate-patients placed into an OHU, for mental health reasons, or MHCB, for any reason, upon decision to release or discharge. | Total Hours divided by 33.86 + _____ Case Manager positions |
| | Subsequent to release from OHU placement continued suicide risk assessment, or MHCB admission suicidal ideation, threats, or attempts, at a minimum of every ninety (90) days for a twelve month period, by a mental health clinician. | |

\# of hours X total \# of CCCMS ASU divided by caseload \#=

No separate total of positions for this page, see next page

00519

Part II CCCMS New Requirements also required in ASU Continued

| |
|---|
| • Within seventy-two (72) hours of return from a Department of Mental Health (DMH) facility, or within 24 hours if clinically indicated based on new arrival screening.<br><br>• Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts. |

TOTAL CASE MANAGER POSITIONS requested from this page is ___

TOTAL CASE MANAGER POSITIONS requested from this page is 7.5

TOTAL CASE MANAGER POSITIONS for Part II is ___