# Memorandum

RECEIVED
AUG 2 6 2004
ROSEN BIEN & ASARO
COPY

Date : August 16, 2004

To : John Dovey
Chief Deputy Director
Field Operations

Subject: **ANNUAL SUICIDE REPORT FOR 2003**

Enclosed please find the 2003 Annual Suicide Report for the California Department of Corrections. This report summarizes data from the 35 suicides that occurred in custody last year.

If you have any questions, please contact Helen Steenman, Ph.D., Senior Psychologist, Health Care Services Division (HCSD), at (916) 327-0148.

RENEE KANAN, M.D.
Deputy Director (A)
Health Care Services Division

Attachment

cc: Roderick Q. Hickman, Agency Secretary, Youth and Adult Correctional Agency
Cheryl Pliler, Deputy Director, Institutions Division
Yulanda, Mynhier, Chief (A), Field Management Section, HCSD
Regional Administrators, Institutions Division
Regional Administrators, HCSD
Anita Mitchell, M.D., Chief Medical Officer, Clinical Standards & Services, HCSD
David G. Gransee, Chief (A), Clinical Policy & Programs Section, HCSD
Timothy Fishback, M.D., Chief Psychiatrist, Clinical Policy & Programs Section, HCSD
Margaret McAloon, Ph.D., Chief Psychologist, Clinical Policy & Programs Section, HCSD
J. Michael Keating, *Coleman* Special Master
Matthew Lopes, *Coleman* Deputy Master
Michael Bien, Rosen, Bien & Asaro, LLP
Donald Specter, Prison Law Office
Raymond Patterson, M.D., *Coleman* Expert
Jennifer Neill, Deputy Attorney General, Department of Justice
Judi Lemos, Staff Counsel, Legal Affairs Division
Catherine Bernstein, Assistant Chief Counsel, Legal Affairs Division
Tim Shively, CC III, Institutions Division
Robin Dezember, *Coleman* Project Team Manager
All Wardens
All Health Care Managers

# SUICIDE PREVENTION IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS

## 2003 ANNUAL SUICIDE REPORT

**Prepared by**
**Helen Steenman, Ph.D.**
**Senior Psychologist, Specialist**
**Health Care Services Division**

Since 1997, the California Department of Corrections (CDC) Health Care Services Division (HCSD) has maintained a database to track inmate deaths. Mental Health Services at HCSD maintains a separate database specifically for tracking inmate suicides. Various demographic and historical variables are included such as criminal and CDC history, mental health history, and treatment. The sources of these data include information gathered during Suicide Reviews (a.k.a. Psychological Autopsies) which include review of Central Files, Unit Health Records, logs, incident reports, and interviews with CDC clinical and custody staff, other inmates, and sometimes family members.

These annual reports describe some of the findings in the data for this year. It is hoped that by continuing to build this database, information may emerge which can be used to improve the CDC Suicide Prevention Program and thereby reduce the number of inmate deaths by suicide in the CDC.

**Overview of 2003 Suicides**

There were 35 completed suicides in the CDC in 2003, up from 21 in 2002. There were a total of 469 documented serious suicide attempts in CDC institutions in 2003, and of these only 7 percent were successfully completed. Although the number of suicides was higher in 2003 than in 2002, the percent of completed attempts decreased slightly (from 8.6 percent in 2002.) A documented serious suicide attempt was defined as one for which a CDC 837 Incident Report was written up.

Suicides occurred at 20 of the 32 CDC prisons, including one inmate in a Youthful Offender Program (YOP). The following table lists the number of suicides at the CDC institutions where they occurred.

**NUMBER OF 2003 SUICIDES BY INSTITUTION**

| Institution | Number of Suicides | Percent of Total Suicides This Year* |
|---|---|---|
| CAL | 1 | 3 % |
| CCI-YOP | 1 | 3 % |
| CIM | 2 | 6 % |
| CMC | 3 | 9 % |
| CMF | 1 | 3 % |
| COR | 4 | 11 % |
| CTF | 2 | 6 % |
| DVI | 2 | 6 % |
| FOL | 1 | 3 % |
| HDSP | 1 | 3 % |
| ISP | 1 | 3 % |
| LAC | 1 | 3 % |
| MCSP | 2 | 6 % |
| PBSP | 1 | 3 % |
| RJD | 2 | 6 % |
| SAC | 2 | 6 % |
| SATF | 4 | 11 % |
| SCC | 1 | 3 % |
| SOL | 1 | 3 % |
| SVSP | 2 | 6 % |
| **Total** | **35** | **100 %** |

* *Not adjusted for Average Daily Population (ADP) or number of inmate-patients in MHSDS*



Suicides are usually reported as rate per 100,000. The rate for the CDC in 2003 was 21.8, the highest since 1993. The average rate of suicides in the CDC over the past 14 years was 15.4. The National Average for males in the United States is about 18 suicides per 100,000.

**NUMBER AND RATE OF CDC SUICIDES**
**CALENDAR YEARS 1990 – 2003**

| YEAR | NUMBER OF CDC SUICIDES | CDC AVERAGE DAILY POPULATION | RATE PER 100,000 |
|---|---|---|---|
| 1990 | 15 | 90,103 | 17 |
| 1991 | 13 | 100,750 | 13 |
| 1992 | 15 | 105,238 | 14 |
| 1993 | 29 | 114,909 | 25 |
| 1994 | 18 | 124,036 | 15 |
| 1995 | 22 | 131,321 | 17 |
| 1996 | 19 | 141,159 | 13.5 |
| 1997 | 18 | 152,004 | 11.8 |
| 1998 | 21 | 158,189 | 13.3 |
| 1999 | 24 | 160,970 | 14.9 |
| 2000 | 14 | 161,567 | 8.7 |
| 2001 | 27 | 160,000 | 16.8 |
| 2002 | 21 | 158,694 | 13.2 |
| **2003** | **35** | **160,772** | **21.8** |
| TOTALS | 291 | 1,914,117 | 15.4 |

**Demographics for 2003 Suicides**

There were no suicides by female inmates in 2003. Female inmates comprised just over 6 percent of the CDC inmate population.

At least 10 (29 percent) of the inmates completing suicide in 2003 were married, an increase from previous years. Relationship difficulties seem to be one of the factors sometimes influencing an inmate's decision to commit suicide.

Following the trend from previous years, the highest incidence of suicides was among Caucasians at 40 percent, with a much higher rate than their representation within the male inmate population of 28.1 percent. Hispanics closely followed Caucasians in incidence of suicides at 34.2 percent, but came much closer to matching their overall representation in the inmate population of 36.9 percent. The number of suicides among African American inmates continued to be low (11.4 percent) in relation to their total representation (39.4 percent) in the CDC. Incidentally, the rate for African American males in the general population is also much lower than that for Caucasian males. The "Other" group this year included three Native Americans, one Pacific Islander, and one Afghani inmate, for a combined incidence of 14.3 percent, much higher than their 5.7 percent representation in the inmate population.

**2003 Suicides by Ethnicity**

| Ethnic Group | Number of suicides | Percent suicides | Percent of total CDC population* |
|---|---|---|---|
| Caucasian | 14 | 40% | 28.1 |
| African American | 4 | 11.4% | 29.4 |
| Hispanic | 12 | 34.3 % | 36.9 |
| Other | 5 | 14.3% | 5.7 |

** As of December 31, 2003*

The chart below illustrates the percent of suicides by ethnicity as compared to the total representation of that ethnic group in the inmate population as of December 31, 2003.

This year the population of inmates completing suicide was slightly older than in previous years.

**2003 Suicides by Age**

| Age Range | Number | Percent |
|---|---|---|
| Under 20 | 1 | 3% |
| 20-29 | 5 | 14% |
| 30-39 | 15 | 43% |
| 40-49 | 10 | 29% |
| 50-59 | 4 | 11% |



Occupation and stability of employment have been difficult to track with accuracy among inmates who committed suicide. Most had very poor work histories, and many were unskilled laborers.

Educational level has not been a meaningful variable among suicides. The range was between 6 and 15 years of education. Most inmates in the suicide group had between 10 and 12 years education or a General Educational Development diploma.

Ability to speak English was tracked in 2003. There was only one case where the inmate had a known limitation in English. In that case, a translator had not been used in providing mental health services at the final institution, which may have been a factor in that suicide.

Season of the year has not been a meaningful variable in CDC suicides, and no discernable patterns have emerged. For 2003, there were six suicides each in January and in March, and there was only one suicide in August and December. The data have never suggested that suicides are more likely to occur in the winter months or around the holidays in the CDC.



The time of day that suicides were discovered has not shown any particular trends over previous years. Time is examined in several ways. Dividing the day into quarters is frequently done in

reports of this type. The first and last quarters of the day represent the night hours and the second and third quarters represent the day hours. This year, 20 or 57 percent of the suicides were discovered between 1801 and 0600 hours, while 15, or 42 percent were discovered during daylight hours. The correspondence between time of discovery and actual time of suicide is uncontrolled, because what time the inmate actually committed the act is unknown.

When time of suicide discovery was examined by watch or shift, there were no differences.

| Watch | Number of Suicides |
| --- | --- |
| 1st Watch (2300-0700) | 12 |
| 2nd Watch (0700 – 1500) | 11 |
| 3rd Watch (1500 – 2300) | 12 |

The most suicides occurred on Saturday (23 percent) and the fewest on Monday (6 percent). Last year the highest numbers were on Sunday.

This was further investigated by clustering days into workweek (Monday through Friday) and weekend (Saturday and Sunday). As in 2002, suicides were somewhat more likely to occur on

the weekend than during the workweek, with 13 (37 percent) occurring on a weekend (28 percent of the week) and 22 (63 percent) on a weekday (71 percent of the week).

Continuing another trend seen in previous years, by far the most frequently employed method for completed suicide in the CDC is by hanging. In 2003, two inmates jumped from a tier, two inmates died from lacerations causing them to bleed out, and one inmate both lacerated and hanged himself. The remainder (N=30 or 86 percent) hanged themselves and died of asphyxiation.




**Sentencing and Term Issues**

Four (11 percent) of the suicides were inmates who had been to court within the past month. One was a Lifer General Population (GP) inmate in the Administrative Segregation Unit (ASU) who had just been to court on charges of possession of drugs in prison. Two were in a Reception Center (RC), and had just been to court for sentencing. One was facing serious new charges in prison that would have resulted in a third strike.

Typically, having a long or Life sentence has been associated with suicide among inmates. In 2003, 54 percent of the inmates had Life or greater than 15 year sentences. Twenty-six (76 percent) had sentences of greater than 10 years. This is consistent with data from previous years. Four were pending sentencing.

**Sentence**

| | |
|---|---|
| < 5 years | 6 |
| 6-10 years | 2 |
| 11-15 years | 4 |
| More than 15 years (including Lifers) | 19 |
| Pending sentencing (PVRT) | 4 |

In addition to sentence, actual time left to serve was also considered. This was calculated as Earliest Possible Release Date minus date of death. Thirty-one percent had more than 15 years to serve. Forty percent had more than ten years to serve.

**Time to Serve**

| | |
|---|---|
| Less than 2 years | 6 |
| 2-5 years | 3 |
| 6-10 years | 7 |
| 11-15 years | 3 |
| More than 15 years (including Lifers) | 11 |
| Pending sentencing | 5 |

Inmates serving a first term are considered to be at greatest risk for suicide, and this was once again supported by the data for 2003. Fifteen (43 percent) were first termers. Seven (20 percent) were second termers. Eight (23 percent) were serving their third or more term. Term number was unknown for five (14 percent). Four were third strikers and two more had a possible or pending third strike.

Finally, in terms of time, inmates committing suicide have often not been in prison for very long. It had been speculated that a subgroup of inmates who commit suicide are not able to adjust to prison. In 2003, 7 (20 percent) of those committing suicide had served no more than 4 months. Forty-six percent had served less than 2 years, and 74 percent less than 5 years. The range was 2 days to 17 years.

Three inmates were known to have Immigration and Naturalization Service (INS) holds, and two more likely did.

**Criminal History**

Violent criminal history continues to be a very high corresponding factor for inmate suicides. Seventy-seven percent had committed a violent crime, much higher than among the inmate population at large, which is only about 46 percent. This year, 34 percent had a history of sexual offending. Twenty-five percent had some sort of gang affiliation, the significance of which is unknown. Forty-eight percent of those for whom the information was available had a juvenile criminal history. Forty percent were parole violators. These factors are summarized in the table below. Where the information is available, comparisons are made with the total inmate population.

**Crime Factors for 2003 Suicides**

| Factor | Present | Absent | Unknown | Percent of Suicides | Percent in Total Population |
|---|---|---|---|---|---|
| Juvenile History | 16 | 17 | 2 | 48% | N/A |
| Gang Affiliation | 8 | 24 | 3 | 25% | N/A |
| Violent Crime | 27 | 8 | 0 | 77% | 52% (crimes against persons) |
| Sex Offense History | 12 | 23 | 0 | 34% | 14% (PC 290 registration required) |
| Parole Violator | 14 | 21 | 0 | 40% | N/A |

**Custody Issues**

The role of violence in suicide is further reflected by custody classification level. Over half (54 percent) of the 35 inmates committing suicide were Level IV, far exceeding the overall population representation of 20 percent. This is consistent with previous years. Higher custody level inmates are at greater risk for suicide.

| Custody Classification Level | Number of Suicides | Percent of Suicides | Total Male Inmates* |
|---|---|---|---|
| I | 4 | 11% | 10% |
| II | 2 | 6% | 26% |
| III | 7 | 20% | 24% |
| **IV** | **19** | **54%** | **20%** |
| Reception center | 3 | 9% | 14% |

* Does not total 100% as the remaining six percent were in camps and CCFs

**Housing**

Over half (56 percent) of the inmates were in ASU or a Security Housing Unit (SHU). This was a higher proportion than in previous years. In 2002, only six, or 29 percent were in ASU or SHU. The average for 1997-2002 was 32 percent in ASU, and the highest of those years was 2000 at 43 percent. An additional three inmates were on lockdown at the time of their suicides, due to institutional issues. One was the only Enhanced Outpatient Program (EOP) inmate who was not in ASU or RC.

**Housing**

| | |
|---|---|
| ASU | 18 |
| SHU | 2 |
| RC | 3 |
| EOP | 1 |
| CTC | 1 |
| OHU | 1 |
| GP | 9 |
| **TOTAL** | **35** |

Of the 20 inmates in ASU and SHU, eight had been placed there within the past week, and 12 within the past month, for a total of 60 percent. Three had recently been returned to ASU from an inpatient (Mental Health Crisis Bed (MHCB), Department of Mental Health (DMH) or Locked Observation Unit (LOU) placement. A total of nine of the 20 who were in ASU/SHU were being held for safety reasons or awaiting Security Needs Yard (SNY) placements. Fourteen of the 20 had long or life sentences. This information is detailed in the chart below.

**Suicides in ASU and SHU**

| Inmate | How long in ASU | Reason for Placement | LOC | Sentence |
|---|---|---|---|---|
| P-31384 | 3 days | Safety | GP | Life |
| C-97584 | 6 days | RVR- (Drugs) | GP | Life |
| T-62140 | 2 months* | RVR- (Battery on staff) | EOP | 14 y |
| E-87491 | 7 months | RVR- (Battery on I/M) | EOP | Life |
| H-05294 | 3 months | RVR | GP | Life |
| P-62291 | 3 days | Safety | GP | 66 y |
| K-39659 | 3 days | Safety | GP | 54 y |
| T-44931 | 1 month | Safety | CCCMS | 13 y |
| E-06655 | 13 months SHU* | SHU term expired, awaiting transfer to SNY | EOP | 2 y |
| E-56871 | SHU | SHU term | CCCMS | 15-L |
| T-67329 | 4 months** | RVR (assault cellmate) | CCCMS (YOP) | 3 y |
| D-56667 | 4.5 months | RVR (new charge: molest visiting child) | GP | 25; facing life on new charge |
| E-82587 | 2 ½ weeks | Safety (enemy concerns) | EOP | Pending |
| T-96571 | 3 weeks | RVR | GP | 2 y |
| H-54017 | SHU since 12/99 | Awaiting transfer to SNY | CCCMS | 25-L |
| P-82238 | 3 mos. | Safety (R-suffix) | CCCMS | 32 mo |
| T-45033 | 5 mos. | | CCCMS | 22 yrs |
| J-12377 | 1 day | Safety (enemy concerns) | GP | Pending |
| H-86940 | 3 mos. 1 wk. | Pending SHU term | CCCMS | 11 yr |
| P-19965 | 45 min | Behavior | CCCMS | 16 yr |

* Inmates had been back and forth to LOU or MHCB placement, returned to ASU the previous day.

** Inmate had been back and forth between ASU and MHCB/DMH, back in ASU for three weeks.

Twenty-one (60 percent) of the 35 inmates committing suicide in 2003 were single-celled at the time. In previous years, a somewhat higher percentage was single celled, with the average from 1997 through 2002 being 68 percent.

Seventeen (85 percent) of the 20 ASU/SHU inmates were single-celled when they committed suicide.

Six inmates had job assignments, although one had just lost his due to ASU placement. Many inmates lack access to meaningful activity.

**Mental Health Issues**

In 2003, there was a greater proportion of inmates in the Mental Health Services Delivery System (MHSDS), and more were at higher levels of care, than had been seen in recent years. Thirty-five percent of the inmates were non-MHSDS. Twenty-four percent were at higher levels of care including EOP, Outpatient Housing Unit (OHU), and MHCB.

As the chart indicates, a large proportion of inmates at each of the three major levels of care were in ASU or a SHU. (ASU and SHU are combined, as there were only two SHU inmates.) One inmate at each major level of care was in a RC. This information is detailed in the table below.

Even though the Department achieved full seven-day-per-week rounding by psychiatric technicians in 2003, this did not prevent a high number of suicides in ASU. In fact, there were more suicides in ASU than in previous years.

**2003 Suicides**

| Housing/Level of Care | Number of Suicides |
|---|---|
| GP | 3 |
| ASU GP | 8 |
| SHU GP | 0 |
| CCCMS | 6 |
| ASU CCCMS | 6 |
| SHU CCCMS | 2 |
| EOP | 1 |
| ASU EOP | 4 |
| OHU (GP) | 1 |
| MHCB (CCCMS) | 1 |
| RC GP | 1 |
| RC CCCMS | 1 |
| RC EOP Enroute | 1 |
| **Total** | **35** |

Information on the mental health history of inmates prior to entering prison is often sparse, and is frequently based on inmate self-report documented somewhere in the records. This year, previous mental health history was indicated for about 15 (43 percent) of the inmates, which was the same percentage as there were in 2002. Information on family mental health history is even more difficult to obtain. Of those for whom some information was available, about 6 (17 percent) appeared to have indications of some mental health problems in the family. These figures may exceed those that would be found among the inmate general population.

At least 16 inmates had previously attempted suicide in the community, and several of these had multiple attempts. An additional individual was noted to have overdosed on heroin, but it was not clear whether that had been a suicide attempt. Another individual had at least threatened suicide in the past. Only 16 of 34 inmates had never attempted suicide prior to incarceration. No information was provided for one inmate. Therefore, the incidence of suicide attempts in the community for this group of inmates who ultimately succeeded was between 47 percent and 53 percent.

Of the 16 inmates with community suicide attempts, 11 were housed in ASU when they committed suicide. Seven of these had been in ASU for a month or less.

Ten inmates had made either previous suicide attempts (one or more) or significant gestures while in the CDC. Only four of these were the same inmates who had attempts prior to CDC. This raises to 22 (65 percent) the total number out of 34 with some history of attempting suicide. Two more had made threats, and one of these also had prior attempts.

Of these ten inmates with prior suicide attempts in the CDC, four were housed in ASU when they committed suicide. Two of the four had been in ASU for a month or less.

Fully 81 percent had a history of illegal drug use or substance abuse, which continues to be one of the strongest factors. However, it is likely that a high percentage of inmates in general have a drug history, which may not make it a distinguishing characteristic of suicides.

**Mental Health History Prior to Incarceration**

| Factor | Present | Absent | Unknown | Percent of Known |
|---|---|---|---|---|
| Psychiatric History | 15 | 27 | 3 | 43% |
| Family Psychiatric History | 6 | 17 | 12 | 17% |
| Suicide History before CDC | 16-18 | 16 | 1 | 47 – 53% |
| Suicide Attempts in CDC | 10 | 24 | 1 | 29% |
| **Any Suicide History** | **22** | **12** | **1** | **65%** |
| Substance Abuse History | 29 | 1 | 5 | 81% |

A variety of stressors seem to trigger a suicide, although not in all cases. Types of issues included family concerns, fears of other inmates, and transfers and housing changes.

Six inmates appeared to have medical concerns that may have impacted their decision to take their life, but in only one of these cases was a lack of appropriate medical attention or response clearly indicated by the review.

Of the 23 inmates in the MHSDS, 13 were primarily diagnosed with some type of mood disorder, most often major depression. Eight were diagnosed with a psychotic disorder not otherwise specified; one with schizophrenia; one with anxiety; one polysubstance abuse; and one "rule out attention deficit/hyperactivity disorder".

**Summary and Recommendations**

There were a total of 35 suicides in 2003, occurring in 20 of the 32 CDC institutions, including one at a YOP. This was the highest rate (21.8 per 100,000) since 1993, and slightly exceeded the community rate for males in the United States. There were a total of 469 documented suicide attempts reported in 2003, up from 245 in 2002. Only 7 percent of these were completed suicides, down from 8.6 percent in 2002.

Similar to trends seen in previous years, inmates who completed suicide were more likely to be Caucasian or Hispanic, and in the 30-39 year age range. Season of the year again did not seem to be following any particular trends, and the holidays saw no increase in completed suicides. In 2003, Saturday had the most suicides (23 percent) and Monday the fewest, but there was no strong trend with regard to day, week, or weekend. Time of day revealed a slight tendency for more suicides to occur at night, but this was not a strong trend, and there were no differences between Watches. Thirty of the 35 suicides (86 percent) were completed by hanging, with a laceration, a jump, and a laceration/hanging combination as other methods used this past year.

Fifty-four percent of the suicides were among inmates with a sentence of 15 years or more, including Lifers. Thirty-two percent had more than 15 years of their sentence left to serve. Forty-three percent were first termers. Forty-three percent had served less than 2 years, and 71 percent had been incarcerated less than 5 years. The combination of long sentences, being new to prison, and having a lot of time left has been an enduring characteristic of CDC suicides.

A very high percentage (77 percent) of inmates committing suicide had violent offense histories. This year, a very high number (34 percent) were sex offenders. Gang affiliation seems to be a low occurrence. Fifty-nine percent were Level IV custody classification, reflecting the violent nature of the suicide population. Sixty percent were single celled, a decrease from previous years.

A very high proportion of the suicides were in ASU, SHU, and lockdown. Many of these were protective housing placements, and/or had only recently been locked down. This was the red flag issue for 2003. There is a need for greater vigilance by clinical and custody staff in ASU. A number of recommendations have been made by a Suicide Quality Improvement Team at HCSD to decrease the risk of suicide in these settings, as follows:

- Placing new arrivals and high risk inmates in high visibility cells (in line of sight of correctional staff)
- Whenever possible, house higher risk inmates with another inmate (restrict single-cell housing)
- Issue direction to the field requiring the custody staff to provide clinical staff with a copy of the CDC form 114d for daily review of new arrivals in ASU.
- Develop a standardized orientation for entrance into ASU that answers questions frequently asked by inmates and addresses common concerns of inmates entering ASU, in an attempt to alleviate common stressors and reduce the risk of suicide.
- Issue direction to the field to conduct the 114d Administrative Review interview between the facility Captain and the inmate on the first working day following placement into ASU (NOTE: It was recommended that the standardized orientation to ASU be conducted during the 114d Administrative interview).
- Issue direction to the field that a mental health clinician must be present during the 114d Administrative Review interview in order to perform a Mental Health Assessment (NOTE: The clinician's role needs to be defined; on weekends, the Lieutenant will stand in for the Facility Captain and the Psychiatric Technician will stand in for the Mental Health clinician).
- Issue direction to the field requiring a Mental Health screening for every inmate entering ASU within 72 hours, including inmates that are being housed in ASU as overflow placement. (Alternatively, provide mental health screening prior to placement, as with medical screening, for all new arrivals.)
- Issue direction to the field to develop an Operating Procedure (OP) for the performance of Mental Health ("Psychiatric Technician") Rounds including:
  - A definition and description of a typical mental health round in accordance with the Program Guidelines (NOTE: the Program Guidelines indicate that the PT shall interact with the inmate sufficiently to conduct an evaluation. This explanation needs to be defined.)

- The identification of a reporting procedure including time frames (e.g., monthly reporting), follow-up action and report distribution.
- Research the feasibility of accessing information from the inmate's central file (C-file) upon entering Ad Seg in order to make the determination to single-cell or double-cell an Ad Seg inmate. A database or database integration is suggested.

In 2003, a higher proportion (65 percent) of suiciding inmates were in the MHSDS, in contrast to previous years. Suicides occurred at all levels of care (excepting DMH). Forty-three percent were in Correctional Clinical Case Management System. Over half of the MHSDS inmates were diagnosed with a mood disorder.

About 43 percent had some psychiatric history prior to CDC. Around 50 percent had attempted suicide in the community, and 65 percent had ever had any suicide attempts at any time in their lives. Any history of prior suicide attempts is clearly an important risk factor.

At least three, and possibly five inmates had INS holds, one had difficulty speaking English, and one inmate suicide was deemed likely to have been influenced by a serious medical condition that was intolerable and was not receiving appropriate medical attention and accommodation. Only 6 of the 35 had job assignments.

Out of 35 suicides in 2003, HCSD reviewers found that corrective actions were necessary for 26 (74 percent) of these. For those suicide cases in which problems were identified, the following issues tended to stand out:

- Poor medication distribution practices, missing Medication Administration Records, and lack of adequate cell searches by custody, relating to situations where medication was hoarded
- Poor continuity of care, i.e. poor communication between the various staff involved with the inmate both within the institution and between institutions
- Inadequate documentation (part of the communication problem) including incomplete progress notes, evaluations, and treatment plans; that did not indicate the rationale for the contact, intervention, or prescription
- Clinical staff who were inexperienced in a correctional setting, particularly contractors, making critical errors in clinical judgment or failing to respond appropriately to emergency situations
- A disturbing trend toward allowing inmates to dictate their own treatment, such as discontinuing prescriptions when inmates decide they no longer want to take their medications
- Single-celling new inmates in ASU even when there is no indication that they would be unable to have a cellmate
- Lack of timely mental health screening of inmates newly admitted to ASU
- Not doing Suicide Risk Assessments when indicated, not completing five-day follow-ups, not referring to DMH when indicated
- Not using a translator and evident lack of understanding of how cultural issues may shape the presentation of a mentally ill inmate-patient
- Ventilation grates with holes large enough to tie a sheet through in old facilities

Many of these problems are occurring on a system-wide basis. The dangers of single celling, particularly when an inmate is under stress such as just being placed in ASU cannot be overemphasized.

HCSD distributed a new Medication Management Policy in 2003, which hopefully is leading to an improvement in medication delivery practices. Institutions Division re-issued a memorandum in 2003 requiring that ASU inmates be double celled unless security considerations prevent it. HCSD has also begun to address some of the system issues through a Suicide Prevention Focus Improvement Team at the central office, chaired by the Chief Psychiatrist. Training is provided to all institutions on an ongoing basis through the monthly Suicide Prevention videoconference from HCSD, which is coordinated by the Chief Psychologist. Finally, the implementation of the Quality Management System should help to ensure that Corrective Action Plan items are audited and compliance is maintained.

HCSD is continuing to track and review suicide cases. It is hoped that continued emphasis on suicide prevention including ongoing training for all staff on recognizing the signs and symptoms of suicidality, along with appropriate evaluation and follow-up care by mental health staff, will keep the number of suicides in the CDC low. The institutions will be required to continue to develop and maintain suicide prevention programs as part of their overall Quality Management Systems.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARCIANO PLATA, et al., Plaintiffs v. ARNOLD SCHWARZENEGGER, et al., Defendants, | NO. C01-1351-T.E.H. **RECEIVER'S FIRST BI-MONTHLY REPORT** |

## TABLE OF CONTENTS

Page

I. Introduction . . . . . 1

II. The State of the State of California . . . . . 2

III. The Waste of Taxpayer Resources . . . . . 7

IV. Establishing an Office of the Receiver . . . . . 12

A. California Prison Healthcare Receivership Corporation ("CPR") . . . . . 12

B. Office Location . . . . . 12

C. Staff Appointments . . . . . 13

D. Establishing the Receiver's Presence in Prison Operations . . . . . 17

V. Problems Being Faced By the Receiver, Including Any Specific Obstacles Presented By Institutions or Individuals . . . . . 21

A. Introduction . . . . . 21

B. Funding the Substantive Changes Ordered by the Receiver . . . . . 22

VI. Success Achieved By the Receiver . . . . . 23

A. Fair Compensation for Prison Health Care Personnel . . . . . 23

B. Contracting with Specialty Care and Other Out of Prison Providers . . . . . 24

C. Pharmacy . . . . . 26

VII. Accounting of Expenditures for the Reporting Period . . . . . 27

A. Revenues . . . . . 27

B. Expenses . . . . . 27

C. 2006-2007 Annual Budget for the Office of the Receiver . . . . . 27

VIII. Other Matters Deemed Appropriate for Judicial Review . . . . . 28

A. Coordination Between *Plata* and *Coleman* . . . . . 28

B. The July 2006 San Quentin Project . . . . . 29

IX. Summary . . . . . 31

# I.

## INTRODUCTION.

The Order Appointing Receiver ("Order") filed February 14, 2006 requires that the Receiver file his "Plan of Action" within 180-210 days. In the interim, the Order calls for the Receiver to undertake "immediate and/or short term measures designed to improve medical care and begin the development of a constitutionally adequate medical health care delivery system." Order at page 2-3. In addition, pursuant to page 3, lines 16-22 of the Order, the Receiver must file with the Court on a bi-monthly basis status reports concerning the following issues:

A. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

B. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

C. Particular success achieved by the Receiver.

D. An accounting of expenditures for the reporting period.

E. Other matters deemed appropriate for judicial review.

The Receiver reports on issues B though E below.[1] Before this reporting, however, the Receiver believes it important to place the initial activities of his Office into context. He begins with the Findings of Fact and Conclusions of Law re Appointment of Receiver ("Findings of Fact and Conclusions of Law") filed October 3, 2005.

The Court iterated its rationale for placing the California Department of Corrections and Rehabilitation ("CDCR") medical care system into Receivership in the Findings of Fact and Conclusions of Law. The Receiver has been mindful of the Findings when conducting his duties and responsibilities to date. The Receiver has not only verified the Findings but, unfortunately, he has as well concluded that the situation in California's prisons is, perhaps, worse than the

[1] Given that the 180 day Plan of Action is not yet prepared, there will be no status report concerning the plan in this report.

descriptions provided in the Findings of Fact and Conclusions of Law. Because of this, the remedies envisioned may be more dramatic, far reaching and difficult to achieve than previously envisioned. Therefore, in addition to discussing the issues required by the Order, the Receiver will address below three additional issues of importance: (a) the state of the State of California; (b) the waste of taxpayer resources, and (c) efforts to establish the Office of the Receiver.

## II.

## THE STATE OF THE STATE OF CALIFORNIA

The Receiver has conducted dozens of meetings concerning the medical care provided inside California's prisons during his first sixty days of appointment. He has met and conferred with counsel for the parties, spoken formally and informally with literally dozens of State of California employees, from Governor Arnold Schwarzenegger to the heads of California's control agencies, executives from the CDCR, and correctional staff and health care clinicians working inside the walls of five prisons (San Quentin, the California Institute for Men, the California Institute for Women, the Central California Womens Facility and the Valley State Prison for Women). He has also interviewed inmate/patients. In addition, the Receiver has met with officials of the bargaining units who represent medical care providers in the CDCR, including the Union of American Physicians and Dentists ("UAPD"), the Service Employees International Union ("SEIU"), the California Correctional Peace Officers Association ("CCPOA") and the American Federation of State, County, Municipal Employees ("AFSCME").

The Receiver also reviewed thousands of pages of documents, including budget proposals, inmate/patient medical care charts, internal affairs investigations, policies and procedures, incident reports, memoranda from counsel, and the reports of the Court experts. In addition, as explained below, the Receiver has aggressively moved to assemble a team of top quality staff, including experts in both corrections and medical care. Based on all of the information reviewed and considered during the initial 60-days of the Receivership, the Receiver finds as follows:

A. The medical services provided by the CDCR are without question "broken beyond repair," as found by the Court in the Findings of Fact and Conclusions of Law. Almost every necessary element of a working medical care system either does not exist, or functions in a state of abject disrepair, including but not limited to the following: medical records, pharmacy, information technology, peer review, training, chronic disease care, and speciality services. Similar to the conditions reported by the Court, the Receiver has observed cases where inmate/patients did not receive adequate care because of their inability to access care; also, and perhaps more disturbing, he has reviewed cases where inmate/patients did not receive adequate care even after accessing the CDCR medical care system.

B. The Receiver commenced the task of raising the level of medical care provided to California prison inmates up to constitutional standards with the assumption that prison medical care services will remain, at least in the near term, within the overall framework of the California correctional system. However, two very serious impediments may, over time, render the Receiver's assignment difficult, if not impossible, to complete:

1. Systemic Long Term Overcrowding: Most California prisons operate at 200% of capacity, with no effective relief in sight. Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system.

2. Instability of Leadership: The Receiver has already dealt with no fewer than three Secretaries or Acting Secretaries of the CDCR. As well, the reassignment, retirement, promotion, or demotion of numerous wardens has significantly contributed to the instability, demoralization and ineffectiveness of the CDCR in both its custody as well as medical care responsibilities.

Given this state of affairs, and the poor reputation that the CDCR has earned as an employer, raising the medical system to constitutional standards may require removing it from the umbrella of the CDCR.

C. The prevalence of "trained incapacity" was correctly noted in the Findings; however, it may have been understated. "Trained incapacity" is a major cultural obstacle. Furthermore, it is both a vertical and horizontal issue, i.e., it involves not only CDCR but all other State Agencies and Departments whose performance significantly affects CDCR's ability to perform adequately and appropriately. Thus, the Receiver affirms that the inadequacy of medical care in California's prisons is not caused by the CDCR alone. As noted in the Findings of Fact and Conclusions of Law, the problems with CDCR medical care are a product of "[d]ecades of neglecting medical care while vastly expanding the size of the prison system [which] has led to a state of institutional paralysis." The present crisis was created by, and has been tolerated by, both the Executive and Legislative branches of the State of the California. Furthermore, these problems have not been adequately addressed by the State's control agencies, including the Department of Finance ("Finance"), the Department of General Services ("DGS"), and the Department of Personnel Administration ("DPA"). For example, the imposition of unreasonable and unfunded bureaucratic mandate, concerning certain essential services (for example, the ability to obtain medical supplies in a timely and cost effective manner and the ability to enter into contracts with specialty providers in a timely and cost effective manner) has all but crippled the CDCR's efforts to provide adequate health care. Therefore, concerning these services, the corrective action required from the Receiver must, of necessity, involve the restructuring not only of the CDCR, but also the operation and oversight of State of California control agencies.

D. It should also be understood that the "trainer" of the aforementioned "trained incapacity" is the State of California itself; including, at least, the Executive and Legislative branches of State government. It may, indeed, not be possible to achieve the mission of the Receivership given the existence of current State laws, regulations, policies and procedures and interpretations of same. This includes existing bargaining agreements for which the State is ultimately responsible. The Receiver references here the non-economic provisions of labor

contracts.[2] Due to labor agreements, statutes, regulations, policies and procedures related to the State personnel system, Civil Service requirements, and the California State Personnel Board, it is virtually impossible to effectively discipline and/or terminate State employees for poor performance, up to and including incompetence and arguably illegal behavior. The sense of hopelessness this creates for supervisors, managers, department heads and others with the responsibility and supposed authority to assure adequate and competent performance of subordinate employees cannot be overstated and has led, in some cases, to the dereliction of their own responsibilities in this regard. In addition, the lack of qualifications, training and, in some instances, competence of the above personnel has created a culture of incompetence and non-performance which, unfortunately, is more rewarded than not within State employment.

E. As noted by the Court in the Findings of Fact and Conclusions of Law, the imposition of the drastic remedy of a Receivership was needed in California's prisons to "reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California's prisons up to constitutional standards." The Receiver finds that the depth of the CDCR medical care delivery problems and the shortfalls of oversight and services from the control agencies, to be so ingrained in operations and thinking, and so severe that the Receiver's remedial process must, of necessity, address both "big picture" policy related concerns as well as extremely detailed procedures, practices, training, and monitoring. To emphasize: there will be no quick fixes. If a quick fix was available, the Court would not have appointed a Receiver.

F. Inmates are not the only prisoners in the California Department of Corrections and Rehabilitation. The Receiver has encountered many CDCR employees, medical providers and correctional personnel who desperately want to do a good job. The medical care crisis in California's prisons was not created by the men and women who toil in the CDCR trenches. The

---

[2] The gross underpayment of State employees, especially in clinical, management and support positions who provide services in California's prisons is well documented and, frankly, more easily correctable than non-workable and unduly burdensome State provisions relating to work rules, roles and responsibilities, performance assessments, disciplinary processes and employee "rights" (as currently defined).

Receiver's observations cannot help but lead to the conclusion that the overwhelming majority of State employees involved in activities essential to the Receiver's mission are also prisoners. They are prisoners to a culture that dictates inappropriate rewards and punishments, and a system of operation groaning under the burden of the numerous statutes, rules, regulations, policies and procedures imposed upon them. The Receiver affirms the Court's finding that there are, despite deplorable conditions, individual employees and pockets of employees who continue to perform admirably and provide quality services to patients. Given the realities of the State system, however, the number of such individuals is far too insufficient at this time to enable the Office of the Receiver to achieve its mission.

G. Therefore, after evaluating the health care crisis in California prisons for a period of sixty days, after meeting and conferring with clinicians in the prisons, examining the CDCR's Central Office operation and consulting with his staff, the Receiver concludes that it will be a fatal error to proceed toward correcting the unconstitutional conditions in a haphazard or less than thoughtful manner. In making this finding, the Receiver emphasizes that he has inspected five prisons in sixty days. He has reviewed letters from inmate/patients and the families of inmate/patients, he has interviewed inmate/patients and observed first hand the real life negative impact of staffing shortages, the inability to contract with outside providers, the inability to order basic supplies, and other problems impinging on the efforts of CDCR clinicians to provide adequate care to inmate/patients. The Receiver is painfully aware of the emergent nature of the present crisis. Nevertheless, placing band-aids on gaping wounds, as has been attempted throughout the more than five year course of this litigation, will only worsen the problem and lead to more waste of limited public resources. Furthermore, the ultimate objective of the Receivership must always be kept in mind: to develop a medical care system that can be returned to the State. Given the depth and scope of the existing problems, and given the State-wide responsibility for the problems and the ultimate objective of the Receivership, the Receiver must proceed in an organized and methodical manner to develop a prison medical care system that is adequate, complete, and sustainable on a long term basis. Again, there will be no quick fixes.

III.

THE WASTE OF TAXPAYER RESOURCES

The creation of a constitutional medical care system is entirely consistent with sound fiscal management. While there will be elements of the prison medical care program which, in order to provide constitutionally mandated care, may cost more under the Receivership than they have in the past, the breakdown of the present system also provides significant opportunities for reducing unnecessary expenses through responsible fiscal management. The existing prison medical care system is not only constitutionally inadequate, it is also wasteful. Furthermore, despite numerous audits, statutes, regulations, and policies, the State of California has proven unable to adequately steward the finances of prison health care.

The Receiver lists below a limited number of examples of the waste of taxpayer resources that presently exist in the CDCR medical care system. The Receiver brings these issues to the Court's attention to emphasize two points. First, these examples of waste were created not only by the CDCR, but also by the State's control agencies. Second, for the Receiver to develop and implement a constitutionally adequate medical delivery system for California's prisons, he must not be bound or otherwise limited by the State's bureaucratic paralysis, including the State's ineffective rules and those dilatory fiscal processes which have created the very situation which led to the appointment of the Receiver.

Examples of the waste of taxpayer funds include the following:

A. Equipment: Diagnostic imaging equipment was purchased for the gastroenterology ("G.I.") clinic at San Quentin State Prison. The equipment, ordered four years ago, arrived two years later and has been in storage ever since because the room in which it was to be installed couldn't bear the weight of the purchased equipment. The fluoroscopy unit, an integral part of a G.I. diagnostic procedure, which operates in conjunction with the radiographic unit, was not even ordered. Without that unit, the full complement of diagnostic exams cannot be performed.

B. In-Prison Dialysis Services: The CDCR provides dialysis services for approximately 150 inmate/patients. Dialysis is provided inside the California Medical Facility ("CMF"), but

prisoners who require dialysis at every other CDCR prison are transported outside the prison for such care, an expensive option which requires correctional officer escorts and presents an increased risk of escape. In 2003 the State attempted to contract for in-prison dialysis care for inmate/patients at the Substance Abuse Treatment Facility ("SATF") and Corcoran State Prison. The contract would have lead to significant savings and improved security. However, due to poor contract management, numerous delays created by the DGS contract process and protest rules (the company with the sole source contract for dialysis services outside California's prisons protested the State's award for an in-prison contract, effectively stopping the process), the SATF/Corcoran in-prison contract is not yet, three years later, operational. Meanwhile, the CDCR continues to transport patients to more expensive and unsecure dialysis treatment outside SATF and Corcoran and the State is faced with an additional task: how to dispose of 16,000 syringes which were purchased by SATF in 2001 in anticipation of in-prison dialysis, which are now outdated.

C. <u>Failure to Conduct Timely Investigations and Implement Discipline of Medical Providers Suspected of Inadequate Patient Care</u>.

While the CDCR has attempted to establish various procedures to investigate clinician misconduct, including the delivery of woefully inadequate medical care, these efforts have not been successful. In some cases the clinicians under investigation have been removed from patient care duties; however, because of untimely investigations and discipline, they continue at full pay on the CDCR payroll for, in some instances, several years after the commencement of the investigation.

D. <u>Pharmacy</u>:

1. *Introduction*:

Even prior to the Receiver's appointment, the Court, at the Receiver's request, took action concerning the pharmacy crisis in California's prisons. The Receiver initiated this action primarily because of concern about patient services; however, it quickly became apparent that the California prison pharmacy system, or more accurately the lack of any system, was also entirely

ineffective concerning the contracting, procurement, distribution, and inventory control of necessary patient medications, including controlled substances. Given the massive size of the CDCR pharmacy operation, the lack of centralized controls, the lack of an effective audit program in prisons, and the inherent potential for fraud and theft which exists in the correctional environment, the Receiver made the decision to obtain a timely and independent evaluation of CDCR pharmacy services.

2. *Pre-2006 State Audits of CDCR Pharmacy Services.*

The Receiver's decision to audit CDCR pharmacy services was in no way unprecedented. During the past five years the pharmacy services of the CDCR have been audited by the State Auditor, the Office of the Inspector General, FOX Systems Inc., and the Senate Advisory Commission on Cost Control in State Government. In every instance the auditing agency found serious problems with the management and control of pharmacy services, with dire fiscal consequences.

3. *CDCR and Control Agency Responses to Prior State Audits.*

Following each such audit, the CDCR responded to the auditing agency with a plan for a plan to correct the serious problems found. The plans, however, were premised on the need for additional funding. The funding sought called for very basic improvements in pharmacy services. For example, at present CDCR pharmacists are paid just under fifty percent of the market rate for pharmacists. Not surprisingly, many prisons operate today with up to a seventy percent vacancy rate for pharmacists, filling in, when possible, with contract providers (who are paid through their registry at substantially higher hourly rates than CDCR employees). CDCR requests for higher salaries were, however, not implemented by Finance or DPA. Likewise, one of the glaring deficiencies noted in the prior State audits was a failure to control pharmacy inventory. However, between 2003 and 2006, four CDCR feasibility studies which called for the automated tracking of medications from receipt in the pharmacy to delivery to the patient were delayed due to a "lack of funding." To summarize, despite the serious fiscal consequences of four audits, CDCR and Finance were unable to sit down cooperatively and implement a cost

effective automated pharmacy management system.

4. *The Maxor Audit.*

The Receiver requested that John Hagar (who at the time had been appointed the Court's Correctional Expert) seek approval from the Court to retain Maxor, a Texas Corporation with extensive experience in correctional pharmacy management, to conduct an up-to-date audit of California's prison pharmacy services. On March 30, 2006 an agreement was reached with Maxor, and an audit began promptly thereafter.

In its comprehensive examination of prison pharmacy services, Maxor reviewed all prior audits, conducted on-site inspections of six California prisons, and initiated its own analysis of pharmacy fiscal controls, examining procurement, inventory control, and distribution.

5. *Findings of the Maxor Audit.*

Maxor's Analysis of the Crisis in the California Prison Pharmacy System ("Analysis"), attached as Exhibit 1, confirms all of the deficiencies detailed in prior audits; specifically:

> (1) lack of effective central oversight and leadership; (2) lack of an operational infrastructure of policies, processes, technology and human resources needed to support an effective program; (3) excessive costs and inefficiencies in the purchasing processes employed; and (4) ineffective systems for contracting, procurement, distribution, and inventory control.

Analysis at 5.

Without question, the crisis in the pharmacy system jeopardizes patient care. As noted in the Maxor Analysis:

> The fragmentation of responsibilities and oversight of the CDCR/DGS pharmacy procurement and distribution program has resulted in the absence of clear lines of authority and accountability, a breakdown in communications, inefficiencies, waste, and the potential for illegal diversion, the sum result of which has seriously endangered the quality and appropriateness of offender health care.

Analysis at 17.

From the perspective of providing adequate health care to inmate/patients, the evidence indicates that California's prison pharmacy system needs to be entirely re-organized. Maxor's audit also, however, points out the seriousness of the waste of public resources that resulted because the prison system and California's control agencies have been unwilling or unable to

work together to address the pharmacy crisis. For example:

> Between January 2005 and April 2006, the State of California incurred avoidable CDCR pharmacy expenditures in excess of $7 million dollars.

Analysis at 17.

> DGS has also negotiated favorable drug manufacturer rebate contracts, although it is clear that there is no central reconciliation of rebates, as evidenced by the estimated $650,000 in outstanding rebates CDCR, through DGS, has yet to receive. Similarly, there is no systemic method for ensuring that DGS-contract pricing is honored by the wholesaler and that individual pharmacies purchase contract items in lieu of more expensive non-contract items. As a result, during CY 2005, the State of California was overcharged by more than $700,000 and failed to take advantage of another $5.8 million in preferable contract pricing by not purchasing the most cost effective DGS contracted items.

Analysis at 19. *See also* the page 19 chart detailing the Top 20 "Missed Savings Opportunities."

> [S]ignificant discrepancies in the prescription dispensing data were identified that indicate a high potential for drug diversion and negative clinical outcomes. Upon initial review, the difference between quantity purchased and quantity dispensed was up to 99% varying by drug and facility, indicating that purchases exceeded documented use by vast margins. It was later explained to Maxor by CDCR staff that the quantity dispensed may be documented by the computer system in nontraditional ways.

Analysis at 20.

> In summary, California's 2005 drug costs are approximately $46 to $80 million dollars higher than comparable correctional programs, even after adjusting for pricing and population.

Analysis at 24. *See also* the page 24 chart comparing California's drug cost expenditures to the Federal Bureau of Prisons and the state prison systems in Texas and Georgia.

6. *The Hearing of July 26, 2006.*

The pharmacy crisis poses an immediate and serious threat to patient care. Furthermore, as noted in the Analysis at page 25, "[i]f immediate and substantial corrective action is not initiated, CDCR offender drug purchases are projected to rise more than 50% over the next three years." Therefore, at the Receiver's request, the Court has calendared a hearing concerning the pharmacy crisis for Wednesday, July 26, 2006. The hearing will begin at 10:00 a.m. in Courtroom 12 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California. Representatives for Maxor will testify at

the hearing and following that testimony the Receiver will propose a plan for immediate and substantial corrective action.

**IV.**

**ESTABLISHING AN OFFICE OF THE RECEIVER**

A. California Prison Healthcare Receivership Corporation ("CPR").

While beginning the process to repair California's prison medical system, the Receiver simultaneously began to establish the infrastructure and organization of the Office of the Receiver. It has been a significant undertaking involving both strategic actions, such as establishing office space and recruiting the Receiver's staff, and more mundane efforts, such as equipping and supplying the office.

The Receiver has established the California Prison Healthcare Receivership Corporation ("CPR"), a California nonprofit public benefit corporation, to provide a corporate embodiment for the Office of the Receiver. Most of the affairs of the Office of the Receiver, such as staff employment, contracting and banking, are being conducted through CPR. The CPR Articles of Incorporation and Bylaws are attached as Exhibits 2 and 3.

The Receiver is grateful for the pro bono legal assistance that the firm of Morgan, Lewis and Bockius LLP provided to the Office of the Receiver in establishing the office. In particular, the Receiver would like to thank Amanda Smith and Jim Penrod for their oversight of the project; Tomer Inbar, Alexandra Thomas, Jesse Minier and Drew Porter for their assistance in incorporating the office, Devon Block and Steve Finn for their assistance in negotiating the office lease; and Alexander Nestor and Daryl Landy for their assistance with employment matters.

B. Office Location.

The Office of the Receiver will be located at 1731 Technology Drive, Suite 700, San Jose, CA 95110. This space is currently undergoing tenant improvements and will not be occupied until approximately August 1, 2006. Until that time, the Receiver's office will remain in temporary quarters.

C. Staff Appointments.

The Receiver, with the approval of the Court, has appointed several staff members to positions within the Office of the Receiver. Brief descriptions of the Receiver's staff follow.

Linda Buzzini is a Staff Attorney for the Office of the Receiver. Ms. Buzzini worked for the State Personnel Board and the Departments of Health and Developmental Services until 1984 when she was appointed by Governor Deukmejian and assumed responsibility for labor/management relations with State employed firefighters. She became an attorney for the Department of Personnel Administration (DPA) in 1996 where she practiced labor and employment law in various forums, including the California Court of Appeal and the California Supreme Court. She represented Governor Davis in labor contract negotiations with the California Correctional Peace Officers Association (CCPOA), the Service Employees International Union, Local 1000, the Professional Engineers in California Government (PECG) and the Attorneys, Administrative Law Judges and Hearing Officers in State Employment (CASE). In October 2002, Ms. Buzzini became Deputy Chief Counsel for the Department of Personnel Administration. In February 2004, she prepared a *Madrid* remedial plan on behalf of the California Youth and Adult Correctional Agency. Since returning to the Department of Personnel Administration, Ms. Buzzini has represented various State agencies in cases pertaining to State employment and labor/management relations.

Lori Estrada-Kim is the Special Assistant to the Receiver. Ms. Estrada-Kirn is responsible for the administrative affairs of the Receiver and the day-to-day operation of the Receiver's office, including coordinating the Receiver's calendar, contacts and correspondence, and managing the office's facilities, administrative and support functions. Ms. Estrada-Kirn comes from Santa Clara County's Health and Hospital System where she worked with Robert Sillen for nearly 25 years and most recently as a Health Care Program Analyst. During that time, Ms. Estrada-Kirn provided direct administrative support to Mr. Sillen, supervised support staff, responded to customer, staff and public inquiries, assisted in the development of policies and procedures, participated in special projects and executive management meetings and coordinated

the Health and Hospital Committee for the County Board of Supervisors.

Jared Goldman is a Staff Attorney for the Office of the Receiver. Mr. Goldman worked for the County of Santa Clara, Office of the County Counsel as a Deputy County Counsel from 2001 to 2006. While at the Office of the County Counsel, Mr. Goldman represented the Santa Clara Valley Health and Hospital System, including Santa Clara Valley Medical Center and the Santa Clara County Public Health Department. From 2004 until joining the Office of the Receiver, Mr. Goldman served as the primary counsel for Santa Clara Valley Medical Center. Mr. Goldman's practice areas include health care operations and compliance, contracts and general government.

John Hagar is the Chief of Staff of the Office of the Receiver. Mr. Hagar is an attorney from San Francisco with extensive litigation experience in jail and prison cases, including class action injunction cases and damage jury trials. For approximately twenty-five years Mr. Hagar has provided legal workshops for jail and prison managers throughout the United States. He is certified as a law enforcement trainer in numerous states, including Alabama, Alaska, California, Colorado, Oregon, and Washington, and serves as a consultant for the National Institute of Corrections. Mr. Hagar was the State Court appointed Monitor over all jails and prisons in Alaska (*Cleary v. Smith*) and is presently the Special Master appointed by the Honorable Thelton E. Henderson over Pelican Bay State Prison (*Madrid v. Tilton*). In addition, Mr. Hagar has previously been appointed as the Court's Correctional Expert in this litigation.

Lara Hasik is the Coordinator of Projects and Receivership Activities for the Office of the Receiver. Ms. Hasik worked for the California Department of Corrections and Rehabilitation (CDCR) for the past six years. For the past two years, Ms. Hasik monitored compliance and coordinated remedial efforts under the *Madrid v. Tilton* (Post Powers) remedial plan related to CDCR's employee discipline and internal affairs investigation processes. This included revising the statewide policy governing employee discipline, assisting in the development of the Employee Disciplinary Matrix, and coordinating the implementation and statewide training of staff on the Matrix and all related disciplinary process revisions. Ms. Hasik also tracked

completion of related remedial tasks and composed all reports and correspondence related to the progress of the remedial plan. From 2000 to 2004, Ms. Hasik worked within the Division of Correctional Health Care Services on the initial *Plata v. Schwarzenegger* policies and procedures, served as the Division's Legislative Coordinator, and developed various healthcare-related policies, procedures, and training materials.

Kristina Hector is the Inmate Patient Relations Manager for the Office of the Receiver. Since 2001, Ms. Hector has worked with Judge Thelton E. Henderson and Special Master John Hagar on the case of *Madrid v. Tilton*. Ms. Hector's duties include working closely with the Special Master, Court appointed experts, the CDCR and affiliated agencies to create and implement new policies and procedures, reviewing inmate complaints of inappropriate use of force by prison officials, and corresponding with inmates and inmate advocates regarding medical care. Ms. Hector has a B.A. in Political Science from UC Berkeley and is a graduate of UC Hastings College of the Law. At Hastings, Ms. Hector was a co-founder and editor of the Hastings Race and Poverty Law Journal, the first such journal of its kind at Hastings to address the issues facing under-represented minority and poor communities. She is a member of the California State Bar.

Terry Hill, M.D. is the Chief Medical Officer for the Office of the Receiver. Dr. Hill, a geriatrician, was Senior Medical Director for Quality Improvement at Lumetra, the Medicare Quality Improvement Organization for California. From 1999-2004 he was medical director of Laguna Honda Hospital. Dr. Hill is on the core faculty of the Stanford Geriatric Education Center and is an Assistant Clinical Professor in the Department of Medicine, UC San Francisco. He serves on the National Quality Forum's Palliative and Hospice Care Review Committee, and he co-chairs the California Coalition for Compassionate Care. He is a board member of the California Institute for Health Systems Improvement, a consultant to California Medical Association's Committee on Quality Care, and a leader in the California Adult Immunization Coalition. He is immediate past-president of the California Association of Long Term Care Medicine. Dr. Hill was in private practice in Oakland from 1994-1999. He has led program

development for hospitals and managed care organizations and he has been medical director of retirement communities, nursing facilities, adult day health centers, and a hospice program. His research and writing has focused on end-of-life care, winter viruses, nurse-physician communication, and ethnogeriatrics.

Rachael Kagan is Director of Communications for the Office of the Receiver, where she oversees media activities, strategic communications and external relations. Ms. Kagan previously served as Director of Communications for the California Association of Public Hospitals and Health Systems, which represents the state's public hospitals that treat all in need regardless of ability to pay, insurance or immigration status. Ms. Kagan's work in health care communications draws on a varied background in policy and journalism. She was Public Information Officer for the Alameda County Medical Center; Publications Director for the Petris Center on Health Care Markets and Consumer Welfare at the University of California, Berkeley, School of Public Health; and Director of the Health Care Quality Project for the California Works Foundation. She also covered health care for the Oakland Tribune and ANG Newspaper group. Ms. Kagan covered education in Paterson, New Jersey and immigration in the region for the North Jersey Herald & News. She began her career at the American Committee on Africa in New York, NY, the organization that orchestrated the successful sanctions and divestment strategy against South Africa's apartheid regime. Her freelance portfolio includes Ms. Magazine, The Nation, Modern Physician and NurseWeek. Ms. Kagan earned a bachelor's degree in History from Macalester College in St. Paul, MN and a master's in Journalism from Syracuse University.

Vincent Marengo is the Director of Facilities Engineering for the Office of the Receiver. Mr. Marengo has a total of twenty years experience in facilities management and engineering. For the past year, Mr. Marengo was the Director of the Department of Public Works for the City of Petaluma where he was responsible for operations and maintenance, engineering and inspections, private/public programs management and projects, traffic engineering, transit and solid waste, public grants, city infrastructure and street rehabilitation and maintenance. Prior to that, Mr. Marengo spent five years as the Senior Regional Manager, Facilities, America's Pacific

Region, for Cisco Systems, Inc., where he managed facility operations for 1000-2000 multiple employee sites. Mr. Marengo has also been the Senior Manager, Facilities Engineering for Komag, Inc., and the Manager of Facilities and Security for ZyMOS Corporation.

Joe McGrath is Director of Custody Support Services for the Office of the Receiver. Joe McGrath has worked in California corrections for 27 years and recently retired from the position of Chief Deputy Secretary, Adult Operations, for the California Department of Corrections and Rehabilitation (CDCR) where he was responsible for prison and parole operations State-wide. Mr. McGrath also served as the Assistant Secretary, Office of Internal Affairs with the CDCR where he improved and implemented statewide employee investigation and discipline processes for the Department. Prior to that Mr. McGrath was the Warden at Pelican Bay State Prison for several years. During his tenure at Pelican Bay, Mr. McGrath co-authored California's use of force policy and procedure, and the health care remedial plan in connection with the case of *Madrid v. Tilton*. He is an industry expert in prison security operations and recently co-authored a chapter of a text book entitled Managing Special Populations in Jails and Prisons, New York: Civic Research Institute. Mr. McGrath is a certified Phi Theta Kappa instructor in leadership and ethics for public safety officers and earned a Bachelor of Arts degree in Corrections and Social Justice from California State University, Sacramento.

D. Establishing the Receiver's Presence in Prison Operations.

1. *Introductions.*

The Receiver devoted significant time during his first sixty days meeting and conferring with State officials, including the Governor and his staff, the Directors of California's control agencies, the Inspector General, Senate leaders, three CDCR Secretaries, all CDCR Wardens, Health Care Managers and Directors of Nursing, health care staff who work in Headquarters at 501 "J" Street, CDCR officials responsible for internal affairs investigations and staff discipline, officials from the Office of the Controller, and correctional and medical care personnel working at five CDCR prisons.

2. *Prison Visits.*

The Receiver visited five State prisons during his initial two months of duty: San Quentin State Prison on April 18, 2006, the California Institute for Men ("CIM") in Chino and the California Institute for Women (CIW) in Corona on May 16, 2006, and Valley State Prison for Women and Central California Women's Facility in Chowchilla on June 18, 2006.

These visits were not formal "inspections" aimed at documenting the conditions of the facilities medical delivery system. The documentation of the crisis facing the State's prisons, which forms the basis of the receivership, is already replete and beyond dispute. These trips were, instead, brief visits with the goal of meeting the facilities' staffs, sharing information about the receivership, and providing the Receiver and his staff a first hand, general impression of the needs of the facilities. Each visit began with introductions, a briefing by the Receiver, and an opportunity for questions by facility staff. Tours of the respective facilities followed, and the visits ended with discussions of the facilities' immediate needs and the Receiver's future expectations. The staff of all five prisons were hospitable. Wardens, Health Care Managers, Chief Medical Officers, Directors of Nursing, and their staff provided open access to facilities, personnel, and inmate/patients. As set forth above, the crisis faced by the prisons' medical system was readily apparent during the facility visits.

Common themes were reiterated at each institution. Identical to the problems found by the Court Medical Experts, clinicians at the prisons expressed concern about inadequate clinical space, staffing, equipment and supplies. To describe one example, the Triage and Treatment Area (TTA) (the emergency treatment unit) in the Acute Care Hospital of CIM lacked staff trained in emergency medicine or Advanced Life Support (ALS) techniques; lacked a sufficient number of working cardiac monitors, blood pressure cuffs, surgical lights and gurneys; and the floor was damaged to a degree which prevented appropriate cleaning and sanitation.

It should be noted that despite the grave problems encountered, the morale of the line staff of all five facilities was good and all clinical personnel expressed hope in the future now that a Receiver had been appointed by the Federal Court.

Following each visit, prison personnel were provided an opportunity to present the Receiver and Division of Correctional Health Care Services with a list of their basic and unmet equipment and supply needs—their "low hanging fruit." These lists are currently being reviewed, and the Receiver will ensure that any equipment or supplies necessary for patient care will be provided to the facilities. The Receiver plans to visit approximately two State prisons a month until he has visited all thirty-three of the State's facilities.

3. *Communications.*

a. Introduction.

The restructuring and improvement of prison medical care cannot be effectuated without significant improvements in communication between those who lead the medical care system and the clinicians, correctional officers, and support staff who provide services in the prisons. Likewise, inmate/patients, the same as any other group of patients, deserve honest and straight-forward information about the Receiver's efforts, as do the public and State officials. Therefore, one of the priorities established by the Receiver during his first sixty days was to begin to build an effective system for communicating with staff, patients, the public, and the State.

b. Office of the Receiver Communications Department.

The Receiver's Communications Department encompasses the following areas: strategic communications advisor to the Receiver, media, publications, public information, public affairs, and external relations -- including government and community affairs, inmate/patient and staff relations. The first two months of the Receivership focused on establishing the basic functions of the areas outlined above, providing day-to-day communications support to the Receiver, and having the Director of Communications, Rachael Kagan, become familiar with the many facets of the California prison medical care system. In addition, Ms. Kagan initiated relationships with journalists who report about corrections in California, responded to press inquiries, and made the Receiver available for interviews upon request (for example, on KCBS and KQED radio news). She also met with CDCR Communications Office personnel in order to establish the appropriate working relationship and to provide direction to CDCR staff as appropriate.

c. Public Information: Media, Publications.

The Office of the Receiver circulated two of an ongoing series of public "Letters from the Receiver" that were distributed to CDCR staff, members of the State Legislature, the Governor's Office, State Administrators, and the bargaining units that represent prison medical care employees. *See* Exhibits 4 and 5. Over time, the Letters will be utilized to inform the audience about how the Receivership works, and as an instrument to deliver news about the Receiver's efforts to bring the California prison system medical services up to constitutional standards.

d. External Relations – Government and Community Affairs.

Ms. Kagan also established relationships with her counterparts at CDCR in the areas of government and community affairs: Joyce Hayhoe, Assistant Secretary, Office of Legislative Affairs; Dean Borg, Adult Operations and Programs Office of Legislation; Del Sayles-Owen, Director, Division of Community Partnerships; David DeLuz, Northern California Coordinator for the Division of Community Partnerships. These meetings were introductory in nature, to learn how these people fulfill their functions and to provide them with the current information about the Receiver's efforts and answer any questions they have about the Receiver, the Receivership, and how the Office of the Receiver will interact with them.

e. Inmate/Patient and Staff Relations.

As mentioned above, an important audience concerning the Receiver's work are the inmate/patients in the prisons and the clinical staff who work inside individual institutions. Effectuating accurate and regular communication with these groups performs two important functions. First, it provides relief and recognition for two populations who have been largely ignored by the prison medical care system in the past. Second, correspondence from inmate/patients and from clinical staff provides the Receiver with a window into specific circumstances and problems that he may not have access to from other sources, missives that will help inform the Receiver's efforts, describe trends and patterns in medical care and will assist in setting priorities.

To facilitate this aspect of the Receiver's communication effort, as explained above, Kristina Hector will serve as the Inmate Patient Relations Manager for the Office of the Receiver. To begin to effectuate this program, Ms. Kagan and Ms. Hector met with the CDCR inmate grievance coordinators, the staff at the Prison Law Office who field inmate complaints, and the CDCR's Ombudsmen Office in order to learn how their role of responding to prisoner and staff complaints may compliment the Receiver's efforts.

f. Communications Planning.

In the near future, the Communications Department of Office of the Receiver will address the following issues:

1. Web site – development, design, content, and maintenance.

2. Constituent communication plan - developing specific instruments for the San Quentin Project (to be discussed below), inmate/patients, CDCR staff and the general public.

3. Media - outreach, creation of statewide media list, and phase one strategy.

4. Additional Staffing – including increased writing and production capacity.

## V.

## PROBLEMS BEING FACED BY THE RECEIVER, INCLUDING ANY SPECIFIC OBSTACLES PRESENTED BY INSTITUTIONS OR INDIVIDUALS.

A. Introduction.

In general, the initial response by State of California officials to the Receivership has been positive. Without question, the Receivership has been greeted by the health care staff in the prisons and by inmate/patients with relief and strong commitments of cooperation.

The major problem encountered by the Receiver during the first sixty days following his appointment, however, is very serious. The problem involves the need to fund the constitutionally mandated improvement in medical care services in California prisons in a carefully planned but timely manner.

B. Funding the Substantive Changes Ordered by the Receiver.

The Order at Paragraph I.C. states as follows:

> The Receiver shall determine the annual CDCR medical health care budgets consistent with his duties and implement an accounting system that meets professional standards. The Receiver shall develop a system for periodically reporting on the status of the CDCR's medical health budget and shall establish relations with the California Office of Inspector General to ensure the transparency and accountability of budget operations.

Following his appointment, the Receiver was presented with a proposed plan for Fiscal Year 2006-07 whereby the State would fund the Office of the Receiver through an "unallocated" account within the budget for the CDCR, Division of Correctional Health Care Services.[3] This proposed Budget, if it had been approved, would have provided up to $250,000,000 for use as directed by the Receiver, including funding of the Office of the Receiver. This funding was to have been above the approximately $1.4 billion proposed by the Governor for the Budget of the Division of Correctional Health Care Services. See Exhibits 8, 9 & 10.

In an effort to work cooperatively with the State concerning finances, especially given the timing of the Receiver's appointment and the State's 2006-2007 budget cycle, the Receiver agreed to consider this approach (but not any specific limits on funding) for 2006-2007. By June 19, 2006, however, the proposed plan had been amended to reduce the $250 million to $100 million. *See* Exhibit 11. After discussing the most recent proposal with CDCR officials knowledgeable of the fiscal requirements needed to improve prison health care, and considering other options with his staff, the Receiver has concluded that the State's proposed plan for the prison medical budget requires further development and specificity.

The Receiver has requested that his Chief of Staff and Staff Attorney meet with the appropriate State officials in an effort to achieve an immediate resolution to this problem. Thereafter, the Receiver will issue a special report to the Court which will include the following:

---

[3] Negotiations between the Court and Finance began prior to the effective date of the Receiver's appointment. *See* Exhibits 6 & 7.

A. Recommendations for a hearing concerning whether the Court should take further action in order to waive State requirements that impede the funding of necessary changes to the prison medical care system pursuant to Paragraph II.D. of the Order and;

B. To request that the Court issue orders mandating that the State provide the funding for specific projects out of the General Fund and/or issue a writ of execution for the levy of State funds sufficient to appropriately fund the California prison medical system.

**VI.**

**SUCCESS ACHIEVED BY THE RECEIVER.**

Given the emergent nature of the medical care crisis that afflicts California's prisons, the Receiver performed an initial assessment concerning State-wide prison medical problems and made the decision to begin to solve three previously intractable but serious medical care problems - inadequate salaries, the collapse of the CDCR system of contracting for specialty care, and pharmacy services - during the first sixty days following his appointment.

A. Fair and Adequate Compensation for Prison Health Care Personnel.

Perhaps the most serious impediment to improving the delivery of medical care in California's prisons is inadequate pay for all types and levels of health care professionals. In late 2005 the Court issued interim orders requiring recruitment and retention differentials for nurses, mid-level providers, and physicians. While those increases have had a positive impact concerning certain clinician positions at certain prisons, no one seriously argues that the compensation presently offered to prison health care personnel is adequate in terms of recruiting, hiring and retaining the quality and numbers of staff needed to accomplish the objectives of the Receivership. Unfortunately, the CDCR, Finance, and DPA have allowed the salaries of the health care professionals to fall to such uncompetitive levels that it is impossible to recruit and retain enough clinicians, pharmacists, and health care managers to operate the California prison

medical care system within constitutional requirements.

This in turn has forced CDCR officials to shift significant public resources to private providers. For example, the CDCR has entered into a series of state-wide contracts with nursing registries, physician provider groups, and pharmacy providers who send contractors into various CDCR institutions. These contractors are paid an hourly rate which far exceeds the salaries of State employees; in fact, the salaries of the contractors often exceeds the salary of the CDCR managers who supervise them. It is important to emphasize that no real taxpayer savings result from the intolerably low salaries of prison health care employees. Instead, according to recent audits, the cost of compensation simply shifted from State employees to the private providers. For example, the total annual cost for contract health care services in the CDCR has increased from approximately 153 million dollars in 2000-2001 to approximately 821 million dollars in 2005-2006, an increase of 668 million dollars or 537%.

The Receiver considers this problem a top priority. In that regard, he made significant progress toward determining the amounts and methods to be utilized in increasing the pay for prison medical personnel during the first sixty days of the Receivership. The Receiver is finalizing a plan to raise salaries within the next sixty days. At that time, he will issue a special report concerning health care compensation.

B. Contracting with Specialty Care and Other Out of Prison Providers.

1. *Introduction.*

On March 30, 2006 the Court filed its Order re State Contracts and Contract Payments Relating to Service Providers for CDCR Inmate/Patients ("Order re Contracts"), noting:

> another chilling example of the inability of the CDCR to competently perform the basic functions necessary to deliver constitutionally adequate medical health care. In this instance, the abdication not only threatens the health and lives of inmates but also has significant fiscal implications for the State.

Order re Contracts at 1:25-28.

As explained in the Order re Contracts, following findings by the California State Auditor of serious fiscal problems relating to CDCR contracts with outside clinical providers, the DGS

established a mandatory policy for obtaining competitive bids for all such contracts, absent certain special circumstances. The State, however, proved incapable of implementing these new requirements. As found by the Court:

> Instead of approaching these new requirements proactively, the CDCR and the State's control agencies - the Department of Finance, the Department of Personnel, and the DGS - stuck their collective heads in the sand. The administrative processes required by the new DGS requirements are quite time-consuming and complex. Yet the CDCR and the State's control agencies failed to provide the staffing and training necessary to handle the newly heightened obligations and implement effective fiscal controls over the contracting process.

Order re Contracts at 2:27 to 3:6.

As a result, the CDCR process for negotiating, processing, renewing, and payment of medical contracts collapsed. Effective April 17, 2006 the Receiver assumed responsibility for overseeing the State's compliance with the provisions of the Order re Contracts, including the Court's mandate (1) that "all current outstanding, valid, and CDCR-approved medical invoices" be paid within 60 days of March 30, 2006; and (2) that under the direction of the Receiver, the CDCR and State entities responsible for contracts develop and institute health care oriented policies and standards to govern the CDCR medical contract management system considering both the need for timely on-going care and the fiscal concerns of the State.

2. *Payment of Outstanding Invoices.*

The CDCR paid outstanding invoices within 60 days in compliance with the Order re Contracts. This effort called for diligence, organization, and constant monitoring, as well as improved coordination between the prisons and CDCR's Central Office and improved cooperation between health care personnel and accounting/contracts personnel. The success of this effort demonstrates that CDCR personnel can, when called to do so and when provided with the appropriate direction, incentive and support, respond to problems in a timely manner. Credit should be given to Richard Kirkland, Deputy Director of Budgets and Tim Gilpin, Associate Director (A) of CDCR Accounting Services for managing the project and reporting accurately to the Receiver both successes and problems; however, literally dozens if not hundreds of rank and

file employees should also be complimented for their hard work reducing the payment backlog.[4] [5]

3. *Development of Health Care Oriented Policies to Govern Contract Management.*

After some initial implementation problems, the State, at the Receiver's direction, has formed what appears to be an effective inter-agency team that appears to be moving forward toward the development of health care oriented policies and standards to govern the CDCR medical contract management system. This process is being monitored by John Hagar and Jared Goldman of the Receiver's staff on a bi-weekly basis.

This project is an important test concerning whether the CDCR and the State's control agencies can begin to work proactively together to solve serious problems that implicate inmate/patient health care, or whether the only way to solve this sort of problem is to remove the contracting and accounting function from the State.

The Project Charter is attached as Exhibit 12. The Receiver will provide the Court with updated status reports in his future bi-monthly reports.

C. Pharmacy.

The status of prison pharmacy services and the results of the Maxor audit are discussed above.

---

4 Problems continue to arise concerning the management of timely payment to providers. The problems appear to be indicative of the complications and bureaucratic delay that was built into the existing system for payment, and not poor fiscal management on the part of CDCR officials. The problems should be addressed by the new, more timely payment system that is presently being developed.

5 The State Controller's Office also took significant steps to process CDCR health care disbursements on an expedited basis during the sixty-day period.

VII.

**ACCOUNTING OF EXPENDITURES FOR THE REPORTING PERIOD.**

A. Revenues.

In accordance with section III.C of the Court's February 14, 2006 Order Appointing Receiver, the State established an initial operating fund with the Court in an amount of $750,000 for use by the Office of the Receiver. Subsequently, the Office of the Receiver established an interest bearing Office Fund Account, as required by section III.E of the Order, for the maintenance of funds received by the office. The entire initial operating fund established by the State has been transferred to the Receiver's Office Fund Account.

Section III.E of the Order Appointing Receiver requires that the Receiver "arrange with Defendants a system for regularly replenishing the Receiver's Office Fund Account." The State has proposed two primary methods of funding the Office of the Receiver—one applicable in the current Fiscal Year, and the other applicable beginning in Fiscal Year 2006-07. For funding in the current Fiscal Year, the State has elected to provide the Office of the Receiver funds from the existing 2005-06 CDCR Budget. To date, the State has been cooperative in this regard. On Friday June 2, 2006, the Receiver requested $2,000,000 for the Receiver's Office Fund Account, with the condition that these funds not be taken from any custody or health care operating fund. With the cooperation of Acting CDCR Secretary James Tilton, the transfer of funds was accomplished in a timely manner.

B. Expenses.

The total operating and capital expenses of the Office of the Receiver from the effective date of appointment to June 30, 2006, equaled $447,136. A balance sheet and statement of expenses is attached as Exhibit 13.

C. 2006-2007 Annual Budget for the Office of the Receiver.

As required by section III.F of the Court's February 14, 2006 Order Appointing Receiver, the Receiver has established a budget for the Office of the Receiver's first year of operation. The Receiver estimates a Fiscal Year 2006-2007 operating budget of $8,383,510. The major expense

items are salaries and contractors which are estimated at $4,600,000 and $3,200,000 respectively. The Receiver anticipates employing approximately twenty-six full time employees in various executive and support staff positions. In addition, the Receiver anticipates engaging consultants and other contractors in areas such as pharmacy services, medical records, purchasing/supply management and information systems. Lease payments for administrative office space in San Jose, California will total $177,860. And capital expenditures, including the purchase of furniture, fixtures, equipment will total approximately $360,000. A budget summary and detail are attached as Exhibit 14.

The budget presented in this report is an estimate and may be subject to significant revision. In particular, it is likely that the number of employees and the degree of contract services required by the Receiver will change as the Receiver's plan for improving the prison medical system evolves. The Receiver will provide the Court with an updated budget for the Office of the Receiver as one element of the Plan of Action to be filed with the Court in approximately 140 days.

## VIII.

## OTHER MATTERS DEEMED APPROPRIATE FOR JUDICIAL REVIEW.

### A. Coordination Between *Plata* and *Coleman*.

Significant areas of overlap exist between the California prison medical delivery system, the subject of the *Plata* litigation, and the California prison mental health delivery system, which is the subject of a class action case in the United States District Court for the Eastern District of California entitled *Coleman v. Schwarzenegger* ("*Coleman*"). To ensure the efficient use of resources, and to avoid conflicting orders, the Honorable Thelton E. Henderson and the Honorable Lawrence K. Karlton conducted a joint hearing concerning the issue of coordination on June 8, 2006. The Receiver and Special Master Michael Keating will conduct an initial face-to-face coordination meeting on July 11, 2006, and plan to meet and confer at least every two months thereafter.

B. The July 2006 San Quentin Project.

1. *Introduction.*

On July 5, 2006 the Office of the Receiver will commence its first prison specific corrective action project: improving medical services provided at San Quentin State Prison. The Project objective is to create a clinical environment where health care professionals can provide quality medical care to inmate/patients. To effectuate this, additional and appropriate clinical space will be needed, as will improved working conditions, including salary increases and staffing increases. The project is limited to improving the operational basics of medical care; it should not be considered transformative. For example, the Office of the Receiver is not going to "fix" San Quentin. The prison is too troubled, too decrepit and too overcrowded for fixing. Nevertheless, improvements with the delivery of medical care should be achieved through a carefully planned, timely and limited project.

2. Project Focus.

The Project focuses primarily on environment, equipment, supplies, and staffing. It will not change the medical record system, but it will ensure that the current system works as well as it can. Objectives for the Project include ensuring a clean environment for medical care delivery; improving operations, providing adequate resources concerning supplies, staffing (including appropriate salary levels) and equipment; implementing programs for the appropriate screening and placement of inmates in need of medical services; improving access to and operation of specialty and ancillary services; and addressing custody-health care interface issues that impinge on each group's ability to support and deliver timely, quality medical care.

3. Project Purpose.

The project will assist the Receiver in accomplishing the restructuring and development of a constitutionally adequate medical care delivery system in two ways:

First, the project will deliver timely and needed relief in the clinical trenches by improving the day-to-day conditions encountered by inmate/patients and staff. By addressing long-neglected but relatively straightforward issues such as supplies, equipment, cleanliness,

staffing and salaries, the project should shift staff's attitudes from one of low expectations to one of hope and thereby improve the quality of care and clinical outcomes. The Project's initial results should facilitate recruitment and commitment at San Quentin, and create the preconditions for a more transformative process in the future.

Second, the Office of the Receiver will utilize the Project to gain insight concerning the most effective manner to address systemic problems. Especially important will be the Project team's evaluation of the impact of State business practices, State laws, rules, regulations, policies and procedures which have created the unconstitutional medical care being delivered at San Quentin.

Upon completion of the San Quentin Project, the Office of the Receiver will be better equipped to assemble a package of corrective interventions that can be used at other prisons. Given the variety of patients and security levels at San Quentin, and the difficulties inherent in the delivery of medical care within its antiquated structures, the prison is an ideal laboratory to test proposed improvements in prison medical care.

4. Project Duration.

The project will take place over a ninety day period; however, certain elements of the Project may continue longer. The Office of the Receiver will continue to, after the ninety day period, monitor and re-calibrate certain corrective actions.

5. Project Team.

The Receiver will install a team on-site to direct and support change. The project leader is John Hagar, Chief of Staff. The Project Team itself includes Joe McGrath, Director of Custody Support Services; Terry Hill, M.D., Chief Medical Officer; Vince Marengo, Director of Facilities Engineering; Lara Hasik, Coordinator of Projects and Receivership Activities, and Kathy Page, Correctional Nursing Expert.

Day-to-day operational chain of command remains in place. For example, Peter Farber-Szekrenyi will continue to manage the daily operations of the Health Care Services Division related to San Quentin, and coordinate with the Receiver's office. Dr. Karen Saylor will continue

to function as the Acting San Quentin Chief Medical Officer.

6. Project Elements.

The aspects or elements of San Quentin health care services that will be improved through the Project are set forth below. For each element a team will be assembled that includes both Office of the Receiver staff and San Quentin personnel.

1. Clinical Space
2. Custody/Clinical Relations
3. Diagnostic Imaging
4. Equipment
5. Evaluate *Plata* Remedial Plan Requirements
6. Facility Maintenance
7. Laboratory
8. Medical Records
9. Organizational Structure
10. Outpatient Housing Unit (OHU)
11. Patient Complaints/Grievance Process
12. Reception Standards and Compliance
13. Salaries
14. Sanitation/Janitorial
15. Specialty Services
16. Staffing
17. Supplies

## IX.

## SUMMARY

As evidenced in the foregoing, the Receiver has reaffirmed the Court's Findings of Fact and Conclusions of Law wherein the utter disrepair of the State's prison medical care system, and relevant support systems upon which the medical system relies, is well documented. The

challenge of bringing access to and the quality of medical care up to constitutional requirements will be even greater than previously anticipated and may entail a significant overhaul of State rules, policies, and practices up to and including the current responsibilities and performance of not only CDCR but, as well, State overhead and control agencies. Labor contracts may also have to be reshaped in order to accommodate salary increases as well as changes to work rules and disciplinary processes.

In addition to dealing on a daily basis with the ongoing crisis in the system, the Receiver will focus during the next 60 day period on the following issues:

1. San Quentin Project.

2. Visitation to additional correctional facilities.

3. Implementation of 2006-2007 budget.

4. Provision of adequate and appropriate staffing and salaries for clinical and support staff in the Health Care Services Division (HCSD) over and above the current appropriated budget.

5. Creation of viable clinical working environments and conditions for HCSD staff in correctional facilities.

6. Provision of adequate supplies, equipment and space for patient care and support activities in the correctional facilities.

7. Exploration of organizational options for the appropriate placement of HCSD functions and activities.

8. Recruitment of additional personnel into the Office of the Receiver.

9. Development and implementation of an action plan to address pharmacy deficiencies as identified in the Maxor audit.

10. Drafting initial design criteria for the future, constitutionally adequate, prison medical care system.

11. Redesigning the broken CDCR/DGS contracting system for the acquisition of community based medical and support services for inmate/ patients.

To summarize, the challenge is great, the crisis is real, and the Receiver's mission, to bring the level of medical care for California's inmate/patient population up to constitutional requirements will be done.

Dated: July 5, 2006

Robert Sillen
Receiver

**PROOF OF SERVICE BY MAIL**

I, Kristina Hector, declare:

I am a resident of the County of Alameda, California; that I am over the age of eighteen (18) years of age and not a party to the within titled cause of action. I am employed as the Inmate Patient Relations Manager to the Receiver in Plata v. Schwarzenegger.

On July 5, 2006 I arranged for the service of a copy of the attached documents described as RECEIVER'S FIRST BI-MONTHLY REPORT on the parties of record in said cause by sending a true and correct copy thereof by pdf and by United States Mail and addressed as follows:

ANDREA LYNN HOCH
Legal Affairs Secretary
Office of the Governor
Capitol Building
Sacramento, CA 95814

PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

J. MICHAEL KEATING, JR.
285 Terrace Avenue
Riverside, Rhode Island 02915

JONATHAN L. WOLFF
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

STEVEN FAMA
DON SPECTER
ALISON HARDY
Prison Law Office
General Delivery
San Quentin, CA 94964-0001

PAUL MELLO
JERROLD SCHAEFER
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, CA 94105

BRUCE SLAVIN
General Counsel
CDCR-Office of the Secretary
P.O. Box 942883
Sacramento, CA 94283-0001

KATHLEEN KEESHEN
Legal Affairs Division
California Department of Corrections
P.O. Box 942883
Sacramento, CA 94283

RICHARD J. CHIVARO
JOHN CHEN
State Controller
300 Capitol Mall, Suite 518
Sacramento, CA 95814

MOLLY ARNOLD
Chief Counsel, Department of Finance
State Capitol, Room 1145
Sacramento, CA 95814

LAURIE GIBERSON
Staff Counsel
Department of General Services
707 Third Street, 7th floor, Suite 7-330
West Sacramento, CA 95605

MATTHEW CATE
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

DONNA NEVILLE
Senior Staff Counsel
Bureau of State Audits
555 Capitol Mall, Suite 300
Sacramento, CA 95814

WARREN C. (CURT) STRACENER
PAUL M. STARKEY
Labor Relations Counsel
Department of Personnel Administration
Legal Division
1515 "S" Street, North Building, Suite 400
Sacramento, CA 95814-7243

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 5, 2006 at San Francisco, California.

Kristina M. Hector

Kristina Hector

253

FILED
JUL 26 1999
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs, No. CIV S-90-0520 LKK JFM P

vs.

PETE WILSON, et al.,

Defendants. ORDER

The special master has filed three reports, all of which include recommendations for action by this court. On May 19, 1999, the special master filed a report on staffing vacancies, in which he recommends that

> (1) defendants be required to reduce within 90 days the vacancy rate among psychiatrists to 25 percent or less and among psych social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at present or comparable rates;
>
> (2) defendants be required to reduce within 90 days the employment of multiple, short-term contract psychiatrists[1] to fill vacancies from the current 40 percent to 25 percent or less of contract services provided, without reducing overall contract

[1] A short-term contract psychiatrist is defined by the special master as "[a] substitute psychiatrist who works less than 40 hours a month in any one institution, in the absence of some extenuating circumstance." (Special Master's Report on Staffing Vacancies, filed May 19, 1999, at 14.)

services unless justified in specific instances by decreasing vacancies; and

(3) defendants be required to develop within 90 days a plan for the retention of psychiatrists in CDC, addressing such issues as the payment structure that penalizes clinical administrators, opportunities for career and professional development, flexibility and enhancements for remote assignments, the development of incentives, monetary and/or otherwise, for longevity, etc.

(Special Master's Report on Staffing Vacancies, at 14-15.) Neither of the parties have filed objections to report on staffing vacancies or the recommendations contained therein. Good cause appearing, the recommendations will be the order of the court.

Also on May 19, 1999, the special master filed supplementary recommendations on staffing ratios and administrative segregation.[2] He recommends as follows:

(1) The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS programs should be provisionally approved by the court, with the exception of the existing ratio of psychiatrists to inmates in the 3CMS program, which should be subject to further review;

(2) Defendants should be directed to adopt and implement within 90 days the following staffing ratio for administrative segregation:

(a) Seven-day weekly coverage in each administrative segregation unit by a psych tech, accomplished by adding a 0.61 psych tech position to each of the 30 positions now authorized;

(b) One half-time psychiatrist to each administrative segregation unit;

(c) One full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed;

(d) One additional full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities;

---

[2] The report is dated May 12, 1999, and the recommendations contained therein supersede previous recommendations of the special master concerning these issues.

(e) One full-time clerical position to support the work of the administrative segregation clinical team; and

(f) One full-time case manager (psychologist or psych social worker) for every nine EOP inmates in administrative segregation with a goal of providing ten hours a week of structured therapeutic activities for EOP inmates in administrative segregation units.

(3) Defendants should be directed to adopt an actual prevalence rate of 10.6 in their FY 99-00 budget and a prevalence rate of 11.1 percent as of January 1, 2000, and to review and adjust the projected prevalence figure annually based on the then actual prevalence rate; and

(4) Defendants should be directed to develop and implement a plan to train mental health staff, staff assistants and hearing officers involved in the new policy on mental health input into the adjudication of disciplinary infractions, the 115 process.

(See Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, at 12-13.)

Defendants filed limited objections, objecting principally to the time frame proposed by the special master for implementation of the staffing ratios for administrative segregation. Plaintiffs have filed a reply to defendants' objections. After further consultation with the special master, the court will extend until December 31, 1999 the time for implementation of the staffing ratios proposed by the special master. The special master has also advised the court that defendants have adopted the 10.6 prevalence rate in their FY 99-00 budget. No further order of the court in that regard is necessary at this time.

Finally, on May 26, 1999, the special master filed his third monitoring report concerning defendants compliance with the plans, policies, and protocols provisionally approved by the court. The report contains a series of recommendations. None of the parties have filed objections with the court. After review of the third monitoring report, further consultation with the special master, and good cause appearing therefore, the court will make certain orders in accordance with recommendations of the special master contained in the third monitoring report.

/////

In accordance with the above, and good cause appearing therefore, IT IS HEREBY ORDERED that:

1. Within ninety days from the date of this order defendants shall reduce the vacancy rate among psychiatrists to 25 percent or less and among psych social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at present or comparable rates.

2. Within ninety days from the date of this order defendants shall reduce the employment of multiple, short-term contract psychiatrists, as defined by the special master and this order, to fill vacancies from the current 40 percent to 25 percent or less of contract services provided, without reducing overall contract services unless justified in specific instances by decreasing vacancies.

3. Within ninety days defendants shall develop and submit to the special master a plan for the retention of psychiatrists in CDC, addressing such issues as the payment structure that penalizes clinical administrators, opportunities for career and professional development, flexibility and enhancements for remote assignments, the development of incentives, monetary and/or otherwise, for longevity, etc.

4. The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS programs are provisionally approved by the court with the exception of the existing ratio of psychiatrists to inmates in the 3CMS program.

5. On or before December 31, 1999 the special master shall file further recommendations addressing the staffing ratio of psychiatrists to inmates in the 3CMS program.

6. On or before December 31, 1999, defendants shall adopt and implement the following staffing ratio for administrative segregation:

a. Seven-day weekly coverage in each administrative segregation unit by a psych tech, accomplished by adding a 0.61 psych tech position to each of the 30 positions now authorized;

b. One half-time psychiatrist to each administrative segregation unit;

c. One full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed;

d. One additional full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities;

e. One full-time clerical position to support the work of the administrative segregation clinical team; and

f. One full-time case manager (psychologist or psych social worker) for every nine EOP inmates in administrative segregation with a goal of providing ten hours a week of structured therapeutic activities for EOP inmates in administrative segregation units.

7. Within ninety days from the date of this order defendants shall develop and implement a plan to train mental health staff, staff assistants and hearing officers involved in the new policy on mental health input into the adjudication of disciplinary infractions, the 115 process.

8. Within ninety days from the date of this order defendants shall develop and implement a system-wide data collection process for capturing information on mental health transfers at the institutional level. The process shall include, among other things, use of a log that records the dates of referral, classification, endorsement and actual movement of inmates referred to a higher level of treatment at any other facility, together with the reasons for rejection of any such referral, and a requirement that reception centers keep a log of all inmates referred to a mental health program who remain in reception longer than sixty days.

9. On or before December 31, 1999, defendants shall develop and implement a plan for expediting the transfers of seriously mentally disordered inmates to programs with the level of care to which they have been referred. Said plan shall be based on the information

gathered from data collected in the system-wide data collection process described in paragraph 7 of this order.

10. Within ninety days defendants shall develop a system in each institution for identifying and recording self-injurious episodes, including forms, logs and other documents necessary to support such a recording system.

11. Within ninety days defendants shall develop a process for tracking self-injurious inmates discharged from an infirmary or MHCB unit to make sure that indicated clinical follow-up occurs as prescribed.

12. Within ninety days defendants shall develop and implement a system-wide method for tracking, recording and aggregating institutional data on staff members' completion of mental health training courses required in the plans provisionally approved by the court in June 1997. Said system shall list all staff in an institution with an indication of whether each individual has, or has not, attended required courses.

DATED: July 22, 1999.

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

ndd

United States District Court
for the
Eastern District of California
July 26, 1999

* * CERTIFICATE OF SERVICE * *

2:90-cv-00520

Coleman

v.

Reagan

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on July 26, 1999, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA 94964

SJ/LKK

CF/JFM

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA 94104

Bruce Michael Slavin
Attorney General's Office of the State of California
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-3664

J Michael Keating Jr
Christopher H Little & Associates
50 S Main St
Providence, RI 02903

Edmund F Brennan
United States Attorney
501 I Street
Suite 10-100
Sacramento CA 95814

Jack L. Wagner, Clerk

BY: Deputy Clerk

FILED
OCT 26 2001
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DOCKETED
SAN FRANCISCO
OCT 29 2001
By F. BISA
No. CF1996FE0001

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs, No. CIV S-90-0520 LKK JFM P

vs.

GRAY DAVIS, et al.,

Defendants. ORDER

_____________________________/

On September 25, 2001, the special master filed an eighth interim monitoring report. The report contains three recommendations for specific action by defendants. Neither party has filed objections to the report or to the recommendations contained therein. Good cause appearing, the recommendations will be the order of the court.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Within ninety days from the date of this order defendants shall meet the staffing ratio of one case manager for every nine enhanced outpatient (EOP) inmates in hub administrative segregation units and defendants shall maintain said staffing ratio thereafter.

2. Within thirty days from the date of this order the Health Care Services Division (HCSD) shall submit to the special master a plan for bringing California Substance

/////

Abuse Treatment Facility (CSATF) into compliance with the plans, policies and protocols provisionally adopted by the court in mid-1977.

3. Within thirty days from the date of this order California State Prison-Los Angeles County (CSP/LAC) shall develop and implement procedures for the identification of inmates arriving at the facility with a valid Keyhea order and ensure they receive immediately appropriate medication and treatment.

4. No EOP inmate shall be transferred to the CSP/LAC hub administrative segregation unit until the facility is able to provide psych tech rounds seven days a week.

5. Within 120 days from the date of this order the special master shall report to the court on the adequacy of defendants' compliance with the requirements of this order.

DATED: ~~October~~ 10/24, 2001.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

/coleman.8in



*BILL LOCKYER*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 327-7872
Facsimile: (916) 324-5205
E-Mail: Lisa.Tillman@doj.ca.gov

May 30, 2006

*Via Email and US Mail*

J. Michael Keating, Jr.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034

RE: Coleman v. Schwarzenegger
USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P

Dear Mr. Keating:

I have relayed your request to review documents submitted by the California Department of Corrections and Rehabilitation for incorporation in the Governor's May revise. Defendants respectfully state their objection to the production of these documents on the basis of the deliberative process privilege.

The deliberative process privilege applies to the process for formulating government decisions as well as government policies. See, e.g., *Dep't. of Interior v. Klamath Water Users Protective Ass'n.*, 532 U.S. 1, 8-9, 149 L. Ed. 2d 87, 121 S. Ct. 1060 (2001) ("deliberative process [privilege ] covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated'") (emphasis added) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 44 L. Ed. 2d 29, 95 S. Ct. 1504 (1975)); *Casad v. United States Dep't. of Health and Human Services*, 301 F.3d 1247 (10th Cir. 2002) (applying deliberative process privilege to documents related to government decision to deny training grant).

Defendants respect the broad authority provided to the Special Master by the Order of Reference. Without waiving the deliberative process privilege, Defendants state their willingness to provide these documents to the Special Master under seal.

J. Michael Keating, Jr.
May 30, 2006
Page 2

Please contact me to discuss this matter further.

Sincerely,

LISA A. TILLMAN
Deputy Attorney General

For BILL LOCKYER
Attorney General

cc. via email and regular mail:
Matthew Lopes, Esq.
Michael Bien, Esq.
Steve Fama, Esq.

0012483.wpd