1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California 94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California 94104
8  Telephone: (415) 433-6830

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA 94107
12 Telephone: (415) 864-8848

13

14 Attorneys for Plaintiffs

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

15                 UNITED STATES DISTRICT COURT

16                 EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN,                              )  No.: Civ S 90-0520 LKK-JFM
                                               )
19         Plaintiffs,                         )  **PLAINTIFFS' NOTICE OF**
                                               )  **VIOLATIONS OF MAY 2, 2006 COURT**
20 vs.                                         )  **ORDER AND REQUEST FOR RELIEF**
                                               )  **AND OBJECTIONS TO DEFENDANTS'**
21 ARNOLD SCHWARZENEGGER, et al.,              )  **AMENDED LONG-TERM BED PLAN**
                                               )  **AND REQUEST FOR ADDITIONAL 60**
22         Defendants                          )  **DAY EXTENSION**
   _____       )

23

24

25

26

27

28

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility. A prison in Vacaville, California. |
| CTC | Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DCHCS | Division of Correctional Health Care Services. This is the Department in CDCR headquarters that manages medical and mental health care. |
| DOF | Department of Finance. |
| EOP | Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs. |
| KVSP | Kern Valley State Prison. A new prison in Delano, California. KVSP has an MHCB unit. |
| MHSDS | Mental Health Services Delivery System. The name given by defendants to their entire mental health system. |
| MHCB | Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCB are generally located inside a Correctional Treatment Center. |
| PSU | Psychiatric Services Unit. There are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |

1

SHU        Security Housing Unit.  This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have been "validated" by the CDCR as belonging to a gang.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women.

2

3

4

UNA        Unidentified Needs Assessment.  This is the name given to the study of unmet demand for intermediate and acute inpatient care that was published by the CDCR on March 30, 2006.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................................i

TABLE OF CONTENTS........................................................................................ iii

INTRODUCTION ...................................................................................................1

ARGUMENT ...........................................................................................................2

I.      DEFENDANTS HAVE FAILED TO COME FORWARD WITH
EVIDENCE JUSTIFYING A SUBSTANTIAL REDUCTION IN
THE SCOPE OF THE RELIEF ORDERED IN THIS COURT'S
MAY 2, 2006 ORDER APPROVING DEFENDANTS' LONG
TERM BED PLAN.................................................................................2

II.     IN ORDER TO JUSTIFY THE EXTRAORDINARY RELIEF
THEY SEEK, DEFENDANTS ARE REQUIRED TO SATISFY
THE REQUIREMENTS OF FEDERAL RULE OF CIVIL
PROCEDURE 60(B) .............................................................................3

III.    A THOROUGH INVESTIGATION SHOULD BE LAUNCHED
INTO DEFENDANTS' CONDUCT AND AN INDEPENDENT
EXPERT SHOULD BE APPOINTED TO VALIDATE CDCR'S
PROJECTIONS AND BED PLANS.....................................................4

IV.    DEFENDANTS HAVE FAILED TO COMPLY WITH OTHER
PROVISIONS OF THE COURT'S MAY 2, 2006 ORDER........................7

       A.    Defendants Have Failed To Present A Long-Term Plan For
Sufficient Enhanced Outpatient Beds (EOP) To Address The
Projected Demand..........................................................................8

       B.    Defendants Have Failed To Present, As To Each Inpatient,
MHCB And EOP Project In Defendants' Bed Plans, A Full
And Complete Analysis Of Steps Available To Accelerate
The Projects .................................................................................9

       C.    Defendants Have Acted In Bad Faith By Using Clinical Staff
From Other Understaffed Mental Health Programs To Activate
The CTC's at Kern Valley State Prison and CSP-Sacramento,
Rather Than Retaining Additional Staff.......................................10

CONCLUSION........................................................................................................11

**INTRODUCTION**

Defendants' Amended Long-term Bed Plan, filed June 30, 2006, violates the terms of this Court's May 2, 2006 Order and must be rejected. In addition, defendants' request for yet another delay to develop yet another bed plan—this one intended to be substantially *reduced* in scope from that presented to the Court and to the Legislature only a few months ago—should be denied. Instead, a full investigation should be undertaken into the facts and circumstances surrounding defendants' ever changing forecasts and bed plans. As part of the investigation, an independent expert should be retained to certify the legitimacy of defendants' population forecasts and bed plans to the Court and to the public. The independent expert should evaluate the conflicting projections and bed plans and provide recommendations to the Court as to which, if any, of these projections should be relied upon. The Court can then determine the need for additional long-term mental health bed construction projects above and beyond those already approved by the Court in its May 2, 2006 Order.

In addition, defendants are in violation of several additional provisions of this Court's May 2, 2006 Order. The Court should so find, and should order defendants to address there violations as soon as possible and no later than August 15, 2006, or be subject to additional sanctions, including but not limited to, contempt. The following provisions of the May 2, 2006 Order have not been complied with: (1) defendants have failed to present a long-term plan for sufficient Enhanced Outpatient Beds (EOP) to address the projected demand for those beds and services, 5/2/06 Order ¶ 2 (rejecting defendants' EOP bed plan due to shortfall of more than 1000 beds); (2) defendants have failed to present, as to each inpatient, MHCB and EOP project in defendants' bed plans, a full and complete discussion of steps that are available to accelerate the projects "as well as a list of any statutory, licensing or staffing barriers to such acceleration and/or timely opening of the projects," 5/2/06 Order ¶ 3; and (3) defendants have acted in bad faith by using clinical staff from other understaffed mental health programs to activate the Correctional Treatment Centers at Kern Valley State Prison and CSP-Sacramento, rather than retaining additional clinical staff, 5/2/06 Order ¶ 12.

**ARGUMENT**

I.    **DEFENDANTS HAVE FAILED TO COME FORWARD WITH EVIDENCE
      JUSTIFYING A SUBSTANTIAL REDUCTION IN THE SCOPE OF THE
      RELIEF ORDERED IN THIS COURT'S MAY 2, 2006 ORDER APPROVING
      DEFENDANTS' LONG-TERM BED PLAN**

The Court, relying on sworn testimony of numerous public officials from various State

agencies, and on the express urgent request of defense counsel, approved defendants' April 17,

2006 "long-term plan for provision of acute and intermediate care and mental health crisis

beds, subject to modification based on current population projections." 5/2/06 Order ¶ 1.  The

Court ordered defendants to file an amended plan within 60 days to take into account the

dramatic and unexpected actual increase in the prison population that had occurred in fiscal

year 2005-06, as well as the resulting significantly increased 5-year projection of California's

prison population that defendants published in the Spring of 2006.   While the May 2, 2006

Order also contemplated that defendants would "incorporate an updated version of the

methodology first adopted in the 2002 Tucker-Alan bed needs projections," 5/2/06 Order ¶ 1, it

was never represented in the course of the two days of hearings that the "update" would result

in a significant *reduction* in defendants' forecasts.  Rather, defendants' admitted that the

update would result in an increase in the population projections and the size of the necessary

new long-term projects.  See Testimony of Doug McKeever, 4/26/06 Transcript 9:9-28:8.

(Excerpts of the April 26 and 27, 2006 Hearings are attached as Exhibits A and B, respectively,

to the Declaration of Thomas Nolan in Support of Plaintiffs' Notice of Violations of May 2,

2006 Court Order and Request for Relief and Objections to Defendants' Amended Long-term

Bed Plan ("Nolan Decl."), filed herewith.)

With sleight of hand and smoke and mirrors worthy of a Las Vegas magic show,

defendants have presented an amended plan that accounts for large projected *increases* in

prisoner population with major *decreases* in the projected demand for acute, intermediate and

EOP beds.  No credible explanation for this money-saving miracle is provided to the Court

(nor is anything supported by a sworn declaration).  The Court is asked to accept the following:

the bed plan forecasting consultant, Tucker-Alan (now called Navigant), was rehired in

1  January 2006 for the purpose of updating the long-term bed plan and projections and

2  incorporating the UNA Study results; Navigant did not, however, participate in, validate or

3  assist in any way in the April 17, 2006 long-term bed plan that was submitted to the Court;

4  Navigant, in June 2006, provided CDCR its updated forecast which, to everyone's surprise,

5  "produced a significantly lower five-year forecasted demand for mental health beds, at most

6  levels of care, as was projected in the original Statewide Mental Health Bed Plan, April 2006."

7  Defendants' 6/30/06 Amended Bed Plan, Page 2.  See Nolan Decl. ¶ 2.  Even if the Court

8  were to accept this unsubstantiated and unlikely series of events as true, there is still no legal

9  basis for modifying this Court's May 2, 2006 Order.

10 **II.   IN ORDER TO JUSTIFY THE EXTRAORDINARY RELIEF THEY SEEK, DEFENDANTS ARE REQUIRED TO SATISFY THE REQUIREMENTS OF**
11 **FEDERAL RULE OF CIVIL PROCEDURE 60(B)**

12      Defendants have not filed a motion with the Court or even attempted to explain, by

13 sworn testimony through declarations, the factual and legal grounds for vacating Paragraph 1

14 of the Court's May 2, 2006 Order.  See Fed. R. Civ. P. 60 (b) (1) (relief from order based on

15 "mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by

16 due diligence could not have been discovered in time….").  Based on the new "revelation,"

17 defendants request additional time to develop yet another amended long-term bed plan, for the

18 purpose of shrinking the projects and delaying yet again a commitment to actually start the

19 long and drawn out process of building the new beds.  This request must be rejected.  There is

20 no legal or factual basis presented by defendants that would justify the major changes in their

21 projections and long-term bed plan, presented only a few months ago by these same state

22 officials, who testified in full support of the plan, under oath, in open court.  At the request of

23 defendants, the Court entered a specific order after two days of hearings, in which

24 representatives of the Governor's Office, the Department of Finance, the Department of Mental

25 Health, as well as numerous CDCR officials, participated.  See 5/2/06 Order.  Further delay of

26 this already long-delayed remedy cannot be tolerated.  If, in fact, defendants actually complete

27 and construct the planned beds and the State ends up with a few more than they need in 2011,

28 they will surely make good use of the beds in 2012 or 2013.  Any "extra" capacity could also

1  be used, as defendants themselves suggest, for other needs.  6/30/06 Plan, pages 10-11

2  (Alternative 3, "additional licensed beds may be used for other CDCR health care programs").

3       Balancing the very unlikely risk that defendants will actually build, license and staff

4  "too many" beds to care for seriously mentally ill inmates against the far more likely outcome

5  that defendants will continue their pattern of insufficient resources at all times for this class,

6  the Court should not delay or reevaluate the already approved long-term bed plans and only

7  consider additions to the plan based on the increases in population.  Projections are nothing

8  more than projections, and they have proven to be inaccurate time and time again.  Moreover,

9  the CDCR has a history of consistently underestimating population growth, as well as demand

10 for medical and mental health services, resulting in severe overcrowding of the prisons and

11 understaffing of clinical programs.  CDCR projections and plans are directly responsible for

12 today's overcrowding crisis, a crisis that even the defendant Governor now finally admits is a

13 cause for alarm.  There is no reason for the Court to allow defendants to "take a mulligan" on

14 the April 17, 2006 Bed Plan and try again.  Such an effort would once again show defendants'

15 deliberate indifference to the plaintiff class.

16 **III.  A THOROUGH INVESTIGATION SHOULD BE LAUNCHED INTO
         DEFENDANTS' CONDUCT AND AN INDEPENDENT EXPERT SHOULD BE
17       APPOINTED TO VALIDATE CDCR'S PROJECTIONS AND BED PLANS**

18      Defendants' "revelation," however, raises serious questions that require a full and

19 complete investigation.  The Court issued its May 2, 2006 Order approving the April 17, 2006

20 Long-term Bed Plan at the urgent request of defendant State officials.  During the April

21 hearings, the CDCR's counsel, the Deputy Attorney General, stated that: "The defendants

22 would very much appreciate the Court issuing an order indicating that it has reviewed,

23 approved and adopted as an order of the court the long range plan that was indicated in the bed

24 plan." Ex. B to Nolan Decl., 4/27/06 Transcript 105:25-106:4.  The urgency expressed was to

25 assure that the Court order would be in place before the May Revise to the State Budget was

26 presented by the Governor to the Legislature.  *Id.* at 1:19-3:23 (CDC and Department of

27 Finance responses to Court's inquiry re: deadline for changes for May Revise).  The Court's

28 Order was the basis for the Governor's request for approval for more than $600 million dollars

1     of new prison mental health bed construction projects. Ex. C to Nolan Decl. (Enclosure XI to

2     Defendants' April 17, 2006 Statewide Mental Health Bed Plan).

3         The April 17, 2006 Statewide Mental Health Bed Plan was represented to the Court to

4     be the product of a multi-agency task force at the highest levels of State Government, 4/17/06

5     Bed Plan at 2, and the product of a sophisticated projecting and planning process that began in

6     December 2005 (the same date that Navigant was retained).  Among the participants

7     acknowledged in the cover letter and the Plan itself are the Office of the Governor, the

8     Department of Finance, the Department of Personnel Administration, the Department of

9     Mental Health, the California Health and Human Services Agency, the Secretary, Chief

10     Deputy Secretary, General Counsel, and numerous other senior officials of the CDCR itself.

11     4/17/06 Bed Plan.  The Court was impressed by these representations: "I want to start by

12     acknowledging the multi-disciplinary group work and appreciation of the collaborative effort

13     among state agencies.  That was an important step forward.  Something you hadn't done

14     before."  Ex. A to Nolan Decl., 4/26/06 Transcript at 6:1-4.

15         Defendants' new contention – that their own April 17, 2006 Projections were far too

16     high, resulting in plans for too many beds – raises serious questions that need to be answered.

17     When was it first discovered that the April 17, 2006 Plan was based on allegedly "erroneous"

18     projections?  Who discovered the "error?"  Why wasn't this "error" brought to the attention of

19     the Court at the April 26 and 27 hearings?  If the "error" was discovered after the hearings,

20     why wasn't it brought to the attention of the Court immediately?  Was a decision made to

21     delay the revelation of the "error" so that the Court Order could be used to defendants' full

22     advantage in their attempts to obtain funding commitments from the Legislature?

23         What role, if any, did the consultant, Navigant, have in the preparation of the April 17,

24     2006 Projections and Bed Plan, or in comments and questions about its assumptions,

25     methodology and calculations?  According to Navigant's Report (attached to Defendants' June

26     30, 2006 submission), it was retained for the purpose of updating the forecasts, and

27     incorporating the UNA Study results "as a requirement for the *Coleman* matter."  June 2006

28     Navigant Report at 2.  Navigant consulted with Robin Dezember (a CDCR official) and CDCR

1  staff "early in the process." *Id.*  Navigant also met with a representative of the Legislative

2  Analyst's Office on April 26, 2006—the day of this Court's Hearing.  *Id.*  If Navigant, in fact,

3  did not participate in the preparation of the April 17, 2006 Projections and Bed Plan, who made

4  the decision to exclude them from the process and why?   See generally, Ex. A to Nolan Decl.,

5  McKeever Testimony, 4/26/06 Transcript at 18:5-28:8.

6        What person or persons actually prepared the April 17, 2006 Projections and Bed Plan?

7  Does that person or persons agree that the projections are "erroneous?"  Do each of the various

8  State agencies and officials who signed off on the April 17, 2006 Bed Plan agree that its

9  projections are "erroneous?"

10       Due to the magnitude of public spending at issue in the long-term bed plan, and the

11  serious questions raised by defendants' changing projections, a full inquiry must be made into

12  both the foundation and assumptions underlying the April 17, 2006 Bed Plan, as well as those

13  for the June 30, 2006 Navigant revised projections and plans.  Defendants have failed to

14  provide to either the Special Master or to plaintiffs' counsel with full and complete access to

15  the information, assumptions, and methods of forecasting used in the bed plans.  In addition,

16  defendants have refused to allow complete and open access to their expert consultants.  Ex. A

17  to Nolan Decl., McKeever Testimony, April 26, 2006 Transcript at 21:8-19 (admits that

18  defendants failed to provide plaintiffs' counsel and Special Master with back up data for April

19  2006 bed projections in advance of hearings as promised); see Nolan Decl. ¶ 2 (limitations on

20  questions to consultants, rushed conference call).

21       The Court should order defendants to immediately produce to the Special Master and

22  plaintiffs' counsel, all the underlying documents, information, computer programs, notes,

23  drafts, contracts and the like, concerning both sets of projections and bed plans.  Defendants

24  should also be ordered to provide the Special Master and plaintiffs with full access to all

25  persons who in any way participated in the development of the Plans and the decisions made

26  concerning the presentations to the Court.  While this process can begin with an informal

27  document production and meeting, depositions of various officials involved in this process

28

1  should be authorized to permit a full and fair report to the Court concerning these extraordinary

2  events.

3       The Court should also authorize the Special Master to retain an independent expert to

4  make findings to the Court and to the public as to the legitimacy of defendants' population

5  forecasts and bed plans.  The independent expert should evaluate the conflicting projections

6  and bed plans and provide recommendations to the Court as to which projections should be

7  relied upon.  The Court can then determine the need for additional long-term mental health bed

8  construction projects above and beyond those already approved by the Court in its May 2, 2006

9  Order.  In addition, the expert should remain engaged in the population projection and bed

10  planning process of the CDCR from this point forward, given defendants' proven inability to

11  get the job done on its own.

12  **IV.    DEFENDANTS HAVE FAILED TO COMPLY WITH OTHER PROVISIONS OF**
         **THE COURT'S MAY 2, 2006 ORDER**
13

14       This Court issued various Orders after the April hearings concerning defendants' bed

15  plans and the dangerous crisis facing mentally ill prisoners in the CDCR:  "It is undisputed that

16  the shortage is leaving critically mentally ill inmates languishing in horrific conditions without

17  access to immediately necessary mental health care."  5/2/06 Order at 2: 16-18.  Plaintiffs have

18  previously filed their objections to defendants' interim bed plan, in response to ¶ 4 of the

19  Order.  The Interim Plan does not, and will not, go far enough to alleviate the immediate

20  danger and suffering cause by "the severe shortage of intermediate care facility beds and

21  mental health crisis beds that currently exists in the CDCR."  5/2/06 Order at 2: 14-16.

22       But defendants have also failed to comply with various other critical provisions of the

23  May 2, 2006 Order.  The Court should so find and order defendants to address, as soon as

24  possible and no later than August 1, 2006, the missing elements, or be subject to additional

25  sanctions, including but not limited to, contempt.

26

27

28

**A. Defendants Have Failed To Present A Long-Term Plan For Sufficient Enhanced Outpatient Beds (EOP) To Address The Projected Demand**

Defendants' April 17, 2006 Bed Plan addressed a major "gap," not only in various levels of inpatient beds, but also in Enhanced Outpatient Beds. Defendants' long-term bed plan, however, failed to close the gap, resulting in a massive shortage of over 1000 beds by 2011. The Court's May 2, 2006 Order, at ¶ 2, rejected defendants' EOP bed plan due to this dramatic shortfall. Dr. Farber-Szekrenyi represented to the Court that the Amended Long-term Bed Plan would fully address the EOP Bed gap. Ex. B to Nolan Decl., 4/27/06 Transcript at 60:19-62:16. The Amended Long-term Bed Plan filed on June 30, 2006, however, fails to address the EOP bed gap, and even omits any discussion of EOP beds. This is unacceptable.

Defendants' argument that the May 2, 2006 Order does not require defendants to address the EOP bed gap may be a technical defense to a contempt motion but it holds no water here as a bar to enforcement of the existing order. The Court explicitly rejected defendants' long-term EOP bed plan in its May 2, 2006 Order. Defendants represented to the Court, under oath, that their next long-term bed plan would address the EOP bed gap. Defendants also conceded that not only is there a massive future EOP bed gap but that there currently exists a massive present gap in EOP beds that is delaying access to care right now. Numerous prior orders of this Court have required defendants to plan for and construct adequate beds to address the anticipated demand for EOP beds. 7/26/99 Order at 2; 10/8/02 Order (adopting Special Master's 9/3/02 recommendations to implement Tucker-Alan Bed needs study, including EOP beds staffing and construction). In addition, plaintiffs' counsel gently reminded defendants of their promise and legal obligation to address the EOP bed gap on June 7, 2006. Nolan Decl. ¶ 6 and Ex. D.

Defendants' April 17, 2006 Bed Plan states as follows (page 5):

> CDCR recognizes that there is also a clear deficit of Enhanced Outpatient Program (EOP) beds and treatment space, and that fixing less than all of the parts of the MHDS, a comprehensive and interconnected continuum of mental health care, will exacerbate the problems in the others. Therefore, the Statewide Mental Health Bed Plan, April 2006 provides a comprehensive plan addressing CDCR's needs for mental health beds within the EOP, ICF, Acute,

1  and MHCB levels of care, and is consistent with the Right
2  Prison/Right Mission Project.

3  The Court should order defendants to immediately prepare interim and long-term bed plans to

4  address the present and projected gaps in EOP beds at all levels of custody including

5  Administrative Segregation units and Psychiatric Services Units ("PSUs").[1]

6  **B. Defendants Have Failed To Present, As To Each Inpatient, MHCB And EOP**
   **Project In Defendants' Bed Plans, A Full And Complete Analysis Of Steps**
7  **Available To Accelerate The Projects**

8  At the express request of defense counsel, the May 2, 2006 Order at ¶ 3, required

9  defendants to investigate each of the long-term bed projects and present options for

10  accelerating the projects or assuring that they opened on schedule. Ex. B to Nolan Decl.,

11  4/27/06 Transcript at 112: 15-23. If acceleration was possible but "barriers" existed,

12  defendants were to identify such barriers.

13  Defendants' acknowledge their understanding of this order and state, on page three of

14  their June 30, 2006 Plan, that they have provided "a list of those projects that can be

15  accelerated as well as a list of any statutory, licensing, or staffing barriers to such acceleration

16  and/or timely opening of the projects" and direct the Court to "Enclosure II." Enclosure II,

17  however, is a seven page discussion of the "Design Bid Build" vs. the "Design Build Process."

18  In one paragraph, on page seven, some of the pending projects are identified by name, and

19  some barriers to using one process over the other are identified. None of the MHCB projects

20  are mentioned. It should be noted that the Court had previously ordered defendants' to

21  accelerate the MHCB construction project at CMF, and that CDCR Director of Facilities

22  Management George Sifuentes had testified on April 27, 2006 that it was possible that the

23  project could be further accelerated if he was given budgetary authority to offer the contractor

24  such an incentive. See Ex. B to Nolan Decl., 4/27/06 Transcript at 102:6-103:7. Given these

26  [1] Defendants' existing Bed Plans apparently do not address the known "gap" in ad seg, ad seg,
   SHU, EOP beds, PSU beds and mental health services for CCCMS patients in all programs.
27  Compare CDCR bed plans with Navigant 6/30/06 projections of demand. *See, e.g.*, pages 25,
   26, 28, 29, 30, of 6/30/06 Plan, Enclosure I.

1    factors, it is remarkable that defendants failed to comply with ¶ 3 of the Order regarding the

2    CMF MHCB project, as well as all of the other long-term bed projects.

3       The Court should order immediate compliance and should consider assigning the

4    contracting and managing of these construction projects to the *Plata* Receiver or some other

5    independent and capable manager.

6    **C. Defendants Have Acted In Bad Faith By Using Clinical Staff From Other**
         **Understaffed Mental Health Programs To Activate The CTC's at Kern Valley**

7          **State Prison and CSP-Sacramento, Rather Than Retaining Additional Staff**

8       The May 2, 2006 Order, at ¶12, required defendants to activate the long delayed

9    Correctional Treatment Centers (CTC's) at Kern Valley State Prison and at CSP-Sacramento,

10   on or before June 30, 2006.  On June 30, 2006, defendants reported to the Special Master that

11   although defendants would activate the MHCB's at both locations on July 1, 2006, "both

12   institutions needed to move existing staff from other mental health programs" to do so,

13   "causing significant impacts to providing mental health services in other areas that will result

14   in limited services until these vacancies can be filled." Ex. E to Nolan Decl., (June 30, 2006

15   Letter from Dr. Farber-Szekrenyi to Special Master Keating regarding KVSP and CSP-SAC

16   mental heath crisis bed programs).  Large numbers of medical, nursing and mental health staff

17   were moved to the CTC's, resulting in major disruptions of medical and mental health services

18   in critical areas of these prisons, including high risk Administrative Segregation units at both

19   prisons. *Id.*

20       This conduct—complying with one court order by violating numerous other orders of

21   the same court—is bad faith that must be addressed promptly by this Court.  The Order itself

22   gave defendants the "out" of "informing the court in writing by that date why the centers are

23   not fully operational."  5/2/06 Order ¶ 12.  In addition, the list of routine recruitment efforts

24   and "barriers" identified by defendants as their excuse for not hiring staff for these programs

25   evidences defendants' "business as usual" attitude: salaries are reportedly too low, yet no

26   efforts are undertaken to raise them to appropriate levels; the registries report that they have no

27   clinicians available for those locations, but no one makes efforts to renegotiate the registry

28   contracts to increase compensation; the State's credentialing and exam process is too slow and

1    cumbersome, but no one has changed it; a loan repayment program would be a positive factor

2    in recruiting, but is not available at these institutions.  Ex. E. to Nolan Decl.

3        Dr. Farber-Szekrenyi testified at the hearings in April that the "salary level we offer is

4    not sufficient to attract candidates." Ex. B to Nolan Decl. (4/27/06 Transcript) at 51:17-19.

5    Yet these same inadequate salary levels remain the major obstacle to hiring clinical staff for

6    the CTC's at KVSP and CSP-Sacramento.  In other words, the problem was not addressed in

7    the more than two months that passed since the hearing and defendants' "solution" to

8    compliance with the May 2, 2006 Order was, once again, robbing Peter to pay Paul.

9        The Court should order defendants to raise salaries at KVSP and CSP-Sac immediately

10   to whatever level is necessary to staff all of the mental health and medical programs at

11   appropriate levels, on or before August 15, 2006.

12                                 **CONCLUSION**

13       For all of the above reasons, plaintiffs respectively request that the Court make the

14   following findings and orders:

15       1.    Defendants' June 30, 2006 Amended Long-term Bed Plan is rejected as it fails to

16   comply with ¶ 1 of the May 2, 2006 Order requiring adjustments based on the increased

17   population projections for CDCR published in Spring 2006.

18       2.    Defendants' request for a 60-day extension to present a new long-term bed plan

19   is denied.  Defendants are to move forward with all deliberate speed with the long-term bed

20   plan projects approved by the Court in its May 2, 2006 Order.

21       3.    Defendants, as well as their consultant, Navigant, are to produce to the Special

22   Master and plaintiffs' counsel, within twenty days, all documents and information, including

23   the underlying drafts, notes, data, computer programs, contracts with consultants, and

24   communications, including emails, that refer or relate to either defendants' April 17, 2006 Bed

25   Plan (and its attachments), or defendants' June 30, 2006 Amended Plan (and its attachments).

26   Defendants and Navigant shall also provide full and unfettered access to the Special Master

27   and plaintiffs' counsel to all persons who participated in any way in the two Bed Plans,

28   including, if necessary, sworn testimony in depositions by plaintiffs' counsel or a hearing or

1  inquiry, with sworn testimony recorded, conducted by the Special Master.  The Special Master

2  shall report to the Court concerning his findings concerning the serious questions raised by the

3  timing and presentation of the April 17 and June 30, 2006 Bed Plans, the State Budgetary

4  Process and the role of Navigant, by September 30, 2006.

5      4.    The Special Master shall also retain a person or persons with expertise sufficient

6  to evaluate Defendants' Bed Planning and construction process and make recommendations to

7  the Court concerning their validity and concerning any necessary changes in data collection

8  and analysis, computer programs, professional and management staff and project management

9  staff, to assure that defendants' plans for construction of mental health beds and hiring of

10  necessary clinical and custodial staff plan are adequate for the predicted population of

11  prisoners with serious mental illness.  The Special Master shall file a report, by November 15,

12  2006, with findings and recommendations.  Among the questions to be addressed are which of

13  the various projections presented to the Court by defendants are most reliable and why,

14  whether appropriate intermediate and long-term projects to address all of the housing and

15  treatment needs of the MHDS population are in place and whether all or parts of the Bed

16  Needs planning and construction process should be removed from the control of defendants

17  and managed by the Plata Receiver or some other person or entity.

18      5.    Defendants are ordered to file with the Court, by August 15, 2006, interim and

19  long-term bed plans, including funding and implementation schedules, to address the present

20  and projected gaps in Enhanced Outpatient Beds to assure timely access to this level of care for

21  all custody levels and in all CDCR programs including but not limited to EOP's in reception

22  centers, Administrative Segregation units, Administrative Segregation EOP units, Psychiatric

23  Housing Units (PSU), Secured Housing Units (SHU) and Sensitive Needs Yards (SNY).

24  These plans must provide for appropriate housing and treatment space and clinical and

25  custodial staffing to assure compliance with the Revised Program Guides for all MHDS

26  participants.

27

28

1       6.     Defendants are in violation of ¶ 3 of the May 2, 2006 Order.  On or before

2   August 15, 2006, defendants are to provide a full and complete analysis, separately for each

3   project in the long-term bed plan, in full compliance with that provision.

4       7.     Defendants are in violation of ¶ 12 of the May 2, 2006 Order concerning the

5   Kern Valley State Prison and CSP-Sacramento CTC/MHCB Units.  Nothing in the Order

6   contemplated that defendants would activate these units without hiring new clinical staff and in

7   a manner that negatively impacted existing mental health and medical care programs.

8   Defendants are ordered to immediately raise salaries and benefits at KVSP and CSP-

9   Sacramento to a level sufficient to staff all mental health programs at appropriate levels, on or

10  before August 15, 2006.  For the convenience of the Court, a proposed order has been lodged

11  herewith.

12

13  Dated: July 10, 2006                    Respectfully submitted,

14

15

16                                         Michael W. Bien
                                       Rosen, Bien & Asaro
                                       Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28