# EXHIBIT A

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF CALIFORNIA

3      ---oOo---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6      RALPH COLEMAN, et al.,

7            Plaintiff,

8      Vs.                          CASE NO. CIV. S-90-0520 LKK

9      ARNOLD SCHWARZENEGGER,
       et al.,

10

11           Defendants.

12      _____/

13

14

15

16                    ---oOo---

17

18              REPORTER'S TRANSCRIPT

19           WEDNESDAY, APRIL 26TH, 2006

20      RE:  EVIDENTIARY HEARING RE MOTION FOR COURT ORDER

21

22                    ---oOo---

23

24

25      Reported by:

                        CATHERINE E.F. BODENE,
                        CSR. No. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                        APPEARANCES

2                         ---o0o---

3

4    FOR THE PLAINTIFF:

5            ROSEN, BIEN & ASARO, LLP
             155 MONTGOMERY STREET, EIGHTH FLOOR
6            SAN FRANCISCO, CALIFORNIA  94104

7            BY:  MICHAEL BIEN,
                  ATTORNEY AT LAW
8

9

10

11   FOR THE DEFENDANTS:

12           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
13           1300 I STREET
             SACRAMENTO, CALIFORNIA  95814
14
             BY:  LISA TILLMAN,
15                DEPUTY ATTORNEY GENERAL

16

17

18

19                        ---o0o---

20

21

22

23

24

25

EXAMINATION INDEX

---o0o---

FOR THE DEFENDANTS:

EXAMINATION:

PAGE

DOUG MCKEEVER

    Direct Examination by Ms. Tillman    10
    Cross-Examination by Mr. Bien    14

GEORGE SIFUENTES

    Direct Examination by Ms. Tillman    29
    Cross-Examination by Mr. Bien    40
    Redirect Examination by Ms. Tillman    55

JOHN RODRIGUEZ

    Direct Examination by Ms. Tillman    56
    Cross-Examination by Mr. Bien    68

---o0o---

1

SACRAMENTO, CALIFORNIA

WEDNESDAY, APRIL 26TH, 2006 - 2:00 PM

---oOo---

THE CLERK:  All rise.  Court is in session.

The Honorable Lawrence K. Karlton is presiding.

THE COURT:  Please, be seated.

Good morning, Ladies and Gentlemen.

May I have counsel approach the podium, state your appearance for the record and indicate whether you will be arguing.

MR. BIEN:  Good afternoon, Your Honor.  Michael Bien on behalf of plaintiffs.

MS. TILLMAN:  Good afternoon, Your Honor.  Lisa Tillman on behalf defendants.

THE COURT:  You are only two lawyers that will be talking this afternoon?

MS. TILLMAN:  Yes, Your Honor.

MR. BIEN:  Yes, Your Honor.

THE COURT:  All those other folks are welcome, but just be quiet.

I do want to talk a little bit about what I think is going on, and then I'm going to hand out some questions to the parties, ask the defendant -- take a recess, ask the defendant to consult with those persons that I've asked to be present, find out who is the appropriate person to answer

2

1    those questions, discuss it with them so that they know what

2    it is we're going to be talking about, and then we'll put

3    them on the stand and try and get the answers that I think

4    are critical.

5         I want to start by making an observation that I am in

6    a sense quite -- Actually, you folks can sit down because I'm

7    about to make a speech.

8         MS. TILLMAN:  Thank you, Your Honor.

9         THE COURT:  I'm happy that the plaintiffs have

10   objected to some of the matters because it gives me an

11   opportunity to have a hearing that I've been thinking I

12   needed for some time.

13        It is not unimportant to the Court that the judgment

14   in this case was entered 11 years ago.  And we are still in a

15   place in which the defendants have been unable to bring the

16   delivery of psychiatric care up to constitutional standards.

17        I don't want to be misunderstood.  I very much

18   understand how much progress has been made, but in a sense --

19   and I don't mean this disrespectfully, though I suspect

20   that's how it's going to sound -- what we've managed to do is

21   crawl our way out of the snake pit.

22        Well, good for us, but that's hardly the standard

23   required by the Constitution.

24        I have profound trust in my Special Master.  I got so

25   lucky, I can hardly believe it.  Nonetheless, it is 11 years,

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3

1  and we are not done.  And that is unacceptable.  It is just

2  plain unacceptable.

3        I promised myself I wouldn't lose my temper, and I'm

4  not going to.

5        In a sense, this hearing is to help me understand why

6  we are where we are, and what we can possibly do to bring the

7  State into conformance with the Constitution of the United

8  States.

9        That's what this case is about.  Every defendant in

10  this case is in violation of the law.  That is shocking.

11  That is shocking.

12        And that we go on and talk about building out to

13  19 -- to 2011, or God knows how much beyond that.  There's no

14  sense of urgency.  There's no sense that the defendants are

15  in violation of the law.

16        So that's one purpose in this hearing.

17        Another purpose is engendered by the fact that

18  Judge Henderson has ordered a receivership in Plata.  And we

19  are going to have a joint hearing, as I think you all know,

20  on June the 8th at ten o'clock here in Sacramento.  I offered

21  to go down to San Francisco, but I think Judge Henderson,

22  because we met down there twice, thought it was his turn to

23  come up.  And it's important for me to be in a position when

24  we talk on June the 8th to have some better sense of what's

25  possible.

4

1    And in that regard, one of the purposes of the

2    meeting -- of the hearing will be to coordinate this case

3    with Plata and try and understand how we can achieve

4    appropriate relief for both medical care and psychiatric care

5    in this system.

6    I want to say something to the defendants, that I

7    appreciate how difficult the problem is.  I really do.  And

8    part of the reason, as I perceive it, that you are out of

9    conformance with the Constitution is the extraordinary

10    explosion both in population in the prison system and in the

11    number of folks who need psychiatric care.

12    And there appear to be at least two significant

13    reasons for that.  One is the determination of the people of

14    the State under the Three Strikes Law to imprison many, many

15    more people for much longer periods of time, thus increasing

16    the population in the prisons.  And the second reason, of

17    course, has been the closing of the statewide institutions --

18    mental institutions so that the prisons have become, in

19    effect, mental hospitals.

20    So many of the people who are in prison today, when I

21    was a lawyer, would have been in a mental institution.  And

22    there's an argument that's where they all belong.  But the

23    State made a different judgment and here we are.

24    And I understand the pressures and the difficulties

25    that that imposes upon the defendants.  But, you know, the

5

1    State has made that judgment. And now the State must pay the

2    piper.

3        I tell the people in Finance who are here, I hope,

4    supposed to be here, the State made a policy judgment. You

5    have to pay for it. And it's going to be horrifically

6    expensive. And if you think this is expensive, wait until

7    you find out what the physical medical costs are going to be.

8        All right. I've sort of gotten, in a sense, what I

9    had to say about that.

10       I am going to ask the parties, if they will, when

11   they are testifying, and the lawyers as well, to avoid

12   acronyms to extent that you can. My Special Master doesn't.

13   Very often, I frequently have to stop and say what in

14   goodness name is this. And now he's taken to writing it out

15   then giving me a bracket so I can go back and find it later

16   on. But it is not a useful thing, if you can avoid it.

17   Sometimes you can't.

18       What I wish to do today is first of all talk about

19   the Bed Plan, which I think is going to take some time and is

20   going to require the answering of a bunch of questions. Then

21   the Plaintiffs to Outstanding Objections to the Monitoring

22   Report, and finally we'll send all the rest the folks but the

23   lawyers home, and we'll try and work out a status conference

24   concerning discovery for the upcoming hearing on the program.

25       Let me talk about the good things before we start

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

6

1  talking about the bad.  I want to start by acknowledging the
2  multi-disciplinary group work and appreciation of the
3  collaborative effort among the State agencies.  That was an
4  important step forward.  Something you hadn't done before.
5      I'm glad you came in late, Denny I've been saying
6  really strong things you won't be able to report.
7      That's the Bee reporter in case you wonder who I'm
8  talking to.
9      And that's a really important step forward, and I
10 urge the parties to continue in addressing these problems to
11 do this in a multi-disciplinary way.  It's the only way it's
12 going to get solved at all.
13     The long-range plan for Acute Care beds, 350 male
14 beds, 25 female beds, appears to me to be a good judgment.
15 And the Court's glad to see the beds will be inside the
16 California Department of Corrections and Rehabilitation.
17     I think that's an important step forward.  To have
18 the Department of Mental Health working within the
19 institution means that the institution can provide the kind
20 of security and custody -- I mean, one of the things, as I
21 sometimes have to remind the plaintiffs, is a lot of their
22 clients are bad, dangerous folks.  And there really has to be
23 the kind of custody and security that, for better or worse,
24 we provide in prison.  So I think that's a step in the right
25 direction.  I would encourage people, as they try to think

7

1    their way through the problem, to start thinking that as a

2    model for the future.

3        Again, the long-range plan for the Intermediate Care

4    Facility appears to me to be essentially appropriate.  The

5    timeline is unacceptable.

6        June 2011.

7        That's five years away.  And there is a crisis today.

8        You are in violation of the Constitution of the

9    United States today.

10       Unacceptable.

11       We've got to find -- I mean, the long-term idea, five

12   years, would be fine if we had an interim plan that makes

13   sense.  I might also say, that as far as I can understand the

14   history of this litigation, we have never met a date.  Not

15   once.  So when you tell me it is five years away, I have a

16   great deal of doubt.  And so we've got to work through this

17   question of immediate help.

18       Then we have the Mental Health Crisis beds, and

19   they're talking about construction, as I understand it,

20   through 2008.  Maybe that will be sufficient.  We have an

21   acute crisis today.  That crisis must be addressed.

22       I am very pleased that the defendants, on their own,

23   have started to address, apparently without the plaintiffs

24   bothering them or even the Special Master, apparently have

25   started to think on their own about how to deal with the

8

1    Enhanced Outpatient Program and finding beds in the future.

2         So there are those good things.  And I want everybody

3    to know that the Court understands that and appreciates that,

4    but we have an immediate crisis.  And somehow or other we

5    must find a way of addressing that crisis, which brings me to

6    the questions.

7         Ana, will you please hand out the questions to

8    counsel for both parties.

9         I don't know how long it is going to take you, Ma'am,

10   to figure out who of your parties are the appropriate people

11   to answer these questions and go over it with them so that

12   they can be prepared to provide us with a sensible set of

13   answers, but what I'm going to do is take a half-an-hour

14   recess to give you an opportunity to do that.

15        If it turns out you're going to need more time, I

16   will do that as well.  And I will tell you if we have to go

17   over to tomorrow, my trial went away, which is why we could

18   start at 2:00, and I will do that as well.

19        I mean, obviously we have got to get going.

20        The Court will take a half-an-hour recess.

21        (Off the record at 2:21 PM)

22        (Back on the record at 2:50 PM)

23        THE CLERK:  Please, remain seated.

24        Court is now in session.

25        THE COURT:  Miss Tillman, are we more or less ready

9

1    to get started?

2              MS. TILLMAN:  Yes, we are, Your Honor.

3              THE COURT:  Very good.  Can we take up the first

4    question, which is the effect of the new population

5    projections.

6              Who would be speaking to that?

7              MS. TILLMAN:  Doug McKeever.

8              THE COURT:  You got to come to the microphone.

9              MS. TILLMAN:  Let me introduce Doug McKeever, Project

10   Director, out of Health Care Services for the Department of

11   Corrections and Rehabilitation.

12             THE COURT:  Come to the stand and be sworn, sir.

13                      DOUG MCKEEVER,

14   was thereupon called as a witness herein by the Defendants,

15   and having been sworn to tell the truth, the whole truth and

16   nothing but the truth, was thereupon examined and testified

17   as follows:

18             THE CLERK:  Please, have a seat.

19             Please, state your name for the record, spell your

20   last name and speak directly into the microphone.

21             THE WITNESS:  Doug McKeever, M-c, capitol,

22   K-e-e-v-e-r.

23   ///

24   ///

25   ///

10

                            DIRECT EXAMINATION

1

2    BY MS. TILLMAN:

3    Q.      Good afternoon, Mr. McKeever.

4            Would you let the Court know what your background is

5    in terms of the Bed Plan submitted to the Court on April

6    17th.

7            THE COURT:  Before you do that, what is your present

8    job title, I guess?

9            THE WITNESS:  I'm Project Director for Mental

10   Health.

11           THE COURT:  Thank you, sir.

12           MS. TILLMAN:  Thank you.

13   BY MS. TILLMAN:

14   Q.      Your background in preparing the report submitted to

15   the Court on April 17th?

16   A.      Essentially, I was asked by Undersecretary, Jeanne

17   Woodford, to lead the multi-disciplinary work group that

18   consisted of all the departments that Your Honor listed

19   earlier and referred to in the development of the Bed Plan

20   submitted in April.

21   Q.      And in the course of preparing that Bed Plan, did you

22   work at all with any of the population projections contained

23   in that plan?

24   A.      Yes, we did.

25   Q.      And in what manner did you work with those

11

1    projections?

2    A.    The population projections that we used were based

3    upon a 2002 Tucker-Alan study that was done in which formal

4    methodology was put in place that allowed for us to

5    understand what the capacity is within the current

6    Department, and then based on the methodology, project out

7    what the forecasted need would be for the variety of mental

8    health inmate patients we have in our system at all the

9    levels of care.

10   Q.    What was the database for the population -- Strike

11   that.

12         What population numbers did you use in engaging in

13   this forecast?

14   A.    In order to comply with the court order and submit

15   the plan in April, we needed to use the fall population

16   projections that were produced by the Department.

17   Q.    And that was fall of what year?

18   A.    2005.

19   Q.    Have those projections been updated at all in light

20   of the spring 2006 projections?

21   A.    The mental health projections have not yet been

22   updated with the spring population projections.

23         THE COURT:  Is that being worked on?

24         THE WITNESS:  Yes, it is.

25         THE COURT:    All right.

12

1          Do you have an idea when that's going to get done?

2          THE WITNESS:  I don't have a specific date for Your

3     Honor.

4          THE COURT:  I understand.  Generally, what do you

5     think?

6          THE WITNESS:  We're hoping within the next several

7     weeks.  However, we have a database issue we're trying to

8     resolved so that could result in that not being completed in

9     the next few weeks.

10         THE COURT:  Okay.

11    BY MS. TILLMAN:

12    Q.     Do you have any understanding as to whether or not

13    the Bed Plan will be revised once the spring population

14    numbers are introduced into the Tucker-Alan methodology?

15    A.     If, in fact, the numbers reflect there is a greater

16    need, than obviously we will reconvene the bed planning group

17    and make any adjustments to the Bed Plan that may be

18    necessary based upon those new projections.

19    Q.     The Court also asked about the methodology for

20    forecasting the demand for mental health beds and asked

21    whether the Tucker-Alan methodology of 2002 needs to be

22    updated.

23         Do you have an opinion on that?

24    A.     My opinion is that it does need to be updated.  And

25    as a result, we have contracted with Mr. John Mizner of

13

1    Navigant to do an analysis of the methodology itself, ensure

2    that what we have done placing the UNA, Unidentified Needs

3    Assessment individuals into that methodology, was done

4    appropriately.  And certainly based upon his findings, if we

5    need to make modifications to that, we will do so.

6    Q.    In preparing the Bed Plan that was submitted to this

7    Court, did you become aware of a shortfall of 123

8    Intermediate Care beds?

9    A.    I believe that shortfall refers to the current wait

10    list that requires Level IV, high-custody inmate patients to

11    be housed at Salinas Valley State Prison.

12    Q.    Do you understand that shortfall will exist until at

13    least July 2008 and perhaps March 2009?

14    A.    Yes.

15    Q.    Are there any plans underway to try to address that

16    shortfall before 2008-2009?

17    A.    We are currently working on some additional

18    strategies to address that particular issue.  And obviously,

19    we would indulge the Court to grant us about 60 more days in

20    order to -- in which to fully vet those strategies and come

21    up with a plan that we believe will address that issue.

22        MS. TILLMAN:  Your Honor, this witness has responded

23    to the first three questions provided in the Court's

24    questionnaire.  For the next set I would have another

25    witness.

14

1          THE COURT:  Mr. Bien, do you desire to question the

2   witness?

3          MR. BIEN:  Yes, please.

4          THE COURT:  You may retire.

5          MS. TILLMAN:  Thank you.

6          THE COURT:  I might indicate to both counsel, the

7   Court is not going to do anything from the bench.  After we

8   get all this out, I've got to go back and think about what

9   I'm hearing.

10          Mr. Bien.

11                         CROSS-EXAMINATION

12   BY MR. BIEN:

13   Q.     Mr. McKeever, do you have any doubt that the spring

14   population projection is going to require an increase in

15   mental health services for the population?

16   A.     I think --

17          THE COURT:  I think what he really means is there is

18   going to be more people that need mental health services.

19          THE WITNESS:  If you're asking for my opinion versus

20   a professional, I'm not a statistician.  All I can offer is

21   my professional opinion.

22   BY MR. BIEN:

23   Q.     Have you looked at the spring population projections?

24   A.     Yes.  They have gone up.

25   Q.     Isn't it correct that between the fall 2005

15

1    projection and the spring 2005 projection, the population

2    projected for 2011 went up by six-and-a-half percent?

3    A.       I can't address whether it was specifically

4    six-and-a-half percent, but I do know it did go up.

5    Q.       And so you know you're going to need more beds,

6    right?

7    A.       One could assume that is correct.

8    Q.       Right.  Hasn't your group already been discussing the

9    need for additional beds based on the spring projections?

10   A.       As I stated earlier, if, in fact, once we get the

11   spring population projections entered into the Gap Analysis

12   Sheet, and once we determine if the bed need is greater than

13   what we had used to provide the Court's plan in April, then

14   we will regroup, revise the plan if necessary, and come back

15   with an additional request.

16           THE COURT:   He's going to ask you a question that I

17   got to ask you.

18           Look, it seems all right certain that you're going to

19   need more beds.  You may not know exactly how many you need,

20   and you're not going to know that until the 60 days are over,

21   God willing and the river don't rise, but you know you're

22   going to need more beds.  Why aren't you -- This is the whole

23   sense of urgency that I tried to talk about earlier.

24           Why aren't you convening the group now and saying,

25   "Look, we don't know exactly how many beds we're going to

16

1    need, we know we're going to need more beds, let's start

2    planning now."

3              Why isn't that being done, sir?

4              THE WITNESS:  Well, I think, let me clarify if I may.

5              We have recognized that there may be an additional

6    need for beds.  As I indicated earlier, there some additional

7    strategies the Department is pursuing to address any

8    additional need there may be, specifically at the mental

9    health crisis bed issue.  So I don't mean to suggest that

10   we're not looking at it now and we're waiting.  So I hope

11   that clarifies it a little bit.

12   BY MR. BIEN:

13   Q.     I'm just trying to give you -- The people who do the

14   spring population projections is the Department of

15   Corrections; isn't that correct?

16   A.     That is correct.

17   Q.     And those projections are based on the actual

18   population that's been going up month-after-month,

19   day-after-day, beyond what you had projected in the fall; is

20   that correct?

21   A.     Yes, it is.

22   Q.     Okay.  So you have known all along that the

23   population projections were out of date -- the spring 2005

24   population projections were out of date?

25             MS. TILLMAN:  Objection.  Misstates the testimony,

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

17

1    spring '05.

2    BY MR. BIEN:

3    Q.        You knew on April 17th, when you filed the Bed Plan,

4    that the numbers you were relying on, the fall 2005

5    projections, were already out of date and wrong, the

6    Department knew they were wrong at that point?

7    A.        The general population projections, correct, were

8    wrong.  But how that impacted the mental health projections,

9    until such time that we get that run through the methodology,

10   I can't sit here and tell you that it is, in fact, going to

11   be "x" number higher.

12            THE COURT:   I'm informed by my Special Master that

13   for some reasonably clear period of time, about 19 percent --

14   it's been sort of a constant at about somewhere between 19

15   and 20 percent of the population now requires mental health

16   services.

17            Is that your understanding as well?

18            THE WITNESS:   That is.

19            THE COURT:   And so you have a -- I'm not suggesting

20   you're bad people.  I just don't understand why you aren't --

21   You know that you're going up.  You know about 19 to 20

22   percent are going to require services.  That's a planning

23   number you can start working on now, isn't it?

24            THE WITNESS:   Yes, sir.  I believe as I indicated

25   earlier, if the Court indulges us and grants us an additional

18

1    60 days, I think we can respond to that more adequately than

2    we may have already done so.

3            THE COURT:    Mr. Bien.

4    BY MR. BIEN:

5    Q.      You're aware the Court ordered you to do this Bed

6    Plan originally about a year ago?

7    A.      I believe --

8    Q.      March 2005?

9    A.      That was the first plan that I was involved in that

10   was submitted to the Court.   That's correct.

11   Q.      And so the Court has already indulged you more than a

12   year, and in that time period no additional plans for beds

13   have gone forth, nothing has gone to the Legislature?

14   A.      If I may correct you, Mr. Bien, there was an

15   additional plan submitted in August for the conversion of CMF

16   and Salinas Valley.   So there were some additional plans

17   submitted to the Court.

18   Q.      You didn't -- you haven't been working with the

19   people who did the Tucker-Alan study in this last year as you

20   developed these plans?

21           THE COURT:   I don't know what that means.

22   BY MR. BIEN:

23   Q.      You mentioned -- I was going to ask you whether or

24   not the Tucker-Alan people had worked with you on this new

25   projection?

19

1    A.      They did not participate in the development of the

2    Bed Plan itself, no.

3    Q.      And the UNA study material has been available to you

4    for more than a year now?

5    A.      Yes.

6    Q.      Okay.  So in this time period you haven't sought the

7    need to engage the Tucker-Alan people and see how these new

8    numbers would plug into their model?

9    A.      Well, as I mentioned earlier, we did contract with

10   Navigant, John Mizner, to ensure that how we included the UNA

11   numbers in the fall projections, in the Gap Analysis that we

12   came up with were done correctly, adequately and effectively.

13   And we're awaiting the results from them to determine if

14   that, in fact, is true.

15          So we engaged them to determine if the methodology

16   and the fact that the UNA came out, we put them into the

17   projections, based on the levels that were identified in the

18   Unidentified Needs Assessment, and now the methodology and

19   how we put those numbers into it are being reviewed by

20   Navigant.

21   Q.      So you already let a contract to them?

22   A.      Yes.

23   Q.      You just don't have the results in time to include in

24   this study?

25   A.      That is correct.

20

1    Q.      Okay.  Sixty days from now will be after the budget

2    process is over in California, isn't it?

3    A.      To my knowledge -- yes, I believe it will be over at

4    this point for the '06-'07 budget.

5    Q.      So 60 days -- if the judge gives you 60 days, that

6    means that whatever men are suffering out there are going to

7    suffer a whole other year?

8           MS. TILLMAN:  Objection.  Lack of foundation as to

9    the budget process.

10          THE COURT:  The question is given what you already

11   know, have you gone to the Legislature?

12          I know there is a whole process to go to the

13   Legislature.  Have you started the process of going to the

14   Legislature and saying that we need all of these other

15   beds -- or the reasonable projection is we're going to need

16   all of these beds, we need the money to make it happen?

17          THE WITNESS:  If you're referring to beds we put into

18   the Plan, that process has already taken place.

19          THE COURT:  And does that include some estimate

20   based upon your knowledge that the figures that you used in

21   the Bed Plan turned out to be short?

22          THE WITNESS:  No.  We would have to go back with an

23   additional request if we found that we needed additional

24   beds.

25   ///

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

21

BY MR. BIEN:

Q.      Have you approached the Legislature and said, you know, we're going to need approximately six-and-a-half percent more in 2011 than what we said?

A.      No.

Q.      Okay.  Has your group discussed doing that?

A.      Not at this time.

Q.      Mr. McKeever, we talked on the telephone over the last week or couple of weeks as your plans were being developed, and we asked some questions about how you had plugged the UNA study information into the Tucker-Alan numbers.

        Do you recall that?

A.      I do.

Q.      And do you recall telling us you would provide us with your backup data?

A.      I do.

Q.      Did you provide us with your backup data?

A.      I did not.

Q.      When you adjusted the Tucker-Alan numbers to reflect the UNA study, did you also adjust the Tucker-Alan numbers to reflect the fact that their projections of population were low?

A.      Can you -- I don't understand the question.

Q.      So if you are using a 2002 study?

22

1    A.        Uh-huh.

2    Q.        You've got to make several changes to it to make it

3    relevant today; is that correct?

4    A.        I don't believe any changes were made to the

5    methodology.  The only changes were the actual data, the

6    population figures, the length of stay data, that type of

7    thing that were made to the projections.  The methodology did

8    not change.

9    Q.        Okay.  What was the Tucker-Alan methodology?

10   A.        Personally, my knowledge of it is only that of which

11   I've read, which is Enclosure 1, based upon what was

12   submitted by Navigant back in 2002.  I'm not the person

13   responsible for that particular component of the program.

14   Q.        Okay.  You're aware the Tucker-Alan projections were

15   way low in 2002?

16             MS. TILLMAN:  Objection.  Lack of foundation.

17             THE COURT:    Sustained.

18   BY MR. BIEN:

19   Q.        In other words, you're the one who's responsible for

20   applying the Tucker-Alan methodology to this current

21   population situation?  You're the Project Director; is that

22   correct?

23   A.        Yes.  And maybe it would be helpful to clarify that,

24   again, my role is to take the data that's provided to me, and

25   then use that data in the development of the plan that was

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

23

1   submitted to the Court.

2          So my knowledge of Tucker-Alan, the methodology, the

3   formulas behind it is very limited because that's not my area

4   of responsibility.

5   Q.      Okay.  Do you plug numbers in?  How do you do this?

6   Do you use a computer program?

7   A.      Again, that's not my area of responsibility.

8   Q.      I understand.  But you said you're the one who

9   takes --

10         THE COURT:  After somebody has given him the

11  numbers.

12         THE WITNESS:  I get the sheet that is included as

13  Enclosure 2.

14  BY MR. BIEN:

15  Q.      Right?

16  A.      The spread sheet in Enclosure 2 in the Bed Plan.

17  Q.      Right.

18  A.      I take that.  It shows me what our current pop is,

19  what our need is or gap, as it's identified in the sheet, and

20  then we facilitated the bed planning group to account for

21  that gap.

22  Q.      Who created Enclosure 2?

23  A.      Enclosure 2 was created by the Division of

24  Correctional Health Care Services.

25  Q.      And who there was responsible for this?

24

1    A.       Her name is Sharon Regal.

2    Q.       Do you understand what she did to manipulate the

3    current numbers and get these numbers?

4             MS. TILLMAN:  Objection as to the characterization of

5    "manipulate".

6             THE COURT:  He doesn't mean in that in a bad way.  He

7    just means how did it get changed.

8             Do you know?  If you don't, it's all right.

9             THE WITNESS:  I am -- again, I'm not familiar enough

10   to sit here and state that I know exactly how she does that.

11   No.

12   BY MR. BIEN:

13   Q.       Do you understand that one of the findings of the UNA

14   study was that the Department was not correctly placing

15   mentally ill prisoners at their appropriate level of care?

16   A.       That is my understanding, yes.

17   Q.       Okay.  And the UNA studies went out and did a study,

18   and it was the Department of Corrections in conjunction with

19   the Special Master and his team, and they determined that

20   approximately 14 percent of the EOP population at the time

21   should have been in higher levels of care, either APP --

22   that's the acute psychiatric, Your Honor -- or ICF

23   Intermediate Care; is that correct?

24   A.       Yes.  I believe that number was 512.

25   Q.       Okay.  But it was a finding that you couldn't rely on

25

1    just how the Department at this moment in time categorized

2    their population; is that correct?

3        In other words, clinicians were not able to move

4    people to the appropriate levels of care for whatever reason.

5    So you just couldn't rely on that I'm going to look at the

6    population right now and see how many are Inpatient, EOP, and

7    then just project out growth based on an increase in

8    population?

9        You have to do something else?

10   A.    Okay.  Again, that would be outside my area of

11   expertise.

12   Q.    Has anyone from the Governor's office told you that

13   you cannot go to the Legislature right now and say:  You

14   know, what, we're short.  Why don't you just adjust these

15   beds six-and-a-half percent?

16   A.    No.

17   Q.    Okay.  Have you asked anyone to do that?

18   A.    Personally, I have not.

19   Q.    Have you heard anyone discuss doing that?

20   A.    I'm not aware that anybody has asked that question.

21   Q.    Does it concern you that you're going to spend close

22   to a billion dollars of money and end up short beds in 2011?

23   A.    From a planning perspective, if we can account for

24   the need now, yes, it would concern me.

25   Q.    What steps have you taken --

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

26

1    THE COURT:  If any.

2    BY MR. BIEN.

3    Q.    -- to address the gap between now, and let's just say

4    2008 when it looks like you may have some new resources for

5    ICF Level IV beds?

6    THE COURT:  Hang on.  I suspect this is the wrong

7    witness.

8    Is that right, counsel, that you've got somebody else

9    to talk about the gap, the current problems?

10    MR. BIEN:  I was asking question A-3.  I don't know

11    if this is something Mr. McKeever knows about or not.

12    THE COURT:  All right.  I mean, that's perfectly

13    legitimate.  But I thought he was limited to 1 and 2.  And

14    you were putting --

15    MR. BIEN:  Okay.

16    THE COURT:  I may be wrong.

17    MS. TILLMAN:  I think he touched upon A-3.

18    THE COURT:  All right.  Put the question to him

19    again.

20    BY MR. BIEN:

21    Q.    What steps, Mr. McKeever, have you taken to address

22    the fact that your plan leaves 123 Inpatient Psychiatric ICF

23    beds for Level IV unmet for several years?

24    A.    There are a number of additional strategies that the

25    Department has identified, which have not been vetted yet

27

1    with the Court, relative to addressing that particular need.

2           And that is why I asked earlier for the Court to

3    grants us an additional 60 days so we can fully scope those

4    strategies out and determine the feasibility of those.

5    Q.    You know that in August your Department asked for

6    additional time, Mr. Keating gave all sorts of comments about

7    your plan, and that was last year, right?

8           MS. TILLMAN:  Objection.  Misstates the evidence.

9           THE COURT:  No, he's asking him, not telling him.

10   BY MR. BIEN:

11   Q.    Isn't it correct that in August of 2005 Mr. Keating

12   gave comments to you and your task force -- I think the

13   letter was addressed to Jeanne Woodford -- talking about what

14   was wrong with the Department's plan for ICF beds, especially

15   the gap, the fact that the interim plan was missing?

16   A.    Yes, I'm aware of that.

17   Q.    Okay.  So the Department has had a lot of time from

18   the Court to address this problem, hasn't it?

19   A.    They have had some time to address this.  That's

20   correct.

21   Q.    Okay.

22          When Mr. Keating made his recommendations to the

23   Court about when your plan would be due -- your Bed Plan

24   would be due, you asked him to extend the time, I think it

25   might have been for an additional 30 or 60 days, from when he

28

1   originally recommended the plan would be due; isn't that

2   correct?

3   A.      That is correct.

4   Q.      Okay.

5           And Mr. Keating, over plaintiffs' objections, and

6    Judge Karlton, granted you that additional time; isn't that

7   correct?

8   A.      Yes, it is.

9           MR. BIEN:  I have no further questions.

10          THE COURT:  Any redirect?

11          MS. TILLMAN:  We have nothing further, Your Honor.

12          THE COURT:  You may step down, sir.

13          Thank you.

14          THE WITNESS:  Thank you, Your Honor.

15          MS. TILLMAN:  Your Honor, looking at page 1,

16  Subsection b, Intermediate Care, we'd like to present George

17  Sifuentes who is a facility's manager for the Department of

18  Corrections to respond to those questions.

19          THE COURT:  Come around and be sworn, sir.

20          THE CLERK:  Raise your right hand.

21                      GEORGE SIFUENTES,

22  was thereupon called as a witness herein by the Defendants,

23  and having been sworn to tell the truth, the whole truth and

24  nothing but the truth, was thereupon examined and testified

25  as follows:

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

95

1    clinical staff required for those facilities?

2    A.      I can only address the second half because I think

3    Mr. Sifuentes addressed the building issues, but yeah.

4           Any of our hospitals, with the possible exception of

5    Metropolitan down in L.A., has challenges with hiring.  And

6    it is something we all pay attention to all the time.  And

7    it's going to be a challenge, but I think we've shown we can

8    pull it off.

9           We've done it for the 36 beds coming on-line next

10   month.  And I presume we're going to do the same thing.

11   Q.      Coalinga you didn't do it on time?

12   A.      No, we didn't.

13   Q.      And Salinas Valley you didn't do it on time?

14   A.      We did it on time for these 36 beds.

15   Q.      The original Salinas Valley was delayed?

16   A.      I didn't think it was staffing.  I think Vic brought

17   it up by using registry staff, which we moved on and

18   converted to some of our staff.  But we opened it with a

19   large number of registry nurses.

20           MR. BIEN:  That's about it, Your Honor.

21           MS. TILLMAN:  Nothing further, Your Honor.

22           THE COURT:  You may step down, sir.

23           THE WITNESS:  Thank you.

24           THE COURT:  It's late, and we have to take a break,

25   but Mr. Bien you have suggested, among other things, that we

96

1   join as a defendant the Director of the Department of Mental

2   Health.

3          I have no idea whether I have the legal authority at

4   this stage to do that.  And I am ashamed to say that I read

5   the decree yesterday just to remind myself how we got here,

6   and I do not recall whether or not it had the standard

7   language "these defendants and all of those persons acting in

8   concert with them," et cetera.

9          Do you recall that?

10         MR. BIEN:  I can't say that, Your Honor.

11         THE COURT:  That makes two of us.  Don't be ashamed.

12  I read it, and I just don't remember.

13         Well, you know my view of it is that this is a --

14  ultimately, this is a problem of the State's, and the

15  Department of Mental Health is just one more piece in the

16  puzzle.  And if I need to find a way to make them subject to

17  the Court's order, we'll find a way.  And whether that's

18  appropriate or not I think is becoming clearer as we talk.

19         In any event, we'll take our recess.

20         What time would you like to convene tomorrow morning?

21  9:15 satisfactory to everybody?

22         I know you didn't contemplate being here tomorrow

23  so --

24         MS. TILLMAN:  That's fine, Your Honor.

25         THE COURT:  Mr. Bien?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

97

1      MR. BIEN:  Sure, Your Honor.

2      THE COURT:    That will be the order.

3      (Off the record at 4:48 PM)

4                    ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

---o0o---

STATE OF CALIFORNIA    )
COUNTY OF SACRAMENTO )

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

        IN WITNESS WHEREOF, I subscribe this certificate at Sacramento, California on this 14th day of MAY, 2006.

_____
CATHERINE E.F. BODENE,
CSR NO. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiff,

8    Vs.                    CASE NO. CIV. S-90-0520 LKK

9    ARNOLD SCHWARZENEGGER,
     et al.,

10

11          Defendants.

12    _____/

13

14

15

16                    ---oOo---

17

18               REPORTER'S TRANSCRIPT

19          THURSDAY, APRIL 27TH, 2006

20    RE:  CONTINUED EVIDENTIARY HEARING RE MOTION FOR COURT ORDER

21

22                    ---oOo---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                CSR. No. 6926

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4   FOR THE PLAINTIFF:

 5            ROSEN, BIEN & ASARO, LLP
              155 MONTGOMERY STREET, EIGHTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN,
                   ATTORNEY AT LAW
 8

 9

10

11   FOR THE DEFENDANTS:

12            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
13            1300 I STREET
              SACRAMENTO, CALIFORNIA  95814
14
              BY:  LISA TILLMAN,
15                 DEPUTY ATTORNEY GENERAL

16

17

18

19                          ---o0o---

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXAMINATION INDEX

---o0o---

FOR THE DEFENDANTS:

EXAMINATION:

PAGE

DOUG MCKEEVER (Previously Sworn)

Examination by the Court                                1


GEORGE SIFUENTES (Previously Sworn)

Examination by the Court                                4
Direct Examination by Ms. Tillman                      83
Cross-Examination by Mr. Bien                          85
Further Direct Examination by Ms. Tillman             100
Further Cross-Exam. by Mr. Bien                        102


JOHN RODRIGUEZ (Previously Sworn)

Examination by the Court                                8
Cross-Examination by Mr. Bien                          11
Cross-Examinatin by Ms. Tillman                        11

Direct Examination by Ms. Tillman                      91


DR. PETER SZEKRENYI

Direct Examination by Ms. Tillman                      13
Cross-Examination by Mr. Bien                          17
Cont'd Cross-Exam. by Mr. Bien                         69
Redirect Examination by Ms. Tillman                    78
Recross-Examination by Mr. Bien                        79

---o0o---

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1                    EXAMINATION INDEX

2                       ---o0o---

3

4

FOR THE DEFENDANTS:

5
    EXAMINATION:

6                                      PAGE

7   SARAH MANGUM

8     Direct Examination by Ms. Tillman     91

9

10  JIM ALVES

11    Direct Examination by Ms. Tillman     91

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

SACRAMENTO, CALIFORNIA

1

THURSDAY, APRIL 27TH, 2006 - 9:15 A.M.

2

---o0o---

3

4        THE CLERK:  All rise.

5        Court is in session.

6        The Honorable Lawrence K. Karlton is presiding.

7        THE COURT:  Please, be seated.

8        Good morning, Ladies and Gentlemen.

9        Folks, I would like to recall each of the witnesses

10   very briefly for a couple of questions which occurred to me

11   last night.

12        Mr. McKeever, will you retake the stand, sir.  I

13   promise you, I won't keep you up there very long.

14        WITNESS MCKEEVER:  Okay, Your Honor.

15        (Doug McKeever, having been previously sworn, resumes

16        the witness stand.)

17                    EXAMINATION BY THE COURT

18   BY THE COURT:

19   Q.    Mr. McKeever, I understood the testimony to be that

20   there is some budget revision opportunity in May, that is you

21   can get supplements if you get your request in by May; is

22   that right or wrong?

23        Do I not understand?

24   A.    My understanding is that there is what is called the

25   May Revise Process.

2

1    Q.      And do you know when it would be necessary to

2    submit -- I gather the way you do that is you start by

3    submitting to the Department of Finance?

4    A.      That be the first step.  Yes, Your Honor.

5    Q.      And do you know how long -- what am I trying to

6    ask -- when you would have to have the revision in to be

7    effective?

8    A.      I don't know the exact date, but I do believe it is

9    coming up within the next few days, weeks.

10         We do have a representative here from the Department

11   of Finance that can probably address that question.

12         THE COURT:  Thank you very much.

13         Do my questions require further inquiry?

14         MS. TILLMAN:  No.

15         THE COURT:  You may step down, sir.

16         Somebody from the Department of Finance, just --

17   Don't be sworn, just tell me.  Just tell me.

18         MS. MANGUM:  The May Revise is released -- is to be

19   released on May 12.  We're still in the process of that.

20         THE COURT:  I'm sorry, ma'am.  You'll have to come to

21   the microphone.  I cannot hear you.

22         MS. TILLMAN:  Do you want her to appear at the

23   podium, Your Honor?

24         THE COURT:  Will you state your name, ma'am?

25         MS. MANGUM:  Sarah Mangum, M-a-n-g-u-m.

3

1          THE COURT:  You're from the Department.

2          MS. MANGUM:  Department of Finance.

3          The May Revise is released on May 12.  We are

4    currently in the process of reviewing it.  We did already

5    receive most May Revise Proposals for the Department of

6    Corrections to review.  However, we would consider, you know,

7    working with them to put forward any proposal that's

8    available.

9          THE COURT:  What is the last date that they could get

10   information or a request to you that could possibly be

11   revised?

12         MS. MANGUM:  I would have to speak with my management

13   to find out the last date, but I believe it would be in the

14   next week or so.

15         THE COURT:  All right.

16         So that what would be required is an order from the

17   Court -- if it is beyond that date, an order of the Court to

18   at least consider it and process it.

19         MS. MANGUM:  I don't believe an order of the Court

20   would be required.  It may be required for us to pursue it

21   with the Legislature through a different vehicle than the

22   budget.

23         THE COURT:  Okay.  Thank you, ma'am.

24         Mr. Sifuentes, can I ask you to come back again for

25   just a moment.

4

1          WITNESS SIFUENTES:   Sure.

2          (George Sifuentes, having been previously sworn,

3          resumes the witness stand.)

4                    EXAMINATION BY THE COURT

5     BY THE COURT:

6     Q.       Mr. Sifuentes, you're going to have to forgive me.   I

7     don't have the documents in front of me, and I'm easily

8     confused at this point.

9          As I understand it, you are in the process of

10    developing beds for Level IV inmates in Folsom; is that

11    correct?

12    A.       No, not at Sacramento.

13         The proposals we have for Level IV, ICF inmates,

14    would be the proposals right now we have is to modify P-2 at

15    CMF, and to modify and add additional beds over at Salinas

16    Valley State Prison.

17    Q.       Okay.  Not at Folsom.  There is something going on at

18    Folsom?

19    A.       There is a project going on at Folsom.  It is Sac. --

20    it is called the Sac. EOP Program.

21         In addition to that, they are adding a Correctional

22    Treatment Center which is going to provide some mental health

23    crisis beds.

24    Q.       When will that -- when is it projected that will be

25    accomplished?

5

1    A.       My understanding is that that project will be done by

2    June 30th.

3         MS. TILLMAN:  Your Honor, if I might interject, which

4    project?

5         WITNESS SIFUENTES:  The CSP-Sacramento.

6         MS. TILLMAN:  EOP?  EOP?

7         WITNESS SIFUENTES:  Yes.

8    BY THE COURT:

9    Q.       You indicated there are beds going in at Salinas

10   right now for Level IV treatment cells, if you will; is that

11   right?

12   A.       That's correct.  We just completed renovation for 36

13   cells.

14   Q.       And you're planning what?

15   A.       At Salinas?

16   Q.       Yeah.

17   A.       Two projects at Salinas.  Number one is a 64 bed ICF,

18   which is in addition to the 64 bed facility that's there.

19   That's one project.

20   Q.       When is that going to be done?

21   A.       The schedule, I believe, calls for it to be done in

22   2009.

23   Q.       Okay.

24   A.       And that's in the plan.

25        The second part of Salinas Valley had to do with

6

1    converting some existing housing units that we have there at

2    Salinas and making them available for ICF.  Unfortunately,

3    those can take as long to get done.

4         I mentioned yesterday that we did the 36 beds, and

5    then we had a proposal in the governor's budget to come back

6    and make those code compliant, as well as some other ones.

7    Q.    If the Court ordered the state to expand the number

8    of units that you just put in, double them, you know, with

9    the same waiver provisions and going back later to get them

10   code compliant, how long would that take?

11   A.    Well, the 36 beds at Salinas Valley took seven

12   months.  So I would have to -- assuming it's the same

13   requirements, the buildings would be the same, I would tell

14   you seven to eight months.

15   Q.    All right.

16        Talk to me about Corcoran.  Assume that the Court

17   were to order Corcoran to accept Title IV, dangerous --

18   whatever we call them, high level, you know.

19   A.    High-custody.

20   Q.    Thank you.  High level inmates.  It would require, as

21   I understand from Mr. Rodriguez's testimony, a major change

22   in the physical plant because he says that they're all open

23   dormitories today.

24        A; is that correct?

25        MS. TILLMAN:  Your Honor, if I might clarify, are we

7

1    discussing Coalinga State Hospital?

2            THE COURT:  What did I say?

3            WITNESS SIFUENTES:  Corcoran.

4            THE COURT:  I meant Coalinga.

5            MS. TILLMAN:  That's Coalinga, high-custody Level IV?

6    BY THE COURT:

7    Q.      Assume that I would do that.  I'm not going to say

8    I'm going to do any of these things.  I'm trying to

9    understand what my options are.

10           Are you familiar with Coalinga?

11   A.      No.  That project was designed and built by the State

12   Department of General Services for the Department of Mental

13   Health, and I believe they did the feasibility study that was

14   referenced.

15   Q.      I want you to assume -- I don't know it so, but I

16   want you to assume that the present physical condition of

17   Coalinga is such that it's open dormitories, open rooms,

18   people wandering around the place, et cetera, and I ordered X

19   number of -- let's just put a number on it just to get some

20   sense of where we're going -- 30 Level IV, high-custody

21   prisoners to be housed there.

22           How long would it take to convert whatever there is

23   there, if you know, if you can even reasonably estimate?

24   A.      I couldn't, Your Honor.  I couldn't do that.  I am

25   not familiar at all with Coalinga.

8

1          THE COURT:  Fair enough.  If you can't, you can't.

2          Okay.  I think that answers the question.

3          Thank you, sir.  Will you step down.

4          WITNESS SIFUENTES:  Sure.

5          THE COURT:  Mr. Rodriguez, may I ask you to take the

6    stand again, sir.  Again, it will be very brief.

7          I'm sorry.  Before I do that, did my questions

8    require further questions by counsel?

9          No?

10         No?

11         MS. TILLMAN:  No, thank you.

12         (John Rodriguez, having been previously sworn,

13          resumes the witness stand.)

14                    EXAMINATION BY THE COURT

15   BY THE COURT:

16   Q.     All right.

17         Mr. Rodriguez, will you please again list for me all

18   of the conditions which in your view contra-indicate the

19   placement of high-custody Level IV prisoners at Coalinga?

20   A.     I presume you're asking in terms of the individuals,

21   as well as the facility?

22   Q.     Yeah.

23   A.     I think you noted most of them in terms of its open

24   nature, the construction is built is to hospital standards as

25   opposed to correctional standards, and, you know, the

58

1          You may proceed, Mr. Bien.

2          MR. BIEN:  May I make an argument about that point,

3     Your Honor?

4          THE COURT:  Yeah.

5          MR. BIEN:  The issue is right now today we're dealing

6     with horrible compromises, and right now today there are

7     people on suicide watch who everyone agrees should be either

8     in a DMH facility or a crisis bed who are instead housed in

9     OHUs or even at Ad. Seg. cells.  We attached that as one of

10    our exhibits.

11         THE COURT:  I know.

12         MR. BIEN:  So the question is, in the interim, how

13    can the Department put a proposal it doesn't provide staffing

14    to meet their own standard, even in these improper places.

15         We think, at minimum, they have to get the clinical

16    staff that they know are necessary, even if they're in the

17    wrong types of facilities.

18         THE COURT:  I understand your position.

19         Please, go on, sir.

20    BY MR. BIEN:

21    Q.    Doctor, isn't it correct that your -- the Bed Plan

22    does not provide beds, even in 2011, for all the patients

23    that you expect are going to need Enhanced Outpatient Care?

24    A.    I don't know the answer to that, to tell you the

25    truth.  I have to refer to the document to look at that.

59

1   Offhand, I don't know that.

2   Q.      But do you have that page that's called Closing The

3   gap?  It's the chart?

4   A.      What page are you referring to?

5   Q.      I think it's your exhibit -- your Attachment 2; is

6   that right?

7   A.      I don't have Attachment 2 to my filing.

8   Q.      We'll get you a copy in a minute.

9          Are you aware that the Bed Plan submitted does not

10  provide all the beds that are projected to be needed for

11  Enhanced Outpatient in 2011?

12         THE COURT:  He just said he didn't know.

13  BY MR. BIEN:

14  Q.      You're not aware of that fact --

15  A.      I'm not aware of that.

16         THE COURT:  He's got to look at the document is what

17  he said.

18         (Document handed to witness for review.)

19         MR. BIEN:  Your Honor, this is Enclosure 2.

20         THE COURT:  I know.

21         MR. BIEN:  I've handed the witness Enclosure 2 to the

22  Bed Plan.

23  ///

24  ///

25  ///

60

1    BY MR. BIEN:

2    Q.      Are you familiar with this document?

3    A.      Yes, I have seen the document.  You talking about the

4    details of it, no, I'm not.  But generally I'm familiar with

5    it, yes.  But not the details of it.

6            Doug McKeever would be a more appropriate person to

7    respond if you have a specific question on it.

8            THE COURT:  This is the document?

9            MR. BIEN:  Right.

10           THE COURT:  Yeah.

11           MR. BIEN:  Your Honor, do you think we should mark

12   it?

13           THE COURT:  It's an exhibit.

14           MR. BIEN:  It's an exhibit.  All right.  Okay.

15   BY MR. BIEN:

16   Q.      On the top line under EOP; do you see that?

17           First line?

18   A.      Yes.

19   Q.      Right.  Isn't it correct that shows that as of July

20   2011, if everything that the State is planning to happen

21   happens, there will be a 1300 bed shortage for Enhanced

22   Outpatient?

23   A.      1336, yes.

24   Q.      1336 beds.

25           And that would be approximately, what, 20 or 30

61

1   percent of the population would not have treatment care?

2   A.      Uh-huh.  Yes.

3   Q.      Okay.  Do you think it is appropriate for the

4   Department to propose a long-range plan to provide health

5   care that leaves a gap of 1300 beds in 2011?

6   A.      Well, like I said to you, this whole process started

7   prior to my time coming in.  I was not involved with this

8   process, doing this.  But also you need to understand we have

9   started already a secondary process on our own identifying

10  EOP needs.  So we intend to address that by the time we get

11  to that stage.

12          THE COURT:  The question was somewhat different.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  It really dealt with the mind set.  It

15  said -- I was about to say something very nasty.

16          Is it appropriate for the State to recognize that its

17  proposals will leave 1336 patients without appropriate care.

18          THE WITNESS:  It should address all the needs.

19  That's correct.  It agree with you, it should address it.

20          THE COURT:  I know you didn't do it.  Can you explain

21  to me how this happened?

22          THE WITNESS:  No, I can't.  Like I said,

23  unfortunately, I was not in the process of this one, in doing

24  this thing.  So I'm no the aware of that, no.

25          THE COURT:  All right.

62

1  BY MR. BIEN:

2  Q.    Will you commit to us, Doctor, that the next plan we

3  see covers all of the needs that the State itself projects

4  for this patient population?

5  A.    At the next --

6      MS. TILLMAN:  I'm sorry.  Objection.  That's vague.

7  What next plan are we referring to?

8      I think we're here about --

9      THE COURT:  The Doctor has just said that they are in

10  the process of revising the Bed Plan.  And Mr. Bien's

11  question is a very straightforward one.  Will the next

12  proposed Bed Plan actually address need?

13      THE WITNESS:  Yes.  I think the next proposed Bed

14  Plan that we talked about will be updated for the new

15  population base anyway.  And a part of that one will be

16  addressing all the needs.

17      THE COURT:  Folks, we're going to take a 15 minute

18  recess.

19      I have an outside meeting.  I'm probably going to

20  break at 11:30 and reconvene at 2:00.  Is that -- I know

21  you're going to be gone for the meeting.  Are we going to get

22  him done by 11:30?

23      MR. BIEN:  Sure.

24      THE COURT:  All right.

25      Am I inconveniencing anybody else?

63

1          All right.  That will be the order then.

2          (Off the record at 10:41 a.m.)

3          (On the record at 11:00 a.m.)

4          THE CLERK:  Please, remain seated.

5          Court is now in session.

6          THE COURT:  Please, be seated everyone.

7          Mr. Bien, I am, as you obviously are, troubled by the

8    process by which the Department is always a year behind what

9    it needs.

10         I'm not sure if this hearing is the appropriate

11   hearing to address that, but it is clear to me, counsel, that

12   it's something we've got to think about and how to make it

13   stop happening.

14         I've sort of tried to cut you off from exploring that

15   because I'm not sure this is the right hearing, but I want to

16   assure you that I am as troubled by it as you are.  And we're

17   just going to have to think about what else to do.  So the

18   fact that I've told you let's get on with what this hearing's

19   about doesn't mean that I don't appreciate how right you are

20   about this being a process problem that's got to be solved.

21         Anyway, go ahead.

22         MR. BIEN:  Thank you, Your Honor.

23         I won't belabor that point.

24   ///

25   ///

64

BY MR. BIEN:

Q.    Doctor, one of the things you've testified here today is that you need to explore various options, at least for the interim, to make sure that Department can do a better job in providing care for mentally ill patients; is that correct?

A.    Yes.  For the short-term, yes.  Address short-term needs.

Q.    And there's a short-term crisis?

A.    Yes, there is.

Q.    Okay.  Have you explored obtaining short-term acute psychiatric care in community hospitals as an option in certain areas of the state?

A.    We have not.  Not to date, No.

Q.    Why not?

THE COURT:  Because they can't get them into the state hospitals.  How are they going to get them into a private one?

I'm sorry.  I didn't mean to -- but it's a --

BY MR. BIEN:

Q.    I guess just to establish that that has not been investigated?

A.    It has not been investigated, no.  It doesn't mean it won't be, but it has not been to date, as far as I know.

THE COURT:  May I interrupt?  I want to ask a different question.

65

1          The Department of Mental Health, I mean, they're good

2     at it.  They've managed to get their docs paid the same level

3     as your docs, despite the fact that they won't take the most

4     seriously ill folks.  And we'll see whether that continues.

5          Is it your view that psychiatrists, dealing with

6     Level IV, high-custody are just, by the nature of things,

7     that's not in the -- that's not an attractive body of

8     patients, and there's got to be some inducement to get --

9     some extra inducement to get those folks treated?

10          THE WITNESS:  Yes.  My point of view is that people

11     working the CDCR, in a sense, should be deserving what I

12     consider to be combat pay.  There should be some recognition

13     that the working conditions they are under, the workload, the

14     patients they are dealing with to a large extent are a lot

15     more hazardous and a lot more challenging, if you will, than

16     some of the counterparts in other places, yes.

17          THE COURT:  All right.  Go ahead.

18     BY MR. BIEN:

19     Q.     You testified earlier about a DPA survey of

20     psychiatrist salaries.  Do you recall that?

21     A.     What I mentioned is DPA did a survey on a number of

22     positions, include psychiatrists in there, yes.

23     Q.     Did they determine that the market rate for

24     psychiatric compensation was higher than what the CDC is now

25     offering?

99

1    understand where we are.  You know, why this is such a

2    problem.

3            What I think I want you to do is to file with the

4    court in a week, if that's convenient, an analysis of the

5    totality of the EOP picture versus the totality of the

6    proposed DMH program so that I can look at it and understand

7    what it is that's -- what it is that is really going on.

8            Actually, don't file it with me.  File it with the

9    Special Master.

10           Is that all right with you, Michael?

11           File it with the Special Master.

12           Thank you, folks, for your help.

13           THE COURT:  I think that takes us through the Bed

14   Plan.

15           MS. TILLMAN:  Did you want any additional information

16   on question 7, page 4, Acceleration of CMF Construction?

17           THE COURT:  I'm sorry.  On page 4?

18           MS. TILLMAN:  Page 4, question 7:

19           What is the current projection for completion of the

20   50 bed facility at CMF and why can't it be expedited?

21           THE COURT:  Yeah.  I would like to be told that.  I

22   don't -- if you can just tell me what's going on, fine.  If

23   you need to put somebody on, do that.

24           MS. TILLMAN:  I think Mr. Sifuentes is best

25   qualified, Your Honor.

100

1          THE COURT:  All right.

2          MS. TILLMAN:  Thank you.

3          (George Sifuentes, having been previously sworn

4          resumes the witness stand.)

                        DIRECT EXAMINATION

6    BY MS. TILLMAN:

7    Q.     Good afternoon, Mr. Sifuentes.

8          You heard the question.  Do you have a response to

9    the Court's concern?

10   A.     Yeah.  I don't want to get too long-winded, but

11   about -- when the order came out, one of the questions that

12   was raised is can you accelerate construction of the 50 bed

13   crisis beds at CMF.

14         Now, just from a historical perspective, that project

15   was appropriated a few years ago.  And when you ask for a

16   project, a brand-new project, you go to the Legislature and

17   say, "Hey, I need this amount of money, it's going to take

18   this long to build."  And when you prepare your budget, you

19   prepare it based upon certain project delivery methods.

20         And that is the scope of the project, that is the

21   schedule of the project.  And based upon that information,

22   people make decisions as to whether to appropriate the money

23   and authorize the project or not.  In this case, we were

24   successful in getting the appropriation.

25         At the time the question was raised, "Can you

101

1   accelerate the schedule," we already had a bid package out on

2   the street.  We had met with contractors, and the bid date

3   was March 9th.  So when it got raised to me, I was probably

4   60 days from bid date.

5        The only thing I could do was to issue what is known

6   as a bid addendum, which I did.  But before that what I did

7   is I got the design team, and I got folks, some of my

8   construction people, and I said, okay, what can I do, given

9   I've got 60 days, and I want to be responsive to the Court.

10        What I felt I could do, and which I did, is I issued

11   a bid addendum asking all contractors who were interested in

12   the project to give me the price by reducing the schedule by

13   60 days.  Because in the document I sent out it had so many

14   days.

15        Now, the reason I can only do that is because current

16   state law says that if I go over 20 percent of an

17   appropriation for a project, I have to stop.  And I felt that

18   any action that would take this project beyond 20 percent was

19   not an action that I thought would meet our objective that we

20   were trying to do.

21        So that's what I did.  We sent it out.  We got the

22   prices.  And right now we have to augment the project by over

23   ten percent.  It's being done.  I expect to have this

24   project, which was originally scheduled for February of '08,

25   to be ready in December of '07.  That's what I asked for.

102

1          THE COURT:   Thank you.

2          My questions -- Does this testimony require any

3    further examination?

                        CROSS-EXAMINATION

4

5    BY MR. BIEN:

6    Q.        Did anyone ask you to accelerate the project prior to

7    receiving this Court's order?

8    A.        Yeah.   What we had done -- one thing that happened to

9    this project, you may recall, Michael, is we found we had a

10   budget deficit in this project of over seven-and-a-half

11   million dollars.   And we went back through Finance to the

12   Legislature to get additional money so we could continue.

13   And we got that and continued on with the design and tried to

14   get it out as quickly as possible.

15   Q.        So in other words, prior to when you originally

16   started the project and you went over budget before you even

17   started building, then you had to go back and it got delayed?

18   A.        Right.

19   Q.        Okay.   My question is before the Court order, did

20   anyone ask you to accelerate this project?

21          In the last six months has anyone said, "Before you

22   go out to bid --"

23   A.        No.   Not in the last six months, no.

24   Q.        And if you got authority to, let's say, increase the

25   budget by 30 percent, could it be accelerated even quicker?

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

103

```
1    A.        At this point in time?

2              THE COURT:  Yeah.

3              THE WITNESS:  From today forward?

4              THE COURT:  Yeah.

5              THE WITNESS:  It's a possibility.

6              MR. BIEN:  Thanks.

7              THE COURT:  Thank you, sir.

8         I think that I need counsel to advise me about what

9    I've heard today and what I ought to be doing about what I've

10   heard today.  And I want to ask counsel -- I don't have to

11   tell you I'm in a hurry, but I want to do it right.

12        And I want to invite counsel, if you'll come to the

13   podium, both of you, to advise me about whether getting it

14   right can be done from argument.

15        When I say "getting it right," I'm going to take

16   everything except what I've ordered today under submission.

17   I don't think I need -- well, I need you to advise me as to

18   whether you think briefing would be helpful or whether oral

19   argument on the basis of what we heard will be sufficient.

20        Mr. Bien, what is your view, understanding the

21   Court's concern about getting orders out on an accelerated

22   basis?

23        MR. BIEN:  I think a lot of things have come before

24   the Court in two days, and I think it would be useful to go

25   over some of them.  I also think that we should get some
```

104

1    clarification here today as to exactly what has been

2    committed to and what's going to happen in the future.

3        So I think that it would be useful, and there may be

4    some need -- for example, you asked me yesterday to remind

5    you about whether DMH needs to be added as a defendant.

6        THE COURT:  I've already decided, I think.

7        MR. BIEN:  And I think defendants have some news on

8    that that they wanted to share with you.

9        THE COURT:  All right.

10       MR. BIEN:  But I think there are some things that

11   would be useful perhaps after we -- and some things just to

12   go over at least for a few minutes with argument from each

13   side.  And then, you know, I think we already have done a bit

14   of briefing.  I guess we feel a lot of urgency in terms of

15   missing the boat that's leaving.

16       THE COURT:  So does the court.  I'm very anxious

17   about the May thing.  Although, Finance has indicated to me

18   that it is possible to go back to the Legislature -- I am

19   correct that -- Yeah.  So it is possible.

20       I assume it gets more difficult the longer we take,

21   but that -- you know -- you know, we are where we are.  And

22   if it is possible -- you know, on the one hand we have this

23   great urgency, and on the other hand, you know, it's foolish

24   to issue orders that either can't be complied with or don't

25   make any sense in light of our needs.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

105

1          I mean, it is easy for me to say you will not close

2     the LOU because it is just difficult to understand why

3     anybody would do that, other than they were obeying a state

4     court action or order and I understand that.  But somebody

5     should have gone to the State and said you got no place to

6     put these people.  You understand what I'm saying.

7          MR. BIEN:  It may even be that order needs some

8     clarification because as far as I know the LOU closed almost

9     a year ago.

10         THE COURT:  It will reopen.  It will -- If it is

11    closed now -- I thought it was proposed to be closed?

12         MR. BIEN:  They're proposing to reopen it.

13         THE COURT:  It will be reopened.  They will promptly

14    do whatever it is necessary to get it reopened and get people

15    into those beds, including staffing and whatever else has to

16    be done.

17         I don't know how to say that any clearer.

18         But you're right, maybe we need a little bit of both.

19         MS. TILLMAN:  If I might speak, Your Honor?

20         THE COURT:  I would like very much to hear from you.

21    And I must say I really appreciate your help.  It's very nice

22    when both lawyers are really good and really helpful.

23         Tell me what you think about oral argument, briefing,

24    or what we need to do?

25         MS. TILLMAN:  At this point, Your Honor, I think the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

106

1    defendants would very much appreciate the Court issuing an

2    order indicating that it has reviewed, approved and adopted

3    as an order of the court the long range plan that was

4    indicated in the Bed Plan.

5         THE COURT:  That I can do.  And I'm satisfied, I

6    think -- although I'll hear from plaintiffs -- I think the

7    long range plan is appropriate, feasible and I will approve

8    it.  And do you have objection to my doing that?

9         MR. BIEN:  Our suggestion was that it be approved,

10    but with the proviso it needs be revised because of the

11    population.

12         THE COURT:  Obviously.  We all agree to that.  I

13    don't think there is any doubt about that.  But beyond that,

14    you're satisfied?  I intend to do that.

15         MS. TILLMAN:  Thank you.

16         THE COURT:  All right.

17         Now, let's talk about the immediate problem.  What do

18    I do, and in regard to that what is the pleasure of the

19    defendants concerning oral argument, briefing or both?

20         MS. TILLMAN:  At this point, I don't see the need for

21    oral argument unless we do provide some briefing.  I think

22    the defendants would very much again appreciate an order

23    indicating that we have 60 days to come up with better

24    strategies to deal with the short-term gap.

25         THE COURT:  You see, I agree I have to give you some

107

1    time.  I agree with that.  And 45 days I suppose I have to

2    live with because people can only do what they can do.

3         The problem is I keep finding things, just in the

4    course of this hearing, which you can do now that you don't

5    need an order from the court, you don't need a long range

6    plan.

7         I mean, I find it -- and I'm not criticizing.  I know

8    I am.  But I don't mean it personally.  But it's just

9    inconceivable to me that the LOU got closed a year ago and

10   nobody went to the state court and said, "You know, this is

11   impossible, we don't have any place to put these sick

12   people."

13        MS. TILLMAN:  If I might say, Your Honor, I

14   personally need to take a second look at that LOU issue.  My

15   understanding -- you know, obviously I am not qualified to

16   state all the facts, but I thought it had been closed

17   before -- well before a year ago based upon concerns voiced

18   by the plaintiff class in Budd.

19        So I'm very happy to take a second look at the LOU.

20   I think that was one of the strategies indicated in the Bed

21   Plan to take a look at the LOU and see if we could open it up

22   for care purposes.  But we will pursue that immediately.

23        THE COURT:  You will, I will tell you.

24        MS. TILLMAN:  We're also happy to provide a list of

25   code issues so the Court's familiar with what barriers

108

1   exist.

2           THE COURT:  I need to know that.

3           MS. TILLMAN:  And then, again, perhaps a written

4   order that we can take to the Budd court indicating this

5   court's concerns about licensing as a barrier to full use of

6   facilities would be helpful.

7           THE COURT:  We can do that as well.

8           Let me talk to -- I'm going to take a ten minute

9   recess.  I want to talk to my law clerks and Special

10  Master.

11          MS. TILLMAN:  Thank you.

12          (Off the record at 02:34 PM)

13          (On the record at 02:50 PM)

14          THE CLERK:  Please, remain seated.

15          Court is now in session.

16          THE COURT:  Folks, let me first of all say that the

17  simplest thing is in order to accommodate Judge Henderson's

18  schedule, the Plata hearing you heard about will commence at

19  1:30 instead of 10:00 or whatever we told you.  There will be

20  an order out telling you that.

21          I'd like counsel to approach the podium, and I want

22  to tell you what my tentative thoughts are and urge you to

23  talk to me now because I don't think I'm going to wait unless

24  I really hear a good reason to have written briefs.

25          First of all, of course the Court intends to approve

148

1     centers.

2           I'm going talk to Mr. Riveland Friday.  I know you're

3     not the lawyer for Valdivia.

4           Mr. Bien, I am -- I want to talk to Mr. Riveland, but

5     I'm inclined to think we have to have a hearing and see

6     what -- well, I want talk to him first and see what his views

7     are.

8           MR. BIEN:  I think that Miss Tillman's suggestion of

9     a joint hearing is important because Valdivia doesn't have

10    clinicians, doesn't have -- you are talking about a due

11    process hearing system.  So, you know, once they're in the

12    gate, once they're inside of the prison, it's difficult.

13    There needs to be some coordination.

14          THE COURT:  I understand.  But I had -- I don't know

15    why I had the idea that we were -- that one of the important

16    benefits of Valdivia was that there was going to be some

17    effort to provide hearings in which alternatives to

18    imprisonment for violations were going to be developed at the

19    local level.

20          I thought that was one of the expectations of the

21    order.

22          MR. BIEN:  We did to.  It says it.  It says it in the

23    injunction.

24          THE COURT:  But nothing happened?

25          MR. BIEN:  That's what they decided, it wasn't a good

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

149

1  thing.  You know, they had pressure from various places.

2  And, you know, that was -- remember it was the attachment to

3  the injunction rather than the injunction.

4          Anyway, it's fits and starts.

5          THE COURT:  Well, we'll have to -- Okay.  We'll have

6  to think about what to do about that.

7          Anyhow, I think that's as far as I'm going to go.

8  You can't be responsible for the fact that people are

9  being -- of course you can be, but it's not your primary

10  concern that people are being returned at a rate that doesn't

11  make any sense for a period of time that doesn't make any

12  sense.  But I do want you to look into some developing of a

13  plan within three months for treatment of those persons who

14  are there within 60 days.

15          You might want to consider, folks, the suggestion

16  made by the Special Master which is to get some

17  classification officer actually in the process of trying to

18  resolve whatever classification problems are causing the

19  delay.  That seems to be at least -- apparently that's a

20  contributing factor.  So you might want to look at that.

21          All right.  That disposes of the two objections.

22          Not very satisfactory dispositions, but the best we

23  can do under the circumstance.

24          We'll now go off the record.

25          (Discussion held off the record.)

150

1          (Off the record at 4:15 p.m.)

2                      ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      REPORTER'S CERTIFICATE

2       ---o0o---

3

STATE OF CALIFORNIA )
4 COUNTY OF SACRAMENTO )

5

6

   I certify that the foregoing is a correct transcript
7

from the record of proceedings in the above-entitled matter.
8

9

10     IN WITNESS WHEREOF, I subscribe this
certificate at Sacramento, California on this 14TH day of
11 MAY, 2006.

12

13

14      _____

15      CATHERINE E.F. BODENE,
       CSR NO. 6926
16

17

18

19

20

21

22

23

24

25

**EXHIBIT C**

Enclosure XI

# Status of Funding for
# Acute, Intermediate and Mental Health Crisis Bed Plan

### Capital Outlay Proposals Submitted to the Legislature March 30, 2006

#### *Finance Letter Process*

Each Spring, the Administration proposes adjustments to the proposed Governor's Budget in accordance with Government Code Section 13308. These adjustments are submitted to the Legislature through what is called the Finance Letter process. The Department of Finance sends a letter to the Legislature that details the adjustments requested for each department and item of appropriation. These letters are typically accompanied by detailed backup information in the form of a Budget Change Proposal (BCP) that was developed by the department seeking an adjustment.

On March 30, 2006, Finance Letters were submitted to the Legislature requesting additional funding for several capital outlay projects in response to the concerns raised by the Coleman court related to the number of beds available for inmates needing to be treated in an Intermediate Care Facility (ICF), Acute Care Facility, and in an Enhanced Outpatient Program (EOP). The specifics of these proposals are outlined below, and for your reference, we have attached the Finance Letter submitted to the Legislature.

#### *Proposals to Increase the Number of Intermediate Care and Acute Care Beds*

Through the March 30, 2006, Finance Letters, the Department of Corrections and Rehabilitation (CDCR) requested preliminary plan funding for acute and intermediate mental health care facility projects. These projects would allow the Department to construct facilities to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed mental health beds based on Fall 2005 population projections indicates a shortage of 356 acute care mental health male beds, 301 intermediate care mental health male beds for Level IV high custody inmate-patients[1], and 19 acute/intermediate care mental health female beds by June 30, 2011. These facilities would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of inmates requiring inpatient mental health care beyond the short-term crisis level of care. The following information summarizes the proposals submitted to the Legislature on March 30, 2006, requesting funding to begin planning and construction of these beds:

- $14,972,000 for the preliminary plans in 2006-07 for a 350-Bed acute mental health facility at California State Prison, Sacramento (CSP-Sac). This project is estimated to be completed in 2010-11 and cost an estimated $289,000,000 in total.

---

[1] Sum of 153 bed deficiency and 148 temporary beds (36 at the California Medical Facility and 112 at Salinas Valley State Prison).

1

- $7,689,000 for the preliminary plans in 2006-07 for a 128-Bed intermediate care facility at CSP-Sac. This project is estimated to be completed in 2010-11 and cost an estimated $101,000,000 in total.

- $8,405,000 for the preliminary plans in 2006-07 for a 128-Bed intermediate care facility at Salinas Valley State Prison (SVSP), Monterey. This project is estimated to be completed in 2010-11 and cost an estimated $111,000,000 in total.

- $4,514,000 for the preliminary plans in 2006-07 for a 64-Bed intermediate care facility at California Medical Facility (CMF), Vacaville. This project is estimated to be completed in 2010-11 and cost an estimated $59,000,000 in total.

- $2,172,000 for the preliminary plans in 2006-07 for a 25-Bed acute/intermediate care facility at California Institution for Women (CIW), Frontera. This project is estimated to be completed in 2010-11 and cost an estimated $34,000,000 in total.

These proposals are *in addition to* the following Administration proposals that were reflected in the Governor's Budget submitted to the Legislature on January 10, 2006, which have been previously identified to the court:

- Funding for a 36-Bed permanent conversion to intermediate care at CMF, which is estimated to be completed in 2009.

- Funding for a 112-Bed permanent conversion to correctional treatment center beds, with temporary use as an intermediate care facility at SVSP, which is estimated to be completed in 2009.

As previously identified to the court, in addition to the proposals reflected in the Governor's Budget and the March 30, 2006 Finance Letters, the Department is expanding mental health treatment capacity through the following projects that are currently underway:

- 36-Bed temporary conversion to intermediate care at CMF until May 2006 funded through the minor capital outlay program. Presently these beds are occupied with a planned transfer of these inmate-patients to SVSP, at a rate of approximately five inmate-patients per week, starting May 1, 2006.

- 36-Bed temporary conversion to intermediate care at SVSP available beginning May 2006 funded through the minor capital outlay program. This project is progressing with anticipated occupancy of this facility beginning May 1, 2006, and is part of the 112-Bed activation referenced above.

- 64-Bed intermediate care facility at SVSP included in the 2005 Budget Act. This facility will have single cells for Level IV high custody inmate-patients. This project is currently funded and approved with an anticipated construction completion date of March 2009.

Enclosure XI

In sum, these proposals will provide the CDCR, by 2010-11, 525 permanent male acute beds (shortage of 6), 448 permanent male intermediate care beds for Level IV high security inmate-patients (surplus of 19), and 55 permanent female acute/intermediate care beds (surplus of 6) all based on Fall 2005 population figures.

### *Proposals to Increase the Enhanced Outpatient Program Space*

Through the March 30, 2006, Finance Letters, the CDCR also requested preliminary plan funding for EOP treatment and program space. While the court has not specifically ordered a response in this area, the court has criticized the Department for inadequate treatment space for the EOP in previous monitoring reports and the bed planning process identified a need for additional EOP beds. This proposal is an effort to proactively address this need through increasing program and treatment space at three institutions. The following information summarizes the proposals submitted to the Legislature requesting funding to begin planning and construction of this program space:

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 180 EOP inmates at Mule Creek State Prison (MCSP), Ione. This project is estimated to be completed in 2010-11 and cost an estimated $2,700,000 in total.

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 150 EOP inmates at California State Prison (CSP-LAC), Los Angeles. This project is estimated to be completed in 2010-11 and cost an estimated $2,700,000 in total.

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 384 EOP inmates at CSP-Sac. This project is estimated to be completed in 2010-11 and cost an estimated $5,600,000 in total.

In addition to the proposals reflected in the March 30, 2006, Finance Letters, the Department is currently planning to add EOP beds through the conversion of existing general population beds. The following summarizes these efforts:

- Add 115 new EOP beds at MCSP for Level IV inmate-patients, which are estimated to be completed January of 2007.
- Add 180 new EOP beds at MCSP for Level III inmate-patients, which are estimated to be completed by January of 2007.
- Add a total of 192 new EOP beds at CSP-Sac. Add 96 of these beds by July of 2006 and the remaining 96 beds by October 2006.
- Add 150 new EOP beds at CSP-LAC, which are estimated to be completed June of 2011.

Combined, these projects will add 637 EOP beds by 2010-11, decreasing the estimated shortfall for these type of beds from 1973 to 1336.

3

Enclosure XI

## Staffing for Proposed New Beds

### Department of Mental Health Clinical Staffing for Male Intermediate Care and Acute Care Beds

The Department of Mental Health (DMH) has agreed to provide clinical staffing for the proposed ICF and Acute Care facilities for male inmates identified in the CDCR Capital Outlay Finance Letters submitted to the Legislature on March 30, 2006. This is in addition to the BCP included in the Governor's Budget to expand the ICF program at SVSP by 36 beds.

In order to determine the acceptable sites for these proposed projects the ability for DMH to hire and operate these facilities was considered. During this process, site considerations included the following factors:

- All of the male prisons are Consolidated Care Centers.

- All of the institutions are located in areas in which there is greater potential for acquiring necessary clinical staffing.

- DMH already provides ICF and Acute Care services at two of these sites.

- The three male institutions are geographically situated to accept referrals for ICF and Acute Care that come primarily from five prisons.

- The cultures of these institutions, given their experience with providing mental health care, are amenable to growth and proper accommodation of the needs of the inmate-patients that will be treated in these new facilities.

The estimated cost of providing DMH staff specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

    CSP-Sac - 350 Acute Beds = $60,316,000 and 620.0 positions
    CSP-Sac - 128 ICF Beds = $18,286,000 and 198.0 positions
    CMF - 64 ICF Beds = $10,054,000 and 104.0 positions
    SVSP - 128 ICF Beds = $14,133,000 and 172.0 positions

In order to receive funding necessary to begin staffing these facilities as construction is completed, DMH anticipates submitting funding requests through both the BCP and the estimate process beginning with Fiscal Year 2007-08 and each year thereafter until full activation of the three facilities (SVPP, CMF-VPP, CSP-Sac) is completed. The requests will include the positions needed for that phase of activation as related to design, licensing, recruitment, program development, training and orientation for each fiscal year. The activation plan will be similar to the phases used in the initial activation of Salinas Valley and Coalinga.

4

Enclosure XI

## Department of Corrections and Rehabilitation Staffing for Proposed Beds

The estimated cost of providing CDCR custody staff at the Intermediate and Acute Care facilities for male inmates specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

> CSP-Sac - 350 Acute Beds = $10,914,000 and 156.7 positions
> CSP-Sac - 128 ICF Beds = $4,936,000 and 70.4 positions
> CMF - 64 ICF Beds = $2,727,000 and 38.9 positions
> SVSP - 128 ICF Beds = $4,943,000 and 70.4 positions

The estimated cost of providing increased CDCR custody and clinical staff at the institutions where there will be an increase in EOP treatment and program space for male inmates (as identified in the March 30, 2006 Finance Letters) specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

> MCSP – 180 EOP Inmate-Patients =$414,000 and 9.5 positions
> CSP-LAC – 150 EOP Inmate-Patients =$414,000 and 9.5 positions
> CSP-Sac – 384 EOP Inmate-Patients =$2,552,000 and 24.8 positions

It should be noted that these projects for EOP treatment and program space are an adjunct to the aforementioned projects adding 637 EOP beds at these prisons through the conversion of existing general population beds at these prisons.

The estimated cost of providing CDCR clinical staff at the proposed Intermediate and Acute Care facility for female inmates specifically tied to these capital outlay project related facilities has not yet been finalized, however preliminary information shows that approximately 12 clinical staff will be needed when this facility opens.

CDCR staff associated with the proposed new facilities would be budgeted through the population projection adjustment process that occurs during the annual budget process. As new beds and institutions become available, or the type of population changes in existing institutions, the Department prepares an activation schedule for the staff needed to operate those beds once they are occupied. The resources needed for these positions are then proposed as a population adjustment in the budget and updated if necessary due to changes in number of inmates, schedule, or mission. For any given fiscal year this projection is updated four times based on updated data. For example, the year-end projection for fiscal year 2005-06 was first developed in September of 2004, it was updated in May 2005, again in September 2005, and will be updated one more time in May of 2006. Although these updates adjust the total level of staffing and funding available to CDCR for staffing needed at year end, the process permits CDCR to staff at the appropriate level, based on the number and type of inmates, at any point in time.

5

Enclosure XI

## Summary of Legislative Approval Process and General Timeframes

Legislative appropriation of funds through the Budget Act is required before CDCR will be authorized to begin implementation of the projects requested through the Governor's Budget and the Finance Letters described above. The general process and timeframes for Legislative approval are the following:

*Budget Subcommittees*
The Budget Subcommittee in each house that is responsible for the CDCR budget must hear and approve or deny the Finance Letters submitted. If the subcommittee does not specifically put the Finance Letter proposals on their agenda and take an action on the proposals, by default, they are denied. The subcommittee process is typically completed during the 3rd week of May.

*Budget Committees*
The full Budget Committee in each house must act on the subcommittee recommendations in order for the Budget Bill to be amended and moved to the floor of each house for deliberation. This typically occurs during the last week of May.

*House Floor*
The members of each house vote on the amended Budget Bill. This typically occurs during the last week of May.

*Conference Committee*
Each house approves its own version of the Budget Bill. In order to resolve differences between the houses, a Conference Committee consisting of members from both houses is established to hear the differences and seek agreement on the final form of the bill. This typically occurs during the first week or two of June.

*House Concurrence with Conference Report*
The conference committee reports its recommendations to both houses, each of which must adopt an identical budget bill before it can be sent to the Governor for signature. Under the State Constitution, the Budget Bill must be passed by the Legislature by midnight on June 15th. Historically, this deadline has often not been met.

*Governor's Signature*
Once the Budget Bill is enrolled and sent to the Governor for signature he has 12 days to act on the bill. The Governor has the ability to make line-item vetoes of items of appropriation.

6

... 

**Enclosure XI**



DEPARTMENT OF
**FINANCE**
OFFICE OF THE DIRECTOR

ARNOLD SCHWARZENEGGER, GOVERNOR
STATE CAPITOL ▪ ROOM 1145 ▪ SACRAMENTO CA ▪ 95814-4998 ▪ WWW.DOF.CA.GOV

MAR 3 0 2006

Honorable Wesley Chesbro, Chair
Senate Budget and Fiscal Review Committee

Attention: Mr. Danny Alvarez, Staff Director (2)

Honorable John Laird, Chair
Assembly Budget Committee

Attention: Mr. Christopher W. Woods, Chief Consultant (2)

**Amendment to Budget Bill Item 5225-301-0001, and Addition of Items 5225-301-0660, 5225-301-0751, and 5225-496, Capital Outlay, Department of Corrections and Rehabilitation**

It is requested that Item 5225-301-0001 be increased by $55,141,000 to reflect the following:

1.  Decrease $1,005,000 for working drawings for a statewide Juvenile Justice fire protection sprinkler system. The preliminary plans for this project have been delayed because of a poorly defined scope and the overarching concern of how this project would fit into future funding requests for Juvenile Justice reform.

2.  Decrease $300,000 for construction of small management yards at Mule Creek State Prison, California State Prison, Solano, Wasco State Prison, and Richard J. Donovan Correctional Facility. There were cost increases in materials and labor which prompted the Department of Corrections and Rehabilitation (Department) to push out the funding for the fifth institution originally funded at North Kern State Prison to a future year resulting in savings in 2006-07.

3.  Increase $4,323,000 for construction of a groundwater treatment and non-potable water distribution system at Deuel Vocational Institution (DVI), Tracy. The increased costs are primarily attributed to the inability to find an onsite source of fill material at either DVI or DVI-East, formerly known as Northern California Women's Facility, and the resulting need to bring in material from outside the area.

4.  Increase $2,327,000 for working drawings and construction of a new wastewater treatment plant at DVI, Tracy. The Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor resulting in the need for additional funds.

5.  Increase $975,000 for preliminary plans, working drawings, and construction of an electrical power substation at DVI, Tracy. The costs increased as a larger substation is needed to meet the increased electrical loads anticipated from the groundwater treatment and non-potable water distribution system project at the facility.

-2-

MAR 3 0 2006

6.  Increase $50,000 for preliminary plans for an electrified fence at the Central facility at the California Institution for Men (CIM), Chino. The additional costs are necessary because of the complexity of the Environmental Impact Report relative to CIM's proximity to the encroaching housing developments, and the Department of Fish and Game's concerns over damage to birds and other wildlife.

7.  Increase $2,066,000 for construction of a potable water distribution system upgrade at California Men's Colony, San Luis Obispo. The Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor resulting in the need for additional funds.

8.  Increase $5.0 million for statewide minor projects. The additional funding is to be used to address space needs identified as part of the Farrell lawsuit. In November 2004, the State of California entered into a consent decree in the Farrell lawsuit concerning mandated educational and programmatic obligations to the youth offender population. The $5.0 million in minor funding for 2006-07 and the recommended $4.2 million in 2007-08 would help satisfy court deficiencies for increased staffing and programming space.

9.  Increase $44,000 for working drawings of a wastewater treatment plant at California State Prison, Corcoran. The increase in costs is associated with the electrical system requiring more design effort than originally estimated because of the need to change out the existing transformer.

10. Increase $138,000 for working drawings of a wastewater treatment plant at California State Prison, Centinela, Imperial. The increase in costs is attributed to the increased rates for the design consultants and additional engineering work required for supporting the permit modifications.

11. Increase $1,484,000 for construction of an arsenic removal project from the potable water supply at High Desert State Prison/California Correctional Center, Susanville. There were additional costs related to the trenching and the backfill of the pipeline. In addition, the Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor.

12. Decrease $1,690,000 for preliminary plans of a heating, ventilation, and air conditioning system at Ironwood State Prison, Blythe. As the bids came in much higher for the same project at the neighboring Chuckawalla Valley State Prison project, it is recommended by the Department to push the funding for this project back a year to see the initial bidding results for the project at Chuckawalla Valley State Prison.

13. Add $14,972,000 for preliminary plans of a 350-Bed acute mental health facility at California State Prison, Sacramento. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed acute care mental health beds based on current population projections indicates a shortage of 320 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

-3-

MAR 3 0 2006

14. Add $7,689,000 for preliminary plans of a 128-Bed intermediate mental health care facility at California State Prison, Sacramento. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

15. Add $8,405,000 for preliminary plans of a 128-Bed intermediate mental health care facility at Salinas Valley State Prison, Monterey. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

16. Add $4,514,000 for preliminary plans of a 64-Bed intermediate mental health care facility at California Medical Facility, Vacaville. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

17. Add $2,172,000 for preliminary plans of a 25-Bed acute/intermediate care facility at the California Institution for Women, Frontera. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds for women based on current population projections indicates a shortage of approximately 19 beds by June 30, 2011.

18. Add $250,000 for preliminary plans of a 150-Bed enhanced outpatient program for treatment and program space at Mule Creek State Prison, Ione. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

-4-

MAR 3 0 2006

19. Add $250,000 for preliminary plans of a 150-Bed enhanced outpatient program for treatment and program space at California State Prison, Los Angeles. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

20. Add $250,000 for preliminary plans of a 350-Bed enhanced outpatient program for treatment and program space at California State Prison, Sacramento. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

21. Add $750,000 for studies to potentially relocate the reception centers from three older institutions (San Quentin, Deuel Vocational Institution, and California Institution for Men) to three newer institutions (California State Prison, Solano, Pleasant Valley State Prison, and California State Prison, Los Angeles) respectively. This is consistent with the mission of the Department to house inmates in a safe manner.

22. Add $2,477,000 for construction of an arsenic removal water treatment system project at Kern Valley State Prison, Kern. The arsenic levels in the existing water are above the new maximum contaminant level. The existing appropriation is being reverted (Issue 642) as the refined cost estimates showed there were not enough funds to construct the project. Specifically, the costs of the specialized equipment to house the arsenic removal equipment have increased.

It is requested that Item 5225-301-0660 be added in the amount of $38.0 million for construction of a heating, ventilation, and air conditioning system at Chuckawalla Valley State Prison, Blythe. The existing air handling units have deteriorated beyond their useful life and the structural integrity of the adjacent walls and roofs are in jeopardy. Furthermore, the temperature control units fail to operate during extreme temperatures and the high humidity conditions experienced in Blythe. The original appropriation is not sufficient to fund the project as bids came in higher than expected and is being reverted (Issue 642).

It is requested that Item 5225-301-0751 be added in the amount of $1,491,000 for construction of a bar screen project at Pleasant Valley State Prison, Coalinga. The existing lift station is unable to effectively remove bulky debris from the wastewater before it is pumped to the wastewater plant, and could start facing noncompliance citations from their respective Regional Water Quality Control Board. The existing funding for the project is being reverted (Issue 642) as the updated working drawings show that the existing appropriation is insufficient to finish the project.

It is requested that Item 5225-496 be added to revert the unencumbered balances of the following:

1. Item 5225-301-0001, Budget Act of 2005, for preliminary plans of a statewide fire sprinkler system for Juvenile Justice.

-5-

MAR 3 0 2006

2.    Item 5225-301-0001, Budget Act of 2005, for construction of an arsenic removal water treatment system at Kern Valley State Prison, Kern.

3.    Item 5225-301-0660, Budget Act of 2005, for construction of a heating, ventilation, and air conditioning system at Chuckawalla Valley State Prison, Blythe.

4.    Item 5225-301-0751, Budget Act of 2005, for construction of a bar screen, prelift station at Pleasant Valley State Prison, Coalinga.

The effect of my requested action is reflected on the attachment.

If you have any questions or need additional information regarding this matter, please call Jim Martone, Principal Program Budget Analyst, at (916) 445-9694.

MICHAEL C. GENEST
Director
By:

*Vincent P. Brown*

VINCENT P. BROWN
Chief Deputy Director

Attachment

cc:    Honorable Kevin Murray, Chair, Senate Appropriations Committee
          Attention:  Mr. Bob Franzoia, Staff Director
       Honorable Dennis Hollingsworth, Vice Chair, Senate Budget and Fiscal Review
          Committee
          Attention:  Mr. Jeff Bell, Staff Director
       Honorable Judy Chu, Chair, Assembly Appropriations Committee
          Attention:  Mr. Geoff Long, Chief Consultant
       Honorable Rick Keene, Vice Chair, Assembly Budget Committee
          Attention:  Mr. Peter Schaafsma, Staff Director
       Honorable Michael Machado, Chair, Senate Budget and Fiscal Review
          Subcommittee No. 4
       Honorable Rudy Bermúdez, Chair, Assembly Budget Subcommittee No. 4
       Ms. Elizabeth Hill, Legislative Analyst (4)
       Ms. Diane Cummins, Senate President pro Tempore's Office
       Mr. Craig Cornett, Assembly Speaker's Office (2)
       Mr. David Harper, Deputy Chief of Staff, Assembly Republican Leader's Office
       Ms. J. S. Woodford, Acting Secretary, Department of Corrections and Rehabilitation
       Mr. Bernard Warner, Chief Deputy Secretary, Division of Juvenile Justice, Department of
          Corrections and Rehabilitation
       Mr. John Dovey, Chief, Division of Adult Operations, Department of Corrections and
          Rehabilitation
       Mr. George A. Sifuentes, Deputy Director, Facilities Management Branch, Department of
          Corrections and Rehabilitation
       Mr. Richard C. Powers, Chief, Facilities Management Branch, Department of Corrections
          and Rehabilitation

icc:    AGUIAR, COSTIGAN, KLASS, FINN, MARTONE, C/F, SUSPENSE, FILE

H:\WP\DOC\FB\2006\April 1 CDCR FL.doc, 3/28/2006, 11:45:32 AM

**EXHIBIT D**

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO **
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
LORI RIFKIN ***
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ****

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

COPY

June 7, 2006

<u>VIA EMAIL AND REGULAR MAIL</u>

Lisa A. Tillman
Deputy Attorney General
Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

Re:    Coleman v. Schwarzenegger
       Defendants' Revised Long Term Bed Plan for EOP Beds
       <u>Our File No. 489-3</u>

Dear Ms. Tillman:

Plaintiffs write regarding defendants' compliance with the Court's May 1, 2006 Order, which rejected defendants' long term plan for enhanced outpatient beds because the plan described a shortfall of more than 1000 beds and directed defendants to file an amended long term plan within sixty days. 5/1/02 Order ¶¶ 1, 2.

During Dr. Farber-Szekrenyi's testimony at the hearings on the Bed Plan, the Court was clearly disturbed by the CDCR's planning process for EOP patients that did not address the existing and long-term need. When Judge Karlton asked, "Is it appropriate for the State to recognize that its proposals will leave 1336 patients without appropriate care?", Dr. Farber-Szekrenyi replied: "It should address all the needs. That's correct." See April 27, 2006 Transcript of Hearing before Judge Karlton ("April 27th Transcript") at 61. Later, Mr. Bien asked whether the next Bed Plan will cover all of the need that the CDCR itself had projected for the EOP population, and Judge Karlton rephrased the question as: "Will the next proposed Bed Plan actually address need?" Dr. Farber-Szekrenyi replied: "Yes, I think that the next proposed Bed Plan that we talked about will be updated for the new population base anyway. And a part of that one will be addressing all the needs" See April 27th Transcript at 62.

Defendants' failure to adequately plan for the EOP bed need has resulted in injury and death to the plaintiff class. There are existing court orders that require that defendants assure that adjustments for the growth in the EOP populations were built into

*     MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**    OF COUNSEL
***   MEMBER OF THE CONNECTICUT AND NEW YORK BAR
****  MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Lisa A. Tillman
June 7, 2006
Page 2

the budget process through staffing ratios. 7/29/99 Order at 2; See October 8, 2002 Order (adopting Special Master's September 3, 2002 Recommendations requiring defendants to implement the Tucker Alan Bed Needs Study, which includes EOP beds, with "proposals for MHSDS staffing and construction based on the bed needs study.") There has been no justification or explanation provided by defendants for the failure to provide for the needs for the EOP population given these existing orders.

The amended Bed Plan to be filed by defendants on July 1, 2006 must include a revised plan to address the EOP bed shortage. If defendants fail to do so, we will file objections and request a further hearing on the adequacy of the amended Bed Plan.

On a final note, plaintiffs have requested further explanation regarding the normal process for annual adjustments of the EOP staffing and bed expansion. Does this adjustment based upon staffing ratios only provide for staffing increases and not bed expansion? How are EOP beds expanded when population figures have resulted in increased staffing allocations? Is this done through the BCP process? When was the last EOP program expansion? If staff is being allocated based upon population figures but no beds have been increased, where has this allocated staff been placed? We request that these issues be on the agenda for the July Policy Meeting.

We hope to receive an amended Bed Plan that addresses all of the need that CDCR has projected for its EOP population. Please feel free to contact me if you have any questions regarding our comments.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:
Cc:     J. Michael Keating, Jr.
        Matthew A. Lopes, Jr.
        Michael Stone
        Katie Riley
        Coleman Co-counsel

# EXHIBIT E

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA  94283-0001



June 30, 2006

J. Michael Keating, Jr.                    via:    Lisa Tillman
Office of the Special Master                       Deputy Attorney General
2351 Sussex Drive                                  Department of Justice
Fernandina Beach, FL  32034                        1300 I Street, Suite 125
                                                   P. O. Box 944255
                                                   Sacramento, CA  94244-2550

**RE: RALPH COLEMAN, et al. v. ARNOLD SCHWARZENEGGER, et al.**
**USDC, Eastern District of California, Case No. CIV S-90-0520 LKK JFM P**

Dear Mr. Keating:

In accordance with the May 1, 2006, court order please find enclosed an update on the activation of the Mental Health Crisis Beds in the Correctional Treatment Centers at Kern Valley State Prison (KVSP) and California State Prison, Sacramento (CSP-SAC).  The court order required these two facilities to be open and operational by July 1, 2006.

The CSP-SAC has already opened their 11 beds crisis unit.  KVSP will open their 12 crisis beds on July 1, 2006.  However, in order to meet the July 1, 2006, activation date both institutions needed to move existing staff from other mental health programs.  Therefore, although the crisis beds will meet the activation date there are significant impacts to providing mental health services in other areas that will result in limited services until those vacancies can be filled.  KVSP reports that the Registered Nurse Triage, Correctional Clinical Case Management System (CCCMS), and Administrative Segregation (Ad Seg) programs will be impacted by the redirection of 1 physician, 1 psychiatrist, 2 psychologists, and most of their nursing staff.  CSP-SAC reports that their CCCMS and Ad Seg Enhanced Outpatient Program will be impacted by the redirection of 1 psychiatrist, 2 psychologists, and .25 of a psychiatric social worker.

Enclosed for your review is the final status report outlining all recruitment efforts utilized to date by the Department and denotes continuing efforts.  The Department will continue working with the institutions until all relevant mental health classifications are filled.  In addition, a listing of issues and barriers contributing to the challenges of opening these facilities is included.

J. Michael Keating, Jr.
Page 2

If you have any questions on any aspect of this update, please contact me at (916) 327-0033, or Nancy Bither, Chief, Human Resources at (916) 445-5454.

Sincerely,

PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services

Enclosure

cc:   James Tilton, Secretary, CDCR
      Bruce Slavin, General Counsel, Office of Legal Affairs, CDCR
      Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs, CDCR
      Michael Stone, Staff Counsel, Office of Legal Affairs
      John Dovey, Director, Division of Adult Institutions, CDCR
      Scott Kernan, Deputy Director, Division of Adult Institutions, CDCR
      Renee Kanan, M.D., MPH, Deputy Director, DCHCS, CDCR
      Yulanda Mynhier, Deputy Director, Health Care Administrative Operations Branch,
          DCHCS, CDCR
      Tim Fishback, M.D., Chief Psychiatrist, Mental Health Program, DCHCS, CDCR
      Nancy Bither, Chief, Human Resources, CDCR
      Eileen Cubanski, Assistant Secretary, California Health and Human Services Agency
      Frank Furtek, Chief Counsel, California Health and Human Services Agency
      Cynthia Radavsky, Deputy Director, Long Term Care Services,
          Department of Mental Health (DMH)
      Norm Black, Staff Counsel, Legal Services, DMH
      Dave Gilb, Chief, Department of Personnel Administration
      Sarah Mangum, Principal Program Budget Analyst, Department of Finance
      Doug McKeever, Project Director, Mental Health Program, DCHCS
      Vicki O'Shaughnessy, Staff Services Manager II, Clinical Programs and Policy Unit,
          DCHCS, CDCR

# Final Response to May 1, 2006, Coleman Court Orders

## 5. Activate MHCB in CTCs at Kern Valley and CSP Sacramento By July 1, 2006

### Court Order

On May 1, 2006, Judge Karlton ordered that, within 60 days from the date of his order (Due July 1, 2006), CDCR shall activate the mental health crisis beds in the correctional treatment centers at Kern Valley State Prison and California State Prison, Sacramento or inform the court in writing that date why said centers are not fully operational.

### Recommended Staff Resources: Nancy Bither (Lead)

**Status:** Both Kern Valley State Prison (KVSP) and California State Prison, Sacramento (CSP-Sac) will activate the mental health crisis beds by filling positions and redirecting existing staff. CSP-Sac has activated all 11 crisis beds and KVSP will activate 12 crisis beds. The Office of Workforce Planning and Selection (OWPS) continues to employ the following recruitment efforts to assist KVSP and CSP-Sacramento to fully staff their mental health programs.

### Current Hiring Efforts

CSP-Sacramento is interviewing five candidates for Senior Psychologist Supervisor the week of June 19, 2006. In addition, they are interviewing two Psychiatrist candidates at the end of June 2006.

KVSP requested a clinical psychologist certification list and Dr. Stephen Bindler is calling each candidate to discuss potential CDCR career opportunities with them. He will call candidates the week of June 19, 2006.

### KVSP-Hiring Status as of June 19, 2006
- Staff Psychiatrist- One Lateral transfer from Wasco selected, personnel completing paperwork.
- Clinical Psychologist-May 30, 2006, interviewed three candidates, one offer made, candidate has not accepted offer as of June 20, 2006.
- Pharmacist II-Candidate offered position. Start date is July 10, 2006.

### CSP-SAC – Hiring Status as of June 19, 2006
- Hired one Pharmacist I
- Hired two Psychologists

### CURRENT RECRUITMENT EFFORTS

### Pay Differential

On June 2, 2006, The Department submitted a recruitment and retention pay differential for various mental health classifications at KVSP that is comparable to the pay differential ordered by the Coleman Court for California State Prison – Corcoran. The Department of Personnel Administration (DPA) reported on June 28, 2006, that they have approved a pay differential for the following classes that had vacancies:  Clinical Social Worker; Psychologist; and Recreation Therapist.

### Exams

The CDCR worked with the State Personnel Board (SPB) to develop an online Staff Psychiatrist exam that will be hosted on SPBs Web Site. The new on-line exam will be available for candidates after July 1, 2006.

### Advertisements

Advertisements for all mental health workshops and institutional vacancies are done on a continuous basis in professional journals, including the American Psychiatric Association and California Psychologist and various

1

## Final Response to May 1, 2006, Coleman Court Orders

Web Sites such as militaryexits.com and Career Builder as well as the vacancy database on State Personnel Board's Web site.

OWPS staff has received five inquiries from Licensed Clinical Social Workers and Clinical Psychologists concerning career opportunities at KVSP from Careerbuilder.com. Information has been forwarded to interested candidates and OWPS staff is monitoring their potential interest.

### Schools

OWPS staff and Dr. Dos Santos did a presentation for the residents at USC. There was interest from first, second, and third year students. OWPS staff will follow up with the residents at the appropriate point in their studies.

OWPS staff is working with California State University, Fresno's Social Work Department regarding potential employment opportunities for their graduating students. In addition, staff is working with several Pharmacy Tech program placement offices regarding job opportunities for their graduating students.

### Certification List Contacts

OWPS will be canvassing the statewide lists for qualified candidates to help fill the vacancies that both CSP-SAC and KVSP have due to the increase in mental health bed staffing. This will be completed by June 26, 2006.

### PAST RECRUITMENT EFFORTS

### Advertisements

Advertisements for all mental health classifications were placed in over 30 different newspapers on a continuous basis advertising the workshops and institutional vacancies, as well as, the vacancy database on State Personnel Board's Web site.

### Schools

OWPS initiated contact with the California Psychiatric Residency Programs in order to distribute literature to resident students regarding job opportunities. Of those contacted, only Stanford and UC Irvine were interested. Staff continues following up with the other Residency Programs.

### Certification List Contacts

OWPS staff contacted KVSP and CSP-SAC certification list candidates to inquire if they were interested in obtaining employment at these institutions for all mental health classifications. Two candidates declined, (found employment elsewhere) and the rest have not returned calls. If OWPS staff receives calls back from any of the remaining cert list candidates, they will direct candidates to the correct personnel office to schedule interviews.

### Mailers

Address data of all California licensed professionals was used to mail workshop announcements (over 3,000 for KVSP and over 4,400 for CSP-SAC). In addition, the institution personnel staff utilized the certification lists of potential employees to mail out notification of the hiring workshops.

## Final Response to May 1, 2006, Coleman Court Orders

**Hiring Workshops**

**KVSP-Workshop was held April 28, 2006**
- 35 interested candidates attended the workshop.
- Eight of the 35 took an exam and were placed on cert lists (1-Clinical Social Worker, 1-Pharmacist and 6 Psychologists) All eight have been interviewed by KVSP and selections have been made.

**CSP-SAC Workshop was held February 17, 2006**
- 65 perspective applicants attended the workshop
- 19 tentative job offers were made:
  - Nine psychologists
    - Five have started
    - One starts in August, and one will start in September
    - Two have declined due to pay
    - The institution changed their mind about hiring one candidate
  - Seven licensed clinical social workers
    - Three started In March 2006
    - Three are working as contract employees
    - One declined due to pay
  - Three psych technicians
    - Three found employment elsewhere

**Association Meetings and Job Fairs**

The OWPS attended the following events in an attempt to recruit qualified candidates:

- Orange County Psych Society-March 11, 2006
- California Psychological Association-March 23-26, 2006
- Northern California Psychiatric Society-March 31-April 1, 2006

There was very little interest generated from the attendance of OWPS staff at these events. We are finding that attending job fairs does not typically result in viable hires for the Department. However, we will continue working with associations to set up meetings and/or presentations.

**Issues/Barriers:** There are a number of issues and barriers preventing CDCR from attracting and retaining qualified health care staff. The inability to compete with salaries and benefits paid by the private sector and working conditions are the main reasons potential candidates are declining job opportunities based on discussions with OWPS and Institution staff.

Details of the issues and barriers that the institutions are facing:
1. **Salary** - Although the State's benefit package is usually better than most private sector employers, the compensation currently offered by CDCR is not competitive with other employers. Candidates specifically have declined job offers stating that the salary was too low, this combined with the unique working environment in a correctional facility, provides no incentive for a health care professional to seek employment in an institution. Both CSP-Sac and KVSP reported that they have been unable to utilize registry due to the fact that the registries do not have staff available.
2. **Environment** - Correctional institutions are inherently more dangerous to work in than other settings and have a poor clinical image. To the clinician, they are seen as undesirable treatment environments.
3. **Location** - Kern Valley State Prison (KVSP) has indicated that the geographic location of their institution has detracted many candidates from seeking employment with their institution. KVSP is located in the Central Valley, which is known for the uncomfortable climate and physical remoteness from resources and amenities of the State's urban centers. KVSP is not the only institution that has noted location as a hindrance to hiring.
4. **Credential Verification Process** - California State Prison-Sacramento (CSP-SAC) has indicated that the time it takes for Credential Verification has impeded the process. According to the

3

# Final Response to May 1, 2006, Coleman Court Orders

institution, what used to take two days now takes three weeks due to competing priorities associated with court order compliance. The increased length of time for credential verification allows a greater opportunity for CDCR to lose a candidate to other job opportunities.

5. **Examination Process** - CSP-SAC and KVSP have stated that the protracted length of time for an exam to be scored and placement of candidates on lists hinders the hiring process due to competing priorities associated with court order compliance and lack of staff resources. OWPS is working with SPB to automate some of the mental health classification exams. Some of the obstacles to online exams are the cost and time consuming process due to dependence on SPB timeframes. If funding were available, CDCR would move toward developing and hosting its own online exams. However, due to the CDCR's server limitations this option is currently not viable. However, CDCR continues to explore this option. Therefore, we are spending approximately $58,000 per exam to have State Personnel Board develop and host CDCR's online exams. In the meantime, exam development and candidate certification eligibility is contingent upon staff resources.

6. **Workload Issues** - Institution staff are overwhelmed due to increased workload issues associated with a number of court orders, stringent hiring requirements and augmented reporting requirements. The institutions do not have the additional resources that are needed to focus on the Coleman hiring efforts. In fiscal year 2006-07, each institution will receive 1 clerical staff position to assist with reporting and hiring efforts and 27 institutions, those with high vacancy rates in health care classifications, will receive an associate governmental program analyst to assist with hiring efforts. In addition, headquarters will receive an additional 17.5 positions dedicated to addressing hiring issues for health care classifications and implement the Live Scan IT project statewide to assist in speeding up the background check process necessary for hiring.

7. **Loan Repayment Program** – The Health Professional Shortage Area (HRSA) Federal Loan Repayment Program is not available to all institutions. At qualifying institutions, the Federal Loan Repayment Program is used to attract potential employees due to their accumulation of financial aid debt used to offset education costs by candidates. The HRSA program "qualifies" institutions based on a combination of vacancy rate and staffing ratios. Currently, there is no other loan repayment program available to offer candidates at institutions that do not qualify for the HRSA program.

8. **Use of Psychiatric Nurse Practitioner-** CSP-SAC has raised the issue of whether they can utilize Psychiatric Nurse Practitioners instead of Staff Psychiatrists to help fill some critical vacancies due to the difficulty of attracting qualified psychiatrist candidates to be employed by CDCR. Proposed minimum qualifications may further limit the candidate pool. Currently, CDCR is developing specifications for this classification.

9. **California Psychiatric Nurse Practitioners programs do not graduate enough candidates to have a adequate candidate pool** – University of California, San Francisco and California State University, Long Beach are the two institutions in California that have a Psychiatric Nurse Practitioner program and in 2004/2005 they only graduated 17 candidates (5 from UCSF and 12 from Long Beach). This low number would not be able to accommodate the need the department has for filling critical vacancies.

10. **Nursing Schools** – Due to funding priorities, nursing schools have not been able to expand their nursing programs that would enable them to accept additional nursing school students. Therefore, nursing programs in California are not able to keep up with the growing demand for nursing professionals in the job market.

11. **Certification candidates** – There is a growing problem with candidates being placed on the certification lists which when contacted regarding job opportunities either do not respond or they indicate they are no longer interested. Therefore, these candidates often hold up the first three ranks making it impossible for the institution to reach candidates in the fourth and fifth ranks even though these candidates would like to work at their institution. This just reiterates that the certification lists might have large numbers of candidates but when OWPS and institution staff canvass the list, they find the candidate pool is actually quite small.

4

KVSP Vacancy Info
CTC Staffing

| Class Code | Classification | Established Positions | # of Vacancies | # on Cert List |
|---|---|---|---|---|
| 9293 | Clinical Lab Technician | 1 | 1 | 0 |
| 9283 | Clinical Psychologist | 2 | 2 | 10 |
| 9872 | Clinical Social Worker | 1 | 1 | 5 |
| 7982 | Pharmacist I | 1 | 1 | 4 |
| 9269 | Physician and Surgeon | 2 | 2 | 4 |
| 9286 | Recreation Therapist | 1 | 1 | 0 |
| 9318 | Supervising Registered Nurse II | 2 | 1 | 14 |
| 7979 | Pharmacy Technician | 1 | 0 | 38 |
| 9272 | Staff Psychiatrist | 1 | 0 | 7 |
|  | Total: | 12 | 9 | 82 |

| Date Contacted | Name of Candidate Contacted | Results | Reason for Decline | |
|---|---|---|---|---|
|  |  |  |  |  |
|  | no vac. At time, no calls made | no interested candidates | no exam given |  |
|  |  |  |  |  |
|  | Contacted By Institution Staff |  |  |  |
| 5/9/2006 | Sharon Walker | No response |  |  |
| 5/9/2006 | Cythina Hirbour | No response |  |  |
| 5/9/2006 | Yenyu Lin | No response |  |  |
| 5/9/2006 | Elisa Max | Bad number |  |  |
| 5/9/2006 | Gurminder Sahasi | Bad number |  |  |
| 5/9/2006 | James Andrews | declined due to distance |  |  |
| 5/9/2006 | Heather Hamm | declined due to distance |  |  |
| 5/9/2006 | Kever Czlapinski | No response |  |  |
| 5/9/2006 | Selina Barnett | No response |  |  |
|  | Contacted by OWPS Staff |  |  |  |
| 6/3/2006 | Cynthia A. Hirbour | Left message |  |  |
| 6/3/2006 | Yenyu Lin | Left message |  |  |
| 6/3/2006 | Gurminder Sahasi | wrong number |  |  |
| 6/3/2006 | James Andrews | inter. At SQ |  |  |
|  |  |  |  |  |
|  | Contacted by Institution Staff |  |  |  |
|  | no vac. At time, no calls made |  |  |  |
|  | Contacted by OWPS Staff |  |  |  |
| 6/3/2006 | Stefan Bain | No response |  |  |
| 6/3/2006 | Rolinda S. Gomez | No response |  |  |
| 6/3/2006 | Joe Acosta | no response |  |  |

*means there was candidate on cert list that had previously been contacted and declined, so no new contact was made
*OWPS staff contacted candidates in the top three ranks only

| Date Contacted | Name of Candidate Contacted | Results | Reason for Decline | |
|---|---|---|---|---|
|  |  |  |  |  |
|  | Contacted By Institution Staff |  |  |  |
| 1/20/2006 | Sean Kane | interviewed not hired |  |  |
| 1/20/2006 | Rambir Singh | no response |  |  |
|  | Contacted by OWPS Staff |  |  |  |
| 6/3/2006 | OWPS did not contact, due to interviews being scheduled |  |  |  |

KVSP Vacancy Info
CTC Staffing

| | | | | |
|---|---|---|---|---|
| | Institution worked cert list no | | | |
| | assistance was given by OWPS | | | |
| | no cert list | | | |
| | Institution worked cert, no | | | |
| | assistance was given by OWPS | | | |

*means there was candidate on cert list that had previously been contacted and declined, so no new contact was made

* Institution has not gotten any interested candidates, no exam has been given