1  BILL LOCKYER
   Attorney General of the State of California
2  JAMES M. HUMES
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  ROCHELLE C. EAST
   Supervising Deputy Attorney General
5  LISA A. TILLMAN, State Bar No. 126424
   Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 327-7872
8    Fax: (916) 324-5205

9  Attorneys for Defendants
   CF1997CS0003



**FILED**
JUL 1 2 2006
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | CASE NO. CIV S-90-0520 LKK JFM P<br><br>*Filed Under Seal*<br>**DECLARATION OF TODD JERUE IN SUPPORT OF DEFENDANTS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' BUDGET REQUESTS FOR STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDE** |
|---|---|

I, Todd Jerue, declare:

1. I am employed as the Program Budget Manager of the Corrections and General Government Unit within the California Department of Finance (DOF). I have served in this position since June 15, 2006. I served in the position of Assistant Program Budget Manager for the Corrections and General Government Unit from October 22, 2004 to June 14, 2006. I have been employed at DOF for nine years in positions directly related to the creation of the Governor's budget proposals.

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

1

2. I have personal knowledge of the facts stated in this declaration and if called to testify upon these facts would do so competently.

3. I have reviewed the *Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide* (Special Master's Report). I am familiar with and have been briefed by DOF staff regarding the exhibits filed with the Special Master's Report. None of the exhibits attached to the Special Master's Report were prepared by DOF staff.

## I.

## THE BUDGETARY PROCESS FOR THE APPROPRIATION OF MONIES

4. Funding is only made available to the Department of Corrections and Rehabilitation (CDCR) through appropriations by the State Legislature. The Governor annually proposes to the Legislature the amount of funding and related positions to be made available in the ensuing fiscal year for each State agency and department, including CDCR. The Governor's budget proposal is created as a result of the following process:

   a. The Secretary of each State agency proposes an annual budget for that agency and the departments within that agency. That proposal is submitted, either as one proposal or as a group of program-specific proposals, to DOF for review and approval pursuant to California Government Code section 13320.

   b. In instructions on the budget proposal process provided by DOF to State agencies and departments, DOF has explained that proposals should, among other things, identify the problem or issue that the resources requested would address; explain how the resources requested would solve the problem or issue identified; provide a clear, substantiated justification for the level of resources needed; identify the methodology, assumptions, and data used in determining the amount of resources requested; and identify any resources that the department already has dedicated to the activity or problem that is identified.

   c. DOF staff perform a review and analysis of each proposal, which results in an internal analysis and recommendation on the merits of the proposal and a decision as to whether

it should be included in the Governor's budget proposal. The accumulation of these recommendations constitutes DOF's "approval" of each department's budget.

    d. DOF's analysis may take place over several weeks or months, depending upon the timing of the request. When conducting this analysis, DOF staff review the written budget proposal provided by the agency; and meet and communicate via e-mail and telephone with agency and department budget and program staff in order to obtain information about the proposal and data provided. If applicable, DOF staff will review existing resource levels at the agency and at the agency's prior related proposals. This process is a fluid process that includes give-and-take among representatives of the agency, DOF, and ultimately the Governor's Office. During this process, the strengths, weaknesses, and alternative ways of viewing the written proposal are discussed. It is not uncommon for new information about the agency's written proposal to come to light during this process which elucidates or illuminates the strengths and weaknesses of the written proposal.

    e. DOF staff's review culminates in a written recommendation on each proposal, and a summary analysis of select, significant issues pertaining to that recommendation. This recommendation and summary analysis is presented to the Director of Finance and the Governor's Office, and shared with the agency Secretary and applicable agency and department staff. The agency Secretary is provided the opportunity to "appeal" any recommendation with which he or she is in disagreement. That "appeal" takes place in a meeting including the Director of Finance or his designee, Governor's Office staff, the agency secretary or his or her designee, and relevant agency and DOF staff.

    f. The funding recommendation that results from this process is ultimately presented to the Governor.

5.    To my knowledge, the Special Master has never reviewed any of the underlying analytical working papers created by DOF for any of the budget proposals referenced in the Special Master's Report, nor, to my knowledge, has he requested to speak to DOF staff about any of the analyses performed.

6.    Once Governor's Office staff has determined to include a funding proposal in the

1   Governor's budget proposal to the Legislature, the agency's budget proposal is revised to reflect
2   the Governor's decision. This "final" budget change proposal is then submitted to the
3   Legislature for review and discussion. This "final" budget change proposal does not reflect
4   DOF's analysis, the discussions that took place with agency or department staff, or the
5   discussions that took place with Governor's Office staff. It does not reflect any alternatives that
6   may have been discussed as part of this interactive process. This "final" budget change proposal
7   is presented to the Legislature as a portion of the Governor's budget proposal and, as such,
8   reflects only the analysis that supports the level of funding and staffing proposed by the
9   Governor.

10      7.    The analysis performed by DOF staff described in paragraph 4 is not performed
11   for the purpose of reducing the level of resources requested. The purpose of that analysis is to
12   provide the Governor's Office the fiscal information necessary to structure the Governor's
13   budget proposal to the Legislature. The Governor's budget proposal reflects the results of the
14   fiscal analysis provided by DOF, and, in addition, the Governor's determinations as to issues of
15   public policy and the appropriate allocation of available resources.

16      8.    During my employment at DOF, I have participated in the creation of nine annual
17   budgets, and have witnessed that the Governor and the Legislature do not always agree on the
18   allocation of available resources or on points of public policy. As a manager in DOF, I am aware
19   that DOF's goal is to ensure that any rejection of a portion of the Governor's Budget by the
20   Legislature occurs for reasons other than because the proposal lacks supporting fiscal analysis
21   from DOF.

22      9.    It has been my experience that many employees within State government
23   misunderstand the interactive budget process because program staff are represented in this
24   process by agency and department budget staff. It is not uncommon to hear State employees use
25   the type of terminology used in the Special Master's Report – that Finance "denied" or "rejected"
26   a budget proposal, or that Finance "will fund" a proposal. However, Finance's role is to analyze
27   and recommend. Finance's "approval" of a budget is in actuality a determination that a budget
28   proposal should be recommended for inclusion in the Governor's budget. The ultimate decision

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

as to the budget to be proposed to the Legislature is made by the Governor and his staff. The ultimate decision as to what is funded, subject to the Governor's veto powers, lies with the Legislature.

## II.

## CDCR FAILED TO PROPERLY SUBSTANTIATE ITS STAFFING REQUEST

10. The Special Master's Report discusses a CDCR budget proposal for fiscal year 2005-06 for budget authority for 822.1 positions to "implement the revised Program Guides." (Exh. B to the Special Master's Report.) This proposal was not presented to DOF for review and analysis during the fiscal year 2005-06 budget process.

11. I am aware that, for fiscal year 2005-06, CDCR sought 496.2 positions for the implementation of the Program Guide and 51.3 positions for mental health staff positions at California State Prison, Corcoran. The Governor's budget proposal did not include CDCR's request for 496.2 positions for implementation of the Revised Program Guide (other than those for institutions other than California State Prison, Corcoran) because CDCR's proposal did not contain sufficient substantiation to support a budget proposal to the Legislature, absent a court order.

12. In my work presenting the Governor's budget proposals to the Legislature, I have learned first-hand that the Legislature generally approves proposals that are justified on the basis of a court order, e.g. when the activity for which funding (or funding and positions) is sought has been ordered by a court, even if that proposal is not supported by data and fiscal analysis. In contrast, when a proposal is not independently supported by analysis and data, and a court has not yet issued an order for the performance of a particular activity, the Legislature will usually defer funding the activity until it is ordered by the court.

13. The Governor's proposed budget for fiscal year 2005-06 budget sought approval by the Legislature of 51.3 positions for California State Prison, Corcoran. The notification sent to the Legislature included an alert that a subsequent request for budget authority would be submitted to address resources needed to implement the revised Program Guide at all institutions, once the revised Program Guide received final court approval.

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

14. In the following fiscal year budget process, CDCR submitted a Mental Health Program Spring 2006 Finance Letter. CDCR sought by this finance letter: 299.98 administrative segregation positions, 71.6 staff positions in reception centers and 72.98 positions for mental health outpatient units, and 100 staff positions for headquarters staffing.[1] (See, Excerpted *California Department of Corrections and Rehabilitation Finance Letter for Fiscal Year (FY) 2006/07*, Exh. C, Special Master's Report). In support of the Mental Health Program Spring 2006 Finance Letter, CDCR presented various documents. One document was a chart, entitled *Locked Units: Mental Health Staffing*, showing the methodology used by CDCR to calculate the need for the 299.98 administrative segregation positions requested in the 2006/07 Finance Letter. As the Special Master's Report does not contain a complete copy of the budget change proposal, defendants hereby submit as Exhibit 2 a copy of the chart incorporated within that proposal.

15. The Governor chose not to propose that the Legislature fund 293.98 of the 299.98 positions requested by CDCR in the Mental Health Program Spring 2006 Finance Letter. This decision is evidenced in the "final" budget change proposal, entitled *California Department of Corrections and Rehabilitation Finance Letter for Fiscal Year (FY) 2006/07*, presented by on behalf of the Governor to the Legislature. (Excerpted portions in Exh. D to Special Master's Report.) The process described in paragraph 4 was followed in the development of this final budget change proposal.

16. During the interactive process addressing the CDCR's submitted finance letter, DOF advised the Governor's staff and CDCR that DOF's review of the historic record of funding of mental health staffing at CDCR reflected that for fiscal year 2000-01 CDCR had requested 285.4 administrative segregation positions to implement the 1997 Program Guide pursuant to a 1999 court order, and that those positions had been approved by the Legislature. CDCR was

---

1. The 299.98 positions requested by CDCR as "administrative segregation" positions appear to include positions for its secured housing units and condemned facility as well as its administrative segregation units. For the purpose of this declaration, I shall use the term "administrative segregation" positions to also include security housing and condemned facility unit positions.

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

6

1  unable to provide DOF with an explanation as to how those positions were accounted for in
2  CDCR's fiscal year 2006-07 budget request.

3     17.     The DOF staff reviewed the 2000-01 "final" budget change proposal entitled
4  *Modifications Necessary to Meet July 26, 1999 Court Order in Coleman v. Davis.* (A true and
5  correct copy of this document is attached as Exhibit 3.) As a "final" budget change proposal, this
6  document reflects a funding proposal submitted to the Legislature as part of the 2000-01
7  Governor's budget proposal. This proposal acknowledged that CDCR only had 35 existing staff
8  dedicated to mental health functions to serve inmates in certain administrative segregation areas
9  of CDCR's mental health services delivery system, and states the *Coleman* court ordered CDCR
10 to increase mental health staffing to serve inmates in those areas.

11     18.     DOF staff noticed that a chart contained within this 2000-01 budget proposal
12 provided the number of staff calculated by institution, the category of mental health need, and
13 staff classification at that time. (See, Exh. 3 at 15.) This chart displays a methodology that is
14 consistent with the methodology provided by CDCR in support of its Mental Health Program
15 Spring 2006 Finance Letter. (Exh. 2, Excerpted chart from CDCR Finance Letter of 2006-07,
16 entitled *Locked Units: Mental Health Staffing*; C to the Special Master's Report.) The primary
17 difference between the information in the chart on page 15 of the 2000-01 budget proposal (Exh.
18 3) and the chart in the 2006 finance letter (Exh. 2) appears to be a result of changes in the number
19 and type of population served on an institution-by-institution basis.

20     19.     This fiscal year 2000-01 proposal was approved by the Legislature, thus
21 increasing the staffing level for CDCR's administrative segregation, secured housing units, and
22 condemned units by 285.4 positions in accord with the methodology required by the order of the
23 *Coleman* court. Therefore, with approval of this proposal, the department had a total of 320.4
24 positions allocated for these activities beginning in fiscal year 2000-01. In subsequent years,
25 staffing was increased as a result of the prevalence and mix process.

26     20.     Twice during each year, CDCR submits to DOF funding requests for resources,
27 including staff needed for the delivery of mental health programs, due to changes in the number
28 and type of inmate population. This calculation, called the 'prevalence and mix,' provides

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

7

staffing in terms of proportional increases in the number of CDCR inmates that have mental health needs. The prevalence and mix process is based on the projected number of inmates with mental health needs as determined by the *Coleman* court approved Tucker-Allan methodology. When these resources are approved by the Legislature in the annual Budget Act or in a supplemental appropriations bill, CDCR is responsible for allocating them to each institution based on the actual number of inmates in the mental health programs at each institution. Beginning in fiscal year 2002-03 this adjustment includes a specific calculation for the staff needed in the administrative segregation units for the Enhanced Outpatient Program.

21. My staff compiled pages from "final" budget proposals, those released to the Legislature pursuant to the process set forth in paragraph 6, to obtain an historical perspective on the staffing provided to CDCR through the prevalence and mix process in each fiscal year following fiscal year 2000-01. The compiled data is attached herein as Exhibit 4.

22. I have received briefings from my staff concerning the data contained in Exhibit 4. The data shows that, in addition to the 320.4 positions available beginning in fiscal year 2000-01, another 44.0 positions were funded for the provision of mental health services in administrative segregation over the following six fiscal years, for a total resource level of at least 364.4 positions. This information has been summarized in a chart created by staff working under my supervision and control. The chart, entitled *Summary of Existing Clinical and Custody Staffing for Ad Seg, SHU and Condemned Units, As Approved in Budget Acts Since Fiscal Year 2000-01*, summarizes the resources requested by the present and prior Governor and granted by the Legislature in fiscal years 2000-01 through 2006-07 for the provision of mental health services in the administrative segregation units within CDCR. This chart is attached as Exhibit 5. In preparing this chart, the historical documentation reviewed by DOF staff included the budget change proposals specific to administrative segregation staffing and related population adjustments since fiscal year 2000-01. (See Exh. 3, Final Budget Proposal, *Modifications Necessary to Meet July 26, 1999 Court Order in Coleman v. Davis*; Exh. 4, *Prevalence Mix Adjustments*.)

23. From this information, DOF staff determined the minimum base level of staffing

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

8

that CDCR had available prior to fiscal year 2006-7 for comparable activities indicated in the funding request made for fiscal year 2006-07. However, it is possible that there are other resources also being used to provide mental health staffing in administrative segregation that CDCR redirected to this function or were provided through other means. This data should not be relied on as a full accounting of all positions utilized by these programs, but represents a minimum level that can be validated with the documentation available.

24. CDCR's 2006-07 budget change proposal for 299.98 staff positions in administrative segregation to implement the Revised Program Guide appears to have failed to account for previously-provided positions. This proposal failed to substantiate the CDCR's current staffing needs with the most rudimentary data: the duties required, duties capable of being performed by existing staff, duties not performed, the amount of time required to perform such duties, and the level of staff required to perform such duties.

25. In the same proposal, CDCR provided this type of basic analysis of the work activities and time required to implement the Revised Program Guide requirements in the reception centers and mental health outpatient housing units. As a result, DOF was able to recommend to the Governor and the Governor included in his proposed budget the positions requested by CDCR for the reception centers and mental health outpatient housing units. Those positions were approved by the Legislature.

26. CDCR has failed to explain whether the staff positions approved and funded by the Legislature in fiscal year 2000-01 and the six years thereafter were included in CDCR's 2006-07 budget change proposal as positions available to address the implementation of the revised Program Guide standards of care. DOF informed CDCR of its determination that CDCR's 2006-07 budget change proposal did not adequately support the administrative segregation positions CDCR had requested in large part because CDCR's request failed to address DOF's concern that the positions being requested might double-count existing administrative segregation positions. Yet, CDCR did not provide DOF with any additional information to support its 2006-07 budget change proposal.

27. CDCR's inability to explain its use of the previously funded administrative

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

9

segregation positions caused DOF to recommend the Governor's inclusion of CDCR's proposed workload study in the Governor's proposed budget to the Legislature. The recommendation was not a ploy to retrieve DOF's credibility, as suggested by the Special Master at page 9, lines 4-8 of the Special Master's Report. Rather, DOF's advice was based on an assessment of what information is necessary to determine the staffing required to implement the Revised Program Guide. Further, DOF recommends that the workload study commence with an audit of exiting staff in order to determine CDCR's existing use of the positions previously authorized to implement the 1997 Program Guide.

## III.
## THE 2006-07 FINANCE LETTER SOUGHT PROGRAM GUIDE AND HEADQUARTERS STAFFING

28. CDCR's fiscal year 2006-07 funding proposal, portions of which are reflected in Exhibit D of the Special Master's Report, included a funding request for Program Guide implementation *and* a request to fund headquarters staffing specifically in response to the March 2, 2006 court order stemming from the Special Master's Fifteenth Round Monitoring Report. (See, Mangum Dec. In Support of Deliberative Process Privilege, ¶¶ 7, 8) The finance letter sought funding for 168.58 positions for Program Guide implementation and 86 for headquarters staffing, as reflected on the title page of the finance letter: "This Finance Letter (FL) addresses the minimum necessary field *and headquarters* staffing required for compliance with Coleman court orders mandated by the Court Special Master." (emphasis added.) The full proposal itself contains much more detail about the headquarters staffing in Section II of the proposal starting on page 11, which is not provided in Exhibit D. The summary of this section of the proposal on pages 25-26, states that the headquarters portion of this request is 86 positions, the balance of the total 254.6 positions requested to address the two *Coleman* court orders. These headquarters positions were included in the Governor's proposed budget and approved by the Legislature.

## IV.

## REQUEST FOR MODIFICATION OF
## FACTUAL FINDINGS AND RECOMMENDATIONS

29. The record on which the Special Master based his report does not contain DOF's analytical support for the decision to seek funding for all but the administrative segregation unit positions requested by CDCR for fiscal year 2006-07. While that information was not sought by the Special Master, that information has now been provided by DOF by this declaration in the hopes of clarifying this issue and obtaining a modification of the Special Master's factual findings and recommendations.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: July 11, 2006        By: _____
                                  TODD JERUE

DEC. JERUE, SUPPORT DEF. RESPONSE SM REPORT

11

# DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **Ralph Coleman, et al. v. Arnold Schwarzenegger, et al.**

Court: **U.S. District Court, Eastern District of California**

Case No.: **2:90-CV-0520-LKK-JFM-P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On ____July 11, 2006____, I served the attached **DECLARATION OF TODD JERUE IN SUPPORT OF DEFENDANTS' RESPONSE TO SPECIAL MASTER'S REPORT ON DEFENDANTS' BUDGET REQUESTS FOR STAFFING TO IMPLEMENT THE REVISED PROGRAM GUIDE** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Post Office Box 944255, Sacramento, California 94244-2550, addressed as follows:

**The Honorable Lawrence K. Karlton**
**c/o CLERK'S OFFICE**
**United States District Court**
**Eastern District of California**
**501 I Street, Room 4-200**
**Sacramento, CA 95814**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on July 11, 2006, at Sacramento, California.

| M. McIntosh | M. McIntosh |
|---|---|
| Declarant | Signature |

30139118.wpd