1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   KEITH WATTLEY Bar No.: 203366
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   THOMAS NOLAN Bar No.: 169692
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

13

14 Attorneys for Plaintiffs

   BINGHAM, McCUTCHEN, LLP
   WARREN E. GEORGE Bar No.: 53588
   Three Embarcadero Center
   San Francisco, California  94111
   Telephone: (415) 393-2000

   HELLER, EHRMAN, WHITE &
   McAULIFFE
   RICHARD L. GOFF Bar No.: 36377
   701 Fifth Avenue
   Seattle, Washington  98104
   Telephone: (206) 447-0900

15              UNITED STATES DISTRICT COURT

16              EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN,                          )  No.:  Civ S 90-0520 LKK-JFM
                                           )
19         Plaintiffs,                      )  **DECLARATION OF JANE E. KAHN IN**
                                           )  **SUPPORT OF PLAINTIFFS' NOTICE**
20 vs.                                      )  **OF MOTION AND MOTION RE: 1)**
                                           )  **POST-JUDGMENT DISCOVERY AND**
21 ARNOLD SCHWARZENEGGER, et al.,          )  **2) PRODUCTION OF COPIES OF TOUR**
                                           )  **BINDERS AND DOCUMENTS**
22         Defendants                       )
                                           )       **HEARING**
23                                          )
                                           )  DATE:          August 17, 2006
24                                          )  TIME:          11:00 a.m.
                                           )  LOCATION:      Courtroom 25
25                                          )
                                           )  THE HONORABLE JOHN F. MOULDS
26                                          )
                                           )
27 _____     )

28

I, Jane E. Kahn, hereby declare:

1.      I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case.  I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify.  I make this declaration in support of Plaintiffs' Notice of Motion and Motion Re: 1) Post-Judgment Discovery and 2) Production of Copy of Tour Binders and Documents.

2.      In January 1997, the Court directed Special Master Keating to work with the parties to complete and submit for approval plans, policies and procedures for meeting the requirements of the Court's remedial order.  Attached hereto as Exhibit L is a true and correct copy of the January 30, 1997 Order Modifying Timelines.   The Mental Health Services Delivery System Program Guides were developed through this negotiated process and were provisionally approved by the court on June 27, 1997.  Attached hereto as Exhibit O is a true and correct copy of the June 27, 1997 Order.

3.      In 2002, the parties and the Special Master agreed to revise and update the Program Guides.  For the past four years, the parties, the Special Master, and his experts and monitors have met to review and negotiate provisions of the Program Guides.

Plaintiffs Seek Discovery In Areas That Are New Or Have Substantially Changed Since Trial

4.      Over the many years since the provisional approval of the Program Guides, there have been new prisons built and programs, policies and procedures that are new or have been substantially changed either by defendants or by the Court.  Plaintiffs' experts have not had an opportunity to observe any of these new programs and, in fact, have not been inside the California prisons in the *Coleman* case since discovery closed before trial in approximately 1992.  Plaintiffs have maintained objections to some of these policies, programs and procedures in Plaintiffs' Objections to the Special Master's Report and Recommendations on Defendants' Revised Program Guide.  Attached

hereto as Exhibit Q is a true and correct copy of Plaintiffs' Objections to the Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed February 17, 2006 ("Plaintiffs' Objections"). Two examples of disputed areas where plaintiffs seek discovery by their experts include: (a) the administrative segregation units created for inmate-patients requiring an enhanced outpatient level of care ("EOP"); and (b) the current tracking system utilized by defendants for monitoring former mental health caseload inmates and inmates with suicide attempt history. (Plaintiffs' Objections at 2-3; 6-7, 12.)

(a) EOP Administrative Segregation Units

The Special Master noted the difficulty faced by defendants when they first established these EOP "treatment units" within administrative segregation:

"Architecturally, the theme in such units is separation and individualization. Privacy, also is not a prized value; open space that is easily supervised is the goal. Most administrative segregation units, moreover, are often incredibly noisy. Enclosed interview rooms and quite, isolated group programming space are just not normal parts of the administrative segregation terrain."

Attached hereto as Exhibit Z is a true and correct copy of excerpts from the Special Master's Report on Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders, filed February 21, 2002 at 11.

Plaintiffs objected to the placement of severely mentally disordered inmates in these units, however, the EOP administrative segregation units were established and years later the obstacles identified by Special Master Keating remain. Attached hereto as Exhibit G is a true and correct copy of excerpts from the Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed January 15, 2006 (California Medical Facility: refusal rate in the unit increased to 30% probably due to limited programming space at 89; San Quentin: still unable to provide the required ten hours of therapeutic activities at 122; Salinas Valley State Prison: arrangement of treatment cells creates visual and

auditory lines of communication sufficiently obstructed to compromise meaningful group interaction and treatment at 198-199; Lancaster State Prison: due to staffing vacancies and increased census the quality of groups declined and attendance low at 255-256; Richard J. Donovan Correctional Facility: EOPs in administrative segregation were not provided with the ten hours and in fact some of the treatment consisted of largely meaningless in-cell activity at 299.) Plaintiffs have filed their objection to the Program Guide sections governing aspects of the EOP administrative segregation program and have requested that their experts be permitted to tour a representative sample of these units to observe patients in their housing units and treatment spaces. Plaintiffs' Objections at 1.

(b) Computerized Tracking of Former Caseload and Suicide History

In the early years of this Court's supervision of its mental health system, defendants tracked mentally ill inmates who were removed from the mental health caseload on a computerized system. Attached hereto as Exhibit AA is a true and correct copy of the Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding, filed December 31, 1998, at 19-20, Ex. E. Without notice to the Special Master or plaintiffs' counsel, defendants eliminated this tracking system. During the Program Guide negotiations, plaintiffs requested that defendants reinstate their computerized tracking of mentally ill inmates who they removed from the mental health caseload, but defendants refused. Plaintiffs have objected to the failure to track former mental health caseload inmates in the current Program Guides. Plaintiffs' Objections at 2. In a related area of computerized tracking, defendants have refused to expand their tracking system to include all inmates with suicide attempt history (they currently only track those inmates who are currently on the mental health caseload). *Id*. Plaintiffs seek discovery regarding defendants' current tracking systems which did not exist at the time of trial or at the time that the Court provisionally approved the Program Guides. Both of these disputed areas-- the long-term placement of EOP patients in administrative segregation units and the failure to

-3-

track former mental health caseload inmates and all inmates with suicide attempt history -- are two examples of disputed issues for which plaintiffs did not even have an opportunity to obtain discovery at the time of trial.

<u>Defendants Have Denied Plaintiffs' Request for Reasonable Discovery</u>

5.      The process of revising the Program Guide has been carried out for the last four years by negotiated agreements and without discovery, or hearings to resolve disputes.

6.      Despite several attempts to resolve remaining discovery issues, the parties have been unable to reach an agreement over the nature or scope of the discovery for the disputed portions of the Program Guide revisions. In Plaintiffs' Objections, plaintiffs requested reasonable discovery for the disputed program guide issue. Plaintiffs' Objections at 1. Plaintiffs' counsel subsequently sent a letter to defendants outlining proposed discovery concerning various disputed issues. Attached hereto as Exhibit R is a true and correct copy of a Letter from Michael W. Bien, counsel for plaintiffs to Lisa A. Tillman, counsel for defendants dated April 18, 2006. Plaintiffs' counsel has made a number of proposals to reduce the burden of discovery through the use of representative samples of prisons or specialized housing units in dispute, but defendants have consistently taken the position that plaintiffs are entitled to no discovery whatsoever. Attached hereto as Exhibit S is a true and correct copy of an Email from Michael W. Bien to Lisa A. Tillman dated May 9, 2006; attached hereto as Exhibit T is a true and correct copy of Defendants' Status Conference Statement, filed 5/18/06 at 4-5; attached hereto as Exhibit C is a true and correct copy of Defendants' Discovery Conference Statement, filed 6/02/06, at 5. Defendants have refused to permit any discovery of the disputed Program Guide issues by plaintiffs' counsel and/or plaintiffs' experts.

7.      The *Coleman* monitors make approximately sixty (60) monitoring tours of the California Department of Corrections and Rehabilitation ("CDCR") prisons each year, divided into two semi-annual monitoring rounds. This includes some revisits to prisons each monitoring round. Attached hereto as Exhibit BB is a true and correct copy of the *Coleman* Travel Schedule, Round XVII. Some prisons only provide tour binders and

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION RE: 1) POST-JUDGMENT DISCOVERY AND 2) PRODUCTION OF COPIES OF TOUR BINDERS AND DOCUMENTS, NO.: CIV S 90-0520 LKK-JFM

documents to the *Coleman* monitors and are not visited because they have "earned" paper monitoring status. The tour binders and documents provided by those institutions to the *Coleman* monitors are the basis of the monitoring report on those institutions' compliance with Program Guide requirements such as daily psych tech rounding, crisis bed admissions, weekly clinical contacts, staffing, medication management, transfer timeline compliance and suicide watch procedures.

8.      Plaintiffs' counsel accompany the court monitors on approximately seven monitoring tours each year. On those tours, plaintiffs' counsel are provided with a copy of the tour binder and other monitoring documents that are provided to the Special Master. Defendants make copies of the tour binders and additional monitoring documents for each court monitor who visits the prison. Therefore, the burden of making an additional copy for plaintiffs' counsel is minimal. I have accompanied the court monitors on numerous monitoring tours and have been provided with many tour binders and other monitoring documents that are provided to the Special Master. The binders and documents provide invaluable and current information about the mental health programs at the prison, about current staffing, suicide prevention practices, multiple crisis bed admissions for individual patients, transfer timelines and delays, use of force against mentally ill patients and other issues of grave concern to the plaintiff class.

9.      On May 8-11, 2006, I accompanied the *Coleman* monitors on a tour of Corcoran State Prison. I was provided with a tour binder and additional monitoring documents during that tour. The tour binder which I was provided with contained the following sections:

(a) Corrective Action Plan: This section included a list of 65 problems that were identified at Corcoran State Prison by the court monitors as well as a report on the current status of each of these problems. The problems range from mental health staffing vacancies, group therapy for mental health patients, discharge planning, custody-clinical relations, crisis bed length of stay, excessive use of restraints,

administrative segregation contacts, delays in DMH transfers, bus screening, suicide prevention, Heat cards, excessive use of OC spray and strip cell status;

(b) <u>Mental Health Staffing</u>:  This section includes a specific and updated listing of staffing positions by programs and vacancies by dates.  It also includes a list of patients per clinician (caseloads) and notes their level of care and housing units.  This section allows us to track specific clients who have written to us, as well as to track current caseload numbers.  We have used these lists to reach out to class members through questionnaires in the past to learn about conditions within specific housing areas.  For example, several years ago, we sent questionnaires to all mentally ill patients housed in the Corcoran SHU and through these questionnaires we learned that the windows in the SHU had been painted over so that no natural lighting entered the cells of the patients.  As a result of this information, we informed the Special Master and as a result of further monitoring of the units, the paint on the windows in the SHU housing units has been removed.  We have utilized monitoring lists from other institutions to conduct outreach to inmates in the administrative segregation units and have discovered that administrative segregation units system-wide have painted or frosted windows.  We are pressing for changes in these units as well.

(c) <u>Medication Management</u>:  This section spells out Corcoran State Prison's psychotropic medication protocols, including a listing of specific medications that are prescribed at Corcoran that are non-formulary medications (e.g. Ritalin).  Medication issues, including the ability of institutions to maintain patients on medications they received when they were transferred to Department of Mental Health ("DMH") facilities and are then returned to their institutions, has been a focus of plaintiffs' review.  The local institutional formulary policies are not available to plaintiffs except in the tour binders.

(d) <u>Mental Health Crisis Beds ("MHCB")</u>:  This section provides critical information regarding the use of crisis beds at Corcoran.  There are several different types of data provided here.  First, is a six month admission/discharge log which lists

each patient, their admission date, CDCR number, housing unit, reason for admission, level of care, length of stay, and discharge location. Second, is a listing of all inmates who have multiple crisis bed admissions and it includes the date of their individual admission, their names, CDCR numbers, reason for admission, discharge dates and lengths of stay. Third, is a listing of all inmates who have been housed in the crisis beds for lengths of stay greater than 10 days. It includes the admission date, the unit from where the patient was admitted, the reason for the admission, and where they were discharged to. Many of these patients have been referred to the Department of Mental Health ("DMH") for an in-patient level of care; Fourth, there is a listing of appointments for those patients housed in crisis beds. Finally, there is a log of patients given involuntary medications and those placed in five-point restraints. Both of these areas are being actively monitored in the case because of the defendants' on-going inability to track Keyhea Orders (involuntary medication orders) system-wide and to implement the new Program Guide standards for restraints. Plaintiffs have a critical interest in all of the material found in this MHCB section. We have sent outreach letters to patients listed on these logs as follow-up to the Unidentified Needs Study conducted by defendants to identify inmates needing in-patient care who have not been appropriately referred because defendants have insufficient in-patient beds. Furthermore, we have utilized the data in this section to track where crisis bed admissions come from within institutions – a fact that we are particularly interested in as plaintiffs' counsel, but which has not been a focus of the Special Master at this point. We utilized the information in this section to do our own monitoring of suicide watch procedures before defendants agreed to a moratorium on their practice of using video-monitoring for suicide watch in their Mental Health Crisis Beds and Outpatient Housing Units. As a result of our own outreach using the information contained in the monitoring binders, we were also able to document inappropriate suicide watch procedures at numerous prisons throughout the CDCR. For example, at CSP-Sacramento, the use of holding cells for suicidal inmates resulted in an official "holding

1    cell" procedure for suicide watch and the tour binder contained this procedure and

2    documentation of the numbers of patients housed in these alternative sites.  Finally,

3    when we receive individual letters regarding class members at an institution, we can

4    review their crisis bed history and this enables us to better advocate on their behalf.

5            (e)  Enhanced Outpatient ("EOP")Administrative Segregation:  This section has a

6    variety of information about mentally ill inmates who are housed in administrative

7    segregation at the enhanced outpatient level of mental health care.  Some of the

8    documents list those patients who have been transferred or are endorsed for transfer to

9    Psychiatric Housing Units ("PSU"), where EOP patients with SHU terms are housed

10   and receive at least ten hours of structured therapeutic activities.  Plaintiffs have been

11   carefully monitoring the transfer delay of EOP patients housed in the administrative

12   segregation units system-wide while they wait for PSU placements, or the review of

13   their rules violations or transfers to other EOP mainline programs where they do not

14   have enemies.  Plaintiffs have objected to the Program Guide provisions that fail to

15   establish a transfer timeline for EOP patients housed in these administrative segregation

16   units and the data provided in the tour binders documents the numbers and reasons for

17   the transfer delays.  The data in the tour binders regarding the EOP patients housed in

18   administrative segregation units who are waiting for transfer to another program is

19   much more complete than any other data provided to plaintiffs' counsel or the Special

20   Master.

21           (f)  Correctional Clinical Case Management System ("CCCMS") Administrative

22   Segregation:  This section includes folders that were provided to the Special Master and

23   plaintiffs' counsel under separate cover during the monitoring tour.  These folders

24   contained the list of patients provided care at the CCCMS level of care in administrative

25   segregation.  CCCMS level of care is outpatient services, which in administrative

26   segregation includes daily rounding by a psychiatric technician, a weekly case manager

27   contact, and medication management by a psychiatrist.  Currently there are virtually no

28   groups provided to CCCMS patients housed in administrative segregation units,

however, it is part of the program description.  The documents provided in this section include the names of class members, their arrival dates, housing units, medications, last clinical contacts, case managers, level of care, ethnicity, and work status.  Plaintiffs have used these lists to do their outreach on specific issues in the past several years including : (1) the status of painted windows, yard, shower access, and clinical contacts in administrative segregation/SHU units; (2) the provision of daily psychiatric technician rounding in overflow administrative segregation units; (3) the use of inappropriate suicide watch procedures and placements during the recent MHCB shortage; (4) treatment for inmate-patients issued rules violations for Indecent Exposure; and (5) use of force incidents in the Corcoran SHU and administrative segregation units.

(g)  Cultural Assessment:  On March 7, 2005, the Court ordered defendants to contract for a "cultural assessment" of Corcoran State Prison within sixty days of the Order, and complete the study within 90 days after it is initiated.  3/7/05 Order ¶ 5. Defendants completed the Cultural Assessment but there has been little communication regarding the results of this assessment that was undertaken as a result of documented disproportionate use of force against mentally ill inmates at Corcoran State Prison. ("Group interviews with clinical staff confirmed inmates' allegations of abuse in both the administrative segregation and the SHU.  Some clinicians in the group interviews, moreover, expressed their own concerns about custody staff retaliation and intimidation."  Fourteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, filed February 11, 2005, at 42.)  This section includes an update on the cultural assessment that was conducted in August 2005, entitled Report on Promoting a Positive Corrections Culture Work For The California Department of Corrections and Rehabilitation, CSP-Corcoran, January 4-6, 2005.  Plaintiffs have a tremendous interest in updates on the continuing implementation of the "plan" developed through the "cultural assessment" process at Corcoran due to reports by the Special Master of on-going disproportionate use of force

1   against mentally ill inmates housed at Corcoran State Prison.  Defendants did not

2   provide this report to plaintiffs' counsel.

3           (h)  Use of Force:  This final section includes documentation of use of force

4   incidents on each housing yard at Corcoran State Prison from December 2005 thru

5   March 31, 2006.  This data has been collected specifically as a result of Court Orders

6   regarding the disproportionate use of force against mentally ill inmates housed at

7   Corcoran State Prison, particularly in the SHU and administrative segregation units.

8   3/7/05 Order ¶¶ 5-7.  The monitors reported that use of force against mentally ill

9   inmates at Corcoran had increased during the May 2006 monitoring tour; however,

10  specific data was not provided during the phone exit.  The data in this section is very

11  specific as to percentages of mentally ill inmates in each housing unit who experienced

12  use of force as compared to non-mentally ill inmates.  Plaintiffs are carefully monitoring

13  this issue for the purpose of determining whether to seek additional Court orders to

14  remedy the continuing disproportionate use of force against vulnerable mentally ill

15  inmates housed at Corcoran State Prison.

16  10.     The tour binder and documents provided to the Special Master and plaintiffs'

17  counsel on the May 8-11, 2006 Corcoran State Prison monitoring tour contains

18  hundreds of pages.  There were two monitoring tours during the Fifteenth Round of

19  monitoring in 2004-2005.  I attended the second tour on April 25, 2005, which was a

20  revisit.  Defendants provided a tour binder which consisted of a 53 page Management

21  Report and several hundred pages of documents including census data, rosters,

22  medication lists, and contact lists.  Given the breadth of the monitoring covered in each

23  of the Special Master's Monitoring Reports, the section on each prison is a concise

24  overview of the prison's compliance with the Program Guide requirements.  (See, e.g.

25  the 15th Report covers 32 prisons and is 422 pages long.  Corcoran State Prison is

26  reviewed in 18 pages of the 15th Report and in 5 pages of the Exhibits. 15th Report at

27  142-160; Exhibits at Ex. G.).  The Special Master's Report does not cite to or attach all

28  of the evidence that he relies on to reach his conclusions about the status of defendants'

compliance with the Program Guides at each of the institutions.  In making this request for the tour binders and documents provided to the Special Master on the monitoring tours, plaintiffs will have access to important data relied upon by the Special Master in reaching his conclusions in his monitoring reports.  By requiring defendants to provide these documents, which defendants have ready access to and already copy for the Special Master, plaintiffs seek to lessen the burden on the Special Master.

11.     Although defendants provide plaintiffs with a monthly package of documents from the Division of Correctional Health Care Services pursuant to the January 19, 1999 court order regarding staff vacancies, this data is incomplete and many months old by the time that plaintiffs receive it.  Attached hereto as Exhibit CC is a true and correct copy of the cover sheet for May 23, 2006 listing the documents provided to plaintiffs pursuant to the January 19, 1999 Order.  The May 23, 2006 package of documents provided are monthly reports for February 2006, reflective of January 2006 data.  In other words, at the end of May 2006, plaintiffs were provided with January 2006 data from defendants on a variety of critically important topics including staffing, crisis bed admissions, EOP patients backlogged in reception, DMH transfer delays, bed shortages, and so on.  By the time plaintiffs receive this data, it is quite stale.  The tour binders and monitoring documents provide up to date information about the status of staffing, transfer delays, crisis bed patients, administrative segregation populations, etc.  There is simply no comparison between these two data sources.  In addition, the data provided in the monthly reports is incomplete and the accuracy is questionable.  For example, the tour binder documents provided during the 16th Round monitoring tour at CSP-Sacramento listed the average daily EOP population in administrative segregation as significantly higher than the number provided in the monthly data.  The Chief Psychologist during the tour at CSP-Sacramento confirmed the higher EOP population.  Plaintiffs' counsel requested an explanation for the discrepancy, which was never provided by defendants.  Attached hereto as Exhibit DD is a true and correct copy of Plaintiffs' Letter to Tillman, dated February 8, 2006 at 3.  Finally, due to the extensive

nature of the monitoring by the Special Master, the Monitoring Reports are often quite delayed.  For example, during the 15th Round the monitors visited Corcoran in November 2004 and April 2005, but the 15th Report was not filed until January 13, 2006, nearly nine months later.  For this additional reason, plaintiffs require the tour binders and monitoring documents provided to the Special Master during the monitoring visits to remain effective advocates for our clients.

12.     Under my supervision, paralegals in our firm track all CDCR suicides in a database.  We add the name of each inmate who commits suicide, and other key data relevant to the suicide to the database when we receive suicide notifications and suicide reports from the defendants.  We also cross-check our database against the Special Master's and defendants' annual suicide reports, and make adjustments to tour tracking data where necessary.  According to our current tracking log, which does not count four deaths which CDCR does not currntly report as suicides although they involve overdoses and restraint deaths, plaintiffs count a total of 26 suicides to date in 2006, with 23 in the first six months.

        To calculate the estimated CDCR suicide rate for 2006, I take the estimated number of 2006 suicides (here doubling the 23 in the first six months to 46), divide by the average CDCR population of 172,000, and then divide by 100,000 for the suicide rate.  The resulting estimated rate is 27.7 per 100,000.  The rate for 2005 was 26 per 100,000 and that was almost double the state prison rate (15 per 100,000) reported by the U.S. Department of Justice in August 2005.

13.     Attached hereto as Exhibit A is a true and correct copy of the Order Regarding Defendants' Revised Program Guide, filed 3/03/06.

14.     Attached hereto as Exhibit B is a  true and correct copy of Plaintiffs' Discovery Conference Statement, filed 6/01/06.

15.     Attached hereto as Exhibit D is a true and correct copy of excerpts from the hearing transcript from the April 26, 2006 evidentiary hearing before the Court on Defendants' April 17, 2006 Bed Plan.

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION RE: 1) POST-JUDGMENT DISCOVERY AND 2) PRODUCTION OF COPIES OF TOUR BINDERS AND DOCUMENTS, NO.:  CIV S 90-0520 LKK-JFM

16.     Attached hereto as Exhibit E is a true and correct copy of the Order filed 5/02/06 concerning Defendants' April 17, 2006 Bed Plan.

17.     Attached hereto as Exhibit F is a true and correct copy of the Order filed 5/25/06 setting the issue of discovery before Chief Magistrate Judge Moulds and outlining a dispute resolution procedure.

18.     Attached hereto as Exhibit H is a true and correct copy of the Declaration of Jane Kahn In Support of Plaintiffs' Objections to Defendants' In-Patient and MHCB Bed Plan, filed 4/21/06.

19.     Attached hereto as Exhibit I is a true and correct copy of excerpts from the Report on Suicides Completed in the California Department of Corrections in Calendar Year 2004, written by the Special Master's Expert, Raymond Patterson M.D.

20.     Attached hereto as Exhibit J is a true and correct copy of excerpts from Enclosure XI from Defendants' April 17, 2006 Bed Plan.

21.     Attached hereto as Exhibit K is a true and correct copy of excerpts from the California Department of Corrections May Revise Finance Letter, Coleman Guidelines to the Mental Health Services Delivery System at Corcoran State Prison, Fiscal Year 2005/2006.

22.     Attached hereto as Exhibit M is a true and correct copy of the Order of Reference, filed 12/11/95.

23.     Attached hereto as Exhibit N is a true and correct copy of the Order determining the effect of the PLRA on the compensation of the special master, filed 7/11/95.

24.     Attached hereto as Exhibit P is a true and correct copy of the Special Master's Report on Plans, dated 5/30/97.

25.     Attached hereto as Exhibit U is a true and correct copy of a Letter from Lisa A. Tillman, counsel for defendants to Michael W. Bien, counsel for plaintiffs dated March 20, 2006.

26.     Attached hereto as Exhibit V is a true and correct copy of the Stipulation and Order Amending Plaintiff Class and Application of Remedy in Coleman, filed 12/24/98.

27.     Attached hereto as Exhibit W is a true and correct copy of the Order filed 7/25/99.

28.     Attached hereto as Exhibit X is a true and correct copy of the Stipulation and Order Regarding Post-Trial Discovery in *Armstrong v. Davis*, Case No. C-94-2307 CW.

29.     Attached hereto as Exhibit Y is a true and correct copy of the Stipulated Order for Permanent Injunctive Relief in *Valdivia v. Schwarzenegger*, Case No. Civ. S-94-0671 LKK/GGH, filed 3/9/04.

30.     Attached hereto as Exhibit EE are true and correct copies of the Findings & Recommendations regarding plaintiffs' motions for attorneys' fees, filed 8/15/97, and Order adopting Findings & Recommendations, filed 9/30/97.


I declare, under penalty of perjury, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on July 13, 2006.


Respectfully submitted,

*/s/ Jane Kahn*

Jane E. Kahn_____
Rosen, Bien & Asaro
Attorneys for Plaintiffs

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION RE: 1) POST-JUDGMENT DISCOVERY AND 2) PRODUCTION OF COPIES OF TOUR BINDERS AND DOCUMENTS, NO.: CIV S 90-0520 LKK-JFM