# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,              No. CIV S-90-0520 LKK JFM P

        vs.

ARNOLD SCHWARZENEGGER,
et al.,

        Defendants.         <u>ORDER</u>

_____/

        Pursuant to court order this matter came on for status conference on May 19, 2006 to schedule this matter for resolution of outstanding issues regarding final approval of the Revised Program Guide. Michael Bien, Esq. and Jane Kahn, Esq., appeared as counsel for plaintiffs. Lisa Tillman, Deputy Attorney General, appeared as counsel for defendants.

        By order filed March 3, 2006, this court approved the undisputed provisions of the January 2006 Revised Program Guide and ordered defendants to immediately implement all such provisions. In their status report, plaintiffs represented that staffing augmentation proposals for fiscal year 2006-7 submitted by defendants to the Department of Finance in response to that order had been rejected. At the time of the status conference, counsel for defendants represented that additional information had been provided to the special master that morning and would be made available to plaintiffs after the status conference. Good cause appearing, the special master will

1

1  be directed to report to the court on the status and sufficiency of defendants' budget requests for

2  staffing augmentation.

3       After hearing, and good cause appearing, IT IS HEREBY ORDERED that:

4       1. This matter is set for a discovery conference pursuant to Rule 26(f) before the

5  Honorable John F. Moulds on June 13, 2006 at 11:00 a.m.  The parties shall file discovery

6  conference statements not later than June 2, 2006.

7       2. The parties are granted an additional period of time in which to negotiate concerning

8  disputed issues relative to those portions of the Revised Program Guide that have not yet been

9  finally approved by the court.

10      3. At such time as any party determines that a disputed issue is ripe for resolution by the

11  court, said party shall file a formal objection raising the issue.  As appropriate, the party shall

12  designate with the objection an expert witness to provide evidence relevant to resolution of the

13  objections.  The special master and the opposing party are granted a period of fifteen days after

14  the filing of a formal objection to designate, as appropriate, one expert witness each.  Whether

15  the parties shall conduct depositions of any experts so designated and, if so, the schedule for

16  conducting such depositions, shall be addressed at the discovery conference set in paragraph 1 of

17  this order.  At the same time, the parties shall also address the schedule for filing a request for

18  hearing on any objection filed by the parties pursuant to the provisions of this order.

19      4. Plaintiffs are granted fifteen days from the date of this order to file and serve a

20  response to Stephen Mayberg's May 17, 2006 response to the court's order to show cause.

21  Defendants are granted ten days thereafter to file a reply to plaintiffs' response.

22  ////

23  ////

24  ////

25  ////

26  ////

2

1        5. Within seven days from the date of this order the special master shall report to the

2    court on the status and sufficiency of defendants' budget requests for staffing augmentation

3    necessary to implement the court-approved provisions of the January 2006 Revised Program

4    Guide.

5    DATED: May 24, 2006.

6                                 LAWRENCE K. KARLTON

7                                 SENIOR JUDGE
                             UNITED STATES DISTRICT COURT

3

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.                    No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

### FIFTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

This report documents the latest and substantially extended round of review of institutional compliance with individual corrective action plans (CAPs) compiled by California Department of Corrections and Rehabilitation (CDCR) facilities in 2000 to ensure implementation of the plans, policies and protocols provisionally approved by the court in mid-1997. The expanded round was a response to the more narrow scope of the preceding 14th round of monitoring, which was limited to just 11 institutions to enable parties, counsel and the special master's monitors and experts to work on program guide revisions and complete the design and undertake an assessment of CDCR's unmet need for inpatient Department of Mental Health (DMH) beds for the most seriously mentally ill inmates in its population. While focusing on 11 CDCR institutions with large and complex mental health programs and a history of difficulty in complying with the provisionally approved plans, policies and protocols, the 14th round of monitoring included no monitoring visits to the remaining 21 CDCR institutions.

These 21 institutions were simply required to file a paper review with the Division for Correctional Health Care Services (DCHCS) in Sacramento to document their continuing compliance efforts.

The limitations of the 14th round of monitoring largely dictated that during the current round, all 32 CDCR institutions would be visited and their mental health programs evaluated. In addition, monitoring in the round focused on four broader topics, including quality management, medication management, mental health input into the hearing and disposition of rule violation reports (RVRs) generated in response to disciplinary infractions committed by seriously mentally disordered inmates and the timeliness of transfers to more intensive levels of mental health treatment. Because 21 of the institutions reviewed in this round, moreover, had not been visited by a monitoring team since late 2003, the period actually covered in the following institutional summaries ranges from a few months to 16 months.

Monitoring during this round was further complicated by the need to review the defendants' use of ten newly built and activated administrative segregation units, specifically restricted by an October 2002 court order, and the referral of RVRs involving seriously mentally disordered inmates to local district attorneys for criminal prosecution. Finally, once the methodology for the conduct of the assessment of the defendants' unmet need for DMH inpatient beds was approved in October 2004, actual conduct of the assessment required the participation of the monitor's experts in each institutional assessment through early March and the preparation of the final report by March 31, 2005. The result of all of these complicating factors was a somewhat extended monitoring period that began in early August 2004 and did not conclude until late May

2005, as well as the most voluminous monitoring report generated to date in this mastership already rich in voluminous reports.

During the 15th round of review, the monitor's psychiatric experts and monitors spent 308 person-days in all 32 CDCR institutions, with 24 of those person-days devoted largely to the new administrative segregation units. The monitor's psychiatric experts compiled numerous case reviews based on interviews with inmates and clinicians, chart reviews, or a combination of these elements, which are included as exhibits in this report. A total of 424 case reviews from 26 institutions are attached to this report. The case reviews are redacted to protect the privacy of inmates.

Institutional administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs and defendants' counsel accompanied monitoring staff during several of the site visits.

The data collected and findings discussed in this report are the product of many members of different monitoring teams, but subsequent references to various monitors throughout the report shall be singular rather than plural. Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

This report contains an institutional summary of compliance for each CDCR institution, which includes a brief report on staffing and staffing vacancies; a list of resolved CAP problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care, as well as problems identified in the institution's

3

CAP and targeted for elimination. A concluding summary of overall compliance is generally followed by an assessment of each institution's likely candidacy for reduced future monitoring or a list of major local obstacles to future reduced review. The institutional summaries are followed by a more general and department-wide analysis of compliance and any recommendations that spring from the analysis.

The arrangement of the institutional summaries in this report corresponds with the defendants' regional service areas, which typically include a hub institution with a Mental Health Crisis Bed (MHCB) unit for short-term inpatient crisis care and an intensive residential Enhanced Outpatient Program (EOP). The service areas also include anywhere from one to four other facilities, each of which generally has a Correctional Clinical Case Management System (3CMS) program in the general population.

### Institutional Summaries

#### Service Area A

This service area includes California State Prison, Sacramento (CSP/Sac) and Folsom State Prison (Folsom).

#### California State Prison, Sacramento (CSP/Sac)
October 6, 2004 – October 7, 2004

Mental health vacancies at CSP/Sac remained low. Of 118.1 mental health positions, 9.1 (7.7 percent) were vacant. Specifically, the institution had positions open for a psychiatrist, a psychologist, a psych social worker, 3.1 nurses, two office assistants and a medical transcriber. A significant portion of the unfilled clinical hours were covered by contractors, who provided between 300 and 380 hours of service per month from June through August 2004.

4

There were few vacancies among auxiliary staff as well. Only one of 27 MTA positions was unfilled, while one of four pharmacy positions was vacant during the monitoring period.

Issue Resolved:

The new mental health assessment process for RVRs involving caseload inmates was implemented adequately.

Quality Management:

The quality assurance process, a CAP item previously resolved, continued to function well at CSP/Sac. The quality management committee met weekly, maintaining ample minutes. Quality improvement teams were chartered in a number of areas, including medication continuity, documentation of group therapy and access to care for EOP administrative segregation inmates. Peer review meetings were conducted for psychiatrists, although not for other clinicians. The monitor's expert reviewed the minutes of these peer review meetings for the period from April through July 2004, but was unable to determine the methodology employed by the review committee or to ascertain the committee's conclusions. Clinicians were not regularly provided with the results of institutional audits.

Medication Management:

Most CAP items pertaining to medication management were resolved during earlier monitoring rounds, but a number of audits were still needed to assess continuing compliance with medication management policies and procedures. Continuity of medication on entry to the facility and transfer to other housing areas within the institution improved further. Implementation of a newly developed inmate movement form during the monitoring period helped eliminate remaining interruptions. Institutional

audits from October 2004 showed compliance rates between 81 and 100 percent for new arrivals and inmates moving to other intra-institutional locations. The institution had not conducted any audits to determine whether inmates in need of medication renewals were seen by a physician before their renewal date or before the expiration of relevant continuity orders.

The timeliness of psychiatric responses to staff and inmate referrals for psychiatric care was uncertain. The institution had yet to track response times to requests for psychiatric services.

Medication refusals were documented on inmates' Medication Administration Records (MARs), and inmates who refused their medications or did not appear for medication distribution were reportedly referred to mental health. The filing of MARs, however, was backlogged, and no audit had been conducted to assess the extent of follow-up to medication non-compliance.

Laboratory testing of inmates on psychotropic medication remained timely, although a problem had developed with the filing of test results in inmates' charts. The institution had not conducted an audit to determine whether clinicians adjusted inmate medications in response to abnormal test results. A quality improvement team was chartered to study the implementation of requirements for laboratory testing of inmates on mood-stabilizing medications.

There were 86 inmates on Keyhea orders in CSP/Sac at the time of the monitor's visit. Keyhea orders were routinely sought for inmates who needed involuntary medications, and renewals of such orders were sought in a timely manner.

Procedures were reportedly in place to ensure that all paroling inmates in need of psychotropic medications were identified and provided with adequate discharge medications, but no audits had been conducted to determine the actual rate of compliance.

The administration of HS (*hora somni*, hour of sleep) medications improved during June 2004, when approximately 80 inmates were receiving such medications. The number of inmates with HS medications declined, however, during July and August to around nine.

Problems with obtaining informed medication consent from inmates on psychotropic medications continued. Not all inmates were appropriately counseled regarding their prescribed medications. A process remained in place, however, to ensure that heat cards were distributed to inmates receiving heat-sensitive medications, and inmates were told of the risks associated with their heat-sensitive medications.

Procedures were in place for observing inmates while taking Direct Observation Therapy (DOT) medications.

Mental Health Assessments for the Disciplinary Process:

The revised mental health assessment process for MHSDS inmates charged with disciplinary infractions was fully implemented at CSP/Sac. A social worker assigned to complete mental health assessments reportedly interviewed all inmates for whom an assessment was requested and reviewed their charts in preparing the assessments.

Mental health input appeared to have an impact on the disposition of a significant number of infractions. From June 1 through April 3, 2004, mental health

-7-

assessments were completed for 178 of the 451 RVRs issued to mental health inmates, 40 percent of which concluded that mental illness had influenced the inmates' behavior. An institutional audit, confirmed by chart reviews, indicated that mental health input was consistently considered by hearing officers and occasionally used to justify a reduced penalty. In some cases, the chief disciplinary officer assigned to review hearing dispositions reduced the penalty imposed by the hearing officer. Some gaps in documentation continued to occur. The monitor reviewed RVRs for eight inmates and found two instances in which clinical input was not summarized in the RVR; one instance in which a completed mental health assessment was not filed in the inmate's C-file; and one instance in which the hearing officer failed to indicate whether the mental health information provided was used in reaching a disposition.

Transfers:

Access to MHCB care at CSP/Sac was erratic. When the MHCB unit at CSP/Sac was full, Psychiatric Services Unit (PSU) staff sometimes chose to retain fragile inmates in need of MHCB care in the PSU under intensified monitoring rather than transfer them to a MHCB unit in another CDCR prison. Other inmates were placed in holding cells with continuous monitoring or in the OHU (Outpatient Housing Unit) pending transfer. The OHU referral log showed that inmates sometimes spent four to seven days in the OHU waiting for a MHCB bed to become available. Access to the OHU was reportedly adequate. There were 250 OHU admissions from June 1 through October 4, 2004, 17 of which lasted longer than 72 hours; 15 of the inmates who remained in the OHU beyond 72 hours were waiting for MHCB beds.

8

According to institutional data, the aggregate EOP refusal rate for structured therapeutic activities decreased slightly from August through December, but the percentage of refusals was still high at roughly 30 percent. Meanwhile, the refusal rate for EOP inmates in administrative segregation increased from 14.75 percent to approximately 30 percent. Limited programming space in the EOP administrative segregation unit may have contributed to the high refusal rate. Programming cells, moreover, did not provide adequate audio privacy and were configured so that individual inmates could not always hear one another.

The quality and variety of treatment groups reportedly improved in the months preceding the monitor's visit, but due to the large number of EOP inmates and the limited amount of programming space, many therapeutic activities were still not driven by treatment needs. Most EOP inmates were assigned to a standard cadre of groups, which included anxiety management, health education and occupational therapy. The groups were large, but some effort was undertaken to divide inmates by level of functioning and amenity to treatment. Insufficient materials and the repetitive use of videos diminished the quality of certain groups.

Follow-up monitoring of suicidal inmates discharged from DMH/APP improved. A newly implemented policy required IDTT meetings for all inmates discharged from DMH/APP, at which the need for follow-up monitoring was considered. Institutional audits and the monitor's review of charts indicated that inmates discharged from DMH/APP, who were deemed to require follow-up, were consistently seen by a clinician for five days. Another QIT concluded that appropriate custody checks were also usually completed, although documentation of custody checks was not always forwarded

89

to the suicide prevention coordinator for accurate tracking. Staff acknowledged that, contrary to departmental policy, suicide risk assessment checklists were not always completed on admission to and discharge from DMH/APP, although clinicians regularly assessed the risk of suicide upon discharge.

A pilot project was underway linking the institution's management information system to the pharmacy's software and data from an outpatient psychiatric program. Completion of the pilot project was expected in March 2005.

New Problem:

The monitor's expert encountered a number of seriously psychotic inmates in administrative segregation, most of whom had not been referred to a higher level of care. See Exhibit C, case reviews 11-13, 18 and 22.

Institutional Summary:

Allocations of mental health staff increased during the monitoring period, but the institution suffered from significant clinical staff turnover. Both factors contributed to an increase in the percentage of vacant positions. Increases in the administrative segregation caseload strained resources and required dispersal of the excess population in a number of locations, complicating the efficient delivery of treatment services.

In three of the four areas that were the focus of this round of monitoring, CMF showed considerable improvement. Quality management was significantly better. Mental health assessments in the disciplinary process were usually completed according to protocols, although RVR logs needed further work. The number of 3CMS inmates referred for mental health assessments at CMF was higher than anywhere else in CDCR, causing some clinical backlash. Access to higher levels of care improved all across the

90

administrative segregation in February. Meeting discussions were reasonably interdisciplinary, but the office where the IDTT meetings were held lacked sufficient audio privacy. In March, the monitor's expert attended IDTT meetings, which had been moved to a better location. No correctional counselor attended these meetings, but the rest of the team engaged in an excellent discussion of the treatment needs of the inmates under review. The IDTT did not usually address medication non-compliance, even in extreme cases, and treatment often seemed to be driven as much by the level of the inmate's cooperation as by clinical judgments.

Treatment for MHSDS inmates in the OHU showed some progress during the monitoring period, but the quality of services provided in the unit continued to be the subject of complaints. During the monitoring period, SQ made some administrative and clinical changes in the unit; a psychiatrist and an experienced psychologist were assigned to cover the OHU, constituting an increase in the staffing of the unit. The institution also began holding weekly IDTT meetings to assess difficult inmates with multiple admissions. A number of inmates with multiple admissions, who were sent to and returned from a MHCB unit, did not have any evidence of an IDTT meeting in their charts. IDTT meetings were reportedly provided for OHU inmates as they were needed, but the criteria were not clearly defined. The institution made an interview area available for clinicians to meet confidentially with inmates on the unit, but logs showed that more than 70 percent of inmate interviews occurred at cell-front, including a substantial number of IDTT meetings. The OHU physical plant, which was a matter of serious concern in October, improved by the time of the monitor's February and March visits. Broken tiles had been removed and new tiles installed in cells; window screens in some

cells had been replaced; and an evaluation of the sprinkler system and air ventilation grates was underway. On the other hand, non-break-away shower heads and some remaining window grates continued to constitute safety hazards, particularly for suicidal inmates.

The frequency of case management contacts with EOP inmates in administrative segregation appeared to increase during the interval between the monitor's first and final visits during the monitoring period. Institutional data for October through December indicated that between 95 and 100 percent of EOP inmates in administrative segregation received weekly case management contacts, while an institutional audit in March, confirmed by the monitor's chart reviews, indicated that 90 percent of inmates received weekly case management contacts. The percentage of administrative segregation EOP inmates seen out-of-cell, while still inadequate, had increased from 35 percent in the preceding monitoring round to between 50 and 74 percent. In contrast, the percentage of 3CMS administrative segregation inmates receiving timely case management contacts decreased from 93 percent in October to 76 percent in November, apparently due to staffing changes. The percentage of 3CMS inmates receiving out-of-cell contacts, only 50 to 65 percent from October through December, was significantly lower than among EOP inmates. The institution reportedly adjusted for discrepancies in the MHTS when gathering data on out-of-cell contacts. Psychiatric contacts were even more problematic; inmates were often seen by different psychiatrists, a high proportion of contacts were missed and medications were sometimes renewed without inmate contacts.

EOP inmates in administrative segregation were not offered ten hours of structured therapeutic activities a week, but studies showed improved programming

on arrival, a problem of increasing dimension given the facility's expanding reception role, continued to elude solution, while some local eccentricities, such as largely leaving the ordering of laboratory testing for inmates on mood-stabilizing medications in the hands of an OT and empowering the local pharmacist to veto psychiatrists' orders for HS medications, created self-inflicted barriers to compliance. In addition, the handling of medication errors, responsiveness to medication non-compliance, the acquisition of informed medication consent forms and the tracking of Keyhea orders all needed further work. The delivery of parole medications seemed improved but needed better documentation.

Despite the challenges associated with the changing size and nature of its population, DVI was still able to resolve three of its CAP issues during the monitoring period and edge closer to the resolution of several others. Treatment plans were improved; initial mental health assessments were more timely; the physical safety of OHU observation cells, at last, was being addressed meaningfully; the suicide prevention committee was functioning more effectively; clinicians' access to mental health records during clinical contacts was better; and medical documentation was being filed more readily in inmates' UHRs.

DVI's continued ability to reduce in whole or in part nearly all of its CAP deficiencies, especially while adjusting to the demands of its new mission, represented encouraging progress. Transfers and access to higher levels of care are probably not issues DVI can settle on its own, but if the facility hopes to move on to a paper review after the next round of monitoring, it must do something in the next six months to address

141

directly its deficient medication management practices. That overall issue remains the key obstacle to avoiding on-site monitoring in subsequent rounds of review.

### Service Area E

This service area includes California State Prison, Corcoran (CSP/Corcoran), the California Substance Abuse Treatment Facility (CSATF), Pleasant Valley State Prison (PVSP) and Avenal State Prison (ASP).

### California State Prison, Corcoran (CSP/Corcoran)
November 15, 2004-November 17, 2004
February 15, 2005-February 16, 2005
April 25, 2005-April 28, 2005

As of the monitor's April visit, CSP/Corcoran reported vacancies in positions for one chief psychiatrist, six staff psychiatrists, 16 psychologists, one psych social worker, two recreational therapists and 2.1 psych techs. Three of these psychiatrist and eight of the case manager positions represented recent allocations for a planned expansion of the institution's MHCB unit that turned out to be unfeasible and was cancelled. Reportedly, the hiring of a staff psychiatrist and two psych social workers was imminent. The institution cited positively the efforts of DHCS in helping to recruit the psychiatrist, perhaps a hint of cooperation and coordination that might continue.

All of the institution's psychiatric and case manager vacancies could not be covered by contracted clinicians. Of the seven vacant psychiatrist positions, only about half were filled through the use of contract psychiatrists, all of whom worked in the facility only on weekends. On the other hand, most of the vacant psychologist positions, other than those allocated for the now-defunct MHCB expansion, were filled by contracted psych social workers, about half of whom had been providing services for longer than six months at CSP/Corcoran. Nonetheless, throughout the monitoring period,

142

the functional vacancy rate remained largely unchanged at approximately 18 percent, an unacceptably high vacancy rate for an institution with a mental health caseload as large and complex as CSP/Corcoran's.

Vacancies among auxiliary staff continued to fluctuate during the monitoring period. Nursing vacancies soared to 47, including RN supervisors, while MTA vacancies declined to just five. The vacancy rate among medical records staff improved marginally, and the facility used approximately 300 hours of overtime monthly for existing records-keeping staff, which resulted in a backlog of filing ranging from one to four weeks, depending on the source of the estimate.

During the preceding monitoring period, a breakdown in the provision of escort officers, particularly in the SHU, so essential to ensuring access for the delivery of mental health services in heightened security environments, created a serious impediment to the delivery of mental health services. Even before the previous monitoring period ended, additional escort teams, formed from existing resources, were assigned to the SHU and administrative segregation to improve access to mental health care. Interviewed clinical staff in each of the monitor's visits throughout the current monitoring period indicated that the system of escort teams implemented in mid-2004 continued to provide adequate access to caseload inmates, particularly in the SHU. This issue was resolved.

The institution also continued to monitor and supervise more closely and effectively the use of force by custody staff against caseload inmates. A report finalized in November on the issue raised as many questions as it answered, and demonstrated that some 86 percent of incidents involving the use of force against seriously mentally

143

disordered inmates occurred on an emergency basis, precluding any opportunity for the intervention of mental health clinicians to calm agitated caseload inmates before force was applied. The report, which was based essentially on videotaped interviews with some mental health staff and inmates willing to go on record with complaints about the behavior of custody staff on their living units, found allegations of custody staff abuse and misbehavior of caseload inmates unsubstantiated. Meanwhile, the long backlog of unreviewed use of force reports was gradually whittled down; new accelerated procedures for review were initiated; a manual on the use of force was developed; and training on the use of force was increased. The manual, which compiled disparate memorandums generated by departmental and institutional administrators over the past five years on the use of force, was a disappointment and had no obvious practical utility.

Nevertheless, when the monitor reviewed the use of force in CSP/Corcoran in April, a full year after the issue arose, the situation in regard to the use of force was found to have changed dramatically. The number of instances involving the use of force against caseload inmates decreased substantially. MHSDS inmates were, for the first time in memory, the object of fewer uses of force than non-caseload inmates; district attorney referrals of caseload inmates declined sharply, largely due to a new and more limited agreement with the local district attorney; and, perhaps most importantly, institutional administrators reviewed more critically and quickly reports on the use of force and intervened actively to identify ill-advised and poorly executed uses of force and prescribe corrective remedies.

Also during the monitoring period, the much discussed "cultural assessment" of CSP/Corcoran occurred. The outcome of the assessment, shared recently

144

with the institutional administration, was awaiting a response from the warden, who was on temporary leave for health reasons, to be followed by continued interaction and planning among the consultants who conducted the assessment and institutional staff and administrators. Whatever the final outcome of the assessment or its ultimate contribution to enhanced cooperation among the various constituencies in CSP/Corcoran, in the year since the disturbing monitoring exit interview in April 2004, the warden and his administrative staff have managed to address gradually and effectively in a variety of ways the issues raised about custody staff's dysfunctional role in the delivery of mental health services in the SHU and administrative segregation. The principal change has been the heightened level of accountability imposed on custody line staff and local supervisors, a level that must be maintained if the changes are to become permanent.

Issues Resolved:

Cooperation between correctional officers and mental health staff was satisfactory.

Inmates discharged from the institution received a 30-day supply of medications.

The results of laboratory tests ordered for inmates on mood-stabilizing medications were obtained and noted by physicians in a timely manner.

Data was entered timely in the MHTS.

Quality Management:

The quality assurance process at CSP/Corcoran continued to evolve. The quality management committee met weekly and kept minutes that reflected activities more accurately. The quality assurance process was useful in that it allowed institutional administrators and staff to identify problems and develop solutions. Documentation of quality assurance efforts changed in September 2004 to conform to Plata requirements.

Audits of medication management were conducted by staff responsible for the administration of medication. Turnover among supervisory nursing staff, however, contributed to an inconsistent audit schedule. Many audits were not completed or were done inaccurately. Small sample sizes remained a problem. Some audits relevant to mental health issues were done independently of mental health staff and were often unhelpful in ascertaining accurately the status and nature of problems.

The structure and scope of the quality management effort outstripped staff's capabilities. Not all QITs were active and not everyone listed as members were aware that they were part of a particular QIT. Some key staff was unaware of QITs directly related to their work. Audits were often small in size with inadequate methodological explanations but covered numerous areas critical to mental health treatment. Despite these limitations, the audits that were conducted were often informative for staff and sometimes served as a basis for change.

Most members of the mental health staff were involved in and aware of quality assurance activities conducted within the mental health department. Many received feedback about their work and viewed quality management favorably. Peer review was underway in January 2005 for all mental health disciplines except psychiatry. Monthly chart reviews were performed regularly, and results were submitted to HCSD, as required.

Use of the MHTS developed substantially during the monitoring period. It emerged as the vehicle through which information about mental health services was communicated to staff at all levels. Regular use of the MHTS provided case managers with information about their caseloads. The MHTS provided psychiatrists with timely

information on the expiration of medication orders. Supervisors used the MHTS for monthly reports on new arrivals, case management contacts, IDTT meetings and other clinical contacts. The MHTS was still unable to produce placement chronos, making it difficult to track changes in levels of care. Supplemental logs were developed by supervisors to capture information the MHTS did not collect, such as data on MHCB admissions, transfers to higher levels of care and completion of five-day clinical follow-up. Data entry into the MHTS was timely, but the accuracy of audits based on the data entered had not been confirmed; audits based on MHTS data, however, were considered by many to be more accurate than audits based on a review of medical records.

Medication Management:

The institution focused considerable attention and effort on medication management, but improvements during the monitoring period were limited. The local operating procedure was revised again to conform to Plata requirements. The institution struggled unsuccessfully to conduct meaningful audits of medication management on an established schedule.

Apart from small sample sizes, unexplained or inadequate methodology often limited the ability to generalize from audit results. Audits of medication non-compliance issues, continuity of medications on arrival and changes in housing locations and the use of HS medication consistently yielded more positive results than the anecdotal reports of staff and inmates on the same subjects.

The use of DOT in the administration of medications improved. The local policy was revised, and a central list of inmates on DOT was maintained. A QIT looked at medication administration, but made no recommendations on the use of DOT and

nurse-administered medication in the EOP or SHU. Food ports in the SHU were no longer opened for the delivery of medications; instead, medication was passed through a gap around the door. Under revised policy, nurse-administered medication required the presence of a correctional officer in the unit when medications were delivered, but reportedly correctional officers were not always available when medications were passed.

Practices surrounding the use of HS medications improved. The number of caseload inmates with HS orders increased from four to 113. Although administrators believed that HS medications were delivered after eight p.m., line staff and inmates reported that it was delivered before 8 p.m.

Blood levels of inmates on mood-stabilizing medications were obtained generally, and test results were reviewed by clinicians and followed up appropriately. Audits did not focus on whether orders for testing were written in all required cases.

Discharged inmates typically received a 30-day supply of medication.

The pharmacy compiled a list of inmates who were offered and received and/or rejected medication at time of discharge.

Medication continuity appeared to improve, but the degree of improvement could not be ascertained with confidence. An institutional audit found that medication orders were rewritten for 70 percent of new arrivals within eight hours of their entry. Audits of medication continuity for inmates who moved within the institution consistently found that doses were not missed. In contrast to these audit findings, line staff and inmates reported that medication deliveries were often interrupted by changes in location. Because of the conflict between audit results and widespread contrary perceptions, it was difficult to formulate any effective approach for improving medication

continuity. Interruptions in medications for inmates discharged from the MHCB were found to be a specific problem in the past, but no audit limited to that phenomenon was conducted. Audits of responses to medication non-compliance found extremely high rates of compliance with institutional policy. In this area, too, anecdotal reports contradicted audit results. An institutional audit found that 84 percent of 49 sampled medical records contained a MAR covering the preceding month. Eighty-eight percent of the available MARs were complete and legible. Another institutional audit found that numerous renewed medication orders expired without corresponding progress notes, suggesting that orders were renewed or discontinued in the absence of inmate contact.

There was a problem with the tracking of Keyhea orders. Keyhea orders for four inmates inadvertently lapsed during the monitoring period. It was uncertain whether Keyhea hearings were initiated for all inmates who needed one.

Mental Health Assessments for the Disciplinary Process:

Implementation of the revised RVR process was mixed. Some mental health assessments provided useful information that was relied on by hearing officers, who subsequently mitigated sanctions. Even in the absence of a useful mental health assessment, hearing officers at times dismissed charges or mitigated penalties expressly for mental health reasons. On the other hand, some mental health assessments were glaringly inadequate, and some inmates were punished for behaviors associated with mental illness even when mental health assessments provided pertinent information.

Requests for mental health assessments remained stable at roughly 125 to 150 in a six-month period. Mandated referrals for assessments of EOP and MHCB inmates accounted for 50 to 80 assessments. About half of all assessments were for EOP

149

inmates and some 20 to 25 involved inmates who were in crisis and treated in the MHCB. Approximately 35 to 40 mental health assessments were requested for 3CMS inmates. Referrals of non-caseload inmates, whose offenses involved bizarre or uncharacteristic behavior, declined. Between July and November 2004 six non-MHSDS caseload inmates were referred for mental health assessments in connection with disciplinary infractions. Only one non-caseload inmate was referred for a mental health assessment from November to March.

Mental health assessments were attached to completed RVR reports and filed in inmates' C-files. An institutional audit in February found that hearing officers often failed to document the content of mental health assessments in the disposition of cases. The warden subsequently issued a memo that directed hearing officers to review mental health assessments prior to conducting disciplinary hearings. Documentation aside, the quality of the revised RVR process varied widely. Deficiencies were found in both legal and clinical aspects of the handling of RVRs through the end of the monitoring period.

In one case, statements in the RVR indicated that the hearing officer did not accept the relevance of mental health input, citing the California penal code's proscription against the use of diminished capacity as a defense in criminal proceedings. Mental health assessments were sometimes inadequate, omitting, for example, information on the inmate's behavior at the time of the offense. Others used jargon, acronyms or idiosyncratic or vague language unlikely to be of much use to hearing officers. One mental health assessment completed for a past offense committed at another institution ruled out the influence of mental illness but failed to refer to any

150

interview or other source of information that might have justified the conclusion. That offense involved sexual behavior. Mental health assessments of another EOP inmate, who incurred repeated RVRs for refusing to go into his cell, throwing tooth powder, covering his window, spitting in the direction of correctional officers, engaging in sexual misbehavior and making inflammatory comments, indicated that he was unstable and his behavior was influenced by his mental illness. Nonetheless, the inmate continued to forfeit credit each time a new charge was heard. In a third case, an inmate with a Keyhea order incurred multiple RVRs, one associated with an incident in which he pulled away from a correctional officer who was escorting him to be involuntarily medicated. Mental health assessments provided useful information in these cases, but maximum losses of credit were assessed, although the inmate's privileges were left intact. In explaining these dispositions, hearing officers cited mental health assessments as the basis for the inmate's retention of privileges.

CSP/Corcoran's January 2005 agreement with the district attorney specifically ruled out referrals for spontaneous pushing or kicking. No cases associated with a calculated use of force were referred to the district attorney. Only 11 incidents met the criteria for referral to the district attorney over a seven month period; eight were referred. All involved 3CMS inmates. Two cases involved indecent exposure; four involved weapons; one was a case of a battery on an inmate; and one was for the attempted murder of a correctional officer. The institution typically took three to four months, but sometimes as long as five months, to decide whether to refer an incident to the district attorney. The district attorney reached a decision within one month in five cases; three cases had been pending for over three months. One indecent exposure case

151

and one weapons case were accepted for prosecution. The number of referrals dropped sharply from the preceding monitoring period, when 22 cases involving caseload inmates were referred to the district attorney from March through October 2004.

Transfers:

Access to DMH's acute care was reported by staff to be good. Logs of referrals to DMH were fragmented, incomplete, difficult to decipher and no longer included the dates of acceptance or a DMH bed assignment. From October through April 7, CSP/Corcoran made 48 referrals to DMH/APP at CMF. All were transferred within 72 hours of receipt of a bed number. Nine referrals did not result in a transfer to acute care. Information on the disposition of seven of the cases that did not go to acute care was not available; of the remaining two, one referral was rejected and one was rescinded because the inmate paroled prior to transfer. Processing times were reported for half of the cases actually transferred to acute care. On average, 8.5 days elapsed between referral and acceptance and 2.2 additional days between acceptance and the assignment of a bed number. Nine psych and return inmates came back to CSP/Corcoran between October 1 and March 31. Three UHRs were available for the monitor's review; all three contained a discharge summary from DMH. No fax cover sheets or psych and return chronos were in the UHRs. None of the discharge summaries contained a recommendation regarding level of care. Clinical staff at DMH reportedly did not contact clinical staff at CSP/Corcoran about returning inmates. Information was passed from classifications staff at DMH to the Chief Psychologist at CSP/Corcoran through a designated correctional counselor.

152

Access to DMH/SVSP's intermediate care facility improved but fell short of the demand. Only seven inmates were transferred, although 23 were accepted. Cases that were not designated as high priority were accepted but were transferred much more slowly, if at all. CSP/Corcoran referred 34 inmates to DMH/SVSP between January 27 and April 7. While twenty-three were accepted, only seven were transferred by April

25. Seven referrals were rejected, while one was rescinded. On average, 19 days elapsed between referral and transfer of the seven inmates actually sent to the program. Sixteen of the 23 accepted inmates were awaiting beds. Fourteen had been waiting for a month or longer, while nine had been waiting 48 days or more. No referrals were made to ASH during the monitoring period.

CSP/Corcoran had a problem with making appropriate and timely referrals to DMH intermediate inpatient programs. Staff frequently took three weeks or more after identifying an inmate in need of an intermediate inpatient level of care to generate a referral to DMH. There were indications, moreover, that not all inmates in need of an intermediate inpatient level of care were actually referred. Staff identified 18 inmates in need of intermediate inpatient care in advance of the unidentified needs assessment (UNA), which was conducted in CSP/Corcoran in February. The visiting UNA review team identified seven more. The institution's subsequent referral log showed that just 12 referrals, rather than the combined total of 25 that were recommended for referral, were made to DMH intermediate programs. Only four were actually transferred. Five were accepted and awaiting transfer. One was rescinded because the inmate paroled. What happened to the remaining 15 (the 13 who apparently were not referred, as well as the

two referred but not accounted [for] was unclear from the data provided during the monitor's April visit.

Care provided to inmates in crisis beds and the staff's ability to monitor the operations of the MHCB unit improved. Out-of-cell treatment was provided. A recreational therapist made use of a courtyard, and individual counseling sessions were held in a confidential setting. An IDTT meeting attended by the monitor's expert was notably improved over those observed in the past.

The average length of stay in the MHCB unit was less than ten days, although 20 percent of admissions stayed longer than ten days. A QIT was chartered to examine lengths of stay in the MHCB unit. Inmates were moved out of the MHCB unit soon after they were clinically discharged. Institutional audits found that 81 percent of treatment plans were completed within three days of admission to the MHCB unit. Audits of suicide risk assessments found they were completed for 83 percent of admitted inmates, but only 77 percent of those discharged. At least ninety-five percent of inmates referred to the MHCB unit for suicide-related behavior were admitted. Eighty-four percent of daily psychiatry rounds were documented. The designation of eight MHCBs for use by NKSP during the latter's CTC renovation increased the local workload. CSP/Corcoran clinicians were critical of the amount of time NKSP staff spent treating their MHCB referrals and the type of IDTT meetings they provided.

Transfers to PSUs typically took four months, but much longer delays occurred in a number of cases. Overall, the wait for PSU beds was reduced. Transfers within four to five months typically involved individuals already serving a SHU term, who were found to need an EOP level of care and free of all complicating disciplinary

and/or classification factors. PSU transfers involving EOP inmates in administrative segregation with newly acquired SHU terms were subject to lengthy delays. The defendants' policy commitment in April 2004 to move inmates in need of a PSU placement in spite of pending disciplinary charges was essentially inoperative.

At the time of the monitor's April visit, 37 inmates were awaiting a PSU placement. Ten inmates were transferred from CSP/Corcoran to PSUs from November through January. Five more transfers to PSUs occurred in April. Five cases were removed from the list of pending PSU transfers; two no longer needed an EOP level of care and three had completed their SHU terms in administrative segregation. The stays of these last three in EOP administrative segregation ranged from 223 to 388 days. In one case, staff took 206 days to assess a SHU term, and the inmate's status was then changed to SNY. By the time an ICC addressed the SNY issue, the end of the inmate's SHU term was imminent. In another case, a SHU term was assessed within 106 days, but the CSR did not review the case. By the time the oversight was discovered, termination of the SHU term, again, was imminent. In the third case, a SHU term was assessed within 108 days. The charges and SHU term were reduced on supervisory review, by which time the end of the SHU term was once again imminent.

During the monitoring period, some ameliorative approaches to delayed transfers to PSUs emerged. Fewer delays were related to ICC decisions, and at least 12 inmates awaiting transfer, who were decompensating in administrative segregation, were referred to higher levels of care. Three other inmates were released early from a SHU term or administrative segregation to an EOP program for mental health reasons. In one case requiring approval of a departmental review board, it took the institution six months

to obtain the required authorization for transfer. The inmate was transferred three weeks after the authorization was received.

While the ability to trace the sources of delay in PSU transfers improved, efforts to expedite the transfers were largely unsuccessful. The monitor's review of transfers to PSU found that preventable delays accounted for a significant number of long stays in administrative segregation or the SHU. In several cases, a lack of CSR endorsement added three to four months to the wait. Breakdowns in the institution's processing of cases occurred regularly, and it appeared that processing was stalled by pending disciplinary charges in other instances. The transfer of one EOP inmate was delayed six months because a classification services representative (CSR) withheld endorsement to a PSU until a BPT hearing was held. In the same case, nearly six months more elapsed between endorsement and transfer. In another case, an inmate with SHU status was designated EOP, but his case was not referred to the CSR for endorsement for over three months. The CSR endorsed transfer to a PSU six weeks later. The inmate was transferred to a PSU within ten weeks, seven months after he was found to need a PSU placement. Several cases of inmates who threatened, assaulted or battered staff and subsequently were treated in a MHCB unit or DMH/APP were reviewed. Adjudication of the charges took six months in one such case and 11 months in another.

Other CAP Issues:

a. Partial Compliance

EOP inmates housed in general population were not seen weekly by a case manager, although EOP inmates in administrative segregation) were. The institution was unable to offer enough mental health treatment to EOP inmates in administrative

segregation when the census exceeded 54, but succeeded in providing nearly ten hours per week to inmates during most of the monitoring period.

Weekly case management contacts occurred with 77 to 97 percent of caseload inmates in administrative segregation during the period from November through March. The 77-percent nadir was associated with staff absences and turnover.

Response time to referrals to psychiatry, which lengthened during the preceding monitoring period, was reduced in the current monitoring period.

The expansion of custody escort teams and treatment space resulted in improved access to mental health treatment in the SHU. Quarterly case management contacts were made with 85 to 93 percent of 3CMS inmates in the SHU from October through March. During the same time, timely case management contacts with 3CMS inmates in the general population ranged from 83 to 98 percent.

Group treatment for 3CMS inmates housed in the SHU began in February. Four groups met twice monthly in February and March. Two more groups were slated to begin in April. Two groups for 3CMS inmates in the general population were also slated to begin in April.

Provision of five-day follow-up of suicidal inmates discharged from the MHCB unit increased from 90 to 95 percent from October to March but fell short of full compliance. Institutional administrators reported that inmates were considered for admission to a MHCB unit when clinically warranted but could not substantiate the report due to inadequate MHCB logs and misfiled documentation.

The frequency of the use of restraints declined by 50 percent from July through March compared with their use during the preceding monitoring period.

157

Duration of time in restraints was also cut nearly in half. Supervisory staff discovered that an out-of-date policy on the use of restraints was mistakenly printed and followed during the monitoring period.

b. Non-Compliance

The institution still had difficulty with the timeliness of assessments of new caseload inmates and the conduct of full-fledged IDTT meetings. Treatment plans were not updated as frequently as required for many EOP and 3CMS inmates. The quality of IDTT meetings was compromised repeatedly by the absence of psychiatrists and/or correctional counselors. The SHU had the distinction of hosting the most timely IDTT meetings for both initial treatment plans and updates.

Medical records remained problematic. A large audit of UHRs found that over 20 percent contained records of the wrong inmate, while documents were filed out of order in 17 percent, and 36 percent had documents filed in the wrong sections. Large amounts of overtime and untrained assistants were used to reduce the filing backlog. Mental health staff reported that documentation of completed treatment was not reliably filed in medical records. UHRs were often unavailable to mental health staff when they attended ICC meetings in administrative segregation and the SHU.

Institutional Summary:

Problems with the acquisition and retention of permanent mental health staff, as well as the procurement of some categories of contracted staff, continued to impinge on CSP/Corcoran's ability to provide adequate mental health services. Increasing allocations of staff did not translate reliably into immediately available clinical bodies.

158

The institution's quality assurance process continued to develop. Custody administrators and supervisors of medical and mental health disciplines worked together reasonably well on quality management issues. The institution stumbled on the development and conduct of meaningful audits of medication management. Use of the MHTS improved substantially, and mental health staff's quality management initiatives relied heavily on the MHTS. Peer review was underway for psychologists and psych social workers, but not for psychiatrists.

Major problems in the management of medications remained, but improvements occurred in the use of HS medications and the monitoring of blood levels of inmates on mood-stabilizing medications. The number of caseload inmates with HS orders increased, although reports on the delivery of HS medications before or after eight p.m. conflicted. Discharged inmates appeared to receive regularly a 30-day supply of medication. Medication continuity appeared to improve for inmates who moved within the institution, but the extent of the improvement was unknown. MARs, present more often in UHRs, indicated that some orders for the renewal of psychotropic medications expired, while others were written without inmate contact. Keyhea orders were not tracked closely enough to prevent inadvertent lapses.

Access to DMH/APP was adequate, but incomplete logs made it difficult to ascertain whether unsuccessful referrals were handled appropriately. Access to DMH inpatient intermediate care improved slightly, but the supply of beds failed to meet the growing demand. Many referrals were accepted as appropriate, but only a third of these acceptances resulted in actual transfers. No referrals to ASH were submitted during the monitoring period. The institution also was not routinely referring all inmates in need of

an inpatient intermediate level of care. The lag between the recognition of a need for intermediate care, when it did occur, and completion of a referral often took too long.

Treatment provided in the MHCB unit improved as did the staff's ability to monitor its operations. Problems persisted with the documentation of daily psychiatric rounds, and lengths of stay crept upward, with twenty percent of stays in the MHCB unit exceeding ten days. An out-dated policy on the use of restraints was applied throughout the monitoring period. Substantial reductions in both the frequency and duration of the use of restraints occurred during the monitoring period.

Access to mental health treatment in the SHU improved due to the enhanced availability of escort officers and expanded treatment space. Group treatment was initiated in the SHU and expanded in the general population. EOP inmates in administrative segregation met weekly with a case manager and were provided with close to ten hours of structured therapeutic treatment weekly, provided the unit's census was at or below capacity. Case management contacts with 3CMS inmates in administrative segregation occurred weekly during most of the monitoring period.

The institution still had difficulty with the timely assessment and provision of IDTT meetings for newly arrived inmates. Medical records remained problematic; documents frequently were missing and/or misfiled. UHRs were not always available for use by mental health staff attending ICC meetings.

CSP/Corcoran still had much to do both to comply fully with its CAP and meet required standards in the areas of quality and medication management, the mental health assessment process for RVRs involving seriously mentally disordered inmates and transfers to higher levels of care. Nonetheless, the most recently completed monitoring

quality of the groups was high. Group leaders used a wide variety of materials; topics were relevant to the members of the groups; modes of communication were effective; discussion was facilitated; and members of the groups were engaged on an individual basis in a therapeutic manner. Interviewed inmates, including some who did not typically attend groups, gave favorable appraisals of the group treatment provided at SVSP. The content and process of the EOP groups were better here than in EOP treatment groups conducted elsewhere in CDCR.

b. Non-Compliance

The institution lacked any meaningful way to track either the timeliness or effectiveness of clinical responses to staff and inmate referrals. There was hope that a change requiring the triaging of referrals and scheduling of appointments in each yard rather than handling them at a central point might result in faster responses and better records, but no data were available on the effect of this change.

The percentage of 3CMS inmates in administrative segregation receiving weekly out-of-cell case management contacts varied depending on the housing unit. Across all administrative segregation buildings, about 40 percent of 3CMS inmates were seen out of their cells weekly, which represented some improvement over past performance. The increase in out-of-cell contacts was attributed to changes in clinical and custody staff and a reduction in the number of 3CMS inmates housed in two of the buildings with the most impediments to the delivery of mental health treatment. Also, in contrast to the preceding monitoring period, no inmates in need of a higher level of care were found by the monitor's experts in administrative segregation.

On the other hand, scanty custody coverage, the frequent redirection of officers and brief windows of opportunity for mental health contacts reduced the frequency of out-of-cell case management contacts in other administrative segregation units. Shortages of correctional officers often delayed the delivery of breakfast, which in turn delayed the start of clinical contacts and reduced the overall opportunity for contacts. Medical appointments trumped mental health appointments; the two often competed for the same office space. Hatches between interview rooms and central control posts overhead remained open. When an office was used by medical staff, mental health clinicians sometimes conducted their interviews in the housing unit itself, which did not afford visual privacy.

Psychiatric coverage in administrative segregation was quite problematic. Attempts to facilitate meetings between psychiatrists and 3CMS inmates did not reliably result in contacts. When questions about the risk of suicide arose, a mental health clinician frequently did not see the individual for up to four hours later; during the interval, the inmate in question was typically placed in a holding cell and observed by a correctional officer. In summary, while mental health services in administrative segregation were gradually improving, basic program mandates remained out of reach due to lack of resources, human and otherwise.

The capacity to treat EOP inmates in administrative segregation improved with the addition of ten new holding cells, essentially doubling programming capacity. Once the new cells become usable for groups, 40 to 50 EOP inmates will be able to receive ten hours of group treatment weekly. The arrangement of the cells was problematic. Visual and auditory lines of communication were sufficiently obstructed to

compromise meaningful group interaction and treatment. The amount of group treatment offered was also increased by more efficient use of available hours, full clinical staffing of the EOP administrative segregation unit and the availability of a "floater" clinician who led groups and made individual contacts as needed. Two group sessions observed in the established group space, one of which was led by a floater, were therapeutic.

Interviewed inmates spoke favorably about the groups and individual sessions.

Confidentiality was preserved during both group and individual contacts. Escort officers knew the EOP inmates well, facilitated their attendance at appointments and maintained excellent records of attendance and reasons for refusal. Although compliance with program guide requirements was not achieved, it was evident that through sustained collaboration between mental health and custody staff a fully functioning treatment program for EOP inmates in administrative segregation was in place and continued to move toward compliance.

Questions about psych tech rounds raised during the preceding monitoring period were put to rest. Although documentation of psych tech rounds in the UHRs was inconsistent, the monitor's review of other sources of information and discussions with staff led to the conclusion that rounds were made as required throughout the monitoring period. Monitoring of psych tech rounds was stepped up. UHR reviews done in April 2005 by the monitor found that weekly summaries of psych tech rounds of segregated MHSDS inmates were present from January 2005 forward. Institutional audits found that psych tech rounds were conducted as required.

New Problems:

Vitek hearings did not conform to legal requirements.

Logs of the use of holding cells in administrative segregation were incomplete and inaccurate.

Institutional Summary:

Staffing vacancies continued to stretch resources. The vacancy rate among mental health staff, however, decreased to 29 percent, and the addition of several psychologists and the continued strong use of contracted services seemed to signal an up-turn in the institution's evolving capacity to provide a better grade of mental health services. While the caseload population continued to grow slightly, the pace of the growth appeared to slacken during much of the monitoring period.

Among the four areas focused on during this round of review, SVSP showed progress in its quality management efforts. The efforts were better organized; documentation was improved; and staff used audits more effectively to monitor progress toward goals. Readily identifiable problems were sometimes addressed collaboratively through the quality assurance process, some with good results. The MHTS also emerged as a useful tool for management, at least, of the general population 3CMS program.

Medication management remained erratic. Modest improvements were made in continuity of medication for inmates changing location within the institution. The content of informed consent forms improved, but informed consent was not regularly obtained. Two areas that progressed during earlier rounds slipped backward during the current monitoring period. Changes in medication orders were no longer accompanied routinely by a documented rationale, and HS medications were no longer delivered after

counselors with C-files is sustained, this problem will be resolved during the next monitoring round.

Case managers typically were notified when inmates were discharged from the MHCB unit. Case managers saw 80 percent of these inmates within ten days of their discharge. The follow-up of inmates discharged from higher levels of care remained only partially compliant, however, because notification of the return of inmates from DMH was unreliable.

Some inmates, who needed more intensive treatment in the EOP or referral to a higher level of care, did not receive treatment appropriately targeted at their conditions and were not referred elsewhere. (See, for example, case reviews four, eight, 11, and 12 in Exhibit O.)

An increase in the number of EOP inmates in administrative segregation resulted in lengthening waits for transfer to other institutions, longer stays in administrative segregation, reduced confidentiality in clinical contacts, declining staff-to-inmate ratios, fewer available escort officers and a diminishing quality of group treatment for administrative segregation EOP inmates. Issues with the appropriate ceiling of inmates also increased with the growing population. Although clinical recommendations for single and double-celling were made by the IDTT, implementation of the recommendations was chaotic. Practices of both mental health and custody staff with regard to single and double-celling were inconsistent and misunderstood.

The number of EOP inmates in administrative segregation rose from under 40 to over 50 during much of the monitoring round. There were also 85 3CMS inmates in administrative segregation. The EOP capacity was 45 inmates, with five case manager

positions allocated. Four of the case manager positions were vacant, meaning that the unit was staffed almost entirely by contractors. Some clinicians were reassigned from other programs on an *ad hoc* basis to maintain the 1:9 ratio between case managers and inmates. Individual case management contacts were not made in a confidential setting. The quality of groups varied, and some groups observed by the monitor's expert were not therapeutic. Attendance at groups was low. Staff believed that two more escort officers were needed to meet mandates for the treatment of 45 EOP and 85 3CMS inmates.

Lengths of stay were prolonged by case factors that limited available choices for placement elsewhere, such as positive Clark evaluations and SNY designations. Multiple pending disciplinary charges, SHU terms and imminent parole dates also inhibited movement. These factors, moreover, were often compounded by inefficiencies and breakdowns within the institution. Reviewed cases revealed infrequent ICC hearings, lost or stalled paperwork, delayed CSR endorsements and further delays in transfer following endorsements. Staff reported that completed RVRs were not forwarded to correctional counselors, leaving these counselors unaware that disciplinary charges had been adjudicated and the process for transferring the involved inmates could proceed. Another procedural snag occurred when hearing officers presided over both RVR hearings and administrative reviews, an error that required the tainted RVRs to be reissued and reheard.

Misconduct and turmoil in the EOP associated with hoarded canteen items had a corrosive effect on the working alliance between custody and mental health staffs at all levels, from line staff through supervisors and administrators. Correctional officers and inmates in the EOP were disciplined. Distortions of fact and widespread mistrust

b. Non-Compliance

As in the past, the medical records of many inmates recently treated in the MHCB unit did not contain essential information. One institutional audit found no impatient records in the UHRs of five of 16 reviewed inmates.

EOP inmates were not provided adequate treatment. The small amount of structured therapeutic activities offered, fewer than five hours per inmate per week, and the amount received, fewer than three hours weekly, remained a substantial problem. EOP inmates were no longer able to participate in education or hold work assignments outside of the EOP unit. The staff reported that the new restriction was the result of a headquarters' directive that prohibited EOP inmates from mingling with non-EOP inmates. Just 16 percent of all EOP inmates (27) were offered three educational groups, led by case managers, which met for several hours each weekday. Community meetings were not held. Some of the treatment provided reportedly consisted of largely meaningless in-cell activity. Discharges of EOP inmates to the 3CMS level of care were questionable in some cases. In an effort to improve EOP treatment, staff revamped existing groups, made supervisory changes and adopted new methods of identifying inmates who were not doing well.

Case managers did not meet weekly with all mental health caseload inmates housed in administrative segregation. Lengths of stay in administrative segregation were unnecessarily long for some inmates and were attributable both to unavoidable delays and the dilatory processing of disciplinary adjudications and classification changes.

Allegations of abuse and retaliation were voiced by staff and inmates in the EOP unit during monitoring visits in July and again in November. Staff morale in the unit was low and affected treatment adversely. Institutional administrators had appropriately initiated investigations of the allegations of custody staff misconduct raised by mental health staff, as well as inmates. The outcome of these investigations needed to be monitored closely.

Institutional Summary:

RJD floundered early in the monitoring period but seemed to rally somewhat later through some more focused local efforts and with assistance from DCHCS. Few significant improvements resulted, but at least further backsliding was halted. Mental health services in the facility remained deficient in many key areas. The underlying cause of the continuing failure was the institution's inability to attract permanent mental health clinicians or find effective contractors to fill vacant clinical positions.

Medication management improved in two specific areas and inched toward overall progress by once again revising and revising local policy and procedures for the administration of medications. Custody staff also began to be involved in the articulation of improved policies and practices for the distribution of medications. Some concrete steps were undertaken to improve record keeping, respond immediately to pill-line no-shows and ensure that inmates moving within the institution received medication without interruption. Most other medication management problems remained unresolved, pending full implementation of the newly developed local operating policy and procedures.

of an extra 45 minutes to distribute medications in the CMF EOP solved a medication management problem but created a new one by abbreviating EOP programming.

Institutions with an adequate complement of staff in the various mental health and medical positions involved in the distribution and management of medications and cooperation between the mental health and medical disciplines sufficient to collaborate on audits of mutual interest demonstrated visible improvements consistently in medication management. CTF was the only CDCR institution that improved in all areas of medication management during the monitoring period. Inadequate record-keeping and audits in many institutions put the identification and resolution of problems out of reach. Often facilities did not know whether the problems found in too small a sample of surveyed cases reflected isolated incidents or systemic breakdowns.

Staffing, leadership and the articulation of clear policy and procedures were the necessary components of a successful regimen for distributing and managing medications. Few institutions had yet to put all three together, but progress in many of them was discernible. On the other hand, progress in such areas as responses to medication non-compliance and DOT vs. nurse-administered medications seem painfully slow in many facilities, while the overall response to requirements to provide HS medications where clinically appropriate was grossly inadequate in nearly two-thirds of CDCR institutions. The long failure to develop an accurate and reliable department-wide management information system for pharmacy matters remained a continuing liability.

Mental Health Assessments for the Disciplinary Process:

Documentation at the institutional level of mental health input into the disciplinary process continued to develop slowly. The major recording tool was a log of

cases referred for a mental health assessment, which was supposed to capture essential milestones in the preparation of assessments and the outcome of the ensuing disciplinary hearing. Logs were inadequate or incomplete in 14 institutions, including ASP, CAL, CCWF, CEN, CMC, CMF, CRC, CSATF, CVSP, NKSP, PVSP, SCC, VSPW and WSP. The lack of accurate and complete logs often made an evaluation of the process onerous, requiring an alternative review of large quantities of full RVRs to ascertain an institution's compliance with the mandated process. Even that alternative was not always adequate because some facilities (e.g., CAL, CCI, CRC, NKSP) failed to record an inmate's level of mental health care either in RVR logs or individual RVRs.

Documentation of training for personnel in the assessment process, on the other hand, was generally available. Only ASP, CSP/LAC and WSP seemed unable to produce documentation of staff training. MCSP, on the other hand, provided evidence of continuing, as well as initial, training and also had available a useful training video on the assessment process for new hires.

The quality of mental health assessments generally improved during the monitoring period, with some exceptions. Most facilities ensured that the clinician preparing the assessment was not the inmate's primary clinician; the inmate accused of the infraction was generally interviewed; UHRs were regularly reviewed as part of the process; C-files were less frequently examined; a majority of assessments contained some narrative explanation of the possible influence of the inmate's mental illness on the inmate's behavior. Clinicians at DVI were required to complete an assessment worksheet identifying 11 factors possibly affecting an inmate's mental health status, as well as 14 other factors with a potential impact on accountability or the mitigation of sanctions. DVI clinicians, moreover, were required to complete a RVR assessment note for each inmate, detailing the clinician's findings, recommendations and rationale. Hearing officers at RJD reportedly found clinicians' assessments clear, informative and useful, a characterization heard only rarely.

In mid-2004, a CSP/LAC audit found the quality of assessments to be inadequate and prescribed additional training; a follow-up audit in November 2004 noted improvement except in assessments prepared by one clinician, who was subsequently

given an additional dose of training. At CRC, the poor performance of the formal assessment process reportedly was attributed to a local practice of informal consultation between correctional officers and clinicians about caseload inmates charged with infractions. Unfortunately, it was difficult to confirm the existence, much less the effectiveness, of the undocumented informal process.

In most institutions, the task of preparing assessments was spread among several clinicians. An exception was CSP/Sac, where one psych social worker prepared all assessments for a large and complex caseload population. For a while, the preparation of assessments was assigned to one clinician at HDSP, but the function was subsequently dispersed. At institutions with small mental health staffs and only a few RVRs generated by a correspondingly small caseload population, it was often impossible to employ independent clinicians to prepare assessments.

The revisions to the mental health assessment process completed in late 2002 sought to identify when mental illness contributed to misbehavior that resulted in RVRs and help disciplinary hearing officers craft outcomes that reflected the difficulties seriously mentally inmates, especially those in crisis, encountered in controlling their behavior. The original assessment process, as well as the revisions, sought to limit the rote escalation in custody levels of seriously mentally inmates, whose disruptive behavior was attributable, in whole or part, to mental illness. The revisions also recognized that the effort to provide meaningful mental health assessments of all inmates on the MHSDS caseload receiving a RVR imposed an impossible burden on available mental health resources and resulted in largely worthless assessments and/or the abandonment of other essential mental health services. The revisions, then, sought to focus assessments on the

most seriously mentally ill inmates at the MHCB and EOP levels of care, for whom assessments were made mandatory whenever they received a RVR. MHSDS caseload inmates at the 3CMS level of care and non-caseload inmates would not be referred for a mental health assessment unless their behavior at the time of the infraction "would reasonably be considered bizarre, unusual of uncharacteristic for that inmate."

The revised version of the mental health assessment process began to be implemented in institutions in early to mid-2003. After some eighteen months of operation, the number of non-caseload inmates referred system-wide for assessments was small; monitoring teams found fewer than 100 such referrals throughout CDCR. Because of the sheer volume of RVRs written regularly in Level III and IV institutions, it was difficult to assess whether non-caseload inmates, who may meet the criteria in the revised policy for referral, were, or were not, being referred. The size of the representative sample needing to be reviewed to make any tenable conclusion exceeded the resources of the Coleman monitoring effort.

Referral for assessment of 3CMS inmates with RVRs, who met the criteria, was considerably better, but inconsistent. In CSP/LAC, with a 3CMS population in excess of a thousand inmates, no 3CMS inmates were referred during the monitoring period. The decision as to whether a 3CMS inmate needed a mental health assessment was made at CSP/LAC by the employee reporting the behavior, generally a correctional officer, with review by a senior hearing officer. At SVSP, also with a 3CMS population of roughly a thousand inmates, only a handful of 3CMS inmates with RVRs were referred for a mental health assessment. MCSP had just five referrals of 3CMS inmates in all of 2004, while CIW referred three of 144 inmates charged with infractions for an

assessment. CRC referred five 3CMS inmates in the year preceding the monitor's visit, and ASP made none in all of 2004.

The question raised by this data is how many were not referred, who should have been. The answer is not easy to determine. During a three-and-a-half month period reviewed by the monitor, CMC, with a 3CMS population of about a thousand, referred just eight 3CMS inmates for an assessment among 263 3CMS inmates receiving RVRs. CMC, however, was one of five institutions where the monitor during the 15th round of review looked at a representative sample of 3CMS inmates charged with disciplinary infractions, who were not referred for an assessment, to determine whether they should have been referred but were not. Among the reviewed sample of 3CMS cases not referred at CMC, mental health assessments did not appear to be warranted, based at least on the facts reported in the examined RVRs.

The five institutions where the monitor conducted this same monitoring exercise included a reception center (DVI), a facility for female inmates (CCWF), a Level IV institution with a mix of MHSDS programs (PBSP), a Level III institution with a predominantly 3CMS MHSDS caseload (Folsom) and CMC with its large array of MHSDS programs and populations. In all five facilities, after examining a representative sample of 3CMS inmates with RVRs who were not referred, the monitor was able to identify just one inmate who arguably should have been referred, but was not. This initial sampling may indicate simply that looking at RVRs alone is not enough to support a conclusion. Further analysis of the issue and testing is needed. This first look, though, did not find lots of 3CMS inmates who met the criteria and were not referred.

371

Conversely, the monitor found in all 32 CDCR institutions extremely few EOP or MHCB inmates who received a RVR and was not referred for a mental health assessment. Based on reviewed documents and observations everywhere in CDCR, EOP and MHCB inmates charged with disciplinary infractions were routinely referred for assessments. In four institutions (CAL, CCI, CEN and HDSP), all MHSDS inmates, whatever their level of care, were automatically referred for an assessment whenever they received a RVR. In CMF, clinicians complained that too many 3CMS inmates, amounting to 79 percent of all 3CMS inmates charged with an infraction, were referred for an assessment.

Other complicating variables included the wide diversity among institutions in the overall number and nature of RVRs issued and the function or mission of different facilities. Reception centers, for example, seemed to generate fewer RVRs, at least for MHSDS inmates, than other facilities. Some institutions with substantial numbers of 3CMS inmates (e.g., ASP, CTF and PVSP) apparently issued few RVRs to caseload inmates. Desert facilities with small MHSDS caseloads obviously rarely issued RVRs to caseload inmates.

Variations in the accuracy and reliability of data, as well as disparities in the periods for which information was kept and provided to the monitor during the 15th round of review, made it difficult to calculate the total of cases referred for assessment and the percentage of cases in which clinicians found inmates' behavior to have been influenced by their mental illness. Analysis of the complex available data suggested that, not surprisingly, behavior was traced in part or whole to mental illness for the bulk of EOP and MHCB inmates for whom an assessment was prepared; the percentage was

372

smaller for assessed 3CMS inmates. In SQ, for example, where assessments were prepared for all EOP inmates and 16 percent of 3CMS inmates with RVRs, clinicians found mental illness to be a factor in almost all EOP RVRs and about half of 3CMS assessments. At WSP, where fewer assessments were requested and prepared, 76 percent reportedly cited mental illness as contributing to the assessed behavior. This high percentage was impossible to confirm because the C-files for transferred reception inmates, the major group of RVR recipients at WSP, were no longer available in the institution.

Most facilities, especially those with a substantial population of caseload inmates at the EOP and MHCB levels of care, kept better data on the outcome of cases in which an assessment was prepared and submitted to a hearing officer. The information available on outcomes indicated that somewhere between one-third and one-half of assessments resulted in some sort of modification in the outcome of the disciplinary process, whether through dismissal of or reduction in the charge or a reduction in the sanction imposed.

The range of attention given to assessments varied considerably. In CSP/Sac, 40 percent of assessments resulted in reductions in charges or sanctions; MCSP, in a shorter period and with fewer assessments, documented reductions in charges or penalties in over 80 percent of submitted assessments. Even in SCC, where the number of assessments prepared declined sharply, reductions occurred in ten of 13 cases with an assessment, compared with four reductions among 38 assessments in the preceding monitoring period. In CIM, the monitor determined that reductions occurred as a result of the assessment in nine of 15 randomly selected and reviewed RVRs.

Hearing officers in CMC consistently considered assessments, reduced charges and reductions when considered appropriate and documented their reasons for rejecting assessments. PBSP had established an explicit presumption in favor of accepting a clinician's mental health assessment and required a hearing officer to detail in writing the reasons for a rejection of a clinician's finding.

On the other hand, in CSP/LAC, where hearing officers documented their consideration of assessments in 65 percent of cases where assessments were filed, reductions occurred in roughly 14 percent of cases with an assessment. Hearing officers in CSP/LAC sometimes looked erroneously at the inmate's behavior during the hearing to determine impact of the behavior at the time of the offense, misread or misunderstood clinicians' input or, more rarely, sought to apply a not-guilty-by-reason-of-insanity standard during the hearing. In a number of other institutions, including CAL, CEN, ISP, NKSP and PVSP, hearing officers did not document their consideration of assessments and only infrequently reduced charges or sanctions. Most of these facilities had small MHSDS caseloads and limited opportunities for preparing and considering assessments. Some other facilities (CCWF, CIW,CMF, CSP/Solano, CSP/Corcoran, Folsom, HDSP and WSP) reported that hearing officers considered assessments and reduced charges and/or sanctions, but lacked sufficiently accurate, complete or reliable data to confirm the reports.

During the monitoring period, SVSP recognized that its assessment process was inadequate and took steps to improve it. After an audit by the associate warden for healthcare of a small number of cases involving assessments, the need for additional training on the process was clear, and specific directives were issued to facility

captains and chief disciplinary officers to supervise the process more closely. When the improvement anticipated from these measures did not occur, a senior correctional counselor was assigned to review all RVRs with the authority to recommend that they be reheard, reissued or referred for a mental health assessment. When an audit in CCI indicated that hearing officers did not regularly incorporate mental health assessments into their findings and dispositions, the institution conducted follow-up training. The provided training focused on the mitigation of penalties as a potential response to a determination that mental illness influenced the behavior of accused inmates. Local documentation indicated that 19 hearing officers received the training during a three-day period. Among other steps designed to improve the performance of its assessment process, DVI developed a worksheet that required hearing officers to reach a determination and document their conclusion on each aspect of the disciplinary infraction, including mental health. Although the effects of these adjustments remain to be determined, all of them represent a useful example of the conjunction between quality assurance and a specific substantive issue.

The overall impact of the still-developing revised mental health assessment process has not yet been as significant as was hoped. Certainly no perceptible plunge in the number of EOP inmates in administrative segregation or PSUs has occurred. On the other hand, emerging indications of indirect impact are encouraging. For example, during the 17 months between January 2004 and May 2005, while the overall MHSDS population increased by approximately 7.5 percent and the EOP population increased by nine percent, the number of EOP inmates in PSU or administrative segregation grew by just six inmates from 659 to 665, while the

375

percentage of EOP inmates in a PSU or administrative segregation unit actually declined from 19.9 percent to 18.4 percent. When every other category of population seemed to be expanding inexorably, this slight downturn may be more significant than it appears. Local implementation of the assessment process, moreover, was progressing further in institutions with substantial mental health programs and population, while the impact of the assessment process was marginal in facilities with few mental health programs and inmates. As clinicians in facilities with large MHSDS caseloads become more comfortable with the assessment process and hearing officers are better trained to use assessments effectively, there is reason to hope that the impact of the assessment process will expand.

Transfers:

During the monitoring period, transfers to more intensive levels of mental health programming and treatment deteriorated sharply and widely. A long-suspected under-utilization of Department of Mental Health (DMH) beds by CDCR was confirmed by the Unidentified Needs Assessment (UNA) conducted jointly by CDCR clinicians and the monitor's experts, which was completed in March 2005. Meanwhile, the availability of Mental Health Crisis Beds (MHCBs), the department's sole internal resource for providing short-term crisis care for unstable and suicidal inmates, underwent a shrinkage that became by mid-2005 a critical issue with severe impact on CDCR's most seriously mentally disordered inmates. This issue remains unresolved. Also during the monitoring period, the waiting list for the admission to Psychiatric Service Units (PSUs) for EOPs with a SHU term, imposed on inmates who are viewed as a danger to themselves or others, expanded steadily, and mental health caseload inmates continued to spend long

376

# EXHIBIT H

1   PRISON LAW OFFICE                        BINGHAM, McCUTCHEN, LLP
    DONALD SPECTER Bar No.: 83925            WARREN E. GEORGE Bar No.: 53588
2   STEVEN FAMA Bar No.: 99641               Three Embarcadero Center
    KEITH WATTLEY Bar No.: 203366            San Francisco, California  94111
3   General Delivery                         Telephone: (415) 393-2000
    San Quentin, California  94964
4   Telephone: (415) 457-9144

5   ROSEN, BIEN & ASARO, LLP                 HELLER, EHRMAN, WHITE &
    MICHAEL W. BIEN Bar No.: 096891          McAULIFFE
6   JANE KAHN Bar No.: 112239                RICHARD L. GOFF Bar No.: 36787
    THOMAS NOLAN Bar No.: 169692             701 Fifth Avenue
7   155 Montgomery Street, 8th Floor         Seattle, Washington  98104
    San Francisco, California  94104         Telephone: (206) 447-0900
8   Telephone: (415) 433-6830

9   THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
10  CLAUDIA CENTER Bar No.: 158255
    LEWIS BOSSING Bar No.: 227402
11  600 Harrison Street, Suite 120
    San Francisco, CA  94107
12  Telephone:  (415) 864-8848

13

14  Attorneys for Plaintiffs

15              UNITED STATES DISTRICT COURT

16            EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN,                   )   No.:  Civ S 90-0520 LKK-JFM
                                     )
19        Plaintiffs,                )   **DECLARATION OF JANE KAHN IN**
                                     )   **SUPPORT OF PLAINTIFFS'**
20  vs.                              )   **OBJECTIONS TO DEFENDANTS' IN-**
                                     )   **PATIENT AND MHCB BED PLAN**
21  ARNOLD SCHWARZENEGGER, et al.,   )
                                     )   **HEARING**
22        Defendants                 )
                                     )   Date:        April 26, 2006
23                                   )   Time:        3:30 P.M.
                                     )   Location:    Courtroom 4
24  _____      )   The Hon. Lawrence K. Karlton

25

26

27

28

1     I, Jane Kahn, hereby declare:

2         1.    I am an attorney admitted to practice law in California and an associate of the

3     law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case.

4     I have personal knowledge of the matters stated herein and if called as a witness I could and

5     would competently so testify. I make this declaration in support of Plaintiffs' Objections to

6     Defendants' In-Patient and MHCB Bed Plan ("Plaintiffs' Objections").

7                Defendants Current Overcrowding and Understaffing Problems

8         2.    The CDCR is becoming increasingly overcrowded. Attached here as Exhibit A

9     is a true and correct copy of the CDCR's Spring 2006 Population Projections. According to

10    the Executive Summary, the population projections in the report have increased substantially

11    over the Fall 2005 Population Projections. The Spring 2006 Population Report projects a June

12    2006 population that is 2,865 (1.7 percent) higher than the Fall 2005 Population Projection

13    defendants used in developing their bed plans, a June 2007 population of 177,738, which is

14    5,719 (3.3 percent) higher than the Fall 2005 Population Projections, and a June 2011

15    population of 193,195, which is 11,721 (6.5 percent) higher than Fall 2005 Population

16    Projections. The Legislative Analyst's Office ("LAO") recently issued an analysis of the

17    CDCR's budget request which confirmed the higher-than-anticipated increase in inmate

18    population. The LOA Report on Coalinga notes that by 2006 the patient population was

19    projected to be about 680 patients, however, due to delayed staffing efforts, the patient

20    population was well below the number assumed in January 2006. DMH reportedly advised

21    the LOA that soon after the *Plata* ruling, efforts to recruit and hire additional clinical staff at

22    Coalinga became difficult in part because compensation levels at Coalinga were not

23    competitive with nearby prisons. The LAO Report indicated that recent caseload information

24    indicates that none of the CDCR 50 beds have been occupied. Attached hereto as Exhibit B is

25    a true and correct copy of excerpts from the LAO Report at D-33-35 and the Analysis of the

26    2006-2007 Budget Bill, pages 1-7.

27         3.    The leadership of the CDCR has issued several memoranda in recent months

28    concerning the current overpopulation crisis. Attached hereto as Exhibit C is a true and

1    correct copy of an October 25, 2005 Memorandum by CDCR Director of Adult Institutions

2    John Dovey. The Memorandum reports that the "historic" population high of 166,148 at that

3    time (the population has since surpassed 170,000) "has caused significant population

4    pressures resulting in public safety concerns for the CDCR" and requires "unprecedented

5    recommendations to modify a variety of correctional operations."

6               The Shortage of ICF Beds and Defendants' Plans for Expansion

7         4.    The Unidentified Needs Assessment or "UNA Study" that was completed last

8    year identified a significant shortage of both Level I-III ICF beds and Level IV ICF beds. The

9    Level IV ICF bed shortage is more readily apparent in routine document productions because

10   there has been a large and persistent waiting list of Level IV inmates waiting for placement

11   into the SVPP ICF program. Attached hereto as Exhibit D is a true and correct copy of an

12   April 11, 2006 Report from the CDCR clinical leadership which documents that as of April

13   10, 2006 there was a 123 inmate waiting list for the Level IV ICF program at SVPP.

14        5.    Although there is not a waiting list, there is also a current shortage of Level I-III

15   ICF beds. That current shortfall of ICF beds is documented in the March 30, 2005 UNA

16   study. That study found that there were 435 CDCR inmates with unidentified and previously

17   unmet need for ICF inpatient care. See Exhibit E hereto, March 30, 2005 UNA Study at

18   Attachment A, Table 2. Later estimates were made that 66 percent of this unmet need was for

19   Level IV beds, with the remainder consisting of Level I-III inmates. See 15th Report at 377.

20   That means that the UNA study found unmet need for 145 Level I-III ICF beds. For that

21   reason, plaintiffs disagree with defendants' assertion on page 7 of their plan that there is a lack

22   of demand for lower security ICF beds. Defendants need to take aggressive actions to ensure

23   that all appropriate cases are being referred for inpatient care.

24        6.    The Court has frequently issued orders in the past requiring defendants to study

25   their unmet need for inpatient care. The Court has issued at least eleven (11) Orders on the

26   issue of the adequacy of existing DMH inpatient resources and access to those resources in the

27   last seven years. These Orders include the following: 5/22/98 Stipulation and Order (in

28   exchange for reduction in ASH beds to 200, defendants promised a new SVPP facility by

1   2001 – the facility did not open until 2004 and it has proved impossible to use roughly 25

2   percent of its beds because they are in dorms unsuitable for high custody inmates); 7/29/99

3   Order at 9 (requiring a plan "for expediting the transfers of seriously mentally disordered

4   inmates to programs with the level of care to which they have been referred"); 8/28/00 Order

5   at 1 (ordering implementation of recommendations of Dr. Koson's Report on improving

6   access to DMH beds); 4/4/01 Order (adopting timelines for transfers to higher levels of care);

7   6/27/01 Order at 4 ("On or before July 6, 2001, defendants shall submit to the parties and to

8   the special master the Department of Mental Health inpatient bed usage study and needs

9   assessment"); 3/4/02 Order (granting third extension of time for defendants to complete

10  inpatient bed study until March 31, 2002 and noting that "no extension of the deadline granted

11  in the previous paragraph will be granted for any reason"); 5/7/02 Order at 3 (rejecting study

12  completed in Spring 2002 and requiring defendants to design a new study with the Special

13  Master and his experts and submit a plan for the study by July 31, 2002); 10/8/02 Order

14  (extending time and directing parties to meet with Special Master concerning study of unmet

15  need); 1/19/04 Order at 4 ("defendants shall complete their study of unmet inpatient bed

16  needs by March 31, 2004"); and 7/9/04 Order (setting date of 7/3/04 by which defendants

17  "with the assistance of the special master's experts, shall complete the design for and submit

18  to the special master a plan for the execution of an unmet inpatient bed needs study").

19          7.      Finally, after many failed studies, defendants produced an adequate assessment,

20  the March 30, 2006 UNA plan. Attached hereto as Exhibit E is a true and correct copy of

21  Exhibit E from that study, which projected defendants' need for various types of ICF and APP

22  beds for several years into the future. Also attached as part of this exhibit is a true and correct

23  copy of an updated version of this chart provided by defendants in May 2005 projecting a

24  higher need for beds at all levels of care based on updated population projections.

25          8.      While the March 30, 2005 report contained an appropriate assessment of the

26  scope of the problem, it also included a deeply flawed plan to meet the identified need for 400

27  additional acute and intermediate beds. The plaintiffs provided defendants with detailed

28  objections to the UNA plan in a letter dated April 27, 2005. Attached hereto as Exhibit F is a

1 true and correct copy of plaintiffs' April 27, 2005 letter. Special Master Keating and his

2 experts also provided objections in a conference call on the plan.

3      9.    After the plaintiffs and the Special Master shared their objections with

4 defendants, the Special Master gave defendants a new deadline of August 15, 2005 for

5 submitting a revised plan. On August 15, 2005, defendants submitted a second plan to meet

6 the need identified in the March 2005 study. The second plan was also inadequate. Plaintiffs

7 sent letters detailing our objections to the August 15, 2005 plan on August 17, 2005 and

8 August 23, 2005, true and correct copies of which are attached hereto as Exhibit G.

9      10.    The Special Master sent a letter to defendants on August 30, 2005 which also

10 provided defendants with a detailed account of the serious shortcomings of their plan and

11 which noted that he was "deeply dissatisfied with the adequacy of the Department's overall

12 plan." Attached hereto as Exhibit H is a true and correct copy of the Special Master's August

13 30, 2005 Letter. The failure of the August 15, 2005 plan in turn led to the current requirement

14 in the 15th Report that defendants produce yet another plan on or before April 17, 2006.

15      11.    The lack of in-patient intermediate care beds for Level IV inmates has resulted in

16 serious injury and death to members of the plaintiff class. In the Special Master's Draft 2004

17 Report, there were at least two EOP suicides identified where the failure to refer these patients

18 to intermediate in-patient care contributed to the inmate's death. Special Master's Draft 2004

19 Report at 42 and 90. The time to file comments and objections to this Draft Report has

20 expired and neither party objected to these findings.

21      12.    On April 11, 2006, I participated in a phone conference with Special Master

22 Keating, plaintiffs' counsel Michael Bien, Thomas Nolan and Keith Wattley, counsel for

23 defendants and representatives from CDCR. During that phone conference the parties

24 discussed defendants' draft Bed Plan. One of the subjects discussed were the SVSP ICF units

25 that are scheduled for retrofit in 2009. One of the three 36-bed units has already been

26 retrofitted and will be open for occupancy in the summer of 2006. The project was completed

27 in less than eight months. Plaintiffs requested an explanation why the other SVSP units to be

28 retrofitted could not be expedited given the serious Level IV ICF bed shortage. Defendants'

-4-

1    only response to plaintiffs' request were some vague licensing concerns but they agreed to

2    consider plaintiffs' request.  In their Bed Plan filed on April 17, 2006, defendants state that

3    this option was considered and rejected "based on current experience with construction and

4    the time it would take, approximately two years, to make the housing unit licensable even

5    with DHS program flexes".  Defendants' Plan at 18.  Defendants also discussed their plan to

6    close the current Level IV ICF 36-bed unit at CMF and transfer those patients to the new ICF

7    unit at SVSP.  Plaintiffs objected to this plan during the phone conference because of the

8    current shortage of Level IV ICF beds and requested that defendants retain that unit.

9    Defendants indicated that their plans to close the unit were based upon their need to retrofit

10   the unit with air conditioning and other amenities required by licensing authorities.

11   Defendants stated that they are concerned about the heat risks to ICF patients associated with

12   remaining in the P-2 unit at CMF during the hot summer months.  There are a number of

13   serious problems with defendants' plan to transfer these patients to the unit at SVSP and close

14   the unit.  First, defendants plan to close down a critically needed 36-bed Level IV ICF unit at

15   CMF because it lacks air-conditioning even though SVSP is also not air-conditioned.  Second,

16   there is no reason why CMF cannot retrofit another unit that is not currently housing ICF

17   patients for a future unit and retain the current critical program.  Third, using the heat safety

18   measures required by the May 11, 1992 heat injunction in this case, CMF has been able to

19   safely house and treat more than 600 EOP patients for more than 13 years without a single

20   serious heat-related injury or death.  There is no reason to think that DMH will be unable to

21   adopt similarly effective alternative cooling procedures for its ICF unit this summer.

22        13.  On Friday, October 29, 2004, John Rodriguez, Deputy Director of the

23   Department of Mental Health, testified during the hearing on defendants' motion to modify a

24   court order to close the day treatment program at CMF.  During his testimony regarding the

25   various DMH facilities including Atascadero, Patton State Hospital and Coalinga State

26   Hospital, Mr. Rodriquez testified that "Coalinga will be our highest security facility".  Mr.

27   Rodriguez testified that while hospital police officers provide perimeter security at Atascadero

28   State Hospital, at Coalinga State Hospital, CDCR custody officers provide the perimeter

1   security. Attached hereto as Exhibit I is a true and correct copy of the Reporter's Transcript,

2   Friday, October 29, 2004, at 53. During his testimony, Mr. Rodriguez told the Court that

3   DMH would be able to provide the CDCR with 50 beds at Coalinga State Hospital in

4   September 2005 and an additional 125 beds at either Atascadero or Coalinga once Coalinga

5   was opened. Exhibit I at 44-48. Despite the fact that Coalinga State Hospital has accepted

6   patients, no CDCR patients have yet been transferred to Coalinga State Hospital. Exhibit B,

7   LAO Analysis of 2006-2007 Budget.

8        14.    In two Suicide Reports completed by CDCR's Suicide Case Review Focused

9   Improvement Team in 2005, the failure to refer the Level IV patients to DMH was identified

10  as a serious problem in the case reviews. In the first suicide, which occurred on July 2, 2005,

11  the patient who was housed in the PSU program at CSP-Sacramento, was described as

12  severely mentally ill, un-medicated and not programming in the PSU. Although he was often

13  "considered" for a referral to a DMH level of care, his case manager never referred him. A

14  review of this patient's medical records provided clear evidence of the need for inpatient care,

15  however, because of the shortage of Level IV ICF beds, a DMH referral was likely to have

16  resulted in placement on the lengthy waiting list for an ICF bed. The second suicide involved

17  an EOP patient who was housed in the administrative segregation unit at CSP-Sacramento for

18  322 days. The Suicide Report identified the failure to refer this suicidal and psychotic patient

19  to DMH. Here again, the clinician failed to refer a Level IV patient, who was likely to remain

20  on a waiting list for the DMH bed that he desperately needed. One of the reasons these

21  clinicians failed to refer their patients was probably their knowledge of the unavailability of

22  DMH beds for this Level IV population.

23                    The Shortage of MHCB Beds and Delays In Access to MHCB Care

24       15.    Under the Program Guide requirements, inmates found to be in crisis or at risk

25  for injury to self or others must be placed in a licensed MHCB unit within 24 hours. January

26  2006 Revised Program Guide, Ch. 5, 12-5-3. Some institutions with MHCB units also house

27  inmates experiencing mental health problems in Outpatient Housing Units or "OHUs." OHUs

28  are simply local infirmaries without assigned mental health staff or 24 hour nursing care.

1    Under the Program Guides, OHUs are not permitted to house seriously mentally disordered

2    inmates for longer than 72 hours (or longer than 24 hours if an inmate is determined to be

3    suicidal). January 2006 Revised Program Guide, Ch. 5, 12-5-26-27. Every month, hundreds

4    of critically mentally ill CDCR inmates are referred to MHCB beds that do not exist. 15th

5    Monitoring Report at 394. Defendants have provided the Special Master and plaintiffs with

6    monthly reports documenting the numbers of inmates referred and placed in MHCB beds.

7    Attached hereto as Exhibit J is a true and correct copy of Defendants' Mental Health Crisis

8    Bed-Monthly Reports, for the months of April to July 2005 and January and February 2006.

9    These reports document the number of inmates referred to MHCB beds, the number of

10    inmates placed in an MHCB bed, the days the inmates waited for a placement, and the number

11    of MHCB referrals that were rescinded. For example, in April 2005: there were 227 MHCB

12    referrals, with only 48 of the inmates placed in an MHCB. Of the 48 inmates transferred, only

13    21 cases were transferred within the required timeframes. In February 2006, there were 230

14    MHCB referrals, with only 67 placed in an MHCB. Of the 67 transferred, only 30 were

15    transferred within the required timeframes. Despite the lack of progress in placing inmates in

16    need of MHCB care, defendants have failed to adequately address the serious MHCB bed

17    shortage in their Bed Plan.

18        16.   In July 2005, in response to the MHCB shortage the CDCR issued memorandum

19    to all Wardens, Health Care Managers and Chiefs of Mental Health to standardize procedures

20    for housing inmate-patients in need of a MHCB in alternative settings. Attached hereto as

21    Exhibit K is a true and correct copy of a July 21, 2005 Memorandum entitled,

22    "Standardization of Mental Health Crisis Bed Admission Procedures." The memo is signed

23    by Adult Institutions Director John Dovey and Health Care Services Director Rene Kanan.

24    The July 21, 2005 Memorandum was issued in recognition of the fact that the CDCR was

25    desperately short of MHCB beds and was placing inmates in unsafe, unmonitored settings

26    within institutions without any guidance from CDCR headquarters. The memo instructed

27    institutions to house inmates in need of MHCB care in alternative settings pending MHCB

28    transfer in the following order of preferred locations: Inpatient beds; outpatient housing units;

1    outpatient housing unit overflow cells; large holding cells with water/toilets including, but not

2    limited to "ZZ cells"; large holding cells without water/toilets, such as "Contraband cells";

3    Treatment and Triage area or other clinic examining room; other unit-housing where complete

4    and constant visibility can be maintained; small holding cells that are designed for the inmate-

5    patient to sit or stand may be used for up to four hours; holding cells within the licensed bed

6    area of the CTC. Many of these alternative locations have inappropriate, excessively punitive

7    conditions. None have appropriate clinical staffing.

8        17.    In response to the July 2005 Memorandum, a chart was prepared and distributed

9    to the Special Master and plaintiffs' counsel which identified alternative MHCB waitlist

10   housing for each institution. Attached hereto as Exhibit L, is a true and correct copy of

11   Mental Health Crisis Bed Waitlist Housing Plan by Institution. These alternative housing

12   sites have no clinical staffing. In some of the locations, patients are unable to sit for any

13   period of time and must be rotated in and out of the location after a four hour period of time.

14   The result is that every month, many inmates, who have been determined to be suicidal,

15   "remain inadequately observed and poorly treated." 15th Report at 394.

16       18.    My law firm receives inmate correspondence from *Coleman* class members

17   which is reviewed daily by our paralegals. I instructed the *Coleman* paralegals to identify

18   inmates who wrote to our office about suicide watch that occurred outside of an MHCB

19   setting since August 2005. In order to better understand the experience of these inmates, we

20   developed a questionnaire that we sent to inmates who wrote to us about their experiences on

21   suicide watch in holding cells, ZZ cells, adseg units, and contraband cells. Attached hereto as

22   Exhibit M is a true and correct copy of a blank Suicide Watch Questionnaire. We received

23   approximately 23 questionnaires in response from inmates housed at SVSP, CCI, Corcoran,

24   Lancaster, and Kern Valley State Prison who were placed on suicide watch or suicide

25   precautions. Fourteen of these inmates were housed in contraband observation rooms, ZZ

26   cells, adseg housing, and holding cells in various locations throughout the prisons. Eleven

27   reported that they were not provided with mattresses and seven reported that they were not

28   provided with a suicide smock during their suicide watch. All but one inmate reported that

-8-

1   they would not tell custody or clinical staff again if they were feeling suicidal because the

2   "suicide watch" conditions they experienced were so punitive.  They described feeling

3   humiliated and cold in their "naked" state.  We also received numerous letters from inmates

4   who were placed in alternative sites on suicide watch who did not return questionnaires who

5   also reported that they were not provided with appropriate suicide smocks, mattresses and

6   blankets.  The overall impression from the questionnaires and correspondence regarding the

7   suicide watch conditions in the alternative locations was that patients found the conditions

8   oppressive and non-therapeutic.  Under those circumstances, a suicidal inmate is quite likely

9   to avoid reporting suicidal feelings.

10          19.    I accompanied the *Coleman* monitors on a tour of CSP-Sacramento on December

11  19-20, 2005.  During that tour we were informed that the institution had been using alternative

12  ZZ cells (holding cells with toilets that are located in corridors outside of housing units) since

13  Spring 2005 for suicide watch because of inadequate MHCB beds at the institution.  CSP-

14  Sacramento has both an MHCB and an OHU, yet the clinical staff reported that both of these

15  units were often full and they were forced to place inmates on suicide watch in the ZZ cells.

16  In an effort to standardize the suicide watch procedures in the ZZ cells, CSP-Sacramento

17  developed a Post Order for the correctional officers who are assigned to conduct suicide

18  watch on inmates who are placed in ZZ cells on suicide watch.  Attached hereto as Exhibit N

19  is a true and correct copy of the CSP-Sacramento ZZ Cell Post Order. There is no clinical

20  staffing assigned to the ZZ watch.  We received letters from several inmates placed on suicide

21  watch in ZZ cells at CSP-Sacramento in August 2005 who reported that they were not

22  provided with mattresses, but were only given a blanket to sleep on during their placement in

23  the cell.

24          20.    In the summer of 2005, at Mule Creek State Prison, administrative segregation

25  units were used for housing and observation of suicidal inmates.  The custody staff's union

26  representative complained to Warden Campbell and the Chief Psychologist about the

27  dangerous suicide watch procedures employed in that housing unit.  Attached hereto as

28  Exhibit O is a true and correct copy of the August 3, 2005 Letter to the Mule Creek State

1   Prison Health Care Manager and Warden from CCPOA President Latimore, regarding the use

2   of administrative segregation housing for suicidal inmates.

3       21.    The lack of adequate MHCB beds in 2004 and 2005 has resulted in the housing

4   of psychotic, dangerous patients in OHU beds who should be housed in licensed MHCBs

5   because of their serious mental health conditions. I reviewed the medical and central files of

6   two of these patients – both of whom were admitted to OHUs on suicide watch. The first

7   inmate, who severely injured himself while monitored on suicide watch, was transferred to the

8   reception center at San Quentin on September 8, 2005 (after a ten-month commitment at

9   Atascadero State Hospital to restore his competency to stand trial.) Upon arrival in the

10  reception center, he was initially classified as 3CMS level of care, but was quickly reclassified

11  as EOP. He was placed in administrative segregation when he arrived at the reception center

12  for his safety but was not provide with the ten hours of therapeutic activities mandated for

13  EOP patients housed in these units. During his stay in the unit, he was described by clinical

14  staff as floridly psychotic, agitated, and with unkempt appearance. He refused most out of

15  cell activities, including showers and yard. Despite his clear decompensation, there was no

16  effort made to refer him to an MHCB bed, DMH or to put him on involuntary medications.

17  There is no evidence of any clinical contact with this patient after November 1, 2005. On

18  November 20, 2005, he was admitted to the OHU at San Quentin because he was behaving in

19  an acutely psychotic manner and had put fecal matter in his eyes, on his body and had

20  bruising on his face. San Quentin does not have an MHCB unit. The inmate was placed on

21  suicide watch with custody officers observing him on a video monitor. Plaintiffs were

22  provided with a copy of the video tape made of this suicide watch. I watched the video tape

23  and observed this inmate being placed in the OHU in his tee-shirt, which he removed and

24  gave to the officer. He was left naked in the cell with a blanket and mattress on the floor. He

25  did not wrap the blanket around his body, but left it lying on the floor. He alternated between

26  sitting on the floor rocking back and forth, standing and sitting quietly. At one point, he put

27  his fingers in his eyes and appeared to gouge them. In the video, he is then observed for the

28  next hour and twenty minutes to be rocking back and forth, stumbling around the cell, and

1  holding his head and eyes in pain before an officer or medical technician comes to his food

2  port and speaks to him.   When an officer or other staff person finally notices his injuries, it

3  appears that he is told to put his hands through the food port to "cuff up", but he is unable to

4  do so at first.  He sits down facing the door backwards but cannot reach the food port sitting.

5  He then stands up and tries to put his hands through the food port facing forward, but pulls his

6  arms out and turns around to be cuffed.  Finally, the door is opened and he is removed from

7  the cell.  The patient's medical records indicate that he was transported to Marin General

8  Hospital where the doctors attempted to save his eyes but he was left blinded.

9          22.     The second file that I reviewed concerns an EOP patient, with previous suicide

10  attempts, who was placed on suicide watch and died in the OHU at DVI reception center on

11  November 30, 2005.  This patient was well known to DVI clinical staff because he had been

12  admitted to the OHU repeatedly over the years, however, during previous admissions when

13  there were adequate MHCB beds he was quickly transferred to a prison with an MHCB unit.

14  (See, e.g. DVI OHU to Corcoran MHCB on 1/18/02 to 1/24/02; DVI OHU to SATF MHCB

15  on 9/10/02 to 10/7/02; DVI OHU to Solano MHCB on 4/4/03 to 4/15/03 and DVI OHU to

16  Mule Creek MHCB on 4/30/03 to 5/5/03.)  This patient had been involuntarily medicated

17  within CDCR in both 2002 and 2003 because of a history of medication non-compliance and

18  serious decompensation when off his medications.  Unfortunately, when this EOP patient

19  returned to the reception center at DVI in August 2005, there were insufficient MHCB beds

20  system-wide, and despite persistent psychotic and suicidal symptoms, he was kept in an OHU

21  bed at DVI for twelve days (8/15/05 to 8/26/05).  During this OHU admission, his cell was

22  described as decorated with excrement and food, he was described as wearing rolled up paper

23  in his ears and around his penis, yelling in a psychotic state.  This EOP patient paroled out in

24  early November 2005 and was returned to custody as a parole violator on November 17, 2005

25  in a psychotic state.  He was placed in the DVI OHU when he arrived in the reception center

26  and was retained there for a week despite *Coleman* mandates prohibiting the housing of

27  psychotic, suicidal inmates in OHUs for more than 24 hours.  He was noted to be in a manic,

28  agitated and delusional state even five days after his admission, yet he was not referred for

1   transfer to an MHCB bed at that time. This EOP patient was discharged two days later, with

2   slightly pressured speech, and a diagnosis of Bipolar, Manic, severe with psychotic features.

3   The OHU, where this patient was repeatedly housed, did not have the clinical capability to

4   initiate the involuntary medication petition that was necessary for this patient. On November

5   29, 2005, he was admitted to the OHU again because he reported he wanted to hurt himself,

6   he appeared confused, and the clinician noted that the housing unit officer stated that the

7   inmate had no sense of "where he was or what he was supposed to do." He was admitted to

8   the OHU at 9:45 a.m. for suicide observation by a video camera monitoring system.

9   Defendants provided plaintiffs with a video tape containing the first two hours of the suicide

10  watch. The remaining 19 hours of suicide watch were not recorded as required by defendants'

11  own suicide watch procedures or the tape was lost. On the video-tape that I viewed, this EOP

12  patient was placed in the OHU cell in a suicide smock without a mattress or blanket. The cell

13  had no toilet except for a hole in the floor. The patient appeared quite agitated and rarely sat

14  still for more than a minute or two at a time. According to the Incident Report provided in the

15  medical records, when the patient was discovered dead in his OHU cell at 6:45 a.m., he was

16  described by the responding officer as rigid with rigor mortis, pale, cold to the touch with

17  mottled pooled extremities due to lack of blood flow. The RN's note indicated that no CPR

18  was undertaken because based upon the rigor mortis and pooling of the blood, which takes

19  about 3-4 hours to manifest, the patient had already been dead for a significant amount of time

20  when he was found at 6:45 a.m. Clearly the inadequate clinical and suicide watch procedures

21  in these OHU units make them inappropriate for the housing of suicidal and psychotic

22  patients. Defendants' failure to provide for an immediate solution to the inadequate MHCB

23  beds system-wide will result in additional pain and suffering to *Coleman* class members who

24  require crisis bed care not available in OHU, holding cells, ZZ cells, and other alternative

25  settings utilized by CDCR to house suicidal and decompensated inmates.

26                          The CDCR's Current Suicide Rate

27       23.    Under my supervision, paralegals in our firm track all CDCR suicides in a

28  database. We add the name of each inmate who commits suicide, and other key data relevant

                                          -12-

1    to the suicide to the database when we receive suicide notifications and suicide reports from

2    the defendants. We also cross-check our database against the Special Master's and

3    defendants' annual suicide reports, and make adjustments to our tracking data where

4    necessary. According to our current tracking log, which does not count several deaths whose

5    cause is currently reported to be unclear (cases which may upon further review turn out to be

6    additional suicides), in 2005, plaintiffs counted 41 suicides in the CDCR. We did not include

7    four deaths reported by defendants as non-suicides, which we have not yet reviewed. We

8    have reviewed two additional deaths reported by defendants as non-suicides, and on the basis

9    of our review of the inmate-patients' central and medical records (and the CDCR's death

10   reviews), we have decided to include these two deaths in our suicide count:  (1) the 9/25/05

11   death of a 3CMS patient, with suicidal history, housed on death row at San Quentin who

12   overdosed on his medications; and (2) the 7/02/05 death of an EOP patient, with suicidal

13   history, who was floridly psychotic and died by suffocation in his cell.  National suicide rates

14   reported by the Bureau of Justice Statistics are based on the rate per 100,000 inmates, with the

15   state prison suicide rate figured at 14 per 100,000 inmates as reported by the Bureau of Justice

16   Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails, which was

17   issued by the U.S. Department of Justice in August 2005.  Attached hereto as Exhibit P is a

18   true and correct copy of the Bureau of Justice Statistics Special Report on Suicide and

19   Homicide in State Prisons and Local Jails. My staff calculated the CDCR suicide rate for

20   2005 by taking the ratio of 2005 suicides to the total current population of male CDCR

21   inmates (41/156,374) and multiplying that ratio by 100,000.  The resulting CDCR suicide rate

22   per 100,000 is 26.21, which rounds down to a rate of 26 per 100,000, which is almost double

23   the state prison rate reported by the U.S. Department of Justice in August 2005.

24       24.   In 2003, there were 36 suicides in CDCR in a population of approximately

25   155,722 resulting in a suicide rate of 23.1 per 100,000.  Special Master's Draft Suicide Report

26   at 9. In 2004, there were 26 suicides in CDCR in a population of approximately 163,346

27   resulting in a suicide rate of 15.9 per 100,000.  *Id.*  In 2005, the suicide rate as figured above

28   was 26 per 100,000.  In 2005, plaintiffs received notification of eight suicides that occurred

-13-

1    during the first three months of 2005.  By contrast, in 2006, during the first three months of

2    the year, plaintiffs had already been notified of thirteen suicides that occurred within CDCR.

3                    The Severe EOP Bed Shortage Is Harming Patients

4            25.    On March 2, 2006, the Court ordered defendants to respond to plaintiffs'

5    contention in their objections to the 15th Round Monitoring Report "that the percentage of

6    mentally ill inmates awaiting treatment in Reception Centers is approaching unconstitutional

7    levels and they ask that defendants be required to create treatment programs for enhanced

8    outpatient inmates in the Reception Centers." 3/2/06 Order.  In response defendants informed

9    the Court that CDCR was "developing a plan to increase EOP capacity at several institutions

10   in order to facilitate the timely transfer of EOP inmate-patients out of the reception centers

11   and into a more suitable treatment environment." Defendants' Response to Plaintiffs' Request

12   for Court Orders Re: Psych Tech Rounds and Reception Center Care, dated March 17, 2006,

13   Ex. A, at 2.

14           26.    On April 17, 2006, defendants filed with the Court their Statewide Mental Health

15   Bed Plan.  Enclosure II to Defendants' Plan is a chart entitled "Closing the Gap" which

16   indicates that the CDCR has a current shortfall of 1180 EOP beds, including a shortfall in

17   Level IV EOP beds of 620 beds.  The Bed Plan provides for an additional 352 EOP beds in

18   2006-2007, as well as the 115 Level IV SNY EOP beds at Mule Creek State Prison that

19   defendants previously announced to the Special Master and plaintiffs more than a year ago

20   during Policy Meetings in February 2005 and July 2005.  In fact, plaintiffs were then told that

21   the MCSP expansion would be completed in the Summer 2006.  Only in 2011 does

22   defendants' Bed Plan provide for an additional 150 EOP beds.  The Bed Plan makes no other

23   provisions for the immediate shortage of 1090 EOP beds, which will impact significantly on

24   reception center EOP patients who receive inadequate mental health services while they wait

25   for transfer to EOP beds that defendants have neither planned nor built.

26           27.    Pursuant to the January 19, 1999 Court Order, the CDCR provides monthly

27   reports on the bed capacity and actual population of EOP and CCCMS patients located at each

28   CDCR institution.  Attached hereto as Exhibit Q is a true and correct copy of the most recent

1   monthly report provided by CDCR to the Special Master and plaintiffs, dated March 22, 2006,

2   reporting the Mental Health Population data download for December 30, 2005. According to

3   this data, there were at least 556 EOP patients housed in the CDCR reception centers in

4   December 2005 waiting for transfer to an EOP program. Although the Court-ordered transfer

5   timelines require that EOP patients be transferred to EOP treatment programs within 60 days,

6   most of the reception center EOPs are not transferred to programs in a timely fashion. 15th

7   Report at 396-97. (See, e.g. CCI: 11/30/05 RC Data reporting 5 overdue transfers with

8   pending average length of 103.50 days; CIM: 11/30/05 RC Data reporting 22 overdue

9   transfers with pending average length of 121.18 days; CIW: 11/30/05 RC Data reporting 9

10  overdue transfers with pending average length of 93.44 days; DVI: 11/30/05 RC Data

11  reporting 16 overdue transfers with pending average length of 128.50 days; HDSP: 11/30/05

12  RC Data reporting 2 overdue transfers with pending average length of 101.00 days; NKSP:

13  11/30/05 RC Data with 37 overdue transfers with pending average length of 235.16 days;

14  RJD: 11/30/05 RC Data with 18 overdue transfers with pending average length of 103.39

15  days; SQ: 11/30/05 RC Data with 45 overdue transfers with pending average length of

16  175.11 days; Wasco: 11/30/05 RC Data with 44 overdue transfers with pending average

17  length of 137.41 days. Attached hereto as Exhibit R is a true and correct copy of the most

18  recent reception center data provided by defendants pursuant to the January 19, 1999 Court

19  Order.) The reason for these delayed transfers is no longer a mystery. There are simply

20  insufficient EOP beds available to transfer reception center EOP patients to and while these

21  EOP patients wait for available treatment beds they are provided with minimal care and suffer

22  mental health harm.

23          28.     On April 6, 2006, I traveled to CSP-Lancaster with a paralegal from our office to

24  interview EOP and 3CMS patients housed in the reception center and mainline facilities. We

25  interviewed four EOP reception center patients and reviewed their medical and central files.

26  Three of the inmates had been in the reception center for at least three months. One had

27  arrived in February 2006. None of these EOP patients had documents in their files indicating

28  that they had been endorsed for transfer to an EOP program. In fact, three of the four reported

-15-

1   that their correctional counselor had informed them that they would be paroling out of the

2   reception center. One patient, a 19 year old who had arrived in December 2005, seemed

3   unaware of his surroundings and his medical records reflected this level of dysfunction. All

4   of these patients reported minimal mental health care – limited to a weekly case manager

5   contact and medical review by a psychiatrist – which was confirmed through our file reviews.

6   EOP programming in a mainline prison includes at least ten hours of weekly therapeutic

7   activities. During the interviews, all of these inmates reported that they are cell fed, and are

8   only out of cell for showers three times a week, yard once a week, and their medical

9   appointments. Some of their clinical appointments were cell-front. These patients are

10   provided with less out of cell time than inmates who are housed in administrative segregation.

11   15 CCR §3343(g) and (h) (requiring ten hours of yard per week for adseg inmates). One of the

12   patients that we interviewed was a 19 year old returned to custody in December 2005, who

13   was diagnosed as Psychotic, with a possible Organic Brain Injury. He believed that he was

14   paroling out in June 2006, although according to the clinical notes he had some confusion

15   over whether he was in prison or a hospital setting. He had several crisis admissions for

16   suicidal ideation, and was doing poorly in the reception setting. He continued to giggle during

17   most of the interview and focused on getting contact information for his mother. Another

18   EOP patient that we interviewed was a 21 year old returned to custody in January 2006, with a

19   diagnosis of Psychotic Disorder, who was described by his clinician as bizarre and catatonic,

20   with paper stuffed in both ears. He brought "writings" to the interview that were illegible and

21   was quite difficult to interview. The failure to transfer these EOP reception center patients in

22   a timely manner significantly impacts on their access to adequate mental health treatment,

23   including adequate diagnoses, medication management and symptom stabilization.

24        29.   One of the 2005 suicides involved an EOP patient housed in the reception center

25   at California Institute for Men. This patient had a history of multiple suicide attempts and was

26   housed in the reception center from June 16, 2005 until his suicide on November 1, 2005.

27   The Suicide Report prepared by CDCR identified multiple problems with his care including

28   the failure to refer him to DMH, problems with suicide risk assessments and missing custody

1    suicide prevention follow-up hourly checks.  The Suicide Report did not identify the failure to

2    provide this EOP patient with appropriate EOP level of mental health care while he was

3    housed in the reception center for more than four months during which time he

4    decompensated and became acutely suicidal.  The housing of EOP patients in reception

5    centers without the provision of EOP level of care has not been identified by CDCR as the

6    clear constitutional failure that it is.

7         I declare, under penalty of perjury, that the foregoing is true and correct, and that this

8    declaration is executed in San Francisco, California on April 21, 2006.

9                                    Respectfully submitted,

10

11

12                                   Jane Kahn
                                     Rosen, Bien & Asaro
13                                   Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT, AND THAT THIS DECLARATION OF JANE
KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' IN-PATIENT AND MHCB BED PLAN, NO.: CIV S 90-0520 LKK-JFM

# EXHIBIT I

*J. Michael Keating, Jr.*
**Office of the Special Master**
*Coleman v. Schwarzenegger*

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
E-mail: jmichaelkeatingjr@yahoo.com

May 9, 2006

<u>**VIA E-MAIL**</u>

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd, Suite M
San Rafael, CA 94901

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

Lisa A. Tillman, Esquire
Deputy Attorney General
Office of the Attorney General
1300 I Street
P. O. Box 944255
Sacramento, CA 95814

Michael Stone, Esquire
California Dept. of Corrections
Legal Affairs Division
1515 S Street, Room 314S
Sacramento, CA 95814-0001

Re:    Coleman et al. v. Schwarzenegger et al.,
<u>No. CIV S-90-0520 LKK JFM P</u>

Counselors:

Enclosed for your convenience is a copy of redlined pages showing changes in the final
version of the <u>Report on Suicides Completed in the California Department of Corrections
in Calendar Year 2004</u> from the draft sent to you in March.

Counselors
Page 2
May 9, 2006


If you have any questions, give me a call.


Sincerely yours,

　　　　/s/

J. Michael Keating, Jr.
Special Master

Enclosures

cc.　　Peter Farber-Szekrenyi,　Director, DCHCS
　　　　Matthew A. Lopes, Esquire.

*J. Michael Keating, Jr.*
**Office of the Special Master**
<u>*Coleman v. Schwarzenegger*</u>

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
E-mail: jmichaelkeatingjr@yahoo.com

July 12, 2006

<u>**VIA E-MAIL AND PRIORITY U.S. MAIL**</u>

Donald Specter, Esquire
Prison Law Office
2173 East Francisco Blvd, Suite M
San Rafael, CA 94901

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery St., 8th Fl.
San Francisco, CA 94104

Lisa A. Tillman, Esquire
Deputy Attorney General
Office of the Attorney General
1300 I Street
P. O. Box 944255
Sacramento, CA 95814

Michael Stone, Esquire
California Dept. of Corrections
Legal Affairs Division
1515 S Street, Room 314S
Sacramento, CA 95814-0001

Re:    Coleman et al. v. Schwarzenegger et al.,
<u>No. CIV S-90-0520 LKK JFM P</u>

Counselors:

Enclosed is a copy of a draft of the <u>Report on Suicides Completed in the California</u>
<u>Department of Corrections in Calendar Year 2004</u>.

You have until April 14, 2006 to submit any objections to this report.

I am not enclosing an un-redacted compilation of inmate names, because I think we all
have a list that matches CDC numbers with the names of the deceased inmates.   If
anyone needs the list, e-mail me and I will send it to you.

Counselors
Page 2
March 14, 2006


If you have any questions, give me a call.


Sincerely yours,


J. Michael Keating, Jr.
Special Master

Enclosures

cc.    Peter Farber-Szekrenyi,  Director, DCHCS
       Matthew A. Lopes, Esquire.

Raymond F. Patterson, M.D.
1904 R Street, N.W.
Washington, DC  20009
Telephone:  301-292-3737
Facsimile:  301-292-6272

### REPORT ON SUICIDES COMPLETED
### IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS
### IN CALENDAR YEAR 2004

## I.  Overview and Introduction

This is the sixth annual report on completed suicides in the California Department of Corrections (CDC)[1] submitted as part of the Special Master's continuing review of the defendants' overall compliance with court mandated remedies and requirements in Coleman v. Schwarzenegger.  To set the suicide rate in CDC in some national perspective, past reports have provided statistics on the incidence of suicide in the general U.S. population and correctional institutions.  The most recent data from the U.S. Department of Justice's Bureau of Justice Statistics indicates that state prison suicide rates dropped from 54 per 100,000 inmates in 1980 to 14 per 100,000 in 2002.  This represents a slight increase from the incidence rate of 12 per 100,000 cited in the preceding report on suicides in CDC in 2003.

The data analysis and recommendations provided in this report follow the same format used in these reports of the special master on suicides in CDC since 1999.  The report includes two tables: Table 1 summarizes collected demographic data, while Table 2 provides a summary of mental health information on CDC inmates who completed suicides while incarcerated in 2004.  The tables represent an extreme distillation of the 26 case reviews, which constitute the heart of this report, and provide in graphic form the data on which the summary analysis is based.

The vast bulk of the data captured in this report has been generated pursuant to the defendants' still evolving suicide review process.  The process requires the preparation of a Suicide Report that includes an executive summary and a more detailed narrative, typically with sections covering the suicide incident itself, the medical autopsy, background information, mental health history, medical history, the deceased inmate's institutional functioning and personality dynamics, precipitating events, pre-suicidal functioning and motive for suicide   Sources of information for the various sections may include custody incident reports, death reports, central classification records, uniform

---

[1]  In 2005, the California Department of Corrections was reorganized and incorporated into the larger California Department of Corrections and Rehabilitation.  Throughout this report, the department will be referred to as the California Department of Corrections, the applicable appellation in 2004.

2000 – 15 suicides in a population of approximately 160,855
        resulted in a suicide rate of 9.3/100,000

2001 – 30 suicides in a population of approximately 155,365
        resulted in a suicide rate of 19.3/100,000

2002 – 22 suicides in a population of approximately 158,099
        resulted in a suicide rate of 13.9/100,000

2003 – 36 suicides in a population of approximately 155,722
        resulted in a suicide rate of 23.1/100,000

2004 – 26 suicides in a population of approximately 163,346
        resulted in a suicide rate of 15.9/100,000

## III.  Summary of Observations and Recommendations

From 1999 to 2004 the suicide rate for inmates in CDC ranged from a low of 9.3/100,000 in 2000 to a high of 23.1/100,000 in 2003, compared to the national average for correctional institutions of 12 to 14/100,000 during most of that same time period.  The difference between the national and CDC rates provides a standard against which to measure the department's record in dealing with suicides.  From an incredibly low rate of suicides in 2000 to significantly higher rates in 1999, 2001 and 2003, with intermediate rates in 1998 and 2002, the department has had over this six-year period an average annual rate of suicides per 100,000 inmates of 16.47[2].

This report indicates that 76.9% (20 of 26) of suicides completed in 2004 were foreseeable, preventable or both based on the definitions used in this review and the information that was, or should have been, available to clinical staff.  The findings also confirm that the department's process for developing both local and system-wide corrective responses to deficiencies identified in individual completed suicides continued to improve, but still reflected some significant substantive inconsistencies.

An analysis of the case reviews provided in Appendix B allows some generalizations, many of which are consistent with conclusions reached in earlier annual reports on suicides in CDC.

o   The three suicides among women in 2004 were a shock.  The number surpassed the total number of suicides for women in CDC in the previous 16 years combined.  All three of these suicides were foreseeable or preventable; two of them were both foreseeable and preventable.

---

[2]  These figures on the annual suicide rate differ somewhat from the rates reported in the department's five-year report on suicides.  The department's calculations were based on the average daily CDC population during the given year, while these reports have used the department's population count on the last day of the covered year.

o  In ten of the 26 case reviews of suicides in 2004 (38.5 percent), delays in the immediate initiation of CPR were cited as potentially contributing to successful completion of the suicide. The report on suicides in 2003 led to a mid-2005 court order directing the defendants to develop and implement a policy requiring custody staff trained to do so to provide immediate life support measures, including CPR, in responding to medical emergencies, including suicides. The completeness of the defendants' response has been the subject of court pleadings and negotiation throughout the past six months and will be a focus of monitoring during the 17th compliance review that begins in March 2006.

o  The failure of clinicians to make use of available information to ensure that inmates are fully and appropriately screened, assessed and treated remained a dominant problem. In too many cases, completed suicides occurred when information in a UHR or central file, had it been reviewed by mental health clinicians during interviews with inmates, might have alerted mental health staff to inmates' potential for suicide. The lack of appropriate screening in confidential settings for new intakes into administrative segregation, including the administration of Suicide Risk Assessments, was also an important recurring problem. Both of these problems represent essentially inadequate clinical practices on the part of the department's clinicians, although the second problem often seemed to involve inadequate custody escort resources and private interview space in administrative segregation units.

o  Inadequate treatment interventions included the failure to place inmates in need of more intensive treatment in appropriate mental health programs or units. This failure, which contributed to a number of 2004 suicides, was confirmed by the Unmet Needs Assessment. That assessment, conducted in early 2005, led to a requirement that the defendants substantially expand the availability of DMH inpatient programs.

o  Two completed suicides in 2004 involved inmates whose Keyhea orders expired within weeks of their completed suicides. In both cases, the inmates were non-compliant with medications, resulting in each case in predictable decompensation. The expiration of the inmates' Keyhea orders was attributable to the failure to anticipate and pursue renewal of the orders, rather than to improvement in the inmates' mental health symptoms or condition. Other medication-related issues contributing to suicides in 2004 included the hording of medications (two suicides resulted from overdoses) and the slow response, or failure to respond at all, to non-compliance with medications.

o  Large-mesh screens covering air ventilation ducts particularly in administrative segregation cells to which a noose can be attached to accomplish suicide by hanging emerged as an issue in 2003 and resulted in a June 9, 2005 court order requiring the defendants to develop a plan for dealing with the large-mesh ventilation screens in administrative segregation cells in which mental health

10

caseload inmates are housed. In 2004, 18 of the 26 completed suicides occurred in administrative segregation units, all but one of which were accomplished by hanging. Five of the 17 hangings involved the large-mesh screens. In the remaining 12, the noose was attached to a variety of anchors, including bunks (in seven instances), light fixtures (two), windows (two) and a shelf (one). While physical plant structure is an important element of prevention efforts to reduce the incidence of suicide in administrative segregation units, the careful, thorough screening of inmates entering administrative segregation, daily rounding by psych techs as required by departmental directives and the prompt identification of inmates whose conditions may be deteriorating, followed by appropriate assessments in a confidential setting and referrals to appropriate levels of mental health treatment, are even more important.

o   While the suicide review process continued to improve, identification of facility versus departmental issues and the documentation of efforts to achieve the objectives, goals, and outcomes for corrective actions specified in some suicide reports varied widely. In some instances, implementation problems were local and involved individual clinician/correctional officer/treatment team issues, as well as human resource and other resource allocation concerns. In some other instances, the suicide review too readily accepted institutional failures as inevitable.

Based on a review of the suicides completed in CDC in 2004, there appears to be less need of new recommendations than a greater need to focus on the full implementation of the recommendations included in the predecessors to this report, namely:

1.   Implement fully all of the elements of the suicide review process already in place, including both institutional and departmental follow-up to corrective action plans and submission to the special master of documentation on the outcome of investigations of staff misconduct, negligence and errors.

2.   Conclude the pilot project at Pelican Bay State Prison and finalize and submit to the special master forthwith a system-wide plan for dealing with the large-mesh ventilation screen issue.

3.   Fix the now broken mechanisms for tracking and maintaining Keyhea orders for the involuntary medication of inmates in need of psychotropic medications.

4.   Continue to work on improving access to DMH inpatient placements, particularly for Level III and Level IV inmates, and focus greater training, supervisory and peer review efforts on the placement of decompensating inmates in appropriate levels of mental health care.

5.   Determine whether clinicians' failure to review and utilize existing UHRs and central files, including probation reports, was attributable to difficulties in access to pertinent records or faulty clinical practices. The department needs to address

11

the accessibility issue, a problem shared by all of the components of health care services. In the meantime, increased training, supervisory and peer review efforts need to be focused on clinicians' review and use of available records and documentation.

6. Undertake increased efforts to understand more clearly and respond adequately to the potential for suicide among the department's female inmates. Fortunately, no female offenders in CDC committed suicide in 2005.

7. Implement fully the finally approved policy on the application of CPR by custody staff.

In 2004, 69.2 percent of all CDC suicides (18 of 26) occurred in administrative segregation, up from an already high 48.5 percent in 2003 (17 of 35). In both years, a majority of the suicides completed in administrative segregation involved inmates who were not on the mental health caseload at the time of their deaths (11 in 2003; ten in 2004). The defendants need to analyze this rising trend more closely and focus more energy and resources on reversing it. Policies and practices appeared to be in place to deal with the problem, including mental health screenings and, where indicated, suicide risk assessments of inmates newly placed inmates in administrative segregation, regular psych tech rounding of caseload and non-caseload inmates, more frequent clinical contacts with caseload inmates, regular interdisciplinary team meetings and classification hearings, but the number of suicides in administrative segregation went unabated. These policies and practices were fully implemented in 2001 and 2002. In the latter year, just 27.2 percent of suicides in CDC occurred in administrative segregation (six of 22).

The individual case reviews of suicides in 2004 in Appendix B suggest that some initial screenings, SRAs and many psych tech rounds were performed perfunctorily and most often at cell-front or in holding cells, where the lack of privacy often precluded meaningful inmate participation, especially for those inmates placed in administrative segregation for protective reasons. Based on the information in the suicide reports, it is uncertain whether these inadequacies reflected poor clinical practices, a lack of adequate mental health staff, insufficient correctional officers to escort inmates to interview space, inadequate confidential space for clinical contacts or some combination of all of these factors.

From all of this comes the single specific recommendation of this report:

- The defendants need to develop by May 31, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units.

Deleted: 15

# EXHIBIT J

Enclosure XI

# Status of Funding for
# Acute, Intermediate and Mental Health Crisis Bed Plan

### Capital Outlay Proposals Submitted to the Legislature March 30, 2006

#### *Finance Letter Process*

Each Spring, the Administration proposes adjustments to the proposed Governor's Budget in accordance with Government Code Section 13308. These adjustments are submitted to the Legislature through what is called the Finance Letter process. The Department of Finance sends a letter to the Legislature that details the adjustments requested for each department and item of appropriation. These letters are typically accompanied by detailed backup information in the form of a Budget Change Proposal (BCP) that was developed by the department seeking an adjustment.

On March 30, 2006, Finance Letters were submitted to the Legislature requesting additional funding for several capital outlay projects in response to the concerns raised by the Coleman court related to the number of beds available for inmates needing to be treated in an Intermediate Care Facility (ICF), Acute Care Facility, and in an Enhanced Outpatient Program (EOP). The specifics of these proposals are outlined below, and for your reference, we have attached the Finance Letter submitted to the Legislature.

#### *Proposals to Increase the Number of Intermediate Care and Acute Care Beds*

Through the March 30, 2006, Finance Letters, the Department of Corrections and Rehabilitation (CDCR) requested preliminary plan funding for acute and intermediate mental health care facility projects. These projects would allow the Department to construct facilities to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed mental health beds based on Fall 2005 population projections indicates a shortage of 356 acute care mental health male beds, 301 intermediate care mental health male beds for Level IV high custody inmate-patients[1], and 19 acute/intermediate care mental health female beds by June 30, 2011. These facilities would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of inmates requiring inpatient mental health care beyond the short-term crisis level of care. The following information summarizes the proposals submitted to the Legislature on March 30, 2006, requesting funding to begin planning and construction of these beds:

- $14,972,000 for the preliminary plans in 2006-07 for a 350-Bed acute mental health facility at California State Prison, Sacramento (CSP-Sac). This project is estimated to be completed in 2010-11 and cost an estimated $289,000,000 in total.

---

[1] Sum of 153 bed deficiency and 148 temporary beds (36 at the California Medical Facility and 112 at Salinas Valley State Prison).

1

Enclosure XI

- $7,689,000 for the preliminary plans in 2006-07 for a 128-Bed intermediate care facility at CSP-Sac. This project is estimated to be completed in 2010-11 and cost an estimated $101,000,000 in total.

- $8,405,000 for the preliminary plans in 2006-07 for a 128-Bed intermediate care facility at Salinas Valley State Prison (SVSP), Monterey. This project is estimated to be completed in 2010-11 and cost an estimated $111,000,000 in total.

- $4,514,000 for the preliminary plans in 2006-07 for a 64-Bed intermediate care facility at California Medical Facility (CMF), Vacaville. This project is estimated to be completed in 2010-11 and cost an estimated $59,000,000 in total.

- $2,172,000 for the preliminary plans in 2006-07 for a 25-Bed acute/intermediate care facility at California Institution for Women (CIW), Frontera. This project is estimated to be completed in 2010-11 and cost an estimated $34,000,000 in total.

These proposals are *in addition to* the following Administration proposals that were reflected in the Governor's Budget submitted to the Legislature on January 10, 2006, which have been previously identified to the court:

- Funding for a 36-Bed permanent conversion to intermediate care at CMF, which is estimated to be completed in 2009.

- Funding for a 112-Bed permanent conversion to correctional treatment center beds, with temporary use as an intermediate care facility at SVSP, which is estimated to be completed in 2009.

As previously identified to the court, in addition to the proposals reflected in the Governor's Budget and the March 30, 2006 Finance Letters, the Department is expanding mental health treatment capacity through the following projects that are currently underway:

- 36-Bed temporary conversion to intermediate care at CMF until May 2006 funded through the minor capital outlay program. Presently these beds are occupied with a planned transfer of these inmate-patients to SVSP, at a rate of approximately five inmate-patients per week, starting May 1, 2006.

- 36-Bed temporary conversion to intermediate care at SVSP available beginning May 2006 funded through the minor capital outlay program. This project is progressing with anticipated occupancy of this facility beginning May 1, 2006, and is part of the 112-Bed activation referenced above.

- 64-Bed intermediate care facility at SVSP included in the 2005 Budget Act. This facility will have single cells for Level IV high custody inmate-patients. This project is currently funded and approved with an anticipated construction completion date of March 2009.

2

Enclosure XI

In sum, these proposals will provide the CDCR, by 2010-11, 525 permanent male acute beds (shortage of 6), 448 permanent male intermediate care beds for Level IV high security inmate-patients (surplus of 19), and 55 permanent female acute/intermediate care beds (surplus of 6) all based on Fall 2005 population figures.

### *Proposals to Increase the Enhanced Outpatient Program Space*

Through the March 30, 2006, Finance Letters, the CDCR also requested preliminary plan funding for EOP treatment and program space. While the court has not specifically ordered a response in this area, the court has criticized the Department for inadequate treatment space for the EOP in previous monitoring reports and the bed planning process identified a need for additional EOP beds. This proposal is an effort to proactively address this need through increasing program and treatment space at three institutions. The following information summarizes the proposals submitted to the Legislature requesting funding to begin planning and construction of this program space:

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 180 EOP inmates at Mule Creek State Prison (MCSP), Ione. This project is estimated to be completed in 2010-11 and cost an estimated $2,700,000 in total.

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 150 EOP inmates at California State Prison (CSP-LAC), Los Angeles. This project is estimated to be completed in 2010-11 and cost an estimated $2,700,000 in total.

- $250,000 for the preliminary plans in 2006-07 for program and treatment space for 384 EOP inmates at CSP-Sac. This project is estimated to be completed in 2010-11 and cost an estimated $5,600,000 in total.

In addition to the proposals reflected in the March 30, 2006, Finance Letters, the Department is currently planning to add EOP beds through the conversion of existing general population beds. The following summarizes these efforts:

- Add 115 new EOP beds at MCSP for Level IV inmate-patients, which are estimated to be completed January of 2007.
- Add 180 new EOP beds at MCSP for Level III inmate-patients, which are estimated to be completed by January of 2007.
- Add a total of 192 new EOP beds at CSP-Sac. Add 96 of these beds by July of 2006 and the remaining 96 beds by October 2006.
- Add 150 new EOP beds at CSP-LAC, which are estimated to be completed June of 2011.

Combined, these projects will add 637 EOP beds by 2010-11, decreasing the estimated shortfall for these type of beds from 1973 to 1336.

3

Enclosure XI

**Staffing for Proposed New Beds**

*Department of Mental Health Clinical Staffing for Male Intermediate Care and Acute Care Beds*

The Department of Mental Health (DMH) has agreed to provide clinical staffing for the proposed ICF and Acute Care facilities for male inmates identified in the CDCR Capital Outlay Finance Letters submitted to the Legislature on March 30, 2006. This is in addition to the BCP included in the Governor's Budget to expand the ICF program at SVSP by 36 beds.

In order to determine the acceptable sites for these proposed projects the ability for DMH to hire and operate these facilities was considered. During this process, site considerations included the following factors:

- All of the male prisons are Consolidated Care Centers.

- All of the institutions are located in areas in which there is greater potential for acquiring necessary clinical staffing.

- DMH already provides ICF and Acute Care services at two of these sites.

- The three male institutions are geographically situated to accept referrals for ICF and Acute Care that come primarily from five prisons.

- The cultures of these institutions, given their experience with providing mental health care, are amenable to growth and proper accommodation of the needs of the inmate-patients that will be treated in these new facilities.

The estimated cost of providing DMH staff specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

      CSP-Sac - 350 Acute Beds = $60,316,000 and 620.0 positions
      CSP-Sac - 128 ICF Beds = $18,286,000 and 198.0 positions
      CMF - 64 ICF Beds = $10,054,000 and 104.0 positions
      SVSP - 128 ICF Beds = $14,133,000 and 172.0 positions

In order to receive funding necessary to begin staffing these facilities as construction is completed, DMH anticipates submitting funding requests through both the BCP and the estimate process beginning with Fiscal Year 2007-08 and each year thereafter until full activation of the three facilities (SVPP, CMF-VPP, CSP-Sac) is completed. The requests will include the positions needed for that phase of activation as related to design, licensing, recruitment, program development, training and orientation for each fiscal year. The activation plan will be similar to the phases used in the initial activation of Salinas Valley and Coalinga.

4

Enclosure XI

### *Department of Corrections and Rehabilitation Staffing for Proposed Beds*

The estimated cost of providing CDCR custody staff at the Intermediate and Acute Care facilities for male inmates specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

> CSP-Sac - 350 Acute Beds = $10,914,000 and 156.7 positions
> CSP-Sac - 128 ICF Beds = $4,936,000 and 70.4 positions
> CMF - 64 ICF Beds = $2,727,000 and 38.9 positions
> SVSP - 128 ICF Beds = $4,943,000 and 70.4 positions

The estimated cost of providing increased CDCR custody and clinical staff at the institutions where there will be an increase in EOP treatment and program space for male inmates (as identified in the March 30, 2006 Finance Letters) specifically tied to these capital outlay project related facilities, based on current staffing ratios and salaries are as follows:

> MCSP – 180 EOP Inmate-Patients =$414,000 and 9.5 positions
> CSP-LAC – 150 EOP Inmate-Patients =$414,000 and 9.5 positions
> CSP-Sac – 384 EOP Inmate-Patients =$2,552,000 and 24.8 positions

It should be noted that these projects for EOP treatment and program space are an adjunct to the aforementioned projects adding 637 EOP beds at these prisons through the conversion of existing general population beds at these prisons.

The estimated cost of providing CDCR clinical staff at the proposed Intermediate and Acute Care facility for female inmates specifically tied to these capital outlay project related facilities has not yet been finalized, however preliminary information shows that approximately 12 clinical staff will be needed when this facility opens.

CDCR staff associated with the proposed new facilities would be budgeted through the population projection adjustment process that occurs during the annual budget process. As new beds and institutions become available, or the type of population changes in existing institutions, the Department prepares an activation schedule for the staff needed to operate those beds once they are occupied.  The resources needed for these positions are then proposed as a population adjustment in the budget and updated if necessary due to changes in number of inmates, schedule, or mission.  For any given fiscal year this projection is updated four times based on updated data.  For example, the year-end projection for fiscal year 2005-06 was first developed in September of 2004, it was updated in May 2005, again in September 2005, and will be updated one more time in May of 2006.  Although these updates adjust the total level of staffing and funding available to CDCR for staffing needed at year end, the process permits CDCR to staff at the appropriate level, based on the number and type of inmates, at any point in time.

5

Enclosure XI

## Summary of Legislative Approval Process and General Timeframes

Legislative appropriation of funds through the Budget Act is required before CDCR will be authorized to begin implementation of the projects requested through the Governor's Budget and the Finance Letters described above. The general process and timeframes for Legislative approval are the following:

*Budget Subcommittees*
The Budget Subcommittee in each house that is responsible for the CDCR budget must hear and approve or deny the Finance Letters submitted. If the subcommittee does not specifically put the Finance Letter proposals on their agenda and take an action on the proposals, by default, they are denied. The subcommittee process is typically completed during the 3rd week of May.

*Budget Committees*
The full Budget Committee in each house must act on the subcommittee recommendations in order for the Budget Bill to be amended and moved to the floor of each house for deliberation. This typically occurs during the last week of May.

*House Floor*
The members of each house vote on the amended Budget Bill. This typically occurs during the last week of May.

*Conference Committee*
Each house approves its own version of the Budget Bill. In order to resolve differences between the houses, a Conference Committee consisting of members from both houses is established to hear the differences and seek agreement on the final form of the bill. This typically occurs during the first week or two of June.

*House Concurrence with Conference Report*
The conference committee reports its recommendations to both houses, each of which must adopt an identical budget bill before it can be sent to the Governor for signature. Under the State Constitution, the Budget Bill must be passed by the Legislature by midnight on June 15th. Historically, this deadline has often not been met.

*Governor's Signature*
Once the Budget Bill is enrolled and sent to the Governor for signature he has 12 days to act on the bill. The Governor has the ability to make line-item vetoes of items of appropriation.

6

**Enclosure XI**



DEPARTMENT OF
**FINANCE**
OFFICE OF THE DIRECTOR

ARNOLD SCHWARZENEGGER, GOVERNOR
STATE CAPITOL ■ ROOM 1145 ■ SACRAMENTO CA ■ 95814-4998 ■ WWW.DOF.CA.GOV

MAR 3 0 2006

Honorable Wesley Chesbro, Chair
Senate Budget and Fiscal Review Committee

Attention: Mr. Danny Alvarez, Staff Director (2)

Honorable John Laird, Chair
Assembly Budget Committee

Attention: Mr. Christopher W. Woods, Chief Consultant (2)

**Amendment to Budget Bill Item 5225-301-0001, and Addition of Items 5225-301-0660, 5225-301-0751, and 5225-496, Capital Outlay, Department of Corrections and Rehabilitation**

It is requested that Item 5225-301-0001 be increased by $55,141,000 to reflect the following:

1.  Decrease $1,005,000 for working drawings for a statewide Juvenile Justice fire protection sprinkler system. The preliminary plans for this project have been delayed because of a poorly defined scope and the overarching concern of how this project would fit into future funding requests for Juvenile Justice reform.

2.  Decrease $300,000 for construction of small management yards at Mule Creek State Prison, California State Prison, Solano, Wasco State Prison, and Richard J. Donovan Correctional Facility. There were cost increases in materials and labor which prompted the Department of Corrections and Rehabilitation (Department) to push out the funding for the fifth institution originally funded at North Kern State Prison to a future year resulting in savings in 2006-07.

3.  Increase $4,323,000 for construction of a groundwater treatment and non-potable water distribution system at Deuel Vocational Institution (DVI), Tracy. The increased costs are primarily attributed to the inability to find an onsite source of fill material at either DVI or DVI-East, formerly known as Northern California Women's Facility, and the resulting need to bring in material from outside the area.

4.  Increase $2,327,000 for working drawings and construction of a new wastewater treatment plant at DVI, Tracy. The Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor resulting in the need for additional funds.

5.  Increase $975,000 for preliminary plans, working drawings, and construction of an electrical power substation at DVI, Tracy. The costs increased as a larger substation is needed to meet the increased electrical loads anticipated from the groundwater treatment and non-potable water distribution system project at the facility.

MAR 3 0 2006

-2-

6.    Increase $50,000 for preliminary plans for an electrified fence at the Central facility at the California Institution for Men (CIM), Chino. The additional costs are necessary because of the complexity of the Environmental Impact Report relative to CIM's proximity to the encroaching housing developments, and the Department of Fish and Game's concerns over damage to birds and other wildlife.

7.    Increase $2,066,000 for construction of a potable water distribution system upgrade at California Men's Colony, San Luis Obispo. The Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor resulting in the need for additional funds.

8.    Increase $5.0 million for statewide minor projects. The additional funding is to be used to address space needs identified as part of the Farrell lawsuit. In November 2004, the State of California entered into a consent decree in the Farrell lawsuit concerning mandated educational and programmatic obligations to the youth offender population. The $5.0 million in minor funding for 2006-07 and the recommended $4.2 million in 2007-08 would help satisfy court deficiencies for increased staffing and programming space.

9.    Increase $44,000 for working drawings of a wastewater treatment plant at California State Prison, Corcoran. The increase in costs is associated with the electrical system requiring more design effort than originally estimated because of the need to change out the existing transformer.

10.   Increase $138,000 for working drawings of a wastewater treatment plant at California State Prison, Centinela, Imperial. The increase in costs is attributed to the increased rates for the design consultants and additional engineering work required for supporting the permit modifications.

11.   Increase $1,484,000 for construction of an arsenic removal project from the potable water supply at High Desert State Prison/California Correctional Center, Susanville. There were additional costs related to the trenching and the backfill of the pipeline. In addition, the Department used a 3 percent escalation factor when estimating the project costs rather than the allowed 5 percent escalation factor.

12.   Decrease $1,690,000 for preliminary plans of a heating, ventilation, and air conditioning system at Ironwood State Prison, Blythe. As the bids came in much higher for the same project at the neighboring Chuckawalla Valley State Prison project, it is recommended by the Department to push the funding for this project back a year to see the initial bidding results for the project at Chuckawalla Valley State Prison.

13.   Add $14,972,000 for preliminary plans of a 350-Bed acute mental health facility at California State Prison, Sacramento. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed acute care mental health beds based on current population projections indicates a shortage of 320 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

MAR 3 0 2006

-3-

14. Add $7,689,000 for preliminary plans of a 128-Bed intermediate mental health care facility at California State Prison, Sacramento. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

15. Add $8,405,000 for preliminary plans of a 128-Bed intermediate mental health care facility at Salinas Valley State Prison, Monterey. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

16. Add $4,514,000 for preliminary plans of a 64-Bed intermediate mental health care facility at California Medical Facility, Vacaville. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds based on current population projections indicates a shortage of approximately 300 beds by June 30, 2011. This facility would provide for additional onsite mental health inpatient treatment for the rapidly growing statewide population of male inmates requiring inpatient mental health care beyond the short-term crisis level of care.

17. Add $2,172,000 for preliminary plans of a 25-Bed acute/intermediate care facility at the California Institution for Women, Frontera. This project is recommended in response to an order from the Coleman court resulting from the 15th round of monitoring by the court's special master. This project would allow the Department to construct a facility to house seriously mentally ill inmates that require an inpatient level of care. The statewide need for licensed intermediate mental health care facility beds for women based on current population projections indicates a shortage of approximately 19 beds by June 30, 2011.

18. Add $250,000 for preliminary plans of a 150-Bed enhanced outpatient program for treatment and program space at Mule Creek State Prison, Ione. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

MAR 3 0 2006

-4-

19. Add $250,000 for preliminary plans of a 150-Bed enhanced outpatient program for treatment and program space at California State Prison, Los Angeles. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

20. Add $250,000 for preliminary plans of a 350-Bed enhanced outpatient program for treatment and program space at California State Prison, Sacramento. The Department has identified a deficiency of enhanced outpatient program beds and associated program space. This proposal is not in response to an anticipated court order. However, the court has criticized the Department for inadequate treatment space for the enhanced outpatient program in previous monitoring.

21. Add $750,000 for studies to potentially relocate the reception centers from three older institutions (San Quentin, Deuel Vocational Institution, and California Institution for Men) to three newer institutions (California State Prison, Solano, Pleasant Valley State Prison, and California State Prison, Los Angeles) respectively. This is consistent with the mission of the Department to house inmates in a safe manner.

22. Add $2,477,000 for construction of an arsenic removal water treatment system project at Kern Valley State Prison, Kern. The arsenic levels in the existing water are above the new maximum contaminant level. The existing appropriation is being reverted (Issue 642) as the refined cost estimates showed there were not enough funds to construct the project. Specifically, the costs of the specialized equipment to house the arsenic removal equipment have increased.

It is requested that Item 5225-301-0660 be added in the amount of $38.0 million for construction of a heating, ventilation, and air conditioning system at Chuckawalla Valley State Prison, Blythe. The existing air handling units have deteriorated beyond their useful life and the structural integrity of the adjacent walls and roofs are in jeopardy. Furthermore, the temperature control units fail to operate during extreme temperatures and the high humidity conditions experienced in Blythe. The original appropriation is not sufficient to fund the project as bids came in higher than expected and is being reverted (Issue 642).

It is requested that Item 5225-301-0751 be added in the amount of $1,491,000 for construction of a bar screen project at Pleasant Valley State Prison, Coalinga. The existing lift station is unable to effectively remove bulky debris from the wastewater before it is pumped to the wastewater plant, and could start facing noncompliance citations from their respective Regional Water Quality Control Board. The existing funding for the project is being reverted (Issue 642) as the updated working drawings show that the existing appropriation is insufficient to finish the project.

It is requested that Item 5225-496 be added to revert the unencumbered balances of the following:

1. Item 5225-301-0001, Budget Act of 2005, for preliminary plans of a statewide fire sprinkler system for Juvenile Justice.

MAR 3 0 2006

-5-

2.  Item 5225-301-0001, Budget Act of 2005, for construction of an arsenic removal water treatment system at Kern Valley State Prison, Kern.

3.  Item 5225-301-0660, Budget Act of 2005, for construction of a heating, ventilation, and air conditioning system at Chuckawalla Valley State Prison, Blythe.

4.  Item 5225-301-0751, Budget Act of 2005, for construction of a bar screen, prelift station at Pleasant Valley State Prison, Coalinga.

The effect of my requested action is reflected on the attachment.

If you have any questions or need additional information regarding this matter, please call Jim Martone, Principal Program Budget Analyst, at (916) 445-9694.

MICHAEL C. GENEST
Director
By:

*Vincent P. Brown*

VINCENT P. BROWN
Chief Deputy Director

Attachment

cc:   Honorable Kevin Murray, Chair, Senate Appropriations Committee
        Attention: Mr. Bob Franzola, Staff Director
      Honorable Dennis Hollingsworth, Vice Chair, Senate Budget and Fiscal Review
        Committee
        Attention: Mr. Jeff Bell, Staff Director
      Honorable Judy Chu, Chair, Assembly Appropriations Committee
        Attention: Mr. Geoff Long, Chief Consultant
      Honorable Rick Keene, Vice Chair, Assembly Budget Committee
        Attention: Mr. Peter Schaafsma, Staff Director
      Honorable Michael Machado, Chair, Senate Budget and Fiscal Review
        Subcommittee No. 4
      Honorable Rudy Bermúdez, Chair, Assembly Budget Subcommittee No. 4
      Ms. Elizabeth Hill, Legislative Analyst (4)
      Ms. Diane Cummins, Senate President pro Tempore's Office
      Mr. Craig Cornett, Assembly Speaker's Office (2)
      Mr. David Harper, Deputy Chief of Staff, Assembly Republican Leader's Office
      Ms. J. S. Woodford, Acting Secretary, Department of Corrections and Rehabilitation
      Mr. Bernard Warner, Chief Deputy Secretary, Division of Juvenile Justice, Department of
        Corrections and Rehabilitation
      Mr. John Dovey, Chief, Division of Adult Operations, Department of Corrections and
        Rehabilitation
      Mr. George A. Sifuentes, Deputy Director, Facilities Management Branch, Department of
        Corrections and Rehabilitation
      Mr. Richard C. Powers, Chief, Facilities Management Branch, Department of Corrections
        and Rehabilitation

icc:   AGUIAR, COSTIGAN, KLASS, FINN, MARTONE, C/F, SUSPENSE, FILE

H:\H\DCCDF\12006\Andi 1 CDCR FL.doc, 3/28/2006, 11:45:32 AM

1 | BILL LOCKYER
Attorney General of the State of California
2 | JAMES M. HUMES
Chief Assistant Attorney General
3 | FRANCES T. GRUNDER
Senior Assistant Attorney General
4 | ROCHELLE C. EAST
Supervising Deputy Attorney General
5 | LISA A. TILLMAN, State Bar No. 126424
Deputy Attorney General
6 | 1300 I Street, Suite 125
P.O. Box 944255
7 | Sacramento, CA 94244-2550
Telephone: (916) 327-7872
8 | Fax: (916) 324-5205

9 | Attorneys for Defendants
CF1997CS0003

10

11

12 | IN THE UNITED STATES ~~~ COURT

13 | FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15 | RALPH COLEMAN, et al.,

16 | Plaintiffs,

17 | v.

18 | ARNOLD SCHWARZENEGGER, et al.,

19 | Defendants.

CASE NO. CIV S-90-0520 LKK JFM P

**DEFENDANTS' NOTICE OF LODGING OF ENCLOSURES OF EXHIBIT A FOR SUBMITTED BED PLAN**

Hearing:   April 26, 2006
Time:      3:00 p.m.
Courtroom: 4
Judge:     The Honorable
           Lawrence K. Karlton

22 | In response to the court order of March 2, 2006, Defendants submitted on April 17, 2006

23 | the following:

24 | 1.   A plan for the provision, in conjunction with DMH or otherwise, of acute and

25 | intermediate inpatient beds for all seriously mentally ill male and female inmates

26 | in the CDCR clinically determined to be in need of these levels of inpatient care.

27 | 2.   A plan for the provision of Mental Health Crisis Beds (MHCB) for all seriously

28 | mentally ill male and female inmates in CDCR within 24 hours of a clinical

DEFENDANTS' NOTICE OF LODGING

1

1                    determination that they require that level of mental health care.

2  (Exhibit A.)

3                    Defendants now submit enclosures I through Enclosure XII as follows:

4         1.    Enclosure I, Tucker Alan Study, Revised Version

5         2.    Enclosure II, Closing the Gap Based on Fall 2005 Projections

6         3.    Enclosure III, Intermediate Care Facility Bed Plan of August 2005;

7         4.    Enclosure IV, Addendum 1 to Memorandum of Understanding re. Intermediate

8              Care;

9         5.    Enclosure V, Addendum 1 to Memorandum of Understanding re. Acute Care;

10       6.    Enclosure VI, Coalinga State Hospital Bed Conversion Study;

11       7.    Enclosure VII, Constitutional Issues of Securing Coalinga State Hospital for

12            Treatment of Level IV High Custody California Department of Corrections and

13            Rehabilitation Inmates;

14       8.    Enclosure VIII, Correctional Treatment Center Beds;

15       9.    Enclosure IX, Correctional Treatment Center 2006 Licensure Project;

16     10.  Enclosure X, Challenges and Initiatives to Increasing Mental Health Crisis Beds

17            at California Men's Colony and California Institution for Men;

18     11.  Enclosure XI, Status of Funding for Acute, Intermediate and Mental Health Crisis

19            Bed Plan;

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

DEFENDANTS' NOTICE OF LODGING

1      12. Enclosure XII, Federal Investigation Impacting Treatment in Department of

2          Mental Health State Hospitals.

3      Dated: April 18, 2006

4                          Respectfully submitted,

5                          BILL LOCKYER
                           Attorney General of the State of California

6                          JAMES M. HUMES
                           Chief Assistant Attorney General
7
                           FRANCES T. GRUNDER
8                          Senior Assistant Attorney General

9                          ROCHELLE C. EAST
                           Supervising Deputy Attorney General

10

11                         */s/ Lisa Tillman*
                           LISA A. TILLMAN
12                         Deputy Attorney General

13                         Attorneys for Defendants

14

15
   30110314.wpd
16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF LODGING
                                         3

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Coleman v. Schwarzenegger**

No.:   **CIV S-90-0520 LKK JFM P**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On April 18, 2006, I served the attached ***NOTICE OF LODGING OF ENCLOSURES OF EXHIBIT A*** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550, addressed as follows:

Pete Cockeroft, H-86887
California State Prison, Sacramento
FA2-205 - H86887
P.O. Box 290066
Represa, CA 95671-0066

Kimberly S. Davenport
California Medical Association
221 Main Street
San Francisco CA 94105

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on April 18, 2006, at Sacramento, California.

| A. Buckley | */s/ A Buckley* |
|---|---|
| Declarant | Signature |

30110415.wpd

# EXHIBIT K

## CALIFORNIA DEPARTMENT OF CORRECTIONS
## MAY REVISE FINANCE LETTER
## COLEMAN GUIDELINES TO THE MENTAL HEALTH SERVICES DELIVERY SYSTEM
## AT CORCORAN STATE PRISON
## FISCAL YEAR 2005/2006

### A. Nature of Request

This Finance Letter is requesting $4.1 million for 51.25 Mental Health positions and associated costs for new Mental Health Services Delivery System (MHSDS) guidelines to be implemented at California State Prison, Corcoran (COR) on July 1, 2005. Custody staffing related to this issue were inadvertently excluded from our original request and will be requested in a future budget change proposal (BCP).

Mental Health Treatment is provided in the California Department of Corrections (CDC) through the MHSDS. The intent of the MHSDS is to advance the Department's mission to protect the public by providing timely, cost-effective mental health services that optimize the level of individual functioning of seriously mentally disordered inmates and parolees in the least restrictive environment.

The court case *Coleman v. Schwarzenegger ET. Al.*, was filed contending that the CDC was violating Eighth and Fourteenth Amendments of the United States Constitution by providing inadequate mental health care to inmates throughout the prison system. In 1997, CDC issued a preliminary version of MHSDS Program Guides, which established preliminary policies and procedures to provide constitutionally adequate mental health services at all CDC institutions. Other court cases including *Clark* and *Armstrong*, require that CDC staff provide reasonable accommodation to inmates with disabilities, and ensure equally effective communication with disabled inmates during contacts of any kind within the MHSDS.

Since 1997, details of the MHSDS Program Guides have been negotiated with all parties in the *Coleman* case in order to develop a final version of the MHSDS Program Guides. Implementing these policy and procedural changes is an integral part of the strategy to exit the *Coleman* case and to reduce costs related to this litigation. In addition, one of the goals and objectives of the CDC is to take responsibility and accountability for the rehabilitation of offenders and provide training, counseling, and support services.

When the resource analysis process for this BCP was initiated in July 2004, final approval of the MHSDS Program Guides were anticipated to be completed by January 2005. The Special Master's Draft Report on Revised Program Guides (Attachment H) states, "The purpose of this report is to begin the movement toward final approval of the revised program guides." However, the *Coleman* parties have not completed negotiation regarding a few components of the MHSDS Program Guides. A subsequent BCP will be submitted to address resources needed to implement the revised MHSDS Program Guides

Version 3.5
6/8/2005

A future BCP will request a total ratio of
1.0 Sr. Psychologist Specialists: 5 Institutions (subtract 3.0 current positions) = 3.0 PY
1.0 HPS I: Region = 3.0 PY
1.0 OT: Region = 3.0 PY

Three (3) Sr. Psychiatrists will each be assigned approximately 10 institutions to provide oversight of Mental Health Forensic Field Consultation Services including court required BPT Reports and MDO Reports.

A future BCP will request 3.0 Sr. Psychiatrist, Specialist = 3.0 PY

Equipment and Supplies
A one-time cost for supplies is required to implement the revised MHSDS Program Guides at COR. A future BCP will request equipment for all institutions (see chart on page 4).

## F.  Analysis of All Feasible Alternatives

**Alternative A:** Implement the revised MHSDS Program Guides at all institutions beginning July 2005 (see Alternative A staffing summary – Attachment A):

a. Establish 526.0 permanent field positions and 21.2 limited term field positions in FY 2005-06 and 296.1 permanent field positions in FY 2006-07
b. Establish 13.0 permanent central office staff positions
c. One time funding totaling $728,862 for equipment (computers, copiers, shredders, fax machines, dictation equipment, golf carts and televisions).
d. On going funding totaling $50,000 for printing and distribution of new forms.
e. One time funding totaling $56,000 for group therapy materials and equipment.
f. One time funding totaling $307,872 for inmate treatment cells.
g. One time funding totaling $500,000 (allocated July 2005) for a contractor to conduct a workload and treatment space survey including:
   i. Treatment space availability in each institution that provides CCCMS level of care in ASU/SHU. Final recommendations regarding provision of group therapy is ASU/SHU with the most efficient use of staff time.
   ii. Mental health workload and staffing survey to determine ways efficiency of staff time can be improved. Collection of workload data to justify positions for group therapy in ASU/SHU and any additional positions required to fully implement the MHSDS program guides.
h. One time funding totaling $443,967, and ongoing funding totaling $402,500 for use of the MCMI-III psychological testing and diagnostic clarification system. In addition, this system will require one time funding totaling $718,694 for information technology infrastructure.

**Pros:** This alternative would provide compliance with policies and procedures contained in the revised MHSDS program guides, which were negotiated with all parties in the *Coleman v. Schwarzenegger* court case. This is the most likely alternative to lead to final exit of the *Coleman* case and reduction of legal costs associated with this case within the next two years. This alternative is consistent with the mission of Youth and Adult Corrections Agency "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services.

**Cons:** This alternative requires significant resource allocation during two fiscal years to fund positions and equipment to implement the revised MHSDS Program Guides. The MHSDS Program Guides have not received final court approval, and requirements may change.

**Alternative B:** Implement the revised MHSDS Program Guides in the following three phases:

Phase One and Two - Allocate *50%* of positions requested for implementation in 2005/2006 and 2006/2007 (100% of headquarters and limited term staff) in order to reduce cost and provide partial compliance with revised mental health policies and procedures (see Alternative B staffing summary – Attachment B):

    a. Establish 256.65 permanent field positions, 13.0 permanent Central Office Staff positions, and 21.2 limited term field positions for a total of 290.85 positions in FY 2005-06 and 261.0 in FY 2006-07.

    b. In FY 2005-06 one time funding totaling $728,862 for equipment (computers, shredder, fax machine, dictation equipment, golf carts).

    c. Starting in FY 2005-06, on going funding totaling $50,000 for printing and distribution of new forms.

    d. In FY 2005-06, one time funding totaling $56,000 for group therapy materials and equipment.

    e. In FY 2005-06, one time funding totaling $307,872 for inmate treatment cells.

    f. In FY 2005-06, one time funding totaling $500,000 (allocated July 2005) for a contractor to conduct a workload and treatment space survey including:

        i. Treatment space availability in each institution that provides CCCMS level of care in ASU/SHU. Final recommendations regarding provision of group therapy is ASU/SHU with the most efficient use of staff time.

        ii. Mental health workload and staffing survey to determine ways efficiency of staff time can be improved. Collection of workload data to justify positions for group therapy in ASU/SHU and any additional positions required to fully implement the MHSDS program guides.

8) In FY 2005-06, one time funding totaling $443,967, and ongoing funding totaling $402,500 for use of the MCMI-III psychological testing and diagnostic clarification system. In addition, this system will require one time funding totaling $718,694 for information technology infrastructure.

Phase Three –Allocate resources as indicated by the above requested space survey and staffing survey.

**Pros:** This alternative would provide partial compliance with policies and procedures contained in the revised MHSDS Program Guides. The requested study would provide specific information regarding space needs for implementing group therapy in CCCMS ASU and SHU, and recommendations regarding improving staff efficiency. This alternative reduces the resources used for MHSDS Program Guide implementation in 2005-2006 and 2006-2007. Fiscal impact is spread over additional years.

**Cons:** This alternative would need to be negotiated with all parties in the *Coleman* court case. The court may not approve the delay in implementation of group therapy in CCCMS and SHU, and may issue a Court Order to implement all policies and procedures in the revised MHSDS program guides. If this alternative is approved by the courts, this strategy is likely to lead to exit from the *Coleman* court case in five (5) years, rather than two (2). Costs associated with litigation in this case do not contribute to the YACA mission. The outcome of the space and staffing survey is likely to recommend allocation of additional staff which would need to be requested in future BCPs.

**Alternative C:** Implement requirements of the revised MHSDS Program Guides without requested resources

**Pros:** Requires no funding

**Cons:** Failure to implement the revised MHSDS Program Guides with requested resources will lead to increased litigation costs and is likely to lead to a Court Order which may be more costly than the current proposal. Failure to provide constitutionally adequate mental health treatment may harm inmates and is a violation of inmate's rights under the Eighth and Fourteenth Amendments of the United States Constitution prohibiting cruel and unusual punishment. This alternative is not consistent with the Youth and Adult Corrections Agency mission.

**Alternative D:** Implement requirements of the revised MHSDS Program Guides in ASU and SHU at COR as requested above beginning July 2005.

  a. Establish 51.25 permanent positions for the Mental Health program at COR.
  b. Resources totaling $18,425 for equipment to support the Mental Health Program at COR.
  c. Resources totaling $15,152 for a workload and space survey.

*As stated earlier, this Finance Letter should have also included the following Custody component, which will be requested in a future BCP:*

**Pros:** Meets requirement of current March 7, 2005 court order from Judge Karlton (Attachment G) which requires the State of California to "include in the FY 2005-2006 budget a request for sufficient clinical staff at COR to provide the mental health services

required in the revised program guides for MHSDS caseload inmates in the administrative segregation unit and the SHU at said institution.." This alternative allocates appropriate resources in order to implement the revised MHSDS Program Guides at COR. Provides a model for future implementation of revised MHSDS Program Guides once the document receives final court approval.

Cons: Failure to implement the revised MHSDS Program Guides at all institutions in FY 2005-2006 may lead to increased litigation costs and/or a Court Order, which may be more costly than the current proposal.

**G.  Timetable**
Resource augmentations are requested for implementation effective July1, 2005

**H.  Recommendation**
The Youth and Adult Corrections Agency mission "to take responsibility and accountability for the rehabilitation of offenders" and to "provide training, counseling, and support" services is consistent with the revisions in the MHSDS Program Guides. Based on the current recommendations from Legal Affairs Division, the best strategy to exit the *Coleman v. Schwarzenegger* court case is to fully implement the revised MHSDS Program Guides. However, due to the fact that the MHSDS Program Guides have not received final court approval, it is therefore recommended that Alternative D be implemented by July 2005.