# EXHIBIT L

487-3plag

RECEIVED

JAN 3 1 1997

ROSEN BIEN & ASARO

FILED

JAN 3 0 1997

CLERK, U. S. DISTRICT COURT
EASTERN

1

2

3

4

5

6

7

8         IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RALPH COLEMAN, et al.,

11           Plaintiffs,              No. CIV S-90-0520 LKK/JFM P

12       vs.

13   PETE WILSON, et al.,             ORDER MODIFYING TIMELINES

14           Defendants.
     _____/

15

16       On February 7, 1996, this court issued an order setting

17   timelines for the submission of remedial plans in the above-

18   entitled action.  Intervening events now require modification of

19   that order.  Accordingly, after consultation with the Special

20   Master and good cause appearing therefore, IT IS HEREBY ORDERED

21   that the order setting timelines filed February 7, 1996 is hereby

22   MODIFIED as follows:

23           1.  On or before April 15, 1997, the special master

24   shall submit for court approval plans, procedures, policies,

25   forms and other applicable documentation concerning the following

26   aspects of defendants' delivery of mental health care services to

                              1

                            795

1  the plaintiff class:

2          a.   Mental health screening procedures for new

3  admissions and readmissions to the California Department of

4  Corrections;

5          b.   Training programs for staff on how to

6  recognize and respond to mentally ill inmates;

7          c.   Arrangements for providing prompt inpatient

8  hospitalization, when needed;

9          d.   Use of 37mm guns on mentally ill inmates;

10          e.   A ratio or formula for health care staffing

11  and a recruitment program for mental health staff;

12          f.   Medication management, including the

13  establishment of an adequate formulary, ensuring timely refilling

14  of prescriptions, maintaining continuity of medication delivery,

15  providing adequate monitoring of medication recipients and

16  avoiding the hoarding of medications;

17          g.   Use of mechanical restraints and involuntary

18  medication on mentally ill inmates;

19          h.   The placement, retention and care of mentally

20  ill inmates in administrative segregation or segregated housing;

21          i.   Mental health screening of intra-departmental

22  transfers;

23          j.   Compilation and maintenance of mental health

24  records;

25          k.   Quality review and peer review program for

26  mental health services; and

1          1.   Procurement of mental health records from

2    county jails for newly admitted inmates and transfer medical

3    notes and records of inmates moved inter-institutionally within

4    the department.

5          2.   The provisions of the February 7, 1996 order

6    regarding defendants' implementation of and compliance with

7    court-approved plans remain in full force and effect.

8          3.   Beginning on April 15, 1997, the special master

9    shall review defendants' compliance with court-approved plans and

10   shall report on compliance quarterly.  In addition to the matters

11   listed above, the special master shall include:

12          (a) with the submission of plans for court

13   approval a report on the extent to which the defendants have

14   filled presently authorized mental health care positions;

15          (b) in his first compliance report filed in

16   accordance with this order a supplemental report on the

17   defendants' compliance with medication-related heat management

18   plans; and

19          (c) in the compliance report filed after approval

20   of plans for staffing ratios and recruitment (i) a report on the

21   extent to which defendants have filled any new mental health

22   positions created pursuant to the proposed ratios; and (ii) the

23   extent to which the defendants' compliance with their suicide

24   ////

25   ////

26   ////

1  prevention program is effected by the availability of mental

2  health staff.

3       IT IS SO ORDERED.

4       DATED:   January 30, 1997.

5

6                         LAWRENCE K. KARLTON
                          Chief Judge Emeritus
7                         United States District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4

United States District Court
for the
Eastern District of California
January 30, 1997

* * CERTIFICATE OF SERVICE * *

2:90-cv-00520

```
RECEIVED
JAN 3 1 1997
ROSEN BIEN & ASARO
```

Coleman

v.

Reagan

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 30, 1997, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

Donald Specter                          SJ/LKK
Prison Law Office
General Delivery
San Quentin, CA  94964

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Bruce Michael Slavin
Attorney General's Office of the State of California
50 Fremont Street
Suite 300
San Francisco, CA  94105-2239

J Michael Keating Jr
Christopher H Little & Associates
50 S Main St
Providence, RI  02903

Edmund F Brennan
United States Attorney
650 Capitol Mall
Sacramento, CA  95814


                                        Jack L. Wagner, Clerk

                                    BY: _____
                                        Deputy Clerk

# EXHIBIT M

FILED

DEC 11 1995

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

        JFM

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

            Plaintiffs,              No. CIV S-90-0520 LKK JFM P

       vs.

PETE WILSON, et al.,

            Defendants.              ORDER OF REFERENCE

_____/

        On November 17, 1995, the magistrate judge filed findings
and recommendations regarding a proposed order of reference of this
matter to a special master.  The findings and recommendations were
served on all parties and contained notice to all parties that any
objections to the findings and recommendations were to be filed
within ten (10) days.  On December 1, 1995, defendants filed
objections to the findings and recommendations.

        In accordance with the provisions of 28 U.S.C.
§ 636(b)(1)(C) and Local Rule 305, this court has conducted a de
novo review of this case.  Upon completion of said review, the

1  court finds that one objection raised by defendants warrants

2  further discussion and amendment of the order proposed by the

3  magistrate judge.

4       Defendants object to the proposed order of reference

5  insofar as it directs the special master to work jointly with

6  counsel for plaintiffs and counsel for defendants in development of

7  a remedial plan.  Defendants propose that the special master be

8  directed to work jointly with defendants and experts selected by

9  the special master.

10      The principal responsibilities of the special master, as

11 previously described by this court, are to provide expert advice to

12 defendants to ensure that their decisions regarding the provision

13 of mental health care to class members conforms to the requirements

14 of the federal constitution and to advise the court regarding

15 assessment of defendants' compliance with their constitutional

16 obligations.  (Order filed September 13, 1995, at 81-82 n.63.)

17 Thus, the main work of the special master in developing a remedial

18 plan will be with the defendants to this litigation, with due

19 regard for both the constitutional deficiencies identified by the

20 court and the deference owed to the discretion of prison

21 administrators in the discharge of their duties.

22      Nonetheless, this remains an adversarial proceeding where

23 both sides of the litigation are represented by counsel.  All

24 parties are entitled to the advice of counsel as this litigation

25 proceeds.  Therefore, while the special master will be directed to

26 /////

2

work with defendants, he will also be directed to consult with counsel for all parties as necessary in the discharge of his duties.[1]/

This court has appointed J. Michael Keating, Jr. to serve as a neutral special master pursuant to Federal Rule of Civil Procedure 53 and the inherent powers of the court. The purpose of this appointment is to assist the court in fulfilling its obligation to fashion a remedy for the constitutional violations in the delivery of mental health care to members of the plaintiff class and to monitor implementation of that remedy. The specific duties and powers of the special master, along with other terms of his appointment, are enumerated herein.

Good cause appearing therefore, the court hereby makes the following order of reference:

A.    Duties of the Special Master

It is HEREBY ORDERED that the duties of the special master are and shall be limited to the following:

1.    To work with defendants and experts to be selected by the special master in accordance with paragraph B(7), _infra_, to develop a remedial plan that effectively addresses the constitutional violations set forth in this court's September 13, 1995 order. In discharging this duty, the special master shall

---

1/ Counsel will be entitled to be heard in any proceeding before this court concerning the adoption of a remedial plan. The court, and the remedial process, will be greatly assisted if the special master has consulted with counsel and addressed their concerns, insofar as possible, prior to the time the proposed remedial plan is submitted to the court.

consult with counsel for plaintiffs and counsel for defendants as
he deems necessary to the discharge of said duty.

2.   To submit to the court within thirty (30) days of the
date of this order, a proposed timeline for development of said
remedial plan.   In developing said timeline, the special master
shall give due regard to the urgency of the problems to be remedied
and the timelines recommended in the June 6, 1994 findings and
recommendations.

3.   To make interim reports to the court on the progress
of the remedial plan.

4.   To monitor defendants' implementation of and
compliance with any remedial plan that this court may order.  It is
anticipated that the specific monitoring duties of the special
master shall be developed in further detail once an appropriate
remedial plan is fashioned and ordered by the court.

5.   To prepare and file with the court periodic reports
assessing defendants' compliance with such remedial plan as the
court may order.

Prior to such filing, the special master shall serve,
upon one designated representative of counsel for plaintiffs and
one designated representative of counsel for defendants, a copy of
each compliance report in draft form, and shall afford counsel a
reasonable time within which to submit to the special master
specific, written objections.  Upon the request of either party,
submitted in conjunction with the specific written objections, the
special master shall, after giving reasonable notice to counsel,

4

1  convene a hearing at which time he shall fully consider the written

2  objections of the parties.  Thereafter, the special master shall

3  serve and file his compliance report with the court in accordance

4  with Federal Rule of Civil Procedure 53(e)(1).

5         6.  To advise the court concerning any modification to

6  the remedial plan that is requested by a party or that appears

7  necessary to effectuate the purposes of the remedial plan.

8         7.  The duties set forth herein may be further specified,

9  expanded or modified only by order of this court.

10        B.  Powers of the Special Master

11        IT IS FURTHER ORDERED that the powers of the special

12  master are and shall be limited to the following:

13        1.  To enter, at any reasonable time, with or without

14  advance notice, any part of any facility at any California

15  Department of Corrections (CDC) institution except the San Quentin

16  State Prison, the Northern Reception Center at Vacaville and the

17  California Medical Facility-Main at Vacaville.

18        2.  To interview, on a confidential basis or otherwise,

19  correctional staff, employees, and appointees of the CDC for the

20  purpose of performing his duties under this Order of Reference.

21  Defendants shall provide suitable facilities and arrange for such

22  interviews to be conducted under conditions satisfactory to the

23  special master.  In addition, the special master may engage in

24  informal conferences with CDC staff, employees, and appointees, and

25  such persons shall cooperate with the special master and respond to

26  inquiries and requests related to the performance of his duties,

AO 72
(Rev.8/82)

1  including requests for the compilation or communication of oral or

2  written information.

3          3.  To interview, confidentially or otherwise, inmates

4  housed at any CDC institution, except the San Quentin State Prison,

5  the Northern Reception Center at Vacaville and the California

6  Medical Facility-Main at Vacaville, as may be necessary to perform

7  his duties under this Order of Reference.  Such interviews shall be

8  held at the institution where the inmate is incarcerated.

9          4.  To attend formal institutional meetings and

10  proceedings at CDC headquarters or at any CDC institution except

11  the San Quentin State Prison, the Northern Reception Center at

12  Vacaville and the California Medical Facility-Main at Vacaville as

13  may be necessary to perform his duties under this Order of

14  Reference.

15         5.  To have unlimited access to the records, files and

16  papers maintained by defendants to the extent that such access is

17  related to the performance of the special master's duties under

18  this Order of Reference.  Such access shall include all

19  departmental, institutional, and inmate records, including but not

20  limited to, central files, medical records, and mental health

21  records.  The special master may obtain copies of all such relevant

22  records, files, and papers.

23         6.  To require the posting of notices in any part of any

24  institution in the class in such number and form as the master may

25  direct to the extent that such notices are necessary and

26  appropriate to effectuate an effective remedy.

AO 72
(Rev.8/82)

7.  To retain or employ independent experts, specialists, assistants, administrative support staff or any other such person whose advice or assistance the special master deems necessary to the effective fulfillment of his duties under this Order of Reference.  All such persons, as well as the nature of their compensation, shall be approved by the court in advance of their retention or employment.

8.  To hold and conduct hearings with respect to defendants' implementation and compliance with such remedial plan as this court may order.  To this end, the special master shall have the power to require the attendance of material witnesses, including prisoners confined by the CDC, the defendants, and any employees or appointees of the CDC, and the special master shall exercise all other powers described in subsection (c) of Rule 53 of the Federal Rules of Civil Procedure.

9.  The powers described herein may only be modified by order of this court.

10.  In exercising the powers enumerated herein, the special master may act by himself or through employees of, or assistants to, the special master approved by the Court.  All actions of such assistant(s) or employee(s) shall be supervised and coordinated by the special master in order to accomplish the objectives of this reference.

11.  The special master shall not be empowered to direct defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance.  The sole power

7

1  to direct compliance and punish noncompliance remains with the

2  court.   Neither the special master nor anyone in his employ shall

3  intervene in the administrative management of the CDC or any of the

4  institutions that are part of the class in the instant action.

5          C.   Compliance Reports

6          IT IS FURTHER ORDERED that any compliance report of the

7  special master filed in accordance with paragraph A(5) above shall

8  be adopted as the findings of fact and conclusions of law of the

9  court unless, within ten days after being served with the filing of

10 the report, either side moves to reject or modify the report.   The

11 court will entertain no objection to the report unless an identical

12 objection was previously submitted to the special master in the

13 form of a specific written objection in accordance with the

14 provisions of paragraph A(5) above.   The objecting party shall note

15 each particular finding or recommendation to which objection is

16 made, shall provide proposed alternative findings or

17 recommendations, and may request a hearing before the court.

18 Pursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the

19 special master's findings of fact unless they are clearly

20 erroneous.

21         D.   Compensation of the Special Master

22         IT IS FURTHER ORDERED that the special master shall be

23 compensated at a reasonable hourly rate of one hundred fifty

24 dollars ($150.00) per hour for services performed in accordance

25 with this order, except that he shall be compensated at the rate of

26 seventy-five dollars ($75.00) per hour for travel time.   All

AO 72
(Rev 8/82)

1  reasonable expenses incurred by the special master in performing

2  his duties under this order shall be reimbursed as costs of the

3  mastership.

4         The special master's fees and expenses shall be borne by

5  the defendants as part of the costs of this action.  Defendants are

6  hereby ordered to deposit, within thirty (30) days of the date of

7  this Order, the sum of two hundred fifty thousand dollars

8  ($250,000.00) with the Clerk of the Court as an interim payment of

9  costs, which amount shall be invested in an interest-bearing

10 account.  All interest earned in the account shall accrue to the

11 benefit of defendants.  The special master shall periodically

12 submit to the Clerk of the Court, with a copy to defendants'

13 designated representative, an itemized statement of the special

14 master's fees and expenses, which shall be payable on receipt.  At

15 such point that the above sum is substantially drawn down, the

16 court may order defendants to deposit additional sums with the

17 Clerk of the Court.

18 DATED:  December **11**, 1995.

19

20

21                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

9

AO 72
(Rev.8/82)

United States District Court
for the
Eastern District of California
December 12, 1995


* * CERTIFICATE OF SERVICE * *


2:90-cv-00520

**RECEIVED**

DEC 1 3 1995

ROSEN, BIEN & ASARO

Coleman

v.

Reagan

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 12, 1995, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.


Donald Specter                          SJ/LKK
Prison Law Office
General Delivery                        CF/JFM
San Quentin, CA  94964
                                        Financial
Warren E George Jr
McCutchen Doyle Brown and Enersen
Three Embarcadero Center
Suite 1800
San Francisco, CA  94111

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Richard L Goff
Heller Ehrman White and McAuliffe
333 Bush Street
Suite 3100
San Francisco, CA  94104-2878

Amelia A Craig
Heller Ehrman White and McAuliffe
333 Bush Street
Suite 3100
SF CA 94104-2878

Ismael A Castro
Attorney General's Office of the State of California
P O Box 944255
1300 I Street
Suite 1101
Sacramento, CA  94244-2550

Karl S Mayer
Attorney General's Office of the State of California
50 Fremont Street
Suite 300
San Francisco, CA  94105-2239

Catherine I. Hanson
California Medical Association
221 Main Street
San Francisco, CA  94105

Ann M Hansen
Seltzer and Cody
180 Grand Avenue
Suite 1300
Oakland, CA  94612

Jack L. Wagner, Clerk

BY:  _____
        Deputy Clerk

# EXHIBIT N

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

       Plaintiffs,

    v.

PETE WILSON, etc., et al.,

       Defendants.

NO. CIV. S-90-520 LKK

O R D E R

**TO BE PUBLISHED**

    This court previously entered an order appointing a special master in this litigation concerning the conditions of confinement experienced by a class of California prisoners.  Below, the court determines the effect of  the Prison Litigation Reform Act on the compensation ordered paid the special master.

## I.

### HISTORY OF THE LITIGATION

    Plaintiffs, a class composed of mentally ill inmates in California's prisons, brought suit under 42 U.S.C. § 1983 alleging that they were being deprived of adequate medical care in violation of the Eighth Amendment to the Constitution of the United States.

1    The matter was referred to a magistrate judge of this court who,

2    after trial, found for plaintiffs and recommended various remedial

3    orders.   The defendants filed objections and, after extensive

4    briefing and argument, this court on September 13, 1995 entered an

5    order which essentially adopted the magistrate judge's findings and

6    noted that his recommendations "were to be implemented by

7    subsequent order of the court." Coleman v. Wilson, 912 F. Supp.

8    1282, 1324 (E.D. Cal. 1995).

9        In the same order the court, concluding that "[m]onitoring

10   compliance with the injunctive relief ordered" would be a

11   "formidable task," and thus exceptional circumstances existed, see

12   Fed. R. Civ. P. 53(b), determined that appointment of a special

13   master was appropriate. Coleman, 912 F. Supp. at 1324.   The special

14   master's duties were to be "twofold:   to provide expert advice to

15   the defendants to aid in ensuring that their decisions regarding

16   the provision of mental health care to class members conform to the

17   requirements of the federal constitution, and to advise the court

18   concerning issues relevant to assessing defendants' compliance with

19   their Constitutional obligations." Id. at n. 63.   The matter was

20   then referred back to the magistrate judge for recommendations

21   concerning who should be appointed as special master.

22       After consulting with the parties the magistrate judge

23   recommended an experienced prison conditions special master,

24   Michael Keating, Jr.   On December 11, 1995, by order of this court,

25   Mr. Keating was appointed.   The reference to the special master

26   directed the implementation of the remedial orders adopted by the

2

1   court and the defendants were ordered to pay his compensation and

2   expenses as a cost of suit. See Fed. R. Civ. P. 53(a).[1]  Since

3   then, the special master has undertaken the discharge of his

4   duties, and with the approval of the court, hired staff and various

5   experts to assist him.    Subsequent to the adoption of the

6   legislation in issue here, the special master, uncertain as to the

7   rate of his own compensation and whether his staff and retained

8   experts would be compensated at all, ceased work pending this

9   court's further direction.

10                              II.

11                 THE PLRA AND ITS EFFECT

12       On April 26, 1996, the President signed into law an omnibus

13  appropriations measure, which included amendments to 18 U.S.C.

14  § 3626.  These amendments, known as the Prison Litigation Reform

15  Act ("PLRA"), establish detailed rules for the administration of

16  prison litigation, including limiting the compensation special

17  masters may receive and directing that their compensation be paid

18  by the federal judiciary. See 18 U.S.C. § 3626.[2]  Because the Act

19  _____

20       [1] Compensation was fixed at one hundred fifty dollars per hour
     except for travel time which was allowed at seventy five dollars
21  an hour.

22       [2] Relative to compensation, the PLRA provides:

23       The compensation to be allowed to a special master under this
     section shall be based on an hourly rate established under section
24  3006A for payment of court-appointed counsel, plus costs reasonably
     incurred by the special master.  Such compensation and costs shall
25  be paid with funds appropriate to the Judiciary.

26  18 U.S.C. § 3626(f)(4).   (continued)

                              3

1   may apply to this court's previous order, because it may have a

2   significant effect on the special master and his ability to perform

3   his duties, and because the special master is unable to proceed

4   without clarification of his compensation, the court requested, and

5   the parties have submitted, briefing on the issue of the effect of

6   the PLRA's compensation clause.[3]

7       The statute provides that § 3626, as amended, "shall apply

8   with respect to all prospective relief whether such relief was

9   originally granted or approved before, on, or after the date of

10  enactment of this title." § 802(b) of Title VIII of the

11  Appropriations for, _inter alia_, the Judiciary. The statute then

12  defines prospective relief as "all relief other than compensatory

13  monetary damages." 18 U.S.C. § 3626(g)(7). In turn, 18 U.S.C. §

14  3626(g)(9) defines the term relief as "all relief in any form that

15  may be granted or approved by the court . . . ."

16  ////

17  ////

18  ////

19  ─────────────────────

20      By virtue of the Act, compensation for special masters
    appointed in this district will be limited to seventy five dollars

21  per hour.

22      [3] Subsequent to the hearing, the court requested input from
    the special master concerning the effects of the application of the
23  PLRA on his ability to perform his duties. Mr Keating submitted
    an affidavit which explained, _inter alia_, his overhead, the
    background and compensation for his staff,  and expressing his
24  concern that "the proposed fee reduction demeans my experience,
    reputation and ability and the dignity and value of the office of
25  the special master," he avers that " I will not continue to serve
    in the role at that rate." Declaration of J. Michael Keating Jr.,
26  filed June 24, 1996, at 7.

                                    4

1   Thus, to the extent that it may constitutionally do so, § 3626

2   applies to all nonmonetary relief ordered in the matter at bar.[4]

3   Under these circumstances, the first question that is tendered is

4   whether the appointment of Mr. Keating is "relief" for purposes of

5   § 3626.[5]

6       Plaintiffs argue that the appointment of a master is a means

7   of facilitating relief, rather than relief itself, and accordingly

8   _____

9       [4] The constitutionality of this statute is under question in
    a number of courts across the country.  One district court has
10  already entered an order declaring the automatic stay provision of
    the PLRA as unconstitutional.  See Hadix v. Johnson, No.
11  4:92:CV:110 (W.D. Mich. July 3, 1996).

12      [5] At least two other questions are potentially also tendered
    by the statute's locution:  Are the orders concerning a master's
13  renumeration "compensatory monetary damages," and does the
    compensation  provision apply if Mr. Keating was not appointed
14  under this section?  Both questions are less straight forward then
    they first appear.
15      Thus the statute provides for "[t]he compensation to be
    allowed to a special master under this section . . . ."
16  § 3626(f)(4).   If this phrase is understood to mean masters
    appointed under the amended § 3626, the subsection does not apply
17  to Mr. Keating because he was appointed before the section existed.
    On the other hand, if it was intended that (f)(4) apply to any
18  master whether appointed "before, on or after" adoption of the
    statute, then under the statute Mr. Keating's compensation has been
19  reduced from $150 per hour to $75 per hour, despite his having
    agreed to accept the position based on the higher rate. A proper
20  resolution of this issue may turn on whether Congress has specified
    the retroactive effect of (f)(4), or whether there is an ambiguity;
21  See Landgraf v. US Film Products, 511 U.S. _____, 128 L.Ed. 229
    (1994).
22      Moreover, given that Mr. Keating has undertaken the discharge
    of his duties pursuant to the court's previous order, and changed
23  his position in reliance thereon, there is a question as whether
    as to him there is a final order relative to compensation which
24  Congress may not now alter.  See Plaut v. Spendthrift Farm, Inc.,
    514 U.S. _____, 131 L.Ed.2d 328 (1995).
25      Given the disposition of the question of the meaning of
    "relief" in the text, I need not address these difficult questions
26  which implicate issues of a constitutional dimension.

1  the statute does not effect compensation of a previously appointed

2  master.[6]  The matter is one of statutory construction.

3  Accordingly, I first turn to the statutory definition. See

4  Gustafson v. Alloyed Co., ___ U.S. ___, 131 L.Ed.2d 1, 21 (1995)

5  (Thomas, J. dissenting citing FDIC v. Meyer, 510 U.S. ___, 127

6  L.Ed.2d 308 (1994))(Where the statute defines a term that

7  definition, rather than common meaning, governs).

8       Unfortunately, the statutory definition of "relief" violates

9  the first rule of a meaningful definition, which is that "[t]he

10  term being defined or a synonym of it should not appear in the

11  definition." Harris v. Tomczak, 94 F.R.D. 687, 698 n.17 (E.D. Cal.

12  1982)(quoting Daniel S. Robinson, *The Principles of Reasoning:*

13  *Introduction of Logic and Scientific Method*, (3rd Ed., 1947) at p.

14  58.)  The reason for this rule is plainly demonstrated by the

15  instant case.  The statutory definition sheds no light on the

16  disputed term's meaning since "relief" is in essence defined as all

17  _____

18       [6] Remarkably, defendants do not respond to the argument,
   apparently taking the position that if the statute applies at all,
19  it self-evidently applies to the future compensation due the
   master.  In sum, their position appears to be that because the
20  statute specifies application to relief granted prior to the
   effective date of the statute, and the overall purpose of the
21  statute is regulation of prison conditions litigation, the term
   "relief" as used in the statute should include the compensation of
22  previously appointed masters.  Such a generic approach is
   inappropriate.  While it is true that intent is gleaned from
23  reading the statute as a whole, Conroy v. Aniskoff, 507 U.S. 511,
   ___, 123 L.Ed.2d 229, 236 (1993), Congress expresses its intent
24  through the language it uses, and it is analysis of that language
   which determines its intent. Connecticut Nat'l Bank v. Germain, 503
25  U.S. 249, ___, 117 L.Ed.2d 391, 397 (1992)("courts must presume
   that a legislature says in a statute what it means and means in a
26  statute what it says").

1  relief.  Thus, while the definition teaches that it encompasses all
2  instances  of  the  term,  it  does  not  tell  us  what  demarks  and
3  distinguishes those instances from others.  Accordingly, the court
4  must  look  elsewhere.  Doing  so  leads  to  the  conclusion  that
5  compensation of a special master is not "relief" within the meaning
6  of the statute.

7      Because  "relief"  in  this  context  addresses  a  question
8  concerning the orders of a court, it is appropriate to look to
9  whether the term has a specialized legal meaning.  <u>See</u> <u>Youngberg v.</u>
10 <u>The Bekins Co.</u>, ___ F. Supp. ___, No. CIV S-95-896, slip. op. at
11 8 n.7 (E.D. Cal. June 24, 1996)(quoting <u>Evans v. United States</u>, 504
12 U.S. 255, 259 (1992)).  The standard legal dictionary suggests as
13 a definition of relief in this context ". . . a general designation
14 of the assistance, redress, or benefit which a complainant seeks
15 at the hands of a court, particularly in equity.  It may be thus
16 used of such remedies as specific performance, injunction, or the
17 reformation of recision of contracts." <u>Black's Law Dictionary</u>, 5th
18 Ed., p. 1161.  This definition, focusing on the ultimate legal form
19 of remedy rather than the means of achieving the remedy, appears
20 to favor plaintiffs' position.  Moreover, to the extent that the
21 definition points the court to the plaintiffs' requested remedy,
22 i.e. "assistance, redress, or benefit which a complainant seeks,"
23 a review of the amended complaint indicates that the appointment
24 of a special master was not sought by the plaintiffs.
25 ////
26 ////

1    An interpretation recognizing a distinction between the relief

2    ordered and the appointment of a special master is supported by the

3    court's order adopting the magistrate judge's findings and

4    recommendations in this case.    There, the court distinguished

5    between the remedies required to cure the constitutional

6    deficiencies, <u>Coleman v. Wilson</u>, 912 F. Supp. at 1323, and the

7    appointment of a special master. <u>Id.</u> at 1324 (noting the need to

8    appoint a master "to monitor compliance with the court ordered

9    injunctive relief").

10    All the above leads the court to conclude that, although

11    § 3626 may apply to "future prospective relief," that term does not

12    apply to the compensation of a previously appointed special

13    master.[7]    The court concludes that the amendments to § 3626

14    effectuated by the PLRA are inapplicable to the court's appointment

15    of Michael Keating, Jr. in the matter at bar.

16    ////

17

18    [7] While the court believes that the issue is resolved by
virtue of the meaning of the word "relief," viewed as a term of
19    art, even if there is an ambiguity, the resolution of the question
adopted in the text would be appropriate because it avoids the
20    constitutional question noted in n.5 <u>supra</u>, which might otherwise
have to be addressed. <u>See</u> <u>St. Martin Lutheran Church v. South</u>
21    <u>Dakota</u>, 451 U.S. 772, 780 (1981); <u>DeBartolo Corp. v. Florida Gulf</u>
<u>Trades Council</u>, 485 U.S. 568, 575 (1988).

22    The court also believes that since construction can be
resolved as a matter of plain legal meaning, it need not examine
23    the legislative history.  If called upon to do so, the court notes
that the history at least suggests that Congress, having been
24    warned of the possible constitutional issue, revised the statute's
language from its originally introduced language to its present
25    form. <u>See</u> S. 400, 104th Cong., 1st Sess. (February 14, 1995); S.
866 104th Cong., 1st Sess. (May 25, 1995); S. 1279, 104th Cong.,
26    1st Sess. (September 27, 1995); 141 Cong. Rec. § 14408-10, § 14418
(September 27, 1995); 1995 WL 496910 (F.D.C.H.) at 13.

8

1    Accordingly, Mr. Keating is DIRECTED to resume his duties and

2    the state is ORDERED to continue to compensate him under the

3    court's original order.[8]

4        IT IS SO ORDERED.

5        DATED: July 11, 1996.

6

7                                LAWRENCE K. KARLTON
                                 CHIEF JUDGE EMERITUS
8                                UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21 ───────────────

22        [8] Mr. Keating has also expressed concern that 18 U.S.C.
   § 3626(f)(6)(B), restricting ex parte communication by the special
23 master "negates the traditional mediating role [of] masters". The
   court had read the section as relating solely to formal fact-
24 finding and thus having no effect on the master's mediation role.
   Given the master's reading, the court now directs the defendants,
25 if they share the master's view, to bring on a motion to modify the
   Order of Reference in this regard within fifteen (15) days. If
26 defendants fail to do so, the issue will be deemed waived.

9

United States District Court
for the
Eastern District of California
July 15, 1996


* * CERTIFICATE OF SERVICE * *


2:90-cv-00520


Coleman

v.

Reagan

**RECEIVED**

**JUL 1 6 1996**

ROSEN, BIEN & ASARO

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  July 15, 1996, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.


Donald Specter                          SJ/LKK (7 Copies)
Prison Law Office
General Delivery                        CF/JFM
San Quentin, CA  94964
                                        SA

~~Michael W. Bien~~
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Bruce Michael Slavin
Attorney General's Office of the State of California
50 Fremont Street
Suite 300
San Francisco, CA  94105-2239

J Michael Keating Jr
Christopher H Little & Associates
50 S Main St
Providence, RI  02903

Edmund F Brennan
United States Attorney
650 Capitol Mall
Sacramento, CA  95814

Jack L. Wagner, Clerk

BY: *K Carlos*
K Carlos, Deputy Clerk

# EXHIBIT O

# FILED

JUN 27 1997

CLERK, U. S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

    vs.

PETE WILSON, et al.,

        Defendants.

No. CIV S-90-0520 LKK JFM P

<u>ORDER</u>

      Pursuant to previous orders of the court, on June 6, 1997, the special master submitted for court approval plans, procedures, policies, forms and other documents relevant to the defendants' delivery of mental health care to members of the plaintiff class (hereafter "remedial plans"). The submission was accompanied by a report from the special master containing specific recommendations concerning issues remaining in five areas. Neither party has filed any objection to the special master's report or to the remedial plans submitted for court approval.

      After review of the record herein, and good cause appearing therefore, the special master's report will be accepted by the court. The court will direct defendants to make the modifications recommended by the special master, will provisionally approve the remedial plans submitted by the special master as so modified, and will direct the special master to commence

1

1  monitoring defendants' implementation of and compliance with the remedial plans in accordance

2  with the court's December 11, 1995 order.

3         In connection with commencement of the monitoring phase, the special master

4  asks for direction concerning the extent, if any, to which he should monitor defendants' use of

5  mechanical restraints on class members, and defendants' suicide prevention policy.[1]  He reports

6  that the parties are in agreement on the substance of defendants' policies in both of these areas.

7  The special master will not be required to separately report on defendants' implementation of or

8  compliance with the policies in either of these areas, unless defendants' policies in either of those

9  areas affect matters that the special master is required to report on; in such an event, nothing in

10  this order precludes him from tendering a complete report to the court.

11         In accordance with the above, IT IS HEREBY ORDERED that:

12         1.  The June 6, 1997 report of the special master on plans is accepted by the court;

13         2.  Within fifteen days from the date of this order, defendants shall make the

14  modifications recommended by the special master in the June 6, 1997 report, as follows:

15         a.  Defendants shall modify their policy on the use of Clozapine to

16  specifically include a provision granting to CDC psychiatrists the discretion to maintain on the

17  drug a newly arrived inmate, already stabilized on Clozapine through a program other than those

18  at Atascadero State Hospital or Patton State Hospital, subject to the housing and monitoring

19  conditions recited in the policy.

20         b.  Defendants shall adopt a process whereby custodial administrators who

21  override a clinical recommendation to transfer an actively decompensating inmate out of

22  administrative segregation are required to put the reasons for the override in writing and the

23  override is subject to review.

24  /////

25

       [1]  The master notes that the parties have agreed on the substance of defendants' policies in

26  both of these areas.

3. As modified, defendants' remedial plans are provisionally approved;

4. The special master shall forthwith commence monitoring defendants' implementation of and compliance with the remedial plans provisionally approved by the court in accordance with this court's December 11, 1995 order of reference; and

5. The special master shall file compliance reports on a quarterly basis. Said quarterly reports shall include, but are not limited to, reports on specific issues as recommended by the special master in his June 6, 1997 report on plans.

DATED: June 2 4, 1997.

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
June 27, 1997

\* \* CERTIFICATE OF SERVICE \* \*

2:90-cv-00520

Coleman

v.

Reagan

RECEIVED

JUN 3 0 1997

ROSEN BIEN & ASARO

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on June 27, 1997, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

Bruce Michael Slavin
Attorney General's Office
50 Fremont Street
Suite 300
San Francisco, CA  94105-2239

J Michael Keating Jr
Christopher H Little & Associates
50 S Main St
Providence, RI  02903

SJ/LKK

Edmund Brennan
USA

Jack L. Wagner, Clerk

by: Deputy Clerk

Michael W Bien
Rosen Bien and Asaro
155 Montgomery Street
Eighth Floor
San Francisco, CA  94104

RECEIVED

JUN 3 0 1997

ROSEN BIEN & ASARO

-------------------------------

Re: 2:90-cv-00520

-------------------------------

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                      No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

RECEIVED

JUN 6 1997

ROSEN BIEN & ASARO

## SPECIAL MASTER'S REPORT ON PLANS

On January 30, 1997, the court entered an order directing the special master to submit for approval plans, procedures, policies, forms and other applicable documents on the defendants' mental health care delivery system by mid-April. On April 17, 1997, the court extended the deadline for submission of the plans to May 30, 1997.

This report accompanies six volumes of materials, including program guides, policies, plans, policy and procedure manuals, forms, training materials and memoranda, as follows:

    1.      Volume I: <u>California Department of Corrections (CDC) Mental Health Services Delivery System Program Guides</u>, dated May, 1997.

    2.      Volume II: <u>Mental Health Services Delivery System Training Materials</u>.

    3.      Volume III: <u>Coleman Documents</u>, the so-called <u>Blue Book</u>, which contains a miscellany of materials, including memoranda, reports, bulletins, procedures, etc. ,keyed to the <u>Coleman</u> court order.

    4.      Volume IV: <u>CDC Health Care Services Division Drug Formulary</u>, dated March, 1996.

5.      Volume V:  <u>Mental Health Services Delivery System Mental Health Forms</u>
<u>Orientation Handbook</u>, dated April 1996.

6.      Volume VI:  <u>Correctional Treatment Center Policy and Procedure Manual:</u>
<u>Health Records Service;  Pharmacy; and Mental Health Volumes</u>, revised on April 3, 1997.

These materials have been the subject of intense scrutiny over the past four months as
parties, counsel, master and master's staff and experts have engaged in an exhaustive review and
critique of the documents contained in this submission.  In February and March, counsel and
parties met separately with the master and his staff and experts during nine full days of meetings
to discuss, issue by issue, the defendants' proposed plans, policies and supporting documents.
During April and May, parties and counsel met together with the master and his staff and experts
for five days of meetings to reconcile differences, where possible, and define clearly their
respective positions on unresolved differences.  The results of that process are impressive.  With
few exceptions, the parties agree that the blueprint for the defendants' mental health care delivery
system contained in these documents describes a system that comports with the requirements of
the court in this case.

While the extent of agreement between the parties is exceptional, some disagreements
persist.  The court has consistently identified 12 broad areas of concern in the defendants'
delivery of mental health care.  In five of those areas, including training, the use of non-lethal
weapons, the screening of intra-departmental transfers, health records and the acquisition of
county records, the parties have reached agreement on governing plans and policies.  Relative to
the use of non-lethal weapons, the parties agree that there is a need to integrate the policies
adopted during this process for the use of force against seriously mentally disordered inmates
into the department's general policies governing the use of force.  The defendants have

committed themselves to the task of integration through the elaborate administrative procedural process required for the amendment of the departmental operations manual.

In addition, the parties have agreed to the criteria for mental health treatment developed by the defendants. The parties believe that the criteria currently articulated in the defendants' policy, if fully and faithfully implemented in the field, will serve adequately to identify seriously mentally disordered inmates who need treatment. The monitoring phase of the mastership will examine closely and carefully the department's success in implementing the criteria agreed to in this process.

In five other broad areas, there is agreement on the bulk of the relevant plans and policies, but some disagreement on one or more specific issues. These include:

**Medications**: One remaining issue in the area of medications involves the defendants' restricted use of Clozaril/Clozapine. Clozapine is an antipsychotic medication for the management of schizophrenic patients who fail to respond to standard antipsychotic drug treatment. The drug has serious potential side effects, including agranulocytosis (a reduction of the white cell blood count) and seizures, that impose extraordinary monitoring requirements and, from the defendants' perspective, great potential legal liability. Until now, the department has restricted the use of Clozapine solely to CDC inmates transferred to and housed in Atascadero State Hospital (ASH) or Patton State Hospital (PSH). Once placed and stabilized on Clozapine at ASH or PSH, a CDC inmate remained there, and could not return to CDC. Largely because of the high placement costs associated with ASH and PSH, the department has recently decided to authorize the use of Clozapine in three designated CDC institutions, but only for those inmates for whom the use of Clozaril was initiated at ASH or PSH and whose use of the drug has become fully stabilized. This means that Clozapine is not included in the department's drug formulary,

nor is it regularly available for prescription by a psychiatrist in the department who wishes to initiate its use to treat a schizophrenic inmate.

The plaintiffs object to the defendants' restrictions on the use of Clozapine, and argue that it is an accepted and commonly used medication and ought to be available for use by CDC psychiatrists in appropriate cases. They also point to the anomaly that would refuse Clozapine to a newly arrived schizophrenic inmate from the community, already stabilized on Clozapine, because the use of the drug had not been initiated at ASH or PSH.

The defendants reply that, given the serious side effects of Clozapine, their caution in its use is fully justified. They point to successor drugs to Clozapine, like Olanzapine, which treat the same symptoms with less serious side effects and which are available to psychiatrists in the department. They add that, in any rare case in which an inmate, already stabilized on Clozaril in some community or other non-DMH program, enters CDC, his or her future treatment would be decided on the basis of a clinical judgment in the individual case, although that is not explicitly permitted in the submitted policy.

Recommendation: The master recommends approval of the defendants' policy for the use of Clozapine, amended to specifically include a provision granting to CDC psychiatrists the discretion to maintain on the drug a newly arrived inmate, already stabilized on Clozapine through a program other than those at ASH or PSH, subject to the housing and monitoring conditions recited in the policy.

Screening/Reception: There are three unresolved issues in the screening and reception area:

1.    Unscreened inmates: There are inmates in the population who have not received a mental health screening (i.e., they have not undergone the 31-question mental health screening

test administered by a psychologist or a master's level mental health clinician) since introduction

of the reception center screening process in mid-1994. The defendants believe that, between the

turn-over in population, regular screenings of inmates placed in administrative segregation and

the system now in place for the referral of inmates with mental health problems, the population

of unscreened inmates is probably small. They also argue that the last two measures ensure that

inmates in the population who have not yet been screened, but who have needed, or who need,

mental health care, will be identified and attended to.

The plaintiffs argue that the terms of the findings and recommendations and the final

order in this case quite clearly require the mental health screening of all inmates, citing the

court's observation that identification of the need for mental health treatment cannot be left to

untrained staff or inmates who, by virtue of their condition, may be incapable of gaining access

to mental health care. While the plaintiffs agree that the number of unscreened inmates may be

small, they suggest that the actual number is uncertain and seek some formal plan to identify and

screen all those in the population who have yet to be screened.

Recommendation: No one knows the size of the unscreened population, although

there are indications that it is small. The master should be directed to conduct a survey through a

random sampling of medical records in some representative facilities during early implementa-

tion monitoring to assess the extent of the problem. Based on the findings from this survey, the

master should submit an appropriate recommendation on this issue with his first quarterly

monitoring report to the court.

2.    Identifying inmates with a past serious mental disorder:  Another unresolved issue

involves the identification and tracking of inmates with a past history of mental illness, but no

present symptoms, who are not included in the active mental health caseload at the time of their

entry into CDC. In terms of the plans submitted to the court for approval, the issue arises in the context of the computerized two-digit identifier code used by the defendants to identify recipients of the department's mental health care services.

Plaintiffs want to see inmates with a past history of serious mental disorder, who are presently able to function adequately in the institutional environment, identified so that, in the event of some future deterioration of their condition, the fact of their past serious mental illness will trigger automatically and immediately active consideration of that past on the inmate's present behavior. The defendants respond that anyone with a past history involving the ten enumerated categories of serious mental disorders designated for treatment in the department, which are characterized by chronic remissions and decompensation, are earmarked routinely for treatment and, thus, included in the code. They also point to the requirement to screen inmates placed in administrative segregation for mental health problems as another safety net for identifying possibly decompensating inmates.

Recommendation: The focus here is not on a requirement to identify and record newly arrived inmates' past mental health problems. Such a requirement already exists. Responses to the 31-question mental health screening instrument, as well as positive responses to questions in any follow-up psychological evaluation, relative to past mental health problems are supposed to be included in an inmate's mental health record. Under policies included in this filing, if a deteriorating inmate self-refers, or is referred, for mental health care, any attending clinician will have access to the inmate's unit health record with its information on past problems; if a deteriorating inmate is charged with a disciplinary infraction that requires housing in administrative segregation, he or she will receive a mental health screening, which also requires referral to the inmate's unit health record with any relevant information on prior mental health

treatment. The question here is whether the defendants must include in their computerized coding system a category for, and a list of, inmates with a history of serious mental disorder, who are presently coping.

Because there is uncertainty about the extent to which information on inmates' past mental health history may, or may not, be available to clinicians or disciplinary hearing officers, it is premature to consider imposing on the defendants a requirement to expand their identifier code system. This is another area where the monitoring process can develop data on the nature and size of the problem, if there is one, and subsequently make whatever policy recommendation seems appropriate. The master should be directed to do so and submit a recommendation on this issue in his second quarterly implementation report.

3.      <u>Validation of the screening instrument</u>: The plaintiffs urge the necessity for conducting a formal validation of the 31-question screening instrument the defendants use for their basic mental health assessment of all inmates. The plaintiffs' principal concern is determining whether the screening instrument misses individuals who actually need mental health services and who, in the absence of such services, subsequently experience some sort of negative outcome.

The defendants respond that their quality assurance system will look at negative outcomes among inmates not initially identified for treatment, and insist that the overall mental health delivery system was designed to provide inmates with prompt access to mental health care through self-referrals or staff referrals, whenever mental health needs arise. Moreover, because the screening instrument is identifying 20 to 25 percent of the screened population for further psychological evaluation, it is meeting the targeted numbers predicted by the various expert projections and consultant studies that estimated CDC's mental health needs. Finally, the

defendants argue, a formal validation is a complex and expensive undertaking, the results of which are rarely definitive, and, to date, there is no mental health screening instrument used in a prison that has been formally validated. On the other hand, the defendants concede that, at some point in the evolution of their mental health care delivery system, they intend to conduct some sort of evaluation of the screening instrument. Indeed, in 1995, they engaged a nationally respected consultant to assess the screening instrument and process, though not to conduct a formal validation. That assessment, they report, was favorable. For all of these reasons, the defendants decline to commit to a formal validation process for the questionnaire, and deny that such a process is required by the findings and orders in this case.

Recommendation: The master's experts concede the cost and difficulties of conducting a formal validation cited by the defendants. They also feel the need to assess through some evaluative process the ability of the mental health screening instrument and process to identify successfully those inmates in the population who need to receive mental health care, while limiting the number of false-positives identified in the screening.

The defendants ought not be compelled to undertake a formal validation process. Initial monitoring efforts aimed at assessing the adequacy of care provided by the defendants through the review of records ought to focus sharply on observed failures of the screening process to identify inmates who should have, and could have, been identified at entry for mental health treatment.

**Inpatient Transfers**: The remaining source of disagreement in this policy area is related to the timelines for transfer of seriously mentally disordered inmates to Mental Health Crisis Bed (MHCB) programs and from MHCB programs to Department of Mental Health (DMH) programs. The defendants' policy sets a time limit of 24 hours for the transfer of emergency

cases to MHCB beds. Presumably that 24 hours is measured from the clinician's determination of the need to remove the inmate, although the policy does not explicitly so state.

Another specific policy provision requires transfers, presumably not involving an emergency, to California Medical Facility (CMF)/DMH programs or to the California Men's Colony (CMC) and the California Institution for Women (CIW) for eventual referral to ASH or PSH, to occur within 72 hours of endorsement. The uncertainty here lodges in that period between clinical determination of the need for a move and endorsement, a passage of time not necessarily within the full control of the clinician, which erodes the value of the 72-hour deadline for movement. There are no other clear timelines for movement in the policy, although state regulations relative to Correctional Treatment Centers (CTCs), within which the defendants' MHCB programs are housed, impose a ten-day limit on the retention of mental health patients with acute psychiatric problems in a CTC.

There is, moreover, some uncertainty about actual practices in the department relative to the timing of transfers and the length of time inmates actually spend in MHCB units. The defendants have recently introduced a system and structure for the management of these mental health population movements that reportedly expedites needed transfers with efficiency. The monitoring that occurred in mid and late-1996 indicated that the movement to inpatient programs was significantly improved over the pace of inpatient transfers that existed at the time of the hearing of this case.

Recommendation: This appears to be another policy area that requires the master to collect data over the next six months and, based on his findings of fact, make appropriate recommendations for specific timelines for the defendants' inpatient transfer plan.

**Quality Assurance**:  Here, again, there was broad agreement over the substance of policy, but disagreement over timelines for implementation of some of the elements of the quality assurance system.  In particular, the plaintiffs objected to the defendants' projected mid-1998 initiation of the peer review system within service areas (regional administrative clusters of institutions with inter-dependent mental health programming), and to the mid-1999 institutional introduction of the Quality Assessment and Improvement (QA&I) component of the quality assurance structure.  These dates suggest the extent of departure of the defendants' schedule for the implementation of their quality assurance system from the schedule envisioned in the June 6, 1994 Findings and Recommendations, which contained a deadline of 90 days after entry of a final order for the development and implementation of a quality assurance program.  Among all of the defendants' efforts to create the framework for a mental health system, plans for a formal quality assurance system are of the most recent vintage and, consequently, were the most raw of the materials presented to the master and plaintiffs for review.  There has not been enough time in this process of scrutiny to complete an implementation schedule that meets the approval of the parties, but doing so does not seem impossible, given some additional time within which to work.

    Recommendation:  The master should be directed to work with the parties to reach agreement on an implementation schedule for the quality assurance plan or, in the absence of agreement, to submit a recommended schedule along with the first quarterly monitoring report.

**Administrative Segregation**:  The parties agreed on most of the policies and plans relevant to the delivery of mental health services in administrative segregation.  There were, however, two issues on which the parties could not fully agree:

    1.    <u>The placement and treatment of EOP and 3CMS inmates in administrative</u>

<u>segregation</u>: There are two different aspects of this issue, one relating to the placement of some

EOP and 3CMS inmates[1] in administrative segregation, the other focusing on the treatment

provided to EOP and 3CMS inmates once they are housed in administrative segregation. As to

the placement issue, while the plaintiffs argue generally that inmates in an EOP program

probably ought never be placed in administrative segregation, they are particularly concerned

about placing EOP or 3CMS inmates who might decompensate, or who a clinician determines

are especially likely to decompensate, in administrative segregation. Plaintiffs urge that policy

empower mental health clinicians to prevent the placement in administrative segregation of

inmates who can be clinically identified as likely to decompensate in the administrative

segregation environment, or who have a history of such decompensation in past exposures to

administrative segregation.

    The defendants respond that it is impossible to identify clinically who is likely to

decompensate and that it is equally impossible to determine clinically that the administrative

segregation environment itself actually caused decompensation in those with a past record of

such decompensation. The defendants remain committed to working with EOP inmates in

administrative segregation, while attempting to expedite their placement elsewhere, where

---

[1] EOP stands for enhanced outpatient program and represents the defendants' most intensive level of outpatient care for inmates who experience adjustment difficulties in the general population, but who are not so impaired they require 24-hour inpatient care. EOP services typically include management of daily living activities, group and individual psychotherapy, medication management, recreational therapy and clinical pre-release planning, all provided in housing separate from the general population. 3CMS stands for correctional clinical case management system, which provides outpatient mental health services to inmates in the general population. Such services range from simple medication monitoring to linkages to psychotherapy and other supportive services and the direct provision of counseling and therapy.

appropriate or necessary, and to provide one-on-one mental health services to 3CMS-level

inmates in administrative segregation.

A different concern of the plaintiffs is about the defendants' ability to provide needed

therapeutic services to EOP inmates in administrative segregation. The defendants say they are

committed to meeting the needs of these inmates, as best they can, within the administrative

segregation context by providing medication, careful monitoring of any deterioration that might

necessitate acute care and individual therapeutic contacts as required. They also express a

commitment to expedite the dispositions of infractions of those prisoners whose psychiatric

needs might be better served outside of administrative segregation, especially those at an EOP

level of care. There is no disagreement among the parties that inmates experiencing

decompensation or some other mental health crisis, who need acute inpatient care, shall be

removed from administrative segregation at the direction of an appropriate mental health

clinician.

Plaintiffs argue that EOP treatment goals and needs, which, according to the defendants'

own program guides, involve a minimum of ten hours a week of structured therapeutic activities,

cannot be met in administrative segregation. The defendants reiterate their belief that only crisis

or acute care treatment needs ought to override those safety and custody interests addressed by

placing inmates in administrative segregation. For all other administrative segregation inmates

with mental health treatment needs, the defendants are committed, as indicated already, to

providing individualized treatment (i.e., individual therapeutic contacts), in addition to

medication, close observation and working to expedite prompt transfer out of administrative

segregation.

Relative to 3CMS treatment in administrative segregation, the defendants note that, with a full-time psych tech assigned exclusively to administrative segregation five days a week in each institution, as well as visits from an inmate's regular clinician/case worker, 3CMS inmates in administrative segregation get more attention and quicker follow-up than 3CMS patients in the general population. In addition, the defendants point out, an MTA delivers medications on weekends, and emergency on-call coverage is provided. While the plaintiffs continue to dispute whether those 3CMS inmates a clinician thinks might decompensate ought to be housed and treated in administrative segregation, the parties seem to agree that other 3CMS inmates might be treated in administrative segregation for a limited period, provided they did not spend inordinately long periods in administrative segregation for relatively minor infractions.

Recommendation: The master's experts' first concern is for those individuals in administrative segregation for whom acute inpatient care is indicated. They find the defendants' provisions for dealing with those cases adequate. More difficult are those cases in which an inmate is beginning to deteriorate, or whose decompensation is gathering steam, when a clinician wants to transfer an inmate out of administrative segregation in anticipation of a worsening situation. Here, the experts believe, there ought to be a process in which clinicians have strong input to bring about a transfer, and in those instances where custody or safety issues override the clinical imperative, custodial administrators ought to be required to put their reasons for the override in writing, and such decisions should be subjected to review. The master believes the defendants have agreed to implement such a process, and will amend the relevant policy provisions to reflect that agreement. Once past that issue, the experts are willing to let the defendants try to provide some outpatient mental health services in administrative segregation, provided there are meaningful efforts to limit the duration of the stay of seriously mentally

-13-

disordered inmates in administrative segregation. They urge close scrutiny of the application of the defendants' policies for the delivery of care in administrative segregation during the monitoring phase to determine whether the reality of delivered care matches the abstract policy directives.

Ultimately, the success of the defendants' efforts to meet the needs of inmates in administrative segregation with serious mental disorders depends on the creation of a collaborative relationship between custodial and mental health professionals. A shared respect for and understanding of the legitimacy of their respective interests and the constraints under which they must both operate are the keys to a fruitful collaboration. There are some encouraging indications that, in some institutions, a pattern of collaboration is beginning to emerge. The goal of this process ought to be to encourage and nuture that development.

The master recommends the provisional adoption of the defendants' plans for the delivery of mental health treatment services to EOP and 3CMS inmates in administrative segregation, as well as the adoption of the master's experts' suggestion for handling cases involving actively decompensating inmates. The master ought also be directed to submit any additional recommended changes, consonant with his findings during the next 180 days, with his second quarterly report.

2.    <u>The role of mental health clinicians in the disciplinary process</u>:  Current departmental policy deliberately limits the input of mental health clinicians in determinations of guilt for disciplinary infractions by inmates with serious mental disorders. The policy reflects the defendants' belief that it is inappropriate for clinicians to influence decisions on institutional, staff and inmate safety, unless, of course, the accused inmate is undergoing some sort of mental health crisis and in need of acute inpatient care. The dialogue among parties and counsel on this

-14-

issue made clear, however, that parties agree that clinical input into the subsequent disposition of disciplinary adjudications is both critical and appropriate. Penalties resulting from the disciplinary process typically include confinement for periods in administrative segregation, loss of good-time credit, and the imposition of points (leading to a higher level of custodial classification), all of which can have an important effect on the access to mental health care of seriously mentally disordered inmates.

The defendants have indicated that input from mental health clinicians will be most useful and appropriate when determining the disposition of the disciplinary infraction. The defendants are committed to creating avenues for such input, but have not been able to do so in time to include them formally in this submission to the court.

Recommendation: The defendants should be given additional time to develop this policy, which should be submitted for approval with the master's first compliance report.

Finally, there are two broad areas in which the parties have not reached agreement relative to policies, but have nonetheless agreed on how to proceed to address their differences:

**Staffing and Recruitment**: The principal obstacle to agreement on this issue is the absence of an objective or validated rationale for the defendants' staffing patterns for different disciplines within the variety of evaluative and treatment components of their mental health care delivery system. Given the diversity within CDC of the nature, custody level and location of institutions within an overall context of explosive growth, in addition to the complexities of the mental health services delivery system itself, the articulation of a precise rationale for staffing patterns defies easy solution. The defendants have adopted and modified somewhat the recommendations of the so-called Scarlett Carp report, but are unable at this point to assess their adequacy. Neither the plaintiffs nor the master's experts are entirely satisfied with

the rationale for the defendants' current staffing patterns, but they are not in a position currently to articulate a more acceptable rationale of their own. Both feel the need to obtain a better understanding of the practical impact of existing staffing patterns.

On the other hand, both plaintiffs and the master's experts are concerned about vacancies in the defendants' authorized clinical mental health positions. Table I shows the number of authorized positions and vacancies as of April 1, 1997 in key classifications in the defendants' mental health delivery system. The defendants point to the exceptional growth in the number of authorized clinical positions over the past three years as the principal source of the problem. The department's clinical staff has nearly tripled during that period. Nonetheless, the defendants have identified the authorized staff they feel is necessary for the implementation of the mental health care delivery system, and there are vacancy rates of better than 20 percent in some key positions. The department uses contracted services to cover the gap to some extent, but that measure satisfies neither the plaintiffs nor the defendants, and presents problems of both quantity and quality.

## Table 1

## CDC Mental Health Staffing Allocations and Vacancies

## As of April, 1997

| Classification | Authorized Staff | Vacancies (#s/%) |
|---|---|---|
| Asst. Supt. Psychiatrist | 1 | 0  (o%) |
| Chief Psychiatrist | 21.5 | 4  (18.6%) |
| Senior Psychiatrist | 11 | 2  (18.1%) |

| | | |
|---|---|---|
| Staff Psychiatrist | 96.2 | 22  (22.8%) |
| Chief Psychologist | 4 | 0  (0%) |
| Senior Psychologist | 42.5 | 5.5  (12.9%) |
| Clinical/Classification Psychologist | 162.8 | 18.85 (11.5%) |
| Supt. Psych Social Worker | 4 | 1  (25 %) |
| Psych Social Worker | 125.1 | 29.6  (23.6%) |
| Recreational Therapist | 34 | 8.5  (25%) |
| Psych Technician | 72.77 | 11.53 (15.8%) |
| MTA | 21 | 1.2  (5.7%) |
| Supervising Nurse | 17 | 2  (11.7 %) |
| Registered Nurse | 95.71 | 10.61  (11%) |
| Med Transcriber | 41 | 5  (12.1%) |
| Office Technician | 50.6 | 10.1  (19.9%) |
| Office Assistant | 18 | 1  (5%) |
| **TOTAL** | **845.18**[2] | **132.89(15.72%)** |

There is an undisputed need to accelerate the recruitment of professional staff. Faced with uncertainty over appropriate staffing patterns and an unsatisfactory rate of vacancies in authorized mental health positions, the plaintiffs agreed to forego their demand for the immediate articulation of the defendants' rationale for staffing decisions with the understanding that the defendants would develop and commit themselves to a fast-track, intensive recruitment plan with

---

[2] This number includes an additional 27 authorized positions in 23 different classifications not shown in this table.

measurable goals and timelines. The defendants have developed such a plan, but not one that meets either the plaintiffs' or the master's expectations relative to measurable goals and timelines.

The defendants' proposed attack on their recruitment problem, which focuses exclusively on psychiatrists and psychiatric social workers, the two categories with the highest rates of vacancies, is two-pronged. The first approach is designed to enhance and regularize the financial inducements the department can offer prospective mental health care professionals; the second looks to centralize and expedite the administrative procedures for hiring, thereby enhancing the efficient management of the process. Unfortunately, the plan provides no measurable goals or objectives against which to evaluate the success of the recruitment effort, and no amount of discussion sufficed to persuade the department to commit to a specific vacancy reduction figure or percentage. Part of the reluctance is born of a disinclination to get caught in a process that puts quantity ahead of quality by requiring some specific number of warm bodies, whatever their competency. The defendants also argue that their program for contracting with private practitioners, and the measures undertaken recently to improve the quality of that program, go a long way toward meeting all staffing needs.

After long and intense discussion, the plaintiffs agreed to suspend their disbelief in the efficacy of the defendants' recruitment plan as presently constituted, provided the master makes sure during the first 90 days of his compliance review that the bureaucratic developments necessary to support the defendants' enhanced recruitment efforts are in place. At the end of 180 days, the master should analyze and report on the defendants' success in filling vacancies, along with any appropriate recommendations for changes in the plan, after consultation with the parties.

Recommendation:  The court should provisionally adopt the defendants' recruitment plan and direct the master to monitor closely its implementation in conformance with the agreement between the parties.  The master should also be directed to work with the parties to develop an acceptable rationale for the staffing patterns of the department's mental health program components and submit recommendations for such patterns with his third quarterly compliance report.

**Involuntary medications**:  This issue involves some possible tension between state and federal law that creates both a legal and practical dilemma for the defendants.  The strict procedural protections demanded in the Keyhea case were mandated to prevent institutional abuse of the use of involuntary medication.  There is, however, a real concern that those same protections may make the use of involuntary medication so onerous, clinicians will elect not to prescribe medications involuntarily even when they are clinically necessary.

Both plaintiffs and defendants concede that there is currently too little understanding of the impact of the Keyhea procedures on institutional practices in regard to the use of involuntary medication to be able at this point to articulate with confidence definitive policy in this area.  They also agree that there is a need to reconcile the underlying legal and practical tensions and provide clinicians with some clear guidance on how to proceed.  Plaintiffs and defendants agree to postpone the submission to the court of a definitive plan on involuntary medications at this time, pending a review of practices in the field by the master, which might serve to provide a better understanding of the nature and dimensions of the problem.

Recommendation:  The master should survey the practical implications of the defendants' current policies on the use of involuntary medications, based on Keyhea, work with

the parties to develop mutually acceptable policy guidelines and report to the court any

recommendations for change in those policies in his third quarterly compliance report.

**Additional Issues:** There are two additional issues that raise primarily legal questions.

The first involves the use of mechanical restraints. The defendants believe that the court's

September 13, 1995 Order rescinded the order on the use of mechanical restraints recommended

in the June 6, 1994 Findings and Recommendations. While the master, after conferring with the

court, accepted that understanding, the issue has not been formally addressed. The plaintiffs

object to the exclusion of the use of mechanical restraints from the remedy. Substantively, the

parties and the master have reviewed and discussed the defendants' policy on the use of

mechanical restraints and agreed to a mutually acceptable version of that policy.

A second issue involves the extent to which the defendants' suicide prevention plan,

policies and practices are subject to the remedial order and the master's review. That, again,

involves an interpretation of the court's order and is beyond the scope of this report. It should be

added that there is no dispute over the substance of the defendants' suicide prevention policy,

plan or training materials, all of which are acceptable to plaintiffs and the master's experts.

Finally, the plaintiffs seek to address what they perceive to be deficiencies in the

defendants' so-called heat plan or policies governing the supervision of psychotropic drugs

during periods of extreme hot weather. The master's January, 1997 Interim Progress Report

suggested a number of changes to improve the defendants' heat plan. The most critical of these

was the transfer of responsibility for departmental coordination of the heat plan from the

institutional division to the health care services division. That transfer has occurred. The

defendants have also agreed to pull together and promulgate the house-keeping suggestions for

standardizing institutional components of the heat plan recommended by the master. These changes address, or will address, the deficiencies in the heat plan reported by the master.

**Procedure for Modification of Plans:** The parties have agreed to a process for future modification of the plans now being submitted to the court, modeled on mutually acceptable arrangements in other cases. That model calls for the following procedures to govern modifications:

1.    Defendants shall submit, with a copy to plaintiffs, a copy of the revised policy, document, etc. to the special master fourteen days prior to its effective date. If there is a *bona fide* emergency, this time period may be reduced by an appropriate amount, but in no event shall the revised policy, document, etc. be submitted to the master later than its effective date.

2.    If the master determines that the modification(s) conflict with any of the court's orders, he shall work with the defendants to reconcile the conflict.

3.    If reconciliation is impossible, the master shall file a report with the court which sets forth his findings as to why the defendants' modification(s) to policy violate the court's order(s). He shall also make recommendations as to what actions should be taken concerning the modification(s).

**A final note:** This catalogue of unresolved issues should not overshadow the enormous amount of agreement that has emerged from this nearly six-month long process of review and collaboration. The parties have worked long and hard to make sure that the six volumes of

materials submitted with this report establish a systemic framework for the delivery of adequate

mental health care services to prisoners in the California Department of Corrections.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

May 30, 1997

#50091273 v1 - LOPESMA - tm_901!.DOC - 9999/1

## DECLARATION OF SERVICE BY MAIL

Case Name:  Ralph Coleman, et al. v. Pete Wilson, et al.
U.S.D.C. Eastern District No. CIV S-90-0520 LKK JFM P

I am employed in the County of Providence, Rhode Island.  I am over the age of 18 years and not a party to the within entitled cause:  my business address is Brown, Rudnick, Freed & Gesmer, One Providence Washington Plaza, Providence, Rhode Island 02903.

On June 5, 1997, I served the attached

## SPECIAL MASTER'S REPORT ON PLANS

in said cause, placing, or causing to be placed, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepared in the United States mail at Providence, Rhode Island as follows:

Honorable Lawrence K. Karlton
Chief Judge Emeritus
United States District Court
Eastern District of California
650 Capitol Mall
Sacramento, CA 95814

Honorable John F. Moulds
Chief Magistrate Judge
United States District Court
Eastern District of California
650 Capitol Mall, Suite 5054
Sacramento, CA 95814

Haven Gracey, Esq.
Senior Staff Attorney to
Chief Magistrate John F. Moulds
United States District Court
Eastern District of California
650 Capitol Mall
Sacramento, CA 95814

Robin J. Dezember, J.D.
Deputy Director
Health Care Services Division
Dept. of Corrections
770 L St., Suite 1200
P.O. Box 942883
Sacramento, CA 94283-0001

Donald Specter, Esquire
Alison Hardy, Esquire
Prison Law Office
General Delivery
San Quentin, CA 94964

Michael Bien, Esquire
Rosen, Bien & Asaro
155 Montgomery Street, 8th Fl.
San Francisco, CA 94104

Peter J. Siggins, Esquire
Senior Assistant Attorney General
50 Tremont Street, Suite 3000
San Francisco, CA 94105-2239

Bruce Slavin, Esquire
Deputy Attorney General
50 Tremont Street, Suite 3000
San Francisco, CA 94105-2239

Jerold A. Prod, Esquire
Deputy Director, Legal Affairs
California Dept. of Corrections
1515 S Street
P.O. Box 942883
Sacramento, CA 94283-0001

Warren E. George, Jr., Esq.
Carolyn L. Reid, Esq.
McCutchen, Doyle, Brown & Enersen, LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Richard L. Goff, Esq.
Heller Ehrman White & McAuliffe
701 5th Avenue
Seattle, WA  98104

I declare under penalty of perjury under the laws of the State of Rhode Island that the foregoing is true and correct, and that this declaration was executed at Providence, Rhode Island on June 5, 1997.

*Christie M. Blanchard*

#50091275 v1 - LOPESMA - tm_b01!.DOC - 9999/1

3

# EXHIBIT Q

1   PRISON LAW OFFICE
    DONALD SPECTER Bar No.: 83925
2   STEVEN FAMA Bar No.: 99641
    KEITH WATTLEY Bar No.: 203366
3   General Delivery
    San Quentin, California 94964
4   Telephone: (415) 457-9144

5   ROSEN, BIEN & ASARO, LLP
    MICHAEL W. BIEN Bar No.: 096891
6   JANE E. KAHN Bar No.: 112239
    THOMAS NOLAN Bar No.: 169692
7   155 Montgomery Street, 8th Floor
    San Francisco, California 94104
8   Telephone: (415) 433-6830

9   THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
10  CLAUDIA CENTER Bar No.: 158255
    LEWIS BOSSING Bar No.: 227402
11  600 Harrison Street, Suite 120
    San Francisco, CA 94107
12  Telephone: (415) 864-8448

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

13

14  Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

15  EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN,

18          Plaintiffs,

19  vs.

20  ARNOLD SCHWARZENEGGER, et al.,

21          Defendants

No.: Civ S 90-0520 LKK-JFM

**PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' REVISED PROGRAM GUIDE**

**HEARING**

22

23

24

Date:        To be determined
Time:        To be determined
Location:    Courtroom 4
             The Honorable Lawrence K.
             Karlton

25

26

27

28

1

## TABLE OF CONTENTS

2  Introduction ......................................................................................................................1

3  Objections to Chapter 1:  Program Guide Overview .........................................................1

4  Objections to Chapter 2:  Reception Center Mental Health Assessment ..........................7

5  Objections to Chapter 3:  Correctional Case Management System....................................8

6  Objections to Chapter 4:  Enhanced Outpatient Program.................................................8

7  Objections to Chapter 5:  Mental Health Crisis Bed ("MHCB") .....................................9

8  Objections to Chapter 6:  Department of Mental Health Inpatient Programs ..................10

9  Objections to Chapter 7:  Administrative Segregation ...................................................11

10  Objections to Chapter 8:  Security Housing Unit ..........................................................13

11  Objections to Chapter 9:  Psychiatric Services Unit......................................................14

12  Objections to Chapter 10:  Suicide Prevention and Response.........................................15

13  CONCLUSION ...............................................................................................................15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

*Coleman v. Wilson,*
912 F.Supp. 1282, 1320 (E.D.Ca. 1995)..........................................................................2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    The Special Master's Report and Recommendations on Defendants' Revised Program

2    Guide ("the Report" or "Special Master's Report") was filed on February 3, 2006.  In the

3    Report, the Special Master states that "[t]he purpose of the report is to submit for the court's

4    final approval that 95 percent of the revised Program Guide that the parties and the special

5    master agree to and initiate a process for resolving the five percent of remaining issues that

6    continue to elude resolution."  Special Master's Report at 4.  Plaintiffs support the

7    recommendation that defendants should be ordered to immediately implement their Revised

8    Program Guide, subject to the exceptions noted by the Special Master.  We file these

9    objections to set forth our specific remaining objections to the proposed Program Guide.  We

10    have not included evidence or argument concerning our objections, as we support the Special

11    Master's recommendation of further proceedings to develop a process for presenting and

12    resolving the remaining objections.  Special Master's Report at 11 (Recommendation 3).  For

13    some of the disputes, plaintiffs request reasonable discovery and an evidentiary hearing; others

14    may be resolved on legal issues.  Plaintiffs have submitted a proposed order to assist the Court

15    in its effort to specify which portions of the Revised Program Guide it is approving and which

16    areas are not yet finally decided and remain in dispute.

17    Set forth below are plaintiffs' remaining specific objections to each chapter of the

18    Program Guide proposed by defendants and recommended for approval by the Special Master:

19    **Chapter 1:  Program Guide Overview**

20    12-1-8 and 12-1-9:  Psychiatrist qualifications:  Plaintiffs agree to withdraw our

21    objection on the issue of psychiatrist qualifications in light of the resolution of the issue set

22    forth by the Special Master in the Report.  Special Master's Report at 4-5.  However, the

23    Revised Program Guide submitted to the Court by defendants still includes the "grandfather

24    clause" that the Special Master indicates defendants have withdrawn.  See Revised Program

25    Guides at 12-1-8 (under Standard Program Staffing, the last sentence in the first paragraph says

26    "psychiatrists hired after [date left blank] shall meet the following training requirements").

27    12-1-9:  Clinical Input into the Disciplinary Process:  In response to this Court's finding

28    after trial that defendants were punishing inmates with mental illnesses without taking into

1  account the role of their mental illness, see *Coleman v. Wilson*, 912 F.Supp. 1282, 1320

2  (E.D.Ca. 1995), the defendants developed a system for providing clinical assessments of such

3  inmates for use in the disciplinary hearing reviewing the infraction.  These clinical assessments

4  are required for all 3,900 Enhanced Outpatient Program ("EOP") inmates who live in sheltered

5  housing units and receive intensive mental health care.  However, for the majority of the

6  *Coleman* class -- the CDCR's 27,000 Correctional Clinical Case Management System

7  ("3CMS") inmates who live in the general population -- these assessments are provided only in

8  extremely limited circumstances.  Plaintiffs object to the Revised Program Guide standard for

9  referring these 3CMS patients for a mental health assessment.  See Revised Program Guides at

10  12-1-9 ("All inmates in CCCMS or non-MHSDS inmates who receive a [disciplinary

11  infraction] and who exhibit bizarre, unusual, or uncharacteristic behavior shall be referred for a

12  Mental Health Assessment.")  This standard, which is currently employed by the CDCR, does

13  not result in a meaningful review of the role of mental health in the disciplinary infractions

14  incurred by the vast majority of the plaintiff class.  Plaintiffs propose the expansion of the class

15  of persons automatically given an assessment to include: (1) all 3CMS inmates charged with a

16  serious rules violation that could result in a SHU term or DA referral, (2) any 3CMS patient

17  with multiple rules violations during a specified period of time.

18      12-1-10 and 12-1-11:  Tracking Caseload History and Suicide Attempt History:  In

19  order to facilitate suicide prevention efforts and improve mental health screening of inmates

20  admitted to administrative segregation, plaintiffs have long sought to require that defendants

21  develop a computerized system to track all former-caseload inmates.  Defendants actually

22  tracked this information in the early years of this Court's supervision of its mental health

23  system, but eliminated this tracking system without notice to plaintiffs or the Special Master.

24  Plaintiffs object to defendants' failure to include in the Program Guide a computerized system

25  that tracks former members of the mental health caseload.

26      This Court's June 9, 2005 Order, which adopted recommendations from the Special

27  Master's Report on 2003 Suicides, requires that defendants track mental health caseload

28  inmates with a history of suicidality.  However, plaintiffs sought a broader suicide history

1    tracking requirement as part of the Program Guide process. Plaintiffs object to defendants'

2    failure to expand their Suicide History Tracking System to include general population inmates

3    with a suicide attempt history. Given the extraordinarily high current number of suicides

4    recently in the CDCR, which include a substantial number of suicides by general population

5    inmates with a history of suicidal behavior, plaintiffs continue to object to defendants' failure

6    to track suicidality history for general population inmates.

7        12-1-11 through 12-1-13: Transfer Guidelines:

8        The Special Master's Report states that plaintiffs' remaining objections to the Program

9    Guide "included six specific complaints about the timelines for transfers to more intensive

10   levels of care within the defendants' MHSDS." See Special Master's Report at 9. The Master

11   goes on to assert that "[a]ll of the protested timelines represent improvements over their

12   predecessors that tied time limits on transfers, especially those to the Department of Mental

13   Health, to the availability of bed space in the receiving program, rather than to a CDCR

14   clinician's referral." *Id.*

15       Plaintiffs respectfully disagree with these characterizations of both plaintiffs' position

16   and of the defendants' timelines. In fact, plaintiffs' objection to three of the time periods

17   below is precisely that the Revised Program Guide timeline continues to link the time limit for

18   transfer to the availability of bed space in the receiving program. In fact, except for plaintiffs'

19   contention below that the timeline for transfer to DMH intermediate inpatient care is simply

20   too long, each objection to a proposed timeline below is based on language in the Revised

21   Program Guide that appears to be included so that defendants may avoid the burden of a strict

22   transfer timeline which starts with the identification of actual clinical need.

23       (A) Identification-Referral Times: Plaintiffs object to the distinction between

24   "identification" and "referral" in the defendants' timelines for transfers into clinical care

25   programs. With the exception of the Department of Mental Health ("DMH") transfer

26   timelines, there are no specific timeframes established for the period between identification

27   and referral. The Special Master's prior Recommendations for Transfer Timelines adopted

28   timelines that "take as a starting point the date of a clinician's referral of a seriously mentally

1   disordered inmate to a specific level of treatment and care." See Ex. A to Declaration of

2   Michael W. Bien in Support of Plaintiffs' Objections to the Special Master's Report on

3   Defendants' Revised Program Guide ("Bien Dec"), 1/3/01 Special Master's Recommendations

4   for Transfer Timelines at 6. In new language first presented on September 9, 2005, defendants

5   define "referral" as "the date the level of care change is documented on a Mental Health

6   Placement Chrono." See Revised Program Guide at 12-1-11. This is an administrative action

7   that has no fixed timeframe and is unrelated to the time when an inmate's clinical need for a

8   higher level of care is identified by his or her clinician. *Id.* Plaintiffs maintain our objection

9   and our position that all timelines should run from the initial identification of clinical need to

10  the actual transfer.

11      (B) <u>Transfer to the Department of Mental Health Acute Psychiatric Program ("APP") at</u>

12  <u>California Medical Facility</u>: Plaintiffs withdraw our objection to the extended timeframe

13  which allows 10 calendar days plus two working days from identification to transfer to the

14  DMH-run Acute Psychiatric Program (APP) at CMF.

15      (C) <u>Timeline Contingent on Acceptance by the Department of Mental Health</u>:

16  Plaintiffs continue to object to the caveat "if accepted to DMH" in the transfer timeline grid on

17  12-1-13 for transfers to both the intermediate and acute inpatient care programs. If the

18  Department of Mental Health ("DMH") does not "accept" the inmate because of insufficient

19  beds, the clinical timelines for referral should still apply. In effect, this is another attempt by

20  defendants to tie the transfer timelines to bed availability. A strict timeline starting with

21  clinical identification of need is necessary in order to force defendants to control their

22  relationship with DMH, to expand the number of inpatient beds available, and/or to develop

23  appropriate alternatives to the existing DMH programs. Defendants must provide access to

24  inpatient care within the clinically mandated time frame.

25      (D): <u>Transfer to DMH Intermediate Care Facilities ("ICFs")</u>: Plaintiffs object to the

26  Program Guide provision allowing a thirty-seven (37) to forty-four (44) calendar day

27  timeframe for transfers to DMH intermediate inpatient care programs like Atascadero State

28  Hospital ("ASH") and the Salinas Valley Psychiatric Program ("SVPP"). See Revised

1   Program Guide at 12-1-13. This timeline is roughly double the time period of twenty-one (21)

2   calendar days previously agreed to by defendants and recommended by the Special Master in

3   April 2005. See Ex. B to Bien Dec, 9/12/03 Letter from Jennifer Neal at 2 ("Defendants agree

4   to incorporate the suggested timelines for transfer to DMH" and setting forth 20 day time

5   period for transfer to ICF level of care); Ex. C to Bien Dec, 4/6/05 Special Master's Draft

6   Report on Revised Program Guides at 9-10 ("Based on the experts' opinion in this regard, the

7   special master recommends that the timelines allow . . . three calendar weeks from a referral to

8   an intermediate DMH program to actual transfer."). Defendants' newly expanded time frame

9   includes 30 calendar days between referral and actual transfer to an ICF program, and another

10   five to ten <u>working</u> days between identification and referral, depending upon whether the

11   inmate needs to be given a due process hearing. See Program Guides at 12-1-13. There is no

12   basis for doubling the referral period previously agreed to by defendants and plaintiffs and

13   found appropriate by the Court experts. The roughly forty-day time period is excessive and

14   clinically inappropriate.

15       (E): <u>Psychiatric Services Unit ("PSU") Transfers</u>: The PSU is a psychiatric treatment

16   program for EOP-level of care inmates with a Security Housing Unit ("SHU") term. Plaintiffs

17   object to the proposed 60-day timeframe for transfer into the PSU program because it is linked

18   to CSR endorsement rather than to the identification of clinical need. See Revised Program

19   Guide at 12-1-13. The proposed timeline does not address existing delays in processing and

20   transferring EOP inmates in administrative segregation EOP programs to the higher level of

21   care PSU programs. The Special Master previously expressed a well-founded concern about

22   linking transfer timelines to CSR endorsement, stating that "[b]y using the date of endorsement

23   as the baseline for timing transfers, the defendants effectively sabotage the purpose of the

24   timelines, which are designed specifically to ensure that inmates have timely access to the level

25   of care a clinician deems necessary." Ex. A to Bien Dec, 1/3/01 Special Master's

26   Recommendations for Transfer Timelines at 5. Plaintiffs agree with this concern and will

27   maintain this objection. Absent a transfer timeline for PSU patients linked to clinical

28   identification, the CDCR will not develop the necessary PSU beds and classification processes

1   for moving these patients rapidly out of Hub EOP Administrative Segregation Units to their

2   treatment programs.

3       (F):  EOP Outpatient Housing Unit ("OHU") transfers:  When inmates at institutions

4   without an EOP program are determined to require an EOP level of care, they often wait for

5   long periods of time in their institution's infirmary or "OHU" until an EOP bed is available at

6   another institution.  OHU's do not provide an EOP level of mental health care.  Plaintiffs

7   object to defendants' proposed EOP OHU transfer timeline, which is also linked to

8   endorsement, unlike the other EOP transfer timelines.  See Revised Program Guide at 12-1-13.

9   If adopted, the provision would legitimize the current pattern of extremely long transfer delays

10  for EOPs housed in OHUs.  The placement of "fragile" EOP patients in OHUs at institutions

11  without EOP programs should be addressed as a short-term crisis in EOP and licensed Mental

12  Health Crisis Bed ("MHCB") capacity and not codified as an ongoing Program Guide

13  treatment standard.

14      (G)  Transfer Guidelines for EOP Patients housed in Hub EOP Administrative

15  Segregation Units ("ASUs"):  "Hub" EOP Administrative Segregation Units are ordinary

16  CDCR Administrative Segregation Units in which EOP treatment programs have been poorly

17  implemented.  Hub Administrative Segregation Units have insufficient program space and

18  inadequate clinical staffing when compared to PSU programs.  These programs generally are

19  not providing the required 10-hours per week of EOP treatment, and in any event the

20  conditions in these units are harsh and dangerous to inmates with severe mental illness.  EOP

21  inmates in these programs tend to be isolated in their cells for much of the day, and the

22  treatment they do receive is provided in cramped metal cages covered with mesh that the

23  CDCR calls "treatment modules."  Plaintiffs object to the failure of defendants to develop a

24  transfer timeline for removal of EOP patients housed in these Hub EOP Administrative

25  Segregation Units.  Long-term housing in these dangerous units must be limited to 60 days.

26  Transfer guidelines for EOP ASU patients will ensure that institutions process Rules Violation

27  Reports ("RVRs"), referrals to local District Attorneys for prosecution, and investigations in a

28  timely manner so as to either return EOP patients to their mainline housing or, if warranted,

1   transfer them rapidly to a PSU program. For those EOP patients housed, sometimes for years

2   at a time, in these Hub EOP ASUs because of the defendants' failure to provide sufficient

3   Level IV EOP Sensitive Needs Yard beds for inmates with safety issues, the transfer timelines

4   will ensure that defendants develop sufficient beds.

5           12-1-14 and 12-1-15:  Program Guides Revision Policy and Procedure

6           Plaintiffs object to this proposed Program Guide Revision Policy and Procedure which

7   permits defendants to unilaterally change the Program Guides. See Revised Program Guides at

8   12-1-14 and 15. Plaintiffs also object to the procedure recommended by the Special Master,

9   which provides for only 14-days notice before defendants implement changes to the Court-

10  ordered Program Guide. See Special Master's Report at 11. The Revision Policy and

11  Procedure must provide at least thirty days (30) written notice to the Special Master and

12  plaintiffs of proposed changes to the Program Guides, with a requirement that the parties meet

13  and confer over the proposed changes. If no agreement is met, the burden will be on the

14  plaintiffs to file a motion for a hearing concerning the proposed Program Guide revisions.

15  **Chapter 2:  Reception Center Mental Health Assessment**

16          Classification Issues:  Annual Point Reductions for EOP Participation:  Defendants

17  indicated in early January 2006 that they agreed to the Special Master's recommendation that

18  EOP inmates who participate in their EOP program should be given annual four point

19  classification score reductions. Ex. D to Bien Dec, Defendants' 1/6/06 Letter at 3 (stating that

20  "defendants agree with the Special Master's recommendation" that "EOP inmates receive

21  annual point reductions in their classification scores for participation in their EOP-related

22  programs."). However, the defendants have not incorporated this requirement into the Revised

23  Program Guide that they filed with the Court, and the Special Master has not repeated the

24  recommendation in his filing with the Court. Plaintiffs agree with the Special Master's

25  recommendation on this issue regarding annual four point reductions for EOPs who participate

26  in their EOP programming.

27          Initial Classification Addition of Four Points for History of Mental Illness:  On a related

28  issue, plaintiffs object to the CDCR practice of assigning four extra classification score points

7

1    at initial classification for inmates with a history of mental illness. This practice is based on

2    irrational stereotypes about individuals with mental illness and results in mentally ill inmates

3    being assigned to higher security prisons where they spend more time in their cell and mental

4    health care is more difficult to access.

5        Extended Reception Center Stays: Plaintiffs also object to defendants' refusal to add

6    mentally ill inmates to the existing procedures for providing general population privileges and

7    credits to disabled inmates who remain in reception centers for extended periods due to their

8    disability. Existing procedures provide such general population privileges and credits to

9    disabled inmates with mobility, vision and hearing disabilities who are retained overlong in the

10    reception centers because of their disability.

11    **Chapter 3: Correctional Case Management System**

12    12-3-2: Plaintiffs object to defendants' refusal to include a policy that requires that

13    3CMS patients will be housed at security levels commensurate with their classification points

14    and will not be excluded from access to the same broad range of programs, services and

15    opportunities available to general population inmates due to their participation in the Mental

16    Health Services Delivery System ("MHSDS"). Existing procedures that require housing

17    3CMS patients at higher security levels discourage mentally ill inmates from participating in

18    the 3CMS program and from taking their medications. For example, 3CMS inmates are not

19    permitted to be housed in most Level I yards.

20    **Chapter 4: Enhanced Outpatient Program**

21    12-4-4: Plaintiffs object to defendants' refusal to ensure that EOP patients will be

22    housed in EOP programs at security levels commensurate with their classification points and

23    will not be excluded from access to the same broad range of programs, services and

24    opportunities available to general population inmates due to their participation in the EOP

25    program. Currently, the lowest security level program for EOP inmates is a Level III program,

26    and most EOP programs exclude EOP inmates from participating in mainline work, vocational,

27    educational and recreational programming.

28

**Chapter 5: Mental Health Crisis Bed ("MHCB")**

Mental Health Patients in Outpatient Housing Units ("OHUs"): Although plaintiffs agree to most of the provisions within Chapter 5, we do not agree to or ratify in any manner the practice of placing mentally ill inmates into unlicensed Outpatient Housing units for crisis observation and/or treatment. For that reason, plaintiffs object to the existing discussion of OHU treatment protocols and ask that a new provision be added to them calling for the elimination of the use of Outpatient Housing Units for providing crisis care or treatment to mentally ill inmates within a fixed number of years.

12-5-7: Plaintiffs withdraw our prior objection concerning this page.

12-5-26 & 27: Plaintiffs object to the provision that allows for the discharge of an inmate-patient from the OHU by a single clinician. This clinician can be a physician with no mental health training. Instead of this provision, plaintiffs propose system-wide adoption of the operational procedures developed by CDCR staff members at CSP-Sacramento for use in their new Mental Health-OHU. According to the relevant SAC operational procedure, an inmate-patient may be removed from the OHU based upon an order by a psychologist, psychiatric social worker or psychiatrist/physician after consultation with an informal interdisciplinary clinical team, which includes, but is not limited to a psychiatrist, nursing staff and a custody representative. Other circumstances where the interdisciplinary clinical team is required include: (1) every 72 hours for inmate-patients pending Mental Health Crisis Bed placement; and (2) within 48 hours of placement to assess the need for higher level of care or release to prior housing. Although, as noted above, plaintiffs object to the use of the OHU as a *de facto* MHCB unit, until the use of OHUs is eliminated, these clinical safeguards are necessary when providing mental health crisis care.

12-5-27: Plaintiffs object to this Program Guide section, which permits the housing of "fragile" EOP patients in OHUs while they wait for transfer to a mainline EOP program. See Objection to OHU to EOP transfer timelines, *supra*, at 6. If there is a shortage of EOP beds, the solution is to expand EOP bed capacity.

**Chapter 6:  Department of Mental Health Inpatient Programs**

The transfer timelines discussed in connection with Chapter 1 above should also be included in Chapter 6.

12-6-1:  Given defendants' modification of the relevant language, plaintiffs withdraw our objection concerning the need for defendants to commit to providing timely access to inpatient care to all inmates who require such care.

12-6-3:  Although defendants have modified some language in this regard, plaintiffs object to language which remains in the Program Guide restricting lengths of stay in the Acute Psychiatric Program at CMF to 45 days.  See 12-6-3 at ¶ 5 ("inmates admitted to the APP shall be inmates anticipated to be stabilized sufficiently for release from DMH within 30 to 45 days.")  There is no existing higher level of care program to which CDCR inmates can be transferred if they cannot be stabilized after 30 to 45 days in the APP.

12-6-7 to 12-6-8 and 12-6-15:  Plaintiffs object to the requirement that inmates must have "an Axis I major (severe) mental disorder with active symptoms" to be admitted to the DMH intermediate level of care programs or to the DMH day treatment program.  This level of treatment should also be available on a medical necessity basis for inmates without a "major (severe)" Axis I diagnosis, and for inmates referred for testing or diagnostic clarification.

12-6-9:  Given defendants' modification of the relevant language, plaintiffs withdraw our prior objection to the provision that required clinicians to contact the C&PR concerning custody issues before referring a patient to DMH.

12-6-15:  Plaintiffs object to two of the criteria set forth in the Revised Program Guide for deciding whether an inmate may be admitted to the Day Treatment Program (DTP) at CMF – Admissions Criteria 4 ("Able to function in a structured therapeutic setting with minimal staff prompting") and Admissions Criteria 5 ("Able to participate in own treatment planning").  Revised Program Guide at 12-6-15.  These criteria have been previously criticized by the Special Master's experts because they require a higher level of functioning for referrals to the DTP program than has historically been required.  See Ex. E to Bien Dec, 1/18/05 Letter from Michael Keating to Defendants concerning DTP ("The admissions criteria seem to identify

1  exclusively higher functioning and volunteer inmate/patients who are verbal and motivated.

2  Traditional day treatment programs, however, have focused more often on lower functioning

3  inmate/patients who might benefit from activities more highly structured than CDC's EOP

4  program without requiring the long-term stabilization of an intermediate care program. The

5  implicit exclusion of inmate/patients with primary Axis II diagnoses . . . is problematic because

6  sometimes these are the very inmate/patients who might benefit most from a day treatment

7  program.") In fact, the Court's July 9, 2004 Order prohibits defendants from changing the

8  DTP program at CMF. 7/9/04 Order ¶ 5. Plaintiffs continue to object to the use of these

9  overly restrictive criteria that will exclude inmates who require inpatient care.

10  **Chapter 7:  Administrative Segregation**

11  <u>12-7-2</u>:  Plaintiffs object to defendants' failure to include a form and/or protocol to be

12  used in conjunction with this section, as well as the Security Housing Unit ("SHU") and

13  Psychiatric Services Unit ("PSU") sections, that requires prior consideration of the patient's

14  likelihood of decompensation when he or she is placed in segregated housing, based upon a

15  review of the patient's health record and a review of his or her past history of decompensation

16  in locked units. The form should also allow a clinician to make a recommendation for

17  alternative placement in appropriate cases. The development of such a protocol would provide

18  substance and specific guidance to the existing language in the Program Guides, which lists

19  "likelihood of decompensation" as one relevant factor to be considered on initial placement in

20  segregated housing. See Revised Program Guide at 12-7-2, ¶ 4.

21  <u>12-7-4</u>:  Plaintiffs object to the reduction in daily psych tech rounding for non-MHSDS

22  inmates in administrative segregation from daily rounds to once a week rounds.

23  <u>12-7-6</u>:  Plaintiffs object to the reduction in individual clinical case management

24  contacts for 3CMS inmates housed in administrative segregation from weekly clinical contacts

25  to every other week clinical contacts.

26  The Special Master's Report points out that these last two objections concern proposed

27  reductions in care, unlike most of the program guide provisions in dispute, and that therefore

28  "the defendants ought to be required to continue to meet currently mandated requirements for

1 daily psych tech rounds of non-caseload inmates and weekly case management contracts with

2 3CMS inmates in administrative segregation." Special Master's Report at 6.

3 However, the Special Master's report nonetheless later recommends that the Court

4 "adopt formally and finally the submitted Program Guide as quickly as possible" without

5 specifically exempting these sections, which are in the Revised Guides submitted by the

6 defendants to the Court. See Special Master's Report at 10; see Revised Program Guide

7 submitted to the Court by defendants at 12-7-4 and 12-7-6. In order to clarify that the Court is

8 not adopting this or the other disputed Program Guide provisions, plaintiffs have carefully

9 prepared a proposed form of order for the Court that is significantly different from the

10 sweeping approval recommended by the Special Master. See Plaintiffs' Proposed Order, filed

11 herewith.

12 <u>Enhanced Outpatient Program Care in Administrative Segregation</u>

13 <u>12-7-6:</u> ¶ H.1. b. This section provides that transfer to an appropriate ASU EOP Hub

14 institution treatment setting will occur within 30 days of placement at the EOP level of care

15 designation. As discussed above, plaintiffs object to this section if the transfer timeline is

16 triggered by the date of the Mental Health Placement chrono, rather than at the time which the

17 patient's case manager refers him or her to EOP level of care.

18 <u>12-7-8:</u> <u>Other Treatment Activities:</u> In treatment planning for therapy programs for

19 EOP ASU patients, there should be a requirement for an individualized assessment of each

20 patient's specific risk for violence towards others. Based on this assessment, for appropriate

21 inmates, therapy options should include group therapy outside of treatment cages (which

22 defendants call "treatment modules") as well as individual therapy outside of these treatment

23 cages. For example, there is currently a large group of EOP inmates in administrative

24 segregation units around the state who are placed their because of their need for protective

25 custody – what the CDCR calls "Sensitive Needs." These inmates are languishing in

26 administrative segregation units because the CDCR has not created enough Level IV Sensitive

27 Needs Yards. The inmates generally have no history of violence, yet they are required to do all

28 of their mental health programming in cages in locked units.

## Chapter 8:  Security Housing Unit

12-8-2:  The Special Master's Report states that plaintiffs seek "application of the exclusionary rule adopted in Madrid to all SHU units in the CDCR."  Special Master' Report at 8.  This is an incomplete description of plaintiffs' objection.  Plaintiffs are requesting that appropriate exclusionary criteria be developed for the other SHU units in the state, which include the Corcoran SHU, the Valley State Prison for Women ("VSPW") SHU, and the SHU at California Correctional Institute – Tehachapi.  These procedures should be developed based on a specific clinical assessment of each SHU unit and the risk each SHU unit poses to mentally ill inmates.

12-8-4:  As noted above in connection with plaintiffs objections to Program Guide Chapter 7, plaintiffs request implementation of a new protocol that will provide for meaningful review of each inmate-patient's "likelihood of decompensation" prior to placement in the SHU.  The same type of protocol developed for screening administrative segregation inmates should be employed for screening of inmates prior to their placement in a Security Housing Unit.  See Objection to 12-7-2, *supra*.

12-8-5:  Sources of Referral for Mental Health Services:  Plaintiffs object to the defendants' failure to include a requirement that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in the SHU.  Special Master Keating recommended that defendants adopt this provision in his April 6, 2005 Draft Report on Revised Program Guides.  See Ex. C to Bien Dec, 4/6/05 Special Master's Draft Report on Revised Program Guides at 12-13 (stating that such a screening would reach inmates who are referred to SHU following a long stay in administrative segregation and explaining that "[p]rolonged detention in administrative segregation can have deleterious effects on inmates' mental health, and a requirement is needed, paralleling the requirement at paragraph E.6. at page 12-7-4 of Chapter 7, that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in a SHU.")  The Special Master's final report

1  does not address this prior recommendation. Plaintiffs will maintain their objections to the

2  absence of this important mental health screening prior to placement in a Security Housing

3  Unit.

4       12-8-6:  Plaintiffs retain our objection to the provision of reduced psych tech rounding

5  to both MHSDS and non-MHSDS inmates in the SHU. See Revised Program Guide at 12-8-6,

6  ¶ 5 (providing for weekly psychiatric technician or case manager rounds of caseload inmates

7  and every other week rounding of non-caseload inmates in the SHU). SHU inmates should

8  receive at least the same frequency of rounding as administrative segregation inmates. All

9  SHU inmates should be provided with daily psychiatric technician rounding, including general

10  population SHU inmates.

11       12-8-9:  Plaintiffs retain our objection to this provision which requires that 3CMS

12  housed in the SHU be provided with an individual clinical case manager contact only once

13  every 30 days (or more frequently if clinically indicated). Plaintiffs' position is that 3CMS

14  inmates housed in the SHU should be provided with a weekly individual clinical case manager

15  contact, which is the same frequency of case manager contacts provided to administrative

16  segregation 3CMS inmates.

17       Enhanced Programming and Treatment

18       Plaintiffs object to defendants' refusal to include provisions in the Program Guide for

19  enhanced programming and improved conditions for inmate-patients with mental illness

20  housed in the SHU. In addition, plaintiffs request procedures to ensure clinical input as to any

21  custody policies or procedures that change conditions or programming in the SHU.

22       Screen of all Non-caseload Housed in CCI, Corcoran and VSPW SHUs

23       Plaintiffs object to defendants' refusal to include a requirement for a one-time screen of

24  all non-caseload inmates currently housed in the Corcoran, the VSPW and the CCI SHUs using

25  the 31 Question mental health questionnaire already developed in this case.

26  **Chapter 9:  Psychiatric Services Unit**

27       12-9-8 & 9:  Required Treatment:  Plaintiffs object to the requirement that EOP inmates

28  in the PSU must be located in cages in order to receive mental health care. Plaintiffs seek a

1  requirement that the PSU treatment program include an individualized assessment of each

2  patient's ability to program in a group or individual setting outside of cages.  The PSU

3  program must provide treatment programs outside of these cages so that inmate/patients can

4  transition to less restrictive programs in prison and in the community.

5      **Chapter 10:  Suicide Prevention and Response**

6      12-10-15 & 16:  Guidelines for clinician-ordered suicide precautions:  Plaintiffs object

7  to the absence of custody observation at staggered intervals not to exceed 15 minutes (*e.g.,* 5,

8  10, 7, 9 minutes) as part of the behavioral checks for inmates placed on suicide precautions in

9  the MHCB or OHU.  See Revised Program Guides at 12-10-15.  See also, Ex. F to Bien Dec,

10  excerpts from Correctional Mental Health Care Standards and Guidelines for Delivering

11  Services, 2003, at 228.  The Program Guide standard is an unsafe level of observation for

12  suicide precautions.

13      12-10-17:  Video-Monitoring:  Plaintiffs object to the use of video-monitoring to

14  replace direct, constant, cell front staff observation of inmates on suicide watch.  Plaintiffs

15  have no objection to video-monitoring which is used as a supplement to, but never as a

16  substitute for, constant observation by staff.

17      12-10-21-22:  Emergency Response and CPR:  Plaintiffs agree with the Special Master

18  that this section must be revised to conform with the final amended policy on emergency

19  response and CPR.

20      **CONCLUSION**

21      For all of the reasons set forth above, plaintiffs respectfully request that the Court enter

22  an order as set forth below and in the Proposed Order filed herewith.  The Proposed Order is

23  consistent with the Special Master's Report and Recommendations.

24      Plaintiffs request that the Court's order clearly specify which portions of the Revised

25  Program Guide are being approved and which portions will be the subject of further

26  proceedings and further orders.  There are several different relevant categories:  First, the

27  majority of the Revised Program Guide is undisputed and can be approved at this time.

28  Second, the provisions that would reduce the frequency of rounding and case manager contacts

1   in Administrative Segregation units should be singled out as not approved at this time.

2   Moreover, defendants should be ordered to continue to provide the level of care in

3   Administrative Segregation units presently mandated by the 1997 Program Guide. Third, as to

4   those other specific provisions in the Revised Program Guide to which plaintiffs object, the

5   Court should order them implemented but note that they are not final and are subject to further

6   Court Orders. Fourth, as to the additional provisions requested by the plaintiffs, the Court

7   should indicate that these will be subject to further proceedings. Finally, the Court should

8   adopt the Special Master's recommendation concerning certain provisions that are likely to be

9   resolved or clarified in the next 30 days.

10        Thus, plaintiffs request that the Court order as follows:

11        1.    The court hereby approves the undisputed provisions of the January 2006

12  Revised Program Guide, and orders defendants to immediately implement all such provisions.

13        2.    The following disputed sections of the Revised Program Guide would, if

14  implemented, reduce the amount of care currently mandated by the 1997 Program Guides. As

15  to these disputed sections, the requirements of the 1997 Program Guide shall continue to apply

16  until plaintiffs' objections have been heard and decided:

17             a.    On page 12-7-4 of the Revised Program Guide, the defendants' proposed

18             reduction in daily psych tech rounding for non-MHSDS inmates in administrative

19             segregation to once a week rounds.  The 1997 Program Guide requirement of daily

20             rounds shall continue to apply.

21             b.    On page 12-7-6 of the Revised Program Guide, the defendants' proposed

22             reduction in individual clinical case management contacts for 3CMS inmates housed in

23             administrative segregation to every other week clinical contacts. The 1997 Program

24             Guides requirement of weekly clinical contacts shall continue to apply.

25        3.    Plaintiffs have filed and maintained objections to various additional provisions in

26  the Revised Program Guides. Defendants are hereby ordered to immediately implement these

27  sections of the Revised Program Guide, even though they remain in dispute. These remaining

28  disputes are set forth in plaintiffs' objections. In addition, plaintiffs request that certain

1 | additional requirements be added to the Revised Program Guide. The court, after consultation

2 | with the parties and the special master, will determine an appropriate procedure for hearing

3 | plaintiffs' objections and schedule these remaining issues for resolution.

4 |     4.     The special master and the parties are directed to finalize the provisions of the

5 | Program Guide related to the review of psychiatrist qualifications, staffing ratios, CPR and

6 | video monitoring within 30 days. The parties are also directed to report to the court

7 | concerning the resolution of those matters within 45 days.

8 | Dated: February 17, 2006

9 |                         Respectfully submitted,

10

11

12 |                         Michael W. Bien
                        Rosen, Bien & Asaro, LLP
                        Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT R

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO **
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
LORI RIFKIN ***
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ****

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

April 18, 2006

<u>VIA FACSIMILE AND U.S. MAIL</u>

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
PO Box 944244-2550
Sacramento, CA 95814

Tel:   (916) 327-7872
Fax:   (916) 324-5205

Michael Stone
CDC Legal Affairs Division
PO Box 942883
Sacramento, CA 94283-0001

Tel:   (916) 324-1421
Fax:   (916) 327-5306

Re:    Coleman v. Schwarzenegger
       Our File No. 489-3

Dear Lisa and Michael:

As you know, one of the issues on the agenda for April 26, 2006 before Judge Karlton is a status conference concerning a schedule and procedures for litigation of the remaining issues in dispute concerning the Program Guides. We are also scheduled to have a telephone conference concerning these issues on Wednesday, April 19, at 1:00 p.m.

We appreciate defendants' apparent willingness to reexamine some of these issues and we, as always, remain willing to settle rather than litigate these disputes. On the other hand, we have been negotiating for several years and we are now subject to a Court order to either resolve the remaining issues or allow the Court to decide them. We are addressing issues here, therefore, that we remain hopeful will be resolved through

*      MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**     OF COUNSEL
***    MEMBER OF THE CONNECTICUT AND NEW YORK BAR
****   MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Lisa Tillman, et al.
April 18, 2006
Page 2

negotiation (classification, suicide precautions, etc.) or through defendants' further study of issues (overall staffing ratios).

You are aware of the issues that are in dispute concerning the Program Guides. I will not repeat them here or attempt to summarize them. (See February 17, 2006 Plaintiffs' Objections to Special Master's Report and Recommendations on Defendants' Revised Program Guide.)

Because many of the remaining issues are overlapping, depositions, tours and document requests should, to the extent possible, proceed in unison rather than issue by issue. That is, if we are going to have plaintiffs' experts tour Corcoran, they should try to cover all issues and not have to go back to Corcoran several times. In some cases, however, it may be appropriate and efficient to break out and/or postpone certain issues even if it may result, for example, in a second tour of Corcoran for a limited purpose.

With cooperation by defendants, plaintiffs can complete their necessary discovery in a six to nine month time frame. (This assumes reasonable cooperation from defendants in scheduling tours and inspections, producing documents and information, etc.). It may also be possible to reduce the scope of discovery by stipulating to certain factual issues, and/or agreeing that certain prisons are representative of conditions and policies at other similar prisons and programs.

## SHU'S AND AD SEG'S

A major focus of our remaining disputes concern the housing of class members in SHU and administrative segregation units. In connection with these issues, plaintiffs' discovery will include the following:

- Tours and inspections of Corcoran, Pelican Bay, CCI and VSPW Secured Housing Units by plaintiffs' counsel and retained expert witnesses. These tours should include tour of the SHU units, cells, offices, MHCB/hospital/OHU/infirmary/ZZ cells, informal interviews of custodial and clinical staff concerning Program Guides and local Operating Procedures and policies, review of a sample of medical and central files, private interviews with class members (some cell front and some in private rooms), observation of psych tech rounds, case manager rounds and appointments, medication rounds, other programming, ICC and Treatment Team and 115 hearings, etc.

- In advance of and in connection with the tours and inspections, we will need defendants to provide various documents and information similar to that provided to the Special Master in connection with Coleman tours, such as lists of inmates residing in the SHU with length of stay and MHDS status, incident reports (relating to use of force issues), referrals to higher levels of care, clinical staffing information, 114 logs, logs and records for

Lisa Tillman, et al.
April 18, 2006
Page 3

psych tech rounds, policies and procedures, internal memoranda, etc. We will use the lists, for example, to sample inmates for more detailed interviews and file reviews.

- In addition to the SHU units at these four prisons, we will also tour and inspect all ad seg units, including, but not limited to, new ad segs, regular ad segs, ad seg EOP hubs, overflow ad seg units. Same stuff as above for the SHU's will be required. Ad seg lists would also require more detailed length of stay information, reasons for ad seg detention, etc.

- In addition to the four prisons with SHU's, we would propose several tours of other prisons to focus on ad segs. SAC, which has the other PSU, would be necessary, as would a sample of other prisons. We would suggest LAC, SVSP, RJD, CIM, DVI, CMC, CMF, Folsom, SQ, Avenal, Wasco, Solano and MCSP.

- We would also devise appropriate discovery to evaluate the RVR process, focusing on these institutions as samples. This would involve requesting a list of 115's, devising a sample, observing some hearings, interviewing custodial and clinical staff.

- For each prison, plaintiffs would propose taking no more than 2-4 depositions of custodial and clinical leadership.

- We would also take 2-4 depositions of headquarters staff. In addition, we would require headquarters to produce documents and information on a state-wide basis including internal memoranda, etc.

## PSU AND AD SEG EOP HUBS

We are also challenging the related issues of the use of cages for treatment in PSU's and Ad Seg EOP Hubs.

- At PBSP, we would also tour the PSU and pilot ad seg program, observing programming, treatment, speaking with clinical and custody staff and informally interviewing patients and reviewing medical and central files.

- At any ad seg EOP Hub programs, we would due the same, observing programming, treatment, speaking with clinical and custody staff and informally interviewing patients and reviewing medical and central files.

- We will also tour the PSU program at SAC.

Lisa Tillman, et al.
April 18, 2006
Page 4



## TRANSFER TO HIGHER LEVELS OF CARE

Another major remaining area of conflict concerns delays in transfers to higher levels of care. This includes reception center delays and failures to provide timely and appropriate access to care at all levels, including but not limited to MHCB's, EOP's and/or DMH programs. These issues also include the numerous remaining disputes over transfer time lines. In addition, these issues include the use of OHU's, ZZ cells, ad seg units and other locations for housing class members who require a higher level of care (MHCB, EOP, DMH). These issues also include DMH admissions criteria, etc.

- Tours and inspections for these issues could probably be accomplished in conjunction with the ad seg/SHU discovery outlined above (that is, additional prisons need not be toured and inspected).

- We would require tours and inspections of DMH facilities, DMH headquarters staff, interviews with DMH clinical staff on tours, depositions of DMH leadership in headquarters and at relevant programs: ASH, Coalinga, SVPP, CMF, Patton. DMH would also be served with document requests.

- CDCR Headquarters staff interviews, document requests and depositions concerning these issues would be extensive: policies and planning, management of wait lists for all levels of care, negotiations for resources, etc.

- Depositions of clinical staff concerning obstacles to higher levels of care caused by DMH practice, policies and procedures, including but not limited to admission procedures, forms, exclusionary criteria, MOU. Depositions of clinical staff concerning custodial obstacles to access to higher levels of care including lock downs, lack of custody staff for escorts, classification and transportation delays, unreasonable security restrictions, etc.

## CLASSIFICATION ISSUES

These issues include four points added in reception, four point annual reduction for successful EOP participation, discrimination in work and educational programs and failure to accommodate class members in access to programs and activities.

- Depositions and document production of UCLA researchers and CDCR officials concerning revised classification system including purported foundation, data and justification for discriminatory four points in reception. We will serve document discovery requiring UCLA and CDCR to produce the computer database, records, other underlying data and studies, paper records and procedures and practices documents regarding the creation and collection of data used (*e.g.*, procedure, practice and

Lisa Tillman, et al.
April 18, 2006
Page 5

guidance documents regarding the screening of inmates at reception for mental illness at the time of the creation and collection of the data used).

- Depositions and document requests of CDCR officials concerning the impact of the revised classification system on class members and their housing and access to programming and services, justifications for decisions such as exclusion of EOP's from work and educational programs, decisions to restrict EOP and CCCMS programs from Level I and II institutions, and to allow blanket exclusions of class members from a variety of CDCR programs and activities.

- We will also seek discovery from individual prisons (depositions and documents) concerning local policies and procedures excluding class members and discriminating against class members.

## PSYCHIATRIST QUALIFICATIONS

The remaining dispute concerns defendants' delay and failure to replace the existing "psychiatrists" with qualified psychiatrists.

- Depositions and discovery of CDCR clinical leadership concerning existing staff, qualifications, supervision, training, peer review, credentialing, etc.

- Depositions and record reviews of MD's without appropriate qualifications, including training, qualifications, supervision and responsibilities.

## SUICIDE PREVENTION ISSUES

The remaining disputes concern defendants' inadequate suicide precautions procedures and tracking former case load and suicide attempt history for non case load.

- Depositions and document discovery concerning defendants' various computer tracking systems and their capabilities, costs to add missing info, internal memoranda re: same.

- Depositions of CDCR clinical staff in headquarters and in various prisons concerning their opinions and experience with the existing standards and screening system and its clinical appropriateness.

## STAFFING RATIOS

We do not accept any of defendants' proposed staffing ratios. This issue includes not only inadequate staffing for reception, ad seg EOP Hubs, SHU's, ad segs, but also the basic staffing for EOP programs and CCCMS programs. Based on defendants' willingness to follow Mr. Keating's suggestions and enhance staffing for reception centers and ad seg units (including ad seg EOP hubs),

Lisa Tillman, et al.
April 18, 2006
Page 6

plaintiffs would consider deferring litigation over inadequate staffing pending defendants' work load study.  We would defer only based on defendants' agreement to commit to a time frame for the work load study for inclusion of any enhancements in next year's budget (2006-7).

Litigation of staffing ratios would require extensive additional discovery beyond the scope of what is described above.  Plaintiffs would seek additional findings form the Special Master concerning these issues in an effort to limit the need for full-scale litigation.

We look forward to further discussion of these issues with you on Wednesday at 1:00 p.m.

Sincerely,

ROSEN, BIEN & ASARO, LLP

By:  Michael W. Bien

MWB:ts
cc:    Keating
       Lopes
       Co-counsel

**MULTI-FAX TRANSMISSION**

# ROSEN, BIEN

# & ASARO, LLP



Attorneys at Law
155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax: (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

___ 7 ___ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 4/18/06

TO: LisA TILLMAN

Recipient's Fax No: (916) 324·5205 Phone No: (916) 327·7872

TO: Michael Stone

Recipient's Fax No: (916) 327·5306 Phone No: (916) 324·1421

TO: Michael Keating

Recipient's Fax No: (904) 491·7158 Phone No: (904) 491·7157

TO: Matthew A. Lopes

Recipient's Fax No: (401) 824·5123 Phone No: (401) 824·5100

FROM: Michael W. Bien    Our File No: 489-3

Message: _____

```
*******************************
***    MULTI TX/RX REPORT    ***
*******************************
TX/RX NO           1810
PGS.                 7
TX/RX INCOMPLETE   -----
TRANSACTION OK     (1)    19163245205p4893
                   (2)    19163275306p4893
                   (3)    19044917158p4893
                   (4)    14018245123p4893

ERROR INFORMATION  -----
```

*MULTI-FAX TRANSMISSION*

# ROSEN, BIEN
# & ASARO, LLP

Attorneys at Law
155 Montgomery Street, 8th Floor          Phone: (415) 433-6830
San Francisco, CA 94104          Fax:     (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us, and you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

___7___ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

DATE: 4/18/06

TO: Lisa Tillman

Recipient's Fax No: (916) 324-5205  Phone No: (916) 327-7872

TO: Michael Stone

Recipient's Fax No: (916) 327-5306  Phone No: (916) 324-1421

TO: Michael Keating

Recipient's Fax No: (404) 491-7150  Phone No: (904) 491-7157