PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

      Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)

No.:  Civ S 90-0520 LKK-JFM

**PLAINTIFFS' REPLY AND OBJECTIONS TO DEFENDANTS' JULY 11, 2006 RESPONSE TO SPECIAL MASTER'S REPORT ON BUDGET REQUESTS, DEPARTMENT OF FINANCE AS PARTY AND SEALING ORDER**

**TABLE OF ABBREVIATIONS**

ASU        Administrative Segregation Unit.

BCP        Budget Change Proposal.

CCM      Clinical Case Manager. Every inmate participant in the mental health delivery system is assigned a clinical case manager who meets with the inmate at regular intervals determined by the inmate's level of care.

CCCMS or 3CMS      Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups. Those CCCMS inmates housed in administrative segregation are provided with enhanced mental health services, including a weekly case manager contact, daily psych tech rounding and a treatment team meeting every 90 days.

CDCR      California Department of Corrections and Rehabilitation.

DOF       Department of Finance.

EOP       Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers.

EOP HUBs      There are ten administrative segregation units located system-wide which have been designated to house EOP patients. According to the July 23, 1999 Order they must provide one full-time case manger for every nine EOP patient in administrative segregation. 7/23/99 ¶ 6.f.

MHSDS      Mental Health Services Delivery System. The name given by defendants to their entire mental health system.

Psych Tech      Psychiatric Technician. Staff person who is assigned to provide daily clinical rounding in administrative segregation units for the purpose of monitoring inmate mental health status and/or deterioration.

SHU       Secured Housing Unit. This is a segregated high-security housing unit where inmates including mentally ill inmates can be housed for indeterminate periods of time in locked down conditions for either in-prison offenses, gang status, or because of safety concerns. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute. There is a SHU for women at Valley State Prison for Women.

SRA       Suicide Risk Assessment.

1

## TABLE OF CONTENTS

2   TABLE OF ABBREVIATIONS.................................................................................i

3   TABLE OF CONTENTS ....................................................................................ii

4   TABLE OF AUTHORITIES ...............................................................................iv

5   INTRODUCTION...............................................................................................1

6   ARGUMENT ......................................................................................................1

7   I.      THE SPECIAL MASTER'S RECOMMENDATION .......................................1

8           A.      The Recommendation To Require Defendants To Fund In 2006/07 The
                    293.98 Administrative Segregation Positions That CDCR's Officials
9                   Requested As Necessary To Comply With Revised Program Guide
                    Requirements Is Fully Supported By The Record .................................2
10

11          B.      The Factual Assertions Made By Defendants Are Unsupported Or
                    Controverted In The Record:  The Special Master's Recommendation Is
                    Fully Supported By The Evidence Of Understaffing In Administrative
12                  Segregation And Secured Housing Units................................................4

13                  1.      Defendants' Argument That They Have Already Been Provided
                            With Sufficient Staffing To Meet Revised Program Guide
14                          Standards Is Contrary To The Evidence ......................................5

15                  2.      The Special Master has identified failures of care in administrative
                            segregation units and secured housing units that have been
16                          inadequately staffed as a result of the defendants' staffing ratios ..............6

17                  3.      The Revised Program Guide Imposes Additional Staff Duties That
                            Cannot Be Met By The Current Staffing Allocations.................................8
18

19                  4.      The Prevalence And Mix Staffing Augmentation Failed To
                            Account For The Burgeoning CCCMS Administrative Segregation
20                          Population ...............................................................................10

21                  5.      The 2006-2007 Finance Letter Fails To Request Adequate Staffing
                            For Secured Housing Units And Administrative Segregation Units ........11

22  II.     THE COURT SHOULD ADD MICHAEL GENEST, DIRECTOR OF THE
            DEPARTMENT OF FINANCE, AS A DEFENDANT IN THIS CASE......................13
23

24          A.      Joinder Of Director Genest As A Defendant Is Proper Where Plaintiffs
                    Seek Prospective Injunctive Relief .......................................................13

25          B.      Joinder Of Director Genest Does Not Unlawfully Abrogate His Discretion
                    As A State Officer.................................................................................14
26

27          C.      The Court Should Add Director Genest In Order To Effectuate
                    Compliance With Its March 3, 2006 Order Directing Defendants To
                    Immediately Implement The Undisputed Portions Of The Revised
28                  Program Guide ......................................................................................15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III.    THE COURT SHOULD UNSEAL ALL OF THE BUDGET DOCUMENTS
        AND PLEADINGS AT ISSUE ...................................................................... 16

CONCLUSION ............................................................................................................ 17

PLAINTIFFS' REPLY AND OBJECTIONS TO DEFENDANTS' JULY 11, 2006 RESPONSE TO SPECIAL MASTER'S REPORT ON BUDGET
REQUESTS, DEPARTMENT OF FINANCE AS PARTY AND SEALING ORDER, NO.:  CIV S 90-0520 LKK-JFM

# TABLE OF AUTHORITIES

## FEDERAL CASES

Foltz v. State Farm Mutual Automobile Insurance Co.,
  331 F.3d 1122 (9th Cir. 2003).................................................................. 16

Milli Lacs Band of Chippewa Indians v. State of Minnesota,
  853 F. Supp. 1118 (D. Minn. 1994) ........................................................ 15

Nixon v. Warner Communications, Inc.,
  435 U.S. 589 (1978) ................................................................................ 16

Pennhurst State School & Hospital v. Halderman,
  465 U.S. 89, 104 S. Ct. 900 (1984) ........................................................ 13

Ex Parte Young,
  209 U.S. 123, 28 S. Ct. 441 (1908)..................................................... 13, 14

## FEDERAL STATUTES

Federal Rule of Civil Procedure 5 ................................................................ 1

## LOCAL RULES

Eastern District of California General Local Rule 5-135(d) ........................... 1

1

**INTRODUCTION**

2    Defendants' unsupported and irrelevant objections to the Special Master's reasonable

3  and limited recommendation for an order requiring defendants to promptly proceed with

4  funding a minimal level of clinical staffing to address the requirements of the Revised Program

5  Guide for administrative segregation units must be rejected.   The record fully supports the

6  Special Master's findings and recommendation.  In fact, the record demonstrates that

7  defendants will have to add far larger numbers of clinical staff to implement the Revised

8  Program Guide standards than are recommended by the Special Master.

9    On July 10 and 11, 2006, plaintiffs and defendants filed pleadings in response to the

10  Court's Order of June 21, 2006 [hereafter "Pls.' Memorandum" and "Defs.' Response"].[1]  The

11  Court ordered the parties to address three issues:  1) support or opposition to the Special

12  Master's recommendation, 2) whether the Department of Finance should be added as a named

13  defendant and, 3) whether the Special Master's Report and exhibits should be unsealed.

14  Plaintiffs respond and object herein to several key points raised in defendants' pleadings and

15  declaration in order to focus and limit the remaining issues for decision by the Court, clarify

16  the record and propose appropriate findings and recommendations on these important issues.

17

18

**ARGUMENT**

19  **I.    The Special Master's Recommendation**

20    The Special Master recommended that "Defendants should be required to incorporate

21  *[in the 2006/07 Budget]* the mental health staffing proposals included in CDCR's FY2006/07

22  BCP (Exhibit C) for implementing the Program Guide revisions.  Any workload study funded

23  by the defendants ought to be required to submit findings and recommendations sufficiently

24  _____

25  [1]  Defendants neglected to serve their pleadings on plaintiffs or the Special Master.  After
    numerous requests, defendants' counsel finally emailed the pleadings to plaintiffs' counsel and
26  the Special Master on Friday, July 14, at 1:40 p.m., PST.  The certificate of service itself states
    that no copies were mailed to anyone other than the Court.  Federal Rule of Civil Procedure 5
27  and Eastern District of California General Local Rule 5-135(d) require service of all
    documents filed with the Court on all parties.

28

timely to be incorporated in the FY 2007/08 budget cycle."   Special Master's Report on the

Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the

Revised Program Guide, filed June 21, 2006 at 10-11 [hereafter "Special Master's Report"].

Defendants object to both parts of the recommendation.  The Court should overrule

defendants' objections and adopt the Special Master's reasonable and measured

recommendation (with minor modifications requested herein) as an order of the Court.

>    A.    The Recommendation To Require Defendants To Fund In 2006/07 The 293.98
>           Administrative Segregation Positions That CDCR's Officials Requested As
>           Necessary To Comply With Revised Program Guide Requirements Is Fully
>           Supported By The Record

Defendants admit that the Governor "chose" not to include "all but six of the 299.98

positions CDCR requested for administrative segregation" in the 2006/07 Budget, as found by

the Special Master.  *Compare* Special Master's Report at 7 with Jerue Decl. ¶ 15 and Defs.'

Response at 4:15-21 ("The Governor chose not to propose to the Legislature 293.98 of the

299.98 administrative segregation positions requested by CDCR.").   Defendants also admit

that the CDCR officials responsible for running the prisons, and for compliance with the

Court's Orders and delivery of mental health care, prepared analyses requesting an even

greater number of  positions in 2005/06 and did not obtain the positions in the Governor's

budget except for a small allocation at Corcoran State Prison.  *Compare* Special Master's

Report at 3-4 with Jerue Decl. ¶¶ 10-13 (admitting that 2005/06 Budget "did not include

CDCR's request for 496.2 positions for implementation of the Revised Program Guide

….because CDCR's proposal did not contain sufficient substantiation to support a budget

proposal to the Legislature, absent a court order," ¶11) and Defs.' Response at 3:15-4:1

(admitting that funding was only provided for positions at Corcoran and not for

implementation of the Revised Program Guide at all other prisons).   While defendants now

contend that the particular 2005/06 BCP relied on by the Special Master "was never submitted

to the DOF [Department of Finance]" (a statement contrary to numerous representations by

other state officials and attorneys to the Special Master and plaintiffs' counsel), that alleged

"error" by the Special Master is beside the point as defendants' admit that some other (and yet

1   unidentified) very substantial request by CDCR was "submitted to DOF," and only the

2   Corcoran funding made it into the 2005/06 budget.  Defs.' Response at 3:19-4:1.  In addition,

3   whether or not the CDCR 2005/06 BCP relied on by the Special Master was "submitted" to the

4   DOF is irrelevant—the document is an admission by the highest level of CDCR officials of

5   dramatic clinical and custodial understaffing.

6          Defendants further admit that the 2005/06 CDCR request was rejected because of the

7   lack of a Court order to implement the Revised Program Guide.  Jerue Decl. ¶ 11.  While Mr.

8   Jerue also asserts, without foundation or explanation, that the CDCR request lacked "sufficient

9   substantiation," *id.*, his "testimony" provides no factual basis to take issue with the Special

10  Master's findings that the CDCR request was fully supported by an extensive field study and

11  analysis of the work load required by the Revised Program Guide.  Special Master's Report at

12  3-4.

13         Defendants do not even attempt to justify their refusal to fund the 293.98 administrative

14  segregation positions requested by CDCR in 2006/07 despite their knowledge of this Court's

15  Order to implement the Revised Program Guide.  Neither Mr. Jerue, the Governor nor defense

16  counsel on behalf of any of the defendants (or the DOF) provide any evidence or argument to

17  establish that clinical staffing in California's prison administrative segregation units and

18  secured housing units is adequate, under any measure, to provide the level of care required by

19  the Revised Program Guide.  With all due respect for Mr. Jerue and his responsibilities, he has

20  not established any foundation for the DOF's repeated recommendations to the Governor that

21  the Governor cut the vast majority of  CDCR's funding requests.  Mr. Jerue has not established

22  any foundation to rely on his expert opinion or analysis of prisons, mental health care, staffing

23  levels, or the requirements of the original Program Guide or the Revised Program Guide.  He is

24  not qualified as an expert and has no relevant personal knowledge.

25         Defendants' feeble objection to the Special Master's recommendation is based on

26  CDCR's alleged failure to answer some questions and "most significantly," "that CDCR did

27  not and apparently could not account for the present use of those previously allocated

28  positions."  Defendants' Response at 5:8-18.  Defendants, in a bizarre admission, even go so

far as to accuse themselves, the CDCR, of misusing previously allocated "funded positions," which "may have been re-directed to other purposes within the same facilities or to other facilities to provide mental health services." *Id.* at 5:13-15. When "questioned" about these alleged indiscretions, defendants admit that CDCR was unable to provide "additional information." *Id*. at 16-18. Thus, even accepting this somewhat remarkable and clearly incomplete tale as true (the CDCR officials were not permitted to tell their side of the story to the Court), the justification for defendants' objection falls flat. No one disputes that the requested positions are now necessary for California's administrative segregation units. The "issue" is whether someone at CDCR lost track of various previously allocated positions. This is simply not a problem with which the Court need be concerned, and provides no justification to deny necessary clinical services to acutely ill men and women housed in dangerous and isolated administrative segregation and secured housing units throughout the State.

> B.      The Factual Assertions Made By Defendants Are Unsupported Or Controverted In The Record:  The Special Master's Recommendation Is Fully Supported By The Evidence Of Understaffing In Administrative Segregation And Secured Housing Units

Defendants' "Factual and Procedural Background" (Defs.' Response at 2-5) does not accurately or fairly present the evidence in connection with these issues; nor is defendants' position supported by admissible evidence concerning the events. Defendants rely solely on the largely incompetent and inadmissible declaration of Todd Jerue of the DOF in support of their position. Plaintiffs file herewith a statement of evidentiary objections to Mr. Jerue's declaration, which, remarkably, places the blame for defendants' failure to obtain adequate funding to implement the Revised Program Guide on the CDCR defendants (who failed to answer DOF's questions), ¶16, and on Governor Schwarzenegger himself (who "chose not to fund 293.98 of the 299.98 positions requested by CDCR"), ¶ 15. Mr. Jerue also criticizes the Special Master for failing to review documents and information from DOF that defendants previously refused to provide to the Special Master (asserting the deliberative process privilege) and then, apparently, chose to withhold from the Special Master once the Court overruled the objection.  ¶5.

1.   Defendants' Argument That They Have Already Been Provided With Sufficient Staffing To Meet Revised Program Guide Standards Is Contrary To The Evidence

Defendants assert, without any citation to evidence, that "[t]his Court has ordered particular staffing ratios for the care of mentally ill inmates in administrative segregation units and the CDCR has obtained funding to enable such staffing ratios in administrative segregation units." Defs.' Response at 2:17-19.  Defendants go on to assert that the "staffing ratios included *sufficient* staff to provide weekly coverage of psychiatric technician rounds," *id*. at 2:21-22 (emphasis added), as well as other required functions. Once again, there is no citation for this factual assertion that is contrary to the findings of the Special Master and to numerous statements made by the CDCR defendants and their staff.   The July 1999 Court Order [hereafter "1999 Order"] ordered a bare minimum of staffing (based on defendants' own analysis and request to the Special Master) and did not include any findings that such staffing was "sufficient" to comply with the lesser requirements of the version of the Program Guide then in effect.  Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation [hereafter "May 1999 Supplemental Recommendations"], filed May 12, 1999 at 7-8 (permitting defendants a chance to implement their plan for staffing administrative segregation rather than imposing the Special Master's ratio for increased staffing for CCCMS patients housed in administrative segregation, and noting that defendants' proposal "arguably is adequate to meet program guide requirements for the roughly 30 to 35 seriously mentally [ill] inmates typically housed in an administrative segregation unit.")[2].

Indeed, at the time that defendants requested their initial funding for staffing to implement the 1999 Order, the percentage of mentally ill inmates housed in administrative segregation was only 15 percent.  Defs.' Response at Ex. 3 (Defs.' 2000-2001 Finance Letter).

_____

[2] On February 6, 2006, twenty of the thirty-three CDCR institutions had at least sixty (60) mentally ill inmates housed in their administrative segregation units.  Ten of these prisons had mental health populations in their administrative segregation units ranging from ninety (90) to 245 inmates.  Nolan Decl. In Support of Pls.' Memorandum, filed July 10, 2006, Ex. A at 00491-00492.

1    Recent data provided by defendants for the numbers of mentally ill inmates housed in

2    administrative segregation indicates that more than 44 percent of the inmates housed in these

3    units are CCCMS patients.  Thomas Nolan Declaration In Support of Pls.' Memorandum, filed

4    July 10, 2006 [hereafter "Nolan July 10, 2006 Decl."], Ex. A at 00492.

5         In short, there is no evidence in the record that the initial staffing ratio established by

6    this Court's 1999 Order was ever "sufficient" to meet the original Program Guide standard for

7    administrative segregation units.  Nor is there evidence that the extremely limited increases in

8    staffing (based on population adjustments), which have clearly not kept pace with the rapid

9    population growth in administrative segregation, have "cured" the understaffing.  The evidence

10   is to the contrary—staffing in administrative segregation has always been and remains severely

11   inadequate to meet the standards of the Revised Program Guide.  As the population of the

12   mentally ill in the administrative segregation units has skyrocketed in the past six years,

13   conditions have deteriorated and many lives have been lost as a result.  There is an urgent need

14   that must be addressed now.

15              2.   The Special Master Has Identified Failures Of Care In Administrative
                    Segregation Units And Secured Housing Units That Have Been
16                  Inadequately Staffed As A Result Of The Defendants' Staffing Ratios

17        The Special Master has repeatedly identified on-going failures of care and the need for

18   enhanced staffing in CDCR's locked housing units.  In the most recent analysis of CDCR

19   suicides that occurred in 2004, the Special Master found that 19 of the 26 suicides (73%)

20   occurred in the locked housing units, and 16 of those were either preventable or foreseeable.

21   Report on Suicides Completed in California Department of Corrections in Calendar Year 2004

22   ("2004 Suicide Report") filed May 9, 2006 at 7, Tables One and Two.  The Report identified

23   the "lack of appropriate screening in confidential settings for new intakes into administrative

24   segregation, including the administration of Suicide Risk Assessments" as a significant

25   problem.  2004 Suicide Report at 10.  The expert Report noted that the individual case reviews

26   suggest that "some initial screenings, SRAs [suicide risk assessments], and many psych tech

27   rounds were performed perfunctorily and most often at cell-front or in holding cells, where the

28

1   lack of privacy often precluded meaningful inmate participation, especially for those inmates

2   placed in administrative segregation for protective reasons." *Id*. at 12.

3        In their Spring 2005-2006 and 2006-2007 Finance Letters, defendants themselves

4   identified the critical staffing shortages and high suicide rates in administrative segregation as

5   reasons for seeking augmented staffing.  Special Master's Report, Ex. B at 19, 41-42 (2005-

6   2006 Finance Letter) and Ex. C at 10, 15 (2006-2007 Finance Letter).  These are damning

7   admissions that defendants cannot avoid and that the Special Master and the Court may rely on

8   in ordering the necessary relief.

9        In the Fourteenth Monitoring Report of the Special Master on Defendants' Compliance

10  with Provisionally Approved Plans, Policies and Protocols ("14th Monitoring Report") filed

11  February 11, 2005, the Special Master reporting on the Corcoran Secured Housing Unit

12  ("SHU") found that the "[t]he provision of mental health care in the SHU was grossly

13  inadequate and unacceptable.  Institutional data indicated that nearly 30 percent of 3CMS

14  inmates in the SHU did not receive even quarterly case management contacts.  Psych tech

15  rounds in the SHU, meanwhile, were also inadequate."  14th Monitoring Report at 39.  As a

16  source of the problem, the Special Master noted that "when the original staffing ratios were

17  developed for the 1997 program guides, no differentiation was made between staffing needs

18  for 3CMS inmates in the general population and those in a SHU.  *That was a serious*

19  *misjudgment because obtaining access to 3CMS inmates in the SHU setting is an intensively*

20  *time-consuming task*".  *Id.* at 40 (emphasis added).

21       The Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance

22  with Provisionally Approved Plans, Policies and Protocols ("15th Monitoring Report") filed

23  January 23, 2006, noted that although the CDCR was plagued by significant psychiatry

24  vacancies, there were not significant functional staffing vacancies system-wide among case

25  managers and psych techs due to the use of contractors.  15th Monitoring Report at 347 (case

26  manager vacancies were 2.7 percent;  psych tech vacancies were ten percent).  Case Managers

27  and Psych Techs are the primary clinical staff who do rounding and screening and deliver

28  mental health services to administrative segregation units and secured housing units.  Despite

the fact that the CDCR did not suffer from major staffing vacancies in these categories of

clinical staff, mental health care in many of the administrative segregation units system-wide

was found problematic in the review by the Special Master, indicating a need for additional

clinical positions.[3]  This is further evidence that the administrative segregation and secured

housing units were never appropriately staffed to provide the required care to the numbers of

mentally ill and general population inmates housed in these units.

> 3.      The Revised Program Guide Imposes Additional Staff Duties That Cannot
>          Be Met By The Current Staffing Allocations

Compounding the failure to adequately assess the staffing needs in the administrative

segregation units based upon the numbers of mentally ill inmates housed in those units is the

fact that the Revised Program Guide imposes additional duties upon case managers,

---

[3] *See, e.g,*  15th Monitoring Report at 12 (quality of psych tech rounds conducted in California State Prison-Sacramento's administrative segregation unit found to be inadequate); 47-48 (problems remained in the administrative segregation unit at High Desert State Prison with the majority of clinical contacts occurring cell-front and with the review of charts indicating documentation of weekly case manager contacts only half the time); 90 (the monitor found a number of seriously psychotic inmates in administrative segregation at California Medical Facility, most of whom had not been referred to a higher level of care);  104, 106 (in Solano's administrative segregation the documentation of daily psych tech rounds was deficient and mental health screenings for inmates transferred into the unit were not always completed in a timely manner); 120-122 (at San Quentin in the administrative segregation unit there were problems with the percentages of CCCMS patients not receiving out-of-cell clinical contacts and daily psych tech rounds were problematic again);  172 (nearly all of the mental health screenings in the administrative segregation unit at California Substance Abuse Treatment Facility occurred at cell-front);  183 (in the administrative segregation unit at Avenal the provision of daily psych tech rounds was problematic again as was weekly case manager contacts for CCCMS patients in the unit);  197-198 (psychiatric coverage and out-of-cell contacts for CCCMS patients housed in administrative segregation at Salinas Valley State was problematic);  211, 215 (the monitor reported that in administrative segregation at California Training Facility there was inadequate documentation of daily psych tech rounds and staff had difficulty providing mental health screens within 72 hours to new admits to the unit);  235 (more than half of the clinical contacts in administrative segregation at Wasco took place cell-front where there was little or no sound privacy);  255-257 (staff at Lancaster were unable to timely screen all newly admitted inmates to their administrative segregation unit, with overdue screenings on average overdue 38 days);  299 (case managers at Richard J. Donovan Correctional Facility did not meet weekly with all of their patients in administrative segregation and lengths of stay for some of them were unnecessarily long);  301 (the failure to provide weekly case manager contacts in administrative segregation reemerged as a problem at Ironwood and those contacts that were provided to CCCMS patients were primarily cell-front); 311 (the psych tech rounds observed in administrative segregation at Calipatria by the monitor were inadequate).

1   psychiatrists, psych technicians, office technicians and custody staff which can only be met

2   with significant additional staffing allocations.  Some of these additional duties were imposed

3   through Court Orders or policies that have been long in practice and have only been formalized

4   through the Program Guide process.  Nevertheless, the additional responsibilities for clinicians

5   were never considered as part of a staffing augmentation prior to 2005-2006.  For example, the

6   Revised Program Guide requires that the assigned case manager (or assigned psychiatrist) in

7   administrative segregation attend all Institutional Classification Committee meetings to present

8   mental health information about the inmate-patient based upon a mental health assessment, a

9   new task that is estimated to create an additional 8 hours of work per week for case managers

10  in those units.  Thomas Nolan Declaration In Support of Pls.' Opposition to Defs.' Formal

11  Assertion of the Deliberative Process Privilege, filed June 9, 2006 [hereafter "Nolan June 9,

12  2006 Decl."], Ex. A at 18.  Defendants have themselves evaluated the Revised Program Guide

13  for the purpose of identifying additional workload concerns, noting when the requirement is

14  part of the Revised Program Guide or an earlier policy.[4]

15      The new requirements imposed by the Revised Program Guide are significant and

16  without additional staffing resources within the locked housing units (administrative

17  segregation and secured housing units), defendants have no hope of implementing the new

18  standards of care.

19

20  [4] Supporting documents provided to the Special Master and plaintiffs' counsel pursuant to the
    June 12, 2006 Order with 2006-2007 Finance Letter:  Tab 4, 00405: describing new psych tech
21  requirements for screening in administrative segregation units and rounds in both
    administrative segregation and security housing units;  00407:  describing increased duty of
22  case manager in security housing unit to provide case management session to patient at least
    monthly rather than every 90 days;  00408:  suicide risk assessment required seven specific
23  times with an estimated timeframe of 60 minutes, not previously required these times;  00409:
    group therapy for CCCMS in administrative segregation and security housing units required
24  based on the treatment plan, not required before;  00410:  requiring a cell front visit by a
    clinician if patient refuses to come to treatment team to discuss reasons and obtain a signed
25  refusal form stating the reasons, which was never required before;  00430:  all inmates placed
    in administrative segregation, including those who have been screened in the past year, must be
26  screened within 72 hours which is a change from old practice;  00431:  In the New Stand-
    Alone Administrative Segregation Units,  mentally ill must be screened out, daily rounds are
27  required, and referrals must be seen and unclear if psych techs have been allocated;  00432:
    psych tech rounding for mentally ill and non-mentally ill inmates housed in the security
28  housing units which was not mandated in the 1997 Program guides.

4.      The Prevalence And Mix Staffing Augmentation Failed To Account For
The Burgeoning CCCMS Administrative Segregation Population

Assuming that the 2000-2001 BCP proposal for 285.4 staff positions for administrative

segregation was in fact approved and allocated to the institutions, as the population of CCCMS

patients exploded in the administrative segregation units system-wide, defendants simply

sought additional staffing resources through the normal "prevalence and mix" process which

allocated staffing for mentally ill inmates based upon ratios for CCCMS inmates housed on the

mainline.  Jerue Decl. ¶ 22 at lines 15-16.  It is clear to defendants, the Special Master and to

plaintiffs that this type of staffing augmentation was insufficient.

Despite an increase in the CCCMS administrative segregation population from 15% to

more than 44% of total administrative segregation beds, defendants were allocated only an

additional 44 positions for the provision of mental health services in administrative segregation

since 2001.  Jerue Decl. ¶ 22.  The only positions allocated for administrative segregation

through the "prevalence and mix" were positions for EOP patients housed in administrative

segregation as required specifically by the 1999 Order.  7/23/99 Order ¶6. f. (one full-time case

manager for every nine EOP inmates in administrative segregation).  No such staffing ratio for

CCCMS patients housed in administrative segregation was created and therefore, no specific

positions for this population were allocated over the past six years.  *See* Jerue Decl., Ex. 4

(Prevalence and Mix Assessments do not divide CCCMS by "ad seg" and "other" as is done

for EOP).  Thus, although the Program Guide required a significantly increased level of mental

health treatment for a CCCMS patient when housed in administrative segregation—weekly

case manager contact rather than once every 90 days and a treatment team meeting every 90

days instead of once a year—no staffing enhancements were provided to CDCR based upon

the increasing numbers of CCCMS patients housed in the administrative segregation units.

Defendants clearly acknowledge this staffing inadequacy in their own budget request

documents for FY2005-2006 and FY2006-2007.  Special Master's Report, Ex. B at 19 ("There

is no currently established ratio for ASU CCCMS.  These duties were never staffed separately

1  from the CCCMS GP [General Population] Population.");  Exhibit C at 15 (2006-2007 Finance

2  Letter).

3          5.      The 2006-2007 Finance Letter Fails To Request Adequate Staffing For
                   Secured Housing Units And Administrative Segregation Units

4

5          Defendants' 2006-2007 request for 298.98 positions for ASU CCCMS ignores two

6  housing areas which have new requirements under the Revised Program Guide and for which

7  no staff have previously been requested or allocated.  This is additional evidence that even if

8  the Court orders defendants to fund all of the positions required by the Special Master's

9  recommendation, there is still likely to be significant staffing shortages based on defendants'

10  own staffing study.

11          Although defendants requested and were allocated clinical and custody staff in the

12  2005-2006 Budget to implement the Revised Program Guide standard of care for the SHU at

13  Corcoran State Prison, no staffing was requested in the 2006-2007 Finance Letter for

14  implementation of the Revised Program Guide SHU standards for mentally ill inmates housed

15  in the other SHU units at California Correctional Institution, Valley State Prison for Women

16  and Pelican Bay prisons.  On February 6, 2006, defendants reported that 88.7% of the inmates

17  housed in the SHU at Valley State Prison for Women were CCCMS and 53% of the inmates

18  housed in the SHU at California Correctional Institution were CCCMS.  Corcoran, where

19  defendants had been ordered to provide the Revised Program Guide care in 2005, currently has

20  only 33% of the inmates in their SHU unit on the mental health caseload.  Nolan July 10, 2006

21  Decl., Ex. A at 00492.   Thus, even if the Governor had not decided to cut the CDCR clinical

22  staffing request by 293 positions, and defendants had been funded for all of the positions they

23  requested, they still would have inadequate staff to immediately implement the Revised

24  Program Guide for CCCMS patients housed in all the SHUs throughout CDCR.

25          In addition, the CDCR has recently (and since the entry of the 1999 administrative

26  segregation staffing order) built ten new stand-alone administrative segregation units from

27  which mentally ill inmates are excluded, in compliance with a stipulated injunction issued by

28  the Court. October 10, 2002 Stipulation and Order, ¶ 1.  The Revised Program Guide provides

for basic mental health services and screening in these new units, which resemble the Pelican

Bay SHU.  Defendants acknowledge in their own Finance Letter of 2005-2006 that case

manager positions necessary to complete required follow-up mental health evaluations for

inmates referred by psych techs or custody officers in these units were never funded.  Special

Master's Report, Ex. B at 18 (2005-2006 Finance Letter).  The Finance Letter notes that "[a]

future BCP will request a ratio of 0.5 CCM [Clinical Case Manager] per each institution that

has an ASU Stand-Alone (10 institutions) = Psychiatric Social Worker 5.0 PY additional."  *Id.*.

It is unclear whether the current 2006/07 request includes positions for the new Stand-Alone

ASUs where there have been at least three suicides to date.

Finally, documentation provided to the Special Master and plaintiffs' counsel in support

of the 2006-2007 Finance Letter indicates that defendants prepared their CCCMS

administrative segregation staffing request for 299 positions based upon their proposed

Revised Program Guide standards for administrative segregation which included a *reduction* in

daily psych tech rounding and a *reduction* in weekly case manager contacts for CCCMS

patients.  Nolan July 10, 2006 Decl., Ex. A at 00512.  The March 3, 2006 Order, however,

directed defendants to retain weekly case manager contacts for CCCMS inmates and daily

psych tech rounding for non-caseload inmates until the disputed Program Guide issues are

resolved.  March 3, 2006 Order, ¶¶ 2a, 2b.

Thus, defendants' 2006/07 request for 299 positions underestimates the actual number

of staffing positions for administrative segregation required to provide the Revised Program

Guide level of care for CCCMS patients housed in these harsh units.  Defendants must be

ordered to add the full 293 clinical positions cut by the Governor from this year's budget and

recommended by the Special Master.  Even then, it is apparent that defendants' clinical staffing

will still be insufficient to deliver the required level of mental health care in administrative

segregation and secured housing units.  Substantial additional resources will need to be

allocated in the 2007/08 budget.

**II.    The Court Should Add Michael Genest, Director Of The Department of Finance, As A Defendant In This Case**

The question properly before the Court is whether Director Genest should be named in his official capacity as a defendant in this case.  Plaintiffs agree with defendants that the Department of Finance is not a "person" for the purposes of § 1983 jurisdiction and should not be named as a defendant in this action.  Joinder of Director Genest in his official capacity, however, is appropriate and well warranted in this case, where state officials in the Department of Finance have interfered with defendants' abilities to comply with the Court Order of March 3, 2006 (ordering defendants to immediately implement undisputed portions of Revised Program Guide). Plaintiffs have proposed  that the Court order be phrased as follows: "Michael C. Genest, the Director of the Department of Finance is hereby added as a defendant in this action, in his official capacity."  Proposed Order Regarding Special Master's June 21, 2006 Report on the Status and Sufficiency of Defendants' Budget Requests for Staffing, lodged 7/10/06 at 2: 27-28; and Amended Proposed Order lodged herewith.

A.    Joinder Of Director Genest As A Defendant Is Proper Where Plaintiffs Seek Prospective Injunctive Relief

Defendants admit that state officials may be sued under § 1983 for injunctive relief.  Defs.' Response at 10: 2-4.  Defendants then argue that the Court may not join Director Genest as a defendant because the Court may not order Director Genest to perform a specific discretionary task.  The Court did not indicate that its purpose in adding Genest as a named defendant would be to issue an order divesting Genest of his discretion.  Narrowly defining the issue of whether Genest may be added in this manner distorts the question the Court raised and requested parties to brief.

The question presented is whether Genest may be named as a defendant.  It is clear, as defendants acknowledge, that state officials may be sued under § 1983 for prospective injunctive relief.  *See Ex Parte Young*, 209 U.S. 123, 154, 28 S.Ct. 441, 451 (1908) (a suit challenging the constitutionality of a state official's action is not one against the State); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909 (1984)

1  (affirming holding of *Ex Parte Young* and finding federal court may enter an injunction that

2  governs state official's future conduct); Defs.' Response at 10:2-4.  Here, the *Coleman* class

3  seeks prospective relief in the form of a final remedial plan to protect the Constitutional rights

4  of the class.  For the reasons outlined in Plaintiffs' Memorandum,  joining Director Genest as a

5  defendant is proper and necessary in this case.  This is especially important in light of the

6  information contained in defendants' brief which highlights additional ways in which DOF has

7  acted to obstruct the state's compliance with Court orders and to keep essential information

8  about the state's funding processes from the Court.

9        B.      Joinder of Director Genest Does Not Unlawfully Abrogate His Discretion As A
               State Officer
10

11       Even if the question were so narrow as defendants propose, the Court may add Director

12  Genest as a defendant.  The Court has issued an order directing defendants to implement the

13  undisputed portions of the Revised Program Guide, and Director Genest and DOF, as

14  defendants also acknowledge, are already subject to that order through the Governor.  *See*

15  Defendants' Response at 10: 15-24; March 3, 2006 Order.  Consequently, neither Director

16  Genest nor DOF may lawfully obstruct compliance with that order, and their actions doing so

17  constitute contempt of the Court's Order.

18       The Court may join Director Genest as a defendant in order to prevent him from

19  interfering with the Court's Order without unlawfully abrogating the discretion allowed a state

20  officer.  *See Ex Parte Young*, 209 U.S. at 159, 28 S.Ct. at 453 ("The general discretion

21  regarding the enforcement of the laws when and as he deems appropriate is not interfered with

22  by an injunction which restrains the state officer from taking any steps towards the

23  enforcement of an unconstitutional enactment, to the injury of complainant.  In such case no

24  affirmative action of any nature is directed, and the officer is simply prohibited from doing an

25  act which he had no legal right to do.  An injunction to prevent him from doing that which he

26  has no legal right to do is not an interference with the discretion of an officer.").  The case

27  cited by defendants for the argument that a court may not compel a state official to perform a

28  discretionary task recognizes this distinction, citing to this precise section of *Ex Parte Young*,

1   and finding: "Although the design and implementation of fish and game policies may be a

2   discretionary act, the Band is not attempting to force the official to adopt a specific policy.  It is

3   merely seeking a definition of its rights under the 1837 Treaty and a declaration of the effect

4   that those rights have on state conservation policies." *Milli Lacs Band of Chippewa Indians v.*

5   *State of Minnesota*, 853 F. Supp. 1118, 1128 (D. Minn. 1994).  Similarly, the Court in the

6   present case may order Director Genest to comply with the Court's earlier orders and stop

7   engaging in behavior precluding compliance, without interfering with the ability of officials to

8   legally perform discretionary tasks.

9        The Court should adopt the Special Master's recommendation to order defendants to

10   secure sufficient staffing to implement the Revised Program Guide.  The Court may order

11   defendants to do that without compromising their discretionary authority.  Defendant CDCR

12   has already submitted its own analysis and request for funding and staffing requirements

13   consistent with implementation of the Revised Program Guide.  Ordering defendants to secure

14   this staffing does not dictate the precise manner of how to obtain this staffing.  Rather, it

15   embraces determinations defendants themselves have already made, and orders all arms of the

16   state executive branch, including DOF, to do the work to effectuate these changes and cease

17   the charade of excuses and finger-pointing evidenced by defendants' most recent brief and

18   supporting declaration.

19        C.    The Court Should Add Director Genest In Order To Effectuate Compliance With
             Its March 3, 2006 Order Directing Defendants To Immediately Implement The
20           Undisputed Portions Of The Revised Program Guide

21        Joining Director Genest as a defendant would not violate the maxim that injunctive

22   relief must be narrowly drawn and be the least intrusive means necessary to correct the

23   violation of the federal right.  Rather, the obstructionist role DOF has played thus far in

24   blocking funding necessary for compliance with the Court's Order to implement the Revised

25   Program Guide indicates that DOF appears to be a necessary party for enforcement of the

26   Court's Order.  Adding Director Genest as a defendant would appropriately widen the reach of

27   the Court enough to ensure protection of the rights of the plaintiff class.

28

III.   **THE COURT SHOULD UNSEAL ALL OF THE BUDGET DOCUMENTS AND PLEADINGS AT ISSUE**

The Court's June 21, 2006 Order directed the parties to address whether the Special Master's Report of the same date and attached exhibits should be unsealed.  June 21, 2006 Order at 2.  Plaintiffs argued that all budget documents at issue should be unsealed because they do not contain privileged information warranting sealing and because the strong public policy in favor of openness in court proceedings is especially applicable in this case, where the subject matter is of grave public concern.  Pls.' Memorandum at 15-20.  Defendants have apparently abandoned their argument and legal objection to disclosure of these documents.  They state that "[f]or the discrete matter of the Special Master's Report and its attached exhibits, Defendants no longer assert the deliberative process privilege and therefore do not seek a continued seal on the records."  Defs.' Response at 5: 24-26.  The only additional sentence on this topic states that the defendants will withdraw their appeals to the Ninth Circuit on this issue.

It is unclear whether defendants are attempting to restrict the unsealing of the documents at issue to the Special Master's Report and exhibits, or if defendants agree with plaintiffs that all budget documents at issue should be unsealed.  Defendants, however, have offered literally no arguments on this topic, nor any reason why all of the budget documents at issue, Special Master's Report and attachments, and pleadings regarding these issues should remain sealed.

Because the presumption is in favor of openness in court proceedings and access to court records, without any reason to keep any of these documents under seal, they should all be unsealed.  *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978) (common law right of access to court records); *Foltz v. State Farm Mutual Automobile Insurance Co.*, 331 F.3d 1122, 135 (9th Cir. 2003) (strong presumption in Ninth Circuit in favor of access to court records).

**CONCLUSION**

For all of the above reasons, plaintiffs respectfully request that the Court issue the following order:

1. Michael C. Genest, the Director of the Department of Finance is hereby added as a defendant in this action, in his official capacity.  The Court orders that a copy of this order and all subsequent orders in this case be served on Michael C. Genest, Director, California Department of Finance, 915 L Street, Sacramento, CA 95814.

2. The recommendation of the Special Master in his 6/21/06 Report is hereby approved, with the following modifications:

    a. Defendants are hereby ordered to obtain funding on an emergency basis for all of the mental health staffing positions and other resources included in CDCR's FY 2006/07 BCP (Exhibit C to Special Master's Report) for implementing the Program Guide revisions that are not already included in the FY 2006/07 Budget.  Defendants shall file a report with the Court, on or before August 30, 2006, confirming that they have complied with the order and that CDCR has been given authority to establish, assign and recruit for all of the new positions.

    b. Any workload study concerning necessary clinical and custodial staffing to implement the Revised Program Guides that is funded by defendants must be required to submit findings and recommendations sufficiently timely to be incorporated in the FY 2007/08 budget cycle.   All consulting contracts, procedures, study criteria and methodology shall be provided to the Special Master and Plaintiffs' Counsel for comments and suggestions and all results of the workload study shall also be made available to the Special Master and Plaintiffs' Counsel.

3. CDCR's  2006/07 Finance Letter, along with all 800-plus pages of the exhibits and attachments thereto, the 6/21/06 Report of the Special Master and its attachments, the additional documents provided by defendants in response to the July 17, 2006 Order, and all pleadings and evidence filed by the parties with respect to this issue are hereby ordered

1   unsealed and shall be made fully available as any other public document in the record of this

2   case.

3          Plaintiffs have lodged herewith, for the convenience of the Court, a revised proposed

4   order, with appropriate findings.

5

6   Dated:  July 21, 2006                              Respectfully submitted,

7

8

9                                                      /s/ Michael Bien_____
                                                       Michael W. Bien
10                                                     Rosen, Bien & Asaro
                                                       Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY AND OBJECTIONS TO DEFENDANTS' JULY 11, 2006 RESPONSE TO SPECIAL MASTER'S REPORT ON BUDGET
REQUESTS, DEPARTMENT OF FINANCE AS PARTY AND SEALING ORDER, NO.:  CIV S 90-0520 LKK-JFM