<u>COLEMAN v. SCHWARZENEGGER</u>
CASE NO. CIV S-90-0520 LKK JFM P

EXHIBIT 5

IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO CONDUCT DISCOVERY AND RECEIVE
TOUR BINDERS

# *J. Michael Keating, Jr.*
### Office of the Special Master
*Coleman v. Schwarzenegger*

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
E-mail: jmichaelkeatingjr@yahoo.com

February 3, 2006

Clerk's Office
United States District Court
  for the Eastern District of California
501 I Street
Sacramento, CA 95814

      Re:    **Ralph Coleman, et al. v. Arnold Schwarzenegger, et al.
                No. Civ. S-90-0520 LKK JFM P**

Dear Sir/Madam:

Please find attached for electronic filing the Special Master's Report and Recommendations on Defendants' Revised Program Guide.

If you have any questions about this filing or its distribution, please call. Thank you for your assistance.

Sincerely yours,

/s/ J. Michael Keating, Jr.

J. Michael Keating, Jr.
Special Master

Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                           No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' REVISED PROGRAM GUIDE

In January 1997, some 13 months into the mastership in this case, the court directed the special master to work with the parties to complete and submit for approval plans, policies and protocols for meeting the requirements of the remedial order. Five months later in response to that directive, six volumes of materials were submitted to the court, the core of which was the <u>California Department of Corrections Mental Health Services Delivery System Program Guides</u>, essentially a collection of standards for the delivery of services within the department's various levels of mental health care. At the same time, the special master reported some continuing differences among the parties and recommended various approaches for dealing with those differences. The parties did not contest those recommendations, and on June 24, 1997 the court provisionally approved the submitted plans, policies and protocols and ordered their implementation.

It was recognized in 1997 that, in many respects, the basic program guides were a work in progress, hence their provisional adoption. Many of the programmatic components of the defendant's mental health system were still embryonic and needed much nurturing. It was uncertain whether some of the standards incorporated in the program guides were realistic or adequate. All agreed that their implementation needed close scrutiny and analysis over the next several years.

During the subsequent implementation process, many aspects of the provisionally approved plans, policies and protocols were revisited and amended by the court, while some other provisions were modified and upgraded by the defendants on their own initiative. The scope of the case, moreover, was broadened to include all California Department of Corrections and Rehabilitation (CDCR) institutions, making the mental health programs at the California Medical Facility at Vacaville (CMF) and California State Prison, San Quentin subject to the program guides. Finally, the size of the defendants' mental health caseload has more than doubled since the provisional program guides were adopted, growing from 14,293 inmate/patients in July 1997 to 30,272 in October 2005.

In late 2002, after more than five years of experience with the provisionally approved program guides, the special master and the parties agreed that the time was ripe to revise and update the program guides and seek their final approval. That agreement initiated a three-year round of meetings among parties, counsel and the special master and his experts and monitors, during which the original program guides were subjected to intense review, analysis and negotiation, followed by a seemingly endless reiteration and critique of draft versions of the final product.

The provisional program guides have also undergone a semantic identity change. The "program guides" adopted in mid-1997 included a series of multiple guides, one for each level of care or program in CDCR's Mental Health Services Delivery System. The revision entitles the whole document simply as a "Program Guide" in the singular, with chapters within the overall guide devoted to different levels of care and programs. Unlike the original program guides, which were accompanied by a miscellany of materials, including memoranda, reports, bulletins, procedures, etc. the revised Program Guide supersedes and incorporates most of these miscellaneous materials.

The revised Program Guide submitted separately and contemporaneously by the defendants represents a substantial improvement over the original document. Experience with the provisionally approved program guides has led to improvements, refinements and additions to the original that are significant. The special master's experts have carefully reviewed the final product and, with a few exceptions that will be noted, have found the revised document adequate and acceptable.

The preparation of this revised version of the program guides has been a ceaselessly dynamic process. While protracted negotiations over existing differences were underway, new developments, difficulties or crises arose that resulted in still more differences. It has become almost impossible to cut off or terminate the continuing debate over new and evolving issues. Each attempt to define, address and resolve continuing differences has generated further changes and objections. In the meantime, the defendants have been unable to make a case to the California General Assembly justifying the allocation of resources needed to implement many of the services and

3

00023

policies included in the proposed revisions that have been jointly identified as essential during negotiations over the revised document.

The purpose of this report is to submit for the court's final approval that 95 percent of the revised Program Guide that the parties and special master agree to and initiate a process for resolving the five percent of remaining issues that continue to elude resolution. Plaintiffs' counsel concur with the revised Program Guide and join in the effort to have the submitted revision approved. On several scores, however, they seek additional requirements and services, broader policies and, in some instances, different, clearer expression of some provisions. The decision to submit this not-quite-complete Program Guide is designed to preserve for the plaintiffs an opportunity to pursue their continuing objections while getting on with implementation of the elements of the Program Guide that are essential and mutually acceptable.

As indicated, the defendants are submitting directly to the court the revised Program Guide endorsed by parties and the special master. The parties and the special master seek the court's final approval of the submitted Program Guide. Because of the defendants' need to incorporate the requirements in the revised Program Guide in budget proposals for the pending FY 2006-07 budget, the court's prompt review and approval is requested.

Some of the remaining unresolved issues have secured the general assent of parties and the special master but require further refinement, including:

- Psychiatrist qualifications: There is agreement on the education-based qualifications included in Chapter 1 (Program Guide Overview), which are the same as those for Board eligibility. The defendants sought to grandfather departmental psychiatrists who currently do not meet these educational criteria, but a subsequent system-wide survey of the department's psychiatrists found a substantial number of non-

4

00024

compliant practitioners. The defendants have withdrawn the grandfathering request. They have agreed to a review of existing psychiatrists who fail to meet the new criteria and, based on the outcome of such a review, to dismiss irredeemably unqualified individuals or impose appropriate limitations on practice and provide adequate supervision on a case-by-case basis. The special master's experts will be assisting the defendants in the structuring of this review.

- Staffing ratios: Once the Program Guide has been approved, the defendants will submit staffing ratios for each of the programs included in the Mental Health Services Delivery System (MHSDS). In addition, upon the court's determination of any heretofore unresolved issues, the defendants will develop appropriately revised staffing ratios. The staffing ratios thus developed will be incorporated in the Program Guide.

- CPR and video-monitoring: Broad agreement has been reached on these two issues, but differences remain over the extent to which the current language in the Program Guide chapter on Suicide Prevention and Response reflects all of the elements of the agreement. The parties continue to work on refining the pertinent language.

These are all critical and complex issues, which need to be finally and fully resolved. While these issues currently elude completion, neither the parties nor the special master want them to delay further the adoption of the revised Program Guide, and all are committed to continue to work to develop mutually acceptable solutions. The Program Guide, moreover, contains a process for annual review and revision. This report also concludes with a recommendation for the court's continuing oversight of changes to the Program Guide during the duration of the court's involvement in the defendants' mental health services.

A couple of other unresolved issues involve defendants' proposals to reduce the level of some services they were required to provide in the program guides provisionally approved in mid-1997 or in subsequent court orders. The plaintiffs object to these proposals, including specifically:

5

00025

- The reduction of psych tech rounds of non-caseload inmates in administrative segregation units from daily to weekly; and

- The reduction of the number of minimally required clinical case managers' contacts with 3CMS (Correctional Clinical Case Management System) inmates in administrative segregation units from weekly to every other week or more frequently if clinically indicated.

Plaintiffs' counsel have long been critical of mental health services provided to seriously mentally disordered inmates in administrative segregation. Even before the program guides were provisionally approved in mid-1997, the plaintiffs argued that seriously mentally disordered inmates ought not to be housed in administrative segregation and acquiesced in the adoption of the provisional guides only because the promised services were supposed to be accompanied by a serious effort to limit the length of stays of mental health caseload inmates in administrative segregation. They argue now that efforts undertaken since 1997 to reduce the length of caseload inmates' stays in administrative segregation have failed and strongly oppose any diminution in the minimum levels of service they reluctantly accepted earlier on behalf of their clients. On the other hand, the special master's experts have reviewed the proposed reductions in service and find them acceptable. At stake here is a definitive understanding of what services the law requires the defendants to provide to seriously mentally disordered inmates in administrative segregation. Until that issue is determined judicially, the defendants ought to be required to continue to meet currently mandated requirements for daily psych tech rounds of non-caseload inmates and weekly case management contacts with 3CMS inmates in administrative segregation.

Plaintiffs also object to the level of services the defendants propose to provide to caseload inmates in Security Housing Units (SHUs) in the revised Program

6

00026

Guide. The services proposed by the defendants, deemed acceptable, again, by the special master's experts, include:

- Psych tech rounds of 3CMS inmates in a SHU weekly and of non-caseload inmates every other week; and

- Clinical case managers' contacts with 3CMS inmates in a SHU every 30 days or more frequently if clinically indicated.

The difference here is that the program guides provisionally approved by the court in 1997 required considerably less mental health services for caseload inmates in a SHU than those proposed in the submitted Program Guide. While the plaintiffs will endeavor to persuade the court that the level of services proposed by the defendants for caseload inmates in a SHU are inadequate, the level of care provided in the revised Program Guide represents an enhancement of presently applicable standards. Hence, the plaintiffs are willing to accept for the interim the proposed services, confident they can convince the court to order expanded services.

The largest category of plaintiffs' objections focuses on issues that involve a considerable expansion of the remedies incorporated in the program guides provisionally approved by the court in mid-1997. Many of the expanded remedies sought are aimed at seriously mentally disordered inmates, who are confined in secure settings characterized by locked-down conditions. Specifically and briefly, the plaintiffs seek:

- A limit of 60 days on the length of stays of Enhanced Outpatient Program (EOP) inmates in EOP administrative segregation hub units;

- For all inmates confined in an EOP administrative segregation hub unit, an individual assessment of each inmate's specific risk factor for violence toward others and the provision of group and individualized therapy outside of secure individual treatment modules for appropriate inmates based on the assessment;

7

- Application of the exclusionary rule adopted in <u>Madrid</u> to all SHU units in CDCR;

- Expanded programming and improved conditions for seriously mentally disordered inmates confined in a SHU;

- In Psychiatric Services Units (PSUs), a treatment program that includes individualized assessment of participating inmates' ability to program in a group or individual setting outside a secure individual treatment module and a level within the behavioral modification framework that includes individual and/or group treatment outside a secure individual treatment module;

- A ban on the placement of seriously mentally disordered inmates in unlicensed Outpatient Housing Units for crisis observation or mental health treatment;

- Relative to classification issues, elimination of the four points added to the classification scores of inmates entering CDCR with a history of mental illness and the addition of a requirement for the housing of EOP and 3CMS inmates in security levels commensurate with their classification scores, together with an end to their exclusion because of participation in the MHSDS from access to the range of programs, services and opportunities available to general population inmates; and,

- A computerized management information system that tracks all inmates discharged from the MHSDS, as well as all non-MHSDS inmates in CDCR with a suicidal history.

Adoption of most of these requests will require significant additional allocations of staffing and programming space and /or operational and institutional changes. The defendants have firmly and consistently rejected these demands. With the exception of those objections related to classification, the special master's experts have not been persuaded of, nor endorsed, the necessity for the requested measures. In the absence of such an endorsement, the special master has not elected on his own authority to insist on their adoption by the defendants. Plaintiffs' counsel, nevertheless, contend that these expanded remedies are essential to redress the constitutional deprivations

8

identified by the court in its initial findings in the case. That is a legal conclusion beyond the jurisdiction of the special master; hence, the reference of these issues to the court.

The foregoing list does not exhaust the most recent catalogue of plaintiffs' objections to the submitted Program Guide, which included six specific complaints about the timelines for transfers to more intensive levels of care within the defendants' MHSDS. All of the protested timelines represent improvements over their predecessors that tied time limits on transfers, especially those to the Department of Mental Health, to the availability of bed space in the receiving program rather than to a CDCR clinician's referral. The plaintiffs objected to the Program Guide's chapter on DMH services because it required an Axis I diagnosis for admission to DMH's intermediate inpatient care programs and specified a 30 to 45-day time limit on lengths of stay for CDCR inmates in DMH's acute inpatient program. Other miscellaneous objections sought a form or protocol in the Program Guide to provide specific guidance to determine the likelihood of decompensation of caseload inmates admitted to an administrative segregation unit, SHU or PSU; a mental health screening of anyone admitted to a SHU without a screening within the preceding 90 days; a one-time mental health screening of all non-caseload inmates in all SHUs; an award of good-time for MHSDS inmates retained in reception for longer than 60 days; and a requirement that any 3CMS inmate charged with a serious disciplinary infraction that may result in a SHU term of a referral to a district attorney or with multiple serious infractions within a specified time period be referred automatically for a mental health assessment. The defendants have also considered this last category of objections or demands and declined to incorporate them into the Program Guide.

9

During the prolonged negotiation of changes to the original program guides, sessions characteristically identified a steadily dwindling list of objections by the special master and plaintiffs to draft versions of the revisions prepared by the defendants, supplemented by the repeated need to consider how best to respond to the latest emerging issues and crises. Such meetings were followed regularly by a summary of newly resolved issues and an articulation of positions on the fresh issues, which typically served as the basis for continued negotiations that often helped resolve fresh issues or narrow existing differences. This process threatens to be eternal, and, as demonstrated in the forgoing lists, revolves around some issues that cannot be negotiated.

The list of unresolved or lingering issues may seem long, but in the decade-long context of the mastership, during which the plaintiffs and defendants have thrashed out and resolved so many differences, the list is quite short. To be sure, the plaintiffs may well want to raise additional issues; during the negotiations over revisions to the Program Guide, they have relentlessly fought to reserve their right to future objections relative to virtually every provision and paragraph in each succeeding draft version. The ceaseless give and take between the parties during the revision process has generated, nonetheless, a blueprint for the provision of mental health services that both sides can take pride in. One hopes the parties will limit the objections they take to court to those that raise genuine issues of law.

Based on the current status of negotiations for revising, up-dating and adopting the submitted Program Guide, the special master makes the following recommendations:

> 1. The court should adopt formally and finally the submitted Program Guide as quickly as possible.

10

2. The special master and the parties should be directed to finalize provisions of the Program Guide related to the review of psychiatrists' qualifications, staffing ratios, CPR and video monitoring within 30 days of approval of the Program Guide and report the outcome to the court within an additional 15 days.

3. Once parties' objections to this report are filed, the court should meet with counsel and special master to fashion procedures for the hearing and determination of remaining objections.

One final note: The special master's report on the original plans, policies and protocols in May 1997 contained a process for the oversight of future modifications to the plans. Such a process is similarly needed during implementation of the revised Program Guide. The process adopted for subsequent changes to the Program Guide submitted by the defendants should include the following steps:

- Defendants shall submit, with a copy to plaintiffs, a copy of any proposed revision to the Program Guide to the special master fourteen days prior to its effective date. If there is a *bona fide* emergency, this time period may be reduced by an appropriate amount, but in no event shall the proposed Program Guide revision be submitted to the master later than its effective date.

- If the master determines that the revision(s) conflict with any of the court's orders in this case, he will work with the defendants to reconcile the conflict.

- If reconciliation is impossible, the master shall file a report with the court which sets forth his findings as to why the defendants' proposed revision(s) to the Program Guide violates the court's order(s). He shall also make recommendations as to what actions should be taken concerning the proposed revision(s).

Respectfully submitted,

/s/

_____
J. Michael Keating, Jr.
Special Master

February 3, 2006

11

00031