**COLEMAN v. SCHWARZENEGGER**
**CASE NO. CIV S-90-0520 LKK JFM P**


**EXHIBIT 7**


**IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION TO CONDUCT DISCOVERY AND RECEIVE**
**TOUR BINDERS**

PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON DEFENDANTS' REVISED PROGRAM GUIDE**<br><br>**HEARING**<br><br>Date: To be determined<br>Time: To be determined<br>Location: Courtroom 4<br>The Honorable Lawrence K. Karlton |

Plfs' Obj to SM's Report and Recs on PG, 489-3.DOC
PLFS' OBJ TO THE SPECIAL MASTER'S REPORT AND RECS ON DEFS' REVISED PROGRAM GUIDE  No.: Civ S 90-0520 LKK-JFM

00034

1

2

TABLE OF CONTENTS

Introduction ...................................................................................................... 1

Objections to Chapter 1: Program Guide Overview ...................................... 1

Objections to Chapter 2: Reception Center Mental Health Assessment ....... 7

Objections to Chapter 3: Correctional Case Management System ................ 8

Objections to Chapter 4: Enhanced Outpatient Program ............................. 8

Objections to Chapter 5: Mental Health Crisis Bed ("MHCB") ................. 9

Objections to Chapter 6: Department of Mental Health Inpatient Programs .......... 10

Objections to Chapter 7: Administrative Segregation ................................ 11

Objections to Chapter 8: Security Housing Unit ....................................... 13

Objections to Chapter 9: Psychiatric Services Unit .................................. 14

Objections to Chapter 10: Suicide Prevention and Response ...................... 15

CONCLUSION ................................................................................................ 15

Plfs' Obj to SM's Report and Recs on PG, 489-3.DOC
i
PLFS' OBJ TO THE SPECIAL MASTER'S REPORT AND RECS ON DEFS' REVISED PROGRAM GUIDE No.: Civ S 90-0520 LKK-JFM

00035

1

TABLE OF AUTHORITIES

2   *Coleman v. Wilson*,
3        912 F.Supp. 1282, 1320 (E.D.Ca. 1995) ..................................................................2

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00036

1      The <u>Special Master's Report and Recommendations on Defendants' Revised Program</u>

2  <u>Guide</u> ("the Report" or "Special Master's Report") was filed on February 3, 2006.  In the

3  Report, the Special Master states that "[t]he purpose of the report is to submit for the court's

4  final approval that 95 percent of the revised Program Guide that the parties and the special

5  master agree to and initiate a process for resolving the five percent of remaining issues that

6  continue to elude resolution."  Special Master's Report at 4.  Plaintiffs support the

7  recommendation that defendants should be ordered to immediately implement their Revised

8  Program Guide, subject to the exceptions noted by the Special Master.  We file these

9  objections to set forth our specific remaining objections to the proposed Program Guide.  We

10  have not included evidence or argument concerning our objections, as we support the Special

11  Master's recommendation of further proceedings to develop a process for presenting and

12  resolving the remaining objections.  Special Master's Report at 11 (Recommendation 3).  For

13  some of the disputes, plaintiffs request reasonable discovery and an evidentiary hearing; others

14  may be resolved on legal issues.  Plaintiffs have submitted a proposed order to assist the Court

15  in its effort to specify which portions of the Revised Program Guide it is approving and which

16  areas are not yet finally decided and remain in dispute.

17      Set forth below are plaintiffs' remaining specific objections to each chapter of the

18  Program Guide proposed by defendants and recommended for approval by the Special Master:

19  **Chapter 1:  Program Guide Overview**

20      <u>12-1-8 and 12-1-9</u>:  <u>Psychiatrist qualifications</u>:  Plaintiffs agree to withdraw our

21  objection on the issue of psychiatrist qualifications in light of the resolution of the issue set

22  forth by the Special Master in the Report.  Special Master's Report at 4-5.  However, the

23  Revised Program Guide submitted to the Court by defendants still includes the "grandfather

24  clause" that the Special Master indicates defendants have withdrawn.  See Revised Program

25  Guides at 12-1-8 (under Standard Program Staffing, the last sentence in the first paragraph says

26  "psychiatrists hired after [date left blank] shall meet the following training requirements").

27      <u>12-1-9</u>:  <u>Clinical Input into the Disciplinary Process</u>:  In response to this Court's finding

28  after trial that defendants were punishing inmates with mental illnesses without taking into

1   account the role of their mental illness, see *Coleman v. Wilson*, 912 F.Supp. 1282, 1320

2   (E.D.Ca. 1995), the defendants developed a system for providing clinical assessments of such

3   inmates for use in the disciplinary hearing reviewing the infraction. These clinical assessments

4   are required for all 3,900 Enhanced Outpatient Program ("EOP") inmates who live in sheltered

5   housing units and receive intensive mental health care. However, for the majority of the

6   *Coleman* class -- the CDCR's 27,000 Correctional Clinical Case Management System

7   ("3CMS") inmates who live in the general population -- these assessments are provided only in

8   extremely limited circumstances. Plaintiffs object to the Revised Program Guide standard for

9   referring these 3CMS patients for a mental health assessment. See Revised Program Guides at

10  12-1-9 ("All inmates in CCCMS or non-MHSDS inmates who receive a [disciplinary

11  infraction] and who exhibit bizarre, unusual, or uncharacteristic behavior shall be referred for a

12  Mental Health Assessment.") This standard, which is currently employed by the CDCR, does

13  not result in a meaningful review of the role of mental health in the disciplinary infractions

14  incurred by the vast majority of the plaintiff class. Plaintiffs propose the expansion of the class

15  of persons automatically given an assessment to include: (1) all 3CMS inmates charged with a

16  serious rules violation that could result in a SHU term or DA referral, (2) any 3CMS patient

17  with multiple rules violations during a specified period of time.

18          12-1-10 and 12-1-11: Tracking Caseload History and Suicide Attempt History: In

19  order to facilitate suicide prevention efforts and improve mental health screening of inmates

20  admitted to administrative segregation, plaintiffs have long sought to require that defendants

21  develop a computerized system to track all former-caseload inmates. Defendants actually

22  tracked this information in the early years of this Court's supervision of its mental health

23  system, but eliminated this tracking system without notice to plaintiffs or the Special Master.

24  Plaintiffs object to defendants' failure to include in the Program Guide a computerized system

25  that tracks former members of the mental health caseload.

26          This Court's June 9, 2005 Order, which adopted recommendations from the Special

27  Master's Report on 2003 Suicides, requires that defendants track mental health caseload

28  inmates with a history of suicidality. However, plaintiffs sought a broader suicide history

1  tracking requirement as part of the Program Guide process.  Plaintiffs object to defendants'

2  failure to expand their Suicide History Tracking System to include general population inmates

3  with a suicide attempt history.  Given the extraordinarily high current number of suicides

4  recently in the CDCR, which include a substantial number of suicides by general population

5  inmates with a history of suicidal behavior, plaintiffs continue to object to defendants' failure

6  to track suicidality history for general population inmates.

7      12-1-11 through 12-1-13:  Transfer Guidelines:

8      The Special Master's Report states that plaintiffs' remaining objections to the Program

9  Guide "included six specific complaints about the timelines for transfers to more intensive

10  levels of care within the defendants' MHSDS."  See Special Master's Report at 9.   The Master

11  goes on to assert that "[a]ll of the protested timelines represent improvements over their

12  predecessors that tied time limits on transfers, especially those to the Department of Mental

13  Health, to the availability of bed space in the receiving program, rather than to a CDCR

14  clinician's referral." *Id.*

15      Plaintiffs respectfully disagree with these characterizations of both plaintiffs' position

16  and of the defendants' timelines.  In fact, plaintiffs' objection to three of the time periods

17  below is precisely that the Revised Program Guide timeline continues to link the time limit for

18  transfer to the availability of bed space in the receiving program.  In fact, except for plaintiffs'

19  contention below that the timeline for transfer to DMH intermediate inpatient care is simply

20  too long, each objection to a proposed timeline below is based on language in the Revised

21  Program Guide that appears to be included so that defendants may avoid the burden of a strict

22  transfer timeline which starts with the identification of actual clinical need.

23      (A)  Identification-Referral Times:  Plaintiffs object to the distinction between

24  "identification" and "referral" in the defendants' timelines for transfers into clinical care

25  programs.  With the exception of the Department of Mental Health ("DMH") transfer

26  timelines, there are no specific timeframes established for the period between identification

27  and referral.  The Special Master's prior Recommendations for Transfer Timelines adopted

28  timelines that "take as a starting point the date of a clinician's referral of a seriously mentally

00039

1  disordered inmate to a specific level of treatment and care." See Ex. A to Declaration of

2  Michael W. Bien in Support of Plaintiffs' Objections to the Special Master's Report on

3  Defendants' Revised Program Guide ("Bien Dec"), 1/3/01 Special Master's Recommendations

4  for Transfer Timelines at 6. In new language first presented on September 9, 2005, defendants

5  define "referral" as "the date the level of care change is documented on a Mental Health

6  Placement Chrono." See Revised Program Guide at 12-1-11. This is an administrative action

7  that has no fixed timeframe and is unrelated to the time when an inmate's clinical need for a

8  higher level of care is identified by his or her clinician. *Id.* Plaintiffs maintain our objection

9  and our position that all timelines should run from the initial identification of clinical need to

10  the actual transfer.

11      (B) <u>Transfer to the Department of Mental Health Acute Psychiatric Program ("APP") at</u>

12  <u>California Medical Facility</u>: Plaintiffs withdraw our objection to the extended timeframe

13  which allows 10 calendar days plus two working days from identification to transfer to the

14  DMH-run Acute Psychiatric Program (APP) at CMF.

15      (C) <u>Timeline Contingent on Acceptance by the Department of Mental Health</u>:

16  Plaintiffs continue to object to the caveat "if accepted to DMH" in the transfer timeline grid on

17  12-1-13 for transfers to both the intermediate and acute inpatient care programs. If the

18  Department of Mental Health ("DMH") does not "accept" the inmate because of insufficient

19  beds, the clinical timelines for referral should still apply. In effect, this is another attempt by

20  defendants to tie the transfer timelines to bed availability. A strict timeline starting with

21  clinical identification of need is necessary in order to force defendants to control their

22  relationship with DMH, to expand the number of inpatient beds available, and/or to develop

23  appropriate alternatives to the existing DMH programs. Defendants must provide access to

24  inpatient care within the clinically mandated time frame.

25      (D): <u>Transfer to DMH Intermediate Care Facilities ("ICFs")</u>: Plaintiffs object to the

26  Program Guide provision allowing a thirty-seven (37) to forty-four (44) calendar day

27  timeframe for transfers to DMH intermediate inpatient care programs like Atascadero State

28  Hospital ("ASH") and the Salinas Valley Psychiatric Program ("SVPP"). See Revised

1  Program Guide at 12-1-13. This timeline is roughly double the time period of twenty-one (21)

2  calendar days previously agreed to by defendants and recommended by the Special Master in

3  April 2005. See Ex. B to Bien Dec, 9/12/03 Letter from Jennifer Neal at 2 ("Defendants agree

4  to incorporate the suggested timelines for transfer to DMH" and setting forth 20 day time

5  period for transfer to ICF level of care); Ex. C to Bien Dec, 4/6/05 Special Master's Draft

6  Report on Revised Program Guides at 9-10 ("Based on the experts' opinion in this regard, the

7  special master recommends that the timelines allow . . . three calendar weeks from a referral to

8  an intermediate DMH program to actual transfer."). Defendants' newly expanded time frame

9  includes 30 calendar days between referral and actual transfer to an ICF program, and another

10 five to ten working days between identification and referral, depending upon whether the

11 inmate needs to be given a due process hearing. See Program Guides at 12-1-13. There is no

12 basis for doubling the referral period previously agreed to by defendants and plaintiffs and

13 found appropriate by the Court experts. The roughly forty-day time period is excessive and

14 clinically inappropriate.

15        (E): Psychiatric Services Unit ("PSU") Transfers: The PSU is a psychiatric treatment

16 program for EOP-level of care inmates with a Security Housing Unit ("SHU") term. Plaintiffs

17 object to the proposed 60-day timeframe for transfer into the PSU program because it is linked

18 to CSR endorsement rather than to the identification of clinical need. See Revised Program

19 Guide at 12-1-13. The proposed timeline does not address existing delays in processing and

20 transferring EOP inmates in administrative segregation EOP programs to the higher level of

21 care PSU programs. The Special Master previously expressed a well-founded concern about

22 linking transfer timelines to CSR endorsement, stating that "[b]y using the date of endorsement

23 as the baseline for timing transfers, the defendants effectively sabotage the purpose of the

24 timelines, which are designed specifically to ensure that inmates have timely access to the level

25 of care a clinician deems necessary." Ex. A to Bien Dec, 1/3/01 Special Master's

26 Recommendations for Transfer Timelines at 5. Plaintiffs agree with this concern and will

27 maintain this objection. Absent a transfer timeline for PSU patients linked to clinical

28 identification, the CDCR will not develop the necessary PSU beds and classification processes

00041

1    for moving these patients rapidly out of Hub EOP Administrative Segregation Units to their

2    treatment programs.

3        (F):  EOP Outpatient Housing Unit ("OHU") transfers:    When inmates at institutions

4    without an EOP program are determined to require an EOP level of care, they often wait for

5    long periods of time in their institution's infirmary or "OHU" until an EOP bed is available at

6    another institution.  OHU's do not provide an EOP level of mental health care.  Plaintiffs

7    object to defendants' proposed EOP OHU transfer timeline, which is also linked to

8    endorsement, unlike the other EOP transfer timelines.  See Revised Program Guide at 12-1-13.

9    If adopted, the provision would legitimize the current pattern of extremely long transfer delays

10    for EOPs housed in OHUs.  The placement of "fragile" EOP patients in OHUs at institutions

11    without EOP programs should be addressed as a short-term crisis in EOP and licensed Mental

12    Health Crisis Bed ("MHCB") capacity and not codified as an ongoing Program Guide

13    treatment standard.

14        (G)  Transfer Guidelines for EOP Patients housed in Hub EOP Administrative

15    Segregation Units ("ASUs"):  "Hub" EOP Administrative Segregation Units are ordinary

16    CDCR Administrative Segregation Units in which EOP treatment programs have been poorly

17    implemented.  Hub Administrative Segregation Units have insufficient program space and

18    inadequate clinical staffing when compared to PSU programs.  These programs generally are

19    not providing the required 10-hours per week of EOP treatment, and in any event the

20    conditions in these units are harsh and dangerous to inmates with severe mental illness.  EOP

21    inmates in these programs tend to be isolated in their cells for much of the day, and the

22    treatment they do receive is provided in cramped metal cages covered with mesh that the

23    CDCR calls "treatment modules."  Plaintiffs object to the failure of defendants to develop a

24    transfer timeline for removal of EOP patients housed in these Hub EOP Administrative

25    Segregation Units.  Long-term housing in these dangerous units must be limited to 60 days.

26    Transfer guidelines for EOP ASU patients will ensure that institutions process Rules Violation

27    Reports ("RVRs"), referrals to local District Attorneys for prosecution, and investigations in a

28    timely manner so as to either return EOP patients to their mainline housing or, if warranted,

1  transfer them rapidly to a PSU program.  For those EOP patients housed, sometimes for years

2  at a time, in these Hub EOP ASUs because of the defendants' failure to provide sufficient

3  Level IV EOP Sensitive Needs Yard beds for inmates with safety issues, the transfer timelines

4  will ensure that defendants develop sufficient beds.

5      <u>12-1-14 and 12-1-15</u>:  <u>Program Guides Revision Policy and Procedure</u>

6          Plaintiffs object to this proposed Program Guide Revision Policy and Procedure which

7  permits defendants to unilaterally change the Program Guides.  See Revised Program Guides at

8  12-1-14 and 15.  Plaintiffs also object to the procedure recommended by the Special Master,

9  which provides for only 14-days notice before defendants implement changes to the Court-

10  ordered Program Guide.  See Special Master's Report at 11.  The Revision Policy and

11  Procedure must provide at least thirty days (30) written notice to the Special Master and

12  plaintiffs of proposed changes to the Program Guides, with a requirement that the parties meet

13  and confer over the proposed changes.  If no agreement is met, the burden will be on the

14  plaintiffs to file a motion for a hearing concerning the proposed Program Guide revisions.

15  **Chapter 2:  Reception Center Mental Health Assessment**

16      <u>Classification Issues</u>:  <u>Annual Point Reductions for EOP Participation</u>:  Defendants

17  indicated in early January 2006 that they agreed to the Special Master's recommendation that

18  EOP inmates who participate in their EOP program should be given annual four point

19  classification score reductions.  Ex. D to Bien Dec, Defendants' 1/6/06 Letter at 3 (stating that

20  "defendants agree with the Special Master's recommendation" that "EOP inmates receive

21  annual point reductions in their classification scores for participation in their EOP-related

22  programs.").  However, the defendants have not incorporated this requirement into the Revised

23  Program Guide that they filed with the Court, and the Special Master has not repeated the

24  recommendation in his filing with the Court.  Plaintiffs agree with the Special Master's

25  recommendation on this issue regarding annual four point reductions for EOPs who participate

26  in their EOP programming.

27      <u>Initial Classification Addition of Four Points for History of Mental Illness</u>:  On a related

28  issue, plaintiffs object to the CDCR practice of assigning four extra classification score points

00043

1    at initial classification for inmates with a history of mental illness. This practice is based on

2    irrational stereotypes about individuals with mental illness and results in mentally ill inmates

3    being assigned to higher security prisons where they spend more time in their cell and mental

4    health care is more difficult to access.

5        Extended Reception Center Stays: Plaintiffs also object to defendants' refusal to add

6    mentally ill inmates to the existing procedures for providing general population privileges and

7    credits to disabled inmates who remain in reception centers for extended periods due to their

8    disability. Existing procedures provide such general population privileges and credits to

9    disabled inmates with mobility, vision and hearing disabilities who are retained overlong in the

10    reception centers because of their disability.

11        **Chapter 3: Correctional Case Management System**

12        12-3-2: Plaintiffs object to defendants' refusal to include a policy that requires that

13    3CMS patients will be housed at security levels commensurate with their classification points

14    and will not be excluded from access to the same broad range of programs, services and

15    opportunities available to general population inmates due to their participation in the Mental

16    Health Services Delivery System ("MHSDS"). Existing procedures that require housing

17    3CMS patients at higher security levels discourage mentally ill inmates from participating in

18    the 3CMS program and from taking their medications. For example, 3CMS inmates are not

19    permitted to be housed in most Level I yards.

20        **Chapter 4: Enhanced Outpatient Program**

21        12-4-4: Plaintiffs object to defendants' refusal to ensure that EOP patients will be

22    housed in EOP programs at security levels commensurate with their classification points and

23    will not be excluded from access to the same broad range of programs, services and

24    opportunities available to general population inmates due to their participation in the EOP

25    program. Currently, the lowest security level program for EOP inmates is a Level III program,

26    and most EOP programs exclude EOP inmates from participating in mainline work, vocational,

27    educational and recreational programming.

28

**Chapter 5:  Mental Health Crisis Bed ("MHCB")**

   <u>Mental Health Patients in Outpatient Housing Units ("OHUs")</u>:  Although plaintiffs agree to most of the provisions within Chapter 5, we do not agree to or ratify in any manner the practice of placing mentally ill inmates into unlicensed Outpatient Housing units for crisis observation and/or treatment.  For that reason, plaintiffs object to the existing discussion of OHU treatment protocols and ask that a new provision be added to them calling for the elimination of the use of Outpatient Housing Units for providing crisis care or treatment to mentally ill inmates within a fixed number of years.

   <u>12-5-7</u>:  Plaintiffs withdraw our prior objection concerning this page.

   <u>12-5-26 & 27</u>:  Plaintiffs object to the provision that allows for the discharge of an inmate-patient from the OHU by a single clinician.  This clinician can be a physician with no mental health training.  Instead of this provision, plaintiffs propose system-wide adoption of the operational procedures developed by CDCR staff members at CSP-Sacramento for use in their new Mental Health-OHU.  According to the relevant SAC operational procedure, an inmate-patient may be removed from the OHU based upon an order by a psychologist, psychiatric social worker or psychiatrist/physician after consultation with an informal interdisciplinary clinical team, which includes, but is not limited to a psychiatrist, nursing staff and a custody representative.  Other circumstances where the interdisciplinary clinical team is required include: (1) every 72 hours for inmate-patients pending Mental Health Crisis Bed placement; and (2) within 48 hours of placement to assess the need for higher level of care or release to prior housing.  Although, as noted above, plaintiffs object to the use of the OHU as a *de facto* MHCB unit, until the use of OHUs is eliminated, these clinical safeguards are necessary when providing mental health crisis care.

   <u>12-5-27</u>:  Plaintiffs object to this Program Guide section, which permits the housing of "fragile" EOP patients in OHUs while they wait for transfer to a mainline EOP program.  See Objection to OHU to EOP transfer timelines, *supra*, at 6.  If there is a shortage of EOP beds, the solution is to expand EOP bed capacity.

00045

**Chapter 6:  Department of Mental Health Inpatient Programs**

The transfer timelines discussed in connection with Chapter 1 above should also be included in Chapter 6.

12-6-1:  Given defendants' modification of the relevant language, plaintiffs withdraw our objection concerning the need for defendants to commit to providing timely access to inpatient care to all inmates who require such care.

12-6-3:  Although defendants have modified some language in this regard, plaintiffs object to language which remains in the Program Guide restricting lengths of stay in the Acute Psychiatric Program at CMF to 45 days.  See 12-6-3 at ¶ 5 ("inmates admitted to the APP shall be inmates anticipated to be stabilized sufficiently for release from DMH within 30 to 45 days.")  There is no existing higher level of care program to which CDCR inmates can be transferred if they cannot be stabilized after 30 to 45 days in the APP.

12-6-7 to 12-6-8 and 12-6-15:  Plaintiffs object to the requirement that inmates must have "an Axis I major (severe) mental disorder with active symptoms" to be admitted to the DMH intermediate level of care programs or to the DMH day treatment program.  This level of treatment should also be available on a medical necessity basis for inmates without a "major (severe)" Axis I diagnosis, and for inmates referred for testing or diagnostic clarification.

12-6-9:  Given defendants' modification of the relevant language, plaintiffs withdraw our prior objection to the provision that required clinicians to contact the C&PR concerning custody issues before referring a patient to DMH.

12-6-15:  Plaintiffs object to two of the criteria set forth in the Revised Program Guide for deciding whether an inmate may be admitted to the Day Treatment Program (DTP) at CMF – Admissions Criteria 4 ("Able to function in a structured therapeutic setting with minimal staff prompting") and Admissions Criteria 5 ("Able to participate in own treatment planning").  Revised Program Guide at 12-6-15.  These criteria have been previously criticized by the Special Master's experts because they require a higher level of functioning for referrals to the DTP program than has historically been required.  See Ex. E to Bien Dec, 1/18/05 Letter from Michael Keating to Defendants concerning DTP ("The admissions criteria seem to identify

00046

1    exclusively higher functioning and volunteer inmate/patients who are verbal and motivated.

2    Traditional day treatment programs, however, have focused more often on lower functioning

3    inmate/patients who might benefit from activities more highly structured than CDC's EOP

4    program without requiring the long-term stabilization of an intermediate care program. The

5    implicit exclusion of inmate/patients with primary Axis II diagnoses . . . is problematic because

6    sometimes these are the very inmate/patients who might benefit most from a day treatment

7    program.")  In fact, the Court's July 9, 2004 Order prohibits defendants from changing the

8    DTP program at CMF.  7/9/04 Order ¶ 5.  Plaintiffs continue to object to the use of these

9    overly restrictive criteria that will exclude inmates who require inpatient care.

10    **Chapter 7:  Administrative Segregation**

11    12-7-2:  Plaintiffs object to defendants' failure to include a form and/or protocol to be

12    used in conjunction with this section, as well as the Security Housing Unit ("SHU") and

13    Psychiatric Services Unit ("PSU") sections, that requires prior consideration of the patient's

14    likelihood of decompensation when he or she is placed in segregated housing, based upon a

15    review of the patient's health record and a review of his or her past history of decompensation

16    in locked units.  The form should also allow a clinician to make a recommendation for

17    alternative placement in appropriate cases.  The development of such a protocol would provide

18    substance and specific guidance to the existing language in the Program Guides, which lists

19    "likelihood of decompensation" as one relevant factor to be considered on initial placement in

20    segregated housing.  See Revised Program Guide at 12-7-2, ¶ 4.

21    12-7-4:  Plaintiffs object to the reduction in daily psych tech rounding for non-MHSDS

22    inmates in administrative segregation from daily rounds to once a week rounds.

23    12-7-6:  Plaintiffs object to the reduction in individual clinical case management

24    contacts for 3CMS inmates housed in administrative segregation from weekly clinical contacts

25    to every other week clinical contacts.

26    The Special Master's Report points out that these last two objections concern proposed

27    reductions in care, unlike most of the program guide provisions in dispute, and that therefore

28    "the defendants ought to be required to continue to meet currently mandated requirements for

1    daily psych tech rounds of non-caseload inmates and weekly case management contracts with

2    3CMS inmates in administrative segregation." Special Master's Report at 6.

3         However, the Special Master's report nonetheless later recommends that the Court

4    "adopt formally and finally the submitted Program Guide as quickly as possible" without

5    specifically exempting these sections, which are in the Revised Guides submitted by the

6    defendants to the Court. See Special Master's Report at 10; see Revised Program Guide

7    submitted to the Court by defendants at 12-7-4 and 12-7-6.   In order to clarify that the Court is

8    not adopting this or the other disputed Program Guide provisions, plaintiffs have carefully

9    prepared a proposed form of order for the Court that is significantly different from the

10    sweeping approval recommended by the Special Master.  See Plaintiffs' Proposed Order, filed

11    herewith.

12         <u>Enhanced Outpatient Program Care in Administrative Segregation</u>

13         <u>12-7-6:  ¶ H.1. b.</u> This section provides that transfer to an appropriate ASU EOP Hub

14    institution treatment setting will occur within 30 days of placement at the EOP level of care

15    designation.  As discussed above, plaintiffs object to this section if the transfer timeline is

16    triggered by the date of the Mental Health Placement chrono, rather than at the time which the

17    patient's case manager refers him or her to EOP level of care.

18         <u>12-7-8:</u>  <u>Other Treatment Activities:</u>  In treatment planning for therapy programs for

19    EOP ASU patients, there should be a requirement for an individualized assessment of each

20    patient's specific risk for violence towards others.  Based on this assessment, for appropriate

21    inmates, therapy options should include group therapy outside of treatment cages (which

22    defendants call "treatment modules") as well as individual therapy outside of these treatment

23    cages.  For example, there is currently a large group of EOP inmates in administrative

24    segregation units around the state who are placed their because of their need for protective

25    custody – what the CDCR calls "Sensitive Needs."   These inmates are languishing in

26    administrative segregation units because the CDCR has not created enough Level IV Sensitive

27    Needs Yards.  The inmates generally have no history of violence, yet they are required to do all

28    of their mental health programming in cages in locked units.

## Chapter 8:  Security Housing Unit

12-8-2:  The Special Master's Report states that plaintiffs seek "application of the exclusionary rule adopted in Madrid to all SHU units in the CDCR."  Special Master' Report at 8.  This is an incomplete description of plaintiffs' objection.  Plaintiffs are requesting that appropriate exclusionary criteria be developed for the other SHU units in the state, which include the Corcoran SHU, the Valley State Prison for Women ("VSPW") SHU, and the SHU at California Correctional Institute – Tehachapi.  These procedures should be developed based on a specific clinical assessment of each SHU unit and the risk each SHU unit poses to mentally ill inmates.

12-8-4:  As noted above in connection with plaintiffs objections to Program Guide Chapter 7, plaintiffs request implementation of a new protocol that will provide for meaningful review of each inmate-patient's "likelihood of decompensation" prior to placement in the SHU.  The same type of protocol developed for screening administrative segregation inmates should be employed for screening of inmates prior to their placement in  a Security Housing Unit.  See Objection to 12-7-2, *supra*.

12-8-5:  Sources of Referral for Mental Health Services:  Plaintiffs object to the defendants' failure to include a requirement that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in the SHU.  Special Master Keating recommended that defendants adopt this provision in his April 6, 2005 Draft Report on Revised Program Guides.  See Ex. C to Bien Dec, 4/6/05 Special Master's Draft Report on Revised Program Guides at 12-13 (stating that such a screening would reach inmates who are referred to SHU following a long stay in administrative segregation and explaining that "[p]rolonged detention in administrative segregation can have deleterious effects on inmates' mental health, and a requirement is needed, paralleling the requirement at paragraph E.6. at page 12-7-4 of Chapter 7, that all inmates not already on the mental health caseload, who have not had a mental health screening within the past 90 days, be administered a mental health screening within 72 hours of their placement in a SHU.")  The Special Master's final report

1   does not address this prior recommendation.  Plaintiffs will maintain their objections to the

2   absence of this important mental health screening prior to placement in a Security Housing

3   Unit.

4       12-8-6:  Plaintiffs retain our objection to the provision of reduced psych tech rounding

5   to both MHSDS and non-MHSDS inmates in the SHU.  See Revised Program Guide at 12-8-6,

6   ¶ 5 (providing for weekly psychiatric technician or case manager rounds of caseload inmates

7   and every other week rounding of non-caseload inmates in the SHU).  SHU inmates should

8   receive at least the same frequency of rounding as administrative segregation inmates.  All

9   SHU inmates should be provided with daily psychiatric technician rounding, including general

10  population SHU inmates.

11      12-8-9:  Plaintiffs retain our objection to this provision which requires that 3CMS

12  housed in the SHU be provided with an individual clinical case manager contact only once

13  every 30 days (or more frequently if clinically indicated).  Plaintiffs' position is that 3CMS

14  inmates housed in the SHU should be provided with a weekly individual clinical case manager

15  contact, which is the same frequency of case manager contacts provided to administrative

16  segregation 3CMS inmates.

17      <u>Enhanced Programming and Treatment</u>

18      Plaintiffs object to defendants' refusal to include provisions in the Program Guide for

19  enhanced programming and improved conditions for inmate-patients with mental illness

20  housed in the SHU.  In addition, plaintiffs request procedures to ensure clinical input as to any

21  custody policies or procedures that change conditions or programming in the SHU.

22      <u>Screen of all Non-caseload Housed in CCI, Corcoran and VSPW SHUs</u>

23      Plaintiffs object to defendants' refusal to include a requirement for a one-time screen of

24  all non-caseload inmates currently housed in the Corcoran, the VSPW and the CCI SHUs using

25  the 31 Question mental health questionnaire already developed in this case.

26  **Chapter 9:  Psychiatric Services Unit**

27      <u>12-9-8 & 9:  Required Treatment:</u>  Plaintiffs object to the requirement that EOP inmates

28  in the PSU must be located in cages in order to receive mental health care.  Plaintiffs seek a

00050

1  requirement that the PSU treatment program include an individualized assessment of each

2  patient's ability to program in a group or individual setting outside of cages. The PSU

3  program must provide treatment programs outside of these cages so that inmate/patients can

4  transition to less restrictive programs in prison and in the community.

5  **Chapter 10: Suicide Prevention and Response**

6  12-10-15 & 16:  Guidelines for clinician-ordered suicide precautions:  Plaintiffs object

7  to the absence of custody observation at staggered intervals not to exceed 15 minutes (*e.g.*, 5,

8  10, 7, 9 minutes) as part of the behavioral checks for inmates placed on suicide precautions in

9  the MHCB or OHU.  See Revised Program Guides at 12-10-15.  See also, Ex. F to Bien Dec,

10  excerpts from Correctional Mental Health Care Standards and Guidelines for Delivering

11  Services, 2003, at 228.  The Program Guide standard is an unsafe level of observation for

12  suicide precautions.

13  12-10-17:  Video-Monitoring:  Plaintiffs object to the use of video-monitoring to

14  replace direct, constant, cell front staff observation of inmates on suicide watch.  Plaintiffs

15  have no objection to video-monitoring which is used as a supplement to, but never as a

16  substitute for, constant observation by staff.

17  12-10-21-22:  Emergency Response and CPR:  Plaintiffs agree with the Special Master

18  that this section must be revised to conform with the final amended policy on emergency

19  response and CPR.

20  **CONCLUSION**

21  For all of the reasons set forth above, plaintiffs respectfully request that the Court enter

22  an order as set forth below and in the Proposed Order filed herewith.  The Proposed Order is

23  consistent with the Special Master's Report and Recommendations.

24  Plaintiffs request that the Court's order clearly specify which portions of the Revised

25  Program Guide are being approved and which portions will be the subject of further

26  proceedings and further orders.  There are several different relevant categories:  First, the

27  majority of the Revised Program Guide is undisputed and can be approved at this time.

28  Second, the provisions that would reduce the frequency of rounding and case manager contacts

1   in Administrative Segregation units should be singled out as not approved at this time.

2   Moreover, defendants should be ordered to continue to provide the level of care in

3   Administrative Segregation units presently mandated by the 1997 Program Guide.  Third, as to

4   those other specific provisions in the Revised Program Guide to which plaintiffs object, the

5   Court should order them implemented but note that they are not final and are subject to further

6   Court Orders.  Fourth, as to the additional provisions requested by the plaintiffs, the Court

7   should indicate that these will be subject to further proceedings.  Finally, the Court should

8   adopt the Special Master's recommendation concerning certain provisions that are likely to be

9   resolved or clarified in the next 30 days.

10          Thus, plaintiffs request that the Court order as follows:

11          1.      The court hereby approves the undisputed provisions of the January 2006

12  Revised Program Guide, and orders defendants to immediately implement all such provisions.

13          2.      The following disputed sections of the Revised Program Guide would, if

14  implemented, reduce the amount of care currently mandated by the 1997 Program Guides.  As

15  to these disputed sections, the requirements of the 1997 Program Guide shall continue to apply

16  until plaintiffs' objections have been heard and decided:

17                  a.      On page 12-7-4 of the Revised Program Guide, the defendants' proposed

18                  reduction in daily psych tech rounding for non-MHSDS inmates in administrative

19                  segregation to once a week rounds.   The 1997 Program Guide requirement of daily

20                  rounds shall continue to apply.

21                  b.      On page 12-7-6 of the Revised Program Guide, the defendants' proposed

22                  reduction in individual clinical case management contacts for 3CMS inmates housed in

23                  administrative segregation to every other week clinical contacts.  The 1997 Program

24                  Guides requirement of weekly clinical contacts shall continue to apply.

25          3.      Plaintiffs have filed and maintained objections to various additional provisions in

26  the Revised Program Guides.  Defendants are hereby ordered to immediately implement these

27  sections of the Revised Program Guide, even though they remain in dispute.  These remaining

28  disputes are set forth in plaintiffs' objections.  In addition, plaintiffs request that certain

1  additional requirements be added to the Revised Program Guide.  The court, after consultation

2  with the parties and the special master, will determine an appropriate procedure for hearing

3  plaintiffs' objections and schedule these remaining issues for resolution.

4      4.     The special master and the parties are directed to finalize the provisions of the

5  Program Guide related to the review of psychiatrist qualifications, staffing ratios, CPR and

6  video monitoring within 30 days.  The parties are also directed to report to the court

7  concerning the resolution of those matters within 45 days.

8  Dated:  February 17, 2006

9                                    Respectfully submitted,

10

11

12                                   Michael W. Bien
                                     Rosen, Bien & Asaro, LLP
13                                   Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLFS' OBJ TO THE  SPECIAL MASTER'S REPORT AND RECS ON DEFS' REVISED PROGRAM GUIDE, No: S 90-0520 LKK-JFM

00053