## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

    vs.                  No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

## SPECIAL MASTER'S SUPPLEMENTAL REPORT ON THE STATUS AND SUFFICIENCY OF DEFENDANTS' INTERIM AND LONG TERM PLANS FOR THE PROVISION OF ACUTE AND INTERMEDIATE INPATIENT BEDS AND MENTAL HEALTH CRISIS BEDS

In an order filed on March 3, 2006, the court directed the defendants to submit by April 17, 2006 a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill inmates, male and female, in the California Department of Corrections and Rehabilitation (CDCR) clinically determined to be in need of inpatient care. The order also required a plan for the provision of mental health crisis beds for all seriously mentally ill inmates in CDCR within 24 hours of a clinical determination that they require crisis intervention and stabilization in a mental health crisis bed. The court also set a hearing for April 26, 2006 on the adequacy of the plan.

On April 17, 2006, defendants filed a Statewide Mental Health Bed Plan. On April 21, 2006, plaintiffs filed their objections to the plan. At the beginning of proceedings on April 26, 2006, the court provided the parties with a series of questions framing the issues to be addressed in the course of the hearing. The ensuing testimony confirmed that the bed plan was based on overall CDCR population projections that were

already significantly outdated and relied on projections for bed needs at the various levels of care in the defendants' Mental Health Services Delivery System that were similarly outdated and in need of revision.

The documents and other evidence provided during the hearing, as well as the testimony of CDCR officials, clearly established that the defendants' mid-April plan inadequately addressed the severe shortage of intermediate inpatient and mental health crisis beds, a shortage that left critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care. The Director of Health Care Services for CDCR forthrightly acknowledged the crisis, described an immediate shortfall of 75 mental health crisis beds and 125 intermediate inpatient beds, especially for inmates at the highest level of security, and confessed that the submitted plan failed to meet the need. The remainder of the hearing focused on possible options for improving the plan, as well as existing and potential bureaucratic obstacles to their adoption.

In a May 1 order, filed on May 2, 2006, the court provisionally approved the defendants' long term plan for acute and intermediate inpatient care and mental health crisis beds but directed the defendants to file within 60 days an amended long term plan based on more accurate and current overall population projections and an updated version of the methodology used in the defendants' 2002 Tucker-Alan projection of mental health bed needs. The court also directed the defendants to file within 45 days a revised plan for the interim provision of intermediate inpatient beds and mental health crisis beds. Revisions to both plans were to include a list of projects that could be accelerated, as well

as a list of statutory, licensing or staffing barriers to acceleration or timely completion of any projects described in their plans.

The order also contained specific directives aimed at the potential remedies identified during the hearing, including:

1. Contrary to their April 17, 2006 plan, defendants were to maintain use of the 36 intermediate inpatient beds in the P-2 unit at the California Medical Facility while paying requisite attention to their obligations under the heat plan adopted in earlier court orders and after undertaking every presently feasible mechanical activity to maintain appropriate temperatures in the unit.

2. Defendants were to open the planned 36 intermediate inpatient Department of Mental Health (DMH) beds for Level IV inmates at Salinas Valley State Prison no later than May 30, 2006, and bring on line an additional 36 intermediate inpatient DMH beds at the same institution within the same period it took defendants to make ready for occupancy the first increment of 36 beds, i.e., roughly seven months.

3. Defendants were to review the list of inmates awaiting transfer to the intermediate inpatient DMH program at Salinas Valley State Prison and identify any who might appropriately be placed in an intermediate inpatient DMH program at Atascadero State Hospital or Coalinga State Hospital. CDCR officials were to conduct the review, with any disagreements over the appropriateness of placements being referred to the special master.

4. Defendants were to make 25 intermediate inpatient beds at DMH's newly opened Coalinga State Hospital available immediately for appropriate CDCR

inmates and place an additional 25 CDCR inmates in need of intermediate inpatient
DMH care in Coalinga State Hospital within 30 days.

5.   Defendants were to activate mental health crisis beds in the
correctional treatment centers at Kern Valley State Prison and California State Prison/
Sacramento by July 1, 2006 or inform the court in writing why they were not fully
operational.

6.   Defendants were to reopen the locked observation unit at California
Men's Colony as a 36-bed mental health crisis bed unit on a temporary emergency basis.
These beds were to remain in use until the court ordered otherwise.

7.   Similarly, defendants were not to cease the use of any intermediate
inpatient or mental health crisis bed on the basis of state licensing requirements without
the approval of the special master, unless the court ruled otherwise.

In addition to these specific directives and the broader requirement to file
amended long range and interim plans, the court also did not approve defendants' long
term plan for enhanced outpatient program beds.  Defendants had submitted a long term
plan enhanced outpatient program beds *sua sponte*; the March 3, 2006 order did not
require them to file such a plan.  Nonetheless the filed plan projected a continuing
shortfall of over a thousand enhanced outpatient program beds by 2011.  Finally, the May
2, 2006 court order required the submission within six months of a report on the
feasibility and cost of creating 30 intermediate inpatient beds at Coalinga State Hospital
for Level IV CDCR inmates.  The report was to be prepared by CDCR in conjunction
with DMH and the California Department of General Services.

On June 15, 2006, defendants submitted to the special master and plaintiffs a copy of their plan for the interim provision of intermediate inpatient and mental health crisis beds, which was subsequently filed, *nunc pro tunc*, with the court on July 5, 2006. Plaintiffs had already filed their objections to defendants' amended interim plan on June 29, 2006.

On June 30, 2006, defendants filed with the court their amended long range plan based on current population projections and an updated version of the methodology used originally in the 2002 Tucker-Alan projections of defendants' need for mental health beds at various levels of treatment. Plaintiffs' objections to the amended long range plan, together with notice of defendants' alleged violations of the court's May 2, 2006 order, were filed with the court on July 10, 2006. On July 21, 2006, defendants filed with the court a response to the plaintiffs' objections that declined to respond to specific objections or requests for a court order, while preserving the right to respond to such at the direction of the court.

One last issue arose during the April 26/27[th] hearing dealing with the provision of mental health services to enhanced outpatient program inmates in CDCR reception centers. The issue stemmed from the special master's 15th round monitoring report and plaintiffs' request, included in their objections to the special master's recommendations, for a court order directing the defendants to create treatment programs for enhanced outpatient program inmates in CDCR's reception centers. In a separate order, also dated May 1 and filed on May 2, 2006, the court directed the defendants to submit within 90 days a plan for providing adequate mental health care for inmates in reception centers who have been identified as requiring an enhanced outpatient program

level of care and remain in reception centers longer than 60 days. Defendants filed the required plan with plaintiffs and the special master on July 31, 2006, and plaintiffs submitted their objections to the proposed plan to defendants and the special master on August 8, 2006.

The purpose of this report is to inform the court about the status of issues raised during the April 26/27, 2006 hearing that resulted in the variety of directives just enumerated and provide an analysis of defendants' amended plans and plaintiffs' critique of those plans, together with any recommendations flowing appropriately from that analysis.

The Amended Long Term Bed Plan

The amended long term plan submitted by defendants included a "Mental Health Bed Need Study – 2006 Update," which was intended to address the court's directive to recalculate the department's future mental health bed needs based on current overall population estimates and an updated version of the methodology used in defendants' bed need study prepared by Tucker-Alan in 2002. The new study, dated June 2006, is attached to this report as Exhibit A.

The revised bed needs study incorporated defendants' Spring 2006 adult population projections; current data on waitlists for DMH programs at Salinas Valley State Prison and California Medical Facility; previously unavailable data that permitted improved analysis of discharge rates and length of stays in DMH programs; and data from the Unmet Needs Assessment completed in early 2005, as well as data on the subsequent placements and failures to place inmates identified in the Unmet Needs Assessment as requiring inpatient DMH treatment. The lead author of the revised study,

John Misener, was the same individual who put together the original mental health population projections prepared by Tucker-Alan in 2002, providing thereby a large measure of continuity. Tucker-Alan, meanwhile, has become part of Navigant Consulting, and the revised bed needs study will hereafter be referred to as the "Navigant study."

The population increases announced by CDCR in its Spring 2006 census and projections generated expectations for an immediate boost in the defendants' need for inpatient DMH beds and CDCR mental health crisis beds commensurate with the expanding population. The potential impact of updating the Tucker-Alan methodology was less certain to predict. The revised long range plan, however, contained projections for acute and intermediate and mental health crisis beds that differed substantially and inconsistently from both the projections presented to the court in defendants' mid-April plan and the expectations associated with the reported population growth.

The greatest difference occurred in projections of need for male acute inpatient DMH beds through 2011. The mid-April projections began with an anticipated acute inpatient count in 2007 of 316 and projected a 68 percent increase to 531 beds by 2011. Navigant's June revisions predicted an acute inpatient DMH population of 203 in 2007 and estimated a 10.3 percent increase through 2011 to 224 beds. The difference between these two projections for 2011 is 307 beds (531-224), slightly more than twice the defendants' current capacity of some 150 acute inpatient DMH beds.[1]

---

[1] The defendants consistently and erroneously report the number of currently available acute inpatient DMH beds as 175, but that number includes the 25 beds at Atascadero State Hospital that were created specifically to house inmates at California Men's Colony (originally) and California Institution for Men (later) in need of a mental health crisis bed level of care because CDCR was unable to provide sufficient mental health crisis beds within the department to meet current needs. For licensing purposes, DMH formally designated these beds as "acute inpatient beds," but they have functioned as mental health crisis beds since their initial designation and are also consistently included in CDCR's calculation of mental

The differences between the two sets of projections were less dramatic for male intermediate inpatient DMH beds. The mid-April projections foresaw a need for 548 intermediate inpatient DMH beds in 2007 for inmates at all levels of custody; the Navigant study expected the same need to be 464 beds or 15.3 percent less than CDCR's April estimate. Within the total of projected intermediate inpatient beds, the differences in distribution of the need between Level III and Level IV intermediate inpatient beds were difficult to discern. The Navigant study's estimates were calculated on the basis of existing programs rather than custody levels, introducing, for example, ambiguity over the custody levels of inmates included in Navigant's projections for intermediate inpatient DMH programs at California Medical Facility. Meanwhile, the figures provided by defendants in mid-April combined and mislabeled levels of custody and gave no programmatic breakdown, so it was difficult to know which numbers to compare in the two sets of projections. By 2011, the difference between projections for all levels of custody flattened somewhat, with Navigant estimating an overall need for 563 beds, 12.1 percent less than defendants' mid-April projection of 641.

Over the next five years, the Navigant study estimated that the need for male mental health crisis beds would be roughly 20 percent higher than the figures included in the mid-April predictions, with the bed need reaching 268, compared with the mid-April estimate of 222 beds. Navigant's projection of need for female mental health crisis beds was slightly lower, with the estimated need in 2007 being just two fewer beds than defendants predicted earlier, with the difference rising to seven fewer beds in 2011.

---

health crisis beds. The regularly reported number of 150 acute inpatient DMH beds at California Medical Facility is also inflated due to the fact that as many as 20 of those beds are similarly reserved for inmates at California Medical Facility in need of a mental health crisis bed level of care. The defendants' actual count of acute inpatient beds currently is roughly 130, not 175.

The range of some of these differences is considerable.  Anticipated need for acute inpatient beds in Navigant is less than half the total called for in the mid-April plan, while the need projected for all custody levels of intermediate inpatient beds is down some 12 percent.  On the other hand, the anticipated need for mental health crisis beds by 2011 is 20.7 percent higher.

While the calculations and projections in the Navigant study did not substantiate anticipated across-the-board increases in all categories of bed needs, its most dramatic departures from the defendants' mid-April projections were not entirely surprising.  Take, for example, Navigant's downward revision of CDCR's earlier projection of the need for acute inpatient beds.  The department's predicted growth of nearly 150 percent in the need for acute inpatient beds between just 2006 and 2007, as well as the prediction for a 70-percent growth rate over the next five years seemed inexplicable, even after allowing for calculations of growing waiting lists, data from the Unmet Needs Assessment and overall population increases.  While the Navigant study's projections for larger increases in the need for mental health crisis beds seemed consistent with recent history, its predicted reduction in the overall need for intermediate inpatient beds was troubling, given the higher spring 2006 population projections and the continuing disproportional growth of the mental health caseload within CDCR's overall population, and needs to be carefully monitored and routinely re-calculated.

Following the submission of defendants' revised long term plan, plaintiffs and the special master and his experts carefully reviewed the Navigant study.  Two telephone conferences were held in which the principal author of the document described at length the methodology employed, explained the differences between the projections

contained in the mid-April plan and the Navigant study and responded to plaintiffs and

the special master's experts' questions. Errors in the defendants' original mid-April

projections were ascribed to inaccurate and incomplete data available to the departmental

compilers of the earlier figures; their lack of understanding of some of the basic aspects

of the original Tucker-Alan methodology; errors in the compilation and calculation of

data; and the failure to consider all of the available placement data resulting from the

Unmet Needs Assessment. In addition, the Navigant study had access to hitherto

unavailable data from DMH on admissions to and length of stays in its programs, which

facilitated a better understanding of historical data and more accurate projections.

Navigant also explained more fully its efforts to incorporate the results of the Unmet

Needs Assessment in its projections. The population identified in that one-time 2005

examination of the unmet need for more intensive levels of treatment was described as

constituting a continuing phenomenon, which needed to be included in the calculation of

all future projections.

      This review by no means represented the detailed assessment of the

Navigant study and all of its underlying data by an independent expert and investigation

of the reasons for the errors in the mid-April projections demanded by plaintiffs in their

objections to the revised long term plan. Nor did the review definitively dispose of all of

the questions raised by the study. Some elements of the study's incorporation of the

Unmet Needs Assessment, for example, remain vague or unclear. The dialogue among

parties, the special master's experts and the Navigant authors of the study about the data

and methodology relied on in preparing the study and its projections needs to continue.

On the other hand, no one was able to point to glaring errors in either the methodology or

calculations of the Navigant update of the original Tucker-Alan study conducted in 2002 and adopted as an acceptable basis for the department's bed need projections.

The development of accurate program population and bed need projections cannot be an episodic process with adjustments occurring at intervals of three years or more. Too many variables converge to confound projections, which must be updated, refined and revised often and regularly. Within the past month, for example, Los Angeles County, driven by its own overcrowding problems, terminated its contract to house temporarily in its Pitchess Detention Facility some 1,300 revoked CDCR parolees and other inmates committed to CDCR and intends to transfer its present complement of CDCR inmates forthwith. While the numbers represent less than one percent of CDCR's present population, the sudden addition of an unanticipated 1,300 inmates to a correctional system perilously close to 200 percent of its design capacity and a commensurately overstressed mental health care delivery system operating way beyond its capacity represents an unexpected, projection-rattling variable.

Experience with CDCR's mid-April plan reflects the department's lack of requisite expertise to correct its population projections regularly and competently. It is capable of collecting historical data on program populations, but apparently not expert enough with predictive formulas to generate reliable projections. A grasp of past population patterns is helpful, but insufficient to underpin projections based on fluctuating discharge rates, lengths of stay, average daily censuses and waitlists. Defendants clearly need continuing input from individuals with competence and experience in developing and updating projected bed needs for their mental health programs.

Plaintiffs' objections to the defendants' revised plan take the position that Paragraph 1 of the court's May 2, 2006 order definitively approved the mid-April long term plan, and defendants' recalculated projected bed needs in mid-June represent a barely disguised effort to vacate the final relief granted in the May order. Consequently, any revisions proposed by the defendants that might reduce the number of beds included in the mid-April plan must be justified procedurally under Fed. R. Civ. P. 60 (b) (relief from order based on "mistake, inadvertence, surprise, or excusable neglect; 920 newly discovered evidence which by due diligence could not have been discovered in time…."). This interpretation seems to expand the actual language of Paragraph 1 of the May 2, 2006 order, which stated in its entirety:

> 1. The defendants' long term plan for the provision of acute and intermediate inpatient care and mental health crisis bed is approved, subject to modification based on current population projections. Within sixty days from the date of this order defendants shall file an amended long term plan that is based on current population projections and incorporates an updated version of the methodology first adopted in the 2002 Tucker-Alan bed needs projection.

Determination of the burden and level of proof required to justify changes in defendants' revised plans to meet their clear need for more acute and intermediate inpatient and mental health crisis beds is better left to the court. In fact, however, despite the revisions to their projections for anticipated bed needs, defendants have not yet changed their plan. The June revision simply summarizes the changes in projections; graphs out the impact of the new numbers on the affected components of the mid-April plan; offers three alternative approaches for dealing with the changed projections; recommends the adoption of one of the suggested alternative approaches; and requests 60 days within which to prepare another plan to carry out the preferred approach. The three

suggested alternative approaches include ignoring the new projections and doing nothing; cutting back the originally proposed construction projects in line with the reduced Navigant projections; and re-evaluating and re-scoping the new construction projects in order to provide needed housing, treatment and office space in other mental health programs where population is outrunning resources. Not surprisingly, the defendants recommend adoption of the last approach. ·

As indicated above, the May 2, 2006 order directed the defendants to include a list of projects in the long term plan that might be accelerated, along with a list of statutory, licensing or staffing barriers to acceleration or timely completion of any of the projects described in the mid-April plan. The defendants' revised plan provided no such lists, but apparently in lieu thereof offered Enclosure II, entitled, <u>Design and Build Process: An Overview</u>, which consisted of a seven-page condensed lecture on the difference between Design-Bid-Build and Design-Build processes for the construction of public building projects. The enclosure is attached to this report as Exhibit B.

Only the concluding two paragraphs of Exhibit B referred specifically to the defendants' mid-April long term plan. The first recommended that the Design-Build process "should be considered for the 64-Bed Intermediate Care Facility project at the California Medical Facility; the 128-Bed Intermediate Care Facility at Salinas Valley State Prison and the 25-bed Acute Care Facility at the California Institution for Women." This recommendation was followed by a note indicating that CDCR currently lacked authority under California law to use the Design-Build process and would need to obtain such authority to utilize it in the enumerated projects.

The second and final paragraph of the document recommended against the use of the Design-Build process for the 128-bed Intermediate Care Facility or the 350-bed Acute Care Facility at California State Prison, Sacramento because these two projects, which ought to be combined to create one facility, "should be properly planned and thought out as allowed under the traditional DBB process."

It is difficult to know what to make of this strange document. One is left with the surmise that it is intended as some sort of stage-whispered hint to the court to order the defendants, irrespective of State law, to utilize the Design-Build process in the projects listed in the first paragraph, but not those in the second paragraph. If that is the case, the hint is much too opaque and the argument too nebulous to sustain the hope of its adoption.

Plaintiffs' objections to the revised long term plan alleged two other violations of the court's May 2, 2006 order, one citing defendants' failure to submit a revised plan for providing adequate enhanced outpatient program beds to meet projected needs and the other for the "bad faith" use of clinical staff from other mental health programs to activate mental health crisis bed units at Kern Valley State Prison and California State Prison, Sacramento. The court's March 3, 2006 order did not require defendants to submit a plan for meeting projected needs for enhanced outpatient program beds, as indicated above, and the May 2, 2006 order simply noted and disapproved defendants' plan for meeting the projected long term shortfall of enhanced outpatient beds. The order did not direct defendants to submit a revised plan within any specified time, as it did with regard to plans for meeting acute and intermediate inpatient and mental health crisis bed needs. Presumably, the requirement to update population

14

projections and integrate the revised Tucker-Alan analysis would impact the size of the long term need for enhanced outpatient beds, and defendants' plans already included projects to expand the short term enhanced outpatient bed capacity. Plaintiffs' objections to defendants' specific efforts to activate mental health crisis beds in Kern Valley State Prison and California State Prison, Sacramento are addressed in the discussion of defendants' revised interim plan, below.

The Amended Interim Plan

The amended Interim Intermediate Care Facility and Mental Health Crisis Bed Plan, June 2006 sought basically to meet the immediate need articulated in the Director of Correctional Health Care Services for CDCR's testimony during the April 2006 hearing for 125 additional intermediate inpatient DMH beds and 75 additional mental health crisis beds. Defendants' revised interim plan also responded to most of the specific requirements listed in the court's May 2, 2006 order.

Defendants' plan for providing 75 mental health beds included three specific measures:

1. "The "swap": Defendants proposed to exchange 25 acute inpatient DMH beds in California Medical Facility for 25 acute inpatient beds at Atascadero State Hospital created specifically for use as mental health crisis beds. Because Atascadero State Hospital cannot house high custody inmates (i.e., Level III and IV inmates who represent security risks for violence or escape), CDCR and DMH have been unable to utilize fully these mental health crisis beds, nearly half of which remain vacant. The underlying logic for the move is that the acute inpatient program at California Medical Facility presently and consistently houses at least 25 inmates, who are not serious

security risks and can meet the custody criteria for placement in Atascadero State

Hospital. The transfer to Atascadero State Hospital of 25 such inmates would free up 25

beds in the acute inpatient program at California Medical Facility, which routinely

accepts and treats high custody inmates.

The swap means that the 150 beds currently constituting the acute

inpatient DMH program at California Medical Facility would now include 125 acute

inpatient beds and 25 mental health crisis beds, while Atascadero State Hospital would

lose 25 mental health crisis beds and gain 25 acute inpatient beds. The swap involves no

diminution in the number of acute inpatient beds, just the relocation of 25 such beds.

Similarly, it involves no expansion in the number of mental health crisis beds available to

CDCR, but allows full utilization of the 25 acute inpatient beds at Atascadero State

Hospital designated as mental health crisis beds, nearly half of which are inaccessible for

high custody CDCR inmates who need a mental health crisis bed.

The swap seems to make sense because it holds out the promise of

allowing the department to utilize fully a much needed but presently under-utilized

resource. Essential to the swap's success, however, is CDCR's ability consistently to fill

the 25 acute inpatient beds transferred to Atascadero State Hospital with inmates who

meet the eligibility requirements for placement there. That issue needs to be closely

monitored. If the acute inpatient beds relocated in Atascadero State Hospital cannot be

kept filled, the swap represents nothing more than a procedural burden.

Defendants have in the past 60 days revised the memorandum of

understanding between CDCR and DMH to facilitate the swap; prepared a transfer plan,

as well as procedures and forms for referrals; developed training materials for referrals to

the mental health crisis beds at California Medical Facility; and scheduled initial transfers for inmates currently in the acute inpatient program at California Medical Facility to Atascadero State Hospital in September.

       2.   As discussed at length during the April hearing, defendants' revised interim plan also called for the conversion of the former locked observation unit at California Men's Colony into a 42-bed mental health crisis bed unit on a temporary basis.  CDCR sought and obtained funding for staff for the unit and minor physical renovations in the FY2006-07 budget.  By June 7, 2006, 40 inmates were receiving a mental health crisis bed level of care in the former locked observation unit.

       3.   Defendants proposed to use 18 medical care beds in the general acute care hospital at California Institution for Men to create and license 16 additional mental health crisis beds.  This will increase the count of mental health crisis beds in California Institution for Men from its present total of 18 to 34.  Defendants have sought permission to begin already funded physical renovations, principally involving the replacement of cell doors, in the unit.  The utility of this provision of the plan is limited by the fact that, for most of the past year, defendants have housed up to 40 mental health crisis bed inmates in the general acute care hospital at California Institution for Men.  The plan, however, does legitimize this occupancy at least temporarily and has won the approval of the receiver in Plata.

       In addition to these proposed changes, which defendants have already undertaken initial steps to implement, the May 2, 2006 order required activation of mental health crisis beds in correctional treatment centers in Kern Valley State Prison and California State Prison/Sacramento by July 1, 2006.  Defendants sought and obtained

court approval for the waiver of some licensing requirements for the Kern Valley State Prison correctional treatment center on the eve of the July 1 deadline but continued to experience great difficulty in hiring clinicians to staff the mental health crisis bed unit there. Nonetheless, by reassigning mental health staff from other mental health programs within the institution and from elsewhere in CDCR, defendants collected sufficient clinicians to begin treating a first increment of mental health crisis bed inmates by late July and reportedly will continue to expand the population to its capacity over the next 60 days. Meanwhile, the 11 new mental health crisis beds in California State Prison/Sacramento were activated, although that institution, too, reported considerable difficulty in finding sufficient mental health staff to operate the unit effectively.

As indicated above, plaintiffs' objections to defendants' revised long term plan cited the temporary redirection of clinical staff from other mental health programs to activate the mental health crisis beds in Kern Valley State Prison and California State Prison/Sacramento as a "bad faith" violation of the court's May 2, 2006 order to open the units, despite the department's full disclosure of the need for and discomfort with the reassignments. The redirection of staff reportedly was to be temporary; the impact on other effected mental health programs has not been ascertained; and the efficacy of any other remedy is uncertain and unlikely to be available promptly. CDCR's mental health staff has nearly doubled in the last four years, increasing by roughly a thousand positions. Recruitment of permanent employees to fill all of these positions has slowed to a standstill. The recently enacted budget, however, contained funds that reportedly allow defendants to hire, on an emergency basis, private clinical vendors at premium rates of pay, a recourse that ought to be available and applicable here.

The activities undertaken and documented in the defendants' revised interim plan are projected to provide during the current fiscal year a total of 249 mental health crisis beds for male CDCR inmates, including 164 extant beds in mental health crisis bed units throughout the department, 62 temporary beds in California Medical Facility and California Men's Colony and 23 new beds in California State Prison/Sacramento and Kern Valley State Prison. That number exceeds the 245 beds projected as needed in the Navigant study, which raised CDCR's earlier estimate of the need by 25 percent. Defendants' schedule for the development of permanent and temporary mental health crisis beds is provided in Table B in <u>California Department of Corrections and Rehabilitation Comparison of Mental Health Beds vs. Bed Projections</u>, updated on June 26, 2006 and included as Exhibit C to this report. In Table B, defendants postpone the full effects of the "swap" of acute inpatient beds between California Medical Facility and Atascadero Hospital and the expansion of mental health crisis beds at California Institution for Men until FY2007-08, when CDCR and DMH will be able to provide a total of 290 beds versus the 252 beds projected as needed in the Navigant study. The supply of mental health crisis beds available to defendants is scheduled to exceed the projected need for such beds through FY2010-11. Defendants have also anticipated in their revised interim plan problems that might arise from the reliance on a substantial number of temporary beds by adding to their interim plan a new commitment to build a 50-bed permanent mental health crisis unit at California Men's Colony, in addition to the 50-bed mental health crisis bed unit already under construction at California Medical Facility.

In the short term, the success of defendants' planning for the provision of an adequate supply of mental health crisis beds can best be gauged by the length of the wait beyond 24 hours for inmates referred to a mental health crisis bed throughout the system. Reportedly the length of such waits began to decline over the summer, but that statistic needs to be monitored closely as defendants' plan unfold over the next months and years.

Defendants' revised plan for interim expansion of intermediate inpatient beds for Level IV inmates similarly included three elements:

1.  Pursuant to discussions during the April hearing, defendants took the measures necessary to retain the 36-bed intermediate inpatient beds on the P-2 housing unit at California Medical Facility. They reportedly upgraded heat plan training on the unit and monitored application of the heat plan, but the revised interim plan did not identify feasible mechanical steps undertaken to mitigate temperatures within the unit during one of the hottest summers in recent memory. Meanwhile, defendants were able to expedite the installation of air conditioning not only in the P-2 unit but also in the whole P-tower. The installation is slated for completion in mid-September, rather than in 2008, as projected in earlier versions of defendants' plans.

2.  Defendants undertook to expedite the conversion of enhanced outpatient program beds into Level IV intermediate inpatient DMH beds at Salinas Valley State Prison. Originally defendants intended to create a total of 112 Level IV intermediate inpatient DMH beds in housing units D-5 and D-6 in Salinas Valley State Prison, a project scheduled for completion in March 2009. The revised interim plan confirms the ordered activation of an initial 36-bed intermediate inpatient program on the

D-6 housing unit beginning in May 2006, followed by the activation of 20 additional

intermediate DMH beds on D-6 by August 1, 2006, and calls for conversion of the

remaining 56 beds on the D-5 unit to intermediate inpatient beds, already initiated on

May 22, 2006, to be completed by December 31, 2006.  Given the history of this case,

this activity at Salinas Valley State Prison represents a positively epic accomplishment.

      3.    Finally, defendants proposed to create 30 additional intermediate

inpatient beds for high custody inmates on the P-3 unit at California Medical Facility by

June 30, 2007.  The most difficult and time-consuming aspect of this component of

defendants' plan will be relocating the administrative segregation unit for enhanced

outpatient program inmates currently occupying P-3.  The use of this unit for high

custody intermediate inpatient DMH inmates is intended to be temporary and will last

only until the 64-bed expansion of the intermediate inpatient DMH program at Salinas

Valley State Prison is completed in 2009.

      These additions suffice to cover by the end of FY2006-07 the need for

high custody male intermediate inpatient DMH beds projected in the updated Navigant

study; they do not meet the need identified in defendants' mid-April projections.  Indeed,

defendants' interim and long range plans together meet the needs projected in the

Navigant study for this category of CDCR's seriously mentally ill population through

FY2011; they do not meet the need identified in defendants' mid-April projections until

permanent construction comes on line sometime in FY2011.

Plan for Treatment of Enhanced Outpatient Program Inmates with Extended Delays in
Reception

      Lastly, defendants filed on July 31, 2006, their plan for providing mental

health care for inmates in reception centers identified as requiring an enhanced outpatient

program level of care who remain in reception centers for longer than 60 days. It is clear from the revised plans discussed above that the problem of long delays for enhanced outpatient program inmates in reception center awaiting transfer to mainline programs will not be resolved quickly, despite the scheduled addition of 487 general population enhanced outpatient program beds in FY2007-08. While the Navigant study reduced the need for general population enhanced outpatient program beds projected in the mid-April plan, the gap between need and available beds will remain significant, rising by FY2011 to 914 beds.

Defendants' plan for upgraded treatment for enhanced outpatient program inmates stuck in reception calls for weekly face-to-face case management contacts and five hours of out-of-cell therapeutic activities per week in five reception centers identified as housing the preponderance of reception center inmates. A third and useful element of the plan mandates broad-based re-entry planning for enhanced outpatient program inmates in reception with release dates within 60 to 120 days. The proposed schedule of treatment seems reasonable.

It is unclear why Deuel Vocational Institution, which regularly houses a relatively high number of enhanced outpatient program inmates, and California State Prison/Los Angeles County with its expanding reception responsibilities were excluded. All reception centers for females were also excluded. The criterion for inclusion in the program ought to be the number of enhanced outpatient program inmates spending more than 60 days in reception, regardless of the overall volume of receptions processed in the facility.

22

Resources dedicated in support of the program are limited and locally determined, presumably because the size of programs will vary from facility to facility and from time to time within facilities. Allocated space is limited to whatever happens to be already available in reception centers, which are not rich in space that is appropriate and readily available for group activities. The plan commits to conducting an evaluation of staffing needed to support the program and the inclusion of a request to meet the identified need for staff in the FY2007-08 budget process.

The plan seems implicitly to rely on the expansion of general population enhanced outpatient program beds in FY2008-08 to reduce the need for the program. Certainly, the preferred solution to the problem is some effective process for expediting the transfers of enhanced outpatient program inmates out of reception and into regular programs, but it is the unlikelihood of any quick implementation of that solution that has given rise to the need for this plan and program.

Two other specific directives included in the May 2, 2006 order need to be addressed before moving on to a summary and some recommendations. CDCR officials were required to review the waiting list for the intermediate inpatient DMH program at Salinas Valley State Prison to determine if any inmates on the list might be eligible for transfer to Atascadero State Hospital. Any disputes between CDCR and DMH over determinations were to be referred to the special master. On June 19, 2006, CDCR reported by letter, included in this report as Exhibit D, that CDCR officials had conducted the mandated review and determined, without dispute, that none of the waitlisted inmates was an appropriate candidate for placement in either Atascadero State Hospital or Coalinga State Hospital based on their classification factors.

23

By letter, dated May 26, 2006 and included as Exhibit E to this report, DMH informed CDCR that, pursuant to the May 2, 2006 court order, administrators from Atascadero State Hospital and Coalinga State Hospital jointly identified 50 intermediate inpatient CDCR inmate/patients for transfer to Coalinga State Hospital from Atascadero State Hospital. Initial transfers of the first 25 inmates so identified began on May 25, 2006 and were scheduled to be completed on May 30. The remaining 25 transfers were expected to be completed by June 27, 2006.

Summary

Parties, counsel and special master have wrestled in this case with general and program population projections since at least 1998. Without reasonably reliable projections, long term planning for the development of complex mental health programs, particularly for high custody inmates, is largely an exercise in futility. In 2002, with some reservations and concerns, the Tucker-Alan methodology for the formulation of population projections for defendants' mental health programming needs was accepted by parties and the court. At the time, Tucker-Alan personnel involved in the project urged the importance of regular review and update of the projections.

According to the Navigant (formerly Tucker-Alan) consultants recalled some three years later to review the department's efforts in 2005 to update the original study, the projections composed by CDCR staff, who lacked sufficient understanding of the formulas and available data to maintain the original Tucker-Alan methodology accurately, were seriously flawed. Even CDCR doubted its capacity to generate accurate projections on its own and, hence, in late 2005, re-engaged Navigant to evaluate and eventually prepare anew the department's projections.

Unfortunately, the renewal of the consulting relationship with Navigant came late, and defendants' mid-April interim and long term plans, in addition to using the obsolete fall 2005 population data, also relied on their own inadequate understanding and application of the Tucker-Alan formulas. The result was another flawed planning effort and the ensuing requirement to return to the drawing board, where Navigant's revised program population projections were to be a driving force.

Plaintiffs urge a rejection of the Navigant study's conclusions without a thorough investigation of the data and methodologies underlying the revisions by independent experts. But parties and the court earlier accepted the competence of Tucker-Alan/Navigant consultants and their original product. Problems with defendants' subsequent use of that product apparently stem from the failure to conduct competent, professional, annual updates of the original projections, an oversight that should not be allowed to recur.

If one accepts the reliability of the updated Navigant projections, CDCR has placed itself in a bind. The department pushed aggressively through the FY2006-07 budgeting process plans based on its own faulty analysis of the 2002 Tucker-Alan projections that turn out to be, in regard to the department's need for acute and intermediate inpatient DMH beds, badly askew. The recently enacted regular and capital budgets reflect an analysis of CDCR's need for mental health bed needs that cannot now be sustained. Defendants must promptly re-calculate their real needs and determine the resources needed to meet those needs. Then, they must persuade both executive and legislative decision-makers to re-shape already approved measures to meet CDCR's now

more fully understood needs, always a painful and frequently a costly process in the political/financial arena.

The nature and magnitude of the error, however, needs to be kept in perspective. The Navigant revisions do not diminish the overall need; they do suggest powerfully a demand for a more accurate analysis of the distribution of needs among mental health programs and an allocation of resources matched more closely to demonstrable need. It is especially important that this process should begin as early as possible in the budgeting cycle for FY2007-08.

Recommendations:

1. The court should approve the program population projections revised and updated in the Navigant study. Defendants should be required to contract with Navigant Consultants to conduct annual reviews and updates of their projections for mental health program populations through FY2008-09; thereafter, defendants may obtain such services through the normal contract bidding process.

2. The special master should be directed to monitor closely the swap of acute inpatient beds between California Medical Facility and Atascadero State Hospital and the status of delays in the transfer of seriously mentally disordered inmates to mental health crisis beds within 24 hours of a clinical referral and report to the court in writing on these two issues within 90 days and semiannually thereafter.

3. Defendants should be required to submit within 30 days a final long range plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female CDCR inmates clinically determined to be in need of those levels of care. The plan must reflect the program population projections in the Navigant study.

4. Defendants should be required to file within 60 days a plan for the provision of enhanced outpatient program beds for all seriously mentally ill male and female CDCR inmates clinically determined to be in need of this level of care. The plan must reflect the program population projections in the Navigant study.

Defendants' planning tasks are complicated by the emergence during the summer of a plan presented to the special session of the Legislature for the possible construction of up to 5,000 beds for seriously mentally disordered inmates. While this initiative is welcome, it must not be allowed to further delay the delivery of sorely needed resources now scheduled for completion in 2011, a year that will mark the twentieth anniversary of the filing of the Coleman suit.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

September 11, 2006

27