PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN,

    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.: Civ S 90-0520 LKK-JFM

**PLAINTIFFS' SUPPLEMENTAL BRIEF ON DEFENDANTS' COMPLIANCE WITH MAY 2, 2006 ORDERS REGARDING INTERIM AND LONG RANGE BED PLANS AND RECEPTION CENTER EOP PROGRAMS**

H:\0489\3\PLEADING\Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ALOS | Average Length of Stay. |
| APP | Acute Psychiatric Program.  A 150-bed acute inpatient unit operated by the Department of Mental Health inside the California Medical Facility. |
| ASH | Atascadero State Hospital.  A state mental hospital operated by the Department of Mental Health in Atascadero, California. |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System.  CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates.  CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days.  A few also participate in groups. |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility.  A prison in Vacaville, California. |
| CMC | California Men's Colony.  A prison in San Luis Obispo, California. |
| CTC | Correctional Treatment Centers.  CTCs are licensed inpatient units inside prisons.  Mental Health Crisis Beds operate inside Correctional Treatment Center Units.  In addition to Mental Health Crisis Beds, most CTCs also include medical beds. |
| DCHCS | Division of Correctional Health Care Services.  This is the Department in CDCR headquarters that manages medical and mental health care. |
| DMH | Department of Mental Health. |
| DOF | Department of Finance. |
| DVI | Deuel Vocational Institute.  A prison in Tracy, California. |
| EOP | Enhanced Outpatient Program.  EOP programs are sheltered treatment programs that house severely mentally ill inmates.  There are currently approximately 4,100 EOP inmates.  Because these inmates are unable to function in a general population setting, they live in segregated housing units.  They are given 10 hours each week of therapy or other "structured therapeutic activities."  EOP inmates meet weekly with their case managers. |
| ICF | Intermediate Care Facility.  ICF programs are "intermediate" inpatient care programs.  These programs are operated by the state Department of Mental Health.  There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital.  Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week.  Inmates generally spend 6-12 months in these programs. |
| KVSP | Kern Valley State Prison.  A new prison in Delano, California.  KVSP has an |

H:\0489\3\PLEADING\Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc                    i

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM M

| | | |
|---|---|---|
| 1 | | MHCB unit. |
| 2 | LOU | Locked Observation Unit.  An unlicensed Outpatient Housing Unit that is currently operating as a de facto MHCB at California Men's Colony. |
| 3 | | |
| | MHSDS | Mental Health Services Delivery System.  The name given by defendants to their entire mental health system. |
| 4 | | |
| 5 | MHCB | Mental Health Crisis Beds.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing |
| 6 | | another kind of mental health crisis can be admitted and treated for up to 10 days.  MHCB are generally located inside a Correctional Treatment Center. |
| 7 | | |
| | OHU | Outpatient Housing Units.  Unlicensed infirmaries inside many CDCR institutions that provide treatment for medical and mental health conditions. |
| 8 | | |
| 9 | PSU | Psychiatric Services Unit.  There are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing |
| 10 | | Unit term. |
| 11 | RC | Reception Center.  This refers to designated prisons or housing units within prisons where inmates are classified and processed when they first arrive in the |
| 12 | | CDCR. |
| 13 | SHU | Security Housing Unit.  This is a segregated high-security housing unit for inmates who have committed serious infractions while in prison or who have |
| 14 | | been "validated" by the CDCR as belonging to a gang.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric |
| 15 | | conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| 16 | | |
| | UNA | Unidentified Needs Assessment.  This is the name given to the study of unmet demand for intermediate and acute inpatient care that was published by the |
| 17 | | CDCR on March 30, 2006. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS..................................................................i

TABLE OF CONTENTS .......................................................................iii

INTRODUCTION ....................................................................................1

    A.   Procedural Background ...............................................................1

    B.   The Ongoing Overcrowding Crisis .............................................4

ARGUMENT ...........................................................................................5

I.    DEFENDANTS SHOULD NOT BE PERMITTED TO DELAY IMPLEMENTATION OF THE RECEPTION CENTER EOP PROGRAM UNTIL FISCAL YEAR 2007-2008 ...............................5

II.   THE COURT SHOULD NOT ACCEPT DEFENDANTS' JUNE 15, 2006 REVISED INTERIM BED PLAN WITHOUT ADDITIONAL CONDITIONS AND MODIFICATIONS ..................................7

    A.   The Court Should Order Defendants to Implement Their Proposal to Build a New 50-Bed MHCB Unit at CMC As Soon As Possible ..........7

    B.   The Court Should Require Defendants to Develop Another 33 Interim MHCB Beds To Meet the Shortfall Defendants Have Themselves Acknowledged And Require Defendants to Eliminate the Use of MHCB Beds By Long-Term Care Medical Patients..................9

    C.   The Court Should Approve the 30 Bed ICF Expansion In P-3 Wing At CMF, But Given The Severe Current Shortage of EOP Beds, The Court Should Order That Defendants May Not Close The 67 Bed EOP Program In CMF's M-3 Wing ...................................10

III.  THE DEFENDANTS' PRESENTATION OF NEW BED PROJECTIONS MUST NOT BE ALLOWED TO FURTHER DELAY THE LONG RANGE PLAN FOR CONSTRUCTION OF NEW INPATIENT FACILITIES APPROVED BY THIS COURT'S MAY 2, 2006 ORDER..........11

    A.   The Court Should Not Accept the New Navigant Bed Projections..........12

    B.   The Court Should Order Defendants To Respond To Plaintiffs' July 10, 2006 Pleading Concerning The Amended Long-Term Bed Plan..................13

    C.   The Court Should Not Permit Defendants to Modify or Scale Back Their Plan to Expand Intermediate Care Facility Beds In Their April 17, 2006 Long Range Plan ...............................................14

    D.   The Court Should Not Permit Defendants to Delay or Scale Back Their APP Expansion Plans Without A More Thorough Assessment of Need ...................................................14

H:\0489\3\PLEADING\Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS, NO.: CIV S 90-0520 LKK-JFM M

iii

E.    The Court Should Order Defendants to Develop Plans to Bring All Other MHCB and Intermediate Inpatient Care Units for Which Waivers Have Been Granted Into Compliance With State Licensing Laws ......................................................................................... 15

CONCLUSION ................................................................................................................. 17

H:\0489\3\PLEADING\Plfs.Objs.to.Supp.SM.Report.on.Bed.Plans.Sept.2006.9-25-06.489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM M

# INTRODUCTION

There are currently a large number of pending plans by defendants to address the chronic shortages of mental health beds in each of the California Department of Corrections and Rehabilitations' (the CDCR's) most critical mental health programs, including interim and long term plans to build additional (1) intermediate inpatient care beds (sometimes called ICF beds), (2) acute inpatient care beds (sometimes called APP beds), (3) mental health crisis beds (MHCBs), and (4) enhanced outpatient program (EOP) beds. Defendants also recently submitted a plan to create an enhanced outpatient program for inmates housed in the CDCR's reception centers. Many of these pending bed plans are addressed by the Special Master in his Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long-Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds ("Supplemental Report"), which was filed on September 11, 2006. Plaintiffs support most of the four recommendations in the Special Master's Supplemental Report. However, plaintiffs ask for several modifications to the recommendations to expedite implementation of the proposals and to ensure that defendants are given clear remedial guidelines (including strict deadlines for completion of pending projects, a directive that sufficient beds will be constructed in each category, and additional requirements for future bed planning functions) that will ensure effective implementation of the new plans. In addition, there are a number of other pending issues relating to the pending bed plans that the Special Master does not address but that the Court should address at this time.

## A. Procedural Background

On April 17, 2006, defendants filed their third bed plan in response to the March 30, 2005 UNA study and this Court's orders to develop appropriate plans to address defendants' ongoing failure to plan for, construct and operate sufficient resources to address the need for higher levels of mental health care for the *Coleman* class. The April 17, 2006 Bed Plan committed defendants to build $600 million worth of new intermediate and acute inpatient beds during the next five years, and also included plans to address severe mental health crisis bed shortages. After two days of hearings on April 26 and 27, 2006, the Court conditionally

approved defendants' April 17, 2006 plan with a variety of additional required elements. 5/2/06 Order at ¶¶ 1-14.  First, the Court required that the defendants revise their long term bed plan within 60 days based on new, higher Spring 2006 population projections.  *Id*. at ¶ 1. Second, the Court required defendants to file a plan within 45 days for the interim provision of intermediate inpatient beds and mental health crisis beds.  *Id*. at ¶ 4.  The new interim plan was required to include "as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan."  *Id*.  Third, the Court required defendants to open or keep open several interim intermediate inpatient programs, including an existing program on the P-2 Wing at the California Medical Facility, a new program on the D-5 and D-6 Wings at SVSP, and a long-promised program at Coalinga State Hospital.  *Id*. at ¶¶ 6, 7, 8, 10.  Finally, the Court required defendants to activate new mental health crisis bed units at Kern Valley State Prison and at California State Prison-Sacramento no later than July 1, 2006.  *Id*. at ¶¶ 12, 13.  In a separate order also filed on May 2, 2006, in response to plaintiffs' objections to the Special Master's 15th Monitoring Report, the Court ordered defendants to develop a plan within 60 days to address the needs of enhanced outpatient program inmates in the CDCR's chronically overpopulated and understaffed reception centers.  5/2/06 15th Round Report Order at ¶ 2.

In the 2006-07 Budget, the Legislature approved initial funding for the $600 million in bed expansions that this Court had approved in its May 2, 2006 Order.  Declaration of Thomas Nolan In Support of Plaintiffs' Objections to Special Master's Supplemental Report ("Nolan Dec.") at ¶ 6.  On June 15, 2006, as required by paragraph 4 of the May 2, 2006 Order, defendants filed an Amended Interim Bed Plan which addressed various short- and medium-term projects to expand MHCB, Acute Inpatient, and Intermediate Inpatient beds while the CDCR constructs the new permanent facilities proposed in the April 17, 2006 Plan.  On June 29, 2006, plaintiffs filed objections to the Revised Interim Bed Plan.  See 6/29/06 Plaintiffs' Objections to Defendants' June 15, 2006 Revised Interim Bed Plan.  Plaintiffs hereby incorporate those objections by reference.

On June 30, 2006, defendants filed what they described as their Amended Long Term

Plan, although it was in fact a request for an extension of time in which to file an actual amended plan. See 6/30/06 Defendants' Submission of Response to Court Order Requiring Amended Long-Term Bed Plan. Defendants' June 30, 2006 filing enclosed a copy of a brand new set of bed need data which projected significantly different future bed need in a variety of different bed categories. This new bed need projection is called the Navigant Bed Projection after the name of the consulting company that prepared it. The principal authors of the new bed study were the authors of the 2002 Tucker Alan Study. See Exhibit A to the 9/11/06 Special Master's Supplemental Report. On July 10, 2006, plaintiffs filed a response objecting to the new Navigant Study and to the absence of a long-term bed plan. See 7/10/06 Plaintiffs' Notice of Violations of May 2, 2006 Court Order and Request for Relief and Objections to Defendants' Amended Long-Term Bed Plan and Request for Additional 60 Day Extension. Plaintiffs hereby incorporate this pending by reference.

Defendants did not file a response to plaintiffs' July 10, 2006 objections. Rather, on July 21, 2006, defendants filed a brief statement indicating that they would respond only if directed to do so by the Court. See 7/21/06 Reply/Response to Plaintiffs Objections to Amended Long-Term Bed Plan at 1-2 ("no formal response to any specific objection or request for a court order will be provided unless this Court so desires.").

On July 31, 2006, defendants filed a plan to create a reception center EOP program. See Defendants' 7/31/06 Submission of Plan for Reception Center/EOP Inmates. Defendants' July 31, 2006 plan calls for funding through the ordinary budget process with an earliest possible potential start date of July 1, 2007. 7/31/06 Reception Center EOP Plan at 8 ("Upon approval of this plan by the Court, any funding or positions deemed necessary to implement this plan will be requested through the annual budget process, with hiring and implementation expected to begin in July 2007.").

On September 11, 2006, the Special Master filed his Supplemental Report on Bed Plans addressing some but not all of the pending issues and objections in the draft plans and in the objections described above and setting forth four recommendations for further action by the Court. See 9/11/06 Supplemental Report. Plaintiffs respectfully request that this Court address

1  not only the issues addressed in the Master's Supplemental Report but also several other

2  significant issues timely raised by plaintiffs herein and previously in their June 29 and July 10

3  pleadings.

4  **B.    The Ongoing Overcrowding Crisis**

5  With each passing month, the crowding crisis within the California Department of

6  Corrections and Rehabilitation (CDCR) continues to worsen.  There are now 172,213 inmates

7  housed in the CDCR – 1,513 more inmates than there were in late April 2006, when this Court

8  held hearings on earlier drafts of defendants' mental health bed expansion plans.  See Nolan

9  Dec. at ¶ 2 and Ex. A (CDCR Population Reports for April 26, 2006 and September 6, 2006).

10  The Governor and the leadership of the CDCR have acknowledged the severity and scope of

11  this crisis, but a Special Legislative Session on the issue of overcrowding in August

12  accomplished little, with the one notable exception being the Legislature's approval of the

13  mental health staffing augmentations that this Court ordered at the end of July.  Nolan Dec. ¶

14  3.  Following the failed Special Session, acting CDCR Agency Secretary Tilton wrote a memo

15  to all CDCR staff which noted "unprecedented levels of overcrowding to our institutions" and

16  which stated that "You need to know that I remain concerned that the failure to pass any relief

17  measure will lead the Department into an emergency situation that not only endangers your

18  safety, but also places burdens on local governments and our communities."  Nolan Dec. at ¶ 3,

19  Ex. B (9/1/06  Tilton Memo to staff).

20  The unprecedented, severe overcrowding will be further aggravated in the next few

21  months because defendants and Los Angeles County are planning to terminate a contract under

22  which 1,300 CDCR prisoners are housed at the Pitchess Detention Center of the LA County

23  Jail.  See Nolan Dec. at ¶ 4 and Ex. C.  In a September 1, 2006 memo discussing the absorption

24  of these 1,300 Pitchess prisoners and the loss of the capacity provided by the LA County Jail,

25  CDCR Health Care Director Dr. Peter Farber-Szekrenyi frankly acknowledged the serious

26  difficulties that absorbing these new inmates will entail for mental health care:

27  • Pharmacy staff will be unable to ensure that mental health inmates transferring to

28  other institutions have a 30-day medication supply to ensure medication

H:\0489\3\PLEADING\Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc                    4

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.:  CIV S 90-0520 LKK-JFM M

1    continuity.

2    •    In order to evaluate all incoming CCCMS inmates, "existing mental heath staff

3    will have to be redirected from their primary responsibility of direct patient

4    care."

5    •    Institutions will be required to increase CCCMS population beyond the Court-

6    ordered limit of 130% of capacity.

7    •    Already severe staffing shortages at many institutions will be exacerbated, with

8    the result that "adequate mental health services would not be provided."

9    •    Existing bed shortages at the Mental Health Crisis Bed (MHCB) and inpatient

10    levels of care will be exacerbated.

11    Nolan Dec at ¶ 4 and Ex. C at 1-3.

12    Nowhere is the cost of these mounting pressures more clear than in the CDCR's

13    extraordinarily high suicide rate. By plaintiffs' count, there have been 34 suicides so far in

14    2006 (through August 31, 2006). Nolan Dec. at ¶ 5. If this trend continues, it will result in an

15    annual total for 2006 of 51 suicides, the highest absolute number and also the highest rate in

16    recent memory – a rate of 29 suicides per 100,000 inmates, well above twice the national

17    average for prisons. *Id.*

18    In this time of crisis, it is essential that the Court and the Special Master closely oversee

19    the defendants' remedial efforts and require expedited construction of the mental health beds

20    that are needed at every level of care. The sense of urgency that has governed the oversight in

21    this case during the last six months needs to continue as defendants move towards

22    implementation of the various pending bed expansion plans.

23    **ARGUMENT**

24    **I.    DEFENDANTS SHOULD NOT BE PERMITTED TO DELAY
       IMPLEMENTATION OF THE RECEPTION CENTER EOP PROGRAM UNTIL**

25    **FISCAL YEAR 2007-2008**

26    The Special Master's Supplemental Report addresses problems with defendants' July

27    31, 2006 Plan for providing EOP care to inmates in Reception Centers but fails to make any

28    recommendations. See 9/11/06 Supplemental Report at 21-23. Given the current continuing

1  crisis in CDCR's Reception Centers that will soon be further exacerbated by the LA County

2  Jail closure, defendants must be ordered to amend their plan and implement it as soon as

3  possible.

4  There are three serious problems with defendants' plan for the provision of EOP care in

5  Reception Centers.  First, the plan fails to include any resources in the current fiscal year for

6  Reception Center EOP programs.  Rather, defendants' plan is to obtain funding "through the

7  annual budget process" with the earliest potential start date of July 2007 (assuming that the

8  funding is actually obtained and that the budget is passed on time).  No clinical staff could be

9  hired under defendants plan for at least 4-6 months after July 1, 2007, under state

10  government's "business as usual" timing.  Given the current severe overcrowding throughout

11  the CDCR, inmates are spending longer and longer time periods waiting in Reception Centers

12  for placement into a mainline mental health program.  See 9/11/06 Supplemental Report at 22

13  ("It is clear from the revised plans discussed above that the problem for long delays for

14  enhanced outpatient program inmates in reception center awaiting transfer to mainline

15  programs will not be resolved quickly.").  It is critical that the defendants' plan for supportive

16  EOP care programs in the Reception Centers go into effect as soon as possible.  The Court

17  should order defendants to fund and implement these programs immediately.

18  Second, defendants' plan for EOP programs in the Reception Centers does not include

19  any female prisons and does not include two male prisons with sizable EOP populations –

20  Deuel Vocational Institute (DVI) and Los Angeles County State Prison (LAC).  The Special

21  Master also objects to these omissions in the Supplemental Report, but failed to include a

22  recommendation requiring expansion of the EOP program to cover these major gaps.  See

23  Special Master's Supplemental Report at 22 ("It is unclear why Deuel Vocational Institute,

24  which regularly houses a relatively high number of enhanced outpatient program inmates, and

25  California State Prison/Los Angeles County with its expanding reception responsibilities were

26  excluded.  All reception centers for females were also excluded.").  The Court should order

27  defendants to expand their plan to cover at least one female reception center, DVI and LAC.

28  Third, the plan states that the need for the new RC programs will be "solved" in the long

1   run by building more EOP beds in mainline institutions and meeting Program Guide transfer

2   timelines.  Plaintiffs disagree that the problem will be solved in this manner.  As the Plan

3   acknowledges, there will always be inmates with needs for EOP treatment whose parole is

4   revoked and who serve their entire term in a Reception Center.  See 7/31/06 Submission of

5   Reception Center EOP Plan at 5 ("Many of the EOP level individuals in reception centers have

6   very short-term commitments that necessitate expedited placements into treatment to increase

7   their potential for successful re-integration into the community.").

8        The Court should order defendants to fund their plan immediately and to fully

9   implement the program no later than January 1, 2007, and to amend the program to include at

10  least one female reception center as well as DVI and LAC.

11  **II.   THE COURT SHOULD NOT ACCEPT DEFENDANTS' JUNE 15, 2006**
         **REVISED INTERIM BED PLAN WITHOUT ADDITIONAL CONDITIONS**
12       **AND MODIFICATIONS**

13       Plaintiffs raised a series of objections to Defendants' June 15, 2006 Revised Interim

14  Bed Plan. While some of these issues have since been resolved by the parties,[1] a number of

15  critical issues remain outstanding that the Court should now address.

16       **A.   The Court Should Order Defendants to Implement Their Proposal to Build**
              **a New 50-Bed MHCB Unit at CMC As Soon As Possible**
17
         As part of their interim plan to increase Mental Health Crisis Bed capacity, defendants
18
    propose building a new 50-bed Mental Health Crisis Bed unit at the California Men's Colony
19
    in San Luis Obispo.  See Defendants' June 15, 2006 Revised Interim Bed Plan at 18 ("The
20
    design of CMC's OHU prohibits permanently licensing this space as an MHCB, even if
21
    extensive facility modifications are performed.  Therefore, the CDCR is proposing to construct
22

23

24  [1] For example, the parties reached a stipulated agreement concerning the swap of acute
    inpatient beds and mental health crisis beds between the California Medical Facility and
25  Atascadero State Hospital.  See 8/10/06 Order Re Stipulation Re ASH/CMF Bed Plan.  As
    plaintiffs noted, this swap will not create any new beds.  However, it may increase the ability
26  of the CDCR to fully utilize existing resources.  In another example, it appears that defendants
    resolved a potential staffing problem that plaintiffs were concerned would prevent defendants
27  from opening the mental health crisis bed unit at the California Institute for Women (CIW).
    Nolan Dec. ¶ 11.

28

1   an additional 50-bed Correctional Treatment Center at CMC to provide MHCB care.").

2   However, defendants have not committed themselves to the project or provided a timetable for

3   completion.  The Court should approve this important project and order defendants to present a

4   plan within 60 days to expedite construction of this new CMC MHCB unit so that it is

5   complete, licensed, staffed and ready for patient care on or before June 30, 2010.  This time-

6   line is further necessitated by the new Navigant bed need projections estimate of 20 percent

7   more MHCB beds by 2011 than was previously estimated.  See Supplemental Report at 8.

8         In the interim, defendants will continue to operate the current 42-bed MHCB unit in the

9   Locked Observation Unit or LOU at CMC.  The operation of the Locked Observation Unit as

10   an MHCB unit is only possible because of the waivers of state licensing standards approved by

11   this Court in its May 2, 2006 Order.  See 5/2/06 Order at 13 (ordering opening of CMC locked

12   observation unit as a mental health crisis bed "on a temporary, emergency basis"); 7/20/06

13   Order (waiving state contracting code for LOU construction project).  These waivers were

14   necessary, but it is important to recall that in the past this Court's experts have expressed grave

15   concerns about the safety and efficacy of the LOU unit, in part because of its dangerous

16   physical plant.  In the March 29, 2000 Study of Timely Access to DMH Inpatient Care

17   prepared by Dr. Koson for this Court, Dr. Koson wrote as follows:

18         The LOU, moreover, is a physically unsafe area, where patients are
          locked down virtually 24 hours a day, getting out only for daily
19        treatment team meetings and a shower.  There is no programming
          or treatment space and no yard for this group. . . .  For many
20        patients, who have come from a MHCB unit elsewhere, CMC's
          LOU represents a lower level of care.

21

22   March 29, 2000 Koson Report at 12-13 (the Koson Report was filed by the Special Master on

23   March 30, 2000 under the title "Notice of Filing of Special Master's Interim Report on DMH

24   Inpatient Care").  Dr. Koson's concerns about the safety of the unit underscore the need to

25   expedite construction of the new MHCB unit at CMC, which will meet all relevant state

26   licensing requirements and which will thus be built to include adequate space for private

27   therapy sessions, recreational therapy, group treatment, and routine yard time.

28         The Court should order defendants to build the new 50-bed MHCB unit at CMC and to

1   develop a plan and a timetable within 60 days that will allow defendants to open the new

2   MHCB unit at CMC for patient care on or before June 30, 2010.

   **B.    The Court Should Require Defendants to Develop Another 33 Interim
          MHCB Beds To Meet the Shortfall Defendants Have Themselves
          Acknowledged And Require Defendants to Eliminate the Use of MHCB
          Beds By Long-Term Care Medical Patients.**

6       CDCR Health Care Director Dr. Farber-Szekrenyi testified in April 2006 that the CDCR

7   has a current shortfall of 75 MHCB beds.  See May 2, 2006 Order at 2 (discussing Farber-

8   Szekrenyi testimony and 75 bed MHCB gap).  Defendants failed to address this 75 bed gap in

9   their interim plan.  As plaintiffs argued in their June 29, 2006 Objections to Defendants'

10  Revised Interim Bed Plans, aside from the 42 beds at CMC ordered by this Court on May 2,

11  2006, the other MHCB beds in defendants' June 15, 2006 Revised Interim Plan are not new

12  beds or simply involve shifting around existing beds.  See Plaintiffs' 6/29/06 Objections to

13  Defendants' June 15, 2006 Revised Interim Bed Plan at 7-14.  The Special Master explained

14  that the allegedly "new" beds at CIM were already being used for MHCB care.  See 9/11/06

15  Supplemental Report at 17 ("The utility of this provision of the plan is limited by the fact that,

16  for most of the past year, defendants have housed up to 40 mental health crisis bed inmates in

17  the general acute care hospital at California Institute for Men.").  Similarly, the ASH-CMF 25-

18  bed swap may improve bed utilization but does not create new beds.  See *id.* at 16 (The swap

19  plan "involves no expansion in the number of mental health crisis beds available to CDCR, but

20  allows full utilization of the 25 acute inpatient beds at Atascadero State Hospital designated as

21  mental health crisis beds").

22      Monthly reports on MHCB referrals demonstrate that although the new CMC MHCB

23  unit has resulted in some reduction in the number of MHCB referrals that cannot be

24  accommodated each month, the number of such unsuccessful referrals remains high.  See

25  Nolan Dec. Ex. E (monthly MHCB report shows that for July 2006 there were 83 MHCB

26  referrals to other institutions which could not be placed; same data for May 2006 indicates that

27  there were 110 referrals that could not be placed).  In addition, as Dr. Farber-Szekrenyi pointed

28  out on September 1, 2006, the LA County Jail bed closure will further aggravate the shortage

of MHCB beds.  Nolan Dec. at ¶ 4 and Ex. C.

The ongoing shortage must be addressed.  Plaintiffs contend that the 75-bed shortfall acknowledged by Dr. Farber-Szekrenyi is not the full shortfall.  See Plaintiffs' 6/29/06 Objections at 2.  However, even to close the 75-bed shortfall acknowledged by Dr. Farber-Szekrenyi, defendants must be required to establish at least another 33 interim MHCB beds.  As plaintiffs have previously noted, defendants have failed to include in their plan the most obvious and rapid method of obtaining additional MHCB beds: to address the ongoing inappropriate use of existing MHCB beds by long-term medical patients.  See Plaintiffs' June 29, 2006 Objections at pages 7-9.  It is apparent that a substantial part of the "missing" 33 MHCB beds could and should be obtained by this method.

**C.    The Court Should Approve the 30 Bed ICF Expansion In P-3 Wing At CMF, But Given The Severe Current Shortage of EOP Beds, The Court Should Order That Defendants May Not Close The 67 Bed EOP Program In CMF's M-3 Wing**

As part of defendants' June 15, 2006 Revised Interim Bed Plan, defendants proposed adding a 30-bed Intermediate Inpatient Program in the P-3 wing at CMF.  See Exhibit A to 6/29/06 Kahn Declaration (Defendants' New Interim Bed Plan) at 15.  This is a welcome and sorely needed expansion of intermediate inpatient care beds for Level IV inmates, and the Court should order defendants to implement this portion of their June 15, 2006 Plan, as well as the plan to expand the number of intermediate inpatient beds at SVSP.  However, in order to accomplish the CMF ICF bed expansion, defendants plan to move the Administrative Segregation EOP unit currently on P-3 into the space occupied by the existing M-3 general population EOP unit *and shut down the 67-bed M-3 EOP unit.  Id.* at 15 ("This plan, once fully implemented, adds 30 ICF beds at the expense of 67 general population EOP beds at CMF.").  This aspect of defendants' plan is not discussed in the Supplemental Report, and the Court should reject it.

The Court must not permit defendants to close these critical high security EOP beds.  Even using the new Navigant figures for EOP demand, defendants have a large existing EOP shortage that will grow to nearly 1,000 beds next year.  *Compare* Ex. A to 9/11/06

Supplemental Report at 24 (Navigant Report projects a need for 3,672 EOP beds in 2007), *with* Nolan Dec. Ex. D (monthly Statistical Report showing current male general population EOP capacity of 2,623). Although the Supplemental Report states that defendants will add another 487 EOP beds next year, that will still leave a shortfall of 562 EOP beds.  See 9/11/06 Supplemental Report at 22.  Given this severe shortage of EOP beds, defendants must be required to find a way to re-locate their P-3 Administrative Segregation EOP program without sacrificing any GP EOP beds.

**III.    THE DEFENDANTS' PRESENTATION OF NEW BED PROJECTIONS MUST NOT BE ALLOWED TO FURTHER DELAY THE LONG RANGE PLAN FOR CONSTRUCTION OF NEW INPATIENT FACILITIES APPROVED BY THIS COURT'S MAY 2, 2006 ORDER**

Defendants June 30, 2006 filing was not a revised long term bed plan, as required by this Court's May 2, 2006 Order.  Rather, defendants submitted a new set of bed need estimates to the Court along with a request for an additional 60 days in which to prepare a significantly revised long term bed plan.  This extension has not been granted and defendants remain in violation of the May 2, 2006 Order (¶ 1).  The Special Master notes that defendants' attempt to change their bed plans has created a significant risk that the Legislative mandate that was obtained for the $600 million in bed expansion projects may be scaled back or eliminated.  See Supplemental Report at 25 (after finalizing new plans, defendants will have to "persuade both executive and legislative decision-makers to re-shape already approved measures to meet CDCR's now more fully understood needs.").  Plaintiffs disagree with the Master's recommendation to "approve" the unsubstantiated "new" bed projections and allow defendants to shrink and delay the inpatient bed projects already approved by this Court (at defendants' request) and previously submitted to and approved by the Legislature.  There is no record before this Court or the Special Master supporting this recommendation and it should be modified.

Rather than an expansion of the long-term bed plans based on the dramatic increase in CDCR population projections presented to the Court at the April 2006 Hearings, defendants now intend to delay and reduce their long-term inpatient bed projects.  The Court must not

1    permit any additional delays or project shrinkage.

2         **A.      The Court Should Not Accept the New Navigant Bed Projections**

3         The Special Master erroneously recommends approval of the Navigant bed need

4    projections.  The Supplemental Report itself includes significant criticisms of the Navigant bed

5    study.  For example, the Supplemental Report notes that the projections of intermediate

6    inpatient need are "troubling, given the higher spring 2006 population projections and the

7    continuing disproportional growth of the mental health case load," and concludes that this

8    portion of the Navigant study "needs to be carefully monitored and routinely re-calculated."

9    Supplemental Report at 9.  The Supplemental Report also states that "[s]ome elements of the

10   study's incorporation of the Unmet Needs Assessment . . . remain vague or unclear."  *Id*. at 10.

11   In addition, the Special Master notes that the "dialogue among parties, the special master's

12   experts and the Navigant authors of the study about the data and methodology relied on in

13   preparing the study and its projections needs to continue."  *Id*.  Plaintiffs agree with these

14   criticisms.  On the basis of these concerns alone, the Court should defer any approval or

15   acceptance of the new Navigant bed need projections until far more is known about them.

16   There are a number of serious additional problems with the Navigant bed projections that the

17   Special Master's Supplemental Report does not discuss.  For example, defendants have

18   admitted that they have had no ongoing contract with Navigant whatsoever and thus no work

19   on the Navigant projections has been performed since June 30.  These problems with the

20   Navigant bed need projections, as well as the concerns raised by the Special Master, need to be

21   the subject of further investigation and discussion between all the parties.  See Nolan Dec. ¶ 9.

22        In order to address any inaccuracies and to make the bed projections as objective and

23   reliable as possible, the Court should order that Court expert Dr. Melissa Warren, who worked

24   closely with defendants on the successful March 2005 UNA study, be appointed to work with

25   defendants and Navigant to ensure that the projections of bed need are as accurate as possible

26   and to ensure that all appropriate data is collected and used to calculate future bed need.

27        The Court should also order that defendants adopt all of the recommendations in the

28   Navigant Report itself, that were intended to improve data collection and the projections of

1    need, including most importantly, the recommendation that periodic UNA-style studies be

2    undertaken to assess whether there is unrecognized need for inpatient care in the system.  Ex.

3    A to 9/11/06 Supplemental Report at 4 (recommending (1) periodic logging of daily census

4    information into a database for each health care program, (2) better collection of DMH data,

5    (3) creation of an EOP tracking database, and (4) periodic clinical audits similar to UNA,

6    possibly rotating a few prisons every year).  It is critical that the Court require defendants to

7    adopt these recommendations from defendants' own consultant.

8         The Court should also enhance the independence and integrity of the Navigant study

9    authors by requiring that their contract be with the Department of Correctional Health Care

10   Services rather than with CDCR Legal.  The Court should also direct that there be ongoing

11   discussions between the parties on the Navigant methodology and data.  There have only been

12   two short one-hour conference calls on the Navigant study this far, and more exchanges of

13   information are needed.  See Nolan Dec. ¶ 9.

**B.    The Court Should Order Defendants To Respond To Plaintiffs' July 10,
2006 Pleading Concerning The Amended Long-Term Bed Plan**

16        Plaintiffs have already fully briefed their position that serious unanswered questions

17   remain concerning defendants' decision to present the Court with a new study shortly after

18   requesting that the Court adopt $600 million worth of new projects based on a prior bed need

19   study.  See 7/10/06 Plaintiffs' Notice of Violations of May 2, 2006 Order and Request for

20   Relief and Objections to Defendants' Amended Long Term Bed Plan at 2-7.  Defendants

21   declined to respond to plaintiffs' arguments and evidence on this point in the absence of a

22   specific direction from the Court to do so.  See Defendants' 7/21/06 Response to Plaintiffs

23   7/10/06 Briefing.  The Special Master deferred this issue to the Court. See Supplemental

24   Report at 12 ("Determination of the burden and level of proof required to justify changes in

25   defendants' revised plans to meet their clear need for more acute and intermediate inpatient

26   and mental health crisis beds is better left to the court.").  The Court should order defendants to

27   respond to plaintiffs' argument and evidence, and the Court should then make appropriate

28   orders based on its full review of the serious legal and factual issues.

**C.**     **The Court Should Not Permit Defendants to Modify or Scale Back Their Plan to Expand Intermediate Care Facility Beds In Their April 17, 2006 Long Range Plan**

Even assuming that the New Navigant bed need projections are eventually accepted, they are very similar to defendants' earlier projections as to future need for one category of beds -- intermediate care facility (ICF) beds.  The new Navigant projections for Intermediate Psychiatric Bed Need indicate that the CDCR will need 563 Intermediate Inpatient Beds in the year 2011.  Ex. A to 9/11/06 Supplemental Report at 16.  These projections likely underestimate the actual need for intermediate inpatient beds, and in particular they underestimate the need for Level IV intermediate inpatient beds, because they use an unrealistically low Average Length of Stay for the Salinas Valley Psychiatric Program of 115 days.  Nolan Dec. at ¶ 8.  However, even accepting these figures for the moment, they are not materially different from the projection of need for 641 beds in the year 2011 in the defendants' April 17, 2006 Bed Plan.  The difference between the two projections of 78 beds is not sufficient to justify any scaling back of the intermediate inpatient bed proposals in the defendants' April 17, 2006 Plan.  The Court should order defendants to proceed with a new bed plan without changing the Intermediate Care Facility portion of their April 17, 2006 plans.

**D.**     **The Court Should Not Permit Defendants to Delay or Scale Back Their APP Expansion Plans Without A More Thorough Assessment of Need**

The category where the Navigant Bed Projections differ most from prior CDCR projections is acute inpatient beds, which are sometimes referred to as Acute Psychiatric Program or APP beds, after the name of the acute program at the California Medical Facility.  As the Special Master explains, the new Navigant bed numbers for acute beds could hardly be more different than the projections used by the CDCR in its April 17, 2006 Plans.  The Navigant projections indicate a need for 203 acute beds in 2007 increasing to 224 beds in 2011.  9/11/06 Supplemental Report at 7.  By way of contrast, the April 17, 2006 Bed Plans estimated a need for 316 APP beds in 2007 rising to 531 beds in 2011.  *Id*.

Defendants have failed to come forward with any admissible evidence justifying their argument that the April 17, 2006 figures for acute bed need were too high.  Not one declaration

addresses the issue.  Plaintiffs' request to meet face-to-face with Navigant as well as the state officials who prepared the original bed plan projections was blocked by defendants and their counsel.  The Court should also consider the compelling evidence that the new Navigant numbers are too low.  The strongest evidence is very straightforward: when this case was tried in 1992, there were 150 APP beds available.  However, since that time, the number of such beds has remained constant while the population of the CDCR has roughly doubled.  Nolan Dec. ¶ 12.  Thus, just to keep pace with the population growth during the last 13 years, the CDCR would need to double the number of available APP population to at least 300 beds.  The low Navigant bed projections for APP are also suspect because they rely on extremely low lengths of stay that are not consistent with historical lengths of stay in the unit.  Nolan Dec. ¶ 12.

Given these uncertainties and the fact that the Court has already approved the APP expansion projects, the Court should order defendants to move forward with their existing acute bed expansion plans while the parties work more closely with Navigant and its bed projections to ensure that they are reliable.  Proceeding with the existing expansion plans despite the bed projection variances is one of the options discussed by defendants in their June 30, 2006 plan attaching the Navigant bed projections – simply moving ahead with the existing plans for APP and ICF beds expansions.  See Defendants' 6/30/06 Submission of Response to Court Order Requiring Amended Long-Term Bed Plan at 16-17 (Alternative 3, listing benefits of not modifying existing plans).  This approach has several key benefits.  First, the funds for the project are already approved.  Second, if in the future not all of the beds are needed, they can be converted to medical beds or other types of mental health beds.  Third, moving forward with existing plans ensures that there will be no further delays in these important inpatient bed expansion projection projects.

E.    **The Court Should Order Defendants to Develop Plans to Bring All Other MHCB and Intermediate Inpatient Care Units for Which Waivers Have Been Granted Into Compliance With State Licensing Laws**

In the last year, defendants have opened new intermediate inpatient care programs for inmates in the P-2 wing at the California Medical Facility (CMF), in the A-2 and A-3 wings at

CMF, in the D-5 and D-6 wings at Salinas Valley State Prison (SVSP), and in the new Coalinga State Hospital. Defendants have also doubled the size of the intermediate care program at Atascadero State Hospital (ASH). In order to monitor these vast changes in defendants' system of inpatient care, the Court should appoint one of the existing court experts to monitor these new programs and report to the court on the progress, safety, and quality of care in these new programs, and to make any recommendations for changes to these programs to improve safety and/or patient care. Many of these new programs are operating with significant waivers of state licensing requirements. Although these temporary waivers are necessary given the current bed shortages of crisis proportions, it is critical that the programs be given in depth reviews and assessments by a clinical expert who can ensure that appropriate care is being safely provided.

Defendants have not adequately documented the licensing and other barriers to rapidly opening the interim bed expansion projects that they have committed to undertake. See Plaintiffs' 6/29/06 Objections to Defendants' June 15, 2006 Revised Interim Bed Plan at 17-18. Defendants have not complied with the May 2, 2006 Order's mandate that they present the Court with a detailed assessment of the barriers to rapid opening of each such unit. 5/2/06 Order at 4 ("Defendants shall include with said interim plan, as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan."). The relevant projects include the Kern Valley State Prison mental health crisis bed unit, the California Institute for Men mental health crisis bed project, the intermediate care facility programs at Salinas Valley State Prison, the California Men's Colony locked observation unit project discussed above, and the CMF intermediate care facility project on P-2. See 6/30/06 Order (granting building code waivers for KVSP); 7/20/06 Order (waiving contracting code requirements for CMC construction project); 5/2/06 Order at ¶¶ 7, 8 (implicitly authorizing waivers for D-5 Wing and D-6 Wing intermediate care programs at Salinas Valley State Prison). See also Nolan Dec at ¶ 13 (defendants have approached plaintiffs about waivers for CIM MHCB project but have not yet filed anything with the Court).

As to each expansion project as to which the Court has granted defendants explicit or

implicit waivers of state law licensing requirements, the Court should order defendants to present a plan to accelerate construction of permanent beds and end the temporary licensing waivers and come into full compliance with state law licensing standards. The Special Master should also assign one or more court experts to evaluate these new programs, especially those operating with license waivers.

**CONCLUSION**

For all of the reasons set forth above, the Court should accept the Special Master's Recommendations with the modifications and additions set forth in the proposed order language below (and in the separate proposed order filed herewith). The first four proposed Orders are modifications to the Special Master's four recommendations:

1.      The program population projection methods in the revised and updated Navigant Study are not accepted unless and until defendants demonstrate compliance with the following conditions and limitations. As recommended by the Special Master, defendants are required to contract with Navigant Consultants to conduct annual population reviews and updates of their projections for mental health program populations through FY 2008-09. In order to enhance the independence of Navigant in administering these updates, the Navigant service contract shall be with the Division of Correctional Health Care Services, not with CDCR's Legal Department. The defendants shall also implement each of the recommendations on page 4 of the Navigant Report for improving data collection and administration of the need estimates. Dr. Warren, one of the Special Master's experts, is hereby assigned to work with the defendants and Navigant to improve the projections and to ensure that all the necessary data is collected to make the projections as accurate as possible. Dr. Warren shall be empowered to recommend changes in the figures and formulas in the bed need projections to the Court in the event that defendants do not agree to her recommendations informally.

2.      The Special Master is directed to monitor closely the swap of acute inpatient beds between California Medical Facility and Atascadero State Hospital and the status of delays in the transfer of seriously mentally disordered inmates to mental health crisis beds within 24 hours of a clinical referrals and report to the court in writing on these two issues

1   within 90 days and semiannually thereafter.

2        3.    Defendants are ordered to submit within 30 days a final long range bed plan for

3   the provision of acute and intermediate inpatient beds, and MHCB beds, for all seriously

4   mentally ill male and female CDCR inmates clinically determined to be in need of those levels

5   of care.  The plan may not include any reduction in the number of intermediate inpatient care

6   or acute inpatient care beds initially proposed in the April 17, 2006 bed plan.  In addition, the

7   plan must include a realistic plan to expedite construction of all of the projects so that they will

8   be completed by June 30, 2010.  The plan shall also include a process for regular updates of

9   bed need projections, and ongoing  planning for new mental health beds based on the revised

10  projections.  If defendants' projections for acute inpatient beds continue to demonstrate a lack

11  of demand for additional acute beds in twelve months, once the parties and the Court experts

12  have thoroughly reviewed the projections and corrected any shortcomings, defendants may

13  present a plan to convert the acute beds to other clinical uses.  When defendants submit their

14  long-term plan for acute and intermediate and MHCB beds in the next 30 days, defendants are

15  reminded that they must comply with paragraph 3 of this Court's May 2, 2006 Order, which

16  required that they must include with their amended long term plan, "a list of those projects that

17  can be accelerated as well as a list of any statutory, licensing, or staffing barriers to such

18  acceleration and/or to timely opening of the projects described in the amended long term plan."

19  See 5/2/06 Order at ¶ 3.

20       4.    Defendants are ordered to file within 60 days a plan for the provision of

21  enhanced outpatient program beds for all serious mentally ill male and female CDCR inmates

22  clinically determined to be in need of this level of care.  The plan must meet the anticipated

23  demand for EOP beds in the program population projections in the Navigant study.

24  Defendants may not close the 67 bed EOP program in the M-3 Wing at CMF.  Defendants'

25  plan for new EOP beds must include a realistic timetable, budget planning, and resource

26  allocations to eliminate the EOP bed shortfall by June 30, 2008.

27       5.    Defendants are ordered to accelerate implementation of their plan for new EOP

28  treatment programs in their Reception Centers so that the programs open on or before

1     January 1, 2007.  Defendants are also ordered to amend their proposal for expanded EOP

2     treatment in reception centers to include full treatment programs for EOP inmates at Lancaster

3     and Deuel Vocational Institute, and at a reception center for women.

4          6.     Defendants are ordered to build their proposed new 50-bed mental health crisis

5     bed unit at the California Men's Colony that is proposed in their June 15, 2006 Revised Interim

6     Bed Plan.  Defendants shall file within 60 days a realistic plan and schedule for construction of

7     the new MHCB that will result in completion of the new MHCB unit by June 30, 2010.  The

8     plan shall also include the establishment on or before June 30, 2007, of an additional 33

9     interim MHCB beds to close the gap in MHCB beds identified by Dr. Farber-Szekrenyi in his

10     testimony to this Court on April 26-27, 2006.  That plan must also address the removal of long-

11     term medical patients from Correctional Treatment Center Beds that then can be used as

12     MHCB beds.

13          7.     Defendants' Plans for a 40-bed interim intermediate inpatient care program bed

14     expansions in the D-5 and D-6 units at SVSP is hereby approved, as is defendants' plan to

15     create an additional 30 interim intermediate inpatient care beds in the P-3 Wing at CMF.

16          8.     The Special Master is hereby directed to monitor the new intermediate care

17     programs at CMF (on P-2, A-2 and A-3), Salinas Valley State Prison (on D-5 and D-6),

18     Coalinga State Hospital, and the program expansion at ASH during the next six months, and to

19     make a report to the court by March 30, 2007 concerning the progress, safety, and quality of

20     care in these new programs, along with any recommendations for changes to these programs to

21     improve safety and/or patient care.

22          9.     The defendants are ordered to file a response, within 14 days, to Plaintiffs'

23     Notice of Violations of May 2, 2006 Court Order, dated July 10, 2006.

24

25     Dated:  September 25, 2006                 Respectfully submitted,

26

27                             */s/ Michael W. Bien___*
                            Michael W. Bien

28                             Rosen, Bien & Asaro
                            Attorneys for Plaintiffs