PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>    Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF THOMAS NOLAN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF ON DEFENDANTS' COMPLIANCE WITH MAY 2, 2006 ORDERS REGARDING INTERIM AND LONG RANGE BED PLANS AND RECEPTION CENTER EOP PROGRAMS** |

I, Thomas Nolan, hereby declare:

1. I am an attorney admitted to practice law in California and an Associate at the law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case. Except where stated to be on the basis of information and belief, I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Plaintiffs' Supplemental Brief On Defendants' Compliance with May 2, 2006 Court Orders Regarding Interim and Long Range Bed Plans and Reception Center EOP Programs.

2. The population of the CDCR has been growing steadily since this Court's hearing on Defendants' Bed Plan on April 26-27, 2006. According to population reports downloaded from the California Department of Corrections and Rehabilitation (CDCR) website, there were 172,213 inmates housed in the CDCR as of September 6, 2006, whereas on April 26, 2006, there were only 170,700 inmates housed in CDCR institutions. The difference is 1,513. Attached hereto as Exhibit A are true and correct copies of two population reports that I downloaded from the CDCR website on Monday September 18, 2006. The first report is dated September 11, 2006 and gives population data as of midnight September 6, 2006. The second report is dated May 1, 2006 and provides population data as of midnight on April 26, 2006.

3. Attached hereto as Exhibit B is a true and correct copy of a September 1, 2006 memo from the California Department of Corrections and Rehabilitation Acting Secretary James E. Tilton entitled "Special Session on Prison Overcrowding." The memo states that "I am deeply disheartened that the special legislative session concluded last night without the passage by the Assembly of any measures to provide either short-term relief or long-term remedies to alleviate the prison overcrowding crisis." The memo also notes "unprecedented levels of overcrowding to our institutions," and states that "You need to know that I remain concerned that the failure to pass any relief measures will lead the Department into an emergency situation that not only endangers your safety, but also places burdens on local governments and our communities."

4. Attached hereto as Exhibit C is a true and correct copy of a September 1, 2006 Memorandum from CDCR Division of Health Care Services Director Peter Farber-Szekrenyi to *Plata* Receiver Robert Sillen and *Coleman* Special Master Michael Keating. The memo describes the likely impact of the pending Los Angeles County revocation of the contract under which Los Angeles houses 1,300 CDCR inmates, mostly in the Pitchess Detention Center.

5. Attached hereto as Exhibit D is a true and correct copy of the Health Care Placement Unit Information Report, which is an excerpt from the defendants' July 3, 2006 Monthly Statistical Report. Our office received the report on July 21, 2006. This is the most recent monthly statistical report we have received. I calculated the total number of existing general population male EOP beds in the CDCR using this report. I added up the EOP capacity column for non-Ad Seg male EOP programs and determined that current total EOP capacity in the CDCR is 2,623. According to the new Navigant Bed Study (p.24), defendants will need 3,672 general population male EOP beds in 2007, meaning that if defendants do not add any more beds by 2007, there will be a shortage of 1,049 EOP beds. The Special Master's Supplemental Report states that defendants will add 487 new EOP beds in 2007. See 9/11/06 Supplemental Report at 22. Presumably these include the planned expansion of the California State Prison – Sacramento EOP program by 192 beds, and the expansion of the MCSP EOP program by 295 beds. See Exhibit C to Supplemental Report at 9 of 9. Defendants should clarify these EOP bed expansion plans in their EOP plan to be filed in 60 days.

6. On information and belief, in the 2006-07 Budget, the State Legislature approved initial funding for the $600 million in bed expansions that this Court had approved in its May 2, 2006 Order.

7. Attached here to as Exhibit E are true and correct copies of monthly reports on MHCB referrals for the months of May 2006 and July 2006. These reports show that in May of 2006 there were 110 referrals to MHCB beds at other institutions that could not be placed. The report for July shows that during that month there were 83 referrals to MHCB beds at other institutions that could not be placed.

8. I have been the attorney most directly involved in inpatient issues for plaintiffs' counsel and I have carefully reviewed all prior bed studies, the UNA Study and defendants' plans. One major problem with the Navigant projections stems from the fact that the figures Navigant used for Average Length of Stay (ALOS) in both the Acute Psychiatric Program and the Intermediate Care Facility programs are significantly shorter than historical lengths of stay, possibly because of the flood of referrals immediately following the Unidentified Needs Assessment (UNA) study. In effect, the scarce existing inpatient beds were rationed following the UNA study by shortening lengths of stay in Intermediate Care Facility programs. This is obvious from the data in the Navigant study itself. The Navigant ICF chart uses a length of stay for the Salinas Valley State Prison Intermediate Care Program of 115 days for the years 2006 through 2011—a length of stay of roughly three and a half months. See Exhibit A to Supplemental Report at 16 (SVSP Table, ALOS row, 2006-2011 columns). By way of contrast, the average length of stay in the lower custody intermediate care program run by DMH at Atascadero State Hospital is 208 days – roughly twice the average length of stay for the Salinas Valley Program. The shorter SVSP length of stay may reflect an appropriate effort to triage cases during a time of severe bed shortages, but any projections forward should adjust the usage figures and the lengths of stay figures upwards to account for these factors. During a conference call on the Navigant figures, Dr. Warren raised concerns about artificially low lengths of stay in the inpatient programs, particularly SVSP. It is unclear what caused these low lengths of stay, but it may have been the result of premature removals for custody reasons or pressure due to the UNA-generated referrals.

9. There are a number of serious additional problems with the Navigant bed projections that the Special Master's Supplemental Report does not discuss. For example, defendants have admitted that they have had no ongoing contract with Navigant whatsoever and thus no work on the Navigant projections has been performed since June 30. These problems with the Navigant bed need projections, as well as the concerns raised by the Special Master, need to be the subject of further investigation and discussion between all the parties. To date the parties have only had two one-hour conference calls to discuss the dramatic and

1  disturbing new Navigant projections.  Plaintiffs' counsel repeatedly requested a face-to-face
2  meeting with the Navigant experts as well as with the state officials responsible for the April
3  15, 2006 bed plan.  These requests were refused and only two brief conference calls with
4  Navigant took place.

5    10.  Another basis for skepticism about the accuracy of the new Navigant bed
6  projections is the fact that the 2002 Tucker Alan projections by the same study authors turned
7  out to be so inaccurate.  In almost every category of need for male mental health beds, the
8  2002 Projections figures for bed need turned out to be far too low, compared to current
9  estimates of 2007 need:

| | Tucker Allen Projection for 2007 (from '02 Tucker Alan Report) | Current Est. 2007 Need (from '06 Navigant Rep) | Percentage Difference |
|---|---|---|---|
| ICF | 224 (p. 45) | 464 (p. 16) | 107% |
| APP | 187 (p.43) | 203 (p.10) | 9% |
| GP EOP | 2935 (p.48) | 3672 (p.24) | 25% |
| PSU | 274 (p.50) | 332 (p.26) | 21% |

16  As this chart makes clear, the estimates of need for 2007 in the 2002 study turned out to be
17  badly flawed.  Part of the reason for the poor projections was the failure of the CDCR to retain
18  Mr. Misener and Navigant on an ongoing basis to adjust and update these figures, but this does
19  not account for the full magnitude of the 2002 Tucker Alan study's errors.  The UNA study
20  made clear that the Tucker Allen method does not account for persistent under-referral of
21  severely mentally ill inmates in a system with constrained capacity at higher levels of care.
22  Because of these problems, the Court should not approve the new Navigant projections without
23  further study and analysis of the figures, and without the requirements in the Special Master's
24  Recommendations that the CDCR be required to retain Navigant on an ongoing basis to
25  improve the CDCR's data collection and to update the projections periodically.  See
26  Supplemental Report at 26 (Recommendation 1).

27    11.  Plaintiffs' June 30, 2006 Objections to Defendants' June 15, 2006 Revised
28  Interim Bed Plans raised a number of issues that have since been resolved between the parties.

For example, the parties agreed to a stipulation covering the CMF/ASH Swap and the Special Master has included a recommendation that he be directed to monitor the swap. In another example, defendants obtained staffing allowing them to open the MHCB unit at the California Institute for Women for which staffing had not previously been obtained.

12. When this case was tried in 1992, there were 150 APP beds available. However, since that time, the number of such beds has remained constant while the population of the CDCR has roughly doubled. Thus, just to keep pace with the population growth during the last 13 years, the CDCR would need to double the number of available APP population to at least 300 beds.

13. It is my understanding that defendants have approached plaintiffs about waivers for CIM MHCB project and that defendants indicated they were planning on filing a request concerning this program with the Court. However, defendants have not yet filed any request for waivers concerning this program with the Court.

I declare, under penalty of perjury, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on September 25, 2006.

*/s/ Thomas Nolan*
Thomas Nolan