PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, | No.: Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **CORRECTED PLAINTIFFS' SUPPLEMENTAL BRIEF ON DEFENDANTS' COMPLIANCE WITH MAY 2, 2006 ORDERS REGARDING INTERIM AND LONG RANGE BED PLANS AND RECEPTION CENTER EOP PROGRAMS** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |

1       **TABLE OF ABBREVIATIONS**

2    ALOS          Average Length of Stay.

3    APP           Acute Psychiatric Program.  A 150-bed acute inpatient unit operated by the
                   Department of Mental Health inside the California Medical Facility.

4
     ASH           Atascadero State Hospital.  A state mental hospital operated by the Department
5                  of Mental Health in Atascadero, California.

6    ASU           Administrative Segregation Unit

7    CCCMS         Correctional Clinical Case Management System.  CCCMS is the name for the
                   largest CDCR mental health program, which currently houses 26,000 inmates
8                  with mental illness who live in general population housing units alongside non-
                   mentally ill inmates.  CCCMS inmates are generally given medication
9                  management, and a meeting with their case manager every 90 days.  A few also
                   participate in groups.
10
     CDCR          California Department of Corrections and Rehabilitation.
11
     CMF           California Medical Facility.  A prison in Vacaville, California.
12
     CMC           California Men's Colony.  A prison in San Luis Obispo, California.
13
     CTC           Correctional Treatment Centers.  CTCs are licensed inpatient units inside
14                 prisons.  Mental Health Crisis Beds operate inside Correctional Treatment Center
                   Units.  In addition to Mental Health Crisis Beds, most CTCs also include medical
15                 beds.

16   DCHCS         Division of Correctional Health Care Services.  This is the Department in CDCR
                   headquarters that manages medical and mental health care.
17
     DMH           Department of Mental Health.
18
     DOF           Department of Finance.
19
     DVI           Deuel Vocational Institute.  A prison in Tracy, California.
20
     EOP           Enhanced Outpatient Program.  EOP programs are sheltered treatment programs
21                 that house severely mentally ill inmates.  There are currently approximately
                   4,100 EOP inmates.  Because these inmates are unable to function in a general
22                 population setting, they live in segregated housing units.  They are given 10
                   hours each week of therapy or other "structured therapeutic activities."  EOP
23                 inmates meet weekly with their case managers.

24   ICF           Intermediate Care Facility.  ICF programs are "intermediate" inpatient care
                   programs.  These programs are operated by the state Department of Mental
25                 Health.  There are currently ICF programs at Salinas Valley State Prison, the
                   California Medical Facility, Atascadero State Hospital, and Coalinga State
26                 Hospital.  Inmates in these programs have frequent clinical contact, 24-hour
                   nursing care and 20 or more hours of therapy and treatment each week.  Inmates
27                 generally spend 6-12 months in these programs.

28   KVSP          Kern Valley State Prison.  A new prison in Delano, California.  KVSP has an

1          MHCB unit.

2  LOU       Locked Observation Unit. An unlicensed Outpatient Housing Unit that is
           currently operating as a de facto MHCB at California Men's Colony.

3

   MHSDS     Mental Health Services Delivery System. The name given by defendants to their
4          entire mental health system.

5  MHCB      Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many
           California prisons where mentally ill inmates who are suicidal or experiencing
6          another kind of mental health crisis can be admitted and treated for up to 10 days.
           MHCB are generally located inside a Correctional Treatment Center.

7

   OHU       Outpatient Housing Units. Unlicensed infirmaries inside many CDCR
8          institutions that provide treatment for medical and mental health conditions.

9  PSU       Psychiatric Services Unit. There are psychiatric treatment programs providing
           Enhanced Outpatient Program level of care to inmates with a Security Housing
10         Unit term.

11 RC        Reception Center. This refers to designated prisons or housing units within
           prisons where inmates are classified and processed when they first arrive in the
12         CDCR.

13 SHU       Security Housing Unit. This is a segregated high-security housing unit for
           inmates who have committed serious infractions while in prison or who have
14         been "validated" by the CDCR as belonging to a gang. There are male SHU
           units at Pelican Bay State Prison (from which all inmates with serious psychiatric
15         conditions are excluded), Corcoran State Prison, and California Correctional
           Institute. There is a SHU for women at Valley State Prison for Women.

16
   UNA       Unidentified Needs Assessment. This is the name given to the study of unmet
17         demand for intermediate and acute inpatient care that was published by the
           CDCR on March 30, 2006.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS.................................................................i

TABLE OF CONTENTS .....................................................................iii

INTRODUCTION ...............................................................................1

    A.   Procedural Background ..................................................1

    B.   The Ongoing Overcrowding Crisis ................................4

ARGUMENT ......................................................................................5

    I.   DEFENDANTS SHOULD NOT BE PERMITTED TO DELAY
       IMPLEMENTATION OF THE RECEPTION CENTER EOP PROGRAM
       UNTIL FISCAL YEAR 2007-2008.................................5

    II.  THE COURT SHOULD NOT ACCEPT DEFENDANTS' JUNE 15, 2006
       REVISED INTERIM BED PLAN WITHOUT ADDITIONAL
       CONDITIONS AND MODIFICATIONS ............................7

         A.   The Court Should Order Defendants to Implement Their Proposal
            to Build a New 50-Bed MHCB Unit at CMC As Soon As Possible ..........7

         B.   The Court Should Require Defendants to Develop Another 33
            Interim MHCB Beds To Meet the Shortfall Defendants Have
            Themselves Acknowledged And Require Defendants to Eliminate
            the Use of MHCB Beds By Long-Term Care Medical Patients..................9

         C.   The Court Should Approve the 30 Bed ICF Expansion In P-3 Wing
            At CMF, But Given The Severe Current Shortage of EOP Beds,
            The Court Should Order That Defendants May Not Close The 67
            Bed EOP Program In CMF's M-3 Wing ...................10

    III.  THE DEFENDANTS' PRESENTATION OF NEW BED PROJECTIONS
       MUST NOT BE ALLOWED TO FURTHER DELAY THE LONG
       RANGE PLAN FOR CONSTRUCTION OF NEW INPATIENT
       FACILITIES APPROVED BY THIS COURT'S MAY 2, 2006 ORDER..........11

         A.   The Court Should Not Accept the New Navigant Bed Projections..........12

         B.   The Court Should Order Defendants To Respond To Plaintiffs'
            July 10, 2006 Pleading Concerning The Amended Long-Term Bed
            Plan..............................................................................13

         C.   The Court Should Not Permit Defendants to Modify or Scale Back
            Their Plan to Expand Intermediate Care Facility Beds In Their
            April 17, 2006 Long Range Plan .................................14

         D.   The Court Should Not Permit Defendants to Delay or Scale Back
            Their APP Expansion Plans Without A More Thorough
            Assessment of Need ...............................................14

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM M

iii

E.    The Court Should Order Defendants to Develop Plans to Bring All Other MHCB and Intermediate Inpatient Care Units for Which Waivers Have Been Granted Into Compliance With State Licensing Laws .......................................................................................... 15

CONCLUSION ..................................................................................................... 17

# INTRODUCTION

There are currently a large number of pending plans by defendants to address the chronic shortages of mental health beds in each of the California Department of Corrections and Rehabilitations' (the CDCR's) most critical mental health programs, including interim and long term plans to build additional (1) intermediate inpatient care beds (sometimes called ICF beds), (2) acute inpatient care beds (sometimes called APP beds), (3) mental health crisis beds (MHCBs), and (4) enhanced outpatient program (EOP) beds.  Defendants also recently submitted a plan to create an enhanced outpatient program for inmates housed in the CDCR's reception centers.  Many of these pending bed plans are addressed by the Special Master in his Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long-Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds ("Supplemental Report"), which was filed on September 11, 2006.  Plaintiffs support most of the four recommendations in the Special Master's Supplemental Report.  However, plaintiffs ask for several modifications to the recommendations to expedite implementation of the proposals and to ensure that defendants are given clear remedial guidelines (including strict deadlines for completion of pending projects, a directive that sufficient beds will be constructed in each category, and additional requirements for future bed planning functions) that will ensure effective implementation of the new plans.  In addition, there are a number of other pending issues relating to the pending bed plans that the Special Master does not address but that the Court should address at this time.

## A.    Procedural Background

On April 17, 2006, defendants filed their third bed plan in response to the March 30, 2005 UNA study and this Court's orders to develop appropriate plans to address defendants' ongoing failure to plan for, construct and operate sufficient resources to address the need for higher levels of mental health care for the *Coleman* class.  The April 17, 2006 Bed Plan committed defendants to build $600 million worth of new intermediate and acute inpatient beds during the next five years, and also included plans to address severe mental health crisis bed shortages.  After two days of hearings on April 26 and 27, 2006, the Court conditionally

approved defendants' April 17, 2006 plan with a variety of additional required elements. 5/2/06 Order at ¶¶ 1-14. First, the Court required that the defendants revise their long term bed plan within 60 days based on new, higher Spring 2006 population projections. *Id*. at ¶ 1. Second, the Court required defendants to file a plan within 45 days for the interim provision of intermediate inpatient beds and mental health crisis beds. *Id*. at ¶ 4. The new interim plan was required to include "as appropriate, a list of any statutory, licensing, or staffing barriers to implementation of any aspect of said plan." *Id*. Third, the Court required defendants to open or keep open several interim intermediate inpatient programs, including an existing program on the P-2 Wing at the California Medical Facility, a new program on the D-5 and D-6 Wings at SVSP, and a long-promised program at Coalinga State Hospital. *Id*. at ¶¶ 6, 7, 8, 10. Finally, the Court required defendants to activate new mental health crisis bed units at Kern Valley State Prison and at California State Prison-Sacramento no later than July 1, 2006. *Id*. at ¶¶ 12. In a separate order also filed on May 2, 2006, in response to plaintiffs' objections to the Special Master's 15th Monitoring Report, the Court ordered defendants to develop a plan within 90 days to address the needs of enhanced outpatient program inmates in the CDCR's chronically overpopulated and understaffed reception centers. 5/2/06 15th Round Report Order at ¶ 2.

In the 2006-07 Budget, the Legislature approved initial funding for the $600 million in bed expansions that this Court had approved in its May 2, 2006 Order. Declaration of Thomas Nolan In Support of Plaintiffs' Objections to Special Master's Supplemental Report ("Nolan Dec.") at ¶ 6. On June 15, 2006, as required by paragraph 4 of the May 2, 2006 Order, defendants served an Amended Interim Bed Plan which addressed various short- and medium-term projects to expand MHCB, Acute Inpatient, and Intermediate Inpatient beds while the CDCR constructs the new permanent facilities proposed in the April 17, 2006 Plan. On June 29, 2006, plaintiffs filed objections to the Revised Interim Bed Plan. See 6/29/06 Plaintiffs' Objections to Defendants' June 15, 2006 Revised Interim Bed Plan. Plaintiffs hereby incorporate those objections by reference.

On June 30, 2006, defendants filed what they described as their Amended Long Term

1  Plan, although it was in fact a request for an extension of time in which to file an actual

2  amended plan. See 6/30/06 Defendants' Submission of Response to Court Order Requiring

3  Amended Long-Term Bed Plan. Defendants' June 30, 2006 filing enclosed a copy of a brand

4  new set of bed need data which projected significantly different future bed need in a variety of

5  different bed categories. This new bed need projection is called the Navigant Bed Projection

6  after the name of the consulting company that prepared it. The principal authors of the new

7  bed study were the authors of the 2002 Tucker Alan Study. See Exhibit A to the 9/11/06

8  Special Master's Supplemental Report. On July 10, 2006, plaintiffs filed a response objecting

9  to the new Navigant Study and to the absence of a long-term bed plan. See 7/10/06 Plaintiffs'

10 Notice of Violations of May 2, 2006 Court Order and Request for Relief and Objections to

11 Defendants' Amended Long-Term Bed Plan and Request for Additional 60 Day Extension.

12 Plaintiffs hereby incorporate this pleading by reference.

13        Defendants did not file a response to plaintiffs' July 10, 2006 objections. Rather, on

14 July 21, 2006, defendants filed a brief statement indicating that they would respond only if

15 directed to do so by the Court. See 7/21/06 Reply/Response to Plaintiffs Objections to

16 Amended Long-Term Bed Plan at 1-2 ("no formal response to any specific objection or request

17 for a court order will be provided unless this Court so desires.").

18        On July 31, 2006, defendants filed a plan to create a reception center EOP program.

19 See Defendants' 7/31/06 Submission of Plan for Reception Center/EOP Inmates. Defendants'

20 July 31, 2006 plan calls for funding through the ordinary budget process with an earliest

21 possible potential start date of July 1, 2007. 7/31/06 Reception Center EOP Plan at 5 ("Upon

22 approval of this plan by the Court, any funding or positions deemed necessary to implement

23 this plan will be requested through the annual budget process, with hiring and implementation

24 expected to begin in July 2007.").

25        On September 11, 2006, the Special Master filed his Supplemental Report on Bed Plans

26 addressing some but not all of the pending issues and objections in the draft plans and in the

27 objections described above and setting forth four recommendations for further action by the

28 Court. See 9/11/06 Supplemental Report at 26. Plaintiffs respectfully request that this Court

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc                    3

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM M

address not only the issues addressed in the Master's Supplemental Report but also several other significant issues timely raised by plaintiffs herein and previously in their June 29 and July 10 pleadings.

**B.    The Ongoing Overcrowding Crisis**

With each passing month, the crowding crisis within the California Department of Corrections and Rehabilitation (CDCR) continues to worsen.  There are now 172,213 inmates housed in the CDCR – 1,513 more inmates than there were in late April 2006, when this Court held hearings on earlier drafts of defendants' mental health bed expansion plans.  See Nolan Dec. at ¶ 2 and Ex. A (CDCR Population Reports for April 26, 2006 and September 6, 2006). The Governor and the leadership of the CDCR have acknowledged the severity and scope of this crisis, but a Special Legislative Session on the issue of overcrowding in August accomplished little, with the one notable exception being the Legislature's approval of the mental health staffing augmentations that this Court ordered at the end of July.  Nolan Dec. ¶ 3 and Ex. B.  Following the failed Special Session, acting CDCR Agency Secretary Tilton wrote a memo to all CDCR staff which noted "unprecedented levels of overcrowding to our institutions" and which stated that "You need to know that I remain concerned that the failure to pass any relief measure will lead the Department into an emergency situation that not only endangers your safety, but also places burdens on local governments and our communities." Nolan Dec. at ¶ 3, Ex. B (9/1/06  Tilton Memo to staff).

The unprecedented, severe overcrowding will be further aggravated in the next few months because defendants and Los Angeles County are planning to terminate a contract under which 1,300 CDCR prisoners are housed at the Pitchess Detention Center of the LA County Jail.  See Nolan Dec. at ¶ 4 and Ex. C.  In a September 1, 2006 memo discussing the absorption of these 1,300 Pitchess prisoners and the loss of the capacity provided by the LA County Jail, CDCR Health Care Director Dr. Peter Farber-Szekrenyi frankly acknowledged the serious difficulties that absorbing these new inmates will entail for mental health care:

- Pharmacy staff will be unable to ensure that mental health inmates transferring to other institutions have a 30-day medication supply to ensure medication

continuity.

- In order to evaluate all incoming CCCMS inmates, "existing mental heath staff will have to be redirected from their primary responsibility of direct patient care."

- Institutions will be required to increase CCCMS population beyond the Court-ordered limit of 130% of capacity.

- Already severe staffing shortages at many institutions will be exacerbated, with the result that "[a]dequate mental health services would not be provided."

- Existing bed shortages at the Mental Health Crisis Bed (MHCB) and inpatient levels of care will be exacerbated.

Nolan Dec at ¶ 4 and Ex. C at 1-3.

Nowhere is the cost of these mounting pressures more clear than in the CDCR's extraordinarily high suicide rate. By plaintiffs' count, there have been 34 suicides so far in 2006 (through August 31, 2006). Nolan Dec. at ¶ 14. If this trend continues, it will result in an annual total for 2006 of 51 suicides, the highest absolute number and also the highest rate in recent memory – a rate of 29 suicides per 100,000 inmates, well above twice the national average for prisons. *Id.*

In this time of crisis, it is essential that the Court and the Special Master closely oversee the defendants' remedial efforts and require expedited construction of the mental health beds that are needed at every level of care. The sense of urgency that has governed the oversight in this case during the last six months needs to continue as defendants move towards implementation of the various pending bed expansion plans.

## ARGUMENT

I.    **DEFENDANTS SHOULD NOT BE PERMITTED TO DELAY IMPLEMENTATION OF THE RECEPTION CENTER EOP PROGRAM UNTIL FISCAL YEAR 2007-2008**

The Special Master's Supplemental Report addresses problems with defendants' July 31, 2006 Plan for providing EOP care to inmates in Reception Centers but fails to make any recommendations. See 9/11/06 Supplemental Report at 21-23. Given the current continuing

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS, NO.:  CIV S 90-0520 LKK-JFM M

5

1  crisis in CDCR's Reception Centers that will soon be further exacerbated by the LA County

2  Jail closure, defendants must be ordered to amend their plan and implement it as soon as

3  possible.

4       There are three serious problems with defendants' plan for the provision of EOP care in

5  Reception Centers.  First, the plan fails to include any resources in the current fiscal year for

6  Reception Center EOP programs.  Rather, defendants' plan is to obtain funding "through the

7  annual budget process" with the earliest potential start date of July 2007 (assuming that the

8  funding is actually obtained and that the budget is passed on time).  See Defendants' 7/31/06

9  Submission of Plan for Reception Center EOP Inmates.  No clinical staff could be hired under

10  defendants' plan for at least 4-6 months after July 1, 2007, under state government's "business

11  as usual" timing.  Given the current severe overcrowding throughout the CDCR, inmates are

12  spending longer and longer time periods waiting in Reception Centers for placement into a

13  mainline mental health program.  See 9/11/06 Supplemental Report at 22 ("It is clear from the

14  revised plans discussed above that the problem of long delays for enhanced outpatient program

15  inmates in reception center awaiting transfer to mainline programs will not be resolved

16  quickly.").  It is critical that the defendants' plan for supportive EOP care programs in the

17  Reception Centers go into effect as soon as possible.  The Court should order defendants to

18  fund and implement these programs immediately.

19       Second, defendants' plan for EOP programs in the Reception Centers does not include

20  any female prisons and does not include two male prisons with sizable EOP populations –

21  Deuel Vocational Institute (DVI) and Los Angeles County State Prison (LAC).  The Special

22  Master also objects to these omissions in the Supplemental Report, but failed to include a

23  recommendation requiring expansion of the EOP program to cover these major gaps.  See

24  Special Master's Supplemental Report at 22 ("It is unclear why Deuel Vocational Institute,

25  which regularly houses a relatively high number of enhanced outpatient program inmates, and

26  California State Prison/Los Angeles County with its expanding reception responsibilities were

27  excluded.  All reception centers for females were also excluded.").  The Court should order

28  defendants to expand their plan to cover at least one female reception center, DVI and LAC.

Third, the plan suggests that the need for the new RC programs will be reduced in the long run once the department builds more EOP beds in mainline institutions and meeting Program Guide transfer timelines.  See 7/31/06 Submission of Plan for Reception Center EOP Inmates at Ex. A at 2.  Plaintiffs disagree that the problem will be solved in this manner.  As the Plan acknowledges elsewhere, there will always be inmates with needs for EOP treatment whose parole is revoked and who serve their entire term in a Reception Center.  See 7/31/06 Submission of Reception Center EOP Plan at Ex. A at 2 ("Many of the EOP level individuals in reception centers have very short-term commitments that necessitate expedited placements into treatment to increase their potential for successful re-integration into the community.").

The Court should order defendants to fund their plan immediately and to fully implement the program no later than January 1, 2007, and to amend the program to include at least one female reception center as well as DVI and LAC.

II.    **THE COURT SHOULD NOT ACCEPT DEFENDANTS' JUNE 15, 2006 REVISED INTERIM BED PLAN WITHOUT ADDITIONAL CONDITIONS AND MODIFICATIONS**

Plaintiffs raised a series of objections to Defendants' June 15, 2006 Revised Interim Bed Plan. While some of these issues have since been resolved by the parties,[1] a number of critical issues remain outstanding that the Court should now address.

A.    **The Court Should Order Defendants to Implement Their Proposal to Build a New 50-Bed MHCB Unit at CMC As Soon As Possible**

As part of their interim plan to increase Mental Health Crisis Bed capacity, defendants propose building a new 50-bed Mental Health Crisis Bed unit at the California Men's Colony in San Luis Obispo.  See Defendants' June 15, 2006 Revised Interim Bed Plan at 12 ("The design of CMC's OHU prohibits licensing this space as a permanent MHCB unit, even if extensive facility modifications were performed.  Therefore, the CDCR is proposing to

---

[1] For example, the parties reached a stipulated agreement concerning the swap of acute inpatient beds and mental health crisis beds between the California Medical Facility and Atascadero State Hospital.  See 8/11/06 Stipulation and Proposed Order Re ASH/CMF Bed Plan.  As plaintiffs noted, this swap will not create any new beds.  However, it may increase the ability of the CDCR to fully utilize existing resources.  Nolan Dec. ¶ 11.

1    construct an additional 50-bed Correctional Treatment Center (CTC) at CMC to provide

2    MHCB care.").  However, defendants have not committed themselves to the project or

3    provided a timetable for completion.  The Court should approve this important project and

4    order defendants to present a plan within 60 days to expedite construction of this new CMC

5    MHCB unit so that it is complete, licensed, staffed and ready for patient care on or before June

6    30, 2010.  This time-line is further necessitated by the new Navigant bed need projections

7    estimate of 20 percent more MHCB beds by 2011 than was previously estimated.  See

8    Supplemental Report at 8.

9            In the interim, defendants will continue to operate the current 42-bed MHCB unit in the

10   Locked Observation Unit or LOU at CMC.  The operation of the Locked Observation Unit as

11   an MHCB unit is only possible because of the waivers of state licensing standards approved by

12   this Court in its May 2, 2006 Order.  See 5/2/06 Order at 13 (ordering opening of CMC locked

13   observation unit as a mental health crisis bed "on a temporary emergency basis"); 7/20/06

14   Order (waiving state contracting code for LOU construction project).  These waivers were

15   necessary, but it is important to recall that in the past this Court's experts have expressed grave

16   concerns about the safety and efficacy of the LOU unit, in part because of its dangerous

17   physical plant.  In the March 29, 2000 Study of Timely Access to DMH Inpatient Care

18   prepared by Dr. Koson for this Court, Dr. Koson wrote as follows:

19                   The LOU, moreover, is a physically unsafe area, where patients are
                 locked down virtually 24 hours per day, getting out only for daily
20                 treatment team meetings and a shower.  There is no programming
                 or treatment space and no yard for this group. . . .  For many of the
21                 patients, who have come from a MHCB unit elsewhere, CMC's
                 LOU represents a lower level of care.
22

23   March 29, 2000 Koson Report at 12-13 (the Koson Report was filed by the Special Master on

24   March 30, 2000 under the title "Notice of Filing of Special Master's Interim Report on DMH

25   Inpatient Care").  Dr. Koson's concerns about the safety of the unit underscore the need to

26   expedite construction of the new MHCB unit at CMC, which will meet all relevant state

27   licensing requirements and which will thus be built to include adequate space for private

28   therapy sessions, recreational therapy, group treatment, and routine yard time.

The Court should order defendants to build the new 50-bed MHCB unit at CMC and to develop a plan and a timetable within 60 days that will allow defendants to open the new MHCB unit at CMC for patient care on or before June 30, 2010.

**B.    The Court Should Require Defendants to Develop Another 33 Interim MHCB Beds To Meet the Shortfall Defendants Have Themselves Acknowledged And Require Defendants to Eliminate the Use of MHCB Beds By Long-Term Care Medical Patients.**

CDCR Health Care Director Dr. Farber-Szekrenyi testified in April 2006 that the CDCR has a current shortfall of 75 MHCB beds. See May 2, 2006 Order at 2 (discussing Farber-Szekrenyi testimony and 75 bed MHCB gap). Defendants failed to address this 75 bed gap in their interim plan. As plaintiffs argued in their June 29, 2006 Objections to Defendants' Revised Interim Bed Plans, aside from the 42 beds at CMC ordered by this Court on May 2, 2006, the other MHCB beds in defendants' June 15, 2006 Revised Interim Plan are not new beds or simply involve shifting around existing beds. See Plaintiffs' 6/29/06 Objections to Defendants' June 15, 2006 Revised Interim Bed Plan at 7-14. The Special Master explained that the allegedly "new" beds at CIM were already being used for MHCB care. See 9/11/06 Supplemental Report at 17 ("The utility of this provision of the plan is limited by the fact that, for most of the past year, defendants have housed up to 40 mental health crisis bed inmates in the general acute care hospital at California Institute for Men."). Similarly, the ASH-CMF 25-bed swap may improve bed utilization but does not create new beds. See *id.* at 16 (The swap plan "involves no expansion in the number of mental health crisis beds available to CDCR, but allows full utilization of the 25 acute inpatient beds at Atascadero State Hospital designated as mental health crisis beds").

Monthly reports on MHCB referrals demonstrate that although the new CMC MHCB unit has resulted in some reduction in the number of MHCB referrals that cannot be accommodated each month, the number of such unsuccessful referrals remains high. See Nolan Dec. ¶ 7 and Ex. E (monthly MHCB report shows that for July 2006 there were 83 MHCB referrals to other institutions which could not be placed; same data for May 2006 indicates that there were 110 referrals that could not be placed). In addition, as Dr. Farber-

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc    9

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.: CIV S 90-0520 LKK-JFM M

1    Szekrenyi pointed out on September 1, 2006, the LA County Jail bed closure will further

2    aggravate the shortage of MHCB beds.  Nolan Dec. at ¶ 4 and Ex. C.

3         The ongoing shortage must be addressed.  Plaintiffs contend that the 75-bed shortfall

4    acknowledged by Dr. Farber-Szekrenyi is not the full shortfall.  See Plaintiffs' 6/29/06

5    Objections at 2.  However, even to close the 75-bed shortfall acknowledged by Dr. Farber-

6    Szekrenyi, defendants must be required to establish at least another 33 interim MHCB beds.

7    As plaintiffs have previously noted, defendants have failed to include in their plan the most

8    obvious and rapid method of obtaining additional MHCB beds: to address the ongoing

9    inappropriate use of existing MHCB beds by long-term medical patients.  See Plaintiffs' June

10   29, 2006 Objections at pages 7-9.  It is apparent that a substantial part of the "missing" 33

11   MHCB beds could and should be obtained by this method.

12        **C.    The Court Should Approve the 30 Bed ICF Expansion In P-3 Wing At CMF, But Given The Severe Current Shortage of EOP Beds, The Court Should Order That Defendants May Not Close The 67 Bed EOP Program In CMF's M-3 Wing**

13

14

15        As part of defendants' June 15, 2006 Revised Interim Bed Plan, defendants proposed

16   adding a 30-bed Intermediate Inpatient Program in the P-3 wing at CMF.  See Exhibit A to

17   6/29/06 Kahn Declaration (Defendants' New Interim Bed Plan) at 15.  This is a welcome and

18   sorely needed expansion of intermediate inpatient care beds for Level IV inmates, and the

19   Court should order defendants to implement this portion of their June 15, 2006 Plan, as well as

20   the plan to expand the number of intermediate inpatient beds at SVSP.  However, in order to

21   accomplish the CMF ICF bed expansion, defendants plan to move the Administrative

22   Segregation EOP unit currently on P-3 into the space occupied by the existing M-3 general

23   population EOP unit *and shut down the 67-bed M-3 EOP unit.  Id.* at 15 ("This plan, once fully

24   implemented, adds 30 ICF beds at the expense of 67 general population EOP beds at CMF.").

25   This aspect of defendants' plan is not discussed in the Supplemental Report, and the Court

26   should reject it.

27        The Court must not permit defendants to close these critical high security EOP beds.

28   Even using the new Navigant figures for EOP demand, defendants have a large existing EOP

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc    10

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.:  CIV S 90-0520 LKK-JFM M

shortage that will grow to nearly 1,000 beds next year.  *Compare* 9/11/06 Special Master's

Supplemental Report at Ex. A (Navigant Report) at 24 (projecting a need for 3,672 EOP beds

in 2007), *with* Nolan Dec. ¶ 5 and Ex. D (monthly Statistical Report showing current male

general population EOP capacity of 2,623). Although the Supplemental Report states that

defendants will add another 487 EOP beds next year, that will still leave a shortfall of 562 EOP

beds.  See 9/11/06 Supplemental Report at 22.  Given this severe shortage of EOP beds,

defendants must be required to find a way to re-locate their P-3 Administrative Segregation

EOP program without sacrificing any GP EOP beds.

### III. THE DEFENDANTS' PRESENTATION OF NEW BED PROJECTIONS MUST NOT BE ALLOWED TO FURTHER DELAY THE LONG RANGE PLAN FOR CONSTRUCTION OF NEW INPATIENT FACILITIES APPROVED BY THIS COURT'S MAY 2, 2006 ORDER

Defendants June 30, 2006 filing was not a revised long term bed plan, as required by

this Court's May 2, 2006 Order.  Rather, defendants submitted a new set of bed need estimates

to the Court along with a request for an additional 60 days in which to prepare a significantly

revised long term bed plan.  This extension has not been granted and defendants remain in

violation of the May 2, 2006 Order (¶ 1).  The Special Master notes that defendants' attempt to

change their bed plans has created a significant risk that the Legislative mandate that was

obtained for the $600 million in bed expansion projects may be scaled back or eliminated.  See

Supplemental Report at 25-26 (after finalizing new plans, defendants will have to "persuade

both executive and legislative decision-makers to re-shape already approved measures to meet

CDCR's now more fully understood needs.").  Plaintiffs disagree with the Master's

recommendation to "approve" the unsubstantiated "new" bed projections and allow defendants

to shrink and delay the inpatient bed projects already approved by this Court (at defendants'

request) and previously submitted to and approved by the Legislature.  There is no record

before this Court or the Special Master supporting this recommendation and it should be

modified.

Rather than an expansion of the long-term bed plans based on the dramatic increase in

CDCR population projections presented to the Court at the April 2006 Hearings, defendants

now intend to delay and reduce their long-term inpatient bed projects.  The Court must not permit any additional delays or project shrinkage.

A.    The Court Should Not Accept the New Navigant Bed Projections

The Special Master erroneously recommends approval of the Navigant bed need projections.  The Supplemental Report itself includes significant criticisms of the Navigant bed study.  For example, the Supplemental Report notes that the projections of intermediate inpatient need are "troubling, given the higher spring 2006 population projections and the continuing disproportional growth of the mental health caseload," and concludes that this portion of the Navigant study "needs to be carefully monitored and routinely re-calculated." Supplemental Report at 9.  The Supplemental Report also states that "[s]ome elements of the study's incorporation of the Unmet Needs Assessment . . . remain vague or unclear."  *Id*. at 10. In addition, the Special Master notes that the "dialogue among parties, the special master's experts and the Navigant authors of the study about the data and methodology relied on in preparing the study and its projections needs to continue."  *Id*.  Plaintiffs agree with these criticisms.  On the basis of these concerns alone, the Court should defer any approval or acceptance of the new Navigant bed need projections until far more is known about them. There are a number of serious additional problems with the Navigant bed projections that the Special Master's Supplemental Report does not discuss.  See Nolan Dec. ¶¶ 8-10. For example, defendants have admitted that they have had no ongoing contract with Navigant whatsoever and thus no work on the Navigant projections has been performed since June 30.  *Id*. These problems with the Navigant bed need projections, as well as the concerns raised by the Special Master, need to be the subject of further investigation and discussion between all the parties.

In order to address any inaccuracies and to make the bed projections as objective and reliable as possible, the Court should order that Court expert Dr. Melissa Warren, who worked closely with defendants on the successful March 2005 UNA study, be appointed to work with defendants and Navigant to ensure that the projections of bed need are as accurate as possible and to ensure that all appropriate data is collected and used to calculate future bed need.

The Court should also order that defendants adopt all of the recommendations in the

Navigant Report itself, that were intended to improve data collection and the projections of need, including most importantly, the recommendation that periodic UNA-style studies be undertaken to assess whether there is unrecognized need for inpatient care in the system. Ex. A to 9/11/06 Supplemental Report at 4 (recommending (1) periodic logging of daily census information into a database for each health care program, (2) better collection of DMH data, (3) creation of an EOP tracking database, and (4) periodic clinical audits similar to UNA, possibly rotating a few prisons every year). It is critical that the Court require defendants to adopt these recommendations from defendants' own consultant.

The Court should also enhance the independence and integrity of the Navigant study authors by requiring that their contract be with the Department of Correctional Health Care Services rather than with CDCR Legal. The Court should also direct that there be ongoing discussions between the parties on the Navigant methodology and data. There have only been two short one-hour conference calls on the Navigant study this far, and more exchanges of information are needed. See Nolan Dec. ¶ 9.

**B.    The Court Should Order Defendants To Respond To Plaintiffs' July 10, 2006 Pleading Concerning The Amended Long-Term Bed Plan**

Plaintiffs have already fully briefed their position that serious unanswered questions remain concerning defendants' decision to present the Court with a new study shortly after requesting that the Court adopt $600 million worth of new projects based on a prior bed need study. See 7/10/06 Plaintiffs' Notice of Violations of May 2, 2006 Order and Request for Relief and Objections to Defendants' Amended Long Term Bed Plan at 2-7. Defendants declined to respond to plaintiffs' arguments and evidence on this point in the absence of a specific direction from the Court to do so. See Defendants' 7/21/06 Response to Plaintiffs 7/10/06 Briefing. The Special Master deferred this issue to the Court. See Supplemental Report at 12 ("Determination of the burden and level of proof required to justify changes in defendants' revised plans to meet their clear need for more acute and intermediate inpatient and mental health crisis beds is better left to the court."). The Court should order defendants to respond to plaintiffs' argument and evidence, and the Court should then make appropriate

1    orders based on its full review of the serious legal and factual issues.

2        **C.**     **The Court Should Not Permit Defendants to Modify or Scale Back Their Plan to Expand Intermediate Care Facility Beds In Their April 17, 2006**

3                 **Long Range Plan**

4          Even assuming that the New Navigant bed need projections are eventually accepted,

5    they are very similar to defendants' earlier projections as to future need for one category of

6    beds -- intermediate care facility (ICF) beds.  The new Navigant projections for Intermediate

7    Psychiatric Bed Need indicate that the CDCR will need 563 Intermediate Inpatient Beds in the

8    year 2011.  Ex. A to 9/11/06 Supplemental Report at 16.  These projections likely

9    underestimate the actual need for intermediate inpatient beds, and in particular they

10   underestimate the need for Level IV intermediate inpatient beds, because they use an

11   unrealistically low Average Length of Stay for the Salinas Valley Psychiatric Program of 115

12   days.  Nolan Dec. at ¶ 8.  However, even accepting these figures for the moment, they are not

13   materially different from the projection of need for 641 beds in the year 2011 in the

14   defendants' April 17, 2006 Bed Plan at 3.  The difference between the two projections of 78

15   beds is not sufficient to justify any scaling back of the intermediate inpatient bed proposals in

16   the defendants' April 17, 2006 Plan.  The Court should order defendants to proceed with a new

17   bed plan without changing the Intermediate Care Facility portion of their April 17, 2006 plans.

18       **D.**     **The Court Should Not Permit Defendants to Delay or Scale Back Their APP Expansion Plans Without A More Thorough Assessment of Need**

19

20         The category where the Navigant Bed Projections differ most from prior CDCR

21   projections is acute inpatient beds, which are sometimes referred to as Acute Psychiatric

22   Program or APP beds, after the name of the acute program at the California Medical Facility.

23   As the Special Master explains, the new Navigant bed numbers for acute beds could hardly be

24   more different than the projections used by the CDCR in its April 17, 2006 Plans.  The

25   Navigant projections indicate a need for 203 acute beds in 2007 increasing to 224 beds in

26   2011.  9/11/06 Supplemental Report at 7.  By way of contrast, the April 17, 2006 Bed Plans

27   estimated a need for 316 APP beds in 2007 rising to 531 beds in 2011.  *Id.*

28         Defendants have failed to come forward with any admissible evidence justifying their

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc                     14

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.:  CIV S 90-0520 LKK-JFM M

1  argument that the April 17, 2006 figures for acute bed need were too high.  Not one declaration

2  addresses the issue.  Plaintiffs' request to meet face-to-face with Navigant as well as the state

3  officials who prepared the original bed plan projections was blocked by defendants and their

4  counsel.  The Court should also consider the compelling evidence that the new Navigant

5  numbers are too low.  The strongest evidence is very straightforward: when this case was tried

6  in 1992, there were 150 APP beds available.  However, since that time, the number of such

7  beds has remained constant while the population of the CDCR has increased by 80 percent.

8  Nolan Dec. ¶ 12 and Ex. F.  Thus, just to keep pace with the population growth during the last

9  13 years, the CDCR would need to increase the number of available APP beds by eighty

10 percent, to a total of 270 beds.  *Id.*  The low Navigant bed projections for APP are also suspect

11 because they rely on extremely low lengths of stay that are not consistent with historical

12 lengths of stay in the unit.  See 9/11/06 Supplemental Report at Ex. A (Navigant Study) at 10

13 (giving higher average lengths of stay in APP 2002 and 2003).

14       Given these uncertainties and the fact that the Court has already approved the APP

15 expansion projects, the Court should order defendants to move forward with their existing

16 acute bed expansion plans while the parties work more closely with Navigant and its bed

17 projections to ensure that they are reliable.  Proceeding with the existing expansion plans

18 despite the bed projection variances is one of the options discussed by defendants in their June

19 30, 2006 plan attaching the Navigant bed projections – simply moving ahead with the existing

20 plans for APP and ICF beds expansions.  See Defendants' 6/30/06 Submission of Response to

21 Court Order Requiring Amended Long-Term Bed Plan at 16-17 (Alternative 3, listing benefits

22 of not modifying existing plans).  This approach has several key benefits.  First, the funds for

23 the project are already approved.  Second, if in the future not all of the beds are needed, they

24 can be converted to medical beds or other types of mental health beds.  Third, moving forward

25 with existing plans ensures that there will be no further delays in these important inpatient bed

26 expansion projection projects.

27  **E.    The Court Should Order Defendants to Develop Plans to Bring All Other**
     **MHCB and Intermediate Inpatient Care Units for Which Waivers Have**
28   **Been Granted Into Compliance With State Licensing Laws**

1    In the last year, defendants have opened new intermediate inpatient care programs for

2  inmates in the P-2 wing at the California Medical Facility (CMF), in the A-2 and A-3 wings at

3  CMF, in the D-5 and D-6 wings at Salinas Valley State Prison (SVSP), and in the new

4  Coalinga State Hospital.  Defendants have also doubled the size of the intermediate care

5  program at Atascadero State Hospital (ASH).  In order to monitor these vast changes in

6  defendants' system of inpatient care, the Court should appoint one of the existing court experts

7  to monitor these new programs and report to the court on the progress, safety, and quality of

8  care in these new programs, and to make any recommendations for changes to these programs

9  to improve safety and/or patient care.  Many of these new programs are operating with

10  significant waivers of state licensing requirements.  Although these temporary waivers are

11  necessary given the current bed shortages of crisis proportions, it is critical that the programs

12  be given in depth reviews and assessments by a clinical expert who can ensure that appropriate

13  care is being safely provided.

14    Defendants have not adequately documented the licensing and other barriers to rapidly

15  opening the interim bed expansion projects that they have committed to undertake.  See

16  Plaintiffs' 6/29/06 Objections to Defendants' June 15, 2006 Revised Interim Bed Plan at 17-

17  18.  Defendants have not complied with the May 2, 2006 Order's mandate that they present the

18  Court with a detailed assessment of the barriers to rapid opening of each such unit.  5/2/06

19  Order at 4 ("Defendants shall include with said interim plan, as appropriate, a list of any

20  statutory, licensing, or staffing barriers to implementation of any aspect of said plan.").  The

21  relevant projects include the Kern Valley State Prison mental health crisis bed unit, the

22  California Institute for Men mental health crisis bed project, the intermediate care facility

23  programs at Salinas Valley State Prison, the California Men's Colony locked observation unit

24  project discussed above, and the California Medical Facility intermediate care facility project

25  on P-2.  See 6/30/06 Order (granting building code waivers for KVSP); 7/20/06 Order

26  (waiving contracting code requirements for CMC construction project); 5/2/06 Order at ¶¶ 7, 8

27  (implicitly authorizing waivers for D-5 Wing and D-6 Wing intermediate care programs at

28  Salinas Valley State Prison).  See also Nolan Dec at ¶ 13 (defendants have approached

1  plaintiffs about waivers for CIM MHCB project but have not yet filed anything with the
2  Court).

3       As to each expansion project as to which the Court has granted defendants explicit or
4  implicit waivers of state law licensing requirements, the Court should order defendants to
5  present a plan to accelerate construction of permanent beds and end the temporary licensing
6  waivers and come into full compliance with state law licensing standards. The Special Master
7  should also assign one or more court experts to evaluate these new programs, especially those
8  operating with license waivers.

9                                    **CONCLUSION**

10      For all of the reasons set forth above, the Court should accept the Special Master's
11  Recommendations with the modifications and additions set forth in the proposed order
12  language below (and in the separate proposed order filed herewith).  The first four proposed
13  Orders are modifications to the Special Master's four recommendations:

14      1.      The program population projection methods in the revised and updated Navigant
15  Study are not accepted unless and until defendants demonstrate compliance with the following
16  conditions and limitations.  As recommended by the Special Master, defendants are required to
17  contract with Navigant Consultants to conduct annual population reviews and updates of their
18  projections for mental health program populations through FY 2008-09.  In order to enhance
19  the independence of Navigant in administering these updates, the Navigant service contract
20  shall be with the Division of Correctional Health Care Services, not with CDCR's Legal
21  Department.  The defendants shall also implement each of the recommendations on page 4 of
22  the Navigant Report for improving data collection and administration of the need estimates.
23  Dr. Warren, one of the Special Master's experts, is hereby assigned to work with the
24  defendants and Navigant to improve the projections and to ensure that all the necessary data is
25  collected to make the projections as accurate as possible.  Dr. Warren shall be empowered to
26  recommend changes in the figures and formulas in the bed need projections to the Court in the
27  event that defendants do not agree to her recommendations informally.

28      2.      The Special Master is directed to monitor closely the swap of acute inpatient

1  beds between California Medical Facility and Atascadero State Hospital and the status of

2  delays in the transfer of seriously mentally disordered inmates to mental health crisis beds

3  within 24 hours of a clinical referrals and report to the court in writing on these two issues

4  within 90 days and semiannually thereafter.

5  　　　　3.　　Defendants are ordered to submit within 30 days a final long range bed plan for

6  the provision of acute and intermediate inpatient beds, and MHCB beds, for all seriously

7  mentally ill male and female CDCR inmates clinically determined to be in need of those levels

8  of care.  The plan may not include any reduction in the number of intermediate inpatient care

9  or acute inpatient care beds initially proposed in the April 17, 2006 bed plan.  In addition, the

10 plan must include a realistic plan to expedite construction of all of the projects so that they will

11 be completed by June 30, 2010.  The plan shall also include a process for regular updates of

12 bed need projections, and ongoing  planning for new mental health beds based on the revised

13 projections.  If defendants' projections for acute inpatient beds continue to demonstrate a lack

14 of demand for additional acute beds in twelve months, once the parties and the Court experts

15 have thoroughly reviewed the projections and corrected any shortcomings, defendants may

16 present a plan to convert the acute beds to other clinical uses.  When defendants submit their

17 long-term plan for acute and intermediate and MHCB beds in the next 30 days, defendants are

18 reminded that they must comply with paragraph 3 of this Court's May 2, 2006 Order, which

19 required that they must include with their amended long term plan, "a list of those projects that

20 can be accelerated as well as a list of any statutory, licensing, or staffing barriers to such

21 acceleration and/or to timely opening of the projects described in the amended long term plan."

22 See 5/2/06 Order at ¶ 3.

23 　　　　4.　　Defendants are ordered to file within 60 days a plan for the provision of

24 enhanced outpatient program beds for all serious mentally ill male and female CDCR inmates

25 clinically determined to be in need of this level of care.  The plan must meet the anticipated

26 demand for EOP beds in the program population projections in the Navigant study.

27 Defendants may not close the 67 bed EOP program in the M-3 Wing at CMF.  Defendants'

28 plan for new EOP beds must include a realistic timetable, budget planning, and resource

allocations to eliminate the EOP bed shortfall by June 30, 2008.

5. Defendants are ordered to accelerate implementation of their plan for new EOP treatment programs in their Reception Centers so that the programs open on or before January 1, 2007. Defendants are also ordered to amend their proposal for expanded EOP treatment in reception centers to include full treatment programs for EOP inmates at Lancaster and Deuel Vocational Institute, and at a reception center for women.

6. Defendants are ordered to build their proposed new 50-bed mental health crisis bed unit at the California Men's Colony that is proposed in their June 15, 2006 Revised Interim Bed Plan. Defendants shall file within 60 days a realistic plan and schedule for construction of the new MHCB that will result in completion of the new MHCB unit by June 30, 2010. The plan shall also include the establishment on or before June 30, 2007, of an additional 33 interim MHCB beds to close the gap in MHCB beds identified by Dr. Farber-Szekrenyi in his testimony to this Court on April 26-27, 2006. That plan must also address the removal of long-term medical patients from Correctional Treatment Center Beds that then can be used as MHCB beds.

7. Defendants' Plans for a 40-bed interim intermediate inpatient care program bed expansions in the D-5 and D-6 units at SVSP is hereby approved, as is defendants' plan to create an additional 30 interim intermediate inpatient care beds in the P-3 Wing at CMF.

8. The Special Master is hereby directed to monitor the new intermediate care programs at CMF (on P-2, A-2 and A-3), Salinas Valley State Prison (on D-5 and D-6), Coalinga State Hospital, and the program expansion at ASH during the next six months, and to make a report to the court by March 30, 2007 concerning the progress, safety, and quality of care in these new programs, along with any recommendations for changes to these programs to improve safety and/or patient care.

/ / / /

/ / / /

/ / / /

/ / / /

9.     The defendants are ordered to file a response, within 14 days, to Plaintiffs'
Notice of Violations of May 2, 2006 Court Order, dated July 10, 2006.


Dated:  September 27, 2006                    Respectfully submitted,


                                             */s/ Michael W. Bien___*
                                             Michael W. Bien
                                             Rosen, Bien & Asaro
                                             Attorneys for Plaintiffs

I:\Corrected Plfs Objs to Supp SM Report on Bed Plans Sept 2006 9-25-06 489-3.doc

PLFS' SUPP BRIEF ON DEFS' COMPLIANCE WITH MAY 2, 2006 ORDERS RE INTERIM AND LONG RANGE BED PLANS,
NO.:  CIV S 90-0520 LKK-JFM M

20