PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>  Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>  Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**CORRECTED DECLARATION OF THOMAS NOLAN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF ON DEFENDANTS' COMPLIANCE WITH MAY 2, 2006 ORDERS REGARDING INTERIM AND LONG RANGE BED PLANS AND RECEPTION CENTER EOP PROGRAMS** |

I, Thomas Nolan, hereby declare:

1. I am an attorney admitted to practice law in California and an Associate at the law firm Rosen, Bien & Asaro, one of the counsel of record for the plaintiff class in the case. Except where stated to be on the basis of information and belief, I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Corrected Plaintiffs' Supplemental Brief On Defendants' Compliance with May 2, 2006 Court Orders Regarding Interim and Long Range Bed Plans and Reception Center EOP Programs.

2. The population of the CDCR has been growing steadily since this Court's hearing on Defendants' Bed Plan on April 26-27, 2006. According to population reports downloaded from the California Department of Corrections and Rehabilitation (CDCR) website, there were 172,213 inmates housed in the CDCR as of September 6, 2006, whereas on April 26, 2006, there were only 170,700 inmates housed in CDCR institutions. The difference is 1,513. Attached hereto as Exhibit A are true and correct copies of two population reports that I downloaded from the CDCR website on Monday September 18, 2006. The first report is dated September 11, 2006 and gives population data as of midnight September 6, 2006. The second report is dated May 1, 2006 and provides population data as of midnight on April 26, 2006.

3. Attached hereto as Exhibit B is a true and correct copy of a September 1, 2006 memo from the California Department of Corrections and Rehabilitation Acting Secretary James E. Tilton entitled "Special Session on Prison Overcrowding." The memo states that "I am deeply disheartened that the special legislative session concluded last night without the passage by the Assembly of any measure to provide either short-term relief or long-term remedies to alleviate the prison overcrowding crisis." The memo also notes "unprecedented levels of overcrowding to our institutions," and states that "You need to know that I remain concerned that the failure to pass any relief measures will lead the Department into an emergency situation that not only endangers your safety, but also places burdens on local governments and our communities." On August 30, 2006, defendants' counsel Lisa Tillman

-1-
DECLARATION OF THOMAS NOLAN ISO PLAINTIFFS' SUPPLEMENTAL BRIEF: No. CIV S 90-0520 LKK-JFM

1  e-mailed plaintiffs' counsel and Special Master Keating stating that "I understand the
2  California Legislature passed SB 1134 with the appropriation for the positions needed to meet
3  the court order of July 28, 2006." A true and correct copy of Ms. Tillman's August 30, 2006
4  e-mail is also attached hereto as part of Exhibit B, behind the memo from Agency Secretary
5  Tilton.

6  4. Attached hereto as Exhibit C is a true and correct copy of a September 1, 2006
7  Memorandum from CDCR Division of Health Care Services Director Peter Farber-Szekrenyi
8  to *Plata* Receiver Robert Sillen and *Coleman* Special Master Michael Keating. The memo
9  describes the likely impact of the pending Los Angeles County revocation of the contract
10 under which Los Angeles houses 1,300 CDCR inmates, mostly in the Pitchess Detention
11 Center.

12 5. Attached hereto as Exhibit D is a true and correct copy of the Health Care
13 Placement Unit Information Report, which is an excerpt from the defendants' July 3, 2006
14 Monthly Statistical Report. Our office received the report on July 21, 2006. This is the most
15 recent monthly statistical report we have received. I calculated the total number of existing
16 general population male EOP beds in the CDCR using this report. I added up the EOP
17 capacity column for non-Ad Seg male EOP programs and determined that current total EOP
18 capacity in the CDCR is 2,623. According to the new Navigant Bed Study (Ex. A to
19 Supplemental Report at 24), defendants will need 3,672 general population male EOP beds in
20 2007, meaning that if defendants do not add any more beds by 2007, there will be a shortage
21 of 1,049 EOP beds. The Special Master's Supplemental Report states that defendants will add
22 487 new EOP beds in 2007. See 9/11/06 Supplemental Report at 22. Presumably these
23 include the planned expansion of the California State Prison – Sacramento EOP program by
24 192 beds, and the expansion of the MCSP EOP program by 295 beds. See Exhibit C to
25 Supplemental Report at 9 of 9. Defendants should clarify these EOP bed expansion plans in
26 their EOP plan to be filed in 60 days.

27 6. On information and belief, in the 2006-07 Budget, the State Legislature approved
28 initial funding for the $600 million in bed expansions that this Court had approved in its May

2, 2006 Order. The approval of these funds is discussed by the Special Master in the September 11, 2006 Supplemental Report at 25-26 (discussing "recently enacted regular and capital budgets" for bed projects and the defendants' need to re-shape "already approved measures.").

7. Attached here to as Exhibit E are true and correct copies of monthly reports on MHCB referrals for the months of May 2006 and July 2006. The reports are routinely produced by defendants in this case, once each month. These reports show that in May of 2006 there were 110 referrals to MHCB beds at other institutions that could not be placed. The report for July of 2006 shows that during that month there were 83 referrals to MHCB beds at other institutions that could not be placed.

8. I have been the attorney most directly involved in inpatient issues for plaintiffs' counsel and I have carefully reviewed all prior bed studies, the UNA Study and defendants' plans. One major problem with the Navigant projections stems from the fact that the figures Navigant used for Average Length of Stay (ALOS) in both the Acute Psychiatric Program and the Intermediate Care Facility programs are significantly shorter than historical lengths of stay in those programs, possibly because of the flood of referrals immediately following the Unidentified Needs Assessment (UNA) study. In effect, it appears that the scarce existing inpatient beds were rationed following the UNA study by shortening lengths of stay in Intermediate Care Facility programs. This is obvious from the data in the Navigant study itself. The Navigant ICF chart uses a length of stay for the Salinas Valley State Prison Intermediate Care Program of 115 days for the years 2006 through 2011—a length of stay of roughly three and a half months. See Exhibit A to Supplemental Report at 16 (SVSP Table, ALOS row, 2006-2011 columns). By way of contrast, the average length of stay in the lower custody intermediate care program run by DMH at Atascadero State Hospital is 208 days – roughly twice the average length of stay for the Salinas Valley Program. The shorter SVSP length of stay may reflect an appropriate effort to triage cases during a time of severe bed shortages, but any projections forward should adjust the usage figures and the lengths of stay figures upwards to account for these factors. There were two conference calls held in June

1  and July of 2006 between plaintiffs' counsel, defendants' counsel, and the Special Master and
2  his experts concerning the new Navigant bed need projections. The first conference call was
3  on June 28, 2006 and lasted approximately one hour. The second conference call was on July
4  28, 2006, and also lasted approximately one hour. I participated in both conference calls.
5  During the second conference call on the Navigant figures, Dr. Warren raised concerns about
6  low lengths of stay in the SVSP inpatient program, and the impact of these lengths of stay on
7  the projections. Dr. Warren noted that ASH has a significantly longer average length of stay
8  than SVSP and noted that there might be some discharges early from the SVSP program for
9  non-clinical reasons.

10     9.     There are a number of serious additional problems with the Navigant bed
11 projections that the Special Master's Supplemental Report does not discuss. For example,
12 during the July 28, 2006 conference call on the Navigant bed need projections, defendants
13 admitted that they do not have an ongoing contract with Navigant whatsoever and thus no
14 work on the Navigant projections had been performed since June 30, 2006. These problems
15 with the Navigant bed need projections, as well as the concerns raised by the Special Master,
16 need to be the subject of further investigation and discussion between all the parties. To date
17 the parties have only had the two one-hour conference calls discussed above concerning the
18 dramatic and disturbing new Navigant projections. Plaintiffs' counsel has repeatedly
19 requested a face-to-face meeting with the Navigant experts as well as with the state officials
20 responsible for the April 15, 2006 bed plan. These requests have been refused and only the
21 two brief conference calls with Navigant have taken place.

22     10.    Another basis for skepticism about the accuracy of the new Navigant bed
23 projections is the fact that the 2002 Tucker Alan projections by the same study authors turned
24 out to be so inaccurate. In almost every category of need for male mental health beds, the
25 2002 Projections figures for bed need turned out to be far too low, compared to current
26 estimates of 2007 need:

27     Tucker Allen Projection for 2007    Current Est.2007 Need    Percentage
28     (from '02 Tucker Alan Report)    (from '06 Navigant Rep)    Difference

-4-
DECLARATION OF THOMAS NOLAN ISO PLAINTIFFS' SUPPLEMENTAL BRIEF: No. CIV S 90-0520 LKK-JFM

| | | | |
|---|---|---|---|
| ICF | 224 (p. 45) | 464 (p. 16) | 107% |
| APP | 187 (p.43) | 203 (p.10) | 9% |
| GP EOP | 2935 (p.48) | 3672 (p.24) | 25% |
| PSU | 274 (p.50) | 332 (p.26) | 21% |

As this chart makes clear, the estimates of need for 2007 in the 2002 study turned out to be badly flawed. Part of the reason for the poor projections was the failure of the CDCR to retain Mr. Misener and Navigant on an ongoing basis to adjust and update these figures, but this does not account for the full magnitude of the 2002 Tucker Alan study's errors. The UNA study made clear that the Tucker Allen method does not account for persistent under-referral of severely mentally ill inmates in a system with constrained capacity at higher levels of care. Because of these problems, the Court should not approve the new Navigant projections without further study and analysis of the figures, and without the requirements in the Special Master's Recommendations that the CDCR be required to retain Navigant on an ongoing basis to improve the CDCR's data collection and to update the projections periodically. See Supplemental Report at 26 (Recommendation 1).

11. Plaintiffs' June 30, 2006 Objections to Defendants' June 15, 2006 Revised Interim Bed Plans raised some issues that have since been resolved between the parties. For example, the parties agreed to the stipulation and proposed order covering the CMF/ASH Swap which was filed on August 11, 2006. Although plaintiffs initially objected to this portion of the plan, after negotiations with the Special Master and defendants, we agreed to allow this aspect of defendants' plan proceed. See 8/11/06 Stipulation and Proposed Order Re ASH/CMF Bed Plan. Although plaintiffs do not believe the swap with provide significant improvement in MHCB referrals because it does not create new resources, it might help defendants to fully utilize their existing resources.

12. Attached hereto as Exhibit F is a true and correct copy of Plaintiffs' Trial Exhibits 1629 and 1572 from the 1992 *Coleman* trial. The exhibit shows that in 1992 there were 150 APP beds and the population of the CDCR was 95,420. Since as noted above, the current population is 172,213, that means that since 1992, the population of the CDCR has

1    grown by 76,923, or 80 percent.  Thus, just to keep pace with the population growth during the
2    last 13 years, the CDCR would need to increase the number of available APP beds by 80
3    percent to a total of 270 beds.

4         13.    Attached hereto as Exhibit G is a true and correct copy of an August 17, 2006 e-
5    mail from Lisa Tillman, counsel for defendants, to myself and other plaintiffs' counsel and
6    Special Master Keating attaching an ex parte motion seeking to waive licensing requirements
7    for certain elements of the California Institute for Men mental health crisis bed conversion
8    project.  It does not appear that defendants have yet filed such a motion with the Court.

9         14.    Under my supervision, paralegals in our firm track all CDCR suicides in a
10   database.  We add the name of each inmate who commits suicide, and other key data relevant
11   to the suicide to the database when we receive suicide notifications and suicide reports from
12   defendants.  We also cross-check our database against the Special Master's and defendants'
13   annual suicide reports, and make adjustments to our tracking data where necessary.
14   According to our current tracking log, which does not count several deaths whose cause is
15   currently reported as unclear (cases which may upon further review turn out to be suicides), in
16   the first eight full months of 2006 (through August 31), there have been 34 suicides in the
17   CDCR, which would annualize to a rate of 51 suicides a year if the rate continues at the
18   current level for the last one-third of the year.  51 suicides in a year would result in an annual
19   rate above 29 suicides per 100,000 inmates, a rate more than double the national average for
20   prisons.  See Special Master's 2004 Suicide Report at 1 (reporting National Average for
21   prisons of 14 per 100,000).  Attached hereto as Exhibit H is a true and correct copy of
22   defendants' Annual Suicide Report for 2005.  According to the defendants' annual suicide
23   report for 2005, there were 36 suicides in 2005.  See Ex. H at 2.  According to the 2004
24   Special Master's suicide report, there were 26 suicides in the CDCR in 2004.  See Special
25   Master's Report on Suicides Completed in the California Department of Corrections and
26   Rehabilitation In Calendar Year 2004 at 3.  In 2003, according to the Special Master's 2003
27   Suicide Report, there were 36 suicides in the CDCR in 2003.  See Special Master's Report on
28   Suicides in Calendar Year 2003 at 2.  Attached hereto as Exhibit I is a true and correct copy of

the CDCR's January 4, 2005 Five Year Report of Suicides 1999-2003. According to this Report at p. 3, the highest number of suicides in that five year period was 35 suicides in 2003. Thus, if there are 51 suicides in 2006, it will be the highest number of suicides since at least 1999 and also the highest per capita rate since at least 1999.

I declare, under penalty of perjury, that the foregoing is true and correct, and that this declaration is executed in San Francisco, California on September 27, 2006.

*/s/ Thomas Nolan*
Thomas Nolan