**RALPH COLEMAN, et al., v. ARNOLD SCHWARZENEGGER, et al.,**

**CASE NO. CIV S-90-0520 LKK JFM P**


**EXHIBIT A**

**DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN
ADMINISTRATIVE SEGREGATION UNITS**



**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA 94283-0001

October 2, 2006

J. Michael Keating, Jr.                via:    Lisa Tillman
Office of the Special Master                   Deputy Attorney General
2351 Sussex Lane                               Department of Justice
Fernandina Beach, FL  32034                    1300 I Street, Suite 125
                                               P. O. Box 944255
                                               Sacramento, CA  94244-2550

RE:    **ADMINISTRATIVE SEGREGATION UNIT SUICIDE REDUCTION PLAN**

Dear Mr. Keating:

In compliance with the *Coleman* court order of June 8, 2006, please find enclosed the *Administrative Segregation Unit Suicide Prevention Plan*, which details the California Department of Corrections and Rehabilitation's (CDCR) plan to address the suicide trends in the administrative segregation units.

If you need clarification on any aspect of this plan, please contact me at (916) 327-0033, or Doug McKeever, Director (A), Mental Health Program, Division of Correctional Health Care Services (DCHCS), at (916) 327-1168.

Sincerely,

PETER FARBER-SZEKRENYI, DR., P.H.                    JOHN DOVEY
Director                                             Director
Division of Correctional Health Care Services        Division of Adult Institutions

Enclosure

J. Michael Keating, Jr.
Page 2

cc:    James Tilton, Secretary, CDCR
Kingston Prunty, Undersecretary, CDCR
Bruce Slavin, General Counsel, Office of Legal Affairs, CDCR
Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs, CDCR
Marisela Montes, Chief Deputy Secretary, Adult Programs, CDCR
David Runnels, Chief Deputy Secretary, Adult Operations, CDCR
Renee Kanan, M.D., MPH, Deputy Director, DCHCS, CDCR
Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations Branch, DCHCS, CDCR
George A. Sifuentes, Deputy Director, Office of Facilities Management, CDCR
Doug McKeever, Director (A), Mental Health Program, DCHCS, CDCR
Michael Stone, Staff Counsel, Office of Legal Affairs, CDCR
Vicki O'Shaughnessy, Staff Services Manager II, Clinical Programs and Policy Unit, DCHCS, CDCR

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

# ADMINISTRATIVE SEGREGATION UNIT
# SUICIDE PREVENTION PLAN

## I.  OVERVIEW OF COURT ORDER

On May 9, 2006, the *Coleman* Special Master filed the <u>Report on Suicides Completed in the California Department of Corrections [and Rehabilitation] in Calendar Year 2004</u>.  The Special Master recommended that the California Department of Corrections and Rehabilitation (or Department) be required to:

> "...develop by May 31, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units.  The plan must be based on an analysis of the causes for the increasing rate· and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units."

The Department responded to the recommendation by requesting to collaborate with the Special Master's experts, and to extend the completion of the plan by requesting the Court adopt August 31, 2006, as the date for completion of the plan.

Plaintiffs' counsel filed a series of responses to the report and requested that the Department obtain the necessary funding to implement any plan in September 2006, collaborate with Plaintiff's suicide expert, and include a schedule for implementation within the plan.

On June 8, 2006, Lawrence K. Karlton, Senior Judge, United States District Court, issued an order adopting the recommendation of the Special Master and the timeframe of August 31, 2006, for completion of the plan.  He ordered the Department to:

> "...include, as appropriate, a budget and implementation schedule for any policy and procedure changes, staffing or budget augmentation, and, if necessary, include a mechanism for obtaining mid-year funding on or before September 30, 2006."

In the course of discussions with Plaintiffs' counsel, the Department submitted a draft plan by September 5, 2006, and Plaintiffs' counsel agreed to permit an extension of the deadline for submission of the final plan to October 2, 2006.  The Court approved the request for an extension of the deadline for the following plan.

## II.    DESCRIPTION OF ANALYSIS OF CONTRIBUTING FACTORS RELATED TO SUICIDES IN ADMINISTRATIVE SEGREGATION UNIT

The Department's Division of Correctional Health Care Services Suicide Prevention and Response Focused Improvement Team met in early June and identified a methodology for the analysis of causes (contributing factors) of increased suicides in Administrative Segregation Units and the preparation of a plan for submission to the *Coleman* court. The process included an in-house analysis of identifiable common factors of all Administrative Segregation Unit suicides in 2004, and an external consultation with a panel including the Special Master's experts, the plaintiff's expert, and California Department of Corrections and Rehabilitation's experts. In addition, the Suicide Prevention and Response Focused Improvement Team undertook a review of ideas or initiatives focused on Administrative Segregation Unit suicide risk reduction that have not been implemented, and identified current policies that have been partially implemented.

The Suicide Prevention and Response Focused Improvement Team met to reach consensus about general areas to investigate in the analysis of contributing factors to Administrative Segregation Unit suicides. The Suicide Prevention and Response Focused Improvement Team identified five major areas (contributing factors) that can contribute to an Administrative Segregation Unit suicide, including: mental health treatment issues; family/external social issues; custodial factors; in-prison safety/social issues; substance abuse issues; and "other", (See Attachment A). Each factor had several components identified by the Suicide Prevention and Response Focused Improvement Team. Subsequently, acting as independent reviewers, two members of the Division of Correctional Health Care Services senior mental health staff read each report of a suicide in Administrative Segregation Unit during 2004. The reviewers identified and tallied the number of times a general factor and its secondary components appeared in the report as contributing factors leading to the inmate's suicide. The reviewers conferred to identify contributing factors that each had identified. Finally, the reviewers compared their findings to those in the Special Master's expert report for each suicide. At the end of the process the tallies for each major contributing factor and its components were totaled to identify the most prominent contributing factors that were identified in the reports (and in Dr. Patterson's reviews) as leading to the suicide of the inmate.

The most frequent factors identified by the reviewers were (listed from most to least frequently identified): Mental Health, Custodial Factors, In-Prison/Safety, Other Issues, Family/External Issues. Within the Mental Health factor the most frequently identified secondary factor was inadequate suicide risk or mental health assessments, underestimation of acuity, lack of referral to a higher level of care, decompensation, and poor follow-up. Custodial issues included change in commitment time, the fact of Administrative Segregation Unit placement, and other factors such as District Attorney referrals, long Administrative Segregation Unit term, imposition of Security Housing Unit term, or violent rules violation. In-prison Safety/Social Issues encompassed fearfulness, reports of being threatened by others, and removal of a peer group.

Simultaneously with the review of 2004 suicides in Administrative Segregation Unit, the Suicide Prevention and Response Focused Improvement Team reviewed its meeting minutes, Action Item Log, and suicide prevention policy memoranda from the past two years to identify practices and policies that either had not been implemented or had been partially implemented to be part of the presentation to the expert consensus panel.

## III.    DESCRIPTION OF EXPERTS MEETING

The expert panel was conceived as a method to bring together subject-matter experts in suicide prevention and to reach consensus on a number of areas and actions to assist the Department in developing the court-ordered plan.

The Department sponsored three experts from around the nation: John Stoner, Ph.D., Colorado Department of Corrections; Thomas White, Ph.D., formerly Federal Bureau of Prisons; and Bill Kissel, M.S., formerly Georgia Department of Corrections. All three have been involved in training in suicide prevention, correctional mental health service delivery, and prison litigation. Plaintiff's expert was Lindsay Hayes, M.S. of the National Center for Institutions and Alternatives, an acknowledged national expert on jail/prison suicide prevention. The Special Master's experts were Jeffrey Metzner, M.D. and Ray Patterson, M.D. Both are acknowledged experts in correctional mental health services delivery and prison suicide issues.

On July 14, 2006, the consensus panel met in San Francisco for eight hours. In addition to the expert participants, others included Special Master J. Michael Keating, Division of Correctional Health Care Services Mental Health Program staff (Drs. Chaiken, McAloon, Steenman, Canning, and Program Director Doug McKeever), Teresa Schwartz, Associate Director, General Population Levels III & IV from the Division of Adult Institutions; Michael Stone, Staff Counsel, of the California Department of Corrections and Rehabilitation Office of Legal Affairs; plaintiff's counsel Jane Kahn and Lori Rifkin.

After introductions and a review of the agenda, Drs. Chaiken and Canning presented background and statistical data on suicides in Administrative Segregation Unit, highlights of the Division of Correctional Health Care Services suicide prevention policy, mental health services in Administrative Segregation Unit, and current and recent initiatives to reduce the risk of suicide in Administrative Segregation Units. In addition, staff presented an overview and the results of the contributing factors analysis.

Discussion by the participants centered on a variety of issues: environmental/physical plant factors, screening and evaluation issues, custodial procedures, and monitoring and auditing of practices.

## IV.    PANELISTS' AND PLAINTIFFS/COUNSELS' RECOMMENDATIONS ON MEANS TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS

During the afternoon, the panel participants discussed the following recommendations that should be considered for inclusion in the plan submitted to the court.

A. Environmental/Physical Plant:

   1) Intake Cells: A percentage of cells in each Administrative Segregation Unit statewide should be reserved for new arrivals. Inmates newly housed into Administrative Segregation Units would be housed in these intake cells. The expert panel recommended that inmates be housed in intake cells for two to three weeks. The Department

recommends that inmates be housed in intake cells for a minimum of 72 hours. These cells would be located in areas that afford more opportunity for observation and interaction between custody staff and the inmate. (Note: Subsequent to the expert panel, Suicide Prevention and Response Focused Improvement Team determined that if, on initial arrival in Administrative Segregation Unit, an inmate can safely be housed with a cellmate, then the inmate would not need to be placed into one of the designated intake cells, since having a cellmate has proven to be a protective factor against suicide risk.)

2) Intake Cells: All intake cells should be retrofitted to reduce availability of hanging attachment sites.
    - When possible, beds should be concrete slab construction.
    - Dangerous protrusions should be eliminated and if possible replaced with "pull away" fixtures.
    - Vent coverings should be installed to reduce use of vent openings as attachment sites for ligatures.
    - Light coverings should be retrofitted to prevent use as attachment sites.
    - If possible, cell doors should be retrofitted or replaced with doors having more window area to increase visibility of cell interior.

B. Custodial Procedures

1) Title 15 Requirements: During the time that inmates are housed in the Administrative Segregation Unit intake cells, or are within the first two to three weeks after placement into Administrative Segregation Unit, the Department should ensure they receive all Title 15 requirements for out-of-cell time and privileges.

2) Confidential Mental Health Interviews:  All inmates housed in Administrative Segregation Unit who meet with mental health staff should have their interviews in private settings (affording confidentiality of sight and sound from other inmates and confidentiality of sound from staff).  Custody should announce these interviews as "health appointments" to avoid stigmatization and possible retribution of other inmates.

3) Reduction in Length of Stay:  The length of time inmates remain in Administrative Segregation Units should be shortened.

4) Return-from-Court ("Bad News") Information:  Inmates returning from court dates often experience increased distress due to "bad news" such as additional incarceration time or adverse court proceedings such as loss of parenting rights. Several institutions have created standardized ways to capture this information and alert mental health staff about possible mental health crises.  Division of Correctional Health Care Services Suicide Prevention and Response Focused Improvement Team should standardize a statewide system to capture such information and communicate that information to mental health staff utilizing a combination of methods developed at Folsom State Prison and the California Correctional Institution.

C. Mental Health Screening, Coordination, and Treatment

1) Pre-placement Suicide Prevention Screening: All inmates placed into Administrative Segregation Unit should have a brief suicide risk screening done as part of their pre-placement medical screening. Results of the brief suicide-risk screening should be used to determine any need for further mental health evaluation, and should be noted in the chart on a chrono.

2) Post-placement Screening: All inmates receive the 31-item screening according to Mental Health Service Delivery System Program Guide timelines. The information available in the Mental Health Tracking System regarding Suicide Risk Factors should be used in order to corroborate self-report from the 31-item screening. The screening interview should be administered in a private, confidential setting. If an inmate refuses screening, a mental health clinician should contact the inmate at cell-front, should review the Unit Health Record, and should contact custody staff in the Administrative Segregation Unit to gather additional information regarding the inmate's mental state.

3) Daily Coordination: By policy memorandum of May 2005, the Department requires that each morning an assigned Licensed Psychiatric Technician should meet with Administrative Segregation Unit staff (including a Sergeant) to solicit information about new arrivals in Administrative Segregation Unit or inmates who may require clinical attention. Henceforth, this meeting should include the assigned Administrative Segregation Unit mental health clinician (social worker or psychologist). Suicide risk data on new arrivals should be available at the meeting to alert custody staff. Clinical concerns should be discussed.

4) Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub Institutions: When an inmate is referred to the Administrative Segregation Unit Enhanced Outpatient Program level of care, there should be a 60 day period of time before the receiving Administrative Segregation Unit Hub Institution can refer the inmate-patient back to Correctional Clinical Case Management System level of care.

D. Quality Management

1) Auditing Case Manager Review of Rounds Notes: Institutional mental health supervisors should regularly audit Administrative Segregation Unit case manager's assessment/review of the License Psychiatric Technician weekly notes including who needs referral for further evaluation for higher level of care.

2) Audit of Screening Refusals: Supervisory staff should regularly audit the percentage of inmates who refuse initial Administrative Segregation Unit mental health screening interviews. If the frequency of refusals exceeds 30% in a 30-day period, a Quality Improvement Team should be created to determine the cause of the refusals and a strategy to improve voluntary participation by inmates in the screening process.

3) Audit of Administrative Segregation Unit Suicide Prevention: Regional Quality Management Assistance Teams should regularly audit the quality of suicide prevention efforts statewide in Administrative Segregation Unit including adherence to all Mental Health Services Delivery System Program Guide requirements, evaluation of the quality of screening and rounds, quality of the daily staff meeting, adherence to suicide prevention measures such as provision of an inmate-orientation pamphlet, and compliance with out-of-cell contacts. A report should be sent through the chain of command to the Health Care Manager and Warden of each institution, and reviewed by the Suicide Prevention and Response Focused Improvement Team.

E. Non-Disciplinary Segregation

Inmates in Administrative Segregation Units for non-disciplinary reasons should be placed in different housing and/or receive more property than is allowed in disciplinary segregation.

F. Custody Welfare Checks

Custody hourly rounds standard, should be increased to include a welfare check every 30 minutes to determine that every inmate is alive, and accounted for.

G. Double Celling

Every effort should be made to double-cell inmates in Administrative Segregations Units, when possible.

H. Emergency Response – Continuous Quality Improvement

Continuous Quality Improvement in Emergency Response is critical to preventing suicides. The Department should make every effort to ensure compliance with current policies.

V.   CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S RESPONSES TO RECOMMENDATIONS AND IMPLEMENTATION PLAN

The following describes the plan to implement suicide prevention recommendations in Administrative Segregation Units. Recommendations that were not fully adopted are discussed.

A1)   Intake Cells:
A percentage of cells in each Administrative Segregation Unit statewide will be retrofitted to reduce the opportunity for inmates to commit suicide. The institutions have been surveyed to determine average intake by Administrative Segregation Unit building and the most appropriate location for the "Intake Cells" based upon proximity to staff traffic and ease of observation from control booths, where applicable. The number and location of cells to be retrofitted has been developed based upon the data received from the institutions, (See Attachments B and C). Inmates newly housed into Administrative Segregation Units will be housed in these intake cells, when they cannot be celled with a cell partner. Inmates that are double celled upon intake will be celled where the vacancy

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

exists.   The Department recommends that inmates be housed in intake cells for a minimum of 72 hours.  These cells will be located in areas that afford more opportunity for observation and interaction between custody staff and the inmate. (Note:  Subsequent to the expert panel, Suicide Prevention and Response Focused Improvement Team determined that if, on initial arrival in Administrative Segregation Unit, an inmate can safely be housed with a cellmate, then the inmate would not need to be placed into one of the designated intake cells, since having a cellmate has proven to be a protective factor against suicide risk.)

**A2)**   **Retrofit Intake Cells:**
The Division of Adult Institutions has identified 406 cells disbursed among 64 housing units at 33 adult prisons to be designated as Administrative Segregation Unit Intake Cells. To the degree possible, the proposed intake cells will be retrofitted to reduce availability of hanging attachment points.  Proposed retrofit modifications include:
- the installation of concrete slab beds,
- the elimination of protrusions in the cell,
- the replacement of cell vents or the installation of cell vent coverings,
- the replacement of cell light fixtures or the installation of light coverings, and
- the replacement or modification of cell doors to increase visibility of cell interior.

Given the diversity (physical plant design, age, construction materials, etc.) of the Administrative Segregation Unit cells at each of the Department's prisons, the Department must be thoughtful, discerning, and deliberate in their planning and implementation of the proposed retrofits.  The Office of Facilities Management must perform site-by-site Architectural and Engineering assessments (architectural, structural, mechanical) to develop project scopes, designs, project cost estimates and schedules. Architectural and Engineering design is imperative given potential impacts to: building foundations due to the weight of proposed concrete bed slabs; to Heating, Ventilation, and Air Conditioning systems; and air and smoke evacuation flows due to vent coverings/modifications, and to the integrity of cell security due to the need for increased cell visibility.

Based upon a priority list developed by the Division of Correctional Health Care Services, the Office Of Facilities Management has developed a three phase plan to assess, design and implement the proposed physical plant retrofit.  The Office of Facilities Management estimates that the conversion of all 406 cells can be accomplished using a three-phased approach with the following schedule:
- **Phase one** includes 160 cells disbursed among 27 housing units at 11 prisons. The Office of Facilities Management will conduct site-by-site Architectural and Engineering assessments and associated design work during the 2007/2008 Fiscal Year, with construction modifications (special repairs) taking place during the 2008/2009 Fiscal Year.
- **Phase two** includes 132 cells disbursed among 21 housing units at 11 prisons. The Office of Facilities Management will conduct site-by-site Architectural and Engineering assessments and associated design work during the 2008/2009 Fiscal

Year with construction modifications (special repairs) taking place during the 2009/2010 Fiscal Year.

- **Phase three** includes 114 cells disbursed among 16 housing units at 11 prisons. The Office of Facilities Management will conduct site-by-site Architectural and Engineering assessments and associated design during the 2009/2010 Fiscal Year with construction modifications (special repairs) taking place during the 2010/2011 Fiscal Year.

**B1)    Title 15 Requirements:**

The Department will ensure Title 15 requirements for out of cell time and privileges are a priority for all inmates during the first three weeks after placement in the Administrative Segregation Unit.

Institutions will be directed to develop methods to identify inmates in their first three days of Administrative Segregation Unit placement to staff in the units. An identifying marker, including date of intake, will be used on the cell front to indicate where newly placed Administrative Segregation Unit inmates are housed upon intake.

Within the constraints of physical plant limitations, every institution is expected to immediately ensure that inmates in the Administrative Segregation Units are offered access to the exercise yard for the departmental minimums, as identified in the California Code of Regulations, 3343(h). Institutions with Small Management Yard facilities should offer newly placed Administrative Segregation Unit inmates access to "Walk-Alone" yard as quickly as possible, within the guidelines of the classification process, and with safety and security as top priorities.

Staff shall account for out-of-cell time for inmates assigned to Administrative Segregation Unit, including, but not limited to, California Department of Corrections and Rehabilitation 114-D, Segregation Order and California Department of Corrections and Rehabilitation Rule Violation Report hearings, Unit Classification Committee, Institutional Classification Committee, medical ducats, interviews, visiting, showers, yard and all other out of cell periods. All out-of-cell time for inmates assigned to Administrative Segregation Unit shall be documented on the California Department of Corrections 114-A, Detention/ Segregation Record. Institutions shall continue to audit the California Department of Corrections 114-A, Detention/ Segregation Records on a weekly basis to ensure compliance with departmental mandates.

Presently, the Office of Audits and Compliance completes reviews throughout the year of administrative segregation and due process operations at various institutions. One portion of this audit evaluates institutional compliance with access to exercise yards for inmates housed in Administrative Segregation. These reports are submitted to the Directorate and assigned to the appropriate Associate Director for assessment and response.

No later than **October 30, 2006**, a survey will be distributed to every institution that maintains Administrative Segregation Units. Each institution will be directed to provide

current information regarding the number and location of Small Management Yards for inmates housed in Administrative Segregation Units. In addition, on a monthly basis each institution will be required to assess, record, and track the current yard access provided to inmates in Administrative Segregation Unit. Finally, each institution will need to provide a list of barriers to meeting the mandated hours of yard access, (i.e. staffing issues, physical plant issues, etc.). This information will be used to assess the need for additional resources to meet the mandated out of cell time.

For the past several years, the Department has been implementing a plan to increase the number of Small Management Yards available as part of the Department's Five Year Infrastructure Plan. A recent review reflects the Department's total Small Management Yard need at 1,342 yards, with 921 being constructed and/or funded as of Fiscal Year 2006/2007. This leaves 441 Small Management Yards that need to be funded and constructed in future years. The Division of Adult Institutions and Office of Facilities Management will continue to work collaboratively to assess current allocation and location of Small Management Yards at each institution and incorporate the findings of the aforementioned survey into the Small Management Yard planning process. The Administration will continue to request additional resources, to the extent needed, through the annual budget process, (See below Section VII *Fiscal Impact*).

**B2) Confidential Mental Health Interviews:**

Current estimates indicate that appropriate space in Administrative Segregation Units can be prioritized for the purpose of providing Confidential Mental Health Interviews. The Division of Adult Institutions and Office of Facilities Management will work collaboratively to assess current space availability for these interviews at each institution to validate these current estimates. In addition, Division of Adult Institutions and Office of Facilities Management will complete an assessment of additional resources needed (plant and staffing)[1]. The Administration will request additional resources, to the extent needed, through the annual budget process, (See below Section VII *Fiscal Impact*).

**B3) Reduction in Length of Stay:**

A Sensitive Needs Yard for Level IV inmates will be available at Mule Creek State Prison in January 2007, which is expected to reduce length of stay for qualifying inmates.

In December 2005, Mr. Dave Runnels, then Deputy Director of the Division of Adult Institutions, directed institutions in Administrative Segregation Overflow status to begin producing Corrective Action Plans outlining the institution's plan to reduce the number of inmates in Administrative Segregation Unit Overflow. These reports are submitted and reviewed on a monthly basis.

In addition, a separate weekly report is compiled by the Institution Support Division, detailing the status of all Administrative Segregation Unit buildings in terms of current

---

[1] This assessment will consider the appropriation recently approved by the Legislature for the Budget Change Proposal that was submitted in August 2006, which included dedicated custody personnel assigned to Administrative Segregation Unit mental health escorts, and additional clinical staff for Administrative Segregation Units statewide.

capacity, population and single-cell inmates, (See Attachment D).   Issues related to Administrative Segregation Unit housing that are identified in this review are referred to the appropriate Associate Director for response and follow-up.   Conference Calls with impacted Wardens are periodically scheduled to develop strategies for Administrative Segregation Unit reduction through timely release of inmates, completion of investigations and disciplinary proceedings.

On a monthly basis, the Office of Audits and Compliance completes an *Audit of Administrative Segregation and Due Process Operations* at a different prison.   While this audit does not specifically address the issue of "Length of Stay", it does evaluate that institution's compliance with the 90 day review of cases.   These reports are submitted to the Directorate and assigned to the appropriate Associate Director for assessment and response.

The Computer Statistics (or COMPSTAT) review process implemented in April 2006 by the Secretary of Corrections is an in-depth analysis of each institution's performance based upon statistical data.   This information is compiled by the COMPSTAT unit and shared with the Secretary of Corrections and the Director of the Division of Adult Institutions, among others, during a formal presentation.   The COMPSTAT format has been modified to include the Administrative Segregation Average Length of Stay for both Administrative Segregation Units and Administrative Segregation Unit Overflows.

The Division of Adult Institutions is working to identify barriers to the transportation of endorsed inmates to appropriate programs from Administrative Segregation Units throughout the State.   The Director of Corrections will be issuing a memorandum to all institutions directing them to review the status of all inmates currently in Administrative Segregation Unit with stays beyond 30 days.   Institutions will be required to identify inmates awaiting transfer, disciplinary hearings and District Attorney review.    In addition, the memorandum will direct institutions to take aggressive steps to ensure the expeditious release of inmates from the Administrative Segregation setting, as soon as possible within Departmental policy.

*The Department has reviewed and adopts each of the recommendations stated above in Section IV. subsections B4 through D3.   In order to implement these recommendations the Department plans to complete the following:*

**B4)    Return-from-Court ("Bad News") Information:**
A policy change adopting the aforementioned recommendation will be implemented system-wide by December 2006.   In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C1)    Pre-placement Suicide Prevention Screening:**
A pre-placement suicide prevention screening in accordance with the aforementioned recommendation will be implemented by June 2007.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

**C2)** **Post-placement Screening:**
Direction was provided to institutional staff via the following memoranda:
- *Transfer of Mental Health Tracking System Suicide History Information*, (Attachment E), and
- *Plan to Reduce Suicide Risk in Administrative Segregation Units*, (Attachment F).

In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C3)** **Daily Coordination:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C4)** **Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub Institutions:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**D1)** **Auditing Case Manager Review of Weekly Rounds Notes:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**D2)** **Audit of Screening Refusals:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F), with an audit system to be developed by the end of October 2006. A memorandum will be distributed in November 2006 system-wide requiring an audit of compliance. In addition, the Quality Management Assistance Team will conduct an initial audit of compliance at selected institutions in January 2007, and at all institutions in March 2007.

**D3)** **Audit of Administrative Segregation Unit Suicide Prevention:**
The Quality Management Assistance Team will conduct an initial audit of compliance, as recommended above, at selected institutions in January 2007, and at all institutions in March 2007.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

**E)**   **Non-Disciplinary Segregation**

The Division of Adult Institutions believes the recommendation for separate housing and/or property retention by inmates placed in Administrative Segregation Unit housing for non-disciplinary reasons would compromise the safety and security of the institution, it's staff and inmates remanded to the custody of the Department.

Providing inmates who are in Administrative Segregation Units for non-disciplinary reasons with more personal property than those who are in Administrative Segregation Units for disciplinary reasons may lead to stigmatization and possible retribution of other inmates.  The Division of Adult Institutions believes that inmates allowed additional property would be subjected to pressure in the form of threats of physical attack, and psychological torment.  This pressure would be intended to influence those inmates to relinquish their personal property to other inmates placed in Administrative Segregation Unit for disciplinary reasons.  In addition, this change would readily identify inmates processed into Administrative Segregation Unit with their property as being confidential informants or as needing special protection from General Population inmates. Any of these circumstances would make the non-disciplinary inmates difficult to house on any general population facility for the remainder of their prison term.

Attempting to accomplish this by separating inmates within the housing unit may work for short periods of time, but Administrative Segregation Unit populations vary too significantly to rely on the disciplinary/non-disciplinary qualifier as a secure and practical determinant of housing.  Some institutions may be able to utilize different tiers or sections of housing units to separate these populations, however, the demands on bed-space would ultimately result in these populations being housed in proximity to one another.

Due to the Department's current housing crisis, separate housing for inmates placed in Administrative Segregation Units for disciplinary and non-disciplinary reasons is unreasonable.  This modification would seriously reduce available bed space for both Administrative Segregation and General Population housing.

In addition, an inmate's placement status into an Administrative Segregation Unit is not usually as simple as disciplinary/non-disciplinary.  Many inmates who do not have pending disciplinary issues, but fear for their safety, have this fear as a result of behavior that is inconsistent with State Law, Departmental Regulations, and Institution Policies. Examples of these behaviors are participating in narcotics activity for which the inmate fails to pay, or gang activity where the inmate is unable to follow through with activities the gang has ordered.

The Department maintains continued skepticism regarding additional property allowances for non-disciplinary Administrative Segregation Unit placement inmates. However, the Division of Adult Institutions will assess the success of the property portion of the Madrid court-ordered Pilot Project at Pelican Bay State Prison (Pelican Bay State Prison Administrative Segregation Correctional Clinical Case Management System Mental Health Management Program) following the one year anniversary of its implementation, beginning on **March 6, 2007**.  The assessment will be submitted to the Court no later than **May 31, 2007**.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

**F)** **Custody Welfare Checks**
The American Correctional Association standard for a "Welfare Check" is, *"All special management inmates shall be personally observed by a correctional officer at least every 30 minutes at an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation."* American Correctional Association 4-4257.

Currently, custody staff assigned to Administrative Segregation Units are required to perform *hourly* security checks to ensure inmates are accounted for and secured within their assigned housing. Requiring a 'Welfare Check' of all inmates housed in Administrative Segregation Unit *every 30 minutes* would further strain the resources available to the Department.

The Division of Adult Institutions is unable to proceed with the recommendations of the experts as they relate to hourly Welfare Checks at this time. However, Division of Adult Institutions will re-evaluate the impact of implementation of this proposal in terms of workload impact and resource allotment. Division of Adult Institutions will complete an assessment of resources necessary to implement this recommendation, and submit a request for resources to the Legislature through the budgetary process.

**G)** **Double Celling**
The California Department of Corrections and Rehabilitation currently double-cells inmates in Administrative Segregation whenever possible. Institutions with physical plant limitations (over/under cell design) house inmates in single-cell situations for extended periods of time. In addition, some inmates have classification criteria that prohibit double-celling. Wardens will be encouraged to place inmates into double-celled housing whenever possible, especially when the inmate is initially placed into Administrative Segregation Unit.

**H)** **Emergency Response**
The California Department of Corrections and Rehabilitation is reviewing and aggressively investigating failures by staff to initiate Cardio-Pulmonary Resuscitation during emergency response.

The Director of the Division of Adult Institutions will be issuing a memorandum directing Wardens to provide all assigned Administrative Segregation Unit staff with refresher training regarding their responsibility to immediately initiate Cardio-Pulmonary Resuscitation when the inmate's condition warrants Cardio-Pulmonary Resuscitation. This training will be ordered to be completed no later than **October 31, 2006**, with Proof of Practice submitted to the appropriate Associate Director.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

## VI.    CLINICAL ROUNDING IN ADMINISTRATIVE SEGREGATION UNITS

The Department will continue to provide daily rounds by a Licensed Psychiatric Technician (or by a mental health clinician) for all inmates housed in Administrative Segregation Units. Resources to facilitate compliance with this requirement were included with the Budget Change Proposal that was submitted to the Legislature in August 2006. The Mental Health Services Delivery System Program Guide will be revised through the annual revision procedure in January 2007 to delete language that indicates possible future reduction in this requirement for inmate-patients not included in the Mental Health Services Delivery System.

## VII.   FISCAL IMPACT

To the extent that components in this plan are found to result in the need for additional resources, the Administration will submit a budget request to the Legislature for consideration through the annual budget process. Requests are made to the Legislature in January, and can also be made during the spring process. To the extent that resources are needed in the current fiscal year, these resources could be secured through either Item 9840-001-0001, Budget Act of 2006, or through a supplemental appropriation from the Legislature, whichever is determined to be most appropriate.

STATE OF CALIFORNIA
ATTACHMENT A
ADMINISTRATIVE SEGREGATION UNIT SUICIDE PREVENTION PLAN
DEPARTMENT OF CORRECTIONS & REHABILITATION

# CONTRIBUTING FACTOR ANALYSIS – SUICIDES IN ASU

Reviewer: _____
Inmate's Age at time of death: _____
Ethnicity: _____
Institution: _____
LOC: _____
CDC#: _____
Custody Level: _____

| Mental Health Treatment | Family/External Social Issues | Custodial Factors | In-Prison Safety/Social Issues | Substance Abuse | Other |
|---|---|---|---|---|---|
| Decompensation | Bereavement | Commitment time | Fearful | Type | Poor communication between custody and MH staff |
| Poor follow-up | Other loss | Change in commitment time | Assault victim | | Poor identification of individual needs that should have over-ridden ASU rules. ASU rule |
| Non-compliance | Lack of support | Paroling | Received threats | | Emergency Response |
| Inadequate treatment | Perceived threat to family | DA referral | Debts | | Medical Condition |
| Emotional change in response to stress factors | | RVRs – 90 days | Relationship | | |
| Cognitive change in response to stress factors | | Long ASU > 90 days | Other | | |
| Inadequate Suicide Risk Assessment | | SHU term | | | |
| | | Fact of ASU placement | | | |
| | | First time in ASU | | | |
| | | Violent RVR | | | |
| | | Single Cell | | | |

**LIST OF ACRONYMS**

| | |
|---|---|
| ASU | Administrative Segregation Unit |
| CDC | California Department of Corrections |
| LOC | Level of Care |
| MH | Mental Health |
| DA | District Attorney |
| RVR | Rules Violation Report |
| SHU | Secured Housing Unit |

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEPT '05 INTAKE | DEC '05 INTAKE | MAR '06 INTAKE | JUNE '06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 3-DAY INTAKE | # OF CELLS TO BE MODIFIED | CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| ASP - UNIT 140 | 270 | 30 | 100 | 100 | 120 | 80 | 7.87 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CAL - ASU #1 | Stand Alone | 24 | 26 | 24 | 26 | 25 | 2.46 | 3 | 100, 101, 102 |
| CAL - A5 | 270 | 71 | 93 | 83 | 75 | 80.5 | 7.92 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CCC - LASSEN, Bldg 4 | 270 | 120 | 50 | 120 | 80 | 92.5 | 9.10 | 9 | 123, 124, 125, 126, 127, 224, 225, 226, 227 |
| CCI - UNIT II | Old Style | 39 | 29 | 19 | 49 | 34 | 3.34 | 3 | |
| CCI - 4A ASU | 180 | 87 | 143 | 78 | 125 | 108.25 | 10.65 | 11 | 111, 112, 113, 114, 115, 116, 212, 213, 214, 215, 216 |
| CCI - 4B ASU | 180 | 19 | 23 | 27 | 38 | 26.75 | 2.63 | 3 | 113, 114, 115 |
| CCWF | 270 | 33 | 38 | 58 | 42 | 42.75 | 4.20 | 4 | 124, 125, 126, 127 |
| CEN - C6 | Stand Alone | 112 | 106 | 96 | 114 | 107 | 10.52 | 11 | 101 through 111 |
| CEN - A5 | 270 | 99 | 56 | 73 | 77 | 76.25 | 7.50 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CIM - PALM HALL | Telephone | 80 | 75 | 80 | 70 | 76.25 | 7.50 | 8 | 118 through 125 |
| CIM - CYPRESS HALL | Telephone | 70 | 80 | 75 | 80 | 76.25 | 7.50 | 8 | 110 through 117 |
| CIW | 270 | 20 | 130 | 110 | 30 | 72.5 | 7.13 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| CMC - B4 Annex | Quad | 152 | 165 | 143 | 190 | 162.5 | 15.98 | 16 | 4151, 4152, 4197, 4198, 4254, 4255, 4256, 4257, 4295, 4296, 4297, 4298, 4302, 4303, 4345, 4346 |
| CMC - Central ASU | Quad | 9 | 9 | 16 | 21 | 13.75 | 1.35 | 1 | 102 |
| CMF - UNIT IV | Telephone | 29 | 35 | 14 | 35 | 28.25 | 2.78 | 3 | 101, 102, 103 |
| CMF - I3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| CMF - P3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| CMF - S3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| COR - 3A03 | 270 | 50 | 56 | 84 | 50 | 60 | 5.90 | 6 | 123, 124, 125, 126, 127, 128 |
| COR - ASU1 | Stand Alone | 31 | 42 | 85 | 50 | 52 | 5.11 | 5 | 101 through 105 |
| COR - 4B1R | 180 | 29 | 29 | 29 | 29 | 29 | 2.85 | 3 | 113, 114, 115 |
| CTF - O WING | Telephone | 40 | 80 | 100 | 95 | 78.75 | 7.75 | 8 | 101 through 108 |
| CTF - X WING | Telephone | 20 | 40 | 50 | 45 | 38.75 | 3.81 | 4 | 101 through 104 |
| CVSP | 270 | 74 | 115 | 61 | 105 | 88.75 | 8.73 | 9 | 123, 124, 125, 126, 127, 224, 225, 226, 227 |
| DVI - J WING | Telephone | 300 | 300 | 300 | 300 | 300 | 29.51 | 30 | 101 through 130 |
| FSP - UNIT IV ASU | Telephone | 60 | 60 | 60 | 70 | 62.5 | 6.15 | 6 | 101 through 106 |
| FSP - UNIT I ASU O/F | Telephone | 18 | 14 | 14 | 26 | 18 | 1.77 | 2 | 101, 102 |

September 25, 2006

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEPT '05 INTAKE | DEC '05 INTAKE | MAR '06 INTAKE | JUNE '06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 3-DAY INTAKE | # OF CELLS TO BE MODIFIED | CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| HDSP - Z UNIT | Stand Alone | 14 | 20 | 21 | 20 | 18.75 | 1.84 | 2 | 101, 102 |
| HDSP - D7 | 180 | 31 | 20 | 16 | 21 | 22 | 2.16 | 2 | 113 & 114 |
| HDSP - D8 | 180 | 56 | 46 | 49 | 52 | 50.75 | 4.99 | 5 | 112, 113, 114, 115, 116 |
| ISP - A5 | 270 | 41 | 46 | 36 | 79 | 50.5 | 4.97 | 5 | 123, 124, 125, 126, 127 |
| KVSP - ASU #1 | Stand Alone | | | | | 0 | 0.00 | 5 | 101 through 105 |
| KVSP - ASU #2 | Stand Alone | | | | | 0 | 0.00 | 5 | 101 through 105 |
| KVSP - B1 | 180 | | | | | 0 | 0.00 | 10 | 112, 113, 114, 115, 116, 212, 213, 214, 215, 216 |
| LAC - ASU1 | Stand Alone | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 101 through 107 |
| LAC - A5 | 270 | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| LAC - A4 | 270 | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| MCSP - Fac C, Bldg 12 | 270 | 24 | 30 | 32 | 43 | 32.25 | 3.17 | 3 | 124, 125, 126 |
| NKSP - D6 | Wing Nut | 60 | 50 | 60 | 40 | 52.5 | 5.16 | 5 | 101, 102, 103, 143, 144 |
| NKSP - A4 | Wing Nut | 30 | 40 | 30 | 50 | 37.5 | 3.69 | 4 | 101, 102, 103, 104 |
| PBSP - ASU 1 | Stand Alone | 50 | 51 | 50 | 51 | 50.5 | 4.97 | 5 | 101 through 105 |
| PBSP - A1 | 180 | 13 | 6 | 25 | 48 | 23 | 2.26 | 2 | 113, 114 |
| PBSP - A2 | 180 | 13 | 25 | 0 | 25 | 15.75 | 1.55 | 2 | 113, 114 |
| PVSP - ASU #1 | Stand Alone | 40 | 78 | 66 | 76 | 65 | 6.39 | 6 | 101 through 106 |
| PVSP - Fac D | 270 | 35 | 27 | 32 | 38 | 33 | 3.25 | 3 | 124, 125, 126 |
| RJD - Fac 2, Bldg 6 | 270 | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| RJD - Fac 2, Bldg 7 | 270 | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| SAC - ASU | Stand Alone | 41 | 49 | 47 | 64 | 50.25 | 4.94 | 5 | 101 through 105 |
| SAC - A6 | 180 | 38 | 25 | 23 | 26 | 28 | 2.75 | 3 | 113, 114, 115 |
| SAC - A7 | 180 | 0 | 0 | 31 | 48 | 19.75 | 1.94 | 2 | 113, 114 |
| SATF - ASU | Stand Alone | 48 | 54 | 42 | 63 | 51.75 | 5.09 | 5 | 101 through 105 |
| SATF - Fac E | 270 | 24 | 66 | 63 | 38 | 47.75 | 4.70 | 5 | 123, 124, 125, 126, 127 |
| SCC | 270 | 162 | 104 | 121 | 80 | 116.75 | 11.48 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| SOL - FAC 2, BLDG 10 | 270 | 63 | 36 | 70 | 57 | 56.5 | 5.56 | 6 | 123, 124, 125, 126, 127, 128 |
| SOL - FAC 2, BLDG 9 | 270 | 50 | 30 | 30 | 30 | 35 | 3.44 | 3 | 124, 125, 126 |

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEPT '05 INTAKE | DEC '05 INTAKE | MAR '06 INTAKE | JUNE '06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 3-DAY INTAKE | # OF CELLS TO BE MODIFIED | CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| SQ - CARSON UNIT | Telephone | 150 | 150 | 150 | 150 | 150 | 14.75 | 15 | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| SQ - CARSON UNIT | Telephone | 150 | 150 | 150 | 150 | 150 | 14.75 | 15 | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| SVSP - D1 | 180 | | | | | 0 | 0.00 | 4 | |
| SVSP - D2 | 180 | | | | | 0 | 0.00 | 4 | |
| SVSP - D8 | 180 | | | | | 0 | 0.00 | 4 | |
| SVSP - D9 | Stand Alone | 62 | 94 | 97 | 82 | 83.75 | 8.24 | 7 | |
| VSPW | 270 | 33 | 13 | 23 | 10 | 19.75 | 1.94 | 2 | 124, 125 |
| WSP - D6 | Wing Nut | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 101, 102, 103, 104, 105, 106, 143, 144, 145, 146, 147, 148 |
| WSP - FAOR | 270 | 30 | 30 | 30 | 30 | 30 | 2.95 | 3 | 124, 125, 126 |

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

## LIST OF PRISON ACRONYMS

| Institution | |
|---|---|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FSP | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

| PRISON | BUILDING DESIGN | # OF CELLS IN UNIT | # OF CELLS TO BE MODIFIED | % OF CELLS TO BE MODIFIED |
|---|---|---|---|---|
| ASP - UNIT 140 | 270 | 100 | 8 | 8.00% |
| CAL - ASU #1 | Stand Alone | 100 | 3 | 3.00% |
| CAL - A5 | 270 | 100 | 8 | 8.00% |
| CCC - LASSEN, Bldg 4 | 270 | 100 | 9 | 9.00% |
| CCI - UNIT II | Old Style | 24 | 3 | 12.50% |
| CCI - 4A ASU | 180 | 64 | 11 | 17.19% |
| CCI - 4B ASU | 180 | 64 | 3 | 4.69% |
| CCWF | 270 | 35 | 4 | 11.43% |
| CEN - C6 | Stand Alone | 100 | 11 | 11.00% |
| CEN - A5 | 270 | 100 | 8 | 8.00% |
| CIM - PALM HALL | Telephone | 102 | 8 | 7.84% |
| CIM - CYPRESS HALL | Telephone | 102 | 8 | 7.84% |
| CIW | 270 | 32 | 7 | 21.88% |
| CMC - B4 Annex | Quad | 151 | 16 | 10.60% |
| CMC - Central ASU | Quad | 104 | 1 | 0.96% |
| CMF - UNIT IV | Telephone | 150 | 3 | 2.00% |
| CMF - I3 | Telephone | 38 | 2 | 5.26% |
| CMF - P3 | Telephone | 38 | 2 | 5.26% |
| CMF - S3 | Telephone | 18 | 2 | 11.11% |
| COR - 3A03 | 270 | 100 | 6 | 6.00% |
| COR - ASU1 | Stand Alone | 100 | 5 | 5.00% |
| COR - 4B1R | 180 | 64 | 3 | 4.69% |
| CTF - O WING | Telephone | 144 | 8 | 5.56% |
| CTF - X WING | Telephone | 84 | 4 | 4.76% |
| CVSP | 270 | 100 | 9 | 9.00% |
| DVI - J WING | Telephone | 143 | 30 | 20.98% |
| FSP - UNIT IV ASU | Telephone | 138 | 6 | 4.35% |
| FSP - UNIT I ASU O/F | Telephone | 36 | 2 | 5.56% |
| HDSP - Z UNIT | Stand Alone | 100 | 2 | 2.00% |
| HDSP - D7 | 180 | 64 | 2 | 3.13% |
| HDSP - D8 | 180 | 64 | 5 | 7.81% |
| ISP - A5 | 270 | 100 | 5 | 5.00% |
| KVSP - ASU #1 | Stand Alone | 100 | 5 | 5.00% |
| KVSP - ASU #2 | Stand Alone | 100 | 5 | 5.00% |
| KVSP - B1 | 180 | 64 | 10 | 15.63% |
| LAC - ASU1 | Stand Alone | 100 | 7 | 7.00% |
| LAC - A5 | 270 | 100 | 7 | 7.00% |
| LAC - A4 | 270 | 100 | 7 | 7.00% |
| MCSP - Fac C, Bldg 12 | 270 | 100 | 3 | 3.00% |

Attachment C

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

| PRISON | BUILDING DESIGN | # OF CELLS IN UNIT | # OF CELLS TO BE MODIFIED | % OF CELLS TO BE MODIFIED |
|---|---|---|---|---|
| NKSP - D6 | Wing Nut | 100 | 5 | 5.00% |
| NKSP - A4 | Wing Nut | 100 | 4 | 4.00% |
| PBSP - ASU 1 | Stand Alone | 100 | 5 | 5.00% |
| PBSP - A1 | 180 | 100 | 2 | 2.00% |
| PBSP - A2 | 180 | 100 | 2 | 2.00% |
| PVSP - ASU #1 | Stand Alone | 100 | 6 | 6.00% |
| PVSP - Fac D | 270 | 100 | 3 | 3.00% |
| RJD - Fac 2, Bldg 6 | 270 | 100 | 12 | 12.00% |
| RJD - Fac 2, Bldg 7 | 270 | 100 | 12 | 12.00% |
| SAC - ASU | Stand Alone | 100 | 5 | 5.00% |
| SAC - A6 | 180 | 64 | 3 | 4.69% |
| SAC - A7 | 180 | 64 | 2 | 3.13% |
| SATF - ASU | Stand Alone | 100 | 5 | 5.00% |
| SATF - Fac E | 270 | 100 | 5 | 5.00% |
| SCC | 270 | 100 | 12 | 12.00% |
| SOL - FAC 2, BLDG 10 | 270 | 100 | 6 | 6.00% |
| SOL - FAC 2, BLDG 9 | 270 | 100 | 3 | 3.00% |
| SQ - CARSON UNIT | Telephone | 238 | 15 | 6.30% |
| SQ - DONNER UNIT | Telephone | 152 | 15 | 9.87% |
| SVSP - D1 | 180 | 64 | 4 | 6.25% |
| SVSP - D2 | 180 | 64 | 4 | 6.25% |
| SVSP - D8 | 180 | 64 | 4 | 6.25% |
| SVSP - D9 | Stand Alone | 100 | 7 | 7.00% |
| VSPW | 270 | 44 | 2 | 4.55% |
| WSP - D6 | Wing Nut | 100 | 12 | 12.00% |
| WSP - FAOR | 270 | 100 | 3 | 3.00% |
| | | 5977.00 | 406.00 | 6.79% |

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

## LIST OF PRISON ACRONYMS

| Institution | |
|---|---|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FSP | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

# Weekly Population/Budgeted Capacity Division of Adult Institution Analysis
## 15-Sep-06

| Institution | Per Fiscal Year 05/06 May Revise Institution Activation Schedule | | | | Weekly Population (Based on Classification Services Unit Weekly Population Report) | | Division of Adult Institution Calculation | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Administrative Segregation Unit Cells (Design Capacity) | Staffed Capacity (Budgeted) number of Inmates | Budgeted Number of Single Celled Inmates | Overcrowding Percentage | Weekly Population | Weekly Inmates in Single Cells | Average Number of Cells Required to House Population (IF Q 2/369) | Over Staffed Capacity | Overflow Status*** |
| ASP | 100 | 175 | 25 | 175% | 141 | 5 | 73 | NO | NO |
| CAL | 200 | 300 | 100 | 150% | 304 | 20 | 162 | YES | NO |
| CCC | 100 | 175 | 25 | 175% | 170 | 0 | 85 | NO | NO |
| CCI**** | 210 | 327 | 93 | 156% | 277 | 114 | 196 | NO | NO |
| CEN | 200 | 350 | 50 | 175% | 293 | 66 | 180 | NO | NO |
| CIM/CRC | 203 | 356 | 50 | 175% | 290 | 44 | 167 | NO | NO |
| CMC | 226 | 226 | 226 | 100% | 254 | 216 | 235 | YES | YES |
| CMF | 164 | 164 | 164 | 100% | 173 | 173 | 173 | YES | YES |
| COR**** | 307 | 460 | 154 | 150% | 427 | 137 | 282 | NO | NO |
| CTF | 192 | 228 | 156 | 119% | 282 | 183 | 233 | YES | YES |
| CVSP | 100 | 175 | 25 | 175% | 122 | 3 | 63 | NO | NO |
| DVI | 235 | 303 | 167 | 129% | 404 | 156 | 280 | YES | YES |
| FOL | 138 | 138 | 138 | 100% | 188 | 143 | 166 | YES | YES |
| HDSP | 228 | 343 | 113 | 150% | 294 | 102 | 198 | NO | NO |
| ISP | 100 | 175 | 25 | 175% | 211 | 1 | 106 | YES | YES |
| KVSP | 264 | 396 | 132 | 150% | 322 | 40 | 181 | NO | NO |
| LAC | 300 | 450 | 150 | 150% | 410 | 160 | 285 | NO | NO |
| MCSP | 100 | 175 | 25 | 175% | 179 | 79 | 129 | YES | YES |
| NKSP | 100 | 175 | 25 | 175% | 123 | 36 | 80 | NO | NO |
| PBSP**** | 164 | 246 | 82 | 150% | 321 | 75 | 198 | YES | YES |
| PVSP | 200 | 350 | 50 | 175% | 311 | 14 | 163 | NO | NO |
| RJD | 200 | 350 | 50 | 175% | 344 | 162 | 253 | NO | YES |
| SAC | 292 | 406 | 178 | 139% | 281 | 169 | 225 | NO | NO |
| SATF | 200 | 325 | 75 | 163% | 290 | 103 | 197 | NO | NO |
| SCC | 100 | 175 | 25 | 175% | 162 | 3 | 83 | NO | NO |
| SOL | 200 | 350 | 50 | 175% | 410 | 52 | 231 | YES | YES |
| SQ | 379 | 379 | 379 | 100% | 451 | 451 | 451 | YES | YES |
| SVSP | 292 | 439 | 145 | 150% | 440 | 107 | 274 | YES | NO |
| WSP | 100 | 175 | 25 | 175% | 205 | 68 | 137 | YES | YES |
| **FEMALE INSTITUTIONS** | | | | | | | | | |
| CCWF | 35 | 61 | 9 | 174% | 40 | 10 | 25 | NO | NO |
| CIW | 32 | 56 | 8 | 175% | 32 | 0 | 16 | NO | NO |
| VSPW | 44 | 76 | 12 | 173% | 112 | 0 | 56 | YES | YES |
| **Total** | 5705 | 8479 | 2931 | | 8263 | 2892 | 5578 | | |

* Based on Classification Services Unit Population Management Weekly report.  The single celled count reported may not accurately reflect operations at the institutions.

** The number of single celled inmates are subtracted from the population. The population is then divided by 2, providing the number of cells needed to double cell the population. To reach the total number of cells needed, add back in the number of inmate single celled.

*** Based on the numbers provided and the calculation of cells, whether your institution should be operating in overflow

****California Correctional Institute, California State Prison - Corcoran, Pelican Bay State Prison house some Administrative Segregation Unit inmates in Secured Housing Units. Those inmates, as reported on the Classification Services Unit Weekly Population report, who are Administrative Segregation Unit inmates in Secured Housing Units beds are backed out of weekly population numbers.

## Weekly Population/Budgeted Capacity Division of Adult Institution Analysis
### 15-Sep-06

## LIST OF ACRONYMS

| Institution | |
|---|---|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FOL | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

# Memorandum

**Attachment E**

Date   :  October 2, 2006

To   :  Health Care Managers
Chiefs of Mental Health

Subject  :  TRANSFER OF MENTAL HEALTH TRACKING SYSTEM SUICIDE HISTORY
INFORMATION

Over the last year mental health clinicians have been providing suicide history data regarding their patients to be entered into the Mental Health Tracking System (MHTS) consistent with a *Coleman* court order. This data is then used to generate the Inmate Profile (IP) which includes suicide history and alerts.

Beginning October 2, 2006, whenever a Mental Health Services Delivery System inmate transfers from one California Department of Corrections and Rehabilitation (CDCR) institution to another CDCR institution, or whenever a confidential Medical/Mental Health Transfer Form 7371 is sent, the IP generated by the MHTS will be included in the transfer envelope.

At the receiving institution the IP will be reviewed by the Receiving and Release Registered Nurse (RN) for referral consideration based on current needs and then forwarded to the Mental Health Program for input into the institution's MHTS.

Your local Operating Procedure (OP) should include all points in this process including:

- How MHTS staff at the sending institution is informed that an inmate is transferring so they can generate the IP.

- How MHTS staff will ensure the IP gets to the nursing staff responsible for generating the transfer envelope.

- How the receiving institution will utilize the IP suicide history information in the bus screening process.

- How at the receiving institution the IP is routed to the MHTS staff for input.

- The Operating Procedure for referral of a positive bus screening to mental health clinicians should be reiterated consistent with the Mental Health Program Guides policy.

Health Care Managers
Chiefs of Mental Health
Page 2

All inmates who are being placed in Administrative Segregation Unit shall have the IP generated and reviewed by the Licensed Psychiatric Technician (LPT) prior to their mental health screening (This will require LPTs to have access to the MHTS to generate IPs)

If you have any questions, please contact Margaret McAloon, Ph.D., Chief Psychologist, Clinical Operations, Mental Health Program, Division of Correctional Health Care Services (DCHCS) at (916) 324-6102.

PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services


cc:   Brigid Hanson, Deputy Director, DCHCS
      Christine Martin, Special Assistant to the Director, DCHCS
      Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations
         Branch, DCHCS
      Dwight Winslow, M.D., Statewide Medical Director (A), DCHCS
      Regional Administrators, DCHCS
      Regional Medical Directors, Clinical Services, DCHCS
      Doug McKeever, Program Director, Mental Health Program, DCHCS
      Andrew Swanson, Chief Psychiatrist, Mental Health Program, DCHCS
      Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
      Margaret McAloon, Ph.D., Chief Psychologist, Clinical Operations, Mental
         Health Program, DCHCS
      Senior Psychologist Supervisors and Specialists, DCHCS Headquarters
      Susan Turner, Statewide Director of Nursing, DCHCS
      Lisa Tillman, Deputy Attorney General, Department of Justice
      Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs
      Sharon Riegel, Health Program Specialist, DCHCS

State of California                                          California Department of Corrections and Rehabilitation

# Memorandum

Date     :   October 2, 2006

To       :   Wardens
             Health Care Managers
             Chiefs of Mental Health

Subject  :   **PLAN TO REDUCE SUICIDE RISK IN ADMINISTRATIVE SEGREGATION UNITS**

**BACKGROUND**

On June 8, 2006 the California Department of Corrections and Rehabilitation (CDCR) was ordered by the *Coleman* court to:

> *"develop . . . a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units."*

In 2004, 69 percent of the suicides committed in CDCR occurred in Administrative Segregation Units (ASU), while only approximately five percent of CDCR inmates were in ASU at any given time. Over time data indicates that about half of the inmates who commit suicide in ASU are not included in the Mental Health Services Delivery System (MHSDS) at the time of their death. Inmates are particularly likely to complete suicides during the first weeks after placement in ASU, with a disproportionate number occurring in the first 72 hours.

Recognizing that housing in ASU places inmates at higher risk, the Department has implemented a number of initiatives to reduce suicides in ASU over the last two years. Currently, custody and clinical staff are required to hold daily morning meetings in ASU to discuss potential suicide risk of new arrivals to the unit, and to communicate about any inmates who demonstrate changes in behavior. Current policy also requires hourly custody security checks, and documentation of all pertinent information relative to ASU inmate services and activities on the CDCR Form 114-A. Additionally, all inmates who arrive in ASU must receive an orientation pamphlet, which describes some of the stressors related to placement in ASU, and contains information about how to request mental health services. Please ensure that all current policies and procedures regarding suicide prevention in ASU are in place.

In response to the court order, CDCR began to analyze causes of suicides in ASU in order to formulate a comprehensive suicide prevention plan. The plan integrates a number of initiatives and involves personnel, policies, and practices across the Division of Adult Institutions (DAI), the Division of Correctional Health Care Services (DCHCS), and the Office of Facilities Management (OFM).

Page 2

Some elements of the plan can be implemented immediately, while others will be implemented over a series of months and years. CDCR has collected initial data required to develop a plan to create ASU Intake Units with cells retrofitted to reduce access to attachment cites for hanging and to increase visibility into the cells.

This memo details initial suicide prevention measures and gives direction on implementation of these policy changes. Additional changes in policies and procedures will be implemented via memoranda and will be incorporated into the MHSDS 2006 Program Guide on an annual basis. All institutions are expected to comply with the changes and implementation timetable, and will be held accountable for compliance and implementation.

**POST-PLACEMENT SCREENING**

Currently, all inmates placed into ASU receive the 31-item screening according to MHSDS Program Guide timelines.

Effective immediately, mental health staff shall conduct the screening interviews in private and confidential settings. The settings will afford confidentiality of sight and sound from other inmates, and confidentiality of sound from staff. All mental health appointments, including the screening interviews shall be announced by custody staff as a "health appointment" to avoid stigmatization and possible retribution by other inmates. Every effort shall be made to encourage inmates to attend these appointments.

If an inmate refuses the screening, the clinician shall contact the inmate at his/her cell-front, review the inmate's Unit Health Record (UHR), and contact custodial staff in the inmate's unit to collect information regarding the inmate's mental state. The clinician shall note the inmate's refusal and the results of the data collection on an Interdisciplinary Progress Note and place it in the inmate's UHR.

**AUDITING OF ASU SCREENING REFUSALS:**

Effective immediately, each institution will develop a local procedure to audit the rate of refusal of initial ASU mental health screenings. The institution's Chief of Mental Health, or designee, shall be responsible for conducting the audit and evaluating the results. The audit tool shall include, at a minimum: the number of inmates admitted to ASU in the last calendar month, the number of mental health screenings completed in that month and the number of inmates who refused to participate in the screening in a private, confidential setting. The procedure will identify a process for review and quality improvement if inmate screening

Page 3

refusals exceed 30 percent. This procedure shall include a process to identify reasons for refusals, and a plan to encourage increased participation in screenings.

## DAILY COORDINATION OF ASU

By memorandum of May 9, 2005, all institutions were directed to "develop a procedure for alerting Mental Health Staff to new arrivals in ASU within 24 hours". This policy included a morning 'check-in' meeting between (at minimum) an ASU Sergeant and designated ASU Mental Health personnel. During the meeting, involved personnel identify new arrivals, discuss current issues, and share any pertinent information regarding risk factors and prevention strategies.

Effective immediately, the morning meeting shall be attended by the assigned ASU mental health clinician (psychologist or social worker). Suicide risk data, from the Mental Health Tracking System Report, shall be communicated to custody staff, and relevant clinical concerns about inmates shall be discussed. Salient clinical information from this meeting shall be documented in the inmate's UHR and if necessary, a referral for mental health services shall be made at the appropriate level of urgency.

## MINIMUM STAY AT ENHANCED OUTPATIENT PROGRAM ASU HUB INSTITUTIONS

Inmates transferred to Enhanced Outpatient Program ASU hub institutions for treatment of severe mental disorders and clinical decompensation can appear to be clinically improved and stable for up to several weeks after their arrival at the receiving institution. This may lead the hub institution to prematurely return the inmate to the sending institution without adequate treatment. Subsequently the inmate may return to their pre-transfer state of clinical decompensation.

Effective immediately, to avoid premature returns of inmate-patients and provide adequate time for observation and evaluation at EOP ASU hub institutions, all inmates transferred to EOP ASU hub institutions for treatment shall be held at the hub institution for no less than 60 days from the date of reception.

## AUDITING CASE MANAGER REVIEW OF WEEKLY ASU ROUNDS NOTES

Currently, CDCR policy requires that a weekly summary of the daily clinical rounds of ASU MHSDS inmate-patients is placed in each inmate's UHR. It is expected that clinical case

Page 4

managers assigned to the ASU regularly review the weekly summaries for inmate-patients on their clinical caseloads as part of their ongoing monitoring of inmate clinical condition.

Effective immediately, each institution will develop a local procedure to ensure the ASU case managers are regularly reviewing the weekly ASU clinical rounds documentation for their assigned inmate-patients.

The institution's Chief of Mental Health, or designee, will be responsible for conducting and evaluating the results of the audit.  The procedure shall include a requirement that case managers document in the UHR that they have reviewed the weekly summaries of rounds for their caseload inmate-patients.  The procedure will also include details of the audit of case managers' reviews.

The audit tool will include, at a minimum, information about the number of inmate-patients assigned to a case manager, the number of weekly reviews expected (number of inmate-patients on the case manager's caseload times the number of weeks the inmates were housed in ASU), and the number of weekly reviews documented by the case manager.  The procedure will also include a process to correct deficient audits (i.e. training and/or progressive disciplinary action for clinicians who do not meet this requirement).


**DOUBLE CELLING**

Statistical information suggests that suicide risk is substantially reduced when inmates have a cellmate.  Therefore, Wardens are encouraged to place inmates into double-celled housing whenever possible, especially when the inmate is initially placed into ASU.


**MEETING TITLE 15 REQUIREMENTS**

One of the contributing factors to inmate suicides is the restricted movement within the ASU environment.  Inmates housed in the ASU, during the first three weeks after ASU placement, shall receive priority access to "Out-of-Cell" time, such as mandated exercise yard and showers.

Staff shall account for out-of-cell time for inmates assigned to ASU,  including, but not limited to, CDCR 114-D, Segregation Order and CDCR Rule Violation Report hearings, Unit Classification Committee, Institutional Classification Committee, medical ducats, interviews, visiting, showers, yard and all other out of cell periods.  All out-of-cell time for inmates assigned to ASU shall be documented on the CDC 114-A, Detention/ Segregation Record. Institutions shall continue to audit the CDC 114-A, Detention/ Segregation Records on a weekly basis to ensure compliance with departmental mandates.

Page 5

Within the constraints of physical plant limitations, every institution is expected to immediately ensure that inmates in the ASU's are offered access to the exercise yard for the departmental minimums as identified in the California Code of Regulations, 3343 (h). Institutions with "Walk-Alone" yard facilities should offer newly placed ASU inmates access to Walk-Alone yard as quickly as possible, within the guidelines of the classification process, and with safety and security as top priorities.

In the near future, each institution will be asked to provide current information regarding the number and location of "Walk Alone" yards for inmates housed in Administrative Segregation Units. In addition, each institution will be required to assess the current yard access provided to inmates in ASU, and the tracking of that access. Finally, each institution will need to provide a list of barriers to meeting the mandated hours of yard access (i.e. staffing issues, physical plant issues, etc...). All of this information will be used to assess the need for additional resources to meet the mandated out of cell time.

CDCR is committed to implementing the recommendations described above, related to the prevention of inmate suicides. Each institution shall be responsible for revising their Local Operating Procedures to include the policy changes in this memorandum and to ensure that all staff assigned to ASU are provided On-the-Job (OJT) training regarding the directives above. The local institutions' Suicide Prevention and Response, Focused Improvement Teams shall review all policies, training materials, and audits, to ensure continuous quality improvement in ASU suicide prevention efforts. **Please send a copy of new ASU Local Operating Procedures and OJT sign in sheets on or before December 1, 2006:**

- For custody staff, to your respective Associate Director.
- For mental health staff to Sharon Riegel, Health Program Specialist (Fax number 916-324-6621).

**The headquarters Quality Management Assistance Teams will audit compliance with all aspects of this memorandum by January 1, 2007.**

If you have questions about this memorandum involving custody issues, please contact Mary Neade, Correctional Counselor II, Division of Adult Institutions, at (916) 322-7997. For questions regarding clinical issues, please contact Robert Canning, Senior Psychologist (A), at (916) 324-8050.

PETER FARBER-SZEKRENYI, DR. P.H.                        JOHN DOVEY
Director                                                Director
Division of Correctional Health Care Services          Division of Adult Institutions

Page 6

**cc:**
Brigid Hanson, Deputy Director, DCHCS
Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs
Andrew Swanson, Chief Psychiatrist, Mental Health Program, DCHCS
Margaret McAloon, Chief Psychologist, Clinical Operations, Mental Health Program, DCHCS
Doug McKeever, Program Director, Mental Health Program, DCHCS
Sharon Riegel, Health Program Specialist, DCHCS
Senior Psychologist Supervisors and Specialists, DCHCS Headquarters
Susan Turner, Statewide Director of Nursing
Lisa Tillman, Deputy Attorney General, Department of Justice
Christine Martin, Special Assistant to the Director, Health Care Services Division
Dave Runnels, Chief Deputy Secretary, Division of Adult Operations
Scott Kernan, Deputy Director, Division of Adult Operations