1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   E. IVAN TRUJILLO, Bar No.: 228790
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   LORI RIFKIN, Bar No.: 244081
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

13

14 Attorneys for Plaintiffs

15            UNITED STATES DISTRICT COURT

16            EASTERN DISTRICT OF CALIFORNIA

17

18 RALPH COLEMAN,                        )  No.:  Civ S 90-0520 LKK-JFM
                                         )
19         Plaintiffs,                   )  **PLAINTIFFS' OBJECTIONS TO**
                                         )  **DEFENDANTS' PLAN TO ADDRESS**
20 vs.                                   )  **SUICIDE TRENDS IN**
                                         )  **ADMINISTRATIVE SEGREGATION**
21 ARNOLD SCHWARZENEGGER, et al.,        )  **UNITS**
                                         )
22         Defendants                    )
   _____)

23

24

25

26

27

28

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ACA | American Correctional Association. |
| ASU | Administrative Segregation Unit. |
| CCM | Clinical Case Manager.  Every inmate participant in the mental health delivery system is assigned a clinical case manager (a social worker or psychologist) who meets with the inmate at regular intervals determined by the inmate's level of care and housing unit (i.e. inmates in administrative segregation are seen more frequently by their case managers). |
| CCCMS or 3CMS | Correctional Clinical Case Management System.  CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates.  CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days.  A few also participate in groups.  The Program Guide requires that CCCMS inmates housed in administrative segregation be provided with enhanced mental health services, including a weekly case manager contact and daily psych tech rounding. |
| CCR | California Code of Regulations |
| CDCR | California Department of Corrections and Rehabilitation. |
| DA | District Attorney. |
| EOP | Enhanced Outpatient Program.  EOP programs are sheltered treatment programs for seriously mentally ill inmates who require a higher and more intensive level of mental health care.  There are currently approximately 4,100 EOP inmates.  Because these inmates are unable to function in a general population setting, they live in segregated housing units.  The Program Guide mandates 10 hours each week of therapy or other "structured therapeutic activities" for EOP inmates.  For EOP inmates housed in administrative segregation they are also provided with a weekly case manager contact and daily psych tech rounding. |
| MHSDS | Mental Health Services Delivery System.  The name given by defendants to their entire mental health system. |
| NIC | National Institute of Corrections |
| PSYCH TECH | Psychiatric Technician.  Clinical staff person who is assigned to provide daily clinical rounding in administrative segregation units for the purpose of monitoring inmate mental health status and/or deterioration. |
| PSU | Psychiatric Services Unit.  These are high security housing units where EOP patients who have been assigned to a Secured Housing Unit are housed.  EOP patients are provided with a minimum of ten hours of |

| | | |
|---|---|---|
| | | structured therapeutic activities that are offered in treatment cages in the units.  There are different steps in the PSU program and patients have different property privileges associated with the different step levels. |
| | SNY | Sensitive Needs Yard.  These are housing units for inmates with safety concerns. |
| | STAND-ALONE ASUS | These new administrative segregation units are "Super-Max" units that are located in ten prisons within CDCR and architecturally resemble the Pelican Bay SHU.  The cells are located on corridors without windows exposed to any natural lighting and the cell doors do not face a dayroom or other inmates, but rather face a concrete wall.  Inmates are placed in these units for disciplinary and non-disciplinary (i.e., safety concerns) reasons. |
| | SHU | Secured Housing Unit.  This is a segregated high-security housing unit where inmates can be housed for specific terms or indeterminate periods of time in locked down conditions for either in-prison offenses, gang status, or because of safety concerns. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| | SRA | Suicide Risk Assessment. |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................................................i

TABLE OF CONTENTS ....................................................................................................iii

TABLE OF AUTHORITIES ...............................................................................................iv

INTRODUCTION AND STATEMENT OF FACTS.......................................................... 1

ARGUMENT ........................................................................................................................ 6

I.     DEFENDANTS SHOULD BE DIRECTED TO EXPEDITE ELEMENTS OF
       THEIR PLAN THAT WILL HELP REDUCE THE ESCALATING SUICIDE
       RATES WITHIN THEIR ADMINISTRATIVE SEGREGATION UNITS NOW ........ 6

       A.     Defendants' Delayed Schedule For Retrofitting Their Intake Units Is
              Unacceptable ........................................................................................................ 6

       B.     Defendants Must Be Directed To Immediately Implement The Pre-
              Placement Suicide Prevention Screening................................................................ 9

       C.     Defendants Must Seek Necessary Funding To Provide All Inmates In
              Administrative Segregation With Required Out Of Cell Time ............................ 11

II.    DEFENDANTS MUST ALSO IMPLEMENT THE EXPERT
       RECOMMENDATIONS REJECTED WITHOUT REASONABLE CAUSE ............... 12

       A.     Defendants Must Be Directed To Implement Thirty Minute Welfare
              Checks In All Administrative Segregation Units In CDCR By July 1, 2007 ....... 12

       B.     Defendants Must Be Directed To Develop And Implement A Plan To
              Provide Non-Disciplinary Inmates In Administrative Segregation With
              Additional Property While They Await Transfers................................................ 15

       C.     The Court Should Direct Defendants To Develop A Plan To Reduce
              Lengths Of Stay In Administrative Segregation .................................................. 17

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

## STATE REGULATION

Cal. Code Regs. Tit. 15, §§ 3343 (g) (h) (2006) ................................................... 11

## OTHER AUTHORITIES

Jeffrey L. Metzner, <u>Mental Health Considerations for Segregated Inmates</u>, <u>in</u> <u>Correctional</u>
<u>Mental Health Care Standards and Guidelines for Delivering Services</u> 234 (National
Commission on Correctional Health Care 2003) ........................................................ 3

## INTRODUCTION AND STATEMENT OF FACTS

Defendants' Plan to address the high rate of suicide in California Department of Corrections and Rehabilitation ("CDCR") administrative segregation units is too little and too late. Plaintiffs respectfully request that the Court order defendants to substantially accelerate the proposed 5-year implementation schedule in light of the ongoing emergency and the continuing high rate of unnecessary and avoidable deaths in these units. In addition, the Court should order defendants to adopt some additional measures that the suicide prevention expert panel agreed are necessary and appropriate to address the dangerous conditions in these units and which will help reduce the high suicide rates.

On May 9, 2006, the Special Master filed the Report on Suicides Completed in the California Department of Corrections in Calendar Year 2004 ("5/9/06 Final Suicide Report"). The Court's June 8, 2006 Order was based upon the findings in the Final Suicide Report that "[i]n 2004, 69.2 percent of all CDC suicides (18 of 26) occurred in administrative segregation, up from an already high 48.5 percent in 2003 (17 of 35)." 5/9/06 Final Suicide Report at 12. More than half of the suicides in administrative segregation involved inmates who were <u>not</u> on the mental health caseload. *Id.* In 2004, 72.2 % (13 of 18) of the suicides in administrative segregation were found to be either foreseeable (where information already available about an inmate indicates substantial or high risk for suicide which requires reasonable intervention(s) to prevent), preventable (situations where if some additional information had been gathered and/or some additional intervention undertaken, usually as required by policy, the likelihood of a completed suicide might have been reduced substantially) or both. 5/9/06 Final Suicide Report at 4-5; Table One and Table Two, attached to 5/9/06 Final Suicide Report.

The need for urgency in the remedial process is further evidenced by the suicides in 2006. Although only five percent of the total prison population is housed in administrative segregation units, through mid October 2006 more than half of the suicides have taken place in CDCR's dangerous administrative segregation units (19 of 35, 54%). Declaration of Jane Kahn in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Kahn Dec.") at ¶10; See Attachment F to Defendants'

1  Plan to Address Suicide Trends in Administrative Segregation Units ("Defs' Plan") filed

2  October 2, 2006.

3       On June 8, 2006, this Court ordered Defendants to develop a plan to address the

4  escalating percentage of suicides occurring in administrative segregation units by August 31,

5  2006.  6/8/06 Order ¶1.  The August 31 date was a 90-day extension of time to file their plan,

6  granted at the request of defendants by the Court, from the original May 31, 2006 deadline

7  recommended by the Special Master.  The June 8, 2006 Court Order further provided that the

8  plan should include a budget and implementation schedule for any policy and procedure

9  changes, staffing or budget augmentation, and if necessary, include a mechanism for obtaining

10  mid-year funding on or before September 30, 2006.  6/8/06 Order ¶ 2.  Finally, the Court Order

11  directed defendants to work with the Special Master's experts, plaintiffs' counsel and

12  plaintiffs' expert, Lindsay Hayes, to develop the plan.  6/8/06 Order ¶3.

13       The administrative segregation units within California Department of Corrections and

14  Rehabilitation ("CDCR") are harsh and dangerous living environments where inmates remain

15  locked in their cells 23 to 24 hours a day.  Kahn Dec. ¶11.  The inmates are cell-fed, and have

16  no educational, vocational or work programming regardless of the reason they have been

17  placed in administrative segregation.  Inmates are not permitted to have radios or televisions

18  and the possession of other personal property is also severely restricted.  *Id*.  As a result,

19  inmates placed in these units for their own safety or awaiting transfer to another institution,

20  experience the same harsh conditions in administrative segregation as inmates who have

21  committed disciplinary infractions.  Kahn Dec. ¶11.  Inmates housed in administrative

22  segregation have extremely limited property in their cells and they are not permitted to have

23  their televisions or radios, except for those inmates housed in the Pilot Program at Pelican Bay

24  State Prison in their administrative segregation unit.  Kahn Dec. ¶17.  Defendants acknowledge

25  in their own plan that they are not and cannot currently provide legally mandated out of cell

26  time, exercise and showers, to inmates housed in these harsh environments.  Defs' Plan at 11-

27  12.  As a result, these units have truly become even harsher "locked down" units where

28

1  inmates are provided with virtually no opportunity for exercise, fresh air or socializing with

2  other inmates.

3        The danger of extreme seclusion and isolation on mentally ill inmates is clearly

4  established. "There is general consensus among clinicians that placement of inmates with

5  serious mental illness in settings with 'extreme isolation' is contraindicated because many of

6  these inmates' psychiatric conditions will clinically deteriorate and not improve…[i]n other

7  words, many inmates with serious mental illness are harmed when placed in such settings."

8  Kahn Dec. ¶13, Ex. A, Jeffrey L. Metzner, <u>Mental Health Considerations for Segregated</u>

9  <u>Inmates</u>, <u>in</u> <u>Correctional Mental Health Care Standards and Guidelines for Delivering Services</u>

10 234 (National Commission on Correctional Health Care 2003). The current extreme

11 conditions in California's over-crowded and understaffed administrative segregation units have

12 contributed to the escalating suicide rate. The Final Suicide Report recommendation and the

13 Order adopting the recommendation were issued to address the crisis of suicides within the

14 administrative segregation units in the CDCR.

15       On July 14, 2006, a distinguished group of experts met in San Francisco for eight hours

16 to develop a set of recommendations to address the escalating rates of suicides in the

17 administrative segregation units. Defs' Plan at 6  The meeting was thoughtful and productive

18 and resulted in a set of comprehensive and realistic recommendations that the experts agreed

19 would assist defendants in reducing the suicide rates in their administrative segregation units.

20 Defs' Plan at 6-9. These recommendations were based upon the considerable experience of the

21 expert panel in suicide prevention in correctional settings. For example, some of these experts

22 had worked in systems which provided non-disciplinary inmates with their own property.

23 Kahn Dec. ¶5. All of the experts acknowledged that the harsh conditions in administrative

24 segregation units could be tempered by increased social contacts and out of cell time. Kahn

25 Dec. ¶4. The expert panel agreed that thirty minute Welfare Checks reflected national

26 standards and practices and would help save lives in administrative segregation units.

27 Declaration of Lindsay M. Hayes in Support of Plaintiffs' Objections to Defendants' Plan to

28 Address Suicide Trends in Administrative Segregation Units ("Hayes Dec.") ¶ 9. Finally,

during the expert panel's discussion of the Intake Units -- cells in the administrative segregations that would be retrofitted to remove protrusions where inmates could attach clothing or bedding to hang themselves -- the experts acknowledged the importance of removing or covering the hazardous large mesh ventilation screens.  Kahn Dec. ¶ 3.

In mid August 2006, defendants requested an additional extension of time -- until October 2, 2006 -- to file their plan with the Court to address the suicide rate in the administrative segregation units.  Kahn Dec. at ¶6.  The Stipulation agreed to by the parties required defendants to provide a draft plan by September 5, 2006, a teleconference to discuss the draft plan on or about September 12, 2006, and extended the date for obtaining mid-year funding from September 30, 2006 to October 2, 2006, the filing date for the Plan.  Stipulation and Order Re: Deadline for Defendants' Submission of Plan to Address Suicide Trends in Administrative Segregation ("Stipulation and Order") at ¶¶2-4.  The draft plan was timely provided to plaintiffs' counsel on September 5, 2006, and a teleconference was held on September 20, 2006 during which plaintiffs' counsel, the Special Master and his experts, plaintiffs' expert Lindsay Hayes, some of defendants' suicide experts and various CDCR officials participated.  Kahn Dec. at ¶ 7, Ex. B, Defendants' Draft Administrative Segregation Unit Suicide Plan ("Draft Plan").  Plaintiffs' counsel provided Special Master Keating and defendants' counsel with comments on the Draft Plan prior to the phone conference which focused on the recommendations by the expert panel that defendants had rejected (Welfare Checks and property for non-disciplinary inmates) or delayed implementing (retrofitting the Intake Units and providing out of cell time to all inmates housed in administrative segregation units).  Kahn Dec. at ¶7,  Ex. C, Plaintiffs' Comments on Draft ASU Suicide Prevention Plan. The final plan was filed on October 2, 2006.

The expert panel's recommendations focused on three major areas:

(1)    Creating safer administrative segregation units through retrofitting some cells for Intake Units, by providing Welfare Checks (living and breathing checks) by custody officers in administrative segregation units, and by ensuring that custody officers are trained in CPR and are required to perform CPR;

(2)    Improving identification of inmates at risk for suicide through pre-placement suicide risk screening, better psychiatric technician rounding, more effective post-placement suicide risk screening out of cell case manager contacts, and by identifying inmates who have received bad news;

(3)    Making life more bearable in the administrative segregation units by providing inmates with their mandated out of cell time by reducing lengths of stay in the units and by creating special units for inmates placed in administrative segregation for non-disciplinary reasons. Defs' Plan at 6-9.

Although Defendants' Plan adopts many of the recommendations made by the expert panel, defendants' proposed delayed implementation schedule for some of the most critical recommendations ignores the current emergency in the administrative segregation units within the CDCR reflected in the unusually high suicides rates. For example, although Defendants' Plan establishes Intake Units where newly admitted inmates will be housed in "safe" cells that have been retrofitted to remove anchors that can be used by suicidal inmates to hang themselves, defendants will not even begin to retrofit a single Intake Unit cell until fiscal year 2008/2009, almost two years from today. Defs' Plan at 10. Despite the Court's order requiring defendants to obtain mid-year funding, if necessary, no mid-year funding was requested to initiate this or any other critical element of Defendants' Plan. In fact, Defendants' Plan delays the complete conversion of these Intake Cells until 2011, five years after the Court's order. Defs' Plan at 11.

Defendants also propose postponing implementation of another important recommendation by the expert panel: adding a suicide risk screening interview at the same time that an inmate is medically screened prior to placement in the administrative segregation units. Revised Program Guide, 12-7-4, filed 2/3/06. Currently inmates placed in administrative segregation are screened for possible suicidal or mental health concerns within 72 hours after their placement in the housing unit. The expert recommendation to screen inmates for suicide risk prior to their placement in administrative segregation was based in part upon CDCR's own suicide data that identifies a significant percentage of inmates who commit

-5-

suicide within the first three days of their placement in the administrative segregation units. Kahn Dec. ¶¶10, 14, Ex. D. Despite the clear life-saving benefit of this pre-placement suicide risk screening, Defendants' Plan proposes delayed implementation of this procedure until June 2007 (nearly one year after the Court's order). Defs' Plan at 13.

Some critical recommendations by the expert panel were unreasonably rejected by defendants. For example, despite the expert panel's recommendation that regular Welfare Checks ("living and breathing" checks) by custody officers would reduce completed suicides and save lives in the administrative segregation units, defendants rejected the recommendation because it would "strain the resources" available to the CDCR. Defs' Plan at 16. The Court must itself reject this excuse and order immediate funding for and implementation of the life-saving Welfare Checks.

Defendants have been ordered to develop a plan to address a crisis situation where lives are directly at stake. Through careful study and the assistance of an expert panel, defendants now know what critical steps must be taken in order to help reduce the shocking rate of suicides in their locked units. However, Defendants' Plan to address the suicide rate within the administrative segregation units in CDCR does "too little, too late." Defendants' failure to act with due diligence to seek the necessary funding for positions and modifications mid-year and to accelerate the implementation of these critical measures smacks of deliberate indifference and demands the Court's intervention.

## ARGUMENT

**I. DEFENDANTS SHOULD BE DIRECTED TO EXPEDITE ELEMENTS OF THEIR PLAN THAT WILL HELP REDUCE THE ESCALATING SUICIDE RATES WITHIN THEIR ADMINISTRATIVE SEGREGATION UNITS NOW**

### A. Defendants' Delayed Schedule For Retrofitting Their Intake Units Is Unacceptable

The expert panel recommended the creation of Intake Units where inmates newly housed in administrative segregation would be placed for careful observation during their first two or three weeks in administrative segregation, which was identified as a high risk period for suicide in these units. Defs' Plan at 9. Defendants' Plan provides for retrofitting of these cells

1    in the administrative segregation units to reduce the availability of hanging attachment sites

2    and includes the replacement of standard bunks with concrete slab beds, the replacement of

3    dangerous protrusions with pull-away fixtures, the replacement of large-mesh ventilation

4    screens, the retrofitting of light coverings and the replacement or retrofitting of cell doors to

5    increase visibility of the cell interior.  *Id.* at 10.  Expediting the retrofitting of the Intake Units

6    will save lives because inmates newly admitted to administrative segregation will be placed in

7    these cells that have no "anchors" for hanging and better visibility for observation.  Hayes Dec.

8    ¶15.

9        Defendants' Plan identifies 64 housing units at 33 prisons for a total of 406 cells that

10   will be retrofitted for Intake Cells.  Defs' Plan at 7.  (Attachment C to Defendants' Plan

11   identifies the specific institutions, including the building design of each administrative

12   segregation unit.)  The Plan, however, delays full conversion of these cells until <u>2011</u>, five

13   years from the June 8, 2006 Order.  Phase One of the Plan begins with design work in Fiscal

14   Year 2007/2008 and retrofitting of the first 160 cells during the 2008/2009 Fiscal Year.  Defs'

15   Plan at 10-11.  This delay is unacceptable.  The suicide rate in CDCR's administrative

16   segregation units is an emergency and the remedial measures must be implemented on an

17   urgent basis to stem this deadly tide.

18       In fact, the retrofitting of cells in administrative segregation units for suicide prevention

19   purposes has been the subject of a previous order of this Court, which defendants have failed to

20   respond to in a timely manner. In 2005, based on the review of the 2003 suicides, defendants

21   were ordered by this Court to submit to the Special Master a plan for dealing with the hazard of

22   large mesh ventilation screens in administrative segregation cells in which mental health

23   caseload inmates are housed.  6/9/05 ¶1.  The Plan submitted by defendants to the Special

24   Master included a feasibility study to assess the replacement of the large mesh ventilation

25   screens with safety screens with a small opening and included a list of tasks and timelines that

26   stretched over several years with no commitment at the end of the study period to replace a

27   single large mesh ventilation screen.  Kahn Dec. ¶15, Ex. E, Plan submitted by George

28   Sifuentes, Deputy Director, Facilities Management and John Dovey, Director, Division of

-7-

1   Adult Institutions.  This "plan for a plan" promised no action whatsoever, and in fact, no large

2   mesh ventilation screen has ever been replaced under the Plan submitted to the Special Master

3   pursuant to the June 9, 2005 Order.  Defendants have already studied the retrofitting of these

4   ventilation screens extensively and done nothing to address the risk; defendants should not be

5   permitted to delay this critical project any longer.  It should also be noted that during the

6   meeting of the suicide panel, one of defendants' experts, Thomas White, commented on a jail

7   project on which he worked where the large mesh ventilation screens were replaced in the jail

8   at a minor expense.  Kahn Dec. ¶3.

9          On October 18, 2006, at the request of plaintiffs' counsel, a phone conference was held

10  to discuss plaintiffs' concerns and objections to Defendants' Plan.  Kahn Dec. ¶8.  During the

11  phone conference, plaintiffs objected to the failure by defendants to expedite the retrofitting of

12  the Intake Units by seeking emergency funding for the design and construction work.  Kahn

13  Dec. ¶9  A representative from Department of Finance spoke during the conference and stated

14  that there is no regular mechanism for mid-year funding available for capital outlay.  *Id.*

15  Defendants failed to so inform plaintiffs' counsel and the Special Master when requesting

16  multiple extensions of time to file their Plan in response to the 5/9/06 Final Suicide Report.

17  Most states allow agencies latitude in responding to emergencies by requesting emergency

18  funds or by delaying or adjusting other projects where funds have not or will not be spent.

19  CDCR's high suicide rate should be sufficient reason for the agency to exercise emergency

20  authority to obtain special funding to retrofit the Intake Units.  Declaration of Walter L.

21  Kautzky in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in

22  Administrative Segregation Units ("Kautzky Dec.") ¶13.

23         The modifications proposed in the Intake Units are not highly structural changes

24  requiring plumbing and electrical modifications that involve extensive design and construction

25  work.  Kautzky Dec. ¶11.  For example, changes to the cell doors, which will improve the

26  officers' ability to see into the cell, can be accomplished quickly once the doors are ordered.

27  *Id.*  The other proposed changes to the Intake Units include bed installations, replacement of

28  light fixtures, elimination of other protrusions in the cell, and the replacement or covering of

1    the large mesh ventilation screens.  Defs' Plan at 10.  CDCR design/build strategies will allow

2    defendants to more rapidly design and construct the type of changes required in their proposal

3    for creating the Intake Units in their plan.  Kautzky Dec. ¶13.

4         The Court must order defendants to substantially accelerate the proposed schedule so

5    that lives can be saved as soon as possible.  First, defendants must be required to seek mid-

6    term funding on or before January 1, 2007, to obtain Architectural and Engineering

7    Assessments and associated design work for the 406 Intake Cells.  To the extent that mid-year

8    funding is not ordinarily available for the capital outlay required, defendants should be

9    required to seek other emergency funding.  Kautzky Dec. ¶13.  The retrofit plan should be

10   modified to require immediate removal/modification of the large-mesh ventilation screens in

11   each of the Intake Unit cells as soon as possible but no later than March 1, 2007.  Other

12   necessary renovations shall also occur in steps, with other minor modifications (the removal of

13   light coverings, fixtures, cell doors) undertaken first.  The modifications to the Intake Cells can

14   be expedited.  Kautzky Dec. ¶11.  All of the Intake Unit cells should be retrofitted as soon as

15   possible but no later than June 1, 2007.  In addition, defendants should be directed to consider

16   other emergency measures before the construction is completed, such as designating certain

17   cells as Intake Units, where newly admitted inmates to administrative segregation can be

18   housed and provided with thirty minute Welfare Checks immediately while defendants seek

19   emergency funding to enable them to fully implement this standard system-wide for all

20   inmates housed in administrative segregation units.  Hayes Dec. ¶14.

### B.    Defendants Must Be Directed To Immediately Implement The Pre-Placement Suicide Prevention Screening

23        Defendants' Plan adopts the expert panel's recommendation for a suicide risk screening

24   interview that will be conducted when the inmate is medically screened before he or she is

25   placed in administrative segregation.  Defs' Plan at 13.  This pre-placement suicide risk

26   screening is used to evaluate whether the inmate requires any further mental health evaluation

27   for suicide risk or other mental health intervention.  *Id*.  The pre-placement suicide risk

28   screening will utilize the CDCR's new Mental Health Tracking System Suicide History

Information which tracks suicide attempt history for inmates on the mental health caseload. Attachment E to Defs' Plan.  The pre-placement suicide risk screening was recommended by the expert panel because it will help identify high risk inmates <u>before</u> they are placed in the units and thereby help reduce suicides.  Hayes Dec. ¶15.

Currently inmates who are placed in administrative segregation are screened within 72 hours of their placement.  However, CDCR's own data identifies the first 72 hours of placement within administrative segregation as a high risk period for suicide, and the pre-placement suicide risk screen is the best means to identify those high risk inmates.  Kahn Dec. ¶¶10, 14, Ex. D (Graph illustrates that significant percentage of non-mental health inmates commit suicide within the first three days of administrative segregation); Declaration of Lori Rifkin in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Rifkin Dec.") (Filed Under Seal) (Defendants' Suicide Reports track length of stay in administrative segregation at time of suicide and in 2003-2005, the percentage of inmates committing suicide within the first three days was 25% in 2003, 28% in 2004, and 38% in 2005.)  (Ex. C at 10; Ex. B at 11; Ex. A at 13.)

Despite the recommendation of the expert panel and CDCR's own data, Defendants' Plan delays implementation of this critical pre-placement suicide risk screen until June 2007, a year from the Court's order.  No reason for the delayed implementation is provided in the Plan. Defs' Plan at 13.  Again, defendants' delayed implementation of their Plan fails to acknowledge the on-going crisis within the administrative segregation units where in 2006 to date at least 19 inmates have committed suicide.  Kahn Dec. ¶10.  These 19 administrative segregation suicides represent 54 percent of the total suicides in 2006.  *Id.*

The Court should order defendants to implement the pre-placement suicide prevention screening as soon as possible, but no later than January 1, 2007, and to seek mid-year funding if necessary.

**C.    Defendants Must Seek Necessary Funding To Provide All Inmates In Administrative Segregation With Required Out Of Cell Time**

The expert panel recommended providing inmates housed in administrative segregation with more out of cell time and privileges.  Kahn Dec.¶4.  Out of cell activities reduce isolation and seclusion and provide some activity in administrative segregation units where isolation, seclusion and lack of activity can lead to depression and even suicide.  Hayes Dec. ¶16. Defendants' Plan only proposes providing the minimum state law requirements in administrative segregation for inmates during their first three weeks in the units.  Defs.' Plan at 11-12.  Plaintiffs object to defendants' failure to even attempt to comply with the bare minimum state law requirement for all inmates, which are fundamental to survival in administrative segregation.  This is unacceptable.

In addition, defendants' plan delays implementation of even their minimal program of improved out of cell time for new admits to administrative segregation for many years. Defendants must be required to accelerate all elements as necessary to provide basic and fundamental out of cell time in administrative segregation.

Administrative segregation units are harsh living environments characterized by isolation, seclusion and lack of stimulation.  Inmates are cell-fed and have no educational, vocational or work opportunities.  They are escorted to yard, showers and any appointments in handcuffs.  Kahn Dec. ¶¶11-13.  Most of the units are noisy, crowded and dirty.  In the new stand-alone "Super-Max" administrative segregation units, inmates are extremely isolated on long, separate corridors with no windows and no view of a dayroom or other cells where they can talk to other inmates or observe activity in the unit. *Id.*  The California Code of Regulations sets for the basic rights of inmates placed in administrative segregation unit which include a minimum of ten hours of out of cell time and three showers a week.  CAL. CODE REGS. TIT. 15, §§ 3343 (g) (h) (2006)

Defendants acknowledged in their Plan and during the September 20, 2006 teleconference that they were not currently providing inmates housed in administrative

segregation with the basic state law requirements for out of cell time (showers and yard) in administrative segregation units.  Kahn Dec. ¶7. Ex. B at 4.

Defendants identify a major obstacle to the provision of out of cell time in administrative segregation as the lack of yard space but do not propose any meaningful plan to promptly sole the problem.  Despite this Court's order to use mid-year funding requests, defendants propose to delay the construction of 441 Small Management Yards by waiting for "the annual budget process" to take its course.  Defs' Plan at 11-12.  The Court should direct defendants to prepare and submit an emergency funding request for all necessary staffing and construction so that CDCR can provide all inmates housed in administrative segregation with the out of cell time required by law and recommended by the expert panel as necessary to reduce the suicide rate as soon as possible, but no later than July 1, 2007.

## II.    DEFENDANTS MUST ALSO IMPLEMENT THE EXPERT RECOMMENDATIONS REJECTED WITHOUT REASONABLE CAUSE

### A.    Defendants Must Be Directed To Implement Thirty Minute Welfare Checks In All Administrative Segregation Units In CDCR By July 1, 2007

The expert panel recommended that defendants provide thirty minute Welfare Checks in all administrative segregation units. Defs' Plan at 9.  A Welfare Check was defined by the expert panel as a "living and breathing" check, that involves a cell-front observation by a custodial officer who stands long enough at the cell-door to see some movement of the inmate that indicates that he or she is alive (*i.e.*, leg, head, chest movement).  Hayes Dec. ¶9.  There was consensus among the experts that these checks were extremely valuable in reducing the suicide rate in administrative segregation units because they increase the opportunity for emergency response to a suicide in progress and because they increase inmate contact with staff in these isolated housing units.  *Id.*  Any remedial plans developed to reduce the high suicide rate within CDCR administrative segregation units will be meaningless unless they include a commitment by defendants to implement thirty minute Welfare Checks.  Hayes Dec. ¶14.  CDCR does not currently provide Welfare Checks in any of their administrative segregation housing units.

1    The American Correctional Association ("ACA") standard for Welfare Checks, which

2   was adopted in 1983, requires that all inmates in administrative segregation units shall be

3   personally observed by a correctional officer at least every thirty minutes at an irregular

4   schedule.  American Correctional Association Standard 4-4257.  Kahn Dec. ¶16, Ex. F; Hayes

5   Dec ¶10.  This custodial rounding addresses the increased suicide risks, medical problems and

6   security incidents in administrative segregation.  Hayes Dec. ¶10.  The majority of state

7   department of corrections throughout the country, as well as the Federal Bureau of Prisons,

8   have implemented and maintained policies requiring thirty minute Welfare Checks in their

9   respective prison systems.  Hayes Dec. ¶10.  The thirty minute Welfare Checks allow officers

10  to more rapidly identify the security and treatment needs of inmates in the administrative

11  segregation units, particularly those who have been newly admitted or those who are

12  particularly vulnerable.  Kautzky Dec. ¶8.  Implementing thirty minute Welfare Checks

13  reduces the potential for inmates to harm themselves, to injure staff or other inmates, or to

14  damage state property.  Kautzky Dec. ¶9.  Thirty minute Welfare Checks enable correctional

15  officers to rescue inmates who have attempted suicide before serious injury or death.  Kautzky

16  Dec. ¶9.  As a result of the custody rounding currently provided by CDCR there have been

17  suicides where inmates have been dead for many hours when discovered by officers which

18  prevented any type of emergency response.  Hayes Dec. ¶11.  Providing thirty minute Welfare

19  Checks in administrative segregation units would significantly reduce the likelihood of these

20  "mishaps."  *Id*.

21    Defendants' rejected the recommended Welfare Checks because, they claim,

22  implementing this requirement would "strain the resources available to the Department."  Kahn

23  Dec. ¶7, Ex. B, Draft Report at 8.  Defendants also claimed to have difficulty understanding

24  the national standard for Welfare Check, but promised that the "Division of Adult Institutions

25  will re-evaluate the impact of implementation of this proposal when the term 'Welfare Check'

26  has been appropriately defined."  *Supra* at 9.

27    During the teleconference held on September 20, 2006 to discuss defendants' Draft

28  Plan, the term Welfare Check was again defined for defendants by the Special Master's expert,

1  Dr. Patterson, and by Lindsay Hayes, plaintiffs' expert.  Hayes Dec.¶12.  The experts

2  confirmed that thirty minute Welfare Checks were the national standard for rounding in

3  administrative segregation units.  Hayes Dec. ¶12.

4         Defendants continue to reject the unanimous recommendation by the expert panel that

5  Welfare Checks are necessary and life-saving in the administrative segregation units.  The only

6  excuse is lack of financial resources but defendants fail to even request the necessary resources

7  that will permit them to implement this critical recommendation.  Defs' Plan at 16.  Instead,

8  defendants propose more delay: they will evaluate their resource needs and submit a request

9  for resources; no timeframes are provided, no commitments are made.  *Id*.

10        During the October 18, 2006 phone conference, John Dovey, Director of Division of

11  Adult Institutions, agreed that the provision of thirty minute Welfare Checks was an

12  appropriate standard of rounding in the administrative segregation units, but he was unwilling

13  to commit to that standard of care in Defendants' Plan.  Kahn Dec. ¶8; Hayes Dec.¶ 13.

14  Plaintiffs' expert, Lindsay Hayes, proposed that defendants immediately implement the thirty

15  minute Welfare Checks for inmates admitted to administrative segregation units during their

16  first few weeks until defendants are able to obtain the necessary staffing resources through

17  mid-year funding requests to provide thirty minute Welfare Checks to all inmates housed in

18  administrative segregation units.  Hayes Dec. ¶13.  This recommendation was echoed by the

19  Special Master's expert, Dr. Ray Patterson.  Kahn Dec.¶8; Hayes Dec.¶13.  Defendants

20  rejected this proposal.  Kahn Dec. ¶8.

21        Defendants have refused to commit and postponed action on this critical, life-saving

22  recommendation for appropriate custody Welfare Checks in administrative segregation and

23  have failed to address this issue with the urgency that the situation demands.

24        The Court should direct defendants to obtain the resources necessary to implement

25  thirty minute Welfare Checks in every administrative segregation unit within CDCR as soon as

26  possible, but no later than July 1, 2007.

27

28

**B.    Defendants Must Be Directed To Develop And Implement A Plan To Provide Non-Disciplinary Inmates In Administrative Segregation With Additional Property While They Await Transfers**

Defendants' own suicide data reveals that more than half of the inmates who committed suicide in administrative segregation in 2005 were housed there for their own safety.  Rifkin Dec.¶2, Ex. A, Annual Suicide Report for 2005, at 13.  Defendants' Report notes that one reason for the lower suicide rate in the Security Housing Units may be that the "**inmates have personal property**" in those units.  *Id* at 12 (emphasis added).  Yet, despite this understanding of the importance of personal property to inmates in locked units and the connection to a lower suicide rate, defendants refused to adopt the recommendation to permit non-disciplinary inmates in administrative segregation some additional personal property.

The expert panel recommended creating separate housing units or tiers for inmates placed in administrative segregation for non-disciplinary reasons (safety concerns) and recommended providing these inmates with additional property and programming.  The experts noted that providing property to this group of inmates would provide stimulation and lessen the adverse impact of the isolation on this group, especially while they wait for their transfers.  Hayes Dec. ¶18.  The expert panel also noted that they were familiar with other correctional systems that had created separate housing for non-disciplinary segregation inmates who were provided with their property and additional privileges.  Kahn Dec.¶5.

CDCR currently runs an administrative segregation unit at Pelican Bay State Prison where non-disciplinary inmates in the unit are provided with additional property and privileges.  Kahn Dec. ¶17.  This "Pilot Program" referred to in Defendants' Plan was initiated because of the <u>Madrid</u> Special Master's concerns over the mental health decompensation experienced by inmates who remained for long periods of time in the administrative segregation unit while they waited for transfer to another institution.  Defs' Plan at 15; Kahn Dec. ¶17, Ex. G., "Special Master's Final Report and Recommendations Re: Administrative Segregation Mental Health Pilot Project."  The program permits inmates with good behavior to possess televisions and radios in the unit.  *Id*.  Defendants' Psychiatric Services Units ("PSU") which are locked housing units for Enhanced Outpatient Program ("EOP") inmates, provide

different amounts of property to inmates in their housing units depending on their "step" level in the program. Kahn Dec. ¶18. Some of these inmates are permitted televisions or radios, while others are not. *Id.*

Despite the success within their own system and the recommendation of the expert panel to provide non-disciplinary inmates in administrative segregation with their property while they wait for their transfers, defendants rejected the recommendation on the basis of a variety of unsubstantiated safety and security reasons. Defs' Plan at 15

Plaintiffs' security expert, Walter Kautzky, has extensive experience with many correctional systems and does not share CDCR's security concerns. Kautzky Dec. ¶¶14-19. Mr. Kautzky is familiar with other correctional systems, including the Federal Bureau of Prisons and Ohio, Florida, Illinois, Colorado, Iowa and Michigan Departments of Corrections where inmates placed in administrative segregation for non-disciplinary reasons are provided with some of their personal property. Kautzky Dec. ¶14. Mr. Kautzky has been Director of a number of state correctional systems and in that capacity created separate units for inmates placed in those units for non-disciplinary reasons. Kautzky Dec. ¶15. He safely implemented the program by separating cellblocks or hallways with partitions and by diminishing the security threat of property with the use of clear plastic covers for electronic devices and personal hygienic items. In Iowa and other states where he implemented this program, he required that all personal radios, televisions, electronic devices, and personal hygiene items be covered in clear plastic for security. Kautzky Dec. ¶ 17. Mr. Kautzky implemented these programs in the administrative segregation units that he administered because he recognized that for mentally ill or other vulnerable inmates who may struggle to remain grounded in reality, personal property can help those inmates stabilize in the harsh conditions of administrative segregation. The undue restriction of personal property items for mentally ill or vulnerable inmates may contribute to further destabilization and even suicide. Kautzky Dec. ¶ 15.

Defendants' "security" reasons fail to acknowledge the known suicide risk faced by inmates placed in administrative segregation for safety reasons. In the opinion of plaintiffs'

expert, defendants concern that providing property to non-disciplinary inmate may put them at risk is unwarranted and unsubstantiated. There are a variety of reasons that inmates are placed in administrative segregation for non-disciplinary reasons that do not involve being a confidential informant (*i.e.*, enemy concerns on the yard, allegations of staff misconduct) and providing these inmates with some of their personal property would not put them at risk. Kautzky Dec. ¶19. Administrative segregation units operate like small densely populated, ethnically diverse neighborhoods where inmates are often the first to know why other inmates have been placed in the unit, oftentimes with much greater accuracy than staff. *Id.* Contrary to defendants' reasoning, other correctional experts recommend that providing property to inmates placed in the administrative segregation units for non-disciplinary reasons (some of whom are experiencing significant stress levels) often stabilizes these inmates. Kautzky Dec.¶ 19; Hayes Dec. ¶18.

At the same time that defendants cite a series of security and safety reasons for rejecting the expert panel's recommendation to provide non-disciplinary inmates with separate housing and/or additional property while they wait for transfer, they have been providing additional property to non-disciplinary inmates housed in the administrative segregation unit at Pelican Bay State Prison since March 2006. Defs' Plan at 15. There is no credible evidence why defendants cannot implement similar programs elsewhere within their system. Plaintiffs request that the Court direct defendants to develop and implement a plan by January 1, 2007 to provide non-disciplinary inmates housed in administrative segregation with additional property – such as a television or radio – during their wait for transfer out of administrative segregation.

**C.    The Court Should Direct Defendants To Develop A Plan To Reduce Lengths Of Stay In Administrative Segregation**

The expert panel identified long stays in administrative segregation as a contributing factor to the high suicide rates within CDCR's administrative segregation units and recommended that the length of time that inmates remain in the units be shortened. Defs' Plan at 7. The reduction in the length of stay in administrative segregation has been a concern of

1  this Court for many years, but in today's extremely over-crowded system it is more difficult

2  than ever to move inmates out of segregation to placements in other prisons.

3       Defendants have adopted an emergency regulation that changes the frequency in the

4  committee reviews of inmates placed in administrative segregation from 30 days to up to 180

5  days.  Kahn Dec. ¶19 , Ex. H, Notice of Adoption of Emergency Regulation, Title 15, Section

6  3335 of the California Code of Regulations.  The Revised Program Guide requires that a

7  clinical case manager or psychiatrist will participate on all committee reviews for mentally ill

8  inmates housed in administrative segregation units and review whether the inmate will

9  decompensate if he or she is retained in the unit.  Revised Program Guide, 12-7-2, filed 2/3/06.

10       Plaintiffs filed objections to this proposed emergency regulation on the grounds that it

11  will not shorten lengths of stay in administrative segregation as touted and because the less

12  frequent reviews of mentally ill inmates places these inmates at greater risk of decompensation

13  and possible suicide.  Kahn Dec. ¶20,  Ex. I. , Plaintiff's Comment on Proposed Regulation

14  Number 05/05 amending Title 15, Section 3335, dated August 30, 2005.  These objections

15  were ignored by defendants and Section 3335 was adopted as a final regulation.  As a result,

16  many inmates are only reviewed by classification committee every six months in

17  administrative segregation.  Although Defendants' Plan promises a memorandum that the

18  Director will issue in the future to all institutions requiring review of the status of inmates who

19  have been housed in administrative segregation beyond 30 days, it does not address the

20  unavailability of beds, delays in transfers due to DA referrals, investigations, and rules

21  violation report processing that will impede any movement out of these units.  Defs' Plan at 13.

22  Nor does Defendants' Plan have any measurable goals or objectives.

23       The court should direct defendants to develop a concrete plan that will substantially

24  reduce the length of stay of inmates placed in administrative segregation to achieve the

25  following measurable goals: reducing the length of stay by twenty percent (20%) by June 1,

26  2007 and an additional twenty percent (20%) by December 1, 2007.  Defendants shall produce

27  monthly reports to the Special Master documenting lengths of stay for all inmates housed in

28

administrative segregation units at every CDCR institution.  The monthly reports shall include data from the previous month.

## CONCLUSION

The Court's June 8, 2006 Order was issued with a sense of urgency over the escalating rates of suicide within the CDCR's administrative segregation units.  In response to the June 8, 2006 Order, an expert panel met and developed a set of significant recommendations that would help reduce the suicide rate within the administrative segregation units.  Unfortunately defendants have either rejected or delayed implementation of the panel's critical recommendations.  Defendants' failure to act in a timely and responsible manner in light of the clear direction provided by the expert panel evidences deliberate indifference on the part of defendants.  The Court must intercede and order appropriate relief for the plaintiff class at this time.

Based on the foregoing, plaintiffs request that the Court issue the following orders:

1.      Defendants are required to immediately seek mid-term funding, to be authorized on or before January 1, 2007, to obtain Architectural and Engineering Assessments and associated design work for the retrofitting of the 406 Intake Cells.  To the extent that mid-year funding is not available for capital outlay, defendants should be required to seek other emergency funding and/or to review existing projects to determine which can be delayed or adjusted where funds have not or will not be spent.  The retrofit plan should be modified to require immediate removal/modification of the large mesh ventilation screens in each of the Intake Unit cells as soon as possible, but no later than March 1, 2007.  Other necessary renovations shall also occur in steps, with minor modifications (the removal of light coverings, fixtures, cell doors) undertaken first.  In addition, defendants should be directed to consider other emergency measures before the construction is completed, such as designating certain cells as Intake Units, where newly admitted inmates to administrative segregation can be housed and provided with the necessary observation required for these higher risk inmates.  All of the Intake Unit cells should be retrofitted as soon as possible, but no later than June 1, 2007.

2.      Defendants shall implement the pre-placement suicide prevention screening as soon as possible, but no later than January 1, 2007, and shall seek mid-year funding if necessary.

3.      Defendants shall prepare and submit an emergency funding request for all necessary staffing and construction, to enable CDCR to provide all inmates housed in administrative segregation units with the out of cell time required by law and recommended by the expert panel as necessary to reduce the suicide rate as soon as possible, but no later than July 1, 2007;

4.      Defendants shall develop and implement a plan as soon as possible, but no later than by January 1, 2007, to provide non-disciplinary inmates housed in administrative segregation with additional personal property – such as a television and radio – during their wait for transfer out of administrative segregation.

5.      Defendants shall develop a plan that will substantially reduce the length of stay of inmates placed in administrative segregation to achieve the following measurable goals: reducing the length of stay in administrative segregation by twenty percent (20%) as soon as possible, but no later than by June 1, 2007, and by an additional twenty percent (20%) by December 1, 2007.  Defendants shall be required to produce monthly reports to the Special Master documenting the lengths of stay for all inmates housed in the administrative segregation units at every CDCR institution.  The monthly reports shall provide data from the previous month.

6.      Defendants shall implement thirty minute Welfare Checks in every administrative segregation unit within CDCR as soon as possible, but no later than July 1, 2007.

///

///

///

///

///

1       7.      Defendants shall implement all other portions of their Plan to Address Suicide

2    Trends in Administrative Segregation Units.

3    Dated:  October 31, 2006                    Respectfully submitted,

4

5                                               /s/ Jane Kahn_____
                                                Jane Kahn
6                                               Rosen, Bien & Asaro
                                                Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28