PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
LORI RIFKIN Bar No.: 244081
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS** |

I, Jane E. Kahn, do hereby declare under penalty of perjury as follows:

1.　I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Asaro, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Objections to

1  Defendants' Plan to Address Suicide Trends in Administrative Segregation Units.

2.  I participated in the July 14, 2006 meeting of the expert panel in San Francisco, California which was organized in response to the June 8, 2006 Court Order. The eight hour meeting included defendants' experts, John Stoner, Colorado Department of Corrections, Thomas White, formerly Federal Bureau of Prisons and Bill Kissel, formerly Georgia Department of Corrections, plaintiffs' expert, Lindsay Hayes, the Special Master J. Michael Keating and his experts, Dr. Patterson and Dr. Metzner, representatives from the Division of Correctional Health Care Services Mental Health Care Program, representatives from CDCR Adult Institutions, CDCR Legal Staff, and plaintiffs' counsel, Jane Kahn and Lori Rifkin. Defendants presented the participants with background and statistical data on suicides in administrative segregation, information about CDCR's suicide prevention policy and CDCR's current efforts to reduce the rate of suicide in the administrative segregation units. The expert panel developed a set of recommendations that were unanimously endorsed as likely to reduce the suicide rate within the administrative segregation units in California's prisons. These recommendations are set forth in Defendants' Plan submitted to the Court on October 2, 2006. Def's Plan at 6-9,

3.  During the July 14, 2006 meeting, there was discussion of the retrofitting of the large-mesh ventilation screens in the administrative segregation units. Defendants were ordered to develop a plan to address the hazard of large mesh ventilation screens in administrative segregation units in 2005 but not a single large mesh ventilation screen has ever been replaced pursuant to this Order. 6/9/05 Order. Thomas White, one of the suicide experts hired by defendants, informed the participants that he had worked with a Kansas jail developing a suicide prevention policy and the jail had replaced their large mesh ventilation screens at a minor expense. Mr. White agreed to provide defendants with contact information for the Kansas jail.

4.  During the July 14, 2006 meeting the expert panel agreed that idleness and the lack of "out of cell" time were contributing factors to suicides in administrative segregation. There was consensus that providing inmates in administrative segregation with more out of cell

1  time would provide the inmates in these isolated housing units with increased social contacts
2  and improved living conditions – both factors that might help reduce the suicide rates in these
3  units.

4      5.    During the meeting on July 14, 2006, members of the expert panel spoke with
5  familiarity about correctional systems in which they had worked, including the Federal Bureau
6  of Prisons and the Colorado Department of Corrections, where inmates placed in
7  administrative segregation for non-disciplinary reasons are provided with their own property
8  and additional privileges.  Based upon their own positive experiences with these systems, the
9  expert panel recommended housing inmates placed in administrative segregation for non-
10 disciplinary reasons separately and/or providing them with some of their own property.

11     6.    On August 11, 2006, Lisa Tillman, Deputy Attorney General, contacted
12 plaintiffs' counsel and requested an extension of time to file defendants' plan to address the
13 suicide rate within the administrative segregation units.  The parties agreed to a stipulation to
14 extend the due date for the final plan to address suicide trends in administrative segregation
15 units from August 31, 2006 to October 2, 2006.  The stipulation included the June 8, 2006
16 Order language requiring as appropriate, a budget and implementation schedule for any policy
17 and procedure changes, staffing and budget augmentation, and if necessary, a mechanism for
18 obtaining mid-year funding.  The stipulation also required that defendants provide plaintiffs'
19 counsel and Special Master Keating with a copy of the draft plan by September 5, 2006, and
20 that defendants agree to arrange a teleconference to discuss the draft plan on or about
21 September 12, 2006, or at another mutually convenient time.  The Court reviewed the
22 stipulation and approved and ordered implementation of the stipulation.  9/8/06 Order.

23     7.    On September 20, 2006, a teleconference was held to discuss the Draft
24 Administrative Segregation Unit Suicide Plan provided to plaintiffs' counsel and Special
25 Master Keating on September 5, 2006.  Attached hereto as Exhibit B is a true and correct copy
26 of Defendants' Draft Administrative Segregation Unit Suicide Plan ("Draft Plan").  I
27 participated in the September 20, 2006 teleconference.  Prior to the September 20, 2006
28 teleconference, plaintiffs provided Special Master Keating and defendants' counsel with

-3-
DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS
IN ADMINISTRATIVE SEGREGATION UNITS, NO.: CIV S 90-0520 LKK-JFM

1  comments on the Draft Plan.  Plaintiffs' comments focused on the expert panel
2  recommendations that were rejected by defendants, including the 30 minute Welfare Checks
3  and the provision of property to inmates housed in administrative segregation for non-
4  disciplinary reasons.  Plaintiffs' also objected to the delayed implementation of the retrofitting
5  of the Intake Cells and the provision of out of cell yard for inmates housed in administrative
6  segregation units.  Attached hereto as Exhibit C is a true and correct copy of my letter to Mr.
7  Keating, Ms. Tillman and Mr. Stone re Draft ASU Suicide Prevention Plan, dated September
8  18, 2006.  There were many participants on this phone call including, but not limited to,
9  Special Master Keating, *Coleman* experts Ray Patterson and Jeff Metzner, defendants' suicide
10 experts Thomas White and John Stoner, plaintiffs' suicide expert, Lindsay Hayes, CDCR
11 officials including John Dovey, Director of Adult Divisions, and Dr. Peter Farber-Szekrenyi,
12 Director of Division of Correctional Health Care Services, defendants' counsel Lisa Tillman
13 and Michael Stone, and plaintiffs' counsel, Michael Bien and Jane Kahn.  During the
14 discussion of Welfare Checks, defendants stated that they had been confused as to what a
15 Welfare Check was and what "personally observed" means.  Welfare Checks had previously
16 been defined by the expert panel on July 14, 2006.  On this phone conference, the experts,
17 Lindsay Hayes and Ray Patterson, again defined and described Welfare Checks to the
18 defendants as a "living and breathing" check, that involves a cell-front observation by an
19 officer who stands at the cell door long enough to see some movement on the inmate that
20 indicates that he or she is alive (i.e., head, chest, leg movement).
21     8.    After receiving Defendants' Plan to Address Suicide Trends in Administrative
22 Segregation Units on October 2, 2006,  I contacted Lisa Tillman, Deputy Attorney General,
23 and briefly raised plaintiffs' concerns regarding the plan's implementation timeframes and
24 scope of recommendations.  I requested that she arrange a teleconference to discuss possible
25 interim measures by defendants to address the high suicide rates within administrative
26 segregation and/or modifications to the existing plan filed with the Court.  A teleconference
27 was held on October 18, 2006 to discuss plaintiffs' concerns with Defendants' Plan.  There
28 were many participants on this phone call including, but not limited to, Special Master

Keating, Deputy Master Lopes, Coleman experts Ray Patterson, Jeff Metzner, Dennis Koson, Kerry Hughes, Melissa Warren, and Ted Ruggles, plaintiffs' expert, Lindsay Hayes, CDCR representatives including John Dovey, Director of Adult Divisions, Dr. Peter Farber-Szekrenyi, Director of Division of Correctional Health Care Services, and Bruce Slavin, General Counsel, defendants' counsel Lisa Tillman, and Michael Stone, and plaintiffs' counsel, Jane Kahn, Lori Rifkin, Amy Whelan and Ivan Trujillo. During the discussion of Welfare Checks in all administrative segregation units, Mr. Dovey noted that he would direct all CDCR institutions to further explore the matter and would implement thirty (30) minute Welfare Checks if CDCR had sufficient resources to do so. Dr. Patterson and Lindsay Hayes recommended that CDCR immediately implement thirty (30) minute Welfare Checks as an interim measure for inmates who are newly admitted to administrative segregation units and fully implement these Welfare Checks for all inmates in administrative segregation once CDCR has requested the necessary resources to implement these life-saving rounds. Mr. Dovey was unable to so commit.

9. During the October 18, 2006 teleconference, George Sifuentes, representing CDCR Facilities Division, discussed the proposed modifications to the Intake Units. He noted that the delayed schedule for retrofitting these units had been established because funding would not be available until Fiscal Year 2007/2008. I objected to defendants' failure to seek emergency, mid-year funding for the design and construction work required to create the necessary Intake Units. In response to my objection, a representative from the Department of Finance spoke and reported that there is no regular mechanism for mid-year funding available for capital outlay.

**SUICIDES IN CDCR AND ADMINISTRATIVE SEGREGATION UNITS**

10. Under my supervision, paralegals in our law firm track all California Department of Corrections and Rehabilitation ("CDCR") suicides in a database. Defendants inform Special Master Keating and our office of each suicide in the CDCR. We add the name of each inmate who commits suicide, and other key data relevant to the database, when we receive suicide notification and suicide reports from the defendants. We also cross-check our database against the Special Master's and defendant's annual suicide reports, and make adjustments to

our tracking data where necessary. Our numbers do not always coincide with the total number of suicides reported by defendants in a year. For example, in 2005, plaintiffs counted 41 suicides by CDCR inmates, which included three deaths reported by defendants as non-suicides. In 2005, CDCR's suicide rate was more than twice the national average for prisons, and was the highest number of suicides ever in the CDCR. According to our current tracking log, which does not count seven deaths reported through the suicidal notification process as accidental or non-suicides (cases which may upon further review turn out to be suicides), through mid October 2006 there have already been at least 35 suicides in the CDCR, with 19 (54%) of these in administrative segregation units. Defendants track the length of stay for inmates housed in their administrative segregation units at the time of their suicide in their own suicide reports. I have reviewed defendants' suicide reports for 2003, 2004 and 2005 and have derived the percentage of inmates who committed suicide in administrative segregation within three days of their admission for each of those years based upon a chart provided in each of defendants' suicide reports that lists, for each suicide in administrative segregation, the length of stay in administrative segregation and the reasons for placement in the administrative segregation units (i.e. battery on staff, safety concerns). Defendants' Annual Suicide Report for 2005 attached as Exhibit A, Declaration of Lori Rifkin filed in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Rifkin Dec.") (Filed Under Seal); Defendants' Annual Suicide Report for 2004 attached as Exhibit B, Rifkin Dec.; Defendants' Annual Suicide Report for 2003, attached as Exhibit C, Rifkin Dec. In 2003, 25% (5 of 20) of the suicides in administrative segregation occurred within the first three days of the inmate's placement in the unit. Defendants' Annual Suicide Report for 2003 at 10. In 2004, 28% (5 of 18) of the suicides occurred within three days of the inmate's placement in administrative segregation. Defendants' Annual Suicide Report for 2004 at 11. Finally, in 2005, 38% (5 of 13) of the suicides occurred within three days of the inmate's placement in administrative segregation. Defendant's Annual Suicide Report for 2005 at 13. Currently, inmates are not screened for suicide risk prior to their placement in administrative segregation.

11. I have extensively toured administrative segregation units in many California prisons in my role as class counsel for *Coleman* plaintiffs and I have observed the harsh conditions of confinement in these units. Inmates in administrative segregation remain locked in their cells for their meals. They are escorted to yard, showers and any appointments in handcuffs. There are no educational, vocational or work programs provided to inmates housed in administrative segregation. Most of the administrative segregation units are very noisy, crowded and dirty. Inmates are not permitted to have radios or television in these units and the possession of other personal property is also severely restricted. Inmates housed in the new stand-alone "Super-Max" administrative segregation units are extremely isolated on long, separate corridors with no windows and no view of a dayroom or other cells where they can talk to other inmates or observe activity in the unit. The California Code of Regulations, Title 15, Section 3343, regulates the basic conditions of confinement in administrative segregation units in CDCR. This state law mandates that inmates in administrative segregation should be provided with yard five days a week for an hour or three days a week for a minimum of ten hours. CAL. CODE REGS. TIT. 15, § 3343(h) (2006). Our office regularly receives inmate correspondence from *Coleman* class members who report that they are not provided with ten hours of yard in administrative segregation units. Inmates have supplied us with responses to grievances they have filed about this lack of out of cell time in which wardens admit that they are unable to provide the exercise time due to lack of staffing, exercise yards and overcrowding.

12. I visited the administrative segregation units at California Institute for Men on October 18, 2006 during a *Coleman* monitoring tour. The institutional staff reported to the *Coleman* monitors and the attorneys on the visit that they were unable to provide the mandated clinical care to the current number of mentally ill inmates housed in administrative segregation because there were at least 35 more mentally ill inmates housed there than the institution could treat. These units were dirty, crowded, isolated, and the men in the units reported that they were provided with very limited hours of yard during the week. In one of the administrative segregation units, inmates were exposed to wind and dust because of a broken window

adjacent to their cell. On August 13, 2006, an inmate committed suicide in Palm Hall, an administrative segregation unit at California Institute for Men.

13. Administrative segregation units are housing units where inmates are locked down in isolated cells for at least 23 hours a day with limited human interaction and minimal or no programming. Dr. Metzner, a *Coleman* expert and one of the authors of the National Commission on Correctional Health Care guidelines for delivering mental health care in administrative segregation units, writes that "[m]ental health clinicians working in such facilities frequently report that it is not uncommon to observe many inmates, who do not have pre-existing serious mental disorders, to develop irritability, anxiety and other dysphoric symptoms when housed in these units for long periods of time." In his chapter, Dr. Metzner noted that "[t]here is general consensus among clinicians that placement of inmates with serious mental illnesses in setting with "extreme isolation" is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve... [i]n other words, many inmates with serious mental illnesses are harmed when placed in such settings." Attached hereto as Exhibit A is a true and correct copy of Jeffrey L. Metzner, Mental Health Considerations for Segregated Inmates, in Correctional Mental Health Care Standards and Guidelines for Delivering Services, 233-234 (National Commission on Correctional Health Care 2003).

14. In addition to the Defendants' Annual Suicide Report data that identifies a percentage of inmates who commit suicide within the first three days of their placement in administrative segregation, I have also reviewed the data provided by defendants to the participants at the July 14, 2006 meeting with the expert panel. Included in the data, which was also projected as slides for discussion during the meeting, was a graph that illustrated the length of stay in administrative segregation for suicides by mentally ill and non-mentally ill inmates. Attached hereto as Exhibit D is a true and correct copy of Clinical Experts Consensus Forum July 14, 2006 Cover, with Graph of Length of Stay in ASU Prior to Suicide: MHSDS vs. Non-MI. During the July 14, 2006 meeting we were informed that the data reported in the graph included only CDCR male suicides from 1996 until 2005. During the discussion of this

-8-
DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS, NO.: CIV S 90-0520 LKK-JFM

1 graph, defendants noted that a significant percentage of non-mental health inmates committed
2 suicide within the first three days of their placement in administrative segregation.

### INTAKE CELL RETROFIT/LARGE MESH VENTILATION SCREENS

15. On June 9, 2005, this Court ordered "[w]ithin thirty days from the date of this order defendants shall submit to the special master a plan for dealing with the hazard of large-mesh ventilation screens in administrative segregation cells in which mental health caseload inmates are housed." 6/9/06 Order ¶1. Defendants provided Special Master Keating with their plan on July 8, 2005.

16. The plan describes the CDCR's efforts to assess the viability of the "S-Vent", a suicide resistant security grille that was highly recommended, but which proved unacceptable when tested within CDCR. Defendants' plan included a "feasibility study" to "assess the conversion of supply and exhaust grille openings in ASU cells housing mental health inmates to the Title 24 (local adult and juvenile detention facilities) standard of no greater than 3/16" openings" The tasks and timeframes identified in the study included: inventory all ASU cells (within 90 days), determine the number of cells based upon the prevalence of mental health inmates in ASU on a site-by-site basis (within 180 days), develop an initial conversion priority list based on historical suicide rate date (within 210 days), identify potential operational alternatives in lieu of physical plant modifications (within 240 days), begin site-by-site assessments to determine scope of work and resource requirements (within 18-24 months), complete a cost-benefit analysis comparing operational alternatives to physical plan modifications (with 90 days from site assessment completion) and "*[b]ased upon the outcome of the feasibility study, the CDCR will develop recommendations and pursue their implementation (To be determined, dependant on decisions made in the aforementioned tasks.)*" Attached hereto as Exhibit E is a true and correct copy of Defendants' July 8, 2005 Response to June 9, 2005 Order regarding Large Mesh Vents, at 3-4. Defendants' plan promised no action whatsoever, and in fact, no large mesh ventilation screen has ever been replaced under the Plan submitted to the Special Master pursuant to the June 9, 2005 Order.

### THIRTY MINUTE WELFARE CHECKS

17. Attached hereto as Exhibit F is a true and correct copy of the Standard 4-4257 for Adult Correctional Institutions, Fourth Edition, American Correctional Association, January 2003, Standard 4-4257. This standard provides that all special management inmates (administrative segregation) will be personally observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation.

### PROPERTY FOR NON-DISCIPLINARY INMATES IN ASUS

18. I am familiar with the Pilot Administrative Segregation Program at Pelican Bay State Prison because I was asked by Steve Fama, my co-counsel at Prison Law Office, to review the proposal in 2005. The Pilot was designed to prevent mentally ill inmates in administrative segregation at Pelican Bay from decompensating while they waited many months to transfer to either a Sensitive Needs Yard or to the Corcoran State Prison Security Housing Unit. Inmates transferred into the unit from the Psychiatric Security Unit because their level of mental health services was reduced are provided with in-cell recreational activities such as art supplies, with additional property including a television or radio, and with additional out of cell clinical activities. Other mental health inmates are provided with additional out of cell clinical activities and property once they remain disciplinary free for a set period of time. Attached hereto as Exhibit G is a true and correct copy of the Madrid Special Master's Final Report and Recommendations re Administrative Segregation Mental Health Pilot Project, dated January 17, 2006.

19. I am also aware that inmates housed in the Psychiatric Services Units (PSU), which are locked housing units for Enhanced Outpatient (EOP) inmates, are provided with different property depending on their step levels within the programs. For example, patients in the PSU at CSP-Sacramento are not permitted televisions or radios in Steps I and II, but they are permitted these devices in Step III and beyond. In Step IV patients are also provided with art supplies from the recreational therapist and are eligible for a state loaner television or radio.

## FREQUENCY OF THE REVIEW OF INMATES PLACED IN ADMINISTRATIVE SEGREGATION UNITS HAS BEEN REDUCED

20. Attached hereto as Exhibit H is a true and correct copy of Notice of Adoption of Emergency Regulations, Title 15, Section 3335 of the California Code of Regulations and the text of the proposed emergency regulation which reduces the frequency of the institutional committee review of an inmate's placement in segregation from every 30 days to 180 days for many inmates placed in administrative segregation. For mentally ill inmates in administrative segregation, the committee review is where their case manager or psychiatrist, who participates on the committee, provide mental health input regarding the "likelihood of decompensation if retained in ASU." Revised Program Guide 12-7-2. The purported reason for this "emergency regulation" was to shorten lengths of stay in administrative segregation. In fact, it does no such thing, and for mentally ill inmates it eliminates the 30 day committee review which includes mental health input.

21. Attached hereto as Exhibit I is a true and correct copy of Plaintiffs' Comment on Proposed Regulation Number 05/05 amending Title 15, Section 3335, dated August 30, 2005. In our comments, plaintiffs objected to the proposed change to less frequent reviews of inmates in segregation because it necessarily lengthens stays in administrative segregation and would likely remove another type of monitoring provided to mentally ill inmates in those harsh units. The *Coleman* Program Guides mandate that a mental health clinician sit on these committee reviews as a necessary safeguard to review whether the inmate will decompensate if he or she is retained in the administrative segregation unit. Revised Program Guide 12-7-1 & 2.

The foregoing is based upon my own personal knowledge, except where stated to be based upon information and belief. If called upon to do so, I could and would so testify.

I declare under penalty of perjury this 31 day of October 2006 at San Francisco, California, that the foregoing is true and correct.

*/s/ Jane E. Kahn*
Jane E. Kahn

-11-
DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS, NO.: CIV S 90-0520 LKK-JFM