# Exhibit A

# Correctional Mental Health Care

## STANDARDS & GUIDELINES FOR DELIVERING SERVICES



National Commission on Correctional Health Care

2003

# APPENDIX D

## Mental Health Considerations for Segregated Inmates

Jeffrey L. Metzner, MD, PC
Clinical Professor of Psychiatry
University of Colorado Health Sciences Center

The scientific literature is sparse concerning the impact of locking an inmate in an isolated cell for an average of 23 hours per day with limited human interaction, minimal or no programming, and in an environment that is designed to exert maximum control over the individual. Mental health clinicians working in such facilities frequently report that it is not uncommon to observe many inmates, who do not have pre-existing serious mental disorders, to develop irritability, anxiety and other dysphoric symptoms when housed in these units for long periods of time (Metzner 2002).

Zinger and Wichmann (1999) provide a very useful literature review relevant to the psychological effects of 60 days in segregation. They point out the literature in this area is conflicting, filled with speculations, and often based upon far-fetched extrapolations and generalizations. Methodological shortcomings apparent from reviewing the literature include reliance on anecdotal evidence, wide variation regarding the conditions of confinement present in different prisons, and an over-reliance on field and laboratory experiments pertinent to sensory deprivation.

Zubek, Bayer, and Shephard (1969) conceptualize segregation units to have three main characteristics: social isolation, sensory deprivation, and confinement. Each of these elements can vary significantly as will different inmates' responses to the segregation experience. In general, the decreased/altered social interactions for inmates in segregation housing units appear to be more of a problem from a mental health perspective in contrast to sensory deprivation. Many of the milieus in such units are characterized by sensory over-stimulation (e.g., inmates yelling for communication purposes or for other reasons). Radios and television sets, which may be available in these housing units, can eliminate or decrease sensory deprivation, although the severe disruption in normal social interactions remains a problem (Metzner 2002).

The difficulties of providing appropriate and adequate access to mental health care and treatment are especially problematic in any segregation environment, related to logistical issues that frequently include inadequate office space and limited access to inmates related to security issues. In

correctional settings with inadequate mental health services, it is often not difficult to find inmates with serious mental illnesses in segregation housing units because their untreated mental illnesses often result in significant behavioral problems.

There is general consensus among clinicians that placement of inmates with serious mental illnesses in settings with "extreme isolation" is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve (Work Group on Schizophrenia, 1997). In other words, many inmates with serious mental illnesses are harmed when placed in such settings. In addition to potential litigation, this is one of the main reasons that an increasing number of the so-called supermax facilities exclude inmates with serious mental illnesses from admission.

A mental health screening process, which should include screening assessments at the sending facility and the receiving facility with the segregation housing units, is a recommended mechanism to identify inmates with serious mental illnesses in a timely fashion. In addition to inmates with serious mental illnesses, developmentally delayed inmates are usually excluded from admission to extreme isolation housing, unless a specialized mental health program exists within the institution similar to residential treatment programs for general population inmates with serious mental illnesses (Metzner, 1998; Haddad, 1999).

Regardless of the policy relevant to admission or exclusion of inmates with serious mental illnesses, mental health staff should regularly perform rounds in all the housing units within a supermax as a further mental health screening procedure. This screening process is necessary because it is frequently not possible to predict a particular inmate's reaction to confinement in a segregation unit characterized by extreme isolation. Establishment of a mental health liaison consultation model with the correctional and health care staffs, along with the rounds process, will facilitate timely identification of inmates exhibiting acute symptoms of mental illness and the provision of appropriate clinical interventions.

Similar rounds should be performed on a regular basis by health care staff, preferably mental health staff, in other segregation housing units as summarized in the *Standards*. The NCCHC *Standards* provide guidance relevant to the definition of "regular rounds" based on the nature of the segregation housing unit. If the monitoring is not done by mental health staff, training should be provided to the health care staff providing the monitoring relevant to pertinent mental health issues.

In providing essential mental health services in segregation housing, a task force of the American Psychiatric Association recommended that the following principles should be observed:

No inmate should be placed in segregation housing solely because he or she exhibits the symptoms of mental illness, unless there is an immediate and serious danger for which there is no other reasonable alternative. (This principle does not refer to medical or psychiatric seclusion, which should follow state mental health law and professional practice.)

When an inmate is placed in segregated housing for appropriate correctional reasons, the facility remains responsible for meeting all of the serious medical and psychiatric needs of that inmate. Thus, such inmates must receive any mental health services that are deemed essential, their segregation status notwithstanding.

Inmates who are in current, severe psychiatric crisis, including but not limited to acute psychosis and suicidal depression, should be removed from segregation until such time as they are psychologically able to tolerate that setting.

Inmates who are known to have serious mental health needs, especially those with a known history of serious and persistent mental illness, when housed in segregation, must be assessed on a regular basis by qualified mental health practitioners, to identify and respond to emerging crises at the earliest possible moment.

Institutions should provide for regular rounds by a qualified mental health clinician in all segregation housing units. During these rounds, each inmate should be visited briefly so that any emerging problem can be assessed. The clinician should also communicate with segregation security staff in order to identify any inmate who appears to be showing signs of mental deterioration or psychological problems (American Psychiatric Association, 2000).

References

American Psychiatric Association. (2000). *Psychiatric Services in Jails and Prisons.* Washington, DC: Author.

Haddad, J. (1999). Treatment for inmates with serious mental illness who require specialized placement but not psychiatric hospitalization. *Correctional Mental Health Report,* 1, 59, 60-62.

Metzner, J. L. (1998). An introduction to correctional psychiatry: Part III. *Journal of the American Academy of Psychiatry and the Law, 26,* 107-116.

Metzner, J. L. (2002). Class Action Litigation in Correctional Psychiatry. *J. Amer. Acad. Psychiatry and the Law, 30,* 19-29.

Work Group on Schizophrenia. (1997). American Psychiatric Association practice guidelines: practice guideline for the treatment of patients with schizophrenia. *American Journal of Psychiatry, 154*(Supplement), 1-63.

Zinger, I. & Wichmann, C. (1999). *The psychological effects of 60 days in administrative segregation.* Research Branch Correctional Service of Canada, 1-90.

Zubek, J. P., Bayer, L. & Shephard, J. M. (1969). Relative effects of prolonged social isolation and confinement: Behavioral and EEG changes. *Journal of Abnormal Psychology, 74,* 625-631.

# Exhibit B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA  94283-0001



September 5, 2006


J. Michael Keating, Jr.                    via:     Lisa Tillman
Office of the Special Master                        Deputy Attorney General
285 Terrace Avenue                                  Department of Justice
Riverside, RI  02915                                1300 I Street, Suite 125
                                                    P. O. Box 944255
                                                    Sacramento, CA  94244-2550


RE:     **DRAFT     ADMINISTRATIVE     SEGREGATION     UNIT     SUICIDE
        PREVENTION PLAN**


Dear Mr. Keating:

Please find enclosed the Draft Administrative Segregation Unit Suicide Prevention Plan.

Please contact Doug McKeever, if you have any questions or concerns at (916) 327-1168.

Sincerely,


PETER FARBER-SZEKRENYI, DR. P.H.                    JOHN DOVEY
Director                                            Director
Division of Correctional Health Care Services       Division of Adult Institutions

Enclosure

cc:     Kathleen Keeshen, Chief Deputy Counsel, Office of Legal Affairs
        John Dovey, Director, Division of Adult Institutions
        Doug McKeever, Program Director, Mental Health Program, DCHCS
        Teresa Schwartz, Associate Director, Division of Adult Institutions
        Brigid Hanson, Deputy Director, DCHCS
        Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
        Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs

Division of Correctional Health Care Services                              9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

**DRAFT**
**ADMINISTRATIVE SEGREGATION UNIT**
**SUICIDE PREVENTION PLAN**

**OVERVIEW OF COURT ORDER**

On May 9, 2006 the *Coleman* Special Master filed the Report on Suicides Completed in the California Department of Corrections [and Rehabilitation] in Calendar Year 2004. The Special Master recommended that the Department be required to:

> "*develop by May 31, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units.*"

The California Department of Corrections and Rehabilitation (the Department) responded to the recommendation by requesting to collaborate with the Special Master's experts, and to extend the completion of the plan by requesting the Court adopt August 31, 2006 as the date for completion of the plan.

Plaintiff's counsel filed a series of responses to the report and requested that the Department obtain the necessary funding to implement any plan in September 2006, collaborate with Plaintiff's suicide expert, and include a schedule for implementation within the plan.

On June 8, 2006 Judge Karlton issued an order adopting the recommendation of the Special Master and the timeframe of August 31, 2006 for completion of the plan. He ordered the Department to:

> "*...include, as appropriate, a budget and implementation schedule for any policy and procedure changes, staffing or budget augmentation, and, if necessary, include a mechanism for obtaining mid-year funding on or before September 30, 2006.*"

In the course of discussions with Plaintiffs' counsel, the Department agreed to submit a draft of the plan by September 5, 2006 and Plaintiffs' counsel agreed to permit an extension of the deadline for submission of the final plan to October 2, 2006. The Court approved the request for an extension of the deadline.

Division of Correctional Health Care Services                           9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

DESCRIPTION OF ANALYSIS OF CONTRIBUTING FACTORS RELATED TO SUICIDES IN
ADMINISTRATIVE SEGREGATION UNIT

The Department's Division of Correctional Health Care Services Suicide Prevention and
Response Focused Improvement Team met in early June and identified a methodology for the
analysis of causes (contributing factors) of increased suicides in Administrative Segregation
Units and the preparation of a plan for submission to the *Coleman* court. The process included
an in-house analysis of identifiable common factors of all Administrative Segregation Unit
suicides in 2004, and an external consultation with a panel including the Special Master's
experts, the plaintiff's expert, and California Department of Corrections and Rehabilitation's
experts. In addition, the Suicide Prevention and Response Focused Improvement Team
undertook a review of ideas or initiatives focused on Administrative Segregation Unit suicide
risk reduction that have not been implemented, and identified current policies that have been
partially implemented.

The Suicide Prevention and Response Focused Improvement Team met to reach consensus about
general areas to investigate in the analysis of contributing factors to Administrative Segregation
Unit suicides. The Suicide Prevention and Response Focused Improvement Team identified five
major areas (contributing factors) that can contribute to an Administrative Segregation Unit
suicide, including: mental health treatment issues; family/external social issues; custodial factors;
in-prison safety/social issues; substance abuse issues; and "other" (see Attachment A). Each
factor had several components identified by the Suicide Prevention and Response Focused
Improvement Team. Subsequently, acting as independent reviewers, two members of the
Division of Correctional Health Care Services senior mental health staff read each report of a
suicide in Administrative Segregation Unit during 2004. The reviewers identified and tallied the
number of times a general factor and its secondary components appeared in the report as
contributing factors leading to the inmate's suicide. The reviewers conferred to identify
contributing factors that each had identified. Finally, the reviewers compared their findings to
those in the Special Master's expert report for each suicide. At the end of the process the tallies
for each major contributing factor and its components were totaled to identify the most
prominent contributing factors that were identified in the reports (and in Dr. Patterson's reviews)
as leading to the suicide of the inmate.

The most frequent factors identified by the reviewers were (listed from most to least frequently
identified): Mental Health, Custodial Factors, In-Prison/Safety, Other Issues, Family/External
Issues. Within the Mental Health factor the most frequently identified secondary factor was
inadequate suicide risk or mental health assessments, underestimation of acuity, lack of referral
to a higher level of care, decompensation, and poor follow-up. Custodial issues included change
in commitment time, the fact of Administrative Segregation Unit placement, and other factors
such as District Attorney referrals, long Administrative Segregation Unit term, imposition of
Security Housing Unit term, or violent rules violation. In-prison Safety/Social Issues
encompassed fearfulness, reports of being threatened by others, and removal of a peer group.

Division of Correctional Health Care Services                                                                      9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

Simultaneously with the review of 2004 suicides in Administrative Segregation Unit, the Suicide Prevention and Response Focused Improvement Team reviewed its meeting minutes, Action Item Log, and suicide prevention policy memoranda from the past two years to identify practices and policies that either had not been implemented or had been partially implemented to be part of the presentation to the expert consensus panel.

## DESCRIPTION OF EXPERTS MEETING

The expert panel was conceived as a method to bring together subject-matter experts in suicide prevention and to reach consensus on a number of areas and actions to assist the Department in developing the court-ordered plan.

The Department sponsored three experts from around the nation: John Stoner, Ph.D., Colorado Department of Corrections; Thomas White, Ph.D., formerly Federal Bureau of Prisons; and Bill Kissel, M.S., formerly Georgia Department of Corrections. All three have been involved in training in suicide prevention, correctional mental health service delivery, and prison litigation. Plaintiff's expert was Lindsay Hayes, M.S. of the National Center for Institutions and Alternatives, an acknowledged national expert on jail/prison suicide prevention. The Special Master's experts were Jeffrey Metzner, M.D. and Ray Patterson, M.D. Both are acknowledged experts in correctional mental health services delivery and prison suicide issues.

On July 14, 2006 the consensus panel met in San Francisco for eight hours. In addition to the expert participants, others included Special Master J. Michael Keating, Division of Correctional Health Care Services Mental Health Program staff (Drs. Chaiken, McAloon, Steenman, Canning, and Program Director Doug McKeever), Teresa Schwartz, Associate Director, General Population Levels III & IV from the Division of Adult Institutions; Michael Stone, Staff Counsel, of the California Department of Corrections and Rehabilitation Office of Legal Affairs; plaintiff's counsel Jane Kahn and Lori Rifkin.

After introductions and a review of the agenda, Drs. Chaiken and Canning presented background and statistical data on suicides in Administrative Segregation Unit, highlights of the Division of Correctional Health Care Services suicide prevention policy, mental health services in Administrative Segregation Unit, and current and recent initiatives to reduce the risk of suicide in Administrative Segregation Units. In addition, staff presented an overview and the results of the contributing factors analysis.

Discussion by the participants centered on a variety of issues: environmental/physical plant factors, screening and evaluation issues, custodial procedures, and monitoring and auditing of practices.

Division of Correctional Health Care Services                                      9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

RECOMMENDATIONS DISCUSSED AND APPROVED FOR CONSIDERATION BY THE CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION

During the afternoon, the panel participants discussed a series of recommendations that should
be considered for inclusion in the plan submitted to the court. The Department is preparing an
implementation plan for the following recommendations:

A. Environmental/Physical Plant:

1) Intake Cells: A percentage of cells in each Administrative Segregation Unit statewide
should be reserved for new arrivals. Inmates newly housed into Administrative
Segregation Units would be housed in these intake cells. The expert panel recommended
that inmates be housed in intake cells for two to three weeks. The Department
recommends that inmates be housed in intake cells for a minimum of 72 hours. These
cells would be located in areas that afford more opportunity for observation and
interaction between custody staff and the inmate. (Note: Subsequent to the expert panel,
Suicide Prevention and Response Focused Improvement Team determined that if, on
initial arrival in Administrative Segregation Unit, an inmate can safely be housed with a
cellmate, then the inmate would not need to be placed into one of the designated intake
cells, since having a cellmate has proven to be a protective factor against suicide risk.)

2) Intake Cells: All intake cells should be retrofitted to reduce availability of hanging
attachment sites.
a) When possible, beds should be concrete slab construction.
b) Dangerous protrusions should be eliminated and if possible replaced with "pull away"
fixtures.
c) Vent coverings should be installed to reduce use of vent openings as attachment sites
for ligatures.
d) Light coverings should be retrofitted to prevent use as attachment sites.
e) If possible, cell doors should be retrofitted or replaced with doors having more
window area to increase visibility of cell interior.

B. Custodial Procedures

1) Title 15 Requirements: During the time that inmates are housed in the Administrative
Segregation Unit intake cells, or are within the first two to three weeks after placement
into Administrative Segregation Unit, The Department should ensure they receive all
Title 15 requirements for out-of-cell time and privileges.

2) Confidential Mental Health Interviews: All inmates housed in Administrative
Segregation Unit who meet with mental health staff should have their interviews in
private settings (affording confidentiality of sight and sound from other inmates and
confidentiality of sound from staff). Custody should announce these interviews as
"health appointments" to avoid stigmatization and possible retribution of other inmates.

Division of Correctional Health Care Services                                      9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

3) Reduction in Length of Stay: The length of time inmates remain in Administrative Segregation Units should be shortened.

4) Return-from-Court ("Bad News") Information: Inmates returning from court dates often experience increased distress due to "bad news" such as additional incarceration time or adverse court proceedings such as loss of parenting rights. Several institutions have created standardized ways to capture this information and alert mental health staff about possible mental health crises. Division of Correctional Health Care Services Suicide Prevention and Response Focused Improvement Team should standardize a statewide system to capture such information and communicate that information to mental health staff utilizing a combination of methods developed at Folsom State Prison and the California Correctional Institution.

C. Mental Health Screening, Coordination, and Treatment

1) Pre-placement Suicide Prevention Screening: All inmates placed into Administrative Segregation Unit should have a brief suicide risk screening done as part of their pre-placement medical screening. Results of the brief suicide-risk screening should be used to determine any need for further mental health evaluation, and should be noted in the chart on a chrono.

2) Post-placement Screening: All inmates receive the 31-item screening according to Mental Health Service Delivery System Program Guide timelines. The screening interview should be administered in a private, confidential setting. If an inmate refuses screening, a mental health clinician should contact the inmate at cell-front, should review the Unit Health Record, and should contact custody staff in the Administrative Segregation Unit to gather additional information regarding the inmate's mental state.

3) Daily Coordination: By policy memorandum of May 2005, The Department requires that each morning an assigned Licensed Psychiatric Technician should meet with Administrative Segregation Unit staff (including a Sergeant) to solicit information about new arrivals in Administrative Segregation Unit or inmates who may require clinical attention. Henceforth, this meeting should include the assigned Administrative Segregation Unit mental health clinician (social worker or psychologist). Suicide risk data on new arrivals should be available at the meeting to alert custody staff. Clinical concerns should be discussed.

4) Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub Institutions: When an inmate is referred to the Administrative Segregation Unit Enhanced Out Patient level of care, there should be a 60 day period of time before the receiving Administrative Segregation Unit Hub Institution can refer the inmate-patient back to Correctional Clinical Case Management System level of care.

Division of Correctional Health Care Services                                    9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

D.  Quality Management

1)  Auditing Case Manager Review of Rounds Notes:  Institutional mental health supervisors
    should    regularly    audit    Administrative    Segregation    Unit    case    manager's
    assessment/review of the License Psychiatric Technician weekly notes including who
    needs referral for further evaluation for higher level of care.

2)  Audit of Screening Refusals:  Supervisory staff should regularly audit the percentage of
    inmates who refuse initial Administrative Segregation Unit mental health screening
    interviews.  If the frequency of refusals exceeds 30% in a 30-day period, a Quality
    Improvement Team should be created to determine the cause of the refusals and a
    strategy to improve voluntary participation by inmates in the screening process.

3)  Audit of Administrative Segregation Unit Suicide Prevention:  Regional Quality
    Management Assistance Teams should regularly audit the quality of suicide prevention
    efforts statewide in Administrative Segregation Unit including adherence to all Mental
    Health Services Delivery System Program Guide requirements, evaluation of the quality
    of screening and rounds, quality of the daily staff meeting, adherence to suicide
    prevention measures such as provision of an inmate-orientation pamphlet, and
    compliance with out-of-cell contacts.  A Report should be sent through the chain of
    command to the Health Care Manager and Warden of each institution, and reviewed by
    the Suicide Prevention and Response Focused Improvement Team.

## RECOMMENDATIONS DISCUSSED AND CONSIDERED, NOT APPROVED FOR IMPLEMENTATION

Recommendation:

*Inmates in Administrative Segregation Unit for non-disciplinary reasons should be placed in
different housing and/or receive more property than is allowed in disciplinary segregation.*

Explanation for rejected recommendation:

The Division of Adult Institutions believes these recommendations would be contrary to
the best interests of the Department of Corrections and Rehabilitation, and inmates
remanded to the custody of the Department.

Providing inmates who are in Administrative Segregation Unit for non-disciplinary
reasons with more personal property than those who are in Administrative Segregation
Unit for disciplinary reasons may create a greater threat to them.  The Division of Adult
Institutions believes that inmates allowed additional property would be subjected to
pressure in the form of threats of physical attack, and psychological torment.  This
pressure would be intended to influence those inmates into relinquishing their personal
property to other inmates placed in Administrative Segregation Unit for disciplinary
reasons.  Passing of property from cell to cell is often accomplished by means of ripped
cloth made into a string, called a "fish line".  In addition, this change would readily
identify inmates processed into Administrative Segregation Unit with their property as

Division of Correctional Health Care Services                                    9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

being confidential informants or as needing special protection from General Population inmates. Any of these circumstances would make the non-disciplinary inmates difficult to house on any general population facility for the remainder of their prison term.

Attempting to accomplish this by separating inmates within the housing unit may work for short periods of time, but Administrative Segregation Unit populations vary too significantly to rely on the disciplinary/non-disciplinary qualifier as a secure and practical determinant of housing. Some institutions may be able to utilize different tiers or sections of housing units to separate these populations, however, the demands on bed-space would ultimately result in these populations being housed in proximity to one another.

Due to the Department's current housing crisis, separate housing for inmates placed in Administrative Segregation Unit for disciplinary reasons than those placed in Administrative Segregation Unit for non-disciplinary reasons is unreasonable. This modification would seriously impact available bed space for both Administrative Segregation and General Population housing. In addition, this change would require significant housing and staff resources, including separate housing units for disciplinary and non-disciplinary Administrative Segregation Unit placement. The change would require the Department to activate numerous additional custody positions to ensure that escorts to medical, dental, mental health, legal and law library appointments are conducted safely within departmental policy.

In addition, an inmate's placement status into Administrative Segregation Unit is not usually as simple as disciplinary/non-disciplinary. Many inmates who do not have pending disciplinary issues, but fear for their safety, have this fear as a result of behavior that is inconsistent with departmental expectations. Examples of these behaviors may be participating in narcotics activity for which the inmate fails to pay for, or participating in gang activity for which the inmate is unable to follow through with activities that the gang has ordered one to do.

In conclusion, separating inmates placed into Administrative Segregation Unit based on the disciplinary/non-disciplinary qualifier is not a process that serves the best interest of the safety and security. Inmates placed into Administrative Segregation Unit are done so with a goal of Administrative Segregation Unit being a temporary housing. The department provides significant resources to the expeditious transfer of inmates out of an Administrative Segregation Unit. These are some of the reasons why issuing property to inmates housed in Administrative Segregation Unit is not done. If inmates who were not housed in Administrative Segregation Unit for disciplinary reasons were issued their property, this would create workload for the staff, an impression that those inmates with possession of their property were confidential informants, and would significantly affect the already overburdened housing crisis that exists in all of our prisons.

Division of Correctional Health Care Services                    9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

Recommendation:
*Custody hourly rounds standard should be increased to include a welfare check to determine that every inmate is, at minimum, alive and not in life-threatening distress.*

Explanation for rejected recommendation:

Currently, the Department requires custody staff to perform many activities during the course of their daily duties while assigned to an Administrative Segregation Unit. These duties include, but are not limited to the following:

- Feeding
- Escorts to and from exercise yards
- Escorts to and from appointments
- Escorts to and from services (library, classification)
- Clothing exchanges
- Escorts to and from showers
- Cell searches
- Housing newly admitted inmates
- Releasing discharged inmates
- Escorts to and from interviews with staff (custody, medical, clinical, etc.)
- Counts
- Security checks

During the course of performing these duties, staff observe activities within the unit, including in-cell behaviors, for security concerns.

Requiring an hourly 'Welfare Check' in the Administrative Segregation Unit would further strain the resources available to the Department. Although research of a national standard for 'Welfare Check' may provide a more specific expectation of custody staff to complete a welfare check, there is insufficient information at this time.

As there appears to be no readily available "national standard", the Department needs to obtain information from other agencies that are tasked with the responsibility of managing prisons and jails to better research and evaluate what constitutes a 'Welfare Check'. We have been unable to identify a "national standard" through a search of the American Correctional Association and the National Institute of Corrections.

Currently, custody staff assigned to Administrative Segregation Units are required to perform hourly **security checks**. Based upon the current Suicide Prevention meetings, it does not appear that the terms 'Welfare Check' and 'Security Check' are synonymous. The Department needs to develop a reasonable definition of a 'Welfare Check' in order to determine if it is reasonable to expect that the task be completed in conjunction with the current 'Security Checks'. If the "Welfare Check" is a more involved process, The Department will need to assess the impact on employee workload to determine if additional resources are required to ensure that the recommended functions can be

Division of Correctional Health Care Services                                    9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

performed.  A review of post orders from three different institutions indicates that the
functions for a security check vary but generally include the following activities:

- A visual check of the overall housing unit for any apparent security concerns
- A visual check of all cells to determine if anything unusual is apparent
- A visual check of all tools and equipment assigned to the unit
- A visual check of all locking devices
- A visual check of all inmates to ensure no harm has come to them

Although the definitions of 'Welfare Check' and 'Security Check' may differ, the goals
and expectations of the activity are similar.  Correctional Officers are accustomed to
observing inmates within the cell during their daily rounds.  Whether these rounds are
performing the function of feeding inmates, showering inmates, or walking the tier to
remove an inmate from the cell for escort to other services, a Correctional Officer is
trained to react to observations of inmates in distress.

The Division of Adult Institutions is unable to proceed with the recommendations of the
experts as they relate to hourly Welfare Checks.  However, Division of Adult Institutions
will re-evaluate the impact of implementation of this proposal when the term 'Welfare
Check' has been appropriately defined.

IMPLEMENTATION PLAN DETAILS WILL REQUIRE:

**A1)    Intake Cells:**
- The implementation of Administrative Segregation Unit Intake Cells will require a
site-by-site operational review by the Department's Division of Adult Institutions in
order to determine the appropriate number and location of cells.  The Division of
Adult Institutions will determine the number and location of all proposed
Administrative Segregation Unit Intake Cells by September 30, 2006.

**A2)    Retrofit Intake Cells:**
- The preliminary cost estimate, plan to obtain funding, and a schedule for completing
cell modifications will be submitted with the final suicide prevention plan by October
2, 2006.

**B1)    Title 15 Requirements:**
- Title 15 requirements for out of cell time and privileges will be insured for all inmates
during the first three weeks after placement in the Administrative Segregation Unit.
- Additional information will be included in the October 2, 2006 plan.

**B2)    Confidential Mental Health Interviews:**
- A Budget Change Proposal has been submitted to the Special Session of the
Legislature that includes dedicated custody personnel assigned to Administrative

Division of Correctional Health Care Services                                        9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

        Segregation Unit mental health escorts and additional clinical staff for Administrative
        Segregation Unit units statewide.

- Current estimates indicate that appropriate space in Administrative Segregation Unit
  can be prioritized for this purpose.

**B3)**   **Reduction in Length of Stay:**

- Additional information will be included in the October 2, 2006 plan.

**B4)**   **Return-from-Court ("Bad News") Information:**

- This policy change will be implemented system wide by December 2006.
- Update of Mental Health Services Delivery System Program Guide – Annual revision
  January 2007.

**C1)**   **Pre-placement Suicide Prevention Screening:**

- Implementation by June 2007.

**C2)**   **Post-placement Screening:**

- Memorandum system-wide requiring enforcement of current policy and
  implementation of new requirement – On or before October 2, 2006.
- Update of Mental Health Services Delivery System Program Guide – Annual revision
  January 2007.

**C3)**   **Daily Coordination:**

- Memorandum system-wide requiring enforcement of current policy and
  implementation of new requirement – On or before October 2, 2006.
- Update of Mental Health Services Delivery System Program Guide – Annual revision
  January 2007.

**C4)**   **Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub
Institutions:**

- Memorandum system-wide implementing new requirement – On or before
  October 2, 2006.
- Update of Mental Health Services Delivery System Program Guide – Annual revision
  January 2007.

**D1)**   **Auditing Case Manager Review of Weekly Rounds Notes:**

- Memorandum system-wide implementing new requirement – On or before
  October 2, 2006.
- Update of Mental Health Services Delivery System Program Guide – Annual revision
  January 2007.

**D2)**   **Audit of Screening Refusals:**

- Audit system development by October 2006.
- Memorandum system-wide requiring audit November 2006.

Division of Correctional Health Care Services                                     9/5/2006
Administrative Segregation Unit Suicide Reduction Plan

- Quality Management Assistance Team initial audit of compliance at selected institutions January 2007.
- Quality Management Assistance Team audit of all institutions March 2007.

**D3)   Audit of Administrative Segregation Unit Suicide Prevention:**
- Quality Management Assistance Team initial audit of compliance at selected institutions January 2007.
- Quality Management Assistance Team audit of all institutions March 2007.

Exhibit C

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
NURA MAZNAVI
THOMAS NOLAN
LORI RIFKIN **
JANET TUNG
KENNETH WALCZAK***
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ****

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

September 18, 2006

<u>VIA EMAIL AND REGULAR MAIL</u>

J. Michael Keating, Jr.
Office of the Special Master
285 Terrace Avenue
Riverside, RI  02195

Lisa A. Tillman
Deputy Attorney General
Office of the Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 95814

Michael Stone
California Dept. of Corrections
Legal Affairs Division
1515 S Street, Room 314S
Sacramento, CA 95814-0001

> Re:    Coleman v. Schwarzenegger
>        Plaintiffs' Comments on Draft ASU Suicide Prevention Plan
>        <u>Our File No. 489-3</u>

Dear Mr. Keating, Ms. Tillman and Mr. Stone:

  In order to make the upcoming teleconference discussion of the draft ASU Suicide Prevention Plan more useful, plaintiffs are providing these written comments. The meeting of the *Coleman* parties with the Expert Panel on July 14, 2006 developed many valuable recommendations for reducing the high rate of suicides in the CDCR's Administrative Segregation Units ("ASUs"). Plaintiffs were particularly pleased with the candor of CDCR's suicide experts: Thomas White, Bill Kissel and John Stoner, each of whom provided valuable suggestions during the meeting. We assume that they will participate in the follow-up teleconference.

*       MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**      MEMBER OF THE CONNECTICUT AND NEW YORK BAR
***     MEMBER OF THE ILLINOIS BAR
****    MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

September 18, 2006
Page 2

We have two general comments regarding the Draft Suicide Plan:

First, the Draft Plan fails to acknowledge and respond to the CDCR's decision to reduce clinical care to both MHSDS and non-MHSDS inmates housed in ASUs.. Although the relevant provisions have not yet been approved (or rejected) by the Court, Chapter 7 of the defendants' Revised Program Guide, which governs mental health care in ASUs, incorporates defendants' proposals to (1) reduce daily psych tech rounding for non-MHSDS inmates from daily rounding to once a week rounding, and (2) reduce individual case manager contacts for 3CMS inmates from every week to every other week. Revised Program Guide, 12-7-4, 12-7-6. Despite recent suicide prevention training by the CDCR, the ASU suicide rate remains extremely high in 2006 (so far more than 50% of the suicides have occurred in ASUs). If defendants are permitted to implement these two provisions of their Revised Program Guide, the rate of such suicides is likely to increase beyond these already extremely high rates. Plaintiffs object to this reduction in care in the ASUs and insist that defendants' Suicide Plan address this proposed reduction in care in the ASUs.

Second, various elements of the Draft Plan are incomplete and must be developed further before the plan is submitted to the Court. Many of the recommendations in the draft plan do not include any details about how they will be implemented (what resources are needed, including staffing, capital projects, policy changes, procedure changes, contract changes, details about who will be the responsible party to ensure the change). Such details are essential if the recommendation is to be effectively implemented.

We begin our comments by discussing two key recommendations by the suicide experts that CDCR rejected:

1. Inmates housed in Administrative Segregation for non-disciplinary reasons should be placed in different housing and/or receive more property than allowed in disciplinary segregation.

At the meeting, there was consensus among the suicide experts that providing inmates housed in segregation for non-disciplinary reasons with more property would help reduce suicides in ASUs. However, the CDCR rejected this recommendation for a variety of prison administrative reasons and because defendants contend that such a policy would endanger the inmates who are provided with the property. The experts who made this recommendation have experience with systems where non-disciplinary segregation inmates are provided with more property and activities, including for example, Colorado Department of Corrections, the Federal Bureau of Prisons and CDCR's own Pelican Bay State Prison.[1] These concerns did not exist in these systems.

---

[1] In the Federal Bureau of Prisons, inmates placed in Administrative Detention (for safety reasons, pending transfer, pending investigation or trial for a criminal act, pending an investigation or hearing for a violation of a Bureau regulation), consistent with available resources and the security needs of the unit, have the same privileges given to

(continued on next page)

September 18, 2006
Page 3

Plaintiffs' security expert, Walter "Kip" Kautsky[2], has experience with many correctional systems, and does not share CDCR's concerns.

Other reasons cited by defendants for their rejection of this recommendation relate to increased workload, which is a factor that should be identified in the Suicide Plan and included in any budget request submitted as part of a Suicide Plan. This is a life or death issue – cost should not be the primary factor in deciding whether to adopt a particular approach. Moreover, defendants have already identified a discrete group of ASU inmates (Level IV EOP SNY patients) who can be segregated in housing spaces and provided with additional property and programming. Defendants have simply not moved forward on this critical recommendation. Plaintiffs object to the rejection of this important recommendation on the basis of vague and unsubstantiated safety and security assertions.

2. Custody hourly rounds standard should be increased to include a welfare check to determine that every inmate is, at minimum, alive and not in life-threatening distress.

Hourly custody "welfare checks" were endorsed by all of the experts as a step to reduce suicides in ASUs. Lindsay Hayes, plaintiffs' expert, proposed the adoption of the American Correctional Association standard for "welfare" checks, a standard that is used in more than 20 state prison systems nationwide, and the Federal Bureau of Prisons.[3]

The ACA standard provides that:

*All special management inmates (which includes ASU, protective custody and disciplinary detention) shall be personally observed by a correctional officer at least every 30 minutes at an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation; ACA, 4-4257.*

After Associate Director Teresa Schwartz indicated that 30 minute "welfare checks" would be impossible, defendants' expert panel adopted the hourly "welfare check" standard as a compromise. Plaintiffs' expert Hayes advised that 30 minutes welfare checks rather than 60 minutes checks could have an appreciable impact on the reduction of ASU suicides.

---

inmates in the general population. This includes, but is not limited to the opportunity to participate in education, library services, social services, counseling, religious guidance, recreation, commissary privileges and reasonable amounts of personal property, including a radio. P.S. 5270.07[d], Chapter 9, page 9, attached hereto. At Pelican Bay State Prison, the Pilot ASU Program provides 3CMS placed in ASU for non-disciplinary reasons the opportunity to have additional property including televisions, radios and recreational art supplies.

[2] Mr. Kautsky has served as the Director, Executive Director or Deputy Secretary of various Departments of Corrections, including Iowa (1997-2003), North Carolina (1992-1997), Colorado (1987-1989), Washington (1982-1987), and has served as Special Master and expert witness in numerous prison class action lawsuits.

[3] There are at least 24 ACA accredited prison systems that provide the 30 minute rounding standard in their ASUs including Illinois, Ohio, Pennsylvania, New York, Texas, Florida and Colorado, as well as the Federal Bureau of Prisons.

September 18, 2006
Page 4

Defendants' basis for rejecting this recommendation is unwarranted. According to defendants: (1) they have been unable to discern what a "welfare check" entails (despite the fact that the standard has been provided to defendants by plaintiffs' expert as well as through defendants' own internet search)[4]; and (2) once they determine what a "welfare check" is and if it involves more work than a security check, they will need to assess the impact on the employee workload to see if they will need additional resources. During the meeting with the experts, Associate Director Schwartz clarified that security checks were not "welfare checks". The CDCR must do an assessment of the employee workload impact to determine the additional resources needed in order to conduct hourly "welfare checks" at a minimum. Plaintiffs' position remains that CDCR should adopt the ACA standard of "welfare checks" every 30 minutes at an irregular schedule in their ASU units because they fail to meet existing Title 15 standards in these units, they fail to provide inmates housed in segregation for non-disciplinary reasons with additional property or programming, because their suicide rate within the unit is so high and because CDCR currently plans to significantly reduce clinical care within these housing units.

In light of the widespread consensus that a disproportionate number of suicides occur in ASUs, as well as consensus that isolation and lack of human contact create decompensation and increased risk of suicide, plaintiffs remain puzzled why the CDCR will not devote correctional manpower to this issue. Any corrective action plan to reduce suicides in the ASUs will remain ineffective without effective staffing, and the initiation and maintenance of a 30 minute welfare check policy.

**Omitted Recommendations From the Plan**

1. Addressing the risk of single-celling in administrative segregation.

The Draft Report suggests that the Intake Cells solve the risk of single celling inmates in ASUs, which was identified as a serious problem in the Report on Suicides Completed in the California Department of Corrections in Calendar Year 2004 ["Special Master's Suicide Report"] at 13-14. Unfortunately, the Plan recommends the use of the Intake Cells for 72 hours versus the two to three weeks recommended by the expert panel. Regardless of the length of stay in the Intake Unit, after discharge from the Intake Unit, the risk of single-celling remains while he or she is housed in ASU.[5] In fact, defendants' own suicide data presented at the July 14, 2006 meeting indicates that longer stays in ASU are also correlated with increased suicide risk.

---

[4] On July 25, 2006, Robert Canning, PhD, a participant at the July 2006 Suicide Planning Meeting posted on the National Institute of Corrections site requesting information about the ACA standards, and received responses from Virginia, Arkansas, Florida, Ohio regarding the ACA standards for welfare checks. See printout of July 25, 2006 posting attached hereto. On August 23, 2006, plaintiffs counsel faxed a copy of the Standards for Adult Correctional Institutions, ACA, to Michael Stone, CDCR Legal. See copy of fax to Michael Stone, dated 8/23/06, attached hereto.

[5] In our review of the Suicide Reports received to date for 2006, we have received suicide reports for 12 of the 18 ASU suicides. All 12 were single-celled in ASU. Six of the 12 had been housed in ASU for two months or longer in single-cell status (Bustamante, Reyes, Murga, Sullivan, Gonzalez, Blizzard)

September 18, 2006
Page 5

    The Plan must develop a statewide procedure that will ensure that inmates housed in ASUs are double-celled unless there are clear indicators otherwise. The various memoranda distributed to the field have been ineffective in addressing this risk factor. It is also unclear whether the obstacles to implementing a policy change have been clearly identified so that when a new statewide procedure is created it will in fact be successfully implemented. .

    2.  <u>The Use of the New Suicide History Tracking System in the Draft Plan Components.</u>

    It is widely accepted that prior suicide attempt history is one of the most important indicators that a person is at greater risk of future suicide.[6] Defendants have not, however, incorporated their Suicide History Tracking System into the Draft Plan for use during the screenings that have been highlighted at both pre-ASU placement and post-ASU placement. During both of these screenings, the screener should be directed to check for suicide history in the MHTS or in whatever computerized system is being utilized for tracking system history for non-MHSDS inmates. For the pre-ASU placement, this information is critical for determining whether the inmate needs any further mental health evaluation, in particular since the inmate may not receive the 31-item screening for 72 hours. The first 72 hours is a very high risk period after ASU placement.

    The Draft Plan discusses the use of suicide risk history during the daily morning meeting in ASUs. This data would be available to alert custody staff. The Draft Plan does not clarify how suicide risk factors will be utilized by custody and/or clinical staff to make decisions in the unit, including presumably where to house the inmate (retain in the Intake Unit or move to another cell), single or double cell, prioritize for yard or other activities, increased rounding or supervision. How will this information be utilized? Training issues are discussed further below in the section on Emergency Response.

    3.  <u>Addressing Emergency Response by Correctional Officers.</u>

    Among the additional items discussed by the suicide experts and by CDCR staff at the July 14, 2006 meeting was the responsibility of custody officers to provide CPR. Despite Judge Karlton's June 9, 2005 Order directing CDCR to develop and implement a policy requiring custody officers to immediately implement CPR, numerous recent Suicide Reports have identified failures by custody officers (and some medical staff) to immediately implement life support measures after discovering an inmate who has attempted suicide.[7]

---

[6] Suicide Prevention in Jails and Prisons, Jeffrey Metzner and Lindsay Hayes, at 140-142 in Textbook of Suicide Assessment and Management, Simon and Hales, American Psychiatric Publishing, Inc. , 2006; How To Identify Suicidal People, Thomas White at 27-28, Charles Press Publishers, Inc. 1999.

[7] See, e.g. McGuire, E-30244 (SAC: January 13, 2006: CPR delayed 13 minutes); Patterson, H-86622 (SVSP, January 20, 2006: 8 minutes to open cell door); Arviso, T-05182 (SVSP, March 16, 2006: No CPR by COs who

September 18, 2006
Page 6

During the meeting with the experts and CDCR staff, Associate Director Schwartz informed the participants that the CDCR was aggressively investigating failures to comply with Judge Karlton's Order. Responding to emergencies in locked housing units is more difficult because of the locations and the higher security requirements, including the rules regarding cell entry. The Draft Plan does not include any specialized custody training for these high stress housing units, such as emergency response procedures that may be unique to administrative segregation and security housing units, where the majority of suicides occur.

Plaintiffs suggest that specialized training, including additional emergency response training for ASU staff, should be mandated as part of the Plan. A budget and schedule for this training should be included in the Final Plan.

<u>Comments on Recommendations Approved by CDCR in Draft Plan</u>

<u>A. 1. Intake Cells</u>: Plaintiffs endorse the recommendation for the creation of intake cells in each ASU statewide for new arrivals to the units. The Plan should specify the percentage of cells in order to prepare necessary budget requests.

As part of the retrofit, the large mesh ventilation screens in the intake cells will be replaced with safe coverings. This has been the subject of another court order directing defendants to develop a plan to address the hazard of large mesh ventilation screens in ASUs housing mentally ill inmates. 6/9/05 ¶1 Order. As the parties and the experts learned during the July 14, 2006 meeting, the cost of replacing these vents may not be the tremendous financial undertaking proposed last year by CDCR. Depending on the percentage of ASU cells that will be retrofitted as Intake Cells, the CDCR should consider modifying additional ASU cells for long-term MHSDS inmates who appear at risk for suicide based upon defendants' own data.

Finally, it is unclear whether the Draft Plan envisions the creation of Intake Units in the Stand-Alone ASUs[8] and in the EOP ASUs. The Stand-Alone ASUs present a unique challenge because of their poor cell door visibility and large-mesh ventilation screens that make it easy to thread a sheet for hanging. The Stand-alone ASUs, which comprise a small percentage of the total ASU beds, have already had two suicides in 2006 (and a total of at least 5 suicides since 2004). What are the Plan's provisions for these two ASU programs?

---

waited for LVN); <u>Gonzalez,</u> V-49628 (ISP, May 1, 2006: No CPR initiated by COs who waited for MTA); <u>St. Jovite,</u> P-84686 (Solano, May 10, 2006: No CPR initiated by CO or MTA who waited 19 min for paramedics who initiated CPR); <u>Huff,</u> T-06010 (SQ: May 22, 2006: No CPR by COs at cell front, taken to TTA for CPR); <u>Velton,</u> W-40635 (CCWF, June 5, 2006: 17 min delay in calling for ambulance); <u>Murga,</u> V-23532 (SAC, July 8, 2006: could not find ambu-bag in unit; no ambulance at stand-alone ASU; CPR discontinued in transport).

[8] The Stand Alone ASUs are the ten units build system-wide that are "Super-Max" units without windows which cannot be used to house MHSDS inmates. Unlike Pelican Bay SHU, however, there is no special screening to exclude inmates with a prior history of suicide attempts.

September 18, 2006
Page 7

    B.1.  Title 15 Requirements:  This section acknowledges that CDCR is not providing inmates housed in ASUs with their Title 15 requirements for out-of-cell time and privileges.  As a result, ASU time is harsher now than it has been within CDCR.  Rather than propose adding additional correctional staff, walk-alone cages for more yard, more in-cell recreational materials, the Plan accepts the fact that most ASU inmates will not receive basic yard, showers and other privileges and focuses on providing these basics to those inmates housed in the Intake Unit (which is "safe" housing).  Does this make sense when determining who is most at risk in the ASU and needs out-of-cell time (and presumably social contact during that time)?  The data indicates that long term ASU placement is also a suicide risk factor.

    Again, the Plan should identify the needed staffing resources and additional funding needed to provide inmates housed in ASUs with their out-of-cell time and privileges.  The Court has directed CDCR to seek those resources as necessary.

    B.2.  The requirement to provide confidential mental health interviews is not a new requirement.  Placing this provision in the Suicide Plan without identifying the resources needed to finally ensure its implementation guarantees that it will make little progress.  What additional resources are needed to ensure that confidential mental health interviews can happen?  Do units need more escort officers?  Are there no private office spaces for escort officers to bring the inmates?  Does it vary by institution?  Was each prison queried about this recommendation and have the obstacles been identified?  The *Coleman* monitoring process has undoubtedly identified the obstacles as part of the monitoring rounds and each institution can likely provide their own "wish" list for what is needed to make this recommendation come true.

    B.3.  Reduction in Length of Stay in ASUs:  Again, what is stated here is a goal but not a plan with specifics that will ensure effective implementation.  Institutions Division needs to have a sense of urgency about suicides in ASU and must work with Health Care Division to develop strategies to move inmates out of this dangerous housing setting rapidly.  There are things that can be done if both sides of CDCR work together on this issue.  For example, there must be strict guidelines established and enforced for completing RVR hearings and for following DA referrals so that inmates do not languish in ASUs.  In the past year, CDCR revised their own regulations (over plaintiffs' objections) to extend the ICC review of inmates placed in ASU from a 30 day review to 90 to 180 days.  Title 15, § 3335.  Plaintiffs' counsel objected to this revision on the basis that extending the review of ASU placements would necessarily lengthen stays.  Finally, there are groups of inmates housed in ASUs system-wide who are waiting for SNY placements who cannot be moved because the CDCR has not created sufficient SNY beds.  The CDCR, through its "Right Mission, Right Prison" process, must review their ASU lengths of stay and determine how to move these inmates rapidly to appropriate housing.  These beds must be created.

September 18, 2006
Page 8

These are plaintiffs' suggestions. The necessary plan to implement this critical recommendation must be developed with Institutions Division and include steps that will be taken to aggressively reduce lengths of stay for inmates in ASUs – including a process for the individual inmate and for the system. Some of these steps simply require changes in regulations (which CDCR knows quite well how to do) and others require funding. They must be identified for the final Plan.

We hope that these comments will be useful in further development of a final Plan to address the escalating suicide rate in the ASUs. We look forward to further discussion of the Plan.

Sincerely,

ROSEN, BIEN & ASARO, LLP


By: Jane E. Kahn

JEK:pj

cc:    Matthew A. Lopes, Jr.
       Coleman Co-counsel
       Coleman Experts
       Lindsay Hayes
       Walter "Kip" Kautzky

8-23-206 1:29PM        FROM NCIA/LINDSAY-M-HAYES 5083373083                      P.2

# STANDARDS
# FOR
# ADULT CORRECTIONAL
# INSTITUTIONS

### Fourth Edition

**American Correctional Association**

In cooperation with the
Commission on Accreditation for Corrections

January 2003

Updated with corrections from the Errata Sheet
of the 4th Edition, July 1, 2003.

# Section D: Special Management

Note: "Segregation" is the generic term used to encompass administrative segregation, protective custody, and disciplinary detention. (*See* glossary definitions.)

**Principle:**   Inmates who threaten the secure and orderly management of the institution may be removed from the general population and placed in special units.

## General Policy and Practice

**4-4249**
**(Ref. 3-4237)**      **When segregation units exist, written policy and procedure govern their operation for the supervision of inmates under administrative segregation, protective custody, and disciplinary detention.**

*Comment*:

*Administrative segregation*: The classification committee or, in an emergency, the warden/superintendent may place in administrative segregation an inmate whose continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution. Inmates in administrative segregation because of behavioral problems should be provided with programs conducive to their well-being. Inmates pending investigation for a trial on a criminal act or pending transfer can also be placed in administrative segregation; this segregation may be for relatively extensive periods of time.

*Protective custody*: Inmates requesting or requiring protection from the general population may be placed in protective custody. Inmates in protective custody should be allowed to participate in as many as possible of the programs afforded the general population, providing such participation does not threaten institutional security. Each protective custody case should be reviewed frequently with the goal of terminating the separate housing assignment as soon as possible.

*Disciplinary detention*: The disciplinary committee may place inmates with serious rule violations in disciplinary detention only after an impartial hearing has determined (1) that other available alternative dispositions are inadequate to regulate the inmate's behavior within acceptable limits and (2) that the inmate's presence in the general inmate population poses a serious threat to the orderly operation or security of the institution.

Total isolation as punishment for a rule violation is not an acceptable practice; when exceptions occur, they should be justified by clear and substantiated evidence and should be fully documented.

**4-4250**
**(Ref. 3-4238)**      **The warden/superintendent or shift supervisor can order immediate segregation when it is necessary to protect the inmate or others. The action is reviewed within 72 hours by the appropriate authority.**

*Comment*: None.

Part 3: Institutional Operations

## Admission and Review of Status

**4-4251**
**(Ref. 3-4239)**

Written policy, procedure, and practice provide that an inmate is admitted to the segregation unit for protective custody only when there is documentation that protective custody is warranted and no reasonable alternatives are available.

*Comment*: Protective custody should be used only for short periods of time, except when an inmate needs long-term protection and the facts are well documented. Admission to protective custody should be fully documented with a consent form signed by the inmate.

**4-4252**
**(Ref. 3-4240)**

Written policy, procedure, and practice provide that an inmate is placed in disciplinary detention for a rule violation only after a hearing by the disciplinary committee or hearing examiner.

*Comment*: None.

**4-4253**
**(Ref. 3-4241)**

Written policy, procedure, and practice provide for a review of the status of inmates in administrative segregation and protective custody by the classification committee or other authorized staff group every seven days for the first two months and at least every 30 days thereafter.

*Comment*: A hearing should be held to review the status of any inmate who spends more than seven continuous days in administrative segregation and protective custody to determine whether the reasons for the placement still exist.

**4-4254**
**(Ref. 3-4242)**

Written policy, procedure, and practice specify the review process used to release an inmate from administrative segregation and protective custody.

*Comment*: An inmate should be released by action of the appropriate authority.

**4-4255**
**(Ref. 3-4243)**

There is a sanctioning schedule for institutional rule violations. Continuous confinement for more than 30 days requires the review and approval of the warden/superintendent. Inmates held in disciplinary detention for periods exceeding 60 days are provided the same program services and privileges as inmates in administrative segregation and protective custody.

*Comment*: The time an inmate spends in disciplinary detention should be proportional to the offense committed, taking into consideration the inmate's prior conduct, specific program needs, and other relevant factors.

**4-4256**
**(Ref. 3-4244)**

Written policy, procedure, and practice provide that a qualified mental health professional personally interviews and prepares a written report on any inmate remaining in segregation for more than 30 days. If confinement

Section D: Special Management

continues beyond 30 days, a mental health assessment by a qualified mental health professional is made at least every three months—more frequently if prescribed by the chief medical authority.

*Comment:* Inmates whose movements are restricted in segregation units may develop symptoms of acute anxiety or other mental problems; regular psychological assessment is necessary to ensure the mental health of any inmate confined in such a unit beyond 30 days.

## Supervision

**4-4257**
**(Ref. 3-4245)**

Written policy, procedure, and practice require that all special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuing observation.

*Comment:* None.

**4-4258**
**(Ref. 3-4246)**

Written policy, procedure, and practice provide that inmates in segregation receive daily visits from the senior correctional supervisor in charge, daily visits from a qualified health care official (unless medical attention is needed more frequently), and visits from members of the program staff upon request.

*Comment:* Because they are restricted from normal movement within the institution, it is imperative that inmates in segregation are visited regularly by key staff members who can ensure that their health and well-being are maintained.

**4-4259**
**(Ref. 3-4247)**

Written policy and procedure govern the selection criteria, supervision, and rotation of staff who work directly with inmates in segregation on a regular and daily basis.

*Comment:* Procedures should be established to supervise and evaluate the on-the-job performance of all staff who work with inmates in segregation, and there should be administrative procedures for promptly removing ineffective staff. Officers assigned to these positions should have completed their probationary period. The need for rotation should be based on the intensity of the assignment.

**4-4260**
**(Ref. 3-4248)**

Written policy, procedure, and practice provide that staff operating segregation units maintain a permanent log.

*Comment:* The log should contain the following information for each inmate admitted to segregation: name, number, housing location, date admitted, type of infraction or reason for admission, tentative release date, and special medical or psychiatric problems or needs. The log also should be used to record all visits by officials who inspect the units or counsel the inmates, all unusual inmate behavior, and all releases.

# ROSEN, BIEN
# & ASARO, LLP

*FAX TRANSMISSION*

**Attorneys at Law**

155 Montgomery Street, 8th Floor
San Francisco, CA 94104

Phone: (415) 433-6830
Fax: (415) 433-7104

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us. It is hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

___5___ PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

TO: _Michael Stone, CDC Legal Affairs Division_

FROM: _Lori Rifkin_   Our File No.: _489-3_

Recipient's Fax No. _916-327-5306_ Phone No: _916-324-1421_
(to confirm)

DATE: _8-23-06_

### IF YOU EXPERIENCE ANY PROBLEMS WITH THE QUALITY
### OF OUR TRANSMITTAL, PLEASE CALL (415) 433-6830

Message:

_____

_____

_____

_____

_____

08/23/2006 11:35 FAX 415 433 7104        ROSEN BIEN ASARO                               ☒001

```
                        ***********************
                        ***   TX REPORT   ***
                        ***********************

       TRANSMISSION OK

       TX/RX NO              2603
       CONNECTION TEL              19163275306p4893
       SUBADDRESS
       CONNECTION ID
       ST. TIME              08/23 11:34
       USAGE T               01'26
       PGS. SENT                 5
       RESULT                OK
```

FAXED
TN 8-23

---

Message:

**IF YOU EXPERIENCE ANY PROBLEMS WITH THE QUALITY
OF OUR TRANSMITTAL, PLEASE CALL (415) 433-6830**

DATE: 8-23-06

Recipient's Fax No. 916-324-5306 Phone No. 916-324-1421
(to confirm)

FROM: Lori Rifkin    Our File No.: 484-3

TO: Michael Stone, CDC Legal Affairs Division

**5.** PAGES TRANSMITTED, INCLUDING THIS COVER PAGE

---

**CONFIDENTIALITY NOTICE**

The documents accompanying this telecopy transmission contain confidential information that is legally privileged. The information is intended only for the use of the recipient named below. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the telecopied documents to us. It is hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited.

# Corrections Community

National
Institute of
Corrections

**A place where corrections professionals can interact and collaborate.**

---

# ACA standards for welfare checks in segregation units

Last post 08-28-2006, 11:31 AM by Sgt. Rodney Shepherd. 8 replies.

---

| | |
|---|---|
| ☐ **07-25-2006, 9:36 AM** | **171** |

| | |
|---|---|
| **rcanning** <br><br> Joined on 07-25-2006 <br><br><br> Posts 2 <br> Points 112 | **ACA standards for welfare checks in segregation units** <br><br><br> Recently, during a panel discussion of ways to prevent suicide in disciplinary segregation units (we call it Administrative Segregation here in California), a participant asserted that ACA standards call for 30 minute welfare checks by custodial staff assigned to segregation. <br><br> I do not have ready access to ACA standards but would like to find out if this is true, the reference for it and if this is the typical practice in state correctional facilities. <br><br> Thanks in Advance <br><br> Robert Canning, PhD <br><br> Sr. Psychologist <br><br> Mental Health Programs <br><br> California Dept. of Corrections and Rehabilitation |

---

| | |
|---|---|
| ☐ **08-03-2006, 1:58 PM** | **227** in reply to **171** |

| | |
|---|---|
| **bigdeepiniowa** <br><br> Joined on 07-14-2006 <br><br><br> Posts 4 <br> Points 54 | **Re: ACA standards for welfare checks in segregation units** |

Corrections Community – ACA standards for welfare checks in segregation units                Page 2 of 4

| | Correctional Officer/STG Intelligence Officer<br>Iowa State Penitentiary |
|---|---|

**08-11-2006, 2:03 PM**                                                                            327 in reply to 171

| | |
|---|---|
| **MReynoldsRRJ**<br><br>Joined on 08-11-2006<br><br>Virginia<br>Posts 2<br>Points 44 | **Re: ACA standards for welfare checks in segregation units**<br><br>Dear Dr. Canning:<br><br>I work in an ACA Accredited jail in Virginia. The ACA reference from the Standards for Adult Local Detention Facilities (3rd Edition) is 3-ALDF-3D-08. The 4th Edition refence is 4-ALDF-2A-52.<br><br>It states:<br><br>"All special management inmates are personnaly observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional."<br><br>I can say that the ACA Accredited Jails I have toured follow this standard.<br><br>I pray this answers your question.<br><br><br>Marvin Reynolds<br>Major<br>Riverside Regional Jail<br>1000 River Road<br>P.O. Box 1041<br>Hopewell, VA 23860<br>(804) 524-2674 |
| | Filed under: Suicide |

**08-11-2006, 3:46 PM**                                                                            329 in reply to 327

| | |
|---|---|
| **PaladinChief**<br><br>Joined on 08-11-2006<br><br>Arkansas<br>Posts 3<br>Points 15 | **Re: ACA standards for welfare checks in segregation units**<br><br>We are doing this in the common population as well. We have open bay barracks that house 55 inmates each. 30 bunks on one Floor and 25 on the lower floor. We have to walk through at a minimum of twice an hour unscheduled. |

Corrections Community – ACA standards for welfare checks in segregation units                    Page 3 of 4

---

□ 08-17-2006, 1:22 PM

**396** in reply to **171**

| | |
|---|---|
| **Gerald T. Milan, CJM**<br>Joined on 07-07-2006<br>Jacksonville, Florida<br>Posts 12<br>Points 135 | **Re: ACA standards for welfare checks in segregation units** |

4-ALDF-2A-52
(Ref. 3-ALDF-3D-08) All special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional.

*Comment:* None.

*Protocols:* Written policy and procedure. Staffing plan. Log format.
*Process Indicators:* Facility records and logs. Documentation of cell checks.

Lieutenant Gerald T. Milan, CJM
Jacksonville Sheriff's Office
Department of Corrections
500 East Adams Street
Jacksonville, FL 32202
Email:  Gerald.Milan@jaxsheriff.org
Phone:  904-630-5744
Fax:  904-630-7550
"Integrity:  Doing the right thing when no one is looking."

Lieutenant Gerald T. Milan, CJM
Jacksonville Sheriff's Office
Department of Corrections
500 East Adams Street
Jacksonville, FL 32202
Email: Gerald.Milan@jaxsheriff.org
Phone: 904-630-5744
Fax: 904-630-7550

---

↻ 08-19-2006, 5:21 AM

**435** in reply to **171**

| | |
|---|---|
| **Gibson**<br>Joined on 08-19-2006<br><br>Posts 5<br>Points 76 | **Re: ACA standards for welfare checks in segregation units** |

Ohio minimum standards call for 10 minute checks at irregular intervals for inmate's on special needs status (high risk, suicidal, restrained, etc.) and yes, we do practice this.

---

Lakewood Community  ACA standards for welfare checks in segregation units    Page 4 of 4

---

📄 **08-20-2006, 1:11 PM**

**440** in reply to **435**

| rcanning | **Re: ACA standards for welfare checks in segregation units** |
|---|---|
| Joined on 07-25-2006 | |
| Posts 2 | |
| Points 112 | 🖂 **Gibson:**<br>Ohio minimum standards call for 10 minute checks at irregular intervals for inmate's on special needs status (high risk, suicidal, restrained, etc.) and yes, we do practice this.<br><br>My question has to do with inmates in state facilities who are in disciplinary segregation and are not on special needs status. Do you know what the ACA standard is for these folks? Thanks. |

---

📄 **08-24-2006, 5:19 PM**

**510** in reply to **440**

| Gibson | **Re: ACA standards for welfare checks in segregation units** |
|---|---|
| Joined on 08-19-2006 | |
| Posts 5 | |
| Points 76 | Sorry about that. Our admin seg inmates are checked every hour at irregular intervals along with the rest of the population. If we feel they are suicidal, special needs, etc. they are moved into a different unit and the checks are bumped up. |

---

📄 **08-28-2006, 11:31 AM**

**514** in reply to **171**

| Sgt. Rodney Shepherd | **Re: ACA standards for welfare checks in segregation units** |
|---|---|
| Joined on 08-23-2006 | |
| Little Rock AR | |
| Posts 1 | |
| Points 5 | Here in Little Rock we also call it administrative segregation. We require irregular checks at no more than 15 minute intervals. This has worked quite well for us.<br><br>Sgt. Rodney Shepherd<br><br>Training Coordinator<br><br>Pulaski County Sherrif's Office |

Exhibit D

California Dept. of Corrections and Rehabilitation

Suicide in Administrative Segregation Units

Clinical Experts Consensus Forum

July 14, 2006





Exhibit E

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**FACILITIES MANAGEMENT**

1515 S Street, Sacramento, CA 95814
P.O. Box 942883
Sacramento, CA 94283-0001



July 8, 2005


Mr. J. Michael Keating Jr.                    via:    Ms. Lisa Tillman
Office of the Special Master                          Deputy Attorney General
2351 Sussex Lane                                      Department of Justice
Fernandina Beach, FL 32034                            P.O. Box 944255
                                                      Sacramento, CA 94244-2550


Dear Mr. Keating:

RESPONSE TO JUNE 9, 2005 COURT ORDER – LARGE MESH VENTS

In response to the June 9, 2005, order signed by Judge Lawrence K. Karlton regarding the Special Master's Report on Suicides Completed in Year 2003. Specifically, this addresses Order #1 "within thirty days from the date of this order defendants shall submit to the special master a plan for dealing with the hazard of large-mesh ventilation screens in administrative segregation cells in which mental health caseload inmates are housed."

**BACKGROUND**
Facilities Management (FM) has been coordinated a demonstration project at California State Prison, Corcoran to evaluate the viability of the Anemostat "S" vent suicide resistant security grille for retrofit situations in cells. The use of ventilation security grilles as a hanging attachment method has become a significant concern of both the *Coleman* and *Madrid* federal lawsuit Special Masters. The project scope called for the installation of 20 vents in 10 cells (4 vents in a 180 design; 4 vents in a 270 design; 2 vents in new administrative segregation unit (ASU) cells) with the goal of determining installation challenges, protocols, and establishing whether appropriate airflows could be achieved in a retrofit situation.

The FM initially cast a broad net in its research of alternative solutions to retrofitting existing ventilations grilles, we narrowed the focus to the product commonly referred to as the "S-Vent" manufactured by Anemostat. We focused on the "S-Vent" after review of the "suicide deterrence" capability of the grille designs by numerous departmental correctional experts from Custody, Health Care, and Maintenance. Those designs included the 5/16" opening configuration installed in the Department's 10 new ASUs; the ¼" opening DCG design commonly installed in cells constructed under the Department's new prison construction program; the 3/16" opening Board of Corrections design; and the Anemostat S-Vent interlaced baffle design.

As indicated in our March 15, 2005, report "*Initial Review of Heating, Ventilation, and Air Conditioning Vents in Celled Housing*" the consensus of the correctional experts was that the size variations of the hole design offer little or no significant deterrence to an

Mr. Michael Keating
Page 2

inmate intent on suicide. On several occasions, staff readily demonstrated the ability to quickly thread materials through even the smallest openings (3/16") in a manner that would be robust enough to create a hanging mechanism. This appears to be validated by published vendor caveats that their respective products are not suicide proof. On the other hand, the same correctional experts felt that Anemostat's integrated baffle design was consistent with their claim that their product "virtually eliminates suicide by hanging." However, the correctional experts raised other significant concerns regarding the Anemostat "S-Vent" design: restricted airflows, security of installation, and maintainability.

The following is a summary of our efforts to assess the viability of the "S-Vent." On January 13, 2005 department staff, with on-site over-the-shoulder guidance from Anemostat representatives, installed of 6 vents in vent cells (one in a 270 cell, one in a 180 cell, and one in a new ASU cell). By January 28, 2005, Department staff completed the rest of the demonstration project installations. The need to procure a product specific caulking gun delayed the scheduling of follow-up airflow and pressure drop measurements. On February 17, 2005, the vendor completed the follow-up airflow and pressure drop measurements and verbally reported to California Department of Corrections and Rehabilitation (CDCR) that the follow-up readings were favorable. However, when the vendor provided their written report, significant drops in airflow were indicated.

The Department informed the vendor that the reported reductions in airflows were unacceptable and demanded that they both re-engineer and reinstall new suicide resistant vents that at least matched the original airflows, or that they restore the cells to the existing conditions. The vendor chose to re-engineer and reinstall new vents.

During the week of May 9, 2005, staff from the Department and the Anemostat company removed the "S-Vent" suicide resistant security air grilles originally installed during the second week of January 2005 and installed "re-engineered" "S-Vent" air grilles. Department staff participated in and observed all of the demolition, reinstallation, and air flow measurement activities.

Staff indicated that the "re-engineered" air grilles appeared to meet the intended air flow requirements at the time of reinstallation, but expressed concerns based on what was discovered during the demolition and reinstallation process. Staff reported that when the previously installed "S" Vents were removed, a significant number of them were clogged with dust and lint, after only 17 weeks of service. The estimated amount of blockage ranged from 50–80 percent.

Approximately six weeks subsequent to the installation of the re-engineered vents, a second set of air flow readings indicated reduced airflows due to blockage. Based on

Mr. Michael Keating
Page 3

this, the Department does not believe the "S" Vent can be effectively retrofitted into existing cell environments.

**PRESENT AND FUTURE ACTIONS RESPONSIVE TO COURT ORDERS**

In light of the adverse outcomes of the "S-Vent" demonstration project, and in order to address the alleged hazard of large-mesh ventilation screens in ASU cells in which mental health case load inmates are housed, the CDCR will:

- Continue to identify, evaluate, and implement operational policies and procedures that improve the identification of and intervention with potentially suicidal inmates. This includes, but is not limited to:
  - Ensuring full implementation of the Mental Health Program Guidelines, once approved by the Court.
  - Continuing to enforce current departmental policy to double cell ASU inmates if they meet the criteria.
  - Continuing to enforce the current departmental policy of hourly security checks in ASU.
  - Continuing to make staff aware of "exceptional eternal stressors" that can contribute to suicides.
  - Continue to pursue that implementation of a systemic approach to Cardiopulmonary Resuscitation (CPR).
  - Promote increased interaction and information exchange between custody and clinical staff.
  - Ensuring that Mental Health staff are alerted to new arrivals in ASU within 24 hours and ensure that Mental Health staff spend extra time with new arrivals to establish contact and provide information.
  - Continue to pursue improvements in the Suicide Review and Corrective Action Plan process.
- Prepare a feasibility study to assess the conversion of supply and exhaust grille openings in ASU cells housing mental health inmates to the Title 24 (local adult and juvenile detention facilities) standard of no greater than 3/16" openings. Our approach is as follows:
  - Inventory all budgeted ASU cells to identify existing grille configurations and opening sizes (Facilities Management to perform within 90 days).
  - Determine the number of cells based upon the prevalence of mental health inmates in ASU and facility operational requirements, on a site-by-site basis. (Health Care and Adult Institutions to perform within 180 days).
  - Develop an initial conversion priority list based on historical suicide rate data (Health Care, Adult Institutions, and Facilities Management to perform within 210 days).
  - Identify potential operational alternatives in lieu of physical plant modifications. (Health Care and Adult Institutions to perform within 240 days).

Mr. Michael Keating
Page 4

    o   Begin site-by-site assessments to determine scope of work and resource requirements (FM and outside vendor tom perform within 18–24 months after completion of above bullet).

    o   Complete a cost-benefit analysis comparing operational alternatives to physical plant modifications (Health Care, Adult Institutions, Facilities Management to perform within 90 days from site assessment completion).

    o   Based upon the outcome of the feasibility study, the CDCR will develop recommendations and pursue their implementation (To be determined, dependant on decisions made in aforementioned tasks.).

Defendants respectfully submit this response to the court in response to its court order concerning the alleged hazard of large mess screens. We look forward to further dialogue with you on this issue. Should you have any questions, please contact me at (916) 324-7500, or Mr. Dovey at (916) 445-6597.

Sincerely,


FOR GEORGE A. SIFUENTES
Deputy Director
Facilities Management


JOHN DOVEY
Director
Division of Adult Institutions

Exhibit F

# STANDARDS
# FOR
# ADULT CORRECTIONAL
# INSTITUTIONS

### Fourth Edition

**American Correctional Association**

**in cooperation with the
Commission on Accreditation for Corrections**

**January 2003**

**Updated with corrections from the Errata Sheet
of the 4th Edition, July 1, 2003.**

Section D: Special Management

continues beyond 30 days, a mental health assessment by a qualified mental health professional is made at least every three months—more frequently if prescribed by the chief medical authority.

*Comment*: Inmates whose movements are restricted in segregation units may develop symptoms of acute anxiety or other mental problems; regular psychological assessment is necessary to ensure the mental health of any inmate confined in such a unit beyond 30 days.

## Supervision

**4-4257**
**(Ref. 3-4245)**

Written policy, procedure, and practice require that all special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuing observation.

*Comment*: None.

**4-4258**
**(Ref. 3-4246)**

Written policy, procedure, and practice provide that inmates in segregation receive daily visits from the senior correctional supervisor in charge, daily visits from a qualified health care official (unless medical attention is needed more frequently), and visits from members of the program staff upon request.

*Comment*: Because they are restricted from normal movement within the institution, it is imperative that inmates in segregation are visited regularly by key staff members who can ensure that their health and well-being are maintained.

**4-4259**
**(Ref. 3-4247)**

Written policy and procedure govern the selection criteria, supervision, and rotation of staff who work directly with inmates in segregation on a regular and daily basis.

*Comment*: Procedures should be established to supervise and evaluate the on-the-job performance of all staff who work with inmates in segregation, and there should be administrative procedures for promptly removing ineffective staff. Officers assigned to these positions should have completed their probationary period. The need for rotation should be based on the intensity of the assignment.

**4-4260**
**(Ref. 3-4248)**

Written policy, procedure, and practice provide that staff operating segregation units maintain a permanent log.

*Comment*: The log should contain the following information for each inmate admitted to segregation: name, number, housing location, date admitted, type of infraction or reason for admission, tentative release date, and special medical or psychiatric problems or needs. The log also should be used to record all visits by officials who inspect the units or counsel the inmates, all unusual inmate behavior, and all releases.