Exhibit G

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEJANDRO MADRID, et al., | ) |
| Plaintiffs | ) NO. C90-3094-T.E.H.. |
| | ) |
| v. | ) SPECIAL MASTER'S FINAL REPORT |
| | ) AND RECOMMENDATIONS RE. |
| | ) ADMINISTRATIVE SEGREGATION MENTAL |
| | ) HEALTH PILOT PROJECT |
| RODERICK HICKMAN et al., | ) |
| Defendants, | ) |

## I.

## INTRODUCTION

Over the course of the past several years the A-Yard Administrative Segregation Housing Unit ("Ad Seg") at Pelican Bay State Prison ("PBSP") has undergone extensive changes.[1] Numerous factors have influenced the new composition of Ad Seg, including:

1. State-wide shortages concerning Psychiatric Services Unit ("PSU") and Enhanced Outpatient Program ("EOP") beds, state-wide shortages of Mental Health Crisis Care beds, state-wide shortages of Special Needs Yard beds, and an inadequate number of beds for CCCMS inmates facing a SHU term.

2. An order in the *Coleman* litigation that prohibits housing inmates with mental health problems in the "new" administrative segregation units, including the "New Ad Seg" at PBSP.[2]

---

[1] The unit is also known as "Old Ad Seg."

[2] New Ad Seg is a free standing building located near the Correctional Treatment Center.

3. Significant delays in transferring inmates from Ad Seg housing units because of bed shortages at other Level IV prisons.

As a result of these factors, almost all of the inmates housed in the A Yard Ad Seg at PBSP are prisoners assigned to a California Department of Corrections and Rehabilitation ("CDCR") mental health program. Furthermore, the length of stay in the unit is often extended while CDCR Headquarters awaits an open bed in the appropriate high security setting (e.g. the CCCMS program in the Corcoran Security Housing Unit ["SHU"] or a "special needs" yard at another high security prison). The Special Master has previously issued reports and conducted meetings concerning the serious and negative consequences of this situation. For example, several cases have been reported where PSU inmates improved their behavior to the degree that they were transferred to the PBSP EOP, and subsequently further improved their behavior to the degree they were reclassified as CCCMS and therefore designated for transfer. After the designation, however, these prisoners were housed in the PBSP Ad Seg unit for so long, and under such harsh conditions (with limited mental health intervention), that they decompensated and were returned to the PSU.

## II.

### THE CDCR RESPONSE CONCERNING THE NEED TO
### ENHANCE MENTAL HEALTH CARE IN THE PBSP AD SEG UNIT

To its credit, after extensive discussion between the Special Master and the parties, the CDCR agreed to develop a program designed to enhance the mental health services provided in the PBSP Ad Seg Housing Unit (see Exhibit 1, Staff Counsel Dawn Whitney's letter of June 3, 2005). After additional meetings and discussions, including program reviews by Court expert Dr. Jeffrey L. Metzner, a two prong enhanced mental health program for Ad Seg was developed by CDCR officials. The plan is comprised of two major elements:

(1) a proposed staffing plan for enhanced mental health services that anticipate the finalization of *Coleman* "program statements;" and;

(2) a new operational plan for Ad Seg that establishes a behavior program for the mental health inmates in the unit.

-2-

1   class in *Madrid*.

2        Therefore, after discussion and meetings, the Special Masters in *Madrid* and *Coleman* have

3   agreed that the corrective actions proposed by PBSP, set forth in Exhibits 2-4, should be

4   implemented in the context of *Madrid*.

## IV.

## FINDINGS

7        1.  The operational program set forth in Exhibit 2 is a necessary element of an adequate plan

8   to provide mental health services to the PBSP old Ad Seg housing unit, with one exception.

9        2.  The staffing positions called for in Exhibit 3 are necessary to implement an adequate plan

10   for mental health services in the PBSP old Ad Seg housing unit, with one exception.

11        3.  The program for delivery of Ad Seg mental health services set forth in Exhibit 4 is a

12   necessary element of an adequate plan to provide mental health services to the PBSP old Ad Seg

13   housing unit.

## V.

## COMPLIANCE WITH THE ORDER OF REFERENCE

16        Pursuant to the Order of Reference filed January 23, 1995, the Special Master served counsel

17   with a draft version of the report on December 5, 2005.  A meeting was conducted to discuss the

18   draft on January 4, 2006.  Both parties submitted objections/comments to the draft report.  Steven

19   Fama submitted a letter for plaintiff dated December 28, 2005 (Exhibit 8).  Michael Jorgenson

20   submitted a letter for defendants also dated December 28, 2005 (Exhibit 9).  Both letters deserve a

21   response from the Special Master.

22        Plaintiffs' Comments

23        Plaintiffs raise two points.  First, plaintiffs interpret the proposed CDCR pilot project as

24   allowing the prison Institutional Classification Committee ("ICC") to determine clinical treatment

25   level decisions, and to over-ride clinical treatment decisions.  At the meeting of January 4, 2006,

26   however, defendants explained that plaintiffs' interpretation of the pilot was not correct.  Consistent

27   with Court approved PSU policy, the Inter-Disciplinary Treatment Team makes all important

28                                                  -4-

clinical/behavioral decisions.

Second, plaintiffs object to the frequency of clinician (case manager) contacts, arguing that the current *Coleman* standard calls for one-visit-per-week, while the proposed PBSP program requires only one visit every two weeks. In response, defendants contend that modified *Coleman* "Program Guides" will require only one visit every two weeks, a point that was contested by plaintiffs at the meeting of January 4, 2006. After reflecting on this dispute, and reviewing the record, the Special Master finds that plaintiffs' objection is well taken. For at least three reasons, the pilot project should be modified to provide for clinician/patient contact at least one per week:

1. The inmates in Ad Seg who have been classified as mental health patients at PBSP comprise a troubled, and difficult to manage group of prisoners. Statistically, they are inmates with a high propensity for violence, as well as suicidal behavior. Without question, supplemental mental health care will help PBSP correctional officials and clinicians work with, and better manage Ad Seg inmate/patients. Given their behavioral history, and the high rate of suicides within CDCR administrative segregation units, there is no reason to reduce the weekly contacts below that currently required for Ad Seg.

2. Court approval of a pilot project which contradicts the existing Order in *Coleman* would set a bad precedent.

3. As the Special Master previously reported, the conditions in Old Ad Seg at PBSP resemble those in the SHU at the time of the trial in this case. Ad seg work assignments are difficult for correctional staff. Ensuring weekly patient/clinician contacts should improve officer safety.

Defendants' Comments:

1. In response to questions asked by the Special Master in his draft report, defendants have clarified that the Court should order the positions needed by PBSP to implement the needed positions as full-time-permanent staff, rather than supplemental staff currently at the prison based on a recently established "prevalence mix" analysis. The Special Master agrees, the appropriate recommendations are set forth below.

2. Defendants express concern about the bureaucratic delays inherent in the State of

1  California's "pilot project" process. At the meeting of January 4, 2006, however, it was agreed that

2  the new program for PBSP Ad Seg does not contradict existing regulations. Therefore, the program

3  should go forward without formal State "pilot project" processes.

4      3. Finally, defendants' point out that construction is necessary to implement the new

5  program (for example, to construct secure and confidential group exercise cages). During the

6  construction, full compliance with the mental health services standards required by the program will

7  be difficult, if not impossible, to achieve. The Special Master agrees that construction is needed.

8  He also agrees that the interim programming proposed by Dr. Wendy Saville is reasonable (see

9  Exhibit 10).

10      In addition to considering written objections, the Special Master allowed for comments not

11  submitted in writing to be discussed at the meeting of January 4th. For example, concern was

12  expressed by Chief Psychiatrist Wendy Saville and Warden Richard Kirkland about the inability to

13  adequately supervise the Psychiatric Technicians who provide care for prisoner/patients in the PSU,

14  EOP and Administrative Segregation. After discussion with CDCR Health Services officials, the

15  Special Master discovered that little real progress has been made at Headquarters to correct this

16  serious problem, despite prior assurances that the issue would be addressed on a state-wide basis.

17  The Special Master agrees with Warden Kirkland, the inability to supervise an expanded group of

18  Psychiatric Technicians has passed the "tipping point." Intervention by the Court is now necessary.

19                                         **VI.**

20                              **RECOMMENDATIONS**

21      The Special Master recommends that the Court issue the following orders:

22      1. Defendants should establish and implement the new Ad Seg Program as set forth in

23  Exhibit 2 effective Monday, March 6, 2006, with one modification: the Ad Seg Program should

24  require contacts between clinicians (Case Manager) and inmate/patients at least once per week.

25      2. Defendants should establish and implement the following *additional* full-time-permanent

26  positions for PBSP no later than Monday, Monday, March 6, 2006:

27      A. Three correctional officers to be assigned to Building A1 on Facility A.

28                                         -6-

B. Two Clinical Case Managers.[5]

C. Three Licensed Psychiatric Technicians.

D. One Psychiatric Technician Unit Supervisor.

E. One and one-half Registered Nurses to be assigned to Building A1 on Facility A.

Defendants should confirm the establishment of these positions through the submission of numbered position confirmations to counsel and the Special Master no later than Friday, March 3, 2006.

3. Working with the Department of Personnel Administration and the State Personnel Board, defendants should establish and implement a Psychiatric Technician Unit Supervisor Duty Statement no later than Friday, April 14, 2006 that provides for both adequate personnel supervision and the appropriate clinical supervision as called for by California law.

4. Defendants should, no later than Friday, February 24, 2006, submit in writing to the Special Master assurances that PBSP has received funding necessary to implement the construction necessary for the programs described in Exhibits 2 and 4.

5. Defendants should implement the program for delivery of Ad Seg mental health services as set forth in Exhibits 2 and 4 (modified to provide for contacts between clinicians (Case Manager) and inmate/patients at least once per week) effective Monday, March 6, 2006, subject to the construction related program modifications set forth in Exhibit 10.


Dated: January 17, 2006.


*John Hagar by ____*
John Hagar
Special Master

---

[5] An additional Case Manager will ensure once per week contact between clinicians and Ad Seg patients.

-7-

## PROOF OF SERVICE BY MAIL

1                                      

I, Kristina Hector, declare:

I am a resident of the County of Alameda, California; that I am over the age of eighteen (18) years of age and not a party to the within titled cause of action. I am employed as an Assistant to the Special Master in *Madrid v. Hickman* in the County of San Francisco, California.

On January 17, 2006 I arranged for the service of a copy of the attached documents described as the SPECIAL MASTER'S FINAL REPORT AND RECOMMENDATIONS RE ADMINISTRATIVE SEGREGATION MENTAL HEALTH PILOT PROJECT on the parties of record in said cause by sending a true and correct copy thereof by United States Mail and addressed as follows:

MIKE JORGENSON
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

STEVEN FAMA
Prison Law Office
General Delivery
San Quentin, CA 94964-0001

PETER FARBER-SZEKRENYI, DR. P.H.
Director
Division of Correctional Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

JANET LEWIS
Administrative Assistant
Division of Correctional Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

MADRID UNIT
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95532

DWIGHT WINSLOW
REGIONAL MEDICAL DIRECTOR
Division of Correctional Health Care Services
CDCR
P.O. Box 942883
Sacramento, CA 94283-0001

RICHARD KIRKLAND
Warden
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95532

1

2    DR. MICHAEL SAYRE
     Chief Medical Officer (A)
     Pelican Bay State Prison
3    P.O. Box 7000
     Crescent City, CA 95532
4
     MAUREEN McLEAN
5    Health Care Manager (A)
     Pelican Bay State Prison
6    P.O. Box 7000
     Crescent City, CA 95532
7
     DR. WENDY SAVILLE
8    Chief Psychiatrist
     Pelican Bay State Prison
9    P.O. Box 7000
     Crescent City, CA 95532
10
     TIM FISHBACK, M.D.
11   Chief of Mental Health; Chief Psychiatrist
     Health Services Division
12   California Department of Corrections and Rehabilitation
     P.O. Box 942883
13   Sacramento, CA 94283-0001

14   J. MICHAEL KEATING, JR.
     Special Master
15   285 Terrace Avenue
     Riverside, Rhode Island 02915
16
     JEFFREY L. METZNER, M.D., P.C.
17   3300 East First Avenue, Suite 590
     Denver, Colorado 80206
18
     WARREN C. (CURT) STRACENER
19   PAUL M. STARKEY
     Labor Relations Counsel
20   Department of Personnel Administration
     Legal Division
21   1515 "S" Street, North Building, Suite 400
     Sacramento, CA 95814-7243
22

23        I declare under penalty of perjury under the laws of the State of California that the foregoing is
     true and correct.  Executed on January 17, 2006 at San Francisco, California.
24

25

26   _____
     Kristina Hector
27

28

                                          -9-

# EXHIBIT 1

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY        ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF CORRECTIONS**
Legal Affairs Division
P.O. Box 942883
Sacramento, CA 94283
(916) 445-0495
(916) 327-5306 (Fax)


June 3, 2005


Mr. John Hagar
Special Master
Federal District Courthouse
Law Library, 18th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re: <u>Mental Health Care in PBSP Administrative Segregation</u>

Dear Mr. Hagar:

In response to your letter of May 16, 2005, regarding staffing in the "old" administrative segregation unit at Pelican Bay State Prison, I wish to confirm that the California Department of Corrections and Rehabilitation (CDCR) will proceed in the manner outlined in your conclusion. We will develop and timely implement a regulation pilot project at PBPS regarding privileges and property. On July 1, 2005, we will provide you with a staffing package for the old administrative segregation unit at PBSP, which will be developed by PBSP. We understand that you will forward the staffing proposal to Dr. Jeff Metzner for review, and if satisfactory, then to Special Master Michael Keating, for review and final approval or disapproval.

PBSP and CDCR headquarters have already begun significant, coordinated efforts to prepare a staffing study and pilot project. I believe that a discussion of the pilot project and staffing study at the July 12, 2005, 30 day meeting would be productive and appropriate, and ask that you consider putting it on the agenda.

If you have questions or comments regarding specifics prior to July 1, I would request that you contact Rich Kirkland, Mark Castellaw, or myself to discuss them.

Do not hesitate to contact me at (916) 324-4123 with questions.

Sincerely,


Dawn Whitney
Staff Counsel
Legal Affairs Division

Mr. John Hagar
Page 2


cc:  Renee Kanan, M.D., Deputy Director (A), Health Care Services Division
     Tim Fishback, M.D., Chief Psychiatrist, Health Care Services Division
     Suzan Hubbard, Deputy Director (A), Institutions Division
     Rich Kirkland, Warden, Pelican Bay State Prison
     Dave Lewis, Deputy Director (A), Financial Services Division
     Dennis Beaty, Assistant Chief Counsel, Legal Affairs Division
     Michael Jorgenson, Deputy Attorney General, Department of Justice
     Lisa Tillman, Deputy Attorney General, Department of Justice

# EXHIBIT 2

State of California

# Memorandum

Date : June 22, 2005

To : Richard Kirkland
Warden

From : Department of Corrections
Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA 95532-7000

Subject : **PILOT PROJECT (PBSP ADMINISTRATIVE SEGREGATION CCCMS MENTAL HEALTH MANAGEMENT PROGRAM)**

## PURPOSE

This Instructional Memorandum announces the establishment and implementation of the California Department of Corrections (CDC) Mental Health Management Program for Administrative Segregation Unit (ASU) inmates, who are at the Correctional Clinical Case Management System (CCCMS) Level of Care (LOC). This Pilot Project is designed to enhance the current level of mental health care provided to ASU CCCMS patients, who may experience deterioration in their psychiatric condition due to lengthy periods of lack of occupation.

## BACKGROUND

CDC and Pelican Bay State Prison (PBSP) have identified a need to enhance the current mental health program for CCCMS patients who are housed in ASU. The CCCMS ASU, located in Facility A, primarily houses inmates who are at the CCCMS LOC, where placement was initiated pursuant to a variety of individual case factors. A large proportion of CCCMS patients in ASU remain in that unit for several months. Over half of the CCCMS patients housed in ASU are there for non-disciplinary placement. A significant number of CCCMS patients in ASU are placed there after being in the Psychiatric Services Unit (PSU) at the Enhanced Out Patient (EOP) LOC, improving in their mental health condition, and subsequently having their LOC lowered to CCCMS. Due to the intense need for PSU beds, these patients are transferred to the PBSP ASU, awaiting transfer to the Corcoran State Prison Security Housing Unit (SHU) CCCMS Program. During the numerous months these patients are housed in the PBSP ASU with no activities to pass the time, it is not unusual for their mental health condition to deteriorate, requiring re-placement in PSU. Also, CCCMS patients awaiting transfer to a Special Needs Yard (SNY) remain in ASU for many months, often over a year. Conditions in the PBSP CCCMS ASU are not conducive to improving or even maintaining good mental health. Patients have no appliances, personal property or activities other than a single one-to-one mental health appointment per week plus medication management. This is not an adequate situation for what has essentially become a Mental Health Unit.

Richard Kirkland
Page 2

## PROGRAM COMPONENTS

**Definitions:**
All CCCMS patients housed within ASU will be eligible to participate in the proposed Pilot Project. Levels of participation will be dictated by each patient's willingness to conform with program parameters. Patients will be categorized as *Orientation Status*, *Level I* or *Level II*. Each patient's individual level designation will be determined by behavior and overall program participation.

**Disciplinary:**
A Level II patient who receives two 128 A Counseling Chronos in a thirty day period, or is found guilty of one CDC 115 Rules Violation Report, will be reduced to Level I and will be required to remain disciplinary free for a period of ninety days, and continue with program participation, before he can re-ascend to Level II.

**Classification:**
Within ten days of placement, the Institution Classification Committee (ICC) will review the case factors of each CCCMS ASU patient for placement into the Level I clinical level, and applicable exercise yard and double cell status. Subsequent ICC reviews will serve as a continuing appraisal, to identify each patient's progress and individual program performance.

## PILOT PROJECT REQUIREMENTS

The primary purpose of the Pilot Project is to enhance levels of mental health service to CCCMS patients who are housed within the ASU. All CCCMS patients housed within ASU are eligible to participate in the Pilot Project. Only those inmates who have remained disciplinary free for a minimum period of ninety days and participate in the minimal program parameters, will be eligible for the Level II privilege group.

## PILOT PROJECT LOCATION

The Pilot Project will be specific to inmates who are at the CCCMS LOC and who are currently housed within ASU at Pelican Bay State Prison, located on the General Population A Yard.

## BEHAVIORAL LEVEL SYSTEM

Participants of the Pilot Project will be divided into three categories: Orientation Status, and clinical Levels I and II. Each level has a separate range of patient requirements, privileges and program benefits. Each patient's level designation will be determined by program participation, disciplinary history and program conduct. Patient progress will be regularly assessed and monitored by the Unit Psychiatric Technician and Interdisciplinary Treatment Team (IDTT). The Level System will be tracked and administered by the Group Psychiatric Technician.

Richard Kirkland
Page 3

## *Orientation Status*

(Criteria)
- All patients enter on Orientation Status except those transferred from PSU who are on clinical Level 4 in PSU. (See Level II) This is a custody designation.

(Program/Privileges)
- Patients remain at Orientation Status until their first ICC (within 10 days).
- Minimal property levels consistent with current ASU policy.
- No exercise yard.
- Expected to attend one-to-one sessions with psychiatrist and clinician.

## *Level I*

(Criteria)
- This is the basic level of all CCCMS patients following their first ICC review.

(Program/Privileges)
- Minimal property levels consistent with current ASU policy.
- Walk alone, reintegrated mixed or controlled compatible exercise yard programs.(Small Exercise Yard or Concrete yard)
- Patients are assigned to one-to-one clinical sessions every two weeks, and psychiatrist appointments.
- IDTT sessions every ninety days.
- One group session each week, unless the IDTT determines the patient is not eligible due to a compelling clinical or custodial reason.

## *Level II*

(Criteria)
- Patients entering ASU from PSU because of a drop in LOC, who are on clinical Level 4 in PSU, are placed directly on ASU Level II.
- Remain disciplinary free for a minimum period of ninety days; defined as no CDC 115s and fewer than two 128A Counseling Chrono's in a thirty day period.
- Attend seventy-five percent of one-to-one pre-scheduled clinical sessions.
- Attend IDTT sessions every ninety days.
- Participate in one to two therapy groups per week, with minimum seventy-five percent participation.
- Participate in double cell program, unless otherwise restricted by ICC.

(Program/Privileges)
- Walk alone, reintegrated mixed or controlled compatible exercise yard programs.(Small Exercise Yard or Concrete yard)
- Property levels (Consistent with current PBSP SHU policy).

Richard Kirkland
Page 4

- Cell assignment in a pre-designated quiet section when available.
- In-cell recreational supplies, such as art materials (Consistent with current PBSP SHU policy).
- In cell appliance (Television or Radio consistent with current PBSP SHU policy). (Note: Patients must acquire their own appliances, except those patients transferring from PSU who are using a PSU "loaner" television may continue to use it in ASU until transfer from PBSP ASU/PSU or reduction of program level.)

### *Level II reduction*

- 128 A Counseling Chrono's are to be written for behavior that does not require a CDC 115, but is disruptive and detrimental to the unit.
- A patient who receives one 128A Counseling Chrono will be restricted from his appliance for a period of thirty days.
- A patient who receives two 128A Counseling Chrono's, or is issued a CDC 115, will be reduced to Level I status.
- Patients who lose Level II program status will only be placed back on program Level II after successfully meeting the above ninety day disciplinary, double celling and therapy requirements.

## PELICAN BAY STATE PRISON MENTAL HEALTH MANAGEMENT OF CCCMS INMATES PILOT PROJECT

Upon completion of this pilot project and approval for adaptation the California Department of Corrections and Rehabilitation, Departmental Operation Manual, Chapter 5, Article 23 Inmate Discipline and Article 43 Inmate Property shall be revised.

If you have any questions please contact either W. Saville, M.D., Chief Psychiatrist at extension 9118, or P. T. Smith, Facility Captain at extension 7904.


WENDY SAVILLE, M. D.                              P. T. SMITH
Chief Psychiatrist                               Facility Captain
                                                 Facility A

# EXHIBIT 3

State of California

# Memorandum

Date : June 24, 2005

To  : R. Kirkland
    Warden

From : **Department of Corrections**
    **Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA 95532-7000**

Subject : **STAFFING PROPOSAL FOR CORRECTIONAL CLINICAL CASE MANAGEMENT
SERVICES ADMINISTRATIVE SEGREGATION UNIT**

In order to adequately meet required mandates relative to the Madrid and Coleman decisions,
Pelican Bay State Prison (PBSP) has made the decision to house all Correctional Clinical Case
Management (CCCMS) inmates requiring placement into the Administrative Segregation Unit
(ASU) in Building A1 on Facility A. The current CCCMS population of Building A1 is 73
inmates.

Recognizing inmates at a CCCMS level of care require mental health treatment, the institution
has previously increased staffing on Second Watch by adding two Mental Health/Medical Escort
Officers. The current Correctional Officer staffing for Building A1 is:

| Position | First Watch | Second Watch | Third Watch |
|---|---|---|---|
| Control Booth | 1.74 | 1.74 | 1.74 |
| Yard Gunner | | 1.74 | |
| Floor Officer | .87 | 3.48 | 3.48 |
| Search and Escort Officer | | 3.48 | 3.48 |
| Mental Health / Medical Escort Officer | | 2.42 | |
| Total | 2.61 | 12.86 | 8.7 |

This represents a total of 24.17 Correctional Officer positions.

All out of cell movement in the ASU is under escort by a minimum of two Correctional
Officers. Most of the escorts occur between the hours of 0600 to 1500. However, mental health
staff have been directed to begin offering group therapy to CCCMS inmate's house in the ASU,
which will require additional escorts.

The staff on Second Watch provide a majority of the currently required escorts to:

- Medical appointments
- Mental Health one-on-one appointments
- Dental appointments
- Law Library

R. Kirkland
Page 2

- Classification Hearings
- Visiting
- Disciplinary Hearings
- Concrete Yard
- Walk Alone Yard

The staff on Third Watch provide escorts for:

- Showers
- Return from the second Walk Alone Yard period
- Disciplinary Hearings

Third Watch staff also provide the following services:

- Feeding
- Laundry / Linen Exchange
- Supplies
- Canteen delivery
- Mail delivery / collection

When PBSP commences the group therapy sessions, the amount of Second and Third Watch escorts will increase. Additionally, if the soon to be proposed CCCMS ASU program using the Level System is approved, the inmates will be required to participate in one-on-one therapy as well as group sessions in order to maintain their privileges. This will no doubt increase the amount of mental health escorts.

Additionally, one of the Mental Health / Medical Escort Officers is funded as a 1.24 position. There is no need for this position to be here on holidays, therefore I am recommending that it be taken to a 1.18 position.

Therefore, I am recommending the following staffing be approved:

| Position | First Watch | Second Watch | Third Watch |
|---|---|---|---|
| Control Booth | 1.74 | 1.74 | 1.74 |
| Yard Gunner | | 1.74 | |
| Floor Officer | .87 | 3.48 | 3.48 |
| Search and Escort Officer | | 3.48 | 3.48 |
| Mental Health / Medical Escort Officer | | 4.72 (2.3 increase) | |
| Total | 2.61 | 15.16 | 8.7 |

R. Kirkland
Page 3

This represents a total of 26.47 Correctional Officer positions. This would require an increase in staff by 2.3 positions. Of course, if the CCCMS population in the ASU increases, there may be a need for additional resources.

If you have any questions, contact me at extension 7904.


P.T. SMITH
Facility Captain
Facility A

EXHIBIT 4

State of California

# M e m o r a n d u m

Date    :  June 22, 2005

To      :  Calvin Smith
           Regional Administrator for Health Care
           Northern Region

From    :  Department of Corrections
           Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA  95532-7000

Subject :  **PROPOSAL FOR MENTAL HEALTH SERVICES IN CCCMS ADMINISTRATIVE
           SEGREGATION UNIT AT PELICAN BAY STATE PRISON – FINAL DRAFT**

The background of this proposal is contained in a letter from Special Master, Mr. John Hagar to the Madrid case attorneys dated May 16, 2005 regarding Mental Health Care in Pelican Bay State Prison (PBSP) Administrative Segregation (Ad Seg) Unit. As the Special Master points out, a large proportion of the CCCMS patients in Ad Seg remain in that unit for many months. Over half the CCCMS inmates housed in Ad Seg are there for non-disciplinary reasons. A significant minority of CCCMS patients in Ad Seg are placed there after being in the Psychiatric Services Unit (PSU) at EOP Level of Care (LOC), improving in their mental health condition, and being lowered to CCCMS LOC. Because of the intense need for PSU beds, these patients are transferred to PBSP Ad Seg awaiting transfer to the Corcoran SHU CCCMS Program. However, during the months they spend in PBSP Ad Seg with no activities to pass the time, it is not unusual for their mental health condition to deteriorate, many times requiring re-housing in PSU. As Mr. Hagar points out, conditions in the PBSP CCCMS Ad Seg Unit are not conductive to improving or even maintaining good mental health. The inmates have no property, no activities other than one one-to-one appointment per week, and essentially nothing to help them pass the time. This is not a sensible situation for what is essentially a Mental Health Unit.

Mr. Hagar requests that we submit to him a proposal that covers two areas:
1.  Proposed staffing for delivery of Mental Health services that meet at least the minimum standards in the Coleman Program Guides.
2.  A proposal for a Pilot Project to modify existing regulations and allow mentally ill inmates who are segregated for non-punitive reasons to be provided with selective privileges and property over and above that allowed to inmates segregated for rules violations.

Our proposed program was developed in consultation with Dr. Jeffrey Metzner, Psychiatrist, Court Expert in the Madrid and Coleman cases. It is based on a minimum standard of being able to offer each CCCMS patient in Ad Seg at least one group per week, one-to-one individual counseling once every two weeks, an in-cell recreation program, a level system offering privileges as delineated below, medication prescription and monitoring, daily rounds and new arrival screenings. Groups will emphasize recreational activities and social skills, but will also include current events, "prison etiquette," cognitive therapy for indecent exposure offenders, anger management, and other topics as developed through experience with the program. The maximum acceptable refusal rate for groups and one-to-one appointments will be 30 percent. Our current refusal rate for one-to-ones is approximately 70 percent. (See proposed daily schedule attached.)

Calvin Smith
Page 2

The following program is proposed on the assumption that the CCCMS Ad Seg census is no higher than 70 patients. If the census were to go over that number, it would not be possible to administer the same program with the same clinical staffing. If the census were high because of a riot, for example, and it were expected to be a relatively short-term situation, those patients placed in Ad Seg due to the riot might not be offered the incentive program or might not be placed in a group if the group slots became full. If the CCCMS Ad Seg census became permanently over 70, a new staffing package would be required. The following is a preliminary proposal only; the final proposal may have considerably different details.

## STAFFING:

*Psychiatrists*. PBSP is currently allocated 1.0 psychiatrists for Ad Seg and SHU. This should continue to be adequate.

*Case Managers*. PBSP is currently allocated 1.5 case managers for Ad Seg. This number has never been adequate, and in fact we have assigned an extra .5 case manager from another unit to provide basic services in Ad Seg (in addition to the approximately .3 position diverted to the new Ad Seg Unit was also not provided.) Particularly in such a small unit, a relief factor is also required in order to provide services without interruption. For a census of 60 to 70, two case managers are needed with a relief factor of .15 for each one, for a total need of 2.32. A case manager is either a psychologist or a social worker. When the census goes above 70 and remains there, additional case manager time would have to be diverted from another unit, thus reducing overall PBSP compliance with court directives to a degree related to the amount of time that must be diverted. Ad Seg patients require much more case manager time and attention than General Population CCCMS patients.

Case manager duties include one-to-one counseling with caseload patients, crisis and emergency interventions, seeing referrals, evaluations, Board of Prison Terms Evaluations, 602 Responses, Indecent Exposure Evaluations, Mental Health Reports for RVRs, ICC attendance, Interdisciplinary Treatment Team (IDTT) preparation and attendance, Staff Meeting attendance, Quality Improvement Team service, C-File Reviews required for several types of reports, documentation of all of the above, consultation with psychiatrists, custody staff, and other staff, and assisting with groups.

In summary, we propose an additional .82 (essentially 1.0) case managers above the current allocation.

*Licensed Psychiatric Technicians*. PBSP is currently funded for 1.5 Licensed Psychiatric Technicians (LPT) positions for this unit. In order to provide the above program, we propose the following:
- 1.64 LPT positions on AM Shift. Duties would include: AM Medication Pass, treatments, labs, some of the daily rounds, general help to the psychiatrist, noting and processing orders, and urgent and crisis interventions.
- 1.64 LPT positions on the PM Shift. Duties would include: PM Medication Pass, daily rounds, administer Medication Administration Records, order medications and supplies, new arrival screens, interventions, and urgent and crisis care. Having LPTs pass meds rather than MTAs will greatly improve the unit culture and medication compliance.

Calvin Smith
Page 3

- 1.15 group LPT (five days per week with vacation and sick relief.) Duties to include two two-hour groups per day, five days per week with seven to eight patients per group, group preparation and documentation, in-cell activity program including inventorying and tracking of supplies, ordering, organizing both programs, inventorying and checking out books, and administration of the level system (below.)
- LPT Unit Supervisor. There are currently 22.5 LPTs at PBSP with no provision made for their supervision, except for two "lead" positions. Currently supervisory time is taken "out of hide" of nursing supervisory positions. PBSP has needed a Unit Supervisor for the LPTs for the past several years. With the addition of CCCMS Ad Seg services, and the proposed increase to approximately 25 LPT positions, the need for a Unit Supervisor for all the LPTs at PBSP becomes even more critical.

In summary, we propose 2.93 (essentially 3.0) additional LPT positions and 1.0 LPT Unit Supervisor.

*Nursing Staff.* The A-1 Ad Seg medical clinic is located in the housing unit, because Ad Seg inmates cannot be taken to the A Yard general medicine clinic. Due to the remote location of the A-1 Ad Seg medical office, and the well above average volume of sick calls and general medical needs of the Ad Seg population, it has been necessary for the nursing department to assign an RN full-time to the Ad Seg medical office. Staffing has never been provided for this position, and this RN is being diverted from other duties. Therefore, we are requesting as part of this staffing augmentation a 1.15 RN position for the medical office.

*Custody Officers.* Captain P.T. Smith is providing the recommendation for additional escort staff to for the above program in a separate memorandum.

## SUMMARY OF HEALTH CARE STAFFING AUGMENTATION:
Psychiatrists – no additional positions.
Case Managers – 1.0 additional case manager.
Licensed Psychiatric Technician – 3.0 LPT positions and 1.0 LPT Unit Supervisor position.
Registered Nursing Staff – 1.15 RN positions.


## PILOT PROJECT FOR CLINICAL LEVEL SYSTEM:

See Joint Mental Health/Custody Memorandum regarding the proposed Pilot Project.


## PHYSICAL PLANT MODIFICATIONS:

See Proposal and Cost Estimate provided by Dayton Conover, Correctional Plant Manager.


## NECESSARY SUPPLIES. The above program would require:
- Television and VCR/DVD player for the group area
- Group therapy supplies including recreational therapy supplies
- In-cell activity supplies
- Movies and music discs

We estimate these supplies, after the start up cost, would cost approximately $1,000.00 per year.

Calvin Smith
Page 4


It is our belief the above program would satisfy a minimum standard for Mental Health care for this type of population.



WENDY SAVILLE, M.D.
Chief Psychiatrist

Attachment

cc:    Richard Kirkland, Warden
       Dwight Winslow, M.D., Health Care Manager
       P.T. Smith, Captain ASU
       Mike Bean, Manager Business Services
       Jeffrey Metzner, M.D.

# PROPOSED DAILY SCHEDULE

|  | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| **MH Office**<br>(A-1 Rotunda) | Psychiatrist<br>0830 – 1430 hrs | Case Manager 2 1:1s<br>0800 – 1400 hrs |  | Case Manager 1 1:1s<br>0800 – 1400 hrs | Psychiatrist<br>0830 – 1430 hrs |
| **Dining Room #1**<br>(8 holding cells) | Group LPT<br>0900 – 1100 hrs<br>1400 – 1600 hrs | Group LPT<br>0900 – 1100 hrs<br>1400 – 1600 hrs | Group LPT<br>0900 – 1100 hrs<br>1400 – 1600 hrs | Group LPT<br>0900 – 1100 hrs<br>1400 – 1600 hrs | Group LPT<br>0900 – 1100 hrs<br>1400 – 1600 hrs |
| **Dining Room #3**<br>(1 holding cell) | Case Manager 3 1:1s<br>0800 – 1400 hrs |  |  |  | Case Manager 3 1:1s<br>0800 – 1400 hrs |
| **Dining Room #5**<br>(1 holding cell) | Case Manager 1 1:1s<br>0800 – 1400 hrs | Case Manager 1 1:1s<br>0800 – 1400 hrs |  | Case Manager 2 1:1s<br>0800 – 1400 hrs | Case Manager 2 1:1s<br>0800 – 1400 hrs |

Offers one group per week per patient (8 X 2 X 5 = 80 patients)

Wednesdays = ICC, IDTT, Staff Meetings

EXHIBIT 5

JEFFREY L. METZNER, M.D., P.C.
3300 EAST FIRST AVENUE
SUITE 590
DENVER, COLORADO 80206

TELEPHONE (303) 355-6842
FACSIMILE  (303) 322-2155

# MEMORANDUM

**To:** John  Hagar, Esq.
**From:** Jeffrey L. Metzner, M.D.
**Date:** June 8, 2005
**Re:** PBSP administrative segregation pilot program

I have reviewed the "PROPOSAL FOR MENTAL HEALTH SERVICES IN CCCMS ADMINISTRATIVE SEGREGATION UNIT AT PELICAN BAY STATE PRISON" described in Appendix I. It is my opinion that this proposal be implemented and further assessed via a QI process.

EXHIBIT 6

# MEMORANDUM

**To:**   John Hagar, Esq.
**From:**  Jeffrey L. Metzner, M.D.
**Date:**  November 20, 2005
**Re:**    Administrative Segregation Pilot Project

---

## Administrative Segregation Pilot Project

Minutes of the Ad Seg C3MS program QIT were reviewed. This QIT met on about a weekly basis from May 17-June 21, 2005. Through the *Madrid* process, a pilot project was proposed and accepted by the Special Master (see Appendices IA, B, & C) around June 2005. However, neither the section 6 request for remodeling nor the staffing proposals have been either approved or disapproved from central office. An apparent recent agreement between Mr. Hagar and Mr. Keating was reported to result in the decision for this project to proceed via the *Madrid* process at the current time.

Although the staffing proposal has not been acted upon, the recent increase in mental health staffing allocations based on the prevalence information comes close to the requested pilot project proposal.

EXHIBIT 7

**JOHN HAGAR - SPECIAL MASTER**
Madrid v. Woodford, C-90-3094 T.E.H.

███████████████████

Federal District Courthouse
Law Library 18ᵗʰ Floor
450 Golden Gate Avenue
San Francisco, CA 94102

June 10, 2005

J. MICHAEL KEATING, JR.
285 Terrace Avenue
Riverside, Rhode Island 02915

Re: PBSP Ad Seg Status Report

Dear Michael:

In response to my letter of May 16, 2005 (a copy of which was finally sent to your new address), the defendants in *Madrid* have agreed to (1) proceed to implement a pilot project to modify the privileges provided in the "old" ad seg unit and (2) to develop a plan for providing enhanced mental health services in the unit. See Dawn Whitney's letter of June 3, 2005 (Exhibit 1).

An outline of the enhanced mental health services plan is attached as Exhibit 2. See also Dr. Jeffrey L. Metzner's responsive letter (Exhibit 3).

I will proceed to work with defendants on the pilot re privileges. I will forward the staffing package to you, after I receive it on July 1, 2005 (from what I've been told, PBSP officials believe that they can provide *Coleman* standards of care in ad seg, including at least once per week group therapy, with additional staffing that is *significantly* below that projected by the Central Office). I will also set the status of both projects for discussion at my "30-day" meeting of July 12, 2005.

Dr. Metzner can discuss these issues with PBSP officials during his *Coleman* on-site inspection of August 2005. The decision to go forward with the enhanced mental health services plan with be a *Coleman* (and not a *Madrid*) decision.

Let me know if you have any questions, comments, or concerns.

Yours truly,

John Hagar

cc. Dr. Jeffrey L. Metzner

JOHN HAGAR - SPECIAL MASTER
<u>Madrid v. Woodford</u>, C-90-3094 T.E.H.

███████████████

Federal District Courthouse
Law Library 18th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

July 14, 2005

J. MICHAEL KEATING, JR.
285 Terrace Avenue
Riverside, Rhode Island 02915

Re: <u>Mental Health Services in PBSP Administrative Segregation Unit</u>

Dear Michael:

I have attached the PBSP proposals to (1) institute a pilot project in administrative segregation to provide a step program and additional mental health services, and (2) to staff administrative segregation with additional escort officers and mental health staff to provide for Coleman ad seg requirements. Taken as a whole, these documents appear to represent a reasonable start to a necessary change in services.

Please review and contact me at your convenience.

Yours truly,

John Hagar

cc.  Madrid Unit
     Steven Fama
     Mike Jorgenson
     Lisa Tillman
     Dennis Beaty
     Dr. Jeffrey L. Metzner
     Dr. Renee Kanan
     Dr. Wendy Saville

EXHIBIT 8



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964-0001

Telephone (415) 457-9144 • Fax (415) 457-9151

*Director:*
Donald Specter

*Staff Attorneys:*
Susan Christian
Steven Fama
Brittany Glidden
Penny Godbold
Megan Hagler
Alison Hardy
Millard Murphy
Sara Norman
Keith Wattley

December 28, 2005

John Hagar
Special Master, *Madrid v. Hickman*
Via e-mail pdf file transfer only

> Re:   Draft Report And Recommendations Re Administrative Segregation Mental Health
> Pilot Project

Dear Mr. Hagar:

Plaintiffs offer the following comments and objections to the above-referenced Draft Report.

Plaintiffs object to Findings # 1 and # 3, at 4:5-7 and 9-11, to the extent that Draft Report determines that the Pelican Bay project and/or program is adequate when they provide for (1) the Institutional Classification Committee (ICC), not an Inter-Disciplinary Treatment Team (IDTT), to make appraisals and determinations related to an inmate-patients' level of participation in a behavior modification/treatment program, and do not permit the IDTT to over-ride restrictions when warranted by treatment concerns or mental health status or even require that privileges be restored if an inmate is found not guilty of a rules violation; and (2) one-to-one clinician contacts at most once every two weeks, instead of every week (as required by the statewide *Coleman* program guides), even when a inmate-patient does not participate in group therapy sessions. The objections are discussed below.

### 1.  ICC appraisals and determinations of treatment levels / program restrictions

The Pilot Project calls for the ICC to make the initial determination regarding whether an inmate-patient will be placed into the "Level 1 clinical level." See Exhibit 2 to Draft Report at 2. The ICC apparently determines subsequent decisions, including placement in Level 2, based on the patient's "progress and . . . program performance." *Id.*

In addition, the Pilot Project provides that restrictions for an inmate's Level II program, including participation in group therapy, will be imposed upon issuance of a counseling chrono or rules violation report, and provide for those restrictions to continue until certain disciplinary free time-periods are completed, without permitting the IDTT to lift restrictions based on treatment concerns or even if the inmate is subsequently found not guilty of a rules violation.

Board of Directors
Marshal Krause, President • Michele WalkinHawk, Vice President
Honorable John Burton • Penelope Cooper • Felecia Gaston • Christine Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Hagar
December 28, 2005
Page 2

Mental health treatment decisions, and restrictions that impact mental health treatment, must involve the IDTT. All other mental health treatment decisions at Pelican Bay involve the IDTT. See, e.g, Health Care Policies and Procedures, Volume V-A, Chapter 3a (at pages 3-5), Chapter 4 (at page 4) and Chapter 8 [addressing role of IDTT in CCCMS, EOP and PSU levels of care, respectively]. Statewide, treatment planning for all inmate-patients in administrative segregation must be done by the IDTT. See Program Guides at 8-7 (section "K"), copy enclosed. Plaintiffs can identify no legitimate penological or other reason for the IDTT to not be involved in treatment related decisions, including imposition and continuation of program restrictions, in the administrative segregation pilot project. IDTT approval or concurrence for such restrictions and program level determinations should be required, and the IDTT when necessary should be required to meet on a particular inmate-patient more frequently than once every 90 days.

The problem of the pilot project not providing for removal of restrictions when the inmate-patient is subsequently found not guilty of a rules violation should be obvious.

2. Frequency of Clinician (Case Manager) Contacts

The pilot project calls for administrative segregation inmate-patients to receive one-to-one contacts with a clinician once every two weeks if they are in program Level I.. See Draft Report, Exhibit 2, at page 3. Oddly, the pilot project does not require any amount of one-to-one clinical contact for inmate-patients in program Level II. *Id.* at pages 2-3.

The statewide Coleman requirements mandate weekly case manager contacts for inmate-patients housed in administrative segregation. See Program Guides, Section 8-7, May 1997 (copy enclosed). The pilot project, when envisioned, was supposed to involve sufficient staff to meet these statewide requirements. See Draft Report, Exhibit 4, at page 1 ["Mr Hagar requests that we submit to him a proposal that covers . . . 1. Proposed staffing for delivery of Mental Health services that meet at least the minimum standards in the Coleman Program Guides"]. As such, it is puzzling why the Pilot Project reduces the frequency of one-to-one case manager contacts for Level I inmate-patients, and does not mandate any such contacts for Level II prisoners. It perhaps might be suggested that the Pilot Project's group therapy sessions adequately substitute for the one-to-one sessions. However, those group sessions are conducted by psychiatric technicians (see Draft Report, Exhibit 4, at page 3, first bullet point [describing duties of psych techs]). In contrast, the one-to-one case manager contacts are normally provided by a psychiatric social worker or psychologist. See Program Guides at 8-7 (enclosed). In addition, even assuming that the group sessions are an adequate substitute for one-to-one encounters, the Pilot Project does not require that weekly one-to-one encounters be scheduled for inmate-patients who for any reason, including impositions of restrictions, cannot or does not participate in the group sessions. For all these reasons, the Pilot Project should be modified to require weekly one-to-ne case manager contacts for all inmate-patients.

Mr. Hagar
December 28, 2005
<u>Page 3</u>

   Thank you for considering these matters.  I look forward to discussing them with you, Pelican Bay managers and staff, and CDCR officials at our upcoming January 4th video conference.

         Sincerely,

         /s/

         Steven Fama

cc: Mike Jorgenson, Deputy Attorney General
  *Madrid* Compliance Unit
  (Both via pdf file transfer only)

**Mental Health Services Delivery System  Program Guides – Health Care Services Division**

    2.  Chief Psychiatrist, or in institutions without such a position, the Health Care Manager or designee, shall attend the ICC to provide clinical input at the committee meeting. (See **IX EOP care**)

K.  INTERDISCIPLINARY TREATMENT TEAM

    1.  The Ad/Seg MHS IDTT shall be chaired by the Chief Psychiatrist, or, in institutions without such a position, a mental health clinician designated by the Health Care Manager. At least one additional clinical member (normally the designated clinical case manager for the inmate under review) shall be required for decisions. Other regular participants in IDTT reviews shall include the unit Facility Captain, Supervising Correctional Counselor, unit Lieutenant, and mental health and custodial staff who have specific information relevant to cases under review. The IDTT reviews may include classification actions in the Department Operations Manual Section 62010.8.2 and California Code of Regulations Section 3375 if appropriate, when classification staff and necessary documentation are present.



    2.  All IDTT actions shall be documented within the individual inmate Unit Health Record on approved forms, and, where custodial issues are involved, on 128C Chronos for the central file.

    3.  The responsibility for overall treatment planning within the Ad/Seg MHS rests with the IDTT.

    4.  All IDTT sessions that involve a change in treatment plans should include the presence of the inmate under review. Inmate participation in the development and adjustment of treatment plans is essential.

L.  CLINICAL CASE MANAGER

Each inmate within the treatment component of the Ad/Seg MHS shall be assigned a clinical case manager through the CCCMS program, normally a Psychiatric Social Worker or Psychologist. This individual shall maintain weekly clinical involvement with the inmate, as well as performing casework functions, including the following:

    1.  Documentation of initial and updates to the treatment plan.

    2.  Weekly monitoring of clinical symptoms.

    3.  Scheduling for periodic treatment team reviews.

Revised May 1997

EXHIBIT 9

*BILL LOCKYER*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5629
Facsimile: (415) 703-5843
E-Mail: michael.jorgenson@doj.ca.gov

December 28, 2005

John Hagar
Special Master
Judges' Reading Room
Court Library, 18th Floor
U.S. District Court, Northern District
450 Golden Gate Avenue
San Francisco, CA 94102

RE:    ALEJANDRO MADRID, et al. v. RODERICK HICKMAN, et al.
       United States District Court, Northern District of California, Case No. C-90-3094 TEH

Dear Mr. Hagar:

       Defendants submit the following comments and objections to the Special Master's Draft Report and Recommendation Re: Administrative Segregation Mental Health Pilot Project served December 6, 2005 (the Report). These are submitted pursuant to the January 23, 1995 Order of Reference, by which the parties may express concerns, comment, and object to a draft report.

       The Special Master requested comments addressing the following three issues:

*Issue 1: The Special Master understands that, to a very significant degree, PBSP recently received staffing increases which provide many, if not all, of the positions requested in Exhibit 3. The status of current staffing should be clarified, and a program for obtaining any additional staff necessary to implement the program should also be explained.*

       The 2.3 correctional officer positions during second watch that were requested in the Special Master's Exhibit 3 were authorized and received at PBSP as part of the "Prevalence Mix Distribution" in September 2005. The mental health staffing authorization received at PBSP in September 2005 as part of the Prevalence Mix included 1.0 Clinical Case Manager and 3.0 Licensed Psychiatric Technicians, which can be used for the Ad Seg Pilot Project. While not reflected in the Special Master's Exhibit 3, a 1.0 Licensed Psychiatric Technician Unit Supervisor position, and 1.15 Registered Nurse position are still requested by Dr. Saville. *See* Special Master's Exhibit 4 p. 3.

       Defendants request that the positions become part of a *Madrid* remedial order rather than



December 28, 2005
Page 2

part of the prevalence mix. It is more appropriate to make those positions part of the remedial plan since the program is being implemented through a court order and calls for permanent positions not subject to removal.

*Issue 2:  The steps taken to receive administrative approval for "pilot" status should be explained.*

The steps taken to receive administrative approval for the "pilot" status are as follows:

The statutory purpose and description for this type of pilot program is found in California Penal Code Section 5058.1.  The first step is to create an instructional memorandum describing the program with the assistance of CDCR's regulations and policy management branch who in turn works with the state's Office of Administrative Law (OAL).  You may recall that an instructional memorandum was prepared for the pilot program in the *Freitag* case.  The program's text should be approved by the Special Master and authorized by CDCR executives and the Department of Finance.  Some of the documents required by the CDCR regulations and policy management branch for submittal to OAL include a financial and economic impact statement (STD form 399), a Certificate of Pilot Program signed by CDCR's Secretary or Chief Deputy Secretary, and a transmittal form (STD form 400).  The Department of Finance also reviews the pilot program for fiscal impact since there is a fiscal impact.  Once the pilot program is submitted to the OAL, it has 30 working days to review the program and suggest changes to the text or provide final approval of the program.  The program will be in effect for 24 months from the date the Certification of Pilot Program is dated.  After that period, a final program will have to be adopted.  Pilot Programs may also be amended by filing a new Form 400 (Part B) and new amended text, however, the 24 months cannot be extended.

*Issue 3: The Special Master understands that Dr. Metzner raised concerns, during his November 2005 Coleman visit, about the adequacy of the proposed group therapy cages. Defendants should submit a plan for the renovations necessary to address the Court expert's findings.*

Dr. Metzner's concerns related to confidentiality and privacy of the mental health inmate patient.  Plans for remodeling the kitchen and dining room area between buildings A-1 and A-2 have been agreed upon by custody and mental health management and are being prepared under the direction of PBSP Plant Operations Supervisor, Chip Conover.  All the clinical spaces in the proposed remodel are "enclosed and sound confidential" as required to meet the specifications as described by Court Expert Dr. Metzner.

Short-term solutions for improving sight and sound confidentiality have been implemented.  They include placing partitions to provide at least a visual barrier for mental health patients.  The partitions may need to be moved during construction.

Defendants have recommendations and objections to the Draft Report's implementation deadlines.  First, it is not possible to complete construction before February 13, 2006, because it involves obtaining construction authorization and funding.  The construction renovation project

December 28, 2005
Page 3

requires the expenditure of approximately $277,000 and the preparation of a Special Repair/Capital Outlay Budget Change Proposal (COBCP). The COBCP's estimate for completion of construction is four months from approval of the project. The construction project includes ordering construction materials, removal of kitchen fixtures, replacing flooring, construction of treatment areas and offices, installation of smoke detection equipment, lighting and electrical renovation, and installation of local area network lines. The project will be accomplished with inmate day-labor.

Second, certain aspects of the mental health program, cannot be fully implemented until the construction project is completed. Until construction renovations are completed, a modified program will need to be used. I summarize comments received from Dr. Saville in support of the recommended changes to the draft report:

By February 13, 2006, an interim program can be implemented pending the remodeling of the area. The interim program will of necessity be suboptimal and provide less than the full range of services in the proposed plan. The spaces are now used for providing therapy services, and the spaces which will be available during the construction phase, are non-confidential, noisy, and subject to frequent interruptions. Also, although the Psychiatric Technician positions have been obtained, people need to be hired. Mental Health staff are confident in being able to fill one of the Psych Tech positions, and that person would run the group and recreational program and administer the level system. Mental Health staff hope to hire the other two Psych Tech as well, within the next two months, and they will provide a critical piece of the proposal, that is, the medication pass and the unit's atmosphere by virtue of their presence and activities there. This, plus the level system, are the key elements in transforming the unit.

Dr. Saville has proposed the two attached daily activity schedules, one for before the start of construction, and the other during construction. It should be understood that both these schedules are subject to revision because of several factors including obtaining staff, being able to obtain the needed supplies in a timely manner, the lack of computers in the current space (requiring staff to travel to remote locations to use computers, which reduces efficiency considerably) and the difficult nature of the current physical plant with its noise, openness, and bustle. It may turn out that fewer one-to-ones and groups can be provided than are tentatively planned at this time. For example, PBSP plans to place escorts on third watch and run the group program on third watch during the construction phase.

Therefore, the Defendants request a change to Recommendation #3 requiring that "Defendants should implement the program for delivery of Ad Seg mental health services as set forth in Exhibit 4 effective Monday, February 13, 2006." Defendants request that the recommendation be changed to: "Defendants should fully implement the program for delivery of Ad Seg mental health services as set forth in Exhibit 4 upon completion of construction renovations."

In light of the need to include mental health services as part of the pilot project, it is not possible for PBSP to meet recommendation #1 by February 13, 2006. That recommendation is



December 28, 2005
Page 4

that "Defendants should implement the pilot project set forth in Exhibit 2 effective Monday, February 13, 2006." But Defendants can comply with the requirement for enhanced property levels by that deadline, if the levels system can be administered. Defendants propose the following language reflecting the operational needs of completing construction: "Defendants should implement the program for delivery of Ad Seg mental health services as set forth in Exhibit 2 upon completion of construction renovations. Defendants should implement the program for enhanced property levels no later than Monday, February 13, 2006."

The Defendants look forward to a further discussion of this matter at the 30-day meeting on January 4, 2006.

Respectfully Submitted,

MICHAEL JORGENSON
Deputy Attorney General

For    BILL LOCKYER
Attorney General
Attorneys for Defendants Hickman, Kirkland and McLean

cc:  Steven Fama, Prison Law Office
Richard Kirkland, Pelican Bay State Prison
Dennis M. Beaty, CDCR Legal Affairs Division
Dr. Peter Farber-Szekrenyi, CDCR Health Care Services Division
Maureen McLean, PBSP Health Care Manager
Dr. Wendy Saville, PBSP Chief Psychiatrist
Janet Lewis, CDCR Health Care Services Division
Madrid Unit, Pelican Bay State Prison

20036991.wpd

EXHIBIT 10

**Proposed CCCMS MH Services Schedule -- DURING Construction**

**Administrative Segregation Unit - II**

### Daily Activity Schedule

| ASU-2 Location | Available Holding Cells | M | T | W | Th | F |
|---|---|---|---|---|---|---|
| MH Office (A-1 Rotunda) | 1 | Psych MD (0830-1430) | C Mgr 1 (1:1's 0800-1400) | Psych MD (varies) | C Mgr 2 (1:1's 0800-1400) | Psych MD (0830-1430) |
| Dining Rm. (Group Area)* | 5 | CM 1 (0800-1400) LPT / Grp A (1500-1700) / Grp B (1800-2000) | CM 2 (0800-1400) LPT / Grp C (1500-1700) / Grp D (1800-2000) | IDTT/ICC (0800-1300) LPT / Grp E (1500-1700) / Grp F (1800-2000) | CM 3 (0800-1400) LPT / Grp G (1500-1700) / Grp H (1800-2000) | CM 3 (0800-1400) LPT / Grp K (1500-1700) / Grp L (1800-2000) |
| Dining Rm. (North Area) | 1 | | | | C Mgr 1 (1:1's 0800-1400) | C Mgr 2 (1:1's 0800-1400) |

Notes: 1. Each group includes up to 5 patients. 10 groups serve 50 patients total.
2. Each 1:1 line includes up to 8 patients. 8 lines serve 64 patients total.
3. Case managers 1 and 2 are full time, C mgr 3 is .5 part time.
* If LAN Drop is installed in "Potato Room" for Medical Staff use, these am 1:1 lines may be conducted in A-2 Rotunda room.

**Administrative Segregation Unit - II**      Proposed CCMS MH Services Schedule -- Prior to Construction Start

## Daily Activity Schedule

| ASU-2 Location | Available Holding Cells | M | T | W | Th | F |
|---|---|---|---|---|---|---|
| MH Office (A-1 Rotunda) | 1 | Psych MD (0830-1430) | C Mgr 1 (1:1's 0800-1400) | Psych MD (varies) | C Mgr 2 (1:1's 0800-1400) | Psych MD (0830-1430) |
| Dining Rm. (Group Area) | 5 | LPT Grp A (0900-1100) Grp B (1200-1400) | LPT Grp C (0900-1100) Grp D (1200-1400) | LPT Grp E (0900-1100) Grp F (1200-1400) | LPT Grp G (0900-1100) Grp H (1200-1400) | LPT Grp K (0900-1100) Grp L (1200-1400) |
| Kitchen (1:1 Area) | 1 | C Mgr 1 (1:1's 0800-1400) | C Mgr 2 (1:1's 0800-1400) | *ICC* *IDTT* *Staff Meetings* | C Mgr 1 (1:1's 0800-1400) | C Mgr 2 (1:1's 0800-1400) |
| Dining Rm. (North Area) | 1 | C Mgr 3 (1:1's 0800-1400) | C Mgr 3 (1:1's 0800-1400) | | | |

Notes: 1. Each group includes up to 5 patients. 10 groups serve 50 patients total.
2. Each 1:1 line includes up to 8 patients. 8 lines serve 64 patients total.
3. Case managers 1 and 2 are full time, C mgr 3 is .5 part time.