# Exhibit H

NOTICE OF ADOPTION OF EMERGENCY REGULATIONS

California Code of Regulations
Title 15, Crime Prevention and Corrections
Division 3, Department of Corrections

**NOTICE IS HEREBY GIVEN** that the Director of the Department of Corrections (CDC), pursuant to rulemaking authority granted by Penal Code (PC) Section 5058.3, in order to implement, interpret and make specific PC Section 5054, proposes to amend section 3335 in the California Code of Regulations (CCR), Title 15, Division 3, relating to the frequency with which the case factors of inmates detained in segregated housing are reviewed by an Institution Classification Committee (ICC).

**PUBLIC HEARING:**

| | |
|---|---|
| Date and Time: | **September 7, 2005, 10:00 a.m. – 12:00 p.m.** |
| Place: | Resource Agency Auditorium<br>1416 Ninth Street<br>Sacramento, CA 95814 |
| Purpose: | To receive comments about this action. |

**PUBLIC COMMENT PERIOD:**

The public comment period will close **September 7, 2005 at 5:00 pm.** Any person may submit public comments in writing (by mail, by fax, or by e-mail) regarding the proposed changes. To be considered by the Department, comments must be submitted to the Department of Corrections, Regulation and Policy Management Branch, P.O. Box 942883, Sacramento, CA 94283-0001; by fax at (916)358-2636; or by e-mail at *RPMB@executive.corr.ca.gov* before the close of the comment period.

**CONTACT PERSON:**

Please direct any inquiries regarding this action to:

**Timothy M. Lockwood, Chief,
Regulation and Policy Management Branch
Department of Corrections
P.O. Box 942883, Sacramento, CA 94283-0001
Telephone: (916) 358-1655**

In the event the contact person is unavailable, inquires should be directed to the following back-up person:
**John McClure
Regulation and Policy Management Branch
Telephone: (916) 358-1655**

Questions regarding the substance of the proposed regulatory action should be directed to:
**Mike Mott, Correctional Counselor III
Institutions Division
Telephone: (916) 322-7150.**

**LOCAL MANDATES:**

This action imposes no mandates on local agencies or school districts, or a mandate which requires reimbursement pursuant to Government Code Section 17561.

**FISCAL IMPACT STATEMENT:**

- Cost or savings to any state agency:                                    *None*
- Other non-discretionary cost or savings imposed on local agencies:                                                        *None*
- Cost or savings in federal funding to the state:             *None*

**EFFECT ON HOUSING COSTS:**

The Department has made an initial determination that the proposed action will have no significant effect on housing costs.

**COST IMPACTS ON REPRESENTATIVE PRIVATE PERSONS OR BUSINESSES:**

The Department is not aware of any cost impacts that a representative private person or business would necessarily incur in reasonable compliance with the proposed action.

**SIGNIFICANT STATEWIDE ADVERSE ECONOMIC IMPACT ON BUSINESS:**

The Department has initially determined that the proposed regulations will not have a significant statewide adverse economic impact directly affecting businesses, including the ability of California businesses to compete with businesses in other states.

**EFFECT ON SMALL BUSINESSES:**

The Department has determined that the proposed regulations may not affect small businesses. It is determined that this action has no significant adverse economic impact on small business, because they are not affected by the internal management of state prisons.

**ASSESSMENTS OF EFFECTS ON JOB AND/OR BUSINESS CREATION, ELIMINATION, OR EXPANSION:**

The Department has determined that the proposed regulation will have no affect on the creation of new or the elimination of existing jobs or businesses within California, or affect the expansion of businesses currently doing business in California.

**CONSIDERATION OF ALTERNATIVES:**

The Department must determine that no reasonable alternative it considered, or that has otherwise been identified and brought to its attention, would be more effective in carrying out the purpose for which the action is proposed or would be as effective and less

burdensome to affected private persons than the proposed regulatory action.

## AVAILABILITY OF PROPOSED TEXT AND INITIAL STATEMENT OF REASONS:

The Department has prepared and will make available the text and the Initial Statement of Reasons (ISOR) of the proposed regulations. The rulemaking file for this regulatory action, which contains those items and all information on which the proposal is based (i.e., rulemaking file) is available to the public upon request directed to the Department's contact person.  The proposed text, ISOR, and Notice of Proposed Action will also be made available on the Department's website http://www.corr.ca.gov.

## AVAILABILITY OF THE FINAL STATEMENT OF REASONS:

Following its preparation, a copy of the final statement of reasons may be obtained from the Department's contact person.

## AVAILABILITY OF CHANGES TO PROPOSED TEXT:

After considering all timely and relevant comments received, the Department may adopt the proposed regulations substantially as described in this notice.  If the Department makes modifications which are sufficiently related to the originally proposed text, it will make the modified text (with the changes clearly indicated) available to the public for at least 15 days before the Department adopts the regulations as revised.   Requests for copies of any modified regulation text should be directed to the contact person indicated in this notice.   The Department will accept written comments on the modified regulations for 15 days after the date on which they are made available.

## INFORMATIVE DIGEST/POLICY STATEMENT OVERVIEW:

PC Section 5054 vests with the Director the supervision, management and control of the prisons, and the responsibility for the care, custody, treatment, training, discipline, and employment of inmates.

PC Section 5058 authorizes the Director to prescribe and amend regulations for the administration of prisons.

PC Section 5058.3 authorizes the Director to adopt, amend, or repeal emergency regulations conducted pursuant to Government Code Section 11340.

This action will amend Title 15, Section 3335, in that when an act of violence is committed in an institution by an inmate, the perpetrator is removed from the general population and placed in an Administrative Segregation Unit (ASU) and will receive a due process review by an ICC to ensure that their restriction in liberty is justified.   Section 3335 stipulates that an initial review by the ICC occur within 10 days of placement, and subsequent reviews occur every 30 days thereafter until the inmate is released.  Over the past several years violence within the Department has increased such that there has been

a corresponding increase in the ASU population.  In an effort to handle the increase in workload with existing staff resources, inmates that are housed in ASU for less than serious disciplinary reasons will appear before an ICC within every 90 days, and within every 180 days for disciplinary reasons.  This change will allow ICC to take action on a case as soon as possible, but not waste staff or committee time routinely reviewing cases on which action is not yet possible due to an incomplete investigation or a pending rules violation report. Staff time in attempting to conduct the additional hearings in which no action is possible could result in some inmates having their liberty impacted by not conduction a due process review at a time when the matters surrounding placement have been resolved and release or transfer could have been accomplished.

**TEXT OF PROPOSED EMERGENCY REGULATION**

In the following, <u>underline</u> indicates added text and ~~strikethrough~~ indicates deleted text.

The heading of Article 7 is amended to read:

Article 7. ~~Administrative~~ Segregation <u>Housing.</u>

Section 3335 is amended to read:

3335.  Administrative Segregation.

(a) When an inmate's presence in an institution's general inmate population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in administrative segregation. Administrative segregation may be accomplished by confinement in a designated segregation unit or, in an emergency, to any single cell unit capable of providing secure segregation.

(b) Temporary Segregation.  Pending a classification committee determination of the inmate's housing assignment, which may include assignment to one of the segregation program units specified in section 3341.5 of these regulations or to the general inmate population, an inmate may be placed in a designated temporary housing unit under provisions of sections 3336-3341 of these regulations.

(c) An inmate's placement in ~~temporary~~ segregation shall be reviewed by the Institutional Classification Committee (ICC) within 10 days of receipt in the unit and under provisions of section 3338(a) of these regulations.  Action shall be taken to retain the inmate in ~~temporary~~ segregation or release to general population.  ~~ICC shall review the inmate at least every 30 days thereafter until the inmate is removed from temporary segregation.~~

~~(1) ICC shall refer for Classification Staff Representative (CSR) review and approval any case in which an inmate is retained in temporary administrative segregation for more than 30 days.  ICC shall recommend one of the following:~~

~~(A) Transfer to another facility.~~

~~(B) Continue in temporary administrative segregation pending completion of an investigation or resolution of court proceedings.  ICC shall designate an anticipated length of time needed to complete the investigation or conclude court proceedings.~~

(d) When, pursuant to this section, an ICC retains an inmate on segregation status, the case shall be referred to a Classification Staff Representative (CSR) for review and approval.  Unless otherwise directed by the CSR, subsequent ICC reviews shall proceed in accordance with the following timelines until the inmate is removed from segregation status:

(1). At intervals of not more than 90 days, until pending Division C, D, E, or F rules violation report is adjudicated.  Upon resolution of such matters, an ICC shall review the inmate's case within 14 calendar days.  At that time, if no further

matters are pending, but continued segregation retention is required pending transfer to a general population, ICC reviews shall be within at least every 90 days until the transfer can be accomplished.

(2) At intervals of not more than 180 days, until a pending Division A-1, A-2, or B rules violation report is adjudicated, a court proceeding resulting from a referral to the district attorney for possible prosecution is resolved, or the gang validation investigation process is complete.  Upon resolution of such matters, an ICC shall review the inmate's case within 14 calendar days.

(3) At intervals of not more than 90 days until completion of the pending investigation of serious misconduct or criminal activity, excluding gang validation, or pending resolution of safety and security issues, or investigation of non-disciplinary reasons for segregation placement.    Should the completed investigation result in the issuance of a Rules Violation Report and/or a referral to the district attorney for criminal prosecution, an ICC shall review the case in accordance with the schedule set forth in subsections (1), (2), or (3) above. Upon resolution of such matters, an ICC shall review the inmate's case within 14 calendar days.   At that time, if no further matters are pending, but continued segregation placement is required pending transfer to a general population, ICC reviews shall be at least every 90 days until transfer can be accomplished.

(e) Inmate retention in administrative segregation beyond the initial segregation ICC hearing shall be referred for CSR review and approval within 30 days and

then thereafter in accordance with subsection (d) above. In initiating such reviews an ICC shall recommend one of the following possible outcomes:

(1) Transfer to another institution in accordance with section 3379.

(2) Transfer to a Segregated Program Housing Unit in accordance with section 3341.5.

(3) Retention in segregation pending completion of an active investigation into an alleged violation of the rules/disciplinary process, an investigation of other matters, or resolution of criminal prosecution. In such instances an ICC shall offer a reasonable projection of the time remaining for the resolution of such matters.

(f) Subsequent to CSR approval of an extension of segregation retention, an ICC will schedule the case for future CSR review in a time frame consistent with the projection(s) made in accordance with subsection (d) above.

(g) Inmates in segregation who have approved Security Housing Unit (SHU) term status, but are still awaiting other processes (i.e., court proceedings, adjudication of other rule violation reports, gang validation, etc.), shall be reviewed by an ICC in accordance with the SHU classification process noted in subsection 3341.8.

(h) The need for a change in housing or yard status of any inmate segregated under the provisions of this article shall be reviewed at the next convened ICC hearing.

(i) All classification committee actions shall be documented, including a specific record of the inmate's participation, an explanation of the reason(s), and the

information and evidence relied upon for the action taken.  The inmate shall be provided copies of the completed forms relied upon in making the decisions affecting the inmate.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code, and _Wright v. Enomoto_, (1976) 462 F Supp 397; _Toussaint v. McCarthy_ (9th Cir. 1986) 801 F2d 1080, cert. denied, 481 U.S. 1069.

**FINAL STATEMENT OF REASONS:**

The California Department of Corrections and Rehabilitation (CDCR) proposes to amend Title 15, Section 3335, of the California Code of Regulations (CCR), pertaining to the physical separation/segregation of inmates from the general population, with particular emphasis on the frequency of Institutional Classification Committees (ICC) in Administrative Segregation (A/S).

Generally, these revisions to Title 15, Section 3335, are necessary in order to ensure frequency of classification hearings of inmates placed in A/S. These changes will allow an ICC to take action as early as possible, but not spend staff or committee time routinely reviewing cases on which action is not yet possible.

If a determination is made that an inmate should be removed from a general population setting and placed in A/S, the reason for such placement shall be documented and a written copy provided to the inmate within 48 hours after placement. On the first working day following an inmate's placement in A/S, designated staff at the level of a Correctional Captain or above shall review the reason for such placement and determine if continued placement is warranted.

If the inmate is retained in A/S, the reviewing official will make a determination regarding a staff assistant, housing, and if the inmate desires to call witnesses or submit documentary evidence at his classification hearing. An ICC shall conduct a classification hearing for consideration and determination of the need to retain an inmate in A/S as soon as practical, but no later than 10 calendar days from the date of A/S placement. If continued retention is warranted beyond the initial ICC hearing, the case factors shall be referred to a Classification Staff Representative (CSR) within 30 days. The CSR, who is a higher level reviewer independent from the institution, is the only departmental representative that has the authority to approve retention in segregated housing. The A/S process is set forth in greater detail in Title 15, Sections 3336 through 3338.

Previously the inmate would be returned to ICC every 30 days. As retention in A/S generally exceeds 30 days, such frequent reviews resulted in staff and committee time reviewing cases on which action, such as release from A/S, would not yet be possible. Under the revised regulations the inmate appears before ICC at 90 days for less than serious disciplinary reasons, and at 180 days for serious disciplinary reasons, court proceedings, or gang validation. The inmate may be returned to ICC at any time when scheduled by staff for specific reasons such as cell status. However, once the reason for A/S placement is resolved, the inmate must appear before ICC within 14 calendar days for closure. As such, the length of time an inmate remains in A/S may well be shortened as the assigned counselor would be more available to return completed casework to an ICC.

The intent of these changes is not to increase inmate segregation time. Rather, it is anticipated the segregation time will be reduced by allowing more staff resources to be directed toward bringing closure to the case. These changes will allow an ICC to take action as early as possible, but not spend staff or committee time routinely reviewing cases on which action is not yet possible.

This regulatory change was prepared as an important step in reducing inefficiency in the classification process. However, this change in practice was not incorporated into the Title 15 regulations at the time the policy was first effected. Upon being advised of this oversight, the Department did revise this regulation, and submitted it to the Office of Administrative Law (OAL) as an emergency regulatory action within the meaning of the Penal Code (PC) effective

on June 15, 2005. As such, the Department's emergency regulatory action is not evidence of an effort to resolve a short term crisis, but of a desire to implement the appropriate changes to regulations promptly based on operational necessity as allowed by statue.

The Department must determine that no alternative considered would be more effective in carrying out the purpose of this action or would be as effective as and less burdensome to affected private persons than the action proposed.

**Article 7 is amended** to change the heading to more accurately reflect that there are several types of segregation housing for inmate placement.

**Subsections 3335(a) and 3335(b) remain unchanged.**

**Subsection 3335(c) is amended** to delete the last sentence in this subsection to reflect a change in the frequency that an inmate must appear before an ICC that is delineated in more detail later in this section. Additionally, the word "temporary" is removed to more appropriately conform to the revised title of the section.

**Subsection 3335(c)(1) is deleted** in its entirety as ICC recommendations to a CSR regarding continued inmate segregation are articulated more clearly later in this section in language that clarifies how frequently an ICC may review an inmates case.

**Subsection 3335(d) is adopted** to inform staff that an inmate on segregated status shall have their case factors reviewed first by an ICC, and subsequently by a CSR, in accordance with the newly established timelines for segregated housing unit inmates until such time the inmate is removed from the segregated placement status.

**Subsection 3335(d)(1) is adopted** to stipulate that inmates in segregation pending resolution of a Division C, D, E, or F rules violation report shall be seen by an ICC within 90 day intervals after the initial appearance, and within 14 calendar days upon resolution of such matters.

**Subsection 3335(d)(2) is adopted** to stipulate that inmates in segregation pending resolution of a Division A or B rules violation, a court proceeding resulting from a referral to a district attorney, or a gang validation investigation process, shall be seen by an ICC within 180 day intervals after the initial appearance, and within 14 calendar days upon resolution of such matters.

**Subsection 3335(d)(3) is adopted** to stipulate that inmates in segregation pending resolution of any other matter shall be reviewed by an ICC within 90 day intervals after the initial appearance, and within 14 days upon resolution of such matters. If the inmate is retained in segregation pending transfer to a general population even though resolution of the case has occurred, ICC reviews shall again be conducted every 90 days until such transfer is effected.

**Subsection 3335(e) is adopted** to provide that when an inmate is retained in segregation beyond the initial hearing, the case factors shall be referred to CSR for review within 30 days and then thereafter in accordance with subsection (d) above. In initiating such reviews, an ICC shall recommend the inmate be transferred to another institution, transferred to a Segregated Program Housing Unit, or retained in segregation pending completion of the processes that caused his placement there.

**Subsection 3335(f) is adopted** to provide that the ICC will schedule the inmate's case for a CSR review in the timeline identified in subsection 3335(d). This regulation will apply when an extension of segregation retention is approved by the CSR.

**Subsection 3335(g) is adopted** to provide that the segregated inmate who may also have approved Segregated Housing Unit status, but is being retained in segregation upon completion of other processes, shall be reviewed by an ICC in accordance with subsection 3341.8.

**Subsection 3335(h) is adopted** to provide that the need for a change in housing or yard status shall be reviewed at the next convened ICC hearing.

**Subsection 3335(i) is adopted** to provide that that the inmate will be provided documentation of all classification committee actions that include the extent of the inmate's participation, reasons for any action, and the information and evidence relied upon for the action taken.

## ASSESSMENTS, MANDATES, AND FISCAL IMPACT:

This action will neither create nor eliminate jobs in the State of California not result in the elimination of existing businesses or create or expand business in the state of California.

The Department determines this action imposes no mandates on local agencies or school districts, and no fiscal effect on federal funding to the state, or private persons. It has been determined there will no fiscal impact or savings on state or local government. It has also been determined that this action does not affect small businesses nor have a significant adverse economic impact on business, including the ability of California businesses to compete with businesses in other states, because they are not affected by the internal management of state prisons; or on housing costs; and no costs or reimbursements to any local agency or school district within the meaning of Government Code Section 17561.

## DETERMINATION:

The Department has determined that no alternative considered would be more effective in carrying out the purpose of this action or would be as effective and less burdensome to affected persons.

## PUBLIC COMMENTS:

**Public Hearing:** Held September 7, 2005, at 10:00 a.m.

## SUMMARIES AND RESPONSES TO ORAL COMMENTS AT THE PUBLIC HEARING

### SPEAKER #1:

**Comment A:** Commenter states that the proposed regulation change is unconscionable and irresponsible, and calls for it to be rejected. Commenter stated that the cost of housing an inmate in A/S is over $90,000 a year. With over 9,000 inmates in A/S, this amounts to a cost to the state of over $800 million, and this cost does not give a payback in terms of reduced recidivism or public safety.

**Accommodation:** None.

**Response A:** The Department contends that A/S was not designed, nor was it ever intended, to address the issue of recidivism. The function of A/S is to temporarily separate an inmate when that inmate's behavior or circumstance in the general prison population presents an immediate threat to the safety of the inmate or others, endangers institution security, or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity. In such cases, the inmate shall be removed from the general population and placed in

A/S. As such, the use of A/S does promote institutional safety and security, and by logical extension does benefit public safety.

The Department utilizes a complex classification system to determine each inmate's individual custody, program, and security needs, and to identify those inmates that are more likely to participate in inappropriate/violent behavior and house those inmates accordingly. Correspondingly the A/S units in those facilities will house the majority of all the inmates housed in A/S units throughout the state. As the majority of those inmates in A/S are serving long or life sentences, any analysis of the comparative impacts associated with A/S costs and those associated with housing in the General Population would be difficult. As of September 23, 2005, the A/S Population Summary indicates there are approximately 8,350 inmates in A/S compared to a total inmate population of 165,945. The Department is aware that the cost associated with housing an inmate in A/S is higher than that of housing an inmate in the general population. However, the Department asserts that the cost of inmate violence within a general prison population, should a known disrupter or predator be allowed to perpetrate an act of violence, may exceed the cost of housing an inmate in A/S in an effort to prevent that violence in the first place.

**Comment B:** Commenter requests clarification as to why the Department feels this policy change is necessary.

**Accommodation:** None.

**Response B:** Currently, an inmate housed in A/S is required to be reviewed by ICC every 30 days, regardless of the need for program review. ICC is a very work intensive process, requiring the attendance of the Warden or a designee, Mental Health staff, managerial custody staff, and counseling staff. The preparation for, and follow-up of, ICC requires substantial work time from line counseling, clerical, and records staff. A CSR, who is a higher level reviewer independent from the institution, is required to review all A/S extensions. In cases where there is no change in the reason for placement in A/S, or need for program review (cell, yard, mental health issues), conducting an ICC becomes an extremely inefficient and expensive use of staff time. This regulation change addresses that issue. It does not alter staff's responsibility to ensure that inmates are removed from A/S as soon as the reason for A/S placement has been resolved. In fact, this regulation change specifies that an inmate must be returned to ICC within 14 days once the A/S placement issue has been resolved. This regulation is intended to eliminate redundant staff work and enhance overall staff performance, all without compromising the safety or welfare of the inmate while retained in A/S.

**Comment C:** Commenter notes that the Department claims that this regulation change will not increase inmate segregation time, although clearly the stated intent is in fact to add more time to the A/S stay, without the benefit of any consistent, timely, or frequent review in order to decrease the amount of time an inmate spends in A/S.

**Accommodation:** None.

**Response C:** The Department disagrees. The Department does not intend to lengthen A/S stays through this rule change. Due process safeguards remain in place. If a determination is made that an inmate should be removed from a general population setting and placed in Administrative Segregation (A/S), the reason for such placement shall be documented on a lockup order, and provided to the inmate no later than 48 hours after placement. On the first working day following an inmate's placement in A/S, designated staff at the level of a Correctional Captain or above shall review the lockup order. The reviewing official may

release or retain the inmate at that time. An ICC shall conduct a classification hearing for consideration and determination of the need to retain an inmate in segregated housing as soon as practical but no longer than 10 calendar days from the date of initial A/S placement. If continued retention is warranted beyond the initial ICC hearing, the case factors shall be referred to a CSR within 30 days. The CSR is the only departmental representative that has the authority to approve continued retention in segregated housing. At the time of the referral, the ICC shall recommend one of several possible outcomes. The inmate may be: 1.) transferred to another institution, 2.) transferred to a Segregated Housing Unit, or 3.) be retained in A/S pending resolution of an investigation, disciplinary process, or District Attorney Referral. In such cases, the ICC is required to provide a reasonable projection of time for the matter to be resolved. If no due process violations occurred, the CSR will approve retention in the A/S for a set period of time and will provide a time frame in which the case needs to be seen again by the ICC. This process is set forth in greater detail in Title 15 Sections 3336 through 3338. However, under the previous process, the inmate would be returned to ICC every 30 days. As retention in A/S generally exceeds 30 days, such frequent reviews resulted in staff and committee time reviewing cases on which action, such as release from A/S, would not yet be possible because necessary information and evidence about the reason for which A/S placement was necessary is not yet available. Under the revised regulations, unless otherwise directed by the CSR, the inmate appears before ICC at 90 days for less than serious disciplinary reasons, and at 180 days for serious disciplinary reasons, court proceedings, or gang validation. The inmate may be returned to ICC at any time when scheduled by staff for specific reasons such as cell status. However, once the reason for A/S placement is resolved, the inmate must appear before ICC within 14 calendar days for closure. As such, the length of time an inmate remains in A/S may be shortened in many cases as the assigned counselor would be more available to return completed casework to an ICC rather than wait for the next scheduled 30 day hearing.

**Comment D:** Commenter states that this proposed change was initially enacted some time ago as an emergency measure to deal with workload. However, an emergency constitutes a state of crisis. If the Department is in a perpetual state of emergency, that is not good and perhaps a change needs to be made to the management of the system. It is not healthy to stay in a perpetual state of emergency.

**Accommodation:** None.

**Response D:** The Department asserts that this change to the frequency that ICC hearings were conducted began several years ago as an important step in reducing inefficiency in the classification committee process. The Department acknowledges that it did not incorporate this change into the Title 15 regulations at that time. Upon being advised of this oversight, the Department did revise its regulation, and submitted it to the Office of Administrative Law (OAL) as an emergency regulatory action pursuant to section 5058.3(a) of the Penal Code. The OAL reviewed this proposed regulatory change, and approved it as an emergency regulatory action within the meaning of the Penal Code effective on June 15, 2005. As such, the Department's emergency regulatory action is not evidence of an effort to resolve a short term crisis, but of a desire to implement the appropriate changes to regulations promptly based on operational necessity as allowed by statue.

**Comment E:** Commenter notes that CDCR has had 31 suicides so far this year, and the year is not over yet. Commenter stated that inmates in California prisons are killing themselves faster than anywhere else in the country. The national average is 14 suicides per 100,000

inmates, but in California it is over 27 suicides per 100,000 inmates, and over 50% of those suicides occur in A/S. To increase the amount of time that an inmate sits in A/S will increase the risk of suicide.

**Accommodation:** None.

**Response E:** The Department does not intend for this regulation change to increase time in A/S. The Department contends that there may be many factors that contribute to the possibility that the inmate suicide rate is higher in California than in other states. Differences in inmate populations between states must be taken into consideration before making direct comparisons of inmate suicide rates. Such factors include the enactment of strict determinate sentencing laws, the Three Strikes sentencing program, the large and well organized street and prison gang populations within California prisons, as well as the closure of all but three of the State's mental hospitals. Each of these factors may contribute to inmate suicide within CDCR. In those states that use indeterminate sentencing for example, inmates may have an opportunity to parole within two to seven years of their incarceration due to good behavior and successful programming. In California, inmates may face 15 years, 25 years, 30 years, or longer before seeing the possibility of parole, regardless of their behavior and programming. This may be a factor that contributes to depression. The closure of State mental health hospitals contributed to the CDCR becoming the single largest provider of mental health services in California. California may have a higher percentage of mentally ill inmates incarcerated than other states, which may be a contributing factor to a higher incidence of suicide. The threat or perceived threat of violence and intimidation caused by prison gangs does not help. With respect to the comment regarding the increased amount of time that an inmate will remain in A/S as a result of this regulation change, see **Speaker #1, Response C.**

**Comment F:** Commenter contends that the paint and frosting should be removed from all the A/S windows immediately. California is not a third world country such that they deny A/S inmates natural light for 90 days or longer. We should be a model for the country and we should be ashamed that we have these kinds of conditions. The Department should also immediately remove the large mesh ventilation screens in some A/S cells that enable inmates to commit suicide by hanging.

**Accommodation:** None.

**Response F:** The Department contends that the conditions of confinement in A/S are subject to regular independent review and audit by a review team outside the chain of command for prison operations. The team reviews due process standards and employs the Toussaint case as its benchmark. All findings are shared with the management of the prison and statewide institution operations. Institutions with a deficiency are required to submit a corrective action plan and are scheduled for follow-up reviews. Additionally, just this year the Department has developed a feasibility study to assess the cost and time that would be required to convert all vent screens in A/S cells throughout the institutions. Regarding frosting or paint on A/S windows, in some institutions the paint or frosting on the windows has already been removed; consideration is being given as to the cost and time involved in doing this statewide. The Department is actively engaged in both issues (vents and frosting) and further research and planning is being conducted.

**Comment G:** Commenter states that the concept of rehabilitation is important for this Department, which must not only comply with the Coleman court case requirements, but live up to the word rehabilitation that is now embedded within the Department's new title.

Commenter further contends that it is inconceivable that there is anything rehabilitative about locking an inmate up for 23 hours a day with no television, radio, or books and with positive human interaction.

**Accommodation:** None.

**Response G:** The Department concurs that the concept of A/S eliminates the possibility of meaningful programming, which is why the Department utilizes A/S only on a temporary basis. A/S is a safety and security response unit, not a rehabilitative strategy. A/S placement is designed to be a short term but highly restrictive housing unit primarily to control violent behavior. The Department notes that the <u>Coleman</u> court case requirements do not address the rehabilitation of inmate's specifically. Rather the impetus of this case is to address the care and treatment of mentally ill inmates. The A/S Unit Mental Health Services (ASU MHS) program is part of the Department's Mental Health Services Delivery System (MHSDS). This program guide outlines program policies and provides basic institutional operational procedures to assure the effective delivery of clinical services to inmates with mental disorders who, for custodial reasons, require housing in A/S. Individual clinical case management, including treatment planning, level of care determination and placement recommendations, are performed by the assigned Clinical Case Manager and approved by the institution Interdisciplinary Treatment Team.

The CDCR MHSDS draft <u>Coleman</u> agreement [Chapter 7, Administrative Segregation] establishes the following in the "Program Goals and Objectives:"

- Continuation of care for inmate-patients with identified mental health treatment needs through regular case management activities and medication monitoring to enable inmate-patients to maintain adequate levels of functioning and avoid decompensation.

- Daily clinical rounds of inmate-patients in the MHSDS and mental health screening and evaluation of inmates who are not currently in the MHSDS caseload to identify mental health needs.

- Referral to a more intensive level of care for inmate-patients whose mental health needs cannot be met in A/S, including expeditious placement into Mental Health Crisis Beds for inmate-patients requiring inpatient mental health care.

- Mental health assessments and input into the classification decision-making process during ICC, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living, ability to understand Due Process proceedings, likelihood of decompensation if retained in A/S, recommendations for alternative placement, and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment.

- Mental health assessments and input into the adjudication of Rule Violation Report hearing proceedings involving MHSDS inmate-patients. Mental health information includes the quality of the inmate-patients' participation in their current MHSDS treatment plan, mental condition that may have been a contributing factor in the alleged misbehavior, and the ability to comprehend the nature of the charges or participate meaningfully in the disciplinary process. Final housing decisions are made by the ICC after considering all relevant clinical and custody factors.

**SPEAKER #2:**

**Comment A:** Commenter states that prisoners are frequently put into A/S for minor reasons and often for bogus reasons that are blatantly vague and invented to manage the prisoners in an inhumane, retaliatory, and arbitrary fashion.

**Accommodation:** None.

**Response A:** The Department contends that placement into A/S is not intended to be a form of punishment. Due to the staff workload and costs associated with A/S, the decision to segregate an inmate is not made lightly. Inmates are separated from the general population for reasons relating to their safety, the safety of others, the safety of the institution, or to preserve the integrity of an ongoing investigation. Placing inmates into A/S for reasons not outlined in departmental regulations is not allowed.

**Comment B:** Commenter states that the murders of inmates by guards, or suicides, occur most frequently in A/S where there are no witnesses. Also, there is no television or radio, the windows are painted over, and the inmate is cut off from the world.

**Accommodation:** None.

**Response B:** The Department asserts that there has not been a murder of an inmate by prison staff reported. If the commenter is aware of such, they are encouraged to contact the District Attorney's office, or the Office of the Inspector General. With respect to the comment regarding A/S living conditions, see **Speaker #1, Response F.**

**Comment C:** Commenter states that even the shortest A/S term is at least 30 days which is too long. Since the 1800's studies have proven that inmates begin to go mad after only a few days in isolation. With these new rules, the shortest term before a review takes place will be 90 days up to 180 days depending on the circumstances.

**Accommodation:** None.

**Response C:** The Department contends that inmates are much more closely monitored for mental health issues in A/S than in the general population. If an inmate begins to decompensate, MHSDS staff will take corrective action. Inmates who are placed in A/S will have their placements up for ICC hearing within 14 days of the completion of the fact finding investigation. Also, see **Speaker #1, Response C.**

**Comment D:** Commenter states that ICC's have guards and administrators sitting on them who put the inmate there in the first place. ICC's are kangaroo courts where there is no oversight and no investigation made to ensure that those sitting on the ICC aren't there unlawfully due to a conflict of interest. Prison administrators are masters at manipulating records and conditions until people go mad. Commenter also contends that it is this activity that keeps the prisons stocked and the human bondage industry going.

**Accommodation:** None.

**Response D:** The Department contends that once an inmate is separated from the general population for placement into an A/S, there are many oversight protections to ensure that the reason for the placement is in fact valid, including an oversight by an independent CSR reviewer (see **Speaker #1, Comment C**). Generally speaking, the staff that are responsible for placing an inmate into A/S are associated with a mainline setting and do not take part in the A/S review process, or the A/S committee process. Each A/S housing unit has an assigned Correctional Counselor, Captain, and Associate Warden, and as a rule they do not participate

in any committees except for those in their assigned A/S units, thereby ensuring there is no conflict of interest.

**Comment E:** The Department contends that there are no doctors or psychologists on the ICC to determine if a mentally ill inmate is just acting out. Most people know that court proceedings take a year or more, and cut off from his family while in A/S an inmate will break down. When they stay in A/S for months or years, they are traumatized and destroyed.

**Accommodation:** None.

**Response E: See Speaker #1, Response G.**

**Comment F:** Commenter states that there is no clean laundry in A/S, that there are no health or dental services, that inmates are semi-starved, and that the program is designed to break people who will be returning to society at some point. A/S conditions are similar to that of living in a third world country.

**Accommodation:** None.

**Response F:** The Department contends that the living conditions in A/S are similar to the general population in terms of such basic needs as meals and laundry, with the exception that there is a heightened level of security that necessitates a slower process for such programs. Additionally, see **Speaker #1, Comment F.**

**Comment G:** Commenter states that they are simply not going to be quiet and sit by and allow our loved ones to be tortured without alerting the voters and filing lawsuits. With six lawsuits pending someone in authority should be taking us seriously by now.

**Accommodation:** None.

**Response G:** The Department contends that although the above comment does regard an aspect of the subject proposed regulatory action and must be summarized pursuant to Government Code Section 11346.9(a)(3). However, the comment is either insufficiently related to the specific action proposed or of such a generalized or unsubstantiated nature that no meaningful response can be formulated by the Department in refutation of or accommodation to the comment.

**SPEAKERS #3 through #7:**

On September 7, 2005, the Department conducted a public hearing for this emergency rulemaking action. There were 15 speakers at the hearing, which was taped. The tape machine is a new recorder, and was tested thoroughly the day before the hearing, as well as the morning of the hearing upon set up. Two tapes were used, with both sides of each tape recorded. Due to some mechanical/tape malfunction, during the transcription we noted that side B of tape 1 did not record, even though it popped up when that side was done recording. Side A of tape 1 had recorded, as did both sides of the 2nd tape.

As such, comments from 5 speakers (each speaker's name was called out and checked against the sign-in sheets) were not recorded. The Department regrets that the comments offered by these commenters were not recorded.

The OAL Reference Attorney was contacted a few days after the hearing and advised of the problem and asked to provide the Department guidance. The Reference Attorney advised contacting the speakers that did not get recorded to request that they submit comments in writing, or to consider holding another hearing for those specific people. The Reference Attorney was informed that the Department would be sending out a letter to each of those

speakers (addresses were complete) explaining what had transpired and to please send us a written copy of their comments as soon as possible. The Department elected to not hold another hearing due to the cost involved, and due to the fact that those speakers addresses ranged from Fresno south to Los Angeles. (State Departments are not required under law to hold public hearings on their proposed regulations. However, the CDCR schedules a public hearing as a routine practice.) The Reference Attorney responded that the Department was doing what was necessary to ensure public participation, and that we were to include a statement in our FSOR as to what had transpired. Additional instructions from the Reference Attorney indicated that the Department should attempt to recreate minutes of the hearing from the notes of the staff who were there to ensure that comments would be accurately represented. As stated, the Department did notice each of the 5 speakers in writing on September 16, 2005, by overnight express mail. None of the 5 speakers responded. Upon further investigation, it is noted that each of the 5 speakers represented the organization named UNION, or "United for No Injustice, Oppression or Neglect". These 5 speakers signed in and spoke after the 2nd speaker, Ms. B. Cayenne Bird, UNION Director, who did in fact leave a written version of her spoken comments. Staff notes indicate that these 5 speakers mirrored portions of Ms. Bird's comments closely, and added no additional content to that provided by Ms. Bird other than to share their own personal experiences. As such, the Department's responses to Speaker #2 would have been reiterated for Speakers #3    through #7.

Copies of the communications between the Department and OAL, the notification letters to the 5 speakers, the written comments by Ms. Bird, and several other documents submitted at the public hearing, are included in the Related Memoranda portion of the Rulemaking File.

### SPEAKER #8:

**Comment A:** Commenter states that the Department should make positive changes instead of just make it easier to put an inmate somewhere and just forget about them.

**Accommodation:** None.

**Response A: See Speaker #1, Response C.**

**Comment B:** Commenter states that there is a lot of meaning to rehabilitation, but it does not mean to keep taking things from inmates and locking them up and giving them indeterminate Segregated Housing Unit (SHU) terms.

**Accommodation:** None.

**Response B:** The Department contends that inmates are assessed an indeterminate SHU term based on Title 15 Section 3341.5(c), which states in part "an inmate whose conduct endangers the safety of others or the security of the institution shall be housed in a SHU...". This Section further outlines the assignment criteria for a determinate and an indeterminate SHU term.

**Comment C:** Commenter states that there is no encouragement in the prison setting for an inmate to change or do better because the cost is too great in terms of giving information or snitching. The cost of crossing over takes an inmates pride and self-worth.

**Accommodation:** None.

**Response C:** The Department contends that although recently there has been an increased emphasis in rehabilitative programs such as increased education and vocational opportunities, the Department has for a number of years placed a high emphasis on behavioral modification.

At the simplest level, the Department has required its staff to conduct themselves as professional correctional custodians, both custody staff and non-custody staff, by maintaining professional conduct on and off the work site, adhering to a strict dress and grooming code, completing required training, and disciplining those staff that do not conduct themselves as professionals. Beyond an emphasis on professionalism, one of the most important tools available to the Department to encourage an inmate to successfully program as they serve their sentence is via the classification process. This process starts at the reception center where a classification score is developed based on social factors and past behavior, either in prior incarcerations or behavior as noted in arrest records. If redeeming social factors are lacking, and an arrest record or behavior has been less than desirable, the classification score will be increased such that the inmate's prison placement will be in as secure a setting as necessary. It is then incumbent upon the inmate to conduct themselves such that their classification score can be reduced. As such, an inmate is not encouraged by staff to be a "snitch" or to compromise their self-worth. If, however, they have conducted themselves in such a manner that their safety or the safety of other inmates or staff is in question, then staff must intervene to separate them from the general population, and determine what in fact has happened and what the next course of action should be. Again, the Department has for many years endeavored to provide the tools to encourage and guide inmates in a successful programming direction and to allow them to safely live and complete their sentences.

### SPEAKER #9:

**Comment A:** Commenter stated that there appeared to be only a small number of people at the hearing, and had only learned of the hearing vicariously through the Internet.

**Accommodation:** None.

**Response A:** The Department confirms that the public was noticed of this public hearing via a written Notice of Change to Director's Rules that was sent out July 1, 2005. Over 4,500 copies were sent to organizations and persons on the Department's mailing list, which is updated on a regular basis. Notices of proposed rule changes and hearing dates and locations are also posted on the Department's internet website. If you are interested in being included on the mailing list with respect to future public hearings, you may direct a request to the attention of: Regulation and Policy Management Branch, California Department of Corrections and Rehabilitation, PO Box 942883, Sacramento, CA, 94283-0001. Information on regulations may be accessed on-line at www.cdcr.ca.gov.

### SPEAKER #10:

**Comment A:** Commenter states that lessening the frequency of ICC reviews is inconsistent with the Department's legal obligation with regards to mentally ill inmates who are placed in A/S.

**Accommodation:** None.

**Response A:  See Speaker #1, Response C and Response G.**

**Comment B:** Commenter expressed concern that not only will mentally ill inmates be harmed by being in A/S, but other inmates will be harmed as well because placing people in A/S can make so many people mentally ill.

**Accommodation:** None.

**Response B:** The Department contends that all inmates are closely monitored while in A/S by both custody and MHSDS staff. Any indications of illness are reported and addressed. The A/S unit is not "Isolation", but rather is segregation. The inmates have direct interaction with staff daily and with other inmates during exercise periods. Additionally, see **Speaker #1, Response G.**

**Comment C:** Commenter states that suicide is a problem that is worsening and needs to be addressed. Suicide rates can't be addressed without looking at what is going on in A/S.

**Accommodation:** None.

**Response C: See Speaker #10, Response B.**

**Comment D:** Commenter noted that in the Coleman court case the special master advised that a mental health professional should be present at all ICC hearings, and should evaluate whether alternative placement would be in order to best serve an inmate's mental health needs. This won't happen if the frequency of ICC hearings is lengthened.

**Accommodation:** None.

**Response D: See Speaker #1, Response G.**

**Comment E:** Commenter states that many people would suffer with mental illness upon isolation.

**Accommodation:** None.

**Response E: See Speaker #10, Response B.**

**Comment F:** Commenter states that the Department will not save anything by means of this change. Any money that will be saved will go right out the door by means of holding inmates in A/S longer.

**Accommodation:** None.

**Response F: See Speaker #1, Response C.**

**SPEAKER #11:**

**Comment A:** Commenter states that the Department has implemented another change without public comment. The reason for the change is unsupported, and the stated reason for the change is that violence has increased.

**Accommodation:** None.

**Response A:** The filing of a regulatory change as an emergency rule adoption does not mitigate the responsibility of the Department to receive public comments and to make changes to the proposed regulations if warranted. The Department contends that the amount of violence in the Department's prisons has increased for several reasons, such as overcrowding, a younger more violent and gang oriented population, disruptive group activities, and understaffing due to budget pressures. This violence does translate into an increase in A/S placement. Additionally, see **Speaker #1, Response D.**

**Comment B:** Commenter claimed the Department acted with an in-your-face emergency rule change, which was implemented without public comment.

**Accommodation:** None.

**Response B: See Speaker #11, Response A.**

**Comment C:** Commenter indicated it was not clear how this rule change would not increase A/S time.

**Accommodation:** None.

**Response C: See Speaker #1, Response C.**

**Comment D:** Commenter states that to keep an inmate in A/S is cruel, and to keep them there 180 days is insane. Why can't staff do their job and get them out quicker?

**Accommodation:** None.

**Response D:** The Department asserts that inmates are placed in A/S due to immediate and serious safety or security concerns, or for inappropriate or violent behavior. These issues are normally not resolved in a few days. To release a dangerous inmate, or one whose life is in danger, back into a general population setting before the issue is fully resolved would be deliberate indifference to the safety of inmates. A/S serves a needed function within the prison system. It is the goal of the Department to release inmates from A/S as soon as appropriate, but not before the issues that led to the A/S placement are resolved.

**Comment E:** Commenter states that returning angry, unrehabilitated, mentally ill inmates to society is not safe, and questions what is causing them to be like that.

**Accommodation:** None.

**Response E:** The Department asserts that inmates should be separated from the general population for reasons relating to their safety, the safety of others, the safety of the institution, or to preserve the integrity of an ongoing investigation per Title 15 Section 3335. The Department will not intentionally place an inmate in A/S without just cause, noting the heavy scrutiny of the reasons for A/S placement. Every consideration shall be made to ensure that if an inmate's parole release date is approaching, the reason for the A/S placement, or continued retention in A/S, be completed to provide the inmate an opportunity to return to a mainline setting prior to parole. With the Departments recent emphasis on rehabilitation, every opportunity will be made to offer the inmate appropriate programs designed to maximize their successful re-entry into society. Correspondingly, it is the inmate's responsibility to make the most of these programs so once released to society, the inmate will be better equipped to be productive and successful.

**Comment F:** Commenter states that there are other alternatives that would reduce the Departments problems, such as building 12 more prisons, or telling the Legislature to stop lengthening sentences. Throwing away the key is not a viable approach.

**Accommodation:** None.

**Response F:** It is unlikely that the legislature will authorize the construction of additional prisons while the state remains under budget pressures. Also see **Speaker #2, Response G.**

**SPEAKER #12:**

**Comment A:** Commenter states that the filing of this regulation change on an emergency basis is an extreme abuse of the system.

**Accommodation:** None.

**Response A: See Speaker #1, Response D.**

**Comment B:**  Commenter states that the Fathers of the entire field of mental health all determined that there are certain conditions that every human needs to avoid getting neurosis, and that the conditions in A/S breed neurosis.

**Accommodation:** None.

**Response B:  See Speaker #1, Response G.**

**Comment C:**  Commenter states that A/S units should be done away with because they are a form of punishment, and it is not right to put victims of crimes in the prison setting in A/S.

**Accommodation:** None.

**Response C:**  The Department contends that it is imperative to place the victim of an in-prison crime in A/S for their safety until a determination can be made as to just what led to the victimization.  To allow the victim to remain on the same mainline where he was victimized would in fact amount to negligence, as they very well could be attacked again.  A very careful analysis must be conducted to determine the reason for the victimization, and to arrange new appropriate housing.  Also, see **Speaker #11, Comment D, and Speaker #1, Comment C.**

**SPEAKER #13:**

**Comment A:**  Commenter states that people who know Corrections know this is bad stuff, and would never endorse or try to promulgate something like this.

**Accommodation:** None.

**Response A:**  The Department contends that this will in fact be a positive change.  The Department acknowledges that the only change to Article 7 of Title 15 at this time is to Title 15 Section 3335.  The Department is still bound to adhere to the requirements and mandates pertaining to Administrative Segregation as set forth in Sections 3336 through 3345.  The Commenter is reminded that once all the circumstances for A/S placement have been determined, the assigned counselor must bring the inmate before ICC within 14 working days to decide the next appropriate course of action.

**Comment B:**  Commenter states that prison systems in third world countries are run better than they are in California.

**Accommodation:** None.

**Response B:  See Speaker #2, Comment G.**

**Comment C:**  Commenter states that if an inmate must be segregated from the general population, then that inmate must be given the same benefits and privileges as the inmates in the general population.

**Accommodation:** None.

**Response C:**  The Department contends that A/S is a segregation unit designed to temporarily house violent or dangerous inmates, as well as victims of the same.  Violent inmates must not be allowed access to property and other items that would provide them with weapons, a policy that must be applied evenly for all segregated inmates.  As a segregation unit, strict control must be maintained for the safety of staff and other inmates.  For those inmates who may have been victimized, A/S is a temporary housing status.  Once all the facts of a case have been collected the inmate will be transferred to another setting.

**Comment D:**  Commenter states that California refuses to endorse accreditation procedures and standards, such as through the American Correctional Association.

**Accommodation:** None.

**Response C:** The Department observes that the California Penal Code does not require the Department to be accredited by the American Correctional Association.

**Comment E:** Commenter states that there should be no violence in a prison setting, and that if it happens it means the administrators are not running their prison properly.

**Accommodation:** None.

**Response E:** The Department agrees with the speaker's version of a prison environment free of violence. However, several criminologists have observed that California's inmate population is qualitatively different from that of most other states. This states inmate population is more likely to be in prison for a serious violent offense, and a higher percentage of them have gang affiliations. add to this the sheer size of California's prisons and the percentage of California inmates with mental health conditions, and the challenge facing California's correctional administrators is clear.

**Comment F:** Commenter questions just why the state legislators would allow a Department such as Corrections to spend money without legislative authorization.

**Accommodation:** None.

**Response F:** The Department contends that this regulatory change has resulted in an increase in efficiency of ICC hearings by reducing the use of expensive staff time on hearings where no new actions are possible. Instead, that staff time can be directed toward fact finding and investigation.

**Comment G:** Commenter states that state employees work in awful working conditions, but lack the integrity to step up and say that what they are doing is wrong.

**Accommodation:** None.

**Response G: See Speaker #2, Comment G.**

**Comment H:** Commenter states that this regulation change does not address who is responsible and accountable for how this regulation is carried out, or the training of those individuals.

**Accommodation:** None.

**Response H:** The Department notes that the commenter is correct, as the text in question, Title 15, Section 3335, does not address those areas. The commenter is directed to the remaining Sections of Article 7 of Title 15, specifically Sections 3336 through 3345, which do pertain to such issues.

**Comment I:** Commentator states that the Division of Correctional Standards (sic) has some weak standards segregated housing that it expects county jails to follow, although the State prison system does not follow them.

**Accommodation:** None.

**Response I:** The Department believes that the speaker is referring to the Correctional Standards Authority (formerly the Board of Corrections). Under the new department organization, good correctional practices will be shared more easily between entities that were formerly separate departments and boards.

**SPEAKER #14:**

**Comment A:** Commenter states that the way we run our prison systems means we are not a civilized country.

**Accommodation:** None.

**Response A:** See **Speaker #2, Comment G.**

**SPEAKER #15:**

**Comment A:** Commenter states that prisons aren't fair, and prisons should really rehabilitate inmates so that when they get back to society they can be accepted.

**Accommodation:** None.

**Response A:** The Department contends that with respect to rehabilitation, the commenter is directed to **Speaker #8, Comment C**. With respect to the remainder of the comment, the Department contends that although the above comment does regard an aspect of the subject matter and must be summarized pursuant to Government code Section 11346.9(a)(3), the comment is insufficiently related to the specific action proposed and that no meaningful response can be formulated by the Department in refutation of or accommodation to the comment.

**SUMMARIES AND RESPONSES TO WRITTEN COMMMENTS:**

**COMMENTER #1:**

**Comment A:** Commenter states that they will attend the public hearing along with a carload of people and a copy of the lawsuit they have filed against the Department. They are coming after the Department in a way that they feel the Department would understand, and that is lawsuits that cost the taxpayers money.

**Accommodation:** None.

**Response A:** The Department contends that Section 5058 of the California Penal code authorizes the Department to prescribe and amend rules and regulations for the safe administration of prisons. This regulation change was initiated to manage prisons, and more specifically the A/S units, more efficiently. The Department regrets that the commenter believes it is necessary to sue and cause taxpayer's money to be used defending a regulation that is being adopted in accordance with the Administrative Procedure Act.

**COMMENTER #2:**

**Comment A:** Commenter states that although the Department contends that this regulation change will not extend the amount of time an inmate is retained in A/S, this is in fact just what will happen. Commenter also states that the Department knows this regulation change is a ruse to keep inmates in A/S longer with no review.

**Accommodation:** None.

**Response A:** The Department disagrees. If a determination is made that an inmate should be removed from a general population setting and placed in Administrative Segregation (A/S), the reason for such placement shall be documented on a lockup order, and provided to the inmate no later than 48 hours after placement. On the first working day following an inmate's placement in A/S, designated staff at the level of a Correctional Captain or above shall review the lockup order. The reviewing official may release or retain the inmate at that time. An ICC

shall conduct a classification hearing for consideration and determination of the need to retain an inmate in segregated housing as soon as practical but no longer than 10 calendar days from the date of initial A/S placement. If continued retention is warranted beyond the initial ICC hearing, the case factors shall be referred to a CSR within 30 days. The CSR is the only departmental representative that has the authority to approve continued retention in segregated housing. At the time of the referral, the ICC shall recommend one of several possible outcomes. The inmate may be: 1.) transferred to another institution, 2.) transferred to a Segregated Housing Unit, or 3.) be retained in A/S pending resolution of an investigation, disciplinary process, or District Attorney Referral. In such cases, the ICC is required to provide a reasonable projection of time for the matter to be resolved. If no due process violations occurred, the CSR will approve retention in the A/S for a set period of time and will provide a time frame in which the case needs to be seen again by the ICC. This process is set forth in greater detail in Title 15 Sections 3336 through 3338. However, under the previous process, the inmate would be returned to ICC every 30 days. As retention in A/S generally exceeds 30 days, such frequent reviews resulted in staff and committee time reviewing cases on which action, such as release from A/S, would not yet be possible because necessary information about the reason for which A/S placement was necessary is not yet available. Under the revised regulations, unless otherwise directed by the CSR, the inmate appears before ICC at 90 days for less than serious disciplinary reasons, and at 180 days for serious disciplinary reasons, court proceedings, or gang validation. The inmate may be returned to ICC at any time when scheduled by staff for specific reasons such as cell status. However, once the reason for A/S placement is resolved, the inmate must appear before ICC within 14 calendar days for closure. As such, the length of time an inmate remains in A/S may well be shortened as the assigned counselor would be more available to return completed casework to an ICC rather than wait for the next scheduled 30 day hearing.

**Comment B:** Commenter stated that ICC reviews should be more frequent than every 30 days, or remain the same.

**Accommodation:** None.

**Response B:** The Department contends that each inmate who is placed in an A/S unit requires due process for continued retention to ensure the restriction in their liberty is justified. One of the due process proceedings is the ICC review. Most of the inmates who are placed in A/S have disciplinary, criminal, or investigative issues pending that require several weeks to resolve. The change in the review cycle from 30 days to 90 or 180 days was initiated to allow ICC to take action on a case as soon as possible, but not spend staff or classification committee time routinely reviewing cases on which action is not yet possible due to an incomplete rules violation report, pending action by the District Attorney or an incomplete investigation. Seeing such cases every 30 days creates an unjustified workload spread across several staff levels with no custodial benefit.

**Comment C:** Commenter stated that all this regulation change will do is open the Department up for more lawsuits about illegal confinement.

**Accommodation:** None.

**Response C:** The Department contends that inmates are not illegally confined in A/S. Inmates shall only be placed in A/S when their presence in the general population presents an immediate threat to the safety of the inmate or to others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal

activity. Several layers of due process reviews ensure inmates are only placed in A/S for the above noted reasons.

**COMMENTER #3:**

**Comment A:** Commenter stated that it is not clear how lengthening the review period for ICC from every 30 days to at least 90 days will in fact shorten the entire process.

**Accommodation:** None.

**Response A:** The Department asserts that under this regulatory change, the length of time an inmate will be retained in A/S will remain the same, or may in fact be shortened. An inmate's reasons for A/S placement will be carefully reviewed at the onset of his placement. As typically the reason for such placement will not be resolved for some time, frequent appearances before ICC often serve little more than to bring an inmate before committee to be told that the reason for their placement had not been resolved. This has been time consuming, resulting in delays in bringing those inmates before committee whose issues had been resolved. This regulatory change mandates that an inmate must be returned to an ICC within 14 calendar days once their reason for A/S placement has been resolved. Thus an inmate's A/S retention can be shortened by up to several weeks by the new process. Although an inmate may not appear before an ICC as frequently as in the past, ICC reviews will now occur at a time when an action is in fact possible. Time in A/S may be shortened in many instances as the assigned counselor would be more available to return completed casework to an ICC.

**Comment B:** Commenter stated that page 2 of the Initial Statement of Reason (ISOR) (Commenter referred incorrectly to page 4 of the ISOR) contradicts page 1 which states a routine review will occur every 90 days. It would be better to take an inmate to ICC once the reason for A/S placement is complete.

**Accommodation:** None.

**Response B:** The Department agrees with the commenter that routine ICC review will occur every 90 to 180 days, depending on the reason for the A/S placement and retention. These time frames have been selected because they most closely represent the actual time an inmate will be housed in A/S based on the seriousness of the reason for their placement in A/S. At the time of the inmate's A/S placement, the reason for the placement is carefully scrutinized by a number of levels of reviewers to determine if the placement is warranted, particularly if mental health concerns are an issue. This revised regulation will now make it mandatory that once the reason for the A/S placement is resolved, the inmate must appear before an ICC within 14 calendar days for closure. Commenter's request that the inmate be returned to ICC once the reason for A/S placement has been resolved is occurring at this time under these emergency regulations.

**Comment C:** Commenter states that if an inmate is held in A/S for 90 days, and the reason for his A/S placement is resolved on the 91st day, he will remain in A/S for another 89 days until his next scheduled hearing.

**Accommodation:** None.

**Response C:** The Department disagrees. The Department notes that the revised regulation, specifically Section 3335(d)(1), requires that an ICC be conducted within 14 calendar days of resolution of A/S placement.

**Comment D:**  Commenter states that Section 3335(2) of the regulation change contains no predicate, and is therefore an incomplete sentence and cannot be considered any form of regulation.

**Accommodation:**  None.

**Response D:**    The Department notes that the commenter is referring to 3335(d)(2). Subsections 3335(d)(1), (2), and (3) are all similar in that they are addressing a particular time line that an inmate must appear before an ICC, based on the seriousness of the reason for an inmates A/S placement.  All three subsections are written similarly, and are a derivative of the last sentence of 3335(d) noting that ICC reviews shall proceed in accordance with specific timelines as set forth in 3335(d)(1), (2), and  (3).

**Comment E:**  Commenter states that this extension of time in A/S is clearly another form of punishment out of hatred for inmates.

**Accommodation:**  None.

**Response E:**    The Department reiterates contends that A/S is not viewed as a form of punishment.  Inmates are separated from the general population for reasons relating to their safety, the safety of others including other inmates and staff, the safety of the institution, or to preserve the integrity of an ongoing investigation per Title 15, Section 3335.  Placing inmates into A/S for other reasons not outlined in this Section is not allowed.  A/S reviews regularly conducted by the Department would uncover such unauthorized A/S placements and report them to the executive management of the Department.

**COMMENTER #4:**

**Comment A:**  Commenter states that an inmate would be locked up in A/S for 90 to 180 days without knowing the reason for their A/S placement.

**Accommodation:**  None.

**Response A:**  The Department contends that if a determination is made that an inmate should be removed from a general population setting and placed in A/S, the reason for such placement shall be documented on a lockup order, and a copy provided to the inmate no later than 48 hours after placement.  An ICC shall conduct a classification hearing for consideration and determination of the need to retain an inmate in segregated housing as soon as practical but no longer than 10 days from the date of A/S placement.  All layers of review are well documented, and the results of each action are written with a copy provided to the inmate to ensure they are well apprised of the reason for their A/S placement as well as the estimated length of stay in A/S.

**Comment B:**  Commenter states that because an inmate could be locked up so long in A/S without knowing why they have been placed there, the inmate would not be able to file an appeal because of lost time constraints.

**Accommodation:**  None.

**Response B:**  The commenter is directed to Title 15 Section 3335(c) in the proposed text which specifies that an inmate's placement in A/S would be reviewed by an ICC within 10 days of receipt in the unit.  Additionally, current Title 15 Sections 3336 and 3337, pertaining to the actual segregation order and the review process, lay out a thorough review process of the order to ensure the reason for A/S placement is valid.  In all review processes the inmate is

provided a written copy of the decision, and the reasons in support of that decision, so that the inmate does have appropriate documentation with which to initiate the appeal process.

**Comment C:** Commenter states that this regulation change will increase the time an inmate spends in A/S because currently the inmate must be seen by an ICC within 10 days of A/S placement.

**Accommodation:** None.

**Response C:** The initial hearing before an ICC within 10 days of placement remains the same.

**Comment D:** Commenter states this rule change will cause overcrowding in A/S.

**Accommodation:** None.

**Response D:** The Department contends that the rule change does not allow an inmate to be retained in A/S for any more time then they would have under the previous process. Although the rule change allows for an ICC review for up to 90 to 180 days if the reasons for placement have not been resolved, at any time during this time frame (if the matters that caused the placement are resolved), the ICC is required to review the inmate's case within 14 calendar days.

## COMMENTER #5:

**Comment A:** Commenter states that there are a number of inmates that are waiting to be transferred from A/S to a sensitive needs yard, and that the transfer process seems to be taking too long.

**Accommodation:** None.

**Response A:** The Department has established several special yards, known as sensitive needs yards, where inmates with enemy concerns or other special case factors can be safely housed. There are a limited number of beds that are available and, depending on an inmate's case factors, they may have to wait before they can get a transfer. The Department is reviewing the individual missions of its institutions statewide and considering adjustments to accommodate changes in the inmate population.

## COMMENTER #6:

**Comment A:** Commenter states that A/S is used for the wrong reasons to lock an inmate up, and no one is there to listen to them.

**Accommodation:** None.

**Response A:** The Department notes that inmates are separated from the general population for reasons relating to their safety, the safety of others, the safety of the institution, or to preserve the integrity of an ongoing investigation per Title 15, Section 3335. As a variety of Departmental staff are involved at various levels of review (officers, counselors institution management, and medical and mental health staff, if needed), the decision for retention in A/S is directly correlated to the inmate's safety or the safety of others. Inmates may verbally request an audience with any official, send a written request, or utilize the CDCR Appeals process, etc., if for any reason they disagree with the reason for their A/S placement.

## COMMENTER #7:

**Comment A:** Commenter states that this rule change will allow for the Department to take their time in processing inmates that have been placed in A/S, and that this will be an excuse to not do their work.

**Accommodation:** None.

**Response A: See Commenter #2, Response A.**

<u>**COMMENTER #8:**</u>

**Comment A:** Commenter states that inmates are being locked up in A/S for no reason whatsoever.

**Accommodation:** None.

**Response A: See Commenter #3, Comment E.**

<u>Commenter #9:</u>

**Comment A:** Commenter expressed concern that committee members would still abuse their power and use illegal discrimination tactics under the revised regulation.

**Accommodation:** None.

**Response A:** The Department contends every placement of an inmate into a segregation unit is reviewed in the same manner. The reason(s) for removing an inmate from a general population setting for placement into an A/S setting are very specific. They range from less than disciplinary reasons, such as an investigation into safety concerns, to more serious disciplinary concerns, such as gang validation or court proceedings stemming from an alleged criminal act committed by the inmate. The entire process is designed to ensure that the reason for removing an inmate from a general population setting for placement in A/S is appropriate and is reviewed by others not involved in the ICC hearings. This extensive review system protects the inmate's Due Process Rights.

<u>Commenter #10:</u>

**Comment A:** Commenter contends that prisoners are being unjustly housed in A/S, and they do not get a fair hearing at committees.

**Accommodation:** None.

**Response A:** The Department contends that the primary thrust of the change to this regulation was to change the frequency with which the case factors of inmates retained in A/S are reviewed by an ICC. There are a number of layers of review involved with the placement of an inmate in A/S to ensure that the reason for the placement is appropriate. A/S placements are also subject to examination by a review team that regularly visits institutions to check A/S processes.

<u>Commenter #11:</u>

**Comment A:** Commenter states that there are many inmates that are being housed in A/S unjustly for no other reason than for discrimination.

**Accommodation:** None.

**Response A: See Commenter #9, Response A.**

**Comment B:** Commenter states that there must be specific guidelines for releasing prisoners from A/S or ICC will just keep them there forever.

**Accommodation:** None.

**Response B:** The Department asserts that the reasons for removing an inmate from a general population setting for placement into an A/S setting are very specific. As such, once the reason for A/S placement has been resolved, the inmate and his assigned A/S counselor will be notified in writing, at which point the counselor must return the inmate to ICC within 14 calendar days to determine the appropriate course of action. In some cases the inmate may be released. In other cases, the inmate will be recommended for transfer to another institution.

**Comment C:** Commenter states that inmate's due process rights must be protected to be free of an indeterminate A/S commitment.

**Accommodation:** None.

**Response C:** The Department agrees. Depending on the basis for placement, an inmate may be held in ASU for 90 days and up to 180 days after his/her initial ICC review prior to being seen again by an ICC. However, the regulations also require an ICC to see them within 14 days any time during this time period if the issues surrounding placement have been resolved.

**Commenter #12:**

Comment A: Commenter states that inmates are locked up discriminatorily because of an abuse of power, and do not get fair hearings from ICC.

Accommodation: None.

**Response A: See Commenter #10, Response A.**

**Commenter #13:**

**Comment A:** Commenter states that inmates are locked up in A/S due to discriminatory practices against Latinos.

**Accommodation:** None.

**Response A: See Commenter #9, Response A.**

**Comment B:** Commenter states that these rules must be adopted so that inmates from Southern California will be given a fair and impartial committee hearing and not locked up for unjust reasons.

**Accommodation:** None.

**Response B:** The Department believes that the proposed A/S hearing process is a fair and impartial method of reviewing inmate placements in A/S, regardless of the region of the state the inmate was from before incarceration.

**Commenter #14:**

**Comment A:** Commenter states that he has been retained in A/S for years for unjust and discriminatory reasons, and as such his due process rights have been violated.

**Accommodation:** None.

**Response A: See Commenter #10, Response A.**

**Commenter #15**

**Comment A:** Commenter states that the proposed changes are inconsistent with the requirements imposed by the Court in the <u>Coleman</u> court case regarding the placement and retention of mentally ill inmates in A/S.

**Accommodation:** None.

**Response A:** The CDCR Mental Health Services Delivery System (MHSDS) draft Coleman agreement [Chapter 7, Administrative Segregation] establishes the following in the "Program Goals and Objectives:"

- Continuation of care for inmate-patients with identified mental health treatment needs through regular case management activities and medication monitoring to enable inmate-patients to maintain adequate levels of functioning and avoid decompensation.

- Daily clinical rounds of inmate-patients in the MHSDS and mental health screening and evaluation of inmates who are not currently in the MHSDS caseload to identify mental health needs.

- Referral to a more intensive level of care for inmate-patients whose mental health needs cannot be met in A/S, including expeditious placement into Mental Health Crisis Beds (MHCB) for inmate-patients requiring inpatient mental health care.

- Mental health assessments and input into the classification decision-making process during ICC, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living, ability to understand Due Process proceedings, likelihood of decompensation if retained in A/S, recommendations for alternative placement, and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment.

- Mental health assessments and input into the adjudication of Rule Violation Report hearing proceedings involving MHSDS inmate-patients. Mental health information includes the quality of the inmate-patients' participation in their current MHSDS treatment plan, mental condition that may have been a contributing factor in the alleged misbehavior, and the ability to comprehend the nature of the charges or participate meaningfully in the disciplinary process. Final housing decisions are made by the ICC after considering all relevant clinical and custody factors.

Inmates requiring an Enhanced Outpatient Program (EOP) Level of Care who are housed in A/S due to security or safety concerns will be transferred to a specialized EOP A/S Hub within ten days of placement. An EOP A/S Hub is staffed with additional MHSDS clinical personnel to ensure continuity of care.

All non MHSDS A/S inmates will be contacted by MHDSD staff and medical staff weekly. All A/S inmates are contacted by custody staff at least 10 times daily. Per the Coleman training, custody staff know they must report unusual, bizarre, or uncharacteristic inmate behavior to MHSDS staff immediately.

An inmate's mental and physical health will continue to be monitored and the appropriate measures taken as an inmate's treatment requires regardless of his/her housing, in keeping with the requirements of the Coleman agreement.

**Comment B:** Commenter states that the Department has failed to show the necessity for the proposed changes, which is a fatal flaw given the need for more frequent hearings for inmates in A/S.

**Accommodation:** None.

**Response B:**  The Department contends that in 2004, the average inmate population housed in A/S pending investigation or completion of disciplinary matters was approximately 6,940. For the many of these inmates, disciplinary proceedings and/or ongoing investigations cannot be completed within 90 days.  As a result, the change in the review cycle from 30 days to 90 or 180 days was initiated to allow ICC to take action on a case as soon as possible, but not spend staff or classification committee time routinely hearing cases on which action is not yet possible.  Based on the average A/S population in 2004, and noting the average time an inmate spends in A/S, the Department estimates that staff would have conducted approximately 50,000 ICC reviews that year where no action was possible.  ICC reviews have an impact on numerous staff levels including, but not limited to, case records staff, Correctional Counselors, Custody Officers, Mental Health staff, Facility Captains and the Warden/Chief Deputy Warden.  Reducing staff time spent on unproductive hearings allows staff to attend to other critical matters in the institution, including timely ICC hearings once the issues for initial A/S placement have been resolved.

**Comment C:**  Commenter states that placing an inmate in A/S, which is a much more restrictive environment than the general population, will only lead to a higher rate of suicide, particularly in cells with wire mesh vents.  Mere reduction in workload for staff associated with A/S is insufficient to justify the considerable harm that will be inflicted under the new system.

**Accommodation:** None.

**Response C:**  The Department acknowledges that A/S is a much more restrictive environment and, as such, inmates housed in A/S receive much closer scrutiny from custody staff, counseling staff, and MHSDS clinical personnel than inmates housed in the general population.  The length of an inmate's placement in ASU is dependant solely on the need for separation from the general population.  Although the Department is committed to reducing the length of time inmates are segregated, ICC will not release an inmate to the general population as long as he/she remains in danger, or continues to present a significant danger to others.  The extended time frames provide an avenue to reduce redundant review of cases where the reasons for placement remain unresolved.  The mental health of inmates is closely monitored by MHSDS staff, which may place an inmate in a crisis bed if such intervention is required.  It is unlikely that ICC reviews every 30 days would, by themselves, reduce the risk of suicide.  It is much more likely that the Department's MHSDS can reduce the suicide risk.  Commenter is directed to **Commenter #15, Response A.**

**Comment D:**  Commenter states that placing inmates in A/S that have already been diagnosed with a mental illness violates the 8th amendment, and the Department has been ordered to develop a protocol to govern such placement.  The placement of mentally ill inmates in A/S can be harmful, and the mentally ill should be moved out of A/S rapidly.

**Accommodation:** None.

**Response D:**  The Department contends that The Eighth Amendment argument regarding placement in segregated housing was addressed and resolved in <u>Toussaint v. Wilson</u> and <u>Madrid v. Davis</u>.  The CDCR has established and implemented specific procedural safeguards to protect the rights of inmates against cruel and unusual treatment.  The CDCR has established a draft remedial plan to address the requirements established by the Court in <u>Coleman v. Schwarzenegger.</u>  An inmate's retention in A/S is mandated under specific situations.  The proposed regulations would have no impact on the commenter's assertion that mentally ill inmates should be moved out of A/S rapidly.  The length of retention is moot until

the reason for placement is resolved.  An ICC review three times in 90 days, as opposed to once, would not affect the inmate's release if the need for retention remained.  The respondent's argument against the proposed regulations is not supported by fact.  Commenter is also directed to **Commenter #15, Response A.**

**Comment E:**  Commenter stated that an agency must demonstrate the necessity of a proposed regulation.  The rulemaking record must demonstrate by substantial evidence the need for a regulation to effectuate the purpose of the statute that the regulation implements.  The Department has given only the barest of reasons, in essence making a cost argument.

**Accommodation:** None.

**Response E:** The Department contends that past practice required a reviewe by ICC every 30 days, regardless of the need for program review.  ICC is a very work intensive process, requiring the attendance of the Warden or a designee, Mental Health staff, managerial custody staff, and counseling staff.  The preparation for, and follow-up of, ICC requires substantial work time from line counseling, clerical, and records staff.  In cases where there is no change in the reason for placement in A/S, or need for program review (cell, yard, mental health issues), then conducting an ICC becomes an extremely inefficient and expensive use of staff time.  This regulation change addresses that issue; it does not alter staff's responsibility to ensure that inmates are removed from A/S as soon as the reason for A/S placement has been resolved.  In fact this regulation change specifies that an inmate must be returned to ICC within 14 days once the A/S placement issue has been resolved.  This regulation is intended to eliminate unproductive staff work and enhance overall staff performance, all without compromising the safety or welfare of the inmate while retained in A/S.  Commenter is also directed to **Commenter #15, Response B.**

**Comment F:**  Commenter states that the end result of this regulatory change is easy to predict; longer inmate stays in A/S and more suicides there as well.

**Accommodation:** None.

**Response F:  See Commenter #15, Response C.**

**Commenter #16:**

**Comment A:**  Commenter expressed concern over the impact of this regulatory change to inmates with mental health issues.

**Accommodation:** None.

**Response A:  See Commenter #15, Response A.**

**Commenter #17:**

**Comment A:**  Commenter states that until now, 30 day ICC reviews were the only way to assess mental health, and that longer delays in between ICC hearings would lead to a deterioration of an inmate with mental health issues.

**Accommodation:** None.

**Response A:**  The Department contends that the A/S ICC reviews an inmate's case factors, including; yard, single cell, program, behavior, as well as mental health needs.  The MHSDS clinical staff make all determinations regarding treatment; including crisis bed placement, as needed.  The ICC has little if any significant impact on an inmate's mental health treatment needs.  Retention in A/S is dependant on an inmate's overriding case factors and, although

respective of mental health issues, his/her threat to security or safety needs must be given priority in housing matters. An inmate who presents a significant danger to himself/herself or others must be kept in a more secure and controlled environment. Failure to address this issue would be irresponsible on the part of CDCR. Commenter is also directed to **Commenter #15, Response A.**

**Comment B:** Commenter states that the Department has not demonstrated the necessity of amending this regulation other than to offer only the most vague and unsubstantiated reasons, essentially stating it is too expensive to offer hearings for inmates at 30 day intervals.

**Accommodation:** None.

**Response B: See Commenter #15, Response B and E.**

**Commenter #18:**

**Comment A:** Commenter states that it is not clear how "an increase in violence" would lead to the promulgation of this regulatory change.

**Accommodation:** None.

**Response A:** The Department contends that when an act of violence occurs, the perpetrator or suspected perpetrator of the act must be removed from the general population and placed into A/S. Inmates who engage in acts of violence have disciplinary or investigative issues that require many days to resolve. Because these matters cannot be resolved immediately, a routine review of these cases every 30 days prior to adjudication of a disciplinary report or the conclusion of an investigation has no custodial benefit. The Department contends that the amount of violence in the Department's prisons has increased for several reasons, such as overcrowding, a younger more violent and gang oriented population, disruptive group activities, and understaffing due to budget pressures. Violence does translate into an increase in A/S placement. Due to the increase in violence, the number of inmates housed in A/S for this type of behavior has increased. As a result, staff time spent conducting unproductive hearings also increased. Redirecting this staff time toward ensuring the disciplinary and investigative process is not being delayed has a greater custodial benefit.

**Comment B:** Commenter requests an explanation as to why this regulatory change was filed on an emergency rule-making basis.

**Accommodation:** None.

**Response B:** The Department has been operating within the 90 to 180 day time frames since November of 2001. Due to recent litigation, the Department would have been required to return to the 30 day review cycle if these regulations were not implemented promptly. Returning to the 30 day review cycle would have had a significant fiscal and administrative impact on institutional operations. It is estimated that returning the 30 day review cycle would require approximately 50,000 additional hearings a year in which no action can be taken. The cost associated with staff time to prepare, participate, and record these hearings would be significant.

**Comment C:** Commenter states that extending the hearing dates is cruel and unusual punishment.

**Accommodation:** None.

**Response C:** The Department contends that an inmate's reasons for A/S placement will be carefully reviewed at the onset of his placement. This regulatory change mandates that an

inmate must be returned to an ICC within 14 calendar days of his reason for A/S placement having been resolved.  Thus inmates A/S retention can be shortened by up to several weeks.  Also, see **Commenter #15, Response D.**

**Comment D:**  Commenter states that releasing angry, frustrated and unrehabilitated inmates back to society is not safe for anyone.

**Accommodation:** None.

**Response D:**  The Department agrees.  However, the Department also asserts that inmates should be separated from the general population for reasons relating to their safety, the safety of others, the safety of the institution, or to preserve the integrity of an ongoing investigation per Title 15 Section 3335.  The Department will not intentionally place an inmate in A/S without just cause, noting the heavy scrutiny of the reasons for A/S placement.  Every consideration shall be made to ensure that if an inmate's parole release date is approaching, the reason for the A/S placement or continued retention in A/S will be resolved to provide the inmate an opportunity to return to a mainline setting prior to parole.  With the Departments recent emphasis on rehabilitation, every opportunity will be made to offer the inmate appropriate  pre-release  programs  designed  to  maximize  their  successful  re-entry  into  society.  Correspondingly, it is the inmate's responsibility to make the most of the programs offered so once released to society, the inmate will be better equipped to be productive and successful.

**Comment E:**  Commenter states that the Department is overlooking the fact that medical costs will increase due to placement in solitary confinement which will increase mental problems.

**Accommodation:** None.

**Response E:**  When considering cost, the Department must weigh the costs of violent acts, inmate on inmate or inmate on staff, against the costs of segregation.  Health care costs associated with violence in the institutions are expensive, especially if an incident requires inmates and/or staff to be transported outside the prison for trauma care.  The Department contends that it is mandated to provide mental health care to inmates and will continue to do so.  The Department must also provide as safe and secure an environment as possible for all inmates and staff.  By separating violent inmates and inmates who have safety concerns from the general population, the Department is able to better accomplish this goal.  The Department will release segregated inmates back to the general population as soon as possible, but must always be cognizant of institutional security when deciding to do so.

**Commenter #19:**

**Comment A:**  Commenter questions how the Department can justify changing the committee time to exceed 30 days and hold the inmates in A/S for at least 90 days before being taken to what is really only a kangaroo court anyway.

**Accommodation:** None.

**Response A:**  A 30 day or 90 day or 180 day review cycle would have little practical impact on the inmate's length of stay in A/S, if ICC is a "kangaroo court" as the commenter claims.  However, the CDCR is committed to enforceable due process for its inmates in A/S.  The Department believes these regulatory changes create a more efficient procedure while protecting the due process rights of inmates.  **See also Commenter #2, Response A, and Commenter #18, Response C.**

**Comment B:**   Commenter states that Correctional Counselors in A/S units don't do their job and they lie.

**Accommodation:**  None.

**Response B:**   The Department observes that although the above comment does regard an aspect of the proposed regulatory action and must be summarized pursuant to B Government Code Section 11346.9(a)(3).  The comment is either insufficiently related to the specific action proposed,  unsubstantiated,  too generalized,  or too personalized to the extent that no meaningful refutation or accommodation can be formulated.

**Comment C:**   Commenter states that the Department already treats inmates like caged animals, and now wants to treat inmates worse, less than human.

**Accommodation:**  None.

**Response C:**  The Department contends that placement into A/S is not intended to be a form of punishment.  Inmates are separated from the general population for reasons relating to their safety, the safety of others, the safety of the institution, or to preserve the integrity of an ongoing investigation.   Placing inmates into A/S for reasons not outlined in departmental regulations is not allowed.

**Comment D:**  Commenter questions why inmates are constantly given indeterminate A/S time.

**Accommodation:**  None.

**Response D:  See Commenter #2, Comment A.**

ADDENDUM TO FINAL STATEMENT OF REASONS

**The following Statements are added to the Final Statement of Reasons as they were inadvertently left out of the Initial Statement of Reasons.**

Exhibit I

SANFORD JAY ROSEN
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com 



August 30, 2005

<u>VIA EMAIL AND REGULAR MAIL</u>
California Department of Corrections
Regulation and Policy Management Branch
P.O. Box 942883
Sacramento, California 94283-0001
E-mail: RPMB@executive.corr.ca.gov

Re:  <u>Proposed Regulation Number 05/05</u>

To whom it may concern:

Rosen, Bien & Asaro is one of the firms representing plaintiffs in <u>Coleman v. Schwarzenegger</u>, a class action seeking improved mental health care for state prisoners. We write on behalf of plaintiffs in <u>Coleman</u> to comment on Proposed Regulation Number 05/05, amending Title 15, Section 3335, regarding segregated housing. Under the proposed emergency regulation (which, as we understand it, has already been implemented), inmates placed in segregated housing would have their cases reviewed by the Institutional Classification Committee (ICC) every 90 days or 180 days, depending on the reason for the placement – as opposed to the review every 30 days provided under the previous language of Section 3335.

Plaintiffs object to the proposed changes as <u>inconsistent</u> with the requirements imposed by the court in <u>Coleman</u> regarding the placement and retention of mentally ill inmates in segregated housing. We further believe that the Department has failed to show any <u>necessity</u> for the proposed changes, a fatal flaw given the powerful factual record in support of the need for more frequent review of inmate placements in segregated housing. Simply put, we believe that less frequent ICC review of placements in segregated housing will mean that more mentally ill inmates placed in such housing will fail to get the attention and help they need. We urge the Department to rescind the emergency regulations and return to implementing the previous language, holding ICC reviews of placements in segregated housing every 30 days.

*     MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**    MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

California Department of Corrections
August 30, 2005
Page 2

<u>Conditions in Segregated Housing</u>:  The segregated housing units where inmates are housed pending resolution of rules violation reports, criminal investigations or safety reviews are a harsh environment.  Inmates placed in segregated housing are denied privileges available to other inmates:  they are locked down 23 hours a day;  they eat alone in their cells; they have no work, educational or vocational opportunities;  there is limited access to television, radio or books;  and these units are characterized by a hostile custodial environment.  In many institutions, the windows in the administrative segregation units are frosted or painted over.  The hundreds of inmates housed in such cells have little natural light and no ability to see outside; if yard privileges are also denied inmates may go weeks or months without ever seeing the sky.

Administrative segregation units are particularly hazardous for inmates who become suicidal – those with a history of suicidal ideation and those who become suicidal due to placement in segregated housing.  The CDCR has been ordered to develop a plan for dealing with the hazard of large mesh ventilation screens in these units because the screens make it far too easy for inmates to hang themselves in the administrative segregation units, which have a high suicide rate within CDCR.   The Plan filed with the Court proposes a several year timeline for replacing the dangerous large mesh ventilation screens.

As these examples make clear, placement in segregated housing is a significant deprivation of liberty beyond what is suffered by inmates in the general population.  Defendants are under a legal obligation, as described below, to create procedures to minimize the harm that may be done by such placement by identifying those cases in which an inmate should not remain in segregated housing and taking action to provide another placement.  The workload concerns cited by the Department as creating the necessity for less frequent review of these placements are not sufficient to justify the considerable harm that will be inflicted under the new system.

<u>Consistency</u>:  The authority of the Department of Corrections to promulgate regulations under Penal Code Section 5058 extends only so far as the regulation is consistent with the statute it purports to implement, and necessary to effectuate the purpose of the statute.  Government Code Section 11342.2.  Moreover, the regulation must not violate other provisions of law – including applicable court decisions.  Government Code Sections 11349(d) and 11349.1.

Here, the Department has lessened the frequency of ICC review of placements in segregated housing without regard for the specific legal requirements which apply to cases where a mentally ill inmate is placed in segregated housing.

In <u>Coleman v. Wilson</u>, the class of California prison inmates with serious mental disorders brought suit under 42 U.S.C. Section 1983 alleging that the mental health care provided within California prisons was so inadequate that it violated the inmates' rights

California Department of Corrections
August 30, 2005
Page 3

under the Eight and Fourteen Amendments of the United States Constitution (barring infliction of cruel and unusual punishment, and guaranteeing due process).

At trial, the evidence presented by plaintiffs showed that mentally ill inmates were placed in administrative segregation ("ad seg") without evaluation of their mental status, that such placement often caused a worsening of their symptoms, and that inmates were denied access to mental health care while housed in ad seg. On the basis of this evidence, the Magistrate Judge found, in his Findings and Recommendations, that the use of ad seg placement of mentally ill inmates, as practiced by the Department, violated the Eighth Amendment. (Findings and Recommendations, page 54. The relevant pages of the Findings and Recommendations are attached to this letter.) He ordered the Department to develop and implement a protocol to govern placement and retention of mentally ill inmates in any ad seg or segregated housing unit. (Id. at 81, emphasis added.) Ruling on defendants' objections to these findings, the federal district court specifically held them to be fully supported by the evidence. (Coleman v. Wilson (1995) 912 F. Supp. 1282, at 1320.)

What was true at the time of trial in Coleman continues to be true today: placement in segregated housing can be extremely harmful to the mental health of mentally ill inmates. This is borne out by statistics: In 2003, 51% of inmate suicides in California prisons occurred in Ad Seg units (18 out of 35); in 2004, 64% occurred in Ad Seg Units (18 out of 28).

Thus the Department remains legally obligated to develop and implement a protocol designed to protect mentally ill inmates from the harm that may be done when they are inappropriately placed or retained in segregated housing or if they do not receive the care they need while housed there. The Special Master appointed in Coleman has also commented on the need to reduce the length of ad seg stays for mentally ill prisoners, stating in one report to the court:

As indicated in the master's earlier report on administrative segregation, the provision of services to the seriously mentally disordered inmates housed in theses units is only part of the solution. The other part consists of keeping seriously mentally disordered inmates out of administrative segregation as often as possible and moving them out of administrative segregation as rapidly as possible once they are housed there. (Supplementary Recommendation of the Special Master on Staffing Ratios and Administrative Segregation at 10, emphasis added, dated May 12th, 1999.)

As part of the ICC process in administrative segregation, a mentally ill inmate's assigned psychiatrist or case manager attends all ICC meetings to provide mental health input. Among the information to be provided by the mental health clinician is the inmate-patient's current participation in treatment, medication compliance, suitability for single or double celling, risk assessment of self-injurious behavior, and likelihood of

California Department of Corrections
August 30, 2005
Page 4

decompensation if retained in administrative segregation. Draft Program Guides, Chapter 7, B.1.3, C.4., July 2004.

Such a requirement becomes meaningless if ICC review is held only every 90, or worse, 180 days. A mentally ill inmate placed in segregated housing has relatively few formal opportunities to bring to the attention of prison authorities problems with his or her placement, mental status, or the care he or she is receiving. By the very nature of their illness, mentally ill inmates may not be willing or able to be aggressive advocates on their own behalf, and therefore may not call attention to their problems absent a hearing. Even when an inmate is able to do so, asking mental health or custody staff for assistance, we all too often hear from our clients that such requests are not taken seriously by staff. Thus the opportunity for an inmate to be heard at an ICC hearing is critical to the ability of the institution to know when an inmate's placement in segregated housing is causing that inmate's mental health to deteriorate, and when a change may therefore be needed.

We maintain, on behalf of our clients, that offering ICC review of a segregated housing placement at best only every three months will result in more inmates suffering deterioration of their mental health due to such placement. The emergency regulation is therefore _inconsistent_ with the requirement under _Coleman_ that the Department put in place appropriate procedures limiting the placement and retention of mentally ill inmates in segregated housing.

Necessity. Under Government Code sections 11349 and 11349.1, an agency must demonstrate the necessity of a proposed regulation – the rulemaking record must demonstrate by substantial evidence the need for a regulation to effectuate the purpose of the statute that the regulation implements. The Department has given only the barest of justifications for the change in Section 3335, in essence making a cost argument: because the caseload of inmates placed in segregated housing has increased they must decrease the frequency of hearings to handle the workload with existing resources. (We note that no caseload data are given in the informative digest or statement of reasons.)

The inadequacy of this justification is clear in light of the serious harm that will be done by reducing the frequency of ICC review. Even in a case where final action regarding the inmate's placement is dependent upon some other matter being resolved – as in the examples given by the Department, where the inmate is in segregation pending completion of an investigation, or resolution of a rules violation report – reasonably frequent ICC review is important for several reasons.

First, the ICC review is not simply a matter of an up or down decision as to whether the inmate is to remain in segregated housing or be placed elsewhere. As is discussed above with regard to the protocols for placement of mentally ill inmates in segregated housing, the ICC may also hear information regarding problems the inmate is having in ad seg, as when the inmate fails to get needed medical or mental health care.

California Department of Corrections
August 30, 2005
Page 5

The Interdisciplinary Treatment Team for a mentally ill inmate in segregated housing need only review the inmate's case every 90 days; ICC hearings, with the participation of a member of the treatment team, provide an important opportunity for staff to review whether the inmate's condition has worsened and removal from administrative segregation is warranted. Even when an inmate is recommended to remain in segregated housing, the ICC can recommend a change of housing or yard status within that placement. This is reflected in proposed Section 3335(h).

The ICC is also required, under the previous language of Section 3335 and under the new language, to give a projection of the time needed to complete an investigation or for a criminal prosecution to be resolved. (Previous Section 3335 (b)(1)(B); Proposed Section 3335 (e)(3).) This serves both as a source of information to the inmate, and as a check to ensure that investigations and the adjudication of rules violation reports do not drag on unreasonably. At a minimum, the inmate is guaranteed that so long as the matter is unresolved, the ICC will hold a hearing once a month, giving the inmate an opportunity to inquire into the reason for the delay.

Given this function, it seems disingenuous for the Department to suggest, as it does, in its Initial Statement of reasons, that the emergency regulation will reduce segregation time by focusing staff resources on the cases where action is possible. It is far more likely that inmates will remain in segregation for far longer periods of time, as the resolution of their cases drags on with greatly reduced oversight of any delay.

In light of these multiple functions of ICC review, it is clear that having regular and reasonably frequent reviews is an important safeguard, against potential abuses while an inmate remains in segregated housing and against the possibility of an inmate remaining in such a placement longer than is necessary. These functions will be seriously compromised by reducing the frequency of review from once a month to once every three or six months.

The most serious impact will be on mentally ill prisoners. With depressing regularity, several times each month, we receive letters from clients housed in ad seg telling us that they are considering suicide. In one such case, reported to the Department's Coleman Project Team in July, the inmate had been housed in ad seg for nearly sixteen months, and reported having begged the ICC to be moved. Nor is this an isolated case: in monthly Health Care Services Documents provided to the Coleman Special Master and plaintiffs' counsel, there are numerous examples of mentally ill prisoners housed for many months in the in ad seg units throughout the CDCR.

In light of such cases, the end result, should the emergency regulation remain in effect, is all too easy to predict: longer stays in ad seg and the possibility of more suicides by inmates who fall through the cracks in ad seg without monthly review of their cases by ICC, which includes clinical input by their case manager.

California Department of Corrections
August 30, 2005
Page 6

We leave you with an example of what we believe will happen more often with less frequent review. On March 3, 2004, an inmate committed suicide, hanging himself in his cell in the Ad Seg unit at Avenal State Prison. He had been housed in Ad Seg for 446 days at the time of his death. The delay in his transfer to a higher security prison was identified as a problem in the CDCR's suicide review, as well as the failure to identify his decompensation in the Ad Seg unit. The inmate was approved several times for a 180-day Ad Seg extension while his disciplinary and classification issues were resolved. Unfortunately there was no regular 30 day ICC review of his case. We believe that a regular ICC review of this inmate's case might have prevented this long stay in Ad Seg and quite possibly have caught his mental health decompensation within the unit. In fact, during the last scheduled ICC in January 2004, the inmate refused to appear and his case was referred to the CSR for an additional 180-day Ad Seg extension. He was described in the CDCR Suicide Review as increasing withdrawn and isolative, not going out to yard, and had a history of attempted suicide by hanging.

The decision to review inmates housed in Ad Seg in ICC every 30 days provides a necessary safeguard within a system that houses mentally ill inmates in the harsh environment of Ad Seg for long periods of time without regard for the known suicide risk posed by these locked units.

Given the overwhelming probability that the number of such tragedies will increase if decreased frequency of ICC review remains in effect, the Department's unsupported argument that this change is necessary due to increased workload is clearly insufficient.

<u>Conclusion</u>

The proposed emergency regulation is inadequate on two grounds: First, as described above, lessening the frequency of ICC review of placements in segregated housing is inconsistent with the Department's obligations, under <u>Coleman</u>, to ensure that mentally ill inmates are placed appropriately and receive the care they need. Second, in light of the great harm that will result from the change, the Department has completely failed to show that the change is necessary. For these reasons, we respectfully suggest that the proposed changes not be adopted, and that the Department instead reinstate the previous language of Title 15, Section 3335.

Sincerely yours,
ROSEN, BIEN & ASARO, LLP

By: Jane Kahn

California Department of Corrections
August 30, 2005
Page 7

cc:    J. Michael Keating
       Matthew A. Lopes, Jr.
       Lisa A. Tillman
       Michael Stone



JUN - 6 1994

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, WINIFRED WILLIAMS
DAVID HEROUX, DAVID McKAY, ROY
JOSEPH, and all others similarly
situated,

     Plaintiffs,     No. CIV S-90-0520 LKK JFM P
  vs.

PETE WILSON, Governor of the State
of California, JOSEPH SANDOVAL,
Secretary of Youth and Corrections
Agency, JAMES GOMEZ, Director of
the California Department of
Corrections, NADIM KHOURY, M.D.,
Assistant Deputy Director for
Medical Services, JOHN S. ZIL, M.D.,
Chief, Psychiatric Services,

     Defendants.    <u>FINDINGS AND RECOMMENDATIONS</u>
_____/

    Plaintiffs are state prisoners proceeding with this class

action challenge to the delivery of mental health care at most

institutions within the California Department of Corrections.

Plaintiffs raise claims under 42 U.S.C. § 1983 based on alleged

violations of the Eighth and Fourteenth Amendments to the United

States Constitution and under the Rehabilitation Act, 29 U.S.C.

§ 794.

AO 72
(Rev.8/82)

> [o]f these, at least seven were actively
> psychotic and urgently in need of acute
> hospital treatment. Nine others suffered
> serious psychopathological reactions to SHU
> confinement, including in several cases a
> history of periods of psychotic
> disorganization. Of the remaining eight, five
> gave a history of psychiatric problems not
> clearly exacerbated by SHU, two others appeared
> to be free of psychiatric difficulties, and in
> one a language barrier prevented adequate
> evaluation. I also interviewed two inmates in
> general population who had a history of prior
> SHU incarceration. Both had a history of
> psychotic disorders which were significantly
> worsened during their past incarceration in
> SHU.

(Id. at 17-18.) Dr. Grassian testified that seven inmates he interviewed were too ill to discuss whether housing in SHU had exacerbated their illness, though it appeared that it had. (Id. at 33.) Nine others, however, had developed psychiatric problems while in SHU that were "strikingly consistent" with the group of symptoms described earlier. (Id.) Dr. Grassian also testified that while the acute symptoms experienced by these individuals would likely subside upon release from SHU, "many of these inmates will likely suffer permanent harm as a result of their confinement in SHU." (Id. at 43.)

Defendants and their employees recognize the danger to mentally ill inmates from housing in segregated housing units, particularly Pelican Bay SHU. (See RT, March 29, 1993, at 14-77; Grassian Declaration at 44 (discussing deposition testimony of Dr. Zil).) Nonetheless, defendants continue to house mentally ill inmates in these units. Defendants' use of administrative segregation and segregated housing at Pelican Bay SHU and statewide

to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing.

Inmates who act out are also subjected to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition.

The Department of Corrections calls tasers and 37mm guns "non-lethal weapons." (Kaufman Declaration at 159.) Both are projectile-type weapons. A taser is a weapon that fires a needle-like dart attached to a wire through which the victim receives an electric shock. (Id.) The 37mm gas gun is used to fire rubber bullets or wooden blocks. (Id.)

Dr. Kaufman cited fourteen examples of mentally ill patients who were tasered and/or shot with the 37mm gun. Each confrontation commenced with a conflict between inmates or between and inmate and staff. In each situation, Dr. Kaufman testified, custody staff escalated the conflict by demanding compliance to orders. When the inmate refused to comply, the staff (custody and medical) suited up in gloves, masks, goggles and raincoat-like suits. (Kaufman Declaration at 162.) If it was deemed necessary (and typically it was) to physically remove the inmate from his

system shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

10.  Within sixty (60) days of the order of the district court, defendants shall develop and implement a protocol, as well as any contractual arrangement that may be necessary, to guarantee prompt access to inpatient psychiatric hospitalization for every class member in need of such hospitalization.  Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

11.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a protocol to govern placement and retention of mentally ill inmates in any administrative segregation or segregated housing unit, and to govern care of any mentally ill inmate who is so housed.  Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

12.  Within ninety (90) days of the order of the district court, defendants shall develop and implement protocols to govern use or non-use of tasers, 37mm guns, mechanical restraints, involuntary medication and other measures on class members.  Said protocols shall specifically address coordination and consultation between mental health staff and custody staff and, in the case of involuntary medications, use of federal due process protections.

AO 72
(Rev 8/82)