| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER Bar No.: 83925<br>STEVEN FAMA Bar No.: 99641<br>E. IVAN TRUJILLO, Bar No.: 228790<br>General Delivery<br>San Quentin, California 94964<br>Telephone: (415) 457-9144 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE Bar No.: 53588<br>Three Embarcadero Center<br>San Francisco, California 94111<br>Telephone: (415) 393-2000 |
| ROSEN, BIEN & ASARO, LLP<br>MICHAEL W. BIEN Bar No.: 096891<br>JANE E. KAHN Bar No.: 112239<br>LORI RIFKIN, Bar No.: 244081<br>155 Montgomery Street, 8th Floor<br>San Francisco, California 94104<br>Telephone: (415) 433-6830 | HELLER, EHRMAN, WHITE & McAULIFFE<br>RICHARD L. GOFF Bar No.: 36377<br>701 Fifth Avenue<br>Seattle, Washington 98104<br>Telephone: (206) 447-0900 |
| THE LEGAL AID SOCIETY – EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER Bar No.: 158255<br>LEWIS BOSSING Bar No.: 227402<br>600 Harrison Street, Suite 120<br>San Francisco, CA 94107<br>Telephone: (415) 864-8848 | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF LINDSAY M. HAYES IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS** |

I, Lindsay M. Hayes, do hereby declare under penalty of perjury as follows:

1. I am an expert in the area of suicide prevention in jails and prisons. On June 8, 2006, the Court ordered defendants to develop a plan to address the escalating percentage of suicides in the administrative segregation units and directed defendants to collaborate with "plaintiffs' expert, Lindsay Hayes." 6/8/06 Order ¶ 3. I participated in the expert panel meeting that occurred on July 14, 2006, and in two subsequent telephone conferences concerning the development of defendants' plan. I make this declaration in support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units. I have personal knowledge of the matters stated herein and if called upon as a witness I could and would be able to competently so testify.

## BACKGROUND AND EXPERIENCE

2. I have a Masters of Science in the Administration of Justice from the American University in Washington, D.C. My primary area of expertise is suicide prevention in correctional settings. I currently serve as the project director of the National Center on Institutions and Alternatives. I am also a technical assistance consultant with the National Institute of Corrections (NIC), a part of the U.S. Department of Justice, in the area of jail and prison suicide prevention. In addition, I am the Project Director and Editor of the *Jail Suicide/Mental Health Update,* a quarterly newsletter published by the U.S. Justice Department (National Institute of Corrections).

3. I have also served, and continue to serve, as a technical assistance consultant to the Special Litigation Section of the U.S. Justice Department's Civil Rights Division in numerous investigations of suicides and general conditions of confinement within jails, prisons and juvenile facilities throughout the country.

4. I have written extensively in the area of suicide prevention in correctional facilities. A complete list of my publications is set forth in my curriculum vitae, a true and correct copy of which is attached hereto as Exhibit A.

5. I have served as an expert witness in other prison and jail suicide cases. I have served and am presently serving as a suicide prevention expert for the State of New York in the

case, *Disability Advocates, Inc. v. New York State Office of Mental Health*, USDC, Southern District of New York Case No. 02-CIV-4002. I have also served as the Juvenile Suicide Prevention Expert to the Special Master in *Jerry M. v. District of Columbia, et al*, between 1989 and the present. I served as the Jail Suicide Prevention Expert to the Special Master in *Campbell v. McGruder, et al* (District of Columbia) between 1994 to 1997. I was the Principal Investigator for the Evaluation of Suicide Prevention Policies and Practices at Bridgewater State Hospital, Massachusetts in 2000. I have also provided Suicide Prevention Services (staff training, program assessment/development and litigation consultation) to a variety of organizations and jurisdictions in the following states: Alabama, Alaska, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Texas, Vermont, Virginia, Washington (State), West Virginia, Wisconsin and Wyoming. A complete list of my professional experience and education is set forth in my curriculum vitae, a true and accurate copy of which is attached hereto as Exhibit A.

**GENERAL OPINIONS**

6. I have been asked by counsel for plaintiffs in this matter to act as a consultant and expert witness on the adequacy of the Defendants' Plan To Address Suicide Trends in Administrative Segregation Units, 10/2/06 ("Defs' Plan"), which was filed in response to the Court's June 8, 2006 Order. I participated in the July 14, 2006 meeting of the expert panel in San Francisco, California pursuant to the June 8, 2006 Order requiring that defendants collaborate with "plaintiffs' expert, Lindsay Hayes." 6/8/06 Order, ¶3. I then participated in a teleconference held on September 20, 2006, with defendants' counsel, CDCR officials, Special Master Keating and his experts, and plaintiffs' counsel to discuss Defendants' Draft Administrative Segregation Unit Suicide Prevention Plan ("Draft Plan"). I also participated in a teleconference held on October 18, 2006, with defendants' counsel, CDCR officials, Special

Master Keating and his experts, and plaintiffs' counsel to discuss our concerns with defendants' October 2, 2006 Plan.

7. In my capacity as consultant and expert witness on the adequacy of Defendants' Plan I have reviewed the Plan, as well as the Draft Administrative Segregation Unit Suicide Prevention Plan ("Draft Plan") provided to the Special Master and plaintiffs' counsel on September 5, 2006. Attached as Ex. B, Declaration of Jane E. Kahn in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Kahn Dec.") I have also reviewed the Special Master's Report on Suicides Completed in California Department of Corrections in Calendar Year 2003, filed on April 28, 2004, and the Special Master's Report on Suicides Completed in the California Department of Corrections in Calendar Year 2004, filed on May 9, 2006. I have reviewed the Defendants' Annual Suicide Report for 2005. Attached as Exhibit A, Declaration of Lori Rifkin in Support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units ("Rifkin Dec."). I have reviewed Defendants' 2004 Annual Suicide Report, a true and correct copy attached as Exhibit B, Rifkin Dec. I have reviewed Defendants' Revised Program Guide filed on February 3, 2006, including Chapters 7 (Administrative Segregation) and 10 (Suicide Prevention and Response). Finally, I have reviewed numerous Suicide Reports prepared by CDCR, including suicides that have occurred within administrative segregation units. These annual and individual reports illustrate the urgent need to implement the expert panel's recommendations.

8. I participated in the July 14, 2006 meeting of the experts in San Francisco during which time expert participants, CDCR employees, and attorneys discussed recommendations for reducing the high rate of suicides in the administrative segregation units within CDCR. It is my opinion that the recommendations unanimously endorsed by the expert panel were reasonable and cognizant of the pressures faced by CDCR, even though the expert panel did not adopt all of the recommendations made by myself or plaintiffs' counsel. For example, while all of the experts acknowledged the suicide risks created by locking down inmates for long periods of time in isolation, the recommendation to provide out of cell time only required

1   CDCR to provide inmates with the minimum out of cell time that California state law already
2   mandates (ten hours a week of yard plus three showers) rather than plaintiffs' recommendation
3   of increased out of cell time.  Similarly, although the CDCR was ordered in 2005 to develop a
4   plan to address the hazards of large-mesh ventilation screens in all administrative segregation
5   cells where mentally ill inmates are housed, the expert panel only recommended removing
6   these hazardous large-mesh screens in the Intake Unit cells.  Defendants' rejection of several
7   of the unanimous recommendations of the expert panel, and the delayed implementation of
8   other recommendations, is, in my opinion, unacceptable.  Defendants have failed to address
9   these reasonable recommendations with the type of serious planning, budgeting and expedited
10  implementation that CDCR's extraordinary suicide rates demand.

## THIRTY MINUTE WELFARE CHECKS

12      9.      During the July 14, 2006 expert meeting, thirty minute Welfare Checks were
13  discussed.  Although the expert panel agreed that the thirty minute Welfare Checks reflected
14  national standards and practices, Deputy Warden Teresa Schwartz stated that the CDCR would
15  be unable to provide thirty minute Welfare Checks due to insufficient staffing resources.  A
16  Welfare Check is a "living and breathing" check, that involves a cell-front observation by an
17  officer who stands at the cell-door long enough to see some movement on the inmate that
18  indicates that he or she is alive (i.e. head, chest, leg movement). It is a staple of any meaningful
19  suicide prevention program and it will save lives in administrative segregation units because
20  thirty minute Welfare Checks increase the likelihood of an opportunity for an emergency
21  response to a suicide in progress and because they increase staff contact with inmates housed
22  in these isolated units.  The other experts agreed and endorsed this recommendation during the
23  July 14, 2006 meeting.

24      10.     The American Correctional Association Standard 4-4257 for Welfare Checks
25  was adopted in 1983, and requires that all inmates in administrative segregation/detention units
26  be personally observed by a correctional officer at least every 30 minutes at an irregular
27  schedule.  It is my understanding that this standard was adopted by the American Correctional
28  Association because of the realization that inmates housed in these locked units are at greater

1  risk of suicide, mental health and medical problems and other security issues. The majority of
2  state departments of correction throughout the country, as well as the Federal Bureau of
3  Prisons, have implemented and maintained policies regarding thirty minute Welfare Checks in
4  their respective prison systems.

5       11.   I reviewed suicide reports prepared by the CDCR and provided to plaintiffs'
6  counsel and the Special Master.  A number of these deaths may have been prevented if thirty
7  minute Welfare Checks had been provided in these housing units rather than the current
8  inadequate custody rounding provided by CDCR.  In each of the cases described below, the
9  inmate was dead for many hours when discovered by officers which prevented any type of
10 emergency response.  It is my opinion that providing thirty minute Welfare Checks in these
11 housing units would have significantly reduced the likelihood of these "mishaps"  and should
12 be required by the Court to reduce the rate of suicide in these units.  Here are some examples:
13 On June 11, 2005, an officer doing a security check in the administrative segregation unit of
14 the reception center at R.J. Donovan State Prison Reception Center noted that a "dummy", not
15 an inmate, was in the cell but during a later custody check found that it was an inmate in the
16 cell and he was hanging dead.  On June 9, 2005, at San Quentin State Prison in the
17 administrative segregation unit, an inmate was found hanging during security checks of
18 administrative segregation and the CDCR Suicide Report concluded, based upon his body
19 temperature, that he had likely been dead for hours.  On  September 2, 2005, an inmate in the
20 condemned unit at San Quentin State Prison was found non-responsive by officers during the
21 process of conducting the shower program, and in an attempt to hand-cuff him the officers
22 reported that his arms were too stiff to be moved (indicating that he had been dead for some
23 time).  Finally, on March 28, 2006, during a security check an inmate was discovered lying
24 face down on the cell floor in administrative segregation at Kern Valley State Prison with his
25 left leg bent at the knee to an approximate 90-degree angle and raised toward his torso --
26 officers noted that he was so stiff that his left leg would not extend or straighten.  The CDCR
27 Suicide Report for this inmate concluded that he may have been dead during several security
28 counts.

12. I participated in the phone conference on September 20, 2006, to discuss defendants' Draft Plan. Despite the fact that thirty minute Welfare Checks had been carefully discussed during the meeting on July 14, 2006, defendants rejected the recommendation for Welfare Checks because they stated that they said they did not understand what they were. Draft Plan at 9. During the September 20, 2006 phone conference, the term Welfare Check was again defined for defendants by Dr. Ray Patterson, one of the Special Master's experts, and by me. The Special Master's experts, Dr. Metzner and Dr. Patterson, confirmed that thirty minute Welfare Checks were the national standard. John Dovey, Director of Adult Institutions, reported that CDCR was not even providing hourly security checks (which differ from Welfare Checks in that they are focused on the unit as a whole to ensure, for example, that doors are locked) during all of the shifts. Defendants made no commitment to provide Welfare Checks.

13. I participated in a follow-up phone conference requested by plaintiffs' counsel on October 18, 2006, to discuss plaintiffs' objections to Defendants' Plan to Address Suicide Trends in Administrative Segregation Units filed with this Court on October 2, 2006. During this phone conference, John Dovey, Director of Adult Divisions, again stated that the CDCR does not provide thirty minute Welfare Checks or even security checks hourly in the administrative segregation units. Mr. Dovey indicated that he would direct all CDCR institutions to further explore the matter and implement thirty minute Welfare Checks if CDCR had sufficient resources to do so. Dr. Patterson and I recommended that CDCR implement thirty minute Welfare Checks immediately as an interim measure for inmates who are newly admitted to administrative segregation units during their first several weeks in the units. In addition, the practice of thirty minute Welfare Checks for all inmates housed in administrative segregation units should be fully implemented once CDCR has requested the emergency resources necessary to implement these life-saving rounds.

14. It is my opinion that implementing thirty minute Welfare Checks in administrative segregation units in CDCR will save lives. CDCR should immediately implement thirty minute Welfare Checks for all newly admitted inmates during their first weeks in administrative segregation units. CDCR should seek emergency funding to enable

them to fully implement this standard system-wide for all inmates housed in administrative segregation units as soon as possible.  **It is my opinion that the initiation of thirty minute Welfare Checks is a prerequisite for any effective suicide prevention plan that CDCR develops.  Any remedial plans developed to reduce the high suicide rate within CDCR administrative segregation units will be meaningless unless they include a commitment by defendants to implement thirty minute Welfare Checks.**

### INTAKE UNIT AND PRE-PLACEMENT SUICIDE RISK SCREENING

15.     Defendants' Plan delays the initiation of the retrofitting of any of the Intake Cells in the administrative segregation units, a critical recommendation by the expert panel, until 2007/2008 and the completion of the process until <u>2011</u>.  Defs' Plan at 10-11.  The Plan also delays implementation of the recommended suicide risk screening that will occur before an inmate is placed into administrative segregation until June 2007, a year from the Court's order.  Defs' Plan at 13.  The Plan also does not include a provision for determining whether the inmate had a prior history of suicidal behavior within the CDCR.  The CDCR's own research indicates a strong relationship between suicide in administrative segregation and prior suicidal behavior.  Inmates are currently placed in administrative segregation without being screened for suicide risk despite the high incidence of suicide within these housing units.   The pre-placement suicide risk screening was recommended by the expert panel because it will help identify high risk inmates before they are placed in the units and thereby help reduce suicides.  Expediting the retrofitting the Intake Units will save lives because inmates newly admitted to administrative segregation will be placed in these cell that have no "anchors" for hanging and better visibility for observation.  In my opinion, the unreasonable and unnecessary delay in implementing both of these critical recommendations by the expert panel will cost lives.

### OUT OF CELL TIME AND PROPERTY FOR NON-DISCIPLINARY INMATES

16.     The expert panel recommended that CDCR provide inmates housed in administrative segregation with the minimum required out of cell time in recognition of the benefits provided by the opportunity to be outside and interacting with other inmates.  Out of cell activities reduce isolation and seclusion and provide some activity in administrative

segregation units where isolation, seclusion and the lack of activity can lead to depression and even suicide. Defendants' Plan identifies a significant shortage of administrative segregation yards but fails to request funding to construct these necessary yards. It is my opinion that Defendants' Plan to provide inmates in administrative segregation with their required out of cell time must be modified and expedited by defendants.

17. The expert panel recommended that CDCR provide inmates housed in administrative segregation for non-disciplinary reasons with some of their property. In my own review of the defendants' suicide reports, I have noted that a significant number of the inmates committing suicide in administrative segregation were housed there for non-disciplinary reasons. For example, in 2005, according to defendants' own suicide report, more than half of the inmates who committed suicide in administrative segregation were housed there for non-disciplinary reasons. Defendants have implemented a Pilot Program at Pelican Bay State Prison in their administrative segregation unit where they provide additional property to mental health inmates housed in the unit for non-disciplinary reasons to prevent decompensation while they wait to transfer. It is my opinion that the expert panel's recommendation to provide property to non-disciplinary inmates in administrative segregation addresses the same concern and should be implemented by defendants because it will help prevent decompensation and save lives.

18. In sum, it would be my opinion that the high rate and incidence of inmate suicide in California's administrative segregation units will not be reduced until the CDCR is required to implement and maintain thirty minute Welfare Checks, provide non-disciplinary inmates in administrative segregation with some property, and expedite the other elements of their plan including the retrofitting of the Intake Units, implementation of the pre-placement suicide risk screening (to include a determination as to whether the inmate had a prior history of suicidal behavior within the CDCR), and the provision of minimum required out of cell time for all inmates housed in these units.

//

//

The foregoing is based upon my own personal knowledge, except where stated to be based upon information and belief. If called upon to do so, I could and would so testify.

I declare under penalty of perjury this 26th day of October 2006 in that the foregoing is true and correct.

*/s/ Lindsay M. Hayes*
Lindsay M. Hayes