1  PRISON LAW OFFICE
   DONALD SPECTER Bar No.: 83925
2  STEVEN FAMA Bar No.: 99641
   E. IVAN TRUJILLO Bar No.: 228790
3  General Delivery
   San Quentin, California  94964
4  Telephone: (415) 457-9144

5  ROSEN, BIEN & ASARO, LLP
   MICHAEL W. BIEN Bar No.: 096891
6  JANE E. KAHN Bar No.: 112239
   LORI RIFKIN Bar No.: 244081
7  155 Montgomery Street, 8th Floor
   San Francisco, California  94104
8  Telephone: (415) 433-6830

9  THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
10 CLAUDIA CENTER Bar No.: 158255
   LEWIS BOSSING Bar No.: 227402
11 600 Harrison Street, Suite 120
   San Francisco, CA  94107
12 Telephone:  (415) 864-8848

   BINGHAM, McCUTCHEN, LLP
   WARREN E. GEORGE Bar No.: 53588
   Three Embarcadero Center
   San Francisco, California  94111
   Telephone: (415) 393-2000

   HELLER, EHRMAN, WHITE &
   McAULIFFE
   RICHARD L. GOFF Bar No.: 36377
   701 Fifth Avenue
   Seattle, Washington  98104
   Telephone: (206) 447-0900

13

14  Attorneys for Plaintiffs

15                  UNITED STATES DISTRICT COURT

16                  EASTERN DISTRICT OF CALIFORNIA

17

18  RALPH COLEMAN,                        )  No.:  Civ S 90-0520 LKK-JFM
                                          )
19        Plaintiffs,                     )  **DECLARATION OF WALTER L.**
                                          )  **KAUTZKY IN SUPPORT OF**
20  vs.                                   )  **PLAINTIFFS' OBJECTIONS TO**
                                          )  **DEFENDANTS' PLAN TO ADDRESS**
21  ARNOLD SCHWARZENEGGER, et al.,        )  **SUICIDE TRENDS IN**
                                          )  **ADMINISTRATIVE SEGREGATION**
22        Defendants                      )  **UNITS**
                                          )
23

24        I, Walter L. Kautzky, do hereby declare:

25        1.      I am a criminal justice consultant in matters related to the operation and

26  management of jails and prisons and have expertise in the areas of safety and security in

27  prisons.  I have been asked by counsel for plaintiffs in this matter to act as a consultant and

28  expert witness on the adequacy of the Defendants' Plan to Address Suicide Trends in

1 Administrative Segregation Units, dated 10/2/06 ("Defs' Plan").  I make this declaration in

2 support of Plaintiffs' Objections to Defendants' Plan to Address Suicide Trends in

3 Administrative Segregation Units filed in response to the Court's June 8, 2006 Order.  I have

4 personal knowledge of the matters stated herein and if called upon as a witness, I could and

5 would be able to competently so testify.

6 **BACKGROUND AND EXPERIENCE**

7       2.      I have a Bachelor Degree in Psychology and Sociology from Regis College in

8 Denver, Colorado, and a Master of Science Degree in Criminal Psychology from Florida State

9 University.  I have worked in criminal justice and corrections for nearly forty (40) years with

10 experience in all aspects of correctional operations and administration.  In my administrative

11 and consultant duties, I have evaluated prison operations and inspected prisons,  including

12 administrative segregation units in California, Colorado, Florida, Hawaii, Illinois, North

13 Carolina, Ohio, Oregon, Massachusetts, Pennsylvania, Texas and Washington.

14       3.      I have been a member of the American Correctional Association ("ACA") for

15 over thirty (30) years and serve as a member of a Bureau of Justice Statistics team researching

16 best practices in eliminating prison sexual assault.

17       4.      I have been Director and Deputy Director of several state correctional systems,

18 including North Carolina Department of Corrections (March 1971 through December 1981 and

19 March 1992 though March 1997), Washington Department of Corrections (January 1982

20 through November 1987), and Iowa Department of Corrections (July 1997 through January

21 2003).  I  also served as Special Master to Governor John Waihee for the Hawaii Department

22 of Public Safety from 1989 to 1990 and assisted the Governor with the implementation of

23 operational improvements ordered in Hawaii's jail and correctional facilities.  A true and

24 correct copy of my curriculum vitae is attached hereto as Exhibit A.

25       5.      I am a criminal justice consultant in matters related to the operation and

26 management of jails and prisons and have expertise in the area of safety and security within

27 prisons. I have served as an expert witness in various jail and prison cases.  A true and correct

28 list of my expert witness cases is attached hereto as Exhibit B.

DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE
TRENDS IN ADMINISTRATIVE SEGREGATION UNITS, NO.:  CIV S 90-0520 LKK-JFM

6.      I have been asked by counsel for plaintiffs in this matter to act as a consultant and expert witness on the adequacy of the Defendants' Plan to Address Suicide Trends in Administrative Segregation Units, dated 10/2/06 (Defs' Plan"). In that capacity I have reviewed documents produced by defendants concerning suicides in administrative segregation units. These documents include the Defendants' Plan, the Defendants' Draft Plan to Address Suicide Trends in Administrative Segregation Units ("Draft Plan"), and the Revised Program Guide, Chapter Seven, Administrative Segregation, and Chapter Ten, Suicide Prevention, filed 2/3/06. From my review of Defendants' Plan, the Draft Plan, and my discussions with plaintiffs' counsel, I understand that an expert panel met on July 14, 2006, and made recommendations to defendants for inclusion in their plan for reducing the high rate of suicides within their administrative segregation units.

## THIRTY (30) MINUTE WELFARE CHECKS

7.      Defendants' Plan fails to adopt the expert panel's recommendation that defendants should provide thirty (30) minute Welfare Checks in all administrative segregation units. The American Correctional Association ("ACA") standard 4-4257 for Welfare Checks, requires that all inmates in administrative segregation units shall be personally observed by a correctional officer at least every 30 minutes at an irregular schedule.

8.      I personally utilized this Welfare Check standard in various systems where I was responsible for administration of the administrative segregation units. In North Carolina, Washington State, Colorado and Iowa, I required trained correctional officers assigned to administrative segregation units to observe inmates at irregular intervals not to exceed thirty (30) minutes. The 30 minute Welfare Checks proved to be critically important to maintaining safe and secure administrative segregation units and allowed correctional officers to more rapidly identify the security and treatment needs of inmates in the units. Frequently officers advised me that the 30 minute Welfare Checks allowed them to gauge the inmate's adjustment to conditions in the administrative segregation units and allowed them to identify problems before they escalated. Correctional officers managing the segregation unit typically did not know the behavioral problems presented by the inmates in the unit, especially those newly

-3-

admitted.  In many instances, correctional staff in mainline housing removed a mentally ill or unstable inmate from the cell block to administrative segregation to stabilize the housing unit.  In other instances, correctional officers transfer an inmate to administrative segregation to protect a vulnerable inmate.  For all of these reasons, frequent monitoring is critical in these units.

9.  In every correctional system where I was responsible for the operation of administrative segregation units, I would return periodically to the units at odd and often late hours, and ask the officers to review their documentation of the 30 minute Welfare Checks.  I did so because I wanted the officers to know that I considered the 30 minute Welfare Checks to be an essential part of the observation and control process, as well as a requirement in the officer's post orders in the segregation units.  The 30 minute Welfare Checks reduced the potential for inmates to harm themselves, injure staff or other inmates, or damage state property by flooding the cell or setting fire to the cell contents.  As a result of the 30 minute Welfare Checks in the administrative segregation units that I supervised, there were no successful suicide attempts, and several inmates who attempted suicide were rescued before serious injury or death.  The checks also enabled correctional officers to be contributing members of the unit team managing the administrative segregation unit, which often included unit managers, nurses, and mental health professionals.

10.  The ACA adopted the 30 minute Welfare Checks in 1983 and it is my understanding that many correctional systems have implemented this standard of care.  It is my recommendation that CDCR, which has a significant suicide rate within its administrative segregation units, should immediately implement 30 minute Welfare Checks in all of its administrative segregation units.

### EXPEDITING THE INTAKE CELL RETROFIT/ADMINISTRATIVE SEGREGATION SMALL MANAGEMENT YARDS

11.  The proposed schedule for retrofitting the Intake Cells in Defendants' Plan fails to reflect the sense of urgency and value placed on the Intake Cells by the expert panel in their own recommendations.  I have experience with prison design and construction and I have

-4-

1   reviewed the proposed changes to the Intake Cells.  It is my opinion that the modifications do

2   not require the extensive timeframe proposed.  The modifications to the Intake Cells are not

3   highly complex structural changes requiring electrical and plumbing modifications that involve

4   extensive design and construction work. The changes to the cell doors, which will improve the

5   officers' ability to see into the cell, can be accomplished quickly once the doors are obtained.

6   Covering or replacing the large mesh ventilation screens can also be accomplished far more

7   rapidly than defendants propose in their Plan.

8          12.  Defendants' Plan also identifies a shortage of 441 Small Management Yards that

9   need to be funded and constructed before inmates housed in administrative segregation units

10  can be provided with their mandated out of cell yard time.  Defs' Plan at 12.  Again,

11  defendants fail to acknowledge the crisis of suicide within their administrative segregation

12  units and fail to request the necessary funds to proceed with construction of these Yards to

13  enable inmates housed in these units to have out of cell time.  Construction of these Small

14  Management Yards can be quickly accomplished if the necessary resources are requested.

15         13.    While I was working with the Colorado Department of Corrections in 1987-

16  1989,  I met with CDCR design administrators.  I strongly recommended that Colorado

17  implement CDCR design/build strategy in Colorado.  CDCR design/build strategies allow

18  CDCR to subcontract with a number of design firms who phase the work by general

19  contractors at the same time they are constructing buildings.  This strategy could be employed

20  to more rapidly design and construct the changes required for the seven different types of

21  administrative segregation units identified in the Defendants' Plan.  Most states allow agencies

22  latitude in responding to emergencies by requesting emergency funds or by delaying or

23  adjusting other projects where funds have not or will not be spent.  In the correctional systems

24  where I have worked, CDCR's high suicide rate would be a sufficient reason to exercise

25  emergency authority to obtain special funding to retrofit the Intake Units and build the

26  necessary Small Management Yards.

27         //

28         //

DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE
TRENDS IN ADMINISTRATIVE SEGREGATION UNITS, NO.:  CIV S 90-0520 LKK-JFM

## ADDITIONAL PROPERTY/SEPARATE HOUSING FOR
## NON-DISCIPLINARY INMATES IN ADMINISTRATIVE SEGREGATION

14.    Unlike many other correctional systems, CDCR does not house inmates placed in segregation for non-disciplinary reasons separately or provide them with any additional property while they are housed in administrative segregation.  The Federal Bureau of Prisons, and Ohio, Florida, Illinois, Colorado, Iowa, and Michigan Departments of Corrections are just a few systems that I am familiar with where inmates placed in administrative segregation for non-disciplinary reasons are provided with some of their personal property.  CDCR can obtain guidance from these correctional systems in implementing the expert panel's recommendation if needed.

15.    I personally have experience with creating units for inmates placed in administrative segregation for non-disciplinary reasons in Washington State, Iowa and Colorado when I was Director.   I was able to safely implement this system of providing personal property to non-disciplinary inmates placed in administrative segregation and it is my opinion that these inmates adjusted better to these units because they retained some of their personal property.  For the most part, the personal property that an inmate retains incorporates the controlled remnants of his or her identity in prison.  Particularly for mentally ill or other vulnerable inmates who may struggle to stay grounded in reality, personal property can be useful in stabilizing the inmate to the extent that conditions of confinement allow.  To unduly restrict personal property items that do not present a security or safety problem for mentally ill or vulnerable inmates may contribute to further destabilization and even suicide.

16.    Furthermore, I recognized that these inmates were not placed in administrative segregation for any disciplinary reason and, thus, it was important to ensure that their housing and other conditions of confinement were similar to the conditions in mainline housing.  I directed that these inmates should be allowed reasonable amounts of their personal property that they would otherwise have in the regular population.

17.    The security threat from property has been significantly diminished with the increasing availability of clear plastic covers for electronic devices as well as personal hygiene

-6-

items.  In Iowa and other states, I required that all personal radios, televisions, electronic devices and personal hygiene items be covered in clear plastic that provides immediate "see through" security.  The availability of clear plastic and the prohibition of security items such as batteries, beard trimmers or other items that can be made into weapons, allows correctional officers to provide personal property to inmates placed in administrative segregation for non-disciplinary reasons.

18.    I have reviewed the list of CDCR's security concerns in Defendants' Plan to Address Suicide Trends in Administrative Segregation Units.  Defs' Plan at 15.  Defendants' reasons include the following:

(a)  Providing non-disciplinary inmates with more property may lead to stigmatization, possible retribution, and could identify these inmates as being confidential informants or as needing special protection from general population inmates;

(b)  Separating inmates within the housing unit might work short-term, but the demands for bed space would result in the populations being housed in proximity to one another;

(c). Due to the housing crisis, separating non-disciplinary and disciplinary inmates is unreasonable as it would reduce bed space available;

(d)  The reasons inmates are placed in administrative segregation are not always simply non-disciplinary or disciplinary since an inmate might have safety concerns because he or she failed to participate in gang activity that is unlawful. *Id*.

19.  It is my opinion that these are unsubstantiated and unwarranted safety concerns that should not preclude CDCR from implementing the expert panel's recommendation to provide inmates in administrative segregation for non-disciplinary reasons with some of their property.  First, inmates are placed in administrative segregation for a variety of non-disciplinary reasons that do not include being a confidential informant and providing them with property would not place them at risk.  (i.e. enemy concerns on the yard and awaiting transfer; allegations of staff misconduct and on-going investigation; EOP inmates awaiting placement in the Mule Creek Level IV SNY Yard).  In my own experience I have not found that providing property to non-disciplinary inmates has placed them at risk by revealing their status or by subjecting them to

-7-

victimization.  I have found that administrative segregation units operate like small densely populated, ethnically diverse neighborhoods where inmates are often the first to know why other inmates have been placed in the unit, oftentimes with much greater accuracy than staff. In my experience, providing property to inmates placed in administrative segregation for non-disciplinary reasons (some of whom may experience significant stress levels) often stabilized these inmates. Second, although defendants' concern over managing their beds in administrative segregation is real, they are currently housing disciplinary and non-disciplinary inmates together in these units and could separate cellblocks or hallways with partitions, as I did in both Colorado and Iowa, to control the flow of inmates if they are concerned over housing the inmates together.  It is my understanding that CDCR provides inmates in locked housing units in both the Security Housing Units and the Psychiatric Housing Units with different levels of property. Thus, CDCR has experience with mixing these populations in locked housing units.  Furthermore, defendants acknowledge that they are currently running a program in the administrative segregation unit at Pelican Bay State Prison, a Level IV high security prison, where inmates placed in the unit for non-disciplinary reasons are provided additional property.  Third, defendants' concern that some inmates placed in administrative segregation for their safety may have created their own safety concerns because of their behavior (i.e. been a gang member but refused to obey an order) ignores the fact that these inmates have not been charged with a rules violation when placed in administrative segregation for his or her own safety.  In the administrative segregation units that I managed during my own correctional career, I ensured that inmates placed in administrative segregation for non-disciplinary reasons had reasonable amounts of their property because they had not been charged with a disciplinary infraction.  It is my opinion, based upon my own experience providing inmates placed in administrative segregation for non-disciplinary reasons with their personal property and based upon my review of other correctional systems that provide property to inmates placed in administrative segregation for non-disciplinary reasons, that CDCR can adequately address their safety and security concerns while providing inmates housed in administrative segregation for non-disciplinary reasons with personal property.

-8-

1      20.    In my opinion, CDCR should amend their Plan to Address Suicide Trends in

2  Administrative Segregation Units and expedite the retrofitting of the Intake Cells and

3  construction of the Small Management Yards, immediately implement the 30 minute Welfare

4  Checks in all of the administrative segregation units, and allow increased personal property for

5  inmates on non-disciplinary status in the administrative segregation units as critical first steps

6  to reducing the high incidence of suicide in CDCR's locked units.

7      //

8      //

9      //

10     //

11     //

12     //

13     //

14     //

15     //

16     //

17     //

18     //

19     //

20     //

21     //

22     //

23     //

24     //

25     //

26     //

27     //

28     //

DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE
TRENDS IN ADMINISTRATIVE SEGREGATION UNITS, NO.:  CIV S 90-0520 LKK-JFM

1  The foregoing is based upon my own personal knowledge, except where stated to be

2  based upon information and belief.  If called upon to do so, I could and would so testify.

3  I do so declare under penalty of perjury this 25ᵗʰ day of October, 2006 at Des Moines,

4  Iowa that the foregoing is true and correct.

5

6  _____  *Walter L. Kautzky*
   Walter L. Kautzky

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF WALTER L. KAUTZKY IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO DEFENDANTS' PLAN TO ADDRESS SUICIDE