| | |
|---|---|
| PRISON LAW OFFICE<br>DONALD SPECTER Bar No.: 83925<br>STEVEN FAMA Bar No.: 99641<br>E. IVAN TRUJILLO Bar No.: 228790<br>General Delivery<br>San Quentin, California  94964<br>Telephone: (415) 457-9144 | BINGHAM, McCUTCHEN, LLP<br>WARREN E. GEORGE Bar No.: 53588<br>Three Embarcadero Center<br>San Francisco, California  94111<br>Telephone: (415) 393-2000 |
| ROSEN, BIEN & ASARO, LLP<br>MICHAEL W. BIEN Bar No.: 096891<br>JANE E. KAHN Bar No.: 112239<br>LORI RIFKIN Bar No.: 244081<br>155 Montgomery Street, 8th Floor<br>San Francisco, California  94104<br>Telephone: (415) 433-6830 | HELLER, EHRMAN, WHITE & McAULIFFE<br>RICHARD L. GOFF Bar No.: 36377<br>701 Fifth Avenue<br>Seattle, Washington  98104<br>Telephone: (206) 447-0900 |
| THE LEGAL AID SOCIETY –<br>EMPLOYMENT LAW CENTER<br>CLAUDIA CENTER Bar No.: 158255<br>LEWIS BOSSING Bar No.: 227402<br>600 Harrison Street, Suite 120<br>San Francisco, CA  94107<br>Telephone:  (415) 864-8848 | |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　Defendants | No.:  Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS' ILLEGAL TRANSFERS** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 2, 2006 at ___, or as soon thereafter as the matter may be heard, before the Honorable Lawrence K. Karlton, in Courtroom 4 of this Court, Plaintiffs Ralph Coleman, et al., will and hereby do move the Court for a Temporary Restraining Order and Preliminary Injunction to Enjoin Defendants' Illegal Transfers.

Plaintiffs seek a Temporary Restraining Order and Permanent Injunction to prevent irreparable injury to plaintiff class members through Defendants' planned transfers of prisoners out of state on Friday, November 3, 2006, pursuant to policies and procedures that violate the 8th Amendment of the Constitution and the safeguards to assure, for example, adequate mental health screening, basic clinical staffing and suicide prevention, adopted through the policies and procedures implemented in the *Coleman* remedial plan.

This motion is based on this Notice of Motion, the Memorandum of Points and Authorities in Support of the Motion, and Proposed Temporary Restraining Order filed and served herewith, and the Declaration of Michael W. Bien filed and served herewith in support of this motion, the Court filings in this action, and such other materials and argument as may be presented before or at the hearing.

## INTRODUCTION

This case is a class action brought under 42 U.S.C. Section 1983 by California prisoners who suffer from serious mental disorders alleging that the mental health care provided within the California Department of Corrections (and Rehabilitation) was so inadequate that their rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated. *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. 1995). This Court found that the "defendants' conduct constitutes deliberate indifference to the serious medical needs of the plaintiff class" and appointed a Special Master to monitor compliance with the court-ordered injunctive relief. *Coleman v. Wilson*, 912 F. Supp. 1319, 1324 (E.D. 1995).

On Friday, November 3, 2006, Defendants will transfer approximately 80 California state prisoners to a private Tennessee prison owned and operated by the CCA Group pursuant to a process that fails to adequately screen inmates who have a history of prior suicide attempts

and prior mental health treatment within California prisons. Because defendants have failed to adequately ensure that appropriate mental health screening has been provided to all of the inmates who will be transferred on Friday, November 3, 2006, and because defendants have failed to ensure that the private Tennessee prison can provide mental health services commensurate with the *Coleman* Revised Program Guide standards, the plaintiffs will be irreparably harmed by this transfer program. Plaintiffs therefore seek a temporary restraining order pursuant to Federal Rules of Civil Procedure 65 to halt Defendants' illegal transfer of prisoners to out-of-state facilities until the matter can be heard before the Court for a final determination on the merits.

**STATEMENT OF FACTS**

California's prisons are dangerously overcrowded. The situation has reached crisis proportions: the Governor, a Defendant in this case, has declared a State of Emergency, admitting that most of the state's prisons "are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks" and that at most California prisons, "the current severe overcrowding…has caused substantial risk to the health and safety of the …inmates housed in them…." Governor's Proclamation of October 4, 2006, which is Exhibit I to Declaration of Michael Bien in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction to Enjoin Defendants' Illegal Transfers ("Bien Dec"). The only measure that Defendants have decided to take to alleviate the overcrowding is the transfer of certain prisoners to out-of-state facilities, including private prisons. Declaration of Donald Specter filed in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction to Enjoin Defendants' Illegal Transfers, Armstrong v. Schwarzenegger, 942 F. Supp. 1252 (N.D. Cal. 1996) filed 11/1/0, Exhibit E to Bien Dec.

On October 19, 2006, the CDCR signed contracts with the Corrections Corporation of American and the GEO Group to house California state prisoners in facilities in various states across the country. Exhibits F and J to Bien Dec. Although both contracts generally state that CDCR prisoners will be provided with health services consistent with the services provided by

1   the CDCR, as of Thursday, November 2, at 12:30 p.m., defendants had not even bothered to
2   provide a copy of the *Coleman* Revised Program Guide standards of care to the contractor
3   scheduled to receive the first group of 80 prisoners at a facility in Tennessee tomorrow:
4   Friday, November 3, 2006!  Bien Dec.¶13.  Obviously, given the complexity of the Revised
5   Program Guide standards, there is simply no way for the Court to be assured that the contractor
6   in Tennessee has received the standards, understands the standards, and has available the
7   appropriate clinical staff and facilities, to assure that the standards can be complied with, after
8   business hours on the East Coast on the day before the California prisoners are to arrive.

9          Defendants acknowledge their failure to address the requirements for mental health
10  screening, suicide prevention and clinical staffing and argue that this is not a problem because
11  they intend to exclude all prisoners who are currently receiving mental health services from the
12  initial group of transfers to the out-of-state facilities.  Letter to Mr. Keating form Bruce Slavin,
13  General Counsel for CDCR, dated October 12, 2006. Exhibit H, Bien Dec.  Even assuming that
14  such blatant disability discrimination was not unlawful, defendants' "solution" to the *Coleman*
15  problem ignores the fact that *Coleman* Revised Program Guide standards apply to *all*
16  California prisoners, not only those who are currently in the mental health caseload.  For
17  example, the Revised Program Guide requires that all prisoners in administrative segregation
18  receive regular rounding by psychiatric technicians to assure that they are not decompensating,
19  suicidal or otherwise in need of mental health intervention.  Revised Program Guide, 12-7-4,
20  filed 2-3-06.  Suicide risk screening, using a specially developed procedure and form, is also
21  required for all prisoners under the Revised Program Guide at various critical points in time,
22  such as before housing in an administrative segregation unit.  Revised Program Guide, 12-10-
23  8-9, filed 2-3-06. Does the Tennessee contractor have any psychiatric technicians on staff?
24  Has the staff been trained in utilizing the suicide risk screening protocol and form required by
25  the Revised Program Guide?  Obviously, the answer is, no, this has not taken place.

26         Special Master Keating reviewed the screening process proposed by defendants for
27  prisoners volunteering to move out-of-state and recommended, in his letter to defendants dated
28  November 1, 2006, substantial revisions of the process were necessary.  These included the

-3-
NO.:  CIV S 90-0520 LKK-JFMPLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS' ILLEGAL TRANSFERS, NO.:  CIV S 90-0520 LKK-JFM

exclusion of non-caseload inmates with a history of recent or serious suicide attempts, or those who are former participants in EOP, PSU, MHCB and inpatient DMH programs, and those with a prior *Keyhea* (involuntary medication) order.  Exhibit A, Bien Dec.  Mr. Keating, in his letter, also raised concerns about the actual state of mental health services in the institutions designated to receive the California inmates.  *Id.*

In a conference call that took place on Thursday, November 2, 2006, at 12 noon, defendants were unable to confirm that Mr. Keating's concerns about the Tennessee prison's clinical staffing, knowledge of the Revised Program Guide standard or capabilities were addressed.  In fact, defendants admitted that they had not yet even sent the Revised Program Guide to the contractor running the Tennessee prison!  Nor could anyone on the call provide any information about the clinical staffing at the Tennessee prison.  Bien Dec. ¶13.  In addition, defendants, who had first received Mr. Keating's letter yesterday afternoon, could obviously not confirm that his screening recommendations—no former caseload, no suicide history, etc. — had been complied with.  Despite these serious problems, defendants were unwilling to agree to delay the November 3 transfer of 80 prisoners to the Tennessee prison.  *Id*.  Instead, defendants requested an opportunity to provide additional information to Mr. Keating at 3 p.m. on Thursday, November 2, when a second conference call is scheduled to take place.

A second telephone conference took place at 3:00 p.m. today.  Defendants provided additional information about the screening process and a chart showing staffing at the Tennessee prison.   The additional information, however, merely confirmed that this Court must stop this dangerous transfer now.  Despite Mr. Keating's recommendations that former case load inmates be excluded from the transfer, no such exclusion was undertaken.  Nor did defendants follow Mr. Keating's recommendation to exclude inmates with significant suicide attempt history—they only looked for very recent suicide history (past year) as exclusionary criteria.  Mr. Keating also expressed grave concerns about the clinical staffing levels at the Tennessee facility—the only mental health staff was a four hour a week psychiatrist on contract for a 600-bed facility!  Defendants admitted that they had negotiated the base ($63 a

day) contract (apparently to save money) and not take into account any of the mental health requirements of the *Coleman* Revised Program Guides. When asked why the transfers could not be postponed until these serious issues are resolved, defendants only response was that they had incurred expenses to charter a plane to fly the inmates to Tennessee. Bien Dec. ¶14.

Counsel for Defendants informed Plaintiffs' counsel at approximately 4 p.m. on Wednesday, November 1, that the first transfer of 80 prisoners to a CCA facility in Tennessee would begin on Friday, November 3. Plaintiffs' counsel informed Defendants' counsel at approximately 4:50 p.m. on Wednesday, November 1, of their intent to seek a temporary restraining order to halt the transfers. Bien Dec. ¶5.

## ARGUMENT

### I. Introduction

The purpose of a temporary restraining order and a preliminary injunction is the same: to maintain the *status quo* pending a final determination of the merits of the action. *New Motor Vehicle Bd. V. Orrin W. Fox Co*., 434 U. S. 1345, 1347 n. 2 (1977) (same standard); *Lopez v. Heckler*, 725 F. 2d 1489, 1509 (9th Cir.), *vacated on other grounds*, 469 U.S. 1082 (1984) (*standard is to maintain status quo*). The "*status quo*" refers to the last uncontested status that preceded the pending controversy. *Lopez,* 725 F.2d at 1509. Thus, a temporary restraining order preserves the Court's power to render a meaningful decision on the merits.

The standard for issuing a temporary restraining order is the same as the standard for a preliminary injunction: the movant must demonstrate either (a) a probability of success on the merits and irreparable injury or (b) serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 565 (9th Cir. 2000).

### II. Plaintiffs Will Be Successful On The Merits Because Defendants' Out-of State Transfer Process Violate the Orders of This Court And Poses A Grave And Avoidable Risk Of Injury or Death To The Inmates To Be Transferred

Defendants' procedures for sending California prisoners to private out-of-state prisons are illegal because they violate the Eighth Amendment of the United States Constitution and this Court's remedial orders in *Coleman v. Schwarzenegger*. Defendants have identified 80

1 California prisoners for transfer on Friday, November 3, 2006, who will be transferred to an
2 out-of-state prison where the adequacy of mental health services are unknown. The prison has
3 not been assessed by the *Coleman* Special Master and his team of experts.  Bien Dec.¶13.
4 Defendants never even bothered to inform the Tennessee prison about this Court's orders or
5 the Revised Program Guide until the afternoon of Thursday, November 2, the day before the
6 prisoners are scheduled to arrive at the prison.  *Id*.  There is simply no way to assure that the
7 Tennessee prison has the understanding, the staffing or the capability to comply with these
8 fundamental and basic standards for mental health care and suicide prevention at this time.

9 Special Master Keating has also recommended that defendants screen the non-caseload
10 inmates who have been identified for transfer and exclude those inmates who have a recent
11 history of suicide attempts or any history of significant suicide attempts.  *Id*.  Special Master
12 Keating also recommended that defendants exclude those non-caseload inmates who were on
13 the mental health caseload and receiving services in specific identified programs.  *Id.*
14 Defendants' screening process that was used to evaluate the 80 prisoners about to be sent to
15 Tennessee did not include a review for these essential factors recommended by Mr. Keating
16 (which were not even communicated to defendants until yesterday afternoon).  See Ex. H  to
17 Bien Dec. ¶10, Slavin to Keating Letter of October 12, 2006, attaching screening protocol.

18 The contracts entered into by defendants with the private prisons make no reference to
19 *Coleman* policies and procedures whatsoever.  See Ex. G and J.   Nor do they provide for the
20 right of Special Master Keating or his experts to monitor the programs, examine records or
21 interview staff.  *Id*.  In contrast, defendants have included specific references to the *Plata*
22 requirements in the contracts and the right of the *Plata* Receiver to access the out-of-state
23 prisons and monitor the programs.

24 This Court has previously found that defendants were deliberately indifferent to the
25 serious mental health needs of the plaintiff class.  *Coleman v. Wilson*, 912 F. Supp. 1282, 1319
26 (1995).  Numerous orders of this Court have been subsequently entered in an effort to achieve
27 compliance with the Eighth Amendment standards for mental health care, including, most
28 recently, the Court's March 3, 2006 Order requiring defendants to implement the Revised

Program Guide. Defendants' out- of-state transfer plan does nothing to assure compliance with the Revised Program Guide and therefore violates the orders of this Court and puts the inmates to be transferred at an unacceptable risk of serious harm or death.

The risk posed by defendants' current plan is serious and can easily be avoided:

1. A thorough and complete screening of the inmates to be transferred must be undertaken by qualified clinicians before the inmates are transferred out of state;

2. The Special Master must be given an opportunity to evaluate the facility to assure that *Coleman* standards have been communicated to the contractor and that clinical staffing, training and appropriate facilities, policies and procedures are in place to safely house these prisoners;

3. The contracts must be amended to specifically assure that *Coleman* Revised Program Guide Standards shall be complied with and that the Special Master shall have the right to monitor the program and have full access to documents, information and staff.

We respectfully request that this Court enter a Temporary Restraining Order barring defendants from proceeding with the planned transfer of inmates to Tennessee now scheduled for Friday morning, November 3, 2006, and set the matter for hearing for a preliminary injunction barring any out-of-state transfers unless and until appropriate policies, procedures, contracts, and staffing are in place.

Dated: November 2, 2006                     Respectfully submitted,


                                            /s/ Michael W. Bien
                                            Michael W, Bien,
                                            Attorneys for Plaintiffs