PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
LORI RIFKIN, Bar No.: 244081
155 Montgomery Street, 8th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS' ILLEGAL TRANSFERS** |

MICHAEL W. BIEN DECLARES:

1. I am a member of the Bar of this Court and of the firm, Rosen, Bien & Asaro, one of the attorneys for the plaintiff class in this litigation. I have personal knowledge of the matters stated herein and if called as a witness I could and would competently so testify. I make this declaration in support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction to Enjoin Defendants' Illegal Transfers.

2. Late morning on Wednesday, November 1, 2006, my associate, Jane Kahn, received a phone call informing us that CDCR was scheduled to transfer 80 inmates to a private prison in Tennessee within 48 hours (by Friday, November 3), and that these inmates were now located at Wasco State Prison. I so informed my co-counsel, Donald Specter, who has been working with defendants on the out of state transfer program and he later informed me that Bruce Slavin, General Counsel of CDCR, had confirmed to him the accuracy of the information: the first out of state transfers under the new program would leave for Tennessee on Friday, November 3. Prior to that time, plaintiffs' counsel had understood that the out of state transfers would not proceed unless and until the process had been approved by Special Master Keating, Receiver Sillen, and plaintiffs' counsel in *Plata* and *Coleman*.

3. Attached hereto as Exhibit A is a true and correct copy of Special Master Michael Keating's Letter, dated November 1, 2006, to Bruce Slavin and Judi Lemos, counsel for defendants, raising serious concerns about defendants' procedures for out of state transfers of inmates. I received the letter as an attachment to an email on November 1, 2006.

4. Attached hereto as Exhibit B is a true and correct copy of a letter from Judi Lemos to me, dated October 31, 2006, concerning the failure of CDCR to include references to the *Coleman* case or its requirements in its contracts with private companies who will house California prisoners. I received this letter by facsimile on November 1, 2006.

5. Attached hereto as Exhibit C is a true and correct copy of an email I sent at approximately 4:50 p.m. on Wednesday, November 1, 2006, to Bruce Slavin, Judi Lemos, Lisa Tillman, Special Master Keating, and various other state officials and interested parties, giving

1  notice that we would seek a temporary restraining order from this Court of the first out of state
2  transfers that are to take place on Friday, November 3, 2006.

3      6. Attached hereto as Exhibit D is a true and correct copy of an email and several
4  attachments that I received from Bruce Slavin, which were addressed to Michael Keating, sent
5  by Mr. Slavin on Wednesday, November 1, 2006, at approximately 9:04 p.m.  Mr. Slavin
6  acknowledges in his letter that he had not previously provided Mr. Keating with copies of the
7  draft contracts with the outside private companies and that these contracts had already been
8  executed.

9      7. Attached hereto as Exhibit E is a true and correct copy of the Declaration of
10 Donald Specter in Support of Plaintiffs' Motion for a Temporary Restraining Order and
11 Preliminary Injunction to Enjoin Defendants' Illegal Transfers filed November 1, 2006.
12 Attachments to the Declaration are not included.

13     8. Attached hereto as Exhibit F is a true and correct copy of the Agreement between
14 the State of California and the GEO Corporation to house California prisoners at out-of-state
15 facilities.

16     9. Attached hereto as Exhibit G is a true and correct copy of a Fact Sheet and
17 Briefing Memo that was distributed by the CDCR to explain the out-of-state transfer program.

18     10. Attached hereto as Exhibit H is a true and correct copy of Bruce Slavin"s
19 October 12, 2006 Letter to Mr. Keating, which includes the Health Care Screening Policy for
20 Out of State Placement.

21     11. Attached hereto as Exhibit I is a true and correct copy of Governor
22 Schwarzenegger's Emergency Proclamation of Prison Overcrowding issue on October 4, 2006.

23     12. Attached hereto as Exhibit J is a true and correct copy of the Agreement between
24 the State of California and Corrections Corporation of America entered into effective October
25 19, 2006.

26     13. I participated in a telephone conference on Thursday, November 2, 2006, at 12
27 noon, with Special Master Keating, Deputy Master Lopes, and court-appointed experts,
28 Melissa Warren and Kerry Hughes, plaintiffs' counsel, Donald Specter, Sara Norman and Jane

Kahn, in-house and outside counsel for defendants, Bruce Slavin, Judi Lemos and Rochelle East, and various California Department of Corrections and Rehabilitation officials. During this phone conference Special Master Keating asked defendants whether the 80 prisoners who were being transferred on Friday, November 3, 2006, had been screened for suicide attempt history and for former caseload history. Defendants were unable to confirm whether the 80 prisoners had been screened for suicide attempt history and for former caseload history. Mr. Keating also asked defendants whether the private out-of-state prisons where defendants were transferring prisoners had been informed of the *Coleman* Revised Program Guide standards and were capable of providing that level of care. Defendants informed Special Master Keating that the *Coleman* Revised Program Guide and other health care standards had not yet been provided to Corrections Corporation of America, which runs the Tennessee prison where the 80 prisoners are transferring on Friday, November 3, 2006. The *Coleman* Program Guide include policies and procedures that govern mental health care for caseload and non-caseload inmates placed in administrative segregation units and in crisis units for suicide prevention, and various other areas of mental health care in prisons. None of the representatives from the California Department of Corrections and Rehabilitation could confirm that the private prison where the 80 prisoners would be transferred had any knowledge of the *Coleman* standards or adequate staff to implement these standards.

14.   I participated in a second telephone conference on Thursday, November 2, 2006, at 3 p.m. with Special Master Keating, Deputy Master Lopes, plaintiffs' counsel, Donald Specter and Jane Kahn, in-house and outside counsel for defendants, Bruce Slavin, Dennis Beatty, Judi Lemos, Michael Stone and Lisa Tillman, and various California Department of Corrections and Rehabilitation officials. Prior to the phone conference, defendants provided the participants with staffing data for the West Tennessee Detention Facility, attached hereto as Exhibit K. During the phone conference Special Master Keating expressed concern over the inadequate mental health staffing level at the facility, based on the fact that the only mental health clinical staff at the 600-bed facility is a single four hour a week contract psychiatrist. Even if that clinician had no responsibilities for the other 500 inmates, he or she would be

unable to provide the Coleman Revised Program Guide standard for rounding if even one of the 80 California inmates was placed in administrative segregation in Tennessee. Defendants admitted that they had not taken into account any of the *Coleman* staffing requirements in the staffing they had negotiated with the contractor. Defendants stated that they had emailed the Coleman Revised Program Guide (a massive document) to the contractor in Tennessee at 1:51 p.m. PST but had not confirmed that anyone had received the email. Obviously, all agreed that there was no time for the receiving Warden and clinicians to read and understand the Program Guide requirements, ask questions, renegotiate the clinical staffing requirements (which defendants admitted would be necessary), prior to the arrival of the 80 inmates tomorrow in Tennessee. Defendants also stated that contrary to Mr. Keating's recommendations, they had not excluded former MHSDS caseload from the group of 80 inmates; nor had they screened for suicide history that was more than a year old. Thus, at this moment, we do not know whether any of the 80 inmates were former case load or had a suicide attempt more than one year ago.

      I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration is executed in San Francisco, California on November 2, 2006.

                                              */s/ Michael W. Bien*
                                              Michael W. Bien