Exhibit G

# FACT SHEET

(916) 445-4950 / WWW.CDCR.CA.GOV



## OUT OF STATE INMATE SURVEY

In early September 2006, the California Department of Corrections and Rehabilitation (CDCR) conducted a survey of adult male inmates in California to determine if any would be interested in transferring voluntarily to another state with available prison occupancy. The following are the results of the survey:

Total surveys: **141,833**

Number of inmate refusing to participate in survey: **35,725**

Number of inmates who indicated they were not interested in a transfer: **86,607**

Number of inmates who indicated an interest in out of state transfer: **19,501**

➢ The 19,501 inmate total, however, is expected to be greatly reduced during a more formal and binding volunteer process. Inmate volunteer totals will further diminish as transfer criteria – such as release dates, security levels, health and mental health considerations – are taken into account.

➢ Of those 19,501 inmates, approximately **6,152** are scheduled to be released between the years 2008 and 2015.

States who have indicated bed space availability: **23**

| | | | |
|---|---|---|---|
| Alabama | Arizona | Arkansas | Colorado |
| Georgia | Illinois | Iowa | Indiana |
| Kentucky | Louisiana | Michigan | Minnesota |
| Montana | Nebraska | New Hampshire | New Jersey |
| New Mexico | North Dakota | Ohio | Oklahoma |
| Oregon | Texas | Wisconsin | |

CDCR officials are currently evaluating the facilities to determine the level of inmate that can be safely housed in each facility.

All out of state facilities will abide by California laws regarding inmate care, discipline, appeals, security level, etc.

CDCR is currently assessing facilities in nine states, including: Oregon, Arizona, New Mexico, Oklahoma, Indiana, Michigan, Louisiana, Tennessee, and Alabama.

For more information on the out of state transfer program, visit CDCR web site at www.cdcr.ca.gov.

###



(916) 445-4950 / WWW.CDCR.CA.GOV



# BRIEFING MEMO
## OUT OF STATE INMATE TRANSFER

The California Department of Corrections and Rehabilitation (CDCR) is working to identify facilities throughout the country where California inmates can be temporarily moved for the next three to five years to relieve severe overcrowding in the state's prisons. California's prison population is at an all time high with more than 170,000 inmates housed in facilities designed for 100,000, and 29 of the state's 33 prisons above maximum safe capacity. Governor Schwarzenegger's emergency proclamation will provide immediate relief for severe overcrowding in these facilities.

1.   **How will inmates be selected to be transferred out of state?**

   Inmates who volunteer to be transferred to a prison outside of California will be selected first. The CDCR has conducted an informal survey to identify inmates who may choose to volunteer for out-of-state placement. Once the voluntary list is exhausted, inmates will be transferred involuntarily, in keeping with the Governor's proclamation of a State of Emergency. Involuntary transfers will only occur if the voluntary transfers do not immediately mitigate the severe overcrowding in the 29 identified prisons and the resulting impacts within California.

2.   **How many inmates will be transferred out of state?**

   In response to CDCR's informal survey, more the 19,000 inmates have expressed an interest in transferring to a correctional facility outside of California. The number of inmates who can be transferred will depend on how many meet the criteria of the out-of-state facilities that are chosen in contract negotiations. Inmates, for example, must be compatible with the security level of an out-of-state facility (low, medium or maximum security) before being transferred there. CDCR officials are assessing facilities in all of the states that have expressed an interest in housing California inmates. When those assessments are completed and contracts are negotiated, the Department can more definitively identify which type or how many inmates can be housed in facilities outside of California.

3.   **How does Governor Schwarzenegger's proclamation of an emergency help CDCR relieve overcrowding?**

   The Governor's emergency proclamation helps to accelerate CDCR's efforts to move inmates by streamlining the contracting process. As a result, inmates may be moved to out-of-state facilities months earlier than they would otherwise without the

emergency order in effect. The declaration also allows the CDCR to involuntarily transfer inmates out-of-state if necessary.

CDCR is ready to enter into contracts that could result in housing for 2,000 to 5,000 inmate beds. In addition to providing much needed relief to overcrowding, it is anticipated that the contracts could reduce the cost of housing those inmates by up to 15 percent, compared to costs in California.

4.  **What is the criteria for involuntary transfers?**

    If the inmate population is not reduced to a safe margin by voluntary transfers, the Governor's emergency proclamation outlines criteria to be used to determine which inmates will be transferred involuntarily. In priority order, that criteria includes: 1) inmates who have been previously deported by the federal government and are criminal aliens subject to deportation or who have committed an aggravated felony as defined by federal statute and are subject to deportation; 2) inmates who are being paroled outside California; 3) inmates who have limited or no family ties, based on a review of their visitation history; 4) inmates who have supportive family in another state; and 5) other inmates chosen and considered appropriate by CDCR.

5.  **What about medical treatment?   Will CDCR work in consultation with the Federal Court Receiver and the Special Master?**

    Governor Schwarzenegger's emergency proclamation directs CDCR to consult with the court-appointed Receiver running the state prisons medical system and the court-assigned Special Master in the Coleman mental health case. Consultation with the Receiver and Special Master will ensure that inmates designated in their class action will receive appropriate care/treatment in keeping with court standards.

6.  **What efforts has the CDCR made to identify out-of-state facilities with available beds?**

    On July 15, 2006, the CDCR issued a Request for Information (RFI) nationwide to determine if any out-of-state beds were available. As a result, public and private correctional operators from 23 states responded offering nearly 15,000 potential beds.

    In September 2006, four teams of CDCR officials traveled to nine states to inspect sites that had the potential to immediately house California inmates.

    CDCR staff in Sacramento also polled Department of Corrections officials in states across the country in search of additional facilities or to explain the state's plan for housing inmates in those states.

    As of September 27, 2006, CDCR has received letters of intent from correctional facilities with beds in nine states representing a total of 4,700 potential beds. CDCR staff is developing a classification process to identify inmates eligible for transfer so that they can be matched up to available facilities.

7.  **How many inmates have volunteered to be moved?**

Non-binding surveys were given to approximately 140,000 inmates in September. Of that, 19,501 responded positively. However, the number of inmates to be transferred will be determined when CDCR complete its assessment of the out-of-state facilities. These assessments will help identify which category of inmates the facilities are able to house. Because the survey was non-binding, the number of inmates who actually volunteer may significantly increase or decrease when inmates are re-interviewed to assess the interest and asked to sign binding contracts for transfer. Inmates have a right to consult with legal counsel concerning what such a transfer means.

8.  **How much will it cost?  More or less than in California?**

Part of the assessment team's responsibility is to measure the costs against the benefits of each facility. The actual housing costs for each out-of-state facility will be negotiated through a contract. Factors that can influence that cost include the security level of the facility (maximum security is more costly than minimum security) or the breadth of services that it provides.    The overriding goal is to house our inmate population as cost-effectively as possible and still be able to provide the necessary security along with the tools an inmate will need to successfully reintegrate into our communities.    Currently, the average cost to house an inmate in California is approximately $35,000 per year.

9.  **What states are being considered?**

In response to Requests for Information (RFI) issued by CDCR this summer, facilities in the following states have expressed an interest in housing California inmates: Alabama, Arizona, Arkansas, Colorado, Georgia, Illinois, Iowa, Indiana, Kentucky, Louisiana, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Oklahoma, Oregon, Texas and Wisconsin. Companies with correctional facilities in nine states have also submitted letters of intent. The assessment teams are reviewing the bed space options in those states to determine if they meet CDCR standards.

10.  **Will these inmates be housed in private prisons or in government-run prisons?**

Inmates may be housed in either government or privately-run correctional facilities. The correctional facility, regardless of ownership, must meet CDCR standards identified in the California Code of Regulations, Title 15, for housing our inmate population. Facilities must also provide incarceration that is consistent with constitutionally adequate housing, care, and programming.

Currently, both government agencies and private correctional corporations have expressed an interest in housing California inmates.

11.  **What criteria will be used to determine where inmates go?**

The criteria set forth in the California Code of Regulations, Title 15, and the CDCR Operations Manual will be used to determine an out-of-state facility's ability to house inmates. The most important factor will be matching inmates to their proper security level. Other criteria will be determined by negotiations and documented in individual contracts. Some facilities, for example, may only have the ability to take medium security level inmates and might choose to accept only inmates with a minimum or maximum number of years remaining on their sentence. Others may or may not choose to accept sex offenders or lifers. An inmates' preference in location, including if relatives are nearby, will be considered in determining the appropriate placement.

12. **How are they going to be transported?**

Transportation will be negotiated with the facility contractor or with another party to provide safe and adequate transportation of inmates. Any transportation of California inmates will meet all CDCR standards for security, including properly restrained inmates escorted by well-trained, armed transportation staff. Inmates will be transported in non-commercial airplanes.

13. **How will the other state facilities be staffed?   Will they be as secure as California prisons?**

Staffing will be considered during the contract negotiations process.  A minimum staffing level is set by custody level and facility design.  For example, an older facility generally requires a larger number of staff because of its floor layout and overall design. Newer facilities generally have built-in security and are designed to create a secure environment with a smaller number of staff.  Maximum security facilities also generally require more staffing than lower level security facilities. Should a facility not offer a staffing package deemed safe and that meets CDCR's criteria for design and security, the CDCR will not enter into a contracted agreement.

14. **Will transfers affect staffing in California prisons?**

All of the state's existing levels of staff will continue to be needed in California. Transferring inmates to other states will reduce severe overcrowding, thereby improving staffing ratios, reducing the need for overtime hours. As a result, correctional officers and other staff will be working in a safer facility. The CDCR will continue to expand its recruitment efforts to fill vacant positions among correctional officers and is planning to expand academies to train new recruits.

15. **Will inmates be returned to California for parole?**

Generally, all inmates who are transferred to other states will be returned to California and will be paroled to the county in which they lived prior to being sent to prison, as required by California state law. Inmates whom the federal government has identified for immediate deportation will be turned over to federal authorities for deportation proceedings.

16. **Has the CDCR met with stakeholder groups on the decision to transfer inmates out of state?**

    Yes. CDCR has discussed plans to transfer inmates with the court-appointed Receiver who oversees the prison system's medical programs and the Special Master who oversees mental health programs, the California Correctional Peace Officers Association (CCPOA), the Prison Law Office and legislative leaders.

17. **Relieving overcrowding was supposed to make room for programs in California prisons. Will these out-of-state facilities offer rehabilitation and vocational training?**

    Overcrowding in California's prisons has significantly hampered CDCR's ability to employ meaningful programming for inmates due to lack of space. The immediate reduction in inmates will provide space in California's prisons for programs for inmates. In addition, out-of-state facilities contracted by the Department will be required to offer a full range of programming that participating inmates would not otherwise receive in California.

18. **Will inmates who transfer out-of-state be given a sentence reduction?**

    No. Inmate sentences will not be reduced due to participation, nor will inmate sentences change to the sentencing structure of the state in which the inmate is transferred. All inmate sentences will be overseen by California law.

19. **Is California the only state to send inmates out of state?**

    No. Currently, a number of states, including Alaska, Washington, Idaho, Hawaii and Louisiana, send inmates out of their states. Colorado is currently pursuing similar transfers.

20. **Why does California's severe prison overcrowding constitute an emergency under the Emergency Services Act?**

    Because conditions of extreme peril to the safety of persons and property exist in 29 CDCR prisons due to the severe overcrowding, as identified in the Governor's proclamation, and the magnitude of the situation exceeds the capabilities of any geographical area in this state. There is substantial risk to the health and safety of staff, inmates, and the public due to the current severe overcrowding. There also is substantial risk of damage to state and private property. The counties within the state are harmed by this situation as well, because the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons, and the local authority is not enough to cope with this emergency. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety.

    ###

Exhibit H

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
OFFICE OF THE SECRETARY
P.O. Box 942883
Sacramento, CA 94283



October 12, 2006

Mr. J. Michael Keating
Special Master, Coleman v. Schwarzenegger
2351 Sussex Dr.
Fernandina Beach, FL 32034



Dear Mr. Keating:

I write as a follow up to our conference call on September 22, 2006, regarding the California Department of Corrections and Rehabilitation's plans for the transfer of several thousand prisoners to out-of-state facilities. Attached is our proposed policy for health care screening of prisoners who have agreed to a transfer. Please note that consistent with our discussion on September 22, we are excluding from transfer all prisoners currently in the Mental Health Services Delivery System (MHSDS). In addition, all prisoners will receive a screening by a registered nurse that is similar to the screening performed prior to placement in Administrative Segregation. If the screening raises any concerns about the prisoner's mental health, he will be referred for a full clinical evaluation and will be excluded from transfer if he condition requires treatment in the MHSDS.

The issue has been raised that some prisoners in the MHSDS may be able to transfer safely to another state and receive appropriate treatment there. As we move forward in this process, we would like to work with you and your staff to see if appropriate screening criteria can be developed to consider MHSDS prisoners for transfer.

If you have any questions, please contact me at 916-323-5567.

Sincerely

*Bruce M. Slavin*

BRUCE M. SLAVIN
General Counsel
Office of Legal Affairs

cc. Lisa Tillman
Donald Specter
Michael Bien

## Phase I
## Health Care Screening for Out-of State Placement

### Policy

The California Department of Corrections and Rehabilitation (CDCR) shall utilize a standardized process and specific screening criteria for consideration of an inmate's request for California Out-of-State Correctional Facility (COCF) placement.

Inmates approved for COCF placement must be in good health, without medical conditions likely to require significant health care intervention; and where transportation over a several day period will not pose a health risk. Inmates without medical conditions or with well-controlled, uncomplicated medical condition(s) may be approved for COCF placement only after a thorough health record review and a face-to-face assessment by a Registered Nurse (RN). Inmates currently on prescription medications or who have an uncontrolled chronic disease that requires on-going treatment and monitoring shall be referred to a Primary Care Provider (PCP) for evaluation. In the event the RN is uncertain of the inmate's medical condition or treatment needs, the RN shall refer the inmate to the PCP for a face-to-face evaluation.

The inmate will not be charged a co-payment fee for the COCF screening, RN face-to-face assessment or the PCP evaluation.

Inmates who have serious medical or mental health conditions, as evidenced by the following, shall be excluded from COCF placement:

### MEDICAL

- Admission to a higher level of care, i.e., OHU, CTC, GACH within the past six months;
- Poorly controlled chronic disease processes;
- Pending specialty service/procedures appointments;
- Terminal medical condition;
- Non-compliance with prescribed treatment regimens or medication within the past six months.

### MENTAL HEALTH

- Currently a member of the Mental Health Services Delivery System.

### DENTAL

- Acute or urgent dental condition (treatment priority 1 or 2).

Phase I
Health Care Screening for Out-of-State Placement
Page 2

Inmates who have the following health care issues shall be considered for COCF placement on a case-by-case basis:

## DISABILITY

An inmate designated to be in any one of the following Disability Placement Program (DPP) categories:

- DPW, full time wheelchair user and requires wheelchair accessible cell.
- DPO, intermittent wheelchair user, requires lower bunk wheelchair accessible path of travel but does not require wheelchair accessible cell.
- DPH, deaf/hearing impaired and must rely upon written communications, lip reading or sign language interpreter.
- DPV, blind/vision impaired and vision is not correctable to central acuity of better than 20/20 without corrective lenses in at least one eye.

## DEVELOPMENTAL DISABILITY

An inmate designated to be in any one of the following Developmental Disability Program (DDP) categories:

DD-3
DD-2
DD-1A
DD-1

## Purpose

To ensure inmate-patients are appropriately screened for medical, mental health and dental contraindications prior to approval for participation in the COCF placement program.

Phase I
Health Care Screening for Out-of-State Placement
Page 3

## Procedure

1. At the screening institution
   a. The Classification and Parole Representative (C&PR) or designee shall provide a list to the Health Records personnel of the inmates who have been tentatively approved by custody/classification for COCF processing. The list shall contain the inmate's name and CDCR number.
   b. The Health Records staff shall provide the list to the Receiving and Release (R&R) Registered Nurse (RN) with the inmate's Unit Health Record (UHR) for review.
   c. The R&R RN shall complete the Health Care Screening For Out-of-State Placement form for each inmate on the list.
   d. The R&R RN shall perform a face-to-face assessment of the inmate as part of the Screening process. The purpose of the face-to-face assessment is to confirm that the inmate does not have any current health care concerns and is able to travel to the COCF location.
   e. The R&R RN shall document the Screening and face-to-face assessment on a CDCR Form 7230, Interdisciplinary Progress Note.
   f. The R&R RN shall contact the institution Utilization Management and Specialty Clinic schedulers to determine if the inmate has a pending or scheduled specialty appointment (including onsite, offsite or telemedicine). If the inmate has a scheduled or pending appointment they will not be approved for COCF placement until the appointment and subsequent treatment is completed. The Health Care Screening for Out-of-State Placement form shall be noted as "Disapproved, due to pending or scheduled specialty appointment."
   g. The inmate may request reconsideration of COCF placement once the specialty appointment and treatment has been completed.
   h. The R&R RN shall perform a thorough UHR review to ensure the inmate's good health and absence of any health care conditions that would exclude him from COCF placement.
   i. The R&R RN shall refer an inmate to a PCP for a face-to-face evaluation, in the event the RN is uncertain of the inmate's medical condition or treatment needs.
   j. If the R&R RN disapproves the inmate for COCF placement, the inmate has the right to appeal this decision through the established inmate appeal process.
   k. The R&R RN shall provide the Central File copy of all Health Care Screening for Out-of-State Placement form to the C&PR.

Phase I
Health Care Screening for Out-of-State Placement
Page 4

    l.  The R&R RN UHR review and face-to-face assessment of the inmate shall be completed within seven business days of receipt of the list from the C&PR or designee.

    m. The Health Care Screening for Out-of-State Placement form shall be distributed per the following, original to the UHR, copy to the Central File and a copy to the inmate.

2.  Transfer to the COCF Hub Institution

    a.  An endorsed COCF placement inmate shall be transferred from their current institution to the COCF Hub institution per existing Health transfer policy, IMSP Vol. 4 Chapter 3.

    b.  The Health Records staff shall ensure that all lose medical filing for the endorsed COCF inmate is located and placed in the UHR prior to transfer to the Hub institution.

    c.  The Health transfer policy requires that the R&R RN complete a CDCR Form 7371 and ensure the inmate is transferred with his current medication, as applicable.

    d.  Upon arrival at the COCF Hub institution, the inmate shall be processed by medical staff following existing policy as stated in Volume 4, Chapter 3, including but not limited to the completion of CDCR Form 7277, "Initial Health Screening".

3.  Transfer from COCF Hub institution to Out-of-State institution

    a.  The COCF Hub institution is responsible for making a complete copy of the inmate's entire UHR.  This complete copy of the UHR shall accompany the inmate upon transfer to the COCF institution.  An inmate will not be transferred unless a copy of the UHR is with him at the time of transfer.

    b.  On the day of transfer the R&R RN shall interview the inmate to ensure that no health care changes have occurred since arriving at the COCF Hub institution.  If the inmate complains of any acute condition(s) or change(s) in their medical, mental health or dental status, the R&R RN shall place a medical hold on the inmate and the inmate will not be transferred to the COCF institution.

    c.  Once the inmate's health care condition is resolved, the medical hold shall be removed and the inmate may then be rescheduled for transfer to the COCF institution.

    d.  The R&R RN shall comply with IMSP Vol. 4 Chapter 3, Health Transfer for COCF institution transfers.

Phase I
Health Care Screening for Out-of-State Placement
Page 5

e.  The original UHR of all transferred COCF inmates shall be mailed to the
COCF Placement Unit in Sacramento within seven days of transfer to the
COCF institution.

f.  The COCF Placement Unit shall maintain the original UHR during the
entire time the inmate is at the COCF institution.

**Phase I**
## HEALTH CARE SCREENING FOR OUT OF STATE PLACEMENT
STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS & REHABILITATION
CONFIDENTIAL MEDICAL INFORMATION

| Current institution | Inmate Name (Last, First, MI) | | CDCR Number | |
|---|---|---|---|---|
| Allergies:<br><br>No known allergies ☐ | | | Date of Screening | |

| SIGNIFICANT   MEDICAL /DENTAL/MENTAL HEALTH PROBLEMS | | | | |
|---|---|---|---|---|
| (e.g. suicide attempts, dental needs, special diet, pending or incomplete consults, laboratory test, x-rays) | | Chronic Care Program (list type) | | Date of Last Visit |
| | | | | |
| | | | | |
| | | | | |

Date of Last Physical: _____  Dental Condition (priority 1 or 2): ☐ Yes ☐ No

Mental Health Level of Care:   ☐ None ☐ CCCMS ☐ EOP ☐ MHCB // Suicide History: ☐ Yes ☐ No

Disability Chrono 1845: ☐ Yes ☐ No  Developmental Disability 128C-2: ☐ Yes ☐ No

Prosthetic device?  ☐ Yes ☐ No   Type:

Medical Chronos reviewed? ☐ Yes ☐ No    Type of Chrono:

| CUURENT MEDICATION PRESCRIBED | | | | | | | |
|---|---|---|---|---|---|---|---|
| MAR Attached ☐ Yes ☐ No ☐ N/A | Pharmacy Profile Attached ☐ Yes ☐ No ☐ N/A | | Medication Education Provided ☐ Yes ☐ No | | | | |
| Name of Medication (include TB) | Dose | Route | | Frequency | Start Date | Stop Date | Heat Risk Medication |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| DIANOSTIC TEST PERFORMED | |
|---|---|
| Tuberculosis | Chest X-ray |
| PDD Test _____ mm Date Read _____ | ☐ Normal ☐ Abnormal Date Read |

**MISC TEST**

RPR/VDRL ☐    ☐ Reactive ☐ Non-reactive  Treated? ☐ Yes ☐ No  Date Treated: _____

Hepatitis:    ☐ Positive ☐ Negative  Type: _____  Treated? ☐ Yes ☐ No Date treated? _____

| Other screening test results & date | | Other Laboratory Data |
|---|---|---|
| | | |
| | | |
| | | |

| Pending Medical Health Appointments | Date | Attachments ☐ Yes ☐ No |
|---|---|---|
| ☐ Chronic Care | | |
| ☐ Specialty | | |
| ☐ Other: | | |
| Comments: | | |
| | | |

_____ Approved, patient is approved for participation COCF
_____ Disapproved, a significant health care condition excludes participation in COCF

| CDC NUMBER NAME (LAST, FIRST, MI) |
| --- |
|  |

Assessment completed by RN: _____ Date: _____
                                         Signature/Title

Reviewed By MD: _____ Date: _____
                                    Signature/Title

Distribution: Original to UHR, copy to Central File, copy to Inmate

Exhibit I



Office of the Governor    ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PROCLAMATION

10/04/2006

### Prison Overcrowding State of Emergency Proclamation

PROCLAMATION
by the
Governor of the State of California

**WHEREAS,** the California Department of Corrections and Rehabilitation (CDCR) is required by California law to house inmates committed to state prison; and

**WHEREAS,** various trends and factors, including population increases, parole policies, sentencing laws, and recidivism rates have created circumstances in which the CDCR is now required to house a record number of inmates in the CDCR prison system, making the CDCR prison system the largest state correctional system in the United States, with a total inmate population currently at an all-time high of more than 170,000 inmates; and

**WHEREAS,** due to the record number of inmates currently housed in prison in California, all 33 CDCR prisons are now at or above maximum operational capacity, and 29 of the prisons are so overcrowded that the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks; and

**WHEREAS,** the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them, because:

With so many inmates housed in large common areas, there is an increased, substantial risk of violence, and greater difficulty controlling large inmate populations.

With large numbers of inmates housed together in triple-bunks, there is an increased, substantial risk for transmission of infectious illnesses.

The triple-bunks and tight quarters create line-of-sight problems for correctional officers by blocking views, creating an increased, substantial security risk.

**WHEREAS,** the current severe overcrowding in these 29 prisons has also overwhelmed the electrical systems and/or wastewater/sewer systems, because those systems are now often required to operate at or above the maximum intended capacity, resulting in an increased, substantial risk to the health and safety of CDCR staff, inmates, and the public, because:

Overloading the prison electrical systems has resulted in power failures and blackouts within the prisons, creating increased security threats. It has also damaged fuses and transformers.

Overloading the prison sewage and wastewater systems has resulted in the discharge of waste beyond treatment capacity, resulting in thousands of gallons of sewage spills and environmental contamination.

And when the prisons "overdischarge" waste, bacteria can contaminate the drinking water supply, putting the public's health at an increased, substantial risk.

**WHEREAS,** overloading the prison sewage and water systems has resulted in increased, substantial risk of damage to state and privately owned property and has resulted in multiple fines, penalties and/or notices of violations to the CDCR related to wastewater/sewer system overloading such as groundwater contamination and environmental pollution; and

**WHEREAS,** overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state and in others; and

**WHEREAS,** in addition to all of the above, in the 29 prisons with severe overcrowding, the following circumstances exist:

Avenal State Prison has an operational housing capacity of 5,768 inmates, but it currently houses 7,422 inmates, with 1,654 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 64 incidents of assault/battery by inmates — 31 of them against CDCR staff — along with 15 riots/melees, and 27 weapon confiscations.

The California Correctional Center has an operational housing capacity of 5,724 inmates, but it currently houses 6,174 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 128 incidents of assault/battery by inmates — 16 of them against CDCR staff — along with 34 riots/melees, and 21 weapon confiscations.

The California Correctional Institution has an operational housing capacity of 4,931, but it currently houses 5,702 inmates, with 771 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 79 of them against CDCR staff — along with 5 riots/melees, and

57 weapon confiscations.

Centinela State Prison has an operational housing capacity of 4,368, but it currently houses 4,956 inmates, with 588 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 141 incidents of assault/battery by inmates — 30 of them against CDCR staff — along with 10 riots/melees, and 151 weapon confiscations.

The California Institution for Men has an operational housing capacity of 5,372, but it currently houses 6,615 inmates, with 1,243 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 170 incidents of assault/battery by inmates — 57 of them against CDCR staff — along with 21 riots/melees, and 47 weapon confiscations.

The California Institution for Women has an operational housing capacity of 2,228, but it currently houses 2,624 inmates, with 396 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 26 of them against CDCR staff — and 6 weapon confiscations.

The California Men's Colony has an operational housing capacity of 6,294, but it currently houses 6,574 inmates, with 280 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 151 incidents of assault/battery by inmates — 33 of them against CDCR staff — along with 11 riots/melees, and 29 weapon confiscations.

The California State Prison at Corcoran has an operational housing capacity of 4,954, but it currently houses 5,317 inmates, with 363 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 147 incidents of assault/battery by inmates — 58 of them against CDCR staff — along with 5 riots/melees, and 111 weapon confiscations.

The California Rehabilitation Center has an operational housing capacity of 4,660, but it currently houses 4,856 inmates, with 196 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 28 of them against CDCR staff — 9 riots/melees, and 34 weapon confiscations.

The Correctional Training Facility has an operational housing capacity of 6,157, but it currently houses 7,027 inmates, with 870 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 85 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 9 riots/melees, and 27 weapon confiscations.

Chuckawalla Valley State Prison has an operational housing capacity of 3,443, but it currently houses 4,292 inmates, with 849 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 50 incidents of assault/battery by inmates — 11 of them against CDCR staff — along with 5 riots/melees, and 21 weapon confiscations.

Deuel Vocational Institution has an operational housing capacity of 3,115, but it currently houses 3,911 inmates, with 796 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 114 incidents of assault/battery by inmates — 54 of them against CDCR staff — along with 7 riots/melees, and 37 weapon confiscations.

High Desert State Prison has an operational housing capacity of 4,346, but it currently houses 4,706 inmates, with 360 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 351 incidents of assault/battery by inmates — 44 of them against CDCR staff — along with 6 riots/melees, and 289 weapon confiscations.

Ironwood State Prison has an operational housing capacity of 4,185, but it currently houses 4,665 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 96 incidents of assault/battery by inmates — 19 of them against CDCR staff — along with 14 riots/melees, and 52 weapon confiscations.

Kern Valley State Prison has an operational housing capacity of 4,566, but it currently houses 4,686 inmates, with 120 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 146 incidents of assault/battery by inmates — 60 of them against CDCR staff — along with 10 riots/melees, and 46 weapon confiscations.

TheCalifornia State Prison at Los Angeles has an operational housing capacity of 4,230, but it currently houses 4,698 inmates, with 468 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 211 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 4 riots/melees, and 101 weapon confiscations.

Mule Creek State Prison has an operational housing capacity of 3,197, but it currently houses 3,929 inmates, with 732 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 65 incidents of assault/battery by inmates — 35 of them against CDCR staff — along with 1 riot/melee, and 28 weapon confiscations.

North Kern State Prison has an operational housing capacity of 5,189, but it currently houses 5,365 inmates, with 176 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 135 incidents of assault/battery by inmates — 43 of them against CDCR staff — along with 16 riots/melees, and 70 weapon confiscations.

Pelican Bay State Prison has an operational housing capacity of 3,444, but it currently houses 3,604 inmates, with 160 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 256 incidents of assault/battery by inmates — 88 of them against CDCR staff — along with 9 riots/melees, and 106 weapon confiscations.

Pleasant Valley State Prison has an operational housing capacity of 4,368, but it currently houses 5,112 inmates, with 744 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 205 incidents of assault/battery by inmates — 59 of them against CDCR staff — along with 12 riots/melees, and 26

weapon confiscations.

The Richard J. Donovan Correctional Facility has an operational housing capacity of 4,120, but it currently houses 4,720 inmates, with 600 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 244 incidents of assault/battery by inmates — 118 of them against CDCR staff — along with 11 riots/melees, and 96 weapon confiscations.

The California State Prison at Sacramento has an operational housing capacity of 2,973, but it currently houses 3,213 inmates, with 240 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 264 incidents of assault/battery by inmates — 159 of them against CDCR staff — along with 5 riots/melees, and 118 weapon confiscations.

The California Substance Abuse Treatment Facility and State Prison at Corcoran has an operational housing capacity of 6,360, but it currently houses 7,593 inmates, with 1,233 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 120 incidents of assault/battery by inmates — 53 of them against CDCR staff — along with 20 riots/melees, and 124 weapon confiscations.

The Sierra Conservation Center has an operational housing capacity of 5,657, but it currently houses 6,107 inmates, with 450 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 61 incidents of assault/battery by inmates — 18 of them against CDCR staff — along with 19 riots/melees, and 50 weapon confiscations.

The California State Prison at Solano has an operational housing capacity of 5,070, but it currently houses 5,858 inmates, with 788 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 60 incidents of assault/battery by inmates — 26 of them against CDCR staff — along with 4 riots/melees, and 114 weapon confiscations.

San Quentin State Prison has an operational housing capacity of 4,933, but it currently houses 5,183 inmates, with 287 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 262 incidents of assault/battery by inmates — 123 of them against CDCR staff — along with 15 riots/melees, and 118 weapon confiscations.

Salinas Valley State Prison has an operational housing capacity of 4,200, but it currently houses 4,680 inmates, with 480 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 181 incidents of assault/battery by inmates — 82 of them against CDCR staff — along with 7 riots/melees, and 91 weapon confiscations.

Valley State Prison for Women has an operational housing capacity of 3,902, but it currently houses 3,958 inmates, with 56 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 125 incidents of assault/battery by inmates — 75 of them against CDCR staff — and 15 weapon confiscations.

Wasco State Prison has an operational housing capacity of 5,838, but it currently houses 6,098 inmates, with 260 inmates housed in areas designed for other purposes. At the same time, in the last year, there were 226 incidents of assault/battery by inmates — 97 of them against CDCR staff — along with 32 riots/melees, and 82 weapon confiscations.

**WHEREAS,** some of these 29 severely overcrowded prisons may even be housing more inmates, because the inmate population continually fluctuates among the CDCR prisons; and

**WHEREAS,** in addition to the 1,671 incidents of violence perpetrated in these 29 severely overcrowded prisons by inmates against CDCR staff last year, and the 2,642 incidents of violence perpetrated in these prisons on inmates by other inmates in the last year, the suicide rate in these 29 prisons is approaching an average of one per week; and

**WHEREAS,** the federal court in the *Coleman* case found mental-health care in CDCR prisons to be below federal constitutional standards due in part to the lack of appropriate beds and space; and

**WHEREAS,** the use of common areas for inmate housing has severely modified or eliminated certain inmate programs in the 29 prisons with severe overcrowding; and

**WHEREAS,** the severe overcrowding has also substantially limited or restricted inmate movement, causing significantly reduced inmate attendance in academic, vocational, and rehabilitation programs; and

**WHEREAS,** overcrowded prisons in other states have experienced some of the deadliest prison riots in American history, including:

In 1971, the nation's deadliest prison riot occurred in Attica, New York, resulting in the death of 43 people. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

In 1981, a riot occurred in the New Mexico State Penitentiary. More than 30 inmates were killed, more than 100 people were injured, and 12 officers were taken hostage, some of whom were beaten, sexually assaulted, and/or raped. On the day of this riot, the prison — which was built for 900 — housed approximately 1,136 inmates.

In 1993, a riot occurred in Lucasville, Ohio. One officer was murdered, four officers were seriously injured, and nine inmates were killed. On the day of this riot, the prison — which was built for 1600 — housed approximately 2,300 inmates.

**WHEREAS,** I believe immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding; and

**WHEREAS,** because of the housing shortage in CDCR prisons, the CDCR has current contracts with four California counties to house 2,352 additional state inmates in local adult jails, but this creates the following overcrowding problem in the county jails:

According to a report by the California State Sheriffs' Association in June 2006, adult jails recently averaged a daily population of approximately 80,000 inmates. On a typical day, the county jails lacked space for more than 4,900 inmates across the state.

Based on the same report, 20 of California's 58 counties have court-imposed population caps resulting from litigation brought by or on behalf of inmates in crowded jails and another 12 counties have self-imposed caps.

Most of California's jail population consists of felony inmates, but when county jails are full, someone in custody must be released before a new inmate can be admitted.

The 2006 Sheriffs' Association report states that last year, 233,388 individuals statewide avoided incarceration or were released early into local communities because of the lack of jail space.

**WHEREAS,** overcrowding conditions are projected to get even worse in the coming year, to the point that the CDCR expects to run out of all common area space to house prisoners in mid-2007, and will be unable to receive any new inmates; and

**WHEREAS,** in January 2006, I proposed $6 billion in the Strategic Growth Plan to help manage inmate population at all levels of government by increasing the number of available local jail beds and providing for two new prisons and space for 83,000 prisoners to address California's current and future incarceration needs; and

**WHEREAS,** the California Legislature failed to act upon this proposal; and

**WHEREAS,** in March 2006, a proposal was submitted as part of my 2006-07 budget to enable the CDCR to contract for a total of 8,500 beds in community correctional facilities within the state; and

**WHEREAS,** the California Legislature denied this proposal; and

**WHEREAS,** on June 26, 2006, I issued a proclamation calling the Legislature into special session because I believed urgent action was needed to address this severe problem in California's prisons, and I wanted to give the Legislature a further opportunity to address this crisis; and

**WHEREAS,** the CDCR submitted detailed proposals to the Legislature to address the immediate and longer-term needs of the prison system in an effort resolve the overcrowding crisis; and

**WHEREAS,** the California Legislature failed to adopt the proposals submitted by the CDCR, and also failed to adopt any proposals of its own; and

**WHEREAS,** in response, my office directed the CDCR to conduct a survey of certain inmates in California's general population to determine how many might voluntarily transfer to out-of-state correctional facilities; and

**WHEREAS,** the CDCR reports that more than 19,000 inmates expressed interest in voluntarily transferring to a correctional facility outside of California; and

**WHEREAS,** the overcrowding crisis gets worse with each passing day, creating an emergency in the California prison system.

**NOW, THEREFORE, I, ARNOLD SCHWARZENEGGER,** Governor of the State of California, in light of the aforementioned, find that conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified above, due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state. Additionally, the counties within the state are harmed by this situation, as the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety, and I find that local authority is inadequate to cope with the emergency. Accordingly, under the authority of the California Emergency Services Act, set forth at Title 2, Division 1, Chapter 7 of the California Government Code, commencing with section 8550, I hereby proclaim that a State of Emergency exists within the State of California's prison system.

Pursuant to this proclamation:

I. The CDCR shall, consistent with state law and as deemed appropriate by the CDCR Secretary for the sole purpose of immediately mitigating the severe overcrowding in these 29 prisons and the resulting impacts within California, immediately contract for out-of-state correctional facilities to effectuate voluntary transfers of California prison inmates to facilities outside of this state for incarceration consisting of constitutionally adequate housing, care, and programming.

II. The CDCR Secretary shall, after exhausting all possibilities for voluntary transfers of inmates, and in compliance with the Interstate Corrections Compact and the Western Interstate Corrections Compact, and as he deems necessary and appropriate to mitigate this emergency, effectuate involuntary transfers of California prison inmates, based on criteria set forth below, to institutions in other states and those of the federal government for incarceration consisting of constitutionally adequate housing, care, and programming. In such instance, because strict compliance with California Penal Code sections 11191 and 2911 would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes are suspended to the extent necessary to enable the CDCR to transfer adult inmates, sentenced under California law, to institutions in other states and those of

the federal government without consent. This suspension is limited to the scope and duration of this emergency.

A.    The CDCR Secretary shall prioritize for involuntary transfer the inmates who meet the following criteria:

1.  Inmates who: (a) have been previously deported by the federal government and are criminal aliens subject to immediate deportation; or (b) have committed an aggravated felony as defined by federal statute and are subject to deportation.

2.  Inmates who are paroling outside of California.

3.  Inmates who have limited or no family or supportive ties in California based on visitation records and/or other information deemed relevant and appropriate by the CDCR Secretary.

4.  Inmates who have family or supportive ties in a transfer state.

5.  Other inmates as deemed appropriate by the CDCR Secretary.

B.    No person under commitment to the Division of Juvenile Justice may be considered for such transfer.

III.  The CDCR Secretary shall, before selecting any inmate for transfer who has individual medical and/or mental-health needs, consult with the court-appointed Receiver of the CDCR medical system and/or the court-assigned Special Master in the *Coleman* mental-health case, depending on the healthcare needs of the inmate, to determine whether a transfer would be appropriate.

IV.  The CDCR Secretary shall, before effectuating any inmate transfer, carefully and thoroughly evaluate all appropriate factors, including, but not limited to, the cost-effectiveness of any such transfer and whether an inmate selected for transfer has any pending appeals or hearings that may be impacted by such transfer.

V.  The CDCR shall, as deemed appropriate by the CDCR Secretary, contract for facility space, inmate transportation, inmate screening, the services of qualified personnel, and/or for the supplies, materials, equipment, and other services needed to immediately mitigate the severe overcrowding and the resulting impacts within California. Because strict compliance with the provisions of the Government Code and the Public Contract Code applicable to state contracts would prevent, hinder, or delay the mitigation of the severe overcrowding in these prisons, applicable provisions of these statutes, including, but not limited to, advertising and competitive bidding requirements, are suspended to the extent necessary to enable the CDCR to enter into such contracts as expeditiously as possible. This suspension is limited to the scope and duration of this emergency.

I **FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of October 2006.



ARNOLD SCHWARZENEGGER

Governor of California

**ATTEST:**

BRUCE McPHERSON

Secretary of State