1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6   RALPH COLEMAN, et al.,

7          Plaintiffs,

8   Vs.                          CASE NO. CIV. S-90-0520 LKK

9   ARNOLD SCHWARZENEGGER,
    et al.,

10

11         Defendants.

12   _____/

**FILED**

NOV - **6** 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

13

14

15

16                    ---oOo---

17

18          REPORTER'S TRANSCRIPT

19       FRIDAY, NOVEMBER 3RD, 2006

20   RE:  ORAL ARGUMENT ON MOTION FOR TEMPORARY RESTRAINING ORDER

21

22                    ---oOo---

23

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926

2026

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4   FOR THE PLAINTIFF:

 5            ROSEN, BIEN & ASARO, LLP
              155 MONTGOMERY STREET, EIGHTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN,
                   ATTORNEY AT LAW
 8

 9            PRISON LAW OFFICE
              GENERAL DELIVERY
10            SAN QUENTIN, CALIFORNIA  94964

11            BY:  DONALD SPECTER,
                   ATTORNEY AT LAW
12

13

14   FOR THE DEFENDANTS:

15            STATE OF CALIFORNIA, DEPT. OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
16            1300 I STREET
              SACRAMENTO, CALIFORNIA  95814
17
              BY:  LISA TILLMAN,
18                 DEPUTY ATTORNEY GENERAL

19

20

21

22                          ---o0o---

23

24

25
```

1

1                      SACRAMENTO, CALIFORNIA

2            FRIDAY, NOVEMBER 3RD, 2006 - 8:30 AM

3                      ---o0o---

4      THE CLERK:  All rise.  Court is now in session.

5      The Honorable Lawrence K. Karlton is presiding.

6      THE COURT:  Please, be seated.

7      THE CLERK:  Calling Civil S-90-0520, Coleman v.

8  Schwarzenegger, et al.

9      THE COURT:  Counsel, approach the podium, state your

10  appearance for the record, remain at the podium if you're

11  arguing.

12      MR. BIEN:  Michael Bien and Don Specter for the

13  plaintiff class.

14      MS. TILLMAN:  Good morning, Your Honor.  Lisa Tillman

15  on behalf of the defendants.

16      THE COURT:  The matter is on because the plaintiffs

17  filed a Motion for a Temporary Restraining Order.  As you

18  folks who have been here a while know, I usually have them in

19  chambers.  But I picked up this morning's paper and

20  discovered that somehow or other they had learned that we're

21  having this hearing, and I decided to have it in court in

22  case there was a reporter present.  I don't know whether

23  there is or not.

24      Obviously, the defendants have not had an opportunity

25  to respond other than filing the letter from Miss Tillman to

2

1    Mr. Keating.

2          Do we have Michael on the phone?

3          MS. TILLMAN:  I believe we have Mr. Lopes.

4          MR. LOPES:  Matt Lopes here.

5          THE COURT:  We were unable to reach Mr. Keating this

6    morning.  Mr. Lopes is on the phone so that he can hear

7    what's going on and advise me if I feel that I don't know

8    where I'm going.

9          Miss Tillman, these are serious problems.  On the

10   other hand, Mr. Bien, I want you to understand that the

11   prison runs the prison.  We have an obligation to the members

12   of the class, which is a very significant one, but ultimately

13   the prison runs the prison.

14         I say that because sometimes, particularly the

15   plaintiffs, forget.  Be that as it may.

16         What do you want to tell me that you think is of

17   significance?

18         MS. TILLMAN:  Your Honor, first I think it is

19   important to thank counsel, as well as Deputy Special Master

20   Lopes and Special Master Keating for the on-going discussions

21   on the issues regarding the transfer.

22         We have been talking for over a month about this

23   matter.  I believe since September 22 Mr. Specter has been

24   engaged in dialog on these issues trying to make sure that we

25   could reach agreement.

3

1          I think a lot of the points along the way have been

2    difficult, and yet we have reached an accord on some of those

3    points.

4          Keep in mind that the Governor issued an emergency

5    proclamation on October 4 stating his great concerns about

6    the safety of the prisons given the overcrowding situation.

7          THE COURT:  Let me stop you.

8          I believe that there is a crisis.  You know I believe

9    that there is a crisis.  So the issue is not the propriety of

10   the Governor's proclamation, nor is the issue whether it is

11   proper to ship people out of state.  That is a decision the

12   prison is going to make.  What we are faced with here is a

13   question of whether we have properly -- whether the prison

14   has properly -- the prison authorities have properly done a

15   triage to ensure people who are members of the class have not

16   been shipped out.

17         Mr. Bien takes the position that there is another

18   issue, and it is a serious issue, which is that people who

19   are otherwise not diagnosed, sent to SHUs, may wind up being

20   nuts as well, and that it is important to have psychiatric

21   evaluations of those people.

22         That is a serious problem which we have to discuss.

23   It is a secondary problem in my view.  I don't mean to

24   suggest it is not an important problem, but it is a secondary

25   problem.

4

1       The primary problem is whether or not we have done

2  enough -- whether you have done enough - I don't mean you

3  personally - have done enough to ensure the people who are

4  being shipped out are not members of the class.  That's what

5  I worry about.

6       MS. TILLMAN:  Let me address that, if I might, Your

7  Honor.

8       As we informed Deputy Special Master Lopes, Special

9  Master Keating, and counsel yesterday in a telephone

10  conference call, the necessary steps have been undertaken to

11  ensure that those inmates awaiting transfer today, which is

12  called Phase I, have been thoroughly reviewed and assessed

13  for any serious mental disorder.

14       Keep in mind that in this case the class

15  certification was only for those members of CDCR who are

16  essentially -- and let me read the court order -- "all

17  inmates with serious mental disorders".

18       So in the process of looking at those inmates who

19  have volunteered for these transfers today, trained

20  clinicians reviewed their unit health records to look for a

21  serious mental disorder that would in some way disqualify

22  them from going through this transfer.

23       They also conducted one-on-one assessments of these

24  inmates who volunteered to, again, ensure no suicide history,

25  to be --

5

1          THE COURT:  What about -- what about -- as I

2    understand what you are saying, if they have a history -- No.

3    You tell me.

4          What were you looking for relative to the suicide

5    investigation?

6          I mean, I agree that's the first most critical group.

7    What did you -- what were you looking at?

8          MS. TILLMAN:  In essence, they reviewed the unit

9    health record and checked with the inmate to see if there was

10   any present status on the mental health caseload, which would

11   mean enhanced outpatient status, 3CMS status, mental health

12   crisis bed status.

13         And I believe plaintiffs attached as an exhibit the

14   mental health screening form that we also provided to them,

15   which also asks about any suicidal attempts in the past.

16         The unit health record would also indicate whether or

17   not this individual had ever been placed in any particular

18   caseload because of a suicide attempt in the past.

19         So that is something that was looked for in --

20         THE COURT:  Your view is -- I'm asking not telling

21   you -- your view is that it is likely that members of the

22   class and/or persons who would be members of the class

23   because in the past they have either had a serious mental --

24   an evaluation of a serious mental illness or suicide have

25   been identified at least as far as these 80 people are

6

1   concerned?

2         MS. TILLMAN:  Yes.

3         THE COURT:  Mr. Bien?

4         MR. BIEN:  We agree that the State made an effort to

5   screen, but we -- what they didn't do was do what Mr. Keating

6   recommended, which was screen for past membership in the

7   caseload.

8         THE COURT:  I'm told they did.

9         MR. BIEN:  No.  I think you -- We established

10  yesterday by -- well, they screened for and might have asked

11  questions, but the criteria for exclusion did not -- only

12  included people who were presently part of the caseload.  It

13  did not include, as Mr. Keating recommended, people who had

14  been a member of the caseload.

15        THE COURT:  Why don't you stop there.  Let's be sure

16  we understand what the facts are before we go any further.

17        Miss Tillman, did you screen for people who in the

18  past have been identified as persons, even if they're in

19  remission now, who have in the past been persons who had a

20  serious mental illness?

21        MS. TILLMAN:  My understanding, and I can bring in

22  Tim Rougeux who is outside in the court hallway if you would

23  like to speak more thoroughly to this issue, my understanding

24  is that the unit health record was reviewed to look for any

25  suicidal history that would have placed them in the mental

7

1    health caseload.

2           However, simple placement in the mental health

3    caseload because of other particular mental problems would

4    not necessarily have been an exclusionary factor.

5           THE COURT:  Okay.  Hang on.  Let me think about what

6    I've just heard.

7               (Brief pause.)

8           MR. LOPES:  Judge, are you still there?

9           THE COURT:  Believe it or not, Matt, I'm just

10   thinking.

11          MR. LOPES:  Okay.  All right.  I thought we lost

12   connection.

13          THE COURT:  That's all right.

14          No.  I've just be been told something which is scary.

15          MS. TILLMAN:  If you like, Your Honor, we can bring

16   in Tim Rougeux to respond.

17          THE COURT:  I accept your representation, ma'am.

18          MS. TILLMAN:  If you like, I can give you the mental

19   health screening form.

20          THE COURT:  What I hear you say -- Here's the

21   problem.  Not the problem, a problem.

22          We have concluded that about 20 percent of the

23   population is currently mentally ill, that is have a

24   diagnosis of a psychotic or other condition such to justify

25   that determination.

8

1      That doesn't cover all of the people who are in

2  remission.  And we never know how someone in remission is

3  going to respond to a significant change in environment such

4  as what you are proposing now.

5      If my calculations are right, out of 80 people

6  there's a potential that 16 are persons within the class.

7  You say that we've gotten rid of those folks, we feel

8  confident that if we made a mistake, it is going to be small

9  enough so that the one or two people can be identified and

10  brought back, I assume?

11      MS. TILLMAN:  They can be brought back.  There are

12  provisions for that.  And remember, we're talking about

13  current membership in the mental health caseload as indicated

14  in their records.  And at this point, none of the 80 inmates

15  have been diagnosed with a serious mental disorder requiring

16  placement in the mental health caseload.

17      THE COURT:  Or a history of suicide?

18      MS. TILLMAN:  Correct.

19      So that introduces, I think, a standing and a case in

20  controversy issue.

21      THE COURT:  I understand.

22      MR. BIEN:  Your Honor, on this suicide point also, we

23  did get -- I want to say that defendants did make these

24  people available to us on the telephone yesterday, and we

25  appreciate that, but I think we clarified that the suicide

9

1    criteria used was different, again, from what Mr. Keating

2    recommended.

3            They excluded people who had a history of suicidality

4    within the past year.  They asked questions about it for a

5    longer period, but they did not -- it was not an exclusionary

6    criteria.  So he recommended a more serious examination.

7            And so really we're here only to advocate that the

8    additional steps that Mr. Keating recommended, that just came

9    out on Wednesday --

10            THE COURT:  I understand.

11            MS. TILLMAN:  I think there is an inaccuracy, if I

12    might add?

13            My understanding, from yesterday's conversation, as

14    well as from looking at the health screening form that was

15    provided to Special Master Keating and plaintiffs' counsel --

16            THE COURT:  Excuse me.  Go ahead.

17            MS. TILLMAN:  -- was that suicide history was a basis

18    for exclusion.  It was not something that was simply

19    considered again in terms of time frame.  If you look at the

20    form:  "Suicide History:  Yes or No."  And if it was checked

21    "yes," it was an exclusionary factor.

22            MR. BIEN:  That was stated differently yesterday.

23            THE COURT:  I'm sorry?

24            MR. BIEN:  It was very clearly stated differently

25    yesterday I thought, but anyway this is -- I think this is

10

1    the issue.

2          From our perspective, again, we support the need to

3    transfer people.  We think there's a crisis.  It just seems

4    to me that they -- for whatever reason, I know people have

5    been working on a lot of things, the mental health side

6    didn't get done.

7          Mr. Keating hasn't looked at any of these facilities,

8    and the screening did not match what he asked for, nor is he

9    even shown the contracts until late, late Tuesday.

10          THE COURT:  I understand that.

11          MR. BIEN:  And it doesn't refer to Coleman.

12          So we disagree, by the way, that these people we're

13    talking about are not members of the class.  The definition

14    of the "caseload" are people with current symptoms.  As the

15    Court has explained, people who are also part of the class

16    and are also subject to Coleman orders who require access to

17    care because you don't know who's in the class until they

18    come forward.

19          That's why the suicide screening applies to everyone.

20    The Ad. Seg. Screening applies to everyone.  And, Your Honor,

21    we also haven't talked about the staffing on the other side.

22          THE COURT:  Yeah.

23          MR. BIEN:  They bought -- they bought, to benefit, I

24    guess, California taxpayers, the cheap contract.  There is

25    clearly inadequate staffing.

11

1    They didn't tell Tennessee what the mental health

2    requirements were until an e-mail went late yesterday, middle

3    of the day yesterday California time.

4         They actually sent the Program Guides.  You know what

5    they are, Your Honor.  I don't know how you would look at

6    that and know what the staffing is.

7         MS. TILLMAN:  But I think, Your Honor, it is

8    important to say -- I first need to object to plaintiffs'

9    counsel's characterization of this being some sort of "cheap"

10   plan.

11        The fact is that when you go out-of-state, as many

12   business have, sometimes you can actually accomplish work on

13   your business at a lower rate because of the different

14   economies.

15        THE COURT:  We're faced, Miss Tillman, with a serious

16   problem because, if under the present contractual arrangement

17   you have a psychiatrist for four hours every week --

18        MS. TILLMAN:  What we assured Special Master Keating

19   and counsel yesterday was not only did the contract indicate

20   that federal constitutional requirements for care had to be

21   met, but also that if an inmate does become seriously

22   mentally disordered and needs the type of care that is

23   provided within California, he is to be returned back.  There

24   is that particular safety net.

25        In addition, to the extent the Court wants staffing

12

1   available for these inmates, even though they are not at this

2   point class members who are seriously mentally disordered, if

3   the Court so desires, we have informed Special Master Keating

4   that we will go back to the contractor over the next few days

5   and engage in a conversation to enable that sort of staffing.

6        Keep in mind what plaintiffs' counsel has indicated

7   is not staffing to enable clinical care for mentally

8   disordered inmates, members of the class, but simply to

9   provide staffing for non-caseload inmates who might find

10   themselves in Administrative Segregation.

11        At this time the inmates who are cleared to go do not

12   have a disciplinary history that would indicate that they'll

13   find themselves in Administrative Segregation any time soon.

14   But should that happen, we're happy to work out the contract

15   so that that is allowed for them, that they get the usual

16   rounds that are required by the Coleman Program Guide.

17        THE COURT:  Part of the problem, I would suspect, is

18   that because the California Prison System has been under

19   supervision for several years, there is a much greater

20   sensitivity.

21        You know, it's no condemnation of the prison system

22   that we used to send mentally ill patients into Ad. Seg.

23   simply because we didn't even know who they were or what they

24   were.  Sending them off to Tennessee, one suspects, doesn't

25   know, that is likely to be what happens there.

13

1          MS. TILLMAN:  Your Honor, actually the contractor has

2    indicated a great willingness to provide the necessary

3    staffing in accord with the ratios indicated in the Program

4    Guide.  So I don't think that will be a barrier.

5          THE COURT:  All right.

6          MS. TILLMAN:  We can report back to the Court within

7    a week about our progress on that point.  At this time --

8          THE COURT:  Here's what I think I'm going to do.  I'm

9    going to disappoint the plaintiffs greatly, I think, and my

10   own Special Master, which really is troublesome because I

11   have such complete confidence in Mr. Keating.

12         I hope, Mr. Lopes, that you understand I'm in no way

13   suggesting that the Special Master's suggestions are not

14   appropriate.  It's just the plane is ready to go, these 80

15   people are rounded up, I don't know what --

16         MR. LOPES:  I understand.

17         THE COURT:  I was about to say a very bad word, which

18   I won't.

19         Let me think.

20              (Brief pause.)

21         No matter what I do it is a bad result.  If I don't

22   let the plane leave, 80 people are stuck in this exceedingly

23   unhealthy overcrowded condition.  That's the real world.

24         It's not as if we have a solution that wouldn't place

25   them under enormous stress because living under these

14

1    conditions are extraordinarily stressful.  It is likely to

2    drive perfectly sane people nuts.  So not sending them is

3    serious.

4         On the other hand, it is equally serious that we're

5    sending them into a situation in which nobody really knows

6    what we're getting.  And I don't mean to suggest that you

7    haven't made effort.

8         What a bad situation.

9         MR. BIEN:  Your Honor?

10        THE COURT:  Yes.

11        MR. BIEN:  One possibility that we haven't heard is

12   why there couldn't be a short delay to allow the extra

13   screening of these 80 men.

14        THE COURT:  Let's talk about that.  Let's talk about

15   that.  Why has your name gone out of my mind?

16        MS. TILLMAN:  That's all right.

17        Lisa Tillman.

18        THE COURT:  Miss Tillman, where is everybody right

19   now?  Let's start there.

20        MS. TILLMAN:  They had planned to take off early this

21   morning.  So the plane is waiting.  Under FAA regulations, we

22   have only until approximately ten o'clock this morning to go

23   forward with the plan.

24        THE COURT:  You know what I'm going to do?  I'm going

25   to let them go.  I'm going order that somebody from the State

15

1  Prison System who is appropriately credentialed will go to

2  Tennessee.

3          MS. TILLMAN:  With the flight?

4          THE COURT:  And interview them in the thorough way

5  that Mr. Keating has ordered.  That's what I'm going to do.

6          If there is anybody on that ship -- on that plane who

7  should not be on that plane, he is to be returned forthwith.

8          That's number one.

9          Number two, nobody else goes without the screening

10 that Mr. Keating has suggested.

11         I mean, it is not a good solution.

12         MR. BIEN:  May I ask, Your Honor, there is some

13 additional things that we request that clearly, I think,

14 again, in the dialog that we've talked about, there is some

15 other issues that have come up about the staffing at these

16 other institutions.

17         THE COURT:  I'm going to accept Miss Tillman's

18 representation that they're in the process of negotiating the

19 proper staffing ratio.  If that turns out to be wrong, within

20 the next week you can come back.  I promise you.

21         MS. TILLMAN:  We will report back to Court and

22 counsel within the week.

23         THE COURT:  As a matter of fact, let's have another

24 hearing in -- Will seven days be enough to tell you where

25 you're going, what you're doing?

16

1          MS. TILLMAN:  Next Friday?

2          THE COURT:  When can I hear that?

3          THE CLERK:  Next Friday we're dark.  It's a

4  Holiday.

5          MS. TILLMAN:  Try for Thursday.

6          THE COURT:  Satisfactory?

7          MS. TILLMAN:  That's fine.

8          MR. BIEN:  Sure.

9          THE CLERK:  We're going to be in the middle of trial.

10         THE COURT:  I'll put them early in the morning, have

11  the trial start later.

12         THE CLERK:  You want to start Thursday at 8:30?

13         THE COURT:  I don't want to, but I will.

14         All right.

15         Folks, I tell you, I'm not happy with what I've done.

16  It puts a great burden on the State.  These people -- we've

17  got to get these people out of there, except I don't want to

18  send them to some place worse.

19         MS. TILLMAN:  We are willing to work with Court and

20  counsel to assuage any concerns in that regard, sir.

21         THE COURT:  Mr. Lopes, will you report to Michael

22  what I have done and have him call me if he's not happy at

23  all.

24         MR. BIEN:  Can we clarify a few things?

25         THE COURT:  Yes.

17

1          MR. BIEN:  First of all, I want to be sure this

2    applies to other transfers, not just to Tennessee.

3          THE COURT:  Are there other transfers?

4          MS. TILLMAN:  There is only one.  This is Phase I

5    today.  There are others planned for the future, but we are

6    not going to do anything without reporting back to the Court

7    on the status of the mental health evaluations.

8          MR. BIEN:  The other thing, Your Honor, is we

9    understand that a lot of this information -- well, we think

10   it is appropriate to interview the inmate.  A lot of the

11   information would be the files, which I assume California is

12   keeping.  And so --

13         MS. TILLMAN:  We can make sure the necessary files

14   are available to whatever clinician accompanies the flight

15   and interviews the inmates.

16         THE COURT:  Okay.

17         That will be the order.  Thank you, folks.

18         Sorry I got you here so early.

19         MR. BIEN:  We appreciate it.  This is an important

20   issue.  We appreciate the Court addressing it.

21         THE COURT:  Well, you weren't on the phone when I

22   spoke sharply to Miss Tillman, but I had to go, my wife was

23   locked out of the house.

24         MS. TILLMAN:  On a rainy night no less.

25         THE COURT:  Yes.  Exactly.

18

1          Stand in recess.

2          I need a formal order from the State, please.

3          MS. TILLMAN:  We'll prepare one.

4          THE COURT:  Thank you.

5          (Off the record at 08:56 AM)

6                          ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

---oOo---

STATE OF CALIFORNIA   )
COUNTY OF SACRAMENTO )


        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


            IN WITNESS WHEREOF, I subscribe this
certificate at Sacramento, California on this 6TH day of
NOVEMBER, 2006.


                        _Catherine E. Bodene_

                        CATHERINE E.F. BODENE,
                        CSR NO. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360