# EXHIBIT E

PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
KEITH WATTLEY Bar No.: 203366
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & ASARO, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
THOMAS NOLAN Bar No.: 169692
155 Montgomery Street, 8th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RALPH COLEMAN,<br><br>     Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants | No.:  Civ S 90-0520 LKK-JFM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION RE: 1) POST-JUDGMENT DISCOVERY AND 2) PRODUCTION OF COPIES OF TOUR BINDERS AND DOCUMENTS**<br><br>**HEARING**<br><br>DATE:            August 17, 2006<br>TIME:            11:00 a.m.<br>COURTROOM:   25<br><br>THE HONORABLE JOHN F. MOULDS |

# TABLE OF ABBREVIATIONS

ASU             Administrative Segregation Unit

CCCMS           Correctional Clinical Case Management System. CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days. A few also participate in groups.

CDCR            California Department of Corrections and Rehabilitation.

CMF             California Medical Facility. A prison in Vacaville, California.

CTC             Correctional Treatment Centers. CTCs are licensed inpatient units inside prisons. Mental Health Crisis Beds operate inside Correctional Treatment Center Units. In addition to Mental Health Crisis Beds, most CTCs also include medical beds.

DMH             Department of Mental Health.

EOP             Enhanced Outpatient Program. EOP programs are sheltered treatment programs that house severely mentally ill inmates. There are currently approximately 4,100 EOP inmates. Because these inmates are unable to function in a general population setting, they live in segregated housing units. They are given 10 hours each week of therapy or other "structured therapeutic activities." EOP inmates meet weekly with their case managers.

ICF             Intermediate Care Facility. ICF programs are "intermediate" inpatient care programs. These programs are operated by the state Department of Mental Health. There are currently ICF programs at Salinas Valley State Prison, the California Medical Facility, Atascadero State Hospital, and Coalinga State Hospital. Inmates in these programs have frequent clinical contact, 24-hour nursing care and 20 or more hours of therapy and treatment each week. Inmates generally spend 6-12 months in these programs.

KVSP            Kern Valley State Prison. A new prison in Delano, California. KVSP has an MHCB unit.

MHSDS           Mental Health Services Delivery System. The name given by defendants to their entire mental health system.

MHCB            Mental Health Crisis Beds. MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. MHCB are generally located inside a Correctional Treatment Center.

OC Spray        Tear gas used by correctional staff.

OHU             Outpatient Housing Unit. OHUs are non-licensed treatment units, and are sometimes called infirmaries. These units generally do not have 24-hour nursing care on the unit (although defendants are now seeking enhanced staffing for these units). They have significantly fewer clinical staff than MHCB units. Suicidal inmates are supposed to be moved out of an OHU and into an MHCB within 24

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION RE: 1) POST-JUDGMENT DISCOVERY AND 2) PRODUCTION OF COPIES OF TOUR BINDERS AND DOCUMENTS, NO.: CIV S 90-0520 LKK-JFM

| 1 | | hours. |
|---|---|---|
| 2 | PSU | Psychiatric Services Unit.  There are psychiatric treatment programs providing Enhanced Outpatient Program level of care to inmates with a Security Housing Unit term. |
| 3 | | |
| 4 | Psych Tech | Psychiatric Technician.  Staff person who is assigned to provide daily clinical rounding in administrative segregation units for the purpose of monitoring inmate mental health status and/or deterioration. |
| 5 | | |
| 6 | SHU | Security Housing Unit.  This is a segregated high-security housing unit where inmates including mentally ill inmates can be housed for indeterminate periods of time in locked down conditions for either in-prison offenses, gang status, or because of safety concerns. There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | UNA | Unidentified Needs Assessment.  This is the name given to the study of unmet demand for intermediate and acute inpatient care that was published by the CDCR on March 30, 2006. |
| 11 | | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................................. i

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................... 5

ARGUMENT ................................................................................................... 11

I.    DEFENDANTS' CONTENTION THAT PLAINTIFFS ARE
    NOT ENTITLED TO ANY POST-JUDGMENT DISCOVERY
    IS CONTRARY TO THE APPLICABLE LAW AND PROCEDURE;
    PLAINTIFFS' REQUEST FOR REASONABLE DISCOVERY
    CONCERNING THE DISPUTED AREAS OF PROGRAM GUIDE
    REVISIONS SHOULD BE GRANTED BECAUSE IT IS DIRECTLY
    RELATED TO THE SUBJECT MATTER OF THE CASE AND
    DEFENDANTS CANNOT MEET THE HEAVY BURDEN
    REQUIRED TO BAR ALL DISCOVERY ............................................... 11

    A.    Defendants' Contention That Plaintiffs Are Not Entitled To
        Any Post Judgment Discovery Is Contrary To The Applicable
        Law And Procedure, And Discovery Is Warranted In This Case.... 11

    B.    Plaintiffs' Request For Discovery Concerning The Disputed
        Areas Of Program Guide Revisions Is Appropriate And Should
        Be Granted Because The Benefit In This Case Far Outweighs
        Any Burden On Defendants ............................................................. 13

II.    PLAINTIFFS ARE ENTITLED TO COPIES OF TOUR BINDERS
    AND MONITORING DOCUMENTS ACCORDING TO CONDITIONS
    OF THE STIPULATION OF THE GATES-COLEMAN MERGER
    AND STANDARD FOR DISCOVERY UNDER FED R. CIV. P. 26(B)(2),
    AS WELL AS THE STRONG PRESUMPTION IN FAVOR OF
    DISCLOSURE IN THE ADVERSARIAL PROCESS .............................. 16

    A.    The Nature Of The Adversarial Process And Due Process
        Concerns Require Production Of These Documents To Plaintiffs.. 17

    B.    The Terms Of The *Gates-Coleman* Stipulation And Federal
        Rules Of Civil Procedure 26(B) Require That These Documents
        Be Produced To Plaintiffs ............................................................... 18

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allende v. Shultz,*
    605 F. Supp. 1220 (D. Mass. 1985) ....................................................... 20

*American-Arab Anti-Discrimination Committee v. Reno,*
    70 F.3d 1045................................................................................... 17, 20

*Blankenship v. Hearst Corporation,*
    519 F.2d 418............................................................................................. 14

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Ca. 1995) .......................................................... 1

*Gates v. Gomez,*
    60 F.3d 925 (9th Cir. 1995)...................................................................... 13

*Ginest v. Board of County Commissioners of Carbon County, Wyoming,*
    295 F. Supp. 2d 1274 (D. Wyoming 2004)............................................... 12

*Hogan v. Robinson,*
    2006 WL. 1049979 (E.D. Cal. 2006) ...................................................... 14

*Loyd v. Alabama Department of Corrections,*
    176 F.3d 1336 (11th Cir. 1999)........................................................... 12, 15

*Lynn v. Regents of the University of California,*
    656 F.2d 1337 (9th Cir. 1981)............................................................. 17, 20

*Oakes v. Halvorsen Marine Ltd.,*
    179 F.R.D. 281 (C.D.Cal. 1998) ............................................................. 14

*Palmer v. Rice,*
    231 F.R.D. 21 (D.D.C. 2005) .............................................................. 11, 12

*Rolland v. Cellucci,*
    151 F. Supp. 2d 145 (D. Mass. 2001) ..................................................... 12

*Ruiz v. Johnson,*
    37 F. Supp. 2d 855 (S.D. Tex. 1999) ...................................................... 12

*U.S. v. Cimino,*
    219 F.R.D. 695 (N.D. Fla. 2003) ............................................................ 12

## FEDERAL STATUTES

FED. R. CIV. P. 26(b) ........................................................................... *passim*

## OTHER AUTHORITIES

MODEL CODE OF PROF'L RESPONSIBILITY, EC 7-1, EC 7-19, DR 7-101 (1983) ............... 5

MODEL RULES OF PROF'L CONDUCT, Preamble, R. 1.3 (2003) ......................................... 5

# INTRODUCTION

The parties have jointly requested that this Court address two important threshold issues raised in this Motion:  1) Defendants' contention that plaintiffs have no right to discovery because this is a post-judgment proceeding, and 2)  Defendants' refusal to produce to plaintiffs' counsel copies of tour binders and other documents routinely produced by defendants to the Special Master and his experts.  The resolution of these threshold issues should reduce the likelihood of additional disputes concerning discovery and access to documents.

This case stands at a critical juncture:  the Court has approved the majority of the Revised Program Guide, and the parties and Special Master have significantly narrowed disputes over the remaining portions.  *See* Declaration of Jane E. Kahn In Support of Plaintiffs' Notice of Motion and Motion Re: 1) Post-judgment Discovery and 2) Production of Copies of Tour Binders and Documents ("Kahn Decl.") ¶ 13, Exhibit A (Order Regarding Defendants' Revised Program Guide filed 3/03/06) [hereafter "3/03/06 Order"]; Kahn Decl. ¶ 14, Ex. B (Plaintiffs' Discovery Conference Statement, filed 6/01/06) [hereafter "Pls.' Disc. Conf. Statement"].  A remedy that has taken over ten years to craft lies close to complete, insofar as the planning phase is concerned.  However, plaintiffs and defendants take opposite views of how to proceed at this stage.  Defendants, apparently viewing the final approval of the Revised Program Guide as the last stretch of this litigation, urge the Court to sprint to the finish: "Defendants respectfully request this Court simply approve the Revised Program Guide and let Defendants move to the next and hopefully final steps of a compliant mental health system." Kahn Decl. ¶ 6, Ex. C at 5 (Defendants' Discovery Conference Statement, filed 6/02/06) [hereafter "Defs.' Disc. Conf. Statement"].  This "simple" approval of the Revised Program Guide, without full and fair consideration of plaintiffs' objections, seems a remarkable suggestion of how the Court should act when considered in the context of a mental health delivery system that remains shockingly inadequate more than ten years after this Court found that defendants violated the Eighth Amendment rights of mentally ill inmates and had been deliberately indifferent to their need for treatment. *Compare Coleman v. Wilson*, 912 F.Supp.

1  1282, 1315-1319 (E.D. Ca. 1995) ("[T]he evidence demonstrates that seriously mentally ill

2  inmates in the California Department of Corrections daily face an objectively intolerable risk

3  of harm as a result of the gross systemic deficiencies that obtain throughout the Department. . .

4  . the evidence of defendants' knowledge of the gross inadequacies in their system is

5  overwhelming.  The risk of harm from these deficiencies is obvious.  The actual suffering

6  experienced by mentally ill inmates is apparent. . . the court finds that defendants' conduct

7  constitutes deliberate indifference to the serious medical needs of the plaintiff class.") *with*

8  statement of Judge Karlton, April 26, 2006, Kahn Decl. ¶ 15, Ex. D at 2: 14-16, 3:  9-11

9  (Transcript of 4/26/06 Evidentiary Hearing) ("[W]e are still in a place in which the defendants

10 have been unable to bring the delivery of psychiatric care up to constitutional

11 standards…Every defendant in this case is in violation of the law.  That is shocking.  That is

12 shocking.") *and* Kahn Decl. ¶ 16, Ex. E at 2: 14-18 (Order filed 5/02/06) [hereafter "5/02/06

13 Order"] ("[T]he plan presented to the court in no way adequately responds to the severe

14 shortage of intermediate care facility and mental health crisis beds that currently exists in the

15 CDCR.  It is undisputed that the shortage is leaving critically mentally ill inmates languishing

16 in horrific conditions without access to immediately necessary mental health care.")

17       It is critical that the remaining disputed issues in the Revised Program Guide be

18 resolved by the Court after appropriate consideration of the evidence and the opinions of

19 experts presented by the parties and the Special Master.  Discovery, focused on the disputed

20 issues, is a necessary precursor to such a judicial determination. The process of revising the

21 Program Guide has been carried out for the last four years by negotiated agreements and

22 without discovery, or hearings to resolve disputes. Kahn Decl. ¶ 5.  In fact, plaintiffs' experts

23 have not been inside California prisons in the *Coleman* case in fourteen years.  Kahn Decl. ¶ 4.

24 The Court has already anticipated this need, detailing a procedure in its May 25, 2006 Order

25 for the resolution of disputed issues by formal objection, designation of expert witnesses to

26 provide evidence, depositions of experts, and evidentiary hearing. *See* Kahn Decl. ¶ 17, Ex. F

27 at p.2, ¶ 3 (Order filed 5/25/06) [hereafter "5/25/06 Order"].

28       Defendants, however, have taken the remarkable position that plaintiffs are entitled to

1  absolutely no discovery, relying on the simple, but unsupported proposition, that this case is

2  now post-judgment. *See* Defs' Disc. Conf. Statement. This ignores the fact that some of the

3  polices, procedures, and programs defendants are now using and that are now at issue did not

4  even exist in any form during the trial phase of this case, nor in the years in which the first

5  Program Guide was formulated. Kahn Decl. ¶ 4.

6       The matter at hand is a grave one: it concerns the remedy for the rapidly-growing class

7  of inmates in California with serious mental illness. There can be no serious argument that at

8  present, the CDCR mental health delivery system is anything other than wholly inadequate.

9  Although the trial phase of this case ended more than ten years ago, mentally ill inmates

10  throughout the state prison system continue to be misdiagnosed or receive inappropriate

11  treatment, go untreated altogether, experience significant and unacceptable delays in treatment,

12  and be disciplined and placed in punitive segregation at highly disproportionate rates. *See,*

13  *e.g.,* 5/02/06 Order at 2 (severe shortage of beds and lack of access to treatment); Kahn Decl. ¶

14  4(a), Ex. G at 375 (Fifteenth Monitoring Report of the Special Master on the Defendants'

15  Compliance with Provisionally Approved Plans, Policies and Protocols, filed 1/23/06)

16  [hereafter "15th Report"] (number of EOP inmates in ad seg or PSU); Kahn Decl. ¶ 18, Ex. H

17  at ¶¶ 4-22 (Declaration of Jane Kahn In Support of Pls.' Objections to Defs.' In-Patient and

18  MHCB Bed Plan, filed 4/21/06) [hereafter "4/21/06 Kahn Decl."] (shortage of beds and delays

19  in or absence of treatment). The Special Master's expert concluded that 76.9 percent (20 of

20  26) of the suicides in the CDCR in 2004 were foreseeable, preventable or both. Kahn Decl. ¶

21  19, Ex. I at 9 (Report on Suicides Completed in the California Department of Corrections in

22  Calendar Year 2004). The number of suicides in the CDCR system continues to escalate, with

23  41 suicides in 2005 (4/21/06 Kahn Decl. ¶ 23), and at least 26 suicides to date in 2006 (Kahn

24  Decl. ¶ 12). The CDCR suicide rate for 2005 and the projected rate for 2006 are nearly double

25  the reported national average for state prisons. Kahn Decl. ¶ 12; 4/21/06 Kahn Decl. ¶ 27.

26       In fact, the conditions facing mentally ill inmates in the California corrections system

27  today are regularly referred to by defendants themselves as a "crisis" situation. *See, e.g.,*

28  5/02/06 Order at 2:18-22 (*quoting* CDCR Director of Health Care Services). In the past year,

1    defendants have identified the need for close to one thousand additional mental health staff

2    positions and more than $600 million dollars of new prison health bed construction projects in

3    order to implement a constitutionally acceptable mental health delivery system. *See* Kahn

4    Decl. ¶ 20, Ex. J (Enclosure XI to Defendants' April 17, 2006 Statewide Mental Health Bed

5    Plan); Kahn Decl. ¶ 21, Ex. K at 40-43(CDC May Revise Finance Letter, Coleman Guidelines

6    to the MHSDS at Corcoran State Prison, FY 2005/2006).

7         At this point, as the Revised Program Guide is being implemented in part, and as

8    remaining issues continue to be negotiated and litigated, plaintiffs must have access to

9    information about class members and their treatment. Because this information is controlled

10   solely by defendants, and defendants have taken the extreme position that plaintiffs are entitled

11   to absolutely *no* discovery, plaintiffs ask this Court to resolve these threshold issues. There are

12   two types of discovery at issue: plaintiffs' right to discovery concerning disputed areas of the

13   Revised Program Guide, and plaintiffs' right to copies of tour binders and other documents

14   provided to the Special Master on tours plaintiffs do not attend. This information is crucial

15   because it is the only means by which plaintiffs can access invaluable information about the

16   mental health programs, staffing, suicide prevention practices, use of force, and other issues of

17   grave concern to the plaintiff class. Kahn Decl. ¶¶ 8-11.

18        Although this litigation is in the post-trial phase, the remedy has not yet been finalized,

19   nor have defendants demonstrated that their practices satisfy constitutional standards. As a

20   result, the litigation is ongoing and plaintiffs continue to need information about changes in

21   defendants' policies, procedures, and practices. Defendants' position that plaintiffs should

22   have no discovery because plaintiffs had discovery over fourteen years ago in the trial phase of

23   the case is untenable, ignoring the subsequent development of entirely new programs in the

24   CDC as well as the obligation of plaintiffs' counsel to ensure that the remedy fashioned

25   through this litigation appropriately safeguards the constitutional rights of the plaintiff class.

26   *See* Defs.' Status Conf. Statement at 5 ("Indeed, the discovery phase of *Coleman* ended years

27   ago with the completion of the trial and entry of judgment.").

28

# STATEMENT OF FACTS

### The Roles of Special Master and Plaintiffs' Counsel

In the Order of Reference, the Court described the role of the Special Master: "The purpose of this appointment is to assist the court in fulfilling its obligation to fashion a remedy for the constitutional violations in the delivery of mental health care to members of the plaintiff class and to monitor implementation of that remedy." Kahn Decl. ¶ 22, Ex. M at 3 (Order of Reference, filed 12/11/95) [hereafter "12/11/95 Order of Reference"]. "The special master's responsibility will be twofold: to provide expert advice to the defendants to aid in ensuring that their decisions regarding the provision of mental health care to class members conform to the requirements of the federal constitution, and to advise the court concerning issues relevant to assessing defendants' compliance with their Constitutional obligations." 912 F.Supp. at 1324; *see also* 12/11/95 Order of Reference at 2; Kahn Decl. ¶ 23, Ex. N at 2 (Order filed 7/11/96). Thus, the role of the Special Master spans consultant, factfinder, and mediator. *See* 12/11/95 Order of Reference. In this guise, the Special Master has obligations both to the Court and to the plaintiff class, and engages in his duties accordingly.

The Court also noted that even with the appointment of a Special Master, "this remains an adversarial proceeding where both sides of the litigation are represented by counsel." *Id.* at 2. Whereas the Special Master is an arm of the neutral Court, plaintiffs' counsel has a different role, and different obligations. Plaintiffs' counsel is obligated to zealously advocate for the class it represents and is, of course, not neutral in this regard. *See, e.g.,* MODEL RULES OF PROF'L CONDUCT Preamble, R. 1.3 (2003); MODEL CODE OF PROF'L RESPONSIBILITY EC 7-1, 7-19, DR 7-101 (1983). These different roles sometimes effect different opinions and conclusions, and, when they perceive that the best interests of the class require it, plaintiffs' counsel submits objections to the findings and recommendations of the Special Master. *See, e.g.,* Kahn Decl. ¶ 4, Ex. Q (Plaintiffs' Objections to the Special Master's Report and Recommendations on Defendants' Revised Program Guide, filed 2/17/06) [hereafter "Pls.' Objections"]. The duty of plaintiffs' counsel in this litigation is to present the Court with its own independent analyses and to argue on behalf of the class; in effect, while the Special

1  Master is expected to be neutral, plaintiffs' counsel must advocate for their clients, the plaintiff

2  class. The Court has recognized the specific importance of plaintiffs' counsel's role in this

3  litigation, finding that plaintiffs' counsel has an independent ethical obligation to the class that

4  cannot be replaced or withdrawn. *See* Kahn Decl. ¶ 30, Ex. EE at 10: 1-16 (Findings &

5  Recommendations regarding plaintiffs' motions for attorneys' fees, filed 8/15/97, Order

6  adopting Findings & Recommendations, filed 9/30/97) [hereafter "8/15/97 Findings &

7  Recommendations"].

8

9                    Discovery Concerning Disputed Areas of Revised Program Guides

10             In January 1997, the Court directed the Special Master to work with the parties to

11  complete and submit for approval plans, policies and procedures for meeting the requirements

12  of the remedial order. Kahn Decl. ¶ 2, Ex. L (Order Modifying Timelines, filed 1/30/97). This

13  process resulted in the California Department of Corrections Mental Health Services Delivery

14  System Program Guides. *See* Kahn Decl. ¶ 2. These Program Guides are a collection of the

15  standards for the delivery of mental health services within the CDCR's various levels of mental

16  health care and within the different custody settings. The Court provisionally approved the

17  submitted Program Guides on June 27, 1997. Kahn Decl. ¶ 2, Ex. O (Order filed 6/27/97).

18  Plaintiffs reserved objections to many issues. *See* Kahn Decl. ¶ 24, Ex. P (Special Master's

19  Report on Plans, filed 5/30/97).

20             Over the nine years since the provisional approval of the Program Guides, these plans

21  and policies have been amended multiple times by the Court and by defendants. Kahn Decl. ¶

22  4. In 2002, the parties and the Special Master agreed to revise and update the Program Guides.

23  Kahn Decl. ¶ 3. For the past four years, the parties, the Special Master, and his experts and

24  monitors have met to review and negotiate provisions of the Program Guides. *Id.* The parties,

25  with the assistance of the Special Master, have reached agreement concerning most of

26  defendants' extensive revisions to the 1997 Program Guides. *See* 1/3/06 Special Master's

27  Report and Recommendations of Defendants' Revised Program Guides; *see also* Pls.'

28  Objections. On March 3, 2006, the Court ordered defendants to implement the undisputed

1  portions of the Revised Program Guide.  3/03/06 Order.

2      The parties have settled or made progress in resolving additional disputed Program

3  Guide issues since the issuance of the March 3, 2006 Order.  Pls.' Disc. Conf. Statement at 1.

4  What remains are a limited number of disputed areas.  In its May 24, 2006 Order, the Court

5  provided for the resolution of disputed issues through a formal objection by the objecting

6  party, designation by both parties and the Special Master of expert witnesses to provide

7  evidence, depositions of experts, and an evidentiary hearing.  5/24/06 Order at 2, ¶ 3.

8      Despite several attempts to resolve remaining discovery issues, the parties have been

9  unable to reach an agreement over the nature or scope of discovery for these disputed portions

10  of the Program Guide revisions.  In plaintiffs' Objections to the Special Master's Report and

11  Recommendations on Defendants' Revised Program Guide, plaintiffs requested reasonable

12  discovery for disputed Program Guide issues.  Kahn Decl. ¶ 4, Ex. Q at 1: 12-15.  Plaintiffs

13  subsequently sent a letter to defendants outlining proposed discovery concerning various

14  disputed issues.  Kahn Decl. ¶ 6, Ex. R (Letter from Bien to Tillman of 4/18/2006).

15      Although plaintiffs' counsel has made a number of proposals to reduce the burden of

16  discovery (*see, e.g.*, Kahn Decl. ¶ 6, Ex. S (Email from Bien to Tillman of 5/9/2006),

17  defendants have consistently taken the position that plaintiffs are entitled to absolutely no

18  discovery.  *See, e.g.,* Defs.' Disc. Conf. Statement at 5; Kahn Decl. ¶ 6, Ex. T at 4-5

19  (Defendants' Status Conference Statement, filed 5/18/06) [hereafter "Defs.' Status Conf.

20  Statement].  Rather, defendants maintain that the current production of internal documents to

21  the Special Master and plaintiffs satisfies any demand for information.  *Id.*  However, the

22  information plaintiffs now receive from defendants does not satisfy plaintiffs' counsel's need

23  for information regarding plaintiff class members and treatment in CDCR.  Plaintiffs' counsel

24  also requires, for example, access to the prisons for tours and observations by plaintiffs' expert

25  witnesses.  Kahn Decl. ¶ 4.  The monthly package of documents now provided to plaintiffs is

26  incomplete and many months old by the time plaintiffs receive it.  Kahn Decl. ¶ 11.  For

27  example, the May 23, 2006 package of documents reflected January 2006 data.  *Id.*  It is also of

28  questionable accuracy, as plaintiffs' counsel has discovered through comparisons to the limited

1   tour binders plaintiffs receive.  *Id.*  And, in addition to being incomplete, this is raw data that

2   contains no qualitative assessment of the type plaintiffs would be able to make through

3   appropriate discovery procedures.  Nor do plaintiffs regularly receive the more detailed and

4   extensive tour binder and reports provided by defendants to the Special Master.

5

6                                   Tour Binders and Monitoring Documents

7           Defendants assert that plaintiffs are not entitled to copies of tour binders and other

8   documents provided to the Special Master during his monitoring tours of correctional facilities.

9   *See, e.g.,* Defs.' Status Conf. Statement at 6-7; Defs' Disc. Conf. Statement at. 5-6; Kahn Decl.

10  ¶ 25, Ex. U (Letter from Tillman to Bien of 3/20/06) [hereafter "3/20/06 Tillman-Bien Letter"].

11  These documents provide the evidentiary foundation for the Special Master's monitoring

12  reports and his recommendations to the Court.  Kahn Decl. ¶ 7.

13          In 1998, the parties entered into a stipulation merging the *Gates* case into the *Coleman*

14  case.  Kahn Decl. ¶ 26, Ex. V (Stipulation and Order Amending Plaintiff Class and Application

15  of Remedy in Coleman, filed 12/24/98) [hereafter "12/24/98 Stipulation"].  Paragraph nine of

16  the 12/24/98 Stipulation states, "The defendants and the Special Master also agree to routinely

17  provide plaintiffs' counsel with copies of any documents provided to the Master by defendants,

18  and to give plaintiffs' counsel notice of any prison tour or visits immediately upon scheduling

19  the same with defendants."  The Stipulation was entered as an order by Judge Karlton on July

20  23, 1999.  Kahn Decl. ¶ 27, Ex. W (Order filed 7/23/99).

21          The court monitors make approximately sixty monitoring tours of the CDCR prisons

22  each year.  Kahn Decl. ¶ 7.  Plaintiffs' counsel accompanies the court monitors on seven of

23  those tours per year, and is provided with the tour binders and other monitoring documents

24  only on those tours.  Kahn Decl. ¶ 8.  The binders and documents provide invaluable

25  information about the mental health programs, staffing, suicide prevention practices, use of

26  force and other issues of grave concern to the plaintiff class.  *Id.*  Although plaintiffs' counsel

27  does receive tour binders and monitoring documents for the seven tours counsel attends each

28  year, defendants have refused to provide plaintiffs with copies for the fifty-three or more tours

1  plaintiffs are not invited to attend. *See, e.g.,* 3/20/06 Tillman-Bien Letter.

2      At the conclusion of every semi-annual monitoring round, the Special Master files a

3  report with the Court. Kahn Decl. ¶ 7. These monitoring reports are broad in scope because

4  their purpose is to update the Court about compliance around the State. Given this breadth,

5  monitoring reports are often filed many months after the tours. For example, the 15th Report

6  was filed on January 15, 2006, and reported on monitoring tours commencing in August 2004

7  and ending in May 2005. *See* 15th Report (Kahn Decl., Ex. G) at 2-3. These monitoring

8  reports, by necessity, do not contain the extensive data provided in the tour binder and

9  monitoring documents, but, rather, the Special Master's summary and conclusions drawn from

10  this larger well of information. *See* Kahn Decl. ¶ 10. For example, the 15th Report contains

11  422 pages summarizing tours of 32 CDCR institutions reflecting 308 person-days spent

12  touring the institutions. 15th Report at 3. Corcoran State Prison is reviewed in 18 pages of the

13  15th Report and in five pages of the Exhibits. Kahn Decl. ¶ 10. In contrast, the tour binder for

14  the second tour to Corcoran in that time period, which was a *revisit*, contained a 53 page

15  Management Report and several hundred pages of documents. *Id.*

16      Although plaintiffs' counsel did not attend the first tour of Corcoran during the

17  Fifteenth Round of Monitoring, counsel did attend the Corcoran tour in 2006 and received the

18  tour binder and documents regularly provided to the Special Master on monitoring tours. Kahn

19  Decl. ¶ 9. This tour book and monitoring package contain well over five hundred pages of

20  documents, including reports and data in the following sections: Corcoran's Corrective Action

21  Plan; Mental Health Staffing; Medication Management; Mental Health Crisis Beds; Enhanced

22  Outpatient Administrative Segregation; Correctional Clinical Case Management System

23  Administrative Segregation; Cultural Assessment; and Use of Force. The attached Declaration

24  of Jane Kahn in Support of Plaintiffs' Notice of Motion and Motion provides a narrative

25  description of the type of information contained in each of these sections and its usefulness to

26  plaintiffs' counsel. *Id.,* ¶ 9. A demonstrative example is the information contained in the

27  section on Mental Health Crisis Beds. This section includes a six month admission/discharge

28  log with detailed information for each patient; a detailed listing of all inmates who have

1  multiple crisis bed admissions; a detailed listing of inmates who have been housed in the crisis
2  beds for more than 10 days; a listing of appointments for patients housed in crisis beds; and a
3  log of patients given involuntary medications and those placed in five-point restraints. *Id.* at
4  (d).

5      Plaintiffs have a critical interest in this material.  Plaintiffs' counsel has sent outreach
6  letters to patients listed on these logs as follow-up to the Unidentified Needs Study conducted
7  by defendants. *Id.*  Plaintiffs' counsel has used the data in this section to track where crisis bed
8  admissions come from within institutions. *Id.*  Plaintiffs' counsel has also used this
9  information to conduct monitoring of suicide watch procedures before defendants agreed to a
10  moratorium on their practice of using video-monitoring for suicide watch in their Mental
11  Health Crisis Beds and Outpatient Housing Units, and was able to document inappropriate
12  suicide watch procedures at numerous prisons throughout the CDCR. *Id.*  In addition, this
13  information enables counsel to better advocate on behalf of class members who write us
14  individually because counsel can review their crisis bed history. *Id.*  This is particularly
15  important given the decompensated mental state of many of our class members and the effect
16  of their mental illness on their ability to clearly communicate to counsel in letters.

17      Access to the tour binders and other documents provided to the Special Master will also
18  help plaintiffs focus and limit their discovery requests to defendants concerning the Program
19  Guide disputes.  The information provided in the tour binder will enable plaintiffs' counsel and
20  plaintiffs' experts to identify samples of clients in units for interviews and file reviews, review
21  policies and procedures and obtain much information with the least burden to defendants, as it
22  is already being gathered and produced for the tours.  Kahn Decl. ¶¶ 10-11.

23

24

25

26

27

28

# ARGUMENT

I. **DEFENDANTS' CONTENTION THAT PLAINTIFFS ARE NOT ENTITLED TO ANY POST-JUDGMENT DISCOVERY IS CONTRARY TO THE APPLICABLE LAW AND PROCEDURE; PLAINTIFFS' REQUEST FOR REASONABLE DISCOVERY CONCERNING THE DISPUTED AREAS OF PROGRAM GUIDE REVISIONS SHOULD BE GRANTED BECAUSE IT IS DIRECTLY RELATED TO THE SUBJECT MATTER OF THE CASE AND DEFENDANTS CANNOT MEET THE HEAVY BURDEN REQUIRED TO BAR ALL DISCOVERY.**

The issue now before the Court is whether plaintiffs are entitled to any discovery whatsoever concerning the disputed areas of the Program Guide revisions. *See* 5/24/06 Order (setting this issue for discovery conference before Judge Moulds). Defendants have taken the extreme position that plaintiffs should be granted absolutely no discovery. Plaintiffs ask the Court to decide the threshold right to discovery question, and believe that the parties can subsequently negotiate a discovery schedule and return to the Court for particular guidance in a specific disputed area only as necessary if agreement cannot be reached.

A. **Defendants' Contention That Plaintiffs Are Not Entitled To Any Post Judgment Discovery Is Contrary To The Applicable Law And Procedure, And Discovery Is Warranted In This Case.**

Federal Rule of Civil Procedure 26(b) provides in part, "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Although this case is post-trial, it is still in the remedial phase, and plaintiffs seek discovery regarding the final disputed areas in the Program Guide revisions, which are to constitute the final remedy in this case. The Revised Program Guide is intended to embody a settlement reached by parties and the Special Master that safeguards the constitutional rights of the plaintiff class. Discovery by plaintiffs to determine if those rights will be adequately protected by the practices and proposals of defendants is thus directly relevant to the subject matter of this case and plaintiffs' original complaint. *See Palmer v. Rice,* 231 F.R.D. 21, 24 (D.D.C. 2005) (Under FED. R. CIV. P. 26, "plaintiffs are entitled to the requested discovery because it is relevant to plaintiffs' original complaint and their claims of discrimination [after the consent decree].").

Discovery is routinely available in post-judgment cases where the remedy is not yet

1   final, and as a result, litigation is ongoing. *See, e.g., Palmer*, 231 F.R.D. 21 (D. D.C. 2005)

2   (Court granted plaintiffs' motion for discovery nine years after approval of consent decree and

3   fifteen years after decision in case); *U.S. v. Cimino*, 219 F.R.D. 695 (N.D. Fla. 2003) (post-

4   judgment discovery in debtor case pursuant to FED R. CIV. P. 25 and 45); *Rolland v. Cellucci*,

5   151 F.Supp.2d 145, 157-58 (D. Mass. 2001) (plaintiffs' reliance on post-judgment discovery

6   and experts was appropriate and provided an appropriate background to court's consideration

7   of motion for post-judgment relief).  In *Palmer*, the Court granted discovery where, "regardless

8   of plaintiffs' entitlement to post-judgment discovery in the generic sense, plaintiffs argue that

9   they need this information in order to respond to [Defendants' Motion to Terminate the

10  Consent Decree]."  231 F.R.D. at 25.  Indeed, plaintiffs can find no authority for defendants'

11  contention that there can be no discovery after the trial phase of a case has ended.  *See* Defs.'

12  Status Conf. Statement at 5.

13      Similarly, in prison conditions litigation cases where defendants have moved to

14  terminate a consent decree or injunction pursuant to the Prison Litigation Reform Act, courts

15  routinely hold that plaintiffs are entitled to discovery and evidentiary hearings.  *See Loyd v.*

16  *Alabama Dept. of Corrections*, 176 F.3d 1336 (11th Cir. 1999) (abuse of discretion for district

17  court to refuse to conduct evidentiary hearing concerning current conditions at prison and

18  scope of prospective relief to be terminated); *Ginest v. Bd. of County Commissioners of*

19  *Carbon County, Wyoming*, 295 F.Supp.2d 1274 (D. Wyoming 2004) (Court granted discovery,

20  noting the state would propose that the district court be forbidden from supplementing the past

21  record); *Ruiz v. Johnson*, 37 F. Supp. 2d 855 (S.D. Tex. 1999) (Court found that plaintiffs were

22  entitled to further discovery despite defendants' position that litigation was years old, plaintiffs

23  had time for discovery, and were entitled to no further discovery).

24      While this discovery is not requested to oppose a motion to terminate, it is requested in

25  connection with the fashioning of a remedy by the Court and the necessary consideration by

26  the Court whether the disputed Program Guide provisions are sufficient to remedy the

27  constitutional violations harming the plaintiff class, given current prison conditions.  In order

28  for this Court to issue an order finalizing the remaining disputed areas of the Revised Program

1    Guide, plaintiffs must be able to intelligently represent to the Court their position as to whether

2    or not defendants' proposals on these points protect the rights of the plaintiff class. The fact

3    that this litigation has spanned numerous years and plaintiffs have previously engaged in

4    discovery is irrelevant to plaintiffs' current request to conduct discovery on conditions that

5    have changed since the trial and judgment phases of this case. In fact, in similar litigation in

6    this state in which plaintiffs' counsel and defendants are involved, post-judgment discovery is

7    available and routinely conducted. *See, e.g.,* Kahn Decl. ¶ 28, Ex. X (*Armstrong v.*

8    *Schwarzenegger*, N.D. Ca. Case No. C-94-2307 CW, 10/02/03 Stipulation and Order

9    Regarding Post-Trial Discovery) [hereafter "*Armstrong* Post-Trial Disc. Stip."]; Kahn Decl. ¶

10   29, Ex. Y at ¶ 25 (*Valdivia v. Schwarzenegger*, 3/09/04 Stipulated Order for Permanent

11   Injunctive Relief) [hereafter "*Valdivia* Order for Perm. Inj. Relief"]. As this Court is well

12   aware, the *Gates* case included significant post-judgment litigation and findings by the Court

13   on disputed issues subsequent to evidentiary hearings and the testimony of experts retained by

14   both parties. *See, e.g., Gates v. Gomez*, 60 F.3d 925, 932 (9th Cir. 1995) (evidentiary hearing

15   and expert testimony regarding 37mm gun dispute).

16   **B.    Plaintiffs' Request For Discovery Concerning The Disputed Areas Of**
          **Program Guide Revisions Is Appropriate And Should Be Granted Because**
17        **The Benefit In This Case Far Outweighs Any Burden On Defendants.**

18

19        The appropriate standard for considering plaintiffs' discovery request is found in

20   Federal Rule of Civil Procedure 26(b)(2). Under that rule, requests for discovery may be

21   limited by the court if:

22        i)    the discovery sought is unreasonably cumulative or duplicative, or is obtainable

23              from some other source that is more convenient, less burdensome, or less

24              expensive;

25        ii)   the party seeking discovery has had ample opportunity by discovery in the action

26              to obtain the information sought; or

27        iii)  the burden or expense of the proposed discovery outweighs its likely benefit,

28              taking into account the needs of the case, the amount in controversy, the parties'

1          resources, the importance of the issues at stake in the litigation and the

2          importance of the proposed discovery in resolving the issues.

3 In the Ninth Circuit, defendants have a heavy burden to show why discovery should be denied.

4 *See, e.g., Blankenship v. Hearst* Corporation, 519 F.2d 418, 429 (9th Cir. 1975 ("Under the

5 liberal discovery principles of the Federal Rules defendants were required to carry a heavy

6 burden of showing why discovery was denied."); *see also Hogan v. Robinson*, 2006 WL

7 1049979 (E.D. Cal. 2006) ("The party who resists discovery has the burden to show that

8 discovery should not be allowed, and has the burden of clarifying, explaining, and supporting

9 its objections," *quoting Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D.Ca. 1998)).

10       In this case, defendants are unable to meet this burden. Plaintiffs are requesting

11 discovery relating to issues that are new disputes, and for which there have been new

12 developments, since the prior discovery was conducted more than fourteen years ago (this case

13 was tried before Magistrate Judge Moulds in the spring of 1993 – most discovery took place in

14 1992). For example, two programs having a critical effect on the plaintiff class,

15 Administrative Segregation Units for Enhanced Outpatient Care patients ("EOP") and

16 defendants' current tracking system utilized for monitoring inmates with suicide attempt

17 histories, did not exist at the time of trial, have been objected to by plaintiffs, and have not

18 been subject to discovery by plaintiffs. *See* Kahn Decl. ¶ 4.

19       Plaintiffs' counsel has offered to work with defendants to reduce the burden of the

20 requested discovery. The information sought is discoverable only from defendants as it relates

21 to touring institutions for which defendants control access, and gathering data and information

22 on policies again known only to defendants. As new issues have arisen and circumstances

23 have changed, the new information is controlled by defendants, and, although plaintiffs have

24 tried to negotiate discovery procedures with defendants, defendants have flatly refused.

25 Finally, this discovery is vitally important to the key issues of this case. The importance of

26 accessing this information cannot be overstated in this case in which the lives of mentally ill

27 plaintiffs are at stake. Plaintiffs' expert witnesses have not had access to the prisons since

28 1992 and cannot assist the Court in resolving these final disputed issues without evaluating

1    current conditions.  Many of the current prisons and programs did not even exist at the time of

2    trial.  *See* Kahn Decl. ¶ 4.

3           In this regard, plaintiffs' requested discovery may actually facilitate a faster resolution

4    of the disputed issues.  Currently, plaintiffs have extremely limited access to the actual

5    information on the ground, and are instead forced to resort to guesswork about the ways

6    defendants' policies are being implemented and their effects on the plaintiff class.  It is

7    possible that discovery by plaintiffs' counsel and plaintiffs' experts may actually alleviate

8    some concerns regarding disputed issues or provide new insight for reaching settlement of

9    these issues.

10          Although the Special Master and his team engage in monitoring of CDCR institutions

11   on behalf of the Court, this arrangement does not foreclose discovery by plaintiffs nor relieve

12   plaintiffs' counsel of their obligation to conduct independent discovery and monitoring.  In

13   *Loyd v. Alabama Dept. of Corrections*, 176 F.3d 1336, 1342 (11th Cir. 1999), the Attorney

14   General of Alabama argued that the plaintiff class was not entitled to an evidentiary hearing on

15   the state's motion to terminate under the PLRA because the record was current, in that the

16   court-appointed monitor had provided eleven reports to the court.  However, the Eleventh

17   Circuit held that, "[a] report alone cannot be cross-examined or disputed.  The party opposing

18   termination must be given the opportunity to challenge or supplement the findings of the

19   monitor and to present evidence concerning the scope of the challenged relief…"  *Id.*

20   Similarly, this Court's May 24, 2006 Order sets forth a procedure for addressing disputed

21   issues that includes the appointment and depositions of expert witnesses, the presentation of

22   evidence, and an evidentiary hearing.  5/24/06 Order at 2, ¶ 3.  If this procedure is to be

23   meaningful, plaintiffs must be allowed to conduct discovery.

24          As noted in the Statement of Facts, the roles of plaintiffs' counsel and the Special

25   Master differ, and plaintiffs' counsel has an independent obligation to advocate on behalf of

26   the class.  This advocacy necessarily includes investigating conditions which may violate the

27   constitutional rights of class members, and apprising the Court of violations and concerns.  In

28   similar prison conditions class actions involving defendants, this post-trial discovery routinely

1  includes prison tours, document production, and depositions, even where a Special Master has

2  been appointed. *See, e.g., Armstrong* Post-Trial Disc. Stip.; *Valdivia* Order for Perm. Inj.

3  Relief.

4      In short there is no legal basis for defendants' position that an absolute bar to post-

5  judgment discovery is appropriate here. Rather, this Court should rule that plaintiffs have a

6  right to conduct reasonable discovery in order to prepare for the evidentiary hearings

7  concerning the remaining Program Guide disputes.

8

9  **II.    PLAINTIFFS ARE ENTITLED TO COPIES OF TOUR BINDERS AND**
   **MONITORING DOCUMENTS ACCORDING TO CONDITIONS OF THE**
10  **STIPULATION OF THE *GATES-COLEMAN* MERGER AND STANDARD FOR**
    **DISCOVERY UNDER FED R. CIV. P. 26(B)(2), AS WELL AS THE STRONG**
11  **PRESUMPTION IN FAVOR OF DISCLOSURE IN THE ADVERSARIAL**
    **PROCESS.**

12

13      Plaintiffs seek copies of tour binders and monitoring documents provided to the Special

14  Master for the tours that plaintiffs' counsel is not permitted to attend. In response, defendants

15  have asserted that these materials "are produced to simply facilitate the Special Master's tours"

16  and their production to plaintiffs' counsel would be "unduly burdensome to Defendants"

17  because defendants' counsel would need to review the documents prior to their production to

18  plaintiffs' counsel. *See* Defs.' Disc. Statement at 5: 9-15. Defendants also maintain that "[t]he

19  fact that the tours do not involve attorneys should be read an (sic) indicator that plaintiffs'

20  counsel do not have a right to these materials." *Id.* at 5: 15-16. The reasons proffered by

21  defendants for denial of these documents to plaintiffs do not comport with the requirements of

22  constitutional due process and the Federal Rules of Civil Procedure.

23      As stated earlier, these tour documents provide a wealth of information about plaintiff

24  class members, and the actual practices of defendants in applying the procedures, policies, and

25  protocols of the Program Guides. Although the Special Master does produce monitoring

26  reports based, in part, upon this information, these reports are, by necessity, summaries of this

27  information and cannot possibly convey the data in its entirety, nor are the summary reports

28  available until many months after the actual tours take place. The information in the tour

1  binders is invaluable to plaintiffs' counsel in the evaluation of whether the class of mentally ill

2  inmates counsel represents are receiving adequate care.  Nor can plaintiffs' counsel make fully

3  informed decisions on objections to the Special Master's findings and recommendations

4  without access to this key underlying information.

5  **A.    The Nature Of The Adversarial Process And Due Process Concerns Require Production Of These Documents To Plaintiffs.**

6

7        Inherent in the adversarial process is a strong presumption in favor of disclosure and

8  access to information by all parties.  The principle of full and fair disclosure forms the basis of

9  codes of behavior throughout the legal system, from those mandating prosecutors disclose

10  information to defense counsel to strict limitations on *ex parte in camera* review.  This

11  presumption is particularly strong where the information at issue is used by the fact finder to

12  make factual determinations or to evaluate evidence.  *See Lynn v. Regents of the University of*

13  *California*, 656 F.2d 1337, 1346 (9th Cir. 1981) ("The system functions properly and leads to

14  fair and accurate resolutions, only when vigorous and informed argument is possible.  Such

15  argument is not possible, however, without disclosure to the parties of the evidence submitted

16  to the court.").  Defendants' failure to disclose documents that form the basis of the fact

17  finder's evaluations and conclusions violates the due process rights of the plaintiff class.  *See*

18  *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 ("Thus, the very

19  foundation of the adversary process assumes that use of undisclosed information will violate

20  due process because of the risk of error.").  Defendants' proffered reasons of convenience in

21  withholding the documents do not override plaintiffs' due process interests in having access to

22  the information on which the fact finder's analysis and conclusions are based.

23        Furthermore, regardless of the Special Master's determinations, plaintiffs' counsel has

24  an independent legal and ethical responsibility to analyze the information and form conclusions

25  as to the constitutionality of the treatment class members receive.  *See* 8/15/97 Findings &

26  Recommendations at 10: 1-16.  Given the nature of the adversarial process, plaintiffs'

27  counsel's access to this information is indispensable to vigorous advocacy for the interests of

28  the class.  There have been and will continue to be times when plaintiffs' counsel objects to

1  certain findings of the Special Master on behalf of the class. Kahn Decl. ¶ 4. Without access

2  to the information provided by defendants to the Special Master – information that is then used

3  by the Special Master to form the basis of his report to the Court – plaintiffs' counsel are

4  unable to fulfill counsel's legal and ethical obligations to the class.

5       **B.**    **The Terms Of The *Gates-Coleman* Stipulation And Federal Rules Of Civil**

6            **Procedure 26(B) Require That These Documents Be Produced To Plaintiffs.**

7       As described in the Statement of Facts, the parties in 1998, entered into a stipulation

8  that merged the *Gates* case into the *Coleman* case. 12/24/98 Stipulation. This stipulation

9  requires that plaintiffs' counsel be provided with copies of any documents provided to the

10  Special Master by defendants. Judge Karlton entered the stipulation as an order on July 23,

11  1999. 7/23/99 Order.

12       Defendants maintain that this clause should not apply to tour reports and monitoring

13  documents, suggesting that these are prepared only as a favor to the Special Master. *See* Defs.'

14  Status Conf. Statement at 6 ("To the extent Plaintiffs seek to incorporate the production of tour

15  binders into the *Coleman* Order of Reference, Defendants state that these materials are

16  produced to simply facilitate the Special master's tours"). Defendants' motivation for

17  producing the documents is irrelevant. In fact, defendants produce these documents to the

18  Special Master in response to his detailed requests, and the Special Master has the power,

19  under the Order of Reference, to demand access to defendants' documents and information.

20  12/11/95 Order of Reference. Both the Stipulation and due process require that plaintiffs

21  receive copies of any documents provided to the Special Master.

22       Defendants also state that this production would be unduly burdensome, both because of

23  the burden of producing an extra copy and because defendants' counsel would have to review

24  the documents. Plaintiffs note that for the seven tours plaintiffs' counsel attends, counsel

25  already receives tour binders and documents. Moreover, although the tour documents contain

26  hundreds of pages of information, many of these pages are similar in nature (e.g. 50 pages of a

27  chart of medication distribution) and therefore the specter of counsel examining hundreds of

28  pages page-by-page is disingenuous. The burden of creating an additional tour binder and

1  copy of attached documents for plaintiffs' counsel is an insignificant burden when weighed

2  against the important information contained within the binders about defendants' policies and

3  practices, and individual conditions and treatment of plaintiff class members.

4      Federal Rule of Civil Procedure 26(b)(2)(iii) further requires a totality of the

5  circumstances analysis, directing the consideration of, among others: the needs of the case, the

6  parties' resources, the importance of the issues at stake in the litigation, and the importance of

7  the proposed discovery in resolving the issues.  In this case, these tour documents are

8  plaintiffs' only means of accessing critical information about conditions at specific prisons in

9  a timely and relatively detailed manner. Kahn Decl. ¶¶ 8, 9, 11.  The tour binders are already

10  being produced in multiple copies by defendants and delivered to the Special Master and his

11  team on each tour. Kahn Decl. ¶ 10. The additional burdens involved are that of ordering an

12  additional set and shipping it to plaintiffs' counsel, and, defendants allege, review by

13  defendants' counsel.  Defs.' Disc. Conf. Statement at 5-6.  The tour binders provide plaintiffs'

14  only access to consistent and reliable information regarding the conditions for and of plaintiff

15  class members beyond the individual hand written letters plaintiffs' counsel receives from class

16  members. Kahn Decl. ¶ 11.  Especially in light of the deteriorated state of many of the

17  *Coleman* class members, access to the more expansive information contained in the tour

18  binders and monitoring documents is crucial to the ability of plaintiffs' counsel to advocate on

19  behalf of the class.

20      As described in detail in the Statement of Facts and in the Kahn Declaration in Support

21  of this Motion, the information contained in the tour binders is critical to plaintiffs.  When

22  plaintiffs' counsel has been able to access this information, counsel is able to respond

23  appropriately to class members in need of serious treatment, monitor new programs and

24  policies implemented by defendants that are sometimes life-threatening, such as the videotaped

25  suicide watch procedures, and object where appropriate to Program Guide provisions that fail

26  to safeguard the lives and rights of the plaintiff class.  Kahn Decl. ¶ 9.

27      Plaintiffs acknowledge that it is important for the Special Master and parties to be able

28  to communicate *ex parte* about issues in this case, especially at times that the Special Master

1  steps into the mediator role.  Plaintiffs are not suggesting that every communication between

2  parties and the Special Master must be disclosed to opposing counsel.  However, when

3  information communicated by a party to the Special Master is then the basis for decisions or

4  recommendations concerning the merits of the case, this information is of the type that must be

5  disclosed to the opposing party.  *See American-Arab Anti-Discrimination Comm.,* 70 F.3d at

6  1069; *Lynn,* 656 F.2d at 1346; *Allende v. Shultz*, 605 F.Supp. 1220, 1226 (D. Mass. 1985) ("the

7  very nature of the adversary system demands that both parties be given full access to any

8  information which may form the basis for a judgment").

9

10                                 **CONCLUSION**

11        Based on the foregoing, the plaintiffs request that the Court issue the following orders:

12        (1) Granting plaintiffs' request for discovery regarding disputed provisions of the

13  Revised Program Guide; and,

14        (2) Directing defendants to provide plaintiffs with copies of the tour binders and

15  monitoring documents routinely produced to the Special Master and his experts on monitoring

16  tours.

17

18  Dated:  July 13, 2006                         Respectfully submitted,

19                                                */s/ Jane Kahn*_____

20                                                Jane E. Kahn
                                                  Rosen, Bien & Asaro
21                                                Attorneys for Plaintiffs

22

23

24

25

26

27

28

# EXHIBIT F

1  | Claudia Center, State Bar No. 158255
   | Lewis Bossing, State Bar No. 227492
2  | THE LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER
   | 600 Harrison St., Suite 120
3  | San Francisco, CA 94107
   | Telephone: (415) 864-8848
4  | Facsimile: (415) 864-8199

5  | Michael W. Bien, State Bar No. 96891
   | Thomas B. Nolan, State Bar No. 169692
6  | Meghan Lang, State Bar No. 221156
   | ROSEN BIEN & ASARO, LLP
7  | 155 Montgomery Street, 8th Floor
   | San Francisco, CA 94104
8  | Telephone: (415) 433-6830
   | Facsimile: (415) 433-7104
9  |

10 | Attorneys for Plaintiff Robert Hecker

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE EASTERN DISTRICT OF CALIFORNIA

13 |

14 | ROBERT HECKER,                                   ) No.:
                                                      )
15 |     Plaintiff, on behalf of himself and          ) **PLAINTIFF'S NOTICE OF**
   | others similarly situated,                       ) **RELATED CASES**
16 |                                                  )
   |     v.                                           ) L.R. 83-123
17 |                                                  )
                                                      )
18 | CALIFORNIA DEPARTMENT OF                         )
   | CORRECTIONS AND                                  )
19 | REHABILITATION, ARNOLD                           )
   | SCHWARZENEGGER, Governor of                      )
20 | the State of California, in his official         )
   | capacity, RODERICK Q. HICKMAN,                   )
21 | Secretary of the California Department           )
   | of Corrections and Rehabilitation, in his       )
22 | official capacity, JEANNE S.                     )
   | WOODFORD, Undersecretary of the                  )
23 | California Department of Corrections             )
   | and Rehabilitation, in her official             )
24 | capacity, JOHN DOVEY, Director,                  )
   | Division of Adult Institutions, in his          )
25 | official capacity, and TERESA A.                 )
   | SCHWARTZ, Warden of the California               )
26 | Medical Facility, in her official capacity,)
                                                      )
27 |     Defendants.                                  )
   | _____)

28 |

Pursuant to Local Rule 83-123, Plaintiff ROBERT HECKER ("HECKER")

hereby gives notice that this case is related to the following three cases already on file in

the Eastern District, two of which are already before the same Judge:

> *Ralph Coleman, et al. v. Arnold Schwarzenegger, et al.,* Case
> No. 2:90-CV-00520 LKK JFM P (E.D. Cal. Filed April 23,
> 1990).
>
> *Mitchell J. Klemaske v. CDCR, et al.,* Case No. CIV S-04-
> 1750 FCD KJM P (E.D. Cal. filed August 24, 2004).
>
> *Wilson v. Woodford, et al.,* Case No. S-05-0876 LKK GGH P
> (E.D. Cal. filed May 3, 2005).

## I.    Relationship to *Coleman v. Schwarzenegger*.

The present class action filed by Plaintiff Hecker is related to the *Coleman* class

action for a variety of reasons.  The *Coleman* case is, by a wide margin, the first of these

related cases on file; it was filed on April 23, 1990, more than fourteen years before the

*Klemaske* case was filed.

### A.    The Cases Involve the Same Parties and Are Based on the Same or Similar Claims.

The present case and the *Coleman* case are related because they "involve the

same parties" and "are based on the same or similar claims."  *See* Local Rule 83-

123(a)(1).

#### 1.    *The Cases Involve the Same Parties.*

Plaintiff HECKER is a member of the *Coleman* class.  Plaintiff HECKER is a

participant in the California Department of Correction and Rehabilitation's (the

"CDCR's") "Enhanced Outpatient Program" or "EOP Program," which provides care to

inmates with severe psychiatric disabilities and which was established as part of the

remedy in *Coleman* for a portion of that plaintiff class.  The proposed *Hecker* class

consists of all California inmates of the CDCR with psychiatric disabilities who are

excluded and/or screened out from any prison program, service, or activity on the basis

of their assignment to or participation in the EOP program.  Since the *Coleman* class

encompasses all CDCR inmates with serious mental disorders, every member of the proposed *Hecker* class is by definition also a member of the *Coleman* class. In a sense, the entire proposed class in this new case is a subclass of the larger class in the *Coleman* case.

In addition, many of the individual defendants named in plaintiff HECKER's Complaint are also defendants in the *Coleman* case. The individual defendants here are employees of the State of California and the CDCR that are primarily responsible for setting policies and procedures for and overseeing the CDCR's mental health programs, as are the defendants in the *Coleman* case. The following defendants in this case are also defendants in the *Coleman* case:

- California Governor Arnold Schwarzenegger, sued in both cases in his official capacity;
- CDCR Adult Division Director John Dovey, in his official capacity. (Before the recent CDCR reorganization, this position was called the Director of the CDC; the original *Coleman* defendant in this position was James Gomez);
- CDCR Secretary Roderick Q. Hickman, in his official capacity. (Before the recent CDCR re-organization, this position was called the Secretary of the Youth and Corrections Agency; the original *Coleman* defendant in this position was Joseph Sandoval).[1]

In addition, counsel for the parties in the two cases are the same. Rosen, Bien & Asaro and the Employment Law Center are plaintiff HECKER's counsel in this case and also counsel for the plaintiff class in the *Coleman* case, and the Attorney General is also certain to represent defendants in this case, as he does in the *Coleman* case.

---

[1] The two remaining defendants in the *Coleman* case are not defendants in the present case – Nadim Khoury, Assistant Deputy Director for Medical Services, and John Zil, Chief of Psychiatric Services, are not sued in the present case. There are also two defendants in this case who were not defendants in the *Coleman* case – Jeannie Woodford, sued in her official capacity as Undersecretary of the CDCR, and Teresa

(continued . . .)

2.    *The Cases are Based on Similar Claims*.

The two cases are based on the "same or similar claims" as required by the second part of Local Rule 83-123(a)(1). In this case, plaintiff HECKER's central claim is that the CDCR has a policy of excluding EOP inmates from programs and services (such as education, vocational training, and work programs) that are routinely provided to non-EOP general population inmates, and that this policy is unnecessary and violates the Americans with Disabilities Act. In *Coleman*, the plaintiffs have asserted the similar claim that the exclusion of EOP inmates from general population programs and services violates the Eighth Amendment by discouraging inmates with serious psychiatric illnesses from seeking needed treatment and therapeutic programs, and by isolating inmates in their cells for long periods of time, causing them to decompensate.

For example, on April 3, 2005, plaintiffs' counsel in *Coleman* sent a letter to defendants and to the *Coleman* Special Master demanding, among other things, that defendants end the policies that improperly exclude EOP inmates from the full range of programs and services provided to non-EOP inmates. Exhibit A to the Bien Declaration in Support of Plaintiff's Notice of Related Cases ("Bien Dec"), filed herewith (April 3, 2005 Letter). Similarly, on May 20, 2005, plaintiffs sent objections to the defendants' latest draft Program Guides (which form the remedial plan in the *Coleman* case) raising these same issues. Exhibit B to the Bien Declaration, filed herewith (May 20, 2005 Letter).[2] These claims advanced in the *Coleman* case are legally and factually very

_____

(continued from previous page)
Schwartz, sued in her official capacity as the Warden of the California Medical Facility.

[2] Defendants in the *Coleman* case have repeatedly indicated, including during meetings with the *Coleman* plaintiffs' counsel and the *Coleman* Special Master in September 2005, that they do not consider the issue of EOP exclusions from general population programs and services to be within the scope of the *Coleman* case. See Bien Dec at ¶ 5. In late October 2005, the defendants in the *Coleman* case responded in writing to plaintiffs' Program Guide objections without directly addressing the EOP exclusions from work, education and vocational programming, except for a memo which admitted that educational opportunities are limited for EOP inmates and which suggested the department will make unspecified efforts to expand such opportunities in the future. See Exhibit C to Bien Declaration.

1   similar to the claims advanced by plaintiff HECKER.

2       Plaintiffs' counsel will continue to seek to change the underlying discriminatory

3   policy with respect to EOP inmates in both the *Coleman* case and in this new class

4   action filed by plaintiff HECKER.  It is clear that because the legal claims in each case

5   are very similar, these cases are related within the meaning of Local Rule 83-123(a)(1).

6       B.    The Two Cases Are Related Because They Involve The Same Event.

7       Under the second prong of Local Rule 83-123(a), these two cases are also related

8   in that they involve the same event.  See Local Rule 83-123(a)(2).  As part of the

9   *Coleman* remedy for the Eighth Amendment violations found by the District Court after

10  trial, defendants were required to create sheltered outpatient housing units scattered

11  throughout the 34 CDCR prisons to provide mental health treatment to inmates with

12  severe psychiatric illnesses in need of intensive treatment.  These sheltered housing

13  units are the EOP programs discussed above.  Currently, the EOP units house

14  approximately 3,500 CDCR inmates.  One of the *Coleman* remedial requirements is that

15  inmates in these EOP programs be given 10 hours per week of "structured therapeutic

16  activity."  Defendants have long struggled to meet this requirement (and continue to fail

17  to meet this requirement in many institutions).  At the same time, counsel in *Coleman*

18  contend that additional activities – including vocational, educational, and employment

19  activities – are an important component of treatment and recovery.  While such

20  additional activities cannot replace structured therapeutic programs, they are a critical

21  adjunct to mental health care.

22      Historically, the CDCR allowed inmates with severe mental illnesses, including

23  those residing in sheltered treatment units, to participate in mainline general population

24  work, vocation, and educational opportunities.  And initially in the *Coleman* case, EOP

25  inmates were allowed continued access to these opportunities.  However, beginning in

26  approximately 2002, the CDCR implemented a new policy excluding EOP inmates at

27  CMF and elsewhere from general population activities.  One of the purported reasons

28  for the policy was to make it easier to meet the remedial requirement in the *Coleman*

1   case that EOP inmates be given 10 hours per week of therapeutic activities.  Class

2   counsel believe that the true reason is not the mandates of the Eighth Amendment or the

3   remedial plans ordered, but rather administrative convenience and budget cutbacks.  See

4   Bien Declaration at ¶ 6.

5         Thus, this same event – the implementation of the new policy excluding EOP

6   inmates from general population activities – has formed the basis for key legal

7   challenges in both the *Coleman* case and plaintiff HECKER's case.  Accordingly, the

8   cases are related under Local Rule 83-123(a)(2).

9

10        C.    Both Cases Involve Similar Questions of Fact and Law And Their
                Assignment to A Single Judge is Likely to Effect A Substantial Savings of
11              Judicial Effort.

12        Plaintiff HECKER's case and the *Coleman* case are related because "both actions

13  involve similar questions of fact and the same question of law and their assignment to

14  the same Judge and/or Magistrate Judge is likely to effect a substantial savings of

15  judicial effort."  Local Rule 83-123(a)(3).  *See also* Local Rule 83-123(a)(4) (cases

16  related when "for any other reason, it would entail substantial duplication of effort if the

17  cases were heard by different Judges or Magistrate Judges).  The similar questions of

18  fact and law at issue in *Coleman* and *Hecker* have been discussed already above.  See

19  Section A, *supra*.

20        It is also clear that assignment of these two cases to the same judge will effect a

21  substantial savings of judicial time and effort.  In the *Coleman* case, Judge Karlton and

22  Magistrate Judge Moulds have spent many years overseeing and monitoring the

23  CDCR's complex system of providing mental health care to its inmates.  This system

24  delivers care to 29,000 inmates with psychiatric conditions and is one of the largest, if

25  not the largest, mental health care delivery systems in the world.

26        The CDCR's complicated mental health care delivery system is spread out across

27  the State's 34 prisons and encompasses numerous different programs and levels of care,

28  including the EOP program, a "Correctional Clinical Case Management System" that

1    provides treatment to 24,000 inmates in general population housing units, a series of

2    licensed Mental Health Crisis Beds spread across the state, six different inpatient care

3    programs operated by the State Department of Mental Health for CDCR inmates, and

4    several additional specialized mental health care programs for high custody-level

5    inmates.  Any new Judge to which the HECKER matter is assigned will be required to

6    become intimately familiar with the entire spectrum of CDCR mental health programs

7    in order to assess the justifications for the policies challenged herein by Plaintiff

8    HECKER.  Judge Karlton and Magistrate Judge Moulds are already extremely well-

9    versed in the complexities of the CDCR's mental health care system, having overseen

10   the trial of this matter and nearly eight years of intensive monitoring and enforcement in

11   the remedial phase of the *Coleman* case.

12        Moreover, given the similar questions of fact and law raised in this case by

13   plaintiff HECKER, it is clear that assignment to a single judge would effect a substantial

14   savings of judicial effort because "the same result should follow in both actions."  If

15   these two actions are not related, it is possible that the defendants will attempt -- without

16   any basis -- to use the requirements of the Court in *Coleman* as a defense in this action.

17   In addition, there is a possibility of inconsistent rulings in the two cases that would need

18   to be resolved by further Court action.  No Judge would be in a better position than the

19   Judge in the *Coleman* case to understand the exact demands of the Constitution in that

20   case.  In fact, there is no reason that, in remedying the constitutional violations found in

21   *Coleman*, the defendants here should violate federal disability discrimination laws.

22   Significant duplication of effort and confusion can be avoided by relating these two

23   cases.  Thus, these cases are clearly also related under Local Rules 83-123(a)(3) and 83-

24   123(a)(4).

25        For all of these reasons, it is clear that the Coleman case and the present case filed

26   by plaintiff HECKER are related cases.

27   **II.    Relationship to *Klemaske v. CDCR*.**

28        A second related case is *Klemaske v. CDCR*.  This case and the *Klemaske* case are

1  related for the following reasons:  First, both cases are on behalf of CDCR inmates with

2  psychiatric disabilities, and both cases involve three of the same defendants – Roderick

3  Hickman, Jeanne Woodford, and the California Department of Corrections and

4  Rehabilitation.  See Local Rule 83-123(a)(1).  In addition, both claim that under the

5  Americans with Disabilities Act the CDCR must cease its discriminatory practices that

6  exclude otherwise qualified prisoners from programs and services on the basis of their

7  psychiatric disabilities.  *See id*.  The *Klemaske* case challenges the exclusion of CCCMS

8  inmates from fire camp placement, while plaintiff HECKER herein complains about the

9  exclusion of EOP inmates from other CDCR programs and services.  However, the legal

10  theory under the ADA is the same.  See Rule 83-123(a)(3) ("both actions involve

11  similar questions of fact and the same question of law.")  Assignment of these two cases

12  to a single judge is likely to increase judicial economy because time spent becoming

13  familiar with the CDCR's mental health delivery system in one case will not need to be

14  duplicated in the second case.

15

16  **III.**    **Relationship to *Wilson v. Woodford*.**

17        A third related case is *Wilson v. Woodford*.  The *Wilson* case is a pro per class

18  action brought by a CMF EOP inmate seeking to overturn the same exclusion of EOP

19  inmates from programs and services challenged by plaintiff HECKER herein.  The

20  *Wilson* case is currently before Judge Karlton, the same Judge to whom the *Coleman*

21  case is assigned.  The *Hecker* case and the *Wilson* case are related because they involve

22  the same institution, the same policy of excluding EOP inmates from work, education

23  and vocational policies, the same legal theories, and many of the same defendants.  Each

24  plaintiff seeks to represent both himself and the same class of similarly situated EOP

25  inmates (although plaintiff Wilson is not represented by counsel and therefore is likely

26  to have difficulty obtaining class status).

27  //

28  ///

1

**CONCLUSION**

2        For all of the reasons set forth above, the HECKER case is related to the *Coleman*

3   case, the *Klemaske* case, and the *Wilson* case.

4                                    Respectfully submitted,

5

    Dated:  December 1, 2005          ROSEN, BIEN & ASARO, LLP

6

7                                    By:

                                         Michael W. Bien

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ERNEST GALVAN

HOLLY BALDWIN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
NURA MAZNAVI
THOMAS NOLAN
LORI RIFKIN **
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ***

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

August 25, 2006

Kurt A. Franklin
Hanson, Bridgett, Marcus, Vlahos & Rudy, LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Lisa A. Tillman
Deputy Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 94244-2550

Jay C. Russell
Deputy Attorney General
455 Golden Gate Ave. Suite 11000
San Francisco, CA 94102-7004

Michael Stone
CDCR
Legal Affairs Division
1515 S Street, Room 314S
Sacramento, CA 95814

Re:   *Hecker v. California Department of Corrections and Rehabilitation,* et al.,
Case No. 2:05-cv-02441-LKK
<u>Our File No. 935-1</u>

Dear Counsel:

As you are aware, on May 5, 2006, Judge Karlton ordered that *Coleman v. Schwarzenegger* and *Hecker v. California Department of Corrections and Rehabilitation* were related within under Local Rule 83-123(a) (E.D. Cal. 1997) because "[t]he actions involve the same parties, and are based on the same or similar claims, the same property, transaction or event, and similar questions of fact and law."

I write to request that Defendants stipulate to modifying the *Coleman* Protective Order dated July 29, 1992, attached hereto as Exhibit A, to include *Hecker* counsel. There are many cross-over issues between these cases. We believe a modification of the protective order will prevent Defendants from having to produce duplicative discovery. In order to promote efficiency and avoid the time and expense of a motion for modification of the protective order, we ask that you stipulate to such a procedure. By way of example, I have attached to this letter as Exhibit B is a Stipulation to Modify Protective Order and Order filed April 22, 2003 in *Armstrong v. Schwarzenegger,*

*      MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**     MEMBER OF THE CONNECTICUT AND NEW YORK BAR
***    MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

August 25, 2006
Page 2

permitting disclosure of *Armstrong* records to *Plata v Davis* counsel and related parties, for your review.

I will draft a Stipulation and Proposed Order for your review. Please do not hesitate to contact me with questions. I would appreciate a response no later than September 8, 2006.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Meghan Lang

ML:kl
Enclosures

Cc:    Co-counsel (via email)