PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

THE LEGAL AID SOCIETY–EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION**<br><br>**HEARING**<br><br>Date:　　　　December 11, 2006<br>Time:　　　　10:00 A.M.<br>Location:　　Courtroom 4<br><br>The Honorable Lawrence K. Karlton |

H:\0489\3\PLEADING\mwb decl iso pls' motion for 3 judge panel, 11-13-06, 489-3.DOC

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

I, Michael W. Bien, do hereby declare:

1.  I am an attorney admitted to practice law in California and a partner in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Motion To Convene A Three Judge Panel To Limit Prison Population.

## THE OVERCROWDING EMERGENCY

2.  There are currently unprecedented levels of overcrowding in the CDCR. On October 4, 2006, Governor Schwarzenegger issued a proclamation declaring a State of Emergency in the State of California's Prison System due to severe levels of overcrowding. Attached hereto as Exhibit A is a true and correct copy of the Governor's "Prison Overcrowding State of Emergency Proclamation," dated 10/04/06.

3.  According to population reports downloaded from the CDCR website, there were 173,463 inmates housed in the CDCR as of November 1, 2006. Attached hereto as Exhibits B and C are a true and correct copies of population reports that were downloaded by my staff from the CDCR website on Wednesday, November 8, 2006. Exhibit B provides population data as of midnight on November 1, 2006. Page two of this report shows that fifteen institutions are at or above 200% of their design capacity and the system overall is at 195.6% of its design capacity. Exhibit C provides population data as of midnight on September 6, 2006. A comparison of the population reports shows that in the past two months alone, the population of the CDCR has risen by more than 1,000 inmates.

4.  On June 30, 2004, the Corrections Independent Review Panel appointed by Governor Schwarzenegger issued a report entitled "Reforming Corrections: A Report of the Corrections Independent Review Panel." Chapter 7, "Inmate/Parolee Population Management" of this Report is attached hereto as Exhibit D. The Panel examined the CDCR population, determining its "design capacity" and the larger "maximum 'safe and reasonable' capacity." The Panel stated that the maximum safe and reasonable male inmate capacity is 137,765 inmates. Ex. D at 123-24. Since the Panel's report, CDCR has opened the Kern Valley State Prison

("KVSP"), which has a design capacity of 2,625 and a current population of 4,779 inmates. *See* Ex. B (CDCR Population Statistics as of 11/1/06). The current male inmate population of CDCR is 161,652 inmates, which far outstrips the maximum safe and reasonable inmate capacity of the CDCR. Ex. B. It also represents an eight percent increase, or more than 12,000 inmates, since the Panel's recommendation in 2004. *Compare* population totals in Ex. D *and* Ex. B

5. Defendants have acknowledged that they are currently housing thousands of inmates throughout the state in unsafe conditions never intended for inmate housing. The Governor's Proclamation states that more than 15,000 inmates are housed in prison areas "never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with approximately 1,500 inmates sleeping in triple-bunks." Ex. A at 1. I have been informed by press accounts and CDCR officials that at various times in the past few months, inmates were being required to sleep in tents at various prisons and on the exercise yard at California Institute for Men ("CIM").

6. On September 1, 2006, following the conclusion of the Legislature's Special Session on Prison Overcrowding, CDCR Secretary James Tilton distributed a memorandum to all CDCR staff in which he acknowledged that CDCR conducts the "unsafe practice of housing offenders in nontraditional beds." Attached hereto as Exhibit E is a true and correct copy of a memorandum from James Tilton to All CDCR Staff, dated September 1, 2006. Tilton also stated, "I am deeply disheartened that the special legislative session concluded last night without the passage by the Assembly of any measures to provide either short-term relief or long-term remedies to alleviate the prison overcrowding crisis." Ex. E at 1.

7. As a result of this severe overcrowding, institutions throughout the state are now operating on an extremely restricted status. Attorneys in my office who visit prisons on monitoring tours on behalf of the plaintiff classes in the *Valdivia*, *Armstrong*, and *Coleman* class actions are regularly told by class members and prison staff that institutions are on "modified program" or "lockdown" as a result of the effects of severely overcrowded conditions. Lockdown status generally means that out of cell time is extremely limited or nonexistent.

Inmates spend up to 23 or 24 hours per day confined to their cells. They do not receive the required basic minimum of ten hours of yard time per week and do not receive yard time on a regular basis. Some of our class members report going for months without any yard time. Inmates do not regularly receive the required basic minimum of three showers per week. Dayrooms throughout the prison system have been converted to dorm space, with inmates celled in multi-tiered bunks in the dayrooms. This means that there is no dayroom access. Other privileges such as access to property, access to mail and visitors, and work and educational programs have also been eliminated or severely restricted. Constitutionally unacceptable delay is routine for inmates requiring medical or mental health attention.

8. Attached hereto as Exhibit F are color photographs downloaded by my staff from the CDCR website titled "Prison Overcrowding Images" (http://www.cdcr.ca.gov/communications/prisonovercrowding.html) on Tuesday, November 7, 2006 that show some of the horrifically overcrowded conditions in the CDCR. According to the information on the website, the pictures are of the following:

- Pictures 1-3:  August 7, 2006 at CIM
- Pictures 4-5:  August 7, 2006 at CSP-Solano
- Picture 6:  July 19, 2006 at Mule Creek
- Pictures 7-9:  August 10, 2006 at CIW
- Pictures 10-14:  August 8, 2006 at CSP-Los Angeles

9. Attached hereto as Exhibit G is a true and correct copy of the CDCR Draft Inmate Population, Rehabilitation, and Housing Management Plan, dated July 2006. It concludes that "CDCR's use of non-traditional beds through June 2007 stretches reasonable security correctional standards and the safety of staff, inmates, and the public. There are no additional alternatives to further overcrowding existing prison capacity without great risk to the public safety." Ex. G at 2.

10. Remedial sanctions were held by this Court in *Valdivia v. Schwarzenegger*, E.D. Ca. No. Civ. S-94-0671 LKK/GGH, to be an integral part of the *Valdivia* Stipulated Order for Permanent Injunctive Relief Preliminary Injunction, filed March 9, 2004. As the Court found

in its June 8, 2005 Order (a true and correct copy of which is attached hereto as Ex. H), defendants stopped the use of remedial sanctions in April 2005. Defendants have yet to reinstate the remedial sanctions program. On approximately May 12, 2006, my office prepared two charts, attached hereto as Exhibit I, illustrating the differences in inmate population intake based on the use of remedial sanctions versus the absence of remedial sanctions. The charts was created using information from the CDCR Spring 2006 Population Projections, Tables 7 and 8, available online at http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/Projections/S06Pub.pdf. True and correct copies of these Tables were downloaded by my staff on November 8, 2006 and are attached hereto as part of Exhibit J. For the first chart, the quarterly intake totals from Tables 7 and 8 of the Population Projections for new terms, parole violators with new terms, and parole violators without new terms were displayed in chart form. The total quarterly intake was then calculated as if just the parole violator without new term intake was reduced from 10% from 2004 through 2005, and 30% thereafter, as provided in the *Valdivia* Permanent Injunction. The result of those 10% and 30% reductions is shown in the green (light colored) line that runs across the chart. The second chart then shows just the total reductions in population that would have resulted if the 10% and 30% goals had been met, *i.e.*, the difference between the total intake and what the intake would have been had the remedial sanctions goals been met.

11. As shown in the Spring 2006 Population Projections, Exhibit J, parole violators continue to be the largest group of new admissions to California's prisons, where they are warehoused in Reception Centers, without access to drug treatment programs, education, or appropriate mental health care. *See, e.g.,* Defs.' Submission of Plan for Reception Center/EOP Inmates, filed 7/31/06 (recognizing current lack of mental health care, pre-release planning, programming in reception centers). They receive no pre-release planning for parole, making them likely to "succeed" on parole for only a brief period (sometimes days or weeks) before they are again violated and returned to custody. *Id.*

12. Attached hereto as Exhibit K is a true and correct copy of a Memorandum from

CDCR Director of Adult Institutions John Dovey to CDCR Secretary Roderick Hickman, dated October 25, 2005. Dovey states that there is a population crisis, cites the extreme influx of parole violators, and concludes that "an imminent and substantial threat to the public safety exists requiring immediate action."

13.  In his Overcrowding Proclamation, and elsewhere, Governor Schwarzenegger has admitted that the California government is unable to effectively address the overcrowding crisis. Attached hereto as Exhibit L is a true and correct copy of an excerpt from the transcript of a hearing, held October 5, 2006, in front of Judge Henderson in *Madrid v. Tilton*, N.D. Cal. No. C 90-3094 (TEH). Arthur Shartsis, the attorney representing the Governor personally, stated that "it is [the Governor's] belief that overcrowding affects virtually all of the issues that the Court is concerned about...it is something that affects prisoners throughout the State," and conveyed the Governor's request that he "tell Judge Henderson that I can use all the help from him I can get." 32:21-34:5.

14.  The only short-term solution advanced thus far by the California government is Governor Schwarzenegger's plan to transfer inmates to other states. This plan covers at most 5,000 inmates, in contrast to the at least 73,000 inmates who are currently housed in CDCR *in excess* of the 100,000 design capacity of the system. Attached hereto as Exhibit M is a true and correct copy of the Briefing Memo Re: Out of State Inmate Transfer produced by the CDCR. More recent information provided to me by defendants in the recent litigation concerning the transfers to Tennessee is that the out-of-state transfer program will be limited to 2,500 inmates or less.

**THE NEGATIVE EFFECTS OF OVERCROWDING ON THE PLAINTIFF CLASS**

15.  The number of inmates/patients in the plaintiff class has more than doubled since the time this Court issued the decision in this case. The number of mentally ill inmates identified by defendants as of October 5, 2006 is 32,348, in contrast to 14,293 identified in July 1997. Almost 4,000 of these inmates are currently classified as EOP. Attached hereto as Exhibit N is a true and correct copy of a chart entitled Mental Health Population-Placement Per Institution, which is dated 10/5/2006, and was produced by defendants in response to plaintiffs'

request. Attached hereto as Exhibit O is a true and correct copy of the Special Master's Report and Recommendations on Revised Program Guide, filed 2/3/2006.

16. The vacancy rate for clinicians and other mental health care staff in the CDCR is stunning. Attached hereto as Exhibit P is a true and correct copy of a chart entitled "Mental Health Services Delivery System Staffing Allocation and Vacancy History" that was received from defendants by plaintiffs on July 21, 2006 as part of defendants' monthly reports and is reflective of March 31, 2006 data. To date, this is the most recent monthly report provided to plaintiffs. This chart shows that the overall vacancy rate for mental health staff is 21 percent, and that 416 positions out of 1,943 are vacant. On July 28, 2006, this Court issued an order requiring defendants to acquire funding for an additional 530.65 permanent and 21.2 limited term positions. The Legislature approved funding for these positions during its Special Session. Plaintiffs have received no information that any of these positions have been filled and have, in fact, been informed that defendants are unable to fill these positions given the existing salary structure. If these vacancies are added to the vacancies shown in defendants' chart, the total is 968 vacancies out of 2,495 positions, or a 39 percent vacancy rate.

17. Attached hereto as Exhibit Q is a true and correct copy of a letter from Steve Cox, president of the CMF chapter of the CCPOA to my co-counsel, Prison Law Office, and received by them on December 8, 2005. In the letter, Mr. Cox states CMF was "running over 60 vacant correctional positions" and explains that the shortage of correctional staff affects the ability of the institution to provide mental health and medical programs. He concludes that "CMF is heading for disaster. All staff members and inmates are at great risk and this institution will not be safe to work or live in. CMF will no longer be able provide [*sic*] services as required by the courts and state laws."

18. Inmates with severe mental illness continue to be disciplined and placed in punitive segregation at highly disproportionate rates. Attached hereto as Exhibit R is a true and correct copy of a CDCR chart of the "Mental Health Adseg/SHU/PSU" statistics as of October 5, 2006 that was produced by defendants pursuant to plaintiffs' request.

19. The suicide rate in the CDCR continues to escalate and marks the overwhelming

depression, hopelessness, and pain of inmates throughout the state who are living in unsafe and increasingly violent conditions. Under my supervision, paralegals in our firm track all CDCR suicides in a database. We add the name of each inmate who commits suicide, and other key data relevant to the suicide to the database when we receive suicide notifications and suicide reports from the defendants. We also cross-check our database against the Special Master's and defendants' annual suicide reports, and make adjustments to our tracking data where necessary. According to our current tracking log, which does not count several deaths whose cause is currently reported to be unclear (cases which may upon further review turn out to be additional suicides), in 2005, plaintiffs counted 41 suicides in the CDCR. We did not include four deaths reported by defendants as non-suicides, which we have not yet reviewed. We have reviewed two additional deaths reported by defendants as non-suicides, and on the basis of our review of the inmate-patients' central and medical records (and the CDCR's death reviews), we have decided to include these two deaths in our suicide count: (1) the 9/25/05 death of a CCCMS patient, with suicidal history, housed on death row at San Quentin who overdosed on his medications; and (2) the 7/02/05 death of an EOP patient, with suicidal history, who was floridly psychotic and died by suffocation in his cell. National suicide rates reported by the Bureau of Justice Statistics are based on the rate per 100,000 inmates, with the state prison suicide rate figured at 14 per 100,000 inmates as reported by the Bureau of Justice Statistics Special Report on Suicide and Homicide in State Prisons and Local Jails, which was issued by the U.S. Department of Justice in August 2005. My staff calculated the CDCR suicide rate for 2005 by taking the ratio of 2005 suicides to the total current population of male CDCR inmates (41/156,374) and multiplying that ratio by 100,000. The resulting CDCR suicide rate per 100,000 is 26.21, which rounds down to a rate of 26 per 100,000, which is almost double the state prison rate reported by the U.S. Department of Justice in August 2005.

20. To date, CDCR has reported at least 37 completed suicides in 2006. This does not include several deaths whose cause is reported to be unclear. The projected suicide rate for all inmates in 2006, as figured above, is 25 per 100,000. This projection includes the population of female inmates because there has been one suicide to date in 2006 in the CDCR

population of women.

21. Special Master Keating filed the Fifteenth Monitoring Report of the Special Master of the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("15th Report") on January 23, 2006. It reflects monitoring tours by the Special Master's team from approximately August 2004 to May 2005. The 15th Report reflects numerous observations concerning the limited ability or failure of defendants to provided adequate mental health treatment as a result of overcrowding and as of May 31, 2004, CDCR housed 10,000 fewer inmates than at present. Moreover, these observations indicate that the crisis does not exist only at high levels of care, but also affects the tens of thousands of CCCMS inmates/patients. For example, the Special Master found that at High Desert State Prison, "[t]he availability of group therapy for 3CMS inmates declined. Staff indicated that it was difficult to run groups due to large case management caseloads, lockdowns, inadequate escort services, restrictions on mixing different blocks of inmates and insufficient access to program space." 15th Report at 49. At SCC, "[l]ess than five percent of the 3CMS caseload received any group therapy. About 80 inmates were on a waiting list, demonstrating both the demand for groups and the institution's inability to meet this treatment need. According to staff, the lack of appropriate space was a principal obstacle to initiating more groups." *Id.* at 78-9. At CSP Solano, "[t]he amount of group therapy offered to 3CMS inmates declined during the monitoring period due to limited program space and high case manager caseloads." *Id.* at 103. At CTF, "group therapy for 3CMS inmates declined during the monitoring period. Programming space for group activities was limited, as were offices and interview rooms." *Id.* at 213.

22. Inmates in the plaintiff class have filed administrative appeals ("602's") regarding the denial of basic human needs such as yard and exercise, and the responses at every level cite overcrowding and indicate that defendants are unable to provide these fundamental rights. Attached hereto as Exhibit S is a true and correct copy of the Director's Level appeal response concerning an inmate housed at Salinas Valley State Prison in an SNY yard, who appealed the denial of adequate yard, dayroom, and showers in October 2005. The response states that the

prison is in a state of emergency due to staffing shortages. Attached hereto as Exhibit T is true and correct copy of the appeal response from an inmate housed at San Quentin in the Adjustment Center, who filed an appeal regarding the denial of a minimum of ten hours of yard per week in December 2005. The response states that the exercise yards have been closed due to staff shortages. (Inmate names have been redacted.)

23. The Court-appointed Receiver in *Plata v. Schwarzenegger*, N.D. Cal. No. 3:01-CV-01351-TEH, the class action concerning medical care in the CDCR, has stated numerous times that the medical system is in a state of failure and the overcrowding crisis must be alleviated. Attached hereto as Exhibit U are true and correct copies of excerpts of the Receivers' First and Second Bi-Monthly Reports, filed 7/5/06 pages 2-3, and 9/19/06 pages 2-4, respectively. Attached hereto as Exhibit V is a true and correct copy of a letter from Receiver Sillen to Governor Schwarzenegger, Speaker of the Assembly Fabian Nunez, and Senate President pro Tem Don Perata, dated 7/24/06, in which Receiver Sillen states, "The medical crisis, however, is in part, a byproduct of the growing overpopulation problem in California's prisons…. It will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels."

24. Attached hereto as Exhibit W is a true and correct copy of the transcript of a unique joint hearing in front of this Court and Judge Henderson on June 8, 2006 regarding the *Coleman* and *Plata* cases. At this hearing, the Court recognized the many areas of overlap and interrelatedness between the two cases.

25. The unprecedented overcrowding will be even further aggravated in the next few months because defendants and Los Angeles County are planning to terminate a contract under which 1,300 CDCR prisoners are housed at the Pitchess Detention Center of the LA County Jail. In a September 1, 2006 memorandum to Special Master Keating and Receiver Sillen discussing the absorption of these prisoners into other institutions, CDCR Health Care Director Dr. Peter Farber-Szekrenyi warned that this will create serious difficulties in delivering mental health care such as lack of medication continuity, redirection of mental health staff from their primary responsibility of direct patient care to screening for all incoming CCCMS inmates, and

1  exacerbation of already existing shortages of MHCB and inpatient beds.  Attached hereto as
2  Exhibit X is a true and correct copy of this memorandum.

3    26.    Attached hereto as Exhibit Y is a true and correct copy of a May 25, 2006 Order
4  entered by a federal district court in Ohio in *Roberts v. County of Mahoning*, D. Ohio, Case
5  NO. 4:03-cv-0229-DDD, that refers consideration of a prisoner release order to a three judge
6  panel.

7    27.    Attached hereto as Exhibit Z is a true and correct copy of a Population Consent
8  Order entered in 1998 by a three-judge panel pursuant to 18 U.S.C. § 3626(a)(3) in a District of
9  Columbia case, *Inmates of Occoquan v. Barry*, No. 86-2128(JLG).

10   28.    Attached hereto as Exhibit AA is a true and correct copy of an excerpt from the
11 transcript of the April 26, 2006 hearing, pages 1-3, held before this Court in the *Coleman* case.

12   29.    Attached hereto as Exhibit BB is a true and correct copy of pages 209-28 from
13 Gary E. Beven, <u>Offenders With Mental Illnesses in Maximum- and Supermaximum-Security
14 Settings</u> in Handbook of Correctional Mental Health, (2005).

15   30.    Attached hereto as Exhibit CC is a true and correct copy of pages 199-239 from
16 Craig Haney, <u>Reforming Punishment</u>, (2006).

17   31.    Attached hereto as Exhibit DD is a true and correct copy of the population report,
18 dated August 3, 2006, downloaded by my staff from the CDCR website on Monday,
19 November 6, 2006, reflecting population data as of midnight on July 31, 2006.

20

21  I declare, under penalty of perjury, that the foregoing is true and correct, and that this
22 declaration is executed in San Francisco, California on November 13, 2006.

23

24
                                    /s/ Michael W. Bien
25                                  Michael W. Bien