Exhibit D





# Reforming Corrections

Report of the

## Corrections Independent Review Panel

Presented to

## Governor Arnold Schwarzenegger

June 2004

# Corrections Independent Review Panel

**Chairman**
Governor George Deukmejian

**Executive Director**
Joseph Gunn

**Principal Consultant**
Robin J. Dezember

**Program Consultant**
George Camp

**Team Leaders**

| | |
|---|---|
| Solange Brooks | Office of the Inspector General |
| Brenda K. Epperly, R.N. | Department of Corrections |
| Nancy L. Faszer | Office of the Inspector General |
| Tammy McGuire | California Youth Authority |
| Michael Pickett | Department of Corrections, Retired |
| Richard Ross | Federal Bureau of Investigation, Retired |
| Tim Rougeux | Department of Corrections |
| Bill Shepherd | Department of Corrections |
| Dewey C. Willis | California Youth Authority, Retired |

**Project Editor**

| | |
|---|---|
| Anne Jackson | Office of the Inspector General |

**Executive Assistant to Governor Deukmejian**
Yolanda Campagna

**Panel Members**

| | |
|---|---|
| Art Aclaro | California Highway Patrol |
| Ken Baird | Board of Prison Terms |
| Mark C. Clemons | California Highway Patrol |
| Maureen Cudahy | Department of Corrections |
| Michael Dust | California Highway Patrol |
| Bob Findlay | California Highway Patrol |
| Laurence E. Finney | Office of the Inspector General |
| Ron Frantz | Board of Prison Terms |
| Kevin M. Frost | Department of Corrections |
| Bryan Kingston | Department of Corrections |
| William J. Languemi | California Highway Patrol |
| Matthew S. Lynch | California Highway Patrol |
| Roy Mabry | Department of Corrections |
| Chris C. Main | California Highway Patrol |
| Amy R. Mangan | California Highway Patrol |
| Daniel Marshall | Department of Corrections |
| Carrie Nevans | Labor and Workforce Development Agency |
| John Petropoulos | California Youth Authority |
| Jennifer J. Santos, Esq. | Department of Corrections |
| Carlene Scott | Department of Corrections |
| Bryan Shill | Board of Prison Terms |
| Allan L. Sloan | California Youth Authority, Retired |
| Colonel Ted Westerman | United States Army, Retired |
| Carole Ylst | Department of Corrections, Retired |

**Student Intern**
Francis Yau



June 30, 2004

The Honorable Arnold Schwarzenegger
Governor of California

Dear Governor Schwarzenegger,

I am pleased to present the Corrections Independent Review Panel's final report,
"Reforming Corrections", on future directions for California's correctional system.
This report details the findings and recommendations of our panel.

Although our panel had a very tight time schedule, I believe the report represents
the most comprehensive analysis of the corrections system to date and I am positive
that our recommendations, when implemented, will once more elevate California to
a national leadership role.

Thank you for your consistent support of our activities over the past few months.
We look forward to discussing this report with you, with members of your
Administration and with members of the Legislature.

Most Cordially,

George Deukmejian
35th Governor of California
Chairman
Corrections Independent Review Panel

# Contents

|  |  | Page |
|---|---|---|
| **Introduction** | | **i** |
| **1** | **A Reorganization Plan for Corrections** | **1** |
| **2** | **Ethics and Culture** | **19** |
| **3** | **Employee Investigations and Discipline** | **27** |
| **4** | **Use of Force** | **41** |
| **5** | **Personnel and Training** | **51** |
| **6** | **Risk Management and Health Care** | **87** |
| **7** | **Inmate/Parolee Population Management** | **121** |
| **8** | **Ward/Parolee Population Management** | **163** |
| **9** | **Closures** | **199** |
| **10** | **Labor Contract** | **229** |
| **11** | **Information Technology** | **233** |

**Appendices**

| | |
|---|---|
| **A: Implementation** | **2** |
| **B: Legal Discussion** | **5** |
| **C: Proposed Statutory and Constitutional Changes** | **8** |
| **D: Bibliography** | **59** |
| **E: Individual Contacts** | **83** |

# Inmate/Parolee Population Management

California's prison system presently holds more than 162,000 adult inmates, with another 114,000 former inmates under state parole supervision. The cost of that system now approaches $6 billion. The size of the prison population has resulted in part from tough-on-crime sentencing policies of recent decades, but the state has also been widely criticized for fueling the numbers by not doing a better job of preparing inmates to return to society. Approximately 90 percent of state prison inmates are eventually released on parole, and at present, more than half return to prison. A 2003 study by the Little Hoover Commission concluded that inmates are not prepared for their release from prison. Department of Corrections reports show that 43 percent of inmates released from prison in 1999 were sent back to prison within a year and that 56 percent returned within two years. Many of those returned to prison are parolees who are sent back for violating the conditions of parole, rather than for committing new crimes, and many of those go back for relatively short periods of time—an average of 5 ½ months. The vast numbers of parolees returning to prison help drive both the size of the prison population and the cost of the system. In 2001 more than 74,000 (47 percent) of the average daily prison inmate population of 157,000 was made up of parole violators.

To identify solutions to these problems the Corrections Independent Review Panel interviewed dozens of correctional experts, examined published studies, and researched the custody and parole practices of other states. As a result of that analysis, the panel recommends that the new Department of Correctional Services undertake several actions to better manage the inmate and parolee populations. The panel concluded that California can reduce the growing cost of managing its adult prison population by addressing three key factors that influence the size of that population — the length of time inmates serve in prison; the training and treatment they receive during incarceration to decrease the likelihood that they will return; and the services they receive during parole to help them remain crime-free and successfully integrate into society.

Underlying the panel's recommendations is the fundamental principle that the main goal of prison is to protect public safety, but that public safety is best served by a system that not only locks up criminals, but also helps inmates prepare for release and improves opportunities for parolees to stay out of prison. For those efforts to succeed, the custody and parole systems must work in concert, beginning with the first day inmates enter prison and continuing until parolees are released from supervision.

The length of time an inmate serves in prison depends on the sentence imposed by the court and on "time credits" earned by the inmate through in-prison work and program activities. The training and treatment inmates receive in prison includes education and other programs offered in accordance with goals identified for each inmate. And parole services include both surveillance and programs such as job placement and drug abuse treatment.

## REFORMING CORRECTIONS

To address the length of time inmates spend in prison, the panel recommends eliminating the current time-credit system for non life-term offenses and adopting instead a "presumptive" sentencing structure that more effectively encourages inmates to achieve identified goals during incarceration. As an immediate measure to shorten prison terms, the panel recommends enhancing time credits inmates can earn in return for accomplishing specified goals. As a further means of reducing the prison population, the panel recommends identifying older inmates who could safely be released early, consistent with similar programs operating in several other states. To better prepare inmates for release, the panel recommends providing inmates with much greater access to in-prison education, vocational classes, life-skills training, re-entry services, and drug treatment. Those efforts should be guided by a research-based needs and risk assessment of each inmate upon entry into prison and should include a programming plan designed specifically to address the inmate's identified needs.

To reduce the number of parolees who return to prison, the panel recommends changes that will enable parole agents to concentrate the most intensive supervision on parolees who represent the greatest risk to the community and improving services to help parolees reintegrate into society. The changes should include a risk-assessment of each parolee. The risk-assessment tool should be updated regularly to reflect any changes in the demographics of the parole population. Parolees identified through risk assessment as very low risk should be discharged from parole after three months. In addition, the panel recommends increasing the number of substance abuse treatment beds in the community and continuing implementation of the Department of Corrections "new parole model," which includes pre-release planning, electronic monitoring, and residential treatment as an alternative sanction for technical parole violations. The new Department of Correctional Services should also implement effective research and data-collection capabilities to precisely identify the most effective and efficient methods of supervising parolees.

In implementing these reforms, the first order of business should be determining the operable capacity of the state's prisons—the maximum capacity of the prisons to house inmates safely and securely while providing effective education, training, and treatment. The second order of business should be to determine the appropriate staffing needed to operate each prison and to provide inmates with needed programming. To improve strategic planning capabilities, the panel recommends that the new Department of Correctional Services contract with one of the state universities to undertake responsibility for inmate population projections.

### Fiscal Impact

The department saves money with each inmate and parolee it safely removes from the prison and parole population. The present average cost of housing an inmate is $28,439 per year, and the average cost of supervising a parolee is $2,930 per year. Some of the recommendations presented here require an initial investment, but can be expected to save money in the future by improving the chances for inmates and parolees to succeed, thereby reducing the numbers who return to prison and shrinking the overall prison population.

Other recommendations may immediately reduce prison and parole populations and thereby produce savings upon implementation.

## Laying the Groundwork for Reform

Every day, hundreds of thousands of inmates and parolees are housed, supervised, and moved around within the state prison and parole systems. Managing this population is complex and challenging. In today's environment, prison administrators must contend with severe overcrowding, the potential for violence, court mandates to provide constitutionally adequate conditions of confinement, budget cuts that have reduced staffing, and burgeoning inmate population levels, fueled in large part by former inmates cycling back into prison.

The key to reforming the system lies in reducing the numbers. That effort will require attention to sentencing practices, time-credit policies that allow inmates to reduce sentences, early-release for low-risk offenders, and a commitment to programs that help inmates and parolees reintegrate into society. For programming to succeed, in turn, the system must free up programming space and provide adequate staffing to provide program services and run the institutions. Strategic planning for that task will require accurate population projections, knowledge of the system's basic operable capacity, and a determination of necessary staffing levels.

## Background

Operable prison capacity — the maximum capacity of the prisons to securely house inmates and provide effective programming— differs from both design capacity and maximum "safe and reasonable" capacity. "Design capacity" is the term used for the past 50 years to designate the number of inmates a prison is designed to accommodate according to standards developed by the Commission on Accreditation and the American Correctional Association.[1] The number can be based on any combination of single-occupancy cells, double-occupancy cells, single- or double-bunked multiple occupancy rooms, or dormitories. The standards take into account the need for humane conditions, as well as the need to prevent violence and move inmates to and from programs, such as mental health care, education classes, and drug abuse treatment. In California, design capacity is based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing. The design capacity of California's male prison system, including the capacity of the state's new prison at Delano, is 76,879 inmates. (See Table 1.)[2]

---

[1] California's actual prison capacity has never been limited to design capacity due to an ever-growing prison population. Actual prison population is represented here as a percentage of design capacity to provide a conceptual framework to convey the volume of prisoners that must be managed within the existing fixed environment.

[2] This report focuses primarily on the male prison population, which comprises 88 percent of the state's total prison population. According to the Department of Corrections "Monthly Report of Population as of April 30, 2004," compiled by the Offender Information Services Branch, the institution population on that date totaled 161,394, with 141,763 male inmates and 9,638 female inmates in the state's prisons and 9,993 male and female inmates in other types of facilities, such as contracted jail beds, public and private community correctional facilities, and other placements.

**REFORMING CORRECTIONS**

Maximum "safe and reasonable" capacity, in contrast to design capacity, refers to the maximum number of inmates who can safely and reasonably be housed in the prison system. That number takes into account the "safe and reasonable" capacity of individual housing units according to inmate custody levels, staffing levels, and the physical structure of the units. Level IV facilities, with a greater potential for violence, for instance, have a lower maximum safe and reasonable capacity than Level II and Level III facilities. The safe and reasonable capacity of each prison can be determined by totaling the safe and reasonable capacities of each housing unit in the prison, and the safe and reasonable capacity of the system can be estimated by combining the totals for each prison. The Department of Corrections has determined the maximum safe and reasonable capacity of the general population and reception center housing to be 190 percent of design capacity, while other housing can be filled only to between 100 and 160 percent of design capacity. Overall, the department has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 inmates - 179 percent of design capacity.

*Defining operable capacity.* Operable capacity, which takes into account space needed for effective programming in addition to safety and security, is greater than design capacity, but far less than maximum safe and reasonable capacity. A group of experienced California prison wardens told the panel at a recent forum that the operable capacity of the state's prisons to support full inmate programming in a safe and secure environment is 111,309 inmates, or 145 percent of design capacity.

*The state's prison system presently far exceeds operable capacity.* California prisons are presently filled to the breaking point, with populations exceeding both design capacity and "safe and reasonable capacity," and far exceeding operable capacity. With 141,763 male inmates in a prison system designed to hold 76,879, as of April 30, 2004, the state's prisons were operating at more than 184 percent of design capacity. That number exceeds the prison system's safe and reasonable capacity by 4,000 inmates — and it exceeds operable capacity by 30,000 inmates.

Even those numbers understate some of the overcrowding. Accommodating the present inmate population has been accomplished by confining two inmates in cells designed for one, by double- and triple-bunking inmates in dormitories designed for single bunks, and by converting activity space into inmate housing areas. As Chapter 9 of this report notes, more than 9,500 male inmates are presently housed in activity space that was never designed for housing. Because Level IV inmates are generally more violent and cannot be crowded to the same degree as other inmate levels, Level IV celled housing units have now reached 152 percent of design capacity and may not realistically be filled beyond that point. As a result, greater numbers of inmates are forced into other housing, which has raised Level III housing to 201 percent of design capacity, and Level II housing to 220 percent. Consequently, the overall population of male prisons exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage. Reception centers, for example, which house all inmates entering prison, are housing a population of 20,000 male inmates in space designed for only 8,500 — putting reception centers at 236 percent of design capacity.

124

*Female prisons are also overcrowded.* Female prisons are nearly as crowded as the male prisons although they do not experience the same levels of violence. The population of female prisons as of April 2004 stood at 9,945 inmates, compared to a design capacity of 5,830. The most severely crowded female prisons operate from 173 to 184 percent of design capacity.[3] The effects of crowding in these prisons are as severe as in the male prisons, even with lower levels of violence. While these prisons do not represent the same challenges for security as their male counterparts, the recommendations in the Report for inmate programming apply equally to both.

*Staffing reductions have accompanied overcrowding.* From fiscal year 1990-91 to 2004-05, more than 5,000 positions were reduced from the state prison workforce through various legislative budget reductions. During the same period, almost 1,200 additional positions were cut from the headquarters and parole staff.[4] The positions cut have extended throughout the system, and have included correctional officer, vocational and classroom teacher and other support staff positions, with a marginal number of correctional officer positions retained to perform essential security functions. Although some positions have been added to accommodate increases in prison population, these have not been sufficient to offset the overall reductions.

*Overcrowding and inadequate staffing impedes programming.* Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security. While the prisons attend to the primary objective of safety and security, they are able to pay little attention to inmate programming.[5] As a consequence, programs have been curtailed, which in turn has increased inmate idleness — ironic, in that effective programming would actually enhance internal security. Instead, combined with the reductions in security and non-security staff, the crowded conditions and lack of programming have elevated security risks and increased the probability of violent confrontations. Meanwhile, inmate programs such as education and substance abuse treatment that might reduce recidivism cannot be delivered because space intended to be used for such programs is instead used to house inmates.

The current situation in California prisons is untenable, and changes are required to bring about necessary controls. Before consideration is given to implementing the recommendations in this report concerning inmate programs, the safety and operability of the prisons must be improved. This report substantiates that education and other programs for inmates contribute to public safety. The environment that is needed for these programs to work must first be created and that requires:

- Violence control;
- Opening up program space by reducing prison population;

---

[3] <u>Monthly Report of Population as of Midnight April 30, 2004.</u> Department of Corrections, Offender Information Services Branch
[4] <u>Summary of Reductions,</u> Department of Corrections, Budget Management Branch
[5] Warden's Forum on Prison Capacity, CIRP, May 26, 2004

- Adding staff necessary to implement specific effective programs; and
- Exploring creative measures for the use of existing resources.

The reduction of prison population may be accomplished through the use of the new parole model (which reduces returns to prison), the initiation of a program of increased credits for time served, and adoption of a new sentencing approach for the majority of inmates who otherwise would receive determinate sentences. These options are discussed below.

*Violence must be brought under control to make programming possible.* The violence potential of Level IV inmates, especially in crowded conditions, severely challenges the development of a program environment in male prisons. To support programming that emphasizes preparing inmates for re-entry into the community, order and control of potentially violent inmates is necessary.[6] Implementing a violence control program has the potential both to provide this needed order and control and to begin the process of improving inmate behavior through programming. Violence control programs use special support staff and a system of rewards to implement programs known to be effective, such as anger management courses designed to control violence and produce the means for violent inmates to improve behavior. The violence control program is endorsed by the National Institute of Corrections and used effectively in 20 other states.[7] This program will permit the new department to begin to take the initial steps necessary to establish an environment in the prisons that can foster a broader application of inmate programming and the "re-entry philosophy."

*Increased staff and program space are needed to support effective programming.* Increases in both program space and staff are required to make effective inmate programming possible. Once operable capacity is determined and accurate population forecasts are made, the Department of Correctional Services can use a standardized staffing model to identify when staffing levels must increase or decrease. The new Department of Correctional Services should undertake a project to determine the appropriate staffing required for the operation of each type of institution, including management, custody, health care, and all other programs. Mission and capacities of institutions should be carefully designated so as to distinguish them on the basis of their mission, physical plant, specific inmate/ward supervision and programming requirements, and any other special consideration for a particular institution. Prisons can generally be divided into two types: modern prisons constructed after 1984 and older prisons constructed before 1984.

While standard staffing "packages" were approved for activating the prisons built after 1984, these packages should be used only for reference and should be updated to reflect

[6] Fifty-eight percent of the current inmate population was sentenced to prison under a determinate sentence and will eventually be released for return to the community, according to *Prison Census Data as of December 31, 2003* provided by the Department of Corrections, Offender Information Services Branch.
[7] Department of Corrections, Violence Control Program Budget Change Proposal for fiscal year 2003-04.

position reductions, redirections, accommodations for "overcrowding," court decisions, and other mandates that have affected staffing allocations. Input from operating wardens should be incorporated in determining the final results of the staffing project to ensure the operability of the institutions. The results should then be reconciled with the current budget for each of the institutions. Other recommendations in this report should be considered with respect to their applicability to the staffing project. The completion of this project can result in a more stable environment for current management and future planning for the continued development of the new department.

*Population projections.* Projecting future institution population is a matter of extreme importance for the department. Providing effective management of inmates and wards is the fundamental mission of the new Department of Correctional Services and can be done only when forecasts of increasing or decreasing population are as accurate as possible, reflect the types of inmates and wards that will require housing, and support effective programs to encourage successful re-entry to parole or aftercare programs. The current method used to forecast institution populations has been shown to be remarkably accurate over a substantial period of years and appears to provide the best basis for planning to accommodate this population, but even this method cannot be 100 percent accurate and "surprises" or emergencies can occur, as when unexpected numbers of inmates arrive at prison reception centers. This kind of emergency prompts criticism of correctional management that at best alleges an inability to plan effectively, and at worst alleges manipulation of the population forecasts.

Notwithstanding the demonstrable accuracy of the current method of projecting population relative to any other forecasting method for this purpose, uncertainty and distrust undermine the credibility of administrators in carrying out their designated responsibilities. A change in methodology appears not to be required. A change in the manner in which the methodology is used is recommended. The new Department of Correctional Services should consider an interagency agreement with one of the state universities that is active both in corrections education and research to undertake the responsibility for population projections. Management of this university relationship should be assigned to the new Office of Research and Planning. Taking these important steps will move the vital function of population projections to a neutral site that has both experience and interest in the management and research value of this process. This move will provide independent credibility for the results. In addition, cooperative research between the new Department of Correctional Services and the selected university can be used to maintain and improve the current population projection model where warranted, and the information generated through the process can be used for other decision-making purposes. The costs of implementing this change are unknown at this time. The panel expects that the university-based researcher would supplement the current staff of the department.

*Reducing the amount of time served in prison.* At present, most California Department of Corrections prisoners can reduce the length of their prison terms by staying out of trouble and having a "work assignment" inside the prison. Work assignments are broadly defined

**REFORMING CORRECTIONS**

to include education and vocational training as well as more traditional work that supports the operation of the prison, such as gardening, maintenance, or food-service. Most prisoners earn "day-for-day" credit, in which they earn one day off their sentence for each day they have a work assignment. Prisoners who are on a waiting list for an assignment earn one day off for every two days they are unassigned. Beginning in January 2003, inmates housed in the department's conservation camps can earn "two-for-one" credit or two days off their sentence for each day they are otherwise eligible to earn sentence credits.[8]

*Methods to reduce sentences.* Short-range and long-range methods are available to reduce the average time served in prison sentences. The average length of time served in prison, the number of new admissions, and the number of parole violators returning to the prison system are the three major factors that influence the prison population. If the amount of time served drops significantly or the number of felons committed to prison declines, then the prison population will also decline. The Corrections Independent Review Panel proposes two methods that will motivate inmates to improve themselves in prison and will result in less time served in prison. (The panel also discusses changes to the parole system later in this chapter.) Both methods alter or expand the sentence-reduction credit process, but differ in how quickly the methods can generate benefits once implemented. The first method, called presumptive sentencing, will require a long implementation period and will only apply to newly committed inmates. The second method can be implemented immediately after minor statutory change, and will enhance the amount of sentence-reduction credits that inmates can earn—providing that the inmates accomplish certain goals.

*"Presumptive sentencing" focuses prisoners on preparing for release.* Inmates serving determinate sentences have a prescribed term imposed at the time of commitment to prison, the actual length of which is subject to change based on the application and removal of sentence-reduction credits for work and other activities. The credit system was originally intended to provide incentives for the inmates to improve themselves and thus reduce the actual time they need to serve in prison by taking advantage of opportunities to work or participate in education programs. It was to serve a dual function of making inmates more manageable in prison while improving their chances for a successful return to the community.

Due in part to the sheer size of the system, the administration of many of its provisions has become automatic, and coupled with its complexities it has become a system in which sentence-reduction credits have become a "right" to be protected. The responsibility of prison officials has shifted from making programs available to making sure the inmates are "programming." Likewise, the focus of inmates has shifted from preparing themselves for parole through treatment and education to simply earning sentence-reducing credits by any means. The system is not the incentive system contemplated but has become instead a constant struggle for obtaining sentence-reduction credits increasingly viewed as a right in a prison structure in which funding for programs has diminished.

---

[8] Penal Code, Section 2933.3

128

Numerous corrections officials expressed to the panel growing frustration in trying to safely manage inmates who have no particular incentive to behave under the current system. An alternative, such as a "presumptive sentence," can return both simplicity and incentives to the administration of prison sentences. Under such a system a presumptive term and a maximum term would be established by a sentencing judge. The maximum term would be the same term as would be assigned under the current sentencing laws. The presumptive term would be a smaller portion of the maximum term (perhaps 50 percent). In selecting the presumptive term, the judge considers that it includes "good behavior" so that the presumptive term becomes the actual time to be served *provided that* good behavior is maintained by the inmate. Good behavior is further defined as completing a "program plan" that is assigned to the inmate upon arrival at prison[9]. (The program plan would need to address specific deficiencies or needs of the inmate and prescribe solutions that are flexible enough to work in the department's varied prison settings.) The inmates would be reviewed periodically by a social worker or counselor to determine their progress with the plan.

Under a presumptive sentencing model, the inmate would be eligible for release after completing the presumptive term. However, actual release would require verification that the inmate actually completed the requirements — the presumptive elements — of the sentence. The details of such an approval process would require more specific development by the new Department of Correctional Services, but one recommended method would be to have the Hearings Administration identified in Chapter 1 of this report conduct a review to verify completion. If, after consideration of the inmate's progress, the Hearings Administration determined that the inmate had completed the prescribed requirement, the inmate would be released. Alternatively, if the Hearings Administration determined that the inmate had not completed the requirements, the inmate would be denied release until he or she had completed the requirements (or until the maximum term elapsed.) Other methods of administering this process should also be considered by the new Department of Correctional Services.

*Presumptive sentencing supports re-entry programming.* A presumptive sentencing model supports a needed shift in the department's philosophy toward a "re-entry" orientation. The concept of a presumptive sentencing model provides a focus on eventual re-entry into the community as well as providing incentives for inmates to behave. It also requires a shift in the capability of the new Department of Correctional Services toward a "re-entry philosophy" that focuses on the eventual release of the inmate. Public safety is served not just by incarceration, but by both incarceration and a prison term dedicated to improving the chances for successful re-entry. Presumptive sentencing will provide an incentive to in-

---

[9] An option would be to tie this process back to the community by having the sentencing judge approve or prescribe the content of the plan. There are a number of obstacles to implementing this option, including ensuring that the plan is prepared in advance of sentencing and making sure that the judge prescribes a plan that is actually available in the prison.

**REFORMING CORRECTIONS**

mates to take the responsibility of completing the program plan and to officials who will have the responsibility of developing and administering it.

It is important to note that the recommendation for a presumptive sentencing model is to replace the current structure of determinate sentences only, as a means of including this sentencing method in a comprehensive correctional approach focusing on successful re-entry. It does not include the current structure for life sentences or the "two-strike" and "three-strike" sentences, which are beyond the scope of this recommendation. In December 2003 there were about 90,500 inmates (58 percent) serving determinate sentences. The remaining 42 percent of the inmates were serving life sentences, two-strike, or three-strike sentences.[10] (Programs for these inmates should be developed as a secondary priority and are not considered in this report.)

The Corrections Independent Review Panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. The presumptive sentencing model would require further development by the new department, and the panel recommends that the new department charter a special commission to fully develop this important sentencing reform.

***Goal-oriented sentence reduction credits could be increased quickly.*** Under the current sentence-reduction credit system, most of the department's inmates are limited to day-for-day credits, although some can earn more. (Fewer than 4,000 inmates housed in conservation camps earn two-for-one credits.) Inmates earn their day-for-day credits by participating in work, academic, or vocational activities; however, there is no requirement that the inmate fulfill any specific goals or even complete the training. The panel proposes that the department create a bonus sentence-reduction credit that would supplement existing credits and reward completion of education, vocational, or drug-treatment programs that are proven to reduce inmate recidivism.

This bonus sentence reduction credit would provide incentives for inmates' work activities by rewarding *completion* of academic, vocational, or drug-treatment goals. For example, an inmate could earn a 90-day sentence reduction for completing a literacy program or a college-level class, or a 180-day reduction for completing a drug-treatment course or a vocational certificate. Larger sentence reductions could be awarded to inmates who complete more rigorous programs, such as a two-year college degree. To implement this concept, the department would need to develop specific policies and procedures, and develop legislation to amend the California Penal Code to grant the authority for inmates to earn additional time credits.

***Release of low-risk inmates to community supervision.*** Other states have successfully formed partnerships with law schools to identify and consider for release low-risk older

---

[10] California Department of Corrections, "Characteristics of the Inmate Population," Table 10, February 2004.

and geriatric inmates. The California Department of Corrections currently houses more than 3,700 inmates who are between 55 and 59 years of age, and nearly 3,100 aged 60 or older[11]. The Legislative Analyst's Office, in its fiscal year 2003-04 Budget Analysis, recommended that California consider early release of elderly inmates. In its analysis, the Legislative Analyst noted that California does not track the cost of incarcerating elderly inmates, but that several other states do and that these other states have estimated that elderly inmates cost two to three times the amount needed to house younger inmates. The Legislative Analyst further reported that New York, for example, estimated its annual cost of housing elderly inmates to be between $50,000 and $75,000 each. The National Center of Institutions and Alternatives estimated the annual cost of confining elderly inmates at $69,000 – nearly three times the national average of $22,000 to incarcerate other inmates.[12]

The Legislative Analyst's Office noted that housing nonviolent elderly inmates is not a good use of scarce resources when they represent a low risk to society.[13] While the majority of these offenders should remain in custody because of the serious, violent, or sexual nature of their crimes, a small percentage could be considered for early release. Statistics published by the U.S. Department of Justice indicate that recidivism drops significantly as inmates age—from over 50-percent nationally for inmates between ages 18 and 29 to about 2-percent for inmates aged 55 or older.[14]

In a December 2003 analysis for the Legislative Analyst, the Department of Corrections estimated that release of non-serious, non-violent inmates aged 55 or older would reduce the inmate population by 657 and result in savings of $10.5 million in fiscal year 2005-06, if these provisions become effective on January 1, 2005. In the first fiscal year, the institution population would be reduced by about 332 inmates, resulting in savings of $5 million. Full-year savings would occur in fiscal year 2006-2007, when institution population would be reduced by 657 inmates, resulting in savings of $11 million. The institution savings would be offset by the cost of supervising these offenders on parole. Also, these savings are based on the average cost of incarceration for all inmates.[15]

In its calculations, the department assumed certain elderly inmates would be excluded from eligibility. Parole violators-returned to custody, inmates with life terms, second-striker inmates, sex registrants, and persons whose current or prior offenses are serious or violent (as defined in Penal Code, sections 1192.7(c), 1192.8, and 667.5(c)) were considered ineligible for early release.

Several states have released elderly inmates under a program created by George Washington University professor Jonathan Turley. Turley is the founder of the Project for Older Prisoners program, which uses a partnership between law schools and corrections depart-

[11] Department of Corrections, "Prison Census Data," December 31, 2003, Table 5.
[12] Legislative Analyst's Office, "Budget Analysis, Fiscal Year 2003-04," p. D-39
[13] *Ibid.*, p. D-40
[14] U.S. Department of Justice, Bureau of Justice Statistics, "Trends in State Parole, 1990-2000."
[15] Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 6," December 16, 2003.

**REFORMING CORRECTIONS**

ments to assess inmates for early release. To date, more than 200 inmates have been released under the program without a single act of recidivism.[16]

The Project for Older Prisoners program is likely to result in fewer early releases than the 657 figure estimated by the department because of its careful risk analysis and assessment of each inmate. This method is recommended, however, because of its conservative approach and excellent track record. Even if only one-quarter of the 657 inmates identified by the department met the more conservative criteria of the Project for Older Prisoners program, savings of $2.75 million could ultimately be realized.

***Contracting with private companies for low-level inmates.*** The Department of Corrections currently contracts with several private corrections companies for about 2,500 beds for lower level inmates. In January 2004 the department discontinued contracts for about 1,000 beds. Privatized beds provide a high degree of flexibility because the department has no long term investment in the infrastructure or the staffing and can renew contracts on an as-needed basis.

Based on the projected Level I male institution population in 2009, the department will need more than 10,000 additional beds in order to house Level I inmates in a safe environment with programming opportunities.[17] Renewing contracts with the existing facilities and reentering into agreements with the previously closed facilities would help to provide the beds needed for this population, with no capital outlay costs to the state.

## Recommendations

The Corrections Independent Review Panel recommends the following actions:

- Begin to create the environment in the prisons that is needed for inmate programs to be effective, which requires the following:

    - Implementation of a Violence Control Program;

    - Opening up program space by reducing prison population through lower returns to custody;

    - Adding staff necessary to implement specific, effective inmate programs;

    - Exploring creative measures for the use of existing resources.

- Develop an interagency agreement with one of the state universities that is active both in corrections education and in research to undertake the responsibility for

---

[16] George Turley, speaking at a sentencing seminar hosted by McGeorge Law School, April 16, 2004; Web-page viewed on March 25, 2004: www.gwu.edu/~ccommit/law.htm

[17] Table 1: Analysis of Male Institution Bed Capacity, CIRP, June 2004

population projections. Management of this function should be assigned to the new Office of Research and Planning.

- Undertake a project to determine the appropriate standard staffing required for the operation of each type of institution, including management, custody, health care and all other programs.

- Charter a commission with appropriate members from the judicial and corrections fields to develop a presumptive sentencing model. The model would apply only to sentences for offenses that are not subject to "two-strikes," "three-strikes," or other life terms.

- Modify the Penal Code to allow inmates to earn supplemental sentence reduction credits after they complete specified education, vocational, or drug-treatment goals.

- Establish a program to identify older inmates who could be safely released early from prison. The program should be similar to the Project for Older Prisoners program that has successfully released more than 200 inmates in other states without a single instance of recidivism.

- Renew contracts with existing privatized correctional facilities and consider reentering into contract agreements with previously closed facilities to provide the beds needed for the Level I population.

## Fiscal Impact

*For sentencing reform.* The panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. It is not possible, however, to estimate the fiscal impact at this time. There may be up-front costs to restore vocational and education programs that have been reduced.

*Standardized staffing.* Until a standardized staffing model is developed, it is impossible to predict whether its use would increase or lower current costs. In the long run, however, use of a standardized staffing model will allow greater accountability, which should result in cost savings.

*University-based population projections.* Similar to standardized staffing, better population projections will allow better planning and, in turn, provide greater accountability for the new department's operations.

*For the early release program.* As noted above, estimated savings are $2.75 million. Even greater savings may accrue from savings in health care cost avoidance; however, those savings cannot be estimated.

**REFORMING CORRECTIONS**

# Education Reforms

Numerous studies show that prison education programs help inmates reintegrate into society and reduce recidivism rates — the rate at which former inmates return to prison. California's recidivism rate is high compared to those of other states, and many of the state's inmates are ill prepared when they return to their communities.

The Corrections Independent Review Panel identified several areas where the new department can improve its educational system and re-entry programs to improve inmates' chances for success. Specifically, the panel recommends on-going assessment and refinement of the education programs. In addition, recently launched programs such as the bridging program, which provides for education in the reception centers, re-entry services, and other programs aimed at increasing inmate employment opportunities should be expanded. Consideration should also be given to using selected inmates in educational programs for other inmates. Rather than seeking entirely to add staff to effectuate programming goals, the new Department of Correctional Services should explore the expansion of existing projects, such as the health care peer educator, teacher aide, and lead vocational trainer projects that identify and train inmates to be used to teach other inmates in programs. There is evidence in other jurisdictions of success with inmates tutoring other inmates in basic reading.

## Background

Many inmates released from California prisons do not have the skills needed to obtain and maintain employment. More than 65 percent are unable to read, write, communicate in English, and function on a job. Many are unable to find jobs when they return to society— the parolee unemployment rate is 70 to 80 percent.[18] This situation is aggravated by the fact that re-entry programs designed to provide links to employment opportunities for parolees serve only about 30 percent of all inmates.[19]

*Effective programs reduce recidivism.* There is ample evidence that prison education and substance abuse programs have a positive impact on parolee recidivism, whereas researchers agree that incarceration alone does not have a measurable impact on recidivism. In May 2002, the Urban Institute completed a literature review of the effectiveness of prison-based education and vocational programs and concluded that: "In general, participants in prison-based educational, vocational, and work-related programs are more successful—that is, they commit fewer crimes and are employed more often and for longer periods of time after release—than are non-participants."[20] Similar results have been found in other studies, including a Federal Bureau of Prisons study that showed a 33 percent drop in recidivism among federal inmates who were enrolled in vocational and apprenticeship training." [21]

---

[18] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. vi.
[19] *Ibid.*
[20] The Urban Institute, "The Practice and Promise of Prison Programming Report," May 2002, p 8.
[21] State Correctional Education Programs, State Policy Update by Michelle Tolbert, March 2002, p 1.

General evidence of the benefit of prison education programs is also reflected in specific studies at the state level. For example, a January 2001 study by the Florida Department of Corrections found that the recidivism rate for inmates who earn a general education degree (GED) was 29.8 percent, whereas the recidivism rate for inmates without a GED was 35.4 percent (a 5.6 percent reduction.) Even more dramatic reductions in recidivism were observed for inmates who both completed a GED and obtained a vocational certificate. In that situation, the inmate's recidivism rate was 19.9 percent compared to the 35.4 percent rate for inmates with neither a GED nor a vocational certificate. The recidivism rate in Florida was even smaller for inmates who completed a GED and improved their Test of Adult Basic Education score to a 9th grade level. The recidivism rate of those inmates was only 12.2 percent.[22]

A three-state study of education programs conducted by the Correctional Education Association and Management & Training Corporation also showed the benefits of education programming in prisons. Statistics from Maryland, Minnesota, and Ohio showed that their rates of re-incarceration dropped from 31 percent for inmates not participating in education programs to 21 percent when inmates participated in education programs.[23]

The Washington State Institute for Public Policy analyzed numerous evaluations of treatment and education programs in North America conducted over the past 25 years. Their findings showed that prison programs can reduce crime in a cost-effective manner. For example, the study showed that prison vocational programs generate savings of up to $12,000 per participant and reduce crime by 13 percent, and that education programs generate savings of up to $9,000 per participant and reduce crime by 11 percent. The Washington review also found that in-prison therapeutic community substance abuse programs could save $2,365 per participant and reduce crime by 5 percent. (After the cost of the treatment was deducted and including both the direct savings to taxpayers and the benefits to potential crime victims.) When the type of program was followed through to the community (parole), the savings increased to an estimated $5,230 per participant and the crime reduction increased to 8 percent. The study showed an even larger savings from cognitive-behavioral programs, which cost about $300 per inmate but generated more than $7,000 in savings per participant and reduced crime by 8 percent.[24]

*Inmates' preparation for release must begin upon entry to the prison.* Re-entry planning and a risk assessment tool are being developed as part of the new parole model.[25] However, the current plan is to use these features only during the six- to nine-month period prior to an inmate's release from prison. The Corrections Independent Review Panel con-

---

[22] Florida Department of Corrections, "Academic, Vocational and Substance Abuse Program Impacts," pp. 3 and 11.
[23] Correction Education Association, Management & Training Corporation, "Education Reduces Crime – Three-State Recidivism Study," February 2003, p.12.
[24] Aos, Steve, *et. al,* Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001, p.8.
[25] Department of Corrections, draft memorandum - New Parole Model, February 2004.

cluded that this is too late. Instead, risk assessment and re-entry planning should begin when the inmate enters the institution, so that parole and prison staff can plan, along with the inmate, for eventual reentry by offering educational, behavioral, and drug treatment programs from the moment the inmate enters prison. Using this time constructively will both enhance public safety and save money if it can reduce the offender's future criminal behavior. It is important to include the parole division in this process because they are familiar with the community resources and what is needed for a successful re-entry.

*The availability of program classes is still limited to a small percentage of inmates.* At present, only inmates in the general population may participate in academic, vocation, or work programs; participation is not allowed for inmates in administrative segregation, secure housing units, and hospitals. Inmates in the reception centers participate in the bridging program, but are not considered part of the eligible population for traditional academic programs. The number of inmates participating in academic education programs rose from 7,178 in 1990 to 11,668 in 2004. During the same time period vocational program participation increased from 7,426 to 15,000.[26] However, the 2004 enrollment numbers reflect that only 26,668 (23 percent) of the 116,338 eligible inmates are participating.

The number of inmates who can enroll in academic and vocation programs is calculated by a formula used by the department that designates one filled teaching position for every 27 inmates. The total number of inmates who can receive programming is referred to as the enrollment capacity. A review of enrollment statistics indicates that the department does not accurately assess a true enrollment capacity number. As an example, in October 2003 the enrollment capacity was determined to be 33,371, while only 30,288 inmates were actually enrolled. Factors that affect the enrollment capacity are classroom availability and teacher vacancies for sick leave, vacation, and special assignments. The department should revise the enrollment capacity numbers to project a true number that accounts for site-specific classroom size, availability limits, and projected teacher absences.

*Program participation is voluntary.* Factors that limit the department from offering programming to a higher number of inmates are further aggravated by the fact that program participation is voluntary. Legislative efforts to mandate programs and incentives that provide day-for-day sentence reduction for class participation have had a limited effect on enrollment numbers. In 1995, Penal Code Section 2053.1 mandated that literacy classes be offered to 60 percent of the eligible inmate population, yet only 35,136 of the available 80,016 eligible inmates participate.[27] The presumptive sentence concept described earlier in this chapter could increase enrollment and provide additional incentives for inmates to participate in education programs. If presumptive sentencing is implemented, the department would need to evaluate and adjust the number of education programs, teaching positions, and program hour needs.

---

[26] Vocation enrollment figures obtained verbally from John Jackson, Supervisor of Academic Instruction, Education and Inmate Programs Unit.

[27] Department of Corrections, "Vocational and Academic Program Summary," October 2003.

*Education begins in the reception centers.* The 2003 Budget Act required the department to implement education programming in reception centers so that inmates could begin earning "day-for-day" sentence-reduction credits pursuant to Penal Code Section 2933. In January 2004, the department began providing academic programs at the reception centers under its "bridging" program. The bridging program allows inmates to receive academic education and day-for-day sentence credits during the average three-month reception center period.

To implement these programs, the department uses an assessment through the Test of Adult Basic Education and Comprehensive Adult Student Assessment System, and education programs in anger management, employment options, life skills, and personal life planning.[28] In April 2004, 215 bridging instructors were in place and another 212 instructor positions were unfilled.[29] Some of the teaching positions were obtained as a result of shifting instructor positions from eliminated vocational programs. Typical academic programs use classroom settings with 27 students and one instructor. The bridging instructor program is designed to allow inmates to use cell study materials. The elimination of a classroom setting allows an inmate/instructor ratio of 54 to 1. This program is designed to provide academic training, which allows day-for-day credits upon entry into the reception centers. The program is new and not fully implemented. The effectiveness of the program will depend on its ability to be fully implemented and evaluations should be conducted to assess the benefits.

*College education shows a decrease in recidivism.* A 2003 Little Hoover Commission report on the parole system presented findings that inmates with at least two years of college education have a 10 percent re-arrest rate and a significantly better rate of employment (60 to 75 percent).[30] A 1997 report by Education Works reported findings from the state of Ohio that calculated that the recidivism rate for inmate graduates of college level programs decreased by as much as 72 percent compared to inmates who do not participate in prison education programs.[31] Correctional studies in Oklahoma found "the rate of recidivism was 8 percent for inmates who participated in college courses in prison and 3 percent for inmates who earned a college degree in prison."[32]

The Ironwood State Prison Community College Program provides an example of the benefits of college courses. The program provides distance learning to approximately 300 inmates. The estimated cost savings to the institution at $8 million dollars per year, based on lower rates of recidivism and a decrease in disciplinary incidents in the prison.[33] The

---

[28] California Department of Corrections, Bridging Program Mission Statement.
[29] Department of Corrections, "Instructor Vacancy Report," April 2004.
[30] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p 44.
[31] Mary Ellen Batiuk, "The State of Post-Secondary Education in Ohio," *Journal of Correctional Education,* June 1997, pp.70-72
[32] Davis, Dr. H.C., "Correctional Education: Success and Hope," *Correctional Education Association News and Notes,* October 1999.
[33] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p. 45.

REFORMING CORRECTIONS

program is provided at no cost to the department. The National Institute for Literacy defines distance learning as follows:

> Distance learning is defined as the delivery of education through electronically mediated instruction such as satellite, video, audio graphic, computer and multimedia technology. Distance education refers to teaching and learning situations in which the instructor and learner or learners are geographically separated and therefore rely on electronic devices and printed materials for instructional delivery.[34]

Another example of college-level courses available in the prisons is the Incarcerated Youth Offenders Program, which began in 1998. Inmates who are under 26 years of age with five years or less commitment time and who possess a high school diploma are allowed to participate. The program offers three areas of study: continuing coursework, obtainment of postsecondary education degree, and/or vocational certificate. In fiscal year 2002-2003, the program was operating at 12 institutions with 1,040 participants. Approximately 45 percent of the participants complete the program. During the same fiscal year, the 401 Incarcerated Youth Offenders Program participants released from prison showed that 124 (31 percent) were employed and 34 (8 percent) returned to prison within a year.[35] The program is paid for with federal funding through the U.S. Department of Education Office of Vocational and Adult Education.[36] The Incarcerated Youth Offenders Program has had a positive effect on recidivism and employment rates and should be continued and expanded.

In 2004, the possibility of implementing on-line college courses, with the program paid for by grant funding, was presented to the department's Education and Inmate Programs Unit by James Fay of California State University, Hayward. The department concluded that implementation of the program would need approval through the Department of Finance and the department's Information Services Division. Additional barriers include current restrictions that bar inmates from Internet access.[37] Based on its ability to provide postsecondary education using grant funding to reduce cost, this program would be beneficial. The program should be implemented and assessed for its effect on recidivism.

*Department of Corrections technology is inadequate to support education programs.* The department lacks a computerized system to easily share inmate education program information and promote effectiveness of paper-based programs. Because an inmate's education files are paper-based and are retained at the institution of commitment, it is difficult for the department to share information. For example, it would be helpful for a parole agent to be aware of an inmate's education background, training, and coursework. Even when inmates are transferred between prisons, their education history may not travel with them. This

---

[34] National Institute for Literacy, "State Policy Update," February 2004, p 2.
[35] Gary Green, Ph.D., "Incarcerated Youth Offenders Program, 2002-2003 Annual Report."
[36] Department of Corrections, Education and Inmate Programs, Incarcerated Youth Offenders Program statistics sheet.
[37] Memorandum, Yvette M. Page, Superintendent of Correctional Education, Education and Inmate Programs Unit.

happens so frequently that inmates are simply retested when they are transferred to a new institution. This places both the inmate and those trying to assist the inmate with education programs at a disadvantage.

A larger-scale solution is needed to ensure that education programming information is widely available. This solution should include a computer program at each institution that is linked statewide to other institutions, parole offices, department education program personnel, and others.

*The Department of Corrections lacks statistical data on program effectiveness.* The department lacks statistical information to show whether its education programs reduce recidivism. The department tracks the number of inmates eligible for vocation and education programs, the number of program participants, inmate levels of achievement, and teaching positions. However, it does not track program statistics to determine whether parolees who recidivate were involved in education programs.

As discussed earlier, various studies have shown that education programs reduce recidivism. However, it is important that the department collect specific information about how its programs reduce recidivism in California, so that the department can optimize its programs. One method to accomplish this would be for the department to document education programming for each parolee who recidivates. This information could be used to determine whether education programs or the lack of programs were a factor in the parolee's return to prison. Similarly, the department should debrief parolees who are about to be discharged from parole so that the department can learn what factors and programs may have contributed to the parolee's success. This information could then be used to measure the effectiveness of institutions and programs.

*Re-entry programs show success.* The New Parole Model of the Department of Corrections includes a bridge between prison education programs and parole needs. The new model has planned for expanded inmate re-entry programs through its Police and Corrections Team program, which establishes a partnership between parole, law enforcement, and service providers in the community. (See Appendix A to this chapter for additional information about the New Parole Model).

During the first two weeks of parole, parolees must attend a mandatory Police and Corrections Team program. The program consist of a 2-1/2 hour orientation meeting where the parolee develops a personal action plan and receives on-site information about housing, food, employment, and substance abuse treatment. A key component of this program is the link to immediate employment opportunities in the community and on-site job training opportunities. Important skills, training, and job opportunities could be enhanced for the parolees if these programs were expanded to a full day instead of the current 2-1/2 hours. In a longer format, additional instruction could be offered for social and interpersonal skills, resume writing, job search, financial literacy, and personal management.

**REFORMING CORRECTIONS**

*Temporary Assistance for Needy Families.* Parolees who have been convicted of a drug felony since August 1996 are not eligible for Temporary Assistance for Needy Families or food stamps. Approximately half of the costs of these benefits are paid by the federal government. Although this restriction affects only the adult portion of the grant and not the portion attributable to children, receipt of these benefits may improve the likelihood that parolees will be successful in reintegrating into society. The federal government allows states to pass a waiver to allow drug offenders to receive these benefits, but this has not occurred in California. Full or partial waivers have been passed in 32 other states.[38]

*Police and Corrections Team.* One example of how employment opportunities are made available to parolees is the Police and Corrections Team program operating in the Sacramento area. This program provides on-site training through the Skills Center operated by the Sacramento Unified School District. One of the training programs available for parolees is an 18-week, 720-hour training class in truck driving. Since 1998, the recidivism rate for the 250 parolees who graduated from this training program has been 7 percent.[39]

*Community Re-Entry Bridging Program.* Another example of a successful re-entry program is the Community Re-Entry Bridging Program in Sacramento. This program supplements the institution re-entry programs by having a teacher assist parolees on an individual basis to identify housing, transportation, health care systems, food, and clothing needs. Participation in the program is voluntary. Sixty-one parolees from piloted institutions have participated in the program and all but one (98 percent) have successfully completed training and are now employed.[40]

These programs are examples of the positive impact that re-entry programs can have to reduce recidivism and help parolees integrate back into their communities. Programs such as these, when they produce demonstrable results, should be expanded to other regions of the state.

*The Joint Venture Program shows economic benefit.* In 1990 a statewide initiative created the Prison Inmate Work Incentive, which mandated the department to recruit private businesses into partnerships using inmate labor. Inmates participating in the joint venture programs are paid a comparable wage with deductions for restitution, room and board, and forced savings.[41] In return for their participation, the inmates receive day-for-day sentence reduction credits. According to the department, since its inception 13 years ago, the program has generated the following benefits:

---

[38] National Conference of State Legislatures website: www.ncsl.org/statefed/welfare/program.htm.

[39] PACT program statistics, e-mail communications with Ward Allen, Program Coordinator, Sacramento City Unified School District.

[40] Education and Inmate Programs Unit, memorandum dated May 7, 2004.

[41] California Department of Corrections Joint Venture Program website: www.cor.ca.gov/institutionsdiv/instdiv/programs/programs-jointventure.asp.

- √  $18.7 million wages paid to inmates
- √  $3.5 million in restitution for crime victims
- √  $2.9 million in taxes paid from inmate wages
- √  $2.3 million deducted for support of inmate families
- √  $4 million placed in mandatory inmate savings accounts.[42]

In fiscal year 2002-03, the program costs were lowered and revenue of $35,000 was returned to the general fund.  The statistics for 2003 were:

- √  $315,066 program budget
- √  $350,714 reimbursement to the general fund
- √  206 average number of inmates participating
- √  10 average number of programs
- √  $1,350 administrative cost per inmate
- √  $1,700,000 wages paid to inmates
- √  $286,944 in restitution for crime victims
- √  $235,924 federal taxes paid by inmates
- √  $59,000 in inmate earnings withholding orders.
- √  $222,855 deducted for support of inmate families
- √  $351,034 placed in mandatory inmate savings accounts
- √  $383,532 placed in inmate trust accounts

Unfortunately, the joint venture program budget for fiscal year 2003-04 was decreased to $103,709, and the budget does not provide adequate funding for the administrative positions and financial firm contract. According to an analysis by the Joint Venture Program, in fiscal year 2004-05 the budget will have to be increased to $410,542.[43]

Based on the low cost to operate the program and the financial benefits in restitution, tax revenue, inmate wages, and savings the department should provide an adequate budget and consider expanding the program. One possibility would be expanding the program to operate outside of the institutions, such as through joint ventures with community-based businesses that employ parolees.  That arrangement would create a natural employment opportunity as parolees transition into their communities.

*Prison Industry Authority programs increase employment and reduce recidivism.* Prison Industry Authority programs show success in increasing employment and reducing recidivism. The Prison Industry Authority was established in 1982 to develop and operate manufacturing, agricultural, and service industries within correctional institutions. The Prison Industry Authority operates more than 60 service, manufacturing, and agricultural industries at 22 prisons, employing 5,823 inmates.[44] According to its fiscal year 2002-03 report, the

---

[42] California Department of Corrections, Joint Venture Program document prepared by J. R. Griggs, Program Manager.
[43] Department of Corrections, Joint Venture Program analysis by Susan Jacobson
[44] Prison Industry Authority, fiscal year 2002-03 annual report.

**REFORMING CORRECTIONS**

Prison Industry Authority provided an annual net cost avoidance to the department of $14.1 million based on programming costs that the department would otherwise incur."[45]

As part of its Inmate Employability Program, the Prison Industry Authority provides certain inmates with industry-accredited certifications in fields such as welding, optical technician, laundry and linen management, and metalworking. Since 2001, 2,346 inmates have received industry-accredited certifications in 13 different fields. These certifications reduce parolee recidivism — the recidivism rate for parolees who obtained accredited certifications is about 13 percent.[46,47] Similarly, Prison Industry Authority-trained inmates have higher employment rates than inmates not trained in its programs. For example, for former Prison Industry Authority workers on parole who had completed six or more months in the program employment rates were approximately 60 percent compared to typical rates of 20 to 30 percent for other parolees.[48] Because of the success of the accredited certification program, it should be continued and expanded where appropriate.

To further assist inmates in finding employment after parole, the Prison Industry Authority will pilot a new job placement service through the Offender Employment Continuum that will begin in July 2004. The program will operate in five institutions and coordinate employment services between the institution and parole.

## Recommendations

The new Department of Correctional Services should take the following actions to improve results from education, vocational, and re-entry programs:

- Provide inmate planning and re-entry assessment at the time of initial incarceration.

- Revise enrollment capacity numbers to reflect accurate capacity.

- Expand education and vocational programs.

- Promote education program attendance by implementing presumptive sentencing.

- Fully implement the bridging program and evaluate the academic effectiveness and sentence reduction benefits.

---

[45] *Ibid.*

[46] California Department of Corrections, *California Prisoners and Parolees — 2002*, Tables 54 and 54a.

[47] Calculations for recidivism vary depending both on the definition of recidivism and amount of time elapsing between release and the moment recidivism is measured. As a result of these variables, the literature and this report cite various recidivism rates for California depending on the source and the context of the discussion. The panel found universal agreement from those it contacted that California's recidivism rate is high compared to those of other states. [Little Hoover Commission, *Back to the Community, Safe & Sound Parole Policies*, 2003, p. 39].

[48] Prison Industry Authority, Inmate Employability Program report, April 29, 2004.

- Expand college correspondence courses and conduct on going evaluations on their effect on recidivism.

- Continue and expand the Incarcerated Youth Offenders Program.

- Implement on-line college programs.

- Track education program participation against parole success (and recidivism.)

- Debrief successful parolees during their last scheduled parole agent contact to determine whether education programs affected their success.

- Develop a state-wide computer database to track inmate education assessment and classroom achievement.

- Continue mandatory participation in the Police and Corrections Team orientation program and consider expanding it to a full day.

- Provide job training programs at the Police and Corrections Team orientations when possible.

- Expand the Community Re-Entry Bridging Program.

- Expand the in-prison joint venture program and explore creating community-based joint venture programs for parolees.

- Expand the Inmate Employability Program.

### Fiscal Impact

Providing greater access to education and vocational programs for inmates will require an investment in additional teachers and other resources, but this investment will generate cost savings through a lower return to prison rate for parolees. This will occur because inmates will be better prepared for reintegration into society.

## Reforming Parole

It costs almost ten times as much to maintain an offender in prison as it does to supervise a parolee. Therefore, unless the risk to public safety requires returning a parolee to prison, supervising parolees in the community is a wiser use of the state's limited financial resources. To make that possible, California must make the best use of both the prison and parole options. The number of parolees returned to prison can be effectively and efficiently reduced by better preparing inmates for eventual release, beginning from the moment the inmate arrives in prison and continuing through careful re-entry planning before release. Once released into the community, the parolee must receive an appropriate level of supervision that includes a broad spectrum of possible services and sanctions.

The panel reviewed the state's existing parole process and found that the Parole and Community Services Division has partially implemented promising improvements through its "new parole model." The panel recommends that the new parole model be closely monitored and that successful programs be expanded as quickly as possible. In addition, the panel identified other improvement opportunities, including early discharge of low-risk parolees, expansion of eligibility rules for drug-treatment programs, better data collection and analysis of parole programs, and, perhaps a reconsideration of the present policy of placing all offenders released from prison on parole.

### Background

In 2002, the California Department of Corrections released more than 117,000 inmates to parole supervision.[49] These inmates were released with few job skills and with limited treatment for health and drug abuse problems. Ten percent end up homeless and nearly 70 percent return to prison within 18 months.[50] In 2003, 78,056 were returned to prison for either parole violations or new prison terms.[51]

After release from prison, parolees are supervised by parole agents, whose duties include monitoring the parolee's activities, assisting the parolee in obtaining needed services such as drug-treatment or job training, and ensuring that parolees abide by specified conditions of parole. If a parolee threatens public safety by committing a new crime or by violating the parole conditions, the parole agent can arrest the parolee and recommend that the Board of Prison Terms revoke parole and return the parolee to prison. In cases where the parolee is to be returned to prison, the Board of Prison Terms decides the length of time the parolee will serve in prison. In 2001, the Board of Prison Terms revoked the parole of approxi-

[49] California Department of Corrections Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1983-2002," Table 8a.
[50] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, pp. i;vi.
[51] California Department of Corrections, Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.

mately 74,400 parolees. Since then, the number of parole revocations has decreased. In 2002 the number dropped to 71,246 and in 2003, it dropped to 62,358.[52]

Not all parolees who violate conditions of parole are returned to prison. In some instances, a parole agent may recommend drug treatment, more intensive supervision, or some other kind of sanction. When appropriate, the use of these types of interventions is preferable to returning a parolee to prison—which is much more costly. However, a large percentage of parolees ultimately return to prison. According to department reports, 41 percent of the 55,321 inmates paroled in 2001 returned to prison within one year of release. After two years, the recidivism rate increased to nearly 55 percent.[53]

In recent years, the Department of Corrections has developed three programs to address these problems. The programs provide opportunities for parolees to make fundamental behavioral changes and also to refocus parole supervision into less punishment-oriented solutions. Specifically, the Preventing Parolee Crime Program offers employment, drug treatment and education; the Office of Substance Abuse Programs provides drug programs both in and out of prison; and the new parole model includes graduated sanctions for minor parole violations and re-entry planning, drug treatment, and program coordination among various community and law enforcement agencies. These programs are described in more detail in Appendix A to this chapter. The new parole model, which the parole division began developing in 2001, consists of the following:

- *Pre-release planning.* Provides for a plan to be developed for the inmate's reintegration into society, based on the inmate's needs and risks. Pre-release planning begins about six months before the end of the prison sentence.
- *Graduated sanctions.* Provides a matrix of sanctions for parole violations, matched to the severity of the violation.
- *Substance abuse treatment control unit.* Provides in-custody drug treatment for low risk parolees who have returned to drug use. Used in lieu of returning the parolee to prison.
- *Halfway back.* Residential treatment facilities that provide life skills, education, and employment assistance for low-risk parolees who have violated the conditions of parole. Used in lieu of returning parolees to custody.
- *Electronic monitoring.* For low-risk parolees who have committed minor violations of parole. Used in lieu of incarceration.
- *Police and Community Corrections Team.* Establishes partnerships between parole, law enforcement, and community service providers. Requires each newly released parolee to attend an orientation meeting with this team.

---

[52] California Department of Corrections, Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1982-2002" Table 5; California Department of Corrections Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.

[53] California Department of Corrections, Policy and Evaluation Division "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

**REFORMING CORRECTIONS**

*Programs that address parolees' problems help reduce recidivism.* Research indicates that the most effective way to break the costly cycle of parolees returning to prison is to treat the parolees' problems of drug addiction, illiteracy, lack of employability, and criminal thinking. For example, a three-year study of the parole division's Preventing Parolee Crime Program showed that 28,000 parolees who participated in the program were significantly less likely to commit new crimes or abscond from parole supervision. The program has generated $21 million in savings for the department. The study further indicated that participants avoided returning to prison for 54 days longer, on average, than those who did not participate in the program. According to the study, for every dollar invested in the program, the program saved $1.56. [54] In another example, an analysis conducted by the Washington Institute of Public Policy of more than 400 research studies showed that many treatment programs both reduced recidivism and generated savings for every dollar invested.[55] Finally, a study of a 2,000-bed expansion in the department's substance abuse treatment program found that the 12-month return to custody rate was 24 percent for parolees who participated in aftercare and 15 percent for those who received 90 days or more of aftercare services.[56]

*The new organizational structure will support preparing inmates for release.* Chapter 1 of this report describes a new organization structure for the parole division. Under the reorganization, both the parole function and the custody function will operate under the control of the Director of Adult Operations. Regional directors will each manage five or six prisons and related-parole operations. In turn, the wardens of individual prisons and the regional parole managers will report to the regional directors. The Corrections Independent Review Panel believes that placing responsibility for both prison and parole operations under the leadership and management of the regional directors, will properly align the focus of the regional directors onto preparing inmates for release back into society.

*Implementation of the department's new parole model has been slow.* The new parole model of the Department of Corrections will address many past recommendations and represents a good start toward bringing California's parole system in line with current research on how to reduce crime without jeopardizing public safety, but its implementation has been slower than expected. The re-entry portion was scheduled to begin in February 2004, and, according to an official from the parole division in charge of the new model, staff has been hired and was scheduled to begin training in May 2004. The pre-release program, which was scheduled to begin in the department's 32 institutions on June 1, 2004, has begun.[57]

---

[54] California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program" by Sheldon Zhang, Ph.D., San Marcos, California, 2003, pp. 4,45.

[55] Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," Olympia, Washington, May 2001, p. 8

[56] UCLA Integrated Substance Abuse Programs, "Semi-Annual Report on the UCLA-ISAP Evaluation of the 2,000-Bed Expansion of Therapeutic Community Programs for Prisoners," Michael L. Prendergast, Ph.D. July – December 2003, Appendix C.

[57] Shirley Poe, Parole Administrator, Parole and Community Services Division, interview, May 12, 2004

It is important to visualize the model not simply as an experiment, but as an investment toward making the department a national leader in helping inmates and parolees reintegrate into society. It is too early to judge the new model's impact on recidivism or public safety because most components have yet to be implemented, but there have been some promising signs. For example, the proportion of parolees returned to custody decreased by 7 percent between July-December 2003 compared to the same period one year earlier.[58] The decrease is probably due not to the new parole model, but to a new policy implemented earlier, which requires parole administrators to review each return to custody recommendation and consider alternatives to incarceration. Nonetheless, the new policy will dovetail with the new parole model because both encourage agents and supervisors to consider alternative sanctions instead of returning the parolee to custody.

The cornerstone of the new parole model is a risk assessment instrument, which the department plans to use, but has not yet purchased. The risk assessment instrument uses an actuarial approach to identify the treatment needs of the parolee and the likelihood that the parolee will re-offend. The predictions are made using a computerized system that takes into account specific information about the parolee's background, including criminal and social history, and compares that information to statistical risk scales. A research group assembled by the parole division reviewed several different risk-assessment instruments, recommended one for selection, and has submitted that recommendation to the Youth and Adult Correctional Agency for approval.

The risk assessment tool is critical to formalized, consistent decision-making by parole agents. For the instrument to be accurate, it is imperative that the parole division complete periodic follow-up evaluations of its results and update the instrument to reflect any changing demographics in the population being assessed. It is also important to evaluate the assessment tool to make sure that it has predictive validity and that the classification of parolees is in line with the parolees' actual behavior.

The violation matrix is another important component of the new parole model. Still being developed by the parole division, the violation matrix will guide parole agents in making decisions about what sanctions, including treatment alternatives to re-incarceration, to impose for particular violations. Parole agents will use the violation matrix to match a parolee's violation against a graduated range of increasingly strident sanctions. According to officials, changes to the violation matrix are pending approval by the division's deputy director.[59] It is risky to begin less-restrictive sanctions, such as drug treatment in the place of re-incarceration, without first using risk-assessment to determine who is appropriate for various programs.

---

[58] California Department of Corrections, "Spring Population Projections 2003," p.13; "Spring Population Projections 2004," p.13.

[59] Shirley Poe, Parole Administrator, Parole & Community Services Division, telephone interview, May 13, 2004

Other components of the new model have only recently been implemented or are similarly awaiting purchase, staffing, and approval. The electronic monitoring component has been submitted for bid offerings and should be solidified by June 2004. The halfway back facilities have been open since February 2004, and the Substance Abuse Treatment and Control Unit component became operational in mid-May 2004. The agents for the Police and Community Team had been chosen and were in place by June 2004, as was the staff for the pre-release component.

The new parole model incorporates many of the recommendations made by both the Little Hoover Commission and the 1990 report of the Blue Ribbon Commission on Inmate Population Management. Specifically, the Little Hoover Commission recommended that the department should prepare inmates for parole while they are still in prison, build strong partnerships with community agencies, use structured decision-making to establish clear guidelines for responding to parole violations, and consider less restrictive, treatment-oriented sanctions for parole violations. As described in Appendix A to this chapter, the new model includes a matrix as a guide for graduated dispositions for parole violations; includes a re-entry component; creates a community/law enforcement/parole team to work with parolees; and provides two new treatment programs to be used in lieu of incarceration for parole violations.

The Corrections Independent Review Panel is optimistic that the new parole model will help the parole division improve its operation and will reduce the number of parolees returned to prison each year. The parole division must implement all features of the new model as quickly as possible, however. Also, the new department must view the new model as an investment, rather than an experiment in reforming its much-criticized parole process.

*An inmate's preparation for release must begin upon arrival at prison.* As discussed earlier, re-entry planning and risk assessment are being developed as part of the new parole model, but the current plan is to use these only during the six- to nine-month period before the inmate is released from prison. Instead, risk assessment and re-entry planning should begin when the inmate enters the institution so that parole and prison staff, along with the parolee, can plan for the parolee's reentry with educational, behavioral and drug treatment programs available from the moment the inmate enters the prison. If it can reduce the future criminal behavior of the offender, using incarceration time constructively will both enhance public safety and save money. It is important that the parole division be included in this effort, because the parole staff is familiar with available community resources and what is needed for successful re-entry.

*Substance abuse treatment in prison should be expanded.* Approximately 210,600 prisoners and parolees under custody or supervision by the department need drug treatment. About 132,000 of those needed drug treatment are inmates, yet, according to the Office of Sub-

stance Abuse Programs, only 14,800 are being treated.[60] More than 95 percent of all inmates will eventually be released from prison. To reduce recidivism, save money and protect the public, the number of treatment beds should be increased. Participation in and completion of the treatment program could be tied to the offender's release using the presumptive sentencing model discussed earlier.

*Successful parole and re-entry programs should be expanded.* The Department of Corrections has made efforts to address parolees' needs for drug, vocational, and education intervention with the Preventing Parolee Crime Program, Office of Substance Abuse Programs, and the new parole model. These programs have demonstrated success, but because they have addressed the needs of only a fraction of eligible offenders, the programs should be expanded with more funding. There is a particular need for residential treatment beds for parolees whose problems cannot be resolved in an outpatient setting. One way to accomplish this would be to change the focus of the existing halfway back program to drug treatment. The department could expand the capacity of substance abuse treatment beds by contracting with existing community-based residential treatment programs. These community-based programs also have secure lock-up facilities available for when that type of program is required. In some instances, these community-based facilities may charge a lower fee than the $59 per day rate charged by the local jail-operated programs currently used by the state.

The Office of Substance Abuse Programs estimates that there are 78,000 parolees with drug abuse problems, but fewer than 25,000 of them receive treatment. A study of the Preventing Parolee Crime Program by California State University found that the rate of return to prison of those who completed the drug and education component was 20-percentage points lower than the non-treated population. For the study period, participants' incarceration rate was reduced by an average of 56.6 days per parolee, saving the state over $21 million after the costs of the program were subtracted.[61]

The Legislature has also recognized the value of providing drug treatment. Penal Code Section 3070 directed the Department of Corrections to develop and present a plan by December 31, 2000, that would ensure that all parolees and inmates "receive appropriate treatment, including therapeutic community and academic programs" by January 1, 2005. According to the parole division, this plan was not prepared; instead, a brief letter was sent to the Legislature reporting that it was not feasible to accomplish the plan now because of fiscal problems and changes in sentencing laws. The Legislature indicated that it agreed. Proposition 36, the ballot initiative that provides drug treatment in lieu of incarceration, passed soon after Penal Code Section 3070 went into effect, but the state's subsequent fiscal

---

[60] Merrie Koshell, Correctional Counselor III, Office of Substance Abuse Programs, telephone interview, Sacramento, California, April 15, 2004.

[61] California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program," by Sheldon Zhang, PhD, (San Marcos, CA, 2003), p.5

**REFORMING CORRECTIONS**

crisis has resulted in uncertainty about whether any substance abuse treatment programs would continue.[62]

***Global positioning satellite tracking can bolster electronic monitoring.*** Global positioning satellites are an advanced form of electronic monitoring that allows real-time tracking of the location of parolees. The devices can be programmed to alert parole agents and local law enforcement when a parolee enters or leaves a particular area. The technology could be useful for high-risk parolees such as armed robbers or sex offenders. Global positioning satellite systems cost about $10 per day to operate —which is significantly less expensive than placing an offender back in prison.

Florida has used global positioning satellite systems since 1997 to target high-risk sex offenders, and other cases of high public interest. Texas also uses global positioning satellite systems to track the highest risk parolees, primarily sex offenders.

One potential drawback to global positioning satellite technology is that it requires parole agents or local law enforcement to respond quickly if an "alert" is issued by the device when a parolee leaves an authorized area. Failure to respond quickly could be a public safety risk, as well as a political embarrassment, if the parolee committed a crime while in an unauthorized area. Another potential drawback is that the increased surveillance that global positioning satellite systems generate can often lead to increased revocations. This increase may counter the money-saving aspect of global positioning satellite systems, but must be considered a necessary public safety benefit.

***Early discharge of low-risk parolees will reduce costs.*** California's existing parole policy focuses treatment time and money on non-serious, nonviolent parolees, yet it is the high risk, serious offenders who commit the most violent offenses and consequently pose the greatest threat to public safety. In 2001, 21 percent of those paroled had originally been sentenced to prison for possession of a small amount of drugs.[63] These parolees take as much time and effort to supervise as do those convicted of violent offenses. Rather than directing resources toward offenders whose crimes are drug-use related and who have no history of violence, the department's emphasis should be placed on serious, high-risk parolees. Low-risk parolees should be required to participate in self improvement programs throughout their prison stay and should be prepared for parole through a rigorous prison re-entry program. Immediately upon release they should be connected with needed community services. This "hand-off" component is critical because parolees tend to fail during the first few months on parole.

---

[62] Merrie Koshell, Office of Substance Abuse Programs, interview, April 15, 2004
[63] California Department of Corrections, Policy and Evaluation Division, "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

The Corrections Independent Review Panel recommends that parolees who are employed or self supporting, have a stable residence, and have no violations of their parole conditions after three months on parole be discharged from parole supervision. The discharge would require approval from the hearings administration identified in Chapter 1 of this report. In December 2003, the Department of Corrections estimated annual savings of between $150 and $176 million if all non-serious or non-violent parolees were discharged after three months.[64] To enhance public safety, a portion of the savings realized from early discharge should be redirected to more closely supervising high-risk parolees. The panel assumes that about 50 percent of low-risk parolees will qualify for release after three months and that 50 percent of the resulting fiscal savings would be redirected to supervising high-risk parolees. Under these assumptions, according to Department of Corrections calculations, the department would save about $10 million in the first six months of implementation and $39 million and $44 million in the second and third years, respectively.[65]

To accomplish this change, the parolee's risk level should be determined using the evidence-based risk and needs instrument described earlier. Parolees with a history of violent or serious felony conduct (such as those crimes identified in Penal Code Sections 1192.7 and 667.5) and parolees who must register as sex offenders would be excluded. The goal would be to require that parolees participate in programs in prison, remain crime free and stable upon release, and be rewarded for their participation and success by early discharge from parole supervision. Following these guidelines will improve public safety.

***Should all inmates released from prison be placed on parole?*** In California, 100 percent of those released from prison are placed on parole supervision for three or four years. In contrast, several other states supervise only certain prisoners after release. A few states, including Maine and Virginia, have abolished parole supervision altogether. Michigan supervises parolees for only two years, compared to California's three- or four-year parole supervision period.[66]

Scarce public resources are forcing corrections to make difficult decisions about where to place limited funds. Joe Lehman, Secretary of Washington State Department of Corrections, noted that when both low-risk and high-risk parolees are placed together on a caseload, parole agents don't give enough time to serious offenders. To remedy this, the Washington officials asked the questions: "Why do we (prison/parole) exist? What can the public reasonably expect us to do?" They concluded that the public wants to be protected from dangerous criminals and has tolerance toward treating drug addicts who are not violent.[67] They

[64] California Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 4&7," December 16, 2003.
[65] Department calculations prepared in December 2003 for the Legislative Analyst.
[66] Petersilia, Joan, Ph.D., *Reforming Probation and Parole,* American Correctional Association, 2002, p.115.
[67] Lehman, Joseph D., "A Forum on Current Issues in the Field of Corrections," presented by the Department of Corrections for the California Performance Review, April 27,2004.

further concluded that focusing on more dangerous offenders and not supervising those on parole for less serious offenses would lower recidivism.[68] That sentiment is echoed by nationally recognized corrections expert Joan Petersilia. Petersilia notes that research indicates that the public is becoming more willing to tolerate treatment for nonviolent offenders, particularly substance abusers, and to focus punishment on those convicted of violent crimes. This is especially so when the public is aware of the high costs of incarceration.[69]

*Participation in drug-treatment programs is presently too restricted.* Studies show that parolees who complete drug treatment programs are less likely to re-offend.[70] Yet many parolees in California are excluded from participation in drug treatment programs because of their past criminal history. For example, parolees whose crimes are defined under Penal Code Sections 667.5 and 1192.7 as "serious" or "violent," or who are required to register as sex offenders are barred from participating in the Substance Abuse Treatment Control Unit program, which has 30-day inpatient and 90-day outpatient components. This restriction is illogical from a public-safety standpoint because the Substance Abuse Treatment Control Unit program is a "lock-up" program typically located in city or county jails. So long as the normal criteria are met for this jail-based drug program and the violation is for drug use only, these currently excluded parolees would benefit from drug treatment as much as a lower risk offender. If these offenders were allowed to participate in the Substance Abuse Treatment Control Unit program, the department would save money because the cost of that program is cheaper than the cost of returning the offender to prison. Moreover, numerous studies have demonstrated that those who complete substance abuse programs are less likely to be sent back to prison, particularly when they complete both in and out patient components.

*Private contractors can be used to provide specific treatment.* Exploring the use of private contracted facilities to provide treatment can expand the availability of efficient resources to support the new parole model. Private contractors could be used to provide secure facilities for specific kinds of treatment designed to maintain the parolee in the community. These programs have the promise of success at a cost substantially lower than state prisons, and sometimes lower than county facilities. Programs provided include 90-day treatment for drug and alcohol addiction, which has been shown to have a positive effect on preventing new offenses. These facilities and programs can be found especially in large urban areas.

*Data collection is critical to measuring program effectiveness.* Collecting data and measuring the results of both new and existing programs is critical to on-going improvement. At

---

[68] Washington State Institute for Public Policy, "Washington's Offender Accountability Act: An Evaluation of the Department of Corrections' Risk Management Identification System," January 2003.

[69] Petersilia, Joan, Ph.D., *Reforming Probation and Parole*, American Correctional Association, 2002, p.180.

[70] Aos, Steve *et al*, Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001.

present, there is no comprehensive, integrated data system in the department to even provide information about trends or the success or failure of policies. This lack of data collection and analysis prevents the department from showing lawmakers and the public the effectiveness of its programs. The lack of data mirrors a similar lack of research to evaluate parole programs nationwide. Petersilia notes,

> It is safe to say that parole programs have received less research attention than any other correctional component in recent years. A congressionally mandated evaluation of state and local crime prevention programs included just one parole evaluation among the hundreds of recent studies that were summarized for that effort.[71]

For years the department has been focused on incarceration over rehabilitation programs, in spite of the research statistics that show rehabilitation programs help offenders and simultaneously reduce the skyrocketing prison populations and costs. As California's new parole programs are implemented, it is important that they be monitored to determine both whether they are affecting return to custody rates and whether they compromise public safety. A measurement component should be built into the programs, and adequate funding should be provided to the department so that decision making and public policy is based on valid analysis of what programs and policies are effective.

The following are suggested outcomes that the new Department of Correctional Services should measure to demonstrate the success of its prison and parole programs. Each of these outcomes should improve as the department becomes more effective at preparing inmates for reintegration back to society.

- Reduction in risk and needs scores, as measured by the risk and needs assessment instrument;
- Rate and duration of parolee employment;
- Program attendance rates;
- Improvements in reading levels;
- Reduction in the number of fugitives from parole; and
- Recidivism rate.

*Effectively supervising parolees requires parole agents to have a balance of skills.* Most agents now working in parole were hired and trained when the department's focus was on surveillance and detection of criminal behavior. This focus was reinforced by department training, which included arrest procedures and use of force. The department provides no training in casework issues, such as patterns of recovery from drug addiction or mental illness and its impact on relapse.

---

[71] Petersilia, Joan, *Reforming Probation and Parole in the 21st Century,* American Correctional Association, 2002., p.190

Furthermore, hiring practices and requirements impede hiring individuals with social services background. Agents are rarely hired from social service disciplines, such as child protection agencies, treatment programs, or even probation, largely because of the lengthy background investigations required of applicants not already employed as peace officers by the department. It can take up to a year to hire an individual from other disciplines such as social services or probation, whereas current department correctional officers can be hired almost immediately. This is because correctional officers seeking parole agent positions have already gone through a Department of Corrections background investigation, so the investigator need only examine the period in the applicant's career subsequent to the original background investigation. To hire an applicant from outside the department, conversely, the investigation must start from scratch—a time-consuming process. Consequently, most new agents are chosen from the prison correctional officer ranks. To develop a more balanced force of parole agents who bring a combination of law enforcement and social work skills to parole operations, the new Department of Correctional Services should remedy these hiring barriers and provide on-going training in social service skills to its parole agents.

## Recommendations

To improve parole operations the new Department of Correctional Services should take the following actions:

- Continue implementation of the Department of Corrections new parole model.

- Consider the use of private contractors to provide specific kinds of treatment in secure facilities designed to maintain the parolee in the community.

- Begin preparation for re-entry when the offender enters prison.

- Increase the number of substance abuse treatment beds in prison.

- Increase the number of substance abuse treatment beds in the community by increasing funding for programs that are proven successful. This could include halfway back, Substance Abuse Treatment Control Unit, or other community-based facilities.

- Use the needs and risk assessment tool when the inmate first enters prison and design a programming plan that addresses those needs.

- Discharge parolees who are determined to be very low risk from parole three months after they are released from prison.

- Consider the use of global positioning satellite tracking for certain high-risk offenders.

154

- Allow both high- and low-risk parolees to participate in treatment and training programs.

- Add a quality control feature to the new parole model programs to measure effectiveness.

- Increase focus on casework skills when recruiting new agents and in agent training.

- Develop a comprehensive data collection and analysis system that measures the effectiveness of the department's parole programs. This system must also link with other department data analysis systems.

## Fiscal Impact

The Little Hoover Commission estimated that changes outlined in the commission's November 2003 report on parole could save the department $151 million by reducing the percentage of parole violators returned to prison. The commission further estimated that an additional $300 million could be saved by reducing the length of revocation sentences for "low end" offenders from an average of 140 days to 100 days.[72] The Department of Corrections has estimated that the new model will reduce the parolee return to prison rate by 5 percent in 2004.[73]  Already, as agents seek alternatives to incarceration, there has been a decrease of 5,765 parolees in prison for violations from January 2003 to January 2004 as compared to the same period a year earlier.

Many of the recommendations of the Corrections Independent Review Panel require an initial investment, but are designed to save money in the future as they increase inmates' chances for success on parole.

The Corrections Independent Review Panel estimates the following savings would occur from implementation of the recommendations presented in this report:

- **Early discharge from parole – after 3 months of successful parole**

    Fiscal Year    2004-05 - $10 million
    Fiscal Year    2005-06 - $39 million
    Fiscal Year    2006-07 - $44 million

---

[72] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. iii.
[73] Arthur Chung, Chief, Offender Information Services Branch, California Department of Corrections, interview,March 22, 2004

**REFORMING CORRECTIONS**

# Appendix A

## Preventing Parolee Crime Program

In 1998 Assembly Bill 2321 provided funding to expand the Department of Corrections pilot program known as the Preventing Parolee Failure program. As codified in Penal Code Section 3068, this program was renamed Preventing Parolee Crime Program and includes the following components.

- Offender Employment Continuum. This is a 40-hour mandatory employment workshop for parolees focusing on identifying and correcting long term barriers to employment. It includes job preparation, resume writing and interviewing skills, as well as employment referral and continued counseling to ensure that the parolee stays on the job.

- Residential Multi-service Centers. These facilities provide a therapeutic environment primarily for homeless parolees to help them transition into independent living. The program offers substance abuse treatment, literacy training, and individual and group counseling. Parolees can live in the program for up to 180 days. There is a 60- to 90-day aftercare period.

- Computerized Literacy Learning Center. This a computer-assisted instructional program staffed by credentialed teachers. The programs are located in parole offices at 21 sites throughout the state. (as of August 2003)

- Substance Abuse Treatment and Recovery. This is a 20-day education-based substance abuse program located in at least 28 parole offices. Parole agents refer parolees who have tested positive for drugs. Approximately 8,060 parolees are using this program.

In its February 1998 analysis of the fiscal year 1998-1999 budget, the Legislative Analyst's Office stated that, according to the department, the Preventing Parolee Failure program resulted in net state savings of $74 million over a four-year period. The Legislative Analyst recommended expanding the Preventing Parolee Failure program, noting that the program would save between $2 and $3 for every $1 invested.[74]

## Office of Substance Abuse Programs

The Office of Substance Abuse Programs estimates that there are 210,000 inmates and parolees with drug abuse problems. The office estimates that approximately 16,500 parolees are receiving treatment in one of its programs. The Office of Substance Abuse Programs coordinates the following prison and community based programs:

---

[74] Legislative Analyst's Office, "Analysis of the 1998-99 Budget Bill," February 1998, pp. D-25, D-33

- Substance Abuse Program. There are 8,500 therapeutic community slots in 35 substance abuse programs in 19 prisons. The length of stay is from six to twenty-four months. Each slot serves an average of 1.33 inmates annually.

- Transitional Treatment Team Program. At Folsom State Prison, 200 inmates participate in this four-month program that includes intensive pre-release planning. Parolees who go back to prison briefly for drug violations and who have completed a substance abuse program in prison are also eligible for this program.

- Parole Services Network. This program is for parolees who have not been in a prison substance abuse program but need drug/alcohol treatment. The average length of stay for a residential program is 30 to 90 days, followed by outpatient services. The Office of Substance Abuse Programs coordinates with the California Department of Alcohol and Drug Programs to manage the service networks. The Department of Alcohol and Drug Programs transmits funds to the counties, which in turn contract with treatment providers. These programs offer up to 180 days of services, which include assessments, detoxification, and residential and outpatient treatment.

- Drug Treatment Furlough. This is an in-prison substance abuse program for 1500 nonviolent, non-serious offenders. Inmates participate in this residential community aftercare treatment program during their last 120 days in prison.

- Family Foundations Program. A 70-bed program for women with small children who have been convicted of low-level felonies. This program is used in lieu of state prison.

- Community Mother Infant Program: This is also a 70-bed program for low-risk female inmates who are pregnant or give birth in prison. The 70 beds are divided between three facilities.

The Community-Based Aftercare Programs are included under the Office of Substance Abuse Programs. Merrie Koshell of the Office of Substance Abuse Programs indicated that according to a study, (R.J. Donovan In-Prison and Community Substance Abuse Program: Three-Year Return-to-Custody) 24 percent of those who complete both the prison and aftercare drug portions of the R.J. Donovan program return to prison, compared to 78 percent of those who complete only the prison component. The programs are much more successful if the inmate/parolee completes all components.

The Substance Abuse Services Coordination Agency is also included under Office of Substance Abuse Programs. The Substance Abuse Services Coordination Agency manages the aftercare portion of the drug programs. The agency has offices in each of the four parole regions and purchases services from community-based providers. These are 30- to 90-day residential care programs followed by outpatient drug treatment.

- Female Offender Treatment and Employment Program. This program was established by Penal Code Section 3054, as enacted by SB 491, Chapter 500 in 1998. Female parolees who graduated from a prison-based substance abuse program are eligible to receive up to 15 months of Female Offender Treatment and Employment Program services. For parolees who choose to use the program, the average length of stay is 135 days. Services include substance abuse treatment, employment/educations programs, and life skills development. Child care and transportation is provided. Some of the residential programs allow children to live with their mothers.

- Enhanced Substance Abuse Treatment Control. This is a 200-bed treatment program located at Folsom Prison. After completion of this program the parolee is eligible to use the other community-based programs of the Office of Substance Abuse Programs.

### The New Parole Model

In September of 2001 the Parole and Community Services Division created its new parole model to address recidivism issues. The model focuses on non-serious/non-violent offenders as they are thought to pose the least risk to the community if they are offered alternative sanctions to incarceration. The basic components of the model are the following:

- Violation matrix. This is a structured system for providing clear guidelines to decision making for parole violations.

- Pre-release planning. Inside prison, a Parole Agent II, social worker and parole service assistant will assess the inmate using a computer-based tool that identifies the inmates' needs and the risk they present to others. Agents will continue to use this tool throughout the parole period and will modify parole conditions and supervision levels accordingly.

- The Police and Corrections Team. The team establishes a partnership between parole, law enforcement, and service providers once the offender is released. Every newly released parolee will be required to attend an orientation meeting with this group of professionals. A Parole Agent II will run this program with the help of a social worker. The department plans to have a team in each of the 24 parole divisions.

- Electronic monitoring will become available for non-violent/non-serious offenders. This will allow agents to impose home detention as an alternative sanction for parole violations. It costs $43.00 a day to house an inmate in prison and approximately $5.00 a day to monitor a parolee at home with an electronic device. There will be 1,000 of these devices, which will provide about five per parole unit.

- The Halfway Back program offers residential treatment as an alternative sanction for parolees who have committed a technical violation and who need a more structured setting to both address their problems and monitor their behavior. The Halfway Back units focus on life skills, education, and employment. Statewide there are 18 facilities with a total capacity of 792 beds. These facilities were being used as work furlough beds for inmates during the last six months of their term. As the work furlough inmates parole, the beds are being filled with parolees. This program began in March 2004. Currently it is 74.5 percent full; however inmates are still in the process of transitioning out of the facilities.

- The Substance Abuse Treatment Control Unit will provide a 30-day, in-custody drug treatment program for parolees whose drug addiction is too advanced to be addressed in the community. It is designed to serve up to 1306 parolees. 1770 beds have been contracted in various jails throughout the state —600 beds are now available at the Los Angeles County Detention Center, with another 20 beds at Humboldt County Jail.

**REFORMING CORRECTIONS**

**TABLE 1**

| Male Institution Bed Type (Includes Civil Addict Program) | Design Capacity (DC) updated on 6/2/04[1] | Actual Male Institution Population April 2004[2] | Actual Percentage of Design Capacity April 2004 | CDC Defined Maximum % of DC | Male Institution Population Equivalent of CDC Maximum | Bed Changes Req'd to Reach CDC's Maximum Percentages | Warden's Proposed Operable Capacity (OC) as % of DC[3,4] | Male Institution Population Equivalent of Warden's Proposed OC | Projected Male Institution Population on 6/30/09[5] | Population Reductions Needed by 2009 to Meet Warden's OC[6] |
|---|---|---|---|---|---|---|---|---|---|---|
| **CAMP BEDS** | **3,588** | 3,752 | 105% | 100% | 3,588 | 164 | **100%** | 3,588 | | |
| General Population: | | | | | | | | | | |
| Level I - MSFs | 4,759 | | | | | | | | | |
| Level I - old design | 5,091 | | | | | | | | | |
| **LEVEL I TOTAL** | **9,850** | 15,751 | 160% | 190% | 18,715 | -2,964 | **150%** | 14,775 | 29,054 | -10,691 |
| Level II - new design | 6,406 | | | | | | 160% | | | |
| Level II - old design | 9,622 | | | | | | 100% | | | |
| **LEVEL II TOTAL** | **16,028** | 35,306 | 220% | 190% | 30,453 | 4,853 | **150%** | 24,042 | 31,334 | -7,292 |
| Level III - standard | 13,252 | | | | | | 140% | | | |
| Level III - over/under | 2,122 | | | | | | 140% | | | |
| **LEVEL III TOTAL** | **15,374** | 30,912 | 201% | 190% | 29,211 | 1,701 | **152%** | 23,325 | 38,245 | -10,048 |
| Level IV - 180 design | 7,510 | | | | | | 150% | | | |
| Level IV - 270 design | 6,520 | | | | | | 150% | | | |
| **LEVEL IV TOTAL** | **14,030** | 21,293 | 152% | 190% | 26,657 | -5,364 | **140%** | 19,642 | 28,030 | -3,591 |
| Reception Center cells | 5,646 | | | | | | 150% | | | |
| Reception Center over/under | 256 | | | | | | 150% | | | |
| Reception Center dorms | 2,608 | | | | | | 190% | | | |
| **RECEPTION CENTER TOTAL** | **8,510** | 20,055 | 236% | 190% | 16,169 | 3,886 | **162%** | 13,808 | 17,628 | -3,820 |
| Administrative Segregation/III | 2,262 | | | | | | 150% | | | |
| Administrative Segregation/IV | 1,152 | | | | | | 120% | | | |
| **AD SEG TOTAL** | **3,414** | 7,092 | 208% | 150% | 5,121 | 1,971 | **140%** | 4,775 | | |
| **SUBSTANCE ABUSE TX** | **1,056** | 1,467 | 139% | 140% | 1,478 | -11 | **140%** | 1,478 | | |
| **SECURITY HOUSING UNIT** | **2,436** | 2,780 | 114% | 120% | 2,923 | -143 | **100%** | 2,436 | 3,165 | -729 |
| **CONDEMNED** | **604** | 604 | 100% | 100% | 604 | 0 | **100%** | 604 | | |
| **YOUTHFUL OFFENDERS** | **82** | 82 | 100% | 100% | 82 | 0 | **100%** | 82 | | |
| **EOP** | **1,691** | 2,397 | 142% | 150% | 2,537 | -140 | **150%** | 2,537 | | |
| **PSU** | **192** | 248 | 129% | 100% | 192 | 56 | **100%** | 192 | | |
| **PHU** | **24** | 24 | 100% | 100% | 24 | 0 | **100%** | 24 | 25 | -1 |
| **TOTAL SYSTEM** | **76,879** | 141,763 | 184.4% | 179.2% | 137,754 | 4,009 | **144.8%** | 111,309 | 147,481 | -36,172 |

## Notes for Table 1

[1] "Design Capacity" (DC) is based on the following assumptions:

(1) one inmate per cell,

(2) single bunks in dormitories, and

(3) no inmates housed in spaces that were not designed for housing, such as dayrooms, hallways and gymnasiums.

The numbers used here provide a basis for expressing the actual capacity of the prisons as a percentage of design capacity. Includes new beds at the Delano II facility.

[2] The population reflected here is the male felon and civil addict population housed in CDC institutions and camps. This population does not include (1) women, (2) inmates housed in various community correctional centers, (3) inmates housed in the Department of Mental Health state hospitals, and (4) inmates housed in county jail beds.

[3] "Maximum Operable Capacity" (MOC) is determined through an assessment of experienced Wardens and is expressed as the percentage of design capacity of the various housing units within the institutions wherein the prison can be operated both safely and can provide programming for every inmate, consistent with the inmate's ability. Programming means the provision of education, vocational education, drug and alcohol prevention and other programs especially for inmates serving a determinate sentence or PV-RTCs, which is consistent with a renewed emphasis on preparation for re-entry. For the purposes of the process of determining Operable Capacity, it is assumed that (1) all "bad beds" are closed, thus freeing up program space, and (2) staff with requisite experience are available to manage an effective program.

[4] Ad Seg and Level III maximum operable capacities are a weighted average based on the number of beds and the recommendations by bed type for the different designs.

[5] Based on Table 6 in the the Spring 2004 Population Projections, which has fewer breakdowns for inmate/bed types. Campers, Administrative Segregation, Substance Abuse Treatment, Condemned, Youthful Offenders, EOP, and PSU inmates are included in the projections for Levels I through IV.

[6] Camp beds are included in Level I figures. Ad Seg beds are broken out between Level III and Level IV. Substance Abuse treatment beds are included in Level III. Condemned, Youthful Offenders, EOP and PSU beds are included in Level IV.