Exhibit H

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9

10  JERRY VALDIVIA, ALFRED YANCY,
    and HOSSIE WELCH, on their own
11  behalf and on behalf of the class
    of all persons similarly situated,
12                                              NO. CIV. S-94-671 LKK/GGH
            Plaintiffs,
13
        v.                                          O R D E R
14
    GRAY DAVIS, Governor of the State
15  of California, et al.,

16          Defendants.
    _____/
17

18      Plaintiffs, on behalf of themselves and a class of

19  California parolees, filed this action on May 2, 1994,

20  challenging the constitutionality of parole revocation

21  procedures by the California Board of Prison Terms ("BPT") and

22  the California Department of Corrections ("CDC").  This matter

23  is before the court on plaintiffs' motion for an order to show

24  cause why defendant Hickman should not be found in civil

25  contempt of the court's Permanent Injunction Order.  I decide

26  the motion based on the papers and pleadings filed herein and

                                1

1 | after oral argument.

2 | **I.**

3 | **PROCEDURAL BACKGROUND**

4 | On June 13, 2002, plaintiffs were granted partial summary

5 | judgment on their claim that California's unitary parole

6 | revocation hearing system violated their due process rights

7 | under Morrissey v. Brewer, 408 U.S. 481 (1972) and Gagnon v.

8 | Scarpelli, 411 U.S. 778 (1973). See Valdivia v. Davis, 206

9 | F.Supp.2d 1068 (E.D. Cal. 2002) ("June 13th Order"). The court

10 | held that California's parole revocation system violated the Due

11 | Process Clause of the Fourteenth Amendment by "allowing a delay

12 | of up to forty-five days or more before providing the parolee an

13 | opportunity to be heard regarding the reliability of the

14 | probable cause determination." Id. at 1078.

15 | On October 18, 2002, the court ordered the defendants to

16 | file a proposed remedial plan addressing the violations

17 | identified in the June 13th Order. On March 17, 2003, the

18 | defendants provided plaintiffs with their proposed Valdivia

19 | Remedial Plan ("VRP"), to which plaintiffs filed two objections.

20 | While the parties continued to engage in settlement negotiations

21 | over remaining claims not adjudged, defendants requested that

22 | the court provide guidance as to the sufficiency of their VRP.

23 | The court in response examined the VRP and ordered that

24 | defendants file a revised remedial plan to meet specific

25 | criteria. See Order dated July 23, 2003. On August 21, 2003,

26 | the defendants filed a revised VRP. In November 2003, before a

1  final hearing on the revised VRP, the parties filed a Stipulated

2  Proposed Order for Permanent Injunctive Relief.  Pursuant to

3  their settlement negotiations, the proposed order required

4  California's BPT and the CDC to develop and implement new parole

5  revocation processes to remedy pervasive constitutional

6  violations in the State's then-existing procedures.  The revised

7  VRP was referenced in and attached to the proposed permanent

8  injunction order.  The parties sought preliminary approval from

9  the court that the settlement was sufficiently fair, reasonable

10  and adequate, and that it justified issuing notices to the class

11  and scheduling a final hearing.  See Fed. R. Civ. P. 23(e).  The

12  parties made their preliminary showing of fairness via a joint

13  Stipulated Motion for Preliminary Approval of Class Action

14  Settlement, filed on November 24, 2003.  On March 9, 2004, the

15  court granted the parties' permanent stipulated injunction and

16  granted final approval of that Stipulated Permanent Injunction

17  on March 17, 2004("Order").

18      The plaintiffs now allege that the defendants are in direct

19  violation of specific terms of the Permanent Injunction.

20                                II.

21                             STANDARD

22      A district court has continuing jurisdiction to enforce its

23  injunction.  Crawford v. Honig, 37 F.3d 485 (9th Cir. 1994).

24  The movant has the burden of proving by clear and convincing

25  evidence that the defendants are in violation of the court's

26  order.  Wolfard Glassblowing Co. v. Vanbragt, 118 F.3d 1320,

                                3

1   1322 (9th Cir. 1997).  To be enforceable by contempt, the

2   injunction must clearly describe prohibited or required conduct.

3   Gates v. Shinn, 98 F.3d 463, 468 (9th Cir. 1996).  A defendant

4   should not be held in contempt for actions that "appear[] to be

5   based on a good faith and reasonable interpretation of the

6   court's order . . . ." Vertex Distributing, Inc. v. Falcon Foam

7   Plastics, Inc., 689 F.2d 885 (9th Cir. 1982).

8                                    **III.**

9                                  **ANALYSIS**

10      On April 11, 2005, defendant Roderick Hickman, Youth and

11  Adult Correctional Authority Secretary, issued a memorandum

12  ("Hickman Memo") to state parole agents with a directive

13  prohibiting the use of certain remedial sanctions in lieu of

14  probation revocation.  Decl. of Ernest Galvan ("Galvan Decl."),

15  Exh. 2.  The memorandum provides, in relevant part, that:

16  "Electronic In-Home Detention ("EID"), Community Correctional

17  Reentry Centers ("Halfway Back" Program) and the Substance Abuse

18  Treatment Control Units ("SATCU") were clearly designed to

19  provide intermediate sanctions in lieu of parole revocation

20  . . . . Effective immediately, these programs will no longer be

21  used."[1]

22      Plaintiffs contend that the change in policy and practice

23  as commanded by the Hickman Memo is in direct contravention of

24  ─────────────────────

25      [1]  SATCUs are residential facilities, often within prisons or
    jails, into which parolees can voluntarily accept detention for a
    period of up to 90 days in lieu of parole revocation.  See Cal.
26  Health & Safety Code §§ 11560, 11561, 11563.

                                    4

1   this court's Order.  The Permanent Injunction, they argue,

2   created procedures for, and ensured the use of, remedial

3   sanctions in place of parole revocation and imprisonment when

4   parole officers determine that such measures will best benefit

5   both the community and the parolee.  According to plaintiffs,

6   the Hickman Memo effectively obliterates the remedial sanctions

7   provisions.  In response, the defendants acknowledge that a

8   remedial sanctions plan is contained in the VRP.  They argue,

9   however, that the court may not find them in violation of the

10  Permanent Injunction because remedial sanctions are not part of

11  that Order.  I examine the parties' contentions below.

12  **A.    PLAIN READING OF THE PERMANENT INJUNCTION**

13      The court must first determine whether the language of the

14  Permanent Injunction Order incorporates remedial sanctions as

15  contended by plaintiffs.

16      As a general matter, principles of state law govern the

17  interpretation and enforcement of settlement agreements.  Jeff

18  D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989); see also Gates

19  v. Rowland, 39 F.3d 1439, 1444 (9th Cir. 1994) ("The rules of

20  contract interpretation of the situs state govern interpretation

21  of the consent decree.").  "This is true even when the

22  underlying cause of action is federal in nature."  United

23  Commercial Ins. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir.

24  1992).

25      California law dictates that "[t]he language of a contract

26  is to govern its interpretation[] if the language is clear and

1   explicit . . . ." Cal. Civ. Code § 1638.  The intention of

2   parties must therefore be gathered from the plain language on

3   the face of contract. <u>Pacific States Corp. v. Hall</u>, 166 F.2d 668

4   (9th Cir. 1948).

5       Section IV of the permanent injunction, entitled "Policies,

6   Procedures, Forms, and Plans," sets forth the prospective and

7   mandatory requirements for defendants.  Paragraph 11(a) directs

8   the defendants to "develop and implement sufficiently specific

9   Policies and Procedures" to ensure compliance with "all of the

10  requirements of [the permanent injunction] Order."  It specifies

11  that "[t]he Policies and Procedures will provide for

12  implementation of the August 21, 2003 Remedial Outline (attached

13  hereto as Exhibit A), as well as the requirements set forth

14  below in Paragraphs 12-24." PI Order, ¶11(a).  As indicated by

15  the language, the VRP is indeed attached to the order.

16  Accordingly, the plain language of the Permanent Injunction

17  clearly and explicitly incorporates the VRP and orders the

18  defendants to comply with and implement it.[2]  Defendants are

19  therefore bound by the terms of the VRP.

20  ////

21

22      [2]  Paragraph 12 reiterates that the Policies and Procedures
    shall ensure that, in addition to the Remedial Plan Outline, the
23  requirements set forth in paragraphs 13-24 are met.  The
    requirements in those paragraphs concern the parolee's appointed
24  counsel's ability to adequately represent the parolee,
    confidentiality of parolee's files, transparency and communication
25  between the involved parties during the parole revocation process,
    and evidence used at the probable cause and final revocation
26  hearings.

1  **B.    THE FOUR CORNERS RULE**

2        Despite the plain language of the permanent injunction

3  incorporating and directing compliance with the VRP, defendants

4  insist that, because remedial sanctions "are not mentioned in

5  the body of the injunction" itself, they cannot be a part of the

6  Order under the "four corners" rule. Def's Opp. Br. at 5.

7  Defendants' understanding of the four corners rule is mistaken.

8  It is well-established that reliance upon references or

9  documents expressly incorporated in a settlement agreement for

10  construction purposes "does not in any way depart from the 'four

11  corners' rule." United States v. ITT Continental Baking Co.,

12  420 U.S. 223, 238 (1975)(construing agreement containing consent

13  order and attached appendix as three "parts of the same

14  agreement" under "four corners" rule). Rather, the terms

15  contained in a document attached to an injunction bind the

16  parties just as much as the terms contained in the injunction

17  itself. See California v. Campbell, 138 F.3d 772, 783 (9th Cir.

18  1998) (holding that enjoined defendants bound by terms of

19  document attached to injunction); see also Davis v. City and

20  County of San Francisco, 890 F.2d 1438, 1450 (9th Cir. 1989).

21        Further, although Rule 65(d) of the Federal Rules of Civil

22  Procedure provides that every order granting an injunction

23  "shall describe in reasonable detail, and not by reference to

24  the complaint or other document, the act or acts sought to be

25  restrained . . .," the rule does not necessarily preclude

26  incorporation by reference. State of Cal., on Behalf of

1  <u>California Dept. of Toxic Substances</u>, 138 F.3d 772 (9th Cir.

2  1998).

3      The Ninth Circuit has explained that "the rationale behind

4  the incorporation-by-reference language in Rule 65(d) [i]s a

5  safeguard to 'ensure adequate notice to defendants of the acts

6  prohibited.'" <u>Id.</u> at 783 (quoting <u>Henry Hope X-Ray Prods., Inc.</u>

7  <u>v. Marron Carrel, Inc.</u>, 674 F.2d 1336, 1343 (9th Cir. 1982)).

8  Here, it cannot be said that the defendants were unaware of the

9  incorporation and contents of the VRP, since the Stipulated

10 Order for Permanent Injunction, including the VRP, were

11 submitted by the parties themselves pursuant to their settlement

12 negotiations.[3]  The Order's reference to and attachment of the

13 VRP therefore conforms with the "four corners rule" as well as

14 with Rule 65(d).

15 **C.    THE VRP AND REMEDIAL SANCTIONS**

16     As contended by the plaintiffs, a review of the VRP

17 demonstrates that remedial sanctions are included at nearly

18 every step of the new revocation process created by the parties

19 pursuant to their settlement negotiations.  The VRP is a six-

20 _____

21      [3]  Other evidence unambiguously demonstrates the defendants'
    own understanding that remedial sanctions are part of the Permanent
22  Injunction.  The defendants posted class member notices, approved
    by the court, in every jail, prison and parole office in
23  California.  The short notice explicitly states that, "[u]nder the
    agreement, by early 2004, some parolees will be sent to community-
    based programs, instead of prison."  Galvan Decl., Exh. 8,
24  attachments.  The longer notice provides that "the Permanent
    Injunction will require many changes in the revocation system,"
25  including that "the BPT and CDC will use alternatives to parole
    revocation, such as treatment in the community, for some parolees
26  who would otherwise be arrested on parole violation charges."  <u>Id.</u>

1  page document along with a flow chart.  The second section of

2  the VRP, entitled "Remedial Sanctions," provides that, "as part

3  of the overall reform of the revocation process, the Parole and

4  Community Services Division of the Department of Corrections

5  will begin using remedial sanctions/community based treatment

6  . . . ." VRP at 1.  It explains that "some of the remedial

7  sanctions/community based treatment programs that will be used

8  are the Substance Abuse Treatment Control Units, Electronic

9  Monitoring, Self-Help Outpatient/aftercare programs, and

10 alternative placement in structured and supervised

11 environments." Id.  Emphasized in bold and capital letters, the

12 VRP provides that if, shortly after the alleged parole violation

13 occurs, "remedial sanctions are deemed inappropriate and a

14 parole hold is placed on the parolee, a probable cause

15 determination/review will take place . . . ."  According to the

16 VRP, officials will then again consider remedial sanctions

17 during the probable cause determination.  That procedure was

18 apparently put into place "in an attempt to take a second look

19 at those individuals who have been placed into custody to

20 determine if the 'present danger to public safety' concern still

21 exists or if remedial sanctions/community based treatment is

22 possible at th[at] juncture." Id. at 2.  If remedial sanctions

23 are deemed inappropriate, the parolee is given notice of charges

24 and a probable cause hearing shall be conducted within ten

25 business days of when the notice is provided.  The VRP explains

26 that remedial sanctions/community based treatment must again be

9

1  considered twice before the probable cause hearing. VRP at 3,

2  4.[4]  Finally, the "Deputy Commissioner/Parole Administrator

3  shall have the complete range of options to resolve the case,"

4  including "remedial sanctions/community based treatment." Id. at

5  5.

6     Accordingly, pursuant to its mandatory language, the

7  permanent injunction requires that defendants (1) consider

8  remedial sanctions throughout the new parole revocation process,

9  and that the remedial sanctions include (2) "the Substance Abuse

10 Treatment Control Units, Electronic Monitoring, Self-Help

11 Outpatient/aftercare programs, and alternative placement in

12 structured and supervised environments." VRP at 1.

13 **D.    PERMANENT INJUNCTION VIOLATIONS**

14    Having concluded that the permanent injunction clearly

15 requires the remedial sanctions procedures as set forth in the

16 VRP, I now examine whether the directives in the Hickman Memo

17 violate the court's Order.

18    The Hickman Memo creates a new policy and practice which

19 prohibit the consideration and use of Electronic In-Home

20 Detention ("EHM"), Substance Abuse Treatment Control Units, and

21

22    [4]  Specifically, the VRP states that "On or before the fourth
    business day, the Unit Supervisor must review the report and
23 . . . consider whether or not remedial sanctions/community based
    treatment is appropriate in lieu of proceeding with referral to the
24 Board of Prison Terms with a recommendation that the parolee be
    returned to prison." Id. at 3.  "The revocation packet is reviewed
25 by the Parole Administrator [on or before the 4th business day] to
    determine whether or not there is a sufficient basis for the case
26 to move forward and whether or not remedial sanctions/community
    based treatment is appropriate at this juncture." Id. at 4.

10

1  Community Correctional Reentry Centers ("CCRCs") as sanctions in
2  lieu of parole revocation.  The prohibition of the use of the
3  first two remedial sanctions offends the Permanent Injunction's
4  mandate that SATCUs and Electronic Monitoring be considered and
5  used when appropriate.  The Order provides that these two
6  programs "*will* be used," VRP at 1(emphasis added).  Defendants
7  respond that any conflict between the memorandum and the
8  permanent injunction is inconsequential because they will
9  "retool" these programs and may offer them to parolees upon
10  their release from prison, even before a parole violation
11  occurs.  Def's Oppo. at 9.  Although such a policy is laudable,
12  it is no substitute for that required by the permanent
13  injunction.  The VRP explicitly states that the SATCUs and
14  Electronic Monitoring "will" be used in the manner described
15  therein, thus indicating a requirement or command and
16  eliminating any choice or discretion as to the matter.
17  Therefore, these programs must be made available and be
18  considered throughout the parole revocation process *after* a
19  parole violation occurs.[5]

20

21    [5] Defendants also assert that the Hickman Memorandum "did not
    supercede the Board of Prison Term's authority under California
22  Code of Regulations, Title 15, sections 2513, 2645 and 2646."
    Defs' Oppo. at 9.  According to them, the BPT retains the
23  discretion to place a parolee in a community program rather than
    revoke probation.  This argument has no merit for two reasons.
24  One, the issue here is not whether the Hickman Memo violates state
    law, but whether it violates the Permanent Injunction.  Second, as
25  plaintiff point out, those sections do not require consideration
    of the remedial sanctions listed in the Permanent Injunction
26  throughout the revocation process.

1      Whether the restriction on the use of Community

2  Correctional Reentry Centers also violates the Permanent

3  Injunction is a closer question.  The VRP mandates the

4  consideration of "Self-Help Outpatient/aftercare programs" and

5  "alternative placement in structured and supervised

6  environments."  Unlike the SATCU and EHD, these other remedial

7  sanctions describe types of programs, rather than specific

8  programs.  Community Correctional Reentry Centers are formal,

9  controlled environments for residential drug treatment, Cal.

10  Penal Code §§ 6250.5(b), 6251, 6253(a),(b), 6258(b), and

11  therefore comport with the requirement for "placement in

12  structured and supervised environments."  However, the Order

13  contemplates that other programs that qualify as structured and

14  supervised environments may also be employed.  It appears, then,

15  that the prohibition of the use of CCRCs does not violate the

16  court's Order as long as the defendants offer other remedial

17  sanctions that are "Self-Help Outpatient/aftercare programs" and

18  "alternative placement in structured and supervised

19  environments."  If they do not, then the removal of CCRCs as

20  available remedial sanctions would result in no "Self-Help

21  Outpatient/aftercare programs" or "alternative placement in

22  structured and supervised environments."[6]  The defendants argue

23  ─────────────

24      [6]  Plaintiffs assert that the CCRCs were the "alternative
   placement in structured and supervised environments" included in
   defendants' policies and procedures filed to implement the

25  Permanent Injunction.  Pls' Reply at 2.  The language of the
   Policies and Procedures does not support plaintiffs' assertion,

26  however.  The language there states only that "[r]emedial sanctions

1  that they continue to provide remedial sanctions under these two

2  categories of remedial sanctions.  According to defendants, they

3  will continue to utilize community based programs in the

4  disposition of parole violations when public safety is not

5  endangered.  The issue then is whether any of those programs are

6  suitable under the "Self-Help Outpatient/aftercare programs" or

7  "alternative placement in structured and supervised

8  environments" categories.

9      Defendants first explain that they will use the "Substance

10  Abuse Recovery and Treatment Program" (STAR) which is "an

11  instructional-based education program designed to teach parolees

12  how to address and prevent substance abuse."  Defs' Oppo. at 8.

13  Plaintiffs object that the STAR program is not a residential

14  alternative, but is rather a classroom-based educational program

15  run out of local parole offices.  Pls' Reply at 13.  Apparently,

16  plaintiffs believe that, because the CCRCs are residential drug

17  treatment programs, any replacement program must also be

18  residential.  That position is not grounded on any authority,

19  however.[7]  In their briefs, plaintiffs also object to the

20  defendants' assertion that they will continue to use programs

21  such as "Proposition 36" community treatment centers, Community

22

23  may include but are not limited to" a "Half-way Back Program"
    (CCRCs).  Galvan Decl., Exh. 5 (Policies & Procedures) at 3.
24

25  [7]   The only terms in the Permanent Injunction relating to a
    residential program relate to the requirement that SATCUs, which
26  are residential facilities, be available and considered as remedial
    sanctions.

1  based drug and alcohol rehabilitation centers, Parole Services

2  Network (PSN), Parolee Partnership Program, Narcotics Anonymous,

3  and Alcoholics Anonymous.

4       At oral argument, the plaintiffs conceded that there are

5  no standard definitions for the terms "Self-Help

6  Outpatient/aftercare programs" and "alternative placement in

7  structured and supervised environments" to guide the court in

8  determining whether defendants' new programs are suitable under

9  these two categories.  More importantly, the plaintiffs also

10 conceded that the use of this broad language vests the

11 defendants with discretion in selecting the programs under these

12 two categories.  The plaintiffs do not provide the court with

13 any information about the substitute programs upon which it can

14 find that these programs are inadequate under the Permanent

15 Injunction.  Further, because this court must "accord deference

16 to the appropriate prison authorities," Turner v. Safley, 482

17 U.S. 78, 85 (1987), in their exercise of discretion regarding

18 what types of programs meet the requirements of these two

19 categories, the court will not find defendants in violation of

20 the Permanent Injunction by virtue of the elimination of CCRCs.[8]

21

22      [8]  The plaintiffs object to the defendants' purported use of
   "Substance Abuse Coordination Agencies" (SACAs) as remedial
23 sanctions on the grounds that those programs offer services to
   parolees "graduating from prison substance abuse programs" and are
   therefore not available to parole violators.  Decl. Of Holly
24 Baldwin in Supp. of Pls' Reply, Exh. B at 21.  Defendants do not
   argue to the contrary.  The defendants are admonished that, if it
25 is true that SACAs are not available for parole violators, then
   they do not qualify as remedial sanctions under the Permanent
26 Injunction.

1    As explained above, while removal of the CCRCs does not
2  violate the Permanent Injunction, removal of Electronic
3  Monitoring and SATCUs as available remedial sanctions as
4  explained in the VRP is violative of that Order.  The court,
5  however, does not believe that a contempt order is warranted at
6  this time.  There is nothing before the court indicating that
7  the Hickman Memo was issued in bad faith, rather, the
8  defendants' interpretation of the Permanent Injunction, although
9  erroneous, was arguably reasonable.  Further, it appears that
10  the defendants have substantially complied with the court's
11  Order.  <u>Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.</u>,
12  689 F.2d 885 (9th Cir. 1982)(explaining that substantial
13  compliance with the terms of a consent judgment is a valid
14  defense to and basis upon which to find against civil contempt).

**IV.**

**CONCLUSION**

17    Plaintiff's motion is GRANTED in part and DENIED in part as
18  follows:
19    1.    The defendants are in violation of the Permanent
20  Injunction Order by virtue of the elimination of the remedial
21  sanctions of Electronic Monitoring and SATCUs;
22    2.    The removal of the CCRCs is not in violation of
23  the Permanent Injunction Order; and
24  ////
25  ////
26  ////

15

1    3.    Defendants will not be held in contempt.

2    IT IS SO ORDERED.

3    DATED:    June 8, 2005.

4                                    /s/Lawrence K. Karlton
                                     LAWRENCE K. KARLTON
                                     SENIOR JUDGE
5                                    UNITED STATES DISTRICT COURT

Exhibit I

### Quarterly Actual (Left of Line) and Projected (Right of Line) Intakes to Prison By Category



Source:  CDCR Spring 2006 Adult Population Projections, 2006-2011, Tables 7 8,
http://www.cya.ca.gov/ReportsResearch/OffenderInfoServices/Projections/S06Pub.pdf

## Quarterly Remedial Sanctions Intake (Actual Left of Line, Projected Right of Line) If Diversion Requirements Were Met



Source:  CDCR Spring 2006 Adult Population Projections, 2006-2011, Tables 7 8, http://www.cya.ca.gov/ReportsResearch/OffenderInfoServices/Projections/S06Pub.pdf

Exhibit J

Population Projections Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
02/09/2006

**Spring 2006 Projections**

Table 7
Movement of Male Felon Institution Population
Fiscal Years 2004/05 through 2006/07

| Fiscal Year | Fiscal Quarter | Total Intake | From Court | PV-WNT | PV-RTC | Other Intake | Total Outgo | First Parole | PV-RTC Parole | Other Outgo | Gain/Loss | Population End of Qtr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004/05 | Jul-Sep | 28,906 | 10,631 | 4,320 | 14,011 | -56 | 27,763 | 13,902 | 13,104 | 757 | 1,299 | 152,792 |
|  | Oct-Dec | 27,294 | 9,819 | 4,086 | 13,335 | 54 | 28,646 | 14,136 | 13,751 | 759 | -1,111 | 151,681 |
|  | Jan-Mar | 27,430 | 10,022 | 4,223 | 13,141 | 44 | 28,778 | 13,925 | 14,215 | 638 | -1,596 | 150,085 |
|  | Apr-Jun | 29,479 | 10,932 | 4,580 | 13,917 | 50 | 27,656 | 14,251 | 12,850 | 555 | 1,931 | 152,016 |
|  | Total | 113,109 | 41,404 | 17,209 | 54,404 | 92 | 112,843 | 56,214 | 53,920 | 2,709 | 523 | |
| 2005/06 | Jul-Sep | 30,014 | 10,750 | 4,536 | 14,675 | 53 | 27,902 | 14,374 | 12,946 | 582 | 1,709 | 153,725 |
|  | Oct-Dec | 30,123 | 10,913 | 4,782 | 14,378 | 50 | 28,611 | 14,538 | 13,503 | 570 | 1,588 | 155,313 |
|  | Jan-Mar * | 30,107 | 11,129 | 5,000 | 13,930 | 48 | 29,106 | 14,698 | 13,938 | 470 | 1,001 | 156,314 |
|  | Apr-Jun * | 31,182 | 11,741 | 4,968 | 14,422 | 51 | 29,062 | 15,089 | 13,492 | 481 | 2,120 | 158,434 |
|  | Total | 121,426 | 44,533 | 19,286 | 57,405 | 202 | 114,681 | 58,699 | 53,879 | 2,103 | 6,418 | |
| 2006/07 | Jul-Sep * | 31,167 | 11,285 | 4,942 | 14,890 | 50 | 28,991 | 14,954 | 13,514 | 523 | 2,176 | 160,610 |
|  | Oct-Dec * | 30,602 | 11,169 | 4,999 | 14,384 | 50 | 30,045 | 15,396 | 14,092 | 557 | 557 | 161,167 |
|  | Jan-Mar * | 30,752 | 11,386 | 5,120 | 14,198 | 48 | 29,658 | 15,370 | 13,788 | 500 | 1,094 | 162,261 |
|  | Apr-Jun * | 31,729 | 11,934 | 5,110 | 14,634 | 51 | 29,746 | 15,794 | 13,483 | 469 | 1,983 | 164,244 |
|  | Total | 124,250 | 45,774 | 20,171 | 58,106 | 199 | 118,440 | 61,514 | 54,877 | 2,049 | 5,810 | |

* Projected

Note: Other intake includes CYA
Other outgo includes discharges and deaths.

Population Projections Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
02/09/2006

Spring 2006 Projections

Table 8
Movement of Female Felon Institution Population
Fiscal Years 2004/05 through 2006/07

| Fiscal Year | Fiscal Quarter | | Total Intake | From Court | PV-WNT | PV-RTC | Total Outgo | First Parole | PV-RTC Parole | Other Outgo | Gain/Loss | Population End of Qtr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004/05 | Jul-Sep | | 3,234 | 1,559 | 427 | 1,248 | 2,844 | 1,747 | 1,045 | 52 | 368 | 10,707 |
| | Oct-Dec | | 2,905 | 1,381 | 381 | 1,143 | 2,954 | 1,742 | 1,145 | 67 | -36 | 10,671 |
| | Jan-Mar | | 2,902 | 1,419 | 376 | 1,107 | 3,085 | 1,806 | 1,229 | 50 | -198 | 10,473 |
| | Apr-Jun | | 3,154 | 1,455 | 387 | 1,312 | 3,039 | 1,836 | 1,163 | 40 | 55 | 10,528 |
| | Total | | 12,195 | 5,814 | 1,571 | 4,810 | 11,922 | 7,131 | 4,582 | 209 | 189 | |
| 2005/06 | Jul-Sep | | 3,424 | 1,600 | 419 | 1,405 | 3,066 | 1,830 | 1,194 | 42 | 399 | 10,927 |
| | Oct-Dec | | 3,333 | 1,529 | 455 | 1,349 | 3,224 | 1,861 | 1,308 | 55 | 149 | 11,076 |
| | Jan-Mar | * | 3,202 | 1,509 | 424 | 1,269 | 3,187 | 1,885 | 1,260 | 42 | 15 | 11,091 |
| | Apr-Jun | * | 3,355 | 1,571 | 424 | 1,360 | 3,144 | 1,894 | 1,215 | 35 | 211 | 11,302 |
| | Total | | 13,314 | 6,209 | 1,722 | 5,383 | 12,621 | 7,470 | 4,977 | 174 | 774 | |
| 2006/07 | Jul-Sep | * | 3,477 | 1,586 | 462 | 1,429 | 3,220 | 1,879 | 1,311 | 30 | 257 | 11,559 |
| | Oct-Dec | * | 3,357 | 1,518 | 450 | 1,389 | 3,377 | 1,962 | 1,374 | 41 | -20 | 11,539 |
| | Jan-Mar | * | 3,364 | 1,585 | 453 | 1,326 | 3,302 | 1,923 | 1,339 | 40 | 62 | 11,601 |
| | Apr-Jun | * | 3,515 | 1,645 | 455 | 1,415 | 3,362 | 2,003 | 1,321 | 38 | 153 | 11,754 |
| | Total | | 13,713 | 6,334 | 1,820 | 5,559 | 13,261 | 7,767 | 5,345 | 149 | 452 | |

* Projected

Note: Other outgo includes discharges and deaths.

Exhibit K

State of California

# Memorandum

Department of Corrections and Rehabilitation

Date  :  October 25, 2005

To    :  Roderick Q. Hickman
         Secretary
         California Department of Corrections and Rehabilitation

Subject :  MODIFICATION TO CORRECTIONAL OPERATIONS DUE TO COMPELLING
           OPERATIONAL NECESSITY

The California Department of Corrections and Rehabilitation's (CDCR) total inmate population reached 166,148 as of October 12, 2005. This historic population high has caused significant population pressure resulting in public safety concerns for the CDCR as well as the counties in our State. The following factors that have led to the population crisis as well as real and potential consequences are:

- **High Levels of County Intake** - The Fall 2005 projections for the first quarter of fiscal year (FY) 2005/06 identified an average male intake of 9,537 male offenders per month. In the first quarter of FY 2005/06, CDCR received an average of 10,102 male offenders per month.

- **Significant Monthly Increases in CDCR's Total Population** - The average monthly increase in the total inmate population for July-September 2005 was 809. The CDCR has not experienced increases of this magnitude since 1997 when the overall population was only 155,013 (September 30, 1997) compared to the population today of 166,148.

- **County Jail Public Safety** - County jails such as Los Angeles have indicated that misdemeanor offenders housed in the jails are being released after having served only 10 percent of their sentence. Los Angeles has to release offenders early in part due to the CDCR's inability to move inmates from County jails to State prisons expeditiously.

- **Court Cases Impacting the Reception Center (RC) Process** - The Department has been subjected to numerous court mandates, in re *Coleman*, in re *Armstrong*, in re *Plata*, in re *Valdivia*, and in re *Clark*. The mandates created additional workload in RCs that have contributed to longer processing times. In 2000, the average processing time for a male inmate was 58.9 days. Thus far in 2005, the average processing time for male inmates has grown to 69.5 days.

- **Health Care Transfer Limitations** - Even when General Population beds are available for transferring of RC inmates, there are often limitations to the number of inmates with mental health or medical needs that a given institution can accept in a given week due to court imposed sanctions for example in *Coleman v. California* the CDCR has agreed to time constraints in which an inmate is seen by a mental health clinician within 14 days of arrival to establish program needs. As such, the number of inmates is limited to the staff's ability to perform those evaluations. We also have clinical staffing ratios and when we are unable to maintain those staffing ratios we are further limited.

- **Lack of Automation** - The CDCR's information systems are grossly inadequate to meet the needs of the RC and contribute significantly to an inmate's length of stay in the RC.

- **Staffing Shortages** - The CDCR is experiencing staffing shortages in a broad range of areas. These range from Correctional Officers, medical/mental health staffing, case records analyst, etc. Not only is hiring staff at many institutions challenging, but those staff must be trained once hired.

Roderick Q. Hickman
Page 2

- **RC Population Reduction at San Quentin (SQ)** - Due to concerns of the *Plata* court in regards to medical care at SQ, the CDCR has reduced the RC population at SQ at a time when there is a critical need for RC beds.
- **County Jail Population Capacities** - The Pitchess Center (Los Angeles County Sheriff's Jail) has been consistently housing CDCR Parole violators in numbers that exceed the contract capacity of 1292 for several months during 2005, while RC have been at capacity levels and unable to accept intake for this type of inmate. A separate capacity in the Los Angeles County Jail for "local assistance" beds is also affected by our inability to accept inmates sentenced to State prison by the courts, in the RCs and has reached highs of 2000+ with current totals at 1367. We have also exceeded the contract capacities at Santa Rita (Alameda County Jail) with a CDCR population of 700+ and must reduce this to below 625. Other County officials from Orange, San Bernardino, Riverside, and San Diego have also requested that extra inmates be delivered to CDCR as a result of jail overcrowding for new commitments and other inmates returning to State prison.
- **County Jails Not Accepting Parole Violators** - Due to the influx of parole violators as stated above, counties such as Riverside, San Diego, and Alameda have, at times, stopped accepting the delivery of additional parole violators, thus requiring parole agents to deliver violators directly to the RC. This exacerbates the situation, in that the County may not accept cases that would be held for Our Hold Only.
- **Bridging Education Program** - In early 2004, the CDCR implemented the Bridging Education Program (BEP). The BEP provided inmates arriving at RCs with day-for-day credit, if eligible. This has created a significant population of inmates housed in RCs that cannot transfer based on their imminent parole date of less than 30 days.

Based on the above facts, we believe that an imminent and substantial threat to the public safety exists requiring immediate action. In a separate document, I will be forwarding some unprecedented recommendations to modify a variety of correctional operations to alleviate the significant population pressures that are affecting public safety.

If you have any questions, please contact me at 445-7688.

JOHN DOVEY
Director
Division of Adult Institutions

cc: Joyce Hayhoe
    Brigid Hanson
    Mike Knowles
    Tim Virga
    Dean Borg
    Associate Directors
    Wardens
    Kathleen Dickinson