Exhibit L

061005madridCV

1

Pages 1 - 54

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE THELTON E. HENDERSON, JUDGE

```
-----------------------------)
Alejandro Madrid, et al.,     )
                              )
              Plaintiffs,     )
                              )
     v.                       )    NO. C 90-3094 (TEH)
                              )
James Tilton, et al.,         )
                              )
              Defendants.     )
-----------------------------)
```

                                    San Francisco, California
                                    Thursday, October 5, 2006


                        TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Prisoner            Prison Law Office
Plaintiff Class:        General Delivery
                        San Quentin, California 94964
                   BY:  DONALD SPECTER
                        STEVEN FAMA

For Madrid              State of California
Defendants:             Department of Justice
                        Office of the Attorney General
                        455 Golden Gate Avenue
                        Suite 11000
                   BY:  MICHAEL W. JORGENSON
                        Deputy Attorney General

For the California      Shartsis Friese LLP
Governor's Office:      One Maritime Plaza
                        Eighteenth Floor
                        San Francisco, California 94111
                   BY:  ARTHUR J. SHARTSIS
                        ERICK C. HOWARD
                        AMY L. HESPENHEIDE


                   CONNIE KUHL, RMR, CRR
        Official Reporter - U.S. District Court (415) 431-2020

2

APPEARANCES (cont.):

For CCPOA:              Carroll, Burdick & McDonough
                        44 Montgomery Street
                        Suite 400
                        San Francisco, California 94104
                   BY:  RONALD YANK
                        GREGG M. ADAM

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

061005madridCV

```
 7   Also Present:          JAMES TILTON
 7
 8
 8
 9
 9
10
10
11
11
12
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

3

```
 1   Thursday, October 5, 2006
 2                                        (10:08 a.m.)
 3            DEPUTY CLERK:  Court is now in session.  Please be
 4   seated.
 5            Calling civil Case Number C 90-3094, Madrid versus
 6   California Department of Corrections.
 7            Please's state your appearances, Counsel.
 8            MR. SPECTER:  Don Specter and Steve Fama from the
 9   Prison Law Office, your Honor.
10            THE COURT:  Good morning, Counsel.
11            MR. JORGENSON:  Michael Jorgenson with the California
12   Attorney General's Office for the Madrid Defendants.
13            THE COURT:  Mr. Jorgenson.
14            MR. SHARTSIS:  Arthur Shartsis, with Erick Howard and
15   Amy Hespenheide, representing Governor Arnold Schwarzenegger.
16            MR. ADAM:  Gregg Adam and Benjamin Sybesma
17   representing amicas CCPOA.
18            THE COURT:  Good morning.
19            Okay.  There are two matters that I want to address
20   today, and we'll proceed in the following manner:
21            First, we'll start with the Special Master's
22   March 16th, 2006 report and recommendations regarding his
23   investigation into selected provisions of the Memorandum of
24   Understanding, or MOU, between the California Correctional
25   Peace Officer's Association and the California Department of
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

4

```
 1   Corrections and Rehabilitation.
 2            Plaintiffs have objected to one aspect of this
 3   recommendation, and we will hear that objection in a short
 4   while.
 5            After I've heard from all the parties on this issue,
```

Page 2

061005madridcv

6   we'll then turn to the objections that have been made to the
7   Special Master's fourth recommendation in his August 22nd
8   report of this year regarding the State's corrective action
9   plans for administrative investigations and discipline.  There
10   have been no objections to the first three recommendations of
11   the Special Master in this report, but as I said, there has
12   been to the fourth.
13        Both of these matters stem from the Special Master's
14   June 24th, 2004 report regarding the post powers investigation
15   and employee discipline.  And I think it's useful to briefly
16   recall the circumstances leading up to this report and some of
17   the Court's findings in light of this report, because I think
18   it provides some context for the hearing today; and I've found
19   that sometimes the background history is important, and they
20   get lost in the heat of the instant hearing.
21        So I'm going to go a little into the background so
22   that we have a context for today.
23        When this Court issued its original decision in 1995,
24   it found that the code of silence existed in full bloom -- and
25   those are my words today -- at Pelican Bay State Prison, a code

1   by which officers would help cover up the misuse of force by
2   other officers against inmates or would face retaliation for,
3   quote, "snitching".  And there was no doubt that this was a
4   factor that contributed to the Court's finding that there was
5   an unconstitutional pattern of excessive force against inmates
6   at Pelican Bay Prison.
7        By 2004, some nine years later, the remedial process
8   at Pelican Bay had made very substantial strides in many
9   important areas.  Serious problems remain, however, with
10   respect to the defendants' ability to effectively conduct
11   administrative investigations into allegations of the misuse of
12   force against inmates and to effectively impose discipline in
13   the event that such an allegation will sustain.
14        And as this Court explained in its 1995 decision and
15   again in its orders of November 17th, 2004, these remaining
16   issues are central to curing the constitutional violations and
17   to bring the remedial process in this case to a successful
18   conclusion.  And that is the goal of everyone here.
19        This is because effective investigation and discipline
20   is, again, as I've stated in '95 and again in 2004, it's the
21   final cornerstone of defendants' use of force remedial plans.
22   And without an effective investigatory and discipline system to
23   back them up, all the use of force, remedial policies, no
24   matter how well-conceived, will eventually turn into little
25   more than a dead letter.

1        In 2004, after a thorough investigation, the Special
2   Master found that the code of silence was continuing to thwart
3   a full and effective use of force remedy at Pelican Bay State
4   Prison.  Specifically, he determined, and the Court concurred
5   in that determination, the following findings:
6        One, that the then director of CDCR, Edward Alameida,
7   had prematurely quashed, at the behest of the CCPOA, an
8   internal affairs investigation into whether a correctional
9   officer at Pelican Bay State Prison had committed perjury in an
10   effort to cover up misconduct by a fellow officer; and,

061005madridcv

11  secondly, that the CDCR systems for internally investigating
12  allegations of misuse of force against inmates and imposing
13  administrative discipline in the event such allegations were
14  sustained were dysfunctional and indeed were broken to the core
15  and subject to interference.
16       In July and November of 2004, the Court directed the
17  Special Master to work with the CDCR to develop and implement
18  remedial plans to address the problems with investigations,
19  with adverse action, discipline and the code of silence.  To
20  its credit, the current administration agreed to address the
21  systemic problems identified by the Special Master on a
22  statewide basis, and it embarked on what the Special Master has
23  described more than once as one of the most productive periods
24  of prison reform in California history.  Specifically, the CDCR
25  began implementing a number of remedial state-wide efforts to

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

7

1  address the code of silence and the problems in administrative
2  investigations and discipline, and the governor instituted the
3  critically important Bureau of Independent Review in the
4  Inspector General's office these various remedial efforts,
5  referred to for convenience as the post powers remedies, are
6  fully chronicled in the Special Master's August 22nd report of
7  this year.
8       In November of 2004, at the same time that the Court
9  directed the Special Master to work with defendants on these
10  remedies, the Court also directed the Special Master to look
11  into the issue of whether certain provisions of the MOU --
12  Memorandum of Understanding -- between the State and the CCPOA
13  violated, by their terms or in practice, the Court's use of
14  force remedial plans because they interfered with the ability
15  of the CDCR to undertake effective administrative
16  investigations and/or discipline.
17       And so this brings us to the present time, some 11
18  years after the original decision in this case.  And I think
19  that this brief background is important and helpful because it
20  illuminates the fact that the issues that underlay the
21  recommendations that are at issue today, and that I will be
22  discussing in just a moment, routing out the code of silence
23  and the ability of the CDCR to effectively address allegations
24  of misuse of force, have not just popped up overnight.  These
25  are not a new issue.  They're long-standing issues with deep

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

8

1  roots that will require vigilance and diligence to overcome.
2  But in my view, overcome they must, if we're to find that the
3  constitutional violations found 11 years ago have been
4  successfully cured such that we can terminate this case, so I
5  can get out of this case.  And I know that makes the -- the
6  thought makes a lot of people happy, that I do plan to get out
7  of this case at the point where we reach that point.
8       So with this bit of history and context in mind, I'm
9  going to turn now to the first report that we are considering
10  today, the Special Master's March 6th, 2006 report regarding
11  this investigation, regarding his investigation into the
12  specified provisions of the MOU.  As the Special Master
13  explains in that report, he conducted numerous meetings with
14  all concerned that led to a stipulation signed in March by the
15  defendants and by the CCPOA which clarified the meaning of the

Page 4

061005madridcv
16    specific MOU provisions at issue.  I note that in his report,
17    the Special Master recommends the representatives of the
18    Department of Personnel Administration and the CCPOA -- I'm
19    sorry, the Special Master commends those parties, the DPA and
20    CCPOA, who worked diligently and in a professional manner with
21    the Special Master on these issues.
22            And the Special Master has recommended that in light
23    of the fact that the administration has made significant
24    progress toward revamping and professionalizing the internal
25    affairs and administrative disciplinary systems, including

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                    9
1     creation of the Bureau of Independent Review, and in light of
2     the stipulation and proposed companion training, that the Court
3     should find that the MOU provisions at issue do not violate the
4     Court's use of force remedial plans and that further
5     investigation into these provisions is not necessary at this
6     time.
7             As I've mentioned, plaintiffs have objected to this
8     recommendation.  In particular, they've objected to the Special
9     Master's recommendation with respect to one provision of the
10    MOU, Section 9.09.  And so I'm going to now allow plaintiffs to
11    speak to this issue and voice their objection here in court;
12    and then the State defendants may respond, following by the
13    CCPOA, which has been allowed limited intervention in this
14    action with respect to the Special Master's review of the MOU
15    provision specified in the November, 2004 order.
16            So, at this time, Mr. Fama?
17            MR. FAMA:  Thank you, your Honor.  And good morning
18    again.
19            This issue concerns a substantial advantage that
20    prison officials give to CCPOA officers under investigation,
21    and plaintiffs' contention that in all fairness, the Court
22    yourself, your Honor, should hold a hearing and take evidence
23    and resolve the issue.
24            At Pelican Bay and at every other prison about the
25    first thing that happens when a prisoner makes a complaint

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                    10
1     about use of force or an alleged cover up is that the officer
2     against whom the complaint is made is told about the prisoner's
3     complaint.  Then, if the officer asks, the officer is given a
4     copy of the inmate's complaint.  This happens at Pelican Bay
5     and other prisons because and only because of the Memorandum of
6     Understanding between the Department of Corrections and the
7     CCPOA, the guard's union.  So far as plaintiffs can tell, it
8     happens in California prisons and no other law enforcement
9     agency that has custody of prisoners.
10            We believe that the ability or the right of officers
11    to be told of an inmate's complaint and to receive a copy of it
12    provides a self-evident bearing to adequate and reliable
13    investigation.  The officer who receives notice and the details
14    of the inmate's complaint is able to color her or his
15    recollection of the incident in question.  And the officer in
16    question has typically weeks prior to any investigative
17    interview to consider the full implications of the particulars
18    of the complaint that the inmate has made.
19            I think it can also be inferred that the knowledge on
20    the part of my clients, the prisoners, that a complaint made
                                Page 5

061005madridCV
21  will be essentially promptly turned over to the officer in
22  question, can have a chilling effect on the actual making of
23  complaints.
24          The stipulation --
25          THE COURT:  I would assume, and you can correct me if

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                            11

1  I'm wrong, that that particular event will eventually be known
2  in any event, so how would it -- will it chill too early or it
3  won't chill later on?  I'm not clear on that point.
4          MR. FAMA:  I think that it won't chill as much later
5  on.
6          As the Court remarked, there has been, through
7  discussion chaired by the Special Master, a stipulation reached
8  between the union on the one hand and the State of California
9  Department of Corrections on the other that discusses this
10  process, notifying officers of complaints and giving them a
11  copy.
12          Plaintiffs do not believe that the provisions of that
13  stipulation cure the self-evident advantage, substantial
14  advantage, that is provided to officers.  The stipulation
15  provides that instead of giving the inmate the -- excuse me,
16  the officer the actual complaint that the inmate made, that the
17  officer instead be given, and these are the words of the
18  stipulation, "a specific or precise summary" of the complaint.
19  And in plaintiffs' view, there is not a difference large enough
20  between the actual complaint and a precise summary to stop the
21  advantage that flows to the officer who learns immediately of
22  what the inmate complaint is.
23          The stipulation also provides that the officer need
24  not be given either the actual complaint, or a summary, in the
25  case of the department conducting an investigation that

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                            12

1  involves a sting.  That, however, your Honor, is already
2  clearly, in plaintiffs' view, a part of the existing MOU, and
3  thus the, again, added value of that part of the stipulation is
4  not, in our view, significant.
5          It also provides, the stipulation does, that the
6  inmate complaint or summary, precise summary, need not be given
7  to the officer when there was a referral to outside law
8  enforcement ab initio, at the immediate start, for
9  investigation.  It's plaintiffs understanding that those types
10  of investigation, that is, where the department completely
11  backs off and turns it over to law enforcement, are very rare.
12  And so in the vast overwhelming majority of cases, the inmate
13  complaint or precise summary will still be going to the
14  officer.
15          The stipulation finally, in terms of the significant
16  provisions related to this particular requirement, states that
17  when management, CDCR management initiates a complaint and an
18  inmate -- excuse me, an investigation, and an inmate is
19  interviewed as part of that management-initiated investigation,
20  the inmate complaint need not be forwarded.
21          And that, I think, is very interesting, your Honor, to
22  think about.  Because in plaintiffs' view, if it isn't
23  necessary to turn over the inmate complaint when it so happens
24  that a sergeant or a lieutenant initiates the investigation,
25  what's the need, what's the justification, for doing it when
Page 6

061005madridcv

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

13

1  it's the prisoner who makes the first step and is the first
2  person to open his or her mouth?
3          I don't think there's a substantial difference, and I
4  think if the department can work with not giving the complaint
5  when their manager happens to start an investigation, that same
6  rule ought to apply when my client starts it.
7          Your Honor, there's been a suggestion that plaintiffs
8  are sort of a Johnny-come-lately with this issue, that it's
9  been many years.  And your Honor recounted some of the history
10  of this case, and it has been many years.  We should remember,
11  too, the context and when the Court first ruled about the
12  inadequacy of investigations at Pelican Bay.  It's not too much
13  of an exaggeration to say that they didn't have any or enough
14  investigators.  And then once this court insured that there
15  were enough investigators, it also had to insure that those
16  investigators knew how to ask questions and knew how to write
17  reports and knew how to gather the evidence.  And once that was
18  done, of course we had to then get across the bridge and making
19  sure that those investigators when they asked their questions
20  asked them in a timely manner so that the statute of
21  limitations wasn't blown in a vast majority of the
22  investigations.
23          And then, as your Honor alluded, we had to cross the
24  almost unbelievable bridge of the Director of the Department of
25  Corrections shutting down investigations.  And it wasn't until

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

14

1  recent years that this court turned to questions related to the
2  Memorandum of Understanding and its possible impact on the
3  adequacy of investigations.
4          So I don't think that we, in the context of this case
5  and the big, huge problems with the adequacy of investigation
6  that we've already dealt with in this action, are late.  This
7  is sort of like the proverbial onion where we finally have
8  gotten down now to some of the meatier issues after having had
9  to deal with all kinds of other equally important issues.
10          The union in its opposition to plaintiffs' objection
11  seems to suggest that California law sort of requires that the
12  officer be told about an inmate's complaints anyway so that the
13  MOU isn't that big a deal.  That overstates the requirements of
14  California law.  Under the Peace Officer's Bill of Rights,
15  Section 3303, Subdivision C, of the Government Code, an officer
16  under investigation must be informed of the nature of the
17  investigation prior to any interrogation of that particular
18  officer.
19          In practice, what that means is that the officer is
20  told of either the general or specific nature of the
21  questioning, 24 or maybe a little or greater number of hours,
22  prior to being questioned.  That's obviously far different than
23  being told immediately after the investigation is made,
24  typically weeks in advance of any questioning.  And I think
25  it's important to remember that the MOU stipulation that has

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

15

1  been reached by the State and the union has so far as what the
Page 7

061005madridcv

```
 2   State has told plaintiffs taken the question of whether
 3   officers should be told immediately or immediately thereafter a
 4   complaint is made about the complaint, receive a summary or a
 5   copy of the complaint itself, off the table in terms of the
 6   current pending negotiations about the new union contract.
 7           And plaintiffs are concerned that not only has it
 8   insulated any attempt by the State -- the State, in other
 9   words, is not going to try and change this on its own.  It
10   says, this deal having been made, it has sort of the force of a
11   prior agreement.  It is an agreement between the prison
12   officials and the union.  And now it's -- it appears to be set
13   in stone almost.  And given the substantial advantages that are
14   provided, we just don't think that is right, given the
15   impairment to investigations.
16           The Special Master, in responding to plaintiffs'
17   objections, has presented arguments, many of which I have
18   already spoken to, or at least I have attempted to.  He also
19   provides a declaration from one of the court experts.  And,
20   your Honor, a declaration having been provided I think
21   underscores now the need for a formal evidentiary hearing
22   before the Court.
23           We should be given the opportunity to test or question
24   the Court expert regarding the matters as stated in the
25   declaration.  And it's similar to what we did in the trial of
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

16

```
 1   this matter now so many years ago, your Honor, where as you
 2   will recall the experts from plaintiffs and defendants
 3   submitted substantial evidence by means of a written
 4   declaration; and then your Honor, rightly, provided each side
 5   with an opportunity to ask questions.
 6           I also note of course that in the second report that
 7   your Honor's going to consider today, about the status of the
 8   post powers remedies, the Special Master remarks there about
 9   how declarations may not always present the full picture.  And
10   that a hearing should be held so that questions can be asked by
11   all sides so as to fill the rack, and we think that is what
12   should happen here on this important issue.
13           That long you very much.
14           THE COURT:  Let me ask you one question, just to make
15   sure I understood the totality of your argument:
16           How much of your concern is the timing?  How much of
17   your concern would be met if the officer weren't told
18   immediately but 24 hours before questioning?
19           MR. FAMA:  Yes --
20           THE COURT:  Is that an important --
21           MR. FAMA:  Yes -- and I'm sorry to interrupt -- that's
22   it.
23           THE COURT:  That's it.
24           MR. FAMA:  It makes a huge difference.  Because not
25   only is there time, substantial time, to color recollection and
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

17

```
 1   conform possible answers to questions to the complaint having
 2   been made; but it also gives an opportunity, and it can't be
 3   denied, for more nefarious code of silence -- direct code of
 4   silence activities, whereas whom an officer to whom a complaint is
 5   made can choreograph.  And if there's only 24 hours' notice,
 6   obviously there's substantially less risk of that, where there
```
Page 8

061005madridCV

7   would need to be a far more quickly thought out and executed
8   plot or conspiracy.
9           And again, if my understanding's correct, and the
10  department is the only one to do this this way, it strikes us
11  as really unfair, and making it very difficult to do so
12  reliable and adequate investigations.  I mean, we discussed the
13  California Supreme Court decision that addressed this.  I think
14  it was the union that made the -- tried to make the point that
15  the -- that decision of the California Supreme Court concerned
16  a broader discovery before an investigatory interrogation
17  involving law enforcement officers.
18          But if you read the Supreme Court decision at --
19  actually, 578 is the jump cite there, your Honor -- the police
20  officers in that case claimed that they had a right to both the
21  complaint and other preinterrogation discovery.
22          And I think it's clear that the California Supreme
23  Court comments pertained to both.  And the Supreme Court
24  comments are just there to -- of course, they're not
25  dispositive on your Honor.  But I think it's very persuasive

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

18

1   that the Supreme Court of California remarked about the obvious
2   advantages that would flow to the person being investigated if
3   they had knowledge, specific along, of the complaint well
4   before they were questioned.
5           Your Honor, that's all I have.  If you have other
6   questions...?
7           THE COURT:  I don't, at this time.  Thank you,
8   Mr. Fama.
9           MR. FAMA:  Thank you.
10          THE COURT:  Shall we hear from CDCR?
11          MR. JORGENSON:  Good morning, your Honor.
12          THE COURT:  Good morning.
13          MR. JORGENSON:  The defendants didn't submit a
14  response to plaintiffs' objections, so I'll limit my documents
15  what Mr. Fama has said here there morning.
16          I would add that the -- the stipulation which was
17  submitted in March hadn't yet been approved from the court, and
18  that the DPA and CDCR's committed to the efforts that they
19  agreed to undertake in stipulation and would proceed with that
20  in many of the undertakings that they'd agreed to take, have
21  already begun, primarily, training.  And that will be an
22  ongoing effort.
23          But also add that the stipulation was the result of a
24  collaborative effort between the Special Master, the
25  court-appointed expert.  The plaintiffs were there for the

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

19

1   proceedings, as well as the CCPOA.
2           Plaintiffs' objections to the stipulation come after
3   the final work product was developed between the various
4   parties to the stipulation.  And they had an opportunity to
5   make and raise these arguments during the formulation of the
6   stipulation, but we didn't see these objections really until
7   the report had been issued.
8           THE COURT:  I'm not familiar with that.  But did they,
9   in fact, have a chance to have input into this?
10          MR. JORGENSON:  They were at the meetings when we
11  developed the stipulation, yes.  And in the development of the

Page 9

061005madridCV

```
12    stipulation, they actually will sit there to draft proposed
13    language of the way the stipulation would read.
14             So I think in the comments that the plaintiffs have
15    made about the stipulation, they've overstated what the
16    correctional officers are entitled to under the stipulation and
17    I would urge the Court to review the stipulation and the way
18    it's worded.  And would add that nothing prevents the DPA from
19    providing less in future MOU's, and if the Court were to add
20    language to that effect, and document stipulation, that is
21    something that the Court should consider.
22             THE COURT:  Say that again, Counsel?
23             MR. JORGENSON:  There's nothing in the stipulation
24    that prevents the DPA and the CCPOA from agreeing to something
25    less than is agreed to in the stipulation.  In other words, a
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

20

```
 1    future MOU could change -- if my understanding is correct of
 2    the stipulation, it could provide fewer documentation than
 3    what's already in the stipulation.
 4             Mr. Fama also queried what is the justification for
 5    providing notice, and I would like to respond to that comment.
 6    There are numerous appeals filed by inmates every year.  There
 7    are numerous complaints against correctional officers, and I
 8    believe the CCPOA contested this as well.  The reason for
 9    providing that notice is the correctional officer's job.  And I
10    believe it becomes an issue when these investigations are
11    initiated.  So it provides the opportunity to the correctional
12    officer to recollect the incident that is complained of.
13             And as far as the plaintiffs' comments regarding the
14    nature of the complaint, the stipulation at Page 4, it's clear
15    that the nature of the complaint would include -- here, I'll
16    read directly from the stipulation -- that the employee
17    requests a copy of the complaint.  CDCR should usually provide
18    it in the form it was received.  However, CDCR may instead
19    provide a specific written summary of the complaint.  The
20    summary must be detailed enough to apprise the employee of the
21    specific substance of the complaint, including the name of the
22    complainant, the date, time, the location of the alleged
23    incidents, and a precise summary of the complaint.
24             I would say that means that gives an opportunity to
25    the correctional officer to recollect the incident in order to
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

21

```
 1    preserve his rights as much as the plaintiffs claim it would
 2    provide the opportunity to color the recollection of the
 3    incident.
 4             So those are my comments as far as the stipulation is
 5    concerned.
 6             THE COURT:  Would it be a fair summation to say at
 7    this point then I'm balancing that right to have a recollection
 8    on the premise that we remember best that which is more recent
 9    than more distant?  That we're balancing that right of a peace
10    officer against plaintiffs' concern that what it really does is
11    give a chance to manufacture that recollection?  Is that what
12    I'm balancing, in your view?
13             MR. JORGENSON:  Yes.
14             THE COURT:  Okay.
15             MR. JORGENSON:  Thank you, your Honor.
16             THE COURT:  Thank you, Counsel.
```

Page 10

061005madridcv

17       Mr. Yank?
18       MR. YANK:  Well, your Honor, Mr. Jorgenson's quite
19  right in saying that counsel for plaintiff had opportunities
20  and input.  At one point, well, not at one point, time and time
21  again, what you had was, there could have been 10 lawyers
22  participating, and you can imagine how much fun it is to draft
23  a document with 10 lawyers throwing in their two cents.  And I
24  think it's extremely fair to say that Mr. Specter and Mr. Fama
25  were very active participants in that.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                        22

1        So I think the Court's right to focus in on the delay
2   in time between the proximity of the complaint and when it is a
3   correction officer might be interrogated.  I think everybody
4   agrees that the Peace Officer Bill of Rights provides at least
5   if not more information be provided to a peace officer than the
6   MOU, but certainly the timing is different.
7        By the way, I don't think that you're in a situation
8   of waiting here, because Mr. Fama and the plaintiffs had plenty
9   of opportunity to bring to the Special Master evidence of
10  what's going on in the rest of, if you will, the law
11  enforcement community and so on.  I think today's the first
12  time I ever heard Mr. Fama make the suggestion that the State
13  is the only peace officer jurisdiction to have something like
14  notice immediately.  I think there may well be some MOU's
15  collective bargaining agreements involving deputy sheriff
16  associations and their sheriff's offices -- so -- that have
17  something similar.
18       My point is that Mr. Fama's belief about what might be
19  out there or not, to my recollection, and this is the business
20  I'm in, shouldn't be brought up at the last moment.
21       The point is that at that point, and I think 909 and
22  the dialogue with the Special Master was painstaking, it was to
23  show the plaintiffs a need for a change, even a need for a
24  hearing.  It wasn't until after his main presentation that, in
25  response to a question from the Court, Mr. Fama first mentioned

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                        23

1   choreographing.  That was discussed, however, in great detail
2   in our dialogue at the hearings.  And in fact, you will find in
3   the stipulation a specific admonition forbidding choreographing
4   and so on.
5        All right.  So you might ask yourself:  Well, okay,
6   but I mean, you know, why create this, quote, "advantage", that
7   Mr. Fama talks about?  The answer is this:
8        Unlike every other noncustodial peace officer in the
9   state, my clients see the same people dressed the same way at
10  the same eight block set of hours day after day after day.  And
11  the whole purpose of this -- well, there are several purposes,
12  and I would just highlight two of them that were brought out to
13  the Special Master.
14       The main purpose, I would have to acknowledge, is so
15  that our members would have a chance to recall this incident
16  about which an inmate complained yesterday or the day before.
17  The document originally stated, the MOU, with us just getting a
18  copy of what's called 602's.  602's are forms.  About 85,000
19  inmate complaints get made in CDCR in a year.  It wouldn't
20  surprise me if Pelican Bay had a little higher proportion than
21  most prisons.  But you're looking at in excess of two thousands
                                Page 11

061005madridCV

22  complaints filed per year.
23      Somebody makes a traffic stop, you know, on the Golden
24  Gate in San Francisco, might not have that tough a time
25  recalling the gentleman driving the blue Toyota whom I stopped

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

24

1   at Larkin and Golden Gate for a taillight violation.  Might
2   have a pretty good shot at remembering that, especially if a
3   ticket were given or a police report were filed.
4       My people have interactions, again, same setting, same
5   people, no way to recall.  Try to come up with an analogy.  And
6   I'll go to our state courts.  They have regular law and motion
7   departments.  Set judge.  Seeing, as you see before you here
8   today, a bunch of lawyers in suits, men and women, who come up
9   and make arguments and so on.  The State system also has a
10  facility, an agency, that looks into complaints against
11  judicial officers.  And the best thing I can come up with is
12  months after the fact, some judge sitting law and motion is
13  being asked to recall what happened because an allegation was
14  filed against him that he continually winked suggestively at
15  the lawyer who was appearing before him, or cut that lawyer
16  off, and so on.  Many of our law and motion departments, I
17  think Sacramento was one, they don't even have a court reporter
18  unless it's specially requested.
19      And that's the best analogy I can make to our reason
20  why 909 in this particular area was bargained for and agreed
21  to.
22      Also, what was pointed out in the hearings in front of
23  the Special Master were sometimes the notifications to officers
24  helped alleviate friction between that officer or other
25  correctional officers in general on the one hand and an inmate

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

25

1   or group of inmates on the other.  And so an inmate might file
2   a 602, or make another complaint, not a 602, about the way food
3   was being passed or presented to the officer, somehow it was
4   offensive because of his or her religion.  And the correctional
5   officer receiving it could get a word to the wise not only for
6   himself/herself, but pass it on to others.
7       Note that under the peace officer bill of rights there
8   can be months and months all the way up to a year of delay in
9   between the complaint and interrogation.
10      The advantage.  What is the advantage of knowing ahead
11  of time?  To us it is the ability to recall, okay, yup, got it
12  in mind, I'll be prepared to deal with it.
13      Counsel gives no example of how this advantage has
14  manifested itself, no investigations that have gone south,
15  nothing of the sort.  And besides the Special Master's own
16  response, you have the expert whose business and specialty is
17  in conducting appropriate investigations.
18      You need a substantial factual predicate to go further
19  in this pursuit to determine that this tiny differential -- and
20  that's all it is that we're talking about -- and the
21  aberrational justification I've just described in the
22  correctional setting, that there is a factual predicate to
23  indicate that that interferes with the ability of this court
24  and the -- and -- well, derivatively this court, and, in the
25  first instance, CDCR, to conduct decent investigations.  It is

Page 12

061005madridCV
CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

26

1   the PLO prison office that has access to inmates who could have
2   come forth with declarations or simply anecdotal problems that
3   might have caused the Special Master to scratch his head and
4   say, Maybe we need to look into this a little bit further.  But
5   in fact, there's no such thing.
6        I mean, I was impressed, surprised, by the vigor with
7   which Mr. Fama pressed his argument here today, because it
8   didn't happen then.  Mr. Jorgenson's quite right.  We dealt
9   with a myriad of matters in the MOU.  Days and days of
10  investigation.  And at least a couple of us were startled at
11  them honing in on this particular item.  I'm not telling you
12  they waived it.  I'm -- you know, they kind of wrestled with us
13  at the time of the stipulation, but they wrestled with us and
14  raised objections to a lot of other portions as well.
15       Key point:  No factual predicate to justify going
16  forward with the kinds of realtime consuming sort of hearing I
17  guess Mr. Fama has in mind.
18       Thank you.
19       THE COURT:  Thank you, Counsel.
20       I'm going to let Mr. Fama, I guess there's a burden on
21  your part, respond, if you care to.  And I guess one question
22  came to mind:  It's not clear to me if I were to grant an
23  evidentiary hearing, how that would inform me as to how to do
24  this weighing, whether they get the report right away or later.
25       MR. FAMA:  I thank you for that question, your Honor.


CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

27

1   And it is an evidentiary hearing that we're asking for, not
2   that you today weigh and determine the issue.  And I think you
3   would -- you heard, through the comments of Mr. Yank and in
4   part Mr. Jorgenson, that there are factual matters in dispute
5   apparently are in dispute including how common or uncommon it
6   is to provide the officer with fairly immediate notice and a
7   copy and/or precise detailed summary of an inmate complaint.
8   Plaintiff did make an offer of proof at Page 45 of their
9   objection that this doesn't happen in big jurisdictions like
10  Los Angeles and Texas.  So that's Number 1, that you will
11  receive evidence as to that.
12       Also, though, you would get a full range of the
13  benefit of, I should say, your Honor, of the full range of
14  testimony from the experts, both the Court's and others, as to
15  the risks, and I suppose acknowledging that the other side may
16  present evidence, the advantages of it, because they asserted
17  that there are.
18       Plaintiffs also made the offer of proof in the papers
19  that there would be testimony from the Inspector General
20  consistent only with the Inspector General's testimony as a
21  subject matter witness before the Legislature a couple of years
22  ago, of the danger of this practice of providing notice in a
23  copy or a precise summary of the complaint when the Department
24  of Corrections itself is conducting criminal investigations.
25       So I think that would be the advantages and benefit to


CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

28

1   the Court of having a hearing.
2        And it should be remembered, we're talking here about

Page 13

061005madridCV

3  use of force and code of silence type complaints only. We're
4  not talking about 65,000 602's including those about how food
5  is served. This case is about serious issues and appropriate
6  force and the covering up of inappropriate force. And that's
7  what we're talking about, the plaintiffs are. So it's not as
8  broad as it's been painted.
9      Mr. Hagar, the Special Master, in his final report, as
10  is his custom, did include I think to the seven plaintiffs a
11  February, 2006 letter in which we made our objection prior to
12  him filing his final report. If Mr. Yank is surprised by my
13  vigor today, perhaps he hasn't seen me go after something
14  before, but I did on behalf of my clients raise this to the
15  Special Master. It should have been no surprise to the
16  parties.
17      Thank you, your Honor.
18      THE COURT: Thank you, Counsel.
19      And with that, I'm going to take this issue under
20  submission and think aloud as I explain how we'll proceed.
21      I appreciate the concerns just expressed and also
22  have, I think, a full appreciation of the issue of how
23  providing officers with a copy of a complaint or a summary of a
24  complaint is not ideal from an investigator's perspective. I
25  find, as I sit here now, I'm not convinced that I can find on

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

29

1  the current record that further inquiry into the effect of
2  Section 9.09 as clarified is warranted, and in saying that, I'm
3  presuming of course that all of the enhancements to the CDCR's
4  internal investigative and disciplinary systems remain in
5  effect, as does the Bureau of Independent Review.
6      This discussion, the objections and the comments from
7  CDCR and CCPOA have been quite helpful, and I'm going to take
8  this under submission and I will issue a written ruling in the
9  very near future on this matter, counsel.
10      Let's turn now to the objections to the fourth
11  recommendation in the Special Master's August 22nd report.
12  This is the recommendation that he be directed to investigate
13  and hold public hearings as necessary and report to the Court
14  concerning whether the Madrid post powers remedial plans have
15  been compromised; and, if so, whether they should be modified.
16      And with this, let's start with the parties, and
17  first, the CDCR, since it has filed an objection; and then the
18  plaintiffs can respond if they wish to do so. And I'll then
19  permit those who are participating as amicas with respect to
20  this issue, that would be counsel for the governor and counsel
21  for CCPOA, to argue their objections. I'm going to, because of
22  the time factor, and -- but I think we can have completeness
23  here -- I'm going to allow each party and each amica 10 minutes
24  each to address this matter; and I'm going to ask Rowena, can
25  you let me know when the 10 minutes is up, but let counsel know

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

30

1  when they have two minutes left, so we can proceed in an
2  orderly fashion.
3      DEPUTY CLERK: Okay.
4      THE COURT: You can begin, Counsel.
5      MR. JORGENSON: I'll begin with saying that I probably
6  won't need the 10 minutes, but depending on what is said by
7  other counsel, may need to reserve some time at the end.

061005madridcv

8      THE COURT:  Okay.
9      MR. JORGENSON:  I don't want to repeat what's in my
10  brief.  I just want to state that the final report makes it
11  very clear that the CDCR's internal affairs operation's
12  significantly stronger today than it was in 2004 because of
13  problems cited in the report are not contributing to any
14  current constitutional violation, and that the proposed
15  recommendations will not remedy any violation, the Court should
16  not order the proposed hearing and investigation.
17      The prior recommendations in the draft report have
18  been -- I'll limit my comments to the fourth recommendation the
19  CDCR's proceeding with the recommendations made in the other
20  areas to the final report -- and would defer to the governor's
21  counsel regarding their arguments as in regards to ordering an
22  investigation into the affairs of the government's staff.
23      That's all I have.
24      THE COURT:  Okay.  Thank you, Counsel.
25      MR. SPECTER:  Good morning, your Honor.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
31

1      THE COURT:  Good morning, Mr. Specter.
2      MR. SPECTER:  In the interest of efficiency and time,
3  I was going to suggest a modification of the procedure that you
4  mentioned, but I'm happy to proceed with the way you -- but I
5  was going to say I probably would be of more assistance to the
6  Court if I come after the amicas because they're the ones who
7  have the more vigilant discussions.
8      THE COURT:  Okay.  Do either of the amicas have any
9  objection to that?
10      MR. YANK:  We don't mind Mr. Specter having the last
11  word.
12      THE COURT:  Okay.
13      MR. SHARTSIS:  Nor do we, your Honor.
14      THE COURT:  Thank you for that courtesy.
15      Okay, do you want to go, Mr. Shartsis?
16      MR. SHARTSIS:  Thank you, your Honor.
17      Your Honor, before I commence, I'd like to take a
18  moment to introduce James Tilton who is no longer the acting
19  secretary of CDCR.  He's sitting with my colleague, Amy
20  Hespenheide.
21      THE COURT:  Congratulations, Mr. Tilton.  And thank
22  you for coming.
23      MR. TILTON:  Thank you.
24      MR. SHARTSIS:  Your Honor, let me focus on two aspects
25  of the August 22nd order.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
32

1      Of course, as we've stated in our brief, if there are
2  issues that relate to the codes of silence, the governor is in
3  full support of whatever the Court needs to do to clear up
4  those matters.
5      THE COURT:  Okay.
6      MR. SHARTSIS:  The second issue, I just want to
7  highlight what's identified in Paragraph 4 that the governor is
8  concerned about.  Paragraph 4 makes -- after earlier
9  discussions which are more speculative in the report, makes the
10  assertion that there is a reversal of policy by Governor
11  Schwarzenegger with regard to prison reform.  It makes the
12  assertion that Susan Kennedy, the governor's chief of staff,

Page 15

061005madridCV
13    appears to have given the CCPOA veto power over the critical
14    appointment of Assistant Secretary of CDCR Labor Relations, and
15    is concerned that the CCPOA will be allowed to select the next
16    assistant secretary.  The report in Item 4 indicates that the
17    CCPOA has influence in the governor's office.
18            Your Honor, in undertaking this representation, I met
19    personally with both the governor and with the governor's
20    senior staff to satisfy myself that the representations that we
21    would make to this court would be accurate.  The governor has
22    told me directly and asked me to convey to you that he is as
23    committed as he has always been to prison reform.  In fact,
24    when I raised that issue with him, he said, Would you please
25    tell Judge Henderson that I can use all the help from him I can

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

33

1    get.  He finds this one of the most difficult things that he
2    has had to deal with as governor.  I can tell you from my
3    discussion he is personally and intimately involved in the
4    issue.  This is not an issue that is directed by staff to him.
5    He has knowledge about the people involved, about the issues,
6    about the conditions, about the politics, about the legislative
7    difficulties he has had, obviously from his special session,
8    and about the intricacies and difficulties in the later area.
9    It is the governor's issue.  It is not someone else's issue.
10   And no one else calls the shots.
11           As you know, earlier this year, the governor focused
12   his efforts on prison overcrowding.  With the exception of
13   calling a special session of the legislature, he could not come
14   to an agreement with the legislature, and in fact one of the
15   principal difficulties was the position of the CCPOA, the very
16   party the Special Master believes is directing what the
17   governor is doing.
18           Yesterday, and I had been aware of these internal
19   discussions, after a lot of internal struggle, in order to deal
20   with what the governor thinks is an intolerable problem of
21   prison overcrowding, the governor issued a state of emergency
22   to do what he could to alleviate the problems within the
23   prisons driven by overcrowding.  And it is his belief that
24   overcrowding affects virtually all of the issues that the Court
25   is concerned about.  It is -- well, while it was not the scope

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

34

1    of the Pelican Bay, the Madrid issue, it is something that
2    affects prisoners throughout the State, and the governor feels
3    it's a top priority.  And I believe, your Honor, it is sound
4    and solid evidence of the government's full commitment to
5    prison reform.
6            Regardless of what the Court does here with regard to
7    how it proceeds under Item 4, the governor is going to proceed
8    and is committed to proceed with prison reform.  He's
9    established an unprecedented record in the State of
10   California -- we've looked back through all the governors in
11   memory -- and he intends to continue to do that.
12           He made a point of saying to me on his own that he is
13   completely unconcerned with anything that an investigation
14   might uncover.  He feels that nothing has been done that is
15   wrong, that the allegations about him being controlled or his
16   staff being controlled in any way by the CCPOA are completely
17   unfounded.  His principle concern is the limited resources that
Page 16

061005madridCV
```
18   he has to work with these problems and the diversion that might
19   occur by having his top staff people involved in what can only
20   be a contentious proceeding, given that there have been
21   allegations that they have perjured themselves in their work.
22           The governor asked me to convey to you that the Davis
23   era is over.  The governor described to me in fact his
24   understanding of the ability of the unions to walk into
25   Governor Davis's office directly and to extract concessions
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

35

```
1    that they might want, and his view was that that has not
2    happened, the fact is that it hasn't happened, it's not just a
3    view, and that it will not happen.  He does not conduct his
4    administration in that way.
5            Your Honor, I understand the concern of the Special
6    Master.  And the governor certainly respects the view of this
7    court and the work that it has done.  There's no question this
8    has to be done and that it's important.
9            I believe this is an overabundance of caution and an
10   attempt to read some tea leaves and read them inaccurately
11   about what's going on within the governor's administration.  He
12   is interested in a relationship of cooperation with the Court.
13   We have proposed a reporting mechanism which we would like to
14   undertake voluntarily.  We'd like to work with the Special
15   Master to determine the best way to inform this court of the
16   governor's efforts and to try to seek ways in which the
17   governor can obtain the kind of assistance that he readily told
18   me that he feels he needs.  He needs all the help he could get.
19           It's difficult to understand, aside from how the
20   hearing would proceed, what it would yield if the hearing is
21   ordered.  There is no question that given what really are some
22   incendiary allegations in the report, the very fact of the
23   hearing and the pendency of the matter will be political fodder
24   for those who oppose the governor's efforts, and because there
25   can be no question that this governor has an unprecedented
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

36

```
1    record of pursuing prison reform, anything which potentially
2    might cripple him might offer those who oppose his efforts a
3    way to claim he is without the moral authority or the mantle to
4    go forward because he is under investigation for failure to be
5    responsive in prison reform, will set back, I believe, the
6    interests of the Court and without question will set back the
7    interests of the governor.
8            So, your Honor we would ask on behalf of the governor
9    that the Court accept our offer to enter into this cooperative
10   measure to enhance the knowledge of the Court about what the
11   governor is doing and the hope that it can lead to getting some
12   assistance on both sides to pursue what we all feel is a very
13   important mission.
14           Thank you.
15           THE COURT:  Thank you, Mr. Shartsis.
16           MR. YANK:  I can only echo the sentiments with a
17   description of Mr. Shartsis in terms of the relationship
18   between my client, CCPOA, on the one hand, and this
19   administration on the other.  There is at least two lawyers I
20   think from DPA, the Department of Personnel Administration,
21   sitting out in the audience.  And it feels like we've been
22   seeing each other more than our partners and spouses these
```
Page 17

061005madridcv

23    days.
24          We are truly at war.  And the notion of collaboration
25    at the highest levels of the State and my client, it would sure

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                    37

1    be nice to see some of it probably from the perspective of
2    those of us who are out dealing with the day-to-day battles.
3          I want to talk -- your Honor sees the difficulty
4    procedurally of the sort of hearing requested, and I'm not
5    going to speak to that at all.
6          As I've said out in the audience, I actually, you
7    know -- I mean, I always knew -- this case is 11 years old, but
8    in those 11 years what I'm reminded of is that no one, not the
9    Court, not an officer of the Court, not a representative of the
10   State, not anybody from the prison law office, nobody in 11
11   years reached out to CCPOA and said words to the effect, Hey,
12   are you interested in helping out here?  Never happened.
13         Now my first involvement in this case, we kind of had
14   to push our way into.  And that was because the Special Master
15   was concerned that a chief spokesperson at the bargaining table
16   under the Davis administration, and in the negotiations of
17   the '01 contract, a woman named Linda Buzzini, had not
18   protected the Court's remedial powers at Pelican Bay.  And we
19   heard about this, and were thinking of issuing an order to show
20   cause, and, you know, we showed up and the Court graciously
21   heard us.
22         And I essentially said, one thing Miss Buzzini did was
23   make clear in this particular provision -- whatever it is, I
24   don't even remember what it was -- was not to apply at Pelican
25   Bay if anybody speaking for the Court thought it would

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
                                                                    38

1    interfere.  And it all turned out well.  And I guess
2    Ms. Buzzini -- I was involved in some way in helping out with
3    the Pelican Bay matters.
4          Nine months ago, 12 months ago, when I stood before
5    you, I indicated, your Honor, I want to try and turn you
6    around.  I'm not here to ask, you know, for any ruling in that
7    regard for fear of being premature or getting a bad answer, but
8    you might recall that I asked if we could participate in the
9    meetings going on between the parties.  Because I thought then,
10   I still think today, that we could help.  Help the Court go
11   where it wants to go.
12         Now, sometimes, and he can speak for himself, but
13   sometimes I wonder if the Special Master or maybe even the
14   Court think that the folks who have appeared in front of the
15   Special Master and the Court -- Lance Corcoran, sitting in the
16   front row there next to these two ladies on the right.
17         THE COURT:  Good morning.
18         MR. YANK:  Who is our director of governmental
19   affairs, and he was the Number 2 guy before he took maybe a
20   more secure and higher public profile position.  And my
21   partner, Gregg Adam and I, we're somehow frosting on a bad
22   tasting cake.  I mean, this is me making some noise, okay?  But
23   as we're drafting the somewhat hard-hitting points and
24   authorities that we filed with the Court objecting to the
25   hearings, my mind also turns to the fact that as I said in the

CONNIE KUHL, RMR, CRR
Page 18

061005madridcv
Official Reporter - U.S. District Court (415) 431-2020

39

1  letter, as I said standing before you some, I don't know,
2  eight, 10 months ago, whatever it's been, there was a unity of
3  interest in having decent, humane, living conditions, working
4  conditions, with inmates, because my clients live with those
5  inmates eight hours a day, and who the heck wants to be dealing
6  with an inmate who is all ticked off because he or she was just
7  maltreated by another correctional officer?  It makes no sense.
8         In my letter -- well, before I sent the letter --
9  clearly I need authority if I'm going to be offering that our
10 organization is going to help put on seminars in front of,
11 minimally, every incoming academy class for the next two years.
12 I also sketched the possibility of existing employees, but that
13 might be expensive.  But it could be limited to Pelican Bay.
14 whatever.
15        THE COURT:  Yes.
16        MR. YANK:  They'll pay me good money if I'm going to
17 have to go up to High Desert Academy or whatnot.
18        So I called Mike Gennaco.  We had a face-to-face
19 meeting.  And I guess this is the second face-to-face meeting
20 with a principle being described this morning, but the fact of
21 the matter is, is our -- let me backtrack or go off on a bit of
22 a tangent.
23        An organization seemingly speaks with lots of
24 different voices.  Special Master refers to a website.  Listen,
25 I've been pilloried on that website.  But ultimately, an

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

40

1  organization has to speak with one voice.
2         And then the last couple of months, it's spoken with
3  one voice twice, once on its own, as I described in my letter
4  at the CCPOA convention.  Instead of just teaching about the
5  stipulation that was the subject of the first hearing today,
6  the organization suggested to me, how about you guys, meaning
7  Mr. Gennaco and I, also teaching about code of silence.  And we
8  did, and from my perspective it was great, and I think it was
9  tremendously well-received, and you've got your own ability to
10 see what Mr. Gennaco thought.
11        The second way the organization has spoken with one
12 voice is when Mike Jimenez said to me, Yank, good idea, go make
13 that offer.  It's fine with us.  And that's why I said to you
14 at the beginning, not quite at the beginning, I first validated
15 the war -- it's where I said to you earlier, no one's ever
16 asked us to help out, the code of silence, make things better
17 for inmates.  Somehow have our very complex prison at Pelican
18 Bay comport with the Constitution.
19        DEPUTY CLERK:  Two minutes, Counsel.
20        MR. YANK:  I stand before you, you know, not out of
21 weakness -- we have our brief -- but because, Honest to Pete,
22 my client and I believe it is in the interests of our
23 organization to achieve what the Court's remedial efforts are
24 designed to achieve.
25        I don't know from the standpoint of the governor

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

41

1  whether 10 sets of hearings could get the kind of commitment
2  you heard from the governor through Mr. Shartsis.  Ultimately,
3  the State has to walk the walk.  You know that from the Plata
Page 19

061005madridCV

4   case.  In Plata, I think the problem has always been money and
5   legislature and the department of finance and so on.  Here, in
6   Madrid, so much less money, and whatnot.
7            I think you ought to take up Mr. Shartsis on his offer
8   and CCPOA on its offer, whether you kick this thing over 60
9   days and put us together with the appropriate court
10  representatives, come up with an action plan -- you have to
11  figure it out.  But you can achieve in a far more direct
12  fashion, what the Court wants, through the suggestion offered
13  by Mr. Shartsis, and what I'm standing before you saying, than
14  the incredibly derivative, indirect process.
15           Thank you.
16           THE COURT:  Thank you, Mr. Yank.  Let me briefly
17  respond.  You can sit down.
18           First of all, no one in my presence during the life of
19  this case has suggested that you or your client are operating
20  from a position of weakness.  I just wanted to -- but I think
21  that any effort, any bona fide effort, to reinforce the code of
22  silence and the zero tolerance policy should be encouraged, and
23  I certainly do so.  So I would encourage you and/or the CCPOA
24  to work with the CDCR and with Mr. Gennaco as you're now doing
25  to see how this presentation can be made to the new academy

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

                                                              42

1   classes.  I encourage it, and if you think that Mr. Hagar can
2   be of assistance in any way, you should feel free to contact
3   him to involve him in that effort.
4            Mr. Specter?
5            MR. SPECTER:  Thank you, your Honor.  I wanted to
6   begin by repaying the courtesy that the government's attorney
7   Mr. Shartsis paid me by letting me go last by agreeing with him
8   on some of the points which he made.
9            We agree, your Honor, that there is an emergency in
10  the prison system.  We agree also with the governor that this
11  emergency is caused virtually in total by the overcrowding.  We
12  agree with the governor that overcrowding affects all of the
13  issues that the Court is concerned about, including the ones
14  that we are here discussing today.  And your other cases.  And
15  we most wholeheartedly and unequivocally agree with his point
16  that he can use all the help he can get.  And we believe that
17  he can use some help, and we stand ready to provide the Court
18  with vehicles for addressing those very serious issues.  That's
19  not the point of this hearing today, but since he brought it
20  up, I thought it was important to emphasize.
21           And that brings in one little point that I want to
22  refer to in the Special Master's otherwise excellent report:
23  He does say that this case has nothing to do with overcrowding.
24  And I kind of agree with the governor's points that this does
25  because its prisons or so overcrowded and there's so much

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

                                                              43

1   attention being diverted to just maintaining survival, that
2   part of the reason that some of these code of silence and
3   investigation of these issues aren't being addressed as quickly
4   as they need to is that energy and resources of the department
5   have been diverted to that issue.  As well as the fact that in
6   the governor's state of emergency proclamation he made
7   yesterday, which is available on the website, he refers to the
8   violence that is occurring at Pelican Bay as one of the reasons

Page 20

061005madridcv

```
 9    for the emergency, and obviously the more adequate the
10    investigations are and the discipline, that has an effect on
11    mitigating the violence at Pelican Bay as well.
12            THE COURT:  Can I interrupt you?  Give me a context
13    for that.  You've been at Pelican Bay longer than anyone here.
14            MR. SPECTER:  Right.
15            THE COURT:  Now, is there, in your view, an increase
16    in violence that you attribute to overcrowding that wasn't
17    there nine years ago?  Or -- I don't have a sense of that.
18            MR. SPECTER:  Well, I think I would definitely
19    attribute violence to overcrowding, your Honor.  There's no
20    doubt about it.  If you had less prisoners and the ratio -- and
21    I think the CCPOA would agree with me, if you had a better
22    ratio of staff to inmates, which is a function of overcrowding,
23    you would see a reduction in the level of violence.
24            THE COURT:  Thank you.
25            MR. SPECTER:  So getting back to the main point:  I
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

44

```
 1    was glad to hear your introduction and your -- the background
 2    that you provided us today about this case, because I believe
 3    that it is critical to an understanding of where we're going
 4    from here.  And if I could sort of just summarize it in a way
 5    that agrees completely -- is consistent with what you said, I
 6    thought that the trial showed us and the evidence that we
 7    brought forward from the experts and the people in Pelican Bay,
 8    both the inmates and the staff, showed what happens on the
 9    ground in terms of the investigation and discipline of possible
10    misconduct.  And as you know, you found that that process was a
11    farce and a sham.
12            The post powers investigation that Mr. Hagar conducted
13    and the reports that he wrote showed us another level of where
14    that code of silence reaches.  And it reaches to the highest
15    part, the highest parts of the Department of Corrections.
16            And I think the Court has been doing this long enough
17    and has monitored the remedial process long enough to
18    understand perhaps better than almost any other judge in the
19    country that in order for true reform to take effect, that
20    reform has to become part of the institutional culture that
21    exists.  Or else it's too easy for there to be backsliding and
22    to resume the -- to the unconstitutional conditions that we
23    have.
24            I think that what we have here is the potential or at
25    least the events that occurred in the beginning of this year
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

45

```
 1    suggested that the potential for this backsliding could
 2    really -- there is a significant potential for such backsliding
 3    in areas which are even higher than the ones that Mr. Hagar
 4    investigated in his post powers reports, and it is no secret,
 5    as Mr. Shatter alluded to, that the union did walk into the
 6    governor's office under prior administrations, and I think it's
 7    a legitimate concern to all of us to be concerned about what
 8    would happen in the governor's office at this time.
 9            Mr. Shartsis made a number of representations about
10    the governor's intentions.  And I have certainly no evidence to
11    suggest that his intentions were anything other than what
12    Mr. Shartsis spoke about.  However, the evidence that I have or
13    the information that I do have indicated to me that there was a
```
Page 21

061005madridCV

14    very, very significant shift in attitude towards prisons and
15    prison issues after the election that happened in November and
16    most particularly beginning in January of this year.  When his
17    chief of staff -- his new chief of staff, Susan Kennedy, began
18    working, there was a very different attitude towards prison
19    issues than had been expressed before.  And not in a positive
20    way, I must say.
21          So to me, that's where sort of the crux of this issue
22    comes.  I mean, the governor can have good intentions and many,
23    many high-ranking government officials have expressed to me
24    over the years their good intentions and desires to fix the
25    problems.  But intentions, though maybe a necessary part of the

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

46

1     equation, they're not a sufficient part of the equation.
2     Especially when you put into the mix of all of the other
3     different factors that such a high ranking official as a
4     governor has to weigh in order to properly or not properly, but
5     in order to govern a state in a manner in which he chooses.
6           And that brings me to Mr. Shartsis's proposal for a
7     report.  And I'm reminded when I hear about what is essentially
8     a proposal to enhance communication, of the governor's words
9     when he first became governor, which was action, action,
10    action.  And I've been waiting for action, action, action for a
11    long time, and yet here we are two plus years later, and the
12    prisons are more overcrowded than they were, and by his own
13    admission, the lives of the staff as well as the prisoners are
14    at risk.
15          I don't -- you know, I don't think we need
16    communication with the governor's office.  He communicates
17    through the press.  He's free to call us or Mr. Hagar or you.
18    You know, we've met with him up in Sacramento.  The problem is
19    not communication, it's what's in the communication and what
20    has he been doing?  And that's why I think the proposal itself
21    is relatively empty -- I see it as an empty vessel.  As
22    something that's easy to give and not lose much by doing.
23          So I reject that as insufficient.
24          DEPUTY CLERK:  Two minutes, Counsel.
25          MR. SPECTER:  Two minutes.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

47

1           DEPUTY CLERK:  Yes.
2           MR. SPECTER:  The last point I want to -- would like
3     to make, your Honor, is that if you do decide to go forward
4     with the hearing, given the position that the CCPOA is
5     apparently going to take in terms of their litigation posture
6     and their efforts to attack the Special Master's credibility --
7     well, not credibility, but his bias, I think is the word they
8     use -- and given mostly given the importance of the issue, I'm
9     not sure whether you shouldn't give some serious consideration
10    to holding the hearing yourself and -- with possibly having the
11    Special Master supervise some of the prehearing factual
12    investigations and in a way that's efficient and thorough so as
13    to minimize any kind of problems on POA.
14          Thank you.
15          THE COURT:  Thank you very much, Mr. Specter.
16          Yes, sir?
17          MR. JORGENSON:  Okay.  I will respond to Counsel's
18    comments.

Page 22

061005madridCV

19          First, the issues of the last six months should not be
20     the subject of further investigation here.  Rather,
21     Mr. Shartsis's proposed reporting on, for example, the labor
22     relations issues, are a more narrowly tailored and less
23     obtrusive alternative to holding further investigations and
24     hearings.
25          The Special Master's final report actually does bear

1      many instances of "action, action, action" that were undertaken
2      since the governor had taken office.  And particular instances
3      of that are the reformation of the office of the Inspector
4      General, the proposed BIR monitoring.  That monitoring is
5      continuing under the Special Master.  And we have a newly,
6      quote-unquote, expert for that BIR monitoring.  And that
7      monitoring is to continue.  That's part of the Special Master's
8      recommendation Number 2 in the final report.
9          Next, I would add that overcrowding itself is not a
10     Madrid issue.  The SHU, PSU, the Level 4 and the ad seg are not
11     places where bunking and gymnasiums exist.  Those were subjects
12     that were raised in recent press releases regarding the
13     overcrowding issue that effects the California prison system in
14     general.
15          Finally, the CCPOA, their briefing and then their
16     argument today, has truly indicated that they'd turned a corner
17     in that they've agreed to recognize the existence of the code
18     of silence; and that they will make efforts to eliminate the
19     code of silence.  And that is something that is beneficial to
20     plaintiffs, the defense and the CCPOA itself.
21          I have nothing to add beyond that.
22          THE COURT:  Okay.  Thank you very much, Counselor.
23          Let me make some random responses before I go back to
24     my outline of things I want to communicate.
25          I have heard from Mr. Shartsis that the governor needs

1      help, and that there's no question about that.  I think that to
2      some extent that translates to Mr. Tilton needs help since he's
3      carrying the laboring oar.  Now, I'm just thinking aloud,
4      because I'm greatly encouraged by what I've heard here, and in
5      particular Mr. Yank's offer of cooperation, which I'm not going
6      to suggest was made here in the first time.  Maybe it's made
7      earlier and it wasn't resonating and being heard or responded
8      to.  That's usually encouraging.
9          One of the things I struggle with almost on a daily
10     basis, as problems in the case comes to me, is whether we're
11     dealing, whether Mr. Hagar is dealing, whether Mr. Tilton is
12     dealing, with dysfunction -- I think no one has questioned that
13     the prison system's hugely dysfunctional.  And it's never clear
14     whether it is that dysfunction which impedes Mr. Tilton that
15     when he makes a decision -- and I've heard nothing but positive
16     things, that you're trying to make the decisions that have to
17     be made -- but there's no one to hand the football off to or
18     you hand it off and they fumble.  That that is a problem.
19          But I think that sometimes the problem is lack of
20     cooperation or lack of willingness.  And there's a fuzz there
21     as to which of those is operative.  And there continues to be,
22     in my view, what I've called trained incapacity, which is a
23     term I've come to embrace and use in this case and the Plata

061005madridCV
24    case because I think it explains a lot of what we are all
25    trying to overcome.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

50

1         One further comment that makes all of this difficult
2    in my mind is I found myself lamenting to my staff this morning
3    when I came in and we had a brief meeting and I said, whatever
4    happened to the good old days when I could find what the facts
5    were and you could tell me what the law was, we could just
6    reach a ruling?  This case takes us and me into the political
7    thicket in ways that are -- they didn't teach me in judge's
8    school.  And it makes this the most difficult judicial journey
9    imaginable.
10        So all of these are things we're all dealing with, and
11   certainly I am, that I think it's healthy to acknowledge, and
12   to the extent that there is a spirit of cooperation here and
13   that there are things that we all want to reach, I think we
14   have to recognize these realities and take them into account as
15   we move forward.
16        Thank you very much for these excellent presentations,
17   Counsel.  This has been very helpful.  And again, I'm going to
18   take this matter under submission.
19        I want to make one thing clear as we proceed:  I
20   believe that the Special Master's recommendation at issue here
21   has become by its very nature politicized to some extent.  It's
22   political in nature.  At least, it has political impacts.  And
23   I want to make clear that my sole purpose and my sole authority
24   as I see it is to ensure that my remedial orders are
25   implemented and enforced and not undermined.  And this is an

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

51

1    obligation that I intend to honor, and it's an obligation that
2    has no room for politics, and I intend to keep it that way.
3    There will be no political hay in terms of political
4    consequences in any of the rulings or decisions that I make.  I
5    think that's important to put on the record.
6         As I stated at the beginning, there's a history in
7    this case, and that history includes all the things that I've
8    said at the beginning.  Clearly there are gaps in the record as
9    to exactly what occurred in the winter and spring of this year
10   and why.  There's no dispute, however, as Mr. Specter has
11   already pointed out or alluded to, that in the space of six
12   weeks, between two former directors of the CDCR strongly
13   committed to the post powers remedial plans resigned, Rob
14   Hickman and Jeanne Woodford.  This was followed by resignations
15   of two others very key CDCR staff involved in the remedial
16   plans:  Joe McGrath, assistant secretary over adult operations,
17   who in my view is primary CDCR contact for all post powers
18   remedial plant and a key, very key and positive force for
19   advancement of these claims; and also Mark Gannt, assistant
20   secretary for internal affairs.
21        And then two senior department of personnel
22   administration executives who were responsible for making
23   contract negotiations, Mike Navarro, director of DPA, and Bill
24   Avery, the deputy director of DPA, also resigned on the eve of
25   negotiations for a new MOU with the CCPOA.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020
Page 24

061005madridcv

52

1      Now, I'm open to the possibility that this is innocent
2  coincidence that will prove to be of no consequence to the
3  remedial process in this case.  This sequence of events,
4  however, raises troubling questions.  I think no fair minding
5  person can dispute that statement particularly in light of the
6  context of the 11-year history of this case which I described
7  at the beginning.
8      I think that the Special Master was absolutely correct
9  to bring this sequence of events to the attention of the Court.
10      I understand at the same time that directing a Special
11  Master to conduct public hearings into these matters is not
12  something to be undertaken lightly.  And it's not something
13  that I would ever do lightly.
14      I've listened closely to the objections and concerns
15  expressed here today, and I want to very carefully weigh and
16  consider all of these matters before determining what is the
17  appropriate course for the Court to take.
18      Again, thinking out loud, as I tend to do, it appears
19  to me that there may be certain preliminary facts that should
20  be addressed while reserving other matters for later inquiry if
21  necessary or if appropriate.  For example, it may be
22  informative to clarify the factual basis for the Special
23  Master's request for an investigation by, for example,
24  obtaining testimony from Mr. Hickman and/or Miss Woodford, and
25  then seeing where things stand at that point.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

53

1      Again, I'm thinking out loud.  This isn't a threat.
2  It's nothing else.  I'm truly thinking out loud as to
3  possibilities that I will be considering after I take this
4  under submission.
5      At this point, I have not decided whether to adopt the
6  fourth recommendation in full, in part or not at all.
7      It should be clear, however, that whatever my ruling
8  on this particular recommendation may be, it's just important
9  that there be no backsliding on the post powers remedial plans,
10  including those plans devoted to eradicating the code of
11  silence, and are hardened by some of the things that have been
12  happening in that regard.
13      It's the defendants' actions tomorrow and the next day
14  and not what's been said in court today that are most important
15  and which I'll be watching closely.  And I expect my Special
16  Master to do the same, to closely monitor the situation and
17  report to me should it appear that such slippage is apparent.
18      With that, I thank counsel for making very helpful
19  comments, and giving me insight into a most difficult set of
20  issues here.  And both issues, as I've said, are submitted, and
21  I hope to get out the rules on both of these within the next
22  few weeks.
23      Court's adjourned.
24      MR. JORGENSON:  Thank you, your Honor.
25      MR. SHARTSIS:  Good afternoon, your Honor.

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

54

1      MR. FAMA:  Thank you, your Honor.
2      MR. YANK:  Thank you, your Honor.
3      (Adjourned)
                              oOo
                        Page 25

061005madridcv

```
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

55

```
 1          CERTIFICATE OF REPORTER
 2
 3
 4      I, CONNIE KUHL, Official Reporter for the United
 5  States Court, Northern District of California, hereby certify
 6  that the foregoing proceedings in Case No. C 90-3094 (TEH),
 7  Alejandro Madrid, et al. v. James Tilton, et al., were reported
 8  by me, a certified shorthand reporter, and were thereafter
 9  transcribed under my direction into typewriting; that the
10  foregoing is a true record of said proceedings as bound by me
11  at the time of filing.
12      The validity of the reporter's certification of said
13  transcript may be void upon disassembly and/or removal from the
14  court file.
15
16
17          _____
18              Connie Kuhl, RMR, CRR
19              Friday, October 6, 2006
20
21
22
23
24
25
```

CONNIE KUHL, RMR, CRR
Official Reporter - U.S. District Court (415) 431-2020

Exhibit M



(916) 445-4950 / WWW.CDCR.CA.GOV



# BRIEFING MEMO

## OUT OF STATE INMATE TRANSFER

The California Department of Corrections and Rehabilitation (CDCR) is working to identify facilities throughout the country where California inmates can be temporarily moved for the next three to five years to relieve severe overcrowding in the state's prisons. California's prison population is at an all time high with more than 170,000 inmates housed in facilities designed for 100,000, and 29 of the state's 33 prisons above maximum safe capacity. Governor Schwarzenegger's emergency proclamation will provide immediate relief for severe overcrowding in these facilities.

1. **How will inmates be selected to be transferred out of state?**

   Inmates who volunteer to be transferred to a prison outside of California will be selected first. The CDCR has conducted an informal survey to identify inmates who may choose to volunteer for out-of-state placement. Once the voluntary list is exhausted, inmates will be transferred involuntarily, in keeping with the Governor's proclamation of a State of Emergency. Involuntary transfers will only occur if the voluntary transfers do not immediately mitigate the severe overcrowding in the 29 identified prisons and the resulting impacts within California.

2. **How many inmates will be transferred out of state?**

   In response to CDCR's informal survey, more the 19,000 inmates have expressed an interest in transferring to a correctional facility outside of California. The number of inmates who can be transferred will depend on how many meet the criteria of the out-of-state facilities that are chosen in contract negotiations. Inmates, for example, must be compatible with the security level of an out-of-state facility (low, medium or maximum security) before being transferred there. CDCR officials are assessing facilities in all of the states that have expressed an interest in housing California inmates. When those assessments are completed and contracts are negotiated, the Department can more definitively identify which type or how many inmates can be housed in facilities outside of California.

3. **How does Governor Schwarzenegger's proclamation of an emergency help CDCR relieve overcrowding?**

   The Governor's emergency proclamation helps to accelerate CDCR's efforts to move inmates by streamlining the contracting process. As a result, inmates may be moved to out-of-state facilities months earlier than they would otherwise without the

emergency order in effect.  The declaration also allows the CDCR to involuntarily transfer inmates out-of-state if necessary.

CDCR is ready to enter into contracts that could result in housing for 2,000 to 5,000 inmate beds. In addition to providing much needed relief to overcrowding, it is anticipated that the contracts could reduce the cost of housing those inmates by up to 15 percent, compared to costs in California.

4.    **What is the criteria for involuntary transfers?**

If the inmate population is not reduced to a safe margin by voluntary transfers, the Governor's emergency proclamation outlines criteria to be used to determine which inmates will be transferred involuntarily.  In priority order, that criteria includes: 1) inmates who have been previously deported by the federal government and are criminal aliens subject to deportation or who have committed an aggravated felony as defined by federal statute and are subject to deportation; 2) inmates who are being paroled outside California; 3) inmates who have limited or no family ties, based on a review of their visitation history; 4) inmates who have supportive family in another state; and 5) other inmates chosen and considered appropriate by CDCR.

5.    **What about medical treatment?   Will CDCR work in consultation with the Federal Court Receiver and the Special Master?**

Governor Schwarzenegger's emergency proclamation directs CDCR to consult with the court-appointed Receiver running the state prisons medical system and the court-assigned Special Master in the Coleman mental health case. Consultation with the Receiver and Special Master will ensure that inmates designated in their class action will receive appropriate care/treatment in keeping with court standards.

6.    **What efforts has the CDCR made to identify out-of-state facilities with available beds?**

On July 15, 2006, the CDCR issued a Request for Information (RFI) nationwide to determine if any out-of-state beds were available. As a result, public and private correctional operators from 23 states responded offering nearly 15,000 potential beds.

In September 2006, four teams of CDCR officials traveled to nine states to inspect sites that had the potential to immediately house California inmates.

CDCR staff in Sacramento also polled Department of Corrections officials in states across the country in search of additional facilities or to explain the state's plan for housing inmates in those states.

As of September 27, 2006, CDCR has received letters of intent from correctional facilities with beds in nine states representing a total of 4,700 potential beds. CDCR staff is developing a classification process to identify inmates eligible for transfer so that they can be matched up to available facilities.

7. **How many inmates have volunteered to be moved?**

Non-binding surveys were given to approximately 140,000 inmates in September. Of that, 19,501 responded positively. However, the number of inmates to be transferred will be determined when CDCR complete its assessment of the out-of-state facilities. These assessments will help identify which category of inmates the facilities are able to house. Because the survey was non-binding, the number of inmates who actually volunteer may significantly increase or decrease when inmates are re-interviewed to assess the interest and asked to sign binding contracts for transfer. Inmates have a right to consult with legal counsel concerning what such a transfer means.

8. **How much will it cost?  More or less than in California?**

Part of the assessment team's responsibility is to measure the costs against the benefits of each facility. The actual housing costs for each out-of-state facility will be negotiated through a contract. Factors that can influence that cost include the security level of the facility (maximum security is more costly than minimum security) or the breadth of services that it provides. The overriding goal is to house our inmate population as cost-effectively as possible and still be able to provide the necessary security along with the tools an inmate will need to successfully reintegrate into our communities. Currently, the average cost to house an inmate in California is approximately $35,000 per year.

9. **What states are being considered?**

In response to Requests for Information (RFI) issued by CDCR this summer, facilities in the following states have expressed an interest in housing California inmates: Alabama, Arizona, Arkansas, Colorado, Georgia, Illinois, Iowa, Indiana, Kentucky, Louisiana, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Oklahoma, Oregon, Texas and Wisconsin. Companies with correctional facilities in nine states have also submitted letters of intent. The assessment teams are reviewing the bed space options in those states to determine if they meet CDCR standards.

10. **Will these inmates be housed in private prisons or in government-run prisons?**

Inmates may be housed in either government or privately-run correctional facilities. The correctional facility, regardless of ownership, must meet CDCR standards identified in the California Code of Regulations, Title 15, for housing our inmate population. Facilities must also provide incarceration that is consistent with constitutionally adequate housing, care, and programming.

Currently, both government agencies and private correctional corporations have expressed an interest in housing California inmates.

11. **What criteria will be used to determine where inmates go?**

The criteria set forth in the California Code of Regulations, Title 15, and the CDCR Operations Manual will be used to determine an out-of-state facility's ability to house inmates. The most important factor will be matching inmates to their proper security level. Other criteria will be determined by negotiations and documented in individual contracts. Some facilities, for example, may only have the ability to take medium security level inmates and might choose to accept only inmates with a minimum or maximum number of years remaining on their sentence. Others may or may not choose to accept sex offenders or lifers. An inmates' preference in location, including if relatives are nearby, will be considered in determining the appropriate placement.

12. **How are they going to be transported?**

Transportation will be negotiated with the facility contractor or with another party to provide safe and adequate transportation of inmates. Any transportation of California inmates will meet all CDCR standards for security, including properly restrained inmates escorted by well-trained, armed transportation staff. Inmates will be transported in non-commercial airplanes.

13. **How will the other state facilities be staffed? Will they be as secure as California prisons?**

Staffing will be considered during the contract negotiations process. A minimum staffing level is set by custody level and facility design. For example, an older facility generally requires a larger number of staff because of its floor layout and overall design. Newer facilities generally have built-in security and are designed to create a secure environment with a smaller number of staff. Maximum security facilities also generally require more staffing than lower level security facilities. Should a facility not offer a staffing package deemed safe and that meets CDCR's criteria for design and security, the CDCR will not enter into a contracted agreement.

14. **Will transfers affect staffing in California prisons?**

All of the state's existing levels of staff will continue to be needed in California. Transferring inmates to other states will reduce severe overcrowding, thereby improving staffing ratios, reducing the need for overtime hours. As a result, correctional officers and other staff will be working in a safer facility. The CDCR will continue to expand its recruitment efforts to fill vacant positions among correctional officers and is planning to expand academies to train new recruits.

15. **Will inmates be returned to California for parole?**

Generally, all inmates who are transferred to other states will be returned to California and will be paroled to the county in which they lived prior to being sent to prison, as required by California state law. Inmates whom the federal government has identified for immediate deportation will be turned over to federal authorities for deportation proceedings.

Out of State Inmate Transfer
Q&A
Page 5 of 5

16. **Has the CDCR met with stakeholder groups on the decision to transfer inmates out of state?**

Yes. CDCR has discussed plans to transfer inmates with the court-appointed Receiver who oversees the prison system's medical programs and the Special Master who oversees mental health programs, the California Correctional Peace Officers Association (CCPOA), the Prison Law Office and legislative leaders.

17. **Relieving overcrowding was supposed to make room for programs in California prisons. Will these out-of-state facilities offer rehabilitation and vocational training?**

Overcrowding in California's prisons has significantly hampered CDCR's ability to employ meaningful programming for inmates due to lack of space. The immediate reduction in inmates will provide space in California's prisons for programs for inmates. In addition, out-of-state facilities contracted by the Department will be required to offer a full range of programming that participating inmates would not otherwise receive in California.

18. **Will inmates who transfer out-of-state be given a sentence reduction?**

No. Inmate sentences will not be reduced due to participation, nor will inmate sentences change to the sentencing structure of the state in which the inmate is transferred. All inmate sentences will be overseen by California law.

19. **Is California the only state to send inmates out of state?**

No. Currently, a number of states, including Alaska, Washington, Idaho, Hawaii and Louisiana, send inmates out of their states. Colorado is currently pursuing similar transfers.

20. **Why does California's severe prison overcrowding constitute an emergency under the Emergency Services Act?**

Because conditions of extreme peril to the safety of persons and property exist in 29 CDCR prisons due to the severe overcrowding, as identified in the Governor's proclamation, and the magnitude of the situation exceeds the capabilities of any geographical area in this state. There is substantial risk to the health and safety of staff, inmates, and the public due to the current severe overcrowding. There also is substantial risk of damage to state and private property. The counties within the state are harmed by this situation as well, because the inability to appropriately house inmates directly impacts local jail capacity and the early release of felons, and the local authority is not enough to cope with this emergency. This crisis spans the eastern, western, northern, and southern parts of the state and compromises the public's safety.

### ###

STATE OF CALIFORNIA-DEPARTMENT OF CORRECTIONS AND REHABILITATION                ARNOLD SCHWARZENEGGER, GOVERNOR





(916) 445-4950 / WWW.CDCR.CA.GOV

# OUT OF STATE INMATE SURVEY

In early September 2006, the California Department of Corrections and Rehabilitation (CDCR) conducted a survey of adult male inmates in California to determine if any would be interested in transferring voluntarily to another state with available prison occupancy. The following are the results of the survey:

Total surveys: **141,833**

Number of inmate refusing to participate in survey: **35,725**

Number of inmates who indicated they were not interested in a transfer: **86,607**

Number of inmates who indicated an interest in out of state transfer: **19,501**

> The 19,501 inmate total, however, is expected to be greatly reduced during a more formal and binding volunteer process. Inmate volunteer totals will further diminish as transfer criteria – such as release dates, security levels, health and mental health considerations – are taken into account.
> Of those 19,501 inmates, approximately **6,152** are scheduled to be released between the years 2008 and 2015.

States who have indicated bed space availability: **23**

| | | | |
|---|---|---|---|
| Alabama | Arizona | Arkansas | Colorado |
| Georgia | Illinois | Iowa | Indiana |
| Kentucky | Louisiana | Michigan | Minnesota |
| Montana | Nebraska | New Hampshire | New Jersey |
| New Mexico | North Dakota | Ohio | Oklahoma |
| Oregon | Texas | Wisconsin | |

CDCR officials are currently evaluating the facilities to determine the level of inmate that can be safely housed in each facility.

All out of state facilities will abide by California laws regarding inmate care, discipline, appeals, security level, etc.

CDCR is currently assessing facilities in nine states, including: Oregon, Arizona, New Mexico, Oklahoma, Indiana, Michigan, Louisiana, Tennessee, and Alabama.

For more information on the out of state transfer program, visit CDCR web site at www.cdcr.ca.gov.

###

Exhibit N

## Mental Health Population - Placement Per Institution
### Download Date October 5, 2006

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| ASP | II | 1,099 | 1,121 | 102% | | 10 | | | 1,131 |
| ASP Ad-Seg | | | 46 | | | 5 | | | 51 |
| CAL | I,IV + | | 22 | | | 4 | | | 26 |
| CAL Ad-Seg | | | 6 | | | 1 | | | 7 |
| CCC | I,II,III | | 4 | | | | | | 4 |
| CCC Ad-Seg | | | 1 | | | | | | 1 |
| CCI | I,II,III,IV * | 1,053 | 988 | 94% | | 15 | | | 1,003 |
| CCI Ad-Seg | | | 102 | | | 5 | | | 107 |
| CCI-RC | | 166 | 184 | 111% | | 11 | | | 195 |
| CCI-SHU | | 130 | 177 | 136% | | 4 | | | 181 |
| CCWF | | 739 | 931 | 126% | 54 | 67 | 124% | 12 | 998 |
| CCWF Ad-Seg | | | 31 | | | | | | 31 |
| CCWF-RC | | 110 | 160 | 145% | | 1 | | | 161 |
| CEN | III | | 13 | | | | | | 13 |
| CEN Ad-Seg | | | 9 | | | | | | 9 |
| CIM | I | 366 | 637 | 174% | | 9 | | 18 | 646 |
| CIM-RC | | 633 | 709 | 112% | | 149 | | | 858 |
| CIW | | 349 | 430 | 123% | 75 | 119 | 159% | 10 | 549 |
| CIW Ad-Seg | | | 13 | | | 1 | | | 14 |
| CIW-RC | | 100 | 155 | 155% | | 1 | | | 156 |
| CMC | I,II,III | 1,049 | 1,088 | 104% | 580 | 539 | 93% | 36 | 1,627 |
| CMC Ad-Seg | | | 53 | | 54 | 37 | 69% | | 90 |
| CMF | I,II,III | 599 | 572 | 95% | 600 | 572 | 95% | | 1,144 |
| CMF Ad-Seg | | | 9 | | 58 | 57 | 98% | | 66 |
| CMF** | | | 85 | | | 2 | | | 87 |
| COR | I,III,IV + * | 499 | 333 | 67% | 150 | 152 | 101% | 23 | 485 |
| COR Ad-Seg | | | 131 | | 54 | 48 | 89% | | 179 |
| COR-SHU | | 450 | 462 | 103% | | | | | 462 |
| CRC-M | II | 599 | 823 | 137% | | | | | 823 |
| CRC-W | | 249 | 191 | 77% | | | | | 191 |
| CTF | I,II | 699 | 794 | 114% | | 6 | | | 800 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

Health Care Placement Unit

" + " is a 270 Design Facility.  " * " is a 180 Design Facility.

R1-1                    10/5/2006

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 4/10/06, part of SAC's ASU is converting to a 64 bed PSU.  During this conversion, SAC's
ASU census will not be accurate.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

| | | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|---|
| | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| CTF Ad-Seg | | | 14 | | | 1 | | | 15 |
| CVSP | I,II | | 11 | | | 1 | | | 12 |
| CVSP Ad-Seg | | | 4 | | | | | | 4 |
| DVI | I,II | 85 | 42 | 49% | | 2 | | | 44 |
| DVI Ad-Seg | | | 50 | | | 5 | | | 55 |
| DVI-RC | | 564 | 659 | 117% | | 35 | | | 694 |
| DVI-RC--Ad-Seg | | | 57 | | | 1 | | | 58 |
| FOL | III | 599 | 519 | 87% | | 5 | | | 524 |
| FOL Ad-Seg | | | 61 | | | | | | 61 |
| HDSP | I,III,IV  * | 608 | 562 | 92% | | 4 | | 10 | 566 |
| HDSP Ad-Seg | | | 76 | | | | | | 76 |
| HDSP-RC | | 91 | 129 | 142% | | 3 | | | 132 |
| ISP | I,III | | 8 | | | | | 5 | 8 |
| ISP Ad-Seg | | | 6 | | | | | | 6 |
| KVSP | I,IV | 349 | 441 | 126% | | 8 | | 12 | 449 |
| KVSP Ad-Seg | | | 52 | | | 1 | | | 53 |
| LAC | I,III,IV  + | 1,000 | 991 | 99% | 300 | 256 | 85% | 12 | 1,247 |
| LAC Ad-Seg | | | 63 | | 54 | 50 | 93% | | 113 |
| LAC-RC | | 149 | 133 | 89% | | 19 | | | 152 |
| MCSP | I,II,III,IV  + | 999 | 1,179 | 118% | 215 | 226 | 105% | 8 | 1,405 |
| MCSP Ad-Seg | | | 40 | | 36 | 36 | 100% | | 76 |
| NCWF | | | 0 | | | | | | 0 |
| NKSP | I,III | 80 | 76 | 95% | | 2 | | 10 | 78 |
| NKSP-RC | | 719 | 734 | 102% | | 46 | | | 780 |
| NKSP-RC--Ad-Seg | | | 49 | | | 6 | | | 55 |
| PBSP | I,IV  * | 349 | 278 | 80% | 64 | 63 | 98% | 10 | 341 |
| PBSP Ad-Seg | | | 56 | | | | | | 56 |
| PBSP SHU | | | 7 | | | | | | 7 |
| PVSP | I,III | 1,299 | 1,406 | 108% | | 12 | | 5 | 1,418 |
| PVSP Ad-Seg | | | 118 | | | 1 | | | 119 |
| RJD | I,III | 800 | 674 | 84% | 330 | 285 | 86% | 14 | 959 |
| RJD Ad-Seg | | | 83 | | 63 | 60 | 95% | | 143 |
| RJD-RC | | 399 | 473 | 119% | | 86 | | | 559 |
| SAC | I,IV  * | 849 | 620 | 73% | 288 | 291 | 101% | 24 | 911 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF.
These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

Health Care Placement Unit

" + " is a 270 Design Facility.  " * " is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 4/10/06, part of SAC's ASU is converting to a 64 bed PSU.  During this conversion, SAC's
ASU census will not be accurate.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

R1-2

10/5/2006

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| SAC Ad-Seg | | 77 | | 124 | 49 | 40% | | 126 |
| SATF       II,III,IV * | 1,049 | 1,168 | 111% | | 6 | | 16 | 1,174 |
| SATF Ad-Seg | | 104 | | | | | | 104 |
| SCC       I,II,III | 499 | 551 | 110% | | 5 | | | 556 |
| SCC Ad-Seg | | 0 | | | 1 | | | 1 |
| SOL       II,III | 1,199 | 1,441 | 120% | | 8 | | 9 | 1,449 |
| SOL Ad-Seg | | 93 | | | 1 | | | 94 |
| SQ       I,II | 350 | 386 | 110% | | 58 | | | 444 |
| SQ-RC | 549 | 404 | 74% | | 34 | | | 438 |
| SQ-RC--Ad-Seg | | 67 | | 36 | 1 | 3% | | 68 |
| SVSP       I,IV * | 999 | 1,054 | 106% | 192 | 191 | 99% | 10 | 1,245 |
| SVSP Ad-Seg | | 207 | | 45 | 55 | 122% | | 262 |
| VSPW | 606 | 758 | 125% | | 5 | | | 763 |
| VSPW Ad-Seg | | 5 | | 9 | 15 | 167% | | 20 |
| VSPW SHU | | 34 | | | 2 | | | 36 |
| VSPW-RC | 143 | 186 | 130% | | 15 | | | 201 |
| WSP       I,III | 105 | 96 | 91% | | 3 | | 6 | 99 |
| WSP-RC | 944 | 1,129 | 120% | | 67 | | | 1,196 |
| WSP-RC--Ad-Seg | | 45 | | | 8 | | | 53 |

**This population includes inmates in Hospice and S3, as well as HIV inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

" + " is a 270 Design Facility.  " ** " is a 180 Design Facility.

Grand Totals do not include MHCB data
COR Ad-Seg EOP housing is located in the SHU.
Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated.
SQ's housing of EOP ASU is such that database tracking is unreliable at this time.
Beginning 4/10/06, part of SAC's ASU is converting to a 64 bed PSU.  During this conversion, SAC's ASU census will not be accurate.
Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

Health Care Placement Unit

10/5/2006

| | CCCMS | | | EOP | | | MHCB | Total Mental Health Pop |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | |
| Totals : | 24,271 | 27,756 | 114.4% | 3,381 | 3,844 | 113.7% | 250 | 31,600 |

| | PSU | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| PBSP | 128 | 119 | 93.0% |
| SAC | 192 | 181 | 94.27% |
| Total PSU: | 320 | 300 | 93.75% |

| | DMH | | |
|---|---|---|---|
| | Capacity | Current Pop | % of Capacity |
| ASH | 256 | 129 | 50% |
| DMH CMF-AIP | 150 | 129 | 86% |
| DMH CMF-ICF | 76 | 72 | 95% |
| DMH CMF-DTP | 44 | 37 | 84% |
| DMH SVPP | 100 | 81 | 81% |
| Totals : | 626 | 448 | 71.6% |

The ASH cap includes the 25 APP beds.

| Grand Totals | | |
|---|---|---|
| Total MH Capacity | Total MH Population | Percent of Total MH |
| 28,598 | 32,348 | 113.1% |

**This population includes inmates in Hospice and S3, as well as HIV Inmates in Unit IV and Y dorm at CMF. These inmates are not counted against the capacity identified in the Gates -Coleman Court Order.

Mental Health numbers are as accurate as the information provided by the DDPS identifier system.

" + " is a 270 Design Facility. " ** " is a 180 Design Facility.

Grand Totals do not include MHCB data

COR Ad-Seg EOP housing is located in the SHU.

Since approximately February 2005, SQ EOP ASU numbers have been and continue to be understated. SQ's housing of EOP ASU is such that database tracking is unreliable at this time.

Beginning 4/10/06, part of SAC's ASU is converting to a 64 bed PSU.  During this conversion, SAC's ASU census will not be accurate.

Beginning 8/2/06, CMC reflects a temporary MHCB capacity of 36 due to a court order.

Health Care Placement Unit

R1-4

10/5/2006