Exhibit O

*J. Michael Keating, Jr.*
**Office of the Special Master**
<u>*Coleman v. Schwarzenegger*</u>

2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
E-mail: jmichaelkeatingjr@yahoo.com

February 3, 2006

Clerk's Office
United States District Court
  for the Eastern District of California
501 I Street
Sacramento, CA 95814

        Re:   <u>Ralph Coleman, et al. v. Arnold Schwarzenegger, et al.</u>
                <u>No. Civ. S-90-0520 LKK JFM P</u>

Dear Sir/Madam:

Please find attached for electronic filing the <u>Special Master's Report and
Recommendations on Defendants' Revised Program Guide.</u>

If you have any questions about this filing or its distribution, please call. Thank you for
your assistance.

Sincerely yours,

/s/  J. Michael Keating, Jr.

J. Michael Keating, Jr.
Special Master

Enclosure

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

Plaintiffs,

vs.                                          No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

Defendants.

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
## ON DEFENDANTS' REVISED PROGRAM GUIDE

In January 1997, some 13 months into the mastership in this case, the court directed the special master to work with the parties to complete and submit for approval plans, policies and protocols for meeting the requirements of the remedial order. Five months later in response to that directive, six volumes of materials were submitted to the court, the core of which was the California Department of Corrections Mental Health Services Delivery System Program Guides, essentially a collection of standards for the delivery of services within the department's various levels of mental health care. At the same time, the special master reported some continuing differences among the parties and recommended various approaches for dealing with those differences. The parties did not contest those recommendations, and on June 24, 1997 the court provisionally approved the submitted plans, policies and protocols and ordered their implementation.

It was recognized in 1997 that, in many respects, the basic program guides were a work in progress, hence their provisional adoption. Many of the programmatic components of the defendant's mental health system were still embryonic and needed much nurturing. It was uncertain whether some of the standards incorporated in the program guides were realistic or adequate. All agreed that their implementation needed close scrutiny and analysis over the next several years.

During the subsequent implementation process, many aspects of the provisionally approved plans, policies and protocols were revisited and amended by the court, while some other provisions were modified and upgraded by the defendants on their own initiative. The scope of the case, moreover, was broadened to include all California Department of Corrections and Rehabilitation (CDCR) institutions, making the mental health programs at the California Medical Facility at Vacaville (CMF) and California State Prison, San Quentin subject to the program guides. Finally, the size of the defendants' mental health caseload has more than doubled since the provisional program guides were adopted, growing from 14,293 inmate/patients in July 1997 to 30,272 in October 2005.

In late 2002, after more than five years of experience with the provisionally approved program guides, the special master and the parties agreed that the time was ripe to revise and update the program guides and seek their final approval. That agreement initiated a three-year round of meetings among parties, counsel and the special master and his experts and monitors, during which the original program guides were subjected to intense review, analysis and negotiation, followed by a seemingly endless reiteration and critique of draft versions of the final product.

2

The provisional program guides have also undergone a semantic identity change. The "program guides" adopted in mid-1997 included a series of multiple guides, one for each level of care or program in CDCR's Mental Health Services Delivery System. The revision entitles the whole document simply as a "Program Guide" in the singular, with chapters within the overall guide devoted to different levels of care and programs. Unlike the original program guides, which were accompanied by a miscellany of materials, including memoranda, reports, bulletins, procedures, etc. the revised Program Guide supersedes and incorporates most of these miscellaneous materials.

The revised Program Guide submitted separately and contemporaneously by the defendants represents a substantial improvement over the original document. Experience with the provisionally approved program guides has led to improvements, refinements and additions to the original that are significant. The special master's experts have carefully reviewed the final product and, with a few exceptions that will be noted, have found the revised document adequate and acceptable.

The preparation of this revised version of the program guides has been a ceaselessly dynamic process. While protracted negotiations over existing differences were underway, new developments, difficulties or crises arose that resulted in still more differences. It has become almost impossible to cut off or terminate the continuing debate over new and evolving issues. Each attempt to define, address and resolve continuing differences has generated further changes and objections. In the meantime, the defendants have been unable to make a case to the California General Assembly justifying the allocation of resources needed to implement many of the services and

policies included in the proposed revisions that have been jointly identified as essential
during negotiations over the revised document.

The purpose of this report is to submit for the court's final approval that
95 percent of the revised Program Guide that the parties and special master agree to and
initiate a process for resolving the five percent of remaining issues that continue to elude
resolution. Plaintiffs' counsel concur with the revised Program Guide and join in the
effort to have the submitted revision approved. On several scores, however, they seek
additional requirements and services, broader policies and, in some instances, different,
clearer expression of some provisions. The decision to submit this not-quite-complete
Program Guide is designed to preserve for the plaintiffs an opportunity to pursue their
continuing objections while getting on with implementation of the elements of the
Program Guide that are essential and mutually acceptable.

As indicated, the defendants are submitting directly to the court the
revised Program Guide endorsed by parties and the special master. The parties and the
special master seek the court's final approval of the submitted Program Guide. Because
of the defendants' need to incorporate the requirements in the revised Program Guide in
budget proposals for the pending FY 2006-07 budget, the court's prompt review and
approval is requested.

Some of the remaining unresolved issues have secured the general assent
of parties and the special master but require further refinement, including:

- Psychiatrist qualifications: There is agreement on the education-based
  qualifications included in Chapter 1 (Program Guide Overview),
  which are the same as those for Board eligibility. The defendants
  sought to grandfather departmental psychiatrists who currently do not
  meet these educational criteria, but a subsequent system-wide survey
  of the department's psychiatrists found a substantial number of non-

4

compliant practitioners. The defendants have withdrawn the grandfathering request. They have agreed to a review of existing psychiatrists who fail to meet the new criteria and, based on the outcome of such a review, to dismiss irredeemably unqualified individuals or impose appropriate limitations on practice and provide adequate supervision on a case-by-case basis. The special master's experts will be assisting the defendants in the structuring of this review.

- <u>Staffing ratios</u>: Once the Program Guide has been approved, the defendants will submit staffing ratios for each of the programs included in the Mental Health Services Delivery System (MHSDS). In addition, upon the court's determination of any heretofore unresolved issues, the defendants will develop appropriately revised staffing ratios. The staffing ratios thus developed will be incorporated in the Program Guide.

- <u>CPR and video-monitoring</u>: Broad agreement has been reached on these two issues, but differences remain over the extent to which the current language in the Program Guide chapter on Suicide Prevention and Response reflects all of the elements of the agreement. The parties continue to work on refining the pertinent language.

These are all critical and complex issues, which need to be finally and fully resolved. While these issues currently elude completion, neither the parties nor the special master want them to delay further the adoption of the revised Program Guide, and all are committed to continue to work to develop mutually acceptable solutions. The Program Guide, moreover, contains a process for annual review and revision. This report also concludes with a recommendation for the court's continuing oversight of changes to the Program Guide during the duration of the court's involvement in the defendants' mental health services.

A couple of other unresolved issues involve defendants' proposals to reduce the level of some services they were required to provide in the program guides provisionally approved in mid-1997 or in subsequent court orders. The plaintiffs object to these proposals, including specifically:

5

- The reduction of psych tech rounds of non-caseload inmates in administrative segregation units from daily to weekly; and

- The reduction of the number of minimally required clinical case managers' contacts with 3CMS (Correctional Clinical Case Management System) inmates in administrative segregation units from weekly to every other week or more frequently if clinically indicated.

Plaintiffs' counsel have long been critical of mental health services provided to seriously mentally disordered inmates in administrative segregation. Even before the program guides were provisionally approved in mid-1997, the plaintiffs argued that seriously mentally disordered inmates ought not to be housed in administrative segregation and acquiesced in the adoption of the provisional guides only because the promised services were supposed to be accompanied by a serious effort to limit the length of stays of mental health caseload inmates in administrative segregation. They argue now that efforts undertaken since 1997 to reduce the length of caseload inmates' stays in administrative segregation have failed and strongly oppose any diminution in the minimum levels of service they reluctantly accepted earlier on behalf of their clients. On the other hand, the special master's experts have reviewed the proposed reductions in service and find them acceptable. At stake here is a definitive understanding of what services the law requires the defendants to provide to seriously mentally disordered inmates in administrative segregation. Until that issue is determined judicially, the defendants ought to be required to continue to meet currently mandated requirements for daily psych tech rounds of non-caseload inmates and weekly case management contacts with 3CMS inmates in administrative segregation.

Plaintiffs also object to the level of services the defendants propose to provide to caseload inmates in Security Housing Units (SHUs) in the revised Program

6

Guide. The services proposed by the defendants, deemed acceptable, again, by the special master's experts, include:

- Psych tech rounds of 3CMS inmates in a SHU weekly and of non-caseload inmates every other week; and

- Clinical case managers' contacts with 3CMS inmates in a SHU every 30 days or more frequently if clinically indicated.

The difference here is that the program guides provisionally approved by the court in 1997 required considerably less mental health services for caseload inmates in a SHU than those proposed in the submitted Program Guide. While the plaintiffs will endeavor to persuade the court that the level of services proposed by the defendants for caseload inmates in a SHU are inadequate, the level of care provided in the revised Program Guide represents an enhancement of presently applicable standards. Hence, the plaintiffs are willing to accept for the interim the proposed services, confident they can convince the court to order expanded services.

The largest category of plaintiffs' objections focuses on issues that involve a considerable expansion of the remedies incorporated in the program guides provisionally approved by the court in mid-1997. Many of the expanded remedies sought are aimed at seriously mentally disordered inmates, who are confined in secure settings characterized by locked-down conditions. Specifically and briefly, the plaintiffs seek:

- A limit of 60 days on the length of stays of Enhanced Outpatient Program (EOP) inmates in EOP administrative segregation hub units;

- For all inmates confined in an EOP administrative segregation hub unit, an individual assessment of each inmate's specific risk factor for violence toward others and the provision of group and individualized therapy outside of secure individual treatment modules for appropriate inmates based on the assessment;

7

- Application of the exclusionary rule adopted in <u>Madrid</u> to all SHU units in CDCR;

- Expanded programming and improved conditions for seriously mentally disordered inmates confined in a SHU;

- In Psychiatric Services Units (PSUs), a treatment program that includes individualized assessment of participating inmates' ability to program in a group or individual setting outside a secure individual treatment module and a level within the behavioral modification framework that includes individual and/or group treatment outside a secure individual treatment module;

- A ban on the placement of seriously mentally disordered inmates in unlicensed Outpatient Housing Units for crisis observation or mental health treatment;

- Relative to classification issues, elimination of the four points added to the classification scores of inmates entering CDCR with a history of mental illness and the addition of a requirement for the housing of EOP and 3CMS inmates in security levels commensurate with their classification scores, together with an end to their exclusion because of participation in the MHSDS from access to the range of programs, services and opportunities available to general population inmates; and,

- A computerized management information system that tracks all inmates discharged from the MHSDS, as well as all non-MHSDS inmates in CDCR with a suicidal history.

Adoption of most of these requests will require significant additional allocations of staffing and programming space and /or operational and institutional changes. The defendants have firmly and consistently rejected these demands. With the exception of those objections related to classification, the special master's experts have not been persuaded of, nor endorsed, the necessity for the requested measures. In the absence of such an endorsement, the special master has not elected on his own authority to insist on their adoption by the defendants. Plaintiffs' counsel, nevertheless, contend that these expanded remedies are essential to redress the constitutional deprivations

8

identified by the court in its initial findings in the case. That is a legal conclusion beyond the jurisdiction of the special master; hence, the reference of these issues to the court.

The foregoing list does not exhaust the most recent catalogue of plaintiffs' objections to the submitted Program Guide, which included six specific complaints about the timelines for transfers to more intensive levels of care within the defendants' MHSDS. All of the protested timelines represent improvements over their predecessors that tied time limits on transfers, especially those to the Department of Mental Health, to the availability of bed space in the receiving program rather than to a CDCR clinician's referral. The plaintiffs objected to the Program Guide's chapter on DMH services because it required an Axis I diagnosis for admission to DMH's intermediate inpatient care programs and specified a 30 to 45-day time limit on lengths of stay for CDCR inmates in DMH's acute inpatient program. Other miscellaneous objections sought a form or protocol in the Program Guide to provide specific guidance to determine the likelihood of decompensation of caseload inmates admitted to an administrative segregation unit, SHU or PSU; a mental health screening of anyone admitted to a SHU without a screening within the preceding 90 days; a one-time mental health screening of all non-caseload inmates in all SHUs; an award of good-time for MHSDS inmates retained in reception for longer than 60 days; and a requirement that any 3CMS inmate charged with a serious disciplinary infraction that may result in a SHU term of a referral to a district attorney or with multiple serious infractions within a specified time period be referred automatically for a mental health assessment. The defendants have also considered this last category of objections or demands and declined to incorporate them into the Program Guide.

9

During the prolonged negotiation of changes to the original program guides, sessions characteristically identified a steadily dwindling list of objections by the special master and plaintiffs to draft versions of the revisions prepared by the defendants, supplemented by the repeated need to consider how best to respond to the latest emerging issues and crises. Such meetings were followed regularly by a summary of newly resolved issues and an articulation of positions on the fresh issues, which typically served as the basis for continued negotiations that often helped resolve fresh issues or narrow existing differences. This process threatens to be eternal, and, as demonstrated in the forgoing lists, revolves around some issues that cannot be negotiated.

The list of unresolved or lingering issues may seem long, but in the decade-long context of the mastership, during which the plaintiffs and defendants have thrashed out and resolved so many differences, the list is quite short. To be sure, the plaintiffs may well want to raise additional issues; during the negotiations over revisions to the Program Guide, they have relentlessly fought to reserve their right to future objections relative to virtually every provision and paragraph in each succeeding draft version. The ceaseless give and take between the parties during the revision process has generated, nonetheless, a blueprint for the provision of mental health services that both sides can take pride in. One hopes the parties will limit the objections they take to court to those that raise genuine issues of law.

Based on the current status of negotiations for revising, up-dating and adopting the submitted Program Guide, the special master makes the following recommendations:

1. The court should adopt formally and finally the submitted Program Guide as quickly as possible.

2. The special master and the parties should be directed to finalize provisions of the Program Guide related to the review of psychiatrists' qualifications, staffing ratios, CPR and video monitoring within 30 days of approval of the Program Guide and report the outcome to the court within an additional 15 days.

3. Once parties' objections to this report are filed, the court should meet with counsel and special master to fashion procedures for the hearing and determination of remaining objections.

One final note: The special master's report on the original plans, policies and protocols in May 1997 contained a process for the oversight of future modifications to the plans. Such a process is similarly needed during implementation of the revised Program Guide. The process adopted for subsequent changes to the Program Guide submitted by the defendants should include the following steps:

• Defendants shall submit, with a copy to plaintiffs, a copy of any proposed revision to the Program Guide to the special master fourteen days prior to its effective date. If there is a *bona fide* emergency, this time period may be reduced by an appropriate amount, but in no event shall the proposed Program Guide revision be submitted to the master later than its effective date.

• If the master determines that the revision(s) conflict with any of the court's orders in this case, he will work with the defendants to reconcile the conflict.

• If reconciliation is impossible, the master shall file a report with the court which sets forth his findings as to why the defendants' proposed revision(s) to the Program Guide violates the court's order(s). He shall also make recommendations as to what actions should be taken concerning the proposed revision(s).

Respectfully submitted,

/s/

_____

J. Michael Keating, Jr.
Special Master

February 3, 2006

11

# Exhibit P

Case 2:90-cv-00520-KJM-SCR    Document 2038-7    Filed 11/13/06    Page 15 of 40

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA  94283-0001

> RECEIVED
>
> JUL 2 1 2006
>
> ROSEN BIEN & ASARO



July 3, 2006

J. Michael Keating, Jr.                    via:    Lisa Tillman
Office of the Special Master                       Deputy Attorney General
2351 Sussex Lane                                   Department of Justice
Fernandina Beach, FL  32034                        1300 I Street, Suite 125
                                                   P. O. Box 944255
                                                   Sacramento, CA  94244-2550

**RE:  INFORMATION REQUESTED, RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Keating:

Enclosed are the monthly reports for May 2006, reflective of April 2006 data, excluding Enclosures 7, 8, and 10, and responsive to the January 19, 1999, court order regarding staff vacancies, including changes agreed to at the August 7, 2003, All Parties meeting.

Due to data integrity issues, Enclosures 7, 8, and 10, for the period of September 2005 – May 2006 will be provided as a supplemental report.  The June 2006 report reflecting May 2006 data will be current.

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2. MHSDS Hiring Activity Report.  This report shows allocated staff and vacancy rate information for the most recent period available.
3. Health Care Placement Unit (HCPU) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution.
7. ~~Referrals for Transfer to the Department of Mental Health.~~
8. ~~Atascadero State Hospital (ASH) Discharges~~
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. ~~The DMH Monthly Report of CDCR Patients in DMH Hospitals – Summary and Penal Code 2684.~~
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.

J. Michael Keating, Jr.
Page 2

15. Allocated Case Manager positions and vacancies for the EOP Administrative Segregation Hub institutions.
16. EOP inmates waiting for transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician rounds in Administrative Segregation at California State Prison-San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Bed Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospitals Health Care Placement Issues.

If you have any questions, please contact me at (916) 323-6811.

Sincerely,

PETER FARBER-SZEKRENYI, DR. P.H.
Director
Division of Correctional Health Care Services

Enclosures

cc:  Renee Kanan, M.D., Deputy Director, DCHCS (w/o enclosures)
     Matthew Lopes, Deputy "Coleman" Special Master (w/enclosures)
     Jeffrey L. Metzner, M.D., "Coleman" Expert (w/enclosures)
     Dennis F. Koson, M.D., "Coleman" Expert (w/enclosures)
     Kerry Hughes, M.D.,. "Coleman" Expert (w/enclosures)
     Melissa G. Warren, Ph.D., "Coleman" Expert (w/enclosures)
     Raymond F. Patterson, M.D., "Coleman" Expert (w/enclosures)
     Paul Nicoll, "Coleman" Expert (w/enclosures)
     Ted Ruggles, "Coleman" Expert (w/enclosures)
     Lisa Tillman, Office of the Attorney General (w/enclosures)
     Michael Stone, Office of Legal Affairs (w/enclosures)
     Michael Bien, Rosen Bien and Associates (w/enclosures)
     Donald Specter, Prison Law Office (w/enclosures)
     Virginia Morrison, Esq. (w/enclosures)
     Mohamedu F. Jones, Esq. (w/enclosures)
     Patricia Williams, Esq. (w/enclosures)
     Doug McKeever, DCHCS (w/enclosures)
     Tim Fishback, M.D., DCHCS (w/enclosures)
     Margaret McAloon, Ph.D., DCHCS (w/o enclosures)

# Enclosure 1

## Mental Health Services Delivery System Staffing Allocation and Vacancy History

# Mental Health Service Delivery System

**Staffing Allocation and Vacancy History**

| | As of 3/31/2006 | | | As of 2/28/2006 | | | As of 1/31/2006 | | | As of 12/31/2005 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time Base | Vac | Vacancy Rate | Time Base | Vac | Vacancy Rate | Time Base | Vac | Vacancy Rate | Time Base | Vac | Vacancy Rate |
| **Grand Total** | 1,943.20 | 415.55 | 21.38% | 1,934.17 | 415.77 | 21.70% | 1,909.47 | 422.82 | 22.14% | 1,903.97 | 417.02 | 21.90% |
| Medical Tech. Assistants | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% |
| Psych Tech Staff | 267.87 | 62.17 | 23.21% | 266.37 | 59.67 | 22.66% | 256.87 | 56.17 | 21.87% | 253.87 | 52.17 | 20.55% |
| Psychiatrists | 220.30 | 84.80 | 38.49% | 220.05 | 84.30 | 38.31% | 218.55 | 79.30 | 36.28% | 219.05 | 80.00 | 36.52% |
| Psychologists | 533.89 | 133.24 | 24.96% | 530.64 | 126.74 | 23.88% | 518.94 | 120.04 | 23.13% | 517.94 | 122.04 | 23.56% |
| Social Workers | 149.59 | 38.59 | 25.80% | 149.59 | 39.59 | 26.47% | 149.59 | 36.59 | 24.46% | 149.59 | 37.59 | 25.13% |
| The Other Classifications | 767.80 | 96.75 | 12.60% | 766.77 | 109.47 | 14.28% | 761.77 | 130.72 | 17.16% | 760.77 | 125.22 | 16.46% |
| **213  Medical** | 10.50 | 2.50 | 23.81% | 11.50 | 3.50 | 30.43% | 11.50 | 3.50 | 30.43% | 11.50 | 3.50 | 30.43% |
| Psych Tech Staff | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| Psychiatrists | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| Psychologists | 0.50 | 0.50 | 100.00% | 0.50 | 0.50 | 100.00% | 0.50 | 0.50 | 100.00% | 0.50 | 0.50 | 100.00% |
| Social Workers | 7.00 | 2.00 | 28.57% | 7.00 | 2.00 | 28.57% | 7.00 | 2.00 | 28.57% | 7.00 | 2.00 | 28.57% |
| The Other Classifications | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| **214  Dental** | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| The Other Classifications | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% | 1.00 | 0.00 | 0.00% |
| **220  Mental Health** | 1,921.30 | 412.65 | 21.48% | 1,911.27 | 414.87 | 21.71% | 1,887.57 | 417.92 | 22.14% | 1,882.07 | 412.12 | 21.90% |
| Medical Tech. Assistants | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% | 3.75 | 0.00 | 0.00% |
| Psych Tech Staff | 266.87 | 62.17 | 23.30% | 265.37 | 59.67 | 22.74% | 255.87 | 56.17 | 21.95% | 252.87 | 52.17 | 20.63% |
| Psychiatrists | 219.30 | 84.80 | 38.67% | 218.05 | 83.30 | 38.20% | 216.55 | 78.30 | 36.16% | 217.05 | 79.00 | 36.40% |
| Psychologists | 533.39 | 132.74 | 24.89% | 530.14 | 126.24 | 23.81% | 518.44 | 119.54 | 23.06% | 517.44 | 121.54 | 23.49% |
| Social Workers | 142.59 | 36.59 | 25.66% | 142.59 | 37.59 | 26.36% | 142.59 | 34.59 | 24.26% | 142.59 | 35.59 | 24.96% |
| The Other Classifications | 755.40 | 96.35 | 12.75% | 754.47 | 108.07 | 14.33% | 750.37 | 129.32 | 17.23% | 749.37 | 123.82 | 16.53% |
| **320  Mental Health** | 10.40 | 0.40 | 3.85% | 10.40 | 0.40 | 3.85% | 10.40 | 1.40 | 13.46% | 10.40 | 1.40 | 13.46% |
| The Other Classifications | 10.40 | 0.40 | 3.85% | 10.40 | 0.40 | 3.85% | 10.40 | 1.40 | 13.46% | 10.40 | 1.40 | 13.46% |

RU 213 - Medical; RU 220 - MH; RU 320 - MH SAC

Exhibit Q





755 Riverpoint Dr., Ste. 200 • West Sacramento, CA 95605-1634 • (916) 372-6060

To: Prison Law Office

My name is Steve Cox, president of the California Medical Facility (CMF) chapter of the California Correctional Peace Officers Association. I am writing to make you aware of a serious dilemma that faces CMF. The California Department of Corrections and Rehabilitation closed down the training academy for one year, at a time when most institutions were already facing correctional staff shortages. The consequence of the Department's action was to create what can only be described as crisis in terms of Correctional Officer staffing levels, particularly at CMF.

CMF is a medical and psychiatric prison hospital. We are the primary state prison with a Department of Mental Health Unit and Outpatient Psychiatric Programs. CMF operates full scale medical services, a Medical Guard Unit at an outside public hospital and treats the greatest number of medically challenged inmates in the State. Of course, CMF houses all levels of inmates common to the state system.

Most of our programs are court mandated and/or court monitored. Due to this, CMF is not allowed to shut down programs as other institutions have done to alleviate correctional staffing shortages. CMF is running over **60** vacant correctional positions. Adding together these vacancies and additional coverage needs one can see the vacancy rate climb to unmanageable levels. CMF is heading for disaster. All staff members and inmates are at great risk and this institution will not be safe to work or live in. CMF will no longer to be able provide services as required by the courts and state laws.

You may be wondering how this is your concern. As an inmate advocacy group, I am asking you to use your influence to help convince Agency Secretary Hickman and Undersecretary, CDCR, Woodford to mandate the immediate hiring of numerous graduates from the Correctional Academy for placement at CMF as soon as possible. Your assistance will not only keep CMF running operationally, it may save lives.

· Please feel free to contact me if you have any questions. Thank you for your time and effort.

Sincerely,

Steve Cox
Chapter President, CMF

Exhibit R

# Mental Health Adseg/SHU/PSU

October 5, 2006

| | | MH POPULATION IN AD SEG | | | AD SEG CAPACITY | MH PERCENT OF AD SEG* | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| ASP | II | 5 | 46 | 51 | 175 | 2.86% | 26.29% | 29.14% |
| CAL | I,IV | 1 | 6 | 7 | 300 | 0.33% | 2.00% | 2.33% |
| CCC | I,II,III | | 1 | 1 | 175 | 0.00% | 0.57% | 0.57% |
| CCI | I,II,III,IV | 5 | 102 | 107 | 327 | 1.53% | 31.19% | 32.72% |
| CCWF | | | 31 | 31 | 61 | 0.00% | 50.82% | 50.82% |
| CEN | III | | 9 | 9 | 350 | 0.00% | 2.57% | 2.57% |
| CIW | | 1 | 13 | 14 | 56 | 1.79% | 23.21% | 25.00% |
| CMC | I,II,III | 37 | 53 | 90 | 226 | 16.37% | 23.45% | 39.82% |
| CMF | I,II,III | 57 | 50 | 107 | 164 | 34.76% | 30.49% | 65.24% |
| COR | I,III,IV | 48 | 131 | 179 | 460 | 10.43% | 28.48% | 38.91% |
| CTF | I,II | 1 | 14 | 15 | 228 | 0.44% | 6.14% | 6.58% |
| CVSP | I,II | | 4 | 4 | 175 | 0.00% | 2.29% | 2.29% |
| DVI | I,II | 5 | 50 | 55 | 303 | 1.65% | 16.50% | 18.15% |
| DVI-RC | I,II | 1 | 57 | 58 | 303 | 0.33% | 18.81% | 19.14% |
| FOL | III | | 61 | 61 | 138 | 0.00% | 44.20% | 44.20% |
| HDSP | I,III,IV | | 76 | 76 | 343 | 0.00% | 22.16% | 22.16% |
| ISP | I,III | | 6 | 6 | 175 | 0.00% | 3.43% | 3.43% |
| KVSP | I,IV | 1 | 52 | 53 | 396 | 0.25% | 13.13% | 13.38% |
| LAC | I,III,IV | 50 | 63 | 113 | 450 | 11.11% | 14.00% | 25.11% |
| MCSP | I,II,III,IV | 36 | 40 | 76 | 175 | 20.57% | 22.86% | 43.43% |
| NKSP-RC | I,III | 6 | 49 | 55 | 175 | 3.43% | 28.00% | 31.43% |
| PBSP | I,IV | | 56 | 56 | 246 | 0.00% | 22.76% | 22.76% |
| PVSP | I,III | 1 | 118 | 119 | 350 | 0.29% | 33.71% | 34.00% |
| RJD | I,III | 60 | 83 | 143 | 350 | 17.14% | 23.71% | 40.86% |
| SAC | I,IV | 49 | 77 | 126 | 406 | 12.07% | 18.97% | 31.03% |
| SATF | II,III,IV | | 104 | 104 | 325 | 0.00% | 32.00% | 32.00% |
| SCC | I,II,III | 1 | | 1 | 175 | 0.57% | 0.00% | 0.57% |
| SOL | II,III | 1 | 93 | 94 | 350 | 0.29% | 26.57% | 26.86% |
| SQ-RC | I,II | 1 | 67 | 68 | 379 | 0.26% | 17.68% | 17.94% |
| SVSP | I,IV | 55 | 207 | 262 | 439 | 12.53% | 47.15% | 59.68% |
| VSPW | | 15 | 5 | 20 | 76 | 19.74% | 6.58% | 26.32% |

Mental Health and HIV numbers are as accurate as the information

provided by the respective DDPS identifier systems.                    *R2-1*

Health Care Placement Unit
10/5/2006

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

| | | EOP | CCCMS | TOTAL | | CAPACITY | EOP | CCCMS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| WSP-RC | I,III | 8 | 45 | 53 | | 175 | 4.57% | 25.71% | 30.29% |
| Totals | | 445 | 1769 | 2214 | | 5504 | 8.09% | 32.14% | 40.23% |

| | | MH POPULATION IN PSU | | | | PSU CAPACITY | MH PERCENT OF PSU | | |
|---|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | | EOP | CCCMS | TOTAL |
| PBSP | I,IV | 113 | 6 | 119 | | 128 | 88.28% | 4.69% | 92.97% |
| SAC | | 178 | 3 | 181 | | 192 | 92.71% | 1.56% | 94.27% |

| | | MH POPULATION IN SHU | | | | SHU CAPACITY | MH PERCENT OF SHU | | |
|---|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | | EOP | CCCMS | TOTAL |
| COR | I,III,IV | | 462 | 462 | | 1400 | 0.00% | 33.00% | 33.00% |
| VSPW | | 2 | 34 | 36 | | 44 | 4.55% | 77.27% | 81.82% |
| CCI | | 4 | 177 | 181 | | 274 | 1.46% | 64.60% | 66.06% |

| | EOP | CCCMS | TOTAL | | CAPACITY | EOP | CCCMS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Total | 6 | 673 | 679 | | 1718 | 0.35% | 39.17% | 39.52% |

Mental Health and HIV numbers are as accurate as the information
    provided by the respective DDPS identifier systems.          *R2-2*

Health Care Placement Unit
10/5/2006

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

Exhibit S

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:  OCT 3 1 2005

In re:

Salinas Valley State Prison
P.O. Box 1020
Soledad, CA 93960-1020

IAB Case No.: 0501909          Local Log No.: SVSP 05-01771

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. Burleson. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position that Facility "A" Sensitive Needs Yard at Salinas Valley State Prison (SVSP) is being punished for other yard problems. He states that the amount of exercise, shower, and dayroom activities is insufficient. The appellant requests that staffing problems be eliminated, and provides suggested courses of action.

**II    SECOND LEVEL'S DECISION:** The reviewer found that the SVSP is presently under a State of Emergency due to staffing shortages. As a result, it has been necessary to implement a Redirection of Staff, and Facility Program Rotation. Every effort is being made to provide the inmate population with the maximum amount of program possible, while maintaining the safety and security of the institution. Inmates housed in Facility "A" are afforded recreation yard every other day according to the tier rotation, in accordance with Operational Procedure #11. The only deviation from this procedure is when there is not a sufficient amount of staffing to safely operate facility programs.

**III    DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A.    FINDINGS:** The requirement of safety and security must take precedence over other considerations in the operation of programs and activities of the institution. The documentation and arguments presented are persuasive that the institution has taken necessary actions to provide for the safety and security considerations while providing access for recreational activities for all inmates. No one could deny that the staffing shortages is a less than ideal situation. Nevertheless, the institution is not in violation of policy while under the State of Emergency.

**B.    BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section: 3044, 3220, 3270, 3383

**C.    ORDER:** No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

*T. Surges*

N. GRANNIS, Chief
Inmate Appeals Branch

cc:    Warden, SVSP
       Appeals Coordinator, SVSP

Exhibit T

# CDC-602 INMATE APPEAL RESPONSE

## FIRST LEVEL RESPONSE

| | |
|---|---|
| DATE: | December 18, 2005 |
| INMATE NAME: | |
| INMATE CDC#: | ( |
| CDC-602-LOG#: | CSQ-6-05-02918 |
| DATE INTERVIEWED: | December 18, 2005 |
| APPEAL DECISION: | DENIED |

## APPEAL ISSUE:

You state that the Adjustment Center Counselor and custody staff are violating your right to the minimum amount of outdoor exercise yard. You further state that Mental Health must enforce your right to yard.

In your appeal you request that the Mental Health staff enforce your right to the minimum outdoor exercise required for mental well being.

## APPEAL RESPONSE:

Your appeal is Denied. Recreational Yard in the Adjustment Center is governed by the Thompson Consent Decree. The Thompson Consent Decree specifically states that inmates housed within a unit, which also houses non-condemned inmates, must be provided a minimum of yard three (3) days per week, with a total of three (3) hours, for inmates assigned to walk alone yards.

On December 18, 2005, I conducted an interview with you and explained the required minimum yard (Out of Cell Activity) as indicated in Thompson. I also noted that during periods when the unit is fully staffed, the minimum requirements are exceeded on a consistent basis.

Unfortunately, due to institutional staffing levels, it has become necessary to close the exercise yards in the Adjustment Center in an effort to avoid operating at unsafe staffing levels. Immediately following the institutions ability to operate with adequate staff, the yard program is returned to normal.

Based on the above information, your appeal is DENIED at the FIRST LEVEL.


**D. L. DORSEY**
**Correctional Lieutenant**
**Adjustment Center**

12/18/05
Date

Noted
12/20/05

## DECLARATION OF SERVICE BY U.S. MAIL

Re: Inmate Appeal Form and Attachments One and Two

    I, Margot Garey, declare that I am over 18 years of age, and not a party to the within cause. On January 5, 2006, I served true copies of the attached:

**Inmate Appeal Form and Attachments One and Two,**

on each of the following, by placing the attached in envelopes addressed (respectively) as follows:

Appeals Coordinator
Decanay or Jeppeson
San Quentin State Prison
San Quentin, CA 94964

Chief Medical Officer
Mental Health Department
San Quentin State Prison
San Quentin, CA 94964

The Honorable Thelton Henderson
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102

    The envelope was sealed and deposited in the United States Mail at San Francisco, California, on January 6, 2006, with the postage paid.

    I declare under penalty that the foregoing is true and correct and that this declaration was signed on January 6, 2006, at San Francisco, California.

DECLARANT

Exhibit U

1
2
3 **IN THE UNITED STATES DISTRICT COURT**
4 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
5
6 MARCIANO PLATA , et al.,                  )          NO. C01-1351-T.E.H.
                                            )
7         Plaintiffs                        )    **RECEIVER'S FIRST BI-MONTHLY**
                                            )    **REPORT**
8         v.                                )
                                            )
9                                           )
10 ARNOLD SCHWARZENEGGER,                   )
   et al.,                                  )
11                                          )
          Defendants,                       )
12                                          )
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  descriptions provided in the Findings of Fact and Conclusions of Law. Because of this, the
2  remedies envisioned may be more dramatic, far reaching and difficult to achieve than previously
3  envisioned. Therefore, in addition to discussing the issues required by the Order, the Receiver
4  will address below three additional issues of importance: (a) the state of the State of California;
5  (b) the waste of taxpayer resources, and (c) efforts to establish the Office of the Receiver.

6                                              **II.**

7                        **THE STATE OF THE STATE OF CALIFORNIA**

8           The Receiver has conducted dozens of meetings concerning the medical care provided
9  inside California's prisons during his first sixty days of appointment. He has met and conferred
10 with counsel for the parties, spoken formally and informally with literally dozens of State of
11 California employees, from Governor Arnold Schwarzenegger to the heads of California's
12 control agencies, executives from the CDCR, and correctional staff and health care clinicians
13 working inside the walls of five prisons (San Quentin, the California Institute for Men, the
14 California Institute for Women, the Central California Womens Facility and the Valley State
15 Prison for Women). He has also interviewed inmate/patients. In addition, the Receiver has met
16 with officials of the bargaining units who represent medical care providers in the CDCR,
17 including the Union of American Physicians and Dentists ("UAPD"), the Service Employees
18 International Union ("SEIU"), the California Correctional Peace Officers Association
19 ("CCPOA") and the American Federation of State, County, Municipal Employees ("AFSCME").
20         The Receiver also reviewed thousands of pages of documents, including budget
21 proposals, inmate/patient medical care charts, internal affairs investigations, policies and
22 procedures, incident reports, memoranda from counsel, and the reports of the Court experts. In
23 addition, as explained below, the Receiver has aggressively moved to assemble a team of top
24 quality staff, including experts in both corrections and medical care. Based on all of the
25 information reviewed and considered during the initial 60-days of the Receivership, the Receiver
26 finds as follows:

27

28                                              2

A. The medical services provided by the CDCR are without question "broken beyond repair," as found by the Court in the Findings of Fact and Conclusions of Law. Almost every necessary element of a working medical care system either does not exist, or functions in a state of abject disrepair, including but not limited to the following: medical records, pharmacy, information technology, peer review, training, chronic disease care, and speciality services. Similar to the conditions reported by the Court, the Receiver has observed cases where inmate/patients did not receive adequate care because of their inability to access care; also, and perhaps more disturbing, he has reviewed cases where inmate/patients did not receive adequate care even after accessing the CDCR medical care system.

B. The Receiver commenced the task of raising the level of medical care provided to California prison inmates up to constitutional standards with the assumption that prison medical care services will remain, at least in the near term, within the overall framework of the California correctional system. However, two very serious impediments may, over time, render the Receiver's assignment difficult, if not impossible, to complete:



    1. <u>Systemic Long Term Overcrowding</u>: Most California prisons operate at 200% of capacity, with no effective relief in sight. Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system.

    2. <u>Instability of Leadership</u>: The Receiver has already dealt with no fewer than three Secretaries or Acting Secretaries of the CDCR. As well, the reassignment, retirement, promotion, or demotion of numerous wardens has significantly contributed to the instability, demoralization and ineffectiveness of the CDCR in both its custody as well as medical care responsibilities.

Given this state of affairs, and the poor reputation that the CDCR has earned as an employer, raising the medical system to constitutional standards may require removing it from the umbrella of the CDCR.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCIANO PLATA , et al.,

   Plaintiffs

     v.

ARNOLD SCHWARZENEGGER,
et al.,

   Defendants,

NO.  C01-1351-T.E.H.

**RECEIVER'S SECOND BI-MONTHLY REPORT**

1

## II.

2

## THE STATE OF THE STATE OF CALIFORNIA (CONTINUED)

3      As indicated in the First Bi-Monthly Report, dysfunction, paralysis, trained incapacity,

4  broken business practices and political machinations of State government are root causes of the

5  devolution of the prison medical care system to its present unconstitutional level.  It is, perhaps,

6  axiomatic that unless and until these root causes and "environmental" conditions within which

7  the CDCR medical care system operates are significantly mitigated and ultimately changed,

8  constitutional levels of access to and quality of medical care will not be achieved.  As will be

9  detailed below, given the scope and interconnection of the problematic conditions which were

10  created by decades of inaction and mis-management, the challenges ahead are immense, the

11  barriers from the body politic and bureaucracy continue and progress, while already begun, will

12  be measured and must be very carefully managed.

13      The State's entrenched unwillingness and/or incapability to effectively discuss, let alone

14  act upon, the crisis in California's prisons underscores the critical importance of the Court and

15  the Receivership in its attempts to assure inmate/patients of their constitutional rights.  Perhaps

16  no more salient example of State paralysis has been the recently concluded Special Session of the

17  Legislature.  On June 26, 2006 the Governor declared the California prison system in crisis and

18  called a special session of the Legislature to deal with the issue of severe overcrowding, the root

19  cause of many of the prison system's ills, including constitutionally inadequate medical care.

20  Instead of the different entities of the State working together, some observers voiced immediate

21  criticism of the Governor's action, calling it "too little, too late."  Other critics were cynical

22  regarding the potential for meaningful action when the Governor declared sentencing reform and

23  reform of existing parole violation policies "off the table."  Because 2006 is an election year, still

24  others characterized the call for a special session as a "political stunt" armed at applying pressure

25  to the Legislature to take action, affirmative or negative, on various proposals put forward by the

26  Governor in an attempt to, if nothing else, share blame should nothing meaningful eventuate

27  from the session.

28                                                    2

1    Despite dire warnings from CDCR administrators that California's prisons will be out of

2  space by June 2007, despite the fact that population levels are now in excess of 200% of

3  designed capacity, nothing was presented to the Legislature by the Administration that provided

4  for immediate relief for Prison Wardens and Health Care Mangers.  Likewise, the Legislature

5  itself offered no realistic proposals to deal with the problems faced within California's prisons in

6  a timely and adequate manner.

7    The Receiver, however, offered comments and suggestions on the special session in a

8  letter to the Governor and legislative leaders dated July 24, 2006, attached as Exhibit 1.[2]

9  Although not intended for the necessary immediate relief concerning overcrowding, the

10  Receiver's proposal would have both mitigated overcrowding and begun a construction process

11  that is without question one element of a comprehensive plan to raise the health care services in

12  California's prisons to constitutional levels.  To the credit of the Governor and Senate, the

13  Receiver's suggestions, as modified during the session, were adopted.  For reasons not disclosed,

14  however, the Assembly did not approve the Governor's revised plan to build medical/mental

15  health assets.  In the end, nothing productive eventuated from the special session and yet again

16  cynicism proved prophetic and the gubernatorial declaration of a crisis in California's prisons

17  was, effectively, left unaddressed.

18    This inaction, planned or otherwise, is emblematic of other examples of political paralysis

19  in the State of California.  Another recent example of similar State behavior was evidenced in the

20  Receiver's call for salary increases (spoken to later in this report) for clinical personnel.  Rather

21  than taking a proactive stance toward such increases, which were well documented by the State

22  itself in its own salary surveys, the State chose to leave it to the Receiver and Court to order such

23  increases, at an attendant additional cost to taxpayers and delay in implementation.

24    The State's unwillingness and/or inability to take remedial action, and the depth of the

25  problems in the prison medical care system (as detailed in this report) brings to mind

26

27    [2] Exhibits are provided in an Appendix of Exhibits filed concurrently with this Report.

28    3

1   euphemisms and clichés such as "swimming upstream", "walking up the down escalator", "two

2   steps forward, one step back", etc. Suffice it to say, the Receiver will not be as reluctant to

3   effectuate positive change. Despite the barriers imposed by the State, the Office of the Receiver

4   continues to identify problems, seek solutions, implement remedial actions and seek out cadres

5   of employees who are willing and able to undertake the goals and tasks at hand. As explained in

6   the Conclusions set forth at the end of this report, during the next sixty days the Receiver will

7   begin a program to construct up to 5000 beds of dedicated medical facilities to be operational

8   within the next three to five years. Working with CDCR officials he will impose a patient cap

9   and reception center intake limit for San Quentin State Prison. The Receiver will, as well,

10  increase the Office of the Receiver's control over the clinical hiring process and initiate plans to

11  expand certain remedial processes on a pilot regional basis.

III.

**THE WASTE OF TAXPAYER RESOURCES**

14          As previously reported by the Receiver, the creation of a constitutional medical care

15  delivery system is entirely consistent with sound fiscal management. Unfortunately, as

16  emphasized by the Receiver in the First Bi-Monthly Report, the California Department of

17  Corrections and Rehabilitation's ("CDCR") failure to deliver constitutionally adequate medical

18  care has been accompanied by extraordinary instances of the waste of taxpayer resources,

19  including the purchase of inappropriate medical equipment, an unnecessarily expensive and

20  poorly managed and dangerous pharmacy system, utilization of acute hospital beds for

21  prisoner/patients who require only sub-acute care, and the use of expensive privately owned

22  clinical registries to fill vacant physician and nurse positions within the prisons.

23          More evidence of the waste of taxpayer resources was discovered during the months of

24  July, August, and September 2006. First, the San Quentin project, as describe in detail below,

25  has uncovered numerous examples of the waste of taxpayer resources.

26          Second, on August 2, 2006 Steve Westly, California's State Controller, issued a report

27  concerning the State Controller's fiscal review of the CDCR's inmate health services delivery

4

Exhibit V

*C*alifornia *P*rison Health Care *R*eceivership
*Office of the Receiver*

July 24, 2006

Governor Arnold Schwarzenegger
State of California
State Capitol Building
Sacramento, CA 95814

Assemblymember Fabian Nuñez
Speaker of the Assembly
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0046

Senator Don Perata
Senate President pro Tem
State Capitol, Suite 205
Sacramento, CA 95814

Dear Governor Schwarzenegger, Assemblymember Nuñez and Senator Perata:

This is to provide some additional perspective for the upcoming Special Session of the Legislature called for by the Governor in recognition of the crisis in the California prison system.

As you are aware, Judge Henderson took the drastic action of placing the medical care system under a Federal Receivership after years of well-documented State neglect of the medical needs of its inmate population. The medical crisis, however, is, in part, a byproduct of the growing overpopulation problem in California's prisons. It cannot be fully resolved until appropriate corrective action is applied to both of these problems in a thoughtful, coordinated manner. In short, the overcrowding and medical crises are integrally related. I believe that the Special Session, if used effectively, presents an opportunity to make headway on both crises and maximizes the impact of the tremendous tax dollars involved. In this spirit, I offer the following points.

1.  It will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels. Other key issues contributing to the medical crisis include staffing for healthcare and custody functions, instability in the leadership of CDCR down through, at least, the warden

level, and the decrepit physical condition of many of the California prisons. The extreme overcrowding of the system, however, makes the challenge of providing constitutionally adequate medical care dramatically more difficult.

2. While I do not believe that the State can realistically "build its way" out of the chronic overcrowding crisis, new major construction must be a component of mitigating the current acute crisis. Maximizing taxpayer benefit from such projects, however, demands "smart" programming for any new construction. Conventional programming wherein conventional prisons are built (with traditional medical and mental health "components" allocated within each) has failed in the past and will certainly fail again, if pursued.

3. Initial data indicates that the "smart" use of $1 billion ($2 billion including finance costs) would be to construct two multi-purpose medical/mental health facilities rather than two conventional prisons. By so doing, inmate/patients may be appropriately placed by disease category (e.g., acute care, long-term care/skilled nursing care, chronic care, care for the seriously mentally ill, crisis care for the mentally ill, hospice and palliative care, "home" care and assisted living care) and custody/security levels to create a system of care which is sadly missing today. The current waste of taxpayer money resulting from duplicative service locations in so many prisons across the State is enormous and is a significant barrier to providing cost effective, constitutional care. I can assure you that this is the approach the Receivership will have to take in any case in the very near future and would involve, most likely, taxpayer dollars similar to that being proposed for the Special Session. I would suggest that amount can be spent only once, rather than twice, in the described "smart" manner.

4. The State would achieve the same benefit with respect to prison overcrowding under the aforementioned scenario (#3) as it would under the current proposal to construct two conventional prisons because moving ill inmates into the new medical facilities will free up the same number of inmate beds that would have been made available by building new conventional prisons. Thus, by engaging in "smart programming," the State can simultaneously accomplish its dual goals of reducing overcrowding and improving the delivery of medical, mental health and dental care – and make a tremendous stride forward toward the ultimate return of the medical care system to the State.

5. Whatever construction is be accomplished, the location is critical. Any new facility should be situated in, or immediately adjacent to, major urban areas. The reality in California today is a tremendous shortage of qualified healthcare personnel (physicians, nurses, technologists, therapists, etc.) and severe competition for them. Locating new facilities in rural areas would only exacerbate the nearly impossible-to-solve (and quite expensive) dilemma of recruiting and retaining highly trained, competent, healthcare staff.

I am prepared to discuss these issues with you further should you so desire and to participate in any way that we see as mutually acceptable during the Special Session.

In time, a constitutionally adequate medical care system will be created by the Receivership. The Special Session is, potentially, a significant step toward a cooperative, collaborative relationship which will maximize the use of large sums of taxpayer dollars, mitigate some of the current waste and inefficiencies in the State prison system, and result in an approach which has a beneficial impact on both prison overcrowding as well as raising access to and quality of medical care to constitutional levels.

Sincerely,

Robert Sillen
Receiver