# Exhibit W

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5     BEFORE THE HONORABLE THELTON E. HENDERSON, SENIOR JUDGE

6

7     RALPH COLEMAN, et al.,

8            Plaintiff,

9     Vs.                        CASE NO. CIV. S-90-0520 LKK

10    ARNOLD SCHWARZENEGGER,
      et al.,

11                               **RECEIVED**

12        Defendants.            JUN 2 2 2006

13    _____/  **Rosen Bien & Asaro**

14

15

16

17                      ---oOo---

18

19              REPORTER'S TRANSCRIPT

20          THURSDAY, JUNE 8TH, 2006

21        RE:  STATUS OF COLEMAN AND PLATA

22

23                      ---oOo---

24

25    Reported by:            CATHERINE E.F. BODENE,
                              CSR. No. 6926

```
 1                        APPEARANCES

 2                        ---o0o---

 3    COLEMAN SPECIAL MASTER:

 4            JOSPEH MICHAEL KEATING
              OFFICE OF THE SPECIAL MASTER
 5            2351 SUSSEX DRIVE
              FERNANDINA BEACH, FLORIDA  32034

 6

 7

 8    FOR COLEMAN PLAINTIFF:

 9            ROSEN, BIEN & ASARO, LLP
              155 MONTGOMERY STREET, EIGHTH FLOOR
              SAN FRANCISCO, CALIFORNIA  94104
10            BY:  MICHAEL BIEN,
                   ATTORNEY AT LAW
11
              BY:  JANE KAHN,
12                 ATTORNEY AT LAW

13            KEITH WATTLEY - STAFF ATTORNEY
              PRISON LAW OFFICE
14            GENERAL DELIVERY
              SAN QUENTIN, CALIFORNIA  94964
15
              BY:  KEITH WATTLEY,
16                 ATTORNEY AT LAW

17

18    FOR PLATA PLAINTIFF:

19            DONALD HOWARD SPECTER - STAFF ATTORNEY
              PRISON LAW OFFICE
20            GENERAL DELIVERY
              SAN QUENTIN, CALIFORNIA  94964
21
              BY:  DONALD SPECTER,
22                 ATTORNEY AT LAW

23

24                        ---o0o---

25
```

```
 1                          APPEARANCES

 2                           ---o0o---

 3

 4

 5    PLATA RECEIVER:

 6          ROBERT SILLEN,
            Receiver, California Prisons
 7

 8

 9    PLATA SPECIAL MASTER:

10          JOHN HAGAR, SPECIAL MASTER
            JUDGE'S READING ROOM
11          450 GOLDEN GATE AVENUE, 18TH FLOOR
            SAN FRANCISCO, CALIFORNIA  94102
12

13    FOR COLEMAN DEFENDANTS:

14          STATE OF CALIF., DEPT. OF JUSTICE
            OFFICE OF THE ATTORNEY GENERAL
15          1300 I STREET
            SACRAMENTO, CALIFORNIA  94244
16
            BY:  LISA TILLMAN,
17               DEPUTY ATTORNEY GENERAL

18

19    FOR PLATA DEFENDANTS:

20          STATE OF CALIFORNIA, DEPT. OF JUSTICE
            OFFICE OF THE ATTORNEY GENERAL
21          455 GOLDEN GATE AVENUE, SUITE 11000
            SAN FRANCISCO, CALIFORNIA  94102-7004
22
            BY:  ROCHELLE C. EAST,
23               SUPERVISING DEPUTY ATTORNEY GENERAL

24          BY:  FRANCES T. GRUNDER,
                 SENIOR ASST. ATTORNEY GENERAL
25                        ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

1           SACRAMENTO, CALIFORNIA

2       THURSDAY, JUNE 8TH, 2006 - 1:30 P.M.

3               ---o0o---

4       THE CLERK:  All rise.  Court is in session.  The

5   Honorable Lawrence K. Karlton and Judge Henderson are

6   presiding.

7       JUDGE KARLTON:  Please, be seated everyone.

8       THE CLERK:  Calling Civil Case S-90-520, Coleman v.

9   Schwarzenegger, and Civil S-01-1351, Plata v.

10  Schwarzenegger.

11      JUDGE KARLTON:  Counsel, approach the podium and

12  state your appearances for the record.

13      MR. BIEN:  Good afternoon, Your Honors.  Michael Bien

14  on behalf of the plaintiff class in Coleman.

15      MR. SPECTER:  Donald Specter on behalf of the

16  plaintiff class in Plata and Coleman.

17      MS. EAST:  Rochelle East representing defendants.

18      JUDGE KARLTON:  You all may retire.

19      You know that old movie line, "I suppose you're

20  wondering why we called you here tonight," Judge Henderson

21  and I felt it was very important that counsel and parties be

22  aware of the fact that he and I and the Receiver in Plata and

23  the Master in Coleman intend to closely coordinate activities

24  in both cases.

25      We are concerned.  We have heard rumors about what's

2

1    going on out in the field, that people are misapprehending

2    the relationship of the cases, and we felt it was important

3    to make clear that there will be very close coordination.

4         It is the intention of the court at this stage, until

5    we see how things work, that the Special Master in Coleman

6    and the Receiver in Plata will meet monthly, at minimum.

7    They're going to be talking on the phone, but I mean have a

8    real meeting once a month to discuss what's going on in both

9    of the cases and to be sure that everybody is working on the

10   same page.

11        The intention then will be that Judge Henderson and I

12   will meet with the Special Master and the Receiver about

13   every third month.  Again, a formal meeting.

14        We want to really make clear that what is -- we don't

15   anticipate -- maybe we're being unduly hopeful, but we don't

16   anticipate that there will be significant substantive issues

17   where there will be any reason to be concerned with possible

18   divergence of views.  But it is our intent and effort, to the

19   degree that we can, to head those off at the pass, if you

20   will.

21        Also I went to put to rest a rumor, which is

22   apparently wandering around the institutions, which is that

23   Coleman will be forthwith folded into Plata.

24        Whoever got that rumor started has got it wrong.  We

25   have our individual obligations under the decree, and those

3

1    will have to be attended to.

2          What else do you want to say?

3          JUDGE HENDERSON:  Not much.  There is not much more I

4    can add, but to give you a bit more background we are going

5    to be cooperating in this.  What prompted this meeting and

6    this plan to go forward is a desire for efficiency.

7          And what brought this to light for me was a visit

8    that I had at the California Institute For Men in which I

9    toured that institute for a day, and certainly Mr. Specter

10   was there that day, I believe, and perhaps others.

11         We toured the institute, and were told of all of the

12   need for space and the things that were not available

13   there for Plata, including interview and treatment rooms for

14   the doctors.  And at the end of the day, while touring the

15   prison, I saw about a dozen spacious, well furnished, highly

16   polished offices.  And I said:  "What are those?"  And they

17   said:  "Those are for Coleman interviews.  Those are Judge

18   Karlton's, and you can't use them."

19         And I called Judge Karlton, and I said:  "Would you

20   mind if we used them?  They were all empty."  And he said:

21   "No, not at all."  And I think we both came to realize that

22   we needed to coordinate because we have the same goals in

23   mind, constitutional delivery of mental health and

24   constitutional delivery of health issues.

25         And so that's why we plan to work closely together

4

1    here and see a need to do so.

2         As Judge Karlton said, his Special Master, my

3    Receiver, and John Hagar will be meeting regularly and

4    coordinating so that nothing that my team does is a surprise

5    to anything and vice versa.  And then to underscore, the

6    monitoring in Coleman will continue as it is, but we will

7    both be cooperating.

8         At this point I think I'd like to ask Bob Sillen and

9    Michael Keating in turn to address.  We're concerned about --

10   we compiled a list of at least 32 items in our two cases that

11   we think overlap, and we're trying to identify kinds of

12   things that we think will benefit from this cooperative

13   report so that there is not duplication or conflict.

14        Bob, would you come up and address your game plan and

15   identify those, and then Mr. Keating will do the same.

16        MR. SILLEN:  Thank you.

17        I don't have off top of my head all 32, but obviously

18   there are areas that have significant overlap.  So when we're

19   talking about issues, for instance, in the pharmacy, medical

20   records, space, transportation issues, and other issues such

21   as that, information technology, so there are some things

22   that are, in fact, going to be addressed in the short-term,

23   and then some other things that are more of a long-term

24   nature that it just would be so duplicative and inefficient

25   to approach these separately that this arrangement whereby,

5

1    you know, Michael and I will be working together on a monthly

2    basis and the two judges working together will really head

3    that off.

4          And to the degree it doesn't, and Michael's and my

5    judgment we need some help from the bench, we'll come get it.

6    We know your numbers, and we know you know ours.  So I think

7    that this will lay to rest some of those rumors that were

8    referred to, but also assure that we're not going in multiple

9    directions all at the same time because nothing positive will

10   come of that.

11         JUDGE KARLTON:  Thank you.

12         MR. KEATING:  Judge Henderson, Judge Karlton, as this

13   sort of historic combination occurs, I'm struck by the fact

14   that I certainly get the better name.  Being a Master is a

15   lot better than being a Receiver, I think.  Particularly at

16   home it's a better title.

17         But I'm very sensitive to the extraordinary breadth

18   of powers that the Receiver has in this case.  I'm especially

19   sensitive to the newness of the use of this particular

20   long-time judicial agent or instrument to effect change.  And

21   having labored in this field under Judge Karlton's guidance

22   for some ten years plus now, and being frustrated frequently

23   with the pace of change, seeing how great the need is, myself

24   and Matt Lopes, who has been with me throughout this period,

25   and the monitors and experts that have worked with me for ten

6

1    years, really look forward with great anticipation to the

2    addition of Plata and the intervention of the Receiver in

3    this case.

4        We hope that it is the means for resolving many of

5    the areas of the problem in mental health that are really not

6    directly mental health at all, but that are part and parcel

7    of the broader medical situation in the California Department

8    of Corrections and Rehabilitation.  And we look forward to

9    the additional strength and help that the Receiver will be

10   able to give us in moving mental health forward.

11       And we are very much wed to the notion of working

12   together to resolve the constitutional problems in both

13   areas.  I think our meeting today has been very useful in

14   laying the groundwork for that, and we look forward to this

15   wonderful experiment and hope for its quick and efficient

16   culmination.

17       Thank you.

18       JUDGE KARLTON:  We have been made aware this morning

19   as we talked that there are differences in the procedures

20   involved in Plata and Coleman which may require some

21   adjustment, or if this that's not the right word, may cause

22   some delay in Coleman in effectuating agreements between the

23   Master and the Receiver because there is a protest period in

24   Coleman, et cetera, which may make a difference.

25       Hopefully, and, you know, my own sense of what's been

7

1  going on in the cases is that there's been a fairly reasoned

2  ability of the parties to resolve issues requiring the

3  intervention of the court, at least in Coleman, much less

4  frequently than I anticipated many, many years ago when we

5  entered the order.  But we are available.  And what we have

6  said to the people out in the field, Michael and Bob, is you

7  know, there's a telephone.

8        I think Judge Henderson and I thought it might be

9  appropriate, and we're springing this on you, and we're not

10 asking you to commit yourselves in any way to anything, but

11 we thought it might be appropriate for counsel for the

12 parties to at least give us a first impression and response

13 to the notion that there's going to be this very close

14 coordination -- we believe very close coordination in the two

15 cases.

16       I guess we'll begin with plaintiffs.  We'll begin

17 with plaintiff Coleman.  I don't care.  Whatever you want.

18       MR. BIEN:  Good afternoon, Your Honors.

19       We too anticipate the effects of working together,

20 which we hope will be an increase in the -- We think that the

21 coordination of the receiver with the efforts of the Special

22 Master will enhance the speed of the remedy and the

23 effectiveness and the scope of the remedy.

24       Some of the problems we have been addressing in the

25 last year in Coleman involved dealing with roadblocks,

8

1    bureaucratic obstacles, and rules and regulations that just

2    seem to be insurmountable to people who are charged with

3    implementing a remedy.

4    And we hope that the receivership and its

5    extraordinary powers will provide the means for defendants

6    acting, you know, through the Receiver to move forward

7    rapidly because the need is great and it is urgent and we're

8    at a time of crisis in the Department of Corrections.

9    We are also concerned about not only the rumors, but

10   rumors that have turned into actual actions in the field

11   where we're told that certain resources, that as the court

12   described, you know, used to be Coleman resources, we're told

13   now are Plata resources.

14   I think there is a lot of confusion in the field, not

15   necessarily for anything that's actually been ordered by the

16   Plata Court or by the Receiver, but a lot of -- a lot of

17   misperception and a lot of anticipation.  And I think a lot

18   of people in the Department really don't know what to do.

19   And there is a real lack of direction.

20   I think it is crucial that the message -- the joint

21   message of the court here today be communicated and that --

22   but that as soon as possible, the kinds of conflicts that are

23   already arising in the field be resolved.  I think there are

24   already conflicts right now.

25   The other concern I think we will work through is

9

1    issues of notice to the class and class counsel as to what's

2    happening.

3            Sometimes thinks are moving rapidly.  It is good they

4    move rapidly, but it is also important that counsel have a

5    chance to understand what's going on and participate in the

6    process.

7            And I think that we can work together with our

8    co-counsel, Prison Law Office, very easily, but we all need

9    to be kept informed of the actions of the Receiver so that we

10   can have some input.

11           We will not slow things down, but I think we add a

12   perspective.  And we have a duty to provide the information

13   that we have from our clients and from our experience to

14   inform the Receiver as to what has happened in the past and

15   what at least we believe is necessary in certain situations.

16           JUDGE KARLTON:  Thank you, Mr. Bien.

17           Mr. Specter.

18           MR. SPECTER:  Thank you, Your Honor.

19           One of the first things Bob Sillen said when he met

20   with us was this sort of oddness of the dichotomy of all

21   these cases.  You know, there is one for dental care, one for

22   mental health, one for medical care.  And he came from a

23   place, quite appropriately, where there is not that kind of

24   dichotomy.

25           I mean, our interest as counsel for the prisoners is

10

1    to have them treated as patients for all their needs

2    regardless of what case it falls under.  And we very much

3    appreciate the fact of the courts willingness and stance and

4    position to work together in these two cases.  We think that

5    accomplishes that goal very much.  So we appreciate that.

6            We also pledge, as my colleague, Mr. Bien did, to

7    work -- work as quickly as possible and as hard as necessary

8    in order to accomplish any of the goals that will effectuate

9    the changes that we all think need to be done.

10           And I also want to echo Mr. Bien's comments about the

11   fact that it is important for us to be, while we're moving

12   fast, we have a duty to our clients, in both cases, and it's

13   important for us to be kept informed even as things move so

14   that we can inform the changes and advise our clients about

15   what is happening and what the plans are to happen so they

16   can have some faith that things are going to get better.

17           Because at this time, as you sort of alluded to,

18   there are a lot of rumors flying around in the field.  We get

19   lots of letters saying, "What's going to happen?  We know the

20   Receiver is appointed."  So we look forward to sharing that

21   information with our clients and helping the Receiver and the

22   Special Master in any way we can.

23           Thank you.

24           JUDGE KARLTON:  Who speaks for the State?

25           MS. EAST:  Your Honors, defendants very much welcome

11

1   this coordination.

2        The Department has tried to move toward a vision of

3   health care, kind of what plaintiff's counsel has alluded to

4   as well.  And certainly having all the different cases tends

5   to fragment that.  So the State very much appreciates the

6   coordination and will certainly, of course, work very, very

7   closely with the Masters and Receiver.

8        And we would also add that because Mr. Hagar is also

9   involved on the Receiver staff, some of those issues

10   coordinate and conflict in some cases with Madrid.  So we

11   could look towards being able to coordinate that as well.

12        And we would request that perhaps at some point

13   consideration be given to working with the dental case

14   because --

15        JUDGE KARLTON:  With the dental case?

16        MS. EAST:  That's Perez.  That is Judge White.

17        JUDGE KARLTON:  You know what, until this morning I

18   didn't know there was a dental case.

19        MS. EAST:  This is why coordination is so good.  And

20   for that very reason.  Perhaps that case is not even close to

21   any of these other two cases, but --

22        JUDGE KARLTON:  There is no judgment entered in that

23   case?

24        MS. EAST:  Your Honor, it is a stipulation.  It's in

25   the process of going through certifying the class and class

12

1    comments.  So it is very much behind, but, again, possibly

2    consolidating and coordinating the tours and so forth might,

3    again, get us closer to that vision of health care rather

4    than different class actions.

5         JUDGE HENDERSON:  Have any of counsel talked to

6    Judge White?  He's in the same building.  I may even talk to

7    him this afternoon if I get back.  Have you talked to him

8    about this possibility?

9         MS. EAST:  Your Honor, he's aware of that.  He

10   certainly is.  Because he knows that initially Perez was

11   considered at one point perhaps to be part of Plata.  So he

12   knows that was broken out.

13        JUDGE HENDERSON:  Okay.

14        MS. EAST:  Thank you.

15        JUDGE HENDERSON:  In partial response to something

16   that Mr. Specter just said, and in interviewing for a

17   Receiver and finally settling on Mr. Sillen, one of the

18   things we talked about, and Mr. Sillen made clear, was his

19   notion and mine of transparency.  That there would be

20   transparency here.  Nothing would be done in secret or

21   decided in secret.

22        And I think that is consistent with your requests,

23   and I would certainly expect Mr. Sillen to be in

24   communication with you and let you know.

25        You've certainly learned by now he's not bashful, and

13

1     I think he'll be in communication with you about what he's

2     doing and will also be receptive to your input.

3          JUDGE KARLTON:  You know, I do want to say we're in a

4     new world here.  You know, this is the first Receiver, to my

5     knowledge, that has ever been appointed in a prison case.  So

6     we're feeling our way along.

7          At the same time, Mr. Sillen is developing his

8     approach and learning what the problems are.  And, you know,

9     we believe that we, in Coleman, are making substantial

10    progress.  You know, it is nothing to boast about, it is

11    almost eleven years, but we're making substantial progress.

12         And just the fact that we've had those differences

13    and experience are probably telling about the way lawyers

14    have understood how to approach the matter.

15         And, you know, I hope and I'm certain that -- Judge

16    Henderson and I have been friends for long before we came on

17    the bench.  You know, we'll work it out.  I must confess I

18    suspect that there will be some bumps along the way, and

19    about all we can do is say that there will be some bumps

20    along the way, and we'll just have to find ways of

21    straightening them out.

22         Anything else you want to say?

23         JUDGE HENDERSON:  No.  I think you've covered it.

24         JUDGE KARLTON:  Unless somebody has something to say,

25    we're going to adjourn the hearing.

14

1          Stand adjourned.

2          Thank you, folks.

3          (Off the record at 02:04 PM)

4                        ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      REPORTER'S CERTIFICATE

 2                         ---o0o---

 3
     STATE OF CALIFORNIA   )
 4   COUNTY OF SACRAMENTO )

 5

 6
          I certify that the foregoing is a correct transcript
 7
     from the record of proceedings in the above-entitled matter.
 8

 9

10             IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, CALIFORNIA on this 19TH day of
11   JUNE, 2006.

12

13

14            Catherine E.B Bodene

15            CATHERINE E.F. BODENE,
              CSR NO. 6926
16

17

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

Exhibit X

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
~amento, CA 94283-0001



September 1, 2006

Robert Sillen, Receiver                         J. Michael Keating, Jr., Special Master
Office of the California Prison Receivership     285 Terrace Avenue
1731 Technology Drive, Suite 700                Riverside, RI 02915
San Jose, CA 95110

## RE: PITCHESS DETENTION FACILITY CLOSURE AND ITS IMPACT ON MEDICAL AND MENTAL HEALTH PROGRAMS

Dear Sirs:

This letter is to advise you of the recent action taken by Los Angeles County to cancel a long-standing contract with the California Department of Corrections and Rehabilitation (CDCR) for approximately 1300 beds at their Pitchess Detention Facility (PDF).  Los Angeles County officials advised CDCR that all CDCR inmates must be out of the PDF no later than the end of January 2007.  As a result of this decision by Los Angeles County the CDCR has begun planning to absorb this increased population within the mandated timeframe.

In order to accomplish the task of increasing the CDCR population by 1300 inmates, additional reception center beds need to be identified, the inmates currently in these beds need to be moved out and an increase in current institution population will be required.  The draft plan has nine institutions involved with California State Prison-Los Angeles (CSP-LAC), Folsom State Prison (FSP), Pleasant Valley State Prison (PVSP), and Mule Creek State Prison (MCSP) experiencing the most significant impacts to its inmate population and programs.  The draft plan will result in thousands of inmate moves over a 13-week period scheduled to begin in September 2006.

The Division of Correctional Health Care Services (DCHCS) has identified a number of significant issues/concerns relative to the above draft plan and I am compelled to advise you accordingly.  Additionally, staff have identified actions that could be taken to mitigate the potential harm to our inmate-patient population regarding this mass movement of inmate-patients.

## MEDICAL AND MENTAL HEALTH ISSUES/CONCERNS

- The medical and/or mental health status of the 1300 PDF inmates is unknown.  Our current demographics indicate that a minimum of 20 percent will require mental health services.  These mental health services will include all levels of care, including but not limited to licensed Mental Health Crisis Bed (MHCB), and intermediate or acute care at Department of Mental Health (DMH).  The CDCR is currently over capacity for MHCBs and there is a long wait list for high custody intermediate beds with DMH.  Additionally, approximately 10 percent of the current population is identified as meeting medical

Robert Sillen, Receiver
J. Michael Keating, Jr., Special Master
Page 2

Chronic Care Program (CCP) criteria. There is a subset of CCP inmate-patients who require specialized medical care, such as dialysis, or licensed medical care due to the severity of their medical conditions. These patients need to be housed at designated institutions where these specialized services can be provided or be housed in licensed medical beds

**Recommendation:** Form a strike team to go to the PDF to conduct medical and mental health assessments on the 1300 inmates and send inmate-patients directly to the appropriate location in order to receive appropriate medical and/or mental health care. It is noted that Atascadero State Hospital has available beds, which could be used for lower security level inmate-patients. A team of staff could be mobilized within a reasonable period of time to begin these medical and mental health assessments. A custody component would also be part of these assessments to ensure safety and security concerns are taken into consideration in placing inmate-patients directly into the appropriate institution for medical and/or mental health purposes.

- **Medication management**: It is unknown if the impacted institutions will have adequate pharmacy support and/or capacity to handle the increased inmate-patient population and the potential increase in medical and/or mental health patients. Inmates transferring out of an institution are required to have a 30-day supply of their prescribed medications in order to ensure continuity of care upon arrival at the new institution. Due to the thousands of inmate-patients moving over the proposed 13 weeks, current pharmacy staff will not be able to meet this policy requirement.

- **Medical Records**: Prior to an inmate-patient being transferred to another institution, their Unit Health Record (UHR) must be brought up-to-date with any pending filing. It is unknown as to what the additional resources will be required in order to up date all UHRs prior to transfer. The current vacancy rate for health records at the impacted institutions will also impede the DCHCS ability to clear up all back logged filing in a timely manner.

## MENTAL HEALTH ISSUES/CONCERNS

- Upon movement of a mental health inmate-patient, they must have a mental health evaluation completed at the receiving institution. For FSP alone, they are scheduled to receive 40 Correctional Clinical Case Management System (CCCMS) inmates per week for 13 weeks in a row. In order to conduct all of these required evaluations, the existing mental health staff will have to be redirected from their primary responsibility of direct patient care.

- Institutions scheduled to increase their CCCMS population may already be at or above the Court ordered limit of 130 percent of capacity.

- Current vacancy rates for mental health clinical staff may contribute to an institution's inability to adequately provide mental health care. For example, CSP-SAC has redirected

Robert Sillen, Receiver
J. Michael Keating, Jr., Special Master
Page 3

mental health staff from its CCCMS and Enhanced Outpatient Program (EOP) programs in order to provide services to the MHCB inmate-patients. Other institutions such as PVSP have and continue to experience severe staffing vacancies for mental health clinical and support staff. Adequate mental health services would not be provided.

**MEDICAL ISSUES/CONCERNS**

- Each of the identified institutions will be tasked with conducting an intake assessment and TB test on all new arrivals. Additionally, all inmates transferring out of the institution require a medical summary form be completed prior to transfer so that the receiving institution is aware of the type of patient they just received. Due to the thousands of inmates moving over the planned 13 weeks, these policy requirements cannot be met with the current staffing.

- All new arrivals to an institution require a medical screening interview and review of their UHR. Based on the inmate-patients medical factors/conditions, the Registered Nurse must make a disposition as to when the inmate-patient needs to see a Primary Care Provider (PCP), i.e. urgent or routine. Medical staff time will be nearly consumed in just new arrival intake appointments during the schedule 13-week implementation of the draft plan. Additional PCP and RN staff will be required in order to meet the patient's medical needs in a timely manner.

- Inmate-patients currently scheduled for outside appointment for specialty services will have to have the appointment cancelled and rescheduled at their new institution. This will result in an increased delay in providing necessary medical services.

- The impacted institutions will continue to have their existing medical missions, however, ensuring that an inappropriate medical needs inmate-patient is not transferred to a location that cannot provide adequate services cannot be guaranteed. For example, inmates who meet Valley Fever exclusion criteria may be inadvertently moved to an institution within the identified endemic area. This error will then result in a subsequent move of the inmate to mitigate the potential exposure to Valley Fever.

We have shared the above issues and concerns with the medical management staff at the impacted institutions. They have been asked to develop a plan regarding what additional resources are needed to ensure patient care. As each institution will be impacted to a different degree, each institution will have to determine its resource needs.

At this time it is clear that there are more questions then answers. However, we will continue discussion with the Division of Adult Institutions, and the County of Los Angeles, to develop an acceptable transition plan with appropriate timeframes and a commensurate implementation plan to the satisfaction of all stakeholders.

Robert Sillen, Receiver
J. Michael Keating, Jr., Special Master
Page 4


If you should have any question, please contact me at 916-327-0033.

Sincerely,

PETER FARBER-SZEKRENYI, DR. P.H.
Director
Division of Correctional Health Care Services

cc: James Tilton
    Dave Runnels
    Darc Keller
    John Dovey
    Doug McKcever
    Tim Rougeux

Exhibit Y

DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Nathaniel Roberts, Individually and on Behalf of the Certified Class, et al., | ) ) | CASE NO. 4:03 CV 2329 |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | <u>O R D E R</u> |
| v. | ) | |
| | ) | |
| County of Mahoning, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

On March 10, 2005, this Court issued a Memorandum Opinion (Doc. No. 193), including Findings of Fact and Conclusions of Law. This Court found that the Class members (1) are being denied their constitutional rights not to be punished without due process of law and/or not to be subjected to cruel and unusual punishment, and (2) are being denied their constitutionally-protected right of access to the courts.

This Court found the remedy in this case is subject to the provisions of 18 U.S.C. §3626(a). This Court appointed Vincent Nathan as Special Master (Doc. No. 108) consistent with the provisions of 18 U.S.C. §3626(f)(2)(A), (B) and (C). Recognizing that deference to defendants to develop a remedial plan in the first instance is consistent with the United States Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343, 362-63 (1996), this Court directed the Special Master to assist the parties, specifically the Defendants, in attempting to find a solution to the problems which created the unconstitutional conditions at the jail. The Special Master in his Fourth Report (Doc. No. 132) formally recommended that the Defendants form a

(4:03 CV 2329)

working group to develop a remedial plan to deal with the constitutional issues raised regarding

the jail and to examine the justice system in Mahoning County to see how changes in the system

could alleviate the overcrowding component of the unconstitutional conditions in the jail. There

being no objection to this recommendation, this Court's Order of August 10, 2005 (Doc. No.

132) adopted the recommendations of the Special Master's Fourth Report. This Court's August

10, 2005 Order constituted an order for a less intrusive relief in compliance with 18 U.S.C. §

3636(a)(1) of the Prison Litigation Reform Act.

Pursuant to this Court's Order (Doc. No. 133), the Criminal Justice Working Group

("CJWG") was formed and began meeting in August of 2005. Over the next ten months, the

CJWG met and made multiple reports of its progress. (*See*, Doc. Nos. 142, 154, 166 and 175).

On May 1, 2006, the CJWG submitted its Final Report to this Court. (Doc. No. 191). This

Court appreciates the great amount of effort and work that has gone into the formation of this

final report and the CJWG's attempt to solve those problems outlined in the Memorandum

Opinion of March 10, 2005. Further, the Defendants have reported that progress has been made

toward resolving a number of the findings in that Memorandum Opinion including legal access,

maintenance, outdoor recreation, and training. However, the central issue of population control

to prevent future overcrowding remains unresolved.

By way of agreement between the Plaintiffs and Defendants, in May of 2005 the

population at the Mahoning County Jail was limited to no more than 296 inmates during the

remedial phase of this action. This Court recognized this agreement in its Order of April 7,

2005. (Doc. No. 117). Thereafter, due to the Common Pleas Court Ordered Release Mechanism

2

(4:03 CV 2329)

("Release Mechanism"), the population cap was implemented. *See* CJWG First Interim Report (Doc. No. 142, Exhibit G). After implementation of the Release Mechanism, the population crept from 296 to upwards of 400. During this interim period, the parties attempted to regain control of the population by implementing additional procedures. *See* CJWG Second Interim Report (Doc. No. 154, pp. 12-13 and Exhibit K). These procedures fell short, in part as a result of judicially imposed "Do Not Release" ("DNR") Orders by the misdemeanant, county, and common pleas courts for certain inmates who would have otherwise been released pursuant to provisions of the Release Mechanism. This left the Sheriff in a predicament of violating such DNR orders, the Common Pleas Court Ordered Release Mechanism, and/or the parties' agreed population limit in this case.

The Defendants reported that, on January 10, 2006, the Sheriff's Department released an inmate with a DNR Order issued by a Youngstown Municipal Court Judge who then sought to have the Sheriff held in contempt. Such action prompted the Defendants to file a writ of prohibition in the Seventh District Court of Appeals seeking to have the appellate court determine the jurisdiction of the lower courts to issue "Do Not Release" Orders in violation of the Mahoning County Common Pleas Court Ordered Release Mechanism. The Seventh District Court of Appeals granted the writ of prohibition on May 22, 2006 by a vote of 2 to 1.[1] The decision, favorable to the Defendants, gives the Sheriff the ability to control the population using the Common Pleas Court Ordered Release Mechanism and prohibits the individual misdemeanant courts from affecting the population with DNR orders. However, in a newspaper

---

[1] A copy of the Opinion and Dissent are attached hereto as Appendix 1.

3

(4:03 CV 2329)

article in *The Vindicator*, dated May 23, 2006, counsel for the City of Youngstown indicated that the City was contemplating filing an appeal to the Ohio Supreme Court or seeking a writ of prohibition regarding the Emergency Release Mechanism.[2]  Therefore, the possibility of a continuing challenge to the Sheriff's ability to control the population with the Common Pleas Court Release Mechanism remains troubling to the Court.[3]

In order to attempt to maintain a constitutional facility and remedy the population issue created by the DNRs, the Sheriff made the decision to open two additional pods.  *See* CJWG Fourth Interim Report.  (Doc. No. 175, Exhibit B).  The Sheriff represented to this Court that these two additional pods are being run in the same constitutional fashion as the tower which was agreed to hold 296 inmates.  Imperative to the issue of population control is staffing. However, due to the increasing jail population, in-service training has been delayed in 2006 in order to insure that adequate staffing levels are being properly maintained.

Defendants, through the CJWG, have attempted to implement a plan to deal with the overpopulation; but this plan remains dependent on factors beyond the parties' control.  In order to maintain population levels, the Sheriff must have the ability to release inmates to prevent overcrowding based on his staffing levels available on any particular day.  This requires a commitment from all common pleas, municipal, and county judges to maintain an agreed-upon

---

[2]  A copy of the article, obtained from the newspaper's website, is attached as Appendix 2.

[3]  An editorial published on May 25, 2006 in *The Vindicator*, the major newspaper in Mahoning County, encouraged the City of Youngstown to challenge the opinion taken by the majority in the prohibition action as set forth in Appendix 1.  A copy of that editorial, clipped from the online digital version of the newspaper, is attached as Appendix 3.

4

(4:03 CV 2329)

population cap. But, to date, only the Common Pleas and County Court Judges have agreed by

Court Order to an Overcrowding Release Mechanism. *See* CJWG Final Report (Doc. No. 191,

Exhibit E).

Since the Sheriff has redirected staff hired as relief for training in order to maintain

security to open additional pods to accommodate the DNRs, at some point he will have to close

pods and reduce the population to accomplish training. Thus, without a mechanism to release

inmates to accomplish training and to maintain population caps based on the number of staff

available to provide adequate staffing, the Defendants are unable to control the jail population

and to prevent unconstitutional overcrowding.

As of May 5, 2006, the jail population stood at 463 inmates.[4] Consequently, this Court

finds that it is unlikely that the plan to maintain constitutional population levels at the jail will be

effective without some intervention by this Court in the form of a prisoner release mechanism.

Accordingly, this Court, in compliance with the Prison Litigation Reform Act of 1995

and the holding in *Lewis v. Casey*, 518 U.S. 343, 362-63 (1996), finds that the Defendants have

been given an opportunity to correct the problem of jail overcrowding and have been unable to

do so without further intervention by this Court.

It is hereby ordered, in accordance with 18 U.S.C. §3626(a)(3)(D), that the matter of

determining a prisoner release order be referred to a three-judge panel in due course in

accordance with 28 U.S.C. § 2284.[5]

---

[4] *See* attached Appendix 4.

[5] The responsibility to appoint a three-judge panel rests with the Chief Judge of the Sixth
(continued...)

5

(4:03 CV 2329)

Notwithstanding this decision and pending the convening of a three-judge district court, this Court encourages the CJWG to continue its efforts to achieve a resolution of all issues in this lawsuit without further intervention by this Court.

IT IS SO ORDERED.


  May 25, 2006                                                         *s/ David D. Dowd, Jr.*
Date                                                        David D. Dowd, Jr.
                                                        U.S. District Judge

---

[5] (...continued)

Circuit, Danny Boggs.  Under the law, the three-judge panel must include at least one circuit judge.  The Court is in the process of requesting Chief Judge Boggs to appoint the panel by Friday, June 30, 2006.

6

# Exhibit Z

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INMATES OF OCCOQUAN, et al.,      )
                                  )
            Plaintiffs,           )
                                  )
v.                                )      Civil Action No.
                                  )      86-2128 (JLG)
MARION S. BARRY, JR., et al.,     )
                                  )
            Defendants.           )
                                  )
_____   )

**FILED**

**JAN 2 0 1998**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

POPULATION CONSENT ORDER

As required by 18 U.S.C. § 3626(a)(3), this three-judge Court was convened, upon the request of the parties, by the District Judge in this case pursuant to the procedures set forth in 28 U.S.C. § 2284.

Based upon the Plaintiffs' Motion for the Appointment of a Receiver and Imposition of Fines Regarding Personal Safety, Defendants' Opposition thereto, the findings of the Special Officer contained in her September 29, 1997 Report on Defendants' Compliance with the Orders Related to Personal Safety, which were adopted by the District Judge, the exhibits appended thereto, which were admitted into evidence by the District Judge, and the record herein, the parties stipulate and the Court finds as follows:

The District Court has previously entered orders in this case that have failed to remedy the deprivation of plaintiffs'

Inmates of Occoquan v. Barry
Population Consent Order
Page 2

constitutional rights that are remedied with this Order.

Defendants have had a reasonable amount of time to comply with

the previous court orders entered in this case.  Thus, the

prerequisites for convening a three-judge court, as set forth

in 18 U.S.C. § 3626(a)(3)(A), have been satisfied.

It has been demonstrated by clear and convincing evidence

that crowding is a primary cause of the high level of violence

described in the Special Officer's Report and that the

violence constitutes a violation of the plaintiffs' federal

constitutional rights.  It has also been demonstrated by clear

and convincing evidence that no relief other than that set

forth herein will remedy this violation.  Thus, the factual

predicate for imposition of a prisoner release order, as set

forth in 18 U.S.C. § 3626(a)(3)(E), has been established.

Furthermore, the relief set forth herein is narrowly

drawn, extends no further than necessary to correct the

constitutional violation, and is the least intrusive means

necessary to correct the violation.  Thus, the requirements

of 18 U.S.C. § 3626(a)(1) for imposition of relief in a civil

action regarding prison conditions are satisfied.

Accordingly, it is hereby ordered that Defendants shall

maintain the population at the Occoquan Facility at or below

Inmates of Occoquan v. Barry
Population Consent Order
Page 3

1400 inmates and shall further reduce the population to 1200 inmates or below by March 31, 1998.  This population ceiling can be exceeded only if the Director of the D.C. Department of Corrections files with the Court a written declaration that (1) there has been an unusual and significant increase in the number of inmates committed to the D.C. Department of Corrections; (2) the Department is unable to safely house these additional inmates in other institutions; and (3) these inmates can be safely housed at Occoquan during the proposed time period.  If defendants seek to exceed the ceiling for a period of greater than 14 days, they shall file a motion with the Court within the 14-day-period seeking the Court's approval to temporarily exceed the limit for a specified additional period.  Such approval shall be granted by the Court only if the defendants demonstrate that the above three factors are satisfied.  In no event shall the facility house more than 1673 inmates.

This Order shall remain in force until such time as the Occoquan Facility ceases to be used by defendants to house inmates.

_____          _____
United States District Judge              United States District Judge

Inmates of Occoquan v. Barry
Population Consent Order
Page 4

_____
United States Circuit Judge

Dated:    January 20, 1998

Consented to by:

JOHN M. FERREN
Corporation Counsel, D.C.
WILLIAM J. EARLE
Acting Deputy Corporation Counsel, D.C.
Special Litigation Division

_____        _____
RICHARD S. LOVE (#340455)               AYESHA N. KHAN (#426836)
Acting Assistant Deputy                 ACLU National Prison Project
Corporation Counsel                     1875 Connecticut Ave., NW
Special Litigation Division             Suite 410
441 Fourth Street, NW                   Washington, DC    20009
6th Floor South                         (202) 234-4830
Washington, DC    20001
(202) 727-6295

Attorney for Defendants                 Attorney for Plaintiffs

Dated:  November 20, 1997

Exhibit AA

Apr26-06

1

```
 1                    SACRAMENTO, CALIFORNIA
 2            WEDNESDAY, APRIL 26TH, 2006 - 2:00 PM
 3                        ---o0o---
 4          THE CLERK:  All rise.  Court is in session.
 5          The Honorable Lawrence K. Karlton is presiding.
 6          THE COURT:  Please, be seated.
 7          Good morning, Ladies and Gentlemen.
 8          May I have counsel approach the podium, state your
 9   appearance for the record and indicate whether you will be
10   arguing.
11          MR. BIEN:  Good afternoon, Your Honor.  Michael Bien
12   on behalf of plaintiffs.
13          MS. TILLMAN:  Good afternoon, Your Honor.  Lisa
14   Tillman on behalf defendants.
15          THE COURT:  You are only two lawyers that will be
16   talking this afternoon?
17          MS. TILLMAN:  Yes, Your Honor.
18          MR. BIEN:  Yes, Your Honor.
19          THE COURT:  All those other folks are welcome, but
20   just be quiet.
21          I do want to talk a little bit about what I think is
22   going on, and then I'm going to hand out some questions to
23   the parties, ask the defendant -- take a recess, ask the
24   defendant to consult with those persons that I've asked to be
25   present, find out who is the appropriate person to answer
```

Apr26-06


CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360


2

1    those questions, discuss it with them so that they know what

2    it is we're going to be talking about, and then we'll put

3    them on the stand and try and get the answers that I think

4    are critical.

5         I want to start by making an observation that I am in

6    a sense quite -- Actually, you folks can sit down because I'm

7    about to make a speech.

8         MS. TILLMAN:  Thank you, Your Honor.

9         THE COURT:  I'm happy that the plaintiffs have

10   objected to some of the matters because it gives me an

11   opportunity to have a hearing that I've been thinking I

12   needed for some time.

13        It is not unimportant to the Court that the judgment

14   in this case was entered 11 years ago.  And we are still in a

15   place in which the defendants have been unable to bring the

16   delivery of psychiatric care up to constitutional standards.

17        I don't want to be misunderstood.  I very much

18   understand how much progress has been made, but in a sense --

19   and I don't mean this disrespectfully, though I suspect

20   that's how it's going to sound -- what we've managed to do is

21   crawl our way out of the snake pit.

22        Well, good for us, but that's hardly the standard

23   required by the Constitution.

24        I have profound trust in my Special Master.  I got so

25   lucky, I can hardly believe it.  Nonetheless, it is 11 years,

Apr26-06

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3

1   and we are not done.  And that is unacceptable.  It is just

2   plain unacceptable.

3          I promised myself I wouldn't lose my temper, and I'm

4   not going to.

5          In a sense, this hearing is to help me understand why

6   we are where we are, and what we can possibly do to bring the

7   State into conformance with the Constitution of the United

8   States.

9          That's what this case is about.  Every defendant in

10  this case is in violation of the law.  That is shocking.

11  That is shocking.

12         And that we go on and talk about building out to

13  19 -- to 2011, or God knows how much beyond that.  There's no

14  sense of urgency.  There's no sense that the defendants are

15  in violation of the law.

16         So that's one purpose in this hearing.

17         Another purpose is engendered by the fact that

18  Judge Henderson has ordered a receivership in Plata.  And we

19  are going to have a joint hearing, as I think you all know,

20  on June the 8th at ten o'clock here in Sacramento.  I offered

21  to go down to San Francisco, but I think Judge Henderson,

22  because we met down there twice, thought it was his turn to

23  come up.  And it's important for me to be in a position when

Page 3