Exhibit BB

mental illness or disorders who have received inadequate care, or none at all (Human Rights Watch 2003). This, in turn, has repeatedly invited legal scrutiny and extensive litigation. Such litigation involves the basic constitutional right to adequate mental health care for those with serious mental illness and the related legal right to avoid penal conditions so harsh that they "cause" mental illness or exacerbate an existing condition (Cohen 1988, 1998).

In this chapter, I present an overview of segregation confinement, discuss the inherent difficulties inmates housed in these settings face, and address the deleterious psychological effects of prolonged isolation, especially for the offender with mental illness. Examples of common barriers to rendering adequate mental health treatment in administrative segregation are discussed. I provide guidelines for the effective screening, monitoring, and treatment of segregated inmates so that both community standards of care and constitutional requirements are met.

## SEGREGATION CONFINEMENT

Prison administrative staff use segregation—a setting in which an inmate is kept for as many as 23 hours per day in his or her cell—as a management tool for the control of prisoners deemed disruptive, dangerous, or predatory or who otherwise violate institutional rules of conduct. Long-term segregation, often called *administrative segregation*, presents a heightened risk of injury to inmates with mental illness and is the principal environmental focus of this chapter. Administrative segregation usually lasts at least 3 months and may continue indefinitely, even for many years. Offenders placed into administrative segregation have been judged as representing serious management problems who jeopardize the safe and orderly management of an institution or prison system. Inmates considered to be the most problematic and incorrigible offenders include sexual predators, gang leaders, enforcers, extortionists, drug dealers, escapees, insurrectionists, and aggressive prisoners with mental illness.

Isolation of an inmate in administrative segregation is meant to separate unruly offenders from the prison general population, insulate segregated inmates from one another, and act as a deterrent to potential wrong-doers, and motivate the insubordinate inmate to conform his or her actions to institutional standards of acceptable behavior. In theory, the judicious use of segregation confinement provides a safer and more orderly correctional facility for staff and inmates. The consignment of inmates to segregation is a relatively common occurrence. In early 2001, 36 states reported a total of more than 49,000 inmates in segregation confinement (Camp and Camp 2002), and in 2000 more than 20,000 offenders were housed in supermaximum-security level facilities (Human Rights Watch 2000).



# Offenders With Mental Illnesses in Maximum- and Supermaximum-Security Settings

Gary E. Beven, M.D.

The provision of mental health care in administrative segregation unit settings, including those found in maximum- and supermaximum-security prisons, presents a difficult challenge. Often the most violent and seriously behaviorally disordered offenders are housed in these facilities, and they are commonly kept for extended periods of time in solitary confinement and isolation. Arguably, these institutional settings are the most stressful areas both for inmates and for corrections staff. Significant barriers to providing adequate care can stand in the way of the mental health clinician's mission, and the provision of clinically necessary treatment is often considered to be at odds with institutional security requirements (Eshem et al. 2001).

Prolonged isolation of inmates in segregation poses an inherent risk of psychological deterioration that cannot be ignored but that becomes difficult to address effectively when it occurs. As a result, many maximum- and supermaximum-security prisons and other administrative segregation facilities have inadvertently become warehouses for aggressive inmates with serious

Inmates housed in administrative segregation may be kept in a discrete solitary confinement area of a prison with several security levels or in a maximum- or supermaximum-security institution designed specifically for such a purpose. Administrative segregation facilities are labeled by a variety of euphemisms, including "special housing unit," "secure housing unit," "intensive management unit," "administrative control unit," and "maximum or supermaximum security unit or prison." An inmate's administrative segregation time ends when prison administrators declare that it is over, and signs of unrepentence or continued recalcitrant behavior may prolong the sanction indefinitely. Because the decision to confine is labeled "administrative" and may not be based on a specific violation, the protections of normal due process are often lacking in placement and retention determinations.

Supermaximum-security facilities are considered to be the most isolative, incapacitating, and restrictive of penal settings (Holton 2003; Riveland 1999). Built specifically to house the most dangerous offenders, a supermaximum-security-level institution is an extreme form of administrative segregation. Unique characteristics of these facilities include prolonged lengths of stay, architectural design that relies on automation and diminished human contact as security safeguards, greatly diminished environmental stimulation, and austere privilege restrictions that require of inmates high levels of patience and submission. Partly because of these factors, some have alleged that supermaximum-security prisons are inhumane, nonrehabilitative, and psychologically injurious, especially for mentally ill offenders. Consequently these facilities have triggered controversy and considerable litigation, the most basic of which challenges the confinement of inmates with a history of mental illness in these facilities (Harrington 1997; Metzner 2002).

## Life in Segregation Confinement

No matter its duration, life in a prison segregation unit is a hardship. The restrictions placed on inmates in such settings are many, and while incarceration itself is difficult, the contrast between life in general population and segregation is striking.

A jaunt through a typical correctional institution's general population often reveals a great deal of relatively normal activity, such as a baseball game in the recreation yard, inmates returning from work in the prison industry building, and religious celebration in the chapel. One may encounter a gymnasium with inmates playing basketball, a busy dining hall, and a visiting area filled with families, offenders and their children. Segregation units, in contrast, are notable for being generally devoid of any such productive activity, and living conditions are often unpleasant. The restrictions placed on offenders in these settings are burdensome, and virtually every aspect of an inmate's

**TABLE 10–5.    Common restrictions in segregation confinement**

- In cell 23 hours per day
- Noncontact visitation
- Solitary recreation
- No work
- No religious programs
- No group programs
- No school versus self-study in cell
- Movement only while escorted and shackled
- Meals alone in cell
- Restricted shower schedule
- Clothing restriction
- No (or restricted) access to television, radio, and phone
- No library/law library access
- Restricted commissary list
- Restricted list of personal items in cell
- No art or music programs
- No privacy (sick-call, mental health staff and administrative staff visits at cellfront)
- Diminished or excessive environmental stimulation
- No social contact with other inmates except verbal communication through door

life is adversely affected. A walk through any segregation unit likely will reveal prisoners sleeping, reading, drawing, pacing, praying, staring out the cell door, or otherwise engaged in solitary activity. The unit may be nearly silent or deafening, as a chorus of pounding, racial epithets, insults, accusations, and profanity reveal that unceasing boredom and anger have taken their place. Table 10-1 summarizes common segregation confinement restrictions.

## Psychological Effects of Prolonged Isolation

Prolonged isolation of any kind may cause psychological deterioration. The deleterious consequences of long-term isolation have been identified in vastly disparate populations, including Russian cosmonauts (Kanas 2000; Kozerenko et al. 2000), Antarctic researchers (Palinkas et al. 2000), and incarcerated felons (Toch 2001). Cosmonauts participating in long-duration space missions have experienced fatigue, irritability, dysphoria, mood instability,

withdrawal, territorial behavior, sleep disturbance, and cognitive performance decrements. Indeed, one of the principal human hurdles to a potential mission to Mars is the National Aeronautic and Space Administration's (NASA) ability to successfully select and then adequately monitor astronauts' ability to tolerate the extreme isolation and related psychological stress such a voyage would entail over the course of 24–36 months (Arehart-Treichel 2002).

Although some segregated offenders may remain entirely unscathed by the experience, long-term segregation confinement is potentially psychologically detrimental (Metzner 2003; National Commission on Correctional Health Care 2003; Toch 2001). Even for inmates with no previous history of a psychiatric disorder, prolonged solitary confinement may lead to a decrement in functioning and the insidious development of psychological deterioration (Grassian 1983; Grassian and Friedman 1986; Haney and Lynch 1997). Indicators of behavioral decline include 1) restlessness and agitation; 2) concentration and memory impairment; 3) irritability, anger, and frustration intolerance; 4) apathy, social withdrawal, and dysphoria, 5) mood and affective lability; 6) generalized anxiety and panic attacks; and 7) irrational suspicion and paranoia.

Over time, a mental health clinician making regular rounds on an administrative segregation unit may notice a previously "normal" inmate pacing restlessly; becoming unaware of the date or time spent in isolation; refusing family visitation and correspondence; declining meals; failing to regularly shower, clean the cell, or exercise; revealing sudden and irrational fits of anger or accusation; ignoring entreaties of therapeutic interaction; sleeping throughout the day and remaining awake during the night; mumbling or speaking to himself or herself; and refusing medical or psychiatric evaluation. It is this author's experience that in segregated inmates without preexisting mental illness, signs of psychological decline typically abate upon release and return to a general population living environment.

The degree of negative psychological impact caused by prolonged segregation is correlated with several factors, including the duration of segregation, the extent of isolation, the degree of environmental stimulation deprivation, and the inmate's premorbid psychological fitness (Grassian and Friedman 1986; Haney and Lynch 1997). Administrative segregation units also commonly produce gross sensory overstimulation (Metzner 2002). The correctional environment may turn clamorous, abusive, and chaotic, as social relationships between segregated inmates become stilted and acrimonious. In this setting, sleep deprivation and intense hostility are common.

Factors with more subtle influence on the psychological impact of segregation include the inmate's perception of the justness underlying the decision to implement his or her segregation, expectations regarding the inmate's abil-

ity to earn release, the length of the inmate's prison sentence, and the inmate's ability to use rationalization as a defense mechanism. This defense may allow the inmate to discover something uniquely positive about the segregation experience, such as freedom from fear of sexual assault in general population or the time to immerse himself or herself in religious study.

## Inmates With Mental Illness in Segregation Confinement

Inmates with mental illness, as a group, are overrepresented in segregation facilities, and correctional mental health experts have asserted that the relative number of seriously mentally ill prisoners housed in segregation is a gauge of the overall quality of a prison system's mental health care (Metzner 2003). Offenders with a history of psychiatric illness are often placed into administrative segregation because of behavior that is related to their mental disorder (National Commission on Correctional Health Care 2001). Examples include a prisoner's being sent into segregation because of assaultiveness that is linked to paranoid delusions, or possessing a "weapon" such as a razor used in a suicide attempt. Other inmates with behavioral disorders who are prone to placement into segregation units include those who have genuine difficulty following rigid prison rules or whose symptoms lead to continual episodes of disruptiveness, outbursts of anger, intrusiveness, or hostility. Inmates in this category include those with mental retardation, borderline personality disorder, mania, organic mental disorders, or impulse-control disorders.

Prolonged segregation produces a more damaging effect on an inmate previously diagnosed as being mentally ill, and it is more common for this group of offenders to be harmed by the experience (Metzner 2002). The stress of long-term segregation may exacerbate preexisting symptoms of mental illness or cause symptoms previously in remission to emerge. This exacerbation or reemergence of symptoms is often compounded by the loss of previously effective multidisciplinary treatment in the general population and the subsequent inadequacy of mental health care in many administrative segregation facilities.

Inmates who deteriorate psychiatrically while in administrative segregation can become enmeshed in a cycle of futility in which behavioral dyscontrol is interpreted by custody staff as intentional disobedience or disruptiveness (Holton 2003). Such an interpretation results in further administrative intervention and prolonged segregation with even greater austerity. This scenario may produce a downward spiral of psychiatric decompensation, behavioral instability, and increasingly self-defeating, yet reflexively administered punitive sanctions that persist indefinitely.

## Common Barriers to Mental Health Care in Segregation Confinement

Security and safety are the cardinal interests of segregation unit custody staff; these issues supersede all others. Consequently, mental health clinicians assigned to work within a segregation facility often have a discouraging task. Segregation unit custody staff frequently assign mental health issues low priority. Within this setting, even highly dedicated and capable mental health clinicians can experience a disquieting sense that their efforts to intercede on behalf of segregated inmates are discounted, or worse, meaningless. An awareness of common obstructions to providing adequate care is necessary to overcome them and also avoid feelings of apathy.

Barriers to the provision of mental health care in administrative segregation generally fall into two categories (Metzner 2003). The first of these comprises philosophical impediments arising from the conviction that segregated offenders manifesting behavioral problems be addressed with orthodox correctional methods, principally additional disciplinary and control measures. This approach, which is based on correctional tradition and training, is effective with inmates whose disruptiveness emanates from volitional actions unrelated to symptoms of mental illness. However, mentally ill inmates often respond poorly to greater restrictions. Subsequent therapeutic intervention by mental health clinicians, including advocacy to divert disruptive mentally ill offenders from administrative segregation into a treatment setting, may be met with derision by custody staff. An awkward scenario may then ensue, in which the correctional mental health clinician feels trapped between a professional duty to the inmate with mental disorder and an allegiance to fellow institutional staff who are responsible for ensuring the clinician's safety. A byproduct of this circumstance is a potential overreliance on the diagnosis of malingering, even in the face of significant behavioral disturbance and self-injury (Bonner 2001). The diagnosis of malingering may arise insidiously as "burned out" clinicians become desensitized by incessant exposure to abusive and indignant offenders. Such abuse can take the form of repeatedly observing disturbing scenes of psychological deterioration (e.g., fecal smearing), having their therapeutic efforts continually thwarted, and facing the concomitant indifference, or perhaps even callousness, of some segregation unit custody staff.

The second category of common hindrance to mental health treatment in segregation is resource limitations. Examples include mental health staff shortages; lack of office space for private interviews and counseling; absence of secure mental health group program facilities; segregation cells that afford inadequate observation, communication, and ventilation; unavailability of maximum security residential care facilities; and insufficient availability of acute

**TABLE 10–6.**  Characteristics of segregation facilities with inadequate mental health care

- Long-term segregation confinement
- No (or discounted) mental health diversion efforts
- Overrepresentation of inmates with serious mental illness in administrative segregation
- Adversarial, or unduly chummy, relationship between mental health and custody staff
- Cursory mental health screening and monitoring
- Disciplining of inmates with mental illness for disruptive behavior regardless of etiology
- Poor lighting, poor ventilation, and inadequate observation of cells
- Interview of segregation inmates occurring without privacy or confidentiality
- Vacant mental health staff positions and large clinician caseloads
- Unavailability of psychotherapy and group programs
- Regular labeling of selfinjurious and suicidal inmates as malingerers
- Psychiatric medication as the sole therapeutic modality for most inmates
- Unavailability of maximum-security residential care
- Severely limited or unattainable psychiatric hospitalization

psychiatric hospitalization. In the face of such physical resource inadequacy, only abbreviated and often substandard mental health care may be rendered—even if a clinician works in a segregation facility where collegiality and compassion are evident. If a mixture of indifference and resource limitations is present, a culture of neglect nearly invariably arises. Table 10–2 lists characteristics common to segregation facilities that provide substandard mental health care.

## MENTAL HEALTH TREATMENT IN SEGREGATION

### Screening and Diversion

Although formal policies may differ, intervention for mentally ill inmates potentially slated for administrative segregation should be initiated at the time of sanction consideration by an institutional rules infraction board or similar administrative body. Following a disruptive or aggressive action by a mentally ill offender, it is recommended that mental health clinicians assist custody staff in determining if symptoms of mental illness influenced the inmate's behavior and if the offender has adequate understanding of the disciplinary proceedings

Case 2:90-cv-00520-KJM-SCR   Document 3638-9   Filed 11/13/09   Page 6 of 38

(Metzner 2003; National Commission on Correctional Health Care 2001). Such an evaluation is crucial if the prisoner is known to be seriously and chronically mentally ill.

Inquiry by correctional mental health staff into an inmate's behavioral instability should include the offender's diagnosis, medication compliance, recently observed symptoms, and possible precipitating or mitigating factors. If the inmate's conduct is related to symptoms of mental illness, treatment rather than discipline is needed, and diversion into a secure correctional mental health unit may avert further psychiatric deterioration in an administrative segregation facility (Kupers 1999). Consider an agitated inmate with paranoid schizophrenia who attacks another inmate without provocation. Further inquiry may uncover poor antipsychotic medication compliance, the development of persecutory delusions, and recent discharge from a residential treatment unit into an outpatient setting. Despite the serious nature of the infraction, correctional mental health clinicians who advocate for diversion to a secure intermediate care facility equipped for the treatment of aggressive, seriously mentally ill inmates make a wise judgment beneficial to everyone—addressing both institutional concerns and the prisoner's treatment needs.

Unfortunately, the majority of disciplinary circumstances are not as clear as this example. In most cases, disruptive or violent acts are in response to common emotions, including anger, hatred, lust, greed, and fear, that occur even in inmates with mental illness. In these cases, involvement of mental health services in adjudication and punitive sanction determination is less helpful. An offender with well-controlled bipolar disorder who sexually assaults another inmate provides an example. If subsequent investigation indicates the brutality was unrelated to active symptoms of his or her mental illness, placement into administrative segregation is likely unavoidable. Nevertheless, the necessary monitoring and ongoing treatment requirements of the segregated offender should become the primary focus of correctional mental health staff.

## Supermaximum-Security Transfers

Transgressions of a very serious nature, such as rape or attempted escape, may trigger a recommendation that the offender be transferred to a supermaximum-security facility. At present, it is considered a best practice that inmates with serious mental illness, or those with a psychological disposition prone to behavioral decay under severe stress, be precluded from transfer to such facilities unless adequate mental health resources are available (Metzner 2002). Inmates vulnerable to deterioration in supermaximum-security facilities include those with any serious mental illness; mental retardation; cognitive disorders such as dementia; a history of self-injury or mutilation; or severe per-

---

sonality disorders (e.g., borderline personality disorder) and a related record of functional impairment due to depression, suicidality, or brief psychosis (Metzner 2003). Prudent record review, a clinical interview, and documentation of any exclusionary factors should occur prior to approval of an inmate for transfer to a supermaximum-security institution and also upon reception at the secure facility. Prisoners who pass through conscientious screening methods yet later behaviorally deteriorate because of the stress of supermaximum-security confinement should be transferred to a segregation facility with fewer restrictions or greater access to mental health treatment.

## Scope of Mental Health Services in Administrative Segregation

Mentally ill inmates housed in administrative segregation require a full breadth of multidisciplinary care to treat active symptoms, maintain psychiatric stability, and prevent deterioration (American Psychiatric Association 2000). Professional treatment guidelines for major mental illness such as schizophrenia, bipolar disorder, and major depressive disorder are not absolved by incarceration (American Psychiatric Association 2004). Irrespective of a prisoner's security needs or prior egregious behavior, the community standard of care for the treatment of mental illness should be followed. While this is admittedly a difficult task in any segregation setting, if mentally ill inmates are consigned to long-term segregation, comprehensive mental health care must be offered. This care should include evaluation, monitoring, psychotherapy, psychiatric medication, crisis care, intermediate level care (including group programs), and acute psychiatric hospitalization. Table 10–3 lists characteristics of segregation facilities that provide effective mental health care.

## Monitoring of Inmates in Segregation

Correctional mental health staff should monitor all inmates in long-term segregation confinement, but particular attention should be given to mentally ill offenders (American Psychiatric Association 2000). Weekly visits to the front of mentally ill inmates for informal inquiry, and observation for signs of decline, should occur (Metzner 1997). During these "house calls," cell cleanliness, attire, attitude, attention, energy level, interaction with peers, and a general sense of well being can be judged—preferably within the context of a consultative relationship with corrections officers assigned to the unit. The findings gleaned from these cell-front parleys can be communicated to other members of the treatment team, including the treating psychiatrist. If inmates not previously identified as being mentally ill reveal indications of distress, a referral for more comprehensive evaluation can be made.

**TABLE 10–7.** Characteristics of segregation facilities that provide effective mental health care

- Acutely mentally ill inmates with active psychosis are rarely in administrative segregation.
- Inmates with mental illness are not transferred to supermax facilities.
- Segregated inmates are frequently monitored by mental health staff.
- Collaborative professional relationship exists between mental health and custody staff.
- Disruptive inmates with mental illness are addressed by mental health staff and not routinely disciplined.
- Mental health interviews and counseling occur in private settings.
- Individual psychotherapy and group programs are available therapeutic options.
- Crisis intervention occurs promptly and without the routine assumption of malingering.
- Multidisciplinary team provides care and actively engages the inmate to meet behavioral goals.
- Psychiatric care reflects a comprehensive knowledge of the segregated offender's unique needs.
- Psychiatric hospitalization is readily available for inmates when needed.
- Inmate with serious mental illness are diverted from segregation into a secure treatment setting.
- Inmates stabilized via hospitalization are not transferred directly back in segregation.
- Maximum-security residential treatment is available.

Although cell-front interviews are meaningful and necessary, such contact is insufficient for initial comprehensive evaluation or individual psychotherapy. All therapeutic contact beyond monitoring should occur in private where confidentiality can be maintained, and preferably in a segregation mental health office or interview area designated for such a purpose. Security concerns are undeniably important but can be appropriately addressed if the inmate is shackled and a corrections officer is nearby. Clinical Case 10–1 highlights some of these important points.

### Clinical Case 10–1: Monitoring of the Segregated Inmate

Mr. Doe, a young man without any known history of mental illness, was placed into administrative segregation after he had stabbed another inmate. The assault was the result of a dispute between rival prison gangs. Mr. Doe had been chosen by his gang leader to commit the offense and bear the subsequent disciplinary consequences, which he did with apparent stoicism.

Mr. Doe was seen weekly at cell-front by the mental health clinician assigned the task of monitoring inmates in segregation. Initially rather brash, Mr. Doe consistently denied any problems and often sarcastically told the mental health clinician to "leave me alone…I'm no nut case." The conversation between the two usually consisted of informal, relatively friendly banter.

After 6 months of segregation, Mr. Doe's hygiene noticeably worsened and he began to look deconditioned, having gained 15 pounds. Ordinarily well-groomed and quite lean, he now rarely showered and had stopped exercising. Mr. Doe's cell became dirty, and his demeanor changed as well, turning sullen and unfriendly. As the weeks passed, he began pacing restlessly in his cell and started to ignore the mental health clinician entirely. Segregation unit corrections officers reported that Mr. Doe was "no problem," although they too noticed him becoming increasingly withdrawn.

Growing concerned, the mental health clinician arranged for a private interview in a nearby office, with a corrections officer nearby. Initially hesitant to speak, the young inmate admitted to feeling depressed and anxious, as well as sleeping only 3–4 hours each night. He found it very difficult to concentrate and felt that "I might be going crazy." Referral for psychiatric evaluation was made.

### Mental Health Treatment Team in the Segregation Unit

The combination of cell-front visitation, psychotherapy, and consultation with security staff should occur in collaboration with a psychiatrist and other correctional mental health providers working as a team, especially in the case of segregated inmates with serious mental illness (Metzner 1997). Other treatment team members may include social workers, psychology staff, activity therapists, and representatives from custody and administration. This multidisciplinary model of care requires treatment team meetings between the segregated inmate, correctional mental health clinicians, and other correctional staff involved in their care at 30- to 90-day intervals. During these encounters, active participation by the offender should be solicited and management of the inmate's mental illness addressed. Behavioral improvement may be augmented if the prisoner is advised the treatment team will recommend eventual administrative segregation release if the inmate's disordered behavior ceases.

In high-profile cases involving behavioral instability and extreme violence, it is often beneficial for senior administrative staff, such as a deputy warden, to attend a treatment meeting to affirm behavioral expectations leading to segregation release and also to be made aware of the mental health department's role. Such involvement should preferably occur in a venue that preserves confidentiality by principally focusing on important custodial concerns without discussion of personal information or psychiatric treatment. Involvement of administrative and custody staff is an important issue, because if mental health clinicians assigned to work in administrative segregation take an overly rigid approach to their duties, focusing exclusively on textbook

symptoms of mental illness while disregarding the correctional context, treatment failure is common. A balanced effort, achieved through multidisciplinary teamwork, provides for the greatest chance of treatment success and often mends philosophical rifts between mental health and custody personnel.

## Psychiatric Care in Segregation

In effective systems, a psychiatrist should play an active role in segregation facilities. Isolation may exacerbate or produce distress that requires a treatment response using psychotropic medication (Burns 2003). To be successful, the correctional psychiatrist must have a comprehensive awareness of both the patient care risks and the custodial intricacies of the environment in which care is provided. In response, prescribing practices and treatment recommendations should be adjusted accordingly. This guideline also applies to psychiatrists who use telemedicine equipment to furnish care in distant prisons and therefore do not have the opportunity to witness the correctional environment directly.

Characteristics of segregation facilities may include the inability of the medication-administering nurse to see clearly into an inmate's cell or properly determine if an inmate is "checking" (i.e., not ingesting) medication. Inmates in such circumstances may hoard medication and then either overdose on it or sell it to other inmates for commissary items and then acutely decompensate. Some mentally ill offenders with poor insight may refuse all medication, rendering treatment efforts useless. During summer months, segregation cells may be stifling, leading to an increased risk of hyperthermia.

A psychiatrist's treatment response to the idiosyncrasies of segregation will be distinct for each prison but may entail prescribing medication in liquid form, using drugs with a lower potential for lethality in overdose, educating nursing and corrections staff on the risk of hyperthermia, relying on medication serum levels to assist with determination of compliance, and resolutely focusing on patient education and medication compliance issues. Correctional psychiatrists who treat segregated inmates should also be vigilant for the gradual development of polypharmacy, especially when several psychiatrists provide care based on a coverage rotation, making continuity of care difficult to achieve. If several classes of psychiatric medications at increasing or maximal doses are being prescribed, one must consider the possibility of environmentally caused deterioration or treatment resistance and the need for transfer to a secure intermediate-care unit. The illicit diversion of medication to other segregated inmates, or medication-seeking behavior in an offender with a history of drug addiction, should also be considered.

Psychiatrists who treat inmates in administrative segregation also require considerable patience. Strict security requirements slow the pace of work considerably, and segregated offenders often require longer interviews because

of the adverse environmental circumstances and a greater need of therapeutic contact. In this setting, a psychiatrist who normally examines 15–20 inmates per day in a general population venue may see only half as many patients in administrative segregation. This should be seen not as a reflection of professional inadequacy but as a reflection of the genuine need for clinical deliberateness within the constraints of a maximum security context.

Security staff in segregation may subtly influence correctional psychiatrists to view inmates in a negative light, leading to compromised professionalism. As a result, the correctional psychiatrist may, for example, ignore signs of an inmate's emotional distress or fail to implement available modes of treatment, including hospitalization, when clinically indicated. Such a scenario may occur when the segregated offender is incarcerated for a heinous crime or the prisoner has seriously injured a fellow staff member. Psychiatrists who choose to work in this setting should remain mindful of their role as physicians and be willing to make unpopular decisions in order to ensure patient safety and provide effective care despite their own negative personal feelings or the pointed opinion of others.

## Crisis Intervention and Malingering

Effective crisis intervention services are sorely needed in administrative segregation, as inmates periodically engage in destructive or bizarre behavior related to mental illness or extreme loneliness and antipathy (Bonner 2001). Such behavior includes fecal smearing, head banging, self-inflicted lacerations, destruction of personal property, fire setting, or suicidal statements. While this behavior may at times be the product of an effort to feign mental illness, it is strongly recommended that correctional mental health clinicians consciously avoid making a reflexive diagnosis of manipulation or malingering. The stress of prolonged segregation can cause mentally ill offenders to engage in unusual acts of self-harm, such as swallowing foreign objects or consuming excrement. Inmates without a history of mental illness may become seriously depressed and consider suicide as a means to escape continued isolation. Additionally, a desperate inmate who strives to maintain some control over his or her austere environment may destroy what few personal belongings he has, making a bad situation even worse.

Offenders who engage in acts of self-injury or irrational aggression deserve prompt crisis intervention regardless of the underlying motives (National Commission on Correctional Health Care 2001). The clinical response may include suicide-watch procedures, seclusion, therapeutic restraint, emergency medication, and careful multidisciplinary evaluation. Seriously mentally ill inmates may ultimately require a more intensive level of care elsewhere. Inmates with personality disorders may benefit from more frequent and intensive inter-

apeutic contact. Prisoners who clearly do not suffer from mental illness but who orchestrate labor-intensive mental health crises should be evaluated, counseled, and referred to proper staff for complaint resolution. Irrespective of the final conclusion, correctional mental health clinicians must act with deliberateness and caution. The risk of error can be very high, with suicide one potential result if signs of genuine distress are discounted, and explosive violence another possible outcome if release to a less secure facility occurs prematurely or without adequate forethought.

## Psychiatric Hospitalization

Despite the mental health treatment team's best efforts, segregated inmates may precipitously deteriorate or harm themselves so severely that transfer to a secure psychiatric hospital facility becomes necessary. The venue of hospital-level care varies between correctional systems but commonly involves transfer to a designated prison hospital facility or, less commonly, a forensic unit of a state hospital. Psychiatric hospitalization, or any other clinically necessary medical intervention, must not be disallowed solely because of security concerns or an inmate's administrative segregation status (American Psychiatric Association 2000; National Commission on Correctional Health Care 1997). If a clinical indication of hospitalization, such as a near-lethal suicide attempt or the development of florid psychosis, arises, transfer should be expedited. It is incumbent on the hospital facility to ensure adequate security while also providing patient care.

The diversion of administrative segregation inmates into a secure residential treatment unit setting following psychiatric hospital discharge should also occur. Immediate return to segregation risks negating the clinical gains achieved during hospitalization. This is especially true if ongoing treatment requirements cannot be met or if the effects of isolation trigger exacerbation of the newly stabilized illness. This scenario often initiates an expensive and futile cycle of deterioration, hospitalization, stabilization, segregation, deterioration and rehospitalization (National Commission on Correctional Health Care 2001). Once again, intensive mental health treatment rendered in a secure setting does not pardon a mentally ill offender's malicious conduct, nor does it invite ongoing misbehavior. Indeed, such care very often leads to significant behavioral improvement and a diminishing risk of further misconduct (Haddad 1999; Lovell et al. 2001).

## Maximum-Security Residential Treatment

Many factors that give rise to psychiatric instability in administrative segregation and prevent an adequate therapeutic response are negated if maximum-security residential care is made available (Eshem et al. 2001). The

development of a secure intermediate-care facility, designed exclusively for the provision of mental health treatment to violent and disruptive mentally ill offenders, can pay great dividends, including a decrease in inmate aggression and subsequent disciplinary response (Condelli et al. 1993; Rayford and Trestman 2002).

Chronically mentally ill inmates who would otherwise be transferred to administrative segregation and disrupt customary unit activities can be diverted to a secure mental health unit following serious misconduct. In this manner, both institutional security needs and individual psychiatric treatment requirements may be addressed without perception that the transgression of prison rules has provoked no disciplinary response. Segregated offenders suspected of malingered psychosis may undergo psychiatric evaluation in the secure setting without risk of potentially ignoring genuine symptoms. Inmates in administrative segregation or supermaximum security facilities who develop active suicidal ideation, or otherwise behaviorally decline, can be properly evaluated and afforded care without sparing security measures. Segregated mentally ill inmates may be discharged from an acute-care facility to a secure residential program for ongoing treatment so that progress attained during hospitalization is not imperiled. Finally, prisoners thought to be entirely beyond hope, including those who engage in continual acts of irrational aggression, rebellion, and self-injury, may receive intensive evaluation and care in a setting that provides a chance of psychosocial rehabilitation and behavioral improvement when all previous correctional interventions have failed. It is with this group of offenders that a maximum-security intermediate-care unit often engenders the greatest results, and the behavioral reformation of an intractably disturbed and unmanageable inmate previously "buried" in administrative segregation may appear miraculous. These points are illustrated in Clinical Case 10-2 below.

## Clinical Case 10-2: The Hopelessly Disruptive Inmate in Segregation

Following his assault of a corrections officer, Mr. Jones had been in administrative segregation for over 3 years. Having borderline intellectual intelligence, a seizure disorder, serious impulse control problems, and illiteracy, he was thought to be hopelessly disruptive. Over the course of his segregation, Mr. Jones developed a repertoire of increasingly maladaptive behaviors, including smearing and throwing feces, spitting on corrections officers, exposing himself to female staff, threatening others and himself, destroying prison property, flooding his cell, head banging, swallowing foreign objects, and self-mutilation. Increasingly restrictive privileges, isolation from other inmates, and frequent custody staff intervention failed to improve Jones's conduct. The intermittent use of restraint and suicide watch precautions, with subsequent release back into segregation, appeared to reinforce his self-injurious behavior.

Mr. Jones was admitted to a maximum-security residential treatment unit (RTU), and a multidisciplinary treatment plan was developed with input from mental health, unit management, and custody staff. Participation in a therapeutic group program for 15 hours per week was initiated. Psychiatric evaluation prompted use of a mood-stabilizing anticonvulsant for enhanced impulse control. A recreation program was begun under the supervision of an activity therapist who implemented a structured exercise regimen, and a reading tutor was assigned. Psychotherapy was initiated with the principal goals being improved impulse control and frustration tolerance. All therapeutic modalities occurred in a secure setting under the direct observation of corrections officers with specialized mental health training.

Over the course of 6 months, Mr. Jones's behavior substantially improved. A mental health professional, present at all security level review hearings, reported the progress to custody and administrative staff. Following a 6-month period entirely free of prison rule infractions or conduct reports, Mr. Jones was released to the prison general population after nearly 4 years of segregation confinement, a feat considered by many to be a "miracle."

The successful implementation of a maximum-security residential treatment unit depends on adequate human and physical resources (Haddad 1999; Metzner 1998). These include corrections officers as security escorts who have undergone additional mental health training; activity therapy staff for therapeutic group and recreational programs; psychiatric nurses; psychology staff; social workers; psychiatrists; and unit management staff sensitive to the needs of mentally ill offenders.

Supplementary mental health training for corrections officers assigned to work in a maximum-security residential treatment unit is of critical importance. Such officers should preferably be volunteers who have demonstrated both compassion and professionalism. Custody staff without additional training, randomly assigned to the mental health unit and not accustomed to working with mentally ill inmates, may inadvertently undermine the mental health treatment team's best therapeutic efforts.

The secure mental health unit should also provide adequate private office space for clerical work and treatment records; cells that afford adequate observation, communication, and ventilation; indoor and outdoor recreation facilities; and secure group program space, such as adjacent holding cells linked in a semicircle. Start-up expenses for a maximum-security residential treatment unit, although costly, may be balanced over time by decreases in the risk of litigation, psychiatric hospital care, and emergency medical care following self-inflicted injury. Morale also improves, as most corrections officers are freed to work with non–mentally ill offenders, and correctional mental health staff can focus on the mission of providing treatment in a setting that greatly enhances the prospect of therapeutic success.

## CONCLUSION

Despite the many disadvantages associated with providing mental health services to segregated offenders, such efforts are indispensable and have the potential to be professionally gratifying. Prior to reaching the basement of the correctional system, mentally ill inmates in administrative segregation have repeatedly been declared failures and written off by family, the educational system, the public mental health system, the private health care sector, the juvenile justice system, and, finally, the adult criminal justice system.

Mental health providers who work in segregation units should take pride in the knowledge that their work is vitally important because they are often the last hope for inmates caught in a downward spiral of psychiatric illness and criminality. To attain any level of treatment success in this challenging setting can be very rewarding. All correctional mental health clinicians who dedicate time and effort to this underserved population should be rightfully proud of their accomplishments.

## SUMMARY POINTS

- Administrative segregation is a form of prolonged solitary confinement with severe privilege restrictions.
- Supermaximum-security prisons are administrative segregation facilities designed to provide the highest level of security precautions and restricted isolation.
- Prolonged segregation confinement is potentially psychologically harmful and has significant potential for exacerbating mental illness.
- Offenders with mental illness are often placed in segregation because of behavior caused by mental illness.
- There are significant barriers to providing adequate mental health treatment to segregated offenders.
- Inmates whose unruly conduct is caused by mental illness should receive psychiatric treatment and should not be placed into segregation or be transferred to supermaximum-security facilities.
- All inmates in segregation should be monitored for signs of mental deterioration.
- Offenders with mental illness in segregation should be afforded multidisciplinary treatment via a team approach.
- Segregated inmates who engage in self-injurious behavior require comprehensive evaluation without the presumption of malingering.



Maximum- and Supermaximum-Security Settings                                    227

- Offenders with serious mental illness in segregation should be afforded psychiatric hospitalization based on clinical need alone, irrespective of security concerns.
- Segregated offenders with mental illness who require psychiatric hospitalization should not be placed back in segregation unless adequate mental health treatment is available.
- Maximum-security residential treatment is a valuable resource in the care and management of inmates with mental illness presenting a security risk.

## REFERENCES

American Psychiatric Association: Psychiatric Services in Jails and Prisons, 2nd Edition. Washington, DC, American Psychiatric Association, 2000

American Psychiatric Association: Practice Guidelines for the Treatment of Psychiatric Disorders Compendium 2004. Arlington, VA, American Psychiatric Association, 2004

Arch&-Treichel J: NASA addresses mental health of Mars-mission members. Psychiatric News 37(February):5, 2002

Bonner R: Rethinking suicide prevention and manipulative behavior in corrections. Jail Suicide/Mental Health Update 10:7–8, 2001

Burns KA: Jail diversion and correctional psychotropic medication formularies, in Management and Administration of Correctional Health Care. Edited by Moore J. Kingston, NJ, Civic Research Institute, 2003, pp 13-1–13-13

Camp C, Camp G: Corrections Yearbook 2001: Adult Systems. Middletown, CT, Criminal Justice Institute, 2002

Cohen F: Legal Issues and the Mentally Disordered Prisoner. Washington, DC, National Institute of Corrections, 1988

Cohen F: The Mentally Disordered Inmate and the Law. Kingston, NJ, Civic Research Institute, 1998

Condelli WS, Dvoskin JA, Holanchock H: Intermediate care programs for inmates with psychiatric disorders. Bull Am Acad Psychiatry Law 21:427–433, 1993

Elstern S, Hasan A, Beven G: New treatment modality in a maximum security prison: administrative control unit for the seriously mentally ill. Correctional Mental Health Report 2:90–92, 2001

Grassian S: Psychopathological effects of solitary confinement. Am J Psychiatry 140: 1450–1454, 1983

Grassian S, Friedman N: Effects of sensory deprivation in psychiatric seclusion and solitary confinement. Int J Law Psychiatry 8:49–65, 1986

Haddad J: Treatment for inmates with serious mental illness who require specialized placement but not psychiatric hospitalization. Correctional Mental Health Report 1:49–62, 1999

Haney C, Lynch M: Regulating prisons of the future: a psychological analysis of supermax and solitary confinement. New York Review of Law and Social Change 23:477–570, 1997

Harrington SPM: Caging the crazy: "supermax" confinement under attack. Humanist 57:14–20, 1997

---

228                                    HANDBOOK OF CORRECTIONAL MENTAL HEALTH

Holton SMB: Managing and treating mentally disordered offenders in jails and prisons, in Correctional Mental Health Handbook. Edited by Fagan TJ, Ax RK. Thousand Oaks, CA, Sage, 2003, pp 101–122

Human Rights Watch: Out of Sight: Supermaximum Security Confinement in the United States. New York, Human Rights Watch, 2000. Available at: http://www.hrw.org/reports/2000/supermax/. Accessed December 7, 2004.

Human Rights Watch: Ill Equipped: US Prisons and Offenders With Mental Illness. New York, Human Rights Watch, 2003. Available at: http://www.hrw.org/reports/2003/usa1003/. Accessed December 7, 2004.

Kanas N: Asthenia: does it exist? (abstract). Aviat Space Environ Med 71:271, 2000

Kozerenko OP, Kozlovskaya IB, Grigoriev AI: Psychological support in long-term space flights (abstract). Avia Space Environ Med 71:349, 2000

Kupers T: Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It. San Francisco, CA, Jossey-Bass, 1999

Lovell D, Allen D, Johnson C, et al: Evaluating the effectiveness of residential treatment for prisoners with mental illness. Criminal Justice and Behavior 28:83–104, 2001

Metzner JL: An introduction to correctional psychiatry, Part II. J Am Acad Psychiatry Law 25:571–579, 1997

Metzner JL: An introduction to correctional psychiatry, Part III. J Am Acad Psychiatry Law 26:107–114, 1998

Metzner JL: Class action litigation in correctional psychiatry. J Am Acad Psychiatry Law 30:19–29, 2002

Metzner JL: Trends in correctional mental health care, in Management and Administration of Correctional Health Care. Edited by Moore J. Kingston, NJ, Civic Research Institute, 2003, pp 12-2 to 12-18

National Commission on Correctional Health Care: Standards for Health Services in Prisons. Chicago, IL, National Commission on Correctional Health Care, 1997

National Commission on Correctional Health Care: Correctional Health Care: Guidelines for the Management of an Adequate Delivery System. Chicago, IL, National Commission on Correctional Health Care, 2001

National Commission on Correctional Health Care: Correctional Mental Health Care: Standards and Guidelines for Delivering Services. Chicago, IL, National Commission on Correctional Health Care, 2003

Palinka LA, Gunderson EKE, Holland AW, et al: Predictors of behavior and performance in extreme environments: the Antarctic space analogue program. Aviat Space Environ Med 71:619–625, 2000

Rayford BS, Trestman RL: The intensive mental health unit in Connecticut's Department of Correction: a model treatment program. Psychiatric Times Supplement 19:2–3, 2002

Riveland G: Supermax Prisons: Overview and General Considerations. Washington, DC, National Institute of Corrections, 1999

Toch H: The future of supermax confinement. The Prison Journal 81:376–388, 2001

Exhibit CC

# 7

## OVERCROWDING AND THE SITUATIONAL PATHOLOGIES OF PRISON

[Under the prevailing view] it is the criminal who first acted, he initiated the whole chain of events. The pain that follows is created by him, not by those handling the tools for creating such pain.

—Nils Christie[1]

Today we still build prisons according to the functional logic that emerged in the course of the nineteenth century.... These muted, functional buildings nevertheless project an eloquent and well understood symbolism which speaks of unshakeable authority, of stored-up power, and of a silent, brooding capacity to control intransigence.

—David Garland[2]

Modern prisons are largely about control—the control of prisoners, their behavior, the degrees of freedom with which they can act, their level of contact with the outside world, and so on. When prisons are at risk of losing this control, those in charge feel compelled to intervene. Applying the contextual model of behavior that I have advanced in this book—but applying it here to the prison itself—highlights the connection between prison conditions and the correctional acts and practices that occur within them. To be sure, the prison administrators who create and implement prison policies and the line staff who enforce them on a day-to-day basis are highly responsive to the context in which they work. In this sense, prisons can be made worse by forces over which correctional personnel have little control. The last several decades represent such a period.

Specifically, I argue in this chapter that extreme levels of overcrowding and high levels of idleness threatened to make prisons especially difficult to manage. Having too many prisoners put correctional authorities at risk of not being able to control any of them. Moreover, because prisoners now

were sent to prison for the explicit purpose of being punished, the use of painful techniques to control and constrain them seemed to be a logical extension of the publicly acknowledged mission of the institution. In addition, the last several decades saw the rise of especially powerful political interest groups that urged a "get tough" approach to crime and punishment. They helped to generate an unusually strident ideology that both demonized prisoners and made the use of repressive techniques seemingly essential to their control.

The view that present-day prisoners represented a new or different "breed" of convict further facilitated their punitive treatment. As one otherwise sympathetic and knowledgeable commentator put it, "Conditions in the prisons may be better than in the nineteenth century, but the prisoners are twentieth-century prisoners. They are sullen and resentful...."[3] By the early 1980s, correctional administrators and others were said to be "almost unanimous in their belief that prisons are receiving a more aggressive, more dangerous, more vocal, and less tractable offender,"[4] despite the lack of any systematic data to support the claims. To complement these views, the media in the 1980s and 1990s often depicted modern-day criminals and prisoners as "rapacious monsters"[5] who needed to be given longer prison sentences and placed in specialized, tougher institutions to be controlled.

Because of the political context in which they operated and the institutional mandates by which they were bound during this period, prison systems had few alternative strategies with which to respond to internal problems generated by these broad outside forces. Thus, law-and-order political agendas were translated into higher rates of incarceration, and legislatures were slow to match funding for prison construction or prisoner programs with the increasingly punitive laws they passed. Prison authorities accommodated in the ways they knew best. Historically, prison authorities have been trained and socialized to use punitive techniques to maintain control in the face of contextual forces acting to undermine it. Thus, when prison staff perceive a crisis or threat, they typically increase the amount of pain they dispense.

Indeed, in the pages that follow I suggest that the correctional decision makers who shaped prison policy and the officials and staff who implemented daily prison operations over the last several decades often reacted to the extraordinarily difficult circumstances with which they were confronted by creating a series of situational pathologies—taking actions that worsened the very problems that they were designed to address. Just as prisoners react adversely to the harsh contexts in which they are placed, and sometimes engage in ill-advised, counterproductive, and even destructive behavior, so, too, prison officials and staff members were compromised by the unique pressures under which they worked over the last several decades.[6] Innovation, humanitarian reform, and prisoner-

199

oriented change were subjugated to security concerns, perceived custodial needs, and the pragmatics of control.

By adopting strategies of repression and harsh control, correctional authorities quickly transformed prisons into more difficult places for prisoners to tolerate and even to survive. The precarious balance between the basic human needs and wants of prisoners and the coercive imperatives of the prison was lost. Thus, any real understanding of the behavior of prison administrations, staff members, and prisons themselves during this period requires an analysis of the immediate contexts in which they acted.

## OVERCROWDING: THE EMERGENCE OF
## A DESTRUCTIVE CORRECTIONAL NORM

As I noted in chapter 3, the massive influx of prisoners that began in the late 1970s and early 1980s produced a rate of growth in the U.S. prison population that researchers repeatedly characterized as unprecedented.[7] Among other things, this meant that prisons everywhere were—and many still are—dangerously overcrowded. According to the ACLU National Prison Project, by 1995 there were fully 33 U.S. jurisdictions under court order to reduce overcrowding or improve general conditions in at least one of their major prison facilities. Nine were operating under court orders that covered their entire prison system.[8] Even those correctional systems which avoided judicial scrutiny often were significantly overcrowded.

In fact, some prison systems grew so large so quickly, that it became difficult for prison officials to keep track of the names and locations of all of the facilities in their system, let alone to meaningfully supervise and oversee them. For example, New York now operates some 70 prisons scattered across the state; fully 52 of them were built over the last 25 years. During this same period, the prisoner population in the state increased nearly sixfold, from approximately 12,000 to more than 70,000.[9]

The two largest prison systems in the nation—California and Texas—experienced comparable rates of rapid growth. Over the last 30 years, California's prisoner population expanded eightfold (from roughly 20,000 in the early 1970s to its current population of approximately 160,000 prisoners). Funding for prisoner services and programming did not remotely keep pace, which meant that many more prisoners had to make do on much less. In Texas, over just the brief 5-year period between 1992 and 1997, the prisoner population more than doubled as nearly 70,000 more prisoners were added to the prison rolls. Indeed, during the mid-1990s Texas quickly achieved one of the highest incarceration rates in the nation, and the state now operates more than 100 prisons to accommodate this rapid expansion in its already sizable prisoner population.

Of course, systems that grow at such a rate are at risk of losing their organizational stability. Moreover, despite unprecedented prison construction programs that increased the capacity of many prison systems, most remain overcrowded. Overcrowding, in turn, exacerbates the chronic pains of imprisonment. It is not surprising that a large literature on overcrowding has documented a range of adverse effects that occur when prisons have been filled to capacity and beyond. As a group of prison researchers concluded in the 1980s, as this problem was just beginning to take shape, "crowding in prisons is a major source of administrative problems and adversely affects inmate health, behavior, and morale."[10] Two other early commentators concluded their review of the literature in much the same way, namely, that "with few exceptions, the empirical studies indicate that prison overcrowding has a number of serious negative consequences."[11] Although other variables may mediate or reduce the negative effects of crowding,[12] the psychological toll can be substantial. Thus, despite an occasional study that yields an inconclusive finding,[13] there is little reason to doubt that crowding significantly worsens the quality of institutional life and increases the destructive potential of imprisonment.

Among other things, we know that prison overcrowding increases negative affect among prisoners,[14] elevates their blood pressure,[15] and leads to greater numbers of prisoner illness complaints.[16] It is not surprising that exposure to "long-term, intense, inescapable crowding" of the sort that characterizes many prison environments results in high levels of stress that "can lead to physical and psychological impairment."[17] In addition, overcrowding has been associated with higher rates of disciplinary infractions. For example, one study concluded that in prisons "where crowded conditions are chronic rather than temporary and where people prone to antisocial behavior are gathered together, there is a clear association between restrictions on personal space and the occurrence of disciplinary violations."[18]

Overcrowding directly affects prisoners' mental and physical health by increasing the level of uncertainty with which they regularly must cope. One useful psychological model of the negative effects of overcrowding emphasizes the way in which being confined in a space that is occupied by too many people increases the sheer number of social interactions persons have that involve "high levels of uncertainty, goal interference, and cognitive load. . . ."[19] Thus, crowded conditions heighten the level of cognitive strain that persons experience by introducing social complexity, turnover, and interpersonal instability into an already dangerous prison world in which interpersonal mistakes or errors in social judgments can be fatal. Of course, overcrowding also raises collective frustration levels inside prisons by generally decreasing the resources available to the prisoners confined in them. The sheer number of things prisoners do or accomplish on a day-to-day

basis is compromised by the number and density of people in between them and their goals and destinations.

## CROWDING AND DEPRIVATION: CREATING A DYSFUNCTIONAL PRISON CONTEXT

Prisoners in overcrowded correctional settings interact with more unfamiliar people, under extremely close quarters that afford little or no privacy or respite, and are less likely to have their basic needs addressed or met. Indeed, overcrowding operates at an individual level to worsen the experience of imprisonment by literally changing the social context or situation to which prisoners must adapt on a day-to-day basis. In addition to these direct, individual-level effects, however, overcrowding changes the way the prison itself functions.

For one, prison systems responding to the press of numbers often forego the careful screening, monitoring, and management of vulnerable or problematic prisoners—in part because there are too many of them to properly assess and in part because the system lacks the capacity to address their special needs anyway. As one group of clinicians conceded, "Unfortunately, the prospect of screening inmates for mental disorder and treating those in need of mental health services has become a daunting and nearly impossible task in the present explosion of prison growth."[60] Unidentified and untreated prisoners with mental illness in mainline prison populations are themselves more likely to deteriorate and, in addition, to have a significant adverse effect on the prisoners with whom they must live and interact.

Over the last several decades, prison administrators reacted to unprecedented levels of overcrowding in other ways that altered the nature of the prison setting. Resources for already limited programming and other activities were reallocated to create bed space and maintain basic security. The prison overcrowding crisis in the United States coincided with the advent of a correctional philosophy that, in a sense, saw deprivation as a goal rather than a problem. Unprecedented amounts of unproductive inactivity and idleness resulted.

For example, overcrowded prison systems often fail to address even the most basic educational needs of their prisoners. Surveys of literacy levels in prisons throughout the United States have documented the magnitude of the problem. One national study concluded that about 7 out of 10 prisoners were either illiterate or functionally illiterate in 1992.[31] Another study reached similar conclusions about the California prisoner population in the mid-1990s. Some 20.8% of California prisoners read at below the third-grade level, and another 30% were only "marginally literate" by accepted

educational standards.[32] Little was done to remedy these problems. By 2002, the California prison system housed over 150,000 prisoners, some two thirds of whom had been incarcerated before. Yet, according to the Department of Corrections, those prisoners, on average, still read at no more than a seventh-grade level.[33] Indeed, prisoners around the country have left prison—and returned—still lacking basic literacy skills.

In addition, prisoners in many correctional systems were placed on long waiting lists to obtain prison jobs, and some never did. By the start of the 1990s, the Bureau of Justice Statistics reported that nearly 40% of the nation's prisoners had no prison work assignments at all, and that another 40% were assigned to what were termed facility support services that included primarily laundry, kitchen, and building maintenance jobs. Only 7% were involved in prison industry programs in which their job experiences and skill development were likely to be transferable to the freeworld.[34] A decade later, a number of large prison systems still were reporting the same levels of idleness. For example, only a little more than half of all prisoners in California are employed in prison jobs of any kind.[35]

In addition to failing to provide basic educational and meaningful occupational opportunities, overcrowded prison systems were unable to make counseling programs fully available to prisoners to address preexisting mental health or substance abuse problems. They also failed to provide many prisoners with the kind of vocational training that they would need to obtain gainful employment once they were released. In many jurisdictions, truly useful educational and vocational training programs have become so scarce that only inmates who are close to their release dates can apply to enter them. As average prison sentences lengthen, long-term prisoners wait for many years before they are even eligible for the programs that are available.

There is widespread agreement among correctional experts that chronic idleness produces negative psychological and behavioral effects in prison. As far back as the 1980s, when trends toward overcrowding and the lack of prison programming had just begun, the U.S. General Accounting Office (now the Government Accountability Office) noted, "Corrections officials believe that extensive inmate idleness can lead to destructive behavior and increase violence within institutions. Moreover, idleness does little to prepare inmates for re-entry into society."[36] But this warning was largely ignored as the trends toward higher rates of incarceration intensified over the next several decades.

Idleness-related frustration increases the probability of interpersonal conflict and assaults in prison. Overcrowding simultaneously reduces the opportunities for staff to effectively monitor prisoner behavior and drastically limits the options to reduce animosities between prisoners by separating them or sending them to different facilities. Thus, there is less for prisoners

to do, and there are fewer outlets to release the resulting tension, a decreased staff capacity to identify prisoner problems, and fewer options to solve them once they do. Among the negative behavioral effects that are likely to occur is the increased risk of victimization. For example, one prison researcher has noted that "in less well-regulated institutions in which prisoners have little recourse to protection, or in which there may be collusion between dominant prisoners and staff to maintain the peace, sexual violence tends to be greater."[97] Others agree that overcrowded conditions in which prisoners have much idle time can contribute to a higher level of prison rapes.[98]

Prison overcrowding also can reverberate back through the criminal justice system, creating problems in local jails.[99] That is, prison officials may react to overcrowded conditions by attempting to slow the rate at which they are willing or able to receive new prisoners. In extreme cases, they may refuse to take them at all. But the jail overcrowding that results—as prisoners back up in the system, awaiting transfer to prison—is harmful in its own right. For example, "Large jail populations may create logarithmically increasing demand for services, with overcrowding speeding the deterioration of jail facilities and further taxing the ability of institutions to provide for basic human needs."[100]

Unlike prisons, jails are not structured for long-term confinement. Keeping prisoners there for longer periods of time means that they will be deprived even further of meaningful activity, programming, or needed services. In some cases, for some prisoners, the consequences are more dire. Thus, researchers have found that suicides are prevalent in jails with high ratios of inmates to staff members.[101] Jail overcrowding also may mean that increasing numbers of persons will enter the prison system already traumatized by their prior incarceration.

## THE DYNAMICS OF DESPERATION: CYCLES OF DYSFUNCTIONAL BEHAVIOR

Overcrowding appears to have especially adverse effects on the institutional behavior of younger inmates. Thus, one study of the Texas prison system found that

> The greater the proportion of young prisoners housed in the institution, the greater the infraction and assault rate. There is some evidence for an interaction effect between age and prison size. Younger inmates may be more susceptible to the problems and control structures in large prisons than older inmates.[32]

Another study obtained similar results, with overall correlations that revealed "a significant association between density and total assaults and

assaults on inmates" such that the greater the density the more frequent the assaults. But researchers found that the relationship between crowding and violence was "strongest in the institutions housing young offenders."[93]

Age-related crowding effects are not surprising. Younger prisoners tend to be more volatile, more sensitive to their surroundings, and in general more likely to react aggressively to the tensions and conflicts that crowded conditions of confinement generate.[34] However, prison officials and staff members respond to these crowding-related infractions by punishing prisoners, often by placing them in disciplinary segregation units. The heightened reactivity of younger prisoners to the context of crowded living conditions means that greater numbers of them will be exposed to even harsher conditions in the segregated or isolated housing units where many eventually are confined.

A number of adverse and presumably unintended long-term consequences are likely to follow from this scenario. Prison officials typically use an inmate's disciplinary segregation status to bar him or her from participation in educational or vocational programming. Moreover, extended time spent in segregation places prisoners at risk of developing a host of adverse psychological reactions that are associated with long-term isolation.[35] The lack of even minimal forms of programming and exposure to potentially disabling solitary confinement jeopardizes subsequent adjustment in the mainline prison population as well as in the freeworld. And if and when these prisoners do return to prison at a later time, they may well find that their prior disciplinary status leads more readily to their classification as a present security risk, making them prime candidates for assignment to a segregation unit once again.

Not surprisingly, several studies have suggested that overcrowding is associated with increased recidivism. For example, at the start of the 1980s, David Farrington and his colleagues found a strong relationship between overcrowding and prison ineffectiveness in England. Prisoners released from overcrowded prisons were more likely to be recommitted for subsequent criminal infractions. The relationship could not be explained away by other variables, leading Farrington to recommend a reduction in prison overcrowding to improve the ability of prisons to reduce crime. By sending fewer people to prison, or by reducing the effective lengths of prison sentences, he argued, the effectiveness of imprisonment might be enhanced.[36]

Similarly, several years after Farrington's English study, Canadian researchers found that placing low-risk offenders in often overcrowded high-security facilities resulted in high rates of reincarceration.[37] The rates were significantly higher than those of comparable low-risk offenders who had been placed in halfway houses. The researchers concluded that the failure to properly divert low-risk offenders from high- to low-security facilities—

something that overcrowded prison systems often lack the capacity to do—"may actually increase the risk of future recidivism."[38]

Thus, the way officials respond to a structurally caused behavioral problem that they did not create and are hard pressed to control—crowding-related disciplinary infractions—can jeopardize the long-term well-being of prisoners, create even more disruptive behavior later on, and, indirectly, increase crime.

## MEASURING HARM IN UNSTABLE PRISON SYSTEMS

Quantitative studies of the effects of prison overcrowding actually may understate the real nature and magnitude of the problems that occur. There are several context-based reasons why this is so. Even though overcrowding research generally uses highly sophisticated statistical models, much of it is premised on a very simple theoretical assumption: Increases in social density are expected to produce corresponding increases in various indices of psychological stress and behavioral dysfunction. However, this model assumes that other things in the environment remain relatively stable, so that the effects of overcrowding per se can be measured. If the environment itself changes in response to overcrowding—as it certainly does in the case of prisons (and, frankly, most other complex social systems)—then isolating the precise psychological effects of increased social density becomes more difficult.

Thus, the way prison administrators, line staff, and prisons themselves behave, react, and change in response to overcrowding conditions may complicate, mask, or neutralize the real effects of overcrowding on prisoners. Because few if any correctional systems have stable measures of the quality of prison life, many of the attempts to accommodate overcrowding that I discuss later in this chapter may hide many of its most pernicious effects and lead administrators to conclude that the problems are less serious, or are being managed more effectively, than, in fact, they are.

For example, in response to the pressures of overcrowding (and in the attempt to minimize their negative consequences), prison authorities may decide to reclassify prisoners, transfer certain inmates to other institutions, place some others in different units within the same prison, or implement different kinds of security procedures, disciplinary rules, and housing policies. Any one of these administrative responses can alter the nature of the prison environment as well as the makeup of the prisoner population housed within it. There is no simple way to separate the effects of these institutional reactions to overcrowding from the effects of overcrowding itself.

In addition, prison staff members who are faced with increasingly overcrowded living conditions may modify the internal and somewhat subjective standards that they use to define and document disciplinary infractions. As Timothy Flanagan observed, "the processes that lead to charging an inmate with a disciplinary infraction are situational in nature—involving a complex interplay between inmate, officer, and the setting in which the interaction occurs."[39] This interplay is subject to many of the same variables that both create and are affected by overcrowding.

Moreover, overcrowded prison conditions may trigger litigation that heightens the level of scrutiny that is focused on the prison by outside evaluators. The threat or reality of external monitoring may affect the behavior of decision makers inside the prison. Thus, as Richard McCorkle noted, prison staff may fail to officially report assaults—out of a concern that "a high assault rate would reflect poorly on the administration's ability to govern the prison."[40] In this way, the outside legal scrutiny that overcrowding often precipitates may heighten concerns over how the prison is being governed and, in turn, discourage staff from reporting every infraction of which they are aware.

On the other hand, overcrowding may lead prisoners to react to certain events in ways that would mask its harmful effects. As McCorkle also observed, "most victims of prison violence never report their victimization."[41] However, when prisoners perceive the correctional staff to be apathetic to their plight, or doubt their ability to protect them from inmate reprisals, they are unlikely to report what is happening to them. Because overcrowding creates even less favorable staff-to-inmate ratios, it contributes to both the perception and reality of worsening staff responsiveness and may lower the amount of victimization that is reported.[42]

Finally, prison officials are charged with the responsibility of monitoring and responding to disruptive and dysfunctional behavior and overt signs of prisoner deterioration. They possess the power to radically alter the mix of prisoners and the particular conditions under which they are confined. Under ideal conditions, prisoners who experience the most adverse reactions to overcrowding would be transferred to other institutions or placed in specialized housing where they would be removed from the normal routines of the mainline prison setting. In theory, at least, they should end up in facilities that provide them with much-needed respite or, depending on the seriousness of their reactions, some form of psychological treatment or counseling. More often, however, these prisoners will be placed in disciplinary segregation or punishment units. Indeed, they will move from being in the midst of too many people to none at all. This kind of re-sorting of prisoners and changes in the conditions to which they are exposed may simultaneously worsen the actual effects of overcrowding yet complicate

any attempt to precisely assess the damaging effects of housing many more people together than the prisons were designed to hold.

## PRISONS BEHAVING BADLY: THE BROADER CONTEXT OF OVERCROWDING

A number of broader contextual forces are often at work that coincide with changes in levels of overcrowding and significantly affect the behavior of guards and prisoners. In turn, they further complicate any straightforward determination of the adverse effects of overcrowding and, simultaneously, make bad situations—inside and even outside of prison—somewhat worse. For example, Sheldon Ekland-Olson studied the consequences of a sweeping federal court order in the Texas prison system that both ended the violent reign of inmate "building tenders" and required the state to reduce and carefully monitor levels of overcrowding.[9] The building tenders had functioned for many years in the Texas system as surrogate guards, wielding tremendous power over other inmates, often operating without supervision or restraint. Moreover, at the time the federal court stopped the practice, the Texas system was becoming dangerously overcrowded and the building tenders played an important, albeit brutal and illegal, role in attempting to manage and suppress the underlying tension and unrest. The court's careful oversight of the entire statewide department of corrections was intended to monitor and respond to this growing problem.

Indeed, because the court ended the abusive building tender practice and required the prison system to reduce overcrowding (as well as to improve conditions in other respects), violence rates should have been reduced throughout the system. Yet, the opposite appeared to occur. There were several reasons for this unexpected turn of events. For one, in part out of resistance to the court order itself, many Texas prison guards were reluctant to step in and control prisoner violence themselves. Increasingly, prisoners were forced to protect themselves, and as they did, officially reported violence rates were elevated.

It is also likely that violence that had once occurred at the hands of building tenders under the previous regime—because it was officially sanctioned—was not characterized as violence at all or was reported much less frequently than it actually occurred. Under the old Texas system, then, the true amount of violence inside the prisons likely was not reflected in the official statistics. After the court order—which was much resented by the prison staff (who thought it gave inmates too many rights)—violence by prisoners was likely to be more conscientiously and accurately documented.

Moreover, the criminal justice system *in general* behaves in response to prison overcrowding in ways that sometimes undermine its overall effectiveness. For example, if overcrowded prisons mean that probation and parole services are overtaxed by rapid increases in the number of recently released prisoners—as most studies of these agencies indicate they are—then agents may be directed to provide less guidance and meaningful supervision, or to offer fewer services designed to help probationers avoid prison and assist parolees in-making a successful transition back into the freeworld. This, too, acts to increase the long-term effect of overcrowding on subsequent reoffending.[44]

Finally, the unprecedented magnitude of overcrowding in American prisons—many now operate at or close to twice their capacity—may have reached and exceeded a ceiling effect for demonstrating adverse consequences.[45] Indeed, the rated capacities of most prisons were never intended to provide for particularly generous or luxurious accommodations. Thus, prisons operating at or close to double those rated capacities certainly experience a lack of more than just space—including shortages in their staffing patterns, available prisoner services, and programming opportunities.[46]

Prison systems that are faced with nearly double their maximum number of prisoners may adopt desperate measures that not only have especially harmful effects on prisoners but also make it extremely difficult to identify stable relationships between population levels and anything else. In this regard, consider the discovery made by one researcher who examined overcrowding in the California prison system: "bus housing." Because the prison system was in such short supply of available bed space, it began "running buses up and down the state's highways containing enough inmates to fill a complete prison."[47] Prisoners were entering the system and being sent on bus trips of several hundred miles, all the while destined for a facility next to the point where they started. Indeed, "One administrator lamented that if a single bus broke down on a given day, the institution would face a major disaster—inmates in the yard with no beds."[48] It is difficult to envision any model of prison overcrowding that would adequately account for the adverse effect that this or similarly extreme approaches to managing severe levels of overcrowding would have on prisoners.

Thus, as I say, the way prisons and prison systems behave in response to overcrowded conditions may intensify their adverse effects and, at the same time, make them more difficult to discern. In fact, in light of the number of mutually interacting and uncontrollable variables in many of these studies, it is surprising that consistent patterns of any kind emerge. Even when they do, the aggregate statistics may fail to capture the range and depth of harmful overcrowding effects and the underlying psychological dynamics that produce them.

## IGNORING THE CRITICAL NEEDS OF PRISONERS IN TIMES OF CRISIS

The unprecedented influx of prisoners over the last several decades has further compromised the already minimal and often superficial evaluation and classification of incoming prisoners. The seriousness of a prisoner's offense for which he or she was committed and the length of his or her sentence now largely determine classification levels and, as a result, dictate most housing assignments. This means that many fewer new inmates are meaningfully screened or given a careful diagnostic evaluation and what—in the days of rehabilitation—was referred to as a needs assessment. The task of assigning prisoners to facilities turns largely on whether and where there is available bed space, rather than any matching of individual prisoner needs with available programming resources.

Overcrowding and the lack of any overarching commitment to rehabilitation has meant that many prisoners go for long periods of time without engaging in any productive activities that would effectively prepare them to be released back to the freeworld. As I noted earlier in this chapter, in many prison systems, fewer than half the prisoners are involved in educational programs, vocational training, or meaningful jobs that provide them with transferable skills or useful work experience. In addition to the sheer number of prisoners who go without such assignments, the quality of the programs for those who are assigned is often undermined by the ratio of prisoners' needs to the resources devoted to meeting them. For example, here is how sociologist John Irwin characterized the vocational training programs in a medium-security California prison he recently studied—programs in which, even then, less than 20% of the prisoners were fortunate enough to be involved:

Several conditions greatly weaken the efficacy of these vocational training programs, most important, the lack of funds and resources. Instructors report that they have great difficulty obtaining needed equipment and materials.... Instructors are fired, or they quit and are not replaced.... Further, the training programs are regularly interrupted by lockdowns [and inclement weather] during which prisoners cannot be released to the hill for vocational training.[6]

In addition, as I discuss in greater detail in the next chapter, even by the most conservative calculations, there are several hundred thousand prisoners who are badly in need of counseling and treatment for a variety of preexisting cognitive, emotional, and psychological problems. Most prison systems do a poor job of identifying such persons, let alone allocating the necessary resources with which to treat them. But there are many other

prisoners with different kinds of special needs that go largely unaddressed because, among other things, overcrowded prison systems do not have the luxury of taking them into account.

For example, a number of states have discontinued their sex offender treatment programs. Indeed, most do not even separate sex offenders from other prisoners. In fact, in the mid-1990s the U.S. Department of Justice reported that only about a dozen prison systems in the United States provided any kind of separate housing facilities for sex offenders, and few if any of those had enough dedicated space to accommodate all of the sex offenders who were incarcerated in their respective institutions.[50] The issue of separate facilities is particularly important for these prisoners. Because they fear victimization in prison, sex offenders are reluctant to identify themselves or draw attention to the nature of the offense for which they were committed. Their participation in sex offender treatment programs, in the rare prison system that provides such treatment, often depends entirely on their being housed in a safe environment where they will not be targeted by mainline prisoners.

Nonetheless, as I noted, overcrowding and scarce resources have helped to ensure that most sex offenders now are housed in general prison populations, where few will receive any special therapy and many are likely to be singled out by other prisoners for special abuse and victimization. The number of such prisoners is not insignificant. For example, in 1995, Texas and California alone reported having about 25,000 sex offenders imprisoned, and, at that time, neither state operated any separate facilities for them[51] Concern over the lack of specialized housing and treatment for sex offenders should also be based on an appreciation of the distorted norms of sexuality that pervade many prisons. In fact, the typical maximum-security prison is a sexually dysfunctional environment whose atmosphere seems almost perfectly designed to exacerbate preexisting sexual problems of whatever kind.[52]

The failure of prison systems to provide effective treatment for sex offenders—not necessarily by choice but often as an accommodation to scarce resources—has created another long-term problem. Many citizens regard untreated sex offenders as potential threats to public safety and, in turn, enthusiastically support the enactment of so-called sexual predator laws. Accordingly, in many states, after sex offenders have completed their prison terms, they routinely are civilly committed to prison-like facilities. These commitments are justified supposedly because their untreated mental abnormality—the one that presumably led to their original offense but was ignored during their term of imprisonment—renders them a "danger." Although these laws have been challenged on constitutional grounds—including the contention that the conditions of their civil confinement are far more punitive than therapeutic—they have been upheld.[53] In effect, it

appears they may result in a lifetime of incarceration for many sex offenders, in part because of the inability or unwillingness of prison systems to provide them with effective treatment at an earlier time.

One final and very different example of the way in which overcrowded and underfunded prison systems have ignored basic prisoner needs and created significant long-term problems involves the plight of Latino prisoners. Although there has been relatively little research focused specifically on them, they now represent a major segment of the prisoner population in the United States. In some jurisdictions they are a plurality of those incarcerated. In addition to their growing numbers, however, many Latino prisoners encounter special problems once they enter prison.[54] Specifically, Latino prisoners with lower levels of English proficiency are functionally excluded from the relatively few existing educational, vocational, and other kinds of prison training programs because such programs typically are not offered in Spanish.[55]

As one study showed, although African American and Latino prisoners together were given less favorable job assignments than their White counterparts, "the fact that many Latinos had few or no English language skills further limited the range of jobs and educational and vocational programs to which they were assigned."[56] Similarly, the lack of any significant number of bilingual prison staff has likely prevented many Latino prisoners in correctional facilities throughout the country from properly using medical and psychiatric services, prison law libraries, and other legal resources, and has even interfered with their ability to fully understand prison rules or to effectively defend themselves in prison disciplinary proceedings.

## MAINTAINING CONTROL THROUGH FORCE AND INTIMIDATION

Overcrowding, widespread idleness, and the failure of many prison systems to address the basic needs of prisoners have changed the context of imprisonment. Prison administrators have been forced to anticipate and react to many volatile and potentially explosive situations. In many instances, their reactions have been predictable but also problematic, serving to increase the amount of prison pain dispensed and making already dangerous situations, in the long run, more so.

Indeed, in the face of extraordinary increases in the sheer numbers of prisoners, many prison administrators pressed for new tools with which to control and contain them. In most jurisdictions, any pretense of carefully managing the prison "careers" of inmates or effectively monitoring the quality of the conditions under which they were kept was sacrificed during the rapid expansion of the prisoner population. Recall that Malcolm Feeley

and Jonathan Simon identified an emerging penological management style in which correctional decision makers thought about prisoners only in the "aggregate," as dangerous "populations" that needed to be "herded," rather than as individuals in need of personal attention. Indeed, in terms that captured both the dehumanized consciousness of the decision makers and the devalued status of the prisoners under their control, Feeley and Simon analogized the overcrowding-driven new penology as akin to a "waste management" function.[57]

Thus, rather than improving living conditions and investing in prison programs and meaningful activities in which prisoners could participate, most systems committed to harsh policies and procedures to maintain order and control. They also began to rely increasingly on sophisticated and expensive security hardware and surveillance technology. Metal detectors, X-ray machines, leg irons, waist chains, handcuffs, "black boxes"[58] holding cages, violent prisoner restraint chairs, psychiatric screens, chain-link fences, concertina wire, tasers, stun guns, pepper spray, tear gas canisters, gas grenades, and, in some jurisdictions, mini 14- and 9-millimeter rifles, 12-gauge shotguns, and the like are used now inside the cellblocks of a number of maximum-security prisons.[59]

For example, in maximum-security prisons in California, guards armed with rifles are strategically positioned inside mainline housing units and authorized to respond to inmate disturbances with lethal force. Thus, even when they are asleep, prisoners are under what is euphemistically called "gun cover." In New York City, the city's large jail on Rikers Island has resorted to what has been characterized as an "iron hand" approach to regain and maintain order by "using an array of tools and tactics—from a huge S.W.A.T. team, to electric stun shields, to a program that aggressively prosecutes inmates for crimes committed inside the jail."[60]

But these iron hands have a decidedly modern, technological grip. At Rikers, for example, "stun devices—large plexiglass shield threaded with wires—deliver six-second bursts of 50,000 volts of electricity, and are used to incapacitate inmates and cut the risk of hand-to-hand violence." In the late 1990s the devices were being used, on average, about once a week in the jail. Guards there and elsewhere also use specially equipped chairs "with magnetic sensors that can search for bits of metal hidden in inmates' mouths and other body cavities."[61] Although many guards and prisoners at some facilities agree that the new combination of technology and toughness can bring about reductions in violence—at Rikers, what was described as "an almost eerie, 'Twilight Zone' calm"[62] was created inside the formerly chaotic jail—it fails to directly address any of the underlying causes of the tensions that precipitated the violence in the first place.

Nonetheless, of course, in the words of one Rikers guard, it "shows we're in charge."[63] Despite the modern technological veneer in which it is

cloaked, this goal—showing who is in charge or in control, sometimes at whatever cost—remains at the core of much correctional thinking. In lieu of confronting the contextual causes of problematic prisoner behavior, harsh and repressive tactics are used to suppress it. The correctional equivalent of the "law of the instrument"[64] means that the sheer availability of the iron hand—technological devices, hardware, and weapons—is likely to increase its use, even in response to minor infractions that in past times, in the absence of these armaments, might have been resolved in less forceful ways.

Moreover, the prevailing punitive ideology in American corrections has served to make the use of repressive forms of control seem more necessary and justified, leading to another punitive correctional trend. Many prison systems are making more extensive use of a new form of disciplinary segregation, or lockup, unit. Presumably designed to limit and control violence by keeping prisoners isolated from one another, the practice confines them under especially harsh and deprived conditions for very long periods of time.

The use of long-term solitary confinement was tried and then abandoned in the 19th century, when its psychological effects were recognized as harmful and inhumane. Yet, in the last several decades of the 20th century, it returned in the form of the modern supermax prison.[65] The trend began slowly. Before the massive influx of prisoners in the mid-1970s, some prison systems were rethinking the role of solitary confinement entirely, and others were devising ways to limit the amount and duration of isolation they used. However, as increasing numbers of prisoners entered the criminal justice system later in that decade—and in each subsequent one—punitive segregation emerged as one of the primary mechanisms to control unprecedented numbers of chronically idle and potentially unruly inmates.

At first, existing prisons were converted to segregation units. Thus, in large maximum-security California prisons like San Quentin and Folsom, there were extended periods during the 1980s when half or more of the entire prisoner population was housed in units that were devoted to long-term lockup. Even though one psychiatrist who worked in these units described them as producing "an atmosphere of terror rarely seen elsewhere" in society,[66] it was not uncommon for prisoners to be confined in them for several years or more.

Eventually, so-called supermax prisons were specially constructed for the purpose of isolating prisoners over the long term (and, for some, even on a permanent basis). Prisoners in supermax are allowed out of their cells for only very brief periods (on average, 1–2 hours a day), and otherwise eat, defecate, and lead the remainder of their lives entirely within the confines of their individual cells. Anytime prisoners in these units are moved or transported for any reason, they first are chained through special "cuff slots" on the outside of the cells, even before their doors are opened. In

many supermax units, inmates must exercise alone in small, specially designed "exercise cages." In the notorious "control unit" at the Marion federal penitentiary, the cages were placed inside the cellblocks themselves. Among other special security procedures, prison rules at many supermax prisons also require two or three guards to serve as escorts whenever a prisoner is moved inside the institution.[67]

Punitive segregation like this is not necessarily reserved for inmates who have committed serious disciplinary infractions. Many prison systems place suspected gang members and affiliates on "indeterminate" terms in their lockup units—whether they have or have not been convicted of any specific, overt behavioral infractions. They release them only after they have provided incriminating information about other suspected gang members. In addition, mainline prisoners can experience supermax-like conditions whether they have or have not been involved in violence or committed a disciplinary infraction. That is, whenever a serious violent incident erupts inside a prison, officials may "lock down" an entire cell block or whole facility, turning it into the equivalent of a segregation unit that confines everyone to his or her cell. These lockdowns can persist for weeks and months and, in the recent history of some institutions, have been in effect more often than not.

The severe conditions created inside the supermax prisons have not escaped legal commentary and critique. In a number of cases, judges have expressed concerns over the "stark sterility and unremitting monotony" of the interior design of these units, and the fact that prisoners housed there can "go weeks, months or potentially years with little or no opportunity for normal social contact with other people." They have observed that the sight of prisoners in the barren exercise pens to which they are restricted creates an image "hauntingly similar to that of caged felines pacing in a zoo,"[68] and acknowledged that "many, if not most" of the prisoners housed in supermax "experience some degree of psychological trauma in reaction to their extreme social isolation and the severely restricted environmental stimulation" to which they are exposed.[69] But they have permitted prison systems to continue to use them.

A basic understanding of self-fulfilling prophecies (by which the expectations of others elicit the anticipated behavior),[70] labeling theory (in which socially constructed labels come to shape and delimit the perceptions of self and others),[71] or psychologist Bonnie Strickland's classic research on surveillance and trust (showing that high levels of the former significantly impaired and impeded the latter)[72] highlights some of the ways in which inmates are likely to be adversely affected by this kind of treatment. Indeed, some prisoners will develop long-lasting psychological dependencies on these drastic and extreme forms of external control. Because surveillance and constraints like these are replicated nowhere else in society, their dependen-

216    REFORMING PUNISHMENT

cies and other reactions may have severely disruptive consequences for the prisoners who eventually are released back into free society.

Of course, some of these social psychological processes operate in both directions. For example, staff members are aware of the general reputation of the prisoners housed inside the supermax units where they work and—given the extraordinarily harsh and deprived conditions that have been created there—may readily conclude that they have been given a mandate to engage in intimidating, painful, and even brutal forms of social control. The tendency for this kind of absolute power to corrupt the behavior of those who wield it has been demonstrated in the brief history of these units.

For example, in the *Madrid* case that focused on California's Pelican Bay supermax prison, the court found that "excessive force was used in a variety of circumstances and settings, from staff assaults on inmates to punitive cagings under harsh conditions," and that "the amount of force applied was so strikingly disproportionate to the circumstances that it was imposed, more likely than not, for the very purpose of causing harm. . . ."[73] The excessive force in question included numerous instances of beating prisoners with batons; firing tasers, 38-millimeter gas guns, and mace at them; forcibly removing them from their cells for offenses as minor as failing to return a food tray; hog-tying prisoners or placing them in fetal restraints for as long as 9 hours for infractions like kicking their cell doors; placing naked prisoners in outdoor holding cages where they were exposed to public view as well as inclement weather (heavy rain and winter cold) for hours at a time; and "unnecessary," and in some cases, reckless . . ." discharging of lethal firearms inside the cellblocks of the prison.[74]

In theory, at least, these units are supposed to control violent prisoners by placing them in environments where they cannot harm anyone. Thus, prison officials claim that supermax prisons reduce the overall level of violence in the prison system by taking the most violent persons out of the general mix of prisoners. Yet there is little real evidence to support this notion. Indeed, Howard Bidna's early study examining the effects of these high-security units—conducted long before Pelican Bay was constructed—concluded that "the levels of fatal violence and of assaults by inmates on staff in California prisons were not significantly altered by the implementation of the strict security policies."[75] Bidna also found that although the overall rate of stabbings in the general prisoner population decreased, the levels increased in the security housing units despite (or perhaps because of) the intensified security procedures.

A more recent study indicated that supermax confinement failed to achieve its primary goal of reducing systemwide violence. That is, quite apart from the adverse psychological effects of supermax conditions on prisoners who experience them for such unprecedented lengths of time, there is no empirical evidence to support the assertion that such extreme

forms of long-term isolation reduce overall levels of aggression. Indeed, in terms that are consistent with the psychological framework I have advanced here, the authors of this study suggested that "patterns of inmate behavior will remain unchanged without addressing the context in which prison violence occurs and how inmate and staff interact in that context."[6]

## THE CONTEXTUAL ORIGINS OF THE PRISON GANG

There is another dysfunctional and dangerous adaptation that prisoners and guards make to each other and to the chaotic conditions around them. In chapter 6, I discussed some of the psychological changes that prisoners in general undergo to survive the rigors of the prison environment. As I noted, these include the struggle to preserve a sense of identity and self-worth in a setting where these things are deeply undermined. In part to establish a system of meaning that is separate from the one imposed on them by the prison, prisoners develop their own internal culture and corresponding set of norms. Indeed, some prisoners devise entirely separate languages or argots with which to communicate and that, among other things, allow them to retain their separate identities apart from the institutions that house them.[7] All prisons have what Polish sociologist Pawel Moczydlowski termed a "hidden life," and particularly in prisons that impose especially harsh conditions and severe deprivations, the terms of that life can become extreme and distorted.[78]

However, as I have argued in this chapter, the situational pathologies of prison extend well beyond the direct adaptations of the prisoners to the extreme environments in which they are placed. They also include the way in which the prison context itself first helps to create problematic behavior among prisoners and then, because of the manner in which this behavior is responded to, exacerbates it. No phenomenon illustrates this complex and paradoxical interplay better than the rise of the prison gangs over the last several decades.

People join gangs in prison for largely the same reasons they do in the larger society: "When faced with an external threat, people tend to band together in groups to protect themselves. . . . The degree to which individuals seek this kind of protection depends on both their internal sense of security and the intensity of the external threat."[79] Thus, there is a personal component to the impulse to align with a group in order to achieve an internal sense of psychological security—especially in environments "where the self is constantly vulnerable to the lack of respect." Particularly in those places in our society "where social domination is increasingly experienced in terms of personal failure," gang membership becomes a preferred "strategy to defend subjectivity. . . ."[80] In addition, there is a social aspect to the attraction of

the gang: "The gang is a response to social disorganization: It produces order in a world of disorder."[48] Of course, both aspects help to explain why street gangs typically take root in neighborhoods where young people—because of poverty, race, or ethnicity—are denied larger cultural representation and otherwise become marginalized and excluded from meaningful participation in the larger society.

With this perspective in mind, the increase in the numbers and the importance of prison gangs over the last several decades is best viewed as a consequence—not a cause—of pathological prison conditions. A growing number of prisoners in the United States have adapted to deteriorating, deprived, and dangerous prison conditions through a collective response: by seeking strength, opportunities, and security in numbers through the formation of prison gangs.[82] More specifically, prisoners who feel personally powerless, threatened, and vulnerable are more likely to feel the need to align themselves with others, to organize for their own protection, and to enhance their own status and control through connections to more powerful groups. Especially among many prisoners whose backgrounds and social histories have been filled with trauma and insecurity, and who confront what appears (at least initially) to be a confusing, socially disorganized prison world, joining with others in common purpose seems to offer them a stable identity and a source of security. In short, gangs provide psychological and physical protection to those who feel they need it.[83]

Yet, the initial self-protective motives of recruits makes them vulnerable to powerful gang-related pressures directing them toward more nefarious ends. Paradoxically, in the long run, prison gangs endanger the well-being of prisoners who initially join in the hope of surviving the treacherous and deprived conditions in which they live in prison. They soon learn that, eventually, having been identified as a gang member virtually always results in a worsened rather than improved quality of prison life. Thus, what begins as a seemingly natural and even necessary adaptation to seemingly intolerable conditions may become ultimately self-defeating. In this sense, gang membership represents another example of what I termed earlier the dynamics of desperation that starts with the tendency of extreme prison environments to force increasingly narrow Hobson's choices on prisoners. As a result, many will pursue what at the time seem like necessary short-term adaptations that over time lead to harmful consequences, ones made difficult to foresee by mounting pressures to survive intolerable conditions.[84]

In addition, however, the prison system's characteristic response to these problems—many of which are institutionally created—exacerbates them, completing the cycle of situational pathology.[85] That is, by viewing gang membership as a reflection of individual deviance, something to be suppressed through punishment, prison systems not only ensure the gangs' continued existence but inadvertently enhance their power. Among other

things, "by imposing harsh, even tortuous, conditions" in an attempt to suppress gang activity, prison officials intensify "the need for 'a sense of belonging,' which is what causes gang members to gravitate toward one another in the first place."[86]

Refusing to acknowledge and alleviate the harsh overall conditions that have contributed to the rise of the gang activity means that the root causes of the problem will not be addressed. This conclusion is shared by others. Indeed, a National Institute of Corrections study of the causes of increased prison gang activity implicated the poor quality of life in contemporary prisons (including a lack of programs and work opportunities, widespread idleness, overly restrictive visiting policies, and overcrowded, unsafe, and poorly maintained facilities).[87] Nonetheless, most prisons have continued to ignore these contextual issues and instead to target only individuals—by isolating gang members in harsh punitive segregation units (nowadays, often in supermax prisons), where "they are forced to rely on each other for human contact and support, because there is no other source."[88] Again, by this flawed logic, the draconian measures that have been introduced in response to the threat posed by the gangs have served to increase their power.

## THE LEGACY OF ADVERSE CONDITIONS: RIOTS AND RECIDIVISM

In extreme cases, breakdowns in prison social organization can precipitate more collective forms of violence. To be sure, prison riots—defined by researchers as the loss of control of "a significant number of prisoners, in a significant area of the prison, for a significant amount of time"[89]—are rare. Most experts acknowledge that a unique set of precipitating conditions—including adverse conditions of confinement, social disorganization, and the loss of legitimacy by the prison administration itself—are required before a prison riot is likely to occur.[90] For example, one social scientist who studied the deadly 1980 riot at the Penitentiary of New Mexico concluded that the prison's "control structure . . . in the late 1970s mirrored the inmate social structure: both depended upon coercion and resulted in fragmentation into cliques. These gradual structural changes within the organization set the stage for the riot."[91]

Similarly, sociologist Bert Useem explained the same riot in terms of the disintegration of social organization within the institution that had occurred beforehand. In the preceding decade, the penitentiary had deteriorated from a benign and orderly facility into a prison that was "harsh, abusive, painfully boring, and without the 'regulatory mechanisms' that had been in place" in the early part of the decade. By the late 1970s, there was a great deal of idleness, and "inmates remained confined to their living units with

controlling for demographics, prior record, and offense.[96] Another such study—this one published in the mid-1970s, as the era of overincarceration was just beginning—reached virtually the same conclusion, namely, that "incarceration is no better than noninstitutional treatment at preventing recidivism and may actually be worse."[97]

In the mid-1980s, Joan Petersilia and her colleagues reported that persons in their study who had been imprisoned were more likely to be arrested than a matched group of probationers (72% vs. 63%), more likely to have charges filed against them (53% vs. 38%), and more likely reincarcerated (47% vs. 31%) over the 2-year period on which they focused.[98] A few years later, another group of researchers reported that the adverse effects of imprisonment differed depending on the kind of crime for which persons were incarcerated. Specifically, the study indicated that "the robber's response to time served [was] linear, with the probability of recidivating increasing monotonically with time served. Evidently, robbers who are punished more severely, in terms of length of imprisonment, are not more likely to adopt avoidance behavior."[99] More generally, they concluded that "offenders who become increasingly estranged from the legitimate world as their sentence lengthens are more likely to recidivate if their sentences are longer."[100]

Note that most of these studies were conducted in an earlier period when at least some attention still was being given to the goal of rehabilitation. In the modern era, in which pain has been made the purpose of imprisonment, studies showing that prisons may do more harm to prisoners than good seem to have less shock value. Yet, the overall pains of imprisonment—and, therefore, the potentially debilitating consequences that follow harsh confinement—are likely to have increased as a result of the new emphasis on punitive social control and longer terms of imprisonment. Prisoners are now exposed to harsh prison conditions overseen by prison officials attempting to manage far too many people, with far too little to do, who are incarcerated for far too long a period of time.

And there is much new evidence that, indeed, these harsh and painful contexts do matter. That is, it does matter when prisons are plagued by a surplus of situational pathologies as opposed to having concerted efforts made to help prisoners resist maladaptive institutional responses and to provide them with humane institutional programming. Recall the results of the large-scale, federally sponsored study I discussed in chapter 3, in which the postprison success rates of persons released in 1994 compared unfavorably with those of persons released a decade earlier.[101] Whatever else the "get tough" policies had accomplished during these years, they had not produced prisons able to either better ensure the success of parolees or create a great enough deterrent effect to dissuade them from future crime.

little to do or look forward to." Prisoners became frustrated and hostile, "not only toward prison officials and guards, but also toward one another."[92] An extraordinarily unfortunate sequence of events allowed prisoners to gain control of the facility, and an explosive outpouring of pent-up emotion and violence ensued.

However, the observations that have been made about preexisting conditions at the Penitentiary of New Mexico in the late 1970s seem to apply, in varying degrees, to many prisons in the United States. If so, what accounts for the relative infrequency of prison riots? The extreme levels of force and intimidation that I discussed earlier in this chapter and the sophisticated forms of technological control that have been introduced in many facilities provide part of the explanation. Prisoner resentment, frustration, and conflict are adequately suppressed and sufficiently controlled so that organized expression or resistance is effectively thwarted. Yet, it would be a mistake to conclude that suppressing these pervasive prisoner reactions prevents them from taking a psychological toll or from being expressed after prisoners are released. Indeed, in the remainder of this section I argue that a broader, albeit less visible, set of problems has been brought about by deteriorating conditions and harsh treatment: postprison debilitation that virtually guarantees high levels of reoffending.

In fact, long before the trends toward overincarceration began in the mid-1970s, a number of early studies of recidivism appear to have documented at least some of the adverse criminogenic effects of incarceration. In one early study, for example, Leslie Wilkins cautiously questioned conventional wisdom and concluded that "the use of probation as treatment for a large proportion of cases which many courts would have sent to prison does not result in a greater proportion of reconviction."[93]

Another early but compelling study suggested that under certain circumstances the experience of imprisonment made the subsequent commission of crimes more, rather than less, likely. Charles Eichman conducted a natural experiment with Florida prisoners that was occasioned by the U.S. Supreme Court's decision in Gideon v. Wainwright,[94] in a ruling that resulted in prisoners who had been unrepresented at their criminal trials being released from custody. Eichman compared over a hundred prisoners freed "prematurely" because of the Court's decision with a matched sample of prisoners who had served their full sentences. After 2 years of unsupervised freedom, the early-release group was almost half as likely to have recidivated as those who had stayed through their full terms (14% vs. 25%).[95]

As similar but less dramatic difference was found by California researchers at the start of the decade of the 1970s when they compared probationers with persons released after serving terms of incarceration. They found that 34% of probationers in their study recidivated, compared with 51% of those who had been incarcerated, and that these differences persisted even after

Consistent with the contextual model of behavior around which much of this book has been structured, there is an emerging new psychology of "prison effects" that documents the painfulness of prison and its long-term harmful—even criminogenic—consequences. For example, Alison Liebling and her colleagues found that the measured levels of distress in the prisons they studied were "extraordinarily high."[102] In fact, in 11 of the 12 facilities they studied, the mean distress score among prisoners was above the threshold needed to inquire into whether a patient is suffering from a treatable emotional or psychological illness. Furthermore, the levels of distress varied in predictable ways, in part as a function of the quality of life in the prison environment (or the prisoners' experience of it). Thus, prisons whose "moral performance" was poor—ones rated low on social climate and other measures—also produced higher levels of distress among prisoners.[103]

In addition to research on the effects of the general social climate of prison, some recent studies have focused on the psychological consequences of particular forms of prison trauma. Of course, not only do prisons vary widely in terms of the kinds of experiences they create for prisoners—the point I made at the outset of chapter 6 that not all prisons are equally benign, painful, or capable of inflicting harm—but prisoners vary in terms of how they experience the same environments or events and how harmful and disabling seemingly identical prison experiences prove to be for them over the long term.[104] Thus, one study of prison distress focused on the degree to which having been victimized in prison led to depression and symptoms of posttraumatic stress.[105] The researchers found that a history of having been exposed to trauma and violence prior to coming to prison helped to explain their level of prison distress, but also that "prison victimization contributes to the occurrence of depressive and [posttraumatic stress] symptoms."[106] Indeed, they concluded that the experience of being victimized in prison *added* to the pains of the preexisting events to which the prisoner had been exposed. Especially because of the potential for posttraumatic stress symptoms to prove disabling on release, the authors recommended that "rehabilitative efforts should help inmates recover from trauma occurring inside and outside prison."

Evidence that high levels of prison distress and trauma translate into lasting problems for the prisoners who suffer them comes from a variety of sources. For example, in Adrian Grounds's psychiatric assessments of a group of long-term prisoners who had been exonerated and subsequently released, he recognized that the most serious psychological problems many prisoners would face were likely to occur *after* they left prison. Indeed, his assessments uncovered a pattern of disabling symptoms and severe psychological problems that paralleled findings from the trauma literature in psychology and psychiatry. Grounds concluded that the "extent of the suffering was profound."[107]

It is not surprising that the overcrowded conditions and anti-rehabilitation ethos that characterized the last several decades in American corrections appear to have greatly increased the criminogenic risks that persons must overcome following incarceration. Joan Petersilia summarized the results of research on the plight of those released from the kind of prisons I have described in this and in several previous chapters this way:

The average inmate coming home will have served a longer prison sentence than in the past, be more disconnected from family and friends, have a higher prevalence of substance abuse and mental illness, and be less educated and less employable than those in prior prison release cohorts. Each of these factors is known to predict recidivism, yet few of these needs are addressed while the inmate is in prison or on parole.[108]

Finally, Paul Gendreau and his colleagues conducted a comprehensive meta-analytic study of the relationship between incarceration, length of confinement, and recidivism. They concluded that doing time in prison actually had a criminogenic effect. Indeed, not only did going to prison increase the chances of reoffending, but also, the more time served, the greater were the crime-producing consequences. Although the overall effects were modest in size, Gendreau and his colleagues concluded that "the enormous costs accruing from the excessive use of prison may not be defensible," and that the long-term societal impact—in terms of increased amounts of crime produced by more people going to prison for longer amounts of time—was particularly problematic "given the high incarceration rates currently in vogue in North America."[109]

Although there is certainly no systematic empirical proof of the proposition, that literally all prisons have significant criminogenic effects, these studies underscore the fact there may be a strong crime control rationale for transforming prisons and reducing the magnitude of the pain that they inflict. As one veteran prison administrator acknowledged,

I now think that my colleagues and I initially underestimated the negative effect of custody. We are now much more willing to say that even the research findings on recidivism affirm a widely shared belief that custody is best viewed as the last resort.[110]

On a more positive note, context matters in the opposite way as well. That is, as Liebling and her colleagues have shown, not only is it possible to measure the quality of prison life and to document that overall distress levels tend to be very high in general, but also, it does matter whether prisoners are treated well in prison. In particular, the quality of prison life and the nature of correctional treatment can compound or alleviate the vulnerabilities with which persons enter prison. This means that prisoners who are confined in safe and caring facilities and who experience fair

treatment during incarceration experience a greater sense of well-being and are less likely to experience negative outcomes during incarceration.[11]

## CONCLUSION

It is not difficult to understand the flawed logic by which dangerously overcrowded prison systems that were threatened with what many administrators feared was an inevitable loss of control would resort to unprecedented and oppressive forms of treatment. In institutions where two or three prisoners were forced to live in cells built for one, or where inmates were required to sleep in hallways or on gymnasium floors, many officials came to regard counseling sessions, mental health services, educational classes, vocational training programs, and the like as niceties that could be dispensed with until more basic concerns were addressed. But they went much further. Many of their ill-advised short-term responses to the uncontrollable influx of prisoners have changed the social concept of prison, producing conditions that are often hurtful and potentially destructive in the long run. They have consequences that will be personally disabling for some prisoners and produce outcomes that are unintended and undesirable both for correctional systems themselves and for society at large.

Many of these situational pathologies now threaten to become functionally autonomous, permanent features of the contemporary prison. They appear to reflect an emerging correctional norm authorizing extreme forms of deprivation and repressive control at the discretion of prison staff and administrators. G. K. Chesterton once noted that perhaps the most horrible thing about public officials was not that they were wicked or stupid, but that they "simply have got used to it,"[12] that is, accustomed themselves to many of the worst things that they were called upon to do. The last several decades have witnessed a spiraling escalation of punishment in the form of repressive control, excessive surveillance, and punitive isolation in penal systems throughout the United States. The rising tide of punishment developed its own momentum. In what might be termed the iron law of corrections, a kind of criminal justice analog to Helson's adaptation-level theory[13] occurred in which the increasingly extreme endpoints on the continuum of severe punishment served as anchors that made harsher punishments more tolerable at all other points along the scale. Thus, too many instances, even outright brutality, that appear in accounts of life inside some American prisons may be easier to understand—although not to countenance—from this perspective.[14]

As I have noted, these harsh policies also emerged within a larger sociopolitical context in which the limits to the pain of imprisonment had

been effectively neutralized or eliminated. On the one hand, correctional administrators were confronted by severe management problems that stemmed from unprecedented overcrowding that they neither had initiated nor were in a position to stop. On the other hand, a punitive political climate allowed them to make a range of expedient but extreme managerial decisions in the name of security and control. Not only were the pains of imprisonment largely unregulated but they had been made the very purpose of incarceration. The pressures to control prisoners through the application of greater levels of pain—force, intimidation, and emerging technologies of pain delivery—proved too great to resist. Many prisons have continued to behave badly in response.

Of course, modern psychological theory would argue for much greater sensitivity to the harmful prison effects that were produced, ensuring that the institutional responses to real and perceived disorder did not cause situations and contexts to deteriorate even further. But this perspective was not represented in the decision-making process that produced these policies. In addition, there were few barriers left in place to prevent the drift toward cruel treatment. Among other things, these punitive trends were facilitated by a number of legal rulings by decision makers—once looked to as a source of protection from state-sanctioned excessive punishment. Absent meaningful oversight or intervention, and little or no consistent enforcement of humane limits to prison pain in many jurisdictions, these forbidding places directed what David Garland called their "stored-up power" and "silent, brooding capacity to control" against many of those prisoners least able to withstand it.[15] In fact, as I discuss in the next chapter, even the most vulnerable prisoners—those who are mentally ill or developmentally disabled—were subjected to many of these punitive extremes.

## NOTES

1. Nils Christie, Limits to Pain (Oxford, England: Martin Robertson, 1982), 46, 49.
2. D. Garland, "Punishment and Culture: The Symbolic Dimensions of Criminal Justice," Studies in Law, Politics, and Society 11 (1991): 191, 203.
3. Lawrence Friedman, Crime and Punishment in American History (New York: Basic Books, 1993), 316.
4. I. Barak-Glantz, "Who's in the 'Hole'?" Criminal Justice Review 8 (1983): 29, 29.
5. See, e.g., "The Incorrigibles: They Rape and Molest. They Defy Treatment. How Can Society Protect Itself?" Newsweek, January 18, 1993, p. 48. This article is typical of the genre. It ends with the observation that "one way or another, society keeps searching for a way to protect itself. After all, the Constitution isn't a suicide pact." 50.
6. Of course, stressful prison conditions exert significant pressures on correctional officers as well as prisoners. Although this book concentrates on the effects of

the prison context on prisoners, the correctional staff is an extraordinarily significant component of that environment. Other scholars and researchers have systematically addressed the important question of how correctional officers are changed and transformed by the experience of working in prison. See, e.g., Ted Conover, *Newjack: Guarding Sing Sing* (New York: Vintage Books, 2000); Gary Cornelius, *Stressed Out: Strategies for Living and Working With Stress in Corrections* (Laurel, MD: American Correctional Association, 1994); Elaine Crawley, *Doing Prison Work: The Public and Private Lives of Prison Officers* (Cullompton, England: Willan Publishing, 2004); P. Finn, "Correctional Officer Stress: A Cause for Concern and Additional Help," *Federal Probation* 62 (1998): 65; R. Huckabee, "Stress in Corrections: An Overview of the Issues, *Journal of Criminal Justice* 20 (1992): 479; Alison Liebling and David Price, *The Prison Officer* (Leyhill, England: Prison Service and Waterside Press, 2001); Alison Liebling, *Prisons and Their Moral Performance: A Study of Values, Quality, and Prison Life* (New York: Oxford University Press, 2004); and Lucien Lombardo, *Guards Imprisoned: Correctional Officers at Work* (New York: Elsevier, 1981).

7. See, e.g., chapter 4, this volume.

8. American Civil Liberties Union, National Prison Project, *Status Report: State Prisons and the Courts* (Washington, DC: Author, 1995).

9. T. Conover, "Guarding Sing Sing," *The New Yorker*, April 3, 2000, p. 56.

10. V. Cox, P. Paulus, and G. McCain, "Prison Crowding Research: The Relevance for Prison Housing Standards and a General Approach to Crowding Phenomena," *American Psychologist* 39 (1984): 1148, 1150; Gilbert Gaes, "The Effects of Overcrowding in Prison," in *Crime and Justice: Annual Review of Research*, ed. Michael Tonry and Norval Morris (Chicago: University of Chicago Press, 1985); Paul Paulus, *Prison Crowding: A Psychological Perspective* (New York: Springer-Verlag, 1988).

11. T. Thornberry and J. Call, "Constitutional Challenges to Prison Overcrowding: The Scientific Evidence of Harmful Effect," *Hastings Law Journal* 35 (1983): 313, 351. Overcrowding studies at women's prisons showed similar effects. See B. Ruback and T. Carr, "Crowding in a Woman's Prison: Attitudinal and Behavioral Effects," *Journal of Applied Social Psychology* 14 (1984): 57.

12. See, e.g., S. Ekland-Olson, "Crowding, Social Control, and Prison Violence: Evidence from the Post-Ruiz Years in Texas," *Law and Society Review* 20 (1986): 389.

13. See, e.g., J. Bleich, "The Politics of Prison Crowding," *California Law Review* 77 (1989): 1125.

14. See, e.g., P. Paulus, V. Cox, G. McCain, and J. Chandler, "Some Effects of Crowding in a Prison Environment," *Journal of Applied Social Psychology* 5 (1975): 86, 90. The present study indicates that living under relatively crowded housing conditions in a prison produces both negative, affect; and a lower criterion of what constitutes overcrowding."

15. See, e.g., D. D'Atri, "Psychophysiological Responses to Crowding," *Environment and Behavior* 7 (1975): 237; "The major hypothesis that there would be an association between degree of crowding and blood pressure, systolic and diastolic, was strongly supported," 247.

227    OVERCROWDING AND SITUATIONAL PATHOLOGIES

16. See, e.g., G. McCain, V. Cox, and P. Paulus, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," *Environment and Behavior* 8 (1976): 283, 288.

17. P. Paulus, G. McCain, and V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," *Environmental Psychology and Nonverbal Behavior* 3 (1978): 107, 115. See also Adrian Ostfeld, Stanislav Dasl, David D'Atri, and Edward Fitzgerald, *Stress, Crowding, and Blood Pressure in Prison* (Hillsdale, NJ: Lawrence Erlbaum, 1987).

18. E. Megargee, "The Association of Population Density, Reduced Space, and Uncomfortable Temperature with Misconduct in a Prison Community," *American Journal of Community Psychology* 5 (1977): 289, 295.

19. See, e.g., V. Cox, P. Paulus, and G. McCain, "Prison Crowding Research," *American Psychologist* 39 (1984): 1148, 1159. See also E. Sieh, "Prison Overcrowding: The Case of New Jersey," *Federal Probation* 53 (1989): 41, for a brief review. For a discussion on the health risks of prison and jail overcrowding, see B. Walker and T. Gordon, "Health Risks and High Density Confinement in Jails and Prisons," *Federal Probation* 44 (1980): 53.

20. F. DiCataldo, A. Greer, and W. Profit, "Screening Prison Inmates for Mental Disorder: An Examination of the Relationship Between Mental Disorder and Prison Adjustment," *Bulletin of the American Academy of Psychiatry and Law* 23 (1995): 573, 574.

21. National Center For Education Statistics, *Literacy Behind Prison Walls* (Washington, DC: U.S. Department of Education, October 1994).

22. Gary Sutherland, *Reading Proficiency of Inmates in California Correctional Institutions* (Sacramento: California State University, 1997).

23. California Department of Corrections Web site, at http://www.cdc.state.ca.us/facsin.htm. Last visited December 30, 2002.

24. Kathleen McGuire and Ann Pastore, *Sourcebook of Criminal Justice Statistics, 1992* [U.S. Department of Justice, Bureau of Justice Statistics] (Washington, DC: U.S. Government Printing Office, 1993), 634.

25. Specifically, only 53.6% of the more than 150,000 California prisoners were employed in any type of work assignment at the end of the year 2002. California Department of Corrections, *CDC Facts* (January 2003; http://www.cdc.state.ca.us/cdcfacts.htm).

26. United States General Accounting Office, *Report to the Attorney General: Improved Prison Work Programs Will Benefit Correctional Institutions and Inmates* (Washington, DC: Author, 1982), 2. Other commentators agreed. Noting that "less than 20 percent of the national prison population works," one expressed concern that most inmates just "sit around, becoming bored, restless and, sometimes, violent." He argued that the best way to keep the control of incarceration low and the potential for rehabilitation high was to "give inmates a job." G. Mehler, "Prisoners Need Jobs, and We Can't Afford to Let Them Sit Idle," *Los Angeles Daily Journal*, July 23, 1984, p. 12. But there was little evidence that this advice was taken.

228    REFORMING PUNISHMENT

27. Michael King, "Male Rape in Institutional Settings," in Male Victims of Sexual Assault, ed. Gillian Mezey and Michael King (Oxford, England: Oxford University Press, 1992), 70.

28. P. Gunby, "Sexual Behavior in an Abnormal Situation," Medical News 245 (1981): 215.

29. See, e.g., H. Fontell and W. Welsh, "Incarceration as a Deviant Form of Social Control; Jail Overcrowding in California," Crime & Delinquency 40 (1994): 18.

30. Wayne Welsh, "The Dynamics of Jail Reform Litigation: A Comparative Analysis of Litigation in California Counties," Law & Society Review 26 (1992): 591, 604–605. See, e.g., Paul Paulus and Garvin McCain, "Crowding in Jails," Basic and Applied Social Psychology 4 (1983): 89. In the era of overincarceration, jail crowding has become the norm. From 1984 to 2000 (the last year for which data were available), jails in the United States operated with inmate populations that were at 90% or above their overall rated capacity, Kathleen McGuire and Ann Pastore, Sourcebook of Criminal Justice Statistics, 2000 [U.S. Department of Justice, Bureau of Justice Statistics] (Washington, DC: U.S. Government Printing Office, 2001), 501. Some facilities are much more crowded, and the problem does not appear to have subsided in recent years.

31. See John Wooldredge and L. Winfree, "An Aggregate-Level Study of Inmate Suicides and Deaths Due to Natural Causes in U.S. Jails," Journal of Research in Crime & Delinquency 29 (1992): 466. In addition, the same study found that natural deaths in jail can be reduced when overcrowding is alleviated and other humane standards of confinement are implemented.

32. S. Ekland-Olson, D. Barrick, and L. Cohen, "Prison Overcrowding and Disciplinary Problems: An Analysis of the Texas Prison System," Journal of Applied Behavioral Science 19 (1983): 163, 174; See also G. Gaes and W. McGuire, "Prison Violence: The Contribution of Crowding Versus Other Determinants of Prison Assault Rates," Journal of Research in Crime and Delinquency 22 (1985): 41.

33. P. Nacci, H. Teitelbaum, and J. Prather, "Population Density and Inmate Misconduct Rates in the Federal Prison System," Federal Probation 41 (1977): 26, 29.

34. Here, too, there are "context effects" at work. Thus, Stephen Light found that the severity of inmate-on-officer assaults was a function of the age distribution of the prisoner population at the facility (and not the age of the prisoner who committed the assault per se.) He concluded that the characteristics of the assaults he studied were "in large part determined by attributes of the prison environment rather than by prisoner characteristics. . . ." S. Light, "The Severity of Assaults on Prison Officers: A Contextual Study," Social Science Quarterly 71 (1990): 267, 281–282.

35. See, e.g., S. Grassian, "Psychopathological Effects of Solitary Confinement," American Journal of Psychiatry 140 (1983): 1450; S. Grassian and N. Friedman, "Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement," International Journal of Law and Psychiatry 8 (1986): 49; C. Haney, "Infamous Punishment: The Psychological Effects of Isolation," National Prison Project Journal 8 (1993): 3; C. Haney and M. Lynch, "Regulating Prisons of

the Future: A Psychological Analysis of Supermax and Solitary Confinement," New York Review of Law & Social Change 23 (1997): 477; and C. Haney, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency 49 (2003): 124.

36. D. Farrington and C. Nuttall, "Prison Size, Overcrowding, Prison Violence, and Recidivism," Journal of Criminal Justice 8 (1980): 221, 230.

37. J. Bonta and L. Motiuk, "The Diversion of Incarcerated Offenders to Correctional Halfway Houses," Journal of Research in Crime & Delinquency 24 (1987): 302.

38. Ibid, 312.

39. Timothy Flanagan, "Correlates of Institutional Misconduct Among State Prisoners," Criminology 21 (1983): 29, 37.

40. Ibid, 161.

41. R. McCorkle, "Personal Precautions to Violence in Prison," Criminal Justice and Behavior 19 (1992): 160, 160–161.

42. There are other subtleties to the measurement of prison overcrowding effects that confound the basic input–output models often used in these studies. For one, not all prisoners adapt to even stable overcrowded conditions in the same ways. Yet, diverse reactions are not easily identified in aggregate data analyses. In addition to these individual differences in the ways prisoners react to overcrowding, there may be important situational differences within the separate institutions whose statistics are aggregated. That is, some kinds of prisons are better equipped to handle overcrowding than others, and some have staff members better trained to respond to the crises that overcrowded conditions provoke. Even variations in the so-called microclimates within the same prison (e.g., certain areas of a prison may be better able to absorb higher concentrations of prisoners than others) can complicate attempts to identify overall patterns or aggregate shifts in the frequency of measurable behaviors (e.g., disciplinary infractions) that may take place in response to overcrowding.

43. Ekland-Olson, "Crowding, Social Control, and Prison Violence: Evidence From the Post-Ruiz Years in Texas."

44. See, e.g., Edwin Lemert, "Visions of Social Control: Probation Reconsidered," Crime & Delinquency 39 (1993): 447; and, Jonathan Simon, Poor Discipline: Parole and the Social Control of the Underclass, 1890–1990 (Chicago: University of Chicago Press, 1993). See also W. Kelly and S. Ekland-Olson, "The Response of the Criminal Justice System to Overcrowding: Recidivism Patterns Among 4 Successive Parole Cohorts," Law & Society Review 25 (1991): 601.

45. Some commentators who de-emphasize the significance of prison overcrowding nonetheless are correct when they note that a particular rated capacity of any specific facility "may vary with a prison's physical configuration, staffing patterns, available services, and program design," and also that precise figures are "difficult to determine and easy to manipulate." Bleich, "The Politics of Prison Crowding," 1141 (footnotes omitted).

46. Bleich's contentions that no one really contests legal claims of prison overcrowding anyway and that courts regularly set unnecessarily low population limits

with which prison administrators are only too willing to comply bear no relationship to the prison conditions litigation with which I am familiar that occurred throughout the United States over the last several decades. Cf. Bleich, "The Politics of Prison Crowding."

47. L. Fry, "Continuities in the Determination of Prison Overcrowding Effects," *Journal of Criminal Justice* 16 (1988): 231, 239.

48. Ibid.

49. John Irwin, *The Warehouse Prison: Disposal of the New Dangerous Class* (Los Angeles: Roxbury, 2005), 75.

50. Kathleen McGuire and Ann Pastore, *Sourcebook of Criminal Justice Statistics, 1996* [U.S. Department of Justice, Bureau of Justice Statistics] (Washington, DC: U.S. Government Printing Office, 1997), 561.

51. Ibid.

52. See, e.g., Lee Bowker, *Prison Victimization* (New York: Elsevier, 1980); Daniel Lockwood, *Prison Sexual Violence* (New York: Elsevier, 1980); and A. I. Ibrahim, "Deviant Sexual Behavior in Men's Prisons," *Crime & Delinquency* 38 (1974): 20, for discussions of these issues.

53. D. Walcott, "Sexually Violent Predator Commitment: Successfully Challenged on Basis of Conditions of Confinement and Treatment," *Journal of the American Academy of Psychiatry & the Law* 28 (2000): 244.

54. Juanita Díaz-Cotto, *Gender, Ethnicity, and the State: Latina and Latino Prison Politics* (Albany, NY: State University of New York Press, 1996), 114. In past times, the limited English proficiency of Latino prisoners was used in some prison systems as a basis to formally restrict their contact with the outside world. Thus, until 1970, in New York state prisons English was the only acceptable language for correspondence. For years thereafter, all outgoing mail had to be written in English.

55. Ibid. For an early and very brief acknowledgement that monolingual Spanish-speaking inmates may find incarceration "particularly stressful" and experience forms of psychological deterioration in prison as a result, see M. Bohn and G. Traub, "Alienation of Monolingual Hispanics in a Federal Correctional Institution," *Psychological Reports* 59 (1986): 560.

56. Díaz-Cotto, *Gender, Ethnicity, and the State*, 111.

57. M. M. Feeley and J. Simon, "The New Penology: Notes on the Emerging Strategy of Corrections and Its Implications," *Criminology* 30 (1992): 449.

58. As described in a federal lawsuit addressing conditions of confinement at the Marion Federal Penitentiary, "a 'black box' is a small box that fits over the chain connecting the two cuffs and that is designed to prevent an inmate from picking the lock on the handcuffs." *Bruscino v. Carlson*, 654 F. Supp. 609, 615 n. 4 (S.D. Ill. 1987). It is designed to immobilize a prisoner's wrists while she or she is handcuffed.

59. Here is how a federal judge summarized the use of lethal force inside California's Pelican Bay, a high-security supermax prison: "The firearms used at Pelican Bay are: (1) the Ruger Mini-14 .223 caliber rifle, (2) the Heckler & Koch Model 94 (H & K 94) 9 millimeter carbine, using the Glaser Safety Slug, (3)

the Smith & Wesson .38 caliber revolver, and (4) the Remington 12-gauge pump shotgun. Firearms were discharged 177 times in 129 incidents between the time the prison opened and September 9, 1993. Of the 177 shots fired, 23 were intended to be for effect (i.e., were fired with the intent to hit a person), 152 were intended to be warning shots, and 2 were accidental. 109 shots were fired outdoors and 68 indoors. Of the 152 warning shots, 13 caused or were alleged to have caused inmate injuries from ricochets or bullet fragments." *Madrid v. Gomez*, 889 F. Supp. 1146, 1179, n. 52 (1995).

60. C. Drew, "Behind Bars, an Iron Hand Drastically Lowers Violence," *New York Times*, 8 November 1999, A1–A27, p. A1.

61. Ibid., p. A27.

62. Ibid.

63. Ibid.

64. Abraham Kaplan is credited with enunciating this principle as the "law of the instrument"—when your only tool is a hammer, too many things look like nails. Abraham Kaplan, *The Conduct of Inquiry* (New York: Harper, 1964). See the discussion of this issue in *Madrid v. Gomez*, 889 F. Supp. 1146 (1995): "The Court is convinced that the instances of force being used excessively and for the purpose of causing harm are of sufficient scope, variety, and number to constitute a pattern. Plaintiffs have convincingly documented a staggering number of instances in which prison personnel applied unjustifiably high levels of force, both pursuant to, and in contravention of, official prison policies. Simply put, the evidence before the Court is proof of the most powerful, unambiguous kind that a pattern of excessive force has become an undeniable reality at Pelican Bay." *Id.* at 1181.

65. In addition to the articles cited at endnote 35, see M. Jaikoff, "Hard Time: The Mission at Marion: Federal Prison Revives Debate on How to Handle Incorrigible Felons," *Washington Post*, May 28, 1991, p. A1, col. 1. See also R. Immarigeon, "The Marionization of American Prisons," *National Prison Project Journal* 7(4) (1992): 1; M. Jaikoff, "Human Rights Group Faults Super Security Prisons," *Washington Post*, November 14, 1991, p. A36, col. 1; B. Perkinson, "Shackled Justice: Florence Federal Penitentiary and New Politics of Punishment," *Social Justice* 21 (1994): 117.

66. R. Slater, "Psychiatric Intervention in an Atmosphere of Terror," *American Journal of Forensic Psychiatry* 7 (1986): 5, 9.

67. Cf. M. Olivero and J. Roberts, "The United States Federal Penitentiary at Marion, Illinois: Alcatraz Revisited," *New England Journal of Criminal and Civil Confinement* 16 (1990): 21.

68. *Madrid*, 889 F. Supp., at 1229.

69. *Id.* at 1235. Indeed, the court's opinion acknowledged that "social science and clinical literature have 'consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances.' *Id.* at 1230. The judge concluded that Pelican Bay inflicted treatment on prisoners that, in his words, "may well hover on the edge of what is humanly tolerable for those with normal resilience, particularly when endured for extended periods

of time." *Id.* at 1280. However, although the *Madrid* court also found that overall conditions in the supermax units were "harsher than necessary to accommodate the needs of the institution," for reasons I discuss in a later chapter, the judge concluded that he lacked any constitutional basis to close the prison or even to require significant modifications in many of its general conditions. *Id.* at 1263.

70. First articulated by sociologist Robert Merton, this concept has been extensively studied. See, e.g., M. Harris, "Self-fulfilling Prophecies in the Clinical Context: Review and Implications for Clinical Practices," *Applied and Preventive Psychology* 3 (1994): 145; A. Kukla, "The Structure of Self-Fulfilling and Self-Negating Prophecies," *Theory & Psychology* 4 (1994): 5.

71. Labeling theory has deep intellectual roots in social psychology and sociology, extending from the early work of Charles Cooley and George Herbert Mead, to Edwin Lemert's more recent theorizing about the way deviant labels affect the persons to whom they are applied, to Howard Becker's account of how their use helps to produce social "outsiders." See Charles Cooley, *Human Nature and the Social Order* (New York: Scribners, 1902); George Herbert Mead, *Mind, Self, and Society: From the Standpoint of a Social Behaviorist* (Chicago: University of Chicago Press, 1934); Edwin Lemert, *Social Pathology* (New York: McGraw-Hill, 1951); and Howard Becker, *Outsiders: Studies in the Sociology of Deviance* (New York: Free Press, 1963). See also Francis Cullen and John Cullen, *Toward a Paradigm of Labeling Theory* (Lincoln, NE: University of Nebraska Press, 1978); and Edwin Schur, *Labeling Deviant Behavior: Its Sociological Implications* (New York: Harper & Row, 1971).

72. B. Strickland, "Surveillance and Trust," *Journal of Personality* 26 (1958): 200. Of course, there is much surveillance and little trust in many correctional facilities. Indeed, if we take one psychologist's operative definition of trust as "a willingness to be vulnerable, or to take interpersonal risks in relationships despite uncertainty regarding the motives, intentions, and prospective actions of others on whom they depend," then it is clear that there is very little trust in most prison environments, and especially little in supermax facilities. R. Kramer, "Trust and Distrust in Organizations: Emerging Perspectives, Enduring Questions," *Annual Review of Psychology* 50 (1999): 569, 571.

73. *Madrid*, 889 F. Supp. at 1161.

74. *Ibid.*, 1179–80.

75. H. Bidna, "Effects of Increased Security on Prison Violence," *Journal of Criminal Justice* 3 (1975): 33, 42. To be sure, conclusions reached on the basis of a single study of a single prison system must be interpreted with caution. Many of the same factors that make it difficult to isolate any simple relationship between overcrowding and prison disciplinary violations apply here as well. As in the case of overcrowding, confounding can occur with numerous variables over which researchers have no control; often are part of the very dynamic that is under study. Thus, changes in violence levels in security housing or supermax units may have numerous influences that are difficult to specify or determine. Despite this qualification, there is no evidence that these severe and psychologically risky forms of extreme isolation achieve any of the long-term goals by

which their use has been justified. A recent study that has the advantage of looking at changes over time, during periods when extraneous variables could be taken into account, and in several systems rather than just one, challenged the notion that supermax prisons were uniformly effective in reducing violence. See C. Briggs, J. Sundt, and T. Castellano, "The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence," *Criminology* 41 (2003): 1341.

76. Briggs et al., "The Effect of Supermaximum Security Prisons on Aggregate Levels of Institutional Violence," 1367.

77. See, e.g., Inez Cardozo-Freeman, *The Joint: Language and Culture in a Maximum Security Prison* (Springfield, IL: Charles Thomas, 1984); T. Einat and H. Einat, "Inmate Argot as an Expression of Prison Subculture: The Israeli Case," *Prison Journal* 80 (2000): 309; Gilbert Encinas, *Prison Argot: A Sociolinguistic and Lexicographic Study* (Lanham, MD: University Press of America, 2001).

78. Pawel Moczydlowski, *The Hidden Life of Polish Prisons* (Bloomington, IN: University of Indiana Press, 1992).

79. Bessel van der Kolk, "The Role of the Group in the Origin and Resolution of the Trauma Response," in *Psychological Trauma*, ed. Bessel van der Kolk (Washington, DC: American Psychiatric Publishing, 1987), 155.

80. Kevin McDonald, "Marginal Youth, Personal Identity, and the Contemporary Gang: Reconstructing the Social World?" in *Gangs and Society: Alternative Perspectives*, ed. Louis Dontos, David Brotherton, and Luis Barrios (New York: Columbia University Press, 2003), 70.

81. *Ibid.*, 66. McDonald sees these aspects as shifting in importance, arguing that, in the contemporary gang, a response to the "constant fragility of identity" has become the primary motive for membership. I see both the social and personal as still very much in operation in prison gangs especially.

82. Sociologist John Irwin and others have suggested that "in the absence of more effective social organization, the tip and clique (gang) networks established ties and bridged gaps between prisoners." John Irwin, *Prisons in Turmoil* (Boston: Little Brown, 1980), 60. However, as tensions and conflicts between prisoners increased, gangs "increasingly became organized for their own members' protection" (*ibid.*, 74).

83. As one researcher described the motivation for and perceived advantages of gang membership for most prisoners, "the most pressing was protection from other inmates." Especially for someone arrested or incarcerated for the first time, "membership in an organization that applied blanket protection throughout the prison system was a blessing" that "bestowed status and prestige and allowed also one offer psychological advantages when the members return to civilian life. That is, 'When many members' households were chaotic, the gang functioned as an alternative family that presented rules and justifications for behavior, thereby bringing some order and structure into potentially unmanageable social and emotional situations." Ric Curtis, "The Negligible Role of Gangs in Drug Distribution in New York City in the 1990s," in *Dontos, Brotherton, and Barrios, Gangs and Society: Alternative Perspectives*, 50.

84. Craig Haney and Philip Zimbardo, "The Socialization into Criminality: On Becoming a Prisoner and a Guard," in Law, Justice, and the Individual in Society: Psychological and Legal Issues, ed. June Tapp and Felice Levine (New York: Holt, Rinehart & Winston, 1977), 217.

85. In some cases, prison systems have been implicated at several levels in the creation and proliferation of the prison gangs. For example, Robert Fong, a prison monitor who served in Texas during the implementation of court-ordered reforms in the early 1980s, noted that the most dominant gang in the Texas system "was originally formed for the purpose of self-protection against the supervisory responsibility of others by Texas prison authorities but whose brutality led a federal court to disband them. R. Fong, "The Organizational Structure of Prison Gangs: A Texas Case Study," Federal Probation 54 (1990, March): 36, 41. However, Fong argued that "as the building tender system faded away, it left behind a power vacuum" that the prison gang "wasted no time filling" (ibid). Of course, the gang's origins lay in the initial brutal treatment that had been created and condoned by the prison; and its increased success stemmed in part from the prison's inability to implement the court-ordered reforms quickly enough to fill the vacuum that had been created.

86. Phillip Kassel, "The Gang Crackdown in the Prisons of Massachusetts: Arbitrary and Harsh Treatment Can Only Make Matters Worse," in Dontos, Brotherton, and Barrios, Gangs and Society: Alternative Perspectives, 235.

87. National Institute of Corrections Information Center, Management Strategies in Disturbances and with Gangs/Disruptive Groups (Washington, DC: United States Department of Justice, 1991), 13.

88. Kassel, "The Gang Crackdown in the Prisons of Massachusetts," 235.

89. Bert Useem and Peter Kimball, States of Siege: U.S. Prison Riots 1971–1986 (New York: Oxford, 1989).

90. See, e.g., M. Colvin, "The 1980 New Mexico Prison Riot," Social Problems 29 (1982): 449; Mark Colvin, The Penitentiary in Crisis: From Accommodation to Riot in New Mexico (Albany, NY: State University of New York Press, 1992); Bert Useem, "Disorganization and the New Mexico Prison Riot of 1980," American Sociological Review 50 (1985): 677.

91. Colvin, "The 1980 New Mexico Prison Riot," 457.

92. Useem, "Disorganization and the New Mexico Prison Riot of 1980," 685.

93. Leslie Wilkins, "A Small Comparative Study of the Results of Probation," British Journal of Delinquency 8 (1958): 201, 207. See also United States General Accounting Office, Intermediate Sanctions: Their Impacts on Prison Crowding, Costs, and Recidivism Are Still Unclear (Washington, DC: Government Printing Office, 1990).

94. Gideon v. Wainwright, 83 S. Ct. 792 (1963).

95. For details of this study, see Charles Eichman, The Impact of the Gideon Decision Upon Crime and Sentencing in Florida: A Study of Recidivism and Socio-Cultural Change, Monograph No. 2. (Tallahassee: Florida Division of Corrections, 1966).

96. Ronald Beattie and Charles Bridges, Superior Court Probation and/or Jail Sample (Sacramento, CA: Bureau of Criminal Statistics, Department of Justice, 1970).

97. A. Hopkins, "Imprisonment and Recidivism: A Quasi-Experimental Study," Journal of Research in Crime and Delinquency (1976): 13, 27. See also L. Goodstein, "Inmate Adjustment to Prison and the Transition to Community Life," Journal of Research on Crime and Delinquency 10 (1980): 246.

98. Joan Petersilia, Susan Turner, and Joyce Peterson, Prison Versus Probation in California: Implications for Crime and Offender Recidivism (Santa Monica, CA: RAND Corporation, 1986).

99. T. Orsagh and J.-R. Chen, "The Effect of Time Served on Recidivism: An Interdisciplinary Theory," Journal of Quantitative Criminology 4 (1988): 155, 164 (emphasis added).

100. Ibid., 167. A more recent, comprehensive review of the relationship between the lengths of prison sentences and rates of recidivism indicated that longer prison sentences actually resulted in slightly higher rates of reoffending. See Paul Gendreau, Claire Goggin, and Francis Cullen, The Effects of Prison Sentences on Recidivism. A Report to the Corrections Research and Development and Aboriginal Policy Brand. (Ottawa: Solicitor General of Canada, 1999).

101. Patrick Langan and David Levin, Recidivism of Prisoners Released in 1994 (Bureau of Justice Statistics Special Report NCJ 193427) (Washington, DC: U.S. Department of Justice, June 2002).

102. Alison Liebling, Linda Durie, Annick van den Beukel, Sarah Tait, and Joel Harvey, "Revisiting Prison Suicide: The Role of Fairness and Distress," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (Cullompton, UK: Willan Publishing, 2005), 209, 216. Consistent with Liebling and her colleagues, other researchers have found that context-related factors help to account for emotional distress and even suicide in prison settings. For example, although Cooper and Berwick reported that there were individual factors and background characteristics that helped to predict suicide in different groups of incarcerated male prisoners, institutional factors—the severity of environmental stress among male prisoners, the severity levels of anxiety, depression, and suicidality. C. Cooper and S. Berwick, "Factors Affecting Psychological Well-Being of Three Groups of Suicide Prone Prisoners," Current Psychology 20 (2001): 677.

103. As similar kind of predictability was reported by Claudia Kesterman in her analysis of the correlates of depressive symptoms among male prisoners in the correctional systems of several European countries. Thus, poor relations with staff and other prisoners (i.e., perceived rejection), the presence of environmental stress factors, the experience of victimization, the lack of respect by staff, and the absence of home and/or work release at the facility were all significant predictors of whether prisoners manifested depression. Claudia Kesterman, "Prison Life: Factors Affecting Health and Rehabilitation." Paper presented at the European Conference on Psychology and Law, Vilnius, Lithuania, July, 2005. Building on the basic notion that unhealthy prisons can have unhealthy psychological effects on prisoners, Kesterman, Frieder Dunkel, and the others

involved in this project have concluded that there are a variety of specific conditions of confinement associated with certain adverse emotional reactions.

104. See, e.g., C. Hemmens and J. Marquart, "Straight Time: Inmate's Perceptions of Violence and Victimization in the Prison Environment," *Journal of Offender Rehabilitation* 28 (1999): 1.

105. A. Hochstetler, D. Murphy, and R. Simons, "Damaged Goods: Exploring Predictors of Distress in Prison Inmates," *Crime & Delinquency* 50 (2004): 436. The researchers defined victimization broadly to include "theft, con games and scams, robbery, destruction of property, assault, and serious threats of bodily injury" (ibid, 444).

106. Ibid, 448. Guthrie also found a high prevalence of posttraumatic stress—30%—in the sample of federal prisoners he evaluated. He concluded that it was attributable in part to their prior histories of preprison trauma and in part to the prison experiences to which they were subjected. Robert Guthrie, *The Prevalence of Posttraumatic Stress Disorder Among Federal Prison Inmates*, Unpublished doctoral dissertation, West Virginia University, Morgantown, West Virginia (1998).

107. Adrian Grounds, "Understanding the Effects of Wrongful Imprisonment," in *Crime and Justice: A Review of Research*, Vol. 32, ed. Michael Tonry (Chicago: University of Chicago Press, 2005), 1, 15. Grounds found "evidence of personality change and adjustment difficulties in this group similar to those described in clinical studies of others who have experienced chronic psychological trauma," including "marked features of estrangement, loss of capacity for intimacy, moodiness, inability to settle, loss of a sense of purpose and direction, and a pervasive attitude of mistrust toward the world." He also identified many who were "withdrawn [and] unable to relate to the world," who manifested the diagnostic criteria for posttraumatic stress disorder, who suffered depressive disorders, and who encountered a whole range of serious problems with family contact, social adjustment, and employment. (ibid., 21–41)

108. Joan Petersilia, *When Prisoners Come Home: Parole and Prisoner Reentry* (New York: Oxford, 2003), 53. From a somewhat different perspective, John Irwin summarized the state of mind of many long-term prisoners preparing to leave a medium-security California prison: "For long-termers, the new situation of doing time, enduring years of restraint, being deprived of material conditions, living in crowded conditions without privacy, with reduced options, arbitrary control, disrespect, and economic exploitation is excruciatingly frustrating and aggravating. Anger, frustration, and a burning sense of injustice, coupled with the crippling processing inherent in imprisonment, significantly reduce the likelihood [that prisoners can] pursue a viable, relatively conventional, non-criminal life after release." John Irwin, *The Warehouse Prison*, 168.

109. Paula Smith, Claire Goggin, and Paul Gendreau, *The Effects of Prison Sentences and Intermediate Sanctions on Recidivism: General Effects and Individual Differences*, Unpublished Manuscript, Department of Psychology, University of New Brunswick (2004), 20. Other research suggests that, in addition to the length of imprisonment, the harshness of the conditions of confinement has an

adverse impact on the amount and nature of recidivism. Specifically, Chen and Shapiro found that "harsher prison conditions induce not only increased but systematically worse crimes." Keith Chen and Jesse Shapiro, "Does Prison Harden Inmates? A Discontinuity-based Approach," Unpublished manuscript, Yale University (2002), 1, 12. It may be that the negative effects of harsher forms of imprisonment result in part from the greater difficulties that prisoners in these facilities encounter in maintaining family ties and establishing connections to employers before they are released. That is, more punitive prisons may not only "harden" the persons confined in them but also harden the nature of the social world to which they return.

Indeed, the negative consequences that imprisonment has on recidivism are likely produced by a number of factors, only some of which are psychological in nature. For example, in addition to the direct negative effects of imprisonment on prisoners themselves, there is much evidence that prison adversely affects subsequent employment opportunities. Thus, not surprisingly, ex-convicts have higher rates of unemployment and earn lower wages when they do find jobs. For a review, see B. Western, J. Kling, and D. Weiman, "The Labor Market Consequences of Incarceration," *Crime and Delinquency* 47 (2001): 410. The long periods of time that prisoners are removed from the job market (during which time most obtain few, if any, marketable skills) and the stigma that employers attach to their having done prison time contribute to these employment effects. In fact, Pettit and Western characterized imprisonment as "an illegitimate timeout that confers enduring stigma." As they point out, this stigma deters many employers from offering even low-wage jobs. Moreover, a prison record also can create formal legal barriers for certain skilled and licensed occupations. B. Pettit and B. Western, "Mass Imprisonment and the Life Course: Race and Class Inequality in U.S. Incarceration," *American Sociological Review* 69 (2004): 151, 155.

110. Don Andrews, "The Psychology of Criminal Conduct and Effective Treatment," in *What Works: Reducing Reoffending*, ed. James McGuire (New York: John Wiley, 1995), 48.

111. See A. Liebling, "Suicide and the Safer Prisons Agenda," *Probation Journal* 49 (2002): 140; Alison Liebling, *Prisons and Their Moral Performance: A Study of Values, Quality and Prison Life* (Oxford, England: Clarendon Press, 2004); and Liebling et al., "Revisiting Prison Suicide: The Role of Fairness and Distress." Similarly, Gendreau and his colleagues concluded that, because serious disruptions in prison are often caused by "situational elements" inside the prison, prevention and control of these kinds of behaviors are possible through the monitoring and improvement of certain aspects of the "institutional climate." Further, they argued that in-prison behavior and postprison success can be improved through prison programming, especially programming that is "appropriate" to the prisoners in question—that is, directed to their particular needs. For summaries of, and citations to, the research that supports these propositions, see P. Gendreau and D. Keyes, "Making Prisons Safer and More Humane Environments," *Canadian Journal of Criminology* 43 (2001):

123. It is interesting to note that Gendreau had authored several widely cited literature reviews that—at the height of the movement toward more and harsher forms of imprisonment—seemed to defend these policies and, at least, provided support the prison status quo, including the use of solitary confinement. (I discussed one of these reviews at some length in chapter 5.) More recently, however, Gendreau expressed dismay that "[g]ladly, there are repeated calls to make prison living conditions even tougher," and termed the current "growth industry [in] the use of various prison segregation environments" that came about over the last decade and a half "appalling." Ibid., 124.

112. G. K. Chesterton, quoted in Jerome Frank and Barbara Frank, *Not Guilty* (London: Gollancz, 1957), 248–249.

113. See Harry Helson, *Adaptation-Level Theory: An Experimental and Systematic Approach to Behavior* (New York: Harper & Row, 1964).

114. Published accounts of the severity of life inside contemporary American prisons come from a variety of journalistic, autobiographical, and social scientific sources. See, e.g., Sasha Abramsky, *Hard Times Blues: How Politics Build a Prison Nation* (New York: St. Martin's Press, 2002); Joel Dyer, *The Perpetual Prisoner Machine* (Boulder, CO: Westview Press, 2000); Alan Elsner, *Gates of Injustice: The Crisis in America's Prisons* (New York: Prentice Hall, 2004); Joseph Hallinan, *Going Up the River: Travels in a Prison Nation* (New York: Random House, 2001); Victor Hassine, *Life Without Parole: Living in Prison Today*, 3d ed. (Los Angeles: Roxbury Publishers, 2004); John Irwin, *The Warehouse Prison*; Paula Johnson, *Inner Lives: Voices of African American Women in Prison* (New York: New York University Press, 2003); Candace Kruttschnitt and Rosemary Gartner, *Marking Time in the Golden State: Women's Imprisonment in California* (Cambridge, UK: Cambridge University Press, 2005); and Christian Parenti, *Lockdown America: Police and Prisons in the Age of Crisis* (New York: Verso, 1999).

115. Garland, "Punishment and Culture," 203.

Exhibit DD

```
Data Analysis Unit                          Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                           State of California
Offender Information Services Branch                                   August 3, 2006
                          MONTHLY REPORT OF POPULATION
                          AS OF MIDNIGHT July 31, 2006
_____
                              TOTAL CDC POPULATION
                                               CHANGE SINCE
                      FELON/   CIVIL                07/31/05       DESIGN  PERCENT  STAFFED
                      OTHER    ADDICT    TOTAL    NO.     PCT.    CAPACITY OCCUPIED CAPACITY

A. TOTAL INSTITUTIONS  170,513  1,268   171,781  +7,283   +4.4
      (MEN, Subtotal)  159,208    918   160,126  +6,614   +4.3
    (WOMEN, Subtotal)   11,305    350    11,655    +669   +6.0

   1. INSTITUTIONS/CAMPS 164,436 1,268  165,704  +6,515   +4.0   87,370   189.7   164,559
      INSTITUTIONS     160,037  1,268   161,305  +6,504   +4.2   83,462   193.3   160,521
      CAMPS(CCC & SCC)   4,399            4,399     +11    +0.2    3,908   112.6     4,038

   2. COMMUNITY CORR. CTRS. 5,894    0    5,894    +750   +14.5    7,550    78.1
      CCF PRIVATE        2,788            2,788    +560   +25.1    2,752   101.3
      CCF PUBLIC         2,362            2,362     -72    -2.9    2,461    96.0
      DRUG TREATMT FURLOUGH 478            478    +239  +100.0    1,056    45.3
      PRIVATE WORK FURLOUGH  90             90      +1    +1.1    1,103     8.2
      PRISONER MOTHER PGM   70             70      +3    +4.4       70   100.0
      FAMILY FOUNDATION PGM 68             68     +10   +17.2       70    97.1
      WORK FUR. IN CUSTODY  38             38      +9   +31.0       38   100.0

   3. DMH STATE HOSPITALS  183            183     +18   +10.9

B. PAROLE              116,221  1,707   117,928  +3,166   +2.7
   COMMUNITY SUPERVISION 114,659 1,707  116,366  +3,187   +2.8
   COOPERATIVE CASES     1,562            1,562     -21    -1.3

C. NON-CDC JURISDICTION  1,920     0     1,920     -95    -4.7
   OTHER STATE/FED. INST.  524             524     -31    -5.5
   OUT OF STATE PAROLE   1,219            1,219     -25    -2.0
   OUT OF STATE PAL        104             104     -24   -18.7
   CYA-W&IC 1731.5(c)
      INSTITUTIONS          73              73     -15   -17.0

D. OTHER POPULATIONS   20,746    294    21,040  -1,260    -5.6
   INMATES
      OUT-TO-COURT, etc. 1,967     55     2,022    +249   +14.0
      ESCAPED             239             239     -12    -4.7
   PAROLEES (PAL/RAL)  18,540    239    18,779  -1,497    -7.3

TOTAL CDC POPULATION  309,400  3,269   312,669  +9,094    +2.9
_____

CHANGE FROM LAST MONTH
   A. TOTAL INSTITUTIONS   -774      -6     -780
        (MEN, Subtotal)    -696     +10     -686
      (WOMEN, Subtotal)     -78     -16      -94
   B. PAROLE             +1,404     -39   +1,365
   D. PAROLEES (PAL/RAL)   -174      +1     -173
This report contains the latest available reliable population figures from OBIS.  They have been
carefully audited, but are preliminary, and therefore subject to revision.

  Figure excludes institution based camps.  Total persons in camps, including base camps, are
  4,482 .  Base camp at CMC is included in institution counts.
Report # TPOP-8.   Questions:       (916) 327-3262   (CALNET) 467-3262.
```

MONTHLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT July 31, 2006

| INSTITUTIONS/CAMPS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| MALE | | | | | | |
| ASP  (AVENAL SP) | 7,523 | | 7,523 | 3,114 | 241.6 | 7,028 |
| CCC  (CAL CORRECTL CTR) | 6,117 | | 6,117 | 3,682 | 166.1 | 5,750 |
| CCI  (CAL CORRECTL INSTITN) | 5,413 | | 5,413 | 3,020 | 179.2 | 5,558 |
| CIM  (CAL INSTITN FOR MEN) | 6,539 | 26 | 6,565 | 3,078 | 213.3 | 6,615 |
| CMF  (CAL MEDICAL FACIL) | 3,035 | | 3,035 | 2,315 | 131.1 | 3,351 |
| CMC  (CAL MEN'S COLONY) | 6,555 | | 6,555 | 3,884 | 168.8 | 6,604 |
| CRC  (CAL REHAB CTR, MEN) | 3,146 | 845 | 3,991 | 1,814 | 220.0 | 3,952 |
| CAL  (CAL SP, CALIPATRIA) | 4,271 | | 4,271 | 2,508 | 170.3 | 4,268 |
| CEN  (CAL SP, CENTINELA) | 4,943 | | 4,943 | 2,316 | 213.4 | 5,103 |
| COR  (CAL SP, CORCORAN) | 5,314 | | 5,314 | 3,016 | 176.2 | 5,134 |
| LAC  (CAL SP, LOS ANGELES CO) | 4,512 | | 4,512 | 2,600 | 173.5 | 5,084 |
| SAC  (CAL SP, SACRAMENTO) | 3,117 | | 3,117 | 1,898 | 164.2 | 3,244 |
| SQ   (CAL SP, SAN QUENTIN) | 5,038 | 10 | 5,048 | 3,661 | 137.9 | 5,681 |
| SOL  (CAL SP, SOLANO) | 6,063 | | 6,063 | 2,658 | 228.1 | 5,660 |
| SATF (CAL SATF AND SP - COR) | 7,431 | 1 | 7,432 | 3,591 | 207.0 | 7,027 |
| CVSP (CHUCKAWALLA VALLEY SP) | 4,224 | | 4,224 | 1,738 | 243.0 | 3,860 |
| CTF  (CORRL TRAING FAC) | 7,117 | | 7,117 | 3,319 | 214.4 | 7,001 |
| DVI  (DEUEL VOCATL INSTITN) | 3,839 | 15 | 3,854 | 1,787 | 215.7 | 3,551 |
| FOL  (FOLSOM SP) | 4,075 | | 4,075 | 2,475 | 164.6 | 4,249 |
| HDP  (HIGH DESERT SP) | 4,729 | 2 | 4,731 | 2,534 | 186.7 | 4,752 |
| IRON (IRONWOOD SP) | 4,597 | | 4,597 | 2,200 | 209.0 | 4,653 |
| KVSP (KERN VALLEY SP) | 4,737 | 1 | 4,738 | 2,718 | 174.3 | 4,636 |
| MCSP (MULE CREEK SP) | 3,938 | | 3,938 | 1,700 | 231.6 | 3,837 |
| NKSP (NORTH KERN SP) | 5,375 | 9 | 5,384 | 2,918 | 184.5 | 5,387 |
| PDC  (PITCHESS DETENT CTR-RC) | 1,441 | | 1,441 | 0 | - | 1,292 |
| PBSP (PELICAN BAY SP) | 3,455 | | 3,455 | 2,376 | 145.4 | 3,582 |
| PVSP (PLEASANT VALLEY SP) | 5,041 | | 5,041 | 2,298 | 219.4 | 5,028 |
| RIO  (RIO COSUMNES COR CTR-RC) | 267 | | 267 | 0 | - | 250 |
| RJD  (RJ DONOVAN CORR FACIL) | 4,566 | | 4,566 | 2,308 | 197.8 | 4,443 |
| SVSP (SALINAS VAL SP) | 4,579 | | 4,579 | 2,914 | 157.1 | 4,510 |
| SRTA (SANTA RITA CO. JAIL-RC) | 581 | | 581 | 0 | - | 750 |
| SBRN (SAN BRUNO CO. JAIL) | 143 | | 143 | 60 | 238.3 | 200 |
| SCC  (SIERRA CONSERV CTR) | 6,079 | | 6,079 | 3,606 | 168.6 | 6,107 |
| WSP  (WASCO SP) | 5,988 | 9 | 5,997 | 3,314 | 181.0 | 6,066 |
| MALE TOTAL: | 153,788 | 918 | 154,706 | 81,420 | 190.0 | 154,213 |
| FEMALE | | | | | | |
| CIW  (CAL INST FOR WOMEN) | 2,621 | 11 | 2,632 | 1,346 | 195.5 | 2,270 |
| CRC  (CAL REHAB CTR, WOMEN) | 385 | 306 | 691 | 500 | 138.2 | 680 |
| CCWF (CENT CAL WOMEN'S FACIL) | 3,808 | 4 | 3,812 | 2,029 | 187.9 | 3,490 |
| RIO  (RIO COSUMNES COR CTR-RC) | 22 | | 22 | 0 | - | 20 |
| SBRN (SAN BRUNO CO. JAIL) | 3 | | 3 | 60 | 5.0 | 200 |
| VSP  (VALLEY SP) | 3,809 | 29 | 3,838 | 2,015 | 190.5 | 3,686 |
| FEMALE TOTAL: | 10,648 | 350 | 10,998 | 5,950 | 184.8 | 10,346 |
| INSTITUTIONS/CAMPS TOTAL: | 164,436 | 1,268 | 165,704 | 87,370 | 189.7 | 164,559 |

#TPOP-1, Page 2

```
MONTHLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT July 31, 2006
```

| MALE INSTITUTIONS | FELON/<br>OTHER | CIVIL<br>ADDICT | TOTAL | DESIGN<br>CAPACITY | PERCENT<br>OCCUPIED | STAFFED<br>CAPACITY |
|---|---|---|---|---|---|---|
| ASP  (AVENAL SP) | 7,523 | | 7,523 | 3,114 | 241.6 | 7,028 |
| CCC  (CAL CORRECTL CTR) | | | | | | |
|     Camps | 2,006 | | 2,006 | 1,708 | 117.4 | 1,708 |
|     Level I | 1,550 | | 1,550 | 866 | 179.0 | 1,456 |
|     Level II | 1,509 | | 1,509 | 608 | 248.2 | 1,393 |
|     Level III | 1,052 | | 1,052 | 500 | 210.4 | 1,193 |
| CCI  (CAL CORRECTL INSTITN) | | | | | | |
|     Level I | 1,310 | | 1,310 | 617 | 212.3 | 1,237 |
|     Level II | 1,390 | | 1,390 | 664 | 209.3 | 1,695 |
|     Level IV | 956 | | 956 | 500 | 191.2 | 1,075 |
|     IV A-Main | 936 | | 936 | 555 | 168.6 | 703 |
|     IV B-Main | 154 | | 154 | 228 | 67.5 | 581 |
|     IV B-SHU | 667 | | 667 | 456 | 146.3 | 267 |
| CIM  (CAL INSTITN FOR MEN) | | | | | | |
|     Level I | 2,825 | 1 | 2,826 | 1,420 | 199.0 | 2,760 |
|     East - Reception Center | 1,138 | 7 | 1,145 | 400 | 286.2 | 990 |
|     Reception Center - Central | 1,246 | 17 | 1,263 | 618 | 204.4 | 1,455 |
|     Reception Center - West | 1,330 | 1 | 1,331 | 640 | 208.0 | 1,410 |
| CMF  (CAL MEDICAL FACIL) | | | | | | |
|     Level I | 162 | | 162 | 117 | 138.5 | 177 |
|     Level II | 366 | | 366 | 250 | 146.4 | 410 |
|     Level III | 2,507 | | 2,507 | 1,948 | 128.7 | 2,764 |
| CMC  (CAL MEN'S COLONY) | | | | | | |
|     East | 3,727 | | 3,727 | 2,425 | 153.7 | 3,750 |
|     West | 2,828 | | 2,828 | 1,459 | 193.8 | 2,854 |
| CRC  (CAL REHAB CTR, MEN) | 3,146 | 845 | 3,991 | 1,814 | 220.0 | 3,952 |
| CAL  (CAL SP, CALIPATRIA) | | | | | | |
|     Level I | 388 | | 388 | 208 | 186.5 | 358 |
|     Level IV | 3,883 | | 3,883 | 2,300 | 168.8 | 3,910 |
| CEN  (CAL SP, CENTINELA) | | | | | | |
|     Level I | 360 | | 360 | 208 | 173.1 | 408 |
|     Level III | 4,471 | | 4,471 | 1,608 | 278.0 | 3,815 |
|     Level IV | 112 | | 112 | 500 | 22.4 | 880 |
| COR  (CAL SP, CORCORAN) | | | | | | |
|     Level I | 873 | | 873 | 492 | 177.4 | 826 |
|     Level III | 329 | | 329 | 200 | 164.5 | 342 |
|     Level IV | 2,858 | | 2,858 | 1,300 | 219.8 | 2,720 |
|     SHU | 1,241 | | 1,241 | 1,000 | 124.1 | 1,200 |
|     PHU | 13 | | 13 | 24 | 54.2 | 46 |
| LAC  (CAL SP, LOS ANGELES CO) | | | | | | |
|     Level I | 289 | | 289 | 200 | 144.5 | 400 |
|     Level III/IV | 3,097 | | 3,097 | 2,000 | 154.9 | 4,284 |
|     Reception Center | 1,126 | | 1,126 | 400 | 281.5 | 400 |
| SAC  (CAL SP, SACRAMENTO) | | | | | | |
|     Level I | 344 | | 344 | 362 | 95.0 | 384 |
|     Level IV | 2,773 | | 2,773 | 1,536 | 180.5 | 2,860 |
| SQ  (CAL SP, SAN QUENTIN) | | | | | | |
|     Level I | 38 | | 38 | 234 | 16.2 | 215 |
|     Level II | 1,729 | | 1,729 | 1,073 | 161.1 | 1,929 |
|     Condemned | 608 | | 608 | 587 | 103.6 | 635 |
|     Reception Center | 2,663 | 10 | 2,673 | 1,767 | 151.3 | 2,902 |
| SOL  (CAL SP, SOLANO) | | | | | | |
|     Level II | 3,346 | | 3,346 | 1,458 | 229.5 | 3,080 |
|     Level III | 2,717 | | 2,717 | 1,200 | 226.4 | 2,580 |
| SATF (CAL SATF AND SP - COR) | 7,431 | 1 | 7,432 | 3,591 | 207.0 | 7,027 |
| CVSP (CHUCKAWALLA VALLEY SP) | | | | | | |
|     Level I | 394 | | 394 | 208 | 189.4 | 408 |
|     Level II | 3,830 | | 3,830 | 1,530 | 250.3 | 3,452 |
| CTF  (CORRL TRAING FAC) | | | | | | |
|     Central-II | 3,141 | | 3,141 | 1,409 | 222.9 | 3,051 |
|     North-II/III | 2,874 | | 2,874 | 1,400 | 205.3 | 2,860 |
|     South-I | 1,102 | | 1,102 | 510 | 216.1 | 1,090 |
| DVI  (DEUEL VOCATL INSTITN) | | | | | | |
|     Level I | 8 | | 8 | 176 | 4.5 | 231 |
|     Level III | 654 | | 654 | 532 | 122.9 | 942 |
|     Reception Center | 3,177 | 15 | 3,192 | 1,079 | 295.8 | 2,378 |
| FOL  (FOLSOM SP) | | | | | | |
|     PSAP | 184 | | 184 | 200 | 92.0 | 200 |
|     TTP | 152 | | 152 | 203 | 74.9 | 203 |
|     Level I | 333 | | 333 | 296 | 112.5 | 471 |
|     Level II | 1,572 | | 1,572 | 1,067 | 147.3 | 2,027 |
|     Level III | 1,834 | | 1,834 | 709 | 258.7 | 1,348 |

```
#TPOP-1A
```

MONTHLY INSTITUTION/CAMPS POPULATION DETAIL

MIDNIGHT July 31, 2006

| MALE | INSTITUTIONS | FELON/<br>OTHER | CIVIL<br>ADDICT | TOTAL | DESIGN<br>CAPACITY | PERCENT<br>OCCUPIED | STAFFED<br>CAPACITY |
|---|---|---|---|---|---|---|---|
| HDP | (HIGH DESERT SP) | | | | | | |
| | Level I | 383 | | 383 | 200 | 191.5 | 400 |
| | Level II | 129 | | 129 | 120 | 107.5 | 120 |
| | Level III | 860 | | 860 | 400 | 215.0 | 1,002 |
| | Level IV | 2,762 | | 2,762 | 1,714 | 161.1 | 2,850 |
| | Reception Center | 595 | 2 | 597 | 100 | 597.0 | 380 |
| IRON | (IRONWOOD SP) | | | | | | |
| | Level I | 353 | | 353 | 200 | 176.5 | 400 |
| | Level III | 4,244 | | 4,244 | 2,000 | 212.2 | 4,253 |
| KVSP | (KERN VALLEY SP) | | | | | | |
| | Level IV | 3,909 | 1 | 3,910 | 1,984 | 197.1 | 3,770 |
| | Level I | 487 | | 487 | 200 | 243.5 | 200 |
| | Adseg | 336 | | 336 | 264 | 127.3 | 396 |
| | CTC | 5 | | 5 | 270 | 1.9 | 270 |
| MCSP | (MULE CREEK SP) | | | | | | |
| | Level I | 385 | | 385 | 200 | 192.5 | 392 |
| | Level III | 2,574 | | 2,574 | 1,000 | 257.4 | 2,335 |
| | Level IV | 979 | | 979 | 500 | 195.8 | 1,110 |
| NKSP | (NORTH KERN SP) | | | | | | |
| | Level I | 330 | | 330 | 208 | 158.7 | 358 |
| | Level III | 433 | | 433 | 500 | 86.6 | 868 |
| | Reception Center | 4,612 | 9 | 4,621 | 2,210 | 209.1 | 4,161 |
| PDC | (PITCHESS DETENT CTR-RC) | 1,441 | | 1,441 | 0 | - | 1,292 |
| PBSP | (PELICAN BAY SP) | | | | | | |
| | Level I | 338 | | 338 | 296 | 114.2 | 384 |
| | Level III/IV | 2,018 | | 2,018 | 1,024 | 197.1 | 1,931 |
| | SHU | 1,099 | | 1,099 | 1,056 | 104.1 | 1,267 |
| PVSP | (PLEASANT VALLEY SP) | | | | | | |
| | Level I | 386 | | 386 | 208 | 185.6 | 408 |
| | Level III | 4,655 | | 4,655 | 2,090 | 222.7 | 4,620 |
| RIO | (RIO COSUMNES COR CTR-RC) | 267 | | 267 | 0 | - | 250 |
| RJD | (RJ DONOVAN CORR FACIL) | | | | | | |
| | Level I | 364 | | 364 | 200 | 182.0 | 392 |
| | Level III | 2,250 | | 2,250 | 1,500 | 150.0 | 2,899 |
| | Reception Center | 1,952 | | 1,952 | 608 | 321.1 | 1,152 |
| SVSP | (SALINAS VAL SP) | | | | | | |
| | Level I | 387 | | 387 | 280 | 138.2 | 400 |
| | Level IV | 4,192 | | 4,192 | 2,634 | 159.1 | 4,110 |
| SRTA | (SANTA RITA CO. JAIL-RC) | 581 | | 581 | 0 | - | 750 |
| SBRN | (SAN BRUNO CO. JAIL) | 143 | | 143 | 60 | 238.3 | 200 |
| SCC | (SIERRA CONSERV CTR) | | | | | | |
| | Camps-Men | 2,088 | | 2,088 | 1,880 | 111.1 | 2,010 |
| | Level I | 1,232 | | 1,232 | 618 | 199.4 | 1,378 |
| | Level II | 1,598 | | 1,598 | 608 | 262.8 | 1,634 |
| | Level III | 1,161 | | 1,161 | 500 | 232.2 | 1,085 |
| WSP | (WASCO SP) | | | | | | |
| | Level I | 246 | | 246 | 200 | 123.0 | 392 |
| | Level III | 459 | 1 | 460 | 500 | 92.0 | 773 |
| | Reception Center | 5,283 | 8 | 5,291 | 2,614 | 202.4 | 4,901 |
| MALE TOTAL: | | 153,788 | 918 | 154,706 | 81,420 | 190.0 | 154,213 |
| | | | | | | | |
| FEMALE INSTITUTIONS | | | | | | | |
| CIW | (CAL INST FOR WOMEN) | | | | | | |
| | Institution | 2,061 | 11 | 2,072 | 916 | 226.2 | 1,505 |
| | Reception Center | 255 | | 255 | 110 | 231.8 | 445 |
| | Camps-Women | 305 | | 305 | 320 | 95.3 | 320 |
| CRC | (CAL REHAB CTR, WOMEN) | 385 | 306 | 691 | 500 | 138.2 | 680 |
| CCWF | (CENT CAL WOMEN'S FACIL) | | | | | | |
| | Institution | 3,139 | 3 | 3,142 | 1,623 | 193.6 | 2,588 |
| | Reception Center | 655 | 1 | 656 | 393 | 166.9 | 887 |
| | Condemned | 14 | | 14 | 13 | 107.7 | 15 |
| RIO | (RIO COSUMNES COR CTR-RC) | 22 | | 22 | 0 | - | 20 |
| SBRN | (SAN BRUNO CO. JAIL) | 3 | | 3 | 60 | 5.0 | 200 |
| VSP | (VALLEY SP) | | | | | | |
| | Institution | 3,047 | | 3,047 | 1,571 | 194.0 | 2,946 |
| | Reception Center | 699 | 29 | 728 | 400 | 182.0 | 678 |
| | SHU | 63 | | 63 | 44 | 143.2 | 62 |
| FEMALE TOTAL: | | 10,648 | 350 | 10,998 | 5,950 | 184.8 | 10,346 |
| | | | | | | | |
| INSTITUTIONS/CAMPS TOTAL: | | 164,436 | 1,268 | 165,704 | 87,370 | 189.7 | 164,559 |

#TPOP-1A, PAGE 2