PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE & McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington 98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY–
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.: Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION**<br><br>**HEARING**<br><br>Date: December 11, 2006<br>Time: 10:00 A.M.<br>Location: Courtroom 4<br><br>The Honorable Lawrence K. Karlton |

I, Jane E. Kahn, do hereby declare:

1.  I am an attorney admitted to practice law in California and an associate in the law firm Rosen, Bien & Galvan, one of the counsel of record for plaintiff class in this case. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Motion to Convene a Three Judge Panel To Limit The Prison Population.

2.  I have extensively toured administrative segregation units in many California prisons in my role as class counsel for *Coleman* plaintiffs and observed the harsh conditions of confinement in these units. Inmates in administrative segregation remain locked in their cells for their meals. They are escorted to yard, showers and any appointments in handcuffs. There are no educational, vocational or work programs provided to inmates housed in administrative segregation. Most of the administrative segregation units are very noisy, crowded and dirty. Inmates are not permitted to have radios or televisions in these units and the possession of other personal property is also severely restricted. Inmates housed in the new stand-alone 'Super-Max' administrative segregation units are extremely isolated on long, separate corridors with no windows and no view of a dayroom or other cells where they can talk to other inmates or observe activity in the unit. The California Code of Regulations, Title 15, Section 3343, regulates the basic conditions of confinement n administrative segregation units in CDCR. This state law mandates that inmates in administrative segregation should be provided with yard five days a week for an hour or three days a week for a minimum of ten hours. CAL. CODE REGS. TIT. 15 § 3343 (h) (2006). Our office regularly receives correspondence from *Coleman* class members who report that they are not provided with their required hours of yard in administrative segregation units. Inmates have supplied us with responses to grievances they have filed about this lack of out-of-cell time in which wardens admit that they are unable to provide the exercise time due to lack of staffing, exercise yards and overcrowding.

3.  Administrative segregation units are housing units where inmates are locked down in isolated cells for at least 23 hours a day with limited human interaction and minimal or no programming. Dr. Metzner, a *Coleman* expert and one of the authors of the National

1  Commission on Correctional Health Care guidelines for delivering mental health care in
2  administrative segregation units, writes that "[m]ental health clinicians working in such
3  facilities frequently report that it is not uncommon to observe many inmates, who do not have
4  pre-existing serious mental disorders, to develop irritability, anxiety and other dysphoric
5  symptoms when housed in these units for long periods of time." In his chapter, Dr. Metzner
6  noted that "[t]here is general consensus among clinicians that placement of inmates with serious
7  mental illnesses in settings with "extreme isolation" is contraindicated because many of these
8  inmates' psychiatric conditions will clinically deteriorate or not improve. [i]n other words, many
9  inmates with serious mental illnesses are harmed when placed in such settings." Attached
10 hereto as Exhibit A is a true and correct copy of Jeffrey L. Metzner, <u>Mental Health</u>
11 <u>Considerations for Segregation Inmates,</u> in <u>Correctional Mental Health Care Standards and</u>
12 <u>Guidelines for Delivering Services</u>, 233-234 (National Commission on Correctional Health
13 Care 2003).
14         4.     On October 17 and 18, 2006, I participated as plaintiffs' counsel in a *Coleman*
15 monitoring tour at California Institute for Men. Also present on this tour were Deputy Special
16 Master Matthew Lopes, *Coleman* monitors, Jeffrey Metzner, Patricia Williams and Ted
17 Ruggles, CDCR legal counsel Michael Stone and plaintiffs' counsel Lori Rifkin.
18         5.     During this CIM tour, I was informed that the prison was severely overcrowded
19 and witnessed some of the dramatic effects of the overcrowding, particularly on members of
20 the plaintiff class. The current census of mentally ill inmates in the prison was reported at
21 approximately 1600 inmates, while prison officials stated that they were only staffed for 1000
22 mentally ill inmates. The additional 600 mentally ill inmates were described by the clinical
23 staff at CIM as acute, difficult inmates. During the initial meeting with *Coleman* Deputy
24 Master, *Coleman* monitors, plaintiffs' counsel and CDCR Legal Counsel, CIM staff reported
25 that the Parole Division had informed the prison that they would be conducting a sweep of skid
26 row in Los Angeles in early November 2006 and would be sending a large number of mentally
27 ill inmates to CIM reception.
28         6.     CIM staff cited the increased number of inmates and staffing shortages as

reasons why they were unable to comply with Revised Program Guide requirements. For example, CIM staff reported that they could not provide the mandated care to the mentally ill inmates housed in administrative segregation because there were at least 35 more mentally ill inmates housed in these units than the institution could treat. As a result of the high census in administrative segregation, staff reported that many of the clinical contacts with the mentally ill inmates occurred cell-front in a non-confidential setting. Staff also reported that due to custody shortages, patients were not brought to their treatment team meetings as required. During our tour of the administrative segregation units, I observed that the units were dirty, crowded and isolated, and the men in the units reported that they were provided with little or no yard during the week. In one of the administrative segregation units, inmates were exposed to wind and dust because of a broken window adjacent to their cell. On August 13, 2006, an inmate committed suicide in Palm Hall, one of the administrative segregation units at CIM.

### **Lockdown Conditions**

7.   During the tour of CIM on October 17 and 18, 2006, we walked through the prison grounds and we were informed that the Level I and II yards were locked down because of staff assaults that had occurred recently in the facility. Staff assaults and lockdowns in the minimum security facilities at CIM have not been reported previously to plaintiffs' counsel during monitoring tours.

### **Observations of Effects of Overcrowding on Plaintiff Class**

8.   During the CIM tour, *Coleman* Deputy Master Lopes, Ted Ruggles, Michael Stone, Lori Rifkin and I met with a group of nine reception center EOP patients in the Alpine Unit. We were informed by staff that clinicians at CIM had refused to come out to this housing unit to meet with mental health patients until the institution had built a "cage" around the bunks on the dayroom floor where the men in this reception center housing unit are living. We were informed that this was because of security concerns of the clinical staff. The bunks are now enclosed in a large "cage" which has the affect of making this cramped housing area resemble an administrative segregation unit. According to CIM staff who accompanied us on the tour, no group therapy is offered to reception center EOP patients due to the security

concerns of the clinical staff.  The EOP patients that we met with reported that they are locked in their housing area except for a half hour in the morning and evening to eat their meals.  They are provided yard every four days for approximately two hours.  They reported that if yard is cancelled for an incident involving one housing unit, yard is cancelled for all reception center units.  Their clinical care consists of a weekly case manager meeting and a periodic psychiatry review of their medications.  The majority of these EOP patients had been in the reception center for many months waiting for transfer to an EOP program.  The overcrowding at CIM has resulted in a reduction in the care offered to EOP patients, who were previously provided with group therapy at CIM.  The overcrowding system-wide has impeded CIM's ability to transfer EOP reception center inmates to EOP beds that do not exist.

9.  During the CIM monitoring tour I accompanied *Coleman* monitor Jeff Metzner, Michael Stone and other individuals during psych tech rounding of the administrative segregation units.  CIM has opened an administrative segregation overflow unit in Birch Hall to house their additional population of administrative segregation inmates.  The psychiatric technician who conducted the daily rounds in the various administrative segregation units walked quickly along the tiers in a cursory manner announcing rounds.  In Cypress, I observed an officer and an inmate become antagonistic during the psych tech rounding in front of the *Coleman* monitor and attorneys.  I was quite disturbed to observe the officer escalate rather than attempt to de-escalate the encounter during a monitoring tour when he was being observed.  The psychiatric technician moved so rapidly through the housing units that he missed an inmate who reported that he was not sleeping.  I spoke to this inmate who had two black eyes and other injuries to his face and I was quite concerned about this inmate's reported distress.  I requested that the psych tech return and talk to this inmate further, which he did.  I have observed psych tech rounds during numerous monitoring tours and it is my opinion that rounding this large population in administrative segregation strained the ability of this psych tech to conduct adequate rounds.

**Effects of Overcrowding on Compliance with Program Guide Requirements**

10.  During the CIM tour on October 17 and 18, 2006, I accompanied the *Coleman*

1  monitors to the hospital where the mental health crisis beds are located.  CIM has 18 licensed
2  MHCB beds that the staff reports are always full.  CIM also uses 18 additional beds in their
3  hospital, which are not licensed as MHCB beds, for mental health patients.  Staff reported to
4  the *Coleman* monitors that their average census was 36 MHCB patients.  Staff also reported
5  that in October 2006 they housed approximately 26 patients in two overflow housing units
6  being used as MHCB overflows ( Del Norte and Cypress ).  During the CIM tour we visited
7  Del Norte and viewed one of the cells used as for MHCB placement.  The cell, where suicidal
8  inmates are placed, had a bunk bed in it.  It is my understanding that, after discussion of the
9  suicide risk of placing an inmate on suicide precautions in a cell with a bunk bed, CIM staff
10 have agreed to retrofit the beds in these overflow MHCB units to remove the top bunks and
11 any remaining anchors on the beds.  The overcrowding in CIM has forced staff to use unsafe
12 housing for inmates requiring MHCB level of care.
13        11.    As part of the Suicide Review Process, defendants provide Special Master
14 Keating and plaintiffs' counsel with Suicide Reports for every inmate that commits suicide
15 within the CDCR.  I read all of these Suicide Reports.  On January 26, 2006, an inmate housed
16 at Salinas Valley State Prison committed suicide by hanging.  This inmate was on the mental
17 health caseload at a CCCMS level of care.  He arrived at Salinas Valley State Prison on
18 December 20, 2005, from out-to-court where he had received an additional two-year sentence.
19 He was housed on the SNY yard, which was under a lockdown the entire time he was at the
20 prison.  The Suicide Report noted that this inmate had a difficult time in lockdown units and
21 was first placed on the mental health caseload in 2002 after he was housed in administrative
22 segregation.  The Report identified him as chronically suicidal.  CDCR does not provide any
23 enhanced mental health services to inmates who are on an extended lockdown, such as this
24 mentally ill inmate.  This inmate committed suicide after six weeks on lockdown status.
25 //
26 //
27        I declare under penalty of perjury, that the foregoing is true and correct, and that this
28 declaration is executed in San Francisco, California on November 10, 2006.

*/s/ Jane E. Kahn*
Jane E. Kahn