PRISON LAW OFFICE
DONALD SPECTER Bar No.: 83925
STEVEN FAMA Bar No.: 99641
E. IVAN TRUJILLO Bar No.: 228790
General Delivery
San Quentin, California  94964
Telephone: (415) 457-9144

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE Bar No.: 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN Bar No.: 096891
JANE E. KAHN Bar No.: 112239
LORI RIFKIN Bar No.: 244081
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

HELLER, EHRMAN, WHITE &
McAULIFFE
RICHARD L. GOFF Bar No.: 36377
701 Fifth Avenue
Seattle, Washington  98104
Telephone: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER Bar No.: 158255
LEWIS BOSSING Bar No.: 227402
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>      Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>      Defendants | ) No.:  Civ S 90-0520 LKK-JFM<br>)<br>) **MEMORANDUM IN SUPPORT OF**<br>) **PLAINTIFFS' MOTION TO CONVENE**<br>) **A THREE JUDGE PANEL TO LIMIT**<br>) **THE PRISON POPULATION**<br>)<br>) **HEARING**<br>)<br>) Date:      December 11, 2006<br>) Time:      10:00 A.M.<br>) Location:    Courtroom  4<br>)<br>) The Honorable Lawrence K. Karlton<br>) |

H:\0489\3\PLEADING\pls' memo iso 3 judge panel  - overcrowding ,11-13-06, 489-3.DOC

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION,
NO.:  CIV S 90-0520 LKK-JFM

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASU Or Adseg | Administrative Segregation Unit. |
| CCM | Clinical Case Manager.  Every inmate participant in the mental health delivery system is assigned a clinical case manager (a social worker or psychologist) who meets with the inmate at regular intervals determined by the inmate's level of care and housing unit (i.e. inmates in administrative segregation are seen more frequently by their case managers). |
| CCCMS or 3CMS | Correctional Clinical Case Management System.  CCCMS is the name for the largest CDCR mental health program, which currently houses 26,000 inmates with mental illness who live in general population housing units alongside non-mentally ill inmates. CCCMS inmates are generally given medication management, and a meeting with their case manager every 90 days.  A few also participate in groups.  The Program Guide requires that CCCMS inmates housed in administrative segregation be provided with enhanced mental health services, including a weekly case manager contact and daily psych tech rounding. |
| CCPOA | California Correctional Peace Officers Association |
| CDCR | California Department of Corrections and Rehabilitation. |
| CMF | California Medical Facility. |
| CIM | California Institute for Men. |
| CIW | California Institute for Women. |
| CTF | Correctional Training Facility |
| EOP | Enhanced Outpatient Program.  EOP programs are sheltered treatment programs for seriously mentally ill inmates who require a higher and more intensive level of mental health care.  There are currently approximately 4,100 EOP inmates.  Because these inmates are unable to function in a general population setting, they live in segregated housing units.  The Program Guide mandates 10 hours each week of therapy or other "structured therapeutic activities" for EOP inmates.  For EOP inmates housed in administrative segregation they are also provided with a weekly case manager contact and daily psych tech rounding. |
| KVSP | Kern Valley State Prison |

H:\0489\3\PLEADING\pls' memo iso 3 judge panel  - overcrowding ,11-13-06, 489-3.DOC    i

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION,
NO.:  CIV S 90-0520 LKK-JFM

| | |
|---|---|
| MHCB | Mental Health Crisis Bed.  MHCB units are licensed inpatient units inside many California prisons where mentally ill inmates who are suicidal or experiencing another kind of mental health crisis can be admitted and treated for up to 10 days. |
| MHSDS | Mental Health Services Delivery System.  The name given by defendants to their entire mental health system. |
| PLRA | Prison Litigation Reform Act |
| PSU | Psychiatric Services Unit.  These are high security housing units where EOP patients who have been assigned to a Secured Housing Unit are housed.  EOP patients are provided with a minimum of ten hours of structured therapeutic activities that are offered in treatment cages in the units.  There are different steps in the PSU program and patients have different property privileges associated with the different step levels. |
| SCC | Sierra Conservation Center |
| SHU | Secured Housing Unit.  This is a segregated high-security housing unit where inmates can be housed for specific terms or indeterminate periods of time in locked down conditions for either in-prison offenses, gang status, or because of safety concerns.  There are male SHU units at Pelican Bay State Prison (from which all inmates with serious psychiatric conditions are excluded), Corcoran State Prison, and California Correctional Institute.  There is a SHU for women at Valley State Prison for Women. |
| SNY | Sensitive Needs Yard.  These are housing units for inmates with safety concerns. |
| SVSP | Salinas Valley State Prison |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ..................................................................................... i

TABLE OF CONTENTS .......................................................................................... iii

TABLE OF AUTHORITIES .......................................................................................iv

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS............................................................................................ 5

    I.      THE OVERCROWDING CRISIS GENERALLY ................................................. 5

    II.     OVERCROWDING NEGATIVELY IMPACTS ALL ASPECTS OF THE
          MENTAL HEALTH SERVICES DELIVERY SYSTEM ..................................... 9

LEGAL ARGUMENT ............................................................................................... 13

    I.      THE PRISON LITIGATION REFORM ACT'S REQUIREMENTS FOR
          CONVENING A THREE JUDGE PANEL TO CONSIDER LIMITS ON
          THE PRISON POPULATION ARE SATISFIED AND THIS COURT
          SHOULD REFER THIS MATTER TO SUCH A PANEL................................. 13

          A.      Previous Less Intrusive Relief Ordered By This Court Has Failed
                 To Remedy The Deprivation Of The Federal Constitutional Right
                 Of The Plaintiff Class To Adequate Mental Health Care. ........................ 16

          B.      Defendants Have Had Reasonable Time To Comply With Previous
                 Court Orders Concerning The Provision Of Mental Health Care To
                 The Plaintiff Class........................................................................ 19

    II.     POPULATION LIMITS SHOULD BE ORDERED IN THIS CASE
          BECAUSE OVERCROWDING IS THE PRIMARY CAUSE OF THE
          VIOLATION OF PLAINTIFFS' FEDERAL CONSTITUTIONAL
          RIGHT TO MINIMALLY ADEQUATE MENTAL HEALTH CARE,
          THE VIOLATION CANNOT BE REMEDIED WITHOUT RELIEF
          FROM OVERCROWDING, AND THIS COURT SHOULD CONVENE
          A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION ............ 21

CONCLUSION ....................................................................................................... 22

H:\0489\3\PLEADING\pls' memo iso 3 judge panel - overcrowding  11-13-06, 489-3.DOC           iii

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION,
NO.: CIV S 90-0520 LKK-JFM

# TABLE OF AUTHORITIES

*Benjamin v. Malcolm*,
    564 F.Supp. 668 (S.D.N.Y. 1983) ................................................................ 15

*Coleman v. Wilson*,
    912 F.Supp. 1282, 1298 (E.D.Cal. 1995) ....................................................... 3

*Essex County Jail Inmates v. Amato*,
    726 F. Supp. 539 (D.N.J. 1989) ................................................................... 15

*Grubbs v. Bradley*,
    552 F.Supp. 1052, 1126 (M.D. Tenn. 1982) ................................................. 16

*Harris v. Angelina County, Tex.*,
    31 F.3d 331, 335-38 (5th Cir. 1994) ............................................................ 15

*Inmates of Allegheny County Jail v. Wecht*,
    565 F.Supp. 1278 (W.D. Pa. 1983),
    *aff'd in rel. part*, 754 F.2d 120 (3d Cir. 1985) ........................................... 16

*Inmates of Occoquan v. Barry*,
    717 F.Supp. 854 (D.D.C. 1989) ................................................................... 15

*Palmigiano v. Garrahy*,
    639 F.Supp. 244 (D.R.I. 1986) .................................................................... 15

*Ruiz v. Estelle*,
    679 F.2d 1115 (5th Cir. 1982)
    *vacated on other grounds by* 688 F.2d 266 (5th Cir. 1982).......................... 15

*Vazquez v. Carver*,
    729 F. Supp. 1063 (E.D. Pa. 1989) .............................................................. 15

*Wellman v. Faulkner*,
    715 F.2d 269 (7th Cir. 1983)....................................................................... 15

## FEDERAL STATUTES

Prison Litigation Reform Act,

    18 U.S.C. § 3626(a)(3) ................................................................................. 5

    18 U.S.C. § 3626(a)(3)(A) ........................................................................... 14

    18 U.S.C. § 3626(a)(3)(C)............................................................................ 21

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION,
NO.:  CIV S 90-0520 LKK-JFM

18 U.S.C. § 3626(g)(4)............................................................................ 14

28 U.S.C. § 2284 .................................................................................... 14

## STATE LAW

CAL. CODE REGS. TIT. 15, §§ 3343 (g) (h) (2006) ....................................2

## OTHER SOURCES

Gary E. Beven, Offenders With Mental Illnesses in Maximum- and Supermaximum-Security Settings, in Handbook of Correctional Mental Health, 209-28 (Charles L. Scott and Joan B Gerbasi ed., 2005)..........................................11

Craig Haney, Reforming Punishment, 199-239 (2006) ...........................................11

Jeffrey L. Metzner, Mental Health Considerations for Segregated Inmates, in Correctional Mental Health Care Standards and Guidelines for Delivering Services, 233 (National Commission on Correctional Health Care 2003) ...............................11

H:\0489\3\PLEADING\pls' memo iso 3 judge panel - overcrowding  11-13-06  489-3.DOC          v

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

**INTRODUCTION**

The failure of defendants to provide a minimally adequate level of mental health care to seriously mentally ill inmates throughout the California corrections system is undisputed. This Court stated on April 26, 2006 that "we are still in a place in which the defendants have been unable to bring the delivery of psychiatric care up to constitutional standards… Every defendant in this case is in violation of the law. That is shocking. That is shocking." Declaration of Michael W. Bien In Support Of Plaintiffs' Motion To Convene A Three Judge Panel To Limit Prison Population ("Bien Decl.") ¶ 28, Ex. AA at 2:14-16, 3:9-11 (Transcript of 4/26/06 Evidentiary Hearing before Judge Karlton). In the eleven years since this Court's ruling in this case, defendants have not cured their violation of plaintiffs' constitutional right to adequate mental health treatment, nor have defendants even approached compliance with the Revised Program Guide that substantially comprises the agreed-upon remedy in this case.

It is also clear, however, that good faith efforts to secure the provision of constitutionally adequate mental health care have been frustrated by the unprecedented overcrowding crisis in the California prison system. *See* Bien Decl. ¶ 8, Ex. F (Prisoner Overcrowding Images downloaded from CDCR website, November 7, 2006). On October 4, 2006, Governor Schwarzenegger declared that "a State of Emergency exists within the State of California's prison system." Bien Decl. ¶ 2, Ex. A (Prison Overcrowding State of Emergency Proclamation): "[C]onditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified [in the proclamation], due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state." *Id.* The Governor explained that this severe overcrowding "causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state." *Id.*

The unprecedented overcrowding in the state's prisons has resulted in maximally restrictive conditions throughout the CDCR, such that whole institutions are now operating on what defendants term "modified program," or "lockdown"—in other words, conditions similar

to those typically associated with administrative segregation.  Bien Decl. ¶ 7.  This means that a shockingly high percentage of inmates throughout the state, regardless of custody level, are confined to their cells up to 23 or 24 hours a day; do not have yard time, dayroom access, or other work or educational programs on a regular basis; do not receive any therapeutic group programming; have extremely limited privileges; experience an increasingly violent and dangerous environment; have delayed access, if any, to necessary medical and mental health treatment; and are not able to be transferred in a timely fashion, if at all, to appropriate levels of mental health treatment programs or crisis beds.  *See, e.g.,* Declaration of Jane Kahn In Support Of Plaintiffs' Motion To Convene A Three Judge Panel To Limit Prison Population ("Kahn Decl."), ¶¶ 5-9 (description of conditions at CIM observed by plaintiffs' counsel on recent monitoring tour).  At the most fundamental levels, inmates are being denied basic human needs.  Defendants have admitted in the context of administrative segregation units, for example, that they are not able to even attempt to meet the legally mandated minimum requirements of ten hours of out of cell time per week for exercise and three showers per week.  *See* Defs.' Plan to Address Suicide Trends in Administrative Segregation Units, filed 10/2/06, Ex. A at 8-9; CAL. CODE REGS. TIT. 15 §§ 3343 (g)(h) (2006).  As a result, inmates in administrative segregation—including *Coleman* class members with mental illness—are remaining locked in their cells 24 hours a day, day after day, let out only once or twice a week.

The effects of the overcrowding emergency on the plaintiff class of mentally ill inmates are grave.  The number of inmates/patients in the plaintiff class has more than doubled, growing from 14,293 in July 1997 to 32,348 in October 2006, almost 4,000 of whom are EOP.  *See* Special Master's Report and Recommendations on Defs.' Revised Program Guide, 2/03/2006 at 3; Bien Decl. ¶ 15, Ex. N (Mental Health Population-Placement Per Institution, 10/5/2006).  Meanwhile, the vacancy rate for clinicians and other mental health care staff in the CDCR is stunning.  Bien Decl. ¶ 16.  Inmates with severe mental illness, including those decompensating or in crisis, cannot be given appropriate placements in mental health crisis beds, EOP beds, and inpatient DMH programs.  In his Report filed January 23, 2006, the Special Master found that "[T]ransfers to more intensive levels of mental health programming

and treatment deteriorated sharply and widely…the availability of Mental Health Crisis Beds (MHCBs), the department's sole internal resource for providing short-term crisis care for unstable and suicidal inmates, underwent a  shrinkage that became by mid-2005 a critical issue with severe impact on CDCR's most seriously mentally disordered inmates.  This issue remains unresolved."  Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("15th Report"), filed on January 23, 2006, at 376.  Inmates languish for months in Reception Centers or other inappropriate housing units, where they receive virtually no mental health treatment or programming.  *See* Special Master's Supplemental Report on the Status and Sufficiency of Defendants' Interim and Long Term Plans for the Provision of Acute and Intermediate Inpatient Beds and Mental Health Crisis Beds, filed 9/11/06 ("Special Master's 9/11/06 Report") at 2 ("[T]he severe shortage of intermediate inpatient and mental health crisis beds…left critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care.").

Mentally ill inmates are also disciplined and placed in punitive segregation at highly disproportionate rates.  *See* Bien Decl. ¶ 18, Ex. R (CDCR Statistics for Mental Health Ad Seg/SHU/PSU as of 10/5/06).  Inmates in these administrative segregation units are locked in their cells from 23 to 24 hours a day, do not get out of their cells for exercise or showers, nor do they receive therapeutic groups or mental health treatment programs required by the Revised Program Guide.  *See* Kahn Decl. ¶¶ 2-3.

These horrific conditions are reflected in the escalating suicide rate in the CDCR, with at least 37 completed suicides to date in 2006.  Bien Decl. ¶ 20.  The CDCR suicide rate for 2005 and the projected rate for 2006 are the highest rates in recent memory and almost double the reported national average for state prisons.  Bien Decl. ¶ 19.

This Court held more than a decade ago that "[t]he obligation to provide for the basic human needs of prisoners includes a requirement to provide access to adequate mental health care."  *Coleman v. Wilson*, 912 F.Supp. 1282, 1298 (E.D.Cal. 1995).  The provision of that care is impossible in a system now so flooded that, according to the Governor, "more than

1    15,000 inmates [are housed] in conditions that pose substantial safety risks, namely, prison

2    areas never designed or intended for inmate housing…" Bien Decl. ¶ 2, Ex. A at 1 (Prison

3    Overcrowding State of Emergency Proclamation).  Yet, in the face of these horrific conditions,

4    the State of California has merely thrown up its hands, failing to adopt any proposals aimed at

5    alleviating the overcrowding crisis, even in the Special Session of the Legislature convened for

6    that very reason.  Following the conclusion of the Special Session, CDCR Secretary Tilton

7    wrote, "I am deeply disheartened that the special legislative session concluded last night

8    without the passage by the Assembly of any measures to provide either short-term relief or

9    long-term remedies to alleviate the prison overcrowding crisis." *See* Bien Decl. ¶ 6, Ex. E

10   (9/1/2006 Tilton Memorandum).  The Governor has admitted the California government's

11   inability to address this overcrowding crisis.  *See* Bien Decl. ¶2, Ex. A at 7.  (California

12   Legislature denied multiple proposals by Governor, failed to adopt proposals submitted by

13   CDCR, and failed to adopt any proposals of its own).

14         Without relief from the conditions created by severe overcrowding, even were

15   defendants to make every good faith effort to comply with the requirements of the Revised

16   Program Guide, there is no real likelihood that they would be able to provide adequate mental

17   health care in the foreseeable future.  The executive and legislative branches of the California

18   government, including the Governor and agency defendants in this case, have completely

19   abdicated their responsibility to provide any realistic plan for addressing the needs of the

20   state's prison population in a reasonable time frame, even in the face of a constant flow of

21   orders by this and other federal Courts.[1]  Defendants' current projection for providing

22   appropriate levels of mental health care is 2011, even after considering possible waivers of

23   state law, acceleration of construction projects, and other exceptional measures.  *See*

24   Defendants' Submission of Response to Court Order Requiring Amended Long-Term Bed

25   _____

26   [1]  Motions requesting a three-judge panel for relief from overcrowding are being
     simultaneously this week filed in *Armstrong v. Schwarzenegger*, No. 94-cv-02307-CW
27   (N.D.Ca.), and *Plata v. Schwarzenegger*, No. 01-cv-01351-THE (N.D.Ca.) courtesy copies of
     the pleadings in these actions will be provided to the Court.

28

Plan, filed 6/30/06; *see also* Transcript of 4/26/06 and 4/27/06 Evidentiary Hearings Before

Judge Karlton, filed 5/17/06.  In a recent hearing in front of Judge Henderson in the *Madrid*

case, the attorney representing the Governor personally stated that "it is [the Governor's] belief

that overcrowding affects virtually all of the issues that the Court is concerned about…it is

something that affects prisoners throughout the State," and conveyed the Governor's request

that he "tell Judge Henderson that I can use all the help from him I can get."  Bien Decl. ¶ 13,

Ex. L at 32:21-34:5 (10/5/2006 Transcript).

The only remedy available to the Court, given the limits on defendants' capacity to

provide adequate mental health housing, staffing and programming, is to immediately impose

strict limits on the population of prisoners.  Consequently, plaintiffs move this Court to

convene a three-judge panel, as required under 18 U.S.C. § 3626(a)(3), so that limits on the

prison population may be entered, and critical and life-saving relief may be obtained for the

plaintiff class.

## STATEMENT OF FACTS

## I.    THE OVERCROWDING CRISIS GENERALLY

The CDCR population is at an all-time high, with the count currently at 173,463

inmates, and nearly 70,000 additional intakes are projected by defendants for the first six

months of 2007.[2]  Bien Decl. ¶ 3, Ex. B at 1 (population data downloaded from CDCR website

as of 11/1/2006); Bien Decl. ¶10, Ex. J (CDCR Spring 2006 Adult Population Projects, 2006-

2011).  System-wide, the CDCR is now at nearly 200% of its design capacity, with fifteen

---

[2]   The unprecedented overcrowding will be even further aggravated in the next few months because defendants and Los Angeles County are planning to terminate a contract under which 1,300 CDCR prisoners are housed at the Pitchess Detention Center of the LA County Jail.  *See* Bien Decl. at ¶ 25, Ex. X.  In a memo discussing the absorption of these prisoners into other institutions, CDCR Health Care Director Dr. Peter Farber-Szekrenyi warned that this will create serious difficulties in delivering mental health care such as lack of medication continuity, redirection of mental health staff from their primary responsibility of direct patient care to screening for all incoming CCCMS inmates, and exacerbation of already existing shortages of MHCB and inpatient beds.  Bien Decl. at ¶ 25, Ex. X (9/1/06 Farber-Szekrenyi memo).  The Special Master described this as "the sudden addition of an unanticipated 1,300 inmates to a correctional system perilously close to 200 percent of its design capacity and a commensurable overstressed mental health care deliver system operating way beyond its capacity…" Special Master's 9/11/06 Report at 11.

1  institutions at or above 200% of design capacity.  *Id.*  As a result, more than 15,000 inmates are

2  housed in prison areas "never designed or intended for inmate housing, including, but not

3  limited to, common areas such as prison gymnasiums, dayrooms, and program rooms, with

4  approximately 1,500 inmates sleeping in triple bunks."  Bien Decl. ¶ 2, Ex. A at 1.  Pictures

5  posted by the CDCR on its own website provide vivid and disturbing illustrations of the

6  Governor's statements, showing inmates triple-bunked and packed into every available space.

7  Bien Decl. ¶ 8, Ex. F.  CDCR Secretary Tilton acknowledged that the practice of housing

8  inmates in these beds is not only "nontraditional," but also "unsafe." Bien Decl. ¶ 6, Ex. E at 2

9  (9/1/2006 Tilton Memo).  According to defendants, overcrowding has resulted not only in

10  increased security concerns and severely affected the CDCR's ability to provide work, training,

11  and educational programs to inmates, but has also "been a major contributor to court

12  intervention regarding CDCR's health care services delivery."  Bien Decl. ¶ 9, Ex. G at 1

13  (CDCR Draft Inmate Population, Rehabilitation, and Housing Management Plan, July 2006

14  "CDCR Draft Housing Plan").  The CDCR Draft Housing Plan concludes that "CDCR's use of

15  non-traditional beds stretches reasonable security correctional standards and the safety of staff,

16  inmates and the public.  There are no additional alternatives to further overcrowding existing

17  prison capacity without great risk to public safety."  *Id.* at 2.

18      The numbers of inmates relative to the physical capacity of the prisons are not the only

19  factor in the overcrowding equation:  defendants also face severe and chronic shortages in

20  custodial and clinical staff.  Overcrowding generally reflects the decreasing ratio of staff to

21  inmates, and in the CDCR, there are overwhelming staff vacancies as well as an exploding

22  number of inmates.  In terms of mental health staff alone, this Court issued an order on July 28,

23  2006 requiring defendants to seek funding in the Special Session of the Legislature for an

24  additional 530.65 permanent and 21.2 limited term positions  An alarming portion, however,

25  even of the previously budgeted mental health staff positions are vacant.  The most recent

26

27

28

monthly data provided by defendants reflects March 2006 data[3], and indicates a 21 percent overall vacancy rate for all mental health staff, a 38 percent vacancy rate for psychiatrists, and a 25 percent vacancy rate for psychologists. Bien Decl. ¶ 16, Ex. P at 1 (MHSDS Staffing Allocation and Vacancy History as of 3/31/2006). 416 positions out of 1,943 are vacant. *Id.* Assuming the permanent positions that the Court determined defendants require to provide minimally adequate staffing for the population—which at the time of the Court's Order was approximately 3,000 fewer inmates that at present[4]—have not yet been filled, this now means that out of approximately 2,495 positions, defendants are now short 968 mental health staff, or have a 39 percent vacancy rate.

In addition, CDCR is experiencing severe shortages of custody staff throughout the State. *See* Bien Decl. ¶ 9, Ex. G at 1(CDCR Draft Inmate Population, Rehabilitation, and Housing Management Plan, July 2006) ("[T]he CDCR is currently experiencing custodial staff shortages that will be exacerbated by demands placed on staffing based upon the projected increases in population."). The availability of custody staff—or lack thereof—directly impacts the ability of defendants to provide mental health care. For example, without adequate custody staff for escorts, inmates cannot access treatment groups or spaces, attend case management conferences, or even go to yard or showers. Kahn Decl. ¶¶ 2, 5-11.

Public admissions about the severity of overcrowding in the CDCR and its effects are not new. In 2004, the Corrections Independent Review Panel appointed by Governor Schwarzenegger found that "the overall population of male prisons exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage." Bien Decl. ¶ 4, Ex. D at 124 ("Reforming Corrections: Report of the Corrections

---

[3]   This data, reflective of March 2006, was provided to plaintiffs in July 2006, and to date plaintiffs have not received any more recent monthly data reports, despite Court orders and agreements requiring that this information be provided monthly to the Special Master and plaintiffs' counsel. See generally Bien Decl. ¶ 16 and Ex. P (Cover letter for monthly production.)

[4]   *Compare* Bien Decl. ¶ 31, Ex. DD *and* ¶ 3, Ex. B (CDCR Monthly Report of Population as of July 31, 2006 and as of November 1, 2006).

Independent Review Panel").  The Panel determined that the "design capacity" of CDCR's male prison system is 76,879 inmates and the "maximum safe and reasonable capacity" is 137,764 inmates.[5] *Id.* at 123-24.  In contrast, the current male inmate population is 161,652, far exceeding the *maximum* number the Panel concluded could "safely and reasonably be housed in the prison system."  Bien Decl. ¶ 3, Ex. B (CDCR Population Statistics as of 11/1/06), ¶ 4 Ex. D at 124.  The Panel found that the solution to unconstitutional conditions in CDCR was to reduce the population size.  Bien Decl. ¶ 4, Ex. D at 123-125 ("The key to reforming the system lies in reducing the numbers...the system must free up programming space and provide adequate staffing to provide program services and run the institutions....The current situation in California prisons is untenable, and changes are required to bring about necessary controls.").  Since that recommendation in 2004, the CDCR inmate population has increased by eight percent, or more than 12,000 inmates.  Bien Decl. ¶ 4, Ex. B.  Moreover, the Panel also found that, while the population has been rising dramatically, staffing positions in CDCR have been severely reduced, with over 5,000 state prison positions and almost 1,200 headquarters and parole staff positions reduced between fiscal year 1990-91 and 2004-05.  Bien Decl. ¶ 4, Ex. D at 125.

Both the CDCR Director of Adult Institutions, John Dovey, and the California Correctional Peace Officers' Association (CCPOA) have declared that the overpopulation creates both danger to inmates and staff, and public safety concerns.  *See* Bien Decl. ¶¶ 12, 17 and Exs. K and Q (10/25/06 Dovey and 12/8/05 Cox memos).  The Governor's proclamation details the litany of grave dangers that directly result from overcrowding, including:

- increased, substantial risk of violence;

- increased, substantial risk for transmission of infectious illnesses;

- increased, substantial security risk;

---

[5]   Since the Panel's report, CDCR has opened the Kern Valley State Prison ("KVSP") facility, which has a design capacity of 2,625 and a current population of 4,779 inmates.  The capacity thus added by KVSP to the "maximum safe and reasonable capacity" of the CDCR system is still only marginal compared to the overwhelming population.  *See* Bien Decl. ¶ 4, Ex. B (CDCR Population Statistics as of 11/1/06)

- increased, substantial risk to the health and safety of CDCR staff, inmates, and the public including blackouts, sewage spills and environmental contamination;

- increased recidivism;

- severe modification or elimination of inmate programs;

- substantial restrictions on inmate movement; and

- increased risk of deadly prison riots.

*See* Bien Decl. ¶ 2, Ex. A.  The Governor has also stated, through his counsel, that "it is his belief that overcrowding affects virtually all of the issues that the Court is concerned about." Bien Decl.  ¶ 13, Ex. L at 33:23-25 (10/5/2006 Transcript).  Plaintiffs' counsel have been told numerous times on monitoring tours that institutions are on "modified program" or "lockdown" where inmates receive no yard time, and various other privileges are withheld because of the overcrowding and marked increase in violence as the population has become less manageable.  Bien Decl. ¶ 7; Kahn Decl. ¶ 2, 4-11.

## II.    OVERCROWDING NEGATIVELY IMPACTS ALL ASPECTS OF THE MENTAL HEALTH SERVICES DELIVERY SYSTEM

Overcrowding directly impacts the fundamental constitutional right of the plaintiff class to receive adequate mental health treatment.  The Governor himself made this connection in his proclamation, citing CDCR's high suicide rate and the lack of appropriate beds and space for mentally ill inmates as part of his justification for declaring a state of emergency due to severe overcrowding.  Bien Decl., ¶ 2, Ex. A at 5-6.  The Special Master concluded in his 15th Report that "[c]urrently long waiting lists for these beds [MHCBS, PSUs and DMH beds] mean that suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment."  15th Report at 421.  These are direct effects of population growth in the CDCR that is out of control.

The super-restrictive conditions in which inmates are presently housed throughout the CDCR are well-documented.  It is crucial to realize that the state of emergency in the prisons is not something inmates have been enduring for a matter of mere weeks or even months:  rather, this extreme system-wide lockdown has been building for years.  Repeatedly, defendants have

1  cited lack of adequate beds and treatment space, lack of adequate staff, lack of adequate

2  funding and resources, and increasingly dangerous and violent conditions as justifications for

3  their failure to provide constitutional mental health treatment.  *See, e.g.,* Kahn Decl. ¶¶ 6-10.

4  Inmates throughout the system have been filing administrative appeals ("602" forms) to

5  complain about the denial of basic human needs such as yard and exercise, and the responses at

6  every level indicate that, in the face of overcrowding, defendants are unable to provide even

7  these fundamental rights.  For example, almost one year ago, in December 2005, an inmate

8  housed at San Quentin in the Adjustment Center, an administrative segregation unit, filed an

9  appeal regarding the denial of a minimum of ten hours of yard per week.  In his appeal, the

10 inmate requested that mental health staff assist him in obtaining this outdoor exercise because

11 of its importance to his mental health.  His appeal was denied because "[u]nfortunately, due to

12 institutional staffing levels, it has become necessary to close the exercise yards in the

13 Adjustment Center in an effort to avoid operating at unsafe staffing levels."  Bien Decl. ¶ 22,

14 Ex. T (CSQ-6-05-02918, December 18, 2005).  In October 2005, an inmate housed at Salinas

15 Valley State Prison (SVSP) in an SNY yard, appealed the denial of adequate yard, dayroom,

16 and showers.  At the Director's Level, the inmate's appeal was denied, with the reviewer

17 concluding that "[n]o one could deny that the staffing shortages [*sic*] is a less than ideal

18 situation.  Nevertheless, the institution is not in violation of policy while under the State of

19 Emergency."  Bien Decl. ¶ 22, Ex. S (Case. No. 0501909, October 31, 2005).  Approximately

20 three months later, on January 26, 2006, an inmate housed on a different SNY yard at SVSP

21 committed suicide after being in the unit on lockdown status for six weeks.  *See* Kahn Decl. ¶

22 11.

23      It is well-established that these kinds of harsh and extreme conditions of confinement

24 both exacerbate existing mental illness--meaning that mentally ill inmates will decompensate

25 and need even higher levels of care and have lower probabilities of being able to be

26 downgraded or removed from the mental health caseload--*and* also severely increase the

27 prevalence of mental illness and mental health needs in the population of inmates who might

28

1    not otherwise require mental health treatment.[6]  This, in turn, translates into a skyrocketing

2    demand for mental health care at all levels (CCCMS, EOP, MHCB, and inpatient) at the same

3    time that defendants' ability to provide such care is severely *decreasing* system-wide.

4    Defendants have acknowledged, and this Court has recognized, the severe shortage of mental

5    health beds at all levels throughout the system.  *See, e.g,* 3/3/06 Order (ordering defendants to

6    submit plan for provision of sufficient interim and long-term acute and intermediate in patient

7    beds, plan for provision of sufficient interim and long-term MCHB beds); Special Master's

8    9/11/06 Report at 2 (severe shortage of inpatient and mental health crisis beds).  This means,

9    for example, that even inmates who require urgent care and are decompensating are unlikely to

10   be admitted to crisis beds in a timely manner (if at all), EOP patients wait for months, and

11   perhaps the entirety of their terms, in reception centers without obtaining any EOP level

12   treatment or programming, and inmates requiring suicide precautions may be housed in

13   inappropriate "overflow" cells such as those plaintiffs' counsel observed at CIM containing

14   bunk beds.  *See, e.g.,* Defs.' Submission of Plan for Reception Center/EOP Inmates, filed

15   7/31/06, Ex. A at 1; Kahn Decl. ¶ 10.

16        Long waiting lists of inmates requiring the highest level of care in DMH hospitals

17   remain common, and DMH and CDCR forecast that this shortage will not be addressed until

18   2011.  *See* Defs.' Submission Of Response To Court Order Requiring Amended Long-Term

19   Bed Plan, filed 6/30/06, Ex. A.  Moreover, Program Guide mandated treatment programs such

---

20
21   [6]  *See, e.g.,* Bien Decl.¶¶ 29-30, Exs. BB and CC (Gary E. Beven, <u>Offenders With Mental
     Illnesses in Maximum- and Supermaximum-Security Settings</u> in Handbook of Correctional
22   Mental Health, 209-28 (2005)("Prolonged isolation of inmates in segregation poses an inherent
     risk of psychological deterioration that cannot be ignored but that becomes difficult to address
23   effectively when it occurs."); Craig Haney, <u>Reforming Punishment</u>, 199-239 (2006)
     ("Overcrowding...exacerbates the chronic pains of imprisonment.…directly affects prisoners'
24   mental and physical health…There is widespread agreement among correctional experts that
     chronic idleness produces negative psychological and behavioral effects in prison.); Kahn
25   Decl., ¶ 3, Ex. A (Jeffrey L. Metzner, <u>Mental Health Considerations for Segregated Inmates</u>, in
     Correctional Mental Health Care Standards and Guidelines for Delivering Services, 233
26   (National Commission on Correctional Health Care 2003) ("Mental health clinicians working
     in such facilities [isolation, minimal or no programming, in environment designed to exert
27   maximum control over the individual] frequently report that it is not uncommon to observe
     many inmates, who do not have pre-existing serious mental disorders, to develop irritability,
28   anxiety and other dysphoric symptoms when housed in these units for long periods of time.")).

as therapeutic groups for CCCMS inmates (*see* MSHDS Program Guide, Ch. 3) have essentially been eliminated in many of the state's prisons as a result of the ever-shrinking ratio of clinical and custody staff to inmates. The general provision of care for the tens of thousands of CCCMS inmates throughout the system has severely declined in recent years. *See* Bien Decl. ¶ 21 (citing Special Master's conclusions in 15th Report). The suicide rate in California's prisons, more than double the average for the nation, is an alarming symptom of the overwhelming desperation and hopelessness that is now felt throughout the CDCR population of approximately 173,500 inmates.

Meanwhile, none of the plans proffered by defendants propose any immediate or short-term solutions. In fact, these plans convey absolutely no sense of urgency, much less emergency, as they continue to target dates *years* in the future. Defendants' projections for providing adequate numbers of mental health beds target 2011 as a goal, leaving the system with bed shortages in the thousands in the intervening years. *See* Defs.' Submission Of Response To Court Order Requiring Amended Long-Term Bed Plan, filed 6/30/06, Ex. A; Special Master's 9/11/06 Report at 27 (plan for beds now scheduled for completion in 2011). Governor Schwarzenegger's recent plan to transfer inmates to other states covers at most 5,000 inmates, in contrast to the at least 73,000 inmates who are currently housed in CDCR *in excess* of the 100,000 design capacity of the system. Bien Decl. ¶ 14, Ex. M at 1-2 (CDCR Briefing Memo Re: Out of State Inmate Transfer). More recent information about the out-of-state transfers projects a number under 2,500. Bien Decl. ¶ 14.

Right now there are over 400 mental health staffing vacancies. Bien Decl. ¶ 16, Ex. P at 1 (MHSDS Staffing Allocation and Vacancy History as of 3/31/2006). Nobody involved in the *Coleman* case suggests that defendants will be able to fill these vacancies, let alone the hundreds of new positions the Court determined are necessary in its July 28, 2006 Order, any time in the near future, given existing salary levels.[7] Even the small-scale project of

---

[7]   *See, e.g.,* 15th Report at 349 (recognizing that even when new positions are added, they fill slowly); Bien Decl. ¶ 16.

1  retrofitting 406 administrative segregation cells in relatively basic ways throughout the CDCR

2  to create safer "intake units" as a critical suicide prevention measure that defendants' outline in

3  their recently filed "Plan To Address Suicide Trends In Administrative Segregation Units," is

4  not—and defendants maintain, *cannot* be—scheduled to *begin* until fiscal year 2008/2009,

5  almost two years from today, and is not scheduled to be completed until 2011, five years from

6  today.[8]  *See* Defs.' Plan to Address Suicide Trends in Administrative Segregation Units, filed

7  10/2/06, Ex. A at 7-8.

8       This Court has patiently attempted for years to induce defendants to cure the

9  constitutional defects in their provision of mental health care, issuing order after order around

10  such issues as staffing and salaries, bed plans at various treatment levels, treatment programs,

11  suicide prevention, resource allocation, and the participation of critical state agencies.  But

12  defendants have been unable to implement these plans in such a way as to meet constitutional

13  standards.  The progress that was accomplished for several years of the *Coleman* remedial

14  process has been not only stopped in its tracks but reversed by the recent overcrowding crisis.

15  Unless the Court promptly intervenes to control the CDCR population, mental health care in

16  the CDCR will likely revert to the horrific levels documented by this Court in 1995.  Such

17  backsliding would be tragic for all concerned but deadly for the plaintiff class.  It must not be

18  permitted.

19                                   **LEGAL ARGUMENT**

20  **I.    THE PRISON LITIGATION REFORM ACT'S REQUIREMENTS FOR
           CONVENING A THREE JUDGE PANEL TO CONSIDER LIMITS ON THE
21         PRISON POPULATION ARE SATISFIED AND THIS COURT SHOULD
           REFER THIS MATTER TO SUCH A PANEL.**

22

23       The Prison Litigation Reform Act (PLRA) specifically contemplates circumstances

24  requiring judicial intervention in the form of a "prisoner release order," whereby a three-judge

25  panel orders the reduction of a prison population in order to protect the federal Constitutional

---

[8]   In fact, retrofitting of cells in administrative segregation units for suicide prevention
purposes was already the subject of a previous 2005 order of this Court which defendants
failed to respond to in a timely manner.  6/9/2005 Order.

1    rights of inmates. 18 U.S.C. § 3626(a)(3). The PLRA defines a "prisoner release order" as

2    "any order, including a temporary restraining order or preliminary injunctive relief, that has the

3    purpose or effect of reducing or limiting the prison population, or that directs the release from

4    or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). A prisoner release order is

5    appropriate for consideration when: (1) a court has previously entered an order for less

6    intrusive relief that has failed to remedy the deprivation of the Federal right sought to be

7    remedied through the prisoner release order; and (2) the defendant has had a reasonable

8    amount of time to comply with the previous court orders. 18 U.S.C. § 3626(a)(3)(A). When a

9    court determines that these requirements are satisfied, it can order that the matter be referred to

10   a three-judge court, in accordance with 28 U.S.C. § 2284, for consideration of whether a

11   prisoner release order should be entered. 18 U.S.C. § 3626(a)(3).

12        An order referring consideration of a prisoner release order to a three judge panel was

13   entered earlier this year by a federal district court in Ohio, in connection with the Court's

14   finding that "it is unlikely that the plan to maintain constitutional population levels at the jail

15   will be effective without some intervention by this Court in the form of a prisoner release

16   mechanism…Defendants have been given an opportunity to correct the problem of jail

17   overcrowding and have been unable to do so without further intervention by this Court." Bien

18   Decl., ¶ 26, Ex. Y at 5 (5/25/2006 Order, *Roberts v. County of Mahoning*, D.Ohio, Case No.

19   4:03-cv-02329-DDD). The Court issued an opinion in March 2005 finding that inmates were

20   being denied constitutional rights, and appointed a Special Master to assist the defendants in

21   finding a solution. After the Special Master recommended a remedial plan, the Court issued an

22   order in August 2005 adopting the Special Master's recommendations. *Id.* The Court noted

23   that subsequent to this order, there was a "great amount of effort and work" by defendants to

24   "attempt to solve those problems" identified by the Court in its decision, and "progress ha[d]

25   been made toward resolving a number of the findings." *Id.* However, because the Court found

26   that "the central issue of population control to prevent future overcrowding remains unsolved"

27   approximately one year later, it recognized the need for the further intervention by the Court

28   authorized by the PLRA. *Id.*

H:\0489\3\PLEADING\pls' memo iso 3 judge panel - overcrowding  11-13-06  489-3.DOC    14

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION,
NO.: CIV S 90-0520 LKK-JFM

In 1998, a three-judge panel convened pursuant to 18 U.S.C. § 3626(a)(3) entered a Population Consent Order in a District of Columbia case, *Inmates of Occoquan v. Barry*, No. 86-2128(JLG). *See* Bien Decl. ¶ 27, Ex. Z (Population Consent Order). The District Court held in 1989 that defendants were violating the constitutional rights of the plaintiff inmate class, and a Special Master was appointed. *See Inmates of Occoquan v. Barry*, 717 F.Supp. 854 (D.D.C. 1989). Nine years later, the panel found that the District Court had entered previous orders that failed to remedy plaintiffs' constitutional rights, and that defendants had a reasonable amount of time to comply with the previous court orders in the case. Bien Decl. ¶ 27, Ex. Z at 1-2 (1/20/98 Population Consent Order). The panel also held that because crowding was a primary cause of the violation of the plaintiffs' federal constitutional rights, and no relief other than that set forth in the Population Consent Order would remedy the violation, "the factual predicate for imposition of a prisoner release order…has been established." *Id* at 2.

Prior to the passage of the PLRA, many courts found population caps necessary in order to achieve constitutional conditions within prisons and jails. *See, e.g., Harris v. Angelina County, Tex.*, 31 F.3d 331, 335-38 (5th Cir. 1994) (upholding population cap because of conditions, but also emphasizing deliberate action of defendants, because the county continued to "pick up" inmates even when aware of overcrowding); *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983) (upholding order for population reduction, citing inadequate medical care, lack of exercise time, deficient maintenance and food service); *Ruiz v. Estelle*, 679 F.2d 1115, 1148 (5th Cir. 1982) *vacated on other grounds by* 688 F.2d 266 (5th Cir. 1982) (upholding population cap as an appropriate remedy considering the harms that existed as a result of the overcrowded conditions in the Texas prisons); *Palmigiano v. Garrahy*, 639 F.Supp. 244, 258 (D.R.I. 1986) (stating population caps are "commonplace" and citing caselaw); *Vazquez v. Carver*, 729 F. Supp. 1063, 1069 (E.D. Pa. 1989) (enforcing population cap); *Essex County Jail Inmates v. Amato*, 726 F. Supp. 539, 541 (D.N.J. 1989) (discussing necessity of population cap and imposing a fine for defendants' non-compliance with cap); *Benjamin v. Malcolm*, 564 F.Supp. 668, 685 (S.D.N.Y. 1983) (denying motion to increase population limit where there

H:\0489\3\PLEADING\pls' memo iso 3 judge panel - overcrowding_11-13-06_489-3.DOC                    15

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

are inadequate safety, unsanitary conditions, and extensive time spent by inmates in the cellblock); *Inmates of Allegheny County Jail v. Wecht*, 565 F.Supp. 1278 (W.D. Pa. 1983), *aff'd in rel. part*, 754 F.2d 120 (3d Cir. 1985) (population limits imposed; ordering additional relief based on conditions); *Grubbs v. Bradley*, 552 F.Supp. 1052, 1126 (M.D. Tenn. 1982) (double-celling banned in certain units at Tennessee State Penitentiary: "overcrowding is a primary source of all the most serious problems. . . . the only effective remedy is to reduce the prison's population . . ." ).

Although the PLRA now creates additional hurdles for the issuance of prisoner release order by a court, it plainly anticipates both that there will be times when overcrowded conditions are the primary obstacle to curing violations of federal rights, and that judicial intervention will be necessary to alleviate those overcrowded conditions and protect the constitutional rights of inmates.  The State of California is now at one of these junctures.  It is undisputed that the plaintiff class of mentally ill inmates is not receiving constitutionally adequate mental health treatment.  The Court has been diligent in its efforts to pursue relief not only in terms of the number of orders it has issued and the constant supervision it has maintained, but also in the variety of measures it has taken to achieve a remedy. Unfortunately, however, at this moment in time, mentally ill inmates in California prisons face life-threatening conditions where their basic human needs are not being met.  They need immediate relief and have no other recourse than to request that this Court access the remedy provided in the PLRA, which begins with an order of referral to a three-judge panel.

    **A.**    **Previous Less Intrusive Relief Ordered By This Court Has Failed To Remedy The Deprivation Of The Federal Constitutional Right Of The Plaintiff Class To Adequate Mental Health Care.**

This Court held in 1995 that "seriously mentally ill inmates in the California Department of Corrections daily face an objectively intolerable risk of harm as a result of the gross systemic deficiencies that obtain throughout the Department," 912 F. Supp. at 1316. Since its original *Coleman* decision, this Court has tried in numerous ways to effect relief for the plaintiff class.  In December 1995, the Court appointed a Special Master "to assist the court in fulfilling its obligation to fashion a remedy for the constitutional violations in the delivery of

mental health care to members of the plaintiff class and to monitor implementation of that remedy." 12/11/95 Order of Reference. In June 1997, the Court provisionally approved the California Department of Corrections Mental Health Services Delivery System Program Guides, a collection of the standards for the delivery of mental health services within the CDCR's various levels of health care within the different custody settings. 6/27/97 Order. In 2002, the parties and the Special Master, recognizing that the original Program Guides were not a sufficient remedy, agreed to revise and update the Program Guides. In March 2006, the Court approved the majority of defendants' Revised Program Guide. 3/3/06 Order. This eleven-year timeline represents the degree of procedural progress that has been made in this case.

Actualization of these policies, however, has not kept pace with planning, and now appears to be severely backsliding in the face of overcrowding. For example, the Special Master concluded in January 23, 2006: "Whatever progress was reported in the preceding round of review, or in the early part of the current review, in the timeliness of transfers of MHSDS inmates out of reception into general population programs has been largely cancelled by the recently escalating growth in the overall CDCR population and the concomitantly increasing number of MHSDS inmates in reception." 15th Report at 396-97. This Court has consistently been called upon to issue orders regarding the development of short-term bed plans, long-term bed plans, interim bed plans, staffing allocations and qualifications, salary increases, and suicide prevention plans. In most cases, orders on these topics have been issued over and over again because defendants have failed to effectively effectuate the plans or relief ordered.[9] In addition to entering such orders, this Court has taken extraordinary steps

---

[9] For example, on April 17, 2006, defendants filed their *third* bed plan in response to the March 30, 2005 Unidentified Needs Assessment study, and this Court's repeated orders to develop appropriate plans to address defendants' ongoing failure to plan for, construct, and operate sufficient resources to address the need for higher levels of mental health care for the *Coleman* class. This Court found that "the plan presented to the court in no way adequately responds to the severe shortage of intermediate care facility beds and mental health crisis beds that currently exists in the CDCR." 5/2/06 Order at 2:14-16. Moreover, these bed plan orders and proposed proposals are only the most recent incarnation of similar orders and proposals that have been issued throughout the eleven year remedial phase of this case.

including appointing experts, holding evidentiary hearings, establishing monitoring by the

Special Master and his team, issuing orders to show cause as to various failures by defendants,

waiving state laws, repeatedly granting defendants time extensions, and adding state officials

as parties—all in an effort to effectuate the remedy for the plaintiff class.  Increasingly in

recent years, however, defendants' consistent answer to the dramatic failure of the mental

health care system has been that they are moving as fast as they can or using what resources

they have as efficiently as possible, but it is not enough to meet the demand resulting from the

combination of skyrocketing population and staff shortage.

The Receiver in *Plata v. Schwarzenegger*, the class action regarding medical care in

California prisons, has stated numerous times that the medical care system is in a state of

failure, that without alleviating overcrowding it may be impossible to fix, and that the state has

proven itself utterly incapable of addressing the overcrowding crisis.  *See, e.g.,* Bien Decl. ¶

23, Ex. U at 2-3 (Receiver's First Bi-Monthly Report, filed 7/5/06) ("Unless and until the

living conditions of some prisons and the overpopulation experienced system-wide is

effectively addressed, the Receiver will be impeded in applying systemic and even some ad

hoc remedies to the medical care system."); Bien Decl. ¶ 23, Ex. U at 2-4 (Receiver's First Bi-

Monthly Report, filed 7/5/06).  This analysis clearly applies to the problems crippling the

mental health care system as well, many of which overlap with or are identical to those of the

medical care system.[10]

Plaintiffs recognize that substantial progress has been made in the provision of mental

health care and the establishment of a promising infrastructure for mental health treatment in

the CDCR since the *Coleman* decision.  However, the work by the parties and the Court over

the past eleven years is threatened—indeed, that progress is presently nullified—by the state of

---

[10] This Court has recognized the relatedness of the *Plata* and *Coleman* cases.  At the joint hearing this Court convened with Judge Henderson on June 8, 2006, Judge Henderson stated that the Courts had "compiled a list of at least 32 items in our two cases that we think overlap." Bien Decl., ¶ 24, Ex. W at 4:9-11 (Transcript of 6/08/06 Hearing).  Special Master Keating noted that "many of the areas of the problem in mental health…are part and parcel of the broader medical situation in the California Department of Corrections and Rehabilitation."  *Id.* at 6:4-8.

emergency resulting from the out-of-control overcrowding and abysmal conditions throughout the CDCR system.  Orders to fix various programs, re-allocate resources, or build more beds have been ineffective due to overcrowding.  As a district court in Rhode Island found in *Palmigiano v. Garrahy*, 639 F.Supp. 244, 258 (D.R.I. 1986), when it imposed prison population limitations nine years after its initial finding of constitutional violations:

> The record shows that for nine years this Court has employed all the artifices it could conceive to have the defendants cure the many constitutional violations it found.  I have been imperious, didactic, and supplicatory; I have cajoled and waited as though for Godot.  I have ever been reluctant to interfere with the operation of the prison…The veritable fortune that has been poured into [the] institution will all be for naught if positive firm steps are not immediately invoked.  The overcrowding must be confronted before it becomes uncontrollable.  A delay under the present conditions can give rise to problems of staggering magnitude not the least of which could be serious riots and/or a medical epidemic.

Most simply put, California inmates are currently facing horrific conditions that plainly violate Eighth Amendment standards prohibiting the unnecessary and wanton infliction of pain, and the state government, both executive and legislative, have absolutely no plan for providing any prompt or meaningful remedy.  This must not continue. The Court has tried every available less intrusive remedy at its disposal, and must act now to safeguard the lives of the more than 170,000 inmates in the CDCR system, over 30,000 of whom have already been identified as mentally ill.

**B.    Defendants Have Had Reasonable Time To Comply With Previous Court Orders Concerning The Provision Of Mental Health Care To The Plaintiff Class.**

That defendants have had reasonable time to comply with previous court orders concerning the provision of mental health care in the prison system cannot be seriously disputed.  The Court issued its decision in this case in 1995, eleven years ago.  Since that time, defendants have demonstrated repeatedly that they are unable to cure their violations of the plaintiff class' right to adequate mental health treatment.  On April 26, 2006, this Court stated that "[e]very defendant in this case is in violation of the law.  That is shocking.  That is shocking."  Additionally, the Court has accommodated defendants' persistent requests for time extensions in filing various plans and responding to orders throughout the history of this case.

H:\0489\3\PLEADING\pls' memo iso 3 judge panel - overcrowding  11-13-06  489-3.DOC    19

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION, NO.: CIV S 90-0520 LKK-JFM

1     Moreover, there is absolutely no reason to believe that any more time will help

2 defendants remedy the ongoing violation.  As the *Plata* Receiver stated in his September 19,

3 2006 Report, "Despite dire warnings from CDCR administrators that California's prisons will

4 be out of space by June 2007, despite the fact that population levels are now in excess of 200%

5 of designed capacity, nothing was presented to the Legislature by the Administration that

6 provided for immediate relief for Prison Wardens and Health Care Mangers [*sic*].  Likewise,

7 the Legislature itself offered no realistic proposals to deal with the problems faced within

8 California's prisons in a timely and adequate manner."  Bien Decl. ¶ 23, Ex. U at 3:1-6

9 (Receiver's Second Bi-Monthly Report).  Although the Governor has ordered the immediate

10 transfer of as many inmates as possible to out-of-state placements, this action will ultimately

11 do little to alleviate the overcrowded conditions in the system.  There are currently thousands

12 of individuals in county jails throughout the state waiting to be sent to CDCR from the county

13 jails to fill the places of inmates transferred out-of-state.  In fact, as noted above, the largest

14 county jail, Los Angeles County Jail, has recently cancelled its contract with CDCR to house

15 1,300 inmates and will return that population to CDCR in the next few months.  Dr. Farber-

16 Szekrenyi, CDCR Director of Health Care, has stated to Special Master Keating and Receiver

17 Sillen that the cancellation of the LA County contract will substantially worsen conditions in

18 the CDCR for all inmates and that he has no adequate plans to address the crisis.  Bien Decl. at

19 ¶ 25, Ex. X (9/1/06 Farber-Szekrenyi Memo).

20     The extremely high recidivism rate for California parolees guarantees the return of

21 thousands more individuals to custody every quarter.  In the past two months alone, the

22 population of the CDCR has risen by more than 1,000 inmates.  *Compare* Bien Decl. ¶ 3, Ex. B

23 *and* ¶ 3, Ex. C (CDCR population data statistics for 9/6/2006 compared to 11/1/2006).  The

24 CDCR's own population projections predict almost 70,000 intakes in the first six months of

25 2007.  Bien Decl. ¶ 10, Ex. J (CDCR Population Projections 2006-2011).

26     The fact is that for the inmates in California prisons, time is up:  they are incarcerated

27 now, in conditions so dire that the Governor has declared a state of emergency.  For the tens of

28 thousands of mentally ill inmates, these conditions have even graver consequences:  suffering

the kind of unnecessary and wanton infliction of pain held by this Court in the *Coleman* decision to be a violation of their Eighth Amendment rights, and a serious threat to their lives.

## II. POPULATION LIMITS SHOULD BE ORDERED IN THIS CASE BECAUSE OVERCROWDING IS THE PRIMARY CAUSE OF THE VIOLATION OF PLAINTIFFS' FEDERAL CONSTITUTIONAL RIGHT TO MINIMALLY ADEQUATE MENTAL HEALTH CARE, THE VIOLATION CANNOT BE REMEDIED WITHOUT RELIEF FROM OVERCROWDING, AND THIS COURT SHOULD CONVENE A THREE-JUDGE PANEL TO LIMIT THE PRISON POPULATION

The PLRA, in relevant part, states:

> A party seeking a prisoner release order in Federal court shall file *with any request for such relief*, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.

18 U.S.C. § 3626(a)(3)(C)(emphasis added). Thus, although an order limiting prison population may not be entered until the three-judge panel has been convened, the statute requires that plaintiffs make the request for such relief in their motion before the District Court. The *Coleman* plaintiff class requests relief in the form of an order limiting the prison population because the overcrowding emergency in California's prisons prevents the plaintiff class from receiving constitutionally adequate mental health care, and no other relief will remedy the violation of this constitutional right.

As described above, although over the past eleven years, the parties, the Court, and the Special Master have developed a remedial plan in the form of the Revised Program Guide that substantially provides for a remedy in this case, the current overcrowding crisis blocks the implementation of that plan. Because of the flooded population in the CDCR, there is inadequate space for treatment of mentally ill inmates, insufficient clinical and custody staff to provide the treatment mandated in the Revised Program Guide, and a severe shortage of treatment beds at every level of mental health care. Defendants have repeatedly acknowledged that there are no actions they can take to provide an immediate, or even short-term, remedy for the violation of the plaintiffs' constitutional right to mental health care, given the overcrowding crisis. Meanwhile, already seriously mentally ill inmates are decompensating at alarming

1  rates, ever-growing numbers of inmates require some level of mental health treatment, which

2  they are likely not to receive in adequate measure, and the suicide rate continues to rise.

3    Given CDCR's own prediction of a population that will continue to grow at escalating

4  rates, with 70,000 additional intakes predicted in the next six months, and the state's admitted

5  inability to act to effectively address the crisis, there is no conceivable remedy other than

6  intervention by the Court in the form of a limit on prison population.  Plaintiffs have

7  demonstrated that the requirements for convening a three-judge panel have been met, and that

8  the three-judge panel is likely to find by clear and convincing evidence that an order limiting

9  California's prison population order should be entered in this case.

## CONCLUSION

11    For the foregoing reasons, the motion should be granted, and this Court should convene

12  a three-judge panel, to limit California's prison population, pursuant to 28 U.S.C. § 2284 and

13  18 U.S.C. § 3626(a)(3).[11]

14  Dated:  November 13, 2006                    Respectfully submitted,

16                                                    /s/ Michael W. Bien
17                                                    Michael W. Bien
                                                     Rosen, Bien & Galvan
18                                                    Attorneys for Plaintiffs

---

27  [11]  Plaintiffs respectfully request that this Court consider the appropriateness of a joint hearing
28  with the other federal court's now addressing this issue in *Plata* and *Armstrong*.