**FILED**

NOV 1 3 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     RALPH COLEMAN, et al.,

7          Plaintiffs,

8     Vs.                         CASE NO. CIV. S-90-0520 LKK

9     ARNOLD SCHWARZENEGGER,
      et al.,

10

11         Defendants.

12     _____/

13

14

15

16                    ---oOo---

17

18               REPORTER'S TRANSCRIPT

19          THURSDAY, NOVEMBER 9TH, 2006

20          RE:   FURTHER HEARING ON TRO

21

22                    ---oOo---

23

24

25     Reported by:              CATHERINE E.F. BODENE,
                                 CSR. No. 6926

                                 2042

```
1                           APPEARANCES

2                            ---o0o---

3

4    FOR THE PLAINTIFF:

5            ROSEN, BIEN & ASARO, LLP
             155 MONTGOMERY STREET, EIGHTH FLOOR
6            SAN FRANCISCO, CALIFORNIA  94104

7            BY:  MICHAEL BIEN,
                  ATTORNEY AT LAW
8

9

10

11   FOR THE DEFENDANTS:

12           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
13           1300 I STREET
             SACRAMENTO, CALIFORNIA  95814
14
             BY:  LISA TILLMAN,
15                DEPUTY ATTORNEY GENERAL

16

17

18

19                           ---o0o---

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

```
1              SACRAMENTO, CALIFORNIA

2         THURSDAY, NOVEMBER 9TH, 2006 - 9:30 A.M.

3                   ---o0o---

4         THE CLERK:  All rise.

5         Court is in session.

6         The Honorable Lawrence K. Karlton is presiding.

7         THE COURT:  Be seated for a moment.  We have to get

8    Mr. Keating on the phone.  He is not going to be here this

9    morning.

10        Just hang on a second while we do that.

11            (Brief pause.)

12        THE COURT:  Good morning, Michael.  Can you hear me?

13        SPECIAL MASTER KEATING:  Yes, Judge, I can.

14        THE COURT:  We can hear you just fine.

15        Counsel, approach the podium, state your appearance

16   for the record, remain at the podium.

17        MS. TILLMAN:  Good morning, Your Honor.  Lisa Tillman

18   on behalf of the defendants.

19        MR. BIEN:  Good morning, Your Honor.  Michael Bien

20   and Jane Kahn on behalf of the plaintiff class.

21        THE COURT:  The record will reflect that the

22   defendants have filed the report.

23        I take it you've got a copy of it, Mr. Bien?

24        MR. BIEN:  Yes, I did, Your Honor.

25        THE COURT:  Have you had a chance to look at it?
```

2

1      MR. BIEN:  Yes, I have.

2      THE COURT:  All right.  I am -- I want you to convey

3  to your clients the Court's gratitude that they have taken

4  the Court's order seriously and have responded appropriately.

5      Whether it is going to be enough in the long run is

6  something we will have to work out I suppose today, but it is

7  clear they were serious and they reacted appropriately, which

8  brings me to the first matter that neither of you, I'm sure,

9  wants to talk about, but I do.

10     I did not include the portion of the proposed order

11 dealing with paying the people who went because I had no idea

12 what it was all about.  If you tell me you need an order from

13 me to do that, I will, of course, give you such an order.

14     MS. TILLMAN:  I would appreciate that, Your Honor.  I

15 can provide that if you like.

16     THE COURT:  Yeah.  Okay.

17     Mr. Bien, what is your response to the reasons that

18 we're here today?

19     MR. BIEN:  We also appreciate the efforts that

20 California made to send the clinicians to Tennessee to do all

21 this work.  And again, I think the most important thing to

22 come out of this is to make sure that it's done before the

23 next transfer.

24     THE COURT:  I agree with that.

25     I assure you, the State must agree with that as well.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

3

1    This is a very difficult thing to do the way we did it.

2          Go ahead.

3          MR. BIEN:  I think there are some additional steps

4    that need to be taken with Tennessee, and we've learned from

5    that collectively, and there are some additional steps that

6    we can do rapidly to assure the remaining transfers that need

7    to take place can get rolling.

8          And I think that -- that as I understand from the

9    defendant's pleading, that they're right now working with

10   Tennessee to make sure that they understand the Program Guide

11   Requirements.

12         Following from that, it's clear from our conversation

13   with the Tennessee officials, which we had on Tuesday -- they

14   were on this conference call that occurred, Your Honor, on

15   Tuesday -- that they, at least in my opinion, need to augment

16   the staffing to meet Coleman Program Guide Standards because

17   they don't have seven day a week.

18         THE COURT:  My understanding -- perhaps it might be

19   easier for you, before you continue, Mr. Keating why don't

20   you report for the record what you told me about your

21   conference call and what your evaluation of the situation is

22   as of now.

23         SPECIAL MASTER KEATING:  Your Honor, relative to the

24   elements of the assessment that you required going to

25   Tennessee, I think the documents provided by the State

4

1    address most of those issues pretty clearly.

2            There are some questions or observations I will make

3    relative to those, but I'll hold off on those for the moment.

4            The other thing that came out of the conference call

5    between representatives of Correctional Corporation of

6    America and CDCR officials and parties here and counsel,

7    indicated that the department folks had sent to CCA in

8    Tennessee at their headquarters copies of the Program Guides

9    and other applicable policies relative to the mental health

10   caseload, and that they were reviewing that to determine what

11   provisions they would need to observe that they were not

12   presently observing under their application of their own

13   internal standards which are based on the American

14   Correctional Association Standards of the National

15   Correctional Health Care Standards to determine what policy

16   issues might be needed and/or resources might be required as

17   well.

18           We have not yet heard.  From the materials that were

19   provided, it appears there is going to be a larger telephone

20   conference between CDCR and CCA to talk through whatever

21   differences there are and the extent to which any resources

22   may be required.  And both I think from the -- from the

23   contracts that have been provided and reviewed, the CCA

24   contractors will be required to provide whatever resources

25   are necessary to meet the Program Guide Requirements and

5

1    other requirements of CDCR relative to the mental health

2    caseload inmates.

3           That is scheduled for later -- or for Thursday.  And

4    out of that presumably will come whatever amendments to the

5    contract are required or whatever further resources need to

6    be identified and provided by the contractor.

7           And also there has been discussion of some of my

8    experts perhaps getting to the facilities themselves and

9    looking at them, and that's something that we're willing to

10   do.

11          THE COURT:  Let's hold off on that for the moment,

12   Michael.  I think you and I and Matt have got to discuss the

13   feasibility of that --

14          SPECIAL MASTER KEATING:  Fine.

15          THE COURT:  -- as an initial matter.  Whether it is

16   at all possible as an on-going matter, which, off the top of

17   my head without having thought about it very much, seems to

18   me just very, very difficult to ask you to do unless you

19   establish an entirely new staff whose business is going

20   around the country examining the facilities.

21          But we may have to do something, which I'm not clear

22   what that is yet, and we may have to ask the parties in due

23   course after we see what shakes out to advise us as to their

24   judgments about the matter.  And they will have to make a

25   motion, if the plaintiffs believe that's necessary, and the

6

1    defendants disagree -- and I'm not suggesting that's going to

2    be either of your positions -- then we'd have to work that

3    out.

4         But right now I think we're going to have to let

5    things shake out a little bit and see where they are before

6    we start doing anything else.

7         I was a little bit concerned and still am a bit

8    concerned, Michael, about the limitations on staff

9    appropriate to mental health patients.

10        Of course, it is important for us to recognize that

11   at least, if we can, we're going to ensure that there aren't

12   any mental health patients there.  That is not to say that

13   given the fact that about 20 percent of the population at

14   some point suffers discernable mental illness that we may not

15   get some.

16        I want to ask the State something about that.

17        Well, why don't you talk a little bit about

18   personnel, then we'll talk about the next issue.

19        Michael, what are they proposing or what do they have

20   on hand?

21        SPECIAL MASTER KEATING:  When I wrote my November 1st

22   letter, Your Honor, which has been sort of a central document

23   here, I was under the impression that they had just the four

24   hours a week contract services of a psychiatrist.

25        In our conversation on Tuesday, it became clear, also

7

1    from the documents provided by the State since the original

2    TRO was filed, it has become obvious they also have a

3    full-time licensed case worker clinician who is full-time,

4    that is to say he works five days a week.

5            That does not provide the 24-hour coverage required

6    for people who are in Ad. Seg., but it is a substantial

7    addition over and above what the original documents had

8    indicated was just the four hours of contracted psychiatric

9    services.

10           So there is more.  And I would assume that out of

11   this meeting, if there is a requirement to cover 24-hours of

12   people in Ad. Seg., they're going to have to provide that.

13           THE COURT:  Let's talk a little bit.  My

14   understanding, Miss Tillman, but I'm not sure this is what

15   the State contemplates -- I don't mean to be cutting you out,

16   Mr. Bien, but I'm just trying to understand where we are --

17   people who have indicia of mental illness in the recent

18   past -- relatively recent past are not going.  That's the

19   State's commitment as I understand it, correct?

20           MS. TILLMAN:  In terms of, again, using the criteria

21   indicated in Mr. Keating's letter of November 1, yes.  And

22   that's why we've done the additional screenings.

23           THE COURT:  My second question is what happens to

24   someone who has gone, who appears to be a perfectly

25   appropriate person to have gone, and who then gets sick?

8

1    Is he going to be shipped back or is he going to be
2    treated there?  What's -- or do we know?

3    MS. TILLMAN:  I know during the conversation, in
4    which Mr. Keating and Mr. Bien were present for on Tuesday
5    with CCA, the question came up what if someone suddenly
6    decompensated and needs acute care.

7    CCA responded that acute care is within an hour away.
8    Apparently, they're within an hour's drive of the University
9    of Tennessee Medical Center.  And I think they also indicted
10   that they were within 20 minutes of another care center.  So
11   should there be an acute need, they can definitely get that
12   person to the right provider within a very appropriate time
13   frame.

14   Obviously, there no intent to continue to house an
15   ill person who needs mental health care in that Tennessee
16   facility.  Once they're stabilized, the intent is to bring
17   them back to California so that they can have continued
18   monitoring under the Program Guide Standards they deserve.

19   THE COURT:  Mr. Bien, your view as to the adequacy of
20   that apparent plan?

21   MR. BIEN:  What I heard on the phone, you know, from
22   CCA sounded good in terms of the location of the prison and
23   their contracts.  What we'd like to see, and I think that's
24   what's being developed, are some actual written policies and
25   procedures that reflect the standards.

9

1          We think that -- that even in the screening process,

2     no matter what screening process goes on --

3          THE COURT:  Someone is going to get missed.

4          MR. BIEN:  As you see in this group, if you looked at

5     the list, people that they did send with the screening

6     process did have a relatively recent history of mental

7     illness.

8          I'm not -- I don't know if that is good or bad.

9     Really depends on the adequacy of the facility on the other

10    side.  And we'd like these people to be able to go and stay

11    so I think it is important that it not be a knee jerk

12    reaction that they are put on a plane.

13         THE COURT:  You know, this is a very complicated

14    problem.  It sounds to me that the State is doing its best to

15    make a reasoned judgment about what to do, and until I see

16    some evidence that they need intervention by the Court or the

17    Special Master, I don't -- I don't propose to make an order

18    other than that what the State seems to be doing makes sense

19    to me.

20         That's -- Michael, am I off?

21         SPECIAL MASTER KEATING:  No, Your Honor.  I think

22    what they've learned in this first round, and at a

23    substantial cost, is some of the ways of applying the

24    criteria that were not applied, you know, initially to this

25    group that went.  And I think it's simple enough to fix, and

10

1    the Department can fix it before they go out.

2            As to what happens when they get there, I think it's

3    the responsibility of the Department to make sure that there

4    are available resources in Tennessee, through their

5    monitoring of the contract and its terms, that there are

6    resources to deal with the emergencies and resources to

7    intervene and make assessments and evaluations quickly that

8    might result in the return of individuals.

9            Other than that, I think -- I'm not sure what else we

10   can do.

11           THE COURT:  That sounds right to me as well.

12           Miss Tillman, as to the people who are going to

13   Indiana next -- I mean, we've learned a whole bunch of things

14   from Tennessee.  We've got to start alerting them early on

15   about what the criteria and protocols are.

16           You're nodding your head.

17           MS. TILLMAN:  That has been accomplished.

18           THE COURT:  I'm sorry?

19           MS. TILLMAN:  That has been accomplished.

20           THE COURT:  Good.

21           Do we know about what happens to emergency situations

22   in Indiana or are we still working that out?

23           MS. TILLMAN:  I haven't been in contact personally

24   with GEO of Indiana, but I will endeavor to find out.  If I

25   need to bring Mr. Bien into that conversation, I'm happy to

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

11

1   do so.

2          THE COURT:  All right.

3          MR. BIEN:  Your Honor, may I?

4          THE COURT:  You certainly may.

5          MR. BIEN:  Here's -- I think that, at least in terms

6   of the conversation we had on Tuesday with Mr. Keating and

7   CCA and the Department of Corrections and the attorneys, it

8   was clear that there are some things that need to be ordered

9   or we need to get a very clear statement that they're going

10  to happen.

11         THE COURT:  Give me an example, Mr. Bien.

12         MR. BIEN:  Well, the contract that they entered into

13  is striking in its lack of reference to mental health care

14  and this case.

15         I don't know if the Receiver is right or wrong, but

16  he redrafted the contract in numerous terms, both in terms of

17  jurisdiction, monitoring.  I don't know if he's right or

18  wrong, but we have a very -- if I was the contractor on the

19  other side, I made one deal with Plata and another deal with

20  Coleman, and they didn't even mention Coleman.

21         And I'm concerned, not now, but let's say it's a year

22  from now, if Mr. Keating wants to get some information or

23  visit a prison, there's an incident, it doesn't provide for

24  any monitoring or even that the Program Guides are

25  acknowledged or anything.

12

1    So I think the contract should be amended, and the

2    new contract with GEO, which, by the way, is a different

3    vendor --

4        THE COURT: Right. I'm aware of that. And I'm

5    sensitive to the fact that the experience that we've had in

6    Tennessee may or may not have anything to do with what

7    happens in Indiana. And I suspect that the State has got the

8    same awareness, and they're going to have to respond to it.

9        I am concerned -- I mean, clearly the people in

10   Tennessee are now aware, if they weren't before, that there

11   is a case, that there is a Special Master, and that there are

12   protocols which they're going to have to follow.

13       It does seem to me probably good sense, even if it

14   weren't necessary, that there be some contractual

15   acknowledgment, at least in the future cases, and perhaps as

16   well in Tennessee, that this case exists and that the

17   California prisoners in Tennessee will continue to have

18   whatever protections the case has developed.

19       And I would think that the State -- I'm not going to

20   order you to because you seem to be making good progress on

21   your own, making good sense, but I am concerned that there be

22   some contractual -- some acknowledgment in the contractual

23   relationship of the existence of the case and the

24   responsibilities that derive therefrom.

25       Mr. Bien, I don't mean to be saying no to you, just

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

13

1    no, but if the State -- I mean, I'm going to say something I

2    must say often that nobody ever hears, and that is it is

3    ultimately the State's responsibility to ensure the mental

4    health care of its prisoners.  And when the State is doing

5    well, we ought to be stepping aside and letting them do their

6    job.  Because ultimately, God willing and the river don't

7    rise, some day I'm going to give this program back to them,

8    and hopefully sooner rather than later.

9         Mr. Keating will now be snickering because I've been

10   saying that for years, but this has been for me a very

11   encouraging sign.  I can't tell you.

12        MR. BIEN:  But, Your Honor, the fact is it took

13   judicial intervention.  I mean, I agree.  I really didn't

14   want to get involved in this and had no interest.  There is

15   no ill will on other side either.  They're very busy.  It

16   didn't happen correctly.

17        THE COURT:  I agree.  But there was a real effort, an

18   important effort to correct what had been done.

19        MR. BIEN:  I agree.

20        THE COURT:  We ought to make -- we ought to recognize

21   that.

22        It is my intention, Miss Tillman, unless the

23   plaintiff does something, not to worry you about Indiana,

24   thinking that you've learned from the experience and that

25   you're going to proceed in a somewhat more orderly way.

14

1          Let me assure you, Mr. Bien, that if it turns out

2     that gets frustrated somewhere along the line, the Court is

3     here.

4          MR. BIEN:  Here's my only concern here is that we had

5     discussed in the conference call that we were going to work

6     together with Mr. Keating to revise the screening criteria.

7          THE COURT:  Yes.

8          MR. BIEN:  We also think that -- what I'm afraid of

9     is that without some review point, some report back, that we

10    will not -- we and Mr. Keating will not get information about

11    what's going on.

12         We only found out about this from a third-party, the

13    Tennessee trip.  And so at least you need to, I think, have a

14    reporting back date or ask Mr. Keating to report back about

15    that we've agreed on a process for keeping the parties

16    informed and only come back for an order if necessary.

17         THE COURT:  Mr. Keating, I assume that's what you

18    would be doing anyhow; is that right?

19         SPECIAL MASTER KEATING:  Yes, Your Honor.

20         THE COURT:  So yeah, once again, I don't feel any

21    great need to issue an order.  I expect Mr. Keating to keep

22    me informed, and I expect the State to keep Mr. Keating and

23    you informed.

24         MS. TILLMAN:  We will do so.

25         THE COURT:  I know you will.

15

1          I really believe that.  I'm ready to get off the

2     bench.

3          Thank you very much.  We will stand in recess.

4          MS. TILLMAN:  Thank you.

5          (Off the record at 09:55 AM)

6                    ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          REPORTER'S CERTIFICATE

2                                ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5

6
          I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10              IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 13TH day of
11   NOVEMBER, 2006.

12

13

14

15           CATHERINE E.F. BODENE,
             CSR NO. 6926
16

17

18

19

20

21

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360