IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.

    Plaintiffs,

      vs.                       No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.


## SIXTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS


J. Michael Keating, Jr., Esq.
Special Master
2351 Sussex Drive
Fernandina Beach, FL 32034
(904) 491-7157
Fax: (904) 491-7158
December 13, 2006

# TABLE OF CONTENTS

**INSTITUTIONAL SUMMARIES**                                              5

**Service Area A**                                                       5

    California State Prison, Sacramento  (CSP/Sac)        5

    Folsom State Prison (Folsom)                          16

**Service Area B**                                                       23

    Pelican Bay State Prison (PBSP)                       23

    High Desert State Prison (HDSP)                       33

    California Correctional Center (CCC)                  51

**Service Area C**                                                       57

    Mule Creek State Prison (MCSP)                        57

    Sierra Conservation Center (SCC)                      72

**Service Area D**                                                       86

    California Medical Facility (CMF)                     86

    California State Prison at Solano (CSP/Solano)        99

    California State Prison at San Quentin (SQ)           114

    Deuel Vocational Institution (DVI)                    132

**Service Area E**                                                       149

    California State Prison at Corcoran (CSP/Corcoran)    149

    California Substance Abuse Treatment Facility (CSATF) 169

    Pleasant Valley State Prison (PVSP)                   181

Avenal State Prison (ASP) 187

**Service Area F** 197

Salinas Valley State Prison (SVSP) 197

California Training Facility (CTF) 214

**Service Area G** 222

California Men's Colony (CMC) 222

Wasco State Prison (WSP) 235

North Kern State Prison (NKSP) 247

**Service Area H** 261

California State Prison, Los Angeles County (CSP/LAC) 261

California Correctional Institution (CCI) 272

**Service Area I** 286

California Institution for Men (CIM) 286

California Rehabilitation Center (CRC) 301

**Service Area J** 311

Richard J. Donovan Correctional Facility (RJD) 311

Ironwood State Prison (ISP) 323

Calipatria State Prison (CAL) 328

Centinela State Prison (CEN) 335

Chuckawalla Valley State Prison (CVSP) 345

**Service Area K** 349

California Institution for Women (CIW) 349

**Service Area L**                                                                 364

    Central California Women's Facility (CCWF)                     364

    Valley State Prison for Women (VSPW)                          377

**SUMMARY**                                                                        390

**CONCLUSION AND RECOMMENDATIONS**                                                 420

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,

          vs.                      No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

      Defendants

## SIXTEENTH MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES AND PROTOCOLS

      This report covers the sixteenth round of monitoring primarily of institutional compliance with individual corrective action plans (CAPs) compiled by California Department of Corrections and Rehabilitation (CDCR) facilities in 2000 to ensure implementation of the plans, policies and protocols provisionally approved by the court in mid-1997. The round included visits to 26 CDCR institutions by teams of monitors and experts, with multiple visits occurring in California Institution for Men (CIM), California Institution for Women (CIW), California State Prison, Corcoran (CSP/Corcoran), California State Prison, Los Angeles County (CSP/LAC), California State Prison, San Quentin (SQ), California State Prison, Solano (CSP/Solano), Richard J. Donovan Correctional Facility (RJD), and Salinas Valley State Prison (SVSP). One of the 26 institutions visited by a monitoring team was the recently opened Kern Valley State Prison (KVSP), where severe hiring problems delayed the activation of the Mental Health Crisis Bed (MHCB) unit and the initial provision of mental health services

generally.  Seven other institutions were monitored by means of a paper review, which
required each facility to file documentation on their compliance with the local CAP and
other issues of special focus in the monitoring round.

Once again, monitoring also focused, apart from just CAPs, on quality
management, medication management, mental health input into the hearing and
disposition of rule violation reports (RVRs) generated in response to disciplinary
infractions committed by seriously mentally disordered inmates and the timeliness of
transfers to more intensive levels of mental health treatment.  More limited monitoring of
new so-called stand-alone administrative segregation units also continued, with monitors
making specific visits to assess compliance with the court's October 10, 2002 order on
the delivery of mental health care in these units.  That order prohibited the defendants
from housing seriously mentally disordered inmates in the new administrative
segregation units and led to an agreement to remove any Mental Health Services Delivery
System (MHSDS) inmates mistakenly placed in the units within 24 hours of
identification of the mistake, conduct daily psych tech rounds of the entire population of
the units, refer inmates with mental health problems in the unit promptly to mental health
clinicians and remove general population inmates identified as needing to be included in
the MHSDS caseload during their tenure in any of the units within 24 hours of the
referral.   Monitors inspected and assessed the mental health services delivered in existing
units in California State Prison, Corcoran (CSP/Corcoran), California State Prison,
Sacramento (CSP/Sac), California Substance Abuse Treatment Facility (CSATF),
Calipatria State Prison (CAL), Centinela State Prison (CEN), Pelican Bay State Prison

(PBSP), Pleasant Valley State Prison (PVSP) and Salinas Valley State Prison (SVSP), as well as in more recently opened units in CSP/LAC and High Desert State Prison (HDSP).

In addition to these continuing monitoring targets, two other issues arose during the monitoring round that required assessment. These included the delivery of cardio-pulmonary resuscitation (CPR) in emergency situations, especially those involving suicides, and the use of video-monitoring to observe suicidal inmates in Mental Health Crisis Bed (MHCB) units and Outpatient Housing Units (OHUs). In the early portion of the monitoring period, review focused on identifying problems, but by the end of the period, both issues were resolved through negotiated agreements, and subsequent monitoring focused on the implementation of various terms of the agreements. The shift in focus during the period of review meant that monitoring teams were looking at different aspects of these issues depending on the timing of their institutional visits.

During the 16th round of review, the monitor's psychiatric experts and monitors spent 308 person-days in the 26 visited institutions. The monitor's psychiatric experts compiled numerous case reviews based on interviews with inmates and clinicians, chart reviews, or a combination of these elements, which are included as exhibits in this report. A total of 234 case reviews from 19 institutions are attached to this report. The case reviews are redacted to protect the privacy of inmates.

Institutional administrators and mental health staff at the visited institutions continued to cooperate fully with the monitoring process. As in earlier rounds, plaintiffs' and defendants' counsel accompanied monitoring staff during several of the site visits.

The data collected and findings discussed in this report are the product of many members of different monitoring teams, but subsequent references to various monitors throughout the report shall be singular rather than plural.  Clinical judgments of the monitor's psychiatric experts are explicitly attributed to an expert.

This report contains an institutional summary of compliance for each CDCR institution, which includes a brief report on staffing and staffing vacancies; a list of resolved CAP problems when appropriate; discussion of the institution's progress, or lack of progress, in meeting requirements related to quality management, medication management, mental health input into the disciplinary process and transfers to more intensive levels of mental health care, as well as problems identified in the institution's CAP and targeted for elimination.  A concluding summary of overall compliance is generally followed by an assessment of each institution's likely candidacy for reduced future monitoring or a list of major local obstacles to future reduced review.   The institutional summaries are followed by a more general and department-wide analysis of compliance and any recommendations that spring from the analysis.

The arrangement of the institutional summaries in this report corresponds with the defendants' regional service areas, which typically include a hub institution with a MHCB unit for short-term inpatient crisis care and an intensive residential Enhanced Outpatient Program (EOP).  The service areas also include anywhere from one to four other facilities, each of which generally has a Correctional Clinical Case Management System (3CMS) program in the general population.

## Institutional Summaries
## Service Area A

This service area includes California State Prison, Sacramento (CSP/Sac) and Folsom State Prison (Folsom).

## California State Prison, Sacramento (CSP/Sac)
December 19, 2005 – December 20, 2005

CSP/Sac had vacant positions for a psychiatrist, a senior psychologist, five psychologists, four psych techs, a senior RN, five RNs and 4.5 office techs. These vacancies included recently allocated positions for a psychiatrist, a psych tech and 1.5 office techs to accommodate increases in the caseload population and additional allocated positions for two psychologists, a psych tech and a half-time office tech to cover the EOP administrative segregation hub unit, which chronically exceeded its capacity.

A number of construction projects were underway at CSP/Sac during the monitoring period. Mental health staffing allocations for these programs totaled nearly 75 new positions. The institution was struggling to hire additional staff, but none had been filled to date. CSP/Sac was building an 11-bed MHCB, referred to as the Crisis Bed Unit or the CBU, to supplement its current 15-bed MHCB unit. Construction was also underway on an additional 64-bed PSU. Both projects were scheduled for completion in mid-January 2006, but given the staffing difficulties, it seemed unlikely that the institution would be able to hire sufficient staff to activate the units by that time. The projects seemed likely to be postponed months due to hiring delays. In addition to its existing 18-bed OHU, CAP/Sac also planned to open a 22-bed mental health outpatient housing unit (MHOHU) on B-1 as soon as recently allocated positions for this unit were filled. In the interim, the institution had begun to use the B-1 unit temporarily to operate

5

what it called a Consolidated Housing Unit for monitoring inmates pending admission to MHCB and OHU beds.

Quality Management:

Many quality assurance issues remained resolved.  The suicide prevention committee had a broad membership and was functioning well.  The committee met monthly with at least half of its membership in attendance.  Minutes were maintained, reflecting substantive discussions in a number of areas.  Institutional audits were conducted using a variety of audit tools, and corrective action plans were developed to deal with identified problems.

Peer review, however, was erratic.  Peer review for psychiatrists, underway during the preceding monitoring period, lay dormant for most of the year.  Ten-chart reviews were conducted quarterly for all psychiatrists, but only for the MHCB unit.  The peer review process began again in October 2005, but some psychiatrists were not included.  Peer review for psychologists and psych social workers developed during the monitoring period.  An excellent QIT had been conducted, and some peer review for case managers had already been undertaken.

Medication Management:

The institution's operating procedures for medication management were not entirely consistent with departmental policies and needed to be revised.  Most of the audits conducted during the monitoring round on medication management, with the exception of audits addressing parole medication and laboratory testing, were problematic.  Many of the audits were based on small samples of just ten charts.  Moreover, even these small samples were not targeted for the specific issues being

audited.  For example, an audit of medication non-compliance could include inmates who were not receiving psychotropic medications.  Finally, the manner of reporting audit results was flawed.  CSP/Sac reported only the percentage of compliance without any analysis of results, description of the methodology used or corrective actions undertaken.

Continuity of medication for inmates arriving at the institution changed little during the monitoring period.  CSP/Sac had procedures in place for handling inmates arriving with medication orders from other facilities.  Arriving inmates who claimed without proof to be on medication were reportedly placed on a medication line for the next day or seen by the physician on call if needed.  No audit had been conducted, however, to determine the degree of compliance with these procedures.

A problem developed with continuity of medication for intra-institutional housing changes during the monitoring period.  Correctional officers did not transmit the newly developed inmate movement forms to the clinic as required.  MARs and medications for inmates changing housing locations were transferred by health care providers and not by correctional staff as specified in the institution's operating procedure.  The institution still had not audited whether inmates in need of medication renewals were seen by physicians before their renewal date or before the expiration of relevant continuity orders.

Follow-up to medication non-compliance was inconsistent.  No audits of this issue had been conducted, but staff reported problems both with referring non-compliant inmates to mental heath and with scheduling timely follow-up appointments.  MARs were generally legible, but some MARs were not initialed as required.  There was also a two to three-week backlog in the filing of MARs.

The timeliness of psychiatric responses to staff and inmate referrals remained unclear. CSP/Sac did not track response times to requests for psychiatric services.

Recent audits showed significant problems with the provision of parole medications for inmates discharged from the institution. CSP/Sac maintained a log of paroling inmates who were offered and either received or rejected medications on discharge, but no audit had been conducted to determine if documentation of such medications was filed in inmates' UHRs.

Laboratory testing of inmates on psychotropic medications was conducted. Institutional audits indicated that appropriate tests were completed in a timely manner and results were returned promptly and filed in inmates' charts. Clinicians reportedly reviewed test results and adjusted inmate medications in response to the results.

Implementation of DOT procedures was somewhat problematic. All EOP inmates routinely received DOT; the criteria for other inmates to receive DOT medications included a history of hoarding or suicide attempts. A list of inmates receiving DOT was generated on a regular basis, but the list had not been forwarded to the nursing staff for at least the last several months. Local operating procedures were not followed. Although custody had agreed to open cell doors for DOT, correctional officers failed to implement the agreement. Administration of DOT was regularly observed by supervisors, as were procedures for nurse administered medications. Suspected cheeking was supposed to be documented on inmates' MARs, but no audit of documentation to confirm the practice had been conducted.

The Keyhea process encountered some difficulty during the monitoring period. More than 100 inmates were on Keyhea orders at CSP/Sac at the time of the monitor's visit. Keyhea orders were routinely sought for inmates in need of involuntary medications, and renewals were generally sought in a timely manner. Orders for three inmates, however, were not renewed during the monitoring period because psychiatrists failed to complete required paperwork in a timely manner despite adequate notification of the need to do so.

Medication errors were compiled, and medication error reports were completed.

The institution still had not made adequate provisions for the administration of HS medications. HS medications were delivered between 7:30 and 8:00 pm, rather than after 8:00 pm as required.

Informed medication consent forms were not obtained for all inmates on psychotropic medications. Heat cards, however, were still provided to inmates on heat-sensitive medications, and inmates were told of the risks associated with their heat-sensitive medications.

Mental Health Assessments for the Disciplinary Process:

Mental health assessments for caseload inmates charged with disciplinary infractions continued to progress. RVRs, however, sometimes failed to document mental health input or to explain whether hearing officers considered mental health input in reaching their dispositions.

Aggregate data and individual case reviews suggested that at least some 3CMS inmates were not appropriately referred for mental health assessments in

connection with their disciplinary infractions. During the period from January 1 to October 31, 2005, 543 RVRs were issued to 3CMS inmates. Among the recipients of all these RVRs, only one inmate was referred to mental health for a mental health assessment.

Transfers:

Access to MHCB care was inadequate. CSP/Sac's 15-bed MHCB unit was too small for the institution's growing MHSDS population. As indicated above, CSP/Sac was in the middle of several construction projects designed to increase the number of crisis and OHU beds, but activation of these units was dependent on the institution's ability to hire staff which was likely to be difficult. Access problems were compounded by the high number of inmates who remained in the MHCB unit for extended periods of time. From June 1 to November 17, 2005, 183 inmates were discharged from the MHCB unit, 66 of whom had lengths of stay in excess of ten days. More than half of the inmates with extended stays had been referred to DMH and were awaiting acceptance or transfer; the average length of stay for inmates transferred to DMH was 24 days, with a range of 14 to 39 days. After discounting those inmates discharged to DMH, approximately 16 percent of MHCB admissions remained longer than ten days. Twenty-five percent of the 174 mental health admissions to the OHU from May 31 to November 30, 2005 lasted four days or longer.

Due to the insufficient number of crisis beds, the institution continued to use ZZ cells for most of the monitoring period to house inmates in need of MHCB care. As indicated in the preceding monitoring report, ZZ cells were holding cells with toilets and, sometimes, mattresses, located throughout the institution. As a result, seriously ill

inmates were often placed in unacceptable physical conditions outside the MHCB unit. Many inmates were held in ZZ cells for more than 72 hours. Of the 73 mental health-related ZZ cell admissions from October 10 to November 11, 2005, 23 lasted beyond 72 hours. The institution discontinued using ZZ cells for mental health inmates on December 5, 2005, when it activated the temporary CHU, mentioned above. The institution provided no data on admissions to the CHU or information on the unit's staffing.

CSP/Sac continued to have adequate access to APP/DMH at CMF. According to the referral log, CAP/Sac referred 106 inmates to APP/DMH from September 9 through November 10, 2005. Of these referrals, 98 were transferred to APP/DMH, six were rescinded, one was rejected and one was transferred elsewhere. The average length of time between referral and transfer to APP/DMH was only 11 days, although about 20 percent of the transfers were delayed by two weeks or more. The institution's DMH referral log was incomplete. The monitor reviewed 74 of the UNA referrals for the period from September through November 2005 in the log and found no follow-up record of the outcome for 32 of the inmates recommended for referrals in the UNA.

Access to SVPP/DMH remained difficult and slow. While only one inmate was rejected by SVPP/DMH during the monitoring period, many referred inmates had no other access to intermediary inpatient care and had to wait months for a transfer to SVPP/DMH. According to the institution's referral log for the period from September 4, 2004 to November 11, 2005, 102 inmates were referred to SVPP/DMH, of whom 34 were eventually transferred to SVPP/DMH. The time between referral and transfer for

these inmates averaged 84 days, with a range of 19 to 327 days. Slightly more than half of the transfers were delayed longer than 60 days. As of December 1, 2005, 22 accepted inmates were pending transfer. Half of these inmates had been waiting longer than 120 days. Another 15 referrals were pending acceptance; nine of these 15 inmates had been waiting longer than 100 days for a decision. As a result of the long delays, a significant number of the SVPP/DMH referrals were redirected to other DMH programs. Of the 102 inmates referred to SVPP/DMH, ten were sent to the DMH/ICF at CMF, while another 13 were sent to APP/DMH. Access to these beds was often delayed, particularly for inmates in need of neuropsychological testing. Despite delays in access to SVPP/DMH, no inmates were referred or sent to ASH.

Other CAP Issues:

    a.  Partial Compliance

        The provision of mental health screenings for non-caseload inmates arriving in administrative segregation improved. Chart reviews confirmed that non-caseload inmates were routinely provided a mental health screening within 72 hours of their placement in administrative segregation. Inmates who refused to be screened were referred to mental health and evaluated by a clinician in a timely manner.

        Problems resurfaced with the provision of group therapy to 3CMS inmates. The number of 3CMS inmates receiving group therapy declined to 30, with 142 inmates on the waiting list. If all planned groups had been operating, the program would have serviced approximately 80 inmates or eight to ten percent of the 3CMS population. The institution had a high therapy refusal rate of 37 percent, resulting in some small groups of three inmates or less.

Construction of the EOP treatment center continued. The monitor toured the area and found the planned programming and office space to be impressive. The project, however, was not due to be completed until the spring of 2006 and, in the interim, program space for general population EOP inmates remained limited. Group therapy still took place in dayrooms, while individual counseling and treatment continued to occur in the dining area.

A significant percentage of 3CMS inmates in administrative segregation did not receive out-of-cell case management contacts. From August 15 through November 11, 2005, the portion of 3CMS administrative segregation inmates receiving out-of-cell contacts varied from 43 to 59 percent, depending on the administrative segregation unit audited. The portion of EOP administrative segregation inmates receiving confidential case management contacts varied monthly from 56 to 62 percent from August through October 2005. EOP inmates in administrative segregation still did not receive ten hours of structured therapeutic activities.

The percentage of suicidal inmates receiving five-day clinical follow-up after being discharged from the MHCB unit or the OHU went from 82 percent in the preceding monitoring period to 89 percent from October 2004 to November 2005. Custody checks for the same period were performed appropriately for 82 percent of eligible inmates. In contrast, five-day clinical follow-up was provided to just two-thirds of suicidal inmates discharged from the OHU, CHU or ZZ cells from October 10 through November 11, 2005.

The restraint policy at CSP/Sac was inconsistent with current departmental standards. Specifically, the institutional policy inappropriately allowed an initial restraint

13

order to be written without requiring a face-to-face evaluation by the ordering clinician within the first four hours. A face-to-face evaluation was only required within the first 24 hours.

According to institutional data, 95 percent of custody staff had completed training on the amended CPR policy. Those who did not complete the training were unavailable to do so because they had been temporarily assigned to another prison or were on military or other long-term leave.

The use of video monitoring for inmates on suicide watch in CSP/Sac was inadequate. The MHCB unit at CSP/Sac had seven cells equipped for video monitoring. The monitoring equipment had zoom and night vision capabilities and could show one, two, four or seven cells at a time; the screen resolution was generally good when capturing a single cell and extremely poor when displaying multiple cells. The institution kept no record of inmates on suicide watch via video monitoring during the six months preceding the monitor's visit. Staff estimated that video cameras were used approximately once a week. Reportedly, more than two inmates were never on suicide watch via video monitoring at the same time. Contrary to departmental policy on video monitoring for inmates on suicide watch, no hourly contacts were required and one correctional officer was permitted to view up to seven inmates. Only "serious suicide attempts" warranted saving videotapes. Post orders on the position available in the MHCB unit were brief and vague.

CSP/Sac developed and implemented a new procedure on sexual misconduct. A staff member was assigned to complete all mental health assessments and all screenings for sexual misconduct. Thereafter, a treatment team was supposed to

14

decide if a comprehensive evaluation was warranted.  According to staff reports,

disciplinary infractions were often completed for incidents that should not have been

construed as indecent exposure.  Moreover, charts reviews indicated that incidents were

sometimes reviewed by one clinician as opposed to a treatment team, as required.  Since

September 2005, 55 screenings had been completed for 30 inmates.  Only one inmate was

determined to meet the criteria for a comprehensive evaluation, but that evaluation had

not yet been completed.  As a result, no one at CSP/Sac had been diagnosed with

exhibitionism.

Institutional Summary:

CSP/Sac had been allocated an extremely large increase in mental health

positions to support the anticipated expansion of its PSU, MHCB and OHU.  The

institution was struggling to fill these new positions as rapidly as possible to be able to

put these expanded programs into operation.

Among the four issues of focus in this round of monitoring, quality

assurance continued to progress with peer review being resumed after nearly a year-long

interruption.  Mental health components of the disciplinary process also improved.

Problems, however, persisted in many aspects of medication management, including

continuity of medication on arrival and changes in housing locations, laboratory testing,

DOT, parole medications, the Keyhea process and HS medications.  Audits were needed

to determine the timeliness of psychiatric responses to referrals, continuity of medication

on renewal and follow-up to medication non-compliance.  Access to acute DMH

programs was adequate, but transfers to the intermediate SVPP/DMH program were

difficult and untimely.  Similarly, access to MHCBs was problematic and resulted in the inappropriate use of ZZ cells for much of the monitoring period.

With respect to other CAP issues, five-day clinical follow-up improved, but CSP/Sac still had problems providing sufficient group therapy for 3CMS inmates, out-of-cell case management contacts in administrative segregation and structured therapeutic activities for EOP inmates.  There were problems with the use of video monitoring for inmates on suicide watch, mental health screenings for non-caseload inmates in administrative segregation and the institution's restraint policy.

CSP/Sac was on the brink of becoming an institution with a unique and pervasive mental health mission in CDCR.  The expansion about to occur, when combined with long term plans for the development of additional Level IV CDCR mental health programs, as well as DMH inpatient programs, will eventually make CSP/Sac the department's core facility for the provision of mental health services to the system's most seriously mentally ill Level IV inmates.

### Folsom State Prison (Folsom)
Paper Review

Psychiatric staffing remained inadequate.  Folsom had only one full-time psychiatrist on staff and a vacancy for a half-time psychiatrist.  The institution reported its anticipation of an additional allocation of a half-time psychiatric position, but no date was provided to indicate when this might occur.  Folsom used a contract psychiatrist to cover its vacancy, but the amount of coverage provided decreased significantly.  Between October 2004 and January 2005, the contract psychiatrist worked 60 to 100 hours a month.  In all but one month from February through October 2005, the contract psychiatrist worked less than 40 hours, providing no coverage at all in March and only

ten hours in February. As a result, clinical caseloads were extremely high. The contract psychiatrist was assigned to cover administrative segregation, which averaged around 50 inmates during this monitoring period as compared to 24 inmates during the preceding monitoring period. This left the sole full-time psychiatrist responsible for the rest of the 3CMS and EOP caseload of more than 600 inmates.

Folsom also had a vacant psychologist position, but did not use contract services to cover the vacancy after February 2005. Case manager caseloads, which had ranged from 105 to 134 during the preceding monitoring period, rose to 137 to 154 inmates during the monitoring period. Another case manager, a psych social worker, was expected to leave the institution in November 2006.

Issue Resolved:

The MHTS was appropriately implemented.

Quality Management:

The quality management committee continued to meet monthly, as did the mental health subcommittee. Minutes of both meetings were maintained. Many QITs were operating during the monitoring period, but the composition of the teams was unclear, and line staff reported minimal participation. No QITs were chartered to study the provision of mental health services in administrative segregation during the monitoring period.

Psychiatric peer review continued to occur quarterly, while psychologists and psych social worker met for peer review weekly. Charts reviews were conducted by the peer review groups, and results were presented to the quality improvement committee.

Medication Management:

     Medication management issues were minimally addressed in the
institution's submission for the paper review.  Practices previously found to be compliant,
such as the acquisition of informed medication consent forms and the use of MARs,
apparently were not assessed by the institution during the monitoring period.  Medication
continuity on arrival remained compliant.  In contrast, medication continuity for intra-
facility transfers showed some slippage.  Three-fourths of inmates changing housing
locations received their medications without interruptions, compared with 85 percent in
the preceding monitoring period.  Twenty percent of the inmates missed one dose of
medication, while five percent missed two or more doses.

     Folsom continued to provide inmates with parole medications at the time
of their discharge from the institution.  According to the institution's data on the issue,
134 caseload inmates were paroled from Folsom from January 2004 through October
2005.  Only one inmate was discharged without receiving his medications, and, in that
case, documentation indicated that his medications were mailed promptly to his parole
officer.

     Laboratory testing of inmates on mood-stabilizing medications appeared
to function well.  Although no institutional audits were conducted, the monitor found that
appropriate laboratory testing was ordered for inmates, and Folsom reported that
prescribed tests were conducted timely.  The monitor further found that test results were
reviewed by the prescribing clinicians and appropriate adjustments were made in
response.  Results reportedly were then entered into the inmates' charts in a timely
manner.  A limited review of eight charts found that 100 percent of laboratory tests were

ordered, reviewed and filed in UHRs. The reviewers did not report on the timeliness of actual tests or the timeliness with which results were entered into the charts.

Nothing appeared to have changed with respect to DOT. During the preceding monitoring period, no system was in place for clinically reviewing decisions distinguishing between DOT and nurse administered medication deliveries. DOT procedures, as well as nurse administered medications, however, were then being documented, observed and supervised at that time. The materials submitted to the monitor provided no further information on the issue.

The status of the use of HS medications was unclear. During the preceding monitoring period, the institution rarely provided inmates with HS medications. The monitor was not provided with information on the number of inmates receiving HS medication during the most current monitoring round.

The pharmacy documented 38 medication errors. No injuries resulted from any of the errors but, in some cases, new policies and procedures were developed to prevent further incidents.

The monitor previously found that Keyhea orders were appropriately tracked. The institution reported that no inmates on Keyhea orders were currently in the institution.

<u>Mental Health Assessments for the Disciplinary Process:</u>

During the monitoring period, 514 RVRs were issued to 3CMS inmates and eight were issued to EOP inmates. These figures constituted 16 percent of all RVRs issued in the facility. Folsom continued to track all requests for mental health assessments in a comprehensive log. According to this log, seven of the eight EOP

inmates charged with infractions received mental health assessments. There was no indication why an assessment was not completed for the eighth inmate, who was found guilty of threatening staff and assessed 45 days loss of credit. Only 12 3CMS inmates, less that one percent of 3CMS inmates receiving RVRs, were given mental health assessments. The institution appeared to have a system for ensuring that mental health assessments were completed by someone other than an accused inmate's case manager. The materials did not indicate whether clinicians reviewed inmates' C-files in connection with assessments, but in the past C-files were not reviewed.

Hearing officers appeared to take mental health input into account. Of the 19 mental health assessments completed during the monitoring period, clinicians determined that mental illness had influenced inmates' behavior in eight cases. Reports by hearing officers reflected consideration of mental health input in all eight cases. Charges were dismissed in six of the cases. The tracking log indicated that one EOP inmate was issued a RVR for failing to take his prescribed medication; the inmate was assessed 30 days loss of credit.

Transfers:

The timeliness of EOP transfers slipped. Of 57 EOP inmates referred to appropriate programs during the monitoring period, 11 waited longer than 60 days for transfer. Three of these inmates were not transferred for approximately 90 days, while four inmates had been waiting longer than 120 days when the facility submitted its paper review.

Folsom transferred 77 inmates to MHCB units and the OHU at CSP/Sac from December 2004 to October 2005. The materials provided to the monitor did not

reflect referral dates, so it was impossible to determine the timeliness of the transfers, an issue that previously was resolved. Folsom did not use its MHTS to track MHCB transfers, but instead relied on a handwritten log. The log indicated that 26 inmates remained longer than ten days in MHCB units elsewhere in CDCR. According to the institution, no inmate had more than one MHCB admission during the monitoring period.

The institution reported no referrals to DMH from October 2004 through October 2005.

Other CAP Issues:

a.  Non-Compliance

Lockdowns, in combination with the shortage of psychiatric staffing, effectively shut shown the IDTT process from May through September 2005. Inmates were no longer escorted to IDTT meetings, and psychiatrists were not generally in attendance. Treatment plans remained generic.

Inmates did not consistently receive mental health screenings within 72 hours of transfer to administrative segregation. An institutional audit indicated that only 25 percent of administrative segregation inmates received a timely initial screening. No data was provided on the length of stays of EOP inmates, the frequency of clinical contacts or the provision of psych tech rounds in administrative segregation.

Institutional Summary:

The paper review materials provided by Folsom did not reflect much progress. Folsom had a serious shortage of psychiatric coverage, which resulted in an impossibly high caseload for the one full-time psychiatrist. Case management caseloads also increased.

Of the four areas of focus in the round, quality assurance appeared to be fully compliant, except for a lack of staff participation in QITs.  Mental health input into the disciplinary process seemed to be reasonably well tracked, but few RVRs issued to 3CMS inmates generated assessments and, in the absence of actual RVRs and assessments, it was impossible to evaluate the quality of the process or its impact on outcomes.

Limited information on medication management was provided to the monitor, perhaps because the facility in the past had been relatively compliant in most aspects of the delivery and management of medications.  HS medications were rarely provided, and continuity of medication for inmates changing housing locations deteriorated slightly.

Transfers to higher levels of care clearly worsened during the monitoring period.  The percentage of EOP inmates transferred within 60 days declined, as did the percentage of inmates receiving timely initial screenings in administrative segregation.  MHCB transfer logs did not contain referral dates, making it impossible to assess the timeliness of transfers.

Overall, the materials submitted for the paper review contained inadequate information on many aspects of the mental heath services provided by Folsom during the monitoring period.

## Service Area B

Service Area B includes Pelican Bay State Prison (PBSP), High Desert State Prison (HDSP) and the California Correctional Center (CCC).

### Pelican Bay State Prison (PBSP)
November 13, 2005 – November 14, 2005

PBSP had vacancies for 2.5 psychiatrists, a senior psychologist, 4.5 case managers, six psych techs, two recreational therapists and two office techs. In addition, the institution had a psychiatrist on military leave and two psych techs on long-term leave. Slightly more than half of the mental health staff openings were new positions allocated to the institution because of population increases. Contract services covered a portion of the vacancies, roughly equivalent to one psychiatrist, 1.75 case managers and four psych techs.

The number of auxiliary staff vacancies increased among RN positions, but remained relatively constant in other areas. Ten of 41 RN positions were vacant, compared with six during the preceding monitoring period. Registry nurses covered eight of the vacancies. Seven of 29 allocated MTA positions and one of three senior MTA positions were still functionally vacant, but five of those positions were covered by contractors. In addition, 1.5 of the 15.5 medical records positions were vacant. No pharmacy positions were vacant.

Issues Resolved:

Custody checks were consistently performed as part of the follow-up provided for inmates discharged from the MHCB unit.

The peer review process was functioning well.

HS medications were appropriately administered.

Quality Management:

The quality assurance process at PBSP was functioning well. The quality management committee continued to meet twice a week and maintain minutes throughout the monitoring period. The mental health subcommittee met on a weekly basis, also maintaining regular minutes.

The institution continued to operate six QITs. As indicated in the preceding monitoring report, mental health staff appeared familiar with the QIT process and received relevant feedback.

The institution still conducted chart reviews on a regular basis, routinely sampling ten percent of the mental health caseload. Peer review for psychiatrists, psychologists and psych social workers was handled well at PBSP.

The institution was having problems with the new Madrid management information system introduced in July. Clinical staff had received training on the system in May and June, and additional training was planned for November. According to the institution, there were over 300 problems with the system. Moreover, it regularly took a long time to enter data electronically in the system. Among other difficulties, the reliability of the institution's monthly overview report was questionable given the problems with the information system. A QIT had been chartered and met weekly to study the new information system; three subcommittees were formed in September to assist with the study. Further monitoring was needed to determine whether expected improvements will be accomplished over the next few months.

Medication Management:

There were few problems regarding continuity of medication. PBSP had adequate procedures in place for ensuring continuity on arrival. Inmates arriving at the institution on medication were accompanied by MARs 90 percent of the time. Inmates on medication rarely arrived without documentation. Procedures were also in place for sustaining medication continuity for inmates changing housing locations. MTAs used the daily movement sheets to monitor intra-facility relocations. Most medications were clinic-stocked and, therefore, likely to be available in inmates' new housing units. Inmates' MARs were generally available to the staff in the receiving unit through the new information system. Finally, medications were renewed in a timely manner because inmates were usually seen by psychiatrists prior to the expiration of their medication orders.

Follow-up to medication non-compliance remained problematic. It was difficult to determine whether inmates were consistently referred to mental health for medication non-compliance due to problems with MARs data in the new management information system. Moreover, no audit had been conducted to assess whether clinical follow-up appointments were scheduled and conducted for non-compliant inmates.

Parole medications were reportedly provided to all caseload inmates discharged from the institution. A procedure was in place to notify the pharmacy ten days prior to an inmate's release. It was not clear whether the institution maintained a log identifying caseload inmates who were offered and received or rejected medications.

Nothing changed regarding medication errors. Medication error reports were completed and compiled by the institution. While prescribing psychiatrists were

reportedly informed of errors as they occurred, staff acknowledged that medication errors probably were underreported. The institution still had not audited this issue.

DOT practices also remained the same. All inmates on psychotropic medications still received DOT. Procedures for DOT were not documented, but staff continued to report that DOT was periodically observed by nursing supervisors.

PBSP continued to track inmates on Keyhea orders. For the period from January through September 2005, approximately 90 inmates a month received involuntary medications through the Keyhea process. Keyhea renewal orders were reportedly sought in a timely manner.

HS medications were administered appropriately. Institutional audits for March 2005 found 99 inmates receiving HS medications, while audits for August and October found 77 and 41 inmates on HS medications respectively. All HS medications were administered after 8:00pm.

Laboratory testing for inmates on mood-stabilizing medications was inconsistent. An institutional audit of 52 charts from September 2005 found that laboratory tests were appropriately filed in 84 percent of the charts, while 95 percent of those test results were returned in a timely manner. An earlier 55-chart institutional audit similarly indicated that laboratory results were present in 89 percent of the charts. According to the September audit, clinicians responded to abnormal test results by adjusting medication appropriately in 66 percent of cases; this portion of the audit, however, may have been unreliable as the sample size was small.

There were some new problems with MARs due to faults in the management information system. MARs were not always filed in the charts, and no-

shows and refusals were not always documented.  Supervisory reviews of MARs were rarely conducted.

<u>Mental Health Assessments for the Disciplinary Process:</u>

PBSP continued to track a wide range of information on caseload inmates involved in the disciplinary process.  From January 1 through September 30, 2005, 702 RVRs were issued to caseload inmates, approximately 25 percent of the total number of infractions written up throughout the institution.  Since mental health inmates constituted only about 15 percent of the PBSP inmate population, it appeared that this group of inmates received a disproportionate number of infractions.  According to the institutional log, 417 inmates were referred for mental health assessments in connection with their disciplinary charges; this included all EOP and MHCB inmates, and a substantial 22 percent of 3CMS inmates.

Mental health staff did not consistently follow departmental protocols in completing mental health assessments for inmates charged with disciplinary infractions.  An institutional audit of 35 assessments found that clinicians completed all of the required assessment components in only 16 of the audited cases.  In the remaining cases, clinicians either did not interview the inmates or failed to review inmates' UHRs and/or C-files.

The institution audited 21 completed RVRs and found that clinicians concluded mental illness had affected inmate behavior in 15 of the reports.  The institution further indicated that hearing officers regularly discussed mental health assessments in reaching their conclusions.  The monitor was unable to review inmates' C-files during the monitoring visit to confirm the institution's findings.

27

PBSP was developing a pilot program for inmates who had engaged in indecent exposure. A number of security measures designed to deal with this problem had already been implemented, including the use of special jump suits. Training had been provided to correctional staff on the management of these inmates. Staff reported that the number of inmates engaging in exhibitionist behavior decreased by about 80 percent after the security measures went into effect. There was also a treatment group for habitual exhibitionists operating in the administrative segregation unit.

Transfers:

PBSP made progress in providing access to the MHCB unit during the monitoring period. Staff was better able to ensure immediate access to the MHCB unit through timely discharges and transfers of medical patients to a local hospital; temporary holding cells were not used to house inmates awaiting transfer to the MHCB unit. The average length of stay in the MHCB unit decreased, ranging from 5.13 to 7.05 days, with most admissions still coming from the PSU. The average length of stay during the preceding monitoring period ranged from 5.15 to 9.47 days. PSU inmates often remained in the MHCB unit after they were clinically discharged due to a chronic lack of beds in the PSU program.

Access to APP/DMH at CMF was adequate. The number of referrals to APP/DMH from January through September 2005 ranged from one to six per month. No inmates referred to APP/DMH were rejected during the period. The average time from referral to transfer ranged from three to 19 days. For the period from August 1 to October 31, 2005, there were 44 referrals from PBSP to APP/DMH, of which 42 resulted in transfers and two were cancelled; again, no referrals were rejected. The time from

referral to transfer averaged 7.6 days, with a range of two to 19 days. Inmates were consistently transferred within 72 hours of receiving a bed assignment. Referrals to APP/DMH were, however, often delayed; it took two weeks or longer, after admission to the MHCB unit, to initiate referrals in 15 of the 42 completed transfers.

Transfers to SVPP/DMH improved, but remained slow. From August 1 through October 31, there were 53 referrals for 47 inmates, of which 31 resulted in transfers to SVPP; only one referral was rejected. The average time between referral and transfer was 49 days, ranging from 12 to 144 days, with more than a quarter of the inmates waiting over 60 days for transfer. At the time of the monitor's visit, three accepted inmates had been awaiting transfers for 229, 80 and 49 days respectively. Another three inmates had been waiting 33, 26 and 18 days for a decision on their referrals. Inmates sometimes decompensated while waiting for transfers to SVPP/DMH. There were seven inmates referred to SVPP/DMH who were sent instead to APP/DMH, presumably due to transfer delays and their deteriorating mental condition; the lapse between the referrals of these inmates to SVPP/DMH and their transfers to APP/DMH was 114, 40, 33, 29, 19 and 17 days respectively.

According to staff, psych and return protocols were followed without problems throughout the monitoring period.

Other CAP Issues:

a. Partial Compliance

The monitor did not have an opportunity to assess the timeliness of psychiatric responses to referrals, an issue that had shown improvement during the

preceding monitoring round. The institution did not keep track of the average response time for urgent and non-urgent referrals.

There were five therapy groups for 3CMS inmates operating at the time of the monitor's visit, one on A Yard, one on B Yard and three in administrative segregation. A needs assessment study performed during the monitoring period concluded that there was a need for further 3CMS groups. Staffing vacancies, however, prevented implementation of this recommendation. The frequency of case management contacts for 3CMS inmates was erratic. From January through September 2005, there were 288 to 306 general population 3CMS inmates in PBSP. Of these anywhere from three to 146 3CMS inmates monthly were not seen as frequently as required in their treatment plans.

The amount of structured therapeutic activities offered to EOP and PSU inmates declined. EOP inmates in general population were offered between 4.71 and 10.13 hours of therapy a week, compared with an average of 11.70 hours during the preceding monitoring period. PSU inmates were offered between 7.36 and 13.15 hours of out-of-cell therapeutic activities, compared with 11.53 to 13.18 hours during the first six months of 2004. PSU inmates were offered more than ten hours of structured therapy during just two months in 2005. Data for the latter part of October and the early part of November showed some improvement in the amount of therapy offered to both EOP and PSU inmates. Treatment services for EOP and PSU inmates were often provided in a non-confidential setting.

There continued to be problems in administrative segregation with the provision of mental health services, including the frequency of case management

contacts. The number of 3CMS inmates in the administrative segregation unit from January through September 2005 ranged from 59 to 68. During this same period, between zero and 23 3CMS inmates a month did not receive weekly case management contacts. Caseload inmates were often seen in a non-confidential setting due to the lack of available office space. Mental health screenings were not consistently completed for non-caseload inmates placed in administrative segregation. Completed screenings were often delayed more than 72 hours after admissions to the unit.

In June 2005, agreement was reached in <u>Madrid</u> on a program in administrative segregation to provide group therapy particularly to 3CMS inmates who were downgraded from participation in the PSU program for clinical reasons and were awaiting transfer to the CSP/Corcoran SHU. Needed physical renovations were identified, as were some slight additional staff allocations needed to implement the program, and appropriate requests were forwarded to DCHCS. Reportedly, no decision had been made at the headquarters level, and the program had not been implemented at the time of the monitor's mid-November visit.

UHRs were more legible and contained more comprehensive clinical data.

b. Non-Compliance

Inmates on heat-sensitive medication did not receive heat cards. While this did not impact significantly on inmates in PBSP, it might present a problem for inmates transferred from PBSP to other institutions, such as CSP/Corcoran.

<u>Institutional Summary:</u>

PBSP continued to progress during the monitoring period. A number of CAP items were resolved, and forward movement was maintained in several of the four

areas of focus in the monitoring round. In particular, the quality assurance process was operating well, and access to higher levels of care improved. The disciplinary process was reportedly improved for caseload inmates, although mental health assessments were not always completed properly. According to the institution, hearing officers took mental health input into account in reaching their determinations. A pilot program for dealing with exhibitionism was also implemented.

Medication management was more erratic. Continuity of medication was good; parole medications were provided; problems with HS medication were largely resolved; the Keyhea process functioned properly; and DOT was reportedly performed routinely. On the other hand, follow-up to medication non-compliance was poor; laboratory testing was inconsistent; MARs were problematic; and measures for dealing with medication errors had not been audited.

Staffing shortages and inaccuracies in the recently implemented electronic information system made it difficult for the institution to maintain its previous level of compliance in some areas. Specifically, the amount of therapeutic activities afforded to EOP and PSU inmates declined; the provision of group therapy and case management contacts for 3CMS inmates slipped; and implementation of the mental health program in administrative segregation was incomplete. An audit was needed with respect to the timeliness of psychiatric responses to referrals.

Overall, PBSP continued to make progress toward compliance warranting a reduced level of review during the next monitoring period. Ongoing problems with the facility's new electronic management information system, however, precluded for the moment the reduction of monitoring to a paper review in the next round.

## High Desert State Prison (HDSP)
October 12, 2005 – October 14, 2005

Psychiatric staffing, which reached crisis proportions during the preceding monitoring period, remained in dire straits. The chief psychiatrist position was converted to a position for a senior psychiatrist, but the psychiatrist recruited to fill the position left after eight days. The position was vacant again at the time of the monitor's visit, although a candidate had been identified and was expected to assume the position in December 2005. All five of the institution's allocated staff psychiatrist positions were vacant throughout the monitoring period. No psychiatrist was on site at HDSP during 86 days in 2005. Between five and 12 contract psychiatrists a month covered up to half, but often as little as a quarter, of the open psychiatrist positions. There was little supervision provided for these contract psychiatrists, and turnover among them was high. Under these circumstances, continuity of care was a significant problem; inmates rarely saw the same psychiatrist twice. HDSP also used between 30 and 70 hours of telemedicine a month, which covered less than one-half of one vacancy. Contract and telemedicine services together covered, at most, 44 percent of vacant psychiatrist positions.

In addition, positions for three psychologists, two psych techs and an office tech were vacant. Another psych tech was expected to leave shortly, and another office tech was on long-term leave. HDSP employed a consistent group of contract clinicians to cover the equivalent of one psychologist position. Despite the staffing shortage, case manager caseloads were under a 100 inmates on most housing yards and in the mid-30s in administrative segregation.

Auxiliary staffing suffered from a 40-percent vacancy rate among MTAs. Contracted MTAs covered about a quarter of these vacancies. While most RN vacancies

were covered by contractors, pharmacy vacancies were only partially covered.  On the medical side, nearly a third of all allocated physician positions were vacant, as was the chief physician's position.  Reportedly, some 160 correctional officer positions were also vacant, resulting in lengthy lockdowns and delaying access to therapeutic activities for mental health inmates.

HDSP remained closed to transfers of MHSDS inmates from other institutions during most of the monitoring period, with the result that the 3CMS caseload declined by more than 30 percent from 784 inmates in September 2004 to 532 inmates in October 2005.  On the other hand, the number of high risk EOP, administrative segregation and reception center inmates increased.  The caseload population in administrative segregation, for example, grew from 55 to 70 inmates during the monitoring period.

<u>Issues Resolved:</u>

Access to confidential treatment space was adequate.

Problems with clinical access to MHCB inmates were resolved.

<u>Quality Management;</u>

The quality management committee and mental health subcommittee both had good interdisciplinary representation, although psychiatric attendance remained problematic.  The quality management committee met monthly, but did not generally focus on mental health issues.  The mental health subcommittee met biweekly and functioned reasonably well.  The suicide prevention committee met monthly, although custody and psych tech participation was limited.  The committee apparently did not discuss the two suicides completed during the monitoring period adequately, nor did the

34

committee discuss thoroughly appropriate responses to serious suicide attempts. According to the warden, reports of correctional officers baiting caseload inmates in administrative segregation to hang themselves were being investigated.

The QIT process was limited. Only three teams were active during the monitoring period. Two of them were involved primarily in designing forms, while the third had gathered a large amount of data but not yet analyzed the information or identified corrective strategies.

HDSP conducted an extraordinary number of monthly and quarterly audits, reviewing a significant number of inmate charts. The methodology of these studies was usually strong, except for some medication-related audits. Audit results were reported at mental health subcommittee meetings, but remedies for poor performance were generally limited to training and supervision.

Psychologist peer review began to occur during the six months prior to the monitor's visit. Peer review for psych social workers occurred throughout the preceding year. Given the staffing situation, i.e., the absence of a single permanent psychiatrist in the institution, there was no peer review for psychiatrists.

Once again, no progress had been made in implementing the MHTS. The data in the system, particularly with respect to medication information, was frequently inaccurate. There were also problems with the system's interface with the pharmacy's software. Tracking was still primarily accomplished through manual logs.

<u>Medication Management:</u>

HDSP still lacked an adequate local operating policy on medication management. Staff losses interrupted efforts to revise the policy for much of the

monitoring period, but the institution recently began the revision process anew. The draft policy under consideration was not entirely consistent with departmental requirements; it included no provisions for HS medications or laboratory testing.

Continuity of medication for arriving inmates worsened. Institutional audits, while methodologically flawed, indicated that less than half of inmates arriving in reception with verified medications received their prescriptions in a timely manner. The institution found examples of medications that were ordered, but never received; in other instances, medications were delayed anywhere from a day to weeks. The pharmacy appeared to cancel some orders, while psychiatrists reportedly discontinued some medications for arriving inmates because the ordered medications were non-formulary.

Procedures for handling inmates arriving with unverified medication claims were in place, but implementation was erratic and no audit of the issue had been conducted by the institution. The monitor's expert reviewed the charts of seven such inmates and found that, while all of the inmates were appropriately referred to mental health, two inmates were not seen by a psychiatrist and several others received inappropriate orders continuing their medications without being seen by a clinician. The average time from referral to psychiatric evaluation for the inmates who were seen was 20.3 days, with a range of nine to 30 days.

Medication continuity for inmates changing housing locations continued to improve. Methodologically sound institutional audits indicated that 85 percent of medications were delivered without interruptions after intra-institutional transfers. Institutional audits did not, however, capture data on the length of interruptions or the housing units where interruptions occurred.

Medication continuity on the renewal of medication orders also improved, but a number of prescriptions still were allowed to expire. Institutional audits showed that renewals were timely 80 to 90 percent of the time. Interviewed inmates reported medication expirations lasting days or weeks. Interviews with staff and chart reviews revealed instances of serial medication renewals without clinical contact.

The provision of parole medications deteriorated. Institutional audits for the period from December 2004 to June 2005 indicated that only one to two-thirds of paroling inmates received their medications upon discharge. The institution developed a new corrective action plan to remedy the problem, but it was too early to assess the effectiveness of the adopted measures.

Follow-up to medication non-compliance remained problematic. Data from the MHTS indicated that some appropriate referrals were made, but the extent to which non-compliant inmates were consistently referred to mental health was unclear. Staff reported that non-compliance was not consistently recorded in inmates' MARs. Institutional audits on the timeliness of psychiatric follow-up were methodologically poor, but seemed to show that the percentage of non-compliant inmates referred to mental health was low, between 20 and 67 percent. According to the same audits, refusal forms were completed in only 22 percent of reviewed cases.

HDSP had an adequate procedure in place for reporting and reviewing medication errors. According to an institutional medication error summary, 72 errors were reported for the period from May through September 2005. All errors were appropriately reviewed.

The institution finally began providing DOT, but some problems persisted. Reportedly, just 11 inmates were on DOT during the monitoring period, compared with one during the preceding monitoring period. IDTT meetings appeared to identify some inmates suspected of hoarding or cheeking their medications, but the institution did not seem to know how many inmates had such a history. Moreover, staff complained that psychiatrists did not regularly adopt IDTTs' recommendations for DOT and did not document their rationale for not doing so. The monitor's expert reviewed HDSP's orientation package for new psychiatrists and found no information on DOT in them. The monitor's expert concluded that a QIT was needed to study the issue.

HS medications were still not prescribed at HDSP.

It was difficult to determine the frequency of blanks on inmates' MARS from institutional audits, but studies showed that MARs were generally legible. HDSP audits found that MARs were filed in 93 to 95 percent of surveyed inmates' UHRs. Chart reviews by the monitor's expert suggested a possible problem with misfiled MARs.

Little had changed with regard to the filing of informed medication consent forms. Four audits conduced during the preceding 12 months demonstrated a rate of compliance ranging from 51.5 to 66.9 percent. The audits noted similar problems with the filing of psychiatric progress notes.

The monitor did not have an opportunity to assess the Keyhea process. Only one inmate had a Keyhea order at the time of the monitor's visit.

Mental Health Assessments for the Disciplinary Process:

HDSP had a system for tracking requests for mental health assessments, which was found to work reasonably well during the preceding monitoring round. The institution provided the monitor with the total number of RVRs issued to caseload inmates, but did not provide a list of the inmates involved. The mental health assessment log submitted to the monitor had some inaccuracies.

During the preceding monitoring period, HDSP referred all caseload inmates charged with serious disciplinary infractions for mental health assessments, contrary to departmental policy. In February 2005, the institution adopted appropriate RVR protocols and started referring only those 3CMS inmates thought to exhibit bizarre or uncharacteristic behavior, along with all EOP and MHCB inmates. As a result of these changes, the number of inmates referred to mental health for assessments dropped from an average of 34 referrals a month during October 1, 2004 through January 31, 2005 to an average of seven referrals a month from February 1 through June 30, 2005, with only two referrals in July 2005. The actual number of inmates who received assessments was low because many of the inmates referred were later found by mental health not to meet the referral criteria. Of the 287 3CMS inmates issued RVRs since February 2004, approximately 250 were determined not to need a mental health assessment. The monitor's expert reviewed a limited number of these cases and found two inmates that should have received mental health assessments.

Most of the mental health assessment protocols were generally followed at HDSP. Mental health assessments were completed by a senior psychologist or a roving clinician who had no case management responsibilities for the accused inmate. Inmates

reportedly were always interviewed for the assessments, although institutional audits indicated that interviews were not usually conducted in a confidential setting. An institutional review of 11 of 16 mental health assessments completed during the second quarter of 2005 found that the assessments used lay terms and consistently included a supporting narrative. On the other hand, UHRs were reviewed only for inmates whose interviews suggested that clinical issues may have affected their behavior, and C-files were seldom reviewed. Several other deficiencies were also noted, including failures by clinicians to return their assessments to custody staff within five days and signature omissions by custody staff; in one troubling instance the assessment neglected to recommend a staff assistant for an EOP inmate; in another instance, a clinician acting as a staff assistant for an inmate offered adverse testimony.

According to information contained in the institutional logs, clinicians concluded that mental illness affected inmates' behavior in about one-third of the mental health assessments. There was some evidence that hearing officers took mental health input into account in most, but not all, cases. Institutional audits showed that 80 percent of hearing officers documented consideration of mental health input in reaching their dispositions. The monitor's limited review of C-files found three cases where charges were either dismissed or reduced based on mental health input, one case where the penalty was lowered and another case where the hearing officer concluded, contrary to the clinician's input, that mental illness played no part in the inmate's conduct.

In 2005, RVRs involving 37 caseload inmates were referred to the district attorney's office for criminal prosecution. Just three of the referrals were accepted for prosecution. It was unclear whether HDSP prepared the referral packets in a timely

manner, because many documents were missing from the packets months after the incidents occurred. It took the district attorney's office between two weeks and four and a half months to reach decisions in referred cases.

A large proportion of the RVRs referred to the DA for prosecution involved sexual misconduct. According to the incident log, 18 such incidents occurred during the monitoring period, 13 of which were referred to the DA. The institution reported that sexual misconduct screenings were taking place, but no supporting documentation was provided. The monitor reviewed a sample of the files maintained by the litigation coordinator and found that, although many of the incidents occurred after the new sexual misconduct protocols were expected to be in place, the files did not contain the required mental health screenings.

Transfers:

While MHTS data on the transfer of 3CMS inmates out of reception was unreliable, it seemed to indicate that the number of transfers increased during the monitoring period, although the length of reported delays remained about the same. At the time of the monitor's visit, 101 3CMS inmates were awaiting transfer. Only three had been waiting longer than 90 days; the longest stay was about five months. Transfer delays for some caseload inmates in reception were, in part, the result of staffing shortages among physicians and other problems with medical processing.

The timeliness of EOP transfers declined slightly, but the majority of EOP inmates were still transferred, paroled or sent to a different level of care within required timeframes. During the monitoring period 58 EOP inmates were housed in HDSP. Of these, 27 were paroled or transferred to an EOP program within 60 days or shortly

thereafter; five were transferred to a higher level of care within 60 days; three were sent

to another reception center; and one was downgraded to a 3CMS level of care.  On the

other hand, 11 EOP inmates remained in the facility a month or more beyond 60 days.

The longest stay was eight months.  Another 11 inmates were awaiting transfer at the

time of the monitor's visit, but only one had exceeded the timelines.  Approximately one-

quarter of EOP inmates in administrative segregation remained longer than the

department's 30-day guideline, but only one inmate remained beyond 60 days.

Treatment of EOP inmates awaiting transfer deteriorated somewhat.

Institutional audits showed that 79 percent of EOP inmates received weekly clinical

contacts.  Data from the unreliable MHTS reflected an even worse rate of compliance in

this area.   Of the 11 EOP inmates in HDSP at the time of the monitor's visit, only four

received consistent weekly contacts; several inmate histories reflected multiple or

prolonged gaps, while other histories were unclear.

Inmates continued to have reasonable access to HDSP's MHCB unit.  The

MHCB unit was closed to outside admissions, except for those from CCC, throughout

2005, and the unit's census was relatively low.  Although the average length of stays in

the MHCB unit was only four days, of the 294 admissions to the unit since April 2005,

17 percent remained longer than ten days.  Most of these inmates were either housed in

the MHCB unit for only a day or two beyond the ten-day guideline or were awaiting a

DMH bed.  Excluding these inmates, just eight percent of inmates admitted to the MHCB

unit remained longer than ten days for clinical reasons.  Multiple admissions to the

MHCB unit were not a problem; in the six months preceding the monitor's visit, only six

The MHCB unit had video cameras in its three safety cells and five regular cells. Video monitoring was employed 21 times in the preceding year. A correctional officer was able to monitor up to six inmates at a time. The institution's camera system was new and had a wide field of vision and fine resolution. Most of the time, the video monitoring equipment was used for inmates placed in restraints for medical reasons, but the rules for suicide watch, which required correctional officers to maintain hourly cell-front contacts with the observed inmates, were applied to everyone placed in restraints and monitored by video. The monitor's expert reviewed a sample of four incidents involving physical restraints and found that the use of restraints was reasonable.

HDSP continued to transfer inmates to APP/DMH at CMF, but at about half the rate of transfers in the preceding monitoring round. There were 33 referrals to DMH/CMF during the preceding 13 months, two of which were rescinded because the inmates stabilized quickly. Only one referral was rejected. Transfers were generally timely, with 85 percent of inmates moving within 12 days; the longest time to transfer was 35 days. There were, however, some delays at all stages of the transfer process. Approximately 25 percent of inmates were not referred to DMH until they had been in the MHCB unit from 11 to 18 days. The time spent waiting for bed assignments was generally less than ten days, with the longest wait being 17 days. The inmate referred to above, who spent eight days in restraints, was waiting for an APP/DMH bed. More than 25 percent of transfers to APP/DMH experienced transportation delays of a day or two, although a few transfers were delayed as many as nine or ten days. According to an

institutional log, DMH/CMF would not accept parole violators until they had received a revocation hearing, causing some inmates to wait much longer.

Psych and return policies seemed to have been followed. Only two charts were available for the monitor's review, but both contained faxed discharge summaries. The monitor did not determine whether clinicians at HDSP received telephone calls from DMH on the return of these inmates.

One PSU inmate was housed in HDSP during the monitoring period. At the time of the monitor's visit, he had already been waiting for more than four months, after endorsement, for a transfer to a PSU. HDSP did not appear to refer inmates to intermediate care DMH programs or facilities, and no referrals were made to either ASH or SVPP during the monitoring period.

Other CAP Issues:

a. Partial Compliance

The timeliness of initial mental health assessments declined during the monitoring round. The institution continued to struggle to complete MH-4s within five working days of arrival, particularly for inmates arriving on Thursdays and Fridays. On the other hand, completion of initial treatment plans remained timely.

The composition of IDTT meetings suffered from the lack of psychiatric participation. Participation by psychiatrists fell to less than three percent, down from 22 percent in the preceding monitoring period. Attendance by case managers and correctional counselors was excellent.

Clinical follow-up for suicidal inmates discharged from the MHCB unit remained generally adequate, although institutional logs indicated that 12 percent of

inmates missed at least one day of scheduled clinical follow-up. Documentation of custody checks was erratic. The monitor reviewed the UHRs of seven inmates who together had been discharged from the CTC 13 times with orders for five-day follow-up during the preceding six months. Five-day clinical follow-up was documented for 12 of the 13 discharges, but custody checks were documented in only six cases. It was unclear whether the problem was with documentation and/or filing or with the actual provision of custody checks.

Institutional audits of mental health services provided to inmates in administrative segregation indicated that in the first three quarters of 2005, psych tech rounds were documented 20, 70 and 90 percent of the time, respectively. Given the shortage of psych techs on staff, it was unclear to what extent these figures reflected poor compliance with the requirement for daily rounding or documentation problems. Audits further indicated 70 to 100 percent compliance with the requirement for weekly case management contacts, but many contacts were conducted at cell-front. Clinicians completed timely mental health screenings for many, but not all, non-caseload inmates arriving in administrative segregation. An institutional audit of arriving inmates found that 77 percent received timely screenings, while the monitor's document review found a 72-percent rate of compliance. Caseload inmates did not receive mental health screenings upon admission to the unit. Initial IDTT meetings reportedly were often delayed and most were not held prior to initial ICC hearings. Contrary to the reported delays, the quarterly institutional audits found 100-percent compliance with the provision of IDTT reviews and updated treatment plans during the preceding six months, but the

size of the audit samples was unknown or extremely small. Some limited group therapy was offered in the administrative segregation unit.

The provision of pre-release services improved. It appeared that inmates were almost always seen at least once by a TCMP clinician before being discharged from the institution. HDSP also developed an effective process for informing case managers and psychiatrists when inmates were scheduled to be paroled.

According to institutional heat logs, 36 Stage I heat alerts occurred from July 1 to August 31, 2005. Despite the hot weather, no Stage II heat alerts occurred because all housing units were air-conditioned. Eighty percent of the inmates interviewed by the monitor's expert had heat cards. Heat return protocols were rarely invoked due to prolonged lockdowns throughout the prison, which prevented most inmates from going to the yard during the summer months.

b. Non-Compliance

Group therapy remained inadequate for 3CMS inmates. Institutional lists showed that 53 3CMS inmates, many in administrative segregation, participated in group therapy during the monitoring period. Most groups, however, were discontinued due to case manager turnover. As of mid-October, only one group with seven inmates was operating in the facility. The institution was unable to provide the monitor with a waiting list. Lockdowns also remained an obstacle to the provision of group therapy.

The institution continued to have problems providing quarterly case management contacts for all 3CMS inmates. Institutional audits showed between 67 and 80 percent of inmates received quarterly contacts, depending upon the housing yard. Most of the missed quarterly contacts were delayed by one or several months. The

47

monitor's review of inmate histories from the MHTS indicated that inmates received more frequent case manager and psychiatric contacts than were reflected in the institutional audits.

Psychiatric responses to inmate and staff referrals, while slightly improved, remained poor. The monitor reviewed inmate histories from the MHTS and found that 70 percent of referrals received a response within two weeks, while the remaining referrals took up to six weeks to be seen or were never seen at all. Institutional data showed that the average response time to routine referrals ranged from six to 15 days, far longer than the institution's goal of five working days. The institution provided no data with respect to urgent or emergent referrals. Moreover, the institution measured response times from the date a referral was received by mental health, rather than the date the referral was initiated. The rescheduling of clinical appointments was a common related problem. The monitor's review of inmate histories revealed that only about half of cancelled appointments were rescheduled within two weeks, while the other half took months to reschedule or were dropped. Of 153 cancellations in the monitor's audit, 46 were rescheduled within two weeks, 86 took ten weeks and 21 were never rescheduled. As a result, some inmates, whose medications expired in the interim, were not seen for as long as four months. Case manager response times were similarly non-compliant. HDSP began using clinical staff to triage referrals but had developed no other corrective response to the problem.

Bus screening referrals, an issue earlier resolved, resurfaced during 2005. Institutional audits showed that only 70 to 80 percent of appropriate cases were referred to mental health.

Institutional Summary:

HDSP's serious mental health staffing shortages, particularly among psychiatrists and psych techs, were not adequately covered by contractors. Vacancies among auxiliary staff, physicians and correctional officers compounded difficulties with the delivery of most mental health services. Despite staffing problems and extended lockdowns, the institution struggled to maintain reasonable access to clinical services for inmates.

Of the four issues of focus in this monitoring round, quality management made some erratic progress. Audit methodology improved in some areas, and peer review was implemented for psychologists, although psychiatric peer review ceased in the absence of any permanent psychiatrists in the institution. The MHTS continued to founder, and the number of functioning QITs contracted to just three. Meetings of the suicide prevention committee did not regularly include substantive discussion of completed suicides or serious suicide attempts.

HDSP continued to transfer EOP inmates to appropriate programs in a generally timely manner, although the number of EOP inmates who remained at HDSP beyond time limits increased, while treatment for EOP inmates awaiting transfer shrank. Inmates had good access to the MHCB unit. Lengths of stay in the MHCB unit were reasonable, and treatment was adequate, although out-of-cell activities were severely limited and psychiatric rounds in the unit were problematic. Fewer acute care referrals and transfers to DMH occurred during the monitoring round, and the institution made no attempt to access DMH intermediate care programs.