Mental health input into the RVR process was not fully developed. The institution had a system in place for tracking mental health assessments and recently revised its RVR protocols appropriately, but several deficiencies were noted with respect to the assessment process. Hearing officers appeared to take mental health input into account, but the extent to which they did so consistently was unclear.

Medication management was plagued with numerous problems. The rate of referrals for medication non-compliance was low; medication continuity on arrival and at renewal was erratic; DOT was used only minimally in the facility; HS medications were not provided; informed medication consent forms were not consistently obtained; medication orders reportedly were discontinued inappropriately; prescriptions were sometimes extended without clinical contact; and there was still no local operating policy in place for governing medication management in the institution. On the other hand, the institution made some progress in delivering parole medications, providing medication continuity for inmates changing housing locations and maintaining MARs.

As for other CAP issues, timely responses to psychiatric referrals and psychiatric participation in IDTT meetings were undone by chronic staffing shortages. There were also problems with the provision of some basic services for 3CMS inmates, including quarterly case management contacts and group therapy. The timeliness of initial mental health assessments was a problem; documentation of custody checks for suicidal inmates released from the MHCB was poor; and bus screening referrals resurfaced as a problem. On the other hand, pre-release services improved; clinical follow-up for suicidal inmates was better; and the heat plan appeared to be functioning well, including the issuance of heat cards.

Overall, HDSP managed to squeeze out some improvements despite prodigious staffing problems, which were made the subject of a specific remedial order at the conclusion of the 15th monitoring period. Until the staffing improvement mandated in that order are implemented, HDSP can do little more than hang on.

## California Correctional Center (CCC)
Paper Review

CCC had vacancies for its sole psychiatrist position and one of its two psychologist positions. The institution used one to three hours of telemedicine a month to cover a small part of its unfilled psychiatric position, but the institution did not use any contracted services. Clinicians from HDSP occasionally provided some coverage.

Auxiliary staffing struggled with a near 50-percent vacancy rate among RNs and MTAs. Five of the 11 RN positions allocated to the institution were vacant. Similarly, nine of 20 allocated MTA positions were unfilled, and another MTA was on leave. In addition, one pharmacy position was open, which was covered by a long-term contractor, and one medical records position was vacant.

At the time of the paper review, only three 3CMS inmates were housed in CCC.

Quality Management:

Quality management continued to develop only slowly. The healthcare quality management committee improved its interdisciplinary composition by including custody representatives, but the committee continued to meet erratically, convening only six times in the preceding 13 months. The institution attempted to develop a mental health subcommittee during the monitoring period, but it met just three times and seemed focused on sharing information.

51

The QIT process began in mid-2005 with the charter of seven QITs. None of the topics under investigation involved mental health directly, but a few had some potential impact on mental health services. The quality of each team varied, and the most service-oriented QITs appeared to disband before completing their work. Some QITS were involved with drafting policies and procedures, but no team conducted any audits.

Chart audits were not practical given the small number of mental health inmates in the institution. Similarly, peer review was not useful given the limited number of mental health clinicians in the institution.

Medication Management:

The operating policy governing medication management at CCC was revised during this monitoring round, adding a few provisions to make it more consistent with departmental policy. The new policy still did not cover laboratory testing or the process for procuring informed medication consent.

CCC conducted its first audit of medication continuity during the monitoring period. The audit reflected good continuity on arrival and at the renewal of and changes in medication orders. No mental health inmates were included in the audit, but the audit found practices in the delivery of medications to inmates throughout the institution to be adequate. Housing changes were rare at CCC, so medication continuity was unlikely to be interrupted when they occurred. According to staff, inmates changing housing locations passed through the clinic, where their medication needs were addressed.

CCC's past medication management policy did not distinguish between DOT and nurse administered medications, and few inmates at CCC were on DOT

medications. That situation changed during the monitoring period, and a substantial number of inmates had DOT orders, including the three caseload inmates in the facility at the time of the paper review. Staff reported no documented overdoses or incidents of cheeking or hoarding.

CCC's revised medication management policy included provisions for HS medication. No mental health inmates were on HS orders at the institution.

MARs were legible and contained only a moderate number of errors or blank spaces. Some MARs were missing from inmates' UHRs.

Tracking of laboratory testing improved and captured all relevant information. An institutional analysis of tracking logs indicated that, on average, laboratory tests were drawn in less than five days; results were returned and reviewed on average in less than four days. About ten percent of inmates experienced problems with at least one step in the process. The logs showed occasional lapses in the ordering of laboratory tests, completing tests in a timely manner and documenting test results.

The staff at CCC described an effective system for ensuring that paroling inmates were seen by a clinician before discharge and provided with a supply of medications. Few inmates were paroled from CCC during the last several years.

CCC had a reasonable procedure in place for handling Keyhea orders, but no inmates in the institution were on a Keyhea order during the monitoring period.

<u>Mental Health Assessments for Disciplinary Proceedings:</u>

RVR procedures were functioning well at the time of the preceding monitoring visit. Since then, clinicians improved the process by routinely reviewing the inmates' C-files. Of the 4,266 RVRs written during the monitoring period, 11 involved

MHSDS inmates. All but three of these inmates were found to meet the criteria for mental health assessments. In addition, three general population inmates were referred for mental health assessments because of bizarre or uncharacteristic behavior. No infractions were issued for self-injurious behavior and no charges against caseload inmates were referred to the district attorney's office.

The clinician completing the mental health assessments concluded that mental illness influenced the inmates' behavior in all of the cases assessed. Mental health input impacted on the disciplinary process. Reports by hearing officers detailed the mental health information in almost all relevant cases, and hearing officers either found inmates not guilty, dismissed the charges or mitigated penalties in 64 percent of the cases in which an assessment was prepared.

One RVR was written for sexual misconduct during the monitoring period; the incident, however, occurred before the new sexual misconduct requirements were implemented. Two inmates were screened under the new procedures for sexual misconduct and determined not to need further evaluation.

Transfers:

CCC still did not use its MHTS to track transfers, but the institution maintained detailed handwritten logs. According to the logs, only eight caseload inmates were sent inappropriately to CCC, as compared to 18 during the preceding monitoring period. These inmates were returned to their sending institutions expeditiously within 13 days or less. CCC staff identified 51 inmates as requiring 3CMS treatment and three inmates as requiring EOP treatment during the monitoring period. The average time from

identification to transfer was 21 days, while the longest time to transfer for any of these inmates was 48 days.

Length of stays in the OHU worsened slightly in the monitoring period. About 38 percent of OHU stays exceeded the 72-hour limit. Most of the excessive stays involved just an additional day or two, but some ranged from seven to 23 days. Most of the extended stays were due to reasonable causes, and treatment in the OHU was adequate.

CCC reported easy and timely access to HDSP's MHCB unit. There were 17 MHCB referrals during the monitoring period. Earlier clinical disagreements between CCC and HDSP appeared to have been resolved.

Transfers from the administrative segregation unit continued to be timely. During the monitoring period, 12 3CMS inmates and one EOP inmate were housed in administrative segregation. The 3CMS inmates all transferred out of the unit in less than 90 days. The EOP inmate was transferred to an administrative segregation hub unit within three weeks. The mental health screening process for inmates entering administrative segregation was deficient, but showed signs of improvement towards the end of the monitoring period, when all but four percent of new arrivals to the unit received a mental health screening. On the other hand, 23 percent of the screenings were untimely. Most screenings were delayed by only a day or two, but a significant minority took longer. Specifically, 164 screenings were a day or two late; 57 took from four days to two weeks to complete; and 38 took longer than two weeks. Screenings were conducted in a confidential setting. Inmates who refused screenings generally received follow-up within three days, but no follow-up was recorded for a third of the refusals.

<u>Other CAP Issues:</u>

### a. Partial Compliance

Psychologists' responses to inmate referrals appeared timely. The average response time for 1,029 referrals was five days. Access to a telemedicine psychiatrist was reportedly available if needed.

There were 12 Stage II and one Stage III heat alerts in 2005. Staff found that only one heat-sensitive inmate was involved in any of the Stage II alerts. Staff's ability to report detailed heat-related information suggested that there was close oversight of the heat plan.

Lockdowns did not appear to interfere with the delivery of mental health services.

<u>Institutional Summary:</u>

CCC made progress on each of the items cited as a problem during the preceding monitoring review. All previously resolved CAP items remained resolved. CCC had an adequate allocation of mental health staff and was able to function well despite some vacancies. The mental health population at CCC remained low, and fewer caseload inmates were mistakenly sent to CCC during the monitoring period.

Among the four issues of focus in the monitoring round, medication management improved considerably. Progress was made with respect to HS medications, MARs, the procurement of informed consent, laboratory testing, DOT and medication errors. The institution had initiated medication-related audits and had adequate systems in place for ensuring medication continuity on entry, timely delivery and renewals. An audit was needed of follow-up to medication non-compliance.

Transfers to MHCB units at HDSP were generally timely, as were transfers of administrative segregation inmates to hub units. Some lengths of stay in the OHU were excessive, and the timeliness of administrative segregation screenings was still problematic.

The mental health assessment component of CCC's disciplinary system was fully adequate, but most aspects of quality management remained fairly embryonic. Clinical responses to referrals were timely; the heat plan was functioning well and lockdowns no longer seemed to interfere with the provision of mental health services.

While a few areas needed improvement, overall, CCC ran a good MHSDS program and fulfilled its mission well, screening inmates for mental illness, treating caseload inmates short-term and transferring them promptly to appropriate mental health programs elsewhere.

### Service Area C

This service area includes Mule Creek State Prison (MCSP) and Sierra Conservation Center (SCC).

### Mule Creek State Prison (MCSP)
December 5, 2005 – December 7, 2005

Historically, MCSP has managed to provide a relatively stable and compliant MHSDS. Unfortunately, the institution lost a large number of mental health staff during the monitoring period, increasing its vacancy rate to 36 percent and taxing its ability to deliver effectively mental health services. Most of the institution's vacancies came among clinicians providing services directly to inmates, losing nine clinicians from May 1 through November 2, 2005, none of whom had been replaced by the time of the monitor's visit. As a result of these staffing losses, positions for 5.5 of the institution's

6.5 psychiatrists, a senior psychologist, five psychologists, 2.5 psych social workers, three psych techs and an office tech were all vacant. In addition, a psych social worker was on a long-term leave of absence. The institution struggled to hire an adequate number of contractors, but only 64 percent of the vacancies were covered by contract clinicians, leaving 5.5 clinical positions uncovered.

MCSP also underwent some major institutional changes during the monitoring period, which, in combination with staffing losses, severely challenged the MHSDS. Most notably, the mission of the institution was expanded to accommodate sensitive needs inmates from other facilities. To accomplish this goal, over 1,200 general population inmates were transferred out of the institution, and Facility C was converted from general population housing to housing for sensitive needs inmates. In connection with the changeover, the institution received a huge influx of 3CMS inmates, necessitating the completion of hundreds of mental health assessments, IDTT meetings and treatment plans. In July, MCSP also implemented Phase I of a new Level IV EOP sensitive needs program for a population of 35 inmates. Phase II of the construction, which was scheduled for completion in January 2007, was expected to increase the capacity of the program to 150 inmates, putting additional pressure on an already overburdened mental health staff. As a result of these changes, the entire prison within the security perimeter became a sensitive needs institution.

During the monitoring period, the 3CMS population at MCSP rose from 880 to 947 inmates, and the institution's 3CMS caseload capacity was increased from 799 to 999 inmates. Similarly, the EOP population expanded from 198 to 258 inmates, and the EOP administrative segregation population rose from 14 to 34 inmates. Due to these

population increases, MCSP was authorized to receive an additional 5.5 psychologists, 1.5 psych techs, a recreational therapist and an office tech, along with a half-time psychiatrist position from CTF.  Of the 9.5 new positions, only the office tech position had been filled by the time of the monitor's visit.

From May through August 2005, MCSP activated 280 emergency dayroom beds, known as E-Beds, to accommodate the large number of 3CMS inmates arriving at the institution.  Although the number of active E-Beds fell to 38 at the time of the monitor's visit, MCSP was scheduled to receive hundreds of transfers from CSP/LAC, including approximately 120 3CMS sensitive needs inmates, in December and January, all of whom were to be housed in E-Beds.  In order to accommodate the expected increase in clinical workloads, the institution planned to divert EOP staff during the upcoming months to evaluate newly arriving inmates, which was likely to impact negatively on the delivery of EOP mental health services.  Moreover, the influx of inmates from CSP/LAC was likely to push the 3CMS population above its recently increased caseload capacity.

Quality Management:

The quality management committee met weekly from January through November 2005, except for the week of November 15.  Minutes indicated that the committee addressed a number of mental health issues, including suicide prevention, HS medications, DOT, quality of care and transfers to higher levels of care.  The mental health subcommittee met regularly from January through May 2005, but did not meet again until November due to staffing changes.  Custody, pharmacy, medical records personnel and psych techs still did not appear to attend the subcommittee's meetings.

The QIT process also suffered from the staffing changes. Although the minutes of the quality management committee mentioned a number of QITs being chartered, related documentation reportedly was lost. As a result, the monitor was unable to assess the effectiveness of QITs and the adequacy of institution's audit methodology. Efforts to revitalize the QIT process began in September, and a number of studies were chartered, but the issue required further monitoring. It was unclear whether staff members were consistently informed of audit results. Supervisors indicated that this information was provided at monthly staff meetings, but many members of the staff complained that they were not notified of audit outcomes.

Quarterly chart reviews ranging from ten to 30 charts were conducted routinely at MCSP. Peer review for psychiatrists and psychologists had begun, but no peer review was conducted for psych social workers.

The MHTS at MCSP was used to monitor and evaluate the quality of mental health services in the institution. The monitor compared the UHRs of 20 inmates with their inmate histories generated by the MHTS and found a concordance rate of better than 90 percent.

Medication Management:

Continuity of medication on arrival remained unchanged during the monitoring period. Institutional audits, confirmed by the monitor's chart reviews, showed that only 75 percent of inmates received their medications in a timely manner. In September, a QIT was formed to study this problem. According to the institution, the QIT successfully implemented a new procedure on medication continuity upon arrival.

The percentage of inmates receiving their medication within 24 hours of an intra-institutional housing change declined from 84 percent during the preceding monitoring report to 50 percent. In particular, MHCB inmates frequently experienced gaps in medication on discharge, as did inmates placed in or discharged from observation cells in the administrative segregation unit. The monitor's chart reviews confirmed frequent medication delays when changing housing locations.

An institutional audit for the period from January to December 2005 indicated that 99 percent of renewals were timely, but the monitor was unable to verify this degree of compliance. Cumbersome procedures for renewing non-formulary medications sometimes disrupted the distribution of medication.

As noted in the preceding monitoring report, MCSP had a system for providing paroling inmates with discharge medications, but the institution still had not conducted an audit to determine whether any inmates were overlooked. The institution did not maintain a parole medication log.

Follow-up to medication non-compliance, which had showed some improvement during the preceding monitoring period, declined significantly. An institutional audit indicated that only 33 to 37 percent of non-compliant inmates were seen for psychiatric follow-up. The audit failed to assess whether all non-compliant inmates were referred to mental health, but the monitor's chart reviews identified some non-compliant inmates who were not referred. The poor level of response to non-compliance largely related to the institution's psychiatric staffing shortage.

Pill lines were long, particularly on the A and C housing yards. Inmates complained of waiting up to an hour for their medications, often in hot or inclement weather. The lengthy waits may have contributed to medication non-compliance.

As noted in the preceding monitoring report, the institution had an adequate system for dealing with medication errors. There were, however, only eight medication errors reported during the review period, which seemed low for the size of the facility.

The Keyhea process had been working well at the time of the last monitoring period. There were 15 inmates receiving Keyhea medications and six inmates with newly initiated Keyhea orders awaiting hearings at the time of the monitor's visit, suggesting that the process continued to identify inmates in need of involuntary medications.

MCSP continued to have problems implementing DOT procedures. According to the institution's senior staff, all medications were administered DOT, and no distinction was made between DOT and nurse administered medications at MCSP. A pill line audit, conducted the weekend before the monitoring visit, was flawed in that the MTAs were aware they were being observed and only one observation was made. The monitor was present for pill lines on Yards B and C, but no correctional officer was posted outside the pill windows on either yard, and no staff member was observed performing DOT for any inmate.

MCSP has had a procedure for ordering laboratory tests for inmates on psychotropic medications since, at least, the preceding round of monitoring. Test results were generally reviewed by the chief psychiatrist or senior psychiatrist, rather than by

contract clinicians. It was not, however, clear whether test results were consistently

retuned in a timely manner. Chart reviews during the preceding monitoring visit found

that test results were often untimely. While the monitor did not find any evidence of

timeliness problems in December, no audit of the issue had been conducted by the

institution.

HS medications were prescribed at MCSP. Inmates and staff reported that

HS medications were administered after 8:00 p.m.

Problems with the completion and filing of medication consent forms were

resolved during an earlier monitoring round. Institutional audits and the monitor's chart

reviews confirmed continued compliance in this area. MARs were also filed in inmates'

UHRs, but the institution had no ongoing system for supervising MTAs in the accurate

completion of these records.

Mental Health Assessments for the Disciplinary Process:

MCSP maintained a RVR log, a mental health assessment log and a log on

completed disciplinary hearings that together documented all of the information relevant

to disciplinary proceedings, including the results of mental health assessments.

From December 2004 to September 2005, 1,031 RVRs were issued to

caseload inmates. From April through October 2005, institutional data showed that there

were 198 mental health assessments completed as part of the disciplinary process; 176

involved EOP inmates, 15 involved 3CMS inmates, two involved MHCB inmates and

five involved general population inmates. The number of 3CMS and general population

inmates referred for an assessment was small, but the institution made no attempt to

determine whether inmates who might have been referred for a mental health assessment were actually referred. This issue, while difficult to assess needed further monitoring.

The mental health assessment process appeared to be functioning well. The monitor reviewed 30 completed RVRs and found that the mental health assessments were complete and returned timely. Two limited chart audits conducted for the periods from April to June and October to December 2005 showed that 100 percent of clinicians interviewed the accused inmates and reviewed their UHRs and C-files before completing the assessments. The monitor reviewed the RVR log for the period from April through October 2005 and found that the clinician identified as completing the assessment was not the inmate's clinician. Of the 30 assessments reviewed by the monitor, 18 concluded that mental illness may have affected the inmates' behavior.

Hearing officers appeared to take mental health input into account in reaching their determinations. Hearing officers referred directly to mental health assessments in 29 of the 30 RVRs reviewed by the monitor; one RVR was too illegible to determine whether a reference was made to the assessment. In addition, charges were reduced or penalties mitigated in a significant portion of the cases where an inmate's behavior was found to have been influenced by mental illness.

The institution had entered into an agreement in April 2005 with the district attorney's office, establishing guidelines for the referral of criminal complaints against inmates.

MCSP had not implemented the department's sexual misconduct protocols. MCSP had only one part-time contract clinician who had the training needed to evaluate sexual misconduct and provide treatment to inmates diagnosed with

exhibitionism. To date, relevant training in this area had not been provided to any other clinicians at the institution. As a result, the required screenings for inmates engaging in sexual misconduct were not completed in a timely manner. According to the RVR log for the period from April through October 2005, seven inmates were issued 14 disciplinary infractions for sexual misconduct, including one inmate who received five RVRs. As of December 6, 2005, two screenings had been completed, which resulted in a comprehensive evaluation diagnosing both inmates with exhibitionism; the clinician completing the evaluations concluded that both inmates would benefit from the provision of group and other behavioral therapy. Neither inmate's case had been reviewed through the IDTT process, as required under the new departmental protocols, and neither inmate was receiving any treatment targeted for this problem. More disturbingly, neither inmate's treatment plan identified sexual misconduct as a problem.

Transfers:

The referral log at MCSP captured most of the important transfer information, but failed to record the specific DMH program to which inmates had been referred. Due to the incomplete referral log, access to DMH programs could not be fully evaluated. Admissions to ASH and to the DMH/APP at CMF appeared adequate. MSCP made 19 referrals to ASH from January 1 to December 5, 2005; only one of these referrals was rejected; three were rescinded; and fifteen were accepted. The average time between referral to ASH and transfer was 18 days, with a range of four to 37 days. During the same time period, there were 19 referrals to DMH/APP, all of which resulted in transfers. The average lapse between referral and transfer to APP was eight days, with a range of two to 20 days; all transfers occurred within 72 hours of receiving a bed

assignment. On the other hand, the timeliness of transfers to SVPP was poor. Three inmates were referred from MCSP to SVPP, two of whom were transferred after waiting 127 and 150 days respectively. The third referral had been waiting 14 days for a transfer at the time of the monitor's visit.

The institution did not have sufficient MHCB cells to accommodate the needs of its caseload inmates. The CTC had only eight crisis beds and two of these were often occupied by inmates with long-term medical problems. As a hub facility, the MHCB unit at MCSP was also supposed to provide care for inmates from CSP/Solano and SCC, but its limited bed capacity restricted admissions from these facilities. On a positive note, the institution had abandoned the practice, criticized in the preceding monitoring report, of using contraband cells for inmates in need of a MHCB level of care.

MCSP appeared to operate its OHU like a *de facto* MHCB unit. In response to the shortages of MHCB beds, the institution in July activated six OHU beds in the EOP sensitive needs housing unit. From August 10 through November 16, 2005, there were 56 admissions to this OHU. Only two of these admissions were from the MHCB unit, indicating that the OHU was rarely used as a step-down unit for MHCB discharges. Of the 56 admissions, 19 were transferred to the MHCB, while two-thirds of were returned to their housing units. More than half of the admissions violated CDCR's length of stay policy and remained in the unit longer than 72 hours, with two inmates staying 19 and 26 day respectively. The long length of stays, combined with multiple discharges to the housing units, suggested that the OHU was being used as a MHCB unit to stabilize inmates in crisis.

The institution was inappropriately housing administrative segregation inmates in need of MHCB treatment in observation cells. Due to the shortage of MHCB beds, the institution also activated five observation cells in the administrative segregation unit in July to house inmates awaiting admission to the MHCB unit or awaiting return to their housing units after discharge from the MHCB unit. Inmates placed in theses cells were provided continuous one-on-one observation by a correctional officer. No information was available on the number of inmates placed in these cells or the length of time they remained there. Chart reviews by the monitor's expert identified one inmate who remained in an observation cell for six days. The monitor concluded that the use of these observation cells for inmates in need of MHCB stabilization was unsafe.

The percentage of MHCB inmates with extended stays in the MHCB unit increased during the monitoring period. From January 1 to October 31, 2005, there were 181 MHCB admissions. According to institutional data, 28 percent of the MHCB admissions extended beyond the ten-day program guide timeline, compared to 12 percent during the preceding monitoring period. Inmates on suicide watch were inappropriately denied mattresses.

MCSP utilized video monitoring to observe inmates on suicide watch in the MHCB unit. Six MHCB cells were equipped for video monitoring. One correctional officer was assigned responsibility for observing all six cells from a monitor in the CTC security station; another monitor located in the nurses' station allowed observation of the seclusion room. Inmates were reportedly observed one-to-one by custody officers whenever there were concerns about their behavior.

67

The completion of mental health screenings for inmates arriving in administrative segregation appeared to decline during the monitoring period. Of just seven charts reviewed by the monitor, four contained no evidence that a mental health screening was conducted on the inmates' admission to the unit. The other three charts reported that each inmate refused a screening, but there was no indication in the charts of any mental health follow-up.

Other CAP Issues:

a. Partial Compliance

The provision of group therapy for EOP inmates, an issue resolved earlier, became problematic again during at least part of the monitoring period due to staffing shortages. According to institutional audits, the percentage of EOP inmates receiving ten hours of scheduled structured therapeutic activities declined to as low as 22.7 percent in the second quarter of 2005 and rose no higher than 40.8 percent during the first quarter and 68.6 percent in the third quarter of the year. Although compliance was almost 100 percent in October and early November, the anticipated influx of inmates from CSP/LAC threatened to divert clinicians from the provision of services for present participants in the EOP program to the evaluation of newcomers. MCSP had requested additional clinical staff on a temporary basis. Many inmates complained about the poor quality of the therapy that was provided; groups reportedly lacked adequate structure and relied heavily on loosely organized recreation and leisure activities. Space constraints also impacted adversely on the provision of therapy, forcing groups for Level IV EOP sensitive needs inmates to meet in dayrooms with limited confidentiality. It was hoped

that the completion in January 2007 of construction for Phase II of the Level IV EOP sensitive needs program would alleviate these space restrictions.

Not all EOP administrative segregation inmates were offered ten hours of structured therapy weekly. The institution reported 80 percent compliance with program guide requirements in administrative segregation, but no documentation of therapy hours was available for review. The lack of appropriate confidential space for therapy was also a problem in administrative segregation.

The timeliness of psychiatric responses to referrals, an issue resolved during the 12th monitoring period, declined due to staffing shortages. An institutional audit indicated that it took an average of 13 days for inmates to be seen by a psychiatrist after referral, as compared to the institution's own goal of five days. The timeliness of psychiatric responses to referrals for administrative segregation inmates was not clear, because the institution neither tracked nor collected data on this issue.

MCSP provided custody staff with CPR training during the monitoring period. Institutional records showed that 99 percent of custody officers had completed training in the new CPR policy and procedure. The monitor interviewed a handful of correctional officers, all of whom had competed CPR training and were carrying the required mouth piece.

b. Non-Compliance

Suicide prevention follow-up worsened during the monitoring period. An institutional audit showed that only 65 percent of inmates received five consecutive days of clinical follow-up after being discharged from the MHCB unit, the back-up OHU beds

or the observation cells. No data was provided on the frequency of custody checks for these inmates.

New Problem:

        Peer review evaluations for the period from July through September expressed major concern about chart legibility.

Institutional Summary:

        A change in the institution's mission, combined with an increase in its caseload population, significant staffing vacancies and inadequate contract services, made it difficult for MCSP to sustain its progress towards compliance. Under these circumstances, it was not surprising that no new CAP items were resolved.

        Among the issues of focus during the monitoring round, the quality assurance process continued to operate reasonably well in some respects. The quality management committee met regularly; the MHTS was reliable; chart reviews were conducted regularly; and peer review was underway for psychiatrists and psychologists. Staffing shortages, however, forced the cancellation of mental health subcommittee meetings for many months and disrupted the QIT process.

        Implementation of the department's assessment process for caseload inmates receiving RVRs continued to progress. RVR logs were adequately maintained; mental health assessments were completed in a timely manner; and hearing officers appeared to take mental health input into account in reaching decisions.

        Medication management remained in need of improvement. On the positive side, HS medications were administered properly; the completion and filing of informed medication consent forms was adequate; parole medications were provided; a system existed for addressing medication errors; and the Keyhea process appeared to be

70

operating. On the other hand, follow-up to medication non-compliance slipped; pill lines were excessively long; DOT procedures were poorly implemented; and it was unclear whether laboratory blood tests were returned in a timely manner. Continuity of medication on arrival and internal transfers was inadequate, while an audit was needed to confirm reports that medications were consistently renewed in a timely manner.

Access to higher levels of care was erratic. Transfers to ASH and DMH/APP at CMF were adequate, while the timeliness of transfers to SVPP was not. MCSP has an insufficient number of MHCB beds and was operating its OHU beds as a *de facto* MHCB unit. Inmates in need of MHCB treatment were also housed inappropriately in observation cells on the administrative segregation unit. Too many inmates remained in MHCB treatment for extended periods of time. In addition, compliance with five-day suicide prevention follow-up was poor.

In regard to the institution's CAP, a number of issues resolved earlier slipped into marginal or non-compliance, including the timeliness of psychiatric responses to referrals and the provision of structured therapy to EOP inmates, both of which had suffered from staffing shortages and appeared likely to suffer further as a result of planned staff diversions. A new problem was noted regarding the legibility of charts.

Overall, MCSP's stable record of relative compliance eroded during the monitoring period in the face of a shrinkage in staffing and a growth in the size and complexity of its caseload.

## Sierra Conservation Center (SCC)
September 26, 2005 – September 28, 2005

Staffing was not a significant problem at SCC. Most of the institution's clinical positions were filled with permanent staff, and all clinical vacancies reportedly were covered by contractors. Staff also reported using some varying amounts of telemedicine. Auxiliary staff positions were also mostly filled, with vacancies covered by contractors. The institution's health care leadership was in a state of flux for some six months preceding the monitor's visit, with turnover in the health care manager and head nursing positions. The general population caseload, meanwhile, declined, while the MHSDS population in administrative segregation and the EOP population increased.

Quality Management:

The overall health care quality management committee met erratically. The most recent meeting prior to the monitor's visit occurred three months earlier, and the committee did not meet during the two months preceding that meeting. No information on the composition of the committee was provided, but minutes from the single meeting that occurred during the preceding six months reflected limited discussion of mental health issues, which consisted largely of an acrimonious debate with custody staff about transportation. The mental health subcommittee, in contrast, met monthly. Eight to ten mental health clinicians were generally present, although psychiatrists never attended. Other disciplines were not represented. A review of committee minutes revealed that a wide variety of relevant issues and CAP-based audits were discussed. The suicide prevention committee met monthly with good interdisciplinary composition and attendance.

The QIT process appeared to have stalled at SCC, and little activity in any of the six chartered QITs occurred after February 2005. Several important QITs were used for routine management activities. The institution completed regular chart reviews and conducted a number of audits. Some of the latter were well designed, while others were methodologically flawed or misused. Audit results were not systematically shared with staff and did not appear to generate problem-solving efforts. Peer review, which began among psychologists during the preceding monitoring period, ceased. The MHTS, however, was used effectively at SCC to monitor the delivery of mental health services.

Medication Management:

SCC's new medication management procedures were finalized and signed during the monitoring period. The new local operating policy conformed to departmental standards and contained local directions for some important issues not covered by the comparable departmental policy.

Medication continuity for inmates arriving at SCC was erratic. As indicated in the preceding monitoring period, SCC had procedures in place for providing 30-day continuity orders for inmates arriving with current prescriptions. According to institutional audits, it took psychiatrists on average 20 to 30 days to assess new arrivals. Although audits showed that 14 percent of newly arrived inmates were not seen by a psychiatrist within 30 days, the institution indicated that only two inmates suffered any medication discontinuity. The monitor's expert found the data supporting this institutional audit unreliable. The monitor's limited chart review also found one inmate who experienced a two-day gap and another who was dropped from the caseload at his own request without ever being seen by a psychiatrist.

The status of medication continuity for inmates changing housing locations was unclear. Institutional audits were so flawed methodologically, it was impossible to measure gaps in medication. Similarly, an institutional audit of medication continuity at the time of renewal of medication orders was methodology flawed.

Follow-up to medication non-compliance was poor. There were many instances of medication non-compliance, with some inmates non-compliant on multiple occasions. In the six months preceding the monitor's visit, an average of 246 referrals occurred each month for non-compliance, involving roughly 120 inmates monthly. While staff indicated that they were screening for duplicate referrals, approximately 37 percent of inmates were seen for non-compliance two or three times a month, often only a few days apart. Delays in response to referrals were common. Institutional audits indicated that the average time from referral to appointment for non-compliance varied from 10.77 to 28.41 days. The monitor's analysis of the raw data relied on in the audit found that just 16 percent of audited inmates received a timely psychiatric response. The time to a first appointment often took three to four weeks and sometimes one to two months. Not all instances of non-compliance seemed to have been referred to mental health. The monitor's chart reviews found instances of non-compliance with no documented referrals.

The provision of parole medications to inmates discharged from the institution continued to improve. Institutional audits were poor, but pharmacy records were well-maintained. According to these records, only two of 100 parole medications were returned to the pharmacy. The institution, however, did not maintain a log of

paroled MHSDS inmates, who were offered, received or rejected medications at discharge.

The extent to which DOT was employed at SCC was unclear.  Nursing supervisors conducted spot checks of medication distribution, but did not distinguish between DOT and nurse administered procedures.  Moreover, it was impossible to track DOT deliveries from pill-line lists provided by the pharmacy.  There continued to be ample evidence of cheeking and unauthorized possession of prescribed medications.  In contrast, nursing audits indicated that between 80 and 100 percent of administrative segregation inmates received their medications via DOT.  The monitor observed the delivery of medication on the Level II yard and found that all of the inmates were subjected to a mouth check.  Local operating procedures for DOT were not, however, consistently followed; not all inmates were removed from their cells for DOT.

The institution's system for reporting medication errors apparently collapsed during the monitoring period.  The binder reportedly used to track medication errors could not be located and, according to staff, no medication error reports occurred during the three months preceding the monitor's visit.

MARs continued to be deficient.  Many MARs were still incomplete with numerous blank spaces and zeros.  The monitor's expert found multiple versions of MARs in reviewed charts, while MARs were missing or out-of-order in some charts.  The monitor did not assess whether notations in the MARs were made at the time medications were administered, but the inconsistent manner in which the MARs were maintained undermined auditing and potentially affected clinical decision-making.

At the time of the monitor's visit, 25 inmates were receiving HS medications at SCC, in contrast to the preceding monitoring period when no HS prescriptions were provided. Despite the improvement, psychiatrists continued to indicate they were reluctant to prescribe such medications due to a memorandum requiring approval of their use by the health care manager and perceived logistical difficulties in distributing medications after 8:00 p.m. The institution, however, seemed capable of delivering most HS medications at an appropriate time; some housing yards had 8:00 p.m. pill lines, while others distributed HS medications at the end of their the last pill line closer to 7:30 p.m. Pharmacists had ceased their practice of routinely changing orders for HS medications.

The institution continued to have problems with procuring informed medication consent forms from inmates. Institutional audits found consent forms for just 66 percent of inmates on medications, a figure nearly identical to one reported in the preceding monitoring round. It was unclear whether the audit included annual updates.

Mental Health Assessments for the Disciplinary Process:

SCC conducted its initial training on the mental health assessment component of the disciplinary process in 2003. Many correctional officers apparently were not trained at that time, and no new training has since been conducted. Data entry problems noted in the preceding monitoring report, however, were corrected during the monitoring period, and RVR logs were improved.

The percentage of RVRs issued to MHSDS inmates was slightly higher than the percentage of caseload inmates in the SCC population. During the first half of 2005, 21 inmates were referred for mental health assessments in connection with RVRs.

Mental health clinicians concluded that the behavior of seven of these inmates was influenced by mental illness. The percentage of requests for a mental health assessment of 3CMS inmates from the Level II yard due to bizarre or uncharacteristic behavior increased from four to 15 percent during the monitoring period, but problems persisted in recognizing bizarre or uncharacteristic behavior in other housing areas. Referrals for 3CMS Level III inmates remained low, for example, with only three inmates identified as exhibiting bizarre or uncharacteristic behavior all year.

The assessment process itself progressed. It appeared that clinicians generally reviewed inmates' UHRs and C-files in connection with mental health assessments. Moreover, SCC reportedly implemented an improved procedure for ensuring that referred inmates were interviewed by clinicians other than their own case managers. Mental illness was found to have influenced inmates' behavior in about a third of the RVRs for which an assessment was sought. Determinations in those cases where mental illness was found not to have been a factor seemed reasonable. The monitor reviewed all of the mental health assessments and found the quality of the narratives to be good.

Mental health input appeared to have a strong impact on disciplinary decisions. Hearing officers reduced or dismissed charges in nearly all of the cases where mental illness was found by clinicians to have influenced inmates' behavior, including some serious charges such as battery.

During the monitoring period, RVRs involving 14 caseload inmates were referred to the district attorney's office for possible prosecution. Referrals from the institution and decisions of the district attorney were made quickly. Almost all of the

district attorney's decisions were completed within five weeks, with the longest decision

taking three and a half months.  The district attorney accepted three cases for prosecution,

two involving 3CMS inmates and one an EOP inmate.

SCC did not appear to have a problem with RVRs related to sexual

behaviors.  Training with respect to the new sexual misconduct protocols took place in

July.  Since then, there had only been three incidents, all handled by the supervising

psychologist.  Similarly, there did not appear to be a problem at SCC with RVRs being

written for self-injurious behavior.

Transfers:

The timeliness of EOP transfers slipped further during the monitoring

period.  The proportion of EOP inmates waiting longer than 60 days for transfer

increased from 23 percent to 63 percent.  None remained at SCC longer than three

months.  Of the 19 mainline EOP inmates in SCC at the time of the monitor's visit, five

had already been in SCC more than 60 days; all but one of the 19 had been at SCC less

than three months.  The single exception had been waiting about seven months for his

transfer.  Institutional logs for completed transfers showed that the endorsement process

was timely, with post-endorsement delays generally ranging from six to eight weeks.

Most delays appeared related to a lack of sufficient bed space.

The timeliness of transfer of EOP administrative segregation inmates was

relatively good.  It took longer than 30 days to transfer 63 percent of EOP administrative

segregation inmates to hub units, but none of the inmates stayed longer than 60 days.

Only one EOP inmate had been in administrative segregation longer than 30 days at the

time of the monitor's visit; he had been waiting six weeks for a transfer.  SCC continued

to provide adequate mental health services to EOP inmates awaiting transfer in administrative segregation.

Lengths of stay in the OHU worsened slightly. Institutional data sources conflicted as to the number of OHU admissions during the monitoring period, but the monitor estimated that between 12 and 15 inmates a month were admitted to the OHU, a figure consistent with past findings. Approximately 26 percent of OHU admissions exceeded the 72-hour deadline, compared with 22 percent during the preceding monitoring period. The average length of stay for inmates who remained in the OHU longer than three days was 7.2 days. The longest stays of 26 to 28 days involved EOP inmates, who were considered too vulnerable to live in the general population. At the time of the monitor's visit, four inmates were in the OHU, with lengths of stay of one, three, seven and 18 days respectively. The latter three inmates were all waiting for EOP beds. The number of inmates with multiple admissions increased from 19 to 35; 13 of these 35 inmates had between three and six admissions and were ultimately sent to either an EOP program or a MHCB unit.

SCC continued to provide good case management and psychiatric care for caseload inmates in the OHU. Chart reviews demonstrated that newly arrived inmates were generally seen by the admitting psychiatrist within one day. Inmates were seen daily and IDTT meetings were held to decide important clinical issues. Institutional audits did not address practices for determining suicide risk during the monitoring period, although earlier audits showed that 19 percent of inmates did not receive a suicide risk assessment on admission to the OHU.

Two cells were fitted with video monitoring equipment in the "deep-seg" portion of the OHU. Monitoring correctional officers sat just outside the door to this area, which was locked. The equipment was technologically good, with an acceptable field of vision and adequate resolution. Institutional policies required monitoring correctional officers to conduct a brief, in-person observation of each inmate every hour, staggering these periods of direct observation with MTA rounds, which also occurred every hour. Correctional officers received training in video monitoring in 2003, but not since then. Instead, officers were required to certify that they had read the policies, procedures and post orders governing video monitoring. In the six months preceding the monitor's visit, video monitoring was used 138 times for suicide watch. No incidents of self-injury occurred among inmates on video monitoring.

Access to MHCB units slowed. The transfer of half of the 22 referrals to a MHCB occurred within the same or next day, and another five referrals were delayed for two days. The remaining referrals were rescinded after waiting from three to 11 days. MHCB referrals were sometimes initiated late; fewer than half of MHCB referrals of inmates in the OHU were initiated in a timely manner, with some referrals taking as long as ten days to generate. The OHU log indicated that two inmates waiting for MHCB beds were discharged to administrative segregation with orders for hourly suicide precaution checks.

SCC did not refer any inmates to DMH or to a PSU during the monitoring period.

<u>Other CAP Issues:</u>

      a. Partial Compliance

      The timeliness of initial treatment plans declined. Institutional audits showed that 79 percent of initial treatment plans were completed within required timelines, compared with 90 percent during the preceding monitoring period. While half of the plans were late by only a few days, it took an extra week to a month to complete the other half. Chart reviews by the monitor's expert revealed problems with the quality of many treatment plans, which were not adequately individualized. The institution, on the other hand, reported improved compliance with requirements for annual treatment plan updates.

      Psychiatric participation in IDTT meetings for administrative segregation inmates improved. Institutional audits indicated that psychiatrists participated in 67 to 90 percent of IDTT meetings. The monitor reviewed records for 13 percent of the MHSDS inmates in administrative segregation and found a 90-percent compliance rate for psychiatrist participation in IDTT meetings.

      The frequency of psychiatric contacts also apparently improved somewhat, but additional audits with better methodology were needed to confirm the improvement. The institution continued to have difficulty providing some inmates with routine psychiatric contacts every 90 days. Despite favorable institutional audits on this issue, the monitor's limited review of charts found one inmate who was seen after a four-month hiatus and another who was not seen for six months. A substantial number of inmates were seen more often than every 90 days. Institutional audits showed that 88 percent of inmates with orders for more frequent contacts were actually seen as planned.

The monitor's chart review found four inmates with orders for more frequent contacts, two of whom were seen as prescribed while contacts with the other two were delayed two to six weeks.

Some improvement occurred with respect to the rescheduling of psychiatric appointments. Institutional audits were badly flawed, but the monitor's analysis of MHTS data indicated that 97 percent of missed case management appointments and 94 percent of missed psychiatric appointments were rescheduled within two weeks. Despite the progress, chart reviews by the monitor's expert found evidence of delays in rescheduling in some instances of up to a month.

Suicide prevention follow-up improved. Institutional audits documented near perfect performance with five-day clinical follow-up for suicidal inmates discharged from the OHU and with custody checks. The monitor audited 20 percent of inmates discharged from the OHU in the preceding three months and found full performance of clinical follow-up in seven of nine cases; one other inmate missed one day of follow-up, while checks for the other started late. Custody checks, the monitor found, were also completed in seven of nine cases, with one other inmate experiencing a lengthy gap, while the last was never seen at all.

Although the number of administrative segregation inmates increased, mental health care in the unit remained adequate. A reliable mechanism was in place for screening inmates newly admitted to the administrative segregation unit. The monitor reviewed the charts of 31 non-caseload inmates and found timely screenings in 90 percent of the cases. Institutional audits showed 90 to 100 percent compliance with the requirement for daily psych tech rounds for all administrative segregation caseload

inmates. Staff reported that psych tech rounds were also conducted for non-MHSDS inmates, but institutional audits did not assess this issue. Case management contacts were consistently provided.

SCC had effectively implemented many, but not all, aspects of the heat plan. Lists of inmates on heat-sensitive medications were routinely distributed by the pharmacy to each yard. Inmates on heat-sensitive medications had their identification cards marked in a way to facilitate yard recalls during heat alerts, but they were not issued heat cards with a warning list of symptoms. Temperatures were regularly recorded, and the monitor's observation in one housing unit confirmed that the thermometer was appropriately placed. SCC did a good job of activating Stage I heat alerts and documenting yard recalls for heat-risk inmates. There were six Stage II heat alerts in a few housing units and one Stage III heat alert. Staff described procedures for distributing ice and providing access to showers during heat alerts, but documentation of these practices was erratic, and some inmates complained that they did not receive cool water and showers as required. No documentation of MTA rounds during the single Stage III heat alert was available, and staff was uncertain whether rounds had been conducted.

The provision of pre-release planning for paroling inmates was poorly audited, but services for paroling inmates apparently declined slightly. According to institutional data, about 76 percent of paroling inmates received an initial contact with TCMP contractors, compared with 82 percent during the preceding monitoring period. SCC did not attempt to determine whether inmates received a second TCMP contact

before discharge. As in the preceding monitoring period, institutional audits indicated that all inmates were seen by a psychiatrist within 90 days of their release.

CPR training was recently initiated for all correctional officers. Fifty of 450 officers had signed and returned related on-the-job training certificates at the time of the monitor's visit. These officers were eligible to receive their mouth shields.

b. Non-Compliance

The provision of group therapy for 3CMS inmates deteriorated even further. Institutional data showed that only seven inmates were receiving group therapy at the time of the monitor's visit, with a waiting list of 103 inmates. It was unclear how many other inmates received group treatment during the rest of the monitoring period. Audits showed that 88 percent of IDTT meetings considered whether group therapy was appropriate. Although space concerns were long recognized as an obstacle to group therapy, no strategy was developed to address the problem.

The timeliness of psychiatric responses to inmate and staff referrals worsened. Documents continued to show problems with the timely transmission of mental health referrals. At least 20 percent of self-referrals took three or more days to reach the mental health department; a small portion of these referrals took weeks, up to 38 days, to be transmitted. The percentage of staff referrals with delayed transmissions was less, but delays tended to be longer, up to 48 days. The average psychiatric response time was nine days, with 36 percent of responses taking more than two weeks and up to three months. Institutional audits did not distinguish between urgent and non-urgent referrals.

Institutional Summary:

Staffing was not a problem at SCC, but the institution continued to have difficulty meeting all program guide requirements. Among the four areas of focus during this monitoring round, quality assurance showed the least progress. The health care quality management and mental health committees did not function well; QITs were erratic; some audits were flawed; and peer review was moribund.

Certain aspects of medication management were also poorly developed, including medication continuity on arrival, follow-up to medication non-compliance, medication errors, MARs and the acquisition of informed medication consent forms. Progress, however, had been made with respect to parole and HS medications. Further audits were needed to assess DOT, laboratory testing and medication continuity for inmates changing housing locations and on the renewal of medication orders.

Some aspects of the RVR process showed substantial improvement. The RVR logs were better; the assessment process was functioning well; and hearing officers appeared to take mental health input into account. On the other hand, the institution still seemed to have some difficulty on some living units recognizing bizarre or uncharacteristic behavior in 3CMS inmates warranting a mental health referral.

Transfers to higher levels of care were frequently deficient. Both EOP and MHCB transfers were often delayed and lengths of stay in the OHU had increased. Transfers of caseload administrative segregation inmates, on the other hand, generally occurred more timely. Treatment in the OHU for inmates awaiting transfers was relatively good. There were no transfers to DMH or PSUs.

With respect to other CAP issues, improvement was noted regarding psychiatric participation in administrative segregation IDTT meetings, suicide prevention follow-up and the rescheduling of psychiatric appointments. Additional audits were needed to determine the frequency of psychiatric contacts and the provision of pre-release services. Mental health care was adequate in the administrative segregation unit and many aspects of the heat plan, although not all, remained strong. On the other hand, the provision of group therapy continued to decline, while the timeliness of psychiatric responses to referrals also worsened.

Overall, despite nearly full staffing, SCC still struggled to meet some basic elements of mental health programs, although the general level of care in the facility continued to improve.

### Service Area D

Service Area D includes the California Medical Facility (CMF), the California State Prison, Solano (CSP/Solano), California State Prison, San Quentin (SQ) and the Deuel Vocational Institution (DVI).

### California Medical Facility
August 22, 2005 – August 25, 2005

Mental health staffing worsened during the monitoring period, with vacancies increasing from 15.2 percent to 19.8 percent. Vacancies among case managers rose to 12 of 44 positions. Seven psych social workers left the institution after February 2005 and, as of July 28, positions for three psychologists and six psych social workers remained vacant. Staff reported low morale as a result of inadequate case management resources and increasing caseloads.

86

In addition, there were vacancies in positions for 2.5 psychiatrists, 2.5 psych techs, two recreational therapists and a half-time office tech. The institution also had a 41-percent vacancy rate among mental health positions for Unit IV, a separate program designed to meet the medical, mental health and educational needs of HIV-positive inmates, including 3CMS inmates  Specifically, positions in Unit IV for a senior psychiatrist, a half-time psychologist and three psych social workers were vacant.

Auxiliary staffing suffered from chronic vacancies. Among MTAs, 47 of 102 allocated positions were vacant, as were 41 of 69 RN and six of 21 pharmacy positions and four medical records positions. The number of correctional officers available to provide escort services also diminished, causing problems with inmate access to programs.

Contractors covered less than 30 percent of the institution's mental health vacancies. On average, just under half of open case manager positions were filled by contract clinicians. CMF also had difficulty obtaining sufficient registry staff to cover the growing vacancy rate among support staff.

Due to continuing census pressure, CMF no longer operated a regional EOP administrative segregation hub unit. The EOP administrative segregation unit housed only caseload inmates from CMF and EOP administrative segregation inmates discharged from DMH who were prohibited from returning to their sending institutions. The EOP administrative segregation population increased from 60 inmates in February 2005 to 75 at the time of the monitor's visit. Contract clinicians reportedly were diverted to cover population increases in the EOP administrative segregation unit, keeping caseloads in the unit relatively low.

In January 2005, the defendants expanded the capacities of the DMH's Day Treatment Program (DTP) and Intermediate Care Facility (ICF). In August 2005, the defendants announced a plan to create a system-wide Level IV intermediate care unit at CMF, which required clinically discharging or moving some ICF inmates to SVPP in order to begin the first phase of physical renovation of the cleared space. According to bi-weekly reports, the DTP program was reduced in size and moved to another CMF dormitory unit (A-2); 17 DTP inmates were discharged or sent to other DMH programs and construction began on the P-2 unit, where the DTP used to be housed. CDCR expected to complete the last stage of the P-2 renovations by July 2008.

Issues Resolved:

MARs were up-to-date and legible.

Documentation of medication prescription practices was generally adequate

The number of inmates receiving multiple anti-psychotic medications and mood stabilizers was reduced.

Quality Management:

The quality management process at CMF continued to improve. The quality management committee met weekly, and the mental health subcommittee met monthly, although the minutes of meetings of both committees contained little substantive information about the discussion of issues. The institution conducted audits of medication continuity, which were a significant improvement over past reliance on anecdotal reports. A QIT was, however, needed to address continuity issues and medication delays. Psychiatric peer review was operating well. Greater participation of direct care clinicians and custody staff was needed in the quality assurance process.

Medication Management:

Medication continuity for inmates in the 3CMS program reportedly slipped during the monitoring period due to psychiatric staffing shortages. No audit of the issue was conducted, but inmates complained about delays in medication administration and staff acknowledged that medications were often interrupted.

Problems persisted with medication continuity for EOP inmates on changes in their housing locations. Institutional audits indicated that some 13 percent did not receive their medications within a day of their transfer. Medication continuity was somewhat worse for EOP inmates moved to administrative segregation, where a limited institutional audit found that 19 percent of transferred inmates did not receive their medications within a day of their transfer.

CMF did not audit follow-up to medication non-compliance during the monitoring period, but the monitor's small chart review suggested that the institution's mechanism for responding to medication non-compliance did not always identify non-compliant inmates and refer them to mental health. Although medication non-compliance was found to have been appropriately addressed for EOP inmates during the preceding round of review, the monitor's survey of charts during the monitoring visit found problems with follow-up for both 3CMS and EOP inmates. Among the charts reviewed, the monitor found that MTAs sometimes failed to refer non-compliant inmates; mental health staff did not consistently note non-compliance, even when it was evident in the MARs; and psychiatric responses were not always timely.

The provision of parole medication to inmates discharged from the facility appeared to be adequate. An institutional audit found 83 inmates who were prescribed

medication at the time of their parole in May 2005. Of these 83 inmates, 92 percent received a supply of all their medications at release. A smaller audit for July 2005 found a 96-percent rate of compliance.

HS medications still were not appropriately distributed at CMF. As described in the preceding monitoring report, inmates who were prescribed HS medications could choose to take their medications between 4:00 and 6:00 p.m. or 6:30 and 8:00 p.m. That choice did not comply either with applicable departmental policy or court orders. The institution reported that 70 percent of inmates with HS prescriptions picked up their medications during the later pill distribution, but the basis for the report was unclear, and the monitor's review of MARs suggested that inmates with evening prescriptions picked up their medications during both time periods intermittently.

CMF substantially reduced the number of inmates receiving multiple antipsychotic medications and mood stabilizers primarily through peer review. Chart reviews confirmed this improvement in medication prescription practices and the issue was resolved. On the other hand, medication orders were sometimes still written without direct clinical contact with inmates, and prescriptions were sometimes changed without a rationale.

MARs continued to be well-maintained. They were generally complete, and the issue of legibility was resolved. On the other hand, MARs for injectible medications were not filed in inmates' UHRs until the orders had expired. In the past, this practice meant that the MARs were not always available on some housing units and medication injections were not always documented.

CMF's system for tracking medication errors was still in an early stage of development. The monitor's review suggested that medication errors were underreported. Informed medication consent forms were still generally filed in the inmates' UHRs.

Mental Health Assessments for the Disciplinary Process:

CMF did not track RVR data adequately. The RVR log contained all of the categories necessary to enable review, but the log was incomplete and at times inaccurate. For example, not all inmates for whom RVRs were issued were listed in the log.

According to the RVR log, MHSDS inmates received 40 percent of the RVRs issued at CMF from February through July 2005. CMF had a process in place for determining whether an assessment was warranted. Approximately, 78 percent of the caseload inmates who received RVRs were referred for mental health assessments, including all EOP inmates. The percentage of 3CMS inmates referred for mental health assessments fell from 80 percent during the preceding monitoring period to 19.4 percent during this monitoring round.

The impact of mental health input on the RVR process was erratic. The monitor reviewed a number of RVRs in which hearing officers apparently determined whether mental illness was a contributing factor on the basis of the inmate's behavior during the disciplinary hearing. The hearing officers in these cases regularly chose not to mitigate penalties despite clinical findings to the contrary in the mental health assessments.

In one instance an inmate received an RVR for self-mutilation. The inmate was found guilty and assessed a penalty without any indication that the procedures applicable in such cases had been observed.

CMF had an agreement with the local DA on referrals of RVRs for criminal prosecution. During the monitoring period, 11 caseload inmates were referred to the DA by CMF. Six of the referrals were rejected; one involving an EOP inmate was dismissed by the court; and the remaining four cases, all of them involving 3CMS inmates, were at various stages of prosecution.

Transfers:

CMF inmates had adequate access to MHCB care. The psychiatric admissions unit (PAU) established in 2004 provided easier access to crisis care. As described in the preceding monitoring report, inmates thought to need MHCB treatment were, after a 24-hour PAU evaluation, either returned to their housing unit or admitted to the PAU or DMH/APP; PAU inmates who were not stabilized within ten-days were reportedly referred to DMH/APP. As a result of establishing the PAU, the length of stays in DMH/APP decreased. Specifically, the average length of stay in DMH/APP, which was 52 days in mid-2004 and 33 days at the end of 2004, fell to 28 days in June 2005, with 38 percent of admitted inmates remaining one day or less; 19 percent remaining two to 11 days; and 44 percent remaining longer than 11 days. CMF continued to generate about a third of DMH/APP admissions but, with inmates remaining in the unit for significantly fewer days, more DMH/APP beds were available for inmates from other CDCR institutions. Prior to the establishment of the PAU, CMF was responsible for 34 percent of all DMH/APP admissions and consumed 30 percent of all patient days in the

unit. While CMF still accounted for 34 percent of all DMH/APP admissions during the first six months of 2005, it consumed only 14 percent of DMH/APP patient days during that same period, allowing the number of inmates admitted to the DMH/APP from other CDCR institutions to grow from 53 inmates a month from May 1, 2003 to December 31, 2004 to 64 inmates a month during the first six months of 2005. This represented a 50-percent reduction in the number of DMH/APP patient days used by CMF and a concomitant 21-percent increase in the number of DMH/APP admissions from elsewhere in CDCR. At the time of the monitor's tour, just 17 percent of the 150 inmates in DMH/APP were from CMF. The waiting list of referrals to the program recently grew due to the lack of available EOP and EOP administrative segregation beds at CMF for the placement of inmates clinically discharged from DMH/APP.

   Access to intermediate inpatient DMH care was erratic. Referrals and transfers to DMH intermediate care occurred regularly, but a significant number were delayed. Earlier, the UNA team found that some referrals were not made for months. According to a list of intermediate care referrals pending at the time of the monitor's visit, ten inmates referred to the ICF program at CMF were rejected for failing to meet dormitory security requirements. None of these inmates was referred to the DTP intermediate care program at CMF, which housed inmates in two-man cells, or to any other intermediate care program. As a result, all ten inmates remained indefinitely without access to the intermediate level of inpatient care they needed. Although these inmates reportedly were receiving an EOP level of treatment, chart reviews suggested that their psychiatric care was inadequate even though they received regular weekly case management contacts.

Access to SVPP intermediate care was slow and problematic. At the time of the monitor's visit, nine inmates were awaiting transfer to SVPP. Two of the inmates were accepted but designated as low priority and had been waiting 120 and 169 days respectively. Completion of the referral packets and the procurement of security clearances for three other inmates had taken at least two months. Inmates admitted to DMH/APP because they were decompensating while awaiting transfer were typically removed from the SVPP waiting list by DMH case managers without notice to CMF staff.

Staff reported reduced access to ASH, but the exact number of referrals actually rejected was unclear. DMH transfer and admission data for the period from February 1 to August 31, 2005 indicated that CMF referred 49 inmates, ten of whom were clinically rejected; none reportedly was rejected for custody reasons. CMF, on other hand, reported fewer rejections and more rescinded referrals that were subsequently diverted to other DMH programs. According to the institution, 36 inmates were referred to ASH from March 1 to August 24, 2005. The referrals of four were still pending at the time of the monitor's visit. Of the remaining 32 referrals, 20 were transferred to ASH, but better than 90 percent were transferred to a DMH program; just six percent of the referrals were rejected, none for custody reasons.

Psych and return practices improved. Inmates discharged from DMH/APP were no longer routinely returned to reception centers. Transfer records for the period from March 4 through August 31, 2005 showed that, of 239 transfers initiated by DMH/APP, only five inmates were inappropriately returned to a reception center. This

94

issue will be resolved provided that compliance continues at this level during the next monitoring period.

<u>Other CAP Issues:</u>

    a. Partial Compliance

    Given the shortages of psychiatric staff, treatment practices at CMF were increasingly problematic. Continuity of care suffered, and inmates were frequently seen by several different psychiatrists. Psychiatrists often saw inmates without benefit of their UHRs. Documentation was deficient and most chart notes were cursory.

    Inmate interviews and the monitor's chart reviews revealed growing difficulties with the 3CMS program. Quarterly case management contacts slipped during the monitoring period, although the extent of the slippage was not ascertainable because of inaccuracies in the information system. A small number of cases also reflected untimely psychiatric responses to inmate referrals and limited access to group therapy.

    Not all general population EOP inmates were offered ten hours of structured therapeutic activities weekly. Contact summaries for June 2005 indicated that two-thirds of 39 surveyed general population EOP inmates were offered 40 hours of therapy during that month. In addition, many groups recorded as lasting an hour, lasted, at most, 45 minutes, while others were even shorter due to various interruptions and scheduling conflicts. Although CMF had a policy of permitting groups to continue during some security alarms, the group cancellation rate for the six months prior to the monitor's visit was 35 percent. The refusal rate continued to be about 30 percent, which met the institution's internal goal. Inmates who chronically refused group therapy were offered enhanced services, including more frequent case management contacts and

monthly IDTT meetings.  The quality of group therapy appeared to improve during the monitoring period, but group assignments were often driven by logistics rather than the inmates' individual treatment needs.

Institutional data indicated that the amount of structured therapeutic activities offered to EOP administrative segregation inmates and the rate of inmate refusals improved.  Data from June 2005 for seven EOP inmates indicated that, on average, inmates were offered 33 hours of therapy a month and completed 25 hours.  The refusal rate was calculated to be 25 percent.  A shortage of escort officers often resulted in late starts and cancellations.  The monitor observed some two-hour groups that began an hour and fifteen minutes late.  Physical plants problems continued to interfere with the provision of group therapy in administrative segregation.  Groups were held in a corridor and library cells that did not permit sound privacy or visual contact between group members.  Despite this, the content and organization of the groups had improved and inmates in the groups observed by the monitor were effectively engaged in participation.

Suicide prevention follow-up improved.  Clinical contacts and custody checks continued to be completed for inmates discharged from the PES, PAU and DMH/APP, but a new policy promulgated in August 2005 prohibited the discharge of inmates on Fridays, weekends or holidays if five-day follow was required.  Contrary to departmental policy, suicide risk assessment checklists were not generally completed prior to an inmate's discharge, but the assessments were usually completed within 24 hours of discharge.

CMF had not fully implemented its MHTS.  Instead, the department was conducting a pilot project at CMF to create a centralized management information system

(CMS-C), which purported to collect and organize all medical and mental health data. Phase I of the project, which had originally been scheduled for completion in December 2004 and then later in 2005, was still incomplete. At the time of the monitor's visit, no new completion date was available. According to the institution, linking the CMS-C to a new software product had proved more difficult than expected, and consultants were needed to assist with the project. Phase II of the project, which was to introduce the new system to two other CDCR institutions, was expected to begin in March 2006. In the interim, there were some problems with data entry. In particular, case management contacts that had been cancelled or refused were mistakenly recorded as having been completed.

        b. Non-compliance

        The composition of IDTT meetings in the 3CMS administrative segregation program, an issue which was previously resolved, was once again problematic. Attendance by psychiatrists and correctional counselors had slipped.

        The heat plan was inadequately implemented at CMF. Monthly reports of heat incidents, including Stage I and Stage II heat alerts, were not compiled and sent to the department. Heat logs were missing for several housing units. Moreover, staff did not appear to have responded appropriately to Stage II heat alerts. According to the heat logs, on ten days in June through August temperatures reached or exceeded 90 degrees in one or more housing area. The logs failed to note the initiation of any Stage II heat alerts; there was no record in the logs of any response to heat alerts, suggesting that cooling measures were not consistently provided. The institution, however, brought

portable swamp coolers to the housing units when temperatures approached 90 degrees in an effort to lower the temperature.

Institutional Summary:

Mental health vacancies at CMF increased, particularly among case managers, and contract clinicians covered only a small portion of the openings. Auxiliary staff also had a significant number of vacancies that impinged on the provision of mental health services.

With respect to the four issues of focus during the monitoring period, quality assurance had made some progress. The institution had a functioning peer review system and began to audit important medication issues. Access to higher levels of care was erratic. The provision of MHCB care improved, but access to intermediate inpatient DMH care remained problematic. The RVR process was still troubled. CMF made an effort to determine more reliably whether mental health assessments were warranted, but RVR data was inadequately tracked and hearing officers did not always take mental health input into account.

Medication management was deficient in a number of areas. Medication continuity for EOP inmates changing housing areas worsened. In addition, follow-up to medication non-compliance was poor; while HS medications were prescribed, they were not delivered after 8:00 p.m.; prescriptions were sometimes still written without direct inmate contact or an adequate rationale; and the system for tracking medication errors was a work in progress. On the other hand, the provision of parole medications was adequate, MARs were well-kept and informed consent forms were filed in inmates' UHRs.

CMF made progress in some of its pending CAP deficiencies, managing to resolve three issues. The quality of group therapy improved, as did some aspects of suicide prevention follow-up. The provision of structured therapeutic activities for EOP inmates in administrative segregation progressed somewhat, but not for general population EOP inmates. Psychiatric treatment practices generally declined; increasing problems with the provision of care in the 3CMS program emerged; the composition of IDTT meetings in the 3CMS administrative segregation unit was deficient; execution of the heat plan deteriorated; and delays occurred in implementing the department's new pilot MHTS at CMF.

Overall, CMF demonstrated progress in some areas, but continued to struggle in others, due, at least in part, to staffing shortages.

### California State Prison, Solano (CSP/Solano)
July 11, 2005 – July 14, 2005
January 6, 2006

In July 2005, a total of 8.5 mental health positions at CSP/Solano were vacant, including positions for a half-time office tech, a recreation therapist, two psych social workers, three psychologists, a staff psychiatrist and a chief psychiatrist. The last was being filled by an acting chief psychiatrist. Contractual services covered 6.1 (72 percent) of the vacant positions, up from 58 percent in preceding monitoring period.

These improvements in staffing were offset by workload factors that limited the effective delivery of mental health services. Of the facility's 15.7 permanent and contract case managers, only 8.2 clinicians provided actual case management services to the 1,300 to 1,400 general population 3CMS inmates routinely housed in CSP/Solano, leaving each case manager with an average caseload of some 165 inmates.

Completion of MDO and BPT reports occupied 2.5 psychologists fully; 1.5 clinicians conducted initial mental health evaluations; one psychologist was assigned to <u>Clark</u> duties; another was assigned to the MHCB unit; and 1.5 case managers provided care to the some 120 caseload inmates in administrative segregation.

Only one of three psych techs was working full-time, which caused some missed rounds in administrative segregation and its overflow units during the summer. One psych tech was on temporary military leave, and another worked a limited schedule. One of two recently hired office technicians was assigned full-time to the medical department rather than to mental health.

Ancillary staffing improved in all areas with the exception of the pharmacy, which suffered from chronic vacancies. Four of seven pharmacy positions, none of which had been filled for over a year, remained vacant. A chief pharmacist aided by technicians staffed the pharmacy. Medical records staffing improved dramatically; only 2.2 of 12.2 positions were vacant. All three senior MTA positions were filled, and 2.9 of 21.4 MTA positions (18 percent) were vacant. Five of 21.6 nursing positions (23 percent) were vacant. Several of these RN positions apparently had been vacant since 2002.

Staff reported that CSP/Solano's 1359 caseload inmates exceeded institutional capacity by 13 percent in July 2005. Due to recent disturbances, the size of the administrative segregation population had also grown substantially. As the result of disturbances preceding the monitor's visit by a few weeks, two overflow administrative segregation units were opened at CSP/Solano, and nearly 40 inmates were transferred to